# EXHIBIT 38

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

---

In the arbitration proceeding between

**ESPF BETEILIGUNGS GMBH, ESPF NR. 2 AUSTRIA BETEILIGUNGS GMBH, AND INFRACLASS ENERGIE 5 GMBH & CO. KG**

Claimants

v.

**ITALIAN REPUBLIC**

Respondent

**ICSID CASE NO. ARB/16/5**

---

## AWARD

---

***Members of the Tribunal***
Mr. Henri C. Alvarez QC, President
Dr. Michael C. Pryles, Arbitrator
Professor Laurence Boisson de Chazournes, Arbitrator

***Secretary of the Tribunal***
Ms. Natalí Sequeira, ICSID Secretariat

*Date of dispatch to the Parties*: 14 September 2020

## COUNSEL FOR THE PARTIES

**Counsel for the Claimants**:

**Counsel for the Respondent**:

**ESPF Beteiligungs GmbH,**
**ESPF Nr. 2 Austria Beteiligungs GmbH**
**InfraClass Energie 5 GmbH & Co. KG**

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Héloïse Hervé
Ms. Isabel San Martín
King & Spalding
12, cours Albert 1er
75008 Paris, France

Mr. Jan K. Schaefer
King & Spalding
TaunusTurm
Taunustor 1
Frankfurt am Main 60310
Germany

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding
1100 Louisiana, Suite 400
Houston, Texas 77002, USA

Mr. Christopher S. Smith
King & Spalding
1180 Peachtree St., NE
Suite 1600
Atlanta, GA 30309, USA

Mr. Enrique Molina
King & Spalding
1185 Avenue of the Americas
34th Floor
New York, NY 10036, USA

**Italian Republic**
Avv. Gabriella Palmieri
Avv. Giacomo Aiello
Avv. Sergio Fiorentino
Avv. Andrea Giordano
Avv. Laura Delbono
Avvocatura Generale dello Stato
Via dei Portoghesi 12
00186 Rome, Italy

Prof. Avv. Maria Chiara Malaguti
External Consultant
Ministero degli Affari Esteri e della
Cooperazione Internazionale (MAECI)
Servizio per gli affari giuridici del
contenzioso diplomatico e dei trattati
Piazzale della Farnesina
00135 – Rome, Italy

Mr. Carlo Montella
Ms. Andrea Gentili
Ms. Daria Bounfiglio
Orrick, Herrington & Sutcliffe
Corso G. Matteotti, 10
Milan 20121, Italy

Mr. Milvio Delfini
Ms. Elisabetta Santo
Orrick, Herrington & Sutcliffe
Piazza della Croce Rossa, 2
Rome 00161, Italy

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    THE PARTIES..................................................................................................... 1

III.   PROCEDURAL HISTORY OF THE PROCEEDINGS ..................................... 2

IV.    FACTUAL OVERVIEW...................................................................................... 15

    A.   European Commission's Directives and Italy's Legislative History of Encouraging Renewable Energy .............................................................. 15

        (1)   *Conto* I ................................................................................................ 22

        (2)   *Conto* II ............................................................................................... 28

        (3)   *Conto* III .............................................................................................. 35

        (4)   *Conto* IV .............................................................................................. 41

        (5)   *Conto* V ............................................................................................... 43

    B.   The Claimants' Investments in the Respondent's PV Sector....................... 53

        (1)   ESPF's Investments in Italy................................................................. 53

        (2)   ESPF 2's Investments in Italy.............................................................. 55

        (3)   ICE 5's Investments in Italy ................................................................ 56

    C.   The Challenged Measures ............................................................................ 57

        (1)   Alleged Reduction of Financial Support to PV Producers (2012-2013) ............. 58

    D.   2017 Constitutional Court Decision ............................................................ 77

V.     QUESTIONS FOR DETERMINATION ........................................................... 82

VI.    REQUESTS FOR RELIEF ................................................................................. 83

VII.   JURISDICTION (ISSUE 1)................................................................................. 85

    A.   Overview of the Parties' Positions on Jurisdiction ..................................... 85

        (1)   Have the Claimants established that the requirements for jurisdiction under the ECT and Article 25 of the ICSID Convention have been met? (Issue 1.1) .... 87

        (2)   Applicability of the ECT to Intra-EU Disputes and the *Achmea* Decision (Issue 1.2)........................................................................... 89

        (3)   Are all or some of the claims barred by the "Taxation Measures" carve-out under Article 21 of the ECT? (Issue 1.3)........................... 132

        (4)   Did the Parties agree on a dispute resolution mechanism other than ICSID arbitration? (Issue 1.4) ..................................................... 138

        (5)   Did the Claimants satisfy the notice requirements under Article 26 of the ECT?  (Issue 1.5) ................................................................... 144

VIII. ADMISSIBILITY (ISSUE 2) ......................................................................... 148

    A.   The Respondent's Arguments ............................................................. 148

    B.   The Claimants' Arguments ................................................................ 149

    C.   The Tribunal's Analysis .................................................................... 150

IX.   APPLICABLE LAW (ISSUE 3) ............................................................... 150

    A.   The Claimants' Arguments ................................................................ 150

    B.   The Respondent's Arguments ............................................................. 151

    C.   The Tribunal's Analysis .................................................................... 152

X.    THE RESPONDENT'S GENERAL DEFENSES ON THE MERITS............................. 153

    A.   The Right to Regulate....................................................................... 153

        (1)  The Claimants' Arguments ................................................... 153

        (2)  The Respondent's Arguments ................................................ 154

        (3)  The Tribunal's Analysis ....................................................... 158

    B.   Necessity ....................................................................................... 160

        (1)  The Respondent's Arguments ................................................ 160

        (2)  The Claimants' Arguments ................................................... 161

        (3)  The Tribunal's Analysis ....................................................... 162

XI.   MERITS: ARTICLE 10(1) OF THE ECT (ISSUE 4) ..................................... 162

    A.   Fair and Equitable Treatment ("FET") (Issue 4.1(A)) ............................. 163

        (1)  Does the ECT's FET Standard Contain One or More Autonomous Sub-Standards?.................................................................... 164

    B.   Legitimate Expectations (Issue 4.1(B))................................................ 167

        (1)  Nature of the *Conto Energia* Regime ................................... 168

        (2)  What Legitimate Expectations Did the Claimants Have Arising From the *Conto Energia* Regime?................................... 175

        (3)  Did the Challenged Measures Violate the Claimants' Legitimate Expectations? ................................................... 211

    C.   Transparency and Consistency (Issue 4.1(C))........................................ 249

        (1)  The Claimants' Arguments ................................................... 249

        (2)  The Respondent's Arguments ................................................ 251

        (3)  The Tribunal's Analysis ....................................................... 252

    D.   The Duty of Good Faith (Issue 4.1(D)) ............................................... 253

        (1)  The Claimants' Arguments ................................................... 253

(2) The Respondent's Arguments ................................................................. 255

(3) The Tribunal's Analysis ...................................................................... 256

E. Unreasonable or Discriminatory Measures and the Impairment Clause (Issue 4.2) .. 257

(1) The Claimants' Arguments .................................................................. 257

(2) The Respondent's Arguments ............................................................. 264

(3) The Tribunal's Analysis ...................................................................... 266

F. The Umbrella Clause (Issue 4.3) ................................................................ 274

(1) What is the Appropriate Interpretation of the ECT's Umbrella Clause? ............ 276

(2) What Obligations did Italy Enter Into With the Investors or their Investments? ......................................................................................... 289

(3) Did the Challenged Measures Breach the Umbrella Clause? ............................ 303

(4) Conclusion on Umbrella Clause ........................................................... 315

G. Conclusions on Liability ........................................................................... 315

XII. DAMAGES (ISSUE 5) ..................................................................................... 316

A. Applicable Compensation Standard (Issue 5.1) .......................................... 317

(1) The Claimants' Arguments .................................................................. 317

(2) The Respondent's Arguments ............................................................. 321

(3) The Tribunal's Analysis ...................................................................... 323

B. Methods of Valuation and Quantification of Damages (Issue 5.2) .................. 325

(1) The Claimants' Arguments .................................................................. 326

(2) The Respondent's Arguments ............................................................. 330

(3) The Tribunal's Analysis ...................................................................... 333

C. Quantum of Damages (Issue 5.3) ............................................................. 339

XIII. INTEREST (ISSUE 6) ..................................................................................... 344

A. The Claimants' Arguments ....................................................................... 344

B. The Respondent's Arguments ................................................................... 347

C. The Tribunal's Analysis ............................................................................ 348

XIV. COSTS (ISSUE 7) .......................................................................................... 349

A. The Claimants' Arguments ....................................................................... 349

B. The Respondent's Arguments ................................................................... 351

C. The Tribunal's Analysis ............................................................................ 351

XV. CONCLUSION ............................................................................................... 354

## LIST OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| **2013 Circular** | A circular issued by Italy's tax authorities in December 2013, in which the Respondent reclassified PV plants as immovable property, which: (i) lowered the depreciation rate for PV plants from 9% to 4% per year, thereby resulting in higher taxable income of PV plant owners; (ii) made the Claimants' PV facilities subject to **IMU Charges**, which the local municipality charges on buildings; and (iii) made the Claimants' PV facilities subject to **TASI Charges**, to cover municipal services such as road maintenance and public lighting |
| **2016 Budget Law** | Law No. 208/2015, 28 December 2015: as of 1 January 2016, the value of certain types of immovable property was to be calculated based on the ground, building and structural elements of the building, without including the value of certain movable elements such as "machinery, devices, equipment and other facilities used in the specific industrial process," thereby reducing the portion of PV facilities that had been deemed to be immovable property |
| **2017 Constitutional Court Decision** | On 24 January 2017, the Italian Constitutional Court released its judgment of 7 December 2016 on the challenge to the legitimacy of Article 26(2) and (3) of the *Spalmaincentivi* Decree |
| ***Achmea* Decision** or simply, ***Achmea*** | ECJ (Grand Chamber), *Slowakische Republik v. Achmea B.V.*, ECJ Case C-284/16, Preliminary Ruling, 6 March 2018 (CL-194) |
| **Administration Fees** | *Conto* V, enacted in June 2012, provided that as of 1 January 2013, all PV producers with incentive tariffs under any *Conto* were required to pay an annual administrative management fee corresponding to €0.0005 per kWh of incentivized energy, to cover the GSE's management, verification and control expenses |
| **AEEG** | Italy's Electrical Energy Authority (*Autoritá per l'Energia Electtrica ed il Gas*), tasked with implementing the **Conto Energia Decrees'** incentive program by billing consumers for the incentive tariff cost as part of their electricity bills, establishing a separate bank account from which to pay the incentive tariffs to eligible renewable energy producers, and appointing the **GSE** as the body responsible to pay the incentive tariffs (C-38) |

| Abbreviation | Definition |
|---|---|
| **Amicable Settlement Letters** | The Claimants' two letters to the Respondent, dated 18 June 2014 and 4 March 2015, stating their intention to commence arbitral proceedings under the ECT and offering to settle the dispute amicably |
| ***Bersani* Decree** | Legislative Decree No. 99/79, which implemented EC Directive 96/92 and liberalized Italy's electricity market with anti-monopoly rules to transfer the generation, distribution and sale of energy from Italy's **ENEL** to newly incorporated companies |
| **CEER** | Council of European Energy Regulators |
| **Challenged Measures** | The measures taken by Italy which the Claimants contest, namely: the Administration Fees, Imbalance Costs, Minimum Guaranteed Prices under the Off-Take Regime, Robin Hood Tax, IMU and TASI Charges, and the *Spalmaincentivi* Decree |
| **CIP** | Italy's Inter-Ministerial Committee for Prices |
| **Claimants** | **ESPF**, **ESPF 2** and **ICE 5**. ESPF and ESPF 2 are institutional funds, while ICE 5 is a retail fund |
| **CNES** | National Solar Energy Commission |
| ***Conto Energia* Decrees or *Contos*** | *Contos* I-V, collectively |
| ***Conto* I** | 2005<br><br>Ministerial Decree No. 18908, 28 July 2005, **MPA**, published in Italian Official Gazette No. 181, 5 August 2005; and Ministerial Decree No. 20998, 6 February 2005, published in Italian Official Gazette No. 38 (***Conto* I Amendment**, jointly ***Conto* I**) (C-039) |
| ***Conto* II** | 2007<br><br>Decree, 19 February 2007, MED and MELS, published in Italian Official Gazette No. 45, 23 February 2007 (C-065) |
| ***Conto* III** | 2010<br><br>Decree, 6 August 2010, MED and MELS, published in Italian Official Gazette No. 197 (C-145) |
| ***Conto* IV** | 2011<br><br>Decree, 5 May 2011, MED and MELS, published in Italian Official Gazette No. 109, 12 May 2011 (C-169) |

| Abbreviation | Definition |
|---|---|
| ***Conto* V** | 2012 |
| | Decree, 5 July 2012, MED and MELS, published in Italian Official Gazette No. 159, 7 July 2012, entered into force 27 August 2012 (C-195) |
| | AEEG Resolution No. 250/2013, 6 June 2013 (C-252), *Conto* V ceased to apply on 6 July 2013, at which point no incentive tariffs were available to any new PV plants installed and connected to Italy's electricity grid. |
| **Contracting Parties** | The contracting parties to the **ECT** |
| **Corrected Counter-Factual Position** | Respondent's experts GRIF's version of the position that the Claimant would have been, but-for the Challenged Measures, adjusted with PVGIS-3 data |
| **Counter-Factual Position** | The position that the Claimants would have been in, but-for the Challenged Measures, as calculated by Claimants' expert, FTI |
| **CPI** | Consumer price index (for wholesale price of electricity) |
| **D'Atena ER1** | First Expert Opinion of Professor Antonio d'Atena, 30 January 2017 |
| **D'Atena ER2** | Second Expert Opinion of Professor Antonio d'Atena, 19 October 2017 |
| **DCF** | Discounted Cash Flow |
| ***Destinazione Italia* Decree** | Law Decree No. 145/2013, 23 December 2013, converted into law by Law No. 9/2014, 21 February 2014, published in Italian Official Gazette No. 43 (C-249) |
| **EC** | European Commission |
| **ECJ** | European Court of Justice (referred to in Respondent's pleadings as "CJEU") |
| **ECT** | The Energy Charter Treaty (C-1) |
| **EEC** | The non-binding European Energy Charter, concluded on 17 December 1991, which is replicated in binding form in the ECT |
| **ENEA** | Italy's National Agency for New Technologies, Energy and Sustainable Economic Development |
| **ENEL** | Italy's National Entity for Electricity |
| **ESPF** | ESPF Beteiligungs GmbH |
| **ESPF 2** | ESPF Nr. 2 Austria Beteiligungs GmbH |

| Abbreviation | Definition |
|---|---|
| **EU** | European Union |
| **EU Member States** or simply, **Member States** | The 28 member states of the EU |
| **FET** | Fair and equitable treatment |
| **FIP** | Feed-in-premium paid in addition to the wholesale price |
| **FIT** or **FITs** | Feed-in-tariff(s) amount per kWh of production |
| **FMV** | Fair market value |
| **FTI** | FTI Consulting; Claimants' Quantum and Regulatory Experts |
| **FTI Q1** | First FTI Quantum Report, 10 February 2017, by Richard Edwards |
| **FTI Q2** | Second FTI Quantum Report, 10 November 2017, by Mr. Richard Edwards |
| **FTI R1** | First FTI Regulatory Report, 10 February 2017, by Dr. Boaz Moselle and Dr. Dora Grunwald |
| **FTI R2** | Second FTI Regulatory Report, 10 November 2017, by Dr. Boaz Moselle and Dr. Dora Grunwald |
| **GRIF** | Fabio Gobbo Industrial and Financial Research Group; the Respondent's Quantum Expert |
| **GRIF Q1** | First GRIF Quantum Report, 22 May 2017 |
| **GRIF Q2** | Second GRIF Quantum Report, 5 March 2018 |
| **GRTN** | *Gestore della rete di transmissione nazionale Spa*, the state-owned company that Italy created in 1999 to manage renewable energy support schemes, which after 1 November 2005 became the **GSE** |
| **GSE** | *Gestore dei Servizi Energetici* (successor of **GRTN** in 1 November 2005), the state-owned company that Italy created to manage renewable energy support schemes |
| **GSE Agreements** | Italy confirmed the availability of the specific incentive tariff rate for the prescribed period of time through contracts that GSE entered into with PV producers |
| **GSE Letters** | After PV producers had built their plants and gone through the requisite regulatory and registration process, the GSE would send a formal tariff confirmation letter under a specific *Conto* indicating the particular tariff rate to be |

| Abbreviation | Definition |
|---|---|
| | received by that facility, and confirming that that producer would receive that tariff for 20 years |
| **GSE Off-Take Agreements** | Contracts that the GSE entered into with producers which confirmed the availability of the **Minimum Guaranteed Price** set out in the 2007 AEEG Resolution No. 280 **Off-Take Regime** (entered into force from 1 January 2008 and is still in effect) for facilities under 1 MW capacity |
| **GW** | GigaWatt |
| **ICE 5** | InfraClass Energie 5 GmbH & Co. KG |
| **ICSID** | International Centre for Settlement of Investment Disputes, also referred to as the **Centre** |
| **IEA** | International Energy Agency |
| **ILC Articles of State Responsibility** | 2002 United Nations International Law Commission Articles on Responsibility of States for Internationally Wrongful Acts |
| **IMU Charges** | Municipal charge on immovable property buildings, imposed by Legislative Decree No. 23/2011, 14 March 2011 (C-218) |
| **IRENA** | International Renewable Energy Agency |
| **IRR** | Internal Rate of Return |
| **Italy** | The Italian Republic, also referred to as the **Respondent** |
| **KGAL** | The Claimants are investment funds managed by KGAL Investment Management GmbH & Co. KG |
| **kW** | KiloWatt |
| **kWh** | KiloWatt Hour (price by kWh is the typical unit by which prices are set for produced electricity) |
| **Lisbon Treaty** (now known as **TEU**) | The international agreement that amends the Treaty on EU (TEU) and Treaty on the Functioning of the EU (TFEU), which form the constitutional basis of the EU; signed by the EU member states on 13 December 2007 and entered into force on 1 December 2009 |
| **MED** | Italy's Ministry of Economic Development (previously **MPA**), which issued *Conto* II, *Conto* III, *Conto* IV and *Conto* V |
| **MELS** | Italy's Ministry of Environment, Land and Sea, which issued *Conto* II, *Conto* III, *Conto* IV, and *Conto* V |

| Abbreviation | Definition |
|---|---|
| **MGP** or **Minimum Guaranteed Price** | Minimum Guaranteed Prices under the **Off-Take Regime** |
| **MPA** | Italy's Ministry of Productive Activities (now **MED**), which issued *Conto* I |
| **MW** | MegaWatt |
| **Off-Take Regime** | 2003 (updated 2005, 2007)<br><br>The off-take regime ("*ritiro dedicato*") mandated grid managers (after 2008, the GSE), if requested by the producer, to purchase all electricity injected into the grid from renewable energy plants in exchange for a **Minimum Guaranteed Price** per kWh. Legislative Decree No. 387/2003 (C-381), Resolution No. 280/2007 (C-382)<br><br>AEEG's initial proposal was to grant Minimum Guaranteed Prices to the first 2 million kWh of electricity produced annually by renewable energy plants under 10 MW, it ultimately narrowed access to plants under 1 MW in consideration of their "high production costs." Annex A to AEEG Resolution No. 34/2005, Art. 5 and Preamble (C-381)<br><br>Abolished by ***Spalmaincentivi*** Decree, effective 1 January 2015 |
| **Opinion by Advocate General Wathelet** | Opinion of Advocate General Wathelet in *Achmea*, Case C-284/16, 19 September 2017 (CL-189) |
| **PAN** | Italy's National Action Plan for Renewables, dated 30 June 2010, which summarized its strategy to reach binding EU renewable energy targets (C-143) |
| **Parties** | The **Claimants** and the **Respondent** |
| **Producers** | PV producers, like the Claimants, which entered into the GSE Agreements |
| **PV** | Solar photovoltaic technology |
| **Residual Period** | The number of years which remained under the original 20-year incentive period under the ***Contos***. (Relevant to the three tariff reduction options set out in the *Spalmaincentivi* Decree) |
| ***Romani*** **Decree** | 2011<br><br>Legislative Decree No. 28/2011, 3 March 2011, whereby Italy implemented the 2009 EC Directive and reinforced the incentive schemes in renewable energy (C-165) |

| Abbreviation | Definition |
|---|---|
| *Salva Alcoa* **Decree** | 2010<br><br>Italy extended the benefits of *Conto* II tariffs to plants constructed by the end of 2010 and connected to the grid by 30 June 2011. Law Decree No. 105 of 8 July 2010, converted into law by Law No. 129 of 13 August 2010 (C-67) |
| *Spalmaincentivi* **Decree** | 2014<br><br>Abolished incentive payment system in *Contos* I-IV, effective 1 January 2015, and replaced it with a new system that provided three options of reduced payments over varying terms<br><br>Law Decree No. 91/2014, 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014 (sometimes referred to by Claimants as "LD 91) (C-248) |
| **TASI Charges** | Charge to cover municipal services such as road maintenance and public lighting, imposed by Law No. 147/2013, 27 December 2013 (2014 Budget Law), Arts. 1.639 and 1.669 (C-219) |
| **TEU** | 2007 Treaty on EU (formerly, the 1992 Treaty of Maastricht), which along with the TFEU forms the constitutional basis for the EU |
| **TFEU** | 2007 Treaty on the Functioning of the European Union (formerly, the 1957 Treaty of Rome), which along with the TEU forms the constitutional basis for the EU |
| **TSO** | Italy's transmission system operator |
| **VCLT** | 1969 Vienna Convention on the Law of Treaties (CL-050) |
| **WACC** | Weighted Average Cost of Capital |

## I.    INTRODUCTION

1.      This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**") on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998[1] (the "**ECT**" or "**Treaty**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.      The dispute relates to the Claimants' investments in Italy's renewable energy sector and arises from the legislative, regulatory and contractual measures implemented by Italy as of 2005 in order to encourage investments in the solar energy industry. The Claimants allege that the government has caused damages in the Claimants' portfolios in photovoltaic ("**PV**") technology projects through regulatory changes. In particular, the Claimants allege that by implementing a series of legislative and regulatory changes and through court decisions, the Respondent substantially reduced fixed incentive tariffs and minimum guaranteed prices intended to attract and support investment in PV facilities, upon which they relied in making their investments in Italy. The Claimants argue that the measures at issue in these proceedings amount to a breach of Article 10(1) of the ECT and international law.

3.      The Respondent alleges that the incentives offered by the government were not guaranteed to remain unchanged, that the measures in question fall within its right to regulate and were reasonable and proportional. According to the Respondent, none of the measures challenged by the Claimants breach the ECT or international law. The Respondent raised a number of objections to the jurisdiction of the Tribunal (addressed in detail in Sections VII – IX of the Award).

## II.    THE PARTIES

4.      The Claimants are ESPF Beteiligungs GmbH ("**ESPF**"), an institutional fund incorporated under the laws of Germany and a subsidiary of European Solar Power Fund Nr. 1 GmbH

---

[1]      For the nationalities involved in this case, namely Germany, Austria and Italy.

& Co. KG;[2] ESPF Nr. 2 Austria Beteiligungs GmbH ("**ESPF 2**"), an institutional fund incorporated under the laws of Austria and a subsidiary of European Solar Power Fund Nr. 2 GmbH & Co. KG;[3] and InfraClass Energie 5 GmbH & Co. KG ("**ICE 5**"), a retail fund established under the laws of Germany[4] (collectively, the "**Claimants**").

5.      The Respondent is the Italian Republic ("**Italy**" or the "**Respondent**").

6.      The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above.

## III.    PROCEDURAL HISTORY OF THE PROCEEDINGS

7.      On 18 June 2014 and 4 March 2015, respectively, the Claimants sent two letters to the Respondent, stating their intention to commence arbitral proceedings under the ECT and offering an amicable settlement of the dispute (the "**Amicable Settlement Letters**").[5] The Respondent did not reply to these letters.

8.      On 29 January 2016, ICSID received a Request for Arbitration from the Claimants against Italy (the "**Request**"), pursuant to the ECT and the ICSID Convention.

9.      On 8 March 2016, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the notice of registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

10.     The Parties agreed to constitute the Tribunal pursuant to Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed

---

[2]      Claimants' Memorial, ¶ 22. ESPF's separate address is: Tölzer Strasse 15, 82031 Grünwald, Germany.

[3]      Claimants' Memorial, ¶ 23. ESPF 2's separate address is: Dresdner Strasse 45, A-1200 Vienna, Austria.

[4]      Claimants' Memorial, ¶ 24. ICE 5's separate address is: Tölzer Strasse 15, 82031 Grünwald, Germany.

[5]      Claimants' Request for Arbitration, ¶¶ 67, 95-95; Claimants' Memorial, ¶ 53; Respondent's Counter-Memorial, ¶ 191. Notices of Legal Dispute Arising under the ECT and Offer of Amicable Settlement, 18 June 2014: C-010; Notices of Legal Dispute Arising under the ECT and Offer of Amicable Settlement, 4 March 2015: C-010A.

by each Party and the third and presiding arbitrator to be appointed by agreement of the two co-arbitrators.

11. On 26 July 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. The Tribunal is composed of Mr. Henri C. Alvarez, a national of Canada, President, appointed by his co-arbitrators in consultation with the Parties; Dr. Michael C. Pryles, a national of Australia, appointed by the Claimants; and Professor Laurence Boisson de Chazournes, a national of France and Switzerland, appointed by the Respondent. Ms. Mairée Uran-Bidegain was designated to serve as Secretary of the Tribunal.

12. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 20 October 2016 by teleconference.

13. Following the first session, on 31 October 2016, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and set out, in Annex A, a schedule for the written and oral phases of the proceedings.

14. On 17 January 2017, ICSID received an Application for Leave to Intervene as a Non-Disputing Party in these proceedings dated 16 January 2017, from the European Commission (the "**EC**"), together with accompanying documentation (the "**NDP Application**").

15. On 1 February 2017, the Claimants filed their observations on the Application.

16. On that same day, together with its observations on the Application, the Respondent submitted a preliminary request for bifurcation (the "**Preliminary Request**").

17.     On 10 February 2017, pursuant to the procedural calendar in Annex A to Procedural Order No. 1, the Claimants submitted their Memorial on the Merits ("**Claimants' Memorial**") together with the following documents:

- Witness Statements of:

  o  Mr. Michael Ebner;

  o  Mr. Alexander Rietz;

  - Expert Reports of:

  o  Mr. Richard Edwards of FTI Consulting;

  o  Dr. Boaz Moselle of Cornerstone Research and Dr. Dora Grunwald of FTI Consulting;

  - Opinion of Professor Antonio D'Atena;

  - Exhibits C-001 to C-388; and

  - Legal Authorities CL-001 to CL-115.

18.     On 22 February 2017, the Claimants submitted their response to the Preliminary Request.

19.     On 28 February 2017, the Tribunal issued Procedural Order No. 2 in which it determined that both the Preliminary Request and the Application were premature since Italy had not yet submitted its Counter-Memorial on the Merits or any Memorial on Jurisdiction. Accordingly, it deferred further consideration of the EC's NDP Application until the Respondent had submitted its Counter-Memorial on the Merits and any Memorial on Jurisdiction. A detailed recount of the procedural steps leading to the Tribunal's Procedural Order No. 2 is included in Section I of that order.

20.     On 9 June 2017, the Respondent submitted its Counter-Memorial ("**Respondent's Counter-Memorial**") which contained, apart from its position on the merits, the Respondent's objections to jurisdiction, and a request for bifurcation of the proceedings

between the jurisdictional and merits phase ("**Request for Bifurcation**"). The Counter-Memorial was accompanied by:

- Witness Statements of:

o Mr. Luca Miraglia;

o Mr. Daniele Bacchiocchi;

- Expert Reports of:

o "Fabio Gobbo" Industrial and Financial Research Group (IFRG) - Report (A);

o "Fabio Gobbo" Industrial and Financial Research Group (IFRG) - Financial Report (B);

- Legal Opinion of Professors Vincenzo Zeno-Zenocovich and Antonio Carratta;

- Exhibits R-001 to R-048; and

- Legal Authorities RL-001 to RL-015.

21. On 4 July 2017, the Claimants submitted their objections to Italy's Request for Bifurcation and Suspension accompanied by Legal Authorities CL-116 to CL-144.

22. On 10 July 2017, the Tribunal invited the Respondent to reply to the Claimants Objections dated 4 July 2017 by no later than 20 July 2017.

23. On 12 July 2017, and having received the Respondent's Counter-Memorial, the Tribunal granted the Parties a final opportunity to provide comments on the EC's Application for Leave to Intervene as a Non-Disputing Party dated 16 January 2017, by no later than 4 August 2017.

24. On 21 July 2017, the Centre, on instruction of the President of the Tribunal, informed the Parties that it had not received the Respondent's reply to Claimants' 4 July

2017 Objections. On 25 July 2017, the Respondent submitted a Reply to the Claimants' Objections dated 4 July 2017.

25.    On 4 August 2017, each Party submitted Observations on the EC's Application of 17 January 2017. On the same date, the Claimants submitted a Rejoinder to the Respondent's Reply on Bifurcation and Suspension accompanied by Legal Authorities CL-145 to CL-155.

26.    On 15 August 2017, the Tribunal issued Procedural Order No. 3 denying the Respondent's requests to bifurcate the proceedings and to suspend the present proceedings. A detailed account of the procedural steps leading to the Tribunal's Procedural Order No. 3 is included in Section I of that Order.

27.    On 22 August 2017, having received the Counter-Memorial, the Tribunal issued Procedural Order No. 4, deciding on the NDP Application from the EC. In its Order the Tribunal (a) denied the EC's request for leave to present its views at an oral hearing; (b) granted the EC leave to submit by 30 September 2017 a "single written submission addressing questions of European Law and the relationship between the ECT and European Law, not to exceed 25 pages in length with 1.5 line spacing;"6 and (c) "direct[ed] the Parties to consult and agree on the case materials to be disclosed to the EC for the purpose of making the submission."

28.    On 4 and 5 September 2017, the Parties notified the Centre that they had agreed to release Exhibits C-002 to C-004, R-022, and R-032 to the EC. On 7 September 2017, the Centre notified the Parties that, apart from the documents selected by the Parties, the Tribunal proposed transmitting to the EC a copy of the Request for Arbitration, and gave them an opportunity to comment on this proposal by 11 September 2017. On 12 September 2017, in absence of observations from either Party, the Centre transmitted the documents to the EC and notified the Parties and the Tribunal of the same.

---

6       Procedural Order No. 4, ¶ 48.

29.    On 29 September 2017, the EC submitted to ICSID an Amicus Curiae Brief (the "**EC Brief**"), accompanied by Annexes EC-001 to EC-028. On the same day, the Centre forwarded electronic copies of the submission to the Parties and the Tribunal.

30.    On 9 November 2017, after multiple attempts by the Centre to resolve the issue with the Respondent, the Centre, on instruction of the President of the Tribunal, communicated to the Parties that the hard copies of the Respondent's Counter-Memorial were not submitted in accordance with Sections 13.2 and 13.3 of Procedural Order No. 1, and indicated that

> [t]he lack of access to properly organized materials, impacts the Tribunal's ability to efficiently and effectively decide this case. Accordingly, and on an exceptional basis, the Centre prepared for each of the Members of the Tribunal, hardcopies of the Counter-Memorial submission … The cost of this service will be charged against the Respondent's share of the advance payment … the President of the Tribunal asks the Respondent to ensure that its subsequent submissions, including all memorials, witness statements, expert reports, and supporting documents, comply with the terms of Procedural Order No. 1.

31.    On 10 November 2017, the Claimants submitted their Reply on the Merits and Counter-Memorial on Jurisdiction ("**Claimants' Reply**") together with the following documents:

- Second Witness Statement of:

o  Mr. Michael Ebner;

- Second Expert Reports of:

o  Mr. Richard Edwards of FTI Consulting;

o  Dr. Boaz Moselle of Cornerstone Research and Dr. Dora Grunwald of FTI Consulting;

- Second Opinion of Professor Antonio D'Atena;

- Exhibits C-389 to C-444; and

- Legal Authorities CL-156 to CL-192.

32.    On 9 March 2018, the Respondent submitted its Rejoinder on the Merits and Reply on Jurisdiction ("**Respondent's Rejoinder**"), along with a request that the Tribunal provide the Parties with an opportunity to address the 6 March 2018 judgment of the Court of Justice of the European Union in Case C-284/16 (the "***Achmea* Decision**" or "***Achmea***"). The submission also included the following documents:

- Second Witness Statement of Mr. Luca Miraglia;

- Second Expert Reports of "Fabio Gobbo" Industrial and Financial Research Group (IFRG);

- Second Opinion of Professors Vincenzo Zeno-Zenocovich and Antonio Carratta;

- Exhibits R-049 to R-059; and

- Legal Authorities RL-016 to RL-019.

33.    On 10 March 2018, the Tribunal invited the Claimants to provide their comments on the Respondent's request of 9 March 2018 regarding *Achmea* by no later than 14 March 2018.

34.    On 12 March 2018, the Claimants proposed to amend the procedural calendar of the case to provide (a) an opportunity for the Respondent to address the *Achmea* Decision, and (b) additional time for the Claimants to file their Rejoinder on Jurisdiction. On the same date, the Tribunal invited the Respondent to make any observations on the Claimants' proposal. On 13 March 2018, the Respondent agreed to the proposal.

35.    On 19 March 2018, the Tribunal adopted the Parties' agreed upon amendments to the procedural calendar of the case.

36.    On 30 March 2018, the Respondent submitted its comments on the *Achmea* Decision accompanied by legal authorities RL-020 to RL-023.

37.    On 5 April 2018, the Respondent requested that the Tribunal reschedule the Hearing on Jurisdiction and Merits ("**Hearing**"), originally scheduled for 18-22 June 2018, alleging

that two members of its legal team could not be present. This request was supplemented by additional comments on 16 April 2018. The Claimants provided their comments to the Respondent's request on 11 and 25 April 2018, respectively.

38.     On 27 April 2018, the Tribunal issued Procedural Order No. 5 fixing the final dates of the Hearing from 20 to 23 June 2018 and requested that the Parties keep 24 June 2018 in reserve.

39.     On 27 April 2018, the Claimants submitted their Rejoinder on Jurisdiction ("**Claimants' Rejoinder on Jurisdiction**"), accompanied by Exhibits C-444 to C-469 and Legal Authorities CL-193 to CL-199.

40.     On 4 May 2018, the Respondent requested the Tribunal to consider calling the EC as a "witness" on the issue of interpretation of the *Achmea* Decision. On 8 May 2018, the Claimants opposed the Respondent's Request of 4 May 2018. On 11 May 2018, the Tribunal rejected the Respondent's proposal to call the EC as a witness.

41.     On 11 May 2018, after multiple attempts by the Centre to resolve the issue with the Respondent, the Centre, on instruction of the President of the Tribunal, communicated to the Parties that the hard copies of the Respondent's Rejoinder had not been submitted. In the letter, the Centre reminded the Respondent of the Tribunal's instructions of 9 November 2017, and reiterated that

> [t]he lack of access to properly organized materials, impacts the Tribunal's ability to efficiently and effectively decide this case … In addition, the Respondent's failure to observe the terms of Procedural Order No. 1, and the Tribunal's additional instructions of November 2017, may be taken into consideration at the appropriate procedural time, including when the Tribunal makes its final decision on the assignment of costs of this proceeding.

42.     On 16 May 2018, the Claimants transmitted a document containing the Parties' agreements on certain organizational issues for the Hearing, as requested by the Tribunal on 1 May 2018, followed by a tentative hearing schedule on 30 May 2018.

43.    On 31 May 2018, the Tribunal issued Procedural Order No. 6 concerning the organization of the Hearing, and confirmed that no pre-hearing conference would be necessary in light of the Parties agreements on the Hearing logistics and organization.

44.    A hearing on the merits and jurisdiction was held in Paris from 20 to 23 June 2018. The following persons were present at the Hearing:

*Tribunal*:

| | |
|---|---|
| Mr. Henri C. Alvarez | President |
| Dr. Michael C. Pryles | Arbitrator |
| Prof. Laurence Boisson de Chazournes | Arbitrator |

*ICSID Secretariat*:

| | |
|---|---|
| Ms. Mairée Uran-Bidegain | Secretary of the Tribunal |

*For the Claimants*:

| | |
|---|---|
| Mr. Kenneth Fleuriet | King & Spalding |
| Mr. Reginald Smith | King & Spalding |
| Mr. Kevin Mohr | King & Spalding |
| Ms. Amy Frey | King & Spalding |
| Mr. Christopher Smith | King & Spalding |
| Ms. Isabel San Martín | King & Spalding |
| Ms. Violeta Valicenti | King & Spalding |
| Mr. Karam Farah | King & Spalding |
| Ms. Juliane Arndt | King & Spalding |
| Mr. Carlos Montella | Orrick, Herrington & Sutcliffe |
| Ms. Cristina Martorana | Orrick, Herrington & Sutcliffe |
| Mr. Alberto Tedeschi | Orrick, Herrington & Sutcliffe |
| Mr. Michael Ebner | KGAL |
| Mr. Alexander Rietz | KGAL |
| Prof. Antonio D'Atena | University of Rome Tor Vergata |
| Mr. Richard Edwards | FTI Consulting |
| Mr. Joel Franks | FTI Consulting |
| Ms. Leona Josifidis | FTI Consulting |
| Mr. Boaz Moselle | Cornerstone Research |
| Ms. Dora Grunwald | FTI Consulting |
| Mr. Jose Alzate | FTI Consulting |

*For the Respondent*:

| | |
|---|---|
| Mr. Giacomo Aiello | Avvocatura dello Stato |
| Mr. Andrea Giordano | Avvocatura dello Stato |
| Ms. Maria-Chiara Malaguti | Ministry of Foreign Affairs (external consultant) |
| Mr. Daniele Bacchiocchi | GSE |
| Mr. Cosimo Danilo Raimondi | GSE |
| Mr. Paolo Berisio | GSE |
| Mr. Valerio Venturi | GSE |

| | |
|---|---|
| Mr. Luca Miraglia | GSE |
| Mr. Vincenzo Zeno Zencovich | Roma3 |
| Mr. Antonio Carratta | Roma3 |
| Mr. Umberto Monarca | GRIF-Luiss |
| Mr. Cesare Pozzi | GRIF-Luiss |
| Mr. Davide Quaglione | GRIF-Luiss |
| Mr. Giuseppe Melis | GRIF Luiss |
| Mr. Ernesto Cassetta | GRIF-Luiss |

*Court Reporters*:
    Ms. Diana Burden
    Ms. Ann Lloyd

*Interpreters*: *English-Italian*:
    Ms. Daniela Ascoli
    Mr. Paolo Cortucci
    Ms. Monica Robiglio

*Interpreters*: *English-German*:
    Ms. Barbara Conte
    Ms. Brigitta Richman

45.    During the Hearing, the following persons were examined:

*On behalf of the Claimants*:

| | |
|---|---|
| Mr. Michael Ebner | KGAL |
| Mr. Alexander Rietz | KGAL |
| Prof. Antonio D'Atena | University of Rome Tor Vergata |
| Mr. Richard Edwards | FTI Consulting |
| Ms. Dora Grunwald | FTI Consulting |
| Mr. Boaz Moselle | Cornerstone Research |

*On behalf of the Respondent*:

| | |
|---|---|
| Mr. Daniele Bacchiocchi | GSE |
| Mr. Luca Miraglia | GSE |
| Mr. Vincenzo Zeno Zencovich | Roma3 |
| Mr. Antonio Carratta | Roma3 |
| Mr. Umberto Monarca | GRIF-Luiss |
| Mr. Cesare Pozzi | GRIF-Luiss |

46.    The Parties filed their Submissions on Costs on 3 August 2018.

47.    The Parties filed simultaneous Post-Hearing Briefs on 7 August 2018. The Centre received the Claimants' Updated Submission on Costs on 6 March 2020 and the Respondent's Updated Submission on Costs 16 March 2020.

48.   On 8 August 2018, the Centre notified the Parties that, due to the departure of
      Ms. Uran-Bidegain from the ICSID Secretariat, Ms. Natalí Sequeira, ICSID Team
      Leader/Legal Counsel was designated to serve as Secretary of the Tribunal.

49.   On 4 February 2019, the Respondent submitted a letter requesting the Tribunal to render
      an "award declaring the immediate termination" of the proceedings on the basis of a joint
      declaration of 15 January 2019 signed by twenty-two EU Member States, the "*Declaration
      of the Representatives of the Governments of the EU Member States of 15 January 2019
      on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on
      Investment Protection in the European Union*" (the "**EU Declaration on *Achmea***") and in
      conformity with Articles 31(2)(b) and 31(3)(a) of the Vienna Convention on the Law of
      Treaties ("**VCLT**") ("**Respondent's Request for Termination**").

50.   On 5 February 2019, the Tribunal invited the Claimants to provide observations on the
      Respondent's Request for Termination by 19 February 2019.

51.   On 19 February 2019, the Claimants submitted their response to the Respondent's Request
      for Termination and a request to admit three new legal authorities to the record. The
      Claimants further requested that the Tribunal permit the Parties an opportunity to submit
      simultaneous written pleadings of no more than fifteen pages discussing how the three new
      legal authorities addressed the intra-EU objection (the "**Claimants' Response**").

52.   On 21 February 2019, the Tribunal invited the Respondent to submit its comments on
      Claimants' request to add new legal authorities by 27 February 2019.

53.   On 27 February 2019, the Respondent reiterated its Request for Termination and opposed
      the admission of the three new legal authorities. The Respondent also requested the
      addition of one legal authority in the event that the Tribunal decided to admit the three new
      legal authorities subject of the Claimants' request (the "**Respondent's Comments**").

54.   On 28 February 2019, the Tribunal invited the Claimants to submit observations by
      8 March 2019.

55.    On 8 March 2019, the Claimants' submitted their response to the Respondent's Comments ("**Claimants' Observations**").

56.    On 18 March 2019, the Tribunal issued Procedural Order No. 7 granting the Claimants' request to submit three additional authorities and the Respondent's request to submit an additional authority, subject to the terms of paragraph the order. The Tribunal granted the Parties the right to submit comments on the additional authorities and deferred its determination on the Respondent's Request for Termination.

57.    On 5 April 2019, pursuant to Procedural Order No. 7, the Claimants submitted brief comments and the new legal authorities CL-200 to CL-203 ("**Claimants' Comments on New Legal Authorities**") and the Respondent submitted its comments and new Legal Authority RL-027 ("**Respondent's Comments on New Legal Authorities**").

58.    On 17 June 2019, the Federal Republic of Germany ("**Germany**") submitted a letter to the Centre attaching the EU Declaration on *Achmea*. On 20 June 2019, the Centre transmitted the correspondence received from Germany to the Tribunal and the Parties.

59.    On 18 June 2019, the Respondent submitted a request for the Tribunal to suspend the proceedings "in order to avoid a conflict of judgements by the Tribunal and the Court of Justice of the European Union" (the "**CJEU**"). On 20 June 2019, the Tribunal invited the Claimants to submit observations on the Respondent's 18 June request and on Germany's submission by 5 July 2019. On 5 July 2019, the Claimants submitted observations to the Respondent's and Germany's letters.

60.    On 8 July 2019, the Federal Ministry for Europe, Integration and Foreign Affairs of the Republic Austria submitted a letter on the EU Declaration on *Achmea*. On the same date, the Centre transmitted the correspondence received from the Republic of Austria to the Tribunal and the Parties.

61.    On 9 August 2019, the Respondent informed the Centre of the award rendered on 6 August 2019 in *Belenergia v. Italy*[7] and requested the Tribunal to include it into the record of the proceedings.

62.    On 25 August 2019, the Tribunal invited the Claimants to submit comments by 30 August 2019.

63.    On 30 August 2019, the Claimants informed the Tribunal that there were no objections to the introduction of the *Belenergia v. Italy* award to the record provided that the Parties were afforded the opportunity for brief commentary on the award. On the same date, the Tribunal invited the Parties to submit commentary on the *Belenergia v. Italy* award by 10 September 2019.

64.    On 3 September 2019, the Tribunal granted an extension to the Parties to submit commentary on the *Belenergia v. Italy* award by 13 September 2019.

65.    On 13 September 2019, the Claimants submitted commentary on the *Belenergia v. Italy* award together with Legal Authorities CL-0214 to CL-0216. On the same date, the Respondent submitted commentary on the *Belenergia v. Italy* award together with Legal Authority RL-0028 ("**Respondent's Comments on *Belenergia***").

66.    On 6 December 2019, the Respondent submitted a request to include two new legal authorities to the record of the proceedings. On 13 December 2019, the Claimants submitted a response to Italy's request including a request to include additional legal authorities into the record.

67.    On 24 December 2019, the Tribunal informed the Parties that it dismissed the Parties' requests as it had been fully briefed and did not find it necessary to include additional authorities into the record.

---

[7]    *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019 ("***Belenergia***"): RL-028.

68.     On 30 March 2020, the Respondent filed a request for leave to introduce into the record the award on jurisdiction and the merits rendered in *SunReserve v. Italy* (SCC 2016/132).[8] Following an invitation from the Tribunal, on 8 April 2020, the Claimants submitted a response on the Respondent's request.

69.     On 13 April 2020, the Tribunal granted the Respondent's request to introduce the *SunReserve v. Italy* award into the record and invited the Parties to submit their comments therein by 20 April 2020.

70.     Following an extension request duly approved by the Tribunal, on 24 April 2020, the Parties filed their observations on the *SunReserve v. Italy* award ("**Comments on SunReserve**"). The Respondent's comments were submitted together with Legal Authority RL-0029.

71.     The proceedings were closed on 26 May 2020.

## IV.    FACTUAL OVERVIEW

### A.    EUROPEAN COMMISSION'S DIRECTIVES AND ITALY'S LEGISLATIVE HISTORY OF ENCOURAGING RENEWABLE ENERGY

72.     Both Parties provided lengthy summaries of the long history of the EU's and the Respondent's policies regarding the promotion of renewable energy.[9] The EC's various directives (collectively, "**EC Directives**") eventually led the Respondent to adopt support schemes to develop its solar PV industry. The origins of the Respondent's renewable

---

[8]     *SunReserve Luxco Holdings S.À.R.L., SunReserve Luxco Holdings II S.À.R.L., and SunReserve Luxco Holdings III S.À.R.L. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020 ("*SunReserve*"): RL-029.

[9]     Claimants' Memorial, ¶¶ 56-62 (A. The Evolution of Italy's Policy Towards Renewable Energy); in particular, *see* discussion at ¶¶ 59-62 regarding CIP-6, Italy's first official program implemented in 1991, and continuing in existence today, to support renewable energy facilities with a feed-in tariff ("**FIT**") program that included an 8-year bonus to new energy facilities, up to 15-year agreements with Italy's National Entity for Electricity ("**ENEL**"), and unambiguous remuneration levels), ¶¶ 63-77 (B. Italy Continued Promoting Renewable Energy with the Liberalization of its Electricity Market and the Adoption of International Energy Targets); Respondent's Counter-Memorial, ¶¶ 216-266.

energy policies date back to the 1980s, although it did not begin to provide economic support to such investments until the 1990s.[10]

73.    The EC Directives and various Italian legislative decrees from 1996 to 2003 indicate that the promotion and support of the renewable energy sector was a priority for the EU generally, and for Italy in particular. Historical highlights include:

- 1991: Italy implemented its first program to support renewable energy facilities through a feed-in-tariff ("**FIT**") program through Law No. 9.[11]

- 1992: Italy's Inter-Ministerial Committee for Prices ("**CIP**") issued its mechanism for establishing competitive purchase prices for electricity in Measure No. 6, which became known as the "CIP-6" program.

- 1996: EC Directive 96/92 established rules for the common electricity market and required EU Member States to liberalize their electricity systems and prioritize renewable energy sources.[12]

- 1998: an EC report on this Directive stressed the necessity of the variety of support schemes in existence across the EU Member States because electricity production from renewable sources was more expensive than electricity produced from competing fuels.[13] The EC endeavoured to propose common rules for the treatment of renewables by the end of 1998.[14]

- 1998: Italy signed the Kyoto Protocol, which aimed to reduce carbon dioxide emissions by eight percent before the end of 2012.[15]

---

[10]    Claimants' Memorial, ¶ 56.
[11]    Law No. 9, January 1991: C-019, Art. 22, ¶ 1; Claimants' Memorial, ¶ 59.
[12]    Directive 96/92 EC: C-026, Arts. 8(3), 11(3); Claimants' Memorial, ¶ 63.
[13]    First Report to Directive 96/92/EC: C-048, p. 2; Claimants' Memorial, ¶ 64.
[14]    First Report to Directive 96/92/EC: C-048, pp. 10-11; Claimants' Memorial, ¶ 65.
[15]    Claimants' Memorial, ¶ 66.

- 1998: The Italian Government committed to enact measures to encourage greater efficiency in the use of energy and double the share of renewable energy sources.[16]

- 1999: Italy's National Agency for New Technologies, Energy and Sustainable Economic Development ("**ENEA**") issued a White Paper which pointed to the strategic importance of renewable energy to Italy and stated that from 2008-2012, Italy would significantly increase energy production from renewable energy sources.[17]

- 1999: Italy implemented EC Directive 96/92 (discussed above) by enacting Legislative Decree No. 79 ("***Bersani* Decree**"), which liberalized Italy's electricity market with anti-monopoly rules to transfer the generation, distribution and sale of energy from Italy's National Entity for Electricity ("**ENEL**") to newly incorporated companies.[18] This Decree provided renewable energy plants priority access to the grid and abolished the requirement that producers enter into agreements with ENEL, instead requiring them to contract with a state-owned company known as the "**GRTN**,"[19] which, in 2005, was renamed the "**GSE**."[20] The GSE is a state-owned company created in 1999 to manage renewable energy support schemes.[21]

---

[16]    National Energy and Environment Conference, Final Document (1998): C-028, pp. 4-6, 6-7; Claimants' Memorial, ¶ 67.

[17]    ENEA, "White Paper for the Development of Renewable Energy Sources:" C-027, p. 9, ¶ 1.3: increase production from renewable energy sources to 20.3 Mtoe; Claimants' Memorial, ¶¶ 66-67.

[18]    Legislative Decree No. 79, 16 March 1999 ("***Bersani* Decree**"): C-029, Art. 13; Article 11 also established a green certificate incentive program, which remains in place today; Claimants' Memorial, ¶¶ 68, 70.

[19]    *Gestore della rete di transmission nazionale Spa* ("**GRTN**"). *Bersani* Decree: C-029, Art. 3, ¶ 12; Claimants' Memorial, ¶ 69.

[20]    *Gestore dei Servizi Energetici* ("**GSE**").

[21]    Claimants' Memorial, ¶ 69. The Parties' submissions on the status of the GSE and the agreements between it and the subsidiaries of the Claimants is discussed below.

74.     From 2001-2009, the EU established the following binding[22] renewable energy targets for its Member States, which the Parties agree were the impetus behind the Respondent's incentives legislation in the solar PV sector:[23]

- 2001: The European Parliament and Council enacted its first renewable energy goal in Directive 2001/77/EC, which prescribed national *targets* (as opposed to requirements) for each EU Member State for the production of electricity from renewable sources, in view of the EU's objective of having 22.1% of total EU electricity consumption produced from renewable sources by 2010.[24] Italy's target was to have 25% of total electricity consumption produced from renewable energy sources by 2010,[25] which was then revised to a more realistic target of 22%.[26]

- 2003: EC Directive 96/92 (discussed above) was replaced by EC Directive 2003/54, which emphasized the "non-discriminatory transmission and distribution of tariffs, through access to the network on the basis of tariffs published prior to their entry into force."[27] EU Member States were allowed to offer tariffs to domestic and foreign investors that took "full account of the costs and benefits of the various renewable energy sources technologies."[28]

- 2009: Because EU Member States had largely not met their 2001 renewable energy production goals, the EC implemented a new set of *mandatory* directives that ultimately led Italy to commit to a target of 26% electricity production from

---

[22]     Respondent's Counter-Memorial, ¶ 219; Claimants' Memorial, ¶ 118.

[23]     *See, e.g.* Claimants' Memorial, ¶¶ 3, 77; Claimants' Reply, ¶¶ 11; Respondent's Counter-Memorial, § III.1 (The rationale behind Italian legislation on incentives to photovoltaic energy sources), ¶¶ 219-266.

[24]     Directive 2001/77/EC "on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market," 27 September 2001: C-033, Art. 3; Claimants' Memorial, ¶¶ 72-73; Respondent's Counter-Memorial, ¶¶ 222-224.

[25]     Directive 2001/77/EC "on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market," 27 September 2001: C-033, Annex; Claimants' Memorial, ¶ 73.

[26]     Hearing Transcript, Day 1, 19:25–20:8.

[27]     Directive 2003/54/EC, 26 June 2003 concerning common rules for the internal market in electricity and repealing Directive 96/92/EC, 2nd recital: C-035; Claimants' Memorial, ¶ 75.

[28]     Directive 2003/54/EC: C-035, Art. 23(f); Claimants' Memorial, ¶ 76.

renewable sources.[29] EC Directive 2009/28 mandated that EU Member States accomplish national targets of 20% consumption from renewable energy sources by 2020 (the "20-20-20" targets),[30] but discretion was left to the governments as to which particular sources to incentivize (hydro, solar, wind, biomass, or other sources of renewable energy) and how to promote that development.[31] Most EU Member States, including Italy, opted for price support tariffs: a FIT amount per kWh of production or a feed-in premium ("**FIP**") paid in addition to the wholesale price. These would be paid to producers for a prescribed period of time set by regulation.[32]

- By 2012, Italy had achieved and surpassed the level of PV production it had projected in 2010 for 2020. By 2016, it was the second largest solar PV producer in Europe in terms of installed PV capacity.[33] According to the Respondent, the "member States have already agreed on a new renewable energy target of at least 27% of final energy consumption in the EU as a whole by 2030."[34]

75.   Italy has a history of legislation on incentives in PV sources. In accordance with the EC Directives just discussed, Italy began implementing legislative, regulatory and contractual support schemes to encourage domestic and foreign investment in its solar energy sector through the following acts:

- 2003: Pursuant to Law 39/2002, the Respondent enacted Legislative Decree No. 387, which required the relevant ministry[35] to establish specific criteria to

---

[29]    Hearing Transcript, Day 1, 20:9-17; First FTI Regulatory Report ("**FTI R1**"), ¶ 3.21.

[30]    Directive 2009/28/EC "on the promotion and use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC," 23 April 2009: C-127, Art. 3, Annex I; Claimants' Memorial, ¶¶ 112-113; Respondent's Counter-Memorial, ¶¶ 219, 225.

[31]    Italy implemented Directive 2009128 in 2011: *see* Legislative Decree No. 28/2011 ("***Romani* Decree**"): C-165.

[32]    Hearing Transcript, Day 1, 22:20–23:5; FTI R1, ¶¶ 4.30-4.33.

[33]    FTI R1, ¶¶ 2.15, 3.31.

[34]    Respondent's Counter-Memorial, ¶ 219.

[35]    The Ministry of Productive Activities ("**MPA**") – now the Ministry of Economic Development ("**MED**") – was required to work with the Ministry of the Environment, Land and Sea ("**MELS**"); Claimants' Memorial, ¶ 84.

incentivize electricity produced from solar energy, and offer an incentive tariff of sufficient duration to guarantee fair remuneration in light of the upfront costs of PV plant operation.[36] Legislative Decree No. 387 gave rise to the *Conto Energia* regime at issue in this case (explained below at paragraphs 76 to 120). It set out a general framework and it instructed Italy's relevant ministries to then develop the specific mechanics of the incentive tariff regime. The Decree reads, in relevant part, as follows:

**Article 7 - Specific provisions for photovoltaic energy**

1. Within six months from the date of entry into force of this decree, the Minister of Productive Activities, in consultation with the Minister of Environment and Protection of Natural Resources, in consultation with the Joint Conference, shall adopt one or more decrees which define the criteria to encourage the production of electricity from solar sources.

2. The criteria referred to in paragraph 1, which shall impose no new cost to the state budget and shall be in compliance with Community legislation currently in force, shall:

    a) establish the requirements of the subjects that may benefit from incentives;

    b) establish the minimum technical requirements of the eligible components and systems;

    c) establish the conditions for the accumulation of the new incentives with other incentives;

    d) establish the modalities for determining the scope of incentives. For electricity produced by photovoltaic conversion of solar energy, provide a specific incentive rate, decreasing amount and duration as to ensure fair remuneration of each investment and operating costs;

    e) establish a target for the nominal power to be installed;

    f) agree also with the upper limit of the cumulative electric power of all plants that can receive the incentive;

    …

**Article 12 - Streamlining and simplification of authorization procedures**

1. The works for the construction of renewable energy plants, as well as those related thereto and necessary for the construction and operation of these plants,

---

[36]    Legislative Decree No. 387, 29 December 2003 ("**Legislative Decree No. 387/2003**"): C-036, Arts. 1, 7.2(d): "a specific incentive rate, decreasing amount and duration as to ensure fair remuneration of each investment and operating costs;" Claimants' Memorial, ¶¶ 83-84.

authorized in accordance with paragraph 3 below, are considered a matter of public utility, not deferrable and of urgency.[37]

- 2005: Law No. 62 directed the government to implement European Directive 2003/54/EC.[38] With respect to the use of incentives to develop renewable energy sources, the law provided as follows:

    **Article 15.**

    1. For the purpose of completing the liberalization process of the electricity market, the Government has been delegated to adopt, within one year of the date of entry into force of this law, with the modalities of which in Article 1, one or more legislative decrees, in order to implement Directive 2003/54/EC of the European Parliament and the Council, of June 26, 2003, concerning common rules for the internal electric energy market and which repeals Directive 96/92/EC, and, consequently, to redefine all the related features linked to the regulation for the national electric system, while observing the authority of the special status regions and of the autonomous provinces of Trento and Bolzano in compliance with their respective statutes and their related implementation standards and in compliance with the following guiding principles and criteria:

    …

        f) develop the use of the new renewable energy sources and of cogeneration by means of market instruments, foreseeing the reorganization of existing interventions, with measures, including those of differentiated nature, by types of power plant and <u>introducing incentive mechanisms based on tenders for the promotion of the most advanced technological solutions that are still far from being commercially competitive</u>, and, notwithstanding, upon the expiration of the current agreements, the termination, without any possibility of extensions, of all incentives for the power plants operating using sources that are assimilated to renewables.[39]

76.    Following these legislative acts, five ministerial decrees were adopted to implement incentive tariff programs for electricity generated by PV sources (the "***Conto Energia Decrees***").[40] The *Conto Energia* Decrees provided for incentive payments per kWh of electricity produced by PV plants for a period of 20 years. The first four *Conto Energia* Decrees provided a FIP which consisted of a payment per unit of electricity produced in

---

[37]    Legislative Decree No. 387/2003: C-036, Arts. 7, 12. *See also* Opinion issued by the Productive Activity Committee (Commissione X) supporting the Decree: C-261.

[38]    Law No. 62, 18 April 2005: C-037, Art. 15.1(f): The aim of incentive schemes is to promote "advanced technological solutions that are still far from being commercially competitive" Claimants' Memorial, ¶ 85.

[39]    Law No. 62, 18 April 2005: C-037, Art. 15.1(f) (emphasis added).

[40]    The individual decrees are referred to as *Conto* I, *Conto* II, *Conto* III, *Conto* IV, *Conto* V and collectively as the "***Conto Energia* Decrees**" or "***Contos*.**" The individual *Contos* are described below.

addition to the wholesale electricity price at which the plants sold their production. *Conto* V provided an "all-inclusive tariff" in the form of an all-inclusive FIT pursuant to which plants received a fixed amount per unit of electricity produced. Certain other plants covered by *Conto* V were eligible for an incentive calculated as the difference between the all-inclusive tariff and the national (or zonal) wholesale market price at which the plants sold their electricity.[41]

### (1)    *Conto* I

77.    The Respondent implemented its first incentive tariff program to support small PV plants under 1 MegaWatt ("**MW**") in capacity on 28 July 2005 by way of a ministerial decree, which came to be known as *Conto* I.[42]

78.    *Conto* I provided, in relevant part, as follows:

> **Article 1.**
> **Purpose**
>
> This decree defines the incentive criteria for the production of electricity from photovoltaic plants in implementation of article 7 of legislative decree no. 387, 29 December 2003, in consideration of article 15 (1) sub-paragraph f) of Law no. 62, 18 April 2005.
>
> …
>
> **Article 5.**
> **Criteria for determining the amount of the incentive tariff for photovoltaic plants with nominal capacity no greater than 20 kW.**
>
> …
>
> 2. The electricity produced by photovoltaic plants with nominal capacity no greater than 20 kW, equipped with suitable systems for the measurement of energy produced, is entitled, in accordance with the provisions of article 6 of legislative decree no. 387, 29 December 2003 and of this decree, to an incentive tariff, the value of which shall be established as follows:

---

[41]    *See* FTI R1, ¶¶ 5.20-5.27.

[42]    Ministerial Decree No. 18908 from the MPA, 28 July 2005, Italian Official Gazette No. 181, 5 August 2005, Art. 1. *Conto* I was integrated and amended by the subsequent Ministerial Decree No. 20998 from the MPA, 6 February 2006, published in the Italian Official Gazette No. 38, 15 February 2006 ("**Amendment *Conto* I**"). Both decrees will be defined herein as "***Conto* I**:" C-039. *See* Claimants' Memorial, ¶¶ 88-99. None of the Claimants' PV facilities at issue in this case were covered by *Conto* I. However, this was the first step in the incentive scheme for PV facilities and, therefore, forms part of the relevant background.

a) for plants in respect of which the application described under article 7 (1) is sent in 2005 and in 2006: 0.445 euro/kWh for a period of twenty years;

b) for plants in respect of which the application described under article 7 (1) is sent in years after 2006: the value of the incentive tariff under point a) shall be reduced by 2%, rounded to the third decimal figure, for each of the years subsequent to 2006, without prejudice to the twenty year period.

…

**Article 6.**
**Criteria for the determination of the amount of the incentive tariff for photovoltaic plants with nominal power in excess of 20 kW.**

1. Electricity produced by photovoltaic plants with nominal capacity in excess of 20kW exported to the electricity grid, shall be withdrawn in accordance with procedures and terms fixed by the Authority for Electricity and Gas pursuant to article 13 (3) of legislative decree no. 387, 29 December 2003.

2. In addition to recognition of the terms under paragraph 1, electricity produced by photovoltaic plants with nominal capacity in excess of 20kW and no greater than 50 kW, exported to the electricity grid in whole or in part, is entitled, in accordance with the provisions of this decree, to an incentive tariff, established as follows:

a) for plants in respect of which the application described under article 7 (1) is sent in 2005 and in 2006: 0.460 euro/kWh for a period of twenty years;

b) for plants in respect of which the application described under article 7 (1) is sent in the years after 2006: the value of the incentive tariff under point a) shall be reduced by 2%, rounded to the third decimal figure, for each of the years subsequent to 2006, without prejudice to the twenty year period.

3. In addition to recognition of the terms under paragraph 1, electricity produced by photovoltaic plants with nominal capacity in excess of 50 kW and no greater than 1000 kW, exported to the electricity grid in whole or in part, is entitled, in accordance with the provisions of this decree, to an incentive tariff, established as follows:

a) for plants in respect of which the application described under article 7 (1) is sent in 2005 and in 2006: 0.490 euro/kWh for a period of twenty years;

b) for plants in respect of which the application described under article 7 (1) is sent in the years after 2006: the value of the incentive tariff under point a) shall be reduced by 2%, rounded to the third decimal figure, for each of the years subsequent to 2006, without prejudice to the twenty year period.

The amount of the incentive tariff actually awarded will be established in accordance with the procedures under article 7, within the maximum limit of total nominal capacity as specified under article 12 (3).

…

6. Any revision to the incentive tariffs under article 5 (2) and article 6 (2 and 3), shall take place commencing from first January of each year, in accordance with the annual rate of variation, for the previous twelve months, in the consumer price index for blue and white-collar worker families recorded by Istat.

**Article 7.**
**Priority criteria for access to the incentive tariff and procedures for establishing the tariff awarded**

…

7. Within 90 days following the deadlines provided for transmission of the applications under paragraph 1, the implementing body (*soggetto attuatore*) shall communicate the outcome under paragraphs 4 and 5 to the plant operators (*soggetti responsabili*) who sent the application under paragraph 1. The implementing body shall also notify entitled operators, on the basis of the provisions under paragraph 5, article 5 and article 6 (2), of the amount of the incentive tariff actually awarded for a period of twenty years commencing from the date of operation of the plant.

…

**Article 8.**
**Obligations connected to realisation of the plant**

1. Within 30 days following the date of receipt of the communication under article 7 (7), the plant operator (*soggetto responsabile)* shall send the grid manager the preliminary project for the plant, as specified under article 7 (1), and shall request connection to the grid pursuant to article 9 (1) of legislative decree no. 79, 16 March 1999 and of article 14 of legislative decree no. 387, 29 December 2003. In case of plants under article 5, the operator will specify that he intends to use the net-metering service (*scambio sul posto*) for electricity produced, in accordance with rules under paragraph 1, or under paragraph 5 of article 5.

Within the following 30 days, the grid manager will inform the plant operator about the delivery point.

In any event, within six months, or for plants under article 6 alone, within twelve months of the date of the communication under article 7 (7), the plant operator (*soggetto responsabile)* will commence works for the realisation of the plant, in accordance with the project sent to the grid manager and to the implementing body (*soggetto attuatore*) in compliance with the provisions under article 4, providing notice to those parties.

Within twelve months, or for plants under article 6 alone, within twenty four months, of the date of the communication under article 7 (7), the plant operator (*soggetto responsabile*) will conclude the realisation of the plant, in accordance with the project sent to the grid manager and to the implementing body (*soggetto attuatore*) in compliance with the provisions under article 4, providing notice to those parties. The notice shall include the commissioning certificate for the plant. The grid manager shall connect the plant to the electricity grid within thirty days of receipt of the aforementioned notice of conclusion of the works.

The plant operator (*soggetto responsabile*) is required to give notice to the implementing body (*soggetto attuatore*) and to the grid manager of the operational

> date for the plant. In any event, this date may not be subsequent to six months
> following conclusion of works for the realisation of the plant, as specified under
> paragraph 3.
>
> …
>
> **Article 12.**
> **Maximum limit of cumulative electricity capacity for all plants that can
> obtain the tariff and priority criteria for access to the tariff**
>
> 1. The incentive tariffs under this decree are awarded until cumulative nominal
> capacity for all plants that obtain the same feed- in tariffs reaches a value of 100
> MW.[43]

79.    According to the Claimants, *Conto* I provided, in Articles 5.2, 6.2 and 6.3, that qualifying
       PV plants had the right ("*diritto*") to receive a specific incentive tariff for a period of
       20 years. The incentive tariff was to be paid to the producer per KiloWatt hour ("**kWh**")
       of the electricity it produced, in addition to whatever sale price the producer obtained for
       its electricity.[44] As provided in the Decree, incentive rates for eligible facilities after
       2006 were reduced by two percent.[45]

80.    Under *Conto* I, and the other *Conto Energia* Decrees, an investor who wished to develop a
       solar facility and benefit from the incentives offered was required to submit a request for
       the corresponding incentive tariff together with a commitment to obtain the necessary
       authorizations for the construction and operation of the plant. Requests were submitted to
       the GSE which would provisionally determine eligibility for the incentive program. The
       investor then had a period from six to twelve months to commence construction of the plant
       and twelve to twenty-four months to complete construction and connect the facility to the
       electrical grid. Failure to meet the deadlines would result in the loss of the right to the
       incentive tariffs.[46] If an applicant qualified, confirmation of the right to the incentive tariffs
       under *Conto* I (and the subsequent *Conto Energia* Decrees) was communicated by a letter

---

[43]    *Conto* I: C-039, Arts. 5.2, 6.2, 6.3, 8, 12. The threshold of 100MW was later extended to 500MW: *see*
Ministerial Decree of 6 February 2006, Art. 2.1 (bold emphasis in the original, underlined emphasis added).

[44]    Claimants' Memorial, ¶ 89. According to the Claimants, *Conto* I established the following tariff rates for
eligible plants authorized in 2005 and 2006 on the basis of the plant's nominal capacity: €0.445/kWh for plants
between 1kW and 20kW; €0.460/kWh for plants between 20kW and 50kW; and €0.490/kWh for plants between 50kW
and 1 MW.

[45]    In February 2006, the original reduction of 2% was increased to 5% for plants qualifying after 2006.

[46]    *Conto* I: C-039A, Arts. 8.3 and 8.6.

from the GSE which set out the specific tariff rate granted (the "**GSE Letter**"). The GSE Letter also invited the investor to log on to the GSE's website, using the ID and password previously assigned to the investor, to access the agreement prepared for the investor's signature by the GSE.[47] The investor was invited to review the contract and sign it, and return it to the GSE. The GSE would then execute the agreement (the "**GSE Agreement**") and make it available in the "agreements" section of its web portal.

81.    The GSE Agreements were executed between the GSE and the local companies operating the PV plants who received incentives under the *Conto Energia* Decrees (the "**Producers**"). The provisions of all of the GSE Agreements were drafted in similar terms.[48] Under *Conto* I, the related the GSE Agreements stated in relevant part as follows:

> **Article 1**
> **Purpose of the agreement**
>
> This agreement concerns the recognition by GSE to the Producer of the contribution due to electricity generated by solar power through photovoltaic conversion and incentivized pursuant to Legislative Decree 387/03, art. 7 of MAP decrees dated 28/07/2005 and 06/02/2006, A.E.E.G. resolution No. 188/05 as subsequent[ly] amended and modified by resolution 40/06 and A.E.E.G. resolution No. 28/06.
>
> **Article 2**
> **Effective date and value of the incentive**
>
> For a period of twenty years as of 08/04/2009, the incentive tariff to be recognised to the photovoltaic plant thereof is equal to 0.46 €/kWh.
>
> **Article 3**
> **Incentives payment methods**
>
> The payment of the incentive tariffs shall be made by GSE according to the measures defined in art. 3-bis of A.E.E.G. resolution No. 40/06 and in conformity with the payment methods regulated by such resolution. With respect to art. 3 bis of A.E.E.G. decision No. 40/06, GIOVA SOLAR SRL is the party responsible for the survey, registration and communication to GSE of the measurements on the incentivised photovoltaic energy. GSE provides for the payment of the incentive

---

[47]    *See Conto* I: C-039A, Art. 7.7: C-039; Ardea GSE Incentive Tariff Confirmation Letter, 4 January 2012 ("**Ardea Tariff Confirmation Letter**"): C-332.

[48]    *See* Sample GSE Agreement under *Conto* I: C-063; Sample GSE Agreement under *Conto* II: C-073; Sample GSE Agreement under *Conto* III: C-140; Sample GSE Agreement under *Conto* IV: C-260; Sample GSE Agreement under *Conto* V: C-246. Reference was also made to a number of specific GSE agreements, including those at the following exhibits: C-284, C-285, C-287, C-294, C-295, C-296, C-297, C-298, C-304, C-310, C-311, C-334-C-337, C-349, C-350, C-364, C-365, C-370. To the extent there are relevant differences, these are addressed when the Tribunal addresses individual GSE agreements.

tariffs with value date as of the last day of the month following the one in which the "Payment Date" measurements are received. In the event the "Payment Date" falls on a holiday, the payment is arranged with value date as of the following business day.

GSE shall arrange for the payment of the incentive tariffs by crediting the amounts to the bank account specified by the Producer in the "data registration form for the purpose of incentive tariffs payment," mentioned in the introductory section of this agreement.

…

**Article 8**
**Effective date and duration of the agreement**

This agreement is effective from 08/04/2009 and shall expire on 07/04/2029.

This contract is deemed as legally terminated and having ceased to produce effects for the Parties should the Producer be faulty on the prohibitions and forfeitures defined in art. 10 of Law 575/1965 as subsequent[ly] amended and modified.

**Article 9**
**Jurisdiction**

For any dispute arising out of or in any way connected to the interpretation of this Agreement and the documents referred to therein, the Parties agree on the exclusive jurisdiction of the Court of Rome.

**Article 10**
**Formalization of the agreement**

This Agreement is signed on two original copies; the Producer and GSE shall separately send their duly signed originals. Any modification to the agreement must occur in writing.[49]

82. In February 2006, *Conto* I was amended in two key respects: the initial cap of 100MW of installed PV capacity eligible to receive the incentive tariff was increased to 500MW; and the tariff reduction of two percent was increased to five percent for 2006 onwards, thereby slightly lowering the tariff rates.[50]

83. The GSE, amongst other authorities, promoted *Conto* I, referring, notably, to the fact that the tariffs available under *Conto* I would remain constant for the period of 20 years.[51]

---

[49]    Sample GSE Agreement under *Conto* I: C-063.

[50]    *Conto* I Amendment, 6 February 2006: C-039B, Arts. 2, 3.

[51]    Claimants' Memorial, ¶ 97 and the various sources cited therein, including a number of presentations by the GSE and a description on the GSE website: GSE Report, "Le attività del Gestore dei Servizi Elettrici – Rapporto

84.    *Conto* I was successful. In July 2006, the GSE advised that it had reached the threshold of capacity available for that year for new PV facilities under *Conto* I and that additional applications could begin in March 2007.[52] By that time, Italy had accepted 387 MW of new PV capacity under the *Conto* program.[53]

### (2)    *Conto* II

85.    *Conto* II was enacted on 19 February 2007, with a stated goal of implementing a simplified, stable and durable system to access PV incentives.[54] *Conto* II provided in relevant part as follows:

> **Article 6.**
> **Incentive tariffs and entitlement period**
>
> 1. Electricity produced by photovoltaic plants, built in accordance with this decree and entering into operation in the period between the date of issue of the measure under article 10 (1) and 31 December 2008, is entitled to an incentive tariff which, on the basis of nominal capacity and type of plant, as specified under article 2 (1) sub-paragraphs b1), b2) and b3), will be of the value specified under the following table (values in Euro/kWh produced by the photovoltaic plant). The tariff identified on the basis of that table is awarded for a period of twenty years commencing from the date of entry into operation of the plant and shall remain constant in current currency for the entire twenty year period.

|  | Nominal capacity of plant P (kW) | 1<br>Plants under article 2 (1) sub-paragraph b1) | 2<br>Plants under article 2 (1) sub-paragraph b2) | 3<br>Plants under article 2 (1) sub-paragraph b3) |
|---|---|---|---|---|
| A) | $1 \leq P \leq 3$ | 0.40 | 0.44 | 0.49 |
| B) | $3 < P \leq 20$ | 0.38 | 0.42 | 0.46 |
| C) | $P > 20$ | 0.36 | 0.40 | 0.44 |

---

2006," 31 December 2006: C-059, p. 47; GRTN Presentation, "GRTN Role on Renewable Energies," Expert Meeting on Renewable Energy, Verona, 10 March 2006: C-056, Slide 35; GSE Presentation, "Il riconoscimento degli incentivi alle fonti rinnovabili," Ecomondo, 9 November 2006: C-057, Slide 30; GSE Presentation, "Il conto energia per il fotovoltaico," Rimini, 10 November 2006: C-058, Slide 18; GSE Website, "Photovoltaics – frequent questions," 12 May 2006: C-378, pp. 4, 7.

52    GSE press release, "Esaurita la Potenza icentivabile per l'anno 2006," 31 July 2006: C-064.

53    GSE Report, "Le attività del Gestore dei Servizi Elettrici – Rapporto 2006," 31 December 2006: C-059, pp. 51-52, 54.

54    Decree, 19 February 2007, MED and MELS, published in Italian Official Gazette No. 45, 23 February 2007 ("***Conto* II**"): C-065, Preamble, ¶ 2. *Conto* II officially entered into force on 13 April 2007 when AEEG issued Resolution No. 90/07, which provided further details regarding the implementation of *Conto* II: *see* Claimants' Memorial, ¶¶ 100-119.

> 2. Electricity produced by photovoltaic plants, realised in accordance with this decree and operational in each of the years in the period between 1 January 2009 and 31 December 2010, are entitled <u>to the incentive tariff under paragraph 1</u>, on the basis of nominal capacity and type of plant, decreased by 2% for each of the calendar years subsequent to 2008, with commercial rounding to the third decimal figure, <u>without prejudice to the twenty year period</u>. <u>The value of the tariff shall remain constant in current currency for the aforementioned twenty-year period</u>.[55]

86.     As with *Conto* I, *Conto* II provided that:

- Once connected to the grid, qualifying PV plants had the right to receive a specific incentive tariff which was to remain constant for a period of 20 years.

- Tariff rates were paid to Producers per kWh of electricity produced in addition to the wholesale price that the producers obtained.

- The specific tariff rate and duration of the incentives was confirmed in the GSE Letters and GSE Agreements.[56]

87.     *Conto* II differed from *Conto* I in the following ways:

- The tariff rates were slightly lower.

- It did not contain the inflation adjustment clause (contained in Article 6 of *Conto* I) allowing Italy to increase or reduce the tariff rate in accordance with the consumer price index for wholesale price of electricity ("**CPI**").

- It simplified the enrolment process by requiring Producers to request the benefit of the incentive tariff only upon the facility's entry into operation, which avoided investors being granted capacity that was never realized.[57]

---

[55]     *Conto* II: C-065, Arts. 6.1, 6.2 (emphasis added in the English translation).

[56]     *See Conto* II: C-065, Arts. 6.1, 6.2; Montalto GSE Incentive Tariff Confirmation Letter, 3 May 2011 ("**Montalto Tariff Confirmation Letter**"): C-284; Sample GSE agreement under *Conto* II, 29 November 2011: C-073, Arts. 1-2.

[57]     Claimants' Memorial, ¶ 101. The former Minister for Environment, at the time President of Fondazione Univerde, noted the simplified process under *Conto* II in Press Release, "In sei anni di Conto Energia installati 480,000 impianti," 21 February 2013: C-066.

- It increased the capacity thresholds for receiving incentive tariffs to include PV plants over 1 MW up to an aggregate installed capacity of 1,200 MW.[58]

- It established tariff rates based on technical criteria, such as the given plant's nominal capacity, plant size and whether it was partially or totally integrated.[59]

- It stated that the Ministry of Economic Development ("**MED**") would issue a subsequent decree revising the incentive tariffs for PV plants connected to the grid after 2010, taking into account energy products and component price trends as well as technological monitoring from ENEA.[60]

88.    A GSE Letter under *Conto* II provided, in relevant part, as follows:

> with reference to the photovoltaic plant referred to as SVS Lazio SAS-Phoenix Solar Montalto dC, we hereby communicate the admission to the incentive tariff under Ministerial Decree 19 February 2007 equal to 0.3460 Euro/kWh.
>
> The tariff will be awarded for a twenty-year period as of the date of entry into operation of the plant: 28/10/2010; the tariff is constant, in current currency for all the twenty-year period."[61]

89.    The GSE Agreements read, in relevant part, as follows:

> **Article 1**
> **Purpose of the Agreement**
>
> This agreement concerns the recognition by the GSE to the Producer of the contribution owed to electricity produced by solar power through photovoltaic conversion and incentivised pursuant to Art. 7 of Legislative Decree 387/03, Ministerial Decree dated 19/02/2007 and [AEEG] resolution No. 90/07.
>
> **Article 2**
> **Effective date and value of the incentive**
>
> For a period of twenty years starting from 28/10/2010, the incentive tariff to be granted to the photovoltaic plant under this Agreement is equal to 0.3460 €/kWh and is constant in current currency.

---

[58]    *Conto* II: C-065, Art. 13.

[59]    *Conto* II: C-065, Art. 6.1.

[60]    *Conto* II: C-065, Arts. 6.3, 14, 15; Claimants' Memorial, ¶ 104, fn. 115. This later decree was *Conto* III, discussed below.

[61]    *See* Montalto Tariff Confirmation Letter: C-284.

**Article 3**
**Incentive tariffs payment**

The payment of the incentive tariffs shall be made by the GSE according to the measures defined by AEEG resolution No. 88/07 and in compliance with the payment procedures specified in AEEG resolution No. 90/07.

…

**Article 8**
**Effectiveness and duration of the Agreement**

This Agreement is effective as of 28/10/2010 and expires on 27/10/2030.

This Agreement is deemed as legally terminated and ceases to produce effects for the Parties should the Producer incur in one of the cases of [incentive tariff] forfeiture defined in art. 10 of Law 575/1965 as subsequently amended and integrated, as well as upon the occurrence of the situation provided for in art. 10, paragraph 3 of AEEG resolution No. 90/07.

**Article 9**
**Jurisdiction**

For any dispute arising out of or in any way connected to the interpretation and execution of this Agreement and the documents referred to therein, the Parties agree on the exclusive jurisdiction of the Court of Rome.

**Article 10**
**Formalisation of the agreement**

For the purposes of formalising this Agreement, the Producer is required to print through the electronic portal the related Declaration of Acceptance and send it to the GSE duly signed, attaching a photocopy of a valid identification document.

This Agreement is executed at the time that the GSE proceeds with the acceptance of the aforementioned Declaration, making available on its electronic portal the copy for the Producer, signed by its legal representative.

Subsequent to the activation of this Agreement, any agreements modifying or integrating the content of this Agreement must be agreed upon in writing otherwise being null and void. The Parties acknowledge that any declaration made under this Agreement is rendered pursuant to the Decree of the President of the Republic (D.P.R.) 445/00.[62]

90.    Various Italian authorities and commentators promoted the stability of the incentive rates in *Conto* II and their 20-year duration. These included:

---

[62]    GSE Tariff Agreement for ESPF's Montalto plant, 28 July 2011: C-286. *See, e.g.*, GSE Agreement between GSE and Energetic Source Green Power SRL, 29 November 2011: C-073.

- A publication of the Italian Government;[63]

- Autoritá per l'Energia Electtrica ed il Gas ("**AEEG**") through Resolution 90/07/2007;[64]

- National Solar Energy Commission ("**CNES**") report;[65]

- ENEA reports and press release;[66]

- The Minister of Environment's statement;[67]

- Italian regional and provincial authorities in Parma, Umbria, Rimini, Tuscany, Sicily, Viterbo, Abruzzo and Biella issued pamphlets and hosted presentations;[68]

- GSE e-book, reports and website;[69]

---

[63]    Government, Dossier, "Vincere la sfida del clima e dare sicurezza energetica al paese," 19 February 2007: C-068, p. 5; Government Website Excerpt on *Conto* II, "Fotovoltaico: incentivi più efficaci," 19 February 2007: C-069.

[64]    AEEG Deliberation 90/07 Implementing *Conto* II, 13 April 2007: C-070; AEEG Performance Evaluation of *Conto* I and *Conto* II, 2007/2008: C-071.

[65]    CNES Preliminary Report on the National Photovoltaic Framework, 21 February 2008: C-072.

[66]    ENEA and Sicilian Region, Paper "Energia per un future sostenibile e fonti rinnovabili," 15 October 2008: C-074; ENEA and Sicilian Region Paper "Progettare e installare un impianto fotovoltaico," 31 December 2008: C-075; ENEA, Press Release "Il nuovo decreto sul *Conto Energia* 2007," 2007: C-076; Interview with Minister of Environment Pecoraro Scanio, Excerpt from Verdi Party website, 2007: C-077 ("The conclusion is that the energy bill is based on 20 years, but 'the system will pay for itself in ten'.").

[67]    Statement from Mr. Alfonso Pecoraro Scanio, Minister for the Environment, Land and Sea in *Il Sole In Casa* (2007): C-078, pp. 2, 4, 7.

[68]    Parma Energy Agency, Summary of second Conto Energia regime, 2007: C-079; Local press of Umbria, "Gubbio: il Ministro Pecoraro Scanio interverrà oggi presso la Sirci," 24 February 2007: C-080; Presentation at promotional and informational meeting organized by Municipality of Rimini, "Gli impianti fotovoltaici – il nuovo conto energia," 19 September 2007: C-081; Memo issued by Tuscany Region, "Fotovoltaico – promemoria per l'accesso al Conto Energia," 14 November 2007: C-082; Region of Sicily promotional pamphlet, "Le fonti rinnovabili nella casa," 18 November 2007: C-083; Paper by Viterbo Province on energy policy, "Energia," 1 August 2008: C-084; Presentation by CIA, published on website of the Abruzzo Region, "Progetto Enersun – incentive per la produzione di energia dalla fonti rinnovabili," 29 August 2008: C-085; Province of Biella, Promotional pamphlet "Opuscolo per migliorare l'efficienza energetica nelle nostre abitazioni," 2 March 2009: C-086.

[69]    GSE, "Elementi," Issue No. 11, September-December 2007: C-087; GSE "The activity of the GSE – 2008 Report," October 4, 2010: C-088; GSE Report, "Incentivazione degli impianti fotovoltaici Relazione delle attività settembre 2008 – agosto 2009," 15 October 2010: C-089; GSE, Webpage excerpt, "Primo *Conto Energia*," 3 February

- Presentations by GSE from February 2007 – March 2010;[70]

- The EC's "Italy Renewable Energy Fact Sheet;"[71]

- European Parliament and Council through EC Directive 2009/28.[72]

- Italian business association;[73]

- "Global Solar Report Cards" publication;[74]

- There were also a number of other contemporaneous articles and reports from law firms[75] and news agencies,[76] amongst others.[77]

91.    On 23 April 2009, the European Parliament and Council enacted Directive 2009/28/EC on the promotion of the use of energy for renewable resources.[78] The Directive established binding national targets for EU member states for renewable energy production in light of

---

2010: C-090; GSE website, FAQ on *Conto Energia* mechanism, 28 February 2010: C-091; GSE Guide to Conto II, Issue No. 4, March 2010: C-092.

[70]    These are listed in Claimants' Memorial, ¶ 110, fns. 128-152: C-093 to C-122.

[71]    European Commission, "Italy Renewable Energy Fact Sheet," 23 January 2008: C-123, p. 1.

[72]    Directive 2009/28/EC, 23 April 2009: C-127, Art. 3, Annex I.

[73]    Gruppo Imprese Fotovoltaiche Italiane ("**GIFI**"), Presentation, "Il Conto energia 2007" (2008 and 2009): C-128; IlSole24Ore Website, Guide "L'abc del fotovoltaico" (2009): C-129, p. 2.

[74]    Global Green USA Report "Global Solar Report Cards – 2009:" C-130, p. 63.

[75]    Norton Rose article "Regulatory regimes for solar power," July 2008: C-139; Norton Rose article "Concentrating our efforts on the sun," November 2009: C-131.

[76]    News of acquisition or completion of PV plants by foreign investors was echoed by INVITALIA, Italy's agency specializing in attracting foreign direct investment. INVITALIA, Press Release "UK alternative asset manager Foresight Group announces €50m solar deals in Italy," June 2009: C-132; INVITALIA, Press Release "Etrion Signs Definitive Agreement with SunPower to Acquire 33 MW Solar Power Plant in Italy," May 2010: C-133.

[77]    Italian Federation for the Rational Use of Energy ("**FIRE**"), "Le tariffe incentivanti per la produzione di energia elettrica da fonte rinnovabile" (2010): C-134; Italian Trade Agency, Presentation "The Photovoltaic [Sector in Italy] – [Legal] Framework and Tariff Incentives – The *Conto Energia* (Il fotovoltaico in Italia – Normative e tariffe incentivanti – *Il Conto Energia*)," 19 January 2010: C-031. Further, the MED participated in a conference designed to open the Italian photovoltaic market to international investment banks and similar institutions. Conference Minutes/Summary, "Focus Italy – Investing in Renewable Energies: How the Italian System can attract investment in renewable energy to overcome the crisis," held in London, 16 June 2010: C-136 (noting attendees such as Morgan Stanley, Bank of America Merrill Lynch, Société Générale, Citigroup, Terra Firma Capital Partners, Convert Italy and H7, among others); INVITALIA, Report: "Investment Opportunities – Photovoltaics Sector," 19 June 2010: C-137; INVITALIA, Press Release "Colexon realizes 993 kWp plant in Imola," August 2010: C-138.

[78]    Directive 2009/28/EC: C-127.

the EU's objective of having twenty percent of the Communities' gross consumption of energy produced from renewable energy resources by 2020.

92.    The Respondent reached its 1200 MW target under *Conto* II in June 2010.[79] In its National Action Plan for Renewables ("**PAN**"), the Respondent described its support schemes as "able to sustain a constant growth of the sector, ensuring, despite the frequent modifications of the legislative framework, enough predictability for conditions regarding returns" because of "a long-term vision" and "incentives based on the technology costs profile."[80]

### a.    *Salva Alcoa Decree*

93.    On 13 August 2010, Italy adopted Law Decree 129 ("***Salva Alcoa* Decree**") in order to address a backlog of plants waiting for connection to the grid by the Grid Operator. The *Salva Alcoa* Decree permitted PV plants to secure *Conto* II tariffs after the original *Conto* II deadline of 31 December 2010, provided that the construction of the plant was complete and verified by the GSE by that deadline and the plant entered into operation by 30 June 2011.[81] Under *Conto* II, once completion of construction had been verified by an authorized technician, and verified by the Grid Manager and the GSE, the plant could be connected to the grid and enter into operation later. Provided this had been done by 31 December 2010, the plant was entitled to receive tariffs under *Conto* II. The *Salva Alcoa* Decree extended the time for the Grid Operator to connect the plant to the grid until 30 June 2011.[82]

---

[79]    GSE Press Release "Raggiunti i 1.200 MW di potenza incentivabile prevista dal Nuovo ContoEnergia," 7 July 2010: C-144. In a press release, the MED stated that the growth in the renewable energy sector recorded in 2009 had helped Italy recover from its financial crisis and confirmed that Italy was "committed to ensuring continuity to the efficient growth" of its solar PV sector. Government Press Release, "Fotovoltaico: l'Italia raggiunge il 2o posto tra I Paesi europei," 2 March 2010: C-141 (emphasis in English translation omitted). *See also* the GSE Managing Director's interview in Economy: *il business magazine di Mondadori*, Interview with N. Pasquali, "In 2010, photovoltaics could double," 13 May 2010: C-142.

[80]    National Action Plan for Renewables of Italy ("**PAN**"), 30 June 2010: C-143, p. 7.

[81]    Law Decree 129 of 13 August 2010: C-443. This Decree officially amended an earlier decree aimed at assisting an aluminium company operating in Sardinia (Alcoa).

[82]    *See Salva Alcoa* Decree: C-443, Art. 1-*septies*; Claimants' Reply, ¶¶ 420-423 and the sources cited therein.

### (3)    *Conto* III

94. *Conto* III was enacted on 6 August 2010 and, as with *Contos* I and II, granted qualifying PV plants the right to receive a specific incentive tariff for 20 years starting from the date of the plant's connection to the grid.[83]

95. *Conto* III reduced tariff rates on a sliding scale from €0.362/kWh to €0.251/kWh for new PV facilities.[84] *Conto* III offered these tariffs to PV plants that entered into operation from 2011 through 2013 and stated that the MED would issue a subsequent decree.[85] The tariffs were available until the aggregate installed capacity of PV plants reached 3,000 MW, with a 14-month grace window for plants that were connected to the grid after this limit was achieved.[86]

96. Article 8 of *Conto* III provided as follows:

> **Art. 8**
> *Incentive Tariffs*
>
> 1. The incentive tariffs under this title apply to solar photovoltaic plants entering into operation following new construction, total revamping or repowering, after 31 December 2010.
>
> 2. Electricity produced by solar photovoltaic plants under this title and operational by 31 December 2011, is entitled to the incentive tariff under table A. Electricity produced by photovoltaic plants under this title entering into operation in 2012 and 2013 is entitled to the tariff under Table A, column C), decreased by 6% per year, with commercial rounding to the third decimal figure.

---

[83]    Decree, 6 August 2010, MED and MELS, published in Italian Official Gazette No. 197, 24 August 2010 ("***Conto* III**"): C-145. Claimants' Memorial, ¶¶ 120-129.

[84]    *Conto* III: C-145, Preamble, p. 29, ¶¶ first, second, fifth, Art. 8; Claimants' Memorial, ¶ 120.

[85]    *Conto* III: C-145, Art. 8.3; Claimants' Memorial, ¶ 121.

[86]    *Conto* III: C-145, Art. 3.2; Claimants' Memorial, ¶ 121.

TABLE A

| Capacity range | CORRESPONDING TARIFF | | | | | |
|---|---|---|---|---|---|---|
| | A) Plants operational at a date subsequent to 31 December 2010 and by 30 April 2011 | | B) Plants operational at a date subsequent to 30 April 2011 and by 31 August 2011 | | C) Plants operational at a date subsequent to 31 August 2011 and by 31 December 2011 | |
| | Photovoltaic plants realised on buildings | Other photovoltaic plants | Photovoltaic plants realised on buildings | Other photovoltaic plants | Photovoltaic plants realised on buildings | Other photovoltaic plants |
| [kW] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] |
| $1 \leq P \leq 3$ | 0.402 | 0.362 | 0.391 | 0.347 | 0.380 | 0.333 |
| $3 < P \leq 20$ | 0.377 | 0.339 | 0.360 | 0.322 | 0.342 | 0.304 |
| $20 < P \leq 200$ | 0.358 | 0.321 | 0.341 | 0.309 | 0.323 | 0.285 |
| $200 < P \leq 1000$ | 0.355 | 0.314 | 0.335 | 0.303 | 0.314 | 0.266 |
| $1000 < P \leq 5000$ | 0.351 | 0.313 | 0.327 | 0.289 | 0.302 | 0.264 |
| $P > 5000$ | 0.333 | 0.297 | 0.311 | 0.275 | 0.287 | 0.251 |

3. By means of a decree of the Minister for Economic Development in concert with the Minster for the Environment and the Protection of Territory and the Sea, in agreement with the Joint Conference (*Conferenza Unificata*), to be issued by 31 December 2012, the tariffs under this title will be revised, for plants operational at a date subsequent to 31 December 2013. The revision will be carried out in consideration of performance in prices for energy products and for the components of photovoltaic plants as well as the results of activities under articles 17 and 18. Pending the aforementioned decree, the reduction under paragraph 2 will apply for each of the years subsequent to 2013.

4. The tariff identified on the basis of table A and of the provisions of paragraph 2, is awarded for a period of twenty years commencing from the operational date of the plant and shall remain constant in current currency for the entire incentive period

5. The tariffs under table A may be increased according to the procedures and terms provided in articles 9 and 10. These increases cannot be combined.

6. Plants operational following an upgrade can access the incentive tariffs limitedly with respect to additional production.

> The above is without prejudice to the obligations provided by taxation regulations on the production of electricity.[87]

97.    As with the previous *Conto Energia* Decrees, *Conto* III provided for confirmation of eligibility by way of a confirmation letter from the GSE and required investors to enter into agreements with the GSE. The GSE Letters confirmed the specific tariff to which the facility was entitled and provided that the tariff was constant, in current currency, throughout the 20-year term. For example, the GSE Letter for ESPF 2 Piazza Armerina plant provided, in part, as follows:

> With reference to the photovoltaic plant hereunder, we hereby communicate the admission to the incentive tariff under Ministerial Decree 6 August 2010 equal to 0.3130 euro/kWh.

> The incentive tariff will be recognized for a period of 20 years as of the date of entry into operation of the plant: 29/04/2011; the tariff is constant, in current currency, all through the 20-year period. Such period is calculated net of a potential shutdown of the plant due to grid stability issues or natural disasters qualified as such by the competent authorities.[88]

98.    The GSE Agreements were similar to those under *Conto* II and provided, in relevant part, as follows:

> **Article 1**
> *Purpose of the Agreement*

> This Agreement concerns the recognition to the *Soggetto Responsabile* by the GSE, of the incentive tariff related to the electricity produced through photovoltaic conversion from solar power by the plant mentioned in the introduction, incentivised pursuant to art. 7 of Legislative Decree 387/03 of the Ministerial Decree dated 6 August 2010 and AEEG resolution ARG/elt 181.10

> **Article 2**
> *Effective date and value of the incentive*

> The incentive tariff to be granted to the photovoltaic plant under this Agreement, which is constant in current currency, is equal to 0.3130 Euro/kWh, a value recognised by the GSE and disclosed to the *Soggetto Responsabile* with the communication of admission to the incentive tariffs.

---

[87]    *Conto* III: C-145, Art. 8. *See* Claimants' Opening Presentation, Slide 48. *See also* the GSE's Summary for *Conto* III published on the GSE website: C-146; the AAEG's measures implementing *Conto* III: AEEG, Deliberazione 20 October 2010/AIG/ELT181/10: C-147, Art. 11. *See also* AEEG Investigation, Indagine Conoscitiva Sulla Strategia Energética Nazionale, 20 October 2010: C-148, p. 24.

[88]    Piazza Armerina GSE Incentive Tariff Confirmation Letter, 8 November 2011 ("**Piazza Armerina Tariff Confirmation Letter**"): C-303. As under the previous *Contos*, the confirmation letters under *Conto* III went on to detail the process required for entry into an agreement with the GSE.

**Article 4**
*Incentive tariffs payment*

The payment of the incentive tariffs shall be made by the GSE according to the procedures set forth in AEEG resolution ARG/elt 181/10.

…

**Article 10**
*Effective date and duration of the Agreement*

This Agreement is effective from 29/04/2011 and expires on 28/04/2031.

…

**Article 13**
*Jurisdiction*

For any dispute arising out of or in any way connected to the interpretation and execution of this Agreement and the documents referred to therein, the Parties agree on the exclusive jurisdiction of the Court of Rome.

**Article 14**
*Formalisation of the Agreement*

For the purposes of formalising the Agreement, the *Soggetto Responsabile* is required to print the relevant Declaration of Acceptance and send it to the GSE through the online portal duly signed, together with a copy of a valid identification document.

This Agreement is formalised at the time that the GSE proceeds with the acceptance of the aforementioned Declaration, providing a copy of the agreement on its electronic portal, signed by its legal representative.

**Article 15**
*Amendments and other*

Any agreements modifying or integrating the content of this Agreement subsequent to the date on which the agreement signed by the GSE is made available must be agreed upon in writing, otherwise being null and void.[89]

99.  As in the case of the previous *Conto Energia* Decrees, the Respondent promoted *Conto* III by way of presentations of the MED, the Ministry of Foreign Affairs and other government bodies and public entities.[90]

---

[89]  Piazza Armerina GSE Agreement No. 005M27423207 ("**Piazza Armerina GSE Agreement**"): C-304.

[90]  *See* Claimants' Memorial, ¶ 123 and the sources cited therein (notably, presentations and publications by the GSE). *See*, *e.g.*, GSE's Guide to *Conto* III, Il Terzo *Conto Energia* – Guida alla richiesta degli incentive par gli impinti fotovoltaici D.M. 6 Agosto 2010, 24 January 2011: C-159, p. 7, which provided in part, as follows "The electricity

100.    *Conto* III was successful in attracting significant investment. In January 2011, it was reported that Italy had achieved 4.5 GW in new PV installations in 2010.[91]

101.    On 4 June 2010, Italy adopted Law No. 96, which established the guiding criteria for the implementation of the 2009 EC Directive on the promotion of the use of energy from renewable resources. On 3 March 2011, Italy implemented the 2009 EC Directive by way of Legislative Decree No. 28/2011, known as the "***Romani* Decree**."[92]

102.    The *Romani* Decree contemplated, amongst other things, gradual regulatory monitoring and controls of tariff rates to account for cost reductions in PV technology and to reduce costs of electricity for consumers, while "protect[ing] the investments made."[93] The Decree read, in relevant part, as follows:

> **Article 23 General principles**
> **In effect starting March 29, 2011**
>
> 1. This Title redefines the regulation of the support schemes applied to the energy produced by renewable sources and to energy efficiency by means of rearrangement and enhancement of the current incentive systems. The new regulations establish a general framework aimed at promoting the production of energy from renewable sources and of energy efficiency in a measure that is appropriate to allow achievement of the objective of which in Article 3, by means of the preparation of criteria and tools that promote the efficacy, efficiency, simplification and stability over time of the incentive systems, pursuing, at the same time, harmonization with other tools having analogous objectives and the reduction of the specific support costs charged to the consumers.
>
> 2. The gradualness of the intervention to protect the investments made and the proportionality in relation to the objectives, as well as the flexibility of the structure of the support schemes, are further general principles of the rearrangement and enhancement intervention of the incentive systems, having the purpose of taking into account market mechanisms and technological evolution of renewable power sources and of energy efficiency.
>
> …

---

produced by the plants is boosted [incentivised] from the date of entry into operation for a period of 20 years and the rate is constant in currency for the whole period of stimulation [incentivization]" (emphasis in English translation omitted).

[91]    Ernst & Young Press Report "Renewable Energy Country Attractiveness Indices," May 2011: C-164, p. 2.

[92]    *Romani* Decree: C-165.

[93]    *Romani* Decree: C-165, Arts. 23.1, 23.2.

**Article 24 Incentive mechanisms**
**In effect starting March 29, 2011**

1. The production of electric energy from power plants powered by renewable energy that started up after December 31, 2012 is incentivized by means of tools and on the basis of the general criteria of which in paragraph 2 and of the specific criteria of which in paragraphs 3 and 4. The safeguard of production that has not received an incentive is carried out with the tools of which in paragraph 8.

2. The production of electric energy from the power plants of which in paragraph 1 is incentivized on the basis of the following general criteria:

   a) the incentive has the purpose of ensuring a fair remuneration of the investment and operational costs;

   b) the period for which a right to the incentive is given is equal to the average conventional useful life of the specific type of power plant and runs from the start-up date of the same;

   c) the incentive remains constant for the entire period for which the right to the incentive is given and can take into account the economic value of the energy produced;

   d) the incentives are assigned by means of private law contracts between GSE and the party who is responsible for the power plant, on the basis of a model contract defined by the Authority for Electric Energy and Gas, within three months of the date of effectiveness of the first of the decrees of which in paragraph 5;

   e) without prejudice to that foreseen in letter i) of this paragraph and of letter c) of paragraph 5, the incentive is exclusively attributed to the production from new power plants, including herein those realized following full reconstruction, from repowered power plants, applicable only to additional production capability, and from hybrid power plants, applicable only to the share of energy produced by renewable sources.

**Article 25 Transitory provisions and abrogations**
**In effect starting June 22, 2013**

…

9. The provisions of the *decree of the Ministry of Economic Development of August 6, 2010*, published in the Official Gazette No. 197 of August 24, 2010, are applied to the production of electric energy from photovoltaic solar power plants that start up before May 31, 2011.

10. Without prejudice to that foreseen in *Article 2-sexies of Law-Decree No. 3 of January 25, 2010*, converted, with amendments, by *Law No. 41 of March 22, 2010*, the incentivization of the production of electric energy from photovoltaic solar power plants that start up after the deadline of which in paragraph 9 is regulated by the decree of the Ministry of Economic Development, to be adopted, together with the Ministry of the Environment and of the Protection of the Sea, after having heard the Unified Conference of which in *Article 8 of Legislative Decree No. 281 of August 28, 1997, within April 30, 2011*, on the basis of the following principles:

a) determination of a cumulative annual electric power limit of the photovoltaic power plants that can obtain the incentive rates;

b) determination of the incentive rates taking into account the reduction of technological and power plant costs and of the incentives applied in the Member States of the European Union;

c) prediction of incentivizing tariffs and of differentiated shares on the basis of the nature of the surrounding area;

d) application of the provisions of *Article 7 of Legislative Decree No. 387 of December 29, 2003*, in as much as the same are compatible with this paragraph.[94]

103.   The *Romani* Decree changed the mechanics of *Conto* III by limiting availability of the *Conto* III tariffs to PV plants that were connected to the grid by 31 May 2011 (rather than by 31 December 2013, as originally provided under *Conto* III). The Decree also required the MED to enact a new decree establishing revised incentive tariffs for PV plants connected to the grid after 31 May 2011.[95]

### (4)   *Conto* IV

104.   On 5 May 2011, as required by the *Romani* Decree, the MED enacted *Conto* IV.[96] The Decree noted that "grid parity" (when PV plants compete with other market players without subsidy support) would be achieved in a few years, and then the incentive schemes would no longer be necessary.[97] *Conto* IV provided, in relevant part, as follows:

**Article 1.**

2. … this Decree applies to photovoltaic plants operational at a date subsequent to 31 May 2011 and up until 31 December 2016, with a national indicative target of 23,000 MW, corresponding to a yearly indicative cumulative cost for the incentives which is estimated between 6 and 7 billion euros.

…

---

[94]   *Romani* Decree: C-165, Arts. 23.1, 23.2, 24.1, 24.2, 25.9, 25.10. The Decree also required the MED to enact a new decree establishing revised incentive tariffs for PV plants connected to the grid after 31 May 2011: *Romani* Decree: C-165, Art. 25.10.

[95]   *Romani* Decree: C-165, Arts. 25.9 and 25.10. The new incentive rates to be established were to take into account the following principles: the establishment of an annual limit on the installed capacity that could benefit from incentive tariffs; determination of incentive tariff rates which would take into account the reduction of the cost of technology and of PV plants and the incentives applied in other member states of the EU.

[96]   Decree of 5 May 2011 of the MED and the MELS: *Conto* IV: C-169.

[97]   *Conto* IV: C-169, Preamble, p. 105.

**Article 12.**

1. For electricity produced by solar photovoltaic plants under this title, the plant operator (*soggetto responsabile*) will be entitled to a tariff identified pursuant to the provisions of annex 5.

2. The tariff is awarded for a period of twenty years commencing from the operational date of the plant and shall remain constant in current currency for the entire incentive period.[98]

105.    *Conto* IV provided that Producers that connected to the grid between 31 May 2011 and 31 December 2016 had the right to receive a specific incentive tariff for 20 years starting from the date of grid connection.[99] The incentive tariffs were different depending on the month in which the plant in question entered into operation. The rates ranged between €0.3440 and €0.1720/kWh. For the 7-month period between June through December of 2011, the rates varied on a monthly basis. For 2012 and 2013, the incentive tariff rates varied by semester.[100] *Conto* IV also stated that a reduced tariff would apply to new plants connected to the grid starting in the second semester of 2013.

106.    *Conto* IV included the following new measures:

- Limits on the amount of incentive tariffs granted to new facilities per semester (*e.g.* €300 million to large facilities), beyond which the incentive tariffs would no longer be available for new facilities during that semester.[101]

- An overall cap on the total PV capacity that could benefit from incentive tariffs and a corresponding cost threshold. The national objective was 23 GW total installed PV capacity, equivalent to €6 to 7 billion for all the *Conto Energia* Decrees incentive tariffs.[102] In other words, the annual cumulative cost for the incentives under all the *Conto Energia* Decrees to date would be capped at an estimated amount between €6 and 7 billion.

---

[98]    *Conto* IV: C-169, Arts. 1(2), 12.

[99]    *Conto* IV: C-169, Arts. 1.2, 12.1, 12.2; Claimants' Memorial, ¶ 132; Hearing Transcript, Day 1, 51:5-7.

[100]    *Conto* IV: C-169, Annex 5; FTI R1, ¶ 5.25. The various tariff rates also depended on the nominal capacity of the plants in question and other technical features.

[101]    *Conto* IV: C-169, Art. 4.

[102]    *Conto* IV: C-169, Art. 1.2.

- The MED was entitled to revise the incentive tariffs for future plans when Italy reached the €6 million threshold, "continuing to foster further sector developments."[103]

107. As under previous *Conto Energia* Decrees, the GSE issued tariff confirmation letters providing that the incentive tariff awarded was for a period of 20 years and that the tariff was constant in current currency throughout the term of 20 years.[104]

108. The GSE agreements entered into under *Conto* IV confirmed the specific applicable incentive rate in constant terms for a period of 20 years.[105]

109. Various Italian authorities, including the GSE, and commentators again promoted the stability of the incentive rates in *Conto* IV in "constant" terms and their 20-year duration.[106]

110. By the end of 2011, Italy had added over 4.3 GW of additional PV capacity under *Conto* IV.[107]

   **(5)**   *Conto* V

111. In accordance with *Conto* IV, because the €6 million threshold had been reached in early 2012, *Conto* V was enacted on 5 July 2012, and entered into force on 27 August 2012.[108] None of the Claimants' investments were subject to *Conto* V, instead qualifying under

---

[103]    *Conto* IV: C-169, Art. 2.3.

[104]    *See*, *e.g.*, Acqua, Aria, Fuoco, Terra, Castel Volturno, and San Tammaro GSE Incentive Tariff Confirmation Letters, 4-5 January 2012, 28 November 2011, 27 April 2012 and 16 April 2012 ("**Acqua et al Tariff Confirmation Letters**"): C-347.

[105]    *See*, *e.g.*, Sample GSE Agreement under *Conto* IV: C-260, Arts. 1, 2, 10, 15. As with the GSE Agreements under the previous *Contos*, this GSE Agreement required any modifications of the Agreement to be made in writing.

[106]    Claimants' Memorial, ¶¶ 135-137 and the sources cited at fns. 216-228. Notably, the GSE confirmed in a series of reports and presentations that the incentives under *Conto* IV were for a period of 20 years in constant currency for the duration of the incentive period. *See*, *e.g.*, GSE, Guide to *Conto* IV, "Regole applicative per il riconoscimento delle tariffe incentivanti previste dal DM 5 maggio 2011," 15 July 2011: C-176; GSE, Annual Activity Report on Solar Sector, "Rapporto statistico 2010 – solare fotovoltaico," 3 October 2011: C-178, p. 31; Presidenza del Consiglio dei Ministri - Conferenza Unificata, Minutes no. 9/2012, 6 June 2012: C-199, p. 90; GSE, Webpage "GSE FAQ Section on *Conto Energia* Mechanism," 17 October 2011: C-181, p. 19.

[107]    GSE, PV Support Results, "Plants that Begin Operating in 2011 (Fourth *Conto Energia*) (Impianti entrati in esercizio nel 2011 (Quarto *Conto Energia*)):" C-040; Claimants' Memorial, ¶ 137.

[108]    Decree, 5 July 2012, MED and MELS, published in Italian Official Gazette No. 159, 7 July 2012 (entered into force on 27 August 2012) ("**Conto V**"): Claimants' Memorial, ¶¶ 138-148.

*Contos* II-IV. It is nonetheless relevant to the background of the dispute to set out how the scheme evolved under the final *Conto Energia* Decree.

112. *Conto* V contained two different incentive regimes based on the PV plants' capacity:

- It made available to plants with capacity of up to one (1) MW an "all-inclusive tariff" (both the price of the electricity and the value of the incentive with a further specific tariff for any self-consumed quantity of energy);[109] and

- It made available to plants exceeding a capacity of one (1) MW an amount equal to the difference (if positive) between the all-inclusive tariff mentioned above and the market price of electricity, plus the revenues derived from the sale of the energy to the market.[110] Therefore, the value of the incentive component varied depending on the market price (*i.e.* if the price of electricity rose, the incentive value decreased and *vice versa*).

113. Regardless of a plant's capacity, *Conto* V provided a bonus tariff on the electricity the operator produced and consumed, which would constitute revenue in addition to the savings that the Producer had from generating its own electricity.[111]

114. *Conto* V simplified access to the incentive tariffs for underdeveloped plants whose development needed to be further incentivized given their cost.[112] Other plants could access the *Conto* V incentives by applying to a registry that was capped in phases corresponding to the total cost.[113]

---

[109]     *Conto* V, Arts. 5.1, 5.4. For end users the existence of all-inclusive tariffs was meant to reduce the costs related to the support scheme. Moreover, this mechanism was aimed at avoiding market distortions under the previous regimes where the value of the incentive tariffs was stable regardless of the price of energy; Claimants' Memorial, ¶ 141. *See also* FTI R1, ¶¶ 5.26-5.27.

[110]     *Ibid.*

[111]     Claimants' Memorial, ¶ 142.

[112]     Presidenza del Consiglio dei Ministri - Conferenza Unificata, Minutes No. 9/2012 of 6 June 2012: C-199, pp. 17-19; Qualenergia Website, article "*Conto Energia* fotovoltaico, ecco come dovrebbecambiare," 7 June 2012: C-200; Claimants' Memorial, ¶ 143.

[113]     Claimants' Memorial, ¶ 143.

115.    Again, the GSE Agreements confirmed the specific applicable tariff rate constant in current currency for a period of 20 years.[114]

116.    Although *Conto* V maintained the provision common in the other *Conto Energia* Decrees that any modifications were required to be made in writing by the Parties, it added a new provision permitting the GSE to unilaterally modify the terms of the Agreement:

> GSE retains the right to unilaterally modify the clauses of the present Agreement which, as a result of any legislative and regulatory amendments are in contrast with the existing framework. These modifications shall be communicated by GSE to the *Soggetto Responsabile* through the electronic portal, not withstanding the possibility for the *Soggetto Responsabile* to withdraw from the present contractual relationship in conformity with provisions of Article 13 above.[115]

117.    Again, the GSE promoted the stability of the incentive rates in *Conto* V and their 20-year duration.[116]

118.    Article 10 of *Conto* V introduced a new administrative management fee on PV Producers who benefited from incentive tariffs under *Conto* V and the previous *Conto Energia* Decrees effective 1 January 2013 ("**Administration Fee**"). The Administration Fee was said to cover "GSE Management costs and the cost of checks and controls by GSE"[117] and was equivalent to €0.0005/kWh of incentivised energy.[118] The Fee could be directly off-set against the incentive tariffs paid to Producers under the *Conto Energia* Decrees but was applied against the GSE's first payment of incentive tariffs to a Producer in a given year.[119]

119.    *Conto* V provided that it would cease to apply 30 days after the AEEG issued a resolution announcing that the Respondent had added €700 million to the total annual cost of the incentive tariffs program, thereby bringing the grand total of all the *Conto Energia* Decrees incentives to €6.7 billion.[120] On 6 June 2013, the AEEG issued a resolution advising that the total cost of the incentive tariffs program had reached the threshold of €6.7 billion and

---

[114]    Sample GSE Agreement under *Conto* V: C-246, Arts. 1, 2, 4.1.

[115]    Sample GSE Agreement under *Conto* V: C-246, Art. 17.3.

[116]    Claimants' Memorial, ¶¶ 145-147 and the sources cited at fns. 241-243.

[117]    *Conto* V: C-195, Art. 10.4.

[118]    Claimants' Memorial, ¶ 218; Respondent's Counter-Memorial, ¶ 404.

[119]    GSE Website (2013): C-247, p. 1; Claimants' Memorial, ¶ 219.

[120]    *Conto* V, Art. 1.5; Claimants' Memorial, ¶ 148.

that, as of 6 July 2013, *Conto* V would cease to apply.[121] Accordingly, as of that date, no incentive tariffs were available to any new PV plant installed and connected to the electricity grid.

120. On 5 July 2012, the AEEG adopted Resolution No. 281, which required renewable energy Producers to pay imbalance costs as of 1 January 2013 ("**Imbalance Costs**").[122]

### a.   *Minimum Guaranteed Prices under the Off-Take Regime*

121. In addition to the incentive tariffs in the *Conto Energia* Decrees, in 2007, through Legislative Decree No. 387/2003, the Respondent also implemented an "**Off-Take Regime**" to support certain renewable energy facilities that had difficulties competing with traditional energy Producers, namely those under 1 MW.[123]

122. It appears that "**Minimum Guaranteed Prices**" or "**MGP**" were first introduced by the AEEG by way of Resolution No. 34/05.[124] The Resolution did not distinguish between renewable energy sources and Producers.

123. The Off-Take regime mandated grid managers, if requested by a Producer, to purchase all electricity fed into the grid for an established price per kWh[125] from renewable energy plants that Italy deemed "were not in a condition to participate in the market due to their high costs and technological immaturity."[126] The Regime initially concerned the first two million kWh of electricity produced by plants fuelled by "non-programmable" sources such

---

[121]     AEEG Resolution No. 250/2013, 6 June 2013: C-252.

[122]     AEEG Resolution No. 281/2012/R/EFR, 5 July 2012: C-233. By way of Resolution No. 493/2012, the method by which the Imbalance Costs would apply to producers was implemented: *see* AEEG Resolution No. 493/2012/R/EFR, 22 November 2012 ("**AEG Resolution No. 493/2012**"): C-234.

[123]     Legislative Decree No. 387/2003: C-036, Art. 13(3) and (4); Respondent's Counter-Memorial, ¶ 350; Claimants' Memorial, ¶¶ 149-160; Respondent's Counter-Memorial, ¶¶ 340-370 (*especially* ¶ 347); Documents for consultation proposing a regime for the "ritiro," 20 October 2004: C-379, p. 13, § 1, ¶ 1.4.

[124]     AEEG Resolution No. 34/2005 and Annex: C-381.

[125]     The "hourly zonal price" was determined daily as a result of negotiations within the Italian Power Exchange ("**IPEX**"); Claimants' Memorial, ¶ 152.

[126]     Claimants' Memorial, ¶ 149. *See* AEEG Consultation for consultation proposing a regime for the "ritiro," 20 October 2004: C-379, § 1, ¶ 1.1, p. 4.

as solar below 10 MW of capacity.[127] This was subsequently narrowed to one (1) MW.[128] The purpose of the Off-Take Regime was to cover the relatively higher operating overhead that smaller facilities experience and ensure their survival by ensuring a minimum level of remuneration independent of the PV electricity market.[129]

124.    After deliberations and consultations in 2006, Resolution No. 34/2005 was replaced by Resolution No. 280/2007.[130]

125.    AEEG Resolution No. 280/2007 provided in relevant part as follows:

> **Italian Regulatory Authority for Electricity Gas and Water**
> **At the meeting of 6 November 2007**
>
> … **Whereas**:
>
> - Article 13, para 3 and 4 legislative decree no. 387/03 and para 41 of law 239/04 provide for the Authority to define, by taking into account market conditions and prices, the terms and conditions for the purchase, by the operator of the grid the relevant plant is connected thereto, of the electricity generated:
>
>   o   by plants with a capacity lower than 10 MW;
>
>   o   by plants, notwithstanding the capacity thereof, based on wind, solar, geothermal, waive [*sic*] power, tidal and hydro, the latter limited to water flowing plants;
>
>   o   as per article 3, para 12, second sentence, legislative decree no. 79/99 [*Bersani* Decree], except for the energy sold to the GSE according to the existing agreements under Cip no. 15/89, no. 34/90, no. 6/92, as well as resolution no. 108/97, limited to newly realized, repowered or revamped plants, as defined at article 1 and 4 of the resolution at issue, until expiration thereof;
>
> …
>
> **RESOLVES**

---

[127]    Claimants' Memorial, ¶¶ 149-150, 153.

[128]    AEEG Resolution No. 34/2005 and Annex: C-381, Art. 5, Preamble.

[129]    Hearing Transcript, Day 1, 15:2-7, 15:12-16; Respondent's Counter-Memorial, ¶ 347.

[130]    Respondent's Counter-Memorial, ¶¶ 350-353. AEEG Resolution No. 280/2007, Annex A: C-382A.

> 1. to approve the terms and conditions for the purchase of the electricity generated as per article 13, para 3 and 4 of legislative decree 29 December 2003, no. 387, and para 41 of law 23 August 2004, no. 239, as specified in Annex A hereto; …[131]

126.    Annex A to AEEG Resolution No. 280/2007 provided, in relevant part, as follows:

> **Annex A**
>
> **TERMS AND CONDITIONS FOR THE PURCHASE OF THE ELECTRICITY GENERATED AS PER ARTICLE 13, PARA 3 AND 4 OF LEGISLATIVE DECREE 29 DECEMBER 2003, NO. 387, AND PARA 41 OF LAW 23 AUGUST 2004, NO. 239**
>
> **SECTION I**
>
> **Article 1**
> *Definitions*
>
> …
>
> **Article 2**
> *Scope and purpose*
>
> 2.1. This document set forth the terms and conditions for the purchase of the electricity generated by plants pursuant to article 13, para 3 and 4 of legislative decree 29 December 2003, no. 387, and para 41 of law 23 August 2004, no. 239.
>
> 2.2. The provisions herein are aimed at ensuring indirect access to the market according to the principle of procedural simplification, certainty of conditions, transparency, non-discrimination, taking into account what [is] provided under article 13, para 3 and 4 of legislative decree 387/03 and para 41 of law 239/04.
>
> …
>
> **SECTION III**
> **Economic conditions of the off-take regime**
>
> **Article 6**
> *Off-take regime prices*
>
> 6.1. For the electricity generated by plants pursuant to article 13, para 3 and 4 of legislative decree no. 387/03 and para 41 of law no. 239/04, the GSE recognizes the energy producer the price established by article 30, para 30.4, let. b) of AEEG resolution no. 111/06.
>
> **Article 7**
> *Minimum guaranteed prices*
>
> 7.1. The Authority sets the minimum guaranteed prices under the off-take regime with reference to the electricity generated and annually injected into the grid by up to 1 MW hydro power plants and plants based on other renewable energy

---

[131]    AEEG Resolution No. 280/2007, Annex A: C-382A.

sources with a capacity up to 1 MW, with the exclusion of hybrid facilities. Minimum guaranteed prices are differentiated according to the relevant source, based on progressive [energy] thresholds and related to the relevant sola[r] year.

7.2. Minimum guaranteed prices referred to above, are paid by the GSE upon request of the relevant producer at the signing date of the off-take regime agreement and as alternative to the prices provided for in article 6 of this document; the minimum guaranteed prices are paid limited to the first two (2) million of kWh injected into the grid …[132]

127.  Pursuant to Resolution No. 280/2007, the AEEG established the conditions of the Off-Take Regime and the GSE served as the commercial intermediary between the producers qualifying for the MGP and the market.[133] This was done by way of separate agreements between Producers and the GSE (the "**GSE Off-Take Agreements**").[134]

128.  Pursuant to the terms of Resolution No. 280/2007, eligible producers wishing to benefit from the MGP under the Off-Take regime were required to enter into the Off-Take Agreements with the GSE for the purchase of their electricity at the Minimum Guaranteed Prices. The Off-Take Agreements read, in relevant part, as follows:

**OFF-TAKE REGIME AGREEMENT …**

**Article 1**
**Scope of the Agreement**

This Agreement provides for the regulation of the technical and economic conditions for the offtake, by the GSE, upon request of the Producer, of the electricity generated and injected into the grid by the plant mentioned in the preamble of this Agreement, pursuant to art. 13, para 3 and 4 of Legislative Decree 387/03 and art. 1, para 41 of Law 239/04, as well as of the economic terms related to the transport and dispatching services at delivery point.

---

[132]    AEEG Resolution No. 280/2007, Annex A: C-382A, Art. 7.4 provided that if the hourly zonal prices in the market were greater than the MGP, the GSE was required to pay the difference to the producers. The Resolution also specified that if, at the end of each calendar year, the product of the Guaranteed Minimum Prices and the quantity of electricity provided was lower than the product of the hourly zonal priced and the same quantity of electricity, the GSE would allocate by billing adjustment, the higher hourly zonal prices. According to the Respondent, this was to prevent the guaranteed minimum prices from becoming disadvantageous as compared to electricity market prices: Respondent's Counter-Memorial, ¶ 353, fn. 147.

[133]    Claimants' Memorial, ¶¶ 151-152, 154, 156; Respondent's Counter-Memorial, ¶¶ 342-343. AEEG set out the principles of the Off-Take Regime by Resolution No. 34/2005: C-381, as amended by Resolution No. 280/2007, which is currently in force.

[134]    The Off-Take Regime Agreements for the Claimants' eligible plants were submitted in evidence at C-312, C-313 and C-439 (over 300 Agreements).

**Article 2**
**Delivery of electricity to the GSE**

The electricity under this Agreement corresponds to the overall quantity of electricity injected into the grid, equal to the gross energy generated by the plant, net of any amount used for ancillary services, factory (if any), self-consumption, energy transformation and power line losses from the productive unit to the grid connection point and net of any amount of energy sold under the multi-year agreements referred to in art. 13, para 3 and 4 of legislative decree 387/03 and art. 1, para 41 Law 239/04. The electricity at issue is deemed delivered to the GSE at the grid connection point falling within the care of Enel Distribuzione S.p.A., located in the Municipality of BRINDISI (BR) nominal voltage 20 kV.

…

**Article 4**
**Off-take regime prices and coverage of the GSE costs for the access to the off-take regime**

The prices recognized by the GSE to the Producer for the offtake of the energy under this Agreement are established under articles 6 and 7 of AEEG resolution no. 280/07 and subsequent amendments and integration thereof.

The contribution due by the Producer to the GSE as coverage of the administrative costs bore for the access to the off-take regime are defined under art. 4, para 2, let. e) of AEEG resolution n. 280/07 as subsequent amended and integrated.

**Article 5**
**Consideration for the transmission service**

The consideration for the transmission service is regulated between the Producer and the GSE pursuant to art. 4, para 2, let. b) of AEEG resolution n. 280/07 and subsequent amendments and integrations.

**Article 6**
**Unbalancing costs for plants based on programmable renewable energy sources**

For plants based on programmable renewable energy sources the unbalancing costs are regulated between the Producer and the GSE pursuant to article 8 of AEEG resolution n. 280/07.

…

**Article 13**
**Effectiveness of this Agreement**

This Agreement is effective from 24/05/2011 and is automatically renewed each year save what provided under art. 14 below or except in case of termination by the Producer to be notified to the GSE by way of registered mail at least 60 days in advance.

In case of early termination before the year, the GSE may execute a new Agreement for the energy offtake only in the year following the one when termination has occurred.

**Article 14**
**Termination, withdrawal and suspension of the Agreement**

This Agreement will be automatically terminated and no more effective between the parties should the Producer be in breach of art. 10 law n. 575/1965 as subsequently amended and supplemented.

In case of non-compliance with the obligations provided in this Agreement, modifications and/or integration of the authorizations necessary for the operation of the plant, judicial challenges to the authorization title or measures adopted by the competent authorities affecting the availability and/or functioning and/or productivity of the plant, the GSE retains the right to suspend the effectiveness of this Agreement, as well as withdraw from the contract, without prejudice to its right to ask for damages and recover, even by offsetting Parties mutual debts and credits, that unduly received by the Producer.

According to paragraph 6 of AEEG ARG/elt 4/10 Resolution, the GSE retains the right to terminate the agreements executed by the producer concerning the productive units as per paragraph 5 of AEEG ARG/elt 4/10 Resolution, should the producer fail to comply with the provisions therein.

The Producer may withdraw from this Agreement anytime upon prior written notice to be sent through registered letter at least 60 days in advance. In order to calculate such term, the date on the registered letter will be taken into consideration.

Should one of the conditions to benefit from the off-take regime cease to exist, this Agreement is automatically terminated pursuant to art. 1456 of the Italian Civil Code.

**Article 15**
**Jurisdiction**

For any dispute deriving from or anyway related to the interpretation and/or the performance of this Agreement and measures referred to herein, the Parties agree on the exclusive jurisdiction of the court of Rome

**Article 16**
**Amendments and other**

The preamble to this Agreement is included as part of this Agreement.

For what not expressly provided for in this agreement, the Parties refer to the provisions of AEEG resolution n. 280/07 and rules on connection to the grid and electricity measurement and, as applicable the provisions of the Italian Civil Code.

The GSE retains the right to modify the provisions of this Agreement consistently with any modifications and integrations made to AEEG resolution 280/07, without prejudice to the right of the Producer to terminate this contractual relationship according to article 14 above.

> The Producer acknowledges that any declaration made under this Agreement and in connection with the activities/obligations related to the performance thereof are made pursuant to the Decree of the President of the Republic (D.P.R.) 445/00.[135]

129. AEEG Resolution No. 280/2007 entered into force on 1 January 2008. From that point forward, the MGP were revised each year by the AEEG and differentiated by renewable energy source (solar, wind, hydro, etc.), after analysis of generation costs. The minimum prices were established in "tranches" on the basis of the energy produced. The MGP for PV plants from 2008 through 2013 were as follows:[136]

| Quantità di energia elettrica ritirata su base annua | Solare fotovoltaica | | | | | |
|---|---|---|---|---|---|---|
| | Anno 2008 | Anno 2009 | Anno 2010 | Anno 2011 | Anno 2012 | Anno 2013 |
| | [€/MWh] | [€/MWh] | [€/MWh] | [€/MWh] | [€/MWh] | [€/MWh] |
| fino a 3.750 kWh | 98,0 | 101,1 | 101,8 | 103,4 | 102,7 | 105,8 |
| oltre 3.750 kWh e fino a 25.000 kWh | 98,0 | 101,1 | 101,8 | 103,4 | 92,4 | 95,2 |
| oltre 25.000 kWh e fino a 500.000 kWh | 98,0 | 101,1 | 101,8 | 103,4 | 78,3 | 80,6 |
| oltre 500.000 kWh e fino a 1.000.000 kWh | 82,6 | 85,2 | 85,8 | 87,2 | 78,3 | 80,6 |
| oltre 1.000.000 kWh e fino a 2.000.000 kWh | 72,2 | 74,5 | 75,0 | 76,2 | 78,3 | 80,6 |

130. The 2011 *Romani* Decree contained a provision concerning the MGP,[137] which was initially interpreted as eliminating the MGP for those plants that also received tariffs under the *Conto Energia* Decrees. However, the AEEG determined that this was not the case and did not reduce the scope of application of MGPs to those facilities already in operation and that the provisions of the *Romani* Decree in question "seems to refer to new incentivizing instruments to be defined with effects as of 2013."[138] Accordingly, plants under 1 MW that received *Conto* tariffs established prior to 2013 could still benefit from both those and the Minimum Guaranteed Prices in the Off-Take Regime.[139]

---

[135]    Brindisi GSE Off-Take Agreement, 12 August 2011 ("**Brindisi Off-Take Agreement**"): C-312.

[136]    AEEG, Document for public consultation No. 486, 31 October 2013: C-383, p. 7; Claimants' Memorial, ¶ 157.

[137]    *Romani* Decree: C-165, Art. 24.8: "by 31 December 2012, on the basis of the [MED's] guidelines, the [AEEG] defines the Minimum Guaranteed Prices, that is the integration of the revenues deriving from the participation in the electric market, in relation to the production of renewable energy systems which continue to be operated without incentives and for which ... the production's safeguard is not ensured by the participation to the market."

[138]    AEEG Resolution No. 103/2011, 28 July 2011: C-263, p 7; Claimants' Memorial, ¶ 159.

[139]    Claimants' Memorial, ¶ 160.

## B.    THE CLAIMANTS' INVESTMENTS IN THE RESPONDENT'S PV SECTOR

131.    The Claimants are investment funds managed by KGAL Investment Management GmbH & Co. KG ("**KGAL**"), a German investment management company.[140] After making similar investments in Germany and Spain, KGAL decided to establish PV-dedicated investment funds and invest in Italy on the basis of its support schemes for PV facilities.[141]

### (1)    ESPF's Investments in Italy

132.    Based on its assessment of *Contos* I and II, in late 2009 and early 2010, ESPF acquired its first two PV projects: Montalto and Guglionesi.[142] The overall original investment cost was approximately €21 million, which was financed entirely with equity and shareholder loans provided by ESPF's shareholders.[143] These plants entered into operation in October 2010 and April 2011, respectively, and thus qualified under *Conto* II for an incentive tariff of €0.346/kWh.[144]

133.    On 20 December 2010, ESPF added two PV compounds or facilities: Carlino 1 (113 plants) and Carlino 3 (125 plants), for a cost of €18.3 million.[145] These facilities

---

[140]    Claimants' Memorial, ¶¶ 25, 161; Ebner WS1, ¶¶ 2, 7. KGAL organizes and manages low-risk investments intended to generate steady cash flows for investors such as insurance companies and pension funds.

[141]    Claimants' Memorial, ¶ 161; Ebner WS1, ¶¶ 5-18. ESPF and ESPF 2 are investment funds while ICE 5 is a retail fund. The Claimants set out a summary of their various investments at paragraph 210 of their Memorial. The various documents including due diligence reports, purchase or investment agreements, GSE incentive tariff confirmation letters and GSE Agreements were all submitted in evidence.

[142]    Claimants' Memorial, ¶¶ 165, 166. The project developers were SVS Molise S.A.S. di Montalto di Castro S r.l. and SVS Lazio S.A.S. di Montalto di Castro S r.l. ESPF incorporated two *ad hoc* special purpose vehicles named InfraClass Renewables Italia S.r.l. and Montalto di Castro S r.l., which acquired Montalto and Gulgionesi on December 15, 2009 and January 27, 2010, respectively. *See* Claimants' Memorial, ¶¶ 163-164, 166 for the reasons why ESPF decided to invest. In particular, all three Claimants invested based on the understanding, which they explicitly cited in their respective Investment Memoranda and Prospectuses, that "the incentive cannot be retroactively revoked from an authorized, constructed, and connected facility." *See* Claimants' Memorial, ¶¶ 164, 183, 196; ESPF Prospectus, 2009: C-273; ESPF 2 Investment Memorandum, 2 July 2010: C-320; ICE 5 Prospectus, 14 September 2009: C-357.

[143]    Monalto and Guglionesi Shareholder Loans, 28 June 2011: C-281, pp. 3, 17. At the time of the acquisition, the targeted companies had also acquired the land rights over the area for the PV facilities for 20 years, which the Claimants assert is consistent with and in reliance on the timeframe provided under the *Conto Energia* regime. Montalto and Guglionesi Lease and Surface Right Agreements, 15 December 2009 and 25 January 2010: C-282, C-283, Art. 4; Claimants' Memorial, ¶ 168.

[144]    Claimants' Memorial, ¶ 168.

[145]    Claimants' Memorial, ¶¶ 169-171.

entered into operation in April 2011.[146] All of the Carlino 3 plants and 96 of the Carlino 1 plants qualified for an incentive tariff of €0.3460/kWh for 20 years under *Conto* II, and the remaining 17 Carlino 1 plants obtained *Conto* III tariffs of €0.3210/kWh for 20 years.[147] DLA Piper confirmed ESPF's understanding of the applicable tariff rates and duration in a due diligence report in July 2011.[148]

134.    In May 2011, ESPF purchased the Piazza Armerina plant, after it had entered into operation on 29 April 2011 and qualified for an incentive tariff of €0.3130/kWh for 20 years under *Conto* III,[149] which DLA Piper confirmed in its July 2011 due diligence report.[150]

135.    In June 2012, ESPF purchased three additional PV plants – Brindisi Crea and Brindisi Elios (Geosis 1 and 2) – after they had entered into operation in May, February and April 2011, respectively, and qualified for an incentive tariff of €0.3460/kWh for 20 years under *Conto* II.[151] DLA Piper confirmed that these facilities benefited from this tariff in its January 2012 due diligence report.[152]

136.    The GSE Letters and subsequent GSE Agreements explicitly confirmed the applicable incentive tariff rate and duration for each facility.[153]

---

[146]    Claimants' Memorial, ¶ 171.

[147]    Claimants' Memorial, ¶ 172.

[148]    Claimants' Memorial, ¶ 172; DLA Piper, "Legal Due Diligence Report on Five Photovoltaic Projects Built and Operating in Friuli- Venezia-Giulia and Sicily," 19 July 2011 ("**DLA Piper, July 2011 Due Diligence Report**"): C-293, pp. 8-9, 159-161.

[149]    Claimants' Memorial, ¶ 175.

[150]    DLA Piper, July 2011 Due Diligence Report: C-293, pp. 8-9, 159-161.

[151]    Claimants' Memorial, ¶¶ 178-179.

[152]    DLA Piper, "Legal Due Diligence Report on a Portfolio of Five Photovoltaic Projects Developed in Puglia by BP Solar Italia," 31 January 2012, pp. 8, 13-15, 20, 23: C-314; Claimants' Memorial, ¶ 181.

[153]    Claimants' Memorial, ¶¶ 168, 173, 175, 179; Montalto Tariff Confirmation Letter: C-284; Guglionesi GSE Incentive Tariff Confirmation Letter, 30 August 2011 ("**Guglionesi Tariff Confirmation Letter**"): C-285; Montalto GSE Agreement, 28 July 2011 ("**Montalto GSE Agreement**"): C-286, "Considerando," Art. 2; Guglionesi GSE Agreement, 21 October 2011: C-287, "Considerando," Art. 2; *See* Carlino 1 GSE Incentive Tariff Confirmation Letter, September 2011 ("**Carlino 1 Tariff Confirmation Letter**"): C-294; Carlino 3 GSE Incentive Tariff Confirmation Letter, January 2012 ("**Carlino 3 Tariff Confirmation Letter**"): C-295; Carlino 1 GSE Agreement, November 2011 ("**Carlino 1 GSE Agreement**"): C-296; Carlino 3 GSE Agreement, March 2012 ("**Carlino 3 GSE Agreement**"): C-297, "Considerando," Art. 2; Carlino 1 GSE Agreement March 2012: C-298; Piazza Armerina Tariff Confirmation Letter: C-303; Piazza Armerina GSE Agreement: C-304, "Considerando," Arts. 2, 10; Brindisi Crea GSE Agreement No. M02F25663907, Oct. 31, 2011: C-310, "Considerando," Art. 2; Brindisi Elios GSE Agreements No. M03F26153607 and No. M03F26154107, 3 November 2011: C-311, "Considerando," Art. 2.

137.    All the Carlino 1 and 3 plants and Brindisi Crea and Brindisis Elios (Geosis 1 and 2) also benefitted from Minimum Guaranteed Prices under the Off-Take Regime.[154]

138.    By the end of 2012, ESPF had invested over €120 million in these 244 plants, holding an overall capacity of 23 MW.

**(2)    ESPF 2's Investments in Italy**

139.    In May-June 2011, ESPF 2 acquired its five PV plants for €83 million, financed with equity and shareholder loans. The facilities include: Noce Laccu, Ardea, Mezzanotte, Viterbo.[155] These plants entered into operation between April and May 2011, and all qualified under the *Conto* III regime and obtained tariffs of €0.3130/kWh (for Noce Laccu and Mezzanotte), €0.289/kWh (for Ardea), and €0.2970/kWh (for Viterbo) for 20 years.[156]

140.    In August 2011, ESPF 2 acquired a further six PV plants: Aria, Acqua, Terra, Fuoco, Castel Volturno and San Tammaro.[157] These plants entered in operation in August 2011 and all qualified under *Conto* IV. Acqua, Aria, Fuoco and Terra obtained a tariff rate of €0.2380/kWh for 20 years and Castel Volturno and San Tammaro obtained a tariff rate of €0.25/kWh for 20 years.[158] DLA Piper confirmed this information in its due diligence reports.[159]

---

[154]    Claimants' Memorial, ¶ 173 and the sources cited therein.

[155]    Claimants' Memorial, ¶¶ 184, 188.

[156]    Claimants' Memorial, ¶ 186.

[157]    Claimants' Memorial, ¶ 189.

[158]    Claimants' Memorial, ¶ 190; Acqua, Aria, Fuoco, Terra GSE Agreement Nos. L06M247156307, L06M249429407, L06M230620807 and L06M228726307, 8 August 2008: C-348; Castelvolturno GSE Agreement Nos. D04M243194307 and D04M242181307, 14 June and 23 April 2012: C-349; San Tammaro GSE Agreement Nos. D04M242356707, 2 May 2012: C-350.

[159]    Claimants' Memorial, ¶ 192, fn. 309, citing DLA Piper, "Legal Due Diligence Report on a Photovoltaic Project Developed in Campania, Italy named Project Castelvolturno," and DLA Piper Report Annex A, 29 September 2011: C-351; DLA Piper, "Legal Due Diligence Report on Four Photovoltaic Projects Developed in Lazio, Italy named Project Acqua, Aria, Terra and Fuoco" and DLA Piper Report Annex A, 29 September 2011: C-352; DLA Piper, "Legal Due Diligence Report on a Photovoltaic Project Developed in Campania, Italy named Project San Tammaro," and DLA Piper Report Annex A, 29 September 2011: C-353.

141.    The GSE Letters and subsequent GSE Agreements confirmed the applicable incentive tariff rate and duration for each facility.[160]

142.    By the end of 2012, ESPF 2 had invested €168 million in 10 plants, with an overall capacity of 44 MW.[161]

### (3)    ICE 5's Investments in Italy

143.    In 2010-2012, ICE 5 invested in three projects owning 102 PV plants. The first project, consisting of 100 plants, was known as Carlino 2 and was acquired on 20 December 2010. It entered into operation in April 2011.[162] Twenty-five plants qualified for an incentive tariff of €0.3460/kWh for 20 years under *Conto* II, while the other 75 plants obtained a tariff of €0.3210/kWh for 20 years under *Conto* III; all of which was confirmed by DLA Piper in its due diligence report.[163]

144.    ICE 5 also acquired the 10-section Torina plant, which entered into operation in April 2011 and obtained an incentive tariff of €0.3460/kWh for 20 years under *Conto* II.[164]

145.    In September 2012, ICE 5 acquired a PV plant called Ginosa, which had entered into operation in October 2011, and qualified for a tariff of €0.2120/kWh for 20 years under *Conto* IV.[165]

146.    The GSE Letters and subsequent GSE Agreements confirmed the applicable incentive tariff rate and duration for each facility.[166]

147.    By the end of 2012, ICE 5 had invested €110.9 million in 102 plants, with an overall capacity of 22 MW.

---

[160]    Claimants' Memorial, ¶¶ 187, 191 and the sources cited therein.

[161]    Claimants' Memorial, ¶ 195 (¶¶ 193-194 set out additional equity injections by ESPF 2 and loans taken to finance the purchase of the six companies in September 2011).

[162]    Claimants' Memorial, ¶¶ 197-199.

[163]    Claimants' Memorial, ¶ 199; DLA Piper, July 2011 Due Diligence Report: C-293.

[164]    Claimants' Memorial, ¶¶ 201, 204.

[165]    Claimants' Memorial, ¶¶ 207-208.

[166]    Claimants' Memorial, ¶¶ 199, 204, 207 and the sources cited therein.

## C.   THE CHALLENGED MEASURES

148.   The key Challenged Measure is the reduction of the *Conto* incentive tariffs by way of the 2014 *Spalmaincentivi* Decree, discussed below at paragraphs 187-196. The second most important measure, according to the Claimants, is the reduction of the Minimum Guaranteed Prices under the Off-Take Regime, discussed below at paragraphs 158-166. The remaining, more particularized, Challenged Measures include the imposition of Administration Fees and Imbalance Costs, and the failure by Italy to reimburse €437,220 paid on account of the allegedly wrongful "Robin Hood Tax"[167] and €3.7 million in IMU and TASI Charges.[168] The Robin Hood Tax was deemed illegal by the Italian Constitutional Court, with prospective effect from the date of the Court's ruling; while the IMU and TASI Charges resulted from a change in the classification policy in government-issued Circulars which reclassified PV facilities from movable to immovable property.

---

[167]   FTI Q1, ¶ 3.16; Robin Hood F24 Information: RE-188: Four of the Claimants' companies that own the Italian Plants were affected by the Italian constitutional court's ruling that the Robin Hood Tax was unconstitutional. Table 3-2 summarizes the amount of Robin Hood Tax paid by these companies in 2013 and 2014, which were not reimbursed following the Decision. *See also* FTI Q2, ¶ A5-2.3.

| Table 3-2: Robin Hood Tax paid by the companies that own the Italian Plants (EUR) | | |
|---|---|---|
| Company | 2014 | 2015 |
| InfraClass | 0 | 95,185 |
| Carlino 1 | 130,607 | 4,680 |
| Carlino 3 | 19,107 | 0 |
| Albano | 98,905 | 88,736 |
| **Total** | **248,619** | **188,601** |

[168]   FTI Q1, ¶ 3.24; Trial Balances of the companies that own the Italian Plants: RE-097 to RE-146; Agenzia delle Entrate extracts: RE-191 to RE-200; Table setting out expected 2016 IMU and TASI charges: RE-201. Table 3-6 summarizes the total IMU and TASI charges paid by the Claimants between 2013 and 2015, and those expected to be paid by the companies in 2016, following the change in tax regulation. *See also* FTI Q2, ¶ A5-2.3.

| Table 3-6: IMU and TASI Charges paid by and expected to be paid by the Claimants, 2012 to 2016 (EUR thousands) | | | | |
|---|---|---|---|---|
| Company | 2013 | 2014 | 2015 | 2016 |
| ESPF 1 | 438.1 | 478.2 | 489.4 | 78.2 |
| ESPF 2 | 852.6 | 800.6 | 817.1 | 177.5 |
| ICE 5 | 340.7 | 356.0 | 340.9 | 67.0 |
| **Total** | **1,631.4** | **1,634.8** | **1,647.4** | **322.7** |

**(1)      Alleged Reduction of Financial Support to PV Producers (2012-2013)**

149.    In 2012, the Respondent enacted several measures that reduced the level of support to the Claimants' PV plants. The Claimants allege that these measures were wrongful modifications of the incentive tariffs which Italy had guaranteed to plants once they qualified under a particular *Conto*, and therefore violated what they say were the Respondent's commitments of stability and predictability under the ECT, and breached the express terms of the *Conto Energia* Decrees and GSE Agreements.[169] Since their PV plants were already built (and 80-90% capital costs sunk) by the time these measures were implemented, the Claimants contend that they have been forced to continue to operate for less remuneration than what was guaranteed to them by Italy. For the reasons discussed below, Italy denies all of the Claimants' allegations.

150.    The Challenged Measures enacted during the 2012-2013 period, in chronological order, are as follows:

- Administration management fees, which the Claimants assert were not previously envisioned under the *Conto Energia* Decrees;[170]

- A reduction of the Minimum Guaranteed Prices offered to plants under 1 MW under the Off-Take Regime, followed by the abolishment of the right to the Prices for plants over 100 kW;[171]

- A requirement for PV producers to pay Imbalance Costs;[172]

- An alleged failure to resolve domestic complaints regarding:

  o  the "Robin Hood Tax" decision;[173] and

---

[169]    Claimants' Memorial, ¶ 214.

[170]    Claimants' Memorial, ¶ 215, 217-221; Respondent's Counter-Memorial, ¶ 4.

[171]    Claimants' Memorial, ¶¶ 215, 222-233; Respondent's Counter-Memorial, ¶ 4.

[172]    Claimants' Memorial, ¶¶ 215, 234-241; Respondent's Counter-Memorial, ¶ 4.

[173]    Claimants' Memorial, ¶¶ 215, 242-255; Respondent's Counter-Memorial, ¶ 4.

○ the reclassification of PV plants as "immovable property;"[174]

- The reduction of the *Conto* incentive tariffs by the *Spalmaincentivi* Decree.

151. The Claimants allege that the Challenged Measures were a "bait-and-switch" by the Respondent which enticed investment in the renewable sector through promises of support and then reduced or clawed back that support once the investments were made.[175] The Respondent contests the Claimants' "theorem of an intentional 'bait-and-switch'," and argues that there is no direct connection between the Challenged Measures, some of which are "completely extraneous to the support schemes to PV energy sources that are the focus of this dispute."[176]

### a. Administration Fees

152. The Claimants contend that the Administration Fees were an indirect way of reducing the *Conto* incentive tariffs, and resulted in a loss of €1 million.[177]

153. *Conto* V, enacted in June 2012, provided that as of 1 January 2013, all PV producers with incentive tariffs under any *Conto Energia* Decree were required to pay an annual "administrative management fee" corresponding to €0.0005 per kWh of incentivized energy, to cover the GSE's management, verification and control expenses.[178] The Administration Fee could be directly offset against the incentive tariffs paid to Producers under the *Conto Energia* Decrees.[179] However, the GSE later clarified that the Administration Fee would be offset against the GSE's first payment of incentive tariffs to the Producer in a given year.[180]

154. *Conto* V provides that "it is appropriate and fair that those who benefit from the FITs for PV contribute to the coverage of charges for the management of the PV incentive scheme,"

---

[174]    Claimants' Memorial, ¶¶ 215, 242, 256-261; Respondent's Counter-Memorial, ¶ 4.

[175]    Claimants' Memorial, ¶ 216.

[176]    Respondent's Counter-Memorial, ¶ 6.

[177]    FTI Q2, ¶ 215, Table 2-4.

[178]    *Conto* V: C-195, Art. 10.4; Claimants' Memorial, ¶ 218; Respondent's Counter-Memorial, ¶ 404.

[179]    *Conto* V: C-195, Arts. 10.4, 10.6; Claimants' Memorial, ¶ 218.

[180]    GSE Website (2013): C-247, p. 5; Claimants' Memorial, ¶ 219.

particularly in light of Legislative Decree 28/2011, which increased management costs of the GSE's monitoring function over the incentive schemes.[181] Article 10.4 of *Conto* V provided, in relevant part, as follows:

> to cover GSE management costs, and the cost of checks and controls by GSE, the plant operators that access incentive tariffs under this decree and decrees issued in implementation of article 7 of legislative decree no. 387,2003 and article 25(10) of legislative decree No. 28,2011 [the previous energy accounts/*Conto Energia* Decrees] are under an obligation, commencing from 1 January 2013, to pay GSE a contribution of 0.05 euro cents for each kWh of subsidised energy, also by means of offset with incentives owed.[182]

155. The same allocation of costs is provided for in similar language in the *Spalmaincentivi* Decree (LD91/2014) at Article 25(1), which provides, in relevant part, as follows: "charges incurred by the GSE for the conduct of management, audit and control activities related to the incentive and support mechanisms, are to be borne by the beneficiaries of the same activities."[183]

156. In the Claimants' view, the Administration Fee introduced under *Conto* V was "unexpected"[184] and directly reduced the remuneration the Claimants reasonably expected from the fixed tariffs provided for in *Contos* II, III and IV at the time of investing.[185] The Claimants assert that *Conto* I-IV do not provide for such costs.[186] Further, the Claimants point out that while Italy claims that the "GSE recorded total costs" of €36.4 million in 2013, it does not allege that the GSE had difficulty covering its costs in previous years or that the GSE's total costs had increased from previous years. The Claimants state that the Respondent does not disclose *what* the GSE's costs were in previous years, and thus there is no indication that the GSE's costs increased in 2013, thereby meriting the Administration

---

[181]    Respondent's Counter-Memorial, ¶¶ 405-406; *Conto* V: C-195, Recital 22.

[182]    *Conto* V: C-195, Art. 10.4.

[183]    Respondent's Counter-Memorial, ¶ 408; Law Decree No. 91/2014, June 24, 2014, converted into law by Law No. 116/2014, 11 August 2014 ("***Spalmaincentivi* Decree**" or "**LD91/2014**"): C-248, Art. 25(1). Italy notes that Articles 25(2) and (3) provide for a review of the charges by the GSE for the conduct of its management, audit and control activities related to the incentive and support mechanisms. The rates are set by the GSE on the basis of costs, planning and development forecasts for the activities in question: *see* Respondent's Counter-Memorial, ¶ 408, fn. 164.

[184]    Hearing Transcript, Day 1, 57:23-24, 60:2, 9.

[185]    Claimants' Memorial, ¶ 219.

[186]    Claimants' Reply, ¶ 491.

Fee.[187] Further, the Claimants contend that out of the 2,500 inspections carried out in 2013 on PV plants by the GSE, only five percent resulted in a negative outcome for the Producer, thus "it cannot be said that the *need* for these inspections warranted imposing the [A]dministrati[on] [F]ee on PV investors."[188]

157.    The Respondent denies that this measure is a disguised reduction of incentives,[189] but acknowledges that the Administration Fee "implies … [a] loss for each producer, with respect to the overall incentive received."[190] The Respondent's position is that the fee is very low and it was reasonable to impose the Administration Fee on all PV facilities that benefited from the administration of the incentive scheme.[191] The Respondent also states that the fee only applied prospectively as of 1 January 2013.[192]

*(i)    Reduction of Minimum Guaranteed Prices under the Off-Take Regime*

158.    In October 2013, the AEEG issued Consultation Document No. 486 (the "**Consultation Document**"), which set out guidelines and proposals for the redefinition of the Minimum Guaranteed Prices in light of purported changes to the average operating costs for renewable energy facilities.[193]

159.    The new proposed formula for establishing Minimum Guaranteed Prices was based on the purported value of the average operating costs of renewable energy facilities, plus eight percent. The Consultation Document stated that the AEEG would establish the Minimum Guaranteed Price for PV plants at a lower amount, approximately €37.8 per MWh of

---

[187]    Claimants' Reply, ¶ 496.

[188]    Claimants' Reply, ¶ 497 (emphasis in original).

[189]    Respondent's Counter-Memorial, ¶ 405.

[190]    Respondent's Counter-Memorial, ¶¶ 409-410.

[191]    Respondent's Counter-Memorial, ¶ 404. According to the Respondent, the Administration Fee was, at most, to 0.179 of the incentive available under *Conto* V.

[192]    *See, e.g.*, Respondent's Rejoinder, ¶ 79: "this measure did not imply any retroactivity, since it only applied for the future to anyone benefiting of GSE's services as a participant into the incentivization schemes."

[193]    AEEG, Document for public consultation No. 486, 31 October 2013: C-383, p. 9 *et seq*. Stakeholders were invited to submit their comments by 25 November 2013; Claimants' Memorial, ¶ 225.

electricity produced, without any variation based on production output, to be adjusted for inflation each year according to the ISTAT index.[194]

160.    In December 2013, the AEEG issued Resolution No. 618/2013 which established the Minimum Guaranteed Prices for 2014 in line with Consultation Document No. 486.[195] Until that time, the Minimum Guaranteed Prices had ranged from between €72.20/MWh and €105.80/MWh and largely had increased over the previous six years. For 2014, the AEEG established a single Minimum Guaranteed Price of €38.90/MWh — a decrease of between 46 and 63%.[196] The AEEG also decreased the amount of electricity that could benefit from Minimum Guaranteed Prices, from 2 million kWh per year to 1.5 million kWh per year.[197]

161.    The AEEG subsequently established the Minimum Guaranteed Price at €39/MWh for 2015 and 2016.[198] The Claimants point out that the average national electricity price in 2014 and 2015 was approximately €52/MWh.[199]

> (ii) *Amended Destinazione Italia Decree (2014): Abolishment of Minimum Guaranteed Prices for PV plants that Already Benefited from the Conto Incentive Tariffs*

162.    On 23 December 2013, the Respondent enacted the *Destinazione Italia* Decree.[200] The Decree stated that it was enacted to address the increasing costs of electricity bills for end consumers, and proposed that renewable energy producers voluntarily accept a reduction of the incentives that Italy had granted to their facilities, in exchange for an extension from

---

[194]    AEEG, Document for public consultation No. 486, 31 October 2013: C-383, p. 10.

[195]    AEEG Resolution No. 618/2013/R/EFR, 19 December 2013 ("**AEEG Resolution No. 618/2013**"): C-267.

[196]    AEEG's Press Release: C-385G2; Claimants' Memorial, ¶ 226.

[197]    AEEG Resolution No. 618/2013: C-267, p. 10.

[198]    AEEG's Press Releases on the Minimum Guaranteed Prices for 2015 and 2016, published on the AEEG's website on 30 January 2015 and 1 February 2016, respectively (*see* attached tables): C-385; Claimants' Memorial, ¶ 227.

[199]    Claimants' Memorial, ¶ 227.

[200]    Law Decree No. 145/2013, 23 December 2013 ("***Destinazione Italia* Decree**"): C-249, converted into law by Law No. 97/2014, 21 February 2014, Art. 1(3)(b).

20 to 27 years in the duration of the incentives.[201] It also provided that for incentivized renewable facilities, Minimum Guaranteed Prices would be equal to market price.[202]

163.  During the debate over whether to convert the Decree into law, the Claimants point out that AEEG's President warned that the *Destinazione Italia* Decree "would neutralize the goals for which [the Minimum Guaranteed Prices] had been introduced in the first place."[203]

164.  While the original Decree did not apply to the Claimants' PV investments,[204] its conversion law, Law 97/2014 of 21 February 2014, did; it confirmed that the Claimants' PV plants could no longer benefit from both the *Conto* incentive tariffs *and* the Minimum Guaranteed Prices in the Off-Take Regime (with the exception of plants with a capacity below 100 kW).[205] The *Destinazione Italia* Decree narrowed the application of the MGP program from plants with a capacity below 1 MW to plants with a capacity below 100kW, and provided that PV plants could benefit from *either* the *Conto* incentive tariffs *or* the Minimum Guaranteed Prices, but not both.[206]

165.  Therefore, once amended in 2014, the Claimants contend that the *Destinazione Italia* Decree effectively abolished the Minimum Guaranteed Prices for PV plants that already benefited from the *Conto* tariffs (thus, virtually all PV plants).[207] Only plants of a minimal capacity less than 100 kW that also received *Conto* tariffs could continue to benefit from

---

[201]    *Destinazione Italia* Decree: C-249, Art. 1(3)(b); Claimants' Memorial, ¶ 263.

[202]    *Destinazione Italia* Decree: C-249, Art. 1(2); Claimants' Memorial, ¶ 228.

[203]    Chamber of Representatives – Session No. 168, Transcript of the discussion about the so-called *Destinazione Italia* Decree (Allegato 1), 6 February 2014: C-264; Summary of the Chamber of Representative VI and X Committees joint meeting, 30 January 2014: C-386; Senate of the Republic – Session No. 195 (Allegato 2 and 3), Senator Giorno, 19 February 2014: C-266; Claimants' Memorial, ¶ 230.

[204]    Claimants' Memorial, ¶ 263.

[205]    The *Destinazione Italia* Decree was converted into law by Law No. 97/2014, 21 February 2014, Art. 1(3)(b); *Destinazione Italia* Decree: C-249, Art. 1(2).

[206]    Hearing Transcript, Day 1, 59:19-25: Italy "tightened the programme from 1 megaWatts and smaller to essentially 100 [K]iloWatts and smaller, and then it said you can benefit from one but not the other of the *Conto Energia* Decrees or minimum guaranteed prices. So essentially the net effect of that for our clients was it was effectively an abolition of the minimum guaranteed prices."

[207]    Claimants' Memorial, ¶¶ 228, 231.

the Minimum Guaranteed Prices, albeit at the reduced prices established by the AEEG in its Resolution No. 618/2013.[208]

166.   The Claimants further argue that, beginning in 2014, the Respondent reduced the Minimum Guaranteed Price by 52%, which dropped it "well below" the market price.[209] The Claimants contest Italy's explanation that it cut the Prices on the basis of data that the actual operating costs of smaller facilities were lower.[210] The Minimum Guaranteed Price was amended as a result of a study of average electricity production costs. The Respondent says that the Minimum Guaranteed Prices established in 2008 were temporary and that the market was fully aware of this.[211] As a result, the Respondent submits that the reduction in the MGP was reasonable, as it was based on actual operating costs, and was not unexpected.[212]

### *Imbalance Costs*

167.   Imbalance costs result from reserving excess electricity produced.[213] Renewable energy plants tend to increase overall system imbalance because they are non-programmable. Policymakers have a choice of either charging producers imbalance charges or passing them on to consumers.[214] As explained by the Claimants, "imbalance costs are an expected consequence of the addition of substantial PV capacity to an electricity system, which tends to increase imbalance in the system because it cannot be programmed to align production with demand."[215] The Claimants submit that the original framework did not require PV producers to pay imbalance costs (or any penalty) that are assessed to a producer as the

---

[208]   Claimants' Memorial, ¶ 231.

[209]   Hearing Transcript, Day 1, 59:5-13.

[210]   Hearing Transcript, Day 1, 59:5-13.

[211]   Respondent's Rejoinder, ¶¶ 77, 406.

[212]   Respondent's Counter-Memorial, ¶¶ 361-370.

[213]   *See* Claimants' Memorial, ¶ 234 for a more comprehensive explanation.

[214]   Claimants' Memorial, ¶ 235.

[215]   Claimants' Reply, ¶ 492.

difference between what it projects it will put into the grid and what it in fact puts into the grid.[216]

168.    The Parties agree that the Respondent initially chose not to charge imbalance costs to PV producers. Instead, these costs were passed on to consumers via their electricity bills and the AEEG's 2006 Resolution No. 111 had required Producers to provide advance production projections to help Italy's transmission system operator ("**TSO**") balance supply and demand.[217] Resolution No. 111 stated that if a producer deviated from the TSO injection schedules, it would be required to pay imbalance charges equal to the sale price of energy accepted on the day-ahead market, which was typically zero for PV plants since they had no marginal costs.[218]

169.    On 5 July 2012, the AEEG adopted Resolution No. 281/2012, which required renewable energy producers to pay imbalance costs as of 1 January 2013 ("**Imbalance Costs**").[219] By way of its Resolution No. 493/2012, the AEEG implemented the method by which the Imbalance Costs would apply to Producers.[220]

170.    The Claimants assert that *Conto* I-IV do not provide for the payment of Imbalance Costs, and thus they cannot be imposed "midstream" and that these "unexpected"[221] charges amount to a reduction in the *Conto* tariffs.[222] The Claimants maintain that these costs were part of the design of Italy's incentive system and were clearly foreseeable by it and its

---

[216]    Hearing Transcript, Day 1, 60:14-18.

[217]    Annex A to AEG Resolution No. 111/2006, 9 June 2006 ("**AEEG Resolution No. 111/2006**"): C-250, Art. 14.

[218]    Claimants' Memorial, ¶¶ 236-237.

[219]    AEEG Resolution No. 281/2012/R/EFR, 5 July 2012 ("**AEEG Resolution No. 281/2012**"): C-233, p. 6: "…The Authority considers that the treatment today provided for other production units not entitled to participation in the Market for Dispatching Services should apply fully to the production of units powered by non-programmable renewable sources"); p. 10: "It has been considered appropriate to define a first regulation of the dispatching service even for plants powered by non-programmable renewable sources, which is a first step in applying the principle of fair allocation of costs to entities that contribute to generate them."

[220]    AEG Resolution No. 493/2012: C-234.

[221]    Hearing Transcript, Day 1, 60:13.

[222]    Claimants' Reply, ¶ 491.

authorities. They say that "[p]assing those costs on to producers after the fact is just a clever way to reduce the tariff."[223]

171.    Conversely, the Respondent's position is that it was reasonable to impose Imbalance Costs on PV facilities because of the "huge development of non-programmable renewable energy sources" that came to be connected to the grid as a direct result of Italy's incentive programs.[224]

172.    Energy producers immediately challenged Resolution Nos. 281 and 493, and in June 2013, Italy's highest administrative court, the *Consiglio di Stato*, held that the AEEG's two Resolutions were unlawful, since they failed to differentiate amongst different types of renewable energy sources.[225] The Claimants submit that, as a result of that judgment, in many cases the GSE reimbursed the Imbalance Costs that Producers had already paid under the Resolutions.[226]

173.    In October 2014, the AEEG issued Resolution 522, which once again imposed Imbalance Costs, which apply to the PV plants owned and operated by the Claimants' subsidiaries, effective 1 January 2015.[227]

### *Failure to Reimburse Allegedly Wrongfully Imposed Payments*

174.    Two of the Claimants' claims relate to the Respondent's alleged failure to correct measures previously held unlawful or unfair, and its refusal to reimburse the Claimants for payments they made in accordance with those measures.[228] The first concerns Italy's application of its Constitutional Court's decision on a tax known as the Robin Hood tax, in which the Court ruled that Italy need only apply its ruling that the tax was unconstitutional on a going-

---

[223]    Claimants' Reply, ¶ 495.

[224]    Respondent's Counter-Memorial, ¶ 385.

[225]    Decision Consiglio di Stato, Sez. VI, 9 June 2014, Ruling No. 2936: C-235 (confirming the first degree Ruling Nos. 1613/2013, 1614/2013, 1615/2013 and 1616/2013, issued by the first degree administrative court, TAR Lombardia).

[226]    Claimants' Memorial, ¶ 239.

[227]    AEEG Resolution No. 522/2014/R/EEL, 23 October 2014: C-236, pp. 13-14.

[228]    Claimants' Reply, ¶¶ 468-469.

forward (*ex nunc*), rather than retroactive (*ex tunc*), basis. The second involves Italy's reclassification of PV facilities as immovable property, rather than movable property.

### i.    Robin Hood Tax

175.    In 2008, the Respondent enacted a windfall profits tax on the profits of oil, gas and other conventional energy companies (the "**Robin Hood Tax**"), but exempted renewable energy producers.[229] The Robin Hood Tax was implemented by way of an increase in the corporate tax of certain companies. In 2011, the Respondent extended the application of the Robin Hood Tax to all energy producers, including renewable energy producers, with a gross annual income of over €10 million and a taxable income of over €1 million.[230] Italy also increased the corporate income tax rate of companies subject to the Robin Hood Tax from 34% to 38%, which applied to fiscal years 2011 through 2013.[231] This development was met with criticism from an environmental organization, the AEEG, various industry associations, and the Parliamentary Committees for Industry and the Environment.[232]

176.    In June 2013, the Respondent further extended the Robin Hood Tax by reducing the applicable income thresholds to gross annual income over €3 million and taxable income over €300,000.[233] This regulatory change by Italy made the Robin Hood Tax applicable to the Claimants' PV plants.

177.    In February 2015, the Italian Constitutional Court ruled that the extension of the Robin Hood Tax to renewable energy producers was unconstitutional.[234] The Court held that its

---

[229]    Law Decree No. 112/2008, 25 June 2008, converted into law by Law No. 133/2008, 6 August 2008: C-237, Art. 81(16).

[230]    Law Decree No. 138/2011, 13 August 2011, converted into law by Law No. 148, 14 September 2011: C-242, Art. 7.1(a) and (c).

[231]     Law Decree No. 138/2011, 13 August 2011, converted into law by Law No. 148, 14 September 2011: C-242, Art. 7.3.

[232]    Claimants' Memorial, ¶¶ 247-249.

[233]    Law Decree No. 69/2013, 21 June 2013, converted into law by Law No. 98, 9 August 2013: C-222, Art. 5.1.

[234]    Decision No. 10/2015 of the Italian Constitutional Court, 11 February 2015: C-255, p. 16. The Constitutional Court declared the constitutional illegitimacy of Art. 81(16) to (18) of Decree-Law No. 112 of 25 June 2008.

decision would not apply retroactively and that it would only have effect as of the date of its publication.[235]

178.    The Claimants assert that "Italy's failure to fairly apply its court ruling or compensate Claimants for sums paid to Italy under an unconstitutional law is unfair, arbitrary, and a violation of the [ECT]."[236] The Claimants argue that it is unfair and in breach of the ECT for Italy to deem an unlawful measure unconstitutional, but then fail to void that measure *ab initio*, and thereby keep money that it admits it wrongfully took from the Claimants' investments.[237] The Claimants' Italian Constitutional Law expert is of the view that the Constitutional Court's ruling that the decision only apply on a going-forward basis also violates Italian legal principles.[238] The Claimants do not contend that the enactment of the Robin Hood Tax itself violated the ECT; nor do they say they need to, since Italy has itself already declared the tax unconstitutional.[239]

179.    As will be discussed in Section VII, below, Italy argued that the Tribunal has no jurisdiction over the Claimants' Robin Hood Tax claim since it arises from a fiscal or tax measure, which is excluded from the scope of the ECT pursuant to Article 21 of the Treaty. Further, Italy objected that since the decision of the Constitutional Court, and the dispute between the Parties, regarding the Robin Hood Tax occurred *after* the Claimants submitted their Amicable Settlement Letters of June 2014 and March 2015, this Robin Hood Tax claim amounts to a new claim, which is inadmissible because no attempt has been made to resolve it amicably pursuant to Article 26(1) of the ECT.

180.    With respect to the merits of the claim, the Respondent says that the annulment of the Robin Hood Tax by the Constitutional Court did not amount to an acknowledgment by Italy of any infringement of the ECT. It also says that the Court annulled the tax on the

---

[235]    Decision No. 10/2015 of the Italian Constitutional Court, 11 February 2015: C-255, p. 15.

[236]    Claimants' Memorial, ¶ 255.

[237]    Claimants' Reply, ¶ 470.

[238]    First Expert Opinion of Professor Antonio d'Atena, 30 January 2017 ("**D'Atena ER1**"), § 12.

[239]    Claimants' Reply, ¶ 470.

basis that it improperly implemented a corporate tax, rather than implementing an additional contribution linked to windfall profits in the energy sector.[240]

181.  Further, the Respondent says that the Court considered the question of the retroactive effect of its judgment and found it appropriate to limit the application of its decision from the date of its publication going forward (*ex nunc*). Accordingly, the Respondent says that its authorities were required to respect the Court's decision and cannot be said to have acted in bad faith.[241]

## ii.  Reclassification of PV Facilities as "Immovable Property"

182.  Since at least 2007, the Italian Revenue Agency had considered PV plants as movable property, which was subject to higher depreciation rates, and thus lower effective tax rates.[242]

183.  Following a circular issued by Italy's tax authorities in December 2013 (the "**2013 Circular**"), the Respondent reclassified PV plants as immovable property, which had three main effects:[243]

- The applicable depreciation rate for PV plants was reduced from nine percent to a maximum of four percent per year. The lower depreciation rate resulted in higher taxable income of PV plant owners.

- The Claimants' PV facilities became subject to a fee referred to as the "**IMU Charge**," which the local municipality charges on buildings.

---

[240]     Respondent's Counter-Memorial, ¶¶ 427-430.

[241]     Respondent's Counter-Memorial, ¶¶ 431-435; Respondent's Rejoinder, ¶¶ 477-485.

[242]     Claimants' Memorial, ¶¶ 256 *et seq*; Claimants' Reply, ¶ 479; Circular No. 46/E, 19 July 2007: C-226, §§ 9.3(b), 9.2.1.2(b), 9.4; Circular No. 38/E, 11 April 2008: C-227, § 1.5.1; Circular No. 38/E, 23 June 2010: C-216, § 1.8(a).

[243]     Circular No. 36/E, 19 December 2013 ("**2013 Circular**"): C-217, §§ 2.1, 3.1.2; Claimants' Memorial, ¶ 258; Claimants' Reply, ¶ 476.

- The Claimants' PV facilities became subject to another municipal charge known as the "**TASI Charge**," to cover municipal services such as road maintenance and public lighting.

184. The Claimants say that, in response to criticism, the 2016 Budget Law provided that, as of 1 January 2016, the value of certain types of immovable property was to be calculated based on the ground, building and structural elements of the building, without including the value of certain movable elements such as "machinery, devices, equipment and other facilities used in the specific industrial process."[244] The 2016 Budget Law thus reduced the portion of PV facilities that had been deemed to be immovable property.

185. The Claimants allege that the classification of PV facilities in the 2013 Circular as immovable property was arbitrary and inconsistent with the Italian Revenue Agency's classification of these facilities as movable property at the time the relevant investments were made. The Claimants submit that the 2016 Budget Law represents the Respondent's admission of its classification error and is its attempt to correct the most negative effects of the reclassification by allowing PV investors to characterize most of their facilities as "movable" property.[245] The Claimants submit that Italy has taken no steps to compensate them "for the sums wrongfully paid to Italy as a result of its unfair classification and confusing guidance on this point."[246] The Claimants say that while the 2016 Budget Law effectively corrected most of the effect of the 2013 Circular, it did not permit their facilities to offset or otherwise recover the €3.7 million in IMU Charges paid under the "unfair classification" of the 2013 Circular.[247]

186. The Respondent says that any reasonable investor should have known that circulars issued by fiscal authorities are not binding and if an investor wishes to rely on a formal answer or interpretation given by the Italian Revenue Agency, it must make a formal written request for interpretation (an *interpello*). The Claimants did not rely on this procedure and,

---

[244]    Law No. 208/2015, 28 December 2015 ("**2016 Budget Law**"), Art. 1.21: C-256; Claimants' Memorial, ¶ 260.

[245]    Claimants' Reply, ¶ 477. The Claimants state that this is "in line with a sensible understanding of how little equipment comprising a PV plant is actually fixed."

[246]    Claimants' Memorial, ¶ 261; Ebner WS, ¶ 31; Reitz WS, ¶ 11; Claimants' Reply, ¶¶ 477, 484.

[247]    Claimants' Reply, ¶¶ 469, 483; F, Table 6-2.

therefore, no legitimate expectation could arise from their reliance on a tax circular. The Respondent says that the 2013 Circular was issued to respond to questions from operators on the treatment of PV plants for different fiscal and cadastral purposes and provided clarification in line with existing Italian law.[248] Further, the Respondent says that the 2016 Budget Law did not modify the definition of PV plants as either movable or immovable property.[249] Rather, it established a favourable regime which assisted PV energy producers to reduce fiscal payments by allowing them to characterize most of their facilities as "movable property." It also provided an indemnity for municipalities facing a reduced income as a result.[250]

### b. Reduction of the Conto Incentive Tariffs (2014) – Spalmaincentivi Decree

187.   On 24 June 2014, the Respondent enacted Law Decree No. 91 (the "**Spalmaincentivi Decree**"), which purported to "redistribute" or "remodulate" the incentive tariffs granted to PV plants with a maximal capacity above 200 kW under all of the *Conto Energia* Decrees and GSE Agreements, effective 1 January 2015.[251]

188.   The *Spalmaincentivi* Decree provided, in relevant part, as follows:

**Article 23.**

*(Reduction of electricity bills in favor of medium and low voltage served clients)*

1. In order to ensure a more fair allocation of tariffs costs between the different categories of electricity consumers, the lower costs for users deriving from arts. 24 to 30 of this law-decree, to the extent they affect single components of electricity fees, are destined to the reduction of electricity fees of medium and low voltage served clients with a connection power available (*potenza disponibile*) higher than 16.5 other than residential customers and public lighting. (…)

---

[248]   The Respondent's position is that its 2013 Circular and its reclassification was not unexpected or arbitrary. It was merely a fair classification of an issue "that had generated some uncertainty in the market." Respondent's Counter-Memorial, ¶ 442 (emphasis in original). The Claimants counter that this "uncertainty" is the result of the Respondent's inconsistent opinions from its Fiscal Agency and the Cadastral/Land Agency.

[249]   Respondent's Counter-Memorial, ¶ 450.

[250]   Respondent's Counter-Memorial, ¶¶ 450-451; Respondent's Rejoinder, ¶¶ 498-501.

[251]   *Spalmaincentivi* Decree: C-248 (sometimes referred to in the Parties' pleadings as "LD 91"); *see* Art. 26(3): "Starting from 1 January 2015, the incentive tariffs for electrical energy produced by PV plants having a capacity higher than 200 kW is remodulated."

**Article 26.**

*(Interventions on the incentive tariffs for solar electrical energy production)*

1. In order to optimize the management of the timing for the gathering and the disbursement of the incentive tariffs and for the purpose of implementing a better sustainability of the renewable energy support policy, the incentive tariffs for solar electrical energy production, provided pursuant to Article 7 of Legislative Decree no. 387/2003 and Article 25 (10) of Legislative Decree no. 28/2011, are disbursed in accordance with the modalities set out below.

2. Starting from the second semester of 2014, the *Gestore dei Servizi Energetici S.p.A.* (GSE) disburses the incentive tariffs mentioned in paragraph 1 with constant monthly installments amounting to 90% of the estimated yearly average production of each PV plant and pays the balance, in relation to the actual production of electrical energy, within the 30th of June of the following year. The operating modalities will be declined by the GSE no later than 15 days from the publication of this Decree with a ministerial decree to be issued by the Ministry of Economic Development.

3. Starting from 1 January 2015, the incentive tariffs for electrical energy produced by PV plants having a capacity higher than 200 kW is remodulated, upon the producer's choice to be communicated to the GSE no later than 30 November 2014, on the basis of one of the following options:

   a) the incentive tariffs is disbursed for a 24-year period, starting from the of entry into operation of the PV plant, and consequently recalculated pursuant to the percentage of reduction set out in the Table 2 annexed to this Decree *(Note: please refer to the Table below).*

| Residual incentivizing period (Years) | Percentage of reduction of the incentive |
|:---:|:---:|
| 12 | **25%** |
| 13 | **24%** |
| 14 | **22%** |
| 15 | **21%** |
| 16 | **20%** |
| 17 | **19%** |
| 18 | **18%** |
| above 19 | **17%** |

   b) without prejudice to the 20-year long payment, the incentive tariff is remodulated by providing a first period in which a reduced incentive tariff is disbursed and a second period in which the incentive tariffs is equally incremented. The remodulation percentages will be established - with a decree to be issued by the Ministry of Economic Development within 1 October 2014, also on the basis of the competent Italian Energy Authority's

(AEEG) opinion – with the aim of allowing a yearly saving, with respect to the current disbursements and on the assumption of the adhesion of all the producers to this option, of at least € 600 billion for the period 2015-2019;

c) without prejudice to the 20-year long payment, the incentive tariffs is reduced, with respect to the amount granted as of the date of entry into force of this Decree, for all of the residual incentivizing period in accordance to the following percentages:

1) 6% for PV plants having a capacity included within 200 and 500 kW;

2) 7% for PV plants having a capacity included within 500 and 900 kW; and

3) 8% for PV plants having a capacity higher than 900 kW.

In the absence of a communication from the producer, the GSE will apply the option provided under letter (c).

4. In relation to the aggregate tariffs (*Note: the so called tariffe omnicomprensive*) disbursed in accordance to the Ministerial Decree of 5 May 2011 published on the Official Gazette no. 109 of 12 May 2011 *(Note: the so called Fourth Conto Energia)* Ministerial Decree of 5 July 2012, published on the Official Gazette no. 159 of 10 July 2012 *(Note: the so called Fifth Conto Energia),* the reductions provided in the table annexed to this Decree will apply only on the incentivizing component, to be calculated on the basis of the provision set forth by Article 5 (2), second paragraph, of the aforementioned ministerial decree.

5. The recipients of the incentive tariffs mentioned in paragraphs 3 and 4 may access to bank loans amounting up to the difference between the expected incentive tariff as of 31 December 2014 and the remodulated incentive tariff pursuant to paragraphs 3 and 4. Such loans can benefit, cumulatively or alternatively, on the basis of agreements with the banking system, of funding or guarantees by *Cassa depositi e prestiti S.p.A.* (Cdp) in relation to the funds provided by Article 5 (7), lett. a, of Law Decree no. 269/2003 as converted by Law no. 326/2003 (*Note: the funding granted to the State, the Regions, the Local Entities, the Public Entities and the public law organizations*). Pursuant to Article 1 (47) of Law no. 147/2013, Cdp's exposure is guaranteed by the Italian State with modalities to be determined with a decree to be issued by the Ministry of Economics and Finance.

6. Should it be necessary in relation to the remodulated duration of the disbursement of the incentive tariffs, the Regions and the local entities adapt, each in relation to their competences, the duration of the permits, however named, issued for the construction and operation of the PV plants falling within the scope of application of this Article 26. (…)

7. The recipients of long-term incentive tariffs, however named, for the production of renewable energy, can sell up to 80% of such incentives to a buyer selected amongst the "primary European financial players."

8. The selected buyer will replace the producers in their right to benefit from the long-term incentive tariffs from the entity entitled to disburse them *(Note: i.e. the GSE),* without prejudice to AEEG's prerogative to annually exercise an option to purchase such rights upon the payment of a sum amounting to the annual constant installment, calculated on the basis of an interest rate T, correspondent to the

financial depreciation of the cost incurred for the purchase of the rights during a timeframe comparable to that of the disbursement of the incentive tariffs.

9. Within 90 days from the entry into force of this Law, AEEG issues resolutions with which:

a) determine the modalities for the selection of the buyer through a competitive and non discriminatory tender procedure having as main choosing criteria the minimum offered value of the interest rate T mentioned in paragraph 8;

b) determine the minimum amount, in any case no lower tha[n] € 30 billion, that the buyer makes available for the purchase of the long term incentive tariffs;

c) define the conditions, procedures and modalities with which the buyer collects the long term incentive tariffs for sale or, alternatively, the annual installments – in the event AEEG should exercise the purchase option mentioned in paragraph 8;

d) determine the criteria and the procedures to determine, also in consideration of the type and location of the plants, the quotas of long-term incentive tariffs which the producers can transfer;

e) define the conditions, procedures and any other useful parameter to regulate the transfer of the quotas of the long-term incentives, to be implemented through competitive bids on the basis of the offered interest rate - which in any case cannot be lower than the interest rate T offered by the selected buyer – and within a maximum cap of the incentives established for each auction;

f) determine for each auction the participation modalities, the minimum discount rate and the maximum cap established for the purchase of the long-term incentives keeping in mind – should the auctions be distinguished on the basis of the type or the dimensions of the plants – the specifications in terms of number, the estimated cost of capital and managing skills related to complex procedures;

g) define any other aspect regarding the selection procedure and the auctions which could be useful in order to maximize the participation thereto, including forms of guarantee excluding the direct or indirect intervention of the Italian State.

10. AEEG, in compliance with the guidelines to be issued with a decree of the Ministry of Economic Development, allocates the eventual difference between the annual cost of the incentives purchased by the selected buyer pursuant to paragraph 7 and the annual disbursements provided by paragraph 8 for the reduction of the A3 component of the electricity bill.

11. The Italian Government carries out any useful initiative in order to fully implement this Article, including agreements with the banking system, in order to simplify the partial or entire withdrawal of the recipients of incentive tariffs from the loan agreements entered into.

> 12. The remodulation procedures provided in paragraph 3 above do not apply to the quotas of the incentive tariffs transferred pursuant to paragraph 9, as of the date of the transfer.
>
> 13. The effectiveness of the provision contained in paragraphs 7 to 12 above is subject to the verification, by the competent Ministry of Finance, of the compatibility of the underlying transactions with the public finance and the commitments undertaken by the Italian State in the EU.

189.  In short, the *Spalmaincentivi* Decree specified three tariff options, from which plant owners were required to choose one by 30 November 2014, failing which option (c) would be applied by the GSE:[252]

(a)  A reduction in the incentive tariff between 17-25% depending on how many years of the original 20-year incentive period remained (the "**Residual Period**"), with the extension of payments to be spread over 24 years (rather than the original 20-year period);

(b)  Depending on the length of the remaining Residual Period, a reduction in the incentive tariff for a first part of the Residual Period, followed by an increase in the incentive tariff in a second part of the Residual Period (to be paid over the remainder of the original 20-year period applicable to each facility); or

(c)  A reduction in the incentive tariff between 6-8%, based on the size of the facility in question, with no modification of the 20-year incentive period.

190.  The *Spalmaincentivi* Decree was intended to benefit primarily small and medium enterprises, which where medium and low voltage users.[253]

191.  On 25 November 2014, the Claimants' subsidiaries which own and operate PV facilities all wrote to the GSE to protest that the provisions of Article 26 of the *Spalmaincentivi* Decree were in breach of their constitutional and contractual rights, and they reserved their rights to take action in response.[254] The Claimants did not choose an option and therefore

---

[252]   *Spalmaincentivi* Decree: C-248, Art. 26(3).

[253]   *Spalmaincentivi* Decree: C-248, Art. 23: C-48; FTI Q1, ¶¶ 6.17-6.18; Misure per la Competitività, 18 June 2014: FTI-177; FTI R2, ¶ 7.17, Table 7-1.

[254]   Letters from Operating Companies to the GSE, 2014: C-441.

defaulted to option (c) for all of their facilities, except those with a nominal capacity of less than 200 kW.[255]

192.    Under the GSE Agreements, the incentive tariff under the *Conto Energia* Decrees was paid monthly based on a PV plant's actual production. In contrast, the *Spalmaincentivi* Decree provided that from the second semester of 2014, the GSE would pay the tariffs in monthly instalments amounting to 90% of the plant's estimated yearly average production of electricity.[256] The balance would be delayed for 6-18 months, which Claimants argue reduced their cash flows.[257]

193.    The *Spalmaincentivi* Decree replaced the Administration Fee that *Conto* V had imposed on all Producers receiving *Conto Energia* incentives, discussed above, with a new administration fee based on a PV plant's capacity (rather than on its output). This new fee was due on an annual basis, and paid by off-setting these against the incentive tariff payments due under the GSE Agreements.[258] The new fee ranges were as follows:

- €1.20/kW for plants above 1 MW of capacity.

- €2.20/kW for plants comprised between 3 and 6 kW of capacity.

194.    The adoption of the *Spalmaincentivi* Decree gave rise to opposition during the course of the debates leading to its adoption[259] as well as from national and international investors.[260]

---

[255]    FTI R2, ¶¶ 4.1-4.5. The Claimants' facilities unaffected by the *Spalmaincentivi* Decree were, it appears: Carlino 1 and Carlino 3 (ESPF 1); Carlino 2 (ICE 5). It appears that of the approximately 13,000 operators affected by the *Spalmaincentivi* Decree, 1% chose option (a), 37% chose option (b) and the rest chose or defaulted to option (c). *See* FTI R1, Table 6-3. *See also* Respondent's Counter-Memorial ¶¶ 312-314. According to the Claimants, most investors opted for the straight 6 to 8% reduction in the tariffs under option (c): *see* Claimants' Reply, ¶¶ 324, 330.

[256]    *Spalmaincentivi* Decree: C-248, Art. 26(2).

[257]    *Spalmaincentivi* Decree: C-248, Art. 26(2); Claimants' Memorial, ¶ 271.

[258]    *Spalmaincentivi* Decree: C-248, Art. 25; MED Decree, 24 December 2014: C-202, Annex 7, § 1; GSE Note, "Modalità operative per il riconoscimento delle tariffe a copertura dei costi sostenuti dal GSE per il sostegno alle fonti rinnovabili e all'efficienza energetica" published on the GSE website on 13 May 2015: C-220, § 2, pp. 3-4.

[259]    *See* Claimants' Memorial, ¶¶ 273-278 and the sources cited therein referring to the debates in the Italian Senate and House of Representatives; and ¶¶ 279-281 relating to concerns of investors.

[260]    *See* Claimants' Memorial, ¶¶ 279-281, referring to letters from the UK Ambassador, the Foreign Investors' Solar Committee and the Association for Producers, Industry and Services of Renewable Energy.

195. The Claimants say that the *Spalmaincentivi* Decree fundamentally altered the incentive tariffs granted to their facilities in breach of the express terms of the *Conto Energia* Decrees, the GSE Agreements and the many assurances by Italian officials and authorities that the tariffs would remain unchanged for their 20-year term.[261]

196. The Respondent says that the *Spalmaincentivi* Decree did not abolish or fundamentally alter the incentive regime, but remodulated it to reduce the cost of electricity for small and medium-sized business and to enhance the competitiveness of Italian markets. This was done by progressive measures offering three different alternatives to operators to permit them to select the best alternative for them. The Respondent says these were reasonable and proportionate measures. In addition, the Respondent says that the *Spalmaincentivi* Decree was intended to promote sustainability of the incentive scheme for renewable energy and to reduce the social burden on electricity consumers.[262]

### D.    2017 CONSTITUTIONAL COURT DECISION

197. On 24 January 2017, the Italian Constitutional Court released its judgment of 7 December 2016 on the challenge to the legitimacy of Article 26(2) and (3) of the *Spalmaincentivi* Decree ("**2017 Constitutional Court Decision**").[263] In its decision, the Court upheld the constitutionality of the challenged provisions of the *Spalmaincentivi* Decree. The Court's judgment reads, in part, as follows:

> 8. The challenges of violation of the other constitutional and European principles indicated in various orders of TAR Lazio share a common reason, which is the violation that article 26, para. 3, Decree 2014/91 supposedly has brought to the legitimate reliance which the percipients of the incentives had put in maintaining their firm position of advantage recognized in the agreements signed with GSE.
>
> 8.1. As a matter of principle, the reliance of citizens in legal certainty is "a fundamental and indispensable element of the rule of law (decision 822/88 and 349/85). However- as the firm case-law of this Court, in coherence also with that of the ECtHR, has clarified - protection of reliance does not entail, in our legal system, that the legislature may not enact provisions which change unfavorably the regulation of long-term relationships, and this even if their object are perfect legal rights ["*diritti soggettivi perfetti*"]. The only exception is, in matters of

---

[261]    Claimants' Memorial, ¶ 273; Claimants' Reply, ¶ 211.

[262]    Respondent's Counter-Memorial, ¶¶ 292-296; Respondent's Rejoinder, ¶¶ 245-249.

[263]    Courte Constituzionale, Decision No. 16/2017 of 7 December 2016 ("**2017 Constitutional Court Decision**"): R-032.

criminal law, that of the prohibition of retroactive norms, set by article 25, second para., of the Constitution." It remains firm that such provisions, "as any other legal norm, must not result in an irrational regulation, arbitrarily effecting substantial rights created by the previous law, frustrating in such way also the reliance of citizens in legal certainty" (decision 822/88; and in analogous sense decisions 203/16; 64/14; 1/11; 302/10; 24,206 and 236/09; 264 and 409/05; 446/02; 416/99).

8.2. The analysis of the *ratio* of the contested norm excludes that it has unreasonably and unforeseeably affected the long-term relations, arising from the agreements reached by the percipients of the incentives with GSE, therefore violating the principle of legal certainty. In fact, the legislature in 2014 has intervened in a general context in which, on the one hand, the remuneration of incentivizing fees for energy produced through photovoltaic apparatus was gradually increasing, taking into account both the costs of production as a result of the considerable technological development of the sector, and the overall European framework. But on the other hand, and correlatively, one registered the growing economic burden of such incentives on the final users of electric energy, especially on SMEs which are the fabric of national industry.

Therefore the legislature, following a balancing objective, has operated with the aim of "favouring a higher sustainability in the policies of support to renewable energies" (article 26, para. 1, Decree 2014/91) and to "reach a more fair distribution of the economic burdens among the various categories of users." The legislature has therefore established that the lesser burdens for users as a result of the reduction of the incentives for photovoltaic apparatuses should be "destined to the reduction of electricity fees for clients of low and medium tension electricity" (article 23, Decree 2014/91).

Such an intervention pursues a public interest, through a fair balancing of the opposing interest at play, promoting at the same time the policies of support to the production of energy from renewable sources, and a more sustainable burden for the final users of electric energy. The incentives to photovoltaic are among the so called general fees of electrical system and are paid also by the final user, directly, through the component A/3 of the electricity bill.

8.3 (…) The decrees that have been issued on the basis of said article 7 are known as "conti energia" and are progressively numbered in accordance with the various, subsequent, versions which have enacted five different procedures of support.

It must be said that, in the context of such general normative framework, the enforcement of systems of incentives to renewable energies is characterized by long-term stability in order to ensure certainty for investors. In particular Decree 2011/28- which according to TAR Lazio has amplified the notion of "stability," states that "the incentive remains constant for all the due period" (article 24, para. 2, letter c).

However, the guarantee of stability of the incentive for all the due period does not imply, however, as a necessary consequence, that the measure should remain unchanged for 20 years, unchanged and unaffected by the variations which are common to long-term contracts. This is even truer if one considers that the agreements reached with GSE cannot be qualified as contracts meant to determine the exclusive profit of the operator, with terms and conditions blocked at the initial conditions, for twenty years, even if technological conditions may change profoundly. They are instead regulatory instruments, aimed at reaching the

objective of incentivizing certain sources of energy in equilibrium with other sources of renewable energy, and with the minimum sacrifice for the users who ultimately bear the economic burden.

In the evolution of the sectorial legislation there are, in fact, elements contrary to the purported consolidation of an acquired right of the beneficiaries of the incentive to maintain unchanged the initial incentive for the whole twenty years of the agreed length of the agreement. Decree 2011/28, at its article 23, para. 1, expressly balances the objective of "stability of the systems of incentives," with that of "harmonization with other systems having analogous aims and the reduction of the specific burden put on consumers."

In this same line the third "conto energia" (Decree 6.8.201 0), adopted on the basis of the previous Decree 2003/387 mentioned the need to adapt the incentivizing fees in the wake of the diminished costs of photovoltaic technologies in order to abide by the principle of fair remuneration of investments.

The fourth "conto energia" (Decree 5.5.2011) foresees, at its article 2, para. 3, the possibility to revise the incentives.

In the general agreement, laid out by the Independent Energy Authority on December 6, 2012 one finds this express provision (article 17, para. 3): "GSE reserves the right to modify unilaterally the clauses of this Agreement which, as a consequence of legislative or regulatory changes, are in contrast with the present legal framework."

Decree 23.12.2013, n. 14 (...) converted into Law 28.2.2014, n. 9, immediately prior to the contested provision, underlined, in its recitals, "the extraordinary and urgent need to enact provisions for the roll-out of the 'Destinazione Italia' plan, for the reduction of electricity and gas fees" considered as essential elements for the promotion of competitivity of Italian enterprises and to attract investments in Italy.

These elements exclude that the down-sizing of the incentives introduced by the contested provision presents the purported characters of "unforeseeability," while instead it was, in some ways, anticipated and aimed precisely to ensure the 'stability' taken into account by the laws that introduced incentives to photovoltaic energy, as a characteristic of the whole system and not of the single incentive.

Furthermore it is an element naturally connected to the normative risk of enterprises in a regulated market such as the one here examined.

8.4. TAR Lazio furthermore expresses the doubt that the way through which the legislator has operated with the contested provision is unreasonable and disproportionate. Also this allegation is unfounded. The down-sizing of the incentives does not affect radically the investments that have been made as, in an abstract way and without any concrete evidence in the various proceedings, is claimed, but is regulated in such a way as to take into account its sustainability.

In fact, in alternative to the, last, case of reduction of the incentives in a not excessive percentage which ranges from 6% to 8% according to the size of the apparatuses, and without prejudice to the 20 year period, the owner of the plant may choose among two options: or to balance the reduction of the incentives with a prolongation of the agreement of further 4 years; or to join a first period of reduction of the incentive with an equal, following, period in which the incentive

is increased "in equal size." The downsizing of the incentives is, furthermore, accompanied by compensatory benefits such as the possibility for the percipients of these incentives to receive bank loans up to the difference between the present incentive and the new one. These loans can be granted on the basis of agreements with the banks guaranteed by 'Cassa Depositi e Prestiti' *(a public financial institution)* (article 26, para. 5).

They may also assign their incentive to a "selected primary European financial operator" (article 26, para. 7, Decree 2014/91). In such a way the investments are, ultimately, safeguarded through the gradual process of downsizing, via the various options offered by the law and by the compensatory measures which reduce the economic impact of the reduction in the incentives, while ensuring the fair remuneration of the investments.

9 (…) The Court of Justice of the European Union in its well-known decision *Plantanol GmbH v. Hauptzollamt Darmstadt* (C-201/08, of 10.9.2009) which is cited also in the orders of TAR Lazio, has recognized that the before-time abolition of a system of benefits falls within the discretional power of national authorities. The only limitation is the reliance that "a prudent and careful business operator" might have put in the maintenance of the system.

As mentioned before the legislature's intervention has not been nor unforeseeable nor sudden, and therefore "a prudent and careful business operator" could have taken into account the possible changes in legislation, considering the temporary and variable nature of support schemes.

10. The allegation of violation of articles 3 and 41 of the Constitution, on the basis of discriminatory treatment, is equally unfounded.

The different size of the various plants, with a power higher or lower than 200 KW in itself justified the re-scheduling fees only with regards those above 200 KW which receive the most of the incentives, with a related higher burden on the system.

There is no disparity of treatment in the fact that plants belonging to local authorities or schools, even if above 200 KW, have been excluded from the re-scheduling of the incentives, considering the obvious differences between the categories of producers and the reasons of public interest which justify an exception in favour of public entities and of schools.

Nor can one consider more founded the allegation that there would be a discriminatory treatments towards solar energy producers in respect of other percipients of incentives equally financed by users through the so-called general system fees.

Also in this case TAR Lazio, although it acknowledges the considerable developments of photovoltaic energy, does not give the appropriate importance to the reasons (among which the size of plants) which are at the basis of varied legislation for photovoltaic energy and other renewable sources of energy.

11. Finally there is no violation of private autonomy because, purportedly, the reduction of the incentives has affected "private law contracts."

Setting aside the fact that such "contracts" are accessory to the provisions granting the incentives, one should recall the principle- which has been repeatedly stated

by this court- that there cannot be a violation of the freedom of economic initiative when the general limits that have been put aim at promoting social welfare, as established by article 41, para. 2, of the Constitution, provided that the measures are not arbitrary and the intervention of the legislature does not pursue its aim through measures which are clearly incongruous. (among the many decision 203/16; 56/15; 152 and 247 /10; 167 /09).

Both these requirements, as already said, have been complied by the provisions reducing and rescheduling the incentives.[264]

198.    The Claimants say that the 2017 Constitutional Court Decision has no direct relevance and may not influence the Tribunal's assessment and application of the ECT standards and related principles of international law. The decision is only relevant, at most, as a matter of fact for the Tribunal to consider.[265]

199.    The Respondent says that its Italian Constitutional Court decisions are relevant both as applicable law and as fact. It says that while the task of the Tribunal is to determine whether it has violated the ECT, and not whether the measures it took comply with Italian law, the latter should nevertheless influence the legal standards that the Tribunal applies to determine whether it violated the ECT or international law.[266]

---

[264]    2017 Constitutional Court Decision: R-032. The decision of the Constitutional Court was discussed at some length in the expert reports of the Parties' respective legal experts: Professor Attorney Antonio D'Atena on behalf of the Claimants: "**D'Atena ER1**," "**D'Atena ER2**;" Professors Vincenzo Zeno-Zencovich and Antonio Caratta, on behalf of the Respondent: "**Zeno-Zencovich/Caratta ER1**," "**Zeno-Zencovich/Caratta ER2**."

[265]    Claimants' Post-Hearing Brief ("**CPHB**"), ¶¶ 24-30. The Claimants also say that, pursuant to Art. 26(6) VCLT and the ILC Articles on State Responsibility, a state party may not invoke the provisions of its internal laws as justification for its failure to perform a treaty. They also note that the Court's decision only became known in January 2017 and, therefore, was rendered a number of years after the Claimants had made their investments. The Claimants also say that the GSE Agreement which the Court considered was the contract under *Conto* V that contained a new provision which permitted the GSE to unilaterally modify the clauses of the Agreement as a result of any legislative and regulatory amendments. In contrast, the GSE Agreements under *Contos* I-IV provided that modifications to the Agreements could only be made in writing with the agreement of both parties.

[266]    Respondent's Post-Hearing Brief ("**RPHB**"), ¶¶ 32-38. The Respondent relies on the Constitutional Court's decision with respect to legitimate expectations, and says that the standards applying to legitimate expectations and fair and equitable treatment, in general, must be assessed by considering both domestic and international case law. The Respondent goes on to state that the Italian Constitutional Court has consistently applied the principle of legitimate expectations and found that these do not imply an absolute preclusion on the modification of contracts, even in the case of long term relationships and vested rights. Accordingly, the Respondent says that if one invests in Italy, an investor cannot expect that because of the existence of a contract in itself, the legislator is automatically prevented from modifying its legislation. It also notes that the GSE Agreements, in its view, are accessory contracts and not merely private law contracts. The Respondent also says that since the Constitutional Court has declared the legitimacy of the *Spalmaincentivi* Decree under Italian law, there can be no infringement of the umbrella clause in the ECT as a matter of fact and of law.

## V.    QUESTIONS FOR DETERMINATION

200.    The issues to be determined in this case are as follows:

- Jurisdiction (Issue 1)

    - Have the Claimants established that the requirements for jurisdiction under the ECT and Article 25 of the ICSID Convention have been met? (Issue 1.1)

    - Applicability of the ECT to Intra-EU Disputes and the Achmea Decision(Issue 1.2)

    - Are all or some of the claims barred by the "Taxation Measures" carve-out under Article 21 of the ECT? (Issue 1.3)

    - Did the Parties agree on a dispute resolution mechanism other than ICSID arbitration?(Issue 1.4)

    - Did the Claimants satisfy the notice requirements under Article 26 of the ECT? (Issue 1.5)

- Admissibility (Issue 2)

- Applicable Law (Issue 3)

- Merits: Article 10(1) of the ECT (Issue 4)

    - Fair and Equitable Treatment (Issue 4.1(A))

    - Legitimate Expectations (Issue 4.1(B))

    - Transparency and Consistency (Issue 4.1(C))

    - The duty of good faith (Issue 4.1(D))

- ▪ Unreasonable or Discriminatory Measures (Issue 4.2)

- ▪ Umbrella Clause (Issue 4.3)

- Damages (Issue 5)

  - ▪ The applicable compensation standard (Issue 5.1)

  - ▪ Methods of Valuation and Quantification of Damages (Issue 5.2)

  - ▪ Quantum of Damages (Issue 5.3)

- Interest (Issue 6)

- Costs (Issue 7)

201. The Tribunal addresses first the issues of jurisdiction and admissibility. Then after determining the applicable law (Issue 3), the Tribunal turns to the merits (Issue 4). The Tribunal then considers whether the Claimants are entitled to damages (Issue 5) and interest (Issue 6). Finally, the Tribunal addresses the appropriate allocation of costs (Issue 7).

## VI.    REQUESTS FOR RELIEF

202. The Claimants request an Award granting them the following relief:

- A declaration that the Tribunal has jurisdiction under the ECT and the ICSID Convention for all of the Claimants' claims, thereby rejecting the Respondent's jurisdictional objections in full;

- A declaration that Italy has violated Part III of the ECT and international law with respect to the Claimants' investments;

- Compensation to the Claimants for all damages they have suffered as set forth in their Memorial and in their Reply Memorial and as may be further developed and quantified during the course of this proceeding;

- All costs of this proceeding, including (but not limited to) the Claimants' attorneys' fees and expenses, the fees and expenses of the Claimants' experts, and the fees and expenses of the Tribunal and ICSID;

- Pre- and post-award compound interest at the highest lawful rate from the Date of Assessment, *infra*, until Italy's full and final satisfaction of the Award; and

- Any other relief the Tribunal deems just and proper.[267]

203.    The Respondent requests that the Tribunal:

- Decline jurisdiction to decide, as the ECT does not cover intra-EU disputes.

- Alternatively, decline jurisdiction over the totality of claims, since:

   o Some of the Challenged Measures are exempted under Article 21 of the ECT;

   o No amicable solution has been attempted for some further Measures; and

   o The exclusivity forum choice contained in the GSE Agreements bans this Tribunal from judging under the umbrella clause.

- In a further alternative, decline admissibility of protection of the Claimants' alleged interests since these are barred from seeking relief, as they did not seek amicable solution for a number of claims.

204.    Should the Tribunal consider itself to have jurisdiction over the case and that claims are either totally or partially admissible, the Respondent requests that the Tribunal declare on the merits that:

---

[267]    Claimants' Memorial, ¶ 394; Claimants' Reply, ¶ 555; Claimants' Rejoinder on Jurisdiction, ¶ 115; CPHB, ¶ 126.

- The Respondent did not violate Article 10(1) of the ECT, first and second sentence, since it did not fail to grant fair and equitable treatment to the Claimants' investments;

- The Respondent did not violate Article 10(1) of the ECT, fourth sentence, either, since it always adopted reasonable and non-discriminatory measures to affect Claimants' investments;

- Article 10(1) of the ECT, last sentence (the so-called "umbrella clause"), does not apply in the case at stake, or, alternatively, that the Respondent did not violate it neither through statutory or regulatory measures, nor the GSE Agreements; and

- Consequently, declare that no compensation is due.

205.   In the event that the Tribunal were to recognise legitimacy to one of the Claimants' griefs, the Respondent requests that the Tribunal:

- Declare that damages were not adequately proved.

- In addition, declare that both the methods for calculation and calculation itself of damages proposed by the Claimants are inappropriate and erroneous.

- Order the Claimants to pay all relevant expenses and disbursements by the Respondent because of these proceedings in accordance with ICSID Arbitration Rules.[268]

## VII.   JURISDICTION (ISSUE 1)

### A.   OVERVIEW OF THE PARTIES' POSITIONS ON JURISDICTION

206.   The Claimants submit that the five basic requirements for jurisdiction under Article 26 of the ECT and Article 25 of the ICSID Convention are met. First, the Claimants are covered

---

[268]    Respondent's Rejoinder, ¶¶ 556-558.

"investors" that are nationals or companies of a Contracting Party (Germany and Austria) to the ECT and of a Contracting State to the ICSID Convention.[269] Second, the Respondent is a Contracting Party to the ECT and a Contracting State to the ICSID Convention.[270] Although the Respondent withdrew from the ECT effective 1 January 2016, the ECT remains in force for Italy for 20 years from that date.[271] Third, the Parties consented to ICSID Jurisdiction. The Claimants say that the Respondent gave its unconditional consent to the submission of this dispute to ICSID arbitration in Article 26(3) of the ECT, which serves as the necessary consent under the ICSID Convention.[272] Fourth, the dispute involves a covered "investment."[273] Fifth, the dispute arises directly out of an investment and concerns the alleged breach of Part III of the ECT.[274] The Claimants argue that, although not a jurisdictional requirement, they have also satisfied the provision in the ECT that provides that the parties attempt to amicably settle their dispute for a minimum three-month period after the Claimants give notice of the dispute to the Respondent.[275] Before commencing this arbitration, the Claimants sent the two Amicable Settlement Letters to the Respondent.

207.    In its Counter-Memorial, Rejoinder, and Brief Considerations on *Achmea*, and its post-hearing submissions, the Respondent maintains four jurisdictional objections to the Tribunal's jurisdiction in this arbitration. First, the Respondent argues that the ECT does not apply to intra-EU disputes.[276] Second, the Respondent alleges that the ECT's tax carve-out under Article 21 of the ECT bars several of Claimants' claims.[277] Third, the Respondent

---

[269]    ICSID Convention, Art. 25; ECT: C-001, Art. 1(7); Claimants' Memorial, ¶¶ 31, 35-41.

[270]    Italy signed the ECT on 17 December 1994, ratified it on 5 December 1997, and it entered into force for Italy on 16 April 1998. Italy signed the ICSID Convention on 18 November 1965 and it entered into force for Italy on 28 April 1971: Claimants' Memorial, ¶¶ 31, 42.

[271]    Claimants' Memorial, ¶ 42.

[272]    Claimants' Memorial, ¶¶ 31, 44-46.

[273]    Article 25 of the ICSID Convention does not define "investment," but it is widely understood to have a broad definition (*see* fn. 22); ECT: C-001: Art. 1(6); Claimants' Memorial, ¶¶ 31, 47-48.

[274]    Claimants' Memorial, ¶¶ 31, 49-52.

[275]    Claimants' Memorial, ¶¶ 31, 32.

[276]    Respondent's Counter-Memorial, ¶¶ 40-143; Claimants' Reply, ¶¶ 45-150; Respondent's Rejoinder, ¶¶ 93-109; Claimants' Rejoinder on Jurisdiction, ¶¶ 11-82.

[277]    Respondent's Counter-Memorial, ¶¶ 144-174; Claimants' Reply, ¶¶ 151-178; Respondent's Rejoinder, ¶¶ 110-160; Claimants' Rejoinder on Jurisdiction, ¶¶ 83-100.

contends that the Claimants have agreed to submit this dispute to the Courts of Rome under the dispute resolution provision in the GSE Agreements governing each of Claimants' PV facilities; or, alternatively, that the Claimants do not have standing to pursue claims related to the GSE Agreements in this arbitration.[278] Fourth, the Respondent submits that it has not received proper notice under Article 26 of the ECT.[279]

208.    Following the *Achmea* decision and the subsequent EU Declaration on *Achmea*, the Respondent submitted its Request for Termination. The Respondent renewed its request for immediate termination of the proceedings following the submission by Germany and Austria of their notices to the Tribunal pursuant to the EU Declaration on *Achmea*. Since the Request for Termination is based on the EU Declaration on *Achmea*, which relates to the ECJ's decision in *Achmea*, it will be discussed following the Tribunal's analysis of that decision.

209.    Because the EC's *amicus curiae* submissions on the issue of intra-EU disputes overlap with those of the Respondent, the Tribunal will only set these out to the extent the EC's position varies from that of the Respondent and where those submissions provide insight on matters relevant to this dispute.

### (1)    Have the Claimants established that the requirements for jurisdiction under the ECT and Article 25 of the ICSID Convention have been met? (Issue 1.1)

210.    The Claimants submit that requirements for jurisdiction under the ECT and Article 25 of the ICSID Convention have clearly been met and that, as a result, the Tribunal has jurisdiction to determine their claims under the ECT. The Respondent does not contest this analysis; its jurisdictional objections relate to its interpretation of the ECT, which it says does not grant the Tribunal jurisdiction to determine intra-EU disputes.

---

[278]    Respondent's Counter-Memorial, ¶¶ 175-190; Claimants' Reply, ¶¶ 179-185; Respondent's Rejoinder, ¶¶ 161-166; Claimants' Rejoinder on Jurisdiction, ¶¶ 101-107.

[279]    Respondent's Counter-Memorial, ¶¶ 191-196; Claimants' Reply, ¶¶ 186-208; Respondent's Rejoinder, ¶¶ 167-174; Claimants' Rejoinder on Jurisdiction, ¶¶ 108-114.

### a. The Tribunal's Analysis

211. The Tribunal confirms that the requirements for jurisdiction on the face of the ECT and Article 25 of the ICSID Convention have been met in this case. Article 25 of the ICSID Convention provides:

> The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State … and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.

212. Article 1(7) of the ECT similarly defines "Investor" to be "a company or other organisation organised in accordance with the law applicable in that Contracting Party."

213. ESPF is incorporated in the Federal Republic of Germany and ICE 5 is also established under those laws while ESPF 2 is incorporated in the Republic of Austria.[280] Thus, the Claimants meet the requirements of Article 25 of the ICSID Convention and Article 1(7) of the ECT, as they are nationals of Germany and Austria.

214. Germany and Austria are both Contracting Parties to the ECT and Contracting States of the ICSID Convention. At the time of their Memorial, the Claimants owned 100% of the investments related to their PV facilities in Italy. They also owned these investments on the date of their consent to ICSID jurisdiction and immediately before the events giving rise to this dispute. The Claimants are covered Investors of a Contracting Party to the ECT and a Contracting State to the ICSID Convention.

215. The Respondent is also a Contracting Party to the ECT and a Contracting State to the ICSID Convention.

216. The Claimants filed a Request for Arbitration on 29 January 2016 and provided their consent in writing to ICSID arbitration pursuant to ECT Article 26(4), which provides that "[i]n the event that an Investor chooses to submit the dispute for resolution … the Investor shall further provide its consent in writing for the dispute to be submitted to … (a)(i) the

---

[280]   *See* ESPF Beteiligungs GmbH Excerpt in the Munich Commercial Registry, 22 September 2015: C-002; ESPF Nr. 2 Austria Beteiligungs GmbH Excerpt in the Austrian Commercial Registry, 6 November 2015: C-003; InfraClass Energie 5 GmbH & Co. KG Excerpt in the Munich Commercial Registry, 22 September 2015: C-004.

International Centre for Settlement of Investment Disputes … if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention."

217.    For its part, the Respondent gave its "unconditional consent" to the submission of disputes to ICSID arbitration in Article 26(3) of the ECT, which serves as the necessary consent under the ICSID Convention.

218.    Further, the dispute in this case arises directly out of an investment, as defined in Article 1(6) of the ECT.

219.    The Claimants' claims relate to guarantees and protections contained in Article 10(1) of the ECT, including the requirement to treat the Claimants' investments fairly and equitably, the prohibition against unreasonable or discriminatory measures that impair the management, maintenance, use, enjoyment or disposal of investments; and the requirement to observe any obligations entered into with an investment or an investor. The dispute is thus a legal dispute arising out of the Claimants' protected investments under Part III of the ECT.

220.    The Tribunal finds that the Claimants have established *prima facie* jurisdiction under the ECT and ICSID Convention.

### (2)    Applicability of the ECT to Intra-EU Disputes and the *Achmea* Decision (Issue 1.2)

#### a.    *The Respondent's Arguments on whether the ECT applies to intra-EU disputes*

221.    The Respondent advances three principal arguments with respect to its first ground for lack of jurisdiction.

222.    First, the Respondent claims that the ECT has never applied to intra-EU disputes. The Respondent argues that this was the Contracting Parties' intention at the time they concluded the ECT and that this intent emerges from the express wording and clear language of the ECT.

223.  Second, the Respondent asserts that even if the ECT applied to intra-EU disputes at one time, this is no longer the case after the adoption of the Lisbon Treaty.

224.  Third, the Respondent submits that the *Achmea* Decision confirms the lack of jurisdiction of arbitral tribunals under Article 26 of the ECT in intra-EU disputes.[281] Further, the Respondent now argues that, as a result of its Request for Termination, the Tribunal should terminate the proceedings immediately.

225.  For the Respondent, "what is at stake is to what extent the EU and EU Member States bound themselves signing the ECT. The issue is one of *intent*."[282] The Respondent argues that Article 25 of the ECT explicitly recognizes the EU, as an economic integration agreement ("**EIA**"), has the scope of "substantially liberalizing … trade and investment," in much the same way as the ECT.[283] On this basis, the Respondent asserts that Article 25 of the ECT recognizes "the understanding that between Contracting Parties that are party to the EU, a 'preferential treatment' does exist and is fully recognized by the ECT."[284] The Respondent contends that Article 25 recognizes "not only that rules of a EIA prevail and are recognized by the ECT, but that also their further implementation by second measures is 'either at the entry into force of that agreement or on the basis of a reasonable time frame'."[285]

226.  In its Rejoinder, the Respondent adopts the EC's argument from its *Amicus* Brief about the existence of an implicit disconnection clause in the ECT which makes it inapplicable between EU Member States stating that it "cannot affirm that the absence of a specific exclusion [*i.e.* a disconnection clause] should amount to a declaration of wide application.

---

[281]    Respondent's Brief Considerations on the *Achmea* Judgment by the ECJ (which the Respondent calls the "CJUE"), 30 March 2018 ("**Respondent's Comments on *Achmea***"), ¶ 4.

[282]    Respondent's Counter-Memorial, ¶ 42 (emphasis in original).

[283]    Respondent's Counter-Memorial, ¶ 51. It is not entirely clear which agreement (EIA) the Respondent is comparing to the ECT, as it refers generally to the "EU" in this regard and not to any particular agreement.

[284]    Respondent's Counter-Memorial, ¶ 52.

[285]    Respondent's Counter-Memorial, ¶ 52.

Member States at that time considered that there was no need for such an express reference."[286]

227.    The Respondent contends that maintaining the ECT's arbitration regime would result in "an intolerable discrimination among citizens of the Union."[287]

228.    On the basis of Article 16 of the ECT, which sets out the rules governing another international agreement involving the same parties and subject matter, the Respondent advances a primacy of EU law argument that EU law prevailed over the ECT at the time of its conclusion.[288] Article 16 provides as follows:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
>
> (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,
>
> where any such provision is more favourable to the Investor or Investment.

229.    According to the Respondent, under Article 16 of the ECT, the Lisbon Treaty must prevail over the terms of the ECT.[289] The Respondent asserts that EU law is "doubtless more favourable to the investor," since it is a more developed and complex legal system than that in the ECT.[290] The Respondent claims that EU treaties are more favourable to investors because "EU law represents a more developed and articulated legal system" that "cannot even be compared to the protection of rights that an international instrument such as the ECT can guarantee."[291] The Respondent alleges that investors "can address courts in the

---

[286]    Respondent's Rejoinder, ¶ 103.

[287]    Respondent's Rejoinder, ¶ 102.

[288]    Respondent's Counter-Memorial, ¶¶ 53-54; Respondent's Rejoinder, ¶¶ 95-102.

[289]    Respondent's Counter-Memorial, ¶¶ 53, 87-92.

[290]    Respondent's Counter-Memorial, ¶¶ 89-90.

[291]    Respondent's Counter-Memorial, ¶ 54; Respondent's Rejoinder, ¶ 99.

Union for all issues that would arise in an ECT arbitration."[292] The Respondent goes on to discuss the rights guaranteed to investors under EU law.[293]

230.    The Respondent further argues that Article 41 of the VCLT – which concerns two or more (but not all) parties to a multilateral treaty modifying a treaty *inter se*, thereby "contracting out" from the original agreement – does not prevent the EU Member States from agreeing between themselves to modify the terms of the ECT when they signed the Lisbon Treaty.[294] Article 41 of the VCLT (*Agreements to Modify Multilateral Treaties Between Certain of the Parties Only*) provides as follows:

> 1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
>> (a) The possibility of such a modification is provided for by the treaty; or
>>
>> (b) The modification in question is not prohibited by the treaty and:
>>
>>> (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>>>
>>> (ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> 2. Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

231.    The Respondent argues that the Lisbon Treaty can be deemed as an *inter se* agreement pursuant to Article 41 of the VCLT which modifies the ECT, because the Lisbon Treaty reinforces "the treatment of investors and investments within the EU." Further, by adopting the Lisbon Treaty, "EU Member States did not affect by any means the enjoyment by the other Contracting Parties of their rights under the ECT or the performance of their obligations, nor has the potential to do so."[295] According to the Respondent, in light of Article 16 of the ECT, "the Lisbon Treaty is a perfectly legitimate *inter se* agreement derogating from the general rules of the ECT by reinforcing the treatment of investors and

---

[292]    Respondent's Rejoinder, ¶ 97.

[293]    Respondent's Rejoinder, ¶ 97.

[294]    Respondent's Rejoinder, ¶¶ 100-101.

[295]    Respondent's Counter-Memorial, ¶¶ 94-96.

investments within the EU."[296] The Respondent suggests that the Lisbon Treaty "[does] not affect by any means the enjoyment by the other [non-EU] Contracting Parties of their rights under the ECT."[297] The Respondent contends that Article 41(1)(a) of the VCLT permits some parties to an agreement to enter into a second treaty by which they modify the previous one as amongst themselves. The Respondent further contends that such modification does not need to be notified to the other parties to the first treaty – the ECT here – pursuant to Article 41(2) of the VCLT.[298]

232. The Respondent also contends that the ECT's context and purpose support a conclusion that it does not apply to intra-EU disputes. The Respondent refers to the "decisions" annexed to the ECT regarding Articles 24(4)(a) and 25 of the ECT in support of its assertion that the Contracting Parties only intended the ECT to apply to disputes involving either non-EU investors against EU Member States or EU investors against non-EU Member States.[299]

233. With respect to the circumstances of the Contracting Parties' adoption of the ECT, the Respondent contends that it was primarily concluded to regulate relations between Europe and Eastern Europe/the Soviet Union, and not intra-EU situations.[300]

234. The Respondent also refers to the EC's 1992 Proposal for a Council Directive concerning common rules for the internal market in electricity and its dispute resolution mechanism as evidence of "the intention of the EU institutions and the EU Member States to regulate intra-EU situations exclusively within the Internal Market rules."[301] The Respondent relies on *Electrabel v. Hungary* for the proposition that the EC, in signing the ECT, "accepted the possibility of international arbitrations under the ECT, both between a non-EU investor

---

[296]    Respondent's Counter-Memorial, ¶ 94.

[297]    Respondent's Counter-Memorial, ¶ 96.

[298]    Respondent's Counter-Memorial, ¶ 95: "This would exempt also from any notification under paragraph 2 of Article 41 to the other parties."

[299]    Respondent's Counter-Memorial, ¶¶ 57-59.

[300]    Respondent's Counter-Memorial, ¶ 64.

[301]    Respondent's Counter-Memorial, ¶ 66.

and an EU Member State or between an EU investor and a non-EU Member State, without any distinction or reservation."[302]

235.    In terms of the evolution of EU law and its effect on the ECT, the Respondent argues that the adoption of the Lisbon Treaty prohibits the application of the ECT to intra-EU disputes in light of the VCLT or, alternatively, Article 16 of ECT.[303]

236.    The Respondent contends that, for the purposes of Articles 30(1), (3) and (4)(a) of the VCLT, the Lisbon Treaty and the ECT share the "same subject-matter."[304] The Respondent's position is that the analysis of whether the subject matter is the same "does not of course require exact coincidence of provisions or even of objectives (they do not have to 'deal' with the same subject-matter)."[305] Although the Respondent concedes that the Lisbon Treaty does not deal with the promotion and protection of investments, in line with a broad determination of "subject-matter," the Respondent asserts that both the ECT and the Lisbon Treaty "share the same efforts of [economic] integration."[306]

### b.  The EC's Arguments on whether the ECT applies to intra-EU disputes

237.    The EC advances three principal arguments for why the Tribunal does not have jurisdiction.

238.    First, the EC argues that intra-EU application of the ECT violates EU law because Member States were not competent to bind themselves *inter se* when they ratified the ECT.[307] The EC argues that applying the ECT to intra-EU disputes would violate Articles 3(2), 267 and 344 of the TFEU, and that *inter se* relations take precedence over express provisions of a treaty.[308] The EC contends that EU Member States' international capacity to consent to be

---

[302]    Respondent's Counter-Memorial, ¶ 68, fn. 11; *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, 30 November 2012 ("***Electrabel v. Hungary* (Decision on Jurisdiction)**"): CL-075, ¶ 4.158.

[303]    Respondent's Counter-Memorial, ¶¶ 82-92.

[304]    Respondent's Counter-Memorial, ¶ 84.

[305]    Respondent's Counter-Memorial, ¶ 84.

[306]    Respondent's Counter-Memorial, ¶ 85.

[307]    EC *Amicus Curiae* Brief, 29 September 2017 ("**EC Brief**"), ¶ 13, § 1.

[308]    EC Brief, ¶ 13, §§ 1, 1.1; Claimants' Reply, fn. 70 ("Article 3(2) TFEU addresses areas that fall under the EU's exclusive competence, while Article 267 establishes the parameters for the ECJ's preliminary ruling mechanism.

bound by a treaty is limited by the EU's internal distribution of competences and that the EU has had exclusive external competence in renewable electricity since it issued its first EC Directive in 2001.[309] The EC thus argues that the Respondent has acted not in its own capacity, but as an organ of the EU when it established or revised its support systems for investment in the PV sector, and that it acted under its obligations under EC Directive 2009/28 and EU state aid law.[310] The EC relies on Article 3(2) of the TFEU, which provides that the EU has exclusive competence for the conclusion of international agreements that "might affect common [EU] rules or alter their scope."[311] The EC also argues that the EU's internal market rules cover all aspects of an investment, including substantive and judicial protection, and that the EU alone has competence over that field.[312]

239.    The EC asserts that if the ECT created obligations between the Member States, those obligations would violate the EU treaties and Articles 267 and 344 of the TFEU in particular.[313] According to the EC, Article 344 of the TFEU does not permit the Respondent to submit any ECT disputes to the Tribunal, as that article prevents EU Member States from submitting a dispute "involving the interpretation or application of the Treaties to a new dispute settlement structure outside the EU Treaties."[314]

240.    The EC's position is that Article 344 of the TFEU covers investor-state disputes.[315] In support of this assertion, the EC relies on Legal Opinions 2/13 and 1/91, which address the obligation of EU Member States to resort to EU law dispute settlement procedures and the

---

In Article 344, Member States undertake not to submit a dispute concerning the interpretation of the EU treaties to any settlement method other than those established under the treaties.").

[309]    EC Brief, ¶ 19.

[310]    EC Brief, ¶ 82.

[311]    EC Brief, ¶¶ 17, 19-23; *Green Network SpA v. Autorità per l'energia elettrica e il gas*, ECJ Case C-66/13, Judgment, 26 November 2014: C-425; *Thomas Pringle v. Ireland*, ECJ Case C-370/12, Judgement, 27 November 2012: C-426.

[312]    EC Brief, ¶¶ 25 *et seq.*

[313]    EC Brief, ¶¶ 13, 17, § 1.3.

[314]    EC Brief, ¶¶ 47-49.

[315]    EC Brief, ¶¶ 47-49.

ECJ's desire to avoid interpretations of EU law that affect the allocation of responsibilities defined in the EU Treaties, respectively.[316]

241.    Second, the EC argues that EU law and the ECT should be interpreted harmoniously, with the result that the Respondent never offered to arbitrate this dispute with the Claimants.[317] The EC posits that the ordinary meaning of the ECT and its surrounding circumstances demonstrate that it does not apply to intra-EU disputes. The EC goes on to argue that there is an implied "disconnection clause" in the ECT which makes it inapplicable between EU Member States.[318] The EC attempts to distinguish the application of the *Charanne v. Spain*, *RREEF v. Spain*, *Blusun v. Italy* and *Eiser v. Spain* arbitral awards by claiming that the tribunals in those cases relied exclusively on a 2008 article by Professor Christian Tietje.[319] The EC submits that it excluded disputes from EU investors against a Member State in its notification to the ECT Secretariat, which provides for the EC and Member States to "determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party."[320] The EC argues that the word "*another* Contracting Party" "clearly excludes disputes brought by EU investors against a Member State."[321]

242.    The EC further argues that the EU Member States decided not to include a disconnection clause in the WTO-related treaties because they do not use that framework for intra-EU matters and acted as "one single block" "throughout the negotiations."[322] The EC contends that because the ECT recognizes certain Regional Economic Integration Organizations

---

[316]    EC Brief, ¶¶ 47-48

[317]    EC Brief, ¶ 14, § 2.

[318]    EC Brief, § 2.2.3.

[319]    EC Brief, ¶ 101.

[320]    EC Brief, ¶ 80.

[321]    EC Brief, ¶ 81; European Communities, Declaration regarding Annex ID of the ECT—Statement sent by Council and Commission on 17.11.97: C-428 (Italics emphasis in the original; underline emphasis added): "The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an investor of <u>another Contracting Party</u>. In such cases, upon request of the investor, the Communities and the Member States concerned will make such determination within a period of 30 days. *(This is without prejudice to the right of the investor to initiate proceedings against both the Communities and their Member States)*."

[322]    EC Brief, ¶¶ 88-90.

("**REIO**") that enter into obligations among themselves, and because the EU is an REIO, this recognition establishes exclusivity within those REIOs, rendering the ECT inapplicable to them. The EC asserts that "[i]t was never intended that the ECT should influence their internal energy policy."[323]

243.  Third, the EC argues that if harmonious interpretation is impossible, EU law should apply, rather than the ECT.[324] According to the EC, the ECT is superseded by EU law through Articles 30 and 41 of the VCLT and Article 351 of the TFEU.

244.  The EC's arguments regarding its request that the proceedings be suspended pending the ECJ's *Achmea* Decision have been rendered moot by the passage of time, thus the Tribunal will not set these out here.

### c.  *The Claimants' Arguments on whether the ECT applies to intra-EU disputes*

245.  The Claimants assert that the Respondent's arguments regarding the non-applicability of the ECT to intra-EU disputes are wrong, and are refuted by:

- the explicit terms of the ECT, which have remained static since the Treaty entered into force for Italy, Germany and Austria, and which contains no implied "disconnection clause" in order to avoid purported conflicts with EU law;[325]

- consistent investment treaty jurisprudence, applying the terms of the ECT in the manner the Claimants suggest, which has unanimously rejected the intra-EU objection;[326] and

- the rules of treaty interpretation.[327]

---

[323]    EC Brief, ¶ 97.

[324]    EC Brief, ¶ 15, § 3.

[325]    Claimants' Reply, ¶¶ 48-64; Claimants' Rejoinder on Jurisdiction, ¶¶ 3, 26-30.

[326]    Claimants' Reply, ¶¶ 65-78; Claimants' Rejoinder on Jurisdiction, ¶¶ 12-18.

[327]    Claimants' Reply, ¶¶ 79-100; Claimants' Rejoinder on Jurisdiction, ¶¶ 19-25.

246.  The Claimants contend that the EC's arguments are equally unpersuasive for the same reasons.[328]

247.  First, the Claimants contest the Respondent's assertion that "at the most" only "four to five" tribunals have ruled against the intra-EU objection. Rather, the Claimants submit that at least 29 investment treaty tribunals have rejected this argument, including seventeen ECT tribunals.[329] The Claimants reject the Respondent's contention that no Tribunal has ever addressed all the issues under international law in those cases, "or the consistency of the two treaties as for material provisions they apply."[330] To the contrary, say the Claimants, "numerous tribunals" – including those in *Novenergia v. Spain*, *Eiser v. Spain*, *Blusun v. Italy* – have unanimously determined that there is no inconsistency between investment treaties and EU law and, that even if there were, investment treaties "clearly" afford investors greater protection.[331] For instance, the *Novenergia v. Spain* tribunal observed that FET under the ECT does not exist in the EU legal order.[332]

248.  Second, the Claimants argue that the Respondent mischaracterizes the scope of EU law and Article 16 of the ECT with its assertion that EU law offers investors more favourable treatment than the ECT.[333] The Claimants' position, supported by the ECJ's Advocate General's Opinion, is that even when taken as a whole, EU law on investors' substantive

---

[328]  Claimants' Reply, ¶¶ 101-150. *See also* Claimants' Rejoinder on Jurisdiction, ¶¶ 11 and note 4.

[329]  Claimants' Rejoinder on Jurisdiction, ¶ 12; *see* cases listed at fn. 6 which puts this number at 18. The Claimants' Comments on the EC Brief update this figure to 29 (*see* ¶ 4).

[330]  Respondent's Rejoinder, ¶ 107.

[331]  Claimants' Rejoinder on Jurisdiction, ¶¶ 13-18; *Novenergia II -Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Procedural Order No. 17, 9 April 2018: CL-197 (the tribunal rejected Spain's request to revisit this issue in light of *Achmea*); *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 ("***Eiser v. Spain***"): CL-135, ¶¶ 160-173, 207 (CL-135); *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 ("***Blusun v. Italy***"): CL-139, ¶ 303.

[332]  Claimants' Rejoinder on Jurisdiction, ¶ 14; *Novenergia II -Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 ("***Novenergia v. Spain***"): CL-195, ¶ 460 ; The tribunal also determined that a decision by the EC based on EU law to regulate certain state aid issues was entirely separate.

[333]  Claimants' Rejoinder on Jurisdiction, ¶¶ 19-25; Respondent's Rejoinder, § II.A.1.

rights does not mean that EU law recognizes fair and equitable treatment ("**FET**"), for instance.[334]

249.    Third, the Claimants contest the Respondent's argument that the EU Member States intended to modify the ECT when they signed the Lisbon Treaty, and that this interpretation is not prevented by Article 41 of the VCLT.[335] The Claimants submit that Article 41(b)(ii) of the VCLT only permits modification if it "does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole."[336] The Claimants submit that derogation from the ECT would be incompatible, given that the object and purpose of the Treaty is the protection of their substantive and procedural rights.[337] The Claimants further assert that there is no discrimination caused by the operation of the ECT within the EU.[338]

250.    Finally, the Claimants argue that the Respondent has not demonstrated that EU Member States did not intend the ECT to apply to intra-EU disputes through an implied disconnection clause by pointing to any source that suggests this was the EU Member States' understanding at the time.[339] The Claimants also point out that the EC's position that intra-EU investment dispute is inconsistent with EU law is not shared by all EU Member States and is also contrary to the opinion of the EU Advocate General's opinion in this respect.[340] In response to the EC's contextual interpretation argument that the Statement Submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the ECT "clearly excludes disputes brought by

---

[334]    Claimants' Rejoinder on Jurisdiction, ¶¶ 20-21.

[335]    Claimants' Rejoinder on Jurisdiction, ¶ 23.

[336]    Claimants' Rejoinder on Jurisdiction, ¶ 24; VCLT: CL-050, Art. 41(b)(ii).

[337]    Claimants' Rejoinder on Jurisdiction, ¶ 24.

[338]    Claimants' Rejoinder on Jurisdiction, ¶ 25.

[339]    Claimants' Rejoinder on Jurisdiction, ¶¶ 26-29.

[340]    Claimants' Rejoinder on Jurisdiction, ¶¶ 58-60. The EC's submission acknowledges this, as it states that "an important number" of EU Member States share its view, which makes clear that this is not the unanimous view of the EU Member States.

EU investors against a Member State," the Claimants point out that the EC's selective quoting from that statement is misleading.[341] That statement provides, in part, as follows:

> … The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.
>
> The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days.

251.    The footnote in the statement to this last quoted sentence provides: "[t]his is without prejudice to the right of the investor to initiate proceedings against both the Communities and their Member States."

### d.    The Respondent's Arguments on *Achmea*

252.    The Respondent argues that because EU law is part of international law, and the applicable law to a dispute under the ECT is international law, it follows that EU law should be applied as international treaty law.[342] The Respondent asserts that "there is no possible doubt" that the ECT's offer to arbitrate as between EU Member States is "exactly identical" to Article 8 of the Slovak-Dutch BIT at issue in *Achmea*.[343] In support of its position, the Respondent relies on a blog post by Professor Steffen Hindelang of the Freie Universität Berlin, who opines that investment disputes between EU Member States under the ECT should not be treated differently from the situation addressed in *Achmea*.[344]

253.    The Respondent asserts that the fact that the ECT is a multilateral treaty, and that the EU itself is a Party, does not affect the bilateral nature of the offer to arbitrate at issue in this case.[345] The Respondent argues that the *Achmea* Decision endorses its contention that intra-

---

[341]    Claimants' Reply, ¶¶ 126-127.

[342]    Respondent's Comments on *Achmea*, ¶¶ 5-6, citing *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, fns. 1, 3; *Blusun v. Italy*: CL-139.

[343]    Respondent's Comments on *Achmea*, ¶ 12.

[344]    Respondent's Comments on *Achmea*, ¶ 13, citing Steffen Hingelang, "The Limited Immediate Effects of CJEU's *Achmea* Judgement," 9 March 2018, *Verfassungsblog*: RL-020.

[345]    Respondent's Comments on *Achmea*, ¶¶ 14-16.

EU investment arbitration violates Articles 267 and 344 of the TFEU and the general principle of the autonomy of EU law, and therefore an arbitration clause becomes inapplicable when invoked by two EU Member States.[346]

254. The Respondent further argues that the ECJ's statement in *Achmea* that the EU, when entering into international treaties, has to "[respect] the autonomy of the EU and its legal order"[347] "necessarily entail[s] the power to submit disputes to the decisions of a court created or designated by such agreements <u>as for the interpretation and application … of such international agreements</u> provided that the autonomy of the EU and its legal order is respected."[348]

255. According to the Respondent, *Achmea* confirms that an offer to arbitrate between intra-EU parties becomes inapplicable if the arbitration tribunal must apply EU law for two principal reasons. First, arbitral tribunals cannot raise a preliminary ruling before the ECJ under Article 267 of the TFEU, and therefore such tribunals breach the monopoly of the ECJ in the interpretation of EU law and prevent those disputes from being resolved in accordance with "the full effectiveness of EU law."[349] The Respondent argues that this is so even within the context of a multilateral treaty.[350]

256. For the Respondent, intra-EU investment arbitration under the ECT is incompatible with EU law because it violates the autonomy of the EU legal order for the same reasons as the intra-EU BIT at issue in *Achmea*.[351] The Respondent asserts it is possible to interpret the ECT as not applying between EU Member States by looking to public international law and, specifically, to the principle of interpretation "in conformity or of harmonious interpretation" (pointing to Article 31(3)(c) of the VCLT and *Electrabel v. Hungary*).[352] In

---

[346]    Respondent's Comments on *Achmea*, ¶¶ 8-11.
[347]    *Slowakische Republik v. Achmea B.V.*, ECJ Case C-284/16, Preliminary Ruling, 6 March 2018 ("***Achmea***"): CL-194, ¶ 57.
[348]    Respondent's Comments on *Achmea*, ¶¶ 17-18 (emphasis in original).
[349]    Respondent's Comments on *Achmea*, ¶¶ 19-21, relying on *Achmea*: CL-194, ¶¶ 56, 58.
[350]    Respondent's Comments on *Achmea*, ¶ 19.
[351]    Respondent's Comments on *Achmea*, ¶ 21.
[352]    Respondent's Comments on *Achmea*, ¶¶ 22-23.

the alternative, if the clear wording precludes interpretation in conformity for being *contra legem*, the Respondent argues that any conflict between the ECT and EU law would have to be resolved in favour of EU law.[353] The Respondent contends that *Achmea* resolves the previous live issue for arbitral tribunals regarding not only with respect to whether intra-EU BITs, but also intra-EU ECT situations, are incompatible with the TFEU, and cites a blog post by Nikos Lavranos where he states that "it would seem that *Achmea* applies" in intra-EU ECT disputes.[354]

257.    Second, the Respondent states that *Achmea* concludes that arbitral tribunals are not jurisdictions under the preliminary ruling procedure set out in Article 267 of the TFEU, and that only state-established permanent jurisdictions qualify as such.[355] While the Respondent acknowledges that "the Tribunal's jurisdiction is derived from the express terms of the ECT" and that it is "a binding treaty under international law," it argues that because the Tribunal is not part of the EU judicial system, and thus, as found in *Achmea*, this Tribunal has no power to refer a reference to the ECJ for preliminary ruling.[356]

258.    In sum, for the Respondent, the ECT's arbitration clause is incompatible with, and adversely affects the autonomy of, EU law because arbitral tribunals are not capable of ensuring the proper application and full effectiveness of EU law in intra-EU disputes on account of their inability to refer a preliminary ruling to the ECJ and their lack of state-established permanent jurisdiction.

259.    The Respondent also argues that EU law offers "functionally more articulated" protection to intra-EU investors than that in the ECT.[357] It alleges that the ECT recognizes the EU as a unified legal system whose provisions on the same matters covered in the ECT must prevail, "and consequently that Contracting Parties signed the ECT under the mutual

---

[353]    Respondent's Comments on *Achmea*, ¶ 24.

[354]    Respondent's Comments on *Achmea*, ¶¶ 25-26, citing Nikos Lavranos, "Black Tuesday: The End of Intra-EU BITs," 7 March 2018, *Practical Law Arbitration Blog*: RL-021.

[355]    Respondent's Comments on *Achmea*, ¶ 27.

[356]    Respondent's Comments on *Achmea*, ¶¶ 30-32.

[357]    Respondent's Comments on *Achmea*, ¶¶ 35-39.

understanding that this would not apply to intra-EU situation" so as not to infringe Article 344 TFEU, as stated in *Achmea*.[358]

260.  The Respondent also contends that the Opinion by Advocate General Wathelet – which assumes that arbitral tribunals could and, in some cases, are obliged to, raise preliminary rulings before the ECJ – is superseded by *Achmea*, which noted that it was not bound by this Opinion.[359]

261.  Finally, the Respondent argues that EU Member States are not permitted to execute awards which infringe upon EU law irrespective of whether they are rendered pursuant to an EU seat of arbitration or a non-EU jurisdiction, or alternatively, under ICSID or non-ICSID rules.[360] The European Commission requires that intra-EU ECT awards be authorized by it before execution because such awards constitute state aids, which Respondent relies on as further evidence of the institutional conflict caused by the ECT.[361]

### e.  The Claimants' Arguments on Achmea

262.  The Claimants assert that the *Achmea* Decision is irrelevant to the current dispute for several reasons.[362] First, the Claimants argue that the Tribunal's jurisdiction is exclusively based on the express terms of the ECT, namely Article 26 of the ECT, and that Article 26(6) of the ECT cannot be used as a "back door" for application of the *Achmea* Decision.[363]

263.  Second, the Claimants submit that at least 29 investment treaty decisions have now rejected intra-EU objections, and that their reasoning for doing so remains resonant for three reasons:[364]

---

[358]  Respondent's Comments on *Achmea*, ¶¶ 38-39; *Achmea*: CL-194, ¶ 57.

[359]  Respondent's Comments on *Achmea*, ¶¶ 40-44.

[360]  Respondent's Comments on *Achmea*, ¶ 45.

[361]  Respondent's Comments on *Achmea*, ¶ 46.

[362]  The Claimants outline the background to that case in their Rejoinder on Jurisdiction, ¶¶ 31-41.

[363]  Claimants' Rejoinder on Jurisdiction, ¶¶ 45-51.

[364]  Claimants' Rejoinder on Jurisdiction, ¶ 52; Claimants' Comments on New Legal Authorities, ¶ 4.

- First, the Claimants observe that had the Contracting Parties to the ECT wanted to exclude intra-EU disputes from the Treaty's coverage, there were tools available to achieve this carve-out – but they did not do so.[365] The Claimants state that tribunals have repeatedly held that interpretive gymnastics should not be undertaken to read an intra-EU restriction into the ECT, when plainly no such restriction exists in the language of the Treaty.[366]

- Second, the Claimants assert that EU law and the ECT do not share the same subject matter, "not least because the ECT affords investors [with] a right to international arbitration that is not included in the EU legal framework."[367] The Claimants state that the ECJ suggested that *Achmea* did not extend to treaties to which the EU is a contracting party, and this issue was addressed in the ECJ's Advocate General Wathelet, who stated that:

  > the material provisions for the protection of investments provided for in that Treaty and the [investors-state dispute settlement] mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.[368]

  The ECJ did not rule that there was a conflict between EU law and the substantive protections in the Netherlands-Slovakia BIT, but rather that the BIT violated jurisdictional protections of the EU treaties by interfering with the ECJ's authority.[369] In any event, the Claimants point out that none of their claims is based on EU law; rather, all claims are based on the ECT and public international law.[370]

- Third, even if such a conflict existed, the Claimants argue that the ECT would prevail over EU law pursuant to Article 16(2) of the ECT, which states that the

---

[365]    Claimants' Rejoinder on Jurisdiction, ¶ 55.

[366]    Claimants' Rejoinder on Jurisdiction, ¶ 54.

[367]    Claimants' Rejoinder on Jurisdiction, ¶ 56.

[368]    Claimants' Rejoinder on Jurisdiction, ¶ 57.

[369]    Claimants' Rejoinder on Jurisdiction, ¶ 58.

[370]    Claimants' Rejoinder on Jurisdiction, ¶ 59.

investor shall benefit from the more favourable provisions contained in the ECT, explicitly including the "right to dispute resolution."[371]

264.    The Claimants submit that, even if *Achmea* were relevant, it is clearly distinguishable from investment arbitrations under the ECT for two reasons:[372]

- *Achmea* is limited to intra-EU BITs and does not apply to investment treaties to which the EU is a party. There are 54 Contracting Parties to the ECT, and thus 25 states that are not EU Member States, and the EU itself. Thus the ECJ limited its decision to BITs concluded between EU Member States. The ECJ "clearly lacks the authority to derogate from a treaty to which non-EU states are parties."[373]

- *Achmea* turned on governing law provisions in the BIT that are not present in the ECT. Article 8(6) of the Netherlands-Slovakia BIT stated that the applicable law included "the law in force of the Contracting Party concerned" "and other relevant Agreements between the Contracting Parties," whereas Article 26(6) of the ECT specifically provides that the Tribunal shall decide disputes in accordance with the terms of the ECT and principles of international law.[374] The Claimants assert that the ECT does not permit the Tribunal to apply the domestic law of the host state or other relevant agreements between the Contracting Parties.[375]

---

[371]    Claimants' Rejoinder on Jurisdiction, ¶¶ 60-63; Opinion of Advocate General Wathelet in *Achmea*: CL-189, ¶ 77, citing ECJ Opinion Case 2/15, 16 May 2017: C-424, ¶ 292 ("recourse to international arbitration is the most essential element of the BITs").

[372]    Claimants' Rejoinder on Jurisdiction, ¶¶ 3, 66-82.

[373]    Claimants' Rejoinder on Jurisdiction, ¶ 68.

[374]    Claimants' Rejoinder on Jurisdiction, ¶¶ 73-74.

[375]    Claimants' Rejoinder on Jurisdiction, ¶ 77.

265.   The Claimants suggest caution in analysing *Achmea*'s theoretical future impact, if any, upon enforcement of ECT arbitral awards, and asserts that this is not a relevant concern for this Tribunal.[376]

### f.   The Tribunal's Analysis

266.   Although the Respondent made multiple objections to the Tribunal's jurisdiction, the main objection, supported by the Commission's submissions and various interpretations of the ECT, was that the arbitration agreement in the ECT does not apply to intra-EU disputes. The Respondent submits that allowing investors from other EU member states, such as Claimants in this case, to bring their claims before an international arbitral tribunal would be antithetical to the nature of the EU and the fundamental principles of "unity, autonomy and effectiveness" and mutual trust enshrined in the TFEU. The Respondent says that all disputes between Member States of the EU should thus be resolved exclusively by courts and tribunals of Member States.

267.   For context before turning to each specific argument made by the Respondent in turn, the Tribunal notes that this position reflects a change in preference of forum by European States for the resolution of investor-State disputes. The system of investor-State dispute resolution by international arbitral tribunals was created by States to address the issues arising from investors having to seek redress in the courts of a State that had allegedly imposed illegal measures and/or seeking the diplomatic protection of their home State. Investment arbitration as we know it today is a system created by States in order to provide a neutral forum for the resolution of investment disputes and thereby encourage investment.

268.   States specifically selected international arbitration as an appropriate means to resolve investment disputes and created the possibility for covered investors to commence proceedings directly. Arbitration is a consensual but binding dispute resolution mechanism; once consent has been given and the offer to arbitrate accepted, it cannot be

---

[376]    Claimants' Rejoinder on Jurisdiction, ¶ 79.

unilaterally withdrawn by either party to a dispute. The agreement of the parties to arbitrate their disputes is fundamental to arbitration and forms the basis for a tribunal's jurisdiction.

269.    Through investment treaties made with each other, host States gave their consent to international arbitration. States agreed to directly resolve their disputes with investors for alleged breaches of the investment treaty in a neutral forum that would apply international law (and, sometimes, consider national laws).

270.    The ECT is an example of such an investment treaty. Its object and purpose is "to promote long-term cooperation in the energy field"[377] and it protects the substantive and procedural rights of investors in the territory of other States signatory to the ECT. To this point, there is no dispute. The Respondent accepts that the Tribunal derives its jurisdiction from the ECT, which is a binding international treaty.[378] The provisions of Article 26 of the ECT that relate to consent to arbitration and its binding nature are found in Part III of the ECT and are set out here:

> …
>
> (3)(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.
>
> > (b)(i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).
> >
> > (ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.
> >
> > (c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).
>
> (4) In the event that an Investor chooses to submit the dispute for resolution [by international arbitration or conciliation], the Investor shall further provide its consent in writing for the dispute to be submitted to:

---

[377]    ECT: CL-001, Art. 2.

[378]    Respondent's Comments on *Achmea*, ¶ 30.

(a)(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

(ii) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

(5)(a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;

(ii) an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and

(iii) "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.

(b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

(7) An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State."

> (8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

271. The Respondent does not rely on either of the explicit exceptions set out in Article 26(3)(b) or (c).[379] Instead, despite the clear wording of Article 26 providing "unconditional consent" to international arbitration, the Respondent (and the Commission) argue that the EU Member States signatory to the ECT never intended the arbitration agreement to apply to disputes between them. In the alternative, the Respondent submits that the Lisbon Treaty, subsequently entered into among the EU member States, is an *inter se* agreement for the purposes of Article 41 of the VCLT that vitiates the Respondent's consent to arbitration given in the ECT as it relates to investors from other EU member States.

272. Further, the Respondent submits that in the *Achmea* decision, the ECJ specifically decided the issue of the validity of intra-EU arbitration agreements in the negative. The Respondent says that the subsequent Declarations by the EU Member States, including the EU Member States party to the ECT relevant in this arbitration (both the home and host States), are determinative and justify its request to terminate the arbitral proceedings. The Respondent submits that the Tribunal is "bound by the will of the Contracting Parties," which it says is expressed in the Declarations and should be taken into account pursuant to Articles 31(2)(b) and 31(3)(a) of the VCLT.

273. As the instrument that gives rise to the Tribunal's jurisdiction in this arbitration, the Tribunal's analysis in the following sections of this award will focus on the text of the ECT. The relevant provisions of the ECT will be interpreted in accordance with the rules of customary international law as codified in the VCLT.

---

[379] The Tribunal notes that the Commission has referred to its statement made pursuant to Article 26(3)(b)(ii) setting out its "policies, practices and conditions with regard to disputes" to support its argument that the EU Member States did not intend to give consent to international arbitration among EU Member States. This was not a reliance on the exceptions directly, which do not in any case apply. The exceptions relate to disputes "previously submitted" "to the courts or administrative tribunals of the Contracting Party party to the dispute" or "in accordance with any applicable, previously agreed dispute settlement procedure," neither of which apply in this case.

274.    The preamble to the VCLT confirms that "the principles of free consent and of good faith and the *pacta sunt servanda* rule are universally recognized" and States' desire "to establish conditions under which justice and respect for the obligations arising from treaties can be maintained." The operative terms of the VCLT address, *inter alia*, the capacity of States to enter into treaties; how States express their consent to be bound by the terms of treaties (or their specific reservations to certain terms) and how that consent may be modified or withdrawn; and how treaties should be interpreted. The VCLT supports clarity in the obligations voluntarily assumed by States through treaties by giving effect to the treaty language negotiated by the State parties and making clear what evidence is required in order for States to be bound.

275.    In the Tribunal's view, it is important that international law as expressed in treaties is capable of being known and is certain. This is of fundamental importance to States, as well as all international actors affected by such treaties. State sovereignty is guarded by this, as States negotiate and choose how to express their agreed limits to their sovereignty. It is also important for other international actors who rely on treaties that the terms of such treaties be clear and the obligations assumed to be certain. These principles are of fundamental importance to the rule of law.

276.    For the reasons articulated below, the Tribunal finds that it has jurisdiction to determine the Claimants' claims under the ECT.

> *(i)    The Original Scope of the ECT and whether it includes an Express or Implied Disconnection Clause*

277.    The Respondent's first argument is that the ECT has never applied to intra-EU disputes.

278.    The Respondent says that the ECT's context and purpose support a conclusion that it does not apply to intra-EU disputes; it was primarily concluded to regulate relations between Europe and Eastern Europe/the Soviet Union.[380] The Respondent refers to the definitions of "Contracting Party," "regional economic integration organisation," and "Area," as well as recognition in the ECT of the relations among EU Member States in Articles 25 and 16,

---

[380]    Respondent's Counter-Memorial, ¶ 64.

in support of its contextual analysis. The Respondent also refers to the "decisions" annexed to the ECT regarding Articles 24(4)(a) and 25 of the ECT in support of this argument.[381] For convenience, the relevant provisions of Articles 24 and Article 25 of the ECT are set out here:

> Article 24(4)
>
> The provisions of this Treaty which accord most favoured nation treatment shall not oblige any Contracting Party to extend to the Investors of any other Contracting Party any preferential treatment:
>
> > (a) resulting from its membership of a free-trade area or customs union; …
>
> Article 25
>
> (1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.
>
> (2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalising, *inter alia*, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame."
>
> (3) …

279. The Claimants point out that it is not altogether clear that the EU is "an EIA, free trade area, or customs union"[382] but, in any event, nothing in the ECT or the Decisions referenced therein supports the Respondent's interpretation that EU investors are prohibited from seeking redress in international arbitration against an EU Member State.

280. The Respondent says that the ECT explicitly recognizes the EU as a REIO with a similar goal to the ECT of liberalizing trade and investment. Article 25 of the ECT recognizes different (preferential) treatment among parties to an EIA. Italy interprets this to mean that the Parties recognized that ECT members who were also EU members would have

---

[381]     Respondent's Counter-Memorial, ¶¶ 57-59.
[382]     Claimants' Reply, ¶ 58.

preferential treatment by virtue of the EIA and that further implementation by second measures was contemplated at the time.

281.    In the Tribunal's view, the Respondent's argument to this point is supported by the text of the ECT. The EU and its Member States are Contracting Parties to the ECT. The EU signed the ECT as a REIO and the ECT contemplates further evolution of the EU's trade and investment rules among the parties to an EIA (irrespective of whether the EU Treaties are an EIA as defined in the ECT). However, Article 25 of the ECT does not address the issue of the obligations owed by one EU Member to the investors of another EU Member.

282.    If it applies to the EU, Article 25 of the ECT addresses the obligations of EU Member States to non-members and provides that there is no obligation "to extend, by means of most favoured nation treatment, … any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto." Article 25 of the ECT makes clear that the contracting parties to an EIA could make arrangements as between themselves to liberalize trade and investment and that non-members of that EIA could not benefit from those arrangements through the ECT. In effect, these provisions address the opposite situation to the one at issue in this case. These provisions confirm that any preferential treatment agreed within the EU would not have to be extended to non-EU members.

283.    Nevertheless, the Respondent relies on Article 25 of the ECT for the proposition that the EU's purpose (through an EIA) is to substantially liberalize trade and investment and that this is "the same subject matter as the ECT."[383] The Respondent also refers to the Decision on Articles 24(4)(a) and 25 as further support for its interpretation, arguing that the wording of this decision providing that an Investment of an Investor with its registered office in the Area of the party to an EIA is to be treated as a party to that EIA.[384]

---

[383]    Respondent's Counter Memorial, ¶ 51.

[384]    Annex 2 to the Final Act of the European Energy Charter Conference, Decisions with Respect to the ECT, Decision with respect to Articles 24(4)(a) and 25.

284.    In addition, Italy says that Article 16 of the ECT supports its argument that EU law prevailed over the ECT at the time of its conclusion.[385]

285.    The Respondent submits that the relevant Contracting Parties in this case (Italy, Germany and Austria) had entered into the EU treaties before entering into the ECT and that the EU treaties "concern the subject matter of Part III or V of [the ECT]." As a result, it says that "nothing in Part III or V of the ECT must be construed to derogate from any provision of the EU Treaties as for investment promotion and protection, or from any right to dispute resolution with respect thereto under the EU Treaties."[386] The Respondent argues that the rights granted under the EU Treaties are more favourable and goes further to argue in effect that Article 16 of the ECT provides that those rights replace any rights granted to other EU Member States under the ECT.

286.    The Tribunal does not consider this interpretation of Article 16 to be supported by the text. While Article 16 does address the coincidence of rights arising from international agreements concerning the same subject matter of Part III or V of the ECT, the language of the provision confirms the intention that any such rights have an additive, rather than substitutive effect. The alternatives in Article 16 make it clear that the Contracting Parties accepted that there were already ("prior") and could in future be ("subsequent") international agreements among some of the Contracting Parties that concerned investment protection and promotion (Part III) and dispute settlement (Part V) (an obvious example being bilateral investment treaties). Article 16 provides for the rights granted under the various international agreements to both co-exist and be operative. Otherwise, there would have been no need to provide a "conflict rule" that relates to the construction of both agreements.

287.    The clear intention of Article 16 was to ensure that Investors or Investments would have access to the "more favourable" applicable provision. Article 16 is intended to preserve the maximum rights available to an Investor or an Investment, not to create a situation where one international agreement's regime has primacy over the other. Said differently, the

---

[385]    The provisions of Article 16 have been set out above at para. 228.
[386]    Respondent's Counter Memorial, ¶ 54.

Contracting Parties agreed that they could not derogate from the substantive protections afforded by either international agreement to which they are parties to the detriment of the Investor or the Investment.

288.    That is not to say that rights granted under other international agreements could be imported into the ECT. Each agreement stands on its own. Article 16 of the ECT simply grants a minimum level of protection to Investors and Investments by confirming that the substantive rights granted could not be derogated from through the interpretation of the provisions in another international agreement. This follows from the language of Article 16 of the ECT, which links the method of dispute resolution to the substantive right asserted. In both Article 16(1) and (2), the reference is to "any right to dispute resolution with respect thereto under [the relevant agreement]." Any disputes as to the provisions of Part III or V of the ECT are to be resolved pursuant to the rights to dispute resolution under the ECT.

289.    The language of Article 16 of the ECT also confirms that the Contracting Parties were cognizant of the fact that multiple instruments could give rise to rights for the same investor and that in such situations it would be the Investor or the Investment who would select which protection and associated dispute resolution mechanism to pursue. This flows from the language and structure of Article 16 of the ECT, which confirms that there may be multiple agreements that create rights and that the provision in the instrument that is "more favourable to the Investor or Investment" shall prevail. When this provision is read together with Article 26(2) of the ECT, which grants the right to an Investor to choose to submit a dispute for resolution, it is clear that the Contracting Parties intended that the Investor select the instrument and related dispute resolution mechanism under which it would pursue its rights.

290.    In the Tribunal's view, these provisions of the ECT do not support the Respondent's proposed interpretation; the ECT's provisions do not indicate the intention of the Contracting Parties to exclude or exempt intra-EU disputes over claims that arise under the ECT.

291. Further, the "context" that these provisions provide cannot be interpreted to indicate that EU parties did not see a need for a specific disconnection clause. To recap, Italy and the EU argue that "at the time" Member States did not see a need for an explicit disconnection clause and that the lack of such a clause should not be interpreted as an intention to include such disputes. As a result, the Respondent's argument (supported by the EC) that the ECT's context and purpose can be used to interpret the ECT dispute resolution provision as applying only between non-Member states must fail.

292. The Tribunal must interpret the ECT pursuant to the VCLT and in light of the VCLT's object and purpose. The wording of the ECT dispute resolution provisions is clear – an Investor may bring a claim against a State party in international arbitration and there are no specific exceptions. Article 6 of the VCLT specifically states that "[e]very State possesses capacity to conclude treaties." Article 42 of the VCLT also confirms that "the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention." Context and purpose cannot be used to override the clear wording of a treaty. The general rule of interpretation is that a "treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

293. Read as a whole, the ordinary meaning of Article 26 of the ECT is that all of the Contracting Parties consented to international arbitration with investors from all other Contracting Parties unless the specific exceptions therein were met. To achieve this result, the language in Article 26(3) goes so far as to indicate that Contracting Parties seeking to avail themselves of the exceptions to that unconditional consent "[for the sake of transparency] … provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification … [or] accession." The Contracting Parties expressly intended that any exceptions to the unconditional consent to international arbitration or conciliation be transparent and articulated before the ECT was in force. To override this clear wording and arrive at the

conclusion that the EU and its Member States did not intend for this consent to apply *inter se*, an explicit disconnection clause would be required.[387]

294.    With respect to the EC's argument that EU Member States did not have the competence to provide for international arbitration *inter se*, the Tribunal agrees with the analysis of the *Blusun v. Italy* tribunal, which stated that "[t]he *inter se* obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that the EC says can be inferred from a set of EU laws and regulations dealing with investment. The more likely explanation, consistent with the text of the ECT, is that, at the time the ECT was signed, the competence was a shared one."[388] This is supported by the fact that both the EC and the EU Member States were Contracting Parties, which indicates the intention that, together, all signatories had all of the necessary competences to agree to the obligations contained in the ECT. This is consistent with the Communities' own statement to the Energy Charter Secretariat at the time that they and their Member States have both concluded the ECT "and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences."[389]

295.    In the Tribunal's view, this confirms that the Contracting Parties intended all of the provisions of the ECT to be binding on all of the Contracting Parties and that together, the EC and its Member States had competence to agree to be bound by all of the provisions of the ECT. Thus, the Tribunal reaches the conclusion, as other tribunals have also reached, that EU Member States and the EU are all Contracting Parties to the ECT and, as such, the Treaty applies equally between its Parties.[390]

296.    The Tribunal rejects the Respondent and the EC's explanation that the EU and the EU Member States did not include a disconnection clause in the ECT because they acted as "one single block" throughout its negotiation, and therefore did not think it necessary. This

---

[387]    The Tribunal notes that the ECT contains at least one such example in its references to the Svalbard Treaty.

[388]    *Blusun v. Italy*: CL-139, ¶ 283.

[389]    *See above*, para. 250. This quotation comes from the Communities' Statement to the Energy Charter Secretariat pursuant to Article 26(3)(b)(ii).

[390]    *See*, *e.g.*, *Blusun v. Italy*: CL-139, ¶ 280(2).

position is not supported by the text of the ECT, which suggests overlapping competence and not an "indivisible whole."[391]

297.    The Tribunal agrees with the reasoning of the *Blusun v. Italy* tribunal and finds that reading (an implied) disconnection clause into the ECT "is not permissible in a context in which the terms of the treaty are clear."[392] In accordance with Article 31 of the VCLT, the ECT is to be interpreted in good faith, according to the plain and ordinary meaning of the terms used in that treaty, in their context and taking into account the object and purpose of the treaty. Applying this means of interpretation, the Tribunal finds no basis to suggest that the Contracting Parties to the ECT intended to include an implicit disconnection clause that would apply to intra-EU disputes. The Respondent's objection on this ground is dismissed.

298.    Further, the ECT's preamble explicitly records its intention to make the commitments contained in the 1991 European Energy Charter ("**EEC**")[393] binding, thereby implying that the scope of the EEC "was replicated in binding form in the ECT."[394] This Tribunal agrees with the *Blusun v. Italy* Tribunal's observation that there is no indication of any *inter se* exclusion in the EEC, which instead refers to a "European-wide and global co-operation based on mutual respect" and "support from the [EU] … through completion of its internal energy market."[395]

*(ii) The Respondent's Primacy of EU Law Argument and the Relationship between Articles 16 and 26 of the ECT*

299.    As a corollary to its first argument, the Respondent invokes Article 16 of the ECT (which sets out the conflict rules regarding other international agreements involving the same parties and subject matter) in support of its contention that EU law prevailed over the ECT at the time of its conclusion. The Respondent claims that EU treaties are more favourable

---

[391]    *See, e.g., Masdar Solar & Wind Cooperatief U.A v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 ("***Masdar v. Spain***"): CL-200, ¶ 331; *Novenergia v. Spain*: CL-195, ¶ 453; *Blusun v. Italy*: CL-139, ¶ 281.

[392]    *Blusun v. Italy*: CL-139, ¶ 280(4).

[393]    17 December 1991, signed by EC and Euratom.

[394]    *Blusun v. Italy*: CL-139, ¶ 280(1).

[395]    *Blusun v. Italy*: CL-139, ¶ 280(1), citing EEC Preamble, ¶¶ 6, 14.

to investors, and that EU law is more developed and articulated than the protections under the ECT such that investors could address in an EU court all issues that would arise in ECT arbitration.

300. The Claimants counter that the Respondent mischaracterizes the scope of EU law and Article 16 of the ECT, and that the ECT in fact offers investors more favourable treatment than the ECT, such as fair and equitable treatment, which does not exist in the EU legal order.[396]

301. As set out above, Article 16 of the ECT does not create a hierarchy among international agreements. Instead, it contemplates that rights under multiple agreements may exist and that, in such circumstances, the Investor may choose which rights to pursue and how. A determination of which of these provisions and its related means of dispute settlement is more favourable to the Investor can only be effectively made once the circumstances giving rise to the dispute arise.

302. The Tribunal finds that the Respondent is bound by Article 26, pursuant to which it has given unconditional consent to arbitration before an international tribunal.

*(iii)Purported Subsequent Modification of the ECT as to Inter Se Matters*

303. The Respondent's second argument is that, even if the ECT applied to intra-EU disputes at the time of its conclusion, the EU Member States intended to modify the ECT when subsequently they signed the Lisbon Treaty. The Respondent suggests that Article 41 of the VCLT does not prevent EU Member States from agreeing *inter se* modifications to the ECT by way of the Lisbon Treaty, particularly where maintaining the ECT's arbitration regime would result in discrimination among EU citizens.

304. In response to this argument, the Claimants first note that the Respondent's arguments in this regard presuppose that the EU Member States intended to modify the ECT when they entered into the Lisbon Treaty and there is no evidence of this intention.[397] The Claimants

---

[396] *Novenergia v. Spain*: CL-195, ¶ 460; Claimants' Rejoinder on Jurisdiction, ¶ 14.
[397] Claimants' Rejoinder on Jurisdiction, ¶ 23.

also point out that Article 41(b)(ii) of the VCLT only permits modifications to existing treaties if it "does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole."[398] Moreover, the Claimants submit that *inter se* modifications cannot be accepted where they are unsupported by express provision or clear understanding to the contrary.[399]

305.    The Respondent supports its argument of its intention to modify the ECT through the Lisbon Treaty by contending that maintaining the ECT's arbitration regime would result in "an intolerable discrimination among citizens of the Union."[400] As the Claimants have noted, the ECT and EU treaties address discrimination within the context of a state's treatment of foreign — not domestic — investors and, as such, there is no discrimination caused by the operation of the ECT between EU Member States.[401] The Tribunal agrees that the Respondent's argument as to the alleged discriminatory effect of the ECT's arbitration regime is incorrect on the face of the clear wording of the ECT, which does not share the same scope as the EU Treaties.

306.    The Tribunal has found that intra-EU dispute resolution was not exempted from the application of Article 26 of the ECT at the time that treaty was entered into. The inquiry now shifts to whether the EU Member States subsequently modified the terms of the ECT with respect to intra-EU dispute resolution. The Respondent relies on Article 41 of the VCLT and asserts that the Lisbon Treaty, in particular, was intended to modify the ECT.

307.    States are free to agree to amend or modify treaties and the VCLT outlines the rules for doing so effectively. The ability of some States to modify a multilateral treaty to which they and others are parties (such as the EU Member States purporting to modify the ECT) after it has been concluded is addressed by Article 41 of the VCLT. When doing so, States are limited to modifications that are not prohibited by the treaty, do not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations

---

[398]    VCLT: CL-050, Art. 41(b)(ii).

[399]    *Blusun v. Italy*: CL-139, ¶ 280(2), citing J. Fawcett, *The British Commonwealth in International Law* (1963) 144-194.

[400]    Respondent's Rejoinder, ¶ 102.

[401]    Claimants' Rejoinder on Jurisdiction, ¶ 25.

and do not derogate from provisions that relate to the effective execution of the object and purpose of the treaty as a whole. Article 41(2) also requires notification of the "other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."

308.   The Lisbon Treaty grants to the EU a new competence over foreign direct investment. However, EU law, either in the Lisbon Treaty or elsewhere, does not provide for international arbitration between an investor and a host state. In addition, EU law does not grant investors the same substantive protections granted in Part III of the ECT, in particular fair and equitable treatment. This suggests that the Lisbon Treaty was not intended to be "an agreement to modify the [ECT] as between themselves alone," as contemplated by Article 41 of the VCLT. The Lisbon Treaty addresses energy specifically, but there is no reference made to the ECT in the Lisbon Treaty[402] and it is common ground that there is no equivalent in EU law of Article 26 of the ECT.[403]   One would expect that States intending to modify a treaty with a subsequent agreement would at least refer to it; a clear intention is required to do so pursuant to Article 41(2). In addition, such intention must be notified. Article 41(2) requires parties purporting to modify a treaty *inter se* to "notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides." Neither the EU nor its Member States expressed such an intention, much less notified it as required.

309.   As a result, the Tribunal concludes that the EU Member States did not agree to modify the ECT as between themselves when they concluded the Lisbon Treaty.

310.   In addition to the Lisbon Treaty, the Respondent refers to the EC's 1992 Proposal for a Council Directive concerning common rules for the internal market in electricity and its dispute resolution mechanism as evidence of the EU and its Member States to regulate

---

[402]   The Lisbon Treaty does expressly indicate that it amends "the Treaty on European Union, the Treaty establishing the European Community and the Treaty establishing the European Atomic Energy Community."

[403]   This issue has been considered by tribunals previously and the Parties did not take issue with this point. *See*, *Wirtgen v. Czech Republic*, PCA Case No. 2014-03/*Ad hoc*, Final Award, 11 October 2017 ("**Wirtgen v. Czech Republic**"): RL-019, ¶ 253; *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007: CL-013, ¶¶ 164-165.

intra-EU situations exclusively within the Internal Market rules.[404] The Tribunal finds that the rules establishing the EU's internal market are arguably broader than those in the ECT, while still being complementary to them. As the tribunal in *Blusun v. Italy* held, "[t]here is no discrimination unless the same benefits are *not* accorded to other EU States, but there is nothing in the ECT that requires such a result."[405] The Respondent relies on *Electrabel v. Hungary* for the proposition that the EC, in signing the ECT, only agreed to international arbitration when one of the parties was a non-EU Member State. That reliance is misplaced. In stating that the EU "accepted the possibility of international arbitrations under the ECT, both between a non-EU investor and an EU Member State or between an EU investor and a non-EU Member State, without any distinction or reservation,"[406] the *Electrabel v. Hungary* tribunal did not define the limits of the EU's consent to arbitration. Rather, the *Electrabel v. Hungary* tribunal observed that EU law can be presumed not to conflict or otherwise be inconsistent with the ECT.[407]

### (iv) The EC's Amicus Curiae Arguments

311.    First, the EC argues that the intra-EU application of the ECT violates EU law – specifically, Articles 3(2), 267, and 344 of the TFEU – because the EU Member States were not competent to bind themselves *inter se* when they ratified the ECT.[408] The EC contends that Article 344 of the TFEU covers investor-state disputes. Article 344 of the TFEU provides as follows:

> Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.[409]

312.    The Tribunal finds that Article 344 of the TFEU does not exclude the possibility of referring intra-EU investor-state disputes to international arbitration not contemplated in

---

[404]    Respondent's Counter-Memorial, ¶ 66.

[405]    *Blusun v. Italy*: CL-139, ¶ 286 (emphasis in original).

[406]    Respondent's Counter-Memorial, ¶ 68, fn. 11; *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 4.158.

[407]    Respondent's Counter-Memorial, ¶ 68, fn. 11; *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 4.136.

[408]    EC Brief, ¶ 17.

[409]    "Treaties" are defined as what this decision refers to as the EU treaties.

the EU treaties.[410] Rather, Article 344 of the TFEU merely prohibits EU Member States from submitting inter-state disputes regarding the interpretation and application of EU law to dispute settlement not provided for in the EU treaties.[411] Article 344 of the TFEU does not address individuals' rights, including an investor's right to resolve disputes against a host State. The dispute in this case also does not involve the interpretation or application of the EU treaties; the Claimants have brought claims under the ECT.

313.    Second, the EC argues that the ECT is superseded by EU law through Articles 30 and 41 of the VCLT and Article 351 of the TFEU, which it says mandates the primacy of EU law in relation to international agreements. According to the EC, EU law should apply rather than the ECT where harmonious interpretation of these two legal orders is impossible.[412] Here too, the Tribunal cannot follow this line of argument. The Tribunal disagrees that specific provisions of the ECT are incompatible with EU law and therefore cannot be applied, with the result that the Tribunal lacks jurisdiction to hear this case. The conflict rules in Article 30(3) of the VCLT read as follows:

> When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under Article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty.

Article 351 of the TFEU provides that the EU treaties do not affect the international agreements of Member States assumed before a State's accession to the EU:

> The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

314.    Article 30(3) of the VCLT deals with the priority between particular provisions of an earlier and a later treaty, as opposed to Article 59 of the VCLT which concerns the termination of an entire treaty. Article 59 of the VCLT requires that the earlier treaty be so incompatible

---

[410]    *Wirtgen v. Czech Republic*: RL-019, ¶ 258; *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 4.151.

[411]    *Wirtgen v. Czech Republic*: RL-019, ¶ 258, citing *Mox Plant* case.

[412]    EC Brief, ¶ 15.

with the later treaty that both cannot be applied at the same time, which is not the case here. EU law is limited to inter-state disputes concerning the interpretation and application of EU law, which does not extend to investor-state arbitration under the ECT. There is therefore no question of incompatibility which would justify reliance on Article 30(3) of the VCLT.[413]

315.     Article 351 of the TFEU applies only to States, which the Claimants in the present case are not. Further, this provision applies only between EU Member States and non-Member States, and here Germany, Austria, and Italy are all EU Member States.[414] The Tribunal does not see how Article 351 of the TFEU applies, and therefore rejects this argument.

316.     The Tribunal sees no reason to deviate from the line of ECT cases that have repeatedly taken the view that, absent an express disconnection clause or an express modification of the ECT, the offer to arbitrate is valid as between EU Member States and their Investors.

*(v)  Applicability of the Achmea Decision to this ECT Dispute*

317.     Based, in part, on its argument of the primacy of EU law, the Respondent submits that the decision of the ECJ in the *Achmea* case is determinative of the issue of whether it had the competence to consent to international arbitration with an investor from an EU Member State. Subsequent to the decision of the ECJ, a number of EU Member States issued the Declaration, which the Respondent submits confirms the agreement of the EU Member States to "inform investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between member States or under the Energy Charter Treaty."[415] Pursuant to the Declaration, Germany and Austria both submitted letters advising this Tribunal of the Declaration.

---

[413]     *Wirtgen v. Czech Republic*: RL-019, ¶ 261; *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction, 6 June 2007: CL-012, ¶ 65 (abeit this case concerned the German-Czech BIT)

[414]     *AES Summit Generation Limited and AES–Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 ("***AES v. Hungary***"): CL-038, ¶¶ 7.6-7.6.11.

[415]     EU Declaration on *Achmea*, p. 2.

318.   It is for this Tribunal to determine its own jurisdiction under the ECT. In doing so, it is necessary to consider (as it already has) the provisions of the ECT itself, as well as whether there has been any subsequent modification of those provisions. The Tribunal's conclusion after performing this analysis is that it does have jurisdiction. The ECT contains an investor-State arbitration clause applicable between EU Member States.

319.   The Respondent now argues that the EU Declaration on *Achmea*, which arises from the EU Member States' obligation to "draw all necessary consequences from [the *Achmea*] judgment pursuant to their obligations under Union law," confirms the agreement of the parties that:

> Union law takes precedence over bilateral investment treaties concluded between Member States. As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable…An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party of the underlying bilateral investment Treaty.
>
> Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied.

320.   In order to address these latest submissions, the Tribunal will examine first whether it is "bound by the will of the Contracting Parties" in their interpretation of intra-EU arbitration provisions such that the Declaration deprives it of its jurisdiction under the ECT. If not, the Tribunal will examine the content of the Declaration itself and the ECJ's decision in *Achmea* that gave rise to the Declaration to determine whether the ECJ's reasoning applies to this case.

321.   The Respondent submits that the fact that the Declaration is signed by all three EU Member States involved in this arbitration (Germany, Austria and Italy) is determinative; the Tribunal is bound by their "will" and must take the Declaration "into account in conformity with Article 31(2)(b) VCLT and Article 31(3)(a) VCLT." The EU Declaration on *Achmea* relied upon by the Respondent has not been agreed by all EU Member States.

322.     Article 31 of the VCLT relates to the general rule of interpretation of a treaty. Article 31(2)(b) allows "any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty" to be considered as part of the context for the purpose of interpretation of a treaty. On its face, this provision does not apply. States cannot create context for the purpose of an interpretation of a treaty through instruments that were not "made … in connexion with the conclusion of the treaty." There is a temporal requirement to this provision of the VCLT that is not met by the EU Declaration on *Achmea*.

323.     Article 31(3)(a) of the VCLT instead permits a tribunal to take into account "any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions." Although the Declaration meets the temporal requirements in Article 31(3), as those relate to subsequent agreements, it does not meet the requirement that it be an "agreement between the parties." First, the Declaration is not an agreement; it provides a shared interpretation of the application of certain of the ECT's provisions by a subset of the parties to the ECT. Second, unlike other provisions in the VCLT, this article does not refer to agreements between some of the parties to the agreement. Article 31(3) of the VCLT clearly refers to an agreement as to interpretation made by all of the parties to the agreement in question. In this case, in order for such an agreement be taken into account in the interpretation of the ECT, it must be an agreement between all of the Contracting Parties.

324.     The Tribunal notes that the interpretation advanced by the Respondent would require the Tribunal to read an exception into the clear wording of Article 26 of the ECT, which provides unconditional consent to international arbitration. Such a reading is more properly described as a modification of the treaty. Interpreting the ECT in this way would run afoul of the general rule of interpretation, which requires ordinary meaning to be given to the terms of the treaty. As discussed above, the VCLT sets out a specific process for such modification of a multilateral treaty by some of the parties to that treaty. If the EU Member States all agree that disputes with investors from the EU under the ECT shall not be resolved by international arbitration, it would be a relatively straightforward exercise for them to notify all of the Contracting States as to their intention to modify the ECT in this

way and to effectively do so. Neither the EU nor its Member States have followed that process, which should not be circumvented by way of an interpretive exercise such as the one proposed by the Respondent.

325.   The provisions of the VCLT apply to treaties generally and safeguard the role of treaties in the formation of binding obligations at international law. Article 26 of the VCLT confirms *pacta sunt servanda*, the fundamental principle of international law that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." Failure to adhere to that principle undermines the legitimacy of international law and can create unfairness. Such a potential unfairness emerges from the EU Declaration on *Achmea*, which in the context of bilateral investment treaties between EU Member States says that all such treaties "are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses)."

326.   The Respondent would have this Tribunal interpret a clear granting of rights to all Investors to international arbitration as having been void *ab initio*, ignoring all of the established international law provisions for modification of treaties, without any notice to the Contracting States to the ECT and without any regard for the rights of the Investors whose rights have crystallized and who have commenced arbitrations accepting the "unconditional consent" offered by those States. The entitlement to dispute resolution under the ECT belongs to the investors, not the Contracting States.[416]  The Tribunal considers the result advocated by the Respondent and the EC to be neither permitted under customary international law nor consistent with the rule of law.

327.   For these reasons, the Tribunal rejects the Respondent's request for an award declaring immediate termination on the basis of the EU Declaration on *Achmea*.

328.   With respect to the underlying *Achmea* decision upon which the Declaration is based, the Tribunal does consider it appropriate to review that decision in detail in light of the

---

[416]    ECT: C-001, Art. 26(2).

Declaration's intention to inform tribunals, such as this one, about the alleged "legal consequences of the *Achmea* judgment." The Respondent contends that the ECJ's decision that intra-EU arbitration agreements are incompatible with EU primary law and thus inapplicable, applies equally to the ECT. The EC contends that the fact that the EU is also a party to the ECT does not affect this conclusion because "the participation of the EU in that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States." [417]

329.    The ECJ's decision arises out of a request for a preliminary ruling under Article 267 of the TFEU from the Federal Court of Justice in Germany, coincidentally one of the home States in this arbitration. The ECJ was asked about the validity under EU law of an agreement to submit a dispute between an investor and a State under a bilateral investment treaty to which both State parties were also EU Member States. The ECJ noted that "the referring court questions whether Article 267 TFEU precludes [such] an arbitration clause,"[418] but it decided to refer the following questions for preliminary ruling:

> (1) Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?
>
> If Question 1 is to be answered in the negative:
>
> (2) Does Article 267 TFEU preclude the application of such a provision?
>
> If Questions 1 and 2 are to be answered in the negative:
>
> (3) Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?

330.    The ECJ reframed the questions posed by the referring court and considered questions 1 and 2 together as follows "whether Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States,

---

[417]    EC Communication on Intra-EU Investment Protection, 19 July 2018, p. 4
[418]    *Achmea*: CL-194, ¶ 18.

such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept." The ECJ noted that "an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court."[419]

331.    The ECJ made it clear that it was reviewing provisions "such as Article 8 of the BIT," which provides as follows:

> 1. All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if, possible, be settled amicably.
>
> 2. Each Contracting Party hereby consents to submit a dispute referred to in paragraph 1 of this Article to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date on which either party to the dispute requested amicable settlement.
>
> 3. The arbitral tribunal referred to in paragraph 2 of this Article will be constituted for each individual case in the following way: each party to the dispute appoints one member of the tribunal and the two members thus appointed shall select a national of a third State as Chairman of the tribunal. Each party to the dispute shall appoint its member of the tribunal within two months, and the Chairman shall be appointed within three months from the date on which the investor has notified the other Contracting Party of his decision to submit the dispute to the arbitral tribunal.
>
> 4. If the appointments have not been made in the abovementioned periods, either party to the dispute may invite the President of the Arbitration Institute of the Chamber of Commerce of Stockholm to make the necessary appointments. If the President is a national of either Contracting Party or if he is otherwise prevented from discharging the said function, the Vice-President shall be invited to make the necessary appointments. If the Vice-President is a national of either Contracting Party or if he too is prevented from discharging the said function, the most senior member of the Arbitration Institute who is not a national of either Contracting Party shall be invited to make the necessary appointments.
>
> 5. The arbitration tribunal shall determine its own procedure applying the United Nations Commission on International Trade Law (UNCITRAL) arbitration rules.
>
> 6. The **arbitral tribunal shall decide on the basis of the law**, taking into account in particular though not exclusively:
>
>> - **the law in force of the Contracting Party concerned**;

---

[419]    *Achmea*: CL-194, ¶ 32.

- the provisions of this Agreement, and other relevant agreements between the Contracting Parties;

- the provisions of special agreements relating to the investment;

- the general principles of international law. [Emphasis added]

332.  Thus, the ECJ's decision relates to the applicability of intra-EU arbitration agreements where the tribunal under such an agreement is empowered to decide the dispute in part on the basis of "the law in force of the Contracting Party concerned," in other words, EU law. The referring court noted that "[t]he arbitral tribunal at issue in the main proceedings is called on precisely to rule on an infringement of the provisions of the BIT, which it must interpret in the light of EU law, in particular the provisions governing the free movement of capital."

333.  The Court begins its analysis with this in mind: "It must be ascertained, first, whether the disputes which the arbitral tribunal mentioned in Article 8 of the BIT is called on to resolve are liable to relate to the interpretation or application of EU law."[420] The Court noted that although the tribunal is called on to rule only on possible infringements of the BIT, pursuant to the particular terms of Article 8 of the BIT, it must take into account EU law in so doing.[421] Having determined that the particular disputes could require the tribunal to interpret or apply EU law, the ECJ went on to consider whether such a tribunal was situated within the judicial system of the EU and within the meaning of Article 267 of the TFEU. The Court found that, in the circumstances, Article 8 of the BIT "established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law."[422]

334.  In addition, the Court noted that an international agreement providing for a court responsible for the interpretation of its provisions is not in principle incompatible with EU law. The EU could submit to the decisions of a court which is created or designated by

---

[420]  *Achmea*: CL-194, ¶ 39.
[421]  *Achmea*: CL-194, ¶ 40.
[422]  *Achmea*: CL-194, ¶ 56.

international agreements as regards the interpretation and application of their provisions provided that the autonomy of the EU and its legal order is respected.[423] The Court goes on to note that the BIT was not concluded by the EU but by Member States and that these two factors had an adverse effect on the autonomy of EU law.

335.    In summary, in *Achmea* the Court was concerned that EU Member States, but not the EU, had entered into an agreement (through Article 8 of the BIT) to refer disputes to an international tribunal that they empowered to apply national (EU) law and that that tribunal did not have recourse to the ECJ to request interpretation of that law. In other words, the Court's concern was that Article 8 of the BIT at issue in *Achmea* raised the possibility that disputes involving not only the interpretation of the BIT, but also the law in force in the host state (national or EU law), could be referred to an arbitral tribunal was that agreed by two EU Member States and not by the EU. The Tribunal does not understand the *Achmea* decision to invalidate all arbitration agreements contained in intra-EU investment agreements. In particular, contrary to the language contained in the Declaration, the Court did not say that "all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable" nor did it say that "[a]n arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty."[424]

336.    The Tribunal does not see the ECJ judgment as applicable to the circumstances of this case for two reasons. In this case, the Court's concern is met by the fact that the EU itself is a party to the ECT and by the fact that the ECT's applicable law provision does not refer to the law in force in the host State.

337.    The EU itself is a party to the ECT along with the EU Member States. The EU is bound by Article 26 of the ECT, including its dispute settlement provisions and applicable law

---

[423]    *Achmea*: CL-194, ¶ 57.
[424]    Respondent's Request for Immediate Termination, 4 February 2019.

provision. The Court noted that the EU was empowered to enter into such agreements and that they were not in principle incompatible with EU law.[425]

338.    In addition, Article 26(6) of the ECT provides that "[a] tribunal … shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." Unlike the *Achmea* tribunal, the Tribunal is not empowered to decide based on "the law in force of the Contracting Party concerned" or "other relevant agreements between the Contracting Parties." The Claimants claim for breaches of the ECT, which must be decided only with reference to the ECT and applicable rules and principles of international law. The Claimants submit that the phrase "applicable rules and principles of international law" in ECT Article 26(6) refers to "public international law, not the regional law of the EU (as interpreted by the ECJ)."[426] The Claimants note that Italian law is only relevant in this case as a matter of fact and rely on the VCLT for their position that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."[427] This Tribunal is not being called upon to decide issues of EU law under Article 26(6) of the ECT.

339.    For these reasons, the Tribunal does not consider that the Court's reasoning in *Achmea* applies to arbitrations under the ECT.

---

[425]    *See Achmea*: CL-194, ¶ 57:

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected.

[426]    Claimants' Rejoinder on Jurisdiction, ¶ 45.

[427]    Claimants' Reply, ¶ 412 citing VCLT: CL-050, Art. 27. The Tribunal also notes that the facts of this case differ from those in the *Electrabel v. Hungary* case where there was a potential conflict between Hungary's international law obligations under the ECT and its international law obligations to comply with a legally binding decision of the European Commission. With respect to the provisions of the ECT providing for arbitration of investor-State disputes and EU law granting the ECJ a monopoly over the interpretation of EU law, the *Electrabel* tribunal found that there was no inconsistency: *see Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 4.146.

(3) **Are all or some of the claims barred by the "Taxation Measures" carve-out under Article 21 of the ECT? (Issue 1.3)**

a. *The Respondent's Arguments*

340. The Respondent objects to four of the Claimants' claims as excluded from the Tribunal's jurisdiction on the basis that Article 21 of the ECT does not create rights or impose obligations with respect to "Taxation Measures":[428]

- The Claimants' allegation that Italy unfairly applied a domestic court decision that ruled the so-called Robin Hood tax unconstitutional, because the decision only applied *ex nunc* (for the future) rather than *ex tunc* (from inception). Italy contends that the claim is excluded, because the Robin Hood tax is a "Taxation Measure."

- The Claimants' allegation that Italy failed to fairly correct its own arbitrary classification of PV facilities as immovable property. Italy claims that since the classification of PV facilities as immovable property subjects them to so-called IMU and TASI taxes, this claim is excluded.

- The Claimants' allegation that Italy's retroactive imposition of administrative fees on their facilities was unfair. Italy claims that the disputed administration fee is a "tax" falling into the "Taxation Measure" exclusion.

- The Claimants' allegation that imposing so-called "imbalance costs" on their facilities was similarly unfair. Italy claims that the disputed imbalance costs are "taxes" falling into the "Taxation Measure" exclusion.

341. With respect to the Claimants' first two claims, the Respondent asserts that the Robin Hood Tax is a tax on income, as confirmed by the Italian Constitutional Court, and that a measure defining an asset as movable or immovable for cadastral and fiscal reasons is "indeed a

---

[428]    Respondent's Counter-Memorial, ¶ 152; Claimants' Rejoinder on Jurisdiction, ¶ 83.

fiscal measure itself, since its sole function is that of defining the scope of the taxation measure."[429]

342.     With respect to the Claimants' third and fourth claims, the Respondent argues that the "Claimants cannot seek redress for reliefs based on the imposition of administrative fees by the [GSE] and the charging of 'imbalance costs' for the storage of electricity … since these are also Taxation Measures under the ECT," and "it is up to domestic law to define when a domestic measure is of a fiscal nature."[430] The Respondent submits that the Italian fiscal system is composed of taxes (*imposte*), fees (*tasse*) and contributions (*contributi*).[431]

### b.     The Claimants' Arguments

343.     With respect to the first two claims, the Claimants assert that these claims do not arise from the imposition of either the Robin Hood tax or the IMU and TASI charges themselves.[432] Rather, the Claimants contest the unfair application of a domestic court decision and unfair classification of PV facilities.[433] The Claimants reject the Respondent's assertion that they did not simply decide to qualify their assets as immovable and thus pay IMU and TASI charges. Instead, the Claimants assert that they paid those charges in good faith on the basis of the Respondent's inconsistent classification of PV plants, and thus are entitled to reimbursement.[434] The Claimants contend that the Respondent was wrong to have applied that tax to its facilities from the beginning, and Italy's constitutional court has agreed. The Claimants assert that they are only contesting whether the application of Italy's court decision on a going-forward basis (*ex nunc*) rather than an application that would deem the measure invalid from inception (*ex tunc*) was fair and in accordance with the ECT.[435]

344.     Similarly, the Claimants argue that the Respondent's classification of PV facilities as immovable property was arbitrary, and that Italy conceded this when it corrected the

---

[429]     Respondent's Counter-Memorial, ¶¶ 157-163, (*especially* ¶¶ 158, 162).
[430]     Respondent's Counter-Memorial, ¶¶ 163, 148-149.
[431]     Respondent's Counter-Memorial, ¶ 150.
[432]     *See*, *e.g.*, Claimants' Rejoinder on Jurisdiction, ¶¶ 83-100.
[433]     Claimants' Reply, ¶ 153.
[434]     Claimants' Rejoinder on Jurisdiction, ¶ 86.
[435]     Claimants' Reply, ¶ 155.

negative effects of that classification in its 2016 Budget Law. However, the Respondent's failure to refund past payment is the crux of this claim. The Claimants make clear that they are claiming only the money that was paid under the wrongful classification, and not all IMU and TASI charges that were ever assessed to Claimants' plants.[436]

345.    With respect to the third and fourth claims, the Claimants assert that the Respondent's suggestion that either the administrative fees or the imbalance costs are "taxes" under Italian law or "Taxation Measures" under the ECT is incorrect. The Claimants submit that Italy has never treated those measures as "taxes" domestically, and only now refers to them as such "to conjure a baseless jurisdictional objection."[437] The Claimants contest the Respondent's characterization of its fiscal system, and argue that its argument that Article 21 covers all three sub-categories of fiscal measures – taxes, fees and contributions – is an "inaccurate characterization of 'taxes' in ECT Article 21(7)(a) as 'fiscal measures' or '*tributi*'." The Claimants aver that the Respondent attempts to "greatly expand the purported scope of Article 21" as including any type of fiscal measure, when Article 21(7)(a) confines "fiscal measures" to the much narrower term of "taxes" (*imposte*).[438] According to the Claimants, the Italian version of the ECT makes this clear.[439]

346.    Citing the legal tests articulated in *Murphy v. Ecuador*, *Occidental v. Ecuador* and *Yukos v. Russia*, the Claimants submit that the Tribunal must "look behind the label" and examine the legal properties of each measure to determine whether it is a "tax" that falls within the scope of Article 21 of the ECT.[440] For instance, taxation measures typically relate to the imposition of a liability on classes of persons to pay money to the state for public purposes and without any benefit to the taxpayer.[441] The Tribunal must consider the plain text of the provision imposing the contested measure and the constitutional framework in which it

---

[436]    Claimants' Reply, ¶ 156.

[437]    Claimants' Reply, ¶ 154.

[438]    Claimants' Reply, ¶ 160.

[439]    Claimants' Reply, ¶¶ 160-161; ECT: C-001, Art. 50.

[440]    Claimants' Reply, ¶¶ 163-166.

[441]    Claimants' Reply, ¶ 164; *Murphy Exploration and Production Company – International v. Republic of Ecuador*, UNCITRAL, Partial Final Award, 6 May 2016: CL-144, ¶ 159.

was enacted.[442] The Claimants emphasize that only *bona fide* taxation measures can be included within Article 21 of the ECT, meaning "actions that are motivated by the purpose of raising general revenue for the state."[443]

347. Within this context, the Claimants advance three reasons why the administrative fees imposed through *Conto* V and the imbalance costs introduced by the 2012 AEEG Resolution No. 281/2012 do not constitute taxation measures under Article 21 of the ECT.[444] First, the measures do not increase state revenues, but rather are meant to cover a specific service provided by a public authority, namely the costs of the GSE's management, monitoring and verification tasks.[445]

348. Second, Italy's tax authorities were not involved in enacting, imposing or collecting either charge, and the Respondent never characterized either measure as a "tax" prior to this arbitration.[446]

349. Third, *Conto* V explicitly refers to the administrative fees as a "contribution" (*contributo*) to the GSE.[447] The Claimants argue that both the administrative and imbalance charges are expressly linked to specific services performed by the GSE and Italy's TSO for the general benefit of energy consumers.[448]

---

[442]   Claimants' Reply, ¶ 165; *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012: CL-160.

[443]   Claimants' Reply, ¶ 166; *Yukos Universal Limited v. Russian Federation*, PCA Case No. AA227, Final Award, 18 July 2014: CL-161, ¶ 1407.

[444]   Claimants' Reply, ¶¶ 167-170.

[445]   *Conto* V: C-195, Art. 10.4; Claimants' Reply, ¶ 168.

[446]   Claimants' Reply, ¶ 169.

[447]   *Conto* V: C-195, Art. 10.4. *See also* Article 25 of Law Decree No. 1/2014, which replaced Article 10(4) of Ministerial Decree 5 July 2012 as of August 2014, and refers to the administration fee as an additional tariff (*tariffe*) owed to the GSE. Subsequent AEEG Resolutions make reference to "compensation" (*corrispettivi di sbilanciamento*): Claimants' Reply, ¶ 170.

[448]   Claimants' Reply, ¶ 173.

350.    Fourth, the imbalance costs represent an increase in the fees for network and dispatching services, and cannot be considered a tax because in electricity bills, they do not fall within this category but, rather, that of network and dispatching services.[449]

351.    Fifth, imbalance costs are subject to corporate income tax (22% VAT) as any ordinary commercial income would be, which Claimants say "is a clear and unequivocal signal of the non-fiscal nature of the underlying payment."[450]

352.    Sixth, the Claimants point out that the administrative fees and imbalance costs are not "taxes" because they are not included in the type of fiscal measures that are subject to the tax jurisdiction of Italy's tax courts.[451]

353.    Finally, the Claimants submit that the challenged charges are not subject to double-taxation treaties under Italian law, which apply to both direct and indirect taxes.[452]

### c.    The Tribunal's Analysis

354.    The Respondent's second jurisdictional objection relates to specific claims made for relief related to the Robin Hood Tax; the (re)classification of the tax status of PV plants; and the administrative fees and imbalance costs, which it says all fall within the ECT's tax carve-out under Article 21. Article 21 of the ECT specifically provides that "nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties." "Taxation Measures" are defined to include "any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein."

---

[449]    Claimants' Reply, ¶ 174.

[450]    Claimants' Reply, ¶ 175 and fn. 164; Italian Constitutional Court, Decision No. 335, 10 October 2008: C-389. There, the court recognized the non-fiscal nature of the tariff payable in relation to sewer and water treatment service; for the opposite reason, the Constitutional Court, confirming once again the principle with respect to which an obligation subject to VAT excludes the fiscal nature of the related payment, recognized the fiscal nature of the Environmental Hygiene Tariff ("**TIA**") that substituted for the Municipal Solid Waste fee ("**TARSU**"); Italian Constitutional Court, Decision No. 238, 10 June 2009: C-390.

[451]    *See* Claimants' Reply, ¶ 176.

[452]    Claimants' Reply, ¶ 177.

355.    With respect to the Robin Hood Tax, the Tribunal is of the view that these measures fall within the broad definition of Taxation Measures contained in Article 21 of the ECT. The Tribunal has noted that the Claimants' claim is framed so as not to challenge the Robin Hood Tax itself, but instead to address the means by which the Italian courts implemented their decision as to the application of the tax. In the Tribunal's view, framing the claim in this way does not change the nature of the underlying measures of which the Claimants' complain; they are tax measures and the underlying issue relates to whether the taxes were fair (and not the Italian court's application of the decision with respect to whether those taxes was fair). Accordingly, the Respondent's jurisdictional objection with respect to Claimants' claims arising out of the Robin Hood Tax is upheld.

356.    Regarding the (re)classification claim, the Tribunal notes that the dispute relates to the application of tax circulars and the Claimants' reliance on one circular, without seeking a definitive tax ruling, in circumstances where a number of circulars had existed and the status of PV plants was, arguably, not clear. These measures are clearly "Taxation Measures" in the sense contemplated in the ECT and thus, the claims related to the (re)classification of property are outside the Tribunal's jurisdiction pursuant to the carve out in Article 21 of the ECT.

357.    Finally, with respect to the administrative fees and imbalance costs, the Tribunal agrees with the Claimants that these charges were not taxes in the sense provided in Article 21 of the ECT: they were not imposed for the purpose of raising general revenue for the state; Italy's tax authorities were not involved in enacting, imposing or collecting either charge; are subject to corporate income tax; and they are not subject to double-taxation treaties under Italian law, which apply to both direct and indirect taxes. Accordingly, they do not fall within the definition of "Taxation Measure" in Article 21 of the ECT. The Respondent's objections to jurisdiction relating to the administrative fees and imbalance costs are dismissed. The Tribunal finds that it has jurisdiction to decide the Claimants' claims with respect to these charges.

**(4)  Did the Parties agree on a dispute resolution mechanism other than ICSID arbitration? (Issue 1.4)**

358.  This objection to jurisdiction is based on the jurisdiction clause contained in the GSE Agreements entered into between the Claimants' Investments and the GSE.[453]

### a.  The Respondent's Arguments

359.  The Respondent argues that the dispute resolution provision in the GSE Agreements governing each of the Claimants' PV plants deprives this Tribunal of jurisdiction.[454] The Respondent contends that the Claimants should "have indeed addressed the administrative Court of Rome to have the GSE [Agreements] and the relevant regulatory acts annulled."[455] The Respondent relies on the discussion of exclusive jurisdiction clauses in *SGS v. Philippines* and *BIVAC v. Paraguay*.[456]

360.  In response to the Claimants' assertion that they are not a party to the GSE Agreements, the Respondent states that "then it must be deduced that no other obligation in the agreement [GSE Agreement] could equally generate an autonomous obligation by Italy towards the Claimants."[457] The Respondent contends that "either a treaty provision has been breached by way of contract, but then only the counter-party shall have a right to address an arbitral tribunal under the ECT … and any third party allowed to claim under the treaty will not be bound by any terms of the contract … but will also be unable to rely on any presumed autonomous contractual obligation it is not part [*sic*] to."[458]

---

[453]    The clause in question is the same in all of the GSE Agreements and figures as Clause 9, 13 or 15 of the applicable agreement. It provides:

> For any dispute arising out of or in any way connected to the interpretation and execution of this Agreement and the documents referred to therein, the Parties agree on the exclusive jurisdiction of the Court of Rome.

[454]    Respondent's Counter-Memorial, ¶¶ 176-189.

[455]    Respondent's Counter-Memorial, ¶ 187.

[456]    Respondent's Counter-Memorial, ¶ 188.

[457]    Respondent's Rejoinder, ¶ 165.

[458]    Respondent's Rejoinder, ¶ 166.

### b. The Claimants' Arguments

361.    The Claimants assert that the Tribunal should reject the Respondent's jurisdictional argument that the dispute resolution clause in the GSE Agreements deprives it of jurisdiction because the Claimants are not a party to those contracts (and thus have no standing to pursue their claims before the Courts of Rome) and because the Claimants are bringing claims under the ECT, not the GSE Agreements.[459]

362.    The Claimants submit that the Respondent's Rejoinder does not directly address the arguments raised by the Claimants that they are not parties to the GSE Agreements (and thus are not bound by the forum selection clause therein) and that their claims are brought under the ECT, not the GSE Agreements.[460] Instead, the Respondent "attempts to confuse the jurisdictional issue with liability under the ECT, re-hashing its argument on the merits that the GSE [Agreements] are 'accessory' agreements."[461] The Claimants argue that the fact that the Respondent's breaches of the GSE Agreements could have simultaneously breached the ECT does not reduce the Claimants' ECT claims to mere contract claims.[462] The Respondent's arguments thus fail to address its liability under the ECT's umbrella clause, since the Italian companies that entered into the GSE Agreements are "Investments" of the Claimants.[463] The Claimants further contend that the Respondent's submissions ignore its liability under FET (Article 10 of the ECT), based on the Claimants' legitimate expectation when they made their Investments that the Respondent would abide by the provisions of the *Conto Energia* Decrees, confirmed by the GSE Agreements.[464]

363.    The Claimants state that the cases – *SGS v. Philippines* and *BIVAC v. Paraguay* – on which the Respondent relies for its assertion that exclusive jurisdiction clauses in a contract prevail over dispute settlement clauses in investment treaties[465] are distinguishable from

---

[459]    Claimants' Reply, ¶¶ 179-180.

[460]    Claimants' Rejoinder on Jurisdiction, ¶ 101; Claimants Reply, ¶¶ 179-185.

[461]    Claimants' Rejoinder on Jurisdiction, ¶ 101, referring to Respondent's Rejoinder, ¶ 165.

[462]    Claimants' Rejoinder on Jurisdiction, ¶¶ 102-103.

[463]    Claimants' Rejoinder on Jurisdiction, ¶ 104. ECT: C-001, Art. 10 ("Each Contracting Party shall observe any obligations it has entered into with … an Investment of an Investor of any Contracting Party").

[464]    Claimants' Rejoinder on Jurisdiction, ¶ 105.

[465]    Respondent's Counter-Memorial, ¶¶ 184-188.

the present facts because the claimants in those cases *were* parties to the contracts at issue in those disputes.[466] Rather than having to decide whether the contractual breach rises to the level of a treaty breach, the issue here is whether the Respondent violated the ECT.[467]

### c.    The Tribunal's Analysis

364.    The Respondent's third jurisdictional objection relates to what it says is a choice of venue – the provisions in the GSE Agreements (between Claimants' local entities and the State) provide for disputes to be submitted to the Courts of Rome. Alternatively, Italy argues that the Claimants do not have the standing to pursue the claims related to the GSE Agreements in this arbitration.

365.    Italy argues that the dispute resolution provision in the GSE Agreements deprives the Tribunal of jurisdiction to decide whether Italy breached those Agreements. Italy contends that the Claimants have to proceed (and should have proceeded) against Italy exclusively before the Italian courts to have the GSE Agreements, the *Spalmaincentivi*, and other "relevant regulatory acts annulled."[468] Italy further asserts that the ECT's umbrella clause is inapplicable because, as opposed to private law contracts, the GSE Agreements are accessory agreements and have a special status under Italian law which requires that the Tribunal evaluate any alleged breach within "[a] very specific context," or else "stay the proceedings waiting for the Court of Rome to judge on the matter."[469]

366.    In the Tribunal's view, the GSE Agreements' exclusive jurisdiction clause does not affect the Claimants' ability to bring the claims they pursue under the ECT.

---

[466]    Claimants' Rejoinder on Jurisdiction, ¶ 106; Claimants' Reply, ¶¶ 181-184.

[467]    Claimants' Rejoinder on Jurisdiction, ¶ 106.

[468]    Respondent's Rejoinder, ¶ 164; Respondent's Counter-Memorial, ¶ 187.

[469]    Respondent's Counter-Memorial, ¶¶ 203-204. The Claimants argue that the GSE Agreements are indeed private law contracts, and acknowledge that they are governed by Italian law. However, contrary to Italy's argument that the GSE Agreements were mere accessory contracts with no legal effect, the Claimants assert that the Agreements were *not* typical operations of administrative law, but rather contain features common in private law contracts. In particular, the Claimants point out that references in those Agreements to Articles 1341 and 1342 of Italy's Civil Code evince that they are in private contracts, in which one party had more bargaining power as author of the contract. Hearing Transcript, Day 1, 81:7-23.

367.    The GSE Agreements provide that disputes arising out of or in any way connected to the interpretation of the Agreement entered into between the GSE and the Claimants' individual Investments fall within the "exclusive jurisdiction of the Court of Rome."[470] The Claimants are not parties to any of the GSE Agreements and they bring their claims pursuant to various clauses of the Article 10(1) of the ECT.

368.    Italy relies on *SGS v. Philippines* and *BIVAC v. Paraguay* for its assertion that exclusive jurisdiction clauses in a contract prevail over dispute settlement clauses in investment treaties.[471] The *SGS v. Philippines* tribunal held that even though it had jurisdiction to hear the contract claims, this did not mean that the parties' express choice of forum in the contract was negated. Rather, the tribunal stated that "a binding exclusive jurisdiction clause in a contract should be respected, unless overridden by another valid provision." Thus, that tribunal held that, although it had jurisdiction to hear the contract breaches due to the umbrella clause violation, the claim was inadmissible as the general provisions of the BIT did not override the forum selection clause in the contract.

369.    However, as the Claimants point out, the Claimants are not themselves a party to the GSE Agreements and thus have no standing to pursue their claims before Italy's domestic courts. Thus, the paramountcy of the exclusive jurisdiction clause over the dispute resolution clause discussion in *SGS v. Philippines* and *BIVAC v. Paraguay* on which Italy relies is distinguishable from the present facts. The claimants in those cases were parties to the contracts at issue in those disputes, whereas here they are not.[472] The Claimants argue that:

> In both *SGS* and *BIVAC*, the tribunals thus had to determine whether a breach of the contract rose to the level of a breach of the investment treaty at issue. The issue here, by contrast, is whether Italy's retroactive modifications of its incentive regimes applicable to the PV sector violated the substantive protections of the ECT. As noted by the *ad hoc* panel in *Vivendi v. Argentina*, "[a] state cannot rely

---

[470]    Sample GSE Agreement under *Conto* I: C-063, Art.9. *See also* Sample GSE Agreement under *Conto* II: C-073; Sample GSE Agreement under *Conto* III: C-140; Sample GSE Agreement under *Conto* IV: C-260; Sample GSE Agreement under *Conto* V: C-246. Reference was also made to a number of specific GSE agreements, including those at the following exhibit numbers: C-284, C-285, C-287, C-294, C-295, C-296, C-297, C-298, C-304, C-310, C-311, C-334-C-337, C-349, C-350, C-364, C-365, C-370.

[471]    Respondent's Counter-Memorial, ¶ 184-188; Respondent's Rejoinder, ¶ 166.

[472]    Claimants' Rejoinder on Jurisdiction, ¶ 106; Claimants' Reply, ¶¶ 181-184.

on an exclusive jurisdiction clause in a contract to avoid the characterisation of its
conduct as internationally unlawful under a treaty."[473]

370.    The Tribunal agrees with this proposition. The mere existence of an exclusive jurisdiction
clause in the agreements is not determinative of the Tribunal's jurisdiction.

371.    The Claimants' position is that they are bringing their claims under the ECT, not under the
GSE Agreements.[474] As such, rather than having to decide whether the alleged contractual
breach of the GSE Agreements rises to the level of a treaty breach, the issue before the
Tribunal is whether Italy violated the ECT.[475] The thrust of the Claimants' argument is that
the GSE Agreements entered into by Italy with the Claimants' Investments provide
evidence of the broad obligations Italy entered into with those Investments and also
informed the Claimants' legitimate expectations. In particular, the Claimants assert that
their claims are brought under the ECT's substantive protective clauses – FET, non-
impairment clause, and the umbrella clause – and, in particular, the legitimate expectation
that Italy would abide by its obligations to the Italian companies who own the Claimants'
341 PV plants at issue (Claimants' Investments).[476]

372.    In response to the Claimants' assertion that they are not a party to the GSE Agreements,
Italy argues that no other obligation in the GSE Agreements generates an autonomous
obligation by Italy towards the Claimants. Italy's position is that *SGS v. Philippines* and
*BIVAC v. Paraguay* confirm that, where the ECT is breached by way of contract, "only the
counter-party shall have a right to address an arbitral tribunal under the ECT … and any
third party allowed to claim under the treaty will not be bound by any terms of the contract
… but will also be unable to rely on any presumed autonomous contractual obligation it is
not part [*sic*] to."[477] The Claimants contend that Italy's line of reasoning does not directly
address the fact that the Claimants are not parties to the GSE Agreements, and thus are not

---

[473]    Claimants' Rejoinder on Jurisdiction, ¶ 106.

[474]    Claimants' Reply, ¶¶ 179-180; CPHB, ¶ 2.

[475]    Claimants' Rejoinder on Jurisdiction, ¶ 106.

[476]    CPHB, ¶¶ 2-5; Claimants' Counter-Memorial on Jurisdiction, Section II C; Claimants' Rejoinder on
Jurisdiction, Section I C. As will be discussed below, the Claimants allege that Italy's obligations under the umbrella
clause arose under the *Conto Energia* Decrees and the GSE letters even before any of the GSE Agreements were
entered into: *see* CPHB, ¶¶ 71-75.

[477]    Respondent's Rejoinder, ¶ 166.

bound by the forum selection clause. Further, their claims are not contractual claims. They are brought under the ECT, not the GSE Agreements.[478]

373.    One commentator identifies the difficulties involved in how to address a breach of contract claim as a treaty claim when the contract itself has a choice of forum clause in it, citing the following passage from the *Vivendi I v. Argentina* annulment decision of 3 July 2002:[479]

> where 'the fundamental basis of the claim' is a treaty laying down an independent standard by which the conduct of the parties is to be judged, the existence of an exclusive jurisdiction clause in a contract between the claimant and the respondent state cannot operate as a bar to the application of the treaty standard. At most, it might be relevant –as municipal law will often be relevant– in assessing whether there has been a breach of treaty.

374.    The *Vivendi I v. Argentina* annulment committee further observed that the choice of forum clause in a contract "did not affect the jurisdiction of the Tribunal with respect to a claim based on the provisions of the BIT. Article 16(4) of the Concession Contract did not in terms purport to exclude the jurisdiction of an international tribunal arising under ... the BIT; at the very least, a clear indication of an intention to exclude that jurisdiction would be required."[480]

375.    The tribunal in *Joy Mining v. Egypt* also noted the distinction between a contractual and treaty claim, and cautioned that "[a] purely contractual claim, however, will normally find difficulty in passing the jurisdictional test of treaty-based tribunals, which will of course require allegation of a specific violation of treaty rights as the foundation of their jurisdiction."[481]

---

[478]    CPHB, ¶ 64; Claimants' Reply, ¶ 461. *See also* Claimants' Rejoinder on Jurisdiction, ¶ 104: The Claimants contend that Italy's pleadings ignore its liability under the ECT's broad umbrella clause. The Italian companies which are party to each of the GSE Agreements are "clearly 'Investments' of Claimants in Italy" and, as such, "Italy's obligations to Claimants do not arise only under the GSE Agreements, but under the ECT's substantive protection clauses, including most notably the umbrella clause."

[479]    Mahnaz Malik, "The Expanding Jurisdiction of Investment-State Tribunals: Lessons for Treaty Negotiators," International Institute for Sustainable Development (2007).

[480]    *Compañia de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002: CL-162, ¶ 76.

[481]    *Joy Mining Machinery Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004, ¶ 75 available at: https://www.italaw.com/sites/default/files/case-documents/ita0441.pdf. Article 2(2) of the Egypt-UK BIT provided: "Each Contracting Party shall observe any obligation it may have entered into with regard to investments of nationals or companies of the other Contracting Party."

376.    The reasoning in these two cases highlights the distinction between a claim of treaty violation and a claim of breach of contract. The Claimants have brought the former. In so far as the Claimants' umbrella clause claims are concerned, the Claimants are not parties to the GSE Agreements and their claims are not for breaches of the GSE Agreements *per se*; they are for breach of the provisions of the ECT that protect an Investor and its Investment from arbitrary acts by the state, by way of the broad language of the umbrella clause in the ECT.

377.    For these reasons, the Tribunal finds that the exclusive forum clauses in the GSE Agreements do not affect its jurisdiction to determine Claimants' claims for breach of the ECT.

### (5)    Did the Claimants satisfy the notice requirements under Article 26 of the ECT?  (Issue 1.5)

378.    As an additional jurisdictional objection, the Respondent argues that the Claimants did not properly notify their claims related to the Robin Hood Tax and the (re)classification measures. The Tribunal has found that it does not have jurisdiction over either of these claims, as they fall within the tax carve out in Article 21 of the ECT. However, for the sake of completeness, the Parties' arguments are set out here and will be briefly addressed.

### a.    The Respondent's Arguments

379.    The Respondent argues that the Claimants have not satisfied the ECT's notice requirements with respect to the following two claims, because these were not notified to the Respondent in the Amicable Settlement Letters:[482]

- The Respondent's allegedly unfair implementation of the Italian court decision finding the Robin Hood tax unconstitutional; and

- The Respondent's alleged acknowledgment in the 2016 Budget Law of the negative effects of its reclassification of the Claimants' PV plants as immovable

---

[482]    Respondent's Counter-Memorial, § II.4; Respondent's Rejoinder, ¶¶ 167-174.

property, but its failure to reimburse the Claimants for payments already made under the "misclassification."

380.    According to the Respondent, the Claimants "spend no words" in their Reply addressing the allegation that the two claims are entirely new.[483] Further, the Respondent asserts that just because it did not respond to any of the Amicable Settlement Letters does not mean that it would not respond to a future letter.[484] The Respondent argues that "[i]f extremely heterogeneous claims are joined under a sole artificial label because all, more or less remotely, affect a specific investment, the State will never be able to consciously evaluate how to address each measure … [thus] the foreign investor, that might miss the chance of an amicable solution" by not notifying it of all claims.[485]

### b.   The Claimants' Arguments

381.    The Claimants submit that over three and a half years have passed since the Amicable Settlement Letters and over two years since the Request for Arbitration, and the Respondent has never attempted to negotiate a settlement to any part of the dispute.[486] The Claimants argue that it would not make sense to decline jurisdiction on the basis of this objection because the waiting period for amicable settlement has passed.[487]

382.    The Claimants state that the two measures that the Respondent contends are outside the scope of the Amicable Settlement Letters occurred either just before or well after Claimants sent their final notice letter to the Respondent,[488] and that they relate to the same subject

---

[483]    Respondent's Rejoinder, ¶ 172.

[484]    Respondent's Rejoinder, ¶ 173.

[485]    Respondent's Rejoinder, ¶ 173.

[486]    Claimants' Rejoinder on Jurisdiction, ¶ 111. Time periods noted are as at the time of Claimants' Rejoinder on Jurisdiction.

[487]    Claimants' Rejoinder on Jurisdiction, ¶ 111, citing Christoph Schreuer, "Traveling the BIT Route: Of Waiting Periods, Umbrella Clauses and Forks in the Road," 5 World Investment and Trade (2004): CL-167 ("The only consequence of such a finding would be to compel the claimant to start the proceedings anew, which would be a highly uneconomical situation."). *See also* Claimants' Reply, ¶¶ 186 *et seq.*

[488]    Claimants' Reply, ¶ 188; Claimants' Rejoinder on Jurisdiction, ¶ 108.

matter of this dispute.[489] The Claimants submit that the Respondent unfairly implemented the court decision finding the Robin Hood tax unconstitutional in February 2015, which was immediately *before* the Claimants sent their first Amicable Settlement Letter in March 2015. Thus they "did not have sufficient information to include a productive discussion" about this measure in their letter.[490] The Respondent's decision to retain IMU and TASI payments was made in January 2016, which was well *after* Claimants sent their second Amicable Settlement Letter.

383.    The Claimants state that the Letters were worded "broadly and discussed the nature of the dispute in detail" and were explicitly stated to be "illustrative rather than exhaustive."[491] The Claimants argue that it would be "procedurally inefficient and hinder claimants from bringing otherwise meritorious claims" to require that the Respondent be notified anew, and re-extend the amicable solution offer, every time the Respondent adopted a new measure that harmed Claimants' investments, particularly given that the Respondent did not respond to the Amicable Settlement Letters.[492] The Claimants rely on *Eiser v. Spain*, which held that Article 26 of the ECT does not require

> additional piecemeal requests for amicable settlement of new issues or elements … following a request for negotiations. It would be unreasonable and inefficient in [a] case … involving an evolving situation, to interpret Article 26 to require the dispute to be carved into multiple slices … Nothing in the record suggests that further requests for negotiations identifying Spain's subsequent measures would have been more effective in securing an amicable settlement.[493]

---

[489]    Claimants' Reply, ¶¶ 187, 189, 194-197, citing *Tenaris S.A. and Talta Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Award, 29 January 2016: CL-164, ¶ 245 (no second notice was required for FET, discrimination, and protection and security claims because they were closely related to the expropriation claim in the letter and arose "out of substantially the same subject matter."), citing, in turn, *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Jurisdiction, 17 July 2003, ¶ 109: CL-165; *Teinver S.A. and others v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012: CL-166 (*see also* Claimants' Reply, fn. 187); *Limited Liability Company Amto v. Ukraine*, SCC Case No. 80/2005, Award, 26 March 2008 ("*Amto v. Ukraine*"): CL-091, ¶¶ 57-58 ("A party can request amicable settlement of a dispute without identifying any ECT claims, and an Investor may have good reason not to formulate claims at this stage … In the subsequent Request for Arbitration the Investor was free to frame its claim as it wished, provided they related to the same dispute"); Claimants' Rejoinder on Jurisdiction, ¶ 108.

[490]    Claimants' Reply, ¶¶ 188-189.

[491]    Claimants' Reply, ¶ 186. *See* Notice of Legal Dispute arising under the ECT and Offer of Amicable Settlement: C-010A, p. 2.

[492]    Claimants' Reply, ¶¶ 190-191.

[493]    Claimants' Reply, ¶ 191; *Eiser v. Spain*: CL-135, ¶¶ 317-319.

384.    The Claimants also rely on the finding in *Generation Ukraine v. Ukraine* that the notice requirement is not overly formalistic and that precise congruity in the investor's articulation of its grievances in mediation and arbitration is not required.[494] Notice need neither be "complete or exhaustive," nor detailed.[495] Moreover, ICSID Arbitration Rule 40 provides that the parties may adjust their claims/counter-claims not later than in the reply or counter-memorial.[496]

385.    The Claimants submit that the Respondent ignores the case law cited in support of the Claimants' arguments.[497] Contrary to the Respondent's assertion that the two claims are new, the Claimants state that the developments in Italy's court and bureaucracy related to the two measures form part of "an evolving series of measures changing the economic regime" for solar power plants in Italy.[498]

386.    The Claimants assert that the Respondent's assertion that allowing the two claims prevents it from consciously evaluating how to address each measure is "nonsensical," given that it already responded fully to these claims, and disregards the reality that parties will develop their claims over the course of a proceeding.[499]

### c.    The Tribunal's Analysis

387.    As noted above, this particular jurisdictional objection has become moot, as the Tribunal has upheld the Respondent's objections to jurisdiction with respect to these specific claims. Since this objection was not framed as an alternative objection, the Tribunal will address it briefly. In the Tribunal's view, the lack of a specific subsequent notice regarding the

---

[494]    Claimants' Reply, ¶ 192; *Generation Ukraine v. Ukraine*, ICSID Case No. ARB/00/09, Award, 16 September 2003: CL-134, ¶ 14.5.

[495]    Claimants' Reply, ¶ 193; *Frank Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013: CL-073, ¶ 339; *Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morroco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 200: CL-0163, ¶ 20; Claimants' Rejoinder on Jurisdiction, ¶ 110.

[496]    Claimants' Reply, ¶ 197.

[497]    Claimants' Rejoinder on Jurisdiction, ¶ 110.

[498]    Claimants' Rejoinder on Jurisdiction, ¶ 110, citing *Eiser v. Spain*: CL-135, ¶ 317.

[499]    Claimants' Rejoinder on Jurisdiction, ¶ 112.

Claimants' claims relating to the Robin Hood Tax and the (re)classification measures, on its own, would not have deprived the Tribunal of its jurisdiction to hear these claims.

388.    The Tribunal is of the view that the Claimants' notice letters in this case were worded broadly enough to provide the Respondent with sufficient notice of the claims.

389.    Had the Contracting Parties intended to include a strict notice and amicable settlement provision in the ECT, it would have included a provision which prohibits the amendment of claims.[500] As pointed out by the Claimants, ICSID Arbitration Rule 40 allows the submission of ancillary claims at later points in the proceedings. Article 47 of the ICSID Additional Facility and Article 22 of the UNCITRAL Arbitration Rules similarly provide for additional claims.

390.    It would be contrary to the need for orderly and cost-effective procedure to halt this arbitration at this advanced juncture and require the Claimants first to consult with the Respondent with regard to the two claims, before re-submitting all of the claims to this Tribunal.

391.    Finally, the Tribunal notes that there is no evidence advanced by the Respondent in these proceedings to indicate its willingness or desire to enter into settlement negotiations in respect of the dispute. The Respondent's arguments in this respect are formalistic and there is no indication that it was unable to effectively discuss these claims (had it engaged in settlement discussions) or suffered prejudice in any way as a result of a lack of specific notification.

## VIII.    ADMISSIBILITY (ISSUE 2)

### A.    THE RESPONDENT'S ARGUMENTS

392.    In the event that the Tribunal rejects the Respondent's jurisdictional objections, the Respondent submits that "these should be at least grounds to declare lack of admissibility,"

---

[500]    *See*, *e.g.*, Article 8.22(1) of the CETA, which provides that "[a]n investor may only submit a claim pursuant to Article 8.23 if the investor: ... (d) has fulfilled the requirements related to the request for consultations; (e) does not identify a measure in its claim that was not identified in its request for consultations."

on account of the exclusive forum clause in the GSE Agreements.[501] The Respondent cites *SGS v. Philippines*, which it says concluded that the exclusive forum clause was a matter of admissibility, rather than jurisdiction, because parties should not be permitted to rely on a contract as the basis of their BIT claim when that contract refers disputes exclusively to another forum.[502] The Respondent avers that, "[a]ssuming the widest definition of arbitrability is taken, this would then mean that the Tribunal had to judge … a breach of a contract," which "could only be judged under Italian law."[503] The Respondent asserts that due to the inapplicability of the ECT's umbrella clause, "the Tribunal will not be in a position to judge whether GSE ever breached the [Agreements]" because they "have a special status under Italian law and this would require the Tribunal to evaluate any potential breach within such [a] very specific context" or else "stay the proceedings waiting for the Court of Rome to judge on the matter."[504]

393.    The Respondent contends that the Claimants' Reply ignores its arguments on admissibility.[505]

## B.    THE CLAIMANTS' ARGUMENTS

394.    The Claimants state that the Respondent incorrectly asserts that the Claimants have not responded to the Respondent's arguments on admissibility.[506] In their Counter-Memorial on Jurisdiction, Reply, and Rejoinder on Jurisdiction, the Claimants submit that their responses to Italy's objections are substantially the same regardless of whether Italy chooses to characterize its arguments as jurisdictional arguments or arguments against admissibility.[507] The Claimants reiterate that they are not parties to the GSE Agreements,

---

[501]    Respondent's Counter-Memorial, ¶¶ 197-198.

[502]    Respondent's Counter-Memorial, ¶ 198; *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Jurisdiction, 29 January 2004 ("***SGS v. Philippines***"): RL-003, ¶ 154.

[503]    Respondent's Counter-Memorial, ¶ 202.

[504]    Respondent's Counter-Memorial, ¶¶ 203-204.

[505]    Respondent's Rejoinder, ¶ 175.

[506]    Claimants' Rejoinder on Jurisdiction, ¶ 8.

[507]    Claimants' Reply, fn. 173, citing its Objections to Bifurcation, ¶ 59, fn. 68; Claimants' Rejoinder on Jurisdiction, ¶ 8.

and as such are not entitled to bring claims in their own right under those agreements.[508] Rather, their claim is brought under the ECT's substantive protective clauses, including the umbrella clause and the legitimate expectation that the Respondent would abide by its obligations to the Claimants' Investments, the Italian solar special purpose vehicles who own the relevant PV plants.

## C.    THE TRIBUNAL'S ANALYSIS

395.    The Tribunal's findings on the jurisdictional objections related to these claims is equally applicable to Italy's objections based on admissibility. The objection as to the admissibility of these claims is dismissed.

## IX.    APPLICABLE LAW (ISSUE 3)

### A.    THE CLAIMANTS' ARGUMENTS

396.    The Claimants state that the ICSID Convention requires that the Tribunal decide the merits of this dispute "in accordance with such rules of law as may be agreed by the parties."[509] By agreeing to resolve this dispute under the ECT, the Parties have agreed to apply the ECT's governing law provision, which provides that the Tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[510] Article 26(6) of the ECT indicates that the ECT and international law are the applicable law of this dispute; not EU law or Italian law.

397.    The Claimants point out that several arbitral awards have confirmed that only international law and the terms of the ECT govern an arbitration, and under the Treaty that the applicable international law includes the 1969 VCLT[511] and the 2002 United Nations International

---

[508]    Claimants' Rejoinder on Jurisdiction, ¶¶ 104-105.

[509]    ICSID Convention, Art. 42(1).

[510]    ECT: C-001, Art. 26(6).

[511]    VCLT: CL-050, Arts. 2(1)(a), 31(3)(c) (treaties are "governed by international law" and must be interpreted in light of "[a]ny relevant rules of international law applicable."). Italy is also a party to the VCLT. Claimants' Memorial, ¶ 287; Reply, ¶ 411.

Law Commission Articles on Responsibility of States for Internationally Wrongful Acts ("**ILC Articles on State Responsibility**").[512]

## B.    THE RESPONDENT'S ARGUMENTS

398.    A number of the Respondent's submissions rely on Italian law. In its arguments on jurisdiction, Italy also argued that EU law is part of the applicable international law to this dispute (which it says deprives this Tribunal of jurisdiction, if the Tribunal upholds the Respondent's intra-EU and primacy of EU law objections). The Respondent suggests that Italian law should influence the legal standards that the Tribunal applies to determine whether Italy violated the ECT and international law.[513]

399.    The Respondent contends that the 2017 Constitutional Court Decision is relevant to this arbitration as applicable law and as fact because it makes reference to EU and ECHR case law, and because the standards applying to legitimate expectations (and FET more generally) "must be assessed also considering that domestic and international case law as relevant applicable law."[514]

400.    The Respondent relies on its Constitutional Court's reasoning and conclusions on the subject of investors' legitimate expectations, particularly regarding the right of the state to modify long-term relationships in legislation affecting vested rights.[515] In arguing that its legislative and regulatory modifications were reasonable, the Respondent refers to what it argues are "similar" constitutional court decisions in Spain.[516] The Respondent contends that these analogous Spanish decisions reflect a "consistent application [that] makes the elaboration of the domestic constitutional courts as common principles to become sources

---

[512]    Claimants' Memorial, ¶¶ 285-286; Claimants' Reply, ¶¶ 409-410; *Hulley Enterprises Limited v. Russian Federation*, PCA Case No. AA226, Final Award, 18 July 2014: CL-048, ¶ 113; *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. Republic of Kazakhstan*, SCC Case No. 116/2010, Award, 19 December 2013: CL-049, ¶ 851, *AES v. Hungary*: CL-038, ¶ 7.6.4.

[513]    RPHB, ¶ 33.

[514]    RPHB, ¶ 35.

[515]    RPHB, ¶¶ 34-35.

[516]    RPHB, ¶ 36.

of international law under Article 38(1) of the Statute of the ICJ [International Court of Justice]."[517]

## C. THE TRIBUNAL'S ANALYSIS

401. The Tribunal agrees with the Claimants[518] that Italian law is relevant to this dispute only as a matter of fact or background context, and that it should not influence the legal standards that the Tribunal applies to determine whether the Respondent violated the ECT. Whether or not the Challenged Measures complied with domestic law is irrelevant for the Tribunal's purposes. The Tribunal observes that EU law is not invoked or implicated in this ECT arbitration, and thus does not form part of the governing international law applicable to the issues before the Tribunal.

402. The ECT specifically refers only to the Treaty and principles of international law as the law governing the dispute. Therefore, the Tribunal is not permitted to apply Italian law in the sense of a governing law in this arbitration and the liability questions in this case need only be determined through an application of the ECT itself, as well as related principles of international law. The Tribunal therefore rejects the Respondent's arguments regarding the deferential approach it should take to Italy's Constitutional Court decisions.

403. It is trite law that a party may not invoke provisions of its internal law as justification for its failure to perform a treaty.[519]

404. This is not to say that Italian law has no role in this arbitration. It is relevant as a factual element of the disputes the Tribunal must resolve. Accordingly, the Tribunal has considered and analysed the various relevant Italian laws and decrees at issue as part of the factual context. In this regard, for example, the Tribunal will address the Respondent's submissions regarding the 2017 Constitutional Court Decision under the legitimate expectations analysis below.

---

[517]     RPHB, ¶ 35.

[518]     Claimants' Memorial, ¶ 288; Claimants' Reply, ¶ 412; Hearing Transcript, Day 1, 66:7-9.

[519]     VCLT: CL-050, Art. 27 reads: "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."

## X.    THE RESPONDENT'S GENERAL DEFENSES ON THE MERITS

405.    Before turning to the Claimants' claims under the ECT, the Tribunal finds it helpful to address a general issue which underlies the Respondent's defenses to the claims based on the *Spalmaincentivi* Decree and other Challenged Measures: namely, the state's right to regulate and the need to reduce incentive tariffs in order to reduce costs to end-users and to preserve the incentive system itself. The Respondent relies on this broad defense at multiple junctures throughout its pleadings in response to all of the Claimants' claims, and the Tribunal will address these specific arguments under Issues 4.1 to 4.3 below.

### A.    THE RIGHT TO REGULATE

### (1)    The Claimants' Arguments

406.    The Claimants' claims are based on the assurances and commitments, which they say were made by Italy in the *Conto Energia* and the Off-Take regimes, on which they relied in making their investments. The Claimants say that these regimes were set out in specific detail in legislation and regulations adopted by Italy, as well as the Agreements concluded with the GSE, a public entity wholly-owned and controlled by Italian ministries. According to the Claimants, Italy exercised its regulatory power to encourage investment in the PV sector by adopting the *Conto Energia* and Off-Take regimes and the assurances and commitments they provided. In doing so, the Respondent deliberately chose to relinquish or limit its discretion to amend those regimes by reducing the *Conto Energia* tariffs and the Minimum Guaranteed Prices.[520] The Claimants say that the Respondent accomplished its goals thanks to the incentives contained in the *Conto Energia* and Off-Take regimes, and cannot subsequently change them for existing plants which qualified for, and were granted, the incentives.

407.    Quoting from *ADC v. Hungary*, the Claimants say that the Respondent accepted limits on its sovereign right to regulate when it entered into the ECT and accepted the investment protection obligations contained in it. According to the Claimants, it is a basic principle of international law accepted by many Tribunals that a state's right to regulate is limited when

---

[520]    Hearing Transcript, Day 1, 10–11; Claimants' Opening Presentation, Slide 4.

the state creates legitimate expectations on the part of investors, especially when those expectations are created by specific commitments or assurances designed to encourage investors to invest.[521] In this case, the Claimants say that Italy gave very specific commitments in the *Conto Energia* Decrees that particular PV facilities would be paid at a specific tariff at a constant rate for a period of 20 years. They say that the Respondent made that commitment in the *Conto Energia* Decrees and in official statements and promotional efforts. In addition, the Respondent reconfirmed its commitment by way of the GSE Letters and GSE Agreements.[522] The Claimants make similar arguments with respect to the Off-Take Regime and the MGP.[523]

408.   The Claimants also say that even where a state has not made a "specific commitment" regarding an investor's investment, the right to regulate is not absolute. In this regard, the Claimants submit that changes to a regulatory framework can be considered unfair if they are contrary to commonly recognized financial and economic principles of "regulatory fairness" or "regulatory certainty."[524] On this basis, the Claimants say that even if Italy had not given specific commitments of stability with respect to their investments, it could not enact measures that violated principles of regulatory fairness and certainty.[525]

### (2)    The Respondent's Arguments

409.   For the Respondent, the key issue before this Tribunal is whether "the ECT prohibit[s] a party to the Treaty from using its sovereign power to make limited adjustments to a category of incentives in the absence of a stabilization clause, and when it does so in a non discriminatory, proportionate and reasonable manner?"[526]

---

[521]    CPHB, ¶¶ 48-49. *See also* Claimants' Reply, ¶¶ 244-245, 341-348 and the sources cited therein.

[522]    CPHB, ¶ 53. In this regard, the Claimants say that where specific commitments have been made by a state, as in this case, there is no room for a "balancing exercise" between the legitimate expectations of the investor and the state's authority and need to regulate and amend its legislation over time: *see* CPHB, ¶¶ 54-55.

[523]    Claimants' Memorial, ¶¶ 222-233, 315, 317; Claimants' Reply, ¶¶ 460-467.

[524]    Claimants' Reply, ¶ 345, referring to *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010 ("***Total v. Argentina***"): CL-051, ¶ 309.

[525]    Claimants' Reply, ¶¶ 346-348.

[526]    Respondent's Closing Presentation, Slide 2.

410.     The Respondent raises a state's right to regulate as a defense in respect of the *Spalmaincentivi* Decree, and other Challenged Measures more generally, and insists that only a "fair return"/"remuneration" was guaranteed to the Claimants.[527] The Respondent argues that "the protection of investor's legitimate expectations cannot amount to a general freezing clause of the State regulatory powers," which "prevent[s] a State from progressing its general legislation in a reasonable way."[528] In the Respondent's view, the FET standard does not require that states freeze their legislation, nor does it only allow them to modify their regulations when in a state of necessity.[529]

411.     The Respondent says that the 2009 EC Directive – which states that "it is vital that [EU] Member States can control the effect and costs of their [incentive tariff] schemes according to their different potentials" – is important for understanding the regulatory context before the Claimants made their investments. The Respondent argues that it is "inherent in the way the mechanism works" that it must remunerate both investment and operating costs, but that the latter "vary in the course of the years and cannot be exactly pre-determined."[530] The Respondent further asserts that the incentive tariff is given on the top of the remuneration for production, and is therefore an "addition" to revenues, varying according to the electricity actually produced.[531]

412.      According to the Respondent, neither its acts nor its general regulatory framework, including the *Conto Energia* Decrees, should be interpreted as a stabilization clause that promised that it would not change the incentive tariffs for 20 years.[532] The Respondent argues that it never unequivocally waived its right to regulate in its general regulatory

---

[527]     *See, e.g.*, Respondent's Counter-Memorial, ¶ 455.

[528]     Respondent's Rejoinder, ¶ 297.

[529]     Respondent's Rejoinder, ¶ 178.

[530]     Respondent's Closing Presentation, Slides 4-5.

[531]     As will be discussed under Issues 4.1-4.3 below, the Claimants counter that the Respondent's specific commitments in the *Contos* and other representations regarding the stability of tariffs granted to PV facilities *limited* its right to change its incentive framework retroactively. The Claimants emphasize that regulatory certainty was one of the benchmark features motivating the support schemes from the beginning, and in this context, the Respondent cannot argue that the *Spalmaincentivi* is a valid exercise of regulatory powers. *See* Respondent's Closing Presentation, Slide 5; Claimants' Reply, ¶ 344; *EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award 8 October 2009 ("***EDF v. Romania***"): CL-056, ¶ 217; *Total v. Argentina*: CL-051, ¶ 309; Claimants' Reply, ¶ 348.

[532]     Respondent's Rejoinder, ¶¶ 13-14.

framework.[533] The Respondent argues that "[a]t [the] primary level of the regulation, the Italian Parliament did not expressly (or implicitly) authorize the Italian Government to dispose of the fundamental State's right to regulate."[534] The Respondent avers that the only way to "freeze" its right to regulate would be if the legislation through which the Italian Parliament instructed the government to implement the EC Directives and to develop a PV regulatory framework (Laws No. 39/2002 or No. 96/2010) had authorized the adoption of such a stabilization clause in the *Conto Energia* Decrees, GSE Agreements, and other relevant legislation or regulation. The Respondent states that the "primary level of the regulation" (either Legislative Decrees Nos. 387/2003 or 28/2011) would have had to include an unequivocal stabilization clause.[535]

413.    The Respondent argues that "an absolute inhibition to further legislate is contrary to a fundamental principle of international law," as the power of a state to "progressively modify its legislation is related to the essence of statehood, subject to the requirement that such modification be made in a reasonable and proportional way and by respecting its own law." For the Respondent this "is an unavoidable starting point for assessing the existence of a violation of the FET standard," rather than "a mere defence."[536]

414.    As will be discussed in detail under each of the Claimants' claims that the Respondent violated the ECT's FET standard, the Respondent argues that Article 10(1) of the ECT does not embody a freezing clause.[537] The Respondent states that "the principle of stability of a regulatory framework is not at all equivalent to an obligation for States not to modify their legislation when investors are affected."[538] Rather, the Respondent asserts that "[s]tability allows for a degree of reasonable modification of existing rules,"[539] and argues

---

[533]    Respondent's Closing Presentation, Slide 3; Hearing Transcript, Day 1, 174:2-4.

[534]    Respondent's Rejoinder, ¶ 14; Respondent's Closing Presentation, Slide 3.

[535]    Respondent's Rejoinder, ¶ 14.

[536]    Respondent's Rejoinder, ¶ 299.

[537]    Respondent's Rejoinder, ¶¶ 300-301, 318.

[538]    Respondent's Rejoinder, ¶¶ 301, 318; *Saluka Investments BV v. Czech Republic*, UNCITRAL/PCA, Partial Award, 17 March 2006 ("***Saluka v. Czech Republic***"): CL-057, ¶ 305. *See also* Rejoinder, ¶¶ 309-311, 325; *Charanne v. Kingdom of Spain*, SCC Case No. 62/2012, Final Award, 21 January 2016 ("***Charanne v. Spain***"): CL-004, ¶ 503 (also discussed in Respondent's Counter-Memorial, ¶¶ 486-488).

[539]    Respondent's Rejoinder, ¶ 300.

that the *Spalmaincentivi* Decree and the other Challenged Measures constitute reasonable modifications.

415.    The Respondent relies on *Saluka v. Czech Republic*, which held that "no investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged."[540] The Respondent relies on the holding in that case that the determination of whether the investor's expectations were justified and reasonable must also take into account "the host State's legitimate right subsequently to regulate domestic matters in the public interest."[541] The Respondent relies on *Parkerings v. Lithuania*, which it says also confirms this point.[542] In submissions following the Hearing, based on more recent cases involving PV investments in Italy, the Respondent also relied on the approach of the tribunals in the *Belenergia v. the Italy*[543] and *SunReserve v. the Italy*[544] in support of its arguments regarding a state's right to regulate.

416.    In response to the Claimants' claim that Italy's imposition of the Administration Fees and Imbalance Charges were an indirect way of reducing the incentive tariffs in the *Conto Energia* Decrees, the Respondent points out that *Contos* I-IV do not expressly address the potential for these additional charges. The Respondent argues that the Tribunal should not construe this silence as sufficient to give rise to legitimate expectations by the Claimants that no such costs would be imposed on them.[545] Invoking its right to regulate, the Respondent suggests that such an interpretation would "transform the FET clause into a general freezing clause of State regulatory activity."[546]

417.    The Respondent asserts that a "regulatory act, such as a *Conto Decree*, is not apt to freeze the successive regulatory activity of a country, without any specific contractual

---

[540]    *Saluka v. Czech Republic*: CL-057, ¶ 305.

[541]    *Saluka v. Czech Republic*: CL-057, ¶ 305.

[542]    Respondent's Rejoinder, ¶¶ 305-306, 310; *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 ("***Parkerings v. Lithuania***"): CL-062, ¶ 332.

[543]    *See Belenergia*: RL-028; Respondent's Comments on *Belenergia*.

[544]    *See SunReserve*: RL-029; Respondent's Comments *SunReserve*.

[545]    *See, e.g.*, Respondent's Rejoinder, ¶ 517.

[546]    Respondent's Rejoinder, ¶ 517.

commitment towards a concrete investor."[547] The Respondent argues that the *Conto Energia* Decrees

> did not include a clause having the specific aim to freeze the future legislation on incentive tariffs for [20] years. Its guarantee was indeed subject to the reasonable evolution of legislation according to the Italian and European legal orders, as the Italian Constitutional Court has also recently recognised, so stating the full legitimacy of the *Spalma-incentivi* Decree.[548]

### (3) The Tribunal's Analysis

418.    In the Tribunal's view, while a state possesses the inherent right to regulate its domestic affairs, it can agree to limit the exercise of that right. Notably, by entering into an international treaty, such as the ECT, the state parties agreed to certain obligations that could have an effect on their inherent right to regulate their domestic affairs. One example of a specific obligation in the ECT that may result in agreed limitations to the inherent right to regulate domestic affairs are the binding investment protection obligations. Numerous arbitral tribunals have found that where a state makes a specific promise or commitment or undertakes a specific obligation to an investor, it limits the exercise of its right to regulate domestic affairs;[549] any such regulation must also be in accordance with the state's international obligations agreed in the ECT. The Tribunal notes that the ECT does not directly limit a state's inherent right to regulate its domestic affairs. Instead, the ECT provides investors affected by domestic regulation that is not in accordance with international obligations with an avenue of recourse for alleged breaches of the ECT in an independent forum.

419.    In *El Paso Energy v. Argentina*, the tribunal held as follows:

> There can be no legitimate expectation for anyone that the legal framework will remain unchanged in the face of an extremely severe economic crisis. No reasonable investor can have such an expectation unless very specific

---

[547]    Respondent's Rejoinder, ¶ 325, relying on *Blusun v. Italy*: CL-139; *Charanne v. Spain*: CL-004.

[548]    Respondent's Rejoinder, ¶ 326.

[549]    *ADC Affiliate Ltd. and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 ("***ADC v. Hungary***"): CL-097; *EDF. v. Romania*: CL-056; *Total v. Argentina*: CL-051; *Parkerings v. Lithuania*: CL-062; *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 ("***Micula v. Romania***"): CL-014; *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL, Award, 23 April 2012 ("***Oostergetel v. Slovakia***"): CL-207.

commitments have been made towards it or unless the alteration of the legal framework is total.

A reasonable general regulation can be considered a violation of the FET standard if it violates a specific commitment towards the investor. The Tribunal considers that a special commitment by the State towards an investor provides the latter with a certain protection against changes in the legislation, but it needs to discuss more thoroughly the concept of "specific commitments." In the Tribunal's view, no general definition of what constitutes a specific commitment can be given, as all depends on the circumstances. However, it seems that two types of commitments might be considered "specific": those specific as to their addressee and those specific regarding their object and purpose …

[A] reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely.[550]

420.    In this case, the Claimants do not argue that the Respondent was required to freeze its framework regulating the incentivization of the production of electricity by PV facilities. Rather, their claim is that the Respondent made specific commitments that the tariffs granted to qualifying PV facilities would be maintained at a constant rate for a fixed period. In the Tribunal's view, this situation must be distinguished from that addressed in other awards in which no specific promise or commitment was alleged or found to have been made.[551] In this case, while neither the legislative decrees nor the *Conto Energia* Decrees contain an express statement by which the Respondent agreed to freeze the incentive regime, the Claimants say that it contains a similar undertaking by guaranteeing specific tariff rates which would remain constant for a term of 20 years.[552]

---

[550]    *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 ("*El Paso v. Argentina*"): CL-055.

[551]    *See*, *e.g.*, *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075; *Saluka v. Czech Republic*: CL-057; *Charanne v. Spain*: CL-004; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 ("*Plama v. Bulgaria*"): CL-085, ¶ 219 (the tribunal's statement that the ECT itself does not protect against future regulatory changes is qualified by the tribunal's finding that Bulgaria had not made "any promises or other representations to freeze its legislation or environmental law to the Claimant or at all").

[552]    Hearing Transcript, Day 1, 39-43, 126-127; CPHB, ¶ 49, citing *EDF v. Romania*: CL-056, ¶ 217:
The idea that legitimate expectations, and therefore FET, imply the stability of the legal and business framework, may not be correct if stated in an overly broad and unqualified formulation. The FET might then mean the virtual freezing of the legal regulation of economic activities, in contrast with the State's normal regulatory power and the evolutionary character of economic life. Except where specific promises or representations are made by the State to the investor, the latter may not rely on a bilateral investment treaty as a kind of insurance policy

421.    The Tribunal notes that, to the extent that the reasoning of the *SunReserve v. Italy* tribunal
can be taken to have included a separate "balancing" exercise between the state's right to
regulate as a general principle of international law and its FET obligations,[553] it disagrees
with that approach. The Respondent undertook specific obligations in the ECT and the
Tribunal's task is to determine the extent of those obligations to the Claimants in this case,
which does involve an interpretation of the ECT provisions and a review of the factual
circumstances particular to the case. It does not involve a fresh consideration of the
Respondent's right to regulate generally; it involves an interpretation of any limits to that
right agreed to by the Respondent through the ECT.

422.    Accordingly, the issue the Tribunal must address is whether the Respondent made specific
assurances, commitments or otherwise entered into any obligations which limited its right
to regulate and modify the tariffs granted to qualifying PV plants in which the Claimants
invested.

## B.    NECESSITY

423.    The Tribunal also finds it helpful to clarify an issue as to whether the Respondent has
invoked the defense of necessity.

### (1)    The Respondent's Arguments

424.    In its submissions, the Respondent refers to the need or necessity to reduce the incentive
tariffs in its FIT mechanism in order to reduce the burden on end-users and also to protect
and guarantee the preservation of the system itself.[554]

425.    In its Rejoinder, the Respondent contests that it is advancing a necessity defense, stating
that the Claimants are "trying to impose on Italy a disproportionate burden," presumably

---

against the risk of any changes in the host State's legal and economic framework.
Such expectation would be neither legitimate nor reasonable" (emphasis added).

    *See also* Claimants' Reply, ¶¶ 245, 343 and the cases cited at fn. 233, *especially Total v. Argentina*: CL-051,
¶ 119 ("specific commitments limit the right of the host State to adapt the legal framework to changing
circumstances").

[553]    *See SunReserve*, ¶¶ 685-687.

[554]    *See, e.g.*, Respondent's Counter-Memorial, ¶ 285; Respondent's Rejoinder, ¶¶ 259-261, 482; Respondent's
Opening Presentation, Slides 58, 78.

by insisting that Italy must satisfy the four elements in order to make out its necessity argument.[555]

426.    In its Comments on New Legal Authorities, the Respondent takes issue with the *Greentech v. Italy* award's finding that, notwithstanding Italy's difficult economic situation, "none of the circumstances evidenced in this case reach the level of *force majeure* … given that the justification for changes relate simply to alleged compensation to the service provider and the marginal cost to consumers."[556] For the Respondent, the crux of its argument is about "the balancing between the right to regulate of a state (that does not amount to proving 'force majeure'!!) against the (extremely limited) restriction of Claimants' rights." The Respondent attempts to distinguish the *Greentech v. Italy* award on the basis that "it takes the liberty to consider that such [public] interest was 'simply' (!!) to protect the right of consumers (and service provider, which in fact does not even correspond to Respondent's claim."[557]

### (2)    The Claimants' Arguments

427.    The Claimants say that the Respondent has not established the basis for any "necessity" defense. They argue that the Respondent has not established a factual basis for the need to implement the *Spalmaincentivi* Decree, whether as regards the need to relieve the burden of electricity prices on end-users or to preserve the FIT incentive system. They also argue that even if the Respondent could point to a valid basis explaining why the *Spalmaincentivi* Decree was necessary, it did not, and cannot, demonstrate the requirements of the defense of necessity under international law.[558]

---

[555]    Respondent's Rejoinder, ¶ 178 ("The Respondent's argument, that there is no violation of FET because no legitimate expectation for a freezing clause exists in the FET standard, is then transformed by the Claimants in a sort of state of necessity, thus trying to impose on Italy a disproportionate burden.").

[556]    Respondent's Comments on New Legal Authorities, ¶ 45; *Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA v. Italian Republic*, SCC Case No. 2015/095, Award, 23 December 2018 ("***Greentech***"): CL-212, ¶ 451.

[557]    Respondent's Comments on New Legal Authorities, ¶ 45; *Greentech*: CL-212, ¶¶ 451, 454.

[558]    Claimants' Reply, ¶¶ 349-355.

### (3)    The Tribunal's Analysis

428.    The Tribunal finds that while Italy refers to its dire financial situation and a need to reduce the burden on end consumers' electricity bills,[559] its arguments focus on its need and obligation to "adapt progressively domestic legislation and secondary regulations to an evolving scenario," which Italy says requires it to review and modify its incentive framework to ensure its sustainability.[560]

429.    The Tribunal finds that the Respondent has not pleaded a defense of necessity under international law and has confirmed that it is not advancing that defense. Consequently, the Tribunal need not address any such defense.

430.    Rather, the Tribunal understands that the Respondent has referred to what it considered to be the need to reduce the cost of electricity to end-users, which it considers to be a legitimate public policy goal of regulation. Further, the Respondent's arguments speak to its need to maintain the sustainability of the incentives regime as factors explaining why it adopted the Challenged Measures and what it maintains was the reasonableness of those measures. These arguments in defense of the claims will be addressed, as necessary, in the analysis that follows.

## XI.    MERITS: ARTICLE 10(1) OF THE ECT (ISSUE 4)

431.    The Claimants claim that the Challenged Measures implemented by the Respondent violate their rights protected by three aspects of Article 10(1) of the ECT: the requirement to accord to investors fair and equitable treatment; the impairment clause, pursuant to which the Respondent may not in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of Investments of Investors; and the umbrella clause, pursuant to which the Respondent must observe any obligations it has entered into with an Investor or an Investment of an Investor. The Claimants submit that

---

[559]    Respondent's Rejoinder, ¶¶ 259, 261, 482.

[560]    Respondent's Rejoinder, ¶¶ 182, 337.

each of the Challenged Measures violated the FET standard, the Impairment Clause and the Umbrella Clause in Article 10(1) of the ECT. Each will be considered in turn.

432. For the reasons that follow, the majority of the Tribunal is of the view that the Respondent breached all three aspects of Article 10(1) of the ECT (FET, the Impairment Clause and the Umbrella Clause). Arbitrator L. Boisson de Chazournes disagrees and her dissenting position on each of these issues is also set out below.

## A.    FAIR AND EQUITABLE TREATMENT ("FET") (ISSUE 4.1(A))

433. Article 10(1) of the ECT requires Italy to accord FET to investors. It provides in relevant part as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.[561]

434. For the Claimants, the issue before this Tribunal is whether

> the ECT permit[s] Italy to induce substantial foreign investments … by guaranteeing support to eligible PV facilities for a fixed period of time under a very clear and certain legal, regulatory and contractual framework … and then fundamentally repudiate or abrogate and alter that framework once investments have been made in reliance upon it.[562]

435. The Claimants allege that once Italy had reaped the benefits of the investments it had attracted through its legislative, regulatory and contractual guarantees and commitments, it reneged on its promises to the substantial detriment of the Claimants.[563] In so doing, the Claimants say the Respondent violated the FET provision in Article 10(1) of the ECT.

436. In addition to its right to regulate outlined above,[564] the Respondent's response to this allegation is detailed under the subsections that follow.

---

561    ECT: C-001, Art. 10(1) (footnotes omitted).

562    Hearing Transcript, Day 1, 62:2-10.

563    Claimants' Memorial, ¶ 2.

564    Section X.: Respondent's General Defenses on the Merits, Sections (A) and (B), above.

### (1) Does the ECT's FET Standard Contain One or More Autonomous Sub-Standards?

#### a. The Claimants' Arguments

437. The Claimants allege that the Respondent breached the FET standard under Article 10(1) of the ECT in three distinct ways:

- First, by violating the Claimants' legitimate expectations of predictable and stable support for their PV facilities;

- Second, by failing to treat Claimants' investments transparently and consistently; and

- Third, by failing to act in good faith towards the Claimants and their investments.[565]

438. The Claimants assert that the ECT's FET standard includes multiple sub-standards, comprised of the protection of legitimate expectations, consistency and transparency, and good faith.[566] They argue that any one of the violations alleged above, standing alone, would breach the FET standards, and that the *Spalmaincentivi* Decree and the other Challenged Measures violated FET in each of those ways.[567] Specifically, the Claimants assert that the Respondent can be found to have breached FET by *either* of the three sub-standards above *or*, alternatively, the same act may be found to have breached FET in one or more different ways (although the Claimants have focused on what they say are the most obvious ways in which the Challenged Measures violate FET).[568]

439. The Claimants contend that academic commentary and several cases confirm that states may breach the FET standard by various types of misconduct. Thus, say the Claimants, undermining legitimate expectations is only one type of conduct by which a state can

---

[565]    Claimants' Memorial, ¶ 294.

[566]    Claimants' Reply, ¶¶ 357-358, fn 355 ("Italy is wrong to claim that consistency and transparency are not autonomous standards, but are subsumed within 'legitimate expectations.'").

[567]    Claimants' Memorial, ¶ 294; Claimants' Reply, ¶ 357.

[568]    Claimants' Reply, ¶ 360.

violate the FET standard.[569] The Claimants assert that it is telling that the Respondent does not attempt to explain why it finds the reasoning in those cases inapplicable to the present case.[570]

### b.   The Respondent's Arguments

440.    The Respondent argues that "only legitimate expectations, and partially transparence [*sic*], play an effective autonomous role in FET clause."[571] The Respondent rejects an interpretation of FET that would create autonomous obligations to treat foreign investments "consistently" and with "good faith," respectively.[572] The Respondent contests the three sub-standards that the Claimants say are within FET, and asserts that FET is composed of various obligations, such as the obligation to act under due process and to not infringe legitimate expectations.[573] According to the Respondent, "there is simply no established Tribunals' practice in favour of [the Claimants'] interpretation of the FET standard."[574] For the Respondent, the key issue is whether the Claimants' second and third sub-standards under FET – transparency/consistency and good faith, respectively, are relevant in this

---

[569]     Claimants' Reply, ¶¶ 357-358, citing Rudolf Dolzer and Christoph Schreuer, *Principles of International Investment Law* (2nd ed., 2012) (excerpts) ("**Dolzer and Schreuer**"): CL-061.1, p. 145; *Micula v. Romania*: CL-014 (the tribunal specifically analysed the state's conduct under both the legitimate expectations and transparency/consistency standards of FET); *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 7.74 (FET "comprises several elements, including an obligation to act transparently and with due process; and to refrain from taking arbitrary or discriminatory measures or from frustrating the investor's reasonable expectations with respect to the legal framework adversely affecting its investment"); *Walter Bau v. Thailand*, ¶ 11.5: CL-179 (FET "comprises a number of different components … protection of legitimate expectations … good faith … transparency, consistency, non-discrimination").

[570]     Claimants' Reply, ¶ 359. *See also* Respondent's Counter-Memorial, ¶ 497: the Respondent accepts that legitimate expectations "is certainly included" in the FET standard.

[571]     Respondent's Rejoinder, ¶ 289.

[572]     Respondent's Counter-Memorial, ¶¶ 499, 501, 637-646 (consistency), 654-656 (transparency), 659-662 (good faith). *See* Respondent's Counter-Memorial, ¶¶ 498, 500 wherein the Respondent rejects the autonomous standing of the duty to ensure transparency and consistency, but then "accepts to autonomously analyse the requirement of transparency," notwithstanding that the Claimants "have never referred to it as an autonomous standard." *See similarly*, ¶ 637: "the Respondent completely rejects an interpretation of FET as creating an autonomous obligation to treat foreign investments consistently … the category of transparency is rather ambiguously referred to in the tribunal practice, but Italy, for the sake of defense, accepts to autonomously analyse such category;" ¶¶ 661-662: "good faith encompasses the whole content of the FET standard … This fact precludes any possible autonomy of a specific infringement of good faith within the FET standard." *See also* Claimants' Reply, ¶¶ 369-371 (transparency/consistency), 376 (good faith).

[573]     Respondent's Rejoinder, ¶ 291.

[574]     Respondent's Rejoinder, ¶ 292.

particular case to the question of whether the Respondent's conduct amounts to a violation of FET.[575]

441.   The Respondent argues that the Challenged Measures are heterogeneous and were taken by different organs and bodies, at different and sometimes distant times, and therefore the Claimants are wrong in alleging that the Measures formed part of a common plan to first entice, then claw back, investments in Italy's PV sector.[576] The Respondent explains that its arguments "autonomously address" each of the Challenged Measures which the Claimants contend violated each of the three FET sub-standards.[577]

### c.   The Tribunal's Analysis

442.   The Claimants assert that the FET standard is comprised of a number of different components, while the Respondent contends that the FET standard is an independent and autonomous standard which turns on the investor's legitimate expectations and, to a more limited extent, on the transparency of the state's conduct.

443.   In the Tribunal's view, little turns on the Respondent's interpretive arguments that the FET standard comprises a single autonomous standard based on legitimate expectations and transparency, as opposed to whether it has three distinct but overlapping elements, as argued by the Claimants. As various tribunals have pointed out, FET is made up of several components, including the duty to create stable conditions, to act in a transparent and consistent manner (with due process and in good faith), and to refrain from taking arbitrary or discriminatory measures or from frustrating investors' legitimate expectations regarding the legal, regulatory, and legislative framework and adversely affecting their investments.[578] The next question is the scope of the host state's obligations in respect of these aspects of FET, and in the context of the unique facts and circumstances of this case.

---

[575]   Respondent's Rejoinder, ¶ 293.

[576]   Respondent's Counter-Memorial, ¶ 502.

[577]   Respondent's Counter-Memorial, ¶ 502.

[578]   *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 7.74; *Walter Bau v. Thailand*, CL-179, ¶ 11.5: FET "comprises a number of different components … protection of legitimate expectations … good faith … transparency, consistency, non-discrimination;" *Micula v. Romania*: CL-014 (the tribunal specifically analysed the

444.    The Tribunal finds that the FET standard includes multiple sub-standards, including the protection of legitimate expectations, consistency and transparency, and good faith. While there is significant overlap in the facts applicable to the allegations under these distinct elements of FET, the Tribunal will analyse the Claimants' claims separately under each of these headings.

## B.    LEGITIMATE EXPECTATIONS (ISSUE 4.1(B))

445.    The Claimants say that each of the Challenged Measures violated their legitimate expectations generated by the *Conto Energia* and the Off-Take (MGP) incentive regimes contained in the Respondent's legislation and regulations, and the notices and agreements these provided for.[579] The Claimants also rely on communications from Italy's government and regulatory authorities describing and supporting the two regimes.

446.    As will be discussed in greater detail below, the Claimants say that the *Conto Energia* regime created the legitimate expectation that the incentives, in particular the tariffs and their payment terms, once granted would be honoured and remain constant for the duration of the 20-year term.[580] Similarly, the Claimants say that the Off-Take Regime created the legitimate expectation that the MGP would remain available, free from direct or indirect reduction, to its qualifying investments and above a certain competitive threshold.[581] The Claimants did not specify in their pleadings or at the Hearing for how long they expected the MGP to remain available, except to say that they expected the MGP would continue at a level reasonably equivalent to that which it had been for the six years prior to the challenged reduction and, in any event, to remain above market price. However, the Tribunal notes from the Claimants' quantum calculations that they seem to have based their

---

state's conduct under both the legitimate expectations and transparency/consistency standards of FET). *See also* Dolzer and Schreuer: CL-061.1, p. 145.

[579]    As the Tribunal has found that it does not have jurisdiction with respect to the Robin Hood Tax and the reclassification of PV plants as immovable property, it will not address the Claimants' allegations in respect of these Challenged Measures.

[580]    Claimants' Memorial, ¶¶ 310-314.

[581]    Claimants' Memorial, ¶¶ 315-317; CPHB, ¶ 87; Claimants' Reply, ¶ 362:

damages in relation to the MGP for the full 20-year period under the *Conto Energia* Decrees.[582]

447.    As will be described below, the Respondent denies that the Claimants had any legitimate expectations arising out of the *Conto Energia* and Off-Take regimes, or that any of the Challenged Measures violated any legitimate expectations the Claimants may have had.

448.    The Tribunal examines each regime in turn.

### (1)    Nature of the *Conto Energia* Regime

### a.    The Claimants' Arguments

449.    The Claimants say that the *Conto Energia* regime is an *ex ante*, at risk regime which provided for fixed incentive tariff (FIT) rates. They say that Legislative Decree Nos. 387/2003[583] and 28/2011 (the *Romani* Decree)[584] provided a general framework for incentives to implement EU directives.[585] Those legislative decrees instructed the relevant Italian ministries to develop the specifics of the incentive regime which included specific tariff rates for the purpose of ensuring "fair remuneration of each investment and operating costs."[586]

450.    The *Conto Energia* Decrees implemented the instructions given in Legislative Decree Nos. 387/2003 and 28/2011 by establishing the detailed framework and rules to govern PV facilities, including, *inter alia*, the specific incentive tariff rates and their duration. As those legislative decrees did not themselves specify the conditions in which the tariffs would apply or the specific level of remuneration to be covered by the tariffs, investors had to look to the *Conto Energia* Decrees. In response to the Respondent's argument that investors should have relied on the legislative decrees which provided only for a "fair

---

[582]    *See* FTIQ2, ¶¶ 5.1-5.19, in particular ¶¶ 5.17-5.18.

[583]    Italy enacted *Conto Energia* I, II, and III according to Legislative Decree 387/2003, which implemented Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources.

[584]    Italy enacted *Conto Energia* IV in accordance with Legislative Decree 28/2011, which implemented Directive 2009/28/EC on the promotion of electricity produced from renewable energy sources.

[585]    Claimants' Reply, ¶¶ 260-262, 269.

[586]    Legislative Decree No. 387/2003: C-036, Art. 7; *Romani* Decree: C-165, Art. 25.

return on the costs of investment and operations," rather than the *Conto Energia* Decrees, the Claimants say that the legislative decrees explicitly instruct Italy's ministries to establish specific mechanics and details of the incentive support they mandate. The *Conto Energia* Decrees provided all the necessary details on which investors relied.[587]

451.    Further, the Claimants say that Legislative Decree Nos. 387/2003 and 28/2011 require the relevant ministries to provide specific incentive rates so as to ensure fair remuneration of each investment and operating costs.[588] These legislative decrees do not refer to a "fair return," as argued by the Respondent.[589] The Claimants say that the legislative decrees do not refer to returns at all.[590] In this regard, the Claimants distinguish between returns that can only be assessed in hindsight, after the actual costs of performance of a facility are known, and remuneration which is generally established or agreed *ex ante*, with the returns on any particular project flowing as a result of the remuneration, costs and performance of a project.[591] The Claimants say that the legislative decrees are very clear in specifying that the Ministries were required to set rates in a forward-looking process by requiring them to "provide a specific incentive rate, decreasing amount and duration as to ensure fair remuneration of each investment and operating costs."[592] This required the Ministries to fix rates *ex ante* rather than *ex post* to achieve a specific return based on cost and performance.[593]

452.    The Claimants say that none of the usual elements of an *ex post*, return-based compensation regime are present in either the legislative decrees or the *Conto Energia* Decrees.[594] For example, such a regime must define what constitutes a fair return such that investors can make decisions on what return to expect.[595] In addition, an *ex post*, return-based regime

---

587    Claimants' Reply, ¶¶ 258-266, 269.
588    Claimants' Reply, ¶ 267. Legislative Decree No. 387/2003: C-036, Art. 7(2); *Romani* Decree: C-165, Art. 24(2).
589    *Ibid.*
590    Claimants' Reply, ¶ 270.
591    Claimants' Reply, ¶ 271.
592    Claimants' Reply, ¶ 271; Legislative Decree 387/2003: C-036, Art. 7.
593    Claimants' Reply, ¶ 271.
594    Claimants' Reply, ¶ 272.
595    Claimants' Reply, ¶ 272.

requires extensive provisions and procedures for determining the allowable costs and the performance basis on which the return is calculated, and the procedures for reviewing and revising applicable tariff rates.[596]

453.    The Claimants say that the Respondent could have enacted an *ex post* return-based compensation regime, but the legislative decrees and their implementation by the *Conto Energia* Decrees make it clear that it did not.[597] Rather, the Respondent provided for specific tariff rates prospectively, which permitted investors to decide whether to invest and to plan their investments based on the tariff rates provided.[598] The Claimants say that because PV plants require significant levels of upfront capital or "sunk costs," investors need to know the applicable tariff rates and their duration in advance of deciding to invest.[599]

### b.  The Respondent's Arguments

454.    The Respondent says that the incentives regime for PV energy was governed by Legislative Decree 387/2003 (covering *Conto* I–III) and Article 24 of Legislative Decree 28/2011 (covering *Conto* IV and V) which provided only for "a fair return on the costs of investment and operation."[600] The Respondent says the Claimants focus solely on the secondary, *Conto Energia* Decrees, which are not autonomous, primary legislative sources. According to the Respondent, the governing policy and rules are set out in Legislative Decree Nos. 387/2003 and 28/2011 which provided only for a "fair return" or "fair remuneration" under the incentive schemes they established. In this regard, the Respondent maintained as follows:

> Claimants should have relied on the stability of the scheme assigning specific echelons of rates based on the kind of plant, rather than on the stability of the individual rates. This is what Claimants should have correctly understood from relevant legislation and consistently with the Italian regulatory framework of ministerial decrees and implementation measures by the GSE. As it was illustrated

---

[596]    Claimants' Reply, ¶¶ 273-277; FTI R1, Section 5; FTI R2 ¶¶ 6.33-6.39.

[597]    Claimants' Reply, ¶¶ 268, 274-275.

[598]    Claimants' Reply, ¶ 275.

[599]    Claimants' Reply, ¶¶ 272, 322, 346; FTI R2, ¶ 6.32.

[600]    Respondent's Counter-Memorial, ¶¶ 233-245, 462; Hearing Transcript, Day 1, 176–180, Respondent's Opening Presentation, Slides 38-43; RPHB, ¶¶ 39-42.

above, both Legislative Decree 387/2003 and Legislative Decree 28/2011 only ensured to investors specific ranges of rates (with decreasing amount and duration) that would ensure a fair return on the costs of investment and operation based on the type of system.[601]

…

[T]he notion of "fair remuneration" is in fact central to the scheme of incentives under Italian law. This was made explicit since Legislative Decree 387/2003. As the Respondent has explained in its Memorials and its legal experts and witnesses have confirmed and strengthen in their reasoning, any investor entering the Italian market had to be aware of the fact that *Conto Energia* were secondary measures to be interpreted under the primary legislation that they implemented. Anyone familiar with Italian law should have known that the scope of ministerial decrees was limited by the mandate indicated by the legislative decree they implemented and that "fair remuneration" was indeed the very parameter to establish such a scope. Moreover, this responds to economics behind any subsidy of the kind at issue … .[602]

455.  Neither the legislative decrees nor the *Conto Energia* Decrees define or identify a "fair return" or "fair remuneration." In its Counter-Memorial, the Respondent identified a benchmark for assessing fair remuneration of a PV plant as the Weighted Average Cost of Capital ("**WACC**") used by the AEEG to define tariffs that ensure a fair return on capital for energy utilities; a range it determined to be between 5.3 – 6.6%.[603] The Respondent also submits that the Claimants' interpretation of the *Conto Energia* incentive scheme eliminates all market or demand risk on the PV producer (since the GSE purchases all energy produced), and also removes all regulatory risk on the producer by way of fixed tariffs.[604]

456.  The Respondent says that the concept of "fair return" was the key parameter in the legislative decrees and was intended to permit fine tuning of the regime, including

---

[601]    Claimants' Counter-Memorial, ¶ 462.

[602]    RPHB, ¶ 39.

[603]    Respondent's Counter-Memorial, ¶ 480. The utilities which the AEEG reviewed were gas and electrical transmission and distribution. This benchmark and the comparison to utilities was criticized by the Claimants' experts, FTI: *see* FTI R2, ¶¶ 3.37-3.51 where they identify the differences between electricity and gas transmission and distribution and PV plants and the different schemes regulating the charges of utilities and the incentive tariffs of PV plants. In their first financial report, the Respondent's experts suggested that the fair rate of return of solar PV plants in Italy is the yield of the treasury bond of equivalent duration: *see* GRIF Q1 Expertise B, p. 8. The Claimants' experts, FTI, contested this stating that it would be unreasonable to expect any investor to choose to invest in building a PV plant as opposed to buying government bonds if the two alternatives offered the same level of expected rate of return: *see*, FTI R2, ¶ 3.55. At the Hearing, the Respondent's experts appeared to accept this: *see* Hearing Transcript, Day 4, 786–787.

[604]    Hearing Transcript, Day 1, 176–180; Respondent's Opening Presentation, Slides 41-42.

subsidies in the form of tariffs which by definition distort competition and generate overcompensation.[605] The Respondent says that investors could only rely on the overall stability of the incentive regime and the fact that incentives could guarantee a fair return and be granted for the average life span of PV plants. The Respondent points to the *Salva Alcoa* Decree as an example of an unexpected regulatory amendment which would work to the benefit of investors as an example of the permitted modification or fine tuning of the regime.[606] In describing the nature of the incentive scheme, the Respondent argued that it is an *ex ante* scheme in which the state maintains the right to make adjustments as a general principle of law, as stated in Legislative Decree Nos. 387/2003 and 28/2011.[607]

### c.   The Tribunal's Analysis

457.    In the Tribunal's view, the legislative and regulatory framework established an *ex ante* regime which provided for fixed incentive rates for qualifying PV facilities for a period of 20 years. The framework for the regime was established in Legislative Decree Nos. 387/2003 and 28/2011, which provided instructions to the relevant Ministries to adopt decrees to define the criteria and implement the modalities for the incentive tariffs. The instructions in the legislative decrees were general, and the details required to implement the mandate given were left to the discretion of the Ministries.

458.    Legislative Decree No. 387/2003, which applied to *Contos* I-III, provided, in relevant part, as follows:

> Article 7 – Specific Provisions for Photovoltaic Energy

---

[605]    Hearing Transcript, Day 1, 180:6-13.

[606]    Hearing Transcript, Day 1, 179–181; Respondent's Opening Presentation, Slides 42-47.

[607]    Hearing Transcript, Day 3, 621:14-21. The Respondent's counsel explained as follows: "It is, in our understanding, an *ex ante* scheme, and in a way we just get to more precise questions that I have for you, it is an *ex ante* scheme where the state maintains the right to make these adjustments as a general principle of law, which is clearly stated in the Legislative Decrees which is primary law under Italian law, that this will be the way this has to be understood." *See also* Hearing Transcript, Day 3, 619:5-11 Respondent's Counsel stated as follows: Italy "guaranteed a stable mechanism where tariffs were supposed to be stable, and that in a regulatory market you can still have some remodulations, some adjustments, which are proportionate and reasonable as long as they maintain the benchmark of a fair return. "*Equa remunerazione*" – that was the language of the Legislative Decree."

> (1). Within six months from the date of entry into force of this decree, [the ministries] shall adopt one or more decrees which define the criteria to encourage the production of electricity from solar sources …
>
> (2). The criteria … shall:
>
> …
>
> > (d) establish the modalities for determining the scope of incentives. For electricity produced by photovoltaic conversion of solar energy, provide a specific incentive rate, decreasing amount and duration as to ensure fair remuneration of each investment and operating costs …[608]

459. Legislative Decree No. 28/2011 (the *Romani* Decree) was similar, and directed the relevant Ministries to adopt a decree specifying incentive tariffs on the basis of the following general criteria:

> (a) The incentive has the purpose of ensuring a fair remuneration of the investment and operational costs;
>
> (b) the period for which a right to the incentive is given is equal to the average conventional useful life of the specific type of power plant and runs from the start-up date of the same;
>
> (c) the incentive remains constant for the entire period for which the right to the incentive is given and can take into account the economic value of the energy produced.[609]

460. The *Romani* Decree also provided more specifically with respect to PV plants that the ministerial decree to be issued should include a determination of an annual limit of the cumulative electricity capacity of PV power plants that could receive the incentive rates. Italy provided that the incentives determined by the Ministries could take into account the value of the energy produced and would remain constant for its entire incentive period.[610]

461. A review of the provisions of the *Conto Energia* Decrees indicates that the relevant Ministries implemented the instructions given in Legislative Decree Nos. 387/2003 and 28/2011. They detailed the criteria for qualifying, applying for and receiving specific incentive tariffs which were to "remain constant" for a term of 20 years (the average

---

[608]    Legislative Decree No. 387/2003: C-036. A fuller extract is quoted above.

[609]    *Romani* Decree: C-165, Art. 24.2.

[610]    *Romani* Decree: C-165, Arts. 24.2, 25.10.

conventional useful life of PV plants). The relevant criteria and tariffs were also confirmed in the GSE Letters and GSE Agreements provided for in the *Conto Energia* Decrees.

462. The *Conto Energia* Decrees further provided time limits by which applications for participation in the incentive scheme had to be made and the conditions which had to be met in order for a producer to qualify for the tariff, and for payment of tariffs to commence. The *Conto Energia* Decrees also provided for decreasing fixed tariff rates for new eligible facilities after the expiry of the initial qualifying period on a going forward basis.

463. The *Conto Energia* Decrees, the GSE Letters and GSE Agreements all specify the tariff rates for which a qualifying producer is entitled for the term of 20 years and make no reference to a rate of return, the calculation of costs or a profit, or other form of regulated return to Producers. Further, the *Conto Energia* Decrees make no reference to the modification, adjustment or remodulation of the specific tariff rates set out therein.[611]

464. Finally, the Tribunal notes that there was no evidence that when Legislative Decree Nos. 387/2003 and 28/2011 or the *Conto Energia* Decrees were adopted a particular rate of return for qualifying producers of renewable energy, and in particular PV plants, was considered or identified.

465. As a result, the Tribunal concludes that the incentive tariff scheme implemented by the Legislative Decrees and the *Conto Energia* Decrees was an *ex ante* regime which provided for specific fixed tariff rates for a period of 20 years for qualifying investors.

466. The Tribunal now turns to the *Conto Energia* Decrees and the procedures they put in place, and what assurances or commitments, if any, they provided to the Claimants.

---

[611]    In this regard, the Tribunal accepts the analysis of the Claimants' regulatory experts, FTI: *see* FTI R2, ¶¶ 6.19-6.51. *See also* Claimants' Comments to New Legal Authorities, ¶ 16; *Greentech*: CL-212, ¶ 449. The *Greentech* tribunal considered the same defenses that Italy has put forward in the present case ("fair return" and right to regulate allowed "fine tuning"), and also found that Italy's assurances were not subject to any reservation of a discretion to change the rates.

**(2)    What Legitimate Expectations Did the Claimants Have Arising From the *Conto Energia* Regime?**

467.    In their respective submissions, the Parties agree that an infringement of an investor's legitimate expectations leads to a violation of the FET standard.[612] Both Parties referred to the *Parkerings v. Lithuania* award, where the tribunal identified three scenarios in which a host state can create legitimate expectations in an investor:

> i) When the investor received an explicit promise or guarantee from a government body as to a particular legal or regulatory provision;
>
> ii) When the investor received implicit promises or guarantees that it took into account in making its investment; or
>
> iii) Absent such assurances or representations, the circumstances surrounding the investment were such as to give rise to a legitimate expectation.[613]

468.    The Parties differ as to whether the *Conto Energia* regime created any legitimate expectations in the Claimants.

### a.    The Claimants' Arguments

469.    The Claimants argue that the promises, assurances, representations, guarantees or commitments attributable to the state may be explicit or implicit, but that the crucial point is whether the state contributed to the creation of reasonable expectations.[614] They say that their claim qualifies on all three prongs of the *Parkerings v. Lithuania* standard, set out above, particularly the first prong because of the explicit promises of stability set out in Legislative Decree No. 387/2003 and, more specifically, in the five implementing *Conto Energia* Decrees, which were reinforced by the GSE Letters and the GSE Agreements. The Claimants submit that explicit commitments or assurances were also made through public statements or declarations by state officials or authorities.

470.    The Claimants assert that they relied on the specific assurances or commitments given by the Respondent in the *Conto Energia* Decrees, which defined a specific "constant" tariff

---

[612]    Respondent's Rejoinder, ¶ 295; Claimants' Memorial, ¶¶ 295-298.
[613]    *Parkerings v. Lithuania*: CL-062, ¶ 331.
[614]    Claimants' Memorial, ¶ 298; Hearing Transcript, Day 1, 83-84.

rate that would be paid upon the commissioning of a qualifying PV plant. In particular, the Claimants drew the Tribunal's attention to the following wording of *Contos* II – IV:

> *Conto* II, Article 6(1): the tariff identified on the basis of [the table at Article 6(2)] is awarded for a period of [20] years commencing from the date of entry into operation of the plant and shall remain constant in currency for the entire [20] year period. [C-065]

> *Conto* III, Article 8(4): the tariff identified on the basis of Table A and of the provisions of paragraph 2, is awarded for a period of [20] years commencing from the operational date of the plant and shall remain constant in current currency for the entire incentive period. [C-145]

> *Conto* IV, Article 12(1) and (2): (1) [f]or electricity produced by solar photovoltaic plants under this title, the plant operator (*soggetto responsabile*) will be entitled to a tariff identified pursuant to the provisions of [A]nnex 5. (2) The tariff is awarded for a period of [20] years commencing from the operational date of the plant and shall remain constant in current currency for the entire incentive period. [C-169]

471. The Claimants say that they relied on the terms of the *Conto Energia* Decrees and invested on the basis that if a plant qualified under the requirements of a specific *Conto*, it had the right to receive the specified tariff for 20 years. They say that this was confirmed in the GSE Letters and GSE Agreements. For the Claimants, the meaning of the provisions of the *Conto Energia* Decrees was clear and required no further assurance or confirmation. Nevertheless, they say that statements by various government officials and agencies confirmed their understanding of the language of the *Conto Energia* Decrees.[615] The Claimants also say that the various due diligence reports they obtained from counsel confirmed their understanding of the legal framework for their investments, in particular the stable nature of the tariffs and their duration.[616] The Claimants also referred to a series of government reports and industry publications which they say all confirm their understanding of the nature of the incentive tariff regime.[617]

---

[615] The Claimants referred, *inter alia*, to a series of statements and presentations by the GSE promoting the stable nature of the incentive rates and the fixed 20-year duration of the incentives as well as government reports and press releases: *see* Claimants' Memorial, ¶¶ 93-98, 106-110, 123-135 and the various sources cited therein.

[616] The Claimants refer to all of the due diligence reports received in respect of each of their incentives: *see* Claimants' Memorial, ¶¶ 165-172, 174, 181, 184-185, 192, 203.

[617] *See, e.g.*, Government, Dossier, "Vincere la sfida del clima e dare sicurezza energetica al paese," 19 February 2007, 5: C-68; Government Website Excerpt on *Conto* II, "Fotovoltaico: incentivi più efficaci," 19 February 2007: C-069; CNES Preliminary Report on the National Photovoltaic Framework, 21 February 2008, C-072; ENEA and

472.   The Claimants cite the *Greentech v. Italy* majority's finding that Italy's assurances in the *Conto Energia* Decrees, GSE Letters and GSE Agreements were not subject to any reservation of a discretion to change the rates.[618]

### (i)   Timing of the Making of the Claimants' Investments

473.   The Claimants say that, at the time they made their decision to invest in the various PV companies and facilities they acquired, they held the expectation that the specific tariff rates for which their PV plants qualified would be guaranteed and remain constant for the 20-year term. The Claimants point to the *Greentech v. Italy* majority's finding that "*at the time of investing*, Claimants had been led to believe, reasonably, that the incentive tariffs would remain the same as promised in the *Conto Energia* Decrees, GSE letters and GSE Agreements throughout a [20] year period."[619] The Claimants say that their expectations were the same for all of their plants. From 2009, when they first decided to invest, throughout the entire investment period, each of the Claimants understood that there was a risk that the Respondent could decrease *Conto Energia* tariffs for plants not yet commissioned and connected to the grid, but that once a plant met the requirements under a particular *Conto* the entitlement to the tariff for 20 years was irrevocable.

---

Sicilian Region, Paper "*Energia per un future sostenibile e fonti rinnovabili*" 15 October 2008: C-074; ENEA and Sicilian Region Paper "Progettare e installare un impianto fotovoltaico," 31 December 2008: C-075; ENEA, Press Release "Il nuovo decreto sul *Conto Energia* 2007," 2007: C-076; Interview with Minister of Environment Pecoraro Scanio, Excerpt from Verdi Party Website, 2007: "the *conto energia* is based on twenty years but 'the system will pay for itself in ten:'" C-077; Statement from Mr. Alfonso Pecoraro Scanio, Minister for the Environment, Land and Sea in *Il Sole In Casa* (2007): C-078, pp. 2, 4, 7; Parma Energy Agency, Summary of second *Conto Energia* regime, 2007: C-079; Local press of Umbria, article "Gubbio: il Ministro Pecoraro Scanio interverrà oggi presso la Sirci" 24 February 2007: C-080; Presentation at promotional and informational meeting organized by Municipality of Rimini, "Gli impianti fotovoltaici – il nuovo conto energia" 19 September 2007: C-801; Memo issued by Tuscany Region, "Fotovoltaico – promemoria per l'accesso al Conto Energia," 14 November 2007: C-082; Region of Sicily promotional pamphlet, "Le fonti rinnovabili nella casa," 18 November 2007: C-083; Paper by Viterbo Province on energy policy, "Energia," 1 August 2008: C-084; Presentation by CIA, published on website of the Abruzzo Region, "Progetto Enersun – incentive per la produzione di energia dalla fonti rinnovabili," 29 August 2008: C-085; Province of Biella, Promotional pamphlet "Opuscolo per migliorare l'efficienza energetica nelle nostre abitazioni," 2 March 2009: C-086; GSE, "Elementi" Issue No. 11, September-December 2007: C-087, p. 30; GSE, "The activity of the GSE – 2008 Report," 4 October 2010: C-088; GSE Report "Incentivazione degli impianti fotovoltaici Relazione delle attività settembre 2008 – agosto 2009," 15 October 2010: C-089; GSE, Webpage excerpt, "Primo *Conto Energia*," 3 February 2010: C-090; GSE Website, FAQ on *Conto Energia* mechanism, 28 February 2010: C-091; GSE Guide to *Conto* II, Issue No. 4, March 2010: C-092; GSE Presentations February 2007 to March 2010, listed in the Claimants' Memorial, ¶ 110, fns. 128-152: C-093 to C-122.

[618]    *Greentech*: CL-212, ¶ 449.

[619]    Claimants' Comments on New Legal Authorities, ¶ 16; *Greentech*: CL-212, ¶ 447 (emphasis added).

474.    The Claimants explain that, like in the present case, both the *Greentech v. Italy* and *CEF v. Italy* claimants acquired many plants during their development phase (before completion and connection to the grid), and thus before Italy had executed GSE Agreements with those plants.[620] Also like the Claimants here, the *Greentech v. Italy* and *CEF v. Italy* claimants acquired some plants *after* a previous owner had completed them, and thus after GSE Agreements had been executed.[621] In *Greentech v. Italy*, the tribunal concluded that whether a claimant invested in plants during development, as opposed to plants acquired after the GSE Agreement was in hand, was not relevant to its legitimate expectations analysis, and ultimately found that Italy had violated the claimant's legitimate expectations to stable tariffs for 20 years for *all* of claimant's plants.[622] The Claimants contest and specifically address the dissenting opinion in *Greentech v. Italy*, which advanced the view that the legitimate expectations analysis should differ depending on whether a particular plant already had received the GSE Agreement at the time of the claimant's acquisition.[623] The Claimants also disagree with the approach of the *SunReserve v. Italy* tribunal in respect of timing of investments.[624]

475.    The Claimants urge the Tribunal to disregard what they refer to as the *CEF v. Italy* tribunal's "timing test."[625] The Claimants argue that the *CEF v. Italy* tribunal erred in drawing an "illogical and unsustainable" distinction between the plants acquired during development phase / before entry into operation and GSE Agreements, and the plants acquired after entry into operation and GSE Agreements, which the tribunal characterized as having "crystallized rights" specifically through the GSE Agreements.[626] In this regard,

---

[620]    Claimants' Comments on New Legal Authorities, ¶ 20.

[621]    Claimants' Comments on New Legal Authorities, ¶ 20.

[622]    Claimants' Comments on New Legal Authorities, ¶ 20 (emphasis in original); *Greentech*: CL-212, ¶¶ 131-142. The Claimants note that the *Greentech* majority did not detail the development posture of each plant at the time of investment, perhaps because the tribunal did not think the issue was germane to its decision, but that it is evident that the investments at issue included plants that were still in development at the time of acquisition: *see* Claimants' Comments on New Legal Authorities, fn. 31; *Greentech*: CL-212, ¶ 136: CL-212 ("In acquiring and developing those [52] plants, NovEnergia and NIP invested more than EUR 175 million").

[623]    Claimants' Comments on New Legal Authorities, fn. 31; *Greentech* Dissenting Opinion of Arbitrator Giorgio Sacerdoti, 5 December 2018 (contained in *Greentech*: CL-212), ¶¶ 67-68.

[624]    Claimants' Comments on *SunReserve*.

[625]    Claimants' Comments on New Legal Authorities, ¶¶ 21-23, 33.

[626]    Claimants' Comments on New Legal Authorities, ¶¶ 21-22.

the *CEF v. Italy* tribunal held that the Claimants only had legitimate expectations of stable tariffs for 20 years, which Italy violated, in relation to the plants they acquired with GSE Agreements already in place.[627]

476.    For the Claimants, *CEF v. Italy*'s "timing test" is wrong because "both the precise tariff amounts each plant was entitled to receive and the [20] year duration in which the tariffs were to remain 'constant' were set forth in the [*Conto Energia* Decrees] and formed the basis of the decision to invest at the outset."[628] The Claimants also point out that Italy promoted the stability of the *Conto Energia* Decrees precisely to induce PV development ("greenfield" construction of PV plants). Without the incentives "<u>no</u> plants would have been constructed and Italy's renewable energy plan to meet its EU targets would have failed."[629] The Claimants assert that "Italy <u>required</u> investors to trust its promises and guarantees by committing 85-90% of the total investment cost [of €400 million] upfront."[630] The Claimants contend that the *CEF v. Italy* tribunal "lost sight of the specificity of the broader regulatory framework" by "focusing almost exclusively on the [GSE Agreements] as the source of legitimate expectations."[631] In so doing, the Claimants say that the *CEF v. Italy* tribunal also "lost sight" of the purpose behind the *Conto Energia* Decrees, and Italian officials' inducement, "which existed at the time that CEF made its first investment[,] and which created its expectations of stability."[632] According to the Claimants, the *CEF v. Italy* tribunal "neglected to consider claimant's actual expectations at the time that it decided to invest in its 'greenfield' projects, which it should have done for a proper legitimate expectations analysis."[633] The Claimants cite the award in *Novenergia II v. Spain*, which observed that "[t]he legitimate expectations of an investor

---

[627]    Claimants' Comments on New Legal Authorities, ¶ 21; *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019 ("***CEF***"): CL-213, ¶ 189.

[628]    Claimants' Comments on New Legal Authorities, ¶ 22.

[629]    Claimants' Comments on New Legal Authorities, ¶ 22 (emphasis added by the Claimants).

[630]    Claimants' Comments on New Legal Authorities, ¶ 29 (emphasis added by the Claimants).

[631]    Claimants' Comments on New Legal Authorities, ¶ 23.

[632]    Claimants' Comments on New Legal Authorities, ¶ 23.

[633]    Claimants' Comments on New Legal Authorities, fn. 33. The Claimants made similar objections to the approach taken by the *SunReserve* tribunal; *see* Claimants' Comments on *SunReserve*.

has generally been considered to be <u>grounded in the legal order of the host State as it stands</u> <u>at the time</u> the investor acquires or makes the investment."[634]

477.   Conversely, the Claimants also argue that the *CEF v. Italy* tribunal "erred by attributing scant importance to the tariff rates and duration set out in the *Conto*[s]," and "failed to appreciate the other sources that created expectations," which were identical to those in the GSE Agreements it held to be legitimate.[635] The Claimants point out that there is no legal principle that says expectations are only legitimate if backed by a contract.[636]

478.   The Claimants assert that the GSE Agreements did not change anything in relation to the precise tariff rate or duration that plants completed by a specified deadline would receive, which had already been promised and promoted by Italian officials.[637] The GSE Agreements were executed later, after the Claimants' expectations had been formed as a result of the *Conto Energia* Decrees and Italy's various promotional efforts, and thus the GSE Agreements "merely confirmed the same tariff amounts and twenty-year duration that were set forth in the earlier *Conto Energia* decrees."[638] The Claimants say they understood the tariff rate, power capacity and date of entry into operation requirements set out in, for example, Article 8(2) of *Conto* III, which provided as follows:[639]

| Capacity range | Corresponding Tariff | | | | | |
| | A) Plants entering into operation from 31 Dec 2010 to 30 Apr 2011 | | B) Plants entering into operation from 30 April 2011 and 31 Aug 2011 | | C) Plants entering into operation from 31 Aug 2011 and 31 Dec 2011 | |
| | PV plants on buildings | Other PV plants | PV plants on buildings | Other PV plants | PV plants on buildings | Other PV plants |
| [kW] | | | | | | |
| | [...] | | | | | |
| 20 < P ≤ 200 | 0,358 | **0,321** | 0,341 | 0,309 | 0,323 | 0,285 |

---

[634]    Claimants' Comments on New Legal Authorities, fn. 33, citing *Novenergia v. Spain*: CL-195, ¶ 532 (emphasis added by the Claimants).

[635]    Claimants' Comments on New Legal Authorities, ¶ 30.

[636]    Claimants' Comments on New Legal Authorities, ¶ 30. For caselaw supporting the opposite position, *see* Claimants' Opening Presentation, Slides 113, 122, 139.

[637]    Claimants' Comments on New Legal Authorities, ¶¶ 23-24.

[638]    Claimants' Comments on New Legal Authorities, ¶ 23.

[639]    Claimants' Comments on New Legal Authorities, ¶ 24.

The Claimants further note that Article 8(4) of *Conto* III stated that whatever rate the Producer qualified for would be paid "for a period of twenty years commencing from the operational date of the plant [and] shall remain constant in current currency for the entire incentive period."[640]

479.    Using Claimant ESPF's Carlino 1 project as an example, the Claimants set out a timeline of their acquisition and their expectations at the time of making their investment. At the time of Claimant ESPF's acquisition of Carlino 1 on 20 December 2010, the 113 plants therein were still in development /"greenfield."[641] The Claimants say that at that time they knew from their study of the express terms of *Conto* III (which they confirmed "with Italian legal counsel at DLA Piper")[642] and Italian officials' statements made prior to Claimants' acquisition,[643] that plants with capacity between 20 and 200kV and which became operational by 30 April 2011 would receive a tariff of 0.321/kWh for 20 years. Seventeen of the Carlino 1 plants were of that capacity and entered into operation on 20 April 2011.[644] Accordingly, their entitlement to that tariff vested on the date on which those plants entered into operation, not from the date of the GSE Agreements, some months later.[645]

480.    The Claimants argue that the right to the specific tariff rate for which the Claimants' plants qualified was "not contingent on later executing a contract with the GSE," nor was there any "'magic' to the GSE [Agreements] in terms of Claimants' expectations."[646] Rather, the GSE Agreements were granted "as a matter of course to confirm the existence of rights already offered, vested, and attained," as is reflected in the following "mandatory language" of *Conto* III: "[e]lectricity produced by [PV] plants under this title … **is entitled**

---

[640]    Claimants' Comments on New Legal Authorities, ¶ 24, quoting *Conto* III: C-145, Art. 8(4).

[641]    Claimants' Comments on New Legal Authorities, ¶ 25.

[642]    Claimants' Comments on New Legal Authorities, ¶ 28; Claimants' Opening Presentation, Slides 55, 68.

[643]    Claimants' Comments on New Legal Authorities, ¶ 28; Claimants' Opening Presentation, Slides 40-42 (from PAN and INVITALIA in June 2010; MELS in 2007).

[644]    Claimants' Comments on New Legal Authorities, ¶¶ 25-26. The Claimants knew that this was how the *Conto* regime operated well before they invested in Italy, whether on a greenfield or brownfield basis: *see* Claimants' Comments on New Legal Authorities, ¶ 28.

[645]    Claimants' Comments on New Legal Authorities, ¶ 26.

[646]    Claimants' Comments on New Legal Authorities, ¶¶ 26-29.

to the incentive tariff under table A."[647] In this regard, the Claimants assert that the GSE had no discretion to refuse to grant or refuse to pay the *Conto* tariff rate to plants which met the deadlines specified therein.[648] Similarly, the GSE had no discretion to alter the terms of the payments or to pay something other than the tariffs set out in the *Conto Energia* Decrees.[649] The Claimants point out that the "exact same tariffs" and 20-year duration defined in *Conto* III were confirmed in the subsequent GSE Letters and GSE Agreements to the Carlino 1 plants.[650]

481. The Claimants say that, due to Italy's slow bureaucracy, it took four months from the date on which the seventeen Carlino 1 plants entered into operation for the GSE to send Claimant ESPF the GSE Letters and seven to eleven months for the GSE Agreements, both of which expressly confirmed that the effective date of the entitlement was the date on which these plants entered into operation (20 April 2011).[651]

482. The Claimants also argue that the *CEF v. Italy* tribunal's "timing test" leads to a "fundamentally unfair result, where the ECT would protect investors in the secondary market, who purchased completed plants, but not the investors who undertook more risk in sinking their capital upfront to develop plants."[652]

483. The Claimants further state that the *CEF v. Italy* award fails to consider the new and distinct "investment" which fell within the ambit of ECT protection once the claimant's plants held GSE Agreements.[653] The Claimants say that although they acquired developing plants, they further acquired investments in the form of "claims to money" and "rights conferred by

[647] Claimants' Comments on New Legal Authorities, ¶¶ 26, 29, citing *Conto* III: C-145, Art. 8 (emphasis added by the Claimants).
[648] Claimants' Comments on New Legal Authorities, ¶ 26.
[649] Claimants' Comments on New Legal Authorities, ¶ 26.
[650] Claimants' Comments on New Legal Authorities, ¶ 27.
[651] Claimants' Comments on New Legal Authorities, ¶ 27.
[652] Claimants' Comments on New Legal Authorities, ¶ 31.
[653] Claimants' Comments on New Legal Authorities, ¶ 32; Claimants' Memorial, ¶ 48.

law or contract" (pursuant to Article 1 of the ECT) when each GSE Agreement was executed.[654]

484.   Finally, the Claimants submit that they acquired eleven of their nineteen PV projects *after* completion, and thus after the plants had rights to the tariffs according to each applicable *Conto*, but *before* the plant operators had the GSE Agreements in hand – a scenario with which the *CEF v. Italy* tribunal was not confronted.[655] The Claimants submit that even if this Tribunal were to follow the logic in *CEF*, the Tribunal should find that "the rights of those projects, which were completed and operating on the date Claimants acquired them, had vested according to the *Conto* decrees on the date they entered into operation."[656]

*(ii) Relevant Date of Assessment of Expectations*

485.   With regard to pinpointing a date of assessment of the Claimants' expectations, the Claimants note that investment is a process which often unfolds over time, rather than a single event which occurs on a specific date. The Claimants refer to the award in *Novenergia v. Spain*, where the investor had invested in PV plants over the course of several years. In that case, the tribunal focused on the date when the investor "had irreversibly committed to investing" and held that it would assess the claimant's expectations based on the date when it acquired its first plant.[657] The Claimants point out that other tribunals have confirmed that assurances made with respect to an investment already made can also give rise to legitimate expectations that warrant protection.[658]

486.   Accordingly, the Claimants say that there are two possible approaches to the relevant date for assessing their expectations. The Tribunal could look at the date of each Claimant's first acquisition of a PV plant on the basis that the investment objective was to build a

---

[654]    Claimants' Comments on New Legal Authorities, ¶ 32

[655]    Claimants' Comments on New Legal Authorities, ¶ 33.

[656]    Claimants' Comments on New Legal Authorities, ¶ 33.

[657]    CPHB, ¶¶ 31-32, citing, *inter alia*, *Novenergia v. Spain*: CL-195, ¶ 539. Conversely, the Claimants criticize the approach of the *SunReserve v. Italy* tribunal for having taken an overly restrictive view of the date of investment and consequently determined that no expectations could have been held by those claimants at the time of investment: *see* Claimants' Comments on *SunReserve*.

[658]    CPHB, ¶ 33, citing *Ioannis Kardassopoulos and Ron Fuchs v. Republic of Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010: CL-205, ¶ 441.

portfolio of PV plants in Italy rather than to simply invest in individual projects. If that approach were adopted, the Claimants say that the relevant dates of investment are: 15 December 2009 for ESPF; 17 June 2011 for ESPF 2; and 20 December 2010 for ICE 5. Alternatively, the Tribunal could view each plant as a separate investment and look to the acquisition date of each of those plants.[659]

487.    According to the Claimants, the choice between the two alternatives is immaterial since the Respondent's regulatory framework did not change materially during the relevant time period. The Claimants say that certain of the PV plants in which they invested were acquired before the plants had been commissioned and received the GSE Letters and GSE Agreements.[660] The Claimants say that their understanding and expectation at the time they acquired these "greenfield" facilities was that once the plants were constructed, commissioned and connected to the grid, the specific tariff for which they qualified would be maintained for 20 years. They say that this expectation was confirmed when each of the plants received a GSE Letter and each of the plants entered into a GSE Agreement, both of which refer to the applicable *Conto Energia* Decree's specific tariff rate in constant terms for 20 years. Other of the Claimants' plants in question had already received the GSE Letters and GSE Agreements confirming that the tariff rate was to be paid for 20 years (namely, the Brindisi Crea, Brindisi Elios and Ginosa plants).[661]

488.    The Claimants say their expectations were essentially the same for all of their plants. From the time that they first decided to invest in 2009, and throughout the entire investment period, the Claimants understood that there was a risk that the Respondent could decrease *Conto Energia* tariffs for plants not yet commissioned and connected to the grid. However, because of the specific assurances in the *Conto Energia* Decrees, the Claimants understood

---

[659]    CPHB, ¶ 34. The specific acquisition dates for each of the Claimants' PV plants is listed in Claimants' Memorial, pp. 76-77.

[660]    According to the Claimants, KGAL, which managed each of the three Claimants, decided to invest in PV plants in Italy by mid-2009. ESPF acquired its first plant on 15 December 2009 and ICE 5 completed the acquisition of its first project in December 2010. ESPF2 began seeking upstream investors in mid-2010 and decided to acquire its first portfolio of plants in May 2011: *see* CPHB, ¶¶ 35-37.

[661]    CPHB, ¶¶ 35-36. The Claimants give the example of ESPF's decision to acquire its first plant, "Montalto" in 2009 which was not commissioned until 28 October 2010. The Montalto plant then received its GSE confirmation letter dated 3 May 2011 and then entered into a GSE Agreement with the GSE on 28 July 2011.

that once a plant met the requirements, the Respondent would pay a constant tariff rate, unchanged for a period of 20 years. The Claimants repeat their assertion that the Respondent confirmed their understanding and expectations, and the legitimacy of these, by way of the GSE Letters and GSE Agreements entered into with each of the plants in question.[662]

### b.  The Respondent's Arguments

489.  The Respondent denies that the Claimants had any of the legitimate expectations they claim. It says that the Claimants' claim amounts to an allegation that Italy agreed or committed to freeze its regulatory regime. The Respondent says that there is no stabilization clause contained in the relevant legislative decrees or the *Conto Energia* Decrees, and that it did not, at any point, agree to freeze its regime or the tariff rates.[663]

490.  The Respondent refers to a number of awards where a distinction was drawn between the stability of legislation and a freezing or stabilization clause.[664] The Respondent relies on the decision in *Blusun v. Italy*, which it says is of particular relevance since it considered the *Romani* Decree, which forms part of the regime at issue in this case. Although the *Blusun* claimants did not qualify for the tariff rates provided for in the relevant *Conto Energia* Decrees in time, the Respondent says that the *Blusun* tribunal confirmed that

---

[662]    CPHB, ¶ 38. The Claimants note that there was a slight difference in their expectations depending on whether the PV plant had already been commissioned at the time of investment or whether commissioning had not yet occurred when the plants were acquired. In the first case, the Claimants expectations were based on the language in the relevant *Conto* decree, the terms of the GSE Letter and the terms of the GSE Agreement signed with the GSE. In the second case, the Claimants say they relied on the language of the *Conto Energia* Decree and expected that the Respondent would honour the terms of the decree by paying the specific tariff rate for a 20-year period from the date of the plant's commissioning. The Claimants say that expectation was based on the language of the decree itself, the description of the program from Italian officials and confirmation from counsel in their due diligence reports. The Claimants say that they knew there was a risk that the tariff levels might decrease before a plant was commissioned and they accepted and managed that risk. However, they expected that the tariff rate could not be changed after a plant was commissioned. They say that expectation was confirmed by the GSE Letters and GSE Agreements. *See* CPHB, ¶ 43.

[663]    *See* Respondent's Counter-Memorial, ¶¶ 504-538; Respondent's Rejoinder, ¶¶ 295-311, 318-329; Respondent's Opening Presentation, Slide 49; Hearing Transcript, Day 4, 895:22–896:4; RPHB, ¶¶ 43-47.

[664]    The Respondent refers, *inter alia*, to *Saluka v. Czech Republic*: CL-057, ¶ 305; *Parkerings v. Lithuania*: CL-062, ¶ 332; *Plama v. Bulgaria*: CL-085, ¶ 219; *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 7.77; *Charanne v. Spain*: CL-004, ¶ 503; *Blusun v. Italy*: CL-139, ¶ 317.

legitimate expectations cannot arise from a generally worded regulatory measure such as the *Romani* Decree. It quotes the following passage:

> [U]nder international law… in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest.[665]

491.    The Respondent criticizes the *Masdar v. Spain* and *Greentech v. Italy* awards for "committing evident factual errors."[666] Italy says that the *Greentech* tribunal's finding that the *Conto Energia* Decrees "bear the hallmarks of … 'an agreement, in the form of a stabilization clause or otherwise'" is wrong.[667] Italy counters that such stabilization clause "clearly does not exist," which is in contrast to the relevant Spanish legislation at issue in *Masdar v. Spain*, which did contain a specific statement that measures would remain unchanged.[668] Italy also endorses the approach of the *SunReserve v. Italy* tribunal with respect to its findings as to a state's ability to regulate in the face of the content of the *Conto Energia* regime.[669]

492.    The Respondent says that there were no "specific assurances" or commitments given by it to the Claimants. There were never any discussions between the Claimants and any Italian authorities regarding the Claimants' individual investments, whether directly with the Claimants or through the Italian companies in which they invested.[670] According to the Respondent, the Claimants could only rely on the existing legislation, which provided only for a fair return or fair remuneration.[671] The Respondent says that the

---

[665]    Respondent's Rejoinder, ¶¶ 24-25, citing *Blusun v. Italy*: CL-139, ¶ 317 (referring to, in turn, *Charanne v. Spain*: CL-004, ¶ 510). The Respondent says that in *Blusun*, the claimants were claiming that the *Romani* Decree had infringed their legitimate expectations based on the *Conto Energia* in force at the time that its tariffs would stay unchanged for 2 more years. The Respondent says that the tribunal found the claimants' argument in that case to be incorrect, stating: "As such, it faces the second and more fundamental difficulty, which is that tribunals have so far declined to sanctify laws as promises:" *Blusun v. Italy*: CL-139, ¶ 367.

[666]    Respondent's Comments on New Legal Authorities, ¶ 43.

[667]    *See Greentech*: CL-212, ¶ 453, citing *Parkerings v. Lithuania*: CL-062; Respondent's Comments on New Legal Authorities, ¶ 43.

[668]    Respondent's Comments on New Legal Authorities, ¶ 43.

[669]    Respondent's Comments on *SunReserve*.

[670]    Respondent's Rejoinder, ¶¶ 221-223.

[671]    RPHB, ¶ 44.

only thing that could be related to [a] "promise," existing at the time of investment, was the *Conto Energia* regime and the gratuitous incentives it granted for [20] years. However, the incentive regime, far from being a concrete "promise" to the Claimants, simply was a regulation, subjected from the beginning to the Italian and EU legal order. In other words, no kind of contractual act was made by Italy towards the Claimants before the starting of the investment. No letter of intent. No individual promise of a special treatment. Nothing.

Therefore, there lacks the basic element of the exceptional category invoked by the Claimants, namely the existence of an agreement, or at least a piece of [an] agreement such as a specific promise or commitment, specifically directed to the Claimants.[672]

493.  The Respondent points out that its incentive scheme was addressed to "any investor, of any size and nationality, was not meant to specifically induce foreigners by any means, nor even associations representing investors played any role in negotiating measures that could have lead [*sic*] to specific assurances (as was the case in Spain …)."[673]

494.  The Respondent also denies that the various statements and presentations to which the Claimants refer in support of their alleged legitimate expectations are specific assurances of the non-modifiability of the incentive tariffs. The Respondent says that these statements were intended for the general public and made by non-lawyers (or regulators or policy makers) and simply intended to repeat what is generally stated in the *Conto Energia* Decrees.[674]

495.  The Respondent criticizes the *Greentech v. Italy* majority finding that "Italy's assurances constituted non-waivable guarantees" directed at specific investors, and argues that "putative 'assurances' are not conclusively stated, as they seem to be generically determined by the *Contos* themselves, or otherwise assumed as existing" in contradiction to the "application of the FET under the ECT and international law."[675]

496.  With respect to the GSE Letters and GSE Agreements, the Respondent says that these cannot represent specific commitments or assurances, since the communication of these to

---

[672]    Respondent's Rejoinder, ¶¶ 323-324. The Respondent also relies on the decision of the *SunReserve v. Italy* tribunal as support for its position.

[673]    RPHB, ¶ 45.

[674]    RPHB, ¶ 46; Respondent's Rejoinder, ¶ 223.

[675]    Respondent's Comments on New Legal Authorities, ¶ 45, citing *Greentech*: CL-212, ¶ 451.

the individual plant operators were simply implementing the *Conto Energia* regime.[676] The Respondent also argues that the GSE Agreements are mere accessory agreements, and thus had no force in law to confirm the terms of the *Conto Energia* Decrees.[677]

497. The Respondent takes issue with the *CEF v. Italy* tribunal's ruling that the claimant had legitimate expectations (which were subsequently violated by Italy) in relation to its one plant which already had a GSE Agreement in hand at the time the claimant acquired it.[678] Italy argues that "since any investor – and in particular investors having made their investment when … both Italian and EU measures had already significantly reduced

---

[676]    RPHB, ¶ 47.

[677]    Respondent's Counter-Memorial, ¶¶ 321, 533. The Respondent also contests the Claimants' argument that the GSE Agreements were private law contracts. It says that the *Romani* Decree, which referred to the GSE Agreements going forward as "private law contracts," applied only to agreements adopted as of 31 December 2012, under *Conto* V: *see* RPHB, ¶¶ 48-53. *See also* Respondent's Rejoinder, ¶ 391:

> … the GSE [Agreements], as explained in the Counter-Memorial and repeated here as confirmed by the Italian Constitutional Court No 162017 on the *Spalma-incentivi*, are merely accessory contracts ("*contratti accessori*" o "*accessivi*"), which simply absorb legal provisions. The parties do not autonomously determine the essential elements of the agreement, which are established outside the contract by the legislative and/or regulatory act they depend from. Accordingly, GSE [Agreements] should be understood as a sort of appendix of legislative or regulatory provisions. In sum, these agreements are structurally different from the sources of obligation usually negotiated with a foreign investor and necessitating to be 'internazionalized' [*sic*] to receive protection under the ECT.

*See also* Respondent's Rejoinder, fn: 159 (emphasis in original):

> … an accessory contract … establishes the operational rules to implement the relevant public measure it is connected to. By definition, this regulates autonomously a number of matters, <u>but it depends on the vicissitudes of the latter, which can be the subject of revision, self-defense, or revocation because of public interest</u>. As a general definition, "accessory" are those contracts governing reciprocal duties of parties that arise from a public measures [*sic*]. To a phase of authoritative exercise of public powers, it follows one built under the scheme of a contractual relationship: <u>whereas the authoritative exercise of power establishes the legal situation, the contractual instrument regulates its operation</u>. Even assuming that, because of these two sides, such a contract is "mixed" in nature, this would in fact mean that the management of the executive aspects of the relationship are regulated by private law, whereas the contract keeps a public nature. <u>In particular, this would not change the fact that the particular nature of the subject matter of the contract (public interest), and its object (the management of this interest), leave intact a position of supremacy by the public power that would make it possible for the latter to unilaterally modify its conditions by modifying the authoritative act</u>.

*See further* Respondent's Rejoinder, ¶¶ 328, 365. The Respondent also refers to the approach of the *SunReserve* tribunal in respect of the classification of the GSE Agreements: *see* Respondent's Comments on *SunReserve*.

[678]    Respondent's Comments on New Legal Authorities, ¶ 58.

incentives (as recognized in *Blusun* in relation to the previous *Romani* Decree), – had to be aware of possible amendments of regulation also affecting existing rights."[679] The Respondent says that the *CEF v. Italy* tribunal "seems to assume that the fact that contractual rights in a regulated marked [*sic*] could be legitimately modified by the State was only established by Italian Constitutional Court 16/2017," which it says is "incorrect, and the opposite was proved … much earlier by other Constitutional Court decisions."[680] The Respondent urges the Tribunal to take the approach of the *SunReserve v. Italy* tribunal in determining the nature of the GSE Agreements and the extent to which legitimate expectations could be based upon those agreements.[681]

### (i) Relevant Date of Assessment of Expectations

498.    With respect to the relevant date for the assessment of the Claimants' legitimate expectations, the Respondent says that it must be the time of the making of the investment. The Respondent argues that since 80-90% of the investment cost in PV plants is incurred up front, and financing therefore needs to be obtained at an early stage, most of an investment is made before the investor can concretely rely on a specific *Conto Energia* Decree. At that stage, the investor can only rely on the macro stability of the system, which Italy could adjust provided that the standard of fair remuneration is maintained. The Respondent says that the developer has to bear a regulatory risk since it cannot rely on fixed tariffs at the time it makes its investment. According to the Respondent, the Claimants "exclude any possibility to apply *Greentech*, since they admit themselves that 'Italy made no guarantees of specific incentive rates with respect to PV facilities <u>under development</u>.'"[682]

499.    However, where an investor purchases a plant which has already been built, commissioned and connected to the grid, it takes no development or construction risk, which, according

---

[679]    Respondent's Comments on New Legal Authorities, ¶ 59.

[680]    Respondent's Comments on New Legal Authorities, ¶ 60.

[681]    Respondent's Comments on *SunReserve*.

[682]    Respondent's Comments on New Legal Authorities, ¶ 48 (emphasis added by the Tribunal), citing Claimants' Reply, ¶ 231.

to the Respondent, affects the price of acquisition.[683] Nevertheless, such a purchase of a plant on the "secondary market" does not eliminate the regulatory risk since the purchaser has invested in a regulated market in which the Respondent had intervened several times.[684] The Respondent suggests that investors, such as the Claimants, purchasing on the "secondary market" do not face the same risks as investors developing and constructing PV plants.[685] Therefore, the Claimants' argument that they face sunk costs which are "trapped" is false.[686] Nevertheless, the Respondent says that investors on the secondary market bear the same regulatory risk as any other operator in a regulated market and "should be able to read legislative sources in the same way as developers."[687]

### *(ii) Timing of the Making of Claimants' Investments*

500.    For the Respondent, legitimate expectations for entitlement to an incentive tariff "can arise only once the investor becomes entitled to such incentive," which occurs, "uncontroverted … under Italian law only once a plant becomes operational"[688] (a proposition with which the Tribunal notes that the Claimants agree). However, the Respondent goes on to argue, in reliance on the tribunal's award in *CEF v. Italy*, that the Claimants' entitlement vests only once the Claimants have a GSE Agreement in hand for that particular plant. The Respondent relies on the *CEF* award for the proposition that, at the time of investment in greenfield operations, the investor could have no legitimate expectation that it would necessarily be awarded the incentives.[689] The Respondent argues that the *CEF v. Italy* award is dispositive of the Claimants' "attempt to state that since *ex post* it is proved that they did obtain entitlement [under a particular *Conto*], such fact would back-date the time of entitlement."[690]

---

[683]    RPHB, ¶¶ 61-62.

[684]    RPHB, ¶ 61.

[685]    RPHB, ¶ 62.

[686]    *See* Hearing Transcript, Day 1, 178:9-18.

[687]    RPHB, ¶ 62. *See also* Respondent's Comments on *SunReserve*.

[688]    Respondent's Comments on New Legal Authorities, ¶ 50.

[689]    Respondent's Comments on New Legal Authorities, ¶ 51, citing *CEF*: CL-213, ¶¶ 186-189.

[690]    Respondent's Comments on New Legal Authorities, ¶ 52.

501.    The Respondent argues that the dissenting opinion in *Greentech v. Italy* and the decisions in both the *CEF* and *SunReserve* awards "massively contradict[ ]" the claimant-favourable rulings on legitimate expectations in *Greentech*.[691] The Respondent advances the view that the *CEF* award, read in conjunction with the *Greentech* dissent "take to reject all the claims of the Claimants in these proceedings."[692] The Respondent says that "even under the assumption that an investment is a process and not necessarily a single shot … it is undisputed that the big majority of transactions … described by the Claimants occurred before obtaining either the GSE [L]etter or the GSE [Agreement]."[693]

*(iii)Alleged Inadequacy of the Claimants' Due Diligence*

502.    The Respondent says that due diligence on the stability of the regulatory framework is particularly important in the case of an acquisition of a completed and connected plant.[694] According to the Respondent, "a firm principle should be that in case of an acquisition the acquirer has to verify the soundness of all titles it acquires together with the target," such that "[i]nvestors should be responsible to ask the relevant legal questions to their lawyers, not being exonerated from liability because they did not ask the right questions or these were not fully elaborated by their legal counsels."[695]

503.    The Respondent alleges that the due diligence undertaken by the Claimants was inadequate.[696] It says that the due diligence reports submitted by the Claimants only confirm the status of ownership of the land or that construction permits were obtained, but that due diligence on the tariff system itself was not undertaken.[697] The Respondent says that if the due diligence reports had been undertaken by competent Italian lawyers, they would have warned the client that in Italy legislation can affect long term relationships, including in the renewable energy sector. In those circumstances, appropriate due diligence

---

[691]    Respondent's Comments on New Legal Authorities, ¶ 49; *see also* Respondent's Comments on *SunReserve*.
[692]    Respondent's Comments on New Legal Authorities, ¶ 49.
[693]    Respondent's Comments on New Legal Authorities, ¶ 52.
[694]    RPHB, ¶¶ 60-62; Respondent's Rejoinder, ¶ 7.
[695]    Respondent's Comments on New Legal Authorities, ¶ 62.
[696]    RPHB, ¶¶ 41, 85.
[697]    Hearing Transcript, Day 4, 884:12-19.

may have indicated that there was a limited risk, but not that there was no risk at all of Italy modifying the terms of the incentive regime.[698] The Respondent points out that certain of the due diligence reports submitted by the Claimants refer to public sector approvals, regulatory risks and the price of electricity risk as well as possible "unforeseeable changes."[699]

504.    The Respondent also refers to the 2017 Constitutional Court Decision, which it says confirms the principle of Italian law that legislation can affect long term relationships notwithstanding the expectations of a party.[700] The Respondent argues that, "a reasonable investor, especially when entering a regulated market, should be aware that the legal landscape might vary and that a state has a general right to regulate" and that "[s]tability would thus not automatically imply fixity … unless the state has clearly undertaken a stabilization clause."[701]

505.    The Respondent criticizes the *CEF v. Italy* award for "not even discuss[ing] predictability of changes for investors not being entitled to incentives. It only does so for the plant that

---

[698]    Hearing Transcript, Day 4, 855:2-12. *See also* Hearing Transcript, Day 4, 886:6-12, 900:15–901:1; Respondent's Closing Presentation, Slides 9-10.

[699]    Hearing Transcript, Day 4, 886:13-25; Respondent's Closing Presentation, Slide 11. The Respondent also points to a memorandum, which states in part as follows:

> In principle, it cannot be ruled out that the current legal situation in the individual target countries will change and the property companies will accept, or not at all, sell the electricity generated by the photovoltaic systems on less favourable terms than in the forecasts due to inapplicability, cancellation or other interpretation of the provisions currently governing the participation. For example, should the property companies be required in the future to dispose of the electricity on the open market contrary to the consensually assumed assumptions (compensation of the energy generated at the statutory rate) and/or the benchmarks relevant for the annual price adjustment of the statutory tariff (for example, a consumer price index), there is a risk of a deterioration in the profitability of the investment, including total loss … property companies bear the risk that business restrictions may be imposed by government authorities, therefore resulting in lost revenues.
>
> In addition, there is the risk of other, currently unforeseeable changes in the respective country's laws, which could have adverse effects on the operation of the photovoltaic facilities and thus on the results arising from the investment (see also in this regard the note on the risk [of changes in the] price of electricity.

*See* KGAL, European Solar Power Fund Investment Memorandum ("**KGAL Memorandum**"): C-273, pp. 99-100. This is an unsigned and undated memorandum which appears to have been created in 2009.

[700]    Hearing Transcript, Day 4, 885:21–886:12; Respondent's Closing Presentation, Slides 9-11; Hearing Transcript, Day 1, 190:23–191:2; Respondent's Counter-Memorial, ¶¶ 322-323; Respondent's Rejoinder, ¶¶ 240-242.

[701]    Respondent's Comments on New Legal Authorities, ¶ 53.

the investor acquired when it had already obtained entitlement and signed the GSE [Agreements]."[702] The Respondent says this means that the Tribunal need only proceed further in its legitimate expectations analysis "for extremely few plants."[703] The Respondent goes on to refer to the dissenting opinion in *Greentech v. Italy*, which states: (i) the *Conto Energia* Decrees were not specifically addressed to investors and Italy could change them; (ii) the GSE Agreements, although more specific, are "of a 'lower' legal force" under Italian law; (iii) the incentives are not self-standing subsidies, which was or ought to have been known to investors since "the [EC] target had been met years head [*sic*] thanks to the generosity of the incentives which in turn had brought about a rush of investments;"[704] (iv) the *Conto Energia* Decrees regime was "quite onerous" on Italy's economy, which made "the reduction of the burden desirable;" and, therefore, (v) it was "prudent for an informed investor to envisage the possibility that some adjustments might be introduced subsequently, thereby affecting the reliance on the stability of the existing scheme" and a prudent investor "should have foreseen that a limited tariff modification might have been subsequently enacted" since "changes were … not unpredictable."[705] The Respondent states that the *Greentech v. Italy* Dissent is consistent with *CEF v. Italy* and "with the mainstream of prior awards against other Member States."[706] Further, the Respondent relies on the *Belenergia v. Italy* award for the proposition that "Italian legislation does not contain any specific commitments, let alone stabilization clauses, creating legitimate expectations that tariffs could never be modified by the regulator,"[707] as well as the *SunReserve v. Italy* award, which also held that there could be no legitimate expectations based on the Italian legislation.[708]

---

[702] Respondent's Comments on New Legal Authorities, ¶ 54.

[703] Respondent's Comments on New Legal Authorities, ¶ 54.

[704] Respondent's Comments on New Legal Authorities, ¶ 55, citing *Greentech* Dissenting Opinion of Arbitrator Giorgio Sacerdoti, 5 December 2018 (contained in *Greentech*: CL-212), ¶ 48.

[705] Respondent's Comments on New Legal Authorities, ¶ 55, citing *Greentech* Dissenting Opinion of Arbitrator Giorgio Sacerdoti, 5 December 2018 (contained in *Greentech*: CL-212), ¶ 48.

[706] Respondent's Comments on New Legal Authorities, ¶ 56.

[707] Respondent's Comments on *Belenergia*, § I.

[708] Respondent's Comments on *SunReserve*, ¶ 24.

506.   With respect to the provisions of the *Conto Energia* Decrees, the Respondent accepts that it is in these decrees that the rate and duration of the incentives are established. It says that the duration of 20 years, the average useful life of PV plants, is a reasonable period to ensure a fair return on the costs of investment and operation of plants.[709]

507.   With respect to the constancy or stability of the rate, the Respondent says that the reference to a "constant" incentive rate means that its monetary value is not subject to updating in accordance with inflation rates.[710] In this regard, the Respondent provides the following translation of Article 12(2) of *Conto* IV: "The incentive rate is valid for a period of twenty years from the date of entry into operation of the plant and is constant at current prices for the whole period of the incentives."[711] In addition, the Respondent says that Article 24(2) of Legislative Decree 28/2011 provides that a "constant" incentive means that the monetary value is not subject to updates with inflation rates and refers to a 2010 publication by the Italian Federation for the Rational Use of Energy which states that the "… incentive fee is payable recognized for 20 years and remains in constant currency, thus not [to] be updated with the inflation rate."[712] The Parties agree that only *Conto* I had an inflation adjustment and that this provision was removed in the subsequent *Conto Energia* Decrees.[713]

### c.   The Tribunal's Analysis

508.   For the reasons set out below, the majority of the Tribunal has concluded that it was unfair or inequitable for the Respondent to have reduced the FIT rates set out in the relevant *Conto Energia* Decrees and said to be constant for twenty years after the Claimants' investments

---

[709]      *See*, *e.g.*, Hearing Transcript, Day 1, 180:14-17.

[710]      Respondent's Counter-Memorial, ¶ 256.

[711]      Respondent's Counter-Memorial, ¶ 255. The Claimants translate *Conto* IV: C-169, Art. 12(2), as follows: "The incentive rate is valid for a period of twenty years from the date of entry into operation and is constant in currency for the whole term incentive." The Italian original reads as follows: "*La tariffa incentivante è riconosciuta per un periodo di venti anni a decorrere dalla data di entrata in esercizio dell'impianto ed è costante in moneta corrente per tutto il periodo di incentivazione.*"

[712]      *See* FIRE, "*Le tariffe incentivanti per la produzione di energia elettrica da fonte rinnovabile*" (2010): C-134, p. 5. It appears that FIRE is an independent scientific association devoted to energy efficiency. *See also* Respondent's Counter-Memorial, ¶ 244.

[713]      *See* Hearing Transcript, Day 1, 38:4-9.

had qualified for those tariffs. The majority of the Tribunal finds that, at the time they invested, the Claimants had the legitimate expectation that the PV plants in which they invested would benefit from the specific tariff set out in the relevant *Conto Energia* Decrees and then reflected in the GSE Letters and GSE Agreements for a period of 20 years.

509.   There are various ways in which a state can make an explicit promise or assurance. In elaborating on what would give rise to a legitimate expectation, the tribunal in *Micula v. Romania* stated that "[t]he crucial point is whether the state, through statements or conduct, has contributed to the creation of a reasonable expectation, in this case, a representation of regulatory stability."[714]

510.   It is undisputed in this case that the object and purpose of Italy's *Conto Energia* regime was to induce investment in its developing PV sector ahead of when that investment would otherwise occur in light of the high cost of investment prevalent at the time. Italy had complete control over how it designed its scheme and opted for a regime that provided numerous incentives and support for these investments. The main defining feature was the incentive tariff scheme, which provided a constant income stream over the expected life of the investment. The scheme was designed to attract early investment, as it reduced the amount of these tariffs in each successive *Conto Energia* Decree. Each *Conto Energia* Decree provided for very specific dates by which a plant needed to be operational in order to benefit from the FITs. There were also limits on the overall capacity that would receive the incentives. Italy designed its FIT system in a way that allowed it to understand the overall cost and phase out the system once that cost had been reached. Italy later decided that its scheme was too costly for certain consumers and reduced the FIT rates it had been paying.

511.   The question for this Tribunal is whether Italy's decision to reduce the FITs previously set out in the *Conto Energia* Decrees relevant to the Claimants' investments was a breach of the obligation to provide fair and equitable treatment to Claimants' investments under the

---

[714]   *Micula v. Romania*: CL-014, ¶ 669.

ECT. At the time that the Claimants made their investments, was it legitimate for them to expect that Italy would not change those FITs for 20 years?

512.    In the Tribunal's view, there is no doubt that a clear and specific commitment is required in order to create an enforceable legitimate expectation. However, in the majority's view, there is no reason in principle why such a commitment of the requisite clarity and specificity cannot be made in the regulation itself where (as here) such a commitment is made for the purpose of inducing investment, which succeeded in attracting the Claimants' investments and, once made, resulted in losses to the Claimants. In these circumstances, there is no principled reason to deny that the investor's expectations of performance by the state are legitimate. The clear and specific guarantee in the *Conto Energia* Decrees satisfies the requisite degree of specificity needed in order for legitimate expectations to arise from legislation. Therefore, as of the date of the Claimants' initial investment in December 2009 (also discussed under timing at paragraphs 131 to 147), the Claimants had a reasonable and legitimate expectation that, provided their projects complied with the *Conto Energia* Decree requirements and entered into operation by applicable deadlines for the specific tariff rates outlined in the *Conto Energia* Decrees, and continued to comply throughout the 20 year duration of the incentive period, they would receive the benefits set out in *Contos* II-IV. That expectation continued and was held at the time the Claimants made each of their investments under the *Conto Energia* Decrees.[715]

513.    Legitimate expectations are based on the investor's *objective* understanding of the legal framework within which the investor has made its investment or, in other words, what a reasonable investor at the time would have expected. Such legal framework includes the host state's domestic legislation and regulations, as well as its international law obligations, any contractual arrangements concluded between the investor and the state, and the specific representations or undertakings made by the state.

---

[715]    The Tribunal notes that a number of tribunals have also found that certain legitimate expectations of an investor can arise from the legal framework – the legislation and regulations – in force at the time an investment was made: *see, e.g., Masdar v. Spain*: CL-200, ¶ 512.

514.    One of the elements of the procedure established by Italy in the present case was the registration of the completed PV plant with the GSE on the date on which the plant entered into operation. All of the Claimants' plants duly entered into operation within the prescribed "window" under each of the applicable *Conto Energia* Decrees. The Tribunal finds that the Claimants' investments having met the specific preconditions and requirements set out in the *Conto Energia* Decrees to qualify for the related tariffs, it was legitimate for the Claimants to expect that those tariffs would be paid for the following reasons.

515.    First, the specific and mandatory language of, *e.g.*, *Conto* III states that "electricity produced by [PV] plants under this title … **is entitled** to the incentive tariff under table A."[716] The *Conto Energia* Decrees do not contain any reservation giving the GSE discretion to refuse to grant or refuse to pay the *Conto* tariff rate to plants which met the deadlines specified therein.[717] Similarly, the GSE had no discretion to alter the terms of the payments or to pay something other than the tariffs set out in the *Conto Energia* Decrees.[718]

516.    Second, the majority of the Tribunal recalls each of the GSE Letters addressed to the Claimants' Investments after entering into operation. The exact same tariffs and 20-year duration defined in the *Conto Energia* Decrees were confirmed in the subsequent GSE Letters. The majority of the Tribunal accepts that the GSE Letters cannot form the foundation for the Claimants' expectations, as they did not yet exist at the time of investment. However, the eventual issuance of these letters confirms the legitimacy of the Claimants' expectations created by the *Conto Energia* regime.

517.    Third, the indication that the PV plant in question was to benefit from the guarantees of the applicable *Conto Energia* Decrees is stated in express terms in each of the respective GSE Agreements, specifically addressed to each of the Claimants' Investments. That the GSE Letters and GSE Agreements were issued *after* and thus not before the Claimants made their Investments does not diminish the fact that they in fact confirm the Claimants'

---

[716]    Claimants' Comments on New Legal Authorities, ¶¶ 26, 29 (emphasis added by the Claimants).

[717]    Claimants' Comments on New Legal Authorities, ¶ 26.

[718]    Claimants' Comments on New Legal Authorities, ¶ 26.

legitimate expectations which arose from their review of *Conto* I at the time of its first investment. While the Claimants did not have certainty that they would be successful in completing their plants before the Respondent changed the *Conto Energia* Decrees, that does not affect the specificity of the commitment contained in the *Conto Energia* Decrees from which the Claimants' legitimate expectations arose.

518. While the *Conto Energia* Decrees may not have contained promises directed at a specific investor, they were designed to attract investment and were directed at investors who made investments that met specific requirements on the relevant timeline. The *Conto Energia* regime was not just a general framework, it provided specific incentives to investors who met specific requirements. The *Conto Energia* Decrees filled in the details of Italy's incentive scheme, as directed by Legislative Decree No. 387. The Claimants do not argue that the Respondent may not change its legislation. Rather, they say they relied on their legitimate expectation held at the time of making their investments that specific rates and duration of the FITs set out in the applicable *Conto Energia* Decrees would remain constant once they met the qualifying criteria detailed in the *Conto Energia* Decrees. The Tribunal recalls that this entitlement was further confirmed in the GSE Letters and GSE Agreements. PV plants which had not met said criteria within the deadline risked the Respondent changing the legislation for plants which had not yet entered into operation.

519. The Respondent drafted the legislative regime in order to attract investment and it did not indicate that the rates provided for were subject to change or were only a proxy for a reasonable rate of return. Thus, in light of the specificity of the tariff regime and the Respondent's failure to advise prospective investors that it reserved the right to adjust the tariffs, the Tribunal finds that the Respondent created a legitimate expectation that it would not change the tariff rates for plants that qualified under each *Conto*. This is not to say that the Respondent could not change its legislation at all. In fact, it did subsequently enact changes to the tariffs with each *Conto* and none of those changes are contested in this case.

520. However, if a change in legislation fails to take into consideration that an investor's legitimate expectations must be protected, although the legislation may be validly amended as a matter of domestic law, the State may incur international liability. In the present case,

Claimants do not contend that the ECT alone prevented Italy from retroactively changing the tariff rates it granted to investors for twenty years.[719] Rather, the ECT prevents Italy from making those changes because Italy itself promised in the *Conto Energia* Decrees (which it later repeated in the GSE Letters, GSE Agreements, and various ministerial reports) not to do by repeatedly assuring investors that the rates would remain constant.

521.    The majority of the Tribunal notes that the circumstances in this case bear some similarity to the regulatory framework in Argentina that gave rise to, among others, Enron's claims. The *Enron v. Argentina* tribunal stated:

> The measures in question in this case have beyond any doubt substantially changed the legal and business framework under which the investment was decided and implemented. Argentina in the early 1990s constructed a regulatory framework for the gas sector containing specific guarantees to attract foreign capital to an economy historically unstable and volatile. As part of this regulatory framework, Argentina guaranteed that tariffs would be calculated in US dollars, converted into pesos for billing purposes, adjusted semi-annually in accordance with the US PPI and sufficient to cover costs and a reasonable rate of return. …

> The Tribunal observes that it was in reliance upon the conditions established by the Respondent in the regulatory framework for the gas sector that Enron embarked on its investment in TGS. Given the scope of Argentina's privatization process, its international marketing, and the statutory enshrinement of the tariff regime, Enron had reasonable grounds to rely on such conditions.

> A decade later, however, the guarantees of the tariff regime that had seduced so many foreign investors, were dismantled. Where there was certainty and stability for investors, doubt and ambiguity are the order of the day. The long-term business outlook enabled by the tariff regime has been transformed into a day-to-day discussion about what comes next. Tariffs have been frozen for almost five years. The recomposition of the tariff regime is subject to a protracted renegotiation process imposed on the public utilities that has failed to provide a final and definitive framework for the operation of business in the energy sector.[720]

522.    The majority of the Tribunal has noted that the Claimants dispute what they say is the stricter standard for determining what can give rise to legitimate expectations in the *Charanne v. Spain* case. In their view, there is no basis for restricting the creation of legitimate expectations to the existence of a specific commitment, either contractual in

---

[719]    Claimants' Reply, ¶ 364.

[720]    *Enron Corporation Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007 ("***Enron v. Argentina***"): CL-064, ¶¶ 261, 264-266. *See also LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ("***LG&E v. Argentina***"): CL-065, ¶¶ 133-135.

nature or founded in statements or specific conditions declared by a state. Rather, in their view, legitimate expectations can also be based on legislation (the legal framework) in force at the time the investment was made.[721] The Claimants say that the issue is academic in this case since the Respondent *did* make explicit promises with respect to the Claimants' investments in its legislative and regulatory decrees, the GSE Letters and GSE Agreements and repeated those promises in its promotion of the *Conto Energia* regime. As the Claimants base their case on the making of a *specific* commitment by the Respondent, the Tribunal need not address this broader issue further.

523.    The Tribunal also notes the tribunal's finding in *El Paso v. Argentina* that

> a commitment can be considered specific if its *precise object was to give a real guarantee of stability to the investor*. Usually general texts cannot contain such commitments, as there is no guarantee that they will not be modified in due course. However, a reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behavior of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely.[722]

524.    As it has concluded above at paragraphs 457-465, the Tribunal finds that the *Conto Energia* Decrees implemented Legislative Decree No. 387/2004 and Legislative Decree No. 28/2011, which gave the relevant ministries the discretion to establish specific incentive rates and duration so as to ensure fair remuneration of each investment and its operating costs. The *Conto Energia* Decrees did this and established detailed rules for applying, qualifying for and receiving the incentive tariffs. It is reasonable to assume that in exercising this delegated authority, the ministries undertook appropriate steps and set conditions and tariffs to ensure fair remuneration of the investment and operating costs of qualifying PV plants. The Tribunal recalls that the purpose of the incentive regime was to attract significant early investment in Italy's nascent PV sector.

525.    *Contos* II, III and IV, pursuant to which the Claimants made their investments, each set out a tariff rate calculated to the third decimal point for a period of 20 years "constant in current currency" for the entire incentive period, which was to coincide with the expected life of a

---

[721]    Claimants' Memorial, ¶ 299; Claimants' Reply, ¶ 365, citing *Charanne v. Spain*: CL-004, ¶ 503.

[722]    *El Paso v. Argentina*: CL-055, ¶ 377 (emphasis in original).

PV plant. The *Conto Energia* Decrees set different tariff rates depending on when a PV producer qualified for receipt of the tariff, providing lower or decreasing tariff rates if a producer qualified after the initial incentive period. For example, *Conto* II, Article 6 provided that producers who qualified under the *Conto* prior to 31 December 2008 were entitled to receive full incentive tariffs (ranging from €0.40 to €0.49 per kWh depending on the capacity of the plant); producers who qualified between 2 January 2009 and 31 December 2010 were entitled to receive tariffs reduced by 2%; and producers who qualified in the following year were entitled to receive tariffs reduced by a further 2%.[723] The specific tariff rate for which a producer qualified was confirmed in the GSE Letters and the GSE Agreements. This implemented the direction in the legislative decrees to provide specific tariffs of "decreasing amounts" to take into account reduction in costs of PV technology and equipment. It also encouraged investors to make their investments despite the higher costs earlier in order to take advantage of higher tariff amounts.

526.    The Tribunal has considered the Respondent's argument that the expression "constant in current currency" (*costante in moneta corrente*) in *Contos* II-IV reflects only that, unlike under *Conto* I, the adjustment of tariffs according to the consumer price index (*ISTAT* inflation adjustment) was no longer provided for.[724] In the majority's view, while by using the term "current" currency the expression may reflect that the tariff rates are not subject to adjustment for inflation as they had been under *Conto* I, it also clearly conveys the meaning that the tariff shall remain "constant" or unchanged for the duration of the incentive period of 20 years. There is no indication in *Contos* II-IV that the specific tariff rates for which a producer qualifies can be adjusted up or down. Rather, the language conveys the intention that the tariff rate will apply throughout the entire 20-year incentive period, *i.e.*, the expected life of the investment.

527.    The *Conto Energia* Decrees also specified the requirements to qualify for an incentive tariff: the application procedure, confirmation of the granting of a specific tariff by the GSE and the requirement to enter into an agreement with the GSE. Once all of the specific

---

[723]    *See* the relevant portions of *Conto* II cited above at para. 85.

[724]    *See* Respondent's Counter-Memorial, ¶¶ 244 and fn. 94, 255-256.

requirements for the qualifications were met, the GSE Letters advised Producers of their admission to the incentive tariff scheme and specified the tariff rate applicable and the duration of 20 years. It also repeated that the tariff was constant in current currency throughout the entire 20-year period. The confirmation letter also advised the qualifying Producer that in order to activate the payment of tariffs, it would have to complete a GSE Agreement available on the GSE's web portal. The GSE Agreement, in turn, again set out the specific tariff rate which was stated to be constant in current currency, and specified a term of 20 years.

528.    The Claimants say they understood that the *Conto Energia* Decrees established specific tariff rates that would apply to the electricity produced by eligible plants for a fixed period of 20 years.[725] They say that based on the language of the *Conto Energia* Decrees they understood that changes to the tariffs were possible for future PV plants, but that they were highly confident that no changes would be made to the tariff rates for plants which had: (i) qualified for the specific tariff rates under the relevant *Conto Energia* Decrees; (ii) were notified of acceptance through a GSE Letter; and (iii) entered into an agreement with the GSE.[726] According to Mr. Ebner, the Managing Director of KGAL, the Claimants relied on the guarantee of the stability of the incentive tariffs over the term of 20 years in deciding to invest in the PV sector in Italy.[727]

529.    In the majority of the Tribunal's view, the Claimants' interpretation and understanding of the incentive regime established under the *Conto Energia* Decrees and, in particular, the understanding that the specific tariff rates granted to qualifying production facilities would remain unchanged for the term of 20 years, was objectively reasonable and justified on the basis of the language of the *Conto Energia* Decrees, the GSE Letters and the GSE

---

[725]    Ebner WS1, ¶ 15.
[726]    Ebner WS2, ¶¶ 2-4.
[727]    Ebner WS1, ¶¶ 15-17; Ebner WS2, ¶¶ 2-4; Hearing Transcript, Day 2, 354:5-355:16.

Agreements. In the absence of any mention in those instruments that the tariffs were subject to adjustment, the Claimants' understanding was well founded.[728]

530. The Tribunal has considered the Respondent's arguments that the *Conto Energia* Decrees were addressed generally to all investors, both domestic and international, and that there were no discussions or meetings between the Claimants or their investment companies and representatives of the Respondent in which any specific assurances or commitments regarding the incentive tariffs were made. In the majority of the Tribunal's view, such meetings or direct discussions were not required. Explicit promises or guarantees can be given in the legislative and regulatory framework of a state at the time an investor makes its investment when the purpose of that framework is to guarantee stability to investors upon which they can rely when deciding to invest.[729]

531. The *Conto Energia* Decrees contain such explicit guarantees, thereby negating the need to support this conclusion in this regard by reference to statements made by Italian officials. The *Conto Energia* Decrees provided in clear terms that PV producers who qualified would receive specific tariffs for a period of 20 years. Further, once a producer qualified, it was sent a letter from the GSE, addressed to it specifically, confirming its qualification and the tariff rate it would receive over a period of 20 years. The plant was then required to enter into an agreement with the GSE, again confirming the specific tariff rate and the term of 20 years.

532. The majority of the Tribunal finds that it is also apparent that the Respondent was aware that foreign investors would invest under the *Conto Energia* regime. This is apparent, for

---

[728]    In this regard, the Tribunal notes that the GSE Agreements under *Contos* I-IV provided that any modification to the agreement had to be agreed to by the parties, whereas the GSE Agreements under *Conto* V provided that the GSE retained the right to unilaterally modify the clauses of the agreement as a result of any legislative and regulatory amendments. *See* Sample GSE Agreements under *Conto* I: C-063, Art. 10; *Conto* II: C-073, Art. 10; *Conto* III: C-332, Art. 15; *Conto* IV: C-347, Art. 15; *Conto* V: C-246, Art. 17.

[729]    *See, e.g.*, *Total v. Argentina*: CL-051, ¶ 119; *LG&E v. Argentina*: CL-065, ¶¶ 130-133; *Enron v. Argentina*: CL-064, ¶¶ 260-266.

example, from the various promotional presentations made by the GSE to international PV conferences.[730]

533.    The Tribunal has also considered the Respondent's argument that the incentives were "gratuitous."[731] The majority of the Tribunal is not persuaded that this qualification is apt, since in order to qualify for the tariffs, producers were required to invest in and construct PV plants and then to operate those plants to produce electricity pursuant to the terms of the *Conto Energia* Decrees and the GSE Agreements. In return, the GSE would pay the specified tariff rates to qualifying Producers.

534.    The Tribunal has also considered the numerous statements made by various government entities and the GSE regarding the *Conto Energia* scheme and the nature of the incentive tariffs. Amongst these, the Tribunal has noted the following:

- GSE Report "*Le attività del Gestore dei Servizi Elettrici*" (2007): describing *Conto Energia* II, which states that "[t]he incentive tariff, not subject to variations for the entire period, is delivered for a period of [20] years."[732]

- Statement from the Minister for the Environment, Land and Sea "*Il Sole in Casa*": "For twenty years, in fact, the state will recognize an incentive that balances widely initial investment … [T]he system guarantees a sure income for 20 years for those who produce electricity from solar panels with high

---

[730]    *See*, *e.g.*, GRTN Presentation, "GRTN, the Italian Body who will manage photovoltaic system" (2005): C-052; GRTN Presentation, "Le attività del nuovo GRTN focalizzate sull'energie rinnovabili" (2005): C-054; GSE Presentation, "Il conto energia per il fotovoltaico" (2006): C-058; GSE Presentation, "L'incentivazione del Fotovoltaico e il ruolo del GSE" (2007): C-093; GSE Presentation, "The experience of feed-in tariff in Italy. Results so far and middle term forecasts" (2008): C-103; GSE Presentation, "Renewable Electricity Support Mechanism in Italy" (2008): C-104; GSE Presentation, "The feed in tariff scheme in the Italian case. An attempt of removing barriers for pv architectural integration and for increasing building energy efficiency" (2008): C-106; GSE Presentation "Results of PV incentive scheme in Italy" (2009): C-117. The Tribunal also notes that the GSE also provided details of the *Conto Energia* Decrees and their tariffs on their website in English. *See*, *e.g.*, "Photovoltaics," GSE Website (excerpt): C-060; GSE, "Statistical Report 2011 – Renewable Energy Power Plants in Italy:" C-183; "Fourth feed-in scheme" GSE Website (excerpt): C-184.

[731]    Respondent's Rejoinder, ¶¶ 323, 330, 333, 548.

[732]    GSE, "Le attività del Gestore dei Servizi Elettrici" (2007): C-101, p. 92.

incentives to transform the initial installation expense into a real investment …
The state contribution that will be granted will remain constant for 20 years."[733]

- ENEA Press Release (2007): "The incentives provided by the decree [*Conto* II]
  allow for the recovery of costs incurred to the plant in no more than 10 years.
  Over the next 10 years the system allows you to have free electricity and collect
  annually a sum proportional to the energy produced, as for any other
  investment. The initially approved rate remains constant in the 20 years covered
  by the decree."[734]

- GSE Presentation to the Italian PV Summit (6 May 2009): The feed-in premium
  as a booster of Italian PV market. "The incentives are fixed for 20 years; [t]he
  tariffs will decrease in 2010 by 2% for new applications and subsequent decrees
  will redefine the rates for the PV plants commissioned after 2010."[735]

- Italian National Renewable Energy Action Plan (11 June 2010): Feed-in Tariff
  for Photovoltaic and Solar Thermal Energy: "The feed-in tariff is a support
  scheme which guarantees constant remuneration at current currency values for
  the electricity produced by plants for a set period of time (20 years for
  photovoltaic plants, 25 years for solar thermal plants). Moreover, the scheme is
  subject to regular adjustments which take into account the trends in the prices
  of energy products and components for photovoltaic plants as well as the results
  of monitoring and promoting technology used to create the plants, with the
  intention of limiting the medium – and long-term costs to the community. In
  any case, the incentive tariff paid when the plant becomes operations [*sic*]
  remains fixed for the whole entitlement period."[736]

---

[733]    Statement from Mr. Alfonso Pecoraro Scanio, Minister for the Environment, Land and Sea in *Il Sole In Casa*
(2007): C-078, pp. 2, 4, 7.

[734]    ENEA, Press Release, "The New Decree under *Conto Energia* 2007:" C-076, p. 2.

[735]    GSE, Presentation to the Italian PV Summit, 6 May 2009: C-114, p. 5.

[736]    PAN: C-143, p. 112.

- GSE Report "Statistical Report 2011 – Renewable Energy Power Plants in Italy": "The feed-in premium ([C]onto [E]nergia) is the main support scheme for solar power generation. The scheme, which has been in place since 1 November 2005, has experienced frequent adjustments due to the changing PV market context [referring to *Contos* I, II, III, IV]. The support is granted for electricity generation as of the date of commissioning of the plant over a period of [20] years. The tariffs vary by capacity class and level of integration of the plant and are constant throughout the support period."[737]

535.   In the majority's view, these promotional statements and reports, amongst others, are all consistent with, and confirm the content of, the *Conto Energia* Decrees and the GSE Letters and GSE Agreements. There was no contemporaneous evidence introduced that there was any other understanding as to how the *Conto Energia* regime was to operate that would undermine either the reasonableness or the legitimacy of the Claimants' expectations. To the contrary, all of the evidence supports the conclusion that the Respondent designed a system based on a constant tariff rate being paid to qualifying investors for the expected operational life of their investments.

536.   The Claimants also submitted a number of contemporaneous reports from law firms and industry associations describing the benefits of the *Conto Energia* program, including an explanation that the tariffs under the *Conto Energia* Decrees were held constant or fixed for 20 years.[738] These reflect a broad understanding in the PV sector and amongst industry advisors consistent with the Claimants' understanding and expectations.

537.   The Claimants also obtained due diligence reports from DLA Piper for each of their investments. These reports cover various aspects of the Claimants' investments. A number of the reports describe the *Conto Energia* regulatory network and refer to the fact that tariffs under the various *Conto Energia* Decrees are granted for 20 years and remain unchanged

---

[737]   GSE, "Statistical Report 2011 – Renewable Energy Power Plants in Italy:" C-183, p. 51.

[738]   *See* Claimants' Memorial, ¶¶ 113, 136 and the sources cited therein.

during this period.[739] None of the due diligence reports indicates that the tariff rates are subject to modification. As noted above, the Respondent maintains that if the due diligence had involved an assessment of the risks of the modification of the *Conto Energia* Decrees, conducted by Italian lawyers, they would have disclosed that long-term regulatory schemes are subject to modification under Italian law. In this regard, it referred to the 2017 Constitutional Court Decision. On that basis, the Respondent suggested that the due diligence undertaken by the Claimants was inadequate.

538.    The majority of the Tribunal is not persuaded by this argument. The provision in the *Conto Energia* Decrees referring to the tariffs as constant throughout the 20-year incentive period, repeated in the GSE Letters and GSE Agreements, is clear and does not appear to have given rise to any concerns by the Claimants' advisors.[740] There was no indication anywhere in the legislation or ministerial decrees that the tariff rates would be subject to revision. In light of this, and the many statements and reports by government entities which described the tariffs as constant or fixed for a 20-year term, referred to above, the majority of the Tribunal is not persuaded that it was incumbent upon the Claimants to request an assessment of the possibility or likelihood that the Italian authorities would modify the *Conto Energia* Decrees and change the tariffs granted to qualifying plants.[741] In reaching this conclusion, the majority of the Tribunal has borne in mind the Respondent's reference to the 2017 Constitutional Court Decision. However, the Decision was published in January 2017 and, as such, could not have affected the Claimants' expectations when they invested in the period of 2009-2012. Further and in any event, having found that the regime made specific promises intended to guarantee stability to prospective investors, seeking an assessment as to the likelihood of Italy modifying the tariffs for investments after they had been made would amount to an assessment of Italy's likelihood to breach the ECT.

---

[739]    *See*, *e.g.*, DLA Piper, July 2011 Due Diligence Report: C-293; DLA Piper, "Legal Due Diligence Report on a Photovoltaic Project developed in Lazio, Italy named Project Ardea in the Municipality of Ardea (Rome)," 17 June 2011: C-326; DLA Piper, "Legal Due Diligence Report of four Photovoltaic Projects developed in Lazio, Italy named Project Aria, Acqua, Terra and Fuoco in the Municipality of Colleferro (Rome)," 29 September 2011: C-352.

[740]    The Tribunal notes that all of the Claimants' due diligence reports were prepared by Italian lawyers, for the most part at the Italian offices of DLA Piper.

[741]    The Tribunal addresses the Court's decision further below.

539.    The Tribunal has also considered the investment memorandum prepared by KGAL, which the Respondent says indicated that the Claimants were aware of the risk that tariff rates in Italy could be modified.[742] The memorandum gives an overview of KGAL's investment strategy for a proposed European Solar Power Fund which was likely to target Germany, Spain, Italy and Greece. One of the elements of the proposed strategy was to target investment in countries with nationally-regulated remuneration programs that guarantee the operator of PV facilities a fixed purchase price over a fixed period.[743] In referring to regulatory risks, the memorandum states, in relevant part that "there is the risk of other, currently unforeseeable changes in the respective country's [*sic*] laws, which could have adverse effects on the operation of photovoltaic facilities and thus on the results arising from the investment (see also in this regard the note on the risk [of changes in the] price of electricity)." Under the note on electricity price, the memorandum stated that it could not be ruled out that the current legal situation in the individual target countries would change and that the investment companies might be required to dispose of the electricity they produced contrary to assumptions such as compensation at statutory rates.[744] In his testimony, Mr. Ebner described the passages in question as general comments on potential risks in an early investment memorandum that did not relate to a specific investment or a specific country. He added that such disclaimers are typical for sales brochures and prospectuses and are intended to cover all possible eventualities, and did not indicate acceptance of any particular risk.[745]

540.    In the majority's view, in light of the clear language of the *Conto Energia* Decrees, the GSE Letters and GSE Agreements, the statements in the investment memorandum do not reflect a failure in the Claimants' due diligence or a relevant risk which should have affected the Claimants' expectations or decision to invest in Italy.

541.    With respect to the date at which the Claimants' expectations should be assessed, it is the date on which the decision to invest was made. The Tribunal accepts that in larger projects

---

[742]    KGAL Memorandum: C-273 *See above* footnote 699.
[743]    KGAL Memorandum: C-273, p. 1.
[744]    KGAL Memorandum: C-273, pp. 99-100.
[745]    Hearing Transcript, Day 2, 365:8–369:11.

that develop over a period of time, there may be some difficulty in ascertaining the precise date at which an investment is made.[746] Adopting the approach taken in *Novenergia v. Spain*, the Claimants say that the Tribunal could assess their expectations at the dates on which each Claimant acquired its first plant in its portfolio of investments, namely 15 December 2009 for ESPF; 17 June 2011 for ESPF 2; and 20 December 2010 for ICE 5. Alternatively, they say that the Tribunal can view each plant as a separate investment and look to the acquisition date for each plant.[747] In the majority of the Tribunal's view, it is not necessary to choose between these alternatives since the regulatory framework did not change in any material way during the time period in which the Claimants made their investments. In any event, the Tribunal has assessed the Claimants' expectations under both alternatives.

542. Regarding any relevance to be attached to the timing of the Claimants' acquisition of their investments, the majority of the Tribunal finds no meaningful distinction in the Claimants' expectations depending on whether the Claimants invested in plants that had already been commissioned or in plants that had not yet been commissioned. With respect to the plants they acquired when already in operation, with a GSE Agreement already in hand, the Claimants say that their expectations were based on: (i) the specific assurance Italy gave in the *Conto Energia* Decree applicable to the given plant; (ii) the specific assurance written in a letter confirming the precise *Conto Energia* tariff that would be paid to the given plant; and (iii) the specific assurance stated in the GSE Agreement. The majority agrees with the Claimants that their right to the specific tariff under the applicable *Conto Energia* Decree vests at the time in which a particular plant enters into operation, and not when the GSE Agreement is executed, sometimes up to one year after that plant becomes entitled to a particular tariff rate under the *Conto Energia* Decree.

543. With respect to the Claimants' plants which they acquired during their development phase, the Claimants say that their expectations were based on the specific assurances given in the applicable *Conto Energia* Decree that the plants in which they were investing were legally

---

[746]    *See Novenergia v. Spain*: CL-195, ¶¶ 538-539.

[747]    CPHB, ¶ 34. *See* Claimants' Memorial, ¶ 210 for the acquisition date of each of the Claimants' plants.

entitled to receive the relevant tariffs for 20 years, which would be confirmed in the GSE Letters and GSE Agreements upon commissioning. With respect to this category, the Claimants say that they understood that there was a risk that tariff levels could be modified before a plant was commissioned. However, the Claimants did not expect that the tariff could be changed after a plant was commissioned, which was confirmed in the GSE Letters and the GSE Agreements in respect of each relevant plant. Once these plants were commissioned and the requirements under the *Conto Energia* Decrees were fulfilled by a plant, it was in the same position as plants acquired by the Claimants after commissioning. In each case, the Claimants' expectation was based on the assurance that tariffs would be paid at the specified rate throughout the incentive period. As such, the majority of the Tribunal finds that the legitimate expectations analysis pursuant to the ECT and international law does not require a "timing test" or temporal aspect, as argued by the Respondent in reliance on the *CEF v. Italy* award and *Greentech v. Italy* dissent.

544.    For the avoidance of doubt, the majority of the Tribunal has specifically considered the fact that some of the Claimants' investments were made after the regime began to decrease the tariffs for new plants and, in particular, after the date of the Romani Decree, a fact that the *Belenergia v. Italy* tribunal considered significant.[748] As the Tribunal's review of the legislative regime details, it was designed to attract early investment in a developing sector in part by decreasing the applicable tariffs over time. A key feature of the regime was the grandfathering of qualifying existing investments as it evolved.

545.    From its review of all of the relevant evidence and the Parties' arguments, the majority of the Tribunal has concluded that the Claimants' expectations arising from the *Conto Energia* regime were legitimate expectations for the purposes of FET under the ECT. *Conto Energia* Decrees II, III and IV gave an express assurance or commitment that plants which qualified under the terms of the regime would receive a specified incentive tariff in constant terms for the duration of the incentive period. The commitment given in the *Conto* decrees was repeated and confirmed in the GSE Letters and GSE Agreements. In addition, the majority of the Tribunal finds that the circumstances surrounding the *Conto Energia*

---

[748]    *See Belenergia*: RL-028, ¶¶ 584 *et seq.*

regime and the Claimants' investment created the reasonable expectation on the part of the Claimants that if they invested and fulfilled the requirements of the *Conto Energia* regime, they would be entitled to payment of the specific tariff rates throughout the term of the 20-year investment period.

546.   In the Tribunal's view, the purpose behind the Respondent's renewable energy incentive regime, and in particular the *Conto Energia* regime specific to PV energy, was to attract investment in order to permit it to comply with the EU's renewable energy initiatives and directives. It appears that the tariffs offered by the Respondent were attractive and resulted in substantial investment, including from the Claimants. The upfront, capital intensive and long-term nature of investments in the PV sector was well known and appears to have been borne in mind in the design of the *Conto Energia* regime, and in particular the granting of specific tariff rates for a period of 20 years to qualifying PV plants. In all the circumstances, the majority of the Tribunal concludes that the Claimants had the legitimate expectation that the plants in which they invested would benefit from the specific tariffs provided in the *Conto Energia* Decrees, GSE Letters and GSE Agreements over a 20-year period.

### (3)    Did the Challenged Measures Violate the Claimants' Legitimate Expectations?

547.   The Claimants allege that the Respondent breached their legitimate expectations regarding the incentive tariffs by: (i) implementing an annual Administration Fee as of 1 January 2013 pursuant to *Conto* V; (ii) requiring renewable energy producers to pay Imbalance Costs as of 1 January 2013 pursuant to AEEG Resolution No. 281/2012; and (iii) decreasing tariffs payable under the *Conto Energia* Decrees pursuant to the *Spalmaincentivi* Decree enacted on 24 June 2014. The Tribunal addresses each of these Challenged Measures in turn.

### a.  *Spalmaincentivi* Decree

#### (i)  *The Claimants' Arguments*

548.   The Claimants say that the implementation and the adoption of the *Spalmaincentivi* Decree violated their legitimate expectations that the plants in which they invested would benefit

from the specific tariffs granted under the *Conto Energia* Decrees over the full 20-year investment period.

549.    The Claimants say that the reduction of the tariffs under the *Spalmaincentivi* Decree caused them significant harm. However, they say that the size or impact of the reduction is irrelevant to the determination of liability with respect to its claims, since none of the applicable legal standards requires a showing of any particular degree of harm.[749] The Claimants emphasize that the specific commitments given by the Respondent under the *Conto Energia* Decrees created very specific expectations that their PV plants would receive precise tariff rates until a specific date. As such, *any* reduction to the tariff rates violates the Claimants' expectations, regardless of the size of the reduction and resulting harm. In any event, the Claimants maintain that the *Spalmaincentivi* Decree reduced the tariffs and harmed their investments significantly.[750]

550.    In addition, the Claimants say that the *Spalmaincentivi* Decree (and the other Challenged Measures that indirectly reduced the *Conto Energia* tariffs) changed the essential characteristics of the *Conto Energia* regime. The Claimants say that by reducing the tariff rates, the Respondent removed the precision that characterized the original regulatory framework which provided for a specific tariff rate for a definite period of time. It was on the basis of that specificity and commitment of stability that the Claimants decided to invest and operate the PV plants they acquired. Further, the Claimants maintain that the *Spalmaincentivi* Decree introduced considerable uncertainty into the *Conto Energia* regime.[751] The original predictable *ex ante* regime which guaranteed a defined tariff rate

---

[749]    CPHB, ¶ 109; Hearing Transcript, Day 1, 137:11-22.

[750]    CPHB, ¶¶ 109-113; Hearing Transcript, Day 1, 136:9–137:10. The Claimants also maintain that if the degree of harm were to be taken into account in determining liability, this would penalize prudent investors and those that took measures to mitigate the harm caused to their investments. In this regard, the Claimants state that their plants were not highly leveraged compared to many other PV investors. The Claimants say they were leveraged at ratios ranging from 47-66%, while others were leveraged at levels of 80-90%. If the Claimants' plants had higher leverage ratios, then the Challenged Measures would have had a greater impact in percentage terms on the Claimants' equity. As will be discussed under quantum, below, the Claimants allege that the reduction in tariffs of between 6-8% by the *Spalmaincentivi* Decree caused a loss in the value of the Claimants' investments of €16 million which, when combined with the effect of the payment term adjustment (€1.5 million reduction in value), represents a decrease of €17.5 million, translating to approximately 7.5% in the value of their investments.

[751]    Hearing Transcript, Day 3, 655:13-20; CPHB, ¶ 116.

for 20 years was converted into an *ex post* and *ad hoc* adjustable regime.[752] The Claimants say that the reduction of tariffs under the *Spalmaincentivi* Decree was unexpected and has left open the possibility of additional changes.[753] They say that the change in the *Conto Energia* regime from a framework that guaranteed fixed tariffs to one that can be modified in the unfettered discretion of the Respondent imposes fundamentally different risks.[754]

551.    In response to the Respondent's arguments, the Claimants say that, in a case such as this, where the Respondent has given specific assurances or commitments there is no room for a balancing exercise between a claimant's legitimate expectations and a state's inherent regulatory authority to amend its legislation. In this regard, the Claimants refer to a number

---

[752]    CPHB, ¶¶ 116-118. The Claimants refer to the reports of their regulatory experts, FTI, which maintained that the nature of the regulatory regime changed from an *ex ante* fixed regime to an *ex post* and *ad hoc* adjustable regime, which is a fundamental difference. According to the Claimants' experts, the regulatory concept and methodology underlying the new incentive tariffs was not disclosed in any regulatory document and there was no explanation of how the different new structure of the tariffs was derived. According to FTI, if the change in the tariffs is based on a particular target level, then the regime has shifted from a fixed tariff model to a regulated return model. Further, under such a model, additional revisions to the tariffs are possible. *See* FTI Presentation Regulatory Issues, Slides 10, 16-19; Hearing Transcript, Day 3, 610:24-611:22.

*See*, FTI R1, ¶ 5.48:

> We note however that looking at the realised (or ex post) rate of return of investors is inappropriate when assessing whether the returns offered to investors were sufficient or excessive. The ex-ante rate of return, that is, the rate of return estimated before the investment is made, captures the uncertainty and risks embedded in the investment decision (including, *inter alia*, plant development risks and operating risks). Ex post rates of return only show the actual realisation of the different possible states of the world that could have occurred, and can be significantly higher or lower than the returns expected by investors when the investment is made. Any analysis regarding the sufficiency of the support, therefore, must be carried out based on the rates of return that would have been expected to be realised at the time the investments were made.

FTI R2, ¶¶ 3.50-3.51:

> On the contrary, the CE schemes regulating the PV plants were designed based on an "at risk" or "ex ante" model in which the regulated firm receives a tariff for each kWh of electricity produced and invests at its own risk, accepting the possibility that its return may be below or above its cost of capital (i.e., its eventual profitability may be lower or higher than the level of profitability that made its investors willing to provide the necessary capital to fund the investment). In this regime there is no mechanism to pass on unforeseen costs to consumers.

> The allocation of risks between investors and the public is clearly different in the two regulatory regimes: the PV plants retain a larger share of the risks than the utilities.

For explanation of the difference between *ex ante* and *ex post* regimes, *see* FTI R2, ¶¶ 6.20-6.21.

[753]    CPHB, ¶ 116; Hearing Transcript, Day 3, 568:13–569:4.

[754]    CPHB, ¶ 118.

of awards which they say illustrate the fundamental principle that a state's right to regulate is limited when it creates legitimate expectations on the part of investors, particularly when those expectations were created by specific commitments or assurances designed to encourage investors to invest.[755] The Claimants say that where arbitral tribunals have employed a balancing exercise, this was because there was no specific commitment or assurance given by the Respondent state, or because any assurance was broad or general.[756]

552.    Similarly, the Claimants say that the concepts of "proportionality" and "reasonableness" are not relevant to an FET analysis such as the one in this case in which the Challenged Measures violate the Claimants' legitimate expectations based on a specific commitment. The Claimants say that the specificity of the Respondent's commitment leaves no room to argue that the concepts of proportionality and reasonableness should be factored into the Tribunal's analysis of liability. The Claimants submit that the only circumstance in which proportionality and reasonableness are relevant is with respect to a violation of the ECT's impairment clause.[757] The Claimants also say that the withdrawal of an assurance or commitment given in good faith as an inducement to investment is, by definition, unreasonable.[758]

553.    In any event, the Claimants say that the *Spalmaincentivi* Decree was neither reasonable nor proportionate. The Claimants complain that the Respondent did not provide meaningful notice of the tariff reductions, but add that no amount of notice would have made the reductions reasonable. They say that the tariff reductions under the *Spalmaincentivi* Decree were introduced and implemented abruptly and that, in any event, they had no meaningful way to avoid the harm caused by the measure since their investments were sunk well before the adoption of the Decree. Further, the Claimants say that the three options for the implementation of the tariff reductions did not make the Decree either reasonable or

---

[755]    The Claimants refer to, *inter alia*, *ADC v. Hungary*: CL-097, ¶ 423; *EDF v. Romania*, ¶ 217; *Total v. Argentina*: CL-051, ¶¶ 117-118; *El Paso v. Argentina*: CL-055, ¶¶ 374-375, 377.

[756]    *See* CPHB, ¶ 55, citing *Total v. Argentina*: CL-051, ¶ 121.

[757]    CPHB, ¶¶ 56-61. The Claimants distinguish the decision in *Charanne v. Spain* on this basis, noting that in that case the tribunal found that the claimants had not claimed that they had the legitimate expectation that the regulatory framework would remain unchanged.

[758]    CPHB, ¶ 60, citing *BG Group Plc v. Argentine Republic*, UNCITRAL, Final Award, 24 December 2007 ("**BG Group v. Argentina**"): CL-081, ¶ 343.

proportionate since each of the options violated the terms of the original tariff framework and would have caused the Claimants and their investments harm. Finally, the Claimants say that the "safeguards" which the Respondent alleges it offered to reduce the effect of the tariff reductions were not meaningful and a number of these were never implemented.[759]

554.   In response to the Respondent's reliance on the 2017 Constitutional Court Decision, the Claimants argue that this decision and Italian law more generally are not legally relevant. At most, they may have some relevance as a matter of fact. As a result, the Claimants say that the Decision has no direct relevance and may not influence the Tribunal's assessment and application of the ECT and related principles of international law.[760]

555.   Insofar as the FET standard and their legitimate expectations are concerned, the Claimants say that Italian court decisions could, in theory, be one element of the relevant factual background, but only to the extent that these were rendered and knowable before the relevant investments were made. In this case, the 2017 Constitutional Court Decision was not published until January 2017 and is therefore irrelevant to the legitimate expectations analysis since the Claimants' investments were made several years earlier, beginning in 2009.[761] The Claimants also argue that the Respondent cannot rely on a domestic court decision that endorsed conduct under domestic law well after the fact in defense of a claim under the ECT or international law.[762]

*(ii) The Respondent's Arguments*

556.   The Respondent says that the *Spalmaincentivi* Decree does not abrogate the *Conto Energia* tariff scheme. It says that the Decree did not create a new regime, but simply implemented a "small" / "limited" remodulation of tariffs in the existing regime, which applied

---

[759]    Claimants' Reply, ¶¶ 323-340.

[760]    CPHB, ¶¶ 24-25.

[761]    CPHB, ¶ 27.

[762]    CPHB, ¶ 29. With respect to their claim under the Umbrella Clause, the Claimants note that the Court's decision addresses the constitutionality of the *Spalmaincentivi* Decree and not whether the GSE Agreements created valid obligations under domestic law. They also note that the GSE Agreement before the Court was under *Conto* V which contained a unilateral modification provision in the GSE's favour – not present in the GSE Agreements under the other *Contos* – which required any changes to be made by agreement of the parties in writing.

prospectively ("in the future, never for the past").[763] The Respondent notes that the PV plants continue to receive incentive tariffs "with the same regularity, duly on time and for the expected duration" – namely, for the original 20-year period – and, therefore, disbursements under the regime remain stable.[764] Further, the Respondent says that the remodulation or "fine tuning" implemented in the *Spalmaincentivi* Decree only applied to the payment of tariffs going forward and was not retroactive.[765]

557.    The Respondent says that it did not limit its ability to remodulate or fine tune its incentives under the *Conto Energia* regime. It says that the legitimate right of states to remodulate their incentive regimes has been accepted by existing arbitral awards as long as the modification is not disruptive of the mechanism.[766] According to the Respondent, irrespective of whether general or specific assurances are given, FET as embedded in Article 10(1) of the ECT requires that a fundamental or radical change occur. It says that no such change occurred to the *Conto Energia* regime, that incentives are still regularly paid and the duration has not been affected. Further, it says that although the Claimants may have suffered a reduction in profits, they remain profitable.[767] The Respondent also says that any commitment or guarantee regarding tariff rates does not imply, as a necessary consequence, that the tariffs should remain immune from changes that are typical of a long term relationship for a period of 20 years.[768] The Respondent contends that this proposition

---

[763]    *See*, *e.g.*, Respondent's Comments on New Legal Authorities, ¶ 43.

[764]    Respondent's Comments on New Legal Authorities, ¶ 43.

[765]    Hearing Transcript, Day 1, 184:3–185:3; Respondent's Closing Presentation, Slide 16. The Respondent contests the Claimants' use of the concept of "retroactivity" to qualify the effects of the *Spalmaincentivi* Decree; it says that the decree does not seek to claw back tariff payments already made. Rather, it only affects tariff payments as of the date of its implementation. On the other hand, the Claimants refer to the effects of the decree as "retroactive" in the sense that it affected tariff rates which had already been granted and implemented under the *Conto Energia* scheme, on the basis of which they had invested. From the Claimants' perspective, the decree had a retroactive effect since it reduced the tariff rates which it expected to rely on to recoup their sunk, upfront capital investment and their ongoing operating costs.

[766]    RPHB, ¶¶ 89-154; Respondent's Comments on New Legal Authorities, ¶ 43.

[767]    RPHB, ¶ 154.

[768]    Hearing Transcript, Day 1, 190:6–191:2, *especially*: "The guarantee that the incentive would remain constant throughout the period of entitlement does not imply, as a necessary consequence, that the corresponding measure should remain, for twenty years, unchanged and completely immune from changes that are typical of long-term relationships."

has been equally recognized in the recent SCC *Isolux* award concerning Spanish measures in the PV sector.[769]

558.    The Respondent says that the Tribunal should balance any legitimate expectations the Claimants may have had with its inherent regulatory authority and its need to preserve the right to amend its legislation over time. The Respondent says that the Claimants should have relied only on the stability of the *Conto Energia* mechanism as a whole and that such stability remains in place since the duration of the incentives has not been reduced and the reduction of the rates was limited. According to the Respondent, the Claimants' investments remain highly profitable.[770] Relying on the award in *Blusun v. Italy* and the award in *SunReserve v. Italy*, the Respondent says that it was entitled to re-modulate the tariffs in a manner proportionate with the aim of its legislation.[771]

559.    The Respondent argues that the proportionality and reasonableness of its measures is relevant in assessing whether there has been a violation of an obligation under the ECT. The Respondent asserts that the *Spalmaincentivi* Decree was reasonable, arguing that the reduction of tariff incentives in terms of the percentage of the total tariff incentives to be paid under the terms of the *Conto Energia* Decrees was extremely low.[772]

560.    The Respondent criticizes the *Greentech v. Italy* award's finding that the changes imposed by the *Spalmaincentivi* Decree were of an unforeseeable "magnitude."[773] Italy argues that the tribunal "could not point to any change to be considered elevated by any reasonable

---

[769]    RPHB, ¶¶ 119-120 citing *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Case No. 153/2013, Award, 12 July 2016 (partial translation): CL-190, ¶ 686; Hearing Transcript, Day 1, 191:3-5.

[770]    Respondent's Rejoinder, ¶ 276.

[771]    RPHB, ¶¶ 64-65, citing *Blusun v. Italy*: CL- 139, ¶ 372; Respondent's Comments on *SunReserve*.

[772]    RPHB, ¶ 71. The Respondent calculates that the reduction of the Claimants' incentives represents 2% of the overall incentive amount forecast to be paid to the Claimants' plants over the course of the incentive period (€16 million compared to a global amount of €570 million). The Claimants contest the Respondent's calculation on a number of bases. They say that the Respondent's calculation compares apples to oranges because the calculation of the incentive tariff reduction (€16.6 million, in the Respondent's calculation) is discounted and after tax, while the calculation of the total amount of tariffs to be paid absent the *Spalmaincentivi* Decree is undiscounted and before tax. Further, the Claimants say that the calculation is not relevant since it does not reflect the impact of the *Spalmaincentivi* Decree on the value of the Claimants' investments which the Parties agree is either €16 million or 16.6 million. The Tribunal discusses this issue further below.

[773]    Respondent's Comments on New Legal Authorities, ¶ 44.

standards, and in comparison with those applied in Spain [e.g., in *Masdar*], where indeed the tribunals consistently differentiated between a first set of measures, considered to be legitimate and whose adjustments were higher that [*sic*] those imposed by Italy, and a second set of measures that were yet considered to violate the ECT but whose changes were radical."[774] The Respondent says that the *Greentech* tribunal fails to explain what exactly changes "of the magnitude" imposed by Italy means and argues that the award is poorly reasoned.[775]

561.    Italy counters that the Challenged Measures, such as the *Spalmaincentivi* Decree, were proportionate to the goal, since the effect on the Claimants' rights was limited when compared to the risk to the sustainability of the incentive system, a crisis in the Italian economy, and an excessive burden for end-users. Specifically, the Respondent says that it faced the need to reduce the incentive tariffs because they created an excessive burden on end-users, primarily small and medium enterprises who paid for the incentives through one component of their electricity bills.[776] The Respondent also submits that it was important to reduce the tariffs in order to preserve the sustainability of the incentive system.[777]

562.    The Respondent says that it enacted the *Spalmaincentivi* Decree progressively, only after offering investors the opportunity to reduce their tariff rates voluntarily pursuant to the *Destinazione Italia* Decree, enacted at the end of 2013.[778] Further, the *Spalmaincentivi* Decree offered PV producers three options on how the tariffs would be restructured.[779] The Respondent argues that this was a reasonable step which permitted producers to choose the option which best fit their situation.[780] In addition, safeguards were offered to PV producers to facilitate obtaining bank loans, requiring local authorities to extend authorizations and permits to align with any extended time period under the decree, and an auction through

---

[774]    Respondent's Comments on New Legal Authorities, ¶ 44.

[775]    Respondent's Comments on New Legal Authorities, ¶¶ 43-44.

[776]    Respondent's Counter-Memorial, ¶¶ 274-285.

[777]    Respondent's Counter-Memorial, ¶ 285; Respondent's Rejoinder, ¶¶ 53, 58, 76, 197, 234, 250, 286, fn. 80. Respondent's Opening Presentation, Slides 56-58.

[778]    Respondent's Counter-Memorial, ¶¶ 287-290.

[779]    These are described below at paras. 593 *et seq.*

[780]    Respondent's Counter-Memorial, ¶¶ 312-314; Respondent's Rejoinder, ¶¶ 277-281.

which renewable energy producers could assign up to 80% of their incentives to one of several "major European financial players."[781]

563.    The Respondent argues that the 2017 Constitutional Court Decision, and previous decisions, is relevant both as applicable law and as fact.[782] It accepts that the Tribunal must determine this dispute on the basis of the ECT and not whether the *Spalmaincentivi* Decree (or other Challenged Measures) comply with Italian law. Nevertheless, it says that Italian law should influence the legal standard the Tribunal applies to determine whether it violated the ECT and international law.

564.    According to the Respondent, the fact that the Constitutional Court found that the *Spalmaincentivi* Decree complied with Italian constitutional law is relevant to the questions this Tribunal must determine.[783] For the Tribunal to understand what legitimate expectations may have arisen in this case, it must conduct a comparative analysis of domestic legal systems to understand the limits of such expectations in domestic law. The Respondent says that the Constitutional Court's decision reaffirmed a well-established principle of Italian law that legitimate expectations do not imply for the legislator an absolute preclusion to modify a long-term relationship, even where the object of the relationship is a vested right, including rights vested by contract.[784]

565.    In addition, the Respondent says that the 2017 Constitutional Court Decision is relevant as a matter of fact since it illustrates the application of the principle that legitimate expectations at Italian law do not imply for the legislature an absolute preclusion from modifying a long-term relationship. The Respondent says that this means that "if one

---

[781]    Respondent's Counter-Memorial, ¶¶ 316-318; Respondent's Rejoinder, ¶ 282. The Respondent says that any delay in the implementation of the bank loan program provided for in the decree was due to the market and not the Ministry of Finance which had adopted a decree recognizing a state guarantee under the loan program.

[782]    RPHB, ¶¶ 32-38.

[783]    RPHB, ¶ 33.

[784]    RPHB, ¶ 34. The Respondent goes on to submit that the Tribunal should take a deferential approach in reviewing the decision of the Court which it says recognized the conformity of its decision with decisions of European courts and the ECHR. The Respondent also submits that the Constitutional Court's decision regarding legitimate expectations coincided with decisions of other national courts, including the Spanish Constitutional Court. The Respondent argues that the consistent application of this principle by Italian and Spanish Courts "makes the elaboration of the domestic constitutional courts as common principles to become sources of international law under Article 38(1) of the Statute of the ICJ:" *see* RPHB, ¶¶ 35-36.

invests in Italy, it cannot expect that, because of the existence *per se* of a contract, the legislator is automatically ban [*sic*] from modifying its legislation."[785]

*(iii)The Tribunal's Analysis*

566.    The majority of the Tribunal has concluded that in the *Conto Energia* Decrees (in particular *Contos* II, III and IV at issue here), the Respondent gave a specific assurance and commitment that the tariffs for which PV plants qualified would remain constant or unchanged for 20 years. These specific assurances were later repeated in the GSE Letters and GSE Agreements. The majority of the Tribunal has also concluded that the specific assurances contained in the *Conto Energia* Decrees gave rise to a legitimate expectation by the Claimants to the same effect and that the later confirmation of these assurances in the GSE Letters and GSE Agreements is evidence of the legitimacy of the Claimants' expectation that the tariff rates for which each investment qualified would remain unchanged for a twenty-year period. For the reasons described below, the majority of the Tribunal finds that by unilaterally decreasing pursuant to the *Spalmaincentivi* Decree the tariffs for which the Claimants' PV plants qualified, the Respondent violated the Claimants' legitimate expectations.

567.    While the Respondent says that the legislative framework did not contain a stabilization clause or promise to freeze the terms of the *Conto Energia* Decrees, the majority of the Tribunal finds that the specific and repeated language of the *Conto Energia* Decrees, which was confirmed in the GSE Letters and GSE Agreements, constituted a specific commitment that the tariffs granted would be paid and remain constant for the full 20-year incentive term. The purpose of the legislative scheme was to encourage investment in the Respondent's PV sector by, *inter alia*, setting out a predictable revenue stream in the form

---

[785]    RPHB, ¶ 37. The Respondent also submits that the GSE Agreements were not "mere private law contract[s]" but accessory contracts, which reduces further the scope of protection as a consequence of legitimate expectations. As a result, according to the Respondent, legitimate expectations that Italian regulation on subsidies to the PV sector could not be remodulated could not have arisen. Finally, with respect to the Claimants' umbrella clause claim, the Respondent says that since the Constitutional Court declared the legitimacy of the decree under Italian law, as a matter of fact, no infringement of the umbrella clause can exist as a matter of law: *see* RPHB, ¶¶ 37-38.

of FITs, which coincided with the expected life of a PV plant, upon which possible investors could assess whether to invest.

568.    The Tribunal notes that neither the legislative decrees nor the *Conto Energia* Decrees gave any indication that the tariffs could or would be modified to take into account factors such as the rate of return to investors, profit margin or the decreasing cost of PV technology, upon which the Respondent now relies, or otherwise. Rather, the *Conto Energia* Decrees provided very specific tariff rates which were stated to remain constant throughout the 20-year term. In fact, the *Conto Energia* Decrees specifically addressed the question of decreasing technology costs by providing lower tariffs for plants entering into production after specified future dates. The later *Conto Energia* Decrees also provided for a cap on the overall annual cost of the incentive regime. These provisions were duly implemented and once the incentive regime reached its cap, no further incentive tariffs were available for new PV plants. However, under the terms of the *Conto Energia* Decrees, the GSE Letters and the GSE Agreements, the tariffs granted to PV plants when they qualified under the terms of the *Conto Energia* Decrees were specifically stated to remain constant throughout the 20-year incentive term.

569.    In addition, the Claimants submit that the *Spalmaincentivi* Decree amended the payment modalities of the incentive tariffs, causing them further harm. Payment was changed from payment of tariffs on a monthly basis based on the PV plant's actual production to payment of tariffs in monthly instalments amounting to 90% of the plant's estimated yearly average production of electricity. The payment of the balance based on actual production would be delayed for 6-18 months, which affected cash flow.[786] The Tribunal has reviewed the language of the payment terms contained in the *Conto Energia* Decrees, the GSE Letters and the GSE Agreements and the majority finds that, unlike the language relating to the incentive tariff rates, the language relating to the payment terms was not specific enough to form the basis of a legitimate expectation that the payment modality for the incentive tariffs would not change over the period of the investment.

---

[786]    Claimants' Memorial, ¶ 271.

570.    On the other hand, in the majority of the Tribunal's view, the repeated express language of the *Conto Energia* Decrees, confirmed in each case by the corresponding GSE Letters and GSE Agreements, which identified the specific Investments that had qualified for the tariffs, that the tariffs would remain constant throughout the incentive term amounted to a specific commitment that the tariffs would remain fixed for the entire term. This specific commitment limited and restricted the Respondent's right to reduce the tariffs for which investors had qualified. It follows that by reducing the tariffs, the Respondent did not honour its commitment and violated the Claimants' legitimate expectations.

571.    The Respondent argues that it did not radically change its incentive regime and only "remodulated" or "fine-tuned" the regime by reducing the tariffs by a modest amount, which did not affect the stability of the overall *Conto Energia* regime. The Respondent also argues that in determining whether there had been a breach of the Claimants' legitimate expectations, the Tribunal should balance the Claimants' expectations with its right to regulate and amend its legislation over time. In addition, the Respondent says that the *Spalmaincentivi* Decree was a reasonable and proportionate measure. In the majority of the Tribunal's view, none of these arguments are pertinent.

572.    The Respondent relies on the award in *Blusun v. Italy* in support of its position that the Claimants did not have any legitimate expectation that the tariffs under the *Conto Energia* Decrees would remain unchanged for 20 years.[787] In that case, one of the measures which was alleged to have caused the failure of a project to construct a large PV plant and obtain tariffs under *Conto* III was the *Romani* Decree, which shortened the period to qualify for tariffs under that *Conto*.[788] In its award, the tribunal quoted from the award in *Charanne v. Spain*, which distinguished between a regulatory standard and a specific commitment of a state, as follows:

> [U]nder international law … in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory

---

[787]    Respondent's Counter-Memorial, ¶¶ 520-522; Respondent's Rejoinder, ¶¶ 217, 311; *Blusun v. Italy*: CL-139.

[788]    *Blusun v. Italy*: CL-139, ¶ 168.

framework such as that at issue in this arbitration is to not be modified at any time
to adapt to the needs of the market and to the public interest.[789]

573.    The *Blusun v. Italy* tribunal went on to conclude that "the *Romani* Decree and [*Conto* IV],
taken overall, were not disproportionate, did not violate specific commitments made to the
promoters of PV plants, and did not breach Article 10(1), first sentence, of the ECT."[790]
The tribunal also found that Italy had made no special commitments to the claimants in
that case with respect to the extension and operation of tariffs nor did it specifically
undertake that relevant Italian laws would remain unchanged.[791]

574.    The Claimants distinguish the decision in *Blusun v. Italy* and say it is irrelevant to the
claims in this case, which are very different. They say that *Blusun v. Italy* did not involve
the *Spalmaincentivi* Decree nor did it involve the reduction of incentive tariffs that had
already been granted to existing PV plants. Rather, the *Romani* Decree changed the
modalities of *Conto* III for plants that had not yet been constructed and properly qualified
under *Conto* III. As such, this aspect of the *Blusun v. Italy* case concerned the loss of an
opportunity to obtain *Conto Energia* tariffs, which is different from the Claimants' claim
in this case where all of their investments had qualified for and received tariffs for several
years before the *Spalmaincentivi* Decree was adopted.[792]

575.    The Claimants say that the *Blusun* tribunal's finding that Italy was within its rights to
modify the *Conto Energia* regime in ways that would affect new (not yet completed or
connected) plants is consistent with their view in this case. The Claimants say they were
aware that the Respondent could change the incentives framework for plants that were not
yet enrolled and in a *Conto Energia* program. However, the Claimants say that they
benefited from the specific commitment in the *Conto Energia* Decrees, confirmed in the

---

[789]    *Blusun v. Italy*: CL-139, ¶ 317, quoting *Charanne v. Spain*: CL-004, ¶ 510.

[790]    *Blusun v. Italy*: CL-139, ¶ 343.

[791]    *Blusun v. Italy*: CL-139, ¶ 374. In dismissing the claimants' claim, the tribunal found that the project the
claimants were seeking to establish had never obtained the substantial financing required, had only commenced
construction on two of many plants and that no solar panels were ever installed or connected to the grid.

[792]    Claimants' Reply, ¶¶ 413-418. The Claimants note that the tribunal in the *Blusun* case concluded that
Blusun's failure to construct the plants or to connect them to the grid was due to its own decisions, notably the failure
to attract adequate finance: *see Blusun v. Italy*: CL-139, ¶ 407.

individual GSE Letters and GSE Agreements, that their PV plants would receive payment of a specific tariff at constant rates for 20 years.[793]

576.   In the majority of the Tribunal's view, the circumstances and claims addressed in the *Blusun v. Italy* case are different from those in this case. The tribunal in the *Blusun v. Italy* case was not required to address the effect of the *Spalmaincentivi* Decree on investors who had qualified for and been granted tariffs under the *Conto Energia* Decrees. Further, both the *Blusun* and *Charanne* tribunals recognized that specific commitments given by a state can give rise to legitimate expectations and neither tribunal addressed the specific provisions of the *Conto Energia* Decrees at issue in the present case.

577.   Turning to the question of the size of the effect of the *Spalmaincentivi* Decree, in light of the very specific commitment and the legitimate expectations it created, the majority of the Tribunal agrees with the Claimants that this consideration is irrelevant. In the majority's view, any reduction of the specific commitment to pay the specific tariff rates on a constant basis throughout the 20-year term is a violation of the Respondent's commitment and the Claimants' legitimate expectations. While in cases where there is not a specific commitment or assurance from a state, or only a broad, general assurance, the nature and degree of change to a regulatory regime may be relevant, this is not the case where such a specific commitment has been given and where the Claimants have satisfied the clearly laid out requirements to qualify for the incentive tariff rates under each of *Contos* II-IV.

578.   In any event, the majority of the Tribunal has concluded that the effect of the *Spalmaincentivi* Decree on the Claimants' investments was significant. It was common ground between the Parties that the effect of the *Spalmaincentivi* Decree was to reduce the tariffs applicable to the Claimants' various plants by 6-8%. This reduction caused a loss in the value of the Claimants' investments of approximately €16 million or 7.5%.[794] In the majority's view, this is a sizable impact and cannot be qualified as a *de minimus* effect.

---

[793]   Claimants' Reply, ¶¶ 417-418.

[794]   As will be discussed below, the Tribunal accepts the methodology adopted by the Claimants' and their quantum experts in calculation damages. Accepting that methodology, the Parties' estimates of the loss in value to the Claimants is between €16 million and €16.6 million.

579.    In addition, the majority of the Tribunal finds that the reduction of the tariff rates affected an essential element of the *Conto Energia* framework. As described above, the regime provided an *ex ante* framework with a fixed tariff rate for a period of 20 years. This provided a predictable basis on which the Claimants decided to invest and operate the plants they acquired. The reduction in the tariffs affected the specific tariff rates on which the Claimants based their decision to invest and introduced uncertainty with respect to tariff rates going forward.[795] As explained by the Claimants' regulatory experts, the reduction of the tariffs on the basis of a "fair remuneration" or "fair return" changed the regime from an *ex ante* fixed regime to an *ex post* and *ad hoc* adjustable regime.[796] As a result, the majority of the Tribunal finds that the adoption of the *Spalmaincentivi* Decree changed the nature of the *Conto Energia* regime and introduced significant uncertainty going forward. As a result, the majority of the Tribunal is unable to accept the Respondent's argument that the *Spalmaincentivi* Decree was simply a "fine tuning" of the *Conto Energia* regime.

580.    The Tribunal has considered the Respondent's argument that the Claimants should have relied only on the stability of the *Conto Energia* mechanism as a whole and that such stability remains since the duration of the incentives has not been reduced and the reduction was minimal. The Respondent also argued that the Claimants' investments remain profitable. In the Tribunal's view, these arguments miss the point. The *Conto Energia* regime included a commitment that specific tariff rates would be paid to qualifying investors on a constant basis for 20 years. In these circumstances, in the majority's view, the fact that the *Conto Energia* regime as a whole remains in place or the fact that the Claimants' investments may currently be profitable is not relevant to the question of whether the Claimants' legitimate expectations with respect to tariff rates has been violated.

---

[795]    Mr. Miraglia, an energy analyst in the Energy Studies, Statistics and Sustainability unit of the GSE, testified that if conditions arose which affected the fair remuneration of fair investment costs and remuneration of costs of PV plants, then the Respondent would have the right to further reduce the incentive tariffs. In this regard, Mr. Miraglia referred to decreased in operating costs: *see* Hearing Transcript, Day 3, pp. 568:16–569:4.

[796]    FTI R2, ¶¶ 2.4-2.32; FTI Regulatory Issues Presentation, Slide 10; Hearing Transcript, Day 3, 610:24–611:13. FTI noted that there was no indication or evidence of how the reductions in the *Spalmaincentivi* Decree were determined or what regulated return level was targeted. In their opinion, the change from an *ex ante* to an *ex post* and *ad hoc* adjustable regime was a significant change from a regulatory perspective.

581.    The majority of the Tribunal reaches a similar conclusion with respect to the Respondent's argument that the *Spalmaincentivi* Decree was a proportionate and reasonable measure and therefore did not violate the Claimants' legitimate expectations or obligation under the ECT. In the majority's view, where an investor's expectations are found to be legitimate and the Respondent's measures violate that expectation, the concepts of reasonableness and proportionality are not relevant.

582.    In considering legitimate expectations and the limits these may impose on a state's ability to limit a state's regulatory authority, arbitral tribunals have distinguished between situations in which a specific commitment has been given to an investor and those where no commitment or only a general regulatory framework exists.[797] As described above, the majority of the Tribunal has found that the Respondent did provide a specific commitment in the *Conto Energia* regime which gave rise to the legitimate expectation of the Claimants that the tariffs for which they qualified would remain constant for 20 years. Further, the reduction in the tariffs was significant and affected an essential element of the incentive tariff regime upon which the Claimants relied. In these circumstances, the Respondent's arguments with respect to proportionality and reasonableness are not relevant to the determination that the Claimants' legitimate expectations were violated.

583.    In any event, the Tribunal has considered the Respondent's arguments regarding the proportionality and reasonableness of the *Spalmaincentivi* Decree.

584.    The Respondent argued that the *Spalmaincentivi* Decree was proportionate in that the effect on the Claimants' rights was limited as compared to the excessive burden the incentive regime created for end-users and the risk of the sustainability of the incentives system.[798] Having carefully reviewed all of the available evidence, the majority of the Tribunal is not persuaded by these arguments. With respect to the alleged burden on electricity consumers,

---

[797]    *See, e.g.*, *El Paso v. Argentina*: CL-055, ¶¶ 374-375, 377; *Total v. Argentina*: CL-051, ¶¶ 117-119; *Blusun v. Italy*: CL-139, ¶ 319(4) (the FET "standard preserves the regulatory authority of the host state to make and change its laws and regulations to adapt to changing needs, including fiscal needs, subject to respect for specific commitments made"); *Oostergetel v. Slovakia*: CL-207, ¶ 223; *Parkerings v. Lithuania*: CL-062, ¶ 331; *Micula v. Romania*: CL-014, ¶¶ 666, 669, 673.

[798]    Respondent's Counter-Memorial, ¶¶ 274-285; RPHB, ¶ 68.

the Tribunal notes that the Decree was intended to reduce electricity rates for small and medium sized enterprises and not residential customers and households. It appears that the reduction to the A3 component to the end-users in those categories resulted in a decrease of only 2.6-2.7% of their electricity bills.[799] From the report of the Claimants' regulatory experts, FTI, it appears unlikely that this decrease in the electricity prices to low and medium voltage consumers in the small and medium enterprises category would stimulate demand for industrial electricity to any measurable extent or that, conversely, increases in electricity prices in the absence of the *Spalmaincentivi* Decree would have caused any meaningful reduction in demand for electricity from the users in question.[800] Given the modest effect of the *Spalmaincentivi* Decree on electricity prices and consumption, the majority of the Tribunal is not persuaded that the incentive system was at risk absent the adoption of the Decree.[801]

585.     This is not to say that the A3 component of electricity bills, which included PV incentives, did not increase substantially as a proportion of the overall A3 cost component due to the significant take up under the *Conto Energia* Decrees. Further, the motivation behind the adoption of the *Spalmaincentivi* Decree may well have been to respond to a perceived fiscal need with a different distribution of tariff charges. In this regard, the Tribunal has taken note of the Respondent's reliance on an extract from the *Blusun v. Italy* award which reads as follows:

> The reduction in FITs was quite substantial, but was not in itself crippling or disabling. Moreover, it was a response to a genuine fiscal need, given the large take-up under the earlier Energy Accounts ... The reduction in incentives was proportionately less than the reduction in the cost of photovoltaic technology during 2010, and left Italian subsidy levels higher than those in Germany, France and Spain.[802]

---

[799]     FTI R2, ¶¶ 2.35, 7.1, 7.39.

[800]     FTI R2, ¶ 7.37. The Claimants' experts conclude as follows: "The [*Spalmaoncentivi*] Legislation did not provide any significant alleviation of any burden imposed on industrial consumers by electricity prices, nor did it lead to any meaningful increase in either electricity demand or industry competitiveness. The CE support schemes therefore, would not have been at risk of default absent the [*Spalmaincentivi*] Legislation: *see* FTI R2, ¶ 7.39.

[801]     The Tribunal also notes that pursuant to the *Conto Energia* regime, once tariffs reached the target of €6.7 billion in 2013, no additional incentivised tariffs were granted. *See* Claimants' Reply, ¶ 305 and the sources cited therein.

[802]     *Blusun v. Italy*: CL-139, ¶ 342.

586. However, as discussed above, the *Blusun* award addressed a different situation and different claims than this case. The *Blusun* claimants had not fulfilled the requirements of the *Conto Energia* regime by completing construction of their plants and connecting them to the grid; their claim was in the nature of a loss of opportunity. The Claimants do not contest Italy's ability to change its tariffs on a going-forward basis where an investor has not fulfilled the conditions of the *Conto Energia* regime and been granted the tariffs provided for. Their claim is that once an investor fulfilled the requirements of the *Conto Energia* regime, the Respondent's commitment to pay the specified tariff rates for a period of 20 years became effective and the reduction of the tariffs thereafter violated their legitimate expectation on which they had based their investment.

587. The Respondent also argued that the *Spalmaincentivi* Decree was reasonable and proportionate because three different options for implementing the tariff reductions were given to investors. Further, it says that investors had been given advance notice in the December 2013 *Destinazione Italia* Decree of the tariff reductions which would follow in the June 2014 *Spalmaincentivi* Decree. For instance, the Respondent says that the *Destinazione Italia* Decree contained a number of measures to reduce the high costs of electricity, and thus was predictable and not an abrupt change, since it should have alerted the Claimants that measures would have to be taken to reduce the cost of electricity to end-users.[803]

588. The Claimants say that the *Destinazione Italia* Decree did not give them, or other PV investors, any kind of notice of the unilateral, mandatory reduction in tariffs implemented in the *Spalmaincentivi* Decree.[804] According to the Claimants, the *Destinazione Italia* Decree only offered certain investors the opportunity to reduce their tariffs voluntarily. Further, the *Destinazione Italia* Decree did not apply to PV producers since the *Conto Energia* tariffs did not fall within any of the categories covered by the Decree. The Claimants say that the offer in the *Destinazione Italia* Decree to permit those producers it covered to choose between the continuation of their existing incentives, and reduction of

---

[803]    Respondent's Counter Memorial, ¶¶ 287-290; Respondent's Rejoinder, ¶¶ 245-247; Respondent's Opening Presentation, Slides 74-78.

[804]    Claimants' Memorial, ¶ 263; Claimants' Reply, ¶¶ 318-322.

those incentives coupled with an extension of the incentive term for seven additional years, did nothing to alert them to measures which were to be adopted in the *Spalmaincentivi* Decree.

589. Regarding the choice of reductions, the Claimants say that the *Spalmaincentivi* Decree was enacted in late June 2014 and required investors to choose one of the three options offered in that Decree by the end of November 2014, and note that the full details of the options in question were not announced until late October 2014. In the circumstances, the Claimants say that the implementation of the *Spalmaincentivi* Decree was unexpected and abrupt. In any event, the Claimants say that whatever notice the Respondent had provided would have been of no effect since all of their investments had already been made and there was no way to avoid the impact of the *Spalmaincentivi* Decree.

590. In the majority's view, the adoption of the *Destinazione Italia* Decree cannot reasonably be said to have given the Claimants or other PV investors notice of the implementation of the modification of the *Conto Energia* tariffs. As noted by the Claimants, the *Destinazione Italia* Decree did not apply to PV producers and the reduction of tariffs proposed was voluntary.[805] Further, the *Destinazione Italia* Decree was adopted well after the Claimants made their last investment.[806]

591. Regarding the three options given to investors as to how to implement the reduction in tariffs, the Respondent says that by offering these alternatives it permitted the plant operator to select the best alternative according to their business choices.[807] The Respondent also says that it put in place certain safeguard measures intended to assist producers in implementing the tariff reductions.[808]

---

[805]    *See Destinazione Italia* Decree: C-249, Art. 1(3). *See also* Second Expert Opinion of Professor Antonio d'Atena, 19 October 2017 ("**D'Atena ER2**"), § 2.2.5; "Destinazione Italia e riduzione volontaria incentivi su rinnovabili non fotovoltaiche," *Green Point*, 23 November 2014: C-415.

[806]    Claimants' last investment was ICE 5's acquisition of the Ginosa Energia PV plant on 12 September 2012: *see* Claimants' Memorial, pp. 76-77, Table of Claimants' Investments.

[807]    Respondent's Counter-Memorial, ¶¶ 312-314; Respondent's Rejoinder, ¶¶ 277-281.

[808]    Respondent's Counter-Memorial, ¶¶ 315-319; Respondent's Rejoinder, ¶¶ 282-283.

592.    The Claimants say that Article 26 of the *Spalmaincentivi* Decree only gave producers three options of how to calculate the new, reduced tariffs that would apply to them. They say this was no real choice since each of the three options significantly reduced the value of the incentives provided for in the *Conto Energia* Decrees under which they had qualified. The Claimants also note that if the producer did not choose one of the three options, then the default option of a 6-8 % reduction in tariffs would apply.[809]

593.    Each of the three options under the *Spalmaincentivi* Decree involved a decrease in the specific tariffs provided for under the *Conto Energia* Decrees. Although two of the options (options A and B) offered either an extension of the incentive period or an increase in the tariff rate in later years to off-set partially the initial reduction in tariffs (which was significantly greater than under the default option C in early years), the Claimants say that did not make the measure neutral for investors.[810] It appears that under each of the three options, the Claimants would have suffered a loss of enterprise or net present value. Although the Respondent argued that Claimants could have chosen option B (to accept a larger decrease than option C in early years and then increased by a factor to be determined by the MED in later years),[811] the majority of the Tribunal accepts the Claimants' argument that the increase in tariffs in later years created additional regulatory risk which would have affected a number of the Claimants' financing obligations. The Tribunal notes that a majority of 62% of the Producers affected by the *Spalmaincentivi* Decree chose option C which involved a reduction of tariffs from between 6-8% for the balance of the incentive period.[812] In the circumstances, the majority of the Tribunal concludes that the Claimants' decision to default to option C was reasonable.

---

[809]    Claimants' Memorial, ¶¶ 266-270; Claimants' Reply, ¶¶ 323-333. The Claimants address the Respondent's safeguard measures at Claimants' Reply, ¶¶ 334-339.

[810]    Claimants' Reply, ¶ 325; FTI R2, ¶¶ 4.1-4.21; FTI Q2, Appendix 5-1b.

[811]    *See* Claimants' Memorial, ¶ 268 and the sources cited therein. The GSE published the tables containing the value of the new coefficients to be used in calculating incentive amounts on 27 October 2014: *see* C-257.

[812]    FTI R1, p. 64, Table 6-3; FTI R2, ¶ 4.3.

594. As a result, the majority of the Tribunal finds that even if the factors of reasonableness and proportionality were relevant, the terms of the *Spalmaincentivi* Decree were not reasonable nor proportionate.

595. The Respondent says that it put in place certain safeguard measures intended to assist producers in implementing the tariff reductions by helping Producers obtain bank loans, requiring local authorities to extend authorizations and permits to align with any extended time period under the *Spalmaincentivi* Decree, and an auction through which renewable energy producers could assign up to 80% of their incentives to one of several "major European financial players."[813] It says that any delay in the implementation of the bank loan program provided for in the *Spalmaincentivi* Decree was due to the market and not the Ministry of Finance which had adopted a decree recognizing a state guarantee under the loan program.[814] The majority of the Tribunal accepts the Claimants' argument that the "safeguards" which the Respondent alleges it offered to reduce the effect of the tariff reductions were not meaningful and a number of these were never implemented.[815]

596. Finally, the Respondent relies on the 2017 Constitutional Court Decision, which it says has conclusively decided that the *Spalmaincentivi* Decree complied with Italian constitutional law. As noted previously, the Respondent says that Italian law should influence the standards which the Tribunal applies to determine whether Italy violated the ECT and international law and that the Decision is relevant in this regard. It says that the Court affirmed the principle that, in Italian law, "legitimate expectations do not imply for the legislator an absolute preclusion to modify, even in a detrimental way, a long-term relationship, and that this is so even when the object of a long term relationship is a consolidated subjective right, a vested right, including of course those vested rights that typically derive from contracts."[816] The Respondent says that the Decision is consistent with the principle elaborated by other European courts and refers to EU and ECHR caselaw. With respect to the questions of reasonableness and proportionality, the

---

[813]    Respondent's Counter-Memorial, ¶¶ 316-318.

[814]    Respondent's Rejoinder, ¶ 282.

[815]    Claimants' Reply, ¶¶ 323-340.

[816]    RPHB, ¶ 34.

Respondent points to the Court's reasoning at paragraph 8.2 of its judgment, where it describes the objective of the decree to achieve a fair balancing of the opposing interests at play, promoting at the same time a policy of support to the production of energy from renewable sources, and a more sustainable burden for final users of electric energy.[817]

597.    As noted above, the Claimants say that Italian law, including Italian court decisions, is not part of the applicable law in this case. Since the Tribunal is required to decide the issues in accordance with the ECT and applicable rules and principles of international law, the 2017 Constitutional Court Decision has no direct relevance. In addition, the Claimants say that both the VCLT and the ILC Articles on Responsibility of States confirm that a party may not invoke a provision of its internal law as justification for its failure to perform a treaty.[818] The Claimants also say that the Decision is irrelevant since it was rendered a number of years after the Claimants made their investments and could not have affected their expectations at that time.

598.    As noted previously, the Tribunal's decision must be rendered in accordance with the provisions of the ECT and applicable rules and principles of international law. On that basis, the majority of the Tribunal has found that the *Conto Energia* regime contained a specific commitment with respect to the incentive tariffs and a legitimate expectation in the Claimants that the tariffs for which they qualified would remain constant for the full incentive term of 20 years. Further, the decision came some years after the Claimants made their investments and could not have informed their expectations at the relevant time. As noted above, the Claimants' expectations were confirmed by the statements made by Italian authorities and the GSE, and were consistent with the understanding in the PV sector, as demonstrated by publications by various industry advisors.

---

[817]    2017 Constitutional Court Decision: R-032, quoted above at para. 197.

[818]    *See* CPHB, ¶ 25 and the sources cited there.

### b. *Administration Fee: Did the Claimants have the legitimate expectation that no Administration Fee would be imposed and, if so, did the Respondent violate this legitimate expectation?*

599.   The Parties' respective positions regarding the Administration Fee are summarized above at paragraphs 152 to 157. The Tribunal addresses here the Claimants' allegations regarding how the Administration Fee breached their legitimate expectations.[819]

### *(i) The Claimants' Arguments*

600.   The Claimants allege that the imposition of the Administration Fee breached their legitimate expectations regarding the stability of the tariffs for the full incentive period under the relevant *Conto Energia* Decrees.[820] The Claimants say that the Administration Fee reduced the incentive tariffs indirectly, but that this is not conceptually different from the direct reduction of the incentive tariffs by the *Spalmaincentivi* Decree. According to the Claimants, the Respondent must have contemplated that the GSE would incur costs in managing the system and that these would be paid out of the difference between the charges to consumers and the tariffs they had agreed to pay to PV producers. The Claimants suggest that passing the costs onto PV producers after the fact is simply an indirect way for Italy to reduce the tariffs.[821] Since the Claimants' expectations were based on explicit promises of the stability of the tariff rates, the Claimants say that the Respondent had no flexibility to alter the terms of the incentive framework. Consequently, imposing the Administration Fee altered the promise of fixed tariffs for 20 years and undermined the Claimants' expectations.

601.   The Claimants accept that neither the *Conto Energia* Decrees nor the GSE Agreements expressly stated that Administration Fees would not be charged. However, for the Claimants, the absence of a specific prohibition on the imposition of additional fees does

---

[819]   The Claimants also allege that the imposition of the Administration Fees constitute inconsistent treatment and reflect a lack of good faith under the other elements of the FET standard. They further allege that these fees breached the ECT's Impairment Clause and the Umbrella Clause. These claims are addressed below.

[820]   Claimants' Reply, ¶¶ 502-504. The Claimants also allege that the imposition of the Administration Fees and Imbalance Costs also violated their legitimate expectations regarding the stability of the general economic framework.

[821]   The Claimants liken this situation to where a buyer agrees to purchase goods at a fixed price and the seller subsequently adds a "warehouse charge" to the buyer's invoice to cover the cost of the seller's own operations. *See* Claimants' Reply, ¶ 495.

not mean that the Respondent was free to impose those charges at will. The Claimants maintain that the additional charges were completely foreseeable costs of the renewable energy support scheme and that the Respondent could have chosen to proportion those costs to producers in the *Conto Energia* Decrees. Had Italy done so, the Claimants say that they could have evaluated the economic value of the promised tariffs in light of the Administration Fee and the risk of additional future charges. The Claimants say that guaranteeing the tariffs in the *Conto Energia* Decrees and then arguing that the costs were implicitly authorized all along, violates any reasonable notion of transparency.[822]

### (ii) The Respondent's Arguments

602.    The Respondent says that it made no representations regarding additional charges such as the Administration Fee. It says that the exemption of PV energy producers from the payment of such charges was unrelated to the incentive tariff scheme and was never considered as a means to support the increase of production of renewable energy.[823] The Respondent says that the fact that it established a support scheme for the production of PV energy cannot affect its ability to adopt measures of a general scope regarding other aspects of the production of PV energy.

603.    The Respondent asserts that the first four *Conto Energia* Decrees were silent on the issue of GSE costs and other charges. The Respondent says that such silence cannot create in an investor a legitimate expectation that such an existing regulatory situation will be maintained, for to do so would transform the FET clause into a general freezing clause limiting its regulatory activity.[824] The Respondent also complains that the Claimants' argument that the imposition of the Administration Fee violates their expectation that the "general economic framework" of the incentive regime for 20 years effectively attempts to

---

[822]    Claimants' Reply, ¶ 504. The Claimants also argue that imposing the costs on the Claimants' PV plants amounts to inconsistent treatment since the charges had not been imposed in previous years (from 2010 to 2012). For similar reasons, the Claimants argue that the imposition of the charges amount to a lack of good faith since their investments were sunk at the time they were made and the Claimants cannot take measures to mitigate the harm caused by the additional charged: *see* Claimants' Reply, ¶ 505. In addition, the Claimants also argue that the additional charges violated the ECT's Impairment Clause and the Umbrella Clause: *see* Claimants' Reply, ¶¶ 506-507.

[823]    *See* Respondent's Counter Memorial, ¶¶ 371-372.

[824]    Respondent's Rejoinder, ¶¶ 516-519.

freeze Italy's ability to adopt any regulatory measures that could negatively affect the interests of investors participating in the incentive tariff regimes. The Respondent says that the Claimants had no legitimate expectation that the general economic framework applicable to its investments would remain unchanged for 20 years.[825]

604.    The Respondent's submissions attempt to explain the history of the implementation of Administration Fee and noted that *Conto* V extended the GSE's functions to include monitoring of the incentive schemes, and that this additional function increased the GSE's management costs. The Respondent says that the Administration Fee was carefully weighted and transparently allocated; it further notes that the Administration Fee was an extremely low fixed charge.[826]

605.    The Respondent also disputes the Claimants' contention that the application of the Administration Fee was retroactive since it only applied prospectively as of 1 January 2013.[827]

> ### c.   *Imbalance Costs: Did the Claimants have a legitimate expectation that no Imbalance Costs would be imposed and, if so, did the Respondent violate this legitimate expectation?*

606.    The Parties' respective positions regarding the Imbalance Costs are summarized above at paragraphs 167 to 172. The Tribunal addresses here the Claimants' allegations regarding how the Imbalance Costs breached their legitimate expectations.[828]

> ### (i)   *The Claimants' Arguments*

607.    The Claimants' position in respect of the Imbalance Costs is very similar to the position they advance in respect of the Administration Fee. The Claimants say that the imposition of the Imbalance Costs reduced the incentive tariffs indirectly, but that this is not

---

[825]    Respondent's Rejoinder, ¶¶ 519-520.

[826]    The Respondent says that the contribution from PV producers receiving incentives amounted, on average, to only 0.16% of the incentive received. The Respondent also says that it is appropriate that the producers benefiting from the incentives should bear this cost: Respondent's Counter-Memorial, ¶¶ 408-410.

[827]    Respondent's Counter-Memorial, ¶ 412.

[828]    The Claimants also allege that the imposition of the Imbalance Costs constitute inconsistent treatment and reflect a lack of good faith under the other elements of the FET standard. They further allege that these fees breached the ECT's Impairment Clause and the Umbrella Clause. These claims are addressed below.

conceptually different from the direct reduction of the incentive tariffs by the *Spalmaincentivi* Decree.

608. The Claimants say that Imbalance Costs are a known cost of any electricity system. They maintain that the decision whether to charge Imbalance Costs to renewable energy producers is inseparable from the level of tariff support because if the Producers bear the risk of having to pay Imbalance Costs, they will require additional compensation to off-set that risk. Since the *Conto Energia* Decrees did not charge Imbalance Costs to PV Producers, the Claimants say that the Respondent's decision after the fact to shift those costs to Producers was a way to indirectly reduce the tariffs promised in the *Conto Energia* regime.[829]

609. For the same reasons as with respect to the Administration Fee, the Claimants say that the imposition of the Imbalance Costs breached their legitimate expectation that they would benefit from the specific tariffs guaranteed under the *Conto Energia* Decrees, GSE Letters and GSE Agreements throughout the 20-year incentive period.[830] The Claimants accept that neither the *Conto Energia* Decrees nor the GSE Agreements expressly stated that Imbalance Costs would not be charged. However, the Claimants argue that Italy violated their legitimate expectations by imposing such costs at will. Since Imbalance Costs were known and foreseeable additional costs on the renewable energy support scheme, the Claimants say that Italy could have proportioned those costs to Producers in the *Conto Energia* Decrees so that the Claimants could have evaluated the economic value of the promised tariffs in the light of the additional charges and the risk of additional future charges.

*(ii) The Respondent's Arguments*

610. As with the Administration Fee, the Respondent says that it made no representations regarding additional charges such as the Imbalance Costs.

---

[829]    Claimants' Reply, ¶ 499.

[830]    Claimants' Reply, ¶¶ 502-504. The Claimants make the same claims as with respect to the Administration Fee in regard of the requirements of transparency and consistency and good faith. The Claimant also advances similar arguments with respect to the breach of the Impairment Clause and the Umbrella Clause.

611.  The Respondent explains that at the end of 2012, the Imbalance Costs for non-programmable production units such as the Claimants' PV plants was set as equal to the hourly zonal price and the full residual share was allocated to the end consumer. However, with the significant development of non-programmable renewable energy sources, the difficulty in forecasting the quantities of energy that they injected into the grid led to a continuing increase in costs allocated to energy users in general. The Respondent says that the injection of non-programmable energy sources generated instability in the system and created other costs. For this reason, AEEG established the partial, gradual application of the Imbalance Costs regulations applicable to other producers to non-programmable renewable energy sources, including the Claimants' PV plants.

612.  According to the Respondent, the decision of the *Consiglio di Stato* of 9 June 2014 did not find that Imbalance Costs could not properly be imposed on PV energy sources. Rather, the Court found that the method used to calculate the charge for non-programmable energy sources was inappropriate. According to the Respondent, the Court found that non-programmable energy sources must be charged imbalance costs in order to avoid discrimination to the detriment of the other producers.[831] The Respondent says that the AEEG implemented the directions of the Court when it adopted the resolution applying Imbalance Costs to non-programmable renewable energy producers.

613.  The Respondent argues that, as in the case of the Administration Fee, the Imbalance Costs have no relationship with the Claimants' alleged expectation that incentive tariffs would remain constant for the period of 20 years. For the Respondent, the Imbalance Costs arise from the supply of electricity into the grid, and are unrelated to incentive tariffs which are pre-determined amounts granted in addition to the revenues obtained by the sale of electricity at market prices.[832] According to the Respondent, its national authorities have the discretionary power to decide how the costs of the supply of electricity into the national grid should be allocated. Since Italy never gave any assurance that PV producers would

---

[831]    Respondent's Counter-Memorial, ¶¶ 383-392.
[832]    Respondent's Counter-Memorial, ¶¶ 547-548.

not be required to pay Imbalance Costs at any future time, the Claimants cannot invoke any reasonable expectation that any such costs would not be allocated to them.[833]

614.    The Respondent asserts that the Claimants' argument that the Imbalance Costs violate their expectation that the "general economic framework" of the incentive regime will remain stable for 20 years effectively freezes Italy's ability to adopt any regulatory measure which is capable of negatively affecting the interests of investors participating in the incentive tariff regimes. The Respondent says that the Claimants had no legitimate expectation that the general economic framework applicable to its investments would remain unchanged for 20 years.[834]

*(iii)The Tribunal's Analysis on Administration Fee and Imbalance Costs*

615.    In the majority's view, the Administration Fee and Imbalance Costs are qualitatively different from the measures relating to tariffs and do not directly affect the tariff rates. The *Conto Energia* regime made no reference to either charge, nor did it make any commitment that such fees would not be applied. There was no specific promise made by the Respondent with respect to the future allocation of any Administration Fee and Imbalance Costs in the *Conto Energia* regime or elsewhere.

616.    The Tribunal is not persuaded by the Claimants' arguments that the possibility of administration fees and/or imbalance costs was foreseeable at the time the *Conto Energia* regime was designed and that, in the absence of any specific reference to these fees in the regime, the Claimants could legitimately expect that these would not be imposed since they would affect the tariff rates. To the extent that the Administration Fee and Imbalance Costs were foreseeable, the Claimants should also have been aware of these potential costs. In the absence of a specific reference in the *Conto Energia* regime, it was not a legitimate expectation that there was no risk of potential future costs being allocated to or imposed on producers.

---

[833]    Respondent's Counter Memorial, ¶ 549; Respondent's Rejoinder, ¶¶ 513-518.
[834]    Respondent's Rejoinder, ¶¶ 519-520.

617.    From the evidence, it appears that both the Administration Fee and Imbalance Costs are related to additional fees or costs of administering the *Conto Energia* regime. In the absence of a specific promise regarding these charges (or even any others like them), there could have been no legitimate expectation that these charges would not be imposed on producers. In addition, the majority of the Tribunal notes that the Administration Fee and Imbalance Costs are also quantitatively different from the tariff decreases; the amounts in question are not substantial and, in the circumstances, do not appear disproportionate or unreasonable. There was no indication that these fees and costs were imposed in order to reduce tariffs paid to producers.

### d.    MGP / Off-Take Regime

618.    As in the case of the *Spalmaincentivi* Decree, the Claimants allege that the reduction of the MGP under the Off-Take Regime violated various provisions of Article 10(1) of the ECT. The Tribunal addresses here the Claimants' claim that the reduction of the MGP breached their legitimate expectations.[835]

#### (i)    The Claimants' Arguments

619.    The Claimants allege that the Respondent's commitment to promote PV facilities and its clear goals of ensuring the competitiveness and economic survival of smaller PV plants, as implemented in the Off-Take Regime, created a legitimate expectation that the MGP, once granted, would remain available to the Claimants' investments and above a certain competitive threshold for a prolonged period of time. They note that the MGP established by the AEEG over a period of six years ranged between €72 and €106 per MWh of electricity produced, and that this course of dealing reinforced the legitimate expectation that the MGP would be paid at rates within that range. The Claimants also note that the AEEG Resolution setting out the basis for the MGPs provided that these would be revised

---

[835]    In addition to the breach of their legitimate expectations, the Claimants allege that the measures breached the obligation to treat their investments transparently and consistently. They also argue that the Challenged Measures were unreasonable. In addition, the Claimants maintain that the Challenged Measures were arbitrary and in breach of the Impairment Clause in Art. 10(1) of the ECT. Finally, the Claimants also allege that the Respondent's measures were in breach of its obligations under the Off-Take Agreements and the MGP program and, therefore, in breach of the ECT's Umbrella Clause.

each year and updated for inflation, which indicated to investors that, if anything, the prices would increase each year.[836]

620.  The Claimants argue that Italy's reduction of the MGP granted to its 338 Carlino plants under 100 kW is a departure from the AEEG's original objectives of ensuring that MGPs safeguard the economic survival of smaller PV plants. In support, FTI advances the view that the MGP applied from 2014 onwards "is not nearly sufficient to cover the plants' total cash operating costs."[837] Since the post-2014 MGP was only higher than €38.9 /MWh in a very few instances in 2014 and lower than the market price from 2015, and since plants only benefit from the MGP when it is *above* the market price for electricity, the Claimants' position is that the Carlino plants no longer benefit from the MGPs. As indicated above, the average national electricity price in 2014 and 2015 was approximately €52/MWh.

621.  The Claimants also allege that the entry into Off-Take Agreements with the GSE, pursuant to the terms of the Off-Take Regime, confirmed their expectation that prices would be established in accordance with the AEEG Resolution which promised to establish prices to ensure the economic survival of qualifying plants "even in case the market prices were to fall significantly."[838]

622.  The Claimants say that the Respondent's "unexpected" and "drastic" decrease of the MGP to €38 in 2014, and its effective elimination of the Regime entirely for their plants, breached both the purpose of the Regime and the Claimants' legitimate expectations.[839]

623.  It is undisputed between the Parties that the purpose of the Off-Take Regime when it was originally introduced by the AEEG was to cover the relatively higher operating overhead that smaller facilities experience and to ensure their survival by ensuring a minimum level of remuneration independent of the electricity market.[840] However, the Parties dispute what

---

[836]    Claimants' Memorial, ¶¶ 315-316; Claimants' Reply, ¶¶ 460, 464-465.

[837]    FTI Q2, ¶ 5.19.

[838]    Claimants' Memorial, ¶ 317.

[839]    Claimants' Memorial, ¶ 317; Claimants' Reply, ¶¶ 464-465.

[840]    *See* Counsel for the Claimants' opening statement during the Hearing (Hearing Transcript, Day 1, 15:2-7, 15:12-16); Respondent's Counter-Memorial, ¶ 347.

items should be included in considering what the Claimants' plants' costs are and whether or not the MPG set by Italy from 2014 onwards was adequate to cover those costs.

624.  The Politecnico Report, on which Italy relied in deciding to reduce the MGP, assessed the average operating costs of electricity production from renewable sources with capacity up to 1 MW by reference to the Levelized Operating Cost of Electricity, or "LOCOE." The Politecnico Report states that the MGPs are "aimed at the recovery of operating costs, maintenance and fuel, where applicable, but not investment costs" (namely, plant development costs related to all phases from initial planning and diligence through permitting to construction and connection of the plants to the grid).[841] Although the Report considered several categories of costs,[842] FTI states that Politecnico did not include all costs that PV plants incur, such as management services or leasing the land on which the plant is situated.[843] In one example, FTI estimates that the Politecnico's analysis represents less than half of that plant's total cash costs.[844] FTI further points out that the Politecnico Report does not state the total number of plants included in the dataset and that it is unclear whether its statistics are for particular or multiple plants; if individual plants, FTI says the data represents, at most, 16 plants from 2007-2013.[845] FTI concludes that the Politecnico Report does not demonstrate a clear decrease in operating costs over time, which is important when considering Italy's argument that the MGP had to be readjusted to account for the significant fall in operating costs over time.[846] Even if operating costs had declined over time for the Claimants' existing plants, there would not be an economic justification for reducing the MGP because older plants would not necessarily have benefitted from

---

[841]   Second FTI Regulatory Report ("**FTI R2**"), ¶¶ 5.7-5.8, citing *Politecnico di Milano* – Energy Department, "Renewable energy sources based electricity production costs" (July 2013) ("**2013 Politecnico Report**"): FTI-240, p. 4 (English version is available as C-384).

[842]   The seven categories of costs considered were: personnel, ordinary maintenance, extraordinary maintenance, insurance, waste disposal, local taxes and IMU charges: FTI Q2 ¶ 5.14; FTI R2, ¶ 5.8, citing 2013 Politecnico Report: FTI-240 / C-384, p. 5.

[843]   FTI R2, ¶ 5.21.

[844]   FTI Q2, ¶ 5.16 and p. 44 (Table 5-1: Operating costs of Carlino 1, 2015).

[845]   FTI R2, ¶ 5.9, 5.11.

[846]   FTI R2, ¶ 5.10.

such trend without newer technology and, in any event, the Claimants were locked into long-term Operating and Maintenance agreements.[847]

625.   As will be discussed further under the quantum analysis, below, the Claimants allege that the Respondent's breaches flowing from the change in the MGP amounts to a reduction in the value of their investments of €4.8 million (presumably over the 20 year duration of the *Conto* incentive regime, although the Claimants do not directly state for how many years they expected the MGP to remain between €72 and €106 per MWh on the basis of the 2007-2013 MGP).[848] The Claimants also say that the additional revenues that would have been earned by their plants which originally benefitted from the MGP scheme in 2014, if the Respondent had not reduced the MPG and eliminated it for the Claimants' plants, after tax, is €810,123.[849]

*(ii) The Respondent's Arguments*

626.   The Respondent denies that any legitimate expectations in the Claimants could arise from the Off-Take Regime. It says, in the first place, that the primary legislation, Legislative Decree No. 387/2003 and Law No. 39/2004, created a broad framework for an Off-Take Regime and did not refer in any way to a favourable mechanism such as MGPs. According to the Respondent, no legitimate expectation could arise from the primary legislation set out in an autonomous regulation adopted by the AEEG.[850]

627.   The Respondent contends that only AEEG Resolution No. 280/2007 is relevant for assessing Claimants' expectations, because it was adopted one year before the beginning of their Investments.[851] The Respondent relies on the provision of Resolution No. 280/2007 which states that the MGPs are determined yearly by the AEEG for its argument

---

[847]    FTI R2, ¶ 5.12.

[848]    *See* FTI Q2, ¶¶ 1.35 (Table 1-1), 5.2, 6.5 (Table 6-2); FTI Presentation, Slide 11.

[849]    FTI Q1, ¶¶ 6.29 (Table 6-3), 6.31 (Table 6-5).

[850]    Respondent's Counter-Memorial, ¶¶ 599-602, citing Legislative Decree No. 387/2003: C-036. Art. 13; Law No. 39/2004: C-380, Art. 4(1).

[851]    Respondent's Counter-Memorial, ¶ 604; AEEG Resolution No. 280/2007, Annex A: C-382A, Art. 7, which updated AEEG Resolution No. 34/2005: C-381.

that the Claimants cannot have expected that such power would be exercised by the AEEG without modifying the incentive scheme.[852]

628.  Further, since the AEEG simply determined the modalities of the Off-Take regime in accordance with legislation, the Respondent argues that there can be no basis for any legitimate expectation arising from the AEEG Resolution.[853] The Respondent says that Resolution No. 280/2007 reshaped the Off-Take regime and introduced some crucial modifications regarding MGPs before the Claimants made their investments. That Resolution provided for the yearly determination of the MGPs by the AEEG and did not provide any limits or ranges on the definition of minimum prices.[854]

629.  The Respondent goes on to argue that the reference in the preamble of AEEG Resolution No. 280/2007 to "ensur[ing] the economic survival of smaller plants, even in case the market prices were to fall significantly" did not limit the power or authority to determine minimum prices. In any event, the Respondent says that "economic survival" of smaller plants would not grant a right to a high enduring profitability.[855] The Respondent asserts that Resolution No. 280/2007's preamble refers to the "economic survival" of smaller plants, and argues that "the 2013 reform" "well grants such a minimum level of prices."[856]

630.  The Respondent also contends that a trend in the MGP is not sufficient to create an expectation regarding their maintenance over time. Specifically, the Respondent contests the Claimants' assertion that the AEEG's maintenance of the MGPs between €72-106 per MWh for six years (2008-2013) gave rise to an expectation that the Prices would be more or less "within that range" in subsequent years.[857] The Respondent argues that this period of time can neither be relied on "for a basic representation of future scenarios," nor can it

---

[852]    Respondent's Counter-Memorial, ¶¶ 605-606.

[853]    Respondent's Counter-Memorial, ¶¶ 599-602.

[854]    Respondent's Counter Memorial, ¶ 605.

[855]    Respondent's Counter-Memorial, ¶¶ 607-609.

[856]    Respondent's Counter-Memorial, ¶¶ 608-609. The Respondent is presumably referring to the *Destinazione Italia* Decree (AEEG Resolution No. 618/2013 and Law Decree No. 145/2013).

[857]    Respondent's Counter-Memorial, ¶¶ 610-611, citing Claimants' Memorial, ¶ 316.

"create an expectation regarding their maintenance prices over time."[858] The Respondent submits that this is particularly the case given the "incongruity regarding the time the investments were made" (2008-2010).[859] It also notes that AEEG's Resolution 280/2007 came into effect in 2008 and that the Claimants' investments occurred in the 2008-2010 timeframe.

631. Italy's position is that the MGPs "represents a duplication of the [*Conto Energia* Decrees] incentive" and that Italy made clear that the MGPs "could be amended."[860] The Respondent says that the calculation of MGPs under the Resolution 280/2007 included the possibility that the prices determined by the AEEG could be lower than market prices. As a result, the regulation implied that in future, the AEEG could reduce the minimum price on the basis of a decrease in the operational costs of the PV plants. The Respondent points out that the underlying regulatory framework therefore does not create an expectation of a stable MGP trend over time.[861]

632. The Respondent also denies that its regulatory framework provided any basis for an expectation that MGPs would continue to be available in addition to incentive tariffs for medium and large PV plants with a capacity of more than 100 kWh. The Respondent says that the fact that this had occurred for some years does not provide a basis to find that a rule permitting this existed.[862]

633. In any event, the Respondent says that its measures were reasonable and consistent with the legislative framework. The Respondent asserts that the MGPs had originally been fixed on a temporary basis pending an accurate determination of operational costs of small plants.[863] Further, the Respondent says that it undertook a consultation process in which it shared its analysis of costs with the market and commissioned a report from *Politecnico di*

---

[858]     Respondent's Counter-Memorial, ¶¶ 610-613.

[859]     Respondent's Counter-Memorial, ¶ 612: Claimants lack "a minimum period of time on which a careful investor could have made some general representations regarding the possible future amount of such tariffs, based on a consolidate [*sic*] trend."

[860]     GRIF Presentation, Slide 34.

[861]     Respondent's Counter-Memorial, ¶¶ 614-619.

[862]     Respondent's Counter-Memorial, ¶¶ 620-622.

[863]     Respondent's Counter-Memorial, ¶¶ 383-391; Respondent's Rejoinder, ¶ 409.

*Milano* on production costs, which indicated that there had been a reduction in operating costs. As a result, the AEEG determined it was appropriate to adjust the Off-Take Regime. The Respondent says that it consulted the market at a first stage in order to collect data which were then used for the preparation of the Politecnico Report which was then the subject of a further consultation.[864] The Respondent notes that the Claimants did not raise any criticisms on the Politecnico Report at the time.

634.    With respect to the termination of the right to obtain both incentive tariffs and MGPs, the Respondent notes that this did not affect plants with a capacity of less than 100 kWh, which are smaller PV plants. Therefore, the Respondent says that its actions were consistent with the legal rationale of the minimum prices regime.[865]

635.    The Respondent's quantum experts, GRIF, assert that the Claimants' purported expectation that the MGPs would remain stable at approximately €79/MWh, "before they are differentiated based on the actual operating costs incurred by each specific renewable source, is completely specious and unjustified." GRIF's position is that Italy's intention "has always been to align these schemes with market parameters."[866] In this regard, the Respondent argues that Resolution No. 280/2007 explicitly foresees the possibility that the MGPs determined by the AEEG would be lower than market prices.[867]

---

[864]    Respondent's Rejoinder, ¶¶ 410-412.

[865]    Respondent's Counter-Memorial, ¶ 633; Respondent's Rejoinder, ¶¶ 453-462. In response to the Claimants' reliance on a statement made by the then-President of the AEEG, the Respondent says that it is simply relevant as a political opinion expressed during the parliamentary discussions and does not affect the validity and effects of Legislative Decree No. 145/2013 (the *Destinazione Italia* Decree): *see* Respondent's Counter-Memorial, ¶¶ 634-635. The Respondent also says that the *Destinazione Italia* Decree was the product of a long period of discussions and analysis starting with the *Romani* Decree in 2011. This, it says, shows the careful consideration of the underlying data that led to the adoption of the *Destinazione Italia* Decree. The Respondent also addresses each of the Claimants' arguments based on transparency and consistency and good faith, as well as the Claimants' claims based on breach of the ECT's Impairment Clause and Umbrella Clause. These arguments are addressed below in the relevant sections of the Award.

[866]    GRIF Q1, p. 54; GRIF Presentation, Slide 28.

[867]    Respondent's Counter-Memorial, ¶¶ 614-615. *See also* AEEG Resolution No. 280/2007, Annex A: C-382A, Art. 7(4): "if, at the end of each calendar year, the product between the guaranteed minimum price and the amount of electricity referred to them is less that the product between the prices referred to in Article 6 and the same amount of electricity, the GSE recognizes, as adjustment, the prices referred to in Article 6."

636.    GRIF underscores in its reports and hearing testimony that the MGPs were "not an unexpected measure" and that, in fact, the "signals of a need to revise the [MGP] scheme were present since 2003" and evolving ever since.[868] GRIF states that, since 2007, investors knew that the MGPs would be changed and become less profitable, as set out in AEEG Resolution No. 280/2007.[869] Citing the Purchase and Sale Agreements for Claimants' Carlino plants, which state that the MGP are "legally regulated by the AEEG (Italian authorities for gas and energy), but this amount is not guaranteed for 20 years," GRIF testified that "everyone was clear that [the MGP] was not a measure destined to last further."[870]

*(iii)The Tribunal's Analysis*

637.    The background and development of the Off-Take Regime is complex. The legislation and relevant decrees are separate from the *Conto Energia* regime. Further, they do not set a specific MGP nor do they set a term over the course of which the MGP would be paid. Rather, the MGPs are calculated and adjusted on an annual basis and the Off-Take Agreements with the GSE were for one-year terms (albeit automatically renewable). In addition, Article 16 of the Off-Take Agreement provides that the GSE retains the right to modify the provisions of the Agreement consistent with any modifications and integrations made to AEEG Resolution No. 287/2007, which signals the risk that the MGPs could be unilaterally changed. Relevant to the facts of this case, MGPs had been paid for approximately six years, including for two to three years after the Claimants invested.

638.    However, the Tribunal agrees with the Respondent that a trend in the MGP from 2007 through 2013 is not sufficient to create an expectation regarding its maintenance over time. There was no specific commitment regarding the MGP amount or duration in AEEG Resolution No. 280/2007, nor in the *Conto Energia* Decrees or otherwise. Thus, in the circumstances, the Tribunal finds that the Claimants had no legitimate expectation that the MGP would continue at a certain level or at all. The Claimants' complaints that the changes

---

[868]    Hearing Transcript, Day 4, 721:4-9.

[869]    AEEG Resolution No. 280/2007, Annex A: C-382A; GRIF Q1, § 6, p. 45; GRIF Presentation, Slide 25.

[870]    Hearing Transcript, Day 4, 722:14-15; GRIF Presentation, Slide 25.

related to the MGPs also breached the Respondent's obligations under the impairment clause of the ECT will be discussed further below.

### e.  Conclusions on Legitimate Expectations (FET) Claims

639. In summary, the majority of the Tribunal finds that the Respondent created a legislative scheme to incentivize private investment in its renewable energy sector that may not have otherwise happened on a timeframe consistent with its EU obligations. The evidence established that these incentives were necessary to attract investment, as the technology had not yet developed to a point where it could compete with traditional energy sources – both upfront investment costs and operating expenses were high. Italy created the *Conto Energia* regime, which established specific FITs for plants that met certain criteria. This regime was augmented by the MGP mechanism and Off-Take Agreements, which provided further support for smaller producers whose operating costs were expected to be high.

640. It was established that it was on the basis of this regime, as a whole, that the Claimants decided to make their investments. To this stage, the majority's analysis has focused on what was objectively reasonable for the Claimants to expect in light of the circumstances that existed at the time that they made their investments in Italy's developing PV sector.

641. The majority of the Tribunal has found that the *Conto Energia* regime created a legitimate expectation that investments that were made in accordance with the specific timing and criteria of each *Conto* would qualify for the corresponding tariffs set out in the legislation for the expected life of the investment. The subsequent GSE Agreements entered into with each individual investment confirmed the tariff rates. The GSE Agreements, which came after the investments were already made, did not themselves create the expectation that the tariff rates would remain unchanged, but they are contemporaneous evidence that the expectation created by the legislation was a legitimate one.

642. Pursuant to the incentive system established by Italy, each investor generally and the Claimants specifically were left to determine whether to make their investments in Italy (or invest their money elsewhere) based on their own assessment of the expected rate of return in light of their expected costs. Italy did not guarantee investors a specific rate of

return. Instead, it guaranteed a specific FIT for a fixed period of time. The *Spalmaincentivi* Decree, which later reduced those tariffs, constituted a breach of the ECT toward the Claimants.

643. With respect to the other Challenged Measures, the Tribunal has found that the Claimants have not established that it was legitimate for them to expect that those incentives would be maintained for the life of their investments. In the majority's view, unlike the tariff rates, there was no specific promise made by Italy that they would be fixed at a certain level for a specific period of time.

644. For the avoidance of doubt, in accordance with the submissions made by the Parties, the majority of the Tribunal has specifically considered the approach of the *SunReserve v. Italy* tribunal with respect to FET under the ECT. The majority of the Tribunal agrees with that tribunal's formulation of the role of legitimate expectations in evaluating whether there has been a breach of FET:

> [T]here are broadly three questions to be answered as part of this examination: (a) whether the investors in the case had any expectations based on any conduct of the host State and if so, whether these expectations were legitimate; (b) whether the investors relied on these expectations to make their investments in the host State; and (c) whether the host State by its subsequent conduct frustrated these expectations. If any of these three questions is answered in the negative, the investors' claim for breach of the FET obligation fails.[871]

645. However, the majority of the Tribunal has reached a different conclusion in its application of this summary of the law to the facts. In the majority's view, the evidence in this case established that the Respondent breached its obligation to provide FET to the Claimants' investments. First, by establishing the *Conto Energia* regime and, in particular, providing that the FITs "shall remain constant in current currency for the entire twenty year period," the Respondent created the legitimate expectation that investors who met the requirements under the relevant *Conto Energia* Decree would, in fact, be entitled to receive the corresponding FIT rate for the duration of their investment. Second, the Claimants in this case established that they relied on those expectations in making their decisions to invest. Third, the Respondent's subsequent reduction of the FITs through the *Spalmaincentivi*

---

[871] *SunReserve*: RL-029, ¶ 695.

Decree frustrated these expectations. It follows that the Claimants' claim for breach of the FET obligation as it relates to the *Spalmaincentivi* Decree succeeds. **Arbitrator L. Boisson de Chazournes** disagrees with the manner according to which the extent of the investors' legitimate expectations have been appraised by the majority. A balancing and weighing exercise should have been conducted in light of the specific circumstances and facts of the present case. She does not consider that the applicable regulation in Italy can be construed as "specific assurances" of immutability. The *Conto Energia* Decrees could not create the legitimate expectation that the tariffs and the payment terms would remain "constant" for the duration of the 20-year term.

646.    The Claimants also claim that the Challenged Measures violate other provisions of the FET. The following sections of this award will address these claims.

## C.    TRANSPARENCY AND CONSISTENCY (ISSUE 4.1(C))

### (1)    The Claimants' Arguments

647.    The Claimants maintain that the Challenged Measures also breached the Respondent's obligation under Article 10(1) of the ECT by failing to treat their investments transparently and consistently. The Claimants say that this obligation is separate and in addition to the obligation to respect an investor's legitimate expectations.[872]

648.    The Claimants say that Article 10(1) of the ECT requires states to "encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make investments in its Area." Referring to the decision in *LG&E v. Argentina*, the Claimants say that FET "consists of the host State's consistent and transparent behaviour, free of ambiguity, that involves the obligation to grant and maintain a stable and predictable legal framework."[873]

---

[872]    Claimants' Memorial, ¶¶ 320-323; Claimants' Reply, ¶¶ 369-372.

[873]    Claimants' Memorial, ¶ 321, citing *LG&E v. Argentina*: CL-065, ¶ 131.

### a. *Spalmaincentivi Decree*

649.  The Claimants say that the reduction of the *Conto Energia* tariffs under the *Spalmaincentivi* Decree was inconsistent with the transparent framework that had been developed, promoted and granted to the Claimants' investments. They contend that the Respondent replaced what was once a stable, transparent regime with uncertainty that undermined the Claimants' economic expectations when they decided to invest. The Claimants argue that for several years, the Respondent made repeated commitments of fixed tariffs for 20 years so that investors could help to develop its PV sector and reach its EU targets for renewable energy. However, once those targets were met, and the Claimants' investments were sunk, the Respondent changed its policies and reduced the specific tariffs that had induced their investments. According to the Claimants, the *Spalmaincentivi* Decree constitutes inconsistent treatment that violates the FET standard.

650.  Further, the Claimants say that if the Respondent knew that it could or would reduce the tariffs it had granted for 20 years at a fixed rate, despite its repeated commitment that the tariffs would remain constant for 20 years, then the Respondent was not treating investors transparently.[874]

### b. *Administration Fee and Imbalance Costs*

651.  The Claimants say that the imposition of the Administration Fee and Imbalance Costs to all of their PV plants was inconsistent with the transparent framework that had been developed, promoted and granted to the Claimants' investments. The Claimants say that guaranteeing the tariffs in the *Conto Energia* Decrees, and then arguing that the Administration Fee and Imbalance Costs were implicitly authorized all along, violates any reasonable notion of transparency. Further, the addition of these charges demonstrate that additional fees could be added by the Respondent without limit, thereby further substantially reducing the value of the *Conto* tariffs.[875]

---

[874]    Claimants' Reply, ¶¶ 371-372.

[875]    Claimants' Reply, ¶ 504. The Claimants also argue that imposing the costs on the Claimants' PV plants amounts to inconsistent treatment since the charges had not been imposed in previous years (from 2010 to 2012). For

### c.   MGP / Off-Take Regime

652.   The Claimants advance the same arguments as above in respect of the Off-Take Regime and the MGP. In violation of the duty to provide consistency and transparency, the Claimants say that for a number of years, the AEEG consistently established the MGP at a range of between €72 and €106 per MWh of electricity produced. Then, in 2014 the Respondent changed course and set the MGP well below market prices of €38. The Claimants also say that two of the Respondent's entities, the AEEG and the Government took conflicting positions regarding the support for PV facilities and the Off-Take Regime.[876]

### (2)    The Respondent's Arguments

653.   Although the Respondent does not accept that an independent duty to act transparently and consistently exists under the obligation to grant FET, it addresses the Claimants' arguments on the basis presented by the Claimants.[877]

---

similar reasons, the Claimants argue that the imposition of the charges amount to a lack of good faith since their investments were sunk at the time they were made and the Claimants cannot take measures to mitigate the harm caused by the additional charged. *See* Claimants' Reply, ¶ 505. In addition, the Claimants also argue that the additional charges violated the ECT's Impairment Clause and the Umbrella Clause. *See* Claimants' Reply, ¶¶ 506-507.

[876]    Claimants' Memorial, ¶¶ 225-233, 326. The Claimants say that the AEEG established the reduced MGPs in Resolution No. 618/2013 for all eligible PV facilities, but that a few days later, the *Destinazione Italia* Decree abolished the MGPs for any PV facility that also received *Conto Energia* tariffs. The Claimants say that in addition to reversing its consistent MGP policy of 6 years, the Respondent no longer had a consistent, coherent policy regarding MGPs. The Claimants note that the President of the AEEG requested the cancellation of the provision of the *Destinazione Italia* regarding MGPs on the basis that it would neutralize the goals for which the MGP had been introduced. Nevertheless, the provision of the *Destinazione Italia* was implemented, with only an exception of PV plants with a capacity below 100 kW.

[877]    Respondent's Counter-Memorial, ¶¶ 637-646. The Respondent addresses the cases referred to by the Claimants and maintains that these all relate to the concept of legitimate expectations. According to the Respondent, the only relevance of consistency is when assessing the legitimacy of a host state's conduct with respect to an existing investor's expectations. Also according to the Respondent, the concept of consistency related to the broader concept of reasonableness. In this regard, it refers to the authority cited by the Claimants, *Mamidoil v. Albania*, where the tribunal defined inconsistency as a state's ability "to exercise its sovereign power in a way that deviates unreasonably from its previous conduct." *See* Respondent's Rejoinder, ¶¶ 349-350, citing *Mamidoil Jetoil Greek Petroleum Products Société S.A. v. Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015: CL-180, ¶ 706.

### a. *Spalmaincentivi Decree*

654. The Respondent argues that the *Spalmaincentivi* Decree was a public act fully accessible and enacted by due process of law. Accordingly, the Respondent says that it fully respected the concept of transparency.[878]

### b. *Administration Fee and Imbalance Costs*

655. The Respondent's position is that each of the Challenged Measures was reasonable and adopted consistently with its legislative and regulatory framework.[879]

### c. *MGP / Off-Take Regime*

656. With respect to the Claimants' allegations regarding consistency and transparency, the Respondent refers to its submissions in respect of the Claimants' alleged legitimate expectations, which it says demonstrate that the measures modifying the MGP were totally consistent with the framework of primary rules which had created the regime and were coherent with previous AEEG decisions.[880]

### (3)    The Tribunal's Analysis

657. While the Tribunal agrees that the language of Article 10(1) of the ECT indicates that "transparency and consistency" could engage different aspects of the obligations to treat investments fairly and equitably, it does not agree that the Claimants have demonstrated that Respondent's acts engage those obligations. The majority of the Tribunal has already found that with respect to the *Spalmaincentivi* Decree, the Respondent breached its obligation to treat Claimants' investments fairly and equitably. The Claimants' complaints regarding transparency and consistency relating to the *Spalmaincentivi* Decree have been addressed within the majority's analysis on the Claimants' legitimate expectations. The *Conto Energia* regime was a transparent regime established to attract investment. In passing the *Spalmaincentivi* Decree, the Respondent was acting transparently, but in doing so, it violated the Claimants' legitimate expectations based on the *Conto Energia* regime.

---

[878]    Respondent's Rejoinder, ¶¶ 351-352.

[879]    Respondent's Counter-Memorial, ¶ 648; Respondent's Rejoinder, ¶ 351.

[880]    Respondent's Counter-Memorial, ¶ 648.

It follows that in passing the *Spalmaincentivi* Decree and reducing tariffs for existing investments contrary to the Claimants' legitimate expectations, Italy's treatment of the Claimants' investments was also inconsistent.

658.    With respect to the Administration Fee, Imbalance Costs, MGP and Off-Take Regime, the Tribunal has found that the Respondent's changes to those aspects of the regime did not violate the Claimants' legitimate expectations. Accordingly, regarding these other measures, the Claimants' complaints related to transparency and consistency must be considered more generally. The complaint is not that each measure was not transparent. The complaint is that these measures, in the context of the entire regulatory regime established to attract investment, were not transparent or consistent, as they eroded the value of the tariffs granted to investors and upon which their decisions to invest were based. The Tribunal finds that, in the absence of specific commitments with respect to future Administration Fee, Imbalance Costs, MGP or the Off-Take Regime, the Respondent did not breach its obligations of transparency and consistency through these measures. Without a specific guarantee that these costs, which both parties accept were foreseeable, or additional incentives would remain constant for any length of time, the Tribunal finds that it was not a breach of the Respondent's obligations of transparency or consistency to adjust its regime in this way. The Claimants' complaints as to erosion of the value of their investment through these indirect measures are more appropriately dealt with in the context of their other claims. These will be addressed further in the following sections.

## D.    THE DUTY OF GOOD FAITH (ISSUE 4.1(D))

### (1)    The Claimants' Arguments

659.    The Claimants allege that the Respondent's measures also breached the autonomous element of FET treatment to treat investors in good faith.[881] The Claimants say that the duty of good faith is at the heart of the concept of FET and entails a sincere intention to deal fairly with investors.

---

[881]    Claimants' Memorial, ¶¶ 329-337; Claimants' Reply, ¶¶ 373-375.

660.    The Claimants submit that the Respondent's decision to attract and accept the benefits of the PV plants and the capacity that the Claimants developed, while denying them the full, originally promised benefits of the *Conto Energia* scheme upon which they relied in making their investment, was not in good faith. The Claimants say that at the time the Challenged Measures were adopted, they had already sunk their investment costs and could not feasibly relocate their PV facilities.

### a.    Spalmaincentivi Decree

661.    The Claimants maintain that the Respondent's justification for the remodulation of the *Conto Energia* tariffs through the *Spalmaincentivi* Decree, to bring down the cost of electricity for end-users, was not a good faith reason or excuse for changing the rules. The Claimants point to statements by GSE's CEO that the burden on end-users to cover the cost of the incentive was acceptable because the cost to the average consumer for the overall support scheme of renewables was minimal.[882] In addition, the Claimants say that the *Spalmaincentivi* Decree targeted and affected only the PV sector and did not produce any meaningful savings.[883]

### b.    Administration Fee and Imbalance Costs

662.    The Claimants also argue that the application of the Administration Fee and Imbalance Costs was contrary to the original commitment of fixed tariffs for 20 years, and thus was not in good faith.[884]

### c.    MGP / Off-Take Regime

663.    The Claimants advance the same arguments as above in respect of the Off-Take Regime and the MGP. The Claimants say that although Italy recognized the need to ensure the economic survival of small PV plants under 1 MW with MGPs, it substantially and

---

[882]    *See* Claimants' Memorial, ¶ 332 and the sources cited therein. The Claimants also point to a statement that the *Conto Energia* regime created jobs and justified the additional cost: GSE Managing Director's interview in: Economy: *il business magazine di Mondadori*, Interview with N. Pasquali, "In 2010, photovoltaics could double," 13 May 2010: C-142. In addition, the Claimants noted declarations made by certain senators warning that investors would challenge the Decree as violating international law: Claimants' Memorial, ¶ 334.

[883]    Claimants' Memorial, ¶ 333, citing FTI Q1, ¶ 7.12; Claimants' Reply, ¶ 374.

[884]    Claimants' Memorial, ¶ 335.

arbitrarily reduced the prices and then effectively ended the regime for all of the Claimants' PV facilities, which violated the duty of good faith under Article 10(1) of the ECT's FET standard.[885]

### (2)    The Respondent's Arguments

664.    The Respondent contests that the concept of good faith constitutes an autonomous duty within the FET standard, as argued by the Claimants.[886] On the merits of whether the Challenged Measures violated any duty of good faith, the Respondent relies on its submissions with respect to the alleged infringement of the Claimants' legitimate expectations, set out above.[887]

### a.   *Spalmaincentivi Decree*

665.    The Respondent says that the *Spalmaincentivi* Decree was reasonable in its aim to maintain a sustainable system of incentives and to ensure "an equitable remuneration of the costs of investment and operation" of PV facilities.[888] Italy also denies that the declarations of certain politicians which warned that the Decree would spawn a backlash from investors, referred to by the Claimants, do not alter or contradict the legal background of the incentive regime set out in the *Conto Energia* Decrees. Further, for the Respondent, the various statements made by the head of the GSE in 2010 explained the reasonableness and legitimacy of the public policy goals underlying the *Spalmaincentivi* Decree.

### b.   *Administration Fee and Imbalance Costs*

666.    The Respondent denies that the Administration Fee and Imbalance Costs are related to, or constitute a means of indirectly reducing, the incentive tariffs as regulated by the *Conto Energia* Decrees. In any event, the Respondent says that the Administration Fee was

---

[885]    Claimants' Memorial, ¶ 335.

[886]    Respondent's Counter-Memorial, ¶¶ 501, 660-674.

[887]    Respondent's Counter-Memorial, ¶¶ 675-680.

[888]    Respondent's Counter-Memorial, ¶ 677, citing Legislative Decree No. 387/2003: C-036, Art. 7.

intended to compensate for the costs of management, verification and control service by the GSE.[889]

667.    The Respondent maintains that the violation of the requirement of good faith as part of the FET standard requires proof of serious behaviour in bad faith. The Respondent says that there can be no allegation that it failed to alert the Claimants of the *Spalmaincentivi* Decree, which was openly published and was intended to implement the EU renewable framework. Accordingly, the Respondent says that the Claimants have failed to prove any sort of concrete bad faith against it.[890]

### c.  MGP / Off-Take Regime

668.    With respect to the Claimants' allegations regarding the duty of good faith, the Respondent refers to its submissions in respect of the Claimants' alleged legitimate expectations, which it says demonstrate that the measures modifying the MGPs were totally consistent with the framework of primary rules which had created the regime and coherent with previous AEEG decisions.[891]

### (3)    The Tribunal's Analysis

669.    As the majority of the Tribunal has found a breach of the FET obligations related to the *Spalmaincentivi* Decree, there is no need to address good faith as a separate component with respect to those measures.

670.    With respect to the Administration Fee, Imbalance Cost, MGP and Off-Take regime, the Tribunal has carefully considered the Claimants' arguments that these measures breached the Respondent's good faith obligations under the ECT. Again, while it could be possible for measures to breach good faith obligations independent from a breach of FET through legitimate expectations, the Tribunal is not satisfied that these circumstances arise in this case. There was no evidence that the Respondent's intention in passing the measures was to undo all of the benefits of the Claimants' investments, as alleged. The Tribunal accepts

---

[889]    Respondent's Counter-Memorial, ¶¶ 677-680.
[890]    Respondent's Rejoinder, ¶¶ 354-355.
[891]    Respondent's Counter-Memorial, ¶ 648.

that the Respondent's intention in passing the measures related to revisiting the system in light of developments in the market, balancing the interests of various stakeholders in the system and complying with its obligations to the EU. A state's obligations of good faith must be assessed in the context of a state's function, which includes regulating in areas where there are competing interests. In short, the Respondent was not acting in bad faith in passing the Challenged Measures. Again, the Tribunal is of the view that any issues relating to the impact on the value of the Claimants' investments arising from the Respondent's transparent measures passed in good faith are more appropriately dealt with in the context of the Claimants' other claims.

### E.   UNREASONABLE OR DISCRIMINATORY MEASURES AND THE IMPAIRMENT CLAUSE (ISSUE 4.2)

671.   The Claimants contend that each of the Challenged Measures also breaches the Impairment Clause contained in Article 10(1) of the ECT, which reads as follows:

> Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.[892]

### (1)   The Claimants' Arguments

672.   The Claimants submit that the requirement not to impair investments by unreasonable or discriminatory measures is a separate, standalone obligation. Although there may be some overlap between the impairment and FET standards, the two obligations give rise to separate claims which require independent analysis. The Claimants maintain that, in fact, the Challenged Measures offend both the FET standard and the Impairment Clause.[893]

673.   The Claimants contest the Respondent's position that the impairment in question must be significant in order violate Article 10(1) of the ECT.[894] According to the Claimants, the case law sets out a low threshold for the requisite impact on an investment, as evidenced

---

[892]   ECT: C-001, Art. 10(1). The Claimants do not advance a claim relating to the first part of the sentence addressing constant protection and security. Rather, they rely on the second half of the clause.

[893]   Claimants' Reply, ¶¶ 357-384.

[894]   Claimants' Memorial, ¶ 379, citing Respondent's Counter-Memorial, ¶ 690.

by the word "any" impairment in Article 10(1) of the ECT.[895] The Claimants argue that interpreting the clause to encompass only large or significant impairments would distort the meaning of the clause.[896] In addition, the Claimants argue that the use of the disjunctive "or" in the third sentence of Article 10(1) indicates that either unreasonable or discriminatory measures will violate the obligation.[897] Whether the Tribunal finds the Challenged Measures unreasonable or discriminatory (or both), the Claimants assert that the measures violate the ECT's Impairment Clause.[898]

674.    The Claimants focus on the alleged unreasonableness of the Challenged Measures.[899] The Claimants say that a measure is unreasonable if it is taken without due consideration of the potential negative effects it will have on foreign investors.[900] In this regard, the Claimants rely on *LG&E v. Argentina* for the proposition that a state's rational decision-making process "would include a consideration of the effect of a measure on foreign investments and a balance of the interests of the State with any burden imposed on such investments."[901] Further, the Claimants say that the reasonableness of a measure must be judged from the standpoint of the parties' expectations at the time of the decision to invest rather than what the state may have subsequently and unilaterally viewed as "reasonable" from a policy perspective.[902] In support, the Claimants refer to *BG Group v. Argentina*, where the tribunal held that the withdrawal of assurances given in good faith to investors to induce investments violated their legitimate expectations and was "by definition unreasonable and a breach of the treaty."[903]

675.    The Claimants say that each of the Challenged Measures violated the impairment clause since they were clearly unreasonable and impaired the Claimants' investments.[904] They say

---

[895]    Claimants' Memorial, ¶ 340; Claimants' Reply, ¶ 376.

[896]    CPHB, ¶ 110.

[897]    Claimants' Memorial, ¶ 340.

[898]    Claimants' Memorial, ¶ 340; Claimants' Reply, ¶ 384.

[899]    Hearing Transcript, Day 4, 865:17-21.

[900]    Claimants' Memorial, ¶ 341.

[901]    Claimants' Memorial, ¶ 341, citing *LG&E v. Argentina*: CL-065, ¶ 158.

[902]    Claimants' Memorial, ¶ 342, citing *BG Group v. Argentina*: CL-081, ¶¶ 342, 344.

[903]    Claimants' Memorial, ¶ 342, citing *BG Group v. Argentina*: CL-081, ¶¶ 342-346.

[904]    Claimants' Reply, ¶¶ 376 *et seq*.

that these measures violated the basic premise behind the incentive support schemes, which had been enacted specifically to encourage investment in a sector defined by significant upfront costs and developing technology, and thus were designed to ensure revenue streams for PV investors for a fixed duration due to their inability to compete with traditional energy producers without such support. According to the Claimants, the Challenged Measures were adopted for the political motivation of a new administration. The Claimants say that the Respondent gave no sound justification for any of the Challenged Measures. Further, the Respondent had no regard for the financial impact of its Measures on PV producers such as the Claimants.[905]

### a. *Spalmaincentivi Decree*

676. The Claimants allege that the *Spalmaincentivi* Decree violates the Respondent's obligation not to impair the management, maintenance, use, enjoyment, or disposal of an investment by unreasonable or discriminatory measures.[906] The Claimants argue that in determining what is reasonable, it is necessary to consider the effect of the *Spalmaincentivi* Decree on investors in light of the Respondent's obligations under the ECT's Impairment Clause. The Claimants submit that Italy has not pointed to a reason for the *Spalmaincentivi* Decree's reduction of the *Conto* tariff rates that is justified in light of Italy's duty under the ECT. The Claimants aver that, even if the *Spalmaincentivi* Decree was motivated "by a vague (and unsubstantiated) need to save costs," *BG Group v. Argentina* confirms that the withdrawal of undertakings and assurances given in good faith to investors in the *Conto Energia* Decrees as an inducement to their making an investment is, by definition, unreasonable and a breach of the treaty.[907]

677. The Claimants also refer to the award in *Toto Costruzioni v. Lebanon*, which held that:

> An unreasonable or discriminatory measure is defined in this case as (i) a measure that inflicts damages on the investor without serving any apparent legitimate purpose; (ii) a measure that is not based on legal standards but on discretion, prejudice or personal preference[;] (iii) a measure taken for reasons that are

---

[905]    Claimants' Memorial, ¶¶ 343-346.

[906]    Claimants' Reply, ¶ 376.

[907]    Claimants' Reply, ¶ 381, citing *BG Group v. Argentina*: CL-081, ¶ 343.

different from those put forward by the decision maker[;] or (iv) a measure taken
in wilful disregard of due process and proper procedure.[908]

The Claimants say that the *Spalmaincentivi* Decree violates the Respondent's Impairment
Clause obligation in all of the ways set out above.[909]

678.  First, the Claimants allege that the *Spalmaincentivi* Decree inflicts damage on the
Claimants without serving any apparent legitimate purpose. The stated purpose for the
measure in end-users' electricity bills, the Claimants say that no legitimate purpose was
served and that the only effect of the measure was to inflict damage on their investments.[910]

679.  Second, the Claimants allege that the *Spalmaincentivi* Decree was not based on proper legal
standards because it violated non-retroactivity principles and targeted PV producers in a
discriminatory manner, while ignoring all of the other renewable energy players that
benefit from that system.[911] It also preferred the interests of users and other types of
renewables producers over those of PV producers. The Claimants say that this was also
discriminatory, as different sectors of the energy market were treated differently.

680.  Third, the Claimants allege that the *Spalmaincentivi* Decree is a measure taken for reasons
that are different from those put forward by the Respondent. The Claimants submit that,
contrary to the Respondent's purported motivation behind the *Spalmaincentivi* Decree –
that consumers were overburdened and needed a reprieve from the cost of the guaranteed
incentive tariffs – the measure was "simply political pandering."[912] The Claimants contend
that it is neither a legitimate purpose nor a rational policy to back out of an explicit promise
to pay funds simply because Italy developed a new policy of no longer paying those
funds.[913]

---

[908]  Claimants' Reply, ¶ 377, citing *Toto Costruzioni Generali S.p.A. v. Republic of Lebanon*, ICSID Case No. ARB/07/12, Award, 7 June 2012 ("***Toto Costruzioni v. Lebanon***"): CL-181, ¶ 157.

[909]  Claimants' Reply, ¶¶ 376-378.

[910]  Claimants' Reply, ¶ 379.

[911]  Claimants' Reply, ¶ 382.

[912]  Claimants' Reply, ¶ 380.

[913]  Claimants' Reply, ¶ 380.

681.   Finally, the Claimants argue that the *Spalmaincentivi* Decree was enacted by Italy without regard for proper procedure because it unilaterally and unreasonably modified the GSE Agreements, which required the mutual agreement of the parties.[914] The Claimants say that it was unreasonable to impose unilateral changes on the contractual relationship governing their PV facilities.

### b.   Administration Fee and Imbalance Costs

682.   The Claimants maintain that the Administration Fee and Imbalance Costs were unreasonable, and that it was unfair for the Respondent to impose them on PV investors that had invested in reliance on an incentive framework that did not include such costs.[915] The Claimants say that the Respondent must have contemplated that the GSE would incur costs in managing the *Conto Energia* system and that those costs would be paid out of the difference between the A3 charges to consumers and the tariffs it agreed to pay PV producers. Imposing those costs on producers after a number of years was an indirect way of reducing the tariff.

683.   With respect to the Administration Fee, the Claimants note that the Respondent maintains that it designed it to cover "the high costs of the public function of the general management of the system" and "in particular [the] audit and investigation" of those facilities.[916] The Claimants say that although the Respondent gives the total recorded costs of the GSE in 2013 (€36.4 million), it does not allege that the GSE had difficulty covering its costs in previous years or that its total costs had increased from previous years. Further, the Claimants say that the Respondent has not disclosed what the GSE's costs were in previous years and that there was no indication that the GSE's costs suddenly increased in 2013. The Claimants also note that the number of audits and inspections carried out in 2013 demonstrated that only 5% had resulted in a "negative outcome" for the Producer.

914   Claimants' Reply, ¶ 383; *Toto Costruzioni v. Lebanon*: CL-181, ¶ 157.
915   Claimants' Memorial, ¶ 345; Claimants' Reply, ¶¶ 494-498; Hearing Transcript, Day 4, 868:9–869:2.
916   Claimants' Reply, ¶ 496, quoting the Respondent's Counter-Memorial, ¶¶ 406.

Therefore, there was no demonstrated need for these inspections which would support the imposition of the Administration Fee.[917]

684.    In addition, the Claimants challenge the Respondent's justification for the Administration Fee that PV investors benefited from the system. They say that the public at large benefited from the PV incentives and it was because of those benefits that the Respondent had decided to design its support scheme to ensure that electricity consumers covered the costs of the PV incentives in the first place. As such, there was no reason why the consumers should not also cover the costs of managing the system, rather than the PV producers alone.[918]

685.    The Claimants advance similar arguments in respect of the Imbalance Costs. They say that imbalance costs are a known cost of any electricity system. A renewable energy support scheme can be designed to allocate imbalance costs to producers or to absorb them within the system by, for example, charging them to consumers or to other producers. The decision of whether to charge imbalance costs to renewables producers is inseparable from the level of tariff support, because if producers bear that risk, they will require additional compensation to off-set it.[919]

686.    The Claimants say that the imposition of the Administration Fee and Imbalance Costs caused a loss for each Producer with respect to the overall *Conto* incentive granted and notes that the Respondent accepts this.[920] They say that imposing these fees and costs is conceptually no different from the *Spalmaincentivi* Decree which reduced the incentive tariffs directly. The Claimants say that the imposition of these fees and costs was unreasonable and caused harm to their investments.[921]

---

[917]    Claimants' Reply, ¶¶ 496-497.

[918]    Claimants' Reply, ¶ 498.

[919]    Claimants' Reply, ¶ 499; FTI Q1, ¶ 4.13.

[920]    Claimants' Reply, ¶ 500.

[921]    Claimants' Reply, ¶ 507. The Claimants say that these measures amount to the withdrawal of the commitments given in the *Conto Energia* regime as an inducement to making their investment. As such, they are unreasonable and in breach of the Impairment Clause.

### c. *MGP / Off-Take Regime*

687.    The Claimants contend that the "leading" and "clearest" example of the Respondent's alleged violation of the ECT's impairment clause is its modification of the MGP under the Off-Take Regime.[922]

688.    The MGP was designed to address the higher operating costs of smaller plants under 1 MW and the Claimants assert that for 6-7 years they operated in a range that did in fact provide the intended protection before "Italy suddenly gutted the programme" "at a particularly opportunistic and unreasonable time" – namely, when market prices were low.[923]

689.    The Claimants argue that Italy cannot defend its new MGPs by showing that they correlate to any rational data or new policy, and thus its assertion that the reduced prices remained aimed at covering the operating costs of small PV plants is false.[924] The Claimants contend that the reduced prices were inadequate to cover their actual operating costs and, what is more, Italy excluded the Claimants' plants from the regime altogether.[925] The Respondent claims that the decrease in operating costs across the PV industry obviated the need of plants between 100kW and 1 MW to benefit from the MGP program. The Claimants counter that the Respondent has not provided evidence that this modification resulted from any decrease in the operating costs of its plants under 1 MW.[926]

690.    The Claimants further assert that Italy's fact witness, Mr. Miraglia, confirmed that the GSE does not monitor the operating costs of PV plants.[927] Therefore, Italy had no insight into whether operating costs declined, and thus its stated motivation for cancelling the Minimum Guaranteed Price program is not a rational policy.[928] The Claimants refer to the second FTI expert report, which confirms that there is no evidence of any decrease in

---

[922]    Hearing Transcript, Day 4, 869:3–870:22; Claimants' Opening Presentation, Slides 127-135; Claimants' Memorial, ¶ 345; Claimants' Reply, ¶¶ 465-467.

[923]    Hearing Transcript, Day 4, 869:10-18. *See also* Claimants' Reply, ¶ 465.

[924]    Claimants' Reply, ¶ 466.

[925]    Claimants' Reply, ¶ 466.

[926]    Hearing Transcript, Day 4, 869:20-25, 870:12-16.

[927]    CPHB, ¶ 61; Hearing Transcript, Day 3, 551:5-8; Hearing Transcript, Day 4, 870:1-2.

[928]    CPHB, ¶ 61.

operating costs and that the new Minimum Guaranteed Price of €38.9 is not sufficient to cover the operating costs of any of the Claimants' plants (even if they could still benefit from it, which they cannot).[929] According to the Claimants, the "abolition" of the Minimum Guaranteed Price program was therefore unreasonable and a violation of the ECT's impairment clause.[930]

### (2)    The Respondent's Arguments

691.    The Respondent argues that there is substantial overlap between the Claimants' claims of unreasonable or discriminatory measures and FET, particularly with respect to the legitimate expectations analysis.[931] The Respondent recalls its arguments under FET and reiterates that its measures were reasonable and were non-discriminatory, which it asserts is the key point for the concrete application of the impairment clause.[932]

692.    The Respondent contends that any impairment must be "significant" in order to violate the ECT's impairment clause, and cannot just be "any" violation as the Claimants contend.[933] The Respondent says that the meaning of "impairment" should be determined by making reference to the legal context of the clause in order to avoid that marginal negative effects suffered by a foreign investor could lead to a claim before an international tribunal.[934]

693.    The Respondent also relies on its arguments relating to the question of "reasonableness" advanced in respect of the Claimants' allegations relating to an alleged breach of their legitimate expectations. The Respondent refers to the interpretation of "unreasonable measure" provided by the tribunal in *AES v. Hungary*, which held that the following two elements must be analysed to determine whether a state's act was unreasonable: "the

---

[929]    CPHB, ¶ 61; FTI Q2, § 5, ¶¶ 5.10 *et seq*., Table 5-2.

[930]    CPHB, ¶ 61.

[931]    Respondent's Counter-Memorial, ¶¶ 685-688, 695-698; Respondent's Rejoinder, ¶ 356, 358.

[932]    Respondent's Rejoinder, ¶¶ 356, 358,

[933]    Respondent's Counter-Memorial, ¶ 690 citing *Electrabel v. Hungary* (Decision on Jurisdiction): CL-075, ¶ 7.152. The Respondent refers to a passage from the *Electrabel* award to the extent that "… a breach of this standard requires the impairment caused by the discriminatory or unreasonable measure to be significant." In contrast, the Claimants rely upon the award in *Saluka v. Czech Republic*, which states "… the term 'impairment' means 'any negative impact or effect:'" *see* Claimants' Memorial, ¶ 340, citing *Saluka v. Czech Republic*: CL-057 , ¶ 458.

[934]    Respondent's Counter-Memorial, ¶ 690.

existence of a rational policy; and the reasonableness of the act of the state in relation to the policy."[935]

### a. *Spalmaincentivi Decree*

694.    The Respondent argues that the *Spalmaincentivi* Decree was enacted for a legitimate purpose and was a reasonable measure.[936] The Respondent says that the sharp growth of PV energy production and the rapid development of technology, which was a particular characteristic of PV energy production, required it to evolve the public system of economic incentives. It says that its treatment of PV producers differed from that of other renewable energy producers because of its different characteristics. The Respondent says that discrimination cannot be proved by simply highlighting a difference between two situations which are not comparable.[937]

695.    With respect to the Claimants' contention that it disregarded proper procedure by modifying the GSE Agreements, the Respondent says that all legal procedures regarding the GSE Agreements, which are exclusively regulated by Italian law, were fully respected and that this was confirmed by the 2017 Constitutional Court Decision.[938]

### b. *Administration Fee and Imbalance Costs*

696.    The Respondent does not directly address the Claimants' allegations regarding the impairment caused by Italy's imposition of the Administration Fee and Imbalance Costs except to assert that all its measures were reasonable.[939]

### c. *MGP / Off-Take Regime*

697.    The Respondent says that because of the sharp growth of PV energy production and the rapid development of technology, Italy did not make long-term guarantees regarding the

---

[935]    Respondent's Counter-Memorial, ¶ 692, citing *AES v. Hungary*: CL-038, ¶¶ 10.3.7-10.3.9.

[936]    Respondent's Rejoinder, ¶¶ 360-361.

[937]    Respondent's Rejoinder, ¶¶ 362-363.

[938]    Respondent's Rejoinder, ¶ 365. The Respondent maintains that the point was not argued further by the Claimants and was difficult to understand. The Tribunal addresses the umbrella clause in the next section of this Award.

[939]    Respondent's Counter-Memorial, ¶¶ 675-699; Respondent's Rejoinder, ¶ 531.

MGP, and thus the MGP changes cannot be said to impair the Claimants' investments. Rather, the MGP was only valid for the one-year duration of the GSE Off-Take Agreements, which "automatically renewed only as long as no new legislation or regulations are introduced."[940] The Respondent argues that the 2013 Politecnico Report found that, compared to the production costs used for the purposes of the previous Resolution No. 103/2011,[941] the reduction to the MGP brought about by AEEG Resolution No. 618/2013 was a product of a reduction in operating costs (mainly insurance and maintenance), which is most pronounced in the case of power plants between 40 kW and 100 kW.[942]

### (3)    The Tribunal's Analysis

698.   Article 10(1) of the ECT prohibits Contracting Parties from "… in any way impair[ing] by unreasonable or discriminatory measures [an investment's] management, maintenance, use, enjoyment or disposal." Although this prohibition is found in the same article of the ECT as the FET protection, the Tribunal finds that the ECT's non-impairment clause is a separate and distinct standard of protection from FET, albeit related.[943] While conduct that breaches the FET standard will usually also breach the Impairment Clause (measures found to be unfair or inequitable will usually also be unreasonable), the converse is not necessarily true. The Impairment Clause protects against a particular type of state action. In order to receive this protection, the Claimants must demonstrate that the measures were either unreasonable or discriminatory and that they impaired the management, maintenance, use enjoyment or disposal of their investment. Thus, a two-part analysis is required. The first part focuses on the measures themselves and whether they are either unreasonable or discriminatory. If they are found to be either unreasonable or discriminatory, then an impairment must be shown. At that stage, the ECT's clear language provides that any impairment will be sufficient to establish a breach of the ECT. In other

---

[940]    Respondent's Opening Presentation, Slide 92; Hearing Transcript, Day 1, 212:24–213:3.

[941]    The Respondent says that Resolution No. 103/2011 introduced differentiation by source but maintains basic prices to guarantee gradual change and implies that these will be updated annually: Respondent's Opening Presentation, Slides 93-94.

[942]    Respondent's Opening Presentation, Slides 93-94.

[943]    *Saluka v. Czech Republic*: CL-057, ¶ 461.

words, any reasonableness analysis relates to the reasonableness of the measures and not to whether the impairment was reasonable. The Respondent was thus obliged to avoid "any" impairment of the Claimants' investments by either unreasonable or discriminatory measures.

699.    The Tribunal has noted the Respondent's argument that this interpretation of the ECT could lead to claims for measures that have only marginal negative effects – a type of floodgates argument, which it says was not the intention of the Contracting Parties. While this could theoretically result, it does not mean that this interpretation is incorrect. Once the measure is found to be unreasonable or discriminatory, the extent of the impairment would be assessed in determining damages. It seems unlikely that such a claim would be pursued by a commercial party if significant impairment, *i.e.* damages, had not occurred. The Respondent's concerns regarding this interpretation leading to a proliferation of claims is unfounded.

700.    Accordingly, the majority of the Tribunal finds that there is no requirement that the impairment be "significant" in order for a claim to succeed. Rather, impairment "in any way" is all that is required. In the majority's view, the ECT protects against any impairment of the operation, management, maintenance, use, enjoyment or disposal of an investment, provided it is caused by unreasonable or discriminatory measures. The majority of the Tribunal notes that the majority of the authorities cited to it and those that it finds most persuasive have adopted this interpretation.[944] For instance, the *Saluka v. Czech Republic* tribunal found that, in accordance with its ordinary meaning (Article 31 of the VCLT), "impairment" means "any negative impact or effect by 'measures'" taken by the host state,

---

[944]    *See e.g.*, *Saluka v. Czech Republic*: CL-057, ¶¶ 458-459 (citing *Fisheries Jurisdiction Case (Spain v. Canada)*, Judgment on Jurisdiction of the Court, 4 December 1998, ICJ Reports (1998) ("*Fisheries Jurisdiction*"), ¶ 66); *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 25 May 2005 ("*CMS v. Argentina*"): CL-071, ¶ 292 (noting that arbitrariness must result in the impairment of the investment); *Azurix v. Argentina* (Award): CL-082, ¶ 393 ("The question for the Tribunal is whether the measures taken by the Province can be considered to be arbitrary and have impaired 'the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal' of the investment of Azurix in Argentina.").

and that measures cover any act, step, proceeding or omission by the state, regardless of their content or aim.[945]

701.    The majority of the Tribunal notes that, in any event, the Claimants allege that the impairment caused by the Challenged Measures was significant.[946]

702.    The key to establishing a breach of the Impairment Clause is to demonstrate that the measures complained of are either unreasonable or discriminatory. The Tribunal notes that there is no requirement that they be both unreasonable and discriminatory because Article 10(1) of the ECT uses the disjunctive "or" instead of the conjunctive "and."[947] The Tribunal accepts the indicia set out in the *Toto Costruzioni v. Lebanon* case, quoted above, to the effect that an unreasonable or discriminatory measure must either:

- inflict damages on the investor without serving any apparent legitimate purpose;

- be based on discretion, prejudice or personal preference rather than on legal standards;

- be taken for reasons that are different than those put forward by the decision maker; or

- be taken in wilful disregard of due process and proper procedure.[948]

703.    Following *BG Group v. Argentina*, the majority of the Tribunal notes that the question of "reasonableness" should be measured against the expectation of the parties, "rather than as a function of the means chosen by the State to achieve its goals." The *BG Group* cited the following passage from the *CMS v. Czech Republic* award approvingly, which majority of this Tribunal finds instructive in guiding the exercise of its arbitral discretion:

---

[945]    *Saluka v. Czech Republic*: CL-057, ¶¶ 458-459 (citing *Fisheries Jurisdiction*, ¶ 66).

[946]    Claimants' Reply, ¶ 379 and § IV.

[947]    *See* Claimants' Memorial, ¶ 340, citing *Azurix v. Argentina* (Award): CL-082, ¶ 391; *LG&E v. Argentina*: CL-065, ¶ 163.

[948]    *Toto Costruzioni v. Lebanon*: CL-181, ¶ 157.

> As with the fair and equitable standard, the determination of reasonableness is in its essence a matter for the arbitrator's judgment. That judgment must be exercised within the context of asking what the parties to bilateral investment treaties should jointly anticipate, in advance of a challenged action, to be appropriate behaviour in light of the goals of the Treaty.[949]

704.    Italy adopted certain measures to address its economic, political and social situation. The Respondent submitted that the Challenged Measures were taken in part due to a purported desire to reduce costs for end-users and ensure the sustainability of the incentive regime. The Tribunal's function is not to judge the reasonableness or effectiveness of such measures as a matter of political economy,[950] nor whether other measures were available to achieve the goal. Instead, the Tribunal must interpret and apply Article 10(1) of the ECT. In the majority's view, the Tribunal must examine the purpose and aim of the ECT and what the Contracting States should have jointly anticipated, in advance of the Challenged Measures, to be appropriate conduct in light of those goals.

705.    The Tribunal notes that in the course of the proceedings, the Claimants shifted the emphasis of their impairment clause claim from the *Spalmaincentivi* Decree (although not abandoning it with respect to legitimate expectations and the obligations to pay specific amounts)[951] to the Respondent's modification of the MGP program and its imposition of the Administration Fee and Imbalance Costs.[952] The Tribunal's analysis will reflect that shift, as well as the majority's previous findings that the *Spalmaincentivi* Decree is a breach of the FET obligation.

### a.    *Spalmaincentivi Decree*

706.    The majority of the Tribunal has found that, through the *Spalmaincentivi* Decree, the Respondent unilaterally modified the specific commitments (tariffs at a specific level for a period of 20 years) that induced the Claimants to make their investments in Italy and that this measure constitutes a breach of the FET standard in the ECT.

---

[949]    *BG Group v. Argentina*: CL-081, ¶ 342, citing *CME v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶ 158.

[950]    *BG Group v. Argentina*: CL-081, ¶ 344.

[951]    Hearing Transcript, Day 1, 89:2-5.

[952]    Hearing Transcript, Day 1, 64:10-15, 88:13–89:8; Hearing Transcript, Day 4, 865:4-7, 870:17-22.

707. Having considered the *Spalmaincentivi* Decree in light of the Contracting Parties' intention of what would constitute reasonable conduct in relation to an investment protected by the ECT, the majority of the Tribunal finds that Italy's unilateral modification of the tariff rates was also unreasonable conduct that breached the Impairment Clause. The purpose of the ECT is to promote and protect investments in the energy sector. In light of that purpose, in the majority's view, it was unreasonable for the Respondent to alter the specifically promised tariff rates upon which the Claimants relied in making their investment.

708. Borrowing from the dicta in *AES v. Hungary*, the majority of the Tribunal finds "that it cannot be considered a reasonable measure for a state to use its governmental powers to force a private party to change or give up its contractual rights."[953] If the state decides that it should no longer observe the fixed incentive tariffs guaranteed in the *Conto Energia* Decrees, which were confirmed in the GSE Letters and GSE Agreements, then it must assume the consequences of its breach of the ECT; it withdrew specific assurances to the Claimants made to induce them into making their investments despite its obligations under the ECT. The majority of the Tribunal therefore agrees with the Claimants[954] that Italy's reduction of the *Conto* tariff rates that it had explicitly guaranteed would not change is not reasonable, even if those reductions were motivated by a perceived need to maintain the overall regime.

709. The majority of the Tribunal does not consider it to have been reasonable for Italy to have enacted the tariff reductions in the *Spalmaincentivi* Decree in light of the specific assurances contained in the *Conto Energia* Decrees, and later confirmed in the GSE Letters and GSE Agreements. This measure was a breach of both the FET obligation and the Impairment Clause. **Arbitrator L. Boisson de Chazournes** disagrees with the majority when it considers that the *Spalmaincentivi* Decree constitutes an unreasonable conduct that breached the Impairment Clause. The majority should have assessed the existence of a rational policy as well as the reasonableness of the State act in relation to the policy pursued by the host State, in the overall regulatory context of the case. Given that the investors'

---

[953] *AES v. Hungary*: CL-038, ¶ 10.3.12.
[954] Claimants' Reply, ¶ 381, citing *BG Group v. Argentina*: CL-081, ¶¶ 342-343.

remuneration is principally made of public subsidies, the minority finds it difficult to see how reducing the cost of electricity to consumers by reducing the incentive tariffs for producers cannot be considered as a rational policy goal.

### b.  *Administration Fee and Imbalance Costs*

710.    With respect to the Administration Fee and Imbalance Costs, the Tribunal has found that there was no specific promise made to the Claimants or their investments regarding these fees and costs and that, accordingly, no there was no breach of the FET obligation in respect of this measure.

711.    The Tribunal must now determine whether the imposition of the Administration Fee and Imbalance Costs upon the Claimants' investments was either unreasonable or discriminatory. The Claimants have not alleged that these measures were discriminatory. For the reasons that follow, the Tribunal has determined that these measures were not unreasonable.

712.    While it is true that Italy did not impose these charges on Producers for 6 or 7 years following the establishment of the incentive scheme, the imposition of new charges, by itself, is not unreasonable when, as the Tribunal has found in this case, there were no express promises made in respect of these types of charges. Was the imposition of Administration Fees and Imbalance Costs unreasonable despite a lack of a specific promise? In entering into the ECT, the Respondent accepted certain limitations on its ability to regulate in ways that affected investments. The Tribunal notes that this does not limit its right to regulate generally, but its regulations must be reasonable and non-discriminatory in order to avoid conflict with its treaty obligations.

713.    The Claimants' allegations with respect to the Administration Fees and Imbalance Costs and the Impairment Clause are essentially that these costs were known costs of the system and that they were initially borne by others but later transferred to producers. The Claimants argue this had the effect of indirectly reducing the tariff rates guaranteed under the *Conto Energia* Decrees. While this may have been the effect, such an effect arguably results whenever there is any increased cost allocated to producers. The Tribunal has found

that the Claimants could not have legitimately expected at the time of their investment that there would be no changes to their costs under the regulatory scheme. In the absence of specific promises, there was a risk that future costs might be allocated to the Claimants. This was permissible as long as those costs were not imposed by measures that are unreasonable or discriminatory.

714.    Having found that the Claimants had no legitimate expectations at the time of their investment with respect to Administration Fees and Imbalance Costs, the question becomes one of the reasonableness of these measures being imposed 6-7 years after that time. The Respondent submits that the reallocation of these costs to producers was part of its review of its renewable energy support scheme and done to address the high costs of the management of the system and the audit of the facilities. The Parties acknowledge that these were known costs of the system, but unlike the tariff rates, no specific promises were made in respect of them. Also, unlike the *Spalmaincentivi* Decree, there was no indication that these measures were passed in order to reduce the tariffs received by producers. It was a reallocation of costs that were foreseen at the outset, but were revisited in light of experience with the actual operation of the system after a period of time.

715.    In the Tribunal's view, the Claimants have failed to demonstrate that the implementation of the Administration Fee and Imbalance Costs was unreasonable. The Respondent was entitled to adjust its regulatory regime, so long as it did not do so unreasonably. The Claimants may not have liked the purposes for which the changes were made and the resulting modest increase in their costs, but, taking into consideration the indicia of unreasonable and discriminatory behaviour set out in *Toto Costruzioni v. Lebanon*, the Tribunal finds that none of those indicia were demonstrated with respect to the Administration Fee and Imbalance Costs. Accordingly, the imposition of the Administration Fee and Imbalance Costs do not violate the Impairment Clause.

### c.   *MGP / Off-Take Regime*

716.    The MGP and Off-Take Regime as enacted at the time of investment provided further incentives for investors to invest in Italy's PV sector. However, the Tribunal has found that the Respondent did not make any specific promises with respect to these additional

incentives in the legislation or elsewhere such as to create a legitimate expectation that these would remain in effect. However, the Claimants maintain that these measures were also unreasonable and violated the Impairment Clause because they must have been taken for reasons other than those put forward by Italy.

717.   The Off-Take Regime was created by the implementation of Legislative Decree No. 387/2003.[955] The express purpose of the program, as originally conceived, was to protect and ensure the survival of the smallest and most vulnerable PV plants (those under 1 MW), even if market prices were to fall significantly, by ensuring coverage of their operating costs.[956] If requested by a PV producer of less than 1 MW, Italy guaranteed a market which would provide it with a MGP if that price exceeded the wholesale price of electricity. For plants that qualified for the MGP, it was effectively the minimum price and the *Conto* incentives that a particular plant had qualified for applied on top of that price. Therefore, the MGP served as a proxy for what would otherwise be the wholesale price, so long as it was higher.[957] The scheme itself contemplates annual review, as the MGP was only valid for the one-year duration of the GSE Off-Take Agreements, which, in turn, could be unilaterally revised in accordance with the legislation.[958]

718.   The AEEG commissioned periodic reports from the Department of Energy at the *Politecnico di Milano*, a respected university, as to the operating costs of the renewable energy producers.[959] In the 2013 Politecnico Report, it found that the overall production costs had decreased by 53 percent for medium PV plants (3kW-100kW) and 49 percent for large PV plants (100 kW and larger) compared to its analysis in 2010.[960] Based on that report and other consultations, the Respondent changed the eligibility criteria to qualify for this program so that only small plants were eligible and adjusted the MGPs for those plants

---

[955]   Legislative Decree No. 387/2003: C-036.

[956]   Claimants' Reply, ¶ 465; Hearing Transcript, Day 1, 15:2-7, 15:12-16, 89:11-12.

[957]   Hearing Transcript, Day 1, 56:14-21

[958]   Legislative Decree No. 387/2003: C-036, Art. 13(3)(4). *See also* Respondent's Counter-Memorial, ¶ 350 (the Respondent submits that guaranteed minimum prices were first introduced by the AEEG in 2005 through Resolution No. 34/2005.).

[959]   2013 Politecnico Report: FTI-240 / C-384, § 4.

[960]   2013 Politecnico Report: FTI-240 / C-384, p. 53.

to reflect the reported decreases in operating costs. The MGPs were based on the operating costs and not the market prices providing protection to smaller producers when the market prices were low and would not cover their higher operating costs.

719.    The Claimants complain that this was unreasonable because the changes were not based on actual operating costs and the new MGPs, even if their plants had remained eligible, were insufficient to cover their actual operating costs. The effect of the measures on the Claimants' plants was exacerbated by the timing of the changes, which coincided with a period of low market prices.

720.    While both the timing and effect of these measures was unfortunate, the Tribunal is not persuaded that they were unreasonable. Italy's review and adjustment of the subsidies provided to smaller producers, as foreseen in the legislation and Off-Take agreements, was not unreasonable. Neither was its reliance on the 2013 Politecnico Report as the basis for its changes. The Claimants no doubt had the right to complain to the Respondent about the changes and the basis for them in light of their actual operating costs and the stated goal of the legislation to protect smaller producers. However, the Tribunal is unable to conclude that the measures amounted to a breach of the Impairment Clause, as none of the indicia of unreasonableness have been established.

## F.    THE UMBRELLA CLAUSE (ISSUE 4.3)

721.    The Claimants' claims in this arbitration have been advanced primarily on the basis of alleged breaches of the FET standard. Additionally, the Claimants argue that certain measures: the *Spalmaincentivi* Decree; the imposition of imbalance costs and administrative fees; and the changes to the MGP and Offtake regime also breached the ECT's umbrella clause protections, as set out in the last sentence of Article 10(1) of the ECT (the "Umbrella Clause").

722.    The Umbrella Clause provides that "[e]ach contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting

Party."[961] The Claimants allege that each of the Challenged Measures adopted by the Respondent breach obligations it entered into with the Claimants or their investments.[962] The Claimants say that the scope of the Umbrella Clause is broad and includes not only contractual obligations, but also obligations created through legislation or regulation and submit that this interpretation is consistent with how other tribunals have interpreted the ECT's Umbrella Clause, as well as similarly-worded umbrella clauses in other treaties. The Claimants also submit that there is no requirement that these obligations be reciprocal in nature. The Respondent argues that the scope of the Umbrella Clause is much narrower and only applies to contractual obligations or those of a similar nature. Further, the Respondent says that in determining whether such an obligation was breached, the law applicable to those obligations (in this case, Italian law) must be applied and that the Claimants have not established that the Respondent breached any such obligation.

723.    As discussed in other sections of this award, the Claimants and the Respondent have both submitted numerous awards from other investment treaty cases as legal authorities in support of their respective positions in this case. Many of these authorities have been cited in relation to the Parties' arguments in respect of the Umbrella Clause. The Tribunal has reviewed each of these authorities and notes that while they provide some useful general guidance, caution must be exercised in applying those conclusions in the instant case. In reaching its conclusions, the Tribunal must consider the facts as proved and the particular arguments presented by the Parties in this case.

724.    For instance, the Tribunal notes that the Parties both urged the Tribunal to take a holistic approach in reviewing the facts and considering the claims related to breach of the Umbrella Clause. Although the Claimants maintain that each of the individual measures breached a separate protected obligation, they note that, considered together, the Measures fundamentally changed the economic framework enshrined in the legislation, regulations

---

[961]    ECT: C-001, Art. 10(1).

[962]    The Claimants also refer to Italy having "fail[ed] to reimburse Claimants' facilities for charges assessed improperly" in their Umbrella Clause claim: *see* Claimants' Memorial, ¶ 357. As the Tribunal has found that these particular measures are not within its jurisdiction, this aspect of the Umbrella Clause claim will not be considered further.

and agreements that govern each of the Claimants' PV plants, and thus disregarded the obligations that the Respondent entered into with respect to the Claimants' investments. The Respondent, for its part, acknowledges that this forms the heart of the Claimants' Umbrella Clause claim and argues that, in the event that the Tribunal finds any protected obligations, the Tribunal should consider the entirety of the Respondent's conduct – measures that it says benefitted the Claimants, as well as those alleged to have harmed them – in assessing whether the Umbrella Clause was violated.[963]

725.    In the following sections, the majority of the Tribunal will provide its interpretation of the Umbrella Clause and then review the Claimants' specific claims for breach of the Umbrella Clause and the Respondent's positions in response.

### (1)    What is the Appropriate Interpretation of the ECT's Umbrella Clause?

#### a.    *The Claimants' Arguments*

##### (i)    *The Umbrella Clause Covers "Any" Obligation "Entered Into" with an Investor's Investment*

726.    The Claimants advance the view that the Umbrella Clause has a wide scope and expressly covers "any" obligations, which they say include statutory and regulatory undertakings that Italy "has entered into with an Investor or an Investment of an Investor of any other Contracting Party."

727.    In support of their arguments for a wide interpretation, the Claimants rely on the plain language of the Umbrella Clause, the awards of other tribunals and scholarly writing. The Claimants say that all of these sources support their interpretation of the Umbrella Clause. In particular, they assert that the purpose of the Umbrella Clause is to "[guarantee] the observance of obligations …" by elevating a breach of the underlying obligation into a breach of the ECT.[964]

---

[963]    Respondent's Counter-Memorial, ¶¶ 732-737; Respondent's Rejoinder, ¶ 401 (*see generally*, ¶¶ 395-405).

[964]    CPHB, ¶ 62; ECT: C-001, Art. 10(1); Dolzer and Schreuer: CL-061 (noting that the umbrella clause is a treaty provision that extends the jurisdiction of a tribunal to "bring contractual and other commitments under the treaty's protective umbrella." Thus, it "guarantee[s] the observance of obligations assumed by the host state vis-à-vis

728.    In addition to providing broad coverage for any obligations, the Claimants say that the Umbrella Clause also specifically protects obligations owed to its investments. The Claimants note that the language of the Umbrella Clause refers to obligations owed to either an investor or "an *Investment* of an Investor," which they argue therefore expressly includes correspondence with and contracts entered into between the Respondent and Claimants' locally-incorporated investment vehicles; in this case, the GSE Letters and GSE Agreements.

729.    As discussed above under the Respondent's fourth jurisdictional objection, the Claimants acknowledge that they have no independent right of action under the GSE Agreements' forum selection clause.[965] Thus, the thrust of the Claimants' argument is that the GSE Agreements were "entered into" by Italy with the Claimants' investments for the purposes of the Umbrella Clause and that the Claimants' claims are therefore based on both the *Conto Energia* Decrees and the GSE Agreements which confirmed the same obligations.[966] All of the Claimants' claims with respect to the alleged breaches of the GSE Agreements relate to the corresponding ECT breach for breach of the obligations owed, not to breach of the GSE Agreements themselves.

730.    The Claimants submit that most of the cases considering the Umbrella Clause only involve a state's obligations expressed in either contracts or legislation, whereas in this case, both are present.[967] Accordingly, the Claimants say that although the statutory framework on its own is sufficient to establish the Respondent's liability, the GSE Letters and GSE Agreements also support the Claimants' Umbrella Clause claim and submit that the Tribunal may consider all of these obligations together.[968]

---

the investor," by elevating a breach of the underlying obligation into a breach of the treaty.). *See also* Claimants' Opening Presentation, Slide 93, citing *Amto v. Ukraine*: CL-091, ¶ 110 (stating that the ECT Umbrella Clause "is of a wide character in that it imposes a duty on the Contracting Parties to 'observe any obligations it has entered into with an investor or an Investment of an Investor of the other Contracting Party.").

[965]    *See above*, para. 361.

[966]    Claimants' Closing Presentation, Slide 42.

[967]    Hearing Transcript, Day 1, 68:3–69:13, 70:24–71:7, 72:1–78:14.

[968]    Hearing Transcript, Day 1, 79:4-9.

731.  The Claimants assert that the Umbrella Clause is "specifically intended to expand the reach of the Treaty's protections to obligations that might not be covered by the Treaty's other substantive provisions."[969] The Claimants submit that the protection afforded by the specific language of the Umbrella Clause is "the high watermark of investment treaty protections … perhaps the most pro-investor of all investment treaties."[970] The Claimants contend that every ECT tribunal that has considered the Umbrella Clause has acknowledged that both contractual obligations *and* those undertaken through law or regulation fall within its scope.[971] In this regard, the Claimants note that the wording of the Umbrella Clause "does not differentiate between contractual obligations and other undertakings, including those in laws, regulations, or correspondence."[972]

732.  In applying an ordinary meaning interpretation pursuant to Article 31 of the VCLT, the Claimants argue that had the ECT Contracting Parties wanted the Umbrella Clause to only cover contractual obligations, they would have drafted "contractual obligations" instead of "any obligation."[973] The Claimants say that there is a clear line of ECT case law applying the word "obligations" not only to contractual commitments, but also to legislative and regulatory commitments, including *Al-Bahloul v. Tajikistan*, *Plama v. Bulgaria*, *Amto v. Ukraine*, *Khan v. Mongolia*, and *Eureko v. Poland*.[974] The Claimants refer to the *Eureko v. Poland* award, where the tribunal observed that "any obligation" "means not only obligations of a certain type, but 'any' – that is to say all – obligations entered into with regard to investments of investors of the other Contracting Party."[975] Similarly, the *Khan*

---

[969]    Claimants' Memorial, ¶¶ 348-349. *See also* Thomas W. Wälde, "Energy Charter Treaty-based Investment Arbitration: Controversial Issues" in 1 Transnational Dispute Management 3 (2004): CL-083, p. 7. The late Professor T. Wälde noted that tribunals should read the ECT's umbrella clause in light of the extensive scope of protection the ECT intends for investors.

[970]    Hearing Transcript, Day 1, 68:9-17.

[971]    Claimants' Memorial, ¶ 350.

[972]    *See* Claimants' Memorial, ¶ 350, fn. 506 and the sources cited therein that confirm umbrella clauses cover contractual obligations.

[973]    Claimants' Reply, ¶ 387: "[T]he Tribunal must apply the umbrella clause 'in good faith in accordance with the ordinary meaning' of its terms."

[974]    *See* Claimants' Memorial, ¶¶ 351-353 and fns. 507-511 and the sources cited therein. *See also* Hearing Transcript, Day 1, 68:20-22.

[975]    Claimants' Reply, ¶ 391; *Eureko B.V. v. Republic of Poland*, Partial Award, 19 August 2005 ("***Eureko v. Poland***"): CL-087, ¶ 246.

tribunal held that Mongolia's breach of its Foreign Investment Law constituted a breach of the Umbrella Clause on the basis of a "plain meaning" reading of the term "any obligation."[976] The Claimants contest the Respondent's assertion that the *Khan v. Mongolia* case is distinguishable from the instant case simply because the tribunal stated that its broad interpretation hinged on the ordinary meaning of the term "any" and the fact that Mongolia did not argue in favour of a narrow reading of the Umbrella Clause.[977]

733.   The Claimants also contest the allegation by the Respondent that they omitted or distorted the rulings on the Umbrella Clause in *Plama v. Bulgaria* and *Al-Bahloul v. Tajikistan*.[978] Although the tribunals in those cases referred to the narrow standard applied by the ICSID *ad hoc* annulment committee in *CMS v. Argentina*, the *Plama* tribunal ultimately held that the wording of the Umbrella Clause "is wide in scope since it refers to 'any obligation,'" which ordinarily means "any obligation regardless of its nature, *i.e.*, whether it be contractual or statutory."[979] Similarly, the *Al-Bahloul* tribunal stated that the ECT's umbrella clause "is broadly stated, referring as it does to 'any obligation' and, as such, by the ordinary meaning of the words, includes both statutory and contractual obligations."[980] The Claimants contend that the *Al-Bahloul* tribunal's reasoning turned on whether the relevant obligations were specific (as opposed to general obligations arising as a matter of law) and involved consent by the investor and the state.[981] As will be discussed below, the Claimants assert that, in contrast, the statutory, regulatory and contractual obligations in this case are very specific, in that they targeted specific types of investors, and offered them specific fixed tariff rates for a specified period of time.[982] As such, the Claimants say that

---

[976]    Claimants' Reply, ¶ 391; *Khan Resources Inc., Khan Resources B.V. and CAUC Holding Company Ltd. v. Government of Mongolia*, PCA Case No. 2011-09, Award on the Merits, 2 March 2015 ("***Khan v. Mongolia***"): CL-092, ¶ 366.

[977]    Claimants' Reply, ¶ 390 and fn. 393, citing Respondent's Counter-Memorial, ¶ 710 (in turn, citing *Khan v. Mongolia*: CL-092, ¶ 295).

[978]    Claimants' Reply, ¶ 392, citing Respondent's Counter-Memorial, ¶¶ 706-707.

[979]    Claimants' Reply, ¶ 392, citing *Plama v. Bulgaria*: CL-085, ¶ 186. *See also* Claimants' Opening Presentation, Slide 94.

[980]    *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. 64/2008, Partial Award on Jurisdiction and Liability, 2 September 2009 ("***Al-Bahloul v. Tajikistan***"): CL-090, ¶ 257. *See also* Claimants' Opening Presentation, Slide 94.

[981]    Claimants' Reply, ¶ 393-394, citing *Al-Bahloul v. Tajikistan*: CL-090, ¶ 257.

[982]    Claimants' Reply, ¶ 394.

their Umbrella Clause claim would be covered even under the more restrictive interpretation in *Al-Bahloul v. Tajikistan*.[983]

734. The Claimants argue that other investment treaty tribunals, such as *LG&E v. Argentina*, *SGS v. Paraguay*, *Enron v. Argentina*, and *Continental Casualty v. Argentina*, have also adopted broad interpretations of similarly-worded umbrella clauses to that of the ECT.[984] The *LG&E* tribunal concluded that Argentina's Gas Law "and regulations became obligations within the meaning of [the BIT's umbrella clause], by virtue of targeting foreign investors and applying specifically to their investments."[985] The *Continental Casualty v. Argentina* tribunal echoed this reasoning and concluded that the umbrella clause at issue in that case could also include the unilateral commitments arising from the host state's law regulating a particular business sector, and specifically addressed to investors regarding their investments therein.[986]

735. The Claimants contend that the Respondent "misleadingly" quotes *SGS v. Philippines* in an attempt to characterize the umbrella clause as only covering contractual obligations.[987] The Claimants assert that the clause at issue in that case was narrower than the Umbrella Clause, but that nevertheless that tribunal adopted a broad approach which required "a State to observe specific domestic commitments," as the Claimants say is the case here.[988]

736. The Claimants also contest the Respondent's reliance on *Noble Ventures v. Romania*. While the tribunal in that case narrowed the umbrella clause to cover only "investment

---

[983]    Claimants' Reply, ¶ 394.

[984]    *See* Claimants' Memorial, ¶¶ 353-355 and fns. 512-514, and the sources cited therein. *See also* Claimants' Reply, ¶¶ 390-391, citing, *inter alia*, *Enron v. Argentina*: CL-064, ¶¶ 274-276.

[985]    Claimants' Reply, ¶ 390, citing *LG&E v. Argentina*, ¶ 175 (*see also*, ¶ 174, cited in Claimants' Memorial, ¶ 354). *LG&E* is cited favourably by *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008 ("***Continental Casualty v. Argentina***"): CL-067, ¶¶ 299-301.

[986]    Claimants' Reply, ¶ 390; *Continental Casualty v. Argentina*: CL-067, ¶ 301.

[987]    Claimants' Reply, ¶ 395, citing Respondent's Counter-Memorial, ¶ 713, fn. 337.

[988]    Claimants' Reply, ¶ 395, citing *SGS v. Philippines*: RL-003, ¶¶ 117, 122, 126.

contracts," the Claimants state that the tribunal limited its analysis to that point because the claimant only argued for the clause to apply to domestic contractual commitments.[989]

737.    In response to the Respondent's submission that the ordinary meaning of "entered into" requires an agreement or contract, the Claimants note that the *Concise Oxford Dictionary* definition relied upon by the Respondent merely uses "an agreement" as an example of what may be "entered into" so as to "bind oneself by (an agreement or other commitment)."[990]

738.    Further, in response to the Respondent's allegations that the Umbrella Clause contains a temporal requirement, the Claimants assert that the Umbrella Clause does not implicate any issues of timing in terms of when various "investments" were made; rather, the analysis "simply turns on whether Italy violated obligations it entered into with Claimants' investments."[991] In support of this position, the Claimants cite the *Greentech* majority award, which refused to incorporate a temporal element into its Umbrella Clause analysis, for to do so would be "incompatible with an appropriately broad interpretation of the umbrella clause" which had "no hint of such a temporal dimension in the plain wording of the ECT's umbrella clause."[992]

739.    The Claimants note that the Respondent has not argued that a distinction should be drawn between plants purchased before and after the GSE Agreements were executed. In reference to later tribunal awards that did make this temporal distinction, the Claimants point out that eleven out of the nineteen PV projects which they acquired were after their entry into operation, but before GSE Agreements were executed and the remaining projects were invested in after the GSE Agreements were executed. The Claimants say that all of their investments met the criteria in the relevant *Conto Energia* Decree and that fact was

---

[989]    Claimants' Reply, ¶ 396, citing *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005 ("***Noble Ventures v. Romania***"): CL-088, ¶¶ 42-43, 51.

[990]    Claimants' Reply, ¶ 388, citing *Concise Oxford Dictionary*, "enter into": CL-183 (emphasis added by the Claimants); available at: https://www.lexico.com/definition/enter_into.

[991]    Claimants' Comments on New Legal Authorities, ¶ 35.

[992]    Claimants' Comments on New Legal Authorities, ¶ 35, citing *Greentech*: CL-212, ¶ 467.

recognized by Italy when it issued the GSE Letters and GSE Agreements with respect to each investment.

### (ii) Italy Could Have Opted-Out of the Umbrella Clause But Chose Not To

740.    Finally, the Claimants contest the Respondent's position that the Umbrella Clause infringes upon state sovereignty and thus should be interpreted restrictively.[993] The Claimants argue that Italy's intention to be bound by the broad Umbrella Clause is demonstrated by the fact it did not avail itself of the explicit opportunity afforded the Contracting Parties to opt-out of it by noting their decision in Annex IA to the ECT.[994] The Claimants contend that precisely because of the wide scope of the Umbrella Clause, each Contracting Party to the ECT had the ability to opt-out of that provision, and Italy did not do so.[995] The Claimants cite academic commentary which notes that "the fact that States [can] 'opt out' of the umbrella clause in the ECT logically reinforces the fact that it is intended to provide a very broad protection to investors."[996]

### b.    The Respondent's Arguments

741.    The Respondent contests the Claimants' assertion that the Umbrella Clause covers statutory and regulatory obligations and that "every ECT tribunal that has considered the provision has acknowledged … obligations undertaken through law or regulation fall within its scope."[997] Instead, the Respondent says that ECT tribunals have not offered "well-defined positions on the point," "which completely prevents … a unitary reconstruction of this legal institution."[998] For the Respondent, the Umbrella Clause covers only contractual obligations, and thus regulatory acts are incapable of creating such obligations.[999] The Respondent contends that the reason for this exclusion lies in the

---

[993]    Claimants' Reply, ¶ 397, citing Respondent's Counter-Memorial, ¶ 724.

[994]    Claimants' Reply, ¶ 397; ECT: C-001, Art. 26(3)(c) and Annex IA.

[995]    CPHB, ¶ 62; ECT: C-001, Annex IA (listing Australia, Canada, Hungary, and Norway as the only countries that opted out of the ECT's broad umbrella clause).

[996]    Claimants' Memorial, ¶ 349, citing Johan Billiet, *International Investment Arbitration: A Practical Handbook* (Maklu, 2016): CL-084, p. 128.

[997]    Respondent's Counter-Memorial, ¶ 704, citing Claimants' Memorial, ¶ 350.

[998]    Respondent's Counter-Memorial, ¶¶ 705; Respondent's Rejoinder, ¶ 378.

[999]    Respondent's Rejoinder, ¶ 376.

rationale of the Umbrella Clause, which is to internationalize contractual obligations that would otherwise remain excluded by the investment treaty due to their private nature.[1000]

742.    The Respondent argues that the ordinary meaning of the phrase obligations "entered into" in the Umbrella Clause means "to 'undertake to bind oneself by' … 'an agreement'."[1001] The Respondent asserts that the reference to "an agreement" in the definition of "obligation" therefore restricts the meaning of the phrase "obligations entered into" to obligations contained in contracts only.[1002] In response to the Claimants' rebuttal that "entered into" applies to both an agreement and a commitment, the Respondent states that "entered into with" implies negotiation between two parties, but that the *Conto Energia* Decrees were not negotiated between investors and Italy, were not designed to induce foreign investment, and were of a general character.[1003]

743.    In the Respondent's view, "to force the meaning of 'entered into with', to include under the scope of the umbrella clause even legislative and governmental State obligations would be illogical, as the FET standard already broadly addresses such kind of obligations."[1004] The Respondent asserts that FET and the Umbrella Clause therefore "deal respectively with two different kinds of State obligations (regulatory and contractual)."[1005] According to the Respondent, "since the amount and duration of incentives are determined previously and authoritatively by an external and public law source, the FET standard is the correct legal parameter."[1006]

744.    The Respondent concludes that, in the absence of "well-defined positions" from ECT tribunals on whether the Umbrella Clause also includes statutory and regulatory obligations, and in contrast to the analysis suggested by the Claimants, its "more careful

---

[1000]    Respondent's Counter-Memorial, ¶ 727.
[1001]    Respondent's Counter-Memorial, ¶¶ 714-716.
[1002]    Respondent's Counter-Memorial, ¶¶ 714-724.
[1003]    Respondent's Rejoinder, ¶¶ 372-373.
[1004]    Respondent's Rejoinder, ¶ 375.
[1005]    Respondent's Rejoinder, ¶ 375.
[1006]    Respondent's Counter-Memorial, ¶ 730. The Claimants counter that the fact that a state action violates both FET and the umbrella clause does not reduce the meaning of the FET clause. *See* Claimants' Reply, fn. 405.

analysis" demonstrates that no obligations can arise from statutory acts for the purposes of the Umbrella Clause.[1007]

745. Regarding the Claimants' reliance on *Al-Bahloul v. Tajikistan*, the Respondent contends that the Claimants omit to quote the full statement by that tribunal, which adds that the "ICSID *Ad Hoc* Committee, in annulling the decision in *CMS v*[.] *Argentina*, took a narrower view, and considered that the words 'entered into' suggest that the obligation is limited to those of a consensual nature."[1008] The Respondent submits that the *Al-Bahloul v. Tajikistan* tribunal relies on the words "entered into" to conclude that the Umbrella Clause "does not refer to general obligations of the State arising as a matter of law."[1009] The Respondent contests the Claimants' argument that, contrary to the general obligations at stake in the *Al-Bahloul v. Tajikistan* case, the Respondent's regulatory obligations were specific and targeted at investors, for a specific duration, and guaranteed a specific tariff.[1010] According to the Respondent, the *Conto Energia* Decrees were general in "both their legal source and concrete rule" and were directed to "the generality of physical and legal persons," including private individuals and families who could (and did) start the procedure to benefit from the FITs.[1011]

746. Similarly, the Respondent asserts that the Claimants' reliance on *Plama v. Bulgaria* is "distorted," and that they "omit to give a complete account of the cited part of the ruling."[1012] The Respondent contends that the *Plama* tribunal did not take a position on the relevant issue for this case and instead merely "refers to two contradictory decisions within the bunch of Argentinian cases at the time of crises, and thus simply gives account of both possible interpretations by concluding that it 'need not extend its analysis any further.'"[1013]

---

[1007]   Respondent's Rejoinder, ¶ 378.

[1008]   Respondent's Counter-Memorial, ¶ 706, citing *Al-Bahloul v. Tajikistan*: CL-090, ¶ 257.

[1009]   Respondent's Counter-Memorial, ¶ 706.

[1010]   Respondent's Rejoinder, ¶¶ 379-380, citing Claimants' Reply, ¶ 394.

[1011]   Respondent's Rejoinder, ¶¶ 381-382.

[1012]   Respondent's Counter-Memorial, ¶ 707.

[1013]   Respondent's Counter-Memorial, ¶ 707, citing *Plama v. Bulgaria*: CL-085, ¶ 187.

747. The Respondent submits that the non-ECT case law is also not well defined, save for *Noble Ventures v. Romania*, which limits the application of umbrella clauses to only contractual obligations.[1014]

748. In commenting on later tribunal decisions applying the Umbrella Clause, the Respondent submits that in this case the Claimants have conceded that "Italy made no guarantees of specific incentive rates with respect to PV facilities *under development*"[1015] and suggests that this is fatal to finding a breach of the Umbrella Clause on the basis of the legislation alone. However, the Respondent notes that the Claimants' articulation of the "obligations … entered into with" it for the purpose of the Umbrella Clause mainly concerns the guarantee of fixed incentives offered through ministerial decree and confirmed in the GSE contracts.[1016] The Respondent argues that should the Tribunal find that such an obligation is protected by the Umbrella Clause (which it opposes), the Tribunal should consider all of the Respondent's behaviour (and not just the *Spalmaincentivi* Decree) in order to properly determine its good faith obligations at international law.[1017]

### c. The Tribunal's Analysis

749. The preliminary task of the Tribunal is to determine the scope of the Umbrella Clause. The Tribunal notes that Article 10(1) of the ECT must be interpreted in accordance with Article 31 of the VCLT, which sets out the general customary international law rules of treaty interpretation.

750. As noted earlier, Article 31 of the VCLT requires a treaty to be interpreted in good faith, according to the plain and ordinary meaning of the terms used in that treaty, in their context and taking into account the object and purpose of the treaty.[1018] Article 32 of the VCLT

---

[1014]    Respondent's Counter-Memorial, ¶ 731; Respondent's Rejoinder, ¶ 384.

[1015]    Respondent's Comments on New Legal Authorities, ¶ 48, citing Claimants' Reply, ¶ 231 (Tribunal's emphasis).

[1016]    Respondent's Rejoinder, ¶ 400, referring to Claimants' Reply, ¶ 402.

[1017]    Respondent's Rejoinder, ¶¶ 401-408.

[1018]    *See above*, para. 297.

permits recourse to supplementary means of interpretation in order to confirm the meaning derived by application of Article 31 or to resolve an ambiguity.[1019]

751.    The ECT's purpose is to promote long-term cooperation in the energy field in accordance with the object and principles of the Charter. Article 10, found in Part III of the ECT, is devoted to Investment Promotion and Protection. Article 10(1) requires each Contracting Party to "encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area." Article 10(1) goes on to set out four more specific conditions or protections: FET, constant protection and security and impairment, minimum standard of treatment and the Umbrella Clause. As a whole, Article 10(1) provides comprehensive protection for investments from certain state acts in order to achieve the goal of providing "stable, equitable, favourable and transparent conditions" for investment. While each type of protection is distinct, there can be overlapping coverage afforded by the various protections. In order to be able to assess the Claimants' claims with respect to the alleged breaches of the Umbrella Clause, it is necessary to interpret the scope of coverage provided by the Umbrella Clause on its own but in the context of the article and treaty in which it appears.

752.    Pursuant to its plain meaning, the Umbrella Clause is intended to ensure that host states observe "any obligation entered into with" the investor or its investment. The use of the word "any" suggests that the drafters intended the protection to apply to any obligations, but this on its own does not assist in interpreting what types of obligation were to be covered. Reading this phrase as a whole indicates that the obligations intended to trigger potential liability under the ECT were not just general obligations, but those that relate to the investment. Further, the use of the phrase "entered into with" suggests that a certain degree of specificity must exist and that the obligation or promise must relate to the investor or its investment. There is no dispute that contracts between the state and an investor or its investment are protected obligations under the Umbrella Clause. Italy does dispute whether other instruments, such as legislation or regulations, are capable of creating obligations that

---

[1019]    *See, e.g.*, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 ("***Antin v. Spain***"), ¶ 207, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9875.pdf.

are also protected by the Umbrella Clause. Further, it submits that accessory contracts, which give effect to such legislation or regulations, are also not protected; instead they absorb the character of legislation or regulations, which it says cannot create obligations protected by the Umbrella Clause.

753. Italy has argued that the phrase "obligation entered into with" requires a bilateral agreement and that establishing a tariff system through legislation and giving effect to that system through regulations, letters and accessory contracts is not sufficient to create obligations entered into with the Claimants or their investments for the purposes of the ECT. In particular, Italy focuses on the word "with" to argue that some degree of negotiation is required for an obligation to be protected.

754. The Tribunal notes that reading the Umbrella Clause as a whole indicates that beyond covered obligations having been "entered into with … an Investment of an Investor,"[1020] such obligations must identify both the promises made (the obligation) and the recipients of those promises (who they were entered into with) with some degree of specificity – enough to establish a relationship between the obligation and the investor or its investment.[1021]

755. The Tribunal agrees with the Claimants that the phrase "entered into" in Article 10(1) of the ECT does not exclude the possibility of a state entering into commitments via legislation or decree, or unilaterally through statements made in offering memoranda designed to induce foreign investment.[1022] However, in order for such obligations to be protected by the Umbrella Clause, a degree of specificity is required – the obligations must be made with investors and be in relation to investment. A general statute regulating a sector of the economy will not normally be sufficient. In this case, the *Conto Energia* regime was intended to induce investment in the PV sector, but not necessarily by foreign investors. The regime provided a conditional offer of specific tariff rates for a period of

---

[1020] ECT: C-001, Art. 10(1).

[1021] *See Continental Casualty v. Argentina*: CL-067, ¶ 297.

[1022] Claimants' Reply, ¶ 388, citing Craig S. Miles, "Where's My Umbrella? An 'Ordinary Meaning' Approach to Answering Three Key Questions That Have Emerged from the "Umbrella Clause" Debate," in 1 *Investment Treaty Arbitration and International Law* (2009): CL-184.

20 years. In order to be in a position to benefit from those tariffs, individual investors had to meet the criteria.

756. In the majority's view, for an obligation to have been entered into with the investor or the investment for the purpose of the Umbrella Clause, the *Conto Energia* Decree on its own was not sufficient; it was necessary for the Investor or its Investment to have met the criteria and notified the Respondent that it had done so. The Claimants in this case accept that the Respondent was entitled to unilaterally modify the regime with respect to prospective investments, as it did. This implies that no protected obligation arose until the criteria were met by an identifiable investment. The investment regime as designed by Italy did just this – it converted the conditional offer of specific tariff rates to an obligation entered into with a specific plant by confirming the obligation in the GSE letter addressed to the plant and, later, in the GSE Agreement, which was entered into with each individual plant. By operation of the *Conto Energia* regime, Italy created obligations entered into with each investment. To the extent that those agreements were entered into with an Investor or its Investment, failure to observe those obligations gives rise to protection under the Umbrella Clause. The Umbrella Clause requires that the obligation be owed by the host state to either the investor directly or to the investment.

757. Although it was not argued by the Respondent in this case, for the sake of good order, the majority of the Tribunal notes that on its face, the Umbrella Clause does not require that the investor own the investment at the time that the obligation was entered into. Unlike FET protection, which examines the investor's legitimate expectations at the time of making its investment, the Umbrella Clause protection only arises if the host state fails to observe an obligation it has entered into with the investment. Through the GSE Letters and GSE Agreements, Italy confirmed the obligations set out in the *Conto Energia* Decrees were owed to the specific plants that had met the criteria, which entitled it to the tariff rates set out in the applicable *Conto Energia* Decree. If those obligations were not observed, then an Investor could bring a claim under the Umbrella Clause.

758. The Tribunal finds that the plain and ordinary meaning of the Umbrella Clause does not only protect contractual obligations, but is broad enough to cover any obligation even if

contained in legislation or regulations so long as the obligation was entered into with an investor or its investment. In this case, the Claimants say that the obligation entered into with its investments was to pay the tariff rates for a period of 20 years and, more generally, to maintain a stable regime that protected smaller producers by not eroding those tariff rates and other protections set out in the *Conto Energia* regime. It says this obligation was entered into with its investments through multiple instruments: the *Conto Energia* Decrees, correspondence from the GSE and the individual GSE Agreements, which are the clearest evidence of the obligation. In light of the Tribunal's interpretation of the Umbrella Clause, it agrees that it is permissible to assess the Claimants' claim for breach of the Umbrella Clause by assessing whether these obligations were, in fact, entered into with Claimants' investments whether by legislation, regulation, correspondence or contract, taken as a whole. In other words, there is nothing in the Umbrella Clause that requires a protected obligation to be tied to a single source. However, the obligation must have been entered into with the investor or its investment.

### (2)    What Obligations did Italy Enter Into With the Investors or their Investments?

#### a.  The Claimants' Arguments

759.    The Claimants submit that the Respondent assumed obligations in respect of the Claimants' investments through the legal, regulatory and contractual framework that it created to encourage PV investments.[1023] The Claimants argue that the Respondent's obligations were not general in nature. To the contrary, the Claimants contend that each *Conto Energia* Decree guaranteed fixed incentive tariff rates for 20 years, and that these specific commitments were given to individual PV plants by the GSE Letters and GSE Agreements acknowledging the eligibility of each PV producer, and confirmed their qualification for the specific incentive tariff rate in the applicable *Conto Energia* Decree.[1024]

760.    The Claimants' position is that Italy entered into obligations with the Claimants' investments in the GSE Agreements and in the offer-and-acceptance mechanism in the

---

[1023]  Claimants' Memorial, ¶ 356.
[1024]      Claimants' Memorial, ¶ 356.

*Conto Energia* Decrees themselves. Although they argue that it is not required for the purposes of the Umbrella Clause, the Claimants and their Investments also entered into reciprocal obligations by developing, acquiring, and maintaining PV plants in Italy that met Italy's requirements, all of which was required to receive the guaranteed tariff payments.[1025]

761.     According to the Claimants, the GSE Agreements provide the "clearest evidence of Italy's obligations under the ECT's umbrella clause."[1026] The Claimants submit that, by entering into the GSE Agreements, the Respondent entered into obligations with each of the Italian companies that own the Claimants' 341 PV plants at issue.[1027] Thus, the Claimants argue that under the Umbrella Clause, the Respondent is bound to fulfil the obligations enshrined in each GSE Agreement, which promised to pay a fixed tariff at a constant rate for a 20 year period.[1028]

762.     The Claimants contend that the Respondent was fully aware that it was entering into obligations with investments of foreign investors because each of the GSE Agreements demonstrates the GSE's acknowledgement that foreign nationals represented the Italian companies that counter-signed those agreements.[1029] For example, with respect to Projects Montalto and Carlino, the relevant GSE Agreements provide that the local company is represented by Messrs. Thomas Engelmann and Curtaz Klaus Adolf, respectively, and expressly notes that they were born abroad.[1030] The Claimants point out that Italy's own

---

[1025]     CPHB, ¶ 75.

[1026]     CPHB, ¶ 71, citing Montalto Tariff Confirmation Letter: C-284; Guglionesi Tariff Confirmation Letter: C-285; Carlino 1 Tariff Confirmation Letter: C-294; Carlino 3 Tariff Confirmation Letter: C-295; Piazza Armerina Tariff Confirmation Letter: C-303; Mezzanotte GSE Incentive Tariff Confirmation Letter, 21 November 2011 ("**Mezzanotte Tariff Confirmation Letter**"): C-330; Viterbo GSE Incentive Tariff Confirmation Letter, 28 November 2011 ("**Viterbo Tariff Confirmation Letter**"): C-331; Ardea Tariff Confirmation Letter: C-332; Noce Laccu GSE Incentive Tariff Confirmation Letter, 30 January 2012 ("**Noce Laccu Tariff Confirmation Letter**"): C-333; Acqua et al Tariff Confirmation Letters: C-347; Carlino 2 GSE Incentive Tariff Confirmation Letters, October 2011 to March 2012 ("**Carlino 2 Tariff Confirmation Letter**"): C-363; Troina GSE Incentive Tariff Confirmation Letters, September to October 2011 ("**Troina Tariff Confirmation Letter**"): C-369; Ginosa GSE Incentive Tariff Confirmation Letter, 20 February 2012 ("**Ginosa Tariff Confirmation Letter**"): C-372.

[1027]     CPHB, ¶ 64; Claimants' Reply, ¶ 461.

[1028]     CPHB, ¶ 64; Claimants' Reply, ¶ 461.

[1029]     CPHB, ¶ 65; Montalto GSE Agreement: C-286; Ardea GSE Agreement, 7 March 2012 ("**Ardea GSE Agreement**"): C-334; Carlino 2 GSE Agreement, 20 December 2011 ("**Carlino 2 GSE Agreement**"): C-364.

[1030]     CPHB, ¶ 65; Montalto GSE Agreement: C-286, p. 1; Carlino 3 GSE Agreement: C-297.

fact witness, Mr. Bacchiocchi, testified that Italy knew that there were "lots of foreign investors" and that the upstream owners of PV facilities included EU as well as non-EU companies.[1031]

763.    The Claimants assert that the GSE Agreements are covered by the Umbrella Clause because they contained specific obligations that Italy entered into with the Claimants' investments.[1032] For example, in the GSE Agreement with the Claimant ICE 5's Investment, Ginosa Energia S.r.l., which operated the Ginosa project, Article 2 defines the "Value of the incentive" as follows:

> The incentive tariff to be granted to the [PV] plant under this Agreement, which is constant in current currency, is equal to 0.2120 €/kWh, a value recognized by the GSE and disclosed to the *Soggetto Responsabile* [*i.e.*, plant operator] with the communication on admission to the incentive tariff [*i.e.*, the GSE Tariff Recognition Letter].[1033]

Article 4 of the GSE Agreement provides:

> Following the entry into force of this Agreement, the GSE shall provide for and ensure that the payment of the tariff due occurs within 120 days from the date it receives the application for admission to the incentive tariff … The frequency of the payments to [Ginosa Energia S r.l.] is defined as follows: … for plants with capacity greater than 20 kW, pursuant to the provisions in art. 11, paragraph 4 of AEEG decision ARG/elt 181/10, the payment of the tariffs and the potential addition or reward shall be executed on a monthly basis with value date as of the last day of the second month subsequent to the reference month … In the event that the Payment Date falls on a holiday, the payment shall be made with value date as of the first subsequent business day.[1034]

Article 6 of that Agreement requires the GSE to:

> [F]ulfil its obligation to pay receivables to the assignee [of the plant operator] upon compliance with the following conditions.[1035]

---

[1031]    CPHB, ¶ 65; Hearing Transcript, Day 3, 522:2-12, 531:16–532:13. At the Hearing, the Claimants say that Professor D'Atena also confirmed that Italy was targeting both domestic and foreign investors with its legal and regulatory framework: Hearing Transcript, Day 2, 287:7–288:12. Italy also widely promoted the incentive regime at home and abroad. Even its foreign investment organization INVITALIA specifically encouraged foreigners to take advantage of the regime. *See, e.g.*, Claimants' Memorial, ¶¶ 97, 110, 123, 135, 145; INVITALIA: Report "Investment Opportunities – Photovoltaics Sector," 19 June 2010: C-137.

[1032]    CPHB, ¶ 66; Claimants' Opening Presentation, Slides 106-109 (enumerating several such obligations).

[1033]    Ginosa GSE Agreement, 19 March 2012 ("**Ginosa GSE Agreement**"): C-468, Art. 2; CPHB, ¶ 66.

[1034]    Ginosa GSE Agreement: C-468, Art. 4; CPHB, ¶ 67.

[1035]    Ginosa GSE Agreement: C-468, Art. 6; CPHB, ¶ 68.

764. According to the Claimants, the Respondent does not contest the factual aspects of the umbrella clause claim, and indeed admits that the *Spalmaincentivi* Decree resulted in a change to the economic framework of the GSE Agreements.[1036] The Claimants contend that the Respondent also admits that the GSE Agreements are binding on both the PV operators and the GSE, but that the Respondent is wrong in arguing that the GSE Agreements do not fall under the protection of the Umbrella Clause simply because the contracts were required by law.[1037]

765. The Claimants point out that the *Greentech* majority did not consider Italy's classification of the GSE Agreements as "accessory" (rather than private law contracts) problematic, because they found that it was not necessary to view the GSE Agreements in isolation.[1038] The Claimants urge the Tribunal to adopt the reasoning of the *Greentech v. Italy* majority, which held that

> [t]aken as a whole, the *Conto Energia* decrees, the GSE letters, and the GSE Agreements, amounted to obligations "entered into with" specific PV operators. Those obligations were sufficiently specific, setting forth specific tariff rates for a fixed duration of twenty years. Accordingly, whether any of the *Conto Energia* decrees, GSE letters, or GSE Agreements would, in isolation, be covered by the ECT's umbrella clause is not the relevant question here, given that each of Claimants' investments received benefits pursuant to all three types of "obligations."[1039]

766. In response to the Respondent's defenses, the Claimants assert that the Respondent's arguments regarding the purported exclusion of non-contractual obligations from the scope of the Umbrella Clause are wrong for two reasons. First, the ECT's Umbrella Clause covers any obligations regarding investors or investments, not just contractual ones. Further, the

---

[1036]    Claimants' Reply, ¶ 402.

[1037]    Claimants' Reply, ¶¶ 385. *See* Respondent's Counter-Memorial, ¶ 733: "The Respondent acknowledges that the Claimants did not challenge any conduct of the GSE. This fact is not surprising, because, as noted above, the GSE had no role in determining the content of the clause and consequently the purported violation of such contract is not due to an autonomous act of the GSE, but to a subsequent authoritative measure that automatically produced a modification of the Convention by law" (footnotes omitted).

[1038]    Claimants' Comments on New Legal Authorities, ¶ 36.

[1039]    Claimants' Comments on New Legal Authorities, ¶ 36, citing *Greentech*: CL-212, ¶ 466.

type of contractual obligations is not restricted.[1040] Second, the GSE Agreements fall within the Umbrella Clause's broad scope.[1041]

767.     The Claimants disagree with the Respondent's proposition that the GSE Agreements do not qualify as contracts, and reject its reliance on *Noble Ventures v. Romania*.[1042] Rather than cast doubt as to whether any contractual obligation is covered by the umbrella clause, the Claimants submit that the *Noble* tribunal simply concluded that it did not have to determine whether the umbrella clause applied to any breach of any contractual obligation of the host state's municipal law or whether "'any obligation', despite its apparent breadth" is limited in light of the nature and objects of the BIT. It did so because the claimant only raised the umbrella clause in regard to alleged violations of domestic contractual commitments.[1043] For the Claimants, regardless of the nature of the GSE Agreements under Italian law, "they are direct evidence of a binding obligation Italy entered into to pay specified tariff rates to Claimants' facilities for twenty years."[1044] The Claimants' Italian law expert confirms that, under Italian law, the nature of the contract ("accessory" or otherwise) does not affect the binding obligations it imposes on the parties to it.[1045]

768.     The Claimants remind the Tribunal that the GSE Agreements at issue in this case were all issued in relation to *Contos* I-IV. These agreements did not contain the language of the GSE Agreements issued in relation to *Conto* V, which permitted unilateral modification by the state. It was the language in the *Conto* V related GSE Agreements that was the subject of the constitutional court decision that the Respondent relies on in part for its contention that all the legal procedures regarding the GSE Agreements, as exclusively regulated by Italian law, were fully respected.[1046] The Claimants note that all of the GSE Agreements at

---

[1040]    *See, e.g.*, Claimants' Reply, ¶¶ 385, 398.

[1041]    Claimants' Reply, ¶ 385; *see also,* ¶¶ 398-401.

[1042]    Claimants' Reply, ¶ 399-400, citing Respondent's Counter-Memorial, ¶ 731.

[1043]    Claimants' Reply, ¶ 400, citing *Noble Ventures v. Romania*: CL-088, ¶ 61.

[1044]    Claimants' Reply, ¶ 401.

[1045]    Claimants' Reply, ¶ 401; D'Atena ER1, §§ 21-22; D'Atena ER2, §§ 38-39.

[1046]    Respondent's Rejoinder, ¶ 365.

issue in this case provided that they were not to be modified without the agreement in writing of the parties.

769.    Further, the Claimants argue that the GSE Letters also evidence that Italy knew it was entering into specific obligations with each of the Claimants' investments.[1047] Pursuant to those letters, Italy obliged itself to pay a fixed, constant *Conto* tariff to each plant for a specific 20-year period. For example, with respect to Project Ardea, the GSE Letter to the First Claimant ESPF 2's subsidiary Victoria Solar S.r.l. states as follows:

> we hereby communicate the admission to the incentive tariff under Ministerial Decree 6 August 2010 [*i.e.*, *Conto* III], equal to 0.2890 euro/kWh. The incentive tariff will be recognized for a period of twenty years as of the date of entry into operation of the plant: 30/05/2011; the tariff is constant, in current currency all through the 20-year period.[1048]

770.    This GSE Letter then required Victoria Solar S.r.l. to execute the GSE Agreement to activate payment of the tariff as of the date of commissioning.[1049] On this basis, the Claimants claim that the GSE Letters also evidence Italy's obligation to pay the defined tariff at a fixed rate for 20 years.

771.    The Claimants argue that the *Conto Energia* Decrees themselves are another source of the obligations Italy entered into with respect to the Claimants' investments. The Claimants submit that the *Conto Energia* Decrees contain Italy's offer to pay eligible PV plants a defined tariff rate for 20 years,[1050] and that to accept that offer, the Claimants' investments built and commissioned PV plants that met the requirements contained in the *Conto Energia* Decrees.[1051] The Claimants contend that their acceptance of Italy's offer was the €400 million that they invested into the PV plants at issue.[1052] The Claimants further point

---

[1047]    CPHB, ¶ 71;  Montalto Tariff Confirmation Letter: C-284; Guglionesi Tariff Confirmation Letter: C-285; Carlino 1 Tariff Confirmation Letter: C-294; Carlino 3 Tariff Confirmation Letter: C-295; Piazza Armerina Tariff Confirmation Letter: C-303; Mezzanotte Tariff Confirmation Letter: C-330; Viterbo Tariff Confirmation Letter: C-331; Ardea Tariff Confirmation Letter: C-332; Noce Laccu Tariff Confirmation Letter: C-333; Acqua et al Tariff Confirmation Letters: C-347; Carlino 2 Tariff Confirmation Letters: C-363; Troina Tariff Confirmation Letter: C-369; Ginosa Tariff Confirmation Letter: C-372.

[1048]    CPHB, ¶ 72; Ardea Tariff Confirmation Letter: C-332.

[1049]    CPHB, ¶ 73; Ardea Tariff Confirmation Letter: C-332.

[1050]    CPHB, ¶ 74; *Conto* I: C-039; *Conto* II: C-065; *Conto* III: C-145; *Conto* IV: C-169; *Conto* V: C-195.

[1051]    CPHB, ¶ 74.

[1052]    Claimants' Comments on New Legal Authorities, ¶ 29.

out that there was no discretion for Italy to refuse the *Conto* tariffs for plants that met the criteria set forth in the *Conto*.[1053] According to the Claimants, Italy's legislative offer and the Claimants' acceptance of that offer constitute a *quid pro quo* – akin to a contractual arrangement, which created binding obligations on Italy's part to pay the promised tariffs unchanged, for 20 years.[1054] The Claimants argue that the GSE Letters and GSE Agreements formalized the obligations that Italy had already entered into with respect to each of the Claimants' plants in its legislation.[1055]

772.    The Claimants contend that although the Umbrella Clause does not require reciprocal obligations on the part the investor or the investment toward the host state in order for the clause to apply,[1056] the Claimants' investments entered into reciprocal obligations with Italy in the GSE Agreements.[1057]

773.    For example, in the GSE Agreement with the Claimant ICE 5's investment, Ginosa Energia S.r.l., which operated the Ginosa project, Article 3 provides that the Claimants' investment

> is required to register on the electronic portal provided by the GSE and must make use of the proper electronic applications and procedures provided for this purpose. …
>
> is required to comply with the obligations imposed by the existing legislation on connection, access to the grid and measurement of electricity injected into the grids with an obligation for connection to third parties …
>
> must allow the GSE to gather, through monitoring and measuring systems, the data (if available) necessary for improving the [foreseeability of electricity injections] …
>
> undertakes at its own costs and expenses to deliver to the GSE, upon simple request and in compliance with the established deadlines, all documentation related to the photovoltaic plant under this agreement …

---

[1053]    CPHB, ¶ 74. *See also* Claimants' Comments on New Legal Authorities, ¶ 26: "Tellingly, Italy has not disputed that the GSE had no discretion to refuse to grant or pay the rates defined in the *Conto Energia* decrees to plants meeting the deadlines specified to those decrees, nor did the GSE have any discretion to alter the terms of the payments or to pay something other than the tariffs as defined in the applicable *Conto Energia* decree."

[1054]    CPHB, ¶ 74.

[1055]    CPHB, ¶ 74. *See also* Claimants' Comments on New Legal Authorities, ¶ 27.

[1056]    CPHB, ¶ 63, citing *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award, 7 December 2011: CL-206, ¶ 875.

[1057]    CPHB, ¶ 69.

is required to supply, through the electronic portal, timely communication to the
GSE regarding any change related to the plant, the connection to the grid, the
measurement equipment and any additional element necessary for the correct
determination of the incentives mentioned in art. 4 of the present Agreement.[1058]

774.   The Claimants contend that the above listed obligations on the part of each of their
Investments was necessary for the *Conto Energia* program to work as intended.[1059] The
Claimants further assert that the GSE Agreements reflect an implied obligation that the
Claimants' investments maintain and operate the plant.[1060] The Claimants say that this is
because the *Conto* tariff was only paid on electricity generated and, thus, the plant operator
was required to ensure that the plant was producing electricity in order to receive the tariff
that Italy's GSE was required to pay.[1061]

775.   The Claimants rely on *Greentech v. Italy*, in which the majority interpreted "'obligations'
referred to in the ECT's umbrella clause as sufficiently broad to encompass not only
contractual duties but also certain legislative and regulatory instruments that are specific
enough to qualify as commitments to identifiable investments or investors."[1062] The
Claimants observe that "[i]t is quite noteworthy that, in addition to finding a violation of
the FET standard, the *Greentech* majority also found that Italy violated the ECT's umbrella
clause."[1063]

776.   The Claimants also allege that the changes to the MGP regime were also a breach of the
Umbrella Clause protection in the ECT. The Claimants recall that the Off-Take
Agreements were entered into between the GSE and each plant eligible to participate in
Italy's Off-Take Regime.[1064] The Claimants state that over 300 of the Claimants' plants
benefitted from the MGP program and held Off-Take Agreements confirming their rights
to do so. The Claimants say that the Off-Take Agreements specifically confirmed the rights
of plants under 1 MW to receive MGPs as established annually in AEEG Resolution

---

[1058]   Ginosa GSE Agreement: C-468, Art. 2; CPHB, ¶ 69, fn. 111.
[1059]   CPHB, ¶ 69.
[1060]   CPHB, ¶ 70.
[1061]   CPHB, ¶ 70.
[1062]   *Greentech*: CL-212, ¶ 464; Claimants' Comments on New Legal Authorities, ¶ 36.
[1063]   Claimants' Comments on New Legal Authorities, ¶ 34.
[1064]   Claimants' Memorial, ¶¶ 149-160; Claimants' Reply, ¶ 436.

No. 280/2007 for the electricity they sold to the GSE.[1065] Specifically, the Off-Take Agreements note that this AEEG Resolution "has defined the modalities and technical-economic conditions of the energy sale and purchase," and they expressly confirmed that the <u>AEEG Resolution fills any gaps in contract terms</u>.[1066] Further, the Claimants point out that Article 4 of the Off-Take Agreements "stated that 'the prices recognized by the GSE to the Producer [of the specific PV plant concerned] are established under articles 6 and 7 of AEEG resolution no. 280/07.'"[1067]

777.    The Claimants contend that Article 7 of AEEG Resolution No. 280/2007 addresses MGPs specifically by stating that they are to be "paid by the GSE upon request of the relevant producer at the signing date of the off-take regime agreement and as alternative to the prices provided for in article 6…."[1068] AEEG Resolution No. 280/2007 further states that "… the GSE **shall** recognize the [MGPs] defined by AEEG to the first and second million of kWh annually produced by a renewable plant under 1 MW, **in order to ensure the economic survival of the smaller plants even in the event the market prices should fall significantly** …."[1069] The Claimants say that this meant that Italy had no room to exercise discretion.[1070]

778.    The Claimants recall that the Off-Take Agreements automatically renewed annually, unless the Producer chose to opt out of the MGP regime.[1071] The Claimants point out that the GSE did not have the right to terminate the agreement unless the Producer violated certain eligibility requirements.[1072]

779.    In sum, the Claimants say that by entering into Off-Take Agreements in which the GSE agreed to purchase all of the electricity produced by PV plants under 1 MW at MGPs, Italy entered into obligations with respect to 341 of the Claimants' investments.[1073] They assert

---

[1065]    Claimants' Reply, ¶ 436; *see*, *e.g.*, Brindisi Off-Take Agreement: C-312.

[1066]    Claimants' Reply, ¶ 436; Brindisi Off-Take Agreement: C-312, Art. 16 (emphasis added).

[1067]    Claimants' Reply, ¶ 436; Brindisi Off-Take Agreement: C-312, Art. 4.

[1068]    Claimants' Reply, ¶ 437; AEEG Resolution No. 280/2007, Annex A: C-382A, Art. 7.

[1069]    Claimants' Reply, ¶ 437; AEEG Resolution No. 280/2007, Annex A: C-382A, pp. 5-6 (emphasis added by the Claimants).

[1070]    Claimants' Reply, ¶ 437.

[1071]    Claimants' Reply, ¶ 438.

[1072]    Claimants' Reply, ¶ 438; Brindisi Off-Take Agreement: C-312, Arts. 13-14.

[1073]    Claimants' Reply, ¶ 461.

that under the Umbrella Clause, Italy was bound to fulfill the contractual obligations enshrined in the Off-Take Agreements.[1074] The Claimants concede that the Off-Take Agreements themselves did not refer to specific MGPs that would apply from year to year, but rather each Agreement expressly incorporated the terms of AEEG Resolution No. 280/2007, which required the GSE to pay MGPs established at levels significant enough to "ensure the economic survival of smaller plants even in the event that market prices should fall significantly."[1075] Thus, the Off-Take Agreements and AEEG Resolution No. 280/2007 confirmed that plants under 1 MW would receive an MGP each year, which the Claimants say created an obligation that Italy was required to fulfill.[1076]

780.    Alternatively, the Claimants say that the Off-Take Agreements and AEEG Resolution No. 280/2007 created an obligation for the Respondent to provide MGPs to PV plants under 1 MW at a meaningful rate; namely an amount sufficient to cover the plants' operating costs and insulate them from market price fluctuations by being *higher* than market price on average.[1077]

781.    Similarly, the Claimants argue that the Respondent's imposition of Imbalance Costs and Administration Fees on its investments breached the obligation with respect to maintaining fixed tariff rates and not eroding those by taking with one hand what had been given by another.

### b.  *The Respondent's Arguments*

782.    The Respondent contests the Claimants' argument that the Umbrella Clause covers statutory and regulatory measures, in addition to contractual obligations.[1078] The Respondent's position is that it never entered into any obligations with either the Claimants

---

[1074]    Claimants' Reply, ¶ 461; *see also* Claimants' Memorial, Section IV.C.

[1075]    *See* Claimants' Reply, ¶¶ 437-438;  Brindisi Off-Take Agreement: C-312, Art. 4, and Claimants' Reply, ¶ 461; AEEG Resolution No. 280/2007, Annex A: C-382A, pp. 5-6.

[1076]    Claimants' Reply, ¶ 461.

[1077]    Claimants' Reply, ¶ 462.

[1078]    Respondent's Counter-Memorial, ¶ 702; Respondent's Rejoinder, ¶ 369.

or any of their investments "because no agreement has ever been undertaken with any of them" and the Claimants "never entered into any reciprocal obligation" with Italy.[1079]

783.    First, the Respondent argues that, upon strict textual analysis, Article 10(1) of the ECT does not cover statutory obligations or general regulations applicable to any operator responding to certain qualities. Contrary to the Claimants' arguments, the Respondent contends that the relevant case law supports this purported exclusion of statutory and regulatory acts from the Umbrella Clause.[1080]

784.    The Respondent takes issue with the *Greentech* tribunal's application of the ECT's Umbrella Clause to a statutory measure (the *Spalmaincentivi* Decree), stating that "to consider that general measures as the [*Conto Energia* Decrees] would be obligations 'entered into' with individual investors … very superficially states principles that are unsupported by any substantial legal analysis or reference to any other awards that could at least vaguely motivate its statements."[1081] For the Respondent, the *Greentech* majority award is "patently wrong both in referencing the facts and assessing them as for the merits" and it asserts that "the dissenting opinion … is much better motivated and articulated, and … follows a much more reasonable approach to the State right to regulate."[1082]

785.    Second, the Respondent asserts that despite Article 10(1) of the ECT covering only contractual obligations, the GSE Agreements do not fall under the protection of the Umbrella Clause because they are "merely accessory contracts" required by law.[1083] In the Respondent's view, the GSE Agreements are not private law contracts generating autonomous rights and obligations.[1084] The Respondent states that the notion of a "contract" must be narrowly construed to exclude "accessory contracts," which "simply

---

[1079]    RPHB, ¶¶ 72-74.

[1080]   Respondent's Counter-Memorial, ¶¶ 703-724; Respondent's Rejoinder, ¶¶ 370-388; RPHB, ¶ 72.

[1081]    Respondent's Comments on New Legal Authorities, ¶¶ 45-46, referring to *Greentech*: CL-212, ¶¶ 464-466 (*see especially*, ¶ 464: "… the Tribunal majority is inclined to interpret 'obligations' referred to in the ECT's umbrella clause as sufficiently broad to encompass not only contractual duties but also certain legislative and regulatory instruments that are specific enough to qualify as commitments to identifiable investments or investors."). *See also* Claimants' Comments on New Legal Authorities, ¶ 36.

[1082]    Respondent's Comments on New Legal Authorities, ¶ 47.

[1083]    Respondent's Counter-Memorial, ¶¶ 725-731; Respondent's Rejoinder, ¶ 391 (*see generally*, ¶¶ 389-394).

[1084]    RPHB, ¶ 72; Respondent's Counter-Memorial, ¶ 725.

transpose legal provisions," and therefore do not generate contractual obligations under the Umbrella Clause.[1085] For the Respondent, since the GSE Agreements are meant to regulate the management and distribution of incentives, and they do not add anything relevant to the legal or regulatory provisions in the *Conto Energia* Decrees, it follows that only the *Conto Energia* Decrees actually determine the legal position of the counter-party.[1086]

786.    The Respondent asserts that neither the Claimants nor any of its Investments ever entered into any reciprocal obligation with the Italy by way of the GSE Agreements "since no synallagma [*sic*] could exist between the tariffs paid and any service or good provided by the investor."[1087] The Respondent submits that "[t]ariffs were subsidies given on top of the price for energy, and were granted also to those investors that were producing for self-consumption ([*i.e.*] in the absence of any sale)" and were non-taxable with VAT "because they did not represent a consideration or anything alike."[1088]

### c.  The Tribunal's Analysis

787.    The Tribunal has found that the Umbrella Clause may, in certain circumstances, protect obligations created by instruments other than contracts. However, in order for a non-contractual "obligation entered into" to give rise to treaty protection, it must be a specific obligation given by the host state to either the investor or its investment. With respect to timing, a successful claim of breach of the Umbrella Clause requires that there be an obligation owed to the Investor or the Investment of the Investor at the time that the Respondent failed to observe that obligation.

788.    As has been discussed above, the Respondent created a regime to attract early and substantial investment in its PV sector. The main mechanism employed to encourage investment was the offer of guaranteed FITs for a period of 20 years for those investors who met the specific criteria set out in the relevant *Conto Energia* Decree. The offer by the

---

[1085]   Respondent's Counter-Memorial, ¶¶ 702, 728; *see also* Respondent's Comments on *SunReserve* in support of this position.

[1086]   Respondent's Counter-Memorial, ¶ 729.

[1087]   RPHB, ¶ 76.

[1088]   RPHB, ¶ 76.

state was specific in the sense that it set out a very specific tariff rate and criteria. It was general in the sense that it was made to all potential investors. Once a specific plant met the criteria and notified Italy, the GSE sent a letter confirming the tariff rate that would apply to that plant. The plant was then required to access the GSE portal and take the necessary steps to record the GSE Agreement.

789.    The Claimants in this case accept that Italy had the ability to unilaterally change the offer in the *Conto Energia* Decree without engaging liability under the ECT before a prospective investor made its investment and advised Italy that it had met the criteria. The Claimants do not challenge the Respondent's ability to adjust, as it did, the specific tariff rates offered in successive *Conto Energia* Decrees. Where the Parties diverge is in their assessment of whether and when the Respondent undertook an "obligation entered into with the investor or its investment," such as to engage the protection afforded by the Umbrella Clause.

790.    The Claimants maintain that the obligations protected by the Umbrella Clause do not require reciprocal obligations. In any event, the Claimants submit that they did, in fact, accept reciprocal obligations by meeting the criteria set out in the *Conto* and making their investments. Further, Italy confirmed those obligations by letter and then followed up with the GSE Agreement addressed to each individual plant. The Respondent maintains that it never entered into any obligations with the Claimants or their investments.

791.    As discussed above, in this case, it is not necessary to consider whether the *Conto Energia* regime on its own created obligations. This is because all of the investments at issue in this case were not only made subject to either *Conto* II, III or IV, they also each received a letter confirming their entitlement to the tariffs set out in the legislation and a GSE Agreement setting out those obligations in the form of a contract, which specifically provided that changes would not be made without the agreement of the parties. The Claimants also allege that the GSE Agreements themselves constitute "obligations" entered into with the Claimants' investments for the limited purpose of the Umbrella Clause. The majority finds that the Respondent entered into the obligation to pay the specific tariff rates set out in the relevant *Conto Energia* Decree and confirmed in the GSE Letters and GSE Agreements for a period of 20 years with the Claimants' investments.

792.    The Tribunal observes that the plain language of the ECT does not limit "obligations" to contractual obligations. The language is broad enough to include statutory and regulatory assurances made to specific investors, as long as those obligations were "entered into with" the investor or its investment. The majority finds that the "obligation" to guarantee specific incentive tariff rates for 20 years arose pursuant to the benefits Italy granted to the Claimants under all three instruments: the *Conto Energia* Decrees, the GSE Letters, and the GSE Agreements, taken as a whole. The majority of the Tribunal agrees with the *Greentech* majority that the analysis need not view the GSE Agreements in isolation.[1089] In any case, the GSE Agreements were clear examples of the obligation entered into with each of the Claimants' investments. The Respondent created a regime designed to attract investment by offering incentive tariffs and then committing to pay those tariffs for 20 years. The system was designed to create specific obligations to each investment by having them confirmed by letter and then followed up with a GSE Agreement. Having found that protected obligations could be made by non-contractual instruments, the Respondent's arguments as to the nature of the GSE Agreements as accessory contracts become irrelevant: if legislation is capable of creating obligations, so too would an accessory contract that gives effect to that legislation.[1090]

793.    Even if the Tribunal were to decide that the "obligations" must arise from a contract, such obligations are in fact enshrined in the GSE Agreements. Having found that they constitute obligations for the purposes of the Umbrella Clause, Italy's assurances as to the specific rate and duration (20 years) granted to each of the Claimants' investments become elevated to an obligation under international law. This "internationalization" of contractual (and statutory and regulatory) obligations is what gives the Tribunal jurisdiction to hear the Claimants' complaints because they are not party to the GSE Agreements, but the ECT provides protection to obligations owed to their Investments. Again, it is important to note

---

[1089]    *Greentech*: CL-212, ¶ 466; Claimants' Comments on New Legal Authorities, ¶ 36.

[1090]    The Tribunal notes that it disagrees with the conclusions reached by the *SunReserve* tribunal with respect to whether the *Conto Energia* Decree language contained sufficient specificity to engage the Umbrella Clause, as well as whether that legislation was directed at a "small and well-defined class of investors." The criteria set out in the *Conto Energia* regime to qualify for the FIT rates was specific and resulted in those tariffs being committed to a small and well-defined class of investors: those who met that criteria and connected to the grid by the relevant date.

that the Claimants do not claim for a breach of the GSE Agreements themselves; the claim is for a breach of the obligation owed to its Investments not to unilaterally modify the tariffs, which obligation is evidenced clearly by the provisions of the GSE Agreements.

794. With respect to the MGPs and Offtake Agreements, the situation is somewhat different. While the MGP regime was set out in the legislation and regulations, the Respondent did not take on an analogous obligation to maintain the MGPs at a certain level or for a specific period of time. The Offtake Agreements, unlike the GSE Agreements, specifically provided for the possibility that the MGPs would change in accordance with the regulations, which the Respondent did not expressly commit to maintain at any particular level. In these circumstances, the majority is of the view that the Respondent did not enter into any obligations with the Claimants or their Investments not to alter the MGP regime or the benefits accorded in the Offtake Agreements.

795. Similarly, there is no express obligation that Italy would not allocate system costs differently than it did at the outset. In order to be protected by the Umbrella Clause, the obligation entered into must be clear. For the purpose of the Umbrella Clause, it is not sufficient to allege that a particular measure had the effect of indirectly impacting an obligation, as the Claimants allege is the case for the imbalance costs and administration fees, which they say impacted the net tariff rates that they received. Accordingly, the majority of the Tribunal finds that there was no obligation entered into with the Claimants or their Investments not to change the allocation of system costs either generally or specifically. It follows that there was no protection under the Umbrella Clause against the imposition of imbalance costs and administration fees.

### (3) Did the Challenged Measures Breach the Umbrella Clause?

#### a. The Claimants' Arguments

##### (i) Spalmaincentivi Decree

796. The Claimants' primary claim under the Umbrella Clause is that the Respondent failed to observe its obligations to the Claimants to pay the fixed tariff amount for a period of 20 years by enacting the *Spalmaincentivi* Decree, which abrogated the original tariff

scheme granted in the *Conto Energia* Decrees (and confirmed in the GSE Letters and Contracts) and imposed reduced tariff rates on the Claimants.[1091]

### *Italy's Obligation to Pay Fixed Conto Tariffs in the Statutory Framework*

797.    The Claimants argue that ECT case law is clear that statutory obligations such as those contained in ministerial decrees and legislation are an "obligation" encompassed by the Umbrella Clause, and thus the *Conto Energia* Decrees "are <u>sufficient on their own</u> to determine Italy's liability."[1092] The Claimants point out that *Contos* II-IV (which are the only *Conto Energia* Decrees applicable to the Claimants' investments) expressly stated that "any agreements modifying … must be agreed upon in writing."[1093] Only in *Conto* V does Italy reserve the GSE's right to unilaterally modify the clauses of the GSE Agreements "as a result of any legislative and regulatory amendments [which] are in contrast with the existing framework."[1094] Since Italy undertook an obligation not to unilaterally modify the express terms of the *Conto Energia* Decrees, the Claimants argue that the Respondent's characterization of the *Spalmaincentivi* measure as a reasonable "fine-tuning" of the incentive tariff regime is irrelevant to the application of the Umbrella Clause.[1095]

### *Italy's Obligation to Pay Fixed Conto Tariffs in the GSE Letters and GSE Agreements*

798.    The Claimants argue that, "while unnecessary to a finding of liability," the GSE Letters and GSE Agreements "provide <u>two independent, additional bases</u> to determine Italy violated the ECT's umbrella clause."[1096] The Claimants say that, whatever their precise nature, the GSE Agreements contain binding obligations, which Professor D'Atena's

---

[1091]    Claimants' Memorial, ¶ 357; Claimants' Reply, ¶ 402.

[1092]    Claimants' Closing Presentation, Slide 41 (emphasis in original).

[1093]    Claimants' Closing Presentation, Slide 46; Carlino I GSE Agreement: C-296, Art. 10; *Conto* III GSE Agreement: C-335, Art. 15; Ginosa GSE Agreement: C-468, Art. 15.

[1094]    Claimants' Closing Presentation, Slide 47; Sample GSE Agreement under *Conto* V: C-246, Art. 17.3.

[1095]    Claimants' Closing Presentation, Slide 38.

[1096]    Claimants' Closing Presentation, Slide 41 (emphasis in original).

testimony confirmed.[1097] The Claimants assert that Italy understood that the GSE Agreements conveyed rights to investors, as evinced by the following statement by an Italian official:

> the operator admitted to benefit from the incentive tariff acquires a subjective [perfected] right to the exact performance of the incentive payment promise … an incentive law … becomes a "guarantee" for the private subject carrying out the incentivized economic activity … A revocation law, therefore, would be inconsistent with the constitutionally protected guarantee offered through the incentive-law.[1098]

799.    The Claimants say that, contemporaneously, Italy understood the GSE Agreements to be typical private law contracts, which is evinced through the express wording of the *Romani* Decree: "The incentives are awarded through private-law contracts between the GSE and the person responsible for the installation."[1099] The Claimants contend that there is no evidence that Italy considered the GSE Agreements differently prior to this arbitration.[1100] Contrary to the Respondent's argument that the GSE Agreements were mere accessory contracts with no legal effect, the Claimants assert that the Agreements were *not* typical operations of administrative law, but rather contain features common in private law contracts, such as references to Articles 1341 and 1342 of Italy's Civil Code (which are required in private contracts where one party has more bargaining power as author of the contract).[1101]

800.    The Claimants contest the Respondent's reliance on the *CEF* award,[1102] stating that there is "no way to reconcile" its findings that the GSE Agreements were "private law contracts" that gave rise to "crystalized rights" with its decision "to absolve Italy of liability under the ECT's umbrella clause without impermissibly concluding that subsequent domestic law

---

[1097]    Claimants' Closing Presentation, Slide 42; Hearing Transcript, Day 2, 256:11-17 ("[Claimants' counsel:] I want to ask you a more basic fundamental question and that is, in your opinion, when our clients' plant entered into this agreement in 2011, would it have been reasonable for our clients to have understood that this agreement contained binding obligations? Prof D'Atena: I would certainly say yes.").

[1098]    Claimants' Closing Presentation, Slides 44-45, citing Italian Procurer General's Brief submitted to the Court of Cassation on 20 September 2016: C-446, pp. 6-7.

[1099]    Claimants' Closing Presentation, Slide 43, citing *Romani* Decree: C-165, Art. 24-2(d).

[1100]    Claimants' Closing Presentation, Slide 43.

[1101]    Hearing, Day 1, 81:7-23.

[1102]    *See* Respondent's Comments on New Legal Authorities, ¶¶ 41-57.

characterizations can override the ECT's umbrella clause at will."[1103] The Claimants advance the view that "there was no doubt for the *CEF* tribunal that the contracts created valid and binding obligations on Italy and created acquired rights for the claimant's plants when they were concluded, which is the point at which the role of domestic law ends in an umbrella clause analysis."[1104]

801.   Moreover, the Claimants say that not only is the 2017 Constitutional Court Decision irrelevant for this Tribunal's Umbrella Clause assessment, but also that the Court only considered a GSE Agreement pursuant to *Conto* V, which contained a "unilateral modification" clause, which was absent from the Claimants' GSE Agreements under *Contos* II-IV, each of which expressly confirmed that it could only be modified by mutual agreement of the parties.[1105]

802.   The Claimants also contest the Respondent's reliance on the 2017 Constitutional Court Decision – which ruled that the *Spalmaincentivi* Decree was constitutional – as a defense against its violations of the GSE Agreements.[1106] The Claimants point out that "Italy's only defense is that its umbrella clause violations are based on domestic law characterizations of its acts as lawful, which are irrelevant under ECT Art. 26(6) and Vienna Convention Art. 27."[1107]

803.   The Claimants argue that the *CEF* tribunal erred in finding that the *Spalmaincentivi* Decree did not violate the Umbrella Clause.[1108] The Claimants take issue with that tribunal's rejection of the claim on the basis of Italian law – by relying on the 2017 Constitutional Court Decision's finding that the *Spalmaincentivi* Decree was compliant with Italian law – rather than grounding its decision in the ECT or international law, thereby "def[ying] the

---

[1103]   Claimants' Comments on New Legal Authorities, ¶ 39, citing *CEF*: CL-213, ¶¶ 217, 237.
[1104]   Claimants' Comments on New Legal Authorities, ¶ 39; CPHB, ¶¶ 98 *et seq.*
[1105]   Claimants' Comments on New Legal Authorities, ¶ 39; CPHB, ¶¶ 29-30.
[1106]   Hearing, Day 1, 79:9-17.
[1107]   Claimants' Closing Presentation, Slide 41 (emphasis in original).
[1108]   Claimants' Comments on New Legal Authorities, ¶ 37.

governing law provision of the ECT."[1109] The Claimants argue that the *CEF* tribunal's deference to the 2017 Constitutional Court Decision "violates fundamental principles of international law, including Article 3 of the ILC Articles on State Responsibility (which states that the characterization of an act as lawful under internal – *i.e.*, domestic – law does not affect the characterization of that act under international law) and Article 25 of the VCLT (which states that a party may not invoke the provisions of its internal law to justify its failure to perform a treaty)."[1110]

*(ii) Administration Fee and Imbalance Costs*

804.   The Claimants argue that the Respondent's "retroactive" and "unexpected" imposition of the Administration Fee and Imbalance Costs on the Claimants' PV facilities (which were deducted from the *Conto* incentive tariff) undermined the Respondent's obligations to pay PV producers fixed incentive tariff rates for 20 years.[1111] The Claimants assert that these Challenged Measures are "classic examples of 'giving with one hand while taking with the other.'"[1112] The Claimants say that these Measures fundamentally changed the economic framework enshrined in the *Conto Energia* Decrees, and in the GSE Agreements that govern each of the Claimants' PV plants, and thus disregarded the obligations that the Respondent entered into with respect to the Claimants' investments.[1113]

*(iii) MGP / Off-Take Regime*

805.   The Claimants allege that the Respondent failed to observe its legal, regulatory, and contractual obligations regarding the Minimum Guaranteed Prices granted in order to protect small PV plants from market fluctuations.[1114] The Claimants contend that the Respondent decreased the Minimum Guaranteed Prices by more than 50%, which resulted

---

[1109]   Claimants' Comments on New Legal Authorities, ¶¶ 37-38, citing *CEF*: CL-213, ¶ 255: "The measures, of which Claimant makes complaint, were addressed to all PV producers and were, in the Tribunal's assessment, compliant with Italian law (as emerged from the decision of the Italian Constitutional Court)."

[1110]   Claimants' Comments on New Legal Authorities, ¶ 38; CPHB, ¶ 25.

[1111]   Claimants' Memorial, ¶ 357; Claimants' Reply, ¶ 506. The Claimants argue that the Respondent's imposition of both administrative fees and imbalance costs of the Claimants' PV facilities violates the ECT in multiple respects, including the umbrella clause.

[1112]   Claimants' Memorial, ¶ 357.

[1113]   Claimants' Reply, ¶ 506.

[1114]   Claimants' Memorial, ¶ 358.

in a price which was 60% lower than market price, and that it eliminated the possibility of the Claimants' plants from benefiting from the regime at all by revising the program so that PV plants could not benefit from both the *Conto Energia* Decrees incentive tariffs *and* the Minimum Guaranteed Price simultaneously.[1115]

### b.  The Respondent's Arguments

#### (i)  Spalmaincentivi Decree

806.  The Respondent relies on *CEF v. Italy* and the dissenting opinion in *Greentech v. Italy* in arguing that the 2017 Constitutional Court Decision "finally settled the matter" of the application of the Umbrella Clause regarding the *Spalmaincentivi* Decree.[1116] The Respondent recalls that the Court held that the obligation which Italy entered into with the Claimants' investments were, under Italian law, subject to unilateral modification by the Respondent.[1117] The Respondent argues that it is a long held principle of Italian law that "also private law contracts can be modified unilaterally by the State."[1118] That said, the Respondent appears to maintain its assertion that the Umbrella Clause cannot apply because the GSE Agreements were accessory contracts.[1119]

### *The Claimants Have Not Proved Any Infringement of Contractual Obligations*

807.  The Respondent contends that the Claimants have not proved any infringement of contractual obligations because they do not allege a direct violation by the GSE and the observance of contractual obligations is for the parties to the contract, not for third parties such as the Claimants.[1120]

---

[1115]   Claimants' Memorial, ¶ 359.

[1116]   Respondent's Comments on New Legal Authorities, ¶ 57; *CEF*: CL-213, ¶¶ 254-255; *Greentech* Dissenting Opinion of Arbitrator Giorgio Sacerdoti, 5 December 2018 (contained in *Greentech*: CL-212), ¶¶ 58-68.

[1117]   Respondent's Comments on New Legal Authorities, ¶ 57. The Respondent fails to specify that this Decision only considered the GSE Agreements executed under *Conto* V, whereas those under *Contos* II-IV do not contain this provision, and instead require mutual agreement by the parties for any modification.

[1118]   Respondent's Comments on New Legal Authorities, ¶ 61.

[1119]   Respondent's Comments on New Legal Authorities, ¶ 63, referring to the *CEF* tribunal's dismissal of the umbrella clause claim.

[1120]   Respondent's Counter-Memorial, ¶ 732 (*see also* ¶¶ 725-740); Respondent's Rejoinder, ¶¶ 395, 401 (*see also* ¶¶ 398-405).

808.    The Respondent further argues that the Tribunal should consider the entirety of the Respondent's conduct in assessing whether the Umbrella Clause was violated. The Respondent says that the Tribunal should consider not only the *Spalmaincentivi* Decree, but also the *Salva Alcoa* Decree (which the Claimants say benefited PV investors) in assessing the Respondent's fulfilment of the Umbrella Clause regarding fixed tariff rates,[1121] which it says lies at the heart of the Claimants' Umbrella Clause claim.[1122]

### (ii) Administration Fee and Imbalance Costs

809.    The Respondent does not provide separate arguments against the Claimants' Umbrella Clause claim regarding the Administration Fees and Imbalance Costs. However, the Respondent does appear to rely on the *CEF* award's recognition that the Umbrella Clause neither applies to any of the Challenged Measures, nor to the GSE Agreements.[1123]

### (iii) MGP / Off-Take Regime

810.    The Respondent does not provide separate arguments against the Claimants' Umbrella Clause claim regarding the MGP.

### c.    *The Tribunal's Analysis*

### (i)  Spalmaincentivi Decree

811.    The majority of the Tribunal has found that it is appropriate in this case to consider the *Conto Energia* Decrees, GSE Letters and GSE Agreements together in assessing whether the Respondent had entered into any obligations with the investors or their investments. In so doing, it is clear that the Respondent entered into obligations with the Investor or its Investments that it would pay the incentive tariff rates for a period of 20 years and not alter that obligation unilaterally. Accordingly, the majority of the Tribunal finds that Italy's violation of the guarantees under the legislative framework in the *Conto Energia* regime through the enactment of the *Spalmaincentivi* Decree violated its obligations to the

---

[1121]    Respondent's Counter-Memorial, ¶¶ 732-737; Respondent's Rejoinder, ¶ 401 (*see generally*, ¶¶ 395-405).
[1122]    Respondent's Rejoinder, ¶ 395, citing Claimants' Reply, ¶ 402.
[1123]    Respondent's Comments on New Legal Authorities, ¶ 63.

Claimants' Investments. The majority therefore finds that this measure also breached the Umbrella Clause.

812.    In so ruling, the majority of the Tribunal has considered whether the provisions of the *Conto Energia* Decrees – the terms of which the majority has already found, above, were confirmed to each of the Claimants' Investments by the GSE Letters and GSE Agreements – constitute "obligations" "entered into" between the Claimants as foreign investors, with respect to their Investments, such that abrogation of the guarantees set forth in the *Conto Energia* Decrees and GSE Agreements violated the ECT.

813.    Italy entered into specific obligations with foreign investors, such as the Claimants, by enacting the *Conto Energia* Decrees, and by confirming the guarantees therein in the GSE Letters and GSE Agreements with each individual qualifying PV plant. The specific incentive tariff rate promised for 20 years under *Contos* II-IV, for which the Claimants' Investments qualified, became obligations within the meaning of Article 10(1) of the ECT once the investors or their investments met the criteria in the relevant *Conto Energia* Decree and advised Italy. The Respondent then confirmed its obligation with respect to the specific plant(s) through a GSE Letter and GSE Agreement addressed to the Investment.

814.    The majority of the Tribunal finds that the *Conto Energia* Decrees themselves set out the basis for the Respondent's obligations, but that these were conditional upon the criteria being met by the specific plant and notified to the Respondent by the Investment. At that stage of the process, there was a specific identifiable obligation entered into with respect to a specific investment.

815.    The *Conto Energia* Decrees contain Italy's offer to pay eligible PV plants a defined tariff rate for 20 years. The Claimants' Investments accepted that offer by building and commissioning PV plants that met the requirements contained in the *Conto Energia* Decrees. The majority of the Tribunal thus agrees with the Claimants that their acceptance of Italy's offer was their investment in the PV plants which all qualified for *Contos* II-IV. This obligation is further evidenced by the inability of Italy to refuse the *Conto* tariffs for plants that met the criteria set forth in the *Conto*. Italy's legislative offer and the Claimants'

acceptance of that offer thus constitute a *quid pro quo* akin to a contractual arrangement to pay the promised tariffs, unchanged, for 20 years. The GSE Letters and, more so, the GSE Agreements formalized the obligations that Italy had already entered into with respect to each of the Claimants' plants.

816.    That said, the majority of the Tribunal finds that by entering into the GSE Agreement, the Respondent also entered into contractual obligations with each of the Italian companies that own the Claimants' Investments (namely, their 341 PV plants at issue).[1124] The majority agrees with the Claimants that, under the Umbrella Clause, the Respondent is therefore bound to fulfil the obligations enshrined in each GSE Agreement, which promised to pay a fixed tariff at a constant rate for a 20 year period.[1125] Italy was, or ought to have been, aware that it was entering into obligations with investments. It was also aware of the identity of the investments and the fact that many of these were represented by foreign nationals.[1126]

817.    Just as the Umbrella Clause does not require an obligation to be in the form of a negotiated agreement to give rise to Umbrella Clause protection, there is no requirement that the obligation be in the nature of a private law agreement. In fact, the classification of the obligation under the law of the host state is irrelevant in interpreting the meaning "obligation" at international law. In any event, the Claimants' Italian law expert confirmed that even at Italian law the GSE Agreements created binding obligations regardless of their character. The majority of the Tribunal notes that any other interpretation of obligation would undermine the object and purpose of the ECT, as it would allow states to avoid international law obligations by classifying those as non-binding at local law. The majority finds that the GSE Agreements were obligations entered into with the Investments such as to give rise to protection under the Umbrella Clause. The Claimants, as the Investors, are entitled to bring a claim under the Umbrella Clause for breach of obligations entered into

---

[1124]    CPHB, ¶ 64; Claimants' Reply, ¶ 461.

[1125]    CPHB, ¶ 64; Claimants' Reply, ¶ 461.

[1126]    CPHB, ¶ 65. *See, e.g.*, Montalto GSE Agreement: C-286; Ardea GSE Agreement: C-334; Carlino 2 GSE Agreement: C-364.

with their Investments. The exclusive jurisdiction clause in the GSE Agreements does not apply to claims for a breach of the ECT.

818.    For the avoidance of doubt, the majority has specifically considered Italy's defense that the *Spalmaincentivi* Decree and its consequent modifications of the GSE Agreements were consistent with Italian law. With respect to the Umbrella Clause claim, Italy made this argument generally in its pre-hearing submissions in support of its primary position that legislative enactments and by extension, accessory contracts that give effect to those enactments, cannot be the source of "autonomous" obligations entered into with an investor for the purposes of the Umbrella Clause. Italy relied on long-standing Italian law principles that allow the state to unilaterally modify accessory contracts,[1127] which it submits were confirmed by the 2017 Constitutional Court decision.[1128] The definition of "obligations entered into" arises from the Tribunal's interpretation of the ECT. The majority has rejected Italy's position that such obligations can never arise from legislation or regulation and instead the protection only relates to private law contracts. Further, the majority has found that in this case Italy did enter into obligations with the Investors' Investments for the purposes of the Umbrella Clause. In accordance with Article 25 of the VCLT, it would be inappropriate for this Tribunal to give effect to Italy's defense that its measures were in accordance with its national law and, ergo, did not breach the ECT. The Tribunal must consider Italy's measures against the international law obligations contained in the ECT.

819.    Also for the avoidance of doubt, the Tribunal has specifically considered Italy's expanded arguments in defense of the Umbrella Clause claim based on other tribunal decisions, which were submitted as comments to those additional awards following the conclusion of the hearing. The Claimants were also afforded the opportunity to comment on those decisions. The Tribunal has already expressed its concern in applying the decisions of other tribunals decided in the context of different investors and facts to matters submitted and argued in this case. However, in light of the extensive submissions made by the Parties, the Tribunal will briefly address the decisions in *CEF v. Italy* and *Greentech v. Italy*, which

---

[1127]    *See*, *e.g.*, Respondent's Rejoinder, ¶ 393.
[1128]    Respondent's Rejoinder, ¶¶ 46-51.

were relied upon by the Parties for certain positions taken for the purposes of the Umbrella Clause claims.

820.   The *CEF* tribunal in that case accepted Italy's position that only contractual obligations can give rise to claims for breach of the Umbrella Clause. Although the *CEF v. Italy* tribunal found that the GSE Agreements were "private law contracts" that gave rise to "crystallized rights," the tribunal ultimately dismissed the claimants' umbrella clause claim in part because of subsequent domestic law characterizations of those Agreements as "merely accessory" by the 2017 Constitutional Court Decision regarding the validity of the *Spalmaincentivi* Decree under Italian law.[1129] As this Tribunal has reached a different conclusion as to the potential sources of obligations entered into with Investors or their Investments for the purposes of the Umbrella Clause, the *CEF v. Italy* tribunal's analysis of the character of the GSE Agreements is irrelevant to this Tribunal's determination.

821.   The *Greentech* majority held that "obligations" as used in the Umbrella Clause is "sufficiently broad to encompass not only contractual duties but also certain legislative and regulatory instruments that are specific enough to qualify as commitments to identifiable investments or investors."[1130] Similar to this Tribunal's finding, it went on to find that "taken as a whole, the *Conto Energia* Decrees, the GSE letters, and the GSE Agreements, amounted to obligations 'entered into with' specific PV operators" and that "each of Claimants' investments received benefits pursuant to all three types of 'obligations.'"[1131]

822.   The dissenting opinion in *Greentech v. Italy*, upon which the Respondent relies, disagrees with this finding of the majority and expresses the view that only contractual obligations are protected by the Umbrella Clause. In advocating the approach of evaluating each obligation separately and, in particular, the GSE Agreements as the source of the obligation, Professor Sacerdoti suggests that the decision of the Italian Constitutional Court that assesses the validity of Italy's measures should be given weight in determining whether

---

[1129]   Claimants' Comments on New Legal Authorities, ¶ 39; *CEF*: CL-213, ¶¶ 217, 237.
[1130]   *Greentech*: CL-212, ¶ 464.
[1131]   Claimants' Comments on New Legal Authorities, ¶ 36, citing *Greentech*: CL-212, ¶ 466.

there was a breach of those contractual obligations at Italian law, as the governing law of those contracts.

823.     The Tribunal disagrees with the proposition that only contractual obligations are protected by the Umbrella Clause. The majority of the Tribunal having found that obligations can be entered into with the Investor or its Investment by sufficiently specific legislation or regulations and that the obligation can be evidenced through multiple instruments, the national law assessment of whether the measures breached obligations is not of primary importance, as it cannot override international law obligations. In any event, even if the Tribunal were to consider the findings of the Constitutional Court, the Claimants rightly point out that the circumstances considered by the Constitutional Court are different than those of this case. Specifically, in arriving at its assessment of whether the state breached the GSE Agreements, the Court only considered the language of a GSE Agreement pursuant to *Conto* V, which contained a "unilateral modification" clause absent from the Claimants' GSE Agreements under *Contos* II-IV. In the context of this case, the relevant GSE Agreements each expressly confirmed that it could only be modified by mutual agreement of the parties.[1132]

824.     Accordingly, in light of this Tribunal's findings, it does not consider it appropriate to apply the reasoning of either the *Greentech* or *CEF* tribunals to its analysis and it finds the 2017 Constitutional Court decision of limited assistance.

### (ii) Administration Fee and Imbalance Costs

825.     As the Tribunal has found that there was no obligation owed by the Respondent to the Claimants or their investments with respect to the imposition of fees, it follows that these measures were not breaches of the Umbrella Clause.

### (iii) MGP / Off-Take Regime

826.     As the Tribunal also has found that there was no obligation owed by the Respondent to the Claimants or their investments with respect to the minimum guaranteed prices or the

---

[1132]     Claimants' Comments on New Legal Authorities, ¶ 39; CPHB, ¶¶ 29-30.

offtake regime, it follows that the measures relating to this regime were not breaches of the Umbrella Clause.

### (4)    Conclusion on Umbrella Clause

827.    The *Spalmaincentivi* Decree breached the Umbrella Clause protection owed to the Claimants. The other measures did not address obligations entered into with the Claimants or their Investments pursuant to the meaning of those terms in the Umbrella Clause.

828.    As the majority of the Tribunal also found that the *Spalmaincentivi* Decree breached the Respondent's FET obligations under the ECT and the damages claimed for each of the alleged breaches is the same, no additional consequences flow from a finding that this decree also breached the Umbrella Clause. **Arbitrator L. Boisson de Chazournes** does not consider that the words "entered into with" in the last sentence of Article 10(1) of the ECT have been given their proper ordinary meaning in light of the customary principles of international law applicable to the interpretation of treaties. These terms do not allow to consider the applicable Italian regulation in the present case which was not specifically designed for *foreign* investors, as an obligation that Italy allegedly "entered into with" the investors. Even assuming that the GSE Agreements are covered by the umbrella clause, the scope of the rights therein does not go beyond that of the regulatory regime on which they were based. Therefore, Arbitrator L. Boisson de Chazournes is not able to subscribe to the majority's approach regarding the finding of a breach of the umbrella clause in this case.

### G.    CONCLUSIONS ON LIABILITY

829.    For the reasons stated above, the majority of the Tribunal has concluded that the *Spalmaincentivi* Decree breached the Respondent's obligation to provide fair and equitable treatment pursuant to Article 10 of the ECT and that it also breached the Impairment Clause and the Umbrella Clause.

830.    The Tribunal has concluded that none of the other Challenged Measures amounted to a breach of the ECT.

831.  In the next section, the Tribunal will address the Claimants' claim for damages flowing from the breaches that have been established.

## XII.  DAMAGES (ISSUE 5)

832.  In light of the Tribunal's findings on liability, only the Claimants' claim for damages flowing from the *Spalmaincentivi* Decree will be considered in the following sections of this award. The majority of the Tribunal has found that the *Spalmaincentivi* Decree breached both the obligation to provide fair and equitable treatment and the Umbrella Clause in reducing the amounts of the feed in tariffs. However, the damages claimed flow from the Decree and its impact on the valuation of the Investments regardless of which provision of the ECT it was found to breach. In other words, no additional damages are claimed because a measure breached multiple provisions of the ECT. The Claimants' damages submissions provided a separate analysis of the alleged impact of each of the Challenged Measures on the value of their investments. Accordingly, it is possible for the Tribunal to assess the damages claim for the *Spalmaincentivi* Decree separate from the other Challenged Measures, which were not found to have breached the ECT. In light of her views on the liability issues as expressed in paras. 645, 709 and 829, **Arbitrator L. Boisson de Chazournes** does not concur with the quantum and interest sections as decided by the majority of the Tribunal. Therefore, the reference to the "Tribunal's Analysis" in Parts XII and XIII of the Award should be read as referring to the majority.

833.  The Parties disagreed as to both the correct legal standard that applies to the assessment of damages in this case, as well as whether the Claimants' Investments suffered any damage at all as a result of the measures and, if so, the quantification of those damages. In the following sections of the Award, the legal standard will be discussed first before turning to the Respondent's specific issues with the Claimants' assessment of and their expert's quantification of damage. Finally, the Tribunal will assess the quantum of the damages proved.

## A.    APPLICABLE COMPENSATION STANDARD (ISSUE 5.1)

834.    The Claimants submit that, in the event that they are successful on any of their claims for breach of the ECT, they are entitled to full compensation for the impact of those breaches on the value of their Investments.

835.    The Respondent argues that the Tribunal has broad discretion to award something other than full compensation, as it can weigh the purpose of the measures against the impact on the Claimants' investments.

836.    The Parties agree that the ECT, the *lex specialis* in this case, does not contain any applicable guidance as to the compensation due in these circumstances. While Article 13 of the ECT outlines the conditions that the Respondent must satisfy in order to lawfully expropriate investments, the Claimants do not claim that their investments were expropriated. Further, the Claimants' success on their claims related to the *Spalmaincentivi* Decree means that they have established that this measure was illegal. Accordingly, both Parties submit that the ECT does not set out an applicable standard for compensation and that the Tribunal must look to customary international law principles.

### (1)    The Claimants' Arguments

837.    The Claimants say that customary international law provides for the full compensation standard, as articulated in the following passage in *Chorzów Factory*:

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe-out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it-such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[1133]

---

[1133]    Claimants' Memorial, ¶ 363, citing *Case Concerning the Factory at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928 (1928 PCIJ, Series A. No. 17) ("***Chorzów Factory***"): CL-096, p. 47.

838.    The Claimants state that numerous tribunals have applied the full compensation standard to investment treaty violations such as FET and other standards, including the tribunals in *Amoco v. Iran*, *MTD v. Chile*, *AAPL v. Sri Lanka*, *Vivendi v. Argentina*, and *Azurix v. Argentina*.[1134] The Claimants note that the *Vivendi v. Argentina* tribunal stated that "it is generally accepted today that, regardless of the type of investment, and regardless of the nature of the illegitimate measure, the level of damages awarded in international investment arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action."[1135]

839.    The Claimants submit that the regulatory and public purpose nature of the Challenged Measures and the absence of fraudulent intent are not factors that this Tribunal should consider in assessing damages.[1136] In any event, the Claimants argue that on the facts of this case, the general regulatory character of the Challenged Measures or the Respondent's position that they were in furtherance of legitimate public policy goals do not excuse Italy's conduct under the applicable substantive legal standards engaged by the ECT and international law.[1137] In short, the Claimants argue that once the Tribunal has found that the Challenged Measures breached the ECT, the aim of the damages assessment is to provide full reparation for those acts. The Claimants submit that the Respondent's approach amounts to rearguing the case on liability in the context of the quantification of damages.[1138]

---

[1134]    Claimants' Memorial, ¶¶ 364-368, citing *Amoco International Finance Corporation v. Government of the Islamic Republic of Iran*, Iran-US Claims Tribunal, Award No. 310-53-3 (Chamber 3), 14 July 1987, 15 Iran-US Cl. Trib. Rep. 189 ("***Amoco v. Iran***"): CL-095, ¶¶ 193-199; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 ("***MTD v. Chile***"): CL-077, ¶ 238 (Iran did not object to the application of full compensation and no differentiation was made about that standard in relation to the grounds on which it is justified); *Asian Agricultural Products Limited (AAPL) v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990 ("***AAPL v. Sri Lanka***"): CL-098, ¶¶ 87-88 (The parties agreed that in a case of property destruction, full compensation for the value of the investment lost); *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ("***Vivendi v. Argentina***"): CL-099, ¶ 8.2.7; *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Annulment, 1 September 2009 ("***Azurix Corp. v. Argentina*** (Annulment Decision)"): CL-100, ¶ 332.

[1135]    Claimants' Memorial, ¶ 367, citing *Vivendi v. Argentina*: CL-099, ¶ 8.2.7.

[1136]    Claimants' Reply, ¶¶ 512-513, 515.

[1137]    Claimants' Reply, ¶¶ 521-522.

[1138]    Claimants' Reply, ¶ 523.

840.    The Claimants assert that the same principles espoused in unlawful expropriation cases govern the determination of damages in cases involving FET and other investment protection treaty standards.[1139] In particular, the Claimants dispute the Respondent's contention that in cases of impairment by non-expropriatory violations, the principle of full compensation does not apply.[1140]

841.    The Claimants also contest the Respondent's suggestion that the Tribunal award no damages because the impact of its illegal measures on the Claimants' investments "was something less than total destruction."[1141] The Claimants rely on *Vivendi v. Argentina* for the principle that, in the event of partial impairment of the investment, full compensation will be based on the amount of impairment in the value of the investment caused by the state's violation.[1142] Therefore, the Claimants say that the degree of harm caused has no bearing on the application of the full compensation principle.

842.    The Claimants agree that the Tribunal has discretion in calculating the amount needed to provide full compensation for the losses suffered, including assessing the reasonableness of the various assumptions embedded in the Parties' quantum calculations and considering whether any of the damages claimed were caused by events independent of the illegal measures.[1143] However, the Claimants strongly refute the Respondent's position that "the Tribunal can or should reduce its award of damages below full compensation based on supposed 'equities,' unmoored to any legal principle or standard, that supposedly justified [the Respondent's] illegal behavior."[1144]

843.    The Claimants request full compensation identified as the diminution in their Investments' fair market value caused by the Respondent's measures and calculated by means of the

---

[1139]    Claimants' Reply, ¶¶ 516-517 and fn. 523; *CMS v. Argentina*: CL-071, *Gemplus S.A. and others, and Talsud S.A. v. United Mexican States*, ICSID Cases Nos. ARB(AF)/04/3 and ARB(AF)/04/4, Award, 16 June 2010: CL-187, ¶ 12-52; *Azurix Corp. v. Argentina* (Annulment Decision): CL-100; *MTD v. Chile*: CL-077.

[1140]    Claimants' Reply, ¶ 520, addressing the Respondent's reliance on *Vivendi v. Argentina*: CL-099 (*see, e.g.*, Respondent's Counter-Memorial, ¶¶ 750, 752.

[1141]    Claimants' Reply, ¶¶ 525-526.

[1142]    Claimants' Reply, ¶¶ 519-520; *Vivendi v. Argentina*: CL-099, ¶ 8.2.7.

[1143]    *See* the discussion of *CMS v. Argentina*: CL-071 and *Azurix v. Argentina* (Annulment Decision): CL-100 in Claimants' Reply, ¶¶ 520-523.

[1144]    Claimants' Reply, ¶ 523.

discounted cash flow method. The Claimants emphasize that, contrary to what is implied by the Respondent's submissions, they do not request the full fair market value of their Investments as damages.[1145] The Claimants' experts calculated the individual impact of each of the Challenged Measures on the fair market value of the Investments.

844.    In response to Respondent's argument that the *Salva Alcoa* Decree should be taken into account in assessing damages, the Claimants maintain that it has no legal relevance and no impact on the Claimants' treaty claims or on quantum.[1146] The Claimants assert that they knew that Italy might change tariff rates for future plants *before* some of the Claimants' plants were constructed and connected to the grid, since Italy did precisely that when it enacted *Contos* II, III, and IV.[1147] The Claimants submit that they worked to manage the risk that the tariff might change during the development and pre-connection stage, and do not claim that Italy violated the ECT for any of those "pre-commissioning" changes.[1148]

845.    The Claimants contend that the *Salva Alcoa* Decree was a change to the regime that Italy made for the benefit of the grid authorities responsible for connecting completed PV plants to the grid within specified deadlines.[1149] It was not adopted for the benefit of the Claimants. The Claimants point out that the *Salva Alcoa* Decree did not alter the Claimants' obligation to complete plant construction by the original deadline of December 2010 and that the Claimants met those obligations.[1150]

846.    The Claimants further argue that the *Salva Alcoa* Decree did not affect the incentive tariffs that Italy had already granted to a given plant.[1151] As such, the Claimants assert that the *Salva Alcoa* Decree did not change the expected revenues of any of its plants.[1152] The Claimants say that Italy's argument that the benefit derived from the *Salva Alcoa* Decree

---

[1145]    Claimants' Reply, ¶ 526.
[1146]    CPHB, ¶¶ 14, 17.
[1147]    CPHB, ¶ 16.
[1148]    CPHB, ¶ 16.
[1149]    CPHB, ¶ 17.
[1150]    CPHB, ¶ 17.
[1151]    CPHB, ¶ 17.
[1152]    CPHB, ¶ 17.

should be off-set in damages is an "irrelevant 'sideshow' to avoid addressing the real issue in this case: the legality of Italy changing its incentives regimes for [qualifying] plants *after* Italy granted fixed tariffs to those plants" on a constant basis for 20 years.[1153]

### (2)    The Respondent's Arguments

847.    The Respondent argues that the Claimants are not entitled to full compensation in the circumstances of this case. The Respondent argues that the Tribunal should consider the Respondent's defenses – the general and regulatory nature of the measures, the absence of fraudulent intent, and the measures' public purpose – and reduce the amount of any compensation owed to the Claimants accordingly.[1154]

848.    In support of its position, the Respondent provides a different interpretation of the passage from *Chorzów Factory* quoted at paragraph 838, above. It agrees that "the rationale of damages is to wipe out the consequences of the illegal act and re-establish the original situation," but goes on to note that the tribunal "mitigated" this standard by using the expression "as far as possible," which it submits confirms that "the correspondence between damages and compensation" is of a "probabilistic" nature.[1155] Second, the Respondent argues that this passage "refers more to the kind of measure to compensate (restitution versus compensation), than to the actual quantification of damages."[1156]

849.    Based on this interpretation and its interpretation of other cases, the Respondent argues that tribunals have discretion in determining their approach to damages in cases that do not involve expropriation.[1157] The Respondent contends that the only non-expropriation case cited by the Claimants in support of their full compensation argument is *AAPL v. Sri Lanka*, which concerned the obligation to provide full protection and security.[1158] However, the

---

[1153]    CPHB, ¶ 17 (emphasis in original).

[1154]    Respondent's Rejoinder, ¶ 539. *See also* Respondent's Counter-Memorial, ¶¶ 752-753 ("… damages to the investor need to be balanced with the State's reasons for the adoption of the contested measures") and 755 ("the amount of … compensation [should] be … reduced by considering the arguments exposed in this [Compensation] Section.").

[1155]    Respondent's Counter-Memorial, ¶ 746.

[1156]    Respondent's Counter-Memorial, ¶ 746.

[1157]    Respondent's Counter-Memorial, ¶¶ 747-748.

[1158]    Respondent's Counter-Memorial, ¶ 749; *AAPL v. Sri Lanka*: CL-098.

Respondent argues that the damages in that case were comparable to those of an expropriation because the investor was deprived of the entirety of its investment due to a complete destruction of the value of the investment.[1159] In this regard, the Respondent also contests the Claimants' reliance on *Vivendi v. Argentina* for the principle of full compensation, noting that the tribunal in that case specifically stated that

> the level of damages necessary to compensate for a breach of the [FET] standard could be different from a case where the same government expropriates the foreign investment. The difference will generally turn on whether the investment has merely been impaired or destroyed.[1160]

850. The Respondent asserts that the Claimants' investments were not destroyed. To the contrary, the Respondent submits that they "are still functioning and (highly) profitable," and thus damages should be reduced accordingly.[1161]

851. In the Respondent's view, for non-expropriatory treaty breaches, a tribunal must balance and "equitably reduce"[1162] the purported damages to the investor with the state's reasons for adopting the measures.[1163] The Respondent relies on the tribunal's decision in *CMS v. Argentina*, which noted in the course of its reasons that the consequences stemming from the financial crisis ought to be considered by the tribunal when determining compensation, as business could not have continued as usual in those circumstances.[1164]

852. For the Respondent, it follows that, if the Tribunal agrees that the *Spalmaincentivi* Decree was enacted for a legitimate public purpose, the Tribunal should not consider the fair market value of the Claimants' investments in assessing the quantum of damages.[1165] The Respondent argues that its "regulatory intervention was proportionate to the goal because it … address[ed] the public policy issue without having a disruptive effect on the

---

[1159]    Respondent's Counter-Memorial, ¶ 749.

[1160]    Respondent's Counter-Memorial, ¶ 750, citing *Vivendi v. Argentina*: CL-099, ¶ 8.2.8.

[1161]    Respondent's Counter-Memorial, ¶ 751.

[1162]    Respondent's Counter-Memorial, ¶¶ 752-754 and fn. 356; *Azurix v. Argentina* (Annulment Decision): CL-100, ¶ 332.

[1163]    Respondent's Counter-Memorial, ¶ 752.

[1164]    Respondent's Counter-Memorial, ¶ 752 and fn. 354 citing *CMS v. Argentina*: CL-071, ¶ 356.

[1165]    Respondent's Counter-Memorial, ¶ 754, citing *Azurix v. Argentina* (Annulment Decision): CL-100, ¶ 332.

stakeholder suffering the cost of the public measure."[1166] It relies on the evidence of Mr. Miraglia of the GSE, which states that the *Spalmaincentivi* Decree was a fine-tuning of the regulatory regime that only resulted in about a two percent reduction in the incentives paid to the Claimants.

853.    The Respondent says that the Claimants' profit expectations at the time they invested were exceeded by their better performance, and that alleged "extra profits"[1167] made by the Claimants' investments reduced the impact of the Challenged Measures, thus lowering the quantum of damages.[1168] The Respondent's experts, GRIF, explained that "extra profits … are profits which are above normal level," namely that they are "higher than the level associated to an analogous financial activity."[1169]

### (3)    The Tribunal's Analysis

854.    In the majority of the Tribunal's view, the Claimants having proved that the *Spalmaincentivi* Decree breached the provisions of the ECT, they are entitled to be fully compensated for the impact of this measure on their Investments.

855.    The standard of full compensation articulated in the *Chorzów Factory* Judgment of 13 September 1928 requires the Tribunal to determine what compensation is necessary in order to "*as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.*" The standard is clear; the goal of the exercise is to compensate the Claimants in a way that wipes out the consequences of the illegal act. While in *Chorzów Factory*, there were a number of options discussed by the tribunal, including restitution in kind, it was clear that the overall aim was to restore the wronged party to the financial situation it would have been in but for the Respondent's wrongful act. It is not possible in most cases

---

[1166]    RPHB, ¶ 80.

[1167]    GRIF Q2, p. 40, Table 2: GRIF's Corrected Counterfactual Position based on the PVGIS data is €200.9 million and its Actual Position is €203.3 million; *ibid.*, p. 8: The Claimants Investments suffered no damages as a result of the Challenged Measures.

[1168]    RPHB, ¶ 80.

[1169]    Hearing Transcript, Day 4, 819:2-12: "From an economic point of view, extra profits are profits which are above normal level. The normal level implies the remuneration of the inputs used by the firm and it is the best alternative use of that input in another, for instance, sector." *See also* Hearing Transcript, Day 4, 820:1-3.

to unwind the clock and put the wronged party back into the situation it was in before the wrongful acts. Thus, in order to wipe out the consequences, this analysis necessarily can only be done "as far as possible." It is impossible to know the exact situation that would have existed if the wrongful act had not been committed. Therefore, the analysis is focused on re-establishing the situation that would have existed "in all probability." It also requires a holistic analysis. The first step provides for restitution in kind or its monetary equivalent and the second for damages for losses sustained but not covered by restitution.

856.    The Tribunal disagrees that this approach entitles it to consider "the general and regulatory character of Italian measures, the absence of any fraudulent intent whatsoever, the fundamental public purpose characterizing each of the measures and therefore equitably reduce the amount of compensation (if any) from the full value of damages,"[1170] as submitted by the Respondent. Having found that the *Spalmaincentivi* Decree was unlawful, the Tribunal must determine what measure of damages would wipe out the consequences of this measure for the Claimants. To the extent that the Respondent's arguments regarding the purpose of the Challenged Measures are relevant, they have already been considered by the Tribunal in reaching its decision on liability.

857.    The cases cited by the Respondent in support of its position that these considerations are relevant to damages were decided in the context of the Argentine financial crisis. The tribunals in those cases recognized that while the measures caused some of the claimants' losses, the financial crisis affected the entire economy and it was difficult to determine which losses were attributable to the measures and which would have been suffered in any event. This did not amount to a reduction of damages on equitable grounds. It was an attempt to assess what situation the claimants would have been in "in all probability" absent the measures, but taking into account the existence of the financial crisis, which was the impetus for the measures. The tribunals in those cases were still looking to award full compensation to the claimants, but only for the losses caused by the measures and not the crisis more generally.

---

[1170]    Respondent's Rejoinder, ¶ 539.

858.    In this case, the Respondent has not argued that the damages claimed are not attributable to the measures or that they would have been suffered in any event. The Tribunal understands the Respondent's position to be that since the measures did not completely wipe out the value of the Claimants' Investments and, in fact, the Investments continued to be profitable after the measures, which were passed for a public purpose, the Tribunal should award the Claimants something less than full compensation. This is contrary to the fundamental customary international law principle of full compensation for wrongful acts. The Tribunal's discretion in estimating the amount of damages needed to provide full compensation does not extend to awarding damages that amount to less than full compensation.

859.    Accordingly, the Tribunal will review carefully the Claimants' claims for damages flowing from the *Spalmaincentivi* Decree in light of the circumstances surrounding the measures in order to ensure that any damages awarded provide full compensation, but no less nor more than full compensation, to the Claimants.

B.    **METHODS OF VALUATION AND QUANTIFICATION OF DAMAGES (ISSUE 5.2)**

860.    The Claimants claim damages for two different aspects of the *Spalmaincentivi* Decree, the incentive tariff reduction itself (the "**IT Decrease**") and the impact in the change to the payment terms of the tariffs ("**IT Payment Term Change**"). Since the Tribunal found that the IT Payment Term Change, unlike the IT Decrease, was not a breach of the ECT, this aspect of the Claimants' claim for damages will not be considered further.[1171] The Claimants' expert, FTI, quantified the effect of these measures by performing a valuation of the Claimants' Investments before and after the IT Decrease. The Claimants claim the diminution in the fair market value of their Investments as calculated by FTI as the damages flowing from the IT Decrease.

861.    The valuation methodology employed by FTI was a discounted cash flow ("**DCF**") analysis. The DCF method values an investment based on future cash flows that the investment is expected to generate, "discounted" to a present value to account for the time

---

[1171]    *See above*, para. 569.

value of money and risk of the forecasted cash flows.[1172] FTI compared the value of the Investments based on the future cash flows expected under the tariffs before the measures (the "**Counterfactual Position**") to the value of the Investments based on the cash flows following the IT Decrease (the "**Actual Position**").[1173] FTI values the Claimants' shares in and shareholder loans made to the companies that own the PV plants in Italy.[1174] FTI calculates the combined effect of the *Spalmaincentivi* Decree on all of the Claimants' Investments to be €17.5 million at the Valuation Date, €16 million of which relates to the IT Decrease.

862.    The Respondent challenges the basis of the Claimants' claim for damages. It argues that fair market value is not an appropriate measure of damages in cases where an investor's investments remain intact and profitable. The Respondent urges the Tribunal to consider all of the circumstances surrounding the PV investments rather than employ strict income-based methods such as DCF, which it says would result in "excessive remuneration of the invested capital" and unjust enrichment of the Claimants.[1175] Further, the Respondent says that the method that the Claimants have used to calculate fair market value and quantify damages – the DCF method – is inappropriate. These objections to the Claimants' methodology will be considered in the following section of the Award before turning to the issues of quantum of damages.

### (1)    The Claimants' Arguments

863.    As noted, the Claimants claim for the diminution in the fair market value of their Investments related to the IT Decrease. The Claimants are investment funds. The Claimants' investments consist of shareholdings in the PV facilities that operate in Italy. In the claim for damages, the Claimants' expert, FTI, has determined the fair market value of each of the investments individually before each of the Challenged Measures and also determined the fair market value of each of the investments individually at 1 January 2015,

---

[1172]    Claimants' Memorial, ¶ 374; FTI Q1, ¶¶ 4.14-4.19.

[1173]    Claimants' Memorial, ¶ 372.

[1174]    Claimants' Memorial, ¶ 372.

[1175]    Respondent's Counter-Memorial, ¶¶ 764-765 and fn. 362; Respondent's Rejoinder, ¶ 546.

which is the date that the last of these measures took effect, in order to calculate the damages suffered by the Claimants.

864.    FTI used the DCF method to perform this analysis, which allowed it to separately quantify the impact of each of the Challenged Measures on the fair market value of the investments. The Claimants submit that a DCF analysis is the most appropriate method for calculating their losses in this case and that the appropriate date for the assessment of damages is 1 January 2015, as this was the effective date of the final measure that the Claimants challenge, the reduction in the incentive tariffs guaranteed by the *Conto Energia* regime.[1176] The Claimants instructed their expert to use 1 January 2015 as the valuation date (the "**Valuation Date**").

865.    In the Claimants' view, the legal standard for determining the quantum of compensation is the same for each Claimant and each Investment regardless of when acquisition occurred.[1177] As discussed above, the Claimants assert that the proper legal standard for quantum is to "as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[1178] The Claimants assert that they acquired all of their Investments before any of the Challenged Measures took effect (or had even been announced), and thus the date of acquisition is irrelevant to quantum.[1179]

866.    The Claimants say that the DCF method is appropriate for this case because the performance of solar PV plants is relatively predictable. In particular, they note that they can sell all of the electricity they produce at prices and costs that are known or can be forecast with a high degree of confidence for a significant period of time.[1180] FTI's Mr. Edwards testified that other valuation approaches – such as the relative valuation,

---

[1176]    Claimants' Memorial, ¶ 373

[1177]    CPHB, ¶ 88.

[1178]    CPHB, ¶ 88, citing Claimants' Memorial, ¶ 365.

[1179]    CPHB, ¶ 88.

[1180]    FTI Q1, ¶¶ 4.14-4.19.

cost-based valuation, and asset-based valuation – are unlikely to lead to an accurate assessment of loss in the circumstances of the case.[1181]

867. FTI's Mr. Edwards testified that the advantages of the DCF method include that it quantifies the impact of individual regulatory changes explicitly and accurately, and that specific characteristics and performance such as capacity, tariff and cost structure of the Claimants' plants are properly reflected in the valuations.[1182] Mr. Edwards described three principal reasons why the DCF method is the most appropriate way to assess quantum in this case.

868. First, demand is guaranteed by the right to priority offtake; market revenue, operating costs and inflation are the same in both the Counterfactual and Actual Positions; and the only material variables in the DCF calculation are electricity production and the Weighted Average Cost of Capital ("**WACC**").[1183] The financial performance of PV assets, once in operation, are highly predictable, particularly when they operate pursuant to a regulatory regime such as the one set out in the *Conto Energia* regime.[1184] In particular, electricity production is highly predictable.[1185] Therefore, the cashflows of the Claimants' Investments are predictable because they do not have to compete in order to sell electricity, since they have priority dispatch and the price at which they sell electricity, and the costs they incur is largely known in advance through long-term maintenance contracts.[1186]

869. FTI suggests that the Respondent's expert, GRIF, concedes the predictability point when it states that investments in renewable energy in Italy are very low risk, and equates returns to that of government bonds.[1187] FTI asserts that GRIF's likening of the *Conto Energia*

---

[1181]    FTI Quantum Presentation, Slides 5, 25. FTI explained that alternative valuation methods make implicit assumptions about future cash flows, but that they are unlikely to allow losses to be assessed accurately.

[1182]    FTI Quantum Presentation, Slide 5. *See also* Claimants' Memorial, ¶ 374: The Claimants contend that the DCF method ensures that the effect of the regulatory changes on the financial performance of the specific asset is properly assessed.

[1183]    Claimants' Opening Presentation, Slide 170; FTI Q1, §§ 4-6.

[1184]    Claimants' Reply, ¶ 528; FTI Q2, ¶¶ 3.4, 3.7-3.9; Hearing Transcript, Day 3, 671:12–674:3.

[1185]    Claimants' Opening Presentation, Slide 171; FTI Q2, ¶ 3.5.

[1186]    Hearing Transcript, Day 3, 671:22–672:4.

[1187]    Claimants' Reply, ¶ 528; FTI Q2, ¶¶ 3.4, 3.7-3.9.

regime to government bonds "implies a very high degree of predictability of returns" and thus supports the use of the DCF method for valuing PV plants.[1188]

870. Second, Mr. Edwards testified that by carefully analysing each of the Claimants' PV plant's cashflows, he could specifically quantify the impact on value of individual measures, which no other evaluation method allows.[1189]

871. Third, Mr. Edwards stated that the DCF method is commonly used by lenders, investors and third-party valuation advisors in the PV market – not just by experts in litigation – as the "primary, and often the only, method used to value PV plants."[1190] Mr. Edwards pointed out that the Respondent's experts, GRIF, and Mr. Miraglia of GSE both used some form of DCF method in their reports.[1191] Mr. Miraglia approached the task of forecasting the Claimants' plants' incentive tariff revenues independently. Mr. Edwards notes that despite slight differences in his approach relating to the assumptions as to degradation of assets compared to FTI's, his calculation of the expected financial performance of the plants was very similar to FTI's.[1192]

872. The Claimants also point out that in *Eiser v. Spain*, a similar case to the present one in that it involved the assessment of damages for changes in a PV tariff regime, Spain's argument that the DCF method was not suitable for valuing damages was rejected by the tribunal as "unwarranted."[1193] The tribunal in that case observed that the DCF method had frequently been applied as an appropriate and effective means for arriving at a valuation of a business operating as a going concern prior to adverse government actions.[1194]

---

[1188]    Claimants' Reply, ¶ 528; FTI Q2, ¶¶ 3.4, 3.7-3.9; GRIF Q1, § 5, p. 25; GRIF Presentation, Slide 13. However, at the Hearing, GRIF testified that it did not mean PV investments in Italy had to guarantee a return on the invested capital at the same level as the government bonds: Hearing Transcript, Day 4, 713:10-15.

[1189]    Hearing Transcript, Day 3, 672:9-15.

[1190]    Claimants' Reply, ¶ 529; FTI Q2, ¶¶ 3.11-3.12; Hearing Transcript, Day 3, 672:16-19; FTI Quantum Presentation, Slide 6.

[1191]    *Ibid.*

[1192]    Hearing Transcript, Day 3, 673:19–674:3.

[1193]    Claimants' Reply, ¶ 530; *Eiser v. Spain*: CL-135, ¶ 465.

[1194]    *Ibid.*

873.    FTI calculates that the *Spalmaincentivi* Decree reduced the value of the Claimants'
investments (determined to be €351.1 million in the aggregate before any of the
measures)[1195] by €17.5 million or 7.5%.

### (2)    The Respondent's Arguments

874.    The Respondent contends that the use of fair market value calculated by means of a DCF
analysis is not an appropriate means to calculate compensation in this case, and that the
Claimants do not provide sufficiently specific arguments in support of their claims.[1196]

875.    As an initial matter, the Respondent submits that fair market value is only appropriate in
cases of expropriation or other treaty breaches that result in a near total destruction of the
value of the investment. According to the Respondent, a fair market value analysis is aimed
at calculating the value of an investment at a given time, rather than the damages
"concretely" suffered by the investor, and is thus typical of damages for expropriation.[1197]

876.    In this case, the Respondent contends that the Claimants have not suffered "effective
damage" because their PV plants remain "fully operational and profitable."[1198] On this
basis, the Respondent asserts that its proposed method of assessing damages is correct. The
Respondent's experts provide an analysis of "the original economic expectations of
Claimants for the remuneration of [their] investment through the [FIT] regime, as
compared with the effective remuneration of such regime."[1199] The Respondent, through
its expert, GRIF, contends that this approach is appropriate in a highly regulated sector like
the one at issue here, as investors should have expected that the state would fine tune the
feed in tariff rates to reflect the decreasing costs and any variance in production levels.

877.    In response to Claimants' methodology, the Respondent asserts that a "concrete calculation
of compensation should avoid determining an amount resulting into an excessive
remuneration of the invested capital, as it would be, from a general point of view, by

---

[1195]    FTI Q1, p. 76, Table 6-1.

[1196]    Respondent's Counter-Memorial, ¶¶ 758-766; Respondent's Rejoinder, ¶¶ 544 *et seq.*

[1197]    Respondent's Counter-Memorial, ¶ 759.

[1198]    Respondent's Counter-Memorial, ¶ 759, ¶ 765.

[1199]    Respondent's Counter-Memorial, ¶ 765.

utilizing income-based methods, such as the DCF."[1200] Further, the Respondent says that the DCF method is highly speculative and therefore not appropriate to quantify damages.[1201]

878.  Further, the Respondent urges the Tribunal to consider all of the circumstances, including the positive impact of the *Salva Alcoa* Decree on the Claimants' investments and the timing of the acquisition of various plants when assessing any damages in this case.

879.  The Respondent characterizes the *Salva Alcoa* Decree as an "unexpected benefit" that it conferred on PV investors, allowing them a longer period of time to gain the higher *Conto* II tariffs, rather than the *Conto* III tariffs that would have otherwise applied. Mr. Miraglia calculates the positive impact of the *Salva Alcoa* Decree on the Claimants' investments to be €10.7 million.[1202]

880.  The Respondent argues that, "following the strict logic of the Claimants, the adoption of the *Salva-Alcoa* was unforeseeable by the investors at the time of making the investment, since this was a measure undertaken as an immediate response to the huge amount of investments made in those years that had generated a deadlock in connection to the grid."[1203] The Respondent contends that if the *Spalmaincentivi* Decree is considered to have retroactive effects because, at the time of making the investment, the producer could *not* have known it would have been adopted, then the same reasoning has to apply in the case of the *Salva Alcoa* Decree. Accordingly, the Claimants received an unexpected benefit from the application of the *Salva Alcoa* Decree, which should be deducted from any changes assessed by the Tribunal.

881.  With respect to the timing of the acquisition of the investments, the Respondent contends that there is a "structural difference" between investors that actually undertook the development and construction of a plant, and those that buy on the secondary market.[1204]

---

[1200]  Respondent's Counter-Memorial, ¶ 764; Respondent's Rejoinder, ¶ 546.
[1201]  Respondent's Rejoinder, ¶ 548.
[1202]  Miraglia WS2, p. 4, Summary Table 2.
[1203]  RPHB, ¶ 16.
[1204]  RPHB, ¶ 83.

For the Respondent, the latter are "less vulnerable," and thus "do not respond to the logics that justify the incentives."[1205]

882.    The Respondent argues that the Tribunal's assessment of damages "should be based on the price of the acquisition and after an assessment of weather [*sic*] and to what extent regulatory risk had been internalised into the negotiated price."[1206] The Respondent further contends that "the price was the result of free negotiation and consequently the investor should bear the whole of the regulatory risk as part of transacting costs in a regulated market."[1207] In the Respondent's view, in the absence of "adequate due diligence," the investor should bear its own damages "and consequently be held at the very least partially responsible."[1208] The Respondent asserts that the Claimants "are very sophisticated investment funds" and thus they should absorb "the regulatory risk inherent in managing a fund."[1209]

883.    The Respondent does not propose an alternative means of calculating damages, as its primary position is that the Claimants have suffered no loss. Instead, the Respondent's experts analyse what they say were investors' economic expectations at the time they made their investments and compare those to the current circumstances arguing that awarding any damages would result in "an unjustified enrichment" by awarding a higher return on invested capital than what it says the Claimants expected.[1210] The Respondent submits that

---

[1205]    RPHB, ¶ 83.

[1206]    RPHB, ¶ 84.

[1207]    RPHB, ¶ 84. *See also* the Respondent's arguments at Transcript, Day 4, 887:23–888:18:

> Now, the scheme was meant to support sunk costs. We all agree. It is also uncontroversial that at least 80, the Claimants say even 90 per cent of costs are supported upfront. Is the level of vulnerability the same for someone acquiring a project close to completion to that sitting duck that makes the development of the plant? Can the acquirer choose among projects, locations, countries? Can the acquirer give a price to regulatory risk? Is there really no difference between these two people in the quality of regulatory risk that they can take? And what is the responsibility that an administrator of a fund must undertake, faced with its investors? FTI affirms that all regulatory risk must be borne by the public. We don't agree with that. But what do you think on the opposite, that it is the role of an investment fund, deciding to invest in an almost-ready project, so not getting into the business of development as for assumption of regulatory risk?

[1208]    RPHB, ¶ 85.

[1209]    RPHB, ¶ 85.

[1210]    Respondent's Counter-Memorial, ¶ 765 and fn. 362.

GRIF relies on "economic previsions originally existing at the time of the Claimants' investment … calculated according to the estimation model available at [the time the Investments were made], and not on current available methods," which it says is the appropriate time at which to value any losses, and concludes that the Claimants suffered no losses.[1211]

### (3)     The Tribunal's Analysis

884.    The Tribunal is not persuaded by the Respondent's objections to the use of an analysis that compares the fair market value of the Investments before and after the measures to assess the Claimants' losses in this case. Since the Claimants' Investments consist of shareholdings, an analysis that seeks to determine the impact on the value of those shareholdings as a result of the measures is entirely appropriate. As for Respondent's position that it is only appropriate to consider fair market value in the event of expropriation or other measures that result in a near total deprivation of an investment, this objection could be relevant if the Claimants were seeking the entire fair market value of their investments as a result of the breaches. However, that is not the Claimants' damages claim. The Claimants seek only the diminution of the value of their investments measured by comparing the fair market value of those investments before and after the measures. To the extent that the Claimants can establish that the illegal measures are the cause of a diminution in the fair market value of their investments, this method is an entirely appropriate one to use in the circumstances of this case.

885.    In order to calculate the fair market value of the investments, FTI used the projected cash flows for each PV plant discounted back to the Valuation Date. The Respondent contends that the "gratuitous nature of the incentives systems (and to the certainty of receiving periodically cash flow from the State)" makes a DCF analysis inappropriate because of its "high speculative character." The Tribunal understands the Respondent's objection to be that the use of a DCF analysis is inappropriate when cash flows are certain and there is low risk. However, the certainty of cash flows makes a DCF analysis more, not less, appropriate

---

and the relative lower risk related to certain cash flows is accounted for in the WACC, which is used to discount those certain cash flows back to the valuation date.

886. The Tribunal is satisfied that, in the circumstances of this case, a DCF analysis can be performed that results in a quantification of damages that is not speculative. The investments at issue have been operating for a significant period. Given the highly regulated nature of the investments (all of the electricity produced can be sold at prices and costs that are either known or can be forecast with a high degree of confidence), the cash flows can be estimated with confidence. The Tribunal notes that for the damages claimed in relation to the breaches proved by the Claimants, a DCF methodology is particularly apt. The *Spalmaincentivi* Decree resulted in a direct and measurable decrease in the IT tariffs set out in the relevant *Conto Energia* Decrees without affecting the other variables used in the DCF analysis.

887. By using the actual production figures for each PV plant and the relevant maintenance and other costs, the damages claimed specifically relate to each investment. A DCF analysis, if properly performed, allows an assessment of the impact of each measure on each investment, which is the purpose of the damages analysis. For the IT Decrease specifically, because the variables other than the IT rates in the DCF analysis remain constant, the damages notionally amount to the difference between the IT rates before and after the *Spalmaincentivi* Decree discounted back to the valuation date. In fact, while he did not perform an assessment of the Claimants' alleged damages, Mr. Miraglia did perform calculations that provided "an evaluation of the change in revenues related to the *'Spalma incentivi'* Decree and the *'Salva Alcoa'* Law." These calculations were done using a DCF methodology and resulted in an evaluation of the impact of the *Spalmaincentivi* Decree that was very similar to that of the Claimants' expert's calculations.

888. The Tribunal also accepts the evidence that the DCF method is commonly used to determine the fair market value of investments in the PV sector for purposes other than damages calculations and that it is also appropriate for damages calculations. It is also a method commonly used in valuing damages resulting from state measures. For these

reasons, the Tribunal finds that a DCF analysis is an appropriate way to measure the Claimants' damages in this case.

889.   The Respondent through its expert, GRIF, argued that damages should be assessed in light of "the objective and reasonable expectations of investors at the time the investments were made."[1212] GRIF compared the IT Decrease as a proportion of the increased productivity of the PV plants and concluded that "investors continue to realise profits well beyond their expectations" even after the measures were imposed.[1213] GRIF criticizes the foundation of the FTI report arguing that the damages should not be evaluated using data updated to the time of the claim for alleged damages, but should instead be based on the objective legitimate expectations as to returns at the time of investment. GRIF's opinion is that if the damages problem in this arbitration were to measure the difference between the original IT rates and the IT Decrease, there would be no need for expert reports; it is evident that "all other factors being equal, if a tariff is cut by X after a certain number of years, revenues for the plant will decrease by Y."[1214] GRIF calculates a rate of return of 18.8% when it compares its analysis of what it says an investor would have objectively expected based on the information available at the time of the investment to the Claimants' actual cash flows and concludes that this rate is an unreasonable expectation "in a regulatory context characterised by low variability and increasing revenues."[1215]

890.   The Tribunal understands the Respondent's position to be that the proper measure of damages in this case is the difference between what an investor would have objectively expected in terms of cash flows at the time of investment and what the actual cash flows were for the PV plants at issue. The Tribunal notes that the Claimants' approach is the same. Where the Parties disagree is as to what the expectation of the investors were as to those cash flows and the proper date at which to assess damages. In this case, the Claimants have successfully proved that their legitimate expectation was that the Respondent would continue to pay the IT rates set out in the relevant *Conto Energia* Decree for a period of

---

[1212]   Respondent's Rejoinder, ¶ 552, citing GRIF Q2, p. 9.
[1213]   Respondent's Rejoinder, ¶ 552, citing GRIF Q2, p. 15.
[1214]   Respondent's Rejoinder, ¶ 553 citing GRIF Q2, p. 15.
[1215]   Respondent's Rejoinder, ¶ 553 citing GRIF Q2, p. 16.

twenty years. The Respondent argued, but failed to establish, that investors could only have legitimately expected some "reasonable" rate of return. The Respondent could have set up its regime that way, but deliberately chose not to do so, which left potential investors to make their own determinations as to whether the IT rates would yield a reasonable rate of return according to their own requirements. The *Conto Energia* regime encouraged investors to be efficient and innovative by promising higher returns if they minimize cost and maximize output, but to bear the risk of earning lower returns if the opposite occurred. The Respondent specifically accepted this in its post-hearing submissions where it said:

> The incentives at stake are not considered as a measure given *ex post* on the basis of actual costs or returns, but rather an incentive calculated *ex ante* on the basis of average costs. It is not the business of the regulator to care whether an entrepreneur is performing better or worst [*sic*]. On the opposite, the regulator gives the same incentive to everyone under the same circumstances then leaving the market compete on who will be able to make a better investment.[1216]

891.   In effect, the Respondent now argues that the Claimants should only be entitled to what a hypothetical investor would have expected the value of the investment to be based on average costs and set tariff rates. In other words, the Respondent suggests that the correct measure of damages is what it expected the impact to investors would have been based on some of the information that was available in the market at the time, but without taking into account what the Claimants actually considered or their own assessment of their ability to make a "better investment" as an efficient operator.

892.   The Claimants established that they considered the capital costs at the time of their investments, the tariff rates and the entire regulatory regime in deciding to make their investments in Italy. Further, the Claimants established that their expectation to receive the tariff rates set out in the *Conto Energia* Decrees, unchanged for a period of twenty years, were legitimate. Accordingly, the Tribunal is of the view that the proper measure of damages is the impact on the value of the Claimants' investments arising from the difference between the cash flows at those rates and the cash flows at the lower rates introduced by the *Spalmaincentivi* Decree at the Valuation Date.

---

[1216]     RPHB, ¶ 77.

893. The Tribunal notes that although the liability analysis is objective in its determination of which expectations will be legitimate, the damages analysis is subjective, as it seeks to award full compensation to these Claimants for their losses arising from the measure. In order to award full compensation, the Claimants' actual losses must be assessed, not the losses suffered (or not) by some hypothetical investor. The analysis should be based on the Claimants' actual production figures and costs unless it can be argued that using those figures would be unreasonable because the Claimants somehow contributed to their own damages or failed to mitigate them.

894. In any event, in the circumstances of this case where the only damages that have been proved are those relating to the IT Decrease, it is a situation where all else is equal in the damages analysis. By adjusting the other components of the DCF analysis, such as using one set of projected production rates for the Counterfactual Scenario and the actual production rates in the Actual Scenario, it would no longer be an apples-to-apples comparison. The Respondent's approach would result in a calculation of hypothetical losses and not actual losses.

895. The Respondent's experts opine that damages should be assessed based on expectations at the time of investment rather than at the time of the breach. They state that this is the only approach that is consistent with a regulated subsidy system subject to future changes by the regulator, as the expectations as to returns were assessed by investors at the time of investment. The problem with this approach is that it is inconsistent with the customary international law principle of full compensation, which is not based on expected losses but on actual losses. Typically, the most accurate way to evaluate actual losses related to a specific measure is to value the investment immediately before and after the breach. Accordingly, the Tribunal accepts that the Claimants' proposed Valuation Date is the appropriate date at which to assess the Claimants' damages flowing from the *Spalmaincentivi* Decree.

896. In arriving at this conclusion, the Tribunal has carefully considered the Respondent's proposed approach both with respect to its position that the *Salva Alcoa* Decree is relevant for the assessment of damages (or, more accurately, their mitigation) and that a DCF

analysis results in "an excessive remuneration of the invested capital … from a general point of view."[1217]

897.    As discussed above, the *Salva Alcoa* Decree extended the benefits of *Conto* II tariffs to plants constructed by the end of 2010 and connected to the grid by 30 June 2011. This granted the grid operator additional time to connect the plants that had met the construction deadline of 31 December 2010 without penalizing those plants for not meeting a deadline over which they had no control. The Respondent submits that the *Salva Alcoa* Decree had a positive impact on Claimants' cash flow of €10.7 million[1218] and argues that this should be taken into account in assessing Claimants' losses as a result of the measures. The Tribunal does not consider this appropriate for two reasons. First, there were no claims based on the *Salva Alcoa* Decree, as that law had the effect of preserving an investor's legitimate expectation that if it met all of the requirements over which it had control in *Conto* II, it would receive the tariff rate guaranteed thereunder. The measure did not change investor's obligations; there was no extension granted to plants to complete their construction; the extension was granted to the grid operator whose role was to connect the plants to the grid. Second, it would be inconsistent with the approach of assessing damages as at the date of the breach to take into account measures that preceded the breach and that were unrelated to the breach.

898.    As for the submission that a DCF analysis would result in an excessive remuneration of the invested capital, the Respondent has failed to prove that this would be the case. Although GRIF alleged that the reconstructed expected rates of return were "up to 18.8%" based on the data available at the time of the investment, FTI calculated the post-tax cost of capital for PV investments in 2011 at 8.2% and the actual post-tax returns on Claimants' plants on average as 7.5%.[1219] In the Counterfactual Position, FTI calculated an

---

[1217]    Respondent's Counter-Memorial, ¶ 764; Respondent's Rejoinder, ¶ 546.
[1218]    Miraglia WS2, p. 4, Summary Table 2.
[1219]    *See* FTI Q2, ¶ 2.7.

approximate post-tax project IRR of 6.6% across all of the Claimants' plants.[1220] There was no indication that returns in the range of 6.6% - 7.5% were excessive.

## C.   QUANTUM OF DAMAGES (ISSUE 5.3)

899.   As the Tribunal has determined that the Claimants' approach to the assessment of damages is appropriate in this case, it will now review the calculations performed by FTI and any criticisms of those calculations submitted by the Respondent.[1221]

### a.   The Claimants' Arguments

900.   As has already been discussed, the Claimants' expert, FTI, calculates the quantum of compensation owed to the Claimants based on the difference between: (a) the value that the Claimants' Investments in Italy would have had if the Respondent had not introduced the Challenged Measures (the but-for or Counterfactual Position), which excludes any of the impacts of the Challenged Measures; and (b) the value of the Claimants' Investments after the introduction of those measures (the Actual Position).[1222]

901.   FTI performs two DCF calculations – one in the Counterfactual Position and one in the Actual Position – so as to isolate the cash flow impacts of each of the Challenged Measures, for each of the Claimants' investments.[1223] FTI's Mr. Edwards explained that his analysis considers future losses, since the Challenged Measures affected the revenues that the Claimants' plants were capable of earning for the remainder of those plants' economic lives, right up until the end of the incentive tariff period.[1224] Mr. Edwards testified that in order to assess the Claimants' lost future profits, he first valued those plants to understand how their value had changed as a result of each of the Challenged Measures.[1225]

---

[1220]   *See* FTI Q2, p. 70, Table A5-3-1.

[1221]   For the avoidance of doubt, the Tribunal does not consider it necessary to review in detail the assumptions and calculations of the alternative damages scenario proposed by the Respondent, which it has rejected on legal grounds.

[1222]   Claimants' Memorial, ¶ 372; FTI Q1, ¶ 2.8, § 4; Hearing Transcript, Day 3, 670:11–671:11.

[1223]   Claimants' Memorial, ¶ 376.

[1224]   Hearing Transcript, Day 3, 669:24–670:5.

[1225]   Hearing Transcript, Day 3, 670:5-10.

(i) *Cashflow Forecasts*

902.   Mr. Edwards explained that his cashflow forecasts in the Counterfactual and Actual Positions share three common assumptions, which are relatively predictable once plants were up and running.[1226]

903.   First, the cashflow forecasts were based on two or three years of actual production and financial data.[1227] FTI forecasted future power production based on the average actual power generated in 2012-2014 (with minor adjustments to account for insurance against production disruptions), which FTI then adjusted downward to account for the future degradation of equipment.[1228] FTI forecasted market revenue from electricity sales by multiplying the projected electricity production by the "central" forecast of wholesale prices prepared by Pöyry (an independent consulting firm that publishes price forecasts that are used widely throughout the European energy industry).[1229]

904.   Second, the cashflow forecasts were based on largely fixed and predictable costs by extrapolating from historical costs (adjusted for certain "one-off" events) and projecting them to increase with expected inflation.[1230]

905.   Third, the cashflow forecasts were based on weather, technical performance, and incentive tariff driven revenues.

(ii) *Discount Rate*

906.   Mr. Edwards explained that the next step in his analysis involved discounting the forecasted cashflows to arrive at a valuation of the plants, which he did by applying a standard WACC discount rate of 5%. This produces an estimate of the post-tax cost of capital applicable to an Italian PV plant on the Date of Assessment. Mr. Edwards calculated a cost of equity at 7.8% and estimated a cost of debt for the Claimants on the Date of

---

Assessment at 4.3%, which resulted in a post-tax discount basis of 3.1%, for a blended average of those two costs of 5%.[1231] Mr. Edwards disagrees with GRIF's contention that the Claimants' investments were very low risk and thus a lower cost of capital ought to apply. Mr. Edwards pointed out that the GSE used a 5% discount rate in mid-2013 in its LOCOE calculations, which he says is consistent with the discount rate that he used in his analysis.[1232]

907.   GRIF did not explicitly challenge Mr. Edwards' calculation of cost of capital. However, Mr. Edwards responded to GRIF's apparent suggestion that a lower cost of capital should be used (it says that the Claimants' plants' risk profile is similar to a government bond), noting that the use of a lower discount rate would result in higher losses because future cash flows are discounted by a lower number.[1233]

*(iii) Assumptions behind the Counterfactual and Actual Positions*

908.   FTI determined the future impact of the *Spalmaincentivi* Decree in the two DCF scenarios (Counterfactual and Actual) as follows:[1234]

### *IT Decrease*

- In the Counterfactual Position, FTI assumes that the Incentive Tariff rate is the rate specified in the applicable *Conto* before the reduction introduced by the *Spalmaincentivi* Decree.

- In the Actual Position, the applicable Incentive Tariff rate is the rate following the reduction introduced by the *Spalmaincentivi* Decree, according to Option C.

909.   When asked by the Tribunal how he calculated the Claimants' total losses occasioned by each of the Challenged Measures, Mr. Edwards explained that the only difference between the Actual and Counterfactual valuations are the differences introduced by each individual

---

[1231]   Claimants' Memorial, ¶ 378; FTI Q1, ¶¶ 5.40-5.42, 6.32-6.34, Appendix 5.3; Hearing Transcript, Day 3, 675:16–676:21.

[1232]   FTI Quantum Presentation, Slide 9.

[1233]   Hearing Transcript, Day 3, 676:24–677:6; FTI Quantum Presentation, Slide 9.

[1234]   Claimants' Memorial, ¶ 377; FTI Q1, §§ 5-6; FTI Quantum Presentation, Slide 7.

Measure, and that the DCF model allowed him to identify these and track the impact of each Measure separately.[1235] Mr. Edwards explained that he started with two Actual Position valuations assuming that none of the measures were claimable, and then one by one, he introduced the effect of each Challenged Measure to each of the valuations to track how the total loss figure evolved with each Measure individually.[1236] He explained that if the Tribunal were to find that one or more of the Challenged Measures was not compensable, it would simply deduct the total losses for that category from €28.6 million (the grand total of the Claimants' losses).[1237]

910.    Mr. Edwards calculated the effect of each of the challenged measures as follows:[1238]

**Table 6-2: Claimants' losses by each Principal Regulatory Change (EUR millions)**

| Principal Regulatory Change | ESPF 1 | ESPF 2 | ICE 5 | Total |
|---|---|---|---|---|
| RHT Decision | 0.2 | 0.2 | 0.0 | 0.4 |
| IMU and TASI Charges | 1.1 | 1.8 | 0.8 | 3.7 |
| Administrative Fee | 0.3 | 0.5 | 0.2 | 1.0 |
| Imbalance Costs | 0.3 | 0.6 | 0.3 | 1.2 |
| MPG Change | 3.0 | 0.0 | 1.8 | 4.8 |
| IT Decrease | 3.5 | 9.8 | 2.7 | 16.0 |
| IT Payment Term Change | 0.5 | 0.6 | 0.4 | 1.5 |
| **Total** | **8.9** | **13.5** | **6.2** | **28.6** |

Source: Appendix 5-1b.

911.    Of the €28.6 million in total damages claimed, FTI calculates that the *Spalmaincentivi* Decree alone (IT Decrease of €16.0 million and IT Payment Term Change of €1.5 million)

---

[1235]    Hearing Transcript, Day 3, 679:16–680:3.

[1236]    Hearing Transcript, Day 3, 679:24–680:6.

[1237]    Hearing Transcript, Day 3, 680:23–681:2; FTI Quantum Presentation, Slide 11.

[1238]    FTI Q2, p. 49, Table 6-2. Mr. Edwards explained that he adjusted his loss calculation of the IT Payment Term Change by €90,000 between his first and second reports since a slightly smaller proportion of revenues was deferred to the following year than he had originally understood: *see* FTI Q2, ¶¶ 6.1-6.5.

reduced the value of Claimants' investments by €17.5 million, or 7.5% of the fair market value of the Investments.[1239]

912.    The Claimants explain that the DCF models determine the enterprise value of each operating company, in both the Counterfactual Position and Actual Position, as of the Date of Assessment.[1240] FTI then deducts the third-party debt held by each operating company to determine the value of the investment in each operating company, in both the Counterfactual Position and Actual Position, as of the Date of Assessment.[1241] The Claimants' losses for each operating company are the differences between the value of the investment in the Counterfactual Position and the Actual Position.[1242]

### b.    The Respondent's Arguments

913.    As has been discussed, the Respondent did not critique the calculations performed by FTI and instead focused their criticism on the basis of the report arguing that using an analysis of the impact of the measures on the fair market value of the investments was not the right approach.

914.    The Respondent did submit evidence from the GSE's Mr. Miraglia, which sought to estimate the variances in the revenues related to the application of the *Spalmaincentivi* Decree and the *Salva Alcoa* Decree on the Claimants' investments. Mr. Miraglia's calculations were aimed at demonstrating the reasonableness of the IT Decrease in the context of the tariffs to be paid to the Claimants' investments over a period of twenty years. He calculates this overall reduction to be in the range of 2-3%. Mr. Miraglia's calculations

---

[1239]    CPHB, ¶ 98; FTI Q1, ¶ 7.3 (counterfactual value of €232.3 million); FTI Q2, ¶ 6.4. *See* FTI Q2, p. 49, Table 6-2, reproduced immediately above. The €17.5 million figure derives from the "IT Decrease" of €16 million plus the "IT Payment Term Change" of €1.5 million. As the Tribunal has found no breach related to the IT Payment Term Change, this aspect of the Claimants' damages claim will not be considered further. The figures are provided here for completeness of the Claimants' total claim for damages for all of the Challenged Measures.

[1240]    Claimants' Memorial, ¶ 378.

[1241]    FTI Q1, ¶¶ 5.40-5.42, 6.32-6.34.

[1242]    FTI Q1, ¶¶ 5.42, 6.34, 7.2-7.3.

with respect to the impact of the *Spalmaincentivi* Decree was essentially identical to FTI's; he arrived at a figure of €16.6 million for the IT Decrease.[1243]

### c.   The Tribunal's Decision

915.   The Tribunal accepts FTI's assessment of the damages caused to the Claimants' investments as a result of the *Spalmaincentivi* Decree. It has reviewed the assumptions on which the analysis is based and finds these to be reasonable and supported by the evidence. The Tribunal finds that the Claimants have proved losses related to the IT Decrease in the amount of €16 million at the Date of Assessment.

## XIII.   INTEREST (ISSUE 6)

916.   The Claimants also claim pre-award and post-award interest in order to be fully compensated for their losses due to the *Spalmaincentivi* Decree.

## A.   THE CLAIMANTS' ARGUMENTS

917.   The Claimants request both pre- and post-award interest at the highest lawful rate from the Date of Assessment (1 January 2015) until the date the Respondent pays the award in full, calculated at a rate based on international interest rates, on a compounded basis.[1244]

918.   FTI's Mr. Edwards explained that, as instructed by the Claimants, he added interest to his Actual Position and Counterfactual Position calculations from 1 January 2015 to 22 June 2018.[1245] He did so in two ways: by calculating interest on the basis of the Respondent's cost of borrowing; and by calculating interest at the Claimants' cost of debt, which he stated is effectively a measure of the additional interest the Claimants have had to pay because they have not had the funds by which to repay their debt, and thus save interest costs.[1246] FTI explains the difference between these two alternative rates of interest as follows:

---

1243    Miraglia WS1, p. 4.

1244    Claimants' Memorial, ¶¶ 381-382.

1245    Hearing Transcript, Day 3, 682:20–683:18, 694:2-4.

1246    Hearing Transcript, Day 3, 682:12-19.

**Italian 3 year government bonds**

7.3 The interest rates on Italian government bonds reflect Italy's cost of borrowing. Consequently, a calculation of interest on the Claimants' losses based on Italian 3 year government bond yields is in effect, the interest rate that the Claimants would have received had they willingly lent the funds in dispute to Italy on the Date of Assessment. The yield on a 3 year Italian government bond at the Date of Assessment was 0.7%.

**The Claimants' cost of debt**

7.4 A calculation of interest based on the Claimants' cost of debt is, in effect, the interest that the Claimants could have saved on their debt had they been compensated for their losses immediately and used the funds to repay their third party debt.[1247]

919. The following table shows FTI's calculated interest for damages assessed based on all of the alleged breaches from the Date of Assessment to 10 November 2017 (which would need to be updated to the date of the Award) using the aforementioned illustrative rates: (a) the Respondent's cost of debt; and (b) the Claimants' cost of debt:

**Table 7-8: My calculation of the Claimants' losses including interest (EUR millions)**

|  | Italian 3 year government bonds | | | | Claimants' cost of debt | | | |
|---|---|---|---|---|---|---|---|---|
|  | ESPF 1 | ESPF 2 | ICE 5 | Total | ESPF 1 | ESPF 2 | ICE 5 | Total |
| Total losses excl. interest | 8.9 | 13.5 | 6.2 | 28.6 | 8.9 | 13.5 | 6.2 | 28.6 |
| Interest on loss | 0.1 | 0.2 | 0.1 | 0.4 | 0.7 | 1.1 | 0.5 | 2.4 |
| **Total loss incl. interest** | 9.0 | 13.7 | 6.3 | 29.0 | 9.7 | 14.6 | 6.7 | 31.0 |

*Sources: Table 7-2, Table 7-3, Table 7-4, Table 7-5, Table 7-6, and Table 7-7.*

920. The Claimants argue that the absence of interest can serve as an incentive for a respondent to delay the arbitral proceedings and/or payment of the award.[1248] The Claimants further assert that international law recognizes compound interest as the generally-accepted standard for compensation in investor-State arbitrations.[1249] Compound interest is more

---

[1247]    FTI Q2, ¶¶ 7.3-7.4. *See also* FTI Q2, p. 55, Table 7-8.

[1248]    Claimants' Memorial, ¶¶ 387, 389.

[1249]    Claimants' Memorial, ¶¶ 382-388, citing, *inter alia*, *Compañía del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000: CL-101; *Wena Hotels Limited v. Arab*

appropriate than simple interest where the claimant could have received the latter by simply placing its money in a readily available and commonly used investment vehicle.[1250] Compound interest also "more accurately reflects what the claimant would have been able to 'earn on the sums owed if they had been paid in a timely manner.'"[1251]

921.    The Claimants also argue that compound interest "furthers the principle of full compensation because it aids in restoring the claimant to the position in which it would have been had the respondent not committed the breach."[1252] The goal of interest is to place the parties in the same position they would have been had the award been made immediately after the cause of action arose, and thus simple interest fails to fully compensate claimants.[1253] Compound interest "prevents unjust enrichment of the respondent by requiring it to pay compensation for the benefits received from using the money it wrongfully withheld."[1254]

922.    The Claimants contest the Respondent's argument that the Tribunal should not grant pre-award interest because most of the damages concern future events. The Claimants state that the Respondent's assertion ignores that FTI calculated damages as of 1 January 2015, and that FTI discounted losses arising from future events by 5% to a date almost four years in the past, which reduced the damages estimate accordingly.[1255]

923.    The Claimants also take issue with the Respondent's argument that the Tribunal should not award compound interest because simple interest is less speculative and the Challenged Measures were public policy objectives. The Claimants argue that compound interest most

---

*Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000 ("**Wena Hotels v. Egypt**"): CL-102; *Bernardus Henricus Funnekotter and others v. Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009: CL-105; *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002: CL-103; *Vivendi v. Argentina*: CL-099; *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ("**Siag v. Egypt**"): CL-104.

[1250]    Claimants' Memorial, ¶ 383; *Wena Hotels v. Egypt*: CL-102, ¶ 129.

[1251]    Claimants' Memorial, ¶ 388; J. Gotanda, *A Study of Interest* (Villanova University School of Law, 2007) ("**Gotanda**"): CL-111, p. 31.

[1252]    Claimants' Memorial, ¶ 387, citing, *inter alia*, Gotanda: CL-111, p. 4.

[1253]    Claimants' Memorial, ¶ 388; Gotanda: CL-111, p. 31; J.M. Colón and M.S. Knoll, "Prejudgment Interest in International Arbitration," 4 Transnational Dispute Management (2007): CL-114, p. 10.

[1254]    Claimants' Memorial, ¶ 387.

[1255]    Claimants' Reply, ¶ 552.

appropriately captures the impact of the time value of money.[1256] The Claimants point out that the Respondent does not respond to any of the arbitral decisions cited by them.[1257]

924.    In response to the Tribunal's question of how to adjust the interest if they find that one or more of the Challenged Measures is not compensable, FTI's Mr. Edwards explained that the Tribunal would "just reduce the interest number [Table 7-8, above] *pro rata* to the amount that you are removing from the [€28.6 million total losses] … it is all essentially proportional."[1258]

925.    At the hearing, FTI provided two alternative pre-hearing interest calculations up to the date of the hearing. With interest calculated from 1 January 2015 up until the date of Mr. Edward's testimony (22 June 2018), FTI estimates that the Claimants' losses are between €29.1 million (when calculated using Italian 3-year government bonds) and €31.5 million (when calculated using Claimants' cost of debt).[1259]

### B.    THE RESPONDENT'S ARGUMENTS

926.    The Respondent asserts that no pre-award interest and only post-award interest should be awarded for the following reasons:

- The bulk of the damages occurred very recently and concern future incentives to be granted by the Respondent, and thus better reflects the actual damages suffered and the concrete circumstances of the case.[1260]

- Simple interest is less speculative.[1261]

- The imposition of extra charges on the Respondent would be unfair and disproportionate in light of the "clear public policy objectives" underlying the

---

[1256]    Claimants' Reply, ¶ 553.

[1257]    Claimants' Reply, ¶ 553, citing Claimants' Memorial, § VII.C.

[1258]    Hearing Transcript, Day 3, 682:25–683:15.

[1259]    Hearing Transcript, Day 3, 694:2-4, 682:20-24; FTI Quantum Slide 21. For date of interest calculations, *see* Hearing Transcript, Day 3, 682:9-10; 683:16-18.

[1260]    Respondent's Counter-Memorial, ¶ 774.

[1261]    Respondent's Counter-Memorial, ¶ 775.

Challenged Measures, the "high benefits" the Claimants earned from entering the market "at a time when investment costs had already been highly reduced but incentives had not yet been consistently adjusted," and the "unexpected positive effects of the *Salva Alcoa* Decree."[1262]

927.    The Respondent made no submissions regarding the appropriate rate of either pre-award or post-award interest.

## C.    THE TRIBUNAL'S ANALYSIS

928.    The Tribunal finds that an award of pre-award interest is necessary to fully compensate the Claimants for the losses caused by the *Spalmaincentivi* Decree. Although the Respondent argues that interest is inappropriate on future cash flows, that ignores the fact that the damages in this case have been assessed as of 1 January 2015 and that the future cash flows had been discounted to that date. In order to fully compensate the Claimants for their losses, interest on the amount of €16 million must be awarded to the date of this award.

929.    The rate of interest that most accurately captures the Claimants' losses is the Claimants' cost of debt, which FTI calculated using the 12-month Euribor plus a spread of approximately 4.0% on the Date of Assessment.[1263] The average rate was approximately 4.0% from January 2015 through November 2017. As this is the Claimants' actual cost of debt, this rate of interest best accords with the principle of full compensation. There was no evidence that it was excessive or unusual such that it would overcompensate for the Claimants' losses. This rate of interest reflects the borrowing costs that could have been avoided by the Claimants if the FIT rates had not been reduced through the *Spalmaincentivi* Decree.

---

[1262]    Respondent's Counter-Memorial, ¶ 777.

[1263]    The Claimants' expert also provided an alternative interest calculation based on the Italian government bond rate, which represents the interest rate that Italy would have paid if it had borrowed the funds (or the rate that the Claimants would have received if they had willingly lent the funds to Italy). However, the Claimants did not willingly lend the funds to the Respondent and the Respondent did not argue that this rate was more appropriate. The Measures found to have breached the ECT resulted in lower tariff rates, which in turn resulted in lower cash flows from the Investments and a related cost of borrowing incurred by the Claimants as a result of the Measures. In these circumstances, the Tribunal considers that awarding interest at the Claimants' cost of borrowing is the proper measure of this component of the damages claim.

930.    The Tribunal is of the view that the pre-award interest should be compounded annually in order to properly compensate the Claimants for the loss of the use of those funds.

931.    Accordingly, the Claimants are awarded interest at the 12-month Euribor rate plus 4.0% compounded annually on the damages awarded of €16 million from 1 January 2015 through the date of this award.

932.    The Respondent does not contest that post-award interest is appropriate in the event that damages are awarded. Accordingly, the Tribunal finds that the Claimants are also entitled to post-award interest at this rate.

## XIV.    COSTS (ISSUE 7)

933.    The issue for the Tribunal's determination is whether either Party should bear some, or all, of the opposing Party's costs. Both Parties claim their costs on the basis of the ICSID Arbitration Rules.

### A.    THE CLAIMANTS' ARGUMENTS

934.    In order to place the Claimants in the same position they would have been if not for the Respondent's breach of its ECT obligations, the Claimants request that the Tribunal award it all of its arbitration costs and expenses, including its attorneys' fees.[1264]

935.    The Claimants submit that the Tribunal has wide discretion to allocate costs between the parties pursuant to Articles 61(2) of the ICSID Convention and Article 28(1) of the ICSID Arbitration Rules.[1265] Factors weighing in favour of a full costs award include a party's conduct during the proceeding and the overall outcome of the case, including the extent to which a party has succeeded on its various claims and arguments.[1266] The Claimants submitted that they should prevail in the arbitration and noted that Italy caused serious

---

[1264]    Claimants' Memorial, ¶¶ 391-392.

[1265]    Claimants' Submission on Costs, ¶ 3.

[1266]    Claimants' Submission on Costs, ¶ 3, citing *Wena Hotels v. Egypt*: CL-102, ¶ 130; *ADC v. Hungary*: CL-097, ¶¶ 533 ("the successful party should receive reimbursement from the unsuccessful party"), 535-542; *Siag v. Egypt*: CL-104, ¶ 630; *Antin v. Spain*, ¶ 744. *See also* Claimants' Memorial, ¶ 393.

harm to their investments and forced Claimants to bring this case to recover the damages Italy caused to their investments.[1267]

936.    The Claimants maintain that, consistent with customary international law principles of full compensation, they are entitled to full compensation for all the consequences of Italy's breaches of the ECT, which in this case include the arbitration costs incurred.[1268]

937.    The Claimants submit that the costs, fees and expenses claimed are reasonable in light of the length of the proceeding, the complexity of the case, and the amount in dispute.[1269] A summary of the amounts claimed totalling €3,527,068.19, updated to 6 March 2020 to reflect the additional post-hearing submissions is set out in the table below:[1270]

| CATEGORY | AMOUNT |
|---|---|
| **Legal Fees** | |
| • King & Spalding | €1,460,075.50 |
| • Orrick, Herrington & Sutcliffe | €697,352.70 |
| **Expert Fees & Expenses** | |
| • FTI Consulting | €651,666.93 |
| • Prof. Antonio D'Atena | €20,196.30 |
| **Claimants' Costs & Expenses** | €101,670.76 |
| **ICSID Advances on Costs** | €596,106.00 |
| **TOTAL** | **€3,527,068.19** |

938.    The Claimants advise that they claim their legal fees and expenses on the basis of the hours worked by each firm at their normal hourly rates and submit that this is a reasonable amount for these services. The Claimants note that their actual legal fees incurred will be based on

---

[1267]    Claimants' Submission on Costs, ¶ 4.
[1268]    Claimants' Submission on Costs, ¶¶ 4-6.
[1269]    Claimants' Submission on Costs, ¶¶ 7-9.
[1270]    Claimants' Updated Submission on Costs (footnotes omitted).

the hybrid "fixed fee plus success fee" basis agreed with their legal representatives. The fixed fee portion paid totals €1,250,000 and an additional success fee will be payable upon successful recovery.

939.    The Claimants also note that their ICSID advances on costs total includes a significant share of the Respondent's additional advance on costs (€125,233.87), which they were requested to advance when Italy failed to make its payments to ICSID in a timely manner.[1271]

**B.    THE RESPONDENT'S ARGUMENTS**

940.    The Respondent did not make any substantive submissions on costs, but claimed legal fees, general expenses, administrative costs and costs of attendance at the hearing totalling US$775,660.79.[1272]

**C.    THE TRIBUNAL'S ANALYSIS**

941.    Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

942.    Rule 28(1), in turn, provides as follows:

> (1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:
>
> (a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;

---

[1271]    Claimants' Updated Submission on Costs, pp. 2, 6. As part of the "ICSID Payments," the Claimants included the following amounts (in Euros): i) ICSID's lodging fee, ii) the Claimants' share of the three advance payments requested by ICSID and iii) "a significant share of Italy's advance on costs … Therefore, the Euro figure corresponds to the sum actually expended by Claimants for ICSID payments to date."

[1272]    Respondent's Updated Submission on Costs, p.1.

(b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.

(2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.

943.    The Tribunal has the discretion to award the reasonable costs of the proceedings and the primary relevant factors are: the relative success of the parties and their conduct throughout the proceedings.

944.    The Tribunal has reviewed the costs as claimed by the Parties and determined that the amounts claimed are reasonable in light of the length of the proceedings, the complexity of the issues and the process required by the Rules.

945.    As to success on the substantive claims, the Claimants have succeeded in establishing that one of the Challenged Measures breached the ECT and been generally successful in defending against Italy's jurisdictional objections. The Claimants have been awarded approximately 56 percent of their total damages claimed. In light of this outcome, the Tribunal considers it appropriate for the Respondent to bear its own costs and for it to contribute to the costs incurred by the Claimants in bringing their claims.

946.    In the Tribunal's view, the Respondent's objection to jurisdiction and the related applications contributed significantly to the overall cost of the proceedings and the Tribunal estimates that this aspect of the case, including the arguments related to the tax measures, accounted for approximately 40% of the overall cost. Of the remaining issues, the Tribunal estimates that approximately one half of the costs related to the issues related to the *Spalmaincentivi* Decree, which was the main focus of the Claimants' submissions, and one half to the other Measures. This is generally consistent with the proportion of the damages awarded (56%) compared to the damages claimed (the damages claimed for the

reduction in FITs and the related payment term changes accounted for approximately 60% of the overall damages).[1273]

947. The estimated costs of the arbitration proceeding, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses | |
| Mr. Henri Alvarez | 381,565.91 |
| Dr. Michael Pryles | 118,449.96 |
| Prof. Laurence Boisson de Chazournes | 114,854.70 |
| | |
| ICSID's administrative fees | 200,000 |
| Direct expenses (estimated) | 98,272.01 |
| **Total** (estimated) | **913,142.58** |

948. The costs of the proceeding have been paid out of the advances made by the Parties.[1274] The Tribunal notes that the advance payments made by the parties and the final costs of the arbitration proceeding will be reflected in ICSID's final financial statement.

949. The Claimants were required to commence the arbitration in order to be compensated for their losses related to the Respondent's breaches of the ECT, which they have established. Accordingly, the Tribunal considers it appropriate for the Respondent to bear the entirety of the costs of the proceeding reflected in ICSID's final financial statement.

950. The majority of the Tribunal also considers it appropriate for the Claimants to be awarded a proportion of their legal and expert fees and costs and other expenses proportionate to their degree of success in the arbitration. Accordingly, the Claimants are awarded 60% of their reasonable legal fees and other expenses calculated as €1,758,577.[1275]

---

[1273]    Note that the damages awarded were less than those claimed because of both the Respondent's success on some of its jurisdictional objections related to tax claims and its success in establishing that the Measures other than the *Spalmaincentivi* Decree did not amount to breaches of the ECT.

[1274]    The remaining balance in the ICSID case account will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

[1275]    Sixty percent of the total costs claimed (as reflected in paragraph 937) excluding "ICSID Payments" claimed: 60% of (€3,527,068 - €596,106) = €1,758,577.

## XV.    CONCLUSION

951.    For the reasons stated above:

> (a) the Tribunal grants a declaration that the Tribunal has jurisdiction under the ECT and the ICSID Convention over all of the Claimants' claims except for those with respect to the Tax Measures described at paragraphs 354 and 355 of this Award (Robin Hood Tax and the IMU and TASI charges);

> (b) the majority of the Tribunal grants a declaration that the Respondent has violated Part III of the ECT and international law with respect to the Claimants' Investments;

> (c) the majority of the Tribunal grants compensation to the Claimants for all damages they have proved to have been caused by Respondent's violations of the ECT in the amount of €16,000,000, together with interest at the rate of 12-month Euribor plus 4% compounded annually from the date of 1 January 2015 until payment in full by the Respondent; and

> (d) the Tribunal orders the Respondent to pay the Claimants for the expended portion of Claimants' advances to ICSID (as reflected in ICSID's final case statement) and the majority of the Tribunal orders the Respondent to pay the Claimants €1,758,177 on account of their reasonable legal and expert fees and expenses.

952.    The Tribunal dismisses all other claims.

_____
Dr. Michael Pryles
Arbitrator
Date:  26 August 2020

_____
Professor Laurence Boisson de Chazournes
Arbitrator
*Subject to the partial dissenting opinion in*
*paragraphs 645, 709 and 828*
Date:

_____
Henri C. Alvarez
President of the Tribunal
Date:

_____
Dr. Michael Pryles
Arbitrator
Date:

Professor Laurence Boisson de Chazournes
Arbitrator
*Subject to the partial dissenting opinion in*
*paragraphs 645, 709 and 828*
Date:   28 August 2020

_____
Henri C. Alvarez
President of the Tribunal
Date:

_____
Dr. Michael Pryles
Arbitrator
Date:

_____
Professor Laurence Boisson de Chazournes
Arbitrator
*Subject to the partial dissenting opinion in paragraphs 645, 709 and 828*
Date:

Henri C. Alvarez
President of the Tribunal
Date: 25 August 2020