# EXHIBIT 40

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**CAVALUM SGPS, S.A.**

Claimant

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/34**

---

# DECISION ON JURISDICTION, LIABILITY AND DIRECTIONS ON QUANTUM

---

***Members of the Tribunal***
Lord Collins of Mapesbury, LL.D., F.B.A., President of the Tribunal
Mr. David R. Haigh Q.C., Arbitrator
Sir Daniel Bethlehem Q.C., Arbitrator

***Secretary of the Tribunal***
Mr. Francisco Grob, ICSID

*Date of dispatch to the Parties:* 31 August 2020

REPRESENTATION OF THE PARTIES

*Representing Cavalum SGPS, S.A.*:

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Héloïse Hervé
Ms. Isabel San Martín
King & Spalding
12, cours Albert Ier
75008 Paris
France

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding
1100 Louisiana, Suite 4000
Houston, TX 77002
United States of America

Mr. Enrique Molina
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
United States of America

Mr. Christopher Smith
King & Spalding LLP
1180 Peachtree St. NE
Atlanta, GA 30309
United States of America

*Representing Kingdom of Spain*:

Mr. José Manuel Gutiérrez Delgado
Ms. Gabriela Cerdeiras Megias
Mr. Pablo Elena Abad
Ms. Antolín Fernández Antuña
Ms. María del Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Mónica Moraleda Saceda
Ms. Elena Oñoro Sainz
Ms. Amaia Rivas Kortazar
Mr. Diego Santacruz Descartín
Mr. Francisco de La Torre Diaz
Mr. Alberto Torró Molés
Abogacía General del Estado
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14, 2ª planta.
28004, Madrid
Spain

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES .................................................................... 1
II.   PROCEDURAL HISTORY .............................................................................. 1
      A.   Registration and Tribunal's Constitution ........................................ 1
      B.   The First Session ............................................................................... 2
      C.   The European Commission's First Application to Intervene ........... 2
      D.   The Parties' First Round of Written Submissions ........................... 3
      E.   Document Production .......................................................................... 3
      F.   The European Commission's Second Application to Intervene ........ 4
      G.   The Parties' Second Round of Written Submissions ........................ 4
      H.   Pre-Hearing Procedures ..................................................................... 5
      I.    The European Commission's Third Application to Intervene ........... 8
      J.    Post-Hearing Procedures .................................................................... 8
III.  THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ........................ 12
IV.   APPLICABLE LAW ........................................................................................ 14
      A.   The Claimant's Position ..................................................................... 14
      B.   Spain's position .................................................................................. 14
V.    FACTUAL BACKGROUND ........................................................................... 15
      A.   The Investor ........................................................................................ 15
      B.   Claimant's Investments in Spain ....................................................... 15
      C.   The Materialization of the Investment ............................................. 16
VI.   JURISDICTION ............................................................................................... 19
      A.   Overview of the Parties' Positions .................................................... 19
           (1)   The Claimant's Position ........................................................... 19
           (2)   Spain's Position ........................................................................ 20
      B.   The Intra-EU Objection ..................................................................... 20
           (1)   Spain's Position ........................................................................ 21
           (2)   The Claimant's Position ........................................................... 23
           (3)   The EC's *Amicus Curiae* Briefs ............................................. 26
      C.   The Tax Objection .............................................................................. 26
           (1)   Spain's Position ........................................................................ 26
           (2)   The Claimant's Position ........................................................... 28

**VII. LIABILITY AND QUANTUM** .......................................................................... **29**

   A.   Overview of the Parties' Positions ................................................................ 30

      **(1)** The Claimant's Position ...................................................................... 30

         a.   Spain Struggled for Years to Find the Best Incentive Program to Accomplish its Renewable Energy Goals Until it Enacted RD 661 and RD 1578 ................ 31

         b.   After Meeting its EU Targets, Spain Pocketed the Benefits and Reneged on its Promises and Guarantees ................................................................................ 33

         c.   Spain Ultimately Abolished the Incentives Regime Entirely and Replaced It with a Completely Different Regulatory Paradigm That Provides Substantially Less Compensation and Vastly Less Stability ...................................................... 34

         d.   Spain's Defences Mischaracterise the Regulatory Framework .................... 37

         e.   Investors were not on Notice that Spain Could Implement Retroactive Changes to the Regulatory Framework ...................................................................... 41

      **(2)** Spain's Position ...................................................................................... 45

         a.   Cavalum Never Had the Rights that it Claims Under the Applicable Regulatory Regime or EU Law ........................................................................... 45

         b.   The Disputed Measures are Legitimate Macroeconomic Control Measures to ensure the Electricity System's Sustainability and Correct Situations of Overcompensation .............................................................................................. 50

         c.   The New Regulatory Regime Preserves the Key Elements of the Former Regime While Still Providing Cavalum with a Reasonable Rate of Return ....... 52

   B.   The Unlawful Expropriation Claim ............................................................. 55

      **(1)** The Claimant's Position ...................................................................... 55

      **(2)** Spain's Position ...................................................................................... 57

   C.   Fair and Equitable Treatment ...................................................................... 59

      **(1)** The Claimant's Position ...................................................................... 59

         a.   Spain Violated the Claimant's Legitimate Expectations ............................. 59

         b.   Spain's Fundamental Change in the Investment Framework Violates the FET Standard Even in the Absence of Legitimate Expectations ............................... 66

         c.   Spain's Conduct Was Not Transparent, Consistent or in Good Faith ........... 67

      **(2)** Spain's Position ...................................................................................... 68

         a.   Cavalum's Alleged Expectations Are Not Protected Under the ECT ........... 69

         b.   Spain Has Acted Consistently, Transparently and in Good Faith ................. 74

         c.   Spain Did Not Impair Cavalum's Investment by Unreasonable (Arbitrary) or Discriminatory Measures ................................................................................. 75

   D.   The Non-Impairment Clause ...................................................................... 76

**(1)** The Claimant's Position ........................................................................ 76

**(2)** Spain's Position ................................................................................... 77

E.   The Umbrella Clause ..................................................................................... 79

**(1)** The Claimant's Position ........................................................................ 79

**(2)** Spain's Position ................................................................................... 80

F.   Quantum ...................................................................................................... 83

**(1)** The Claimant's Position ........................................................................ 83

**(2)** Spain's Position ................................................................................... 85

**VIII. THE TRIBUNAL'S REASONING** ...................................................................... **88**

A.   Jurisdiction .................................................................................................. 88

**(1)** The Intra-EU Issue ................................................................................ 88

    a.   Introduction ..................................................................................... 88

    b.   Does Achmea Apply to Multilateral Agreements such as ECT? .................. 90

    c.   The Regional Economic Integration Organization (REIO) Point ................. 92

    d.   Disconnection Clause ......................................................................... 94

    e.   EU Law, the Achmea Ruling Point, and the VCLT ..................................... 94

    f.   The Vienna Convention on the Law of Treaties (VCLT) ............................ 97

    g.   The Achmea Ruling ............................................................................ 99

    h.   EU Law as International Law, and the Primacy of EU Law ...................... 108

**(2)** The Taxation Carve-Out ....................................................................... 114

    a.   The Legislation ............................................................................... 116

    b.   The Parties' Position in Summary ...................................................... 117

    c.   Discussion ..................................................................................... 117

B.   Liability .................................................................................................... 122

B.1  The FET and Related Claims ........................................................................ 122

**(1)** Legal Principles ................................................................................. 122

    a.   "Stable, Equitable, Favourable and Transparent Conditions" ................... 123

    b.   Commitment to Accord at all Times Fair and Equitable Treatment ........... 124

    c.   Stability and Transparency ............................................................... 124

    d.   "Shall [not] in any way impair by unreasonable or discriminatory measures" 126

    e.   Proportionality ............................................................................... 127

    f.   Non-Discrimination .......................................................................... 127

    g.   Retroactivity .................................................................................. 127

|  |  | h. | Legitimate Expectations ................................................................ | 127 |
|  | (2) | The Investments ..................................................................................... | 135 |
|  | (3) | The Main Points in Issue ....................................................................... | 137 |
|  |  | a. | The Claimant's Case ...................................................................... | 137 |
|  |  | b. | Spain's Case .................................................................................... | 139 |
|  | (4) | Legitimate Expectations and the Legal and Commercial Position at the Time of the Claimant's Investments | 141 |
|  |  | a. | General ............................................................................................ | 141 |
|  |  | b. | The Legislation Prior to, and at the Time of the Claimant's Investment | 141 |
|  |  | c. | The Spanish Supreme Court Decisions ......................................... | 152 |
|  |  | d. | Due Diligence ................................................................................. | 156 |
|  |  | e. | What were Spain's Commitments to PV Investors at the Time of the Claimant's Investments? | 164 |
|  | (5) | The 2010 Changes .................................................................................. | 171 |
|  | (6) | The New Regulatory Regime ................................................................. | 174 |
|  | (7) | The Reasonable Rate of Return Issue .................................................. | 184 |
|  | (8) | The Radical and Fundamental Changes Introduced by the New Regulatory Regime | 188 |
|  | (9) | Other Alleged Breaches of the ECT ..................................................... | 195 |
|  | (10) | Overall effect ......................................................................................... | 196 |
| B.2 | The Expropriation Claim .................................................................................. | 196 |
|  | (1) | Article 13(1), ECT ................................................................................. | 196 |
|  | (2) | The Parties' Positions ............................................................................ | 197 |
|  | (3) | Legal Principles ..................................................................................... | 198 |
|  | (4) | The Tribunal's Conclusion .................................................................... | 199 |
| C. | Damages ............................................................................................................ | 200 |
|  | (1) | Introduction ............................................................................................ | 200 |
|  | (2) | Legal principles ..................................................................................... | 203 |
|  | (3) | Damages .................................................................................................. | 205 |
|  | (4) | Calculation of WACC ............................................................................ | 209 |
|  | (5) | The way forward ..................................................................................... | 213 |
| IX. | **DECISION** ...................................................................................................... | **215** |

**TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS**

| | |
|---|---|
| 2005 PER | 2005-2010 Renewable Energy Promotion Plan |
| Abandoned Projects | *Fotovoltaica Lobón*, *Solar Lobón* and *Solar de Botoa* |
| Accuracy's First Expert Report | Respondent's First Expert Report by Accuracy dated 28 October 2016 |
| Accuracy's Second Expert Report | Respondent's Second Expert Report by Accuracy dated 29 May 2017 |
| Albiñana | Spanish law firm *CMS Albiñana y Suarez de Lezo* |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| C-# | Claimant's Exhibit |
| Cavalum or the Claimant | Cavalum SGPS, S.A., public limited company incorporated under the laws of Portugal |
| CJEU | Court of Justice of the European Union |
| Cl. Mem. | Claimant's Memorial on the Merits dated 25 July 2016 |
| Cl. PHB | Claimant's Post Hearing Brief dated 18 September 2018 |
| Cl. Rej. | Claimant's Rejoinder on Jurisdiction and Response to the EC's *Amicus Curiae* Brief dated 7 July 2017 |
| Cl. Reply | Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction dated 28 March 2017 |
| CL-# | Claimant's Legal Authority |
| CWS-MHB1 | Claimant's First Witness Statement by Ms. Maria Helena Brandão dated 25 July 2016 |
| CWS-MHB2 | Claimant's Second Witness Statement by Ms. Maria Helena Brandão dated 27 March 2017 |

| | |
|---|---|
| CWS-JP1 | Claimant's First Witness Statement by Mr. José Valentim Pereira da Cunha dated 25 July 2016 |
| CWS-JP2 | Claimant's Second Witness Statement by Mr. José Valentim Pereira da Cunha dated 28 March 2017 |
| CWS-SLM | Claimant's Witness Statement by Ms. Sonia López Mera dated 25 July 2016 |
| Disputed Measures | RD 1565/2010, RDL 14/2010, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, MO IET/1045/2014 and RD 413/2014 |
| EC | European Commission |
| EC's First Application | European Commission's First Application for Leave to Intervene as a Non-Disputing Party dated 18 April 2016 |
| EC's Second Application | European Commission's Second Application for Leave to Intervene as a Non-Disputing Party dated 17 January 2017 |
| EC's Third Application | European Commission's Third Application for Leave to Intervene as a Non-Disputing Party dated 16 May 2018 |
| ECT | Energy Charter Treaty which entered into force for the Kingdom of Spain and Portugal on 16 April 1998 |
| EPC | European and Community Patents Court |
| FiT | Feed-in Tariff |
| FTI's First Quantum Report | Claimant's First Quantum Report by Mr. Richard Edwards of FTI Consulting dated 22 July 2016 |
| FTI's Second Quantum Report | Claimant's First Quantum Report by Mr. Richard Edwards of FTI Consulting dated 28 March 2017 |

| | |
|---|---|
| FTI's First Regulatory Report | Claimant's First Regulatory Report by Dr. Boaz Moselle and Dr. Dora Grunwald of FTI Consulting dated 22 July 2016 |
| FTI's Second Regulatory Report | Claimant's Second Regulatory Report by Dr. Boaz Moselle and Dr. Dora Grunwald of FTI Consulting dated 28 March 2017 |
| Hearing | Hearing on Jurisdiction and the Merits held from March 12 to 16 March 2018 in London |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IRR | Internal Rate of Return |
| Law 2/2011 | Law 2/2011, of 4 March 2011, on Sustainable Economy, published in the Official Gazette No. 55 of 5 March 2011 |
| Mr. Margarit's Testimony | Videoconference held by the Tribunal and the Parties on 28 June 2018, for the cross-examination of the Claimant's Witness, Mr. Jaume Margarit |
| New Regulatory Framework | RDL 9/2013, Law 24/2013; RD 413/2014; and Order IET/1045/2014 |
| PO1 | Procedural Order No. 1, dated 5 May 2016, concerning procedural matters |
| PV | Photovoltaic |
| R-# | Respondent's Exhibit |
| RDL 14/2010 | Royal Decree-Law 14/2010, of 23 December 2010, establishing urgent measures for the correction of the tariff deficit of the electricity sector, published in the Official Gazette no. 312 of 24 December 2010 |
| RAIPRE | Special Regime (*Registro de Instalaciones de Producción en Régimen Especial*) |

| REIOs | Regional Economic Integration Organizations |
|---|---|
| Request | Request for arbitration from Cavalum against Spain dated 27 July 2015 |
| Resp. C-M | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 28 October 2016 |
| Resp. PHB | Respondent's Post Hearing Brief dated 18 September 2018 |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 2 June 2017 |
| RL-# | Respondent's Legal Authority |
| Spain or Respondent | The Kingdom of Spain |
| TEC | Treaty Establishing the European Community |
| TEU | Treaty on the European Union |
| TFEU | Treaty on the Functioning of the EU |
| Tr.-E Day [#] [Speaker(s)] [page:line] | English Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 22 January 2016 |
| TVPEE | 7% tax on the production of electricity, established by Law 52/2012 |
| VCLT | Vienna Convention on the Law of Treaties |

CASES
_____

*9REN Holding S.à.r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 ("*9REN v. Spain* (Award)"), Legal Authority CL-0219.

*AES Summit Generation Limited and AES-Tisza Erömü Kft. v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 ("*AES Summit v. Hungary* (Award)"), Legal Authority RL-0039.

*Antin Infrastructure Services Luxembourg S.à.r.l. & Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 ("*Antin v. Spain* (Award)"), Legal Authority CL-0199.

*BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 ("*BayWa v. Spain* (Decision on Jurisdiction, Liability and Directions on Quantum)"), RL-0095.

*Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 ("*Blusun v. Italy* (Award)"), Legal Authority CL-0192.

*Case Concerning the Factory at Chorzów*, PCIJ Rep, Series A, No. 17, Judgment, 13 September 1928 ("*Factory at Chorzów* (Judgment)"), Legal Authority CL-0116.

*Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC 062/2012, Final Award and Dissent, 21 January 2016 ("*Charanne v. Spain* (Final Award)"), Legal Authority RL-0049/CL-0004.

*Compañía del Desarrollo de Santa Elena S.A. v. The Republic of Costa Rica*, ICSID Case No. ARB/96/1, Final Award, 17 February 2000 ("*Compañía del Desarrollo de Santa Elena S.A. v. Costa Rica* (Final Award)"), Legal Authority CL-0108.

*Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 ("*Cube v. Spain* ("Decision on Jurisdiction, Liability and Partial Decision on Quantum)"), Legal Authority RL-0094.

*EDF (Services) Limited v. Romania*, ICSID Case No ARB/05/13, Award, 8 October 2009 ("*EDF v. Romania* (Award)"), Legal Authority CL-0054.

*Eiser Infrastructure Limited and Energia Solar Luxembourg S.À R.I. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 ("*Eiser v. Spain* (Award)"), Legal Authority CL-0191.

1

*Eiser Infrastructure Limited and Energia Solar Luxembourg S.À R.I. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on Annulment, 11 June 2020 ("*Eiser v. Spain* (Annulment Decision)"), Legal Authority RL-102.

*Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ("*Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability)"), Legal Authority CL-0070.

*Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, ("*Electrabel v. Hungary* (Award)"), Legal Authority RL-0048.

*El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 ("*El Paso v. Argentina* (Award)"), Legal Authority CL-0053.

*EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN 3481, Award, 3 February 2006 ("*EnCana v. Ecuador* (Award)"), Legal Authority RL-0027.

*Enron Corporation and Ponderosa Assets, L.P v. The Argentine Republic*, ICSID Case No ARB/01/3, Award, 22 May 2007 ("*Enron v. Argentine Republic* (Award)"), Legal Authority CL-0062.

*Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. Kingdom of Spain,* SCC Arb V 2015/150, 14 November 2018 ("*Foresight v. Spain* (Final Award*"), Legal Authority CL-0217.

*Invesmart, B.V. v. Czech Republic*, UN-0036-01, Award, 26 June 2009 ("*Invesmart v. Czech Republic* (Award)"), Legal Authority RL-0019.

*Ioan Micula, Viorel Micula and others v. Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, ("*Micula v. Romania* (Award)"), Legal Authority CL-0014.

*Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain* (SCC Case V2013/153), Award, 12 July 2016 ("*Isolux v. Spain* (Award)"), Legal Authority RL-0075/CL-0176.

*LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v. The Argentine Republic*, ICSID Case No ARB/02/1, Decision on Liability, 3 October 2006 ("*LG&E v. Argentine Republic* (Decision on Liability)"), Legal Authority CL-0063.

*Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015 ("*Mamidoil v. Albania* (Award)"), Legal Authority CL-0173.

*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 ("*Masdar v. Spain* (Award)"), Legal Authority CL-0198/RL-0091.

*Mr. Jurgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v. The Czech Republic*, PCA Case No. 2014-03, Final Award, 11 October 2017 ("*Wirtgen v. Czech Republic* (Final Award)"), Legal Authority RL-0087.

*Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arbitration 2015/063, Final Award, 15 February 2018 ("*Novenergia v. Spain* (Final Award)"), Legal Authority CL-0196.

*OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 ("*OperaFund v. Spain* (Award)"), Legal Authority CL-0225.

*Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007 ("*Parkerings v. Lithuania* (Award)"), Legal Authority CL-0060.

*Plama Consortium Limited v. The Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, 27 August 2008 ("*Plama v. Bulgaria* (Award)"), Legal Authority RL-0034.

*The PV Investors v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 ("*PV Investors v. Spain* (Award)"), Legal Authority RL-100.

*The PV Investors v. Spain*, PCA Case No. 2012-14, Concurring and Dissenting Opinion of Charles N. Brower, 28 February 2020 ("*PV Investors v. Spain* (Dissenting Opinion)"), Legal Authority RL-101.

*RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spai*n, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 ("*RREEF v. Spain* (Decision on Jurisdiction)"), Legal Authority CL-0135.

*RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spai*n, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 ("*RREEF v. Spain* (Decision on Responsibility and Principles of Quantum)"), Legal Authority RL-0093.

*Saluka Investments B.V. v. The Czech Republic,* UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 307 ("*Saluka v. Czech Republic* (Partial Award)"), Legal Authority CL-0055.

*Stadtwerke München GMBH, RWE Innogy GMBH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, ("*Stadtwerke v. Spain* (Award)")

*Slowakische Republik (Slovak Republic) v. Achmea BV*, Court of Justice of the European Union, Case C-284/16, Judgment, 6 March 2018 ("*Achmea* ruling"), Legal Authority CL-0205.

*Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No ARB(AF)/00/2, Award, 29 May 2003 ("*Tecmed v. United Mexican States* (Award)"), Legal Authority CL-0056.

*Vattenfall AB, Vattenfall GmbH, Vattenfall Europe Nuclear Energy GmbH, Kernkraftwerk Krummel GmbH & Co. oHG, Kernkraftwerk Brunsbuttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 ("*Vattenfall v. Germany* (Decision on the *Achmea* Issue)"), Legal Authority CL-0216.

*Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 ("*Waste Management v. United Mexican States* (Award)"), Legal Authority CL-0057.

*WNC Factoring Ltd (United Kingdom) v. The Czech Republic*, PCA Case No. 2014-34, Award, 22 February 2017 (*WNC v. Czech Republic* (Award)"), Legal Authority RL-0076.

*Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014 ("*Yukos v. Russia* (Final Award)"), Legal Authority RL-0073.

## I.    INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of
    Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty,
    which entered into force for the Kingdom of Spain and Portugal on 16 April 1998 (the
    "**ECT**"), and the Convention on the Settlement of Investment Disputes between States and
    Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID
    Convention**").

2.  The claimant is Cavalum SGPS S.A. ("**Cavalum**" or the "**Claimant**"), a company
    incorporated under the laws of Portugal. The respondent is the Kingdom of Spain ("**Spain**"
    or the "**Respondent**").  The Claimant and the Respondent are collectively referred to as
    the "Parties." The Parties' representatives and their addresses are listed above on page (i).

3.  The dispute relates to measures implemented by the government of Spain, which modified
    the regulatory and economic regime of renewable energy projects.

## II.    PROCEDURAL HISTORY

### A.    REGISTRATION AND TRIBUNAL'S CONSTITUTION

4.  On 27 July 2015, ICSID received a request for arbitration from Cavalum against Spain,
    accompanied by Exhibits CEX-001 to CEX-007 (the "**Request**").

5.  On 4 August 2015, the Secretary-General of ICSID registered the Request in accordance
    with Article 36(3) of the ICSID Convention and notified the Parties. The Secretary-General
    also invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in
    accordance with Rule 7.d of ICSID's Rules of Procedure for the Institution of Conciliation
    and Arbitration Proceedings.

6.  On 19 October 2015, the Parties informed the Centre of their agreement on the method for
    the constitution of the arbitral tribunal. According to this, the Claimant would appoint an
    arbitrator by 19 October 2015, Spain would appoint an arbitrator by 30 October 2015, and

the Parties would try to reach an agreement on the appointment of the presiding arbitrator by 13 November 2015.

7.   On that same date, the Claimant appointed Mr. David R. Haigh Q.C., a national of Canada, as an arbitrator. On 28 October 2015, Mr. Haigh accepted his appointment.

8.   On 12 November 2015, Spain appointed Sir Daniel Bethlehem Q.C., a national of the United Kingdom, as an arbitrator. Sir Daniel accepted his appointment on 14 November 2015.

9.   On 15 January 2016, the Claimant informed the Centre of the Parties' agreement to appoint Lord Collins of Mapesbury, LLD, FBA, a national of the United Kingdom, as the presiding arbitrator in this case. On 18 January 2015, Spain confirmed the agreement.

10.  On 22 January 2016, the Secretary-General, in accordance with Rule 6.1 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mr. Francisco Grob, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

**B.   THE FIRST SESSION**

11.  In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 18 March 2016, by teleconference.

12.  Following the first session, the Tribunal issued Procedural Order No. 1 ("**PO1**") on 5 May 2016, recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues.

**C.   THE EUROPEAN COMMISSION'S FIRST APPLICATION TO INTERVENE**

13.  On 18 April 2016, the European Commission ("**EC**") submitted an Application for Leave to Intervene as a Non-Disputing Party pursuant to Article 37.2 of the ICSID Arbitration Rules ("**EC's First Application**").

14.    On 6 May 2016, each Party submitted its observations on the EC's First Application. The Claimant's submission was accompanied by Indexes of Exhibits and Legal Authorities, Exhibit C-0008 and Legal Authorities CL-0001 to CL-0042. Spain's submission was accompanied by Appendices 1-3.

15.    On 20 May 2016, the Tribunal issued Procedural Order No. 2. The Tribunal found that the Application was premature and dismissed it without prejudice to a further application by the Commission after Spain had submitted its Counter-Memorial.

**D.    THE PARTIES' FIRST ROUND OF WRITTEN SUBMISSIONS**

16.    On 25 July 2016, the Claimant filed its Memorial on the Merits ("**Cl. Mem.**"), together with the Witness Statements of Mr. José Valentim Pereira da Cunha ("**CWS-JP1**"), Mss. Maria Helena Brandão ("**CWS-MHB1**") and Sonia López Mera ("**CWS-SLM**"), the Expert Reports of Manuel Aragón Reyes, Jaume Margarit and FTI's Consulting Quantum ("**FTI's First Quantum Report**") and Regulatory ("**FTI's First Regulatory Report**") Reports accompanied by their corresponding supporting documentation, Indexes of Exhibits and Legal Authorities, Exhibits C-0009 to C-0235, and Legal Authorities CL-0043 to CL-0134.

17.    On 28 October 2016, Spain filed its Counter-Memorial on the Merits and Memorial on Jurisdiction ("**Resp. C-M**"), together with a Witness Statement of Carlos Montoya ("**RWS-CM1**") and its supporting documentation, and Expert Reports of Professors Pablo Pérez Tremps and Marcos Vaquer Caballería and Accuracy ("**Accuracy's First Expert Report**"), which was filed together with its corresponding supporting documentation, Indexes of Factual Exhibits and Legal Authorities, Exhibits R-0001 to R-0229, and Legal Authorities RL-0001 to RL-0069.

**E.    DOCUMENT PRODUCTION**

18.    Pursuant to the Parties' agreement of 19 December 2016, each Party filed on 22 December 2016, a Request for Production of Documents, together with its corresponding Redfern Schedule and the Responses or Objections to the Other Party's Request.

3

19. On 13 January 2017, the Tribunal issued its rulings on the Parties' Requests for Production of Documents.

F.    THE EUROPEAN COMMISSION'S SECOND APPLICATION TO INTERVENE

20. On 17 January 2017, the EC submitted a Second Application for Leave to Intervene as a Non-Disputing Party ("**EC's Second Application**").

21. On 30 January 2017, each Party submitted its observations on the EC's Second Application. The Claimant's submission was accompanied by Indexes of Exhibits and Legal Authorities, and Legal Authority CL-0135. Spain's submission was accompanied by Appendices 1-3.

22. On 21 February 2017, the Tribunal issued Procedural Order No. 3, granting the EC's Second Application. The Commission was permitted to make a written submission on the specific matter of the intra-EU jurisdictional objection, limited to 25 pages, followed by comments by the Parties.

23. On 28 April 2017, the EC filed its *Amicus Curiae* Brief, together with Annexes EC-01 to EC-21.

G.    THE PARTIES' SECOND ROUND OF WRITTEN SUBMISSIONS

24. On 28 March 2017, the Claimant filed its Reply Memorial on the Merits and Counter-Memorial on Jurisdiction ("**Cl. Reply**") together with the Second Witness Statements of Mr. José Valentim Pereira da Cunha ("**CWS-JP2**") and Ms. Maria Helena Brandão ("**CWS-MHB2**"), the Expert Report of Mr. Andrew Lars Kirkpatrick of FTI Consulting together with its corresponding documentation, the Second Expert Reports of Manuel Aragón Reyes, Jaume Margarit, and FTI's Consulting Quantum ("**FTI's Second Quantum Report**") and Regulatory ("**FIT's Second Regulatory Report**") Reports, accompanied by their corresponding supporting documentation, Indexes of Exhibits and Legal Authorities, Exhibits C-0235 to C-0288, and Legal Authorities CL-0136 to CL-0188.

25. On 2 June 2017, Spain filed its Rejoinder on the Merits and Reply on Jurisdiction ("**Resp. Rej.**"), together with the Second Witness Statement of Carlos Montoya ("**RWS-CM2**")

4

and its supporting documentation, the Second Expert Report of Professors Pablo Pérez Tremps and Marcos Vaquer Caballería, and Accuracy ("**Accuracy's Second Expert Report**") along with its supporting documentation, Indexes of Factual Exhibits and Legal Authorities, Exhibits R-0230 to R-0316, and Legal Authorities RL-0070 to RL-0078.

26.    On 7 July 2017, the Claimant filed its Rejoinder on Jurisdiction and Response to the EC's *Amicus Curiae* Brief ("**Cl. Rej.**"), together with Indexes of Exhibits and Legal Authorities, Exhibits C-0289 to C-0298, and Legal Authorities CL-0189 to CL-0195.

### H.    PRE-HEARING PROCEDURES

27.    On 19 January 2018, the Claimant notified the Tribunal of the witnesses and experts it wished to call for cross-examination at the hearing, and Spain did so on 20 January 2018.

28.    On 1 February 2018, a pre-hearing teleconference was held between the Tribunal and the Parties pursuant to Section 19.1 of PO1.

29.    On 2 February 2018, the Tribunal issued Procedural Order No. 4. It reflected the Parties' agreements and the Tribunal's decisions concerning the organization of the hearing.

30.    Pursuant to Section 17.2 of PO1, on 23 February 2018, the Claimant requested leave from the Tribunal to file a Supplemental Expert Report by Mr. Richard Edwards into the record. Spain filed its observations opposing this request on 28 February 2018.

31.    On 1 March 2018, the Tribunal denied the Claimant's request, and directed the Parties to submit a Joint Expert Memorandum on certain issues.

32.    On 2 March 2018, each Party requested leave from the Tribunal to introduce additional supporting documentation into the record. On 5 March 2018, the Tribunal invited the Parties to provide observations on the opposing Party's request by 6 March 2018.

33.    On 6 March 2018, the Tribunal informed the Parties that at the hearing it wished to receive the Parties' arguments on the judgment of the Court of Justice of the European Union ("**CJEU**") in the *Achmea* ruling. On this same date, each Party submitted observations on

the other Party's request to introduce additional supporting documentation into the record. Spain's communication included the request to introduce the *Achmea* ruling into the record.

34. On 7 March 2018, pursuant to the Tribunal's instructions of 1 March 2018, the Parties submitted to the Tribunal a Joint Memorandum on Quantum and a Joint Memorandum on the Discount Rate in the Actual Scenario. The Parties requested an extension of time to file a Joint Memorandum on Regulatory Issues.

35. On 8 March 2018, the Tribunal issued its decision on the Parties' requests to file additional supporting documentation into the record.

36. On 12 March 2018, the Parties filed a Joint Memorandum on Regulatory Issues.

37. A Hearing on Jurisdiction and the Merits was held in London from 12 to 16 March 2018 (the "**Hearing**"). The following persons were present at the Hearing:

*Tribunal*:
Lord Lawrence Collins                 President
Mr. David R. Haigh Q.C.               Arbitrator
Sir Daniel Bethlehem Q.C.             Arbitrator

*ICSID Secretariat*:
Francisco Grob D.                     Secretary of the Tribunal

*For the Claimant*:
Mr. Kenneth Fleuriet                  King & Spalding
Mr. Reginald Smith                    King & Spalding
Mr. Kevin Mohr                        King & Spalding
Ms. Isabel San Martín                 King & Spalding
Mr. Antoine Weber                     King & Spalding
Mr. Carlos Cardoso                    Cavalum
Mr. José Alzate                       FTI Consulting
Mr. Joel Franks                       FTI Consulting
Ms. Kristina Danilova                 FTI Consulting

*For Spain*:
Mr. Diego Santacruz Descartín         Abogacía General del Estado
Mr. Antolín Fernández Antuña          Abogacía General del Estado
Ms. Mónica Moraleda Saceda            Abogacía General del Estado
Ms. Elena Oñoro Sáinz                 Abogacía General del Estado
Ms. Amaia Rivas Kortazar              Abogacía General del Estado

| Ms. Raquel Vázquez Meco | Instituto para la Diversificación y Ahorro Energético |
| Ms. Laura Cózar | Accuracy |
| Mr. Alberto Fernández | Accuracy |
| Mr. Carlos Canga | Accuracy |
| Ms. Julie Dasse | Accuracy |

*Court Reporters*:

| Mr. Trevor McGowan | English Court Reporter |
| Mr. Paul Pelissier | English Court Reporter |
| Mr. Dionisio Rinaldi | Spanish Court Reporter |

*Interpreters*:

| Mr. Jesus Getan Bornn | English-Spanish Interpreter |
| Ms. Amalia Thaler – de Klemm | English-Spanish Interpreter |
| Mr. Marc Viscovi | English-Spanish Interpreter |
| Ms. Maria Fordham | Portuguese-Spanish Interpreter |
| Mr. Cristóvão Leitão | Portuguese-Spanish Interpreter |

38.    During the Hearing, the following persons were examined:

*On behalf of the Claimant*:

| Mr. José Valentim Pereira da Cunha | Cavalum |
| Ms. Maria Helena Brandão | Cavalum |
| Ms. Sonia López Mera | Cavalum |
| Mr. Manuel Aragón Reyes | |
| Dr. Dora Grunwald | FTI Consulting |
| Dr. Boaz Moselle | Cornerstone |
| Mr. Richard Edwards | FTI Consulting |

*On behalf of Spain*:

| Mr. Carlos Montoya Rasero | Instituto para la Diversificación y Ahorro Energético |
| Prof. Dr. Pablo Pérez Tremps | Universidad Carlos III de Madrid |
| Prof. Dr. Marcos Váquer Caballería | Universidad Carlos III de Madrid |
| Mr. Eduard Saura | Accuracy |
| Mr. Stéphane Perrotto | Accuracy |
| Mr. Christophe Schmit | Accuracy |

7

I.    THE EUROPEAN COMMISSION'S THIRD APPLICATION TO INTERVENE

39.    On 16 May 2018, the EC filed a communication proposing to update its *Amicus Curiae* Brief of 28 April 2017 ("**EC's Third Application**"), in light of the *Achmea* ruling.

40.    On 28 May 2018, pursuant to ICSID Arbitration Rule 37.2, each Party filed its observations on the EC's Third Application.

41.    On 12 June 2018, the Tribunal granted the EC's Third Application and on 22 June 2018, the EC filed its updated *Amicus Curiae* Brief.

J.    POST-HEARING PROCEDURES

42.    On 11 May 2018, the Parties filed their agreed corrections to the Hearing transcript.

43.    On 28 June 28, 2018, the Tribunal held a videoconference with the Parties, for the cross-examination of the Claimant's Witness, Mr. Jaume Margarit ("**Mr. Margarit's Testimony**"), who had been unable to testify at the Hearing.

44.    On 3 September 2018, the Parties filed their agreed corrections to the transcript of Mr. Margarit's Testimony.

45.    The Parties filed simultaneous Post-Hearing Briefs on 18 September 2018.

46.    On 23 November 2018, the Claimant asked the Tribunal to take judicial notice of the award rendered in *Foresight v. Spain*. On 10 December 2018, Spain objected to the Claimant's request. On 13 December 2018, the Tribunal invited the Parties to formally introduce the *Foresight* award into the record and to make simultaneous submissions on its relevance, if any, by 21 December 2018.

47.    On 21 December 2018, the Parties filed their comments on the *Foresight* award. Claimant's submission was accompanied by Legal Authority CL-0217.

48.    On 25 January 2019, Spain requested leave from the Tribunal to introduce the "Declaration of the Representatives of the Governments of the Member States, of 15 January 2015 on the legal consequences of the judgment of the Court of Justice in Achmea and on

Investment Protection in the European Union". On 4 February 2019, the Claimant filed its observations on Spain's request. It urged the Tribunal: (1) to reject Spain's request, (2) if the Tribunal was to admit Spain's request, to also admit into the record the Second Declaration made by other EU Member States – including Finland, Luxembourg, Malta, Slovenia, and Sweden, and (3) to allow the Parties to file simultaneous submissions addressing both Declarations and any relevant case law post-*Achmea* on the intra-EU issue.

49.    On 12 February 2019, the Tribunal granted Spain's request of 25 January and the Claimant's request of 4 February 2019. The Parties were thus invited to make simultaneous submissions addressing both Declarations and any other relevant case law post-*Achmea* on the intra-EU issue. The Parties did so on 19 February 2019. The Claimant's submission was accompanied by Exhibits C-0309 and C-0310, and Legal Authority CL-0218.

50.    On 22 February 2019, the Tribunal invited the Claimant to submit its comments on a suggestion made by Spain in its 19 February submission, in order to invite Portugal to advise the Tribunal of the consequences of the *Achmea* ruling. On 1 March 2019, the Claimant submitted its comments, objecting to Spain's proposal.

51.    On 6 May 2019, Spain requested leave from the Tribunal to introduce into the record the Decision on Responsibility and on the Principles of Quantum issued in *RREEF v. Spain*, together with the Partially Dissenting Opinion of Professor Robert Volterra. On 16 May 2019, the Claimant accepted Spain's request on the condition that Spain consented to the addition of the Decision on Jurisdiction, Liability and Partial Decision on Quantum issued by the tribunal in *Cube v. Spain*. On 27 May 2019, Spain granted its consent.

52.    On 13 June 2019, Spain filed the *RREEF* and *Cube* decisions as Legal Authorities RL-0093 and RL-0094, along with its comments thereon.

53.    On the same date, the Claimant submitted a letter, calling the Tribunal's attention to the reasoning of the award rendered on 31 May 2019, in the proceeding between *9REN Holding S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/15/15).

54.    On 4 December 2019, Spain requested leave from the Tribunal to file the award rendered in *Stadtwerke München GmbH, RWE Innogy GmbH and Others v. Kingdom of Spain*

(ICSID Case No. ARB/15/1), and the Decision on Jurisdiction, Liability and Directions on Quantum issued in *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/16).

55. On 6 December 2019, the Tribunal invited the Parties to confer and inform the Tribunal as to whether they agreed to introduce the proposed legal authorities as well as any others the Parties considered relevant into the record.

56. On 10 December 2019, each Party submitted its comments on the other Party's request for introduction of new legal authorities. In its communication, the Claimant stated that it "believe[d] that the Tribunal should consider that totality of awards and decisions issued by tribunals in treaty arbitrations against Spain related to the same Disputed Measures at issue in this proceeding". Additionally, the Claimant requested leave to file additional documents into the record.

57. On 10 January 2020, Spain submitted its comments on the Claimant's communication of 10 December 2019. Spain's communication also included a request to add an additional decision into the record.

58. On 22 January 2020, the Tribunal communicated the Parties its decision regarding the admission of new documents. The Tribunal also invited Spain to submit its comments concerning the Claimant's characterization of RDL 17/2019, one of the proposed documents to be filed.

59. On 31 January 2020, the Claimant filed into the record Exhibits C-0311 and C-0312, and Legal Authorities CL-0219 to CL-0226. In this communication, the Claimant requested leave from the Tribunal to introduce another document into the record.

60. On 3 February 2020, Spain submitted its comments on the Claimant's request of 31 January 2020. Spain also requested leave to file an additional document into the record.

61. On 5 February 2020, the Tribunal granted the Parties' requests as formulated in the Claimant's communication of 31 January 2020 and Spain's communication of 3 February 2020.

62.    On 10 February 2020, Spain submitted its comments on the characterization of RDL 17/2019. The submission was accompanied by Legal Authorities RL-0095 to RL-0099.

63.    On 11 February 2020, the Claimant filed Legal Authority CL-0227. Additionally, the Claimant requested leave from the Tribunal to present its comments on Spain's submission of 10 February 2020. On 12 February 2020, Spain opposed this request. Alternatively, Spain requested that in case the Tribunal accepted the Claimant's request, it granted leave for Spain to submit a response to the Claimant's comments.

64.    On 20 February 2020, the Tribunal granted both Parties' requests. Following this decision, on 28 February 2020, the Claimant submitted its comments on RDL 17/2019 and Spain's comments thereto of 10 February 2020. The Claimant's comments were accompanied by a corrected version of Exhibit C-0312.

65.    On 5 March 2020, Spain requested a time extension to submit its comments on the Claimant's submission of 28 February 2020. Additionally, Spain requested leave to introduce a new decision into the record, while stating that the Parties' comments on such decision were not necessary. On 6 March 2020, the Tribunal granted Spain's requests.

66.    Also, on 6 March 2020, the Claimant informed the Tribunal that it disagreed with Spain's "suggestion that it is not necessary for the Tribunal to receive comments from the Parties" on the new decision. The Claimant opined that the Parties should be allowed to submit their comments.

67.    On March 12, 2020, Spain submitted its comments on RDL 17/2019, and introduced the Final Award rendered on 28 February 2020 in *The PV Investors v. Spain* (PCA Case No. 2012-14), along with the Dissenting Opinion of Charles Concurring and Dissenting Opinion of Charles N. Brower, Legal Authorities RL-0100 and RL-0101.

68.    On 13 March 2020, the EC submitted a communication concerning a Decision by which "it authorizes the measures adopted in the Spanish legislation in 2013 and 2014 as State aid", which in its opinion "directly affects the legal assessment" of the current proceeding.

69.   On 6 April 2020, the Claimant submitted its comments on the *PV Investors* Final Award, and copies of the Preliminary Award on Jurisdiction issued in the same case on 13 October 2014.

70.   On 20 April 2020, Spain submitted its comments on the *PV Investors* Final Award.

71.   On 21 April 2020, the Tribunal thanked the EC for their communication of 13 March 2020 and advised it that the Tribunal had no further questions to ask in this regard.

72.   On 23 June 2020, Spain requested leave to file a copy of the Decision on the Kingdom of Spain's Application for Annulment rendered on 11 June 2020 in *Eiser Infrastructure Limited and Energía Solar Luxembourg S.á r.l. v. Kingdom of Spain* (the ICSID Case ARB/13/36). On 2 July 2020, Claimant agreed to Spain's request, so long as the Parties were permitted to submit comments on the decision.

73.   Following the Tribunal's directions, on 13 July 2020, Spain filed a copy of the *Eiser* annulment decision (Legal Authority RL-102), along with its comments thereon. On 22 July 2020, the Claimant responded to Spain's comments.

## III.   THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

74.   In its final pleading, its Rejoinder on Jurisdiction, the Claimant stated its request for relief to the Tribunal as follows:

> a declaration that the Tribunal has jurisdiction under the ECT and the ICSID Convention for all of Cavalum's claims, thereby rejecting Respondent's jurisdictional objections in full;
>
> a declaration that Spain has violated Part III of the ECT and international law with respect to Cavalum's investments;
>
> compensation to Cavalum for all damages it has suffered as set forth in its Memorial on the Merits and in its Reply Memorial on the Merits and as may be further developed and quantified during the course of this proceeding;

all costs of this proceeding, including (but not limited to) Cavalum's attorneys' fees and expenses, the fees and expenses of Cavalum's experts, and the fees and expenses of the Tribunal and ICSID;

pre- and post-award compound interest at the highest lawful rate from the Date of Assessment until Spain's full and final satisfaction of the Award; and

any other relief the Tribunal deems just and proper.

75.    Spain, in its Rejoinder on the Merits and Reply on Jurisdiction, requests the following from the Tribunal:

a)  declare its lack of jurisdiction to hear the claims of the Claimant, or if applicable their inadmissibility, in accordance with what is set forth in section III of this Memorial, referring to Jurisdictional Objections; and

b)  Subsidiarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the Claimants' claims regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to sections IV and V herein, referring to the Facts and the Merits, respectively;

c)  Secondarily, to dismiss all the Claimant's claims for damages as the Claimant has no right to compensation, in accordance with section V herein; and

d)  Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.

## IV.    APPLICABLE LAW

### A.    THE CLAIMANT'S POSITION

76.    For the Claimant, it follows from Article 42(1) of the ICSID Convention and Article 26.6 ECT that the ECT itself and other sources of international law form the applicable law of this dispute. This includes the Vienna Convention on the Law of Treaties ("**VCLT**"), and other applicable rules and principles of international law, including those authoritatively set out in the Articles on Responsibility of States for Internationally Wrongful Acts of the International Law Commission of the United Nations.

77.    Spanish law is relevant to this dispute only as a matter of fact, to be considered by the Tribunal along with other facts of this case. Spanish law does not provide and cannot influence the legal standards that the Tribunal applies to determine whether Spain violated the ECT and international law. It is well settled that a State cannot avoid liability under international law by relying upon its domestic law. Thus, whether or not Spain's regulatory measures complied with its domestic law is irrelevant to the Tribunal's consideration of Spain's breaches of the ECT and international law.

### B.    SPAIN'S POSITION

78.    Spain argues that EU law is international law and as such, it must be applied by the Tribunal in accordance with Article 26.6 ECT. EU law is also part of the laws of Spain and a relevant fact for deciding the dispute.[1]

79.    Both Spain and Portugal, the Claimant's home State, are EU Member States. In an intra-EU context, EU law has primacy over the laws of Member States.

80.    EU Law is not confined to the Treaties signed by EU Member States, but it has to be extended to the relevant legal acts of EU Institutions through which those Institutions exercise the European Union's competencies, including Regulations, Directives and

---

[1] Resp. PHB, ¶¶ 4-16.

Decisions as provided for by Article 288 of the Treaty on the Functioning of the European Union (thereinafter "**TFEU**").[2]

81.    Moreover, the core of the dispute in this case revolves around issues of State Aid.  Public subsidies are the largest component of feed-in tariffs. This is a matter regulated by EU law. EU law is thus decisive in determining the scope of investors' rights under the regulatory framework of renewable energies in Spain.

## V.    FACTUAL BACKGROUND

### A.    THE INVESTOR

82.    Cavalum SGPS, S.A. ("**Cavalum**") is a joint-stock company ("*sociedade anónima*") incorporated under the laws of Portugal. It was created by two Portuguese engineers, Mr. Carlo Cadoso and Mr. José Valentim Pereira da Cunha. Cavalum specialises in developing, financing, and operating facilities that produce electricity from renewable energy sources.

83.    In 1995, Cavalum began investing in the Portuguese market. It expanded outside Portugal in 2007, with plans to establish a presence in France and Spain across multiple renewable energy technologies. Until today, Cavalum maintains a strong presence in the renewable energy sectors of Portugal, Spain, and France. Although, as noted below, Spain initially asserted that Cavalum did not have standing in respect of claim by companies in which it is a shareholder, that claim was not maintained. Subject to Spain's "intra-EU" objection, addressed below (which goes to the issue of whether the Claimant is an investor of *another* Contracting Party, i.e., not whether it is an "investor" *per se*), there is no material dispute about the Claimant as investor in Spain.

### B.    CLAIMANT'S INVESTMENTS IN SPAIN

84.    There is equally no material dispute about the nature of the Claimant's investments in Spain. Through its Spanish subsidiaries and special purpose vehicles, Cavalum holds

---

[2] Resp. PHB, ¶¶ 71-80.

interests in, controls, and operates the following seven photovoltaic ("**PV**") power plants in Spain:

- Don Alvaro PV plant ("**Don Alvaro**"), located in Extremadura, which has an installed nominal power capacity of 1.5 MW and was commissioned in May 2008. Cavalum owns 100% of this facility.

- La Albuera PV plant ("**La Albuera**"), located in Extremadura, which has an installed nominal power capacity of 2.0 MW and was commissioned in July 2008. Cavalum owns 50% of this facility.

- Fuente de Cantos PV plant ("**Fuente de Cantos**"), located in Extremadura, which has an installed nominal power capacity of 4.0 MW and was commissioned in July 2008. Cavalum owns 50% of this facility.

- La Roda PV plant ("**La Roda**"), located in Castilla-la-Mancha, which has an installed nominal power capacity of 2.0 MW and was commissioned in August 2008. Cavalum owns 100% of this facility.

- Riosalido PV plant ("**Riosalido**"), located in Castilla-la-Mancha, which has an installed nominal power capacity of 1.5 MW and was commissioned in September 2008. Cavalum owns 100% of this facility.

- Talarrubias PV plant ("**Talarrubias**"), located in Extremadura, which has an installed nominal power capacity of 1.9 MW and was commissioned in June 2010. Cavalum owns 51% of this facility.

- Solarwell PV plant ("**Solarwell**"), located in Extremadura, which has an installed nominal power capacity of 2.5 MW and was commissioned in January 2013. Cavalum owns 51% of this facility.

**C.  THE MATERIALIZATION OF THE INVESTMENT**

85.  The Claimant states that in early 2007, Cavalum was put in contact with Sonia López Mera from the Spanish company Acción Solar Iberia SL, regarding investment opportunities in Spain.  Ms. López Mera introduced Valsolar to Cavalum's shareholders and management, which had been developing PV and other renewable energy facilities in Spain since 2006.

86.  Following several meetings, Cavalum and Valsolar executed on 21 August 2007 an agreement on the sale of rights for the *Don Álvaro* PV project. Parque Fotovoltaico Don Álvaro, S.L. was incorporated along with 15 other special purpose vehicles for this project, of which Cavalum owns 100% of the shares. Cavalum then obtained the necessary EPC and O&M agreements for the construction of the facilities in fall 2007. Don Álvaro was commissioned in May 2008 and registered in the Registry of Power Installations under

16

Special Regime (*Registro de Instalaciones de Producción en Régimen Especial*) **("RAIPRE")** in June 2008.

87.    On 23 November 2007, Cavalum and Valsolar entered into a Joint Participation Agreement to complete the development of the *Fuente de Cantos* and *La Albuera* projects. Parque Fotovoltaico Fuente de Cantos, S.L. was established with additional 40 special purpose vehicles. Cavalum has a 50% ownership stake in these subsidiaries. Parque Fotovoltaico La Albuera, S.L. was also incorporated as a subsidiary project company along with 20 special purpose vehicles. Cavalum has a 50% ownership stake in these companies. After entering into the relevant EPC and O&M agreements for the construction of the facilities, *La Abuera* and *Fuente de Cantos* were commissioned and registered in the RAIPRE during the summer of 2008.

88.    While Cavalum was jointly developing these three projects with Valsolar, the company also partnered with Bosques Solares S.L., a development company in Spain, to complete and acquire two additional projects, *Riosalido* and *La Roda*. On 2 May 2008, Cavalum incorporated two subsidiary project companies for these additional projects, Parque Fotovoltaico La Roda, S.L. with 20 special purpose vehicles and Parque Fotovoltaico Riosalido, S.L. with 19 special purpose vehicles. Cavalum owns 100% of the shares in both subsidiaries. On the same day of their incorporation, these companies entered into EPC and O&M agreements with Bosques Solares for the construction of the facilities. Over the course of July and August 2008 both the *Riosalido* and *La Roda* facilities were commissioned and registered in the RAIPRE.

89.    Cavalum states that after new PV facility registration was closed under RD 661/2007 in September 2008, it continued to assess additional investments in Spain. By April 2009, Cavalum claims that it had secured all of the necessary documents to apply for enrolment in RD 1578/2008 for six additional plants: *Talarrubias* (planned capacity of 1.9 MW); Vega de Botoa or *Solarwell* (planned capacity of 2.5 MW); *Calzadilla* (planned capacity of 2.0 MW); *Fotovoltaica Lobon* (planned capacity of 2.7 MW), *Solar Lobon* (planned capacity of 2.4 MW), and *Solar de Botoa* (planned capacity of 2.5 MW).

17

90.    On 10 October 2008, Cavalum acquired 51% of the shares in *Solarwell*. In November 2008, Cavalum applied for the pre-allocation registry for these installations, which it secured in October 2011. Cavalum achieved final commissioning for *Solarwell* on 29 January 2013, and final registration in the RAIPRE on 7 March 2013.  On 9 May 2009, Cavalum also acquired 51% of the shares in *Talarrubias*. In July 2009, this plant was registered in the pre-allocation registry of RD 1578/2008. Construction was completed in June 2010, and final registration in the RAIPRE on 30 June 2010. Two more subsidiary companies were incorporated for these projects, Fotovoltaica Talarrubias, S.L. and Solarwell Parques Fotovoltaicos, S.L. Cavalum has a 51% ownership share in both of these subsidiaries.

91.    Spain enrolled *Calzadilla* into the RD 1578/2008 pre-allocation registry in 2011, but Cavalum and Valsolar sold that facility in April 2012. The Claimant states that the three other projects were never developed, because they did not secure a spot in the RAIPRE registration before the enactment of Royal Decree – Law 1/2012 (the "**Abandoned Projects**").

92.    For purposes of this arbitration, Claimant contends that the relevant date of the investment is when Cavalum made the decision to invest in each of the PV plants, not the date of subsequent expenditures to develop the PV plants. These dates are as follows:[3]

| Plant | Claimant's Investment | RAIPRE Registration | Sources |
|---|---|---|---|
| Don Alvaro | 21 Aug. 2007 | 30 June 2008 | Agreement on Sale/Purchase of Rights (C-198); RAIPRE Registration (C-205) |
| La Albuera | 23 Nov. 2007 | 28 Aug. 2008 | Joint Participation Agreement (C-194); RAIPRE Registration (C-211) |
| Fuente de Campos | 23 Nov. 2007 | 4 Sept. 2008 | Joint Participation Agreement (C-194); RAIPRE Registration (C-213) |
| La Roda | 2 May 2008 | 25 Aug. 2008 | Deed of Incorporation and EPC/O&M Agreements (C-215, C-217, C-219); RAIPRE Registration (C-224) |
| Riosalido | 2 May 2008 | 25 Aug. 2008 | Deed of Incorporation and EPC/O&M Agreements (C-216, C-218, C-220); RAIPRE Registration (C-222) |

---

[3] Claimant's Opening Presentation, p. 144. See also Tr.-E, Day 1, Mr. Mohr, pp. 111-114.

93.   Even if the date of subsequent expenditures was relevant, the Claimant states that all these plants were completed by the summer of 2008, when they received their RAIPRE registrations. The only plants that were completed later are *Talarrubias* and *Solarwell*. For these plants, the date of investment, according to the Claimant, must be when Cavalum committed to these projects, which in the case of *Talarrubias* is 9 May 2009, when Cavalum acquired the shares in the SPV and paid €327,000 for them. In the case of *Solarwell*, Cavalum committed to this project on 12 October 2008, when Cavalum acquired the shares for a price of €663,000.  At this point, the Claimant argues, Cavalum could not simply walk away without losing its investment and the bank guarantees submitted to apply for the pre-allocation registry (*i.e.,* €950,000 for the Talarrubias plant and 1.25 million for the Solarwell plant) to secure completion of these projects.

94.   For the three Abandoned Projects, the Claimant submits that relevant date should be determined based on the time at which significant capital contributions were made, in October 2008, and the pre-allocation applications, which were submitted in February and April 2009.

## VI.   JURISDICTION

### A.   OVERVIEW OF THE PARTIES' POSITIONS

#### (1)   The Claimant's Position

95.   The Claimant asserts that the Tribunal has jurisdiction to hear this claim. The Claimant is a company incorporated in Portugal, and of Portuguese nationality. Portugal and Spain are Contracting States to both the ICSID Convention and the ECT.

96.   Cavalum consented to ICSID arbitration by filing a Request for Arbitration on 27 July 2015 after it attempted, unsuccessfully, to settle the dispute amicably.[4]   Spain gave its

---

[4] Claimant sent a letter to Spain on 16 June 2014, notifying it of this dispute and offering to settle the dispute amicably. Spain did not respond to Claimant's communication.

"unconditional consent" to the submission of this dispute to ICSID arbitration in Article 26.3 ECT.

97.    The dispute involves covered "Investments" under the ECT, which include: (i) the Claimant's ownership of tangible and intangible property and property rights; (ii) the Claimant's ownership of shares and equity participation in Spanish companies and business enterprises, as well as debt obligations; (iii) the Claimant's right to returns, claims to money, and claims to performance pursuant to contracts having economic value and related to the investments; (iv) rights conferred by law, including, but not limited to, the rights to fixed feed-in tariffs conferred through RD 661/2007 and RD 1578/2008; and (v) rights conferred by licenses and permits.

98.    The dispute is also of a legal nature relating to Part III of the ECT.

**(2)    Spain's Position**

99.    In its Counter-Memorial, Spain raised three jurisdictional objections. It contended that (a) the ECT does not apply to disputes involving EU Member States (i.e., the so-called "intra-EU" disputes); (b) the ECT's tax "carve-out" bars Cavalum's Article 10 claims in relation to Law 15/2012; and (c) Cavalum does not have standing to claim damages sustained by the companies in which it is a shareholder.

100.    The last objection, however, was withdrawn by Spain in its Reply Memorial on Jurisdiction.[5]    Consequently, only the intra-EU and the tax "carve-out" objections are addressed below.

**B.    THE INTRA-EU OBJECTION**

101.    Spain raised the intra-EU objection in its Counter-Memorial and developed it further in its Rejoinder.    Shortly before the March 2018 Hearing, the CJEU rendered a ruling in the *Achmea* case, which is discussed below.    At the Hearing, both Parties addressed this decision. The Parties further developed their arguments in their post-hearing briefs.

---

[5] See Resp. Rej., ¶ 4, fn.1.

A summary of the Parties' positions concerning this objection is provided below. The Parties' arguments are addressed at length in section [VII.A.1] *infra*.

**(1)    Spain's Position**

102.    Spain objects to the Tribunal's *ratione personae* jurisdiction, arguing that the Claimant is not an "investor of *another* Contracting Party" in the terms of Article 26 ECT. The Claimant is a company incorporated in Portugal.  Both Spain and Portugal were EU Member States at the time they entered into the ECT.  In Spain's view, the ECT does not apply to disputes relating to "intra-EU" investments such as this.[6]

103.    In its Counter-Memorial, Spain raised three main arguments in support of this objection: *(i)* the EU system confers particular protection upon the EU-national investor, which is of preferential application over the provisions of the ECT;[7] *(ii)* the prevalence of EU law among EU Member States is reflected in the literal interpretation, context and purpose of the ECT;[8] and *(iii)* commentators also support Spain's position.[9]

104.    Spain draws attention, particularly, to the following provisions of the ECT: (a) Article 1.2, which includes Regional Economic Integration Organizations ("**REIOs**") such as the EU under the definition of the "Contracting Parties" and Article 1.3, which recognises the binding nature of competences conferred to the EU by its Member States; (b) Article 16, which establishes the rules of compatibility between the ECT and other treaties, including EU treaties, which prevail over the ECT in intra-EU relations; (c) Article 25, which prevents the applicability of the EU's system of preferential treatment to other ECT Contracting Parties that are not EU Member States via the Most Favoured Nation clause; (d) Article 36.7, which provides REIOs with votes equivalent to the number of its member states which are Contracting Parties to the ECT when voting on matters over which it has

---

[6] Resp. C-Mem., ¶ 47-51.

[7] Resp. C-Mem., ¶¶ 56-64.

[8] Resp. C-Mem., ¶¶ 65-87. 1.

[9] Resp. C-Mem., ¶¶ 88-98 (citing Bruno Poulain, *Développements récents du droit communautaire des investissements internationaux*, Revue Générale de Droit International Public, C XIII/2009, 4 (RL-0060), p. 881; and Jan Kleinheisterkamp, *Investment protection and EU Law: the intra- and extra- EU dimension of the Energy Charter Treaty*, Journal of International Economic Act 15.1, Oxford University Press 2012, RL-0064, pp. 101, 103 and 108).

competence; and (e) Article 26.6, which requires disputes to be resolved "in accordance with this Treaty and applicable rules and principles of International law", which requires , in Spain's view, that the Tribunal must interpret the dispute settlement provision of Article 26 ECT in accordance with EU law, which is applicable international law. EU Law, as reflected in Article 344 TFEU, prevents Spain from submitting any matters relating to the EU's Internal Market in Electricity (such as this dispute) to any dispute settlement method other than the EU judicial system. At the time the ECT was signed, the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market (as it is an area in which they had transferred competence to the then European Community) and for this reason the EU is a Contracting Party to the ECT. Therefore, Article 26 ECT does not generate obligations between the EU Member States.

105.    In its Rejoinder, Spain added that under the "principle of primacy" of EU law, it is EU law and not the ECT which must be applied to resolve this dispute.[10] EU law constitutes part of public international law and thus the "applicable rules and principles of international law" under Article 26.6 ECT.[11] Articles 25 and 26 ECT recognise the primacy of EU law in the context of intra-EU relations (to the extent that Article 25 refers to "preferential treatment" applicable between the parties to an economic integration agreement. Moreover, EU law, not the ECT, should apply because this dispute affects essential elements of EU law such as State aid.[12]

106.    At the Hearing and in its the post-hearing submission, Spain focused its jurisdictional arguments on the *Achmea* ruling.[13] Spain submits that this ruling applies in the context of the ECT and confirms Spain's intra-EU objection in this case.

107.    Concerning the relevance of this ruling Spain mentions, *inter alia*, the following: ***(i)*** the findings of the judgment are not a novelty but reflect consolidated case law that dates back

---

[10] Resp. Rej., ¶¶ 76-86.

[11] Resp. Comments on EC Submission, ¶ 13.

[12] Resp. Rej., ¶ 92.

[13] Tr.-E, Day 1, 170:9 *et seq.*; Tr.-E, Day 5, 154:7 *et seq.*; Resp. PHB, ¶¶ 96 *et seq.*; and Resp. Comments on EU Members Declarations of 19 February 2019.

to 1991; *(ii)* the judgment's scope of application is not limited to BITs but it extends to any international treaty, including the ECT; *(iii)* the judgment is applicable in this case because it concerns an intra-EU dispute in which the Tribunal is obliged to apply EU law; and *(iv)* given that the Tribunal does not form part of the EU judicial system, and therefore cannot make a question for a preliminary ruling to the CJEU under Article 267 TFEU, the Tribunal lacks jurisdiction over this intra-EU dispute.

108.   Finally, with regard to the declarations made by EU Members States on 15 and 16 January 2019 regarding the *Achmea* ruling, Spain considers, *inter alia*, that the declaration adopted by the majority of Member States "confirms that Article 26 ECT cannot be considered a valid consent to arbitration in the case of intra-EU disputes for it would be incompatible with the autonomy and primacy of EU law".[14]

**(2)   The Claimant's Position**

109.   The Claimant submits that the ECT applies to "Intra-EU" disputes. In its Reply Memorial on the Merits and Counter-Memorial on Jurisdiction, the Claimant gave three main reasons in support of this contention.

110.   *First*, there is nothing in the text of Article 26 or elsewhere in the ECT that detracts from this conclusion.  The EU's Status as a Contracting Party is irrelevant to this dispute, which is not against the EU but against Spain. The definition of "REIO" and "Area" of an REIO in ECT Articles 1.3 and 1.10 contain no language affecting the ability of investors of EU Member States to commence an arbitration against EU Member States. The ECT merely acknowledges that some Contracting Parties are also members of REIOs. If anything, the voting provisions selectively quoted by Spain confirm the desire of the Contracting Parties to the ECT to preserve the autonomy of EU Member States to exercise their individual rights as ECT Contracting Parties. If the EU Member States had wanted to include a disconnection clause in the treaty, they could have easily done so, as they have done in the context of many other treaties.

---

[14] Resp. Comments on EU Members Declarations, ¶ 23.

111.    ***Second***, the relationship between the ECT and EU Law does not lead to the nonapplication of the ECT to intra-EU disputes. As is clear from the terms of Article 16 ECT, when two international agreements between the same Contracting Parties are in force, the ECT gives preference to more favourable provisions for investors and investments. Cavalum's right under the ECT to submit its dispute to a neutral arbitration forum is more favourable than a rule that would require it to resort to the domestic courts of Spain before continuing through the EU legal system. The reference in Article 26.6 ECT to international law does not in any way help Spain as international law requires the Tribunal to apply the ECT according to its provisions. Even assuming that the ECT and the EU treaties share the same subject matter, there is no incompatibility between the ECT and the EU legal framework. Article 344 TFEU does not play any role in this case. The reference to "the Treaties" in that provision does not point to the ECT, but to the TFEU itself and the Treaty on the European Union ("**TEU**"), neither of which Claimant has invoked in this dispute. Nor does Legal Opinion 1/91 of the CJEU advance Spain's position. There is no risk that the present Tribunal would need to interpret EU law at all in resolving the present dispute. Even if it did, the exclusivity of EU courts to interpret EU law does not mean that another authority cannot apply EU law.

112.    ***Third***, unanimous case law confirms the ECT's application to "intra-EU" disputes.

113.    In its Rejoinder on Jurisdiction and Response to the European Commission's *Amicus Curiae* Brief, the Claimant added that it is not correct that EU Member States lacked the external competence to conclude the ECT. They did have such competence. The Claimant also stated that Spain mischaracterised both the principle of EU "Primacy" and ECT Article 25, and that the outcome of the CJEU's then-pending judgment in *Achmea* was irrelevant for the fate of Spain's intra-EU objection.

114.    At the Hearing and in its the post-hearing submission, the Claimant reiterated its arguments and denied that the *Achmea* ruling supported Spain's position.[15]

---

[15] Cl. Reply, § II.A; Cl. Rej., § I.A; Claimant's Opening Presentation, § III.

115.   The Claimant states that the *Achmea* ruling is irrelevant for the present proceedings because the German Federal Court of Justice only asked the CJEU to determine whether the BIT was in compliance with EU law. Hence, *Achmea* applies solely to the BIT between Slovakia and Netherlands.[16]

116.   In any event, key distinguishing factors exist between *Achmea* and the dispute at hand. Unlike the Netherlands-Slovakia BIT in issue in *Achmea*, the EU is a Contracting Party to the ECT.[17] This fact is outcome determinative because the CJEU stated that *Achmea* would not apply to investment protection treaties where the EU is a contracting party.[18] Moreover, the Netherlands-Slovakia BIT in *Achmea* contains governing law provisions that expressly provided that a tribunal constituted under the BIT consider the "law of the contracting party concerned," "relevant agreements between the contracting parties," and "provisions of [the] agreement and other relevant agreements between contracting parties." Pursuant to these provisions a tribunal constituted under the Netherlands-Slovakia BIT in *Achmea* could be called upon to interpret EU law. However, this is not the case in the dispute at hand because the ECT's governing law provisions refer only to the ECT itself and "applicable rules and principles of international law." Claimant thus concludes that— unlike the Netherlands-Slovakia BIT at the core of the dispute in *Achmea*—nothing in the ECT requires the Tribunal to interpret or apply EU regional law.[19]

117.   The Claimant also notes that all tribunals – pre- and post- *Achmea* – have rejected the intra-EU objection.

118.   Lastly, the Claimant submits that the possible difficulties that might hamper the enforcement of any arbitral decision remain essentially speculative since at the present stage it is highly uncertain in what way an award might be enforced

---

[16] Cl. Rej., ¶ 66.

[17] Claimant's Opening Presentation, § III.

[18] Cl. PHB, ¶ 69.

[19] Cl. PHB, ¶¶ 69-72.

**(3)**    **The EC's *Amicus Curiae* Briefs**

119.    The Commission submits, in essence, that the ECT has not created international obligations between the EU Member States *inter se*, but only between EU States and non-EU countries. Even if certain *inter se* obligations were created, those would not cover investment protection and ISDS, for which Member States have no competence. Any such obligations, if ever created, must be interpreted in conformity with EU law. If this is not possible, they must be deemed superseded or derogated as contrary to EU law.

120.    According to the Commission, the *Achmea* ruling has confirmed that an offer for investment arbitration made by a Member State to investors from another Member State is precluded by the general principle of Union law of autonomy, Article 19 TEU, and Articles 267 and 344 JFEU.

**C.    THE TAX OBJECTION**

**(1)    Spain's Position**

121.    Spain contends that the Tribunal lacks jurisdiction over Cavalum's claims under Article 10 ECT relating to Law 15/2012, which established a 7% tax on the production of electricity (the "**TVPEE**"). These claims are barred under ECT Article 21's tax "carve-out". Spain has not consented to arbitration in respect of Cavalum's claims under ECT Article 10.

122.    The TVPEE is a taxation measure for purposes of the ECT. According to Article 21.7 ECT, the term "taxation measure" includes "any provision relating to taxes of the domestic law of the Contracting Party". Law 15/2012 was approved by the Spanish Parliament in accordance with ordinary legislative procedures. Its constitutionality and conformity with EU law have been upheld by both the Spanish Constitutional Court and the European Commission, respectively.[20]

123.    The TVPEE is also a tax from the perspective of international law. It was established by law, it imposes an obligation on a class of persons, and it produces a revenue for the State.

---

[20] Judgment 183/2014, from 6 November 2014, R-0018 and Case file of the EU Pilot procedure 5526/13/TAXU, R-0026.

Indeed, the TVPEE is part of Spanish law, it is levied on all entities that produce and incorporate electricity into the grid and the revenues are included in the State's general budget, through which State's expenditures are funded. This is clearly reflected in the State Budget of the Spanish government for 2013 (the first year the TVPEE was in force), 2014, 2015, and 2016.[21] The fact that an amount equivalent to this revenue is allotted to finance the costs of the electricity system is simply irrelevant.

124.  The findings above are sufficient to dispose of this claim. There are no "extraordinary circumstances" that may warrant the sort of good-faith analysis undertaken by the *Yukos* tribunal. The TVPEE was not adopted to destroy a company or eliminate a political opponent. It is also clear that the TVPEE is a tax by legal operation, which is the criterion that must be used over and above the economic effect of the measure, as correctly noted by the *Encana v. Ecuador* tribunal.

125.  In any event, the TVPEE is a non-discriminatory and *bona fide* tax. It is levied on both renewable and conventional energy producers. The Claimant concedes this point, but it argues that renewable energy producers should have received a better treatment to compensate for the allegedly greater impact of this tax on the income of renewable energy facilities. A similar argument was put before the Spanish Constitutional Court and rejected.[22] There are good reasons, however, to tax the production of electricity without distinguishing the source of energy. First, the very existence of these facilities involves environmental effects. Second, the transmission and distribution lines used by all energy producers to get the energy to consumers also have environmental effects. The Preamble of Law 15/2012 points to these two reasons to explain the tax.

126.  Nor does the TVPEE discriminate against renewable energy producers in terms of legal or economic repercussions. From a legal standpoint, the TVPEE is not an indirect tax that can

---

[21] Extracts of the General Budgets of the Spanish State for 2013, 2014, 2015 and 2016, R-0020, R-0021, R-0022 and R-0019.

[22] Judgment 183/2014, from 6 November 2014, R-0018. The court held that the Spanish Parliament has wide discretion to design taxes and that there is no right to positive discrimination under Spanish law in the context of regulatory matters; nor is there any impediment for the government to use taxes as an instrument to achieve broader public policy objectives.

be passed on to consumers – either by conventional or renewable energy producers. From an economic perspective, the impact of the TVPEE has been neutralised: the TVPEE is one of the costs that are reimbursed to renewable producers through the specific remuneration they receive. This is laid out in Order IET/1045/2014. The TVPEE is also treated as a deductible expense for purposes of assessing corporate taxes without distinctions.

127. Unsurprisingly, all the tribunals in renewable energy cases against Spain have upheld this objection and have declined jurisdiction to hear claims relating to Law 15/2012.

**(2)    The Claimant's Position**

128. For the Claimant, the TVPEE is not a *bona fide* tax, but a disguised and unlawful attempt to reduce the financial incentives Spain had promised to investors. It therefore falls outside the carve-out for taxation measures in Article 21 ECT.

129. To determine whether a measure qualifies as a tax, domestic law is by no means determinative (and even if it was, the validity of the TVPEE under Spanish law is far from clear).[23] Investment treaty tribunals have consistently held that one must "look behind the label," and examine the legal characteristics of the purposed tax.

130. Commonly used criteria include: (i) the measure must serve a "public purpose"; (ii) it must contribute to raise general revenue for the state; and (iii) it should affect a broad class of persons. The TVPEE does not fall within any of these criteria.

131. First, the stated purpose of the TVPEE was to "harmoniz[e] [Spain's] tax system with more efficient, respectful, and sustainable use of the environment" and to internationalise "environmental costs arising from the production of electricity." As a matter of law however, the TVPEE applied to renewable energy producers (like Cavalum) in the same manner as it applied to conventional energy producers. Even worse, by applying the "tax" to all revenue including incentive tariffs, and without deducting depreciation, renewable plants effectively paid a much higher "tax" on the same amount of electricity production than conventional plants without being able to pass on to consumers the costs related to the

---

[23] Cl. Rej., ¶ 71.

Energy "Tax" through prices as tariffs were fixed. Its discriminatory design and disproportionate impact runs against its stated goal or any notion of public purpose.

132.   Second, funds raised from Law 15/2012 were neither directed to the general treasury, nor were they even ear-marked for grid development or maintenance works. Law 15/2012 provided that revenues raised from the measures would flow back into the electricity system in order to reduce the tariff deficit. State revenues as such did not increase.

133.   Third, Law 15/2012 was not imposed on a broad class of persons because, as noted above, it had a massively disproportionate impact on renewable energy producers. At this point, there is not enough information to determine whether the effects of the "tax" have been fully neutralised as Spain claims.

134.   Spain's appeals to *EnCana v. Ecuador* and *Duke Energy v. Ecuador* tribunals are unavailing. The VAT and customs duties at issue in those disputes did involve taxation measures, but the claimants instead based their arguments on the fact that certain measures permitting rebates or exemptions from those measures fell outside the scope of the taxation measure carve-out. That is not the case here. Law 15/2012 clearly does not satisfy the definition of a "taxation measure". Nor is the Claimant's position in this case the same as the claimants' positions in *Eiser* and *Isolux* as explained above. In any event, the reasoning of these tribunals is flawed. If enacting a measure under false pretences is not sufficient to demonstrate bad faith, then it is difficult to imagine what would.

135.   Finally, the Claimant notes that Spain's objection has no bearing on Cavalum's claim that the TVPEE was an unlawful expropriation under ECT Article 13 or contributed to such an expropriation.

## VII.   LIABILITY AND QUANTUM

136.   The Claimant argues that Spain (1) breached the FET Standard by (1.1) violating the Claimant's legitimate expectation of fixed feed-in tariffs for its PV facilities; (1.2) failing to treat the Claimant's investments transparently and consistently; and (1.3) failing to treat the Claimant's investments in good faith. The Claimant also contends that Spain (2)

impaired its investments through unreasonable or discriminatory measures; (3) violated the ECT's umbrella clause; and (4) unlawfully expropriated the Claimant's investments. Spain denies all these allegations.

137.   Specifically, the measures challenged by the Claimant are: RD 1565/2010, RDL 14/2010, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, MO IET/1045/2014 and RD 413/2014 (the "**Disputed Measures**").

A.    OVERVIEW OF THE PARTIES' POSITIONS

(1)   **The Claimant's Position**

138.   The Claimant argues that Spain guaranteed under RD 661/2007 and RD 1578/2008 that Cavalum's PV installations would receive incentive tariffs at fixed amounts for a period of twenty-five years, and then at 80% of those fixed amounts for the remaining lives of the plants subject to RD 661/2007. It says further that Spain also guaranteed that it would not retroactively alter the value of those incentives once the plants were established and registered under the RD 661/2007 and RD 1578/2008 regimes. The Claimant invested in reliance on these guarantees and the value of the "incentivized" revenue streams that resulted from them. However, Spain then undermined and ultimately abolished the RD 661/2007 and RD 1578/2008 regimes though the Disputed Measures and replaced them with the much less favorable and more arbitrary New Regulatory Regime.  In doing so, Spain violated Cavalum's rights under Spanish law and the ECT.

139.   Spain's violations of the ECT cannot be excused by the defence of necessity under international law.[24]  The tariff deficit in Spain was a problem of Spain's own making and neglect, which did not compel the Disputed Measures.  Spain deliberately ignored the tariff deficit while it continued to expand its incentives regime in the PV sector to encourage additional new investment, including RD 661/2007 and RD 1578/2008.

---

[24] Cl. Reply, ¶¶ 519-558.

a.    *Spain Struggled for Years to Find the Best Incentive Program to Accomplish its Renewable Energy Goals Until it Enacted RD 661 and RD 1578*

140.    According to the Claimant, Spain committed under EU law and other international instruments to ambitious renewable energy targets. To meet such targets, it developed a system of feed-in incentives specifically designed to induce investors to invest in Spain and to facilitate their access to financing.  This system, which Spanish officials aggressively promoted overseas to attract foreign investment from various countries guaranteed, among other things, a price per kWh of electricity produced during lifetime of their installations once a renewable energy facility qualified for the applicable regime.

141.    The Claimant submits that by the mid-2000s, it was clear that Spain was not on track to meet its renewable energy targets.[25] The two major incentive frameworks until that time (enacted in 1998 and 2004) did not provide enough stability and security required for long-term and capital-intensive investments, such as renewable energy facilities, where as much as 90% of the total cost of production is incurred up front in order to build the plant. The latest of the two earlier incentive frameworks, RD 436/2004, calculated the tariffs by reference to a formula that the government estimated to a large degree in its own discretion. Not surprisingly, investments under RD 436/2004 had been modest, particularly in the PV sector (which remained very premature even compared to wind at the time). Improvements were needed.

142.    It was in this context that Spain enacted RD 661/2007.[26] This new regulation eliminated the government's discretion in the setting of rates by utilizing absolute terms (euros per kWh), pegged to the consumer price index.  These rates were also higher than those offered in RD 436/2004. RD 661/2007 retained two other improvements introduced by RD 436/2004, namely the guaranteed duration of the tariffs and premiums (25 years, and thereafter at a reduced rate for the remaining operating life of a facility), and prohibiting retroactive applications of revisions to the incentives. As a result, Spain maintained discretion to adjust the tariffs that would apply to new projects at defined future intervals,

---

[25] Cl. Mem., ¶¶ 110-147.

[26] Cl. Mem., ¶¶ 148-170.

while guaranteeing specific tariff rates for completed plants throughout their entire operating lives.[27] In addition, RD 661/2007 eliminated contradictory language that implied tariffs might be revised for existing plants upon reaching certain capacity targets. Spain specifically designed these guarantees to address the concerns of PV investors and enable them (and their lenders) to model financial returns and profitability with a very high degree of certainty.

143.    Following RD 661/2007's enactment, Spain embarked on an aggressive campaign to promote Spain's renewable energy market to investors. Government ministries, State agencies, and the CNE were vocal about the assurances enshrined in RD 661/2007.[28]

144.    RD 661/2007 attracted a flood of desired investments.[29] Spain reached 85% of its initial capacity target for PV in just four months. As anticipated in RD 661/2007, Spain adopted a new Royal Decree, RD 1578/2008 in September 2008.[30] Since investment costs had fallen, the new regime offered lower, although still attractive, incentive tariffs. Similar to RD 661/2007, RD 1578/2008 was also a success.

145.    Cavalum completed and commissioned five PV plants under RD 661/2007 (i.e. *Don Alvaro*, *La Albuera*, *Fuente de Cantos*, *La Roda*, *Riosalido*). Cavalum also acquired and developed six additional PV projects under RD 1578/2008 (i.e. *Talarrubias, Solarwell, Calzadilla* (sold), and the Abandoned Projects). Altogether, Cavalum invested over €88 million in reliance on these regimes.[31]

---

[27] Cl. Mem., ¶¶ 171-177.

[28] Cl. Mem., ¶¶ 178-183.

[29] Cl. Mem., ¶¶ 184-194.

[30] Cl. Mem., ¶¶ 195-214.

[31] See "The Materialization of the Investment" above.

**b.** *After Meeting its EU Targets, Spain Pocketed the Benefits and Reneged on its Promises and Guarantees*

146. After Spain met its EU targets in 2010, the Claimant contends that Spain shamelessly pocketed the benefits of all the investments it induced without paying the tariffs it had promised to induce them.

147. First, RDL 14/2010 imposed impermissible hour limitations on the quantity of electricity produced by PV plants that was eligible to receive feed-in tariffs established under RD 661/2007 and RD 1578/2008. This was done despite the fact that Article 17 of RD 661/2007 and RD 1578/2008 along with article 30.2 of Law 54/1997 guaranteed fixed feed-in tariffs to Claimant's facilities for all of their electricity production. RDL 14/2010 also created a new "access toll" of 0.5 €/MWh on all electricity that a producer delivered into the grid, reducing the tariffs guaranteed in the original regulatory framework, and thus violating Article 44.3 of RD 661/2007 and Article 12 of RD 1578/2008.

148. RD 1565/2010 then cancelled the right of the Claimant's RD 661/2007 projects to receive the tariffs after year 25 of their operating lives (which Spain then lengthened to year 28 and finally to year 30 through RDL 14/2010 and Law 2/2011). This was done despite the clear language in Article 36 of RD 661/2007 and Article 11 of RD 1578/2008 that facilities would be eligible for the specific tariff rates set out in such decrees for the first twenty-five years of operation and a rate of 80% for the remainder of the operating lives of the plants subject to RD 661/2007.[32] In addition, RD 1565/2010 reduced the tariff rates available under RD 1578/2008 by 46% for certain facilities, which violated the formula for establishing those rates stated in that decree and undermined the tariff rate that Cavalum expected for the plants subject to that regulation.

149. Subsequently, RDL 1/2012 cancelled the incentive programs under RD 661/2007 and RD 1578/2008 for new facilities and suspended pending pre-allocation registration processes under RD 1578/2008. This measure led Cavalum to abandon three other renewable energy projects under development, after having committed nearly €2 million in investment costs,

---

[32] RD 661/2007, Art. 36, Table 3, C-0098.

33

a measure which Spain's own Supreme Court has ruled was a violation of investors' legitimate expectations.[33]

150.    The same year, Spain enacted Law 15/2012, further reducing the amount of the tariff for all renewable energy facilities under the guise of an energy "tax". Notably, the 7% tax rate was applied not just to the market value of the electricity generated by renewable producers, but also to the premium component of the tariffs that Spain guaranteed.[34] Spain then transferred the proceeds into the electricity system in order to reduce the tariff deficit. Contrary to Spain's contentions, this measure was not "neutralized" in 2012 through the first half of 2013, and thus caused injury for which the Claimant is entitled to damages.

151.    A year later, Spain reduced the rate of tariff growth by redefining the inflation adjustment in RDL 2/2013.  While it is true that the new inflation index was at times higher than the CPI index, it was lower on balance over time, and therefore this measure harmed Cavalum's investment and contravened the clear terms of Article 44.1 of RD 661/2007 and Article 12 of RD 1578/2008.

152.    Spain abolished RD 661/2007 and RD 1578/2008 in their entirety in June 2013 and substituted those regimes with its new regulatory regime a year later. In its place, Spain enacted a fundamentally different incentive scheme that completely changed the rules in the middle of the game.  The model resulting from this reform is laid out in RDL 9/2013, Law 24/2013; RD 413/2014; and Order IET/1045/2014 (the "**New Regulatory Regime**").

    *c.*    *Spain Ultimately Abolished the Incentives Regime Entirely and Replaced It with a Completely Different Regulatory Paradigm That Provides Substantially Less Compensation and Vastly Less Stability*

153.    According to the Claimant, the New Regulatory Regime requires investors to sell electricity on the wholesale market. It only offers "supplementary" revenue based on the investment and operating costs of what Spain arbitrarily has deemed to be a "standard installation," plus a rate of return (currently) tied to the 10-year average yield of Spanish Government bonds plus 300 basis points. In practice, the New Regulatory Regime (as

---

[33] RD-L 1/2012, C-0175.

[34] *See* Law 15/2012, Preamble II, Title II - Articles 4 and 6, C-0040.

currently in force, subject to future revisions) aims to provide investors with a rate of return of 7.398% *before tax*, equivalent to a post-tax return of 5.6%.[35] This is much less than the target rate of return that Spain considered reasonable when establishing the RD 661/2007 and RD 1578/2008 incentive rates, which ranged from a minimum of 7% to up to 9.2% *after taxes*.[36] The difference is even greater if one considers that the return that Cavalum's plants were expected to earn under RD 661/2007 and RD 1578/2008 as a result of its efficiency as a developer would have averaged approximately 10.2% post-tax for all seven plants if a 25-year operating life is assumed,[37] or 10.7% post-tax, if a 35-year operating life is assumed.[38]

154.    The Claimant contends that the New Regulatory Regime changed the structure of the incentive payments to the detriment of investors such as Cavalum. It substituted a production-based system, under which tariffs were paid based on the amount of electricity produced and delivered to the grid, with a system based on installed capacity. By this shift from a production incentive to a capacity incentive Spain appropriated the benefits that investors expected to receive as a result of their productivity-maximizing choices in respect of issues such as the location and amount of solar irradiation of the plants, the proximity to the transmission grid, the project scale, the plant's design (fixed axis, single axis trackers or dual axis trackers), etc.

155.    Moreover, while the previous regulatory regime fixed the returns that investors could expect from a PV plant in the form of fixed tariff rates irrespective of whether interest rates went up or down, the new regime establishes that Spain will update the rate of return every six years based on prevailing interest rates. As Spain implemented this change in 2014, knowing that interest rates had declined substantially since 2007, it appropriated the gains that investors would have otherwise received on their fixed-rate PV investments.[39] This change has also harmed investors like Cavalum, which relied on the fixed-rate nature of

---

[35] Cl. Reply, ¶¶ 573, 582.

[36] Cl. Reply, ¶ 345.

[37] FTI's Second Quantum Report, ¶ 4.39 and Appendix 4, ¶ A4-2.1; FTI's Second Regulatory Report, ¶ 7.21.

[38] FTI's Second Quantum Report, Table A4-2-2.

[39] Cl. Reply, ¶¶ 349-352 (citing to FTI's First Regulatory Report ¶¶ 6.27-.29, 6.62-.66).

RD 661/2007 and RD 1578/2008 when structuring the financing for their investments through swap agreements.[40] Contrary to Spain's defence, Article 30 of Law 54/1997 does not state that the relevant "cost of money" to be considered in setting the premiums should be variable over time. Nor did Spain hold this view in 2007, because RD 661/2007 fixed the tariff rates with no mechanism for adjustment based on changes in interest rates.

156.    Additionally, the assumptions about project costs under the New Regulatory Regime are incomplete, inaccurate, and arbitrary under the different compensation categories. Law 24/2013 has also increased the working capital requirements of projects by forcing producers in practice to fund any deficit tariff while the problem is solved and it has increased the risk of default and insolvency of highly leveraged projects. To make things worse, Spain retains enormous discretion to revise incentive payments years after an investment is made.

157.    Spain's suggestion that the tariffs in RD 661/2007 resulted in "excess" or "windfall" compensation must be rejected.  First, this is not a valid justification where, as here, a promise was made in exchange for increased levels of investment. Second, Spain's justification for such assertion is at odds with the way tariffs under RD 661/2007 were set in the first place.  The fact that the inflation adjustment applied to the entire tariff, while 85% of total costs were fixed at construction and thus would not increase with inflation, did not and could not result in windfall profits. The tariffs were set by estimating what level of cash flows over the lifetime of a hypothetical facility – including an inflation adjustment – would be necessary to generate the target return on investment. Nor is the fact that interest rates have declined or that investors built plants that were more efficient than anticipated, a valid excuse for Spain to adjust the tariff rates "dynamically". Lower interest rates are irrelevant to what rate of return is reasonable in relation to an investment that was made and completed years ago.  Spain always knew and accepted that some plants would beat the assumptions made by the regulator in setting tariff rates.

---

[40] Cl. Reply, ¶ 355.

158.    Finally, it is important to note that Cavalum's damages claim is based on the valuations of its plants and do not materially vary on how Cavalum financed its investments.[41] Spain knew and expected that equity investors like Cavalum would finance their investments with debt. If this was not factored in the renewable energy plans calculations, it is implied because there are infinite possibilities for the financing of plants which cannot be reflected, as Mr. Montoya conceded during the hearing. It was not because Spain believed investors would not or should not utilise debt financing.[42] What Spain cannot definitively argue is that the cuts would have been much less severe on a percentage impact basis if only investors had made their investments with equity rather than with debt. Not after actively inducing investors to finance their investment with debt.

### d.    Spain's Defences Mischaracterise the Regulatory Framework

159.    Cavalum argues that Spain's defences severely mischaracterise the Electricity Law and its implementing regulations, which guaranteed specific tariff rates for a defined duration rather than a reasonable rate of return. Spain also mischaracterises EU State aid law.

160.    Renewable energy generation under Law 54/1997 was not a "regulated activity", in which remuneration should be adjusted "dynamically" from time to time to provide investors with a "reasonable rate of return" on their investments. Rather, it is a "liberalized activity" in which Spain guaranteed eligible solar PV facilities an unqualified "right" to sell *all* of their electricity to the system in exchange for the tariff set in RD 661/20007 and RD 1578/2008 (as applicable) for the stated duration, updated annually for CPI.

161.    Law 54/1997 deregulated all electricity generation including renewable energy. This is clearly stated in the preamble of the Law and further reflected in its Articles 3 and 11. Neither the Electricity Law nor its implementing regulations provided any of the procedures that are typical to regulated industries, such as pre-approval of investment and operating costs by the government (as opposed to transmission and distribution activities, which remained regulated activities under Law 54/1997). The financial data that renewable

---

[41] Cl. PHB, ¶¶ 103-114.

[42] Cl. PHB, ¶ 112.

energy producers were required to make available, which Spain cites as an example of the regulated nature of this activity, was solely meant to assist Spain with setting appropriate incentives for <u>new</u> facilities, not for existing installations. The regulation that imposed this reporting obligation made this abundantly clear, pointing specifically to Spain's obligation under Article 40 of RD 436/2004 (which is similar to Article 44 of RD 661/2007) not to review tariffs retrospectively.

162.    Far from providing a vague reasonable rate of return, Law 54/1997 and its implementing regulations guaranteed specific tariff rates, which the Spanish regulator set *ex ante* for a defined duration in respect of all the electricity that producers delivered into the grid without any limitations. This allowed investors to plan their investments beforehand. Although these rates were arguably based on a post-tax target return rate close to 7%, resulting from Spain's economic modelling in the Renewable Energy Plans,[43] the regulations did not limit – or otherwise guarantee – that plants would receive this level of remuneration. Spain knew that actual returns would vary significantly from the target based on whether investors designed individual projects more or less efficiently than the hypothetical model.  Spain thereby left the investment risk with the investors: Spain would not be required to compensate investors at the "guaranteed" return rate if facilities turn out to be too expensive or performed poorly, but it would also not bar investors from achieving a higher return if they outperform the plant models. Spain acknowledged this in various reports made by public agencies.[44]  Article 30.2.a of Law 54/1997 also made it clear that the remuneration would be paid on the amount of electricity that special regime generators delivered into the system, not on the capacity that producers installed. This idea is reiterated in Article 16.7 of the Law. Unsurprisingly, Spain had to modify Article 30.4 of the Law in 2013 to allow for incentive payments based on installed capacity under the New Regulatory Regime. It does not follow from the reference in Article 30.4 of Law 54/1997 to "investment costs incurred", that retrospective changes to incentives could be made after plants were built to account for historical investment costs.

---

[43] Cl. Reply, ¶ 182.

[44] See, e.g., 2003 CNE Report, § 3.3 at 13, C-0238; Economic Memorandum of Royal Decree 436/2004, 2004, at 4, R-0052 (improved translation).

163.    Law 54/1997 did not enshrine an overriding principle of economic sustainability of the electricity system. The two alleged sources of this principle that Spain cites, the Preamble and Article 10 of that Law, say nothing about it.  Maintaining security of supply is by no means tantamount to ensuring affordable conditions for consumers. Nor were the incentives in RD 661/2007 or RD 1578/2008 tied to the macroeconomic, technical, or methodological bases (or assumptions) underlying the PER 2005-2010 – not in a way that it could mean a constraint for the investors or the actual plants' rights under such regimes. First of all, RD 661/2007 refers to the PER 2005-2010 only four times and never establishes such a connection. Second, the plant models in the PER 2005-2010 did not correspond to the tariff categories in RD 661/2007 (or RD 1578/2008). RD 661/2007 established three different tariffs for solar PV plants that differed only according to capacity (under 100 kW, 100 kW up to 10 MW, and 10-50 MW).[45] The 2005-2010 Renewable Energies Plan, by contrast, contained "technical sheets" for four different standard plant models. Third, the plant definitions set out in the 2005-2010 Renewable Energies Plan referenced tariffs *and premiums* for solar PV plants (even though RD 661/2007 and RD 1578/2008 only provided a tariff option for solar PV), and expressed them as a percentage of the Average Electricity Tariff (even though RD 661/2007 eliminated the Average Electricity Tariff as a basis for determining the level of incentives and, for PV installations, instead established fixed tariff rates, which was also true of RD 1578/2008).[46] Also, the tariff rate implied in the standard plant model for plants over 100 kW according to the 2005-2010 Renewable Energies Plan was only €0.219912/kWh,[47] whereas the tariff in RD 661/2007 for plants between 100 kW and 10 MW was nearly double that amount, €0.4175/kWh.[48]

164.    Article 44 of RD 661/2007 confirmed that its economic regime would not be modified for commissioned plants registered in the RAIPRE. This non-retroactivity guarantee was established in direct response to the industry criticism and demands for greater regulatory stability. It identifies the only instances in which the tariff rates guaranteed to registered

---

[45] RD 661/2007, Art. 36 (Subgroup b.1.1), C-0098.

[46] *See* 2005 PER at 295-98, C-0082 (or R-0092).

[47] *See* 2005 PER, at 298, C-0082 (or R-0092). The definition references a tariff that is 300% of the TMR, which is stated to be 7,3304 cents€/kWh.

[48] RD 661/2007, Art. 36 (Subgroup b.1.1), C-0098.

solar PV facilities could change. Thus, the fact that the stabilization language in Article 44.3 of RD 661/2007 refers to the revisions indicated "in this section" ("*en este apartado*") does not mean that other revisions were permitted. That phrase exists to distinguish the revisions in Article 44.3 of the RD from the revisions in Article 44.1 of the RD (the annual CPI revision), which expressly applied to existing plants. If Spain could revise the economic regime at any time for any reason, then it was unnecessary to specify in Article 44 what kind of revisions could occur and when. In fact, the revisions at issue in this case – allegedly enacted to address changes in technology costs, market interest rates, and the impact of the incentives on the economic management of the electricity system – are all revisions contemplated in Article 44.3 of RD 661/2007, and thus are revisions that Spain guaranteed would not affect existing plants. Similarly, absent an express provision in RD 1578/2008 allowing Spain to modify the economic regime as it applied to existing plants, Spain had no right to do so. This is the conclusion that flows from the preamble and Article 1 of RD 1578/2008.[49]

165.  Article 44.3 of RD 661/2007 was no less restrictive than Article 40.3 of RD 436/2004. The reference to "upper and lower limits" in Article 44.3 of RD 661/2007 points to the market plus premium option, which includes the "premiums, incentives or supplements" that Spain alleges to be missing. The point is irrelevant, however, because only changes to the fixed tariff are at issue in this case. Similarly, the absence of an explicit reference to the useful life or hours of production of the plants is simply unnecessary. Any cap to these rights is inherently precluded by Article 44.3 to the extent that it reduces the fixed tariff to €0 during the time period after the cap is reached. Finally, the removal in Article 44.3 of the reference to measures of "retroactive effect" is also immaterial. Such language would have been redundant because Article 44.3 clearly states that revisions shall not affect commissioned plants.

---

[49] Cl. Mem., ¶ 203.

> ### e. Investors were not on Notice that Spain Could Implement Retroactive Changes to the Regulatory Framework

166.     The Claimant contends that the reference in the Preamble of Law 54/1997 to a "goal" of obtaining electricity at the "lowest possible cost", and "protection of the environment", does not imply and could not be read to mean that the incentives offered would be subject to retroactive reduction in furtherance of that goal. Nor does Article 30 of Law 54/1997 necessarily compel retrospective changes to incentives after plants are built to account for historical investment costs or variations in interest rates (i.e. the "cost of money").

167.     The fact that RDL 7/2006 temporarily froze the incentives paid to renewable energy facilities registered under RD 436/2004 until Spain decoupled them from the Average Electricity Tariff did not alert, and could not have alerted, investors that retroactive changes would be possible going forward, notwithstanding the language in Article 44 of RD 661/2007. RD 436/2004 did not offer the same level of protection that Spain subsequently included in RD 661/2007 and RD 1578/2008. RD 436/2004 contained language suggesting that tariffs could be revised for *wind* facilities when installed capacity reached certain target levels, which undermined the clarity of the non-retroactive review provision in Article 40 of RD 436/2004.

168.     Spain's permanent elimination of the reference "Average Electricity Tariff" (also called "TMR") "feedback loop" (by substituting RD 661/2007 for RD 436/2004) is not comparable to Spain's subsequent reduction of the tariffs. This was clearly a defect in the law that threatened to cause incentives to increase in completely artificial and unexpected ways and needed to be fixed. Nevertheless, de-linking the incentive rates from the Average Reference Tariff had two major benefits for producers. First, it protected them from government discretion, because the formula for the Average Electricity Tariff was based on government forecasts of certain cost and demand variables.[50] Second, the change protected producers from market volatility, because the Average Electricity Tariff formula also included a component for the cost of production in the ordinary regime.

---

[50] *See* First Margarit Expert Report at 19-20; *see also* Cl. Mem., ¶ 130.

169.    Contrary to Spain's assertions, RD 661/2007 did not deteriorate the remuneration conditions of renewable energy facilities; it improved them. The remuneration structure under RD 661/2007 offered at least the same level, but generally higher, tariffs to renewable generators. The values that Spain relies on to argue otherwise, based on Mr. Montoya's witness statement, ignore that the annual increase in the TMR was capped at 2% unless Spain granted an exception.  The large increase in the tariff that Mr. Montoya anticipated under RD 436/2004 in 2007 was not at all guaranteed by that decree, and in fact it was completely illusory. Similarly, the CNE's report, upon which Spain also relies to support its position, is unclear with respect to how the CNE calculated the projected returns of *hydro* plants and *wind* farms under the market premium option to conclude that they would diminish (e.g., whether market prices would continue to rise). Moreover, Spain's assertion that the CNE "admitted the legality of the changes" ignores CNE's conclusion that "dynamic innovations" should "be surrounded by certain guarantees and precautions (sufficient transition periods for adaptation and, if applicable, compensatory relief)".[51] The fact that wind producers opted to remain under RD 436/2004 during a period of high wholesale prices does not necessarily mean that wind producers considered RD 661 to be materially worse in the long run. After all, no wind producer filed a legal challenge to it.

170.    The "pool plus premium" option in RD 436/2004 that was removed by RD 661/2007 did not have a meaningful impact that could have warned investors about subsequent changes. This option was only available to PV plants over 100 kW, and few if any plants over 100 kW were enrolled under RD 436/2004 because the tariff rate for such plants in RD 436/2004 was 52.17% of the rate for plants under 100 kW.  Similarly, while the "cap and floor" mechanism that RD 661/2007 introduced for (non-PV) existing plants electing the market option might have reduced compensation for some plants in the near term, in the long term it served to insulate plants under the market option from market volatility, which was a significant improvement.  RD 661/2007 also included a transitory provision designed to minimise the impact of the regulatory change on plants that had been completed under RD 436/2004.  Moreover, the preamble of RD 661/2007 itself recognised that the changes

---

[51] CNE Report 3/2007, p. 21, ¶ 1, C-0061.

strengthened the regulatory regime for investors. So too did Spanish officials at the time. That is why the renewable energy industry welcomed these changes, contrary to Spain's contentions. The only one case in which an investor challenged RD 661/2007 on the ground that it adversely modified the remuneration regime for its registered facilities was rejected by the Spanish court after it found that RD 661/2007 caused no harm as the tariffs were "identical."[52]

171.    RD 1578/2008 also could not have put investors on notice that the regulatory regime under RD 661/2007 could be modified retroactively. RD 1578/2008 did not apply to facilities that were registered in the Special Regime under RD 661/2007. This was clearly stated in Article 2 which defined its "Applicability". In this sense, RD 1578/2008 was completely consistent with the guarantee in Article 44 of RD 661/2007 that revisions of tariffs due to cost changes would not apply to plants that were already registered in the Special Regime. Contemporaneous statements from Spanish officials confirmed this.[53] Notably, when Spain enacted RD 1578/2008, it knew that the installation of new solar PV capacity under RD 661/2007 had greatly exceeded its capacity target and yet it decided to go ahead and grant new feed-in tariffs for additional PV capacity. Also, the language in the Fifth Additional Provision of RD 1578/2008, anticipating a tariff revision in 2012, can only be understood in this context as referring to changes in respect to new plants. The CNE shared in this understanding of this provision.[54]

172.    RD-L 6/2009, on the other hand, said nothing about modifying the guaranteed costs of the system in order to balance the tariff deficit. It only called for the elimination of the tariff deficit by 2013 and introduced the pre-allocation registry for new renewable energy projects. This registry, which RD 1578/2008 had already introduced for PV investments, merely established an additional administrative prerequisite for *new* plants to be eligible

---

[52] *See* Judgment of the Spanish Supreme Court of 3 December 2009, rec. 151/2007, C-0256 (improved translation of R-0121).

[53] *See* Miguel Sebastián (Minister of Industry, Commerce and Tourism), Appearance before the Senate on 25 September 2008, Cortes Generales. Diario de Sesiones del Senado. IX Legislatura. Comisiones Núm.47. Comisión de Industria, Turismo y Comercio. Presidencia del Excmo. Sr. D. Antonio Cuevas Delgado on 25 September 2008, at 9, C-0174.

[54] R-0297, p. 2, section 1.

43

for Special Regime incentives. It was therefore perfectly consistent with Article 44 of RD 661/2007. The preamble even confirmed Spain's commitment to honor its guarantees of legal security to existing investments.

173.   Only four of the Supreme Court decisions that Spain invokes were issued prior to Cavalum's investments and all of them concerned relatively small changes to incentive regimes that pre-dated RD 661/2007. These incentives regimes did not contain an express guarantee against retroactive revisions, on which the investors could rely to resist detrimental changes from applying to existing facilities.[55] The Supreme Court decision of December 2009 is also irrelevant because by then Cavalum had already taken all the necessary steps to finalise its investments in Spain.[56]

174.   Far from casting any doubts, the contemporaneous statements and actions of everyone connected to Spain's renewable energy industry overwhelmingly corroborate the Claimant's understanding of the RD 661/2007 regulatory framework. Spanish officials and agencies repeatedly and consistently touted the regulatory stability and legal certainty afforded by the RD 661/2007 regime, focusing on the transparency of its tariffs and premiums, and its protection against retroactive changes. Industry analysts and trade groups such as APPA also shared Claimant's view of the regulatory framework, not the revisionist history that Spain advances in this arbitration. Spain's argument ignores the massive amount of investment that poured into its renewable energy sector in 2007 and 2008, much of which was debt financing that banks provided on a non-recourse basis, reflecting investor's confidence in the RD 661/2007 and RD 1578/2008 regulatory framework.

175.   Finally, EU State aid laws are irrelevant for the analysis of Cavalum's expectations or for the merits of the present dispute.[57] At most, this matter may be relevant in enforcement proceedings before courts of EU Member States but not to an ECT tribunal. Nor has the EC ever determined that the RD 661/2007 or RD 1578/2008 tariffs amounted to State aid

---

[55] Cl. Reply, ¶ 417.

[56] Cl. Reply, ¶¶ 422-423.

[57] Tr.-E, Day 5, Mr. Fleuriet, pp. 105-117. See also Cl. PHB, ¶¶ 98-102.

much less unlawful state aid. The November 2017 EC decision solely concerned the New Regulatory Regime. The truth is that prior to the arbitrations against Spain, no one considered that RD 661/2007 or RD 1578/2008 tariffs constituted State aid – neither Spain nor the European Commission, which never investigated Spain's former incentive schemes.

**(2)    Spain's Position**

    **a.    *Cavalum Never Had the Rights that it Claims Under the Applicable Regulatory Regime or EU Law***

176.    Spain argues that the Electricity Law 54/1997 guaranteed renewable energy generators enrolled in the Special Regime a reasonable rate of return calculated by reference to the cost of money in the capital market (Article 30.4). Nothing else was promised, much less guaranteed.[58]

177.    To ensure this level of remuneration, subsidies were offered to producers "where appropriate" to cover their investment and operating costs and generate a reasonable return (Article 16.7).[59]   Between 1998 and 2010, the government issued multiple Royal Decrees implementing Law 54/1997 (e.g., RD 2818/1998, RD 436/2004, RD 661/2007, RD 1578/2008, etc.), which established financial incentives in the form of "feed-in" subsidies tied to production. This particular form of remuneration however, was neither imposed nor required to be maintained by Law 54/1997.[60]   This was known by the industry.[61]

178.    Law 54/1997 established a "dynamic" (i.e., flexible) framework so that the government would have sufficient leeway to adjust remunerations if the application of a rate formula resulted in higher than reasonable returns, and thus in contravention of Law 54/1997 or EU State aid regulations.[62]

---

[58] See Resp. PHB, ¶¶ 125-126; Resp. Rej., ¶¶ 170-184.

[59] Resp. Rej., ¶¶ 301, 308-317.

[60] Resp. Rej., ¶¶ 322-323, 855.

[61] Resp. Rej., ¶ 328 (citing ILEX Pöyry Report "Current and future state of wind energy in Spain and Portugal", July 2007 edition. Page 58. R-0256).

[62] Resp. Rej., ¶¶ 227-258; 338-348; 424-429 and 859-860.

179.   The fundamental criterion used by Law 54/1997 to judge the reasonableness of the rate of return is the cost of money in the capital market (i.e., the rate of interest charged), which is in itself a dynamic benchmark. Another criterion used is the historical investment cost of facilities, which may require looking backwards in time and assessing what is a reasonable rate of profitability.[63]

180.   Tariff rates were thus only detailed in lower level and easy-to-amend regulatory instruments, called Royal Decrees. Royal Decrees are subordinate laws which can be superseded by subsequent regulations of the same rank under the Spanish legal principle of hierarchy of norms. As Spanish courts held in multiple challenges to various Royal Decrees since as early as 2005, as long as the limit set forth in Article 30.4 of Law 54/1997 was respected, and a reasonable rate of return was maintained, the Government had the power to modify the applicable remuneration conditions through new royal decrees, even to existing facilities.[64]

181.   Registration in the RAIPRE did not confer an acquired or vested right to a specific remuneration rate or regime.[65] The Disputed Measures cannot, therefore, be considered retroactive.[66] This was just an administrative requirement applicable to all special (i.e., renewable energy) and ordinary (i.e., conventional) regime facilities to feed electricity into the grid. None of these facilities were granted a license, contract or concession under Spanish law. Professor Aragón, the expert presented by the Claimant, disagrees but he admits that his opinion is contradicted by the *jurisprudence constante* of the Spanish Supreme Court since 2006, the State Council's opinions, the renewable energy sector's understanding, and several CNE's reports.

182.   Article 44.3 of RD 661/2007, which was substantively identical to Article 40 of RD 436/2004, was not a stabilization clause. The most obvious evidence of this is the fact that

---

[63] Spain's "Fundamental Facts" slide 44; Hearing Tr.-E, Day 1, p. 228:14-25; Day 2, p. 43:21-22.

[64] Resp. Rej., ¶ 190 (referring to the 2005 Supreme Court judgment); and ¶¶ 353-355 (referring to the 2006 Supreme Court judgment).

[65] Resp. Rej., ¶¶ 552-569.

[66] Resp. Rej., ¶¶ 570-614.

the revisions adopted through RD Act 7/2006 and RD 661/2007 were not foreseen in Article 40 of RD 436/2004 and yet they were implemented by the government and upheld by the courts.[67]  Although the CNE criticised these changes on policy grounds in early 2007, it admitted that they were lawful under Spanish law pointing to the October 26, 2006 Supreme Court decision,[68] an opinion that it later reaffirmed in a decision issued in July 2008.[69]  The motive behind all these changes, and those which followed, was exactly the same: ensuring the electricity system's economic sustainability and avoid excessive remuneration to some renewable energies.[70]

183.   Moreover, Article 44.3 of RD 661/2007 did not preclude all sorts of detrimental changes or downward revisions.[71] The only prohibited changes to the remuneration rates for RAIPRE-registered facilities were mandatory quadrennial revisions of the "regulated [i.e., fixed] tariff and the upper and lower limits" in RD 661/2007. These are the planned revisions that "this section" ("*en este apartado*") refers to as it follows from the plain terms of Article 44 of RD 661/2007. Other changes to remuneration rates for existing facilities were permitted, including unplanned changes that were necessary to (1) ensure the economic sustainability of the SES, or (2) to correct situations of over-remuneration. Changes to factors that impacted the calculation of remuneration rates were also permitted, such as the number of hours amenable to tariffs and premiums; the index used for adjusting tariffs and premiums to inflation; and supplements or penalties for reactive power and taxes or other fiscal measures.  This is clear from the wording of Article 44.3 of RD 661/2007, which is more restrictive than its predecessor, Article 40.3 of RD 436/2004. Unlike the latter, Article 44.3 of RD 661/2007 did not extend to premiums, incentives or supplements, or refer to useful life or to hours of production. The idea that a promise of stabilization

---

[67] Resp. Rej., ¶¶ 193-198 (referring to the Supreme Court's 9 December 2009 judgment). See also Resp. Rej., ¶¶ 538-543.

[68] Resp. Rej., ¶¶ 199-201.

[69] Resp. Rej., ¶¶ 477-480.

[70] Resp. Rej., ¶ 193, referring to the CNE 3/2007 Report of 14 February 2007, p. 18, R-0222. See also the draft report of 25 January 2007, attached thereto, pp. 17. See also Resp. Rej., ¶¶ 483-515.

[71] Resp. Rej., ¶¶ 519-537.

could be read into Article 44.3 of RD 661/2007 was also dismissed by the *Charanne* and *Isolux* tribunals.

184.    Although renewable energy generation is not a "regulated activity", it forms part of a "regulated area".[72] This is explained by the fact that renewable energy facilities' main income, subsidies, are set by regulation and represent a cost of the electricity system, subordinate to its sustainability.[73] Principles of economic sustainability were incorporated into this legal framework since the enactment of Law 54/1997.[74] The preamble of the law states very clearly that electricity should be generated at the "lowest possible cost". The State must also ensure electricity supply, which is defined as an "essential service" in Article 2.1 of Law 54/1997.  To do so, the system must be sustainable both technically and economically. The SES is a closed circuit that is funded through its own revenues, without external financing. Any tariff deficit must be remedied from within.

185.    The need for sustainability explains all the planning that went into this system, as reflected in the various renewable energy plans. These instruments did not only estimate costs, they also assessed whether the costs were sustainable for the electricity system as a whole based on technical and economic assumptions, including projections of electricity demand, standard lifetime of plants, operating hours, and average costs among others.[75] The fact that regulations were predicated upon these plans' underlying assumptions is no mystery. The preambles of both RD 436/2004 and RD 661/2007 refer explicitly to the 2000 and 2005 Renewable Energy Plans, respectively.[76]   No investor could have expected that subsidies would remain unaltered if the basis and projections of such subsidies turned out to be inaccurate. This is what happened with the electricity demand in Spain, which has experienced an unexpected and dramatic fall since 2009.

---

[72] Resp. Rej., ¶¶ 259-260.

[73] Resp. Rej., ¶ 339.

[74] *Ibid*., ¶¶ 264-296.

[75] Resp. Rej., ¶¶ 369-375.

[76] Resp. Rej., ¶¶ 279-280.

186.  As these plans show, remunerations for PV facilities such as the Claimant's installations were intended to be "close to 7%" on equity after taxes based on an estimation of around 1,644 operating hours/year and a lifespan of 25 years.[77] Notably, the PER 2005 refers to a return "close to" 7%, whereas the PER 2000 referred to a "minimum" return of 7%.[78] Standard installations were used as a reference for setting all these values. Contrary to Claimant's allegations, financial costs were never considered to be a recoverable investment for purposes of calculating returns.[79] This is the same methodology used by the CNE in its reports on draft decrees 436/2004 and 661/2007. All these values were commented on in various studies made by renewable energy associations as early as 2005.[80]

187.  RD 661/2007 was not designed to offer higher returns. RD 661/2007 was introduced to substitute for RD 436/2004 and fix the "perverse effects" of the TMR on remunerations.[81] Precisely because of the disproportionately large costs and profits resulting from RD 436/2004, RDL 7/2006 was adopted as an urgent measure (*i.e.*, a RDL) followed by RD 661/2007, as explicitly stated in RDL 7/2006's preamble. The 2005 Renewable Energy Plan (upon which RD 661/2007 is based) shows that the Spanish regulator knew that the initial objectives set out for most technologies, including PV power, could be achieved without increasing the contemporary remuneration levels.[82]

188.  If anything, RD 661/2007 reduced remuneration conditions as the CNE stated at the time.[83] For instance, it lowered the incentives under the pool plus premium option for *hydro* and

---

[77] PER 2005-2010, p. 274, R-0092.

[78] Resp. Rej., ¶¶ 382-385.

[79] Resp. Rej., ¶¶ 386-407.

[80] Resp. Rej., ¶¶ 408-414. Spain cites the ASIF report Towards an environmentally friendly electricity, October 2005, p. 9, R-0265; the Role of Photovoltaic Generation in Spain by Arthur D Little, in November 2007, for ASIF and APPA p. 13, R-0266; and AEE News, R-0267.

[81] RD 436/2004 remunerations were tied to calculations based on the costs of the electricity system, which included subsidies to renewable energies in the form of premiums and/or regulated tariffs. Therefore, when TMR was implemented, constant feedback in remunerations took place, leading to disproportionately large costs in the electricity system and windfall profits for renewable energy installations, including PV plants.

[82] Resp. Rej., ¶¶ 378, 453-461 (citing to the 2005-2010 PER).

[83] *See* CNE Report 3/2007.

*wind* plants by nearly 10%, and it abolished the pool plus premium option altogether for *PV* producers.[84] It also set tariff rates, which were generally lower than what they would have been had RD 436/2004 and RDL 7/2006 remained in place.[85]  The fact that every single *wind* farm decided to stay under RD 436/2004 rather than transition to RD 661/2007 demonstrates that RD 661/2007 did not generally improve the subsidies set in RD 436/2004.[86] So too does the harsh criticism and opposition of renewable energy associations against RDL 7/2006[87] and early drafts of RD 661/2007. APPA, the major renewable energy association, decried the change as "disastrous and devastating for future investments".[88] At the time of these critiques, the draft RD 661/2007 already contemplated Article 44.3[89] – a provision which the Claimant states turned RD 661/2007 into a major improvement from the existing regime, widely welcomed by the industry.[90] Nothing could be further from the truth.

    *b.*    ***The Disputed Measures are Legitimate Macroeconomic Control Measures to ensure the Electricity System's Sustainability and Correct Situations of Overcompensation***

189.    The Disputed Measures sought to ensure the economic sustainability of the electricity system and to correct situations of overcompensation in the context of a severe economic crisis.[91]  They were necessary macroeconomic measures to stabilise the Spanish economy and were entirely reasonable under the circumstances.

190.    As is well known, the 2009 financial crisis had an extraordinary impact on the Spanish economy: Spanish GDP shrunk, the rate of unemployment grew dramatically, the fiscal

---

[84] Resp. Rej., ¶ 466. Spain's "Fundamental Facts" slide 21.

[85] Resp. Rej., ¶¶ 467-472. RWS-CM2, ¶¶ 28-39.

[86] Resp. Rej., ¶¶ 462-465. Spain's "Fundamental Facts" slide 20; R-0194.

[87] Resp. Rej., ¶¶ 442-452. Spain cites an APPA report of November 2006, pp. 3, 40 and 44, R-0216; the APPA Info magazine no. 22 entitled "The Controversial Energy Decree-Act", May –July 2006, R- 0165; and the APPA Info magazine no. 23, August –December 2006, entitled "RD-L 7/06 and review of RD 436/04. Storm in the renewable energy sector", p. 9, R-0164.

[88] APPA Report on Draft RD 661/2007, 3 April 2007, p. 7, R-0273.

[89] Draft RD 661/2007, 19 March 2007, R-0272.

[90] Resp. Rej., ¶¶ 543-547.

[91] Resp. Rej., ¶¶ 702-721.

position of the government deteriorated, and the accumulation of budget deficits resulted in a huge increase in Spain's government debt. This led to a sharp decline in electricity demand which, in turn, caused tariffs to rise much more than the average European tariff rates. Many of the most critical assumptions upon which RD 661/2007 was premised turned out disproved, including electricity demand forecasts, which bear deeply in the overall balance of the system.

191. The Disputed Measures were adopted in this context. But these were not the only actions taken by the Government. Electricity prices paid by consumers were raised, becoming one of the highest in Europe; the Government committed funds from the State budget to fund the deficit as an exception to the self-sufficiency principle; entry into operation of pre-registered plants was deferred; remunerations for transmission and distribution activities were reduced, and so was the remuneration for electricity production in insular territories; payments for capacity were also reduced, among many actions. Even though subsidies to renewable energies are the main cost of the electricity system, the Government sought to balance out the measures.

192. The first measure that the Claimant challenges is Royal Decree 1565/2010 of 23 November 2010. This measure eliminated fixed tariffs (i.e., incentive tariff) for PV installations after 30 years. This was in line with the estimated useful life of the plants.[92] After this period, an investor must have recovered all its costs and made a reasonable profit. Therefore, there is no need, nor would it be permissible under EU State aid regulations, to continue providing public support. Law 54/1997 never guaranteed that producers would receive feed-in tariffs for the whole lifetime of the plants.

193. The second measure is RDL 14/2010. It set a limit on the annual operating hours for which PV facilities could receive feed-in tariffs in accordance with the calculations made in the PER 2005-2010. These estimated annual operating hours were known to investors. The

---

[92] *See* Royal Decree-Law 14/2010, of 23 December 2010, establishing urgent measures for the correction of the tariff deficit of the electricity sector, published in the Official Gazette No. 312 of 24 December 2010 ("**RDL 14/2010**"), C-0102; Law 2/2011, of 4 March 2011, on Sustainable Economy, published in the Official Gazette No. 55 of 5 March 2011 ("**Law 2/2011**"), 44th Final Provision (which amends First Final Provision of RDL 14/2010 and extends the remuneration rate under RD 661/2007 to year 30), C-0095.

51

specific limit varied based on the geographic location and type of PV technology. Above these caps however, plants could continue producing and selling its energy on the market. Additionally, RDL 14/2010 subjected PV facilities, registered under RD 661/2007, to a 3-year limit on equivalent operating hours irrespective of their location and it also created a new "access toll" on all electricity that a producer delivered into the grid. At the same time, Spain also enacted RD 1614/2010, which contained similar provisions for wind and solar thermoelectric facilities.

194.    Spain then enacted Law 15/2012, which introduced a 7% levy on all electricity producers (i.e., the TVPEE) to contribute to finance the electricity system. This measure, however, did not have any impact on Cavalum's installations because under the new regime the operating incentive payments are calculated to allow renewable producers to recover the amounts paid for TVPEE. Therefore, any adverse effect of this measure upon Cavalum's installations has been neutralised.

195.    In early 2013, Spain enacted RDL 2/2013. This measure substituted a new index, the CPI, for updating remunerations. The CPI was adopted in order to bring the updating mechanism into conformity with generally accepted economic practices, excluding those inputs that were most variable in the calculation's formula. CPI, although it was superseded by additional regulations, did not adversely affect Claimant's PV facilities. Cavalum actually benefitted from it during the short time it was in force.

196.    Later that year, Spain conducted a more in-depth reform of the incentive scheme. The model resulting from this reform is laid out in RDL 9/2013, Law 24/2013; RD 413/2014; and Order IET/1045/2014. The new regime strengthens the support for renewable technologies.

     *c.*     ***The New Regulatory Regime Preserves the Key Elements of the Former Regime While Still Providing Cavalum with a Reasonable Rate of Return***

197.    The new remuneration framework is not a paradigm change or anything like it. Rather, the key components of the former regulation are largely preserved.

198.    Both the former and the new remuneration regimes provide generous subsidies to renewable energy producers.[93] To do so, they follow a similar formula. A "reasonable return" on the investment (CAPEX) and operating costs (OPEX) is provided based on a "standard" model that references the cost of money in the capital market (*i.e.* a dynamic benchmark). This is done by adding up a subsidy to the market price. Although the new regime specifies that the rate to be used for this purpose is that of the average yield of ten-year Spanish government bonds plus 300 basis points, the result is essentially the same: a rate of return of 7.398% before taxes, which is consistent with the 7% post-tax return that the old regime sought to provide. This "robust" index had already been used by the Spanish regulator to set remunerations in related industries such as for the electricity distribution and transportation.[94] In this respect, not only does the new system continue the trend of the previous one, but it also gives investors greater legal security because the basic parameters are set out in the law. This is something that investors had demanded for a long time.

199.    The key difference between these two regulatory regimes is that the previous model used a single fixed tariff to remunerate CAPEX, OPEX, and provide a reasonable rate of return. Under the current regime, subsidies are paid in a disaggregated manner. One portion goes to cover the investment cost (Ri) based on the installed capacity of the facility, and another portion goes to cover the gap between the market price and the operating costs (Ro) based on the energy produced. Although now "subsidies depend in greater proportion on the investment made, which is a sunk cost that is not updated anymore, and in the previous model depended in greater proportion on the production of the plant, which generated inefficiencies that have been corrected, […] in both cases […] the production of the facilities and investment are considered." [95]

200.    The most significant inefficiency of the former remuneration model, which the Claimant chooses to ignore, is that the inflation adjustment applied to the entire tariff, while roughly

---

[93] Resp. Rej., ¶¶ 769-776.

[94] Resp. Rej., ¶¶ 786-793, 879-882.

[95] Resp. Rej., ¶ 846 (citing from RWS-CM2).

85% of total costs are fixed at construction and therefore should not increase with inflation. In this sense, the CPI adjustment had an adverse effect similar to that of the TMR, resulting in excessive compensation.[96] To fix this, the new framework distinguishes among these components and only adjusts operating costs at an annual rate of 1%, leaving investment costs aside.  The market price standard is also adjusted every three years to adapt the forecast to the actual evolution of the pool price and so too is the portion of the subsidies intended to provide a reasonable return at the end of every regulatory period (being the first regulatory period of six years and then every two years).  These adjustments protect the value of investments over time against interest rate fluctuations.[97]

201.    The regulatory lifespan of the plants determines the period over which installations will receive incentive (called specific) remuneration. This period has been set at 30 years for all PV plants. That was also the case under the former regime after the enactment of RD 1565/2010, although before then RD 661/2007 already incorporated an analogous limitation by reference to the PER 2005-2010.  After the regulatory lifespan of a Plant, an investor has recovered all its costs and made a reasonable profit. Therefore, there is no need, nor would it be permissible under EU State aid regulations, to continue providing public support. The plants however, can continue to produce and sell energy on the wholesale market; they still enjoy priority of access and dispatch (Article 26 of Law 24/2013).[98]

202.    Efficiency continues to play a major role in the new regime just as it did in the former regime. To calculate the income and cost parameters, an "efficient and well-managed company" is taken as a reference in a similar manner that Renewable Energy Plans used to do. Contrary to Claimant's allegations, the investment and operating costs of the standard facilities do adequately reflect actual costs.[99] A simple comparison between the parameters used in MO IET/1045/2015 and Cavalum's financial statements shows that Cavalum's plants are all under the relevant thresholds. For instance, Cavalum's plants actual CAPEX

---

[96] Resp. Rej., ¶¶ 858-885.

[97] Resp. Rej., ¶¶ 883-884.

[98] Resp. Rej., ¶¶ 777-781.

[99] Resp. Rej., ¶¶ 817-830.

are significantly lower than the plants' imputed CAPEX, resulting in a nearly USD 20 million benefit for Cavalum's accounts. Cavalum's actual OPEX are also lower on average than the estimated OPEX - after one deducts Cavalum's management fees, which Cavalum has improperly treated as operating costs in circumstances where they should be accounted as part of Cavalum's returns. Also, financial costs were never considered to be a recoverable investment for purposes of calculating returns, neither under the previous regime nor under the current regime.

203.    The best example that shows how the current framework provides a reasonable return is Claimant's own case on damages. With the Disputed Measures in place, Cavalum still obtains a 9.8% return on its investments *before* tax, or a 7.7% return *after* tax (excluding managements fees).[100] This is more than two points above the standard return foreseen in the current regulatory regime and is higher than the 7.164% cost of the Claimant's capital before taxes, as calculated by its own experts.[101] The rate of return of the Spanish regulatory regime is also higher than the average of the discount rates used in their impairment tests by companies in the PV sector between 2013 and 2014, which ranged from 4.9% to 5.6% before tax.

B.    THE UNLAWFUL EXPROPRIATION CLAIM

(1)    The Claimant's Position

204.    The Claimant argues that Spain's retroactive measures expropriated its rights under RD 661/2007 and RD 1578/2008, violating Article 13 ECT.  The cumulative effect of Spain's measures was to deprive the Claimant of its equity in its PV facilities.

205.    The ECT defines "Investments" to include "tangible and intangible property," "any property rights," "forms of equity participation in a company or business enterprise," "claims to money," and "any right conferred by law or … permits."[102]  All these rights are independent investments capable of expropriation.  It is not necessary that a Contracting

---

[100] Resp. Rej., ¶¶ 902-909. Accuracy estimates Cavalum's IRR at 7.0% if management fees are not excluded.  See Accuracy's Second Expert Report, ¶¶ 50 and 64.

[101] Accuracy's Second Expert Report, ¶ 17.

[102] *Id.*, Art. 1.

Party take the investor's overall business operation. A partial expropriation or a creeping one is no less illegal than a full expropriation. Abundant case law supports this position, including the decisions in *Middle East Cement*, *Eureko v. Poland* and *EnCana v. Ecuador*. Similarly, a measure is expropriatory when a State interferes with a protected investment in a way that significantly or substantially deprives the investor of the use, benefit, or value of the investment, to an extent that is more than ephemeral. This covers any regulatory actions, including taxation measures.

206.    In this case, RD 661/2007 and RD 1578/2008 conferred distinct legal rights to investors, including the right to receive fixed tariffs on all of the electricity they produced for the first twenty-five years of operation and 80% of those rates thereafter (Article 36 of RD 661/2007); the right to annual adjustments for inflation according to the Consumer Price Index (Articles 17, 36 and 44.1 of RD 661/2007, and Articles 11 and 12 of RD 1578/2008); and protection against any future revisions to the RD 661/2007 tariff framework (Article 44.3 of RD 661/2007). These were legal rights under Spanish law as noted by Professor Aragón, and not mere expectations. An "expectation" existed *only prior* to the development and registration of the facilities into the registry. Once the plants were registered – and all of Claimant's plants were – they held a *vested right* to the incentive tariff guaranteed under the respective regime.  Therefore, Spain's reliance on *Nations Energy v. Panama* to contest Cavalum's expropriation claim is out of place. Unlike Cavalum, the claimants in *Nations Energy* did not have a right that was subsequently revoked by state actions. What they had was a mere possibility of applying for future tax credits. That is clearly different from the case at hand.

207.    By modifying the royal decrees, the Spanish government substantially interfered with and violated Cavalum's legal rights under RD 661/2007 and RD 1578/2008. Specifically, Spain cancelled the right of the RD 661/2007 facilities to receive the tariffs after year 30, imposed operating hour limitations on all of Cavalum's facilities, interfered with Cavalum's legal rights under the royal decrees by imposing a 7% reduction of the facilities' revenues (including tariff revenues) as a purported "tax" on electricity production, and finally destroyed Cavalum's rights to have its RD 661/2007 and RD 1578/2008 tariffs adjusted annually according to the Consumer Price Index by substituting the New Regulatory

Regime.  The cumulative effect of all of Spain's measures was to deprive the Claimant of all of its equity in its PV facilities. As the Claimant's quantum experts have shown, over 100% of the equity that the Claimant held in its PV facilities has been destroyed as a result of the Disputed Measures.[103]

208.    The expropriation was unlawful because it did not satisfy the four cumulative requirements for a lawful expropriation outlined in Article 13 ECT.  Spain's retroactive legislation does not fall within the traditional scope of a State's police powers, because the disputed measures are unreasonable and discriminatory and they also resulted in a substantial deprivation. Spain's measures inflicted substantial harm on Claimant's investments without serving a legitimate purpose. While the draconian measures did have the effect of reducing the tariff deficit, they did so in a manner that arbitrarily and disproportionately affected renewable energy investors, causing severe financial ham.

209.    The Tribunal should not follow the *Charanne* award on this point. First, the tribunal in that case misconstrued the ECT's definition of investment to conclude that only an investment that is owned or controlled (directly) by an investor is protected under the ECT. That is plainly wrong. The ECT explicitly covers indirect investments. Because the Claimant owns registered plants under RD 661/2007 and RD 1578/2008, it also (indirectly) owned and controlled the right to future tariffs. Second, the *Charanne* award only considered the expropriation claim in the context of the measures Spain adopted in 2010, which had a harmful, albeit more limited, effect on the *Charanne* claimants' investments than the case at hand.

**(2)    Spain's Position**

210.    Spain denies having expropriated the Claimant's investments. The laws of a host State define what property rights are susceptible to expropriation. Only acquired rights that exist under such laws can be expropriated under the ECT.  To be considered tantamount to an expropriation, a measure must prevent the investor from operating an investment or otherwise constitute a substantial deprivation of it, annihilating the value of the

---

[103] FTI's First Quantum Report, ¶ 7.2.

57

investment forever.  Cases like *Electrabel*, *AES v. Hungary*, *Mamidoil* and *Charanne* all support this proposition. Also, there is no expropriation if a contested measure is reasonable or in proportion with the intended objective or public interest sought.

211.  Cavalum neither holds nor controls the future income of the PV installations. Under Spanish law, there is a clear distinction between an acquired right and a mere expectation. Projected revenues, such as those for which the Claimant seeks compensation in this case, are not an acquired right, but just an expectation. They cannot be expropriated under Spanish law nor under the ECT, which defers to the host State's domestic law for this purpose.  As the *Nations Energy* tribunal put it, Cavalum is "confusing the principle of non-retroactivity with the principle of immediate effect of the new act for the future".  The *Charanne* tribunal came to the same conclusion.

212.  The Claimant has experienced no substantial deprivation of its investment. It still has control over the shares in the SPVs that own the installations.  The plants continue to sell energy into the grid, receive generous subsidies, and they still make reasonable profits. During the operating life of the plants, the Claimant will recover the full amount of its investment plus operating costs and will earn no less than the equivalent of the 10-year Spanish bond plus 300 basis points. Accuracy has calculated that the returns from the Claimant's Plants following the challenged measures will be higher than the estimated return, coming out to a 9.8% pre-tax return or 7.7% post-tax.[104]

213.  There is no way that a reduction like this can be considered a "substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment", as required by the *AES Summit* tribunal, to find breach of ECT Article 13. This is even less so where, as here, this rate is higher than the average of the discount rates used by the industry in their impairment tests and Cavalum's own cost of capital as calculated, i.e., 5.5% after tax.[105]

---

[104] Resp. PHB, ¶ 214.

[105] Resp. PHB, ¶ 215 (citing to FTI's Second Quantum Report, Table 5-1).

214. The TVPEE also does not have any expropriatory effect. The economic impact of the TVPEE has been neutralised. The TVPEE is one of the costs that are reimbursed to renewable producers through the specific remuneration they receive, and it is also deductible from corporate income tax. Spanish authorities have also confirmed that the TVPEE does not amount to an expropriation pursuant to Article 21.5.b ECT.

215. The Disputed Measures are, in any event, legitimate regulatory acts, which do not give rise to compensation. As noted above, they were reasonable, proportional, non-discriminatory, and responded to a clear public interest.

**C.** **FAIR AND EQUITABLE TREATMENT**

**(1)** **The Claimant's Position**

216. The Claimant argues that by adopting the Disputed Measures Spain breached the FET standard in multiple ways: (a) it violated the Claimant's legitimate expectation; (b) it fundamentally changed the investment framework to the Claimant's detriment;[106] and (c) it failed to treat the Claimant's investments transparently and consistently, or in good faith. The Claimant argues that each of these represents an individual basis to find Spain liable for an FET violation as discussed hereunder.

*a.* *Spain Violated the Claimant's Legitimate Expectations*

217. For the Claimant, the protection of legitimate expectations is one of the major components of the FET standard.[107] The central question in finding a breach of legitimate expectations is whether a government has induced reliance on the part of an investor, typically in relation to the stability of one or more elements of the investment framework. This inducement can take multiple forms – including a promise, a guarantee, a commitment, an assurance, or otherwise – and can be enshrined in a variety of sources including, statutory commitments, repeated (written or verbal) statements from State officials, the investment context, the State's conduct, and a specific undertaking between the affected investor, or an identifiable

---

[106] Cl. PHB, p. 30.

[107] Cl. Mem., ¶ 348 (see cases cited therein).

59

group of investors, and the State itself.[108]   Specific assurances are not indispensable (although here they existed).[109]  Once an investor's legitimate expectations have been so established, the State cannot invoke a "right to regulate" or point to shifting policies and/or competing interests to undermine those expectations.[110] Nor is it appropriate to employ any kind of "balancing" test.

218.    In this case, Spain created legitimate expectations through general and specific promises, assurances, and representations that once Cavalum's plants were constructed and registered under RD 661/2007 or RD 1578/2008 (as evidenced by their RAIPRE registrations), those plants would receive the tariffs in the amount and duration defined in those very same decrees. Spain's incentive program, which Spanish officials aggressively promoted overseas to attract foreign investment,[111] was very clear in this regard. It was specific as to its audience, as to its object and purpose, and as to the way it operated.[112]

219.    Cavalum relied on these representations upon making its investments along with many other sophisticated investors and lenders, such as those in the *Eiser*, *Novenergia,* and *Masdar* cases. Cavalum invested in state-of-the-art PV technology that could maximise production output, using double-axis trackers for the panels to follow the sunlight, even if that meant paying a higher price than what another facility might demand.[113]

220.    Cavalum's reliance and expectations were legitimate and well-supported. They resulted from *(i)* the explicit terms of the decrees, and particularly from RD 661/2007 Article 17 (which guarantees a fixed tariff for all energy fed into the grid), Article 36 (which sets a specific rate per kWh for 25 years and a slightly reduced rate for thereafter), Article 44.1 (which provides for annual adjustment for inflation), Article 44.3 (which bars tariff revisions in respect of existing facilities), and the corresponding provisions of RD

---

[108] *Ibid*, ¶¶ 349 *et seq*. See also Cl. PHB, ¶¶ 2-14.

[109] Cl. Reply, ¶ 400.

[110] Cl. Reply, ¶ 379.

[111] Cl. Reply, ¶¶ 391, 411. *See,* e.g., Exhibits C-0026, C-0126, C-0133, C-0136 (Invest in Spain), C-0072, C-0073, C-0077, C-0107, C-0127, C-0128, C-0130, C-0149, C-0150 (CNE), C-0110, C-0120, C-0177 (IDAE).

[112] Cl. PHB, ¶¶ 21-24.

[113] Cl. Reply, ¶ 379; Cl. Mem., ¶ 221, 232; CWS-JP1, ¶ 13.

1578/2008; *(ii)* the long-term nature of renewable energy investments and the need to recoup the investment over the operating lives of the plants (i.e., they are so capital-intensive that most of the total cost of a PV facility is incurred up front in order to build the plant); *(iii)* the quid-pro-quo required of PV producers for facilities to gain the rights to the tariffs (i.e., while the decrees contained the offer of tariff stability in exchange for the investment, the individual plants' entitlement to stable remuneration for the lifetime of the plants was not granted unless the investor managed to develop, build, commission, and register the facilities in time in the RAIPRE); *(iv)* the context in which Spain enacted RD 661/2007 and RD 1578/2008 (i.e., repeated unsuccessful attempts to secure higher levels of investment to meet the ambitious EU targets, which lead Spain to pass these new regulations providing for greater incentives and more stability); *(v)* the numerous statements by Government representatives including, Spain's highest officials, such as two different Ministers of Energy and General Secretaries regarding the stability of the regime and the tremendous amount of promotional efforts that Spain carried out to attract foreign investment (i.e. references to guaranteed tariffs throughout the life of the facilities, the stability of the system, etc.);[114] and *(vi)* the support from legal counsel in Spain and the fact that international banks were willing to provide financing on favorable terms due to the predictable cash flows that the regimes guaranteed.[115]

221.   Cavalum was a diligent investor. It sought and obtained advice from experienced counsel and partners in Spain such as Ms. López Mera, a Spanish lawyer who counselled Cavalum on its expansion into the Spanish PV sector, and four different groups of legal advisors who assisted Cavalum with its investment, none of whom raised any concern that Spain could reduce the tariffs.[116] Moreover, the terms of the financing agreements related to Cavalum's investments do not indicate that Cavalum anticipated the regulatory changes

---

[114] Cl. Reply, ¶¶ 388-390 and 407; Cl. Mem., ¶ 366-367.

[115] *See* the statement of Ms. López Mera, a Spanish lawyer who counseled Cavalum on its expansion into the Spanish PV sector. CWS-SLM, ¶ 6; Hearing Tr.-E, Day 2, p. 119:9-12 (Sonia López Mera); Partnership memorandum with Valsolar, pp. 1-2, C-191; CWS-JP2, ¶ 3.

[116] CMS Albiñana & Suarez de Lezo Legal Due Diligence Report on Riosalido plant, C-0265; CMS Albiñana & Suarez de Lezo Legal Due Diligence Report on La Roda plant, C-0266; Uría Menéndez Legal Due Diligence Report, C-0267; Gómez-Acebo & Pombo, which carried out exhaustive due diligence for LBBW Bank (Hearing Tr-E, Day 2, p. 101:25–p. 103:1); as well as Sonia López Mera (Hearing Tr.-E, Day 2, p. 100:9-22).

Spain subsequently enacted. The language Spain cites is legal "boilerplate" common to financial agreements and designed to allocate the risk of future harmful events, without regard to whether those risks were likely or even legal.  The fact that three of the financing agreements (covering Cavalum's Don Alvaro, Fuente de Cantos and Talarrubias plants) provided financing with recourse to shareholders is not indicative that the bank anticipated regulatory changes. The reason was simply that Cavalum could conclude the financing more quickly by agreeing to that provision than if it insisted on a full, non-recourse loan. Because Cavalum was up against a tight deadline to register its facilities, Cavalum did not want to spend the little time it had finalizing a non-recourse loan.

222.    Although the Claimant had an acquired (or vested) right under Spanish law to the incentive remunerations set out in RD 661/2007 and RD 1578/2008, as Professor Aragon explained in his expert opinion,[117] this question is not determinative to find that Spain violated the "fair and equitable treatment" standard or its "legitimate expectations." Even assuming *arguendo* that registration in the RAIPRE did not convey established rights on Claimant's facilities, it cannot be denied that registration crystallised a general offer of incentives into a specific entitlement for Claimant's facilities that sufficed for purposes of a "legitimate expectation."

223.    Contrary to Spain's allegations, there were no warning signs that could have put Cavalum on notice that the Special Regime would not remain intact over the lifetime of the PV plants. First, most of the exhibits on which Spain relies to make this claim, post-date Cavalum's investments in Spain, including both its initial investment in August 2007 as well as its final investment in May 2009. Therefore, these documents could not have informed Cavalum's expectations. Second, Spain misconstrues the limited evidence it has put forward that pre-dates Cavalum's investments. As noted above, only four of the Supreme Court decisions were issued prior to Cavalum's investments and all of them concerned changes to incentive regimes that pre-dated RD 661/2007. These previous regulation changes were much less radical than those that Spain imposed after 2010. Changes to the Special Regime introduced prior to 2007 could not have alerted Cavalum

---

[117] Second Aragón Expert Report at 45; *see also id.*  42-43; 44-45.

because RD 661/2007 was enacted precisely to solve the problems of the previous regimes, providing for greater stability. Whatever changes Spain may have introduced in the past, they could not alter the content of the specific entitlement granted to the Claimant under RD 661/2007. The *Micula* tribunal came to a similar conclusion in respect to a very similar argument by Romania.[118] Even RD-L 6/2009 was enacted after Cavalum had completed development of most of the plants in its Spanish portfolio (in 2007-2008), and after Cavalum had already sunk significant capital into the development of its last operating plant, Talarrubias, which Cavalum formally acquired during the first week of May 2009. Unsurprisingly, the *Novenergia* tribunal dismissed all the pre-investment sources upon which Spain relies noting that they were still generally vague and insufficiently defined at the time of the claimants' investments. The *Masdar v. Spain* tribunal reached the same conclusion, finding that there was no Spanish Supreme Court authority, which "in any way cast doubt upon the legality or validity of the terms of RD 661/2007 generally or the stability provision of Article 44.3 in particular."[119]

224. Specifically, Spain violated Cavalum's expectations of incentive tariffs for the full operating life of Cavalum's RD 661/2007 plants when it adopted RD 1565/2010 cancelling this right after year 30 of operation in contravention to Article 36 of RD 661/2007. Spain also violated Claimant's expectations to fixed tariffs on all of the electricity produced by its plants, adjusted for inflation only as set out in Articles 17, 36 and 44.1 of RD 661/2007 and Articles 11 and 12 of RD 1578/2008, when it imposed "operating hour" limitations on the Claimant's facilities and introduced a new access tolls in RDL 14/2010 (which under RD 661/2007 and RD 1578/2008 did not exist), and further reduced by 7% all revenues of the Claimant's plants under the guise of a tax, the TVPEE, in Law 15/2012. Furthermore, all these measures violated Cavalum's expectations of stability and non-retroactivity flowing from Article 44.3 of RD 661/2007 and Article 1 and the preamble of RD 1578/2008. RDL 1/2012, on the other hand, violated the terms of RD 1578/2008 and

---

[118] *Micula v. Romania* (Award), ¶ 442.

[119] *Masdar v. Spain* (Award), ¶ 497.

Cavalum's expectations that its three pending projects would achieve enrolment, likely sometime in 2012.

225.    The New Regulatory Regime goes even further in violating the Claimant's legitimate expectations. First, the Claimant did not invest in Spain with the expectation of receiving a "reasonable rate of return" as unilaterally and arbitrarily defined by Spain *ex post facto*. Rather, the Claimant invested in Spain on the legitimate expectation its facilities would receive the precise tariffs established in RD 661/2007 and RD 1578/2008 for all of the electricity produced by its installations, which the Claimant concluded based on its own criteria and judgment, would offer a sufficient return to justify the risks of investment. Second, the Claimant invested in reliance on a clear, straightforward, and stable regime. The RD 661/2007 and RD 1578/2008 frameworks were easy to understand and offered the ability to accurately predict cash flows for the future. Explicit tariff rates, adjusted for inflation, were offered to facilities that were properly constructed, connected, and registered before an established deadline. Those rates would apply to all electricity produced — period. Furthermore, Spain expressly guaranteed that any future revisions to the tariffs would not apply to existing facilities already registered under the regime. Spain's measures violated that central guarantee of non-retroactivity.

226.    Additionally, the New Regulatory Regime is very complex and uncertain. Spain has created 578 different "standard installations" purporting to correspond to different types of PV facilities. Spain claims to use these "standard installations" to calculate the costs that factor into its formula to determine the rate of return that it considers "reasonable" for each actual facility. Once Spain calculates the "reasonable" return for a given facility, it uses that figure as a ceiling to the remuneration it will pay that facility, and compares this figure against the returns a facility has made since it began operation. Furthermore, any remuneration to be paid to the Claimant's facilities under the New Regulatory Regime is subject to partial review every three years beginning in 2016 and full review every six years starting in 2019. Thus, not only is Spain's assessment of the returns that a facility "should" be able to earn contrary to the fixed tariffs Spain promised in RD 661/2007 and RD 1578/2008, and the expectations it created in that respect for the Claimant, but also it is incredibly ambiguous, difficult to calculate, and impossible to predict for the future. All of

64

these factors taken together has further violated the Claimant's legitimate expectation of a stable and straightforward legal framework governing its investments.

227. A "balancing" exercise such as the one employed by the *Novenergia* and *Eiser* tribunals is not an appropriate legal standard for this case. These tribunals failed to give due consideration and effect to the express and specific guarantee of Article 44.3 of RD 661/2007. Had they done so, there would have been no need or room for them to make any such exercise, which lacks clear boundaries and legal rigor. But even if a balancing exercise were to be employed, a proper application would lead to the conclusion that all of Spain's measures, taken cumulatively as it should be, violated the FET standard. All the relevant factors in this case would weigh strongly in Cavalum's favor, such as the importance of the original policy served by the incentives, the strength of the guarantee, the relevance of the incentives for the investments, the need for regulatory intervention, the cause of it, the impact on the investments, and the ability of the investors to adapt. The government simply decided to shift policy priorities, after receiving the benefit of the investments that it needed and that it had induced with express assurances, at a moment when investors such as Cavalum could do very little to change anything. To make things worse, the reason for those changes – the tariff deficit – was a problem of Spain's own making. Finally, there should be no doubt that there can be no proportionality analysis with respect to the quantum assessment. The harm caused by Spain's measures, which was catastrophic by any measure, is immaterial to the illegality of those measures.

228. The cases upon which Spain relies (*AES Summit*, *Electrabel*, *Plama*, and *Charanne*) do not detract from this conclusion. On the contrary, this Tribunal should follow the findings in the tribunals of *Micula* and *Total*. Also, it was not until the end of 2010 that Spain made abrupt, unexpected changes harming existing plants and breaching its international obligations to Cavalum. This case therefore stands in stark contrast to other situations in which a claimant invested under an incentives regime at a later stage, when indications of change were or should have been known, such as *Antaris v. Czech Republic*.

229. Lastly, it is worth noting that Spain does not dispute that legitimate expectations can arise from its regulatory framework. In fact, Spain contends that investors did have legitimate

expectations that they would receive a reasonable rate of return on their investments (which is an assurance that Spain made, if at all, only in the regulatory regime and not in a contract or some more specific context directed to investors). Rather, the crux of Spain's case challenges what the regulatory regime assured to investors.

### b.    Spain's Fundamental Change in the Investment Framework Violates the FET Standard Even in the Absence of Legitimate Expectations

230.    The Claimant argues that recent decisions show that Spain has been found liable for FET violations because it radically and fundamentally dismantled the RD 661/2007 and RD 1578/2008 regimes through the Disputed Measures to the investor's detriment. This Tribunal should follow these precedents.

231.    As noted by the *Eiser v. Spain* tribunal, the FET obligation in the ECT "means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance on those regimes of their investment's value."[120] This is exactly what Spain did by imposing the New Regulatory Regime in the present case.

232.    The *Novenergia v. Spain* tribunal endorsed this view by noting that the FET standard "protect[s] investors from a radical or fundamental change to legislation . . . that does not adequately consider the interests of existing investments already made on the basis of such legislation."[121] The tribunal found that the New Regulatory Regime in Spain was "radical and unexpected," and that the manner in which Spain adopted it fell "outside the acceptable range of legislative and regulatory behaviour".[122]

233.    Similarly, the *Antin v. Spain* tribunal explained that the FET obligation under the ECT "means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered — *i.e.*, stripped of its key features — as applied to existing investments in ways that affect investors who invested in reliance on those

---

[120] *Eiser v. Spain* (Award), ¶ 382.

[121] *Novenergia v. Spain* (Final Award), ¶ 654.

[122] *Id.*, ¶ 695.

regimes."[123] The tribunal then concluded that Spain breached the FET standard by eliminating the essential features of RD 661/2007.

### c.    Spain's Conduct Was Not Transparent, Consistent or in Good Faith

234.    According to the Claimant, another key aspect of the fair and equitable treatment standard is the State's duty to treat investors and their investments transparently, consistently, and in good faith. These are each independent bases to find Spain liable under the FET standard.

235.    A State's duty of "transparency" requires the absence of any ambiguity or opacity in its treatment of investments. The governing legal framework must be readily apparent and States need to correct or clarify any uncertainty that may develop over time. States also have an obligation to act coherently and apply its policies consistently. This duty endures after a change of administration. A new government cannot repudiate or alter the commitments or relationships entered into with investors by a previous government without violating its obligation to afford fair and equitable treatment. Good faith entails a sincere intention to deal fairly with others.

236.    Spain's defence in this case is a damning confession on the subject of transparency as well as consistency and good faith. Spain has argued that it always knew that it could make fundamental changes to the RD 661/2007 and RD 1578/2008 regimes after it had benefited from billions of euros of investment in its renewables sector, although it crafted a regulatory regime that contained a guarantee against non-retroactivity and its officials were touting the "total legal security" of the framework. If Spain's defence is credited, Spain misled the Claimant and thousands of other investors by creating the appearance of a stable regulatory regime that guaranteed specific tariff rates for a defined duration. Also, Spain imposed cuts to the Claimant's remuneration retroactively, without giving it any opportunity to comment on the new regime.

237.    Spain's retroactive measures were also inconsistent with the clear terms of RD 661/2007 and RD 1578/2008. None of these measures were envisaged, let alone authorised, under the original regime. RD 661/2007 provided for fixed tariffs for the entire operating life of

---

[123] *Antin v. Spain* (Award), ¶ 532.

the plants without any limitation on the number of years, annual operating hours, toll access charge, or a further reduction under the guise of a green tax. Similarly, Spain's extraordinary reduction of the RD 1578 tariffs available to new facilities (which applied to Cavalum's Solarwell plant) was inconsistent with the formula established in RD 1578. That measure was also arbitrary as it did not correspond to a 45% reduction in the costs of constructing such a facility.

238.    Nor were Spain's measures carried out in good faith. Spain reaped the full benefits of the Claimant's PV plants and energy capacity they created, while denying the Claimant the full, originally-promised benefits of the tariff regime that induced those investments. Spain's measures targeted Cavalum and other renewable energy investors as the cause of Spain's tariff deficit — when the real cause was a failure of Spain to address the tariff deficit from the beginning and a lack of political will to pass on costs to consumers. This forced Cavalum and other renewable energy investors to bear the burden of the "solution."

239.    Spain's reliance on *AES v. Hungary* is misplaced. The facts of that case are vastly different from those of the present case.

**(2)    Spain's Position**

240.    For Spain, the FET must be interpreted in accordance with the objectives of the ECT. The two main objectives being to (1) ensure a "level playing field" through the principles of national treatment and non-discrimination as understood in customary international law and (2) "to promote the development of an efficient energy market" in the EU (Article 2.a).[124] To provide stable and transparent conditions and to refrain from taking arbitrary or discriminatory measures (the so-called "non-impairment clause" of the ECT), or from frustrating an investor's reasonable expectation are not independent, self-standing obligations. They are all elements of the FET standard, which must be interpreted in light of the ECT's objectives and balanced against any other relevant consideration. That is the

---

[124] See Resp. Rej., ¶¶ 43, 974.

approach adopted by the tribunals in *Plama*,[125] *Charanne*, and *Isolux* and followed by Spain in this case.

241.   The FET does not prevent a Contracting State from taking measures of macroeconomic control or to protect consumers by reasons of public interest (Article 4.4.b). As the *Electrabel* tribunal noted, a "host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance". No investor can expect that its interests will be protected unconditionally, even if that means distorting the energy market or harming consumers, much less so in such a highly sensitive and regulated area. States are not stripped from their police powers or required to freeze their legislation under the ECT. Article 10(1) ECT demands stable conditions not a frozen regulatory framework. The ECT is not insurance policy against all kinds of regulatory risks. A reasonable evolution of the host State's Law is part of the environment within which investors must contend.

242.   Contrary to the Claimant's allegations, Spain is not asserting a defence of necessity.[126] It is simply stressing the importance of balancing the interests of (i) investors, (ii) the State, and (iii) consumers in the application of the ECT's standards and particularly of the FET. In any event, the Claimant bears the burden of proving its case under the ECT.[127]

### a.   *Cavalum's Alleged Expectations Are Not Protected Under the ECT*

243.   For Spain, an expectation is protected under the FET only if it is grounded in a specific commitment addressed to a foreign investor (or an identifiable group of foreign investors) whereby a State undertakes not to amend a certain regulation. The investor's expectations should be assessed objectively considering all circumstances surrounding the investment, including the information that the investor knew or should have known had it used due diligence to understand the legal framework in which it invested. An investor's expectation is not objective or reasonable if it is based on an incomplete or partial reading of the regulatory environment or if it fundamentally differs from the reasoned perception of other

---

[125] *Plama v. Bulgaria* (Award), ¶ 173.

[126] Resp. Rej., ¶ 955.

[127] Resp. Rej. ¶ 966.

investors, the industry, regulatory advisers, and other actors similarly situated. The investor bears the burden of proving the elements of its claim. These basic propositions have been accepted in a wide variety of ECT cases, such as *Charanne B.V. v. Spain*,[128] *Isolux v. Spain*,[129] *AES Summit v. Hungary*,[130] *Electrabel v. Hungary*,[131] and *Invesmart BV v. Czech Republic*.[132]

244.    In this case, the only commitment that Spain made was that it would provide renewable energy investors, whether foreign or national, with a reasonable rate of return calculated by reference to the cost of money in the capital market as set out in Article 30.4 of the Electricity Law.[133] This target rate was estimated in around 7% before taxes based on projections made in the Renewable Energy Plans, which later translated into the values set out in RD 661/2007. This is about the same return rate that Cavalum's PV Plants achieve under the current regime. No other commitment, much less a specific promise, was ever made.

245.    Article 14 (RAIPRE registration), Articles 36 (tariff rates), Article 44 (alleged stabilization clause) of RD 661/2007, and the corresponding provisions of RD 1578/2008 did not confer a vested or acquired right to the revenue streams that resulted therefrom. The Disputed Measures therefore cannot be considered retroactive under Spanish or international law, as noted by the tribunals in *Charanne* and *Isolux*, following the precedent established by *Nations Energy v. Panama*.[134] The Disputed Measures apply prospectively even though they take into account existing situations for purposes of setting remunerations forward, such as the income received by the different installations in order to comply with EU State aid regulations. But they do not claw back earnings already received, just as RDL 7/2006

---

[128] *Charanne v. Spain* (Final Award), ¶ 499.

[129] Award handed down in the case *Isolux v. Spain* (Award), ¶¶ 771 and 775.

[130] *AES v. Hungary* (Award), ¶ 9.3.29.

[131] *Electrabel v. Hungary* (Award), ¶¶ 155, 157 and 162.

[132] *Invesmart v. Czech Republic* (Award), ¶¶ 250-258.

[133] Resp. PHB, ¶¶ 125-126.

[134] Resp. Rej., ¶¶ 577-614.

or RD 661/2007 did not touch the earnings already received by such facilities either - even though both applied to existing facilities[135].

246.    All these provisions, including Article 36's timeframes and Article 44's looking-forward directions, were meant to be in effect so long as RD 661/2007 remained in force and cannot be read in isolation of higher norms such as Law 54/1997, to which they are subordinate.[136] The Government did not go any further when enacting RD 661/2007 or RD 1578/2008 because it did not know what the future would look like and it wished to retain sufficient room to manoeuvre.[137]  Investors knew that Royal Decrees could be superseded by the Government, and for that reason they lobbied for years to have specific remuneration rates set out in the law. [138]

247.    Both Spanish law and EU law require subsidies to be proportional to the goal that is pursued (i.e., enable the recipient to compete on equal footing in the market). They cannot go any further without breaching Spanish and EU State aid laws.[139]  As the *Electrabel* tribunal stated, foreign investors cannot have a legitimate expectation that the ECT would shield their investments from the effects of EU law in regard to anti-competitive conduct.[140] Under EU State aid laws, any subsidies must also be notified to the EC. A recipient of State aid cannot have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.  That is also settled case law of the CJEU. There is no doubt that the feed-in tariffs set forth in RD 661/2007 and RD 1578/2008 are subsidies subject to EU State aid regulations. This has been conclusively decided by the EU Commission, which is the competent authority to make this determination.[141]

---

[135] Resp. C-M, ¶ 1075-1086; Resp. Rej., ¶¶ 1023-1030.

[136] Resp. PHB, ¶¶ 136-139.

[137] *Id*.

[138] Resp. C-M, ¶ 399; Resp. Rej., ¶ 316.

[139] Resp. PHB, ¶¶ 17-70.  See also Resp. Rej., ¶¶ 332-333.

[140] Resp. PHB, ¶ 49 (citing to *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 4.141).

[141] Resp. PHB, ¶ 30 (citing to the 26 February 2016 EC's Response to Spanish PV investors, R-0160; and the EC's Decision on State Aid of 10 November 2017, RL-0087).

248. The statements from ministers and officers that the Claimant selectively quotes, omitting many others,[142] were made in the context of political debates. If read in full, these statements should have put the Claimant on notice that "tariffs are not going to pay for anyone's party",[143] rather than reassure them that they could expect windfall profits. The IDAE or *Invest in Spain* PowerPoint presentations, on the other hand, were part of seminars given by CNE staff, most of which are in Spanish, thus disproving that they were aimed at foreign investors. There was neither an aggressive campaign to attract foreign investment nor were RD 661/2007 or RD 1578/2008 specifically addressed to foreign investors. RD 661/2007 and RD 1578/2008 did not provide distinctions or preferences depending on the nationality of the investor.

249. These presentations and press notes relied upon by the Claimant also do not support the existence of any commitment to maintain subsidies petrified.[144] The former simply point to certain aspects of the regulatory regime as existing at the time, whereas the latter, which have no legal value under Spanish law, merely summarise in colloquial terms the content of the various measures adopted by the Council of Ministers. The tribunals in *Charanne* and *ECE Projektmanagement v. The Czech Republic* both stated that legitimate expectations could hardly be based on statements made by subjects lacking the capacity or the competence to grant or fulfil the commitments made.[145]

250. The Claimant's alleged expectations are not reasonable, nor do they stand up to an objective analysis.[146] Cavalum claims to have made the bulk of its investment "in the period between 2007 and 2010"[147] in reliance on what it considered to be stabilization guarantees in RD 661/2007 and RD 1578/2008. Yet it has not supplied evidence of a single due diligence that would support such understanding. The only due diligences on file do not

---

[142] Resp. Rej., ¶¶ 679-681.

[143] Statement of the Minister of Industry, Energy and Tourism in the Senate, 16 October 2006, R-0264. See also Resp. Rej., ¶¶ 679, 1040.

[144] Resp. Rej., ¶¶ 617-629.

[145] RL-0045. See also RL-0049.

[146] See Resp. Rej., ¶¶ 987-1005.

[147] Resp. PHB, ¶¶ 119-124.

even advise on regulatory matters,[148] because Cavalum never asked for such advise as Mr. Valentin Pereira da Cunha openly admitted during the hearing.[149] In addition, the record shows that the Claimant's advisers warned of possible regulatory changes and, moreover, the contractual and financing documents as well as their parent company accounts, envisaged such changes.[150] Three of the financing agreements (covering Cavalum's Don Alvaro, Fuente de Cantos and Talarrubias plants) provided financing with recourse to shareholders, which according to the Claimant itself, is indicative that the bank was not certain as to whether the projects could generate stable and predictable revenues and opted to protect itself from possible changes by requesting further guarantees as collateral. The financing agreements also provide for early maturity (termination) in the event that Spain adopted subsequent measures having a material effect on cash flows. As noted by the tribunal in *Invesmart v. Czech Republic*, the ECT does not protect "ill-informed" or "overly optimistic" investors.[151]

251.  Cavalum's expectations are also inconsistent with the evolution of the regulatory regime up to the date of the Claimant's investment and with contemporaneous case law that was widely available to investors. Since 2006, the government selectively reduced remunerations to both prospective *and existing* renewable energy installations every time it was necessary to ensure the sustainability of the system and avoid windfall profits. All of these measures were upheld by the Spanish Supreme Court, which from 2006 on made it clear that renewable energy producers did not have a right to a specific remuneration formula, and that the Government was entitled to adjust remunerations downward so long as it preserved the reasonable rate of return, as delineated in Law 54/1997. In particular, neither was Article 40.3 of RD 436/2004 found to be an impediment to the remuneration cuts introduced by RDL 7/2006 and RD 661/2007, nor was Article 44.3 of RD 661/2007 considered to prevent subsequent adjustments brought about by RD 1578/2008, RDL 6/2009, and RD 1614/2010. The Claimant contends that these changes led to improvements

---

[148] Resp. Rej., ¶¶ 693-701.

[149] Resp. PHB, ¶¶ 245-248.

[150] Resp. Rej., ¶¶ 686-692.

[151] *Invesmart v. Czech Republic* (Award), ¶ 250.

in remuneration rates, but this argument is rebutted by the fact that in each instance where a new measure was adopted, renewable energy associations strongly opposed them, critiqued them, and many even challenged them before Spanish courts.

252.   This jurisprudence was known by investors and renewable energy associations because it was referred to in reports made by the CNE in 2007 and 2008, and it was also criticised by renewable energy associations in several contemporaneous publications. Likewise, the associations criticised prior amendments to the remuneration system for being "retroactive" insofar as they affected RAIPRE-registered plants.[152] Following the draft of RD 661/2007 being disclosed for comments in early 2007, APPA put investors on notice about the risk that the Government could make changes to the remuneration rate by stating that investors "must consider the risk that such remuneration could be lowered" outside the terms of Article 40.3 (one of the alleged stabilization guarantees relied upon by the Claimant whose wording is very similar to that of RD 661/2007 Article 44.3).

253.   The cases cited by the Claimant are completely inapposite. *Total*, *Enron*, *LG&E* and *BG* are not ECT cases. They are also based on a very different legal framework. In all these cases Argentina had entered into specific concessions and/or license agreements with the investors' local companies, which contained detailed stabilization clauses. That is not the case here. *Micula v. Romania* is also a non-ECT case. In this case, investors should have known that subsidies could not be higher than reasonable. Another key difference is that here Cavalum is still receiving subsidies after the measures were adopted and making a profit.

   **b.    Spain Has Acted Consistently, Transparently and in Good Faith**

254.   Spain contends that the ECT does not impose the sort of unrestricted legal security and stability that the Claimant demands. This would effectively freeze the regulatory framework even in the absence of any commitment to that effect. The ECT only requires that the respondent State's conduct fall within an "acceptable range of legislative and regulatory behaviour", as held by the *AES Summit v. Hungary* tribunal.  The precedents

---

[152] Resp. Rej., ¶¶ 596-600.

relied upon by the Claimant are inapposite. They all referred to non-ECT cases, with the exception of one, the *Electrabel* case, in which the claimant did not even make an allegation regarding lack of transparency.

255. Spain has acted transparently and consistently at all relevant times. Since 2005, the Spanish Supreme Court has made it clear that there was no vested right to a particular rate of return, provided that changes did not affect earnings already received, and that the principle of a reasonable rate of return was not affected.

256. Spain has followed the legally established procedures in all the measures taken since 2010, without incurring any undue delays and ensuring participation in the legislative process by stakeholders.[153] The structural reform to the electricity system was announced more than a year before its implementation. Hundreds of observations on the drafts of RD 413/2014 and MO 1045/2014 were received from the entire renewable energy industry, which were carefully considered by the regulator (i.e., CNMC). This resulted in significant changes to the initial drafts, which largely benefited investors such as Cavalum.

257. Contrary to the Claimant's allegations, regulatory periods are not discretionary. Nor is the methodology for reviewing certain elements of the remuneration formula uncertain. There are clear deadlines and procedures.

258. Moreover, the contested measures have maintained the pillars of the Spanish remuneration model in place since 1997.[154]

   *c.    Spain Did Not Impair Cavalum's Investment by Unreasonable (Arbitrary) or Discriminatory Measures*

259. Spain also denies having impaired Cavalum's investment by unreasonable or discriminatory measures. Spain's arguments are discussed in subsection D.2 below.

---

[153] Resp. Rej., ¶¶ 886 *et seq*.

[154] See Section A.2.c above.

D.    THE NON-IMPAIRMENT CLAUSE

(1)    **The Claimant's Position**

260.    According to the Claimant, the "impairment" clause of the ECT sets forth a low threshold
for the requisite impact on an investment (any impact is sufficient), which Spain violated
by undertaking the unreasonable and discriminatory measures at issue in this arbitration.
Because Article 10(1) ECT uses the disjunctive "or" instead of the conjunctive "and,"
either unreasonable or discriminatory measures will violate this provision. A measure is
unreasonable if it is taken without due consideration of the potential negative effects it will
have on foreign investors, something that must be judged from the standpoint of the parties'
expectations at the time of the decision to invest.

261.    All of Spain's measures in this case were "unreasonable". Although they addressed the
long-growing tariff deficit, they did so in a manner that was unnecessary, arbitrary, that
disproportionately impacted Cavalum's investments, and caused them significant financial
harm. Backing out of explicit promises after inducing investors to put their resources in,
because it wanted to avoid the political repercussions associated with having consumers to
pay the actual costs of electricity, and making renewable energy investors bear the burden
of this problem, is neither a legitimate purpose nor a rational policy. Spain had many other
financial tools available to address this deficit. It is not sufficient for Spain to point to any
"reason" underlying its policy choice – the reason Spain points to must be justified in light
of Spain's duty to protect investors and encourage investment, as enshrined in the ECT.
The statements of the EC, International Monetary Fund, and International Energy Agency
on which Spain relies are nothing but general statements approving Spain's decision to
(finally) address and eliminate its Tariff Deficit. They do not analyze whether Spain could
have eliminated the Tariff Deficit by other means, something that it could have certainly
done without reducing the incentives it had already granted to investors under RD 661/2007
and RD 1578/2008.

262.    Spain's measures also violated fundamental principles of non-retroactivity and
discriminated against renewable energy investors. Spain's excuse that investors, such as
those in the PV sector, should bear the burden of the cuts because they benefited from

windfall profits is simply not true. Nor is it true that most investors accepted the new incentive regime or that such regime has any resemblance to past proposals from the sector (such as APPA's 2009 proposal), which are always meant to apply prospectively.[155]  The so-called "renewable energy boom" following Spain's illegal repeal of RD 661/2007 is a complete misrepresentation of the facts. This boom is not due to greater stability, but just the result of investors wishing to rid themselves of distressed assets.

263.   Finally, Spain's reliance on the awards in *Charanne* and *Isolux* are misplaced. The claimant in *Charanne* did not raise a claim under the ECT's impairment clause and the *Isolux* tribunal found that Spain's measures did not negatively impair the claimant's investments.

**(2)   Spain's Position**

264.   The Disputed Measures are not unreasonable or discriminatory. A State's act is unreasonable, as the *AES Summit v. Hungary* tribunal noted, if it does not pursue a rational policy, i.e., one that follows a logical (good sense) explanation with the aim of addressing a public interest matter, and there is no appropriate correlation between the State's public policy objective and the measure adopted to achieve it.  Discrimination exists, as noted by the *EDF v. Romania* tribunal, where a measure inflicts damage without serving any apparent legitimate purpose; it is not based on legal standards but on discretion, prejudice or personal preference; it is taken for reasons that are different from those put forward by the decision maker, or in wilful disregard of due process and proper procedure.

265.   The Disputed Measures pursue a legitimate and rational policy. They addressed the growing tariff deficit and the excessive profits made by some producers, which were heavily burdening consumers while putting the overall sustainability of electricity system at risk. Electricity costs to consumers had increased by 81% between 2004 and 2011, placing the price of electricity in Spain well above the average of the European Union. In parallel, the costs of the system had tripled, with the increase mainly corresponding to RE subsidies.[156] Addressing these issues was as much of a concern as it was in the *AES Summit*

---

[155] *See*, APPA and Greenpeace, Proposal for draft Bill for the Encouragement of Renewable Energy, 2009, Article 20.1, C-0252 (or R-0218, *see also*, R-0197).

[156] Resp. C-M, ¶ 297.

*v. Hungary* case.[157] A similar analysis has subsequently been adopted by other tribunals such as the *Electrabel* and *Charanne* tribunals.

266.    Not only was there a proper correlation between the public policy objective and the Disputed Measures, but they were also proportionate. The Government took various actions, which have been praised by several international institutions such as the EC, IMF, and the International Energy Agency to adequately distribute the burden between consumers and producers, distributors, carriers, and producers. The State also committed additional resources through the general budget, making taxpayers bear part of the costs.

267.    The new regime is not arbitrary, but it is based on clear and defined legal standards. It also respects the principle of economic equilibrium for long-term investments enunciated in *Total v. Argentina* case. Renewable energy producers, whether national or foreign, are able to recover operations costs, amortise investments, and make a reasonable profit over time of about 7.398% before taxes. In the case of Cavalum's plants, the rate is even higher, coming to 9.8% before taxes (7.7% after taxes), as calculated by Accuracy experts.[158] This explains why the New Regulatory Regime has attracted over 5 billion euros of RE investment in Spain in 2015.

268.    The Spanish government has followed the legally established procedures to enact the regulatory standard of remuneration in the electricity sector. The Government disclosed the successive drafts of the measures to the stakeholders, who then had various opportunities to submit observations and comments before final texts were adopted and implemented.

---

[157] *AES v. Hungary* (Award), ¶¶ 10.3.31 and 10.3.34.

[158] Accuracy's Second Expert Report, ¶ 18.

E.   THE UMBRELLA CLAUSE

**(1)    The Claimant's Position**

269.   The Claimant submits that the ECT's umbrella clause covers any obligations, rather than only contractual obligations, and that Spain's legislative and regulatory promises clearly fall within its scope.

270.   This is the ordinary meaning of the terms used in Article 10(1) ECT. The Oxford English Dictionary defines "entered into" as to "undertake to bind oneself by (an agreement *or other commitment*"). Unlike other umbrella clauses, Article 10(1) explicitly refers to "any obligations" with an Investor "or" an Investment. Had the Contracting Parties to the ECT wanted the umbrella clause to only cover contractual obligations, they would have drafted "contractual obligations" instead of "any obligation".

271.   Spain entered into a binding obligation when it conferred the rights of RD 661/2007 and RD 1578/2008 to the Claimant's plants. This was not a "general" obligation backed only by a legal framework open to anyone. The RD 661/2007 and RD 1578/2008 rights were available only to a limited number of investors who met certain eligibility requirements, and only for a limited amount of time. The Claimant's facilities satisfied all these requirements, obtaining Final Commissioning Certificates and were individually registered in the RAIPRE. In the case of Talarrubias and Solarwell, the fixed tariff rate was also communicated in an official resolution from Spain upon the facility's enrolment in the pre-allocation registry and Spain specifically awarded those facilities a place among its quarterly capacity allocations, conveying an independent right to those facilities under the regime. As Prof. Aragón explains, RD 661/2007 and RD 1578/2008 granted specific property rights under Spanish law to the Claimant.[159]  Violations of those rights give rise to Spain's liability under its own domestic law, which means that a violation of those rights also violates the umbrella clause.

272.   Relevant case law supports the Claimant's position. The *AMTO v. Ukraine* tribunal recognised the "wide character" of the ECT's umbrella clause. Although the *Plama* tribunal

---

[159] Aragón Second Expert Report, pp. 16, 41-43.

did not need to find that the umbrella clause covered non-contractual obligations (because the dispute involved contractual obligations), it did embrace the notion that the scope of the clause extended to statutory obligations undertaken by a State. So too did the *Khan Resources v. Mongolia* tribunal, by adopting a plain meaning approach. Spain's objections to the contrary based on misconceived readings of the *Al-Abahloul v. Tajikistan* and *Eureko v. Poland* cases are of no avail. Spain's statutory and regulatory obligations were not general, but very specific.

273.   The fact that the ECT's umbrella clause covers more than contractual obligations is also in line with the holdings of several tribunals in cases involving umbrella clauses that are narrower than the one found in the ECT. Examples include *LG&E v. Argentina*, *Enron v. Argentina*, *Continental Casualty v. Argentina*, *CMS v. Argentina* (annulment case), and *Noble Ventures v. Romania*. Furthermore, the ECT Secretariat in the ECT Reader's Guide does not suggest that Article 10(1) ECT is limited to contractual obligations only. The Guide simply raises the issue in the context of its discussion of "Individual Investment Contracts."

274.   In this case, Spain violated the obligation it had undertaken in Article 36 of RD 661/2007 to pay fixed tariffs to the Claimant's plants for their full operating lives. Spain also violated the Claimant's right to receive the tariffs set in Articles 17 and 36 of RD 661/2007 and Article 11 of RD 1578/2008 (as well as the resolution issued in respect of Talarrubias and Solarwell), on all of the electricity produced by their plants, adjusted for inflation only as set out in Article 44.1 of RD 661/2007 and Article 12 of RD 1578/2008. Likewise, Spain violated the non-retroactivity obligation in Article 44.3 of RD 661/2007, which was also applicable to RD 1578/2008. Finally, Spain's abrogation of RD 661/2007 and RD 1578/2008 violated all of the obligations it had undertaken for Claimant's investments in its legislative and regulatory framework.

**(2)    Spain's Position**

275.   Spain denies having violated the umbrella clause of the ECT. It argues that the Claimant's interpretation is at odds with the text of Article 10(1) ECT and the case law that has applied

this provision. Spain has not acquired any commitments with the Claimant in respect to its Plants by virtue of RD 661/2007 or RD 1578/2008.

276.    Article 10(1) only applies to obligations that a State has "entered into with an Investor or an Investment". This language shows that only commitments that arise out of a bilateral or similar instrument may qualify for protection (e.g. administrative contract, concession or license between the state and the investor). The commitment must also be unequivocal and specific with respect to a particular investment.   General provisions of a host State's legislation, such as RD 661/2007 and RD 1578/2008, do not fall within this category.

277.    This is how the ECT's umbrella clause has been interpreted by the ECT's Secretariat, in scholarly writings, and in the prevailing case law.[160]  For example, the ECT Reader's Guide discusses the umbrella clause by exclusive reference to investment agreements under a heading entitled "Individual Investment Contracts".[161] Scholars like Thomas W. Wälde even call it the *pacta sunt servada* clause to stress its contractual nature.[162]  There is no single case in which the ECT's umbrella clause has been applied without there being a contract, a concession, or a rule addressed *exclusively* to foreign investors. There are, on the other hand, numerous decisions both in ECT and non-ECT cases that confirm Spain's position about the scope umbrella clauses,[163] including the two only awards issued in renewable energy cases brought against Spain based on the same investment framework at issue here, namely *Charanne* and *Isolux*.[164]

278.    The ECT decisions cited by the Claimant do not detract from this conclusion. The *Plama* tribunal never accepted the application of the umbrella clause to non-contractual

---

[160] See, e.g., *Noble Ventures, Inc v. Romania,* ICSID Case No. ARB/01/11, Award, 12 October 2005, ¶ 51. RL-0026; *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan,* ICSID Case No. ARB/01/13, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003, ¶ 166, RL-0024; and *AES v. Hungary* (Award) (to the extent that the tribunal found no jurisdiction over contract claims).

[161] The Energy Charter Treaty: A Reader's Guide, June 2002, p. 26, RL-0053.

[162] The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases. Thomas W. Wälde. HEINONLINE 6 J. World Investment & Trade 183 2005, p. 226, RL-0055.

[163] See case cited in ft. 160 above. See also, for non-ECT cases, *WNC v. Czech Republic* (Award), ¶¶ 346 and 347.

[164] *Charanne v. Spain* (Final Award), ¶¶ 510 and 511; and Award handed down in the case of *Isolux v. Spain* (Award), ¶¶ 768 to 772.

obligations; it expressly noted that it "need not extend its analysis any further" on this point because that case was based on a contract. The same can be said about *Mohammad A. Al-Bahloul v. Tajikistan* and *AMTO v. Ukraine*. These two cases were based on contractual obligations. The *Mohammad A. Al-Bahloul* tribunal went even further to point out that an umbrella clause "does not refer to general obligations of the State arising as a matter of law." In *Khan Resources v. Mongolia* on the other hand, the dispute related to obligations arising from a specific host state's law designed to attract foreign investment. Spain's regulatory framework however, is general legislation that did not and does not distinguish between domestic and foreign investors.

279.   The other non-ECT cases cited by the Claimant also do not support its position. In both *Enron* and *LG&E*, Argentina had entered into specific concession and/or license agreements with the investors' local companies. The same applies to *SGS v. Paraguay* and *Eureko v. Poland*. That is not the case here. Moreover, the tribunal in *El Paso* and the annulment committee in *CMS* specifically rejected Claimant's broad interpretation of an umbrella clause. In *Noble Energy v. Ecuador* on the other hand, the tribunal very clearly stated that "'entered into' indicates that specific commitments are referred to and not general commitments, for example by way of legislative acts. This is also the reason why Article II (2)(c) would be very much an empty base unless understood as referring to contracts".

280.   Registration in the RAIPRE, which by 2016 covered over 64,400 facilities with over 44,600 different owners, creates no commitment of this sort. This is just a mandatory requirement for any plant to deliver electricity into the grid. RD 661/2007 and RD 1578 were directed at any owner of an electricity plant, regardless of both nationality and origin. The scope of application of these regulations was not limited to a few who met *subjective* requirements, but it applied to any who met the *objective* requirements established in the legislation.

**F.    QUANTUM**

**(1)    The Claimant's Position**

281.    The Claimant's overall position is that it is entitled to damages of EUR 57.4 million in respect of its PV plants, and EUR 1.8 million in respect of its investment in the Abandoned Projects.[165]

282.    The ECT does not expressly provide a standard of compensation for violations of the ECT, and the customary international law principle of full compensation applies: *Chorzów Factory*,[166] which continues to be cited and followed in contemporary cases.[167]

283.    The Claimant's expert, FTI Consulting ("FTI"), calculates the quantum of compensation that Spain owes to Claimant in respect of its seven operating PV plants, based on the difference between: (a) the value that the Claimant's investments in Spain would have had if Spain had not introduced the measures that Claimant contends violated the ECT (the "Counterfactual Position"); and (b) the value of those investments after the introduction of those measures (the "Actual Position").[168] The investments which FTI values are the Claimant's equity interest in and shareholder loans to the operating companies which own the seven PV.[169] For the Abandoned Projects, FTI includes damages based on the amounts invested by Claimant through payments or through subscribed debt.[170]

284.    FTI uses the discounted cash flow ("DCF") method to calculate the value of Claimant's investments in the seven operating PV plants.[171] The DCF method is appropriate because

---

[165] Cl. Reply, ¶ 608.

[166] *Factory at Chorzów* (Judgment), at 47.

[167] *Amoco Int'l Fin. Corp. v. Iran*, Case No. 56, Partial Award No. 310- 56-3, 14 July 1987 ¶¶ 189, 191-193, CL-0115; *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No ARB/03/16, Award of the Tribunal, 2 October 2006, ¶¶ 481, 483, CL-0117; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 238, CL-0072; *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, ¶¶ 87-88, CL-0118; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award II, 20 August 2007, ¶ 8.2.7, CL-0119.

[168] FTI's First Quantum Report ¶¶ 2.4, 4.18.

[169] *Id*. ¶¶ 1.9, 1.19, 2.1, 4.13-4.18.

[170] *Id*. ¶¶ 1.12, 1.19, 8.2-8.3.

[171] *Id*. ¶ 4.22-4.25.

the future performance of operating PV plants is relatively predictable; and the DCF method allows the valuer to ensure that the specific characteristics of particular assets or companies are properly reflected in the analysis, and that the effect on value of various changes to the financial performance of those assets (such as regulatory changes) is properly assessed.

285.    The damages are assessed as at June 30, 2014, the date which is the end of the quarter in which Spain finalised the terms of the New Regulatory Regime, and at which point the full impact of the measures was known to the market.

286.    On that basis the Claimant claims[172] the difference between the value of its investments in the Counterfactual Position (EUR 53.2 million) and the value of its investments in the Actual Position ((EUR 4.2 million)), namely EUR 57.4 million. It also claims EUR 1.8 million for the sunk investment costs it undertook to develop and apply for registration into RD 1578/2008 with respect to the Abandoned Projects, comprised of EUR 1.2 million which the Claimant spent and EUR 0.6 million worth of debt obligations owed to Valsolar.

287.    In response to Spain's Counter-Memorial, the Claimant says[173] that Spain has simply re-stated its case on the merits by assuming that the Claimant was entitled only to a reasonable rate of return, and not the tariff rates guaranteed in RD 661/2007 and RD 1578/2008 which were the core of Claimant's case, and then by putting forward an Asset Based Valuation ("ABV") to measure the difference between a reasonable rate of return with what Spain says that the Claimant actually receives now, to reach the conclusion that the Claimant suffered almost no damages.

288.    Accuracy's alternative DCF valuation assumes that if Spain had not enacted the Disputed Measures, it would have had to implement measures to solve the tariff deficit in any event. This fails to value damages based on the claims asserted, which allege that Spain's tariff deficit did not excuse its illegal measures because it was a problem of Spain's own making, and the illegal measures were not a reasonable much less necessary means of redressing it.

---

[172] As amended in Cl. Reply, ¶ 608.

[173] Cl. Reply, ¶¶ 559 et seq.

289.    Spain and Accuracy argue that FTI's valuation is unreliable because the enterprise value
which FTI calculates is disproportionate to the amount originally invested in the plants,
and the losses that FTI computes are disproportionate to the Claimant's original equity
investment, and speculative. Accuracy calculates an implicit internal rate of return ("**IRR**")
on equity of 35.4%, which it argues is extraordinarily high in a regulated and protectionist
market.[174] But the increase in the value of the assets results almost entirely from the fact
that the Claimant (with its partner on some of the plants) was very efficient in building the
plants; from the significant impact of falling interest rates since 2008; and from the effect
of leverage, since the Claimant financed a significant portion of the investment cost of the
seven PV plants with debt financing, which magnifies the effect of gains (or losses) in the
value of the equity interest. .from the substantial decline in interest rates since they were
built. When corrected for these errors, the project IRRs in the Counterfactual Position are
8.4%, which is realistic and consistent with Spain's view of what was reasonable.

**(2)    Spain's Position**

290.    Spain's overall position is that there has been no loss, but alternatively, if the approach of
the Claimant's expert to calculation by the DCF method is right (which Spain disputes) the
loss would be EUR 4 million.[175]

291.    The alleged damages estimated in the FTI's First Quantum Report were not compensable,
as they were totally speculative. The Claimant bears the burden of proving the loss
founding the claims for compensation. If that loss is found to be too uncertain or speculative
or otherwise unproven, the Tribunal must reject these claims, even if liability is
established.[176]

292.    The New Regulatory Regime guaranteed that PV plants enjoyed reasonable profitability,
protected from the uncertainties and fluctuations of the market. There was no basis for the
Claimant's contention that the Actual Position was going to be maintained in the coming

---

[174] Accuracy's First Expert Report, ¶¶ 313-320.

[175] Resp. C-M, ¶¶ 1255, 1258; Cl. Rej., ¶ 1163.

[176] *Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No.
ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010, ¶¶ 12-56, RL-0077.

decades. No evidence had been provided for the alleged damages arising from the Abandoned Projects.

293.    The DCF method has been rejected on numerous occasions in favour of methods based on the costs of the assets.[177] ABV is much easier and less speculative. When the investment is very recent, or still in process of being made, there is an obvious and often easier alternative to using Net Present Value ("NPV") of future cash flow to determine Fair Market Value ("FMV"). If a project was expected to generate normal rates of return for the business, then the amount of investment itself provides a reasonable starting point for determining FMV. In most cases, the FMV of recently acquired assets is unlikely to be substantially different from the cost of those assets.[178] ABV is particularly appropriate where the acquisition date is close to the appraisal date.[179]

294.    In DCF calculations, small adjustments in the estimation can yield significant divergences in the results, and valuations made through a DCF analysis must in any case be subjected to a "sanity check" against other valuation methodologies."[180] This check using other valuation methods was not carried out by the Claimant.

295.    FTI's calculation uses parameters outside economic logic, and highlights the speculative nature of the claim, especially with regard to: setting an 8% fixed rate of return from 2007; discounting the cost of capital of 5.5%, by implicitly including a 2.5% premium; increasing the FMV in the Counterfactual Position; and discounting the Actual Position with a 12% discount rate, artificially lowering the value of the plants after the implementation of the measures.

---

[177] Ripinski and William, *Damages in International Investment Law* (2008), p. 227, RL-0057.

[178] Marboe, *Calculation of Compensation and Damages in International Investment Law* (2009), pp. 267, 275, 276, RL-0058.

[179] Ripinski and William, *Damages in International Investment Law* (2008), p. 221, RL-0057; Sabahi, *Compensation and Restitution in Investor-State Arbitration – Principles and Practice* (2011), pp. 132-133, RL-0059.

[180] *Rusoro Mining Limited v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016, ¶ 760, RL-0070; and also *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Award, 29 January 2016, ¶¶ 525, 526, 527, RL-0078.

296. FTI's Counterfactual Position assumes that the tariffs set in RD 661/2007 and RD 1578/2008 were guaranteed for 35 years and that the rest of the profitability variables will remain constant throughout that assumed lifetime. These assumptions yield an IRR of 10.56% (post-tax), i.e. almost twice the Cost of Capital at the valuation date (5.5%, as determined by FTI).

297. In the Counterfactual Position calculated by FTI there would be an average IRR for the Claimant of 35.4%. That rate of return is disproportionate, and in the Actual Position this supposes a revaluation of 62% over cost. Taking into consideration the amount actually paid by investors, the increase of value in the Counterfactual Position would total 349%.

298. The standard laid down in Ministerial Order IET/1045/2014 broadly covers the investment costs which have been made. The guaranteed reasonable return is 7.398%, calculated over the standard investment, and the actual return of the project would be higher than 7.398%, since the cost of the investment has been lower than the remuneration base.[181] The profitability enjoyed by the Claimant's plants will be far in excess of that established in the legislation as a reference.

299. Using FTI's projections, Accuracy says that the plants will obtain a project IRR of 7% (post-tax). This return includes management fees as cost. No objective evidence has been provided regarding the actual services and costs behind these management fees; they should therefore be seen as dividends. The correct return in the Actual Position is 7.7% post-tax.[182]

300. If the DCF method were applicable, a correct application of the DCF method would result in a negative impact of EUR 4 million.[183]

---

[181] Accuracy's First Expert Report, ¶¶ 230-231.

[182] Accuracy's Second Expert Report, ¶¶ 21, 75.

[183] Accuracy's First Expert Report, Figure 5-1; Accuracy's Second Expert Report, ¶¶ 106 et seq; 176.

## VIII.  THE TRIBUNAL'S REASONING

### A.  Jurisdiction

### (1)  The Intra-EU Issue

#### a.  *Introduction*

301.  Spain and the Commission contend (in summary) that the Tribunal has no jurisdiction because (1) the ECT does not apply to the relationship between EU Member States; (2) even if it did create *inter se* obligations between EU Member States, those obligations would not include the provisions on investment protection and dispute settlement; (3) EU law forbids the existence of any dispute mechanism other than that established by the EU Treaties; and (4) in the event of a conflict between EU law and the provisions of the ECT, EU law prevails.[184]

302.  Since the initial pleadings in this case the CJEU has given its ruling in the *Achmea* ruling. The operative part of the ruling was:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[185]

303.  The *Achmea* ruling will be analysed below, but at this stage it is important to notice that the ruling was given in proceedings relating to a BIT and that the operative part was expressed to apply to "an international agreement…, such as" the relevant provision of the BIT, and there is an important question as to whether it applies to a multilateral treaty to which the EU and its Member States, together with many other States, are parties.

---

[184] Resp. C-M, ¶¶ 47 *et seq*; Resp. Rej., ¶¶ 72 *et seq*; Resp. PHB, ¶¶ 4 *et seq*; EC Amicus Curiae Briefs, 28 April 2017; 22 June 2018.

[185] *Achmea* ruling, ¶ 62.

304.    The Claimant says that: (1) the *Achmea* ruling has no effect on these proceedings because the Tribunal applies international law and not EU law; (2) in any event, its scope is limited to BITs (with an express reference to the law of the Contracting Parties) and it does not apply to multilateral agreements such as the ECT, to which the EU is a party; and (3) this Tribunal should follow the many other decisions of arbitral tribunals under BITs and the ECT which have refused (both before and after the *Achmea* ruling) to accept the intra-EU objection as depriving them of jurisdiction.[186]

305.    The Claimant is incorporated under the laws of Portugal.  Spain and Portugal joined the EC in 1986.  Portugal and Spain ratified the ECT in 1997, and the ECT entered into force on 16 April 1998.

306.    The relevant European treaty provisions at the time the ECT entered into force were those of the Treaty establishing the European Community ("**TEC**"), but there is no material difference between the versions of the relevant Articles since their inception in the EEC Treaty and their present iteration in the TFEU.

307.    The principal question is whether (as Spain and the Commission argue) Article 26 ECT generates obligations between the EU Member States, because the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market (because it is an area in which they had transferred competence to the European Community) and for this reason the EU is a Contracting Party to the ECT.

---

[186] *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, CL-0013; *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction, 6 June 2007, CL-0012; *Jan Oostergetel & Theodora Laurentius v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010, CL-0189; *Achmea B.V. (formerly Eureko) v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 Oct. 2010, CL-0010; *European American Invest. Bank AG (EURAM) v. Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction, 22 Oct. 2012, CL-0190; *Micula v. Romania* (Award); *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (Decision on Jurisdiction not public); *Electrabel v. Hungary* (Award); *EDF Int'l S.A. v. Republic of Hungary*, UNCITRAL (award not public): *see Republic of Hungary v. EDF Int'l S.A.*, Swiss Federal Tribunal Case 4A_34/2015, Judgment, CL-0008); *RREEF v. Spain* (Decision on Jurisdiction); *Charanne v. Spain* (Final Award); *Isolux v. Spain* (Award); *Blusun v. Italy* (Award); *WNC v. Czech Republic* (Award); *I.P. Busta & J.P. Busta v. Czech Republic*, SCC Case V 2015/014, Final Award, 10 March 2017, CL-0187; *Anglia Auto Accessories Ltd. v. Czech Republic*, SCC Case V 2014/181, Final Award, 10 March 2017, CL-0186; *Eiser v. Spain* (Award); *Wirtgen v. Czech Republic* (Final Award); *Novenergia v. Spain* (Final Award); *Masdar v. Spain* (Award); *Antin v. Spain* (Award); *Vattenfall v. Germany* (Decision on the *Achmea* Issue), ¶ 208; *Foresight v. Spain* (Final Award); *Greentech Energy Systems A/S et al. v. Italy*, SCC Arb. No. 2015/095, Final Award, 23 December 2018, CL-0218; *Cube v. Spain* (Decision on Jurisdiction, Liability and Partial Decision on Quantum).

308.    Within this main point, that intra-EU disputes are outside the competence of the Tribunal, are the arguments of Spain and the Commission that (1) the *Achmea* ruling applies to multilateral treaties such as the ECT (and the *Masdar v. Spain* award[187] to the contrary is wrong); (2) EU law is international law; (3) EU law is paramount and displaces any other national or international provision; (4) EU law (relevant to issues in the arbitration) applies to claims in the arbitration; (5) the *Achmea* ruling is binding on the Tribunal because it has to apply EU law.

### b.    Does Achmea Apply to Multilateral Agreements such as ECT?

309.    The starting point is the express wording of the jurisdiction and choice of law provisions in the ECT and the ICSID Convention.

310.    **Energy Charter Treaty**: The effect of Article 26.1-3 is that where there arise "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former" which cannot be settled amicably, the Investor may submit it to a form of dispute resolution including ICSID arbitration "if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention" and in such a case "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration … in accordance with the provisions of this Article" (Article 26.3.a), and the tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law" (Article 26.6).

311.    **ICSID Convention:** By Article 25(1): "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally."

---

[187] *Masdar v. Spain* (Award), ¶¶ 679-680.

312.  By Article 41.1: "The Tribunal shall be the judge of its own competence."

313.  By Article 42.1: "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable."

314.  With regard to jurisdiction, the combined effect of these provisions on their face is that the Tribunal has jurisdiction where the investor is a national of a Contracting Party and the respondent State is a Contracting Party. Those conditions are plainly fulfilled since Portugal and Spain are ECT Contracting Parties, the Claimant is a Portuguese company, and both Spain and Portugal are parties to the ICSID Convention.

315.  So far as choice of law is concerned, the combined effect of Article 42(1) of the ICSID Convention and Article 26.6 ECT is that the Tribunal, which has jurisdiction under Article 26 ECT, applies, by virtue of Article 26.6 ECT, the ECT Treaty and "applicable rules and principles of international law."

316.  The Parties plainly accept that the Tribunal is the judge of its own competence, as is expressly recognised by Article 41(1) ICSID Convention.

317.  There is, of course, no suggestion that Spain or Portugal lacked capacity in the sense of Article 6 of the VCLT.

318.  There are, therefore, three ways in which the Spain and the Commission can argue that the Tribunal lacks jurisdiction to determine the dispute.

319.  The first is to say that, as a matter of construction, the ECT Treaty does not apply to the present dispute. This is the principal basis of the argument that, because of the provisions relating to REIOs, the Tribunal has no jurisdiction because an investment by an EU investor in another EU Member State is not an investment in the "Area" of another Member State for the purposes of Article 26.1 ECT.

320.    The second way of putting the argument is to say that EU law is to be applied because (a) it is applicable international law; (b) EU law has primacy; and (c) EU law precludes intra-EU investment disputes from being submitted to extra-EU dispute settlement.

321.    The third way (which is a variant on the second) is to say that the ECT dispute settlement provisions are inapplicable because they are inconsistent with EU Treaty obligations and therefore inapplicable by virtue of the VCLT or the ECT.

### c.    The Regional Economic Integration Organization (REIO) Point

322.    The argument of Spain and the Commission is that: (1) the ECT acknowledges the special nature of the EU as an international organisation constituted by States to which they have transferred competence over certain matters: Articles 1.3 and 36.7 ECT; and (2) the effect of the ECT is that in such circumstances relationships between EU Member States are governed by EU law: Articles 1.2 and 1.10 ECT.[188]

323.    The relevant provisions of the ECT are as follows.

324.    By Article 1:

> (2) "Contracting Party" means a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force.
>
> (3) "Regional Economic Integration Organization" means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.
>
> …
>
> (10) "Area" means with respect to a state that is a Contracting Party:
>
> (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; …

---

[188] See especially EC Amicus Curiae Brief, 22 June 2018, ¶¶ 59 *et seq*.

…

> With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.

325.    By Article 25:

> (1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.

> (2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalizing, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.

326.    The dispute settlement provisions of the ECT apply to "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former": Article 26.1 ECT.

327.    By Article 36.7 ECT:

> A Regional Economic Integration Organization shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organization shall not exercise its right to vote if its member states exercise theirs, and vice versa.

328.    The Tribunal considers[189] that these provisions do not assist Spain in its objections to jurisdiction. Article 26.1 ECT plainly means that the "investment in the Area of the former," i.e., the Contracting Party, is an investment in the national territory of the respondent State.  The fact that the EU is also a Contracting Party and a "Regional Economic International Organization" does not mean in the context of Article 26.1 that the Area is the territory of the EU as a whole, which would make no sense.  Neither can it in itself bar the Tribunal's jurisdiction; nor can the Tribunal's jurisdiction be removed by the fact that the ECT recognises that competence may be transferred to such an REIO, or the fact that in certain circumstances the Organization may vote instead of the Member States. Article 25 ECT does not prevent REIO members from agreeing to other obligations under a different treaty regime, such as the ECT.

### d.    Disconnection Clause

329.    Nor is there anything express or implied in these provisions to support the EC's argument[190] that there is an implied "disconnection clause," i.e., a provision that disapplies certain provisions of a treaty in mutual relations between certain parties. As the tribunal in *RREEF v Spain* said: "The purpose of a disconnection clause is to make clear that EU Member States will apply EU law in their relations *inter se* rather than the convention in which it is inserted ... given that there is no disharmony or conflict between the ECT and EU ... there was simply no need for a disconnection clause, implicit or explicit…"[191]

### e.    EU Law, the Achmea Ruling Point, and the VCLT

330.    The principally relevant provisions of EU law are as follows:

(1)    **Article 267 TFEU (formerly, with immaterial differences, Article 177 EEC Treaty and Article 234 TEC)**

---

[189] See also *Isolux v. Spain* (Award), ¶¶ 630-640; *Antin v. Spain* (Award), ¶¶ 217-221; *Masdar v.* Spain (Award), ¶¶ 315-322; *Charanne v. Spain* (Final Award), ¶¶ 427-432.

[190] EC Amicus Curiae Brief, 22 June 2018, ¶¶ 91 *et seq*.

[191] *RREEF v. Spain* (Decision on Jurisdiction), ¶ 82.

The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

(a) the interpretation of the Treaties;

…

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

…

(2)  **Article 344 TFEU (formerly, with immaterial differences, Article 219 EEC Treaty and Article 292 TEC)**

Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

(3)  **Article 351 TFEU (formerly, with immaterial differences, Article 234 EEC Treaty and Article 307 TEC)**

The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.

In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded

95

under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.

331.    Article 16 ECT provides:

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III ["Investment Promotion and Protection", which includes Articles 10 and 13] or V ["Dispute Settlement", which includes Article 26] of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.

332.    The effect of Article 26.1-3 ECT is that where there arise "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former" which cannot be settled amicably, then the Investor party may submit it to a form of dispute resolution including ICSID arbitration "if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention" and in such a case "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration … in accordance with the provisions of this Article" (Article 26.3.a), and the tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law" (Article 26.6).

> ### *f.     The Vienna Convention on the Law of Treaties (VCLT)*

333.    Not all of the parties to the ECT are parties to the VCLT, but the International Court of
Justice and other international tribunals have recognised that the provisions of the VCLT
on the interpretation of treaties reflect customary international law,[192] and it is therefore
convenient to refer where relevant to the VCLT. The VCLT provides in Article 30 (which
is headed "Application of successive treaties relating to the same subject matter"):

> 1. Subject to Article 103 of the Charter of the United Nations, the
> rights and obligations of States parties to successive treaties relating
> to the same subject matter shall be determined in accordance with
> the following paragraphs.
>
> …
>
> 3. When all the parties to the earlier treaty are parties also to the later
> treaty but the earlier treaty is not terminated or suspended in
> operation …, the earlier treaty applies only to the extent that its
> provisions are compatible with those of the later treaty.
>
> 4. When the parties to the later treaty do not include all the parties
> to the earlier one:
>
> (a) as between States Parties to both treaties the same rule applies as
> in paragraph 3;
>
> (b) as between a State party to both treaties and a State party to only
> one of the treaties, the treaty to which both States are parties governs
> their mutual rights and obligations.

334.    By Article 31 ("General rule of interpretation"):

> 1. A treaty shall be interpreted in good faith in accordance with the
> ordinary meaning to be given to the terms of the treaty in their
> context and in the light of its object and purpose.
>
> 2. The context for the purpose of the interpretation of a treaty shall
> comprise, in addition to the text, including its preamble and annexes:

---

[192] *See* Gardiner, Treaty Interpretation, 2d ed 2015, pp. 13-17.

(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) any relevant rules of international law applicable in the relations between the parties.

4. A special meaning shall be given to a term if it is established that the parties so intended.

…

335.    By Article 32:

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a) leaves the meaning ambiguous or obscure; or

(b) leads to a result which is manifestly absurd or unreasonable.

336.    By Article 41.1 ("Agreements to modify multilateral treaties between certain of the parties only"):

Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

(a) the possibility of such a modification is provided for by the treaty; or

(b) the modification in question is not prohibited by the treaty and:

(i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

(ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

### g.    *The Achmea Ruling*

337.    In determining the scope and effect of the *Achmea* ruling, it is important to put its background in context, and to give a detailed account of the reasoning.

338.    The arbitration to which the ruling gave rise was an UNCITRAL arbitration (with the PCA as Registry) with a seat in Germany brought under the Netherlands-Czechoslovakia BIT by a Dutch investor against Slovakia.  The tribunal awarded damages against Slovakia, which sought, in the German courts, to have the award set aside on the ground (*inter alia*) that the award was contrary to public policy because the tribunal was unable to make a reference to the CJEU on questions of EU law which it had failed to take into account.

339.    So far as material, the questions referred by the BGH were:

(1)    Does Article 344 TFEU *preclude the application of a provision in a bilateral investment protection agreement*[193] between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter state before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

---

[193] *Slowakische Republik v. Achmea BV*, Case C-284/16, Opinion of Advocate General Wathelet, 19 September 2017, CL-197. Emphasis added.

(2)    If question (1) is to be answered in the negative: Does Article 267 TFEU preclude the application of such a provision?

340.    Wathelet A-G's opinion was that Articles 267 TFEU and 344 TFEU were to be interpreted as not precluding the application of an investor/State dispute settlement mechanism established by means of a bilateral investment agreement concluded before the accession of one of the Contracting States to the European Union and providing that an investor from one Contracting State might, in the case of a dispute relating to investments in the other Contracting State, bring proceedings against the latter State before an arbitral tribunal.

341.    In the course of his opinion he said:

> Furthermore, all the Member States and the Union have ratified the Energy Charter Treaty, signed at Lisbon on 19 December 1994. That multilateral treaty on investment in the field of energy operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense, the material provisions for the protection of investments provided for in that Treaty and the [investor-State dispute settlement] mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.[194]

342.    The answer by the CJEU, however, was that Articles 267 and 344 TFEU were to be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one Member State might, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

343.    The crucial steps in the legal reasoning were:

---

[194] *Ibid.*, ¶ 43.

(1)     An international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the court.[195]

(2)     That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties: CJEU Opinion 2/13 (European Convention on Human Rights).[196]

(3)     The autonomy of EU law with respect both to the law of the member states and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law.[197]

(4)     EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of provisions which are applicable to their nationals and to the Member States themselves.[198]

(5)     Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other: Opinion 2/13, paras 165-167.[199]

(6)     The Member States are obliged, by reason, *inter alia*, of the principle of sincere co-operation, to ensure the application of and respect for EU law, and to take for those purposes any appropriate measure to ensure fulfilment of the obligations

---

[195] *Achmea* ruling, ¶ 32.

[196] *Id.*

[197] *Achmea* ruling, ¶ 33.

[198] *Id.*

[199] *Id.*

arising out of the Treaties or resulting from the acts of the institutions of the EU: Opinion 2/13, paras 168 and 173.[200]

(7)  In order to ensure that the specific characteristics and the autonomy of the EU legal order, it is for the national courts and tribunals and the CJEU to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law.[201]

(8)  The EU judicial system has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as the particular nature of the law established by the Treaties: Opinion 2/13, para. 176.[202]

344.  The application of those principles involved the following steps:

(1)  Under the terms of BIT Article 8.6, the arbitral tribunal was called on to rule on possible infringements of the BIT, but in order to do so it was obliged to take account in particular of the law in force of the Contracting Party concerned and other relevant agreements between the Contracting Parties, and might therefore be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital.[203]

(2)  The arbitral tribunal was not part of the judicial system of the Netherlands or Slovakia, and it was the exceptional nature of the tribunal's jurisdiction compared with that of the courts of the two Member States that was one of the principal reasons for the existence of Article 8 of the BIT.[204]

---

[200] *Achmea* ruling, ¶ 34.

[201] *Ibid.*, ¶ 36.

[202] *Ibid.*, ¶ 37.

[203] *Ibid.*, ¶¶ 39-42.

[204] *Ibid.*, ¶¶ 43-45.

(3)     Consequently, it could not be classified as a court or tribunal "of a Member state" within the meaning of Article 267 TFEU.[205]

(4)     Under Article 8.7 of the BIT, the decision of the arbitral tribunal was final, and, pursuant to Article 8.5 of the BIT, the arbitral tribunal was to determine its own procedure applying the UNCITRAL arbitration rules and was itself to choose its seat and consequently the law applicable to the procedure governing judicial review of the validity of the award.[206]

(5)     Because the arbitral tribunal chose to sit in Frankfurt am Main, German law was applicable to the procedure governing judicial review of the validity of the arbitral award, but the review was a limited review, concerning in particular the validity of the arbitration agreement under the applicable law and the consistency with public policy of the recognition or enforcement of the arbitral award.[207]

(6)     By contrast with commercial arbitration, where the requirements of efficient arbitration proceedings justify limited review of arbitral awards by the courts of the Member States, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference for a preliminary ruling,[208] arbitration proceedings under Article 8 of the BIT derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies in the fields covered by EU law,[209] disputes which may concern the application or interpretation of EU law.[210]

(7)     By concluding the BIT, the Member States established a mechanism for settling disputes between an investor and a Member State which could prevent those

---

[205] *Ibid.*, ¶¶ 46, 49.

[206] *Ibid.*, ¶ 51.

[207] *Ibid.*, ¶¶ 52-53.

[208] Citing *Eco Swiss China Time Ltd v. Benetton International NV*, Case C-126/97 [1999] ECR I-3055, ¶¶ 35, 36 and 40; and *Mostaza Claro v. Centro Móvil Milenium SL*, Case C-168/05) [2006] ECR I-10421, ¶¶ 34–39.

[209] Citing *Associação Sindical dos Juízes Portugueses*, Case C-64/16 [2018] ECLI:EU:C:2018:117, ¶ 34.

[210] *Achmea* ruling, ¶¶ 54-55.

103

disputes from being resolved in a manner that ensured the full effectiveness of EU law, even though they might concern the interpretation or application of that law.[211]

(8)     In a passage on multilateral treaties the CJEU said:

It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law.  The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected (see, to that effect, Opinion 1/91 (EEA Agreement-I) of 14 December 1991, EU:C:1991:490, paragraphs 40 and 70; Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, paragraphs 74 and 76; and Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 182 and 183).

In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States.  Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation …[212]

345.    The *dispositif* has been set out above, but it is helpful to repeat it in context (emphasis added):

Articles 267 and 344 TFEU must be interpreted as *precluding a provision in an international agreement concluded between Member*

---

[211] *Ibid.*, ¶ 56.

[212] *Ibid.*, ¶¶ 57-58.

> *States, such as Article 8* of the Agreement on encouragement and
> reciprocal protection of investments between the Kingdom of the
> Netherlands and the Czech and Slovak Federative Republic, under
> which an investor from one of those Member States may, in the event
> of a dispute concerning investments in the other Member State, bring
> proceedings against the latter Member State before an arbitral tribunal
> whose jurisdiction that Member State has undertaken to accept.

346.    On 15 and 16 January 2019, the 28 EU Member States issued declarations on the legal
consequences of the *Achmea* ruling.

347.    Twenty-two of the Member States (including Portugal and Spain) expressed the view that
the judgment applied also to international agreements concluded by the EU, including the
ECT, which were an integral part of the EU legal order and must therefore be compatible
with the Treaties. Accordingly, if Article 26.3 ECT were interpreted as containing an
arbitration clause applicable between Member States, "that clause would be incompatible
with the Treaties and thus would have to be disapplied."[213]

348.    Five other Member States issued a declaration, which did not express a view on the effect
of the *Achmea* ruling on multilateral treaties such as the ECT. They said:

> The *Achmea* case concerns the interpretation of EU law in relation to an
> investor-state arbitration clause in a bilateral investment treaty between
> Member States.  The Member States note that the *Achmea* Ruling is
> silent on the investor-state arbitration clause in the Energy Charter
> Treaty.  A number of international arbitration tribunals post the *Achmea*
> Ruling have concluded that the Energy Charter Treaty contains an
> investor-State arbitration clause applicable between EU Member States.
> This interpretation is currently contested before a national court in a
> Member State.[214] Against this background, the Member States underline
> the importance of allowing for due process and consider that it would
> be inappropriate, in the absence of a specific judgment on this matter,
> to express views as regards the compatibility with Union law of the intra
> EU application of the Energy Charter Treaty.[215]

---

[213] Declaration of the Representatives of the Governments of the Member States, 15 January 2019, p. 2, C-0309.

[214] This is a reference to *Novenergia II v. Spain* in the Svea Court of Appeal. Hungary issued a separate declaration to
the same effect, but omitting any reference to the Swedish proceedings.

[215] Declaration of the Representatives of the Governments of the Member States of 16 January on the Enforcement of
the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, p. 3, C-0310.

349. The first question is whether the *Achmea* ruling has any application to multilateral treaties such as the ECT. The majority of EU Member States (22 out of the then 28) issued a Declaration to say that it did so apply. But in the view of the Tribunal, that was a political act, without legal relevance or force and does not affect the jurisdiction of the Tribunal; and in particular, as a declaration by only some of the parties to the ECT it cannot, for the purposes of Article 31 VCLT, be regarded as a subsequent agreement between the parties regarding its interpretation or application, or as practice establishing agreement. Consequently, the Tribunal will address this question without giving any weight to the Declaration.

350. The *Achmea* ruling concerned BITs, but, as indicated above, Wathelet A-G expressed the view in the course of his opinion that the investor-State provisions in the ECT operated as between Member States because it was concluded not as an agreement between the EU and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing.[216] But his overall view that there was no incompatibility between dispute resolution provisions in BITs and EU law was not accepted by the CJEU, and therefore only limited weight can be given to his view on the ECT.

351. It is therefore necessary to turn to the ruling of the CJEU.  The relevant paragraphs have been quoted above.

352. What is being said there is that the EU has competence in the field of international relations to enter into an international agreement providing for the establishment of a court created or designated by such agreements as regards the interpretation and application of their provisions and whose decisions are binding on the institutions, including the CJEU, are not in principle incompatible with EU law, provided that the autonomy of the EU and its legal order is respected.

---

[216] *Slowakische Republik v. Achmea BV*, Case C-284/16, Opinion of Advocate General Wathelet, 19 September 2017, CL-197, ¶ 43.

353.    There are two reasons for supposing that the CJEU did not express the view that investor-State dispute resolution procedures in a multilateral agreement such as the ECT were outside the scope of its intra-EU ruling.  The first is that the following paragraph suggests, by its reference to the BIT being concluded "not by the EU but by member states," that it was mainly directing itself to agreements with third States.  The second reason is the citation of previous rulings, two of which concerned treaties concluded by the European Community or the European Union with third states: Opinion 1/91 (EEA Agreement - I) EU:C:1991:490, paras 40 and 70; and Opinion 2/13 (Accession of the EU to the ECHR), EU:C:2014:2454, paras 182 and 183).  The third ruling, Opinion 1/09 EU:C:2011:123, concerned the draft Agreement creating a unified patent litigation system, to which the Member States were parties, and concerned the draft agreement on the European and Community Patents Court.

354.    In Opinion 1/09, the CJEU ruled that although the CJEU had no jurisdiction to rule on direct actions between individuals in the field of patents (since that jurisdiction was held by the courts of the Member States), the Member States could not confer the jurisdiction to resolve such disputes on a court created by an international agreement which would deprive courts of their task, as courts within the EU legal order, to implement EU law and, thereby, of the power or obligation in Article 267 TFEU to refer questions for a preliminary ruling in the field concerned.

355.    The essence of these decisions is contained in Opinion 2/13:

> The Court of Justice has admittedly already stated in that regard that an international agreement providing for the creation of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not, in principle, incompatible with EU law; that is particularly the case where, as in this instance, the conclusion of such an agreement is provided for by the Treaties themselves. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions (see Opinions 1/91, EU:C:1991:490, paragraphs 40 and 70, and 1/09, EU:C:2011:123, paragraph 74).

107

> Nevertheless, the Court of Justice has also declared that an international agreement may affect its own powers only if the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order (see Opinions 1/00, EU:C:2002:231, paragraphs 21, 23 and 26, and 1/09, EU:C:2011:123, paragraph 76; see also, to that effect, judgment in *Kadi and Al Barakaat International Foundation* v *Council and Commission*, EU:C:2008:461, paragraph 282).

> In particular, any action by the bodies given decision-making powers by the ECHR, as provided for in the agreement envisaged, must not have the effect of binding the EU and its institutions, in the exercise of their internal powers, to a particular interpretation of the rules of EU law (see Opinions 1/91, EU:C:1991:490, paragraphs 30 to 35, and 1/00, EU:C:2002:231, paragraph 13).[217]

356.    The Tribunal will therefore  assume, contrary to the contention of the Claimant,[218] that there is at least the possibility, and perhaps the probability, particularly as a result of the citation of Ruling 1/09 on the European and Community Patents Court, and the use of the term "international agreement" in the *dispositif* (by contrast with the term "bilateral investment protection agreement" in the reference by the BGH) that if the compatibility of the ECT with the TFEU arose before the CJEU, it would apply the *Achmea* ruling to the dispute resolution mechanism under the ECT.

### h.    EU Law as International Law, and the Primacy of EU Law

357.    It is also necessary to mention three fundamental points about EU law. First, it has been established for more than 50 years that, from the viewpoint of EU law, the European Union "constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only Member States but also their nationals".[219] In *Electrabel v Hungary*[220] it was said that EU law is international law because it is rooted in international treaties as

---

[217] Opinion 2/13, ¶¶ 182-184.

[218] E.g.  Claimant's Comments on Declarations of Member States dated 19 February 2019, ¶¶ 3 *et seq.*

[219] *NV Algemene Transport- en Expeditie Onderneming Van Gend en Loos v. Netherlands Inland Revenue Administration,* Case 26/62  [1962] ECR 1, 12, p. 2.

[220] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶¶ 4.120 *et seq.*

legal instruments under public international law; and EU law as a whole is part of the international legal order, without any material distinction between the EU Treaties and the "droit dérivé," with the result that all EU legal rules are part of a regional system of international law and therefore have an international legal character (citing *Van Gend den Loos*).

358.    Like the tribunal in *Vattenfall AB v. Germany*,[221] this Tribunal considers that this formula can be accepted on the basis that "the corpus of EU law derives from treaties that are themselves a part of, and governed by, international law, and contains other rules that are applicable on the plane of international law, while also containing rules that operate only within the internal legal order of the EU and, at least arguably, are not a part of international law …".  The tribunal in *Vattenfall AB v. Germany* went on to say that since the CJEU was empowered by the EU treaties to give preliminary rulings on the interpretation of EU law, including the treaties, the *Achmea* ruling's "interpretation of the EU Treaties likewise constitute[d] a part of the relevant international law".[222]

359.    But in the view of this Tribunal, the point that EU law (or most of it) is international law, or that the rulings of the CJEU are part of international law is not in any sense conclusive. The question still remains as to whether EU law and the rulings of the CJEU are part of the applicable international law.

360.    The second point is that it has also been established for more than 50 years that it is a fundamental principle of EU law that the EU has created its own legal system, which is an integral part of the legal system of Member States and which their courts are bound to apply.[223]

361.    The third point is that the system of references under what is now Article 267 TFEU is designed to ensure the proper application and uniform interpretation of EU law in all the

---

[221] *Vattenfall v. Germany* (Decision on the *Achmea* Issue), ¶ 146.

[222] *Ibid.*, ¶ 148.

[223] *Flaminio Costa v. ENEL*, Case 6/64 [1964] ECR 585, 593, C-0289.

Member States between national courts, in their capacity as courts responsible for the application of EU law, and the CJEU.[224]

362. But even if, as a matter of EU law, final determination of its content is reserved to the CJEU, it does not follow that non-EU courts and tribunals are precluded from deciding issues of EU law.[225]  Indeed, it would be absurd if a court in a non-Member State, which otherwise had jurisdiction over a dispute, but could not make a reference to the CJEU, would have to refrain from dealing with issues of EU law raised by a party. The same must be true for arbitral tribunals in non-Member States, and, *a fortiori*, for international tribunals.

363. Although phrased in terms of interpretation of two provisions of the TFEU, it is hard to read the *Achmea* ruling as a normal case of treaty interpretation, since Article 267 is simply the latest iteration (originally in Article 177 of the EEC Treaty) of the power (and in some cases the duty) of national courts to make references to the CJEU, and Article 344 (originally Article 219 of the EEC Treaty) simply prevents Member States from submitting disputes concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties.

364. The residual remedy for a national of an EU Member State who wishes to complain of a breach by an EU Member State of the relevant provisions of the ECT is to commence an ICSID arbitration against that State.  The only time at which national courts will normally be engaged in this process is at the time of enforcement.

365. It is impossible to see how, on the face of Articles 267 and 344 TFEU, and in accordance with normal rules of treaty interpretation, the effect of Article 26.3 ECT is to prevent national courts from making references to the CJEU or to allow Member States to submit disputes concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the EU Treaties.

---

[224] *CILFIT srl v. Ministry of Health,* Case 283/81 [1981] ECR 3415, 3428.

[225] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶¶ 4.146-147.

366.    The *Achmea* ruling is a decision on the constitutional order of the EU in support of the policy of European integration rather than an orthodox application of the rules of treaty interpretation.  As such the ruling of the CJEU is entitled to the greatest respect from an international arbitral tribunal.  But such a tribunal is not in any sense bound by the ruling.  Nor, consequently, can the Tribunal find that on any normal basis of interpretation under customary international law or the VCLT that the dispute resolution provisions of the ECT are incompatible with Articles 267 and 344 TFEU.

367.    It follows that, in the view of the Tribunal, there is no conflict between Article 26.1-3 ECT and Articles 267 and 344 TFEU such as to bring the principles reflected in Articles 30 or 41 VCLT into play.  Nor does Article 16 ECT have the effect of invalidating the dispute resolution provisions in Part V of the ECT, since, even if (which is not the case) the EC and EU Treaties gave a right to dispute resolution in respect of the subject matter of Part III (investment protection) and Part V (dispute settlement) of the ECT, Part V would still be operative if it were more favourable to the investor.

368.    The *Achmea* ruling says that the agreement to arbitrate is precluded,[226] not that it is void, or incompatible with the TEC/TFEU, and consequently the ruling leaves open the question of the effect of preclusion, and in particular whether its effect is that any such provision ceased to have effect, or whether Member States should modify or abrogate the BITs between them.

369.    The Commission says that the Tribunal should decline jurisdiction on the basis that an eventual award in the Claimant's favour would be incompatible with EU law and unenforceable.[227]  This is not relevant to the Tribunal's jurisdiction: "While the Tribunal is mindful of the duty to render an enforceable decision and ultimately an enforceable award, the Tribunal is equally conscious of its duty to perform its mandate granted under the ECT."[228]

---

[226] *Achmea* ruling, ¶ 60 and the *dispositif*.

[227] EC *Amicus Curiae* Brief, 22 June 2018, ¶ 139.

[228] *Vattenfall v. Germany* (Decision on the *Achmea* Issue), ¶ 230; see also *Ion Micula v. Romania* (Award), ¶¶ 330, 340-341.

370. The Tribunal therefore concludes:[229]

(1)     The Tribunal is "the judge of its own competence:" ICSID Convention, Article 41(1).

(2)     The question of jurisdiction must be distinguished from the question of applicable law, or choice of law. As indicated above, Article 42.1 provides that the "Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties ..."

(3)     In the present case Article 26.6 ECT provides that the "tribunal established ... shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

(4)     The issues in dispute are those concerning alleged breaches of obligations relating to investments: Article 26.1 ECT. Accordingly, Article 42(1) ICSID Convention and Article 26.6 ECT do not determine jurisdiction, and are not relevant for present purposes.

(5)     By virtue of Article 25(1) ICSID Convention jurisdiction exists where (1) there is a legal dispute which (2) arises directly out of an investment, (3) between a Contracting State and a national of another Contracting State, and (4) which the parties to the dispute consent in writing to submit to the Centre.

(6)     By virtue of Article 26.1-3 ECT: (1) where there arise disputes between a Contracting Party and an investor of another Contracting Party relating to an investment of the latter in the area of the former, (2) which cannot be settled amicably, (3) the investor party may submit it to ICSID arbitration, (4) if the Contracting Party of the investor and the Contracting Party to the dispute are both parties to the ICSID Convention.

---

[229] Since the *Achmea* ruling the results in other ECT cases have been in the same sense: *Masdar v. Spain* (Award); *Antin v. Spain* (Award); *Vattenfall v. Germany* (Decision on the *Achmea* Issue); *Foresight v. Spain* (Final Award).

(7)    There is plainly a dispute between the Claimant and Spain which arises out of an investment in Spain, and the Contracting Party of the investor, Portugal, is party to the ECT and to the ICSID Convention, as is Spain.

(8)    Accordingly Spain has given "its unconditional consent to the submission of [the] dispute to international arbitration" (Article 26.3.a ECT), and the Claimant has taken advantage of that consent.

(9)    If the principles in the *Achmea* ruling apply to the ECT as a matter of EU law, that cannot affect the jurisdiction of the Tribunal under the applicable international law, namely the ECT and the ICSID Convention.

(10)   For the reasons given above there is nothing in the combination of the ECT and EU law which could give rise to an implication of a "disconnection" clause.

(11)   There is no conflict between Article 26.1-3 ECT and Articles 267 and 344 TFEU such as to bring Article 30 VCLT into play.

(12)   It is therefore not necessary to decide whether the effect of Article 16 ECT is that, even if there were an inconsistency between Articles 267 and 344 TFEU (and their predecessors) and the ECT, there would be no derogation from the dispute resolution provisions in Part V of the ECT.

(13)   There is nothing in the *Achmea* ruling which could deprive a Tribunal so constituted of jurisdiction. Neither it, nor the decisions which it cites on multilateral agreements, suggest that Member States had no *capacity* to enter into agreements such as the ECT.

(14)   The fact that the Tribunal, as a mechanism of international law, and not national law, cannot make a reference to the CJEU, does not deprive it of jurisdiction under international law. Nor can the plain meaning of the jurisdictional provisions of the ECT and the ICSID Convention be affected by the CJEU's interpretation of Articles 267 and 344 TFEU.

(15)   The declaration of the majority of the Member States of January 2019 is a political declaration without legal force and *ex post facto* cannot and does not affect the

113

jurisdiction of the Tribunal; and in particular, as a declaration by only some of the parties to the ECT it cannot, for the purposes of Article 31 VCLT, be regarded as a subsequent agreement between the parties regarding its interpretation or application, or as subsequent practice establishing such agreement.

(16)    The fact that EU law is international law for at least some purposes does not affect the conclusion that, on the plain meaning of the ECT and the ICSID Convention, the Tribunal has jurisdiction.  It is true that EU law is international law because it is rooted in international treaties, but it does not follow that all of EU law is international law for all purposes, nor that it will necessarily be the applicable law in all circumstances.

(17)    The fact that EU law has primacy under the principle in *Costa v. ENEL* does not affect the position.  The principle is concerned with primacy over national law and not international law, whether customary law or treaty law.

(18)    The fact that an Award of the Tribunal may not be effectively enforceable in an EU Member State does not affect its jurisdiction.

371.    It follows that the Tribunal has jurisdiction over the dispute.

**(2)    The Taxation Carve-Out**

372.    Article 21 ECT provides:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> …
>
> (3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:
>
> (a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax

114

provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; …

…

(5) (a) Article 13 shall apply to taxes.

…

(7) For the purposes of this Article:

(a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

…

(d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

373. Article 21.3 ECT refers to Article 10.2 and Article 10.7 ECT. Article 10.2 ECT, together with Article 10.3 ECT, imposes an obligation on Contracting Parties to endeavour to accord to investors of other Contracting Parties treatment which is no less favourable than that which they accord to their own investors or to investors of any other Contracting Party or any third State, whichever is the most favourable.

374. Article 10.7 ECT provides:

115

> Each Contracting Party shall accord to Investments in its Area of
> Investors of other Contracting Parties, and their related activities
> including management, maintenance, use, enjoyment or disposal,
> treatment no less favourable than that which it accords to
> Investments of its own Investors or of the Investors of any other
> Contracting Party or any third state and their related activities
> including management, maintenance, use, enjoyment or disposal,
> whichever is the most favourable.

### a.    The Legislation

375.    Law 15/2012[230] on tax measures for energy sustainability introduced a 7% tax on all
revenue received from the generation of electricity, TVPEE, whether from conventional or
renewable sources.  The preamble stated that this measure was introduced to address tariff
imbalance and to meet environmental concerns: "The objective of this Act is to harmonise
our tax system with a more efficient use which greater respects the environment and
sustainability, values which have inspired this reform of the tax system, and as such in line
with the basic principles governing the tax, energy, and of course environmental policies
of the European Union."

376.    By Article 1 of Law 15/2012: "The tax on the value of the production of electrical energy
is a tax of a direct and real nature levied on the performance of activities of production and
incorporation into the electricity system of electrical energy, measured in power station
busbars, through each of the installations indicated in Article 4 of this Act." The effect is
that the TVPEE is a tax on receipts.

377.    By Article 4.1 of Law 15/2012: "…[T]he taxable event is the production of electrical
energy and its incorporation into the electricity system, measured in power station busbars
…"

378.    Act 15/2012 provided that an amount equal to that collected through the TVPEE would be
allocated to finance the costs of the Electricity System.

---

[230] R-003. See also Claimant's partial translation, C-040.

116

### b.    The Parties' Position in Summary

379.    The arguments have been set out in full above.

380.    Spain says that the TVPEE is a taxation measure for purposes of the ECT. It is a taxation measure both under Spanish law and international law.  It was established by law, it imposes an obligation on a class of persons, and it produces a revenue for the State. The fact that an amount equivalent to this revenue is allotted to finance the costs of the electricity system does not affect its quality as a tax. There are no grounds for impugning Spain's good faith, and the tax is bona fide and non-discriminatory.

381.    The Claimant says that the TVPEE is not a bona fide tax, but a disguised and unlawful attempt to reduce the financial incentives Spain had promised to investors. It therefore falls outside the carve-out for taxation measures in Article 21 ECT.  Commonly used criteria include: (i) the measure must serve a public purpose; (ii) it must contribute to raise general revenue for the state; and (iii) it should affect a broad class of persons. By applying the TVPEE to all revenue including incentive tariffs, and without deducting depreciation, renewable plants effectively paid a much higher tax on the same amount of electricity production than conventional plants without being able to pass on the costs to consumers. The discrimination and lack of proportionality negated the public purpose. Funds raised from the TVPEE were not directed to the general treasury, and were not even ear-marked for grid development or maintenance works. Law 15/2012 provided that revenues raised from the measures would flow back into the electricity system in order to reduce the tariff deficit. State revenues as such did not increase.  Law 15/2012 was not imposed on a broad class of persons because, as noted above, it had a massively disproportionate impact on renewable energy producers. At this point, there is not enough information to determine whether the effects of the "tax" have been fully neutralised as Spain claims.

### c.    Discussion

382.    Article 21 ECT does not contain a comprehensive definition of "Taxation Measures", although Article 21.7.a does indicate that they include any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision or local authority; and any provision relating to taxes of any convention for the avoidance of double taxation

or of any other international agreement or arrangement by which the Contracting Party is bound; Article 21.7 gives a (probably non-exhaustive) list of measures to be regarded as taxes on income or capital for the purposes of (inter alia) Article 21.3, and excludes customs duties.

383.    In order to ascertain whether a measure qualifies under Article 21 ECT it is first necessary to consider the characterisation of the measure in the State's domestic law. In order for Article 21 to apply, the domestic law of the host State must characterise the measure as a tax in nature and substance. That is clear from several references in Article 21 to taxation measures of the Contracting Parties (e.g., Article 21.1, 3) or "taxes of the domestic law of the Contracting Party" (Article 21.7.a.i).

384.    But simply describing a measure as a tax is not sufficient. Article 21.7 provides that the term "Taxation Measure" includes "any provision relating to taxes of the domestic law of the Contracting Party." But even if a measure is characterised as a tax by national law, the characterisation by domestic law is not conclusive for the purposes of international law. In the view of the Tribunal, to qualify as a taxation measure, the measure must be both a tax under national law and also under the ECT. In the absence of a comprehensive definition in the ECT, resort must be had to international arbitral decisions.

385.    There is no doubt that the TVPEE is regarded as a taxation measure under Spanish law. Law 15/2012 described itself as relating to "fiscal measures" and Law 17/2012[231] on the Budget for 2013 provided that the taxes raised under Law 15/2012 should be assigned to finance the costs of the promotion of renewable energy in the electricity system under the Electricity Act. In deciding that the legislation on TVPEE was justified by an extraordinary and urgent need to make cost adjustments in the electricity sector and was compliant with the Spanish Constitution, the Constitutional Court proceeded on the basis that it was a tax: November 6, 2014,[232] as did decisions of the Spanish High Court in June 2014.[233]

---

[231] R-0023.

[232] R-0018.

[233] R-0010; R-0011.

386.   International arbitral practice indicates that for the purpose of determining the taxation carve-out in investment treaties, the following factors are relevant: (1) that it is imposed by law and is part of a regime for the imposition of a tax; (2) that it imposes a liability on classes of persons to pay money to the State for public purposes.[234]

387.   The Tribunal does not accept the Claimant's argument that discrimination and lack of proportionality negate the necessary element of public purpose. Those factors may be evidence of bad faith, but in themselves they cannot turn something which is otherwise a tax for public purposes into something which is not a tax for the purposes of Article 21 ECT.

388.   In view of what is said above, there is no doubt that on its face the TVPEE was imposed by law, was part of the taxation regime in Spain, and imposed a liability on classes of persons to pay the taxes in question for public purposes.

389.   Nevertheless, even if a measure is *prima facie* a taxation measure, it may be outside the carve-out if it is called a taxation measure but is imposed in bad faith for other reasons. In such a case a tribunal would look beyond the form of the measure and consider the reality.

390.   In *Yukos v. Russia*, the tribunal said:

> …the Tribunal finds that, in any event, the carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).
>
> …
>
> To find otherwise would mean that the mere labelling of a measure as "taxation" would be sufficient to bring such measure within the ambit of Article 21(1) of the ECT, and produce a loophole in the

---

[234] *EnCana v. Ecuador* (Award), ¶ 142; *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, ¶ 174, RL-0033; *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, ¶¶ 164 and 165, RL-0036.

protective scope of the ECT. Since the claw-back in Article 21(5) of the ECT relates only to expropriations under Article 13 of the ECT, a State could, simply by labelling a measure as "taxation", effectively avoid the control of that measure under the ECT's other protection standards. It would seem difficult to reconcile such an interpretation with the purpose of Part III of the ECT.[235]

391.    Thus, the *RosInvestCo* tribunal concluded that:

[I]t is generally accepted that the mere fact that measures by a host state are taken in the form of application and enforcement of its tax law, does not prevent a tribunal from examining whether this conduct of the host state must be considered, under the applicable BIT or other international treaties on investment protection, as an abuse of tax law to in fact enact an expropriation.[236]

392.    Similarly, the *Quasar* tribunal opined that:

It is no answer for a state to say that its courts have used the word "taxation" ... in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation.  When agreeing to the jurisdiction of international tribunals, states perforce accept that those jurisdictions will exercise their judgment, and not be stumped by the use of labels.[237]

393.    But it is for a claimant to meet what must be the heavy burden of showing bad faith. It would be a serious matter for a tribunal to find that the exercise of the sovereign power to tax was exercised in bad faith.

394.    The Claimant has been equivocal on this point.  In the Reply,[238] the Claimant said that the TVPEE was "a clever means" to reduce the tariff incentives through a measure which

---

[235] *Yukos v. Russia* (Final Award), ¶¶ 1407, 1433.

[236] *Ibid.*, ¶ 1437, quoting *RosInvestCo UK Ltd. v. The Russian Federation*, SCC Case No. 079/2005, Final Award, 12 September 2010, ¶ 628.

[237] *Ibid.*, ¶ 1438, quoting *Quasar de Valores SICAV S.A., et al. (Formerly Renta 4 S.V.S.A et al.) v. The Russian Federation*, SCC Case No. 24/2007, Award, 20 July 2012, ¶ 179, CL-0166.

[238] Cl. Reply, ¶ 114.

resembled a tax, and was consequently not a *bona fide* taxation measure for the purposes of Article 21 ECT. In the Rejoinder on Jurisdiction, the Claimant said that Spain imposed the tax "under false pretenses for the illicit purpose of reducing the financial incentives that Spain promised to investors;"[239] and "[i]f enacting a measure under false pretenses is not sufficient to demonstrate bad faith, then it is difficult to imagine what would;"[240] and that "Spain obscured the purpose of Law 15/2012 in order to hide its unlawful and discriminatory impact …"[241] But the Claimant also says that it is not required to establish Spain's true intentions or motivations,[242] and in its written and oral opening presentations[243] it said that the decisions in *Eiser v. Spain*,[244] *Isolux v. Spain*,[245] and *Novenergia II v. Spain*[246] focussed incorrectly on Spain's alleged bad faith intent.

395.    The Claimant is plainly trying to suggest actual bad faith without any evidence to prove it, and the Tribunal has no hesitation in concluding that the Claimant has failed to discharge its heavy burden in this respect.

396.    Given this, the Tribunal concludes that there are no grounds for displacing the conclusion reached in paragraph 388 above, namely, that the TVPEE was imposed by law, was part of the taxation regime in Spain, and imposed a liability on classes of persons to pay the taxes in question for public purposes. It follows that the Tribunal has no jurisdiction to consider the Claimant's claims in relation to the TVPEE, other than expropriation claims under ECT Article 13, and only then under the conditions in ECT Article 21.5.

---

[239] Cl. Rej., ¶ 69.

[240] *Ibid.*, ¶ 82.

[241] *Ibid.*, ¶ 84.

[242] *Id.*

[243] Claimant's Opening Presentation Slides 164-165; Tr.-E, Day 1, pp. 129-130.

[244] *Eiser v. Spain* (Award), ¶¶ 258-259 (annulled by *Eiser v. Spain* (Annulment Decision)).

[245] *Isolux v. Spain* (Award), ¶ 726.

[246] *Novenergia v. Spain* (Final Award), ¶ 512.

**B.    LIABILITY**

397.    Put broadly, the Claimant advances two heads of liability that fall within the Tribunal's jurisdiction, first, that the changes made to the regulatory and incentives framework applicable to PV facilities caused loss and damage to the Claimant's investments in breach of the fair and equitable treatment, and related commitments in Article 10(1) ECT, and, second, that Spain expropriated its investments contrary to Article 13(1) ECT. Put in headline terms in its Memorial, the Claimant contends as follows:

> The Energy Charter Treaty affords a number of substantive protections to Claimant's investments, including (i) the right to fair and equitable treatment, (ii) protection against impairment of investments by unreasonable discriminatory measures, (iii) a guarantee that Spain would observe all obligations entered into with respect to the Claimant's investments, and (iv) a prohibition against unlawful expropriation.  Through the measures it implemented between 2010 and 2014, Spain violated not only the spirit and purpose of the ECT, but also each of those four key standards of protection contained in the Treaty.[247]

398.    The Claimant advances its claims under points (i), (ii) and (iii) above by reference to Article 10(1) ECT and its claims under point (iv) above under Article 13(1) ECT.

399.    While these contentions are advanced cumulatively, rather than in the alternative, there is evident overlap between them, notably in respect of the Article 10(1) claims.

**B.1    THE FET AND RELATED CLAIMS**

**(1)    Legal Principles**

400.    By Article 10(1) ECT:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and

---

[247] Memorial, para.343.

> security and no Contracting Party shall in any way impair by
> unreasonable or discriminatory measures their management,
> maintenance, use, enjoyment or disposal. In no case shall such
> Investments be accorded treatment less favourable than that required
> by international law, including treaty obligations. Each Contracting
> Party shall observe any obligations it has entered into with an
> Investor or an Investment of an Investor of any other Contracting
> Party.

401.    The Parties have cited many awards on the applicable legal principles in relation to those,
or comparable, obligations, which may be grouped under the following headings.

*a.    "Stable, Equitable, Favourable and Transparent Conditions"*

402.    On the face of Article 10(1) ECT there is a separate obligation to "create stable, equitable,
favourable and transparent conditions," which includes a "commitment to accord at all
times … fair and equitable treatment."

403.    Some tribunals have taken the view that the stability and transparency obligation is "simply
an illustration of the obligation to respect the investor's legitimate expectations through the
FET standard, rather than a separate or independent obligation."[248]  But nothing turns on
the point in this arbitration[249] because it is clear that stability and transparency are also part
of the FET standard itself.  Thus the tribunal in *Plama v. Bulgaria*[250] said that "stable and
equitable conditions are clearly part of the fair and equitable treatment standard under the
ECT," and the tribunal in *Frontier Petroleum v. Czech Republic* put it in this way:

> Stability means that the investor's legitimate expectations based on
> this legal framework and on any undertakings and representations
> made explicitly or implicitly by the host state will be protected.  The
> investor may rely on that legal framework as well as on
> representations and undertakings made by the host state including
> those in legislation, treaties, decrees, licenses, and contracts.
> Consequently, an arbitrary reversal of such undertakings will

---

[248]*Novenergia v. Spain* (Final Award), ¶ 646; *Isolux v. Spain* (Award), ¶¶ 764-766; see also *Charanne v. Spain* (Final Award), ¶ 476; *Antin v. Spain* (Award), ¶ 527; *Foresight v. Spain* (Final Award).

[249] It has been said to be "an artificial issue:" *RREEF v. Spain* (Decision on Responsibility and Principles of Quantum), ¶ 314.

[250] *Plama v. Bulgaria* (Award), ¶ 173. See also *Foresight v. Spain* (Final Award), ¶ 351; *Novenergia v. Spain* (Final Award), ¶¶ 642-646.

constitute a violation of fair and equitable treatment. While the host state is entitled to determine its legal and economic order, the investor also has a legitimate expectation in the system's stability to facilitate rational planning and decision making.[251]

**b.    Commitment to Accord at all Times Fair and Equitable Treatment**

404.    As developed below, the protection of legitimate expectations can be considered the dominant or most important component of the investor-State FET treaty standard that is reflected in Article 10(1) the ECT and is a common feature of bilateral investment treaties.[252]

**c.    Stability and Transparency**

405.    As indicated above, stability and transparency are included in the express obligation in Article 10(1) ECT for the State to "create stable … and transparent conditions" and are also implicit in the obligation to accord FET, and stability is also part of the legitimate expectation of the investor.

406.    Stability is linked to the investor's legitimate expectations that the legal framework will not be arbitrarily changed and that commitments will be observed. But it does not mean that an investor is protected from any change. The obligation has a relatively high threshold, and the emphasis is on the subversion of the legal regime,[253] or, put differently, it protects against radical or fundamental change.[254]

---

[251] *Frontier Petroleum Services Ltd. v. The Czech Republic*, UNCITRAL, Final Award, 12 November 2010, ¶ 285, CL-0071.

[252] *EDF v. Romania* (Award), ¶ 216; *Saluka v. Czech Republic* (Partial Award), ¶ 302; *Tecmed v. United Mexican States* (Award), ¶ 154; *Waste Management v. United Mexican States* (Award), ¶ 98; *Occidental Exploration and Production Co. v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004, ¶ 183, CL-0058; *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.75; *Enron v. Argentine Republic* (Award), ¶¶ 264-266; *LG&E v. Argentine Republic* (Decision on Liability), ¶¶ 130 and 133.

[253] *Blusun v. Italy* (Award), ¶ 363.

[254] *Charanne v. Spain* (Final Award), ¶ 514; *Novenergia v. Spain* (Final Award), ¶ 654; *Antin v. Spain* (Award), ¶¶ 532 *et seq*; *RREEF v. Spain* (Decision on Responsibility and on the Principles of Quantum), ¶ 323.

407. The duty to provide stable conditions does not mean that a State does not maintain, as it has been put, a reasonable degree of regulatory flexibility[255] or its legitimate right to regulate.[256]  In *AES Summit v. Hungary*, the tribunal said:

> The stable conditions that the ECT mentions relate to the framework within which the investment takes place.  Nevertheless, it is not a stability clause.  A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts.

> Therefore, to determine the scope of the stable conditions that a state has to encourage and create is a complex task given that it will always depend on the specific circumstances that surround the investor's decision to invest and the measures taken by the state in the public interest.[257]

408. Transparency is plainly linked with stability.  Transparency will enable the investor to be shielded from arbitrary change and from the frustration of legitimate expectations.

409. In the context of the ECT, in *Electrabel v. Hungary*, the tribunal said:

> Article 10(1) ECT not only speaks of fair and equitable treatment and equitable and stable conditions, it also refers to 'favourable and transparent conditions'.  The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations…[258]

---

[255] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.77.

[256] *Plama v. Bulgaria* (Award), ¶ 177.

[257] *AES v. Hungary* (Award), ¶¶ 9.3.29 and 9.3.30.

[258] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.79. See also *Tecmed v. United Mexican States* (Award), ¶ 154; *Plama v. Bulgaria* (Award), ¶ 178; *Micula v. Romania* (Award), ¶ 530.

### d.    *"Shall [not] in any way impair by unreasonable or discriminatory measures"*

410.    The obligation not to impair investments by unreasonable or discriminatory measures appears as a free-standing obligation in ECT Article 10(1), but there is no doubt that the FET standard contains the same obligation.

411.    Regulatory measures must be proportionate, non-arbitrary, and non-discriminatory.[259] Consequently, in the absence of a specific commitment, the State has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[260]

412.    Reasonableness means that "the State's conduct bears a reasonable relationship to some rational policy."[261] But that alone is not sufficient. In *Micula v. Romania*, the tribunal said:

> … for a state's conduct to be reasonable, it is not sufficient that it be related to a rational policy; it is also necessary that, in the implementation of that policy, the state's acts have been appropriately tailored to the pursuit of that rational policy with due regard for the consequences imposed on investors.[262]

413.    But the criterion of "unreasonableness" is not to be used as an open-ended mandate to second-guess the host state's policies.[263]

---

[259] See, e.g., *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No ARB/03/16, Award of the Tribunal, 2 October 2006, ¶ 424, CL-0117; *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.79; *Plama v. Bulgaria* (Award), ¶ 178.

[260] *Blusun v. Italy* (Award), ¶¶ 319, 372.

[261] *Saluka v. Czech Republic*, UNCITRAL, 17 March 2006, ¶ 460, CL-0055; *Electrabel v. Hungary* (Award), ¶ 179.

[262] *Micula v. Romania* (Award), ¶ 525.

[263] *Blusun v. Italy* (Award), ¶ 318.

126

### e.    Proportionality

414.    The requirement of proportionality is part of the reasonableness standard and of the fair and equitable treatment standard.[264]

415.    A measure must be suitable to achieve a legitimate policy objective, necessary for that objective, and not excessive considering the relative weight of each interest involved, and involves a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate with regard to the affected rights and interests.[265]

### f.    Non-Discrimination

416.    "Non-discrimination" requires a rational justification of any differential treatment.  For a measure to be discriminatory two similar situations must be treated differently, without objective justification. [266]

### g.    Retroactivity

417.    There is no general principle which prohibits the retroactivity of legislation, but it may, depending on the context, be relevant to unreasonableness, breach of legitimate expectation or destruction of acquired rights.

### h.    Legitimate Expectations

(i)    Legitimate Expectation and the Right to Regulate

418.    In this context, legitimate expectation means a legally protected expectation.  It is not synonymous with a reasonable business judgement.  It is in the nature of businesses to take decisions or risks on the basis of the facts known to them, their appreciation of the unknown, and their reasonable predictions about the future.  Not every such decision is legally protected.

---

[264] *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No ARB/06/11, Award, 5 October 2012, ¶¶ 404 *et seq.*, CL–0169.

[265] *Electrabel v. Hungary* (Award), ¶¶ 179-180; *Novenergia v. Spain* (Final Award), ¶ 657; *RREEF v. Spain* (Decision on Responsibility and on the Principles of Quantum), ¶¶ 465-466.

[266] *Saluka v. Czech Republic* (Partial Award), ¶¶ 307, 460; *Plama v. Bulgaria* (Award), ¶ 183.

127

419.  As has already been said above, the starting point is that a State is generally free to amend its laws and regulations.[267]  In *Foresight v. Spain*, the tribunal referred with approval to the reference in *Philip Morris Brands v. Uruguay* to "the State's rights to exercise sovereign authority to legislate."[268]  That is part of a State's margin of appreciation in public international law.[269]

420.  The ECT does not protect investors against any and all changes in the host country's laws, and under the fair and equitable treatment standard the investor is only protected if (at least) reasonable and justifiable expectations were created in that regard.[270]

421.  The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance.[271]

422.  But a reasonable market expectation as to some state of affairs, justified or not, is not a basis for shifting risks to the public sector, i.e., the state budget.  Circumstances change and in the absence of specific commitments, the risk of change is for entrepreneurs to assess and assume.[272]

423.  An FET standard may legitimately involve a balancing or weighing exercise by the host State.[273]

424.  *First*, the State's sovereign right to regulate has been affirmed in many awards, and the State is entitled to a "high measure of deference."[274]

---

[267] *Micula v. Romania* (Award), ¶ 686.

[268] *Foresight v. Spain*, (Final Award), ¶ 363, quoting *Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., v. Republic of Uruguay*, ICSID Case No. ARB/10/7, Final Award, 8 July 2016, ¶ 422.

[269] *RREEF v. Spain* (Decision on Responsibility and Principles of Quantum), ¶ 242.

[270] *Plama v. Bulgaria* (Award), ¶ 219.

[271] *Electrabel v. Hungary* (Award), ¶ 165.

[272] *Blusun. v. Italy* (Award), ¶ 373.

[273] *Electrabel v. Hungary* (Award), ¶ 165.

[274] *Saluka v. Czech Republic* (Partial Award) ¶ 305; *Total v. Argentina* (Decision on Liability), ¶ 115.

425.   *Second*, the idea that legitimate expectations, and therefore FET, imply the stability of the legal and business framework does not mean the virtual freezing of the legal regulation of economic activities.[275]  There has to be a weighing of an investor's expectations and the State's regulatory interests.[276]

426.   *Third*, in the absence of specific promises or representations by the State to the investor, the investor may not rely on an investment treaty as a kind of insurance policy against the risk of any changes in the host State's legal and economic framework.[277]

427.   *Fourth*, it has been said that it is inconceivable a State would make a general commitment never to change its legislation whatever the circumstances, and it would be unreasonable for an investor to rely on such a freeze,[278] in particular where times and needs change, or where crisis arises.

428.   *Fifth*, economic, social, environmental and legal circumstances and problems are by their nature evolutionary, dynamic and bound to constant change, and it is indispensable for successful public infrastructure and public services to be adaptable to change in evolving circumstances.[279]

429.   *Sixth*, consequently, the FET standard preserves the regulatory authority of the host state to make and change its laws and regulations to adapt to changing needs, including fiscal needs, subject to respect for specific commitments made.[280]

430.   *Seventh*, the expression "margin of appreciation," can be used to convey the point that the State's right to regulate is subject to a wide latitude, subject to its compliance with its duties under the ECT and customary international law.  As the tribunal in *Electrabel v. Hungary* said:

[275] *EDF v. Romania* (Award), ¶ 217.

[276] *Saluka v. Czech Republic* (Partial Award), ¶ 306.

[277] *EDF v. Romania* (Award), ¶ 217.

[278] *El Paso v. Argentina* (Award), ¶ 374; *Foresight v. Spain* (Final Award), ¶¶ 356-359.

[279] *Mamidoil v. Albania* (Award), ¶ 617. Cf. *EDF v. Romania* (Award), ¶ 217.

[280] *Blusun v. Italy* (Award), ¶ 319.

> Regulatory pricing (by operation of law) was and remains an important measure available to State regulators in liberalised markets for electricity. It is, even at best, a difficult discretionary exercise involving many complex factors. In short, Hungary would enjoy a reasonable margin of appreciation in taking such measures before being held to account under the ECT's standards of protection.[281]

### (ii)   Basic Principles and the Importance of Commitments by the State

431.   For legitimate expectations to operate, there must be a promise, assurance or representation of a specific character and content that is attributable to a competent organ or representative of the State, which may be explicit or implicit.[282]

432.   Explicit promises can be made through statutory commitments[283] or through conduct, or in the legal or regulatory framework of the host State at the time the investor made its investment.[284]

433.   A reiteration of the same type of commitment in different types of general statements may amount to a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely.[285]

434.   A specific entitlement to incentives may give rise to a protected legitimate expectation.[286]

435.   Most of these principles appear from the award in *Micula v. Romania*:

> …the fair and equitable treatment standard does not give a right to regulatory stability *per se*. The state has a right to regulate, and investors must expect that the legislation will change, absent a stabilization clause or other specific assurance giving rise to a legitimate expectation of stability.

---

[281] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶¶ 7.75, 8.35; *RREEF v. Spain* (Decision on Responsibility and Principles of Quantum), ¶¶ 242-243.

[282] *Micula v. Romania* (Award), ¶ 669; *Saluka v. Czech Republic* (Partial Award), ¶¶ 328-329.

[283] *Enron v. Argentine Republic* (Award), ¶ 265.

[284] *Parkerings v. Lithuania* (Award), ¶ 331; *Total v. Argentina* (Decision on Liability), ¶¶ 117-119.

[285] *El Paso v. Argentina* (Award), ¶¶ 375-376.

[286] *Micula v. Romania* (Award), ¶¶ 675-67.

…

The Parties agree that, in order to establish a breach of the fair and equitable treatment obligation based on an allegation that Romania undermined the Claimants' legitimate expectations, the Claimants must establish that (a) Romania made a promise or assurance, (b) the Claimants relied on that promise or assurance as a matter of fact, and (c) such reliance (and expectation) was reasonable. This test is consistent with the elements considered by other international tribunals.

…

This promise, assurance or representation may have been issued generally or specifically, but it must have created a specific and reasonable expectation in the investor. That is not to say that a subjective expectation will suffice; that subjective expectation must also have been objectively reasonable. As stated by the *Saluka* tribunal, 'the scope of the Treaty's protection of foreign investment against unfair and inequitable treatment cannot exclusively be determined by foreign investors' subjective motivations and considerations. Their expectations, in order for them to be protected, must rise to the level of legitimacy and reasonableness in light of the circumstances.'

The Claimants must also have relied on that expectation when they made their investments. However, it is not necessary for the entire investment to have been predicated solely on such expectation. Businessmen do not invest on the basis of one single consideration, no matter how important. In the Tribunal's view, that expectation must be a determining factor in an investor's decision to invest, or in the manner or magnitude of its investments.

When the alleged legitimate expectation is one of regulatory stability, the reasonableness of the expectation must take into account the underlying presumption that, absent an assurance to the contrary, a state cannot be expected to freeze its laws and regulations...[287]

(iii) *Commitments*

---

[287] *Ibid.*, ¶¶ 666, 668, 671-673. Cf. *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.77.

131

436. The same or similar points are made in many other awards, often subject to the same important proviso that a change in the law may be a breach of an investor's legitimate expectation if a specific commitment has been made not to change the regulatory framework.

437. In the context of the ECT, in *Plama v. Bulgaria*[288] the tribunal made it clear that the ECT did not protect investors against any and all changes in the host country's laws. Under the FET standard, the investor was only protected if (at least) reasonable and justifiable expectations were created in that regard by the State's promises or other representations to the investor to freeze its legislation on environmental law.

438. Usually, general texts cannot contain such commitments, as there is no guarantee that they will not be modified in due course. In *Blusun v. Italy*, the tribunal said:

> … a representation as to future conduct of the state could be made in the form of a law, sufficiently clearly expressed. But there is still a clear distinction between a law, i.e. a norm of greater or lesser generality creating rights and obligations while it remains in force, and a promise or contractual commitment. There is a further distinction between contractual commitments and expectations underlying a given relationship: however legitimate, the latter are more matters to be taken into account in applying other norms than they are norms in their own right. International law does not make binding that which was not binding in the first place, nor render perpetual what was temporary only…[289]

439. Consequently, general legislation, without more, typically does not give rise to legitimate expectations of stability of that legislation.[290]

440. But it has been said[291] that legitimate expectations may be engendered by the legal framework at the time of the investment, especially if there has been "a reiteration of

---

[288] *Plama v. Bulgaria* (Award), ¶ 219.

[289] *Blusun v. Italy* (Award), ¶ 371.

[290] *Total v. Argentina* (Decision on Liability), ¶ 429; *El Paso v. Argentina* (Award), ¶ 374.

[291] See the discussion in *Masdar v. Spain* (Award), ¶¶ 490 *et seq.*

the same type of commitment in different types of general statements,"[292] but this may properly be regarded as an aspect of stability rather than as an example of a specific commitment.

### (iv) *Critical Date*

441.    The critical date for determining legitimate expectation is the date of the investment.[293]

### (v) *Burden of Proof*

442.    The burden of proof of a violation of the FET standard is on the claimant.[294]

### (vi) *Due Diligence*

443.    Fairness and consistency must be assessed against the background of information that the investor knew or should reasonably have known at the time of the investment, and of the conduct of the host State.[295] Legitimate expectations must be examined objectively and must be objectively reasonable and take into account all relevant circumstances to determine whether an investor's expectations of stability are legitimate, including the form and content of the promise of stability.[296]

444.    An investor making an investment in a highly regulated sector has the burden of performing its own due diligence in vetting the investment within the context of the operative legal regime: see *Invesmart, B.V. v. Czech Republic*,[297] which listed the relevant circumstances as: (1) the reasonableness of the expectation; (2) contemporaneous evidence of the investor's expectation such as contractual documents by which it acquired its investment; (3) dealings with officials; (4) due diligence performed when the investor made its

---

[292] *El Paso v. Argentina* (Award), ¶ 377.

[293] E.g., *Saluka v. Czech Republic* (Partial Award), ¶ 302; *LG&E v. Argentine Republic* (Decision on Liability), ¶ 130; *Wirtgen v. Czech Republic* (Final Award), ¶ 407; *RREEF v. Spain* (Decision on Responsibility and on the Principles of Quantum), ¶ 391, among many others.

[294] E.g., *Electrabel v. Hungary* (Award), ¶ 154.

[295] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.78; *RREEF v. Spain* (Decision on Responsibility and on the Principles of Quantum), ¶ 397.

[296] *Wirtgen v. Czech Republic* (Final Award), ¶¶ 407, 411.

[297] *Invesmart v. Czech Republic* (Award), ¶¶ 250-258.

investment; (5) the legal regulatory regime in place in the host state; and (6) whether state officials involved had actual authority.

445.    It follows that it is important to assess the investor's due diligence exercise at the point at which it made the investment, and in particular whether, for example, the investor investigated or took advice on the host State's applicable law.[298]

446.    In assessing whether an investor was aware that the regulatory framework might be amended, it is legitimate to take into account decisions of the host State's courts: "Without requiring a reasonable investor to perform an extensive legal research investigation at the time of investing, knowledge of important decisions from the highest authority regarding the regulatory framework for investment may be presumed."[299]    Such decisions are factually relevant to verify that an investor was unable, at the time of the disputed investment, to have the reasonable expectation that in the absence of a specific commitment the regulation was not going to be modified.[300]

447.    Consequently, given the State's regulatory powers, in order to rely on legitimate expectations, the investor should inquire in advance regarding the prospects of a change in the regulatory framework in light of the then prevailing or reasonably to be expected changes in the economic and social conditions of the host State.[301]

(vii)    *Discrimination*

448.    Discrimination "corresponds to the negative formulation of the principle of equality of treatment. It entails like persons being treated in a different manner in similar circumstances without reasonable or justifiable grounds."[302]

(viii)    *Unreasonable/Disproportionate*

---

[298] *Total v. Argentina* (Decision on Liability), ¶ 124.

[299] *Isolux v. Spain* (Award), ¶¶ 793-794.

[300] *Charanne v. Spain* (Final Award), ¶¶ 507-508.

[301] *Ibid.*, ¶ 505.

[302] *Plama v. Bulgaria* (Award), ¶ 184.

449.   In *AES Summit v. Hungary*, the tribunal said:

> There are two elements that require to be analyzed to determine
> whether a state's act was unreasonable: the existence of a rational
> policy; and the reasonableness of the act of the state in relation to
> the policy.
>
> A rational policy is taken by a state following a logical (good sense)
> explanation and with the aim of addressing a public interest matter.
>
> Nevertheless, a rational policy is not enough to justify all the
> measures taken by a state in its name. A challenged measure must
> also be reasonable.   That is, there needs to be an appropriate
> correlation between the state's public policy objective and the
> measure adopted to achieve it.  This has to do with the nature of the
> measure and the way it is implemented.[303]

**(2)    The Investments**

450.   It has already been seen that, as indeed is obvious, legitimate expectations have to be
assessed at the time the investment is, or investments are, made. Consequently it is vital to
put the investments in their context in determining the legitimate expectations of the
Claimant. Putting it broadly, the Claimant says[304] that the investments were between 2007
and 2010.[305]

451.   An investment goes through various stages, including corporate decisions, contractual
commitments, financing, acquisition, construction, registration and start-up.[306] The
Tribunal considers that the critical date is the date of actual investment or irrevocable
commitment to invest.

452.   Those dates were as follows:

---

[303] *AES v. Hungary* (Award), ¶¶ 10.3.7-9.

[304] Tr.-E, Day 1, p. 18, ll. 23-35.

[305] Spain suggests that additional funding until 2013 may affect the critical date but is content to treat 2007-2010 as the relevant period: Resp. PHB, ¶ 124.

[306] *Novenergia v. Spain* (Final Award), ¶ 538.

(1) Don Álvaro: 31 July 2007, when the Claimant and Valsolar executed an agreement on the sale and purchase of rights;[307]

(2) La Albuera: 23 November 2007, when the Claimant and Valsolar entered into a Joint Participation Agreement;[308]

(3) Fuente de Cantos: 23 November 2007, when the Claimant and Valsolar entered into a Joint Participation Agreement;[309]

(4) La Roda: 2 May 2008, when the EPC/O&M Agreements were executed;[310]

(5) Riosalido: 2 May 2008, when the EPC/O&M Agreements were executed;[311]

(6) Solarwell: 10 October 2008, when the Share Purchase Agreement was executed;[312]

(7) Talarrubias: 8 May 2009, when the Share Purchase Agreement was executed.[313]

453.    To the extent that they are relevant, which will be addressed below, the RAIPRE registrations were effected on 30 June 2008 (Don Álvaro[314]); 28 August 2008 (La Albuera[315]); 4 September 2008 (Fuente de Cantos[316]); 25 August 2008 (La Roda and Riosalido[317]); 30 June 2010 (Talarrubias[318]); 7 March 2013 (Solarwell[319]).

---

[307] C-0198.

[308] C-0194.

[309] *Id.*

[310] C-0215; C-0217; C-0219.

[311] C-0216; C-0218; C-0220.

[312] C-0232.

[313] C-0264.

[314] C-0205.

[315] C-0211.

[316] C-0213.

[317] C-0224; C-0222.

[318] C-0231.

[319] C-0235.

454.  Registration was closed under RD 661/2007 in September 2008, and Talarrubias was registered under RD 1578/2008 because it was registered into the RD 1578/2008 pre-allocation registry on 13 July 2009. Solarwell was also registered under RD 1578/2008.

455.  There were three other projects in which the Claimant had made a capital contribution in October 2008: Fotovoltaica Lobon, Solar Lobon, and Solar Botoa plants.[320] These did not achieve the RD 1578/1998 pre-allocation registration and were abandoned after RD-L 1/2012. The Claimant says that it had expended approximately €1.8 million on those projects, all of which was lost.

**(3)    The Main Points in Issue**

456.  It is relevant to recall, at the risk of over-simplification and repetition, the essential points in issue.

*a.    The Claimant's Case*

457.  The Claimant's overall case is that Spain guaranteed under RD 661/2007 and RD 1578/2008 that the Claimant's PV installations would receive incentive tariffs at fixed amounts for a period of 25 years, and then at 80% of those fixed amounts for the remaining lives of the plants subject to RD 661/2007; and that Spain would not retroactively alter the value of those incentives once the plants were established and registered under the RD 661/2007 and RD 1578/2008 regimes.

458.  The Claimant invested in reliance on these guarantees and the value of the incentivised revenue streams which resulted from them.

459.  Spain undermined and then abolished the RD 661/2007 and RD 1578/2008 regimes through the Disputed Measures and replaced them with the New Regulatory Regime:

(1)    RDL 14/2010 (a) imposed hourly limitations on the quantity of electricity produced by PV plants which was eligible to receive FiTs under RD 661/2007 and RD 1578/2008; and (b) created a new access toll of 0.5 €/MWh on all electricity which

---

[320] C-0183; C-0184; C-0182.

a producer delivered into the grid, reducing the tariffs guaranteed in the original regulatory framework, in violation of Article 44.3 of RD 661/2007 and Article 12 of RD 1578/2008.

(2)    RD 1565/2010 (a) cancelled the right of the Claimant's RD 661/2007 projects to receive the tariffs after year 25 of their operating lives (which Spain then lengthened to year 28 and then to year 30 by RDL 14/2010 and Law 2/2011); (b) reduced the tariff rates available under RD 1578/2008 by 46% for certain facilities.

(3)    RDL 1/2012 cancelled the incentive programs under RD 661/2007 and RD 1578/2008 for new facilities and suspended pending pre-allocation registration processes under RD 1578/2008. This measure led the Claimant to abandon three other renewable energy projects under development, after having committed nearly €2 million in investment costs, a measure which the Spanish Supreme Court has ruled was "unexpected and violated the principle of legitimate expectations."[321]

(4)    Law 15/2012 further reduced the amount of the tariff for all renewable energy facilities under the guise of a 7% energy tax (TVPEE), which was applied not just to the market value of the electricity generated by renewable producers, but also to the premium component of the tariffs that Spain guaranteed. Spain then transferred the proceeds into the electricity system in order to reduce the tariff deficit.

(5)    In 2013, Spain reduced the rate of tariff growth by redefining the inflation adjustment in RDL 2/2013. Although the new inflation index was at times higher than the CPI index, it was lower on balance over time, and therefore this measure harmed the Claimant's investment and contravened the terms of Article 44.1 of RD 661/2007 and Article 12 of RD 1578/2008.

(6)    Spain abolished RD 661/2007 and RD 1578/2008 in their entirety in June 2013 and substituted those regimes with the New Regulatory Regime in 2014, when Spain enacted a fundamentally different incentive scheme: RDL 9/2013, Law 24/2013; RD 413/2014; and Order IET/1045/2014.

---

[321] C-0122, 16 April 2016, third ground.

138

(7)     The New Regulatory Regime changed the structure of the incentive payments to the detriment of investors such as the Claimant. It substituted a production-based system for a system based on installed capacity. By this shift from a production incentive to a capacity incentive Spain appropriated the benefits that investors expected to receive as a result of their productivity-maximising choices in respect of issues such as the location and amount of solar irradiation of the plants, the proximity to the transmission grid, the project scale, and the plant's design, etc.

(8)     While the previous regulatory framework fixed the returns that investors could expect from a PV plant in the form of fixed tariff rates, irrespective of whether interest rates went up or down, the New Regulatory Regime provided that Spain would update the rate of return every six years based on prevailing interest rates. As Spain implemented this change in 2014, knowing that interest rates had declined substantially since 2007, it appropriated the gains that investors would have otherwise received on their fixed-rate PV investments. This change has also harmed investors like the Claimant, which relied on the fixed-rate nature of RD 661/2007 and RD 1578/2008 when structuring the financing for their investments through swap agreements.

### b.    Spain's Case

460.    Spain's case is that Law 54/1997 only guaranteed renewable energy generators enrolled in the Special Regime a reasonable rate of return calculated by reference to the cost of money in the capital market.[322]

461.    To ensure this level of remuneration, subsidies were offered to producers to cover their investment and operating costs and generate a reasonable return.[323] The implementing decrees (RD 2818/1998; RD 436/2004; RD 661/2007; RD 1578/2008) established financial incentives in the form of feed-in subsidies tied to production. This form of remuneration was neither imposed nor required to be maintained by Law 54/1997.

---

[322] C-0066A, Law 54/1997, Article 30.4.

[323] *Ibid.*, Article 16.7.

139

462. Law 54/1997 established a dynamic or flexible framework so that the government would have sufficient flexibility to adjust remuneration if the formula resulted in higher than reasonable returns, in contravention of Law 54/1997 or EU State aid rules.

463. The fundamental criterion used by Law 54/1997 to judge the reasonableness of the rate of return was the cost of money in the capital markets. Law 54/1997 did not guarantee that producers would receive FiTs for the whole lifetime of the plants.

464. The elimination of fixed tariffs for PV installations after 30 years by RD 1565/2010 was in line with the estimated useful life of the plants. After this period, an investor would have recovered all its costs and made a reasonable profit.

465. RDL 14/2010 set a limit on the annual operating hours for which PV facilities could receive feed-in tariffs in accordance with the calculations made in the PER 2005-2010. These estimated annual operating hours were known to investors. Above these caps, plants could continue producing and selling its energy on the market.

466. Law 15/2012, introducing the TVPEE to contribute to finance the electricity system, did not have any impact on the Claimant's installations because under the New Regulatory Regime the operating incentive payments are calculated to allow renewable producers to recover the amounts paid for TVPEE.

467. The new index, CPI, substituted by RDL 2/2013, for updating remuneration was adopted in order to bring the updating mechanism into conformity with generally accepted economic practices, excluding those inputs that were most variable in the calculation's formula. CPI, although it was superseded by additional regulations, did not adversely affect the Claimant's PV facilities. The Claimant benefited from it during the short time it was in force.

468. The New Regulatory Regime in RDL 9/2013, Law 24/2013, RD 413/2014, and Order IET/1045/2014 strengthens the support for renewable technologies, and the key components of the former regime are largely preserved.

469.    Both the former and the new remuneration regimes provide generous subsidies to renewable energy producers. Although the New Regulatory Regime specifies that the rate to be used for this purpose is that of the average yield of ten-year Spanish government bonds plus 300 basis points, the result is essentially the same: a rate of return of 7.398% before taxes, which is consistent with the 7% post-tax return which the former regime sought to provide. It gives investors greater legal security because the basic parameters are set out in the law.

**(4)    Legitimate Expectations and the Legal and Commercial Position at the Time of the Claimant's Investments**

*a.    General*

470.    In determining an investor's legitimate expectations at the time of investment, the legal and commercial environment has to be considered in the light of the due diligence which an investor can be expected to undertake.

471.    A foreign investor will not itself normally have a detailed knowledge of the legal system, the laws governing the investment or the history of government policy statements. But it will plainly know the essential commercial characteristics of the law governing the incentives for its investment, and will take a commercial view on the likely future stability of the system.

472.    The detailed knowledge, on the other hand, will reside in its legal, commercial and financial advisers and that is why the extent and quality of the due diligence undertaken by the investor is so important in determining its legitimate expectations.

473.    Since legal due diligence, in the light of the surrounding circumstances, is the most directly relevant in determining legitimate expectations, it is appropriate to start with (a) the state of the legislation at the time of investment, and (b) the relevant decisions of the Spanish Supreme Court.

*b.    The Legislation Prior to, and at the Time of the Claimant's Investment*

474.    As has been indicated, the crucial date for determining legitimate expectations is the date of the actual investment or the irrevocable commitment to invest. This section will set out

the background to, and the substance of, the legislation which was in force at the relevant time.

475.    This section will consider the Spanish regulatory framework against the background of EU relevant policy and legislation.  Spanish legislation for this purpose consists of Acts (or Laws) approved by the legislature; Royal-Decree Laws (or RDL) which are enacted by the executive, but subject to legislative approval; Royal Decrees (RD), which implement RDLs; and Ministerial Orders. In the Spanish hierarchical system, Acts or Laws are the authority for governmental decrees, which must comply with the enabling legislation.

476.    **The Electricity Law 54/1997**:[324]  The Electricity Law 54/1997 liberalised the Spanish electricity sector and set out the general principles and objectives for its implementation. It provided that by 2010 the contribution of renewable sources of energy to the Spain's gross energy consumption should reach 12%. Qualifying electricity generators using renewable sources of energy as primary energy, and with an installed capacity of less than 50MW, became subject to a "Special Regime".[325]  The Special Regime generators were entitled to receive the market price of electricity plus a supplementary premium (the amount of which was to be fixed in statutory terms by governmental regulations).  Ordinary Regime traditional generation plants received remuneration from the wholesale price of electricity.

477.    Article 30.4 of Law 54/1997 provided:

> To determine the premiums, voltage levels delivered to the grid shall be considered, as well as the actual contribution to environmental improvement, primary energy savings and energy efficiency, and the investment costs incurred to obtain reasonable rates of return with regard to the cost of the money in the capital markets.

478.    All energy producers were required to be registered in the RAIPRE.

---

[324] C-0066; R-0059.

[325] *Ibid*., Article 27.

479. Law 54/1997 was implemented by a series of Royal Decrees, following Spain's signature in April 1998 of the Kyoto Protocol to the United Nations Framework Convention on Climate Change, which required the contracting parties to reduce greenhouse gas emissions and set binding emission targets to achieve reduction.

480. **RD 2818/1998**:[326] RD 2818/1998 implemented the Special Regime, and provided that Special Regime generators who had been duly registered in the RAIPRE were entitled to remuneration consisting of the market price plus a premium. RD 2818/1998 classified the qualifying Special Regime renewable generators into categories and groups according to, inter alia, the generation technologies used.

481. The premiums set out in RD 2818/1998 were subject to revision every 4 years, based on the evolution of the price of electricity on the market, the participation of Special Regime facilities in coverage of demand, and their impact on the technical management of the electricity system.[327]

482. **The Development Plan for Renewable Energies 2000-2010 ("1999 PER"):**[328] The 1999 PER was prepared by the IDAE and approved by the Council of Ministers in December 1999. It set capacity and production targets for each renewable technology to achieve by 2010 (along with interim targets for 2006) in order to meet Spain's forthcoming obligations under EU law.

483. It said: "The value of the premium has been set bearing in mind the delivery voltage to the network, the contribution to improving the environment, the saving in primary energy and energy efficiency and the investment costs incurred in order to ensure reasonable rates of return with regard to the cost of money on the capital market."[329]

484. As regards profitability it said:

---

[326] C-0067; R-0067.

[327] *Ibid.*, Article 32.

[328] C-0068; R-0090 (extract only).

[329] C-0068, p. 6.

> Profitability of the standard projects: calculated in line with maintaining an Internal Rate of Return (IRR), measured in current pesetas and for each standard project, minimum of 7%, with equity, prior to financing and after tax.[330]

485. **EU Directive 2001/77/EC:** In 2001, the EU adopted Directive 2001/77/EC[331] on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market, in order to comply with the Kyoto Protocol.

486. The Directive provided that support schemes for renewable energy sources would be set by the Member States subject to the European Union state aid rules.[332] It obliged all EU Member States (a) to "take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources" in order to "meet Kyoto targets more quickly", (b) "to set national indicative targets for the consumption of electricity produced from renewable sources", and (c) to report regularly to the EU on their progress in meeting those targets.[333] Spain's indicative target was to draw 24.9% of its electricity from renewable sources by 2010. The Directive required Spain to enact implementing legislation by October 27, 2003.

487. **RD 436/2004:[334]** The Economic Report on RD 436/2004 prepared by the Spanish Ministry of Energy stated (emphasis added):

> Parameter A [Production cost: the investment, operating and maintenance costs for each technology] has a significant weighting in establishing the amount of the regulated tariff for sale to distributors. This way, *any plant in Spain in the special regime, provided it is equal to or better than the standard (the standardised plant) for its group, will obtain reasonable return*.
>
> …

---

[330] *Ibid.*, p. 182.

[331] C-0057; RL-0015.

[332] *Ibid.*, Recital (12).

[333] *Ibid.*, Article 3, Recitals (1) and (5).

[334] C-0075; R-0069.

> …it is assumed, in all cases, that 100% of the funding will come from equity. The leverage and percentage between equity and other sources of funding are independent decisions in each project and for each promoter that, when made wisely, should provide better ratios than those estimated in this report.[335]

488.    RD 436/2004 repealed RD 2818/1998 and adapted the feed-in system to the new average or reference electricity tariff (*tarifa eléctrica media o de referencia* or *TMR*)[336] methodology.  Its preamble stated (emphasis added):

> The intention is, therefore, to continue down the path first taken by Royal Decree 2818/1998 ...  This time, however, there is the added advantage of being able to take advantage of the stability bestowed on the whole system at large by Royal Decree 1432/2002, dated December 27th, establishing the methodology for the approval or modification of the average or reference tariff, to provide those who have decided or will decide in the near future to opt for the special regime with a durable, objective and transparent framework.
>
> ...
>
> Whichever remuneration mechanism is chosen, the Royal Decree guarantees operators of special regime installations *fair remuneration for their investments and an equally fair allocation to electricity consumers of the costs that can be attributed to the electricity system.*[337]

489.    RD 436/2004 gave qualifying renewable energy producers the right to choose, on an annual basis, between: (i) a fixed tariff, calculated as a specific percentage of the TMR, defined as a single flat rate and, where applicable, a supplement for reactive energy ("regulated tariff option") and (ii) the pool price plus a premium and an incentive for participating in the market, and, where applicable, a supplement for reactive energy ("pool price plus premium

---

[335] R-0052, pp. 4-5.

[336] On 1 January 2003, Spain put into effect a new formula to calculate the average or reference electricity tariff ("Tarifa Eléctrica Media" or "TMR"), one of the inputs to determine the remuneration of renewable energy installations.  The TMR would be set by the Government annually and published in advance based on estimated costs needed to remunerate projected electricity supply and consumer demand.

[337] R-0069.

145

option"). Premium, incentive and supplement were all calculated by reference to the TMR as a fixed percentage.

490.     Pursuant to the transitional provisions of RD 436/2004, existing Special Regime installations which were previously under RD 2818/1998 could choose: (a) to benefit from the economic regime established in RD 436/2004 from the date RD 436/2004 entered into force (March 28, 2004); or (b) to continue to be subject to RD 2818/1998's remuneration regime until 31 December 2006, and thereafter migrate to the RD 436/2004 regime automatically from 1 January 2007 (later extended to 31 May 2007).[338]

491.     Article 40.1 of RD 436/2004 contemplated revisions to the regulated tariff, premiums and incentives stipulated therein, every four years starting from 2006, based on the costs associated with each of the renewable technologies, their degree of participation in the Special Regime in demand coverage and their impact on the technical and economic management of the system.

492.     Article 40 provided:[339]

> **Article 40. Revision of tariffs, premiums, incentives and supplements for new plants**
>
> 1. During 2006, in view of the findings of the monitoring reports on the degree of performance of the renewable energies promotion Plan, the tariffs, premiums, incentives and supplements defined in this Royal Decree shall undergo revision. This shall bear in mind the costs associated with each one of these technologies, their degree of participation in the special regime in demand coverage and their impact on the technical and economic management of the system. Every four years, starting from 2006, a new revision shall take place.
>
> ...
>
> 3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the

---

[338] This transitional period was extended, by RD 1634/2006, until 31 May 2007 (the day before the entry into force of RD 661/2007).

[339] Translation from C-0075. The R-0069 translation is the same.

entry into force referred to in the paragraph above and shall not have
a backdated effect on any previous tariffs and premiums.

493.   **2005-2010 Renewable Energy Promotion** Plan **("2005 PER"):**[340] The 2005 PER was
prepared by IDAE and approved by the Council of Ministers in August 2005.

494.   The Plan stated: "… it is essential to place the various technologies in a position to be of
financial performance, thereby making them attractive to investors, as well as to facilitate
access to bank financing."[341]

495.   The 2005 PER also said:

> In order to bring the targets set out here to fruition, **a detailed
> evaluation has been made of the investment envisaged over the
> period as a whole, the nature of this investment and the public
> aid necessary to meet the targets**. This analysis, based on the
> specific features of each technology, such as its degree of maturity
> and contribution to the overall target, rests on a balance between all
> the factors, such that a return is achieved from on public and private
> investments, and the necessary resources are mobilised to ensure the
> envisaged investments are made.[342]

496.   The 2005 PER established the following conception of return of standard projects: "*Return
on project type*: calculated on the basis of maintaining an Internal Rate of Return (IRR),
measured in legal tender and for each standard project, around to 7%, on equity (before
any financing) and after taxes."[343]

497.   **RDL 7/2006:**[344] RDL 7/2006 adopted urgent measures for the energy sector. It suspended
the remuneration's revisions for renewable energy technologies until a new remuneration
scheme dissociated from the TMR was developed.

---

[340] C-0082; R-0092.

[341] *Ibid.*, p. 276.

[342] C-0084 (summary), p. 56 (emphasis in original).

[343] C-0082; R-0092, p. 274.

[344] R-0056.

498.    In February 2007, the CNE reported that a majority of its Board considered that the need to make what became RD 661/2007 retroactive had not been sufficiently justified, and emphasised that RD 436/2004 "offer[ed] a very important value, namely: regulatory stability."[345]

499.    **RD 661/2007:**[346] RD 661/2007 was enacted on 25 May 2007, i.e., before the critical date of the Claimant's investments. Its objective was to create enhanced incentives. It stated in its preamble:

> The creation of the special regime for the generation of electricity meant an important milestone in the energy policy of our country. The targets in respect of the promotion of renewable energy and combined heat and power are covered in the Renewable Energy Plan 2005-2010 and in the Strategy for Energy Saving and Efficiency in Spain (E4), respectively. In view of the above, it can be seen that although the growth seen overall in the special regime for electricity generation has been outstanding, in certain technologies the targets posed are still far from being reached.

> From the point of view of compensation, the business of the production of electrical energy under the special regime is characterised by the possibility that the compensation system can be supplemented by the receipt of a premium under the terms and conditions established in the regulations, in order to determine which such factors as the voltage level of the energy delivered into the grid, the contribution to the improvement in the environment, primary energy saving, energy efficiency, and the investment costs incurred, may all be taken into account.

> The modification of the economic and legal framework which regulates the special regime existing to date has become necessary for various reasons. First of all, the growth seen in the special regime over recent years tied to the experience accumulated during the application of Royal Decree 2818/1998, of 23 December and Royal Decree 436/2004, of 12 March, has shown the need to regulate certain technical aspects in order to contribute to the growth of those technologies, while maintaining the security of the electrical system and ensuring the quality of supply, and minimising the restrictions on the production of electricity generated in this manner. In view of

---

[345] C-0061, p. 64; R-0101, p. 61.

[346] C-0098; R-0071.

the behaviour of the prices in the market, where certain variables which were not considered in the cited compensation system for the special regime have, over recent times, acquired greater importance, the economic circumstances established by Royal Decree 436/2004, of 12 March, make it necessary to modify the compensation system and de-link it from the Mean Electricity Tariff, or Reference Tariff, which has been used to date. Finally, it is necessary to include the changes in the legislation deriving from European law, and from Royal Decree-Law 7/2006, of 23 June, Adopting urgent measures in the energy sector, introducing major amendments in respect of the law applicable to the combined heat and power business.

The present Royal Decree replaces and repeals Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematisation of the legal and economic framework of the activity of the production of electrical energy under the special regime, while maintaining the basic structure of the regulations therein.

The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, *guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable*, although incentives are provided to playing a part in this market since it is considered that in this manner lower government intervention will be achieved in the setting of prices, together with better, more efficient, attribution of the costs of the system, particularly in respect of the handling of diversions and the provisions of supplementary services. (emphasis added)

500.   RD 661/2007 implemented a remuneration regime pursuant to which a qualifying Special Regime generator could choose between selling its electricity output at either: (a) a fixed regulated tariff (in euro cents per kWh) at the same rate for all scheduling periods (i.e., a FiT option);[347] or (b) the pool price *plus* a fixed premium payment (in euro cents per kWh) over and above the pool price (i.e., a FiP option).[348] The generators could choose between these two options – the "regulated tariff" or the "pool price plus premium" on an annual

---

[347] *Ibid.*, Article 24.1.a.

[348] *Ibid.*, Article 24.1.b.

basis.[349]  The Special Regime producers were entitled to obtain the regulated tariff or the pool price plus premium for all of their electricity output (measured in kWh), without any limit on production.

501.    By contrast with RD 436/2004, the fixed regulated tariff and premium under RD 661/2007 were not calculated by reference to annual TMR values.  It disassociated subsidies from the TMR and updated them annually based on an adjusted CPI.

502.    In relation to the "pool price plus premium" option, RD 661/2007 introduced a cap and floor mechanism, by establishing upper and lower limit values for the sum of the hourly market price plus a "reference" premium, so that the actual premium for each hour could be limited by reference to those values.  Pursuant to this mechanism, when the hourly pool prices were excessively low, installations were guaranteed a minimum level of remuneration (the lower limit or "floor").  When the pool prices reached, or exceeded, the defined upper limit or "cap", the actual hourly premium payable was zero (thereby imposing no extra burden on the electricity system).[350]

503.    RD 661/2007 also provided for an inflation adjustment mechanism pursuant to which the values of the regulated tariff, premium, and lower and upper limits provided for in RD 661/2007 were to be updated on a yearly basis to reflect increases in the Spanish CPI.[351]

504.    Article 44.3 of RD 661/2007 contemplated a review of the tariffs, premiums and lower and upper limits every four years, starting from 2010, to determine whether those incentives still reflected a particular technology's costs, market participation and a reasonable return for the investor. It provided:

> 3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and

---

[349] *Ibid.*, Article 24.4.

[350] *Ibid.,* Explanatory Preamble (excerpt on the cap and floor mechanism).

[351] *Ibid.*, Article 44.1.

lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.

The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[352]

505. **RD 1578/2008:**[353] RD 1578/2008, enacted on 26 September 2008, after the critical date of some of the Claimant's investments but before the critical date of other of its investments, put in place a new remuneration regime applicable to PV facilities that were not registered by the deadline for RD 661/2007. RD 1578/2008 offered lower tariffs than RD 661/2007. It also provided that the tariffs fixed each quarter would remain in force for "a maximum period of twenty-five years" and would be updated as "provided for in Article 44.1 of Royal Decree 661/2007".[354]

506. **RDL 6/2009:**[355] RDL 6/2009, dated 7 May 2009, was enacted shortly before the last of the Claimant's investments. It amended Law 54/1997. Its preamble stated that (a) the growing tariff deficit was causing serious problems which, in the context of the current international financial crisis, was having a deep effect on the system and jeopardising not only the financial situation of electricity sector companies but the very sustainability of the system itself; (b) the imbalance was unsustainable; (c) the trend of these technologies might put at risk the sustainability of the system in the short term, both from the economic point of view and its impact on the electricity tariff, as well as from the technical point of view, compromising the economic feasibility of the installations already finished, whose working

---

[352] *Ibid.*, Article 44.3.

[353] C-0046; R-0072.

[354] *Ibid.*, Articles 11.5 and 12.

[355] C-0296; R-0057.

depended on the suitable balance between manageable and non-manageable generation; (d) it had become necessary to adopt an urgent measure of urgency to guarantee the necessary legal security for those who have made investments, and to lay the foundation to establish new economic schemes which afforded fulfilment of the intended objectives: the fulfilment of some power targets by technology at a reasonable cost to the consumer and their technological evolution which allowed a gradual reduction of their costs and therefore of their competition with the conventional technologies.

507.  It provided that enrolment (which was subject to conditions) on a "pre-assignment of payment register" established by the Decree-Law would be necessary to obtain the right to take advantage of the Special Regime under RD 661/2007.[356]  It also allowed Spain to introduce restrictions on the number of registered installations which could begin operating if RE targets were exceeded.

508.  **EU Directive 2009/28/EC:**[357] The Directive on the promotion of the use of energy from renewable sources repealed Directive 2001/77/EC and increased the EU's Community-wide target for total energy from renewable sources from 12% by 2010 to 20% by 2020, and a minimum target of 10% for each Member State.  Member States were required to adopt a National Action Plan for the implementation of the Directive and its targets.

509.  The broad effect of the legislation and other material summarised above was that the subsidies were intended to give reasonable rates of return with regard to the cost of the money in the capital markets (Law 54/1997), being a reasonable return, or fair remuneration: 1999 PER; Economic Report on RD 436/2004; RD 436/2004; RD 661/2007.

   *c.    The Spanish Supreme Court Decisions*

510.  The first relevant Spanish Supreme Court decision is that of 15 December 2005, in which the Supreme Court, in a challenge against RD 436/2004, said:

> There is no legal obstacle for the Government, exercising its
> regulatory authority and the broad empowerments it is endowed

---

[356] *Ibid.*, Article 4.2.

[357] C-0097; RL-0017.

with in an area which is so strictly regulated as electricity, to modify a specific remuneration system provided that it remains within the framework stipulated by the LSE [Law 54/1997].[358]

511.    In its decision of 25 October 2006,[359] the Supreme Court, in a challenge against RD 2351/2004,[360] ruled:

> … electricity producers under the special regime do not have an 'unalterable right' to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future.

> It is true that in this case the setting of premiums is subject to certain normative standards, as stated above, but is also so that the Council of Ministers may, respecting them, introduce quantitative variations in the formulas by which the premiums are from time to time adjusted, or in the calculation of them. If the change has not deviated from these legal guidelines and, again, there is no allegation of infringement of Article 30 of the Law on the Electrical Sector, it can hardly be considered unlawful.

> The value of 'legal certainty' cannot be applied to a regulatory amendment as allegedly invalidating this argument. It is true that the rules should provide some stability to the regulatory frameworks of economic activities (in fact in the preamble to Royal Decree 436/2004, amended by the provision now under challenge, stated that '(...) this new methodology for calculating the special regime charges, for the security and stability it offers, should help encourage investment in this type of installation'), but so it is that legal certainty is not incompatible with the regulatory changes from the perspective of their validity, which is the only factor on which we can decide in law.

> The same consideration applies to the principle of legitimate expectations, increasingly but unduly deployed as an argument against quite a few regulatory changes that some economic operators have deemed more or less harmful to their interests. The appellants argue that their investments in the production of electrical

---

[358] C-0257; R-0117

[359] R-0118.

[360] Which modified RD 436/2004.

energy under the special regime were made at a particular time 'when they trusted the Government not to change the legal conditions that decided them to (...) build their facility'. This premise leads them to conclude that the reduction of premiums subsequent to Royal Decree 2351/2004 with respect to those in Royal Decree 435/2004 is contrary to the principle.

We cannot agree that this reasoning can be applied to an incentive mechanism such as the premiums in question. Until it is replaced by another, the above outlined legal regulation (Article 30 of the Electricity Law) allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining 'reasonable rates of return with reference the cost of money in the capital market' or, to put it again in the words of the preamble to Royal Decree 436/2004, 'reasonable compensation for their investments.' However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.

Just as in terms of an economic policy with many different aspects (the promotion of renewable energy but also the planning of electricity networks, and other considerations regarding energy saving and efficiency) grants and incentives for the production of electricity under the special regime may increase from one year to another, but they may also decrease when those same considerations warrant it. We stress that these changes have remained within the legal limits that regulate this type of promotion, and the mere fact that the annual adjustment or the level of the premium goes up or down does not of itself constitute grounds for revocation or affect the legitimate expectations of their recipients.

Companies that freely decide to enter a market such as electricity generation under the special regime, knowing that is largely dependent on the setting of economic incentives by public authorities, are or should be aware that they may be modified within legal guidelines, by those same authorities. One of the 'regulatory risks' to which they submit and which they must take into account, is precisely the variation of parameters for premiums or incentives, something which the Electricity Sector Law limits, as previously discussed, but does not preclude.

154

512.    In its decisions of 20 March 2007[361] (a decision on amendments to RD 2828/1998) and 9 October 2007[362] (a challenge to RD 1454/2005[363]): the Supreme Court confirmed that there is no vested right to receive a specific subsidy in the future.

513.    In the first of those cases the Court said:

> It is alleged by those who made their investments trusting that the Government would not change the legal conditions ... What article 30 of the LSE allows companies is to aspire that the premiums would include ... reasonable return rates in relation to the cost of money in the capital market; that is, a reasonable return on their investments. Owners of facilities under a Special Regime are not guaranteed the intangibility of a given benefit or income regime in relation to those obtained in previous years, nor are they guaranteed the indefinite permanence of the formulas used to fix premiums. Changes should be made within the legal limits."[364]

514.    In the second case the Court said:

> It is also claimed that a right acquired for payment of the premium is being damaged. The argument must be rejected given up what would have existed in favour of the appellant would be an expectation of obtaining said right as it had not come to form part of their patrimony, a right which elsewhere is being questioned through administrative channels, and the rejection of this is being debated with the Courts, as the party states in its brief.[365]

515.    None of these decisions deals with RD 661/2007 or RD 1578/2008. Three of them pre-date RD 661/2007, and all of them pre-date RD 1578/2008. But they reveal  a consistent jurisprudence from which the following propositions can be derived: the Spanish Government may modify a specific remuneration system provided that it remains within the framework of Law 54/1997;  electricity producers do not have an inalienable right to an unchanged economic regime; they have an expectation that they will obtain reasonable

---

[361] R-0119.

[362] R-0120.

[363] R-0118.

[364] R-0119.

[365] R-0120.

he

rates of return with reference to the cost of money in the capital market, but they have no guarantee that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulae for fixing the premiums will stay unchanged; and one of the regulatory risks which they undertake is that premiums or incentives may be varied within the limitations of Law 54/1997.

### d.    Due Diligence

516.    The Claimant's case on due diligence is as follows. It entered the Spanish PV sector on the advice and with the counsel of a Spanish lawyer who had specific experience in the renewable energy sector, Ms. Sonia López Mera, a Spanish lawyer who had previously worked as a business consultant for Ernst & Young for 13 years. The Claimant says that after several discussions with Ms. López Mera and other legal counsel in Spain, as well as potential partners, the Claimant grew confident in the clear terms of Spain's regulatory framework and the security that came with investing in a developed, European country.[366]

517.    It obtained a legal diligence report from a Spanish law firm (CMS Albiñana y Suarez de Lezo ("**Albiñana**")) and was aware that two other Spanish law firms (Uría Menéndez and Gómez-Acebo & Pombo) provided legal diligence to the financing banks. Ms. Brandao (employed by the Claimant as Advisor in Business Management) gave evidence that the Claimant counted on (*inter alia*) the services of Albiñana to ensure that it understood the legal framework correctly and that each of the plants met the requisites for inclusion in the tariff regimes.[367] None of those firms raised doubts about the risk of regulatory changes to the tariffs provided in RD 661/2007 or RD 1578/2008.

518.    In carrying out its investments in Spain, the Claimant reasonably relied on (i) the clear terms of RD 661/2007, which its directors studied independently (and which were broadly publicised and explained by Spanish authorities and legal advisors); (ii) the legal and business expertise of Ms. López Mera, who advised the Claimant on its expansion into the Spanish PV sector; (iii) the in-depth experience of its Spanish business partners, Valsolar

---

[366] Cl. Mem., ¶ 224, citing Board Minutes of April and July 2007: C-0187; CWS-JP1, ¶ 15.

[367] CWS-MHB1, ¶ 9.

and Bosques Solares; (iv) similar reviews and counsel regarding RD 1578/2008; and (v) due diligence carried out by at least three different Spanish law firms – including those conducted at the request of the banks that financed the projects.[368]

519.    Mr. Pereira da Cunha said that he recalled reading a summary of RD 661/2007 on the web page of Albiñana, and found that the concept was straightforward and somewhat similar to the regime with which the Claimant was familiar in Portugal, although the Spanish framework was more favourable, because the duration of the regime was unlimited for plants that registered in time.[369] The Claimant's directors discussed the Spanish regime frequently with Ms. López Mera, who also concluded that the terms of the incentives support regime were "very clear" – "precise tariffs were explicitly guaranteed in the terms of the Royal Decree and Spain guaranteed that any future revision that might be made to the tariffs in subsequent years would not impact the fixed tariff rates that had already been granted to existing facilities."[370] Ms. López Mera "never warned ... that Spain would be able to alter the incentives after Spain granted them to a particular plant."[371]

520.    The Claimant relied on advice from Albiñana (on the recommendation of Ms. López Mera[372]) when it acquired the Don Alvaro, La Albuera and Fuente de Campos Plants,[373] and when it acquired La Roda and Riosalido Plants,[374] and that the financing institutions relied on Uría Menéndez, who prepared a 48-page report regarding the La Albuera Plant[375]

---

[368] Cl. Reply, ¶ 285, citing CWS-JP2, ¶¶ 2-5.

[369] Cl. Reply, ¶ 286, citing CWS-JP2, ¶ 3.

[370] Cl. Reply, ¶ 287, citing CWS-SLM, ¶ 3.

[371] CWS-JP2, ¶ 3.

[372] CWS-SLM, ¶ 11: she says that the firm conducted the legal due diligence of the transactions regarding assets, plants and permits, as well as legal advice with respect to the drafting and execution of agreements.

[373] CWS-JP1, ¶ 19.

[374] R-0314; R-0315.

[375] C-0267; R-0316.

157

and on Gómez-Acebo & Pombo, who advised LBBW.[376] Neither of the firms raised a risk of change or issues of legal uncertainty.[377]

521. The Claimant says[378] that if there had been any indicators that the regime was in any way unstable, Uría Menéndez and Gómez-Acebo & Pombo would have identified the source of such instability and advised the Claimant's banks, since their objectives were to identify legal risks to the long-term financing that these banks ultimately issued on a non-recourse basis. Further, it is clear that the law firms, the banks, and the Claimant all expected Spain to apply RD 661/2007 (and RD 1578/2008) exactly as those decrees were written. The reason that there are no due diligence reports which warn of instability of the tariff system in RD 661/2007 and RD 1578/2008 is that no such instability existed. Ms. López Mera said in evidence that none of the lawyers involved expressed any doubts about the stability of the RD 661/2007 regime.[379]

522. Mr. Pereira da Cunha accepted that Ms. López Mera (who has never practised law[380]) was not formally retained to give legal advice, and also that the Claimant did not ask for specific legal advice on what he accepted was the critical issue of the stability of the Spanish system, or on the relationship between Law 54/1997 and RD 661/2007, or the general principles in Law 54/1997.[381] It seems likely that the Claimant did not receive a copy of the advice which Gómez-Acebo & Pombo gave to LBBW.[382]

523. In this case, the advice from Albiñana was concerned with regulatory compliance. Ms. López Mera's evidence was that for the conclusion of deals with Valsolar, as well for the formalisation of all agreements and contracts that followed, she put the Claimant in contact with the firm, which conducted the legal due diligence of the transactions regarding assets,

---

[376] CWS-JP2, ¶ 5.

[377] Cl. Reply, ¶ 291.

[378] Cl. Reply, ¶ 292.

[379] Tr.-E, Day 2, p. 103.

[380] *Ibid.*, p. 101, ll. 5-6.

[381] *Ibid.*, pp. 72-75, pp. 81-82.

[382] *Ibid.*, p. 77 (Mr. Pereira da Cunha).

plants and permits, as well as the legal advice with respect to the drafting and execution of agreements. There is no suggestion that they gave, or were asked to give, advice on the wider issues.

524.    In relation to La Roda[383], they stated:

>   Our responsibility is to express an opinion on the abovementioned documentation in its entirety, based on work performed in accordance with professional practices in the field of regulatory compliance … The purpose of this Report, in accordance with the instructions received, is to certify compliance in certain areas of the Project. Specifically, the following areas have been analysed: land, ownership and charges; corporate status; urban development or electrical licences, permits and authorisations which are necessary for the implementation of the Project. This Report does not include the study of certain aspects of the Project which, in order to be fully analysed, would require specific audits or audits of a different nature (e.g. fiscal, financial or relating to insurance, occupational or environmental) or any other area that has not been analysed in this Report. …[384]

525.    The advice to the banks from Uría Menéndez (which was expressed to be given solely for Banco SPI) was also very qualified.

526.    The Claimant relied[385] on the statement by Uría Menéndez that:

>   The definitive registration with the RAIPRE determines the remuneration to be received for the electricity generated by the Project. In this sense, provided that the Project is definitively registered with the RAIPRE before 29 September 2008 with each of the two hundred (200) solar units having an installed generation capacity of 9.9 kW and an individual transformer for each one, the current remuneration is €0.455134/kWh during the first 25 years and €0.364107/kWh the following years. This remuneration is reviewed yearly.[386]

---

[383] R-0314; and extract C-0266; also C-0265 in relation to Riosalido.

[384] R-0314, p. 2.

[385] Claimant's Opening Presentation, p. 151.

[386] R-0316, p. 33, 26 June 2008.

527. But they also said:

> (b) Our review has been exclusively limited to the areas identified in this Report (namely, corporate, real estate, contracts, urban planning, electricity sector and environmental regulation). (c) Our task has been limited to reviewing the aforementioned documentation from a strictly legal point of view. … Moreover, we have not analysed the correctness and reasonableness of the economic or commercial terms of the documentation reviewed. Our review addresses only the issues which we, at our discretion, have considered significant from a legal perspective. We do not accept responsibility for assessing the commercial or technical implications of the documents reviewed.[387]

528. Spain relies on provisions in the bank financing documents which define Adverse Material Effect, as (*inter alia*) legislative or regulatory modifications which have a negative and substantial effect on the renewable energy sector, to argue the regulatory risk, i.e., the possibility of a modification to the regulatory system applicable to renewable installations under the Special Regime, was a risk known by the Claimant.[388] In the view of the Tribunal Spain cannot place reliance on the fact that the financing documents provided for possible recourse in the event of an adverse change in the law as anticipating that there would be changes. This is not evidence that the parties and the lawyers thought that change was likely. It is simply protection against events which might, or might not, occur. The Tribunal considers, therefore, that the Claimant is right to say that recourse terms in bank financing agreements do not indicate any actual anticipation of change.[389]

529. If the lawyers were asked about regulatory change, they certainly did not reflect those instructions in their advice. If they had been asked, they would have had to present their clients with an analysis of the relevant decisions of the Spanish Supreme Court at that time.[390]

---

[387] *Ibid.*, p. 1.

[388] Resp. C-M, ¶¶ 640-653.

[389] Cl. Reply, ¶¶ 299-314.

[390] A striking fact in the awards which have been placed before this Tribunal is that many of the claimants obtained due diligence advice from leading and eminent firms, both Spanish and foreign, either directly or through funding

530. The relevant parts of the decisions have been set out above. What they show is that in Spanish law (as the lawyers involved must have known) at the time the investments were made, the Supreme Court had established that (1) changes to the incentive regime were lawful if they were made within the framework of Law 54/1997; (2) consequently, electricity producers under the Special Regime did not have an unalterable right to unchanged incentives; (3) there was no guarantee that incentives would remain unchanged; (4) regulatory changes would be compatible with principles of legal certainty; (5) electricity producers could expect under Law 54/1997, Article 30, that incentives would be designed to provide reasonable rates of return on investments with reference to the cost of money, but not that a certain level of profits or revenues would be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums would stay unchanged; (6) there was legitimate expectation that the annual adjustment or the level of the premium would not have the effect of reducing incentives.

531. This Tribunal is, of course, applying the international law standard of legitimate expectation, and not that of Spanish law, but in deciding what expectations an investor has it is highly relevant to determine what it reasonably considered that it was obtaining through its investments. Business people will not necessarily be expected to know about such judicial decisions, but their lawyers, especially well-known experts in international commercial law and Spanish energy and administrative law, can properly be held to a standard of knowledge in respect of such decisions.

---

banks, and yet in the majority of published awards it seems that the claimants did not enquire about, or were not given advice about, possible regulatory change, although the Supreme Court decisions had been the subject of wide industry discussion. See *Eiser v. Spain* (Award), ¶ 118 (Gómez-Acebo & Pombo); *Masdar v. Spain* (Award), ¶¶ 497 et seq (Latham & Watkins, and Jones Day); *Foresight v. Spain* (Final Award), ¶¶ 104, 379-380 (Garrigues); *9REN v. Spain* (Award), ¶¶ 231, 272 (Garrigues); *OperaFund v. Spain* (Award), ¶¶ 165, 187 (Cuatrecasas); *Stadtwerke v. Spain* (Award), ¶¶ 347-348 (Garrigues); *BayWa v. Spain* (Decision on Jurisdiction, Liability and Directions on Quantum), ¶ 78 (Lovells) (but see ¶ 76 (Bemm & Asociados, who advised the vendor of possible regulatory change)). Contrast *Cube v. Spain* (Decision on Jurisdiction, Liability and Partial Decision on Quantum), ¶ 301 (Garrigues), whose advice was that regulatory modification without compensation would not be constitutional; *Antin v. Spain* (Award), ¶¶ 120 et seq (Herbert Smith) and *RREEF v. Spain* (Decision on Responsibility and Principles of Quantum), ¶¶ 151-152 (Herbert Smith), where the lawyers drew attention to possible change and its lawfulness in the light of the Supreme Court decisions. See also *Novenergia v. Spain* (Final Award), ¶¶ 317-323 (Uría Menéndez): "in-house documents that demonstrate that legal advice was received, that has been hidden from the Tribunal" (¶ 320).

532.    The Tribunal, by majority,[391] therefore agrees with those tribunals which have regarded the existence of the Supreme Court decisions as highly relevant to the determination of the investor's expectations at the time of the investment.[392]

533.    The Claimant says that these decisions would not have given any warning that the Special Regime might be changed because they involved changes made for different purposes and did not concern provisions containing types of provision guarantees of fixed tariff rates and protections against future changes.[393] But this is not an answer to the point that change within the scope of Law 54/1997, and otherwise compliant with Spanish law, was potentially lawful, and soon afterwards (after the Claimant's investments) the Supreme Court dealt with challenges to the replacement of RD 436/2004 by RD 661/2007.  It again confirmed, applying the December 2005 decision, that Law 54/1997 did not require remuneration to be immune from change, since the government had a discretionary power to determine remuneration in the exercise of its regulatory power and the general interest.[394] There was no unalterable right to the maintenance of the remuneration framework, provided that the principles of Law 54/1997 regarding the reasonable rate of return were respected, which RD 661/2007 did.[395]

534.    It does not of course follow, because the Claimant knew or should have known that change was possible under Spanish law, that it could have no legitimate expectations about change at all, and in particular radical change. What it knew, or should have known, was that under

---

[391] For the reasons given in his Dissenting Opinion, Mr. David R. Haigh Q.C. expresses a different view.

[392] *Charanne v. Spain* (Final Award), ¶¶ 505 *et seq*; *Isolux v. Spain* (Award), ¶ 789; *Foresight v. Spain* (Final Award), ¶¶ 368-374. Contrast *Masdar v. Spain* (Award), in which the tribunal found (¶ 496) that there was no Spanish Supreme Court authority which "in any way cast doubt upon the legality or validity of the terms of RD 661/2007 generally or the stability provision of Article 44.3 in particular." It said that due diligence had been undertaken (including consulting Latham & Watkins and Jones Day) and said that (at ¶ 497): "No concerns were aroused, much less any indication at the time when Claimant was making its investment that there was the slightest possibility that the RD 661/2007 regime applicable to existing installations registered with RAIPRE would be swept away by the Disputed Measures, or that any reasonable investor might foresee that they might be." But the question for the lawyers should not have been about the validity of RD 661/2007, Article 44.3, or about the possibility of amendment, but about ministerial or legislative power to amend the incentive regime.

[393] Cl. Reply, ¶¶ 260, 267.

[394] R-0121.

[395] R-0122.

162

Spanish law Royal Decrees could be amended or replaced provided that the change was within the scope of Law 54/1997.

535. In particular, the Claimant must be taken to have known through its advisers that the RD 436/2004 regime had been replaced by RD 661/2007.

536. The Claimant's answer is that RD 436/2004 did not contain the same level of protection against retroactive changes to its remuneration terms that Spain subsequently included in RD 661/2007 and RD 1578/2008.[396] Articles 40.2 and 40.3 of RD 436/2004 provided that the quadrennial revisions of the tariffs, premiums, and incentives would apply only to plants that commenced operating after the revisions entered into force. But other sections of the Decree allowed for revisions of the tariffs when categories of energy reached certain limits of installed capacity.[397] There was no equivalent in RD 661/2007, which significantly improved the legal certainty and stability afforded to completed projects. The "cap and floor" mechanism which RD 661/2007 introduced for plants electing the market option, including plants built under RD 436/2004, might have reduced compensation for some plants in the short term, but in the long term it was an improvement in the regulatory framework to correct a defect which threatened investors with exposure to substantial price volatility. RD 661/2007 also included a transitional provision designed to minimise the impact of the regulatory change on plants which had been completed under RD 436/2004.

537. Spain does not effectively deny that in principle RD 661/2007 was an improvement on RD 436/2004. What it says[398] is that RD 661/2007 was not more beneficial for all parts of the sectors than RD 436/2004. For example, wind facilities wished to maintain the transitional option of RD 436/2004 before opting for the remuneration of RD 661/2007; and, for PV, RD 661/2007 resulted in a reduction in the returns and the elimination of the remunerative option of pool plus premium.

---

[396] Cl. Reply, ¶ 227.

[397] C-0075/R-0060, Articles 32-38.

[398] Resp. Rej., ¶¶ 462 *et seq.*

538.    The Tribunal, by majority, is satisfied that the combination of the overarching framework established by Law 54/1997, the relevant Supreme Court decisions, and the fact that RD 661/2007 had replaced the earlier regulatory regime, was sufficient to have put the Claimant's advisers on notice that the Special Regime was not immune from change. Further, by majority, in the Tribunal's view, investors cannot be presumed to have invested on the basis of an expectation, whether advised or otherwise, that the legal and regulatory environment into which they were investing would remain static. What they *may* reasonably be entitled to expect, in reliance on appropriate due diligence to this effect, is that the legal and regulatory regime into which they were investing would not change radically and fundamentally without notice.

    **e.    *What were Spain's Commitments to PV Investors at the Time of the Claimant's Investments?***

539.    This heading involves a number of interlinked questions, which include these: (1) what commitment, if any, was represented by, or what legitimate expectations, if any, were engendered by RD 661/2007 in general and by Article 44.3 thereof in particular; and/or what, commitments, if any, were represented by, or what legitimate expectations, if any, were engendered by, official statements made on behalf of Spain?; (2) what was the underlying basis of the Spanish incentive regime on which investors could reasonably rely, and in particular (as Spain contends) was the underlying basis the principle of "reasonable rate of return"?

540.    These questions are linked both as regards the Claimant's claim that Spain was in breach of commitments in its legislation and in statements by officials, and also as regards its claim that, irrespective of specific commitments, Spain was in breach of the FET and other ECT standards.

    (i)    *The Question of Construction*

541.    Article 40.3 of RD 436/2004 provided:

    The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of entry

into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.[399]

542.  When RD 436/2004 was replaced by RD 661/2007, the equivalent of Article 40.3 of RD 436/2004 was Article 44.3 of RD 661/2007.

543.  The Parties disagree on the effect of Article 44.3 of RD 661/2007. It provides:

> The revisions to the regulated tariff and the upper and lower limits [under the premium option] indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[400]

544.  The first question is one of construction, namely whether (quite apart from Spain's right to alter it or evoke it) Article 44.3 set out the only circumstances in which under RD 661/2007 Spain could revise the tariffs (as the Claimant contends) or whether (as Spain contends) the reference in Article 44.3 to reviews referred to "in this paragraph" meant that revisions which were motivated or justified by the economic sustainability of the SES or by the need to avoid excessive remuneration were outside the scope of Article 44.3.

545.  The literal wording of Article 44.3, and of its predecessor, Article 40.3 of RD 436/2004, supports Spain's construction,[401] while the Claimant's construction is supported by the fact that the initial draft of RD 661/2007 did not contain any provision for the protection of existing plants from 4 yearly revisions. The CNE had pointed out:

> It is the CNE's view that the transparency and predictability of economic incentives in the future reduce regulatory uncertainty, which operates as an incentive for investments in new capacity and minimizes the projects' funding costs, thus bringing down the end costs for consumers. Regulations should offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the entire life of the facilities, establishing, where applicable, transparent mechanisms for annual adjustments, tied to changes in strong indexes (such as the average or reference rates,

---

[399] R-0069/C-0075.

[400] C-0098/R-0071.

[401] With which Mr. David R. Haigh Q.C. does not agree.

> the IPC, and ten-year bonds), and periodic reviews, for instance,
> every four years, affecting new facilities only, as regards the
> investment costs, with the possibility of affecting a reduction in the
> operating costs of existing facilities as well.[402]

546. But that is not a question which the Tribunal needs to address.

547. In the view of the majority of the Tribunal, irrespective of the differing interpretations, RD 661/2007 (and RD 1578/2008) did not contain the type of specific commitments (or, as it is sometimes put, a stabilisation clause) which gave rise to legitimate expectations under the FET standard that there will be no adverse change.

548. The applicable legal principles make it clear that States retain regulatory powers, and general provisions such as these are not immune from change, not only in national law, but also in international law.[403]

549. The Tribunal, by majority, has concluded that, through its advisers, the Claimant must be taken to have been on notice that the regulatory conditions could be altered to adapt to changed circumstances, or, alternatively, that if the Claimant was not so advised, this was a shortcoming in its due diligence such that it could not rely on the advice that it received to properly found a claim of legitimate expectations.

### (ii) *Registration in RAIPRE*

550. The Tribunal, by majority, equally, does not consider[404] that acceptance of registration in the RAIPRE amounted to a specific commitment, or created vested rights, because it was simply an administrative requirement, without creating any rights under Spanish law, and it could not be endowed with any greater rights under international law.

### (iii) *Statements by Ministers and Officials*

---

[402] CNE Report 3/2007, C-0061, at p. 19.

[403] See above, section on legal principles; and also *Charanne v. Spain* (Final Award), ¶ 493; *Isolux v. Spain* (Award), ¶ 772; contrast *Antin v. Spain* (Award), ¶ 553.

[404] See also *Charanne v. Spain* (Final Award), at ¶¶ 509-510; contrast *Antin v. Spain* (Award), at ¶ 552; *Masdar v. Spain* (Award), at ¶ 512.

551.    The Tribunal, by majority, further, does not consider that there were governmental assurances which could be regarded as specific commitments to investors such as the Claimant.

552.    The Claimant's case is that Spanish officials repeatedly made explicit promises to investors that the support they would receive through the RD 661/2007 and RD 1578/2008 incentives and other elements of the regime would remain constant throughout the operating lives of the PV facilities.[405]

553.    In particular, the Claimant relies, first, on statements by Government Ministers, including these:

(1)    In answer to a request for a stable framework made by the chairman of the Spanish Energy Club in Madrid, the Ministry of Industry, Tourism and Trade referred to "Calmness and stability so that the players in the energy sector are well aware of what lies ahead in the medium-term."[406]

(2)    In March 2007, when addressing the 2007 reforms, the Minister said that the Government would not bring about any lack of legal security for renewable energies, and would remain committed to the strengthening of this type of energy; and assured the audience that there would be no lack of legal security from the Government of Spain, and that the return on investments would be maintained.[407]

(3)    In the same period, the Secretary of Energy said (in an interview about wind energy) that the regime ensured "total legal certainty."[408]

(4)    The Ministry of Industry, Energy and Tourism press release on RD 661/2007 stated:

> It will be in 2010 that the tariffs and premiums set out in the proposal will be revised in accordance with the targets set in the Renewable Energies Plan 2005-2010 and in the Energy Efficiency and Savings

---

[405] Cl. Mem., ¶¶ 168-169, 366-367; Cl. Reply, ¶¶ 269 *et seq*; Claimant's Opening Presentation, Slides 50-54.

[406] Press article, 18 October 2006, C-0114.

[407] Press article, March 2007, C-0113.

[408] Press article, May 2007, C-0115.

Strategy and in line with the new targets included in the following Renewable Energies Plan for the period 2011-2020.

…

The new text, which replaces Royal Decree 436/2004, fits into the energy policy commitment to drive forward the use of clean, native and efficient energies in Spain. The Government commitment to these energy technologies was the reason why the new regulations sought stability over time, which allows businessmen to carry out medium and long-term scheduling as well as a sufficient, fair return that, combined with stability, makes the investment and dedication to this activity attractive.

…

The revisions carried out in the future of the tariffs will not affect those Installations already in operation. This guarantee provides legal [security] for the producer, affording stability to the sector and fostering its development.[409]

(5)   In an appearance before the Senate the Minister of Industry, Tourism and Trade said that RD 661/2007 guaranteed legal certainty for investors, and rejected claims that there was a lack of legal security in the PV energy generation activity and gave assurances that the Government would show a clear and firm attitude in favour of renewables.[410]

554.   Similar statements were made in relation to RD 1578/2008:

(1)   "The remuneration period for each facility is 25 years and the annual updating of the remuneration [is] in line with the IPC-0.25 or 0.50, in both cases the same as in the previous Royal Decree."[411]

---

[409] Ministry of Industry press release, 25 May 2007, C-0099.

[410] Press articles of 9 October 2007, C-0103 and C-0117.

[411] Ministry of Industry press release, 26 September 2008, C-0138.

    (2)   "The tariffs assigned to the projects in each call will be maintained for 25 years from commissioning."[412]

    (3)   "… the holders of facilities have twelve months to complete their installation and get it up and running in order to be entitled to this remuneration for a 25-year period."[413]

555.    The Claimant also relies on statements by senior officials from CNE and IDAE[414] at presentations and conferences, emphasising the profitability and stability of the RD 661/2007 regime, including these:

    (1)   Carlos Solé Martín (CNE) Madrid, 18 June 2007: "Regulatory stability. Predictability and safety of economic incentives during the life of the installation (encouraging investors and lower financial cost)."[415]

    (2)   Francisco Javier Peón Torre (CNE), Colombia, 19-23 November 2007: "To ensure regulatory stability. Predictability and safety of economic incentives during the life of the installation (encouraging investors and lower financial cost): non-retroactivity."[416]

    (3)   Jaume Margarit (IDAE) Madrid, 11 December 2007: "Consolidation of the regulatory framework, providing the system with stability and predictability. Feed-in tariff and Premium system which complement the market price. Guarantee throughout the life of the installation."[417]

    (4)   Carlos Solé Martin and José Miguel Unsión (CNE), Costa Rica, 22 April 2008: "Revisions every 4 years (2008-2012-2016…). "They come into force on January 1st of the second year (in 2010, the incentives would be set for 2012). Without

---

[412] CNE Report 30/2008, 29 July 2008, C-0111.

[413] Ministry of Industry press release, 23 April 2009, C-0155.

[414] Also on presentations by Invest in Spain, a state agency for the promotion and attraction of foreign investment, and which promoted investment in renewables: e.g. C-0026, C-0176 (2009); C-0153 (2010).

[415] C-0130.

[416] C-0107.

[417] C-0120.

retroactivity for existing installations (start-ups only affect new installations as from 2008)."[418]

(5) Carlos Solé Martín (CNE), Israel, December 2008: "Security and predictability of economic support > To eliminate the regulatory risk (warranty by law). Non retroactive > Less uncertainties for investors (and Banks) and lower cost to the consumers."[419]

556.  By majority, the Tribunal finds that in light of the way the Claimant put its case, and especially because it was not its case that it actually relied on these statements, the statements cannot be regarded as a specific commitment, or series of specific commitments, by Spain that it would make no adverse changes to the regulatory system. The most that could be said is that these statements could have been a basis for a reasonable business decision as regards the risk of change. In any event, informed industry observers would have known that the Government, any government, would impicitly have reserved the right to make changes in the public interest, and that these statements were being made in the context of changes which had had some resistance. Indeed, RDL 7/2006 and RD 661/2007 had met some resistance from industry on the ground that they were retroactive.[420]

557.  It does not, of course, follow that in terms of its treaty obligations, for example. under the ECT, Spain's power to make changes was unlimited.

558.  The Tribunal considers that a distinction must be made between the 2010 changes and the subsequent dismantling of the incentive system and its replacement by the New Regulatory Regime.

---

[418] C-0127.

[419] C-0128 (Slide 33).

[420] Cl. Mem., ¶ 353, citing *Micula v. Romania* (Award), ¶¶ 137-139.

(5)    **The 2010 Changes**

559.    In the year after the last of the Claimant's investments, Spain published the 2010
Renewable Energy Action Plan, 30 June 2010 (PER 2011-2020):[421] The PER 2011-2020
stated that the then-existing remuneration framework for renewable energies under RD
661/2007 was "stable, predictable, flexible, controllable and secure for developers and the
electricity system";[422] electrical energy production under the special procedure was
founded on three basic principles, namely "legal certainty, feasibility and regulatory
stability"; and any present or future economic remuneration system to support the
generation of electricity from renewable sources would be based on those principles.  It
also stated:

> **Royal Decree 661/2007** of 26 May 2007 regulating electrical
> energy production under the special regime, implements the
> Electricity Sector Act Law 54/1997 and defines the legal and
> economic regime for electrical energy and cogeneration plants and
> plants that use renewable energies and waste as raw material, with
> the overarching objective of establishing *a stable and predictable
> system that guarantees a reasonable return* on electrical energy
> production under the special regime.[423]
>
> …
>
> The economic framework, currently implemented by **Royal Decree
> 661/2007** of 25 May 2007 regulating electrical energy production
> under the Special Regime, and Order ITC/3519/2009 of 28
> December 2009 reviewing access fees as from 01 January 2010
> along with the tariffs and premiums corresponding to special regime
> installations, provide for electricity generation remuneration levels
> *that afford a reasonable return on investment*. In determining those
> levels, account is taken of the specific technical and economic
> aspects of each technology, installed capacity and the date operation
> commenced, in all cases using criteria of system economic
> sustainability and efficiency.[424]

---

[421] R-0093.

[422] *Ibid*., p. 49.

[423]  *Ibid*., p. 106 (emphasis added).

[424] *Ibid*., p. 112 (emphasis added).

…

Royal Decree 661/2007 *provides for reviews of remuneration* amounts every four years, which may be modified on the basis of technological developments within the sectors, market behaviour, degree of compliance with renewable energy targets, percentage of demand covered by special regime facilities and their effect on the technical and economic management of the system, *while always guaranteeing reasonable rates of return*. In any event, these reviews take account of cost trends associated with each technology with three objectives in mind: to see that renewable technologies become as competitive as possible with Ordinary Regime generation, to foster a technological development balance and to see that the remunerative scheme moves in the direction of minimising socio-economic and environmental costs.[425]

…

Technical parameters and investment costs incurred will be considered in determining remuneration *with a view to providing a reasonable rate of return referenced to the cost of money on the capital market in accordance with the provisions of the Electricity Sector Act.*

Also, effective administrative supervision is required to assure that gains from the development of these technologies in terms of relative cost competitiveness are passed on to society, thus *minimising the speculative risks posed in the past by excessive rates of return*, which not only hurts consumers but is also damaging to the industry in general in terms of the perception people have of it. Therefore, it will be necessary to devise sufficiently flexible and transparent systems that permit the issue and reception of economic and market signals so as to minimise the risks associated with investment and its remuneration and those caused by fluctuations in the energy markets.[426]

560.    Virtually contemporaneously with the publication of the PER 2011-2020, in 2010, Spain took measures to restrict tariff incentives for PV (and other renewables).[427]

---

[425] *Ibid.*, p. 115 (emphasis added).

[426] *Ibid.*, p. 118 (emphasis added).

[427] See RD 1614/2010 (wind and CSP), R-0075.

561.    RD 1565/2010[428] capped the quantity of electricity produced by PV plants which was eligible to receive incentive tariffs and eliminated the tariffs after 25 years of operation, which was later extended to 28 years and then to 30 years (by RDL 14/2010 and Law 2/2011). RD 1565/2010 also imposed a reduction in the tariff rate available to certain facilities enrolling in the RD 1578/2008 regime.

562.    RDL 14/2010[429] introduced urgent measures to correct the tariff deficit. It imposed a temporary three-year cap on the number of operating hours during which PV installations were entitled to the RD 661/2007 tariff, in exchange for a three-year extension of the 25-year tariff term (which was later extended by a further two years by Law 2/2011). It also imposed an access fee (of €0.50/MWh) on all producers for access to transmission and distribution networks.

563.    The Tribunal has concluded above, by majority, that investors who had made their investments prior to 2010, and who had conducted effective due diligence, would have known that there had been prior changes, and could have foreseen that there would be further changes to the system. The Tribunal has also concluded that there was no commitment on the part of Spain to investors not to make any changes.

564.    In the Tribunal's assessment, the changes introduced by RD 1565/2010 and RDL 14/2010 were not radical. They did not alter the essential elements of the scheme. They were not disproportionate or discriminatory. They were well within Spain's margin of appreciation and within its regulatory powers under international law in general and the ECT in particular.

565.    Nor can there be any successful suggestion that they were not *bona fide* measures in the public interest. The preamble to RDL 14/2010 stated:

> Since the adoption of the Royal Decree-law [RDL 6/2009], there have been a series of supervening circumstances that have had a direct impact on the anticipated tariff deficit in the electricity system and it has been determined that the capped ex ante deficit limits, as

---

[428] C-0129; R-0074.

[429] C-0102; R-0058.

established in the aforementioned Twenty-First Additional Provision, have been largely overcome. The impact of the global crisis, which traverses the Spanish economy, has led to a significant decline in the demand for electric energy, however, supply has been impacted by aspects such as the evolution of the price of fuels on the international markets during the current year, 2010 and the favourable climatic conditions that have led to increased electric energy production from renewable sources. The current economic situation has not had symmetrical consequences in all electric power sectors: while the ordinary regime (traditional electric power plants) have seen a reduction in their operating hours and income, due to the decline in wholesale market prices, however, producers under the special regime are found to be in a different circumstance, as this specific regime ensures the sale of generated electricity at preferential rates within the system.[430]

566.    The preamble also stated that it was enacted "in consideration of the rate of growth of photovoltaic installations" and that the PV sector was a major contributor to the regulated costs of the electricity system as a consequence of the objectives being exceeded.

567.    There is no reason to doubt the accuracy and *bona fides* of this motivation.

568.    Consequently, the Tribunal considers that there are no grounds for the Claimant's complaints in relation to the 2010 changes.[431]

**(6)     The New Regulatory Regime**

569.    Law 2/2011 on Sustainable Economy,[432] outlined the need to undertake a reform in energy regulation in general and the incentives for the Special Regime in particular.  Section 78.1 set a minimum national goal of 20% for the participation of renewable energies in gross energy consumption for the year 2020; and the target was to be attained with an energy

---

[430] R-0058.

[431] See also *Novenergia v. Spain* (Final Award), at ¶ 688, that: "The measures enacted in 2010 did not, in the Tribunal's view, 'fall outside the acceptable range of legislative and regulatory behaviour' [citing *AES Summit v. Hungary*, ¶ 9.3.73]. Put differently, those measures cannot be considered as having 'entirely transform[ed] and alter[ed] the legal and business environment under which the investment was decided and made'" [citing *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, ¶ 275, CL-0066]; see also *Charanne v. Spain* (Final Award), at ¶¶ 505 *et seq*; *Foresight v. Spain* (Final Award), ¶ 388. See also *Cube v. Spain* (Decision on Jurisdiction, Liability and Partial Decision on Quantum).

[432] C-0095; R-0045.

quota from renewable energies in all kinds of transmission by 2020 that was equivalent to at least 10% of the final energy consumption in the transmission sector.

570.    On March 7, 2012, CNE issued Report 2/2012 recommending measures to address the tariff deficit.[433] It said:

> The Spanish electrical system has recorded a structural deficit in the revenues from regulated activities (tariff deficit) for a decade, due to the fact that the costs that have been recognised for the various regulated activities and costs have been (and continue to be) higher than the revenues obtained from the regulated prices paid by consumers.
>
> …
>
> … the current situation is unsustainable.  The introduction of regulatory measures, as requested by the document of the SEE, is called for with immediate effect in the short term, in order to eliminate the deficit of the system, mitigate the cost of funding the yet unsecuritised debt and clearly define the access costs that will be assumed by electricity consumers, in order to determine their access tariffs in a satisfactory and stable manner.[434]

571.    On July 20, 2012, Spain and the EU signed a Memorandum of Understanding in which Spain committed to "address the electricity tariff deficit in a comprehensive way".[435]

572.    **RDL 1/2012:**[436] RDL 1/2012 eliminated feed-in remuneration under RD 661/2007 for new plants, and suspended new RAIPRE registrations. Facilities which, at the time of the entry into force of RDL 1/2012, had been finally registered in the RAIPRE were excluded from its scope of application.  The preamble restated the efforts made by RDL 6/2009 and RDL 14/2010 to address the tariff deficit, and stated that (a) the measures adopted so far had not been sufficient, and the final purpose of eliminating the tariff deficit as from 2013 was still in jeopardy; (b) it was therefore considered appropriate to withdraw the economic

---

[433] R-0105.

[434] *Ibid.*, pp. 6-16.

[435] RL-0067, p. 15.

[436] C-0175; R-0060.

incentives for certain special regime facilities and for certain ordinary regime facilities using similar technologies, as well as to suspend the remuneration pre-allocation procedures established for them, in order to address the problem of the electricity sector high tariff deficit in a more favourable environment; (c) by adopting this measure, the Government had chosen to limit its scope to special regime facilities not yet registered, except where such condition was due to the Administration's failure to comply with the relevant time limit for making a decision; (d) it had been decided to limit the scope of the measure in order to prevent it from affecting investments already made with regard to ordinary regime facilities, not subject to the pre-allocation scheme.

573.    **Law 15/2012:**[437] Law 15/2012 has already been summarised above in the section on the taxation carve-out (paras. [...]).  It introduced the TVPEE.

574.    **Law 17/2012:**[438] Law 17/2012 on the general state budget supplemented Law 15/2012 and earmarked an amount equivalent to the tax collected under Law 15/2012 to fund the costs of the electricity system related to promotion of renewable energy.

575.    Decrees towards establishing the New Regulatory Regime were then enacted.

576.    **RDL 2/2013 and MO IET/221/2013 implementing RDL 2/2013**:[439]  The preamble of RDL 2/2013 recognised "the dual goal of guaranteeing a reasonable return on investment for those facilities, while avoiding their over-remuneration" and said:

> The data reported by [CNE]... has revealed the appearance of new deviations in estimates of costs and revenues caused by various factors, both for the end of 2012 and 2013, that in the current economic context, would render almost unfeasible their coverage with electric tolls and the items prescribed from the State General Budget.
>
> These deviations are due largely to a higher growth in the cost of the special regime, due to an increase in the operation hours exceeding the projected and an increase in the compensation values after

---

[437] C-0040; R-0003.

[438] R-0023.

[439] R-0063/C-0083, C-0181.

indexing to the Brent price, and a reduction of toll revenues due to a very sharp drop in demand which is consolidated for this exercise. The proposed alternative would be a further increase in the access tolls paid by electricity consumers. This measure would affect directly household economies and corporal competitiveness, both in a delicate situation, given the current economic situation.

Given this scenario, in order to alleviate this problem the Government has decided to adopt certain cost-reduction urgent measures to avoid the assumption of a new effort by consumers; helping them, through consumption and investment, to collaborate as well for the economic recovery.

577. RDL 2/2013 effectively eliminated the premium under the "pool price plus premium" option under RD 661/2007 and replaced the PI-linked updating index in RD 661/2007 with a lower index: (1) it ascribed a new value of "zero" per kWh to the reference premiums (and caps and floors) applicable to Special Regime installations under RD 661/2007; (2) if a Special Regime facility opted to sell electricity under the "pool price" option (without premium), it would no longer be entitled to choose the regulated tariff option during the remainder of its operational life; and (3) with effect from 1 January 2013, it replaced the CPI used for making the annual updates in RD 661/2007 with a CPI "to constant taxes with no unprocessed food nor energy products," the effect of which was that any annual updates to the feed-in remuneration would no longer reflect any variations in the tax rates or inflation in relation to the prices of unprocessed foods and energy products.

578. On 14 February 2013, Spain implemented several of these changes through the approval of Order 221/2013,[440] which dealt with the access tolls, tariffs and premiums for Special Regime facilities.

579. **RDL 9/2013:[441]** RDL 9/2013, effective as of 1 January 2013, repealed RD 661/2007. It eliminated the regime of fixed tariffs and premiums both for new and existing installations, and substituted a system providing for "specific remuneration" based on "standard" costs per unit of installed power, plus standard amounts for operating costs.

---

[440] C-0181.

[441] C-0091; R-0064.

580.    The preamble stated:

> … for a decade [the Spanish electric system] … has adopted a structural nature, due to the fact that the actual costs related to regulated activities and the operation of the electricity sector are higher than the collection of the tolls set by the Government, which are paid by consumers.
>
> Between the years 2004 and 2012, the revenue of the electricity system due to consumer toll fees increased by 122%, while the increase of the regulated costs of the system during this period has been 197%. Among the cost headings that have contributed the most to the increase are the special regime premiums and the annuities of accumulated deficits, headings that have been multiplied by six and nine respectively in that period.  According to the latest data available from the National Energy Commission [CNE], there is a balance of accumulated debt of 26,062.51 million euros as of 10 May 2013. Complementary to the calculation of the debt of the electricity system, the [CNE] notes that since 2003 and until 10 May, 2013, the amount paid to finance the deficit of the electricity system through annuities incorporated into the consumer access tolls, at current prices for each year, amounts to 11,823 million euros.
>
> These figures give testimony of the unsustainable nature of the deficit of the electricity sector and the need to adopt urgent measures of an immediate effect that would put an end to this situation.

581.    Article 1 substituted a new Article 30.4 in Law 54/1997:

> Additionally, and in the terms determined legally by Royal Decree of the Council of Ministers, for the remuneration for the sale of energy generated, valued at market price, the facilities shall be able to receive a specific remuneration made up of  one term per power unit installed,  that covers, when appropriate, the investment costs of a standard facility that cannot be recovered by the sale of energy and an end to the operation that covers, as applicable, the difference between the operating costs and revenue by participation in the market of such standard facility.
>
> For purposes of calculating this specific remuneration, the Law shall consider the following for any standard facility throughout its useful life and in reference to the business activity carried out by an efficient and well-managed company: (a) The standard revenue for the sale of the energy generated, valued at the production market

178

price. (b) The standard operating costs. (c) The standard value of the initial investment.

For these purposes, this shall never include the costs or investments determined by regulations or administrative acts which are not applicable across the entire Spanish territory. In the same way, this will only take into account those costs and investments that respond exclusively to the field of production of electricity.

…

This remuneration scheme does not exceed the minimum level necessary to cover the costs that allow for the facilities to compete equally with the rest of technologies in the market and that would lead to a reasonable rate of return by reference to the standard facility applicable in each case.  Notwithstanding the foregoing, exceptionally the remuneration scheme may also include an incentive for investment and the execution within a specific time period when the facility in question involves a significant reduction of costs in the insular and extra-peninsular systems.

This reasonable rate of return shall focus, before tax, on the average yield in the secondary market of the Obligations of the State within ten years by applying the appropriate differential.

The parameters of the remuneration scheme may be revised every six years.

582.    The reasonable profitability provision was as follows:

**First additional provision. Reasonable profitability of production facilities with the right to feed-in tariff scheme.**

For purposes of the provisions of the penultimate paragraph of Article 30.4 of Law 54/1997, of 27 November, for the facilities that as of the entry into force of this Royal Decree law have the right to a feed-in tariff scheme, the reasonable rate of return shall focus, before taxes, on the average yield in the secondary market for ten years prior in to the entry into force of this Royal Decree-Law of the Obligations of the State within ten years increased by 300 basic points, without prejudice to the revision envisaged in the last paragraph of that article.

583.    Details were left to be determined by implementing decrees.

179

584.    **Law 24/2013:**[442] Law 24/2013, 26 December 2013, superseded Law 54/1997.  It removed the distinction between Ordinary and Special Regimes under RD 661/2007.  According to the preamble:

> … a decisive element for undertaking this reform was also the accumulation during the last decade of annual imbalances between income and costs of the electrical system which has brought about the appearance of a structural deficit.
>
> The causes of this imbalance lie in the excessive growth of certain costs' items owing to energy policy decisions without ensuring their correlative income from the system. This has all been exacerbated by the lack of growth in electrical demand, essentially the consequence of the economic crisis.
>
> ... The imbalance has reached the point where the accumulated debt of the electrical system is currently in excess of twenty six billion Euros, the structural deficit of the system stands at ten billion per annum and the failure to correct the imbalance has introduced the risk of the bankruptcy of the electrical system.
>
> Law 54 enacted on November 27th 1997 has proven insufficient to ensure the financial balance of the system, amongst other reasons because the remuneration system for regulated activities has lacked the flexibility required for its adaptation to major changes in the electrical system or in the evolution of the economy.
>
> Hence, the experience of the last decade has made it clear that the economic and financial instability of the electrical system, brought about by the tariff deficit, has prevented the assurance of a stable regulatory framework which is necessary for the smooth carrying out of an activity like the electrical business which is very capital intensive.
>
> Hence, the economic unsustainability of the electrical system, along with the continuous evolution in the sector during the last sixteen years, has required the legislator to adapt, on numerous occasions, Law 54 enacted on November 27th 1997 regarding the Electrical Sector, often through the approval of urgent measures by Royal

---

[442] C-0180; R-0047.

Decree and at present there is a normative dispersion which is not desirable in such a relevant economic sector.

…

Essentially, the continuous normative changes have entailed an important distortion to the normal operation of the electrical system and which needs to be corrected through action by the legislator which lends the regulatory stability that electrical activity requires. This regulatory safety, combined with the need to undertake the reforms needed to ensure the sustainability of system in the long-term and to resolve the existing shortcomings in system operation would recommend the approval of an overall reform of the sector, based on a new income and expenses regime for the electrical system which tries to return to the system the financial sustainability it lost a long time ago and whose eradication has not been achieved to date through the adoption of partial measures.

…The remuneration regime for renewable energies, cogeneration and waste will be based on the necessary participation in the market of these installations, complemented by market income with specific regulated remuneration which enables these technologies to compete on an equal footing with the other technologies on the market. This specific complementary remuneration will be sufficient to attain the minimum level to cover any costs which, by contrast to conventional technologies, they cannot recover on the market and will allow them to obtain a suitable return with reference to the installation type applicable in each case.[443]

585. The object of the New Regulatory Regime was: "to establish the regulation of the Electrical Sector with a view to ensuring the supply of electrical energy and to adapt it to the needs of consumers in terms of safety, quality, efficiency, objectivity, transparency, and at the minimum cost."[444]

586. Law 24/2013 eliminated the distinction between the Ordinary and Special Regimes, on the basis that renewables producers were on the same footing as conventional power generators, except as expressly provided. It provided for the Special Payment remuneration

---

[443] R-0047, Preamble.

[444] *Ibid.*, Article 1.1.

scheme to be subject to revision every six years, with the base line predictions reviewed every three years.

587. Pending regulations (RD on renewable production, subsequently RD 413/2014; and Ministerial Order on remuneration parameters, subsequently MO IET/1045/2014[445]) were to apply from their date of enactment to 14 July 2013.

588. **RD 413/2014:**[446] RD 413/2014 established the New Regulatory Regime, and Ministerial Order IET/1045/2014 gave details of the new compensation formulas.  Together, RDL 9/2013, Law 24/2013, RD 413/2014, and MO IET/1045/2014 comprised the New Regulatory Regime.

589. RD 413/2014 stated in Article 1 that its purpose was "to regulate the legal and economic regime governing the business of electricity generation from renewable energy sources …"[447] It was to apply "to installations … which do not reach the minimum level required to cover the costs that would allow them to compete equitably with the rest of technologies in the market with a reasonable profitability, taking into account the  corresponding standard installation".[448]

590. To determine the specific remuneration scheme applicable in each case, every facility depending on its features was to have an assigned standard facility, and the remuneration for each facility was to be obtained from the remuneration parameters for the standard facility and the features of the actual facility (Articles 11.4, 11.5). By Article 19, reasonable profitability for the standard facility was to be calculated as the average yield of 10-year Spanish bonds in the secondary market during the 24 months prior to May of the year before the regulatory period increased by one differential. It was to be based on a standard installation with an operational life of 25 years.

---

[445] C-0179; R-0086.

[446] C-0090; R-0080.

[447] C-0090, Article 1.

[448] *Ibid.*, Article 11.2.

591. Tariff payments received prior to the inception of the new regime were to be counted towards the total remuneration which an installation might receive over its deemed operational life, to determine whether the plant had received a reasonable return. If the installation surpassed the "reasonable return" (7.398%), it would not receive further subsidies.

592. **MO IET/1045/2014:[449]** This Ministerial Order (consisting of some 1750 pages) also referred in its preamble to a remuneration model which "ensur[ed] the facilities' reasonable profitability." It set the remuneration parameters for "standard" facilities, including the estimated "standard costs" applied under the new regulatory regime, and the criteria for "standard installations" for different types of renewable. Under Annex III of the Order, the target rate of return for renewable energy producers is set at 7.398% pre-tax. This value will apply until 31 December 2019 (until the end of the first regulatory period running from 12 July 2013), and is then subject to discretionary reviews for subsequent regulatory periods.

593. The Special Regime generators' entitlement to the regulated tariff was eliminated. The only option now available to renewable energy generators was to sell their entire electricity output at market prices, with the possibility in exceptional circumstances of receiving from the State an additional specific remuneration, which may include one or both of the following elements: (1) a "remuneration to investment" (investment incentive) (RIN), per MW of installed capacity, seeking, in theory, to cover the hypothetical investment costs of a "standard installation" that cannot be met by market prices; and (2) a "remuneration to operation" (operating inventive) (ROP), per MWh of electricity produced, seeking to cover the hypothetical operating costs of a "standard facility" (a hypothetical efficient plant) which cannot be met by market prices. (1) is calculated on the basis of standard historical values of the operation and performance of a "standard facility" throughout its regulatory lifespan, so that it theoretically reaches a target return; and (2) is only received by facilities which have not exceeded a certain number of years of operation (30 years, in the case of PV). Remuneration parameters (including the rate of return) could be revised every 3 or 6

---

[449] C-0179; R-0086.

years, including for existing facilities. The use of CPI as an index to inflation was abandoned.

594.    If the return before July 2013 exceeded the target return, it would not be entitled to the regulated revenue even though the scheme did not then exist, as if the scheme had then been in existence. If the installation passed the "reasonable return" test (7.398%) it would not receive further subsidies.

595.    The consequences of these changes are dealt with below.

**(7)    The Reasonable Rate of Return Issue**

596.    The essence of Spain's case on what investors were reasonably entitled to expect (their legitimate expectation) is that the reasonable rate of return principle is the cornerstone of the remuneration system for the production of energy from renewable sources, and this principle requires a necessary balance between the benefits to be received by producers and the effort involved in the rollout of renewable technology.[450]

597.    Spain's "reasonable rate of return" contention is described by the Claimant as "self-serving," "arbitrary," "idiosyncratic," and as determined by "arbitrary, opaque, and complex formulas," [451] and as a "myth" and "revisionist history, clearly devised for purposes of litigation."[452]

598.    The crucial question is what, if any, legitimate expectations the regulatory regime engendered. Spain says that it engendered no more than an expectation of a reasonable rate of return. The Claimant's principal argument is that it invested in Spain on the legitimate expectation that its facilities would receive the precise tariffs established in RD 661/2007 and RD 1578/2008 for all of the electricity produced by its installations which were properly constructed, connected, and registered before an established deadline.

---

[450] E.g. Resp. Rej., ¶ 300.

[451] Cl. Mem., ¶¶ 296, 323, 386.

[452] Cl. Reply, ¶¶ 20, 23.

599.    The Tribunal has already rejected the Claimant's principal argument on legitimate expectation, concluding that the Claimant had no legally protected right to the RD 661/2007 incentives for the life of the plants,[453] and in particular that the 2010 changes cannot be impugned.

600.    The relevant question, therefore, is whether the reasonable rate of return principle is the cornerstone of the incentive regime in relation to the substantive complaints concerning the New Regulatory Regime, and also to the question of damages.

601.    The Tribunal, by majority, is satisfied that Spain is right in contending that the "reasonable rate of return" or reasonable profitability is the cornerstone of the incentive regime and the only relevant expectation which was legitimate in the present context.

602.    When the measures of which the Claimant complained were enacted, the enabling legislation was Law 54/1997, which was at all material times the relevant controlling legislation in the Spanish system of legislative hierarchy.

603.    Article 16.7 of Law 54/1997 provided that in the case of the Special Regime a premium was to be determined by the Government in accordance with the provisions of Article 30.4, which provided that:

> The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under the statutory terms set out in regulations and in the following cases
>
> …
>
> To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so *as to*

---

[453] With which Mr. David R. Haigh Q.C. does not agree.

> *achieve reasonable profitability rates with reference to the cost of money on capital markets.*[454]

604. The 2005 PER stated:

> The analysis tries to balance the application of resources so that ROI levels make it attractive relative to other alternatives in an equivalent sector, in terms of profitability, risks and liquidity, and always attempting to optimise available public resources.[455]

605. The Financial Report to RD 436/2004 stated:

> Parameter A (investment, operation and maintenance costs for each technology) has significant weighting in establishing the amount of the regulated tariff for sale to distributors. *This way, any plant in Spain in the special regime, provided it is equal to or better than the standard (the standardised plant) for its group, will obtain reasonable return.*[456]

606. In its judgment of October 25, 2006, the Supreme Court said:

> *... Until it is replaced by another, the above outlined legal regulation (Article 30 of the Electricity Law) allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining 'reasonable rates of return with reference the cost of money in the capital market' or, to put it again in the words of the preamble to Royal Decree 436/2004, 'reasonable compensation for their investments.'* However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.[457]

607. The preamble to RD 661/2007 stated:

> The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November,

---

[454] R-0059 (emphasis added).

[455] R-0092, p. 273.

[456] R-0052 (emphasis added).

[457] R-0118 (emphasis added).

> on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable.[458]

608.    In evidence, Mr. Jaume Margarit, former Director of Renewable Energy at the IDAE, said:

> I believe that the idea of having the investors decide to go into renewable energy, is based on the idea which was already reflected in Act 54/1997, that, in order for this to happen, investors must receive a reasonable and sufficient return in order to undertake these investments[459]

609.    The Claimant emphasises that (1) it did not invest in Spain on the expectation of receiving a "reasonable rate of return" as unilaterally and arbitrarily defined by Spain *ex post facto*;[460] (2) Law 54/1997 did not define the rate of return which Spain was to take into account when establishing incentives; (3) from 1998 to 2013, Spain never enacted a measure implementing Law 54/1997 in a way that incentivised investors on the basis of a defined return on their investments; (4) enabling a reasonable return on investment was an objective of the premiums for renewable generation authorised by Law 54/1997, but it does not follow that Law 54/1997 therefore guaranteed a reasonable rate of return.[461]

610.    In the view of the majority of the Tribunal these are not answers to the basic point that, as confirmed by later judicial and legislative developments, the basis of the enabling legislation was the reasonable rate of return principle.

611.    Spain has argued that the Claimant could have no legitimate expectation that the RD 661/2007 and RD 1578/2008 regime would remain unaltered, because a recipient of State aid cannot, in principle, have legitimate expectations of the lawfulness of aid that has not been notified to the Commission. But it is clear that neither Spain nor the Commission ever

---

[458] R-0071, preamble.

[459] Tr.-E, Day 6, p. 15, ll. 8-12. Ms. López Mera said in evidence that "the tariffs were also intended to provide a reasonable return for investors who assumed a risk and were willing to enter this sector:" Tr.-E, Day 2, p. 122, ll. 10-14.

[460] Cl. Mem., ¶ 372.

[461] Cl. Reply, ¶¶ 20, 121, 130, 159, 161.

had any concern that the RD 661/2007 regime was contrary to State aid rules, and that is confirmed by the EC's Decision on State Aid of 10 November 2017.[462] In the light of its conclusions, the Tribunal does not consider that Spain's State aid argument arises, but if it had arisen, the Tribunal would have dismissed it on the basis that there is no necessary connection between an investor's legitimate expectation of a reasonable rate of return and a failure by the State to notify state aid, and that in any event it was not now open to Spain in the light of its prior conduct to raise it.

612.   Consequently the Tribunal, by majority, is of the view that the cornerstone of the subsidy regime was the principle embodied in the enabling legislation under the umbrella of which the Claimant made its investments, namely the principle of reasonable rates of return by reference to the cost of money on capital markets, in Law 54/1997.

**(8)    The Radical and Fundamental Changes Introduced by the New Regulatory Regime**

613.   The Tribunal has concluded that the Claimant has no claim in relation to the 2010 changes.

614.   But different considerations apply to the total dismantling of the incentive system and its replacement by the New Regulatory Regime.

615.   The Tribunal does not doubt that the measures were introduced in the public interest.

616.   Spain's case is that the tariff deficit arose because the costs of the SES increased by a multiple of 3.2 between 2006 and 2013 and income, despite the drop in demand, increased by a multiple of 2 through an increase in the electricity bills paid for by consumers. The drop in demand for electricity following the international financial crisis of 2008 increased the deficit. Subsidies became the main cost of SES. Officials warned from 2006 about the need to balance consumer charges and subsidies.[463] The drop in wholesale market prices meant that the regulated costs increased. The difference between the revenue from access tolls and the costs of the regulated activities of the system increased the deficit.

---

[462] EC's Decision on State Aid of 10 November 2017, RL-0087.

[463] R-0223; R-0224; R-0256; R-0264.

188

617.    The Government's aims were supported by the IMF, the IEA and the EC, which in its 2015 review, said that the 2013 reform of the electricity sector had helped to contain the tariff deficit, and the 2014 deficit was expected to be smaller than in previous years.[464] By 2015 the Council considered that the macroeconomic problem derived from the tariff deficit had been resolved.[465]

618.    The Claimant says that the tariff deficit was not created by the incentives for the Special Regime and was a result of Spain's own failure to properly charge consumers for the cost of electricity for over a decade. Spain's choice to unreasonably target renewable energy investors was a politically motivated endeavour to avoid raising prices for end-consumers of electricity. Spain adopted a State policy of requiring renewable energy investors to bear the burden of a problem which Spain had created.

619.    It is unnecessary for the Tribunal to express a view on whether Spain properly managed the costs and benefits of the SES, and it is doubtful whether it is properly equipped with material which would enable it to express such a view, especially because a claimant would bear a very heavy burden to show mismanagement of a vital national industry in the context of the overall national economy and social conditions in the country.

620.    The Tribunal accepts that Spain faced a serious public policy issue and that it was entitled to take measures to deal with it.

621.    Although Spain emphasises that the measures were economically necessary, the Tribunal does not (contrary to the Claimant's submission) regard Spain's case as based on a defence of necessity. Its case is that the measures were adopted for a *bona fide* public purpose in the public interest. It does not, of course, follow from this that they were in compliance with the ECT or general international law.

622.    The Spanish legislation has been set out above in detail. In summary:

---

[464] R-0181.

[465] R-0030.

(1) Law 15/2012[466] introduced a 7% tax on all revenue received from the generation of electricity, the TVPEE, whether from conventional or renewable sources.

(2) RDL 2/2013 (and MO IET/221/2013)[467] eliminated the premium under the "pool price plus premium" option under RD 661/2007 and replaced the PI-linked updating index in RD 661/2007 with a lower index.

(3) RDL 9/2013 repealed RD 661/2007, and eliminated the regime of fixed tariffs and premiums both for new and existing installations, and substituted a system providing for "specific remuneration" based on "standard" costs per unit of installed power, plus standard amounts for operating costs.

(4) Law 24/2013 eliminated the distinction between the Ordinary and Special Regimes, and provided for the Special Payment remuneration scheme to be subject to revision every six years, with the base line predictions reviewed every three years.

(5) RD 413/2014 established the new regime, and Ministerial Order IET/1045/2014 gave details of the new compensation formulas. Together, RDL 9/2013, Law 24/2013, RD 413/2014, and MO IET/1045/2014 comprised the "New Regulatory Regime."

(6) MO IET/1045/2014[468] set the remuneration parameters for "standard" facilities, including the estimated "standard costs" applied under the new regulatory regime, and the criteria for "standard installations" for different types of renewable.  Under Annex III of the Order, the target rate of return for renewable energy producers was set at 7.398% pre-tax.

623. The New Regulatory Regime largely eliminated the production payment and replaced it with an incentive based on installed capacity. Under the New Regulatory Regime, an eligible PV plant receives: (1) the wholesale price paid on electricity production (€/MWh); (2) an "operating incentive" paid on electricity production (€/MWh), which is capped; and

---

[466] C-0040; R-0003.

[467] C-0083; C-0181; R-0063.

[468] C-0179; R-0086.

(3) an "investment incentive" that is paid on installed capacity (€/MW). The investment incentive comprises the substantial majority of total remuneration.

624.    In the New Regulatory Regime, remuneration is largely unrelated to operating performance, being primarily driven by the installed capacity of the plants.

625.    The essence of the regime under Law 54/1997 was the principle of "reasonable rate of return." As the Tribunal , by majority, has pointed out, the material legislation at the time of the Claimant's investments and after they were made, all purported to apply notions of reasonable profitability or reasonable rates of return. To the extent that the New Regulatory Regime did not adhere to that principle in relation to the Claimant's plants, there has been a breach of the Claimant's legitimate expectations.

626.    In the view of the majority of the Tribunal, a reasonable rate of return (but not one which is unilaterally determined by Spain) is the only legally protected expectation that the Claimant could legitimately have had.

627.    In its Memorial, however, the Claimant expressly disavowed that its claim was founded on a legitimate expectation of (only) a "reasonable rate of return:"[469]

> … Claimant did not invest in Spain on the expectation of receiving a "reasonable rate of return" as unilaterally and arbitrarily defined by Spain ex *post facto*. Rather, Claimant invested in Spain on the legitimate expectation its facilities would receive the precise tariffs established in RD 661/2007 and RD 1578/2008 for all of the electricity produced by its installations, which Claimant concluded based on its own criteria and judgment would offer a sufficient return to justify the risks of investment.

---

[469] Cl. Mem., ¶ 372; see also Reply, ¶ 147.

628.    In the Reply, the Claimant referred to Spain's argument based on the reasonable rate of return as a "myth"[470] or "revisionist history"[471] or a "vague and undefined notion"[472] and one of the "falsehoods" in Spain's case.[473]

629.    The Tribunal considers that, notwithstanding the Claimant's disavowal, it is entitled to find that the Claimant had a legitimate expectation of a reasonable rate of return because it has always been the essence of the Claimant's case that (a) it had a legitimately held expectation, (b) that expectation related to the return that it expected on its investments, and (c) that return was rooted in the measures and provisions that have been at the heart of the Tribunal's liability analysis. In addition the Claimant's expert produced alternative calculations assuming a "reasonable return" of 7% and 8%.[474] In these circumstances, the fact that the Claimant did not advance a reasonable rate of return case as an alternative to its maximalist case is not determinative.

630.    A similar approach was taken in *RREEF*, where it appears from the Decision that the Claimants' position was that they "did not base their investments on the notion of reasonable return,"[475] but the Tribunal decided that "the only legitimate expectation of the Claimants was to receive a reasonable return ..."[476]

631.    The conclusion, by majority, therefore, is that, to the extent (if any) that the New Regulatory Regime did not provide a reasonable rate of return for investors entitled to take advantage of the ECT there has been a breach of Article 10(1) ECT.

---

[470] Cl. Reply, ¶ 20.

[471] Cl. Reply, ¶ 21.

[472] Cl. Reply, ¶ 409.

[473] Cl. Reply, ¶ 115. The Claimant's expert also produced alternative calculations assuming reasonable return based on 8% (cost of capital for PV plants in 2007 and 2008) and 7% (Spain's targeted return for PV plants under RD 661/2007): FTI's Second Quantum Report, ¶¶ 3.25 et seq; App. 3-4. But the Claimant did not rely on these calculations.

[474] FTI's Second Quantum Report, ¶¶ 2.14-2.17 Appendix 3-3 and Appendix 3-4.

[475] Decision ¶ 291.

[476] Decision ¶ 386; and also ¶ 521.

632.    But the New Regulatory Regime is opaque and it is not easy to determine whether it provides a reasonable rate of return. Consequently, the Tribunal, by majority, agrees with the conclusion of the tribunal in *RREEF v. Spain*:

> ... the Claimants had, when they made their investments, a legitimate expectation to get a reasonable return on their investments. Such expectation did not include a guarantee to have the legal regime in place unchanged until the end of the operation of the plants, but it did include to have any modifications reasonable and equitable. Whether such a legitimate expectation was violated can only be assessed by way of a global view of the situation that resulted from the modifications introduced by the Respondent after the date of the investment. It is only in case the answer to this question is in the affirmative that compensation is due to the Claimants under this head of claim.[477]

633.    It is necessary to turn to the so-called "claw-back" point. If the return before July 2013 exceeded the target return, it will not be entitled to the regulated revenue, even though the scheme did not then exist, as if the scheme had then been in existence. If the installation passed the "reasonable return" test (7.398%) it will not receive further subsidies.

634.    The Claimant did not put the claw-back point at the forefront of its submissions, but it was squarely put by its experts both in their reports and at the Hearing without objection, and will be treated by the Tribunal as the Claimant's submission.

635.    FTI put it in this way in their Regulatory Presentation at the Hearing: "It clawed back higher returns earned on period up to the introduction of NRR. Plants which had earned above 7.398% pre-tax per year prior to 2013, earn below 7.398% per year from 2013 on, to ensure 7.398% per year over regulatory plant lifetime."[478] As Dr Moselle (FTI) said in evidence:

> Lastly, the fourth difference is what we call the "clawback" provisions in the NRR, and in fact there are two clawback provisions, so a big one and a small one. The big one relates to the 7.398% return. The thing to understand here is that when Spain introduced the 7.398% in 2014, they did not set tariffs so that,

---

[477] *RREEF v. Spain* (Decision on Responsibility and the Principles of Quantum), ¶ 399.

[478] FTI Regulatory Presentation at the Hearing, slide 12, referred to at Tr.-E, Day 4, pp. 9-10 (Dr Moselle).

starting in 2014 and looking forwards, the investor would earn a return of 7.398% over the remaining life of its assets. They introduced tariffs which were lower than that level would have given because they said, in effect, "We think you've earned too much in the preceding years, and we're going to reset tariffs so that when we go back in time to the beginning of your investment and do the calculations starting from that date, over the whole time period you will earn 7.398%".[479]

636.    The *RREEF* tribunal concluded that this element of retroactivity is objectionable because the subtraction of past remuneration (remuneration that was due under the previous regime) from future remuneration has the effect of clawing back past remuneration in breach of acquired rights. The tribunal said:

> There is, however, one aspect of the case, on which the Arbitral Tribunal has no hesitation to find that the Respondent acted in breach of its obligation to respect the principle of stability which, as recalled above, is a required obligation under the ECT, in that the challenged measures are partly retroactive.
>
> ...
>
> ... The Respondent's New Regulatory Regime applies only for future remuneration, but it subtracts past remuneration (remuneration that was due under the previous regime) from the future remunerations. The Tribunal agrees with the Claimants that this measure has the effect of clawing-back past remuneration that is shareholders' acquired rights when this remuneration was realised.[480]

637.    The Tribunal agrees with the conclusion of the *RREEF* tribunal that to the extent that it was applied to the Claimant, the claw-back was inconsistent with the obligation of stability in Article 10(1) ECT. For that reason, as will appear in the section on damages, returns in the years before the New Regulatory Regime became effective will not be counted against

---

[479] Tr.-E, Day 4, pp. 4/15. See also Tr.-E, Day 4, p. 28 (Dr Grunwald, FTI); and First Aragón Expert Report (p. 17).
.

[480] *RREEF v. Spain* (Decision on Responsibility and on the Principles of Quantum), at ¶¶ 325 *et seq*. See also *Foresight v. Spain* (Final Award), ¶ 395; *cf. Novenergia v. Spain* (Final Award), ¶ 697; *Masdar v. Spain* (Award), ¶ 651; *Antin v. Spain* (Award), ¶ 567.

remuneration going forward (claw-back) because to do so would be contrary to Spain's obligation of stability.

**(9)      Other Alleged Breaches of the ECT**

638.    Most of the Claimant's complaints under other potential heads have in substance been dealt with above.  Three points remain, to which the Tribunal now turns.

639.    *First*, the Claimant says that the Disputed Measures were (1) in breach of the State's duty under the FET standard to treat investors and their investments transparently and consistently, since Article 10(1) ECT requires states to "encourage and create stable, equitable, favourable, and transparent conditions;"[481] and (2) inconsistent with the transparent framework that Spain had developed, promoted, and granted to the Claimant's facilities.[482] In the light of the Tribunal's prior findings, it is only necessary to say that to the extent that the Tribunal has found that the New Regulatory Regime was in breach of the Claimant's legitimate expectations, there is a plain overlap with the duty to maintain stable and equitable conditions. But the Tribunal does not consider that there was any lack of transparency.

640.    *Second*, the claim[483] that Spain's measures were unreasonable, because they violated the commitments and guarantees in RD 661/2007 and RD 1578/2008, and the assurances of Spain's officials, which induced the Claimant to invest, adds nothing to the principal claims which the Claimant has advanced. The Tribunal does not consider that there is any merit in the claim that the measures were discriminatory.

641.    *Third*, the Claimant claims[484] that Spain has been in breach of the "umbrella clause" in Article 10(1) ECT: "Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party." The Tribunal has found that there were no specific regulatory or other governmental

---

[481] Cl. Mem., ¶ 376.

[482] *Ibid.*, ¶¶ 382, 385.

[483] *Ibid.*, ¶¶ 398–402.

[484] Cl. Mem., ¶¶ 403 *et seq*; Cl. Reply, ¶¶ 482 *et seq*.

commitments or obligations, and this claim therefore adds nothing to the claim of breach of legitimate expectations and the FET standard.

**(10)    Overall effect**

642.    The overall effect of the findings of the majority of the Tribunal is that, by enacting and applying the New Regulatory Regime, Spain has undermined the Claimant's legitimate expectations implicit in the FET obligation in Article 10(1) to the extent (if any) that the return on its investments in the plants falls short of a reasonable return by reference to the cost of money in the capital markets and, to that extent also, breached the obligation of stability in Article 10(1) ECT.

**B.2    THE EXPROPRIATION CLAIM**

**(1)    Article 13(1), ECT**

643.    Article 13(1) ECT provides:

> Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation') except where such Expropriation is:
>
> a. for a purpose which is in the public interest;
>
> b. not discriminatory;
>
> c. carried out under due process of law; and
>
> d. accompanied by the payment of prompt, adequate and effective compensation.
> Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment…
>
> …

and by Article 1.6:

196

"Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

(d) Intellectual Property;

(e) Returns;

(f) any right conferred by law or contract or by virtue of any licenses and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

A change in the form in which assets are invested does not affect their character as investments and the term 'Investment' includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.

…

**(2)    The Parties' Positions**

644.    The Claimant's case under this head is that Spain expropriated (without complying with the conditions in Article 13(1) ECT) its vested rights to the fixed tariffs under RD 661/2007 and RD 1578/2008, and the cumulative effect of Spain's measures was to deprive the Claimant of its equity in its PV facilities.

197

645.    Spain's case is that the Claimant had no right to the fixed tariffs, and in any event (a) Spain complied with the Article 13(1) ECT conditions, and (b) the Claimant has experienced no substantial deprivation of its investment, because it still has control over the shares in the SPVs which own the installations, and the plants continue to sell energy into the grid, receive generous subsidies, and still make reasonable profits.

**(3)    Legal Principles**

646.    There is no significant difference between the Parties on the legal principles to be applied under this head. The following propositions can be derived from the ECT and the awards cited by the Parties.

647.    *First*, Article 13(1) ECT expressly provides that for a taking to be lawful, each of the conditions of (a) public purpose, (b) non-discrimination, (c) due process of law, and (d) compensation, must be satisfied.

648.    *Second*, it applies expressly to indirect expropriation by virtue of the reference to "measures having effect equivalent to … or expropriation," and indirect expropriation may take the form of "creeping expropriation", e.g., a series of measures which cumulatively have an expropriatory effect by gradually depriving the investor of its property,[485] or where the measures irreversibly and permanently deprive the owner of property of the effective use of the asset, even where legal ownership not affected, and the form of the deprivation measure is less important than its actual effects.[486]

649.    *Third*, regulatory measures (including taxes[487]) can constitute indirect expropriation.  This is so where the negative economic impact of such actions on the financial position of the investor is sufficient to neutralise in full the value, or economic or commercial use of its

---

[485] See e.g., *Compañía del Desarrollo de Santa Elena S.A. v. Costa Rica* (Final Award), ¶¶ 76-77.

[486] *Tecmed v. United Mexican States* (Award), ¶ 116. See also *CME Czech Rep B.V. v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶¶ 604-5, CL-0076.

[487] *Yukos v. Russia* (Final Award) ¶¶ 1579, 1580.

investment without the receipt of any compensation;[488] or to deprive it of "all significant economic value."[489]

650.    *Fourth*, the relevant property may be intangible, including financial commitments,[490] provided that it is a vested property right under the law of the State.[491] Consequently, "a law which cancels a liability the State already has to an investor … is capable of amounting to expropriation."[492]

651.    *Fifth*, a loss of some of the anticipated returns on investments in shares may not, depending on the facts, be an expropriation,[493] and a mere loss in value of an investment, as distinct from interference with the control or use of the property, is not an indirect expropriation[494] unless the loss of value is such that it could be considered equivalent to a deprivation of the investment.[495]

**(4)    The Tribunal's Conclusion**

652.    As the above account of the relevant principles establishes, regulatory measures can amount to indirect expropriation, but if they are to amount to indirect expropriation there must be substantial deprivation, i.e., the loss of significant economic value such as can be considered to be equivalent to a taking of property or of the core attributes of ownership. In contrast, a loss in the value of an investment in consequence of measures taken by a

---

[488] *Tecmed v. United Mexican States* (Award), ¶¶ 121-122.

[489] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶¶ 6.53, 6.63; see also *AES v. Hungary* (Award), ¶ 14.3.1; or the loss of "all the attributes of ownership:" *Compañía del Desarrollo de Santa Elena S.A. v. Costa Rica* (Final Award), ¶ 76; *Mamidoil v. Albania* (Award), ¶ 572.

[490] *Waste Management, v. United Mexican States* (Award), ¶ 168; *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 19 August 2005, ¶¶ 239-41, CL-0084; *EnCana v. Ecuador* (Award), ¶ 183; *Deutsche Bank v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, 31 October 2012, ¶ 521, CL-0113.

[491] *EnCana v. Ecuador* (Award), ¶ 184; *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. The Argentine Republic*, Decision on Liability, 30 July 2010, ¶ 140, RL-0028; *Nations Energy Inc., Electric Machinery Enters. Inc., and Jaime Jurado v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010, ¶¶ 640-48, RL-0040.

[492] *EnCana v. Ecuador* (Award), ¶ 183.

[493] *Cf. Charanne v. Spain* (Final Award), ¶¶ 458-459.

[494] *Mamidoil v. Albania* (Award), ¶ 572.

[495] *Charanne v. Spain* (Final Award), ¶ 465.

State that is not on a scale equivalent to a taking of the investment will not constitute expropriation.

653.    In the present case, the Tribunal considers that Spain's actions were not such as to unlawfully deprive the Claimant of its investments or to so denude them of value such that the loss can be said to be equivalent to a taking of the investments or of the core attributes of ownership of the investments.  The Tribunal is satisfied that the Disputed Measures amounted to lawful regulatory measures for the public good which did not have the effect of depriving the Claimant of its investment.  The Claimant still holds shares in the SPVs. The plants are still operating. They are still generating revenue. In these circumstances, the Tribunal concludes that, whatever else may be the legal effect of Spain's measures – addressed further above – this cannot be said to have amounted to an expropriation of the Claimant's investments contrary to Article 13 ECT.

654.    It may be added that the conclusion just expressed is reinforced, for the majority of the Tribunal, by the conclusion reached above on FET that the Claimant did not have a vested right to the tariff incentives under RD 661/2007 and RD 1578/2008 and, accordingly, that there was no taking of any vested right to this effect equivalent to a taking of property.

### C.    DAMAGES

### (1)    Introduction

655.    Given its findings on liability, the Tribunal's task, for purposes of an assessment of damage (whether nominal or actual), and, if there is actual damage, of an assessment of the quantum of damages properly due to the Claimant, is to calculate the difference between the present value of the actual returns on the Claimant's investments and the putative present value of the returns that there would have been under a reasonable rate of return hypothesis.[496]

656.    The overall effect of the Tribunal's findings is that, by enacting and applying the New Regulatory Regime, to the extent (if any) the return on its investments in the plants falls

---

[496] Mr. David R. Haigh Q.C. does not agree that the reasonable rate of return is the proper yardstick for assessing damages: see his Dissenting Opinion attached to this Decision.

200

short of a reasonable return by reference to the cost of money in the capital markets, frustrated the Claimant's legitimate expectations implicit in the FET obligation in Article 10(1) and was in breach of the obligation of stability in Article 10(1).

657.  The following conclusions of the Tribunal on liability are relevant to the quantification of damages (if any):

(1)  Law 54/1997 was the controlling legislative framework in respect of the Claimant's investments pursuant to which the various subsidiary measures in issue in these proceedings were adopted.

(2)  The principles underlying legitimate expectation do not protect an investor against any and all changes to a host State's laws and regulatory environment.

(3)  RD 661/2007 was enacted before each of the Claimant's investments.

(4)  RD 1578/2008 was enacted before the Claimant's Solarwell and Talarrubias investments and its capital contributions in Fotovoltaica Lobon, Solar Lobon, and Solar Botoa, but after the investments in Don Álvaro, La Albuera, Fuente de Cantos, La Roda and Riosalido.

(5)  As a matter of Spanish law, the Spanish Supreme Court, addressing the regulatory framework in respect of renewable energy investment, found that regulatory measures do not give rise to vested rights on the part of investors, it being understood that the government retained the right to modify the remuneration system in such measures subject to remaining within the controlling framework of Law 54/1997. The key decisions were handed down before each of the Claimant's investments.

(6)  The Claimant did not, and does not, have a legally protected legitimate expectation that the remuneration regime in RD 661/2007 and RD 1578/2008 would remain static. What the Claimant was entitled to expect was that the regulatory regime, including as regards remuneration, into which they were investing would not change radically and fundamentally without notice.

201

(7)     The controlling remuneration framework of the Special Regime under Chapter II of Law 54/1997 included the commitment, contained in the second paragraph of Article 30.4 of that Law, "to achieve reasonable profitability rates with reference to the cost of money on capital markets."

(8)     This remuneration formula in Article 30.4, second sentence of Law 54/1997 is reflected in Article 44.3 of RD 661/2007: "a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in capital markets."

(9)     It is this remuneration formula, set out in the relevant controlling legislation, and repeated in the measures subsequently adopted thereafter relevant to and in place at the date of the Claimant's investments, that was capable of giving rise to a legitimate expectation on the part of the Claimant as regards its investments.

(10)    In contrast, the detailed remuneration arrangements set out in RD 661/2007 and RD 1578/2008 could not and did not give rise to a legally protected legitimate expectation on the part of the Claimant that the specific remuneration arrangements would not be changed.

(11)    The changes introduced in 2010 into the regulatory regime by RD 1565/2010 and RDL 14/2010 did not introduce radical changes in the regulatory regime on the basis of which the Claimant invested, and these measures were neither discriminatory nor disproportionate. They were within Spain's margin of appreciation and consistent with its commitments under Article 10(1) ECT.

(12)    The New Regulatory Regime effected changes, inter alia, to the remuneration arrangements of the investment regime (including the clawback of past remuneration) on the basis of which the Claimant had invested that radically and fundamentally changed that regime such as to constitute a breach of the Claimant's legitimate expectation in respect of such remuneration if, and to the extent, that they did not provide for a reasonable rate of return.

658.    The Tribunal has concluded that, notwithstanding the Claimant did not found its claim on a legitimate expectation of a right to a reasonable return, the Tribunal is entitled to find such a legitimate expectation because it has always been the essence of the Claimant's case

that (a) it had a legitimately held expectation, (b) that expectation related to the return that it expected on its investments, and (c) that return was rooted in the measures and provisions that have been at the heart of the Tribunal's liability analysis. The fact that the Claimant did not advance a reasonable rate of return case as an alternative to its maximalist case is not determinative, particularly since both sets of experts addressed the question in the second round of pleadings.[497]

**(2)    Legal principles**

659.    In approaching these issues, the Tribunal has in mind the long-settled principle of the Permanent Court of International Justice in the *Chorzów Factory* case, now commonly accepted to be applicable beyond inter-State disputes, that "reparation must, as far as possible, wipe out all the consequences of the illegal act."[498] In a well-known passage, the Permanent Court said: [499]

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and *reestablish the situation which would, in all probability, have existed if that act had not been committed.* Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.

660.    This indicates that the primary task of the Tribunal is to assess what would have happened if the New Regulatory Regime measures had not been enacted, and the answer must be that Spain would have enacted some measures to deal with the tariff deficit, and, for damages

---

[497] As noted above, the Claimant's experts produced alternative calculations assuming "reasonable returns" based on 8% (cost of capital for PV plants in 2007 and 2008) and 7% (Spain's targeted return for PV plants under RD 661/2007): FTI's Second Quantum Report, ¶¶ 3.25 et seq; App. 3-4; FTI-Edwards Presentation, slide 29. *Cf.* Accuracy's Second Expert Report, ¶¶ 177 et seq; Accuracy Presentation, slide 4; Resp. Rej, ¶ 1147.

[498] *Factory at Chorzów* (Judgment), at 47.

[499] *ibid* (emphasis added).

purposes, Spain should be regarded as having enacted measures which give a reasonable rate of return.

661. It follows that the Claimant is not, as it claimed, entitled to damages based on the difference between what it will receive under the New Regulatory Regime and what it would have received under the RD 661/2007 regime.

662. This is in line with what the tribunal in *RREEF v. Spain* said, of tribunals which had found liability, that they had:

> … considered that, since the Respondent had been found in breach of Article 10 of the ECT, it was obliged to make full reparation for the losses suffered; this has been the position taken by the *Eiser* and *Novenergia* tribunals. This last position would be illogical in the present case since the Tribunal accepted that the Claimants were not immune from reasonable changes in the regime applicable to its investment; therefore, it is only to the extent that the modifications would have exceeded the limits of what is reasonable that compensation would be due and should be calculated.[500]

663. The tribunals in *Antin v. Spain*, *Foresight v. Spain* and *Masdar v. Spain* adopted the same approach as *Eiser v. Spain* and *Novenergia II v. Spain*. In *Cube v. Spain*[501] and *9REN Holding Sarl v. Spain*[502] the solution was to discount the return which would have been made under the old regime by the chance of lawful changes being made.

664. The Tribunal is satisfied that the approach in *RREEF v. Spain* is right in principle and accords with the principle in the *Chorzów Factory* case.

665. Otherwise than in exceptional circumstances, compensatory damages are contingent on proof of loss, and an award of compensation must be linked to economically assessable damage sustained by the injured party.

---

[500] *RREEF v. Spain* (Decision on Responsibility and on the Principles of Quantum), ¶ 515.

[501] *Cube v. Spain* (Decision on Jurisdiction, Liability and Partial Decision on Quantum), ¶¶ 461-466.

[502] *9REN v. Spain* (Award), ¶¶ 394-395.

**(3)    Damages**

666.    The Tribunal has concluded that it is not in a position at this stage to determine that Spain's breach of Article 10(1) ECT must necessarily sound in compensatory damages. Whether this is the case will turn on the Tribunal's assessment of whether, under the New Regulatory Regime, the Claimant would be entitled to, and would in practice receive, a reasonable rate of return, which the Tribunal considers comports with the formula "reasonable profitability rates with reference to the cost of money on capital markets" – or whether it would receive something less.

667.    A decision on this issue is accordingly deferred pending further submissions from the Parties and their quantum experts in the light of the Tribunal's findings on liability and such other directions that the Tribunal considers that it can usefully provide at this stage.

668.    The reasons that have led the Tribunal to this conclusion are as follows. The Tribunal, in this Decision, has reached a determination of liability with which the Parties and their quantum experts have not been able to engage fully. More particularly, the Parties in their pleadings did not deal with the hypothetical that the other side might prevail on liability, or that there might be some outcome on liability that gave them less than that for which they contended, and the experts did not deal as fully with the reasonable rate of return calculations as they would have done if it had been the Claimant's pleaded contention.

669.    In particular, the experts proceeded on the basis of instructions which rested on certain assumptions. These are stated in paragraphs 1.21 and 1.23 of FTI's First Quantum Report for the Claimant on the issue of loss in the following terms (emphasis added):

> [1.21]  As part of my assessment of loss, *I have been instructed to assess the market value of Cavalum's investments in the Spanish Plants on the Date of Assessment. That is, the likely realisable value in the event of a sale of the investments on or around that date.*
>
> [1.23]  I offer no opinions on matters of law, and in particular on whether the various elements of the Claimant's claims are properly claimable. Instead, *I have been instructed to assume, for the purposes of my calculations, that the Claimant prevails in its claims as pleaded, and to assess the diminution in the value of the Claimant's investments on that basis.*

205

670.    The consequence was that the main focus of the experts' debate was whether, as the
        Claimant contended, the DCF method should be adopted or whether, as Spain contended,
        the ABV (Asset-based Value) was appropriate.[503]

671.    The result leaves the Tribunal without sufficient guidance on the issue of damages which
        comports with its findings on liability.

672.    The task for the Tribunal is to determine the difference (if any) between the actual post-tax
        rate of return of each of the Claimant's plants (IRR) in the actual scenario and the
        reasonable post-tax rate of return as determined by the Tribunal (RRR) in the but-for
        scenario, and then to express the difference (if any) as lump-sum damages.

673.    Accordingly the Tribunal will have to consider: (1) how the IRR of the individual plants
        should be calculated; (2) what constitutes a reasonable post-tax rate of return; (3) whether
        each of those plants are achieving a rate of return above or below that which has been
        calculated to be reasonable; and (4) what damages (if any) have been suffered by the
        Claimant.

674.    In this Decision the Tribunal refrains from setting out or engaging in any detail with the
        Parties' submissions and expert evidence on damages. But some of the expert evidence put
        forward in the context of the Claimant's case, denied by Spain, that the Claimant had a
        legitimate expectation in respect of premiums under the previous regime, touches upon
        issues which the Tribunal has to decide.

675.    The Tribunal considers that it is useful to set out some indicia relevant to the issue of
        damages. The Tribunal provides additional guidance and direction on what it would wish
        to hear from the Parties in the subsequent procedure in the section that follows, having
        regard to the evidence on quantum that has already been submitted.

---

[503] See, e.g. Cl. Reply, ¶¶ 565-583; Claimant's Opening Presentation, slides 183-184; Resp. Rej., ¶¶ 1232-1244;
Resp.'s Opening Presentation, Quantum, slides 12-16; FTI-Edwards Presentation, slides 6, 15-16; Accuracy
Presentation, slides 28-30.

676.   The New Regulatory Regime adopted a target pre-tax return of 7.398% for all renewables, subject to periodic reviews, the first of which took place with the enactment of RDL 17/2019.[504]

677.   The Claimant has said that in the actual scenario 7.398% IRR pre-tax is equivalent to 5.6% IRR post-tax, based on a 30 year operating life, a 30% corporate tax rate until 2014, lowered to 28% in 2015, and to 25% from 2016 onwards; and standard (rather than actual) investment and operating costs as set out in Ministerial Order MO IET/1045/2014.[505]

678.   Spain has said that the equivalent post-tax figure is 7.7% IRR (excluding management fees), or 7% IRR (including management fees), based on the Claimant's actual investment costs, an effective tax rate of 20.9% and a 30 year operating life.[506]

679.   The Claimant will only be entitled to damages if the IRR of the facilities falls short of the RRR.

680.   The first consideration is that the Parties accept that the targeted return of 7.398% is pre-tax, and consequently the IRR should be calculated on a post-tax basis.

681.   Second, an assessment of damage must be based on the Claimant's interest in the plants on a plant-by-plant, or project, basis. Remuneration under the New Regulatory Regime is on a plant-by-plant basis and the experts have in substance adopted this method in relation to their opposing approaches to damages and their responses.[507] Such loss or damage that the Claimant may have suffered in the actual scenario (IRR) falls to be assessed by reference to its individual circumstances rather than by reference to an aggregation of the plants in question or to an industry analogue.

---

[504] This resulted in a new target rate of 7.09% applicable for the following 5 years, unless investors dropped their claims against Spain. The new target rate is the average yield on 10-year treasury bonds plus a premium of 300 basis points. See the Parties' letters: 10 December 2019, 10 January 2020; 10 February 2020; 28 February 2020; and 10 March 2020.

[505] FTI's Second Quantum Report, ¶¶ 2.14, 2.16, 3.22, 3.27, 3.34, 3.40, and Appendix 3-1.

[506] Accuracy's Second Expert Report, ¶ 64, ACQ-0042.

[507] See e.g. FTI's First Quantum Report, ¶¶ 2.5 et seq, 5.9 et seq, 6.26 et seq, 7.2 , FTI's Second Quantum Report, ¶¶ 2.15, 2.44, 3.29 et seq, 5.85, Appendix 3-4; Appendix 4-2; Accuracy's First Expert Report, ¶¶ 427, 431; Accuracy's Second Expert Report, ¶¶ 93, 101, 176, 190 et seq.

682.    Third, for purposes of assessing what constitutes a reasonable rate of return – which the Tribunal equates with "reasonable profitability rates with reference to the cost of money on capital markets" – the Tribunal considers that the relevant benchmark will be the RRR for the PV sector. The remuneration formula that the Tribunal has found to be capable of giving rise to a legally protected legitimate expectation is a formula derived from general legislation which applied to renewables as a whole, but its implementation was affected by the sector involved.

683.    Fourth, in determining the cost of money on capital markets, the Tribunal will wish to have submissions from the Parties on which market or markets should be the benchmark.

684.    Fifth, the relevant date for the calculation can be taken as 30 June 2014. Both Parties have produced calculations on the basis of this date (rather than 14 July 2013, the date as from which the measures were deemed to come into effect) for purposes of their computations.[508]

685.    Sixth, in determining the but-for RRR, returns above 7.398% in the years before the New Regulatory Regime became effective should not be counted against remuneration going forward (claw-back) because to do so would be contrary to Spain's obligation of stability.

686.    Seventh, in determining the actual scenario IRR, the Tribunal considers that the relevant temporal benchmark is that the operating life of the plants should be deemed to be 30 years. The 30 year period is the deemed operating life for PV plants in the New Regulatory Regime, and assumed to be the appropriate period by the Spain's experts.[509] The Claimant's experts assume an operational life of 35 years for DCF purposes.[510] In the light

---

[508] For example, Mr. Edwards says: "I use 30 June 2014 as the date at which to assess Cavalum's loss (the "**Date of Assessment**") as it is shortly after the publication of Order 1045 and is a quarter end, convenient for financial and operating reporting purposes": FTI's First Quantum Report, ¶ 1.20. Accuracy, for Spain, initially produced calculations for its ABV analysis as at 24 November 2010 but also produced calculations as at June 2014: Accuracy's First Expert Report, ¶¶ 426 et seq; but in its Second Expert Report responded mainly to FTI's analysis as at 30 June 2014: Accuracy's Second Expert Report, ¶¶ 45, 176.

[509] Accuracy's First Expert Report, A.77-A.83.

[510] FTI's First Quantum Report, ¶ 5.7; FTI's Second Quantum Report, ¶¶ 5.83-5.85.

of the expert reports, the Tribunal has no reason to doubt that the 30 year assumption in the New Regulatory Regime is reasonable

687.    Eighth, the Tribunal agrees with the conclusion of the tribunal in *RREEF v. Spain* that a WACC calculation was required because Act 54/1997 required the calculation to be made by reference to the cost of money in the capital markets, a reasonable return had to be superior to the cost of money. To calculate the cost of money, both Parties used the WACC, which reflected the cost of raising funds from shareholders and lenders for a typical company operating in a given industry.[511] In that case, the tribunal found, following the CAPM model, that the reasonable post-tax rate of return was WACC (as calculated by the tribunal) plus 1%.[512]

**(4)    Calculation of WACC**

688.    In *RREEF v Spain* WACC was calculated as being 5.86%, based on these findings:[513]

    (1)    it was necessary (as Spain argued in that case) to calculate WACC on the basis of both equity and debt;

    (2)    the ratio of debt/equity to be taken was 60/40;

    (3)    the cost of debt was taken as 3.43% in 2013 (the agreed date calculation date in that case);

    (4)    the average yield on 10-year Spanish bonds (4.398%) was to be taken as the risk-free rate (as the Claimants argued), rather than 10 year German Government bonds (1.38%) plus a country risk premium of 1.41% (as Spain argued);

    (5)    it was agreed that the market risk premium was 5.5%;

    (6)    the Claimants argued for a 0.5 beta and Spain argued for 0.41 and the tribunal split the difference at 0.455.

---

[511] *RREEF v. Spain* (Decision on Responsibility and Principles of Quantum), ¶ 574.
[512] ¶¶ 586 to 589.
[513] ¶¶ 576-586.

689.    The *RREEF* tribunal added 1% to the resulting figure of 5.86% on the basis that the Claimants had legitimate expectations that the return on their investment would be above WACC and Spain attracted investments in the renewable energy sector by raising hopes of above-average profits.[514]

690.    In the present case neither party has produced a WACC-based damages calculation as the one used by the tribunal in *RREEF v. Spain*.

691.    But both Parties have estimated the value of WACC for purposes of their DCF valuations, because WACC is one of the components to determine the appropriate discount rate.[515] FTI and Accuracy have calculated the cost of capital (for the purposes of their DCF valuations) as of June 2014 following the CAPM model, at similar levels, although with different inputs.

692.    FTI's figure is 5.5%, using a risk-free rate of 1.2% derived from German 10-year government bonds and assuming a 40% equity/60% debt ratio (cost of equity 8.7%/cost of debt 3%).[516] Accuracy's figure is 5.8%, using a standardised risk-free rate of 3.5% and assuming no debt.[517]

693.    Spain's experts do not accept that a premium should be added, and disagree[518] with the Claimant's experts who say that there should be scope for an investor to create value by earning returns above the cost of capital, especially because the pre-existing regime was intended to incentivise investment.[519]

---

[514]  ¶ 587.

[515]  FTI's First Quantum Report,¶¶ 6.26 et seq; App 6-1; FTI's Second Quantum Report,  ¶¶ 2.39 et seq, ¶¶ 5.5 et seq; Accuracy's Second Expert Report, ¶¶ 41 et seq.

[516]  Tr-E Day 4, Edwards, 42: 16-23; FTI's First Quantum Report, App. 6-1; Edwards PPT, slide 8.

[517]  Accuracy's Second Expert Report, ¶ 139; with detail in Accuracy's First Expert Report, App. 7, A.42 et seq. The principal differences between the Parties in relation to the cost of equity are these: (a) the Claimant says that the risk-free rate should be 1.2% on the basis of 10-year German government bonds whereas Spain inputs a "standardised risk-free rate" of 3.5%; (b) the Claimant inputs a country risk premium of 2.1%; (c) the Claimant inputs a market risk premium of 5% FTI, and Spain inputs 4.5%; and (d) the Claimant's beta is 1.1 and the Spain's beta is 0.5.

[518]  Accuracy's Second Expert Report, ¶ 60.

[519]  FTI's Second Quantum Report, ¶ 3.21.

694. The Tribunal also defers to the subsequent procedure the determination of the appropriate premium (if any) above the WACC that will be necessary to accommodate the requirement of a reasonable rate of return with reference to the cost of money on the capital markets.

695. In  *RREEF v. Spain*  the tribunal took the average yield on Spanish government 10 year bonds as the risk-free rate.[520] In this case the Claimant's experts say that the yield on German Government 10 year bonds in mid-2014 is usually considered the best proxy for a risk free investment denominated in Euros.[521]   Spain's experts say that current rates cannot be used as proxy of a risk-free rate given that bonds have undergone much greater volatility compared with previous decades.

696. In the present case, the Tribunal has not had sufficient material to determine which of the Parties has the better case on the WACC elements, and the extent to which they make a substantial difference. In particular the Tribunal is, equally, conscious that there are some components of this calculation upon which it cannot give guidance as they have not been discussed in detail between the experts, namely the market risk premium, the beta, the debt/equity ratio and the correct approach to levels of taxation (save that the 7% levy should be taken into account in the calculation).

697. It follows from the preceding that the Tribunal considers that the appropriate approach to assessing damages in these proceedings is by reference to WACC, which should be calculated on the basis of both debt and equity. The Tribunal defers to the further process a determination of the percentage split between debt and equity.

698. Accordingly, the Tribunal's assessment in due course of whether the Claimant has in fact suffered loss and damage in consequence of Spain's breach of Article 10(1) ECT, and, if so, the amount of the damages due to the Claimant for that breach, will proceed by reference to the following:

(a)    the legitimate expectation on which the Claimant is entitled to rely is of a remuneration regime in respect of its investments that corresponds to a "reasonable

---

[520] *RREEF v. Spain* (Decision on Responsibility and Principles of Quantum), ¶ 580.
[521] FTI's Second Quantum Report, ¶ 5.9.

rate of return", a phrase that the Tribunal considers reflects and incorporates the remuneration formula in Article 30.4 of Law 54/1997, namely, "reasonable profitability rates with reference to the cost of money on capital markets";

(b)    an assessment of whether the Claimant has suffered damage, and if so of the quantum thereof, should proceed on a plant-by-plant, or investment-by-investment, basis;

(c)    the appropriate date for the calculation is 30 June 2014;

(d)    the relevant temporal benchmark is that the operating life of PV plants should be deemed to be 30 years;

(e)    the relevant benchmark for assessing the reasonable rate of return will be the deemed reasonable rate of return for the PV sector;

(f)    for these purposes, the relevant actual scenario IRR will be plant (or project) IRR rather than shareholder (or equity) IRR;

(g)    the WACC should be calculated on the basis of both debt and equity, but a determination of the appropriate split in the debt/equity ratio is deferred pending further experts' reports or submissions from the Parties;

(h)    the Tribunal defers a decision on whether a premium should be added over WACC is deferred pending further experts' reports or submissions from the Parties.

699.    The Claimant also seeks damages for losses incurred in relation to its 51% interest in the three Abandoned Projects (Fotovoltaica Lobon, Solar Lobon, and Solar Botoa) on the basis that, having failed to obtain registration under RD 1578/2008, they were not viable under the New Regulatory Regime. The amount claimed is EUR 1.8 million, consisting of EUR 1.2 million spent by the Claimant and EUR 0.6 million owed to its Spanish business partner for expenditure.[522] Spain's experts contest the quantum on the basis that they were unable

---

[522] FTI's First Quantum Report, ¶¶ 8.1-8.3; FTI's Second Quantum Report, ¶¶ 2.45, 6.1-6-5.

to verify the costs.[523] The Claimant's details were given in two witness statements by Ms Brandao, and the Tribunal has no reason to doubt their accuracy. If, therefore, the New Regulatory Regime did not provide a reasonable rate of return, the Claimant will be entitled to damages in the amount of the wasted expenditure.

700.    Separately from Spain's breach of the Claimant's legitimate expectation in respect of the remuneration regime of the New Regulatory Regime, the Tribunal has concluded that the introduction of the New Regulatory Regime breached the stability obligation of Article 10(1). The Parties are accordingly invited to make submissions on the question of whether this breach should sound in damages, as opposed to a declaratory award, and if so the appropriate quantum of such damages.

**(5)    The way forward**

701.    The Tribunal has given thought to whether it would be appropriate for it to appoint its own quantum expert to advise it on the issues that remain outstanding. The Tribunal has concluded that it would be inappropriate to do so at this stage, given its appreciation that (other than the question of the availability of a separate remedy for breach of the stability obligation) the issues to be addressed going forward would be best, and most efficiently, addressed by the Parties' quantum experts. But it reserves the power to do so on any material point of difference between the experts.

702.    In the light of the Tribunal's findings on liability and the considerations outlined above, the Parties are directed to endeavour to agree within 28 days of notification of this Decision a timetable for reaching agreement on (a) a post-tax reasonable rate of return based on WACC as at 30 June 2014; (b) agreed post-tax IRRs for the Claimant's plants; and (c) to the extent that (b) falls short of (a), the compensation which would be due from Spain to the Claimant.

703.    The timetable shall include the provision within 28 days thereafter to the Tribunal by the experts of a Joint Memorandum indicating the areas of agreement, and (if any) the areas of disagreement, together with reasons, and any proposals for a procedural timetable for

---

[523] Accuracy's First Expert Report, ¶¶ 601-604; Accuracy's Second Expert Report, ¶¶ 241-242.

213

further submissions thereon. The Joint Memorandum shall include a Joint Model to enable the Tribunal to make the necessary calculations flowing from its determination of disputed issues.

704.   The time limits above are subject to variation by the Parties with the consent of the Tribunal or further direction by the Tribunal.

705.   As indicated above, the Tribunal reserves its power to appoint an independent expert if it deems it to be necessary.

## IX.    DECISION

706.    The Decision of the Tribunal is as follows:

(1)    The Tribunal declares that it has jurisdiction over the Claimant's claims, except for its claim that the TVPEE violates Article 10(1) ECT.

(2)    The Tribunal, by majority, declares that by enacting and applying the New Regulatory Regime, Spain has undermined the Claimant's legitimate expectations implicit in the FET obligation in Article 10(1) to the extent (if any) that the return on its investments in the plants falls short of a reasonable return by reference to the cost of money in the capital markets and, to that extent also, breached the obligation of stability in Article 10(1) ECT.[524]

(3)    The Parties are directed to endeavour to agree within 28 days of notification of this Decision (or such later date as may be agreed or directed) a timetable for reaching agreement on (a) a post-tax reasonable rate of return based on WACC as at 30 June 2014; (b) agreed post-tax IRRs for the Claimant's plants; and (c) to the extent that (b) falls short of (a), the compensation which would be due from Spain to the Claimant.

(4)    The timetable shall include the provision to the Tribunal within 28 days thereafter (or such later date as may be agreed or directed) by the experts of a Joint Memorandum indicating the areas of agreement, and (if any) the areas of disagreement, together with reasons, and any proposals for a procedural timetable for further submissions thereon. The Joint Memorandum shall include a Joint Model to enable the Tribunal to make the necessary calculations flowing from its determination of disputed issues.

(5)    The Parties shall notify the Tribunal, upon expiry of the 28 day period from notification of this Decision, of the agreed timetable, which shall also include

---

[524] The Dissenting Opinion of Mr. David R. Haigh Q.C. is attached to this Decision.

provision for one round of submissions by the Parties on the remedy for breach (if any) of the stability obligation in Article 10(1) ECT.

(6)    If the remuneration of the Claimant's plants falls short of a reasonable post-tax return in the PV sector, the Claimant will be entitled to EUR 1.8 million in compensation in respect of its expenditure on its interest in the Abandoned Projects (Fotovoltaica Lobon, Solar Lobon, and Solar Botoa).

(7)    The Tribunal dismisses the Claimant's claims under Article 13(1) ECT.

(8)    Costs are reserved to the Award.

216

_____
Mr. David R. Haigh Q.C.
Arbitrator
Subject to attached Dissenting Opinion

_____
Sir Daniel Bethlehem Q.C.
Arbitrator

_____
Lord Collins of Mapesbury, LL.D., F.B.A.
President of the Tribunal