# EXHIBIT 42

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

**MR. IOAN MICULA, MR. VIOREL MICULA, S.C. SCANDIC DISTILLERIES S.A., S.C. EUROPEAN FOOD S.A., S.C. TRANSILVANIA GENERAL IMPORT-EXPORT S.R.L., S.C. STARMILL S.R.L., S.C. EUROPEAN DRINKS S.A., S.C. MULTIPACK S.R.L., S.C. RIENI DRINKS S.A., S.C. TONICAL TRADING S.R.L., S.C. EDRI TRADING S.R.L., AND S.C. WEST LEASING INTERNATIONAL S.R.L.**

Claimants

and

**ROMANIA**

Respondent

**ICSID Case No. ARB/14/29**

---

# AWARD

---

***Members of the Tribunal***
Professor Donald McRae, President
Mr. John Beechey CBE
Professor John Crook

***Secretary of the Tribunal***
Ms. Anna Holloway

*Date of dispatch to the Parties:* 5 March 2020

**REPRESENTATION OF THE PARTIES**

*Representing Mr. Ioan Micula, S.C. Scandic Distilleries S.A., S.C. Starmill S.R.L., S.C. Multipack S.R.L., S.C. European Food S.A., and S.C. Transilvania General Import-Export S.R.L.*

*Representing Romania:*

c/o Mr. Jakob Ragnwaldh
Mr. Fredrik Andersson
Mr. Aron Skogman
Mr. David Sandberg
Mr. Jacob Rosell Svensson
Mannheimer Swartling Advokatbyrå AB
Box 1171
SE-111 87 Stockholm
Sweden

c/o Dr. Veijo Heiskanen
Mr. Matthias Scherer
Ms. Laura Halonen
Mr. Samuel Moss
Mr. Alptug Tokeser
Ms. Juliette Asso
Ms. Tessa Hayes
LALIVE
35, Rue de la Mairie
PO Box 6569
1211 Geneva 6
Switzerland
 and
c/o Dr. Crenguta Leaua

*Representing Mr. Viorel Micula, S.C. Edri Trading S.R.L., S.C. European Drinks S.A., S.C. West Leasing International S.R.L., S.C. Tonical Trading S.R.L., S.C. Rieni Drinks S.A., and S.C. Transilvania General Import-Export S.R.L.*

Mr. Gheorghe Matei
Mr. Marius Grigorescu
Ms. Raluca Popa
LEAUA DAMCALI DEACONU
PAUNESCU - LDDP
10 Zborului Street, sector 3
Bucharest 030595
Romania

c/o Mr. Barton Legum
Ms. Anna Crevon
Mr. Nandakumar Srivatsa
Dentons
5, boulevard Malesherbes
75008 Paris
France

ii

TABLE OF CONTENTS

I.   INTRODUCTION AND PARTIES ............................................................................ 1

II.  PROCEDURAL HISTORY .................................................................................... 2

III. FACTUAL BACKGROUND .................................................................................. 45

     A. Development of Regulatory Framework for Alcohol Sector in Romania – Early 1990s
        ........................................................................................................................ 46

     B. Claimants' Early Investments in Romania (1990 – 1997) ........................... 47

     C. Development of The Mineral Water Project (1997-2001) ........................... 48

     D. Changes to the Regulatory Framework (1998-2003) ................................... 49

     E. Claimants' Continued Expansion (1998-2003) ........................................... 51

     F. Further Regulatory Changes (2003 and after) ............................................. 52

     G. Developments in the Romanian Spirits Market from 2004 ......................... 55

     H. Changes to the Mineral Water Contract ..................................................... 55

     I. Other Events ................................................................................................ 56

IV.  THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ............................... 56

V.   JURISDICTION AND ADMISSIBILITY ........................................................... 58

     A. The *Achmea* Decision/Incompatibility with EU Law Objection (Additional
        Preliminary Objection) ............................................................................... 61

        (1) The Parties' Positions ......................................................................... 61

            a.  Respondent's Position .................................................................. 61

            b.  Claimants' Position ...................................................................... 64

        (2) The Tribunal's Analysis...................................................................... 70

            a.  The Timing Issue ......................................................................... 70

            b.  The Substance of the Achmea Objection .................................... 71

            c.  Consent of the Claimants ............................................................ 72

            d.  Consent of Romania .................................................................... 74

     B. The Preliminary Objections to the Mineral Water Claim ........................... 79

        (1) The Parties' Positions ......................................................................... 79

            a.  Respondent's Position .................................................................. 79

            b.  Claimants' Position ...................................................................... 80

        (2) The Tribunal's Analysis...................................................................... 81

     C. The Objection to Admissibility vis-à-vis the Micula Brothers ................... 83

        (1) The Parties' Positions ......................................................................... 83

|     |     | a. | Respondent's Position .................................................................. | 83 |
|     |     | b. | Claimants' Position ...................................................................... | 83 |
|     | **(2)** | The Tribunal's Analysis .................................................................. | | 84 |
| **VI.** | LIABILITY ................................................................................................. | | | 84 |
|     | A. | Fair and Equitable Treatment ............................................................. | | 85 |
|     |     | **(1)** | The Parties' Positions ................................................................. | 85 |
|     |     |     | a.  Claimants' Position .............................................................. | 85 |
|     |     |     | b.  Respondent's Position .......................................................... | 93 |
|     |     | **(2)** | The Tribunal's Analysis .............................................................. | 99 |
|     |     |     | a.  Applicable Law ..................................................................... | 99 |
|     |     |     | b.  The Scope of FET ................................................................ | 101 |
|     |     |     | c.  Protection of Legitimate Expectations ............................... | 102 |
|     |     |     | d.  Failure to Provide a Stable and Consistent Legal Framework and Business Environment ........ | 107 |
|     |     |     | e.  Good Faith ............................................................................ | 108 |
|     |     |     | f.  Unreasonable or Discriminatory Conduct ........................... | 109 |
|     | B. | Unreasonable and Discriminatory Measures ..................................... | | 109 |
|     |     | **(1)** | The Parties' Positions ................................................................. | 109 |
|     |     |     | a.  Claimants' Position .............................................................. | 109 |
|     |     |     | b.  Respondent's Position .......................................................... | 114 |
|     |     | **(2)** | The Tribunal's Analysis .............................................................. | 117 |
|     |     |     | a.  Discrimination ..................................................................... | 118 |
|     |     |     | b.  Unreasonableness ................................................................. | 121 |
|     | C. | Full Protection and Security .............................................................. | | 122 |
|     |     | **(1)** | The Parties' Positions ................................................................. | 122 |
|     |     |     | a.  Claimants' Position .............................................................. | 122 |
|     |     |     | b.  Respondent's Position .......................................................... | 125 |
|     |     | **(2)** | The Tribunal's Analysis .............................................................. | 128 |
| **VII.** | COSTS ....................................................................................................... | | | 131 |
|     | A. | Claimants' Cost Submissions ............................................................. | | 131 |
|     | B. | Respondent's Cost Submissions ......................................................... | | 132 |
|     | C. | The Tribunal's Decision on Costs ...................................................... | | 132 |
| **VIII.** | AWARD ..................................................................................................... | | | 135 |

iv

**TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| *Achmea* or *Achmea* Decision | *Slovak Republic v Achmea BV*, Case C-284/16, CJEU Judgment, 6 March 2018, RL-115 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| BIT | Agreement between the Kingdom of Sweden and Romania on the Promotion and Reciprocal Protection of Investments, done on 29 May 2002, and entered into force on 1 April 2003, C-14 |
| C-[#] | Claimants' Exhibit |
| CJEU | Court of Justice of the European Union |
| Cl. Cost Sub. | Claimants' Cost Submission dated 30 August 2019 |
| Cl. Mem. | Claimants' Memorial on the Merits dated 14 December 2015 |
| Cl. Reply | Claimants' Reply on the Merits dated 13 February 2017 |
| Cl. Reply to Add. Prelim. Obj. | Claimants' Reply to the Respondent's Additional Preliminary Objection dated 17 September 2018 |
| CL-[#] | Claimants' Legal Authority |
| Hearing | Hearing on the Merits held 21 January 2019 to 1 February 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| Resp. C-Mem. | Respondent's Counter-Memorial on the Merits dated 23 May 2016 |
| Resp. Cost Sub. | Respondent's Cost Submission dated 30 August 2019 |

| Resp. Rej. | Respondent's Rejoinder on the Merits dated 27 July 2017 |
| --- | --- |
| Resp. Add. Prelim. Obj. | Respondent's Additional Preliminary Objection dated 1 August 2018 |
| RL-[#] | Respondent's Legal Authority |
| TFEU | Treaty on the Functioning of the European Union, dated 13 December 2007, effective on 1 December 2009, R-273 |
| Tr. Day [#] [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 24 April 2015 and reconstituted on 22 January 2018 |
| VCLT | Vienna Convention on the Law of Treaties, 23 May 1969, CL-59 |

## I.     INTRODUCTION AND PARTIES

1.     This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Agreement between the Kingdom of Sweden and Romania on the Promotion and Reciprocal Protection of Investments, which entered into force on 1 April 2003 (the "BIT" or "Treaty") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 and which became binding on Romania on 12 October 1975 and on Sweden on 28 January 1967 (the "ICSID Convention").

2.     The individual claimants are Mr. Ioan Micula and Mr. Viorel Micula, natural persons having the nationality of Sweden (together "individual Claimants" or "Messrs. Micula"). The corporate claimants, all companies incorporated under the laws of Romania, are S.C. Scandic Distilleries S.A. ("Scandic"); S.C. European Food S.A. ("European Food"); S.C. Transilvania General Import-Export S.R.L. ("TGIE"); S.C. Starmill S.R.L. ("Starmill"); S.C. European Drinks S.A. ("European Drinks"); S.C. Multipack S.R.L. ("Multipack"); S.C. Rieni Drinks S.A. ("Rieni"); S.C. Tonical Trading S.R.L. ("Tonical Trading"); S.C. Edri Trading S.R.L. ("Edri Trading"); and S.C. West Leasing International S.R.L. ("West Leasing") (together the "corporate Claimants"). (Collectively, the claimants are referred to as "Ioan Micula, Viorel Micula, and Others" or the "Claimants").

3.     The respondent is Romania ("Romania" or the "Respondent").

4.     The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.     This dispute relates to the Claimants' business activities in Romania pertaining to the production and sale of alcoholic spirits and related activities, and to actions or omissions by Romania said to affect these activities. The Claimants contend that Romania's conduct breaches the BIT, including its provisions requiring Romania to ensure fair and equitable treatment (Article 2(3)), prohibiting the impairment of investments through unreasonable

or discriminatory measures (Article 2(3)), and to provide investments full protection and security (Article 3(1)), as well as the BIT's umbrella clause (Article 2(4)).

## II.    PROCEDURAL HISTORY

6.    On 30 October 2014, ICSID received a request for arbitration dated that same day from the Claimants against Romania, together with Exhibits C-1 through C-28 (the "Request").

7.    On 24 November 2014, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.    In the absence of an agreement between the Parties on the method of constituting the Tribunal, the Tribunal was constituted in accordance with the formula set forth in Article 37(2)(b) of the ICSID Convention.

9.    The Tribunal is composed of Professor Donald McRae, a national of Canada and New Zealand, President, appointed by the Chairman of the ICSID Administrative Council in accordance with Article 38 of the ICSID Convention; Mr. John Beechey CBE, a national of the United Kingdom, appointed by the Claimants, and Professor John Crook, a national of the United States of America, appointed by the Respondent. Mr. Beechey was appointed on 22 January 2018, after the resignation of Dr. Michael Pryles, a national of Australia, who was the Claimants' initial appointee.

10.    On 24 April 2015, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), notified the Parties that all three initially-appointed arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Martina Polasek, ICSID Legal Counsel, were designated to serve as Secretary of the Tribunal. During the

2

course of the arbitration, Ms. Polasek was replaced by Ms. Celeste Mowatt, Legal Counsel; thereafter Ms. Mowatt was replaced by Ms. Anna Holloway, Legal Counsel.

11. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 8 June 2015 by teleconference.

12. Following the first session, on 21 July 2015, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and that the place of proceeding would be Paris, France.

13. On 18 November 2015, the Claimants submitted a request for a ten-day extension to file their Memorial on the Merits, and on 19 November 2015, the Respondent requested leave to respond to the request, which was granted by the Tribunal on the same day. By letter of 23 November 2015, the Respondent opposed the Claimants' request, and asked that the Tribunal either suspend the existing procedural timetable or grant the Claimants a three-day extension to file their Memorial and the Respondents a three-day extension to file its Counter-Memorial or its Rejoinder.

14. On 27 November 2015, the Tribunal issued Procedural Order No. 2 concerning the procedural calendar, granting the Claimants a six-day extension to file its Memorial, and the Respondent a six-day extension to file its Counter-Memorial, and setting a revised procedural calendar.

15. On 14 December 2015, in accordance with the revised procedural calendar, the Claimants filed a Memorial on the Merits, together with Exhibits C-1 through C-247, Legal Authorities CL-1 through CL-83, as well as four witness statements and five expert reports.[1]

---

[1] The witness statements were:

(1) CW-1, the Witness Statement of Mr. Ioan Micula, dated 12 December 2015, together with Exhibits CW-1-A to CW-1-C;

16.    On 23 December 2015, the Claimants filed an Application for Provisional Measures (the "December 2015 Application"), together with Exhibits C-248 through C-260 and Legal Authorities CL-84 through CL-95.  The earlier ICSID Award in *Ioan Micula, Viorel Micula and others v Romania* (ICSID Case No. ARB/05/20) ("*Micula I* Award"), issued on 11 December 2013, had awarded damages to the claimants in that proceeding (some of whom are also the Claimants in this proceeding).[2]  On 30 March 2015, the European Commission ("EC") had ruled that payment by Romania of the sums due under that Award would constitute illegal state aid and required Romania to recover any amounts already paid to the *Micula I* claimants ("Final Decision on State Aid" or "EC Decision"). The Claimants' December 2015 Application arose in light of measures taken by Romania in connection with that EC Decision.

17.    In the Application, the Claimants requested that the Tribunal issue:

> (i) *an Order restoring the status quo existing prior to the Measures by instructing Romania to revoke, or suspend all effects of, Decision 106/22.10.2015, unseal Scandic's production equipment, allow Scandic to resume control of its own ethyl alcohol stock, and abstain from implementing any new or similar measures against any of the Micula Companies (European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Edri Trading, West Leasing, Tonical Trading and Transilvania General Import Export) or their affiliates, prior to the Tribunal's issuance of its final award (and that the final award itself deal[] with the matter as appropriate at that time, such as*

---

(2) CW-2, the Witness Statement of Mr. Viorel Micula, dated 12 December 2015;

(3) CW-3, the Witness Statement of Mr. Mircea Halbac, dated 14 December 2015, together with Exhibits CW-3-A to CW-3-F;

(4) CW-4, the Witness Statement of Mr. Juan Gamecho, dated 12 December 2015;

The expert reports were:

(1) CER-1, the Expert Report of Brattle Group, dated 14 December 2015, together with Exhibits CER-1-001 to CER-1-075 and CER-1-077 to CER-1-254;

(2) CER-2, the Expert Report of Compania de Anchete, with Exhibits CER-2-001- to CER-2-009;

(3) CER-3, the Expert Report of PwC, dated 8 December 2015, with Exhibits CER-3-001 to CER-3-014;

(4) CER-4, the Expert Report of CURS, dated 2 December 2015;

(5) CER-5, the Expert Report of BDO, dated 9 December 2015.

[2] The claimants in the *Micula I* proceeding were Ioan Micula, Viorel Micula, S.C. European Food S.A. ("European Food"), S.C. Multipack S.R.L. ("Multipack"), and S.C. Starmill S.R.L. ("Starmill"), who are also Claimants in this proceeding.

> *by maintaining the Order in place until Romania has
> satisfied the terms of the final award in full); and*
>
> *(ii) an Order preserving the status quo by instructing Romania
> to suspend all effects of its decisions to annul the
> rescheduling agreements with TGIE, Rieni Drinks and
> European Drinks, respectively, to withdraw or otherwise
> cease and desist from pursuing the forced execution against
> the assets of TGIE, Rieni Drinks and European Drinks, and
> abstain from implementing any new or similar orders
> against any of the Micula Companies (European Food,
> Starmill, Multipack, European Drinks, Rieni Drinks,
> Scandic Distilleries, Edri Trading, West Leasing, Tonical
> Trading and Transilvania General Import Export) or their
> affiliates, prior to the Tribunal's issuance of its final award
> (and that the final award itself deals with the matter as
> appropriate at that time, such as by maintaining the Order
> in place until Romania has satisfied the terms of the final
> award in full); and*
>
> *[…] an emergency, temporary order: (i) instructing
> Romania to suspend all effects of Decision 106/22.10.2015,
> immediately unseal Scandic's production equipment and
> allow Scandic to resume control of its own ethyl alcohol
> stock; and (ii) prohibiting Romania from pursuing the
> immediate and forced execution against TGIE's, Rieni
> Drinks' and European Drinks' assets, or the assets of any of
> the Micula Companies […] or their affiliates, and from
> otherwise aggravating or extending the existing dispute,
> until the Tribunal issues its decision on this application.*[3]

18. On 30 December 2015, both Parties filed their views on the briefing schedule in respect of the Application, and the Respondent filed comments on the Claimants' request for an emergency temporary order, together with Exhibits R-001 and R-002 and Legal Authorities RL-001 through RL-005.

19. On 1 January 2016, the Tribunal declined to issue the emergency order sought by the Claimants and advised the Parties of the briefing schedule with regard to the December 2015 Application. The Tribunal further stated that "during the pendency of the consideration of the [December 2015 Application], the parties shall refrain from any action

---

[3] Application for Provisional Measures, dated 23 December 2015, paras. 72-73.

that may prejudice the position of the other party in these proceedings or otherwise aggravate the dispute."

20.    On 13 January 2016, the Respondent filed observations on the Claimants' request for provisional measures contained in the December 2015 Application, accompanied by Exhibits R-003 through R-030 and Legal Authorities RL-006 through RL-013.

21.    On 25 January 2016, the Claimant filed a reply on provisional measures, together with CER-5, the second expert report of BDO Business Advisory, dated 22 January 2016 (the "Second BDO Expert Report"), Exhibits C-261 through C-300, and Legal Authorities CL-96 through CL-104.

22.    By letter of 26 January 2016, the Respondent sought an extension for the filing of its rejoinder on provisional measures and requested that the Tribunal disregard the Second BDO Expert Report. On 27 January 2016, following the Tribunals invitation, the Claimants provided comments on the Respondent's requests of 26 January 2016.

23.    On 28 January 2016, the Tribunal granted the Respondent an additional seven days for the filing of its rejoinder, including its comments on the admissibility of the Second BDO Expert Report.

24.    On 8 February 2016, the Respondent filed its Rejoinder on the Claimants' December 2015 Application for provisional measures, together with an expert report of Dr. Robin Cohen, dated 8 February 2016, Exhibits R-031 through R-040, and Legal Authorities RL-014 through RL-016.

25.    On 1 March 2016, the Tribunal issued its Decision on Provisional Measures (addressing the Claimants' December 2015 Application).  The Tribunal directed the Parties to "refrain from any action that may prejudice the position of the other party in these proceedings or otherwise aggravate the dispute" and directed the Respondent to "notify the Tribunal in advance of taking any measures against the Claimants that could significantly impair the financial position of the Corporate Claimants during the course of these proceedings." The Claimants' other requests for provisional measures were denied, and the Tribunal reserved the issue of costs.

26.  By letter of 15 April 2016, the Respondent requested that the Tribunal order the Claimants to immediately provide documentation connected with CER-4, the "CURS Report," dated 2 December 2015.  Later that same day, the Tribunal invited the Claimants to file their comments on the Respondent's request by 20 April 2016. In accordance with the Tribunal's instructions, on 20 April 2016, the Claimants provided their comments on the Respondent's letter, and requested that the Tribunal dismiss the requests contained therein in their entirety.

27.  On 25 April 2016, the Tribunal issued Procedural Order No. 3, denying the Respondent's request of 15 April 2016, but noting that the relevant documentation could be requested in accordance with the procedure set out in Procedural Order No. 1.

28.  On 23 May 2016, the Respondent filed its Counter-Memorial on Jurisdiction and Merits, together with the Witness Statement of Mr. Claudiu Codrea, dated 20 May 2016, the Expert Report of Dr. Robin Cohen, dated 23 May 2016, with Exhibits RC-1-001 to RC-1-137, Exhibits R-041 through R-268, and Legal Authorities RL-017 through RL-075.

29.  On 15 July 2016, the Parties submitted their requests for the production of documents to the Tribunal. On 15 August 2016, the Tribunal issued Procedural Order No. 4, ordering the Parties to produce documents by 29 August 2017, together with any privilege logs.

30.  On 26 September 2017, the Parties informed the Tribunal that they had entered into a confidentiality agreement regarding the production of certain documents responsive to the Claimants' document production requests. On the same date, the Parties transmitted the confidentiality agreement to the Tribunal.

31.  On 27 September 2017, the Claimants requested that the President of the Tribunal organize a conference call with the Parties to review the state of production of documents.

7

32.     After an exchange of correspondence with the Parties, the teleconference took place on 28
        October 2016. Participating in the teleconference were:

*Tribunal*:
|  |  |
|---|---|
| Prof. Donald McRae | President |
| Prof. John Crook | Arbitrator |
| Dr. Michael Pryles | Arbitrator |

*ICSID Secretariat*:
|  |  |
|---|---|
| Ms. Celeste Mowatt | Secretary of the Tribunal |

*For the Claimants*:
**Counsel:**
|  |  |
|---|---|
| Mr. Jakob Ragnwaldh | Mannheimer Swartling Advokatbyrå AB |
| Mr. Fredrik Andersson | Mannheimer Swartling Advokatbyrå AB |
| Mr. Aron Skogman | Mannheimer Swartling Advokatbyrå AB |
| Mr. Barton Legum | Dentons |
| Ms. Anna Crevon | Dentons |
| Ms. Annelise Lecompte | Dentons |

***Parties:***
|  |  |
|---|---|
| Mr. Ioan Micula | Claimant |
| Mr. Viorel Micula | Claimant |
| Ms. Oana Popa | European Food S.A. |
| Mr. Horia Ciurtin | Scandic Distilleries S.A. |

*For the Respondent*:
**Counsel:**
|  |  |
|---|---|
| Dr. Veijo Heiskanen | LALIVE |
| Mr. Sam Moss | LALIVE |
| Ms. Tessa Hayes | LALIVE |
| Ms. Mihaela Maravela | Leaua & Asociatii |
| Ms. Sofia Cozac | Leaua & Asociatii |
| Ms. Raluca Bengescu | Leaua & Asociatii |

33.     The Tribunal provided clarifications regarding its document production order during the
        course of the call.

34.     On 10 November 2016, the Respondent informed the Tribunal that domestic stay orders
        preventing the Romanian National Agency for Fiscal Administration ("ANAF") from
        pursuing enforcement proceedings in Romania against particular Claimants (proceedings
        arising from the EC Decision pertaining to the *Micula I* Award) had been lifted, and
        therefore the ANAF "intend[ed] to take enforcement actions against [those] Claimants to

recover a total amount of RON 383,174,578.82 plus interest that the European Commission ruled to constitute illegal State aid under European law in its Decision of 30 March 2015." The Respondent explained that it did "not consider that the contemplated actions necessarily constitute measures that 'could significantly impair the financial position of the Corporate Claimants', such that they must be notified in advance to the Tribunal in accordance with its Decision on Provisional Measures of 1 March 2016. Nonetheless, out of an abundance of caution, the Respondent wishes to inform the Tribunal in advance of its planned enforcement measures."

35.    On the same date, the Claimants asked that the Tribunal allow them to comment on the Respondent's letter.  The Claimants also requested the Tribunal to (i) order Romania to provide evidence supporting its allegation that the stay orders have been lifted and any other documents on which it relied, and (ii) direct Romania not to take any of the measures indicated until further order of the Tribunal ("Claimants' 10 November 2016 Requests").

36.    On 12 November 2016, the Tribunal confirmed that it would allow the Claimants to respond to the Respondent's letter, but deferred the Claimants' 10 November 2017 Requests until after it received an elaboration of the Claimants' position.

37.    On 17 November 2016, the Claimants filed their response to the Respondent's 10 November 2016 letter, accompanied by Exhibits C-331 to C-335. In their letter, the Claimants argued, *inter alia*, that, contrary to the Respondent's assertions, the domestic proceedings in question were "still pending and the stays of enforcement are therefore still in force, and will continue to be in force, until the final resolution of these proceedings." The Claimants requested that the Tribunal order the preservation of the *status quo* by instructing Romania to cease and desist from pursuing the planned enforcement actions and to refrain from pursuing similar measures prior to the issuance of the Tribunal's final award. The Claimants also requested that the Tribunal order that all Parties refrain from any action that may prejudice the position of the other party in these proceedings or otherwise aggravate the dispute, pending the resolution of the Application (together, "Claimants' 17 November 2016 Requests").

9

38.    On 21 November 2016, the Tribunal invited the Respondent to respond to the Claimants'
       17 November 2016 letter and to clarify the statement in the Respondent's letter of 10
       November 2016 that the "legal challenges brought by the companies […] have since been
       rejected by the courts and the suspensions lifted."

39.    On 28 November 2016, the Respondent filed its observations on the Claimants' 17
       November 2016 letter, accompanied by Exhibits R-269 to R-284 and Legal Authorities
       RL-76 to RL-79.

40.    On 6 December 2016, the Claimants sought an extension of time of at least eight additional
       weeks to submit their Reply.  The Claimants noted that an extension would necessarily
       require a change to the hearing dates and suggested that the Tribunal could first provide
       the Parties with its next availabilities for the hearing, after which the Parties could "confer
       and propose a new procedural timetable for the submission of Claimants' Reply and
       Romania's Rejoinder."

41.    By a second letter of the same date, the Claimants requested that the Tribunal issue a
       confidentiality order in anticipation of certain "Attorneys-Eyes Only" documentation they
       intended to submit as evidence.  The Claimants' letter summarized the areas of agreement
       already reached in *inter partes* correspondence, presented the Claimants' position on one
       disputed matter, and proposed text for the body of a confidentiality order by the Tribunal.

42.    On 7 December 2016, the Claimants filed a reply to the Respondent's observations on the
       Claimants' 17 November 2016 Requests, accompanied by CER-6, the third expert report
       of BDO Business Advisory dated 7 December 2016 ("Third BDO Expert Report"),
       Exhibits C-336 to C-338 and Legal Authorities CL-107 and CL-108.

43.    On 9 December 2016, the Respondent submitted a letter responding to the Claimants' first
       letter of 6 December 2016, regarding the Claimants' request for an extension.

44.    On 12 December 2016, the Respondent submitted a letter responding to the Claimants'
       second letter of 6 December 2016 concerning confidentiality.

45.     On 14 December 2016, the Respondent filed a rejoinder on the Claimants' 17 November
        2016 Requests, accompanied by the second Expert Report of Dr. Robin Cohen, dated 14
        December 2016.

46.     By letter of the same date, the Claimants set forth further comments regarding their
        requested extension.

47.     On 21 December 2016, the Tribunal granted a one-month extension of the deadline for the
        Claimants' Reply and a corresponding extension for the filing of the Respondent's
        Rejoinder. Noting that the extension would require the postponement of the proposed
        hearing dates, the Tribunal invited the Parties to indicate their availability for a hearing
        from 21 to 26 August 2017.

48.     Also, on 21 December 2016, the Claimants provided their comments on Romania's letter
        of 12 December 2016 concerning the submission of documents and information designated
        as confidential under the Confidentiality Agreement. The Respondent responded to the
        Claimants' letter on 22 December 2016.

49.     On 21 December 2016, the Respondent submitted to the Tribunal a letter that Romania
        received from the European Commission on 16 December 2016, after it had filed its 14
        December 2016 submission on the Claimants' New Application. The letter was submitted
        as Exhibit R-288.

50.     On 22 December 2016, the Claimants objected to the Respondent's submission of the 16
        December 2016 letter from the EC as Exhibit R-288, arguing that paragraph 16.3 of
        Procedural Order No. 1 provided that exhibits were to be filed with written submissions
        authorized by the Tribunal except in exceptional circumstances and with advance leave
        granted by the Tribunal. In the alternative, the Claimants requested an opportunity to
        respond to the document and requested the Tribunal to direct Romania to produce the
        "previous correspondence" referred to in Exhibit R-288 as well as any other
        correspondence exchanged between Romania and the EC concerning these matters during
        the February-December 2016 timeframe.

11

51.  Following the Tribunal's invitation, the Respondent replied to the Claimants' 22 December 2016 communication concerning Exhibit R-288 on 30 December 2016.  The Respondent objected to the Claimants' request that Exhibit R-288 not be admitted, but it indicated that it would be willing to provide the previous correspondence referred to in Exhibit R-288, if it would be helpful to resolve the Claimants' application.

52.  On 30 December 2016, the Parties responded to ICSID's letter of 21 December 2016 concerning the procedural calendar. They indicated that it might be possible to complete the hearing within 6 days, but requested that the Tribunal reserve an additional one or two days.

53.  On 6 January 2017, the Tribunal decided to admit Exhibit R-288 into the record and invited the Respondent to produce the "previous correspondence" referenced in that document by 13 January 2017. Each Party was to be granted an opportunity to comment on such documents. By the same letter, the Tribunal responded to the Parties' correspondence of 30 December 2016 concerning the procedural calendar. The Tribunal indicated that if the Parties were not available during the proposed August 2017 dates, it would likely not be possible to schedule a hearing until April or May of 2018. The Parties were invited to indicate whether a hearing in August 2017 would be a possibility

54.  Also, on 6 January 2017, the Respondent submitted a letter requesting the Tribunal's assistance in resolving a matter concerning the production of documents relating to criminal proceedings ("Respondent's 6 January 2017 Application"). The letter was accompanied by Exhibits R-289 to R-295. The documents at issue were criminal complaints responsive to the Claimants' document production Request No. 9, which had already been produced by the Respondent in accordance with Procedural Order No. 4 and the Confidentiality Agreement signed by the Parties' representatives on 19 and 20 September 2016. The Respondent asserted privilege with respect to all criminal complaints relating to ongoing criminal investigations, and requested the Tribunal to order the Claimants to destroy any copies it may hold of listed criminal complaints.  On 9 January 2017, the Claimants requested that they be granted until 3 February 2017 to respond to the Respondent's application (i.e., one business day after the deadline for the Claimants'

Reply). On 11 January 2017, the Respondent commented on the Claimants' requested extension. The Tribunal subsequently declined the Claimants' request to extend the time for their response to the Respondent's 6 January 2017 Application until after the filing of the Reply. The Claimants were instead invited to submit their response by 18 January 2017.

55.    On 11 January 2017, the Tribunal issued its Procedural Order No. 5 concerning confidentiality. Pursuant to this order, the Parties were permitted to submit certain documents as evidence in redacted form to remove certain personal information, provided that non-redacted versions of those documents were transmitted to opposing counsel on an "Attorneys Eyes Only" basis.

56.    Also, on 11 January 2017, the Parties each responded to the Tribunal's letter of 6 January 2017 concerning the scheduling of the hearing. While the Respondent confirmed its availability, the Claimants stated that they were not available during the proposed August 2017 dates.

57.    On 13 January 2017, the Respondent submitted electronically the "previous correspondence" referenced in Exhibit R-288 as Exhibits R-296 to R-304.

58.    On 18 January 2017, the Claimants responded to the Respondent's 6 January 2017 Application. The Claimants confirmed that they had deleted two documents in their possession, but otherwise objected to the request that they be required to destroy documents produced by the Respondent on the basis of privilege, arguing that no privilege applied.

59.    On 19 January 2017, the Claimants requested a further three-week extension of the deadline within which to file their Reply (which was, at that time, set for 30 January 2017).

60.    On 20 January 2017, the Claimants sought leave to submit an additional document related to their request concerning enforcement measures. The document in question was a judgment rendered that day by the English Commercial Court, Queen's Bench Division, High Court of Justice. It addressed Romania's application to set aside or stay the registration in the United Kingdom of the Award rendered in the *Micula I* arbitration.

61.     On 20 January 2017, the Respondent commented on the Claimants' letter of 18 January 2017 regarding Respondent's 6 January 2017 Application.

62.     Further to the Tribunal's invitation, on 24 January 2017, the Respondent responded to the Claimants' request of 19 January 2017 for an extension of the deadline for the filing of the Reply.  The Respondent objected to any further extension.

63.     On 26 January 2017, the Tribunal granted an additional two-week extension of the deadline for the Claimants' Reply and a corresponding extension of the deadline for the Respondent's Rejoinder.

64.     On 27 January 2017, the Respondent also responded to the Claimants' request of 19 January 2017 to submit into the record the 20 January 2017 judgment of the English Commercial Court relating to the enforcement of the *Micula I* Award. The Respondent did not object to the document being entered into the record. In its letter the Respondent also requested an amendment to paragraph 16.3 of Procedural Order No 1 concerning the submission of documents.

65.     In view of the Parties' agreement and following the Tribunal's invitation, on 3 February 2017 the Claimants submitted the 20 January 2017 English High Court judgment as Exhibit C-339.

66.     Also, on 3 February 2017, the Claimants, by separate letter, commented on the Respondent's request of 27 January 2017 to amend paragraph 16.3 of PO1, objecting to the Respondent's request. In their letter, the Claimants also requested the opportunity to comment by 17 February 2017 on the 20 January 2017 judgment which was filed as Exhibit C-339.  The Tribunal approved that request on 6 February 2017.

67.     On 8 February 2017, the Tribunal issued its Procedural Order No. 6 concerning the Respondent's 6 January 2017 Application regarding privileged documents previously produced to the Claimants. The Tribunal instructed the Claimants to destroy or return the Criminal Complaints listed in Annexes A and B to the Application to the Respondent. The order further provided that once the Respondent established that proceedings related to any

14

Criminal Complaints have concluded, the Respondent was to make those documents available to the Claimants.

68. On 13 February 2017, at the Tribunal's invitation, the Respondent submitted further comments concerning its proposed amendment to paragraph 16.3 of PO1.

69. Also, on 13 February 2017, the Claimants filed their Reply on the Merits, together with Factual Exhibits C-340 to C-460, Legal Authorities CL-109 to CL-163, as well as two witness statements and six expert reports.[4]

70. On 15 February 2017, the Claimants informed the Tribunal that they had complied with the instructions in Procedural Order No. 6 concerning the Criminal Complaints.

71. On 15 February 2017, the Tribunal issued Procedural Order No. 7 declining the Respondent's 27 January 2017 request to amend paragraph 16.3 of PO1. However, the Tribunal advised the Parties of "its expectation that any request for leave to submit new documents submitted further to paragraph 16.3 of Procedural Order No. 1 will focus on the justification for the introduction of the new evidence and refrain from entering into the substance of the matter."

72. On 17 February 2017, the Claimants submitted their comments on Exhibit C-339, the English High Court judgment of 20 January 2017.

73. On 22 February 2017, the Tribunal invited the Parties to indicate by Tuesday, 1 March 2017, whether they would be available for a hearing during the weeks of 23 April and 30

---

[4] The witness statements were:
(1) CW-5, the Witness Statement of Ioan Micula, dated 12 February 2017, with Exhibits CW-5-A to CW-5-F;
(2) CW-6, the Witness Statement of Mircea Halbac, dated 13 February 2017, with Exhibits CW-6-A to CW-6-R;
The expert reports were:
(1) CER-7, the Expert Report of the Brattle Group, dated 13 February 2017, with Exhibits CER-7-001 to CER-7-153;
(2) CER-8, the Expert Report of CURS, dated 8 February 2017, with Exhibits CER-8-001 to CER-8-005;
(3) CER-9, the expert Report of Prosman Spavlovič, dated 13 February 2017, with Exhibits CER-9-001 to CER-9-006;
(4) CER-10, the Expert Report of BDO, dated 10 February 2017;
(5) CER-11, the Expert Report of Dr. Roy J. Epstein, dated 11 February 2017, with Exhibits CER-11-001 to CER-11-019;
(6) CER-12, the Expert Report of FinExpert, dated 13 February 2017.

April 2018. By communications of 24 February 2017 and 28 February 2017, the Parties confirmed their availability for a hearing during the proposed dates.

74.    On 6 March 2017, the Tribunal issued a Decision on Enforcement Proceedings addressing the Claimants' 17 November 2016 Requests related to enforcement proceedings against the Claimants in Romania.  The Decision recorded the following orders:

> *1.   The Tribunal reaffirms its decision of March 1, 2016, in particular:*
>
> *That the parties shall refrain from any action that may prejudice the position of the other party in these proceedings or otherwise aggravate the dispute; and*
>
> *That the Respondent shall notify the Tribunal in advance of taking any measures against the Claimants that could significantly impair the financial position of the Corporate Claimants during the course of these proceedings.*
>
> *2.   The Respondent shall provide the Tribunal with an update on the enforcement actions outlined in its letter of November 10, 2016.*
>
> *3.   The Claimants' other requests are denied.*
>
> *4.   Costs shall be reserved until later in these proceedings.*

75.    On 29 March 2017, in accordance with the Decision on Enforcement Proceedings, the Respondent provided an update on the enforcement actions outlined in its notification to the Tribunal of 10 November 2016.

76.    On 5 April 2017, the Tribunal issued its Procedural Order No. 8 concerning the procedural calendar. The Order recorded the extensions granted by the Tribunal on 26 January 2017, confirmed that the hearing would be held during the weeks of 23 April and 30 April 2018, and notified the Parties of other changes to the procedural calendar consequent upon the postponed hearing dates.

77.     On 6 April 2017, the Claimants wrote to the Tribunal seeking leave to respond to the Respondent's update of 29 March 2017 concerning enforcement measures. The Tribunal invited the Claimants to submit their comments by 13 April 2017.

78.     On 12 April 2017, the Claimants wrote to the Tribunal concerning documents responsive to their document Request No. 9, produced by the Respondent on 6 April 2017. Given the late production of the documents, the Claimants requested that the Tribunal order that neither Party be permitted to rely on the additional documents produced by the Respondent. The Respondent was invited by the Tribunal to respond to the Claimants' request by 19 April 2017.

79.     On 13 April 2017, the Claimants submitted their comments on the Respondent's 29 March 2017 update, accompanied by Exhibits C-461 though C-463. The Claimants requested the Tribunal to amend its Decision on Enforcement Proceedings "so as to require that any notice under Section IV, item 2 of the Decision must (i) specify the enforcement measures to be taken, the specific assets involved and the date and place for the execution of the measure and, (ii) be given at least thirty (30) days in advance."

80.     On 19 April 2017, the Respondent replied to the Claimants' 12 April 2017 letter requesting that neither Party be permitted to rely on the additional documents produced by the Respondent on 6 April 2017. The Respondent stated that "[i]f granted, the Claimants' request would have the drastic effect of preventing the Respondent from submitting with its Rejoinder documents the relevance and materiality of which are undisputed by the Parties. Having failed to even request the opportunity to file a supplementary submission on the Additional Documents which would be entirely feasible given that the current procedural timetable provides for a hearing only in April 2018, the Claimants cannot be heard to argue that the Additional Documents should be excluded from this arbitration."

81.     On 20 April 2017, the Respondent objected to the Claimants' letter of 13 April 2017 requesting an amendment to the Decision on Enforcement Proceedings.

82.     On 25 April 2017, the Claimants responded to the Respondent's letter of 19 April 2017 regarding the documents produced by the Respondent on 6 April 2017.

17

83.    By letter of 28 April 2017, the Tribunal decided on the Claimants' application of 13 April 2017 seeking the modification of the Decision on Enforcement Proceedings. The Tribunal considered that no action was required at that time. It stated that:

> *Having considered these matters, the Tribunal is of the view that it need take no further action. It reminds the Parties that, as set out in its Decision of 1 March 2016, the primary concern of the Tribunal in considering the issue of enforcement measures is "for the procedural integrity of the proceedings and the avoidance of any aggravation or exacerbation of the dispute during the course of the proceedings".*
>
> *The Tribunal also reminds the Parties of the obligation set out in Section IV, paragraph 1 of that Decision, not to "prejudice the position of the other party in these proceedings or otherwise aggravate the dispute."*
>
> *The Tribunal requests the Respondent to provide a further update on enforcement measures six months from the date of this letter. The Tribunal expects that such an update will provide sufficient specificity of the enforcement measures and the assets to which they relate to allow the Tribunal to evaluate the effect, if any, of the measures on this proceeding.*
>
> *The Tribunal also reminds the Respondent that, independently of the update on enforcement measures, it has an obligation under paragraph 2 of the Decision of 1 March 2016 to "notify the Tribunal in advance of taking any measures against the Claimants that could significantly impair the financial position of the Corporate Claimants during the course of these proceedings".*

84.    On 1 May 2017, with the Tribunal's leave, the Respondent submitted a response to the Claimants' letter of 25 April 2017.

85.    On 2 May 2017, the Respondent submitted a further letter concerning enforcement measures, notifying the Tribunal that "the Excise Commission may decide to revoke European Food's fiscal warehouse authorisation. ANAF would also be required to take steps to recover European Food's reinstated tax debts, however Romania will notify the Tribunal separately in advance of any such actions."

18

86.    On 11 May 2017, the Tribunal issued its Procedural Order No. 9, which addressed the Claimants' request of 12 April 2017, concerning the documents produced by the Respondent in April 2017. The Tribunal decided that it would be "premature to rule that documents produced in April 2017 be disregarded without knowing what specific documents are being referred to and what reliance is being placed on them." The Tribunal therefore instructed the Parties that, "[i]f either Party wishes to rely on documents included in the April Document Production, it shall seek authorization from the Tribunal to do so by 15 June 2017, indicating the purpose for which the documents would be introduced and how they would constitute 'rebuttal documentary evidence' for purposes of paragraph 16.1 of Procedural Order No. 1."

87.    On 24 May 2017 the Respondent provided a further update concerning enforcement measures.

88.    On 15 June 2017, further to Procedural Order No. 9, the Respondent sought authorization from the Tribunal to rely on certain challenged documents in its Rejoinder.

89.    Following an invitation by the Tribunal, on 29 June 2017 the Claimants responded to the Respondent's 15 June 2017 letter. The Claimants maintained their objection to the submission of these documents into the record by the Respondent. The Claimants requested that, if the Tribunal were to grant the Respondent's application, the Claimants be given "leave to submit a supplemental report by FinExpert addressing Romania's use of such materials in its Rejoinder."

90.    By email the same day, the Respondent confirmed that it would not object "if the Tribunal wished to grant the Claimants a reasonable deadline for submitting a second expert report from FinExpert after the Rejoinder, should they feel the need to do so."

91.    On 7 July 2017, the Tribunal issued its Procedural Order No. 10 which granted the Respondent's request to submit the documents and information identified in its 15 June 2017 letter. The Tribunal also granted the Claimants the opportunity to submit a supplemental FinExpert Report "addressing the way in which the Respondent has used these documents in its Rejoinder" by 15 September 2017.

19

92.    On 27 July 2017, the Respondent filed its Rejoinder, together with four witness statements, three expert reports, Exhibits R-305 through R-443 (including the documents which the Respondent was permitted to submit further to Procedural Order No. 10), and Legal Exhibits RL-080 through RL-113.[5]

93.    On 7 September 2017, the Claimants requested an extension until 17 November 2017 to submit FinExpert's supplemental report.

94.    On 11 September 2017, the Respondent objected to the request, arguing that the Claimants "are in effect not requesting an extension of time to file an expert report that complies with PO 10, but to significantly expand upon the scope from what the Tribunal gave them permission to submit." (emphasis omitted)

95.    On 15 September 2017, the Claimants responded to the Respondent's objection.

96.    On 22 September 2017, the Tribunal issued its Procedural Order No. 11 concerning the Claimants' requested extension of the deadline for the Supplemental FinExpert report and the Parties' subsequent correspondence, granting the Claimants until 30 October 2017 to file the report, and the Respondent until 30 November 2017 to submit any observations thereon.

97.    On 19 October 2017, the Parties submitted a joint proposal to modify the procedural calendar, suggesting revised dates for the pre-hearing deadlines. The Tribunal, on 25 October 2017, approved the revised deadlines and proposed that the pre-hearing

---

[5] The witness statements were:

(1) the Second Witness Statement of Mr. Claudiu Codrea, dated 27 July 2017;

(2) the Witness Statement of Mr. Ionel Mateescu, dated 27 July 2017;

(3) the Witness Statement of Mr. Eugen Serban, dated 27 July 2017;

(4) the Witness Statement of Mr. Petre Tănase, dated 21 July 2017;

The expert reports were:

(1) the Second Expert Report of Dr. Robin Cohen, dated 27 July 2017 (with CRA2-001 through CRA2-082);

(2) the Expert Report of Professor Wojciech Kopczuk, dated 26 July 2017 (with WKR-001 through WKR-029, and WK-001 through WK-016);

(3) the Expert Report of Professor Vintilă Mihăilescu, dated 27 July 2017 (with VM-001 through VM-035).

organizational meeting be held by the President with the Parties by telephone conference on 1 February 2018.  The Parties subsequently confirmed their availability.

98.    On 30 October 2017, the Respondent provided a six-month update concerning enforcement measures in accordance with the Tribunal's directions in its letter of 28 April 2017. The update detailed enforcement measures which were to be undertaken against several of the corporate Claimants in furtherance of the EC's Decision on State Aid.

99.    On 31 October 2017, the Claimants submitted the supplemental expert report of Ms. Ramona Milea of FinExpert Consulting dated 31 October 2017.

100.    On 6 November 2017, the Respondent objected to the FinExpert's supplemental expert report, arguing that it did not comply with the Tribunal's directions because the report was not "limited to 'addressing the way in which the Respondent has used [the new] documents in its Rejoinder'" as required by paragraph 7 of the Procedural Order No. 11. The Respondent requested that the Tribunal not admit the report, fix a short period of no more than one week for the Claimants to file a revised report that complied with the Tribunal's directions, and invite the Respondent to respond within one month from the date of its filing.

101.    On 7 November 2017, the Claimants submitted a corrected version of the supplemental expert report of Ms. Milea dated 31 October 2017, stating that in reviewing the report, Ms. Milea had "noticed that corrections to certain calculations had not been incorporated resulting in some small differences in certain of the figures presented" as well as certain typographical errors. The Claimants provided a version of the Supplemental FinExpert Report showing the modifications in track changes.

102.    On 14 November 2017, at the Tribunal's invitation, the Claimants responded to the Respondent's application of 6 November 2017, disputing the Respondent's interpretation of Procedural Order No. 11.  The Claimants argued that an analysis of the full set of documents produced by the Respondent was not contrary to the Tribunal's direction, and noted that the Rejoinder "used the late-produced documents to criticize the conclusions that FinExpert had reached based on a sample of the full set of documents." The Claimants

therefore asked the Tribunal to reject the Respondent's request to disregard the Supplemental FinExpert Report.

103. On 15 November 2017, the Claimants responded to the Respondent's update of 30 October 2017 concerning enforcement measures. The Claimants requested that the Tribunal:

> (i) *affirm that Romania's Second Update does not provide "sufficient specificity of the enforcement measures and the assets to which they relate to allow the Tribunal to evaluate the effect, if any, of the measures on this proceeding" which would satisfy the requirements set forth in the Tribunal's letter of 28 April 2017 (including, but not limited to, any measures against Multipack and/or European Food as a result of Romania's planned cancellation of Multipack's debt restructuring agreement); and*

> (ii) *order Romania to refrain from (a) cancelling Multipack's rescheduling agreement and (b) initiating any enforcement measures against any of the Claimants before the expiry of thirty (30) days following a notification fulfilling the requirements of the Tribunal's letter of 28 April 2017.*

> *Claimants note that the current situation is very different from that before the Tribunal at the time of its Decision on Provisional Measures of 1 March 2016, in that (i) Claimants have not, and cannot, initiate court proceedings concerning the cancellation of Multipack's agreement (because a decision is yet to be taken) and (ii) Romania states that it will take action upon cancellation (cf. paras 58-60 of the Tribunal's Decision on Provisional Measures, 1 March 2016). Since it can take months following a decision to cancel the rescheduling agreement to obtain a stay order in court (against the immediate enforcement of the cancellation decision) Romania can – absent the requested order from the Tribunal – proceed with enforcement measures immediately upon cancellation. Therefore, the requested order (see item (ii) above) is necessary, and urgent, to avoid that Romania takes measures that will significantly impair the financial position of the Corporate Claimants during the course of these proceedings and prejudice Claimants' position in these proceedings.*

104. On 16 November 2017, the Tribunal invited the Respondent to submit its comments to the Claimants' letters of 14 and 15 November 2017 by 23 November 2017. The following day, the Respondent requested an extension of the deadline for its response to the Claimants'

15 November 2017 letter, on the basis that the letter contained a new request for provisional measures. The Tribunal granted the Respondent's request for an extension until 4 December 2017.

105.   On 21 November 2017, the Respondent submitted its comments to the Claimants' 14 November 2017 letter and maintained its request to have the Supplemental FinExpert Report disregarded as contrary to the Tribunal's previous orders and prejudicing the Respondent's rights of due process. Alternatively, the Respondent requested that, should the Tribunal decide to admit the Supplemental Expert Report, the Respondent be granted until 26 January 2018 to provide its comments.

106.   On 22 November 2017, the Claimants wrote to the Tribunal to notify it "of a violation by Romania of the Decision on Provisional Measures that intervened after Claimants' last communication concerning Romania's Second Update on Enforcement." The Claimants requested urgent relief concerning this violation. In particular, the Claimants requested:

> *That the Tribunal immediately order Romania to refrain from taking any enforcement measures against European Food for the recovery of RON 26,462,788.70 in additional interest on the recovery of allegedly paid State aid in accordance with the EC Final Decision. Given the urgent nature of this request, Claimants respectfully request that the Tribunal issue such a decision before 4 December 2017, i.e. the day prior to the expiry of the 15-day notice period and the commencement of Romania's enforcement measures against European Food. If such an order is not rendered, then Claimants request that the Tribunal instruct Romania not to take any action before the Tribunal has rendered its decision on these matters.*

107.   Following the Tribunal's invitation, the Respondent responded to the Claimants' urgent request of 22 November 2017 on 28 November 2017. The Respondent asserted that "the Claimants' request relies on misrepresentations of the facts and Romanian law and is pleaded before the wrong forum. Romania respectfully requests the Tribunal to dismiss the Claimants' request for urgent relief of 22 November 2017."

108.   Also, on 28 November 2017, the Tribunal issued its Procedural Order No. 12 concerning the Respondent's request of 6 November 2017 relating to the Supplemental FinExpert Report. The Tribunal rejected the Respondent's request to disregard the supplemental

23

FinExpert Report and set a deadline of 5 January 2018 for the Respondent to file its comments on that Report. The Order also recorded the amendments to the procedural calendar further to the Parties' joint proposal of 19 October 2017.

109.   Following the Tribunal's invitation, on 30 November 2017, the Claimants submitted comments on the Respondent's letter of 28 November 2017. The Claimants disputed the Respondent's characterization of the request as being outside the scope of this proceeding. The Claimants maintained the request in their 22 November 2017 letter, but in the alternative, requested that the Tribunal instruct Romania not to take any action before the Tribunal had (i) been provided with a notification sufficient to "evaluate the effect, if any, of the measures in this proceeding" and (ii) rendered its decision on these matters.

110.   By letter of 1 December 2017 sent by ICSID, the Tribunal decided on the Claimants' application of 22 November 2017, as follows:

> *The Tribunal has reviewed the letters of the Claimants of 22 November 2017 and 30 November 2017 and the letter of the Respondent of 28 November 2017 regarding certain enforcement measures that the Claimants say Romania is planning to take after 5 December 2017, including seizure of bank accounts and the sale of assets of one of the Claimants, European Foods.*
>
> *The Tribunal understands the position of Romania to be that the interest that was the subject of the ANAF summons of 20 November 2017 was interest on existing amounts for which the enforcement measures have been identified in their notifications to the Tribunal of 11 November 2016 and 30 October 2017 and there are no separate plans for the enforcement of the interest amount in the summons of 20 November 2017 from those described in these previous notifications.*
>
> *Accordingly, the Tribunal requests the Respondent to confirm by c.o.b. Monday 4 December 2017 that enforcement of the amounts indicated in the ANAF summons of 20 November are to take place in accordance with the enforcement plans described in the Respondent's notifications of 11 November 2016 and 30 October 2017 and that there will be no separate enforcement, including seizure of ba[n]k accounts and sale of assets of European Foods, following 5 December 2017.*

24

> *If the Tribunal receives the assurances requested, it sees no need at*
> *the present time to make the orders requested by the Claimants.*

111.    By a second letter of 1 December 2017, ICSID notified the Parties that Dr. Pryles was resigning as an arbitrator in this proceeding; Dr. Pryles' resignation was submitted in view of his unavailability during the scheduled hearing dates in April and May 2018.

112.    On 2 December 2017, the Claimants requested that Dr. Pryles "reconsider and withdraw his resignation as a Member of the Tribunal" and further requested that the other Members of the Tribunal "refrain from deciding whether to accept Dr. Pryles' resignation until he has had an opportunity to respond to this request."

113.    On 3 December 2017, the Respondent responded to the Claimants' letter for 2 December 2017. It stated that it had no comments on the letter, but that it would strongly object to any postponement of the hearing.

114.    On 4 December 2017, the Claimants notified the Tribunal of further actions being taken by the Respondent against the Scandic Distilleries. The Claimants' letter stated:

> *Since no mention of this new attempt by Romania to put Claimants*
> *out of business has been made in either of Romania's previous*
> *updates to the Tribunal, Claimants expect that Romania will comply*
> *with the orders of this Tribunal and refrain from taking any*
> *prejudicial action against Claimants – specifically issuing a*
> *decision on the enforcement of excises on vinegar against Scandic*
> *Distilleries – until it has properly notified this Tribunal.*

115.    On 4 December 2017, the Respondent responded to the Claimants' application of 15 November 2017.

116.    On 6 December 2017, ICSID wrote to the Parties at the request of the President of the Tribunal concerning Dr. Pryles' resignation.  The Parties were invited to indicate whether they would agree to a postponement of the hearing to September 2018 and for Dr. Pryles' resignation to be withdrawn.

25

Case 1:19-cv-01618-TSC    Document 68-43    Filed 06/09/22    Page 33 of 143

117.   On 7 December 2017, in accordance with the Decision on Provisional Measures of 1 March
       2016, the Respondent notified the Tribunal of further enforcement measures which it
       intended to take.

118.   On 13 December 2017, the Parties responded to ICSID's letter of 7 December 2017
       concerning Dr. Pryles' resignation. The Claimants indicated that they would not be
       available for a hearing during September 2018 and the Respondent indicated that it would
       not agree to the postponement of the hearing.

119.   Following the invitation of the President of the Tribunal, the Claimants responded to the
       Respondent's 7 December 2017 letter on 14 December 2017. The Claimants' letter was
       accompanied by the fifth expert report of BDO. The Claimants requested that the Tribunal
       order Romania to refrain from "(a) cancelling Multipack's rescheduling agreement (b)
       garnishing Multipack's bank accounts and sending letters to third party garnishees; and (c)
       initiating the seizure of European Food's assets." The Claimants stated that "[a]bsent the
       requested order from the Tribunal, Romania will proceed with enforcement measures
       immediately on 18 December 2017. Therefore, the requested order is necessary and urgent"
       (emphasis in original).

120.   On 15 December 2017, the Respondent requested leave to respond to the Claimants' letter
       of 14 December 2017 requesting urgent relief.

121.   On 18 December 2017, ICSID notified the Parties that Dr. Pryles had confirmed that no
       possible alterations in the number of sitting days or the sitting hours for the April 2018
       fixture could enable him to attend the hearing as scheduled. His resignation of 1 December
       2017 was therefore confirmed, and ICSID's letter confirmed that, in accordance with
       ICSID Arbitration Rule 10(2), the proceeding was suspended until the vacancy resulting
       from Dr. Pryles' resignation had been filled. The letter further informed the Parties that
       Professor Crook and Professor McRae had consented to the resignation of Dr. Pryles from
       the Tribunal and, accordingly, the vacancy on the Tribunal was now be filled by an
       appointment made in accordance with ICSID Arbitration Rule 11. Finally, the letter
       recorded that:

26

> *With respect to the Claimants' open application for an urgent order regarding pending enforcement proceedings, while no action can be taken on the Claimants' request until the Tribunal is reconstituted, Professor McRae and Professor Crook have suggested that, if the Respondent wishes to file observations on the Claimants' request (as it requested to do in its December 15, 2017 letter) and the Parties agree, it should submit those observations to the ICSID Secretariat, to be held pending the Tribunal's reconstitution. Should the Respondent wish to file observations in such manner, it is invited to seek the consent of the Claimants, and inform the Secretariat of the agreed date by which it will file those observations. Professor McRae and Professor Crook have also asked us to communicate that they encourage the Parties to endeavor to retain the status quo until after the Tribunal has been reconstituted and can rule on the Claimants' application.*

122. On 22 December 2017, the Respondent filed with ICSID its observations on the Claimants' application of 14 December 2017 regarding the enforcement measures it was pursuing in Romania.

123. Following appointment of Mr. John Beechey by the Claimants, the Tribunal was reconstituted on 22 January 2018.

124. On 29 January 2018, the Respondents provided a further update on the enforcement measures, indicating that the hearing for six of the insolvency proceedings was set for 8 March 2018 and that Romania had received another letter from the European Commission which was provided to the Tribunal.

125. On 5 February 2018, the Claimants filed a new request for provisional measures, arguing that Romania had violated the Tribunal's previous order on provisional measures. After detailing the impact of Romania's enforcement measures on the Claimants' business activities, the Claimants requested the Tribunal to order that Respondent:

> *(a) refrain from taking any enforcement action in relation to debts subject to Multipack's invalidated debt restructuring agreement; (b) cancel the current garnishment of Multipack's bank accounts, as ordered in Romania's letter of 23 January 2018, and refrain from transferring any money from the accounts named therein; and (c) refrain from any future garnishment of Multipack's bank accounts or any other assets in recovery of the alleged State aid debt.*

27

126.    On 7 February 2018, the Parties submitted joint proposed amendments to the procedural calendar, which included hearing dates in the weeks of 21 and 28 January 2019.

127.    In accordance with the proposed modifications to the procedural timetable, on 9 February 2018, the Respondent filed its comments on the Second Expert Report of Ramona Maria Milea of FinExpert.

128.    On 12 February 2018, the Tribunal notified the Parties that their proposed agreed modifications to the procedural calendar were adopted.

129.    On 13 February 2018, the Respondent filed its observations on the Claimants' 5 February 2018 request for provisional measures. The Respondent's observations provided a further update on the status of the enforcement measures and argued that Romania had not breached the Tribunal's orders as claimed by the Claimants. The Respondent reiterated its position that Romania had obligations in accordance with EU and domestic law to recoup the State aid from the *Micula I* claimants and the matter was not relevant to the proceeding in this matter. On 19 February 2018, the Respondent provided a further update on the status of the enforcement measures.

130.    On 2 March 2018, the Claimants filed their response to the Respondent's update of 19 February 2018. In it, the Claimants argued that the planned enforcement measures by Romania were without basis and would have a negative impact on the Micula Companies. The Claimants attached an impact analysis prepared by BDO, and requested that the Tribunal order Romania to refrain from:

> *(a) issuing letters to any third-party of Scandic or any company in which Scandic is a shareholder seizing payment due from such third parties; (b) garnishing Multipack's bank accounts and sending letters to third party garnishees; and (c) continuing enforcement procedures related to seized assets of European Food and garnishing its bank accounts.*

131.    On 15 March 2018, the Tribunal issued its Second Decision on Enforcement Proceedings.
It made the following determinations:

> *a. The Tribunal declines to make the orders requested by the Claimants in their letters of February 5, 2018 and March 2, 2018;*
>
> *b. The Tribunal declines to grant the relief in the terms requested by the Respondent in its letter of December 19, 2017 and reiterated in its letter of February 13, 2018;*
>
> *c. The Tribunal reiterates its Decisions of March 1, 2016, and March 6, 2017;*
>
> *d. It is appropriate for the Tribunal to call on Romania to exercise restraint in its enforcement measures against the Claimants and specifically, and to the extent that it is able to do so within the limits of its own law, to delay any eventual enforcement, so far as the Claimants are concerned during the pendency of these proceedings; and*
>
> *e. Costs shall be reserved until later in the proceedings.*

132.    By email of 16 April 2018, the Respondent provided a further update on the status of the enforcement measures. The Claimants filed their observations to the Respondent's update on 27 April 2018.

133.    On 11 May 2018, the Respondent requested leave to file a new jurisdictional objection based on the *Achmea* Decision together with Legal Authorities RL-115 to RL-118.

134.    On 25 May 2018, the Claimants filed their Reply to the Respondent's request of 11 May 2018.

135.    On 5 June 2018, the Tribunal issued its Procedural Order No. 13 granting leave to the Respondent to file submissions on the impact on these proceedings of the decision in *Achmea*. In granting this request, however, the Tribunal made no decision on the question of whether a jurisdictional objection could be raised at this stage of the proceedings. The Tribunal noted that a decision on that matter would be taken in the light of the further submissions of the Parties.

136.    On 1 August 2018, the Respondent filed an Additional Preliminary Objection together with Annexes Nos. 1 and 2, Exhibits R-446 to R-457 and Legal Authorities RL-119 to RL- 153.

137.    On 17 September 2018, the Claimants filed their Reply to the Respondent's Additional Preliminary Objection together with Exhibits C-476 to C-478 and Legal Authorities CL-182 to CL-235.

138.    By letter of 25 September 2018, the Tribunal notified the Parties that it had "considered the Parties' submissions on the admissibility of Respondent's objection and on the impact of the *Achmea* Decision, and has decided to defer to the merits hearing its decision on admissibility of Respondent's objection and, if admissible, the merits of that objection." In its letter, the Tribunal also advised the Parties that it did not require any further written submissions on these issues and that the Parties could present oral arguments during the Hearing on the Merits scheduled for January 2019.

139.    On 3 October 2018, the Respondent wrote to the Tribunal, requesting a second round of written submissions on its Additional Preliminary Objection. The Respondent indicated that it had approached the Claimants to seek agreement to have a second round of written pleadings and the Claimants did not consent. In the alternative, the Respondent requested that the Tribunal grant it leave to file new legal authorities before the hearing of oral arguments.

140.    By letter of 8 October 2018, the Claimant responded to the Respondent's request of 3 October 2018, stating that a second round of written submissions on the Respondent's Preliminary Objection was not necessary, would negatively impact preparation for the Hearing and would prejudice the Claimants. The Claimants did not oppose Romania's alternative request for leave to file new legal authorities on the matter.

141.    In a separate letter of same date, the Claimants requested leave to submit into the record "a limited number of additional documents" described in Annex A to the letter. The Claimants stated the reasons for its request to be:

> *(i) Romania, in connection with the filing of its Rejoinder, introduced new expert testimony (including the expert reports of*

> *Professors Mihăilescu and Kopczuk) and new evidence supporting*
> *factual assertions and arguments made in the Rejoinder and Dr*
> *Cohen's Second Report;*
>
> *(ii) It has transpired that Romania, as part of the more than 100,000*
> *pages produced in response to Claimants' Document Requests 6-9,*
> *erroneously has produced documents responsive to other Document*
> *Requests; and*
>
> *(iii) Documents relevant to the case did not exist at the time*
> *Claimants filed their Reply.*

The Claimants contended that the submission of these documents would not prejudice the Respondent, as it would have an opportunity to address them at the Hearing in January 2019.

142.   In its letter of 19 October 2018, the Respondent objected to the Claimants' application to submit additional documents. The Respondent argued that the scope of the request went beyond a "limited number of additional documents" and encompassed "vast quantities of new data, two new expert reports, several broadly defined categories of documents […] and several further pleadings described as 'summary overviews'." The Respondent contended that the Claimants did not have any basis to submit these new documents.

143.   Following further exchanges between the Parties, by letter of 14 November 2018, the Tribunal granted leave to the Claimants to file limited documents: 1) documents relevant to updating the Claimants' damages; and 2) a short update to the Brattle Expert Report with limited annexes. After receiving that update, and in consultation with the Parties, the Tribunal would decide whether to grant the Respondent a chance to respond in advance of the Hearing so that the update might be addressed during the Hearing or whether that response should be postponed until after the Hearing, with a potential of reconvening the hearing at a later point. The Tribunal invited the Claimants to further identify the documents that were directly responsive to new issues raised in the Respondent's Rejoinder and not simply responsive to the Respondent's rebuttal of the Claimants' arguments.

144. Following the exchange of correspondence between the Parties and the Tribunal, a pre-hearing organizational meeting was held on 13 November 2018 by telephone conference. Participating in the teleconference were:

*Tribunal*:

| | |
|---|---|
| Prof. Donald McRae | President |
| Prof. John Crook | Arbitrator |
| Mr. John Beechey CBE | Arbitrator |

*ICSID Secretariat*:

| | |
|---|---|
| Ms. Anna Holloway | Secretary of the Tribunal |

*For the Claimants:*

| | |
|---|---|
| Mr. Jakob Ragnwaldh | Mannheimer Swartling Advokatbyrå AB |
| Mr. Fredrik Andersson | Mannheimer Swartling Advokatbyrå AB |
| Mr. Aron Skogman | Mannheimer Swartling Advokatbyrå AB |
| Mr. Barton Legum | Dentons |
| Ms. Anna Crevon | Dentons |
| Mr. Nandakumar Srivatsa | Dentons |
| Mr. Ioan Micula | Claimant |
| Mr. Viorel Micula | Claimant |
| Ms. Oana Popa | S.C. European Drinks S.A. representative |
| Ms. Medora Purle | S.C. European Drinks S.A. representative |
| Ms. Ioana Blahuta Aron | S.C. European Drinks S.A. representative |

*For the Respondent:*

| | |
|---|---|
| Dr. Veijo Heiskanen | LALIVE |
| Mr. Matthias Scherer | LALIVE |
| Ms. Laura Halonen | LALIVE |
| Mr. Sam Moss | LALIVE |
| Mr. Alp Tokeser | LALIVE |
| Ms. Crenguta Leaua | LDDP |
| Ms. Mihaela Maravela | LDDP |
| Ms. Sofia Cozac | LDDP |
| Ms. Raluca Popa | LDDP |

145. Thereafter, the Tribunal issued its Procedural Order No. 14 concerning the organization of the hearing on 15 November 2018.

146. In accordance with the Tribunal's instructions of 14 November 2018, by letter of 16 November 2018, the Claimants identified the documents for submission into the record that in their view met the criteria set out by the Tribunal.

32

147.   On 20 November 2018, following an invitation from the Tribunal to submit brief comments on the Claimants' letter of 16 November 2018, the Respondent stated that none of documents identified by the Claimants in their letter met the criteria set by the Tribunal and requested that the Tribunal reject the Claimants' requests to submit additional documents.

148.   On 21 November 2018, after reviewing the Parties' arguments concerning the additional documents identified in the Claimants' letter of 16 November 2018, the Tribunal decided to grant leave to the Claimants to submit those documents. The Tribunal reserved the right to revisit the issue of the documents' relevance and weight in light of the arguments to be presented by the Parties.

149.   In accordance with Procedural Order No. 14, on 3 December 2018, the Parties submitted additional legal authorities: RL-154 and RL-155 submitted by the Respondent and CL-238 and CL-239 submitted by the Claimants.

150.   On 5 December 2018, in accordance with the Tribunal's decisions of 14 and 21 November 2018, the Claimants submitted additional documents: Exhibits C-479 through C-488 and CER-13, CURS Updated Report.

151.   On 10 December 2018, in accordance with the Tribunal's decision of 14 November 2018, the Claimants submitted CER-14, the updated Brattle Group Report with appendices CER-14-001 to CER-14-018 (the "Updated Brattle Report").

152.   By letter of 17 December 2018, the Respondent submitted its comments on the procedure for responding to the Updated Brattle Report. The Respondent asserted that the updated report went beyond the scope of the leave granted by the Tribunal. The Respondent indicated that its expert, Dr. Cohen, considered he would need a significant amount of time to complete his review of the new data submitted and to provide an update, and that this work could not take place simultaneously with preparations for the hearing. The Respondent requested that the Tribunal decide, following the hearing, an appropriate date for the Respondent's response in consultation with the Parties.

153.   On 20 December 2018, at the Tribunal's invitation, the Claimants submitted their observations on the Respondent's letter of 17 December 2018.  The Claimants asserted that the Updated Brattle Report fully complied with the scope of the leave granted by the Tribunal and characterized Dr. Cohen's estimates of the time needed to complete his analysis as "exaggerated and unreasonable."  The Claimants requested the Tribunal to direct submission of Dr. Cohen's rebuttal report by 17 January 2019 at the latest, and to provide directions clarifying the scope and length of that rebuttal report.  The Claimants also reserved their right to call Dr. Cohen for cross-examination, in the event that he was permitted to submit his rebuttal report after the hearing.

154.   On 21 December 2018, the Respondent filed a request to submit, as a new exhibit, the full translation of one of the new exhibits submitted by the Claimants. The Respondent's letter further addressed the Claimant's comments regarding the timing of Dr. Cohen's response to the Updated Brattle Report.

155.   By letter of 21 December 2018 the Tribunal granted leave to the Respondent to submit a full translation of the document filed by the Claimants as C-485. It further decided that any "consideration of the time frame for and modalities of response by the Respondent to the Updated Brattle Group Report and any issues arising out of the documents produced by the Claimants on 5 December 2018" was to be deferred until the Hearing. The Tribunal advised the Parties that no further communications on these matters were required at that time.

156.   On 8 January 2019, the Respondent submitted Exhibit R-458, in accordance with the leave granted on 21 December 2018.  Respondent also requested leave to submit a small number of additional documents.  The Claimants confirmed they had no objections to this on 10 January 2019; later that same day the Tribunal confirmed they would be admitted to the record.  Respondent's Exhibits R-459 to R-468 were duly submitted on 14 January 2019.

157.   On 11 January 2019, the Parties, in accordance with the Tribunal's instructions of 9 October 2018, each submitted some further legal authorities relating to the Respondent's Additional Preliminary Objection (CL-0240 through CL00242 and RL-0158 through RL-0161, respectively).  The Claimants also requested leave to submit a further legal authority;

that leave was granted on 15 January 2019, and the authority submitted as CL-0243 on 16 January 2019.

158.   On 14 January 2019, the Parties submitted their respective skeleton arguments. The Claimants' accompanying letter submitted an updated Prayer for Relief in which the quantum of Claimants' total damages claim was reduced in light of the Updated Brattle Report.

159.   Also, on 14 January 2019, the Respondent informed the Tribunal that its expert, Professor Mihăilescu had been hospitalized and would be unable to travel to Paris for the hearing. It requested the postponement of his examination. The following day, the Claimants and the Tribunal concurred that the issue would best be discussed at the hearing.

160.   On 18 and 29 January 2019, the Respondent filed additional Legal Authorities RL-156 through RL-163.

161.   A hearing on the Merits was held in Paris, France, from 21 January to 1 February 2019 (the "Hearing"). The following persons were present at the Hearing:

*Tribunal*:
  Prof. Donald McRae                    President
  Mr. John Beechey CBE                  Arbitrator
  Prof. John Crook                      Arbitrator

*ICSID Secretariat*:
  Ms. Anna Holloway                     Secretary of the Tribunal

*For the Claimants*:
  Counsel:
  Mr. Barton Legum                      Dentons
  Ms. Anna Crevon                       Dentons
  Mr. Nandakumar Srivatsa               Dentons
  Ms. Haoua Savadogo (Intern)           Dentons
  Ms. Constantina-Madalina Sandu        Dragne & Asociatii
  Mr. Stelian Garofil                   Dragne & Asociatii
  Ms. Oana-Andreia Dumitrescu           Dragne & Asociatii
  Mr. Jakob Ragnwaldh                   Mannheimer Swartling
  Mr. Fredrik Andersson                 Mannheimer Swartling
  Mr. Aron Skogman                      Mannheimer Swartling
  Mr. David Sandberg                    Mannheimer Swartling

35

| | |
|---|---|
| Mr. Jacob Rosell Svensson | Mannheimer Swartling |
| Parties: | |
| Mr. Ioan Micula | Claimant |
| Mr. Mircea Halbac | European Food |
| Mr. Cristian Bulzan | Multipack |
| Ms. Ioana Blahuta Aron | European Drinks |
| Mr. Cristian Ciceu | European Drinks |
| Ms. Doina Micula | European Drinks |
| Ms. Medora Purle | European Drinks |
| Mr. Calin Vidican | Rieni Drinks |
| Mr. Viorel Micula | Rieni Drinks |
| Mr. Horia Ciurtin | Scandic Distilleries |
| Ms. Oana Popa | Scandic Distilleries |
| Ms. Nicoleta Duma | Transilvania General Import-Export |
| Ms. Diana Radu | Transilvania General Import-Export |
| Mr. Vasile Popa-Bota | Transilvania General Import-Export |
| Experts: | |
| Mr. Carlos Lapuerta | Brattle |
| Mr. Florin Dorobantu | Brattle |
| Ms. Nina Anderson | Brattle |
| Ms. Rachael Barza | Brattle |
| Mr. Richard Caldwell | Brattle |
| Mr. Ryan Tholanikunnel | Brattle |
| Mr. Tom Dorrington Ward | Brattle |
| Mr. Mihai Belu | Compania de Anchete |
| Mr. Mircea Petru Capros | CURS |
| Mr. Paul Cristian Ene | Fin Expert Consulting |
| Ms. Andreea Mitrea-Nastrut | Fin Expert Consulting |
| Ms. Manuela Furdui | Fin Expert Consulting |
| Ms. Ramona Maria Milea | Fin Expert Consulting |
| | |
| *For the Respondent*: | |
| Counsel: | |
| Dr. Veijo Heiskanen | LALIVE |
| Mr. Matthias Scherer | LALIVE |
| Ms. Laura Halonen | LALIVE |
| Mr. Sam Moss | LALIVE |
| Mr. Alp Tokeser | LALIVE |
| Ms. Juliette Asso | LALIVE |
| Mr. Subhiksh Vasudev | LALIVE |
| Dr. Crenguta Leaua | LDDP |
| Mr. Gheorghe Matei | LDDP |
| Ms. Mihaela Maravela | LDDP |
| Mr. Marius Grigorescu | LDDP |
| Ms. Sofia Cozac | LDDP |
| Parties: | |

| | |
|---|---|
| Mr. Attila Gyorgy | State Secretary of the Ministry of Public Finance |
| Mr. Victor Strambeanu | Head of Service of the Endorsement and Legislation Service no. 3 from the General Legal Division of the Ministry of Public Finance |
| Witnesses: | |
| Mr. Claudiu Codrea | Head of service of the general division for fiscal procedural code legislation, non-fiscal and accountancy regulations within the Ministry of Public Finance |
| Mr. Eugen Serban | General Manager of the general division for income tax audit on individuals within ANAF |
| Mr. Ionel Mateescu | Counsellor at the Regional Customs Directorate Timişoara |
| Mr. Petre Tănase | Producer of ţuică and rachiu |
| Experts: | |
| Dr. Robin Cohen | CRA |
| Mr. Knight Sukthaworn | CRA |
| Prof. Wojciech Kopczuk | Professor of Economics and of Public and International Affairs at Columbia University |

*Court Reporter*:
  Mr. Trevor McGowan

*Interpreters*:
  Ms. Silvia Statescu
  Ms. Daniela Ionescu
  Ms. Lilioara Popa


162.    During the Hearing, the following persons were examined:

*On behalf of the Claimants*:

| | |
|---|---|
| Mr. Ioan Micula | Claimant |
| Mr. Viorel Micula | Claimant |
| Mr. Mihai Belu | Compania de Anchete |
| Mr. Mircea Petru Capros | CURS |
| Ms. Ramona Maria Milea | Fin Expert Consulting |
| Mr. Carlos Lapuerta | Brattle |
| Mr. Richard Caldwell | Brattle |

*On behalf of the Respondent*:

| | |
|---|---|
| Mr. Eugen Serban | General Manager of the general division for income tax audit on individuals within ANAF |
| Mr. Claudiu Codrea | Head of service of the general division for fiscal procedural code legislation, non-fiscal and accountancy regulations within the Ministry of Public Finance |
| Mr. Ionel Mateescu | Counsellor at the Regional Customs Directorate Timişoara |
| Mr. Petre Tănase | Producer of ţuică and rachiu |
| Prof. Wojciech Kopczuk | Professor of Economics and of Public and International Affairs at Columbia University |
| Dr. Robin Cohen | CRA |

163.    At the Hearing, the Respondent submitted additional Legal Authorities RL-164 and RL-165.

164.    Following the hearing, by letter of 5 February 2019, the Tribunal confirmed the subsequent procedural steps as discussed with the Parties during the last day of the Hearing. The Tribunal granted leave to the Respondent to file a third expert report from Dr. Cohen in response to the Claimants' Updated Brattle report and directed the Parties to agree on the scope of that report. The Parties were advised to reserve 26 and 27 June 2019 for a possible further hearing on quantum and were invited to advise the Tribunal whether the Claimants wished to cross-examine Dr. Cohen regarding his third expert report and for the Respondent to confirm whether Prof. Mihailescu would be able to appear at the June hearing for cross-examination. Finally, the Parties were instructed to submit any corrections to their respective quantum experts' reports in the form of errata sheets.

165.    On 6 February 2019, the Respondent submitted an errata sheet to Dr. Cohen's second expert report.

166.    By letter of 7 February 2019, the Respondent requested that the Tribunal decide on the Additional Preliminary Objection submitted by the Respondent on 1 August 2018 as a preliminary matter, as it pertained to the Tribunal's jurisdiction or lack thereof.

167.   In a letter of 8 February 2019, the Respondent advised the Tribunal that the Parties were unable to reach an agreement on the scope of Dr. Cohen's third report (the "Rebuttal Report"). The Respondent stressed that the scope of the Rebuttal Report was already limited to responding to the latest Brattle report, and argued that limiting the scope further was inappropriate and might prevent Dr. Cohen from responding and addressing certain issues present in, or arising from, the Brattle report. The Respondent also discussed the scope of the possible further hearing, noting that at the time of the January Hearing, it had not had an opportunity to examine the latest Brattle report and, therefore, had not been in a position to cross-examine the Claimants' quantum expert on that report. The Respondent argued that it would not be fair if it was deprived of an opportunity to cross-examine the Claimants' expert while the Claimants were allowed to cross-examine Dr. Cohen on his Rebuttal Report.

168.   On the same day, the Claimants submitted their observations regarding the scope of the Rebuttal Report. The Claimants noted that the Updated Brattle Report dealt with only a limited number of issues largely pertaining to updating calculations, so the Rebuttal Report should be confined to a limited number of topics and not exceed 20 pages. The Claimants listed specific topics on which Dr. Cohen should comment and requested that the Tribunal "issue directions reflecting the limitations [...] as to the scope of the [Rebuttal Report]." The Claimants further discussed the Respondent's request to cross-examine the Claimants' quantum expert on the basis of the Updated Brattle Report. The Claimants noted that the Tribunal had not indicated that the hearing would reconvene; it had only identified a possibility of holding a further hearing if necessary. The Claimants further argued that the Updated Brattle Report was submitted on 10 December 2018 and the Respondent had had six weeks before the hearing to review it. It was the Respondent's decision not to cross-examine Brattle on the updated report even though the Tribunal, in its Procedural Order No. 14, had expressly directed the Parties "to come to the hearing prepared to make their full case." The Respondent was given a fair opportunity to cross-examine the expert, but chose not to. The Claimants accordingly requested that the Respondent's request for another cross-examination be denied.

169.    By letter of 12 February 2019, the Tribunal addressed the Parties' comments regarding the scope of the Rebuttal Report. It noted that the Claimants' request of 8 October 2018 to update the Brattle Report listed the scope of such update and, in granting the Claimants' request, the Tribunal stated that the updated report should be short with limited annexes. In the Tribunal's view, the same limitations should be applied to the Rebuttal Report, which should only deal with issues in the Updated Brattle Report. It should deal with earlier expert reports only to the extent necessary to respond to the Updated Brattle Report. The Tribunal directed that that the Rebuttal Report be short with limited annexes. On the matter of cross-examination of the Claimants' quantum expert, the Tribunal noted that it was reasonable to consider that if the Respondent was not in a position to respond in writing to the Updated Brattle Report before the Hearing, it was also not in a position to cross-examine the Claimants' expert on that report at the Hearing. The Tribunal, therefore, decided that each Party had "the right to cross-examine the other's expert on the matters contained in their respective final reports."

170.    On 12 February 2019, the Claimants submitted their comments to the Respondent's letter of 7 February 2019 regarding the Additional Preliminary Objection, contending that the Tribunal should dismiss the Objection. First, the Claimants argued that the Objection was untimely pursuant to ICSID Arbitration Rule 21(1) and should be dismissed for that reason. The Claimants argued further that Romania could not unilaterally withdraw its consent to arbitrate and, contrary to the Respondent's assertion, that an exchange of letters between Romania and Sweden did not "reflect a subsequent agreement on the interpretation of the BIT within the meaning of Article 31(3)(a) of [the Vienna Convention on the Law of Treaties ("VCLT")[6]], and that the declarations adopted by a number of EU countries including Romania and Sweden did not constitute treaties. The Claimant further noted that the Tribunal should deal with the Objection "in any manner it deems appropriate" and the Claimant "would not object to the Tribunal issuing a separate decision on jurisdiction."

171.    By letter of 13 February 2019, the Tribunal notified the Parties that it would deal with both the issues of jurisdiction and merits in its Award.

---

[6] Vienna Convention on the Law of Treaties, **CL-59**.

172.    On 6 March 2019, the European Commission (the "EC") filed an Application for Leave to Intervene as a Non-Disputing Party, together with Annexes 1 to 6 (the "EC Application").

173.    On 7 March 2019, the Tribunal invited the Parties to submit their comments to the EC Application.

174.    On 8 March 2019, the Parties submitted the list of their agreed and disagreed corrections to the Hearing transcripts and asked the Tribunal to decide on corrections about which they disagreed.

175.    On 22 March 2019, each Party submitted its observations on the EC Application.  The Respondent supported the EC's Application, contending that it met the requirements of ICSID Arbitration Rule 37(2) as it would bring particular knowledge relevant to the impact of the *Achmea* Decision on the Tribunal's jurisdiction, the EC's intervention would address a matter within the scope of the dispute, especially in light of the Respondent's pending Additional Preliminary Objection, and the EC had a significant interest in the proceeding as "guardian of the treaties." Respondent added that the EC's intervention would not disrupt the proceeding. The Respondent also agreed to grant the EC access to certain case materials to allow it to file a more focused submission. The Respondent filed additional Legal Authorities RL-166 through RL-172 along with its observations.

176.    The Claimants, on the other hand, objected to the EC Application, arguing that it would "severely disrupt" the proceeding. The Claimants noted that this proceeding commenced in 2014, and that it was "implausible" that the EC was not aware of it. Therefore, the application to intervene was inexcusable at this late stage. The Claimants further argued that the intervention would prejudice them and would not assist the Tribunal, as the Parties had addressed the topic of the *Achmea* Decision at length in their submissions. The EC would not present any new perspective or knowledge and had failed to demonstrate that it had any significant interest in this dispute.  The Claimants' comments were accompanied by additional Legal Authorities CL-244, CL-245, CL-246, and CL-489 through CL-492.

177.    On 29 March 2019, in accordance with the Tribunal's invitation, the Respondent submitted its reply comments on the Claimants' observations to the EC Application, asserting that

the Claimants' arguments "lack[ed] merit." The Respondent argued that the mere fact that the issue of the *Achmea* Decision had already been briefed by the Parties did not mean that the EC would not bring a particular knowledge relevant to the same issue. The Respondent further stressed that the EC had a significant interest as a "guardian" of EU treaties and in "preventing conflicts between arbitral awards and EU law." It continued, "[t]he potential conflict would also affect the Tribunal's jurisdiction and the Claimants' ability to enforce an award." The Respondent also argued that the intervention would not disrupt the proceedings and would not unduly burden or unfairly prejudice the Parties.

178.    By email of the same date, the Claimants maintained their position on the EC Application as presented in their submission of 22 March 2019 and noted that "Romania's observations of the same date do not show that the Commission would present any new point."

179.    On 12 April 2019, the Tribunal issued Procedural Order No. 15 regarding the EC Application. While it observed that the Application met the requirements of Rule 37(2)(b) and (c), the Tribunal noted that the issues in respect of which the EC sought to intervene had been fully briefed by the Parties and it was doubtful that the EC's submission would materially assist the Tribunal on those issues. The Tribunal further noted that the Hearing on the merits had already taken place, and that the Tribunal had a duty to ensure that the proceeding was not disrupted and the Parties not unduly burdened. The Tribunal also found that the EC's contention that it did not have knowledge of the status of the arbitration as not a sufficient justification; the record of the proceeding showed the EC's awareness of this arbitration. Based on those conclusions, the Tribunal denied the EC's Application to intervene.

180.    The EC was notified of the Tribunal's decision by letter of 12 April 2019. On the same day, the EC replied taking note of the decision. It asked the Tribunal to keep the EC's Application on file.

181.    On 30 April 2019, the Respondent filed Dr. Cohen's Rebuttal Report together with Exhibits RC-3-001, RC-3-003, RC-3-005 through RC-3-009, RC-3-015 through RC-3-017, RC-3-032, RC-3-040, RC-3-042, RC-3-053, RC-3-062, RC-3-063, RC-3-074, RC-3-077, RC-3-078, and RC-3-100 through RC-3-103.

182.  By letter of 14 May 2019, the Claimants advised the Tribunal that they did not seek to cross-examine Dr. Cohen regarding his Rebuttal Report. However, the Claimants reserved the right to call him for cross-examination if the Respondent decided to call the Brattle expert for cross-examination. The Claimants also noted that the Rebuttal Report exceeded the limited scope as set by the Tribunal. The Claimants further mentioned that the Romanian courts had recently dismissed the insolvency proceedings upon which the Respondent had relied in its cross-examination at the Hearing. The Claimants reiterated their position that those proceedings were "irrelevant to the issues presented and the insinuations advanced by Romania based on them are impertinent and unfounded."

183.  By letter of same date, the Respondent advised the Tribunal that Prof. Mihailescu would not be able to travel to Paris for a hearing, but he would be able to appear for cross-examination by a video-link if necessary. And, while he was available at the proposed hearing dates, the Respondent could not guarantee that he would continue to be available if any medical exigency arose.

184.  On 16 May 2019, the Respondent notified the Tribunal that it did not seek to cross-examine Brattle as Dr. Cohen's Rebuttal Report sufficiently addressed the Updated Brattle Report. It further addressed the Claimants' argument on the scope of Dr. Cohen's report, contending that it did not exceed the scope as outlined in the Tribunal's Order of 12 February 2019 and "it merely updates the analysis in the Second [Report of Dr. Cohen] in light of the Third Brattle Report and the new data on which it relies." The Respondent also addressed the Claimants' assertion regarding the Romanian insolvency proceedings, noting that the court had not yet issued the reasons for its decision and that those proceedings were "far from irrelevant" as contended by the Claimants.

185.  By letter of 23 May 2019, the Tribunal took note of the Parties' respective decisions not to cross-examine each other's quantum experts, but it observed that Prof. Mihailescu would be available for cross-examination and invited the Claimants to indicate whether they wished to proceed with that cross-examination.

186.  On 29 May 2019, the Claimants responded to the Tribunal's inquiry, noting that the Respondent could not guarantee that Prof. Mihailescu would be available on the proposed

hearing dates. The Claimants stated that "the time and cost for preparing and conducting a proper video hearing […] are not justifiable (*sic*) considering […] the apparent risk […] that Professor Mihailescu may not be able to participate." The Claimants, therefore, requested that the Tribunal either strike Prof. Mihailescu's report from the record or, in the alternative, grant the Claimants leave to submit written comments to his report. The Claimants further asked the Tribunal to fix the date for the submission of the Parties' statements of costs.

187.    On 3 June 2019, the Respondent responded to the Claimants' letter of 29 May 2019, arguing that the Claimants' requests to strike Prof. Mihailescu's report from the record or to have leave to file yet another submission were "misguided." The Respondent pointed out that it was the Claimants' choice not to call Prof. Mihailescu despite the fact that the Respondent had made him available for examination. The Respondent further noted that making "a further submission on the Mihailescu Report *in lieu* of cross-examination" was misguided, because "a written submission is not a substitute for testing evidence by way of cross-examination."

188.    On 7 June 2019, the Claimants responded to the Respondent's observations. The Claimants contended that because of the conditions and qualifications placed by the Respondent upon his appearance, the Respondent had not, in fact, made Prof. Mihailescu available. When considering the options available to them, the Claimants questioned whether "the time and cost of a separate examination of Professor Mihailescu [was] justified," given the uncertainty as to his availability. The Claimants maintained their request to strike his expert report from the record or, in the alternative, that they be granted leave to file a short submission responding to that report.

189.    On 11 June 2019, the Tribunal issued Procedural Order No. 16 regarding the Claimants' requests of 29 May 2019. The Tribunal observed the Prof. Mihailescu's inability to attend the Hearing had arisen through no fault of his own. While Prof. Mihailescu had indicated his willingness to appear for cross-examination, there was no guarantee that by the time arrangements were made, he would be able to participate. In this regard, the Tribunal agreed that it would not be appropriate for the Claimants to assume the burden of making

arrangements for cross-examination that might not happen. However, the Tribunal also saw no basis to strike the entirety of Prof. Mihailescu's report from the record, as the Tribunal could derive some assistance from it. The Tribunal, therefore, decided to grant the Claimants leave to submit brief observations on Professor Mihailescu's report "reflecting the questions that would have been raised with Professor Mihailescu."[7]

190.    On 21 June 2019, the Claimants submitted their observations upon Prof. Mihailescu's expert report.

191.    On 3 July 2019, at the invitation of the Tribunal, the Respondent submitted brief comments on the Claimants' 21 June 2019 observations.

192.    On 30 August 2019, in accordance with the Parties' agreed timetable, the Claimants filed their Statement of Costs, together with Annexes 1 to 3 and Legal Authorities CL-246 through CL-252. On the same day, the Respondent filed its Statement of Costs together with Annexes 1 and 2.

193.    On 13 September 2019, each party filed observations upon the Statement of Costs of the other.

194.    The proceeding was closed on 21 February 2020.

## III.    FACTUAL BACKGROUND

195.    Below, the Tribunal provides a brief summary of the factual background to the dispute as set out in the Parties' submissions. This summary does not constitute any finding by the Tribunal on any facts disputed by the Parties. A detailed analysis of the facts relevant to the Tribunal's determinations on jurisdiction and liability are contained in Sections V and VI.

---

[7] Given the conclusions reached by the Tribunal on the merits of the Claimants' claims, the Tribunal did not ultimately need to address the question of the weight to be given to Prof. Mihailescu's expert report.

A.    **DEVELOPMENT OF REGULATORY FRAMEWORK FOR ALCOHOL SECTOR IN ROMANIA –
EARLY 1990S**

196.   Until the 1989 revolution, Romania was a communist dictatorship. At the time of the
revolution, Romania had one of the most controlled and centralised economies in Central
and Eastern Europe.  Thus, after the revolution, the State faced the significant challenge of
integrating Romania's economy into the greater world economy.[8]

197.   In the early 1990s, Romania undertook wide scale economic reform, involving, *inter alia*,
the privatization of the country's alcohol industry and the modernization of the regulatory
framework, which governed it.  Pursuant to Law 15/1990, State enterprises involved in the
production of food products (including alcohol) were converted into joint-stock companies.
As a consequence, at the end of 1990, twelve State-owned companies were formed, which
supplied ethyl alcohol to the entire alcohol industry in Romania.[9]

198.   In 1991, Romania continued on the path of increased privatization, enacting legislation
pursuant to which, 30% of the shares of these newly formed companies were to be
transferred to five "private regional ownership funds."[10] At the same time, Romania
enacted legislation to attract capital and foreign investment, specifically Law 96/1990 and
Law 35/1991.[11]  Finally, also in 1991, Romania made the first significant amendment to
the post-communist legislative regime for the alcohol sector, through GD 779/1991. That
law required both domestic producers and importers to pay an *ad valorem* tax on goods,
calculated as a percentage of the sales price on sales to the distributor.[12]

199.   In 1993, Romania entered into the "Europe Agreement" with the EU Member States, a
formal pre-accession agreement aimed to facilitate Romania's accession to the EU.  The
Europe Agreement provided the legal framework for the accession process and relations
between Romania and the EU Member States, and was scheduled to come into force in

---

[8] Resp. CM., paras. 20-22; *see also* Cl. Mem, para. 11.

[9] Cl. Mem., paras. 42-46.  *See also* Resp. CM., para. 46 ("The Claimants' description of the changes to the regulatory
regime for alcohol in 1990-2003 is largely accurate.").

[10] Cl. Mem., para. 47.

[11] Cl. Mem., para. 51.

[12] Cl. Mem., paras. 58-59.

February 1995.[13] Romania was required by the Europe Agreement, *inter alia*, further to develop its legal framework in order to align its laws with those in the EU.[14]

200.    In accordance with this requirement, in July 1993 the *ad valorem* taxes on alcohol and derivative products were raised from 60% to 100% of sales price and the sanctions and penalties for non-compliance were enhanced.[15]  At around the same time, tax rates for other categories and sub-categories of alcohol saw further changes.[16] In 1995, preparation of a new Government Ordinance (GO 23/1995) commenced, in order to introduce a new legal framework for excisable products, including alcohol. The new legal regime introduced an obligatory labelling system to enhance the administration and monitoring of the payment and collection of excise taxes, strictly prohibited the sale of unlabelled products, and further increased fines for violations.  It entered into force in May 1998.[17]

## B.    CLAIMANTS' EARLY INVESTMENTS IN ROMANIA (1990 – 1997)

201.    Mr. Ioan Micula registered the company TGIE in Bihor County, Romania, in October 1990. He was joined by his brother, Mr. Viorel Micula in that enterprise.  Initially, the Micula brothers, through TGIE, engaged in importing a variety of consumer products from Western Europe.  In 1992, the Micula brothers created a joint venture, S.C Stroh Transilvania S.R.L. ("Stroh Transilvania"), together with Austrian liqueur manufacturer, Sebastian Stroh, to introduce the alcoholic drink "Swedish Bitter" into the Romanian market.[18]

202.    In 1993, the Micula brothers set up an additional company, European Drinks, principally to facilitate the production of Tetra Pack packaging for their beverage products.  European Drinks produced, *inter alia*, the drink "Scandic Pop Vodka."[19] Over time, the Claimants

---

[13] Resp. CM., para. 25.
[14] Cl. Mem., para. 61; *see also* Resp. CM., paras. 23-24.
[15] Cl. Mem., para. 62.
[16] Resp. CM., para. 49.
[17] Cl. Mem., paras. 63-66.
[18] Cl. Mem., paras. 68-73.
[19] Cl. Mem., paras. 76-77.

built an extensive spirits brands portfolio, as well as a portfolio of non-alcoholic beverage products.[20] In pursuit of an integrated business model and enhanced cost-efficiency, additional companies were created to produce intermediate industrial products for the group's supply chain.  Thus, Tonical Trading, Reini Drinks and Edri Trading were set up in 1994.[21]  In addition, in 1995 the Claimants commenced the construction of a distillery in Drăgăneşti in Bihor County (a major capital investment) to facilitate the production of ethyl alcohol, further reducing overall manufacturing costs.  Construction was completed in 1997.[22]

**C.    DEVELOPMENT OF THE MINERAL WATER PROJECT (1997-2001)**

203.    In the mid-1990s, the Romanian Government announced its intention to develop a mineral water spring located in the West Carpathian Mountains. It began to look for an investor to invest in the project.  In March 1997, European Drinks entered into a long-term sale and purchase contract, commercial contract no. 16828/04.03.1997, with the Autonomous Administration of Mineral Waters of Romania for the acquisition of mineral water from the natural spring Izvorul Minunilor – Stana de Vale (the "Mineral Water Contract"). The Mineral Water Contract stipulated a fixed price of ROL 10.10 per litre, although the price was subject to "[…] change at intervals correlated with the influences of the economy," by written agreement of the parties in the form of addenda to the Contract. In December of that year, Romania assigned the rights of the Autonomous Administration of Mineral Waters under the Mineral Water Contract to the state-owned National Company of Mineral Water ("SNAM"). Further to the Mineral Water Contract, European Drinks and other Micula Companies constructed pressurized pipelines located within an underground tunnel and built bottling facilities in Rieni and Draganesti. Commercial production of mineral water began in June 2001.[23]

---

[20] Cl. Mem., paras. 78-79.

[21] Cl. Mem., paras. 80-82.

[22] Cl. Mem., paras. 83-92; I. Micula WS, **CW-1**, para. 46.

[23] Cl. Mem., paras. 94-107.

D.    CHANGES TO THE REGULATORY FRAMEWORK (1998-2003)

204.    From 1998, Romania continued to develop its legislation, including legislation applicable to the alcohol industry, to prepare for its accession into the EU.

205.    In 1998, Romania adopted Emergency Government Ordinance ("EGO") 82/1997, which replaced the previous *ad valorem* tax system.  The new tax system introduced a fixed tax rate to be paid by alcohol producers on the quantity of produced alcohol and regulated fiscal audits and supervision. The same year, as noted above, the new tax label system came into effect.[24]

206.    In addition, EGO 50/1998 introduced a new system for fiscal supervision to ensure compliance with the 1998 tax regime.  Producers were obliged to use specific invoices for the production and sale of products, and the legislation introduced a mandatory requirement that all commercial actors engaged in the sale of alcohol be authorized to do so.  The system also regulated production activities by imposing mandatory reporting obligations, requiring the installation of "counters" to monitor each step of the distillation process, and designating fiscal supervisors for each producer.  The import and transportation of alcoholic drinks in bulk was regulated through mandated importation licenses, use of customs authority seals, and the recording of imported quantities in a special registry. The production of traditional brandies (e.g., *tuica*) was regulated by mandating producers to register production equipment, observe reporting obligations, and have their equipment formally sealed and unsealed by legal regulatory authorities, who were to record such activity in a special register.  These regulations were supported by criminal sanctions for violations.[25]

207.    In 1999, the EU decided to start formal bilateral negotiations with Romania in February 2000. The process required lengthy negotiations and substantial changes in the domestic Romanian market.[26]

---

[24] Cl. Mem., paras. 110-115; Resp. CM., paras. 55-63.
[25] Cl. Mem., paras. 116-129.
[26] Resp. CM., paras. 27-29.

49

208.    The increases of taxes on alcohol in 1998 led to a rise in black market activities within the sector.  To address this, in February 2000, Romania adopted GO 27/2000, which *inter alia* established a minimum sales price for alcoholic drinks to facilitate identification of black market products, and imposed sanctions for non-compliance.  In October 2000, GO 27/2000 was amended and supplemented by EGO 134/2000, which banned most bulk sales of spirits, introduced further monitoring regimes and decreased the excise tax.  The following year, EGO 117/2001 further amended the regime, introducing measures to enhance monitoring and fiscal control.[27]

209.    In October 2000, Romania adopted EGO 181/2000, which introduced a State monopoly system requiring producers to sell to the State, which would then sell alcohol to distributers at a price that included relevant taxes. EGO 181/200 further sanctioned any unauthorized sale or circulation of alcohol among commercial actors.  Two months later, in December 2000, Romania further reduced the applicable tax rates.[28]

210.    In 2001, Romania, in anticipation of its accession to the European Union, submitted a Position Paper to the EU, requesting "a transition period of 5 years, until 31 December 2011 for the implementation of the minimum level of excise duties provided by Article 3 of Directive 92/84/EEC for the subgroup 'alcohol and alcoholic beverages'."[29]  In the two years that followed, Romania made minor tax increases.[30]

211.    In 2002, home production of alcohol, except for private use, was forbidden and all commercial producers were brought within the registration regime. This change did not impact the right to produce for home consumption.[31]

---

[27] Cl. Mem., paras. 130-142.

[28] Cl. Mem., paras. 143-144.

[29] Cl. Mem., para. 146; 2001 Conference on Accession to the European Union - Romania - Romania's Position Paper Chapter 10 - Taxation, dated 24 July 2001, p. 10, **C-65**.

[30] Cl. Mem., para. 150.

[31] Resp. CM., para. 53.

E.     CLAIMANTS' CONTINUED EXPANSION (1998-2003)

212.    During the late 1990s and early 2000s, the Claimants continued to expand their businesses and capabilities in Romania, pursuing an "integrated business strategy" for the group of companies. This included, *inter alia*:

a.  the purchase of bottle blowing and injection machines for polyethylene terephthalate ("PET") bottles and can-filling lines (1996-1999);[32]

b.  the purchase of machinery to produce additional packaging materials such as stretch film, shrink film, paper labels and plastic labels, materials used *inter alia* to package and distribute the spirits produced in the Drăgănești distillery;[33]

c.  the establishment of the company "Multipack" in 2002, dedicated to expanding the Micula Companies' in-house production of packaging materials for use by their other businesses;[34]

d.  the 1998 investment in a water supply and demineralization station for use by the soft drinks production and distillery business lines;[35]

e.  commencing in 2000, the construction of a new electricity substation in Drăgănești, to ensure consistent power supply to the Claimants' production facilities;[36]

f.  investments in railway companies (early 2000s) and a waste water treatment plant (2003);[37]

g.  the acquisition of additional warehouses throughout Romania, and expansion of the fleet of delivery trucks and other vehicles (2000 – 2004);[38]

---

[32] Cl. Mem., paras. 155-156.
[33] Cl. Mem., para. 158.
[34] Cl. Mem., para. 159.
[35] Cl. Mem., para. 161.
[36] Cl. Mem., para. 162.
[37] Cl. Mem., paras. 163-165.
[38] Cl. Mem., paras. 168-170.

h.  the creation of the company Scandic, which assumed ownership of all assets related to alcohol production (2000);[39]

i.  the expansion of production of non-spirits products, including the construction of a vinegar plant and commencement of vinegar production and the construction of a soft drinks plant and production of soft drinks (1999), the construction of a sugar dissolving plant and production of simple syrup, the production of bottled mineral water (as part of the "Mineral Water Project"), the construction of a carbon dioxide recovery plant and the production of carbon dioxide for use in sparkling mineral water and soft drinks (2001);[40]

j.  the establishment of European Foods in 1999, the commencement of production of a variety of packaged food products, and the acquisition of various equipment for this purpose;[41] and

k.  the establishment Starmill, and the commencement of (maize and wheat) milling operations to produce milled products for use in the Claimants' other production operations.[42]

F.   FURTHER REGULATORY CHANGES (2003 AND AFTER)

213.  A number of regulatory changes were commenced in 2003.

214.  In mid-2003, following pressure from the EU, Romania informed the EU that it had reviewed its position and wished to withdraw its earlier request for a five-year transitional period (i.e., until 31 December 2011) to implement the minimum level of alcohol excise duties applicable under EU law.[43] In pursuance of the objective of reaching the EU-mandated levels for excise duties, successive increases to the excise rates were made in July 2003, July 2004, April 2005, May 2006 and July 2006. Over this three-year period,

---

[39] Cl. Mem., para. 171.
[40] Cl. Mem., paras. 172-177.
[41] Cl. Mem., paras. 178-183.
[42] Cl. Mem., para. 184.
[43] Cl. Mem., para. 194; *see above* at para. 210.  *See also* Resp. CM., paras. 67-70.

the excise tax rate increased by almost 700%.[44] The excise rate then remained unchanged until August 2013, when it temporarily increased before reverting to the prior rate in January 2016.[45]

215.    In addition, in December 2003, Romania enacted Law 571/2003 (the "2004 Tax Code"), which was intended to harmonize all excise duty legislation in the framework of a single fiscal code, including rules concerning labelling, manufacturing, taxation, control, violations and sanctions relating to the alcohol industry. This detailed legislation, which brought Romania's regulatory framework into line with the EU regime, increased the regulations applicable to Romanian alcohol producers, including through the introduction of a new "fiscal warehouse" regime. This required all production, processing and storage of excisable products, such as alcohol, to take place in an authorized "fiscal warehouse" and mandated that all labelling of alcoholic products be carried out by authorized warehouse keepers.[46]

216.    This new regime required producers to obtain fiscal warehouse authorization (or, in the case of individual households producing beer, wine, fermented drinks or plum or fruit brandy for sale, "individual producer permits"), and to comply with a number of ongoing requirements with respect to the maintenance and operation of the warehouse.  It also required all producers (including household producers) to register with the Ministry of Public Finances ("MPF"), and mandated that sales of alcohol produced in still pots could only be made to authorized fiscal warehouse operators, effectively outlawing alcohol sales by individual household producers (unless they had the fiscal warehouse authorization).[47]

217.    Finally, the 2004 Tax Code provided for detailed rules concerning the fiscal monitoring of the alcohol market. It introduced stricter rules regarding the sales of alcohol in bulk, codified pre-existing regulations on the supervision of the import and export of alcohol and individual production of natural brandies, and established general rules concerning the

---

[44] Cl. Mem., paras. 196-197; Resp. CM., paras. 84, 86-89.

[45] Resp. CM., paras. 102, 106.

[46] Cl. Mem., paras. 202-203, 208; Resp. CM., paras. 76-82.

[47] Cl. Mem., paras. 204-217; Resp. CM., para. 82.

control of the alcohol sector. It also introduced a series of additional acts considered illegal under the new regime and expanded the available penalties for infractions.[48]

218.    In 2004, a number of laws were passed further regulating the alcohol industry, including with respect to adherence to food safety, hygiene, environmental, and occupational and fire safety laws.    These laws brought Romanian regulations further in line with EC requirements.[49]

219.    Also, in 2004, Romania codified in GO 83/2004 a full tax exemption for unlimited amounts of plum and fruit brandy produced for personal consumption.  This measure differed from the proposed exemption Romania had sought from the EU (namely a tax rate equal to 50% of the commercial tax rate for household production, with an annual production limit of 50L of fruit spirits with 40% alcohol content). Subsequently, the EU, following negotiations with Romania, approved in Council Directive 92/83/EEC the requested exemption, which was to be in place by the time of accession, without specifying any alcohol content percentage.  In February 2005, at the EU's behest, the rules were amended to introduce a quantitative limit of 300L per year.  In January 2007, the previously agreed 50% tax obligation was imposed on volumes of up to 50L per household per year, with alcoholic concentration of 100% by volume – extending the excise tax regime to the household production market for the first time.  Romania acceded to the EU in 2007, and in October 2008 a full tax exemption for household consumption for the production of no less than 250 litres of pure alcohol was approved (coming into force in November 2009). That exemption was wound back in April 2010.[50]

220.    Council Directive 2008/118/EC of 16 December 2008 brought about an important change to the excise tax regime: the implementation of the EU-wide Excise Movement Control

---

[48] Cl. Mem., paras. 204-217.

[49] Cl. Mem., paras. 221-235.

[50] Cl. Mem., paras. 243-248, 356; *see also* Resp. CM., paras. 54, 72-73, 90-92, 96-97; Protocol concerning the conditions and arrangements for admission of the Republic of Bulgaria and Romania to the EU, Annex III, OJ L 157 dated 21 June 2005, at p. 88 (Ch. 4, para. 2), **R-100**.

System ("EMCS"). The Directive was implemented into Romanian law by GEO 109/2009.[51]

221.  In 2014 and 2015, the Romanian Government worked on rewriting the 2004 Tax Code and facilitated a public consultation process in this regard. The 2016 Fiscal Code was approved by Law No. 227/2015, which took effect on 1 January 2016.[52]

### G.    DEVELOPMENTS IN THE ROMANIAN SPIRITS MARKET FROM 2004

222.  In the period from around 2004, the recorded legal volumes of alcohol produced in Romania dropped, as did the number of registered producers on the market.[53] The extent to which recorded volumes of alcohol produced outside of the legal market increased during this time period, and the cause for these market changes, is the subject of dispute between the Parties, and is addressed as relevant in the Tribunal's analysis below.

### H.    CHANGES TO THE MINERAL WATER CONTRACT

223.  In December 2001, six months after the commercial production of water under the Mineral Water Contract began, the Government enacted an emergency ordinance, regulated by the Romanian Competition Office, which had the effect of imposing controls on prices of mineral water at source.  In accordance with this regime, SNAM successfully asked the Competition Office to increase the price for mineral water at the source. In February 2002, SNAM notified European Drinks that the price of mineral water at the source under the Contract would increase from ROL 10.10/L to ROL 60/L.  Beginning in June of that year, European Foods repeatedly notified SNAM of its position that this price revision was in breach of the Contract and Romanian law.  Between 2002 and 2015, SNAM changed the price on six occasions, with the latest modification being notified in October 2015.  In January 2007, European Foods signed an amendment to the Contract, which included a new contract price.  However, it did so under protest, specifying its disagreement with the

---

[51] Resp. CM., para. 94.
[52] Resp. CM., paras. 104-106.  *See also* Cl. Reply, para. 96 ("Romania's description of the 2016 Tax Code is largely accurate.").
[53] Cl. Mem., paras. 257-258.

change in the price in a separate document. It also continued to pay the price originally specified in the Contract, until a Romanian Court judgment upheld the position taken by SNAM.[54]

I. **OTHER EVENTS**

224. Certain other events in Romania in the years after 2011 are alleged to have impacted several of the Corporate Claimants. In particular, in December 2012, audits of Scandic's denaturation processes took place. Prior to a March 2015 decision of the High Court of Cassation and Justice, Romania had not applied tax amnesty laws to Claimants' investments, giving rise to additional tax liability for the Claimants. In October and November 2015, Scandic's fiscal warehouse license was revoked, its production facilities were sealed and TGIE's debt rescheduling agreements were revoked. Finally, Romania resisted making payment in accordance with the award in the *Micula v Romania I* arbitration to five of the Claimants in this arbitration, who (or which) were also party to the earlier arbitration.[55]

IV. **THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF**

225. The Claimants' request for relief, as submitted by letter on 14 January 2019, is as follows:

> *Claimants respectfully request the Arbitral Tribunal to:*
>
> *(i) DECLARE that Romania has breached its obligations towards Claimants under the BIT;*
>
> *(ii) ORDER Romania to pay to Claimants damages resulting from Romania's breaches, relating to Claimants' spirits business, in the amount of RON 9,082.4 million (which amount includes pre-award interest accrued as of 30 November 2018), as follows: to Mr Ioan Micula 40% of the amount just stated, to Mr Viorel Micula 40% of the amount just stated and to the Corporate Claimants 20% of that amount;*

---

[54] Cl. Mem., paras. 417-432.
[55] Cl. Mem., paras. 433-446.

*(iii) ORDER Romania to pay to Claimants damages resulting from Romania's breaches, relating to Claimants' mineral water business, in the amount of RON 39.4 million (which amount includes pre-award interest accrued as of 30 November 2018), as follows: to Mr Ioan Micula 40% of the amount just stated, to Mr Viorel Micula 40% of the amount just stated and to the Corporate Claimants 20% of that amount;*

*(iv) ORDER Romania to pay the expenses incurred by the Claimants in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention;*

*(v) ORDER Romania to pay interest on all sums awarded at a rate of 3-month ROBOR plus 10%, compounded on a quarterly basis, as from the date of the arbitral award until the date of full payment.*

*(vi) ORDER such other relief as the Tribunal may deem just and proper.*

226.    The Respondent's request for relief as set forth most recently in its Rejoinder is as follows:

*[…] the Respondent respectfully asks the Tribunal to:*

*a) Dismiss the mineral water claim, and all the claims of Tonical Trading, for lack of jurisdiction;*

*b) Dismiss all the claims of Messrs Ioan and Viorel Micula as inadmissible; and*

*c) Dismiss the claims over which the Tribunal finds jurisdiction and which are admissible as unfounded.*

*And in any event:*

*d) Order the Claimants to bear, jointly and severally, the Respondent's costs of the arbitration on a full indemnity basis, including attorney's fees and expenses and all fees and other expenses incurred in participating in the arbitration, including internal costs.*

227.    Finally, the Respondent's request for relief with respect to its Additional Preliminary Objection, is as follows:

> *The Respondent respectfully requests that the Tribunal:*
>
> *a) determine that the Respondent's additional preliminary objection is timely and complies with Article 41 of the ICSID Arbitration Rules; and*
>
> *b) dismiss the Claimants' claims for lack of jurisdiction under Article 7 of the Sweden-Romania BIT or, alternatively, as inadmissible.*

## V.    JURISDICTION AND ADMISSIBILITY

228.    In their Memorial, the Claimants presented an affirmative case on jurisdiction.  In sum, they argued:

a.    the Tribunal has jurisdiction *ratione personae*:

    i.    The individual Claimants, Messrs. Ioan and Viorel Micula, are "investors" under Article 1(2) of the BIT, as Swedish citizens who revoked Romanian citizenship prior to the date of consent and the date of the filing of the Request for Arbitration (the "RfA"), a proposition confirmed by the *Micula I* Award, which is binding and *res judicata* between Romania and Messrs. Micula in this arbitration.[56]

    ii.    The corporate Claimants are "investors" under Article 1(2) of the BIT, as "legal entities" incorporated in Romania which are jointly owned and controlled by Messrs. Micula, which Romania has agreed to treat as nationals of another Contracting State for the purposes of Article 25(2)(b) of the ICSID convention, pursuant to Article 7(3) of the BIT;

---

[56] Cl. Mem., paras. 447-456.

b.  the Tribunal has jurisdiction *ratione materiae* under Article 7(2) of the BIT, because the dispute concerns an investment, defined in Article 1(1) to include "any kind of asset owned or controlled invested directly or indirectly by an investor […] include[ing] … movable and immovable property[,] … shares, debentures and other forms of participation in companies[, and] intellectual property rights, technical processes, trade names, know-how, good will, and other similar rights[…]." The Claimants identify:

i.  the shares in the corporate Claimants held by Messrs. Micula, as well as the investments of those corporate Claimants controlled by Messrs. Micula, as the investments of those individual Claimants;

ii.  the investments made by the corporate Claimants in moveable and immovable property, and intellectual property rights, as the investments of the corporate Claimants;[57]

c.  the Tribunal has jurisdiction *ratione temporis* over the current dispute under Article 9(1), because the BIT entered into force on 1 April 2003 and the dispute concerns actions and measures from the period after this date, and the dispute itself arose, at the earliest, on 5 July 2010.[58]

229.    The Respondent raises a number[59] of objections to jurisdiction and/or admissibility:

---

[57] Cl. Mem., paras. 460-462.

[58] Cl. Mem., paras. 463-466.

[59] In its Counter-Memorial, the Respondent initially raised a further objection to jurisdiction – that the Claimants had failed to establish the Tribunal's jurisdiction over their claims, as they have not demonstrated that the Micula Brothers were shareholders of the EFDG Companies during the relevant period, or that they controlled the EFDG Companies. *See* Resp. CM., paras. 324-326.  However, the Claimants produced with their Reply "a more complete version of the excerpts from the Romanian Trade Registry … confirm[ing] that the Individual Claimants owned the Corporate Claimants at all relevant time" (Cl. Reply, fn. 1003, and "Excerpts from the Romanian Trade Registry for all Corporate Claimants," **C-422**).  Thereafter, that objection was largely abandoned in the Rejoinder.  *See* Resp. Rej., para. 360 ("The Claimants produced with their Reply evidence that appears to show that the Micula Brothers held, directly or indirectly, a majority of the shares in each of the EFDG Companies, with the exception of S.C. Tonical Trading S.R.L. ("Tonical Trading"), during the relevant periods. The Respondent therefore does not pursue the argument that the Claimants have failed to establish the Micula Brothers' shareholding and control of the EFDG Companies, except with respect to Tonical Trading." As to Tonical Trading, the Respondent argues that the excerpt from the Romanian Trade Registry produced by the Claimants shows that "between 2002 and 2011, only approximately 40% of Tonical

a.  that Article 267 and 344 of the Treaty on the Functioning of the European Union ("TFEU"),[60] as interpreted by the Court of Justice of the European Union (the "CJEU") in the case of *Slovak Republic v Achmea BV* ("*Achmea*" or the "*Achmea* Decision"),[61] preclude the Claimants from consenting to arbitration under Article 8 of the BIT and equally render no longer effective the consent of Romania to arbitrate disputes under Article 8 ("Additional Preliminary Objection" or "*Achmea*/Incompatibility with EU Law Objection");

b.  that the Tribunal has no jurisdiction with regard to the Claimants' Mineral Water Claim, because:

    i.  the dispute regarding the mineral water claim arose before the entry into force of the Sweden-Romania BIT ("*Ratione Temporis* Objection to Mineral Water Claim");

    ii.  the mineral water claim does not relate to a dispute between an investor and Romania; rather the investor's claim is predicated on the flawed argument that the National Company of Mineral Water SA (SNAM) is a State entity ("No Qualifying Dispute Objection to Mineral Water Claim"); and

    iii.  that the Micula Brothers have no interest in the claims they are bringing in this arbitration and that their claims are therefore inadmissible ("Objection to Admissibility vis-à-vis the Micula Brothers").

230.  The Tribunal addresses these objections below. For the sake of completeness, the Tribunal notes that, subject to its determinations as to the Respondent's objections, it otherwise

---

Trading was owned by the Micula Brothers, while approximately 55% was owned by Original Prod SRL and General Transilvania Exim SRL, for which no further information is provided" (Resp. Rej., fn. 664). In view of the Tribunal's decision on Liability the question whether the documentary evidence establishes control by the Micula Brothers over Tonical Trading in the period between 2002 and 2011 has become moot.

[60] Treaty on the Functioning of the European Union, dated 13 December 2007, that came into effect on 1 December 2009 (the "TFEU"), **R-273**.

[61] *Slovak Republic v Achmea BV*, Case C-284/16, CJEU Judgment, 6 March 2018 ("*Achmea*"), **RL-115**.

accepts the Claimants' submissions with regard to its jurisdiction under the ICSID Convention and the BIT.

**A.    THE *ACHMEA* DECISION/INCOMPATIBILITY WITH EU LAW OBJECTION (ADDITIONAL PRELIMINARY OBJECTION)**

**(1)    The Parties' Positions**

231.    The Parties' pleadings are summarized in this section and addressed in more detail as necessary in the Tribunal's analysis.

***a.    Respondent's Position***

232.    The Respondent rejects the Claimants' procedural complaints regarding its Additional Preliminary Objection, in addition to addressing the merits of the Objection.

*(i)    Timeliness*

233.    The Respondent argues that its objection is based on a new fact, and is therefore timely and justified under ICSID Rule 41(1).  In the Respondent's view, the CJEU indicated its authoritative and binding opinion on the incompatibility of intra-EU BITs with EU law for the first time in *Achmea*. The relevant "fact" is that this incompatibility is no longer a matter for debate; the institution which has been granted the power definitively to resolve any such question by the Member States ruled that EU law provisions must prevail over intra-EU BITs.  Although the legal questions posed to the CJEU were known to Romania previously, the definitive answer to that issue was not previously known.[62]

234.    Relatedly, the Respondent rejects the Claimants' contention that the *Achmea* Decision cannot affect the Tribunal's decision, since it postdates the RfA.  This, the Respondent argues, misses the point: the incompatibility of the BIT with EU law became a fact, at the latest, when the TFEU took effect on 1 December 2009.  Thus, *Achmea* clarified, with retroactive effect, that the dispute resolution clauses in intra-EU BITs are incompatible with EU law.[63]

---

[62] Resp. Add. Prelim. Obj., paras. 75-77.
[63] Resp. Add. Prelim. Obj., para. 78.

235.  The Respondent also rejects the argument that, since the questions posed to the CJEU in *Achmea* were known to it at the time it filed its Counter-Memorial, the Respondent must be deemed to have waived this jurisdictional objection when it filed its Counter-Memorial without making the objection.  In the Respondent's view, its Additional Preliminary Objection relates to an aspect of the Tribunal's jurisdiction – valid consent to arbitration – that cannot be waived or altered by the Parties' agreement.  The Respondent also emphasises that no procedural inefficiency has arisen as a consequence of the late jurisdictional objection.  Finally, the Respondent rejects as inapposite the cases relied on by the Claimants in which late jurisdictional objections were not considered by other tribunals.[64]

236.  In the alternative, the Respondent argues, *Achmea* and its impact on the Tribunal's jurisdiction should be taken into account by the Tribunal *proprio motu*, in accordance with ICSID Arbitration Rule 41(2).  An ICSID tribunal's primary task, the Respondent emphasises, is to determine whether there is consent to arbitrate. A tribunal should not lightly decline to examine this question, when doubts as to the very existence of consent have emerged. Since the Additional Preliminary Objection is based on a very recent development which goes to the heart of the Tribunal's jurisdiction, the Tribunal must examine it.[65]

     *(ii)    Merits of the Objection*

237.  The Respondent argues that the CJEU in its decision in *Achmea* held that arbitration clauses in investment treaties concluded between two EU Member States ("intra-EU BITs") were not compatible with Articles 267 and 344 of the TFEU, and that consequently, EU law must be interpreted as precluding a provision in an intra-EU BIT pursuant to which an investor from a Member State may bring proceedings against another Member State before an arbitral tribunal.[66]

---

[64] Resp. Add. Prelim. Obj., paras. 79-85.
[65] Resp. Add. Prelim. Obj., paras. 86-89.
[66] Resp. Add. Prelim. Obj., paras. 4, 63.

238.    In the Respondent's view, *Achmea* represents an authoritative interpretation of EU law that
is binding on EU Member States (including Romania and Sweden), their courts and their
nationals, including the Claimants:

> *Although the CJEU did not specify the practical implications of its
> ruling for other investment arbitrations brought pursuant to intra
> EU BITs, the holding applies erga omnes: the CJEU made clear that
> Articles 267 and 344 of the TFEU should be interpreted as
> precluding a provision "in an international agreement concluded
> between Member States", i.e. in any intra EU BIT with a dispute
> resolution clause similar to Article 8 of the Netherlands-Slovakia
> BIT.*[67]

239.    In addition, decisions of the CJEU have retroactive effect in the sense that, once the CJEU
has ruled on a given issue, its interpretation of EU law has effect from the time that the
provisions of EU law at issue entered into force.  The effect of the *Achmea* Decision is that,
in this case, the Tribunal does not have jurisdiction over the Claimants' claims under the
Sweden-Romania BIT; in the alternative, those claims are inadmissible.[68]  In support of its
position, the Respondent points to statements by the European Commission regarding the
effect of *Achmea*, as well as an announcement by the Netherlands that it will terminate all
its intra-EU BITs in light of the decision.[69]

240.    The Respondent acknowledges that the present proceedings are governed by the ICSID
Convention and the ICSID Arbitration Rules, and not by the UNCITRAL Arbitration
Rules, like the *Achmea* proceedings.  However, in its view, this difference does not affect
the applicability of the *Achmea* Decision here. The State's consent to arbitrate, and thus
the basis of the Tribunal's jurisdiction, is contained in the BIT; the applicable arbitration
rules have no bearing on the existence of an agreement to arbitrate between the investor
and the host State or on the tribunal's jurisdiction over claims under the BIT.[70]

---

[67] Resp. Add. Prelim. Obj., para. 70.
[68] Resp. Add. Prelim. Obj., paras. 5-6, 26; 90-93.
[69] Resp. Add. Prelim. Obj., paras. 72-73.
[70] Resp. Add. Prelim. Obj., para. 94.

241.    The Respondent finds support for the aforementioned position in the Claimants' *lex societatis* (which governs whether the Claimants had the capacity to sue Romania under the Sweden-Romania BIT) and the TFEU, as interpreted by the CJEU (which governs whether Romania had validly given consent in Article 7 of the BIT). First, under the applicable domestic law, the Claimants lost the right to consent to arbitration under Article 7 of the BIT at the latest when the TFEU came into force on 1 December 2009. Thus, when the Claimants initiated this arbitration and purported to give their own consent to arbitrate in the RfA, they had no right under EU law – as incorporated into Swedish and Romanian law – to do so. Hence there is no valid arbitration agreement between the Parties. Second, Romania's consent to arbitrate in the BIT also became inapplicable when the TFEU entered into force, pursuant to Article 30(3) of the VCLT dealing with successive treaties on the same subject matter. In this regard, Articles 267 and 344 of the TFEU relate to the same subject matter as Article 7 of the earlier BIT and must prevail over the latter. Thus, Romania's unilateral consent to arbitrate contained in Article 7 of the Sweden-Romania BIT was not valid or capable of invocation and acceptance when the Claimants purported to accept it.[71]

### b.  *Claimants' Position*

242.    The Claimants reject the Respondent's Additional Preliminary Objection both as a matter of procedure and on the merits.

### (i)    Timeliness

243.    The Claimants argue that Romania's objection is barred as untimely by ICSID Arbitration Rule 41(2). The Claimants note that the Respondent does not dispute that ICSID Rule 41(1) requires that any jurisdictional objection "shall be made as early as possible […] [and] no later than the expiration of the time limit fixed for the filing of the counter-memorial." They reject the Respondent's position that its late objection should be admitted because it falls under the "facts […] unknown" exception in Rule 41(1) and is exempt from

---

[71] Resp. Add. Prelim. Obj., paras. 90-121.

the principle of waiver or, in the alternative, that the Tribunal should exercise its discretion under Rule 41(2) to consider the objection because it relates to the Parties' consent.[72]

244.    In the Claimants' view, the additional objection remains inadmissible under Rule 41(1), because it is not based on an unknown "fact." The *Achmea* Decision is not a fact but a legal decision, and the arguments raised there had been publicly debated for over a decade previously. In this regard, the Claimants emphasize that the drafting history of the ICSID Convention makes clear that the drafters understood the difference between "fact" and "law" and used the two terms with distinction and care. Indeed, the tribunal in *Gavrilović v Republic of Croatia*, confronted with a similar argument, concluded that while "the handing down of the [*Achmea*] decision is a fact [...] the decision itself is legal rather than factual in nature: it clarifies the law in the EU."[73]

245.    Even if the *Achmea* Decision were a fact, the Claimants argue, it is irrelevant to the Tribunal's jurisdiction, because the latter is determined by the facts at the time of the request for arbitration, not by any new "*fact*" in 2018. The jurisdiction of international tribunals is based on the facts as of the time of the request for arbitration, and events taking place after that date will not affect jurisdiction. Thus, to the extent that the Respondent argues that the *Achmea* Decision is a "fact" that occurred in 2018, it cannot affect the Tribunal's jurisdiction that was established in 2014.[74]

246.    In addition, the Claimants contend that the Respondent waived any objection based on the arguments addressed in the *Achmea* Decision pursuant to ICSID Arbitration Rules 26(3) and 27 by failing to raise the objection in its Counter-Memorial, as required under Rule 41(1). In this regard, the Claimants reject the Respondent's argument that the Objection relates to an aspect of the Tribunal's jurisdiction that cannot be waived.[75] As noted by Schreuer, "[A] party that has indicated its consent during the proceedings either explicitly

---

[72] Cl. Reply to Add. Prelim. Obj., paras. 9-13.

[73] Cl. Reply to Add. Prelim. Obj., paras. 14-17, citing to *Gavrilović v Republic of Croatia,* ICSID Case No. ARB/12/39, Decision on the Respondent's Request of 4 April (30 April 2018), para. 42, **CL-185**.

[74] Cl. Reply to Add. Prelim. Obj., paras. 18-20.

[75] Cl. Reply to Add. Prelim. Obj., paras. 21-22.

or by pleading on the merits of the case without objecting that consent was lacking, defective or too narrow is precluded from raising such an objection later on."[76]  While this does not apply to the objective criteria in Article 25(1) of the ICSID Convention, namely the existence of a legal dispute arising directly out of an investment and nationality, "the tribunal may rely on a party's failure to invoke the non- existence of its consent as an indication of its consent."[77]   Indeed, the Claimants emphasize, the tribunals in *Antaris* and *Garilović* both recently rejected, on the basis of a waiver analysis, belated *Achmea*-based objections raised in those cases.[78]

247.   The Claimants also reject the Respondent's contention that the Tribunal should exercise its discretion under Rule 41(2) to consider the objection because it relates to the Parties' consent.  The Tribunal's "own initiative" under Rule 41(2) is limited to the examination of the ICSID Convention's *objective* jurisdictional requirements and does not extend to consent. The Claimants argue that other ICSID tribunals have had no difficulty dismissing untimely jurisdictional objections while refusing to exercise their discretion under Rule 41(2), including in the context of belated *Achmea*-based objections.  In addition, if a tribunal were to consider any late jurisdictional objection under Arbitration Rule 41(2), the specific deadline in Rule 41(1), as well as Rules 26 and 27 on time limits and waiver, would become meaningless.[79]

### (ii)   Merits of the Objection

248.   Beyond their procedural objections, the Claimants also contend that the Additional Preliminary Objection has no basis in substance.  In the Claimants' view, the Respondent has failed to establish how the *Achmea* Decision affects the jurisdiction of this Tribunal.  That jurisdiction was established by agreement of the disputing parties in 2014. It is

---

[76] Cl. Reply to Add. Prelim. Obj., para. 22, citing to Schreuer *et al.*, *The ICSID Convention: A Commentary*, 2nd ed. (2009), p. 225, **CL-173bis**.

[77] Cl. Reply to Add. Prelim. Obj., para. 22, citing to Schreuer *et al.*, *The ICSID Convention: A Commentary*, 2nd ed. (2009), p. 530, **CL-173bis**.

[78] Cl. Reply to Add. Prelim. Obj., para. 23, citing to *Antaris Solar GmbH v The Czech Republic*, PCA Case No. 2014-01, Award (2 May 2018), para. 73, **CL-186**, and *Gavrilović v Republic of Croatia*, ICSID Case No. ARB/12/39, Decision on the Respondent's Request of 4 April (30 April 2018), para. 43, **CL-185**.

[79] Cl. Reply to Add. Prelim. Obj., paras. 28-35.

elemental that the jurisdiction of international tribunals depends upon the facts existing at the time of commencement of proceedings. Subsequent developments cannot oust a tribunal's jurisdiction. Moreover, the Claimants argue, the law governing jurisdiction here is international law, notably in the form of the ICSID Convention and the Romania-Sweden BIT. The CJEU in *Achmea* did not purport to apply international law. Rather, the decision was based on principles of EU law autonomous from international law, and it is therefore of no significance to the analysis that this Tribunal must undertake.[80]

249.   Under the governing international law, the Claimants argue, the BIT and the ICSID Convention are treaties in force for Sweden and Romania. *Pacta sunt servanda.* Romania must perform its obligations in good faith under these treaties. The Claimants consider it "telling" that every tribunal ever to address the "so-called 'intra-EU objection'" under international law has rejected it.[81]

250.   The Claimants also reject the specific arguments made by Romania in support of its objection.

251.   First, the Claimants argue, there is no merit in the Respondent's assertion that the Claimants lacked the capacity or the right to consent to arbitration under the Sweden-Romania BIT when they submitted the RfA in October 2014, because "[t]he investor's capacity" to consent to arbitration is determined by *lex societatis*, i.e., Romanian law and Swedish law, which in turn, incorporate EU law, including the *Achmea* Decision. In the Claimants' view, this argument is based on an erroneous approach to the notion of legal capacity. Under the proper analysis, Claimant's consent to arbitrate is governed by the ICSID Convention and the BIT, and the Respondent cannot rely on its domestic law to escape its international obligations. Finally, as a matter of EU law, there is no support for Romania's suggestion that the *Achmea* Decision has a direct effect on private parties.[82]

252.   Second, the Claimants argue, there is no merit in the Respondent's assertion that its own consent "became inapplicable" when the TFEU took effect on 1 December 2009 because

---

[80] Cl. Reply to Add. Prelim. Obj., paras. 2-3.
[81] Cl. Reply to Add. Prelim. Obj., para. 4.
[82] Cl. Reply to Add. Prelim. Obj., paras. 38-54.

the TFEU takes precedence over Article 7 of the earlier BIT according to Article 30(3) of the VCLT and the TFEU renders a consent to arbitrate provided in an intra-EU BIT "inapplicable." Contrary to the Respondent's arguments, the Claimants contend that this Tribunal's jurisdiction is governed by the ICSID convention and the BIT, and Romania may not revoke its consent under the ICSID convention. As noted by the International Court of Justice ("ICJ") and by Schreuer, it is an accepted principle of international adjudication that jurisdiction will be determined by reference to the date on which judicial proceedings are instituted, such that events taking place after that date will not affect jurisdiction. ICSID tribunals have consistently rejected jurisdictional challenges based on events taking place after the registration of a claimant's request for arbitration.[83]

253.   Here, the relevant date for assessing this Tribunal's jurisdiction is 24 November 2014. Once jurisdiction is established at that critical date, any subsequent change will not defeat jurisdiction. The Claimants also emphasize the express provision in Article 25 of the ICSID Convention that "[w]hen the parties have given their consent, no party may withdraw its consent unilaterally." It is clear, the Claimants argue, that the TFEU has not rendered (and *cannot* render) the ICSID Convention invalid or "inapplicable" in the present case. Since Romania's consent to arbitrate was valid at the time the Claimants initiated this arbitration, its Additional Preliminary Objection amounts to nothing more than an attempt unilaterally to withdraw its consent, which conflicts with both the ICSID Convention and the law of treaties, including the principle of *pacta sunt servanda* codified in Article 26 of the VCLT. The law of treaties admits only a limited number of exceptions to the fundamental obligation to perform treaties in force, none of which applies here. Even if these prerequisites were met, under the VCLT the BIT would take precedence over the provisions of EU law addressed in *Achmea,* which date from 1958.[84]

254.   Third, even if EU law were relevant to this Tribunal's jurisdiction, the Claimants argue that neither EU law, nor the CJEU's judgment in *Achmea*, would support Romania's argument that Article 7 of the Sweden-Romania BIT is "inapplicable" under EU law. In the Claimants' view, the fact that a treaty may be deemed incompatible with EU law does not

---

[83] Cl. Reply to Add. Prelim. Obj., paras. 55-60.
[84] Cl. Reply to Add. Prelim. Obj., paras. 61-153.

automatically make that treaty inapplicable. Indeed, even after *Achmea*, the European Commission has continued to pursue its infringement proceedings against five EU Member States. Were the Respondent correct that *Achmea* automatically rendered these BITs (including the BIT at issue in this case) "inapplicable," there would be no reason for the European Commission to continue these infringement proceedings.[85]

255.    Moreover, the CJEU's judgment in *Achmea* does not hold that Article 7 of the Sweden-Romania BIT is invalid or "inapplicable" under EU law. Instead, the CJEU reframed the question posed to it by the German Supreme Court to avoid addressing the impact of EU law on the *application* of an investor-State arbitration provision in any particular case. It is thus clear that the CJEU did not intend to answer that question, but rather confined the legal implications of its findings in *Achmea* to the Member States' obligations under EU law. Thus, *Achmea* cannot be interpreted as invalidating, or otherwise affecting the "application" of, the dispute resolution clause in the Sweden-Romania BIT under EU law.[86]

256.    Furthermore, even if EU law applied in this arbitration and *Achmea* had concerned the validity or "*application*" of intra-EU BITs, *Achmea* would still be irrelevant. None of the sources cited by Romania supports the notion of a general rule stipulating that judgments of the CJEU have *erga omnes* effect.  But in any event, any *erga omnes* effect of *Achmea* could only extend to the courts of the EU Member States, not to individual subjects of EU Member States and definitely not to this Arbitral Tribunal.[87]

257.    Lastly, the Claimants reject the Respondent's argument that *Achmea* would be relevant for the present case because deciding this case on the merits necessitates the interpretation and application of EU law. This statement is, in the Claimants' view, "a gross misrepresentation" of the case as pleaded by both Parties.[88]

---

[85] Cl. Reply to Add. Prelim. Obj., paras. 154-155.
[86] Cl. Reply to Add. Prelim. Obj., paras. 158-163.
[87] Cl. Reply to Add. Prelim. Obj., paras. 164-167.
[88] Cl. Reply to Add. Prelim. Obj., para. 168.

258.   In conclusion, the Claimants argue, *Achmea* can only be properly understood as a direction to EU Member States that they are obliged, under EU law, to terminate or modify existing intra-EU BITs that include dispute resolution mechanisms such as that in the Netherlands-Slovakia BIT. The consequence of any failure to do so, however, is not that the BITs are invalid or "inapplicable," but merely that any non-compliant EU State may be in breach of the TFEU – which is irrelevant for this Tribunal's assessment of its own jurisdiction.[89]

### (2)    The Tribunal's Analysis

#### a.   *The Timing Issue*

259.   The Respondent argues that notwithstanding the fact that its preliminary objection based on the judgment of the CJEU in *Achmea* has been brought at a late stage in the proceedings, the Tribunal should hear the objection. It concerns a new 'fact' within the meaning of ICSID Rule 41(1) and in any event the Tribunal should exercise its discretion to consider the matter under Rule 41(2).[90] The Claimants, by contrast, argue that the *Achmea* Decision is not a new fact – the decision is a ruling of law and not a fact. Moreover, the arguments underlying the *Achmea* Decision were well known before that decision was reached and the Respondent could have based a preliminary objection on them earlier.[91] It did not do so, and the Respondent must be taken to have waived any objection on this basis.

260.   The Tribunal considers that the objection made by the Respondent on the basis of the *Achmea* Decision falls within the framework of Rule 41(1) justifying late jurisdictional objections. A late objection may be made, according to Rule 41(1), when "the facts on which the objection is based" are unknown to the party at the time for making an objection. While it is true that a judgment is a legal decision and not strictly a fact, it can be, as the *Gavrilović* tribunal pointed out, both a fact and a ruling of law.[92] If it is only the fact that there has been a ruling of law and nothing more, then the terms of Rule 41(1) may not have been met. This appears to have been what influenced the tribunal in the *Gavrilović* case.

---

[89] Cl. Reply to Add. Prelim. Obj., para. 169.
[90] Resp. Add. Prelim. Obj., para. 75.
[91] Cl. Reply to Add. Prelim. Obj., para. 12.
[92] *Gavrilović v. Republic of Croatia*, ICSID Case No. ARB/12/39, Decision on the Respondent's Request of 4 April (30 April 2018), para. 42, **CL-185**.

261.    However, what the Respondent is arguing here is that the *Achmea* Decision of itself changes the factual situation that confronts the Tribunal. It means, according to the Respondent, that the Claimants have no right to bring the claim before this Tribunal and the Respondent has not consented to arbitration of the claim.

262.    If the consequence claimed by the Respondent were established, it would make the *Achmea* Decision not merely another or additional legal ruling. It would take away *ab initio* the legal basis on which jurisdiction is determined in this case. Moreover, this would respond to the Claimants' argument about waiver.[93] The *Achmea* case, the Respondent claims, is not simply a reiteration of earlier arguments about intra-EU BITs. Instead, by focusing on the consent of both the Claimants and the Respondent, it fundamentally changes the basis on which jurisdiction has to be assessed.

263.    In light of this, the Tribunal concludes that the terms of Rule 41(1) are met, and it is appropriate for the Tribunal to consider this objection, notwithstanding that it has been brought late in the proceedings. In these circumstances, there is no need to consider the relevance of Rule 41(2).

### b.    *The Substance of the Achmea Objection*

264.    The essence of the Respondent's argument is that *Achmea* decided as a matter of EU law that the effect of Articles 267 and 344 of the TFEU is to preclude a provision in a bilateral investment treaty between EU member states providing for investor-state dispute settlement from having any effect. The result is that once the TFEU came into effect on 1 December 2009, the Claimants no longer had a right to consent to arbitration and the Respondent's consent to arbitration under a BIT was abrogated.[94] Consequently, the Respondent argues, the Tribunal has no jurisdiction to hear this claim.

265.    The denial of the Claimants' right to consent to arbitration derives, according to the Respondent, from the fact that EU law is automatically part of the domestic law of Sweden. Thus, the effect of *Achmea* is that under Swedish law, the law of the Claimants' nationality,

---

[93] Resp. Add. Prelim. Obj., para. 80.
[94] Resp. Add. Prelim. Obj., para. 110.

the Claimants have no capacity to bring this claim.[95] With respect to its own consent under Article 7 of the Sweden-Romania BIT, the Respondent argues that the TFEU is a treaty that is later in time than the BIT. Thus, in accordance with Article 30(3) of the VCLT, the terms of the BIT apply only to the extent that they are compatible with the terms of the later TFEU.[96] The Respondent argues that *Achmea* establishes that its consent to arbitration with another EU state under the BIT is incompatible with the TFEU. Since in accordance with VCLT Article 30(3) the later treaty governs, there is no longer any consent by the Respondent to arbitration.[97]

266.    The Claimants counter that the issue of capacity to bring a claim before this Tribunal is determined by the ICSID Convention and the BIT, not by the domestic law of Sweden.[98] While the issue whether a claimant is a legal entity entitled to pursue a claim is a matter for the domestic law of Sweden (such as whether the claimant is a minor or whether it is an incorporated entity), the issue whether it can bring a claim under the Convention and the BIT has to be determined by those instruments themselves, not by the domestic law of Sweden incorporating provisions of EU law.

267.    The Tribunal will deal first with the question of the consent of the Claimants to arbitration (Section V(A)(2)(c)) and second with the consent of the Respondent (Section V(A)(2)(d)).

### c.    *Consent of the Claimants*

268.    The argument that the effect of *Achmea* as a matter of Swedish domestic law is to deny the Claimants the right to bring this claim is based on the premise that capacity for the purposes of this Tribunal is determined by reference to the domestic law of Sweden. However, the jurisdiction of this Tribunal is based on the ICSID Convention and the Sweden-Romania BIT.[99] Article 25 of the ICSID Convention defines the jurisdiction of the Centre, and hence of this Tribunal, in terms of consent and nationality. There is no dispute as to the nationality

---

[95] Resp. Add. Prelim. Obj., para. 111.

[96] Resp. Add. Prelim. Obj., paras. 113-115.

[97] Resp. Add. Prelim. Obj., paras. 120-121.

[98] Cl. Reply to Add. Prelim. Obj., para. 3.

[99] *See* Z. Douglas, *The International Law of Investment Claims* (Cambridge, 2009), p. 74, Rule 6, **CL-188**: "The law applicable to an issue relating to the jurisdiction of the tribunal [...] is the investment treaty and, where relevant, the ICSID Convention."

of the Claimants and the Claimants have notified their consent in the form contemplated by the Convention. There is nothing in Article 25 that subjects the ability to grant consent to the domestic law of the state of nationality of claimants.

269.　Of course, there are matters under Article 25 for which the domestic law of a claimant's state is relevant; that law determines whether a claimant is in fact a national of that state or is a juridical person. But once these requirements are met, there is no basis for looking at the law of the claimant state in search of some other barrier to exercising jurisdiction. Moreover, if a party to the Convention were to change its domestic law in a way that denied access to ICSID dispute settlement, then the question might arise whether that party was in breach of its obligations under the Convention. But even in such an event, the domestic law of the party would not be the basis for the determination of jurisdiction by the Tribunal, which would still be governed by Article 25 of the Convention.

270.　The Sweden-Romania BIT, which provides the basis for investor-state arbitration under the ICSID Convention in this case, deals with jurisdiction in terms of investors and investments, both of which are defined in Article 1 of the Treaty. An investor is defined in terms of citizenship of one of the parties or in terms of legal entities formed in accordance with the law of a contracting party that have their seats in the territory of that contracting party. There is no dispute over these matters in this case. As in the case of the ICSID Convention, there is nothing in the BIT that provides for any further jurisdictional stipulation by reference to the domestic law of one of the contracting parties. Equally, as in the case of the ICSID Convention, if one party were to change its domestic law so as to deny access to the dispute settlement process set out in the BIT, that may constitute a breach of obligations under the BIT, but it does not affect the jurisdiction of a tribunal established in accordance with the BIT, which must apply the terms of the BIT and not the domestic law of one of the parties.

271.　As a result, the Tribunal cannot see how its jurisdiction over the Claimants under the BIT and the ICSID Convention can be changed as a result of a change in the domestic law of Sweden, the state of nationality of the Claimants. An amendment to either the BIT or the ICSID Convention (or both) would be required to change the jurisdiction of the Tribunal.

But that has not been done in this case and the jurisdiction of the Tribunal depends on whether the terms of the ICSID Convention and of the BIT have been complied with. In respect of the right of the Claimants to bring this claim there is no issue of non-compliance with the terms of the ICSID Convention or the BIT. The jurisdictional challenge in respect of the consent of the Claimants is based solely on a change in Swedish domestic law.

272.    Thus, even if it were correct that the effect of the *Achmea* Decision is to change the domestic law of Sweden, a position that the Claimants challenge,[100] that would not be sufficient. There would have to be a change in the ICSID Convention or the BIT to have the effect for which the Respondent contends.

### d.  Consent of Romania

273.    The Respondent argues that once the TFEU came into force, its own consent to arbitration under the BIT was terminated. It reaches this conclusion on the basis of VCLT Article 30(3), which sets out the conditions under which a later treaty takes the place of an earlier treaty.

274.    The relevant provisions of Article 30 of the VCLT are as follows:

Article 30(1)

> *Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.*

Article 30(3)

> *When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.*

---

[100] Cl. Reply to Add. Prelim. Obj., paras. 51-53.

275.   The Respondent concludes that since Article 7 of the BIT dealing with dispute settlement is incompatible with Article 267 and 344 of the TFEU, Article 7 is inapplicable, so Romania can no longer be taken to have consented to ICSID arbitration. The Claimants argue that the terms of Article 30(3) have not been met, because the BIT and the TFEU are not "treaties relating to the same subject matter" within the meaning of VCLT Article 30(1) and the relevant provisions are not incompatible.

276.   The Respondent's argument is on two fronts. It argues, first, that there is a general conflict between the BIT and the TFEU, because it was the intention of the negotiators of the TFEU to bring foreign investment within the framework of the TFEU, and, second, that there is a specific conflict between Article 7 of the BIT, which provides for investor-state dispute settlement, and Articles 267 and 344, which gave jurisdiction in matters of the interpretation of the EU Treaties to the CJEU.

277.   With respect to the general conflict between the BIT and the TFEU, the Tribunal observes that the interpretation of international agreements is not based on a general reference to the intention of the parties. The Vienna Convention on the Law of Treaties deals with intention through the interpretive rule of Article 31. In other words, the outcome of the interpretive process will determine the intention of the parties. Thus, whether there is incompatibility between the BIT and the TFEU has to be determined through the interpretation of the specific provisions involved.  The fact that both treaties deal with investment does not answer the question whether one is incompatible with the other.

278.   In the view of the Tribunal, the starting point for determining whether there is incompatibility between the BIT and the TFEU within the meaning of VCLT Article 30(3) is the question whether the two treaties are "successive treaties relating to the same subject matter." At a certain level of generality, they do relate to the same subject matter, but the question is whether that level is specific enough to meet the requirements of Article 30(3).

279.   The Respondent argues that the two treaties deal with the same subject matter "because Article 7 of the Sweden-Romania BIT deals with the resolution of disputes that may

involve the application of the EU Treaties."[101] The fact that BIT arbitration may involve the interpretation of EU law was the CJEU's objection to investor-state arbitration in *Achmea*. But *Achmea* was not concerned with whether BITs and the TFEU were treaties dealing with the same subject matter within the meaning of VCLT Article 30 or with interpretation under the VCLT at all. Rather, it was because the CJEU considered that a tribunal established under a BIT might have to interpret EU law that it found an inconsistency with TFEU Articles 267 and 344 giving it exclusive jurisdiction over the interpretation of EU law. To allow BIT tribunals to interpret the EU treaties would, in the view of the CJEU, contravene the principles of "mutual trust" and "sincere cooperation" as well as "the preservation of the particular nature of the law established by the Treaties."[102]

280.    While these concerns are understandable in considering the integrity of European Union law, they do not constitute criteria for determining whether two treaties relate to the same subject matter in the application of the principles set out in VCLT Article 30. Interpretation in accordance with Article 31 of the VCLT requires that the terms of both treaties be looked at closely.

281.    Article 7 of the BIT empowers the investors of one party to sue the other party and sets out alternative processes for such claims, which in the present case is arbitration under the ICSID Convention. The TFEU does not provide a specific process for investors in one EU state to sue another EU state. Instead, the articles that are invoked as dealing with the same subject matter deal with the jurisdiction of the CJEU to give preliminary rulings in the interpretation of the EU treaties (Article 267) and the exclusive jurisdiction of the CJEU to interpret the Treaties (Article 344).

282.    If the BIT had set up a tribunal to interpret and apply EU law, then the treaties would be dealing with the same subject matter and incompatibility would be established. Article 344 gives the CJEU exclusive authority to interpret the EU Treaties and if an investment tribunal were given authority to resolve disputes under EU law then the TFEU (and,

---

[101] Resp. Add. Prelim. Obj., para. 118.
[102] Resp. Add. Prelim. Obj., paras. 64, 67, citing to the *Achmea* Decision, paras. 33-34, 58-59, **RL-115**.

specifically, Article 344) and BIT Article 7 would not be compatible. However, tribunals are established under BITs to resolve disputes over the interpretation and application of the obligations set out in the BIT in question.  They are not established to resolve disputes under EU law.

283.    Of course, such a tribunal may well have to have regard to EU law, but this will be incidental and will not be a question going to the core issues of the dispute. The CJEU recognized the contingent nature of investment tribunals referring to EU law when it said that a claim under a BIT "may" relate to the interpretation of the EU agreement or EU law. The Respondent has argued that EU law is in fact implicated in this case, referring to EU Directives relating to excise tax concerning alcohol producers.  However, these provisions are invoked by the Claimants to establish the background to the measures that they claim violate Romania's obligations under the BIT.  They are not invoked in order to have the Tribunal make determinations of EU law.

284.    In late submissions to the Tribunal, the Respondent provided additional documents relating to its argument on the jurisdiction of the Tribunal in respect of an intra-EU state claim. They included Declarations by a number of EU member states on the "Legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union" of 15 January 2019 and on "The Enforcement of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union" of 16 January 2019. The Declarations are similar in that they reiterate the finding in *Achmea* that Articles 267 and 344 of the TFEU preclude investor-state arbitration and they draw consequences for member states which have to undertake certain actions. In particular, member states undertake to inform pending investment tribunals of the legal consequences of the *Achmea* Decision as set out in the declaration, which is what the Respondent has done here.

285.    The Respondent argued that these Declarations constituted binding subsequent agreements between the parties to the BIT; the Claimants contested this and argued that they were no more than political declarations.  The Tribunal does not see any need to choose between these conflicting positions. The Declarations do no more than reiterate what was concluded

77

in the *Achmea* Decision. If the *Achmea* Decision itself did not remove jurisdiction from this Tribunal, repeating what the decision says, whether by agreement or otherwise, can have no greater effect than the decision itself.

286.   In the view of the Tribunal these declarations do not affect the Tribunal's analysis. They indicate the state of the law within the European Union and the obligations of EU member states in light of *Achmea*. They are interpretations of EU law and they do not provide insight into the issues here – whether capacity to bring a claim under a BIT is regulated by the BIT and the ICSID Convention or whether it is regulated by the domestic law of a claimant's state of nationality, and whether as a matter of international law the TFEU is a subsequent treaty relating to the same subject matter as the BIT. Indeed, the CJEU in *Achmea* did not purport to deal with any of these issues.

287.   The Respondent further introduced into the record almost at the end of the hearing two diplomatic notes, one from Romania to Sweden dated 18 January 2019 and the other from Sweden to Romania dated 31 January 2019. In the former note, the Government of Romania requested the support of the Government of Sweden to inform this Tribunal, in accordance with the terms of the declarations of the EU states, of the legal consequences of the *Achmea* Decision. In its response the Government of Sweden affirmed its commitment to the declarations and to its obligation to inform investment tribunals of the legal consequences of *Achmea* and stated:

> *Therefore, according to the case law of the CJEU, the provisions of a bilateral agreement between Member states of the EU containing an investor-state arbitration clause such as the one described in the Achmea judgment is contrary to Union law and thus inapplicable.*

288.   The Respondent contends that this exchange of notes can constitute an agreement,[103] but as with the Declarations, the exchange of notes cannot have the consequences contended for. They constitute, as articulated in the Swedish note, the state of "the case law of the CJEU." That is precisely what was referred to above where the conclusion was reached

---

[103] Tr. Day 9, 110:15-20.

that the case law of the CJEU, the *Achmea* Decision, cannot remove the jurisdiction of this Tribunal.

289. In light of the above, the Tribunal rejects the Respondent's objection to jurisdiction based on the CJEU's ruling in *Achmea*.

**B. THE PRELIMINARY OBJECTIONS TO THE MINERAL WATER CLAIM**

**(1)    The Parties' Positions**

*a.  Respondent's Position*

290. With regard to the Claimants' Mineral Water Claim, the Respondent contends that European Drinks challenged the invoice issued by SNAM on the basis of the new price set by the Competition Council on 25 February 2002, and that this is the date upon which the dispute arose.  However, the BIT was signed on 29 May 2002 and entered into force on 1 April 2003.  The Respondent says that since Article 9(1) of the BIT expressly excludes the application of the BIT to disputes regarding investments that arose prior to the BIT's entry into force, the Mineral Water Claim is outside the Tribunal's jurisdiction *ratione temporis*.[104] The Respondent rejects the Claimants' argument that their claim relating to price increases occurring after 2008 is not excluded by the Respondent's temporal objection. In the Respondent's view, this misstates what the dispute involves – the application of the amended pricing regime through legislation GEO 178/2001.  It is undisputed that the enactment of the new pricing regime occurred before the entry into force of the Sweden-Romania BIT.[105]

291. In addition, the Respondent contends that the Mineral Water Claim does not relate to a dispute between an investor and Romania. Therefore, neither the requirements of Article

---

[104] Resp. CM., paras. 327-331. The Respondent initially argued that Claimants have failed to demonstrate that European Drinks' mineral water business qualifies as an investment within the meaning of Article 1(1) of the BIT and Article 25 of the Convention, and that the Mineral Water Claim therefore stands to be dismissed on this basis alone. It further contended that the Claimants have failed to establish how the Mineral Water Contract is an obligation entered into with them with regard to a qualifying investment. *See* Resp. CM., para. 327. The Claimants flatly rejected these contentions in their Reply, reserving the right to revert further if the Respondent sought to pursue this argument in its Rejoinder.  *See* Cl. Reply, paras. 676-682.  The Respondent did not pursue these arguments in its Rejoinder. In any event, given the Tribunal's findings as to the Respondent's *ratione temporis* objection to the Mineral Water Claim, the Tribunal need not consider this.

[105] Resp. Rej., paras. 363-370.

25 of the ICSID Convention, nor of Article 7 of the BIT have been satisfied and the Tribunal has no jurisdiction. The Respondent emphasizes that European Drinks' Mineral Water Contract was entered into with SNAM – a State-owned joint-stock company operating under private law, with no authority to exercise governmental authority or other public prerogatives – and that the Claimants do not invoke any obligation undertaken by Romania itself with respect to this contract. The Respondent argues that an umbrella clause does not create new legal obligations; it merely transforms already existing legal obligations into treaty obligations. In other words, a claimant and the State must both be a party to the underlying contract for the umbrella clause to have any operation.[106] In this regard, the Respondent rejects Claimants' reliance on the rules of attribution in attempting to support their contention that "SNAM is Romania." In the Respondent's view, the rules of attribution concern alleged breaches of international obligations of States and not the existence of those international obligations. In any case, even if the rules of attribution were relevant, SNAM is not, contrary to the Claimants' contentions, empowered to exercise governmental authority, but rather is mandated to undertake commercial activities only.[107]

### b. *Claimants' Position*

292.   The Claimants argue that while the first unilateral price revision under the Mineral Water Contract took place before the entry into force of the BIT, Romania's *ratione temporis* objection can have no application with respect to the five unilateral price changes imposed by Romania after the entry into force of the BIT. In the Claimants' view, disputes relating to all subsequent price increases necessarily arose after the enactment of those price increases and after the entry into force of the BIT.[108] The Claimants withdrew their claims relating to price increases before the contracting parties agreed to an amendment of the Contract in 2007. The claim for damages thus begins with the price increase in 2008, "put[ting] a rest to Romania's temporal objection."[109]

---

[106] Resp. CM., paras. 332-343.
[107] Resp. Rej., paras. 371-382.
[108] Cl. Reply, para. 685.
[109] Cl. Reply, para. 686-688.

293.    In addition, the Claimants reject the Respondent's argument that it cannot be held liable for a breach of the umbrella clause, because it is not a party to the underlying Mineral Water Contract.  First, the Mineral Water Contract was initially entered into by RAMIN (the Autonomous Administration of Mineral Waters of Romania), which is Romania; Romania then decided to assign RAMIN's rights to SNAM.  Second, on Claimants' case, SNAM is Romania: SNAM is wholly owned by the Romanian State, with the Ministry of Industry and Commerce exercising the rights and obligations related to SNAM's shares. SNAM exercises elements of governmental authority concerning the management of State-owned mineral water resources, including with respect to the Mineral Water Contract. And SNAM's conduct at issue in this arbitration results from the exercise of this governmental authority in relation to mineral water resources subject to the Mineral Water Contract, by amending the existing legal regime and introducing price revisions by Romania's Competition Office and MPF, for non-contractual public policy reasons.  Finally, the Claimants invoke the text, object and purpose of the BIT's umbrella clause in support of its arguments.[110]

### (2)    The Tribunal's Analysis

294.    The Respondent argues that the claim that it had violated Article 2(4) of the BIT by unilaterally changing the price under the Mineral Water Contract was not a matter that fell under the Sweden-Romania BIT.[111] Article 9(1) of the BIT provides that the Agreement does not apply "to any dispute concerning an investment which arose, or any claim concerning an investment which was settled, before its entry into force."

295.    The alleged breach, the Respondent argues, took place no later than 25 February 2002, but the BIT did not enter into force until 1 April 2003. According to the Respondent, the claim thus does not fall within the Sweden-Romania BIT and therefore is outside the jurisdiction of the Tribunal.

---

[110] Resp. CM., paras. 689-706.

[111] Resp. CM., paras. 329-330.

296.   The Claimants argue that although the first unilateral price change took place before the BIT came into force, the subsequent five price changes occurred after the BIT came into force. It limits its claim to the invoices issued after 2008, thus contending that the Tribunal has jurisdiction over this dispute.[112]

297.   However, the Respondent points out that the price changes were made pursuant to GEO 178/2001, legislation that set up a pricing regime under which invoices were sent. Thus, the objections to invoices with the revised pricing amounts were objections to the right asserted in GEO 178/2001, which preceded the entry into force of the BIT.

298.   The Tribunal has concluded that it does not have jurisdiction over the Mineral Water Contract dispute. The legislative authority provided on 25 December 2001 for the unilateral determination of prices was implemented with an increase in prices on 25 February 2002. At that point, the question arose whether this unilateral setting of prices constituted a breach of the stipulation in the agreement between European Drinks and SNAM that price changes would be agreed between the parties. Thus, that is when any breach of contract relating to prices under the Mineral Water Contract arose and any violation of Article 2(4) of the Sweden-Romania BIT would have occurred.

299.   Subsequent invoices based on the same 2001 legislative authority might well have increased the loss attributable to a breach, but they were not new disputes. Each invoice was a manifestation of the action of the Respondent in assuming the power to set prices unilaterally, which it had done in 2001 and 2002, more than a year before the Sweden-Romania BIT came into force. In the terms of Article 9(1) of the BIT, the dispute arose before the entry into force of the BIT.

300.   Accordingly, the Tribunal has no jurisdiction in respect of the Mineral Water Claim.

301.   In light of this decision, the Tribunal sees no need to consider the other preliminary objections relating to the Mineral Water Claim.

---

[112] Cl. Reply, paras. 684-685.

C.    THE OBJECTION TO ADMISSIBILITY VIS-À-VIS THE MICULA BROTHERS

(1)    The Parties' Positions

a.  *Respondent's Position*

302.    The Respondent contends that the claims in this arbitration relate to the injury allegedly incurred by the Corporate Claimants. As shareholders, the Micula Brothers have no automatic right to, or legal interest in, the Corporate Claimants' profits, and hence they do not have any interest in the claims they are bringing in this arbitration, which are therefore inadmissible.[113]  In this regard the Respondent argues that the principle of separate legal personality applicable in domestic law cannot be ignored under international law, and therefore a bilateral investment treaty cannot have the effect of granting shareholders substantive rights with respect to a limited company, or conferring on them a substantive legal interest, which they do not have under municipal law.[114]

303.    The Respondent emphasises that the admissibility of a shareholder's claim is a different question to whether the shareholder qualifies as an investor. Here, just as in *BG v Argentina,* the Micula Brothers, as shareholders, are seeking to recover alleged lost profits of the Corporate Claimants to which they have no right, and in which they have no legal interest.  While shareholders may be entitled to dividends, that entitlement only arises if a company declares a dividend, which it may choose not to do, and may in fact be precluded from doing by law or by agreements with creditors.  Shareholders can bring separate claims for reflective loss (i.e., claims for the diminution in value of their shareholdings, or for lost dividends, as a result of the impact of the alleged breaches on the companies in which they own shares).  But the Micula Brothers have not done so here.[115]

b.  *Claimants' Position*

304.    The Claimants do not directly address the Respondent's objection in the terms of admissibility articulated by the Respondent. However, they do address the Respondent's

---

[113] Resp. CM., para. 344.

[114] Resp. CM., paras. 345-346.

[115] Resp. CM., paras. 347-351, referring to *BG Group v Argentina*, UNCITRAL, Final Award (24 December 2007), **RL-31**; Resp. Rej., para. 383.

related contention that any damages should be awarded to the Corporate Claimants only, because Messrs. Ioan and Viorel Micula have not proved their losses and shareholders can be compensated only for injury sustained either through lost dividends or a decrease in the value of their shareholdings. To that, the Claimants argue that the *Micula I* tribunal has already decided that an arbitral tribunal has the power to allocate damages according to the Claimants' agreement regarding the allocation of damages between them, and that this finding is *res judicata* between the Parties to this arbitration. They also emphasize that the BIT here (in Article 2(2)) provides for the protection of indirect investments, and that there are prior awards in which tribunals have awarded damages directly to the controlling shareholders.[116]

**(2)    The Tribunal's Analysis**

305.    In view of its decision on Liability below, the Tribunal does not consider it necessary to make a determination on this issue.

**VI.    LIABILITY**

306.    The Claimants claim that Romania's conduct breaches the BIT in four respects. They allege that Romania has:

  a.    breached the obligation of fair and equitable treatment, by "trampl[ing]" on Claimants' legitimate expectations that Romania would enforce its laws and prevent illegal production in the liquor market, and by failing to provide a stable legal environment and to enforce its laws against participants in the black market (Section VI(A));

  b.    breached the BIT's prohibition of impairment of investments through unreasonable or discriminatory measures, through the same failings (Section VI(B));

---

[116] Cl. Reply, paras. 1326-1342, referring to e.g., *Arif v Moldova*, ICSID Case No. ARB/11/23, Award (8 April 2013), **CL-120**; *Lemire v Ukraine*, ICSID Case No. ARB/06/18, Award (28 March 2011), **CL-155**.

    c.   failed to accord full legal protection to Claimants' investments as required under the BIT, also through the same failings (Section VI(C)); and

    d.   failed to observe the obligations it undertook as regards Claimants' investments in the mineral water business, giving rise to a breach of the umbrella clause in the BIT.

307.    The Tribunal addresses each claim in turn in the sections below.

## A.    FAIR AND EQUITABLE TREATMENT

### (1)    The Parties' Positions

#### a.   *Claimants' Position*

308.    The Claimants contend that Romania has breached its obligation under Article 2(3) of the BIT to treat Claimants' investments fairly and equitably, by "failing to enforce its tax laws in a consistent manner and fostering the growth of a substantial illegal spirits market."[117]

    *(i)   The Applicable Standard*

309.    With respect to the specific standard applicable under the BIT, the Claimants refer to the decision in *Micula v Romania I,*[118] which was decided on the basis of the same Sweden-Romania BIT at issue in the present case. In that case, the Claimants argue, Romania agreed that the FET standard "should be interpreted in the light of the object and purpose of the BIT as reflected in its Preamble" and it did not contest that the FET standard is "an autonomous one, different from the international minimum standard."[119] In the Claimants' view, *Micula v Romania I* is *res judicata* and additionally binding on the Parties pursuant to Article 53(1) of the ICSID Convention, and the Respondent may not relitigate any question linked to the meaning of the BIT provisions decided by the *Micula v Romania I*

---

[117] Cl. Mem., para. 468.

[118] *Ioan Micula, Viorel Micula and others v Romania*, ICSID Case No. ARB/05/20, **CL-1** ("*Micula v Romania I*").

[119] Cl. Mem., para. 471, citing to *Micula v Romania I*, Award (11 December 2013), paras. 503, 509, **CL-1**.

tribunal.  The Claimants cite to, *inter alia*, the *Apotex Holdings v USA* Award in support of this position.[120]

310.    In the Claimants' argument, the FET standard is broad and fact-specific. In applying it, tribunals have considerable discretion to review the "fairness" and "equity" of government actions in light of the facts and circumstances of the case.[121] Claimants rely on the following summary of the FET standard articulated by the *LG&E* tribunal:

> *[…] the fair and equitable standard consists of the host State's consistent and transparent behaviour, free of ambiguity that involves the obligation to grant and maintain a stable and predictable legal framework necessary to fulfill the justified expectations of the foreign investor.*[122]

311.    The Claimants reject the Respondent's reliance on *Waste Management II* in this context. In addition to being in conflict with the findings of the *Micula I* tribunal, *Waste Management II* "contains a summary of measures that may amount to a breach of the minimum standard of treatment, not the definition of the standard."  It also dealt with alleged breaches of NAFTA (as did the other cases applying it) and is therefore not applicable to the FET standard under the BIT here.[123]

312.    The Claimants assert that breaches of the FET standard may be by act or by omission, and need not be egregious.[124] The Claimants reject the Respondent's submission that an omission can give rise to an FET breach only in "exceptional circumstances" – in the Claimants' view, there is no support for this contention, which is in conflict with

---

[120] Cl. Reply, para. 485-495, citing to *Apotex Holdings v USA*, ICSID Case No. ARB(AF)/12/1, Award (25 August 2014), paras. 7.41 *et seq*, **CL-6**.

[121] Cl. Mem., paras. 471-474.

[122] Cl. Mem., para. 474, citing to *LG&E v Argentina*, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006), para. 131, **CL-9**.

[123] Cl. Reply, paras. 531-539, referring to *Waste Management, Inc. v Mexico*, ICSID Case No. ARB(AF)/00/3, Award (30 April 2004), **RL-33**.

[124] Cl. Mem., para. 475.

incontrovertible principles of international law and with prior awards imposing no caveats on the application of this principle.[125]

313.    The Claimants argue that previous tribunals have held that the FET standard imposed by FET provisions similar to Article 2(3) includes four elements.[126]

314.    *First*, the FET standard encompasses a duty to protect the legitimate expectations of the investor.  This, the Claimants argue, is the "dominant element" of fair and equitable treatment.  Expectations may be based on explicit or implicit undertakings or representations by a host State, as well as by the nature of the legal framework and the general business environment existing at the time of the investment. Specific representations are not required, contrary to the Respondent's assertions.  Legitimate expectations may also be based on more basic and general expectations including as to the continuous existence of conditions that enable an investor to operate its business. With regard to expectations based on the legal framework, the Claimants argue that this extends to the basic premise that legislation will be consistently applied and that the host State will "implement, monitor and enforce" its own laws.  That, the Claimants say, has been confirmed by other tribunals, including the tribunals in *GAMI Investments v Mexico* (a host State must "accept liability if its officials fail to implement or implement regulations in a discriminatory or arbitrary fashion"), *MTD v Chile* (a host State "has an obligation to act coherently and apply its policies consistently"), *Lemire v Ukraine* ("a blatant disregard of applicable […] rules, distorting fair competition" can amount to a violation of the FET standard), and *Tecmed v Mexico*.[127]  The Claimants reject the Respondent's suggestion, made in reliance on *GAMI*, that arbitral tribunals impose a high bar to qualify a State's failure to enforce its laws as a breach of the FET standard; in the Claimants' view, the

---

[125] Cl. Reply, paras. 503-510.

[126] *See* Cl. Mem., para. 476.

[127] Cl. Mem., paras. 476-484, citing to *GAMI Investments, Inc. v Mexico*, UNCITRAL, Final Award (15 November 2004), para. 94, **CL-24**; *MTD Equity Sdn. Bhd. v Chile*, ICSID Case No. ARB/01/7, Award (25 May 2004), paras. 165-166, **CL-25**; *Joseph Charles Lemir v Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability (14 January 2010), para. 385, **CL-27**; *Tecnicas Medioambientales Tecmed v Mexico*, ICSID Case No. ARB(AF)/00/2, Award (29 May 2003), para. 154, **CL-17**.  *See also* Cl. Reply, paras. 540-547.

Respondent's reading of *GAMI* is erroneous, and its other attempts to minimize the importance of the relevant jurisprudence is unavailing.[128]

315.    *Second*, the FET standard encompasses a duty to provide a stable, predictable and consistent legal framework and business environment.  In this regard, the Claimants point to, *inter alia*, the decision of the tribunal in *CMS v Argentina*, holding that "a stable legal and business environment is an essential element of fair and equitable treatment" and "fair and equitable treatment is inseparable from stability and predictability."[129]

316.    *Third*, the FET standard encompasses an obligation to act in good faith.  Previous tribunals have found that good faith is inherent in the FET standard, that the obligation to act in good faith encompasses an obligation not purposefully to inflict damage upon an investment, and that the use, by the host states, of legal instruments for purposes other than their intended use constitutes a bad faith action.  The Claimants emphasise that while bad faith is not required to find an FET breach, "a finding of bad faith is *in and of itself* sufficient" for finding an FET breach.[130]

317.    *Fourth*, the FET standard encompasses a duty not to act arbitrarily or unreasonably, or to discriminate against the foreign investor.  In this regard, the Claimants note (relying on the awards in *CMS v Argentina* and *Micula v Romania I*) that any measure "that might involve arbitrariness or discrimination" or "conduct that is substantively improper, whether because it is arbitrary, manifestly unreasonable, discriminatory or in bad faith" will violate the FET standard.[131]

318.    The Respondent, the Claimants contend, has violated all four elements of the FET standard, in that it has failed to (i) protect Claimants' legitimate expectations, (ii) provide a stable and consistent legal framework and business environment, (iii) act in good faith, and (iv)

---

[128] Cl. Reply, paras. 511-515.

[129] Cl. Mem., paras. 476, 485-486, citing to *CMS v Argentina*, ICSID Case No. ARB/01/8, Award (12 May 2005), paras. 274 and 276, **CL-28**.

[130] Cl. Mem., paras. 476, 487-488 (emphasis in original).

[131] Cl. Mem., paras. 476, 489, citing to *CMS v Argentina*, ICSID Case No. ARB/01/8, Award (12 May 2005), para. 290, **CL-28**; *Micula v Romania I*, Award (11 December 2013), paras. 522 *et seq*, **CL-1**.

abstain from acting arbitrarily, unreasonably and discriminatorily. Their arguments in respect of each of these elements are set forth below.

### (ii)   Failure to Protect Claimants' Legitimate Expectations

319.   The Claimants characterise as their "initial investment period" the period 1994-1998, when they obtained financing to construct a spirits distillery and created a spirits brand, distribution network, bottling capacity and can-filling lines. At that time, the Claimants contend, the business environment in the spirits industry was characterized by the existence of a "large legal [spirits production and sales] market and a level playing field." It was not possible for an operator to sell spirits at prices much lower than those offered by efficient business operators, even if it evaded taxation. As a result, competition in the form of black market activities had no material impact on legal spirits producers.[132]

320.   In this "initial investment period," the legal framework made the sale of untaxed spirits illegal and the Romanian authorities "had the mandate to identify and stop untaxed spirits sales." Moreover, new legislation was introduced aimed at safeguarding the rights of legal alcohol operators and facilitating fiscal control of the spirits market.[133]

321.   The Claimants assert that they made their initial investments in reliance on the legitimate expectation that Romania would enforce its own laws and would not allow a massive influx of illegal competition from operators able to offer extremely low prices as a result of Romania allowing them to evade their tax obligations. The Claimants also assert that they had a legitimate expectation that they would be able to make use of the distillery's cost-efficiency to compete on pricing against other operators in the market. The Claimants would never, they contend, have invested as they did, but for these legitimate expectations on their part.[134] The Respondent's argument that there is no evidence of reliance by the Claimants on the existing market structure is, the Claimants say, unfounded, and ignores Claimants' witness evidence and expert evidence regarding the evolution of the market.[135]

---

[132] Cl. Mem., paras. 495-496.
[133] Cl. Mem., paras. 496-498.
[134] Cl. Mem., paras. 499-502.
[135] Cl. Reply, paras. 548-553.

322.    In the period that followed, from 1998 and into the early 2000s, the Claimants assert that their legitimate expectations were reinforced.  In particular, once Romania realised that black market activities had increased following an increase in the applicable taxes, it implemented measures to reverse the negative development, reinforcing the expectation that Romania would continue to enforce its tax legislation equally against all market players and to take action to protect legal operators against black market competition. Similarly, the introduction of additional regulatory mechanisms in the period 1998-2002, described above,[136] gave rise to the Claimants' continued legitimate expectation that Romania would monitor the spirits industry and ensure compliance with tax laws, and that regulatory control over the spirits industry would increase.[137]   Last, contemporaneous statements by Romania, including those made within the framework of Romania's accession negotiations with the EU, "confirm[ed] the legitimacy and reasonableness of Claimants' expectations that Romania would enforce its own tax laws."[138]

323.    However, the Claimants argue, Romania frustrated these legitimate expectations and thereby breached the FET standard, through its rapid tax increases, coupled with its failure to collect taxes from most spirits producers and its failure to prevent substantial production of untaxed illegal spirits, resulting in a substantial decrease of the taxed, legal spirits market.[139] Romania's contention that it made "reasonable and cost-efficient efforts" to fight tax evasion, exceeding the minimum applicable threshold, is unfounded; the Claimants take issue with the inspection evidence relied on by the Respondent, arguing that it principally relates to inspections of legal registered producers (and not illegal black market producers).  The Claimants highlight the evidence – including expert evidence – in support of their contentions with their Reply.[140]

---

[136] *See above*, at Section III.D.

[137] Cl. Mem., paras. 506-509, citing to "2001 Conference on Accession to the European Union - Romania - Romania's Position Paper Chapter 10 - Taxation," dated 24 July 2001, pp. 10-11, **C-65**.  *See also* Cl. Reply, paras. 555-559.

[138] Cl. Mem., paras. 509-512.

[139] Cl. Mem., paras. 513-517.

[140] Cl. Reply, paras. 560-569.

324.    In their Reply, the Claimants reject the Respondent's contention that Romania's level of development is critical to assessing whether or not a State's failure to implement its laws amounts to an FET breach.  In the Claimants' view, this cannot be reconciled with the fact that the FET standard is an absolute standard.  Moreover, Article 2(3) of the BIT does not support the view that the host State's level of development should be relevant to determine whether or not a breach of FET has occurred.  Nor does the case law support this contention.[141]  The Claimants point to, *inter alia*, the holding of the tribunal in *Arif v Moldova* that the fact that a state is not yet comparable to long-established democracies and market economies does "not lower the standard of investment protection provided by a BIT or excuse breaches of that standard."[142]  The Claimants also assert that the Respondent has failed to show that its level of development is such that could excuse it from enforcing its laws.[143]

      *(iii)    Failure to provide a stable and consistent legal framework and business environment*

325.    The Claimants rely on the same facts as just described in support of their contention that Romania breached the FET standard by failing to provide a stable and consistent legal framework and business environment for the Claimants' investments.  In this regard, they argue that the Respondent's failure to prevent the expansion of the spirits black market, through the introduction of very significant tax increases while completely disregarding its obligation to enforce taxes against all market players amounted to a failure to prevent – indeed, it allowed the emergence of – a completely deteriorated business environment.[144]

326.    The Claimants argue that the Respondent's position that there could be no expectation that Romania would not change its laws absent a stabilisation clause "misses the point," noting that the Claimants' claims are based on Romania's failure to implement its laws. For the

---

[141] Cl. Reply, paras. 516-525, referring to *Joseph Charles Lemire v Ukraine*, Decision on Jurisdiction and Liability (14 January 2010), paras. 317, 418, **CL-27**; *Duke Energy v Ecuador*, ICSID Case No. ARB/04/19, Award (18 August 2008), paras. 340, 355-364, **CL-35**.

[142] Cl. Reply, para. 526, citing to *Franck Charles Arif v Moldova*, ICSID Case No. ARB/11/23, Award (8 April 2013), paras. 605-606, **CL-120**.

[143] Cl. Reply, paras. 527-529.

[144] Cl. Mem., paras. 518-523.

Claimants, the Respondent's argument that it was the acts of third parties – for which the Respondent is not liable – which led to the proliferation of the black market is also baseless. The development of the black market was directly linked to Romania's inaction in enforcing its laws, and as argued elsewhere, there is no evidence that Romania made significant efforts to fight the black market in the spirits sector.[145]

> *(iv)    Failure to act in good faith*

327.   The Respondent, the Claimants argue, was "fully aware" that the sharp increases in excise duties, without adequate and complementary enforcement measures, would lead to the expansion of a spirits black market and inflict damage upon the businesses of legal operators such as the Claimants.   They point in this regard to warnings made by the European Union and the European Institute of Romania, as well as to Romania's own internal documentation.[146]

328.   However, the Claimants argue, the Respondent knowingly disregarded these warnings and expressions of concern by proceeding as it did.   Moreover, it was "repeatedly advised" of the devastation its acts and omissions were inflicting on legal producers, yet it declined to adopt any effective measures to address the problem.   In this manner, the Claimants argue, the Respondent breached it obligation to act in good faith.   In doing so, the Respondent may have been motivated by political concerns – the failure to enforce its laws cannot be attributed to a lack of financial or administrative means.[147]

329.   The Claimants reject the Respondent's argument that their good faith claim is duplicative. The Claimants' claim based on the Respondent acting in a discriminatory or arbitrary manner is based on acts and omissions, whereas the claim for failure to act in good faith is

---

[145] Cl. Reply, paras. 570-573.

[146] Cl. Mem., paras. 524-530, citing to *inter alia,* "Excerpts from Agenda 2000 - Commission Opinion on Romania's Application for Membership of the European Union," dated 15 July 1997, p. 3 (in the excerpt), **C-239**; "Excerpt from 1998 Regular Report from the Commission on Romania's Progress Towards Accession," dated 17 December 1998, pp. 29-30, **C-67**; "Pre-accession study number 7 - EU indirect taxation transposition sequence in Romania (VAT and Excise Duties)," not dated, pp. 42, 44, **C-241**; "2001 Conference on Accession to the European Union - Romania - Romania's Position Paper Chapter 10 - Taxation," dated 24 July 2001, p. 10, **C-65**.

[147] Cl. Mem., paras. 531-535.

based on Respondent's state of mind.[148]   In addition, the Claimants reject what they characterize as the Respondent's suggestion that the requirements of the EU regarding Romania's accession justify the development of the black market.   Romania was aware that it would have to take appropriate enforcement measures when adopting new laws in accordance with EU requirements.[149]   Finally, the Claimants reject Romania's defenses based on traditional activities of the population, arguing that there is no legal authority to support them.[150]

> (v)   *Failure to abstain from acting arbitrarily, unreasonably and discriminatorily*

330.   Finally, the Claimants reference their allegations, summarized in Section B(1)a) below, in support of their argument that the Respondent also breached the FET standard by failing to abstain from acting arbitrarily, unreasonably and discriminatorily.[151]

### b.  *Respondent's Position*

331.   The Respondent rejects the Claimants arguments, asserting that it has, in fact, ensured that the Claimants' investments received fair and equitable treatment.

> (i)   *The Applicable Standard*

332.   The Respondent agrees that the discussion concerning the legal standard for FET in the *Micula I* Award is instructive.   In the Respondent's view, the "main thrust" of the legal standard of fair and equitable treatment as articulated in *Micula I* was to emphasise that a balanced approach to the interests of a foreign investor and the general right of States to regulate in the public interest must be taken.[152]   However, the Respondent rejects the Claimants' suggestion that the *LG&E* tribunal set down any "universally applicable 'summary'" of the standard.   Rather, the applicable summary is found in *Waste Management II*, expressly approved by the *Micula I* Award. It provides:

---

[148] Cl. Reply, paras. 574-585.
[149] Cl. Reply, paras. 576-582.
[150] Cl. Reply, paras. 583-584.
[151] Cl. Mem., para. 536; Cl. Reply, paras. 585-586.
[152] Resp. CM., paras. 358-360.

> [T]he minimum standard of treatment of fair and equitable
> treatment is infringed by conduct attributable to the State and
> harmful to the claimant if the conduct is arbitrary, grossly unfair,
> unjust or idiosyncratic, is discriminatory and exposes the claimant
> to sectional or racial prejudice, or involves a lack of due process
> leading to an outcome which offends judicial propriety – as might
> be the case with a manifest failure of natural justice in judicial
> proceedings or a complete lack of transparency and candour in an
> administrative process. In applying this standard it is relevant that
> the treatment is in breach of representations made by the host State
> which were reasonably relied on by the claimant.[153]

333.    The Respondent also argues that the Claimants' assertion that the FET standard may be breached by omission is unsupported by the case on which the Claimants rely, *Suez v Argentina*. In *Suez*, the Respondent contends, the action upon which the Claimants rely as an ostensible omission was, in fact, not an omission. In the Respondent's view, "[o]nly in exceptional circumstances can an omission amount to a breach of the obligation to provide FET."[154]

334.    With respect to the specific elements identified by the Claimants, the Respondent had the following observations.

335.    *First*, although the Respondent agrees that legitimate expectations are an important factor in the FET standard, it argues that the Claimants' notion of legitimate expectations is too broad and unrealistic and fails to protect States' legitimate right to regulate. In particular, the cases relied on by the Claimants do not support the proposition that the FET standard protects "basic and general expectations" including the "continuous existence of conditions that enable an investor to operate its business." It says that that notion has in fact been rejected by many previous tribunals; specific promises or undertakings are required.[155] The Respondent points *inter alia* to *PSEG v Turkey* ("[l]egitimate expectations by definition require a promise of the administration on which the Claimants rely to assert a right that

---

[153] Resp. CM., paras. 361-362, citing to *Waste Management, Inc v Mexico*, ICSID Case No. ARB(AF)/00/3, Award (30 April 2004), para. 98, **RL-33**. *See also* Resp. Rej., paras. 414-416.
[154] Resp. CM., paras. 363-364, referring to *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v Argentina*, ICSID Case No ARB/03/19, Decision on Liability (30 July 2010), para. 238, **CL-11**.
[155] Resp. CM., paras. 366-369; Resp. Rej., para. 417.

needs to be observed"), and *EDF v Romania* (requiring "specific promises or representations") in support of its position.[156] It also emphasises the importance of a State's ability to change existing legislation and adopt new laws, in reliance on *AES v Hungary*.[157] In response to the Claimants' contention that "an investor is entitled to rely on the basic premise that the host State will implement, monitor and enforce its own laws," the Respondent argues that the Claimants' main legal support for their argument, *GAMI v Mexico*, sets a very high standard for such a finding, requiring that there must be "an 'outright and unjustified repudiation' of the relevant regulations."[158] The other authorities relied on by the Claimants can, the Respondent argues, be "dismissed swiftly as irrelevant."[159] Finally, the Respondent argues that the Claimants' position in this case is a "180º departure from the Claimants' previous position" in *Micula I.*[160]

336. *Second*, the Respondent argues that the Claimants have framed too broadly the element of the FET standard creating an obligation to maintain a stable and consistent legal framework and business environment. It is wrong to suggest that FET includes a stand-alone obligation on the host State to stabilise its regulatory and legislative system, divorced from the investor's legitimate expectations, which can only arise from specific undertakings of the State. Absent a contract with a stabilisation clause or another legally binding undertaking or a clear representation (which the Claimants did not receive), States bear no substantive obligation to ensure stability in the general sense, particularly in the context of significant economic and/or political transition, such as the process of Romania's accession to the EU.

---

[156] Resp. CM., paras. 370-371, citing to *PSEG v Turkey*, ICSID Case No. ARB/02/5, Award (19 January 2007), para. 241, **CL-80**; *EDF v Romania*, ICSID Case No. ARB/05/13, Award (8 October 2009), at para. 217, **CL-45**. *See also* Resp. Rej., para. 417.

[157] Resp. CM., para. 372, citing to *AES v Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010), at para. 9.3.29, **CL-46**.

[158] Resp. CM., paras. 373-375, citing to *GAMI v Mexico*, UNCITRAL, Final Award (15 November 2004), at para. 103, **CL-24**. *See also,* Resp. Rej., paras. 420-423.

[159] Resp. CM., para. 376.

[160] Resp. Rej., paras. 418-419.

The Respondent finds support for its position in *Parkerings v Lithuania, Oxus v Uzbekistan*, *Charanne v Spain*, and *Isolux v Spain*.[161]

337.    *Third*, the Respondent accepts that the FET standard encompasses an obligation to act in good faith, but it characterizes the Claimants' arguments in this regard again as articulating an "overly broad legal standard."[162]

338.    *Fourth*, the Respondent also accepts that the FET standard encompasses a duty not to act arbitrarily or unreasonably, or to discriminate against the foreign investor, noting that the Parties agree that the two standards expressed in Article 2(3) of the Sweden-Romania BIT, namely FET and prohibition of impairment of certain functions of the investment by discriminatory or unreasonable measures, are closely linked.[163]

339.    The Respondent's responses to the Claimants' contention that it has violated all four elements of the FET standard are set forth below.

*(ii)    Claimants' Allegations Regarding Breach of Legitimate Expectations*

340.    The Respondent argues that the Claimants' allegations regarding breaches of legitimate expectations, even if accepted at face value, would fail because "there is no representation, express or implied, general or specific, regarding the enforcement of taxation in the spirits market spirits that anyone in the Romanian government would have made to the Claimants that would have induced them to invest in the spirits business."[164]

341.    Further, the Respondent argues, the Claimants in any event mischaracterize the facts and evidence. In particular, they argue that there is no evidence beyond "vague statement[s]" of witnesses of any reliance by the Claimants upon alleged acts or representations of the

---

[161] Resp. CM., paras. 392-396, citing to *Parkerings v Lithuania*, ICSID Case No. ARB/05/8, Award (11 September 2007), at paras. 335-336, **CL-57**; *Oxus Gold v Uzbekistan*, UNCITRAL, Final Award (17 December 2015), at para. 824, **RL-40**. *See also* Resp. Rej., paras. 438-439, citing to *Charanne BV & Construction Investments SARL v Spain*, SCC Arbitration No. 02/2012, Final Award (21 January 2016), **RL-91**; *Isolux Infrastructure Netherlands B.V. v Spain*, SCC Case No V2013/153, Award (12 July 2016), **RL-92**.

[162] Resp. CM., para. 405.

[163] Resp. CM., para. 408.

[164] Resp. CM., para. 379; Resp. Rej., para. 426.

Respondent, and that evidence of the Respondent's efforts to enforce its excise tax laws, was not initially presented, and was, once presented, misleading.[165] The Respondent also emphasizes the inevitability of changes to taxation regulation given Romania's EU accession plans, rendering the idea that any official may have made representations that no such changes were contemplated "inconceivable." The Respondent argues that, contrary to Claimants' assertions, the function of a tax is to raise revenues for the state, and that the increases in excise tax were made in part to cover increasing health costs arising from alcohol consumption. Finally, the Claimants misrepresented the market evolution and the actions of Romania. In particular, the Respondent asserts that, "[t]o the extent that participants have not been willing to comply, but have attempted to avoid excise taxes due to the State, the authorities have taken action consistently throughout the years." Romania provides statistics on the numbers of investigations it has undertaken and convictions it has pursued. The Respondent says that these details repudiate the Claimants' contention that Romania "allowed" any party to evade its obligations. Rather, Romania took "reasonable and cost-efficient efforts" and it is "neither economically cost-efficient nor […] reasonable social policy to aim at perfect enforcement of tax […] laws."[166]

> (iii)    *Claimants' Allegations Regarding Provision of a Stable Legal and Business Framework*

342.    The Respondent argues that "[t]he Claimants' claim for an alleged failure to provide a stable and consistent legal framework and business environment is based on 'the same reasons' as their claim for breach of their legitimate expectations. Accordingly, it adds very little to the claim."[167] The Respondent emphasizes that the changes to the Romanian legal framework were entirely legitimate and had been foreseeable since at least the early 2000s, and, citing to *Paushok v Mongolia,* it asserts that "[…] no claim can arise from such steps in the absence of a stabilisation clause prohibiting Romania from enacting new tax laws."[168]

---

[165] Resp. CM., para. 380; Resp. Rej., paras. 427-429, 431-434.

[166] Resp. CM., paras. 381-391; Resp. Rej., para. 429.

[167] Resp. CM., para. 397.

[168] Resp. CM., para. 398-399, citing to *Sergei Paushok v Mongolia*, UNCITRAL, Award on Jurisdiction and Liability (28 April 2011), at para. 302, **RL-41**.

343. The Claimants' argument about a lack of stability in the business framework equally fails, in the Respondent's view. A State can only be held responsible for changes in the business environment where those changes are due to its own actions, and the Claimants have provided no evidence to support the notion that, to the extent that tax evasion occurred, this was caused by Romania's actions. To the contrary, the Respondent made "significant efforts to fight the black market."[169] Respondent also emphasizes its view that the expert evidence establishes that a large part of Scandic's loss of sales was due to tax increases and competitive pressures from other branded producers.[170]

(iv)    *Claimants' Allegations Regarding Lack of Good Faith*

344. The Respondent asserts that the Claimants' arguments about bad faith add little to their other arguments and constitute an unhelpful duplication of claims. In the Respondent's view, the Claimants are making serious allegations of bad faith "on the basis of the flimsiest of evidence – innuendo and conjecture at best." Measures taken by governments and legislatures in areas such as alcohol consumption are nuanced and multifaceted and require a balancing exercise to advance the public interest. In any event, as previously argued, the Respondent did take measures to fight tax evasion in the alcohol sector.[171]

(v)    *Claimant's Allegations of Unreasonable or Discriminatory Conduct*

345. The Respondent dismisses the Claimants' allegations of unreasonable or discriminatory conduct as part of their FET claim for the same reasons as summarized in Section B(1)b) below.[172]

(vi)    *Lack of Benchmarks*

346. In its Rejoinder, the Respondent emphasizes that the Claimants have failed to explain what it is that Romania allegedly omitted to do (i.e., to provide any benchmark by which to assess Romania's conduct). In the Respondent's view, the Claimants' case for breach of

---

[169] Resp. CM., para. 402-404; Resp. Rej., paras. 442-443.
[170] Resp. Rej., para. 443.
[171] Resp. CM., para. 405-407; Resp. Rej., paras. 444-445.
[172] Resp. CM., para. 408.

the FET standard is effectively an argument that Respondent's efforts were not "enough," and which the Claimants seek to substantiate with "empty platitudes." In short, the Claimants "have failed to identify any standard or criteria that the Tribunal should apply to determine what Romania should have done in order to comply with the FET obligation."[173]

### (2)    The Tribunal's Analysis

347. The Claimants argue that Romania has breached its obligation under Article 2(3) of the BIT to provide the Claimants with fair and equitable treatment in that it failed to enforce its tax laws in a consistent manner and thereby fostered the growth of a substantial illegal spirits market.

### a.    *Applicable Law*

348. The Parties make no specific submissions on the applicable law. The law relevant to this case is found in the BIT between Sweden and Romania, the relevant provisions of the ICSID Convention and any relevant rules of international law applicable to the interpretation and application of the BIT as well as any rules of international law applicable in the relationship between Sweden and Romania.[174]

349. However, a specific question about the content of the applicable law has arisen in respect of the decision of the tribunal in *Micula I*. In their Reply, the Claimants argue that the rulings in the *Micula I* decision regarding the applicable law are *res judicata* for this Tribunal.[175] According to the Claimants, "Romania may not re-litigate […] all the questions linked to the meaning of the BIT provisions decided by the *Micula v Romania 1* tribunal."[176]

---

[173] Resp. Rej., paras. 446-449.

[174] ICSID Convention, Article 42(1).

[175] The Claimants had also raised the question of *res judicata* effect of the *Micula I* decision in respect of jurisdiction *rationae personae* (Cl. Mem., para. 455), but in view of the decision reached in this case, the Tribunal did not find it necessary to deal with that argument.

[176] Cl. Reply, para. 485.

350. The Respondent challenges this application of the *res judicata* principle.[177] It argues that the parties to the two arbitrations are not identical in that some of the Claimants in this case were not claimants in *Micula I*. The subject matter of the claims and their object are also different. *Micula I* related to the effect of the withdrawal of tax incentives on, in particular, the beer production, grain milling and packaging operations of the claimants in that case. The present case does not concern the withdrawal of subsidies, nor is it focused on those industries. It concerns the alleged failure of the Respondent to enforce its laws in respect of the illegal sale of alcohol and the effect of this failure on the spirits products sold by the Claimants. Moreover, the legal grounds for the present claims cannot be equated with *Micula I*. The Respondent says that what the Claimants are trying to do is to tie it to elements of the legal reasoning in *Micula I* applicable to the interpretation of the BIT, something that is not a permissible application of the *res judicata* principle.

351. The Tribunal does not consider that the principle of *res judicata* has the effect in this case that the Claimants contend. Although the parties are to some extent the same, the claims, the conduct complained of, and the relief sought, are different in the two cases, requiring the Tribunal to determine and apply the law in a very different context. Thus, the actual decision of the *Micula I* tribunal could not have *res judicata* effect in respect of the facts in this case. What the Claimants are seeking to do here is to use the *res judicata* principle to restrict interpretations of the applicable law to interpretations adopted in the *Micula I* award in a different setting. In other words, the scope of the reasoning to be utilized by this Tribunal is to be fettered by the reasoning in *Micula I*. In the view of the Tribunal this is not a proper invocation of the *res judicata* principle.

352. Of course, the *Micula I* decision, like the decisions of other investment tribunals, is relevant and can be taken into account by this Tribunal. And, the closer other cases are to the legal issues and factual circumstances of this case, the more persuasive the decisions in those cases may become. But they have no more weight than that. The fact that the Parties had a fundamentally different case before another investment tribunal does not make the decisions of that tribunal or its reasoning *res judicata*.

---

[177] Resp. Rej., para. 392 *et seq*.

### b. *The Scope of FET*

353.  Article 2(3) of the Sweden-Romania BIT provides that each party shall "at all times ensure fair and equitable treatment of the investments by investors of the other Contracting Party." In general terms, the Parties do not disagree over the ambit of the obligation to provide fair and equitable treatment, although the Claimants see the obligation as being broader in scope than does the Respondent.

354.  The Claimants cite the view of Dolzer and Schreuer that "the standard of FET is a broad one, and its meaning will depend on the specific circumstances of the case at issue."[178] The Claimants contend, in particular, that an omission as well an act can constitute a failure to comply with the obligation to provide fair and equitable treatment.[179] On the basis of the position taken by other investment tribunals, the Claimants see four standards implicit in the obligation to provide fair and equitable treatment. These are: the protection of the investor's legitimate expectations; a duty to provide a stable, predictable and consistent legal framework and business environment; an obligation to act in good faith; and a duty not to act arbitrarily, unreasonably or to discriminate against the foreign investor.[180]

355.  The Respondent claims that the standard of fair and equitable treatment is best summarized in the *Waste Management II* decision.[181] While it agrees that a failure to fulfil the FET obligation can result from an omission, it takes the view that this can be so only in "exceptional circumstances."[182] The Respondent does not deny that a breach of any of the standards identified by the Claimants could in principle constitute a denial of fair and equitable treatment; it does deny that on the facts of this case, any such breach arises.

356.  The Tribunal does not find it necessary to define in the abstract the scope of the obligation to provide fair and equitable treatment. Instead it will look at the particular assertions of a

---

[178] Cl. Mem., para. 473, citing to R. Dolzer and C. Schreuer, *Principles of International Investment Law*, 2nd Edition (Oxford, 2012), para. 309, **CL-7**.

[179] Cl. Mem., para. 475.

[180] Cl. Mem., para. 476.

[181] Resp. CM., para. 361, citing to *Waste Management, Inc v Mexico*, ICSID Case No ARB(AF)/00/3, Award (30 April 2004), para. 98, **RL-33**.

[182] Resp. CM., para. 364.

denial of fair and equitable treatment raised by the Claimants and consider each on its own merits.

### c. *Protection of Legitimate Expectations*

357.    The Parties agree that the protection of legitimate expectations is "an important factor in the FET standard."[183] Indeed, the Claimants describe it as a "fundamental obligation of the host state."[184] But they disagree about the scope of legitimate expectations and, as a consequence, how it is to be applied in this case.

358.    The essence of the Claimants' case is that, when they invested in Romania, they had the expectation that Romania would enforce its laws, in particular its laws relating to the taxation of alcohol. They argue that "if legislation in force at the time of the investment provides that sales of untaxed spirits are illegal, an investor is entitled to rely on the premise that the legislation will be consistently applied in relation to the producers covered by the tax obligation in question."[185]

359.    The Claimants found their expectations on the state of the market when they started operations and subsequent actions of the government up until around 2004, which, in the Claimants' view, evidenced an intention to enforce its tax laws. This included measures taken in 1998 and following after increases in taxation on the production of spirits that involved increased control measures applicable to alcohol producers. Such measures included a requirement that tax stamps be placed on alcohol products, the imposition of penalties for failing to do so and requiring spirits producers to register and report to the fiscal authorities. The Claimants claim that they saw these measures as positive developments and that they were linked to an increase in their sales.[186] They saw the introduction of a Tax Code in 2004 as a further indication that the Respondent would enforce its laws.

---

[183] Resp. CM., para. 366.
[184] Cl. Mem., para. 477.
[185] Cl. Mem., para. 480.
[186] Cl. Mem., paras. 505-510.

360.   The Tribunal accepts that in appropriate cases, a breach of the obligation to provide fair and equitable treatment can result from an omission as well as from positive action. The Respondent argues that this can occur only in exceptional circumstances[187] and that the omission in this case – the alleged failures of compliance with taxation laws – was not an omission in respect of the Claimants, but an omission in respect of third parties, the producers of non-taxed spirits.

361.   In the view of the Tribunal, the key question in this case is whether there was anything on which the Claimants' expectations could be based, so that the alleged omission or failure of the Respondent could be treated as a basis for liability. The Parties agree that there was no specific representation by the Respondent, although they differ on whether legitimate expectations relied on by a party have to be based on a specific representation.

362.   The Tribunal agrees with the Claimants that there does not have to be a specific representation and that legitimate expectations can arise from a State's acts or conduct. However, to borrow the language used by Schreuer and Kriebaum, which the Claimants cite with approval, what are the "general or specific assurances given by the host State" on which the Claimants rely?[188] The acts or conduct upon which the Claimants rely are either acts of general legislation or specific actions taken by the Respondent relating to the enforcement of their taxation legislation – requiring tax stamps to be affixed to containers of alcohol, requiring alcohol producers to register and report, developing a tax code. None of these measures was specific in its application to the Claimants. These actions, together with the general market condition at the time that the Claimants entered the market for spirits in Romania created, the Claimants argue, an expectation that the Respondent would continue to enforce its taxation laws relating to spirits.

363.   What the Claimants rely on to ground their expectations at the time of investment are the witness statements of the Micula brothers of their recollection of their expectations at that

---

[187] Resp. CM., para. 364.
[188] Cl. Reply, para. 543, citing to C. Schreuer and U. Kriebaum, "At What Time Must Legitimate Expectations Exist?", in: J. Werner and A. Hyder Ali (eds), *A Liber Amicorum: Thomas Wälde* (CMP Publishing, 2009), pp. 265, 276, **CL-122**.

time.  And when the Claimants assert that "the Government continuously communicated that it would *not* allow a massive expansion of a black spirits market at the expense of legal operators,"[189] the support for this proposition consists of the actions taken by governments in terms of legislation, such as the adoption of a tax code. There were no "communications" from the government to the Claimants and no representations by government officials subsequent to the Claimants' investment. Moreover, there is no evidence establishing due diligence taken by the Claimants to confirm the Micula brothers' subjective expectations or showing contacts with governments to provide reassurance.  The representations or assurances the Claimants invoke are inferences based not on what was said, but upon the circumstances prevailing at the time of their investment, a belief that the market in which they had entered would not change to their disadvantage, and the fact of subsequent legislation relating to taxation of alcohol production and sale.

364.    The Claimants believe that the market changed to their detriment as a result of the Respondent's omission in failing to satisfactorily enforce its taxation legislation.  However, the Tribunal has difficulty seeing the precision in the expectation asserted by the Claimants that would give it some clear content to which liability could be attached. An expectation that a state will enforce its laws is of a high degree of generality, even if it were restricted to an expectation that a state would enforce its tax laws or taxation relating to alcohol. The Claimants do not regard enforcement by the Respondent as adequate and assert that it was not directed at the principal causes of the tax evasion problem. Yet they do not provide a standard against which their expectation of adequate enforcement can be assessed, apart from their belief that their loss of sales was attributable to a failure on the part of Romania to enforce its tax laws and an assertion that other countries did things differently.

365.    The evidence that the Claimants provide of the Respondent's failure to enforce its laws rests largely on inference derived from their allegation that black market sales had increased to 90% of sales transactions. They argue that the statistics on enforcement provided by the Respondent show that the State had not made any serious attempt to enforce its taxation laws. The focus of enforcement, the Claimants argue, is monitoring

---

[189] Cl. Mem., para. 501 (emphasis in original).

registered producers rather than concentrating on illegal producers,[190] and when illegal production is found, the result generally is only a warning or a minimum or negligible penalty.[191] The Claimants provide examples of the occurrence of illegal sales, such as in markets and fairs, on roadsides and on the Internet. The Claimants also assert that Romania could take measures to improve enforcement, such as focusing on home production and authorizing police to enter houses to check for illegal production.

366.    The Respondent argues that it did not fail to enforce its taxation laws. It cites the work of the Romanian National Agency for Fiscal Administration (ANAF), the number of customs controls over industrial production in the period 2007-2015 (a total of 157,946),[192] the work of the Financial Guard and the organ that replaced it, DG Anti-Fraud, and prosecutions before the courts.[193] With respect to home production, the Respondent points out the difficulty in dealing with widely dispersed production, the social and cultural attachment to the production of *tuica* and *palinca*, the rights of homeowners and the laws regarding entry into households.  They point out, too, that over the period 2007-2015, a total of 34,796 customs controls were exercised by ANAF over individual households.[194] They also point out that enforcement is guided in this field by the cost effectiveness of enforcement, taking account of the dispersed individual households and the need to avoid social disorder, given the special social and cultural importance of home production of *tuica* and *palinca.*

367.    The Tribunal agrees that there may be circumstances in which a failure to enforce laws could amount to a denial of legitimate expectations and hence a breach of the obligation to provide fair and equitable treatment. The *GAMI* tribunal recognized that a failure to enforce regulations could amount to a violation of NAFTA Article 1105 if it "amounted to an 'outright and unjustified repudiation' of the relevant regulations."[195] The Claimants also rely on the *Zelena* case where the tribunal found that there had been a "manifest, systematic

---

[190] *See* Cl. Reply, paras. 410 *et seq*.

[191] *See* Cl. Reply, paras. 422 *et seq*.

[192] Resp. CM., para. 259.

[193] Resp. CM., para. 275.

[194] Resp. CM., para. 249.

[195] *GAMI v. Mexico*, UNCITRAL, Final Award (15 November 2004), at para. 103, **CL-24**.

and sweeping lack of application of Serbian legislation"[196] relating to the treatment of
hazardous animal byproducts over a period of two years. Although in *GAMI* the tribunal
found no failure to provide fair and equitable treatment on the facts, in *Zelena* the tribunal
found that there had been a failure to meet the claimants' legitimate expectations.[197]

368.    However, the Tribunal does not consider that what the Claimants rely on to show that the
Respondent had failed to enforce its laws in this case meets the *GAMI* test of an "outright
and unjustified repudiation" of its law. There is no "repudiation" of the standards set out
in the legislation. The Romanian government engages in the enforcement of its tax laws
relating to alcohol. It has a structure and personnel and investigations are carried out. Fines
are imposed and prosecutions occur. A budget of EUR 25 billion is allocated to taxation
enforcement and in a two-year period DG Anti-Fraud uncovered over EUR 2 billion in tax
evasion.[198] Romania cannot be considered to have abandoned its authority in this field.
Thus, if the appropriate test for determining whether the Respondent has failed to enforce
its taxation laws is the *GAMI* test, then the Claimant's argument must fail.

369.    Equally, the Tribunal does not regard the *Zelena* decision as suggesting a different
conclusion in this case. In *Zelena* the claimants had engaged in significant due diligence
before deciding to invest, including meetings and correspondence with government
officials. Although the tribunal took the rather novel view that only promises or assurances
that were legally binding could be the basis for legitimate expectations,[199] it nonetheless
concluded that there was a "manifest, systematic and sweeping" lack of enforcement of the
relevant legislation that went beyond what the claimants could reasonably expect. Rather,
the tribunal said, what a claimant should be entitled to expect were "serious and visible
efforts at the implementation and enforcement of the relevant law." [200]

370.    In the view of this Tribunal, Romania has engaged in "serious and visible" efforts to
enforce its taxation laws relating to alcohol. The Claimants' argument that Romania has

---

[196] *Zelena v. Serbia*, ICSID Case No. ARB/14/27, Award, at para. 293, **CL-243**.

[197] *Zelena v. Serbia*, ICSID Case No. ARB/14/27, Award, at para. 267, **CL-243**.

[198] Resp. CM., para. 424.

[199] *Zelena v. Serbia*, ICSID Case No. ARB/14/27, Award, at para. 156, **CL-243**.

[200] *Zelena v. Serbia*, ICSID Case No. ARB/14/27, Award, at para. 239, **CL-243**.

failed to enforce its alcohol taxation laws is really a disagreement about how Romania has gone about enforcement. In the view of the Claimants, Romania should have gone about enforcement differently. But this does not demonstrate that there have been no "serious and visible" efforts at enforcement or that there has been a "manifest, systematic and sweeping failure" to enforce the law. Thus, the *Zelena* case provides no support to the Claimants.

371.    In light of the above, the Tribunal does not consider that the Claimants have established that there has been a failure by Romania to enforce its taxation laws. The Claimants clearly feel that the Respondent could do more and they doubt the effectiveness of the measures taken by Romania to enforce its taxation regime with respect to alcohol. However, the Respondent has established that it has a sophisticated mechanism for the enforcement of its laws, a strategy of ensuring that enforcement is cost-effective and a structure for enforcement at both the household producer and industrial producer levels, involving ANAF, Customs and DG Anti-Fraud. Illegal activities have been uncovered and fines levied. None of this can be characterized as a failure to enforce taxation laws.

372.    As a result, the Tribunal concludes that the Claimants have failed to establish that there was a denial of their legitimate expectations on the basis of a failure by the Respondent to enforce its taxation laws relating to alcohol.

### d.    *Failure to Provide a Stable and Consistent Legal Framework and Business Environment*

373.    The Claimants also argue, as an aspect of their claim to fair and equitable treatment, that the Respondent failed to provide a stable and consistent legal framework and business environment. As a result of a combination of increased taxes, which "incentivized" tax avoiders,[201] and a failure to enforce its tax laws, the Claimants argue, the Respondent has facilitated the growth of a large illegal black market, which made it impossible for legal operators to compete. This change in the legal and business environment was in breach of the Respondent's obligation to maintain a stable legal environment.

---

[201] Cl. Mem., para. 520.

374.    The Respondent contests the Claimants' view that it is under an obligation to maintain a stable legal environment in the absence of a stabilisation clause. The Claimants could not have had, the Respondent argue, the legitimate expectations they claim, because any investor has to expect that a market will change and that legislation will change. In the circumstances of Romania, which was going through a process of political and economic transition and engaged in negotiations to be admitted to membership of the European Union, changes to the legal framework involving increases in taxation were "entirely legitimate and foreseeable."[202]

375.    In the view of the Tribunal, the Claimants' argument about a stable legal and business environment is simply a different formulation of its argument that the Respondent had failed to enforce its tax laws. Had the Respondent enforced its tax laws in the way that the Claimants argue it should, then, according to the Claimants, the legal and business environment would not have changed. However, the Tribunal has concluded that the Claimants have not proved a failure by the Respondent to enforce its taxation laws and thus its arguments relating to a stable legal and business environment must also fail.

### e. *Good Faith*

376.    The Claimants argue that Romania had not acted in good faith in failing to enforce its taxation laws. They point out that the EU had stated during the negotiations on EU admission that an increase in Romania's administrative capacity to enforce taxation laws would be necessary.[203] The Claimants also state that non-governmental organizations had pointed this out to Romania as well.[204] Thus, the Claimants argue, Romania was fully aware of the consequences of not making adequate provision for the enforcement of its taxation laws.

377.    The Respondent argues that the Claimants' claim of failure to act in good faith was based on "innuendo and conjecture, at best."[205] It points out that the increases in taxation between

---

[202] Resp. CM., paras. 392-398.
[203] Cl. Mem., paras. 525-526.
[204] Cl. Mem., paras. 527-528.
[205] Resp. CM., para. 407.

the period 2003-2007 were required as a result of entering the EU and that the exercise of government powers of enforcement are based on a variety of factors in the public interest and not just the concerns of the industrial-based producers of alcohol.

378.    The Tribunal notes that allegations of bad faith require a high standard of proof, particularly where, as the Claimants point out, its argument is based on Romania's "state of mind."[206] But there is an initial hurdle. A claim that Romania acted in bad faith in failing to enforce its tax laws requires proof that Romania has in fact failed to enforce its laws. However, the Tribunal has already concluded that the Claimants have not shown that Romania had failed to enforce its laws. Thus, there is no basis for a claim that Romania failed to act in good faith in not enforcing its tax laws.

### f.    Unreasonable or Discriminatory Conduct

379.    This aspect of the Claimants' argument is essentially identical to the Claimants' additional claim under Article 2(3) of the BIT that the Respondent has taken discriminatory and unreasonable measures, which is addressed in the section below.

### B.    UNREASONABLE AND DISCRIMINATORY MEASURES

### (1)    The Parties' Positions

### a.    Claimants' Position

380.    The Claimants argue that Respondent has taken discriminatory and unreasonable measures in violation of Article 2(3) of the BIT.

#### (i)    The Applicable Standard

381.    On the Claimants' case, an "unreasonable measure" is the same as an "arbitrary measure" in the relevant jurisprudence; this standard of treatment protects investors against "a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety."[207] A measure need not be outrageous to be unreasonable or arbitrary; rather,

---

[206] Cl. Reply, para. 575.

[207] Cl. Mem., paras. 552-553, citing to *Case concerning Elettronica Sicula (ELSI)*, Judgment, ICJ Reports (20 July 1989), para. 128, **CL-43**.

tribunals have found unreasonable (i) damaging measures that had no apparent legitimate purpose; (ii) measures based on discretion, prejudice or personal preference; and (iii) measures taken for reasons other than those publicly given, or undertaken without engaging in a rational decision making process.[208] The Claimants rely on the Award in *AES v Hungary*, in which the tribunal found that reasonableness should be analysed on the basis of two elements: (i) the existence of a rational policy (i.e., a policy that has a logical (good sense) explanation and aims to address a public interest matter), and (ii) the reasonableness of the act in question (i.e., whether there is an appropriate correlation between the State's public policy objective and the measure adopted to achieve it).[209]

382.  As for discriminatory measures, the Claimants argue that no intent to discriminate is necessary for there to be a violation of Article 2(3). As held in *LG&E v Argentina* and *Siemens v Argentina*, it is sufficient that the host State's action or omission be discriminatory *in effect*.[210] A measure will be discriminatory in effect "if it results in a treatment of an investor different from that accorded to other investors in a similar or comparable situation;" i.e., if similar cases are treated differently without reasonable justification.[211] Moreover, in order for a measure or conduct to constitute discrimination, it need not be specifically directed towards the disfavoured foreign investors, but could manifest itself e.g., in the form of tax rules which indirectly favour domestic operators.[212]

*(ii)    Discriminatory Measures*

383.  Romania, the Claimants argue, has discriminated against the Claimants by enforcing its tax laws and regulatory requirements relating to the production of spirits as concerns the

---

[208] Cl. Mem., para. 554. *See also* Cl. Reply, para. 613.

[209] Cl. Mem. para. 556, citing to *AES v Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010), paras. 10.3.7-10.3.9, **CL-46**. *See also* Cl. Reply, para. 619.

[210] Cl. Mem., para. 540, citing to *LG&E v Argentina*, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006), para. 146, **CL-9** and *Siemens v Argentina*, ICSID Case No. ARB/02/8, Award (6 February 2007), para. 321, **CL-39**. *See also* Cl. Reply, para. 593.

[211] Cl. Mem., paras. 540-542, citing to N. Blackaby, C. Partasides, with A. Redfern and M. Hunter, *Redfern and Hunter on International Arbitration* (Oxford, 2015), p. 485, **CL-8**; *LG&E v Argentina*, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006), para. 146, **CL-9**; *Saluka v Czech Republic*, UNCITRAL, Partial Award (17 March 2006), para. 313, **CL-18.**

[212] Cl. Mem., para. 543, citing to *Corn Products v Mexico*, ICSID Case No. ARB(AF)/04/01, Decision on Responsibility (15 January 2008), para. 119, **CL-42**.

Claimants, but not as concerns all – or even the majority – of other operators producing and selling similar spirits on the Romanian market.[213]

384.    In this regard, the Claimants argue that illegal operators are engaged in precisely the same business as the Claimants (i.e., the production and sale of spirits in Romania), and hence it is proper, and in accordance with the findings of the tribunal in *Apotex Holdings v United States*, to compare the treatment of the Claimants with that of the illegal operators.[214] Moreover, Romania's failure to identify and stop illegal producers was – and still is – discriminatory, at least in effect, in that this differential treatment has resulted in a distorted market, creating a competitive advantage for the beneficially treated illegal operators.[215] Finally, there is no reasonable justification for Romania's differential treatment of the Claimants as compared to the black market operators.  In particular, there is no conceivable public interest that could justify this discrimination (but rather, there is a clear public interest associated with non-discriminatory enforcement of laws and regulations).[216]

385.    In their Reply, the Claimants dispute a number of the arguments made by the Respondent in its Counter-Memorial.

386.    *First*, with respect to the Respondent's argument that illegal home producers are not the correct comparators for the analysis, the Claimants contend that all other producers that sell spirits are in a comparable situation in all respects pertinent to assessing Romania's violations of the BIT. All spirits sales are subject to payment of an excise tax and spirits offered for sale must be produced in a tax warehouse. While the rate of the excise tax may differ, the same legal requirements to pay excise tax and comply with the tax warehouse regulations apply to all producers of spirits for sale in Romania. The Claimants suggest that the award in *Grand River v USA* supports the view that important weight is to be

---

[213] Cl. Mem., para. 544.
[214] Cl. Mem., para. 545, citing to *Apotex Holdings v USA*, ICSID Case No. ARB(AF)/12/1, Award (25 August 2014), para. 8.15, **CL-6**.
[215] Cl. Mem., paras. 546-548.
[216] Cl. Mem., paras. 549-551.

assigned to whether there are "like legal requirements."[217]  They argue that, contrary to the Respondent's contentions, the relevant case law in fact confirms that all producers subject to the same legal requirements are deemed to be in like circumstances for the purposes of determining whether a State's measures were discriminatory.[218]

387.    *Second*, the Claimants reject the distinction drawn by the Respondent between companies like the Claimants that operate through tax warehouses, and home producers and small distilleries that do not.  In particular, the Claimants argue that small distilleries are obliged to hold fiscal warehouse licenses, and moreover, the fact that illegal producers do not possess such licenses is merely evidence of the failure to enforce the laws in a non-discriminatory manner.[219]

388.    *Third*, the Claimants reject the Respondent's contention that the criteria the Claimants have applied are inapposite.  In *Apotex*, the case on which the Claimants rely, contrary to the Respondent's suggestion, the tribunal did not have to consider whether differing legal regimes were in themselves discriminatory.  Rather, the tribunal addressed discrimination in the enforcement of a legal regime fully analogous to that under consideration here.[220]

389.    *Finally*, the Claimants reject the Respondent's argument that other industrial-scale producers are treated "exactly the same."  It points in this regard to "[t]he fact that Romania's officials deliberately chose to allow certain producers to produce alcohol while their licenses had been revoked" (referencing the treatment given to producer Euroavipo) and argues that Romania turns a blind eye to 60-70% of the producers in the commercial market that sell spirits at prices that do not even cover the cost of production and taxes.  This demonstrates that Romania does not treat industrial-scale producers of spirits equally.[221]

---

[217] Cl. Reply, paras. 594-597, citing to *Grand River Enterprises Six Nations, Ltd and others v United States of America*, UNCITRAL, Award (12 January 2011), para. 166, **RL-42**.

[218] Cl. Reply, paras. 597-602, 604.

[219] Cl. Reply, paras. 605-607.

[220] Cl. Reply, para. 608-609.

[221] Cl. Reply, para. 611.

*(iii)    Unreasonable Measures*

390.   The Claimants also argue that the Respondent's choice to enforce its spirits tax laws only in relation to some spirits producers also constituted unreasonable and arbitrary measures, impairing Claimants' investments.

391.   In the Claimants' view, such behaviour offends every reasonable and impartial person, and does not serve a legitimate purpose. Rather, the choice was biased and politically motivated, and there were reasonable alternatives available. Moreover, the Respondent's choice was not the result of a rational decision-making process that considered the effect of the measure on foreign investments and the balance of the interests of the State. In support of this contention, the Claimants point to evidence that the choice has also resulted in negative health and environmental outcomes for Romania, as well as a loss of tax revenue. Relatedly, the Claimants assert that it would be "relatively easy" for Romania to increase its enforcement activities.[222]

392.   The Claimants argue that previous arbitral tribunals have examined whether the measure alleged to be unreasonable or arbitrary was the result of a rational decision-making process. This analysis includes the examination of the existence of a genuine public purpose and of a reasonable relationship between the aims pursued by the State and the effectiveness of the measures taken. They point in this regard to *Saluka v Czech Republic* and *AES Summit v Hungary*.[223] They also contend that the Respondent's reliance on the *ELSI* case and its reference to a "reasonable correlation between the [rational] policy and the act that aims to implement the policy" is entirely misplaced. It is simply not possible for Romania to argue that the disputed conduct aimed to implement a rational policy, the Claimants argue, because Romania's conduct did the very opposite.[224]

---

[222] Cl. Mem., paras. 558-570; Cl. Reply, paras. 615-616, 622.

[223] Cl. Reply, paras. 617-619, citing to *Saluka v Czech Republic*, UNCITRAL, Partial Award (17 March 2006), para. 460, **CL-18**, and *AES v Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010), paras. 10.3.7-10.3.9, **CL-46**.

[224] Cl. Reply, paras. 623-626, citing to *Case concerning Elettronica Sicula (ELSI)*, Judgment, ICJ Reports (20 July 1989), p. 76, para. 128, **CL-43**.

393.    In addition, the Claimants argue that Romania's implementation of rules permitting household production of alcohol at a level that significantly exceeds personal consumption was also unreasonable within the meaning of Article 2(3) of the BIT. There was no reasonable justification for doing this; the thresholds implemented exceeded personal consumption by a wide margin, whereas such consumption was the only stated justification for maintaining the household rules.[225] In this regard, the Claimants reject the Respondent's argument that the Claimants misunderstand the so-called "household rules" on fruit-growers' spirits production for personal consumption. Although the Claimants maintain their view that these rules were arbitrary, what is relevant for the purpose of the Claimants' damages claim is not the "household rules" as such, but Romania's failure to enforce its laws in relation to illegal producers who illegally sold spirits without (i) holding a fiscal warehouse license and (ii) paying the applicable taxes on spirits sales. In the Claimants' view, the record shows that significant quantities of home-produced spirits are sold on the black market and that Romania has failed to provide evidence of any real effort to ensure household compliance with relevant rules. Rather, Romania's authorities principally conducted scheduled inspections of registered producers.[226]

**b.    *Respondent's Position***

394.    The Respondent argues that it has not impaired the Claimants' enjoyment of their investments by unreasonable or discriminatory measures. In the Respondent's view, the Claimants' arguments under this claim fail for the same reasons as the Claimants' full protection and security claim; nevertheless, the Respondent addresses both allegations separately in their pleadings for the "sake of conceptual accuracy."[227]

*(i)    The Applicable Standard*

395.    With respect to the determination of whether Romania's measures were discriminatory, the Respondent argues that the "critical question" for the Tribunal is to determine what might be comparable situations. The key question in this context is whether the alleged

---

[225] Cl. Mem., paras. 571-573.
[226] Cl. Reply, paras. 628-630.
[227] Resp. Rej., para. 450.

comparator was subject to the same legal regime as the Claimants. In this regard, the Respondent notes that even where two companies "operate in the same industry and are subject to same kind of rules," they are not necessarily in a "like situation." Rather, tribunals must look carefully at the circumstances in order to determine whether they are indeed comparable. The alternative criteria proposed by the Claimants are inapposite, as they are derived from case law where the tribunals concerned were considering whether differing legal rules constituted in themselves discriminatory treatment – and that is not the claim alleged here.[228]

396. As regards the claim of unreasonable measures, the Respondent contends that the Claimants' articulation of the applicable standard sets the standard too low, and neglects the main authority, which is the ICJ's ruling in the *ELSI* case. That case emphasizes that "[a]rbitrariness is […] something opposed to the rule of law […] a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety."[229] While the Parties agree that there must be a reasonable correlation between the policy and any act that aims to implement the policy, in the Respondent's view, given the applicable *ELSI* standard, the margin of appreciation granted to the State is wide:

> *It is up to States to determine what policies to pursue and how. Only in the extreme circumstance where the correlation between the two is so remote or artificial as to "shock[], or at least surprise[], a sense of juridical propriety" would this amount to an unreasonable measure in breach of Article 2(3) of the Sweden-Romania BIT.*[230]

### (ii) Discriminatory Measures

397. The Respondent rejects the Claimants' contention that the spirits producers that do not pay taxes are engaged in precisely the same business as the Claimants and thus that they are in a comparable situation. Two categories of producers in Romania are subject to a different legal regime than that applicable to Scandic, Claimants' primary alcohol brand, and thus are not, by definition, in a similar situation to Scandic: home producers of fruit-based

---

[228] Resp. CM., paras. 410-414; Resp. Rej., para. 451.

[229] Resp. CM., paras. 425-426.

[230] Resp. CM., para. 427. *See also* Resp. Rej., para. 460.

brandy, and small distilleries that produce less than 10 hectolitres of alcohol per year. Thus, only the industrial-scale producers of alcohol are the applicable comparators. These producers are treated exactly the same across the board.  In the Respondent's view, "criminals" cannot be the appropriate comparator – but even if the Tribunal were minded to consider them as such, the Respondent has demonstrated an absence of discrimination in the extensive measures it has taken, and is taking, to prevent and fight tax evasion in the alcohol sector.[231]

398.    In its Rejoinder, the Respondent first emphasized that home sales have been recognised by the Romanian legislature as a separate market from that of large-scale producers, including through the imposition of a much-reduced tax rate.  Moreover, the two markets have historically been subject to two different customs regimes. Second, with regard to *Apotex v USA*, on which the Claimants rely as being analogous to the present case, the Respondent emphasizes that the Claimants are advancing a claim different from that advanced in *Apotex*. Third, as to Claimants' invocation of the treatment of the producer Euroavipo, the Respondent argues that it is "unclear what is the 'treatment' that Romania gave Euroavipo and failed to give the Claimants."[232]

*(iii)    Unreasonable Measures*

399.    The Respondent also rejects the Claimants' allegation that the measures taken by Romania with regard to increasing spirits taxes and its manner of enforcing its rules constitute unreasonable measures.

400.    The Respondent argues that increasing the level of excise tax in the alcohol sector in 2002-2007 and introducing stricter regulatory requirements was not a "choice" for Romania – except to the extent that seeking accession to the EU was a choice.  Moreover, the notion that there was a "choice" by Romania not to enforce its laws is wrong and nonsensical. The first and main victim of tax evasion is the State itself, and Romania has always sought to control manufacturing and sale of alcohol and curb tax evasion.  The Respondent argues that the setting of tax rates and institutional arrangements for tax collection and

---

[231] Resp. CM., paras. 415-424; Resp. Rej., paras. 451-453, 459.
[232] Resp. Rej., paras. 454-458.

enforcement in Romania have been to some extent exercises in "trial and error," as is to be expected from any state undergoing as profound a transition as Romania has faced since the 1989 revolution.  In the Respondent's view, the Claimants demonstrate a "complete lack of understanding of the difficulties as well as unavoidable cost and policy considerations inherent in law enforcement in this area."  The Respondent rejects the notion that it had a policy of enforcing regulations only in relation to those operators that voluntarily complied with the law, commenting that, "[t]o state that the existence of criminal activity shows that there is a policy of enforcing laws only against those that abide by the laws is nonsense."  Finally, Respondent argues that Claimants' argument regarding the "personal consumption" limits is misconceived, in that it fails to account for cultural traditions of gifting in Romania, and in any event overlooks that production within these limits is for personal use and not sale.[233]

401.    In its Rejoinder, the Respondent first emphasised that Claimants' criticisms of the ways Romania acted to enforce its laws ignores the obvious question: "What should Romania have done in order to allegedly act 'reasonably'?"  Second, it rejected the Claimants' complaint that enforcement efforts focused on scheduled inspections of registered producers, arguing that the Claimants manipulated the statistics and that in reality "customs' controls […] target […] shops, wholesalers, markets and in traffic rather than registered producers."  Relatedly, the Respondent disputes the Claimants' account of the relevant statistics regarding the size of the black market as well as the tax-gap.[234]

(2)    The Tribunal's Analysis

402.    The Claimants argue that the Respondent treated them in a discriminatory and unreasonable way, both as an aspect of the failure to provide fair and equitable treatment and as an additional violation of Article 2(3) of the Sweden-Romania BIT which provides, in addition to fair and equitable treatment, that each party: "shall not impair the management, enjoyment, use or disposal thereof [of investments], as well as the acquisition

---

[233] Resp. CM., paras. 430-438; Resp. Rej., paras. 461-463.
[234] Resp. Rej., paras. 465-468.

of goods or services or the sale of their production through unreasonable or discriminatory measures."

### a. Discrimination

403.   The Claimants argue that the Respondent breached the non-discrimination requirement "by enforcing its tax laws and regulatory requirements relating to the production of spirits as concerns the Claimants, but not as concerns all – *or even the majority* – of other operators producing and selling similar spirits on the Romanian market."[235] The Claimants also repeat the assertion that the Respondent raised taxes without providing for enforcement of those taxes, hence penalizing those who actually paid the taxes.

404.   The Respondent denies that it discriminated in this way. It argues that the Claimants are essentially complaining about the fact that taxes were raised. In essence, they want a dispensation from paying the higher taxes,[236] an assertion that the Claimants deny. The Respondent further argues that in making their discrimination claim, the Claimants are not using the right comparator. They are arguing that discrimination occurred because household producers were treated differently from industrial spirits producers, but the two groups were not in competition.[237]

405.   The question for the Tribunal is whether there was in fact differential treatment by the Respondent of the Claimants compared with other producers of spirits of a kind prohibited by the BIT.

406.   The Claimant's argument is that there is improper differential treatment between producers who pay taxes and producers who do not, described by the Claimants as "illegal operators" and "black market operators." Into this category the Claimants place all producers of spirits who do not pay taxes. The differential action of the Respondent in the enforcement of its taxation of sprits has, the Claimants argue, a discriminatory effect on its sales of its

---

[235] Cl. Mem., 544 (emphasis in original).
[236] Resp. CM., para. 416.
[237] Resp. CM., para. 422.

products. To make good this argument, the Claimants have to support their contention that the Respondent has failed to enforce its taxation laws.

407.     There are, as the Respondent points out, two quite distinct categories of spirits producers – home producers and industrial-scale producers – and the taxation basis for each is different. Home producers have a lower taxation rate. The Respondent argues that these producers are not in like circumstances with the Claimants, which are industrial producers, and thus the appropriate comparator group is other industrial producers of spirits.

408.     In the context of the FET claim, the Tribunal concluded that the Claimants failed to establish that there had been a "manifest, systematic and sweeping" rejection by Romania of its enforcement laws and regulations. The Respondent engaged in "serious and visible" enforcement of its taxation laws. Is this sufficient in the context of a discrimination claim?

409.     The Claimants do not make a separate argument about what constitutes a failure to enforce in the context of their discrimination claim, nor do they accept the Respondent's contention about there being different comparator groups. Their comparison is between those who pay taxes and those who do not. The discrimination argument depends on a blanket conclusion, asserted in the FET claim, that Romania has failed to enforce its laws. And that argument is based largely on an inference drawn from the disputed facts of non-enforcement. The Claimants' experts argue that 90% of the spirits sold in Romania are untaxed;[238] the Respondent disputes those figures, arguing that the facts are more in line with the assessment of their expert, who identifies the appropriate tax gap as being in the range of 55-80% which is in line with the tax gap in comparator countries such as Bulgaria and Hungary.[239]

410.     The Claimants suggest a variety of ways in which the Respondent could improve its enforcement system, citing what has been done in Slovakia, and suggest that inaction in enforcement by Romania reflects a deliberate choice not to enforce. The Respondent denies that there is any basis for concluding that there exists a policy not to enforce taxation laws,

---

[238] Cl. Reply, para. 41, citing to Second Expert Report of the Brattle Group, para. 166, **CER-7**.
[239] Resp. Rej., para. 195, citing to Expert Report of Wojciech Kopczuk, paras. 126-130.

and urges that enforcement has to be considered in the particular context of Romania. The Romanian situation, it argues, is characterized by a highly rural society, a low level of income, a large number of small producers, and a tradition of home-based production of plum-based spirits – *tuica* and *palinca*.

411.    The Tribunal has already concluded that the Respondent has not failed to enforce their taxation laws, in that it has devoted substantial resources to enforcement, it has engaged in controls over production activity in respect of both home production and industrial-scale production, and it has prosecuted tax evaders. While the evidence before the Tribunal undoubtedly shows that there is widespread evasion of taxes in relation to the production of spirits in Romania, it equally shows that there is a widespread pattern of enforcement activities against tax evaders. No doubt enforcement could be improved, but the evidence before the Tribunal does not admit of the conclusion that there has been a failure to enforce taxation laws against spirits producers as a group or failure to enforce against home producers or against illicit industrial-scale producers.

412.    To the extent that the Claimants are arguing that there has not been sufficient enforcement, the Tribunal has not been provided with any standard by which to measure sufficiency. The Claimants cite Slovakia, but as the Respondent's expert has shown, Romania has its unique characteristics, such as rurality, low income levels and a strong tradition of home-made spirits, that affect the extent to which enforcement, which was effective in, say, Slovakia, may be effective in the Romanian context.[240]

413.    In the end, the Claimants are saying they have been discriminated against, because some producers have avoided paying taxes on their spirits production. But that is too broad a proposition on which to found a claim of discrimination. A finding of discrimination depends, as with Claimants' other arguments, on a finding that Romania has failed to enforce its tax laws. But, as the Tribunal has concluded, the claim that there has been a failure by Romania to enforce its laws has not been substantiated. Hence the claim that there has been discrimination must also fail.

---

[240] Expert Report of Wojciech Kopczuk, paras. 86-89.

### b. Unreasonableness

414. The Claimants argue that the decision of Romania to implement steep tax increases within a short period of time without enforcing those increases against all operators was unreasonable.[241] In stating their claim in this way, and focusing on enforcement against "all" operators, the Claimants linked their unreasonableness claim directly to the claim of discrimination. As a result, the claim to unreasonableness has the same difficulties as the claim to discrimination.

415. Relying on *AES v Hungary*, the Claimants argue that to meet the test of reasonableness, government action or inaction must be taken in pursuance of a rational policy.[242] The Claimants list a variety of ways in which failing to enforce taxation laws could not be regarded as a rational policy, in particular because it left unregulated a substantial volume of spirits production with negative implications for safety and health and deprived the government of substantial revenues that could be gained from proper tax enforcement. The Claimants also argue that enhancing enforcement could have been done easily by Romania given the undisguised sales of illegal spirits, the ease of enforcement in open markets and of controlling prices by retailers.[243]

416. However, the basic premise of the Claimants' argument on unreasonableness is that the Respondent has failed to enforce its taxation laws or has enforced them against some producers but not against others. But the claim that the Respondent has failed to enforce its tax laws has been rejected by the Tribunal and thus the claim that Romania's action in the enforcement of its taxation laws was unreasonable must also be rejected.

---

[241] Cl. Mem., para. 560.

[242] Cl. Mem., para. 569, citing to *AES v Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010), paras. 10.3.7-10.3.9, **CL-46**.

[243] Cl. Mem., paras. 565 *et seq*.

C.    FULL PROTECTION AND SECURITY

(1)    The Parties' Positions

a. Claimants' Position

417.    The Claimants argue that although the Sweden-Romania BIT does not specifically provide for the full protection and security of investments ("FPS") made by investors of Contracting Parties, its Most-Favoured Nation Clause ("MFN Clause") in Article 3(1) allows investors to invoke a substantive standard of protection contained in another investment protection treaty entered into by the host State with a third party.  They therefore invoke (i) Article 4(1) of the Romania-Albania BIT, which provides that "investments by investors of either Contracting Party shall enjoy full protection and security;" and (ii) Article 3(1) of the Romania-Iran BIT, which provides that "[i]investments of investors of either Contracting Party […] shall receive the host Contracting Party's full legal protection […]."[244]  On the Claimants' case, the Respondent violated its FPS obligations.

(i)    Applicable Standard

418.    In the Claimants' view, the FPS standard imposes a positive obligation on the host State to protect investments and requires the host State to exercise reasonable care to achieve that objective.  The scope of the protection extends beyond just physical protection of real and tangible property to legal protection.  In this regard, the Claimants emphasize the explicit reference to "legal protection" in the Romania-Iran BIT.[245]

419.    In their Reply, the Claimants dispute Respondent's contention that the interpretation of the FPS standard that "favours limiting the clause to protection from physical interference by third parties is to be preferred" and should be adopted by this Tribunal.  That, the Claimants argue, is an outdated standard and fails in that it (i) does not accurately describe the standard of protection in customary international law as it has evolved into the 21st century,

---

[244] Cl. Mem., paras. 574-577, citing to "Agreement between the government of Romania and the government of the Republic of Albania for the Promotion and Reciprocal Protection of Investments, made on 11 May 1994," **C-242**, and "Agreement between the government of Romania and the government of the Islamic Republic of Iran on the promotion and reciprocal protection of investments, made on 26 January 2003," **C-243**.

[245] Cl. Mem., paras. 578-580; Cl. Reply, paras. 656-657.

and (ii) is irreconcilable with the text, context and object and purpose of the BIT provisions at issue. Moreover, the authorities relied on by the Respondent in support of its narrow interpretation of the FPS standard have been superseded by subsequent awards.[246]

420. The Claimants also reject the Respondent's contention that if the standard is not limited to physical protection, it will be "subsumed in and conflated with the obligation to provide FET." In the Claimants' view, FET and the FPS obligations are stated in many BITs as independent concepts, reflecting the intention of the drafters to recognize them as two separate and distinct obligations undertaken by a State – as tribunals have recognized.[247]

421. Equally, the Claimants object to the Respondent's argument that the protection offered in Article 3(1) of the Romania-Iran BIT "overall" is no more favourable than that offered in Article 4(1) of the Romania-Albania BIT, so that there is no treatment granted by Article 3(1) of the Romania-Iran BIT to be imported by the use of the MFN clause. In the Claimants' view, this strained interpretation disregards the clear text of Article 3(1) of the Romania-Iran BIT,[248] which makes clear that investments receive two separate guarantees ("full legal protection" as well as "fair treatment not less favourable" than treatment afforded to Romanian or other investors). Moreover, the Respondent's interpretation of Article 3(1) is not made in accordance with its ordinary meaning and in light of the treaty's object and purpose, as required by the VCLT.[249]

422. As to the content of the FPS standard, the Claimants cite a variety of holdings by prior tribunals, to emphasize, *inter alia*: (i) that FPS can be undermined by legislative and administrative action or by a failure to take reasonable preventative action (including in the face of a threat to the investor's ability to operate its business on a level playing field); (ii)

---

[246] Cl. Reply, paras. 637-642.

[247] Cl. Reply, paras. 643-648.

[248] "Agreement between the government of Romania and the government of the Islamic Republic of Iran on the promotion and reciprocal protection of investments, made on 26 January 2003," at Art. 3.1, **C-243**, ("Investments of investors of either Contracting Party effected within the territory of the other Contracting Party shall receive the host Contracting Party's full legal protection and fair treatment not less favourable than that accorded to its investors or to investors of any third State who are in a comparable situation. Neither Contracting Party shall impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment, extension, sale or liquidation of the investments of investors of the other Contracting Party.").

[249] Cl. Reply, paras. 649-655.

that FPS includes a guaranty of stability in a secure environment (including commercial and legal); (iii) that the FPS obligations apply regardless of whether the State whose conduct is under examination is underdeveloped; (iv) that the standard is an absolute one, irrespective of protections being provided by the State to its own nationals; and (v) that breach gives rise to an obligation to restore the previous situation.[250]

### (ii)    Failure to Accord FPS

423.  The Claimants argue that the Respondent's failure properly to enforce its alcohol tax laws and prevent the growth of the illegal spirits market constitutes a failure to accord FPS.

424.  On the Claimants' case, the Respondent is liable both for the deficiencies in its legislation and for deficiencies in its authorities' performance in carrying out the State's directives. Romania's actions must be compared to those of a well-administered government, and it is not credible or acceptable that a well-administered government would allow black market operators to take over an entire market.  In this regard, the Claimants emphasize that Romania established that it had an "adequate legal system" when acceding to the EU.[251]

425.  In considering the Respondent's actions, the Claimants argue that Romania has failed to exercise basic due diligence to prevent the wide-spread growth of the black market in the spirits sector. They point in this regard to their view that the illegal spirits market has accounted for approximately 90% of spirits consumption in Romania since 2005.[252]

426.  In addition, the Claimants argue that Romania also failed to provide full legal protection and security by enacting the distorted versions of the household rules, which further incentivised and facilitated the proliferation of the spirits black market, and in turn affected the Claimants' ability to operate normally on a level playing field.[253]

---

[250] Cl. Mem., paras. 581-583.  *See also* Cl. Reply, paras. 660-661.
[251] Cl. Mem., paras. 585-590.
[252] Cl. Reply, para. 662.
[253] Cl. Mem., para. 591.

124

427.    The Respondent, the Claimants contend, has failed to restore the previous situation.  The legal spirits market is now stuck at a level representing less than 10% of the total spirits consumption in Romania.[254]

428.    In their Reply, the Claimants first argue that there is no merit in Romania's argument that the Claimants should have "notified the State of the risk" of harm that could result from tax evasion and the proliferation of the black market.  In the Claimants' view, such risks are assessed by law enforcement agencies of any State and are well documented here. Moreover, the EU specifically warned Romania of the black market risk due to the increase of excise taxes. Finally, the record establishes that Romania fully understood that legal producers such as the Claimants would be severely prejudiced should Romania increase taxes but fail to enforce them, pointing in particular to express statements released by Romania.  In any event, the Claimants argue, the authorities cited by the Respondent in support of its "notification" argument are inapposite – they concern acts of physical violence against select individuals and their property, not economic and financial injury caused to an entire market on account of largescale illegal activity.[255]

429.    Second, the Claimants argue that Romania is also wrong to contend that it cannot be held responsible for the "indirect effect of actions taken by unidentified third parties."  On any interpretation, the FPS standard extends to protection against interference by third parties. Moreover, the preventive and repressive measures against third parties contemplated by the FPS standard fall within the ambit of State powers.[256]

### b.  Respondent's Position

430.    The Respondent accepts that the effect of the MFN clause in Article 3(2) of the BIT is to incorporate "higher protection[s]" contained in the Romania-Albania and Romania-Iran BITs.  However, it disputes the existence of such higher protections, rejects the Claimants'

---

[254] Cl. Mem., para. 592; Cl. Reply, paras. 668-669.
[255] Cl. Reply, paras. 662-666.
[256] Cl. Reply, paras. 670-672.

articulation of the applicable FPS standard, and denies that its actions gave rise to a breach of the FPS standard.

### (i)    Applicable Standard

431.    As to the scope of what is incorporated, the Respondent rejects the notion that the Romania-Iran BIT's reference to "full legal protection" somehow creates a higher level of protection. In the Romania-Iran BIT, there is no self-standing FET standard. Rather, Iranian investors are entitled to the protection that Romania's laws provide, as well as to fair treatment to the extent that this is granted to other investors. This overall is not treatment more favourable than that granted by the Sweden-Romania BIT to Swedish investors and therefore cannot be imported by the use of the MFN clause in Article 3(1) of the Sweden-Romania BIT.[257]

432.    As to the precise meaning of FPS, the Respondent contends that there is no "*jurisprudence constante*" among investment treaty tribunals on the scope of an FPS provision. In the Respondent's submission, the interpretation that favours limiting the clause to protection from physical interference by third parties, a reading which respects the original meaning of the clause, is the more appropriate reading of the provisions the Claimants rely on. The Respondent relies on the decisions of tribunals in *Saluka v Czech Republic*, *PSEG v Turkey*, *BG v Argentina*, and *Noble Ventures v Romania*, in support of its position. And, if the standard of FPS is not limited to protection from physical interference, the Respondent argues, then "it becomes subsumed in and conflated with the obligation to provide FET" and any consideration on this basis should be undertaken "in light of the considerations and limitations that apply to such other concepts, in particular the legitimate expectations of the Claimants."[258]

433.    In its Rejoinder, the Respondent rejects the Claimants' contention that the notion that FPS is limited to physical security is "outdated." It argues that, even if this were the case, "the

---

[257] Resp. CM., paras. 439-442; Resp. Rej., para. 469.

[258] Resp. CM., paras. 443-448, citing to *Saluka v Czech Republic*, UNCITRAL, Partial Award (17 March 2006), at para. 484, **CL-18**; *PSEG v Turkey*, ICSID Case No. ARB/02/5, Award (19 January 2007), at paras. 258-259, **CL-80**; *BG Group v Argentina*, UNCITRAL, Final Award (24 December 2007), at paras. 324-326, **RL-31**; *Noble Ventures v Romania*, ICSID Case No. ARB/01/11, Award (12 October 2005), at para. 164, **RL-45**. *See also*, Resp. Rej., paras. 475-477.

Claimants are attempting to import protection from a treaty concluded in 1994 – at the time when the alleged "evolution" was yet to take place. Thus, it is the "unevolved" protection that they are entitled to, "not an alleged customary law standard that may be something different today than what it was in 1994." In any event, the Respondent contends, there is no support for the notion of an evolved standard, and the case law, including *Crystallex v Venezuela*, does not support this notion.[259]

434.    The Respondent rejects the Claimants' contention that FPS requires a state to ensure a "level playing field." It argues that the Claimants' contention takes the standard well beyond its natural or intended remit, not just equating it with the FET standard, but going beyond it. There is no obligation on a State under investment treaties or otherwise to shield a market player from the effects of competition – or from legitimate regulatory action that may have an uneven impact on different businesses.[260]

435.    Finally, the Respondent comments that the standard of FPS protection is that of due diligence, which requires the State to "take reasonable actions within its power" to prevent harm. The protection that must be provided against the acts of third parties is not the same as the protection that a State must provide against the acts of its own organs. And whether the allegedly injured party notified the State of the risk is critical to the assessment of whether a State has breached its duty of due diligence.[261]

        *(ii)    Failure to Accord FPS*

436.    According to the Respondent, the Claimants' claim must fail. Romania has not taken any action against them, nor has it failed to prevent any third parties from taking action against them, whether on the "physical" or the "legal" plane. The Claimants' claim, arising from indirect effects of third-party action is a stretch even on the Claimants' own concept of

---

[259] Resp. Rej., paras. 472-474, citing to *Crystallex v Venezuela*, ICSID Case No. ARB(AF)/11/2, Award (4 April 2016), at paras. 632-634, **CL-145**.
[260] Resp. CM., para. 449; Resp. Rej., para. 470.
[261] Resp. CM., para. 450.

expanded "legal security." By contrast, the cases the Claimants cite all involved action taken by the State towards the investor directly.[262]

437.  With regard to the Claimants' allegations that Romania tolerated the widespread black market, and thereby failed to maintain a secure legal and commercial environment, the Respondent states that this claim fails for the same reasons as the Claimants' FET claim. In addition, it points out that there is no evidence that the Claimants ever notified Romania of the risk before 2010, when the Respondent intensified its fight against tax evasion. Moreover, the Respondent argues, even if the Tribunal accepted as applicable the standard for which the Claimants argue, the obligation would still only be one of due diligence, and there is no question that this standard has been met (and the burden lies with the Claimants to establish a failure to exercise due diligence).  The Respondent emphasizes that its efforts were increased once complaints – including those from the Claimants – were received.[263]

438.  Finally, the Respondent rejects the Claimants' allegations pertaining to the rules governing household protection of traditional spirits – these rules are reasonable in the circumstances, and, in any event, enacting different rules for different products could never constitute a failure to provide FPS.  Also rejected are the Claimants' complaints about Romania's alleged failure to restore the previous situation. In the Respondent's submission, the Claimants are not entitled to the entirely outdated tax rates from 2002.  In addition, they have provided no evidence of any "good old days" with regard to enforcement against tax evasion from which the situation deteriorated. Rather, enforcement has improved over time.[264]

### (2)    The Tribunal's Analysis

439.  The Claimants argue that an obligation to provide full protection and security, although not specifically provided for in the Sweden-Romania BIT can be imported by the MFN provision in Article 3(1) which provides:

---

[262] Resp. Rej., para. 477.

[263] Resp. CM., paras. 451-454. *See also* Resp. Rej., paras. 470, 477-482.

[264] Resp. CM., paras. 455-458. *See also* Resp. Rej., para. 470.

> *Each Contracting Party shall apply to investments made in its territory by investors of the other Contracting Party a treatment which is no less favourable than that accorded to investments made by its own investors or investors of third States, whichever is more favourable to the investor.*

440.    This has the result, the Claimants argue, that provisions on FPS can be imported from the Romania-Albania BIT and the Romania-Iran BIT.[265]

441.    Article 4(1) of the Romania-Albania BIT provides, "investments by investors of either Contracting Party shall enjoy full protection and security."

442.    Article 3(1) of the Romania-Iran BIT provides, "investments of either Contracting Party shall […] receive the host Contracting Party's full legal protection."

443.    The Respondent does not disagree in principle with the application of the MFN provision in Article 3(1) of the Sweden-Romania BIT to import provisions on full protection and security, but it disagrees with the implications that the Claimants seek to draw from it.[266]

444.    The Claimants take the view that full protection and security is not limited to physical protection, but covers "legal protection" as well which, in any event, is included specifically in the Romania-Iran BIT.[267] Such protection includes, in the view of the Claimants, protection of an investor's ability to "operate its business on a level playing field."[268] The Claimants then argue that the Respondent's failure to enforce its laws within the spirits sector has deprived it of full security and protection.

445.    The Respondent denies that full protection and security includes legal protection. It points out that the wording of the Romania-Iran BIT is, in fact, a substitute for "fair and equitable treatment" for which there is no separate provision in the BIT.[269] In any event, the

---

[265] Cl. Mem., 577.
[266] Resp. CM., para. 439 *et seq*.
[267] Cl. Mem., para. 580.
[268] Cl. Mem. para. 582.
[269] Resp. CM., para. 442.

Respondent argues that, regardless of the interpretation given, the standard is one of due diligence which it has clearly met.[270]

446.   The Tribunal accepts that the MFN provision in Article 3(1) of the Sweden-Romania BIT can bring into the relations between the Parties an obligation of full protection and security, noting that while the Parties agree on the incorporation of the FPS obligation under Article 4(1) of the Romania-Albania BIT, they disagree over the inclusion of the obligation under Article 3(1) of the Romania-Iran BIT and the nature of that obligation.

447.   However, the Tribunal does not believe that it is necessary to resolve this disagreement. The substance of the Claimants' argument is that the failure of the Respondent to enforce its taxation laws has deprived it of the level playing field for the operation of its spirits production business. Whatever view the Tribunal might take of the scope of the obligation of full protection or security, there has to be an act or omission that has denied full protection and security. And the Tribunal has already concluded that the claim that the Respondent has failed to enforce its tax laws has not been substantiated.

448.   Accordingly, the claim that there has been a violation of the obligation of full protection and security is rejected.

*          *          *

449.   The Tribunal has found no breach of Article 2(3) of the Sweden-Romania BIT, nor a breach of the provisions relating to full protection and security under the Romania-Albania BIT and the Romania-Iran BIT which the Claimant claimed were applicable by virtue of the MFN provision in Article 3(1) of the Sweden-Romania BIT. The Tribunal has also found that it has no jurisdiction to consider the Mineral Water Contract claim. Accordingly, the Tribunal has no need to address the arguments of the Claimants on whether there has been a breach of the umbrella clause in Article 2(4) of the Sweden-Romania BIT or questions of causation and damages. Equally, since there are no damages to be awarded, the question whether the Micula Brothers can bring claims in their own rights is moot.

---

[270] Resp. CM., para. 450.

## VII.  COSTS

### A.  CLAIMANTS' COST SUBMISSIONS

450.  The Claimants request the Tribunal to order Romania to pay:

    a.  the costs and expenses incurred by the Claimants in connection with these proceedings in the following amounts:

        i.  EUR 10,355,184.07;

        ii.  RON 2,422,523;

        iii.  GBP 23,372; and

        iv.  USD 6,385.

    b.  the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention.[271]

451.  The Claimants argue that the costs that they have incurred were reasonable and should be compensated in full, on a "costs follow the event basis."  Further, and, in any event, regardless of the Tribunal's findings on the merits, the Claimants argue that Romania must be ordered to bear the costs for:

    a.  its "flawed and belated jurisdictional objection relating to the CJEU's *Achmea* ruling."  The Claimants state the costs incurred in respect of this objection were in an amount of EUR 155,520.50; and

    b.  the entirety of costs arising from, and associated with, the Respondent's "unscheduled and disruptive April 2017 document production."  The Claimants

---

[271] Cl. Cost Sub., para.1.

state that the costs incurred in respect of this process were in the amount of EUR 128,833.70 and RON 150,000.[272]

### B.    RESPONDENT'S COST SUBMISSIONS

452.    The Respondent requests that the Tribunal order the Claimants to pay:

    a.    compensation to the Respondent in an amount of:

        i.    USD 450,000;

        ii.    RON 18,556,915.38; and

        iii.    EUR 1,737,824.73; and

    b.    in any event, compensation to the Respondent in an amount of RON 1,442,263.23 and EUR 42,000 in relation to the Claimants' provisional measures applications;

    c.    simple interest thereon at a rate of 2.91% per year, as from the date of the Award.[273]

453.    The Respondent argues that the general principle followed in international arbitration, including ICSID proceedings, is that the successful party is entitled to be reimbursed the costs it has incurred in connection with the arbitration proceedings.[274]

### C.    THE TRIBUNAL'S DECISION ON COSTS

454.    Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

---

[272] *See* Cl. Costs Sub., paras. 2-32.
[273] Resp. Costs Sub., para. 34.
[274] Resp. Costs Sub., para. 3.

455.    This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

456.    While both Parties argue that costs should follow the event, they also argue that there are particular circumstances in this case that justify deviating from that principle and awarding costs that take account of the conduct of the other party that led to delay in the proceedings. For the Claimants, the Respondent's late request to state an additional jurisdictional objection and its late production of documents and a supplemental expert report increased the length of the proceedings with a consequent increase in the Claimants' costs. For the Respondent, the Claimants' several requests for provisional measures and the extensions requested for filing its Reply, as well as its position on a confidentiality regime, all extended the life of the case and resulted in increasing the Respondent's costs.

457.    The Tribunal recognizes that the circumstances cited did prolong the proceedings but does not consider that they should result in an adverse costs award against either Party. Counsel for both Parties were representing their clients' interests in respect all of these matters and were entitled to do so fully. None of the circumstances raised in any way demonstrates that there was an abuse of process or that the proceedings were affected to the disadvantage of either party. Accordingly, the Tribunal finds no basis for taking these matters into account in the allocation of costs.

458.    In considering costs, the Tribunal notes that on the principal issue of liability the Respondent prevailed. That has to be taken into account in the allocation of costs. It also notes that the Respondent was successful in having jurisdiction denied in the claims in respect of the Mineral Waters Contract dispute. However, notwithstanding their opposition to the consideration of the Respondent's Additional Preliminary Objection, the Claimants prevailed in defending the challenge to jurisdiction on that point. That, too, is a factor to consider in determining costs.

459.    In respect of the costs of the arbitration – the costs of ICSID and those of the Tribunal – the fact that the Respondent prevailed on the substantive claims suggest that the Claimants should bear the large part of those costs. Taking account of all of the arguments made by

the Parties in their statements of costs, the Tribunal orders that the Claimants be responsible for 75% of the costs of the arbitration.

460.    In respect of the costs of each party, the Tribunal notes that the costs that a party incurs reflect the way in which that party perceives the case and how best to serve its interests in prosecuting or defending the case. There is no objective basis on which to determine what the costs ought to be for each party.

461.    Taking into account the arguments of the Parties, the Tribunal concludes that the Claimants should absorb their own costs and that they should contribute to 75% of the Respondent's costs and the Tribunal so orders.

462.    The Parties agree that interest should be payable on any unpaid costs award. Accordingly, the Tribunal sets the interest rate as proposed by the Respondent as 2.91% per annum (simple interest) reflecting the rate applied to Romanian sovereign bonds in 2018.

463.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):[275]

|  |  |
|---|---|
| Arbitrators' fees and expenses | |
| Professor McRae | $230,034.30 |
| Mr. Pryles | $69,151.10 |
| Mr. Beechey | $95,181.50 |
| Professor Crook | $136,745.16 |
| ICSID's administrative fees | $180,000.00 |
| Direct expenses (estimated)[276] | $152,547.88 |
| **Total** | **$863,569.94** |

464.    The above costs have been paid out of the advances made by the Parties in equal parts.[277] As a result, each Party's share of the costs of arbitration amounts to USD 431,784.97.

---

[275] The ICSID Secretariat will provide the Parties with a detailed Financial Statement of the case account once all invoices are received and the account is final.

[276] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying).

[277] The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

465.    Accordingly, the Tribunal orders the Claimants to pay the Respondent USD 215,892.49 (corresponding to 50% of the expended portion of the Respondent's advances to ICSID) and USD 337,500, RON 13,917,686.54, and EUR 1,303,368.55 (corresponding to 75% of the Respondent's legal fees and expenses).

## VIII.    AWARD

466.    For the reasons set forth above, the Tribunal decides as follows:

(1)    the Tribunal has jurisdiction over claims brought by the Claimants notwithstanding they are brought under an intra-EU State BIT, but it does not have jurisdiction over the Mineral Water Contract claim, since that dispute arose before the entry into force of the Sweden-Romania BIT;

(2)    the Claimants have failed to establish that there has been a denial of fair and equitable treatment within the meaning of Article 2(3) of the Sweden-Romania BIT;

(3)    the Claimants have failed to establish that there has been a denial of full protection and security, even if such an obligation is incorporated in the Sweden-Romania BIT by virtue of the MFN provision in Article 3(1);

(4)    accordingly, the claims of the Claimants in this arbitration relating to the liability of the Respondent are dismissed;

(5)    the Claimants shall bear 75% of the costs of the arbitration and 75% of the Respondent's legal fees and expenses, and shall therefore to pay the Respondent USD 215,892.49 (corresponding to 50% of the expended portion of the Respondent's advances to ICSID) and USD 337,500, RON 13,917,686.54, and EUR 1,303,368.55 (corresponding to 75% of the Respondent's legal fees and expenses);

(6)    the Claimants shall pay simple interest on the amounts specified in the subparagraph above at a rate of 2.91% per annum, payable from the date of the Award until full payment of the Award; and

(7)    all other requests for relief are dismissed.

_____
Mr. John Beechey CBE
Arbitrator

Date:            3 MAR 2020

_____
Professor John Crook
Arbitrator

Date:            2 MAR 2020

_____
Professor Donald McRae
President of the Tribunal

Date:            4 MAR 2020

136