# EXHIBIT 44

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**EURUS ENERGY HOLDINGS CORPORATION**

Claimant

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/16/4**

---

# DECISION ON JURISDICTION AND LIABILITY

---

**_Members of the Tribunal_**
Judge James Crawford, President
Mr. Oscar Garibaldi, Arbitrator
Prof. Andrea Giardina, Arbitrator

**_Secretary of the Tribunal_**
Ms. Celeste Estefanía Salinas Quero

_Date of dispatch to the Parties:_ 17 March 2021

**REPRESENTATION OF THE PARTIES**

*Representing Eurus Energy Holdings Corporation:*

Mr. Nicholas Lingard
Mr. Joaquín P. Terceño
Mr. Daniel Allen (until 31 March 2019)
Freshfields Bruckhaus Deringer LLP
Akasaka Biz Tower 36F
5-3-1 Akasaka, Minato-ku
Tokyo 107-6336
Japan

Mr. Peter Turner, QC
Mr. Yuri Mantilla
Ms. Claire Pauly (until 14 September 2018)
Freshfields Bruckhaus Deringer LLP
9 avenue de Messine
75008 Paris
France

Ms. Samantha Tan
Freshfields Bruckhaus Deringer LLP
10 Collyer Quay 42-01
Ocean Financial Centre
Singapore 049315

Mr. Ignacio Borrego
Ms. Ana Calvo
Freshfields Bruckhaus Deringer LLP
Torre Europa
Paseo de la Castellana, 95
28046 Madrid
Kingdom of Spain

*Representing Kingdom of Spain:*

Mr. José Manuel Gutiérrez Delgado
Ms. Irene Bonet Tous
Ms. Gabriela Cerdeiras Megias
Ms. Lorena Fatás Pérez
Ms. Ana Fernández-Daza Álvarez
Mr. Antolín Fernández Antuña
Ms. Patricia Elena Fröhlingsdorf Nicolás
Ms. Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria
Ms. Mónica Moraleda Saceda
Ms. Elena Oñoro Sainz
Ms. Amaia Rivas Kortazar
Mr. Diego Santacruz Descartín
Ms. Alicia Segovia Marco
Mr. Alberto Torró Molés
Mr. Luis Vacas Chalfoun
Abogacía General del Estado
Ministerio de Justicia del Gobierno de España
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004 Madrid
Kingdom of Spain

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................. 1

II.   PROCEDURAL HISTORY .......................................................................... 2

      A.   Commencement of the Arbitration ..................................................... 2

      B.   Tribunal's Constitution ...................................................................... 2

      C.   First Session and Parties' Pleadings ................................................. 3

      D.   The Withdrawal of Eurus Europe, the Hearing on Jurisdiction and the Merits ............ 6

      E.   Post-Hearing Matters ....................................................................... 11

      F.   The European Commission's Application to Intervene .......................... 13

      G.   Legal Authorities added Post-Hearing .............................................. 15

III.  FACTUAL BACKGROUND ...................................................................... 20

      A.   The Spanish Electricity System and the Special Regime ...................... 20

      B.   Claimant's Decision to Invest............................................................ 29

      C.   The Disputed Measures .................................................................... 34

           (1)  Law 15/2012 ........................................................................... 34

           (2)  RD-Law 2/2013 ........................................................................ 34

           (3)  RD-Law 9/2013 ........................................................................ 35

           (4)  Law 24/2013 ............................................................................ 35

           (5)  RD 413/2014 and Order IET/1045/2014 ..................................... 35

      D.   The Disputed Measures and Spanish Courts Decisions ........................ 36

IV.   THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ............................... 38

V.    JURISDICTION AND ADMISSIBILITY ...................................................... 41

      A.   First objection: The TVPEE is a taxation measure which is exempt from the scope
           of the ECT by reason of Article 21(1) of the ECT ................................ 42

           (1)  The Parties' Positions .............................................................. 42

           (2)  The Tribunal's Analysis............................................................. 46

      B.   Second objection: The Tribunal lacks jurisdiction to decide on Eurus's gross-up
           claim in relation to Japanese taxation of the award under Article 21(1) of the ECT
           ................................................................................................... 50

           (1)  The Parties' Positions .............................................................. 51

           (2)  The Tribunal's Analysis............................................................. 53

C.   Third objection: Inadmissibility of the claim for expropriation under Article 13 of the ECT .................................................................................................................... 53

(1)  The Parties' Positions ................................................................................ 54

(2)  The Tribunal's Analysis ............................................................................. 56

D.   Putative objection: Status of the Claimant as an investor for the purposes of Article 26(1) of the ECT and related issues ............................................................... 57

VI.   APPLICABLE LAW ......................................................................................... 60

(1)  The Parties' Positions ................................................................................ 60

(2)  The Tribunal's Analysis ............................................................................. 64

VII.   MERITS ............................................................................................................ 71

A.   The Expropriation Claim: Article 13(1) of the ECT ..................................... 72

(1)  The Claimant's position ............................................................................ 72

(2)  The Respondent's position ........................................................................ 74

(3)  The Tribunal's Analysis ............................................................................. 76

B.   Spain's alleged breach of Article 10(1) of the ECT, first & second sentences ........... 81

(1)  The Claimant's Position ............................................................................ 81

(2)  The Respondent's Position ........................................................................ 89

(3)  The Tribunal's Analysis ............................................................................. 95

C.   Spain's alleged breach of Article 10(1) of the ECT, third sentence ......................... 116

(1)  The Parties' Positions .............................................................................. 116

(2)  The Tribunal's Analysis ........................................................................... 119

(3)  Conclusions on Article 10(1) of the ECT ................................................ 121

D.   The EU state aid arguments .......................................................................... 121

(1)  Introduction ............................................................................................. 121

(2)  The EC's application insofar as it concerns state aid ............................... 122

(3)  The Tribunal's conclusions on state aid ................................................... 125

VIII.   DAMAGES ...................................................................................................... 134

(1)  The Parties' Positions .............................................................................. 134

(2)  The Tribunal's Analysis ........................................................................... 139

(3)  The Tax Gross-up Claim ......................................................................... 141

IX.   CONCLUSIONS ............................................................................................... 142

**SELECT TABLE OF ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| APPA | Association of Renewable Energy Producers (by its Spanish acronym: *Asociación de Productores de energías renovables*) |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| BDO Expert Report | Expert report of BDO, entitled 'Expert economic-financial report on the EURUS wind farms' of 11 April 2017 |
| BOE | Official State Journal (by its Spanish acronym: *Boletín Oficial del Estado*) |
| Brattle | Claimant's regulatory and quantum experts |
| Brattle First Quantum Report | Expert report of Brattle, entitled 'Financial Damages to Investors' dated 18 November 2016 |
| Brattle First Regulatory Report | Expert report of Brattle, entitled 'Changes to the Regulation of Wind Installations in Spain Since December 2012' dated 18 November 2016 |
| Brattle Rebuttal Quantum Report | Rebuttal report of Brattle, entitled 'Financial Damages to Eurus' dated 29 September 2017 |
| Brattle Rebuttal Regulatory Report | Rebuttal report of Brattle, entitled 'Changes to the Regulation of Wind Installations in Spain Since December 2012' dated 29 September 2017 |
| C-[#] | Claimant's Exhibit |
| CL-[#] | Claimant's Legal Authority |
| Cl. Mem. | Claimant's Memorial of 18 November 2016 |
| Cl. Rej. | Claimant's Rejoinder on Jurisdiction of 8 February 2018 |
| Cl. Reply | Claimant's Reply of 29 September 2017 |

| CNE | National Energy Commission (by its Spanish acronym: *Comisión Nacional de Energía*) |
| --- | --- |
| DCF | Discounted cash flow |
| EC | European Commission |
| ECT | Energy Charter Treaty |
| EU | European Union |
| EUR | Euros |
| Expert Report of Ernst & Young Japan | Expert report of Ernst & Young, entitled 'Japanese Taxation of Damage Compensation and Dividends Received from Foreign Subsidiary' dated 29 September 2017 |
| FET | Fair and Equitable Treatment |
| FIT | Feed-in tariff |
| Hearing | Hearing on jurisdiction and merits held on 18-23 July 2018 |
| Hearing Day [#], [page:line] [(Speaker(s))] | Transcript of the Hearing (as revised on 13 February 2019) |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| PER-89 | Renewable Energy Plan of 1989 (by its Spanish acronym: *Plan de Energías Renovables de 1989*) |
| PFER | Plan for the Promotion of Renewable Energies 2000-2010 (by its Spanish acronym: *Plan de Fomento de Energías Renovables 2000-2010*) |
| PPA | Power Purchase Agreement(s) |
| R-[#] | Respondent's Exhibit |
| RL-[#] | Respondent's Legal Authority |

| | |
|---|---|
| RAB | Regulatory asset-based |
| RAIPRE | Administrative record of electricity production facilities (by its Spanish acronym: *Registro administrativo de instalaciones de producción de energía eléctrica*) |
| RD | Royal Decree |
| RD 1432/2002 | Royal Decree 1432 of 2002, enacted on 27 December of 2002 |
| RD 2818/1998 | Royal Decree 2818 of 1998, enacted on 23 December 1998 |
| RD 413/2004 | Royal Decree 413 of 2004, enacted on 6 June 2004 |
| RD 436/2004 | Royal Decree 436 of 2004, enacted on 12 March 2004 |
| RD 661/2007 | Royal Decree 661 of 2007, enacted on 25 May 2007 |
| RE | Renewable Energies |
| Resp. C-Mem. | Respondent's Counter-Memorial of 12 April 2017 |
| Resp. Rej. | Respondent's Rejoinder of 22 December 2017 |
| RPI | Retail price index |
| Second BDO Expert Report | Expert report of BDO, entitled 'Expert report duplicating Brattle's Rebuttal Report: Financial Damages to EURUS' and 'Rebuttal Report: Changes to the Regulation of Wind Installations in Spain Since December 2012' dated 21 December 2017 |
| SPC | Special Purpose Company(ies) |
| Tribunal | Arbitral Tribunal constituted on 2 May 2016 |

## I.     INTRODUCTION AND PARTIES

1.     This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ('**ICSID**' or the '**Centre**') on the basis of the Energy Charter Treaty, which entered into force for Spain on 16 April 1998 and for Japan on 21 October 2002 (the '**ECT**'),[1] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the '**ICSID Convention**').

2.     The Respondent is the Kingdom of Spain ('**Spain**' or '**Respondent**').

3.     Initially there were two Claimants, Eurus Energy Holdings Corporation ('**Eurus Japan**'), a limited liability company incorporated under the laws of Japan,[2] and Eurus Energy Europe BV ('**Eurus Europe**') a private limited liability company incorporated under the laws of the Netherlands, wholly owned by Eurus Japan and itself the holder of shares and other interests in 13 Spanish special purpose companies ('**SPC**') which own and operate wind farms in Spain (the '**Wind Farms**'). As recited in paragraph 36 below, by Procedural Order No. 4 of 11 June 2018, the Tribunal allowed Eurus Europe's application to withdraw from the arbitration on condition as to costs attributable to its participation. As a result, the arbitration proceeded with Eurus Japan as sole Claimant.

4.     The Claimant and the Respondent are collectively referred to in this Decision as the '**Parties**', and the term '**Party**' is used to refer to either Claimant or Respondent. The Parties' current representatives and their addresses are listed above on page (i).

---

[1] Request for Arbitration, ¶¶ 1, 7, 8, 54.

[2] Request for Arbitration, ¶ 7; Eurus Japan is jointly owned by Toyota Tsusho Corporation (60 percent) and Tokyo Electric Power Company, Inc (40 percent).

## II.    PROCEDURAL HISTORY

### A.    COMMENCEMENT OF THE ARBITRATION

5.    On 19 February 2016, ICSID received a request for arbitration dated 17 February 2016, together with exhibits C-0001 to C-0023 (the '**Request for Arbitration**').

6.    On 1 March 2016, the Secretary-General of ICSID registered the Request for Arbitration and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the '**ICSID Institution Rules**').

### B.    TRIBUNAL'S CONSTITUTION

7.    The Parties agreed that the Tribunal would be constituted in accordance with Article 37(2)(a) of the ICSID Convention and would consist of three arbitrators, one appointed by each Party ('**Co-Arbitrators**'), and the third arbitrator, the President of the Tribunal, to be appointed by agreement of the Parties.[3]

8.    The Tribunal is composed of Judge James Crawford, an Australian national, President, appointed by agreement of the Parties; Mr. Oscar M. Garibaldi, an Argentine and United States national, appointed by Claimant; and Professor Andrea Giardina, an Italian national, appointed by Respondent.  Mr. Paul-Jean Le Cannu, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

9.    On 2 May 2016, in accordance with Rule 6(1) of the ICSID Arbitration Rules, the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date.

---

[3] Claimant's letters of 16 March 2016 and 25 March 2016; Respondent's communications of 21 March 2016 and 30 March 2016.

C.     **FIRST SESSION AND PARTIES' PLEADINGS**

10.     In accordance with ICSID Arbitration Rule 13(1), the Arbitral Tribunal held a first session with the Parties on 20 July 2016 via teleconference.

11.     Following the first session, on 7 September 2016, the Arbitral Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provided, *inter alia*, that the applicable Arbitration Rules are those in effect from 10 April 2006, that the procedural languages are English and Spanish, and that the place of the proceedings was to be Paris, France. Procedural Order No. 1 set out the agreed schedule for a combined jurisdictional and merits hearing.

12.     On 18 November 2016, the Claimant submitted its Memorial ('**Claimant's Memorial**'), together with exhibits C-0001 to C-0445, legal authorities CL-0001 to CL-0078; three witness statements of Mr. Masaaki Matsuoka (CW-1), Mr. Shigehito Nakamura (CW-2), and Mr. Tetsuya Suwabe (CW-3), and three expert reports prepared by Mr. Carlos Lapuerta and Mr. José Antonio García (The Brattle Group) (CE-1), by Mr. Carlos Lapuerta and Mr. Richard Caldwell (The Brattle Group) (CE-2), and by Dr. Joseph F. Rakow (Exponent) (CE-3).

13.     On 12 April 2017, the Respondent submitted its Counter-Memorial on the Merits and Memorial on Jurisdiction ('**Respondent's Counter-Memorial**'), together with exhibits R-0001 to R-0259, legal authorities RL-0001 to RL-0067, the witness statement of Mr. Juan Ramón Ayuso (RW-1), and an expert report prepared by Messrs. Gervase MacGregor, Eduardo Pérez Ruiz, David Mitchell, and Francisco Javier Espel Sesé (BDO).

14.     On 1 June 2017, the Parties submitted a joint request to the Tribunal regarding the proposed timetable for the document-production phase.

15.     On 13 June 2017, the Tribunal issued Procedural Order No. 2 concerning the Parties' Document Requests.

16.     Following exchanges between the Parties and the Tribunal, on 18 September 2017, the Tribunal confirmed that the hearing dates would be moved to 16-20 July 2018 in Paris.

17.    On 19 September 2017, the Tribunal approved the Parties' joint proposal for the amended timetable for the document production phase.

18.    On 22 September 2017, the Respondent filed exhibit R-0260, which had inadvertently not been submitted with the Counter-Memorial, as well as the corrected version of the consolidated exhibit list.

19.    On 30 September 2017, the Claimant submitted its Reply on the Merits and Counter-Memorial on Jurisdiction ('**Claimant's Reply**'), together with exhibits C-0446 to C-0481, legal authorities CL-0079 to CL-0093; supplemental witness statements of Mr. Masaaki Matsuoka (CW-4) and Mr. Tetsuya Suwabe (CW-5); rebuttal expert reports prepared by Mr. Carlos Lapuerta and Mr. José Antonio García (The Brattle Group) (CE-4), and by Mr. Carlos Lapuerta and Mr. Richard Caldwell (The Brattle Group) (CE-5), as well as an expert report of Mr. Koichi Sekiya (Ernst & Young Japan) (CE-6).

20.    Following the Claimant's communication of 19 September 2017, the Tribunal confirmed on 6 October 2017 that the Hearing would take place on 16-21, and 23 July 2018, with 24 July 2018 held in reserve.

21.    On 27 November 2017, the Tribunal approved the Parties' agreement to extend the deadline for the submission of Respondent's Rejoinder on the Merits and Reply on Jurisdiction to 22 December 2017. Accordingly, the Parties agreed to extend the deadline for the submission of the Claimant's Rejoinder on Jurisdiction to 8 February 2018. All other dates in the procedural timetable would remain unchanged.

22.    On 4 December 2017, the Secretary-General of ICSID informed the Parties that Ms. Celeste Salinas Quero had been appointed to serve as the Secretary of the Tribunal, replacing Mr. Paul-Jean Le Cannu.

23.    On 22 December 2017, the Respondent submitted its Rejoinder on the Merits and Reply on Jurisdiction ('**Respondent's Rejoinder**'), together with exhibits R-0260 to R-0339, legal authorities RL-0068 to RL-0086, the second witness statement of Mr. Juan Ramón Ayuso, and a second expert report prepared by Messrs. Gervase MacGregor, Eduardo Pérez Ruiz, David Mitchell, and Francisco Javier Espel Sesé (BDO).

4

24.     On 8 February 2018, the Claimant submitted its Rejoinder on Jurisdiction ('**Claimant's Rejoinder**'), together with exhibits C-0482 to C-0485, and legal authorities CL-0094 to CL-0111.

25.     On 28 March 2018, the Claimant filed a request to introduce into the record the award issued in *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain* (SCC Arbitration 2015/063) ('*Novenergia II*') (**CL-0112**). Additionally, the Claimant requested that the Tribunal order that 'arbitral awards involving Spain and relating to the Disputed Measures that might become publicly available before the close of these proceedings can be submitted into the record without the need to follow the procedure set out in Section 16.3 of Procedural Order No. 1.'[4]

26.     On 17 April 2018, Spain replied accepting the Claimant's requests under certain conditions and proposed to amend the procedure set out in Section 16.3 of Procedural Order No. 1 to incorporate legal authorities into the record. The Respondent also proposed to submit into the record, among others, the *Achmea* judgment of the Court of Justice of the European Union ('**CJEU**').[5]

27.     On 27 April 2018, the Claimant filed a response to Spain's letter of 17 April 2018. The Claimant rejected Spain's proposal, but it 'agree[d] to the admission of the decision in *Achmea* case.'[6]

---

[4] Claimant's letter of 28 March 2018.

[5] *Slowakische Republik (Slovak Republic) v. Achmea BV*, Case C 284/16, 6 March 2018 ('*Achmea*'). The Claimant accepted Respondent's proposal to add to the record the CJEU's *Achmea* judgment and the Tribunal permitted its addition at ¶ 7 of Procedural Order No. 3 of 17 May 2018. Ultimately, however, neither Party submitted the *Achmea* judgment as a numbered legal authority to the record. The Parties referred to the *Achmea* judgment (i) in subsequent written submissions regarding the European Commission's Application to participate as non-disputing party and Respondent's request to add into the record the Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union, (ii) in oral argument at the hearing on jurisdiction and merits, and (iii) when commenting on many of the legal authorities added to the record after the hearing that referred to *Achmea*.

[6] Claimant's letter of 27 April 2018.

**D.    THE WITHDRAWAL OF EURUS EUROPE, THE HEARING ON JURISDICTION AND THE MERITS**

28.    On 11 May 2018, the Claimant informed the Tribunal that Eurus Europe was to discontinue its claims. On the same day, the Tribunal invited the Respondent to comment on Eurus Energy Europe B.V.'s withdrawal request by 16 May 2018.

29.    On 17 May 2018, the Tribunal issued Procedural Order No. 3 concerning the admission of documentary evidence. In particular, Procedural Order No. 3 amended section 16.3 of Procedural Order No. 1, incorporating Section 16.3.3.3 so as to allow a Party to submit into the record awards or decisions that become public before the close of the proceedings and that have been rendered in cases brought against Spain in the renewable energy sector. In such case, the Party submitting the award was entitled to make comments of no more than five pages and the other Party to submit a response of the same length.  The Tribunal also admitted into the record, *inter alia*, the award issued in *Novenergia II* and the CJEU's decision in *Achmea*. Pursuant to this provision, a number of further decisions/awards were submitted into the record and the Parties were afforded an opportunity to submit comments. These comments have been duly taken into account in what follows.

30.    On 18 May 2018, Spain submitted a response to the Claimant's letter of 11 May 2018 concerning Eurus Energy Europe B.V.'s withdrawal request.

31.    On the same day, 18 May 2018, the Claimant submitted a letter noting that the Tribunal had instructed Spain to provide its comments on the discontinuance of Eurus Europe's claims by no later than close of business in Washington, D.C. on 16 May 2018.[7] Since the deadline had elapsed without a response from Spain, the Claimant argued that Spain had 'acquiesced in the discontinuance'.[8]

32.    By letter of 21 May 2018, the Tribunal informed the Parties that the issue of discontinuance of claims would be discussed during the upcoming pre-hearing organizational teleconference scheduled for 5 June 2018.

---

[7] Communication from ICSID to the Parties of 11 May 2018.
[8] Claimant's letter of 18 May 2018.

33.    On 22 May 2018, the Claimant submitted the award in *Novenergia II* and the award issued by the tribunal in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (ICSID Case No. ARB/14/1), dated 16 May 2018 ('**Masdar**') (**CL-0113**).

34.    On 1 June 2018, the Respondent filed its comments on the *Novenergia II* award.[9]

35.    A pre-hearing procedural teleconference was held on 5 June 2018, regarding the organization of the hearing to be held from 18-21 and 23 July 2018, at the International Chamber of Commerce (the '**ICC**') in Paris, France.

36.    On 11 June 2018, the Tribunal issued Procedural Order No. 4 on the withdrawal of Eurus Energy Europe B.V.'s claims. In its Procedural Order No. 4, the Tribunal, after reciting the positions of the Parties, noted that ICSID Rule 44, under which Eurus Europe had requested the withdrawal of its claims, deals with the 'discontinuance of the proceeding', but that Rule 44 is silent about partial discontinuance, such as when one party wishes to withdraw all its claims, while the proceeding continues between the remaining parties in relation to the remaining claims. The Tribunal held that it had discretion to allow partial discontinuance, based on the authority that ICSID Convention Article 44 gives to tribunals to decide questions that are not covered by the Arbitration Rules or any rules agreed by the parties.[10] As to the exercise of that discretion, the Tribunal considered that late withdrawal of a party should not be permitted if the respondent objects and can demonstrate prejudice, including the potential loss of a *res judicata* against the withdrawing party. On the other hand, the late timing of Eurus Europe's withdrawal had been explained by the Claimants and by recent developments, in particular, the *Achmea* judgment of the CJEU and the ruling of the Dutch tax authorities. Taking into account that allowing the withdrawal of Eurus

---

[9] Pursuant to Section 6 of Procedural Order No. 3 and amended paragraph 16.3.3.1 of Procedural Order No. 1, the Parties had the opportunity to comment on the award issued in *Masdar* at the hearing on jurisdiction and merits.

[10] The Tribunal referred to *Aguas Provinciales de Santa Fe S.A, Suez, Sociedad General de Aguas de Barcelona, S.A., and InterAguas Servicios Integrales del Agua, S.A. v. Argentine Republic* (ICSID Case No. ARB/03/17), Procedural Order No. 1 Concerning the Discontinuance of Proceedings with Respect to Aguas Provinciales de Santa Fe S.A., 14 April 2006; *Aguas Argentinas S.A. Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/03/19), Procedural Order No. 1 Concerning the Discontinuance of Proceedings with Respect to Aguas Argentinas S.A., 14 April 2006, and *International Company for Railway Systems (ICRS), Privatization Holding Company (PHC) v. Hashemite Kingdom of Jordan* (ICSID Case No. ARB/09/13), Procedural Order No. 1 Concerning the Discontinuance of Proceedings with Respect to Privatization Holding Company (PHC), 26 February 2010.

Europe's claims would simplify the proceedings, saving time and some costs, and that any prejudice to the Respondent was largely notional because, in any event, the Claimants had stated that they would not seek damages in favour of Eurus Europe, the Tribunal decided to allow Eurus Europe's withdrawal, subject to Eurus Japan's undertaking to comply with any order for the costs attributable to Eurus Europe's involvement in this arbitration.[11]

37.    On 12 June 2018, the Tribunal issued Procedural Order No. 5 reflecting the Parties' agreements and the Tribunal's decisions on procedural matters concerning the organization and logistical arrangements of the hearing to be held from 18-21 and 23 July 2018, at the ICC in Paris, France.

38.    On 12 July 2018, the Claimant submitted two awards as new legal authorities: *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain* (ICSID Case No. ARB/13/31), Award, 15 June 2018 ('**Antin**') (**CL-0114**) and *Antaris GmbH and Dr. Michael Göde v. Czech Republic* (PCA Case No. 2014-01), Award, 2 May 2018 ('**Antaris**') (**CL-0115**).[12]

39.    A hearing on jurisdiction and the merits was held at the ICC in Paris from 18-21 and 23 July 2018 (the '**Hearing**'). The following persons were present at the Hearing:

*Tribunal*:
 Judge James Crawford                    President
 Mr. Oscar M. Garibaldi                  Arbitrator
 Professor Andrea Giardina               Arbitrator

*ICSID Secretariat*:
 Ms. Celeste Salinas Quero               Secretary of the Tribunal

*For Claimant*:

**Counsel:**
 Mr. Peter J. Turner QC                  Freshfields Bruckhaus Deringer
 Mr. Nicholas Lingard                    Freshfields Bruckhaus Deringer
 Mr. Ignacio Borrego                     Freshfields Bruckhaus Deringer

---

[11] Procedural Order No. 4, 11 June 2018.

[12] Pursuant to Section 6 of Procedural Order No. 3 and amended paragraph 16.3.3.1 of Procedural Order No. 1, the Parties had the opportunity to comment on the awards issued in *Antin* and *Antaris* at the hearing on jurisdiction and merits.

| | |
|---|---|
| Mr. Joaquin Terceño | Freshfields Bruckhaus Deringer |
| Mr. Daniel Allen | Freshfields Bruckhaus Deringer |
| Ms. Claire Pauly | Freshfields Bruckhaus Deringer |
| Mr. Yuri Mantilla | Freshfields Bruckhaus Deringer |
| Mr. David Perrett | Freshfields Bruckhaus Deringer |

*Parties:*

| | |
|---|---|
| Mr. Hidenori Mitsuoka | Eurus Energy Holdings Corporation |
| Ms. Masako Takahata | Eurus Energy Holdings Corporation |
| Mr. Yoshito Inagaki | Eurus Energy Holdings Corporation |
| Mr. Jesse Harman | Eurus Energy Holdings Corporation |

*Witnesses:*

| | |
|---|---|
| Mr. Masaaki Matsuoka | Green Power Investment Corporation |
| Mr. Tetsuya Suwabe | Eurus Energy Holdings Corporation |

*Experts:*

| | |
|---|---|
| Mr. Carlos Lapuerta | The Brattle Group |
| Mr. José Antonio García | The Brattle Group |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. Jack Stirzaker | The Brattle Group |

*For Respondent*:

*Counsel:*

| | |
|---|---|
| Mr. Diego Santacruz Descartín | Abogacía del Estado |
| Mr. Antolín Fernandez Antuña | Abogacía del Estado |
| Ms. Mónica Moraleda Saceda | Abogacía del Estado |
| Ms. Elena Oñoro Sainz | Abogacía del Estado |
| Ms. Amaia Rivas Kortazar | Abogacía del Estado |
| Ms. Irene Bonet Tous | Abogacía del Estado |

*Party:*

| | |
|---|---|
| Ms. Carmen María Roa | IDAE |

*Witness:*

| | |
|---|---|
| Mr. Juan Ramón Ayuso | IDAE |

*Experts:*

| | |
|---|---|
| Mr. David Mitchell | BDO |
| Mr. Gervase MacGregor | BDO |
| Mr. Eduardo Pérez | BDO |
| Mr. Javier Espel | BDO |
| Ms. Susana Campos | BDO |
| Mr. Tse Chen Choi | BDO |
| Ms. Susan Blower | BDO |

*Court Reporters*:
  Mr. Trevor McGowan                    The Court Reporter
  Mr. Rodolfo Rinaldi                   D-R Esteno
  Mr. Leandro Iezzi                     D-R Esteno

*Interpreters*:
  Mr. Jesus Getan Bornn                 English-Spanish interpreter
  Ms. Amalia Thaler de Klemm            English-Spanish interpreter
  Ms. Anna Sophia Chapman               English-Spanish interpreter
  Ms. Ryoko Okamoto                     Japanese-English interpreter
  Ms. Mariko Higuchi                    Japanese-English interpreter

40.    During the Hearing, the Parties submitted the following demonstrative exhibits:

**From the Claimant**

- Claimant's Opening Submissions (not numbered); Brattle Quantum Presentation (not numbered); Brattle Regulatory Presentation (not numbered); Claimant's Closing Submissions (not numbered); Supplementary slide 28(a) to Claimant's closing submissions (not numbered).

- C-0486 (Draft RD 661/2007 of 19 March 2007).

**From the Respondent**

- Fundamental fact issues of the arbitration (not numbered); Preliminary objections on jurisdiction and admissibility (not numbered); Merits of the case (not numbered); Quantum (not numbered); BDO Presentation (not numbered); Respondent's Closing Statement (not numbered)

- R-0340 (Table in Vol. II tab 11 used in cross-examination of Mr. Caldwell); R-0341 (Table in Vol. II tab 13 used in cross-examination Mr. Caldwell); R-0342 (Table in Vol. II tab 15 cross-examination Mr. Caldwell); R-0341 (Proposal of Royal Decree regulating the activity of electricity production under the special regime and certain facilities of comparable technologies under the ordinary regime - Draft RD 661/2007 of 19 March 2007) (ENG and SPA).

### E.    POST-HEARING MATTERS

41.    On 14 August 2018, the Parties requested that the Tribunal extend the deadline to submit the reviewed transcripts until 14 September 2018.

42.    On 15 August 2018, the Tribunal approved the amended date for the submission of the agreed corrections to the transcripts by 14 September 2018.

43.    On 7 September 2018, the Respondent requested that the Tribunal extend the deadline to submit the Parties' submissions on costs until 14 September 2018. By communication of the same date, the Claimant informed the Tribunal that even though it was disappointed with the lateness of the request, it did not object to the request made by the Respondent.

44.    On 8 September 2018, the Tribunal approved the amended date for the Parties' submissions on costs.

45.    On 13 September 2018, the Respondent requested for a second extension of the deadline for the submission of the agreed corrections to the transcripts until 21 September 2018. By communication of the same date, the Claimant informed the Tribunal that it agreed with the request made by the Respondent.

46.    On the same date, the Tribunal approved the second extension to submit the agreed corrections to the transcripts by 21 September 2018.

47.    The Parties filed their submissions on costs on 14 September 2018.

48.    On 19 September 2018, the Respondent requested that the Tribunal, in view of the significant amount of costs and for the sake of transparency, order counsel for the Claimant to provide the following documents: (i) budget sent by Freshfields Bruckhaus Deringer to the Claimant regarding the legal services to be provided in relation to this arbitration; and (ii) receipt of the payments made by the Claimant for such legal services.

49.    On 20 September 2018, the Claimant requested that the Tribunal grant it leave to submit a short response to Spain's communication of 19 September 2018. By communication of the

same date, the Tribunal asked the Claimant to submit comments on the Respondent's request by 24 September 2018.

50.  On 21 September 2018, the Claimant submitted its comments on the Respondent's request of 19 September 2018.

51.  By communication of the same date, the Claimant informed the Tribunal that the Parties had agreed on the corrections to the English-language transcripts and would send them to the English court reporter in accordance with section 21.3 of Procedural Order No. 1. The Claimant also informed the Tribunal that the Parties had failed to agree on certain corrections to the Spanish-language transcripts. The Claimant requested that the Tribunal decide on certain corrections proposed by Spain to the Spanish-language hearing transcripts.

52.  On September 25, 2018, the Respondent confirmed that there was disagreement on certain issues of translation in the Spanish-language transcripts.

53.  On 9 October 2018, the Tribunal issued its decisions on the Respondent's request of 19 September 2018 and the Claimant's request of 21 September 2018.

54.  On 12 October 2018, counsel for the Claimant sent to the English court reporter, Mr. McGowan, the corrections agreed by the Parties to be entered to the English-language transcripts. On the same date and by separate email, counsel for the Claimant sent to the Spanish court reporter, Mr. Rinaldi, the corrections to the Spanish-language transcripts adopted by the Tribunal.

55.  On 16 October 2018, Mr. Rinaldi sent to the Parties and the Tribunal the final versions of the Spanish-language transcripts.

56.  By letter of the same date, the Claimant informed the Tribunal that it was prepared to submit: (i) redacted copies of the relevant pages of Freshfields' Tokyo office's bank statements, showing all relevant fund transfers received by Freshfields (with translations from Japanese to English); and (ii) a copy of the cover page of Freshfields' latest invoice to Eurus, which has been accepted but not yet paid out in the ordinary course. In addition,

the Claimant requested that Spain be required to make a reciprocal disclosure on a simultaneous-exchange basis. The Claimant also requested that before exchanging the material, Spain describe the material it intended to disclose.

57.    On 17 October 2018, the Tribunal requested that the Respondent submit comments on Claimant's letter by 19 October 2018.

58.    By communication of the same date, the Respondent requested an extension of the deadline until 22 October 2018. The Tribunal granted the extension.

59.    On 22 October 2018, the Respondent submitted its comments on the Claimant's letter of 16 October 2018.

60.    On 30 October 2018, the Claimant submitted its comments on the Respondent's letter of 22 October 2018.

## F.    THE EUROPEAN COMMISSION'S APPLICATION TO INTERVENE

61.    On 5 November 2018, the European Commission filed an Application for Leave to intervene as a Non-Disputing Party pursuant to Rule 37(2) dated 29 October 2018 (the '**European Commission's Application**'). The Commission sought leave to intervene on the applicability of Article 26 of the ECT to intra-EU disputes and on EU law on state aid as applicable law to the merits precluding an award on damages against Spain.

62.    On 6 November 2018, the Tribunal invited the Parties to submit comments on the European Commission's Application by 13 November 2018.

63.    On 8 November 2018, the Claimant submitted its observations on the European Commission's Application opposing the Application on grounds of delay, costs and its irrelevance to the case as now constituted.

64.    On 13 November 2018, the Respondent submitted its observations on the European Commission's Application, supporting the Application on grounds of its materiality to the issues before the Tribunal.

65.    On 28 November 2018, the Tribunal informed the Parties that it was minded to grant conditional leave to the European Commission's Application confined to the issue of state aid as a substantive matter. The Tribunal invited the Parties to submit further comments on the European Commission's Application on the substantive issue of state aid by 5 December 2018.

66.    The Centre received the Claimant and Respondent's comments, respectively, on 4 and 5 December 2018.

67.    On 21 December 2018, the Tribunal issued Procedural Order No. 6 on the European Commission's Application. The Tribunal granted the European Commission leave to file by 17 January 2019 a written submission on the issue of state aid. The written submission was subject to a number of conditions, including that the Commission submit by 4 January 2019 'a written undertaking that it will comply with any decision on costs ordered by the Tribunal and attributable to its intervention' (the '**Undertaking on Costs**').

68.    On 4 January 2018, the European Commission submitted a Request to alter the Tribunal's Procedural Order No. 6 dated 21 December 2018 (the '**European Commission's Request**'). The Commission requested that the Tribunal remove the condition of the Undertaking on Costs, or alternatively, that its Application for Leave to Intervene be admitted into the record instead of its proposed submission.

69.    On 9 January 2019, following an invitation from the Tribunal, each Party submitted observations on the European Commission's Request.

70.    On 16 January 2019, the Tribunal issued Procedural Order No. 7 on the European Commission's Request. The Tribunal rejected the Commission's request to waive the condition of an Undertaking on Costs but granted the Commission's request to introduce into the record the European Commission's Application instead of its proposed submission. The Tribunal invited the Parties to submit by 31 January 2019 further comments on the Commission's Application on the issue of state aid.

71.    On 17 January 2019, the European Commission informed the Tribunal that it was not in a position to comply with the Undertaking on Costs and that it would not file a written submission.

72.    Meanwhile, on 25 January 2019, the Respondent filed a request to introduce into the record as an additional legal authority a Declaration of the Representatives of the Governments of the Member States of 15 January 2019, on the legal consequences of the judgment of the CJEU in *Achmea* and on investment protection in the European Union. The declaration was signed by 22 EU Member states. The Respondent argued that the Declaration 'addresses many of the same issues relating to Spain's intra-EU jurisdictional objection.'

73.    On 31 January 2019, the Parties filed their respective comments on the European Commission's Application on the issue of state aid.  These arguments are dealt with in substance below.

74.    On 4 February 2019, the Claimant filed its objections to the Respondent's request, arguing that the Declaration would be irrelevant because there is 'no European claimant in this case, and no intra-EU jurisdictional objection'.

75.    On 7 February 2019, the Tribunal rejected the Respondent's request, observing *inter alia* 'that the Declaration is not unanimous and only deals with intra-EU disputes. On this basis, the Tribunal is of the view that the Declaration is not of such nature as to constitute a decisive factor in the Tribunal's decision.'

### G.    LEGAL AUTHORITIES ADDED POST-HEARING

76.    On 13 February 2019, Mr. McGowan sent to the Parties and the Tribunal the final versions of the English-language transcripts.

77.    On 11 April 2019, the Respondent requested that the Tribunal admit into the record the decision of the tribunal in *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Responsibility and on the Principles of Quantum, dated 30 November 2018 ('**RREEF**'). On 15 April 2019, the Claimant commented on the Respondent's request.

78.    On 17 April 2019, the Respondent submitted the *RREEF* decision into the record (**RL-0088**) (partially dissenting opinion submitted as **RL-0089**)[13] along with its comments thereon.  On 29 April 2019, the Claimant filed its comments on *RREEF*.

79.    On 29 April 2019, the Claimant requested that the Tribunal admit into the record the award of the tribunal in *Foresight Luxembourg Solar 1 S.à r.l. and others v. Kingdom of Spain* (SCC Case V(2015/150), dated 14 November 2018 ('***Greentech***') and to exempt the Parties from submitting any comments. The Claimant also requested that the Tribunal direct the Respondent to submit existing awards from arbitrations related to its renewable energy regime and to continue to submit such awards until the Tribunal should indicate otherwise. The Claimant indicated that it was aware of further awards and decisions issued in such cases that had not been made public.[14] On 3 May 2019, the Tribunal admitted the *Greentech* award into the record and issued a decision on the filing of awards and decisions. A number of other more recent awards and decisions were also submitted, and the Parties made short presentations on many of these. Those awards and decisions are indicated further below.

80.    On 5 May 2019, the Claimants introduced the *Greentech* award into the record (**CL-0116**) along with its comments thereon. On 24 May 2019, the Respondent submitted its own comments on the award.

81.    On 29 May 2019, the Respondent introduced into the record the decisions issued in *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 ('***Cube***') (**RL-0090**) and *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain* (ICSID Case No. ARB/14/11), Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019 ('***NextEra***') (**RL-0091**) and

---

[13] **RL-0089**, *RREEF*, Partially Dissenting Opinion by Prof. Robert Volterra, 30 November 2018.

[14] The Claimant referred to the Decision on Jurisdiction, Liability and Partial Decision on Quantum issued on 19 February 2019 in *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20); the Decision on Jurisdiction, Liability and Quantum Principles issued on 12 March 2019 in *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain* (ICSID Case No. ARB/14/11); and the Decision on the 'Intra-EU' Jurisdictional Objection issued on 25 February 2019 in *Landesbank Baden-Württemberg and others v. Kingdom of Spain* (ICSID Case No. ARB/15/45) ('***Landesbank***').

submitted its comments on those decisions.[15] On 11 June 2019, the Claimant submitted its own comments on those decisions.

82.     On 18 June 2019, the Claimant introduced into the record the award of the tribunal in *9REN Holding S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/15/15) dated 31 May 2019 ('**9REN**') (**CL-0117**) and submitted its comments on the award. On 2 July 2019, the Respondent also submitted into the record the award of the tribunal in *9REN* (**RL-0092**) along with its own comments on the award.

83.     On 22 July 2019, the Claimant introduced into the record the award of the tribunal in *Cube*, dated 15 July 2019[16] (**CL-0119**) and requested that the Tribunal exempt the Parties from commenting the award because it 'merely implements the Tribunal's earlier holdings on which the Parties already have commented.' The Claimant also introduced the Decision on the 'Intra-EU' Jurisdictional Objection of the tribunal *Landesbank*, dated 25 February 2019 (**CL-0118**), which had become public. The Claimant also requested that the Tribunal accept that decision without any comments from the Parties, as the sole issue addressed is the validity of the intra-EU arbitration under the ECT.[17]

84.     On 24 July 2019, the Respondent informed that it intended to submit comments on *Landesbank*.

85.     On 9 August 2019, the Claimant requested that the Respondent submit several awards issued in other arbitrations and that the Tribunal exempt the Parties from submitting comments on those awards.

86.     After further exchanges between the Parties on the matter, on 23 August 2019, the Tribunal instructed the Respondent and the Claimant to comment on the decision in *Landesbank*. The Tribunal also informed the Parties that having received their comments on the Decision

---

[15] The Respondent explained that it was not in a position to submit the *Landesbank* decision, pending a decision on confidentiality by the tribunal in that case.

[16] **CL-0119**, *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. 15/20), Award, 15 July 2019.

[17] Claimant's communication of 22 July 2019.

on Jurisdiction, Liability, and Partial Decision on Quantum issued by the tribunal in *Cube*, it saw no need for the Parties' comments on the award.[18]

87.  On 27 August 2019 and on 2 September 2019, the Respondent and the Claimant submitted their comments on *Landesbank*, respectively.

88.  On 3 October 2019, the Claimant requested that the Tribunal direct the Respondent to submit the award of the tribunal in *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain* (ICSID Case No. ARB/15/36), dated 6 September 2019 ('**OperaFund**'). On 7 October 2019, the Tribunal invited the Respondent to submit the award in *OperaFund* and invited the Parties to submit comments thereon.

89.  On 10 October 2019, the Respondent submitted the award in *OperaFund* (**RL-0093**) (dissenting opinion submitted as **RL-0094**)[19] along with its comments thereon. On 23 October 2019, the Claimant submitted its comments.

90.  On 9 December 2019, the Claimant requested that the Tribunal direct the Respondent to submit the decision of the tribunal in *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/16), dated 2 December 2019 ('**BayWa**') and the award of the tribunal in *Stadtwerke München GmbH, RWE Innogy GmbH, and others v. Kingdom of Spain* (ICSID Case No. ARB/15/1), dated 2 December 2019 ('**Stadtwerke**').

91.  On 23 December 2019, the Respondent submitted the decision in *BayWa* (**RL-0095**) (dissenting opinion submitted as **RL-0096**)[20] and the award in *Stadtwerke* (**RL-0097**) (dissenting opinion submitted as **RL-0098**)[21] along with its comments thereon. On 9 January 2020, the Claimant submitted its comments on the decision and the award. The Claimant also submitted the award of the tribunal in *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38), dated 31 July 2019 ('**SolEs**') (**CL-0120**)[22] and

---

[18] Tribunal's communication of 23 August 2019.

[19] **RL-0094**, *OperaFund*, Dissent on Liability and Quantum by Prof. Philippe Sands, Q.C., 13 August 2019.

[20] **RL-0096**, *BayWa*, Dissenting Opinion by Dr. Horacio Grigera Naón (undated).

[21] **RL-0098**, *Stadtwerke*, Dissenting Opinion by Prof. Kaj Hobér, 20 November 2019.

[22] **CL-0120**, *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38), Award, 31 July 2019.

suggested that further comments on the award and other decisions were not necessary. On 9 March 2020, the Respondent indicated that it did not oppose the suggestion of the Claimant, but added that it wished to submit the award rendered in the *PV Investors v. Kingdom of Spain* with comments, unless the Tribunal were to decide that there was no need for such comments from either Party. On 10 March 2020, the Claimant responded that it did not object to Spain's submitting the *PV Investors v. Spain* award to the record but that it did not believe that comments on this award by the Parties were warranted. On 12 March 2020, the Tribunal thus admitted the award in *SolEs v. Spain* and the award in *PV Investors v. Spain* into the record without comments and invited Spain to submit the latter award as a numbered legal authority. Spain did so on 13 March 2020.[23]

92.    On 17 June 2020, the Respondent requested leave to submit without comments the *Decision on the Kingdom of Spain's Application for Annulment rendered on 11 June 2020 in the ICSID Case No. ARB/13/36 Eiser Infrastructure Limited and Energía Solar Luxembourg S.á r.l. v. Kingdom of Spain*. The Claimant did not oppose this decision being added to the record. Thus, the Tribunal admitted the Annulment Decision into the record without comments. Spain submitted the Decision on 25 June 2020.[24]

93.    On 20 October 2020, the Respondent submitted the decision in *Cavalum SGPS, S.A. v. Kingdom of Spain* (ICSID Case No. ARB/15/34), Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020 ('***Cavalum***') (**RL-0102**)[25] (dissenting opinion submitted as **RL-0103**)[26] along with its comments thereon. On 3 November 2020, the Claimant submitted its comments.

---

[23] **RL-0099**, *PV Investors v. Kingdom of Spain* (UNCITRAL Arbitration PCA Case No. 2012-14) Award, 28 February 2020, with Concurring and Dissenting Opinion of Prof. Charles N. Brower, 28 February 2020 (**RL-0100**).

[24] **RL-0101**, Annulment proceeding between Eiser Infrastructure Limited and Energia Solar Luxembourg S.á r.l. (claimants) and the Kingdom of Spain (applicant-respondent) (ICSID Case No. ARB/13/36), Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020.

[25] **RL-0102**, *Cavalum SGPS, S.A. v. Kingdom of Spain* (ICSID Case No. ARB/15/34), Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020.

[26] **RL-0103**, Dissenting Opinion by Mr. David R. Haigh Q.C., 31 August 2020.

### III.    FACTUAL BACKGROUND

94.    The factual background below contains a summary of relevant facts, some of which are disputed between the Parties. This summary does not seek to include all the facts submitted in this proceeding and is without prejudice to the full factual record that has been considered by the Tribunal.

### A.    THE SPANISH ELECTRICITY SYSTEM AND THE SPECIAL REGIME

95.    Spain characterizes the Spanish electricity system ('**SES**') as 'an economic, technical and legal system' comprising the 'set of activities aimed at ensuring the supply of electricity in the Spanish territory.'[27] The main objective of the SES is to ensure that all consumers have access to electricity in conditions of equality and quality, with electricity produced at the lowest possible cost while having regard to environmental protection.[28]

96.    Spain explains that participation in the SES is provided for in regulations, which should be understood having regard to the hierarchy of norms within the Spanish legal system. In descending order, these are: The Constitution, Laws, Royal Decree-Laws, Royal Decrees, and Ministerial Orders, subject to the qualification that EU law is part of the Spanish legal system and its implementation is subject to the ultimate jurisdiction of the European courts.[29]

97.    The EU policy on energy and environment, aligned with the Kyoto Protocol,[30] sets targets that Spain, as a member state, is required to meet.[31] Spain contends that Directive

---

[27] Resp. C-Mem., ¶ 245.

[28] Resp. C-Mem., ¶ 271.

[29] Resp. C-Mem., ¶¶ 248-255.

[30] Kyoto Protocol to the United Nations Framework Convention on Climate Change (adopted 11 December 1997, entered into force 16 February 2005) 2303 UNTS 162.

[31] Resp. C-Mem., ¶¶ 304, 305.

2001/77/EC[32] recognized the need to provide state aid to renewable energy ('**RE**') in accordance with Community guidelines on state aid for environmental protection.[33]

98.    In the interpretation of the European Commission, such state aid is intended to cover the difference between the cost of producing energy and the market price, including a fair return on capital. But such state aid should not give rise to over-remuneration.[34] The Claimant disagrees with Spain's reference to the 2001 Directive, which creates the impression that the regime established under RD 2818/1998 (under which the Claimant made part of its investment) was limited in time as financial incentives were set to cease once an alleged reasonable return was reached.[35]

99.    The generation of electricity from RE sources was regulated in Law 40/1994,[36] implemented by RD 2366/1994,[37] of 9 December 1994. The Parties agree that Law 40/1994 set out a two-tiered system with an 'Ordinary Regime' and a 'Special Regime' of remuneration and that Law 54/1997,[38] enacted in November 1997, maintained this two-tiered system.[39] The Claimant explains that in this two-tiered system, Special Producers classified as 'ordinary' were subject to a free market pricing system (*i.e.* required to sell their energy on the market through a pooling system) and Special Producers qualifying for the Special Regime, including the Wind Farms, were entitled to receive additional remuneration.[40] In particular, Law 54/1997, section 30(4) set out criteria for the

---

[32] **RL-0015**, Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal market in electricity, published in the Official Journal of the European Union on 27 October 2001.

[33] The 2001 Directive was replaced by **R-0065**, Community Guidelines on State Aid for Environmental Protection 2008/C 82/01, European Commission, published in the Official Journal of the European Union on 1 April 2008, which is to similar effect.

[34] Resp. C-Mem., ¶¶ 311-314; **RL-0021**, Final Commission Decision C(2016) 7827, 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN) – Czech Republic.

[35] Cl. Reply, fn. 63, referring to Resp. C-Mem., ¶¶ 400, 402, 404.

[36] **R-0070**, Law 40/1994 on the regulation of the National Electricity System, 30 December 1994.

[37] Resp. C-Mem., ¶¶ 316, 343.

[38] **R-0003**, Law 54/1997, on the electric power sector, 27 November 1997.

[39] Cl. Mem., ¶ 41; Resp. C-Mem., ¶ 259.

[40] Cl. Mem., ¶ 41.

determination of premiums 'so as to achieve reasonable profitability rates with reference to the cost of money on capital markets.'[41]

100.    Spain submits that the Special Regime, created with RD 2366/1994, is based on the principle of reasonable return. A reasonable rate of return involves receiving revenues sufficient to recover the investment costs, operating costs, and make a return in line with market criteria. The methodology involves (i) a standard facility, recognizing and reconstructing an economic operating structure, identifying the investment, operating and maintenance costs according to market criteria and with the performance of a 'diligent investor' and (ii) setting a target for the economic return for a given period of time, which is dynamic, balanced and proportionate, in accordance with the capital market. This target should be achieved through the sum of a) the market price and b) subsidies. Spain submits that it has historically used this methodology in its Plans for Promotion of Renewable Energies ('**PFER**') of 1986,[42] 1989,[43] 2000-2010[44] and 2005-2010.[45]

101.    Spain explains that until 1997, the SES was a regulated system, in which the government established the price of electricity and compensated the electricity producers for the costs of generation, transmission, and distribution. Law 54/1997 began to deregulate the SES as a result of EU requirements to encourage competition and the efficiency of the electricity sector.[46]

102.    Spain argues that the Tribunal should analyse the changes introduced to the SES taking into account the principle of economic sustainability. That principle justifies the regulatory

---

[41] **C-0004** or **R-0003**, Law 54/1997, Art. 30(4). The Claimant and the Respondent relied on the same English translation of Law 54/1997, taken from a 2008 publication by the *Comisión Nacional de Energía*. The Tribunal also uses said translation, and notes that the translation corresponds to Law 54/1997 as amended by Law 17/2007 of 4 July 2007 and Royal Decree 7/2006 of 23 June 2006. In what respects to Art. 30(4) on the determination of the premiums, the language "reasonable profitability rates with reference to the cost of money on capital markets" (present also in the version of Law 54/1997 published in *the Boletín Oficial del Estado* on 28 November 1997) remained until Art. 30(4) was amended by RD-Law 9/2013.

[42] **W-R-0260**, PFER 1986.

[43] **R-0083**, PFER 1989.

[44] **R-0118**, PFER 2000-2010.

[45] **R-0119**, PFER 2005-2010; Resp. C-Mem., ¶¶ 335-346.

[46] Resp. C-Mem., ¶¶ 256-261.

intervention in the income and costs of the SES, including the costs of subsidizing RE.[47] This intervention, however, is limited to ensuring RE producers a reasonable return according to the cost of money in the capital market, pursuant to Article 30(4) of Law 54/1997.[48] This return, Spain argues, was linked to the construction and operating costs of the plants.[49]

103.    The meaning of the standard of 'reasonable profitability rates' (or what Spain in its submissions calls 'reasonable rate of return') in Law 54/1997 and subsequent regulation is an important point of controversy. The Claimant disagrees with Spain's proposition that the inclusion of the language 'reasonable profitability' in Article 30(4) of Law 54/1997 has the meaning that Spain *now* wishes to attribute to it, *i.e.* that incentives for existing facilities were always subject to an undefined cap to keep them consistent with said language. For the Claimant, a guarantee of a reasonable rate of profitability means that minimum levels of profitability were to be assured, not that profitability would be capped.[50]

104.    The Claimant notes that years later when Spain used the language 'reasonable rate of return' in an implementing regulation, namely, in Article 44(3) of Royal Decree 661/2007 ('**RD 661/2007**')[51] which governs the conditions for updating and review of incentives available to special procedures, said provision expressly clarified that revisions would not apply to existing facilities:

> 3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system,

---

[47] Resp. Rej., ¶ 188.

[48] Resp. Rej., ¶¶ 185-188.

[49] Resp. C-Mem., ¶ 388(c).

[50] Hearing Day 1, p. 49, ll 17-23 (Mr. Lingard).

[51] **R-0101** or **C-0008**, Royal Decree 661/2007 of 25 May, regulating the production of electrical energy under the Special Regime.

> and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.
>
> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[52]

105.   For the Claimant, the inclusion of what it characterizes as a 'stabilization clause' in Article 44(3) of RD 661/2007 immediately after the discussion of guaranteeing reasonable rates of profitability according to the cost of money in the capital markets, is explained by the fact that if Spain had said in Law 54/1997 that overall investments were subject to an undefined cap on investment returns, Spain simply would not have attracted the investment it hoped to attract. The Claimant would not have invested in Spain, much less expanded its investment over the years.[53]

106.   The Claimant also supports its position on the meaning of 'reasonable rate of return' referring to the language of Article 36 of RD 661/2007, regulating the relationship between the remuneration to receive and the passage of time. The Claimant notes that the regulated tariff would be maintained at one level for 15 years, and then reduced but still available 'thereafter.' The use of the word 'thereafter,' the Claimant submits, means an indefinite period, without any indication that the incentives would be capped once the facility had reached a target rate of return.[54]

107.   In December 1998, Spain enacted RD 2818/1998 which implemented Law 54/1997. Under Article 18 of RD 2818/1998, Special Producers were entitled, among other things:

> [To] [t]ransfer to the system through the electricity distribution company their output or surpluses of electricity provided that it is technically possible for them to be absorbed into the network and to

---

[52] Hearing Day 1, p. 49, ll 6-25 (Mr. Lingard); p. 50, citing **C-0008** (or **R-0101**), RD 661/2007, Art. 44(3).

[53] Hearing Day 1, p. 51, ll 1-7 (Mr. Lingard).

[54] Hearing Day 1, p. 48, ll 23-25 (Mr. Lingard); p. 49, ll 1-5 (Mr. Lingard); Cl. Reply, ¶ 246.

receive for it the wholesale market price plus the incentives provided for in the economic arrangements made under this Royal Decree.[55]

108.    RD 2818/1998, like RD 2366/1994, provided that Ordinary and Special Regime producers should register in an administrative registry, later denominated the Administrative Record of Electricity Production Facilities ('**RAIPRE**').[56] The Parties disagree on the legal consequences of registration.  Spain contends that the creation of the RAIPRE shows the intention of the regulator to monitor compliance with the targets set out in Spain's energy plants.[57] The Claimant argues that registration in RAIPRE entitled Special Producers to certain incentives, as set out in Article 23 of RD 2818/1998, subject to modification every four years based on defined criteria.[58]

109.    In particular, RD 2818/1998 set out a feed-in tariff ('**FIT**') to be calculated using market prices as a base with a premium to be added. The premium for wind power facilities with less than 50 MW installed capacity was 5.26 pesetas per kWh, which, combined with the market price, would be the price that Special Producers could receive. Special Producers were also given the option to receive a fixed rate of 11.02 pesetas per kWh. As noted, the premiums would be subject to review every four years.

110.    The listed criteria to be applied in the quadrennial review of premiums did not include 'a quantitative limit on the amount of remuneration a facility could receive.'[59] Spain contends, however, that since the premiums were subject to review, 'no investor could undertake an investment trusting in the grandfathering of the remunerative regime established by RD 2818/1998.'[60]

111.    In 1999 Spain approved the PFER 2000-2010,[61] which established the economic conditions and methodologies to determine the remuneration of the Special Regime. The Plan defined for each RE technology different 'standard facilities'. Each standard facility was subject to

---

[55] Cl. Mem., ¶ 43, citing **CL-0005**, RD 2818/1998, Art. 18.

[56] Resp. C-Mem., ¶¶ 406-408, referring to **R-0101**, RD 661/2007, which introduced the acronym.

[57] Resp. C-Mem., ¶¶ 406, 408.

[58] Cl. Reply, ¶ 57.

[59] Cl. Reply, ¶ 62.

[60] Resp. C-Mem., ¶ 411.

[61] **R-0118**, Plan for the Promotion of Renewable Energies 2000-2010.

standards of investment costs, operating costs, useful life, hours of rewarded production, and market price. The Respondent contends that, applying that methodology, a standard facility would reach within its useful life a reasonable rate of return, according to the cost of money in the capital market.[62]

112.    In 2002, Spain enacted RD 1432/2002.[63] According to the Claimant, the preamble of RD 1432/2002 expressly acknowledged the importance of 'send[ing] out signals of stability' to prospective investors.[64] Spain explains that the tariff or the premium and the incentive, depending on the case, consisted of a multiple of the average electricity tariff ('**TMR**'). The TMR, or what Claimant's describes as the 'reference tariff' was defined in RD 1432/2002.[65] Article 4 of RD 1432/2002 provided for the reference tariff to be calculated according to a formula that took into account various costs and considerations. For the Claimant, the relevance of RD 1432/2002 was that it stabilized the calculation of incentives under the Special Regime by anchoring them to the TMR or 'reference tariff.'[66]

113.    In 2004, Spain enacted RD 436/2004.[67] Article 22 of that RD provided Special Producers with the option of (i) selling RE electricity at a regulated tariff or (ii) selling RE electricity at the market price, receiving the pool price and an additional premium and an incentive for each sale. For wind power facilities with installed capacities above 5 MW the premium and incentive were fixed at 40% and 10%, respectively. The Claimant describes RD 436/2004 as 'further improv[ing] the remuneration scheme for [RE] facilities.'[68]

114.    Spain contends that, subject to the principle of economic sustainability and reasonable return, RD 436/2004 repealed RD 2818/1998 to achieve by 2011 the objectives of the PFER.[69] Accordingly, RD 436/2004 fixed the subsidies using the calculation methodology set out in the PFER to grant producers a reasonable rate of return with reference to a

---

[62] Resp. C-Mem., ¶¶ 412-420.

[63] **C-0006** or **R-0099**, RD 1432/2002, of 27 December 2002.

[64] Cl. Mem., ¶ 105, citing **C-0006** (or **R-0099**), RD 1432/2002, Preamble.

[65] Resp. C-Mem., ¶¶ 427, 455.

[66] Hearing Day 1, p. 42, ll 1-17 (Mr. Lingard).

[67] **C-0007**, RD 436/2004, of 12 March 2004.

[68] Request for Arbitration, ¶ 16; Cl. Mem., ¶ 45.

[69] Resp. C-Mem., ¶¶ 420, 421.

standard facility, but did not grant an indeterminate profitability.[70] The Claimant disagrees with this reading of RD 436/2004, as its preamble '*guarantees* the operators of special regime facilities reasonable remuneration for their investments.'[71] In Claimant's view '[i]t would not make sense to describe "reasonable remuneration" as a "guarantee" if it had in fact been an upper limit.'[72]

115.    Under RD 436/2004, wind producers could annually choose between (i) a fixed tariff calculated as a percentage of the TMR ('**Fixed Tariff**') and (ii) the pool price plus a premium and an incentive ('**Premium Option**'). Further, Spain explains that the premium given to RE installations under RD 436/2004 was a percentage of the TMR. This meant that, if the installed power increased, the costs associated with the production of RE subject to the Special Regime also increased. This led to an increase of the TMR,[73] which led in turn to an increase in the Special Regime production costs, because the tariffs and premiums were a percentage of the TMR. RD 436/2004 thus 'caused perverse effects for the sustainability of the SES.'[74] Among other factors, an increase in oil prices caused an increase in the price of energy as high as 50-60 Euros/MW. This led to a situation where most facilities opted for remuneration according to the market price plus a premium, obtaining much higher returns than those envisaged by the regulator.[75] This situation led to the approval of RD-Law 7/2006, the preamble of which highlighted the inefficiency of the then-current remuneration system.[76]

116.    In 2005, Spain revised the PFER by adopting the PFER 2005-2010, which used the same methodology as the PFER (with reference to standard facilities) to calculate subsidies necessary to cover the investment and operating costs and to reach a return on the project

---

[70] Resp. C-Mem., ¶¶ 421(b), 423.

[71] Cl. Reply, ¶ 68, citing **C-0007**, RD 436/2004, preambular ¶ 7 (emphasis added by Claimant).

[72] Cl. Reply, ¶ 68.

[73] Resp. C-Mem., ¶ 455, citing Witness Statement of Mr. Ayuso, ¶¶ 32-37.

[74] Resp. C-Mem., ¶ 454.

[75] Resp. C-Mem., ¶ 458.

[76] Resp. C-Mem., ¶ 459.

close to 7% before tax through a useful life set for wind farms at 20 years.[77] Spain contends that the RE sector was aware of the profitability limits set by this methodology.[78]

117.  In 2007, Spain enacted RD 661/2007, implementing RD-Law 7/2006. The Claimant characterizes RD 661/2007 as the final update of the Special Regime before the Disputed Measures.[79] Spain characterizes it as a measure 'to eliminate the perverse effect that the previous system, based on the TMR, produced for the SES' economic sustainability.'[80]

118.  Under Article 24 of RD 661/2007, Special Producers could sell their energy in the pool market and then receive an additional premium, or they could opt to receive a fixed regulated tariff. The incentives available to wind power producers would be updated annually according to the national retail price index ('**RPI**'),[81] instead of the TMR.[82] Article 27(2) set a 'reference premium' to which the premiums to be determined would be tethered, so that future premiums would fall within a predefined range, depending on the type of facility in question.[83]

119.  Spain explains that, for wind technologies, the First Transitional Provision of RD 661/2007 established a transitional period until 31 December 2012. That is, the wind facilities that had opted under RD 436/2005 to sell electricity at a market price plus a premium would continue to receive premiums based on that method until 31 December 2012, but with premiums not updated after 2006 (because RD-Law 7/2006 froze the updating of premiums under the TMR). Thereafter, they would be subject to RD 661/2007.[84]

---

[77] Resp. C-Mem., ¶ 452; Resp. Rej., ¶ 355.
[78] Resp. Rej., ¶ 358.
[79] Cl. Reply, ¶ 69.
[80] Resp. C-Mem., ¶ 473.
[81] Cl. Mem., ¶¶ 46, 116.
[82] Resp. C-Mem., ¶ 474.
[83] Cl. Mem., ¶ 46.
[84] Resp. C-Mem., ¶¶ 477, 478.

## B.    CLAIMANT'S DECISION TO INVEST

120.    The Claimant began its development and investment in Spain's RE in 1997, as one of the enterprise divisions of Tomen Corporation ('**Tomen**'), now Toyota Tsusho Corporation.[85] The Claimant, Eurus Japan, is Tomen's power business branch. Eurus Japan is 60% owned by Toyota Tsusho Corporation and 40% by Tokyo Electric Power Company Holdings, Inc. ('**TEPCO**').[86]

121.    The Claimant's investment in Spain consists of shares in 13 SPCs,[87] held indirectly through its wholly owned subsidiary, Eurus Europe. These SPCs in turn own and operate 21 different wind projects in Galicia and Asturias:

- **Eos Pax IIa SL** (projects Paxareiras I and IIA, both approved on 7 March 1997),

- **Parque Eólico de Barbanza SA** (project Barbanza, approved on 7 March 1997),

- **Parque Eólico de Vicedo SL** (project Vicedo, approved on 5 September 1997),

- **Parque Eólico de A Ruña SL** (project Paxareiras II F, approved on 17 July 1998),

- **Parque Eólico de Virxe do Monte SL** (project Paxareiras II C, approved on 17 July 1998),

- **Parque Eólico de Ameixenda Filgueira SL** (Paxareiras II D & E, approved on 10 August 2000),

- **Parque Eólico de Adraño SL** (project Paxareiras II B, approved on 9 May 2001),

- **Parque Eólico de Currás SL** (Paxareiras II F+, approved on 9 May 2001),

---

[85] In its Memorial, the Claimant recounts that in 1992, when Eurus was still part of Tomen's power business, Tomen partnered with SeaWest España, the Spanish subsidiary of SeaWest, a United States company specializing in wind power. Tomen and SeaWest España set out to explore the Spanish wind industry with focus on sites in Galicia and Asturias. See Cl. Mem., ¶¶ 49, 50, 54.

[86] Cl. Mem., ¶¶ 3, 19.

[87] Cl. Mem., Appendix II.

- **Parque Eólico de la Bobia y San Isidro SL** (project BSI, approved on 25 July 2001),

- **Parque Eólico de Deva SL** (project Deva, approved on 18 February 2002),

- **Parque Eólico de Tea SL** (project Tea, approved on 18 February 2002),

- **Parques Eólicos de Buio SL** (projects Buio, Rioboo, Gamoide, all approved on 25 February 2005, projects Fonteavia and Bidueiros, both approved on 26 December 2005), and

- **Parque Eólico de Abara SL** (projects Alto de Abara, approved on 24 May 2006, and Grallas, approved on 22 February 2008).

Claimant's indirect shareholding in the SPCs is shared with the Spanish conglomerate Acciona S.A. ('**Acciona**').[88]

122.    Although wind power offers certain benefits compared to fossil-fuel energy generation methods, wind power is expensive to produce because of its substantial construction costs.[89] Hence, according to the Claimant, governments like Spain have often provided incentives to render wind power a competitive investment option for energy producers. FITs enable energy producers to receive payment for the energy generated, taking into account the producer's costs, rather than solely the market price for electricity. FITs allow energy production methods that have higher costs, like wind power, to achieve predictable and stable profitability.[90] The Claimant alleges that Spain's special incentives, including FITs, were the primary reason why the Claimant invested in Spain.[91]

123.    The Claimant explains that in the process of making and expanding its investment in Spain, it followed internal protocols called in Japanese the *ringi* system, materialized in a comprehensive document called *ringi-sho*, to evaluate potential investment opportunities

---

[88] Cl. Mem., ¶¶ 21, 22.

[89] Cl. Mem., ¶¶ 30-32.

[90] Cl. Mem., ¶ 33.

[91] Cl. Mem., ¶ 34.

30

and to decide whether to proceed with them. The Claimant followed the *ringi* system before committing to investing in each of its wind farms in Spain, and also consulted external financial advisors.[92]

124.    In 1994, Spain enacted Law 40/1994, implemented by RD 2366/1994, creating a Special Regime for RE energy producers, which adopted differential tariff levels taking into account the specific conditions of RE producers.[93]

125.    In 1995, the Ministry of Industry and Commerce of Galicia ('**Xunta**') published a plan to allow the development of 2.550 MW of wind power in Galicia. Galicia called for interested investors to submit development plans. In January 1996, Galicia approved the development plan submitted by SeaWest España, which had set out its intention of partnering with Tomen.[94]

126.    In March 1996, the then President of the Xunta visited Japan, where it met representatives from Tomen at the Spanish Embassy in Tokyo.  In his witness statement, Mr. Matsuoka affirms that the President of the Xunta guaranteed that Galicia would actively support wind power investment.[95] The Parties disagree about the value that is to be given to the alleged assurances of the President of the Xunta. Spain argues that this official, as a representative of an Autonomous Community, had no competence to create obligations of Spain regarding the SES.[96]

127.    In July 1996, Tomen and SeaWest España entered into a Joint Development Agreement to conduct their business in Spain through the joint venture company EuroVento SL ('**EuroVento**').

128.    In February 1997, the Xunta granted Special Producer status to EuroVento for its first project under the development plan. This status qualified EuroVento to receive the benefits of the Special Regime. In March 1997, the Xunta granted administrative authorization for

---

[92] Cl. Mem., ¶¶ 24-26.
[93] Cl. Mem., ¶ 55.
[94] Cl. Mem., ¶¶ 56-59.
[95] Cl. Mem., ¶ 62.
[96] Resp. C-Mem., ¶¶ 1020-1023.

EuroVento's project. In May 1997, financial advisors commissioned by SeaWest España and Tomen issued a preliminary financial memorandum to attract financing for the project. The memorandum set out the advisor's independent view of the Special Regime, stating that 'a major adverse change in the Government's policy towards renewable energy generally, and wind energy in particular, is highly unlikely in the foreseeable future.'[97]

129.  The Claimant says that the Special Regime was the primary reason for Tomen to decide to invest in Spain, with the expectation that Spain's commitments to the promotion of RE was reliable and durable. The Claimant further states that, even if Spain were to change the Special Regime, the Claimant expected that those changes would not retroactively affect existing wind power plants.[98] In March 1997, Tomen decided to invest in Spain, in what became the Paxareiras I and II A wind power facilities.[99]

130.  Between 1997 and 2008, the Claimant made a series of investments, in each case through Eurus Europe, in Spanish wind farms.[100] In all but two cases, Eurus's interest in the operating SPCs was 50%; in one it was 12.5%; in another, it was 48.5%. These investments were approved and made under the auspices of successive Spanish laws (Law 40/1994, replaced by Law 54/1997) and Royal Decrees (RD 2366/1994; RD 2818/1998; RD 436/2004; and RD 661/2007). The Parties dispute the impact of these various changes, and the Tribunal will return to that issue in due course. But despite these fluctuations, the Special Regime instituted by these laws and decrees retained the character of a system in which the remuneration of renewable energy producers included a subsidy over the market price.

131.  Starting in 2005, however, the SES began to show an increasing deficit, which over time grew substantially. By 2013, the accumulated deficit was almost EUR 30 billion.[101] The Parties disagree on the causes of the deficit. The Respondent takes the view that the main cause of the deficit was the extent of subsidies payable to producers under the Special

---

[97] Cl. Mem., ¶ 67, citing **C-0045**, First Babcock Memorandum, May 1997, ¶ 11.7.

[98] Cl. Mem., ¶ 69.

[99] Cl. Mem., ¶ 70.

[100] Cl. Mem., ¶¶ 65-123; Cl. Mem., Appendix II.

[101] Resp. C-Mem., ¶ 898.

Regime. The Claimant contends that the main cause was Spain's reluctance to transfer to consumers the full cost of the system. Whatever the causes, the accumulated deficit and other factors would lead in 2012-2014 to a significant change in Spanish policy with regard to the calculation of subsidies.[102]

132.    What the Claimant describes as a 'temporary precursor' to this overhaul was RD 1614/2010, which imposed production limits on and temporarily reduced incentives for, *inter alia*, wind power facilities.[103] Under Article 2 of RD 1614/2010, the energy produced above specified limits would not qualify for financial incentives. In relevant part, Article 2(4) provided:

> 4. For wind technology facilities on land, the number of benchmark equivalent hours will be 2,589 hours/year when, in a calendar year, the median annual operational hours of all the wind technology facilities on land with a definitive registration […] exceed 2,350 hours/year.
>
> For facilities registered definitively in the administrative Register of production facilities operating under the special system […] on 7 May 2009 […] the benchmark values for annual equivalent hours, 2,350 and 2,589 hours/year, cannot be revised during their operational life.

133.    Spain explains that RD 1614/2010 was adopted to guarantee the economic sustainability of the SES and resolve certain inefficiencies regarding wind and other technologies, as stated in its preamble.[104] In Spain's view, this showed that RE producers were aware that the economic sustainability of the SES could prompt changes affecting existing facilities. Also, energy sector associations had urged the adoption of measures to reform the Special Regime.[105]

134.    According to the Claimant, RD 1614/2010 did not have a significant effect on its investment.[106]

---

[102] Resp. C-Mem., ¶¶ 541-560; 590; 682-707; Resp. Rej., ¶ 495; Cl. Mem., ¶¶ 127-139; Cl. Reply, ¶¶ 262-266.

[103] Cl. Mem., ¶ 126, citing **C-0010**, RD 1614/2010, Art. 2.

[104] Resp. C-Mem., ¶ 622, citing **R-0105**, RD 1614/2010, Preamble.

[105] Resp. C-Mem., ¶¶ 621, 622.

[106] Cl. Mem., ¶ 126.

C.    **THE DISPUTED MEASURES**

135.    Between 2012 and 2014, Spain enacted what the Claimant characterizes as the 'Disputed Measures,' which, the Claimant argues, drastically overhauled the Special Regime, in breach of Articles 10 and 13 of the ECT.[107]

### (1) Law 15/2012

136.    In 2012, Spain enacted Law 15/2012.[108] Article 8 of that law introduced a 7% environmental tax ('**TVPEE**') on the production of energy, applicable to all energy generators including but not limited to RE producers. The Parties disagree as to the characterization of the TVPEE.  Spain sees it as a domestic taxation measure, within the meaning of Article 21 of the ECT, of general application to both ordinary and RE producers with the purpose of raising state revenue.[109] The Claimant sees it as a disguised tariff cut particularly affecting RE producers, and argues that it was not a *bona fide* tax.[110]

137.    Law 15/2012 permitted ordinary energy producers to set their own prices when selling energy to the pool market, enabling them to pass the cost of the 7% tax to the buyers (consumers). But Law 15/2012 required RE producers to sell to the pool at a price of zero and then to receive remuneration through a regulated formula, based on the average market price and a regulated tariff. Under such a formula, the regulated tariff decreases as the average pool market price increases, that is, the remuneration to RE producers does not increase if the average pool price increases.[111]

### (2) RD-Law 2/2013

138.    In February 2013, Spain enacted RD-Law 2/2013[112] eliminating the payment of premiums and leaving RE producers only with the option of a regulated tariff. RD-Law 2/2013 also introduced an adjusted CPI before tax, which did not account for tax increases or the cost

---

[107] Cl. Reply, ¶ 77. See also **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶ 3.

[108] **C-0012**, Law 15/2012, of 27 December 2012.

[109] Resp. C-Mem., ¶¶ 691, 692; Resp. Rej., ¶¶ 102-164.

[110] Cl. Reply, ¶¶ 150-166.

[111] Cl. Mem., ¶ 128, referring to **C-0019**, Electricity Market Operating Rules, 9 May 2014, Art. 39.4.4.

[112] **C-0014**, Royal Decree-Law 2/2013, of 1 February 2013.

of energy products and food prices.[113] Spain contends that the methodological changes introduced by RD-Law 2/2013 were aimed at avoiding distortions in the CPI unrelated to the economy and were endorsed by the rules and criteria of the EU.[114]

### (3) RD-Law 9/2013

139.    In July 2013, Spain enacted RD-Law 9/2013,[115] which replaced the incentive system, based on levels of financial support per MWh produced, with a remuneration system based on (i) pre-tax target returns based on the average yield on 10-year Spanish Treasury bonds and (ii) costs, revenues, and investment of an efficient and well-managed installation. This remuneration system would be revised every 6 years. RD-Law 9/2013 modified Article 30(4) of Law 54/1997, to regulate the compensation for an 'efficient and well-managed company' to obtain a 'reasonable profitability.'[116]

### (4) Law 24/2013

140.    In December 2013, Spain enacted Law 24/2013,[117] which repealed Law 54/1997 (but for a few provisions), and abolished the distinction between the Ordinary and Special Regimes. The Claimant argues that by repealing the legal framework under which all RE installations were operating and eliminating the two-tiered system, the Special Regime was abolished.[118]

### (5) RD 413/2014 and Order IET/1045/2014

141.    In June 2014, Spain enacted RD 413/2014,[119] which set a methodology to reach the new levels of financial support available to RE producers. Ministerial Order IET/1045/2014 implemented that methodology by setting out multivariable parameters to calculate the

---

[113] Cl. Mem., ¶ 130.

[114] Resp. C-Mem., ¶ 698.

[115] **C-0015**, Royal Decree-Law 9/2013, of 12 July 2013.

[116] Cl. Mem., ¶ 131, citing **C-0015**, RD-Law 9/2013, Art. 1(2).

[117] **C-0016**, Law 24/2013 of 26 December 2013.

[118] Cl. Reply, ¶ 81.

[119] **C-0017**, Royal Decree 413/2014, of 6 June 2014.

levels of financial support for RE production.[120] The pre-tax target return referred to above was set at 7.398% for the first six years of the New Regime.[121]

142.   Under RD 413/2014, wind farms were limited to a specific remuneration consisting of (i) a remuneration based on MW of installed capacity and (ii) a remuneration based on MWh on top of the pool price.[122] Each existing installation was to be classified per type according to its technology, installed capacity, age, and electricity system.[123] The annual specific remuneration would depend on the number of annual operating hours assigned for each installation type.[124] The remuneration dependent on installed capacity was not based on the initial investment expenditures, but on the assumed value of initial investment made for a standard installation of that type of facility.[125]

### D.   THE DISPUTED MEASURES AND SPANISH COURTS DECISIONS

143.   From 2005 onwards, the Spanish Supreme Court issued a number of decisions on appeals brought against various royal decrees that modified features of the Special Regime. Spain submits that the Supreme Court is the ultimate interpreter of the Spanish legal system and no diligent investor could ignore its case-law.[126] In its submissions, Spain frequently relied, *inter alia*, on:

- Judgment of 15 December 2005,[127] rejecting an appeal brought by an association of RE producers against RD 436/2004, for not providing an updating mechanism for the Fixed Tariff. The Court held that there were no legal obstacles for the

---

[120] **C-0018**, Spanish Ministry of Industry, Energy and Tourism Order IET/1045/2014, of 16 June 2014. This Order was updated on 12 August 2014.

[121] Cl. Mem., ¶ 135, referring to **C-0015**, RD-Law 9/2013, Second Additional Provision; **C-0016**, Law 24/2013, Second Final Provision.

[122] Cl. Mem., ¶ 136, referring to **C-0017**, RD 413/2014, Art. 11(6); **C-0018**, Spanish Ministry of Industry, Energy and Tourism Order IET/1045/2014, Arts. 3, 5.

[123] Cl. Mem., ¶ 137, referring to **C-0017**, RD 413/2014, Art. 13.

[124] Cl. Mem., ¶ 137.

[125] Cl. Mem., ¶ 138, referring to **C-0017**, RD 413/2014, Art. 21(3).

[126] Resp. C-Mem., ¶¶ 361-386; Resp. Rej., ¶¶ 372-404.

[127] **R-0137**, Judgment of the Third Chamber of the Supreme Court of the Kingdom of Spain, 15 December 2005 ('*2005 Judgment*'), eighth legal ground.

Government, in the exercise of its regulatory power, to modify the compensation system, provided that it remained within the framework set out in Law 54/1997.

- Judgment of 25 October 2006,[128] rejecting an appeal brought against amendments made by RD 2351/2004 to RD 436/2004 which changed the system for calculating the Special Regime premiums. The Court rejected the appellant's argument that the changes violated their legitimate expectations and confirmed that Special Regime scheme seeks to encourage the use of RE through incentives and cannot be guaranteed to remain unchanged in the future.

- Judgment of 20 March 2007,[129] rejecting an appeal brought against further amendments made to RD 436/2004. The Court noted that the appellants were invoking against RD 2351/2004 the same grounds rejected by its 2006 Judgment. The Court confirmed that Special Regime producers are not guaranteed the intangibility of a given benefit or income regime in relation to those obtained in the past, nor are they guaranteed the indefinite permanence of the formulas used to fix premiums.

- Judgment of 3 December 2009,[130] the Court rejected an appeal brought by photovoltaic energy producers against RD 661/2007. They sought to annul the first transitory provision of RD 661/2007 that excluded them from the possibility of receiving a remuneration pursuant to the pool price plus premium. The producers argued, *inter alia*, that such exclusion violated the alleged guarantee of non-retroactivity set out in Article 40(3) of RD 436/2004. The Court held that neither the freezing of the Special Regime remuneration system nor a right to the immutability of such system follows from Law 54/1997.

---

[128] **RL-0138**, Judgment of the Third Chamber of the Supreme Court of the Kingdom of Spain, 25 October 2006 ('***2006 Judgment***'), third legal ground.

[129] **RL-0139**, Judgment of the Third Chamber of the Supreme Court of the Kingdom of Spain, 20 March 2007 ('***2007 Judgment***'), second legal ground.

[130] **RL-0141**, Judgment of the Third Chamber of the Supreme Court of the Kingdom of Spain, 3 December 2009 ('***2009 Judgment***'), fourth legal ground.

- Judgment No. 270/2015 of the Spanish Constitutional Court and Decision No. 1260/2016 of the Supreme Court (Contentious-Administrative Division)[131] which elaborated on the specific issue of the retrospectivity of the Disputed Measures, both concluding that the Disputed Measures did not infringe Article 9.3 of the Spanish Constitution prohibiting retroactivity.

## IV.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

144.    The Claimant's request for relief is formulated in its Reply as follows:

> 431. Eurus seeks the following relief:
>
> (a) a declaration that Spain has breached the ECT;
>
> (b) a declaration that each such breach by Spain has caused harm to Eurus by diminishing the value of its wind power investment in Spain's territory;
>
> (c) an award of damages (including appropriate interest and gross-up for taxes) to compensate Eurus for the loss it has suffered as a result of Spain's breaches of the ECT;
>
> (d) an award of its costs of the arbitration, on a full indemnity basis;
>
> (e) an award of interest on sums awarded up to the date of payment; and
>
> (f) such other relief as the Tribunal determines to be appropriate.
>
> 432. Eurus reserves the right to amend and/or supplement the relief sought. Eurus also reserves the right to apply for interim or interlocutory relief should it consider such action necessary.[132]

145.    The Respondent, in turn, requests in its Rejoinder:

> 896. In view of the arguments set forth in this Memorial, the Kingdom of Spain respectfully requests the Arbitral Tribunal to:

---

[131] **R-0154**, Judgment of the Constitutional Court, 17 December 2015 (Appeal Inc. 5347/2013); **RL-0242 (English version)**, Judgment of the Spanish Supreme Court Contentious-Administrative Division Court, 1 June 2016. See also on the retrospectivity issue the reference at ¶ 382.

[132] Cl. Reply, ¶¶ 431, 432.

a) Declare that there is no jurisdiction to hear the complaints of the Claimant or, where appropriate, the inadmissibility thereof, in accordance with what is stated in section III of this Memorial, related to Preliminary Objections;

b) In the alternative, in the event that the Arbitral Tribunal decides that it does have jurisdiction to hear the present dispute, that it dismiss all the Claimant's claims on the merits, due to the fact that the Kingdom of Spain has not breached in any way the ECT, in accordance with what is stated in sections IV and V of this Memorial, referring to the Facts and the Merits of the Case, respectively;

c) Furthermore, all claims for compensation of the Claimant should be dismissed as they are not entitled to compensation in accordance with section VI of this Memorial; and

d) Orders the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable interest rate from the date on which those costs are incurred and the date of their actual payment.

897. The Kingdom of Spain reserves the right to supplement, modify or add to these claims and to present any additional arguments required under the ICSID Convention, the ICSID Arbitration Rules, the Procedural Orders and the Arbitral Tribunal's directives in order to respond to all claims made by the Claimant with regard to this matter.[133]

146.  The Tribunal has described, in paragraph 3, 28-36 above, the circumstances which led to the withdrawal of Eurus Europe from this arbitration. Its withdrawal did not affect Eurus Japan's prayer for relief, which encompasses the claims listed in paragraph 144 above.

147.  In its Counter-Memorial, Spain raised several jurisdictional objections, as reflected in its prayer for relief reproduced in paragraph 145 above.  In particular, Spain argued that the Tribunal lacked jurisdiction *ratione personae* over Eurus Europe, which as a Dutch national is not a national of another ECT Contracting Party within the meaning of Article 26(1) of the ECT.  Alternatively, Eurus Europe is not an investor protected by the

---

[133] Resp. Rej., ¶¶ 896, 897.

ECT, since the Netherlands and Spain are member states of the European Union and the ECT does not apply to intra-EU investment disputes.[134]

148.    In its written pleadings, Spain did not present this as an objection to the Tribunal's jurisdiction over the claims brought by Eurus Japan. There remain, however, other objections to the jurisdiction of this Tribunal and to the admissibility of certain claims: these are dealt with in Part V of this Award.  In addition, in its closing submissions Spain raised for the first time objections related to the Tribunal's competence over claims brought by Eurus Japan, specifically 'that the Tribunal does not have jurisdiction *ratione materiae*' over Eurus Japan's claim[135] in light of the decision of the CJEU in the *Achmea* case.

149.    The Parties' respective positions on the matters at issue in the arbitration are summarized in the Parts that follow. The Tribunal has considered the full extent of the Parties' arguments in both their written and oral submissions. The fact that a given argument is not referred to expressly in the summary of the Parties' positions should not be considered as an indication that the Tribunal has not considered the argument.

150.    As a general matter, it is well-known that the issues facing the Tribunal have been or are being dealt with in more than 40 completed or pending arbitration cases against Spain under the ECT, as well as in a variety of other cases concerning renewable energy incentives brought against other states under the ECT or bilateral investment treaties. The Parties have relied on many of the awards and decisions issued by the tribunals in those cases, asking this Tribunal to adopt or depart from their conclusions. This presents a question of principle as to how these diverse (and partly inconsistent) decisions are to be treated. In the Tribunal's view, it should have careful regard to relevant awards and decisions duly presented to it, but it is bound to make up its own mind based on the arguments of the Parties and its own analysis of the facts and the applicable law. This conclusion is to some extent qualified by the fact that the Spanish cases have mostly concerned the same measures and similar, if not identical, issues.  Where tribunals have

---

[134] Resp. Rej., ¶¶ 58-101.

[135] Hearing Day 5, p. 119, ll 7-22 (Ms. Moraleda Saceda). The Claimant objected 'insofar as there is any jurisdictional objection' (ibid, p. 126, ll 7-8 (Mr. Turner)).

taken a consistent position, the Tribunal should pay particular attention to that position and the reasoning supporting it.

## V.    JURISDICTION AND ADMISSIBILITY

151.    The Tribunal turns to the issues of jurisdiction and admissibility raised in the course of the proceedings.

152.    In this context, it is necessary to make a preliminary point as to the arguments raised (or not raised or not maintained) by Spain, a number of which arguably relate to issues of European public order (*ordre public*). Spain, having argued in its written pleadings that the Tribunal lacked jurisdiction over the intra-EU claim maintained by Eurus Europe, did not make any such argument in relation to Eurus Japan. It accepted that Eurus Japan's investments were lawfully made, and implicitly that Eurus Japan was and is an investor as defined in Article 1(6) of the ECT. It did not take any jurisdictional point as to its initial failure to notify the Special Regime under European state aid rules, despite the fact that this failure may have resulted in the subsidies granted to the SPCs having adverse consequences under European law. Nor did Spain present any expert evidence on the European law of state aid, despite the fact that this has been done in certain cases involving the Disputed Measures.

153.    In the Tribunal's view, EU member states that are parties to ECT proceedings (or indeed BIT proceedings generally) remain *sui juris*. Accordingly, they have the normal capacities that a state party has in an arbitration, including the capacity to formulate its case and to take steps in the proceeding.[136] The legal consequences of such choices of litigation strategy are a matter for the Tribunal to appreciate in the course of its award, applying the standards of international law.

---

[136] In *Antaris*, the tribunal refused an application to admit the CJEU's decision in *Achmea* on the ground that it was 'too late, since […] [Respondent] had waived any objection on the EU jurisdictional point'. **CL-0115**, *Antaris*, ¶ 73.

**A.**  **FIRST OBJECTION: THE TVPEE IS A TAXATION MEASURE WHICH IS EXEMPT FROM THE SCOPE OF THE ECT BY REASON OF ARTICLE 21(1) OF THE ECT**

154.    The Claimant argues that the Respondent breached its obligations under Article 10(1) of the ECT by introducing, by means of Law 15/2012, a 7% tax on the value of electric energy production (the TVPEE). The Respondent argues that the Tribunal lacks jurisdiction to determine that claim because the TVPEE is a taxation measure exempt from the scope of the ECT by reason of the carve-out of Article 21(1) of the ECT.[137]

**(1) The Parties' Positions**

*a.  The Respondent's position*

155.    The Respondent argues that it has not consented to arbitrate disputes deriving from tax measures such as the TVPEE. Under Article 26(3) of the ECT, Spain only consented to arbitrate disputes arising out of alleged breaches of Part III of the ECT. While Article 10(1) of the ECT is included in Part III, the TVPEE – the introduction of which allegedly breaches Spain's obligations under Article 10(1) – is a taxation measure. Taxation measures are exempt from the scope of protection of Article 10(1) by virtue of Article 21(1) of the ECT, which provides that 'nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.' Article 21(5) reapplies Article 13 to taxation measures, subject to a process of preliminary referral to 'the relevant Competent Tax Authority', a matter to which the Tribunal will return. But Article 10(1) is not reapplied.

156.    The Respondent maintains that the TVPEE is a 'Taxation Measure' as defined by Article 21(7)(a)(i) of the ECT.  In accordance with this definition, the TVPEE is a domestic law of Spain, enacted by the Spanish Parliament in accordance with the relevant procedures under Spanish law,[138] and is recognized as a tax under Spanish and international law.[139]

---

[137] Resp. C-Mem., ¶¶ 113-223.
[138] Resp. Rej., ¶ 110.
[139] Resp. Rej., ¶¶ 111-116.

157.    Spain also submits, contrary to the Claimant's argument,[140] that the TVPEE is a *bona fide* taxation measure. According to Spain, the TPVEE is a tax applying generally to both renewable and conventional energy producers, which are granted the same treatment without according tax benefits to renewable energy procedures not accorded to others.[141] In November 2014, the Constitutional Court of Spain confirmed the legislator's right to enact the TVPEE, dismissing the appeal brought by the Government of Andalusia against the alleged unconstitutionality of Law 15/2012.[142]

158.    Spain further argues that this case does not present the extraordinary circumstances (such as the destruction of a company and the elimination of a political opponent) found in the cases *Hulley v. Russia* and *Yukos v. Russia*,[143] on which the Claimant relies to illustrate non-*bona fide* taxes.[144] The taxation measures imposed in those cases pursued a purpose entirely unrelated to that of obtaining revenue for the state.[145]

159.    The purpose of the TVPEE is precisely to raise revenue for Spain to finance public expenses. The revenues from the TVPEE are accounted for in Spain's annual General Budget; it is not a disguised tariff cut targeting producers of renewable energy.[146] In fact, the economic effects of the TVPEE on producers of renewable energy are neutralized. Spain notes that RE producers are entitled to receive the specific remuneration to recover the costs of the TVPEE, because under Order IET/1045/2014, the TPVEE is among the operating costs considered to calculate the specific remuneration that they receive.[147]

---

[140] Cl. Reply, ¶¶ 148-166.

[141] Resp. Rej., ¶¶ 117-159.

[142] Resp. Rej., ¶ 132, citing **R-0043**, Ruling 183/2014 of the plenary session of the Constitutional Court, 6 November 2014, (Rec-inc. 1780/2013).

[143] **RL-0077** or **CL-0004** or **CL-0081**, *Hulley Enterprises Limited (Cyprus) v. The Russian Federation* (PCA Case No. AA 226), Final Award, 18 July 2014 ('*Hulley v. Russia*' or '*Hulley*'); **RL-0078**, *Yukos Universal Limited (Isle of Man) v. The Russian Federation* (PCA Case No. AA 227), Final Award, 18 July 2014 ('*Yukos v. Russia*' or '*Yukos*').

[144] Cl. Reply, ¶ 151.

[145] Resp. Rej., ¶ 120.

[146] Resp. Rej., ¶¶ 154-159.

[147] Resp. Rej., ¶¶ 145-150, citing **R-0115** (or **C-0118**), Spanish Ministry of Industry, Energy and Tourism Order IET/1045/2014 (section III).

160.  Finally, the Respondent relies on the awards of the tribunals in *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain* (SCC Case No. V2013/153)[148] and *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/36).[149] Those tribunals declared that they lacked jurisdiction to decide the claim for alleged breach of Article 10(1) of the ECT through the introduction of the TVPEE by Law 15/2012.[150]

### b. The Claimant's position

161.  The Claimant argues that the carve-out of Article 21(1) of the ECT only applies to taxation measures that are *bona fide*, *i.e.* not actions disguised as a tax but aiming at achieving a different purpose.[151] The Claimant views the TVPEE established by Law 15/2012 not as a *bona fide* tax, but as a disguised requirement that RE producers reimburse Spain for a portion of their pecuniary incentives.[152]

162.  The Claimant argues that the circumstances surrounding the enactment of Law 15/2012 reveal that its purpose to improve Spain's level of energy efficiency 'was a sham'.[153] The Claimant refers, among others, to statements by the then President of the Government of Spain and the Ministry of Industry, Energy and Tourism, to the effect that, as a result of the tariff deficit, Spain would have to reform the remuneration payable to RE producers. The Claimant also refers to statements of members of the Spanish Parliament when Law 15/2012 was debated, that the tax did not comply with the objective of more efficient use and respect for the environment and energy sustainability.[154]

163.  The Claimant maintains that even the Spanish Supreme Court had doubts about the constitutionality of the tax and its stated environmental purpose, because renewable energy

---

[148] **RL-0024**, *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain* (SCC Case No. V2013/153), Award, 12 July 2016 ('*Isolux v. Spain*' or '*Isolux*'), ¶ 741.

[149] **RL-0071** or **CL-0079**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/36), Award, 4 May 2017 ('*Eiser v. Spain*' or '*Eiser*'), ¶ 271.

[150] Resp. Rej., ¶¶ 160-164.

[151] Cl. Reply, ¶¶ 149-151.

[152] Cl. Mem., ¶¶ 156, 160; Cl. Reply, ¶ 151, citing **CL-0081**, *Hulley*, ¶ 1407.

[153] Cl. Reply, ¶¶ 153, 154.

[154] Cl. Reply, ¶ 154.

44

producers are already subject to a trade tax on their economic capacity. The Claimant explains that the Spanish Constitutional Court rejected the Supreme Court's question about the constitutionality of the TVPEE, on the ground that the question should have been posed to the CJEU, but did not rule on the substance of the question.[155] The doubts of the Spanish Supreme Court bolster the inference that the TVPEE was introduced with an ulterior purpose.[156]

164.   In addition, the Claimant explains that RE producers are prevented from passing the cost of the TVPEE on to consumers, because RE producers cannot determine the price of their product; they have to accept a regulated premium.[157] This discriminatory effect was reflected, among others, in the discussions in the Spanish parliament preceding the adoption of Law 15/2012 and in statements by Spain's Ministry of Energy and Tourism saying that Spain could have opted to reduce premiums, but instead chose to adopt a tax.[158]

165.   Also, Spain offers no reasons why the extraordinary conditions of the cases *Hulley v. Russia* and *Yukos v. Russia* are not present here.  The Claimant maintains its position that the TVPEE of Law 15/2012 was introduced with the purpose of reducing incentives to RE producers and was shaped as a tax to avoid liability under the ECT, which is a purpose entirely unrelated to that of raising revenue for Spain, as in *Yukos*.[159]

166.   The fact that the TVPEE is of general application arguably misses the point. Most of the Claimant's wind plants have been unable to offset the TVPEE, since they have obtained returns above 7.398% and thus are not eligible to receive specific remuneration under the

---

[155] Cl. Rej., ¶ 53.

[156] Cl. Reply, ¶¶ 157-161.

[157] Cl. Mem., ¶ 159; Cl. Reply, ¶ 155, citing **C-0458**, Document from the General Technical Secretariat of the Ministry of Treasury and Public Administrations containing a draft response to be forwarded to the European Commission in response to its request of 13 January 2014 for additional information on Pilot Project 5526/13/TAXU, 17 February 2014, p. 6.

[158] Cl. Mem., ¶ 160; Cl. Reply, ¶ 154(c), citing **C-0456**, Interview with José Manuel Soria, Minister of Industry, Energy and Tourism, *La Gaceta*, 14 October 2012, p. 19.

[159] Cl. Rej., ¶ 54.

New Regime. For this reason, Spain's explanation that the TVPEE is one of the costs that RE producers, including Claimant, are allowed to offset is not relevant here.[160]

167.   Finally, in the Claimant's view, *Isolux v. Spain* and *Eiser v. Spain* offer no useful guidance. In *Isolux v. Spain*, the tribunal considered that Spain's adoption of Law 15/2012, although misleading, did not rise to the level of Russia's conduct in the adoption of taxation measures in the cases *Yukos* and *RosInvest*. The ruling in *Isolux v. Spain* arguably failed to appreciate the connection between Spain's use of a tax to reduce incentives and the fact that Spain was facing the first claims under the ECT.[161]

168.   Eurus Japan is in a different position compared to the claimants in *Eiser v. Spain* in respect of Law 15/2012. In *Eiser v. Spain*, the tribunal reasoned that any damages flowing from the TVPEE would be reduced, if not eliminated, by Spain's inclusion of the TVPEE among the costs compensable to CSP operators subject to the new regime that replaced RD 661/2007.[162]  Here, all but two of the Claimant's wind farms have received no incentives over the pool price, with the effect that the Claimant has not been able to recover the cost of the TVPEE through such incentives. If the TVPEE is found to be in breach of Article 10(1) of the ECT, the Claimant's damages would be substantial.[163]

### (2) The Tribunal's Analysis

169.   In agreement with all other tribunals which have faced this issue, the Tribunal holds that the TVPEE is a taxation measure excluded from its jurisdiction under Article 10(1) of the ECT by reason of the carve-out in Article 21(1) of the ECT, which provides:

> Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[164]

---

[160] Cl. Rej., ¶ 56. Eleven out of Eurus' 13 SPCs no longer receive subsidies due to the Disputed Measures' cap on investment returns. See Cl. Reply, ¶¶ 191, 219.

[161] Cl. Reply, ¶ 164.

[162] Cl. Reply, ¶ 165, citing **CL-0079**, *Eiser*, ¶ 272.

[163] Cl. Reply, ¶¶ 162-166.

[164] **CL-0001**, ECT, Art. 21(1).

170.  The ECT does not define the term 'taxation measure', although Article 21(7)(a) includes within the scope of this term 'any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein' as well as 'any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.'[165]

171.  To interpret Article 21, the Tribunal will apply the general rule of treaty interpretation as found in Article 31(1) of the VCLT, which provides that '[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.'

172.  The Tribunal agrees that the term 'taxation measure' should be given its ordinary meaning in the context of the treaty. According to the interpretation of the term 'taxation measures' in *EnCana v. Ecuador*:

> The question whether something is a tax measure is primarily a question of its legal operation, not its economic effect. A taxation law is one which imposes a liability on classes of persons to pay money to the State for public purposes. The economic impacts or effects of tax measures may be unclear and debatable; nonetheless a measure is a taxation measure if it is part of the regime for the imposition of a tax. A measure providing relief from taxation is a taxation measure just as much as a measure imposing the tax in the first place.[166]

173.  Furthermore, for a taxation measure to fall within the scope of Article 21(1) of the ECT, it must have been enacted in good faith. This is not to say that bad faith in the state's exercise of its taxing powers is to be presumed. For a taxation measure to have been enacted in bad faith, the Claimant needs to establish that the disputed measures were taken for ulterior, improper motives under the guise of taxation and therefore in bad faith. This additional

---

[165] **CL-0001**, ECT, Art. 21(7)(a).

[166] **CL-0005**, *EnCana Corporation v. Republic of Ecuador* (UNCITRAL), Award, 3 February 2006 ('***EnCana v. Ecuador***'), ¶ 142.

*bona fides* test was applied by the tribunals in *Yukos v. Russia* and *Hulley v. Russia*. In *Yukos v. Russia*, the tribunal found that:

> [T]he carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).[167]

174. The *Yukos* tribunal, like the tribunal in *Hulley*, distinguished between *bona fide* taxation measures and measures aimed at unrelated purposes such as destroying a company or a political opponent.[168]

175. *Prima facie*, the TVPEE is a tax. First, the Claimant concedes that it has all the formal attributes of a tax.[169] Second, it was upheld as such by the Spanish courts. The Respondent enumerates various decisions of the Spanish High Court relating to Ministerial Order HAP/703/2013 of April 2013.[170] This Order approved Form 583 by which taxpayers self-assess and pay the TVPEE to the Spanish Treasury. The High Court declared the Order lawful.[171] The Respondent also points to a decision of the Constitutional Court of 6 November 2014,[172] which dismissed a claim that Articles 4, 5 and 8 of the TVPEE were unconstitutional.[173] The Court ruled that 'the challenged provisions do not exceed the freedom of configuration of the legislator, who is in no way prevented from employing taxation […]'[174] and referred to the TVPEE as 'the tax in question'.[175] As to the second limb of the definition of the term 'taxation measure', namely whether the TVPEE

---

[167] **RL-0078**, *Yukos*, ¶ 1407.

[168] **RL-0078**, *Yukos*, ¶ 1407; **CL-0081**, *Hulley*, ¶ 1407.

[169] Cl. Reply, ¶ 149.

[170] Resp. C-Mem., ¶ 171.

[171] See **R-0039**, Judgment of the High Court dismissing appeal 297/2013, 2 June 2014; **R-0040**, Judgment of the High Court dismissing appeal 298/2013, 2 June 2014; **R-0041**, Judgment of the High Court dismissing appeal 296/2013, 30 June 2014.

[172] Resp. C-Mem., ¶¶ 176ff.

[173] **R-0043**, Judgment 183/2014, 6 November 2014, published in the BOE of 4 December 2014.

[174] **R-0043**, Judgment 183/2014, 6 November 2014, published in the BOE of 4 December 2014, p. 14.

[175] Ibid.

constitutes a compulsory exaction of money by law for public purposes, the Tribunal agrees with the conclusion in *Isolux v. Spain*.[176] The TVPEE was collected by the Spanish state and was compulsory for all producers of electric energy for the purpose of raising funds for the state. The objective of Law 15/2012 was to harmonize Spain's tax system with a usage that is more efficient and respectful of the environment and sustainability.[177] On its face, the TVPEE constitutes a compulsory exaction of money by law for public purposes.[178]

176. As to the *bona fides* requirement, the Tribunal is not confronted with a scenario similar to the one in *Yukos* or *Hulley*. There is no evidence that Spain intended to destroy the Claimant by means of the TVPEE. As stated by the tribunal in *Isolux v. Spain*, the 'economic repercussions or effects of the [T]VPEE may be obscure and debatable, but that does not constitute a sufficient argument to conclude that the [T]VPEE is a tax measure that was promulgated in bad faith.'[179]

177. In *Eiser*, the tribunal did not decide whether there is a bad faith exception to Article 21(1):[180] it held that the bad faith allegation 'could be maintained only if Spain knew or should have known that the RD 661/2007 tariffs cannot be substantially altered, and so knowingly violated its obligations under the ECT by adopting Law 15/2012. The evidence is not sufficient to sustain this contention.'[181]  Without expressing an opinion on the criterion adopted in *Eiser v. Spain* for a bad faith allegation to be sustainable, the Tribunal considers that, in the present case, the Claimant has failed to establish circumstances indicating that the TVPEE was adopted in bad faith.

178. In *Antaris*, the tribunal held that a levy chargeable only to the recipients of subsidies and collected by way of an offset against subsidy entitlements was not a tax.  The decision on that point is distinguishable *inter alia* on the basis that the Czech Supreme Administrative Court had found that the 'Solar Levy is not a tax for purposes of the prohibition against

---

[176] **RL-0024**, *Isolux*, ¶ 740.

[177] **R-0030**, Law 15/2012, Preamble (see also **C-0012**).

[178] Cl. Reply, ¶ 149.

[179] **RL-0024**, *Isolux*, ¶ 739.

[180] **CL-0079**, *Eiser*, ¶ 269.

[181] Ibid.

double taxation under Czech law'.[182] The avowed purpose of the levy was to reduce the feed-in tariffs for certain investors and not to raise revenue for the state budget.[183]

179.    The Claimant alleges (paragraph 161 above) that the TVPEE applies unequally to its SPCs because all but two of them are unable to claim back amounts of tax paid because they are ineligible for subsidies. This allegedly unequal incidence of the TVPEE does not, by itself, constitute evidence of bad faith. Nor does any such unequal incidence change the character of the TVPEE as a tax. A tax does not cease to be a tax because it applies unequally or disproportionately to particular taxpayers or categories of taxpayers, and no such equality or proportionality of incidence is required by the ECT for a measure to qualify as a taxation measure. If the TVPEE is a tax measure for the purposes of ECT Article 21(1), Article 10(1) simply does not apply to it.

180.    For these reasons, the TVPEE constitutes a taxation measure for the purposes of Article 21(1) of the ECT and the claim falls outside the Tribunal's jurisdiction insofar as it involves an alleged breach of Article 10(1) of the ECT.

**B.    SECOND OBJECTION: THE TRIBUNAL LACKS JURISDICTION TO DECIDE ON EURUS'S GROSS-UP CLAIM IN RELATION TO JAPANESE TAXATION OF THE AWARD UNDER ARTICLE 21(1) OF THE ECT**

181.    The Claimant contends that its compensation must comprise a tax gross-up to offset the taxes to which the amounts potentially awarded to the Claimant may be subject in Japan in order to receive full compensation.[184] The Respondent argues that the Tribunal lacks jurisdiction to hear the Claimant's claim as a result of the tax carve-out of Article 21.[185]

---

[182] **CL-0115**, *Antaris*, ¶¶ 233, 238.

[183] Ibid., ¶¶ 250ff.

[184] Cl. Mem., ¶ 310(d); Cl. Reply, ¶¶ 369-387.

[185] Resp. C-Mem., ¶¶ 1159-1164; Resp. Rej., ¶¶ 858-862. The Respondent objected to the 'admissibility' of the gross-up claim based on the carve-out of Article 21 of the ECT. The question whether the gross-up claim is excluded from the protections afforded by the ECT by reason of the carve-out of Article 21 of the ECT is, in the Tribunal's view, a question about the Tribunal's jurisdiction to adjudicate the gross-up claim, rather than about the admissibility of the claim.

182.    The Parties argued the issue of the exclusion of the gross-up claim from the scope of the protections of the ECT as a matter of quantum.[186] However, the question of the Tribunal's jurisdiction over the gross-up claim can be addressed already at this stage.

**(1) The Parties' Positions**

*a. The Respondent's position*

183.    The Respondent argues that it has not consented to submit to arbitration the resolution of disputes deriving from tax measures and that the tax carve-out contained in Article 21(1) of the ECT applies.[187]

184.    Spain maintains that the carve-out of Article 21 of the ECT excludes from the scope of the ECT taxation measures implemented in the investor's host and home state, in so far as both are 'Contracting Parties' to the ECT.[188]

185.    Further, no tax measure in another state can create an obligation for Spain on the basis of the ECT, considering that in the event of inconsistencies, the tax carve-out of Article 21 of the ECT prevails over any other provision of the ECT, including Articles 10, 13 and 26 of the ECT, as provided by the second sentence of Article 21 of the ECT.[189]

186.    Spain argues that its position is consistent with Article 2 of the ILC Articles on State Responsibility, whereby a state's conduct is an internationally wrongful act giving rise to international responsibility if it is 'attributable to the State under international law' and if it constitutes a breach of an international obligation of that state.[190] This position is arguably also consistent with the decision of the tribunal in *Rusoro v. Venezuela*, according to which tax liability derived from tax laws of a country other than the investor's host country is not a consequential loss arising from the host country's breach of the treaty and

---

[186] Resp. C-Mem., ¶¶ 1158-1163; Resp. Rej., ¶¶ 850-863; Cl. Reply, ¶¶ 369-374.

[187] Resp. C-Mem., ¶ 1160.

[188] Resp. C-Mem., ¶ 1162; Resp. Rej., ¶ 862.

[189] Resp. C-Mem., ¶ 1163; Repl. Rej., ¶ 863.

[190] Resp. Rej., ¶¶ 863-865.

does not engage the home country's liability.[191]  Therefore, Spain cannot be held liable to pay for tax measures implemented by Japan for which Spain is not responsible.[192]

### b.  The Claimant's position

187.  The Claimant maintains that, under the principle of full reparation, it is entitled to be compensated for the sum of 'Historical Damages', 'Lost Value Damages', compound interest on those two amounts of damages[193] and, if necessary, a tax gross-up to off-set the taxes to which the amounts potentially awarded to the Claimant may be subject in Japan.[194]

188.  The Claimant argues that, contrary to Spain's contention,[195] the claim for a tax gross-up is 'admissible' under the ECT.  First, the carve-out of Article 21 of the ECT does not apply to a tax gross-up. Instead, the carve-out aims at maintaining each Contracting State's sovereign taxation powers. If the tax gross-up were granted, the Tribunal would not be imposing obligations on Spain with respect to Japanese measures, nor creating rights in favour of the Claimant with respect to Spanish taxation measures; the Tribunal would be awarding additional damages to cover the tax that the Claimant will be required to pay.[196]

189.  Second, while the Japanese tax is not attributable to Spain, the payment of additional Japanese taxes on the damages awarded to Claimant is a consequential loss arising from Spain's breach of the ECT, which is attributable to Spain.[197] Further, *Rusoro v. Venezuela*, referenced by Spain,[198] is irrelevant as the claimant there abandoned its request for a tax gross-up.

190.  Third, the reasoning of the tribunal in *ConocoPhillips v. Venezuela* was based on the principle of full compensation, requiring that any tax applied in any country (not just the

---

[191] Resp. C-Mem., ¶ 1165; Resp. Rej., ¶ 867, citing **RL-0037**, *Rusoro Mining Limited v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/12/5), Award, 22 August 2016, ¶ 854.

[192] Resp. Rej., ¶ 868.

[193] Cl. Mem., ¶¶ 306-310.

[194] Cl. Mem., ¶ 310.

[195] Resp. C-Mem., ¶¶ 1158-1168; Resp. Rej., ¶¶ 850-872.

[196] Cl. Reply, ¶ 374.

[197] Cl. Reply, ¶¶ 375-377.

[198] Resp. C-Mem., ¶ 1165.

investor's home country) on the proceeds of the award, that should not have been paid in the absence of a state's breach, be compensated by the state.[199]

### (2) The Tribunal's Analysis

191.    Eurus seeks higher damages on the basis that it will lose part of the value of the award in Japanese tax. The Respondent argues that the claim is inadmissible by reason of the tax carve-out of Article 21(1) of the ECT.[200]

192.    Yet Article 21(1) is not applicable in terms. Article 21(1) excludes from the jurisdiction of the Tribunal claims relating to a breach of a provision of the ECT that creates rights or imposes obligations through a taxation measure.

193.    The Claimant's claim, however, would not 'create rights or impose obligations with respect to Taxation Measures of the Contracting Parties', as stated in Article 21(1) of the ECT. This is because the claim is not with regard to a right or an obligation that stems from the ECT.  It constitutes solely a claim for full reparation under international law.

194.    Spain's only obligation, if it is held to be responsible, is to pay compensation in accordance with international law. The claim concerns the quantum of that obligation.  This leaves the taxation measures of the Contracting Parties exactly as they were.

195.    The Tribunal therefore has jurisdiction to hear the claim.

### C.    THIRD OBJECTION: INADMISSIBILITY OF THE CLAIM FOR EXPROPRIATION UNDER ARTICLE 13 OF THE ECT

196.    Article 21 of the ECT provides:

> (5) (a) Article 13 shall apply to taxes.
>
> (b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

---

[199] Cl. Reply, ¶ 378.
[200] Resp. Rej., ¶¶ 850, 858-862.

(i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii) The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where non-discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Cooperation and Development;

(iii) Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period.

### (1) The Parties' Positions

### a. *The Respondent's position*

197. The Respondent argues that the claim under Article 13 of the ECT for alleged expropriation of Eurus Japan's investment by reason of the TVPEE is inadmissible, because the Claimant failed to refer to the competent national tax authority the issue whether the TVPEE tax constitutes an expropriation or is discriminatory.[201]

198. Therefore, the Respondent maintains, the carve-out for taxation measures effected by Article 21 of the ECT does not apply to expropriation claims under Article 13.[202] (Article 13 does not contain a free-standing prohibition of discrimination, although

---

[201] Resp. C-Mem., ¶¶ 224-242; Resp. Rej., ¶¶ 167-179.
[202] Resp. C-Mem., ¶ 228.

discrimination is one of the indicia of an expropriatory tax measure.) Article 21(5)(b)(i) of the ECT sets out a procedure which must be followed whenever an issue arises under Article 13.

199.    The Respondent argues that the words of the provision 'shall refer' indicate that the procedure of Article 21(5)(b)(i) is mandatory. The Respondent acknowledges that the claimant in *Isolux v. Spain* already referred the issue to the competent authority, which determined that the tax was neither expropriatory nor discriminatory,[203] but argues that both the referral and the determination in that case are irrelevant, since a referral must be made on each occasion.

200.    The Respondent maintains that, given that the Claimant continues to be in breach of its obligation to refer the issue, the Tribunal should declare the Article 13 claim inadmissible in relation to the TVPEE and refer the issue to the competent tax authorities, pursuant to Article 21(5)(b)(i) of the ECT.[204]

### b.  The Claimant's position

201.    The Claimant contends that the requirement under Article 21(5)(b) of the ECT, to refer the issue to the competent tax authority, does not apply when referral would be futile.[205] The claimant in *Isolux v. Spain* referred the issue whether the TVPEE under Law 15/2012 was expropriatory and/or discriminatory to the Spanish Tax Department, the competent tax authority in that case.[206] On 29 March 2016, the Spanish Tax Department reported that the TVPEE was neither expropriatory nor discriminatory, citing in support the judgment of the Spanish Constitutional Court of 6 November 2014. Also, on 23 December 2014, the Spanish General Directorate of Taxation issued a written answer to a tax consultation, saying that the 7% tax of Law 15/2012 is a tax deductible accounting expense, a statement which the General Directorate of Taxation would not have made had it regarded the 7%

---

[203] Cl. Reply, ¶¶ 169-173.
[204] Resp. C-Mem., ¶ 243; Resp. Rej., ¶ 179.
[205] Cl. Reply, ¶ 168, citing **CL-0081**, *Hulley*, ¶ 1424.
[206] Cl. Reply, ¶ 169.

tax as expropriatory or discriminatory.[207] By the time the Claimant submitted its Request for Arbitration on 17 February 2016, the position of the competent authority was clear, and would have made a referral by the Claimant futile.[208]

202.  Further, the Claimant argues that Article 21(5) of the ECT does not set a precondition for the Claimant's resort to arbitration under Article 26 of the ECT.  The sole consequence of non-compliance with Article 21(5) is that the bodies called upon to settle the dispute under Article 26(2)(c) or 27(2) (in the present case, this Tribunal) shall make the referral.[209]

203.  Finally, the Claimant contends that the use of the singular 'Authority' in Article 21(5)(b)(i) was deliberate. The Tribunal already has the benefit of the conclusions of the Spanish authority, without needing further referral, and may assign them whatever weight it deems appropriate.[210]

### (2) The Tribunal's Analysis

204.  The first point to make is that Article 21(5), which is carefully drafted, does not say that failure by a claimant to notify the competent tax authority renders a claim inadmissible. The sole consequence of such failure is that the tribunal hearing the claim is called on to notify the competent tax authorities itself.  The sole further consequence of such a referral (provided the competent tax authorities can agree that the tax measure is expropriatory or discriminatory) is that the tribunal should take any such agreement into account. If the Article 13 claim were inadmissible by reason of the claimant's failure to notify the competent tax authority, there would be no point in the tribunal doing so, because the claim would already be barred. Hence a claimant's failure to act is not in itself a ground of inadmissibility.

205.  Nor will this Tribunal of its own motion notify the competent tax authorities, since it already knows the position of the competent Spanish authority, which, consistent with the

---

[207] Cl. Reply, ¶¶ 169-172, citing **R-0009**, General Directorate of Taxation's reply to the Tax Consultation in effect V3371-14, 23 December 2014, pp. 1-2.
[208] Cl. Reply, ¶ 173.
[209] Cl. Rej., ¶ 59.
[210] Cl. Rej., ¶¶ 61, 63.

decision of the Constitutional Court of 4 November 2014 already referred to, is that the TVPEE is neither expropriatory or discriminatory.[211] This fact, which is relevant not to admissibility but to the merits, will be taken into account in due course. For the Tribunal to make a reference itself would be the purest formalism and a waste of time. The Article 13 claim is admissible.

**D.    PUTATIVE OBJECTION: STATUS OF THE CLAIMANT AS AN INVESTOR FOR THE PURPOSES OF ARTICLE 26(1) OF THE ECT AND RELATED ISSUES**

206.    Under Article 26 of the ECT, if an investor is a party to a dispute 'relating to an Investment […], which concern[s] an alleged breach of an obligation of the [host state] under Part III', and which cannot be settled amicably within 3 months, the investor may choose to submit the dispute to arbitration under Part V.

207.    'Investment' is defined as:

> every kind of asset, owned or controlled directly or indirectly by an investor and includes:
>
> […] (b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise […]
>
> (e) Returns; […][212]

208.    'Investor' is defined to mean, *inter alia*:

> (a) with respect to a Contracting Party:
>
> […]
>
> (ii) a company or other organisation organised in accordance with the law applicable in that Contracting Party; […][213]

209.    'Returns' are defined to mean:

> the amounts derived from or associated with an Investment, irrespective of the form in which they are paid, including profits,

---

[211] **RL-0043**, Judgment 183/2014, 6 November 2014, published in the BOE of 4 December 2014.
[212] **CL-0001**, ECT, Art. 1(6).
[213] **CL-0001**, ECT, Art. 1(7).

> dividends, interest, capital gains, royalty payments, management, technical assistance or other fees and payments in kind.[214]

210.    In accordance with these definitions, Eurus Japan is plainly an indirect investor of Japan in the SPCs, and its investment includes returns which, even if paid through Eurus Europe, are 'derived from or associated with an investment'.

211.    As part of its closing submissions, Spain argued that the Claimant had not proven that any damages suffered at plant level had flowed through to Eurus Japan.  In this context, it cited a paragraph in its Counter-Memorial,[215] a passage in the cross-examination of Claimant's quantum witness,[216] and the decision in *Nykomb v. Latvia*.[217] At no point did the Respondent argue that the Tribunal lacks jurisdiction *ratione personae* over Eurus Japan. It did argue, prior to Eurus Europe's withdrawal as a Claimant, that there was no jurisdiction over Eurus Europe, essentially on the ground that the dispute between Spain and Eurus Europe was an intra-EU dispute to which the ECT did not apply.[218] That argument, fortified by the CJEU's decision in the *Achmea* case, was not put forward by the Respondent at the oral phase, presumably because it had been rendered moot by Eurus Europe's withdrawal from the arbitration. However, the ghost of the argument remained, as in the following passage:

> MS. MORALEDA SACEDA:  This dispute concerns EU law from the beginning point to the end one. You cannot decide this dispute without EU law; that's the problem. And that's the conflict with the principle of autonomy of EU law, which is a question of public order, acknowledged by the ECT itself.
>
> MR. GARIBALDI: So what are we supposed to do?

---

[214] **CL-0001**, ECT, Art. 1(9).

[215] Resp. C-Mem., ¶ 1127 (a passing reference to the issue).

[216] Hearing Day 5, p. 235, ll 1-5 (Mr. Fernández Antuña).

[217] Hearing Day 5, p. 235, ll 7-19 (Mr. Fernández Antuña), referring at slides 196-198 of Respondent's Closing Statement to **RL-0057**, *Damages in International Investment Law*, Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), 2008 ('**Ripinsky**'), p. 156, citing *Nykomb Synergetics Technology Holding AB v. Republic of Latvia* (SCC Case No. 118/2001), Award, ('***Nykomb v. Latvia***'), 16 December 2004, pp. 39-41. At the Hearing, the Claimant objected to these references as being new material. While noting the objection, the Tribunal admitted the references which were made in response to a question from the Tribunal. See Hearing Day 5, p. 203, ll 24-25 (Mr. Turner), pp. 204, 205, ll 12-21 (The President).

[218] Resp. C-Mem., ¶¶ 57-112; Resp. Rej., ¶¶ 58-101.

> MS. MORALEDA SACEDA: Declare that the Tribunal does not have jurisdiction *ratione materiae*.[219]

212. In the Tribunal's view, jurisdiction (if, and to the extent that, it exists) derives from the ECT, which represents the legal basis for the constitution of the Tribunal. There can be no doubt, as things stand, as to the jurisdiction of the Tribunal *ratione personae* over Eurus Japan: indeed, Spain, if not expressly then by clear implication, accepted as much.[220] Spain never presented the flow-through issue as one which affected jurisdiction; rather it went to quantum, and will be dealt with below in that context.

213. As to jurisdiction *ratione materiae*, this too is governed by the ECT, and will be dealt with below in the context of the applicable law. It is sufficient to hold here that *Achmea* concerned jurisdiction under an intra-EU bilateral investment treaty, as made clear by the CJEU in the operative part of the judgment:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[221]

214. *Achmea* did not concern jurisdiction vis-à-vis a third-state national under a multilateral treaty to which the EU itself was and remains a party.

215. To summarize, the *Achmea* decision is inapplicable to the present case, in so far as it concerns the jurisdiction of the Tribunal over the dispute between Eurus Japan as an

---

[219] Hearing Day 5, p. 119, ll 7-15 (Ms. Moraleda Saceda).

[220] Resp. C-Mem., ¶¶ 57-112 and Resp. Rej., ¶¶ 58-101: Respondent at no point disputed the jurisdiction of the Tribunal *ratione personae* over Eurus Japan. It only contested the Tribunal's jurisdiction *ratione personae* over Eurus Europe.

[221] *Achmea*, ¶ 62.

indirect investor and the Kingdom of Spain.[222]  It is not necessary therefore for the Tribunal to decide as between subsequent decisions such as *RREEF*,[223] *Greentech*,[224] *Cube*,[225] *9REN*,[226] and *Stadtwerke*[227]which held *Achmea* inapplicable to intra-EU ECT disputes on different grounds. The Tribunal's jurisdiction is not called into question by the issue of flow-through of damages via Eurus Europe to Eurus Japan, which was presented exclusively as a matter relevant to quantum.

## VI.    APPLICABLE LAW

### (1) The Parties' Positions

#### a.    *The Respondent's Position*

216.    In the context of its intra-EU objection,[228] Spain argued that EU law has a threefold dimension in this case, (i) as international law applicable to the resolution of the dispute under Article 26(6) of the ECT; (ii) as part of Spain's internal law; and (iii) as a 'fundamental point' shaping Eurus' legitimate expectations.[229]

217.    Spain disagrees with the findings of the *Cube* tribunal, and maintains that 'EU law is international law that shall be applied together with the ECT to decide the issues in dispute, both on jurisdiction and on the merits, pursuant to Article 26(6) of the ECT.'[230] Spain submits that the Tribunal is bound by primary (treaties) and secondary (EC directives and decisions) sources of EU law, which are applicable to this case.[231]

---

[222] Indeed, in **CL-0118**, *Landesbank*, ¶¶ 119, 149, Spain and the EC both accepted that the tribunal would have had jurisdiction if the claimant had been Japanese. This point was made by Claimant in its Comments on the *Landesbank* Decision on Jurisdiction, 27 August 2019, ¶ 3.

[223] **RL-0088**, *RREEF*, ¶ 211.

[224] **CL-0116**, *Greentech*, ¶ 220

[225] **RL-0090**, *Cube*, ¶¶ 141-152

[226] **CL-0117**, *9REN*, ¶¶ 150-158, 173.

[227] **RL-0097**, *Stadtwerke*, ¶ 142.

[228] See Resp. C-Mem., ¶¶ 58-101. As explained, at paragraph 211 above, the intra-EU objection was rendered moot after Eurus Europe's withdrawal.

[229] Resp. Rej., ¶ 66.

[230] Respondent's comments on *Cube*, 29 May 2019, ¶ 8.

[231] Respondent's Comments on the European Commission's Application to intervene, 31 January 2019, ¶ 2.

218.    Spain argues that the 'subsidies sought by the Claimant' are state aid.[232] Spain relies on the European Commission's Decision of 10 November 2017 regarding the Spanish State Aid Framework for Renewable Sources ('**EC decision of 10 November 2017**')[233] to argue that the Tribunal lacks jurisdiction to decide whether the Claimant's wind farms are entitled to a *sine die* right to a specific amount of state aid. Such decision, Spain submits, would distort market competition in the Claimant's favour, which would amount to a violation of the 'essential pillar[s]' of EU law.[234]

219.    The EC decision of 10 November 2017 held that Spain's current support scheme (*i.e.* the Disputed Measures) is state aid compliant with the internal market (Article 107(3)(c) of the TFEU.  Spain argues that the state aid granted until the adoption of the EC decision was unlawful, because the EC had not been notified of it, which was in breach of Spain's stand-still obligation under Article 108(3) TFEU.[235] According to Spain, the EC, following the CJEU's settled case law, confirmed that under EU law there is no right to state aid; further, there cannot be any legitimate expectations to unlawful State aid.[236]

220.    Spain submits that the reasons provided by the EC to consider that the subsidies given under the Disputed Measures are State aid can be extended to the subsidies provided under the Special Regime of RD 661/2007.[237] Spain argues that, in line with the CJEU's case law, Eurus cannot have legitimate expectations to unnotified state aid (*i.e.* subsidies under RD 661/2007). Thus, the application of EU law excludes the Claimant's legitimate expectations claim.[238]

---

[232] Spain contends that the Special Regime was State aid subject to the 2008 Community Guidelines on State Aid for the Environmental Protection, later replaced by the 2014-2020 Guidelines on State aid for environmental protection and energy. See Resp. Rej., ¶ 63, referring to **R-0065**, Community Guidelines on State Aid for the Environmental Protection, (2008/C 82/01) and **R-0066**, Guidelines on State aid for environmental protection and energy 2014-2020 (2014/C 200/01).

[233] Resp. Rej., ¶ 77, citing **RL-0073**, Decision of the European Commission, of 10 November 2017, regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (State Aid S.A. 40348 (2015/NN) ('**EC decision of 10 November 2017**'), ¶¶ 159-166.

[234] Resp. Rej., ¶ 65.

[235] **RL-0073**, EC decision of 10 November 2017, ¶¶ 83-89.

[236] **RL-0073**, EC decision of 10 November 2017, ¶¶ 155, 158.

[237] Respondent's Comments on the European Commission's Application to intervene, Section III.

[238] Respondent's Comments on the European Commission's Application to intervene, Section III.

221.    Spain adds that the EC decision of 10 November 2017 noted that any compensation granted
        by a tribunal to an investor on the basis that Spain modified the Special Regime by
        introducing the Disputed Measures would constitute state aid. Tribunals are not competent
        to authorize state aid, which is an exclusive competence of the EC. Also, any compensation
        granted would be notifiable state aid.[239]

### b.  *The Claimant's Position*

222.    The Claimant argues that EU law is not applicable to the dispute. Relying on *Eureko v.
        Slovak Republic*,[240] the Claimant submits that, in accordance with Article 26(6) of the ECT,
        an ECT tribunal can interpret and make determinations as to the meaning of EU law if
        questions of EU law arise in an ECT dispute. That a tribunal might consider questions of
        EU law in deciding the dispute does not mean that an arbitration under the auspices of the
        ECT is to be determined according to a source of law other than the ECT.[241] That is, EU
        law cannot alter or eliminate the protections granted by the ECT. In this regard, the
        Claimant disagrees with the *BayWa* majority that considered that '[o]nly if and to the extent
        that the claims made are valid under the ECT do the substantive EU law issues arise.'[242] In
        contrast, the Claimant considers that the Tribunal should take the view of the *Cube* tribunal,
        that EU law is only one among several regional and national legal systems, and '[w]ithin
        the system of international law, EU law does not have supremacy, and has no hierarchical
        priority over the laws of non-Member States, or over rules of international law, including
        the ECT.'[243]

223.    Further, the Claimant clarifies that its case rests on Spain's breaches of its obligations under
        the ECT, not on any issue of EU law. Eurus is not asking to receive subsidies in perpetuity
        under the Special Regime (what Spain characterizes as a *sine die* right to state aid). Instead,
        the Claimant argues that it was entitled under the ECT to fair and equitable treatment,

---

[239] Respondent's Comments on the European Commission's Application to intervene, Section III, referring to **RL-0073**, EC decision of 10 November 2017, ¶ 165.

[240] Cl. Rej., ¶ 11, citing **CL-0096**, *Eureko B.V. v. Slovak Republic* (PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 ('***Eureko v. Slovak Republic***'), ¶ 274.

[241] Cl. Rej., ¶¶ 8-11.

[242] Claimant's comments on *BayWa*, 9 January 2020, ¶ 18, citing **RL-0095**, *BayWa*, ¶ 409.

[243] Claimant's comments on *Cube*, 11 June 2019, ¶ 19, citing **RL-0090**, *Cube*, ¶ 130.

including 'stable' and 'favorable' conditions for its investment. Yet, Spain breached those substantive standards by eliminating through the Disputed Measures rights that Eurus once enjoyed. Eurus claims damages for the harm caused by Spain in accordance with the standard of full reparation under international law. Those damages are measured based on the amounts that Eurus would have received under the Special Regime, because the most plausible counterfactual scenario is one in which Spain did not wrongly eliminate rights in reliance upon which Eurus invested.[244]

224.    The Claimant notes that the alleged effects of *Achmea* on the Tribunal's jurisdiction should have been eliminated from this case with Eurus Europe's withdrawal.[245] In any case, Spain's argument that payments under a potential award in favor of Eurus would constitute state aid and bar jurisdiction fails because (i) Eurus is not asking the re-establishment of the subsidies *per se*, but the remedy due under international law: lump-sum compensation for Spain's breach of its ECT commitments; and (ii) the EC's decision of 10 November 2017 covers only the Disputed Measures (*i.e.* the New Regime), it does not declare that the Special Regime constituted unlawful state aid.[246] In this regard, the Claimant notes that the tribunal in *Greentech* considered that Spain's reliance on the EC decision of 10 November 2017 was misplaced, because the tribunal's jurisdiction derives from the ECT, not from EU law.[247]

225.    The Claimant also submits that the satisfaction of an award under the ICSID Convention cannot constitute state aid.[248] In any event, as decided by the tribunal in *Micula v. Romania*,[249] the Tribunal should not embark on predictions as to the possible conduct of

---

[244] Cl. Rej., ¶¶ 12-15.

[245] Claimant's comments on *Greentech*, 10 May 2019, ¶ 4.

[246] Cl. Rej., ¶ 16, 28; Claimant's Comments on the European Commission's Request to intervene, 31 January 2019, ¶¶ 11-14.

[247] Claimant's comments on *Greentech*, 10 May 2019, ¶ 6, referring to **CL-0116**, *Greentech*, ¶¶ 217-219.

[248] Claimant's Comments on the European Commission's Request to intervene, 31 January 2019, ¶ 27.

[249] **CL-0023**, *Ioan Micula and others v. Romania* (ICSID Case No. ARB/05/20), Final Award, 11 December 2013, ('**Micula v. Romania**' or '**Micula**'), ¶ 328.

persons or authorities after the issuance of the award, nor is it appropriate for the Tribunal to base its decision on EU law matters that may apply after the award has been rendered.[250]

**(2) The Tribunal's Analysis**

226.    Article 26(6) of the ECT deals with the applicable law in arbitrations under Part V. It provides that:

> A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

227.    Also, of potential relevance is Article 16 of the ECT ('Relation to other Agreements'), which provides:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
>
> (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, *where any such provision is more favourable to the Investor or Investment.*
>
> (emphasis added)

228.    By clear inference, Parts III and V of the ECT derogate from any provision of some other agreement, or from any right to dispute resolution under that agreement, in so far as the subject matter of the two is common and the ECT provision is more favourable to the investor or the investment.

229.    In fact, there are no prior or subsequent international agreements between Japan and Spain the terms of which concern the subject matter of Parts III or V of the ECT, so that the rule

---

[250] Cl. Rej., ¶¶ 8-18.

of priority expressed in the final (italicized) phrase of Article 16 has no application here. But Article 16 remains indirectly relevant as concerns the relation between the ECT and the TFEU, in that by clear implication the ECT prevails over the TFEU to the extent that the ECT provision 'is more favourable to the Investor or Investment'. One would not expect a non-EU member state, or the nationals of such a state, to be treated less well.

230.    To the extent that EU law is part of the applicable law under Article 26(6) of the ECT (*i.e.* if and insofar as EU law constitutes 'applicable rules and principles of international law'), this Tribunal is *prima facie* authorized to apply it.

231.    On this issue, the decisions of earlier tribunals have been markedly inconsistent:

- *AES Summit*, **CL-0050**: The parties agreed that EU law is to be taken into account as a relevant fact,[251] and the tribunal ruled that it would consider the Community competition law regime as a fact.[252]

- *Electrabel*, **CL-0018**: The tribunal stated that EU law is to be treated as a 'fact'[253] and is also to be classified as international law.[254] But in intra-EU disputes, 'EU law would prevail over the ECT in case of any material inconsistency'.[255]

- *Eureko v. Slovak Republic (Jurisdiction)*, **CL-0096**: The tribunal decided that it 'can consider and apply EU law, if required, both as a matter of international law and as a matter of German law'.[256] It further noted, however, that it 'does not have jurisdiction to rule on alleged breaches of EU law as such'.[257]

- *Micula*, **CL-0023**: The parties seemed 'to agree that EU law forms part of the "factual matrix" of the case' and 'that the question of EU law may be relevant to determining whether Romania acted fairly and equitably with respect to the Claimants' investments

---

[251] **CL-0050** or **RL-0039**, *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary* (ICSID Case No. ARB/07/22), Award, 23 September 2010 ('***AES Summit v. Hungary***'), ¶ 7.5.3.

[252] Ibid., ¶ 7.6.6.

[253] **CL-0018** or **RL-0002**, *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ('***Electrabel v. Hungary***' or '***Electrabel***'), ¶ 4.127.

[254] Ibid., ¶ 4.119.

[255] Ibid., ¶ 4.191.

[256] **CL-0096**, *Eureko v. Slovak Republic*, ¶ 283.

[257] Ibid., ¶ 290.

[…]'.[258] The tribunal concurred as the 'overall context of EU accession in general and the pertinent provisions of EU law in particular may be relevant to the determination of whether, *inter alia*, Romania's actions were reasonable in light of all the circumstances, or whether Claimants' expectations were legitimate'.[259] However, it decided that EU law, and state aid law in particular, was irrelevant to the tribunal and solely a matter for the enforcing court.[260]

- *Charanne*, **RL-0049**: The tribunal did not decide on whether the dispute concerned the interpretation or application of the European treaties in the sense of Article 344 TFEU, since it took the view that Article 344 does not apply to investor-state arbitrations.[261]

- *RREEF (Jurisdiction)*, **CL-0006**; *RREEF (Merits)*, **RL-0088**: The tribunal observed that public international law prevails in case of conflict between the ECT and EU law. 'EU law does not and cannot "trump" public international law.'[262] The tribunal awarded substantially reduced damages to the claimants solely in relation to the allegedly 'retrospective' aspects of the 2013-14 regime. That aspect of the decision is discussed in more detail below.[263]

- *Wirtgen*, **CL-0097**: The tribunal concluded that international law encompasses EU law,[264] but it did not find any relevant conflict, thus the issue of primacy did not arise.[265] Finally, there was no need to discuss state aid issues since the claims failed on other grounds.[266]

---

[258] **CL-0023**, *Micula*, ¶ 328.

[259] Ibid.

[260] **CL-0023**, *Micula*, ¶ 340.

[261] **RL-0049**, *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain* (SCC Case No. V062/2012), Final Award, 21 January 2016 ('**Charanne v. Spain**' or '**Charanne**'), ¶¶ 446, 447.

[262] **CL-0006**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Jurisdiction, 6 June 2016, ¶ 87 (emphasis omitted).

[263] See below, ¶¶ 346-355.

[264] **CL-0097**, *Mr. Jürgen Wirtgen and others v. Czech Republic* (PCA Case No. 2014-03), Final Award, 11 October 2017, ¶ 177.

[265] Ibid., ¶¶ 178, 259-265.

[266] Ibid., ¶ 468.

- *Novenergia II*, **CL-0112**: The tribunal decided that EU law is not applicable and irrelevant to the determination of the jurisdiction of the tribunal.[267]

- *Masdar*, **CL-0113**: The tribunal admitted neither the *Achmea* judgment,[268] nor the EC's decision of 10 November 2017.[269]

- *Antin*, **CL-0114**: The tribunal did not admit the *Achmea* judgment,[270] noting that EU law is substantively irrelevant to the issue of jurisdiction.[271] However, it held that Spain did not properly analyse the impact of EU law on the legitimate expectations of the investor.[272]

- *Antaris*, **CL-0115**: The tribunal did not admit the *Achmea* decision on the basis of the Respondent's earlier waiver of objections on the EU jurisdictional point.[273] It did not need to discuss the state aid issue since the application failed on other grounds.

- *Greentech*, **CL-0116**: The tribunal considered that EU law and the *Achmea* judgment were irrelevant to its decision on jurisdiction, finding Article 26(6) of the ECT applicable to the merits only.[274] The majority of the tribunal noted that the EC decision of 10 November 2017 did not assess the RD 661/2007 incentives scheme under which the claimants had invested and hence had no bearing on the claimants' legitimate expectations of regulatory stability at the time of their investment.[275]

- *Cube*, **RL-0090**: The tribunal found that, while EU rules against state aid are part of EU law, they 'plainly cannot be "principles of international law" within the meaning of Article 26(6) ECT.'[276] The tribunal considered Spanish law and EU law relevant

---

[267] **CL-0112**, *Novenergia II*, ¶¶ 459-465.

[268] **CL-0113**, *Masdar*, ¶¶ 679-683.

[269] Ibid., ¶ 79.

[270] **CL-0114**, *Antin*, ¶¶ 56-58.

[271] Ibid., ¶¶ 224-230.

[272] Ibid., ¶ 658.

[273] **CL-0115**, *Antaris*, ¶ 73.

[274] **CL-0116**, *Greentech*, ¶¶ 218, 220-222.

[275] Ibid., ¶ 381.

[276] **RL-0090**, *Cube*, ¶ 159.

only as facts to determine how claimants could expect their investments in Spain to be treated, but did not to apply the provisions on EU law concerning state aid.[277]

- *NextEra*, **RL-0091**: The tribunal rejected the intra-EU objection but noted that while the *Achmea* judgment dealt with an intra-EU BIT dispute, the *Achmea* judgment was also discussed in the context of investor-state arbitration under the ECT.[278] The tribunal decided that the applicable law was the ECT and any rules of international law relevant to its interpretation and application, adding that it would refer to provisions of Spanish and EU law, if appropriate.[279] No reference was made to EU law concerning the merits.

- *9REN*, **CL-0117** or **RL-0092**: On jurisdiction, the tribunal found that EU law was not materially incompatible with investor-state arbitration under Article 26 of the ECT and the ICSID Convention, while the *Achmea* decision '[did] not extend to the ECT.'[280] After upholding jurisdiction, the tribunal considered that it was 'within that jurisdiction to consider EU law to the extent necessary for the resolution of the dispute under *international* law.'[281] (emphasis in the original)

- *Landesbank*, **CL-0118**: This decision concerned only Spain's intra-EU objection. The tribunal concluded that by operation of Article 16 of the ECT, EU law did not prevail over the ECT, as the basis for the tribunal's jurisdiction. No issues of state aid were addressed.[282]

- *OperaFund*, **RL-0093**: The tribunal considered that the distinction between the applicable substantive law and the law applicable to jurisdiction must be respected. The tribunal concluded that all substantive provisions of the ECT applied and that EU law was not part of the applicable substantive law of that case.[283]

---

[277] Ibid., ¶ 160.

[278] **RL-0091**, *NextEra*, ¶ 334.

[279] Ibid., ¶ 390.

[280] **CL-0117**, *9REN*, ¶¶ 172, 173.

[281] Ibid., ¶ 172.

[282] **CL-0118**, *Landesbank*, ¶ 194.

[283] **RL-0093**, *OperaFund*, ¶ 330.

- *BayWa*, **RL-0095**: The tribunal considered that '[o]nly if and to the extent that the claims made are valid under the ECT do the substantive EU law issues arise.'[284]

- *Stadtwerke*, **RL-0097**: The tribunal considered that EU law did not govern the tribunal's jurisdiction by virtue of Article 26(6) of the ECT. On applicable law, the tribunal considered that Spanish law, as the host State's national law, was not extraneous to the determination that the tribunal must make in respect of the issues in dispute. The tribunal considered that the issue of claimants' legitimate expectations could be resolved without an assessment of the national law that created and implemented the legal and regulatory framework applicable to the investment.[285]

232.    In the Tribunal's view, EU law is part of international law, being established by a series of treaties as interpreted by courts (notably the CJEU) to whose jurisdiction EU member states have consented.[286] It is correct that Japan is a third party to the EU treaties and is not bound by them as such. But the EU treaties have established legal regimes for regulating matters such as state aid, which are furthermore directly applicable as part of the law of the member states. To the extent that Japanese or other third-state corporations establish activities in the EU that are regulated by those regimes, they may be affected by them.

233.    In oral argument, the Respondent, while accepting that in principle EU law was applicable to the Claimant's investment, denied that the Tribunal could apply it, referring to the CJEU's strictures as to the autonomy of that law.[287] In particular, the CJEU said that:

> [T]he [EU] judicial system […] has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which […] has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as

---

[284] **RL-0095**, *BayWa*, ¶ 409.

[285] **RL-0097**, *Stadtwerke*, ¶ 181.

[286] To the same effect *Vattenfall AB v. Federal Republic of Germany* (ICSID Case No. ARB/12/12), Decision on the *Achmea* Issue, 31 August 2018 ("*Vattenfall*"), ¶ 146, citing **RL-0048**, *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award, 25 November 2015 ('*Electrabel (Award)*'), ¶ 4.120: 'EU law is international law because it is rooted in international treaties'. The Tribunal notes that while *Vattenfall* is not in the record it is in the public domain and Spain referred to it in its comments on *Cavalum* of 20 October 2020 (see para. 4, fn. 4 referring to the findings of the tribunal in *Cavalum* at ¶¶ 357 and 358 with respect to EU law as part of international law); the Claimant submitted comments on *Cavalum* in response to Spain on 3 November 2020.

[287] Hearing Day 5, p. 119, ll 4-12 (Ms. Moraleda Saceda).

well as, ultimately, the particular nature of the law established by the Treaties.[288]

234.  The Respondent interpreted this passage as denying ECT tribunals (to which the preliminary ruling procedure is inapplicable) any capacity to have regard to EU law.  The Tribunal does not read the CJEU's judgment in that sense. The core of the CJEU's reasoning was as follows:

> 57. It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected […].

> 58. In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States.  Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above.

> 59. In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.[289]

235.  In the present case, by contrast, the Tribunal's jurisdiction is not established by 'an agreement which was concluded not by the EU but by Member States'. It is established by a multilateral treaty to which the EU itself is a party. Moreover, the ECT contains no

---

[288] *Achmea*, ¶ 37.
[289] *Achmea*, ¶¶ 57-59 (references omitted).

disconnection clause,[290] nor does it contain any provision giving precedence to EU over international law, in particular so far as third states are concerned.[291] In the absence of any such provisions, the Tribunal is called on to apply the normal rule of priority of international law by virtue of Article 26(6) of the ECT.[292]

236.    References to the autonomy of EU law do not entail that an ECT tribunal may not take EU law into account in appropriate circumstances. Autonomy is not the same as invisibility, and ECT tribunals can take note of, and apply, clear and established rules of EU law that are relevant to the facts before them. This does not convert such tribunals into unmonitored organs of the EU, nor does it mean that they can exercise powers expressly conferred on EU organs, such as the various competences of the European Commission in relation to state aid. It is one thing to exercise conferred powers, and another to note the settled legal consequences of facts established in the course of the proceedings, for example, the fact that unnotified state aid gives rise to adverse consequences under Article 108(3) of the TFEU. To that extent, at least, EU law is part of the applicable law under Article 26(6) of the ECT.

## VII.    MERITS

237.    The Claimant alleges three causes of action arising under the ECT:

(A)    indirect expropriation (Article 13);

(B)    breach of fair and equitable treatment (Article 10(1), first and second sentences);

(C)    breach of the obligation of most constant protection, which refers also to impairment with unreasonable or discriminatory measures (Article 10(1), third sentence).

---

[290] Cf **CL-0083**, *Blusun*, ¶ 280; and many other decisions of investment tribunals to similar effect.

[291] The definition of REIO in ECT Art. 1(3) does not have this effect. It is concerned to identify and characterise bodies such as the EU as parties to the ECT and to identify their role and obligations alongside states parties. Art. 1(3) does not incorporate by reference any conflicts rule of EU law giving it priority over international law in certain cases.

[292] Cf **CL-0006**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Jurisdiction, 6 June 2016, ¶ 87.

238.    Before turning to the merits of these claims, insofar as they fall within the Tribunal's jurisdiction, it is relevant to observe that a large number of parallel claims have been filed against the Respondent arising out of the Spanish measures, producing somewhat discrepant results.

239.    As a general matter, investment tribunals (like other international tribunals) are not bound by a strict doctrine of precedent but are charged to make their own appreciations based on the evidence and arguments presented to them. In practice, tribunals regularly cite previous, publicly available awards and pay careful attention to them. In the Tribunal's view, concordant decisions on the interpretation and application of the ECT merit serious consideration, especially if they rise to the level of a *jurisprudence constante*. Where they diverge, a later tribunal has no choice but to form its own view of the relevant law and its application to the facts. This the Tribunal has done.

240.    In assessing the Claimant's substantive claims, it is appropriate first to consider these under the ECT before turning to consider the parties' arguments on EU law.

A.    THE EXPROPRIATION CLAIM: ARTICLE 13(1) OF THE ECT

(1) The Claimant's position

241.    The Claimant maintains that the ECT protects investors from direct and indirect expropriation, unless carried out in accordance with the conditions laid down in Article 13(1) of the ECT. The Claimant contends that unlawful expropriation relates to tangible property as well as to rights economically significant to the investor, as supported by the jurisprudence of international tribunals, as in *SPP v. Egypt*,[293] and as described in the United Nations Conference on Trade and Development's study on Taking of Property.[294] In particular, relying on *Goetz v. Burundi* and *Middle East Cement v. Egypt*, the Claimant contends that legal rights arising out of unilateral acts by host states, such as laws or

---

[293] Cl. Mem., ¶ 173, citing **CL-0016**, *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt* (ICSID Case No. ARB/84/3), Award, 20 May 1992 ('***SPP v. Egypt***'), ¶¶ 165-167.

[294] Cl. Mem., ¶ 172, citing **CL-0015**, United Nations Conference on Trade and Development, UNCTAD Series on issues in international investment agreements: Taking of property (2000), p. 36.

decrees, are protected against unlawful expropriation.[295] Further, a state's intention is irrelevant when assessing whether the measures taken resulted in an indirect expropriation.[296]

242.    The Claimant argues that Spain, by adopting the Disputed Measures, in particular, RD-Law 2/2013, expropriated the Claimant's rights to receive premiums, without providing any compensation for the Claimant's losses. The Claimant's rights to receive premiums derived from each of the Claimant's SPCs having received and maintained under Spanish law the status of Special Producer. Each SPC was entitled to receive, at a minimum, premiums above the pool price for the generation of electricity.[297]

243.    The Claimant's entitlement was embodied in official certificates, which have been almost completely devalued through Spain's removal of the feed-in-tariffs, producing the same effect as if they had been revoked.[298] After Spain adopted the Disputed Measures, 11 out of 13 SPCs ceased to receive incentives, although their Special Producer Certificates entitled all of them to do so. The Claimant compares this situation to that of *Middle East Cement v. Egypt*, where the tribunal held that a new law prohibiting the importation of cement, rendering the license to import cement moot, was tantamount to an expropriation.[299]

244.    The Claimant maintains that Spain failed to pay any compensation for eliminating the payment of the feed-in tariffs through RD-Law 2/2013. Relying on the Brattle Regulatory Report, the Claimant argues that, instead, Spain actively clawed back remuneration that existing facilities had received under the Special Regime.[300]

---

[295] Cl. Mem., ¶¶ 174, 175, citing **CL-0002**, *Antoine Goetz and others v. Burundi* (ICSID Case No. ARB/95/3), Award, 10 February 1999, ¶ 76; and **CL-0003**, *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt* (ICSID Case No. ARB/99/6), Award, 12 April 2002, ¶ 107.

[296] Cl. Mem., ¶¶ 169-171.

[297] Cl. Mem., ¶ 178.

[298] Cl. Mem., ¶¶ 179-181.

[299] Cl. Mem., ¶ 181, citing **CL-0003**, *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt* (ICSID Case No. ARB/99/6), Award, 12 April 2002, ¶ 107.

[300] Cl. Mem., ¶ 184, citing **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶¶ 32, 239.

245.  The Special Regime had no quantitative limit on the cumulative amount of financial incentives that a RE producer could receive.  But then the Disputed Measures set a 7.398% investment return for renewable energy investments, applied not only prospectively but also retrospectively. This means that, if an investor had earned returns exceeding 7.398% in previous years, the Disputed Measures balanced that with reduced returns (to the point, where applicable, of zero subsidies) in the future. That is, existing producers, like the Claimant, must reimburse Spain by means of a set-off for remuneration already received under the Special Regime, and facilities which overall earned returns exceeding 7.398% were ineligible for future incentives.[301] This constituted an indirect expropriation of Claimant's rights.

246.  Spain thereby breached Article 13 of the ECT by failing to pay 'prompt, adequate and effective' compensation, unlawfully expropriating the Claimant's legal rights as a Special Producer.

### (2) The Respondent's position

247.  The Respondent argues that no expropriation of rights has occurred, since the rights that the Claimant argues were expropriated do not exist under Spanish law and, therefore, are not part of Claimant's assets. Further, the Disputed Measures were not retroactive.[302]

248.  The Respondent explains that the certificates to which the Claimant refers were granted upon registration in the RAIPRE. Such certificates resulted from a mandatory administrative step both for conventional and renewables producers and did not reflect any commitment by Spain to guarantee a certain tariff indefinitely into the future.[303]

249.  Registration was used by Spain to monitor the evolution of the electrical energy produced and used, and the energy transferred into the grid, to verify that the objectives in the Plan to Encourage Renewable Energies in Spain 2000-2010 were met. This view was supported by the tribunal in *Charanne v. Spain*[304] and follows from RD 2366/1994, which created the

---

[301] Cl. Mem., ¶ 185, citing **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶ 187.
[302] Resp. C-Mem., ¶¶ 949, 950; Resp. Rej., ¶¶ 619-638.
[303] Resp. Rej., ¶¶ 684-689.
[304] Resp. Rej., ¶ 685, citing **RL-0049**, *Charanne*, ¶¶ 509, 510.

RAIPRE and defined its purpose as gathering statistics and offering information about the contribution of the plants to the electrical system.[305]

250. The Respondent argues that, when the Disputed Measures were approved, the Claimant did not hold an acquired right to receive a subsidy indefinitely in time beyond a reasonable return, nor did it hold an acquired right that the formulas used to set the premiums would remain unchanged. Such rights have never existed and cannot be acquired rights incorporated within Claimant's assets protected against expropriation under Article 13 of the ECT.[306] This position also finds support in the 2005, 2006, 2007, and 2009 Judgments of the Supreme Court, a report of the CNE, and a ruling of the EC.[307]

251. The Respondent also argues that the Disputed Measures are not expropriatory because they were not retroactive, either under international law or under Spanish law. Relying on *Nations Energy v. Panama*,[308] the Respondent maintains that regulations which are applied in the future, but do not affect rights already acquired, are not retroactive from an international law perspective.[309] Here, the payment of the new remuneration was deployed to the future, taking into account as a relevant fact payments made before the entry into force of RD-Law 2/2013.[310]

---

[305] Resp. Rej., ¶¶ 686, 687.

[306] Resp. C-Mem., ¶¶ 968-971.

[307] Resp. C-Mem., ¶¶ 970-972, citing **R-0126**, CNE Report 4/2004 on the Proposal of Royal Decree which establishes the methodology for updating and systematizing the legal and economic system of the activity of electricity production in special regimen, 22 January 2004, and **R-0140**, Third Chamber of the Supreme Court, sect. 3, Judgment, 9 October 2007, rec. 13/2006; **RL-0021**, European Commission, Decision C(2016) 7827 final, issued in the aid file SA.40171 (2015 / NN) – Czech Republic, 28 November 2016, ¶ 135; Resp. C-Mem., ¶¶ 954, 955, citing **R-0138**, *2006 Judgment*, third legal ground, p. 4; **R-0141**, *2009 Judgment*, fourth legal ground. See also regarding the case-law of the Spanish Supreme Court Resp. C-Mem., ¶¶ 365, 366, citing **R-0137**, *2005 Judgment*: 'There is no legal obstacle that exists to prevent the Government in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration'. **R-0138**, *2006 Judgment*, third legal ground: '[…] electricity producers under the special regime do have an "unalterable right" to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future'.

[308] Resp. Rej., ¶ 623, citing **RL-0040**, *Nations Energy Inc. and others v. Republic of Panama* (ICSID Case No. ARB/06/19), Award, 24 November 2010 ('***Nations Energy v. Panama***'), ¶¶ 642, 646 (The Spanish-language version of the award is public. Spain submitted English-language translations of ¶¶ 642, 644 and 646 as **RL-0040**).

[309] Resp. Rej., ¶ 624.

[310] Resp. Rej., ¶ 628.

252. Further, the tribunal in *Isolux v. Spain* considered that RD-Law 9/2013 did not have a retroactive effect; instead it applies to the future as it did not revoke rights acquired in the operation of the plants.[311] Relying on *Charanne v. Spain*, the Respondent argues that the concept of retroactivity defended by the Claimant implies freezing the regulatory framework with respect to the remuneration throughout the entire lifetime of a facility, which is contrary to the object and purpose of the ECT, which allows adopting macroeconomic control measures, even if investors' profits are reduced thereby.[312]

253. The Disputed Measures are not retroactive under Spanish law, as confirmed by the Spanish Constitutional Court[313] and the Spanish Supreme Court.[314] These courts ruled that the modification of the reasonable rate of return introduced by the Disputed Measures only affected the overall calculation of subsidies that the owners of facilities were entitled to in future, without affecting or clawing back amounts received in the past.[315]

**(3) The Tribunal's Analysis**

254. Article 13(1) of the ECT states:

> (1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as 'Expropriation') except where such Expropriation is:
>
> (a) for a purpose which is in the public interest;
>
> (b) not discriminatory;

---

[311] Resp. C-Mem., ¶ 974, citing **RL-0024**, *Isolux*, ¶ 814.

[312] Resp. Rej., ¶¶ 629, 630, citing **RL-0049**, *Charanne*, ¶¶ 546, 548.

[313] Resp. Rej., ¶¶ 634, 635, referring to **R-0154**, Judgment of the Constitutional Court, 17 December 2015 (Appeal Inc. 5347/2013), **R-0156**, Judgment of the Constitutional Court, 18 February 2016 (Appeal Inc. 5852/2013), **R-0157**, Judgment of the Constitutional Court, 18 February 2016 (Appeal Inc. 6031/2013).

[314] Resp. Rej., ¶¶ 634, 635, referring to **R-0155**, Judgment of the Supreme Court 63/2016, 21 January 2016, (Rca. 627/2012), **R-0089**, Judgment of the Supreme Court 1260/2016, 1 June 2016, (Rec. 649/2014), **R-0023**, Judgment of the Supreme Court 1266/2016, 1 June 2016, (Appeal 564/2014), **R-0045**, Judgment of the Supreme Court 1259/2016, 1 June 2016, (Rca. 650/2014), **R-0026**, Judgment of the Supreme Court 1261/2016, 1 June 2016, (Rca. 653/2014), **R-0027**, Judgment of the Supreme Court 1264/2016, 1 June 2016, (Rca. 657/2014).

[315] Resp. Rej., ¶ 637, citing **R-0089**, Judgment of the Supreme Court 1260/2016, 1 June 2016, (Rec. 649/2014), pp. 14, 15.

(c) carried out under due process of law; and

(d) accompanied by the payment of prompt, adequate and effective compensation.[316]

255.    The claim under Article 13 presents a number of issues.

256.    First, it is necessary to distinguish between the claim for expropriation under Article 13 of the ECT and claims made under Article 10, 1st–3rd sentences, whether based on instability, frustration of reasonable or legitimate expectations or unreasonable or discriminatory measures. Article 13 of the ECT, like other expropriation guarantees, is concerned with the protection of property interests, including certain legal rights to money or benefits, from seizure or taking, or with conduct equivalent thereto.  It is not intended to protect the wider range of interests associated with the idea of reasonable or legitimate expectations.  Such expectations can be frustrated or denied, but they cannot be expropriated.

257.    Secondly, when it comes to conduct tantamount to expropriation (or as formulated in Article 13, conduct having 'equivalent effect'), it is necessary to bear in mind that expropriation, direct or indirect, requires substantial deprivation of the asset in question or its value.  For example, the tribunal in *AES v. Hungary* observed:

> For an expropriation to occur, it is necessary for the investor to be deprived, in whole or significant part, of the property in or effective control of its investment: or for its investment to be deprived, in whole or significant part, of its value.[317]

258.    There are many other decisions to similar effect.[318]

259.    For the purposes of Article 13 of the ECT, it is necessary to ask, first, what rights are identified by the Claimant as having been expropriated. As to this, the Claimant clarified

---

[316] **CL-0001**, ECT, Art. 13(1).

[317] **CL-0050**, *AES v. Hungary*, ¶ 14.3.1

[318] See, e.g., **RL-0049**, *Charanne*, ¶ 464 ('[F]or a loss of value to be equivalent to an expropriation, it has to be so large that it equals a deprivation of property'); **CL-0112**, *Novenergia II*, ¶ 727 ('It is uncontroversial in international arbitration that a State measure resulting in a "substantial deprivation" of an investment – that is, when the measure substantially interferes with the control or the economic value of the investment – constitutes an expropriation.'); **RL-0024**, *Isolux*, ¶ 839 ('That is to say, the impact to the rights or goods of the investor of the measures, must be of such magnitude that its investment loses all or a significant part of its value, which amounts to a deprivation of its property.').

in oral argument that 'the claim is for an expropriation of the public law right to the FITs'.[319] That public law right was said to arise, in the first place, from the Special Producer Certificates issued to each of the project companies pursuant to their registration in the RAIPRE.[320]

260.    The RAIPRE was created by Article 6 of RD 2366/1994, which provided that:

> 1. For the purpose of adequately monitoring energy planning, in terms of both installed power and evolution of produced energy and primary energy used, a General Registry of Special Regime Production Facilities is hereby created within the General Energy Agency of the Ministry of Industry and Energy [...].[321]

261.    Article 7 of RD 2366/1994 then spelled out producers' rights and obligations under the Special Regime, but it did not specify the duration of those rights.

262.    This was replaced by relevant provisions of the Spanish Electrical Power Law 54/1997:

> Article 21(4). An Administrative Register of Electricity Generation Installations is hereby created in the Ministry of Industry and Energy in which all those electricity generation installations that have been authorised must be entered together with their conditions and especially the capacity of the installation.
>
> Article 31. Electricity installations falling under the special regime must be entered in the Administrative Register of Electricity Generation Installations referred to in point 4 of article 21 of this Act. In each case, the entry shall specify the remunerative arrangements that apply.[322]

263.    Subsequent royal decrees were to similar effect, referring back to the Administrative Register created by the 1997 Law.[323]

---

[319] Hearing Day 5, p. 10, ll 24-25 (Mr. Turner).

[320] Cl. Reply, ¶¶ 184-191.

[321] **C-0002**, RD 2366/1994, Art. 6.

[322] **R-0003**, Law 54/1997, Arts. 21(4), 31.

[323] **C-0005**, RD 2818/1998, Art. 9 ('For proper monitoring of the special regime'); **C-0007**, RD 436/2004, Art. 9 ('For adequate monitoring of the special regime'); **C-0008**, RD 661/2007, Art. 9 ('In order to ensure appropriate monitoring of the special regime').

264.   In the Tribunal's view, these are perfectly standard administrative provisions, and do not by themselves imply immutability. The RAIPRE registration was essentially administrative in effect; it qualified applicants to receive FITs but did not entail a binding promise that these would be maintained unchanged.

265.   In that respect, the tribunal in *Charanne* held that:

> [T]he Respondent has convincingly proved that, under Spanish law, registration with the RAIPRE was a mere administrative requirement in order to be able to sell energy, and by no means implied that registered facilities had a vested right to a certain remuneration.[324]

266.   Nor has the Claimant established that, as a matter of Spanish law, the operating companies had a vested right to a particular remuneration. The Spanish courts have consistently denied there was any such right.  For example, in relation to an appeal brought against RD 436/2004, the Third Chamber of the Supreme Court stated in its Judgment of 15 December 2005:

> There is no legal obstacle that exists to prevent the Government in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration as long as [the Government stays] within the framework set out by the ELS [1999 Electricity Law][325]

267.   The Third Chamber also stated in its Judgment of 25 October 2006 in relation to amendments made to RD 436/2004:

> Until it is replaced by another, [Article 30 of the Electricity Law] allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining "reasonable rates of return with reference the cost of money in the capital market" or, to put it again in the words of the preamble to Royal Decree 436/2004, "reasonable compensation for their investments." However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those

---

[324] **RL-0049**, *Charanne*, ¶ 510.

[325] **R-0137**, *2005 Judgment*, eighth legal ground.

obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.[326]

268.    Again, on 20 March 2007, the Third Chamber of the Supreme Court stated:

> What article 30 of the [1997 Act] allows companies is to aspire that the premiums would include […] reasonable return rates in relation to the cost of money in the capital market; that is, a reasonable return on their investments. Owners of facilities under a Special Regime are not guaranteed the intangibility of a given benefit or income regime in relation to those obtained in previous years, nor are they guaranteed the indefinite permanence of the formulas used to fix premiums. Changes should be made within the legal limits.[327]

269.    Furthermore, the Third Chamber of the Supreme Court has stated on many occasions that the 'public regulatory framework […] could not subsequently be immune to any relevant modifications to basic economic data in the light of which it is logical for the public authorities to keep in step with the new circumstances.'[328]

270.    In its decision of 3 December 2009 rejecting a challenge to RD 661/2007, the Third Chamber of the Supreme Court stated:

> Nor can recognition of the right of producers under the special regime to the immutability of this regime be understood, since the Government, according to the intent of the Legislator, holds a margin of assessment to determine the energy outputs offered, in line with clear targets inherent in the execution of the economic, energy and environmental policies, and taking into consideration in the exercising of its regulatory power the obvious and essential general interests involved in the correct operation of the electricity production and distribution system and, in particular, the rights of the users.[329]

---

[326] **R-0138**, *2006 Judgment*, third legal ground.

[327] **R-0139**, *2007 Judgment*, second legal ground.

[328] **R-0140**, Supreme Court Third Chamber Judgments of 18 July 2012 (Appeal 19/11), of 5 November 2012 (Appeal 103/2011), of 9 November 2012 (Appeal 89/2011), of 12 November 2012 (Appeal 98 and 110/11), of 16 November 2012 (Appeal 116/11), of 21 November 2012 (Appeal 34/2011).

[329] **R-0141**, *2009 Judgment*, fourth legal ground.

271.  It added that 'the principle of legal certainty […] does not include any right to the freezing of the existing legal system'.[330]

272.  In short, expropriation of intangible rights requires, *inter alia*, that the rights in question exist under the relevant legal system, which is not the case here.

273.  It may be recalled that no ECT tribunal has yet upheld an Article 13 claim in relation to the Disputed Measures.  Such claims have either been avoided on the ground that the dispute was covered by Article 10 or rejected outright.[331]

274.  Accordingly, the Claimant's expropriation claim fails because the right claimed to have been expropriated was not an acquired right susceptible of expropriation.  Had the expropriation claim been made in respect of the Claimant's 100% indirect interest in the project companies, that claim would have also failed, because the plants are still intact and operating under the Claimant's ultimate control and continued oversight, although their value is impaired.  Two of the wind farms are still receiving subsidies.  In sum, the Claimant has alleged no conduct on the part of Spain that is tantamount to expropriation, and consequently the Article 13 claim fails.

275.  In the end, the Claimant's main argument has been that the subsidy regime of RD 661/2007 was to be maintained in its essentials by virtue of Article 10(1) of the ECT, not that it was a vested right.  Its chief claim is to stability, not immutability.  It is to that claim that the Tribunal turns.

B.    **SPAIN'S ALLEGED BREACH OF ARTICLE 10(1) OF THE ECT, FIRST & SECOND SENTENCES**

      **(1) The Claimant's Position**

          *a.  The FET standard*

276.  The Claimant maintains that the FET standard under the ECT is especially protective of investors' legitimate expectations with respect to regulatory environments.  Article 10(1) of the ECT requires states to provide 'fair and equitable' treatment and sets a higher

---

[330] Ibid.

[331] As in **RL-0049**, *Charanne*, ¶¶ 460-467; **CL-0112**, *Novenergia II*, ¶¶ 759-763, **RL-0024**, *Isolux*, ¶¶ 837-854.

standard of protection than the typical FET standard of a bilateral investment treaty, by requiring states to create 'stable' and 'favourable' conditions,[332] particularly, for environmentally-friendly energy investments, as follows from the ECT's object and purpose.

277.    Investment tribunals have confirmed that the FET standard requires states to offer 'consistent and transparent behaviour',[333] to grant and maintain a stable and predictable regulatory framework to fulfil the justified expectations of a foreign investor at the time of the investment.[334] This special feature of the ECT does not prevent Spain from changing its regulatory framework, but commits Spain to 'provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments,' as held by the tribunal in *Eiser v. Spain*.[335]

278.    The Claimant argues that legitimate expectations are to be determined objectively, having regard to the regulatory framework in place at the time of the investment. This is especially so, when such framework is designed to address the needs of a special class of long-term investors, like investors in energy generation facilities.[336] The adoption of retroactive legislation is one of the strongest forms of regulatory instability and disfavouring treatment, and the European Commission has discouraged states from retroactive regulatory intervention in the electricity sector.[337]

279.    The Claimant first invested in Spain in 1997 (Paxareiras I and IIa),[338] with a final expansion of its investment in 2008 (Grallas). During that period, all of Claimant's SPCs were entitled

---

[332] Cl. Reply, ¶¶ 205, 206.

[333] Cl. Mem., ¶¶ 187-194, citing **CL-0020**, *LG&E Energy Corp. and others v. Argentine Republic* (ICSID Case No. ARB/02/1), Decision on Liability, 3 October 2006, ¶ 131.

[334] Cl. Mem., ¶ 194, referring to **CL-0022**, *Impregilo S.p.A. v. Argentine Republic* (ICSID Case No. ARB/07/17), Award, 21 June 2011, ¶¶ 315, 326, 330, 331, 370; and, among others, to **CL-0023**, *Micula* (See Cl. Mem., fn. 376).

[335] Cl. Reply, ¶¶ 207-209, citing **CL-0079**, *Eiser*, ¶ 382.

[336] Cl. Mem., ¶ 195.

[337] Cl. Mem., ¶ 196, referring to **CL-0042**, European Commission, 'Questions and Answers: EU Commission: Guidance for state intervention in electricity', 5 November 2013, pp. 1, 3.

[338] The Claimant submits that its contributions to Spain began long before any conceivable concern about Spain's economic situation. The Claimant affirms that it began considering investing in wind power in Spain in 1992 when Tomen and SeaWest España explored sites in Galicia and Asturias; in 1995 Eurus presented its strategic plan to the Xunta; and in 1997 Eurus began its investment. See Claimant's comments on *BayWa*, 9 January 2020, ¶ 4, referring to Cl. Mem., ¶¶ 54, 58.

to benefit from the Special Regime, last revised through RD 661/2007.[339]  Relying, among others, on *Saluka v. Czech Republic*,[340] the Claimant argues that, for the purposes of determining when Claimant's legitimate expectations were formed, the Tribunal should see the constituent parts of Claimant's investment in Spain as an indivisible whole;[341] with Claimant's decision to invest based on an assessment of the regulatory framework existing at the time of the investment and the changes made during the investment process, including RD 661/2007.[342]

280.  The Claimant argues that this view was supported by the tribunal in *Blusun v. Italy*, which held that the substantive protections of Article 10(1) of the ECT are not limited to the initial making of the investment, but include subsequent extensions of the investment and changes of form.[343]

### b. Spain breached Article 10(1) of the ECT by violating Claimant's legitimate expectations

281.  The Claimant did not expect Spain to petrify its regulatory framework, but it expected that Spain would not significantly weaken or take away the Special Regime in respect of any existing SPC for the duration of its operational lifetime. The Claimant expected that its investments would benefit from a regime at least as favourable as that set out in RD 661/2007.[344] Brattle, the Claimant's regulatory expert, explains in its Regulatory Report that stable governmental Special Regimes are critical to attract long-term investment in wind power, as such investments have high up-front costs and must operate a long time to recoup those costs.[345]

---

[339] Cl. Mem., ¶ 202.

[340] Cl. Mem., ¶ 200, citing **CL-0031**, *Saluka Investments B.V. v. Czech Republic* (UNCITRAL), Partial Award, 17 March 2006, ¶ 301.

[341] In its comments on *BayWa*, the Claimant restated its position that while Eurus sought internal approval each time it expanded its long-term wind project, this remained a single investment that began in 1997, involving several wind farms developed and expanded in the following decades. See Claimant's comments on *BayWa*, 9 January 2020, ¶ 4.

[342] Cl. Mem., ¶¶ 197-201; Cl. Reply, ¶ 250.

[343] Cl. Reply, ¶ 250, citing **CL-0083 or RL-0074**, *Blusun S.A. and others v. Italian Republic* (ICSID Case No. ARB/14/3), Award, 27 December 2016 ('***Blusun v. Italy***' or '***Blusun***'), ¶ 319.

[344] Cl. Mem., ¶ 204.

[345] Cl. Mem., ¶ 218, citing **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶ 9.

282.    The Claimant argues that its expectations of stability, *i.e.* that the subsidies to the Claimant's SPCs would not be retroactively revoked, were legitimate on the basis that the Special Regime legislation included provisions that signalled Spain's view of the FITs as a way to encourage long-term energy investments to reach its long-term environmental goals.[346]

283.    Further, other contextual sources confirm that the Claimant's expectations arising out of Spain's legislation were legitimate:

(1)    The Preamble of RD 2366/1994 states that renewable energies reduce the consumption of conventional primary energy with a positive impact on environmental protection.[347] Article 7 of RD 2366/1994 stated that Special Producers, such as all of the Claimant's projects, had the right to 'transfer their excess energy to the electricity distribution company, provided it [was] possible for such energy to be absorbed by the grid and to receive in exchange the price resulting from the provisions of this Royal Decree.' Spain did not include language to limit the duration of such right.[348] Also, in setting out the formula to calculate the additional compensation above the market price ('coefficient') that Special Procedures would receive, Article 18 of RD 2366/1994 stated that after a period of five years, the value of the coefficient shall 'remain constant,' without including any language to contradict the message that it would continue so long as the facilities of Special Producers were able to produce power.[349]

(2)    The preamble of Law 54/1997 placed the promotion of renewable energies above all considerations in Spain's energy policy. Further, the Eighth transitory provision of Law 54/1997 provided that in the case that premiums were revised in the future, existing Special Producers would be entitled to choose to be covered by whatever economic arrangements were applicable to them under Law 54/1997.[350]

---

[346] Cl. Mem., ¶ 225; Cl. Reply, ¶ 244.

[347] Cl. Mem., ¶ 226, citing **C-0002**, RD 2366/1994, Preamble.

[348] Cl. Mem., ¶ 227, citing **C-0002**, RD 2366/1994, Art. 7(d).

[349] Cl. Mem., ¶ 228, referring to **C-0002**, RD 2366/1994, Art. 18.

[350] Cl. Mem., ¶ 230, citing **C-0004**, Law 54/1997, Eighth Transitory Provision (2).

(3)    The preamble of RD 2818/1998 expressly stated that there was 'no time limit' for the incentives granted to Special Producers, and explained the economic logic behind that decision, as the inability of renewable energy facilities to compete in a free market due to their characteristics, technologies and higher costs.  Article 32 of RD 2818/1998 established that Special Producers could continue to be subject to the previous remuneration schemes, even in case of revision of the premiums set in RD 2818/1998, by reference to the eighth transitory provision of Law 54/1997.[351]

(4)    The preamble of RD 436/2004 referred to the 'security and stability' of the calculation method of the remuneration under the special regime to 'foster investment in this kind of plants.'[352]  Article 1(b) of RD 436/2004 stated that the purpose of the decree was to establish a lasting economic regime for plants eligible to be under the special regime, based on an objective, transparent methodology to calculate the remuneration.  Article 34 set out a timeline for wind power facilities to receive a certain tariff from the 15th year *onwards* (emphasis added), *i.e.* on an indefinite basis.[353]  Article 40 provided explicitly that future revisions to incentive rates would not apply to existing facilities.[354]

(5)    Article 36 of RD 661/2007 set out that wind power facilities would be entitled to receive certain financial incentives the first 15 years and then, certain incentives *thereafter* (emphasis added), *i.e.* indefinitely in time.[355]

284.    The legitimacy of the Claimant's expectations arising out of the Spanish legislation on the Special Regime was confirmed by reports issued by the Claimant's independent financial advisers in 1997 and 2001. They reported that major adverse changes in the policy toward wind power were highly unlikely in the foreseeable future and that the risk that electricity prices decrease in the future was mitigated by the regulatory framework, which promoted the renewable energy sector without a time limit.[356] The Claimant also rejects Spain's

---

[351] Cl. Mem., ¶ 231, citing **C-0005**, RD 2818/1998, Preamble and Art. 32.

[352] Cl. Mem., ¶ 236, citing **C-0007**, RD 436/2004, Preamble.

[353] Cl. Mem., ¶ 238, citing **C-0007**, RD 436/2004, Art. 34(4).

[354] Cl. Mem., ¶ 240, citing **C-0007**, RD 436/2004, Art. 40.

[355] Cl. Mem., ¶ 242, citing **C-0008**, RD 661/2007, Art. 36, excerpt of table 3.

[356] Cl. Mem., ¶¶ 244-251, ¶ 246, citing **C-0045**, First Babcock Memorandum, May 1997, p. 84; ¶ 247, citing **C-0047**, Second Babcock Memorandum, November 2001, p. 86; and ¶ 250, citing **C-0049**, Bayerische Hypo- und Vereinsbank

suggestion that Eurus' due diligence was insufficient with regard to the case-law of the Spanish Supreme Court from October 2006. Eurus notes that its investment began in 1997 and only one of its facilities, Grallas, was approved after October 2006.[357]

285.    The Claimant also argues that its expectations based on the Spanish legislation on Special Regime were legitimate, as they were bolstered by personal assurances by the President of Galicia at a meeting in the Spanish Embassy in Tokyo, in which he invoked the Special Regime and encouraged the Claimant to invest.[358] The Claimant's legitimate expectations were also underscored by (i) Galicia's Xunta and the Government of Asturias approving in 1996 EuroVento's long-term plan in wind farms, and granting Special Producer status to the Claimant's SPCs to receive remuneration consistent with the Special Regime; and (ii) the Power Purchase Agreements ('**PPA**') that Spanish state-owned utilities entered into with the SPCs, allowing the SPCs to sell all of their electricity to the utilities in line with the Special Regime.[359]

### c. *Spain breached Article 10(1) of the ECT by failing to maintain stable and favourable conditions for the Claimant's investment*

286.    According to the Claimant, Spain's retroactive changes to the Special Regime also constitute unstable and unfavourable conditions for its investment, in breach of Article 10(1) of the ECT. The Claimant does not dispute that Spain could alter the Special Regime as applied to new projects and new investors. But Spain violated the FET standard by retroactively and fundamentally changing the Special Regime into a new regulatory framework, reducing the value of the Claimant's investment to about one third of what it used to be.[360]

287.    The Claimant notes that the tribunal in *Total v. Argentina* recognized a state's power to fix the tariffs of a public utility, if operation costs can be recovered, investments amortized

---

AG, EuroVento 201MW Wind Energy Project Confidential Information Memorandum ('**BHV Memorandum**'), October 2002, p. 77.

[357] Cl. Reply, ¶ 231.

[358] Cl. Mem., ¶¶ 252, 253, referring to **CW-1**, Witness Statement of Mr. Matsuoka, 18 November 2016, ¶¶ 17, 19-22.

[359] Cl. Mem., ¶ 222.

[360] Cl. Mem., ¶¶ 270-275, ¶ 278, referring to **CE-2**, Brattle First Quantum Report, 18 November 2016, ¶ 18.

and a reasonable return over time can be made.[361]  Yet, the Disputed Measures fail to meet these conditions. Spain says that the Disputed Measures maintained stability, as they were consistent with the principle governing the investments made under Law 54/1997, 'to ensure that all investors could recover, by taking a "standard facility" as a reference, (1) the cost of their investment, (2) the operating costs and (3) obtain reasonable rate of return.'[362] The Claimant disputes that tying subsidies to the costs of hypothetical standard facilities in 2014, at the time of the Disputed Measures, which did not form part of Spain's regulatory framework when the Claimant invested and subsequently expanded its investment, fails to ensure that existing investors can recover the costs of wind facilities built from 1997 to 2008. Thereby, Spain failed to provide stable conditions in breach of Article 10(1) of the ECT.[363]

288.  Also, the Disputed Measures removed the option to receive premiums, capped the investment returns at a rate of 7.398% (before tax) and effectively required the Claimant to reimburse Spain for incentives that it previously received under the Special Regime.[364] The Disputed Measures result in many of the Claimant's plants having insufficient remuneration to cover their operating costs, financing commitments, and to generate the expected returns.[365] Before the Disputed Measures, the Special Regime ensured that investors like the Claimant could earn minimum returns, without any cap on such returns.[366]  The Disputed Measures' cap on investment returns has left 11 out of the Claimant's 13 SPCs receiving no incentives, showing that, contrary to Spain's allegation, it is not correct that Spain 'maintained the subsidies'.[367] Thereby, Spain failed to create stable and favourable conditions for the Claimant's investment.

---

[361] Cl. Mem., ¶ 275, citing **CL-0039** or **RL-0050**, *Total S.A. v. Argentine Republic* (ICSID Case No. ARB/04/1), Decision on Liability, 27 December 2010 ('***Total v. Argentina***'), ¶ 122.
[362] Cl. Reply, ¶¶ 213, 214, citing Resp. C-Mem., ¶¶ 1047, 1048.
[363] Cl. Reply, ¶ 217.
[364] Cl. Mem., ¶ 276.
[365] Cl. Mem., ¶ 277.
[366] Cl. Reply, ¶ 218.
[367] Cl. Reply, ¶ 219, citing Resp. C-Mem., ¶ 1049.

### d. The Claimant's position on the internal rate of return (IRR)

289. The Claimant's expert Brattle rebutted the IRR analysis as put forward by the Respondent's expert BDO. It made two main points. First, it disagreed with the use of individual plant cash flows instead of a target standard installation. Second, BDO's methodology was inaccurate as it overstated the IRR and understated the required return.[368]

290. Since Eurus's plants have had a higher production than the standard installations in the past, it is reasonable for Eurus to receive higher returns. Yet, BDO's IRR analysis takes advantage of this situation and uses the Claimant's high profitability to deny any negative impact to the Disputed Measures. By using the cash flows of a standard facility this scenario would be avoided.[369]

291. Furthermore, Brattle argued that BDO omitted to include in the analysis important portions of the initial investment costs, which fell into two categories: 'Financing and other' costs, and 'Development/Advisory' costs. Brattle did include these costs in their analysis and as a result, the IRR as calculated by BDO dropped from 15.1% to 12.5%.[370]

292. Finally, Brattle maintained that the reasonable return expected by the Claimant is higher than what BDO considered reasonable. BDO underestimated the return for three reasons. First, the Claimant's lack of liquidity raised the risk and would have therefore led to higher required returns. Second, BDO imputed to the plants the tax benefits of debt financing, which is inconsistent with the exclusion of 'Financing and other' costs from the IRR calculation. Third, BDO did not include the construction risk, which would raise the cost of capital by up to 0.5%. Furthermore, BDO estimated the pre-tax WACCs per year by grossing up its estimate using an effective tax rate of 22%. While the need to apply an effective tax rate was not disputed, the tax rate as applied by BDO was incorrect. The rate has not been constant over the years and should be calculated for each year individually.[371]

---

[368] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶¶ 51-54.
[369] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶¶ 55-60; Hearing Day 3, p. 31, ll 3ff (Mr. Lapuerta); Hearing Day 3, p. 165, ll 18ff (Mr. Caldwell).
[370] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶¶ 61-70.
[371] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶¶ 71-83.

293. As a result, the reasonable return before taxes in 2007 according to Brattle was 9.8% with an after-tax equivalent of 7.3%. This is supported by the 7.398% (pre-tax) that Spain considered reasonable at the time.[372]

### (2) The Respondent's Position

#### a. *The Claimant's expectations were not legitimate*

294. Spain argues that the Claimant expected that any changes to the Special Regime would apply only prospectively, petrifying the Special Regime with respect to the Claimant's existing facilities, and that in effect it had an acquired right to future tariffs to be received for the entire useful life of a facility.[373] Yet, such expectation was not reasonable considering either the regulatory framework applicable at the time of investment and its evolution thereafter, or other sources referenced by the Claimant.[374]

295. Spain agrees with the Claimant in that the legitimacy of an investor's expectations must be analysed objectively. The Tribunal should assess what the investor knew or should reasonably have known about the conduct of the host state, as upheld by the tribunal in *Electrabel v. Hungary.*[375] Here, Spain's conduct is expressed in the regulatory framework existing at the time of the investment, which, as decided by the tribunal in *Charanne v. Spain*, an investor should diligently analyse to support the legitimacy of its expectations.[376]

296. Spain maintains that the Claimant fails to show that it performed a diligent analysis of the existing legal framework,[377] which a foreign investor in a highly regulated sector, like the energy sector, should perform.[378] The Claimant failed to produce the due diligence reports that the Spanish law firm Uría Menéndez made before the Claimant invested in Spain in 1996.[379]

---

[372] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶ 82.

[373] Resp. C-Mem., ¶¶ 981, 983.

[374] Resp. C-Mem., ¶¶ 1008, 1009.

[375] Resp. C-Mem., ¶ 984, ¶ 986, citing **RL-0048**, *Electrabel (Award)*, ¶ 7.78.

[376] Resp. C-Mem., ¶ 987, citing **RL-0049**, *Charanne*, ¶¶ 495, 505.

[377] Resp. C-Mem., ¶¶ 984-1000; Resp. Rej., ¶¶ 720-723.

[378] Resp. C-Mem., ¶ 999.

[379] Resp. Rej., ¶ 721.

297.    Besides, a serious and reasonable assessment of the Spanish regulatory framework and of its possible changes was required in light of the jurisprudence of the Supreme Court of the Kingdom of Spain. In December 2005 and October 2006, the Supreme Court ruled that the premiums and incentives to produce electrical energy under the Special Regime might increase as much as they might decrease from one year to the next.[380]

298.    Further, a diligent investor should have verified the limits of the regulator's power to change the applicable framework.  Such limits, Spain says, were found in Law 54/1997, which sets the principle of 'reasonable return' and 'economic sustainability of the SES'.[381] But, as follows from the witness statement of Mr. Suwabe, the Claimant expected to receive remuneration in the terms set in RD 661/2007 throughout the lifetime of its SPCs. In other words, the Claimant expected that the regulatory framework set out in RD 661/2007 would be set in stone with respect to Claimant's investment, unless a more favourable one would become available.[382]

299.    Even if the Tribunal found that the Claimant was diligent in its investment decisions, the Disputed Measures did not violate Claimant's legitimate expectations.  Relying *inter alia* on *Charanne v. Spain*, *Electrabel v. Hungary*, and *Blusun v. Italy*,[383] Spain contends that in the absence of specific commitments by a state, an investor cannot legitimately expect that a certain regulatory framework will remain unchanged.[384] As Spain made no specific commitments to the Claimant that it would not change the Special Regime, the Claimant could not legitimately expect that the Spanish regulatory framework would remain unchanged.[385] The Claimant's lack of diligence rendered its expectations unrealistic and

---

[380] Resp. C-Mem., ¶¶ 361-385, citing, among others, **R-0137**, *2005 Judgment*, eighth legal ground; Resp. C-Mem. ¶ 995, ¶ 996, citing **R-0138**, *2006 Judgment*, third legal ground; Resp. Rej., ¶¶ 723, 729.

[381] Resp. C-Mem., ¶ 997.

[382] Resp. Rej., ¶¶ 704, 706.

[383] Resp. Rej., ¶ 707, ¶ 708, citing **RL-0049**, *Charanne*, ¶ 510; ¶ 709, citing **RL-0048**, *Electrabel (Award)*, ¶¶ 165, 166; ¶ 712, citing **RL-0074**, *Blusun*, ¶ 372.

[384] Resp. Rej., ¶ 707.

[385] Resp. Rej., ¶ 713.

lacking any objectivity. Therefore, a claim based on alleged breach of such expectations must be dismissed.[386]

300. Also, the Claimant's expectations were unreasonable considering the regulatory framework in place at the time of investment and its development thereafter. The regulatory framework evolved between 1997 and 2008 in manner that revealed the possibility of regulatory changes adversely affecting the remuneration of the Claimant's wind farms, for example, in the case of RD 436/2004.[387]

301. A diligent investor would know that Spain's electricity system was governed by essential principles, including, among others, the principle of regulatory hierarchy, the principle of economic sustainability and the principle of reasonable return.[388] These regulatory standards were based on Law 54/1997 and the case law, not on RD 661/2007. A diligent investor cannot legitimately expect that Spain would not adopt measures to resolve the tariff deficit affecting the sustainability of the SES, or that public subsidies would be maintained after the plants had achieved the corresponding target return.[389]

302. The other sources referenced by the Claimant could not legitimately reinforce Claimant's expectations that the Special Regime would remain unchanged.

(i)   The competence to set the regulatory regime of the remuneration of electricity production lies with the state, not the Autonomous Communities, as provided by Article 3(1)(c) of Law 54/1997. Therefore, neither an administrative act from the Autonomous Communities of Galicia and Asturias nor any alleged guarantee from their President could generate a legitimate expectation that the regulatory regime would remain unchanged.[390]

(ii)  The certificates for registration in the RAIPRE did not shield the plants from being subject to the changes introduced by RD 2818/1998, RD 436/2004, RD-Law

---

[386] Resp. C-Mem., ¶ 1000.

[387] Resp. C-Mem., ¶ 1015.

[388] Resp. C-Mem., ¶ 1010; Resp. Rej., ¶¶ 726, 732.

[389] Resp. C-Mem., ¶¶ 1011-1013.

[390] Resp. C-Mem., ¶¶ 1020-1025; Resp. Rej., ¶¶ 735-737.

7/2006 or RD 661/2007. Such registration was an administrative step required from ordinary and special regime producers, to control their participation in the SES. The tribunal in *Charanne* confirmed the view that such registration did not give producers an acquired right to a rate so as to establish the expectation that such rate would not be changed.[391]

(iii)    The contracts that the Claimant signed with Spanish distributors cannot be characterized as PPAs. These contracts simply established the settlement of the subsidies that distributors paid to producers, for which the distributors were later reimbursed by the regulator. The amounts paid under those contracts were determined by the applicable regulations, and not by the distributor and the producer. In any case, RD 661/2007 modified those contracts (the CNE taking over the distributors' settlement functions) and the contracts expressly contemplated the possibility of the regulatory framework being modified.[392]

### b.  *Spain created stable conditions for the Claimant's investment*

303.    Spain argues that 'stable conditions' admit the adoption of reasonable and proportionate macroeconomic control measures motivated by a reasonable cause, as supported by the tribunals in *Plama v. Bulgaria*,[393] *AES Summit v. Hungary*,[394] and *Mamidoil v. Albania*.[395] The changes made to Special Regime aimed at guaranteeing the sustainability and balance of the SES, to grant producers a reasonable return during their useful lives, as set out in the PFER 2005-2010.[396]

304.    Spain argues that the tribunals in *Charanne* and *Eiser* considered that the measures adopted by a state were proportionate and did not breach the obligation to create stable conditions, in so far as they did not suddenly and unexpectedly eliminate the essential features of the

---

[391] Resp. C-Mem., ¶¶ 1026-1029, citing **RL-0049**, *Charanne*, ¶¶ 509-511.

[392] Resp. C-Mem., ¶¶ 1030-1038.

[393] Resp. C-Mem., ¶ 1043, citing **RL-0034**, *Plama Consortium Limited v. Republic of Bulgaria* (ICSID Case No. ARB/03/24), Award, 27 August 2008 ('**Plama v. Bulgaria**'), ¶ 219.

[394] Resp. C-Mem., ¶ 1044, citing **RL-0039**, *AES Summit v. Hungary*, ¶¶ 9.3.29, 9.3.30.

[395] Resp. C-Mem., ¶ 1045, referring to **RL-0046**, *Mamidoil Jetoil Greek Petroleum Products S.A. v. Republic of Albania* (ICSID Case No. ARB/11/24), Award, 30 March 2015, ¶¶ 617, 618.

[396] Resp. C-Mem., ¶¶ 1039-1047; Resp. Rej., ¶¶ 744-747.

regulatory framework in place.[397]  Here, the Disputed Measures maintained the essential nature of the regulatory framework, that is, investors can recover the cost of their investment, operating costs and obtain a reasonable return, taking the costs of a standard facility as reference.[398] A rational and objective understanding of the Spanish regulatory framework indicates that an investor could form expectations concerning recovery of the costs of the production of electricity only by reference to the costs incurred by a standard facility. Yet, Spain argues, the tribunal in *Eiser* precisely failed to consider that essential element of the Spanish regulatory framework.[399]

305.  Spain also created stable conditions, since the Disputed Measures were not retroactive.[400] For legislation to be retroactive, it must affect acquired rights, as decided by the tribunal in *Nations Energy v. Panama*.[401]  The Claimant did not have acquired rights to receive immutable tariffs. The Spanish Constitutional Court has repeatedly ruled that the measures adopted since RD-Law 9/2013 apply to the future and are not retroactive, as they do not affect acquired rights.[402]

306.  Further, the tribunal in *Blusun v. Italy* found that, in the absence of express commitments by a state, the obligation to create stable conditions does not prevent the state from changing its regulations.[403] A distinction is to be made between contractual commitments and expectations underlying a given relationship, 'the latter are more matters to be taken into account in applying other norms than they are norms in their own right.'[404] Spain argues that this interpretation on the limits of a state's regulatory power is directly linked to the  objective of the ECT to create an efficient energy market and to the stable conditions standard of Article 10(1) of the ECT.  According to Article 2 of the ECT, the

---

[397] Resp. Rej., ¶¶ 773-778, 781.

[398] Resp. Rej., ¶ 776.

[399] Resp. Rej., ¶ 789.

[400] Resp. Rej., ¶ 769.

[401] Resp. C-Mem., ¶¶ 1053-1067, citing **RL-0040**, *Nations Energy v. Panama*, ¶¶ 642, 644, 646.

[402] Resp. C-Mem., ¶ 1065, citing **R-0154**, Judgment of the Constitutional Court of 17 December 2015, delivered in appeal of unconstitutionality 5347/2013 and see ¶ 1066 referring to **R-0156**, Judgment of the Constitutional Court of 18 February 2016, delivered in appeal of unconstitutionality 5852/2013 and **R-0157**, Judgment of the Constitutional Court of 18 February 2016, delivered in appeal of unconstitutionality 6031/2013.

[403] Resp. Rej., ¶ 752, citing **RL-0074**, *Blusun*, ¶¶ 317, 367, 372.

[404] Resp. Rej., ¶¶ 752, 753, citing **RL-0074**, *Blusun*, ¶ 371.

main objectives of the ECT are the need to ensure market efficiency, non-discrimination, and market-led pricing. Article 9 of the ECT provides that nothing prevents a Contracting Party from taking measures to ensure the integrity and stability of its financial system and capital markets. Spain argues that these provisions should be considered when assessing whether the measures complied with the obligation to create stable conditions. The Disputed Measures have not prevented the Claimant from pursuing its economic activity, with its plants operating normally.[405]

### c. The Respondent's position on the IRR

307.   The Respondent argues that an analysis of the IRR proves that the Disputed Measures did not have a negative impact on the Claimant's investment and are therefore proportionate. To this end it compares the project IRR to the WACC.

308.   According to the Respondent, there is a difference between the project IRR and the shareholder IRR. The former represents the return considering the operating cash flows without taking into account how the project has been funded. It constitutes the internal rate of return which will be earned on the project.[406] According to Order IET/1045/2014 of 16 June 2014, the pre-tax project IRR in Spain should be about 7.398%. The latter represents the return of the shareholders as generated by the project and constitutes the final return of the shareholders taking into account both the cash flows and the funding of the project.[407] Finally, according to the EC and an analysis of the market, a project IRR of 7.398% is reasonable and proportionate.[408]

309.   Moreover, the project IRR should be similar to the WACC, which constitutes a useful comparator. The WACC is calculated by taking into account the cost demanded by shareholders and the providers of external financing. This is then weighted against the total

---

[405] Resp. Rej., ¶¶ 752-762.
[406] Hearing Day 4, p. 26, ll 18ff (Mr. MacGregor).
[407] **RE-1**, Expert Report of BDO, 11 April 2017, ¶¶ 138ff; Hearing Day 4, p. 26, ll 24ff (Mr. MacGregor).
[408] Resp. Rej., ¶¶ 519-527.

financing costs. According to BDO's calculations, the applicable WACC is 4.90% after tax.[409] The applicable pre-tax WACC is 7.36%.[410]

310.    To assess Eurus's return rate, BDO assumed a useful life of 20 years over which the cash flows of the investor have been taken into account.[411] Having assessed all available data, BDO considers the pre-tax project IRR to be 15.15%.[412] This number is far higher than the reasonable return under the new Spanish incentive regime or the pre-tax WACC. Hence, there is no negative impact on the Claimant's investment through the Disputed Measures.[413]

### (3) The Tribunal's Analysis

311.    As noted in paragraph 240 above, the Tribunal will first consider Eurus's claim under Article 10(1) of the ECT, first and second sentence, on its merits, without reference to EU state aid law.  The analysis and conclusions set forth in this subsection (¶¶ 311-369) are adopted by majority.  Arbitrator Garibaldi dissents in respect of the overall conclusion and most aspects of the supporting reasoning.  The extent of the dissent and the reasons therefor are stated in a Partially Dissenting Opinion, appended hereto.

### a.    The applicable ECT standard

312.    Article 10(1) of the ECT, first and second sentences, provide in relevant part as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.

---

[409] **RE-1**, Expert Report of BDO, 11 April 2017, ¶¶ 148ff.

[410] **RE-1**, Expert Report of BDO, 11 April 2017, ¶ 172.

[411] Hearing Day 4, p. 34, ll 1ff (Mr. MacGregor).

[412] **RE-1**, Expert Report of BDO, 11 April 2017, ¶ 172.

[413] **RE-1**, Expert Report of BDO, 11 April 2017, ¶¶ 168ff, BDO working papers, Tables F and G.

313.    These provisions have been extensively discussed in successive arbitral decisions,[414] and there is little point in the Tribunal going over the same ground.  But some general points can be made.

314.    The Claimant laid emphasis on the phrase 'stable, equitable, favourable and transparent' (Article 10(1) of the ECT, first sentence).[415]  But, as several tribunals have noted, the first sentence of Article 10(1) cannot be interpreted in isolation from the second sentence.[416] It does not give a general mandate to ECT tribunals to decide whether government decisions affecting investments are 'equitable' or 'favourable', any more than the FET standard gives a general discretion to BIT tribunals to impose their own views as to 'fairness' and 'equity'. The legal standard embodied in the first and second sentences of Article 10(1) takes into account the prerogatives and responsibilities of governments as well as the rights and interests of investors, including their interest in stability.

315.    Of particular relevance by reason of its subsidies context (though it concerned PV power, not wind) is the award of the tribunal in *Blusun v. Italy*.  There the tribunal concluded:

> In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[417]

---

[414] See, e.g., **CL-0051**, *Petrobart Limited v. Kyrgyz Republic* (SCC Case No. 126/2003), Arbitral Award, 29 March 2005; **RL-0034**, *Plama v. Bulgaria*; **RL-0039**, *AES Summit v. Hungary*; **CL-0018** or **RL-0002**, *Electrabel*; **RL-0077**, *Hulley*; **RL-0078**, *Yukos v. Russia*; **RL-0048**, *Electrabel (Award)*; **RL-0049**, *Charanne*; **RL-0024**, *Isolux*; **CL-0083** or **RL-0074**, *Blusun*; **CL-0079**, *Eiser*.

[415] See Cl. Reply, ¶ 206.

[416] See **CL-0083**, *Blusun*, ¶ 319(3); **CL-0115**, *Antaris*, ¶ 365; **CL-0112**, *Novenergia II*, ¶¶ 642-646; *contra Rupert Binder v. Czech Republic* (UNCITRAL), Award on Jurisdiction, 15 July 2011, ¶ 446.

[417] **CL-0083**, *Blusun*, ¶ 319(5).

The tribunal went on to add:

> These considerations apply even more strongly when the context is subsidies or the payment of special benefits for particular economic sectors.[418]

316. It may be objected that this formulation makes no reference to legitimate expectations, which have become something of a *leitmotif* in the case-law on the fair and equitable treatment standard. The *Blusun* tribunal explained the matter in the following terms:

> It is […] true that a representation as to future conduct of the state could be made in the form of a law, sufficiently clearly expressed. But there is still a clear distinction between a law, i.e. a norm of greater or lesser generality creating rights and obligations while it remains in force, and a promise or contractual commitment. There is a further distinction between contractual commitments and expectations underlying a given relationship: however legitimate, the latter are more matters to be taken into account in applying other norms than they are norms in their own right. International law does not make binding that which was not binding in the first place, nor render perpetual what was temporary only.[419]

317. On this view, legitimate expectations are essentially *consideranda*. The term itself does not appear in the ECT, or for that matter in BITs, and there is no rule that legitimate expectations are to be observed, analogous to the *pacta sunt servanda* rule in the law of treaties. Rather, they are relevant factors to be taken into account in the interpretation and application of treaty standards such as Article 10(1) of the ECT, first and second sentences.

318. The *Blusun* test was endorsed by both Parties in their pleadings.[420]

### b. The Article 10(1) standard applied to the Claimant's Wind Farms

319. Applying the *Blusun* dictum, it is necessary to ask the following questions: (i) was there a specific commitment of intangibility; (ii) absent a specific commitment, did the Claimant entertain a legitimate expectation that subsidies would not be reduced during the lifetime

---

[418] **CL-0083**, *Blusun*, ¶ 372.

[419] **CL-0083**, *Blusun*, ¶ 371.

[420] Cl. Reply, ¶¶ 195, 207, 208; Hearing Day 1, p. 60, ll 8-25 – p. 61, ll 1-23 (Mr. Turner); Resp. Rej., ¶¶ 707, 712, 745; Hearing Day 1, p. 133, ll 13-23 (Ms. Moraleda Saceda); Hearing Day 1, p. 173, ll 11-15 (Mr. Santacruz Descartín).

of the project; (iii) were the subsidies lawfully granted; (iv) were the changes of 2013-14 disproportionate to the legitimate aim of the legislative amendments; and (v) did they have due regard to the reasonable reliance interests of recipients who had committed substantial resources on the basis of the earlier regime.  By way of summary, in the following sections, the Tribunal answers these questions as follows: (i) no specific commitments were made; (ii) the Claimant had legitimate expectations that subsidies would be continued in some substantial form, but not that the subsidies regime of RD 661/2007 would be maintained as such for the life of the investment; (iii) subject to EU law (considered below) the subsidies were lawfully granted; (iv) in all but one respect (the claw-back of benefits already paid) the Disputed Measures were not disproportionate, given the circumstances in which they were imposed; (v) to the same effect, the changes, had they been applied without the claw-back, had due regard to the reasonable reliance interests of recipients.

320.   In the following sub-sections, the Tribunal gives its reasons for these conclusions.

### (i)  Was there a specific commitment as to the FIT regime?

321.   The Tribunal has already dealt with and rejected the argument that RAIPRE registration itself implied a commitment to the Special Regime.[421] The Claimant expressly accepted that there was no specific commitment made as to the immutability of the FIT regime under RD 661/2007.[422] In the Tribunal's view, this is correct. Not only is it consistent with the position taken by the Spanish courts in relation both to RD 436/2004[423] and RD

---

[421] See above, ¶¶ 260-265.

[422] Claimant did argue that Article 44(3) of RD 661/2007 acted as a stabilization clause, but it accepted that the amounts payable by way of subsidy were not frozen but were the subject of a stability obligation in terms of the first sentence of Art. 10(1) of the ECT: in effect a more flexible guarantee.  See Cl. Mem., ¶¶ 117, 119, 213; Cl. Reply, ¶ 246; Hearing Day 5, p. 27, l 20; p. 29, l 20; p. 311, ll 3ff; p. 33, ll 3ff; p. 34, ll 1ff.  Consistently with this, the Claimant made no claim under ECT Article 10(1), final sentence (the umbrella clause). See also Claimant's letter of 29 April 2019: 'Spain […] makes much of the RREEF decision's holding that investors could not expect a frozen regulatory regime, but of course this has no bearing whatsoever on the present proceeding, since *Eurus has never contested that right*' (emphasis in original).

[423] See above, ¶¶ 266-269.

661/2007;[424] it is also consistent with the conclusions reached by most of the tribunals which have considered the matter.[425]

322.    *A fortiori*, the assurances said to have been given to Eurus Japan by the President of the Xunta of Galicia on a visit to Japan[426] did not amount to specific commitments. Oral statements made on promotional occasions are not sufficient for this purpose, quite apart from the inevitable uncertainty as to just what was said. The Tribunal also accepts the Respondent's argument that a representative of an Autonomous Community had no competence to create financial obligations of Spain regarding the SES.[427] As a result, the approval of EuroVento's strategic long-term plan by Galicia's Xunta and the government of Asturias and the granting of Special Producer status to the Claimant's SPCs also do not give rise to legitimate expectations. Neither can the fact that Spanish state-owned utilities entered into PPAs with the Claimant's SPCs be seen as creating legitimate expectations vis-à-vis the Spanish state.

### (ii) What legitimate expectations did the Claimant have?

323.    The Claimant did however argue that it had legitimate expectations that Spain would not revoke or significantly weaken the Special Regime as applicable to existing projects, so Eurus expected that the remuneration of RD 661/2007 would continue to apply to its investment.[428]

324.    In fact, all but one of the Claimant's wind farms was commissioned before the entry into force of RD 661/2007, the first three of them before even the enactment of the 1997 Law.[429]

---

[424] See above, ¶ 270.

[425] **RL-0071**, *Eiser*, ¶¶ 363, 387; **RL-0049**, *Charanne*, ¶ 503; **CL-0114**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain* (ICSID Case No. ARB/13/31), Award, 15 June 2018, ¶¶ 553, 555; **RL-0024**, *Isolux*, ¶¶ 774, 787.  In *Masdar*, the tribunal held there was a 'specific commitment […] that each of the Plants qualified under the RD661/2007 economic regime for their "*operational lifetime*"' (**CL-0113**, *Masdar*, ¶ 520).  In the present case there was no equivalent letter to the one construed by that tribunal as a guarantee. It also held that 'RD661/2007 […] include[s] a stabilisation clause [which] is sufficient to exclude *any* modification of the law, so far as investors, which had made investments in reliance upon its terms, were concerned' (**CL-0113**, *Masdar*, ¶ 503 (emphasis added)).

[426] Cl. Mem., ¶ 62. See above, ¶¶ 120-134, 279.

[427] Resp. C-Mem., ¶¶ 1020-1023.

[428] Cf Cl. Mem., ¶ 216; Cl. Reply, ¶ 239.

[429] Cf Cl. Mem., Appendix II: Eos Pax IIa SL (Paxareiras I and Paxareiras IIa), Parque Eólico de Barbanza SA (Barbanza), and Parque Eólico Vicedo SL (Vicedo).

In the Tribunal's view, as a matter of general principle, a legitimate expectation is a form of reliance interest which must relate to facts or circumstances in existence at the time the investment is made.[430] The Claimant argued that it is possible for expectations to be enhanced by subsequent developments: for example, an investor could be seen as relying on a new decree if the investment was maintained (as distinct from being sold) after the decree was passed.[431] Any such construction would imply that investors' expectations simply track the state of the law from time to time, and the idea of a reliance interest would lose all autonomy. Moreover, the continuous updating of legitimate expectations that such a theory would seem to imply cannot explain why expectations should always be enhanced as distinct from being impaired by subsequent developments. If they can be as easily destroyed as created, they would lose much of their value as a conduit of stability.

325.    This is enough in itself to exclude the hypothesis of a legitimate expectation that the regime of RD 661/2007 would be at least maintained for pre-existing projects.

326.    On the other hand, express provisions in legislation as to future conduct are capable of generating legitimate expectations, despite the generally valid distinction between laws and promises.

327.    In this respect, the Claimant refers to provisions which it submits 'signalled Spain's long-term commitment to stability'[432]: the Preamble of RD 2818/1998, eight transitory provisions of Law 54/1997, Article 40(3) of RD 436/2004 and Article 44(3) of RD 661/2007. These last two provided that:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have

---

[430] For the proposition that legitimate expectations are those existing at the time of the investment, see, e.g., **RL-0080**, *Joseph Charles Lemire v. Ukraine* (ICSID Case No. ARB/06/18), Decision on Jurisdiction and Liability, 14 January 2010, ¶ 264; **RL-0081**, *Philip Morris Brands SÀRL and others v. Oriental Republic of Uruguay* (ICSID Case No ARB/10/7), Award, 8 July 2016, ¶ 429; **RL-0084**, *National Grid plc v. Argentine Republic* (UNCITRAL), Award, 3 November 2008, ¶ 173; **RL-0069**, *Invesmart, B.V. v. Czech Republic* (UNCITRAL), Award, 26 June 2009, ¶ 202.

[431] Cf Cl. Mem., ¶ 241, referring to Eurus' express reliance on RD 661/2007 'in continuing and expanding its investment'; Cl. Reply, ¶ 250.

[432] Cl. Reply, ¶ 244. See also Cl. Mem., ¶¶ 233-243.

a backdated effect on any previous tariffs and premiums.[433]  (RD 436/2004, Article 40(3))

The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[434]  (RD 661/2007, Article 44(3), 3rd subparagraph)

328.    The Claimant refers to Article 32 of RD 2818/1998:

Every four years, the premiums set in this chapter of this Royal Decree and the values stipulated for the facilities covered by Royal Decree 2366/1994 shall be revised, without prejudice to the stipulations of the eighth transitory provision of [Law 54/1997], by taking into account the evolution of the price of electric power on the market, the participation of these facilities of demand and their impact on the technical management of the system.[435]

329.    Even though the Claimant admitted that RD 1614/2010 did not have a significant effect on its investment, it was the precursor of Spain's overhaul. In this context, reference might also be made to Article 5(3) of RD 1614/2010, which provided that:

Notwithstanding that established by this Royal Decree, for wind technology facilities that come under Royal Decree 661/2007, of 25 May, revisions of tariffs and premiums, both upper and lower, referred to by article 44.3 of the aforementioned Royal Decree will not affect facilities entered definitively in the administrative Register for production facilities operating under the special system and reporting to the Directorate General of Energy Policy and Mines on 7 May 2009 […].[436]

330.    Of particular importance is the Spanish Electric Power Law 54/1997, which was in force until its repeal in 2013. Article 30(4) provided that:

The remuneration arrangements for electric power generation installations operating under the special regime shall be

---

[433] **C-0007**, RD 436/2004, Art. 40(3).

[434] **C-0008**, RD 661/2007, Art. 44(3).

[435] Cl. Reply, ¶ 244, citing **C-0005**, Royal Decree 2818/1998, Preamble.

[436] **C-0010**, RD 1614/2010, Art. 5(3).

supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases:

[…]

To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, […] and the investment costs incurred *shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets*.[437] (emphasis added)

331.    In the Tribunal's view, this Law stated a coherent general principle and is inconsistent with the thesis that particular Royal Decrees, notably RD 661/2007, stabilized the regime. The 1997 Law was to be implemented by regulations which would likely to change and did change, and not in any uniform direction favouring the recipients.

332.    In particular, there was no legitimate expectation that subsidies would never be reduced or capped. Some decrees grandfathered existing plants, but others did not, and although grandfathering may be best practice, it is not in the Tribunal's view required by the ECT. In this regard, this Tribunal disagrees with the tribunal in *Cube* which was of the view that references to a reasonable return did not 'signified a limit on the profit that a producer could earn'.[438] Nor does the Tribunal accept that the three 'grandfather clauses' cited above established any general principle, as also held by the tribunal in *RREEF*.[439]

333.    The Claimant could not have had legitimate expectations to the remuneration of RD 661/2007, since most of its plants were commissioned between March 1997 and May 2006, and only one was commissioned in February 2008. More specifically, four of Claimant's projects were commissioned after 15 December 2005,[440] while the other projects were

---

[437] **C-0004** and **R-0003**, Law 54/1997, Art. 30(4).

[438] **RL-0090**, *Cube*, ¶ 293: '293. We do not consider that the references in RD 661/2007 to a "reasonable return" were intended to have any application outside the context of reviews of the tariffs and of the upper and lower limits under Article 44.3 RD 661/2007. In particular, we do not consider that the references to a "reasonable return" signified a limit on the profit that a producer could earn from any power facility or group of facilities without suffering a reduction or lower-than-normal increase in tariffs, or that the references provided any basis for changes to the 2007 Regime outside the mechanisms set out in RD 661/2007.'

[439] **RL-0088**, *RREEF*, ¶¶318-321.

[440] **Fonteavia** and **Bidueiros** both commissioned on 26 December 2005 and belonging to the SPC Parques Eólicos de Buio; and **Alto de Abara** commissioned on 24 May 2006 and **Grallas** on 22 February 2008, belonging to the SPC Parque Eólico Abara SL. See Cl. Mem., Appendix II.

commissioned between March 1997 and February 2005. From December 2005 onwards, the Supreme Court said that a specific remuneration system could be changed as long as the changes made were within the framework of the 1997 Law.[441]

334.    The parties disagreed sharply on the relationship between the 'reasonable return' provision stated in Article 30(4) of the 1997 Law and the successive subsidy regimes established by royal decree.[442] In the Tribunal's view, this is a false dichotomy. Article 30(4) of the 1997 Law stated a general principle and empowered the administration to give effect to it by regulation. The stream cannot rise higher than its source or commit the state to more than the legislative framework allows. A requirement that the remuneration system be such as to allow recipients 'to achieve reasonable profitability rates with reference to the cost of money on capital markets' is general in its terms, but it is perfectly intelligible and imposes some limits on what can be done.

### *(iii) Were those legitimate expectations violated by the Disputed Measures?*

335.    Turning to the question of breach, it follows from the analysis of legitimate expectations in paragraphs 323-334 above that it is not sufficient for the Claimant to show that certain expectations were impaired or affected by the measures complained of.  To recall the point made specifically with regard to subsidies in *Blusun*:

> [I]f it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[443]

336.    Thus, it is necessary to assess the proportionality of the change in financial arrangements and whether it had due regard to the reasonable reliance interests of recipients of subsidies.

---

[441] **R-0137**, *2005 Judgment*, eighth legal ground: 'There is no legal obstacle that exists to prevent the Government in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration as long as [the Government stays] within the framework set out by the ELS [1999 Electricity Law].'

[442] See Resp. C-Mem., ¶¶ 951-959; Cl. Reply, ¶¶ 44-49.

[443] **RL-0074**, *Blusun*, ¶ 319(5).  The tribunal in *RREEF* relied on *Blusun* (¶¶ 516, 547).

337.  As to the aim of the Disputed Measures, the primary reason given, then and now, was to address the deficit on the tariff account of the SES (as to which see paragraphs 131-134 above).  This had already been declared to be 'unsupportable' in 2009, and by 2013 had reached nearly EUR 40 billion.[444] This was not really contested by Eurus, which instead argued that other measures (notably, increased customer tariffs) could have been adopted to deal with the problem, and that the RE producers should not have been required to bear the whole burden of cuts. Eurus also noted that the Respondent had not made a formal plea of necessity as a circumstance precluding wrongfulness under the law of state responsibility.[445]  That observation, while true, does not exhaust the relevance of the tariff deficit as the major underlying factor leading to the Disputed Measures.

338.  In the Tribunal's view, the growing deficit on the energy account was unsustainable. Moreover, it is not for the Tribunal to second guess reasonable measures taken to address the deficit (including measures affecting existing plants), to propose alternative policies that could have been adopted, or to weigh up for itself the competing demands of generators and consumers. If the measures were 'not disproportionate to the aim of the legislative amendment, and [had] due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime', they would be consistent with the FET standard in Article 10(1).  Applying that standard, it is necessary to differentiate between different aspects of the Disputed Measures.

### (iii) (a) Regulatory rather than actual plant life (20 years rather than 25 or 30 years)?

339.  In its Memorial, the Claimant summarized its expectation as follows: 'Eurus expected that the Incentives Regime would not be worsened or taken away in respect of any particular project for the duration of the project's operational lifetime.'[446]

---

[444] Resp. C-Mem., ¶¶ 297ff.

[445] Hearing Day 5, p. 7, ll 2-3 (Mr. Turner), referring to Spain's justification for the introduction of the regulatory regime.

[446] Cl. Mem., ¶ 204.

340.   With its Memorial, Eurus presented an expert report by Exponent.[447] Exponent was asked to evaluate the operational life of wind turbines on the Claimant's wind farms. Exponent concluded that the Claimant's wind farms would at a minimum have a 30-year operational life.[448] Based on the findings of Exponent, the Claimant instructed Brattle to project future cash flows for each SPC on the assumption that the wind farms would operate for 30-years.[449] This instruction of 30-year operational lifetime was confirmed at the hearing by the testimony of the Claimant's quantum expert Mr. Caldwell,[450] as well as by one of the Claimant's regulatory experts, Mr. García.[451] In its first Regulatory Report, Brattle states that 'the New Regulatory Regime limits the financial incentive to wind farms to the first 20 years of operation. In contrast, RD 661/2007 […] applied for a wind farm's entire useful life, which in the case of Eurus' wind farms, we understand is projected to exceed 30 years.'[452]  The Claimant argues that Spain failed to submit evidence to challenge the 30-year operational lifetime analysis provided by Exponent.[453] On cross-examination, with regard to the statement of Brattle's first Regulatory Report, Mr. García was asked:

> MS. RIVAS KORTAZAR: Do you recall that, as we have seen at the beginning, those 20 years of useful life was the same reference as used by the Renewable Energy Plan from the year 2005-2010?
>
> DR. GARCÍA: No, I wouldn't agree with that general statement. I would say that it was the regulatory life defined in the Renewable Energy Plans, not necessarily the useful life of the plant. There's a distinction between the regulatory life and the useful life.
>
> MS. RIVAS KORTAZAR: I agree with that point. Indeed, the disputed measures refer as well to the regulatory life of the plants; do you agree on that? To a regulatory life of 20 years for wind farms?
>
> DR. GARCÍA: Yes.[454]

---

[447] **CE-3**, Exponent Report, 18 November 2016.

[448] **CE-3**, Exponent Report, 18 November 2016, ¶¶ 5, 8.

[449] Cl. Mem., ¶ 323.

[450] Hearing Day 3, p. 225, ll 24-25 and p. 226, ll 1-12 (Mr. Caldwell).

[451] Hearing Day 3, p. 115, ll 6-9 (Mr. García).

[452] **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶ 23 (references omitted).

[453] Cl. Reply, ¶ 419(a).

[454] Hearing Day 3, p. 115, ll 13ff (Mr. García).

341.    In its Counter-Memorial, the Respondent objected to the Claimant's expectation[455] that 'the Regulated Tariff would apply to *the whole* operational life of the facilities.'[456] Spain explains that the New Regime's remuneration system is complemented by the regulatory lifetime of a standard facility. The end of the regulatory life sets the time at which a standard facility has reached the reasonable return set by the Regulator, *i.e.* when the standard facility has recovered its investment and operation costs through the subsidies received.[457]

342.    At the Hearing, Spain's expert Mr. MacGregor stated that '[t]he useful life is generally taken from the accounts: they show useful lives of between 18 years and 25 years, but generally 20 years.' Also, he stated that the financial models produced by the Claimant before undertaking the investments assumed a 20-year life and that Spain's Renewable Energy Plan looked at a 20-year useful life for wind farms, without there being any support for the 30-year life argued by the Claimant.[458]

343.    On this issue, the Tribunal is inclined to disagree with the Respondent. Earlier regulations had been clear that the incentives regime would last for longer than 20 years, though possibly at a reduced level.[459] There is a case for 25 years as a reasonable target. Although none of the following cases involved wind turbines (but rather CSP plants),[460] all the tribunals considered the useful life of renewable energy plants under the Spanish regulatory regime to be 25 years:

- In *Antin*, the tribunal noticed that the evidence submitted was inconsistent and the assumed lifetime spanned from 20 to up to 40 years. In particular, the Tribunal noted that substantial repairs to the plants had to be made after 25 years, which would affect the subsidy according to Article 4.3 of RD 661/2007. Based on the

---

[455] Resp. C-Mem., ¶ 981, referring to Cl. Mem., ¶ 204.

[456] Resp. C-Mem., ¶ 982(iii) (emphasis in original).

[457] Resp. C-Mem., ¶¶ 798-811.

[458] Hearing Day 4, p. 34, ll 2-10 (Mr. MacGregor).

[459] **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶ 23.

[460] The Tribunal has taken note of the Claimant's comments on *BayWa* that the findings of other tribunals regarding 25-year lifetime of other technologies are not relevant (See Eurus' comments on *BayWa*, ¶ 11. See also Cl. Reply, ¶¶ 115-117), but finds this argument not persuasive.

evidence submitted, the tribunal decided that the useful life of the plants is 25 years.[461]

- In *Eiser*, the tribunal was not convinced by the documentary record submitted to it, which was limited and inconsistent. However, the primary document used, an expert due diligence report, was supportive of a 25-year life. Therefore, the tribunal rejected the claim that the plants were designed for a 40-year life.[462]

- In the same vein, the *Masdar* tribunal assumed a life of 25 years rejecting the claimant's claim as to a 40-year operational life based on the weight of the evidence, which contradicted the claimant's assertion.[463]

- Finally, the *RREEF* tribunal agreed with other tribunals that have faced this issue and decided that the useful life of CSP plants should be considered to be 25 years, which corresponds to the claimant's initial assessments before the dispute arose.[464]

344. Based on the above, the Tribunal considers a 25-year life to be adequate for the wind plants.

### (iii) (b) The 'standard facility' as a basis for calculation?

345. The Claimant argued that its legitimate expectations related to its own plants: to adopt another standard of calculation, without regard of actual costs, characteristics or production levels, deprived Eurus of the benefit of its prudent investment and management of the plants.[465] On the other hand, Spain had to deal with some 6,000 wind plants, not to mention other RE facilities; there were elements in earlier legislation of calculations based on standard facilities,[466] and it was not unreasonable, at least for the future, to calculate subsidies on the basis of standard facilities, adapted to the method of power generation.

---

[461] **CL-0114**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain* (ICSID Case No. ARB/13/31), Award, 15 June 2018, ¶¶ 692-714.

[462] **CL-0079**, *Eiser*, ¶¶ 443-452.

[463] **CL-0113**, *Masdar*, ¶¶ 613-618.

[464] **RL-0088**, *RREEF*, ¶ 549.

[465] Cl. Reply, ¶¶ 84-88, 198; Hearing Day 1, p. 71, ll 14ff (Mr. Turner).

[466] See exchanges between Claimant's expert, Mr. Lapuerta and Spain's Counsel, Ms. Rivas Kortazar. Mr. Lapuerta recognized that the concept of standard facility was present in the renewable energy plans of 1989, 2000-2010 and 2005-2010 (Hearing Day 3, p. 83, ll 4-25, p. 84, ll 1-9 (Mr. Lapuerta)). As stated at paragraph 100 above, the PFER 1989 to PFER 2005-2010 used the concept of standard facility.

In the end, in the Tribunal's view, this aspect of the Disputed Measures did not breach Article 10(1) of the ECT.

### *(iii) (c) 'Retrospectivity' and the claw-back*

346.  The Spanish courts held that the Disputed Measures were not retrospective, and that finding is entitled to some deference.[467] Moreover, Spain did not claw back money actually paid above the total allowable amount of subsidies: the claw-back was in the nature of a set-off rather than a counterclaim.  In the words of the Brattle First Regulatory Report:

> Our view is that the New Regulatory Regime reduces the remuneration to those installations that were already operating under the Original Regulatory Regime. Although technically the installations do not have to 'pay back any amount', reducing the future remuneration based on past gains is tantamount to asking to reimburse these gains, since the investors are being forced to offset what they have already earned against the remuneration due under the New Regulatory Regime.[468]

347.  In short, the Disputed Measures took into account earlier subsidies for the purpose of assessing future payments, resulting in no entitlements for 11 of the Claimant's 13 facilities. This is a weaker form of retrospectivity, but the label 'retrospective' is not crucial: what matters is the substance.

348.  The Respondent argues that the Disputed Measures were not retroactive because they did not affect acquired rights:

> [T]he Claimant has never had an '*acquired right*' to a remuneration in the future, *sine die*, by means of a fixed and unchanging FIT, not

---

[467] **R-0154**, Constitutional Court, Judgment of 17 December 2015, 5347/2013, 7th legal ground (a) and (c); **R-0029**, Spanish Supreme Court, Judgment 22 July 2016, appeal 1964/2016. 5th and 6th Legal Grounds; **R-0002**, Supreme Court, Judgment 9 December 2009, referring to **R-0123**, Opinion of the Standing Committee of the Council of State 937/2013, of 12 September 2013 General Comment VI, Document; **R-0156**, Constitutional Court, Judgment 18 February 2016, delivered in appeal of unconstitutionality 5852/2013; **R-0157**, Constitutional Court, Judgment 18 February 2016, delivered in appeal of unconstitutionality 6031/2013.  Cf the majority decision of the Supreme Court (Contentious Administrative Division), **R-0089**, Judgment 1260/2016, 1 June 2016, decided by 4-3 with illuminating dissents on the topic of retrospectivity; e.g. Judge Espín Templado, p. 37: 'The system itself, however, applies as if it had been in force from the very first moment that each facility commenced its regulatory life.  In my opinion that retroactive projection, which sets aside the *in tempore* application of the system in force prior to [2014], as though the latter had never existed, and the fact that the new regulation is considerably less favourable for the facilities concerned, amount to a serious abuse of judicial certainty […]'.

[468] **CE-1**, Brattle First Regulatory Report, 18 November 2016, ¶ 190.

> subject to possible macroeconomic control measures or reforms of
> the SES. As shown above, the reform contained in RD-Act 9/2013
> is only effective in the future, without affecting *acquired rights*.[469]

349.    The Tribunal agrees, for reasons already given, that there was no acquired right to remuneration in future, still less to 'a fixed and unchanging FIT'. But that is not the point. It is one thing to amend payments for future production with immediate effect, and another to reduce payments that would have otherwise been made by reference to payments lawfully made in the past in respect of past production.  Again, what matters is not the label 'retrospective' but the substance.

350.    The Respondent also relies on the decision of the tribunal in *Nations Energy v. Panama*.[470] That was an expropriation claim concerning substantial restrictions on the right to rely on investment tax credits under a new law, which the claimant alleged had retroactive effect, contrary to the Panamanian Constitution. The tribunal held that the claimants did not have the right that they claimed to transfer their tax credits. But even if they had such right, the new legislation did not revoke or cancel it, let alone retroactively: the claimants were still entitled to the full amount of their tax credits. Only the conditions under which they could be relied on were modified, *inter alia* by sharply lowering the annual cap.  The tribunal added that the new legislation 'would have been retroactive […] *if it had reincorporated in the tax rate the deductions previously made*, or […] if it had disavowed existing credits.'[471] [Tribunal's translation]

351.    The decision concerned a situation remote from the present one: it involved an expropriation claim under a BIT, not a claim to breach of the legal stability guarantee in Article 10 of the ECT. The passage italicized above shows, however, that the distinction between immediately operative and retrospective measures is a far from simple one.  There is an analogy between a law which disallows deductions already made (affecting future tax liabilities) and a law which deducts subsidies already lawfully paid from future entitlements to subsidies.

---

[469] Resp. C-Mem., ¶ 1056 (emphasis in original).

[470] Resp. C-Mem., ¶ 972, citing **RL-0040**, *Nations Energy v. Panama*, ¶¶ 641, 642, 646.

[471] **RL-0040**, *Nations Energy v. Panama*, ¶ 647 (emphasis added).

352.    Different tribunals in Spanish RE cases have reached different conclusions on the retrospectivity point. In *Charanne*, which concerned only the 2010 regulations, the tribunal rejected the retrospectivity argument, which the claimant there had presented in the form of a claim to a vested right that the regulatory framework could not be altered 'in any way'. The tribunal formulated the question as being 'to what extent the State can modify, with immediate effect, generally applicable regulatory provisions.'[472] But although the claimant may have put it in these terms, that is not the question. The Tribunal agrees that there was no contractual right or legitimate expectation to an unchanging subsidy in any form, and it agrees that (subject to considerations of proportionality) Article 10(1) did not preclude new regulations from having immediate effect. But it is one thing to give new regulatory measures immediate effect for existing installations, and quite another to eliminate future subsidies otherwise payable by reference to amounts lawfully paid and received in earlier years on a quite different basis.

353.    The *Isolux* tribunal took a similar position, also relying on *Nations Energy v. Panama*.[473]

354.    The matter was central to the decision in *RREEF*. The tribunal there emphasized that the claimants acquired a right to a 'general regime guaranteeing the essential advantages they could reasonably expect when they made their investments.'[474] Furthermore, the tribunal had 'no hesitation to find that the Respondent acted in breach of its obligation to respect the principle of stability' by applying the Disputed Measures retroactively.[475] More precisely, according to the tribunal, the Disputed Measures took into account past remuneration under the previous regime and deducted them from future payments. This has the effect of clawing back remuneration to which the investor had a right at the time the payment was made.[476]

---

[472] **RL-0049**, *Charanne*, ¶ 545, and see ibid, ¶¶ 546-548.

[473] **RL-0024**, *Isolux*, ¶ 814, cited in Resp. C-Mem., ¶ 974.

[474] **RL-0088**, *RREEF*, ¶ 322.

[475] Ibid, ¶ 325.

[476] Ibid, ¶¶ 328, 329. The tribunal was unanimous on this point.

355.    The Tribunal takes note of this analysis[477] and considers that the subsidies paid in earlier years were duly paid and duly taken into account in the operation of the SPCs, in their financing and (presumably) their taxation arrangements.  To claw back those profits on the basis of a subsequent judgment that they were 'excessive' would seem inconsistent with the principle of stability in Article 10(1) of the ECT and has not been shown to have been necessary to resolve the tariff deficit problem, which would have been solved in any event by the Disputed Measures without much further delay and without the element of claw-back.  It may have been reasonable to take into account, in calculating subsidies going forward, the 7.398% pre-tax that the Plants were deemed to be entitled to under the Disputed Measures. To count against them the amounts previously earned would be to penalise the Plants for their successful operation during those years.  For these reasons, the Tribunal holds that, insofar as the claw-back operation is concerned, Spain breached Article 10(1) of the ECT.[478]

### (iv) Were the Disputed Measures proportionate?

### (iv) (a) The RREEF standard on IRR

356.    Turning to the proportionality of the Disputed Measures, it is necessary to analyse their impact on the returns generated by the Claimant's investments. For reasons already given (paragraphs 354-355 above), this Tribunal agrees with the *RREEF* tribunal that the only legitimate expectation the Claimant could have had was that of a 'reasonable return' in terms of the 1997 Law.[479]  In particular, the Tribunal does not consider that the Claimant had a legitimate expectation to the regime of RD 661/2007, which (a) was not in force when all but the most recent investments were made by the Claimant, (b) was not the subject of a stabilization regime, and (c) was subordinate to the 1997 Law.

---

[477] It may be observed that in its comment of 17 April 2019 in response to the *RREEF* decision, Spain asserts (without specifically mentioning the claw-back issue) that 'the statements and conclusions of the RREEF [d]ecision are applicable to this arbitration' (¶ 2), and refers to its 'correct damages approach' (¶ 5).  The Claimant states that retroactivity was 'obviously a violation of [the] ECT' (Response of 29 April 2019, ¶ 5), while arguing that there were other breaches.

[478] For the impact of EU law, see below, ¶¶ 391-414. For the implications of this conclusion for quantum, see below, ¶¶ 415-433.

[479] **RL-0088**, *RREEF*, ¶¶ 470, 521.

357. In this regard, the Tribunal agrees with the decision in *RREEF* that the Claimant is entitled to

> compensation for unreasonable return on their investments – if established – […] [but] cannot claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent; they can only get compensation to the extent that such decrease is below the threshold of a reasonable return.[480]

358. The *RREEF* tribunal conducted its proportionality analysis under the rubric 'The Principle of Damages' in the section of its Decision dealing with quantum. It did so on the ground that 'the determination of a violation of the principles of proportionality and reasonableness is inseparable from an assessment of the damages – if any – endured by the Claimants as a consequence of the measures taken by the Respondent.'[481] The two are closely connected in practice, but nonetheless the question of disproportionality pertains to the merits – whether there has been a breach in the first place – and not to issues of quantum, which are consequential. This difference of principle is important in practice because it is only if the breach is identified with precision that the question of reparation for that breach can be approached.

359. It is notable that the Parties and their experts treated the question of quantum in an essentially undifferentiated way, as the amount of loss suffered by the Claimant as a result of the Disputed Measures globally. That led them to identify the amount of reparation owing by reference to an undifferentiated 'but for' situation.[482] For the Claimant's experts this was the *status quo ante*, the regime of RD 661/2007.[483] But if the Claimant had no

---

[480] **RL-0088**, *RREEF*, ¶ 523.

[481] Ibid, ¶ 472.

[482] Cf **CL-0116**, *Greentech*, ¶¶ 537, 538 on the undifferentiated character of claims against the Disputed Measures.

[483] In CE-5, the Brattle Rebuttal Quantum Report, the Claimant's expert puts forward two alternative valuations. In the Rebuttal Quantum Report, ¶¶ 175ff, Brattle changed 6 incorrect parameters used in BDO's alternative DCF calculation, the most important of which was the application of RD 661/2007's tariffs, this change alone increases BDO's assessment of damages from EUR -1 million to EUR 126 million. Furthermore, in the Rebuttal Quantum Report, ¶¶ 208ff, Brattle assessed the amount of damages that the Claimant would be entitled to in an alternative scenario, where the Claimant would have been entitled to a reasonable return instead of fixed tariffs. Brattle calculated an alternative but-for scenario with a 7% after tax return over a 20-year regulatory useful life period. Brattle then calculated an alternative tariff per MWh produced and applied it to the production forecasted to each SPC. Based on that methodology, Brattle offers two alternative figures: a) damages for EUR 237 million, assuming a but-for scenario where the same tariff applies to all plants; b) damages for EUR 120 million, assuming different tariffs per MWh

right to the continuation of that regime, it cannot have acquired any such right by reference to the secondary rules of reparation. The venerable dictum of the Permanent Court of International Justice in *Chorzów Factory* does not guarantee the continuation of a factual situation (the Special Regime) to which the Claimant was not otherwise entitled.[484]

360.   The question thus becomes whether the Disputed Measures operated

> in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[485]

361.   To examine the proportionality of the Disputed Measures, the Tribunal agrees with the *RREEF* tribunal that the relevant measure is the internal rate of return ('**IRR**'):

> Since the Tribunal has determined that the only legitimate expectation of which the Claimants could prevail themselves was that of a 'reasonable return', it is appropriate to compare both regimes depending on the IRR that the Claimants can get under each of them. As the *Novenergia* tribunal put it, 'the internal rates of return is a relevant measurement for what the Claimant was expecting to get from its investment in the Kingdom of Spain at the time of making the investment.'[486]

362.   According to the Respondent's experts, the IRR equates to the 'reasonable return' as provided for by the provisions of the Spanish regulatory regime.[487] Investors take the IRR into account and compare it to the weighted average cost of capital (WACC) to decide on the profitability of a potential investment. If the project IRR is higher than the required rate of return it follows that the cash flows generated by the investment will cover the costs associated with the project.[488] In principle, the Tribunal agrees with this assessment. If the

---

produced by each SPC, based on the remuneration code assigned to each SPC under the New Regime. This second scenario accepts most of Spain's assumptions for the calculation of damages.

[484] **CL-0054**, *Case Concerning the Factory at Chorzów* (Permanent Court of International Justice, Judgment No. 13), Claim for Indemnity – Merits, 13 September 1928, p. 8.

[485] **CL-0083**, *Blusun*, ¶ 372, endorsed in **RL-0088**, *RREEF*, ¶ 547.

[486] **RL-0088**, *RREEF*, ¶ 521, citing **CL-0112**, *Novenergia II*, ¶ 826.

[487] **RE-1**, Expert Report of BDO, 11 April 2017, ¶ 135.

[488] **RE-2**, Second Expert Report of BDO, 21 December 2017, ¶¶ 185ff.

project IRR exceeds a reasonable return, the Disputed Measures would be proportionate and would not breach Article 10(1) of the ECT.

### (iv) (b) The project IRR under Spain's Special Regime

363.  As stated by the Parties, there is a difference between the project IRR and the shareholder IRR. Whereas the ECT protects shareholders' rights and accords different protection standards to them, the Tribunal agrees with the Parties that the relevant IRR targeted by the notion of legitimate expectation to a reasonable return is the project IRR over the useful lifetime of the plants.

364.  Yet the Parties do not agree on the project IRR under the Special Regime. This Tribunal needs not determine the exact IRR before the entry into force of the Disputed Measures. Nonetheless, it notes that the IRR under the new incentives regime is lower than under the initial regime, and not surprisingly.  As already held by the Tribunal, the Respondent has the right to modify and amend its regulations, *i.e.* the amount of the targeted IRR, as long as they remain reasonable and do not breach the ECT.

365.  The *RREEF* tribunal calculated a reasonable rate of return at 6.86% including a 1% supplementary premium.[489] That is well below the Claimant's IRR in the present case, even if all of Brattle's criticisms of BDO's IRR analysis are accepted.

366.  The Tribunal does not take any position on the exact amount of the reasonable return. This return can change over time depending on various factors. The Respondent emphasizes that the reasonable return is a 'dynamic' concept.[490] The Tribunal agrees. The term 'reasonable' allows the state to accommodate a change in these factors instead of fixing the IRR at a certain number. Nonetheless, the Tribunal notes that even if the Claimant had a legitimate expectation of an IRR of 6.86%, the actual IRR clearly exceeded that amount.

367.  The Parties' positions as to the project IRR are set out in the table below:[491]

---

[489] **RL-0088**, *RREEF*, ¶¶ 588, 589.

[490] Resp. C-Mem., ¶ 356.

[491] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶ 70; BDO Workpaper F -financial model.

| Plant | BDO Actual IRR | Brattle Corrected Actual IRR | But-For according to Brattle IRR |
|---|---|---|---|
| Paxareiras | 19.3% | 13.2% | 15.3% |
| Vicedo | 13.5% | 10.5% | 12.5% |
| A Ruña | 19.8% | 16.7% | 18.4% |
| Virxe do Monte | 16.7% | 13.7% | 15.7% |
| Adraño | 16.5% | 14.1% | 16.5% |
| Ameixenda y Filgueira | 14.8% | 12.8% | 15.7% |
| BSI | 14.6% | 12.8% | 15.9% |
| Currás | 20.9% | 24.7% | 26.2% |
| Deva | 12.3% | 10.5% | 14.6% |
| Tea | 11.7% | 10.3% | 14.2% |
| Buio | 10.0% | 8.8% | 12.2% |
| Abara | 7.0% | 6.1% | 8.6% |
| Barbanza | 17.9% | 13.5% | 14.7% |
|  |  |  |  |
| **Total** | **15.1%** | **12.5%** | **14.5%** |

368. The Tribunal notes that the Parties do not agree on the total project IRR. However, it is not in dispute that the actual return targeted by the Disputed Measures is a 7.398% pre-tax project IRR.[492] According to Brattle's Rebuttal Report and BDO Workpaper F, the total IRR after the enactment of the Disputed Measures as calculated by BDO is 15.1%.[493] The total IRR as calculated by Brattle is 12.5%. The average of both numbers is 13.8%, which is well above the 7.398% target of the Spanish regulator.

369. The Tribunal therefore decides that the Respondent has not breached its obligation to ensure a reasonable return. Thus, the Claimant's legitimate expectation to a reasonable return has not been frustrated.

---

[492] **RE-1**, Expert Report of BDO, 11 April 2017, ¶ 134; **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶ 52.

[493] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶ 70; BDO Workpaper F -financial model.

**C.    SPAIN'S ALLEGED BREACH OF ARTICLE 10(1) OF THE ECT, THIRD SENTENCE**

370.    The Claimant also argues that the Disputed Measures unreasonably impaired Claimant's investment, in breach of Article 10(1) third sentence, of the ECT, which provides in relevant part that the investments:

> […] shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.[494]

**(1) The Parties' Positions**

*a.  The Claimant*

371.    The Claimant submits that Article 10(1) third sentence of the ECT is an 'unreasonable or discriminatory measures' clause, which is breached if a state measure does not follow a rational policy or is not a reasonable implementation of such a policy.[495]

372.    More specifically, the Claimant relies on the dictum in *BG Group v. Argentina*, where the tribunal held that:

> Unilateral withdrawal by Argentina of [the] key components of the Regulatory Framework was from the perspective of the [applicable treaty] unreasonable and it was therefore in breach of [the treaty's unreasonable measures clause].[496]

373.    The Claimant applies this principle to the Disputed Measures. It argues that the Disputed Measures withdraw key components of the Special Regime and reduced the value of the investment by two-thirds. As a result, the Disputed Measures impaired the investment in an unreasonable way.[497]

374.    The Claimant also rejects the Respondent's arguments. It maintains that first, the Disputed Measures were not required by macroeconomic circumstances; second, no RE producer

---

[494] **CL-0001**, ECT, Art. 10(1).

[495] Cl. Mem., ¶¶ 288, 289, citing **CL-0050**, *AES Summit v. Hungary*, ¶¶ 10.3.7, 10.3.9.

[496] **CL-0047**, *BG Group Plc v. Argentine Republic* (UNCITRAL), Final Award, 24 December 2007, ¶ 346.

[497] Cl. Mem., ¶ 291.

endorsed the Disputed Measures; and third, current rates of investment are irrelevant as to the reasonableness of the Disputed Measures.[498]

375.  As to Spain's first argument, the Claimant responds that the Disputed Measures were not necessary to solve the issues arising out of the tariff deficit because the payment of subsidies did not threaten the sustainability of Spain's electricity system.[499] An alternative solution would have been to raise electricity prices.[500] Furthermore, Spain cannot rely on changes in the interest rates on government bonds to argue necessity because there were no relevant changes.[501]

376.  As to Spain's second argument, neither the renewable energy industry's main association (APPA), nor Greenpeace, nor any player of the renewable energies market regarded the reform as desirable or urgently needed.[502] The Claimant notes that Spain relies on a proposal of 2009 ('**2009 Draft Law**') made by APPA, which, according to Spain, largely resembles the changes eventually introduced by Spain.[503] But, the Claimant argues that the 2009 Draft Law excluded retroactivity of any measures; it made explicit that any changes would not affect existing plants, which would be entitled to maintain the economic scheme applicable.[504] Even the European Commission expressed concern as to whether the Disputed Measures could achieve their objectives and contribute to the 2020 targets.[505] Participants in the renewable energy sector such as the Spanish Wind Power Business Association, the Spanish Renewable Energy Business Association and independent consultants that evaluated the new regime noted errors and had serious doubts about the Disputed Measures.[506]

---

[498] Cl. Reply, ¶¶ 259-295.

[499] Cl. Reply, ¶ 264.

[500] Cl. Reply, ¶ 266.

[501] Cl. Reply, ¶¶ 267-269.

[502] Cl. Reply, ¶¶ 270-275.

[503] Resp. C-Mem., ¶¶ 1081-1084

[504] Cl. Reply, ¶¶ 270-275.

[505] Cl. Reply, ¶ 276, citing **BRR-122**, EC, EU Energy Markets in 2014, Publications Office of the European Union, 2014, p. 70.

[506] Cl. Reply, ¶¶ 276-293.

377.  As to Spain's third argument, the Claimant reiterates that the harmful impact of the Disputed Measures was to existing wind plants. The costs when making the investment were different from current costs (they were much higher), and therefore current rates of investment were irrelevant for existing investors such as Eurus.[507]

### b. *The Respondent*

378.  The Respondent contends that the Disputed Measures were not discriminatory, unreasonable or disproportionate.  In rejecting the claim, the Respondent makes three points.

379.  First, the Claimant has the burden of proof of a breach of Article 10(1) third sentence, and, Spain argues, Eurus has failed to meet the standard of proof.[508] The worsening of the tariff deficit, required the Respondent to take necessary steps to resolve the situation. The Respondent points also to the principle of sustainability of the SES, the worsening of the economic crisis, the exceptional decline in electricity demand, the existence of overcompensation in the RE sector, and Spain's bail-out commitments undertaken with the EU. Thus, according to Spain, the measures were reasonable in the circumstances to address the tariff deficit and rebalance the system.[509]

380.  Second, not only did APPA endorse the Disputed Measures but so did most domestic and foreign investors. For example, the Disputed Measures' remuneration system was in line with that proposed by APPA in the 2009 Draft Law. Also, international organizations made positive assessments of the Disputed Measures. This evidences that the Disputed Measures were a reasonable and proportionate response in the circumstances.[510]

---

[507] Cl. Reply, ¶¶ 294, 295.

[508] Resp. C.-Mem., ¶¶ 1069-1076.

[509] Resp. C.-Mem., ¶¶ 1069-1080; Resp. Rej., ¶¶ 796-799.

[510] Resp. C.-Mem., ¶¶ 1081-1087.

381.   Finally, the Respondent relies on statements of the tribunals in *EDF v. Romania*,[511] *AES Summit v. Hungary*[512] and *Total v. Argentina*[513] to support the conclusion that the Disputed Measures were neither discriminatory nor unreasonable.[514]

382.   Relying on *EDF v. Romania*, Spain submits that the Disputed Measures are compliant with the FET standard because they were (i) adopted to serve the legitimate purpose of solving the imbalance created by the tariff deficit, without burdening consumers in the midst of an economic crisis; (ii) based on the legal standards set out in the applicable regulatory framework and the jurisprudence of the Spanish Supreme Court, and were not on prejudice or personal preference; (iii) adopted to guarantee sustainability, a reason stated in the regulatory framework; and (iv) adopted following due process.

383.   Relying on *AES Summit v. Hungary*, Spain argues that the Disputed Measures are a reasonable response to a public policy objective. They formed macroeconomic control measures to reduce the tariff deficit and ensure the sustainability of the SES. According to Spain, the tribunal in *Eiser v. Spain* supported this view.[515] In *Total v. Argentina*, the tribunal found that in sectors involving long-term investment with large amounts of capital, a state's change of its legal framework complies with the FET standard if the investor can recover its operational costs, amortize its investment and obtain a reasonable rate of return. According to Spain, these criteria are met, since the Disputed Measures affected all operators, offering a reasonable return of 7.398% before tax, in line with Spain's public policy objectives.[516]

### (2) The Tribunal's Analysis

384.   Under Article 10(1) third sentence of the ECT, States have to provide on constant protection and security while also ensuring that 'the management, maintenance, use,

---

[511] **RL-0035**, *EDF (Services) Limited v. Romania* (ICSID Case No. ARB/05/13), Award, 8 October 2009, ¶ 303.

[512] **RL-0039**, *AES Summit v. Hungary*, ¶¶ 10.3.7-10.3.9.

[513] **RL-0050**, *Total v. Argentina*, ¶ 122.

[514] Resp. C.-Mem., ¶¶ 1091-1121.

[515] Resp. Rej., ¶ 805, referring to **RL-0071**, *Eiser*, ¶ 371.

[516] Resp. C-Mem., ¶¶ 1113-1118, referring to **RL-0050**, *Total v. Argentina*, ¶ 122.

enjoyment or disposal of the investment is not impaired by unreasonable or discriminatory measures'.

385.    Article 10(1) third sentence appears to have a twofold sense.  In the first place, it obliges the state to ensure the physical protection of the investment, safeguarding it against violence and harassment; in this respect, at least, it is not a re-statement of the fair and equitable treatment standard in different words.  This was the view of similar clauses taken by numerous tribunals, including *Noble Ventures v. Romania*,[517] *Tecmed v. Mexico*,[518] *APL v. Sri Lanka*,[519] *Wena Hotels v. Egypt*,[520] *AMT v. Zaire*[521] and *Eureko v. Poland*.[522]

386.    Here there is no evidence that Eurus's investment has suffered from any physical harm or deterioration through the Disputed Measures and Eurus has not suggested otherwise. Moreover, there is no evidence that Eurus's management, maintenance, use, enjoyment or disposal of the wind plants, as distinct from its income and thus its value, have been impaired by the change of the Incentives Regime.

387.    Secondly, the provision expressly refers to unreasonable or discriminatory measures. In the Tribunal's view, unreasonable or discriminatory measures in the general sense are examples of measures that breach the FET standard as contained in Article 10(1), first and second sentences. It agrees with the tribunal in *RREEF*, which analysed the alleged discriminatory character of the Disputed Measures and issues of proportionality and reasonableness as part of the FET claim.[523] The *RREEF* tribunal decided that:

---

[517] *Noble Ventures, Inc. v. Romania* (ICSID Case No. ARB/01/11), Award, 12 October 2005, ¶¶ 164-167.

[518] **CL-0024**, *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States* (ICSID Case No. ARB(AF)/00/2), Award, 29 May 2003, ¶¶ 175-182.

[519] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka* (ICSID Case No. ARB/87/3), Award, 27 June 1990, ¶¶ 45-86.

[520] **CL-0088**, *Wena Hotels Ltd. v. Arab Republic of Egypt* (ICSID Case No. ARB/98/4), Award, 8 December 2000, ¶ 84.

[521] *American Manufacturing & Trading, Inc. v. Republic of* Zaire (ICSID Case No. ARB/93/1), Award, 21 February 1997, ¶¶ 6.02ff.

[522] **CL-0032**, *Eureko B.V. v. Republic of Poland*, Partial Award, 19 August 2005, ¶¶ 236, 237.

[523] **RL-0088**, *RREEF*, pp. 136ff. and 145ff.

> [T]here can be no doubt that [...], (iii) non-impairment including
> (iv) non-discrimination and (v) proportionality and reasonableness,
> are elements of the FET – and certainly so under the ECT.[524]

388.    No conclusive evidence was provided to necessitate a finding of unreasonableness or discrimination under those elements of the FET standard, save insofar as the retro-active aspect of the Disputed Measures, in the form of the claw-back clause is concerned. In absence of any persuasive argument to the contrary, no separate finding of unreasonableness or discrimination under Article 10(1), third sentence, can be made.

389.    In the light of the above, nothing further remains to be decided as regards the claim under Article 10(1), third sentence, of the ECT.

### (3) Conclusions on Article 10(1) of the ECT

390.    For these reasons the Tribunal concludes that to the extent the Disputed Measures were applied clawing back subsidies paid before their adoption, they form a breach of Article 10(1) first and second sentence of the ECT.  In all other respects, no breach has occurred. But, as already noted (paragraphs 235-236 above), this conclusion concerns the ECT in the absence of EU law, notably the EU rules concerning state aid. To this the Tribunal turns.

### D.    THE EU STATE AID ARGUMENTS

### (1) Introduction

391.    According to Spain, EU law has a specific relevance to the claim, in that EU state aid law, which is part of Spanish law, has the effect that the Claimant did not have, and could not have had, any legitimate expectation of receiving Special Regime subsidies, still less that they were fixed at the level of RD 661/2007.[525]  Moreover, Spain argues that the EC's decision of 10 November 2017 authorizing the Disputed Measures as permissible state aid[526] entails that compliance with any award of this Tribunal requiring Spain to make payments in excess of those provided by those Measures would itself constitute

---

[524] Ibid, ¶ 260.

[525] Resp. C-Mem., ¶ 66.

[526] **RL-0073**, EC decision of 10 November 2017.

impermissible state aid and would trigger the stand-still obligation in Article 108(3) of the TFEU.[527]

392.    At the hearing the Claimant briefly refuted these arguments.[528]

393.    The Parties elaborated further in their responses of 31 January 2019 to the EC's Application of 29 October 2018, which in accordance with Procedural Order No. 7 became part of the record of this arbitration, even though the EC in the event chose not to intervene.[529]  Before setting out its views on these issues, the Tribunal will first summarise the arguments thereby presented.

### (2) The EC's application insofar as it concerns state aid

394.    In its Application for leave to intervene as a non-disputing party, the EC argued that the incentives regime constituted unlawful state aid pursuant to Article 107(1) of the TFEU because it had not been notified to, still less authorised by, the EC itself. Therefore, in accordance with the consistent jurisprudence of the CJEU, the Claimant could not have had any legitimate expectation that the incentives regime was lawful.  This entailed that the Claimant could not have the legitimate expectation that aid be granted.[530]

395.    Finally, the EC reiterated that if Spain were to comply with an award in favour of the Claimant, the payment would constitute state aid under Article 108(3) of the TFEU and would be subject to the standstill obligation.[531]

### a.    *The Claimant's response*

396.    The Claimant puts forward three reasons to reject the argument that it could not have developed any legitimate expectations in the matter due to the incompatibility of the

---

[527] For the Respondent's arguments on state aid see e.g. Resp. C-Mem., ¶ 858 (citing **R-0024**, Order of the CJEU laid down regarding the preliminary ruling C-275/13, ELCOGAS, 22 October 2014), ¶¶ 806, 965-967 (citing **RL-0020**, Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)–Czech Republic, ¶ 96); Resp. Rej., ¶¶ 528, 792; Hearing Day 1, p. 130, ll 1-10; p. 138, ll 9-13; p. 139, ll 1-6, 9-15; p. 149, ll 12-17.

[528] Hearing Day 5, p. 55, l 21 – p. 69, l 13 (Mr. Turner).

[529] See above, ¶¶ 61-75.

[530] European Commission, Application for leave to intervene as non-disputing party, 5 November 2018, ¶¶ 38-41.

[531] Ibid, ¶¶ 46-51.

Special Regime with EU law on state aid. First, Spain itself never considered the Special Regime to constitute state aid. Second, the possibility that the Special Regime under the 1997 Act could have been reviewed by the EC or the CJEU does not mean that the Claimant cannot rely on the regime until it has been reviewed (which never happened). Third, the state aid issue played no role in Spain's decision to introduce the Disputed Measures and the risk, in the event unrealised, that subsidies paid under the Special Regime could be considered unlawful state aid and recovered as such did not render the Claimant's expectations under the ECT illegitimate.[532]

397.   As to the first reason, Spain aggressively promoted the RE Special Regime, stressing the EC's support of the scheme to attract investors. To all appearances, neither Spain nor the EC believed that the Special Regime could be contrary to EU law, and neither of them acted on that view. The Claimant maintains that by not notifying the regime to the EC, Spain in effect communicated to the investors that the incentives regime was lawful under EU law. Furthermore, the Claimant conducted due diligence as required under the ECT and international law. Although that due diligence did not address EU law on state aid, that very fact (according to the Claimant) is itself consistent with Spain's and the EC's initial view that this was not state aid.[533]

398.   As to the second reason, the Claimant argues that the fact that a measure can be reviewed through domestic processes, including the EC, does not mean that the Claimant cannot rely on that measure. In support, the Claimant refers to the decision in *SPP v. Egypt*, in which the tribunal held that:

> It is possible that under Egyptian law certain acts of Egyptian officials […] may be considered legally nonexistent or null and void or susceptible to invalidation. However, these acts were cloaked with the mantle of Governmental authority and communicated as such to foreign investors who relied on them in making their investments.
>
> Whether legal under Egyptian law or not, the acts in question were the acts of Egyptian authorities, including the highest executive

---

[532] Claimant's Comments on the European Commission's Request to intervene, 31 January 2019, ¶ 3.
[533] Ibid, ¶¶ 4-17.

> authority of the Government. These acts, which are now alleged to have been in violation of the Egyptian municipal legal system, created expectations protected by established principles of international law. A determination that these acts are null and void under municipal law would not resolve the ultimate question of liability for damages suffered by the victim who relied on the acts.[534]

399. Similarly, by its conduct in promoting and repeatedly affirming the Special Regime, Spain nurtured the Claimant's expectations as to its lawfulness, and the availability of a review mechanism at EU level does not render those expectations illegitimate.[535]

400. Third, the Claimant argues that the fact that the EC could have declared the Special Regime incompatible with EU law is of no importance since this did not happen. For 15 years, Spain did not question the lawfulness of the Special Regime. Even if the Claimant had considered the Special Regime to constitute illegal state aid (which it did not), Spain would still be responsible for any damage caused to the Claimant's investment, because it would then have failed to provide stable, favourable and transparent conditions for Eurus's investment.[536]

401. Finally, the Claimant submits that an award in Eurus's favour would not constitute unlawful state aid. This is because by not enforcing such an award, the EU and its member states would violate their obligations under the ECT.[537]

### b. The Respondent's response

402. Spain stresses two points in relation to the state aid issue, while generally endorsing the EC's position.

403. First, Spain reiterates that the Claimant did not have and could not have any legitimate expectations of receiving Special Regime subsidies. The EC has declared the incentives regime to constitute state aid.[538] The consequence of this declaration, which is binding on

---

[534] **CL-0016**, *SPP v. Egypt*, ¶¶ 82, 83. Also relevant there was the finding that the Egyptian authorities subsequently and repeatedly authorised the location of the project: ibid, ¶¶ 96-99.

[535] Claimant's Comments on the European Commission's Request to intervene, 31 January 2019, ¶¶ 18-21.

[536] Ibid, ¶¶ 22-26.

[537] Ibid, ¶¶ 27, 28.

[538] Respondent's Comments on the European Commission's Request to intervene, 31 January 2019, ¶¶ 11-14.

the Tribunal under the applicable law, is not the repayment of the subsidies to Spain but the exclusion of any legitimate expectations to the payment of the state aid.[539] Therefore, the Claimant's legitimate expectations have not been breached.[540]

404.    Second, Spain emphasises that the EC expressly stated in its decision of 10 November 2017 that any compensation awarded to the Claimant would constitute unauthorised state aid pursuant to Article 108(3) of the TFEU. On that basis, an award in Eurus's favour could not be enforced, at least within the EU.[541]

### (3) The Tribunal's conclusions on state aid

#### a.  *EU law on state aid*

405.    The analysis that follows is adopted by majority. Arbitrator Garibaldi concurs in the decision to the extent that EU rules on state aid are not an impediment to the Claimant's claims but dissents in respect of other aspects of the majority's conclusion and the supporting reasoning.  The reasons for the dissent are set forth in his Partial Dissenting Opinion.

406.    The Tribunal will first summarise what it understands, on the basis of the submissions of the parties and the EC's request to intervene as a non-party, and the referenced documents, to be the relevant rules of EU state aid law.

407.    Article 107(1) of the TFEU provides that:

> [A]ny aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.

408.    There are certain exceptions to the prohibition in Article 107(1), none of them relevant here.

---

[539] Ibid, ¶¶ 8-10.

[540] Ibid, ¶¶ 14-16.

[541] Ibid, ¶ 10.

409.    Article 107(3) sets out criteria to be applied by the EC in approving state aid proposals.  If a proposal is not approved, it must be withdrawn or duly modified, an injunction enforceable by the CJEU (Article 108(2)).

410.    Article 108(1) requires the EC, in cooperation with member states, to 'keep under constant review all systems of aid existing in those States'. In accordance with Article 108(3):

> The Commission shall be informed […] of any plans to grant or alter aid. If it considers that any such plan is not compatible with the internal market having regard to Article 107, it shall without delay initiate the procedure provided for in paragraph 2. The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision.

411.    According to these provisions, state aid which is not notified under Article 108(3), or which is implemented before it is authorised by the EC, is unlawful. Unlawful aid can and in principle should be recovered, as the EC can require its repayment by all recipients to the granting state. But the failure to notify aid, though it makes the aid unlawful, does not entail that the EC may not subsequently find the aid compatible with the internal market: this is what happened with the Disputed Measures, which were notified by Spain only after their implementation. In approving them in its decision of 10 November 2017, the EC confined itself to 'lamenting' the late notification.[542] It could have ordered the payment of interest on amounts paid prior to the approval date but did not do so.

412.    The question whether particular payments constitute aid under EU law is a matter for the EC, national courts, and ultimately the CJEU. The onus lies primarily on the state, whose obligation it is to notify its (planned) aid measures, but also the recipient can be expected to ascertain whether the measures have been notified, which it can do by consulting the on-line register of aid.[543]  Moreover, it is well established that:

> [S]o long as the Commission has not taken a decision approving aid, and so long as the period for bringing an action against such a decision has not expired, the recipient cannot be sure as to the

---

[542] **RL-0073**, EC decision of 10 November 2017, p. 33.

[543] EC register of state aid decisions: http://ec.europa.eu/competition/state_aid/register/.

> lawfulness of the proposed aid which alone is capable of giving rise to a legitimate expectation on his part.[544]

413. This principle is of long-standing.  For example, in 1997, the Court held:

> [I]n view of the mandatory nature of the supervision of State aid by the Commission under Article 93 [now 108] of the Treaty, undertakings to which an aid has been granted cannot, in principle, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent operator should normally be able to determine whether that procedure has been followed.[545]

414. In the EU state aid context, the relevance of legitimate expectations is that they can, in certain limited circumstances, constitute a defence to a claim for repayment of aid.[546]

### b. The application of state aid law to the Special Regime

415. The Claimant argues that neither Spain nor the EC initially considered Special Regime subsidies to constitute state aid. Nevertheless, the two Directives on Renewable Energy of 2001 and 2009 both expressly refer to Articles 87-88 TFEU,[547] and the EC, in implementing these Directives, has approved a large number of subsidies schemes for renewable energy. The matter was put by the EC in 2005 in the following terms:

> As stated in indent 12 of the pre-amble of Directive 2001/77/EC, the rules of the Treaty, and in particular Articles 87 and 88 thereof, apply to public support. Such support is normally covered by the Community Guidelines on State aid for Environmental Protection and might be economically justified on a number of grounds as the beneficial effects of such measures on the environment outweigh the distorting effects on competition. Since the use of renewable energy sources is a priority in the policy of the Community, the mentioned guidelines are rather generous for such support schemes. On that basis, some 60 State aid schemes supporting renewable energy

---

[544] Case C-199/06, *Centre d'exportation du livre français v. Société internationale de diffusion et d'édition*, 12 February 2008 (GC), ¶ 67, citing Case C-91/01 *Italy v. Commission* [2004] ECR I-4355, ¶ 66.

[545] Case C-169/95, *Kingdom of Spain v. Commission*, ¶ 51, citing earlier authority.

[546] Council Regulation (EC) No 659/1999, Art. 14.

[547] See **RL-0015**, Directive 2001/77/EC, 27 September 2001, preambular ¶ (12), ¶ 4 (support schemes '[w]ithout prejudice to Articles 87 and 88 of the Treaty'); **RL-0017**, Directive 2009/28/EC, 23 April 2009, ¶ 3 (support schemes '[w]ithout prejudice to Articles 87 and 88 of the Treaty').

127

sources were approved by the Commission during the period 2001 to 2004.[548]

416.    In fact, it does not appear that *any* green energy subsidy scheme was disapproved by the EC during this period. The EC register of state aid lists only five negative decisions, involving Austria (2011[549]), France (2016[550] and 2018[551]) and Germany (2015[552] and 2018[553]).  None of these schemes bore any resemblance to the Spanish Special Regime in force up to 2013.

417.    Thus, it appears to have been the case that state aid rules were in principle applicable, but that the EC took a 'rather generous' approach to their application,[554] consistent with the Guidelines on Renewable Energy.

418.    It may be pointed out that Spain itself notified certain proposed schemes to the EC under Article 88. The first such notification seems to have been in 2003, well before RD 661/2007.[555]

---

[548] **BRR-130**, EC Report, Communication From The Commission - The Support of Electricity from Renewable Energy Sources, COM(2005) 627 final, 7 December 2005, ¶ 3.5; **RL-0095**, *BayWa*, ¶ 562.

[549] SA.26036, 8 March 2011 (part of scheme only disapproved), EC decision upheld by General Court, T-251/11, 11 December 2014.

[550] SA.39621, 8 November 2016 (amended scheme approved).

[551] SA.36511, 31 July 2018 (amended scheme approved).

[552] SA.33995, 5 August 2015 (part of scheme only disapproved). On 29 March 2019, the European Court of Justice set aside the judgment of the General Court of the European Union of 10 May 2016, *Germany v. Commission* (T-47/15, EU:T:2016:281) and annulled Commission Decision (EU) 2015/1585 of 25 November 2014 in State aid proceedings: CJEU, 2019/C-187/04.

[553] SA.45852, 17 October 2018.

[554] According to uncontradicted evidence of Claimant's expert Mr. Carlos Lapuerta:

> [T]he original regime was not notified to the Commission as state aid at the time. It's not the only one that wasn't notified at the time. But in total – I've counted – there are 90 different applications for approval by different European countries submitting renewable energy support schemes for approval by the Commission, and there have been 90 approvals granted. And some of those approvals occurred in the same timeframe as RD 661/2007 was passed, and some of those approvals included regimes that were offering higher returns than Spain offered, and regimes that explicitly grandfathered existing plant from further reviews. So this was just not an issue of concern at the time.

Hearing Day 3, p. 141, ll 17-25 – p. 142, ll 1-5 (Mr. Lapuerta).

[555] N 132/2003 was a notification by Spain in 2003 of a proposed state aid regime involving the regional government of Navarra. The proposed scheme consisted in direct subsidies to cover up to 40% of the investment costs of renewable energy facilities below 100 KW located in Navarra.  The EC raised no objection to the scheme.

419.    As to whether the Special Regime subsidies constitute state aid as defined, the Claimant confined itself to arguing, without further elaboration or documentary support, that at the time of the investment, both Parties and the EC assumed that they did not. Nevertheless, the Guidelines of 2001 point in a contrary direction. Although the cost of the subsidies was intended to be met by consumers, the Spanish state provided for them by law and was closely involved in the operation of the system. In its decision of 10 November 2017, the EC held that the Disputed Measures constituted state aid, and by parity of reasoning so did the Special Regime. The CJEU's decision in *PreussenElektra*, which is sometimes cited in this context, seems plainly distinguishable.[556]   The Tribunal concludes that the Special Regime constituted state aid as defined and should have been notified to the EC under Article 108 of the TFEU.

420.    The Claimant points out that the EC never condemned the Special Regime subsidies as state aid, still less did it require their repayment by the large number of recipients of subsidies.[557]   The Respondent asserts that it follows from the EC's 2017 decision on the Disputed Measures that the Claimant can have had no legitimate expectation of receiving subsidies in excess of those provided for by those Measures, or indeed at all.[558]

421.    In its Decision of 10 November 2017, the EC held that payments made under the Disputed Measures from their inception in 2014 until 10 November 2017 were state aid and, not having been notified, were unlawful.[559] After examination, it decided that the aid was compatible with the internal market pursuant to Article 107(3)(c) of the TFEU. As for existing facilities, 'payments under the premium economic scheme are covered by the decision in order to assess proportionality, *i.e.* the absence of overcompensation.'[560]   But it was 'not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not.'[561]

---

[556] *PreussenElektra AG v. Schleswag AG*, CJEU 2001/C-379/98 (GC), 13 March 2001. This related to a subsidy scheme managed and funded by the private sector without the use of state resources.

[557] Cl. Rej., ¶ 28.

[558] Resp. Rej., ¶¶ 673-677.

[559] **RL-0073**, EC decision of 10 November 2017, ¶¶ 84-89.

[560] Ibid, ¶ 4.

[561] Ibid, ¶ 156.

422.    A separate question for the Tribunal is the relevance, if any, of the EC's intimation or decision that compliance with any damages award in the present case would by itself constitute notifiable state aid, subject to the standstill obligation.[562] In this regard the Tribunal agrees with the *Vattenfall* tribunal:

> While the Tribunal is mindful of the duty to render an enforceable decision and ultimately an enforceable award, the Tribunal is equally conscious of its duty to perform its mandate granted under the ECT […] The enforceability of this decision is a separate matter which does not impinge upon the Tribunal's jurisdiction.[563]

423.    Turning to the substantive question of the interaction of EU law with the ECT, the following observations should be made:

(a)    In principle, an investor cannot have a legitimate expectation of treatment which is unlawful under the law of the host state, provided that the host state law itself is not acting inconsistently with the treaty under which the tribunal exercises its jurisdiction.[564] In an international forum such as the present one, a host state may not rely on its domestic law as a ground for non-fulfilment of its international obligations.[565] Investors, for their part, are under an obligation to conduct a due diligence assessment prior to investment to acquaint themselves with the applicable host state law and form their legitimate expectations accordingly.

(b)    In the present case, the host state's law itself (incorporating EU state aid rules) is not inconsistent with the ECT, under which the tribunal exercises its jurisdiction. Although arguably harsh on recipients as they risk bearing the harmful consequences of the subsidizing state's omission to notify the aid, the EU rules in regard of non-notified aid are clear and have been consistently interpreted. From the standpoint of international law, 'municipal laws are merely facts which express the will and constitute the activities of States, in the same manner as do legal

---

[562] Ibid, ¶ 165.

[563] *Vattenfall AB v. Federal Republic of Germany* (ICSID Case No. ARB/12/12), Decision on the *Achmea* Issue, 31 August 2018, ¶ 230.

[564] See **RL-0074**, *Blusun*, ¶¶ 264-268; **RL-0078**, *Yukos*, ¶ 1352; **RL-0034**, *Plama v. Bulgaria*, ¶¶ 138, 140, 143.

[565] ILC, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Art. 3.

decisions or administrative measures.'[566] The Tribunal therefore does not interpret EU law as such, but accepts the consistent interpretation of EU law as applied by the relevant institutions.

424.    The initial investments at issue in the present case were made in 1997, after a due diligence process that had no regard to EU state aid law.[567]   As it is at least arguable that state aid law should have been seen as relevant even at that time, the Tribunal finds this omission surprising.

425.    The EC, which has primary responsibility for administering and enforcing state aid law, was well-informed as to the Spanish special subsidy regime in its various manifestations under the 1997 Law. Indeed, it extolled the Special Regime as 'the main driver for investment in wind energy' and as 'rather well adjusted to generation cost'.[568] There is no indication that it did anything to raise with Spain the state aid issue until the Disputed Measures were belatedly raised by Spain itself in December 2014, well after the cessation of Special Regime subsidies and the repeal of the 1997 Law.

426.    Spain, an EU member since 1986, ought to have been aware of its notification duty under Article 108(3) of the TFEU and should have acted accordingly. There is, however, no causal link between the omission to notify and the fact that the Claimant has not continued to receive the amount of subsidies provided for in RD 661/2007. The illegality of unnotified Special Regime subsidies played no role in subsequent events, including the enactment of

---

[566] *Certain German Interests in Polish Upper Silesia (Germany v. Poland)*, 1926 P.C.I.J. (ser. A) No. 7, ¶ 52.

[567] As admitted by the Claimant's due diligence witness, Mr. Matsuoka, in response to questions from the Tribunal. See Hearing Day 2, p. 23, ll 2-10 (Mr. Matsuoka):

> THE PRESIDENT: […] Were you advised by Uría Menéndez of the potential issue of state aid in relation to the incentive regime?
>
> A: No, I did not. I did not receive any such advice.
>
> THE PRESIDENT: Did you have any awareness that there was a state aid regime applicable to investments in the European Union?
>
> A: No, I did not at that time. However, after I left Eurus, I became aware of such issue.

[568] **BRR-130**, EC Report, Communication from The Commission - The Support of Electricity from Renewable Energy Sources, COM (2005) 627 final, 7 December 2005, p. 28; **RL-0095**, *BayWa*, ¶ 569(d).

the Disputed Measures, which were driven by purely domestic concerns, notably the tariff deficit.

427. Despite its detailed knowledge of the Special Regime, the EC for its part has taken no steps to enforce the relevant provisions of EU law against the recipients of subsidies generally. Instead it has elected to try or threaten to block the payment of any award of ECT and BIT tribunals, including this Tribunal, as constituting *de novo* a form of state aid. It will be for the parties through subsequent proceedings to work through the consequences of the Tribunal's award under EU law and international law, including by reference to the provisions of the ICSID Convention concerning the status and enforcement of awards.[569] The Tribunal can do nothing but decide the present case in accordance with the applicable law.

428. In the circumstances, the Tribunal finds by majority that under EU law and the law of Spain, the Claimant could not legitimately have expected that the Special Regime subsidies were, for certain, lawful. Even if the subsidies were lawful, it could not expect, under EU law and the law of Spain, that the amount of state aid granted under these measures would be paid for the lifetime of the plants. The Claimant should have known that these measures had not been notified to, let alone approved by, the EC.

429. However, the EC has equally not rendered a decision that the Special Regime subsidies were unlawful. It merely stated, with full knowledge of the facts, that it was 'not relevant' whether the previous scheme was compatible with EU law. As such, the EC has not created a right (still less a duty) for Spain to procure the reimbursement of amounts of state aid already paid, including to the Claimant's wind farms and other recipients. Nor, in the light of the record, does the Tribunal believe that EU law required only the level of subsidy provided by the Disputed Measures. The EC, which has quite broad discretion in such matters, made no such finding.

---

[569] Cf *Altmark Trans GmbH et al. v. Nahverkehrsgesellschaft Altmark GmbH*, Case C-280/00, Judgment, ECJ, 24 July 2003; **CL-0104**, *Asteris and others v. Greece and Commission of the European Communities*, Case C-106/87, Judgment, ECJ, 27 September 1988.

430.    The Tribunal has already held that no compensation is due to the Claimant for the non-continuation after 2013 of the level of state aid under the Special Regime that was in force before 2013. But the position with respect to claw-back of subsidies paid under the Special Regime is not, in the Tribunal's view, to be treated in the same way. Recipients of such subsidies could not have had a legitimate expectation that they would be continued unchanged. But the subsidies having been paid (and subject to any lawful recovery measures by the EC, which did not occur), they remained entitled to the benefit of the stable regime which Article 10(1), first and second sentences, of the ECT promised.

431.    Indeed, the effect of the non-application in practice of the law as to unnotified state aid is that continuing investors such as the Claimant are disadvantaged as compared to those who benefited from the Special Regime subsidies but sold their investment prior to the introduction of the Disputed Measures. In the absence of recovery of the unnotified aid from all recipients (which has not happened), the latter group retain the benefit of the earlier subsidies, as reflected in the sale price, without claw-back.

432.    The Tribunal notes that in its decision of 10 November 2017 (C(2017) No. 7384), the EC did not consider the Spanish Disputed Measures, including their claw-back effects, as a violation of the principle of legal certainty and legitimate expectation. Basing itself on the 'principle of interpretation in conformity', the EC found that the 'principle of fair and equitable treatment cannot have a broader scope than the Union law notions of legal certainty and legitimate expectations in the context of a State aid scheme'. However, the focus of the EC decision was on the post-2013 situation, as evidenced by its decision 'not to raise objections to the aid [*i.e.* the Disputed Measures, leaving aside the previous regime] on the grounds that it [was] compatible with the internal market pursuant to Article 107(3)(c) [of the] TFEU'. However, as this Tribunal does not have jurisdiction to interpret EU law itself but has to accept the consistent interpretation of EU law as applied by the relevant institutions, so does the EC not have jurisdiction to impose a binding interpretation of the meaning of legitimate expectations *under the ECT* (a treaty to which the EU has acceded as a party thereby agreeing to submit itself to the jurisdiction of an arbitral tribunal, should any dispute arise, and to comply with the resulting binding awards).

433.  The question thus becomes one of the implications of these conclusions for quantum. To this the Tribunal turns.

## VIII.  DAMAGES

### (1) The Parties' Positions

#### a.  *The Claimant's position*

434.  The Claimant argues that it is entitled to full reparation for the harm suffered because of the Disputed Measures. It claims reparation for a reduction in the fair market value of its shares in the SPCs, compound interest and a tax gross-up.[570] To assess the damage the Tribunal must take into account the date the last of the Disputed Measures entered into force.[571]  In doing so, it must use a discounted cash flow (DCF) analysis.[572] This method has often been applied in ECT disputes by international tribunals, especially to investments with a proven track record.[573]

435.  Under the full reparation standard, according to the Claimant, its damages consist of four different parts. First, the damage consists of *historical damages*, running from the date the first Disputed Measure entered into force until the date the last Disputed Measure entered into force, *i.e.* 30 June 2014.[574] Second, the Claimant claims *lost value damages*, which consist of the difference between the value of its shares in a hypothetical but-for scenario in which the Respondent would not have violated the ECT and the value of its shares on 30 June 2014. Third, the Claimant includes *compound interest* on the first two amounts running from 30 June 2014. Fourth, the Claimant adds *a tax-gross up*, which takes into account the hypothetical payment of taxes on the awarded damages.[575]

---

[570] Cl. Reply, ¶¶ 297, 298.

[571] Cl. Mem., ¶ 301.

[572] Cl. Mem., ¶ 303.

[573] Cl. Mem., ¶¶ 304, 305.

[574] Cl. Mem., ¶ 311.

[575] Cl. Mem., ¶ 310.

436.    To calculate historical damages Brattle uses a model setting out what the SPCs' financial performance would have been between December 2012 and 30 June 2014 if Spain had not adopted the Disputed Measures, but RD 661/2007 would have continued to apply.[576]

437.    Second, the Claimant and its experts apply a DCF analysis to quantify the impact of the Disputed Measures on the investment (lost value damages). To do so, Brattle compares two scenarios. In the Actual Scenario, it projects the Claimant's future cash flows to which the Disputed Measures apply. In the second scenario, called the But-For Scenario, Brattle assumes that Eurus has the right to receive payments under RD 661/2007.[577] Hence, the But-For Scenario applies the hypothesis that none of the Disputed Measures ever entered into force.

438.    Furthermore, the Claimant argues that the DCF method is the relevant method for the quantification of its damages. Two facts render the method particularly appropriate for the quantification of damages in ECT arbitrations. First, the investment has a long history of profitability and second, several variables that affect the future profitability of the investment can be applied in a reliable way.[578]

439.    To calculate the lost value damages Brattle first determines the future cash flow of each SPC as of the Valuation Date. The experts also take into account business forecasts and the amount due to Eurus under RD 661/2007 as well as under the Disputed Measures. Finally, various maintenance agreements assist the experts in gaining data on operating and maintenance costs of the investor.[579]

440.    Second, Brattle takes the regulatory risk and the systematic risk into account, which reduced its projection of the future cash flow. The formula that needs to be applied follows the standard capital asset pricing model: Discount rate = Risk Free Rate + (Risk Adjustment Factor x Market Risk Premium). The outcome of the analysis is a discount rate of 4.84%.[580]

---

[576] Cl. Mem., ¶¶ 315, 316; **CE-2**, Brattle First Quantum Report, 18 November 2016, ¶¶ 30-38.

[577] Cl. Mem., ¶ 317.

[578] Cl. Mem., ¶¶ 318, 319; **CE-2**, Brattle First Quantum Report, 18 November 2016, ¶ 41.

[579] Cl. Mem., ¶¶ 323-327; **CE-2**, Brattle First Quantum Report, 18 November 2016, ¶¶ 51-57, Appendix F.

[580] Cl. Mem., ¶¶ 328-333; **CE-2**, Brattle First Quantum Report, 18 November 2016, Sec. V.D.2 and ¶¶ 102-105.

441. Third, Brattle adjusts its analysis by deducting the value of each SPC's outstanding debt and the liquidity levels of Eurus' interest in each SPC.[581]

442. In the Rebuttal Quantum Report, Brattle updated the total amount of damages taking into account new data.[582] Based on said report Eurus claims losses, exclusive of interest and tax gross-up, of EUR 173 million.[583]

443. In addition, the Claimant argues that, if the Tribunal held that Claimant was entitled to no more than a 'reasonable return' it would nonetheless be entitled to damages.[584] This would mean that Eurus would have been entitled to receive a 7% after-tax return – as under RD 661/2007 – over a 20-year 'regulatory period'.[585] In this regard, Brattle proposed two alternative figures of damages, either EUR 237 million or EUR 120 million.[586]

444. Finally, the Claimant maintains that in order to comply with the standard of full reparation, the award must include compound interest running from the date of the breach, *i.e.* when Spain enacted the Disputed Measures.[587] Moreover, the Claimant points out that Spain did not contest the inclusion of compound interest.[588] The basis of claim is Article 13(1) of the ECT, which allows for an interest to be applied at a 'commercial rate established on a market basis'. Based on Spain's sovereign borrowing rate, based on a 10-year bond, Brattle deems it appropriate to apply a rate of 1.16% compounded monthly. This is because according to Brattle, the Claimant has become an 'unwilling lender' since Spain did not pay the compensation promptly. This renders the sovereign borrowing rate an appropriate reference. The claim for pre-award interest is EUR 12 million.[589]

445. Finally, Eurus argues that it is to be awarded a tax gross-up of 28%, amounting to EUR 72 million. In Japan, Eurus would have to pay taxes on the compensation awarded. However,

---

[581] Cl. Mem., ¶¶ 322, 334, 335.
[582] Cl. Reply, ¶ 355.
[583] Cl. Reply, ¶ 337.
[584] Cl. Reply, ¶¶ 422-426.
[585] Cl. Reply, ¶ 423.
[586] **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶¶ 220, 221; Cl. Reply, ¶ 421.
[587] Cl. Mem., ¶¶ 306-309.
[588] Cl. Reply, ¶¶ 360-363.
[589] Cl. Mem., ¶ 342; Cl. Reply, ¶ 430.

this would leave the Claimant still out of pocket as compared with the situation where the Respondent had not enacted the Disputed Measures. According to Section 2-1-43 of the Japanese Corporate Tax Act, the applicable rate would amount to 27.8%, which needs to be taken into account by the Tribunal.[590]

446.     In total, the Claimant's compensation amounts to EUR 258 million including damages, interest and the tax gross-up.[591]

### b.   The Respondent's Position

447.     The Respondent argues that the Claimant has not suffered from any damage. Accordingly, the result of the quantum analysis is that Claimant cannot claim any compensation whatsoever. Further, Spain maintains its argument that Claimant's quantification is wholly speculative.[592] Moreover, the DCF analysis is not an adequate method to quantify the Claimant's damage, even assuming it had suffered damage.[593]

448.     First, the Respondent criticises the calculation method chosen by Brattle. Spain puts forward that none of the alleged damages has been proven, which renders the damages speculative and hypothetical. Moreover, the Spanish Supreme Court has rendered more than one hundred judgments rejecting the speculative quantification methods used by the Claimant. According to the Supreme Court that method 'lacks [the] necessary rigour and certainty'.[594]

449.     Furthermore, Spain argues that the DCF method is inappropriate and the Tribunal should adopt an asset-based method. This is because, according to doctrine, the following circumstances render the DCF method inadmissible and impossible:

---

[590] Cl. Reply, ¶ 366; Cl. Mem., ¶¶ 343, 344.

[591] Cl. Reply, ¶ 430.

[592] Resp. Rej., ¶¶ 816-832.

[593] Resp. Rej., ¶ 838.

[594] Resp. C.-Mem., ¶¶ 1130, 1134-1150.

(a)   The fact that it involves a capital-intensive business, with a significant asset base. Practically all its costs arise from investing in tangible infrastructure. There are no relevant intangible assets to analyse.

(b)   The high dependency of the cash flows on external, volatile and unpredictable elements, such as the price of the pool, *inter alia*.

(c)   The long-term nature of the forecasts.

(d)   The disproportion between the alleged investments (and the alleged assumed risk).[595]

450.   Taken together, these circumstances lead to the conclusion that the DCF method is inapplicable. As a result, the Tribunal must apply an asset-based quantification method taking into account the profitability and book value of the investment.[596]

451.   Moreover, Spain argues that Claimant's returns have been higher than 'the reference rates' used by Eurus and Brattle. Pursuant to BDO's calculation, the Claimant's average IRR amounts to 13.43% before taxes, with a result of 15.15% before taxes for the shareholders. Compared to the return before taxes under the Disputed Measures, which is at 7.398%, there is no negative impact. As a result, Eurus is not entitled to any damages.[597]

452.   Nonetheless, BDO performs a subsidiary DCF analysis to show that there has not been any negative impact on the Claimant's investment. To compare the Actual Scenario with a But-For Scenario, BDO applies similar criteria as Brattle. However, it uses lower revenues and a shorter useful life of the plants, reduced to 20 years. As to the But-For Scenario, BDO changes the parameters of the analysis, reaching a different result compared to Brattle's analysis. According to BDO's DCF analysis, the impact of the disputed measures on Claimant's investment is 'neutral or mildly positive for the Claimant'.[598]

---

[595] Resp. C.-Mem., ¶ 1143.

[596] Resp. C.-Mem., ¶¶ 1137-1150; Cl. Reply, ¶¶ 415-421.

[597] Resp. C.-Mem., ¶¶ 1151-1153; BDO Expert Report, ¶ 172 and Table 20; Resp. Rej., ¶¶ 833-838; Second BDO Expert Report, Table 15.

[598] Resp. C.-Mem., ¶¶ 1154ff; BDO Expert Report, ¶¶ 276ff; Resp. Rej., ¶¶ 839-842.

453. As to the determination of interest, the Respondent does not object to the application of pre-award interest. However, Brattle calculates interest on the basis of a ten-year Spanish bond, whereas BDO uses a short-term government debt interest rate. Using the ten-year bond artificially inflates the risk and therefore the compensation, which is contrary to the ILC Articles on State Responsibility and the principle laid out by the Court in the *Chorzów* case.[599]

454. Finally, Spain maintains that the tax gross-up claim is inadmissible and unjustified. This is for three reasons. First, Article 21 of the ECT contains a tax carve-out, preventing the Claimant from asking for a compensation for any hypothetical taxes it will have to pay. Furthermore, the tax cannot be attributed to the Respondent under the ILC Articles on State Responsibility, as the tax is applied by a third state. As it is not an act of the Respondent, it is not attributable to Spain. Second, the Claimant has not submitted any proof as to their obligation to pay taxes on the award in Japan. In this regard, Spain also argues that Eurus Japan's alleged damages would flow-through its wholly-owned Dutch subsidiary, Eurus Europe, which may have liabilities, like taxes, loans, etc. But Eurus Japan's tax gross-up claim fails to account for the corporate layer of Eurus Europe.[600] Third, all this renders the claim 'speculative, contingent and uncertain'.[601] As BDO points out, this conclusion is supported by the fact that Brattle only dedicated three paragraphs to the tax gross-up.[602]

### (2) The Tribunal's Analysis

455. It follows from the Tribunal's decisions on jurisdiction and liability that neither of the primary claims of the Parties as to quantum can be accepted.

456. In terms of jurisdiction, the Claimant's primary claim includes an amount on account of TVPEE, which claim the Tribunal has held to be outside its jurisdiction.

---

[599] Resp. Rej., ¶¶ 843-849.

[600] Hearing Day 5, p. 233, 15-25; pp. 234-235 (Mr. Fernández Antuña).

[601] Resp. C.-Mem., ¶¶ 1158-1174; Resp. Rej., ¶¶ 850-895.

[602] BDO Expert Report, ¶ 311.

457.    In terms of substance, the Claimant's experts value the claim on the basis that the Claimant had a 'legal entitlement to a specific schedule of tariffs' reflected in RD 661/2007.[603] As put by the Claimant in closing:

> That regime, Royal Decree 661, is our but-for, and it is our but-for scenario however you might choose to parse out the various plants that comprise the Claimant's investment.[604]

458.    The Tribunal has however held, by majority, that the Claimant's investments had no right to subsidies at the level of RD 661/2007, and no legitimate expectation to such subsidies either.  Moreover, even if there had been such an expectation, the but-for situation would not have been, as the Claimant argues, RD 661/2007, with or without modifications, but something more indeterminate.

459.    It is not, however, necessary to pursue these issues further.  The Tribunal has held that the breach of Article 10(1), first and second sentences, of the ECT is limited to the effects of the 'retroactive reduction in the allowed return' (the '**Claw-Back Feature of the Disputed Measures**'),[605] and the question is how to value that amount.

460.    Like the *RREEF* tribunal, the present Tribunal has not been able, despite its best efforts, to quantify the amount of this retroactive reduction on the basis of the reports and supporting work papers filed by the Parties' respective experts.[606]  It is, however, satisfied that the Parties' experts are qualified and have sufficient knowledge of the case and that the different results obtained by both experts are a result of the different calculation methods which they applied. Consequently, the Tribunal decides that the Parties, with the assistance of their experts, shall seek to reach an agreement on the impact of the Claw-Back Feature of the Disputed Measures alone, on the basis that those measures were otherwise consistent with the ECT.

---

[603] See e.g. **CE-5**, Brattle Rebuttal Quantum Report, 29 September 2017, ¶ 10.

[604] Hearing Day 5, p. 14, ll 2-5 (Mr. Lingard).

[605] To use the terminology of the CE-5, Brattle Rebuttal Quantum Report, 29 September 2017, ¶ 10.

[606] The Claimant's Alternative Claim incorporates this amount but does not assist in identifying it: ibid, ¶¶ 220, 221.

461.  If the Parties cannot, within 3 months of the date of this Decision, reach agreement on the amount payable in this respect, either Party may request the Tribunal to decide the outstanding issues in dispute, in accordance with a prompt briefing schedule.  If the Parties do reach agreement on the amount due, they should report this to the Tribunal in order to enable it to issue an Award incorporating this Decision and dealing with any residual issues identified, including costs, thereby terminating the proceedings.

### (3) The Tax Gross-up Claim

462.  One matter of quantum that can be resolved at this stage is the tax gross-up claim.

463.  The Claimant seeks compensation for the hypothetical payment of taxes in Japan so that it can receive full reparation.[607] The Respondent rejects the claim on the ground that it cannot be held liable to pay for tax measures implemented by a third state.

464.  In this context, it is significant that there appears to be no precedent for the award of a tax gross-up involving taxation of a third state.  In five recent cases, *Eiser*,[608] *Masdar*,[609] *Antin*,[610] *OperaFund*,[611] and *BayWa*,[612] the tribunals rejected the gross-up claims for lack of supporting evidence.

465.  The Tribunal agrees with the Respondent that, on the material now available, there is uncertainty as to the legal position on damages and taxation.[613] It is unclear at what point the damages awarded would have been taxed in the normal course and remitted in whole or in part to the Claimant. Eurus also failed to submit a persuasive rebuttal of Spain's argument that Eurus Japan's tax gross-up claim fails to account for the corporate layer of Eurus Europe.

466.  For these reasons the Tribunal rejects the claim for a tax gross-up.

---

[607] Cl. Reply, ¶ 1241.

[608] **CL-0079**, *Eiser*, ¶ 456.

[609] **CL-0113**, *Masdar*, ¶ 660.

[610] **CL-0114**, *Antin*, ¶ 673.

[611] **RL-0093**, *OperaFund*, ¶ 704.

[612] **RL-0095**, *BayWa*, ¶ 626.

[613] Hearing Day 1, p. 231, ll 2-16 (Mr. Fernández Antuña).

## IX.    CONCLUSIONS

467.    For these reasons, the Tribunal finds, by majority:

(a)    that the ECT and the European state aid regime apply concurrently to the investment and form part of the applicable law;

(b)    that the Claimant did not have a legitimate expectation that the Special Regime subsidies, notably in terms of RD 661/2007, would continue to be paid for the lifetime of its plants;

(c)    that the retro-active claw back by Spain, in and after 2013, of subsidies earlier paid at levels in excess of the amounts that would have been payable under the Disputed Measures, had they been in force in previous years, did breach the obligation of stability under Article 10(1), first and second sentences, of the ECT;

(d)    that there was no other breach of the ECT;

(e)    that all other claims must be rejected.

468.    The Parties shall seek to reach agreement on the impact of the claw-back feature of the Disputed Measures, on the basis that those measures were otherwise consistent with the ECT, taking in due account the reasoning and findings in the present Decision.

469.    If the Parties do not, within 3 months of the date of this Decision, reach agreement on the amount payable in this respect, either of them may request the Tribunal to decide the outstanding issues in dispute, in accordance with a prompt briefing schedule.  If the Parties do reach agreement on the amount due, they should report this to the Tribunal in order to enable it to issue an Award incorporating this Decision and dealing with any residual issues identified, including costs, thereby terminating the proceedings.

[Signed]

_____
Mr. Oscar Garibaldi
Arbitrator

(Subject to Partial Dissent)

[Signed]

_____
Prof. Andrea Giardina
Arbitrator

[Signed]

_____
Judge James Crawford
President of the Tribunal

**ICSID Case No. ARB/16/4**


**between**

**EURUS ENERGY HOLDINGS CORPORATION**


**and**


**KINGDOM OF SPAIN**

---

**PARTIAL DISSENT**

---


Mr. Oscar M. Garibaldi
Arbitrator


17 March 2021

Table of Contents

I.    INTRODUCTION ........................................................................................... 1

II.   ON THE APPLICABLE LAW ..................................................................... 2

III.  ON THE MERITS ......................................................................................... 5

      A.   INTRODUCTION ................................................................................... 5

      B.   CLAIMS GROUNDED ON ARTICLE 10(1), FIRST AND SECOND SENTENCES, OF THE ECT 7

           1.   The First Sentence ...................................................................... 7

           2.   The Second Sentence ................................................................... 9

      C.   CLAIMS GROUNDED ON ARTICLE 10(1), THIRD SENTENCE, OF THE ECT ................... 51

      D.   ON EU STATE AID ............................................................................ 52

IV.   CONCLUSION ............................................................................................ 63

# PARTIAL DISSENT

## OF ARBITRATOR OSCAR M. GARIBALDI

### *EURUS ENERGY HOLDINGS CORPORATION V. KINGDOM OF SPAIN*

## I.    INTRODUCTION

1.    I dissent from the decisions of my esteemed colleagues (henceforth, the Majority) (i) to hold EU law to be a part of the applicable law under Article 26(6) of the ECT and (ii) to dismiss the bulk of the Claimant's claims grounded on Article 10(1) of the ECT.  I concur, on substantially different grounds, in the Majority's decisions that (iii) the claw-back feature of the Disputed Measures breached the first two sentences of Article 10(1) of the ECT and (iv) EU law on state aid does not bar the claim based on the claw-back feature.[1] The purpose of this dissenting opinion is to explain (a) to what extent and why I disagree with the Majority's decisions and their supporting reasons on points (i) and (ii) and (b) to what extent and why I concur in the Majority's decisions on points (iii) and (iv) but disagree on the reasoning on which they are based.

2.    I regard a dissenting opinion as an opportunity to voice criticism on important points of law or fact on which no agreement has been reached.  If we are to make progress in our search for better solutions to legal issues that are serious and recurring, we should be ready to criticize the decisions of others and the grounds on which those decisions are based, as well as to open our minds to countercriticism.  That is why it is not enough, in my view, for a dissenting arbitrator merely to state an alternative position, as it is often done. The dissenter should explain, respectfully, what he or she sees as flaws in the majority's position, so that others may assess the relative strength of the opposing reasons.  This is the approach to be followed in this Partial Dissent.

---

[1] I also dissent, consequentially, from the Majority's decisions on the quantum of compensation.  If my views on the merits had been accepted, the compensation to which the Claimant is entitled should have been calculated under different principles.  For the purposes of this Partial Dissent, it is not necessary to develop this point further.

3.      I should make it clear that I hold my colleagues in the highest regard, personally and professionally.  My criticism of their views is always directed *ad sententias et argumenta*, never *ad homines.*

4.      As will become apparent, while I agree in some respects with the Majority's analysis and conclusions on the matters subject to this dissent, I disagree in many (perhaps most) other respects.  Because the points of agreement are intertwined with those of disagreement, a comprehensive discussion is necessary.  And because I find the Majority's analysis flawed in critical respects, I prefer to discuss most contested issues in my own words.

## II.      ON THE APPLICABLE LAW

5.      The main issue presented under the rubric of "Applicable Law" is whether the law to be applied by the Tribunal in this case should include EU law.  The Majority acknowledges that Japan is not a party to the EU treaties and "is not bound by them as such."[2]  Yet, the Majority takes the view that the Tribunal is allowed "to note the settled legal consequences of facts established in the course of the proceedings, for example, the fact that unnotified state aid gives rise to adverse consequences under Article 108(3) of the TFEU."[3]  On this basis, the Majority concludes: "To that extent, at least, EU law is part of the applicable law under Article 26(6) of the ECT."[4]  True to that conclusion, when it comes to discussing EU state aid, the Majority applies EU law *as law*.[5]

6.      The Majority's conclusion that EU law is part of the applicable law is unsupported by the ECT and contradicts the basic principle of international law that treaties are not binding on non-parties.  As explained below, except to the extent that the ECT itself may contain a *renvoi* to EU law, the Tribunal may take cognizance of EU law only *as a fact*, and only to

---

[2] Decision on Jurisdiction and Liability (henceforth, Decision), ¶ 232.  Unless stated otherwise, the abbreviations used in this Partial Dissent are the same as those used in the Decision.

[3] Decision, ¶ 236.

[4] *Id.* I note that the phrase "at least" leaves open the possibility of a broader application of EU law.

[5] Decision, ¶¶ 423(b), 428-32, especially 427, 432.  The way in which the Majority applies EU law is discussed in detail *infra*, ¶¶ 121-139.

the extent necessary to apply the ECT and other rules and principles that are applicable as law.

7.      The starting point of the analysis must be Article 26(6) of the ECT, which prescribes the law to be applied in an arbitration under Part V:

> "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[6]

8.      This provision directs the Tribunal to apply, in addition to the ECT itself, "*applicable* rules and principles of international law."[7]  The EU treaties are (or rather contain) rules and principles of international law, but they are not "applicable" in this case, because Japan is not a party to them and, as the Majority acknowledges, is not bound thereby.[8]  Therefore, EU law cannot be part of the substantive law applicable in this case.

9.      The Majority also refers to Article 16 of the ECT, which provides that if two or more Contracting Parties to the ECT have entered or may enter into a treaty concerning the subject matter of Part III or Part V of the ECT, neither the other treaty nor the ECT shall be construed to derogate from a provision of each other that is more favourable to the Investor or the Investment.[9]  In this case, Article 16 is plainly inapplicable, because Spain and Japan have not entered into any other treaty concerning the subject matter of Part III or Part V of the ECT.  Nevertheless, the Majority takes the view that "Article 16 remains indirectly relevant as concerns the relation between the ECT and the TFEU, in that by clear implication the ECT prevails over the TFEU to the extent that the ECT provision 'is more

---

[6] **CL-0001**, Energy Charter Treaty (henceforth, ECT), Art. 26(6).

[7] *Id.* (emphasis added).

[8] **RL-0010**, Vienna Convention on the Law of Treaties (henceforth, VCLT), Art. 26 ("*Pacta sunt servanda*. Every treaty in force is binding upon the parties to it and must be performed by them in good faith.")

[9] **CL-0001**, ECT, Art. 16  ("Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty, (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, — [applying to both (1) and (2)] where any such provision is more favourable to the Investor or Investment.")

favourable to the Investor or Investment'."[10]  The Majority offers no basis for this alleged implication, other than saying that "[o]ne would not expect a non-EU member state, or the nationals of such a state, to be treated less well."[11]  The interpreter's expectations, however, are not a substitute for what Article 16, properly interpreted under the rules of the VCLT, actually provides.  In fact, the ECT does prevail over the TFEU in this case, but not because one would expect the rule of Article 16 to be extended to Japan or its nationals, but because the TFEU is inapplicable, and hence there is no conflict for Article 16 to resolve.

10.    The Majority correctly dismisses the Respondent's argument that, under the authority of the CJEU's pronouncements in *Achmea*, the Tribunal has no competence to apply EU law.[12]  The Majority does so by construing *Achmea* narrowly, as not applying to a multilateral treaty such as the ECT, to which the EU itself is a party.[13]  Such a narrow construction is a possible one, although there are more fundamental reasons to conclude that the *Achmea* decision does not control the Tribunal's competence, a competence which does not derive from the EU treaties but from the ECT.[14]  In the present case, however, the question of the Tribunal's competence to apply EU law *as law* is academic, because, for the reasons stated, EU law is not part of the applicable law.

11.    All that being said, the Majority is right to point out that "the EU treaties have established legal regimes for regulating matters such as state aid, which are furthermore directly applicable as part of the law of the member states," with the consequence that "[t]o the extent that Japanese or other third-state corporations establish activities in the EU that are regulated by those regimes, they may be affected by them."[15]  Those legal regimes and the consequences derived therefrom are among the *factual* circumstances that the Tribunal must take into consideration in applying the provisions of the ECT.  To give those facts proper consideration in the proper context, it is neither necessary nor justifiable to turn

---

[10] Decision, ¶ 229.

[11] *Id.*

[12] Decision, ¶¶ 233-234.

[13] Decision, ¶¶ 235-236.

[14] See, *e.g.*, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018.

[15] Decision, ¶ 232.

them into applicable law. In this respect, EU law is in a position akin to that of Spanish law, in which it happens to have been incorporated: Spanish laws and judicial and administrative decisions are to be considered as facts, except to the extent that the ECT might require, expressly or by clear implication, that they be applied as law.[16]

## III.   ON THE MERITS

### A.   INTRODUCTION

12.   The Claimant's claims are based on (i) Article 13(1) of the ECT, which concerns the expropriation of investments, and (ii) three clauses of Article 10(1) of the ECT, which concerns the promotion, protection, and treatment of investments. The Tribunal unanimously dismisses the claim based on Article 13(1) on grounds with which I am generally in agreement. As for the claims based on Article 10(1) of the ECT, the Tribunal (by majority) dismisses them, except for the claim related to the claw-back feature of the Disputed Measures, which the Tribunal upholds under the principle of stability derived from the first and second sentences of Article 10(1) of the ECT.

13.   I concur in the portion of the Majority's decision which upholds the claim related to the claw-back feature of the Disputed Measures, although the reasons for my concurrence are different from those of the Majority. I dissent from the Majority's dismissal of the remainder of those claims and from the reasoning supporting the dismissal. I explain in this section the extent of my partial concurrence, the extent of my dissent, and the reasons therefor.

14.   The starting point of the discussion must be Article 10(1) of the ECT. The entire text of that provision, with added numbers for each sentence and italics to set out the clauses on which the Claimant relies, is as follows:

---

[16] *Certain German Interests in Polish Upper Silesia (Germany v. Poland)*, 1926 P.C.I.J. (ser. A) No. 7, ¶ 52 ("municipal laws are merely facts which express the will and constitute the activities of States, in the same manner as do legal decisions or administrative measures.") For example, the ECT implicitly requires the application of Spanish law *as law* to determine whether the Claimant had rights subject to expropriation under the rules of Article 13 of the ECT.

"[1] *Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area*. [2] *Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment*. [3] Such Investments shall also enjoy the most constant protection and security and *no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal*. [4] In no case shall such investments be accorded treatment less favourable than that required by international law, including treaty obligations.  [5] Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."[17]

15.    The Claimant's first claim under Article 10(1) of the ECT is purportedly grounded on the first and second sentences taken together.  The Majority likewise discusses those two sentences together, on the ground that the first sentence cannot be interpreted in isolation from the second.  To simplify the presentation, I shall also address the two sentences in the same subsection, although I shall analyse them individually (Subsection B).

16.    The Claimant's second claim under Article 10(1) of the ECT, based on the italicised portion of the third sentence, will be discussed in Subsection C.

17.    The Majority ends its analysis by addressing the Respondent's defences based on EU rules on state aid.  One defence is dismissed altogether and the other is dismissed in respect of the sole claim which the Majority upholds, which is based on the claw-back feature of the Disputed Measures.  I concur in the dismissal of those defences, but to a different extent and on different grounds (Subsection D).

---

[17] **CL-0001**, ECT, Art. 10(1) (emphasis added).

### B. CLAIMS GROUNDED ON ARTICLE 10(1), FIRST AND SECOND SENTENCES, OF THE ECT

#### 1. The First Sentence

18. The first sentence of Article 10(1) states: "*Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.*"[18] This provision, as well as all other provisions of the ECT at issue in this case, must be interpreted under the rules of interpretation of the VCLT. First and foremost, the provision must be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of the object and purpose of the treaty.[19]

19. The Majority states, citing some earlier decisions in support, that the first sentence of Article 10(1) cannot be interpreted in isolation from the second sentence.[20] It would be more accurate to say that the first and the second sentences form the proximate context of each other, and context is one of the primary elements of interpretation under the rules of the VCLT. Aside from the role of proximate context in the interpretation of both sentences, there is no reason why the two sentences cannot be applied separately, each in accordance with its own prescriptive content.[21]

20. As for the content of those obligations, the Majority states that the first sentence "does not give a general mandate to ECT tribunals to decide whether government decisions affecting investments are 'equitable' or 'favourable.'"[22] That statement is correct, but as a comment on the content of the first sentence it misses the mark. The first sentence does not purport

---

[18] *Id.* (emphasis added).

[19] **RL-0010**, VCLT, Arts. 31 and 32, especially Art. 31.1.

[20] Decision, ¶ 314.

[21] By "prescriptive content" of a treaty provision I mean the conduct that the provision qualifies as permitted, not permitted, or obligatory, including the set of conditions under which such qualification takes effect. I do *not* understand the Majority's position to be that (i) the first sentence is merely hortatory or otherwise lacks prescriptive force, or (ii) the prescriptive content of the first sentence is subsumed within that of the second sentence, so that the first sentence does not really impose any separate obligation. These theories, which several tribunals have espoused, have no basis in the ECT. The first sentence is couched in the same prescriptive language ("shall") as the second. A tribunal faced with multiple treaty provisions framed in equally mandatory language does not have discretion to select which ones it will treat as prescriptive and which ones it will not.

[22] Decision, ¶ 314.

to give ECT tribunals any such "general mandate" nor does the scope of the sentence refer to (any and all) "government decisions affecting investments."  In fact, the scope of the obligations arising from the first sentence and the effects of that sentence on the Claimant's claims are more limited than the concerns that prompted the Majority's statement.

21.     The first sentence requires the state to encourage and create "stable, equitable, favourable and transparent conditions" *for the making of investments*.  Leaving aside for the moment what counts as stable, equitable, favourable, and transparent (a matter to be discussed later), those conditions concern only "the making of Investments."  Article 1(8) of the ECT defines "Make Investments or Making of Investments" as "establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity."[23]  Therefore, the first sentence of Article 10(1) concerns the conditions that the Respondent was required to create for the Claimant to carry out new investment activities. In the circumstances of this case, this amounts primarily to a reference to the "original" conditions, that is, the conditions that the Respondent had created and existed at the time the Claimant made each of its investments in eolic energy in Spain.

22.     The first sentence of Article 10(1) requires that those original conditions be stable, equitable, favourable, and transparent.  In this case, however, the Claimant does not allege that the original conditions for each of its investments (which were not necessarily the same) were inequitable, unfavourable, or non-transparent.  With the possible exception of the requirement that those conditions be stable, the Claimant's claims are not based on an alleged inconsistency between the original conditions and the requirements of the first sentence; they concern a subsequent *change*, to the Claimant's detriment, of (i) the original conditions or (ii) conditions imposed subsequently which the Claimant had accepted or to which it had acquiesced.  Therefore, again with the possible exception of the requirement of stability, the first sentence cannot provide a legal basis for the Claimant's claims.

23.     The requirement that the original conditions be "stable" is different in an important respect from the other requirements set forth in the first sentence.  In the case of the other

---

[23] **CL-0001**, ECT, Art. 1(8).

requirements, it is possible to assess at a single point (*e.g.*, at the time the investment was made) whether the original conditions were equitable, favourable, and transparent – to such degree as may be required.  But in the case of the requirement that the original conditions be "stable," it is not possible to assess compliance with the requisite degree of stability until some time should have elapsed.  Stability, whatever the required degree, is a quality that the original conditions must possess over time, *i.e.* a certain degree of continuity or lack of change over a certain period.  Accordingly, if the stability of the original conditions is affected by the subsequent treatment of the investment, the requirement of the first sentence that the original conditions be "stable" may overlap with the requirements of the second sentence concerning the treatment of the investment "at all times."  The existence and extent of the overlap will depend on a comparative analysis of the requirement of stability in the first sentence with the requirement of fair and equitable treatment in the second sentence.

24.    I conclude that, aside from the requirement that the original conditions be "stable," the first sentence of Article 10(1) cannot serve as a basis for the Claimant's claims.  In view of this conclusion, it is unnecessary to discuss, in the context of the first sentence, the requirement that the original conditions be equitable, favourable, and transparent. The requirement of stability under the first sentence will be examined, for convenience, together with the requirement of fair and equitable treatment under the second sentence.

### 2.    The Second Sentence

### a.    The "Fair and Equitable Treatment" Standard

25.    The second sentence of Article 10(1) requires a commitment to accord the investment, at all times, fair and equitable treatment.  The Majority notes that Article 10(1) has been extensively discussed in earlier decisions and finds little point in going over the same ground.  The Majority makes two general observations and immediately goes on to adopt the "test" formulated in *Blusun v. Italy*.[24]

---

[24] Decision, ¶¶ 312-315.

26.    The Majority's first general observation is that the fair-and-equitable-treatment standard does not give tribunals sitting under investment treaties general discretion to impose their own views as to "fairness" and "equity."[25]   This observation is of course correct. Arbitrators do not have the power, under the guise of interpretation, to treat the terms of a treaty as empty vessels in which to pour their own policy preferences or to improve on the textual choices made by the drafters of the treaty.  But, as we shall see, neither do they have the power to discard the terms of the treaty and apply instead rules, standards, or tests of their own making.

27.    The Majority's second observation is that the first and second sentences of Article 10(1) embody a legal standard, "which takes into account the prerogatives and responsibilities of governments as well as the rights and interests of investors, including their interest in stability."[26]   This statement is so general that it is difficult to take issue with it, except to note that it says nothing about what that legal standard exactly is or on what it is based.

28.    Then the Majority adopts as its own the following *dictum* in *Blusun v. Italy*:

> "In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime."[27]

29.    The *Blusun dictum* then becomes the roadmap for the Majority's analysis of the Claimant's claims under the first and second sentences of Article 10(1) and for the ultimate disposition of those claims.  I disagree with the so-called *Blusun* "test" and the way the Majority applies it, on two levels.

---

[25] Decision, ¶ 314.

[26] *Id.*

[27] Decision, ¶ 315, quoting from **CL-0083**, *Blusun v. Italy*, ¶ 319(5).

30.    On a more general and more fundamental level, I perceive no legal or theoretical justification for applying the *Blusun* "test" (or any comparable arbitrator-made "test" or standard) in place of the fair-and-equitable-treatment standard set forth in the second sentence of Article 10(1).   The second sentence requires "fair and equitable treatment," not something else.  The *Blusun* "test" is in fact a complex arbitrator-made rule, designed to serve as the governing rule for decision in cases concerning subsidies first granted and later modified. That rule is framed in terms of tiered sub-rules, concepts, and criteria which are different from the "fair and equitable treatment" standard, and the Majority makes no effort to demonstrate that those sub-rules, concepts, and criteria derive from or are otherwise connected (in a manner consistent with the rules of the VCLT) with the "fair and equitable treatment" standard.

31.    In fact, the Majority adopts and uses the *Blusun* rule *as a substitute* for the "fair and equitable treatment" standard.  This is incorrect.  Just as a tribunal is not authorized to impose its own views concerning what is "fair" or "equitable," as the Majority correctly points out, *a fortiori* a tribunal is not authorized to toss aside the "fair and equitable treatment" standard imposed by the treaty and apply instead a substitute rule, "test," or standard of its own choosing.

32.    On a more specific level, I find the *Blusun* rule a poor substitute for the "fair and equitable treatment" standard.  If the "fair and equitable treatment" standard is sometimes criticized on the ground that it is not precise enough, the *Blusun* rule is hardly an improvement.  I shall analyse each component of the rule later.[28]  For the moment, suffice it to note that the concepts of "necessary to modify" and "due regard" are neither precise nor unambiguous. Nor is it self-evident (i) whether or how the twin restrictions set forth in the *Blusun* rule (proportionality to the aims of the challenged measure and "due regard" for the investor's reliance interests) are related to the concepts of fairness and equity or (ii) if so related, whether, how, or why they are jointly *sufficient* to satisfy the requirement that the treatment be "fair and equitable."

---

[28] *Infra*, ¶¶ 43-47.

33.     It cannot be seriously claimed that the term "fair and equitable treatment" is exempt from the need for interpretation.  But any interpretation must be done by following the rules of the VCLT, not by adopting a substitute rule or standard unconnected with the text of the treaty.  It bears repeating that, under the primary rule of interpretation of the VCLT, the second sentence of Article 10(1) must be interpreted in good faith in accordance with the ordinary meaning of the terms used in their context and in the light of the object and purpose of the ECT.  I shall discuss each of these elements in turn.

### The Terms

34.     The terms of the second sentence are: "*Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment*."[29]  "Such" indicates that the term it modifies ("conditions") is one that has been referred to previously – in this case in the preceding sentence.  Hence, "[s]uch conditions" can only refer to the conditions mentioned in the first sentence, *i.e.* "stable, equitable, favourable and transparent conditions."[30]

### Ordinary Meaning

35.     The ordinary meaning of "fair and equitable treatment" is not a particularly difficult issue.  Several tribunals have started their analyses by quoting the dictionary meaning of "fair" and "equitable."[31]  I regard that step as not quite necessary, because it is reasonable to assume that most people, and certainly all lawyers, know the ordinary meaning of these terms.  The difficulty (if there is one) lies not in a lack of understanding of what "fair" or "equitable" means in ordinary language, but in the process of applying these concepts to a particular instance of treatment in the circumstances of a particular case.  But that difficulty

---

[29] **CL-0001**, ECT, Art. 10(1) (emphasis added).

[30] "Such conditions" cannot refer to the conditions "to make Investments," that is, to the original conditions for a new investment activity, because the second sentence makes clear that the required treatment must be accorded "at all times."

[31] See, *e.g.*, **CL-0114**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energía Termosolar B.V. v. Kingdom of Spain* (ICSID Case No. ARB/13/31), Award, 15 June 2018, ¶ 518 ("'fair' means 'just, unbiased, equitable, impartial, legitimate"; and "'equitable' is defined as 'characterised by equity or fairness', where 'equity' means 'fairness; impartiality; even-handed dealing'."); **CL-0028**, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 113 ("just", "even-handed", "unbiased", "legitimate").

(if it exists) is neither extraordinary nor unsolvable.  Applying general concepts like "fair" and "equitable" is not different in kind from what adjudicators do and have always done: applying general rules and concepts to the circumstances of particular cases.

36.     It is sometimes said that the term "fair and equitable treatment" expresses a legal concept. That is true, in the sense that this term and cognate terms are frequently used in legal texts and legal discourse, as well as in ordinary language.  In fact, by the time the ECT was drafted and opened for signature (17 December 1994), the term "fair and equitable treatment" had been used for decades in numerous investment-protection treaties and had been interpreted and applied in multiple arbitral awards.  Those awards had frequently linked the term "fair and equitable treatment" to various concepts, including consistency, transparency, stability, and respect for objectively reasonable expectations derived from antecedent state action.  These observations do not mean, however, that "fair and equitable treatment" should be given a special meaning, in the sense of Article 31.4 of the VCLT, because it has not been established in this case that the parties to the ECT intended to adopt any particular exegesis of "fair and equitable treatment" made by any pre-December 1994 decision or set of decisions.  Much less do these antecedents justify that "fair and equitable treatment" be regarded as an open-ended legal concept, the meaning of which should depend on "evolving" interpretations adopted by tribunals in pre- or post-ECT decisions, which in any event are not binding on this Tribunal.  On the contrary, "fair and equitable treatment" must be regarded as a term which had an objective meaning at the time the ECT was framed – a meaning to be established in good faith under the rules of the VCLT.

### Context

37.     As already noted, the second sentence of Article 10(1) immediately follows the first sentence and explicitly refers to a term contained therein.  Accordingly, the first sentence forms the proximate context of the second, and this context must especially be taken into account in the interpretation of the latter.[32]  The drafters of the ECT could simply have

---

[32] For a similar analysis, see, *e.g.*, **RL-0098**, Dissenting Opinion of Kaj Hobér in *Stadtwerke München GmbH, RWE Innogy GmbH, and others v. Kingdom of Spain* (ICSID Case No. ARB/15/1), 20 November 2019 (henceforth, Hobér Dissent), ¶ 6.

provided, as other treaties do, that each Contracting Party shall accord at all times fair and equitable treatment to the Investments of Investors of other Contracting Parties. Instead of doing so, they chose a more elaborate formulation, which links the commitment to accord fair and equitable treatment to the "stable, equitable, favourable, and transparent conditions" referred to in the first sentence.

38. This observation suggests that the drafters understood "fair and equitable treatment" to belong to a larger class of "stable, equitable, favourable, and transparent conditions." This does not imply, however, that "fair and equitable treatment" is the same as "stable, equitable, favourable, and transparent conditions" ("equitable" being redundant), because the second sentence does not say so. But this close contextual relationship does indicate that stability, favourability, and transparency (to certain degrees, as will be discussed) are among the relevant factors or circumstances that should be taken into account in determining whether a given instance of treatment is "fair and equitable."

### *Object and purpose*

39. The traditional way of ascertaining the object and purpose of a treaty is to look at any statement of purpose that it might contain. Article 2 of the ECT, titled "Purpose of the Treaty," states that the ECT "establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the [European Energy] Charter."[33]

40. The European Energy Charter is a declaration of goals and principles for international cooperation in the energy field, adopted in 1999.[34] It consists of a very general statement of goals (Title I: Objectives), a set of more specific (but still general) ideas about pursuing those goals (Title II: Implementation), and a set of undertakings to negotiate certain specific agreements (Title III: Specific Agreements).[35]

---

[33] **CL-0001**, ECT, Art. 2.

[34] **CL-0001**, European Energy Charter.

[35] **CL-0001**, European Energy Charter, *passim*.

41.　As regards the protection of foreign investment, the most relevant and specific statement of "objectives and principles" can be found in Title II.  Paragraph 4 of Title II states that "it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security […]."[36]  The ECT is the product of the negotiations called upon by this statement.  Accordingly, the reference to the objectives and principles of the European Energy Charter suggests that one purpose sought by the drafters of the ECT was to provide a "high level of legal security" to investments.[37]

42.　Another way of ascertaining the object and purpose of the ECT is to look at the overall structure and content of the treaty, that is, what the treaty actually *does*.  What Part III of the ECT fundamentally does is to lay down certain *international* standards which Contracting States are required to observe in their treatment of investments of nationals of other Contracting States.  This observation is a sufficient reason to reject, as inconsistent with the object and purpose of the treaty, any interpretation of "fair and equitable treatment" that seeks directly or indirectly to reduce the international standards imposed by the ECT to mere observance of the host state's law.

### *Conclusions on the "Fair and Equitable Treatment" Standard*

43.　The term "fair and equitable treatment" must therefore be interpreted in good faith in accordance with its ordinary meaning in the context and in the light of the object and purpose just discussed.  Yet, stability, transparency, and favourability are matters of degree, and the goal of providing a "high level" of legal security for investments does not indicate a precise point in the metaphorical height-scale of protection.  Because these are matters of degree, the preceding observations on context and object and purpose do not imply by

---

[36] **CL-0001**, European Energy Charter, II.4.  The immediately preceding paragraph states that "the signatories will *at national level* provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade."  *Id.* (emphasis added).  This passage plainly refers to actions to be taken internally, at the national level, while the immediately following paragraph (the pertinent part of which is quoted in the text) refers to the negotiation and adoption of the binding international agreements.  It follows that the passage concerning actions to be taken at the national level is not relevant to determine the purposes to be served by the binding international agreements.

[37] *Id.*

any means that for an instance of treatment to be "fair and equitable" it must satisfy an *absolute* degree of stability, transparency, or favourability, or to reach an *absolute* height of protection – if such things are capable of being so measured. In fact, those elements of context and of object and purpose indicate to the interpreter a *direction*, more than a *destination*. The direction is very important, because it indicates the intent of the framers of the ECT. But the destination, the end point, the precise degree of stability, transparency, and favourability required in each particular case is determined by what is "fair and equitable" in that case, that is, by the ordinary meaning of "fair and equitable treatment."

44.    "Fair and equitable" are the defining attributes of the treatment that the second sentence of Article 10(1) of the ECT requires. But these are not *inherent* attributes of a given instance of treatment, in the sense that the date of a regulation or the colour of the paper on which it was written are. What is "fair and equitable," as these terms are ordinarily used, depends on the surrounding circumstances. Barring extreme examples, a given instance of treatment (*i.e.* the same state measure) may be fair and equitable in one set of circumstances and unfair and inequitable in another set of circumstances. That is why prior arbitral decisions regarding "fair and equitable treatment" must be approached with particular caution, even if they relate to the same measure under the same treaty, because not all the relevant circumstances in the two cases are necessarily the same.[38] Therefore, the "fair and equitable treatment" standard should be applied in light of *all* the relevant circumstances of the case, not in light of a subset of those circumstances selected by arbitrators and turned into substitute standards.

45.    The preceding conclusion does not require an arbitrator to ignore that, over a span of several decades, tribunals have identified various patterns of treatment as raising questions of fairness and equity. For example, the degree of stability, transparency, or consistency of a given set of treatment conditions may raise such questions and, depending on the

---

[38] The Tribunal takes the view that "concordant decisions on the interpretation and application of the ECT merit serious consideration, especially if they rise to the level of a *jurisprudence constante*." Decision, ¶ 239. I subscribe to this view in the understanding that prior decisions should be given serious consideration in a critical, not deferential, manner. Each tribunal is entitled to interpret and apply the ECT on the basis of the VCLT and in the light of the arguments presented to it. This is a moot point, however, because arbitral jurisprudence on the matters at issue in this case can hardly be considered concordant or *constante*.

remaining circumstances, compel an answer one way or another. It is no accident that the framers of the ECT chose to refer specifically to stable and transparent conditions in the first sentence of Article 10(1). But in the context of the second sentence of Article 10(1), stability, transparency, and consistency are *factors to be taken into account* in a fair-and-equitable-treatment analysis; they are not requirements to be used as a substitute for the "fair and equitable treatment" standard.

46.    The same can be said of another widely recognized pattern of treatment which may raise questions of fairness and equity: the frustration of so-called "legitimate" expectations.[39] This pattern of treatment consists of a complex set of interactions between a state and a foreign investor in which the state (i) takes actions that give rise to objectively reasonable expectations on the part of the investor and then (ii) takes some further action that frustrates those expectations. The Majority relies on a statement in *Blusun* which notes, among other things, that the term "legitimate expectations" does not appear in the ECT or other treaties.[40] The Majority takes the view that such expectations are essentially *consideranda*: "they are relevant factors to be taken into account in the interpretation and application of treaty standards such as Article 10(1) of the ECT, first and second sentences."[41] I agree with this view, insofar as it concerns the application of the fair-and-equitable-treatment standard under the second sentence. The pattern of treatment that the Majority calls "legitimate" expectations is relevant to the fair-and-equitable-treatment analysis but does not exhaust all the relevant considerations. The Majority fails to appreciate, however, that if the term "legitimate expectations" does not appear in the ECT or other treaties, neither does the *Blusun* rule or any of its components. If the former are properly reduced to mere *consideranda*, a position with which I agree, by the same token the same must be true of the latter.

47.    The statement in *Blusun* on which the Majority relies ends with the sentence: "International law does not make binding that which was not binding in the first place, nor render

---

[39] On this terminology, see *infra*, ¶ 79.
[40] Decision, ¶ 316, quoting *Blusun*, ¶ 371.
[41] Decision, ¶ 317.

perpetual what was temporary only."[42]  This statement is overbroad.  It is important to show where it goes astray, lest it be used (improperly) as an *a priori* constraint on the interpretation of the fair-and-equitable-treatment standard.  It is true that *customary* international law does not obligate states to refrain from frustrating objectively reasonable expectations, as the ICJ ruled in *Obligation To Negotiate Access to the Pacific Ocean* Case,[43] but customary international law *does* make binding certain unilateral statements made on behalf of a state that may not be binding otherwise, as the ICJ ruled in the *Nuclear Tests Case*.[44]  More to the point, absent a violation of *ius cogens* there is no reason of principle why *treaty* law may not make binding what was not binding in the first place (under customary international law or municipal law); it all depends on the terms of the treaty.  Therefore, for all its aphoristic qualities, the quoted sentence in *Blusun* cannot be relied upon to foreclose the possibility that the fair-and-equitable-treatment standard of the ECT might have, in certain circumstances, the effect of holding a state to its commitments.  The fair-and-equitable-treatment standard of the ECT must be interpreted under the rules of the VCLT, not under *a priori* conceptions about what a treaty may or may not prescribe.

### *The Stability Overlap*

48.    As noted, the first sentence of Article 10(1) requires that the conditions for the making of investments be, *inter alia*, "stable."  This stability requirement, which can only be assessed over time, may overlap with the obligation to afford fair and equitable treatment at all times, as stability is one of the relevant circumstances to be taken into account in the application of the fair-and-equitable-treatment standard.  A stability overlap can only be partial, because the two sentences have different scopes of application (the first applies to the making of investments; the second at all times).  The overlap would also depend on the extent to which the meaning of "stability" and the required degree of stability are the same under both sentences.  In this respect, the use of the same terms and the close contextual relation suggest that both sentences refer to stability in the same sense and to the same

---

[42] Decision, ¶ 316, quoting *Blusun*, ¶ 371.

[43] International Court of Justice, *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, Judgment of 1 October 2018, ¶ 162.

[44] International Court of Justice, *Nuclear Tests Case (Australia v. France)*, Judgment of 20 December 1974, ¶¶ 43-46.

degree. Consequently, the discussion on stability in the next subsection is meant to apply to both sentences of Article 10(1).

### b. The Application of the "Fair and Equitable Treatment" Standard to the Circumstances of this Case

49. As noted, to determine whether the Disputed Measures meet the fair-and-equitable-treatment standard of the ECT, it is necessary to consider all the relevant circumstances of the case. For the purposes of this Partial Dissent, however, I shall place particular attention to the circumstances which the Majority and I assess differently. To facilitate the analysis, the relevant circumstances can be grouped as follows: (i) circumstances related to the Respondent's antecedent conduct, *i.e.* its conduct preceding the Disputed Measures; (ii) circumstances related to the Claimant's conduct, including its expectations and reactions based on the Respondent's antecedent conduct; and (iii) circumstances related to the Disputed Measures. I shall discuss these three sets of circumstances separately and then draw general conclusions on the application of the fair-and-equitable-treatment standard.

### i. Circumstances Related to the Respondent's Antecedent Conduct

50. The Respondent's relevant antecedent conduct consisted primarily of adopting laws and regulations on the generation of electricity through conversion from eolic energy.[45]

51. In the relevant period, that is, the period in which the Claimant made investments in Spain in the eolic sector, the Respondent adopted two statutes and four material royal decrees governing that sector. Those statutes and royal decrees established four successive legal regimes, each consisting of (i) a statute establishing a general legal framework for the regulation of this subject and (ii) a royal decree "developing" the statute, *i.e.* regulating the

---

[45] The Claimant invokes also certain statements made by a representative of the Xunta in Japan concerning investment in wind plants in Galicia. I agree with the Majority, however, that those statements cannot be invoked as the source of commitments by the Respondent. See Decision, ¶ 322.

same matters in greater detail, within the general parameters of the statute. The last three legal regimes included, and were based on, the same statute.

52.     Those four successive legal regimes were the following:

- First Regime, consisting of Law 40/1994 and RD 2366/1994.
- Second Regime, consisting of Law 54/1997 and RD 2818/1998.
- Third Regime, consisting of Law 54/1997 and RD 436/2004.
- Fourth Regime, consisting of Law 54/1997 and RD 661/2007.

53.     The First, Second, and Third Regimes are primarily relevant to an analysis of the Claimant's conduct, a topic which will be addressed separately. For the purposes of the present discussion, the Fourth is the most relevant legal regime. The Fourth Regime (with a relatively minor change introduced later by RD 1614/2010)[46] was in effect at the time the Disputed Measures were adopted and was replaced by those measures. If the Disputed Measures breached the standard of fair and equitable treatment under the ECT, it must be because (*inter alia*) they abrogated the Fourth Regime, not the preceding three regimes, which had generally ceased to be in effect long before the Respondent adopted the Disputed Measures.

54.     Two fundamental questions must be asked in respect of the Fourth Regime:

a.     *Commitments:* whether the regime set forth one or more commitments, undertakings, promises, assurances, guarantees, or other forms of representation (to be collectively referred to as commitments) that the investors or investments in the eolic energy sector would be treated in a certain way, including any commitment concerning the duration of any such treatment; and

b.     *Specificity:* how specific were any such commitments.

**Commitments**

---

[46] **C-0010**, RD 1614/2010. The changes introduced by this Royal Decree are discussed *infra*, ¶ 85. The Claimant asserts that these changes had no significant effect on its investment. Claimant's Memorial, ¶ 126.

55. The question whether the Fourth Regime contained commitments requires an objective answer, based on what the Respondent said and did in adopting that regime. The Claimant's understanding of any such commitments and any expectations it derived therefrom are separate matters, to be discussed later as circumstances related to the Claimant's conduct.[47]

56. The Fourth Regime consisted of Law 54/1997 and RD 661/2007. Law 54/1997 established a special regime for the generation of electricity from wind and other renewable sources, a pattern which had been adopted by the predecessor statute. The special-regime producers were entitled to sell their energy at a price consisting of (i) a component determined by a market-price mechanism and (ii) a premium (*prima*) to be determined by the Government on the basis of certain criteria.[48] Article 30.4 of Law 54/1997 established the legal framework for the premiums:

> "*Adicionalmente, la producción de energía eléctrica mediante energías renovables no hidráulicas* […] *percibirá[ ] una prima que se fijará por el Gobierno de forma que el precio de la electricidad vendida por estas instalaciones se encuentre dentro de una banda porcentual comprendida entre el 80 y el 90 por 100 de un precio medio de la electricidad, que se calculará dividiendo los ingresos derivados de la facturación por suministro de electricidad entre la energía suministrada.* […]
>
> *Para la determinación de las primas se tendrá en cuenta el nivel de tensión de entrega de la energía a la red, la contribución efectiva a la mejora del medio ambiente, el ahorro de energía primaria y a la eficiencia energética, y los costes de inversión en que se haya incurrido, al efecto de conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales.*"[49]

---

[47] Accordingly, I cannot agree with the Majority's view that the Claimant's current position (it expected stability, not immutability) has a bearing on the *existence* and *extent* of commitments made in RD 661/2007. See Decision, ¶ 324 and n. 430.

[48] **C-0004** or **R-0003**, Arts. 16.1 and 30.

[49] *Id.*, Art. 30.4. (My literal translation of this passage is as follows: "In addition, the production of electric energy by means of non-hydraulic renewable energies […] shall receive a premium which shall be fixed by the Government in such a way that the price of electricity sold by these installations fall within a percentage band between 80 and 90 percent of an average electricity price, which shall be calculated dividing the revenues derived from invoicing for the supply of electricity by the electricity supplied. […] To determine the premiums, there shall be taken into account the voltage level at which the energy is delivered to the network, the effective contribution to the improvement of the

57.    The Majority takes the view that the second transcribed paragraph, which it quotes in a non-literal translation, states a "coherent general principle," which "imposes some limits on what can be done."[50]   The Majority acknowledges that Law 54/1997 empowered the administration to establish the premium by regulation, but argues that "[t]he stream cannot rise higher than its source or commit the state to more than the legislative framework allows."[51]   On this basis, the Majority concludes that Article 30.4 of Law 54/1997 is inconsistent with the thesis that particular Royal Decrees, notably RD 661/2007, stabilized the regime.[52]

58.    The metaphor that "the stream cannot rise higher than its source" and the reference to what "the legislative framework allows" suggest that the Majority considers a regulation such as RD 661/2007 incapable of setting forth a commitment unless such a commitment has been expressly authorized by the statute.   The Majority's legal theory appears to be, then, that for the purposes of expressing a commitment, any provision of RD 661/2007 (or any other Royal Decree issued under Law 54/1997) that purported to "stabilize" the regime (*i.e.* to give any aspect of it a specified duration) was *ultra vires* and therefore either invalid under Spanish law or otherwise to be disregarded.   This theory, to be addressed in the following paragraphs, appears to be different from a related argument, to be discussed later in connection with the Claimant' expectations, that those provisions of RD 661/2007 could not have given rise to "legitimate" expectations, because they were subject to being amended or repealed by later Royal Decrees or other norms of a higher rank, as in fact they were.[53]

59.    In my view, the Majority's theory is based on a misreading of the relevant legal texts and a flawed reasoning based on that misreading.   To show why, we must first examine Article

---

environment, to the savings of primary energy, and to energy efficiency, and the investment costs incurred, with the purpose of achieving reasonable rates of return with reference to the cost of money in the capital market.")

[50] Decision, ¶¶ 331, 334.

[51] Decision, ¶ 334.

[52] Decision, ¶ 331.

[53] *Infra*, ¶¶ 101-102.

30.4 of Law 54/1997 closely and then compare it with the provisions of RD 661/2007. A close examination of Article 30.4 leads to the following observations.

60.     The first observation is an obvious point, but its consequences are often overlooked. Article 30.4 established norms of two different kinds. First, it provided that the producers were to receive a premium over the price for the energy sold, which means that it gave the producers a *right* to such a premium. This was a primary norm (or norm of conduct), that is, the kind of norm that creates rights and imposes obligations on persons subject thereto. The right created by that primary norm was, however, the right to *a* premium, not to a *particular, specified* premium. For the creation of the latter, Article 30.4 delegated on the Government the setting of the premium, while specifying certain criteria that the Government had to take into account in fulfilling that task. This was a secondary norm (or norm of competence), that is, a norm that empowered another organ of the system to set the premium, subject to those criteria.

61.     The criteria which the Government had to apply in setting the premium included various factors to be considered (voltage level on delivery to the network, contribution to the improvement of the environment, contribution to savings of primary energy, contribution to energy efficiency, and cost incurred in the investment) and an overall objective: "to achieve reasonable rates of return with reference to the cost of money in the capital market." These criteria were not addressed to the producers; they were directed to the Government's conduct in setting the premium. Further, applying these criteria was not a mathematical exercise; it involved an exercise of judgment and a weighing of competing factors within a complex process of technical evaluation, quantification, and assessment of how eolic energy furthered certain economic and policy goals. Accordingly, setting the premium was an act of governmental rulemaking; it was not a mere deductive exercise from the content of Article 30.4.

62.     For these reasons alone, it cannot be right to consider, as the Majority does, that any right (or "legitimate" expectation) that the producers had in respect of the premium had to be based solely on Article 30.4. Put differently, it is a mistake to regard Article 30.4 as the sum total of a producer's rights under the Fourth Regime (or the sole source of an investor's

objectively reasonable expectations) and to treat the regulations thereunder as something that can safely be disregarded. In fact, the setting of the premium, as a separate governmental act, was an integral component of the legal regime established by the Law.

63.    A second observation is that the criteria set forth in Article 30.4 concern only the *quantum* of the premium to be established by the Government. Law 54/1997 said nothing about the *timing* for setting the premium or the *duration* of the premium once set. In particular, the Law did not require the Government to establish that premium annually (as Law 40/1994 had done) or to establish or revise it at any time or at any particular intervals. Nor did Law 54/1997 debar the Government from designating a particular duration for the premium or for any element of the calculation. Because by necessity the setting of the premium had to happen at some time and the premium had to have some duration, it must be concluded that timing and duration are matters which the legislature deliberately left open, to be determined by the Government in the exercise of its regulatory function.

64.    A third observation is that Article 30.4 set forth the criteria that the Government had to take into account in *setting* the premium. It did not require that the premium, once set, had to conform to those criteria at all times. Any such requirement would have been unworkable, of course, because some components of the criteria vary continually over time. It must be understood, then, that the criteria of Article 30.4 were to be applied in setting the premium for the first time and in any later revisions. But since Article 30.4 did not require that the premium be revised at any particular intervals, it did not exclude the possibility that the premium might be established (on the basis of the designated criteria) as a variable premium to be adjusted in accordance with an index.

65.    A fourth, and most important, observation is that, under the criteria set forth in Article 30.4, "achiev[ing] reasonable rates of return with reference to the cost of money in the capital market" was the overall objective *of the process for setting the amount of the premium*.[54]

---

[54] **C-0004** or **R-0003**, Law 54/1997, Art. 30.4 ("***Para la determinación de las primas*** *se tendrá en cuenta el nivel de tensión de entrega de la energía a la red, la contribución efectiva a la mejora del medio ambiente, el ahorro de energía primaria y a la eficiencia energética, y los costes de inversión en que se haya incurrido,* ***al efecto de conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales***.") (emphasis added).

It was not an overall target imposed by the statute *on the actual financial results* of any producer in the special regime.  Therefore, there is no basis in Article 30.4, or elsewhere in the statute, for the contention that the overall objective of reasonable rates of return referred to in the statute worked as a ceiling (or a floor, for that matter) on the *actual* rate of return that a producer was entitled or permitted to have (or could reasonably expect) in any particular period or over the entire duration of the investment.  In this respect, the tribunal in *Cube* correctly read Article 30.4, and the Majority's disagreement with that decision cannot be based on the actual words of the statute.[55]

66.    The other principal component of the Fourth Regime is Royal Decree 661/2007.  This Royal Decree set forth a comprehensive, highly detailed regulation for the generation of electrical energy from a variety of sources, including wind. The producers of electricity from eolic energy (group b.2) had the right to choose between receiving (i) a regulated tariff or (ii) a market or negotiated price plus a premium.[56] The alternative selected had to be in effect for at least one year.[57]   As for the first alternative, RD 661/2007 established that eolic plants installed on land (group b.2.1) would be entitled to a regulated tariff of 7.3228 c€/Kwh for the first 20 years and of 6.1200 c€/Kwh thereafter ("*a partir de entonces*").[58]   As for the second alternative, the Royal Decree established a variable premium, which depended, in part, on the "reference market price," a concept defined in the decree.[59]  The actual premium to be applied would be a "reference premium," but this premium, added to the reference market price, could not exceed an upper limit or fall below

---

[55] **RL-0090**, *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (henceforth, *Cube*), ¶ 293 ("We do not consider that the references in RD 661/2007 to a "reasonable return" were intended to have any application outside the context of reviews of the tariffs and of the upper and lower limits under Article 44.3 RD 661/2007. In particular, we do not consider that the references to a "reasonable return" signified a limit on the profit that a producer could earn from any power facility or group of facilities without suffering a reduction or lower-than-normal increase in tariffs, or that the references provided any basis for changes to the 2007 Regime outside the mechanisms set out in RD 661/2007."); Decision, ¶ 332 (disagreeing with the quoted statement in *Cube*, also quoted in footnote, without referring to the text of Article 30.4 of Law 54/1997).

[56] **C-0008** or **R-0101**, RD 661/2007, Art. 24.

[57] *Id.*

[58] *Id.*, Art. 36.

[59] *Id.*, Art. 27.

a lower limit set forth in the decree.[60]  For eolic plants installed on land (group b.2.b), RD 661/2007 established, for the first 20 years, a reference premium of 2.9291 c€/Kwh, an upper limit of 8.4944  c€/Kwh, and a lower limit of 7.1275 c€/Kwh.[61]  After the first 20 years, the reference premium would be zero.[62]  These amounts would be adjusted annually according to any increase in the national consumer-price index (IPC) minus (i) 25 basis points until 31 December 2012 or (ii) 50 basis points thereafter.[63]

67.  Article 44.3 of RD 661/2007 regulated the revision of the regime described above.  It provided that the tariffs, premiums, upper and lower limits, and other add-ons would be revised in 2010 and thereafter every four years.[64]  Nevertheless, it provided that a revision of the regulated tariff or the upper and lower limits (but not including the reference premium) would not affect existing plants:

> "*Las revisiones a las que se refiere este apartado de la tarifa regulada y de los límites superior e inferior no afectarán a las instalaciones cuya puesta en servicio se hubiera otorgado antes del 1 de enero del segundo año posterior al año en que se haya efectuado la revisión.*"[65]

68.  Royal Decree 661/2007 provided a transition regime for existing eolic plants operating under the Third Regime.  The producer had to make an irrevocable choice between the two options granted by the preceding regime: (i) selling electricity to the distribution company at a regulated tariff or (ii) selling it to the market at the market price plus a premium.[66]  If the producer chose the first option, the regulated tariffs of RD 661/2007 would not apply.[67]  If the producer chose the second option, the premium established under the Third Regime

---

[60] *Id.*

[61] *Id.*, Art. 36.

[62] *Id.*

[63] *Id.*, Art. 44.1 and First Additional Provision.

[64] *Id.*, Art. 44.3.  (My literal translation is as follows: "The revisions which are referred to in this subsection of the regulated tariff and of the upper and lower limits shall not affect the installations the commissioning of which shall have been granted before the 1st of January of the second year following the year in which the revision shall have been made.")

[65] *Id.*

[66] *Id.*, First Transitory Provision (1).

[67] *Id.*

would continue to apply for a transition period ending on 31 December 2012.[68]  In either case, the producer could opt into the regime of RD 661/2007, in which case that regime would apply *in toto*.[69]

69.    The preceding review leads to the following conclusions, based on the plain texts of Law 54/1997 and RD 661/2007.  Law 54/1997 (i) set forth a commitment that the relevant producers would receive a premium over the market price of the energy sold, and (ii) left to the Government the setting of the premium, subject to certain specified criteria on quantum.  Royal Decree 661/2007 "developed" the regime of the law by setting forth a commitment to a remuneration regime comprising two alternatives, at the producer's choice: (i) a regulated tariff or rate (which would have taken into account the premium, to make it a realistic choice) or (ii) a variable premium calculated on the basis of quantified factors.  Royal Decree 661/2007 also set forth a commitment on the duration of each alternative and a commitment that future revisions of the regulated tariff and the upper and lower limits (but not including the regulated premium) would not affect existing plants.[70]

70.    We can now assess the Majority's view that the duration and stability commitments set forth by RD 661/2007 should be disregarded to the extent not expressly contemplated in Law 54/1997.  As the Majority's position could be interpreted in two different ways, I shall consider both alternatives.

71.    First, the Majority's position could be that those commitments in RD 661/2007 were invalid *ab initio* as a matter of *Spanish law*.  Any such contention would be unsustainable, for various reasons.  The Respondent does not claim that RD 661/2007 was, in whole or in part, invalid *ab initio* as inconsistent with Law 54/1997; it argues instead that RD 661/2007 was validly superseded by later norms of the same or higher rank.[71]  Nor is there any

---

[68] *Id.*

[69] *Id.*, First Transitory Provision (3).

[70] To the same effect, see **RL-0093**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain* (ICSID Case No. ARB/15/36), Award, 6 September 2019, ¶ 485 (henceforth, *OperaFund*) ("[I]t is hard to imagine a more explicit stabilization assurance than the one mentioned in Article 44(3)").

[71] Decision, ¶¶ 299-301 (summarizing Respondent's arguments, centred on the possibility and validity of regulatory change).  The Respondent argues separately that RD 661/2007 was invalid under EU law because it was part of a subsidies regime that was not notified to the EC.  That contention is analysed *infra*, ¶ 125.

evidence on the record that the Spanish courts declared RD 661/2007 null and void *ab initio* as contrary to Law 54/1997.  It is also highly doubtful that the Tribunal might have jurisdiction to decide, *as a matter of Spanish law*, that the presumption of legality of RD 661/2007 must be overridden and certain portions of the decree be declared *ultra vires* and invalid *ab initio*.

72.  Second, the Majority's position could be that, as a matter of interpretation and application of the fair-and-equitable-treatment standard of the ECT, a commitment made in a Royal Decree should be disregarded if not expressly authorized by the respective statute.  The Majority offers no basis for any such contention, other than the metaphor that "the stream cannot rise higher than its source."[72]  The metaphor is inapposite, however, because the source of the Government's power to regulate is Article 97 of the Spanish Constitution, not (or not only) the relevant statute.[73]  In the Spanish system, in which a statute like Law 54/1997 provides a general framework to be supplemented or "developed" by detailed regulations, it is unjustified, as well as unrealistic, to expect that every aspect of the regulations will be foreseen and provided for in the statute.  To be sure, in the Spanish system the regulations may not *contradict* the provisions of the statute, but the preceding analysis has shown that there is no inconsistency between the commitments made in RD 661/2007 and the provisions of Law 54/1997.

73.  Therefore, I perceive no valid reason for an arbitral tribunal to disregard the commitments set forth in RD 661/2007.  It remains to be determined whether, and to what extent, the commitments made in the Fourth Regime are sufficiently specific.

### *Specificity*

74.  The specificity of a commitment is quintessentially a matter of degree.  The degree of specificity of a commitment is one of the circumstances that should be taken into account

---

[72] Decision, ¶ 334.

[73] Constitución Española, Art. 97 ("El Gobierno […] [e]jerce la función ejecutiva y la potestad reglamentaria de acuerdo con la Constitución y las leyes."), http://www.senado.es/web/conocersenado/normas/constitucion/index.html. My literal translation: "The Government […] exercises the executive function and the regulatory power in accordance with the Constitution and the laws."

in assessing whether a particular instance of treatment meets the fair-and-equitable-treatment standard. Other things being equal, the less specific the commitment, the more difficult it would be to find that any expectations based thereon were objectively reasonable and, ultimately, that a subsequent measure breaching that commitment amounted to unfair and inequitable treatment.

75. By contrast, the *Blusun* rule and other similar rules treat the specificity of a commitment as an all-or-nothing factor, working as a diverting valve which, depending on the way it is set, leads the analysis through one conduit or another. In fact, the *Blusun* rule is a default rule, which purports to apply "[i]n the absence of a specific commitment."[74] The Majority does not explain what kind or degree of specificity would be sufficient to make a commitment "specific." Nor does the Majority explain what legal consequences would follow from a "specific commitment," although it can be surmised that the breach of such a commitment would amount to unfair and inequitable treatment, unless perhaps other (unstated) factors might change that result. In any event, the Majority seems to take the view that the *Blusun* rule comes into play because the commitments of RD 661/2007 should be disregarded or treated as non-existent, not because they were not sufficiently specific.[75] Since I have concluded that those commitments did exist and cannot be disregarded, the question of specificity becomes critical even for the purposes of the *Blusun* rule and other similar approaches that turn on the existence of specific commitments.

76. In this regard, it cannot be denied that the commitments set forth in RD 661/2007 and hence those contained in the Fourth Regime as a whole are highly specific. They are highly specific in respect of the content of the commitments: the *quantum* of the remuneration to which the producers were entitled, the *duration* of the specified quantum, and the *exemption* of existing plants from future revisions to certain key components of the

---

[74] Decision, ¶ 315, quoting from *Blusun*, ¶ 319(5).

[75] Decision, ¶ 321. This leads the Majority to the odd result that the highly specific commitments of RD 661/2007 are disregarded, while the much less specific criteria of Article 30.4 of Law 54/1997 are treated as the state's sole relevant antecedent conduct.

specified remuneration.[76]  Those commitments are also highly specific in respect of the *beneficiarie*s of the commitments, *i.e.* the class of producers validly registered in the RAIPRE as beneficiaries of the special regime.[77]

77.    The preceding review of the Respondent's relevant antecedent conduct leads to the following conclusion: by adopting the Fourth Regime comprising Law 54/1997 and RD 661/2007, the Respondent made highly specific commitments to the producers of electricity from eolic energy in respect of the remuneration to which the producers would be entitled, including the quantum of the remuneration, the duration thereof, and the exemption of existing plants from any future changes affecting certain components of the remuneration.

## ii.    Circumstances Related to the Claimant's Conduct

78.    The relevant circumstances related to the Claimant's conduct comprise the Claimant's reactions (including its objectively reasonable expectations) in respect of the legal regime existing at the time of each investment and any subsequent changes to that regime.  The Claimant's objectively reasonable expectations in respect of those legal regimes and any commitments they contained are important *consideranda* in a proper analysis under the standard of fair and equitable treatment.

79.    I should start with an explanation of the term "objectively reasonable expectations."  I am not aware of any substantive difference between what the Majority means by "legitimate expectations" and what I mean by "objectively reasonable expectations."  But I prefer to use the latter term, which is more descriptive, and avoid the ubiquitous, overused, ambiguous adjective "legitimate."[78]  The concept, which I believe to be generally accepted

---

[76] To the same effect, see **CL-0112**, *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain* (SCC Arbitration 2015/063), Award, 15 February 2018 (henceforth, *Novenergia II*), ¶¶ 665-667 ("The commitment from the Kingdom of Spain could not have been clearer"); Haigh Dissent, ¶ 10.

[77] For similar conclusions, see, *e.g.*, **CL-0117**, *9REN Holding S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/15/15), Award, 31 May 2019, ¶¶ 257, 295; **CL-0113**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (ICSID Case No. ARB/14/1), Award, 16 May 2018, ¶ 512; Haigh Dissent, ¶¶ 11-12, 50-52.

[78] When we use the term "legitimate," we do so by reference to an underlying criterion of legitimacy, which may be made explicit or not.  In the absence of an explicit reference to a criterion of legitimacy, it is not clear whether the underlying criterion is a moral or religious code, or a legal system, or a political theory, or a particular custom, or a

regardless of the terminology used, is that an investor's expectations are relevant to the fair-and-equitable-treatment analysis only to the extent that they are reasonable from an objective standpoint, that is, the standpoint of a reasonable investor in the circumstances.[79]

80.    The critical issues to be considered in this subsection are: (i) whether the relevant expectations of the Claimant are limited to those which arose at the time of the initial investment or may also include those which arose in connection with each change of legal regime; and (ii) whether expectations based on commitments set forth in Royal Decrees were objectively reasonable.

### Timing of the Expectations

81.    The Majority takes the view that "as a matter of general principle, a legitimate expectation is a form of reliance interest which must relate to facts or circumstances in existence at the time the investment is made."[80]  This view is correct when applied to the usual case, in which the legal regime existing at the time of the investment and the expectations derived therefrom are abrogated or destroyed by the subsequent measures on which the claim is based.  But in a case of a long-term investment which has been subjected to successive intermediate legal regimes, it is unrealistic and artificial to limit consideration of the investor's objectively reasonable expectations to those held at the beginning of the process, based on a legal framework that may have long been repealed by the time the questioned measures were imposed.  As already noted, whether a particular instance of treatment is fair and equitable depends on all the relevant circumstances, not on a subset of them selected by a rigid arbitrator-made rule.

82.    The Majority rejects the possibility that "legitimate" expectations might change in the course of the investment on two grounds: (i) those expectations need not always change in the direction more favourable to the investor, and (ii) if the expectations can change in both

---

[79] dynastic principle, etc.  Leaving the reference open carries the risk of a later redefinition of the term through switching the criterion of reference.

[79] See **CL-0023**, *Ioan Micula and others v. Romania* (ICSID Case No. ARB/05/20), Final Award, 11 December 2013 (henceforth, *Micula*), ¶ 669 ("Whether a state has created a legitimate expectation in an investor is thus a factual assessment which must be undertaken in consideration of all the surrounding circumstances.")

[80] Decision, ¶ 324.

directions, they would simply "track the state of the law from time to time, and the idea of a reliance interest would lose all autonomy."[81]  The first observation is of course correct but the second is not.  The investor's expectations need not track the state of the law, because they depend on the investor's attitude and decisions concerning each change in the law, a point to which I shall presently return.  Further, the supposed "autonomy" of the notion of reliance cannot mean that reliance can be predicated only in reference to the state of affairs at the time of the initial investment.  An investor can rely on something (such as a state commitment) for its initial decision to invest, but that reliance does not prevent the investor from relying on something else (such as another state commitment) for a subsequent decision concerning the investment.[82]  As will be seen, long-term investments like those in the present case present a more complex reality, which a proper analysis must take into account.

83.    It is undisputed that the individual wind farms on which the Claimant invested were approved and commissioned at different times, under various legal regimes.[83]  Depending on the date of approval or start of operations, each individual wind farm in the Claimant's inventory was subject to one, two, three, or four successive legal regimes in the period preceding the Disputed Measures.[84]  To simplify the analysis, let us take the three oldest plants (Pax I and II A, Barbanza, and Vicedo), which were approved under the First Regime, although they came into operation under the Second.[85]  Progressively simpler

---

[81] Decision, ¶ 324.

[82] See **CL-0046**, C. Schreuer and U. Kriebaum, "At What Time Must Legitimate Expectations Exist?" in J. Werner and A. Hyder Ali (eds.), *A Liber Amicorum: Thomas Wälde* (2009), pp. 273-274 ("A foreign investor may be presumed to know the general regulatory framework prevalent in a country at the time it first embarks upon the investment.  But it is not only the framework existing at that early stage that can create legitimate expectations.  If there are favourable changes to the legal framework during the establishment or during the lifetime of the investment, this may also create legitimate expectations which will be protected if the foreign investor relies on them in subsequent business decision [*sic*].")  The same reasoning should apply to *unfavourable* changes to the legal framework in which the investor acquiesces.  One possible exception, depending on the circumstances, may be "creeping" detrimental changes which may not individually justify a challenge but in their combined effect may amount to unfair and inequitable treatment.  This hypothetical situation, which is analogous with that of "creeping" expropriation, does not correspond to the facts of the present case.

[83] Claimant's Memorial, Appendix II.

[84] Compare *id.* with the dates on which each successive regime took effect.

[85] Claimant's Memorial, Appendix II.

versions of the same analysis will apply to the newer plants, which were subject to fewer changes in the applicable legal regime.

84.   The Claimant's expectations at the time of its initial investment in the three oldest plants derived from the First Regime (Law 40/1994 and RD 2366/1994), which was in force at the time.  That legal regime was later superseded by the Second Regime (Law 54/1997 and RD 2818/1998), which was superseded by the Third Regime (Law 54/1997 and RD 436/2004), which was superseded by the Fourth Regime (Law 54/1997 and RD 661/2007), which was amended, in a relatively minor way, by RD 1614/2010.  Each time the legal regime was changed, the investor faced a business decision, which was informed, in part, by (objectively reasonable) expectations concerning the treatment to be afforded by the new regime and, in particular, by the revenues to be expected from the level of subsidies to be paid thereunder.

85.   Such a business decision involved, in a very real sense, the acceptance or non-acceptance of the new regime, a decision based, at least in part, on the (objectively reasonable) expectations derived from that regime.  If the investor was given the choice of remaining under the old regime or to opt into the new one (as the Second and Third Regimes and to some extent the Fourth Regime did),[86] the investor had to make that choice, and if it opted to come under the new regime (whether more or less favourable to its interests), it cannot seriously be denied that its expectations going forward would be those derived from the new regime. On the contrary, if the Government imposed the new regime on existing investors (as it did generally in the case of RD 661/2007 and fully in the case of RD

---

[86]  **C-0004** or **R-0003**, Law 54/1997, Eighth Transitory Provision (producers under the preceding regime would continue to be subject thereto, for as long as a certain compensatory scheme for certain other producers remained in effect, but could opt into the remuneration regime of the new law); **C-0005**, RD 2818/1998, First Transitory Provision (producers under the preceding regime would continue to be subject thereto, but could opt into the remuneration regime of the decree); **C-0007**, RD 436/2004, Second Transitory Provision (producers under the regime of RD 2366/1994 [First Regime] would be generally exempt from the regime of the new decree, except that they would have the right to sell energy to the market and could opt into the entire regime of the new decree; producers under the regime of RD 2818/1998 [Second Regime] would continue to be subject to the previous remuneration regime for a transition period of about 6 years, but could opt into the regime of the new decree.); **C-0008** or **R-0101**, RD 661/2007, First Transitory Provision (producers under the regime of RD 436/2004 would continue to generally subject to that regime for a transition period but could opt into the new regime; in all other respects, the new regime generally replaced the previous one, which was repealed.)

1614/2010)[87], the investor had to decide whether to acquiesce in the new regime, or to contest it under the local law or under the ECT, or to sell the investment. In making that business decision, the investor would have to take into account a variety of factors, including the expectations derived from the new regime as compared with the expectations created by the old one. If for any reason the investor decided to keep the investment and to acquiesce in the new regime, it is unrealistic to ignore the expectations created by the new regime and unreasonable to insist that the sole expectations that count are those generated by the previous, no longer applicable regime.

86.     The Claimant's description of the facts, its insistence in the unity of its investments, and its reliance on the Fourth Regime, portrayed as the apex of the evolution of a unitary system of incentives provided to the eolic-energy sector in Spain – all indicate that the Claimant accepted every legal regime to which its investments were successively subjected, until the Disputed Measures.[88] Whether the Claimant regarded each new regime as more or less favourable than its predecessor is immaterial, because it appears that the Claimant did not contest the new regime or sell any of its investments. Notably, the Claimant appears to have embraced the Fourth Regime and the amendment of RD 1614/2010 unreservedly, even though they were generally imposed on its existing investments *nolens volens*.[89] Therefore, it must be concluded that at the time the Claimant ceased investing in Spain, it had acquiesced in the application of the Fourth Regime to all of its investments and had adjusted its expectations to the terms of that regime.

---

[87] **C-0008** or **R-0101**, RD 661/2007, First Transitory Provision (see preceding note); **C-0010**, RD 1614/2010 (Article 2 imposed reference limits on the number of hours of production for which the producer would be entitled to the premium or premium equivalent. Article 5 generally reduced, for a designated period, the reference premium applicable to certain installations under RD 661/2007.)

[88] See, *e.g.*, Claimant's Memorial, *passim* (treating the "Incentives Regime" as a unit); ¶¶ 46, 216 (RD 661/2007 "final update to the Incentives Regime"), 197 (investment should be considered as an "indivisible whole"), 204 (expectation that the Claimant's projects would continue to benefit from a regime at least as favourable as that of RD 661/2007).

[89] The Fourth Regime was imposed on existing projects after a transition period. **CW-5**, Supplemental Witness Statement of Tetsuya Suwabe, ¶ 7 ("Although we opted to continue to receive remuneration under the scheme set out in Royal Decree 436/2004 for all the projects (except for the Grallas project) that were entitled to do so, the further confirmation of stability provided by Royal Decree 661/2007 directly contributed to Eurus' ongoing decision to stay in Spain. We were particularly reassured by the fact that Eurus' wind power facilities that chose to remain under the 2004 regime would later be entitled to the incentives regime defined by Royal Decree 661/2007, once the latter's transitional period was over. As a result, Eurus did not pursue or consider a sale of its interests in any of the SPCs.").

87.     It is clear that, in the end, the Claimant's expectations were based on the Fourth Regime, as amended by RD 1614/2010.[90]  Yet it is also clear, by the Claimant's own admission, that its expectations did not exactly coincide with the terms of that regime.  The Claimant appears to have expected that in the future its investments would be subject to conditions not significantly worse than those set forth in the Fourth Regime, as amended by RD 1614/2010.[91]  Further, the Claimant has stated that it did not expect that regime to be "frozen" or "petrified" but that any subsequent change would be either more favourable to its interests or at least would not destroy its business model without compensation.[92]  Therefore, the Claimant appears to have expected that the amended Fourth Regime would be *stable*, as distinguished from *immutable*.

### Objective Reasonableness

88.     The next question is whether the Claimant's expectations based on the Fourth Regime can be considered to be objectively reasonable.  The Majority considers that no "legitimate" expectations could have derived from RD 661/2007, for two basic reasons: (i) that such expectations must be based on the legal regime that existed at the time of the investment, which for all but one of the Claimant's plants was an earlier regime;[93] and (ii) that the regime of RD 661/2007 was subject to change within the framework of Law 54/1997, and there could have been no "legitimate" expectation that existing plants would be grandfathered.[94]  The Majority's first reason does not apply in the complex circumstances of this case, as explained in the preceding subsection.[95]  The Majority's second reason,

---

[90] See, *e.g.*, Claimant's Memorial, ¶¶ 204, 213-214; Claimant's Reply, ¶¶ 239-240.

[91] *Id.*

[92] See, *e.g.*, Claimant's Reply, ¶ 240; Decision, n. 422.

[93] Decision, ¶ 333.

[94] Decision, ¶¶ 332-333 (citing a 2005 decision of the Spanish Supreme Court to that effect).  The Majority also states that regulations "[had] change[d] and not in any uniform direction favouring the recipients."  *Id.*, ¶ 331.  The Majority also mentions in this context that "the stream cannot rise higher than its source or commit the state to more than the legislative framework allows."  Decision, ¶ 334.  As already discussed, this argument is more properly analysed as one against the existence of specific commitments arising out of RD 661/2007.  For the reasons already explained, this argument is invalid.  *Supra*, ¶¶ 75-77.

[95] *Supra*, ¶¶ 81-87.

which can be referred to as the "revocability argument," broadly coincides with the Respondent's position on this matter. It will be discussed in the following paragraphs.

89.   There is no doubt that, *as a matter of Spanish law*, the Respondent had the general legal power or authority to amend or repeal, through the appropriate organs and procedures, each component of the Fourth Regime, in particular Law 54/1997 and RD 661/2007. Moreover, the Claimant was aware of the existence of that general power[96] or at any rate should have been aware of it, because it concerned a fundamental feature of the host country's legal system, not an obscure rule or unsettled point of law. What appears to have been unsettled at first was whether the exercise of such power would require compensation to injured producers,[97] but in late 2005 the Supreme Court issued a decision from which it could be inferred that a change in the regulations within the framework of Law 54/1997 would not give affected producers a right to compensation under Spanish law.[98]

90.   The question is, however, whether *as a matter of application of the standards of the ECT*, the mere existence of that general power under domestic law is enough to foreclose any objectively reasonable expectations based on a state commitment that such power will not be exercised in certain respects and for a certain period. The answer must be negative, for the following reasons:

a.   First, to say that the Government had or retained its general power under Spanish law to amend or repeal RD 661/2007 is to say that the commitments set forth in that Royal Decree were not binding on the Government as a matter of Spanish law. But a state commitment need not be binding under domestic law to be one of the circumstances to be considered in a fair-and-equitable-treatment analysis. Fair and equitable treatment is not limited to compliance with legal obligations under domestic law. Consequently, even though the commitments made in RD 661/2007

---

[96] See **C-0049**, BHV Memorandum, October 2002, p. 77 (referring to an opinion of the Landwell law firm to the effect that Spanish legislation gave the producers of renewable energy certain rights, which constituted acquired rights, so that *any reversal of such rights* would obligate the Government to provide compensation) (emphasis added).

[97] *Id.*

[98] *Id.*; see **RL-0137**, *2005 Judgment* (producers do not have an unmodifiable right that the specific system of remuneration will stay the same).

were revocable as a matter of Spanish law, that revocability in itself does not foreclose the possibility that they might have created objectively reasonable expectations.

b.   Second, from the standpoint of a reasonable investor trying to ascertain the Respondent's intent in making the commitments set forth in RD 661/2007, only three alternatives are apparent: either (i) the state made those commitments with the intent of repudiating them at a later time; or (ii) the state made those commitments with the intent of complying with them initially, but with the (unstated) reservation that it may well change its mind in the future and repudiate them; or (iii) the state made those commitments with the intent of complying with them in accordance with their terms.   The first alternative must be discarded; it would be an instance of bad faith, which cannot be presumed and has not been proved in this case.   The second alternative must also be discarded; the principle of transparency would have required the state to disclose that it intended to honour the commitments unless and until it decided otherwise – a disclosure which would have deprived the commitments of all value as investment incentives.   The sole remaining alternative is the third one.   Therefore, a reasonable investor would have had reason to conclude that the state, presumed to act in good faith, intended to honour its commitments according to their terms, and to refrain from exercising its power to revoke them.[99]

c.   Third, if objectively reasonable expectations could not have arisen from the commitments made in RD 661/2007 because the state had the general power to amend or repeal that decree, the same reasoning would apply to the (less specific) commitments made in Law 54/1997, because that law could have been (and in fact was) later repealed.   In this sense, the logic of the revocability argument extends beyond RD 661/2007, to all norms of the Spanish legal system that are subject to

---

[99] See **RL-0090**, *Cube*, ¶ 305 ("[A]fter careful reflection, being perfectly aware of the jurisprudence of their Supreme Court, the Spanish authorities decided that the Special Regime for the remuneration of renewable energy should be established for a long duration in order to attract sufficient investment that otherwise could not have been obtained. This was a deliberate decision from which the Respondent cannot move away lightly.").

amendment or repeal. It is therefore inconsistent for the Majority and the Respondent to embrace the revocability argument while accepting that the Claimant could derive "legitimate" expectations from the reference to "reasonable rates of return" in Article 30.4 of Law 54/1997.[100]

d.  Fourth, the theory that no objectively reasonable expectations can be based on revocable commitments contradicts common sense and the way in which real-world investors make long-term investment decisions. It follows from that theory that a "reasonable" investor would have to *assume* that the state *would* exercise its power to repudiate its commitments, notwithstanding grounds to believe that the state sincerely intended to honour those commitments. In other words, according to that theory, a "reasonable" investor must assume that any state commitment that is subject to change cannot be trusted and should be ignored. In the real world, however, governments offer incentives to investors for the intended purpose of being relied upon, and reasonable investors do not make decisions by automatically assuming that outcomes will always be the worst. (Otherwise, fewer investments would be made.) In particular, if real-world investors had to assume that state commitments such as those made in RD 661/2007 should be ignored, those commitments would never be able to achieve their intended purpose of providing incentives to long-term investors. An incentive on which no investor can rely is not an incentive.

91.  It follows from the preceding discussion that, as a matter of application of the standards of the ECT, the revocability of a legal regime does not prevent that regime from giving rise to objectively reasonable expectations. It remains to determine whether the Claimant's expectations to the stability of the amended Fourth Regime, including the commitments set forth in RD 661/2007, were in fact objectively reasonable. As on all matters concerning the standard of reasonableness, the answer depends on all the relevant circumstances.

---

[100] Decision, ¶ 355; *Id.*, ¶ 301 (summarizing the Respondent's position).

92.    As already discussed, a reasonable investor had good reasons to believe that the Respondent *intended* to honour its commitments according with their terms.[101]  Further, those commitments were made against the background of a consistent, long-standing state policy aimed at increasing the production of electricity from renewable sources, a policy consistent with EU directives and other international commitments of the host state.[102]  That policy had been implemented through a succession of legal regimes which generally maintained or increased the incentives provided to producers of energy from wind.[103]  Those successive regimes generally gave existing investors the choice of staying under the old regime or opting into the new one.[104]  One important exception was RD 661/2007, which was generally imposed on existing producers, but in that case grandfathering the existing remuneration regime would have perpetuated a design flaw, which was not a matter of policy but the perverse operation of an ill-chosen adjustment formula.[105]  Further, the Claimant's expectations were not that the Fourth Regime, as amended, would be immutable, but that it would be stable.  In light of these circumstances, it must be concluded that the Claimant's expectations based the Fourth Regime, including the overall stability of the regime, were objectively reasonable.

### iii.    Circumstances Related to the Disputed Measures

93.    The relevant circumstances related to the Disputed Measures concern the character of the measures and the effects they had on the preceding legal regime and the Claimant's objectively reasonable expectations based thereon.  As already discussed, the commitment under the second sentence of Article 10(1) of the ECT to accord fair and equitable treatment is textually and contextually linked to the conditions referred to in the first sentence of the

---

[101] *Supra*, ¶ 90.

[102] See generally, Decision, ¶¶ 97-119.

[103] See *Id.*; see **CE-1**, Brattle First Regulatory Report, ¶¶ 99-110.

[104] *Supra*, ¶ 85.

[105] Under the Third Regime, tariffs were adjusted by reference to the *Tarifa Media o de Referencia*, an index of the cost of electricity for final consumers in Spain.  It turned out that this index was unsuitable because an increase in the generation of electricity from renewable sources would have led to higher premiums, which would have led to an increase in the index, which would have led to higher premiums, etc.  See Respondent's Counter-Memorial, ¶ 473.  RDL 7/2006 (**BRR-101**) suspended operation of the index and RD 661/2007 replaced it.  **C-0008** or **R-0101**, RD 661/2007, Second Transitory Provision.

same provision.[106]   Accordingly, an analysis of the relevant circumstances related to the Disputed Measures should include: (i) the degree to which the measures were favourable and transparent; (ii) the extent to which they affected the preceding legal regime and the degree to which the resulting treatment conditions can be considered stable; and (iii) the extent to which they repudiated specific commitments or frustrated the Claimant's objectively reasonable expectations based on the preceding regime.

94.    As already explained, I perceive no legal basis for applying the *Blusun* rule, either as purported interpretation of the fair-and-equitable-treatment standard of Article 10(1) of the ECT or as a substitute therefor.[107]   Nevertheless, as part of the discussion in this subsection I shall critically examine the three conditions, factors, or criteria which would come into play under the *Blusun* rule in the assumed absence of a special commitment: (i) whether it became "necessary" to modify the subsidies granted by the preceding regime; (ii) whether the modification was done in a manner "not disproportionate to the aim of the legislative amendment"; and (iii) whether the modification was made with "due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime."[108]

### *Favourability*

95.    The Disputed Measures were undoubtedly less favourable to the producers of electricity from wind than was the preceding legal regime.  The Claimant argues that the Respondent failed to provide favourable conditions for the investment.[109]   The question is, however, whether the concept of favourability referred to in the first sentence of Article 10(1) of the ECT (and relevant also to the second sentence) applies to treatment consisting of granting and modifying subsidies.  Subsidies are indeed favourable to the recipient, but they differ fundamentally from the ordinary conditions that states create for investments; they are extraordinary, ultra-favourable benefits which states grant in exceptional circumstances to

---

[106] *Supra*, ¶ 24.

[107] *Supra*, ¶ 32.

[108] *Supra*, ¶ 28.

[109] Claimant's Memorial, ¶¶ 206-212 and the immediately following heading.

sustain or promote particular economic activities.  No provision of the ECT requires states to grant such extraordinary benefits.  In particular, no such obligation appears in Article 19(1)(d) of the ECT, which merely requires Contracting Parties to "have particular regard […] to developing and using renewable energy sources."[110]

96.    In light of this context and the extraordinary nature of subsidies, the term "favourable conditions" in Article 10(1) should be interpreted as referring to ordinary conditions for an investment, not including subsidies.  For these reasons, the Claimant's argument on favourability should be rejected.  Article 10(1) of the ECT did not require the Respondent to grant subsidies to the eolic-energy sector and, if it chose to grant such subsidies, a requirement that they be maintained cannot be derived from the favourability factor of Article 10(1).[111]

### *Transparency*

97.    If the Disputed Measures are taken at face value, their prescriptive content and effects on the preceding regime are reasonable clear.  But the Respondent's arguments in defence of those measures give rise to serious transparency issues, as shown by the preceding discussion and the one yet to come.  For example, if it were true that the producers were entitled only to the "reasonable rates of return" referred to in Article 30.4 of Law 54/1997 and nothing more (a position that the Majority accepts), the entire regime would have been non-transparent, because it would have failed to explain (i) what rates of return the state considered reasonable or (ii) on what "cost of money in the capital markets" they were based or (iii) how future tariffs would reflect changes in (i) or (ii).  Further, the Disputed Measures fail to explain why rates of return once considered reasonable are no longer so considered or what changes in the cost of money in the capital markets led the state to that conclusion.    These transparency issues become less important if one rejects the false

---

[110] **CL-0001**, ECT, Art. 19(1)(d).

[111] This conclusion refers exclusively to the favourability factor in the circumstances of this case and has no bearing on the other elements of the fair-and-equitable-treatment analysis. The Majority reaches a similar result, without discussing the favourability factor.  See Decision, ¶ 317.

premise that the producer could have no rights or expectations other than those arising out of the reference to "reasonable rates of return" in Article 30.4 of Law 54/1997.[112]

### *Stability*

98.     As already discussed, the first sentence of Article 10(1) of the ECT requires that the state create "stable conditions" for the making of investments.   In addition, for textual and contextual reasons the stability of the existing conditions is a relevant factor to be considered in the application of the fair-and-equitable-treatment standard. As noted, stability is not the same as immutability.   The stability of a legal regime is consistent with changes that do not exceed a certain magnitude – a magnitude which is usually explained in terms of the importance or centrality of the changed elements and the effects and timing of the changes.[113]   Accordingly, we must review the extent of the changes that the Disputed Measures introduced in the preceding regime and then assess the magnitude of those changes and the resulting impact on the stability of that regime.

99.     The Disputed Measures introduced the following principal changes in the preceding legal regime:

    a.     *Change in the Rate of Return Deemed Reasonable*.  While the rate of return implicit in the earlier regime was not disclosed, the evidence shows it was in the order of 7% after taxes or 9.382% before taxes.   For the first six years, the Disputed Measures adopted as reasonable a rate of return of 7.398% before taxes, which translates to about 5.179% after taxes.   This rate was based on the average yield of

---

[112] *Supra*, ¶ 90.

[113] For examples of different ways of describing the magnitude of a change that deprives the changed regime of stability see, *e.g.*, **RL-0093**, *OperaFund*, ¶ 508 (essential characteristics of the regulatory regime relied upon by investors); **CL-0116**, *Foresight Luxembourg Solar 1 S.à r.l. and others [Greentech] v. Kingdom of Spain* (SCC Arbitration V (2015/150)), Final Award, 14 November 2018, ¶ 365 (fundamental and abrupt alteration), ¶¶ 397-398 (radical and unexpected, fundamental change); **CL-0112**, *Novenergia II*, ¶ 695 (radical and unexpected); **CL-0079** or **RL-0071**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/36), Award, 4 May 2017, ¶ 382 (radical alteration that deprives investors who invested in reliance of the regime of the value of their investments), ¶ 387 (drastic and abrupt revision of the regime on which the investment depended in a way that destroyed its value); **CL-0039** or **RL-0050**, *Total S.A. v. Argentine Republic* (ICSID Case No. ARB/04/01), Decision on Liability, 27 December 2010, ¶ 168 (no respect for certain basic features of the amended regime); **CL-0023**, *Micula*, ¶ 687 (formal shell of regime maintained but eviscerated of all or substantially all of its content); Hobér Dissent, ¶ 9 (fundamental and radical changes).

10-year Treasury bonds in the secondary market over the preceding ten years, plus 300 basis points.

b.    *Change in the Remuneration Regime*.  The Disputed Measures completely replaced the previous remuneration regime.  The old premiums and regulated feed-in tariffs were replaced by a "specific remuneration" consisting of two components, one based on installed capacity (the 'investment incentive") and another based on production (the "operating incentive").  The operating incentive is not available for wind farms.  The investment incentive is calculated as a 7.398% pre-tax return based on the estimated investment costs of a standard installation.

c.    *Change in the Effects of Production on the Remuneration.*  The specific remuneration depends on attaining a number of annual operating hours assigned to a particular type of installation to which each installation is in turn assigned.  The financial support varies between an operating threshold and a minimum number of operating hours and, once that minimum number is attained, it does not increase with any increased production.

d.    *A New Claw-Back Feature*.  The Disputed Measures provide that if under the previous regimes a plant earned a rate of return higher than the one now deemed reasonable (7.398% before taxes), the cumulative return in excess of the new target rate would be set off against the financial incentives to which the plant would be entitled under the new regime.  The effect of this change is to claw-back the benefit of the efficiencies achieved by the producer under the old regime and effectively to cap the producer's actual rate of return at the level the regulator now deems reasonable.

e.    *Change in the Relevant Life of a Plant.*    The remuneration provided under the preceding regime applied to the entire useful life of a facility.  The Disputed

Measures provide that the specific remuneration would apply only to the "regulatory life" of the facility, which it sets at 20 years.[114]

100.   The changes just described affected critical aspects of the preceding legal regime.  The Claimant's expert on regulation characterized them as a "mid-stream switch in the regulatory paradigm" for existing plants.[115] The preceding regime followed a paradigm based on a generally stable subsidized remuneration per MWh produced, which gave producers an incentive to build and manage projects efficiently, in the hope of achieving better financial results than those made possible by the subsidized remuneration, in exchange for taking the risk of selecting the sites, designs, and equipment. In contrast, the Disputed Measures adopted a paradigm based on imputed (not actual) costs (even for plants already built under the old regime) and a designated pre-tax target rate of return based on such imputed costs, a rate of return which operated as a ceiling on the producer's actual financial results.  This change of paradigm has had the effect of depriving efficient producers of the rewards that they accrued under the previous system in exchange for the risks taken.  The point here is not whether one paradigm is better than the other or the switch in mid-stream was economically efficient or inefficient.  The point is the magnitude of the change, and the change was indeed radical.  Consequently, the stability of the preceding legal regime was severely impaired.

### *Abrogation of Specific Commitments and Frustration of Objectively Reasonable Expectations*

101.   As discussed, RD 661/2007 set forth certain specific commitments regarding the remuneration regime for producers of electricity from wind and the duration of that regime.[116]  By repealing and replacing the entire regime, the Disputed Measures abrogated those commitments.

---

[114] **C-0018**, MO IET/1045/2014 of 16 June 2014, Art. 5.

[115] **CE-1**, Brattle's First Regulatory Report, ¶¶ 154-183.

[116] *Supra*, ¶ 77.

102.    I have also concluded that the Claimant derived objectively reasonable expectations to the stability of the Fourth Regime, as amended.[117]  By radically impairing the stability of the preceding regime, the Disputed Measures frustrated those expectations.

### The Blusun Criteria

103.    The *Blusun* rule sets forth three criteria that the state must satisfy to modify subsidies previously granted, in the absence of a specific commitment to keep them unmodified: (i) the modification must have become necessary; (ii) it must not be disproportionate to the aim pursued; and (iii) it should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[118]

104.    The first criterion is *necessity* ("if it becomes necessary to modify them").  The Majority does not discuss it in detail, but it plainly concludes that the modification of the existing subsidies regime had become necessary to address the tariff deficit.[119]

105.    Two observations must be made regarding the criterion of necessity.  The first is that the "necessity" at issue here is not a plea of necessity under customary international law, as codified in Article 25 of the ILC's Articles on Responsibility of States for International Wrongful Acts, and therefore the requirements of the latter are not applicable.[120]  The second observation is that in applying this criterion, the Majority does not use "necessary" in a strict sense.  Strictly speaking, to say that modifying the Fourth Regime was *necessary* to "address" the tariff deficit is to say that the modification was a *necessary condition* (*conditio sine qua non*) for achieving that result or, in other words, that no other measures would have solved or ameliorated the problem.  This is certainly not the way in which the Majority applies this criterion. Not only does the Majority fail to show that the tariff deficit could not have been addressed without modifying the Fourth Regime – it expressly declines

---

[117] *Supra*, ¶ 87.
[118] **CL-0083** or **RL-0074**, *Blusun*, ¶ 319(5); Decision, ¶ 335.
[119] Decision, ¶¶ 337-338.
[120] **CL-0057**, Articles on Responsibility of States for International Wrongful Acts, Article 25.

to consider alternative measures.[121] It appears, then, that in the Majority's view, the relation between the problem (the tariff deficit) and the means to address it (the modification of the subsidies) is not a matter subject to the Tribunal's review.

106.    In this light, it appears that "if it becomes necessary to modify the subsidies" in fact means "if the state considers, in its discretion, desirable to modify the subsidies." This means that the "necessity" criterion (as the Majority applies it) has no limiting function, and hence it can have no meaningful role in the evaluation of a measure under the *Blusun* rule.

107.    The second criterion in the *Blusun* rule is "proportionality to the aim of the legislative enactment."[122] In this case, the Disputed Measures are the "legislative enactment" and the aim of the Disputed Measures is to "address" (presumably, to eliminate or reduce) the tariff deficit.[123] Accordingly, to satisfy this criterion the Disputed Measures must have been proportionate to the aim of eliminating or reducing the tariff deficit. Yet, it is not entirely clear what the *Blusun* rule and the Majority understand by "proportionality." It appears that, as a starting point, the measure must be *suitable* to achieve the aim, but it is not self-evident at what point a suitable measure should be considered disproportionate to the aim. The way the Majority applies this criterion suggests that a suitable measure is disproportionate to the extent it is not necessary (perhaps *stricto sensu*) to achieve the aim, even if the absence of the measure should delay achievement of the aim.[124]

108.    The idea of proportionality often plays a role in the application of the fair-and-equitable-treatment standard, either as a separate *considerandum* (or element of the standard) or as

---

[121] Decision, ¶ 338 ("[I]t is not for the Tribunal to second guess reasonable measures taken to address the deficit (including measures affecting existing plants), to propose alternative policies that could have been adopted, or to weigh up for itself the competing demands of generators and consumers.")

[122] **CL-0083** or **RL-0074**, *Blusun*, ¶ 319(5); Decision, ¶ 335 ("[The modification of the existing subsidies] should be done in a manner which is not disproportionate to the aim of the legislative amendment").

[123] Decision, ¶ 338.

[124] In the Majority's analysis, all aspects of the Disputed Measures meet the criterion of proportionality, except for the claw-back feature. The claw-back feature is excluded because it "has not been shown to have been necessary to resolve the tariff deficit problem, which would have been solved in any event by the Disputed Measures without much further delay and without the element of claw-back." Decision, ¶ 355. It is not clear, however, why the same reasoning should not apply to the shortening of the relevant life of a plant, which the Majority regards as satisfying the criterion of proportionality.

part of the reasoning through which the various elements are assessed and weighed.[125]  In any case, the Majority's version of proportionality cannot *meaningfully* serve as an element in the fair-and-equitable-treatment analysis, much less as an overall control factor.  Let us examine the characteristics of this criterion more closely.  First, the aim of the measure is deemed to be unreviewable.  Second, the *Blusun* proportionality relation is primarily an instrumental one – that of means to an end.  Only to the extent that the means somehow overshoot the end are they considered disproportionate.  Conceivably, a system of review of state measures focused on ends and means can combine either a strong or weak review of means with either a strong or weak review of ends.  The proportionality criterion of the *Blusun* rule combines a weak review of means with no review of ends.  The result is a very weak criterion, which puts no meaningful limits on the state's power to modify subsidies.  More important, it is not apparent whether this weak version of proportionality bears any relationship to the ordinary meaning of "fair and equitable treatment."  I shall presently return to the way the Majority applies this criterion.

109.    The third *Blusun* criterion is "due regard to the reasonable reliance interests of recipients [of the subsidies] who may have committed substantial resources on the basis of the earlier regime."[126] The Majority does not explain what this criterion means, nor does the Majority appear to apply it independently of the proportionality criterion. The most obvious difficulty is the uncertain meaning of "due regard." This expression, common in diplomatic language and "soft" legal texts, normally refers to something that ought to happen in the process of taking a decision, not to the result of that process.[127] This criterion appears to mean, then, that in modifying the subsidies the state ought to *consider* (or consider carefully) the reasonable reliance interests of the recipients of the subsidies.[128]  If this is so, then this third criterion can serve as an exhortation to the state about how it should act in the process of devising changes to the subsidies but not so much as a basis for a tribunal to

---

[125] See, *e.g.*, **RL-0093**, *OperaFund*, ¶ 555 (part of a balancing assessment).

[126] **CL-0083** or **RL-0074**, *Blusun*, ¶ 319(5); Decision, ¶ 335.

[127] See, *e.g.*, Art. 19(1)(d) of the ECT (requiring Contracting Parties to "have particular regard […] to developing and using renewable energy sources").

[128] It is also unclear whose reliance interests the state ought to consider.  Depending on whether the relative sentence beginning with "who may have committed" is read as a qualification or an explanation, the class of the relevant recipients may or may not be restricted to those who committed substantial resources on the basis of the earlier regime.

review the objective results of that process.[129] By contrast, the standard of Article 10(1), second sentence, concerns the fairness and equity of the actual *treatment* received by an investor, not (or not only) the fairness and equity of the process through which the state devised such treatment. Therefore, the third *Blusun* criterion is not really useful as a basis on which a tribunal can determine whether a particular measure constitutes fair and equitable treatment.

110.    The Majority applies the *Blusun* rule in a piecemeal manner, to various components of the Disputed Measures,[130] an approach which implicitly discards assessing the overall stability of the regime.  In so doing, the Majority finds fault with only two aspects of the Disputed Measures: (i) the claw-back feature and (ii) the shortened "regulatory" life assigned to the existing installations. The Majority adjudges the claw-back feature to be inconsistent with the principle of stability and to fail the *Blusun* criterion of proportionality.[131] As for the life assigned to the existing installations, the Majority  considers it to be unreasonable, but this presumptive violation is in the end erased after applying an overall control of proportionality.[132]

111.    Nevertheless, when it comes to applying the overall control of proportionality to all aspects of the Disputed Measures other than the claw-back feature, the Majority sets aside the (conceptual) proportionality criterion of the *Blusun* rule and adopts instead a quantitative test, based on the approach used in another case to quantify damages.[133] The Majority's quantitative-proportionality test is based on its view of the Claimant's "legitimate" expectations to an *actual* rate of return. The Majority's reasoning is as follows: (i) "the only legitimate expectation the Claimant could have had was that of a 'reasonable return'

---

[129] A state may carefully consider the reasonable reliance interests of the recipients of subsidies and yet decide that those interests are outweighed by other interests.  If such a decision were unreviewable (as a matter of application of the *Blusun* rule or for sheer practical reasons), this would be another criterion that places no meaningful limits on the state's discretion.

[130] Decision, ¶ 339.

[131] Decision, ¶ 355.

[132] Decision, ¶¶ 340-344.

[133] Decision, ¶¶ 357-358, relying on **RL-0088**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 523.

in terms of the 1997 Law;"[134] (ii) the "reasonable return" is a dynamic concept;[135] (iii) the Disputed Measures set a target return of 7.398%; (iv) the Claimant's overall projected rate of return after the Disputed Measures is 13.8% (average of the experts' calculations); and (v) this rate of return is "well above the 7.398% target of the Spanish regulator."[136] On this basis, the Majority concludes that the Respondent did not breach its obligation to ensure a reasonable return and did not frustrate the Claimant's "legitimate" expectation to obtain such a return.[137]

112.   As already discussed, the premise on which this whole approach is based is faulty.  Law 54/1997 did not give producers a right to an *actual* rate of return (reasonable or unreasonable, floor or ceiling); it just set forth a conceptual target (reasonable rates of return with reference to the cost of money in the capital markets) for the Government to aim at in setting the premiums.[138] A producer's actual rates of return could be higher or lower depending *inter alia* on the efficiency of its choices.  For the same reason, the Claimant did not have a "legitimate" expectation to realizing any particular *actual* rate of return; its objectively reasonable expectation was merely to receive the premiums calculated on the basis of the Fourth Regime in the manner and for the period designated, subject to an overall expectation to the stability of that regime.  Apart from being based on a false premise, the Majority's quantitative-proportionality calculation is also flawed in its economic effect: it counts against the Claimant the value of the efficiencies it realized under the abolished regime.

113.   I conclude that if the *Blusun* criteria were intended, as surrogates for the requirement of fair and equitable treatment, to place some limits on the state's power to modify subsidies, they do not do that well or even meaningfully. I agree, though, that there is room for a meaningful criterion of proportionality in a fair-and-equitable treatment analysis.  The key issue is, after all, whether it is fair and equitable for the investor or a class of investors to

---

[134] Decision, ¶ 356.

[135] Decision, ¶ 366.

[136] Decision, ¶¶ 367-368.

[137] Decision, ¶ 369.

[138] *Supra*, ¶¶ 65, 111.

bear all or most of the cost of a policy change which the state deems desirable.[139] In this respect, a criterion of proportionality that compares the burden placed on the investors with the burden placed (or which could have been placed) on an appropriate comparator group, or the population at large, would be more closely related to the ordinary meaning of "fair and equitable treatment." The record contains no such comparison, but it does contain a related, indirect exercise. The Claimant's regulatory expert compared five alternative ways of dealing with the tariff deficit and concluded that the Respondent relied *disproportionately* on the Disputed Measures, which means that those measures were not a proportionate solution.[140]

### c.    Conclusions

114.    In the preceding subsections I have analysed the circumstances of the present case that appear relevant to assess the claim for breach of the fair-and-equitable-treatment standard. Those circumstances include specific commitments made in the legal regime that the Disputed Measures replaced, the Claimant's objectively reasonable expectations, the degree of favourability and transparency of the Disputed Measures, and the effects of those measures on the stability of the antecedent regime, the specific commitments, and the Claimant's objectively reasonable expectations.  I have also critically examined the criteria set forth in the *Blusun* rule.  Partial conclusions have been drawn at each step of the analysis.  It remains to reach a general conclusion.

115.    If the Disputed Measures are considered in the light of all the circumstances analysed in the preceding subsections, it must be concluded that the treatment provided by those measures did not accord with the ordinary meaning of "fair and equitable." Consequently, by imposing the Disputed Measures the Respondent breached its obligation under the

---

[139] See **CL-0117**, *9REN Holding S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/15/15), Award of 31 May 2019, ¶ 243 ("The question before the Tribunal however is whether such changes [changes of Spanish regulatory measures made in the exercise of Spanish sovereignty] can be made by Spain **without financial consequences** under the ECT.") (emphasis in the original).

[140] **CE-1**, Brattle, Changes to the Regulation of Wind Installations in Spain since December 2012, ¶¶ 132-149, esp. ¶ 149. ("The reasons behind Spain's failure to implement alternative solutions to the Tariff Deficit, including the $CO_2$ tax and fuel tax and the profiling of FITs for renewable installations recommended by the EC or the CNE, remain unclear.  The failure to exhaust other alternatives demonstrates that Spain relied *disproportionately* on the Disputed Measures – in other words they were not a proportionate solution.") (emphasis in the original).

second sentence of Article 10(1) of the ECT. Separately, for the same reasons set forth in respect of the analysis of the stability factor, the Respondent breached its obligation under the first sentence of Article 10(1) to create stable conditions for the Claimant's investments made under the Fourth Regime.

## C.    CLAIMS GROUNDED ON ARTICLE 10(1), THIRD SENTENCE, OF THE ECT

116.    The Claimant argues that the Disputed Measures violated a portion of the third sentence of Article 10(1) of the ECT concerning unreasonable or discriminatory measures.[141]   The Respondent rejects that claim.[142] The Majority takes the view that "unreasonable or discriminatory measures in the general sense are examples of measures that breach the FET standard as contained in Article 10(1), first and second sentences."[143] Then it finds that "[n]o conclusive evidence was provided to necessitate a finding of unreasonableness or discrimination under those elements of the FET standard, save insofar as the retro-active aspect of the Disputed Measures, in the form of the claw-back clause is concerned."[144] On this basis, the Majority declines to make a separate finding of unreasonableness or discrimination, even in respect of the claw-back feature.[145]   In the end, this claim is rejected in the *dispositif*.[146]

117.    The third sentence of Article 10(1) of the ECT provides that

> "no Contracting Party shall in any way impair by unreasonable or discriminatory measures their [Investments of Investors of other Contracting Parties] management, maintenance, use, enjoyment or disposal."[147]

118.    I cannot agree with the view that the quoted portion of the third sentence is somehow subsumed within the standard of fair and equitable treatment under the second sentence.

---

[141] Decision, ¶¶ 371-377.

[142] Decision, ¶¶ 378-383.

[143] Decision, ¶ 387.

[144] Decision, ¶ 388.

[145] *Id.*

[146] Decision, ¶ 467(d), (e).

[147] **C-0001**, ECT, Art. 10(1), third sentence.

Legal provisions that purport to state separate rules should be applied separately, even if upon analysis their prescriptive contents partially overlap. In this respect, it cannot be assumed, without the benefit of analysis, that the prescriptive content of the quoted portion of the third sentence is a subset of the prescriptive content of the second sentence, or vice versa.

119.    If the Majority had upheld the claims under the first and second sentences of Article 10(1) in full, it might have been justifiable to decline to address the claim under the third sentence, on the ground that the quantum of compensation would not have changed.  But since the Majority rejects almost all aspects of the claims under the first and second sentences, it would have been appropriate for the Tribunal to analyse the prescriptive content of the third sentence and to resolve the claim thereunder. I cannot perceive any justification for the Majority's blanket dismissal of this claim.

120.    For the purposes of this Partial Dissent, it is unnecessary to embark on a comparative analysis of the standard of fair and equitable treatment and that of unreasonable and discriminatory measures. But even without getting into details, one conclusion can be drawn from the preceding discussion. If the Disputed Measures breached the obligation of stability under the first sentence of Article 10(1) and the obligation to provide fair and equitable treatment under the second sentence, as I have concluded earlier, *a fortiori* they should be considered to have breached the obligation not to impair, by unreasonable measures, the use and enjoyment of the Claimant's investments.

### D.    ON EU STATE AID

121.    The Respondent has raised two defences grounded on the EU legal regime on state aid. The first defence is that the Claimant did not have, and could not have had, any "legitimate" expectation to receiving any Special Regime subsidies.[148]  The second is that any Award rendered in this case ordering the Respondent to make payments in excess of those

---

[148] Decision, ¶ 391.  For present purposes, it is unnecessary to distinguish the various versions of the regime preceding the Disputed Measures.  I shall therefore adopt the Majority's terminology and refer to it as the Special Regime.

provided by the Disputed Measures would itself constitute impermissible state aid and would be subject to a stand-still obligation under EU law.[149]

122. With regard to the second defence, I agree with my colleagues that the Tribunal is bound to decide the present case in accordance with the applicable law.[150] The enforceability of the Award is a separate matter, to be addressed in a separate proceeding, outside this Tribunal's jurisdiction.[151] The EC's threat to block enforcement of the Award cannot deter the Tribunal from fulfilling its function.

123. On the contrary, I disagree with the Majority's analysis and disposition of the first EU-state-aid defence. The Majority states its conclusion as follows:

> "In the circumstances, the Tribunal finds[,] by majority[,] that under EU law and the law of Spain, the Claimant could not legitimately have expected that the Special Regime subsidies were, for certain, lawful. Even if the subsidies were lawful, it could not expect, under EU law and the law of Spain, that the amount of state aid granted under these measures would be paid for the lifetime of the plants. The Claimant should have known that these measures had not been notified to, let alone approved by, the EC."[152]

124. The reasoning supporting these conclusions appears to consist of the following key steps: (i) under EU law, the Respondent had an obligation to notify state aid to the EC;[153] (ii) state aid which is not notified to the EC, or which is implemented before it is authorized by the EC, is unlawful;[154] (iii) in a case of unnotified state aid, the EC has the power to recover such aid from recipients or, alternatively, to approve such aid if it finds it compatible with

---

[149] *Id.*

[150] Decision, ¶ 427.

[151] Decision, ¶ 422, quoting from *Vattenfall AB and others v. Federal Republic of Germany* (ICSID Case No. ARB/12/12), Decision on the *Achmea* Issue, 31 August 2018, ¶ 230; Decision, ¶ 427.

[152] Decision, ¶ 428. It is not clear what the majority means by saying that *even if the subsidies were lawful*, the Claimant could not have "legitimately" expected, under EU and Spanish law, that the subsidies would be paid for the lifetime of the plants. Perhaps the Majority is referring to its own prior analysis based on Spanish law, in which it concluded that the regime did not give rise to any such expectation. But then, why the reference to EU law? Or perhaps the Majority is referring to the Claimant's expectation preceding a subsequent EC decision to approve the subsidies (as in the case of the Disputed Measures), a decision which would erase the illegality. Or perhaps the Majority is alluding to something else. These uncertainties need not be resolved because the Majority takes the view, as discussed further in the text, that the subsidies regime was unlawful under EU law.

[153] Decision, ¶ 410.

[154] Decision, ¶ 411.

the internal market;[155] (iv) the Special Regime constituted state aid and hence should have been notified to the EC;[156] (v) the Respondent should have been aware of its notification duty and should have acted accordingly;[157] (vi) it is undisputed that the Respondent made no such notification;[158] (vii) ergo, the Special Regime was unlawful under EU and Spanish law;[159] (viii) the Claimant should have known that the Special Regime had not been notified to the EC;[160] (ix) ergo, the Claimant could not have had the "legitimate" expectation that the subsidies granted by the Special Regime were, for certain, lawful;[161] and (x) therefore, the Claimant could not have derived any "legitimate" expectations from that regime.[162]

125.    This reasoning, if I understand it correctly, has two important implications.  The first is that the Majority's EU state-aid analysis largely obviates its own analysis under the *Blusun* rule.  As already discussed, the Majority concludes, incorrectly in my view, that the Claimant could have derived no "legitimate" expectations from the regime of RD 661/2007.  That

---

[155] Decision, ¶ 411.

[156] Decision, ¶ 419.

[157] Decision, ¶ 426.

[158] The Majority acknowledges that the EC (i) was well informed of the Special Regime and even praised it; (ii) took a "rather generous" approach to such schemes; and (iii) took no enforcement action while that regime was in force or afterwards.  Decision, ¶¶ 415-417, 425, 427.  Yet these facts play no role in the Majority's reasoning leading to the conclusion quoted in the preceding paragraph.  The absence of enforcement action does play a role in the Majority's discussion of the claw-back feature in the context of EU state-aid law, as discussed later in the text.

[159] This conclusion is not explicit in the Majority's argument, but it follows necessarily from the preceding steps.  In addition, the Majority notes that the EC took the view that the Disputed Measures "were state aid and, not having been notified, were unlawful," in spite of which the EC approved them as compatible with the internal market.  Decision, ¶ 421, citing **RL-0073**, EC decision of 10 November 2017, ¶¶ 84-89.  The Majority relies on this EC Decision to conclude "by parity of reasoning" that the Special regime constituted state aid.  Parity of reasoning would also lead the Majority to conclude that the Special Regime, not having been notified, was unlawful under EU law.  Decision, ¶ 419.

[160] Decision, ¶ 428.

[161] Decision, ¶ 428.

[162] Decision, ¶ 423(a) ("In principle, an investor cannot have a legitimate expectation of treatment which is unlawful under the law of the host state, provided that the host state law itself is not acting inconsistently with the treaty under which the tribunal exercises its jurisdiction.").  This statement may be acceptable in principle, but only in principle.  It cannot be used as a technical rule to foreclose consideration of other circumstances bearing on the objective reasonableness of the expectation.  See **CL-0016**, *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt* (ICSID Case No. ARB/84/3), Award on the Merits, 20 May 1992 (henceforth, *SPP v. Egypt*), ¶¶ 82, 83 ("These acts, which are now alleged to have been in violation of the Egyptian municipal legal system, created expectations protected by established principles of international law.  A determination that these acts are null and void under municipal law would not resolve the ultimate question of liability for damages suffered by the victim who relied on the acts.").

conclusion was based on the notion that the "stream" (RD 661/2007) cannot rise higher than its "source" (Law 54/1997), but the same conclusion now flows from the Majority's EU state-aid analysis. Up to that point, both analyses of the Majority lead to the same result, but the same is not true in respect of Article 30.4 of Law 54/1997, which the Majority regards as the source (the sole source) of a "legitimate" expectation to a reasonable rate of return, which in turn becomes the benchmark for the Majority's notion of proportionality. If Article 30.4 of Law 54/1997 is part of a subsidies regime which was not notified to the EC and hence was unlawful under EU and Spanish law, it is difficult to see how (under the Majority's reasoning) Article 30.4 could be the source of an expectation of a reasonable return or how such expectation could serve as a measure of proportionality.

126. A second implication flows from the Majority's discussion of the claw-back feature in the context of the unnotified subsidies regime. The Majority dismisses the Respondent's state-aid defence on the ground that "the subsidies having been paid (*and subject to any lawful recovery measures by the EC, which did not occur*), they remained entitled to the benefit of the stable regime which Article 10(1), first and second sentences, of the ECT promised."[163] This statement underscores the fragility of the basis on which the Majority finds a breach of Article 10(1), first and second sentences, in respect of the claw-back feature. That finding is now "subject to any lawful recovery measures by the EC." No such recovery has occurred to date, but it may still occur (if EU law so authorizes), or at any rate it might have occurred. Therefore, in the Majority's view the Respondent's breach of the ECT in respect of the claw-back feature depends on the contingent fact that the EC has not exercised its enforcement powers under EU law.

127. The Majority's line of reasoning on EU state aid and its conclusions and implications are, in my view, incorrect. First, it is not correct to regard EU law as part of the law to be applied in this case, and to apply it as such, even though the EU Treaties, as *res inter alios acta*, are not binding in the relations between the Respondent and Japan. The Majority indeed applies EU law as law, notably by adopting as a major premise that unnotified state aid is

---

[163] Decision, ¶ 430 (emphasis added).

unlawful,[164] by holding (by parity of reasoning from the EC's Decision of 10 November 2017) that the Special Regime constituted state aid,[165] and by concluding that, because the Respondent failed to notify the Special Regime, that regime was unlawful under EU and Spanish law.[166] This last conclusion is, in turn, the major premise for the findings that the Claimant could have had no "legitimate" expectation to the lawfulness of the Special Regime and that the stability of that regime was subject to the EC's power to recover the subsidies paid under that regime.

128.    Second, it is incorrect to accept the possibility that EU law, as applicable law, might trump a legal conclusion based on the ECT. If the EC's exercise of its powers under EU law could have foreclosed a ruling from the Tribunal that the stability obligation under Article 10(1) of the ECT was breached, the source of such powers (EU law) would have trumped the ECT. This conclusion cannot be reconciled with the primacy of the ECT under its Article 26(6) or even with the Majority's own view that, through the "indirect relevance" of Article 16 of the ECT, an ECT rule that is more favourable to the investor would prevail over a conflicting rule of EU law.[167] Apart from this role as a trump card, EU law on state aid works as an overriding consideration in the fair-and-equitable-treatment analysis, superseding other considerations required by such analysis. This whole approach is inconsistent, in my view, with the system of norms which the Tribunal is bound to apply under Article 26(6) of the ECT.

129.    On the contrary, from the standpoint of international law, which is the Tribunal's standpoint, the laws of Spain (which happen to incorporate EU state-aid rules) are merely facts, except to the extent that the ECT effects a *renvoi* to them expressly or by clear implication.[168] As already explained, EU law, based on treaties which are *res inter alios acta*, plays a similar role. Therefore, both Spanish law and EU law contribute to the *factual* matrix in respect of which the provisions of the ECT must be applied. But the legal status

---

[164] Decision, ¶ 411.

[165] Decision, ¶ 419.

[166] Decision, ¶ 421.

[167] See discussion *supra*, ¶ 9.

[168] Decision, ¶ 423(b).

of the Special Regime under EU law is not the sole factual element to be considered in applying Article 10(1) of the ECT. All the circumstances related to such legal status must be considered, including in particular the Respondent's failure to notify the regime to the EC and the context in which that failure took place.

130.    Let us then examine the influence of these EU state-aid considerations on the Claimant's objectively reasonable expectations. As we have seen, the Majority takes the view that "the Claimant could not legitimately have expected that the Special Regime subsidies were, *for certain*, lawful,"[169] and such a lack of certainty would prevent any "legitimate" expectation of treatment according to that regime.[170] This requirement of certainty of lawfulness appears to be based on a series of decisions of the CJEU.[171] Yet, whatever may be said about such a certainty requirement as a condition for "legitimate expectations" to arise *under EU law*, CJEU precedents have no bearing on the conditions for "legitimate expectations" (or objectively reasonable expectations) *under the ECT*.[172]

131.    As a matter of application of the ECT, it cannot be right to require that the Claimant have expected, "for certain," that the Special Regime was lawful. The Special Regime, like any other Spanish laws and royal decrees, bore a presumption of legality, and the Claimant was entitled to rely on that presumption, unless and until other factors came to light that were sufficient to overcome that presumption.[173] Even apart from the presumption of legality, it is unreasonable to demand that, to be "legitimate" (*i.e.* objectively reasonable under the ECT), the Claimant's expectation on the lawfulness of the Special Regime reach the level of *certainty*. In the absence of a binding decision by a competent authority, a decision which did not exist at the time the Claimant formed its expectations and still does not exist

---

[169] Decision, ¶ 428 (emphasis added).

[170] Decision, ¶ 423(a).

[171] See Decision, ¶ 412, quoting from Case C-199/06, *Centre d'exportation du livre français v. Société internationale de diffusion et d'édition*, 12 February 2008 (GC), ¶ 67, citing Case C-91/01 *Italy v. Commission* [2004] ECR I-4355, ¶ 66 ("[S]o long as the Commission has not taken a decision approving aid, and so long as the period for bringing an action against such a decision has not expired, the recipient *cannot be sure* as to the lawfulness of the proposed aid which alone is capable of giving rise to a legitimate expectation on his part.") (emphasis added).

[172] The Majority admits as much in respect of EC's pronouncements ("[…] so does the EC not have jurisdiction to impose a binding interpretation of the meaning of legitimate expectations *under the ECT*."). Decision, ¶ 432 (emphasis in the original).

[173] See **CL-0016**, *SPP v. Egypt*, ¶¶ 82, 83.

today, it is difficult to see how a reasonable investor could have been *certain* at that time that the Special Regime was or was not in accord with EU or Spanish law.

132.   The question is, then, whether having regard to all the relevant circumstances, it was objectively reasonable for the Claimant to rely on the legality of the Special Regime or, more precisely, whether from the standpoint of a reasonable investor there were sufficient elements to overcome the presumption of legality of that regime, so that it would have been objectively *un*reasonable to rely on it. The key facts are the following:

a.   Article 108(3) of the TFEU requires member states to notify the EC of "any plans to grant or alter aid;"[174]

b.   As Article 108(3) is a general rule, it is necessary to determine whether a particular subsidies scheme, such as the Special Regime, falls under it;

c.   No competent authority determined, either at the time the Claimant was forming its expectations or thereafter, that the Special Regime fell under Article 108(3);[175]

d.   The Respondent was aware of its obligation to notify under Article 108(3), as it had notified certain proposed schemes in prior years;[176]

e.   In the relevant period, the EC took a "rather generous" approach to the application of the state-aid rules; it approved all energy subsidies schemes submitted to it, including those that offered higher returns than the Special Regime and those that grandfathered existing plants from further reviews;[177]

f.   The Respondent did not notify the Special Regime to the EC;

g.   The Claimant's due-diligence investigation does not appear to have included issues of EU state aid;[178]

---

[174] Decision, ¶ 410, quoting from Art. 108(3) of the TFEU.

[175] The Majority concludes that the Special Regime was subject to the notification rule, but it reaches that conclusion, by parity of reasoning, on the basis of the Decision of the EC of 10 November 2017, issued ten years after the time the Claimant was forming its expectations based on the Fourth Regime.  See Decision, ¶ 419.

[176] Decision, ¶ 418.

[177] Decision, ¶ 417, quoting from uncontradicted evidence of Claimant's expert Mr. Carlos Lapuerta.

[178] Decision, ¶ 424.

h.  The EC was "well informed" of the various versions of the Special Regime under Law 54/1997 and even praised it;[179]

i.  The EC did not raise any state-aid issue with Spain in respect of the Special Regime nor did it take any enforcement action while that regime was in effect or thereafter;[180]

j.  Between the enactment of Law 54/1997 and the adoption of the Disputed Measures, the Respondent enjoyed a large increase in investments in the eolic-energy sector in Spain, based on the incentives set forth in the Special Regime;[181]

k.  When the Respondent (belatedly) notified the EC of the Disputed Measures, the EC approved them, but declined to make any determination in respect of the abolished Special Regime;[182]

l.  The Respondent did not question the legality of the Special Regime until this and other arbitration cases.

133.  This set of facts raises two fundamental questions: (i) did the Respondent make any initial determination, at the times the various components of the Subsidies Regime were adopted, whether they fell under Article 108(3) of the TFEU and, if so, what was that determination? and (ii) why did the Respondent fail to give notice to the EC of the various components of the Subsidies Regime?

134.  On the first question, it should be recalled that the Respondent had a generic obligation under Article 108(3) of the TFEU to notify any state-aid scheme to the EC. As the obligor, the Respondent was responsible for making an initial determination, for its own compliance purposes, that the Special Regime did or did not fall under Article 108(3) of the TFEU. Such a determination, though not conclusive, would have been relevant to a decision by the Respondent whether or not to notify the Special Regime to the EC. Also to be recalled is that no competent authority has ever determined that the Special Regime was or was not subject to notification under Article 108(3). The Majority does find that the Special Regime

---

[179] Decision, ¶ 425.

[180] Decision, ¶¶ 425, 427.

[181] **CE-1**, Brattle's First Regulatory Report, ¶¶ 111-112 ("Spain added about 2,089 MW per year on average from 2004 up to and including 2009, significantly more than in previous years."), relying on **BRR-38** (official source).

[182] Decision, ¶ 421.

was subject to notification, but the Tribunal is not a competent authority to rule on this matter.[183]  In any event, the Majority's finding is based, by "parity of reasoning," on an EC decision dated 10 November 2017.[184] No such *ex post facto* determination can be relevant to ascertain how the Respondent viewed the matter in 1997 (when Law 54/1997 was enacted) or in 2007 (when RD 661/2007 was issued), or to assess the Claimant's objectively reasonable expectations at the relevant times.

135.    The record contains no evidence of (i) any determination, made by the Respondent at any time, that the Special Regime did or did not fall under Article 108(3) of the TFEU or (ii) the reasons for the Respondent's failure to give notice to the EC under that provision.[185] Nevertheless, in the absence of evidence let us consider the various possibilities from the standpoint of a reasonable investor.

136.    First, the Respondent may have studied the matter and concluded that the Special Regime did not fall under Article 108(3), either because it was originally designed not to involve payments from the state treasury or for other reasons. In such case, that conclusion may very well have been the reason for not notifying the scheme to the EC. But if the state had any doubt about its initial determination (which after all was not conclusive), it would have been bound to disclose both the determination and the doubts, to comply with the requirement of transparency under Article 10(1) of the ECT. No such disclosure having been made, it would have been objectively reasonable for an investor to conclude that the state had satisfied itself (by consulting with the EC or otherwise) that the Special Regime was not subject to Article 108(3) and that no risk of illegality existed.

---

[183]  The Majority takes the view that "this Tribunal does not have jurisdiction to interpret EU law itself." Decision, ¶ 432.  In my view, the Tribunal does not have jurisdiction to rule on the question whether the Special Regime was subject to notification under Article 108(3) of the TFEU because EU law is not part of the law which the Tribunal is charged with applying in this case.

[184] Decision, ¶ 419.

[185] The burden of proof on these matters falls on the Respondent, to the extent that they are necessary elements of its defence based on EU state-aid law.  That is so, for two reasons: (i) it was the Respondent which invoked its own failure to notify the Special Regime as an affirmative defence (*actori incumbit onus probandi*; *reus in excipiendo fit actor*), and (ii) the Respondent is the only party capable of providing such evidence.

137.  Second, the Respondent may have concluded that the Special Regime indeed fell under Article 108(3). In such case, the Respondent may have had various reasons for not giving notice to the EC despite its own conclusion that notice was required. For example, the state may have decided not to notify the Special Regime to preserve a defence of illegality in the event it wished to repudiate its commitments in the future – a case of bad faith which can be entertained as a hypothesis but cannot be taken as established without adequate proof. Alternatively, the state may have considered that, given the EC's actual knowledge of the Special Regime, its favourable opinion of it, its generous approach toward the application of state-aid rules to energy projects based on renewable sources, and its willingness to approve such schemes even if they were not notified at the proper time, the required notification was as a simple formality which could have been accomplished later if necessary. As a third alternative, the state may have had other reasons for the absence of notice, including a simple oversight. In all those scenarios, the Respondent's decision not to give notice would have involved a risk to the recipients of the subsidies – a risk of which the Respondent would have been aware, having concluded (by hypothesis) that notice was indeed required. In such circumstances, transparency would have required the Respondent to disclose to the investors its conclusion that the Special Regime was subject to notice and the risks resulting from its decision not to notify. Absent such a disclosure, a reasonable investor would have had no grounds to believe that the Respondent had reached that conclusion or that it was consciously subjecting investors to the risks of illegality and disgorgement of the subsidies.

138.  Third, and least likely, the Respondent may simply have overlooked making an initial determination whether the Special Regime fell under Article 108(3) and such oversight may have been the reason for its failure to notify the EC. Under that hypothesis, the absence of notice and the consequent illegality of the Special Regime under EU law would have been the result of the state's negligence. In such case, it would be unreasonable and inconsistent with the ECT standard of fair and equitable treatment to place the harmful consequences of the state's negligence on the investor's shoulders. A reasonable investor

cannot be held to a higher standard of diligence than the state itself, on a matter concerning the state's compliance with its own obligations.[186]

139.    In light of the relevant facts and the preceding analysis of alternative answers to questions not covered by the evidence, it must be concluded that, under the fair-and-equitable-treatment standard of the ECT, no elements were available to a reasonable investor to overcome the presumption of legality of the Special Regime – even if the investor knew or could have discovered that the Respondent had failed to notify the Special Regime to the EC.  The key issue is who should bear the injurious consequences of the Respondent's own failure to notify the Special Regime to the EC, if any such notification was indeed required.  Whether that omission was in good or bad faith, malicious or negligent, the result is the same: it was the state's own conduct which caused the illegality, or risk of illegality, of the Special Regime under EU law, while the state benefited from the investments induced by that regime over a span of more than sixteen years. It is hardly consistent with the principle of good faith for the state now to seize on its own breach of duty to shift the entire burden of that breach on the investor, nor does it seem consistent with a sense of juridical propriety for a tribunal to condone such result.[187]

---

[186] See **RL-0090**, *Cube*, ¶ 306 ("The obligations regarding State aid were incumbent upon the Respondent, and investors were entitled to assume that they had been taken into account by the Respondent when drafting its legislation. It was not for the Claimants to second-guess the Respondent's legislature. Moreover, at the time that the investments were made it was not at all clear that the tariff regime should be regarded as State aid, let alone as impermissible State aid."); **RL-0096**, Dissenting Opinion of Horacio Grigera Naón, ¶¶ 29-42 (analysis coinciding in several respect with that in the text), in **RL-0095**, *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/16), Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019.  In *Cavalum*, the tribunal noted that neither Spain nor the EC ever had any concerns that the RD 661/2007 regime was contrary to state aid rules.  The tribunal stated that, given its conclusions, the respondent's state-aid argument had not arisen, "but if it had arisen, the Tribunal would have dismissed it on the basis that there is no necessary connection between an investor's legitimate expectation of a reasonable rate of return and a failure by the State to notify state aid, and that in any event *it was not now open to Spain in the light of its prior conduct to raise it.*" **RL-0102**, *Cavalum SGPS, S.A. v. Kingdom of Spain* (ICSID Case No. ARB/15/34), Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, ¶ 611 (emphasis added).

[187] See **CL-0105**, Cheng, Bin, GENERAL PRINCIPLES OF LAW AS APPLIED BY INTERNATIONAL COURTS AND TRIBUNALS, Cambridge 1953, 2006, pp. 149 *et seq.* ("A State may not invoke its own illegal act to diminish its own liability"), citing, *e.g.*, PCIJ, Advisory Opinion No. 15 (1928) ("Poland could not avail herself of an objection which […] would amount to relying upon the non-fulfilment of an obligation imposed upon her by an international agreement.").

## IV.    CONCLUSION

140.    For the reasons and to the extent set forth in the preceding sections, I dissent from the Majority's decisions concerning (i) the application of EU law, (ii) the claims based on Article 10(1) of the ECT, and (iii) the effects of EU law on state aid, and from the Majority's reasoning supporting those decisions.

141.    I have explained to what extent and why the Tribunal should have upheld the Claimant's claims based on the first three sentences of Article 10(1) of the ECT. If this conclusion had been accepted, the quantum of compensation would have had to be calculated under principles different from those set forth in the Decision. Accordingly, my dissent should be understood consequentially to include the directions on quantum and other ancillary results.

[Signed]

Oscar M. Garibaldi
Arbitrator