# EXHIBIT 46

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**BAYWA R.E. RENEWABLE ENERGY GMBH AND BAYWA R.E. ASSET HOLDING GMBH**
Claimants

and

**KINGDOM OF SPAIN**
Respondent

**ICSID Case No. ARB/15/16**

---

**DECISION ON JURISDICTION, LIABILITY AND DIRECTIONS ON QUANTUM**

---

***Members of the Tribunal***
Judge James R. Crawford, President
Dr. Horacio A. Grigera Naón
Ms. Loretta Malintoppi

***Secretary of the Tribunal***
Mr. Francisco Grob

*Date of dispatch to the Parties:* 2 December 2019

## REPRESENTATION OF THE PARTIES

*Representing BayWa r.e. renewable energy GmbH and BayWa r.e. Asset Holding GmbH:*

Mr. Alberto Fortún Costea
Mr. Luis Pérez de Ayala
Mr. Iñigo Quintana Aguirre
Professor Miguel Gómez Jene
Mr. Antonio Delgado Camprubí
Dr. José Ángel Rueda García
Mr. Borja Álvarez Sanz
Mr. Antonio María Hierro Viéitez
Mr. José Ángel Sánchez Villegas
Ms. Adriana González García
*Cuatrecasas, Gonçalves Pereira*
Almagro, 9
28010 Madrid
Spain

*Representing Kingdom of Spain*:

Mr. José Manuel Gutiérrez Delgado
Mr. Pablo Elena Abad
Mr. Antolín Fernández Antuña
Mr. Roberto Fernández Castilla
Ms. Patricia Froehlingsdorf Nicolás
Ms. Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Elena Oñoro Sainz
Ms. Amaia Rivas Kortazar
Mr. Mariano Rojo Pérez
Ms. Mª José Ruiz Sanchez
Mr. Diego Santacruz Descartín
Mr. Francisco de la Torre Diaz
Mr. Alberto Torró Molés
Mr. Luis Vacas Chalfoun
*Abogacía General del Estado*
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16,
2ª planta,
28004, Madrid
Spain

TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 1

II. THE PARTIES........................................................................................................ 1

III. PROCEDURAL HISTORY..................................................................................... 2

    A.  Registration and Constitution of the Tribunal ................................................. 2

    B.  The First Session .............................................................................................. 3

    C.  The European Commission's first application to intervene ............................. 4

    D.  The parties' first round of written submissions............................................... 4

    E.  Document Production and Admissibility of New Documents ......................... 5

    F.  The European Commission's Second Application to Intervene ....................... 7

    G.  The Parties' Second Round of Written Submissions ....................................... 8

    H.  Pre-hearing Procedures.................................................................................... 9

    I.  First Hearing on Jurisdiction and the Merits .................................................. 9

    J.  Post-Hearing Procedures ............................................................................... 11

    K.  The European Commission's Proposal of 16 May 2018................................ 13

    L.  Second Hearing on Jurisdiction and the Merits............................................. 13

IV. FACTUAL BACKGROUND................................................................................. 15

    A.  The Investors ................................................................................................. 15

    B.  The Claimants' Investments.......................................................................... 15

    C.  The Decision to Invest in Spain .................................................................... 19

    D.  The Regulatory Framework and its Evolution .............................................. 23

        (1)  Basic features ......................................................................................... 23

        (2)  State actors ............................................................................................. 24

        (3)  Law 54/1997 ........................................................................................... 24

        (4)  RD 2818/1998 ........................................................................................ 26

        (5)  RD 436/2004 .......................................................................................... 29

        (6)  RDL 7/2006 ............................................................................................ 34

        (7)  RD 661/2007 .......................................................................................... 38

        (8)  RD 1578/2008 ........................................................................................ 48

        (9)  RDL 6/2009 ............................................................................................ 50

        (10) RD 1614/2010 ........................................................................................ 56

        (11) RDL 14/2010 .......................................................................................... 65

**(12)** RDL 1/2012 ................................................................................................ 69

E.    The Disputed Measures ................................................................................ 73

   **(1)**  Law 15/2012 ....................................................................................... 73

   **(2)**  RDL 2/2013 ........................................................................................ 74

   **(3)**  RDL 9/2013 ........................................................................................ 74

   **(4)**  Law 24/2013 ....................................................................................... 76

   **(5)**  RD 413/2014 ....................................................................................... 76

   **(6)**  MO IET/1045/2014 ............................................................................ 77

   **(7)**  MO IET/1168/2014 ............................................................................ 78

F.    Spanish Court decisions on the Disputed Measures ..................................... 79

G.    The Tariff Deficit ......................................................................................... 82

H.    European Union Law .................................................................................... 83

   **(1)**  European state aid law ........................................................................ 84

   **(2)**  Compatibility of the ECT with European Union law ........................... 87

   **(3)**  Vattenfall AB v. Germany, Decision on the Achmea Issue ................. 89

   **(4)**  UP and CD Holding v. Hungary ......................................................... 90

V.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ........................... 91

A.    The Claimants.............................................................................................. 91

B.    The Respondent ........................................................................................... 94

VI.   JURISDICTION ................................................................................................ 95

A.    The Intra-EU Objection ............................................................................... 95

   **(1)**  The Respondent's Position ................................................................. 95

   **(2)**  The Claimants' Position ..................................................................... 96

   **(3)**  The Tribunal's Analysis ..................................................................... 96

      *(a)  The original scope of the ECT* ....................................................... 97

      *(b)  Subsequent EU Treaties and Decisions* ....................................... 100

   **(4)**  Conclusions ...................................................................................... 102

B.    The Taxation Claim ................................................................................... 110

   **(1)**  The Respondent's Position ............................................................... 110

   **(2)**  The Claimants' Position ................................................................... 112

   **(3)**  The Tribunal's Analysis ................................................................... 114

I.    THE MERITS OF THE CLAIM ...................................................................... 119

A.    Introduction ............................................................................................... 119

B.   Overview of the Parties' Positions ............................................................ 120

   **(1)**   Claimants' positions.......................................................................... 121

       *(a) The evolution of the regulatory framework* ................................. 121

       *(b) The 2010 Agreement* ................................................................. 125

       *(c) The approval of the Disputed Measures* ...................................... 126

       *(d) The impact of the Disputed Measures* ....................................... 129

       *(e) The Claimants' expectations* ...................................................... 132

   **(2)**   The Respondent's position................................................................ 135

       *(a) The evolution of the regulatory framework* ................................. 135

       *(b) The 2010 Agreement* ................................................................. 141

       *(c) The approval of the new regulatory regime* ................................. 143

       *(d) The impact of the Disputed Measures* ....................................... 146

       *(e) The Claimants' expectations* ...................................................... 151

C.   The Substantive Claims under the ECT .................................................. 155

   **(1)**   The Expropriation Claim (Article 13 of the ECT)............................ 156

       *(a) The Claimants' position* ............................................................. 156

       *(b) The Respondent's position*.......................................................... 157

       *(c) The Tribunal's analysis* ............................................................. 158

   **(2)**   The Umbrella Clause Claim (Article 10 of the ECT, last sentence)................... 162

       *(a) The Claimants' position* ............................................................. 163

       *(b) The Respondent's position*.......................................................... 165

       *(c) The Tribunal's Analysis*.............................................................. 167

       *(d) Conclusion on the Umbrella Clause* ........................................... 177

   **(3)**   The Fair and Equitable Treatment Claim: Article 10.1, first and second sentence .. ...................................................................................................... 177

       *(a) The Tribunal's Analysis*.............................................................. 177

   **(4)**   Spain's alleged breaches of Article 10.1 of the ECT, third sentence ................. 199

       *(a) The Claimants' position* ............................................................. 199

       *(b) The Respondent´s position*.......................................................... 200

       *(c) The Tribunal's Analysis*.............................................................. 202

   **(5)**   The EU state aid arguments ............................................................ 204

       *(a) The EC's applications and the positions of the Parties* ............................. 205

       *(b) The Tribunal's approach*.............................................................. 209

**(6)** The Tribunal's Conclusions on Liability ............................................................ 224

VII.   DAMAGES ................................................................................................................. 228

(A)  The Claimants' position .......................................................................................... 228

(B)  The Respondent's position ...................................................................................... 230

(C)  The Tribunal's Analysis .......................................................................................... 233

(D)  The tax gross-up claim ............................................................................................ 234

VIII.  CONCLUSIONS ......................................................................................................... 236

**TABLE OF SELECTED ABBREVIATIONS**

| | |
|---|---|
| 2000 Renewable Energy Plan | *Plan de Fomento de las Energías Renovables en España 2000-2010* |
| 2005 Supreme Court judgment | Judgment issued by the Spanish Supreme Court on 15 December 2005 |
| 2005-2010 Renewable Promotion Plan | *Plan de Energías Renovables en España 2005-2010* approved by the Council of Ministers of Spain of 26 August 2005 |
| 2006 Supreme Court judgment | Judgment issued by the Spanish Supreme Court on 25 October 2006 |
| 2010 Regulatory Impact Report | Explanatory Report of draft Royal Decree 1614/2010 |
| 2016 Refinancing | Claimants refinancing of their loans in 2016 |
| *9REN v. Spain* (Award) | Award rendered on 31 May 2019 in the case *9REN Holding S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15 |
| *Achmea* | Judgment of Court of Justice of the European Union in the case *Slowakische Republik (Slovak Republic) v. Achmea*, BV, Case C 284/16, 6 March 2018 |
| AEE | Spanish acronym for Spanish Wind Energy Association ("*Asociación Empresarial Eólica*") |
| *AES Summit v. Hungary* (Award) | Award rendered on 23 September 2010 in the case *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22 |
| *Antaris v. Czech Republic* (Award) | Award rendered on 2 May 2018, in the case *Antaris GMBH (Germany) and Dr. Michael Göde (Germany) v. The Czech Republic*, PCA Case No. 2014-01 |
| *Antin v. Spain* (Award) | Award rendered on 15 June 2018, in the case *Antin Infrastructure Services Luxembourg S.à r.l. and Antin Energia Termosolar B.V. v Kingdom of Spain*, ICSID Case No. ARB/13/31 |

| | |
|---|---|
| APPA | Spanish acronym for Renewable Energies' Producers Association ("*Asociación de Productores de Energías Renovables*") |
| ASIF | Spanish acronym for the Association of Photovoltaic Producers ("*Asociación de la Industria Fotovoltaica*") |
| Babcock | Babcock & Brown GmbH |
| BayWa AH | BayWa r.e. Asset Holding GmbH |
| BayWa RE | BayWa r.e. Renewable Energy GmbH |
| BCG | Boston Consulting Group |
| Bemm Report | Due Diligence Report prepared by the Madrid law firm Bemm & Asociados concerning the projects in Spain, dated 1 September 2009 |
| *Blusun v. Italy* (Award) | Award rendered on 27 December 2016, in the case *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case ARB/14/3 |
| C-# | Claimants' Exhibit |
| *Charanne v. Spain* (Final Award) | Final Award rendered on 21 January 2016, in the case *Charanne B.V. Construction Investments S.à r.l. v. Kingdom of Spain*, SCC Arbitration, Arbitration No. 062/2012 |
| CJEU | Court of Justice of the European Union |
| CL-# | Claimants' Legal Authority |
| Cl. Mem. | Claimants' Memorial on the Merits, dated 3 March 2016 |
| Cl. Rej. | Claimants' Rejoinder on Jurisdiction, dated 24 May 2017 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, dated 6 February 2017 |

| | |
|---|---|
| CNE | Spanish acronym for National Energy Commission ("*Comisión Nacional de Energía*") |
| CNE Report 3/2007 | Report 3/2007 issued by the CNE regarding the Proposed Royal Decree [RD 661/2007] Regulating Electricity Generation in the Special Regime and Specific Technological Facilities Equivalent to the Ordinary Regime of 14 February 2007 |
| CNMC | Spanish acronym for National Markets and Competition Commission ("*Comisión Nacional de los Mercados y la Competencia*") |
| *Continental v. Argentina* (Award) | Award rendered on 5 September 2008 in the case *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, |
| CPI | Consumer Price Index |
| CWS-ES | Claimants' Witness Statement by Mr. Errol Schulz, February 1, 2016 |
| CWS-MT | Claimants' Witness Statement by Mr. Matthias Taft dated 24 February 2016 |
| DCF | Discounted Cash Flow |
| EC | European Commission |
| EC's Decision on State Aid | Decision C(2017) 7384 of the European Commission dated 10 November 2017 |
| EC's First Application | EC's Application for Leave to Intervene as a Non-Disputing Party dated 16 February 2016 |
| EC's Second Application | EC's Second Application for Leave to Intervene as a Non-Disputing Party dated 17 January 2017 |
| ECJ | European Court of Justice |
| *Ecolgás* | *Elcogás S.A. v. Administración del Estado and Iberdrola S.A.* [2014] ECLI:EU:C:2014:2314, Case No. 275/13 |

| Econ One First Report | Econ One Research Inc., Expert Report dated 15 June 2016 |
|---|---|
| Econ One Second Report | Econ One Research Inc., Expert Report dated 7 April 2017 |
| ECT | Energy Charter Treaty signed in December 1994 and in force since 16 April 1998 |
| *Eiser v. Spain* (Award) | Award rendered on 4 May 2017 in the case *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36 |
| *Electrabel v. Hungary* (Decision on Jurisdiction) | Decision on Jurisdiction, Applicable Law and Liability, issued on 30 November 2012, in the case *Electrabel S.A. v. Republic of Hungary,* ICSID Case No. ARB/07/19 |
| *Eureko v. Poland* (Partial Award) | Partial Award rendered on 19 August 2005 in the case *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award |
| European Commission's State Aid Decision | Decision issued by the European Commission on the Spanish State Aid Framework for Renewable Resources dated 23 November 2017 |
| FiP | Feed-in Premium |
| FiT | Feed-in Tariff |
| FPS | Full Protection and Security |
| *Greentech v. Spain* (Final Award) | Award rendered on 14 November 2018, in the case *(1) Foresight Luxembourg Solar 1 S.à r.l., (2) Foresight Luxembourg Solar 2 S.à r.l., (3) Greentech Energy Systems A/S, (4) GWM Renewable Energy I S.P.A., (5) GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150) |
| *Hulley v. Russia* (Final Award) | Final Award rendered on 18 July 2014, in the case *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

| | |
|---|---|
| IDAE | Spanish acronym for Institute for Diversification and Saving of Energy ("*Instituto para la Diversificación y ahorro de la Energía*") |
| IRR | Internal Rate of Return |
| *Isolux v. Spain* (Award) | Award rendered on 17 July 2016, in the case *Isolux Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153 |
| *JSW Solar v. Czech Republic* (Award) | Award rendered on 11 October 2017, in the case *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v. The Czech Republic*, PCA Case No. 2014-03 |
| KPMG First Damages Report | KPMG's Expert Report on Damages dated 3 March 2016 |
| KPMG First Regulatory Report | KPMG's First Expert Witness Report dated 3 March 2016 |
| KPMG Second Damages Report | KPMG's Complementary Expert Report on Damages dated 6 February 2017 |
| KPMG Second Regulatory Report | KPMG's Second Expert Witness Report dated 6 February 2017 |
| KWh | Kilowatts hour |
| Law 15/2012 | Law 15/2012 of 1 January 2013 introducing the TVPEE |
| Law 54/1997 | Law 54/1997 on the Electricity Sector of 27 November 1997 |
| *LG&E v. Argentina* (Decision on Liability) | Decision on Liability issued on 3 October 2006 in the case *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1 |
| March 2007 Supreme Court judgment | Judgment issued by the Spanish Supreme Court on 20 March 2007, concerning an amendment to RD 436/2004 with regard to the methodology for updating premiums |

| | |
|---|---|
| *Masdar v. Spain* (Award) | Award rendered on 16 May 2018, in the case *Masdar Solar & Wind Cooperatief UA v. Kingdom of Spain*, ICSID Case No. ARB/14/1 |
| May 2018 Hearing | Hearing held at the Peace Palace in The Hague from 22 to 23 May 2018 |
| Ministry of Energy | Ministry of Industry, Energy and Tourism |
| MO | Ministerial Order |
| *Mohammad Al-Bahloul v. The Republic of Tajikistan* (Award) | Partial Award on Jurisdiction and Liability rendered on 2 September 2009 in the case *Mohammad Ammar Al-Bahloul v. The Republic of Tajikistan*, SCC Case No V (064/2008) |
| MW | Megawatts |
| MWh | Megawatts hour |
| *Nations Energy v. Panama* (Award) | Award rendered on 24 November 2010 om the case *Nations Energy Inc v. Republic of Panama*, ICSID Case No. ARB/06/19 |
| *NextEra v. Spain* (Award) | Award rendered on 31 May 2019 in the case *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11 |
| *NextEra v. Spain* (Decision on Jurisdiction) | Decision on Jurisdiction, Liability and Quantum Principles issued on 12 March 2019 in the case *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11 |
| *Noble Energy v. Ecuador* (Decision on Jurisdiction) | Decision on Jurisdiction issued on 5 March 2008 in the case *Noble Energy Inc. and Machala Power Cia. Ltda. v. Republic of Ecuador and Consejo Nacional de Electricidad*, ICSID Case No. ARB/05/12 |
| *Noble Ventures v. Romania* (Award) | Award rendered on 12 October 2005 in the case *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11 |

| | |
|---|---|
| November 2017 Hearing | Hearing on Jurisdiction and the Merits held at the ICC hearing facilities in Paris from 6 to 10 November 2017 |
| October 2007 Supreme Court judgment | Judgment issued by the Spanish Supreme Court on 9 October 2007 |
| PDF Project Development | PDF Project Development Fund GmbH & Co KG |
| Plana de Jarreta | Plana de Jarreta Wind Farm ("*Parque Eólico Plana de Jarreta*") |
| PO2 | Procedural Order No. 2 dated 23 May 2016 |
| PO6 | Procedural Order No. 6 dated 4 April 2017 |
| *PreussenElektra* | *Judgment of the European Court of Justice, PreussenElektra v. Schleswag,* Case C-379/98, dated 13 March 2001 |
| Project Companies | Parque Eólico La Carracha, S.L. and Parque Eólico Plana de Jarreta, S.L. |
| R-# | Respondent's Exhibit |
| RAIPRE | Spanish acronym for the State Register of Production Facilities under the Special Regime ("*Registro administrativo de instalaciones de producción en régimen especial*") |
| RB | Roland Berger |
| RD 1565/2010 | Royal Decree 1565/2010 of 23 November 2010 |
| RD 1578/2008 | Royal Decree 1578/2008 of 26 September 2008 |
| RD 1614/2010 | Royal Decree 1614/2010 of 7 December 2010 |
| RD 2818/1998 | Royal Decree 2818/1998 of 23 December 1998 |
| RD 436/2004 | Royal Decree 436/2004 of 12 March 2004 |
| RD 661/2007 | Royal Decree RD 661/2007 of 25 May 2007 |
| RDL 1/2012 | Royal Decree-Law 1/2012 of 27 January 2012 |

| | |
|---|---|
| RDL 14/2010 | Royal Decree Law 14/2010 of 23 December 2010 |
| RDL 2/2013 | Royal Decree Law 2/2013 of 1 February 2013 |
| RDL 6/2009 | Royal Decree Law 6/2009 of 30 April 2009 |
| RDL 7/2006 | Royal Decree Law of 23 June 2006 |
| RDL 9/2013 | Royal Decree Law 9/2013 of 12 July 2013 |
| REIO | Regional Economic Integration Organisations |
| Renerco | RENERCO Renewable Energy Concepts AG |
| Renewable Promotion Plans | 2000 and 2005 Plans prepared by the Ministry of Energy and IDAE |
| Resp. C-Mem. | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, dated 15 June 2016 |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Jurisdiction, dated 7 April 2017 |
| RfA | Request for Arbitration dated 16 April 2015 |
| RL-# | Respondent's Legal Authority |
| Roland Berger's Report | Roland Berger's Report "Análisis de estándares de proyectos de producción de electricidad en régimen especial", dated 31 October 2014 |
| *RREEF v. Spain* (Decision on Responsibility) | Decision on Responsibility and on the Principles of Quantum issued on 30 November 2018, in the case *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom Spain*, ICSID Case No. ARB/13/30 |
| RWS-JRA2 | Respondent's Second Witness Statement by Mr. Juan Ramón Ayuso, dated 7 April 2017 |
| Shell | Shell Overseas Holdings Limited |
| SPVs | Parque Eólico La Carracha, S.L. and Parque Eólico Plana de Jarreta, S.L. |

| | |
|---|---|
| Supplement for Reactive Energy | Bonus (or discount) introduced by RD 2818/1998 applied to revenue from the sale of energy for maintaining (or failing to maintain) certain power factors on an hourly basis, which are required for the proper functioning of the electricity system |
| TMR | Spanish acronym for the average or reference electricity tariff ("*Tarifa eléctrica Media o de Referencia*") |
| Tr-E Day [#] [Speaker(s)] [page:line] | English Transcript of the Hearing |
| TVPEE | A 7 % charge on the value of the electric power production, established by Act 15/2012 |
| *UP and C.D Holding v. Hungary* (Award) | Award rendered on 9 October 2018, in the case *UP and C.D Holding v. Hungary,* ICSID Case No. ARB/13/35 |
| *Vattenfall AB v. Germany* (Decision on *Achmea*) | Decision on the *Achmea* Issue issued on 31 August 2018, in the case *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12 |
| VCLT | Vienna Convention on the Law of Treaties |
| Wind Farms or the Projects | Parque Eólico La Carracha and Parque Eólico Plana de Jarreta. |
| *Yukos v. Russia* (Final Award) | Final Award rendered on 18 July 2014, in the case *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No. AA 227 |

## I.      INTRODUCTION

1.    This case has been submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") under the Energy Charter Treaty, which entered into force for the Kingdom of Spain and the Federal Republic of Germany on 16 April 1998 (the "**ECT**")[1] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.    It concerns a dispute between two German investors and the Kingdom of Spain arising out of measures implemented by the Government of Spain modifying the regulatory and economic regime of renewable energy projects.

## II.     THE PARTIES

3.    The Claimants are BayWa r.e. Renewable Energy GmbH ("**BayWa RE**")[2] and BayWa r.e. Asset Holding GmbH ("**BayWa AH**"),[3] companies incorporated under the laws of Germany (together, the "**Claimants**"). The Respondent is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

4.    The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

---

[1] ECT, CL-0008.
[2] Excerpt from BayWa's Energy Commercial Registry, Exhibit C-0001.
[3] Excerpt from BayWa's Asset Holding Commercial Registry, Exhibit C-0002.

## III.   PROCEDURAL HISTORY

### A.   REGISTRATION AND CONSTITUTION OF THE TRIBUNAL

5.    On 16 April 2015, the Claimants submitted a Request for Arbitration against Spain (the "**RfA**").

6.    On 8 May 2015, the Secretary-General of ICSID registered the RfA in accordance with Article 36.3 of the ICSID Convention and so notified the Parties.

7.    On 9 July 2015, the Parties informed the Centre of their agreement as to the number of arbitrators and the method for the Tribunal's constitution. Pursuant to this agreement, the Tribunal shall consist of three arbitrators; one appointed by each Party and the third, the presiding arbitrator, to be appointed by agreement of the Parties. If no such agreement could be reached by 7 September 2015, either Party could request the Secretary-General to appoint the President after consulting both Parties through a ballot procedure. As further agreed, the presiding arbitrator need not necessarily be selected from the Panel of Arbitrators.

8.    On 10 July 2015, the Centre invited the Parties to clarify certain aspects of the proposed ballot procedure. The Claimants and the Respondent provided such clarifications by communications sent on 15 and 16 July, respectively.

9.    In accordance with the Parties' agreement, the Claimants appointed Dr. Horacio A. Grigera Naón, an Argentine national, on 17 July 2017, and the Respondent appointed Ms. Loretta Malintoppi, an Italian national, on 27 July 2017, as arbitrators.

10.    On 8 September 2015, the Claimants informed the Centre that no agreement had been reached. They thus requested the Secretary-General to propose a ballot of possible candidates as per the Parties' agreement. On 17 September 2015, the Secretary-General sent such ballot to the Parties.

11.    On 5 October 2015, the Centre informed the Parties that the ballot procedure had not resulted in any mutually agreeable candidate, and that the Secretary-General would proceed with the appointment of the presiding arbitrator pursuant to the default method agreed by the Parties.

12.    By letter of 28 October 2015, the Secretary-General communicated that she intended to appoint Judge James R. Crawford and invited the Parties to send their comments, if any, by 4 November 2015. On 5 November 2015, after not having received any comments, the Secretary-General informed the Parties that the Centre would proceed with the proposed appointment of Judge Crawford as President of the Tribunal.

13.    On 6 November 2015, the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"). Mr. Francisco Grob, ICSID Legal Counsel, was designated Secretary of the Tribunal. Mr. Grob's legal and professional background was communicated to the Parties by a letter sent on 26 May 2015.

### B.    THE FIRST SESSION

14.    In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 10 December 2015, by teleconference.

15.    Following the first session, on 29 December 2015, the Tribunal issued Procedural Order No. 1 recording the agreements of the Parties on procedural matters and the decisions of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules are those in effect from 10 April 2006 and the procedural languages would be English and Spanish. In addition, Procedural Order No. 1 set out a schedule for the written and oral proceedings.

### C. THE EUROPEAN COMMISSION'S FIRST APPLICATION TO INTERVENE

16. On 16 February 2016, the European Commission ("**EC**") submitted an Application for Leave to Intervene as a Non-Disputing Party pursuant to Article 37.2 of the ICSID Arbitration Rules ("**EC's First Application**"). The EC sought to intervene on the question whether the Tribunal had jurisdiction over intra-EU investment disputes under the ECT.

17. Following observations from both Parties, the Tribunal issued Procedural Order No. 2 ("**PO2**"), dated 23 May 2016. The Tribunal found the application premature as the Respondent had not raised any jurisdictional objections at that point, nor had it filed its Counter-Memorial. In the Tribunal's view:

> Due to the absence so far of submissions by the Respondent on the very matter on which the Commission seeks to intervene, the Tribunal considers that it is not in a position to determine whether the Commission's intervention would assist the Tribunal in the terms of ICSID Arbitration Rule 37(2)(a). In the Tribunal's opinion, this criterion can only be sensibly assessed after the Respondent has had the opportunity to address the Tribunal's jurisdiction (i.e. after the Counter-Memorial, due on June 15, 2016).[4]

18. Accordingly, the Tribunal rejected the EC's First Application without prejudice to a further application by the EC following the filing of the Counter-Memorial.

### D. THE PARTIES' FIRST ROUND OF WRITTEN SUBMISSIONS

19. On 3 March 2016, the Claimants filed their Memorial on the Merits ("**Cl. Mem.**") accompanied by the witness statements of Mr. José Alberto Ceña Lázaro, Mr. Andreas Helber, Mr. Errol G. Schulz ("**CWS-ES**"), and Mr. Matthias Taft ("**CWS-MT**"), and by KPMG's First Expert Witness Report ("**KPMG First Regulatory Report**") and Damages Expert Report ("**KPMG First Damages Report**").

---

[4] PO2, para. 27.

20.    On 15 June 2016, the Respondent filed a Counter-Memorial on the Merits and Memorial on Jurisdiction ("**Resp. C-Mem.**"), accompanied by the witness statement of Mr. Juan Ramón Ayuso and Econ One's Expert Report ("**Econ One First Report**").

E.    DOCUMENT PRODUCTION AND ADMISSIBILITY OF NEW DOCUMENTS

21.    On 12 September 2016, each Party filed a document production application as per Section 15.2.5 of Procedural Order No. 1.

22.    On 3 October 2016, the Tribunal issued Procedural Order No. 3 concerning the Parties' document production applications.

23.    On 18 November 2016, the Respondent requested permission to introduce the final award rendered on 17 July 2016, in the case *Isolux Netherlands, B.V. v. Kingdom of Spain*, SCC Case V2013/153 (the "*Isolux v. Spain* (**Award**)").

24.    Following the Tribunal's invitation, the Claimants filed their observations on 2 December 2016. They objected to Respondent's application, contending that it was inconsistent with Respondent's refusal to produce other ECT decisions and awards during document production and also with the Tribunal's conclusion that such rulings were not relevant or material to this case. In addition, the Respondent would breach the presumed confidentiality of the *Isolux* arbitration proceeding if it was allowed to introduce that award without the consent of the Claimants in that case, Isolux Netherlands BV.

25.    On 21 December 2016, the Tribunal issued Procedural Order No. 4 concerning the Respondent's 18 November application. It held that it is not for it to decide whether the Respondent should or should not submit a certain authority in support of its case; as a general rule, no prior leave of the Tribunal is required for submitting an authority with scheduled pleadings provided that the applicable rules of procedure are otherwise met. Nor is it for the Tribunal to enforce alleged confidentiality obligations involving a non-party to the proceeding:

Without prejudice to the discretion of this Tribunal to decline ordering production of a confidential document or otherwise exclude from the file information that is to be kept confidential between the parties, it is generally for the person by whom such confidentiality is owed to seek any necessary consent to the release of protected information and for the person to whom such confidentiality is owed to ensure that such information is not improperly released and to seek appropriate remedies if need be.[5]

26.    The Tribunal therefore denied the Respondent's application, without prejudice to the right of either Party in the course of pleadings to cite decisions on file or in the public domain which they judge to be relevant to this case, and the right of the other Party to respond thereto.[6]

_____

[5] Procedural Order No. 4, para. 5.

[6] In the end, the *Isolux* award was tendered with the Rejoinder without objection, and was discussed by the Parties in oral argument. RL-0088. The award of 4 May 2017, in *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36 (hereinafter "*Eiser v. Spain* (**Award**)"), was submitted by the Claimants with their Rejoinder on Jurisdiction, CL-0217, and discussed extensively during oral argument. Subsequent awards and decisions submitted with the consent of the Tribunal and commented on by the Parties were: *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v. The Czech Republic,* PCA Case No. 2014-03, Award, 11 October 2017 (hereinafter "***JSW Solar v. Czech Republic* (Award)**"), CL-0225, *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. V 063/2015, Final Award, 15 February 2018 (hereinafter "*Novenergia II v. Spain* (**Final Award**)"), CL-0227; *Slowakische Republik (Slovak Republic) v. Achmea*, CJEU, BV, Case C 284/16, 6 March 2018 ("*Achmea*"), RL-0111; *Masdar Solar & Wind Cooperatief UA v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (hereinafter "*Masdar v. Spain* (**Award**)"), CL-0231; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 ("hereinafter "***Antin v. Spain* (Award)**"), CL-0234;*Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 (hereinafter "***Vattenfall AB v. Germany*Decision on *Achmea***"), CL-0236; *UP and C.D Holding v. Hungary,* ICSID Case No. ARB/13/35, Award, 9 October 2018 ("hereinafter "***UP and C.D Holding v. Hungary* (Award)**"); CL-0237; *Antaris GMBH (Germany) and Dr. Michael Göde (Germany) v. The Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (hereinafter "***Antaris v. Czech Republic* (Award)**"), CL-0243; *(1) Foresight Luxembourg Solar 1 S.à.r.l., (2) Foresight Luxembourg Solar 2 S.à.r.l., (3) Greentech Energy Systems A/S, (4) GWM Renewable Energy I S.P.A., (5) GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018, (hereinafter "***Greentech v. Spain* (Final Award)**"), CL-0238; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (hereinafter "***RREEF v. Spain* (Decision on Responsibility)**"), CL-0239; *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019 (hereinafter "***NextEra v. Spain* (Decision on Jurisdiction)**"), RL-0121, *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Award,

27.    In the meantime, on 13 December 2016, the Claimants filed an application by which they challenged the Respondent's compliance with Procedural Order No. 3. The Claimants asserted that the Respondent had failed to conduct proper searches for, or to produce complete copies of, documents which the Tribunal ordered be produced.[7]

28.    By invitation of the Tribunal, the Respondent filed comments on Claimants' application on 20 December 2016.

29.    On 23 January 2017, the Tribunal issued Procedural Order No. 5 concerning the Claimants' 13 December application. Among others, the Tribunal ordered the Respondent to produce the requested documents concerning the work performed by Roland Berger ("**RB**") and Boston Consulting Group ("**BCG**") for the Respondent as well as those relating to Invest in Spain's engagement of German international business development agency, AHP Gruppe.

## F.    THE EUROPEAN COMMISSION'S SECOND APPLICATION TO INTERVENE

30.    On 17 January 2017, the EC submitted a Second Application for Leave to Intervene as a Non-Disputing Party pursuant to Article 37.2 of the ICSID Arbitration Rules ("**EC's Second Application**").

31.    After receiving observations from the Parties, the Tribunal issued, on 4 April 2017, Procedural Order. No. 6, by which it rejected the EC's Second Application ("**PO6**"). The Tribunal was not convinced that a submission by the EC would add to the sum total of available information as to intra-EU jurisdiction under the ECT in the terms of Rule

---

31 May 2019 (hereinafter "*NextEra v. Spain* (**Award**)"), RL-0122, *9REN Holding S.à.r.l. v. Kingdom of Spain,* ICSID Case No. ARB/15/15, Award, 31 May 2019 (hereinafter "*9REN v. Spain* (**Award**)"), RL-0123.

[7] These documents concerned, among others, presentations made by Spanish authorities regarding the Spanish legal framework for renewable energy; Invest in Spain's engagement of German international business development agency, AHP Gruppe; and work performed by Roland Berger and Boston Consulting Group for the Respondent in relation to MO IET/1045/2014.

37(2)(a), while it would most likely cause additional costs to the Parties. In the Tribunal's view:

> […] A non-disputing party permitted to file a submission under that Rule does not thereby become a party to the proceedings, and the Tribunal has no jurisdiction to award costs against it. No doubt permission to file might be made subject to a prior condition of the provision of security for costs, but the Tribunal understands that the Commission, faced with such a condition, has declined to file or to provide security.[8]

> […] The questions [on which the EC seeks to intervene] have been extensively discussed in a number of published awards, and have been well ventilated in the literature. The parties in the present case are fully capable of presenting the legal issues at stake.[9]

## G.    THE PARTIES' SECOND ROUND OF WRITTEN SUBMISSIONS

32.    The Claimants filed a Reply on the Merits and a Counter-Memorial on Jurisdiction ("**Cl. Reply**") on 6 February 2017, accompanied by the second witness statement of Mr. José Alberto Ceña Lázaro and KPMG's Rebuttal Expert Witness Report ("**KPMG Second Regulatory Report**") and Complementary Report on Damages ("**KPMG Second Damages Report**")

33.    The Respondent filed a Reply on Jurisdictional Objections and a Rejoinder on the Merits ("**Resp. Rej.**") on 7 April 2017, accompanied by the witness statement of Mr. Daniel Lacalle and the second witness statement of Mr. Juan Ramón Ayuso ("**RWS-JRA2**"), and by Econ One's Second Expert Report ("**Econ One Second Report**").

34.    On 24 May 2017, the Claimants filed a Rejoinder on Jurisdiction ("**Cl. Rej.**").

---

[8] PO6, para. 32.
[9] PO6, para. 34.

## H.    Pre-hearing Procedures

35.    As scheduled, each Party notified the Tribunal of the witnesses and experts it wished to call for cross-examination on 13 September 2017.

36.    Pursuant to Section 19.1 of Procedural Order No. 1, a pre-hearing conference call was held on 5 October 2017, between the President of the Tribunal and the Parties.

37.    Following the pre-hearing conference call, the Tribunal issued Procedural Order No. 7, dated 10 October 2017. This Order reflects the Parties' agreements and the Tribunal's decisions on other issues pertaining to the organization of the hearing.

38.    On 23 October 2017, the Parties informed that they couriered to the Secretary of the Tribunal five USB drives with a joint electronic bundle containing a full hyperlinked copy of the case file. The USB drives included new documents and translations agreed by the Parties to be incorporated into the record per Section 25 of Procedural Order No. 7, as well as updated lists of factual exhibits and legal authorities.

39.    On 25 October 2017, the Claimants sent a letter to the Tribunal seeking to clarify their prayer for relief in respect of the tax treatment of the claim for damages, a request to which the Respondent objected by a letter of 30 October. On 1 November the Claimants responded and, on 3 November the Respondent replied. The Parties were informed that the Tribunal would hear them on this issue at the hearing and would then rule on it by a communication sent on 5 November.

## I.    First Hearing on Jurisdiction and the Merits

40.    A first hearing on Jurisdiction and the Merits was held at the ICC hearing facilities in Paris from 6 to 10 November 2017 (the "**November 2017 Hearing**"). The following persons were present at the November 2017 Hearing:

*Tribunal*:
 Judge James R. Crawford                   President
 Dr. Horacio A. Grigera Naón              Arbitrator
 Ms. Loretta Malintoppi                       Arbitrator

*ICSID Secretariat*:
 Mr. Francisco Grob                          Secretary of the Tribunal

*For the Claimants*:
 Mr. Alberto Fortún                          Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. Luis Pérez de Ayala                  Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. Miguel Gómez Jene                   Cuatrecasas, Gonçalves Pereira, S.L.P.
 Ms. Maribel Rodríguez                    Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. Antonio Delgado                       Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. José Ángel Rueda                      Cuatrecasas, Gonçalves Pereira, S.L.P.
 Ms. Mónica Lasquibar                     Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. José Ángel Sánchez                   Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. Ignacio Frutos                          Cuatrecasas, Gonçalves Pereira, S.L.P.
 Mr. Kai Peters                                BayWa r.e. renewable energy GmbH
 Mr. Tobias Steegmann                     BayWa r.e. Asset Holding GmbH

*For the Respondent*:
 Ms. Amaia Rivas Kortazar               State Attorney´s Office
 Mr. Antolín Fernández Antuña         State Attorney´s Office
 Mr. Roberto Fernández Castilla        State Attorney´s Office
 Ms. Patricia Froehlingsdorf Nicolás   State Attorney´s Office
 Ms. María José Ruiz Sánchez           State Attorney´s Office
 Ms. Carmen Roa Tortosa                 IDEA

41.    During the November 2017 Hearing, the following persons were examined:

*On behalf of the Claimants*:
 Mr. Andreas Helber                        BayWa AG
 Mr. Matthias Taft                            BayWa r.e. renewable energy GmbH
 Mr. Errol Schulz                             NAB
 Mr. José Alberto Ceña Lázaro          Asociación Empresarial Eólica
 Mr. Carlos Solé                              KPMG Asesores S.L.
 Mr. Gregorio Mednik                      KPMG Asesores S.L.
 Mr. Fernando Cuñado                     KPMG Asesores S.L.
 Mr. Alberto Rabano                        KPMG Asesores S.L.
 Mr. Alfonso Manzano                      KPMG Asesores S.L.

*On behalf of the Respondent*:
Mr. Juan Ramón Ayuso Ortíz
Mr. Daniel Lacalle
Mr. Daniel Flores                                    Econ One
Mr. Andrés León                                      Econ One
Mr. Juan Riveros                                     Econ One

42.   The Tribunal ruled during the hearing on the Claimants' request to clarify their prayer for relief. It stated "[...] we do not regard the Claimants' letter as an additional or responsive document within the meaning of section 16.3 of Procedural Order No. 1, nor do we regard the request for clarification as a modification of the *petitum*."[10]

43.   The request was therefore noted and the Tribunal informed the Parties that it would consider the substantive questions associated to it, if any, as they arise.

## J.   POST-HEARING PROCEDURES

44.   On 23 November 2017, the Respondent requested leave to submit into the record a decision issued by the European Commission on the Spanish State Aid Framework for Renewable Resources. Following an exchange between the Parties, the Tribunal authorized the Respondent to submit this document and set a schedule for the Parties to comment on it.

45.   On 13 December 2017, the Parties submitted their agreed corrections to the November Hearing's transcripts, which the Tribunal approved by letter dated 13 January 2018.

46.   On 12 January 2018, the Respondent filed its comments on the European Commission's State Aid Decision, which were followed by Claimants' comments on 29 January 2018.

47.   On 13 February 2018, the Respondent requested permission to submit the award rendered in *JSW Solar v. Czech Republic*. Upon the Tribunal's invitation, the Claimants responded

---

[10] Tr-E, November 2017 Hearing, Day 1, pp. 67-8:25-4 (the President).

11

on 21 February 2018. They accepted the introduction of the *JSW Solar* award provided that the dissenting opinion attached thereto by arbitrator Gary Born was also added to the record. Additionally, they requested that the award in *Novenergia II v. Spain* be produced by the Respondent. They did not believe that further submissions concerning these decisions were necessary.

48. On 7 March 2018, the Tribunal wrote to the Parties as follows:

> Since the hearing last year, a number of developments have occurred. On November 10, 2017, the European Commission issued its decision on State aid, which is now part of the record (RL-0117). In February 2018, the awards in JSW Solar vs. The Czech Republic (PCA Case No. 2014-03) and Novenergia II v. the Kingdom of Spain (SCC Case No. V 063/2015) became public. The Respondent has applied to introduce the first of these decisions and the Claimants the second. Moreover, [yesterday] the Court of Justice of the European Union (CJEU) issued its decision in the proceeding of Slowakische Republik (Slovak Republic) v. Achmea BV, Case C 284/16, which has been referred to in both parties' pleadings (e.g. Resp. Rej. Jur., paras 36-38; Cl. Rej. Jur., paras 38 and 51; exhibits CL-143 & CL-220).
>
> Without prejudice to any final decision, the Tribunal considers appropriate to be informed of these developments, and have the Parties' views in relation thereto, while still in session. The Tribunal is therefore prepared to admit the aforementioned decisions not yet in the record.

49. In addition, the Tribunal invited the Parties to comment, both orally and in writing, on (1) the implications (if any) of the CJEU decision for the Tribunal's jurisdiction under the ECT; (2) the relevance (if any) of the recent investment treaty decisions; and (3) the implications (if any) of the European Commission's State Aid Decision for jurisdiction and merits. A subsequent schedule and hearing were set.

50. On 4 May 2018, the Parties submitted their comments on the three points referred to in the previous paragraph.

12

51.     On 23 October 2018, the Tribunal invited comments on two recent jurisdictional decisions potentially relevant to the *Achmea* issue.[11] The Parties provided their comments on 13 November 2018.

## K.     THE EUROPEAN COMMISSION'S PROPOSAL OF 16 MAY 2018

52.     On 16 May 2018, the EC wrote "to inform the Tribunal that in case the Tribunal would deem that useful for its deliberations, the Commission would still be available to present written observations or attend any hearing, in the light of the recent judgment of the European Court of Justice in *Case C-284/16 Achmea v. Slovak Republic*, and in particular to set out its view on the consequences of that judgment for pending arbitration cases based on the Energy Charter Treaty".

53.     On 18 May 2018, each Party filed observations on the EC's proposal. The Respondent urged the Tribunal to let the EC intervene. The Claimants objected to it.

54.     On 29 May 2018, the Tribunal rejected the EC's proposal. It considered the Parties' further pleadings and oral arguments sufficient to inform the Tribunal of the EU law issue that relate to the claims and positions of the Parties in this proceeding.

## L.     SECOND HEARING ON JURISDICTION AND THE MERITS

55.     A second hearing was held at the Peace Palace in The Hague from 22 to 23 May 2018 (the "**May 2018 Hearing**"). The following persons were present at the May 2018 Hearing:

*Tribunal*:
Judge James R. Crawford                    President
Dr. Horacio A. Grigera Naón               Arbitrator
Ms. Loretta Malintoppi                        Arbitrator

*ICSID Secretariat*:
Mr. Francisco Grob                              Secretary of the Tribunal

---

[11] *Vattenfall AB v. Germany* (Decision on *Achmea*), CL-0236; *UP and CD Holding v. Hungary* (Award), CL-0237.

13

*For the Claimants*:
Mr. Alberto Fortún                     Cuatrecasas, Gonçalves Pereira, S.L.P.
Mr. Iñigo Quintana Aguirre             Cuatrecasas, Gonçalves Pereira, S.L.P.
Mr. Miguel Gómez Jene                  Cuatrecasas, Gonçalves Pereira, S.L.P.
Ms. Maribel Rodríguez                  Cuatrecasas, Gonçalves Pereira, S.L.P.
Mr. José Ángel Rueda                   Cuatrecasas, Gonçalves Pereira, S.L.P.

*For the Respondent*:
Ms. Amaia Rivas Kortazar               State Attorney´s Office
Mr. Antolín Fernández Antuña           State Attorney´s Office
Ms. Patricia Froehlingsdorf Nicolás    State Attorney´s Office
Ms. María José Ruiz Sánchez            State Attorney´s Office

56.   The Parties filed their submissions on costs on 2 July 2018.

57.   On 28 January 2019, the Respondent requested the Tribunal to introduce as an additional legal authority a Declaration of the Representatives of the Governments of the Member States of 15 January 2019, on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union. The declaration was signed by 22 EU Members. By invitation of the Tribunal, the Claimants filed their response on 6 February 2019, opposing the production. The Tribunal issued its decision on 6 February 2019, stating that pursuant to Section 16.3 of Procedural Order No. 1, no exceptional circumstances existed to admit the proposed document at an advanced stage of the proceedings. It therefore denied the request.

58.   By letters of 17 May and 5 June 2019, the Tribunal invited the Parties to comment on five new decisions that had come into the public domain.[12]  These, and several subsequent cases, are analysed below.

---

[12] The decisions were: *Antaris v. Czech Republic* (Award), CL-0243/RL-0117; *Greentech v. Spain* (Final Award), CL-0238/RL-0118; *REEFF v. Spain* (Decision), CL-0239/RL-0119; *NextEra v. Spain* (Decision), CL-0240/RL-0121; *9Ren v. Spain* (Award), CL-0242/RL-0123.

14

## IV.    FACTUAL BACKGROUND[13]

### A.    THE INVESTORS

59.    The Claimants are two German companies, BayWa RE and BayWa AH. BayWa RE owns
100% of the shares in BayWa AH. BayWa RE, in turn, is a wholly owned subsidiary of
BayWa AG ("**BayWa AG**"), a related company incorporated under the laws of Germany,
which is not, however, a Claimant in this proceeding.

60.    Between 2009 and 2012, BayWa RE acquired the total capital of Renerco Renewable
Energy Concepts AG ("**Renerco**").

61.    Renerco at the time held shares and other interests in the projects at stake in this
arbitration. Following this acquisition, Renerco changed its name to BayWa AH on 27
March 2013, and its legal corporate form to a German limited liability company (*GmbH*).

### B.    THE CLAIMANTS' INVESTMENTS

62.    The Claimants hold shares and participative loans in two companies incorporated in Spain,
Parque Eólico La Carracha, S.L. and Parque Eólico Plana de Jarreta, S.L. (collectively the
"**SPVs**"). These companies own and manage two wind farms with an installed capacity of
about 49 MWs each, located in La Muela, province of Zaragoza, Spain: La Carracha and
Plana de Jarreta (the "**Wind Farms**" or the "**Projects**").

---

[13] There are several English translations of the same documents in the record. For quotations, the Tribunal uses the
translations that it has deemed more accurate. Reference is made to the translation's source in each case.



63. The Wind Farms were developed in 1997 by a German company, Thyssen Rheinstahl Technik GmbH in cooperation with a Danish wind turbine manufacturer.

64. In 1999, Thyssen along with other four firms sponsoring the Projects incorporated in Germany a company named PDF Project Development Fund GmbH & Co. KG ("**PDF Project Development**"). On 11 March 1999 PDF Project Development formed the SPVs in Spain, whose purpose was to run the Wind Farms.

65. The Wind Farms were provisionally registered in the *Registro administrativo de instalaciones de producción en régimen especial* ("**RAIPRE**") on 28 June 1999.[14] Pursuant to the applicable regulations, they were authorized to benefit from the Special Regime set out in RD 2818/1998 subject to the execution of the Projects and the completion of final registration in the RAIPRE.

66. On 28 December 2001, the main participants to the Projects at the time entered into a financing agreement ("**Framework Agreement for the investment in the Wind**

---

[14] Certificate of production facility under the Special Regime granted to La Carracha Wind Farm, 5 July 1999, C-0047; and Certificate of production facility under the Special Regime granted to Plana de Jarreta Wind Farm, 5 July 1999, C-0048.

**Farms**").[15] The Wind Farms were to be financed with a ratio of approximately 25% capital and 75% debt. The capital was provided by the participants / investors using a combination of equity and subordinated loans. A syndicate of banks provided the bank financing.

67.   On 25 November 2002, the installations were commissioned.[16] The *Diputación General de Aragón* attested their Final Registration at the RAIPRE, with effect as of 22 November 2002, through Certificates issued on 26 March 2003.[17] Around the same dates the Wind Farms started commercial operation.

68.   On 28 July 2003, PDF Project Development, then an indirect shareholder to the Projects, and two other German companies including another shareholder merged to create Renerco (subsequently renamed BayWa AH).[18] Renerco was incorporated in Germany on 7 November 2003. From the date of its inception up until 2009, it owned approximately a 32.6% interest in the SPVs, inheriting the project portfolio of its founding parents.

69.   On 30 June 2006, the Projects' owners agreed with the lenders to refinance the debt.[19] The Projects distributed nearly EUR 17.3 million to shareholders. The funds were distributed in the form of dividends, reduction in share capital, and principal payments on shareholder

---

[15] Framework Agreement for the investment in the Wind Farms, dated 28 December 2001, C-0067.

[16] Commissioning certificate of La Carracha Wind Farm, 25 November 2002, C-0059, and commissioning certificate of Plana de Jarreta Wind Farm, 25 November 2002, C-0060.

[17] Certificate of final registration of La Carracha Wind Farm in the RAIPRE, 22 November 2002, C-0061, and Certificate of final registration of Plana de Jarreta Wind Farm in the RAIPRE, 22 November 2002, C-0062. The certificates stated: "[i]n accordance with Article 12 of Royal Decree 2818/1998, of December 23 [...] the facility […] has obtained Final Registration […], in the Register of Production Facilities under the Special Regime of the General Council of Aragón […]."

[18] Translation of an Informative Excerpt from Renerco, C-0074.

[19] CWS−MT, para. 56. Deed of the Modifying Novation of the Credit Agreement entered into with Parque Eólico La Carracha, S.L., dated 30 June 2006, C-0078, and Parque Eólico La Carracha, of the same date, C-0228 (no English).

loans.[20] After the refinancing, debt represented 91% of the total capital as opposed to around 75% initially.[21]

70.    On 3 November 2009, BayWa RE (at the time BayWa Green Energy GmbH) purchased 87.7% of Renerco's share capital from Babcock & Brown GmbH ("**Babcock**") and became the majority shareholder.[22] BayWa RE would acquire the remaining 12.2% from the remaining minority shareholders by way of a "squeeze out" in October 2012.[23] At the time, Renerco's share in the SPVs remained at around 32.6%.[24]

71.    On 8 September 2011, Renerco (then under control of BayWa) purchased the participation of Shell Overseas Holdings Limited ("**Shell**"), which was at the time a shareholder in the SPVs.[25] As a result of this transaction, Renerco became the majority shareholder in the Projects, holding a 73.1% in Parque Eólico La Carracha and 72.2% in Parque Eólico Plana de Jarreta.[26]

72.    On 12 March 2012, Renerco acquired the equity holding that *Corporación Empresarial Pública de Aragón* had in both Projects (0.9% in La Carracha and 1.8% in La Plana de Jarreta).[27]

---

[20] See Econ One First Report, para. 64, RER-001; KPMG Second Damages Report, para. 146, CER-0004.
[21] CWS−MT, para. 56 ("From our point of view, the Lender's willingness to provide extra financing and increase their exposure to the project on a non-recourse basis was always a very positive signal").
[22] Press release issued by BayWa AG, dated 3 November 2009, C-0098.
[23] See Informative Excerpt from Renerco, C-0074. See also Cl. Mem., para. 286.
[24] November 2017 Hearing, Claimants' Opening Presentation, p. 12.
[25] Shareholder Loans Assignment Agreement entered into between Renerco and Shell, of 8 September 2011, Clause 1.1, C-0196.
[26] CWS−MT, para. 87.
[27] Share Purchase Agreement entered into between *Corporación Empresarial Pública de Aragón* and Renerco regarding Parque Eólico La Carracha, of 12 March 2012, C-0197; and Share Purchase Agreement entered into between *Corporación Empresarial Pública de Aragón* and Renerco regarding Parque Eólico Plana de Jarreta, of 12 March 2012, C-0198.

73.     As a result, Renerco acquired a 74% shareholding interest in each of the SPVs, which corresponds to the share capital investment currently owned by it in the Projects.[28] The evolution of Renerco's investments is shown in the following table.

| Renerco / BayWa AH | 2003-2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Interest in the Projects | 32.6% | 32.6% | 32.6% | 72.6% | 74% |

Source: Econ One Presentation, November 2017 Hearing, Slide 8

74.     In 2013, Renerco changed its name to BayWa AH. The following table shows the interests of BayWa AH and BayWa RE, respectively, in the SPVs:

| BayWa RE | 2003-2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Direct Interest in Renerco / BayWa AH | 0% | 87.8% | 87.8% | 87.8% | 100% |
| Indirect Interest in the Projects | 0% | 28.7% | 28.7% | 63.4% | 74% |

Source: Econ One Presentation, November 2017 Hearing, Slide 9

## C.    THE DECISION TO INVEST IN SPAIN

75.     BayWa RE made a first offer for Babcock's shares in Renerco in August 2009. The Claimants state that this offer was based on an analysis and presentation made by the financial firm Goetzpartners Corporate Finance Gmbh, which reviewed the project (then called "Nova" or "Nova Group") and suggested "a conservative valuation at the lower end of the range of €42 million to €45 million as the purchase price for an 88% share [...]".[29] The presentation points to "[c]hanges in legal conditions" as "[p]ossible [r]isks", affecting

---

[28] Cl. Mem., para. 398; Resp. C-Mem., para. 374. See also the D-1A model attached to both Share Purchase Agreements, last page, C-0197 and C-0198.

[29] Project Nova, Potential Acquisition in the Area of Renewable Energies, dated 18 August 2009, C-0099, p. 3.

Renerco's business segment of "[p]roject development", a risk that was considered "[m]edium to high". With respect to the "[p]ower generation" segment, the presentation states that "[f]ixed compensation models (such as the Renewable Energies Act) contribute significantly" to business planning.[30] For Respondent, this shows that Claimants knew about the risk of legal changes.[31] Claimants contend that such risk concerned the project development segment of Renerco's business; however, La Muela had been developed more than six years before and should be considered as falling within the power generation segment. The presentation made no reference to state aid issues.

76. Following this offer, BayWa RE was given access to two due diligence reports, both commissioned by the vendor: (i) Vendor Due Diligence Report, dated 4 September 2009, prepared by the Munich based law firm Stock Aders + Partners Rechtsanwälte,[32] which included a legal report prepared by the Madrid law firm Bemm & Asociados concerning the projects in Spain ("**Bemm Report**");[33] and (ii) Vendor Due Diligence Report, dated 8 September 2009, prepared by KPMG AG.[34] The KPMG report contains mostly financial information on Renerco's renewable energy operations in Europe. The Bemm Report is more specific. It is introduced as a "limited legal vendor due diligence", which concerns Renerco's wind farms in Spain, La Carracha and Plana de Jarreta. It contains a detailed overview of the Spanish "legal framework for the constructions and operation of onshore wind farms" as well as analyses of various other legal issues such as corporate structure, permits and licenses, sale of energy, financing agreements, land use regulations, among others. Regarding the regulatory framework, it states:

> Renewable energies have undergone several modifications of its legal framework. However, as per today, the applicable rules are essentially contained in Royal Decree No. 661/2007 as of

---

[30] Ibid, p. 4.
[31] Resp. Rej., para. 1147.
[32] Nova Stock Aders + Partners Rechtsanwälte, Vendor Due Diligence Report, dated 4 September 2009, C-0100.
[33] "Project Nova" Babcock & Brown GmbH, Vendor Due Diligence Report on the Spanish affiliated companies of Renewable Energy Concepts AG, dated 1 September 2009, C-0101.
[34] Project Nova, KPMG, Vendor Due Diligence Report, dated 8 September 2009, C-0102.

25.05.2007 which sets forth the framework for energy production under the 'Special Regime' (hereinafter referred to as 'RD 661/2007'). Producers of energy out of renewable energies that comply with the relevant provisions may apply for recognition of the status of the 'Special Regime' which entitles the beneficiary and owner of such power plants to (i) feed in to the grid and sell the entire energy production of such plants and (ii) to obtain the benefits (premiums, complements and other advantages) granted by low [sic] to all energy producers registered in the 'Register for Special Regime Power Plants'... [footnotes and emphasis omitted] [...]

Notwithstanding, under no circumstance such change in the applicable legal regulations does affect in any way the legal and valid existence of the licenses and permits granted to Carracha SL, Jarreta S.L. and La Muela AIE. [...][35]

The aforementioned does not imply that there might not be new regulations to which the Wind Farms are bound and which affect their business.[36]

77. In September 2009, Renerco made a presentation in Munich with the purpose of introducing the company to BayWa AG.[37] The presentation contained information about Renerco's portfolio of European assets, including the Wind Farms.

78. On 6 October 2009, Lovells LLP prepared a report for BayWa AG in relation to the contemplated acquisition of the Babcock's shares in Renerco. The report states:

For the purposes of the Transaction, BayWa has entrusted us with the performance of a limited legal due diligence under exclusion of any commercial, financial as well as insurance and tax related issues and for the identification of exclusively transaction-relevant legal risks. Transaction-relevant legal risks in the aforesaid meaning are exclusively legal risks, which are recognisable for us to our

---

[35] "Project Nova" Babcock & Brown GmbH, Vendor Due Diligence Report on the Spanish affiliated companies of Renewable Energy Concepts AG, dated 1 September 2009, C-0101, p. 5 [PDF].
[36] Ibid, p. 6 [PDF].
[37] Project Nova RENERCO, Management presentation, Munich, dated September 2009, C-0103.

21

estimation are of economic relevance for the purchase decision of BayWa.[38]

We make no statement whether the scope of the examination is sufficient for the purposes of BayWa or is satisfactory or a sufficient basis for a decision for the continuation of development of the transaction by BayWa and insofar do not assume any liability.[39]

In general terms, we have reviewed all the documentation within the VDR concerning the compliance with regulatory and environmental law. Except as further explained below, we have not detected any substantial contingency that could affect the Transaction.[40]

79.    On 8 October 2009, BayWa RE proposed the acquisition of Renerco's shares to the Management Board of BayWa AG. At the time, it reported that "[i]n the course of due diligence, no issues were identified that would preclude the potential purchase of the Nova Group".[41] Its business model was considered of "low to medium" risk based on two considerations: "Readily foreseeable and uniform business performance based on fixed feed-in fees [and] Feed-in fees for existing projects guaranteed for 20 years."[42] The presentation points to a "[c]hange in the legal environment (e.g. feed-in fee for future projects)" as one of the "[s]pecific project risks".[43] Profitability was assessed in "about > 7% to 9% for equity capital".[44] On 3 November 2009, BayWa AG approved the acquisition of 87.8% of Renerco for EUR 50 million.

80.    On 1 April 2011, Renerco – already under BayWa's control – considered the acquisition of a controlling stake in the Wind Farms. An internal document remarked at the time that "[t]he regulatory framework for renewable energies in Spain [had] experienced significant

---

[38] Limited Due Diligence Report (Highlights only), prepared by Lovells LLP, Draft of 6 October 2009, p. 9, R-0448.
[39] Id.
[40] Limited Due Diligence Report (Highlights only), prepared by Lovells LLP, Draft of 6 October 2009, pp. 12 (La Carracha) and 14 (Plana de Jarreta), R-0448.
[41] Project Nova, Summary of Results, Presentation to the Management Board, dated 8 October 2009, p. 4, C-0104.
[42] Ibid, p. 6
[43] Ibid, p. 9.
[44] Ibid, p. 6.

changes in the last 12 months…[n]evertheless, as before, RENERCO does not classify the local long-term potential in the wind sector for existing installations as vulnerable."[45]

81.   On 8 September 2011, Renerco acquired Shell's stake in the Wind Farms, becoming the majority shareholder in the Projects.

### D.   THE REGULATORY FRAMEWORK AND ITS EVOLUTION

### (1)   Basic features

82.   The Spanish legal system has a hierarchical structure. The Constitution is the supreme law. Subordinate to the Constitution are laws enacted by Parliament. Royal Decree Laws are measures promulgated by the Government to cope with emergency situations which have immediate effect but require parliamentary ratification. Royal Decrees are executive acts promulgated by Ministries in the exercise of regulatory powers. They are implemented by Ministerial Orders and Resolutions. Supreme Court case law complements this normative regime.[46]

83.   As a Member of the European Union, Spain is bound by the EU treaties (notably the TFEU), EU regulations, directives and decisions. Regulations are generally self-executing and do not require implementing measures. Directives require Member States to achieve a specific result although without dictating the means to achieve such result. Decisions are binding upon the parties to which they are addressed.

84.   Other interpretative tools relied upon by the parties in respect of the application of Spanish law include preambles of legal statutes (also referred to as explanatory statements); Renewable Energy Plans and press releases issued by the Council of Ministers; financial and regulatory dossiers of impact reports on draft decrees; additional reports of and studies

---

[45] Investment Application 'Wind Farm La Muela (99MW), Spain, prepared by Renerco, dated 1 April 2011, Section 5.2 on "Risks", p. 6, C-0194.
[46] Article 1.6 of the Spanish Civil Code ("Case law shall complement the legal system by means of the doctrine repeatedly upheld by the Supreme Court in its interpretation and application of statutes, customs and general legal principles."), R-0095.

prepared by various authorities such as the Ministry of Industry, Trade and Tourism, since 2011 renamed as Ministry of Industry, Energy and Tourism (the "**Ministry of Energy**"), the Secretary of State for Energy, the National Energy Commission ("**CNE**"), since 2013 the National Markets and Competition Commission ("**CNMC**"), and the *Instituto para la Diversificación y Ahorro de la Energía* (Institute for Diversification and Saving of Energy or "**IDAE**"). Reference has also been made to presentations made by some of these authorities, particularly CNE and IDAE officers, and employees of the Spanish agency "Invest in Spain".

**(2)    State actors**

85.    The Council of Ministers is an administrative body that comprises the President, the Prime Minister and individual ministers. Among other things, the Council enacts royal decrees. The Ministry of Energy is responsible for the Government's policies on electricity and regulation of energy matters. It proposes royal decrees to the Council of Ministers and approves the Ministerial Orders that implement energy legislation. It is divided into Secretariats, one of which is the Secretariat of Energy presided over by the State Secretary of Energy. Subordinated to the Secretariat of Energy is IDAE, which contributes to the definition of the energy policy, advises on technical and economic issues and prepares national renewable energy plans. It also liaises with the industry. The President of IDAE is the State Secretary for Energy. "Invest in Spain", on the other hand, is a public agency dependent on the Ministry of Economy and Competitiveness, which promotes foreign investments in Spain. Finally, the CNE, replaced later by the CNMC, advises the Government on energy matters. It issues non-binding reports and opinions on proposed legislative measures concerning energy regulation.

**(3)    Law 54/1997**

86.    In 1997 Spain liberalized its electricity market, enacting Law 54/1997 on the Electricity Sector ("**Law 54/1997**"). The promotion of renewable energy production was one of the

objectives of the new legal framework which included specific renewable energy targets.[47] This was in line with international commitments adopted by Spain at the time (and later) to reduce greenhouse gas emissions and increase the share of renewable energy sources. These included the Kyoto Protocol and multiple EU directives. [48]

87.    Power generation activities were organized in two separate regimes: ordinary and special. The "Ordinary Regime" applied to conventional generation facilities using non-renewable energy sources. They were required to sell their electricity output in the wholesale market for electricity at market price (also known as "pool price"). The "Special Regime", by contrast, applied to qualifying electricity generators using renewable sources of energy such as wind with an installed capacity of less than 50 MW like the Claimants' Wind Farms.[49] Special Regime facilities were entitled to remuneration in the form of market price and "where applicable" a supplementary premium for the electricity delivered into the grid.[50] Remunerations for the electricity market participants were to be set against tariff rates, prices, transportation and distribution charges.[51]

---

[47] Law 54/1997, Preamble, C-0032. See also Law 54/1997, Sixteenth Transitional Provision ("So that by 2010, renewable energy sources cover at least the 12% of total energy demand in Spain, a Promotion Plan of renewable energy sources shall be established to take account of the setting of premiums.").

[48] Communication from the Commission. 'Energy for the Future: Renewable Sources of Energy', White Paper for a Community Strategy and Action Plan. COM (97)599 final, 26 November 1997, C-0031 (setting out an Action Plan to promote RES sources "directed towards the goal of achieving a 12% penetration of renewables in the Union by 2010"). See also: Directive 2001/77/EC of the European Parliament and of the Council, of 27 September 2001, on the promotion of electricity produced from renewable energy sources in the internal electricity market, RL-0015 ("all Member States [...] to set national indicative targets for the consumption of electricity produced from renewable sources" - Spain's specific indicative target was to reach 29.4% of its overall consumption coming from renewables by 2010); and Directive 2009/28/EC of the European Parliament and of the Council, of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC .Target 20-20-20, RL-0017.

[49] Law 54/1997, Article 27, C-0032.

[50] Ibid, Article 16.7.

[51] Ibid, Article 15.1. See C-0032 ("Activities for the supply of electric power shall be financially remunerated in the manner prescribed herein, with charge tolls and prices settled"); or R-0079 ("The activities involved in the supply of electric power shall be remunerated economically in the manner provided by this Act, as charged to the rates and prices paid").

88.  To qualify for either regime, enrolment in an administrative registry (known as RAIPRE for its Spanish acronym) was required.[52] Although the definition of the specific financial incentives under the Special Regime was left to implementing regulations, Law 54/1997 directed the Government to take into account factors such as voltage level, environmental contribution, energy efficiency and investment costs so as "to achieve reasonable profitability rates with reference to the cost of money on capital markets".[53] Special Regime producers were also given priority of access to distribution and transmission networks.[54]

**(4)    RD 2818/1998**

89.  On 23 December 1998, Spain adopted Royal Decree 2818/1998 ("**RD 2818/1998**"), which introduced a feed-in scheme in the form of two incentive remunerations into the general framework of Law 54/1997. This regime and its incentives applied to renewable energy facilities including wind energy installations.[55] The Wind Farms at issue in this arbitration were constructed and commissioned under this royal decree. Key features of it include:

(i)    Owners of registered installations could choose between selling their electricity to distributors in exchange for a feed-in tariff for each kWh produced (Article 28.3), or on the wholesale market and receive a feed-in premium on top of the market price (Articles 23, 28 and 28.3);[56]

---

[52] Articles 21.4 and 31, Law 54/1997, R-0079.

[53] "The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases:[...] To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account [...]" Article 30.4 of Law 54/1997, R-0079.

[54] Article 30.2, Law 54/1997, R-0079.

[55] Article 2.1.b of RD 2818/1998 included under "Group b.2." those installations "that only use wind power as their primary energy source." C-0026.

[56] Article 23 provided that owners of installations under 50 MW, with final registration in the RAIPRE, were "not required to submit offers to the wholesale market" and were entitled to "sell their surplus or, if applicable, their electrical production, to distributors at the final average market price for electric power, plus any premiums or

(ii)   Premiums and tariffs were to be updated each year by the Ministry of Energy considering the evolution of an index, i.e. the average electricity market price (Article 28.2);

(iii)  Premiums would be revised every four years considering the evolution of electricity market price, the installations' demand coverage and the effect on the management of the Electricity System as a whole (Article 32);

(iv)   No time limit was set for the application of premiums or tariffs;[57]

(v)    A transitional period was established for existing facilities to join the new regime (first transitory provision).

90.   In addition, RD 2818/1998 provided for a supplement or penalty, depending on the circumstances, for reactive energy ("**Supplement for Reactive Energy**"). This is a bonus (or discount) applied to revenue from the sale of energy for maintaining (or failing to maintain) certain power factors on an hourly basis, which are required for the proper functioning of the electricity system. This supplement/penalty applied under RD 2818/1998 and subsequent royal decrees irrespective of the selected remuneration scheme.

91.   In accordance with the sixteenth transitory provision of Law 54/1997, the Spanish Government approved in December 1999 a *Plan de Fomento de las Energías Renovables en España 2000-2010* ("**2000 Renewable Energy Plan**"). This Plan laid out the Government's policy to attain the renewable energy target of 12% by year 2010, as set by

---

incentives based on the amounts indicated in this chapter." Article 28 established the premiums for each Group, establishing a premium of 5.26 pesetas/kWh for wind installations under 50 MW, included in Group b.2. Article 28.3 provided that wind installations in Group b.2 could choose "not to apply the premiums [...] and to apply a total price at all hours of [...] 11.02 pesetas/kWh." RD 2818/1998 introduced a basic feed-in system that guaranteed wind installations under 50 MW a FiP of 5.26 pesetas/kWh and a FiT of 11.02 pesetas/kWh with "no time limit".

[57] Preamble, Royal Decree 2818/1998, C-0026 ("For facilities based on renewable energies and recycling waste, the incentive established herein has no time limit due to the need to internalize their environmental benefits, and because, given their special characteristics and level of technology, their higher costs make it impossible for them to compete in a free market").

the European Union.[58] As far as wind energy is concerned, no change was considered necessary, on the basis that their "economic profitability is assured by merely maintaining the current policy on premiums for electricity production".[59]

92.    The Plan makes reference to a "[s]tandard project profitability: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in current pesetas and for each standard project, at a minimum of 7%, with own capital, before financing and after tax".[60] Reference is also made to a projected annual increase of the electricity demand of around 2%, a lifetime of wind power facilities like the Claimants' Wind Farms of 20 years and an estimate of 2,400 of operating hours a year.[61] The Plan explains the methodology used as follows:

> Taking as a baseline the proposed energy targets, the financing requirements have been determined for each technology according to its profitability, defining a range of standard projects for the calculation model. These standard projects have been characterised by technical parameters relating to their size, equivalent operating hours, unit costs, periods of implementation, lifespan, operating and maintenance costs and sale prices per final unit of energy. Similarly, some financing assumptions have been applied, as well as a series of measures or financial aid.[62]

| 28 July 2003 - Renerco is formed (BayWa not yet a shareholder) |
| --- |

---

[58] "So that by 2010, renewable energy sources cover at least the 12% of total energy demand in Spain, a Promotion Plan of renewable energy sources shall be established to take account of the setting of premiums." C-0032. See also R-0079 ("In order for renewable energy sources to cover at least 12% of Spain's total energy demand by the year 2010, a plan shall be drawn up to promote renewable energies and whose objectives shall be taken into account in the setting of premiums.")

[59] R-0292, [ENG is not paginated -PDF, p. 13].

[60] Ibid, [ENG is not paginated – PDF, p. 12].

[61] Ibid, [ENG is not paginated – PDF, pp. 6 and 15] ("final energy consumption in the Baseline Scenario grows at an average annual rate of 2%"), ("Lifespan: 20 years" and "Equivalent operating hours: 2,400 hours/year").

[62] R-0292, Section 2, p. 180 (SPA Original) [ENG is not paginated – PDF, p. 11].

(5)     **RD 436/2004**

93.     On 1 January 2003, Spain put into effect RD 1432/2002, of 27 December. This regulation established a new methodology to calculate the average or reference electricity tariff ("**Tarifa Eléctrica Media**" or "**TMR**"), one of the inputs to determine the remuneration of renewable energy installations. The TMR would be set by the Government annually and published in advance based on estimated costs needed to remunerate projected electricity supply and consumer demand.

94.     On 22 January 2004, the CNE issued a report on a draft that later became Royal Decree 436/2004. Among others, the report states:

> Production facilities included under the special regime hold the right to receive a determined compensation for any energy sold, but logically only hold the acquired right to receive such compensation concerning the energy already sold, but not in regard to the energy that is projected to be sold in the future, which solely constitutes an expectation.[63]

95.     In respect of project financing, the economic memorandum of RD 436/2004 prepared by the Ministry of Energy states that:

> […] in all cases, 100% of the financing is assumed to have been through equity capital. Leveraging and the percentage between equity capital and external funds are decisions specific to each project and each promoter. If made wisely, they should provide better ratios than those estimated here.[64]

96.     On 12 March 2004, Spain enacted Royal Decree 436/2004 ("**RD 436/2004**"), which adapted the Feed-in system to the new TMR methodology, thereby superseding RD 2818/1998. Its preamble states that this new regulation should serve to accomplish the objectives set out in the 2000 Renewable Energy Plan, by providing "security and stability" and establish a "long-lasting, objective and transparent regulatory framework"

---

[63] CNE Report 4/2004 of 22 January 2004 on the proposed RD 436/2004, p. 42, R-0126.
[64] Regulatory Impact Report, p. 5/10, R-0262 [English translation from Resp. Rej., para. 294].

in order to foster investment in renewable energy projects. RD 436/2004 gave wind producers the right to choose, on an annual basis, between:

(i)      a fixed tariff calculated now as a specific percentage of the TMR, defined as a single flat rate and, where applicable, a Supplement for Reactive Energy ("**Fixed Tariff**" or "**Regulated Tariff**").

(ii)     the pool price plus a premium and an incentive for participating in the market ("**Premium Option**")[65] and, where applicable, a Supplement for Reactive Energy. Premium, incentive and supplement were all calculated by reference to the TMR as a fixed percentage.

97.    Under both options producers could sell the full net amount of energy generated although the TMR's specific percentages of the fixed tariff decreased progressively after the 5th year of operation and therewith the installation's remuneration (Article 34, sub.b.2.1)[66]

98.    Under Article 40.3 of RD 436/2004, remuneration revisions would be prospective only taking into account costs, degree of implementation of each technology and the correspondent economic impact on the system. Article 40.3 reads:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the facilities that commence operations subsequent to the date of the

---

[65] Unlike the Fixed Tariff, the Pool Price plus Premium and Incentive option involved market risk because part of the remuneration came from the wholesale price of electricity. An incentive (on top of the premium) was therefore offered to account for that risk and make this option more attractive. See RD 436/2004, Preamble, C-0027, ("incentive for participation in the market as it considers that it thus achieves less administrative involvement in setting electricity prices, as well as a greater and more efficient allocation of the system's costs, especially with regard to managing deviations and the provision of supplementary services.")

[66] For onshore wind farms exceeding 5MW of installed capacity (like the Wind Farms), Fixed Tariff was established as (i) 90% of TMR for their first 5 years of operation, (ii) 85% of TMR from year 6 to year 15 of operation, and (iii) 80% of TMR from year 16 of operation onwards for the entire lifespan of the wind farm.

entry into force referred to in the section above and shall not be effective retroactively on any previous tariffs and premiums.[67]

99.    This is one of the provisions relied on by the Claimants as a purported grandparent clause. It is discussed below.

100.    Finally, installations subject to RD 2818/1998, which had already obtained final registration in the RAIPRE, were granted a transitional period during which they could choose between remaining subject to RD 2818/1998 for a limited time, or switching to RD 436/2004 immediately.[68] An alleged amendment to this and other provisions of RD 436/2004 prompted an appeal which was decided by the Spanish Supreme Court in a judgment rendered on 25 October 2006.[69]

101.    The new regulation was criticized by some renewable energy producers. In April 2004, the *Asociación de Productores de Energías Renovables* ("**APPA**") made a presentation in which it discussed RD 436/2004. Among the "negative aspects" of the new regulation, APPA pointed out to its ʿretroactivityʾ because of "[d]eadlines starting from ʿcommissioningʾ instead of after the date of entry into force of the decree."[70]

102.    Around the same time, on 24 May 2005, IDAE prepared an informative brochure called "The Sun Can Be Yours". This brochure outlined key features of the Spanish regulatory framework for *PV technology*. Reference is made to an internal rate of return ("**IRR**") between 5.5% and 13.5%, depending on the type of PV installation, although the brochure

---

[67] RD 436/2004, Art. 40.3, C-0027. R-0099's wording is not materially different.
[68] RD 436/2004, Second Transitional Provision ("[C]hoose to be fully subject to this Royal Decree, by expressly communicating it to the General Directorate of Energy Policy and Mining, subsequently requesting, where appropriate, the relevant modification of their registration according to the categories, groups and subgroups to which Article 2(1) refers. Following their final inclusion under this Royal Decree, the facilities may not return to the economic regime provided for in this Transitional Provision."), C-0027.
[69] See paragraph 112 below.
[70] Power Point Presentation "New Special Regime Decree", APPA Informational Session, 19 April 2004, Slide 25, R-0301.

points out that the return may "at times […] reach 15%".[71] Financing alternatives are also mentioned.[72]

103. On 30 September 2005, the Wind Farms elected to sell their net electricity output under the Pool Price plus Premium and Incentive option of RD 436/2004, with the option to switch on an annual basis and receive the Supplement for Reactive Energy. With respect to this Supplement, the Wind Farms remained under RD 2818/1998 until January 2007.

104. On 26 August 2005, Spain's Council of Ministers approved the *Plan de Energías Renovables en España 2005-2010* ("**2005-2010 Renewable Promotion Plan**"). The new plan reassessed the standing of renewable energies in Spain, including the costs involved in their support. No change to the remuneration regime was deemed necessary to achieve the targets set in the 2000-2010 Renewable Energy Plan for wind energy,[73] which by then had reached 91% of the capacity set for 2010 under the 2000 Renewable Energy Plan.[74] A more ambitious target for wind power was established instead.[75] Calculations were, as in the 2000 Renewable Energy Plan, predicated upon "technical-financial assumptions" for "standard projects",[76] including, as regards wind installations like the Claimants' Wind Farms, a 20-year operational life,[77] 2,350 operating hours,[78] and demand forecasts.[79] The plan was based on "[r]eturn on Project Type: calculated on the basis of maintaining an

---

[71] IDAE, The Sun can be Yours 'Answers to all the Key Questions', 24 May 2005, p. 43, C-0089. On 6 June 2007, IDAE published another brochure with the same title, in which reference is made to a return which "at times can reach 20%.", p. 4, C-0090.

[72] IDAE, The Sun can be Yours 'Answers to all the Key Questions', 24 May 2005, p. 33, C-0089.

[73] 2005-2010 Renewable Promotion Plan, pp. 60, 282-284, R-0119 (SPA Original).

[74] 2005-2010 Renewable Promotion Plan, p. 41, C-0033 (resubmitted).

[75] 2005-2010 Renewable Promotion Plan, pp. 60-64, R-0119 (SPA Original). See also KPMG First Regulatory Report, paras. 188-190, CER-0001.

[76] 2005-2010 Renewable Promotion Plan, R-0119t, Section 4.2, pp. 273-4.

[77] Ibid, p. 284.

[78] Id.

[79] 2005-2010 Renewable Promotion Plan, R-0119 (SPA Original), Section 5.4, p. 323 [translation from Resp. C-Mem., para. 437] ("… two general energy scenarios (called Trend Scenario and Efficiency Scenario) and a further three scenarios of developing renewable energies (Current, Probable and Optimistic) having chosen the Trend scenario as the reference for setting the Plan objectives, and choosing the so-called "Probable" scenario for the renewable energies scenario".)

Internal Rate of Return (IRR), measured in legal tender and for each standard project, around 7%, on equity (before any financing) and after taxes."[80] Among others, the existence of a "stable regulatory framework" was credited with the success of the regime in promoting renewable energies.[81] The plan estimated that around 77% of the investment in renewables would likely be debt-financed and refers to "project finance" as one of the financing alternatives available to investors.[82]

105.    In October 2005, a report by the *Asociación de la Industria Fotovoltaica* ("**ASIF**"), was published. Regarding the new regulation, the Report points out:

> […] [RD 436/2004] provides a reasonable return on investment for an average standard facility. This reasonable rate of return is considered [...] by the Plan for Renewable Energies, as […] an internal rate of return on the own equity invested of between 5 and 7%.[83]

106.    On 6 October 2005, the Spanish and German Governments made a joint declaration in Madrid whereby they committed to "promote renewable energies" and "improve the feed-in system in their respective countries".[84] In addition, the two Governments created the International Feed-in Cooperation, an international platform to promote feed-in systems of remuneration among other countries and to fund research projects through IDAE (for Spain) and Fraunhofer ISI (for Germany).

107.    On 15 December 2005, the Spanish Supreme Court issued a judgment concerning an appeal brought by an association of renewable energy producers against RD 436/2004 (the "**2005 Supreme Court judgment**"). Among other arguments, the association

---

[80] 2005-2010 Renewable Promotion Plan, R-0119, Section 4.2, p. 274.
[81] 2005-2010 Renewable Promotion Plan, p. 46, C-0033t (resubmitted).
[82] 2005-2010 Renewable Promotion Plan, p. 282 ("External funding: 77.1%", ENG – PDF, p. 23) and ("External financing: 77.1%", ENG – PDF, p. 46), R-0119.
[83] ASIF Report Towards environmentally-friendly electricity, October 2005, p. 9. R-0294.
[84] Joint Declaration between the Ministry for Industry, Tourism and Trade of the Kingdom of Spain and the Ministry for the Environment, Nature Conservation and Nuclear Safety of the Federal Republic of Germany on cooperation om the development and promotion of a feed-in system to increase the use of renewable energy sources in the production of electricity, Clause 1, C-0082.

contended that RD 436/2004 did not provide for an updating mechanism in respect of one of the two pricing options (i.e. the Fixed Tariff), while it set out stricter technical requirements applicable to not only new installations but also existing installations. The Supreme Court dismissed the appeal on all counts. Drawing upon an earlier judgment from July 2005, the Court did not consider updates to be mandated by Law 54/1997, but rather a procedure devised by RD 2818/1998: "[g]iven the normative rank of this Royal Decree, nothing prevents another norm of the same hierarchical rank from modifying it."[85] Regarding the additional requirements, the Supreme Court held:

> There is no legal obstacle that exists to prevent the Government, in the exercise of its regulatory powers and of the broad entitlements it has in a strongly regulated issue, such as electricity, from modifying a specific system of remuneration, provided that it remains within the framework established in the [Law 54/1997]. And even though it might be necessary on the basis of the principle of legitimate expectations to include transitory provisions for the adaptation to the new system of existing companies, in no way this demand reaches the point of respecting the previous regime without the slightest change during a more or less prolonged period.[86]

**(6)    RDL 7/2006**

108.    On 23 June 2006, the Government passed Royal Decree Law 7/2006, adopting urgent measures for the energy sector (**"RDL 7/2006"**). Among others, RDL 7/2006 suspended the remuneration's revisions for renewable energy technologies including wind power until a new remuneration scheme dissociated from the TMR was developed (second transitory provision) and called the Government to do so as soon as possible (second final

---

[85] Supreme Court Judgment of 15/12/2005, Seventh Ground, R-0137. [Tribunal's Translation]
[86] Ibid, 8th Legal Ground, R-0137. (Claimants' Translation: Reply, para. 288). (Emphasis omitted)

provision).[87] Respondent contends that RDL 7/2006 was enacted to remedy the perverse feed-back effect of the TMR ("tariffs are not to pay for a party").[88]

109.    The Preamble reads:

> The regulation in force since 2003 setting out the methodology for the approval or modification of the average or reference electricity tariff identifies a maximum annual limit for any increase to such tariff and certain costs to be included in its calculation. The experience concerning its application, especially since 2005 [...], makes it necessary to authorize the Government to modify the costs to be considered, as well as to make the limits of tariff variation and the different tariff groups more flexible. And this with the urgency determined by the tariff revision scheduled for July 1, 2006, as the deadline.[89]

---

| 30 June 2006, the Wind Projects are refinanced (BayWa not yet a shareholder) |
| --- |

---

110.    In response to this new regulation, the main associations of the renewables sector, led by APPA, the *Asociación Empresarial Eólica* (Spanish Wind Energy Association or "**AEE**") and **ASIF**, addressed a joint letter to the Minister of Energy dated 26 July 2006. The letter reads:

> "[these] business associations can only state their rejection, their most profound discontent and their most serious concern about how

---

[87] Transitional provision two: "Until the provisions set forth in sections one to twelve of Article 1 are implemented through regulations, in accordance with the provisions set forth in final provision two of this Royal Decree-Act: 2. The revision of the mid tariff made by the government will not be applicable to the prices, premiums, incentives and tariffs that form a part of the remuneration for electric power production under the special regime*".* R-0087. [Tribunal's Translation]

[88] See Minister's statement in the Senate: Resp. C-Mem., para. 430, Res. Rej., para. 695. Claimants deny this and argue that this RDL enabled the government actually to increase tariffs: Cl. Reply, para. 80.

[89] RDL 7/2006, R-0087 [Tribunal's Translation]. The Spanish original reads: la regulación vigente desde 2003 de la metodología para la aprobación o modificación de la tarifa eléctrica media o de referencia, establece un límite máximo anual al incremento de dicha tarifa y determinados costes a incluir en su cálculo. La experiencia de su aplicación, especialmente desde 2005 [...], hace necesaria una habilitación al Gobierno que permita modificar los costes a considerar, así como flexibilizar los límites de variación tarifaria y de los diferentes grupos tarifarios. Y ello con la urgencia determinada por la revisión tarifaria prevista para el 1 de julio de 2006, como fecha límite.

and why the process is being carried out. […] RD-L 7/2006 substantially breaches the regulation of renewable energies established in the Energy Sector Act […]".[90]

111.    In a note published shortly after, APPA criticized the new regulation:

> Royal Decree-Act 7/2006 was approved last June, which contains a frontal assault on the national policy for the promotion of renewables: it eliminates the 80-90% bracket and the mechanisms of remuneration stability [of Royal Decree 436/2004], without also considering the established guarantees and time periods. The standard, which changes the game rules mid-game, introduces retroactivity and very seriously damages the legitimate expectations of investors. […] Royal Decree-Act 7/2006 has been published like in old times: at night and with aforethought: without prior consultations of the agents involved and, contrary to what has been repeatedly stated, the rules of the game have been changed in the middle of the match. Acquired rights have been modified retroactively.[91]

112.    On 25 October 2006, the Spanish Supreme Court issued another judgment concerning an amendment to RD 436/2004 which had been brought about by a subsequent decree, not at issue in this arbitration, namely Royal Decree 2351/2004 (the "**2006 Supreme Court judgment**").[92] According to the plaintiff, RD 2351/2004 "changed the system for calculating the premiums [...] under the special regime", first, by setting up a new methodology for updating such premiums in the future and, secondly, by raising from 10 to 15 MW the minimum capacity requirement set forth in RD 436/2004 to qualify for the full premium. Among other arguments, the plaintiff invoked the principle of legitimate expectations under Spanish law; it claimed to have invested in reliance of certain legal conditions remaining stable. The Supreme Court dismissed the appeal:

---

[90] "*Decretazo energético*", APPA Info Journal No. 22, May-July 2006. R-0191 (SPA Original) [Tribunal's Translation].

[91] "Dead-of-Night Energy Decree", APPA Journal No. 22, May-July 2006, R-0191 [translation from Resp. C-Mem., paras. 429 and 427].

[92] Supreme Court judgment of 25 October 2006, R-0138. See also Supreme Court judgment of 20 March 2007, R-0139 (SPA Original).

Until it is replaced by another, the above outlined legal regulation (Article 30 of the Electricity Law) allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining 'reasonable rates of return with reference the cost of money in the capital market' [...]. However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.[93]

113.    On 26 October 2006, the Minister of Energy appeared before the Senate. He stated in relation to renewable energy:

[…] It is important for all operators to receive this message and to be aware that our road map entails adapting to this framework as quickly as possible, which involves generating more market that we hope will be efficient, because it is not always so, and obviously, the tariffs are not going to pay for anyone's party. Tariffs by law can only take into account energy costs, and shareholder ventures are not energy costs.[94]

114.    On 8 November 2006, the Secretary of Energy also appeared before the Parliament. He stated:

[...] The regulation of wind power in 2004 was rather unfortunate. In 2004, the current Royal Decree, 436, established premiums based on market price expectations. […] What has happened? That the price of market now is of 55 or of 60 and the wind power has a total remuneration of almost 100 Euros/MW-hour. This remuneration has an IRR of around 20 percent. I believe in renewable energies as much as anyone, but I also believe that we have to do things reasonably. Technologies, that is my opinion, whose investment is guaranteed through a premium […] they cannot have returns of 20 per cent; nobody has those. Some speculators do have them. We must be reasonable [...][95]

---

[93] Supreme Court judgment of 25 October 2006, third ground, R-0138.
[94] Appearance of the Minister for Energy before the Industry, Tourism and Trade Commission of the Spanish Senate, 26 October 2006, R-0293.
[95] Appearance of the Secretary General of Energy before the Spanish Parliament, R-0302.

(7)     **RD 661/2007**

115.    The initial draft of what would become RD 661/2007 was released on 28 November 2006. It did not contain explicit language protecting existing plants from quadrennial revisions. Draft article 40.3 provided:

> During 2010, in view of the results of the monitoring reports on the degree of compliance with the 2005-2010 Renewable Energies Plan (PER), and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan for the period 2011-2020, there will be a revision of the tariffs, premiums, supplements and lower and upper limits defined in this royal decree, application which shall start from January 2011, considering the costs associated with each of these technologies, the degree of participation of the Special Regime in covering the demand and its impact upon the technical and economic management of the system. Every four years, a new revision shall be performed.[96]

116.    The final version added a paragraph stating:

> The revisions of the regulated tariff and the upper and lower limits indicated in this section shall not affect facilities for which the commissioning certificate had been granted prior to January 1 of the second year following the year in which the revision had been performed.

117.    On 19 January 2007, AEE published a note in which it criticized this draft:

> […] the proposal is puzzling as it even advocates amending [the predefined remuneration] for facilities already in operation and for investments in progress, while removing the right to receive the remuneration established, recognised by the current regulation, which would seriously affect the legal certainty and legitimate expectations that were generated based on the sustainability that this regulation guarantees.[97]

---

[96] November 2006 Draft RD 661/2007, p. 24, C-0095 (SPA Original). [Tribunal's Translation]
[97] Article from *La Gaceta*. Shadows of a contradiction AEE, 19 January 2007, R-0364.

118.    On 14 February 2007, the CNE issued a report on this draft ("**CNE Report 3/2007**"). It noted that economic incentives are an essential regulatory instrument to reach the renewable energy targets set by the Government. It also highlighted the importance of legal stability for investors and financers, and suggested that any future revisions to the incentive's regime should be predefined as in RD 436/2004 and must not affect existing facilities.[98] It pointed out at the same time:

> As stated by both scientific and jurisprudence doctrine [...] these principles [of legal certainty and legitimate expectation] do not prevent the dynamic innovation of the same, or new regulatory provisions from being applied in the future to situations that commenced prior to their entry into force, but which continue following the entry into force of the new rules.[99]

119.    The preliminary version of this Report refers specifically to the Supreme Court Judgment of 25 October 2006 and reproduces a large portion of it. The CNE characterized it as "very illustrative" in relation to the legality under Spanish law of regulatory changes.[100]

120.    On 19 March 2007, the Government presented a new draft royal decree for consultation.[101]

121.    On 20 March 2007, the Spanish Supreme Court issued another judgment concerning an amendment to the transitory regime established in RD 436/2004 with regard to the methodology for updating premiums ("**March 2007 Supreme Court judgment**").[102] This measure had been challenged and ruled upon in the 2006 Supreme Court judgment. The plaintiff claimed, among others, that the amendment reduced by 22.6% the premium value in force the year before, undermining their legitimate expectations under Spanish law in view of the fact that they had invested in reliance of this and other legal conditions

---

[98] CNE Report 3/2007, pp. 16, 23 and 24, R-0128.
[99] R-0128, p. 18 [translation from Resp. Rej., para. 168]. (Emphasis omitted)
[100] See the CNE draft report of 25 January 2007, attached by the Respondent to R-0128, pp. 130 ff, specifically, p. 21 [PDF, p. 153] [only in Spanish]. See also Resp. C-Mem., para. 485; Resp. Rej., paras. 384-385, 605-607.
[101] Proposal of Royal Decree, regulating the activity of electricity production under the Special Regime, and specific installations of analogous technologies, of 19 March 2007, R-0434.
[102] Supreme Court judgment of 20 March 2007, R-0139 (SPA Original).

remaining stable. The Supreme Court did not agree and rejected the appeal, quoting extensively from its 2006 judgment.

122. On 21 March 2007, the Ministry of Energy prepared a report on the proposed new regulation, which the Claimants contend is an internal document which was only released during document production.[103] According to the Report:

> The regulated tariff has been calculated to guarantee a return between 7% and 8%, depending on the technology. Premiums have been calculated according to the same criteria established in Royal Decree 436/2004, that is, the premium has been calculated as the difference between the regulated tariff and the average market price considered for these technologies. […]
>
> With the remuneration provided, the return would be 7% for the regulated tariff option, and between 5% and 9% for the market sale option.[104]

123. The draft RD 661/2007 was criticized by APPA. In its comments (*alegaciones*) on the draft RD 661/2007 APPA contended that the new regulation "breach[ed] the principle[s] of legal certainty and legitimate expectations: changing the economic regime retroactively" in respect of installations which had entered into operation under RD 436/2004, in circumstances where, in their view, Article 40.3 only contemplated quadrennial revisions while ruling out any other adjustment to remunerations. It also complained about the Government's use of subsequent decrees to change remuneration's regimes through the back door, circumventing Article 40.3 of RD 436/2004. It further stated that, should the Government go ahead with the proposed regulation, it will…

> no longer be credible: any rational investor, when planning facilities of this type, must bear in mind not only the costs and the foreseeable

---

[103] Cl. Reply, para. 515.
[104] MITYC Report dated March 21, 2007 (legal and economic assessment of draft RD 661/2007), Section 1 (Introduction) Sections 3 and 3.2.3, C-0394.

remuneration, but it also must consider the risk that such remuneration could be lowered [in the future].[105]

124.    On 9 May 2007, AEE issued a press release criticizing the draft:

> For AEE, today the important thing is to ensure the door is not left open to changes in remuneration parameters at the halfway point, as is the case with the current wording of the decree. The "stable" nature of the twenty-year period proposed by the new Royal Decree for the allocation of remuneration is fictional if the premium amendments are retroactive as is contradictorily regulated now.[106]

125.    On 25 May 2007, Spain enacted Royal Decree 661/2007 ("**RD 661/2007**"). The new regulation:

(i)     set premium and tariff rates in numerical terms (EUR/kWh), pegged to the consumer price index ("**CPI**"); incentives were therefore permanently delinked from the TMR (including for purposes of revisions which had been suspended by RDL 7/2006) (Article 44);[107]

(ii)    kept the supplement (or, where applicable, penalty) for reactive energy and the right to sell the full net amount of electricity (Article 17.b);

(iii)   set lower and upper limits to the remuneration of qualifying facilities (other than PV installations) under the market-price-plus-premium option tied to the variation of the price electricity in the market ("**Caps**" and "**Floors**") (Articles 27 and 36);

---

[105] Submissions from APPA of 3 April 2007 to the Draft RD 661/2007, pp. 1, 6, R-0304. See also Eólica 2007, Yearbook of the Spanish Wind Power Association, p. 35, R-0184; AEE, Press release on RD 661/2007, 9 May 2007, R-0365.

[106] AEE Press release on RD 661/2007 of 9 May 2007, R-0365.

[107] "In view of the behaviour of the prices in the market, where certain variables which were not considered in the cited compensation system for the special regime have, over recent times, acquired greater importance, the economic circumstances established by Royal Decree 436/2004, of 12 March, make it necessary to modify the compensation system and *de-link it from the Mean Electricity Tariff, or Reference Tariff*, which has been used to date." RD 661/2007, Preamble, R-0101 (Emphasis added).

(iv)    stated that fixed tariffs and premiums would be available "[f]or the first 20 years" of operation of wind installations. "Thereafter", premiums would drop to zero but the fixed tariff option would still be available under a reduced value subject to no specific time limit (Article 36, sub.b.2.1).[108]

126.    A transitory provision, which the Claimants contend (by reference to the witness statement of Mr. Ceña[109]) was agreed upon between AEE and the Government along with caps and floors, was included in RD 661/2007. This provision granted existing wind farms (i.e., those commissioned before 1 January 2008, like the Claimants' Wind Farms) the possibility to opt among three alternative remuneration schemes:

(i)    Keep the Fixed Tariff of RD 436/2004 and continue to receive this form of remuneration during all the wind farm's remaining operational life;

(ii)    Receive the feed-in remuneration values set in RD 661/2007;

(iii)    Opt before 1 January 2009 for a transitional period of approximately 5 years (i.e., until 31 December 2012), during which wind farms would be remunerated under the previous Premium option available under RD 436/2004. Once this transitional period ended (i.e., from 1 January 2013), feed-in remuneration values and the option to choose between the Regulated Tariff and Premium options of RD 661/2007 would apply for existing wind farms, although without TMR revisions which, as the Respondent states, were eliminated permanently by RDL 7/2006.[110]

127.    The Wind Farms selected the third option and were remunerated under the Premium option of RD 436/2004 until 31 December 2012.[111] Thereafter, they would no longer

---

[108] RD 661/2007, Article 36, subgroup b.2.1, R-0101 and C-0028 (Spanish original reads "*primeros 20 años*" and "*a partir de entonces*").

[109] Cl. Mem., paras. 249-254.

[110] RD 661/2007, First transitory provision, R-0101.

[111] Cl. Mem., para. 254. See also See CWS-MT, para. 64; CWS-ES, para. 28; and e-mails dated 18 and 20 June 2008, C-0305.

benefit from the premium updates set out in RD 436/2004 because that option was removed by RDL 7/2006. Respondent argues that RD 661/2007 was therefore publicly criticized by RE producers.[112]  Claimants contend that these criticisms were directed at the previous draft of RD 661/2007, not the one approved, which was balanced.[113] Virtually all wind installations opted for the transitory premium option under RD 436/2004.[114] By contrast, RD 661/2007 eliminated the right to choose between fixed tariff and pool plus premium for *PV* installations over 100 kW with no transitional period, on which basis it was challenged by a PV investor. The Spanish Supreme Court ruled upon this challenge in a judgment issued on 3 December 2009 referred to below.[115]

128.    Like RD 436/2004, the revisions set out in RD 661/2007 Art. 44.3 were to be prospective only. They would not affect existing plants already registered in the Special Regime:

> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[116]

129.    RD 661/2007 also established installed capacity targets per technology by reference to the 2005-2010 Renewable Energy Plan.[117] Once 85% of a technology target was reached, a period of no less than 12 months would be established by the Secretariat of Energy for all existing projects using that technology (under development and/or construction) to be finished so that they could benefit from the economic regime of RD 661/2007. Facilities included in the RAIPRE after this period would not be entitled to the remuneration scheme. PV installations reached the 85% target and therefore the Government enacted a

---

[112] AEE press release of 10 January 2008, R-0163; APPA submissions before the Council of State concerning the Draft RD 661/2007, April 2007, R-0304.
[113] Cl. Reply, para. 166.
[114] Cl. Mem., para. 248, fn. 182.
[115] See paragraph 148 below.
[116] RD 661/2007, Article 44.3, second paragraph, R-0101.
[117] Ibid, see Preamble.

new regulation applicable to PV facilities registered thereafter. This was RD 1578/2008, which is discussed below.[118]

130.   The same day, 25 May 2007, the Government issued a press release, which is one of the press releases relied on by Claimants to support its legitimate expectations and umbrella clause claims.[119] The press release reads:

> The Government assigns priority to profitability and stability in the new Royal Decree on renewable energy and cogeneration.
>
> The purpose of this Royal Decree is to improve the remuneration of those less mature technologies, such as biomass and thermosolar, so as to be able to meet the objectives of the 2005-2010 Renewable Energies Plan […].
>
> The new regulation guarantees a return of 7% for wind and hydraulic installations opting to cede their output to distributors, and between 5% and 9% if they participate in the electric energy generation market […].
>
> […] The government's commitment to these energy technologies has been the reason why in the new regulation stability in time is sought allowing business owners to plan in the medium and long term, as well as a sufficient and reasonable return which, like the stability, makes the investment and engagement in this activity attractive .
>
> Any revisions of tariffs to be carried out in the future will not affect the facilities already in operation. This guarantee provides legal certainty for the producer, providing stability for the sector and promoting its development.[120]

---

[118] See paragraph 138 below.
[119] See paragraphs 436 and 453 below.
[120] Official Press Release of the Ministry of Energy of 25 May 2007, pp.1, 2, C-0094.

44

131.    On 4 July 2007, the Spanish Government enacted Law 17/2007. This regulation amended Article 18.1 of Law 54/1997 to read: "tariffs of last resort will be established in such a way that the calculation thereof will respect the principle of sufficient revenue and not cause any distortion to competition."[121] This is one of the provisions relied upon by Respondent to support the existence of a principle of sustainability and/or self-sufficiency of the electricity system. It also updated transitional provision sixteenth of Law 54/1997 to reflect the new 20% renewable energy target set by the European Union.[122]

132.    In July 2007, Pöyry issued a report on the Spanish renewable energy market, focusing on wind energy. It noted that:

> The Spanish Government has been historically concerned with the increases on the regulated tariff as they affect Spanish inflation and competitiveness. The average reference tariff (TMR – *tarifa media de referencia*) was one of the key components to a wind farm's remuneration, representing around 50% of the revenues for wind farms on the Market Option or almost all of its revenue on the Fixed Tariff Option under RD 436. Hence higher average tariffs were beneficial for wind generators.

> However, owing to the tariff deficit, and windfall profits for wind farms during 2005 and 2006, the Spanish government has reviewed the legal framework for the Special Regime (co-gen and renewables).

> Wind generators received (under RD 436) a payment linked to the TMR. However, this had an unfortunate side effect of a feedback (as outlined in Pöyry's wind reports from 2004). In essence, this meant higher system costs as a result of wind farms led to higher TMRs, which in turn raised remuneration to wind farms, leading to higher system costs and higher TMRs etc.

---

[121] Law 17/2007, of 4 July 2007, amending Law 54/1997, C-0501. See also R-0272.

[122] Law 17/2007 amended the content of Transitional Provision Sixteen of Law 54/1997 and relocated it in Additional Provision Twenty-five, which reads: "The government will modify the Plan for the Promotion of Renewable Energies to adapt it to the objectives of 20% by 2020 that it has established with respect to the European Union, therefore maintaining the commitment that this plan established, which was 12% for 2010. These objectives will be taken into account when establishing the premiums for this type of facility". R-0079. [Translation from Resp. C-Mem., fn. 126].

Given the likelihood of ongoing tariff deficits in the future the government decided to de-link remuneration from the TMR permanently. Since the introduction of RD 7/2006 on June 2006, wind generators have collected the 50% (40% as premium and 10% as incentive) of the January 2006 TMR, which is €76.588/MWh.

[…] As tends to be the case in Spain, the resulting legislation, RD 661/2007, is a negotiated compromise which is seen as positive by most of the industry, although key members of the major Spanish wind association (AEE) have not been too complimentary of the changes contained within it.[123]

133.    Also in 2007, ASIF published an article in which it discussed RD 661/2007. After noting that the regulation seeks to provide a reasonable return to investors, the article states:

[...] but, what is a reasonable rate of return for an investment in renewable energy, specifically in photovoltaic energy? […] It is considered quite reasonable for an investment payback period to be around ten years, and an internal rate of return on a project (without financial leverage) around 7%, which is in line with other regulated investments. […][124]

134.    On 9 October 2007, the Supreme Court issued a decision on another amendment to RD 436/2004 ("**October 2007 Supreme Court judgment**").[125] The amendment provided that gas cogeneration facilities with installed capacity above 50 MW may (or may not) receive a premium to be determined by the Government. The plaintiffs claimed that leaving the matter to the Government's discretion was in breach of EU Directives, Law 54/1997 and general principles of law. The Supreme Court rejected the claim. In the Court's opinion, EU law affords Member States significant discretion in designing the specific incentives that they wish to use to promote gas cogeneration facilities, which must, however, be

---

[123] ILEX-Pöyry Report Current and Future State of Wind Energy in Spain and Portugal 2007, p. 81, R-0411.
[124] See Javier Anta Fernández (ASIF), "*Visión desde la Asociación de la Industria Solar Fotovoltaica*", published in Informe "*Energía solar: Estado actual y perspectiva inmediata*", edited by the Universidad Pontifica de Comillas, 2007, p. 197, R-0416.
[125] Supreme Court Judgment of 9 October 2007, R-0140.

balanced against the restrictions imposed by EU rules of state aid.[126] Gas cogeneration facilities with an installed capacity above 50 MW are not included in the Special Regime and do not therefore have a right to the system of premiums established in Article 30.4.[127] There is no impediment for a royal decree to be amended by another under the principle of hierarchy of norms.[128] Drawing upon the October 2006 and March 2007 Supreme Court judgments, the Court held that renewable energy producers do not have an intangible right to the premium's regime, nor a vested right to such premiums but a mere expectation.[129]

135.    In the same year, AEE criticized RD 661/2007 in its industry yearbook:

> From a regulatory perspective, the new R.D. 661/2007 strays from the path marked by the regulator and not only revises remuneration by reducing the premium, but also basically modifies the mechanisms involved in its allocation and repeals all aspects of the above-mentioned R.D. 436/2004, regulating on the very same issues just two years after its approval […]. On the other hand, the new decree removes the incentive to participate in the electricity market and annuls the non-retroactivity of this revision and of future revisions concerning premiums and remuneration supplements, thereby applying it universally to all installations regardless of when they are commissioned. The proposal also entails a high level of uncertainty with regard to the indices for the annual updating of all parameters. […] The measure clearly contradicts the allocation of these values over a 20-year period, rendering the concept of durability completely fictitious, insofar as subsequent changes to these values have also been planned that, as a result, would be applied retroactively.[130]

136.    Between 2007 and 2008, *Invest in Spain*, a State-owned entity, carried out a series of presentations in foreign countries (including Germany) about "opportunities in Renewable Energy in Spain". These presentations point to Spain as the "most attractive country in the

---

[126] Ibid, second ground, R-0140 (SPA Original).
[127] Ibid, third ground.
[128] Ibid, fourth ground.
[129] Ibid, fifth ground.
[130] 2007 AEE Industry Yearbook, Analysis and Data, R-0184, pp. 33 and 35.

world for investment projects in renewable energies";[131] offering "one of the most attractive combinations of incentives, low costs, political stability and economic transparency";[132] and "one of the top five countries in terms of newly installed wind capacity".[133] Reference is also made to the "the "Renewable Energy Plan – PER 2005-2010" and to the "premium system guaranteed" under RD 661/2007.[134]

137.    On 10 January 2008, AEE issued a press note assessing the impact of the RD 661/2007 in respect of wind facilities. It states:

> the remuneration of wind energy fell in 2007 to the levels of 2003 and 2004. In the seven months during which the new RD 661/2007 has been in effect, the premium has been lower than that of RD 436/2004 by 5.07 E/MWh. All the wind farms have remained under RD 436/2004 with an average remuneration of €77.62/MWh throughout 2007, given that if they had changed to RD 661/2007, it would have been €74.11/MWh.[135]

### (8)    RD 1578/2008

138.    On 26 September 2008, Royal Decree 1578/2008 ("**RD 1578/2008**") put in place a new remuneration regime applicable to PV installations that were not registered by the deadline provided by RD 661/2007. The new regime offered lower remunerations and created a pre-allocation remuneration register (*Registro de Preasignacion de Retribución*) which, among others, gave the Government the power to scale entry into operation of new installations. RDL 6/2009 (discussed below) did something similar with respect to other renewable energy technologies including wind power.[136] The Preamble states:

---

[131] Presentation "*Opportunities in Renewable Energy in Spain*", 15 November 2007, at Slide 4, C-0091; and presentation "*Opportunities in Renewable Energy in Spain*", November 2008, at Slide 4, C-0092.
[132] Presentation "*Opportunities in Renewable Energy in Spain*", 15 November 2007, at Slide 40, C-0091.
[133] Presentation "*Opportunities in Renewable Energy in Spain*", November 2008, at Slide 6, C-0092.
[134] Presentation "*Opportunities in Renewable Energy in Spain*", November 2008, at Slides 20 and 21, C-0092.
[135] "In 2007 wind energy remuneration fell to levels of 2003 and 2004" AEE press release, 10 January 2008, R-0163 [English translation from Resp. Rej., para. 360].
[136] See paragraph 144 below.

The growth of installed capacity experienced by photovoltaic solar technology has been much greater than expected. [...] Just as insufficient compensation would make the investments nonviable, excessive compensation could have significant repercussions on the costs of the electric power system and create disincentives for investing in research and development [...]. Therefore, it is felt that it is necessary to rationalize compensation and, therefore, the royal decree that is approved should modify the economic regime downward, following the expected evolution of the technology, with a long-term perspective.[137]

139. On 16 October 2008, the Secretary of Energy appeared before the Senate and stated:

[…] The tariff deficit generated for the first time in the year 2000 is becoming increasingly large and, therefore, more unsustainable. Its elimination is one of the major challenges that we propose to resolve during the term. [...] We want to obtain investments that create wealth, not those that just absorb consumer resources. [...] we must be aware of the financial sustainability of the cost of energy […].[138]

140. On 29 October 2008, Mr. Fernando Martí Scharfhausen, Vice President of CNE, made a power point presentation entitled "The Legal and Regulatory Framework of Renewable Energies". Reference was made to:

b. Regulatory stability. Predictability and certainty of economic incentives over the lifetime of the facility (encourage investors and lower financial costs): non-retroactivity.[139]

141. During 2009, Spanish Government officials participated in events overseas where they highlighted Spain's regulatory framework for renewable energies. For instance, Mr. Sebastián stated at the International Renewable Energy Agency Conference in Bonn:

---

[137] RD 1578/2008, Preamble, R-0102.

[138] Energy Secretary General before the Spanish Senate on 16 October 2008 (PDF, p. 1), R-0332.

[139] F. Martí Scharfhausen, "The Legal and Regulatory Framework of Renewable Energies", 29 October 2008, (PDF, p. 3), C-0415 (Emphasis omitted). See also F. Martí Scharfhausen, "Renewable Energy Regulation in Spain," February 2010, slide 29, C-0418. The presentation stresses the importance of the "security and predictability of the economic supports" in order to eliminate "regulatory risk (warranty by law)" and reduce uncertainty to "investors (and Banks)".

Spain has made a clear commitment to attain the maximum contribution of renewable energies to our energy system. As a result of this commitment, Spain is among the world leaders regarding installed capacity in technologies such as wind, photovoltaic, solar thermal, and biofuels. Renewable facilities amount to 34 GB out of a total 91 GB installed capacity, generating around 20% of our total output. Our wind sector is especially remarkable. Wind contribution to our power generation already exceeds 10%. […]

In our experience, one of the key factors to this success is the design of an adequate regulatory framework that grants the long-term stability required to undertake the necessary investments.[140]

142. On 9 and 13 February 2009, CNE officials Messrs. Carlos Solé and Luis Jesús Sánchez de Tembleque made a presentation entitled "Economic Study of Renewable Energies", where they analysed the economic profitability of renewables.[141] The presentation states that "[a]llowing a remuneration to investments with a profitability higher than the WACC implies that the business will be able to develop the project with profitability."[142] They also discussed the financing of renewable projects through "project finance", mentioning a "financial leverage between 55% and 90% of the investment."[143]

**(9)    RDL 6/2009**

143. Royal Decree Law 6/2009 of 30 April 2009 adopted new measures in the energy sector ("**RDL 6/2009**"). Its preamble reads:

The growing tariff deficit (that is, the difference between the amounts collected from the regulated tariffs established by the

---

[140] Dr. Miguel Sebastián Gascón, Minister of Energy, video of the speech at IRENA conference, Bonn, 26 January 2009, C-0416. Reference can also be made in this regard to the speech by Dr. Miguel Sebastián in Denver, CO,  in October 2009: "An important factor has been Spain's early adoption of an appropriate energy policy, which provides producers with a guarantee that all the electricity they produce will be purchased by distribution companies at different premiums over the market price.", C-0357; and the speech of Dr. Marín in Los Angeles, CA, also in October 2009: "Feed-in-tariff mechanisms have provided a reliable and stable regulatory environment.", C-0358.

[141] C. Solé Martín & L.J. Sánchez de Tembleque, *Estudio económico de las Energías Renovables,*" Cartagena de Indias, 9-13 February 2009, C-0417.

[142] Ibid, Slide 31.

[143] Ibid, Slide 30.

Administration and the rates paid by consumers for their regulated supply, and the access tariffs that are established by the deregulated market and the real costs associated to such tariffs) is provoking serious problems that, in the context of the current international financial crisis, is seriously affecting the system and not only putting the financial situation of the companies in the electric power sector at risk, but also the sustainability of the system itself. This imbalance is unsustainable [...][144]

144.    RDL 6/2009 imposed on prospective investors additional conditions to access the Special Regime. It set up a Pre-Allocation Register akin to that put in place by RD 1578/2008 for PV installations, with stricter requirements to achieve pre-registration, and gave the Government power to scale entry into operation of pre-registered installations where the economic or technical sustainability of the SES so required (Fifth Transitory Provision). This power was exercised through the Council of Minister's Agreement of 13 November 2009, referred to below. It also prescribed that from 2013 onwards, access tolls had to be sufficient to satisfy all of the costs of the regulated activities without any *ex-ante* deficit (Article 1).[145]

145.    RDL 6/2009 was not welcomed by renewable energy producers. For example, the renewable energy association APPA commented that:

> That is how Miguel Sebastián, who has never met with or considered the sector regarding the regulatory changes, confirmed his declared commitment to meeting the European objectives. Meanwhile, in Spain he had created another obstacle for Spanish renewables. Two days later, Royal Decree-Law 6/2009 was published in the BOE, passed by the Council of Ministers on 30 April, adopting diverse measures to reduce the tariff deficit and to increase the administrative obstacles for clean energy. The measures under the RDL […] will make the sector's development even more difficult,

---

[144] RDL 6/2009, Preamble, C-0399. See also R-0088.

[145] Article 1.1 of RDL 6/2009 modified the Twenty-First Transitional Provision of Law 54/1997 and established that "as from January 1, 2013, the access tolls will cover all the costs of the regulated activities, without allowing any *ex ante* deficit to arise", C-0399.

while, as in other sectors, it suffers from funding issues arising from the crisis.[146]

146.    On 20 May 2009, APPA and Greenpeace submitted to the Ministry of Energy a proposal for a draft bill on a Renewable Energies Development Act.[147] The draft proposed economic incentives to achieve "reasonable rates of return", which were in line with feed-in regulations already in place. Calculations were based on estimated costs per type of facility and "an annual percentage rate equivalent to the previous year's average yield on 10-year Spanish government bonds, plus a spread of 300 basis points". Grandfathering provisions were included.

---

3 November 2009 - BayWa RE purchases 87.8% of Renerco

---

147.    On 13 November 2009, the Council of Ministers issued a resolution concerning renewable energy facilities subject to RDL 6/2009. The Spanish Government decided to accept in the Special Regime new capacity above the initial wind and CSP's objectives based on two technical reports that concluded that this was technically and economically feasible, although not without risks in view of the decline in the electricity demand.[148] According to the resolution, overall benefits of additional renewable installations "greatly exceed the costs and justify the support for renewable energy of the regulatory framework".[149]

---

[146] "Europe, new policy. Spain, new imposed decree". APPA Info 29 May 2009. Editorial, pp. 1-2, R-0219. See also: "The renewable energy associations condemn some of the requirements that Article 4 of RDL 6/2009 demands as being practically impossible to achieve, preventing many projects from being carried out and which will subsequently lead to an industrial standstill and job loss. A clear and disastrous example can be seen in Royal Decree 1578, which regulates activity relating to solar photovoltaic technology and has caused the sector to grind to a halt, leading to factory closures and investment relocation. The new RDL may have the same impact on other renewable technologies and even affect wind energy, the most developed." APPA, ADAP, APREAN, EolicCat, GiWatt and the Cluster of Energy of Extremadura, "RDL 6/2009, new controversial decree-law against renewables", p. 3, R-0219.
[147] Draft Bill for the Promotion of Renewable Energies by APPA and Greenpeace, 21 May 2009, R-0187.
[148] Resolution of the Spanish Council of Ministers issued on 13 November 2009, published in the Official Gazette of the Kingdom of Spain on 24 November 2009, C-0405. See also Report on the Medium-term Integration of Renewable Generation 2009-2014 prepared by *Red Eléctrica de España*, R-0407.
[149] Resolution of the Spanish Council of Ministers issued on 13 November 2009, published in the Official Gazette of the Kingdom of Spain on 24 November 2009, p. 3, C-0405.

148.    On 3 December 2009, the Supreme Court rejected a challenge to RD 661/2007 brought by owners of PV facilities ("**3 December 2009 Supreme Court judgment**").[150] The appellants sought to reverse the exclusion of PV facilities from RD 661/2007's transitional period, under which other installations including wind farms could still be remunerated pursuant to the Pool Price plus Premium and Incentive option available under the previous RD 436/2004 until December 2012, whereas PV facilities could not. Among other arguments, they contended that RD 661/2007 breached their legitimate expectations under Spanish law by "disregarding the guarantee against retroactivity set out in Article 40.3 of RD 436/2004."[151] The Supreme Court dismissed all grounds of challenge. It held that such "petrification" of the economic regime did not follow from Law 54/1997, which affords the Government a margin of discretion to set remuneration values and delimit transitional periods as appropriate. In doing so, it relied on the 2005 Supreme Court judgment.[152]

149.    On 9 December 2009, the Supreme Court issued another decision on essentially the same amendment at issue in the October 2007 Supreme Court judgment ("**9 December 2009 Supreme Court judgment**").[153] The amendment provided that gas cogeneration facilities with installed capacity above 50 MW could receive a premium subject to the Government's discretion. The appellants claimed that leaving the matter to the Government's discretion was in breach of EU Directives, Law 54/1997 and general principles of Spanish law. The Supreme Court found the amendments to conform with EU Directives and Law 54/1997, noting that gas cogeneration facilities like those of the appellants were not included in the Special Regime and did not have a right to the system of premiums established in Article 30.4. It added:

> [...] [the Claimants] [do] not pay enough attention to the case law of this Chamber [...]. This involves the considerations set out in our decision dated October 25 2006 and repeated in that issued on March 20 March 2007, inter alia, about the legal situation of the owners of

---

[150] Supreme Court Judgment of 3 December 2009, R-0141.
[151] Ibid, 4th Legal Ground, R-0141 (SPA Original). [Tribunal's Translation]
[152] See paragraph 107 above.
[153] Supreme Court Judgment of 9 December 2009, 2nd and 3rd Legal Grounds, R-0106.

electrical energy production installations under a special regime to whom it is not possible to acknowledge for the future an 'unmodifiable right' to the maintenance unchanged of the remuneration framework approved by the holder of the regulatory authority provided that the  stipulations of the [Law 54/1997] are respected in terms of the reasonable return on the investments.[154]

150.    In response to Directive 2009/28/EC, which set new renewable energy targets for Spain, the Government approved on 30 June 2010 the *Plan de Acción Nacional de Energías Renovables de España*. Calculations in this Plan are again predicated upon technical/financial assumptions for standard projects including forecasts to achieve reasonable rates of return with reference to the cost of money in the capital market. Reference was also made to "sustainability criteria", the need for "stability" and to "minimising the speculative risks posed in the past by excessive rates of return, which not only hurts consumers but it is also damaging to the industry in general".[155]

151.    On 31 December 2009, MO ITC/3519/2009 was published. This order contained the updated feed-in values applicable to wind facilities pursuant to Article 44.1 of RD 661/2007. The Claimants state that these are the values that would have applied to their facilities as of 2013 (i.e. the end of the RD 661's transitory period), including the option

---

[154] Ibid, 6th Legal Ground, R-0106.
[155] Spain's National Renewable Energy Action Plan (NREAP) 2011-2020, R-0120.

to choose between the Regulated Tariff or the Premium, had Spain not abrogated the feed-in regime in 2013:[156]

| Term | Regulated Tariff €0.01/KWh | Reference Premium €0.01/KWh | Upper Limit €0.01/KWh | Lower Limit €0.01 /KWh |
|---|---|---|---|---|
| First 20 years | 7.7471 | 3.0988 | 8.9866 | 7.5405 |
| Thereafter | 6.4746 | 0 | 0 | 0 |

Source: MO ITC/3519/2009, Annex III, sub.b.2.1[157]

152.    In February 2010, a study of the Supreme Court's case law was published on a renewable energy sector magazine. The study recounts that:

> [..] retroactivity on premiums was indeed granted and explained by the Supreme Court [...]. As we have been saying, it is nothing new, and we will now look at why: Recently, the [...] ruling of 3 December 2009, [...] based on a ruling of 15 December 2005, stated literally that: 'the appellant commercial entities have no right to the remuneration regimen of the electricity sector remaining unchanged, [...] and 'does not guarantee the perpetuation of the existing situation'; which can be modified at the discretion of the institutions and public authorities to impose new regulations taking into account the needs of the general interest. [The appeal was overturned as] the return of the activity of generation from this technology was higher than that considered as sufficient and reasonable remuneration.[158]

---

[156] Cl. Mem., para. 562. See also paragraphs 126-127 above.
[157] Translation from Cl. Mem. para. 562.
[158] Suelo Solar News, "There is a clear history of retroactivity regarding photovoltaic premiums", 16 February 2010, R-0279.

153.    In April 2010, APPA published another report on the Supreme Court's case law on renewables. The report states:

> Supreme Court case-law is conclusive: it openly and emphatically justifies retroactivity of the rules that regulate or which could regulate the economic regime of the special regime, whilst respecting the principles established in Law [...]
>
> [...] these 'reasonable rates of return' that the Supreme Court itself has fixed, based on IDAE indications, at Internal Rate of Return of 7 percent.
>
> [it is worth] fleeing from any optimism [...] a certain modification to the premiums [...] beneath that 7 percent [...] could perfectly be validated by the court [...] maintaining that the 'reasonable nature' of the rates of return in the year 2006 or 2007 may have stood at the aforementioned 7 percent, but there is no reason why this figure should be matched at the time the modification is made.[159]

### (10)    RD 1614/2010

154.    Also in April 2010, the Ministry of Energy released a set of files including one eight-page document titled "*Elementos para un acuerdo sobre la política energética*".[160] Among other measures, this document proposed:

> Adapting renewable energy remuneration mechanisms to advances in technology, ensuring facilities receive reasonable earnings in all cases and that complying with renewable share targets is compatible with sufficiency principles concerning costs and energy system efficiency. [...] Deadline: Before July 1, [2010]

155.    Several contacts and proposals followed from April to July 2010 between Government officials from the Ministry and Secretariat of Energy, and AEE representatives.[161] In these exchanges, various aspects of the proposed regulation were discussed, particularly, the

---

[159] APPA Report, of 30 April 2010. R-0276 [translation from Resp. Rej., para. 174]. (Emphasis omitted)
[160] C-0124. (Emphasis omitted)
[161] See documents cited in Cl. Mem., para. 319, fn. 252.

limitation of hours subject to premium, premium values, transitional periods and the scope of future revisions.

156.    On 2 July 2010, the Secretary of Energy sent a draft to Mr. José Donoso, AEE chairman, entitled "Agreement with the Wind Sector". It reported that the Ministry of Energy had "reached an agreement with the wind sector whereby it undertakes to promote the following actions":

> 1.    Temporary and extraordinary 35% reduction of the reference premium currently in force for wind farms subjected to Royal Decree 661/2007, applicable from the entry into force of the new Royal Decree and until 12/31/2012, notwithstanding the annual updates of the reference premium in accordance with Royal Decree 661/2007. The rules established in First Transitional Provision remain unchanged until 12/31/2012 and thereafter shall be subject to the provisions of Royal Decree 661/2007, with annual updates.

> 2.    Amendment of Art. 44.3 of Royal Decree 661/2007 stating that future revisions of the premiums should not affect existing facilities, in precisely the same manner as currently established for regulated tariffs and upper and lower limits, nor those facilities, upon approval of the review, that were already registered into the Pre-allocation Remuneration Register established by Royal Decree-Law 6/2009, of April 30.

> 3.    For those years in which the average production values of the industry as a whole exceed the provisions of PER2005-2010 (2,350 hrs), the hours of each plant exceeding 2,589 hrs (2,345 +10%) shall be remunerated at the pool price. […][162]

157.    The same day, 2 July 2010, a press release was issued whereby the Respondent announced the following:

> July 2, 2010 The Ministry of Industry, Tourism and Commerce has closed agreements with wind and thermosolar energy industry representatives, the Spanish Wind Energy Association (AEE) and

---

[162] Email from the Secretary of State for Energy to Mr. José Donoso Alonso, 2 July 2010, C-0153.

the Spanish Thermosolar Industry Association, Protermosolar, respectively, for the revision of the regulatory frameworks of electric power production from these technologies.

The agreements [with the CSP and wind sectors] include short-term measures that will reduce the impact of these technologies on the price of electricity, as well as long-term measures which will provide these technologies with stability and certainty for their future development.

The wind energy premiums established in RD 661/2007 will be reduced by 35% until January 1, 2013. […]

[...] the number of hours entitled to the remuneration above the market price is limited for wind and thermosolar plants, taking into account the different technologies and what was set out in the 2005-2010 Renewable Energies Plan for the calculation of the facilities' profitability.

This measure, which does not compromise the profitability of existing facilities will guarantee that renewable production above the one foreseen benefits consumers and does not compromise the economic sustainability of the system.

Also, this agreement strengthens the visibility and stability of the regulation of these technologies for the future, guaranteeing the current premiums and tariffs of RD 661/2007 for facilities in operation (and for those included in the pre-register) after 2013. […]

Industry will immediately begin the process which will allow the content of the agreement to be converted into a law.[163]

158.    On 9 July 2010, AEE issued a bulletin reporting on the agreement reached with the Government.[164] The bulletin noted:

The Spanish Association of Wind Power Businesses [...], in representation of the wind power sector, has finally reached an

---

[163] Press release issued by the Ministry of Energy on 2 July 2010, C-0152.
[164] AEE's Weekly Internal Bulletin, 9 July 2010, pp. 1-2, C-0155.

agreement with the Spanish Ministry of Industry, Commerce and Tourism (MICyT) under which there will be a temporary reduction in the remuneration for operating installations in exchange for greater regulatory stability.[165]

159.    On 13 July 2010, a legal opinion about case law on renewables was published in a Spanish law review. The opinion stated:

> As has been explained, we understand that a modification of the tariffs established in RD 1578/2008 (ACT 13234/2008) applicable to authorised facilities that are operational prior to such amendment, could be interpreted by the courts as "foreseeable" and in no case diminishing the principle of legitimate expectations.[166]

160.    A first draft of what became RD 1614/2010, dated 14 July 2010, was disclosed to AEE on 15 July 2010.[167] AEE suggested specific changes to this draft by a communication sent on 20 July.[168] A new draft followed on 30 July 2010, which was circulated for observations along with a first explanatory report (*Memoria*) of the same date.[169]

161.    On 30 August 2010, AEE made formal observations (*alegaciones*) to this new draft. They stated:

> The proposed modification of the remuneration regime of the reactive energy, if approved, would have a level of retroactivity such that, according to the Jurisprudence of the Constitutional Court, it may be considered of a "minimum degree" as it only has an impact on the economic effects that in a future would be produced although

---

[165] Id. (Emphasis omitted)

[166] "The risk of retroactive modification of the tariff for photovoltaic solar installations (in particular those regulated in Royal Decree 1578/2008)", *La Ley*, 13 July 2010, by Ms. Yurena Medina, actual Senior Associate of the law firm KPMG Abogados, R-0321.

[167] See email from Mr. José Donoso Alonso to Mr. Alberto Ceña *et al*, 14 July 2010, forwarding the email from Mr. Antonio Hernández to Mr. José Donoso Alonso of 14 July 2010, C-0179 (resubmitted).

[168] See email from Mr. José Donoso Alonso to Mr. Alberto Ceña *et al*, 21 July 2010, forwarding the email from Mr. José Donoso Alonso to Mr. Antonio Hernández of 20 July 2010, C-0181.

[169] See email from Mr. José Donoso Alonso to Mr. Alberto Ceña *et al*, 30 July 2010, forwarding the email from the Ministry of Energy to Mr. José Donoso Alonso, 30 July 2010, C-0182.

the basic situation or relation has arisen in accordance with the previous one.

It is true that the Supreme Court has declared, in relation to this type of retroactive modification, that it is not an "unchangeable right" that the economic regime remains unaltered [...] thus recognizing a relatively broad margin to the "*ius variandi*" of the Administration in a regulated sector involving general interests.[...] the jurisprudence has established limits [...] with regard to the retroactive modification of this remuneration framework, in particular "that the requirements of the Law on the Electrical Sector are observed with regard to the reasonable return of investments.

Lastly, the sector is sensitive to the economic situation in Spain and the exceptional fall in the demand for electricity, which may require measures of joint responsibility that, in the case of wind energy, must be limited in time and scope, in proportion to the specific needs of this technology and its contribution to the electrical system.[170]

162.    On 26 October 2010, the Ministry of Energy issued a report in which it stated in reference to what would become Article 5.3 of the proposed regulation:

Article 4 of the project, to compensate the above restriction, also guarantees to the thermoelectric facilities covered by the Royal Decree 661/2007 and affected by it, that future quadrennial reviews rates, bonuses and upper and lower limits for this kind of technology, provided in Article 44.3 thereof, shall not apply to them.[171]

163.    On 4 November 2010, after the Government decided to divide the new regulation into two decrees (i.e. RD 1614/2010 and RD 1565/2010), a new explanatory report (*Memoria*) of the draft Royal Decree (1614/2010) ("**2010 Regulatory Impact Report**") was issued. It states:

---

[170] Submission presented by the majority wind energy association AEE before the CNE against the draft RD 1614/2010, dated 30 August 2009, pp. 6, 2, R-0166. (Emphasis omitted)

[171] Cl. Reply, para. 345. (No source is cited, and no such document appears in the record).

The installed power objectives set out under the Renewable Energy Plan 2005-2010 have been reached or exceeded for the solar thermal and wind power technologies. While this development can be considered a major achievement for all actors involved [...] it has also caused problems that need to be addressed before they pose an irreversible threat to the economic and technical sustainability of the system.

[…] This Royal Decree provides a series of austerity measures to contribute to transferring to society the gain from the proper evolution of these technologies in terms of competitiveness in relative costs, reducing the deficit of the power system, while safeguarding the legal security of investments and the principle of reasonable profitability.[172]

164. In relation to the limit introduced for operating hours for which premiums would be payable, the 2010 Regulatory Impact Report noted that:

The remuneration values of Royal Decree 661/2007 were calculated in order to obtain reasonable profitability rates and by taking the installations' average operating hours of these three technologies as an initial hypothesis. These operating hours can be found in the Renewable Energy Plan 2005-2010, for all technologies. Subsequently, during actual system operation, it was shown that the hours of operation of the installations, in some cases, exceed those initially expected, for various reasons, technological improvement, over-installation, etc. In any case, this means that, for them, the remuneration obtained exceeds that which is considered reasonable.[173]

165. Regarding future revisions, it stated that:

[…] as compensation for the reduction in remuneration for the given period, the wording of Article 44 of Royal Decree 661/2007 is amended, thereby guaranteeing the installations in operation, and those pre-allocated, that the value of the regulated and maximum

---

[172] Regulatory Impact Analysis Report of the draft Royal Decree (1614/2010). R-0082.
[173] Ibid.

tariffs, as well as the value of the bonus [premium], will stay the same over time.[174]

166.    On 23 November 2010, Royal Decree 1565/2010 was enacted ("**RD 1565/2010**"). RD 1565/2010 affected mostly PV facilities (including RAIPRE pre-registered facilities). It capped the quantity of electricity produced by PV plants that was eligible to receive incentive tariffs and eliminated such tariffs after 25 years of operation (Article 1. Tenth), later extended to 28 years and then to 30 years. As noted above, RD 661/2007 set a tariff rate for the first 25 years of operation of a PV installation and then 80% of the feed-in-tariff for the remaining life of the facility (both adjusted for inflation). RD 1565/2010 also modified Article 18 of RD 661/2007 to impose additional technical requirements and reduced the tariff rate available to PV facilities under the RD 1578/2008 regime. Under RD 1578/2008 (as enacted), tariff rates decreased from year to year, in line with the maturing of the sector, and a formula was set out to calculate future tariff rates. RD 1565/2010 enacted a new level of tariffs that, according to the Claimants, resulted in "another major cutback to the Feed-in remuneration scheme applicable to the PV subsector".[175]

167.    RD 1565/2010, along with RDL 14/2010 referred to below, were challenged under the ECT in *Charanne B.V. and Construction S.A.R.L v. Kingdom of Spain*, where the Tribunal ruled in favour of Spain.

168.    On 3 December 2010, the Government announced the approval of RD 1614/2010 with the following press release:

> The Council of Ministers has approved a Royal Decree that regulates remuneration of electricity production by the wind and concentrated solar power technologies.

---

[174] Ibid. See also Cl. Reply, para. 346.
[175] Cl. Mem., para. 354.

The new regulations, which were agreed with both sectors last July, have the main objectives of obtaining savings to benefit consumers and to make the objectives of promotion of renewable energies compatible with those of limiting electricity production costs to guarantee the sustainability of the electricity system.

The regulation also involves reinforcement of the visibility and stability of the regulation of these technologies in the future, and guarantees the present premiums and tariffs of Royal Decree 661/2007 as of 2013 for facilities in operation and for those included on the pre-register.

WIND ENERGY

The premiums are reduced by 35 per cent for wind technology installations adhered to said Royal Decree of 2007 and those with a power exceeding 50 MW linked to those of the special regime, for the period between the date of this Royal Decree coming into force and December 31, 2012.

From January 1, 2013, these installations shall recover the premium values, as the premiums set in the Ministerial Order of 2009 that reviews the tariffs and premiums of the special regime installations, shall be applicable. [176]

169.    On 8 December 2010, Royal Decree 1614/2010 was published ("**RD 1614/2010**"). According to the Claimants, this was intended to implement the July 2010 agreement between operators and the Government.[177] Its Preamble states that: "[t]his Royal Decree intends to resolve certain inefficiencies in the application of [...] Royal Decree-Law 6/2009 of 30 April, for the wind and solar thermoelectric technologies." [178]

---

[176] C-0190.
[177] Cl. Reply, paras. 86-99, 221, 265.
[178] RD 1614/2010, R-0105. Claimants' English, translation C-0029t: "this Royal Decree aims to resolve certain inefficiencies in the implementation of Royal Decree-Law 6/2009 of April 30, for wind and thermosolar technologies." With respect to thermal solar facilities, RD 1614/2010 suspended this remuneration option for twelve months.

170.    With respect to wind power, RD 1614/2010 established that premium values under RD 661/2007 would be reduced by about 35% and that such reduction would apply to all facilities save for those which had elected (under the First Transitory Provision of RD 661/2007) to be remunerated in accordance with RD 436/2004, as the Claimants' Wind Farms had done.[179] Such facilities would remain subject to RD 436/2004 premium values until 31 December 2012. From then on, however, all existing facilities including the Wind Farms would be subject to the premium values set in RD 661/2007 for year 2010 (instead of the higher 2013 values that would have otherwise applied) (Article 5.2).[180]

171.    Additionally, RD 1614/2010 limited the number of hours of operation subject to premium in the event that certain caps were surpassed (Article 2.4). It also stated that this limitation would not be later revised for facilities registered in the RAIPRE (like the Claimants' Wind Farms) or the pre-allocation Register created by RDL 6/2009 (Article 2.4 *in fine*):

> The reference equivalent hours [2,350 and 2,589 hours/year], shall not be revisable during their operational life, for those facilities finally registered on the administrative Register of power production facilities under the special regime, part of the General Directorate of Energy Policy and Mining as of May 7, 2009 and for those facilities registered on the remuneration pre-allocation Register pursuant to the Fourth Transitional Provision of Royal Decree-Law 6/2009 of April 30, and that comply with the obligation established in Article 4.8 thereof.[181]

172.    Also, pursuant to Article 5.3 RD 1614/2010:

> Without prejudice to that set forth in this royal decree, for wind power technology facilities governed under Royal Decree 661/2007, of May 25, the reviews of the tariffs, premiums and lower and upper limits referred to in Article 44.3 of the aforementioned royal decree will not affect the facilities finally registered in the Register of Production Facilities under the Special Regime dependent on the General Directorate of Energy Policy and Mining as of May 7, 2009,

---

[179] See paragraph 127 above.
[180] See Cl. Mem., para. 336.
[181] RD 1614/2010, Article 2.4, C-0029.

or those which had been registered in the Remuneration Pre-Allocation Register under the fourth transitional provision of Royal Decree-Law 6/2009, of April 30, and fulfil the obligation laid down in Article 4.8 thereof.[182]

### (11)    RDL 14/2010

173.    A few days later, on 23 December 2010, a new access toll was introduced by Royal Decree Law 14/2010 on urgent measures for the correction of the tariff deficit in the electricity sector ("**RDL 14/2010**"). All electricity producers, both under the Ordinary and Special Regimes, were required to pay a toll to use the transportation and distribution grids. RDL 14/2010 also limited the annual operating hours amenable to premium for which PV installations could receive feed-in-tariffs. The Preamble contained the following recitals:

> The impact of the global crisis, which traverses the Spanish economy, has led to a significant decline in the demand for electric energy […] Thus, a set of provisions is established, so that all industry agents contribute, in a further and combined effort, to the reduction of the deficit of the electricity system. Special attention and care has been taken not to affect the economic-financial balance of companies within the sector […] to ensure that […] power generation companies under the special regime receive adequate and reasonable compensation. […]

> […] it seems reasonable that producers under the special regime also make a contribution to mitigate the extra costs of the system; this contribution should be proportional to the characteristics of each technology, […] and the existing margin in remuneration, while guaranteeing in any case a reasonable profitability. This method has been used with the same purpose during the approval in recent months by the Government of regulatory measures aimed at electricity producers using wind turbine, thermosolar and cogeneration technologies.[183]

---

[182] Ibid, Article 5.3.
[183] RDL 14/2010, Preamble, 23 December 2010, pp. 1-3. R-0089 [Tribunal's Translation]. See also translation of the second paragraph in C-0163.

174.   After the Council of Ministers' meeting at which RDL 14/2010 was approved, the Government issued the following press release:

> The Council of Ministers has adopted a Royal Decree Law containing a number of measures to reduce the regulated costs of the electric power system; the primary goal of this Royal Decree Law is to ensure the system's economic sustainability and help eliminate the so-called tariff deficit according to the schedule established in 2009.
>
> The electric power sector is going through an exceptional situation caused by a sudden drop in electricity demand. [...]
>
> The direct consequence of this situation has been a loss of revenue for the whole system, as well as an increase in total regulated costs, due to the effects of the fall in demand.
>
> Since 2009, the Government has adopted a series of measures to rationalize regulated costs and reduce the tariff deficit. [...]
>
> In 2010, the Government has continued to work on cost reduction and has adopted a number of technical measures to improve quality:
>
> -Agreement with the wind sector, which temporarily reduces their premiums by 35%, limits the number of hours eligible for premiums, [...] eliminates the option to pay market price plus premium (more advantageous than the regulated tariff option) for all plants registered in the pre-registry for one year; delays the entry into operation of plants registered in the preregistry; and limits the number of hours with the right to receive premiums based on the different technologies in place.[184]

175.   On 26 January 2011, the Minister of Energy, Miguel Sebastián Gascón, appeared before the Lower House of the Parliament. He stated:

---

[184] Press release of the meeting of the Council of Ministers of Spain of 23 December 2010, C-0164.

[…] since 2009, the Government has been working to adopt a set of measures whose common denominator is the streamlining of regulated costs and the reduction of the tariff deficit […][185]

These actions in 2009, [...] have continued to be used in 2010, first, after reaching an agreement with the wind farm sector, reducing their premiums temporarily by 35 percent and permanently limiting the number of hours they are entitled to premiums. […][186]

All these measures have come about from dialogue, both with the sectors affected as well as with the main political forces. But these measures of 2009 and 2010 have not been enough. The imbalances have been accentuated as a consequence of the appearance of a series of adverse circumstances, in some cases exceptional, of which I should like to highlight two. Firstly, the above forecast growth of some of the regulatory costs during 2010, in particular the premiums of the special regime, and secondly, the evolution of electricity demand, which in 2009 fell 4.7%. This is the first fall in electricity demand after 25 years of sustained increases of around 4% per year. These decreases in electricity demand reduce the income of the system and entail fixed costs that have to be paid by fewer users of electricity, which raises the cost per user. These two circumstances have increased the tariff deficit and have meant that the measures adopted thus far to guarantee the progressive reduction of the tariff deficit in a balanced way among all sector agents proved to be inefficient. Consequently, the need to urgently approve new measures.[187]

176.   As noted above, RDL 14/2010 (along with other measures affecting PV investors) was challenged and upheld in *Charanne.* Claimants here deny it to be a breach of the ECT because Article 17 of Law 54/1997 allowed the Respondent to impose access tolls. It was known and accepted.[188]

---

[185] R-0227, p. 47. [English Translation from Resp. C-Mem., para. 567].
[186] C-0166, p. 47. [English translation from Cl. Mem., para. 355] (Emphasis omitted). More references to an "agreement" with the wind sector can be found at pp. 48, 54, 56, and 58.
[187] Translation from Resp. C-Mem., para. 567.
[188] Cl. Reply, paras. 359-361.

177.    In March 2011, the consulting firm Pöyry published a report on the "Current and Future Trends in the Spanish Solar Industry". The report states:

> […] the zero deficit target is unlikely to be met by the end of 2012 […]. If the zero tariff deficit target by end of 2012 is postponed, it will open up the opportunity to more deficit generation. Considering the Government behaviour, it is likely that future changes might be implemented if considered needed. […] We feel that the Government is in a position to continue with the same energy policy, if considered a requirement, including implementation of further reductions in remuneration to renewables and non – renewable technologies.[189]

178.    In June 2011, APPA lodged an appeal against RD 1565/2010 in which it stated:

> A number of judgments by that High Court [i.e. Supreme Court] have rested on the argument that changing the special remuneration regime for electricity generation to reflect changing circumstances over time is in the hands of the legislator, subject solely to the requirement that such changes respect the provisions of section 30.4 of the Electricity Sector Act, so that the modifications do not affect "reasonable rates of return with regard to the cost of money in capital markets" as guaranteed in the aforementioned Act. These Supreme Court judgments are those handed down on 25 October 2006; 20 March 2007; 3 December 2009; 9 December 2009 (Tarragona Power, S.L.) and another of the same date.[190]

8 September 2011 - Renerco [under BayWa's control] buys shares from Shell and brings its own participation in the SPVs from 32.6% up to 73%. The purchase price was not disclosed to the Tribunal.

179.    In December 2011, the *Partido Popular* took office after a general election.

---

[189] Pöyry Management Consulting "Current and Future Trends in the Spanish Solar Industry (March 2011)", p. 154, R-0354. See also Resp. C-Mem., paras. 681 and 682.
[190] APPA Appeal against RD 1565/2010 before the Supreme Court, 8 June 2011, p. 9, R-0409. (Emphasis omitted)

**(12)    RDL 1/2012**

180.  On 27 January 2012, the new Spanish Government passed Royal Decree-Law 1/2012 ("**RDL 1/2012**").[191] RDL 1/2012 suppressed the feed-in remuneration regime of RD 661/2007 for new Special Regime facilities. Facilities which, at the time of the entry into force of RDL 1/2012, had been finally registered in the RAIPRE – such as the Claimants' Wind Farms – were excluded from its scope of application. The preamble summarises the efforts made by RDL 6/2009 and RDL 14/2010 to address the tariff deficit. It then states:

> […] the measures adopted so far have not been sufficient, and the final purpose of eliminating the tariff deficit as from 2013 is still in jeopardy.
>
> In light of the above, it was considered appropriate to withdraw the economic incentives for certain special regime facilities and for certain ordinary regime facilities using similar technologies, as well as to suspend the remuneration pre-allocation procedures established for them, in order to address the problem of the electricity sector high tariff deficit in a more favourable environment. By adopting this measure [RDL 1/2012], the Government has chosen to limit its scope to special regime facilities not yet registered in the Remuneration Pre-Allocation Registry, except where such condition is due to the Administration's failure to comply with the relevant time limit for making a decision. Along these lines, it has been decided to limit the scope of this measure in order to prevent it from affecting investments already made with regard to ordinary regime facilities, not subject to the pre-allocation scheme.
>
> This Royal Decree-Law maintains the remuneration regime established in the legal system for facilities already in operation and for those already registered on the Remuneration Pre-Allocation Registry.[192]

---

[191] Royal Decree-Law 1/2012, of 27 January, suspending the remuneration pre-allocation procedures and eliminating economic incentives for new electricity generation facilities from cogeneration, renewable energy sources and waste (BOE, 28 January 2012), C-0199.
[192] RDL 1/2012, Explanatory Preamble, paras. 5, 14 and 16, C-0199. See also Respondent's English translation, R-0090.

181. On the same day the Government issued a press release, stating that further measures needed to be taken to correct the tariff deficit, reaffirming the need for renewable energy support, and noting that…

> The regulation is not retroactive, i.e., it will not affect facilities already in operation, premiums already authorised or facilities already registered in the pre-allocation registries.[193]

182. On the same day RDL 1/2012 was approved, a press conference was held. The new Minister of Energy, Mr. José Manuel Soria López, affirmed that the new regulation would not affect vested rights:

> […] this Royal Decree-Law does not in any way affect any vested rights, not only of the holders of renewable energy plants already in operation, but also of the companies which have been granted a pre-allocation, regardless whether they have started to operate the plant or not. By this, I mean that this provision does not foresee any kind of retroactivity; we only consider it from now onwards.[194]

| 12 March 2012: Renerco gets to the current 74% of shares in the SPVs |
| --- |

183. Starting in April 2012,[195] the Supreme Court issued several decisions in appeals brought by producers against RD 1565/2010 and RDL 14/2010, which, as noted above, eliminated regulated tariffs for PV facilities after 25 years of operation (later extended to 28 and then 30 years) and introduced new access tolls, respectively.[196] Among other grounds, producers argued that these changes were retroactive and breached the Spanish law

---

[193] Official press release of the Council of Ministers of Spain of 27 January 2012, C-0201.

[194] C-0202; Cl. Mem., para. 406. See also Gazette of Parliament Sessions (Congress of Deputies), year 2012, X Term, No. 30, 31 January 2012, C-0449, p. 30 ("- the royal decree does not suspend — and the incidence that was commented concerning the effects on jobs, on the contrary of the royal decrees that in this matter were approved in 2009 with the subsequent correction in 2010, this royal decree does not tread — let me use the expression — in a single acquired right.")

[195] The first ruling concerning a challenge against RD 1565/2010 was resolved in a judgment rendered on 20 December 2011. However, this challenge was based on an alleged conflict of competences between the Spanish Government and the autonomous community of Galicia. See Spanish of the Supreme Court Judgment of 20 December 2011, (case No. 16/2011), R-0143.

[196] See paragraphs 166 and 173 above.

principle of legitimate expectations as they had invested in reliance of a regulated tariff with no time limit as set out in RD 661/2007. The Supreme Court rejected all these challenges, referring where appropriate to previous decisions. For instance, in a judgment issued on 12 April 2012, the reasoning of which has been confirmed in several later decisions, the Court held with regard to the retroactivity claim:

> The concept of 'prohibited retroactivity' is much more limited than that of mere 'retroactivity' [...]
>
> [...] the remit of prohibited retroactivity does not include provisions which, lacking any ablative or pejorative effects towards the past (they do not require the revision nor removal of past facts, they do not alter the reality already experienced over time and they do not annul the legal effects exhausted), [...] deploy their immediate effectiveness looking towards the future even if this means impacting a relationship or legal situation which are still in progress.
>
> Based on this premise, a regulatory measure such as the one challenged in the present litigation, whose effectiveness is not planned "back" in time but rather 'forward', once it has been approved, does not fall within the remit of prohibited retroactivity. [...]
>
> [...] Retroactivity would occur if the new regulation required the owners of photovoltaic installations to return the amount of those tariffs already received in previous financial years, but not when it merely stipulates that their receipt will cease within thirty years. Strictly speaking, it could not even be classified as a retroactive measure and all the less so if we use this legal concept in its 'proper' sense.[197]

184.   In respect of the legitimate expectations claim, the judgment states that the regulatory regime set out in RD 661/2007, including the provisions that offered a regulated tariff for

---

[197] Supreme Court, 12 April 2012, Case No. 40/2011, 3rd legal ground, R-0144. See also: Supreme Court, 12 April 2012, Case No. 35/2011, R-0145; Supreme Court, 19 June 2012, Case No. 62/2011, R-0146; Supreme Court, 24 September 2012, Case No. 60/2011, R-0147; Supreme Court, 25 September 2012, Case No. 71/2011, R-0148 (all dismissing challenges against RD 1565/2010).

an indefinite period of time after 25 years of operation of a PV facility, were subject to "implicit" limits stemming from the operating life of a standard renewable energy facility.[198] The judgment also refers to the Government's learning curve with renewable energy technologies. It added:

> [...] as we have stated on many occasion, the owners of electrical energy production installations under a special regime do not have an "unmodifiable right" to maintain unchanged the economic regime.

> Private operators [...] who 'renounce' the market, even if they do so more or less "induced" by the generous remuneration offered to them by the regulatory framework, without any recompense for assuming major risks, were aware or should have been aware that said public regulatory framework, approved at a given time, in the same way as it was consistent with the conditions of the economic scenario in force at that time and with the electricity demand forecasts made at that time, could not subsequently be immune to any relevant modifications to basic economic data in the light of which it is logical for the public authorities to keep in step with the new circumstances. [...] And this is all the more so in the event of situations involving a widespread economic crisis and, in the case of electrical energy, in view of the growth in the tariff deficit which, to a certain degree, derives from the impact that the remuneration of the former has on the calculation of access fees by way of the regulated tariff insofar as it is a cost imputable to the electricity system.

> [...] even when [RD 661/2007] (...) talk[s] – in its original version – of a period "subsequent" to the 25 years, it can easily be assumed that this implicitly set as a ceiling or termination the final date of the working life of the photovoltaic installations [...]

> [...] Hence, the updating and revision system for tariffs, premiums and complements set out in article 44 of Royal Decree 661/2007 and specified in article 36 of the same Royal Decree for category b) installations may be modified by Royal Decree 1565/2010 whose determinations are not subject to that laid down by the previous one.

---

[198] Ibid, 4th legal ground, R-0144.

> As there are no regulatory hierarchy relations between both, it can hardly be asserted that the precept contained in one Royal Decree "breaches" precepts of another which is just as equally binding [...]

185. Similarly, another judgment concerning a challenge against RD 1565/2010 rendered in June 2012 stated:

> According to the claim, [...] the 'significant loss in returns' [...] must be viewed by comparing the rates of return resulting from this Decree with those resulting from the regulations prior to this Decree [...] The idea that the 'reasonable rate of return' estimated at a particular moment in time must remain unaltered, at other moments in time, cannot be shared. Depending on changing economic and other circumstances, a rate of return percentage viewed as 'reasonable' in a first instance, may require subsequent adjustments precisely in order to maintain the 'reasonableness' when faced with the modification of other economic and technical factors.[199]

186. The Court dismissed challenges against the new access toll introduced by RDL 14/2010 following similar reasoning.[200]

### E.  THE DISPUTED MEASURES

187. Starting in December 2012, the Respondent adopted the following measures which are challenged by the Claimants in this case (the "**Disputed Measures**").

### (1)  Law 15/2012

188. On 1 January 2013, Law 15/2012 entered into force. It introduced a 7% tax on all revenue from the generation of electricity ("**TVPEE**"), whether from conventional or renewable sources. The preamble states that this measure was introduced to address the tariff imbalance and out of environmental concerns. It also provides that an amount equal to

---

[199] Supreme Court, 19 June 2012, Case No. 62/2011, R-0146 [English translation from Resp. C-Mem., para. 348].
[200] See e.g., Supreme Court, 25 June 2013, Case No. 252/2012, R-0150 (dismissing an indirect challenge to RD 1565/2010 and RDL 14/2010); Supreme Court, Judgment 63/2016, 21 January 2016, Case No. 627/2012, R-0155 (dismissing a challenge to RD 1565/2010, RDL 14/2010 and Law 2/2011).

that collected through the TVPEE would be allocated to finance the costs of the Electricity System (Second Additional Provision).

189.    Law 15/2012 created three additional taxes, which are not disputed in this arbitration: (i) a tax on production of spent nuclear fuel and radioactive waste, (ii) a tax on storage of spent nuclear fuel and radioactive waste, and (iii) a levy on use of continental waters for electricity production.

### (2)    RDL 2/2013

190.    On 1 February 2013, Royal Decree Law 2/2013 ("**RDL 2/2013**") was issued, effective as of 1 January. It fixed the premium under the Premium option of RD 661/2007 at 0 EUR/kWh (thereby effectively eliminating this option) (Article 2). According to Respondent's Witness Mr. Ayuso, this led to all existing wind facilities opting for the fixed tariff as of that date.[201]

191.    In addition, RDL 2/2013 cancelled the mechanism for updating tariffs, premiums and remaining elements of remuneration in accordance with the Consumer Price Index, substituting a different index, the CPI at constant tax rates, which excluded unprocessed foods and energy products (Article 1). It also eliminated the possibility to choose on a yearly basis the feed-in remuneration option (Article 3), meaning that those Special Regime facilities that after the entry into force of RDL 2/2013 on 2 February 2013 opted to sell their electricity under the "new" Premium at 0 EUR/kWh option would no longer be entitled to choose the fixed tariff option during the remainder of their operational life.[202]

### (3)    RDL 9/2013

192.    On 12 July 2013, Spain adopted Royal Decree Law 9/2013 ("**RDL 9/2013**"), effective from 1 January 2013. RDL 9/2013 amended Article 34 of Law 54/1997 (which created the Special Regime for renewables producers) and repealed RD 661/2007 altogether. It

---

[201] RWS-JRA2, para. 33.
[202] On 14 February 2013, Spain brought these modifications into effect by MO IET/221/2013.

eliminated the regime of feed-in incentives (i.e. fixed tariffs and premiums) both for new and existing installations, and substituted a system providing for incentives by way of "specific remuneration" based on "standard" costs per unit of installed power, plus standard amounts for operating costs depending on the type of technology and facility.

193. "Specific remuneration" is defined as the amount on top of market revenue necessary to provide the target rate of return to a standard facility during its "regulatory useful life". It consists of two main components: (1) an "investment incentive" calculated per MW of installed capacity (Rinv); and (2) an "operating incentive" calculated per MWh of electricity production (Ro). The investment incentive purports to compensate investors for the capital cost of their investment (CAPEX), whereas the operating incentive seeks to compensate facilities for the gap between the operating costs of a renewable energy facility (OPEX) and the wholesale price of electricity. "Standard facilities", on the other hand, represent facilities that have similar characteristics (e.g., technology type, capacity, date of installation, location, useful life, etc.), all of which receive investment and operating incentives in accordance with the same parameters. In addition to Rinv and Ro, other parameters, although of arguably minor relative importance, are used to establish remunerations.[203]

194. RDL 9/2013 set the target rate of return at 300 points above the ten-year average yield of Spanish Government ten-year bonds.[204] Further details were left to be determined by implementing decrees.

195. Pending such regulations, RDL 9/2013 provided for a system of "payments on account". Renewable energy facilities would continue to receive remuneration under RD 661/2007 as amended, but subject to "final regularization and set-off at a future undefined date" when the new regime entered into force (Third Transitory Provision).[205] In addition,

---

[203] RD 413/2014, Art. 13.2, R-0110.

[204] RDL 9/2013, Preamble and First Additional Provision, R-0094.

[205] Cl. Mem., para. 502.

RDL 9/2013 abolished the provisions of RD 661/2007 relating to the supplement for reactive energy but kept the related penalty.

### (4)    Law 24/2013

196.    In December 2013, Respondent adopted Law 24/2013, which superseded Law 54/1997. The purpose of this Law was to implement the new renewable energy framework envisaged by RDL 9/2013. It provided that remuneration under the new renewables support scheme should be "compatible with the economic sustainability of the electrical [sic] system" and would:

> not exceed the minimum level required to cover costs which allow production installations from renewable energy sources [...] to compete on an equal footing with the other technologies on the market and which allows a reasonable return to be earned on the installation type in each applicable case.[206]

197.    Law 24/2013 also established a mechanism to have renewable energy producers finance any tariff imbalance up to a limit of 2% for a given financial year (and 5% in terms of accumulated imbalance).[207]

198.    Between July 2013 and 31 May 2014, while the Respondent was drafting RD 413/2014 and MO IET/1045/2014, renewable producers were paid remuneration on an interim basis.

### (5)    RD 413/2014

199.    In June 2014, Spain announced the precise terms of the new regime, when it enacted RD 413/2014 (establishing the new regime) and MO IET/1045/2014 (publishing details of the new compensation formulas).

---

[206] Law 24/2013, Art. 14.7, R-0076.
[207] Ibid, Art. 19.

### (6)    MO IET/1045/2014

200.    This Ministerial Order, made on 16 June 2014, set the remuneration parameters for "standard" facilities, including the estimated "standard costs" and "regulatory useful life" to be applied under the new regulatory regime. For purpose of identification, a standard facility code is assigned to each eligible facility ("IT" in the Spanish acronym).

201.    Under Annex III of MO IET/1045/2014, the "reasonable return" announced in RDL 9/2013 was set at 7.398% (pre-tax) for existing renewable energy facilities on the basis of a predefined "regulatory useful life", which in the case of wind facilities such as the Claimants' was set at 20 years.  This meant that any wind farm would not receive special remuneration after year 20 from its commissioning, but only the pool price regardless of their costs.

202.    Under RD 413/2014, this target return is set to apply until 31 December 2019 (i.e., until the end of the First Regulatory Period, running from 12 July 2013 to 31 December 2019), and it would then be subject to periodic reviews for subsequent regulatory periods of 3 to 6 years each. After the end of these periods, many of the assumptions on which the incentives are calculated will be reviewed based on the performance of actual indicators, including market price and the target return,[208] and the incentives may consequently be revised up or down too. By contrast, the initial CAPEX and the regulatory useful life of standard plants are not subject to later reviews.[209]

203.    The Claimants' installations were classified as belonging to Standard Facility IT-00652. This corresponds to onshore wind installations with more than 5MW of installed capacity commissioned in 2002. Order IET 1045/2014 attributes to IT-00652 facilities an initial capital expenditure (CAPEX) of EUR 94.7 million, a certain level of operating expenses, and regulatory life of 20 years.

---

[208] RD 413/2014, Art. 19.1, R-0110.
[209] Ibid, Art. 20.1.

204. IT-00652 facilities are considered to have covered their estimated CAPEX (and OPEX) and to have obtained a rate of return higher than 7.398% prior to the end of the 20-year regulatory life.[210] To make this determination, payments received under the Special Regime are computed. Thus, as the table below shows, these facilities do not receive an "investment incentive" under MO IET/1045/2014. Nor do they receive an "operating incentive", because their estimated OPEX is lower than expected market revenues.[211]

| Código de Identificación | Vida Útil Regulatoria (años) | Retribución a la Inversión Rinv 2013 (*) (€/MW) | Retribución a la Operación Ro 2013 (€/MWh) | Horas de funcionamiento máximo para la percepción de Ro 2013 (h) | Nº Horas equivalentes de funcionamiento mínimo Nh 2013 (**) (h) | Umbral de funcionamiento Uf 2013 (**) (h) |
|---|---|---|---|---|---|---|
| IT-00647 | 20 | 0 | 0,000 | - | - | - |
| IT-00648 | 20 | 0 | 0,000 | - | - | - |
| IT-00649 | 20 | 0 | 0,000 | - | - | - |
| IT-00650 | 20 | 0 | 0,000 | - | - | - |
| IT-00651 | 20 | 0 | 0,000 | - | - | - |
| IT-00652 | 20 | 0 | 0,000 | - | - | - |
| IT-00653 | 20 | 0 | 0,000 | - | - | - |
| IT-00654 | 20 | 3.609 | 0,000 | - | 210 | 126 |
| IT-00655 | 20 | 8.557 | 0,000 | - | 219 | 131 |

Source: MO IET/1045/2014, p. 46531, R-0115 (SPA Original), C-0216

205. Consequently, since 2014 the income of BayWa's wind farms comes solely from market revenues; they receive no subsidies.

### (7)    MO IET/1168/2014

206. Ministerial Order IET/1168/2014 of 3 July 2014 supplemented RDL 9/2013 and particularly RD 413/2014 by providing that facilities formerly entitled to feed-in

---

[210] See RWS-JRA2, para. 130 ("The Internal Rate of Return of the project obtained by the IT-00652 by the end of year 2013 reached 8.08%, already exceeding, in its first 11 years of exploitation, the rate of reasonable rate of return established by Order IET/1045/2014.") Spain estimates that under the new regime the IRR of IT-00652 facilities will be around 9.96% before taxes at the end of their regulatory life in 2023. See RWS-JRA2, para. 129.

[211] Ibid, paras. 131-132.

remuneration would automatically be registered in the new registry, RRRE, as of 9 July 2014.[212]

### F.    SPANISH COURT DECISIONS ON THE DISPUTED MEASURES

207.    From 2014 on, the Spanish Supreme Court and the Constitutional Court have issued a series of decisions on challenges to the Disputed Measures.[213] These decisions consistently, although not always unanimously, rejected the various claims, holding that neither RD 661/2007 nor RD 1565/2010 promise or guarantee that the legal regime was immune from changes by subsequent royal decrees or higher norms.

208.    The Tribunal is not aware of any specific decision on Article 44 (tariff reviews) or Article 36 (the tariff rate term). It seems that the Supreme Court considered that these issues were settled by its previous jurisprudence. With these qualifications, the legality of the Disputed Measures overall was upheld under Spanish law, with passing reference also to EU law.

209.    For instance, the Constitutional Court held in various decisions that the Disputed Measures did not breach the Spanish principle of legislative expectations or the prohibition against retroactivity. The Court reiterated its previous jurisprudence on the distinction between the proscribed and permissible retroactivity of a norm. It considered

---

[212] MO IET/1168/2014, First Provision, C-0225.

[213] See, e.g., Constitutional Tribunal, Judgment 183/2014, 6 November 2014, Case No. 1780-2013, R-0019 (dismissing a constitutional challenge against Law 15/2012 and RDL 2/2013); Constitutional Court, Judgment 28/2015, 19 February 2015, Case No. 6412-2013, R-0151 (dismissing a constitutional challenge against RDL 2/2013); Supreme Court, Judgment 966/2015, 16 March 2015, Case No. 118/2013, R-0152 (dismissing by majority a challenge against MO IET/221/2013 which implemented RDL 2/2013); Supreme Court, Judgment 1159/2015, 26 March 2015, Case No. 133/2013, R-0153 (dismissing by majority a challenge against MO IET/221/2013 which implemented RDL 2/2013); Constitutional Court, 17 December 2015, Case No. 5347/2013, R-0154; Constitutional Court, 18 February 2016, Case No. 5852/2013, R-0156; and Constitutional Court, 18 February 2016, Case No. 6031/2013, R-0157 (the last three dismissing constitutional challenges against RDL 9/2013); Supreme Court, Judgment 1260/2016, 1 June 2016, Case No. 649/2014, R-0149 (dismissing by majority a challenge against RD 413/2014 and MO IET/1045/2014); Supreme Court, Judgment 1730/2016, 12 July 2016, Case No. 456/2014, R-0351 (dismissing by majority a challenge against RD 413/2014 and MO IET/1045/2014); Supreme Court, Judgment 1964/2016, 22 July 2016, Case No. 500/2014, R-0352 (dismissing by majority a challenge against RD 413/2014 and MO IET/1045/2014).

that RDL 9/2013 was not impermissibly retroactive as it "does not affect economic rights already consolidated and definitively incorporated into the assets of the recipient, or expired or consummated favourable legal situations."[214] It also stressed that the changes were not unforeseen if one considers the growing tariff deficit, the economic crises and the changes already introduced. For the Court:

> [...] the disputed measures certainly involve a change from the previous system, a decision that the legislature adopted as urgent in view of the situation in which the electricity system found itself. The change that has taken place cannot be described as unexpected, since the changing circumstances affecting that sector of the economy, made it necessary to make adjustments to this regulatory framework, as a result of the difficult circumstances of the sector as a whole and the need to guarantee the required economic balance and proper management of the system. There are, therefore, no grounds for arguing that changing the compensation system under review was unforeseeable for a 'prudent and diligent economic operator', based on the economic circumstances and the insufficient measures taken to reduce persistent and continuously rising deficits in the electricity system not sufficiently tackled with previous provisions.[215]

210.    For its part, the Supreme Court found in one of the first judgments concerning an appeal against RD 413/2014 and MO IET/1045/2014, handed down by majority on 1 June 2016 and often referred to in subsequent decisions, as follows:

> […] this Court has insisted when faced with the succession of regulatory changes, that it was simply not possible to recognise an 'unchangeable entitlement' *pro futuro* for titleholders of facilities for production of electricity subject to the special system, thereby guaranteeing the unchanging nature of the remuneration framework passed into law by the regulatory legislator. The proviso in this regard was that prescriptive entitlements of the Electricity Sector Act should be adhered to in relation to reasonable profitability of

---

[214] Constitutional Court, 17 December 2015, Case No. 5347/2013, R-0154 (dismissing constitutional challenges against RDL 9/2013).
[215] Id.

investments. [...] the jurisprudence of this Court has been consistent over the years.[216]

211.    In another majority decision issued by the Supreme Court on 12 July 2016, with regard to a challenge brought by AEE (the wind energy association), the Court held:

> […] of course there does not exist, or at least it is not invoked in the claim, any kind of commitment or external sign, directed by the Administrative authority to the appellants, in relation to the immutability of the regulatory framework in place at the time when the renewable energy production began.

> Nor do we believe that the system in place at that time could alone be deemed to be a conclusive enough external sign to generate the legitimate expectation in the appellant; i.e. the rational and well-founded belief that the electrical power remuneration regime that it produced could not be altered in the future, as no provision of the RD 661/2007, by which its facilities were protected, guaranteed that the regulated tariff would not be subject to change.

> In this regard, the jurisprudence of this Court has been constant over the years on pointing out, in the interpretation and application of the authorising rules of the legal and economic system applicable to electricity production using renewable energy sources, which guarantee the right to the reasonable rate of return on investments made by the owners of these facilities, but do not recognise their unalterable right to maintain the remuneration framework approved by the holder of regulatory power unaltered [...][217]

212.    Three out of the seven judges of the Administrative Law Chamber dissented.[218] They considered that the new system as implemented by RD 413/2014 and MO IET/1045/2014 breached the Spanish law proscription against retroactivity and the Spanish principles of legal certainty and legitimate reliance. This was so, as one of them put it, because the new

---

[216] Supreme Court, Judgment 1260/2016, 1 June 2016, Case No. 649/2014, R-0149.
[217] Supreme Court Judgment 1730/2016, 12 July 2016, Case No. 456/2014, R-0351. The dissenting judges were Mr. Eduardo Calvo Rojas, Ms. Isabel Perelló Domenech and Mr. Eduardo Espín Templado.
[218] Supreme Court Judgment 1260/2016, 1 June 2016, case No. 649/2014, R-0149. See also C-0455, C-0456 and C-0457.

system reduces the level of remuneration that plants are otherwise entitled to by reference to past earnings and it "applies as if it had been in force from the very first moment that each facility commenced its regulatory life".[219] Two of them also opined that "Ministerial Order IET/1045/2014, of 16 June, should have been declared void ab initio as there was no technical justification for the values and parameters of various kinds established in that Order as the defining values and parameters of the remuneration system for each standard facility."[220]

## G. THE TARIFF DEFICIT

213. A relevant fact during the years of Claimants' investments was the increasing tariff deficit, which was publicly funded. This was exacerbated by the world financial downturn of 2008, although it was not caused by it. By 2013, the accumulated deficit was almost EUR 30 billion, as shown in the following tables published by the International Energy Agency based on figures from the Ministry of Energy.[221]

**Figure 8.5** Tariff deficit accumulated in Spain, 2000-14



* Estimated.

Source: Ministry of Industry, Energy and Tourism.

---

[219] Dissenting Opinion of Justice Mr. Eduardo Espín Templado, Supreme Court Judgment 1260/2016, 1 June 2016, Case No. 649/2014, R-0149.

[220] Dissenting Opinions of Justices Mr. Eduardo Calvo Rojas and Isabel Perelló Domenech, Spanish Supreme Court Judgment 1260/2016, 1 June 2016, R-0149.

[221] Energy Policies of IEA Countries - Spain 2015 Review, International Energy Agency, p. 99, EO-34.



**Figure 8.6** Costs and revenues in the Spanish electricity system, 2005-13

Source: Ministry of Industry, Energy and Tourism.

214. For IT-00652 facilities such as the Claimants' Wind Farms, Spain states that about 47% of their income during the first 10 years of operation came from subsidies.[222]

215. According to the Claimants, the "Disputed Measures have been effective in eliminating the Tariff Deficit".[223] But they complain that "the Respondent is trying to recover the accumulated Tariff Deficit over time" in breach of its obligations under the ECT.[224]

## H.    EUROPEAN UNION LAW

216. It is also necessary to refer to certain decisions taken at European level. This includes decisions on the specific subject of state aid in the renewable energy sector and on the general issue of incompatibility of the ECT with European law.

---

[222] RWS-JRA2, para. 135 (the figure was "32% for the useful regulatory lifetime as a whole": ibid.).
[223] Cl. Reply, para. 1139. See also KPMG Second Regulatory Report, para. 137, CER-0003 ("The KPMG First Expert Witness Report does not call into question the short-term effectiveness of the Measures from July 2013 onwards as a tool for reducing regulated costs. On the contrary, our negative assessment of the reasonableness of these measures was focused on their lack of regulatory orthodoxy").
[224] Cl. Reply, para. 1139.

(1)     **European state aid law**

217.   It is acknowledged by Spain that the Special Regime under Law 54/1997 was never notified by Spain to the EC under Article 108.3 TFEU, for reasons never explained to the Tribunal. This was despite the fact that successive EC Directives on Renewable Energy were expressly stated to be "without prejudice to Articles 87 and 88 of the Treaty".[225]

218.   In March 2001, the CJEU found in the case *PreussenElektra v. Schleswag* that the obligation imposed by German Law on regional electricity distribution companies to purchase electricity from renewable energy sources at fixed minimum prices did not constitute state aid:

> In this case, the obligation imposed on private electricity supply undertakings to purchase electricity produced from renewable energy sources at fixed minimum prices does not involve any direct or indirect transfer of State resources to undertakings which produce that type of electricity.
>
> Therefore, the allocation of the financial burden arising from that obligation for those private electricity supply undertakings as between them and other private undertakings cannot constitute a direct or indirect transfer of State resources either.
>
> In those circumstances, the fact that the purchase obligation is imposed by statute and confers an undeniable advantage on certain undertakings is not capable of conferring upon it the character of State aid within the meaning of Article 92(1) of the Treaty.[226]

219.   In September of 2001, the EU issued Directive 2001/77/EC on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market.

---

[225] Directive 2001/77/EC, 27 September 2001, Art. 4, RL-0015; Directive 2009/28/EC, 23 April 2009, Art. 3.3, RL-0017. See above, paragraph 86.

[226] *PreussenElektra v. Schleswag,* Case C-379/98, Judgment, ECJ, 13 March 2001 (hereinafter "*PreussenElektra*"), paras. 59-61, C-0547.

The Directive recited that public aid for renewable energy sources should be set by EU Member States consistently with the obligations imposed in Articles 87 and 88 of the Treaty on state aid.[227] The Directive obliged them to "take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources" in order to "meet Kyoto targets more quickly", and required "all Member States … to set national indicative targets for the consumption of electricity produced from renewable sources", and to report regularly to the EU on their progress in meeting those targets. Spain's specific indicative target was to draw 24.9% of its electricity from renewable sources by 2010. The Tribunal understands that notified schemes were generally approved by the EC.[228]

220. In April 2009, the EU issued Directive 2009/28/EC, which repealed Directive 2001/77/EC and increased the EU's community-wide target for total energy from renewable sources from 12% by 2010 to 20% by 2020.[229] Member States were directed to follow the Guidelines on state aid for environmental protection and energy, approved the year before.[230] These Guidelines provided that "the aid amount must be limited to the minimum needed to achieve the environmental protection sought."[231] To do so:

> Member States may grant operating aid to compensate for the difference between the cost of producing energy from renewable sources, including depreciation of extra investments for environmental protection, and the market price of the form of energy concerned. Operating aid may then be granted until the plant has been fully depreciated according to normal accounting rules. Any further energy produced by the plant will not qualify for any

---

[227] Recital (12) of Directive 2001/77/EC, RL-0015.
[228] According to an EC report, 'the Community Guidelines on state aid for Environmental Protection … are rather generous for […] support schemes. On that basis, some 60 state aid schemes supporting renewable energy sources were approved by the Commission during the period 2001 to 2004': EC Communication, The support of electricity from renewable energy sources (COM(2005) 627, para. 3.5.
[229] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009, RL-0017.
[230] Community Guidelines on State Aid for Environmental Protection (2008/C/82/01), R-0064.
[231] Ibid, para. 31.

assistance. However, the aid may also cover a normal return on capital.[232]

221.   In December 2013, the CJEU ruled in *Vent de Colère!* that support mechanisms financed by consumers constitute state aid if a public body is involved in managing the funds, a position that it reaffirmed in the 2014 *Elcogás* case in respect of the Spanish renewable energy regime.[233]

222.   On 10 November 2017, the EC issued a decision in which it found Spain's new regulatory regime to be compatible with EU state aid regulations.[234] The Commission reviewed a sample of 21 standard facilities. It observed that new "scheme replaces and supersedes the premium economic scheme [...], which was governed by Royal Decrees 661/2007 and 1578/2008. Payments under the premium economic scheme are covered by the decision in order to assess proportionality, i.e. the absence of overcompensation".[235] To be proportional, according to the EC, the aid must be limited both in time (i.e. it cannot last longer than the depreciation period of the facility) and amount; it should be restricted to minimum required to achieve a "level playing field"[236]

223.   The EC added:

> As a general comment, the Commission recalls that there is 'no right to State Aid'. A Member State may always decide not to grant an aid, or to put to an end to an aid scheme [...][237]

> In the very specific situation of the present case, where a Member State grants State aid to investors, without respecting the notification

---

[232] Ibid, para. 109.
[233] *Elcogás S.A. v. Administración del Estado and Iberdrola S.A.* [2014] ECLI:EU:C:2014:2314, Case No. 275/13 (hereinafter "***Ecolgás***"), para. 25, RL-0090.
[234] Decision of the European Commission, 10 November 2017, regarding the Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste (State Aid S.A. 40348 (2015/NN)) (hereinafter "**EC's Decision on State Aid**"), RL-0107.
[235] Ibid, para. 4.
[236] Ibid, para. 113 ff.
[237] Ibid, para. 155.

and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded. That is because according to the case-law of the Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.[238]

[…] In an intra-EU situation, Union law is part of the applicable law, as it constitutes international law applicable between the parties to the dispute. As a result, based on the principle of interpretation in conformity, the principle of fair and equitable treatment cannot have a broader scope than the Union law notions of legal certainty and legitimate expectations in the context of a State aid scheme. [...] This has been expressly recognised by Arbitration Tribunals.[239]

[...] If they award compensation, such as in *Eiser v Spain*, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.[240]

### (2)    Compatibility of the ECT with European Union law

224.    On 6 March 2018, the CJEU issued its *Achmea* decision. The CJEU concluded that the arbitration clause in Article 8 of the Netherlands-Slovakia BIT is incompatible with Articles 267 and 344 TFEU:

> […] Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[241]

---

[238] Ibid, para. 158.
[239] Ibid, para. 164.
[240] Ibid, para. 165.
[241] *Achmea*, para. 31, RL-0111.

225.    *Achmea* concerned the status of an UNCITRAL award in favour of Dutch Claimants against the Slovak Republic under a BIT concluded between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, which was succeeded to by Slovakia on independence. It did not involve the ECT. Slovakia became an EU member in 2004. It applied to the German courts (Germany being the place of arbitration) to set aside the award on the ground that arbitration under Article 8 of the BIT was incompatible with EU law.

226.    The Court held that it was incompatible, on the grounds that:

(1)    In deciding a claim under the BIT, the tribunal could be required to apply EU law "as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States".[242]

(2)    The tribunal was not "situated within the judicial system of the EU" …in that its decisions are subject to mechanisms capable of ensuring the "full effectiveness of EU law".[243]

(3)    "[A]part from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States". Thus Article 8 of the BIT "has an adverse effect on the autonomy of EU law".[244]

(4)    In the circumstances, "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member

---

[242] Ibid, para. 41.
[243] Ibid, paras. 43, 45, and 56.
[244] Ibid, paras. 58 and 59.

States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept".[245]

227. The CJEU decision has been and is being followed by other decisions and developments, which will be referred to as relevant and necessary. Two of these require specific mention here.

### (3) Vattenfall AB v. Germany, Decision on the Achmea Issue

228. The tribunal in *Vattenfall AB v. Germany* upheld its jurisdiction under the ECT notwithstanding *Achmea*.

229. As to the applicable law, the tribunal decided that the law determining its jurisdiction is Article 26 of the ECT in conjunction with Article 25 of the ICSID Convention.[246] The tribunal held that Article 26.6 constitutes a choice of law pursuant to Article 42.1 of the ICSID Convention and applies to the merits only.[247] Hence, EU law is not applicable to the jurisdiction of the tribunal. Although under Article 31.3.c VCLT any relevant rules of international law applicable in the relations between the parties shall be taken into account, "(i)t is not the proper role of Article 31(3)(c) VCLT to rewrite the treaty being interpreted, or to substitute a plain reading of a treaty provision with other rules of international law, external to the treaty being interpreted, which would contradict the ordinary meaning of its terms."[248] Thus EU law cannot be taken into account under Article 31 VCLT to interpret Article 26 of the ECT, as a departure from the ordinary meaning of Article 26 is not foreseen.[249]

---

[245] Ibid, para. 60.
[246] *Vattenfall AB v. Germany* (Decision on *Achmea*), para. 166, CL-0236.
[247] Ibid, paras. 117, 121.
[248] Ibid, para. 154.
[249] Ibid, para. 165.

230.  Moreover, the tribunal rejected the EC's contentions that (i) the relationships between the Contracting Parties that are members of Regional Economic Integration Organisations ("**REIO**") are governed for ECT purposes by the provisions contained in the agreement establishing the REIO; (ii) investments by investors from one EU Member State in the area of another EU Member State are made within the "Area" of the same party; and (iii) the EU's offer to arbitrate is only made to investors from non-EU Member States.[250] Articles 1.2, 1.3 and 1.10 of the ECT do not exclude intra-EU arbitrations.[251] Further, it would have been possible to expressly exclude intra-EU arbitrations, which was envisaged but ultimately dropped.[252]  Article 16 of the ECT confirms the tribunal's analysis. The ordinary meaning of Article 26.6 and Article 16 both make it clear that it is not possible to read into Article 26 an interpretation whereby certain investors would be deprived of their right to dispute resolution.[253]

231.  Finally, the *Vattenfall* tribunal analysed, albeit briefly, whether EU law prevails under a conflict of laws analysis. It reached three conclusions: first, the rules contained in the TFEU do not constitute a *lex posterior* to the ECT;[254] second, the ECT has not been modified by Germany and Spain *inter se*,[255] and third, Article 16 of the ECT is *lex specialis* to Article 351 TFEU.[256]

### (4)    UP and CD Holding v. Hungary

232.  *Vattenfall* is to be contrasted with the decision of an ICSID tribunal in *UP and CD Holding v. Hungary*, which was based on the exclusivity of jurisdiction under the ICSID Convention. The tribunal identified three fundamental differences as between its situation and that of the tribunal in *Achmea*. First, in *Achmea* (an UNCITRAL arbitration), the seat

---

[250] Ibid, paras. 178-182.
[251] Ibid, para. 184.
[252] Ibid, para. 205.
[253] Ibid, para. 196.
[254] Ibid, para. 218.
[255] Ibid, para. 220.
[256] Ibid, para. 229.

was Frankfurt with the result that German law applied to the arbitration proceedings, whereas the *UP* tribunal was a delocalised ICSID tribunal with the result that the ICSID Convention and ICSID Arbitration Rules were exclusively applicable to the proceedings. Second, whereas in *Achmea* the German courts had the right to exercise judicial review of the validity of the award, in *UP* judicial review was subject exclusively to the annulment procedure under Article 52 of the ICSID Convention. Thirdly, whereas in *Achmea*, the German *Bundesgerichtshof* submitted a preliminary question to the ECJ, in *UP* no other judicial review by any other court was possible.[257]

233. Hungary had argued that its accession to the EU implied its withdrawal *pro tanto* from the ICSID Convention.[258] But the tribunal held that, even if Hungary had actually withdrawn from the ICSID Convention, both Article 72 of the ICSID Convention[259] as well as the survival clause in Article 12.2 of the France-Hungary BIT would have allowed UP to maintain their claim.[260]

## V.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

### A.    THE CLAIMANTS

234. The Claimants' request for relief as stated in their Memorial on the Merits is as follows:

> (i)    DECLARING that the Respondent's actions and omissions with respect to the Claimants' Investment in the Wind subsectors in Spain amount to breaches of the Respondent's obligations under Part III of the Energy Charter Treaty, as well under the applicable rules and principles of international law;

---

[257] *UP and CD Holding v. Hungary* (Award), paras. 254, 255, CL-0237.
[258] Ibid, para. 258.
[259] Ibid, paras. 261, 265.
[260] Ibid, para. 265.

(ii)    ORDERING the Respondent to pay to the Claimants compensation in the amount of EUR 61,931,524; compensation which may be increased;

(iii)    ORDERING the Respondent to pay the entire costs of the arbitration and all legal costs incurred by the Claimants;

(iv)    ORDERING the Respondent to pay to the Claimants pre- and post-award interest accrued on all amounts claimed, compounded monthly, until full payment thereof; and,

(v)    ORDERING any such further relief as the Arbitral Tribunal may deem appropriate.

235.    Claimants' request for relief as stated in the Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction is as follows:

(i)    DECLARING that the Arbitral Tribunal has jurisdiction to hear all claims submitted by the Claimants under the Energy Charter Treaty and, consequently, rejecting each of the preliminary objections that the Respondent raised against the jurisdiction of the Arbitral Tribunal in its Memorial on Jurisdictional Objections of June 15, 2016;

(ii)    DECLARING that the Respondent's actions and omissions with respect to the Claimants' Investment in the Wind subsector in Spain amount to breaches of the Respondent's obligations under Part III of the Energy Charter Treaty, as well as under the applicable rules and principles of international law;

(iii)    ORDERING the Respondent to pay to the Claimants compensation in the amount of EUR 67,347,516 (amount that may be increased);

(iv)    ORDERING the Respondent to pay the entire costs of the arbitration and all legal costs incurred by the Claimants;

(v)    ORDERING the Respondent to pay to the Claimants pre- and post-award interest accrued on all amounts claimed,

compounded, until full payment thereof, at the rates specified by the Claimants;

(vi)    DECLARING that the Arbitral Tribunal's Award is made net of all taxes, and that the Respondent may not impose any tax on the Claimants arising from the Arbitral Tribunal's Award;

(vii)    ORDERING the Respondent to indemnify the Claimants for the amount of any additional tax liability in Germany and/or elsewhere, in relation to the compensation awarded in the Arbitral Tribunal's Award;

(viii)    ORDERING any such further relief as the Arbitral Tribunal may deem appropriate.

236.    The Claimants' request for relief as stated in the Claimants' Rejoinder on Jurisdiction is as follows:

(i)    DECLARING that the Arbitral Tribunal has jurisdiction to hear all claims submitted by the Claimants under the Energy Charter Treaty and, consequently, REJECTING each of the preliminary objections that the Respondent raised against the jurisdiction of the Arbitral Tribunal in its Counter-Memorial on the Merits and Memorial of Preliminary Objections of June 15, 2016 and kept in its Reply on Preliminary Objections of April 7, 2017;

(ii)    DECLARING that the Respondent's actions and omissions with respect to the Claimants' Investment in the Wind subsector in Spain amount to breaches of the Respondent's obligations under Part III of the Energy Charter Treaty, as well as under the applicable rules and principles of international law and, consequently, ORDERING the Respondent to pay compensation in the terms set out in the Claimants' Reply on the Merits of February 6, 2017 (points (iii) to (viii) of the Reply's Petitum);

(iii)    ORDERING the Respondent to pay the entire costs of the arbitration and all legal costs incurred by the Claimants, in particular the legal costs incurred by the Claimants to address (i) the preliminary objections raised by the Respondent in its Memorial of June 15, 2016 and (ii) the requests to submit an amicus curiae brief

93

by the European Commission on February 16, 2016 and January 17, 2017.

(iv)    ORDERING the Respondent to pay to the Claimants pre- and post-award interest accrued on all amounts claimed, compounded, until full payment thereof, at the rates specified by the Claimants; and,

(v)    ORDERING any such further relief as the Arbitral Tribunal may deem appropriate.

237.    By communication dated 25 October 2017, the Claimants offered to clarify one of their petitions, namely their request "for granting compensation net of taxes". After considering the Parties' positions on this matter, the Tribunal decided on this matter as stated in paragraph 42 above.

## B.    THE RESPONDENT

238.    The Respondent requests the Tribunal in its Counter-Memorial on the Merits and Memorial on the Jurisdiction (reiterated in its Rejoinder on the Merits and Reply on Jurisdiction) to:

a)    Declar[e] lack of jurisdiction for hearing the Claimants' claims or, if applicable, their inadmissibility, pursuant to that laid down in the Memorials of Jurisdictional Objections and Reply to the Jurisdictional Objections;

b)    Secondarily in the event that the Arbitration Tribunal were to decide that it has jurisdiction to hear the present dispute, that it should reject all the claims of the Claimants on the merits, since the Kingdom of Spain has not breached in any way, the ECT, in accordance with what is set forth in sections II and III of the present Writ;

c)    Secondarily, dismiss all of the Claimants' compensatory claims, as the Claimants have no right to compensation, pursuant to that stated in section IV herein; and

94

d)      It condemns the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the arbitrators' fees and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.

## VI.    JURISDICTION

239.    The Respondent contests the jurisdiction of the Tribunal on two grounds, one general, one specific. First, it denies that the ECT applies as between EU Member States; as a corollary the Tribunal lacks jurisdiction with respect to claims under the ECT brought by German investors against Spain. Secondly, even if the Tribunal has jurisdiction with respect to some of the Disputed Measures, this does not extend to Law 15/2012 imposing the TVPEE, which is specifically excluded as a taxation measure by Article 21 of the ECT.

### A.    THE INTRA-EU OBJECTION

### (1)    The Respondent's Position

240.    According to Spain, under the principle of primacy, EU Law puts aside the application of any other regulation in issues arising between EU Member States and their citizens.[261] Further, Spain argues that investment treaties between EU Member States are incompatible with EU law.[262] Spain points out that the Claimants are EU national investors, and that as such they are granted particular protection which is preferential to that provided for by the ECT and by any BIT.[263] Since this is an intra-EU dispute,[264] Spain

---

[261] Resp. C-Mem., para. 100. Resp. Rej., paras. 21-5, 32.
[262] Resp. Rej., para. 17.
[263] Resp. C-Mem., para. 61.
[264] November 2017 Hearing, Day 5, 84:21-2.

argues that EU law is the international law applicable for the resolution of the dispute,[265] and that the ECT has no application in intra-EU disputes.

### (2)    The Claimants' Position

241.    For the Claimants, Articles 26.6 of the ECT and 42.1 of the ICSID Convention are the provisions determining the law that the Tribunal must apply to the merits of the dispute. Article 42.1 of the ICSID Convention provides that the Tribunal "shall decide a dispute in accordance with such rules of law as may be agreed by the parties." Article 26.6 of the ECT requires the Tribunal to apply "this Treaty [ECT] and applicable rules and principles of international law."[266]

242.    EU Law is part and parcel of Spanish law and is, therefore, subordinate to international law, which must prevail.[267] The regulations and decisions issued by EU bodies are not "international law". They are simple facts, which cannot override Spain's international law obligations and commitments. In this regard, the "CJEU is no more no less than the supreme court of a Contracting Party".[268]

243.    Even if one were to accept the proposition that EU law could be considered as applicable international law, rather than a fact, the application of EU law would be subordinated to the ECT by virtue of Article 16 of the ECT.[269]

### (3)    The Tribunal's Analysis

244.    Before *Achmea*, the intra-EU objection had been repeatedly raised before investment tribunals, both in the context of the ECT and of intra-EU BITs, and repeatedly rejected.[270]

---

[265] November 2017 Hearing, Day 1, 221:14-6.
[266] Cl. Submission of 4 May 2018, para. 42.
[267] Cl. Submission of 29 January 2018, para. 15.
[268] Cl. Submission of 4 May 2018, para. 18.
[269] Ibid, para. 53.
[270] *Eastern Sugar B.V. v. Czech Republic,* SCC Case No 088/2004, Partial Award, 27 March 2007, paras. 160, 165, 167-8, 175, 180, CL-0141; *Rupert Binder v. Czech Republic,* Award on Jurisdiction (UNCITRAL Rules), 6 June 2007, paras. 60-1, 63-6; *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Decision

It was equally rejected, for detailed reasons given, by Advocate-General Wathelet in *Achmea*.[271] It was however accepted by the CJEU in that case, leading this Tribunal to order further written and oral briefing as described in paragraphs 49, 50, 51, 55, 57, and 58 above.

245.  On analysis, the intra-EU objection raises two distinct questions. The first is whether the ECT had *inter se* application prior to the adoption of the TFEU. The second is whether the TFEU changed anything in this regard. Since the CJEU in *Achmea* relied on the TFEU as the basis for its conclusion, it is principally relevant to the second issue.

### (a)  The original scope of the ECT

246.  Spain argues that that when the ECT was signed, the Member States of the European Community were unable to contract obligations between them regarding the Internal Market and that this is why the EU is a contracting party to the ECT.[272]

247.  On its face there is nothing in the text of the ECT that carves out or excludes issues arising between EU Member States.

---

on Jurisdiction, 30 April 2010, para. 190 CL-0142; *Eureko B.V. v. The Slovak Republic,* UNCITRAL, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, paras. 225, 229, 233-245, 249-55, 259-6, 274-77, 279-83, CL-0143; *European American Investment Bank AG (EURAM) v. The Slovak Republic,* PCA Case No. 2010-17, UNCITRAL, Award on Jurisdiction, 22 October 2012, paras. 185-6, 191-7, 209-10, 212, 218, 234, 236, 238, 248-87, CL-0220; *Electrabel S.A. v. Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (hereinafter "*Electrabel v. Hungary* (**Decision on Jurisdiction**"), paras. 4.11, 4.194, 4.196, 5.32, 5.34-7, RL-0002; *Micula v. Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, paras. 319, 321, 326, CL-0100, affirmed on Annulment, 26 February 2016, paras. 189, 191-2, 195, 201-2; *Charanne B.V. Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Arbitration, Arbitration No. 062/2012, Final Award, 21 January 2016 (hereinafter "*Charanne v. Spain* (**Final Award**)"), paras. 429, 435-9, 443-4, CL-0006; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, paras. 74-6, 79-88, CL-0166; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case ARB/14/3, Award, 27 December 2016, (hereinafter "*Blusun v. Italy* (**Award**)") paras. 277-303, RL-0105; *Isolux v. Spain,* (Award), paras. 636-640, 644-6, 653-6, RL-0088; *Eiser v. Spain* (Award), paras. 183-4, 186-199, 204-7, RL-0108.
[271] *Slowakische Republik v. Achmea BV* (Case C-284/16), Opinion of Advocate General Wathelet, 19 September 2017, CL-0223.
[272] Resp. C-Mem., para. 90.

(1)    The preamble to the ECT records that it intends to "place the commitments contained in [the European Energy Charter] on a secure and binding international legal basis." This implies that the scope of the (non-binding) European Energy Charter of 17 December 1991 was replicated in binding form in the ECT. There is no indication of any *inter se* exclusion in the Charter, which refers to a "new desire for a European-wide and global co-operation based on mutual respect and confidence," and further refers to the "support from the European Community, particularly through completion of its internal energy market".[273] The EC and Euratom were signatories to the Charter. This was of course before the Treaty of Maastricht, let alone the Lisbon Treaty.

(2)    Article 1.2 of the ECT defines "Contracting Party" as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force." In accordance with this definition, EU Member States and the EU are all Contracting Parties. *Prima facie* at least, a treaty applies equally between its parties. It would take an express provision or clear understanding between the negotiating parties to achieve another result.

(3)    There is no such express provision (or 'disconnection clause') in the ECT.[274]

(4)    While it is not permissible in a context in which the terms of the treaty are clear to rely on preparatory works,[275] it is worth mentioning that the *travaux préparatoires* seem to point against implying a disconnection clause: one was proposed during the course of the negotiations for the ECT, but was not adopted.[276]

---

[273] ECT, Preamble, RL-0006.

[274] For an express provision, compare the United Nations Convention on the Law of the Sea, Montego Bay, 10 December 1982, 1833 UNTS 397, Art. 35 and Annex IX, esp. Art. 4.

[275] VCLT, Art. 32, RL-0010.

[276] See Energy Charter Treaty, *Draft Ministerial Declaration to the Energy Charter Treaty*, versions 2-7 (version 7, at 6), 17 March 1994, and cf earlier drafts: European Energy Charter Conference Secretariat, *Draft Basic Agreement*

98

248.    Spain states that EU Member States have transferred competence over certain matters in an irrevocable and binding way to the EU and that part of the matters comprised by the ECT are exclusively upon decided by the EU;[277] it quotes the voting rules applicable to a REIO.[278] However, there is nothing in the text to support this argument. The mere fact that the EU is party to the ECT does not entail that EU Member States did not have competence to enter into *inter se* obligations in the Treaty. Instead, the ECT seems to contemplate that there would be overlapping competences. The term REIO is defined in Article 1.3 of the ECT to mean an "organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters." The Area of the REIO is also defined by Article 1.10 with reference to EU law. But nothing in Article 1, nor any other provision in the ECT, suggests that the EU Member States had then transferred exclusive competence over all matters of investment and dispute resolution to the EU.

249.    Pursuant to Article 6 of the VCLT, every State possesses capacity to conclude treaties and is bound by those obligations pursuant to the principle of *pacta sunt servanda.* No limitation on the competence of the EU Member States was communicated at the time that the ECT was signed. Article 46 of the VCLT provides that a State may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance. While EU law operates on both the internal and international plane, a similar principle must apply. Even if, as a matter of EC law, the EC then had exclusive competence over matters of internal investment, the fact is that Member States to the EU signed the ECT without qualification or reservation. The *inter se* obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that Spain argues can be inferred

---

*for the European Energy Charter*, 12 August 1992, para. 27.18. The Parties discussed the existence (or lack of) a disconnection clause in their filings. See Resp. Rej., paras. 74-83.
[277] Resp. C-Mem., paras. 75-8. Resp. Rej., paras. 61-5.
[278] Resp. C-Mem., para. 81. Resp. Rej., paras. 66-8.

from a set of (mostly later) EU laws and regulations dealing with investment. The more likely explanation, which is consistent with the text of the ECT, is that, at the time the ECT was signed, the competence was a shared one.

250.    Spain argues that there is no diversity of territory among the investors and the host State as required by Article 26 of the ECT, since both are part of the same "Contracting Party" for ECT purposes.[279] According to Spain the ECT would only apply to a dispute between an investor from a third party country which is a signatory to the ECT and an EU Member State.[280] But if, as the Tribunal considers, the Member States were Contracting Parties to the ECT in their own right, there is no difficulty in applying Article 26 severally to them in matters concerning their own territory and responsibility.

251.    For these reasons the Tribunal holds that the ECT had *inter se* application prior to the TFEU. The question is whether this position has changed since the adoption of the TFEU.

### (b)    Subsequent EU Treaties and Decisions

#### (i)    The Respondent's position

252.    The Respondent argues that, even if the ECT had originally applied *inter se*, this changed in 2007 with the Treaty of Lisbon.[281] In its view this Treaty "expressly speaks in favour of EU jurisdiction in matters of foreign investments" and overrides the ECT by virtue of the *lex posterior* rule in Articles 30 and 59 of the VCLT,[282] whereby "successive treaties relating to the same subject matter" will prevail over the earlier to the extent that the treaties are not compatible.

253.    Turning first to the substantive investment obligations, Spain argues that these are incompatible with the investment rights protected under European law. Spain points to the

---

[279] Resp. C-Mem., paras. 57-60. Resp. Rej., paras. 6, 15.
[280] Resp. C-Mem., para. 92.
[281] Resp. Rej., paras. 50-1.
[282] Id.

rules establishing the European internal market, with free movement of goods, persons, services and capital.[283] Spain states that discriminatory measures are not permitted under European law.[284]

254.    As far as concerns dispute resolution, the Respondent argues that the dispute resolution clause, Article 26 of the ECT, prevents an intra-EU investor from bringing arbitration proceedings against an EU Member State regarding its investment, and that the clause is itself incompatible with Article 344 of the TFEU,[285] which provides that "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."

255.    Respondent also says that under Article 16 of the ECT's rules for compatibility between previous and subsequent treaties and the ECT, treaties that regulate the EU prevail over the ECT in intra-EU relations.[286]

256.    The Respondent argues that EU law must be applied by the Tribunal in accordance with Article 26.6 of the ECT as "international law". EU law is also part of the laws of Spain and a relevant fact for deciding the dispute.[287]

257.    Moreover, the core of the dispute in this case revolves around issues of state aid. Public subsidies are the largest component of feed-in tariffs. This is a matter regulated by EU law, which is thus decisive in determining the scope of investors' rights under the regulatory framework of renewable energies in Spain.

---

[283] Resp. C-Mem., paras. 65-6.
[284] Resp. C-Mem., paras. 78-9. Resp. Rej., paras. 45-6.
[285] Resp. C-Mem., paras. 83-4, 101.
[286] Resp. C-Mem., para. 79.
[287] Resp. Submission of 4 May 2018, paras. 10-21, 109.

258.    EU Law is not confined to the treaties between EU Member States. It also includes the relevant legal acts of EU institutions such as regulations, directives and decisions as provided for by Article 288 TFEU.[288]

*(ii)    The Claimants' position*

259.    For the Claimants, Articles 26.6 of the ECT and 42.1 of the ICSID Convention are the provisions determining the law that the Tribunal must apply to the merits of the dispute. Article 42.1 of the ICSID Convention provides that the Tribunal "shall decide a dispute in accordance with such rules of law as may be agreed by the parties." Article 26.6 of the ECT requires the Tribunal to apply "this Treaty [ECT] and applicable rules and principles of international law."[289]

260.    EU Law is part and parcel of Spanish law and is, therefore, subordinate to international law, which must prevail.[290] The regulations and decisions issued by EU bodies are not "international law". They are simple facts, which cannot override Spain's international law obligations commitments. In this regard, the "CJEU is no more no less than the supreme court of a Contracting Party".[291]

261.    Even if one were to accept the proposition that EU law could be considered as applicable international law, rather than a fact, the application of EU law would be subordinated to the ECT by virtue of Article 16 of the ECT.[292]

**(4)    Conclusions**

262.    The Tribunal begins by observing that the source of its competence is the ECT, a valid multilateral treaty to which all EU Member States and the EU itself are parties and which is governed by international law. Specifically, Article 26 defines the jurisdiction of the

---

[288] Ibid, paras. 31-36.
[289] Cl. Submission of 4 May 2018, para. 42.
[290] Cl. Submission of 29 January 2018, para. 15.
[291] Cl. Submission of 4 May 2018, para. 18.
[292] Ibid, para. 53.

Tribunal, which (as already held) had *inter se* application when it was concluded. Whether that jurisdiction was excluded by subsequent developments at the European Union level depends on the rules of international law as to the relations between successive treaties.

263.    The starting point is Article 26.6 of the ECT, which provides:

> A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

264.    In *Vattenfall v. Germany*, the tribunal held that:

> […] Article 26(6) ECT, either viewed through Article 42(1) ICSID Convention or interpreted independently of the ICSID Convention, applies only to the merits of a dispute between the Parties. It does not apply to issues or questions relating to the Tribunal's jurisdiction. For this reason, Respondent's argument that Article 26(6) brings EU law and the ECJ Judgment into application in the context of the Tribunal's jurisdiction must fail.[293]

265.    But what the *Vattenfall* tribunal excluded via the front door of Article 26.6, it substantially brought back in as treaty law independently of Article 26.6. It did so in two key respects. First it went on to say that it had to apply "the principles of international law relating to treaty interpretation, application, and other aspects of treaties, which render the ECT workable. They are reflected in the VCLT, and provide the framework through which all treaties are interpreted and applied".[294] Secondly, it agreed with the *Electrabel* tribunal that EU law is part of international law "because it is rooted in international treaties".[295] It went on to qualify that conclusion to some extent in the following passage:

> […] It would be more exact to say that the corpus of EU law derives from treaties that are themselves a part of, and governed by,

---

[293] *Vattenfall AB v. Germany* (Decision on Achmea), para. 121, CL-0236.
[294] Ibid, para. 125.
[295] *Electrabel v. Hungary* (Decision on Jurisdiction), para 4.120, RL-0002, cited in *Vattenfall AB v. Germany* (Decision on Achmea), para. 146, CL-0236.

> international law, and contains other rules that are applicable on the plane of international law, while also containing rules that operate only within the internal legal order of the EU and, at least arguably, are not a part of international law; but for present purposes the *Electrabel* formula suffices.[296]

266.    The present Tribunal does not need to explore the putative "internal legal order" exception raised in this passage. It is clear that the provisions of European law relied on by the Respondent and by the Court in *Achmea* – such as Articles 107, 108, 267 and 344 TFEU – apply as treaty provisions between the EU and its member states and do not pertain just to "the internal legal order of the EU".[297]

267.    To summarise the Tribunal's view, Article 26.6 is itself part of the ECT, which is governed by international law. Article 26.6 is an unexceptionable provision, which would have had to be implied if it had not been expressed. What other rules than those in the ECT and the surrounding rules of international law relating to the jurisdiction of tribunals and the content and interpretation of treaties would be applicable if Article 26.6 were to be given a restrictive interpretation? Whatever route one takes to the applicable law, the result is effectively the same.

268.    The question then becomes what the ECT and relevant rules of international law have to say about the application of EU law.

269.    That matter is regulated in the first instance by Article 16 of the ECT ("Relation to Other Agreements"), which provides:

> Where two or more Contracting Parties […] enter into a subsequent international agreement, whose terms […] concern the subject matter of Part III or V of this Treaty […]

---

[296] Ibid.

[297] Cf the ICJ's discussion of the "Constitutional Framework" for Kosovo as international law in *Unilateral Declarations of Independence*, ICJ Reports 2010 p. 403 at 439-442 (paras. 88-93).

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.

270. By implication this gives priority to Parts III and V of the ECT where two conditions are met: (1) the other treaty (here the TFEU) is one whose terms concern the subject matter of Part III or V, and (2) the other treaty is less favourable to the investor or the investment.

271. The Tribunal would be inclined, if necessary, to hold that the second condition is met here, in that Article 10 of the ECT, in conjunction with Part V, is more favourable to the Investor or the Investment.[298] Nothing in the TFEU allows a direct challenge by an Investor to a State measure harmful to it on grounds specified in Article 10, or on more favourable grounds. Nor does the TFEU provide for an international tribunal to decide disputes directly between investors and host States, as Part V of the ECT does. However, the first condition is in the Tribunal's view not met, because the TFEU is not an international agreement concerning the subject matter of Part III or V of the ECT.[299] Article 16 therefore does not resolve potential conflicts between the TFEU and the ECT.

272. In argument Spain relied on Article 30 VCLT as resolving that conflict, but it does not do so. Article 30 is entitled "Application of Successive Treaties relating to the same Subject-matter". In relevant part it provides:

3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

4. When the parties to the later treaty do not include all the parties to the earlier one:

---

[298] Cf *Vattenfall AB v. Germany* (Decision on *Achmea*), para. 194, CL-0236.
[299] Id.

*(a)* As between States parties to both treaties the same rule applies as in paragraph 3;

*(b)* As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

273. Article 30 is only concerned with successive treaties relating to the same subject matter (see Article 30.1) whereas, as already noted, the TFEU is not a treaty related to the same subject matter as the ECT. Even if it were, the *lex posterior* rule, which is stated in Article 3.3.a and which gives priority to the later treaty to which both states are parties, is inapplicable here.[300] When it is applied to cases where the parties negotiating the later treaty do not include all the parties to the earlier one, Article 3.3.a is without prejudice to Article 41 or to any questions of responsibility which may arise from the coexistence of incompatible treaties: see Article 30.5. This makes it clear that even on an *inter se* basis, questions of responsibility may arise.

274. The relevant provision is thus Article 41 VCLT, entitled "Agreement to modify multilateral treaties between certain of the parties only".[301] It is also the salient provision, because the position taken by Spain (on the assumption that, as the Tribunal has found, the ECT originally had *inter se* application within the EU both as to substance (Part III of the ECT) and procedure (Part V of the ECT) is that the parties to the TFEU thereby excluded the ECT as between themselves.

---

[300] Ibid, paras. 216-218.
[301] Ibid, briefly considered in para. 221.

275.    Article 41 VCLT provides:

> 1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
> *(a)* The possibility of such a modification is provided for by the treaty; or
>
> *(b)* The modification in question is not prohibited by the treaty and:
>
> (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>
> (ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> 2. Unless in a case falling under paragraph l(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

276.    It should be noted that, unlike Article 16 of the ECT or Article 30 of the VCLT, Article 41 is not limited to treaties having the same subject matter. *A priori*, it is capable of applying to the abrogation *inter se* by the TFEU of the ECT, provided the conditions laid down by Article 41, to the extent that they reflect the customary international law of treaty modification, have been met. But in the Tribunal's view, there are two ways in which they have not been met. First, it is not suggested that the parties to the TFEU notified the other parties of the intended modification to the ECT. Secondly, it is very doubtful whether the abrogation *inter se* of the ECT as between EU Member States is compatible "with the effective execution of the object and purpose of the [ECT] as a whole". Article 16 of the ECT suggests that it is not, since it evinces an intent, even as between treaties on the same

subject matter, to preserve the rights of investors and investments, which constitute a major plank of that multilateral treaty.[302]

277.    This interpretation finds support in the ILC's commentary to Article 41. The commentary to draft article 37 (adopted without material change as Article 41) distinguishes sharply between *inter se* modifications and amendments to a multilateral treaty in which all parties to the treaty are involved (the latter dealt with in Article 40 VCLT):

> Clearly, a transaction in which two or a small group of parties set out to modify the treaty between themselves alone without giving the other parties the option of participating in it is on a different footing from an amending agreement drawn up between the parties generally, even if ultimately they do not all ratify it. For an *inter se* agreement is more likely to have an aim and effect incompatible with the object and purpose of the treaty.[303]

278.    As to the procedural condition laid down in Article 41.2 VCLT, the commentary stresses its importance as a means of notifying states parties to the prior treaty of the intention to modify it, and thus supports the conclusion that the requirement reflects general international law:

> *Paragraph 2* seeks to add a further protection to the parties against illegitimate modifications of the treaty by some of the parties through an *inter se* agreement by requiring them to notify the other parties in advance of their intention to conclude the agreement and of the modifications for which it provides.[304]

---

[302] To similar effect *Vattenfall AB v. Germany* (Decision on *Achmea*), para. 229, CL-0236.
[303] ILC Ybk 1966 vol II, p. 235.
[304] Ibid.

279.    Article 41.2 is thus a corollary of the principle expressed in Article 40.2 which protects the right of existing parties to multilateral treaties to be involved in their amendment or modification.[305]

280.    For these reasons, the Tribunal, if it were free to do so, would hold that under international law the TFEU did not modify *inter se* the provisions of the ECT, either as to substance (Part III, notably Article 10) or as to jurisdiction (Part V, notably Article 26). The question is whether the CJEU's decision in *Achmea* compels the contrary conclusion. For just as the European treaties are part of international law, so the CJEU, which exercises jurisdiction as between EU Member States, is an international court whose decisions are binding on those states *inter se*. International law allows the states parties to a regime treaty to establish their own international courts with jurisdiction over and authority to bind the Member States on issues of international law affecting them. It also allows those States to establish the priority of the regime treaty over other sources of international law, at least so long as peremptory norms are not implicated.[306]

281.    As noted in paragraph 224 above, the CJEU held in *Achmea* that:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[307]

---

[305] For the view that the relevant articles, which were adopted without opposition at the Vienna Conference, reflect general international law see ME Villiger, *Commentary on the Vienna Convention on the Law of Treaties* (2009) 516 (Art. 39), 526 (Art. 38), 538 (Art. 41). But the doctrine is divided.

[306] See Art. 53 VCLT, RL-0010. A group of states could no more authorize a court established by them to override a peremptory norm than they could authorize it themselves. But no issue of the application of peremptory norms arises here, nor any issue of the application of Art. 103 of the United Nations Charter: cf Art. 30.1 VCLT.

[307] *Achmea*, para. 60, RL-0111.

282.    If this dictum were to be applied to the ECT, it would authoritatively establish, as between Germany and Spain, that the TFEU modifies Article 16 of the ECT on an *inter se* basis. But the CJEU in *Achmea* was considering a bilateral treaty "concluded between Member States", not a multilateral treaty such as the ECT. Secondly, the CJEU was discussing "an agreement which was concluded not by the EU but by Member States",[308] whereas the ECT was concluded also by the EU and its terms are opposable to the EU.[309]

283.    For these reasons, the Tribunal concludes that its jurisdiction is not pre-empted by the *Achmea* decision. This conclusion does not mean that European law, in particular state aid law, is irrelevant to the merits of the present dispute. Its relevance and impact will be discussed in due course.

## B.    THE TAXATION CLAIM

### (1)    The Respondent's Position

284.    The Respondent contends that the Tribunal lacks jurisdiction to determine whether the 7% tax on the value of electric energy production introduced by Law 15/2012 constitutes a breach of Spain's obligations under Article 10.1 of the ECT, since the TVPEE is a taxation measure exempt from the ECT by means of the carve-out of Article 21 of the ECT.[310]

285.    The Respondent argues that it has not consented to submit to arbitration the resolution of disputes deriving from tax measures as the TVPEE. Pursuant to Article 26.3 of the ECT, Spain consented only to submit to arbitration disputes arising out of alleged breaches of Part III of the ECT. While Article 10.1 of the ECT is included in Part III, the TVPEE – whose introduction allegedly breaches Spain's obligations under Article 10.1 – is a taxation measure exempt from the scope of protection of Article 10.1 by virtue of Article 21.1 of the ECT, which provides that "nothing in this Treaty shall create rights or impose

---

[308] Ibid, para. 58.

[309] To similar effect *Masdar v. Spain* (Award), para. 682, CL-0231; *Vattenfall AB v. Germany* (Decision on *Achmea*), paras. 161-165, CL-0236.

[310] Resp. C-Mem., paras. 104–211, Resp. Rej., paras. 85–157.

obligations with respect to Taxation Measures of the Contracting Parties". Article 21.5 then reapplies Article 13 to taxation measures, subject to a process of preliminary referral to "the relevant Competent Tax Authority", a matter to which the Tribunal will return. But Article 10.1 is not reapplied.

286. The Respondent maintains that the TVPEE is a 'Taxation Measure' as defined by Article 21.7.a.i of the ECT. In accordance with this definition, the TVPEE is a domestic law of Spain, enacted by the Spanish Parliament in accordance with the relevant procedures under Spanish law,[311] and is recognized as a tax under Spanish and international law.[312]

287. Besides, contrary to Claimants' argument,[313] the TVPEE is a *bona fide* taxation measure. It is a tax of general application to renewable and conventional energy producers, which are granted the same treatment without according tax benefits to renewable energy procedures not accorded to others.[314] The Constitutional Court of Spain confirmed the legislator's right to enact the TVPEE, dismissing the appeal brought by the Government of Andalusia against the alleged unconstitutionality of Law 15/2012.[315]

288. Spain further argues that, in the case *Yukos v. Russia,*[316] referenced by the Claimants as examples of non-*bona fide* taxes,[317] the taxation measures imposed pursued a purpose entirely unrelated to that of obtaining revenue for the State, such as the destruction of a company and the elimination of a political opponent. Such extraordinary circumstances are not present here.[318]

---

[311] Resp. Rej., paras. 91-94.
[312] Ibid, paras. 95-111.
[313] Cl. Reply, paras. 68-84.
[314] Resp. Rej., paras. 121-124.
[315] Resp. Rej., para. 130, citing R-0019, Ruling 183/2014 of the Plenary Session of the Constitutional Court, 6 November 2014, (Recinc. 1780/2013).
[316] *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL (PCA Case No. AA 227), Final Award, 18 July 2014 (hereinafter "***Yukos v. Russia* (Final Award)**"), RL-0082.
[317] Cl. Reply, para. 71.
[318] Resp. Rej., para. 115.

289. In addition, the economic effects of the TVPEE on producers of renewable energy is neutralized, as renewable energy producers subject to the payment of the TVPEE receive a special remuneration to recover the costs of the TVPEE, which, unlike conventional producers, they cannot recover in the market, thereby allowing a reasonable return and putting them on equal footing with conventional energy producers.[319]

290. Also, the purpose of the TVPEE is to raise revenue for Spain and contribute to the State resources that finance public expenses. The revenues from the TVPEE are accounted in Spain's annual General Budget; it is not a disguised tariff cut targeting producers of renewable energy.[320]

291. Finally, the Respondent refers to the arbitral jurisprudence of *Isolux v. Spain* [321] where the tribunal declared that it lacked jurisdiction to decide the claim for alleged breach of Article 10.1 of the ECT through the introduction of the TVPEE by Law 15/2012.[322]

### (2)    The Claimants' Position

292. The Claimants argue that the carve-out of Article 21.1 of the ECT only applies to taxation measures that are *bona fide, i.e.* not actions disguised as a tax but aiming at achieving a different purpose.[323]  In this regard, the tribunal in *Yukos* decided that the tax carve-out does not apply to measures that are carried out under the guise of taxation and that have another objective than raising revenue for the State.[324]

---

[319] Ibid, paras.142-145.
[320] Ibid, paras. 146-150.
[321] *Isolux v. Spain* (Award), para. 741, RL-0088.
[322] Resp. Rej., paras. 151-155.
[323] Cl. Reply, paras. 70-84.
[324] Ibid, para. 71, citing *Yukos v. Russia* (Final Award), CL-0134.

293.    Furthermore, the Claimants explains that the TVPEE established by Law 15/2012 is, in its view, not a *bona fide* tax; instead it is a disguised requirement that the producers of renewable energy reimburse Spain for the tariff deficit.[325]

294.    The Claimants maintain that even the Spanish Government explained that the real purpose of the TVPEE "was to slash the remuneration guaranteed by RD 661/2007 to Special Regime producers to reduce the tariff deficit".[326]

295.    Moreover, the Claimants contend that the arguments of the claimants in *Isolux v. Spain* are not the same as those used by the Claimants in this arbitration. This is for two reasons. First, in *Isolux*, the claimants argued that the TVPEE was not a *bona fide* tax because "(1) there was a contradiction between the environmental purpose that Act 15/2012 assigns to the TVPEE and its true purpose, to reduce the tariff deficit; and (2) the TVPEE discriminated photovoltaic producers".[327] As to these arguments, the tribunal decided that only because there is a contradiction between the TVPEE's theoretical environmental purpose and its real one, does not render the TVPEE *mala fide*.[328] Second, the claimants in *Isolux* failed to observe that even if the TVPEE were considered a tax for the purposes of Article 21 of the ECT, it would fall under the terms of a tax "other than those on income or on capital".[329] This is because the TVPEE imposes a charge on "gross revenues", which is not included in the definition of "income" under Article 21 of the ECT. [330]

296.    The Claimants also argue that they are entitled to MFN treatment pursuant to Article 10.7 of the ECT in connection with the Respondent's taxation of foreign investments. Article 10.7 of the ECT requires the Respondent to provide MFN treatment to German investors in the Spanish energy sector. In other investment treaties, the Respondent has agreed to

---

[325] Cl. Reply, para. 79.
[326] Ibid, paras. 76-79.
[327] Cl. Rej., para. 84.
[328] Ibid, paras. 83-87.
[329] Cl. Reply, paras. 85-97.
[330] Ibid, paras. 90-97, Cl-Rej., paras. 88-96.

observe also in relation to taxation measures the standard range of investment protections (umbrella clause, fair and equitable treatment, constant protection and security and non-impairment). Thus, the Claimants are entitled to the same investment protection in relation to the TVPEE by virtue of Articles 21.3 and 10.7 of the ECT.[331]

**(3)    The Tribunal's Analysis**

297.    In agreement with all other tribunals which have faced this issue, the Tribunal holds that the TVPEE is a taxation measure excluded from its jurisdiction under Article 10.1 of the ECT by Article 21.1 of the ECT, which provides:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[332]

298.    The term "taxation measure" is not defined in the ECT, although Article 21.7.a includes "any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein" as well as "any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound."

299.    In the Tribunal's view, the term "taxation measure" should be given its normal meaning in the context of the ECT. According to the tribunal in *EnCana v. Ecuador*:

> The question whether something is a tax measure is primarily a question of its legal operation, not its economic effect. A taxation law is one which imposes a liability on classes of persons to pay money to the State for public purposes. The economic impacts or effects of tax measures may be unclear and debatable; nonetheless a measure is a taxation measure if it is part of the regime for the imposition of a tax. A measure providing relief from taxation is a

---

[331] Cl. Reply, paras. 844-847.
[332] ECT, Art. 21.1, RL-0006.

114

taxation measure just as much as a measure imposing the tax in the first place.[333]

300.  The tribunal was interpreting the term "tax measure" in a BIT, but there seems no reason not to apply its definition here. For the purposes of Article 21.1 of the ECT, it suffices to demonstrate that the TVPEE constitutes a tax, *i.e.* a compulsory exaction of money by law for public purposes.

301.  *Prima facie*, the TVPEE is a tax. It was upheld as such by the Spanish courts. The Spanish High Court dismissed a challenge to Ministerial Order HAP/703/2013 of April 2013,[334] which approved Form 583 by which taxpayers self-assess and pay the TVPEE to the Spanish Treasury. The High Court declared the Order lawful.[335] Second, the Constitutional Court on 6 November 2014[336] dismissed a claim that Articles 4, 5 and 8 of the TVPEE were unconstitutional.[337] The Court ruled that "the challenged provisions do not exceed the freedom of configuration of the legislator, who is in no way prevented from employing taxation [...]"[338] and referred to the TVPEE as "the tax in question".[339]

302.  As to the second limb of the definition of the term "taxation measure", namely whether the TVPEE constitutes a compulsory exaction of money by law for public purposes, this Tribunal agrees with the tribunal's conclusion in *Isolux v. Spain*.[340] The TVPEE was collected by the Spanish State and was compulsory for all producers of electric energy for the purpose of raising funds for the State. The objective of Law 15/2012 was to address the efficient production of energy that respects the environment and sustainability.[341] On

---

[333] *EnCana Corporation v. Republic of Ecuador* (UNCITRAL), Award, 3 February 2006, para. 142, RL-0027 and CL-0005.
[334] Resp. C-Mem., paras. 162-163.
[335] See Judgment of the High Court dismissing appeal 297/2013, 2 June 2014, R-0010; Judgment of the High Court dismissing appeal 298/2013, 2 June 2014, R-0011; Judgment of the High Court dismissing appeal 296/2013, 30 June 2014, R-0012.
[336] Resp. C-Mem., para. 171.
[337] Sentence 183/2014, 6 November 2014, published in the BOE 4 December 2014, R-0019.
[338] Ibid, p. 104, [PDF p. 14].
[339] Id.
[340] *Isolux v. Spain* (Award), para. 740, RL-0088.
[341] Law 15/2012, Preamble, R-0003.

its face, the TVPEE constitutes a compulsory exaction of money by law for public purposes.

303.    In the Claimants' view, however, for a taxation measure to fall within Article 21.1 of the ECT it must have been enacted in good faith. This additional *bona fide* test was applied by the tribunals in *Yukos v. Russia* and in *Hulley v. Russia*. In *Yukos* the tribunal found that:

> […] the carve-out of Article 21 (1) can apply only to *bona fide* taxation actions, *i.e.* actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standard of the ECT under the taxation carve-out in Article 21(1).[342]

304.    The *Yukos* tribunal, like the tribunal in *Hulley*, distinguished between *bona fide* measures and measures aimed at destroying a company or political opponent.[343]

305.    The Tribunal is not confronted with a similar scenario. There is no evidence that Spain intended to destroy the Claimants by means of the TVPEE. As stated by the tribunal in *Isolux v. Spain,* the "economic repercussions or effects of the [T]VPEE may be obscure and debatable, but that does not constitute a sufficient argument to conclude that the [T]VPEE is a tax measure that was promulgated in bad faith."[344]

306.    In *Eiser v. Spain* the tribunal did not decide whether there is a bad faith exception to Article 21.1:[345] it held that the bad faith allegation "could be maintained only if Spain knew or should have known that the RD 661/2007 tariffs cannot be substantially altered, and so

---

[342] *Yukos v. Russia* (Final Award), para. 1407, RL-0082.
[343] Ibid, para. 1407. *Hulley Enterprises Limited (Cyprus) v. The Russian Federation* (PCA Case No. AA 226), Final Award, 18 July 2014 (hereinafter "***Hulley v. Russia* (Final Award)**"), para. 1407, CL-0135.
[344] *Isolux v. Spain* (Award), para. 739, RL-0088.
[345] *Eiser v. Spain* (Award), para. 269, CL-0217.

knowingly violated its obligations under the ECT by adopting Law 15/2012. The evidence is not sufficient to sustain this contention."[346] Likewise in the present case: there was a concern as to the burgeoning tariff deficit, but it was a legitimate concern and it was reasonable that the energy sector as a whole should bear at least part of the fiscal burden.

307.    The decision in *Antaris v. Czech Republic* is not inconsistent with this conclusion. There the tribunal held that a levy chargeable only on the recipients of subsidies and collected by way of an offset against subsidy entitlements was not a tax. The decision on that point is distinguishable *inter alia* on the basis that the Czech Supreme Administrative Court found that the "Solar Levy is not a tax for the purposes of the prohibition against double taxation under Czech law"[347]. The levy's avowed purpose was to reduce the feed-in tariffs for certain investors and not to raise revenue for the State budget.[348]

308.    By contrast the Spanish Constitutional Court in its decision of 4 December 2014 upheld the TVPEE on the ground that:

> […] the challenged provisions do not exceed the freedom of configuration of the legislator, who is in no way prevented from employing taxation as an economic policy instrument in particular sectors … which means for ordinance or extra-fiscal purposes … The widespread application of the tax in question responds to an option open to the legislator, who while respecting constitutional principles, has a broad margin for establishing and setting up the tax. This margin cannot be constrained by demands for a differentiation that is not constitutionally obligatory, however much the appellant feels this is appropriate or necessary, nor by expectations of the maintenance of the pre-existing tax scheme – which in itself, would prevent any kind of legislative innovation.[349]

---

[346] Id.
[347] *Antaris v. Czech Republic* (Award), paras. 233, 238, CL-0243.
[348] Ibid, paras. 250f.
[349] Ruling 183/2014 of the plenary session of the Constitutional Court, 6 November 2014 (translation, p. 14), R-0019.

309.    For these reasons, the Tribunal finds that the TVPEE constitutes a taxation measure for the purposes of Article 21.1 and the claim falls outside the Tribunal's jurisdiction insofar as it involves an alleged breach of Article 10.1 of the ECT.

310.    The Claimants seek to avoid the exclusionary consequences of classifying the TVPEE as a "taxation measure" by relying on Article 21.3 of the ECT, which provides that, with certain irrelevant exceptions, "Article 10(2) and (7) shall apply to Taxation Measures… other than those on income or on capital".  Article 10.7 contains an MFN provision under which the Claimants may invoke other international investment treaties to which Spain is a party.  These agreements contain the standard range of investment protections, including umbrella clauses, fair and equitable treatment provisions and constant protection and security and non-impairment provisions.  Thus, the Claimants argue, Article 21.3 lets in by the back door the protections excluded by Article 21.1 in relation to "Taxation Measures".[350]

311.    But it only does so if the TVPEE is not a "tax measure on income or on capital".  Article 21.7.b of the ECT defines this term broadly as:

> […] all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

312.    The question is then whether the TVPEE is a "tax measure on income or on capital".  In which case the MFN clause in Article 10.7 would not apply. According to the KPMG Expert Witness Report, Law 15/2012 introduced a 7% tax on the "total revenue… for the production and incorporation of energy into the electricity system."[351] The term "total income" used in Article 21.7.b can be equated to the term "total revenue" used by the

---

[350] See above, paragraph 292.
[351] KPMG First Regulatory Report, para. 243, CER-0001.

Claimants' experts. Even if the two terms are not co-extensive, Article 21.7.b states that taxes imposed on "elements of income" also constitute tax measures on income or on capital. If "total revenue" does not constitute the "total income" it undoubtedly constitutes "elements of income".

313.    Article 6 of Law 15/2012 states that the "tax base" is the "total amount that is to be received by the taxpayer".[352]  Further, the "calculation of the total amount will take into account the remuneration […]". The tax is therefore imposed at least on "elements of income".

314.    As a result, the TVPEE is a tax on income in the sense of Article 21.7.b of the ECT. Consequently, the Claimants cannot invoke any other protection standards by means of the MFN clause in Article 10.7 of the ECT.  This further basis of claim must also fail.

## I.    THE MERITS OF THE CLAIM

### A.    INTRODUCTION

315.    The Claimants allege five causes of action arising under the ECT:

(a)    indirect expropriation (Art. 13 of the ECT);

(b)    breach of the umbrella clause (Art. 10(1) of the ECT, last sentence);

(c)    breach of fair and equitable treatment (Art. 10(1) of the ECT, second sentence);

(d)    breach of the obligation of most constant protection (Art. 10(1) of the ECT, third sentence);

---

[352] Law 15/2012, C-0203t.

(e)    impairment of the investment by unreasonable or discriminatory measures (Art. 10(1) of the ECT, third sentence).

316.    Before turning to the merits of these claims, insofar as they fall within the Tribunal's jurisdiction, it is relevant to observe that a large number of parallel claims have been filed against the Respondent arising out of the Disputed Measures, producing somewhat discrepant results.

317.    As a general matter, investment tribunals (like other international tribunals) are not bound by a strict doctrine of precedent, but are charged to make their own appreciations based on the evidence and argument presented to them. On the other hand, in practice tribunals regularly cite previous, publicly available awards and pay careful attention to them. In the Tribunal's view, concordant decisions on the interpretation and application of the ECT are entitled to respect, especially if they rise to the level of a *jurisprudence constante*. On the other hand, where they diverge, a later tribunal has no choice but to form its own view of the relevant law and its application to the facts. This the Tribunal has done.

## B.    OVERVIEW OF THE PARTIES' POSITIONS

318.    This section sets out the Parties' positions regarding (a) the evolution of the regulatory framework for renewable energies in Spain; (b) the scope and legal effect (if any) of the 2010 Agreement; (c) the approval of the new remuneration regime; (d) the impact of the Disputed Measures on the Wind Farms; and (e) Claimants' asserted expectations. Section VI(C) below addresses the claims submitted under the ECT and the arguments of the Parties in relation thereto.

(1)    **Claimants' positions**

(a)    *The evolution of the regulatory framework*

319.    According to the Claimants, Spain committed under EU law and other international instruments to ambitious renewable energy targets.[353] To meet such targets, it put in place a system of feed-in incentives specifically designed to induce "qualifying investors" to invest in Spain[354] and to facilitate their access to project finance.[355] This system, which was promoted by Government officials overseas to attract foreign investment from various countries including Germany (home State of the Claimants) guaranteed, among others, "a price per kWh of electricity produced during lifetime of their RES installations (FiT or FiP)"[356], a right that "ran with the installation, benefitting subsequent investors".[357]

320.    According to the Claimants, Article 30.4 of Law 54/1997 granted Special Regime producers a general entitlement to a premium (i.e. remuneration "shall" be supplemented by a premium).[358]  Successive regulations gave content to this entitlement by establishing specific rights, which were meant to be permanent and to remain stable over time.  As set out in RD 661/2007, these rights included: (i) to choose on an annual basis between Regulated Tariff or the Pool Price plus a Premium Option; (ii) to sell under both options the full net amount of the electricity produced; (iii) to receive the Feed-in remuneration scheme for an unlimited period of time, thus including the entire lifespan of the Wind Farms; (iv) to receive a Feed-in remuneration scheme in which Tariffs, Premiums and upper and lower limits had to be annually updated in accordance with the general CPI less 0.25% until the end of 2012 and less 0.50% onwards; (v) to priority access to the transmission and distribution grid and energy dispatch priority; and, (vi) to receive, regardless of the sale option elected under Article 24.1 of RD 661/2007, a Supplement for

---

[353] Cl. Reply, paras. 22-62.
[354] Ibid, para. 135.
[355] Ibid, paras. 108-119.
[356] Ibid, para. 43.
[357] Ibid, para. 125.
[358] Ibid, paras. 247 to 255.

Reactive Energy for the maintenance of certain stipulated power factor values, which was established at 0.082954 EUR/kWh.[359]

321.    According to the Claimants, only "qualifying renewable energy producers who managed to successfully build, commission and register their installation in RAIPRE and contributed to the objectives set out in the Renewable Promotion Plans, were entitled to the FiTs and FiPs guaranteed in the Feed-in Regulations."[360]  A legal relationship was at that point formed between the investor and the Spanish Government.[361]  Spain thus "made a regulatory compact with investors by offering a vested economic right to earn a FiT or FiP in exchange for committing investments that materialized in renewable installed capacity in Spanish territory".[362]

322.    Neither Law 54/1997 nor the Feed-in Regulations established that Special Regime incentives could be modified or eliminated as a result of macro-economic variables,[363] based on any kind of "sustainability principle" or "self-sufficiency principle". [364]  Between 1997 and 2007, Article 15 of the Law 54/1997 simply provided that the Government shall fix electricity prices against tariffs, transportation and distribution tolls.[365]  It was only in 2007 – ten years after Law 54/1997 – that a principle of "self-sufficiency" was introduced in Article 18.1 of Law 54 by Law 17/2007, and it was not the broad "sustainability" principle described by the Respondent; it only concerned the very specific situation of tariffs of last resort in order to avoid distorting competition.[366]  If there was ever a more encompassing principle of self-sufficiency of the Spanish electricity system, that was only introduced as a binding parameter in December 2012, through Law 15/2012, one of the

---

[359] Cl. Mem., paras. 11, 256, 833, 892.
[360] Cl. Reply, para. 135.
[361] Cl. Mem., para. 150.
[362] Cl. Reply, para. 121.
[363] Ibid, paras. 232-246.
[364] Ibid, paras. 86-99.
[365] See Law 54/1997, C-0032.
[366] See Law 17/2007, C-0501.

Disputed Measures.[367]   Before then, the Respondent had funded part of the electricity system's costs through general State revenues, which disproves the existence of any such principle.

323.   Renewable Energy Plans were not adopted to estimate the costs of increasing renewable energies nor did they set up any discernible limits to an investor's returns. Rather, they estimated the amount of money required to fund the desired increase in installed capacity and decide on effective regulatory stimuli to attract that capital in the form of investments.[368] As noted above, RD 661/2007 guaranteed the right to sell all electricity produced (priority of dispatch), the purpose of which was that investors would not bear the electricity demand risk.[369] The Renewable Energy Plans' estimation of future demand cannot be used to defeat that purpose. Nor can the underlying assumptions concerning returns and operational life prevail over the terms of the applicable royal decrees.

324.   Contrary to Respondent's assertions, Articles 40.3 of RD 436/2004 and Art. 44.3 of RD 661/2007 are not confined to scheduled revisions of the "regulated tariff and the upper and lower limits" of RD 661/2007, or the "tariff, premiums, incentives and supplements" of RD 436/2004. Their scope is much broader. They protect existing installations from any "detrimental adjustment" or "downward revision" (other than those envisioned in the applicable updating and revision provisions) or, at the very least, they created justifiable expectations to that effect.[370] This interpretation flows from the context in which these provisions were issued and the conduct of Spanish authorities in reliance of them.[371]

---

[367] See the Preamble of Law 24/2013, as amended ("Act 54/1997, of November 27, has proven insufficient to ensure the financial equilibrium of the system"), C-0212.

[368] Cl. Reply, para. 61.

[369] Ibid, para. 727.

[370] Ibid, para. 146.

[371] Otherwise, the Claimants asked: "Why did CNE urge the Spanish Government to respect the grandfathering provision of RD 436/2004 during the elaboration of RD 661/2007? Why was the State Attorney required to issue a report on the potential retroactivity of RD 661/2007 in light of Article 40(3) of RD 436/2004? Why did the Spanish Government reach an Agreement with AEE and Protermosolar before introducing retroactive amendments in RD 661/2007 through RD 1614/2010? And further… how could thousands of sophisticated and experienced investors

123

325.  Until 2012 the Respondent had "constantly sought to improve the regulatory stability of renewable energy projects"[372], negotiating any proposed amendment with the renewable energy sector before putting it in place.  RD 661/2007 was not introduced following the adoption of RDL 7/2006 to remedy the "perverse effects" of RD 436/2004 and protect the sustainability of the electricity system as the Respondent contends.  As a matter of fact, the changes made by RD 661/2007 enabled the Government to "establish even higher FiTs and FiPs",[373] which were increased for those technologies having the lower levels of growth such as biomass and thermosolar. Regulated tariffs were also raised for wind installations[374] and the cap & floor mechanism introduced with respect to premiums for all technologies did not benefit the Spanish Government only (i.e. no FiP if market price above the cap) but also investors (i.e. minimum FiP if market price below the floor), strengthening price stability under the FiP option.[375] These changes were all coherent with the Feed-in model.  Moreover, a transitional period was established to protect existing installations.[376]

326.  Nor was RDL 6/2009 adopted to rebalance the sustainability of the electricity system. It was just another "[failed] attempt to deal with the Tariff Deficit in a manner compatible with [Spain's] renewable energy policies, without using renewable investors as scapegoats."[377]  It only affected prospective investors. Even so, investors who managed to get pre-registration and to build on time would benefit from the remuneration's regime under RDL 6/2009. Therefore, "through RD-L 6/2009, the Respondent incentivized prospective investors to make stronger investment commitments in exchange for specific

---

and banking institutions be so naïve so as to commit multimillion euro investments in risky renewable ventures on the basis of meaning less provisions?". Cl. Reply, para. 158. See also ibid, paras. 264-265.

[372] Cl. Reply, paras. 63-85 and 120 *et seq.*

[373] Ibid, para. 81.

[374] Ibid, para. 85.

[375] Ibid, paras. 162-163.

[376] See paragraph 126 above.

[377] Ibid, paras. 180 and 178.

guarantees of stability and legal certainty".[378] Moreover, Spain eventually accepted additional installed capacity above the initial objectives on the basis of studies that concluded that this was economically feasible,[379] which disproves that RDL 6/2009 had been necessary to ensure the sustainability of the electricity system.

327.   Properly understood, FiTs and FiPs were not subsidies but costs to correct market failures and ensure the correct functioning of the electricity market, diversifying and strengthening energy supplies.[380]   They are therefore not covered by the EU state aid legislation.

### (b)   The 2010 Agreement

328.   If there was ever some degree of regulatory risk, Respondent made it disappear in 2010 when it entered into an agreement with the Wind sector to guarantee the stability of the feed-in regulations. After lengthy negotiations, both parties agreed to reciprocal concessions "leading to a compromise solution recorded in writing and described by the Ministry itself as an Agreement without inverted commas".[381] So did multiple Spanish authorities and the AEE.[382]   The Respondent subsequently included the provisions of this agreement into the *first* draft RD 1614/2010 released on 30 July 2010, the relevant date for purposes of Article 24.1.c. of Law 50/1997 on the Spanish Government.

329.   Contrary to Respondent's contentions, these negotiations were not part of any ordinary consultative process under Article 24 of Law 50/1997; they preceded the draft royal decree and cannot be subsumed under that provision. The result of this agreement was Article 5.3, pursuant to which Respondent committed "not to approve regulatory changes that affected the remuneration to be received by La Muela",[383] as reported in contemporaneous documents. This was "an additional guarantee of legal stability to the one existing in

---

[378] Ibid, para. 188.
[379] See paragraph 147 above and the Council of Minister's Resolution of 13 November 2009, C-0405.
[380] Cl. Reply, paras. 100-107.
[381] Ibid, para. 317.
[382] See paragraph 158 above.
[383] Cl. Reply, para. 342.

Article 44.3 RD 661/2007, which did not include a specific guarantee on the Premiums,"[384] its purpose being to serve as a "*cláusula de intangibilidad*".[385]   In addition, the Government included Article 2.4 *in fine*, under which the number of equivalent hours of operation would not be revised for wind farms already registered on RAIPRE, like the Wind Farms.

330.   The access toll introduced by RDL 14/2010 does not in any way disprove the existence of this agreement nor its binding force. Article 17 of Law 54/1997 empowered Respondent to establish access tolls, a factor which was not new for the Claimants when they decided to invest in the Wind Farms. For the Wind subsector this toll, whose economic impact was minimal, was not considered a breach of the Agreement.

331.   Claimants asked, and the Tribunal ordered, the Respondent to produce several documents relative to the 2010 Agreement. The Respondent did not comply with these requests and orders. The Tribunal should, therefore, draw negative inferences against the Respondent when assessing the evidence adduced by the Parties on this point. [386]

### (c)   *The approval of the Disputed Measures*

332.   The changes to the regulatory framework started in 2012, after a new Government took office. The purpose of these changes was to reduce the tariff deficit, a problem of Spain's own creation. Its essential cause lies in "the Government's repeated failure to set regulated retail consumer tariffs that would recover the full costs of the electricity services that Spain regulates"[387] as well as its decision to include in the system costs that do not belong to it, such as support schemes for Spanish insular territories.   Financial incentives to the wind

---

[384] Ibid, para. 347.
[385] Ibid, paras. 350-353.
[386] See Cl. Reply, para. 381 ("The Claimants insist on the fact that the Respondent has not properly complied with PO No. 3 with regard to Petitions 33-35 (granted by the Arbitral Tribunal) and Petitions 23-32 (not ordered by the Arbitral Tribunal in view of the Respondent's representations). Time is now to affirm that the Respondent fully breached PO. No. 3 and that, pursuant to Article 9(5) IBA Rules, the Arbitral Tribunal can interpret missing and unproduced evidence to be adverse to the Respondent as requested Party.")
[387] Cl. Reply, para. 748.

126

sector played only a limited role in the accumulation of the tariff deficit. Even though the Respondent had multiple alternatives available to address this problem, it decided to adopt the Disputed Measures which were neither necessary nor proportionate.

333.    First, Law 15/2012 introduced a 7% cut on the remuneration of energy producers under the guise of an environmental tax, the TVPEE.[388] This measure had a disproportionate effect on wind installations which have generally higher costs. It is also discriminatory because renewable energy producers, unlike conventional (non-renewable) producers, cannot pass the tax over to consumers and the Claimants' Wind Farms do not receive specific remuneration under the new regime; therefore, the fact that the amounts paid for TVPEE are considered recoverable costs under such regime is of no avail.

334.    RDL 2/2013 then eliminated *de facto* the FiP option by reducing premium values to zero, and therewith the "right" to choose annually between FiP or FiT under RD 661/2007. Contrary to Respondent's contentions, this measure did not follow a recommendation made by the CNE to reduce premium by 12% in order to remedy an inconsistency in the premium's calculation; it went far beyond. Nor are the effects of this measure comparable to the termination of the Premium option for *PV producers* introduced in 2007. RD 661/2007 increased the Regulated Tariff as compensation for such measure, making PV investments more attractive. Additionally, the substitution of the CPI, another change brought about by RDL 2/2013, had a negative impact on the Wind Farm's profitability from January 2013 to mid-July 2013.

335.    Just a couple of months later, RDL 9/2013 repealed the Special Regime of Law 54/1997 altogether. It then took a year for the Respondent to substitute the specific remuneration parameters, a period during which producers were left in uncertainty. Such parameters were only set out in RD 413/2014, later supplemented by MO IET/1045/2014. To make things worse, they were to apply retroactively from the date of enactment of RDL 9/2013,

---

[388] Ibid, paras. 384-405.

in July 2013. Meanwhile, payments were made on account of a final regularization under the new regime, leading to the "compulsory payment to the Respondent of EUR 460,000 'unduly' received [by the Wind Farms] between July 2013 and June 2014".[389]

336.    This whole process was the product of "grossly arbitrary and non-transparent conduct by the Respondent".[390]   The draft RD 413/2014 was submitted for fast-track consultation without the remunerative parameters which came later, when MO IET/1045/2014 was approved. This prevented renewable agents from assessing the economic implications arising from the new system. Meanwhile, the Respondent hired two consulting firms, BCG and RB, in an obscure tender process to calculate the remunerative parameters and verify IDAE's estimates and methodology. BCG and RB handed over two reports.  The reports criticized IDAE's hypotheses and methodology, especially when applicable to existing installations. Among others, BCG considered that a standard installation type benchmark should not be applied to existing installations because of their heterogeneity. It also noted that IDAE failed to gather accurate data to adopt the New Remuneration Model. They both concluded that the Respondent considered standard investment costs for each installation type lower than their real costs. BCG also stressed that the Respondent overlooked extensive construction and financing costs incurred by existing projects in defining the standard installation type.

337.    Notwithstanding repeated requests by stakeholders and its own transparency regulations, the Respondent refused to disclose the BCG and RB reports or any other internal studies. Instead, it requested changes to the BCG and RB reports. Pending implementation of these changes, the Respondent adopted the New Remuneration Model behind closed doors disregarding the experts' technical advice and the renewable sector's recommendations. After putting it in place, the Respondent terminated BCG's contract, threatened to execute

---

[389] Cl. Mem., para. 636(x).
[390] Cl. Reply, Section IV.

bank guarantees against BCG and refused to disclose any of the BCG-RB material to investors.

338.   The Claimants asked, and the Tribunal so ordered, that the Respondent produced several documents relative to these reports. The Respondent did not comply with these requests and orders. The Tribunal should draw negative inferences against the Respondent when assessing the evidence adduced by the Parties on this point.[391]

### (d)   The impact of the Disputed Measures

339.   According to the Claimants, the new regime is an unprecedented system based on regulatory principles radically different from the previous regime; more akin to natural monopolies than traditional Feed-in regulations.[392]  It is a "paradigm change" and a "clear cut case of opportunistic regulatory behavior."[393]

340.   The old regime was designed to increase energy output by offering investors higher rates of return on an ex-ante basis if electricity production was maximized efficiently – even if this came at a higher cost.[394]  Neither Article 30.4 of Law 54/1997 nor the Feed-in Regulations capped potential returns; they only set a floor.

341.   Under the new regime, renewable energy installations are no longer *entitled* to incentives and have very few reasons to maximize electricity output.[395]. Specific remuneration is available only if the cap of 7.398% on pre-tax returns is not surpassed, a cap that does not reflect the WACC of the industry, as the CNE has pointed out.[396] To figure this out, past earnings are computed from the start of each plant's regulatory life (hence retroactively), even though none of the Disputed Measures existed before 2012. If the installation

---

[391] Cl. Reply, paras. 703–712.
[392] Ibid, paras. 423-440.
[393] Ibid, paras. 435, 438.
[394] Ibid, paras. 476-490.
[395] Ibid, paras. 471-475.
[396] Ibid, para. 460.

qualifies, it receives specific remuneration for a maximum period of 20 years, regardless of the installation's actual operational life. Plants such as the Wind Farms can operate up to 41.4 years subject to minimum repair and they would have been entitled to feed-in incentives for this whole period under RD 661/2007. KPMG estimates that this would require adding around EUR 67.5 million of CAPEX in 2028[397] (a sum Econ One considers excessive as the total initial CAPEX of the plants was between EUR 94 and 99 million. It proposes to use a figure of EUR 17.2 million instead, which corresponds to the costs of replacing the rotor blades).[398]

342.  The New Remuneration Model applies retroactively to erase the Special Regime *de facto*.[399] The "reasonable rate of return" is calculated taking into account the standard plant's earnings under previous regulatory framework. If the remuneration received prior to July 2013 exceeds the level determined under the new regime, the excess is offset by a reduction in the remuneration to be received from July 2013 onwards. This aspect of the new regime was even criticized by Supreme Court judges.[400]

343.  The investment costs attributed to the Wind Farms (IT-00652) are also lower than their real investment costs. [401]  Order IET 1045/2014 sets an initial CAPEX of EUR 94.7 million for an IT-00652 Standard Facility, whereas the Projects' initial CAPEX was nearly EUR 5 million higher.[402] Moreover, Renerco continued to make investments after 2001, with a current value of the total fixed assets (total CAPEX) of EUR 108.8 million[403] (neither KPMG nor the Claimants explain the precise impact of a higher *total* -as opposed to initial- CAPEX on damages).

---

[397] KMPG Second Damages Report, fn. 128, CER-0004.
[398] Econ One Second Report, paras. 221-222.
[399] Cl. Reply, paras. 501-505.
[400] Ibid, paras. 504-505. See also paragraph 212 above.
[401] Ibid, para. 483.
[402] See KPMG Second Damages Report, para. 164 and fn. 24, CER-0004, referred to in Cl. Reply, para. 483, fn. 441.
[403] KPMG Second Damages Report, para. 165, CER-0004.

344.    As for the Projects' OPEX, KPMG states that they are actually 14% lower than those defined in MO IET/1045/2014. Claimants, therefore, do not make any claim in relation to the New Regime's OPEX estimations.[404]

345.    In addition, TVPEE and penalties for reactive energy continue to apply although the supplement has been erased, and the new obligation imposed on renewable producers to finance situations of tariff imbalance has led to significant delay in payments. For instance, by 30 June 2015, renewable producers had collected only 82.68% of the payments they were entitled to under the new regime corresponding to the first half of 2015.[405]

346.    In the case of the Claimants' Wind Farms, they have been "stripped of every single incentive based on the argument that [they] had already achieved the standard 7,398% pre-tax return, even though this cap did not exist [before]".[406] Cash flows have come down by 81.2% resulting in damages to the Claimants of around EUR 70 MM.[407]  As a result of this, the New Remuneration Model has substantially reduced La Muela's IRR from 9.40% to only 7.08% (after-tax), which means an "impact and an effect on IRR, with a difference of 2.33% (post tax)"[408].  The New Remuneration Model thus deprives the Claimants of their legitimate rewards under the former regulatory regime.[409] The Claimants undertook technological and construction risks because that regime offered the possibility of earning returns higher than what the Respondent now considers to be reasonable.

347.    Because of the impact of the Disputed Measures, the Claimants had to refinance their loans in onerous terms (the "**2016 Refinancing**").  BayWa AG stepped in as guarantor (which is at odds with the non-recourse nature of the original financing arrangement); the payment schedule was prolonged from 19 to 23 years; financial *ratios* are now much

---

[404] Ibid, paras. 159-162.
[405] Cl. Mem, paras. 579-582.
[406] Cl. Reply, para. 483.
[407] November 2017 Hearing, KPMG Quantum Presentation, Slides 27, 49.
[408] November 2017 Hearing, KPMG Quantum Presentation, Slide 75.
[409] Cl. Reply, paras. 491-500.

stricter; the ordinary interest rate increased from 0.75% to 1.60%; dividends cannot be distributed to shareholders until debt is fully repaid and the Project's credit rating has dropped significantly.

348.    Lastly, the New Remuneration Model is the antithesis of stability. It contemplates deep regulatory changes every three and six years: "Today the 'reasonable rate of return' is 7.398%. But tomorrow it could be 6% or even 5%. It all depends on the Respondent's mood, since the methodology (if any) for updating the 'reasonable rate of return' or, more specifically, the spread that will apply in future regulatory periods has not been disclosed."[410]

### (e)    The Claimants' expectations

349.    Claimants state that they did not expect that a particular royal decree would remain frozen, but they did expect, and were entitled to expect, that any change would preserve "the essential conditions that were guaranteed when they invested (FiT or FiP during the entire lifetime of La Muela)."[411]

350.    The original investors built up the Wind Farms under this understanding.[412]  Upon its incorporation on 7 November 2003, BayWa AH (formerly RENERCO) "inherited the expectations of its founding companies."[413] These expectations "evolved as Spain developed the Special Regime in line with its renewable policies":[414] first, by the enactment of RD 436/2004 which improved the conditions of RD 2818/1998 and included a express grandfathering commitment (i.e. Article 40.3); and then by RD 661/2007 which kept the essentials of the previous royal decree and included an additional grandfathering commitment. Claimants' expectations were further confirmed after the Spanish Government and AEE reached the July 2010 Agreement in which further promises of

---

[410] Cl. Mem., para. 569. See also paragraph 202 above.
[411] Cl. Reply, para. 209. See also ibid, para. 274.
[412] Ibid, para. 202. See also the January 2001 prospectus issued for prospective investors in La Muela, C-0022.
[413] Cl. Reply, para. 208.
[414] Id.

stabilization were made. Thus, when the opportunity arose on 8 September 2011, to acquire a controlling stake in La Muela from Shell, the Claimants did not hesitate to increase their investments in the Spanish renewable sector. This is the relevant date for legitimate expectation purposes. It was in reliance of the regulatory framework as it stood at the time, that BayWa AH (through BayWa RE) decided to acquire a controlling stake in the Wind Farms.[415] For due diligence purposes, however, the relevant date should be November 2009, when BayWa AH acquired most shares of Renerco (later renamed BayWa RE).[416]

351.  The Supreme Court decisions cited by the Respondent are irrelevant to the assessment of Claimants' expectations.[417] The vast majority of them were issued "after the Claimants invested in La Muela (i.e. …from September 2011 onwards)".[418] Those issued before cannot simply "override the numerous statements made by the Spanish Government regarding the meaning of Regulatory Framework No. 1 and the express assurances made under the Agreement […]".[419] First of all, these decisions concerned appeals under Spanish law seeking annulment of royal decrees for violation of Spanish law's hierarchy of norms. They did "not consider the reasonable expectations of investors and the liability of the Spanish administration as a result of these expectations being frustrated."[420] The subject-matter of these proceedings is therefore very different from this arbitration. Second, they deal with relatively "minor modifications to specific features of an installations' remuneration"[421] the extent of which was tempered by grandfather clauses and transitory provisions. They did not concern a complete change of paradigm eliminating all incentives, as in this case. Third, investors are not required under the ECT to carry out exhaustive research into the case law of the host State. Due diligence is all

---

[415] Tr-E, November 2017 Hearing, Day 5, Mr. Fortún, pp. 29-30.
[416] Ibid, pp. 30-31.
[417] Cl. Reply, S. 5, paras. 273-315.
[418] Ibid, para. 277.
[419] Ibid, para. 279.
[420] Ibid, para. 284.
[421] Ibid, para. 285.

that is needed. Fourth, following these decisions, AEE and the Spanish Government reached the July 2010 Agreement. The existence of this agreement and the commitments adopted thereunder "has a stronger impact on the Claimants' legitimate expectations than any of the prior and subsequent judgments adopted by the Supreme Court."[422] The Supreme Court cannot contradict the Government's public declarations. None of the presentations made by Government officials mentioned the Supreme Court's case law to prospective investors, nor that the whole system could be abrogated without compensation based on macro-economic variables.[423]

352.  The new regime came unexpectedly for existing installations. It is not true that the new measures were announced at the end of 2011 and that investors should have seen them coming. The new regime developed chaotically from 2012 until the end of 2014. Even as late as in July 2013, no one knew exactly what sort of reform the Respondent would implement. The only thing that was announced in 2011 was the new Government's determination to address the tariff deficit.

353.  Likewise, the existence of the tariff deficit does not undermine Claimants' expectations. Spain adopted RDL 6/2009 to remedy the tariff deficit, while it guaranteed that in the event that pre-registered capacity was higher than the capacity objectives established in Article 37 of RD 661/2007, the remuneration regime under RD 661/2007 would be limited exclusively to pre-registered facilities (Fifth Transitional Provision). In these circumstances, Claimants had even stronger grounds to assume that their investment in the Wind Farms, which had been registered as far back as 2002, would not be negatively impacted by the Respondent's issues with the Tariff Deficit. The same considerations apply with even stronger force to the Resolution of the Council of Ministers of 13 November 2009. By this resolution, the Government decided to accept capacity in excess of the initial targets on the basis of reports that concluded that the system could stand

---

[422] Ibid, para. 295.
[423] Ibid, para. 314.

3,100 MW per year until 2014.[424] Another reason for the Claimants to believe that pre-existence of the Tariff Deficit would not jeopardize the stability of the Feed-in Model applicable to the Wind Farms is the fact that the financial support to the wind sector, and to renewable energies in general, was not the main reason for the accumulated Tariff Deficit.

354.   Finally, the Respondent's insinuations on state aid have no bearing on this case. It was perfectly reasonable for the Claimants to believe that the regulatory framework as it stood was compatible with EU law.  Spanish authorities never notified their feed-in legislation to the EC. Raising this issue at this point is just an attempt by the Respondent to abuse this proceeding.

### (2)   The Respondent's position

#### (a)   *The evolution of the regulatory framework*

355.   Law 54/1997 guaranteed a reasonable return to investments of Special Regime producers calculated by reference to the cost of money in the capital market (Article 30.4).  Nothing else was promised or guaranteed.[425]

356.   To ensure this level of remuneration, subsidies were offered to producers "where applicable" to cover their costs and ensure a profit (Article 16.7).[426]  Although subsidies took the form of "feed-in" incentives through various royal decrees (e.g. RD 2818/1998; RD 436/2004, RD 661/2007), Law 54/1997 did not impose this form of remuneration nor did it require the Government to maintain it.[427]

357.   Law 54/1997 guaranteed a reasonable return and not a more precise remuneration rate because that would have undermined the capacity of the Government to adjust

---

[424] Ibid, paras. 190-199.
[425] Resp. Rej., paras. 205-209.
[426] Ibid, para. 210.
[427] Ibid, paras. 230-235.

remunerations if the application of any given formula resulted in returns higher than reasonable and thus in contravention of Law 54/1997 and EU state aid regulations, or where the system's sustainability so required.[428] The framework was meant to be flexible to cope with changing economic, social and technical conditions in a highly regulated and economically sensitive area.  Furthermore, the fundamental criterion used by Law 54/1997 to judge the reasonableness of the rate of return is the cost of money in the capital market (i.e. interest rates), which is in itself a dynamic benchmark.[429]

358.    Precise remuneration values were thus left to lower-rank, ease-to-amend, regulations such as royal decrees, which can be superseded by subsequent regulations of the same rank under the Spanish law principle of hierarchy of norms.[430]  As confirmed by Spanish courts every time an amendment was challenged by producers since as early as 2005, this left the Government with ample discretion to substitute existing regulations and modify remuneration formulas in respect of both existing and prospective installations provided that a reasonable return was preserved.[431]

359.    Registration in the RAIPRE did not confer an acquired or vested right to a specific remuneration rate or regime.[432] It was just an administrative requirement applicable to all special (i.e. renewable energy) and ordinary (i.e. conventional) regime facilities feeding electricity into the grid. None of these facilities was granted a license, contract or concession under Spanish law as a result of registration.  The CNE made this clear as early as in 2004, in a report on a preliminary draft of Royal Decree 436/2004.[433] So did Spanish courts around the same time.[434]

---

[428] Ibid, paras. 93-108, 244-258 and 312-336.
[429] Ibid, para. 257.
[430] Ibid, para. 249.
[431] Ibid, paras. 259-263. See also paragraphs 107, 112, 134, 148, 149.
[432] Resp. Rej., paras. 421-439.
[433] See paragraph 94 above referring to CNE Report 4/2004 of 22 January 2004 on the proposed RD 436/2004, p. 42, R-0126.
[434] See paragraph 107 above referring to the 2005 Supreme Court Judgment, R-0137.

360.    Articles 40.3 of RD 436/2004 or 44.3 of RD 661/2007 did not preclude all sorts of detrimental changes or downward revisions as the Claimants contend.[435] Only mandatory quadrennial revisions of the "regulated tariff and the upper and lower limits" of RD 661/2007, or the "tariff, premiums, incentives and supplements" of RD 436/2004, were excluded in respect of registered installations. Those are the scheduled "reviews [or revisions] referred to [and provided for]" in the corresponding sections of Articles 40.3 and 44.3 as it follows from their own terms.[436]

361.    Extraordinary revisions were still possible and permissible including "(i) those resulting from adopting macroeconomic control measures or (ii) to avoid situations of excess remuneration or unreasonable return or (iii) to guarantee the economic sustainability of the SES."[437] So were changes in other variables having an impact upon remunerations such as the number of hours amenable to tariffs and premiums; the index used for adjusting tariffs and premiums to inflation; the supplement (or penalty) for reactive power and taxes or other fiscal measures. Moreover, neither Article 40.3 of RD 436/2004 nor Article 44.3 of RD 661/2007 provided anything concerning the right to choose between tariff or premium subsidies.

362.    That is why RD 436/2004 Article 40.3, whose wording is very similar to RD 661/2007 Article 44.3, did not entail that RDL 7/2006 froze remunerations for all registered plants.[438] Nor did it prevent RD 661/2007 from reducing remunerations under RD 436/2004, including for existing plants with no exception as of 31 December 2012.[439] All these changes were upheld by Spanish courts.[440] The *Charanne* and *Isolux* tribunals denied that a promise of stabilization could be read into Article 44.3 of RD 661/2007.

---

[435] Resp. Rej., paras. 517-552.
[436] See paragraphs 98 and 128 above.
[437] Resp. Rej., para. 526.
[438] Ibid, paras. 379-387.
[439] See paragraph 126 above.
[440] See paragraphs 107, 112, 134, 148 and 149 above.

363.    According to the principle of economic sustainability, regulated revenues (i.e. tariffs paid by the consumers) ought to be sufficient to cover regulated costs (i.e. incentives, premiums, etc.).[441] As Claimants' own experts concede, this principle follows from the architecture of the legal framework; it was not introduced for the first time in 2007 or 2012.[442] Since its enactment in 1997, Article 15.1 of Law 54/1997 provided that "[a]ctivities involved in the supply of electric power shall be remunerated economically in the manner provided by this Act, based on the tariffs, tolls and prices paid".[443] Contrary to Claimants' contentions, what Law 15/2012 did was to establish an exception to this principle by authorizing electricity system's costs to be funded through general State revenues. This confirms rather than disproves the general rule of self-sufficiency.

364.    Just as royal decrees cannot be interpreted in isolation of higher norms to which they are subordinate, they cannot be dissociated from the renewable energy plans upon which they are based.[444] These plans did not only estimate costs as Claimants contend.  They also assessed whether these costs were sustainable for the electricity system as a whole based on technical and economic assumptions, including projections of electricity demand, standard lifetime of plants, operating hours, average costs, among other things.[445] The fact that regulations were predicated upon these plans, including their underlying assumptions, was no mystery.  The preambles of both RD 436/2004 and RD 661/2007 refer explicitly to the 2000 and 2005 Renewable Energy Plans, respectively.[446]

365.    As these plans show, remunerations for wind farms such as the Claimants' installations were intended to be at around 7% after taxes (with own resources) based on an estimation

---

[441] Resp. Rej., paras. 109-120.
[442] Resp. Rej., para. 115 where reference is made to KPMG Second Regulatory Report, paras. 113, 123-124, 262-263, CER-0003.
[443] Resp. Rej., paras. 117, 1110 [Respondent's English translation].
[444] Resp. Rej., paras. 121-147.
[445] Resp. Rej., paras. 264-298. See also paragraphs 92, 104, 150 above.
[446] See R-0099 [PDF p. 5] and R-0101 [PDF p. 3].

138

of around 2,350 to 2,400 operating hours/year and a lifespan of 20 years.[447] Standard installations were used as a reference for setting all these values.[448] Contrary to Claimants' allegations, financial costs were never considered to be a recoverable investment for purposes of calculating returns. This is the same methodology used by the CNE in its reports on draft decrees 436/2004 and 661/2007.[449] All these values were commented on in various studies made by renewable energy associations since as early as 2005.[450]

366.  It is not true that RD 661/2007 intended to offer higher returns[451] or that it was designed to attract foreign investment: "no precept specifically designed for this purpose can be found in any of the articles of RD 661/2007. Neither RD 661/2007 nor any of the legislation regulating the SES is a Foreign Investment Act. Neither does it provide for tariffs and premiums to be fixed in foreign currency, nor for them to be updated based on non-domestic indices. Far less do they provide that their modification would require the consent of the foreign investor." [452]  Rather, RD 661/2007 was introduced to substitute RD 436/2004 and fix the "perverse effects" of the TMR on remunerations.[453] This index, which remunerations under RD 436/2004 were tied to, was calculated based on the costs of the electricity system. Subsidies to renewable energies (in the form of premiums and/or regulated tariffs) are one of these costs. Thus, while the TMR was in place a constant feedback (or loop effect) in remunerations occurred. This led to a disproportionate increase in the costs of the electricity system and "windfall profits" for renewable energy installations including wind farms.[454]  That is why RDL 7/2006 was adopted in the form

---

[447] See paragraphs 92 and 104 above.
[448] Resp. Rej., paras. 280-298.
[449] Economic Report of Royal Decree 436/2004, R-0100. CNE Report 4/2004 of 22 January on the proposal of Royal Decree which establishes the methodology for updating and systematizing the legal and economic system of electricity production in Special Regime, R-0126, pp. 8-9.
[450] Resp. Rej., paras. 300-306.
[451] Ibid, paras. 328-329.
[452] Ibid, para. 199.
[453] Ibid, paras. 330-336 and 365-378.
[454] Ibid, para. 334.

139

of an urgent measure (i.e. a RDL) followed by RD 661/2007. This is clearly reflected in RDL 7/2006's preamble.[455]

367.   The 2005 Renewable Energy Plan, upon which RD 661/2007 was based, did not call for a remuneration increase to all renewable energy installations.[456] The Claimants misrepresent the preparatory works leading to the enactment of RD 661/2007.  The 2005-2010 Renewable Promotion Plan expressly stated that the initial objectives set out for most technologies including wind power could be achieved by maintaining the current remuneration levels.[457]   In fact, RD 661/2007 went as far as to reduce remuneration conditions for PV technology by eliminating with immediate effect the possibility to choose between regulated tariff and pool price plus premium.  It did this notwithstanding Article 40.3 of RD 436/2004, one of Claimants' purported stabilization commitments.

368.   As it is well known, the 2009 financial crisis had an extraordinary impact on the Spanish economy. This led to a sharp fall in the electricity demand which, in turn, caused tariffs to rise much more than the average European level. Many of the most critical assumptions upon which RD 661/2007 was premised were disproved, including electricity demand forecasts, which bear deeply in the overall balance of the system.

369.   Prompted by the crisis, the Government adopted a series of measures starting in 2009 to ensure the economic sustainability of the system and address the growing tariff deficit.[458]

370.   The first measure was RDL 6/2009, whose title and preamble speak for themselves.[459] This Decree set up a pre-assignment register and gave the Government the power to scale up entry into operation of preregistered installations. Although new capacity above the initial thresholds was later accepted, the technical reports upon which this decision was made warned about potential risks for the sustainability of the system: "[t]herefore, any

---

[455] See paragraph 109 above.
[456] Resp. Rej., paras. 350-357.
[457] See paragraph 104 above.
[458] Resp. Rej., paras. 388-392.
[459] Ibid, paras. 393-420. See also paragraph 143 above.

diligent investor who had, at least, read the Preamble to the 13 November 2009 Agreement, would have known that, if any of the risks noted should arise, the Kingdom of Spain would have to continue implementing measures to ensure the economic and technical sustainability of the SES."[460] RD 1578/2008 had already introduced preregistration for PV plants and yet the Government made changes in 2010.[461]

371.    Similarly, the 2010 Renewable Energy Plan was more explicit than its predecessors in stressing the importance of sustainability and the need for "…minimising the speculative risks posed in the past by excessive rates of return, which not only hurts consumers but is also damaging to the industry in general…"[462]

372.    RD 1565/2010 then eliminated regulated tariffs for PV installations from their 25th year of operation and introduced additional requirements concerning wind farms on wind facilities.[463]

*(b)    The 2010 Agreement*

373.    RD 1614/2010 was enacted shortly thereafter. Like previous measures, its essential purpose was to guarantee the long-term sustainability of the electricity system. Its Regulatory Impact Report makes this clear.[464]

374.    Consistent with this purpose, RD 1614/2010 reduced remunerations to both existing and prospective wind facilities (although in different degrees), and limited the number of hours amenable to premiums above certain thresholds.[465]

---

[460] Resp. Rej., para. 419.
[461] See paragraphs 138 and 144.
[462] See Spain's National Renewable Energy Action Plan 2011-2020, R-0120, p. 118. See also Resp. Rej., paras. 451-461.
[463] Resp. Rej., paras. 462-470.
[464] Regulatory Impact Analysis Report of the draft Royal Decree (1614/2010), R-0082, (RD 1614/2010 deals with "problems that need to be addressed before they pose an irreversible threat to the economic and technical sustainability of the system").
[465] See paragraphs 170 and 171 above.

375.    Article 5.3 was not a compromise nor was it intended to preclude the Government from making further changes going forward.[466] This provision just made Article 44.3 paragraph 2 of RD 661/2007 (concerning the inapplicability of ordinary remuneration revisions in respect of registered plants) valid with regard to not only tariffs, caps and floors (which were already covered by Article 44.3) but also premiums (like former Article 40.3 of RD 436/2004) in relation to both registered and pre-registered installations (i.e., installations that had been commissioned under RDL 6/2009).  In doing so, the Government sought to avoid an unintended consequence of RDL 6/2009 – namely, that ordinary revisions contemplated in Article 44.3 paragraph 1 applied to pre-registered installations, which was not judged convenient at the time. This is expressly noted in the preamble of RD 1614/2010.[467]  Just like Article 44.3 (to which Article 5.3 is tied), Article 5.3 did not rule out other revisions or adjustments.[468]

376.    The fact that RD 1614/2010 was discussed with and eventually supported by renewable energy associations such as AEE does not change its nature nor does it turn it into a preclusive agreement of any kind.  Consultations with stakeholders are mandated by the law of administrative procedure for the approval of royal decrees (Article 24.1.c and d of Law 50/1997). Multiple examples of like negotiations exist.[469] Contrary to Claimants' contentions, they can take place either before or after the hearings contemplated in the administrative procedure law.  Here they took place before. There is nothing exceptional about it.

377.    Whether an agreement is reached or not, the Government retains the power to enact proposed regulations.  RD 1565/2010 was passed, for instance, even though PV producers strongly opposed it and no agreement was reached.  Moreover, under Spanish law even if

---

[466] Resp. Rej., paras. 553-568.
[467] See paragraph 169 above.
[468] Resp. Rej, para. 566 (thus: "if Article 40.3 of RD 436/2004 did not prevent the reviews instrumented through RD-Act 7/2006, RD 661/2007, RD-Ley [sic] 6/2009, the Agreement of the Council of Ministers of 13 November 2009 and RD 1565/2010 from affecting the existing installations, articles 4 and 5.3 of RD 1614/2010, approved on 7 December, would also not prevent other reviews").
[469] Resp. Rej, para. 477.

an agreement is reached and the proposed regulation is enacted, the Government may still repeal or amend it if considered appropriate. Law 54/1997 was agreed upon and yet it was revised several times and eventually derogated from. Tellingly, not even AEE asserted any such argument when it challenged the Disputed Measures in the Spanish courts.

378.    Similarly, RD 1614/2010 did not prevent the Government from issuing RDL 14/2010 just weeks after concluding the alleged agreement.[470] This measure introduced access tolls in respect of all producers including wind installations, thereby in effect cutting down remunerations.  This shows that neither RD 1614/2010 nor the agreement upon which is said to be based was intended to curtail the Government's ability to introduce further adjustments to remunerations if the sustainability of the system so required. The preamble of RDL 14/2010 is clear about this.[471]

### (c)    *The approval of the new regulatory regime*

379.    As with the 2009-2011 measures, the Disputed Measures sought to ensure the economic sustainability of the electricity system and correct situations of overcompensation in the context of a severe economic crisis.

380.    As a result of the global financial crisis, Spanish GDP shrank, the rate of unemployment grew from 8% in 2007 to 25% in 2012; the fiscal position of the Government deteriorated; the accumulation of budget deficits between 2008 and 2012 resulted in an increase in Spain's Government debt from 39% of GDP in 2008 to 85% of GDP in 2012; revenues in the electricity system were negatively impacted by lower demand for electricity and the tariff deficit went from EUR 2 billion in 2005 to EUR 26 billion in 2012.

381.    It was in this context that the Disputed Measures were adopted. But these were not the only measures taken by the Government. Electricity prices paid by consumers were raised becoming one of the highest in Europe; the Government committed funds from the State

---

[470] Resp. Rej., paras. 501-11.
[471] See paragraph 173 above.

budget to fund the deficit as an exception to the self-sufficiency principle; entry into operation of pre-registered plants was deferred; remunerations for transmission and distribution activities were reduced, and so was the remuneration for electricity production in insular territories; payments for capacity were also reduced, among many other steps. Even though subsidies to renewable energies are a main cost of the electricity system, the Government sought to balance out the measures.

382.    The first of these measures was Law 15/2012, which introduced a 7% tax on electricity producers (i.e. the TVPEE).[472] This tax did not have a disproportionate impact or discriminatory effect on renewable energy producers; it applied to both conventional and renewable energy producers alike. Moreover, Law 15/2012 not only introduced the TVPEE; it also created three additional taxes unrelated to renewable energy. Finally, if conventional producers could pass on the tax to consumers, renewable energy producers, whose remuneration is calculated by reference to market prices, would benefit from the resulting market price increase. This disproves the idea that renewable energy producers were disproportionally affected by this measure.

383.    RDL 2/2013 then fixed premiums at 0 EUR/kWh under the Price plus Premium and Incentive option for certain technologies including wind energy and substituted a new index, the CPI, for updating remunerations.[473] The former measure was in line with RD 661/2007, which had years before eliminated the Price plus Premium and Incentive option for PV technology, leaving PV producers with regulated tariffs only.[474] It is not true that RD 661/2007 increased the Regulated Tariff in compensation for this measure. As for the CPI, this measure was adopted to bring the remuneration's updating mechanism into conformity with generally accepted economic practices in other States, excluding some of the most variable inputs from the calculation's formula. During its brief tenure (it

---

[472] Resp. Rej., paras. 751-757.
[473] Ibid, paras. 758-771.
[474] See paragraph 127 above.

was superseded by subsequent regulations), it did not cause any prejudice to the Claimants' Wind Farms.

384.  The process that led to Spain's adoption of the Disputed Measures was also transparent.[475] Spain announced in 2011, this is, more than 2 years before the first measure was taken, that it was considering a structural reform to the system.  All main measures were put out for public consultations with stakeholders. The largest renewable energy associations such as APPA and AEE actively participated in this process. The comments received were carefully considered by the Spanish authorities: many of these were accepted, resulting in changes to the initial drafts.[476]

385.  For instance, the first draft of RD 413/2014 was made public only 4 months after RDL 9/2013 came into effect. Claimants base their critiques against this measure on a CNE report of the time. However, they omit to say that, precisely as a result of the CNE's observations, the Government restarted the process to have this decree approved including all the requisite legislative steps. Later, the CNE issued a new report in which it praised the Government for having taken care of its observations. In other words, the Claimants' critiques were fixed during the legislative process. Similarly, the first draft of MO IET/1045/2014 was circulated only 3 months after the draft RD 413/2014 and received observations from all over the industry including AEE.[477]

386.  The Claimants misrepresents the real purpose and scope of the BCG and RB's reports.[478] BCG and RB were not engaged to calculate the basic parameters of MO IET/1045/2014; their role was to provide support and technical assistance. IDAE was the real technical expert. As neither BCG nor RB finalized their reports in time, they could not be added to the administrative file that led to the approval of RD 413/2014 and MO IET/1045/2014 or be made available to the public. The working documents that the Claimants complain

---

[475] Resp. Rej., paras. 855-879.
[476] Ibid, para. 866. See also R-0086.
[477] Resp. Rej., paras. 870-878.
[478] Ibid, paras. 880-918.

about not having been disclosed were just preliminary drafts, not yet final, and were subject to confidentiality obligations.

387.    Be that as it may, the investment costs (CAPEX) considered by MO IET/1045/2014 fall within the ranges proposed by BCG and RB in their working documents and are fully in line with the market averages at the time the Claimants' facilities were built. The operating costs (OPEX) included in the MO IET/1045/2014 are also in line with those observed by both consulting firms. The methodology employed in MO IET/1045/2014 was endorsed by BCG as the only one possible. Finally, both BCG and RB consider that it is "necessary to take account of the past remuneration of the Plants in order to be able to set the future remuneration, without this involving retroactivity."[479]

### (d)    The impact of the Disputed Measures

388.    According to Spain, the new remuneration's regime is neither "opportunistic" nor does it amount to a "paradigm change" as the Claimants contend.[480] The essential aspects of the former regulation, as properly understood, are preserved.

389.    Both the former and the new remuneration's regime seek to provide a "reasonable return" on the investment and operating costs of a "standard" renewable energy facility by reference to the cost of money in the capital market (*i.e.* a dynamic benchmark).[481] Although the new regime specifies that the rate to be used for this purpose is that of the average yield of ten-year Spanish Government bonds plus 300 basis points, the result is essentially the same: a rate of return of 7.398% (pre-tax) which is consistent with the 7% return that the old regime sought to provide.  In this respect, "the new System not only continues with the previous System, but it gives investors greater security because (1) it enshrines in law the return that should be granted to investors, (2) it identifies the specific

---

[479] Resp. Rej., para. 951.
[480] Cl. Reply, paras. 435, 438.
[481] Resp. Rej., paras. 781-793, 825-854.

capital market that should be used for setting the return and (3) it sets the specific return that investors can aspire to."[482] It also sets out clear timeframes for purpose of reviewing the operation of the various remuneration criteria, something that the Government did in practice under the previous regime by enacting successive royal decrees.[483]

390.    Contrary to Claimants' representations, the old regime did not offer subsidies indiscriminately. They were subordinated to the goal of providing a reasonable return to investors as a complement to market prices. They were due therefore only "where applicable" to accomplish this goal. This is very clear from the terms of Article 30.4 and Article 16 of Law 54/1997.[484]    As noted above, although from 1998 to 2012 subsidies were given in the form of "feed-in" incentives through various royal decrees (e.g. RD 2818/1998; RD 436/2004, RD 661/2007), Law 54/1997 did not impose this form of remuneration nor did it require the Government to maintain it.    In any event, both the former and the new remuneration regimes provide generous subsidies to renewable energy producers.[485]

391.    The New Regime is not "retroactive"; it only applies prospectively.[486] It considers existing situations such as the income received by the installations under the previous regime for the sole purpose of setting remunerations for the future. This is needed to comply with EU state aid regulations. It would be "retroactive" if producers were compelled to return the income received above the target rate of return, but that is not the case. This is expressly forbidden by Law 24/2013 (Third Final Provision). Thus, even if a facility has received payments above the target level of return, the State is not authorized to claim back or collect the excessive remuneration.

---

[482] Ibid, para. 784.
[483] Ibid, paras. 826-827.
[484] See paragraphs 87 and 88 above.
[485] Resp. Rej., paras. 775-776.
[486] Ibid, paras. 576-589.

392.    The difference between the two systems lies in the manner in which subsidies are set forth.[487] Under the old regime (as supplemented by RD 661/2007), subsidies were given in the form of feed-in incentives and were thus tied to production; under the new regime, subsidies are based on cost estimations. Although these two methodologies differ in that respect, both seek to cover the estimated investment and operating costs of a standard facility and leave the owner with a profit of around 7%. Importantly, not even under the old regime were subsidies provided for the full production of the plants, but they were capped to a maximum number of operating hours. This limitation was introduced by RD 1614/2010 in respect of wind facilities, a measure that the Claimants have not challenged in this case.  Before then, operating hours were factored in by renewable energy plans along with other variables to calculate the incentives needed to allow for a reasonable return.

393.    Just like under the old regime, producers still have an incentive to be efficient in terms of costs and to produce more than the estimated operating hours.[488] Although no subsidies are granted above that level, the electricity delivered can be sold at pool prices and is afforded priority of access to the grid. If, in addition, producers manage to have lower costs than those estimated, their net profit will be higher than 7.398% (pre-tax). The only difference in this respect is that now the framework contemplates more types of standard facilities.

394.    The costs estimations that the new regime seeks to cover adequately and to reflect CAPEX and OPEX of actual plants.[489] They were made carefully based on information collected by IDAE for years about the operation of real plants in Spain. But generalities aside, the Claimants have not even compared the estimated costs in the MO IET/1045/2014 with the actual costs of their Wind Farms. Instead, they claim damages for the whole difference in

---

[487] Ibid, paras. 816-824.
[488] Resp. Rej., paras. 809-815.
[489] Ibid, paras. 919-946.

cash flows that they say results from the application of the new regime as if they were entitled to these revenue streams under the legal regime frozen as of 2011.

395.    According to Econ One, the CAPEX and OPEX of the Projects have been unreasonably high, something that the Claimants have failed to explain.[490] For instance, the Projects' initial CAPEX was higher than the Projects' own estimates in 2001 and also higher than the estimated costs for a Standard Facility IT-00652. Econ One believes that the explanation may be that CAPEX reported in the audited financial statements included capitalized financing expenses but those do not represent real investments and should be excluded. If this is corrected, the Projects' initial CAPEX goes down to "€ 95.1 million, a figure that is closer to the CAPEX shown in the Investors Base Case (€ 93.8 million) and the Standard Facility IT-00652 (€ 94.7 million)."[491] Similarly, although all the Projects' operating cost projections in the record (e.g. the 2001 projection, 2006 refinancing, 2016 refinancing, and KPMG projection) are lower than the operating costs for a Standard Facility IT-00652 (i.e., all the available operating cost projections specific to the Projects indicate that the Projects should obtain higher returns than the Standard Facility), the Projects' historical operating costs, as reported in their financial statements, have been substantially higher than any projection in the record in all but a few years.[492]   At the same time, KPMG claims that the operating costs of the Projects are lower than those defined in MO IET/1045/2014.[493]

396.    In any event, if the Claimants' Wind Farms are no longer entitled to subsidies, that is because they have received already a reasonable rate of return on their investments. From 2002 to 2012, the average internal rate of return of standard facilities IT-00652 such as the Claimants' farms has exceeded 8% net of taxes; this is higher than the target rate of

---

[490] Resp. Rej., paras. 883-884. See also Econ One Second Report, Section IV.C.
[491] Econ One Second Report, para. 75.
[492] Ibid, paras. 44-45.
[493] Ibid, para. 46. See also KPMG Second Damages Report, paras. 159-162, CER-0004.

return under the new regime.[494] Nearly half of these facilities' revenues reflected public subsidies (46.85%). Furthermore, it is estimated that by the end of their regulatory life in 2022, IT-00652 facilities – even operating only on market revenues – will achieve a 9.6% IRR (post-tax) and public subsidies would represent nearly a third of their total revenues.[495]

397.    In the case of Claimants' Wind Farms,  Econ One has calculated that that they have a post-tax internal rate of return of 8.88% in the actual scenario (with the Disputed Measures in place).[496] This is the IRR that results after some adjustments to KPMG's calculations such as excluding capitalized financing expenses from the initial CAPEX; computing historical and future taxes in cash flows; estimating operating and maintenance costs according to the OMS Contract Amendment; anticipating further capital expenses in 2028 for EUR 17.2 million (i.e., 20% of the original EPC contract) and using a 7.25% discount rate to calculate the Enterprise Value in the Actual Scenario. But even adopting all the assumptions embedded in KPMG's model, the IRR would still be above 7% (after-tax), specifically 7.08%. This number matches KPMG's IRR calculation in the Actual Scenario. The difference is that Econ One does not calculate a case-specific But-for IRR with which to compare this figure. Instead, Econ One takes the position that under the former regime, Claimants were only entitled to a reasonable rate of return of around 7% irrespective of the actual rate of return that resulted from the application of RD 661 (as amended). Therefore, they see no adverse impact as a result of the Disputed Measures.

398.    Nor have the Projects been rendered worthless by the Disputed Measures. The enterprise value of the projects as of 31 December 2015, in the Actual Scenario is about EUR 53 million, using all of KPMG's assumptions except its unreasonably high future CAPEX estimate. The debt of the Projects on the same date was about EUR 29 million, resulting

---

[494] RWS-JRA2, W-01080(II).
[495] RWS-JRA2, para. 129. See also November 2017 Hearing, Econ One Presentation, Slide 19.
[496] November 2017 Hearing, Econ One Presentation, Slide 38.

in an equity value of the Projects of about EUR 24 million, 74% of which belongs to Claimants.[497] Moreover, according to KPMG's own projections, the Projects are projected to generate substantial cash flows from their operations in KPMG's Actual Scenario.[498]

399.   Finally, if Claimants are having difficulties in servicing the Projects' debt, that is because of the decisions made in 2006.[499] That year, the Projects' owners decided to refinance the Projects' debt and used the inflow of funds to distribute EUR 17.3 million to shareholders. This was a major turning point in the financial health of the Projects.  As a result, in 2012 the Projects were more leveraged than at the outset (i.e. at the end of 2006 debt represented 91% of the total capital, as opposed to 74% initially) and were thus ill-prepared to cope with unexpected business downturns. This and not the Disputed Measures is the reason behind the Projects' financial difficulties.

### (e)   The Claimants' expectations

400.   The Respondent asserts that 2003 and 2009 are the relevant investment dates for assessing Claimants' expectations.[500]   Renerco (today BayWa RE) was formed in 2003 with a portfolio that included a 32.6% interest in the Wind Farms. That is, therefore, the date of BayWa RE's investment.  BayWa AH, on the other hand, invested in 2009 for the first time when it acquired most of the shares of Renerco.

401.   In 2003, RD 2818/1998 was in force. This statute does not provide for any of the alleged stabilization promises relied upon by the Claimants in this case.  Furthermore, the 2001 and 2006 financing agreements contemplated the possibility of changes and/or cuts in the remuneration regime.[501] In 2009, on the other hand, only RD 661/2007 was in force. This means that RD 1614/2010, RDL 14/2010 and RDL 1/2012, all of which are invoked by

---

[497] Ibid, Slide 6.
[498] Ibid, Slide 5.
[499] Econ One Second Report, paras. 24-40.
[500] Resp. Rej., paras. 697 ff.
[501] Resp. Rej., paras. 704, 705. See also Exhibits C-0078 and C-0228.

the Claimants at some point or another to support their legitimate expectations case, could not have had anything to do with Claimants' initial decision to invest in Spain.

402.    By 2009 all investors knew or should have known of the Spanish jurisprudence on regulatory changes, which supplements the legal framework for renewable energies and contributes to define investor's rights thereunder.[502]  Since 2005, the Supreme Court made it clear that renewable energy producers did not have a right to a specific royal decree's remuneration formula remaining unchanged, and that the Government was authorized under the principle of hierarchy of norms to adjust remunerations downward in respect to both existing and prospective plants provided that Law 54/1997's reasonable return was preserved.[503]  Investors knew that royal decrees could be superseded and that is why they lobbied the Government (although unsuccessfully) to have the specific remuneration values set out in the text of the law. [504]

403.    Article 40.3 of RD 436/2004 was not found to be an impediment to the regulatory adjustments introduced by RDL 7/2006 and RD 661/2007.  Nor did article 44.3 of RD 661/2007 prevent subsequent adjustments brought about by RD 1578/2008, RDL 6/2009 and RD 1614/2010.[505] All these changes share the same *leitmotiv*: the need to ensure the electricity system's economic sustainability and to avoid situations of excessive remuneration to some technologies including wind power.[506]  They were all upheld by Spanish courts even though they led to reduced remunerations.  It is not true that they improved remunerations for wind energy producers as the Claimants contend. Proof of it is the opposition and strong criticism by renewable energy associations every time one of these measures was adopted.[507]

---

[502] Resp. Rej., paras. 148-156.
[503] Ibid, paras. 154, 205-209. See also paragraphs 107, 112, 134, 148 and 149 above.
[504] Resp. C-Mem., paras. 500-551.
[505] Resp. Rej., paras. 157-166.
[506] Ibid, para. 157.
[507] Ibid, paras. 339-349, 358-363 and 631-634.

404.  This jurisprudence was known and referred to in reports made by the CNE in 2007 and 2008,[508] and even criticized by renewable energy associations in several publications of 2010.[509] Before then, these associations had also complained about prior amendments being "retroactive" insofar as they affected RAIPRE-registered plants.[510] Quite eloquently, after the draft RD 661/2007 was disclosed for comments in early 2007, APPA went as far as to state that from that point on any investor "must consider the risk that such remuneration could be lowered" outside the terms of Article 40.3.[511]  This shows that, contrary to the Claimants' assertions, renewable energy producers knew that these provisions did not preclude the Government from adjusting remunerations downwards. Any investor diligent enough to do basic research when BayWa AH invested for the first time in Spain would have learned about this. In addition, the CNE made it clear as early as in 2004 that registration in the RAIPRE did not confer an acquired or vested right to a particular remuneration regime.[512]

405.  Claimants cannot seriously fall back on a few press releases by the Council of Ministers and power point presentations by *Invest in Spain* or CNE's employees, which they have not demonstrated that they knew about at the time, to rebut this consistent and widely disseminated jurisprudence.[513]  Nor would it be reasonable for them to believe (if they ever did) that Article 44.3 of RD 661/2007 or Article 5.3 of RD 1614/2010 would rule out subsequent changes.  Press releases have no legal value under Spanish law, something that any reasonably informed investor knows or should know.  Nor do these press releases

---

[508] Resp. Rej., paras. 167-191. See also CNE Report 3/2007 of 14 February 2007, p. 18. R-0128; the draft report of 25 January 2007, attached to R-0128 (SPA Original), p. 17; and CNE Report 30/2008 of 29 July 2008, p. 9, R-0275 [no specific decision is identified]. See also Resp. C-Mem., para. 485; Resp. Rej., paras. 167-170, 384-385, 605-607.
[509] Resp. Rej., paras. 635-639. See the APPA report of 30 April 2010, R-0276, referred to in paragraph 153 above; AEE's observations on the draft RD 1614/2010 of 30 August 2010, R-0166, referred to in paragraph 161 above; and press notes published by Suelo Solar Journal on 8 and 19 February 2010 and April and June 2010, R-0278, R-0279, R-0280 and R-0281. R-0279 is referred to in paragraph 152 above.
[510] See also Resp. Rej., para. 597. See also paragraph 101 above.
[511] R-0304. Art. 44.3 is one of the alleged grandfathering provisions relied upon by the Claimants whose wording is very similar to that of RD 661/2007 Art. 40.1.
[512] See paragraph 94 above.
[513] Resp. Rej., paras. 192-201.

or the presentations relied upon by the Claimants support the positions the Claimants look to derive therefrom. The former merely summarize in colloquial terms the content of the various measures adopted by the Council of Ministers; the latter simply point to certain aspects of the regulatory regime as existing at the time. No promises of stabilization are made.

406.   The Claimants' contractual and financing documents show that they envisaged the risk of regulatory changes.[514] Clause 27 of the 2001 financing agreements expressly provides for a scenario in which remunerations vary.[515] This clause remained unaltered after the 2006 refinancing.[516] So too did clause 13.4 of the agreement signed between La Carracha and Plana de Jarreta with EGL Spain for the sale of energy, which expressly considers the risk of a modification in the remuneration's regime (i.e. then RD 436/2004).[517] Furthermore, the Claimants' own evidence in this case shows that the industry had already experienced adverse changes in the remunerations of some plants, such as when RD 436/2004 was replaced by RD 661/2007.[518]

407.   Claimants also knew (or should have known) that remunerations for wind installations such as the Claimants' Wind Farms were intended to be around 7% after taxes (with own resources) and that their lifespan was estimated at 20 years.[519] The 2000 and the 2005

---

[514] Resp. Rej., paras. 702-707, 713-727.

[515] See C-0068, [PDF, p. 128] and C-0068 (SPA Original), [PDF, p. 9] ("In the event of any change in the applicable legislation on the remuneration regimes regarding the energy produced by the Borrower with respect to the current regulation under Act 54/97 and Royal Decree 2818/98, or in the event of any other regime that might replace them in the future, provided that the Borrower could choose between the new regime and the one formerly in force, the Borrower shall request prior written authorization of the Majority to change the remuneration regime…").

[516] See C-0078, [PDF p. 128, SPA Original] ("In the event that the new rates at that moment are greater than or equal to those provided by the Base Case attached hereto as Annex I, the prior, written authorization mentioned above shall not be necessary…").

[517] R-0453 ("The Parties have expressly agreed to review and amend this Contract in case a new regulation substituting totally or partially the existing Royal Decree No. 436/2004 should be approved and becoming applicable to La Carracha as renewable energy producer. Such negotiation to be carried out in good faith among the Parties. The right of each Party to early terminate this Contract according to Section 11.2. d) above in case of disagreement on the new terms shall not be affected.").

[518] Resp. Rej., paras. 719-721. See also AEE's 2008 Yearbook, para. 9 (SPA Original), C-0406.

[519] Resp. Rej., paras. 708-712.

renewable energy plans, both of which are relied upon by the Claimants in this case, made this clear.[520]  Even the informative brochure ("Project Information Prospectus") prepared by the initial developers of the Wind Farms to attract investments estimated an internal return of around 6.98% (as results from projecting the cash flows referred to in that brochure).[521]  So too did the parent company of the Claimants, BayWa AG, when BayWa AH (then Renerco) acquired an additional interest in the Projects in 2011.  BayWa AG applied a 6.8% discount rate to the cash flows expected to be generated by the Projects.[522]

408.    Contrary to Claimants' allegations, financial costs were never considered to be a recoverable investment for purposes of calculating returns.[523]  This is the same methodology used by the CNE in its reports on draft decrees 436/2004 and 661/2007.[524]  Furthermore, all these figures, assumptions and estimations were commented on in various studies made by renewable energy associations since as early as 2005, which shows that investors were perfectly aware of them.[525]

## C.    THE SUBSTANTIVE CLAIMS UNDER THE ECT

409.    In assessing the Claimants' substantive claims, it is appropriate first to consider these under the ECT before turning to consider the Parties' arguments on EU law. Only if and to the extent that the claims made are valid under the ECT do the substantive EU law issues arise.

---

[520] See paragraphs 91, 104 above.

[521] Wind Farms La Muela, Zaragoza (Aragón). Project Information Brochure, January 2001, C-0022. See also Econ One First Report, figure 11 and par. 112.

[522] See EO−18, BayWa AG Annual Report 2011, p. 110.

[523] Resp. C-Mem., paras. 661, 1283.

[524] Economic Report of Royal Decree 436/2004, R-0100. CNE Report 4/2004 of 22 January on the proposal of Royal Decree which establishes the methodology for updating and systematizing the legal and economic system of the activity of electricity production activity in Special Regime, R-0126, pp. 8-9.

[525] See, e.g., ASIF Report "*Hacia una electricidad respetuosa con el medio ambiente*", October 2005, p. 9. R-0294 (SPA Original). See also The Role of Photovoltaic Generation in Spain by Arthur D. Little, November 2007, for ASIF and APPA, R-0295, p. 13; and AEE news item: "*Los que invirtieron en Renovables tienen mejor rendimiento que la mayoría del Ibex*": R-0296 (SPA Original).

155

**(1)    The Expropriation Claim (Article 13 of the ECT)**

*(a)    The Claimants' position*

410.    The Claimants maintain that the ECT protects investors from direct and indirect expropriation, unless carried out in accordance with the conditions laid down in Article 13.1 of the ECT.  In particular, they allege that the rights of property over the investment has been affected, which consists of the management and economic enjoyment of Parque Eólico La Carracha, S.L. and Parque Eólico Plana de Jarreta, S.L.[526]

411.    Contrary to what the Respondent alleges, the Claimants do hold an investment that is capable of being expropriated.[527] This consists of shared capital and debt in the two SPVs owning the Wind Farms.[528] To demonstrate the expropriation of their assets, the Claimants argue that the three requirements of the test proposed by the Respondent are fulfilled. First, the Claimants hold an asset. Second, it has a property right consisting of an indirect shareholding interest in the SPVs. Third, a causal link exists between the "abrogation of Regulatory Framework No. 1 and the impossibility for the Claimant[] to legitimately benefit from their investments in the SPVs [...]".[529]

412.    The Claimants maintain that the Disputed Measures qualify as an indirect expropriation as opposed to a non-compensable regulatory Governmental measure.[530] This is because the Disputed Measures are contrary to the public interest, are discriminatory against the Wind subsector and La Muela, have caused a disproportionate damage to La Muela and did not comply with due process of law.[531]

---

[526] Cl. Reply, para. 852.
[527] Ibid, paras. 864-872.
[528] Ibid, para. 867.
[529] Ibid, para. 870.
[530] Ibid, paras. 873-895.
[531] Ibid, paras. 879-895.

413. Finally, referring to *Charanne v. Spain*,[532] the Claimants maintain that case law has established that the "effect of such indirect expropriation may be seen in the substantial deprivation of the investment".[533] The deprivation can be seen in the effect of the measures on the management and enjoyment. First, due to the Disputed Measures, the Claimants had to focus on the survival of the SPVs to avoid their bankruptcy, which had a negative effect on the management.[534] Second, the Claimants were no longer able to enjoy the investment, as, since, 2011, the SPVs no longer pay dividends which "is in itself an expropriation".[535]

### (b)    The Respondent's position

414. The Respondent denies that it has expropriated the Claimants' investments. This is for three reasons. First, there was no indirect expropriation since no investment susceptible of being expropriated exists.[536] Second, the Disputed Measures did not expropriate the Claimants.[537] Third, the Disputed Measures do not meet the criteria for an indirect expropriation.[538]

415. Spain maintains that the Claimants' investments cannot be subject to an expropriation.[539] Since the Claimants' investments are comprised of the ownership of 74% of the shareholdings of the SPVs, their shares and debts can be expropriated.[540] However, what cannot be expropriated under Spanish law is the "right to receive specific dividends and to the management and administration of rights".[541]

---

[532] *Charanne v. Spain* (Final Award), para. 461, CL-0006.
[533] Cl. Reply. paras. 896-899.
[534] Ibid, para. 898.
[535] Ibid, para. 899.
[536] Resp. C.-Mem., paras. 1221-1240.
[537] Ibid, paras. 1241-1257.
[538] Ibid, paras. 1258-1333.
[539] Resp. Rej., paras. 1454-1506.
[540] Ibid; para. 1471.
[541] Ibid, para. 1470.

416.   Moreover, the Respondent refers to various other awards to argue that for a measure to constitute a "compensatable expropriation", five requirements must be met: "(i) if the measure is recognised as one of the regulatory powers of the State; (ii) the purpose (public) and the effect of the measure; (iii) if the measure is discriminatory; (iv) the proportionality between the measures used and the objective sought; and (v) the bona fide nature of the measure."[542] It goes on to analyze all five requirements to prove that the Disputes Measures do not amount to an expropriation.[543]

417.   In addition, the Respondent explains, that the Disputed Measures do not constitute a substantial deprivation of the Claimants' investment.[544] This is first, because the Claimants have not lost their ownership of the shares.[545] Second, the Disputed Measures did not restrict the Claimants in exercising their alleged rights of management and enjoyment of the shares.[546] Third, there is no causal link between the Disputed Measures and the financial difficulties of the Wind Farms.[547] Said financial difficulties arise out of the "free business decision" taken by the Claimants.[548] Fourth, the Spanish tax authorities have already confirmed the non-expropriatory character of the TVPEE .[549]

418.   Finally, Spain rejects the claim that the Claimants have suffered any reduction in the value of their shares. Therefore, the Respondent has not breached Article 13 of the ECT.[550]

### *(c)   The Tribunal's analysis*

419.   Article 13.1 of the ECT states:

---

[542] Resp. Rej, para. 1477, referring to *Fireman's Fund v. Mexico, CME v. the Czech Republic, Saluka v. the Czech Republic and Paso Energy International Company v. the Republic of Argentina*.
[543] Resp. Rej. paras. 1482-1506.
[544] Ibid, paras. 1507-1564.
[545] Ibid, para. 1522.
[546] Ibid, paras. 1524-1539.
[547] Ibid, paras. 1540-1554.
[548] Ibid, para. 1548.
[549] Ibid, paras. 1555-1564.
[550] Ibid, paras. 1567, 1568.

> (1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:
>
> (a) for a purpose which is in the public interest;
>
> (b) not discriminatory;
>
> (c) carried out under due process of law; and
>
> (d) accompanied by the payment of prompt, adequate and effective compensation.[551]

420.   During oral argument the Claimants said nothing about the Article 13 claim, simply referring the Tribunal to the written pleadings.[552] Although that claim was not formally abandoned, in the circumstances it can be dealt with rather summarily.

421.   First, it is necessary to distinguish between the claim for expropriation under Article 13 and claims made under Article 10, 1st–3rd sentences, based on alleged frustration of reasonable or legitimate expectations or due protection. Article 13 of the ECT, like other expropriation guarantees, is concerned with the protection of property interests, including certain legal rights to money or benefits, from seizure or taking, or with conduct equivalent thereto.

422.   Secondly, when it comes to conduct tantamount to expropriation (or as formulated in Article 13 of the ECT, conduct having an "effect equivalent") it is necessary to bear in mind the principle that expropriation, direct or indirect, requires substantial deprivation of the asset in question. For example, the tribunal in *Electrabel* observed:

---

[551] ECT, Art. 13.1, RL-0006.
[552] Tr-E, November 2017 Hearing, Day1, p. 19:19-25 (Rodriguez).

> As regards indirect expropriation, the Tribunal considers that the wording of Article 13(1) ECT requires Electrabel to establish that the effect of the PPA's termination by Hungary was materially the same as if its investment in Dunamenti had been nationalised or directly expropriated by Hungary. In other words, Electrabel must prove, on the facts of this case, that its investment lost all significant economic value with the PPA's early termination.[553]

423.    There are many decisions to similar effect.[554]

424.    In the present case, the Claimants' investments in the Wind Farms have taken the form of shares in the project companies, and the control associated with them. Nor did the Claimants assert a legal right to subsidies of which either of them has been deprived.

425.    The Spanish courts have consistently denied there was any such right to subsidies. For example, in its Judgment of 20 March 2007, the Third Chamber of the Supreme Court stated:

> [Article 30 of the 1997 Act] allows companies to aspire that the premiums would include [...] to the effect of obtaining 'reasonable

---

[553] *Electrabel v. Hungary* (Decision on Jurisdiction), para. 6.53, CL-0037.

[554] See, e.g., *Charanne v. Spain* (Final Award), para. 464 ("for a loss of value to be equivalent to an expropriation, it has to be so large that it equals a deprivation of property"), RL-0049; *Novenergia II v. Spain*, (Final Award), para. 727 ("It is uncontroversial in international arbitration that a State measure resulting in a 'substantial deprivation' of an investment – that is, when the measure substantially interferes with the control or the economic value of the investment – constitutes an expropriation.[...]"), CL-0037; *Electrabel v. Hungary* (Decision on Jurisdiction), para. 6.62 ("In short, the Tribunal considers that the accumulated mass of international legal materials, comprising both arbitral decisions and doctrinal writings, describe for both direct and indirect expropriation, consistently albeit in different terms, the requirement under international law for the investor to establish the substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment.[...]"), CL-0037; *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, para. 14.3.1 ("For an expropriation to occur, it is necessary for the investor to be deprived, in whole or significant part, of the property in or effective control of its investment: or for its investment to be deprived, in whole or significant part, of its value."), CL-0120 (hereinafter "***AES Summit v. Hungary* (Award)**"); *Isolux v. Spain* (Award), para. 839 ("That is to say, the impact to the rights or goods of the investor of the measures, must be of such magnitude that its investment loses all or a significant part of its value, which amounts to a deprivation of its property."), RL-0088.

return rates in relation to the cost of money in the capital markets' […].

Owners of facilities under a Special Regime are not guaranteed the intangibility of a given benefit or income regime in relation to those obtained in previous years, nor are they guaranteed the indefinite permanence of the formulas used to fix premiums. Changes should be made within the legal limits.[555]

426.    The Third Chamber of the Supreme Court has stated on many occasions that "[the] public regulatory framework [...] could not subsequently be immune to any relevant modifications to basic economic data in the light of which it is logical for the public authorities to keep in step with the new circumstances".[556]

427.    In its decision of 3 December 2009 rejecting a challenge to RD 661/2007, the Third Chamber of the Supreme Court stated that producers have no right "under the special scheme to the …unchangeability of the said scheme."

[...] the Government, in compliance with the legislator's plan, has a degree of discretion to determine the energy yields offered, on the basis of the clear objectives inherent to the implementation of economic, energy and environmental policies, and taking into account – on exercising its regulatory power – the obvious, essential general interests involved in the proper functioning of the electricity production and distribution system, and specifically, users' rights.[557]

---

[555] Supreme Court judgment of 20 March 2007, Second Legal Ground, R-0139 (SPA Original) [Tribunal's Translation].
[556] See above, paragraph 184, which refers to Supreme Court judgment of 12 April 2012, Case No. 40/2011, Third Legal Ground, R-0144. See also: Supreme Court, 12 April 2012, Case No. 35/2011, R-0145 (SPA Original); Supreme Court, 19 June 2012, Case No. 62/2011, R-0146; Supreme Court, 24 September 2012, Case No. 60/2011, R-0147; Supreme Court, 25 September 2012, Case No. 71/2011, R-0148 (all dismissing challenges against RD 1565/2010).
[557] R-0141.

428.   It added that "the principle of legal certainty [...] does not include any right whatsoever to freeze the existing law".[558]   Expropriation of intangible rights requires, *inter alia*, that the rights in question exist under the relevant legal system, which is not the case here.

429.   It may be recalled that no ECT tribunal has yet upheld an Article 13 claim in relation to the Disputed Measures. Such claims have either been avoided on the ground that the dispute was covered by Article 10, or rejected outright.[559]

430.   Insofar as the expropriation claim concerns Claimants' indirect interest in the project companies, these are still intact and operating under the Claimants' ultimate control and continued oversight, although their value is impaired.

431.   In its Reply, Claimants argued, in the alternative, that the overall effect of the Disputed Measures was a *de facto* expropriation of the shares, since no shareholder would receive a dividend from the project companies until at least 2024.[560]   But this is to confuse the financial impact of change in the subsidy regime with the taking of property.   On that view, any significant cost or burden on an investor could be equated to expropriation, *pro tanto*, by the entity responsible for the cost or burden, and the general distinction between expropriation and breach of the fair and equitable treatment standard would tend to disappear.   Within broad limits, the loss of advantages is not to be equated to the taking of rights.

432.   The Tribunal concludes that here was no conduct tantamount to expropriation, and the Article 13 claim fails.

### (2)   The Umbrella Clause Claim (Article 10 of the ECT, last sentence)

433.   Article10.1, last sentence provides:

---

[244] Id.
[559] As in *Charanne v. Spain* (Final Award), paras. 460-467, RL-0049; *Novenergia II v. Spain* (Final Award), paras. 759-763, RL-0112, *Isolux v. Spain* (Award), paras. 837-854, RL-0088.
[560] Cl. Reply, para. 914.

> […] Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

434.   Two aspects of this stipulation are immediately apparent. It applies to obligations generally, but only those which the Contracting Party 'has entered into with' an investor or investment of another Contracting Party.

### (a)   The Claimants' position

435.   In its Request for Arbitration, the Claimants state that in the 1990s the Respondent put in place a specific legal and economic regulatory framework to promote power generation from wind energy, which by the end of the 1990s and during the 2000s "provided for specific incentives aimed at inducing investors to engage in renewable generation projects in Spain."[561] Those incentives had been articulated though a Special Regime the Respondent committed to comply with.[562] However, between 2012 and 2014 the Respondent 'made continuous drastic changes to the regulatory framework'[563] which breached Article 10.1 of the ECT.[564]

436.   This is particularized to some degree in the Claimants' Memorial, which identifies "statutory provisions and official statements by state officials" as the basis for the umbrella clause claim.[565] Specifically, the Claimants argue that the Respondent "set forth a favorable regulatory framework for the Wind subsector" through the central pieces of Regulatory Framework No. 1 (i.e. Law 54/1997, RD 2818/1998, RD 436/2004, RD 661/2007 and RD 1614/2010), which provide for rights and guarantees for investors in the wind subsector,[566] and which "contained unilateral commitments addressed to a

---

[561] RfA, para. 16.
[562] Ibid, paras. 17-31.
[563] Ibid, para. 38.
[564] Ibid, para. 72.
[565] Cl. Mem., para. 844.
[566] Ibid, para. 829.

particular business sector (renewable energy) and a specific subsector (Wind) for the purposes of attracting investors therein."[567] As regards the Respondent's official statements, Claimants' highlight a number of press releases issued by the Respondent stating that "Regulatory Framework No. 1 was not going to be changed for those renewable energy facilities that would meet certain requirements… particularly being already registered in the RAIPRE."[568] The Claimants list a series of unilateral acts of the Respondent which, in their view, gave rise to obligations towards them, including: official press releases dated 25 May 2007; 2 July 2010; 3 December 2010; 23 December 2010; and 27 January 2012;[569] statements by two Ministries of Energy;[570] as well as other documents (Brochures by Spain's IDAE, presentations by *Invest in Spain* in foreign countries, international roadshows, and ribbon-cutting ceremonies for the inauguration of renewable energy facilities).[571]

437.  The Claimants' Reply explains this argument in more detail. The Claimants argue that Article 10.1 of the ECT, final paragraph is one of the most extensive umbrella clauses,[572] whereby a State can oblige itself by either a bilateral relationship (in investment law, a contract) or a unilateral relationship (i.e. a unilateral act of the State such as a statutory provision or an official statement by state officials).[573] The Claimants argue that, through the unilateral acts described above, Respondent specifically committed itself not to change the regulatory framework applicable to the energy sector for La Muela,[574] and that the

---

[567] Ibid, para. 830.
[568] Ibid, para. 839.
[569] Id. See also paragraphs 130, 157, 168, 174, 181 above.
[570] Ibid, para. 840. See also paragraphs 175 and 182 above.
[571] Ibid, para. 842. See also paragraphs 102, 136 and 140-142 above.
[572] Cl. Reply, para. 932.
[573] Ibid, para. 933.
[574] Ibid, para. 921.

umbrella clause protects such a commitment.[575] The Claimants suggest that the mere abrogation of RD 661/2007 and RD 1614/2010 was a violation of the umbrella clause.[576]

438.    In their closing argument, the Claimants, without formally abandoning the umbrella clause claim, placed little or no reliance on it.[577]

### (b)    The Respondent's position

439.    In its Counter-Memorial on the Merits and Memorial on Jurisdiction, the Respondent denies having breached the umbrella clause for six reasons. First, the Respondent argues that the Claimants' interpretation of the umbrella clause is contrary to the literal wording of Article 10.1 of the ECT and the dominant concept in international jurisprudence and doctrine, which would require a bilateral commitment (i.e., an agreement or contract).[578] Second, the Respondent denies having assumed specific obligations with any investor or investment, whether by the regulatory framework, the press releases, or other unilateral acts.[579] Third, the Respondent says that the Claimants did not allege or confirm that the unilateral acts played a decisive part in their investment, and the Claimants accepted the risk that the remuneration regime that existed at the time of investment could change.[580] Fourth, in the hypothetical case that the Respondent had assumed specific obligations by the unilateral acts, these obligations would never have been assumed with the Claimants or their Investment. This is because, according to the Respondent, those obligations could only be recognised for renewable energy facilities, and not to third parties who hold a stake or debt in the companies that own those facilities.[581] Fifth, the Respondent denies having made any commitment to the Claimants or their Investment freezing the

---

[575] Ibid, para. 937.
[576] Ibid, paras. 954-5.
[577] Tr-E, November 2017 Hearing, Day 5, p. 32:19-33:9.
[578] Resp. C-Mem., paras. 1096-1149.
[579] Ibid, paras. 1150-91.
[580] Ibid, paras. 1192-3.
[581] Ibid, paras. 1194-1201.

remunerative regime that was in force when the investment was made.[582] Sixth, the Respondent affirms that the Disputed Measures comply with the Spanish system of remuneration to plants that generate energy from renewable sources and that in particular the guarantees of priority access and dispatch were maintained.[583]

440.    In its Rejoinder, without abandoning its previous arguments, the Respondent focused on three points.[584] First, it insisted that the Claimants' interpretation of the umbrella clause is contrary to: the literal meaning of Article 10.1 of the ECT; the concept as applied in the arbitration decisions interpreting the ECT; and the concept that predominates in international law.[585] Second, the Respondent denies having made any unilateral commitment to the Claimants or to their investment pursuant to the regulatory framework or otherwise. The Respondent argues that the regulations were applicable to all producers of electrical energy covered by them and did not contain specific commitments; that registration in RAIPRE did not create obligations towards the Claimants; and that the press releases and road shows were generic and were not directed at attracting foreign investments.[586] Third, the Respondent reiterates that the Claimants did not demonstrate that they made the investment relying on those alleged commitments. The Respondent adds that the Claimants have not proved that it saw the presentations of *InvestSpain*, of the IDAE or of the CNE, or that it attended the inauguration of the Gemasolar thermal solar power plant or that they knew about the press releases. Moreover several of these unilateral acts occurred after 2003 and 2009, two essential moments for the Claimants' investments.[587]

441.    In its closing argument, the Respondent relied on the *Isolux* tribunal's analysis of the umbrella clause argument. There the tribunal found the Respondent had not entered into

---

[582] Id.
[583] Ibid, paras. 1095, 1202-1213.
[584] Resp. Rej., para. 1372.
[585] Ibid, paras. 1374-1408.
[586] Ibid, paras. 1409-1424.
[587] Ibid, paras. 1425-1428.

agreements establishing specific obligations with the claimants or their investment in Spain, and hence the tribunal declined to examine whether there had been noncompliance with those hypothetical obligations.[588]

### (c)    The Tribunal's Analysis

#### (i)    The generic claim

442.    In the Tribunal's view, the umbrella clause in the last sentence of Article 10.1 of the ECT only applies to obligations specifically entered into by the host State with the investor or the investment. The paradigm case is an obligation under an investment contract duly entered into. By contrast the Tribunal does not accept that obligations arising under the general law, including legislation, of the host State, fall within the scope of the clause. When enacting legislation, the State establishes binding rules of conduct, but it does not make specific promises to each person entitled to claim under the law, nor does it enter into obligations to specific investors or their investments even when these entities are numbered among the beneficiaries of the law. A general law is not a promise.

443.    But even if it were a promise, it would be a promise under Spanish law, an obligation governed by that law. The obligations to which the umbrella clause refers are paradigmatically obligations governed by the law of the host State (in the case of contractual obligations, the proper law of the contract). But unless a national law creates vested rights, obligations under such a law cease when the law is relevantly and validly amended or repealed. In the case of the Disputed Measures, their validity was upheld in numerous decisions of the Spanish Supreme Court.[589] Following the supersession of the earlier laws and decrees, there was no relevant obligation of Spain, nothing for the umbrella clause to operate upon.

---

[588] November 2017 Hearing, Slide 181.
[589] See paragraph 207 and the cases cited therein.

444. This understanding of the operation of umbrella clauses worded as that in Article 10.1 of the ECT has been upheld by numerous investment tribunals.[590]

445. The Claimants rely for the contrary view on dicta in several cases:

(a) In *Plama v. Bulgaria*, the tribunal said that "the wording of this clause in Article 10.1 of the ECT is wide in scope since it refers to 'any obligation.' An analysis of the ordinary meaning of the term suggests that it refers to any obligation regardless of its nature, i.e., whether it be contractual or statutory."[591] However, the tribunal understood that it did not need to extend its analysis because in that case the parties were exclusively concerned with the application of the umbrella clause to consensual obligations.[592] Moreover, the tribunal said that it "believes that the ECT does not protect investors against any and all changes in the host country's laws."[593]

(b) In *Amto v. Ukraine*, the tribunal expressed the view that "[t]he so-called 'umbrella clause' of the ECT is of a wide character in that it imposes a duty on the Contracting Parties to 'observe any obligations it has entered into with an Investor or an Investment of an Investor of the other Contracting Party.'"[594] Once again, this passage is *obiter dictum*. In *Amto* the dispute was related to contracts entered into

---

[590] See, e.g., *Isolux v. Spain* (Award), paras. 769-771, RL-0088; *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, para. 51, RL-0026 (hereinafter "***Noble Ventures v. Romania* (Award)**"); *Oxus Gold v. Republic of Uzbekistan*, UNCITRAL, Final Award, 17 December 2005, paras. 368-9, 848; *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 25 September 2007, para. 95, RL-0031.

[591] *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 186, CL-0013 (hereinafter "***Plama v. Bulgaria* (Award)**"), quoted by Cl. Mem., paras. 791 and 809, and Cl. Reply, para. 947.

[592] *Plama v. Bulgaria* (Award), para. 187, CL-0013.

[593] Ibid, para. 219.

[594] *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, award, 26 March 2008, para. 110 quoted by Cl. Mem., para. 792.

between an investor's subsidiary and a legal entity independent from the Ukrainian State.[595] It did not concern obligations under general legislation.

(c)   In *Mohammad Al-Bahloul v. Tajikistan*, the tribunal said that Article 10.1 *in fine* of the ECT's "protection is broadly stated, referring as it does to 'any obligation' and, as such, by the ordinary meaning of the words, includes both statutory and contractual obligations."[596] However, in that case the claimant had argued that the respondent had breached contractual obligations and that its issuance of licenses did not comply with those contracts.[597] Moreover, the tribunal went on to add that "this provision does not refer to general obligations of the State arising as a matter of law."[598]

(d)   In *Liman Caspian Oil v. Kazakhstan,* the tribunal drew an analogy between host State's offer to submit disputes to arbitration and unilateral promises under the umbrella clause.[599] However, in that case the tribunal expressly said it did not have to deal with the umbrella clause claim.[600] Moreover, the tribunal added that:

> it is not clear from the wording of ECT Article 10(1), last sentence, whether the 'umbrella clause' also encompasses state legislation concerning the protection of foreign investment... the words 'obligation the Respondent has entered into with an investor or an Investment of an Investor of any other Contracting Party' in ECT Article 10(1), last sentence, rather seem to suggest that a contractual or similar bilateral relationship must exist between the host state and the investor.[601]

---

[595] Id.

[596] *Mohammad Ammar Al-Bahloul v. The Republic of Tajikistan*, SCC Case No V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009 (hereinafter **"*Mohammad Al-Bahloul v. The Republic of Tajikistan* (Award)"**), para. 257, CL-0026, quoted by Cl. Mem., para. 810 and Cl. Reply, para. 946.

[597] *Mohammad Al-Bahloul v. Tajikistan* (Award), para. 258, CL-0026.

[598] Ibid, para 257.

[599] Quoted by Cl. Mem., para. 812.

[600] *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, para. 449, CL-0014.

[601] Ibid, para. 448.

In any event, the Claimants had not demonstrated any breach of local law, and thus no breach of the umbrella clause could be established on any view.[602] Once again, this decision does not support the Claimants' argument.

(e)    In *Khan Resources v. Mongolia*, the tribunal accepted the claimants' interpretation of Article 10.1 of the ECT and found that "a breach by Mongolia of any obligations it may have under the Foreign Investment Law would constitute a breach of the provisions of Part III of the Treaty."[603] This case dealt with obligations arising from the host State's foreign investment law,[604] a specific law designed to attract foreign investment. The instant case is different. Spain's regulatory framework was general legislation that did not provide for distinctions or preferences between domestic and foreign investors.

(f)    Claimants also refer to three Argentina-US arbitrations: *Enron*, *Continental Casualty*, and *LG&E*. None of these awards made reference to the ECT. (i) In *Enron Corporation v. Argentina*, the tribunal said that "'any obligation' refers to obligations regardless of their nature."[605] The *Enron* award was annulled, including the finding on the umbrella clause.[606] While the annulment committee said the reasoning was clear,[607] the committee also declined to determine whether the tribunal's construction was correct or convincing.[608] Hence, *Enron* cannot be cited to support the Claimants' argument. (ii) In *Continental Casualty v. Argentina*, the tribunal held that the obligations a host State must observe under the umbrella clause

---

[602] Ibid, para. 450.
[603] *Khan Resources Inc., Khan Resources B.V. & CAUC Holding Company Ltd. v. The Government of Mongolia and MonAtom LLC*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012, para. 438, CL-0078, quoted by Cl. Mem., para. 811.
[604] Id.
[605] *Enron Corporation & Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, para. 274, CL-0073, quoted by Cl. Mem., para. 813.
[606] *Enron Creditors Recovery Corp. & Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Application for Annulment of the Argentine Republic, dispositif, point 3, CL-0080.
[607] Ibid, para. 331.
[608] Ibid, para. 332.

"can include the unilateral commitments arising from provisions of the law of the host State regulating a particular business sector and addressed specifically to the foreign investors in relation to their investments."[609] In that case the tribunal also said that the "umbrella clause does not come into play when the breach complained of concerns general obligations arising from the law of the host State."[610] It went on to find that the provisions of the respondent's Convertibility and Intangibility Laws could not be a source of obligations that the respondent had assumed specifically with regard to the Claimants' investment company because those laws affected the generality of the respondent's public as well as depositors and subscribers to financial instruments.[611] Hence, the tribunal dismissed the umbrella clause claim regarding non-contractual instruments. [612] (iii) In *LG&E v. Argentina*, the tribunal said that the respondent's "laws and regulations became obligations within the meaning of Article II(2)(c) [the umbrella clause], by virtue of targeting foreign investors and applying specifically to their investments, that gave rise to liability under the umbrella clause."[613] The *LG&E* tribunal considered that the gas law provisions were specific in relation to the claimants' investment.[614] The present Tribunal finds it hard to analyse that conclusion, given the lack of precision of the *LG&E* award on this point. Additionally, in the instant case Spain's regulatory regime was not targeted at foreign investors.

(g)   In *Noble Energy v. Ecuador*, an Ecuador-US BIT arbitration, the tribunal observed that "Ecuador's obligations vis-à-vis the Claimants stem not only from the

---

[609] *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008 (hereinafter "***Continental v. Argentina* (Award)**"), para. 301, CL-0064, quoted by Cl. Mem., para. 819.
[610] *Continental v. Argentina* (Award), para. 300, CL-0064.
[611] Ibid, para. 302.
[612] Ibid, para. 303.
[613] *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (hereinafter "***LG&E v. Argentina* (Decision on Liability)**"), para. 175, CL-0070 quoted by Cl. Mem., para. 817; Cl. Reply, para. 952.
[614] *LG&E v. Argentina* (Decision on Liability), para. 174, CL-0070.

171

Agreements but also from laws and regulations. It also notes that the Investment Agreement appears to contain a stabilization clause which may constitute an obligation of a State capable of falling within the scope of an umbrella clause."[615] This passage belongs to a decision on jurisdiction, not an award on the merits. In that context, what the tribunal said was that the claimants had argued that the respondent had breached the umbrella clause both by not complying with an investment agreement, a concession contract, and the electricity regulation.[616] But the tribunal neither analysed whether the regulation was a specific commitment towards the investor nor did it adjudicate on the merits.

(h)   In *Eureko v. Poland*, a Netherlands-Poland BIT arbitration, the tribunal said that "[t]he plain meaning –the 'ordinary meaning' – of a provision prescribing that a State 'shall observe any obligations it may have entered into' with regard to certain foreign investments is not obscure… 'Any' obligations is capacious; it means not only obligations of a certain type, but 'any' – that is to say, all – obligations entered into with regard to investments of investors of the other Contracting Party."[617] In that case the obligations protected by the umbrella clause were an SPA and its first addendum;[618] that is to say, they were contractual obligations. No question arose as to whether the umbrella clause extended to obligations under general Polish laws.

(i)   In *EDF v. Argentina*, an Argentina-Luxemburg BIT and Argentina-Germany BIT arbitration, the tribunal said that "[t]he 'umbrella clauses' in question are broadly worded. A clear and ordinary reading of these dispositions covers commitments undertaken with respect to investors, or undertaken in connection with

---

[615] *Noble Energy Inc. and Machala Power Cia. Ltda. v. Republic of Ecuador and Consejo Nacional de Electricidad,* ICSID Case No. ARB/05/12, Decision on Jurisdiction, 5 March 2008 (hereinafter "***Noble Energy v. Ecuador*** **(Decision on Jurisdiction)**"), para. 157, quoted by Cl. Mem., para. 822.

[616] *Noble Energy v. Ecuador* (Decision on Jurisdiction), para. 156, CL-0082.

[617] *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 19 August 2005 (hereinafter "***Eureko v. Poland*** **(Partial Award)**"), para. 246, quoted by Cl. Mem., para. 794.

[618] Ibid, para. 250.

172

investments…"[619] That case dealt with the breach of a concession agreement[620] and not with general legislation. Moreover, the tribunal went on to state that that not all contractual breaches necessarily raise to the level of a treaty violation.[621]

(j)    In *SGS v. Paraguay*, an arbitration under the Switzerland-Paraguay BIT, the tribunal affirmed that:

> […] Article 11[…] creates an obligation for the State to constantly guarantee observance of its commitments entered into with respect to investments of investors of the other Party. The obligation has no limitations on its face —it apparently applies to all such commitments, whether established by contract or by law, unilaterally or bilaterally, etc […] But even as to the Article 11 claims that are predicated directly on Paraguay's alleged breach of the Contract, we have no hesitation in treating the Contract's obligations as 'commitments' within the meaning of Article 11.[622]

This was an award on jurisdiction. More importantly, in that case the claimants contended that the respondent had failed to honour commitments undertaken under a contract, as well as subsequent alleged promises to honour the contract and to pay debts,[623] and that was the argument the tribunal actually analysed.[624]

(k)    In *SGS v. Philippines*, an arbitration under the Switzerland-Philippines BIT, the tribunal said that "[t]he term 'any obligation' is capable of applying to obligations arising under national law, e.g. those arising from a contract… Interpreting the actual text of Article X.2, it would appear to say, and to say clearly, that each

---

[619] *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republi*c, ICSID Case No. ARB/03/23, Award, 11 June 2012, para. 938, CL-0019, quoted by Cl. Mem., para. 795.
[620] Ibid, para. 939.
[621] Ibid, para. 940.
[622] *SGS Société Générale de Surveillance, S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010, para. 167, CL-0072, quoted by Cl. Mem., para. 798. (Emphasis omitted)
[623] Ibid, para. 163.
[624] Ibid, para. 167-8.

173

Contracting Party shall observe any legal obligation it has assumed, or will in the future assume, with regard to specific investments covered by the BIT."[625] But in this decision on jurisdiction, the tribunal stressed that the obligation protected by the umbrella clause must have been assumed in relation to the investment. Specifically, the tribunal understood that "the host State must have assumed a legal obligation, and it must have been assumed vis-à-vis the specific investment—not as a matter of the application of some legal obligation of a general character."[626]

446. To summarise, the Claimants' contention that general laws such as the Disputed Measures can be considered a commitment protected under Article 10.1 of the ECT finds no support in the case law of international investment tribunals. To the contrary, tribunals have consistently resolved (occasional dicta to the contrary notwithstanding) that the ECT umbrella clause only protects obligations specifically entered into by the host State with the investor or the investment. These have almost always been contractual obligations. In no case of which the Tribunal is aware has a provision of the general law of a host State been enforced under the umbrella clause in Article 10.1 of the ECT or an equivalent provision.

(ii)    Unilateral commitments of Spain

447. Alternatively, the Claimants argue that unilateral statements made by Spanish officials are binding as such under international law, under the doctrine of binding unilateral statements endorsed by the International Court in the *Nuclear Tests* cases,[627] and articulated by the ILC in its Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations adopted in 2006.[628] But that doctrine has no application to statements made vis-à-vis private parties in a domestic context. The French

---

[625] *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, para. 115, CL-0074, quoted by Cl. Mem., para. 799.
[626] Ibid, para. 121.
[627] Cl. Mem., paras. 806-8. Cl. Reply, paras. 941-2, 980.
[628] Cl. Mem., para. 846. Cl. Reply, para. 979.

174

President's commitments in relation to atmospheric testing were made against the background of an interstate dispute which had given rise to interstate litigation; the Court held that they were intended to be relied on *erga omnes* at the international level. It said:

> The unilateral statements of the French authorities were made outside the Court, publicly and *erga omnes*, even if some of them were communicated to the Government of New Zealand. As was observed above, to have legal effect, there was no need for these statements to be addressed to a particular State, nor was acceptance by any other State required… The Court is entitled to presume… that these statements were not made *in vacuo*, but in relation to the tests which constitute the very object of the present proceedings, although France has not appeared in the case.[629]

448.    Nor do the ILC Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations[630] assist the Claimants. As explained in the first preambular paragraph, the Guiding Principles only apply to the "unilateral behaviour [of States] on the international plane". These are defined as follows:

> unilateral acts *stricto sensu*, i.e. those taking the form of formal declarations formulated by a State with the intent to produce obligations under international laws.[631]

449.    Neither the Guiding Principles nor the commentaries allude to the possibility of characterizing domestic laws as binding unilateral acts. In the ordinary course of events, a domestic law providing for subsidies for renewable energy generation is no more made 'on the international plane' or 'with the intent to produce obligations under international laws' than a law on any other subject. Nor have the Claimants adduced any evidence of such an intent in the present case. In this context it may be recalled that the Spanish

---

[629] *New Zealand v. France*, ICJ Reports 1974, p. 474, para. 52, CL-0025.
[630] *Yearbook of the International Law Commission, 2006*, vol II(2), CL-0086.
[631] Ibid, p. 370. The commentary indicates that this restrictive definition is "very directly inspired" by the dicta in the *Nuclear Tests* cases: ibid.

measures did not specifically address foreign investors or their investments; they are generally applicable.

450. What has been said is sufficient to justify dismissal of the umbrella clause claim based on Spanish legislation, in particular RD 661/2007. But for the sake of completeness something should be said briefly about the other alleged sources of obligation on which Claimants rely.

*(iii)*    *The 2010 Agreement*

451. In 2010, the Respondent concluded an Agreement with the wind subsector group of AEE on the design of the regulatory framework that applied to renewable energy producers.[632]

452. This agreement was an outcome of an industry-wide consultation, pre-legislative and non-contractual in character. Moreover, it was carried out with a trade association with no authority to bind its members. It did not bind the Respondent and did not create any obligations towards the Claimants as such.

*(iv)*    *Press releases and official statements*

453. The Claimants list a series of unilateral acts of the Respondent which, in their view, gave rise to obligations towards the Claimants, including: official press releases dated 25 May 2007; 2 July 2010; 3 December 2010; 23 December 2010, and 27 January 2012,[633] and two statements by the Ministry of Energy.[634] In the view of the Tribunal, these documents and statements were clearly non-contractual in character and did not create obligations specifically entered into by the host State with the investor or the investment.

---

[632] Cl. Reply, paras. 968-970 and 976 (referring to this Agreement). See also paragraphs 154-158 above.
[633] Cl. Mem., para. 839; Cl. Reply, paras. 969, 976. See also paragraphs 130, 157, 168, 174 and 181 above.
[634] Cl. Mem., para. 840; Cl. Reply, para. 970. See also paragraphs 175 and 182 above.

*(v)      Other documents*

454.   The Claimants base their claim on other documents (brochures by IDAE, presentations by *Invest in Spain* in foreign countries, international roadshows, and ribbon-cutting ceremonies for the inauguration of renewable energy facilities).[635] Again, none of these documents was contractual in character, nor did they bind the Respondent specifically with regard to the Claimants or their particular investments.   Like other documents considered in the foregoing paragraphs, they may be relevant in connection with the Article 10.1 claim and the doctrine of legitimate expectations, but as such they do not trigger the umbrella clause.

### (d)    Conclusion on the Umbrella Clause

455.   For these reasons, the Tribunal rejects the Claimants' claim under the umbrella clause in Article 10.1 of the ECT, final sentence.

### (3)    The Fair and Equitable Treatment Claim: Article 10.1, first and second sentence

### (a)    The Tribunal's Analysis

*(i)      The applicable FET standard*

456.   Article 10.1 of the ECT provides in relevant part as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.

---

[635] Cl. Mem., para. 842; Cl. Reply, paras. 971-972, 977. See also paragraphs 102, 136, and 140-142 above.

457.    Article 10.1 has been extensively discussed in successive arbitral decisions,[636] and there is little point in the Tribunal going over the same ground.  But some general points can be made.

458.    The Claimants laid emphasis on the phrase 'stable, equitable, favourable and transparent' (Art 10.1 of the ECT, first sentence).  But, as several tribunals have noted, the first sentence of Article 10.1 cannot be interpreted in isolation from the second sentence.[637]  It does not give a general mandate to ECT tribunals to decide whether Government decisions affecting investments are 'equitable' or 'favourable', any more than the FET standard gives a general discretion to BIT tribunals to impose their own views as to 'fairness' and 'equity'.  There is a legal standard embodied in the second sentence of Article 10.1 of the ECT, which takes into account the prerogatives and responsibilities of governments as well as the rights and interests of investors.

459.    A useful summary of the state of play was given by the tribunal in *Antaris*, referring to the earlier case-law.  In particular:

> (1) There will be a breach of the FET standard where legal and business stability or the legal framework has been altered in such a way as to frustrate legitimate and reasonable expectations or guarantees of stability.

> (2) A claim based on legitimate expectation must proceed from an identification of the origin of the expectation alleged, so that its scope can be formulated with precision.

---

[636] See, e.g., *Petrobart Limited v. The Kyrgyz Republic*, SCC Case No. 126/2003, Arbitral Award, 29 March 2005; *Plama v. Bulgaria* (Award), CL-0013; *AES Summit v. Hungary* (Award), CL-0120; *Electrabel v. Hungary* (Decision on Jurisdiction), RL-0002; *Hulley v. Russia* (Final Award), CL-0135; *Yukos v. Russia* (Final Award), RL-0082; *Electrabel S.A. v. Hungary*, ICSID No. ARB/07/19, Award, 25 November 2015, RL-0048; *Charanne v. Spain* (Final Award), RL-0049; *Isolux v. Spain* (Award), RL-0088; *Blusun v. Italy* (Award), RL-0105; *Eiser v. Spain* (Award), CL-0217.

[637] See *Blusun v. Italy* (Award), para. 315, RL-0105; *Antaris v. Czech Republic* (Award), para. 365; CL-0243; *Novenergia II v. Spain* (Final Award), paras. 642-646, CL-0227; *contra Binder v. Czech Republic*, 15 July 2011, para. 446.

(3) A claimant must establish that (a) clear and explicit (or implicit) representations were made by or attributable to the state in order to induce the investment, (b) such representations were reasonably relied upon by the Claimants, and (c) these representations were subsequently repudiated by the state.

(4) An expectation may arise from what are construed as specific guarantees in legislation.

(5) A specific representation may make a difference to the assessment of the investor's knowledge and of the reasonableness and legitimacy of its expectation, but is not indispensable to establish a claim based on legitimate expectation which is advanced under the FET standard.

(6) Provisions of general legislation applicable to a plurality of persons or a category of persons, do not create legitimate expectations that there will be no change in the law; and given the State's regulatory powers, in order to rely on legitimate expectations the investor should inquire in advance regarding the prospects of a change in the regulatory framework in light of the then prevailing or reasonably to be expected changes in the economic and social conditions of the host State.

(7) An expectation may be engendered by changes to general legislation, but, at least in the absence of a stabilization clause, they are not prevented by the fair and equitable treatment standard if they do not exceed the exercise of the host State's normal regulatory power in the pursuance of a public interest and do not modify the regulatory framework relied upon by the investor at the time of its investment outside the acceptable margin of change.

(8) The requirements of legitimate expectations and legal stability as manifestations of the FET standard do not affect the State's rights to exercise its sovereign authority to legislate and to adapt its legal system to changing circumstances.

(9) The host State is not required to elevate the interests of the investor above all other considerations, and the application of the FET standard allows for a balancing or weighing exercise by the State and the determination of a breach of the FET standard must be

179

made in the light of the high measure of deference which international law generally extends to the right of national authorities to regulate matters within their own borders.

(10) Except where specific promises or representations are made by the State to the investor, the latter may not rely on an investment treaty as a kind of insurance policy against the risk of any changes in the host State's legal and economic framework. Such expectation would be neither legitimate nor reasonable.

(11) Protection from arbitrary or unreasonable behaviour is subsumed under the FET standard.

(12) It will also fall within the obligation not to impair investments by 'unreasonable … measures' (Article 10(1), ECT) or 'arbitrary ... measures' (Article 2(2), Czech Republic/Germany BIT).

(13) The investor is entitled to expect that the State will not act in a way which is manifestly inconsistent or unreasonable (i.e. unrelated to some rational policy).[638]

460.    Of particular relevance by reason of its subsidies context (though it concerned solar power, not wind) is the dictum of the tribunal on Article 10.1 of the ECT in *Blusun v. Italy*:

In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[639]

461.    The tribunal went on to add:

---

[638] *Antaris v. Czech Republic* (Award), para. 360 (references omitted), CL-0243.
[639] *Blusun v. Italy* (Award), para 319(5), RL-0105.

These considerations apply even more strongly when the context is subsidies or the payment of special benefits for particular economic sectors.[640]

462.   This test was expressly endorsed by both Parties in their pleadings.[641]

> (ii)   *Spain's alleged breach of Article 10.1 of the ECT, first & second sentences*

463.   Applying the *Blusun* dictum, it is necessary to ask the following questions: (1) was there a specific commitment of intangibility; (2) absent a specific commitment, did the Claimants entertain a legitimate expectation that subsidies would not be reduced during the lifetime of the project; (3) were the subsidies lawfully granted; (4) were the changes of 2013-14 disproportionate to the legitimate aim of the legislative amendments; and (5) did they have due regard to the reasonable reliance interests of recipients who had committed substantial resources on the basis of the earlier regime?  By way of summary, in the following sections, the Tribunal answers these questions as follows: (1) no specific commitments were made; (2) the Claimants had legitimate expectations of continuation of subsidies in some substantial form but had no legitimate expectation that the subsidies regime of RD 661/2007 would be maintained unchanged for the life of the investment; (3) subject to EU law (considered below) the subsidies were lawfully granted; (4) in all but one respect (the claw-back of benefits already paid) the Disputed Measures were not disproportionate, given the circumstances in which they were imposed; (5) to the same effect, the changes, had they been applied without the claw-back, had due regard to the reasonable reliance interests of recipients.

---

[640] Ibid, para 372.
[641] See e,g, for the Claimants, Tr-E, November 2017 Hearing, Day 1, p. 108:20 – p. 109: 9 (especially p. 108, ll. 19 ff) (Delgado): "this rule was upheld in Blusun… Our position is that in this case they [sc, the Claimants' reasonable reliance interests] have not been respected, and that the rules should be applied to find Spain liable." And for the Respondent, Tr-E, November 2017 Hearing, Day 1, p. 225:22 – p. 226:9 (Rivas Kortazar): "We consider that the Blusun v Italy award… is fully applicable to the case."

464.     In the following sub-sections the Tribunal gives its reasons for these conclusions. In reaching these conclusions, the Tribunal draws support from its subsequent reading of the Decision on Responsibility and on the Principles of Quantum, dated 30 November 2018, in *RREEF v. Spain*,[642] and refers to several other decisions which the Parties have tendered and commented on.

### (iii)     Was there a specific commitment as to the FIT regime?

465.     The Claimants accepted that there was no specific commitment made as to the immutability of the FIT regime under RD 661/2007: "Claimants' expectations were directed towards the conduct of Spain not the freezing of a particular royal decree".[643]

466.     In the Tribunal's view, this is correct.  Not only is it consistent with the position taken by the Spanish courts in relation both to RD 436/2004[644] and RD 661/2007;[645] it is also consistent with the conclusions reached by most of the tribunals which have considered the matter.[646]  Nor is there any reliable inference to be drawn from the various failures or alleged failures of the Respondent to produce certain documents.[647]

---

[642] *RREEF v. Spain* (Decision on Responsibility), RL-0119.

[643] Cl. Reply, para. 209; see also ibid, para. 274.

[644] See above, paragraphs 112, 121, 134, 148, 149.

[645] See above, paragraphs 183-186.

[646] *Eiser v. Spain* (Award), paras. 363, 387; RL-0108, *Charanne v. Spain* (Final Award), para. 503, RL-0049; *Antin v. Spain* (Award), paras. 553, 555, CL-0234; *Isolux v. Spain* (Award), paras. 774, 787, RL-0088.  In *Masdar*, the tribunal held there was a "specific commitment … that each of the Plants qualified under the RD661/2007 economic regime for their '*operational lifetime*'" (*Masdar v. Spain* (Award), para. 520, CL-0231). In the present case there was no equivalent letter to the one construed by that tribunal as a guarantee. It also held that "RD 661/2007… included a stabilisation clause", which "is sufficient to exclude *any* modification of the law, so far as investors, which had made investments in reliance upon its terms, were concerned" (*Masdar v. Spain* (Award), para. 503, CL-0231 (emphasis added).

[647] The Claimant asks the Tribunal to draw an adverse inference from the Respondent's alleged failure to produce certain documents: see above, paragraphs 331, 338.  The Tribunal does not consider that any failures that may have occurred have been established, and in any event, having regard to the elaborate documentary evidence produced by both Parties, it does not believe that any such defects alter its conclusions of law and fact.

*(iv)    What legitimate expectations did the Claimants have?*

467.    The Claimants did however argue that they had legitimate expectations that the Respondent would continue to provide subsidies for its total RE production for the effective life of the plants, in substantially the form in which they were provided in RD 661/2007.

468.    In this respect the Claimants refer to what they submit are successive 'grandfather clauses': RD 436/2004 Article 40.3 and RD 661/2007 Article 44.3.  These provided that:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.  (RD 436/2004 Article 40(3))

> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.  (RD 661/2007 Article 44(3), 3rd sub-paragraph)

469.    Reference might also be made to RD 1614/2010, Article 5.3, which provided that:

> Without prejudice of that set forth in this Royal Decree, for the wind technology installations within the scope of Royal Decree 661/2007, of 25 May, the revisions of the tariffs, premiums and upper and limits, within the scope of article 44.3 of the aforementioned Royal Decree, do not affect installations enrolled definitively in the administrative register for production installations in the special scheme dependent on the Energy and Mines General Policy Board dated 7 May 2009…

470.    Of particular importance is Law 54/1997, which was in force until its repeal in 2013. Article 30.4 provided that:

The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases:

[…]

To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred *shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets*. (emphasis added)

471. In the Tribunal's view, this stated a coherent general principle, and is inconsistent with the thesis that particular Royal Decrees, notably RD 661/2007, stabilized the regime. Law 54/1997 was to be implemented by regulations which would naturally change, and did change, and not in any uniform direction favouring the recipients.[648]

472. In particular, there was no legitimate expectation that subsidies would never be reduced or capped. Some decrees grandfathered existing plants, but others did not, and although grandfathering may be best practice it is not in the Tribunal's view required by the ECT. Nor does the Tribunal accept that the three 'grandfather clauses' cited above established any general principle.[649] Moreover, the decisions of the Spanish Supreme Court from 2005 onwards consistently denied that the subsidy regime was intangible.[650]

473. The Parties disagreed sharply on the relationship between the 'reasonable return' provision stated in Article 30.4 of Law 54/1997 and the successive subsidy regimes established by royal decree. In the Tribunal's view this a false dichotomy. Article 30.4 of Law 54/1997 stated a general principle and empowered the administration to give effect

---

[648] See e.g. paragraphs 108, 127, 166, 169-171.
[649] In this respect, the Tribunal agrees with the analysis in *RREEF v. Spain* (Decision on Responsibility), paras. 318-321, CL-0239. See also above, paragraphs 98, 128, 172.
[650] See above, paragraphs 112, 121, 134, 148, 149, 183, 186, 207.

to it by regulation. The stream cannot rise higher than its source, or commit the state to more than the legislative framework allows. A requirement that the remuneration system be such as to allow recipients 'to achieve reasonable profitability rates with reference to the cost of money on capital markets' is general in its terms, but it is perfectly intelligible and imposes some limits on what can be done.

474.     In *NextEra v. Spain*, the tribunal correctly noted that the regulatory framework "was based on legislation and legislation can be changed."[651] As a result, "Claimants could not have had the expectation that the RD 661/2007 regime was frozen and could not be changed."[652] Yet, NextEra relied on specific assurances given to the investor, which confirmed that the Spanish Government had no intention to change the incentives regime as contained in RD 661/2007.[653]

475.     A somewhat different view was taken by the tribunals in two more recent cases against Spain. In *9REN*, the tribunal agreed with UNCTAD that "that legitimate expectations may arise from 'rules not specifically addressed to a particular investor but which are put in place with a specific arm to induce foreign investments and on which the foreign investor relied on making his investment.'"[654] Based on this, the *9REN* tribunal decided that RD 661/2007 constitutes a clear and specific commitment.[655] Referring to *Masdar*, it concluded that the specific letters the investor in *Masdar* had received "simply confirmed" the content of RD 661/2007.[656]

476.     Moreover, the *Cube* tribunal considered RD 661/2007 to create expectations by deciding that "Claimants were entitled to rely on the maintenance of the relevant tariffs and

---

[651] *NextEra v. Spain* (Decision) para. 584, RL-0121.

[652] Ibid, para. 591.

[653] Ibid, paras. 592 ff.

[654] *9REN v. Spain* (Award), paras. 292, 294, RL-0123, referring to UNCTAD, *Fair and Equitable Treatment* (2012) n. 263, p. 69.

[655] *9REN v. Spain* (Award), paras. 294-297, RL-0123.

[656] Ibid, para. 299 referring to *Masdar v. Spain* (Award), paras. 503, 504, 511, CL-0231.

185

premiums set out in Article 36 RD 661/2007 throughout the reasonable planned operating life of each power plant."[657] Whereas it agreed that states have the right to regulate and change their legislation, it also noted that Spain committed itself to guarantee the stability of the incentives regime.[658] Consequently, it decided by majority that the claimants correctly relied upon the representations made by Spain in RD 661/2007 and the accompanying press release.

> *(v)    Were those legitimate expectations violated by the Disputed Measures?*

477.    Turning to the question of breach, it follows from the analysis of legitimate expectations in paragraphs 467-476 above that it is not sufficient for the Claimants to show that certain expectations were impaired or affected by the measures complained of.  To recall the point made specifically with regard to subsidies in *Blusun*:

> […] if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[659]

478.    Thus it is necessary to assess the proportionality of the change in financial arrangements and whether it had due regard to the reasonable reliance interests of recipients of subsidies.

479.    As to the aim of the Disputed Measures, the primary reason given, then and now, was to address the deficit on the tariff account of the SES (as to which see Section IV(G) above). This had already been declared to be 'unsustainable' in the preamble to RD 6/2009,[660]

---

[657] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (hereinafter "***Cube v. Spain* (Decision)**"), paras. 311, 390.

[658] Ibid, para. 397.

[659] *Blusun v. Italy* (Award), para. 319(5), RL-0105. The tribunal in *RREEF v. Spain* (Decision on Responsibility), paras. 516, 547, CL-0239, relied on *Blusun*.

[660] RDL 6/2009, Preamble, C-0399, R-0088.

passed at around the time the Claimants made a substantial tranche of their investment. By 2013 the accumulated investment had reached some EUR 29 billion.[661]  This was not really contested by BayWa,[662] which instead argued that other measures (notably, increased customer tariffs) could have been adopted to deal with the problem, and that the RE producers should not have been required to bear the whole burden of cuts.[663]

480.  In the Tribunal's view, the growing deficit on the energy account was, and was known to be, unsustainable.  But it is not for the Tribunal to second guess reasonable measures taken to address the deficit (including measures affecting existing plants), to propose alternative policies that could have been adopted, or to weigh up for itself the competing demands of generators and consumers.  If the measures were "not disproportionate to the aim of the legislative amendment, and [had] due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime"[664] they would be consistent with the FET standard in Article 10.1.  Applying that standard, it is necessary to differentiate between different aspects of the Disputed Measures.

(vi)     *Regulatory rather than actual plant life*

481.  In its Counter-Memorial, the Respondent objected to Claimants' expectation that the Regulated Tariff would apply to the whole operational life of the facilities.[665]  Spain explains that the New Regime's remuneration system is complemented by the regulatory

---

[661] IEA "Energy Policies of IEA Countries, Spain, 2015 Review", R-0211, p. 10.
[662] See, e.g., Cl. Reply, para. 1139 ("The Disputed Measures have been effective in eliminating the Tariff Deficit and now the Respondent is trying to recover the accumulated Tariff Deficit over time.") See also KPMG Second Regulatory Report, para. 31, CER-0003 ("The KPMG First Expert Witness Report does not call into question the short-term effectiveness of the Measures from July 2013 onwards as a tool for reducing regulated costs. On the contrary, our negative assessment of the reasonableness of these measures was focused on their lack of regulatory orthodoxy").  But lack of regulatory orthodoxy is not equivalent to unfair and inequitable treatment: more is required.
[663] Cl. Reply, paras. 717-721, 770-792. See also KPMG Second Regulatory Report, Section 7.2 and Appendix I, CER-0003.
[664] *Blusun v. Italy* (Award), para. 319(5), RL-0105.
[665] Resp. Rej., paras. 1215-1219.

lifetime of a standard facility. The end of the regulatory life sets the time at which a standard facility has reached the reasonable return set by the Regulator, i.e. when the standard facility has recovered its investment and operation costs through market revenues and subsidies received.

482.    The Tribunal notes that the Claimants' engineering expert, Mr. Holzmüller, expressed the view that the plants could last for up to 41 years, but he accepted that substantial capital expenditures would be incurred at 25 years.[666] This estimate was not contested by Econ One, or for that matter by the Respondent, which sought to justify the 20-year limit on economic grounds.

483.    *Cube* involved PV and hydro plants, a series of investments made in the period 2008-2011, and not wind power.  The Tribunal understands that the life expectancy of wind power plants is shorter than hydro plants.  Earlier regulations had been clear that the incentives regime would last for longer than 20 years, though possibly at a reduced level.[667]  There is a case for 25 years as a reasonable target.[668]  Although none of the following cases involved wind turbines, nearly all the tribunals which dealt with the issue considered the useful life of renewable energy plants under the Spanish regulatory regime to be 25 years:

- In *Antin*, the tribunal noted that the evidence submitted was inconsistent and the assumed lifetime spanned from 20 to up to 40 years. In particular, the tribunal noted that substantial repairs to the plants had to be made after 25 years, which would affect the subsidy according to Article 4.3 RD 661/2007. Based on the

---

[666] KPMG First Damages Report, Exhibit 3, p. 5, CER-0002.

[667] RD 2818/1998, C-0026; RD 436/2004, C-0027; RD 661/2007, C-0028; RD 1614/2010, C-0029. See also above, paragraphs 89, 96, 125, 169-172.

[668] KPMG, First Damages Report, Exhibit 3 - Report "Calculation of the overall lifetime considering the actual loads", January 2016, prepared by Mr. Jürgen Holzmüller, pointing to a useful life of 41.4 years after refurbishment, CER-0002.

evidence submitted the tribunal decided that the useful life of the plants is 25 years.[669]

- In *Eiser*, the tribunal was not convinced by the documentary record submitted to it, which was limited and inconsistent. However, the primary document used, an expert due diligence report, was supportive of a 25-year life. Therefore, the tribunal rejected the claim that the plants were designed for a 40-year life.[670]

- In the same vein, the *Masdar* tribunal assumed a life of 25 years, rejecting the claimants' claim as to a 40-year operational life, based on the weight of the evidence, which contradicted the claimants' assertion.[671]

- The *RREEF* tribunal agreed and decided that the useful life of CSP plants should be considered to be 25 years, which corresponded to the claimants' initial assessments before the dispute arose.[672]

484.    Based on the above, the Tribunal considers a 25-year life to be an appropriate regulatory life for wind plants.

(vii)    *The 'standard facility' as a basis for calculation?*

485.    It was argued that the Claimants' legitimate expectation related to its own plants: to adopt some other standard of calculation deprived them of the benefit of their prudent investment and management of the plants.[673] On the other hand, Spain had to deal with some 6,000 wind plants, not to mention other RE facilities; there were elements in earlier legislation of calculations based on standard facilities, and it was not unreasonable, at least for the future, to calculate subsidies on the basis of standard facilities, adapted to the

---

[669] *Antin v. Spain* (Award), paras. 692-714, CL-0234.
[670] *Eiser v. Spain* (Award), paras. 443-452, CL-0217.
[671] *Masdar v. Spain* (Award), paras. 613-618, CL-0231.
[672] *RREEF v. Spain* (Decision on Responsibility), para. 549, CL-0239.
[673] Cl. Reply, paras. 88, 198; Hearing Day 1, p. 71, paras 21 f.

189

method of power generation.  In the end, in the Tribunal's view, this aspect of the Disputed Measures did not breach Article 10.1 of the ECT.

*(viii)    Estimated costs under the Disputed Measures*

486.    The Parties disagreed as to the sufficiency of the estimated costs under the new regime: their respective positions have already been described.[674]  The Tribunal has found that there was no binding commitment on the part of Spain to the level of subsidies under RD 661/2007, and thus no claim under the ECT's umbrella clause.[675]  As to the estimated costs constituting or at least contributing to a breach of Article 10.1, first and second sentence, it is necessary to consider separately operating from capital expenditures.  As to OPEX, there is no claim that these were excessive.[676]  As to CAPEX, the Respondent sought to explain the apparent under-estimate of the Claimants' CAPEX by reference to such features as the inclusion of financing costs which were inadmissible for financial support.  On that basis the difference between Claimants' adjusted CAPEX and the attributed CAPEX under the Disputed Measures is relatively slight, and does not evidence a breach of fair and equitable treatment.[677]

*(ix)    'Retrospectivity' and the Claw-back*

487.    The Spanish courts held that the Disputed Measures were not retrospective, and that finding is entitled to some deference.[678]  Moreover, Spain did not claw back money

---

[674] See above, paragraphs 193, 203, 343-344, 394-395.

[675] See above, paragraphs 447-455.

[676] See above, paragraph 344.

[677] See above, paragraphs 394-395.

[678] Constitutional Court, Judgment of 17 December 2015, 5347/2013, 7th Legal Ground (a) and (c), R-0154; Spanish Supreme Court, Judgment 22 July 2016, Judgment No. 1964/2016, 5th and 6th Legal Grounds, R-0352; Constitutional Court, Judgement 17 December 2015, R-0154, referring to Opinion of the Standing Committee of the Council of State 937/2013, of 12 September 2013 General Observation VI, Document, R-0123; Constitutional Court, Judgment 18 February 2016, delivered in appeal of unconstitutionality 5852/2013, R-0156; Constitutional Court, Judgment 18 February 2016, delivered in appeal of unconstitutionality 6031/2013, R-0157. Cf the majority decision of the Supreme Court (Contentious Administrative Division), R-0149, Judgment 1260/2016, 1 June 2016, decided by 4-3 with illuminating dissents on the topic of retrospectivity; e.g. Judge Espín Templado, p. 37: "The system itself,

190

actually paid above the total allowable amount of subsidies: the claw-back was in the nature of a set-off rather than a counterclaim. Except for a short advertised period in 2013-2014, before the level of payments under the Disputed Measures was fixed and came into force, 'overpayments' of subsidies were not recovered back.

488. But the Disputed Measures took into account earlier subsidies for the purpose of assessing future payments, resulting in no entitlements for the Claimants' facilities. This is a weaker form of retrospectivity, but the label 'retrospective' is not crucial: what matters is the substance.

489. The Respondent argues that the Disputed Measures were not retroactive because they did not affect acquired rights.

490. The Tribunal agrees, for reasons already given, that there was no acquired right to remuneration in future, still less to 'a fixed and unchanging FIT'. But that is not the point. It is one thing to amend payments for future production with immediate effect, and another to reduce payments that would have otherwise been made by reference to payments lawfully made in the past in respect of past production.

491. The Respondent also relies on the decision of the tribunal in *Nations Energy Inc v. Panama*.[679] That was an expropriation claim concerning substantial restrictions on the right to rely on investment tax credits under a new law, which the claimants alleged had retrospective effect, contrary to the Panamanian Constitution. The tribunal held that the claimants did not have the right that they claimed to transfer their tax credits. But even if

---

however, applies as if it had been in force from the very first moment that each facility commenced its regulatory life. In my opinion that retroactive projection, which sets aside the *in tempore* application of the system in force prior to [2014], as though the latter had never existed, and the fact that the new regulation is considerably less favourable for the facilities concerned, amount to a serious abuse of judicial certainty…". See also above, paragraphs 210-212.

[679] *Nations Energy Inc v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010 (hereinafter **Nations Energy v. Panama** (**Award**)"), paras. 635-648, RL-0040, cited in Resp. C-Mem., paras. 991, 1234, 1239; Resp. Rej., para. 576.

they had such right, the new legislation did not revoke or cancel it, let alone retroactively: the claimants were still entitled to the full amount of their tax credits. Only the conditions under which they could be relied on were modified, *inter alia* by sharply lowering the annual cap. The tribunal added that the new legislation "would have been retroactive […] *if it had come to reintroduce, into income tax, part of the deductions previously made*, or […] if it had supressed existing credits."[680]

492. The decision concerned a situation remote from the present one: it involved an expropriation claim under a BIT, not a claim to breach of the legal stability guarantee in Article 10 of the ECT. However, the passage italicized above shows that the distinction between immediately operative and retrospective measures is a far from simple one. There is an analogy between a law which disallows deductions already made (affecting future tax liabilities) and a law which deducts subsidies already lawfully paid from future entitlements to subsidies.

493. Different tribunals in Spanish RE cases have reached different conclusions on the retrospectivity point. In *Charanne*, which concerned only the 2010 regulations, the tribunal rejected the retrospectivity argument, which the claimants there had presented in the form of a claim to a vested right that the regulatory framework could not be altered 'in any way'. The tribunal formulated the question as being "to what extent the State can modify, with immediate effect, generally applicable regulatory provisions".[681] But although some claimants may have put it in these terms, that is not the question. The Tribunal agrees that there was no contractual right or legitimate expectation to an unchanging subsidy, and it agrees that (subject to considerations of proportionality) Article 10.1 did not preclude new regulations from having immediate effect. But it is one thing to give new regulatory measures immediate effect for existing installations, and

---

[680] *Nations Energy*, para. 647 (emphasis added). [Tribunal's Translation]
[681] *Charanne v. Spain* (Final Award), para. 545, and see ibid, paras. 546-8, RL-0049.

quite another to eliminate future subsidies otherwise payable by reference to amounts lawfully paid and received in earlier years on a quite different basis.

494.    The *Isolux* tribunal took a similar position, also relying on *Nations Energy v. Panama*.[682]

495.    The matter was central to the decision in *RREEF v. Spain*. The tribunal there emphasized that the claimants acquired a right to a "general regime guaranteeing the essential advantages they could reasonably expect when they made their investments."[683] Furthermore, the tribunal had "no hesitation to find that the Respondent acted in breach of its obligation to respect the principle of stability" by applying the Disputed Measures retroactively.[684] More precisely, according to the tribunal, the Disputed Measures took into account past remuneration under the previous regime and deducted them from future payments. This has the effect of clawing back remuneration to which the investor had a right at the time the payment was made.[685]

496.    The Tribunal agrees with this analysis.[686]  In its view, the subsidies paid in earlier years were duly paid and duly taken into account in the operation of the SPVs, in their financing and (presumably) their taxation arrangements.  To claw back those profits on the basis of a subsequent judgment that they were 'excessive' was inconsistent with the principle of stability in Article 10.1 of the ECT and has not been shown to have been necessary to resolve the tariff deficit problem, which would have been solved in any event by the Disputed Measures without much further delay and without the element of claw-back of payments earlier lawfully made.  It may have been reasonable to take into account, in

---

[682] *Isolux v. Spain* (Award), para. 814, RL-0088, cited in Resp. C-Mem., para. 991.
[683] *RREEF v. Spain* (Decision on Responsibility), para. 322, RL-0119.
[684] Ibid, para. 325.
[685] Ibid, paras. 328-329. The tribunal was unanimous on this point.
[686] It may be observed that in its comment of 18 June 2019 in response to the *RREEF* decision, Spain asserts (without specifically mentioning the claw-back issue) that "the Tribunal will find the most similarities with the case at hand in the *RREEF* Decision" (para. 2), and refers to its "correct damages approach" (para. 57).  The Claimants reply that the *RREEF* tribunal awarded compensation in that case for "losses incurred as a consequence of the retroactive nature of Regulatory Framework 3" (Response of 18 June 2019, para. 56) while arguing that there were other breaches.

calculating subsidies going forward, the 7.398% that the Plants were deemed to be entitled to under the Disputed Measures. To count against them the amounts previously earned in excess of that threshold was to penalise the Plants for their successful operation during those years. For these reasons, the Tribunal would, if EU law as part of the applicable law so allows, hold that Spain breached Article 10.1 of the ECT by this claw-back operation.[687]

*(x)    Overall proportionality of the Disputed Measures*

497.    Turning to the overall proportionality of the Disputed Measures, it is necessary to analyse their impact on the returns generated by the Claimants' investments. This is without prejudice to the conclusion, just arrived at, as to retrospectivity. On that basis the question is whether the Disputed Measures, had they been applied *pro futuro*, without the element of seizure of assets lawfully acquired in previous years under the Special Measures, would have been considered proportionate and consistent with Article 10.1 and 2.

498.    For reasons already given (paragraphs 467-476 above), this Tribunal agrees with the *RREEF* tribunal that the only legitimate expectation the Claimants could have had was that of a 'reasonable return' in terms of Law 54/1997.[688] In particular, the Tribunal does not consider that the Claimants had a legitimate expectation to the regime of RD 661/2007, which (a) was not in force when all the investments were made by the Claimants, (b) was not the subject of a stabilization regime, and (c) was subordinate to Law 54/1997.

499.    In this regard, the Tribunal agrees with the decision in *RREEF v. Spain* that the Claimants are entitled to…

> compensation for unreasonable return on their investments – if established –, the Claimants cannot claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent; they can only get compensation to the

---

[687] For the impact of EU law, see below, paragraphs 535-571.
[688] *RREEF v. Spain* (Decision on Responsibility), paras. 470, 521, CL-0239.

194

extent that such decrease is below the threshold of a reasonable return.[689]

500.   The *RREEF* tribunal conducted its proportionality analysis under the rubric 'The Principle of Damages' in the section of its decision dealing with quantum.  It did so on the ground that "the determination of a violation of the principles of proportionality and reasonableness is inseparable from an assessment of the damages – if any – endured by the Claimants as a consequence of the measures taken by the Respondent".[690]  The two are closely connected in practice, but nonetheless the question of disproportionality pertains to the merits – whether there has been a breach in the first place – and not to issues of quantum, which are consequential.  This difference of principle is important in practice because it is only if the breach is identified with precision that the question of reparation for that breach can be approached.

501.   It is notable that the Parties and their experts treated the question of quantum in an essentially undifferentiated way, as the amount of loss suffered by the Claimants as a result of the Disputed Measures globally.  That led them to identify the amount of reparation owing by reference to an undifferentiated 'but for' situation.[691]  For the Claimants' experts this was the *status quo ante*, the regime of RD 661/2007 as amended.  But if the Claimants had no right to the continuation of that regime, they cannot have acquired any such right by reference to the secondary rules of reparation.  The venerable dictum of the Permanent Court in *Chorzów Factory* does not guarantee the continuation of a factual situation (the Special Regime) to which the Claimants were not otherwise entitled.[692]

---

[689] *RREEF v. Spain* (Decision on Responsibility), para. 523, CL-0239.
[690] Ibid, para. 472.
[691] Cf *Greentech v. Spain* (Final Award), paras. 537-8, CL-0238, on the undifferentiated character of claims against the Disputed Measures.
[692] *Factory at Chorzów*, Merits, PCIJ Ser A No 17 (1928) 8.

502.    The question thus becomes whether the Disputed Measures operated…

> in a manner which is not disproportionate to the aim of the
> legislative amendment, and should have due regard to the reasonable
> reliance interests of recipients who may have committed substantial
> resources on the basis of the earlier regime.[693]

503.    To examine the proportionality of the Disputed Measures, the Tribunal agrees with the
*RREEF* tribunal that the relevant measure is the internal rate of return (IRR):

> Since the Tribunal has determined that the only legitimate
> expectation of which the Claimants could prevail themselves was
> that of a 'reasonable return', it is appropriate to compare both
> regimes depending on the IRR that the Claimants can get under each
> of them. As the *Novenergia* tribunal put it, 'the internal rates of
> return is a relevant measurement for what the Claimants was
> expecting to get from its investment in the Kingdom of Spain at the
> time of making the investment.'[694]

504.    According to the Respondent's experts, the IRR equates to the "reasonable return" as
provided for by the provisions of the Spanish regulatory regime.[695] Investors take the IRR
into account and compare it to the weighted average cost of capital (WACC) to decide on
the profitability of a potential investment.[696] If the project IRR is higher than the required
rate of return it follows that the cash flows generated by the investment will cover the
costs associated with the project.[697] In principle, the Tribunal agrees with this assessment.
If the project IRR exceeds a reasonable return, the Disputed Measures would be
proportionate and would not breach Article 10.1 of the ECT.

---

[693] *Blusun v. Italy* (Award), para. 372, RL-0105, endorsed in *RREEF v. Spain* (Decision on Responsibility), para. 516, CL-0239.
[694] *RREEF v. Spain* (Decision on Responsibility), para. 521, CL-0239, citing *Novenergia II v. Spain* (Final Award), para. 826, CL-0227.
[695] Econ One First Report, paras. 113-124.
[696] Econ One Second Report, paras. 124-136; KPMG Second Damages Report, para. 68, CER-0004.
[697] Econ One First Report, para. 133.

505. As stated by the Parties, there is a difference between the project IRR and the shareholder IRR. Whereas the ECT protects shareholders' rights and accords different protection standards to them, the Tribunal agrees with the Parties that the relevant IRR targeted by the legitimate expectation to a reasonable return is the project IRR over the useful lifetime of the plants.

506. Yet the Parties do not agree on the project IRR under the Special Regime. This Tribunal need not determine the exact IRR before the entry into force of the Disputed Measures. Nonetheless, it notes that the IRR under the new incentives regime is lower than under the initial regime, and not surprisingly. As already held by the Tribunal, the Respondent has the right to modify and amend its regulations, i.e. the amount of the targeted IRR, as long as they remain reasonable and do not breach the ECT.

507. The *RREEF* tribunal calculated a reasonable rate of return at 6.86% after tax, including a 1% supplementary premium.[698]

508. The Tribunal does not take any position on the exact amount of the reasonable return under the Disputed Measures. This return can change over time depending on various factors. The Respondent emphasizes that the reasonable return is a dynamic concept.[699] The Tribunal agrees. The term 'reasonable' allows the State to accommodate a change in these factors instead of fixing the IRR at a certain number. Nonetheless, the Tribunal notes that even if the Claimants had a legitimate expectation of an IRR of 6.86% after tax, the actual IRR clearly exceeded that amount.

509. The Parties' positions as to the Project IRR and the reasonable rate of return are set out in the table below:

---

[698] *RREEF v. Spain* (Decision on Responsibility), paras. 588-9, CL-0239.
[699] Econ One First Report, para. 124.

|  | KPMG | Econ One | Econ One 'Prevailing Scenario' |
|---|---|---|---|
| **Project IRR** | 7.08% | 8.88% | 8.03% |
| **Reasonable rate of return** | 9.40% | 7% | 7% |
|  |  |  |  |
| **Impact:** | - 2.32% | 1.88% | 1.03% |

510. The Tribunal notes that the Parties neither agree on the total project IRR, nor on the reasonable rate of return.

511. According to the Claimants' experts, the project IRR under the Disputed Measures of wind farms in Spain is 7.08%, whereas the estimated reasonable rate of return for RE producers is 9.40%. Consequently, the financial damage in terms of IRR is 2.32%.[700]

512. According to the Respondent's experts, the actual project IRR is 8.88% for wind farms under the Disputed Measures.[701] Considering that the reasonable rate of return for renewable energy projects is 7%, no negative impact on the Claimants' investment can be seen.[702] Even under the Claimants' experts' 'prevailing scenario' the project IRR would be 8.03%, which does not entail a negative impact on the investment.

513. As to the reasonable rate of return of 9.40% put forward by the Claimants, the Tribunal notes that KPMG did not take into account the Disputed Measures but based its calculations solely on what the Claimants could allegedly expect.[703] The Tribunal has already decided that the Claimants had no right to the continuation of the Special Regime. Hence, it cannot base its calculation solely on RD 661/2007, and the reasonable rate of return calculated by KPMG must be rejected.

---

[700] Tr-E, November 2017 Hearing, Day 3, 192:11-14 referring to KPMG, Witness Presentation, illustrative exercise, slide 75; Initially, KPMG calculated the IRR in the KPMG Second Damages Report, paras. 96-102, CER-0004.
[701] Econ One Second Report, paras. 104-108.
[702] Ibid, paras. 141-146.
[703] KPMG Second Damages Report, para. 51, CER-0004.

514.    The average of both total IRRs after the enactment of the Disputed Measures is 7.98%, which is above the 7.398% pre-tax target of the Spanish regulator. It is also above the *RREEF* tribunal's reasonable rate of return of 6.86%.

515.    The Tribunal therefore decides that the Respondent has not breached its obligation to ensure a reasonable return for the future. Accordingly, the Claimants' legitimate expectation to a reasonable return has not been frustrated.

### (4)    Spain's alleged breaches of Article 10.1 of the ECT, third sentence

516.    The Claimants also argue that the Disputed Measures breached Article 10.1 third sentence, ECT, which provides that the investments "shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal".[704]

### (a)    The Claimants' position

517.    The Claimants maintain that Article 10.1 third sentence contains a protection standard equivalent to what is more commonly called "full protection and security".[705] This standard protects the physical integrity of the investor and must be understood as an obligation to provide a "secure legal investment environment" including legal stability and security.[706] Even if the Tribunal considered the ECT not to oblige Spain to provide legal security, the Claimants invoke the MFN clause as contained in Article 10.7 of the ECT to invoke the full protection and security ("**FPS**") provisions of various other BITs the Respondent has concluded. The Claimants argue that said clauses also oblige Spain to ensure legal stability.[707]

---

[704] Cl. Mem., paras. 1009-1065.
[705] Ibid, para. 1010.
[706] Ibid, para. 1011.
[707] Cl. Reply, para. 1162.

199

518.   The Claimants put forward three reasons to argue that the Disputed Measures did create legal uncertainty. First, Spain enacted eight pieces of legislation, which altered the original Incentives Regime and "dashed the stable framework it had rationally developed".[708] Second, between July 2013 and 31 May 2014, all RE producers received payments on an interim basis since the new regime had not been entirely shaped until the enactment of MO IET/1045/2014. Third, the Respondent will change the new regime periodically every three and six years.[709] Finally, the Claimants argue that the Disputed Measures "considerably devaluated" the investment, which breaches Spain's obligation to provide a secure investment environment.[710]

519.   Furthermore, the Claimants argue that Spain has impaired their investment with unreasonable and discriminatory measures.[711] First, the Disputed Measures are unreasonable since they breached the Claimants' expectations for a "stable, certain and consistent" regulatory framework. Moreover, the amount of the target return of 7.398% is unjustified and "does not reflect correctly the capital cost of the most efficient companies". Second, the Claimants maintain that the TVPEE is not an environmental tax and does not contribute to its alleged objective. Third, the TVPEE has a discriminatory impact on the investment.[712]

520.   As a result, the Disputed Measures are, according to the Claimants, in breach of Article 10.1 third sentence.

### (b)   The Respondent´s position

521.   The Respondent rejects the claim. Spain argues that it agrees with the Claimants insofar as the standard protects the investor against physical harm. However, the Claimants erred

---

[708] Cl. Mem., para. 1018.
[709] Cl.-Mem., paras. 1016-1020; Cl. Reply, paras. 1157-1169.
[710] Cl.-Mem., paras. 1022-1028.
[711] Ibid, paras. 1029-1065.
[712] Cl. Mem, paras. 1040-1065; Cl. Reply, paras. 1179-1216.

"in not distinguishing this standard from that of the FET".[713] Furthermore, the Respondent has already proven (i) that it had the right to adopt macro-economic control measures and (ii) that the Disputed Measures are proportionate and reasonable.[714]

522.  As to the Claimants' arguments relating to the reasonableness and discriminatory nature of the Disputed Measures, the Respondent makes three points.

523.  First, the prevailing economic circumstances required Spain to adopt the Disputed Measures.[715] Second, the RE sector proposed a change of the remuneration method itself.[716] Third, both national and foreign investors accepted the Disputed Measures and considered them reasonable and attractive.[717]

524.  Finally, the Respondent relies on *EDF v. Romania* and *AES Summit v. Hungary* in support of the proposition that the Disputed Measures were neither discriminatory nor unreasonable.[718]

525.  According to the test in *EDF v. Romania*, the Disputed Measures are not discriminatory in nature as they i) serve a legitimate purpose, which is the resolution of the unsustainable tariff deficit, ii) are in full compliance with Spanish law, iii) were taken so serve a disguised purpose, iv) respected the rules of due process.[719]

526.  According to the test in *AES Summit v. Hungary*, the Disputed Measures are reasonable as they i) are rational and meet the objective of a public economic policy and ii) contributed to the resolution of the public policy objective.[720]

---

[713] Resp. C-Mem., para. 1036.
[714] Ibid, para. 1037.
[715] Ibid, paras. 1052-1055.
[716] Ibid, paras. 1056-1059.
[717] Ibid, paras. 1060-1063.
[718] Ibid, para. 1068.
[719] Ibid, paras. 1070-1072.
[720] Ibid, paras. 1074-1092.

527.    For these reasons, the Respondent maintains that the Disputed Measures did not breach Article 10.1 third sentence.

### (c)    The Tribunal's Analysis

528.    The focus of Article 10.1 third sentence of the ECT is on constant protection and security. In that regard, the State needs to ensure that "the management, maintenance, use, enjoyment or disposal of the investment is not impaired by unreasonable or discriminatory measures".

529.    Article 10.1 third sentence appears to have a twofold sense.  In the first place, it obliges the State to ensure the physical protection of the investor and to protect it against physical violence and harassment; in this respect, at least, it is not a re-statement of the fair and equitable treatment standard in different words.  This was the view of similar clauses taken by numerous tribunals, including *Noble Ventures v. Romania*,[721] *Tecmed v. Mexico*,[722] *APL v. Sri Lanka*,[723] *Wena Hotels v. Egypt*,[724] *AMT v. Zaire*,[725] and *Eureko v. Poland*.[726]

530.    In the *ELSI* case, a Chamber of the ICJ interpreted the terms "the most constant protection and security" included in a bilateral treaty. It focused on whether the plant and machinery at stake suffered any material damage or harm and rejected the claim as there was no proof of "any deterioration in the plant and machinery" and the authorities were able to protect the plant.[727]

531.    Here there is no evidence that BayWa's investment has suffered from any physical harm or deterioration through the Disputed Measures and BayWa has not suggested otherwise.

---

[721] *Noble Ventures v. Romania* (Award), paras. 164-167, RL-0026.
[722] *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award 29 May 2003, paras. 175-182, RL-0072.
[723] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, paras. 45-86.
[724] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, para. 84.
[725] *American Manufacturing & Trading, Inc. v. Republic of Zaire*, ICSID Case No. ARB/93/1, Award, 21 February 1997, paras. 6.02 ff.
[726] *Eureko v. Poland* (Partial Award), paras. 236-237, RL-0043.
[727] *Elettronica Sicula S.p.A (ELSI) (US v. Italy)*, ICJ Reports 1989, paras. 104-108.

Moreover, there is no evidence that BayWa's management, maintenance, use, enjoyment or disposal of the Wind Plants, as distinct from its income and thus its value, have been impaired by the change of the Incentives Regime. Hence, the Claimants' attempt to invoke various other FPS clauses – through the ECT's MFN clause – to argue that Spain has the obligation to ensure legal stability, must also fail.

532.  Secondarily, the provision expressly refers to unreasonable or discriminatory measures. If this were a free-standing obligation, it would overlap considerably if not completely with the obligations contained in the first two sentences of Article 10.1.  On this basis, it would not lead to a different result than they do. In the Tribunal's view, unreasonable or discriminatory measures in the general sense are examples of measures that may breach the FET standard as contained in Article 10.1, first and second sentences. In this regard, the Tribunal agrees with the Respondent. Moreover, it agrees with the tribunal in *RREEF*, which analysed the alleged discriminatory character of the Disputed Measures and issues of proportionality and reasonableness as part of the FET claim.[728] The *RREEF* tribunal decided that:

> there can be no doubt that [...], (iii) non-impairment including (iv) non-discrimination and (v) proportionality and reasonableness, are elements of the FET – and certainly so under the ECT.[729]

533.  As to the FET standard, the Tribunal has already decided that the retroactive aspect of the Disputed Measures breached the FET standard under the ECT.

534.  Nothing further accordingly remains to be decided as regards the claims under Article 10.1, third sentence.

---

[728] *RREEF v. Spain* (Decision on Responsibility), pp. 136 ff. and 145 ff., CL-0239.
[729] Ibid, para. 260.

### (5)    The EU state aid arguments

535.    For these reasons the Tribunal concludes that, to the extent the Disputed Measures were applied to claw back subsidies duly paid before their adoption, they breached the stability guarantee in Article 10.1 first and second sentence of the ECT.  In all other respects there was no breach of Article 10.1. But, as already noted (paragraphs 409, 463 and 496 above), this conclusion concerns the ECT in the absence of EU law, notably that concerning state aid.  To this the Tribunal turns.

536.    The Tribunal has already considered and dismissed the generic EU law arguments based on the preclusive effect of EU law and supported by reference to the *Achmea* decision.[730] It follows from that discussion that, for the purposes of the ECT which forms the basis of this Tribunal's jurisdiction, Parts III and V continue to apply to the Claimants' investments.  But EU law, according to Spain, also has a specific relevance to the claim, in that EU state aid law, which is part of Spanish law, has the effect that the Claimants did not have, and could not have had, any legitimate expectation of receiving Special Regime subsidies, still less that they were fixed at the level of RD 661/2007.  Moreover, the EC's decision of 10 November 2017 authorizing the Disputed Measures as permissible state aid specifies that compliance with any award of this Tribunal requiring Spain to make payments in excess of those provided by those Measures would itself constitute impermissible state aid and would trigger the stand-still obligation in Article 108.3 TFEU.[731]

537.    The Parties elaborated further in their responses of 13 January 2018 and 29 January 2018 to the EC's Decision on State Aid which after a short round of written observations and in accordance with the Tribunal's decision of 23 December 2017 became part of the record of this arbitration, even though the EC in the end did not intervene.[732] On 4 May 2018, the

---

[730] See above, paragraphs 262-283.
[731] EC's Decision on State Aid, para. 165, RL-0107.
[732] See Tribunal's Decision 23 December 2017.

Parties set out their positions in further written submissions on EU law and current developments.

538.    On 22 and 23 May 2018, a hearing took place in The Hague to address among others the state aid issue.[733] Before setting out its views on these issues, the Tribunal will first summarise the arguments thereby presented.

### (a)    The EC's applications and the positions of the Parties

539.    In its Applications for leave to intervene as a non-disputing party, the EC argued that its intervention "may in particular be warranted if the [Disputed] [M]easures at stake were to involve State aid in the sense if Article 107 (1) Treaty on the Functioning of [the] European Union, and the investors claim in that regard legitimate expectations."[734] According to the EC, in accordance with the consistent jurisprudence of the CJEU, a recipient of aid cannot have had any legitimate expectation that the incentives regime was lawful.  This entailed that the Claimants could not have the legitimate expectation that aid be granted.[735]

540.    Finally, in the EC's Decision on State Aid, the EC reiterated that if Spain were to comply with an award in favour of the Claimants, the payment would constitute state aid under Article 108.3 TFEU and would be subject to the standstill obligation.[736]

541.    The Claimants put forward three reasons to reject Spain's argument that it could not have developed any legitimate expectations in the matter due to the incompatibility of the Special Regime with EU law on state aid. First, the Claimants had the legitimate expectation that Spain would act in compliance with EU state aid law and that the incentives regime did not constitute state aid. Second, Spain did notify the Disputed Measures but only after a considerable delay, during which the Claimants had developed

---

[733] See above, paragraph 54.
[734] EC's First Application, para. 4; EC's Second Application, para. 6.
[735] EC's First Application, fn. 1; EC's Second Application, fn. 1.
[736] EC's Decision on State Aid, para. 165, RL-0107.

legitimate expectations. Third, the Claimants do not have an obligation to oversee if the Respondent respected its EU obligations.

542.    As to the first reason, the Claimants argue that they had the legitimate expectations that Spain and the EC had acted in compliance with EU state aid law. The CJEU declared in the *PreussenElektra* decision that "a national scheme mandating that minimum prices should be paid to sellers of energy generated from renewable sources was not inconsistent [with] and did not infringe 107 of the [TFEU]."[737] This is the basis on which Claimants were entitled to believe that the incentives regime did not constitute state aid.[738] This is supported by the fact that between 2003 and 2014 the EC did not raise any objections to regimes providing for returns of 13%-15% after taxes for wind and solar support schemes.[739] In this regard, the EC did not take any action when many other incentive schemes were introduced by EU Member States, only some of which were notified. Hence, at the time of the investment (2003 and 2011) the Claimants invested believing that the incentive regime did not constitute state aid under EU law.[740] Even the Respondent admits that "until recently" the situation was unclear.[741] Only in 2013, the CJEU definitively ruled in *Vent de colère!* against schemes financed by consumers but organised by the State.[742] This was confirmed later in *Elcogás*.[743] However, at the time of the investment, Claimants had the legitimate expectation that everything was in order.[744]

543.    As to the second reason, the Claimants refer to the delay between the entry into force of the Disputed Measures and the EC's Decision on State Aid. According to the CJEU, an "unexplained 26 month delay on the part of the Commission in adopting its decision on

---

[737] Tr-E, May 2018 Hearing, Day 1, p. 56:5-ff, referring to *PreussenElektra*, C-0547.
[738] Cl. Submission of 4 May 2018, para. 56.
[739] Id.
[740] Tr-E, May 2018 Hearing, Day 1, 57:2 ff.
[741] Resp. C-Mem., para. 763.
[742] Tr-E, May 2018 Hearing, Day 1, 57:19 referring to *Association Vent De Colère*!, Case C-262/12, Judgment of the Court (Second Chamber), 19 December 2013, C-0551.
[743] Tr-E, May 2018 Hearing, Day 1, 57:20 referring to *Elcogás*, RL-0090.
[744] Tr-E, May 2018 Hearing, Day 1, 57:2 ff.

the legality of the aid conferred a legitimate expectation."[745] The EC notified its decision to Spain on 14 November 2017. Meanwhile, the Claimants had developed the expectation that that the incentives regime was not state aid and could be declared compatible. Since the decision came too late, it is of no relevance to the case and adds nothing new.[746]

544. As to the third reason, the Claimants argue that they had no obligation to carry out due diligence assessing whether Spain had complied with its obligations and notified the incentives regime to the EC or not. According to the CJEU there is no specific obligation of the recipient to oversee whether the State has complied with its obligations under EU law.[747] Furthermore, the Respondent did not respect its obligation to notify the incentives regime to the Commission. Spain, by omitting to notify, was in breach of international law, a breach for which BayWa does not have to account.[748]

545. Finally, the Claimants argue that the project companies do not have to refund the aid they received. If they had the legitimate expectation that the aid was lawful, they do not have to refund the aid.[749] Hence, the courts of EU Member States, and *a fortiori* this Tribunal, are not bound by any decision of the EC. In exceptional circumstances the courts can decide against the EC's Decision on State Aid and allow the recipient to keep the aid.[750]

546. Spain stresses four points in relation to the state aid issue, while generally endorsing the EC's position.

547. First, Spain reiterates that the Claimants did not have and could not have had any legitimate expectations of receipt of Special Regime subsidies.[751] The EC has declared the

---

[745] Tr-E, May 2018 Hearing, Day 1, 65:2 ff, referring to *Rijn-Schelde-Verolme (RSV) Machinefabrieken en Scheepswerven NV v. Commission of the European Communities*, Case 223/85, Judgement, ECJ, 24 November 1987.
[746] Tr-E, May 2018 Hearing, Day 1, 69:9 ff.
[747] Tr-E, May 2018 Hearing, Day 2, 33:20-34:1 ff referring to *Syndicat Français de l'Express International (SFEI) and Others v. La Poste and Others*, Case C-39/94, Judgment, ECJ, 11 July 1996, para. 73, C-0554.
[748] Tr-E, May 2018 Hearing, Day 2, 39:9 ff.
[749] Tr-E, May 2018 Hearing, Day 2, 32:3 ff, referring to *Commission of the European Communities v. Federal Republic of Germany*, Case C-5/89, Judgment, ECJ, 20 September 1990, para. 16, C-0553.
[750] Tr-E, May 2018 Hearing, Day 2, 33:9 ff.
[751] Resp. Submission of 4 May 2018, paras. 121-122.

207

incentives regime to constitute state aid. The consequence of this declaration, which is binding on the Tribunal under the applicable law, is not the repayment of the subsidies to Spain (which the EC has not ordered) but the exclusion of any legitimate expectations to the payment of the state aid. Therefore, the Claimants' legitimate expectations have not been breached. Despite the fact that the Special Regime was never notified by Spain, it fulfilled all the criteria of state aid. It must be considered to constitute state aid since 2001, which is long before the Claimants' investment.[752]

548.    Second, the Respondent argues that the Claimants could have neither had the legitimate expectation to endlessly receive any aid nor to receive a certain amount.[753] The incentives regime will always remain subjected to the control of the European Commission:

> Indeed, according to Article 108, the Member States are always obliged, jointly with the European Commission, to review and to control the supportive schemes. That is why no investor could have a legitimate expectation to receive a specific level of state aid without an end, because that level of state aid will be always subject to the control of the European Commission, and therefore can be changed at any moment. That is why the European Commission concludes that there is no right to state aid, and therefore an investor cannot have a legitimate expectation to state aid, and even less could have a specific expectation when the state aid scheme has not been notified to the European Commission.[754]

549.    Third, the Tribunal must apply the standard of a diligent businessman. According to this standard, any investor must know that any incentives regime can be abolished at any time according to EU law. Therefore, the Claimants cannot have any legitimate expectations to receive state aid.[755] Furthermore, the CJEU states that an investor is obliged to know

---

[752] Tr-E, May 2018 Hearing, Day 2, 74:18 ff.
[753] Strictly speaking, the subsidies were received by the Spanish project companies, but this point was not taken by the Claimants.
[754] Tr-E, May 2018 Hearing, Day 1, 154:7-20.
[755] Tr-E, May 2018 Hearing, Day 1, 155:11-20.

which rules are applicable to its investment. As a result, the investor has to take into account the behaviour of the State and the applicable law, which includes state aid law.[756]

550. Fourth, the EC's Decision on State Aid is directed at Spain's incentives scheme and hence to all investors and companies that have benefited from the system.[757]

551. Moreover, the Claimants rebut the Respondent's *PreussenElektra* argument by referring to *Elcogás*, which stated that *PreussenElektra* cannot be applied to facts similar to those before this Tribunal. This is because in *PreussenElektra*, no "regulation or mechanism regulated by the state to manage the payments" was involved, as it is in the case at hand.[758]

552. Finally, Spain emphasises that the EC expressly stated in its Decision on State Aid that any compensation awarded to the investments would constitute unauthorised state aid pursuant to Article 108.3 TFEU. Therefore, an award in the Claimants' favour could not be enforced, at least within the EU.[759]

### (b) The Tribunal's approach

#### (i) EU law on state aid

553. The Tribunal will first summarise what it understands, on the basis of the submissions of the Parties and the referenced documents, to be the applicable EU law of state aid.

554. Article 107.1 TFEU provides that:

> any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods

---

[756] Tr-E, May 2018 Hearing, Day 2, 83:8 ff.
[757] Tr-E, May 2018 Hearing, Day 2, 70:20-71:4.
[758] Respondent's Comments on the *Achmea* Ruling, European Commission Decision the State Aid SA.40348 (20151NN) and the *Wirtgen* and *Novenergia* Awards, para. 124; Tr-E, May 2018 Hearing, Day 1, 106:10 ff.
[759] Tr-E, May 2018 Hearing, Day 2, 75:10 ff.

shall, in so far as it affects trade between Member States, be incompatible with the internal market.

555.    There are certain exceptions to the prohibition in Article 107.1, none of them relevant here.

556.    Article 107.3 sets out criteria to be applied by the EC in approving state aid proposals. If a proposal is not approved, it must be withdrawn or duly modified, an injunction enforceable by the CJEU (Article 108.2).

557.    Article 108.1 requires the EC, in cooperation with Member States, to "keep under constant review all systems of aid existing in those States". In accordance with Article 108.3:

> The Commission shall be informed… of any plans to grant or alter aid. If it considers that any such plan is not compatible with the internal market having regard to Article 107, it shall without delay initiate the procedure provided for in paragraph 2. The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision.

558.    State aid which is not notified under Article 108.3 or which is implemented before it is authorised by the EC is unlawful. Unlawful aid can and in principle should be recovered by the EC, which can require its repayment by all recipients to the granting State. But the failure to notify aid, though it makes the aid unlawful, does not entail that the EC may not subsequently find the aid compatible with the internal market: this is what happened with the Disputed Measures, which were notified by Spain only some time after their implementation. In approving them in its Decision on State Aid, the EC confined itself to 'lamenting' the late notification.[760] It could have ordered the payment of interest on amounts paid prior to the approval date, but did not do so.

559.    The question whether particular payments constitute aid as defined is a matter of law for the EC, State courts and ultimately the CJEU. The onus is on the recipient to ascertain

---

[760] EC's Decision on State Aid, p. 33, RL-0107.

whether the aid has been notified, which it can do by consulting the on-line register of aid.[761]  Moreover, it is well established that:

> so long as the Commission has not taken a decision approving aid, and so long as the period for bringing an action against such a decision has not expired, the recipient cannot be sure as to the lawfulness of the proposed aid which alone is capable of giving rise to a legitimate expectation on his part.[762]

560.    This principle is of long-standing.  For example, in 1997, the Court held:

> […] in view of the mandatory nature of the supervision of State aid by the Commission under Article 93 [now 108] of the Treaty, undertakings to which an aid has been granted cannot, in principle, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent operator should normally be able to determine whether that procedure has been followed.[763]

561.    In the EU state aid context, the relevance of legitimate expectations is that they can, in certain limited circumstances, constitute a defence to a claim for repayment of aid.[764]

            (ii)    *The application of state aid law to the Special Regime*

562.    The Claimants argue that neither Spain nor the EC discussed the nature of the Disputed Measures until 2017, when the EC's Decision on State Aid was rendered. However, the two Directives on Renewable Energy of 2001 and 2009 both expressly refer to Articles 87-88 TFEU,[765] and the EC, in implementing these Directives, has approved a large

---

[761] EC register of state aid decisions: http://ec.europa.eu/competition/state_aid/register/.

[762] *Centre d'exportation du livre français v. Société internationale de diffusion et d'édition*, Case C-199/06, 12 February 2008, Judgment of the Court (GC), para. 67, citing *Italy v. Commission*, Case C-91/01, [2004] ECR I-4355, para. 66.

[763] *Kingdom of Spain v. Commission of the European Communities*, Case C-169/95, Judgment, ECJ, 14 January 1997, para. 51, citing earlier authority.

[764] Council Regulation (EC) No 659/1999, 22 March 1999, Art. 14, C-0557.

[765] See Directive 2001/77/EC, 27 September 2001, preambular para. 12, Art. 4 (support schemes "without prejudice to Articles 87 and 88 of the Treaty"), RL-0015; Directive 2009/28/EC, 23 April 2009, Art. 3 (support schemes "without prejudice to Articles 87 and 88 of the Treaty"), RL-0017.

number of subsidies schemes for renewable energy. The matter was put by the EC in 2005 in the following terms:

> As stated in indent 12 of the preamble of Directive 2001/77/EC, the rules of the Treaty, and in particular Articles 87 and 88 thereof, apply to public support. Such support is normally covered by the Community Guidelines on State aid for Environmental Protection and might be economically justified on a number of grounds as the beneficial effects of such measures on the environment outweigh the distorting effects on competition. Since the use of renewable energy sources is a priority in the policy of the Community, the mentioned guidelines are rather generous for such support schemes. On that basis, some 60 State aid schemes supporting renewable energy sources were approved by the Commission during the period 2001 to 2004.[766]

563.     In fact, it does not appear that *any* green energy subsidy scheme was disapproved by the EC during this period. The EC register of state aid lists only five negative decisions, involving Austria (2011[767]), France (2016[768] and 2018[769]) and Germany (2015[770] and 2018[771]). None of these schemes bore any resemblance to the Spanish Special Regime in force up to 2013.

564.     Thus, it appears to have been the case that state aid rules were in principle applicable, but that the EC took a 'rather generous' approach to their application.

---

[766] EC Communication, The support of electricity from renewable energy sources (COM(2005)) 627, para 3.5, C-0386.

[767] SA.26036, 8 March 2011 (part of scheme only disapproved), EC decision upheld by General Court, T-251/11, 11 December 2014.

[768] SA.39621, 8 November 2016 (amended scheme approved).

[769] SA.36511, 31 July 2018 (amended scheme approved).

[770] SA.33995, 5 August 2015 (part of scheme only disapproved); on 29 March 2019, the European Court of Justice (C-405/16 P) set aside the judgment of the General Court of the European Union of 10 May 2016, *Germany v. Commission* (T-47/15, EU:T:2016:281) and annulled Commission Decision (EU) 2015/1585 of 25 November 2014 in state aid proceedings: CJEU, 2019/C-187/04.

[771] SA.45852, 17 October 2018.

565.   As to whether the Special Regime subsidies constituted state aid as defined, the Claimants argued that at the time of the investment, both Parties and the EC assumed that they did not.  However, the Guidelines of 2001 point in a contrary direction.  Although the cost of the subsidies was intended to be met by consumers, the Spanish State provided for them by law and was closely involved in the operation of the system.  The EC in its Decision on State Aid had no difficulty in holding that the Disputed Measures constituted state aid, and by parity of reasoning so did the Special Regime.   The CJEU's decision in *PreussenElektra*, which the Claimants cited in this context, is plainly distinguishable.[772] The Tribunal concludes that the Special Regime potentially constituted state aid and should have been notified to the EC under Article 108 TFEU.

566.   The Claimants point out that the EC never condemned the Special Regime subsidies as state aid, still less did it require their repayment by the large number of recipients of subsidies.  The Respondent asserts that it follows from the EC's 2017 decision on the Disputed Measures that the Claimants can have had no legitimate expectation of receiving subsidies in excess of those provided for by those Measures, or indeed at all.

567.   The EC's Decision on State Aid held that payments made under the Disputed Measures from their inception in 2014 until 10 November 2017 were state aid and, not having been notified, were unlawful.[773]  After examination, it decided that the aid was compatible with the internal market pursuant to Article 107.3.c TFEU.  As for existing facilities, "[p]ayments under the premium economic scheme are covered by the decision in order to assess proportionality, i.e. the absence of overcompensation".[774]  But it was "not relevant

---

[772] Claimants' Response to the Respondent's Comments on the European Commission Decision on State Aid Procedure SA. 40348 (2015/NN), 29 January 2018, para. 29 referring to *PreussenElektra*, C-0547. This related to a subsidy scheme managed and funded by the private sector without any use of state resources.
[773] EC's Decision on State Aid, paras. 84-89, RL-0107.
[774] Ibid, para. 4.

213

for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not".[775]

568.     A preliminary question for the Tribunal is the relevance, if any, of the EC's intimation or decision that compliance with any damages award in the present case would by itself constitute notifiable state aid, subject to the standstill obligation.[776]  In this regard the Tribunal agrees with the *Vattenfall* tribunal:

> [...] While the Tribunal is mindful of the duty to render an enforceable decision and ultimately an enforceable award, the Tribunal is equally conscious of its duty to perform its mandate granted under the ECT... The enforceability of this decision is a separate matter which does not impinge upon the Tribunal's jurisdiction.[777]

569.     Turning to the substantive question of the interaction of EU law and the applicable law for this Tribunal founded on the ECT, the following observations should be made:

(a)     In principle, an investor cannot have a legitimate expectation of treatment which is unlawful under the law of the host State, provided that the host State law itself is not inconsistent with the treaty under which the tribunal exercises its jurisdiction.[778]  In an international forum such as the present one, a host State may not rely on its domestic law as a ground for non-fulfilment of its international obligations.[779]  But subject to that qualification, investors must also comply with

---

[775] Ibid, para. 156.
[776] Ibid, para. 165.
[777] *Vattenfall AB v. Germany* (Decision on *Achmea*), para. 230, CL-0236.
[778] See e.g. *Blusun v. Italy* (Award), paras. 264-268, RL-0105; *Yukos v. Russia* (Final Award), para. 1352, RL-0082; *Plama v. Bulgaria*, paras. 138, 140 and 143, CL-0013, *World Duty Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006, paras. 157, 188; *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/11/12, Award, 10 December 2014, para. 332; *Phoenix Action, Ltd. v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, para. 78; *David Minnotte and Robert Lewis v. Republic of Poland*, ICSID Case No. ARB(AF)/10/1, Award, 16 May 2014, para. 131.
[779] ILC, Articles on Responsibility of States for Internationally Wrongful Acts, Art. 3, CL-0001.

214

the law of the host State, both as regards their investment and their concomitant expectations.

(b) In the present case, the host state's law itself (incorporating EU state aid rules) is not inconsistent with the ECT, under which the Tribunal exercises its jurisdiction. Although arguably harsh on recipients as they risk bearing the harmful consequences of the subsidizing State's omission to notify the aid, the EU rules in regard of non-notified aid are clear and have been consistently interpreted. From the standpoint of international law, "municipal laws are merely facts which express the will and constitute the activities of States, in the same manner as do legal decisions or administrative measures".[780] The Tribunal therefore does not interpret EU law as such, but accepts the consistent interpretation of EU law as applied by the relevant institutions.

(c) The initial investments here were made in the period between 2008 and 2011, after a due diligence process which seems not to have had any regard to EU state aid law. As it is at least arguable that state aid law should have been seen as relevant even at that time, the Tribunal finds this omission surprising.

(d) The EC, which had primary responsibility for administering and enforcing state aid law, was well-informed as to the Spanish special subsidy regime in its various manifestations under Law 54/1997. Indeed it extolled the Special Regime as "the main driver for investment in wind energy" and as "rather well adjusted to generation cost".[781] There is no indication that it did anything to raise with Spain the state aid issue until the Disputed Measures were belatedly raised by Spain itself in December 2014, well after the cessation of Special Regime subsidies and the repeal of Law 54/1997.

---

[780] *Certain German Interests in Polish Upper Silesia*, 1926 P.C.I.J. Ser.A No. 7, [PDF, p. 33], CL-0085.
[781] EC Communication, The Support of Electricity from Renewable Energy Sources (COM(2005) 627, p. 28, C-0386.

(e)    Spain, an EU member since 1986, ought to have been aware of its duty of notification under Article 108.3 TFEU, and should have acted accordingly. There is, however, no causal link between the omission to notify and the fact that the Claimants have not continued to receive the amount of subsidies provided for in RD 661/2007.  The illegality of unnotified Special Regime subsidies played no role in subsequent events, including the enactment of the Disputed Measures, which were driven by purely domestic concerns, notably the tariff deficit.

(f)    Despite its detailed knowledge of the Special Regime, the EC for its part has taken no steps to enforce the relevant provisions of EU law against the recipients of subsidies generally.  Instead it has elected to seek to block the payment of any award of ECT and BIT tribunals, including this Tribunal, as constituting *de novo* a form of state aid.  It will be for the Parties through subsequent proceedings to work through the consequences of the Tribunal's award under EU law and international law, including by reference to the provisions of the ICSID Convention concerning the status and enforcement of awards.[782]  The Tribunal can do nothing but decide the present case in accordance with the applicable law.

(g)    In the circumstances, the Tribunal finds that under EU law and the law of Spain, the Claimants could not legitimately have expected that the Special Regime subsidies were lawful.  Equally they could not expect that the amount of state aid granted under these measures would be paid for the lifetime of the plants.  The Claimants should have known that these measures had not been notified to, let alone approved by, the EC.

(h)    However, the EC has equally not rendered a decision that the Special Regime subsidies were unlawful. It merely stated, with full knowledge of the facts, that it

---

[782] *Altmark Trans GmbH et al. v. Nahverkehrsgesellschaft Altmark GmbH*, Case C-280/00, Judgment, ECJ, 24 July 2003, *Asteris and Others v. Greece and Commission of the European Communities,* Case C-106/87, Judgment, ECJ, 27 September 1988.

was 'not relevant' whether the previous scheme was compatible with EU law. As such, the EC has not created a right (still less a duty) for Spain to procure the reimbursement of amounts of state aid already paid, including to the Claimants' Wind Farms and other recipients. Nor, in the light of the record, does the Tribunal believe that EU law required only the level of subsidy provided by the Disputed Measures. The EC, which has quite broad discretion in such matters, made no such finding.

(i)     The Tribunal has already held that no compensation is due to the Claimants for the non-continuation after 2013 of the level of state aid under the Special Regime that was in force before 2013. But the position with respect to claw-back of subsidies paid under the Special Regime is not, in the Tribunal's view, to be treated in the same way. Recipients of such subsidies could not have had a legitimate expectation that they would be continued, but the subsidies having been paid (and subject to any lawful recovery measures by the EC, which did not occur), they were entitled to the benefit of the stable regime which Article 10.1, first and second sentences, of the ECT promised.

570.    Indeed, the effect of the non-application in practice of the law as to unnotified state aid is that continuing investors such as the Claimants are disadvantaged as compared to those who benefited from the Special Regime subsidies but who sold their investment prior to the introduction of the Disputed Measures. In the absence of recovery of the unnotified aid from all recipients (which has not happened), the latter group retain the benefit of the earlier subsidies, as reflected in the sale price, without claw back.

571.    This conclusion is consistent with findings of most earlier ECT tribunals in cases against Spain insofar as these concern jurisdiction and admissibility, as well as responsibility for expropriation (Article 13), full protection and security (Article 10.1, 3rd sentence) and breach of the umbrella clause (Article 10.1, final sentence). On questions of responsibility for breach of Article 10.1 first and second sentence, the decisions are variable. Most

217

tribunals have held that there was no specific commitment in terms of RD 661/2007, and that Article 44.3 of that decree did not constitute an express or implied individual commitment of the 2007 level of subsidies to the claimant. These cases have already been referred to in earlier sections of this decision.[783]

572.    Some reference should be made, however, to certain recent cases tendered by the Parties.

573.    In *Greentech v. Spain*, the tribunal awarded EUR 39 million (out of a claim of EUR 58.2 million) to a Dutch company for breach of Article 10.1, first and second sentences, ECT. It held that Article 26.6 of the ECT only applies to the merits, not to jurisdiction, and was therefore irrelevant to the jurisdictional objection based on EU law. That objection it rejected.[784] Claims based on full protection and security and the umbrella clause were rejected, as also the stabilization claim based on RD 661/2007, in particular Article 44.3.[785] There was no expropriation.[786] But there was a breach of Article 10.1, first sentence, ECT because the new regime involved "a radical or fundamental change in the legal or regulatory framework under which the investments are made".[787] This conclusion was reached despite fallings in due diligence on the part of the investors.[788] It was based on the majority's conclusion (unaffected by EU law or state aid rules[789]) that the new regime met "the threshold requirement of a fundamental change to the regulatory framework".[790] The quantum claim was reduced by EUR 11.2 million to reflect a reduced

---

[783] See e.g. paragraphs 466, 473-476.

[784] *Greentech v. Spain* (Final Award), paras. 218-219, 381, CL-0238. *Achmea* was pronounced irrelevant: ibid, para. 220. Spain's preliminary objection as to the TVPEE was upheld: ibid, paras. 247-260.

[785] Ibid, paras. 412, 413, 366, respectively.

[786] Ibid, paras. 423-431.

[787] Ibid, para. 359; see also para. 365.

[788] Ibid, para. 380, and for the contrary view see the dissent of Professor Vinuesa, ibid, paras. 28, 39-50.

[789] Ibid, paras. 198-9, 219, 381; but see the dissent of Professor Vinuesa, paras. 4-7, 17-27, 34.

[790] Ibid, para. 388, and see paras. 391-6 for the reasoning.

218

operating life (30 rather than 35 years for PV facilities) and by EUR 8 million to reflect claimant's failure to quantify historical losses.[791]

574. In *NextEra v. Spain*, the decision of the tribunal on jurisdiction, liability and quantum principles rejects EU law as a helpful guide in assessing the claims. The case was brought by Dutch companies owning shares in the Spanish plants operating CSP facilities. The decision to invest in principle was made in 2009 by preregistration applications, even though bank financing was only drawn upon in 2011 and the plants were finally registered and operative only in May-June 2013.[792] EU law, it was held, cannot affect jurisdiction:

> The fact that there may exist a partial overlap between the two set of rules on the merits (such as FET and Fundamental Freedoms), cannot, *for the purpose of jurisdiction*, be resolved in favour of EU Law. This is because the questions pertaining to the Tribunal jurisdiction must be answered in light of Article 26 of the ECT.[793]

575. The EU jurisdictional objection was thus rejected.[794] But the TVPEE objection for tax measures was accepted.[795]

576. The merits were dealt with more summarily. Respondent's claim of lack of due diligence was rejected essentially on onus of proof grounds:

> […] Claimants had the Poyry consultant reports and Claimants refer to legal opinions they received on Spanish law. The fact that Claimants refused to waive their privilege in respect those legal opinions should not lead to any adverse inferences. Nondisclosure means that Respondent and the Tribunal have not had access to the content of those opinions, but the fact that Claimants received legal advice is not really contested. In short, the Tribunal does not

---

[791] Ibid, paras. 517, 537-8 respectively.

[792] *NextEra v. Spain* (Decision on Jurisdiction), paras. 169-179, RL-0121.

[793] Ibid, para. 351 (Emphasis in the original).

[794] Ibid, para. 357.

[795] Ibid, paras. 372-373.

consider that the assertion that there was a lack of due diligence on the part of Claimants has been established.[796]

577.   The breach of Article 10.1 was also fairly summarily established:

> […] the assurances made by the Spanish authorities were not about a reasonable return; they were about the regulatory certainty and stability that NextEra could expect. The denial of legitimate expectations is based on the failure to provide that certainty and security by changing fundamentally the regime under which remuneration was to be calculated.[797]

578.   No reference was made to EU law concerning the merits.

579.   As for quantum, the tribunal rejected the claimant's DCF calculation based on RD 661/2007, on the ground that less than a year's actual operation of the plants did not give any sound basis for a DCF analysis.[798]  Instead "a calculation of the value of the assets and a reasonable return on that value is an appropriate method for valuation of loss in this case."[799]  In the event, after giving directions on various points, the tribunal called on the parties' financial experts to seek to agree on quantum, and eventually awarded EUR 290.6 million as damages plus interest and costs.

580.   In *Cube v. Spain*,[800] the tribunal considered in detail but rejected a preliminary objection relating to EU law.[801] The ECT, including Article 16, had general application including within the EU,[802] and was not displaced by the TFEU.  Nor was the TFEU applicable

---

[796] Ibid, para. 565.

[797] Ibid, para. 600.

[798] Ibid, para. 647.

[799] Ibid, para. 650.

[800] *Cube v. Spain* (Decision).

[801] Ibid, para. 138.

[802] Ibid, para. 124.

under Article 26.6 of the ECT, because it did not constitute one of the 'principles of international law'.  In sum:

> This Tribunal does not have to apply, or take a decision on any question of, Spanish law or EU law. Under the provisions concerning the applicable law that are binding on this Tribunal, Spanish law and EU law are relevant only as facts in the light of which the rights and duties of the Parties under the ECT and international law are to be determined.  Thus, for example, the provisions on EU law concerning State aid are not applied by this Tribunal, nor does the Tribunal make any decision on their interpretation. They are relevant only as part of the factual matrix, and in this case particularly as part of the factual basis for determinations of how the Claimants could expect to be treated in respect of their power plants in Spain.[803]

581.    But it upheld the third preliminary objection related to taxation measures and the TVPEE.[804]

582.    In dealing with the merits, the tribunal held that, when the decisions to build RE plants were made, the investments were made in reliance on the stability of the RD 661/2007 regime.[805]  The Spanish Supreme Court decisions of 2005 and 2006 did not address the ECT or the claim of legitimate expectations, but were based on the Constitution; they did not "put the Claimants on notice that the tariffs and premiums established by RD 661/2007 might be reduced or withdrawn contrary to the terms of RD 661/2007 itself".[806]

> This conclusion does not imply that Spain had no right to amend RD 661/2007 or that the 2007 Regime was in some sense 'petrified.' It does, however, imply that the balance struck in RD 661/2007 between the interests of consumers and producers of electricity was, and was intended to be, secured by a regime which investors could be sure would not be changed for existing plants registered under

---

[803] Ibid, para. 160.
[804] Ibid, paras. 230-233.
[805] Ibid, para. 296.
[806] Ibid, para. 300.

the Special Regime except in accordance with the procedures set out in RD 661/2007 – or at least, not changed in a manner that significantly altered the economic balance that existed at the time when an investment made in reliance on RD 661/2007 was made.[807]

583.    But the intangibility created by the claimants' reliance on RD 661/2007 was relative, not absolute.  In particular, there was a distinction between legitimate expectations of an investor in 2008-9 (the PV investments) under the auspices of RD 661/2007 and investments made in 2011-12 (the hydro investments) after the regulatory changes of 2010-11.  There was thus a significant difference between the regulatory risks run in the two classes of investment: "any reasonable investor would have taken a much more cautious view of the extent to which the continuation of the existing legal regime could be relied on, but would not have had reason to expect the complete abandonment of the Special Regime".[808]

> The Tribunal does not consider that when they made their investments in hydro facilities in 2011 and 2012, the Claimants could reasonably rely on there being no change whatever to the Special Regime applicable to existing facilities. The Special Regime was clearly under so much economic pressure as to be unsustainable as it stood; and adjustments to the Special Regime were to be expected. Realistically, electricity producers must have recognized that there was very considerable pressure to reduce their profits and must have expected that steps in that direction would in fact be taken.[809]

584.    The changes made up until RDL 2/2013, even considered collectively, did not breach Article 10.1 of the ECT.[810]  But the subsequent changes, starting with RDL 9/2013 and culminating with RD 413/2014 and MO IET/1045/2014, "represented a fundamental

---

[807] Ibid, para. 308.

[808] Ibid, para. 333.

[809] Ibid, para. 334.

[810] Ibid, para. 424.

change in the economic basis of the relationship between the State and the Claimants", and did constitute such a breach.[811]

585.    The difference between the earlier and later investments emerged at the quantum stage: in the tribunal's words "[u]nlike the PV plants, the representation on which investors were entitled to rely in 2011-2012 does not extend to the entire working life of the plants: and it is limited to radical changes."[812]  The tribunal unanimously awarded EUR 2.89 million in damages in respect of the PV investment, without any regulatory discount, but by majority awarded a 40% discount in respect of regulatory risk on the hydro claim, resulting in a grant of EUR 30.81 million in the subsequent final award.[813]

586.    Professor Tomuschat dissented on the latter point: in his view…

> In general, an investor cannot be deemed to have a vested right to the continuity of the administrative system according to which a promised advantage will be provided to it. The guarantee given is a guarantee of economic value. In what form the relevant advantage shall be granted is a matter to be determined primarily by the host State. Therefore, only if it could be shown that the transformation of the system went so far as to call into question the guarantee of a reasonable return would the Claimants have a claim to compensation pursuant to the general rules of responsibility. According to my analysis of the facts, that demonstration has not been made.[814]

587.    In *9REN v. Spain*,[815] the tribunal awarded EUR 42 million to a Luxembourg investor for a breach of Article 10.1 of the ECT, dismissing all other claims. It held that RD 661/2007 contained a grandfathering clause which gave rise to legitimate expectations as to a stable

---

[811] Ibid, para. 427.

[812] Ibid, para. 512.

[813] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Award, 15 July 2019.

[814] *Cube v. Spain* (Decision), Separate and Partial Dissenting Opinion of Professor Christian Tomuschat, para. 25.

[815] *9Ren v. Spain* (Award), RL-0123.

incentives regime. The tribunal agreed with UNCTAD that "that legitimate expectations may arise from 'rules not specifically addressed to a particular investor but which are put in place with a specific arm to induce foreign investments and on which the foreign investor relied on making his investment'."[816] Based on this, the *9REN* tribunal decided that RD 661/2007 constitutes a clear and specific commitment.[817] However, in the tribunal's view, Law 54/1997 stated a general principle, which gave the competence to the Government to give effect to it by regulation. It was to be implemented by regulations which would naturally change, and did change, and not in any uniform direction favouring the recipients.[818] In particular, there was no legitimate expectation that subsidies would never be reduced or capped. Consequently, RD 611/2007 does not constitute a specific commitment out of which legitimate expectations can arise.

### (6)    The Tribunal's Conclusions on Liability

588.    The jurisprudence on Article 10.1, first and second sentences, ECT, is rather variable. ECT tribunals have uniformly upheld their jurisdiction notwithstanding *Achmea* and the rulings of the EC, although the reasoning has varied somewhat.  Inadmissibility arguments have failed.  On the merits, a few tribunals have treated the subsidy level under RD 661/2007 as in effect guaranteed, although that is a minority view.  Most tribunals have sought to distinguish between strict compliance with the status quo before 2013 (which is not required, absent express commitments by the state) and substantial abandonment of the system of support altogether (which breaches the ECT standard).  State aid issues have been largely ignored, although with little reasoning.[819]

---

[816] Ibid, paras. 292, 294 referring to UNCTAD Fair and Equitable Treatment, (2012) n. 263, p. 69.

[817] *9REN v. Spain* (Award), paras. 294-297, RL-0123.

[818] See e.g. paragraphs 108, 127, 166, 169-172.

[819] The principal exception amongst the BIT decisions is Arbitrator Raúl Vinuesa's dissent in *Greentech*: above paragraph 573. Some tribunals have been content to dismiss EU law arguments as irrelevant to international law responsibility, but whether an investor has a legitimate expectation at the time of the investment is not a pure question of international law, quite apart from Art 26.6 of the ECT.

589.    There is a division in the decisions as between those tribunals that have granted substantial amounts by way of compensation (sometimes in the hundreds of millions of EUR) and those which, on whatever ground, have sought to limit the reparation awarded to some degree.  Relevant factors here have included lack of due diligence on the part of the investor, increased levels of risk as the problems of the electricity budget deficit strengthened after 2008, and a sense that some investors have sought to capitalise unduly on Spain's generous incentive provisions.  On the other hand, while the favourable Spanish superior court decisions have been cited, they have not generally been applied to limit compensation awards.

590.    Nonetheless, the Tribunal, by majority, does not discern a general breach of the FET standard embodied in Article 10.1, first and second sentences, ECT.  In reaching this conclusion the Tribunal takes into account the following matters:

(a)    The investment was made by BayWa RE in 2009 and subsequently, at a time when the economic situation was problematic and was acknowledged as such by Parliament and the Supreme Court at the time.

(b)    In particular, the preamble to RDL 6/2009 referred to "serious problems that, in the context of the current international financial crisis, [are] seriously affecting the system and not only putting the financial situation of the companies in the electric power sector at risk, but also the sustainability of the system itself. This imbalance is unsustainable".[820]

(c)     There was limited due diligence so far as possible constraints imposed by EU law were concerned.

(d)    No specific or binding representations were made by Spain to the investor as such, whether before 2009 or subsequently. Legislation is subject to modification as

---

[820] RDL 6/2009, Preamble, C-0399. See also R-0088.

circumstances change, and within broad limits investors take the risk that non-discriminatory changes in financial subsidies may be necessary.

(e)     The Respondent sought to avoid major changes by a series of measures—including changes in the operating hours qualifying for subsidies, the TVPEE, adding an access toll to use the transportation and distribution grids and suppressing the feed-in remuneration regime of RD 661/2007 for new Special Regime facilities.  To the extent that these measures fall within the Tribunal's jurisdiction, they are not asserted by the Claimants as breaches of Article 10.1 of the ECT.  Their claims focus on the Disputed Measures of 2013-14.

(f)     The Disputed Measures present a stronger case of a breach.  In one respect at least – the claw back of subsidies lawfully paid and received – they were in breach of the FET standard, as the Tribunal has held.[821]   In other respects, too, they were vulnerable to criticism, notably for the scale of the reduction in tariffs, even leaving aside the claw-back. But on the other hand, a substantial support system survived, with priority of access retained and returns for wind power plants at the level of an IRR of 7.98%.[822]  In the circumstances the Tribunal (by majority) does not regard that aspect of the new system as amounting to unfair and inequitable treatment.

(g)     The Tribunal is reinforced in this conclusion by considerations of European law. By about 2010, if not earlier, the Special Regime subsidies were at least arguably state aid and notifiable as such to the EC: the subsidies were not notified, and were unenforceable as such pending EC approval following notification, which never happened.  This gave them added vulnerability.

---

[821] See above, paragraphs 496, 533.
[822] See above, paragraph 514.

591.    For these reasons, the Tribunal finds:

(a)    that the European state aid regime and the ECT apply concurrently to the investment and form part of the applicable law.

(b)    that the Special Regime subsidies constituted unnotified state aid which was on that account unlawful.  But the EC never ruled that they were unlawful, never ordered any recovery and never drew any other legal conclusions from that fact.

(c)    that the Claimants could not have had a legitimate expectation that the Special Regime subsidies, notably in terms of RD 661/2007, would continue to be paid for the lifetime of its Plants.

(d)    that in the circumstances, the clawing back by Spain, after 2013, of subsidies earlier paid at levels in excess of the amounts that would have been payable under the Disputed Measures, had they been in force in previous years, was in breach of the obligation of stability under Article 10.1, first and second sentences, of the ECT.

(e)    that this conclusion is not, as at the date of this Decision, inconsistent with EU law as applied to the Claimants' investment.

592.    Arbitrator Grigera Naón dissents as to these conclusions on Article 10.1, for the reasons explained in the attached dissenting opinion.

593.    The next question is the implications of these conclusions for quantum. To this the Tribunal turns.

## VII.   DAMAGES

### (A)   THE CLAIMANTS' POSITION

594.   The Claimants argue that they are entitled to full reparation for the harm suffered because of the Disputed Measures. They claim reparation for a breach of their rights under the ECT.[823] To assess the damage the Tribunal must take into account the date on which the Disputed Measures entered into force.[824] In doing so, it must use a discounted cash flow (DCF) analysis.[825] This method has often been applied in ECT disputes by international tribunals.[826]

595.   Under the full reparation standard, according to the Claimants, their damages consist of two different parts. First there are *Past Damages*, which are calculated by comparing the value of the free cash flows under an Actual and a But-For scenario until 31 December 2015. Second, the Claimants claim *Future Damages*, which consist of the difference in value of the Claimants' investment under the Actual and the But-For scenarios.[827] In the Actual Scenario the experts project how the Claimants' investment would have performed if the Disputed Measures applied with full force. In the But-For scenario, the experts assume that BayWa has the right to receive payments under RD 661/2007.[828]

596.   Moreover, the Claimants argue that the DCF method is the relevant method for the quantification of their damages. Two facts render the method particularly appropriate for the quantification of damages in ECT arbitrations. First, La Muela is a fully developed

---

[823] Cl. Mem., para. 1066.
[824] Ibid, para. 1092; According to the Claimants, the Respondent's measures came into effect on 1 January 2013.
[825] Cl. Mem., para. 1088.
[826] Cl. Reply, para. 1220.
[827] Cl. Mem., para. 1091.
[828] Ibid, paras. 1088-1090.

project that has been operating for more than a decade. Second, La Muela has a clear and established track record.[829]

597.    To quantify Past Damages, the Claimants' expert calculated "the free cash flows denied to the Project Companies from the date in which the Respondent's measures came into effect (January 1, 2013) until the valuation date (December 31, 2015)."[830] In total, Past Damages amount to EUR 16,303,851.[831]

598.    To quantify Future Damages, the Claimants' experts apply a DCF analysis to quantify the impact of the Disputed Measures on the investment. To do so, they calculate the difference between the Claimants' investment under the Actual scenario and a But-For scenario. To this end, the experts take into account two periods. The first period runs from 2016 until 2027, which constitutes the lifetime of the plants. The second period runs from 2028 until 2043 and takes into account reduced tariffs under RD 661/2007 and higher market prices as of 2022.[832] In total, Future Damages amount to EUR 45,627,673.[833]

599.    At the November 2017 Hearing, KPMG updated the total amount of damages on 30 September 2017 taking into account new data. Based on this report, BayWa claims losses, exclusive of interest, of EUR 70,734,037.[834]

600.    In addition, the Claimants argue that, if the Tribunal held that the Claimants were not entitled to any more than a "reasonable return", they would nonetheless be entitled to damages.[835] This is because the project IRR under the Disputed Measures of wind farms

---

[829] Cl. Reply, para. 1219.
[830] Cl. Mem., para. 1092.
[831] Ibid, para. 1093.
[832] Ibid, para. 1095.
[833] Ibid, para. 1097.
[834] November 2017 Hearing, KPMG, Witness Presentation, illustrative exercise, Slide 70.
[835] Cl. Reply, paras. 1226-7.

in Spain is 7.08%, whereas the estimated reasonable rate of return for RE producers is 9.40%. Consequently, the financial damage in terms of IRR is 2.33%.[836]

601.    Finally, the Claimants claim post-award interest. The basis of claim is Article 13.1 of the ECT, which allows for interest to be applied at a "commercial rate established on a market basis". In addition, a punitive moratorium component of 2% must be added to ensure prompt payment of the award.[837]

602.    In total, the Claimants' damages claim amounts to EUR 74 million as of 30 September 2017.[838]

**(B)    THE RESPONDENT'S POSITION**

603.    The Respondent argues that the Claimants have not suffered any damage. Accordingly, the result of their quantum analysis is that the Claimants cannot claim any compensation.[839] Further, Spain maintains its argument that the Claimants' quantification is wholly speculative.[840] Moreover, the DCF analysis is not an adequate method to quantify the Claimants' damage, even assuming they suffered damage.[841]

604.    First, the Respondent criticises the calculation method chosen by KPMG. In Spain's view the alleged damage has not been proven, which renders the claimed damages speculative and hypothetical. Moreover, the Spanish Supreme Court has rendered more than one hundred judgements rejecting the speculative quantification methods used by the Claimants. According to the Supreme Court that method "lacks [the] necessary rigour and certainty".[842]

---

[836] Tr-E, November 2017 Hearing, Day 3, p. 192:11-14 referring to KPMG, Witness Presentation, illustrative exercise, Slide 75.
[837] Cl. Reply, paras. 1233-1240.
[838] November 2017 Hearing, KPMG, Witness Presentation, illustrative exercise, Slide 49.
[839] Resp. C-Mem., para. 1342.
[840] Ibid, paras. 1348-1355.
[841] Ibid, paras. 1356-1368.
[842] Ibid, paras. 1348-1355; Resp. Rej., paras. 1603–1610.

605.    Furthermore, Spain argues that the DCF method is inappropriate and that the Tribunal should adopt an asset-based method. In its view, the following circumstances render the DCF method inadmissible:

> (a) is a capital-intensive business with an important asset base. Virtually the whole of its costs are investment costs in tangible infrastructures. There are no relevant intangibles to asses.

> (b) The high dependence of the cash flows on volatile and unpredictable exogenous elements, such as the price of the pool, inter alia.

> (c) The financial weakness of the Project Finance structures without recourse agreed, that excessively levered the wind farms, compromising and conditioning their viability.[843]

606.    Taken together, these circumstances lead to the conclusion that the DCF method is inapplicable. As a result, the Tribunal must apply an asset-based quantification method taking into account the profitability and book value of the investment.[844]

607.    Moreover, Spain argues that the Claimants' returns have been higher than the reasonable rate of return. On Econ One's calculation, the Claimants' average IRR after the enactment of the Disputed Measures amounts to 8.88% before taxes. Compared to the return before taxes under the Disputed Measures, which is 7.398%, or the reasonable returns calculated by Econ One, there is no negative impact. As a result, BayWa is not entitled to any damages.[845]

608.    Nonetheless, Econ One performs a subsidiary DCF analysis to show that there has not been any negative impact on the Claimants' investment. To compare the Actual Scenario with a But-For Scenario, Econ One applies similar criteria to KPMG. However, it uses a lower risk in the Actual Scenario. As to the But-For Scenario, Econ One changes the

---

[843] Resp. C.-Mem., para. 1362.
[844] Resp. C.-Mem., paras. 1364-1368; Resp. Rej., paras. 1611–1619.
[845] Resp. C.-Mem., paras. 1369-1372; Resp. Rej., paras. 1620–1627.

parameters of the analysis, taking into account (i) the initial investment, (ii) cash flows generated by the Projects and (iii) a reasonable return on the initial investment, reaching a different result compared to KPMG's analysis. According to Econ One's DCF analysis, there is no negative impact of the Disputed Measures on the Claimants' investment as the value of the investment has increased by EUR 23.6 million.[846]

609.    The Respondent does not object to the application of pre-award interest. However, it is necessary to distinguish between pre- and post-award interest. Spain argues that the pre-award interest rates identified by KPMG are inappropriate and must follow a "risk-free short term rate" as calculated by Econ One.[847] The post-award interest claimed is punitive in character and is not allowed under international law. Spain refers to paragraph 4 of the Commentaries of Article 36 of the Articles on the Responsibility of States for Internationally Wrongful Acts, which expressly states that:

> […] Compensation corresponds to the financially assessable damage suffered by the injured State or its nationals. It is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character [...]

> Hence the Claimants may not claim a punitive post-award interest.[848]

610.    Finally, Spain maintains that the tax gross-up claim is inadmissible and unjustified. This is for three reasons. First, Article 21 of the ECT contains a tax carve-out, which does not allow the Claimants to seek compensation for any hypothetical taxes they may have to pay. Furthermore, the imposition of the tax cannot be attributed to the Respondent under the ILC Articles on State Responsibility, as the tax is applied to the Respondent by a third State. It is not an act of the Respondent, and cannot be attributed to Spain. Second, the Claimants have not submitted any proof as to their obligation to pay taxes on the award

---

[846] Resp. C.-Mem., paras. 1373-1383; Resp. Rej., paras. 1628–1633.
[847] Resp. C.-Mem., paras. 1384-1387; Resp. Rej., paras. 1636–1637.
[848] Resp. Rej., paras. 1639–1648.

in Germany, where the award would fall under a principle called "participation exemption". This exemption allows for the tax-free distribution of profits between parent companies and their subsidiaries within the EU. Third, this renders the claim "speculative, contingent and ambiguous". This conclusion is supported by the fact that the Claimants have neither submitted any legal grounds for the hypothetical taxation, nor any reports by tax experts.[849]

611.    As a result, the Claimants are not entitled to claim any damages.

**(C)    THE TRIBUNAL'S ANALYSIS**

612.    It follows from the Tribunal's decisions on jurisdiction and liability that none of the primary claims of the Parties as to quantum can be accepted.

613.    In terms of jurisdiction, the Claimants' primary claim includes an amount on account of TVPEE, which claim the Tribunal has held to be outside its jurisdiction.

614.    In terms of substance, the Claimants' experts value the claim on the basis of the "prevailing regulation at the time when the projects were acquired by BayWa". In other words, KPMG takes as its base the regulatory framework as reflected in RD 661/2007 as amended in 2010.[850]   The majority of the Tribunal has however held that the Claimants' investments had no right to subsidies at the level of RD 661/2007, and no legitimate expectation to such subsidies either. Moreover, even if there had been such an expectation, the but-for situation would not have been, as the Claimants argue, RD 661/2007, with or without modification, but something more indeterminate.

615.    It is not, however, necessary to pursue these issues further.  The Tribunal has held that the breach of Article 10.1, first and second sentences, of the ECT is limited to the retroactive reduction in the allowed return. The question is how to value that amount.

---

[849] Resp. Rej., paras. 1649–1672.
[850] See e.g. KPMG First Damages Report, p. 14, fn. 11, CER-0002.

616.  Like the *RREEF* tribunal, the present Tribunal has not been able, despite its best efforts, to quantify the amount of this retroactive reduction on the basis of the expert reports and supporting work papers filed by the Parties' respective experts.  It is, however, satisfied that the Parties' experts are qualified and have sufficient knowledge of the case and that the different results obtained by both experts are a result of the different calculation methods which they applied. Consequently, the Tribunal decides (by majority) that the Parties, with the assistance of their experts, shall seek to reach an agreement on the impact of the unlawful retroactive application of the Disputed Measures, assuming a 25-year regulatory life for wind plants, but otherwise on the basis that those measures were consistent with the ECT.

617.  If the Parties do not, within 3 months of the date of this Decision, reach agreement on the amount payable in this respect, either Party may request the Tribunal to decide the outstanding issues in dispute, in accordance with a prompt briefing schedule.  If the Parties do reach agreement on the amount due, they should report this to the Tribunal in order to enable it to issue an Award incorporating this Decision and dealing with any residual issues identified, including costs, thereby terminating the proceedings.

**(D)  THE TAX GROSS-UP CLAIM**

618.  One matter of quantum that can be resolved at this stage is the tax gross-up claim, which the Tribunal has already held admissible. It remains to consider the merits of that claim.

619.  The Claimants seek compensation for the hypothetical payment of taxes in Germany so that it can receive full reparation.[851] The Respondent rejects the claim on the ground that it cannot be held liable to pay for tax measures implemented by a third State.

---

[851] Cl. Reply, para. 1241.

620.    At the November 2017 Hearing, in response to a question from the Tribunal, the Claimants briefly mentioned the tax gross-up claim.[852] During his cross-examination, Mr. Solé Martin, the Claimants' expert, admitted that he was not a tax expert.[853]

621.    The Tribunal agrees with the Respondent that, on the evidence now available, there is uncertainty as to the legal position on damages and taxation.[854] It is unclear at what point the damages awarded would have been taxed in the normal course and remitted in whole or in part to BayWa RE Germany. In this context, it is significant that there appears to be no precedent for the award of a tax gross-up involving taxation of a third State.  In three cases tribunals have rejected such claims.

622.    In *Eiser* the tribunal noted that it:

> […] received no evidence to show whether or in what amount any tax might actually be due on a future award and only limited argument regarding the issues raised by this claim. Given these circumstances, the Tribunal can make no decision as to whether or when a tax "gross-up" of the kind claimed here might be appropriate. Accordingly, this portion of Claimants' damages claim must fail.[855]

623.    In *Masdar* the tribunal concluded that:

> […] Claimant failed to provide sufficient evidence for an actual future obligation imposed by its home jurisdiction to pay taxes on an award paid by a foreign government. The 'Tax Advice' on which Brattle bases the inclusion of a tax gross-up in its calculations does not give a categorical answer to the 'question […] whether an award granted for the loss in value of shares in Torresol might be exempt from Dutch tax under the Dutch participation exemption.'[856]

---

[852] Tr-E, November 2017 Hearing, Day 1, p. 3:19-20, p. 122:16 ff.
[853] Tr-E, November 2017 Hearing, Day 3, p. 124:8-12.
[854] Tr-E, November 2017 Hearing, Day 1, p. 220:2-16.
[855] *Eiser v. Spain* (Award), para. 456, CL-0217.
[856] *Masdar v. Spain* (Award), para. 660, CL-0231.

235

624.    In *Antin* the tribunal stated that:

> […] it is for the Claimants to prove whether or in what amount any tax on compensation determined by a future award may be due. There is no evidence on the record to prove the type and amount of tax that may be due on an award of compensation and whether such tax would be affected by the regime to which the Claimants as taxpayers are subjected in the given jurisdiction(s). Under these circumstances, the Tribunal is not in a position to determine whether there would be a specific tax impact that requires a tax gross-up like the one claimed by the Claimants. Therefore, this portion of the Claimants' damages claim must fail.[857]

625.    The situation in the present case is complicated by uncertainty as to the German tax position.

626.    In the Tribunal's view, the Claimants did not substantiate their claim to a tax gross-up. It is accordingly unnecessary to decide whether in principle such an award could be justified.

627.    For these reasons the Tribunal rejects the Claimants' claim for a tax gross-up.

628.    As to pre- and post-award interest, this can be left to be agreed by the Parties or determined in a final award. The Tribunal will simply observe at this stage that, in accordance with established principle, awards of interest cannot contain a punitive element, but are purely compensatory.


## VIII.    CONCLUSIONS

629.    For these reasons, the Tribunal finds, by majority:

(a)    that the European state aid regime and the ECT apply concurrently to the investment and form part of the applicable law;

---

[857] *Antin v. Spain* (Award), para. 673, CL-0234.

(b)　　that the Claimants did not have a legitimate expectation that the Special Regime subsidies, notably in terms of RD 661/2007, would continue to be paid for the lifetime of its Plants;

(c)　　that in the circumstances, the clawing back by Spain, in and after 2013, of subsidies earlier paid at levels in excess of the amounts that would have been payable under the Disputed Measures, had they been in force in previous years, was in breach of the obligation of stability under Article 10.1, first and second sentences, of the ECT;

(d)　　that there was no other breach of the ECT;

(e)　　that all other claims must be rejected.

630.　The Parties shall seek to reach agreement on the impact of the unlawful retroactive application of the Disputed Measures, on the basis that those measures were otherwise consistent with the ECT.

631.　If the Parties do not, within 3 months of the date of this Decision, reach agreement on the amount payable in this respect, either of them may request the Tribunal to decide the outstanding issues in dispute, in accordance with a prompt briefing schedule.  If the Parties do reach agreement on the amount due, they should report this to the Tribunal in order to enable it to issue an Award incorporating this Decision and dealing with any residual issues identified, including costs, thereby terminating the proceedings.  The Tribunal will deal with costs issues in that Award.

632.　Mr. Grigera Naón disagrees with these conclusions, insofar as they hold Spain not responsible for full compensation for the New Regime.  In his view, Spain breached Article 10.1, first and second sentence, of the ECT, in 2013 by imposing that regime upon the Claimants' Wind Farms, which were already well established and had legitimate expectations as to the maintenance of the Special Regime.  A statement of the reasons for this dissent is attached.

_____
Dr. Horacio A. Grigera Naón
Arbitrator
*Subject to attached Dissenting Opinion*

_____
Ms. Loretta Malintoppi
Arbitrator

_____
Judge James R. Crawford
President of the Tribunal

238

**Horacio A. Grigera Naón**
*Doctor en Derecho*

<u>**Dissenting Opinion**</u>

<u>BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH and Kingdom of Spain (ICSID CASE No. ARB/15/16)</u>

1.     This dissenting opinion is limited only to findings and conclusions in the Majority Decision on Jurisdiction, Liability and Directions on Quantum (the "Decision") starting at the Decision's para. 456 regarding the Claimants' claim based on the fair and equitable standard (the "FET") under Article 10.1 of the Energy Charter Treaty (the "ECT"). More specifically, I dissent with the Decision's reasons and determinations according to which the Claimants are only entitled to damage compensation for what the Decision characterizes as *"...the retroactive reduction in the allowed return...."*, and not to full compensation for the life of the Claimants' facilities, and the basis to establish such compensation. Therefore, I also disagree with the analysis, conclusions and way forward on quantum of damages set forth in paras. 612-617 of the Decision.

2.     However, to avoid misunderstanding as to the scope of this dissent, I share: a) the Decision's conclusion at paras. 483 and 484 that a 25 year-life is appropriate for Wind Farms; b) the analysis of and conclusions on the protection and security Claimants' claim at the Decision's paras. 528-534; and c) the Decision's analysis and conclusions regarding the tax gross-up claim set forth at paras. 618-628 of the Decision. Further, although certain coincidences in the approach and reasoning in this dissent and in the Decision may be noticeable, this does not detract from substantial disagreements evidenced in the text and conclusions that follow. The undersigned believes that only reading together this dissent and the Decision's paragraphs covering the FET claim allows to adequately identify such areas of disagreement even where the Decision does not specify that it is rendered by majority.

3.     A FET analysis requires a balancing exercise between Claimants' rights under the legal framework spanning 1996-2012 (the "Special Regime") and the regime put in place through legal enactments by the Spanish Government in 2013-2014 (the "New Regime").

4.     It is common ground between the Parties that the Special Regime could be subject to regulatory changes. The issue is the balance to be struck between the rights granted to the Claimants and accompanying expectations of stability, gain and profit through concrete and specific provisions under the Special Regime and the New Regime regulations curtailing or eliminating such rights or baffling those expectations. Such balance requires a weighing of different factors along notions of reasonableness and proportionality. To this exercise I now turn.

1

5. One first relevant factor to be accounted for in this exercise is that the Claimants' rights under the Special Regime and accompanying expectations of stability, gain and profit originate (just considering the Special Regime's concrete legal provisions) in specific rules of law having mandatory force of their own. Therefore, without denying the importance of general representations or statements generating investors' legitimate expectations, the analysis should be, first and foremost, centered on the imperative legal provisions at the heart of the Special Regime.

6. Expectations arising out of such Special Regime's legal rules are *necessarily legitimate* among other things because, on the contrary, the very function of rules of law – particularly in democratic societies - to create areas of predictability and security orienting human action would be defeated. They are also *objective,* since they flow from specific rules of law and not from subjective evaluation. As set forth in the *9REN* award [1]*:*

   *"There is no doubt that an enforceable 'legitimate expectation' requires a clear and specific commitment, but in the view of this Tribunal there is no reason in principle why such a commitment of the requisite clarity and specificity cannot be made in the regulation itself where (as here) such a commitment is made for the purpose of inducing investment, which succeeded in attracting the Claimant's investment and once made resulted in losses to the Claimant".*

   Thus, those questioning the relevance or effects of such expectations have the burden to prove the facts and legal grounds supporting the reasons to do so.

7. Against this backdrop, the Special Regime's salient legal traits shall be now considered.

8. The Special Regime had as its point of departure Law 54/1997 which provided for less than 50 MW wind facilities like the Claimants (such Claimants' facilities hereinafter the "Wind Farms") the right to opt for pool (market) price plus premium for the sale of their electricity. Premium determination[2] *"… will take into account the voltage level of the delivery of energy to the network, the effective contribution to the improvement of the environment, the primary energy savings and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred, in order to achieve reasonable profitability rates with reference to the cost of the money on capital markets"* (the "Law 54 Standard").

---

[1] *9REN v. f Spain* (Award), para. 295, RL-0125. In the same vein, the *Cube v. Spain* (Decision), at para. 388: "*The Tribunal does not consider it necessary that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise. At least in the case of a highly – regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them".*
[2] Law 54/1997, Article 30.4.c, C-0032.

9.  The Wind Farms were built, commissioned and RAIPRE registered under RD 2818/1998 on 22-25 November 2002[3]. It provided certain guiding and predictable parameters defining the legal framework that in general terms remained applicable to the Wind Farms until 2013; namely, the Wind Farms could either directly sell electricity to distributors at a fixed tariff in Spanish pesetas for each kWh, or at the pool (market price) plus a fixed premium in pesetas also for each kWh. Under this Decree, the premiums were to be revised every four years considering the evolution of electricity market price, the installations' demand coverage and the effect on the management of the Electricity System as a whole. Like future decrees, it provided for a transitory regime allowing facilities pre-dating this Decree to stay under the previous regime.

10. Six years later RD 436/2004 was adopted. It maintained the option of fixed tariff (as a percentage of the TMR or *tarifa eléctrica media*) and pool price plus premium. Tariffs, premium, incentives and complements under this Decree became effective in respect of facilities commencing operations on 1 January of the second year after the revision of tariffs under this Decree, i.e., excluding the Wind Farms from the retroactive application of the Decree (Article 40.2). This is further confirmed by Article 40.3 of the Decree stating that it *"...shall not be effective retroactively on any previous tariffs and premiums"*. Premiums under this Decree were set forth at a Euro price by kWh. As allowed by this Decree, the Wind Farms chose in 2005 not to remain under the RD 2818/1998 regime until 2007 and to sell electricity under the pool price/premium option pursuant to RD 436/2004, with the annual option (never elected by the Wind Farms) to shift to the TMR percentage regime.

11. Years later RD 661/2007 was adopted. It set a Euro price tariff per kWh adjusted to the consumer price index (CPI) as one option, and as another option, a pool price plus premium also set at a Euro amount per kWh, adjusted in accordance with CPI, and subject to caps and floors. Article 44.3 of this Decree provided that it would not affect facilities commissioned prior to the second following year in which the revision shall have been performed, thus excluding its retrospective application to the Wind Farms.

12. The Wind Farms opted to stay in the pool price plus premium option under RD 436/2004 until 31 December 2012. After then it was subject to the RD 661/2007 regime with the possibility to annually choose between the fixed tariff and the pool price plus premium option under this Decree. RD 661/2007 further provided that at the expiration of a twenty-year period counted from the beginning of operations of the Wind Farms (i.e., November 2022) the option would come to an end and, without any time limitation, the electricity would be sold at the fixed tariff price only.

13. Although RDL 6/2009 did refer to the electricity system tariff deficit among its reasons, it did not affect wind facilities like the Wind Farms since it only set forth more stringent requirements for new entrants to the Special Regime. Wind facilities like the Wind Farms were not included in the New Regime enacted under RD 1565/2010 reducing the economic benefits of PV (photovoltaic) plants.

---

[3] November 2017 Hearing, Claimants' Opening Slides (the "Slides"), Slide 85.

14.  In 2010, Royal Decree 1614 was adopted. Among other things, it provided that premiums under RD 661/2007 would be reduced by 35% but that such reduction would not apply to facilities like the Wind Farms that had chosen to stay under the RD 436/2004 regime, which would remain under the 2010 premium and tariff values (i.e., not the higher 2013 values that would have  applied otherwise) once the transitory application to the Wind Farms of the RD 436/2004 came to an end. It further provided (Articles 5.2, 5.3) that facilities like the Wind Farms would not be subject to the reviews of tariffs and premiums upper and lower limits (all set at kWh prices as of 2010) established in RD 661/2007[4].

15.  In view of the electric system tariff deficit, Article 1 of RDL 6/2009 of 7 May 2009 modified Law 54/1997 essentially to impose access tolls on Special Regime facilities like the Wind Farms exclusively to pay for the costs of Special Regime activities assumed to contribute to the deficit. Later, RDL 14/2010 of 23 December 2010, also aimed at coping with the tariff deficit, increased the toll burden on Special Regime facilities like the Wind Farms.

16.  Royal Decree Law 1/2012, also prompted by the electricity tariff regime deficit, suppressed the pool price plus premium remuneration afforded under RDL 1/2012. However, this measure only applied to new Special Regime entrants, and the Decree emphasized that it did not retrospectively affect vested rights (including those of the Wind Farms).

17.  As from 2013, the New Regime drastically put an end to and in fact erased the Special Regime by introducing a "new model" for the compensation of renewable energy producers like the Wind Farms[5], essentially as follows:

     a)  It eliminated the price plus premium option (the one elected by the Wind Farms)

     b)  It changed the tariff adjustment factor, eliminating unprocessed foods and energy products from the adjustment basket.

     c)  It afforded no possibility to sell electricity at a fixed tariff option (meaning that electricity prices are freely fixed by the market).

     d)  It eliminated the regime of fixed tariffs and premiums for all renewable energy facilities, new and old, introduced for the first time a remuneration system based on standard costs per unit of installed power plus standard amounts for operating costs and set a target rate of return at 300 points above the ten-year average yield of Spanish Government ten-year bonds.

     e)  It set the remuneration parameters for standard facilities including standard costs (without considering the actual costs of each specific facility) as a result of which the reasonable return is set at 7.398% pre-tax for all facilities like the Wind Farms, subject to periodical three-year and six-year reviews. The first such six-year period lapses on

---

[4] Slides 106 and 108.
[5] Ministerial Order IET/1045/2014 of 16 June 2014 (the "IET Order"), at 46430, C-0216.

31 December 2019 counted as from the coming into effect of RDL 9/2013 of 12 July 2013[6]. After the facilities' regulatory period lapses (20 years after the beginning of their operation in the case of the Wind Farms), the facilities would not receive any price other than the pool (market) price.

f) Facilities deemed to have reached such reasonable return level could not benefit from a specific compensation paid by the State covering investment costs and operating costs that cannot be recouped through sales in the electricity market, such costs corresponding to a type or standard facility defined in the IET Order based on standard revenue obtainable from sales in the electricity market, standard costs necessary for the operation of the facility and the standard value of the original investment for an enterprise deemed efficient and well managed during its useful life.[7]

18. Until the enactment of the New Regime, unlike the situation of other renewables, such as the photovoltaic facilities, the measures taken by the Spanish Government were aimed at preserving the Special Regime for wind facilities like the Wind Farms.

19. This is especially true in connection with the Wind Farms, not only because of the specific rights vested in them under the Special Regime, but also because of the successive elections they made to remain under RD 436/2004 by exercising the option to choose between regulated tariff and pool price under such Decree and remain under the RD 661/2007 on renewable energy and cogeneration once the RD 436/2004 would cease to apply to them.

20. In particular, the Official Press Release of 25 May 2007 of the Ministry of Industry, Tourism and Commerce of the Kingdom of Spain in connection with RD 661/2007 assigned priority to profitability and stability of the incentives under the Special Regime and emphasized both its non-retroactive character and its non-application to facilities like the Wind Farms in operation by 1 January 2008.

21. Among other things, this press release expressed that RD 661/2007 was aimed at establishing *"....a stable system of incentives guaranteeing an attractive return for the activity of energy production under the special regime"*, as part *"...of the energy policy commitment to promote the use in our country of clean, autochthonous and efficient sources of energy..."*. It also expressed that the Decree was a manifestation of the Spanish Government's commitment to seek in the new regulation *"...stability in time (...) allowing business owners to plan in the medium and long term, as well as a sufficient and reasonable return which, like the stability, makes the investment and engagement in this activity attractive"*. It also stated that *"Any revisions of tariffs to be carried out in the future shall not affect the facilities already in operation. This guarantee provides legal certainty for the producer, providing stability for the sector and promoting its development*[8].

---

[6] IET Order, at 46431.
[7] *Ibidem*, at 46432.

[8] Slides 101-104.

22.  Statements in this press release are consistent with the wording precluding the retrospective application of its provisions set forth in Article 44.3 of RD 661/2007, constitute specific representations that future tariff revisions would have no retroactive effect and would not affect facilities already in operation, although the stability afforded was not unlimited in time [9].

23.  In other words, in part by exercising rights contemplated under the Special Regime allowing them to preserve the pool price plus premium option, in part because of the very legal provisions of the Special Regime applying to them and expressions attributable to the Respondent in connection with RD 661/2007, it is fair to say that the Wind Farms could unequivocally rely on the Special Regime's stability specifically designed to attract their long-term investment in the Spanish renewable energy sector.

24.  This contrasts with the remuneration criteria introduced by the New Regime because:

a)  as summarized in the *Eiser* award[10]: *The new regime pays no regard to actual costs (including loan servicing) or actual efficiencies of specific existing [plants](…) Moreover, within limits intended to assure threshold amounts of production, remuneration no longer is based on the amount of electricity generated. Instead, existing plants' remuneration is based on their generating capacity and regulators' estimates of the hypothetical capital and operating costs, per unit of generating capacity, of a hypothetical standard installation of the type concerned. The regulatory regime also sets the regulatory life of a plant*[11]. *Once set, neither the regulatory life nor the prescribed "initial value of the investment" can be changed"*;

b)  the investors in the Wind Farms were legitimately relying on a remuneration mechanism based on the production of electricity quantities at an hourly price for kWh and not on a remuneration regime exclusively depending on a relationship between standardized operative costs and cash inflows or efficient investment criteria, which, further, are all disconnected from the *actual* operation costs and investment data of the Wind Farms. Reasonable return references in different provisions of the Special Regime were merely benchmarks without setting forth maximum return limits on investments. Thus, under the Special Regime, the more electricity produced the more remuneration (and eventually a higher return for the investors) was obtainable, i.e., there was an incentive to produce more electricity to feed the market reducing the need to inject in the grid electricity from less environmental friendly sources[12] (it should be noted that the New Regime does not put emphasis on environmental concerns);

c)  the New Regime is perverse not only because the rigid standardized criteria it imposes *ex post* renders some wind facilities (like the Wind Farms) unprofitable and others profitable without regard to the actual economic characteristics of each facility in terms, *inter alia*, of their real investment and operating costs, but also because it does not

---

[9] *Cube v. Spain* (Decision) cit. *supra*, at paras. 273, 311.
[10] *Eiser v. Spain* (Award), at para. 398, CL-0217.
[11] For wind facilities, reduced from 25 to 20 years.
[12] KPMG Second Regulatory Report, at para. 9, CER-0003.

allow the Claimants to predict future costs and investment standards – as well as return rates for the following years - since they depend on variables unilaterally and discretionarily determined by the Respondent, and in any case detached from the realities of the Claimants' investments and operations;

d) wind facilities like the Wind Farms are unable to adapt *ex post* to existing investment and operational characteristics to fit under the New Regime's standardized parameters resulting in the imposition of a maximum pre-tax return, which also did not account for the differentiated tax regime wind facilities may be subject to depending on their location in different administrative and tax territorial divisions of the Spanish Kingdom [13], and are left as their only option to actually attain the pre-set, pre-tax 7.398% return by reducing their costs even if their reduction might not be realistically attainable or technically convenient, or even if such reductions may lead to economic or technical demise of the facility;

e) without such predictability levels, project finance, allowing higher leverage levels that result in better value for consumers (since this form of financing is less expensive than other forms of financing, including owners' equity infusions) would not be possible[14].

f) both Decrees 6/2009 and 14/2010 mentioned at para. 15 above, as well as the freezing at 2010 values of incentives pursuant to Royal Decree 1614 described in para. 14 above, constituted a reassurance to investors in wind facilities like the Claimants' that they had already contributed their fair share to address the tariff deficit within the general context of the existing Special Regime proportionately to their benefits under the Special Regime, and therefore, that no further sacrifices would be requested from them to pay for a deficit that, after all, there is no evidence that at least the Wind Farms originated or contributed to in any substantial way.

25. The record further shows that:

a) the tariff deficit addressed by the New Regime originated in 2000,[15] well before the enactment of the decrees of 2004 and 2007 constituting the core of the rights and expectations on which the Claimants' claims are based. The Spanish Government, certainly aware of the deficit, chose however to further burden it through the introduction of the Special Regime in order to attract, promote and benefit from investments in renewable energy technologies. If the balance between such burden and the tariff system was miscalculated by the Spanish Government or the ensuing imbalance not early cauterized, it has of course the right and the obligation to rebalance the system, but not at the cost of sacrificing rights and expectations of investors like the Claimants, which are protected by the ECT.

---

[13]*Ibidem* at paras. 26-27.
[14] *Ibidem* at para. 24.
[15] *Ibidem*, at para. 113.

b) It is undisputed that since 2001 the Wind Farms were financed by resorting to project finance.[16] There is no indication under the Special Regime or related evidence that project finance or other forms of financing should be excluded from the cost, remuneration and profit calculation of investors investing in wind facilities like the Wind Farms. In fact, both the 2000-2010 Renewable Promotion Plan approved by the Spanish Council of Ministers on 30 December 1999[17] and the 2005-2010 Renewable Promotion Plan approved by the Spanish Council of Ministers of 26 August 2005[18] referred to project finance as a normal means to finance projects like the Wind Farms and none of them excluded the consideration of financial costs under these facilities from the Project costs to be taken into account in the Claimants' profit or return estimates and associated expectations under the Special Regime in their decision making process regarding investing in the Spanish wind power sector.[19] As the *NextEra* arbitral tribunal found:[20]

> *"The question before the Tribunal is not how a regulated activity should determine what constitutes a reasonable return, but what loss the Claimants suffered. On undertaking an investment an investor would reasonably expect that the returns from the investment would cover all the costs of making that investment. The examples given by Claimants where regulatory regimes do include financing costs in determining a reasonable rate of return reinforce the reasonableness of this expectation. No rational investor would sink money into a project that did not offer a return that would cover its costs. And, the financing of projects of this size and duration inevitably involves a regime with third party financing".*

c) Therefore, these financing costs were legitimately considered by the investors in the Wind Farms when estimating the Project's cash flows under the Special Regime. The mere fact that the Project cash flows exceeded the operating costs[21] does not detract from the fact that the investors' legitimate expectations in the Wind Farms included obtaining cash flows through electricity sales permitting them to meet their obligations with the lenders to avoid acceleration of the loans and the insolvency of the Wind Farms

---

[16] CWS-ES, paras. 21-23, at pp. 5-6.

[17] C-0030 at pp. 61, 177-184, 203-218. (SPA Original)

[18] C-0033 at 281-284. (SPA Original)

[19] The Respondent refers to a *Memoria Económica* underlying the proposal of RD 436/2004 which in its page 5 states that only financing of the Projects under this Decree with investors' own funds is covered, and that having recourse to external finance is a decision under the responsibility of the investors. However, the record does not permit to conclude whether this document went beyond being a mere proposal or not, and its recommendations may not be traced to actual provisions in the Decree. There is no reason to give to this isolated document more weight than the 2000-2010 and 2005-2010 plans mentioned above, expressly including project finance among the financial resources for the Special Regime. Furthermore: a) project finance was already resorted to finance the Wind Farms' activities in 2001 (CWS-ES, paras. 21, 26 at pp. 5-7), i.e., well before RD 436/2004, which could not have been foreseen by the investors in the Wind Farms in 2001 even assuming that such RD excluded financing costs from the investments in the Wind Farms, which it did not; b) the 2006 financing and any later financings were refinancing of the original 2001 financing; and c) the 2005-2010 Plan, which refers to RD 436/2004 and came after this Decree maintains project finance as part of the allowed financing and also provides that the wind facilities like the Wind Farms would rely that 80% of the investment would be sourced from external financing.

[20] *NextEra v. Spain* (Decision) para. 658, RL-0121.

[21] CWS-ES, p. 7.

inevitably ensuing – as unrebutted evidence shows[22] -- from the New Regime, and this despite the refinancing of the project finance debt in 2006. It is also unrebutted that the unprecedented situation created by the New Regime resulted in a failure to meet the debt coverage ratio under the project financing structure leading to the acceleration of the loans and possibly triggering the insolvency of the Wind Farms,[23] which was only averted after a renegotiation of the project finance debt bringing about, among other negative consequences, that the Claimants – under the current New Regime scenario – will not receive any dividend from the Wind Farms until 2024.

26.   In sum:

   **a)**   the Claimants could not anticipate when investing in the Wind Farms that they would be imposed a model which redefined *ex post facto* whether the Wind Farms were and are efficiently operated and well-managed and the economic benefits derived from them;[24]

   **b)**   the radical change in the model brought about by the New Regime was not limited to suppressing the pool price plus premium mechanisms under the Special Regime, since it also radically eliminated the investment, remuneration and cost criteria on which investors under the Special Regime relied upon for calculating economic burdens and profits and set a limit on investors' returns;

   **c)**   the New Regime drastically changed the remuneration criteria and cost and investment structure existing under the Special Regime, both for the past and for the future, in ways and on the basis of criteria that were totally unpredictable for the Claimants;

   **d)**   although Special Regime regulations changed across time, such changes did not constitute a radical innovation in the then applicable legal framework or a Copernican modification going to the roots of the Special Regime, and could not be deemed to have been the harbinger of the radical new model introduced through the New Regime as far as the Wind Farms are concerned.

27.   The following considerations are apposite for scenarios like the ones depicted above:

---

[22] *Ibidem*, paras. 38-42, at p. 10.

[23] As it was clearly set forth in the letter of 8 October 2014 to the Wind Farms from UNI Credit Corporate and Investing Banking, the agent bank representing the project finance creditors C-0270:

> "*In particular, the approval of the New Regulations and the impact that, among other factors, they could have on the Project, are circumstances that, in the reasonable opinion of the Banks, have a clear and direct negative effect on the cash flows of the Project and, therefore, on its viability. In this regard, the Banks are of the reasonable understanding that the aforesaid circumstances could become a Material Adverse Effect as they could substantially impair, among others, the financial solvency of the Borrowers and the Guarantors considered collectively as well as the viability of the Project. These circumstances are an event of default as provided in clause 16.1 h) of the Loan Agreements*".

[24] IET Order, at 46434, C-0216.

a) *"...Indeed, an investor has the legitimate expectation that, when the State modifies the regulation under which the investor made the investment, it will not do so unreasonably, contrary to the public interest, or in a disproportionate manner (...)The Arbitration Tribunal considers that the proportionality requirement is fulfilled as long as the modifications are not random or unnecessary, and that they do not suddenly and unexpectedly eliminate the essential features of the regulatory framework in place"*[25].

b)     "*Taking account of the context and of the ECT's object and purpose, the Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments. This does not mean that regulatory regimes cannot evolve. Surely they can... '[T]he legitimate expectations of any investor [...] [have] to include the real possibility of reasonable changes and amendments in the legal framework, made by the competent authorities within the limits of the powers conferred on them by the law.' However, the Article 10(1) obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance on those regimes of their investment's value.*"[26]

28.   Circumstances described in paragraphs 17-26 above, examined against the backdrop of the above considerations, lead to concluding that the New Regime measures imposed a disproportionate, unreasonable and unexpected economic burden on the Claimants which suppressed the legal and economic substance of the regulatory framework they relied upon when investing, and thus defeated their legitimate expectations.

29.   There is no reason to depart from these findings and conclusions because of the alleged violation by the Wind Farms of the European State Aid Provisions (the "State Aid") invoked by the Respondent on the basis of the European Commission (the "EC") decision SA.40348 (2015/NN) of 10 November 2017 (the "EC Decision") issued in response to a notification by the Respondent of 22 December 2014, the purpose of which was to validate the New Regime under the State Aid regime.

30.   The Respondent refers particularly to Sections 3.5.2. and 3.5.3 of the EC Decision in which the EC, in statements that can only be considered *obiter dicta* given the fact that the Respondent's consultation only concerned the compatibility of the New Regime with the State Aid (and not the Special Regime), asserts: (i) that State Aid to investors by a Member State without respecting the notification and stand-still obligation under Article 108.3 of the Treaty on the Functioning of the European Union ("TFEU") does not generate legitimate expectations; and (ii) the lack of jurisdiction of arbitral tribunals to decide investment disputes in intra-European cases (an allegation that has been unanimously rejected in this arbitration).

---

[25] *Charanne v. Spain* (Final Award), paras. 514, 517, RL-0049.
[26] *Eiser v. Spain* (Award), cit. *supra* at para. 382, CL-0217.

31. The EC Decision – addressed to the Kingdom of Spain and not to the Claimants or the Wind Farms – raises for the first time the issue of investors' legitimate expectations from an European law perspective specifically in connection with the Special Regime. In itself – because of its date – the EC Decision could not have been taken into account when the Claimants invested. The same should be said, because of their dates, of the European Court of Justice 19 December 2013 decision *Association Vent de Colère!* and the order of the same Court in the *Elcogas SA* matter of 2014. As far as the timing of the EC Decision and these European Court decision and order is concerned, they cannot be invoked to challenge the Claimants' legitimate expectations when investing in the Wind Farms.

32. The issue is then whether the investors, prior to investing within the framework of the Special Regime, failed to properly discharge their due diligence obligations as a *diligent businessman* should do.[27]

33. It is undisputed that the Respondent failed to notify the Special Regime to the EC or comply with the standstill obligation set forth in Article 108.3 of the TFEU. On the other hand, the Respondent could not have been unaware, or had the duty to be aware, of any substantive violation of European law by the Special Regime. The essential failure to comply with European law or the hypothetical unlawfulness of the Special Regime is first and foremost imputable to the Respondent, which is indeed alleging, for the first time in this arbitration, its own fault in order to shirk its obligations and responsibilities under the EC Treaty FET standards, in violation of the principle *nemo turpitudem suam allegarem potest.*

34. The conduct of the Respondent is even more reprehensible if one considers that it relied for a period spanning 1997-2013 on the Special Regime to attract renewable energy investments and gave assurances as to the benefits of the Special Regime, at least in connection with RD 661/2007.

35. The legitimate expectations of the Claimants and their reliance on the representations arising out of the Special Regime *"....do not depend on there being evidence of any particular form or scale of legal due diligence by external legal advisors.."*[28] This is true also when the alleged incompatibility of the Special Regime with the State Aid system not captured in the due diligence carried out by the investor prior to investing is invoked to deny the investor's rights under the ECT in a scenario in which the investor is confronted with a drastic suppression of the very legal regime enticing its investment which could not be reasonably anticipated by the due diligence exercise. Indeed, investing is not a *caveat emptor* exercise like buying goods under a sales contract and requires a cooperative attitude by States among themselves and with the addressees of the ECT protective provisions as part and parcel of the implementation of policies aimed at attracting foreign investment. This is illustrated by the ECT text itself:

> *ARTICLE 2 PURPOSE OF THE TREATY* This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on

---

[27] This standard is mentioned at fn. 64 of the EC Decision, RL-0107.
[28] *Cube v. Spain* (Decision), cit. *supra*, at paras. 395, 396.

complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.

36.   Raising in arbitration as a lack of due diligence on the side of the investor its not having detected that the failure to notify the Special Regime was an infringement of European Law or its failing to realize the substantial incompatibility of the Special Regime with the State Aid system, with the ultimate consequence of invalidating the very Special Regime the Respondent was relying upon to attract millions of Euro investments to its renewable energy sector, is inimical to the cooperation purposes of the ECT. In fact, it is an attempt by the Respondent to capitalize on its own failure to observe obligations under European law in violation of the principle of good faith under international law, including as comprised by the ECT FET standard.

37.   This conduct is even more blatantly in violation of the ECT in view of the relevant parts of its Article 10.1:

> *Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.*

38.   Even admitting that  the encouragement of stable, equitable and transparent conditions for foreign investors and investments in the energy sector is part already of FET protection, under the ECT (and not an autonomous standard), the fact that ECT, Article 10.1, lays special emphasis on these objectives cannot be mere happenstance and can only be interpreted as meaning that among the protective standards covered by FET, the EC Member States assigned particular importance to ensuring stable, favorable and transparent conditions for foreign investment. The Respondent infringed its transparency and stability commitments by: a) failing to notify the Special Regime pursuant to its obligations under European law; b) failing to alert prospective investors – like the Claimants – as to potential risks of the very Special Regime the Respondent was seeking to draw benefit from; and c) only raising this defense in arbitration.

39.   Further (as the Decision points out) it is undisputed that: a) The EC was well informed about the Special Regime, never raised any issues regarding its lawfulness under European law, and even extolled its benefits although the Kingdom of Spain had not notified the Special Regime to the EC  in compliance with European Law; b) there is no specific EC decision rendering the Special Regime unlawful; c) there is no EC right of or duty on the Kingdom of Spain to procure the reimbursement of the Special Regime payments made to the Claimants or anybody else.

40.   This is the situation the Claimants were confronted with when investing and the situation contemplated by the Respondent when the investments were made. Whatever the realities of the European legal system might be or have been, it can only be concluded, from the perspective of the FET protection afforded to the Claimants under the ECT, that if the

investors invested and the Kingdom of Spain accepted the application of the Special Regime to such investments during a period spanning at least ten years, both were persuaded that the Special Regime was lawful under Spanish and European law, and shared legitimate expectations that such would be the case.

41. Indisputably, State Aid rules are part of Spanish law. A higher level of due diligence regarding the situation of Spanish law cannot be required from the foreign investor than the one incumbent on the Respondent in enforcing European law and its own law incorporating State Aid provisions. The same can be said of the EC during the existence of the Special Regime under which millions of Euros were infused into the Spanish renewables sector, without however the EC raising red flags about the incompatibility of the Special Regime with European law or supposedly excessive investor returns.

42. A different conclusion would mean that the Kingdom of Spain was acting in bad faith by actually blowing hot and cold at the same time, i.e., resorting to the Special Regime to attract foreign investment to the renewable energy sector and in parallel not complying with European law as regards the Special Regime or knowing that the Special Regime did not comply with European law. It would also imply that during the long years in which the Special Regime was in place, the EC failed in its duties to monitor and oversee the Special Regime in light of European law protecting fair competition in the European markets. From the perspective of the ECT and international law, such facts and circumstances lead to concluding that the expectations of the Claimants arising out of the Special Regime are not illegitimate and, therefore, that are entitled to protection under the ECT FET standard.

43. On the basis of the above reasons and findings, it is to be concluded that the Respondent has violated the FET standard under the ECT and that the Claimants are entitled to full compensation for past and future damages resulting to the Claimants from the New Regime.

### A. **Quantum Issues**

44. The Parties' quantum experts have adopted very different approaches.

45. KPGM quantifies the Special Regime incentives the Claimants have been deprived of during the useful life of the Wind Farms. Depending on the date the calculation is made, and considering that the relevant measure came into effect on 1 January 2013, KPGM proceeds as follows: a) at the date of calculation, it calculates the difference between free cash flows to the Claimants under the New Regime and free cash flows to the Claimants under the Special Regime between 1 January 2013 and the date of calculation; and b) after the date of calculation, it calculates the moneys the Claimants should receive in the future in accordance with the Special Regime, discounted to present value to the date of calculation pursuant to a DCF methodology .

46. Econ One's analysis, on the contrary, is premised on a maximum reasonable return approach in line with the New Regime provisions and the Law 54/1997 standard.

13

47.  However, the Special Regime, which did not impose maximum limitations on the investors 'returns[29], set forth a premium or tariff regime necessarily compatible with the Law 54 Standard, because on the contrary an oxymoron would ensue: the Special Regime would be incompatible and compatible at the same time with such Standard. Consequently, the Claimants legitimately relied on the Special Regime as expressing in concrete legal norms the Law 54 Standard. On the other hand, there is nothing in the wording of the Special Regime indicating that the open-ended (and opaque) text of the Law 54 Standard would lead to – and much less justify- the replacement of the Special Regime with an utterly different model unilaterally destroying the substance of the Claimants' rights under the Special Regime.

48.  As found by the arbitral tribunal in *Novenergia II*:[30]

> *As regards statements in relation to 'economic sustainability' and 'reasonable rate of return' the Tribunal finds the Respondent's arguments unconvincing, since these principles were still generally vague and insufficiently defined at the time of the Claimant's investment. Precise content was given to these principles through the introduction of Law 15/2012 and RDL 9/2013, which were enacted long after the Claimant had already made its investment. Accordingly, they cannot be considered apposite for the assessment of the reasonability of the Claimant's expectations at the time of the investment, as the Respondent suggests (...) The above conclusion deals with the majority of the Respondent's statement's.*

49.  It is then too much to rub to the open-textured and undefined terms of the Law 54 standard and what purports to be a particularization of such standards in the New Regime, the imposition on the Wind Farms, not only retroactively, but also for the future, of an entirely new and unpredictable cost, investment and remuneration model.

50.  Therefore, the FET violation does not directly depend on the deprivation of the Claimants' return, whatever that return might be: rather, it is the direct consequence of the suppression of the Special Regime the Claimants relied upon when investing. Thus, it is such suppression, rather than the suppression of real or hypothetical returns, which must be compensated. In the words of the *Eiser* tribunal (coincidental with the *NextEra* holding when rejecting the reasonable return calculations of both parties' experts):

> *Without entering into the details of Claimants' experts' calculation of this alternate claim, and of Respondent's rebuttal to it, the Tribunal finds the legal theory underlying it unpersuasive. ECT Article 10(1) does not entitle Claimants to a 'reasonable return' at any given level, but to fair and equitable treatment.*[31]

---

[29] For example, in respect of RD 661/2007, declaration of Respondent's expert Dr. Daniel Flores in cross-examination, November 2017 Hearing, Day 4, at pp. 86-88.

[30] *Novenergia II v. Spain* (Final Award), paras. 673, 674, CL-0227.

[31] *Eiser v. Spain* (Award), para. 434, CL-0217.

51.  And as it was held by the *Cube* tribunal[32]:

> *The Tribunal does not accept that the cost-based approach, calculating a reasonable rate of return on the amount initially invested, is appropriate in the present context. The 2013-2014 change of the regulatory regime so as to introduce the concept of a reasonable rate of return as a cap on support under the regulatory regime, in place of the fixed tariffs and premiums for which the Special Regime had provided, is one of the measures at the very heart of the complaint in this case; and the Tribunal has found that this amendment constituted such a fundamental change in the economic basis on which the investments were made – a 'mid-stream switch in the regulatory paradigm' – as to amount to a defeat of the Claimants' legitimate expectations in breach of the FET standard in Article 10 ECT.*

52.  For these reasons, the KPGM methodology for calculating damages resulting from the deprivation of the Special Regime appropriately corresponds to the findings on the merits set forth above.

53.  However, KPGM's calculations should be adjusted as follows:

a)  The appropriate date to be considered as the New Regime implementation date for calculation purposes should be the date of the IET Order setting forth the New Regime in full and in its final form, i.e., 16 June 2014 rather than 1 January 2013; and

b)  Using a DCF methodology to calculate future damages for the useful life of the Wind Farms is justified for the 25-year period counted from 25 November 2002 through 25 November 2027. Calculating future damages through the end of the useful life of the Wind Farms beyond this date seems too speculative given the variables taken into account to such effect.[33] Therefore, also in accordance with reasonableness and proportionality notions, the calculation of future damages and application of the DCF methodology should not go beyond 25 November 2027.

54.  As calculated by KPGM as of 6 November 2017 (pre-award interest included), the compensation amount equals € 65,243,815[34].This sum should be adjusted to an updated calculation date taking into account the criteria set forth in paragraph 53 and also by excluding compensation for the imposition of the 7% tax and without computing the tax gross-up, both denied by the Arbitral Tribunal.

---

[32] *Cube* (Decision), para. 473.
[33] KPMG First Damages Report, paras.153, 208, CER-0002.
[34] November 2017 Hearing, KPGM Damages Slides, slide 67 (Appendix V. Sensitivities to Damages Calculation (Euros)).

15

Dr. Horacio A. Grigera Naón
Arbitrator

16