# EXHIBIT 47

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**INFRASTRUCTURE SERVICES LUXEMBOURG S.À.R.L. AND ENERGIA TERMOSOLAR B.V. (FORMERLY ANTIN INFRASTRUCTURE SERVICES LUXEMBOURG S.À.R.L. AND ANTIN ENERGIA TERMOSOLAR B.V.)**

Respondents on Annulment

and

**KINGDOM OF SPAIN**

Applicant

**ICSID Case No. ARB/13/31**
**Annulment Proceeding**

# DECISION ON ANNULMENT

**Members of the *ad hoc* Committee**
Mr. Cavinder Bull SC, President
Prof. Dr. Nayla Comair-Obeid
Mr. José Antonio Moreno Rodríguez

**Secretary of the *ad hoc* Committee**
Ms. Anna Toubiana
Ms. Anneliese Fleckenstein

*Date of dispatch to the Parties:* 30 July 2021

## REPRESENTATION OF THE PARTIES

*Representing Infrastructure Services Luxembourg S.À.R.L. And Energia Termosolar B.V.:*

Mr. Jeffrey Sullivan
Ms. Ceyda Knoebel
Mr. Theo Tyrrell
Ms. Stephanie Collins
Gibson, Dunn & Crutcher UK LLP
Telephone House
2-4 Temple Avenue
London, EC4Y 0HB
United Kingdom
and
Mr. Rahim Moloo
Ms. Ankita Ritwik
Gibson, Dunn & Crutcher LLP
200 Park Avenue New York, NY 10166
United States of America

*Representing the Kingdom of Spain*:

Mr. José Manuel Gutiérrez Delgado
Mr. Pablo Elena Abad
Ms. Gabriela Cerdeiras Megias
Ms. Lorena Fatas Pérez
Ms. Ana Fernández-Daza Alvarez
Ms. María del Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Lourdes Martinez de Victoria Gómez
Ms. Elena Oñoro Sainz
Ms. Mª José Ruiz Sánchez
Mr. Diego Santacruz Descartín
Mr. Alberto Torró Molés
Abogacía General del Estado
Dpto. Arbitrajes Internacionales
Ministry of Justice of the Government of Spain
c/ Marqués de la Ensenada, 14-16
2ª planta
28004, Madrid
Spain

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     PROCEDURAL HISTORY ....................................................................................... 2

III.    GROUND 1: MANIFEST EXCESS OF POWERS BY THE TRIBUNAL ...................... 17

        A.      Spain's Position ........................................................................................... 17

        B.      The Claimants' Position ............................................................................... 21

        C.      The Committee's Analysis ............................................................................ 24

IV.     GROUND 2: SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF
        PROCEDURE ......................................................................................................... 33

        A.      Spain's Position ........................................................................................... 33

        B.      The Claimants' Position ............................................................................... 36

        C.      The Committee's Analysis ............................................................................ 38

V.      GROUND 3: FAILURE TO STATE REASONS IN THE AWARD ................................ 42

        A.      Spain's Position ........................................................................................... 42

        B.      The Claimants' Position ............................................................................... 44

        C.      The Committee's Analysis ............................................................................ 48

VI.     COSTS ................................................................................................................... 56

        A.      Spain's Cost Submissions ............................................................................ 56

        B.      The Claimants' Cost Submissions ................................................................ 57

        C.      The Committee's Decision on Costs ............................................................. 57

VII.    DECISIONS AND ORDERS .................................................................................... 58

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| Application | Application for Annulment filed on 22 May 2019 |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Award | Award rendered on 15 June 2018 in the case *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. the Kingdom of Spain* (ICSID Case No. ARB/13/35) by a Tribunal composed of Mr. Eduardo Zuleta (President), Mr. Klaus Reichert, and Mr. J. Christopher Thomas, as rectified by the Tribunal's Decision on Rectification of the Award on 29 January 2019 |
| BIT | Netherlands-Slovakia Bilateral Investment Treaty signed on 29 April 1991 |
| Brattle | Brattle Group |
| C-[#] | Claimants' Exhibit |
| CJEU | Court of Justice of the European Union |
| CL-[#] | Claimants' Legal Authority |
| Counter-Memorial on Annulment | Claimants' Counter-Memorial dated 29 April 2020 |
| Committee | *Ad hoc* Committee composed of Mr. Cavinder Bull SC (President), Prof. Dr. Nayla Comair-Obeid, and Mr. José Antonio Moreno Rodríguez |
| EC | European Commission |
| EC Decision 7384 | European Commission's Decision C(2017) 7384 dated 10 November 2017 |
| ECT or the Treaty | Energy Charter Treaty |
| EU | European Union |
| FET | Fair and Equitable Treatment |

| Hearing | Hearing on Annulment held on 24 November, 30 November and 1 December 2020 |
|---|---|
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Memorial on Annulment | Respondent's Memorial on Annulment dated 29 April 2019 |
| R-[#] | Respondent's Exhibit |
| Rejoinder on Annulment | Claimants' Rejoinder dated 9 September 2020 |
| Reply on Annulment | Respondent's Reply on Annulment dated 8 July 2020 |
| RL-[#] | Respondent's Legal Authority |
| Spain | Kingdom of Spain |
| TFEU | Treaty on the Functioning of the European Union |
| Tr. Day [#] [page:line] ([language] version) | Transcript of the Hearing |
| Tribunal | Arbitral tribunal that rendered the Award |

## I.    INTRODUCTION

1.    This annulment proceeding concerns an application for annulment (the "**Application**") of the award rendered on 15 June 2018 (the "**Award**") by a Tribunal composed of Mr. Eduardo Zuleta (President), Mr. Klaus Reichert, and Mr. J. Christopher Thomas (the "**Tribunal**"), in the arbitration proceeding between Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) and the Kingdom of Spain (ICSID Case No. ARB/13/31), as rectified by the Tribunal's Decision on Rectification of the Award on 29 January 2019.

2.    This Decision will continue to use the "**Claimants**" to refer to Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) and "**Spain**" for the Kingdom of Spain, as in the original proceeding. The Claimants and Spain are collectively referred to as the "**Parties**." The Parties' representatives are:

| Representing the Claimants: | Representing Spain: |
|---|---|
| Mr. Jeffrey Sullivan | Mr. José Manuel Gutiérrez Delgado |
| Ms. Ceyda Knoebel | Mr. Pablo Elena Abad |
| Mr. Theo Tyrrell | Ms. Gabriela Cerdeiras Megias |
| Ms. Stephanie Collins | Ms. Lorena Fatas Pérez |
| Gibson, Dunn & Crutcher UK | Ms. Ana Fernández-Daza Alvarez |
| LLP Telephone House | Ms. María del Socorro Garrido Moreno |
| 2-4 Temple Avenue | Mr. Rafael Gil Nievas |
| London, EC4Y 0HB | Ms. Lourdes Martinez de Victoria Gómez Ms. |
| United Kingdom | Elena Oñoro Sainz |
| and | Ms. Mª José Ruiz Sánchez |
| Mr. Rahim Moloo | Mr. Diego Santacruz Descartín |
| Ms. Ankita Ritwik | Mr. Alberto Torró Molés |
| Gibson, Dunn & Crutcher LLP | Abogacía General del Estado |
| 200 Park Avenue New York, NY | Dpto. Arbitrajes Internacionales |
| 10166 United States of America | Ministry of Justice of the Government of |
| | Spain c/ Marqués de la Ensenada, 14-16 |
| | 2ª planta |
| | 28004, Madrid |
| | Spain |

1

3.   The Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") under the Energy Charter Treaty ("**ECT**" or the "**Treaty**") which entered into force with respect to Spain, Luxembourg and the Netherlands on 16 April 1998, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

4.   The dispute in the original proceeding related to measures undertaken by Spain in the renewable energy sector and the alleged breaches of its obligations under the ECT and international law with respect to the Claimants and their investments.

5.   In the Award, the Tribunal decided that (i) it had jurisdiction under the ECT and the ICSID Convention over most of the Claimants' claims; (ii) Spain breached the fair and equitable treatment standard in Article 10(1) of the ECT; and (iii) Spain was liable to pay the Claimants €112 million, with interest, as compensation.

6.   Spain applied for annulment of the Award on the basis of Article 52(1) of the ICSID Convention, identifying three grounds for annulment: (i) manifest excess of powers (Article 52(1)(b)); (ii) serious departure from a fundamental rule of procedure (Article 52(1)(d)); and (iii) failure to state reasons (Article 52(1)(e)).

## II.   PROCEDURAL HISTORY

7.   On 22 May 2019, Spain filed an application for annulment of the Award, together with Annexes 01 through 18[1] (the "**Application**"). The Application also contained a request under Article 52(5) of the ICSID Convention and Rule 54(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**") for the stay of enforcement of the Award until the Application was decided (the "**Request for Stay**").

8.   On 23 May 2019, pursuant to ICSID Arbitration Rule 50(2), the Secretary-General of ICSID registered the Application. On the same date, in accordance with ICSID

---

[1] Spain renumbered Annex 01 as Legal Authority RL-0081, Annexes 02 to 03 as Exhibits R-0233 to R-0234, Annexes 4 to 5 as Legal Authorities RL-0082 to RL-0083, Annex 6 as Exhibit R-0235, Annex 07 as Legal Authority RL-62 (submitted in the underlying arbitration), Annex 08 as Legal Authority RL-84, Annexes 09 to 12 as Exhibits R-0236-0239, Annexes 13 to 18 as Legal Authorities RL-0085 to RL-0090.

Arbitration Rule 54(2), the Secretary-General informed the Parties that the enforcement of the Award had been provisionally stayed.

9.    On 19 August 2019, in accordance with ICSID Arbitration Rules 6 and 53, the Parties were notified that an *ad hoc* Committee composed of Mr. Cavinder Bull, a national of Singapore, appointed to the Panel by Singapore, and designated as President of the Committee, Mr. José Antonio Moreno Rodríguez, a national of Paraguay, appointed to the Panel by Paraguay, and Prof. Dr. Nayla Comair-Obeid, a national of France and Lebanon, appointed to the Panel by Lebanon, had been constituted (the "**Committee**"). On the same date, the Parties were notified that Ms. Anna Toubiana, ICSID Legal Counsel, would serve as Secretary of the *ad hoc* Committee.

10.   On 26 August 2019, the Committee invited the Parties to confer and confirm their joint agreement for the first session and preliminary procedural consultation to be held by telephone conference either on 18 or 19 September 2020. The Committee also invited the Parties to confer regarding the timetable for the exchange of written submissions on the Request for Stay contained in the Application.

11.   On 30 August 2019, the Claimants informed the Committee of the Parties' agreement to hold the first session and preliminary procedural consultation by telephone conference on 18 September 2019. The Claimants further informed the Committee that the Parties had agreed on the following schedule for the exchange of written submissions on Spain's Request for Stay:

–    Spain's first submission – 3 September 2019
–    Claimants' response – 9 September 2019
–    Spain's reply – 12 September 2019
–    Claimants' rejoinder – 16 September 2019

12.   The Claimants also informed the Committee that the Parties had agreed to provide oral argument on Spain's Request for Stay at the first session. Spain confirmed this agreement on the same date.

13.   On 2 September 2019, the Committee confirmed that the first session would be held on 18 September 2019. The Committee further confirmed its agreement with the Parties' schedule for the exchange of written submissions on the Request for Stay.

14. On 3 September 2019, Spain filed its Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award, together with Annexes 19 through 32.[2]

15. On 5 September 2019, the Committee circulated a draft agenda and a draft Procedural Order No. 1 to the Parties and invited them to confer and submit a joint proposal advising the Committee of any agreements reached and/or of their respective positions where they were unable to reach an agreement.

16. On 9 September 2019, the Claimants filed their Response to Spain's Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award, along with Annexes 01 through 24.

17. On 12 September 2020, the Claimants submitted the Parties' consolidated comments on the draft Procedural Order No. 1. Spain confirmed its agreement on the same date.

18. On the same date, Spain filed its Reply in Support of the Continuation of the Provisional Stay of Enforcement of the Award, along with Annexes 33 to 51.[3]

19. On 16 September 2019, the Claimants filed their Rejoinder to Spain's Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award, together with Annexes 25 through 48.

20. In accordance with ICSID Arbitration Rules 53 and 13(1), the Committee held a first session with the Parties on 18 September 2019 by telephone conference.

21. On the occasion of the first session, the Parties presented their oral submissions on the continuation of the stay of enforcement of the Award.

22. On the same date, further to Spain's submissions during the first session, the Committee invited Spain to present a brief statement on the European Union ("**EU**") law issues, as discussed during the session, in response to the Claimants' arguments included in their

---

[2] Spain renumbered Annexes 19 to 22 as Exhibits R-0240 to R-0243, and Annexes 23 to 32 as Legal Authorities RL-0091 to RL-0100.

[3] Spain renumbered Annexes 33 and 34 as Exhibits R-0244 and R-0245, Annexes 35 to 40 as Legal Authorities RL-0101 to RL-0106, Annex 41 as R-0246, Annexes 42 to 45 as Legal Authorities RL-0107 to RL-0110, Annex 46 as Exhibit R-0247, Annex 47 as RL-20 (submitted in the underlying arbitration), Annex 48 as Legal Authority RL-0111, Annex 49 as Exhibit R-0248, and Annexes 50 and 51 as Legal Authorities RL-0112 and RL-0113.

Rejoinder to Spain's Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award, at paragraphs 53-79.

23.  On 20 September 2019, the Committee issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Committee on disputed issues. Procedural Order No. 1 provided, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of the proceeding would be Washington, D.C. Procedural Order No. 1 also set out the agreed procedural calendar for the proceeding.

24.  On the same date, the Committee (i) proposed to hold a two-day hearing at the World Bank facilities in Paris, France; (ii) indicated its availability from 2 to 13 November 2020 and from 24 to 27 November 2020; and (iii) invited the Parties to confirm their availability on the proposed dates and venue.

25.  On 26 September 2019, the European Commission (the "**EC**") filed an Application for Leave to Intervene as a Non-Disputing Party pursuant to ICSID Arbitration Rule 37(2), dated 25 September 2019.

26.  On the same date, the Committee invited the Parties to submit their comments on the EC's Application of 25 September 2019, if any, by 7 October 2019.

27.  On 30 September 2019, Spain filed its comments on the EU law issues raised in the Claimants' Rejoinder to Spain's Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award, along with Annexes 52 and 53[4] and a revised version of Annex 33.

28.  On the same date, the Claimants informed the Committee of the Parties' preference for the hearing on annulment to take place during the week commencing 2 November 2020. Spain confirmed its agreement on 1 October 2020.

29.  On 1 October 2020, the Committee confirmed that the hearing on annulment would take place in Paris, France at the World Bank facilities on 2-4 November 2020.

---

[4] Spain renumbered Annexes 52 and 53 as Legal Authorities RL-0114 and RL-0115.

30.     On 7 October 2019, with the Committee's leave, the Claimants filed their Response to Spain's Statement on EU Law in Support of the Continuation of the Provisional Stay of Enforcement of the Award, along with Annexes 49 through 52.

31.     On 7 October 2019, the Parties filed their observations on the EC's Application for Leave to Intervene as a Non-Disputing Party. Spain's observations were accompanied by Annexes 54 and 55[5] while the Claimants' observations were accompanied by Annexes 53 through 69.

32.     On 8 October 2019, the Committee invited the Parties to present their comments on the opposing party's observations on the EC's Application for Leave to Intervene as a Non-Disputing Party by 22 October 2019.

33.     On 21 October 2019, the Committee issued its Decision on the Continuation of the Provisional Stay of Enforcement of the Award. The Committee decided that the stay of enforcement should not be continued.

34.     On 22 October 2019, the Parties filed their comments on their respective counterpart's  observations on the EC's Application. On 13 November 2019, the Committee issued its Decision on the EC's Application for Leave to Intervene as a Non-Disputing Party. The Committee decided that the EC may file an application to intervene after the Parties have completed their written submissions; and reserved the issue of costs on this Application to a further order or decision.

35.     On 21 November 2019, Spain requested leave to admit two new expert reports into the record.

36.     On 25 November 2019, the Committee invited the Claimants to submit their comments on Spain's request of 21 November 2019.

37.     On 29 November 2019, the Claimants filed their Comments on Spain's Request to Submit New Evidence.

---

[5] Spain renumbered Annexes 54 and 55 as Legal Authorities RL-0116 and RL-0117.

38.     On 2 December 2019, the Committee invited (i) Spain to submit a response to the Claimants' comments of 25 November 2019 by 13 December 2019; and (ii) the Claimants to submit a final reply by 20 December 2019.

39.     On 3 December 2019, Spain wrote to the Committee to seek confirmation that, should the Committee authorize the submission of new evidence pursuant to Section 15.3 of Procedural Order No. 1, that submission would take place after the filing of Spain's Memorial on Annulment.

40.     On 4 December 2019, the Committee confirmed that Spain was invited to submit a response to the Claimants' submission of 29 November 2019 by 13 December 2019 and that the Claimants were invited to submit a final reply by 20 December 2019. The Committee further indicated that the Respondent's Memorial on Annulment should be submitted on 18 December 2019, pursuant to Annex A of Procedural Order No. 1. Finally, the Committee stated that, should the Committee grant Spain's application to submit further evidence, the Committee would give directions for how that further evidence would be presented and opportunity would be given to both Parties to make submissions.

41.     On 13 December 2019, Spain submitted its observations on the Claimant's comments of 29 November 2019.

42.     On 18 December 2019, Spain filed its Memorial on Annulment, together with Factual Exhibits R-0249 through R-0253, and Legal Authorities RL-0118 through RL-0152 (the "**Memorial on Annulment**").

43.     On 20 December 2019, the Claimants submitted their Response to Spain's Further Comments on its Request to Submit New Evidence in the Annulment Proceedings dated 13 December 2019.

44.     On 8 January 2020, the Committee issued Procedural Order No. 2 in which it granted Spain leave to file the two expert reports "*on the basis that these Reports do not contain any new factual evidence or arguments that were not presented in the underlying arbitration*".

45. On 16 January 2020, Spain requested a one-week extension of the deadline to submit its new expert reports.

46. On the same date, the Committee invited the Claimants to submit by 21 January 2020 their comments on Spain's request of 16 January 2020.

47. On 21 January 2020, the Claimants informed the Committee that they had no objection to Spain's request. The Claimants further informed the Committee that, depending on the scope of the reports and the language in which they were submitted, they might need an extension of time for the submission of their Counter-Memorial on Annulment.

48. On the same date, the Committee took note of the Parties' agreement and granted the extension of the deadline for the submission of Spain's two new expert reports until 5 February 2020.

49. On 5 February 2020, Spain submitted two new expert reports, namely, the Expert Report of Prof. Gosalbo on European Union Law dated 29 January 2020 and, the Expert Report of BDO on the amendment to the amount of the award against Spain dated 5 February 2020.

50. On 10 February 2020, the Claimants requested that it strike out Spain's expert reports on the basis that the reports contained new evidence and arguments not advanced before the Tribunal in the underlying arbitration.

51. On 14 February 2020, the Claimants provided an update to the Committee regarding their need for an extension of time for the filing of their Counter-Memorial on Annulment.

52. On 19 February 2020, with the Committee's leave, Spain submitted its comments on the Claimants' communication of 10 February 2020.

53. On 10 March 2020, the Committee issued Procedural Order No. 3, indicating that it would disregard paragraphs 83 to 89 of Prof. Gosalbo's report but declined to disregard any other part of Spain's expert report.

54. On 17 March 2020, the Claimants informed the Committee of the Parties' agreement on a four-week extension of the deadline for the filing of the Claimants' Counter-

Memorial on Annulment and on a further extension of the remaining submissions. Spain confirmed its agreement on the same date.

55.   On 18 March 2020, the Committee took note of the Parties' agreement to amend the procedural calendar and informed the Parties that it found the revised procedural calendar acceptable.

56.   On 23 March 2020, Spain informed the Committee of the measures taken by the Spanish government to tackle the COVID-19 pandemic, and noted that while its Reply on Annulment was not imminent and it was not yet requesting any type of extension or equivalent measure, it had considered it necessary to inform the Committee of the situation.

57.   On 29 April 2020, the Claimants filed their Counter-Memorial on Annulment, together with Annexes A and B, Factual Exhibits C-0297 through C-0322, and Legal Authorities CL-0202 through CL-0263 (the "**Counter-Memorial on Annulment**"). Annex A of the Claimants' Counter-Memorial responded to the arguments raised in Prof. Gosalbo's report.

58.   On 29 June 2020, Spain wrote to the Committee seeking clarification on whether it had to file a new request to submit a further expert report from Prof. Gosalbo responding to Annex A of the Claimants' Counter-Memorial.

59.   On 1 July 2020, the Committee confirmed that Spain did not require further permission to file a rebuttal expert report, provided that this report remained within the parameters of the Committee's previous procedural orders.

60.   On 8 July 2020, Spain submitted its Reply on Annulment, together with Prof. Gosalbo's Rebuttal Expert Report dated 1 July 2020, Factual Exhibits R-0254 through R-0256, and Legal Authorities RL-0153 through RL-0165 (the "**Reply on Annulment**").

61.   On 22 July 2020, the EC asked the Centre to confirm whether it could submit a second request for leave to intervene as a non-disputing party.

62.   On 23 July 2020, the Committee informed the EC that it would consider any application it wished to make at that time.

63.    On 3 August 2020, the EC filed its Second Application for Leave to Intervene as a Non-Disputing Party, together with Annex EC-1.

64.    On 7 August 2020, the Committee invited the Parties to submit their comments on the EC's Second Application by 20 August 2020 and reply submissions by 3 September 2020.

65.    On 20 August 2020, the Parties submitted their observations on the EC's Second Application. The Claimants' observations were accompanied by Legal Authorities CL-0264 through CL-0274.

66.    On 24 August 2020, the Committee invited the Parties to confer on whether the hearing scheduled for 2-4 November 2020 should be heard virtually, considering the global travel restrictions arising from the COVID-19 pandemic. The Committee also indicated that if the Parties favoured a virtual hearing, they might wish to begin discussion on the terms of a protocol for the conduct of a virtual hearing.

67.    On 25 August 2020, the Claimants requested leave from the Committee to submit an expert report on EU law rebutting Prof. Gosalbo's expert reports dated 29 January 2020 and 1 July 2020.

68.    On 26 August 2020, the Committee invited Spain to comment on the Claimants' request of 25 August 2020 by 31 August 2020.

69.    On 31 August 2020, Spain filed its comments on the Claimants' request of 25 August 2020.

70.    On 1 September 2020, the Claimants informed the Committee of the Parties' preference for an in-person hearing, their agreed position on the eventuality of holding a virtual hearing, and their proposal to defer their final decision on the conduct of a virtual hearing until 25 September 2020. Spain confirmed its agreement on the same date.

71.    On 2 September 2020, the Committee acknowledged receipt of the Parties' communications of 1 September 2020 and informed them that it looked forward to hearing from the Parties by 28 September 2020.

10

72.     On 3 September 2020, the Parties submitted their comments on their counterpart's observations on the EC's Second Application to Intervene as a Non-disputing Party.

73.     On 5 September 2020, the Committee issued Procedural Order No. 4 granting the Claimants' request to file with their Rejoinder on Annulment an expert report responding to Prof. Gosalbo's expert reports dated 29 January 2020 and 1 July 2020, and permitting Spain to file an expert report responding to the Claimants' expert evidence.

74.     On 9 September 2020, the Claimants filed their Rejoinder on Annulment, along with Annexes A and B, the Expert Opinion of Prof. Piet Eeckhout, and Legal Authorities CL-0275 through CL-0281 (the "**Rejoinder on Annulment**").

75.     On 16 September 2020, Spain transmitted to the Committee a letter from Prof. Gosalbo (dated 15 September 2020) concerning the Claimants' Rejoinder on Annulment and its Annex A.

76.     On 28 September 2020, the Claimants informed the Committee of the Parties' agreement to hold the hearing on annulment virtually in light of the COVID-19 restrictions in place in Europe. Spain confirmed its agreement on the same date.

77.     On 29 September 2020, Spain submitted Prof. Gosalbo's Rebuttal Report to Prof. Eeckout's Expert Opinion (dated 28 September 2020).

78.     On 30 September 2020, the Committee (i) suggested timings for the hearing on annulment; (ii) invited the Parties to indicate whether those timings were suitable; and (iii) invited the Parties to confer and seek to agree the terms of a virtual hearing protocol and a hearing schedule by 14 October 2020.

79.     On 2 October 2020, the Claimants requested that the Committee direct Spain to resubmit Prof. Gosalbo's Rebuttal Report to Prof. Eeckhout's Expert Opinion without paragraphs 69 to 84, which, according to the Claimants, "*plainly* [were] *not responsive to the Eeckhout Report*".

80.     On 6 October 2020, the Committee invited Spain to respond to the Claimants' communication of 2 October 2020, by 13 October 2020.

81.     On the same date, the Committee proposed that the pre-hearing organizational meeting take place either on 23 or 27 October 2020, and invited the Parties to confer and inform the Committee of their preference.

82.     On 7 October 2020, the Committee issued its Decision on the EC's Second Application to Intervene as a Non-Disputing Party, rejecting the EC's Second Application.

83.     On 9 October 2020, the EC informed the Committee that it regretted that the Committee had refused its application following an interpretation of ICSID Arbitration Rule 37(2) the EC considered incorrect.

84.     On 9 October 2020, the Parties confirmed their availability for a pre-hearing organizational meeting on 27 October 2020.

85.     On 13 October 2020, Spain submitted its observations on the Claimants' communication of 2 October 2020.

86.     On 14 October 2020, the Claimants submitted the Parties' proposed Virtual Hearing Protocol. Spain confirmed its agreement on the same date.

87.     On 15 October 2020, the Committee confirmed that the pre-hearing organizational meeting would take place on 27 October 2020.

88.     On 15 October 2020, the Committee informed the Parties that the Claimants' request of 2 October 2020 was denied.

89.     On 16 October 2020, the Committee informed the Parties that they should comply with the deadlines in their proposed Virtual Hearing Protocol on which they were in agreement, and those issues on which there was no agreement would be dealt with at or promptly after the pre-hearing conference.

90.     On 16 October 2020, Spain notified the Committee of its intention to call Prof. Eeckhout for cross-examination. On 19 October 2020, the Claimants notified the Committee of their intention to call Prof. Gosalbo for cross-examination.

91.     On 21 October 2020, Spain informed the Committee that the Parties had exchanged their requests for the submission of new documents and that the Claimants had agreed to all of its requests, but Spain had not agreed to all of the Claimants' requests.

12

Therefore, the Claimants would simultaneously be making an application to the Committee pursuant to Section 15.8 of Procedural Order No. 1. Spain sought confirmation of whether it would be afforded an opportunity to respond to the Claimants' application and explain why the requested documents could not be admitted.

92. On 22 October 2020, the Claimants requested leave to introduce new exhibits into the record. Spain provided its comments on the same date.

93. On 22 October 2020, Spain requested the adjournment of the hearing on annulment scheduled on 2-4 November 2020 due to one member of Spain's legal team having tested positive for COVID-19 and the rest of the team being in quarantine in application of the protocols established by Spain's Ministry of Health and Ministry of Justice.

94. On the same date, the Committee invited the Claimants to reply to Spain's application for an adjournment of the hearing by 26 October 2020.

95. On 23 October 2020, the Claimants provided their comments on Spain's request of 22 October 2020 and Spain indicated that it would make its best effort to accommodate the hearing before 15 December 2020.

96. On the same date, the Committee directed that the pre-hearing conference on 27 October 2020 proceed as scheduled in order to deal with (i) the possible re-fixing of the hearing dates; and (ii) the differences between the Parties in respect of draft Procedural Order No. 5. The Committee further requested the Parties to make themselves available for the substantive hearing on 17-19 November 2020, and inform the Committee of their availability by 26 October 2020.

97. On 24 October 2020, the Claimants confirmed their availability for a hearing on 17-19 November 2020.

98. On 26 October 2020, Spain confirmed its ability to address at the pre-hearing conference the two issues indicated by the Committee, and further indicated that it was not available on the hearing dates proposed by the Committee.

99. On the same date, the Committee informed the Parties of its availability for a hearing on 24, 27, and 30 November and 1 December 2020.

100.    On 27 October 2020, the Committee decided to allow the introduction of the new exhibits referred to in the Claimants' application of 22 October 2020 and requested that the Claimants produce those documents by 30 October 2020.

101.    On 27 October 2020, the Committee held a pre-hearing organizational meeting with the Parties by videoconference.

102.    On 28 October 2020, the Committee issued Procedural Order No. 5 on the Virtual Hearing Logistics.

103.    On 30 October 2020, Spain wrote to the Committee with regard to the documents from the *travaux préparatoires* of the ECT introduced into the record by the Claimants. In particular, Spain submitted that the Committee "*should be able to assess the complete drafting history of the ECT and not the four versions submitted by the Claimants…* [to] *be presented with the complete negotiation process that led to the final approval of the ECT*".

104.    On 31 October 2020, the Committee invited the Claimants to respond to Spain's communication of 30 October 2020, by 3 November 2020.

105.    On 3 November 2020, the Claimants provided their comments to Spain's communication of 30 October 2020.

106.    On 4 November 2020, Spain requested leave to make a correction to the Claimants' communication of 3 November 2020.

107.    On 4 November 2020, the Committee informed the Parties that it did not see a need for the entire *travaux préparatoires* to be placed on the record. The Committee further indicated that it would read any relevant provisions from the *travaux préparatoires* in their proper context, and that should there be any application for specific portions of the *travaux préparatoires* to be referred to in the proceedings, it would deal with such a request at that time.

108.    On 4 November 2020, the Committee confirmed that the hearing on annulment would take place on 24 November, 30 November and 1 December 2020.

14

109.    On 10 November 2020, Spain requested leave to introduce into the record the Opinion of Advocate General Saugmandsgaard Øe delivered on 29 October 2020 in Joined Cases C-798/18 and C-799/18.

110.    On the same date, the Committee invited the Claimants to submit their comments on Spain's communication of 10 November 2020 by 12 November 2020.

111.    On 12 November 2020, the Claimants provided their comments on Spain's communication of 10 November 2020, informing the Committee that they had no objection to Spain's request.

112.    On 13 November 2020, the Committee granted Spain's request of 10 November 2020.

113.    A hearing on annulment was held by videoconference on 24 November, 30 November and 1 December 2020 (the "**Hearing**"). The following persons were present at the Hearing:

*Committee*:
| | |
|---|---|
| Mr. Cavinder Bull SC | President |
| Mr. José Antonio Moreno Rodríguez | Member of the Committee |
| Prof. Dr. Nayla Comair-Obeid | Member of the Committee |

*ICSID Secretariat*:
| | |
|---|---|
| Ms. Anna Toubiana | Secretary of the Committee |

*For the Claimants*:
**Counsel**
| | |
|---|---|
| Mr. Jeffrey Sullivan | Gibson Dunn & Crutcher UK LLP |
| Mr. Rahim Moloo | Gibson Dunn & Crutcher UK LLP |
| Ms. Ceyda Knoebel | Gibson Dunn & Crutcher UK LLP |
| Mr. Theo Tyrrell | Gibson Dunn & Crutcher UK LLP |
| Ms. Siham Freihat | Gibson Dunn & Crutcher UK LLP |

**Expert**
Prof. Piet Eeckhout

*For Spain*:
**Counsel**
| | |
|---|---|
| Mr. José Manuel Gutiérrez | Ministry of Justice of the Government of Spain – *Abogacía General del Estado* |
| Mr. Pablo Elena Abad | Ministry of Justice of the Government of Spain – *Abogacía General del Estado* |
| Ms. Gabriela Cerdeiras Megías | Ministry of Justice of the Government of Spain – *Abogacía General del Estado* |
| Mr. Alberto Torró Molés | Ministry of Justice of the Government of |

15

|  | Spain – *Abogacía General del Estado* |
| Ms. Lourdes Martínez de Victoria Gómez | Ministry of Justice of the Government of Spain – *Abogacía General del Estado* |
| Mr. Juan Antonio Quesada Navarro | Ministry of Justice of the Government of Spain – *Abogacía General del Estado* |
| Ms. Ana María Rodríguez Esquivias | Ministry of Justice of the Government of Spain – *Abogacía General del Estado* |

**Expert**
Prof. Ricardo Gosalbo Bono

*Court Reporters*:
  Mr. Trevor McGowan          Caerus Reporting Ltd
  Mr. Dante Rinaldi             DR - Esteno

*Interpreters*:
  Ms. Silvia Colla
  Ms. Amalia Thaler de Klemm
  Mr. Charles Roberts
  Mr. Daniel Giglio

114.    During the Hearing, the following persons were examined:

       *On behalf of the Claimants*:
        Prof. Piet Eeckhout

       *On behalf of Spain*:
        Prof. Ricardo Gosalbo Bono

115.    During the Hearing, the Parties submitted the following exhibits: C-0360 to C-0362, and R-0259.

116.    On 27 November 2020, the Committee circulated the questions which should be addressed by the Parties during their oral closing statements on 1 December 2020.

117.    On 10 December 2020, Spain informed the Committee of (i) the Parties' agreement to set 8 February 2021 as the tentative deadline to submit simultaneously their cost statements; and (ii) their intention to submit the revised versions of the transcripts by 22 December 2020. The Claimants confirmed their agreement on 11 December 2020.

118.    On 11 December 2020, the Committee confirmed the Parties' agreement on the tentative deadline of 8 February 2021 to submit their statement of costs simultaneously, pursuant to the terms established by the Parties, and their agreement to submit the revised versions of the transcripts by 22 December 2020.

119.   On 21 December 2020, the Parties submitted their agreed corrections to the transcripts. On 23 December 2020, the Centre circulated the revised and final versions of the transcripts to the Parties.

120.   On 2 February 2021, the Committee and the Parties were advised that Ms. Anneliese Fleckenstein, ICSID Legal Counsel, would be replacing Ms. Anna Toubiana as Secretary of the Committee.

121.   The Parties filed their submissions on costs on 15 February 2021.

122.   The proceeding was closed on 15 June 2021.

## III.   GROUND 1: MANIFEST EXCESS OF POWERS BY THE TRIBUNAL

### A.   Spain's Position

123.   According to Spain, the Award must be annulled under Article 52(1)(b) of the ICSID Convention as the Tribunal "*manifestly exceeded its power*" by (i) deciding that it had the jurisdiction to decide an intra-EU dispute under the ECT between an EU Member State and investors from another EU Member State; and (ii) awarding to the Claimants damages for measures that the Tribunal itself declared were not contrary to the ECT.[6]

#### (i)   Applicable standard for manifest excess of powers

124.   Spain submits that a manifest excess of power exists "*when the Tribunal does not apply the appropriate law or when the Tribunal exceeds its jurisdiction or lacks jurisdiction, or when the Tribunal rules on matters not raised by the Parties*".[7] An arbitral tribunal in turn fails to apply the appropriate law where it either "*ignores* [the] *applicable law*" or mistakenly applies it in a manner "*so gross or egregious as substantially to amount to failure to apply the proper law*".[8] Even if an arbitral tribunal correctly declares the applicable law, a manifest excess of powers may exist if the tribunal failed to effectively apply the principles as acknowledged. As stated in *Iberdrola v. Guatemala*, "*a mistake*

---

[6] Memorial on Annulment, ¶¶ 52-53.
[7] Memorial on Annulment, ¶ 55.
[8] Memorial on Annulment, ¶ 56, citing RL-0062, *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No ARB/02/7, Decision of the *ad hoc* committee on the application for annulment, 5 June 2007 ("*Soufraki*"), ¶ 86.

*in the application of the law may reach such a level of severity that it would be equivalent to amount to failure to apply the proper law*".[9]

125. Spain disagrees with the Claimants' submission that a 'manifest excess of power' under Article 52(1)(b) of the ICSID Convention must be "*clear*", "*obvious*" or "*self-evident*".[10] In this regard, Spain relies on *inter alia* the annulment committee's observation in *Occidental Petroleum v. Ecuador* that the term 'manifest' in Article 52(1)(b) "*does not prevent that in some cases an extensive argumentation and analysis may be required to prove that the misuse of powers has in fact occurred*".[11]

    (ii)   <u>Whether the Tribunal manifestly exceeded its powers by assuming jurisdiction over the Parties' intra-EU dispute</u>

126. Spain argues that the Tribunal manifestly exceeded its powers by assuming jurisdiction over the Parties' dispute under the ECT. According to Spain, Articles 267 and 344 of the Treaty on the Functioning of the EU ("**TFEU**") "*forbid any disputes on subjects regulated by EU Law not to be reviewed by the CJEU*",[12] and such disputes therefore cannot be submitted to arbitration. This is pursuant to the principle of autonomy in the EU legal system which requires disputes concerning the interpretation of EU law be submitted to the EU's legal system, and not international arbitration.[13]

127. Spain argues that the Parties' dispute is governed by EU law pursuant to the principle of primacy, which gives EU law preference in the case of any conflict between the rules of a Member State and EU law. Spain also reiterated its position in the Arbitration that "*EU law, including the treaties creating the European Economic Community ('EEC') and the EU and allocating competences among European institutions and their member countries, EU's internal legislation, and decisions of the CJEU constitute 'applicable rules and principles of international law' for purposes of Article 26(6)* [of the ECT]".[14]

---

[9] Memorial on Annulment, ¶58, citing RL-0123, *Iberdrola Energía, S.A. v. Republic of Guatemala*, ISID Case No. ARB/09/5, Decision on the remedy for annulment of the Award submitted by Iberdrola Energía, S.A., 13 January 2015, ¶ 97.
[10] Counter-Memorial on Annulment, ¶46.
[11] Reply on Annulment, ¶42, citing RL-0087, *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment, 2 November 2015, ¶59.
[12] Memorial on Annulment, ¶¶77-79.
[13] Memorial on Annulment, ¶84.
[14] Memorial on Annulment, ¶99, citing Award, ¶160.

128. Spain then argues that a dispute concerning the application of EU law cannot be validly submitted to arbitration. Spain relies in particular on the 2018 judgment of the Court of Justice of the European Union ("**CJEU**") in *Achmea*.[15] In *Achmea*, the CJEU decided a dispute between the Dutch insurer Achmea BV and Slovakia brought under the 1991 Netherlands-Slovakia bilateral investment treaty ("**BIT**"). Prior to the CJEU proceedings, Achmea had commenced arbitration against Slovakia under the BIT and obtained an award of damages against Slovakia. The CJEU set aside the award, holding that the arbitration clause in the Netherlands-Slovakia BIT was incompatible with the principle of autonomy under EU law as the clause provided for disputes involving the interpretation of EU law to be determined by bodies outside the EU's judicial system.[16]

129. Applying *Achmea*, Spain argues that Article 26(6) of the ECT, which provides for disputes to be referred to investment treaty arbitration, cannot be applied to its dispute with the Claimants, being an intra-EU dispute involving the application of EU law.[17] Spain finds support in the European Commission's Communication COM(2018) 547/2, which states that Article 26 of the ECT, read in light of *Achmea*, "*does not provide for an investor-State arbitration clause applicable between investors from a Member States of the EU and another Member States of the* EU" and that "*the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU*".[18]

130. According to Spain, the Tribunal manifestly exceeded its powers in failing to correctly identify EU law as the law applicable to the Parties' dispute and to provide adequate reasons for its refusal to accept Spain's arguments on this issue.[19] The Tribunal's Award, Spain submits, leaves unanswered the "*crucial question*" of how it could be possible that "*the EU and all its Member States, which promoted the ECT to foster international relations with third states and not among themselves, obliged themselves*

---

[15] RL-0082, Judgment of the CJEU, Case C-284/16, Republic of Slovakia/Achmea BV, 6 March 2018 ("***Achmea***").
[16] *Achmea*, ¶¶35-36, 45-46.
[17] Memorial on Annulment, ¶91.
[18] RL-0128, Communication from The European Commision to The European Parliament and The Council on the Protection of intra-EU investment, COM (2018) 547/2, 19 July 2018.
[19] Memorial on Annulment, ¶¶100-103.

*to submit intra-EU disputes to arbitration, in open contradiction to EU law which binds them under the principle of primacy*".[20]

(iii)    Whether the Tribunal manifestly exceeded its powers by compensating the Claimants for measures that were not contrary to the ECT

131.    Spain contends that the Tribunal exceeded its jurisdiction by ordering damages in respect of measures that were found *not* to be in breach of the ECT.

132.    First, Spain argues that the Tribunal awarded damages as if "*all the disputed measures were contrary to the ECT and gave rise to liability… despite the fact that it was determined by the tribunal itself that (i) Spain had the right to regulate; (ii) the Tribunal lacked jurisdiction over the 7% tax on the value of energy production that was approved by Law 15/2012; and (iii) Spain had not breached its obligation of Fair and Equitable Treatment with regard to Law 15/2012… and RDL 2/2013*".[21]

133.    In its Award, the Tribunal accounted for the measures that it found to be lawful by refusing to award damages for the Claimants' "*historic losses*".[22] However, Spain submits that the Tribunal's calculation of the Claimants' future losses also awards damages for "*measures which* [the Tribunal] *has declared to be lawful or beyond its jurisdiction*".[23] According to Spain, the Tribunal should have, but did not, make the necessary adjustments to the model submitted by the Brattle Group ("**Brattle Model**") in order to account for their findings that some of Spain's measures were lawful.[24] Had these adjustments been made, Spain contends that the Claimants' loss of future cash flow, based on the Brattle Model, would have been €10 million, and not €101 million as awarded by the Tribunal.[25]

134.    Secondly, Spain also contends that the Tribunal awarded damages in accordance with a valuation model that assumed a 40-year useful life for the plants, despite having found that the plants would have a useful life of only 25 years.[26] The Tribunal manifestly

---

[20] Reply on Annulment, ¶72.
[21] Memorial on Annulment, ¶107; BDO Expert Report dated 5 February 2020 ("**BDO Expert Report**"), ¶¶57-70.
[22] Award, ¶667.
[23] Memorial on Annulment, ¶121.
[24] Memorial on Annulment, ¶¶142 *et seq*.
[25] Memorial on Annulment, ¶¶147-150, 155 *et seq*.
[26] Memorial on Annulment, ¶109; BDO Expert Report, ¶¶71-80.

exceeded its powers, Spain argues, by awarding damages that go beyond those justified by its factual findings.

## B.  The Claimants' Position

### (i)  Applicable standard for manifest excess of powers

135.  The Claimants argue that for an excess of powers to be "*manifest*", such excess must be "*clear*", "*obvious*", "*self-evident*" and discernible "*without need for an extensive analysis of the award*".[27] A finding of excess of powers that requires in-depth analysis of the award or the underlying evidence before the tribunal cannot be considered 'manifest', and cannot result in the annulment of the award. This is in line with the well-established view that annulment committees do not sit as appeal courts under the ICSID Convention but are rather meant to play a limited role in ensuring the integrity of the process in accordance with ICSID Convention standards.[28]

136.  According to the Claimants, the limited standard of review available under the ICSID Convention means that annulment committees do not have the power to reassess tribunals' competence *de novo*.[29] As stated by *Azurix v. Argentina*, annulment is only available where it is "*obvious, without deeper analysis, that a tribunal lacked or exceeded jurisdiction*". In cases where "*reasonable minds might differ as to whether or not the tribunal has jurisdiction*", then it "*falls to be resolved definitively by the tribunal in exercise of its power*".[30]

### (ii)  Whether the Tribunal manifestly exceeded its powers by assuming jurisdiction over the Parties' intra-EU dispute

137.  The Claimants disagree that the Parties' dispute is governed by EU law or that the arbitration agreement in Article 26(1) of the ECT does not apply to intra-EU disputes. According to the Claimants, the Tribunal correctly found that public international law, not EU law, applies "*as the correct starting point for interpreting a treaty*".[31]

---

[27] Counter-Memorial on Annulment, ¶46.
[28] Counter-Memorial on Annulment, ¶50.
[29] Counter-Memorial on Annulment, ¶56.
[30] Counter-Memorial on Annulment, ¶¶57-58, citing RL-0060, *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 September 2009, ¶58.
[31] Counter-Memorial on Annulment, ¶88; Award, ¶¶204-207, 216.

138. Under international law, Article 26 of the ECT is to be interpreted "*in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*".[32] Applying this approach, the Tribunal found that the ordinary meaning of the ECT "*demonstrates Spain's unconditional consent to arbitrate disputes with investors from Luxembourg and the Netherlands*" and "*provide*[s] *the Tribunal with jurisdiction to entertain claims against Spain (a Contracting Party) by investors of Luxembourg and the Netherlands (both a Contracting Party) related to "Investments" made by the Claimants in the Spanish RE sector*".[33] The Claimants hence argue that the Tribunal was correct in rejecting Spain's intra-EU argument and finding that EU law did not govern the interpretation of Article 26 of the ECT.

139. The Claimants also contend that Spain's reliance on Article 26(6) of the ECT is misplaced. While Spain argues that EU law constitutes the "*applicable rules and principles of international law*" referred to in Article 26(6),[34] the Claimants note that Article 26(6) only applies to the merits of the case and is therefore "*irrelevant to the question of jurisdiction*".[35] The Claimants hence argue that the Tribunal was reasonable in finding that Article 26(6) of the ECT does not require the application of EU law to the issue of jurisdiction.[36]

140. As for the CJEU's decision in *Achmea*, the Claimants submit that *Achmea* has no relevance to the ECT. This is because (i) EU law (including *Achmea*) is not relevant to the question of jurisdiction; (ii) even if EU law were relevant, *Achmea* cannot retroactively invalidate Spain's consent to arbitrate given that the Claimants' initiated arbitration proceedings in 2013, almost five years before the *Achmea* decision was rendered; and (iii) even if *Achmea* could have retroactive effect, it remains irrelevant to

---

[32] Counter-Memorial on Annulment, ¶88; Vienna Convention on the Law of Treaties, 23 May 1969, Article 31(1).
[33] Award, ¶¶186, 188, 212; Counter-Memorial on Annulment, ¶88.
[34] Counter-Memorial on Annulment, ¶152.
[35] Counter-Memorial on Annulment, ¶¶104-105, citing CL-0231, *Landesbank Baden-Württemberg and others v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on Objection to Jurisdiction, 25 February 2019, ¶159; CL-0223, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. The Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award and Partial Dissenting Opinion of Arbitrator Raül Vinuesa, 14 November 2018 ¶218; CL-0201, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 199.
[36] Counter-Memorial on Annulment, ¶106.

the Arbitration because the judgment does not apply to the ECT, but only to the BIT at issue in that particular case.[37]

141.   Finally, the Claimants argue that even assuming that the Tribunal had exceeded its powers with respect to jurisdiction, Spain has not shown that the excess of powers was manifest.[38] According to the Claimants, an excess of powers that is manifest should be clearly discernible from the award itself and should not require meticulous examination on the part of the committee – this is not the case here given that Spain is asking the Committee to conduct a detailed analysis into a number of EU law decisions and opinions, the majority of which were never brought to the attention of the Tribunal.[39] Moreover, a significant number of ECT and non-ECT tribunals have rejected the intra-EU jurisdictional argument relied on by Spain, showing that the Tribunal was not acting alone or unreasonably in doing the same.[40]

(iii)   Whether the Tribunal manifestly exceeded its powers by compensating the Claimants for measures that were not contrary to the ECT

142.   The Claimants argue that the Tribunal had "*appropriately calculated damages in light of its factual and legal findings*", and had adjusted the damages awarded "*to account for its finding that some of Disputed Measures did not breach the ECT and its finding regarding the lifetime of the plant*".[41]

143.   First, the Claimants point out that the Tribunal expressly refused to award damages for "*historic losses*" arising from measures adopted by Spain that were *not* in violation of the ECT.[42] The Tribunal deducted the value of such historic losses from the valuation model provided by the Claimants' damages expert, the Brattle Group ("**Brattle**"), and therefore calibrated the damages awarded to only account for the Claimants' loss of future cash flows.[43]

144.   Secondly, although the Tribunal initially made a clerical error in adopting the wrong figure as the value of the Claimants' lost future cash flows, this has been subsequently

---

[37] Counter-Memorial on Annulment, ¶¶113-116, citing CL-0234, *Eskosol*, ¶¶199-203.
[38] Counter-Memorial on Annulment, ¶131.
[39] Counter-Memorial on Annulment, ¶132.
[40] C-0360, Claimants' Demonstrative 1, 'Updated Table of ECT and Non-ECT Tribunals that have Dismissed the Intra-EU Objection'.
[41] Counter-Memorial on Annulment, ¶173.
[42] Counter-Memorial on Annulment, ¶186.
[43] Award, ¶¶666-667, 674.

rectified by the Tribunal, who reduced the damages awarded by €11 million to account for the error.[44]

145.    Thirdly, the Claimants argue that the Tribunal had properly accounted for its finding that the Claimants' plants had an operational life of 25 years, and not 35 to 40 years as submitted by the Claimants in their damages model. In its Award, the Tribunal deducted €36 million from the lost future cash flows modelled by the Claimants to arrive at its final damages figure.[45] The Claimants explained that, rather than adopting Brattle's calculations wholesale, the Tribunal had made its own estimate of the appropriate deduction based on the estimates put forward by Brattle.[46]

146.    Fourthly, the Claimants argue that even if Spain's criticisms of the Tribunal's methodology are valid, they nonetheless cannot serve as grounds for annulment. This is because, the Claimants submit, annulment committees "*cannot review de novo the facts, evidence and criteria used by the tribunal in assessing the damages nor the amount of compensation awarded to* [the claimants]".[47] Spain's case, at its highest, is that the Tribunal made the wrong deductions – but mistakes by a tribunal are not grounds for annulment.[48]

147.    For the above reasons, the Claimants deny that the Tribunal exceeded its powers in awarding damages. They contend that Spain's complaint is really that the Tribunal got it wrong, and that the Tribunal should have made different deductions (that were never proposed by Spain to the Tribunal).[49]

## C.    The Committee's Analysis

148.    Article 52(1)(b) of the ICSID Convention provides for annulment only where (i) the tribunal has exceeded its powers; and (ii) the excess is 'manifest'. This is a dual

---

[44] Counter-Memorial on Annulment, ¶202, citing Decision on Rectification, ¶32. See also Award, ¶725.
[45] Counter-Memorial on Annulment, ¶204; citing Award, ¶725.
[46] Counter-Memorial on Annulment, ¶204.
[47] Counter-Memorial on Annulment, ¶234; citing RL-0143, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment, 24 January 2014, ¶ 160.
[48] Counter-Memorial on Annulment, ¶245.
[49] Counter-Memorial on Annulment, ¶207.

requirement that "*necessarily limits an ad hoc Committee's freedom of appreciation as to whether the tribunal has exceeded its powers*".[50]

(i)   Applicable standard for manifest excess of powers

149.   On the applicable standard of review, the Committee agrees with the Claimants that the term 'manifest' refers to an excess that is "*obvious*", "*clear*" or "*self-evident*". This definition of 'manifest' is, as stated in the 2016 Background Paper on Annulment for the Administrative Council, one adopted by "*most ad hoc Committees*".[51] For example, the annulment committee in *CDC v. Seychelles* held that:

> "[T]*he excess must be plain on its face for annulment to be an available remedy. Any excess apparent in a Tribunal's conduct, if susceptible of argument 'one way or the other', is not manifest. As one commentator has put it, 'If the issue is debatable or requires examination of the materials on which the tribunal's decision is based, the tribunal's determination is conclusive'.*"[52]

150.   Similarly, the *AES v. Hungary* committee explained that:

> "*Concerning the meaning of 'manifest', the Committee shares Professor Schreuer's view that the term relates to the ease with which an excess of powers is perceived, rather than its gravity, and that such an excess must be able to 'be discerned with little effort and without deeper analysis.' Such an approach is consistent with a manifest excess being one which is at once 'textually obvious and substantively serious.'*"[53]

151.   The Committee sees no reason to depart from the well-established approach taken by the international arbitration community. On the contrary, the Committee finds that the above definition of 'manifest' is in line with the exceptional and limited character of an annulment as opposed to an appeal. Further, it better accords with the intentions of the drafters of the ICSID Convention. As Prof Schreuer observes, the term 'manifest' in Article 52(1)(b) was deliberately chosen by the drafters of the ICSID Convention to promote finality in ICSID arbitration and to minimise the "*risk of frustration of*

---

[50] RL-0147, *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision of the *ad hoc* Committee on the Application for Annulment of the Republic of Seychelles, 29 June 2005 ("*CDC*"), ¶39.

[51] R-0235, Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016, ¶83.

[52] RL-0147, *CDC*, ¶ 41; *see also* RL-0144, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment, 1 February 2016, ¶174; CL-0213, *Alapli Elektrik B.V. v. Republic of Turkey, ICSID Case No. ARB/08/13*, Decision on Annulment, 10 July 2014, ¶77.

[53] RL-0036, *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Decision of the *ad hoc* Committee on the Application for Annulment, 29 June 2012, ¶31.

*awards*".[54] This objective justifies a higher standard for when an ICSID award may be annulled on the ground of an excess of power.

152.    For these reasons, the Committee cannot agree with Spain's submission that there can be manifest excesses of power that are nevertheless only be discernible upon "*extensive argumentation and analysis*".[55] In the Committee's view, an error that is obvious or self-evident must necessarily be one that would be readily apparent without a need to resort to extensive argumentation and analysis to reveal it.

(ii)    Whether the Tribunal manifestly exceeded its powers by assuming jurisdiction over the Parties' intra-EU dispute

153.    The next question is whether it is obvious or self-evident that the Tribunal exceeded its powers in assuming jurisdiction over the Parties' intra-EU dispute. The Committee finds that it is not, for the reasons explained below.

154.    The Committee notes that 56 other tribunals have dismissed the intra-EU jurisdictional argument raised by Spain (of which 35 were considering the intra-EU argument in the context of the ECT).[56] The Committee agrees with the view of the tribunal in *InfraRed v. Spain* that one cannot "*overstate the importance of the long record of recent arbitral awards or partial awards which disposed of the intra-EU jurisdictional objections and maintained the jurisdiction of the respective ECT tribunals… [as] these form an arbitral* jurisprudence constante *which, short of binding this Tribunal, provides nonetheless a persuasive, reasoned and documented analytical framework that the Tribunal endorses and adopts without the need to spell it out in detail below.*"[57] In the Committee's view, the fact that 56 other tribunals agree with the Tribunal's views suffices to show that the Tribunal's reasoning was tenable and not clearly or self-evidently wrong.

155.    Spain has not shown any international arbitration decisions ruling in support of its intra-EU objection. Rather, Spain responded to the overwhelming weight of authority against it by arguing that "*there is no rule of precedent in the ICSID system*" and that this

---

[54] CL-0261, C. H. Schreuer et al., *The ICSID Convention: A Commentary* (2nd ed., CUP 2014) (Excerpt), p. 938, ¶134.
[55] Memorial on Annulment, ¶56.
[56] C-0360, Claimants' Demonstrative 1, 'Updated Table of ECT and Non-ECT Tribunals that have Dismissed the Intra-EU Objection'.
[57] CL-0240, *InfraRed Environmental Infrastructure GP ltd. et al v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019, ¶260.

Committee therefore "*has the autonomy to establish its own view* [on] *whether Article 26 of the ECT gives jurisdiction to hear intra-European Union disputes*".[58] The Committee does not accept this argument for two reasons.

156. First, while the Committee is not bound by previous decisions, it should nonetheless "*pay due consideration to earlier decisions of international tribunals*" so as to "*contribute to the harmonious development of investment law and thereby to meet the legitimate expectations of the community of States and investors towards certainty of the rule of law*".[59] The decisions of previous tribunals on the intra-EU objection are therefore material in assessing whether the Tribunal had manifestly exceeded its powers. Collectively, these decisions overwhelmingly show that the Tribunal's decision is, at the very least, reasonable and defensible.

157. Secondly, the Committee considers that it does not have an unfettered autonomy to reconsider the merits of Spain's intra-EU objection *de novo*. As discussed at paragraphs 26 to 29 above, the ICSID Convention gives annulment committees a limited form of review over the underlying tribunal's exercise of its jurisdictional powers. The Committee agrees with the annulment committee in *Bernhard Von Pezold and Others v. Republic of Zimbabwe* that:[60]

> "*It is also clear from the language of Article 52, and it is well established in ICSID annulment practice, that annulment is an extraordinary remedy and not an appeal from the legal or factual findings of the arbitral tribunal. The object and purpose of annulment proceedings is not to test the substantive correctness of the award… The function of an ICSID ad hoc committee is not to review the factual findings of an ICSID tribunal or its decision on the merits, but to determine whether any of the annulment grounds in Article 52 has been established.*"

158. Accordingly, even assuming *arguendo* that the Committee disagrees with the Tribunal on the merits of Spain's intra-EU objection, the Committee cannot disregard the many prior decisions showing that the Tribunal's decision was, at the very least, not obviously or manifestly incorrect. As the requirement of a 'manifest' excess is clearly not satisfied,

---

[58] Tr. Day 3, 23:7-11 (English version).
[59] *Saipem S.p.A v. The People's Republic of Bangladesh,* ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, ¶67.
[60] CL-0224, *Bernhard Von Pezold and Others v. Republic of Zimbabwe*, Decision on Annulment, 21 November 2018, ¶¶239–240.

the Committee sees no reason to scrutinise further the Tribunal's conclusions on the intra-EU objection.

159.    Thirdly, the Committee notes that the Tribunal's decision should be evaluated on the basis of the arguments and evidence raised before the Tribunal. As the Claimants have pointed out, Spain relies significantly on documents that post-date the Award (e.g. a 2018 European Commission communication,[61] a 2019 declaration by EU Member States;[62] a 2020 opinion by the Advocate-General of the European Court of Justice[63]). In the Committee's view, it would not be appropriate to impugn the Tribunal's Award on the basis of authorities or documents rendered post-Award. Moreover, the fact that Spain has to rely on further authorities not before the Tribunal suggests that the Tribunal's decision was not obviously or manifestly incorrect.

160.    In the premises, the Committee finds no reason to conclude that the Tribunal manifestly exceeded its power in assuming jurisdiction over the Parties' dispute.

(iii)    Whether the Tribunal manifestly exceeded its powers by compensating the Claimants for measures that were not contrary to the ECT

161.    The Committee also does not find that damages awarded by the Tribunal was a manifest excess of its powers.

162.    The background for the Tribunal's award of damages is as follows. In the Arbitration, the Claimants challenged a series of measures taken by Spain that affected the Claimants' renewable energy investments ("**Disputed Measures**"). The first set of measures (comprising Law 15/2012. RDL 2/2013 and RDL 9/2013, collectively "**Earlier Measures**") initially adopted by Spain was found to have modified Spain's original regulatory regime, but did not replace it.[64] The Tribunal found that these set of measures were not in breach of the ECT.

---

[61] RL-0128, Communication from The European Commission to The European Parliament and The Council on the Protection of intra-EU investment, COM (2018) 547/2, 19 July 2018.
[62] RL-0129, Declaration of the Representatives of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, 15 January 2019.
[63] RL-0169, Opinion of Advocate General Mr Henrik Saugmandsgaard Øe delivered on 29 October 2020. Joined Cases C-798/18 and C-799/18 Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others (C-798/18), Athesia Energy Srl and Others, (C-799/18) v Ministero dello Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA.
[64] Award, ¶¶139-144.

163.   Subsequently, Spain completely repealed and replaced its original regulatory regime ("**Original Regime**") with a series of further measures (comprising Law 24/2013, RD 413/2014, and Ministerial Order IET/1045/2014, collectively the "**Further Measures**") comprising a new regulatory regime ("**New Regime**"). The Tribunal found that the Further Measures violated the ECT.[65] In line with this, the Tribunal chose 20 June 2014, the date on which the Government published Ministerial Order IET/1045/2014, as the appropriate valuation date for the Claimants' losses.[66]

164.   As the Tribunal found that Spain's first set of measures were lawful, the Tribunal declined to award to the Claimants any "*historical losses*" arising prior to June 2014.[67] Instead, the Tribunal only granted damages for the Claimants' loss of cash flows after June 2014, which were assessed based on the Brattle Model submitted by the Claimants' experts.[68] The Tribunal's initial award of €148 million in damages, however, was erroneous as it included "*both historical and future cash flows*".[69] To rectify this, the Tribunal subsequently ordered for the Claimants' damages to be reduced by €11 million.[70]

165.   Further, in considering the damages payable to the Claimants, the Tribunal also had to consider the useful life of the Claimants' plants. In this regard, the Tribunal rejected the Claimants' case that the plants had a useful life of 40 years, finding instead that the useful life of the plants is 25 years.[71] To account for this, the Tribunal deducted the sum of €36 million from the quantum set out in the Brattle Model, which corresponds "*to the difference between the estimate of 35 to 40-year service of the plants, which the Tribunal considered unsupported, and the 25-year lifetime that the Tribunal considered acceptable*".[72]

166.   Spain contends that the Tribunal's refusal to award damages for historical losses is not sufficient. According to Spain, the Earlier Measures affected not only the value of the Claimants' historical losses, but also that of the Claimants' future cash flows.[73] In other

---

[65] Award, ¶¶562-573.
[66] Award, ¶583.
[67] Award, ¶¶ 667-668.
[68] Award, ¶674, 691.
[69] Decision on Rectification, ¶32.
[70] Decision on Rectification, ¶32.
[71] Award, ¶714.
[72] Award, ¶725.
[73] Memorial on Annulment, ¶¶147-150; BDO Expert Report, ¶77.

words, if the New Regime was not implemented, Spain would have retained the Earlier Measures even past June 2014. This would have affected the but-for values of the Claimants' future cash flows and should have been taken into account by the Tribunal.

167. Having considered the Parties' arguments, the Committee finds that the Tribunal has not obviously or manifestly exceeded its powers.

168. As a starting point, the Committee is mindful that the annulment procedure under the ICSID Convention is not an appeal against the Tribunal's legal and factual findings.[74] The Committee hence agrees with the Claimants that it cannot review *de novo* the facts, evidence and criteria used by the Tribunal in its award of damages, nor can the Committee make or substitute its own findings of fact in lieu of the Tribunal's. On this point, the decision of the *Impregilo* annulment committee is instructive:[75]

> *"... [The annulment committee] **cannot review de novo the facts, evidence and criteria used by the Tribunal in assessing the damages nor the amount of compensation awarded to Impregilo**. It is clear that Argentina disagrees with the causal connection found by the Tribunal between the damages and the disputed measures; that it considers that there was a gap in the analysis of causation and that the evidence produced should have resulted in a different compensation; and that it disagrees with the interpretation by the Tribunal of the applicable law in the assessment of the damages. However, **a disagreement with the analysis of the Tribunal as to causation, or with respect to the assessment of the evidence or the interpretation of the law does not constitute ground for annulment under Article 52**."* (emphasis added)

169. In line with the above, the Committee finds that it can only annul the Tribunal's award on damages if the Tribunal had made an obvious or manifest error that is discernible from the face of its Award. The Committee should not make its own findings of fact or law apart from what is clearly established in the Award. Nor should this Committee re-evaluate the quantum of damages that should have been awarded by the Tribunal on the basis of evidence or arguments not before the Tribunal.

170. Turning the Parties' arguments, the Committee does not see how the Tribunal was manifestly wrong in calculating the Claimants' lost future cash flows. In the Committee's view, Spain's argument that the Tribunal should have taken the Earlier

---

[74] See ¶37 above.
[75] RL-0143, *Impregilo*, ¶160.

Measures into account hinges on a factual premise never adopted by the Tribunal – that the Earlier Measures would have continued past June 2014 had the Further Measures not been put in place. While the Committee acknowledges Spain's point that the Tribunal's Award "*does not conclude that the Earlier Measures are temporary*",[76] the Tribunal likewise never found that the Earlier Measures *would* have continued if the Further Measures were not adopted. Indeed, this issue does not appear to have been placed or argued before the Tribunal. In the absence of any finding by the Tribunal on this issue, the Committee does not consider it appropriate to fill in the gaps with its own factual findings. As explained above, such fact-finding is not the function of an annulment committee.

171. Moreover, the Committee notes that the Tribunal was not specifically asked to adjust its future cash flow calculations to account for the Earlier Measures, nor were there submissions on what the appropriate adjustments should have been. Spain submits that the Tribunal could easily have made the appropriate adjustments by switching various options in the spreadsheet provided with the Brattle Model.[77] The Claimants, on the other hand, submit that "[t]*here were no functional 'switches' for the Earlier Measures in the Brattle Model submitted to the Tribunal and the Brattle Model was built on the assumption that the Earlier Measures did not extend beyond June 2014*".[78] Having reviewed the Brattle Model,[79] the Committee finds that it is not obvious or self-evident that the Brattle Model could be adjusted in the manner suggested by Spain, or that these adjustments were necessary and appropriate.

172. In sum, it appears to the Committee that the issues of (i) whether the Brattle Model should be adjusted to account for the Earlier Measures, and (ii) if so, the nature of the adjustments to be made; were not raised before the Tribunal. The Tribunal therefore did not have a chance to rule on these issues, nor is it obvious what the correct ruling would be. In the circumstances, the Committee does not find that there has been any manifest excess of power by the Tribunal on these issues.

173. Next, the Committee also does not find that the Tribunal's assessment of future losses based on a 25-year useful life was a manifest excess of power. As a starting point, the

---

[76] Reply on Annulment, ¶132.
[77] Memorial on Annulment, ¶¶149-151.
[78] Counter-Memorial on Annulment, ¶219.
[79] R-0253, "Brattle Model", Rebuttal Financial Model (Excel format).

Committee agrees with the Claimants that the Tribunal is entitled to make its own estimates as to the damages suffered by the Claimants – there is no requirement that the Tribunal adhere strictly to the expert estimates provided by the Parties.[80] As noted by the committee in *Rumeli v. Kazakhstan*:[81]

> *"… the tribunal must be satisfied that the claimant has suffered some damage under the relevant head as a result of the respondent's breach. But once it is satisfied of this, the determination of the precise amount of this damage is a matter for the tribunal's informed estimation in the light of all the evidence available to it."*

174. As explained at paragraph 43 above, the Tribunal deducted €36 million from the damages payable to the Claimants to account for its finding that the Claimants' useful plant life was 25 years. In its Decision on Rectification, the Tribunal explained it had "*in the exercise of its discretion and based on its own calculation of the 25 difference between the plant with a 35 to 40-year lifetime and a 25-year lifetime arrived at what the Tribunal considers to be a fair measure of the Claimants' damages*".[82] The Tribunal further rejected Spain's submission that the figure was the result of a typographical or copy-paste error.[83]

175. Spain argues that the Tribunal wrongly determined its figure of €36 million by subtracting the Brattle Group's damages estimate for a useful life of 25 years (€84 million) from its estimate for a useful life of 35 years (€120 million).[84] This is erroneous because the Brattle valuation relied on by the Tribunal assumed a useful life of 40 years, not 35.[85] The correct figure, according to Spain, should have been €53 million based on the Brattle Group's estimates.[86] According to Spain, the Tribunal's error is a "*glaring excess of powers*".[87]

176. The Committee disagrees. Spain's case, even taken at its highest, only shows that the Tribunal made a mistake in calculating the appropriate quantum of damages. Such a

---

[80] Counter-Memorial on Annulment, ¶¶ 229-231, 396.
[81] CL-0047, *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Decision of the ad hoc Committee, 25 March 2010, ¶147.
[82] Decision on Rectification, ¶36.
[83] Decision on Rectification, ¶37.
[84] Memorial on Annulment, ¶132; see R-0239, Second Brattle Quantum Report (December 2015), Appendix A, Table 14.
[85] Memorial on Annulment, ¶133.
[86] Reply on Annulment, ¶148.
[87] Memorial on Annulment, ¶133.

mistake, even if it exists, does not amount to a manifest excess of power by the Tribunal: as stated in *TECO*, it is "*not within* [an annulment committee's] *powers to correct a tribunal's interpretation of the law or assessment of the facts*". [88] Errors of law or fact *simplicitur* do not constitute an excess of a tribunal's powers and are not grounds for annulment.

## IV.      GROUND 2: SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### A.      Spain's Position

177.   Spain submits that it was deprived of its right to submit two crucial pieces of evidence in the Arbitration below, namely (i) the European Commission's Decision C(2017) 7384 dated 10 November 2017 ("**EC Decision 7384**") and (ii) the CJEU's decision in *Achmea*. [89] These were allegedly "*vitally important documents*" that would have informed the Tribunal on the proper approach that should have been taken with regard to EU law, and the Tribunal's refusal to allow these documents to be added to the record is a serious departure from a fundamental rule of natural justice. [90]

### (i)      Applicable standard for a serious departure from a fundamental rule of procedure

178.   Spain relies on the fundamental rule that a party to an arbitration must be given a full and equal opportunity to present its case. [91] This includes a right for parties to have "*the opportunity to present all the arguments and all the evidence that they deem relevant*" and to "*address… every legal issue raised by the case*". [92] Such a right is violated where tribunals "[refuse] *to allow the submission of an argument or evidence*". [93] Further, even though tribunals have the discretion to allow or reject the submission of arguments or

---

[88] RL-0146, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016 ("*TECO*"), ¶78.
[89] R-0258, Spain's Opening Statement in the Hearing, slide 35; RL-0082, *Achmea*; RL-0083, Decision C(2017) 7384 of the European Commission, rendered on 10 November 2017, regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2015/NN)) ("*EC Decision 7384*").
[90] Memorial on Annulment, ¶¶191-193.
[91] Memorial on Annulment, ¶ 163.
[92] Memorial on Annulment, ¶163, citing RL-0124, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015 ("*Tulip*"), ¶ 57.
[93] Memorial on Annulment, ¶166, citing RL-0124, *Tulip*, ¶82.

evidence, a serious departure from a fundamental rule of procedure "*cannot be justified in light of a tribunal's discretion*".[94]

179. Spain also submits that a 'serious' departure from a fundamental rule of procedure does not require proof that "*the result would have been different… if the rule had been respected*".[95] This is because requiring an applicant to "*show that it would have won the case or that the result of the case would have been different if the rule of procedure had been respected is a highly speculative exercise*".[96]

> (ii) <u>Whether the Tribunal seriously departed from a fundamental rule of procedure by rejecting Spain's request to submit new documents</u>

180. Spain contends that the Tribunal's refusal to admit EC Decision 7384 and the *Achmea* decision were serious departures from the fundamental rule of procedure allowing parties' full and equal opportunity to present their cases.

181. Spain submits that the above documents were "*essential*" to its case.[97] The significance of the *Achmea* decision to Spain's case is discussed above. In summary, Spain contends that the *Achmea* decision supports its position that EU law does not permit the arbitration of intra-EU investor-State disputes under the ECT, and that the Tribunal therefore has no jurisdiction over the Parties' disputes.

182. EC Decision 7384, in Spain's words, analyses Spain's Disputed Measures "*from the perspective of State aid*".[98] In the Decision, the EC decided that the Disputed Measures constituted State Aid under EU law,[99] and that the State Aid was "*proportionate*" and "*does not exceed what is required to recover the initial investment costs and the relevant operational costs, plus a margin of reasonable return*".[100] The EC further stated that "*there is no right to State Aid*" and that "[a] *Member State may always decide not to grant an aid or put an end to an aid scheme*".[101] This would have affected the

---

[94] Reply on Annulment, ¶195, citing RL-0146, *TECO*, ¶196.
[95] Reply on Annulment, ¶191, citing *Victor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012 ("*Pey Casado*") ¶ 78.
[96] Reply on Annulment, ¶193, citing RL-0146, *TECO*, ¶ 85.
[97] Memorial on Annulment, ¶191.
[98] Memorial on Annulment, ¶182; RL-0083, EC Decision 7384.
[99] Memorial on Annulment, ¶183, citing RL-0083, EC Decision 7384, ¶156.
[100] Memorial on Annulment. ¶185, citing RL-0083, EC Decision 7384, ¶¶120, 131.
[101] Memorial on Annulment, ¶187, citing RL-0083, EC Decision 7384, ¶155.

Tribunal's analysis on whether the Disputed Measures were contrary to the Claimants' legitimate expectations.[102]

183.   EC Decision 7384 also touches on the Tribunal's jurisdiction to hear the Parties' dispute and to award damages to the Claimants. The EC states in the Decision that "*any provision that provides for investor-State arbitration between two Member States is contrary to Union law*", thus supporting Spain's intra-EU objection.[103] The Decision further suggests that the Tribunal has no competence to award damages to the Claimants, stating that "*any compensation which an Arbitral Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme by the notified scheme would constitute in and of itself State aid. However, the Arbitral Tribunals are not competent to authorize the granting of State Aid. That is an exclusive competence of the Commission.*"[104]

184.   Spain argues that the Tribunal did not have valid reasons to refuse the admission of the above documents to the record. In respect of EC Decision 7384, the Tribunal stated that it had "*a very advanced draft of the Tribunal's Award*" and did not consider it "*necessary to incorporate into the record the* [Decision]" or "*convenient to start a new round of submissions with the Parties' positions on that decision*".[105] Spain submits that the Tribunal's reasons were inadequate as "*the specific state of that deliberation process cannot justify the infringement of an essential procedural right*".[106] Moreover, Spain notes that despite the Tribunal's statements, there were three months between the Tribunal's refusal to admit EC Decision 7384 and the closing of the proceedings, and seven months between the refusal and the rendering of the Award.[107]

185.   As for the *Achmea* decision, the Tribunal found that Spain "*did not articulate any convincing reason why the ECJ Judgment shall be considered "new evidence" under the terms of Arbitration Rule 38(2)*" and that "*reopening the proceeding requires more than a general affirmation that the alleged 'evidence' affects jurisdiction and some other issues related to the merits*".[108] Spain submits that the Tribunal's reliance on "*a*

---

[102] Memorial on Annulment, ¶187.
[103] Memorial on Annulment, ¶188, citing RL-0083, EC Decision 7384, ¶¶160-161.
[104] Memorial on Annulment, ¶189, citing RL-0083, EC Decision 7384, ¶165.
[105] Reply on Annulment, ¶207, citing C-0315, Letter from ICSID to the Parties dated 29 November 2017.
[106] Reply on Annulment, ¶209.
[107] Reply on Annulment, ¶210.
[108] C-0332, Procedural Order No. 10 of the Arbitration dated 16 April 2018, ¶23. See also ¶¶15-16, 20.

*formality such as the distinction between 'evidence' and 'authority' cannot justify such a serious limitation of a party's right of defence as that discussed here*".[109]

186.    For the above reasons, Spain submits that the Tribunal's refusal to admit the above two documents to the record constituted a departure from a fundamental rule of procedure. It further argues that such a departure is a serious one, as it involved "*an essential element of Spain's defence*"; had these documents been analysed, the "*result of the underlying arbitration may very well have been different*".[110]

(iii)    Whether the Tribunal seriously departed from a fundamental rule of procedure by refusing to grant the EC unconditional leave to intervene as *amicus curiae*

187.    Spain's Memorial on Annulment argues that the Tribunal's refusal to grant the EC unconditional leave to intervene as *amicus curiae* was a procedural breach that "*deprived the Parties… and the Tribunal itself of receiving the essential contribution of such a key institution for an intra-EU dispute as is the European Commission*".[111] Spain, however, appears to have dropped this argument in its Reply on Annulment, stating that it "*shall not submit to the Committee for consideration the response given by the Antin Award Tribunal to the European Commission's request for amicus curiae brief in the underlying arbitration*".[112]

**B.    The Claimants' Position**

(i)    Applicable standard for a serious departure from a fundamental rule of procedure

188.    The Claimants state that "*it is a high bar to establish that a tribunal has unequivocally and objectively violated a party's right to be heard*".[113] The Claimants submit that, as annulment proceedings are not appeals, "*it is not for the Committee to revisit the Tribunal's assessment of the parties' arguments on procedural issues to determine if they agree with that assessment*".[114] As observed by the annulment committee in *Venezuela Holdings*, an annulment committee should not assess whether "*either side was right or wrong in* [their procedural arguments]" but should only consider "*the*

---

[109] Reply on Annulment, ¶216.
[110] Memorial on Annulment, ¶¶191-192.
[111] Memorial on Annulment, ¶199.
[112] Reply on Annulment, fn 181.
[113] Counter-Memorial on Annulment, ¶256.
[114] Counter-Memorial on Annulment, ¶257.

*possible effect of the Tribunal's refusal to order disclosure*".[115] Annulment should only be ordered where "*a tribunal reached its ultimate award on a ground that one or both parties had had no opportunity to address at all in its argument*".[116]

189. The Claimants also argue that an annullable error would be highly unlikely to occur in areas where the tribunal has considerable discretion, such as that of whether to admit evidence to the record.[117] Thus, while "[a] *clear violation of a rule of evidence, such as the reversal of the burden of proof, may amount to a serious violation of a fundamental rule of procedure... the evaluation of evidence is within the discretion of the tribunal*".[118]

190. Further, the Claimants submit that according to some committees a departure from a rule of procedure is 'serious' only where a party suffers material prejudice as a consequence of the departure.[119] A departure would be material and require an annulment if it "*affects the legal right of the parties with respect to an outcome-determinative issue*" and the Committee finds that "*if the rule had been observed the tribunal could have reached a different conclusion*".[120]

(ii) <u>Whether the Tribunal seriously departed from a fundamental rule of procedure by rejecting Spain's request to submit new documents</u>

191. The Claimants contend that the Tribunal has "*duly considered the Parties' positions as to whether or not the* Achmea *judgment and the Commission's 2017 Decision should be submitted to the record*" and argues that the Committee should not "*second-guess the Tribunal's conclusion or replace it with a different one*".[121] According to the Claimants, the Tribunal "*afforded Spain every opportunity to make its case, but Spain's arguments were either delayed, unconvincing or hardly made at all*".[122]

---

[115] Counter-Memorial on Annulment, ¶257, citing RL-0142, *Venezuela Holdings B.V., et al (case formerly known as Mobil Corporation, Venezuela Holdings, B.V., et al.) v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment, 9 March 2017 ("*Venezuela Holdings*"), ¶132.
[116] RL-0142, *Venezuela Holdings*, ¶133.
[117] Counter-Memorial on Annulment, ¶260.
[118] Counter-Memorial on Annulment, ¶260, citing RL-0124, *Tulip*, ¶ 84.
[119] Counter-Memorial on Annulment, ¶¶263-264.
[120] Counter-Memorial on Annulment, ¶265, citing RL-0090, *Víctor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012 ("*Pey Casado I*"), ¶ 80.
[121] Counter-Memorial on Annulment, ¶297.
[122] Counter-Memorial on Annulment, ¶298.

192. The Claimants point out that, pursuant to section 16.3 of Procedural Order No. 1 in the Arbitration, neither Party was permitted to submit additional documents to the record after filing their respective last written submissions, unless "*under exceptional circumstances at the discretion of the Tribunal upon a reasoned written request followed by observations from the other party*".[123] The Tribunal had given detailed reasons for its decision to reject Spain's requests to submit EC Decision 7384 and the *Achmea* decision, and the Committee should not second-guess the Tribunal's reasons.[124]

193. The Claimants also dispute that the Tribunal's decision impacted Spain's right to be heard. They note that "*the issues to which the Commission's 2017 Decision and the Achmea judgment were allegedly principally relevant—the jurisdiction of the Tribunal—had been addressed in detail by both Parties during the Arbitration*".[125]

194. Finally, the Claimants argue that "[e]*ven if the Achmea judgment and the Commission's 2017 Decision had been submitted to the record in the Arbitration, however, this would have had no impact on the outcome of the case*".[126]

## C.    The Committee's Analysis

195. The Committee considers that the Tribunal did not seriously depart from a fundamental rule of procedure. In the Committee's view, it is the Tribunal's prerogative to determine the relevance of Spain's documents to the issues before it, and to decide whether to admit such documents to the record. Moreover, the Tribunal's rejection of Spain's request did not deprive Spain of the opportunity to make submissions on the salient issues in the Arbitration.

(i)    Applicable standard for a serious departure from a fundamental rule of procedure

196. Article 52(1)(d) of the ICSID Convention permits annulment where "*there has been a serious departure from a fundamental rule of procedure*".[127] There is no dispute that

---

[123] Rejoinder on Annulment, ¶151.
[124] Rejoinder on Annulment, ¶¶151-166.
[125] Counter-Memorial on Annulment, ¶300.
[126] Counter-Memorial on Annulment, ¶301.
[127] Both the English and French texts of the ICSID Convention refer in Article 52(1)(d) to a serious departure from a fundamental rule of procedure ("*serious departure from a fundamental rule of procedure*"; "*inobservation grave d'une règle fondamentale de procedure*"). However, the Spanish text refers to a serious departure from a

there are three conditions that must be satisfied for annulment to be viable: (i) the procedural rule alleged to be violated must be 'fundamental'; (ii) there must be a departure from that rule; and (iii) the departure must be 'serious'.

197. As regards the first condition, there is no dispute that the parties' right to be heard is a fundamental rule of procedure applicable to the Arbitration.[128] Where parties disagree is on whether the Tribunal has departed from said rule, and if so, whether the alleged departure was serious.

198. As regards the second condition, the Committee accepts that "*the refusal to order the production of documents may, under certain circumstances, constitute a breach of a party's opportunity or the right to be heard*".[129] While international tribunals have the discretion to decide whether to allow the submission of documents or evidence to the record, this discretion remains "*subject to the parties' right to due process*".[130]

199. A party's right to be heard, however, does not entitle it to submit to the record any document it wishes. Tribunals may refuse to admit documents to the record in a multitude of circumstances, such as where the documents are deemed to be irrelevant or where admission may unnecessarily prolong proceedings. This discretion would be nugatory if tribunals had to allow every request by a party to submit further evidence. Moreover, given that annulment proceedings are not an appeal, annulment committees should accordingly refrain from assessing whether a tribunal's procedural order was "*right or wrong... as a matter of law or as a matter of discretionary assessment*".[131] Only in cases where a party has been deprived of an opportunity to present its case should annulment be ordered.[132]

200. As for the third condition, the Committee notes that there is some variance in the jurisprudence on what constitutes a "serious" departure from a fundamental rule of

---

rule of procedure ("*quebrantamiento grave de una norma de procedimiento*"). The Committee agrees with the analysis of the Committee in the annulment proceeding of *EDF v. Argentina* in paragraph 199 of the Decision on Annulment and will refer in its decision to a *quebrantamiento grave de una norma fundamental de procedimiento* ("serious departure from a fundamental rule of procedure").

[128] Counter-Memorial on Annulment, ¶256.
[129] RL-0149, Gabrielle Kaufmann-Kohler, "Globalization of Arbitral Procedure", 36 Vanderbilt Journal Of Transnational Law 1313 (October 2003), pp. 1327-1328.
[130] RL-0151, Klaus Peter Berger, *Private Dispute Resolution In International Business: Negotiation, Mediation, Arbitration* (3rd ed., Kluwer Law International 2015), pp. 585-586.
[131] RL-0142, *Venezuela Holdings*, ¶132.
[132] RL-0142, *Venezuela Holdings*, ¶133.

procedure. Certain committees have held that "*in order to be grounds for annulment, the departure has to have a material impact on the outcome of the award*".[133] The applicant must therefore prove that the departure in question would have affected the outcome of the award.

201. Other *ad hoc* committees have adopted a more flexible position. In *Pey Casado v. Chile*, the committee held that "[t]*he applicant is not required to show that the result would have been different, that it would have won the case, if the rule had been respected*".[134] This is to avoid having the annulment committee "*enter into the realm of speculation which it should not do*".[135] For annulment to be ordered, it suffices for the committee to be satisfied that "*the Award <u>might</u> have been substantially different*" (emphasis added).[136]

202. The Committee considers the approach in *Pey Casado* reasonable. In the Committee's view, it would be unrealistic to require a party to prove that the outcome of an award would have been different had a departure from a fundamental rule of procedure not occurred. As held by the annulment committee in *Tulip*, "[w]*here a complex decision depends on a number of factors, it is almost impossible to prove with certainty whether the change of one parameter would have altered the outcome*".[137] Moreover, such a determination would require the Committee to go into the merits of the Parties' arguments and the Tribunal's decision, which is inappropriate given the limited nature of annulment proceedings under the ICSID Convention.

    (ii)    <u>Whether the Tribunal seriously departed from a fundamental rule of procedure by rejecting Spain's request to submit new documents</u>

203. Applying the above principles, the Committee does not find that the Tribunal's refusal to admit Spain's further evidence constitutes a serious departure from a fundamental rule of procedure.

---

[133] CL-0214, *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 22 September 2014, ¶269.
[134] RL-0090, *Pey Casado I*, ¶78.
[135] RL-0090, *Pey Casado I*, ¶80.
[136] RL-0090, *Pey Casado I*, ¶269.
[137] *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015, ¶ 78.

204.    First, the Committee is not persuaded that the Tribunal's decision deprived Spain of the opportunity to present its case. As the Claimants correctly point out, the principal issue to which EC Decision 7384 and the *Achmea* judgment are relevant – the intra-EU objection – was extensively briefed by the Parties during the Arbitration.[138] There is no dispute that Spain had in the Arbitration made both written and oral submissions on this issue. Thus, even if Spain could not introduce two supporting pieces of evidence to the record, this did not deprive it of the opportunity to present its case.

205.    Secondly, the Committee considers it to be within the Tribunal's discretion whether to accept Spain's further submissions. In Procedural Order No. 1, the Parties agreed that they would <u>not</u> have the right to submit further documents after their written submissions had been filed. Such further documents would only be admissible in "*exceptional circumstances at the discretion of the Tribunal*".[139] Having accepted the Tribunal's discretion to disallow the submission of further documents, Spain should not be readily allowed to challenge the Tribunal's exercise of said discretion against their favour. The Committee, as stated at paragraph 157 above, will not review the merits of the Tribunal's reasoning in deciding to reject Spain's requests.

206.    Thirdly, and in any event, the Committee is not convinced that the departure alleged by Spain is a "serious" one that may have changed the outcome of the Award. EC Decision 7384 and the *Achmea* judgment concern interpretations of EU law by EU institutions. The Tribunal, however, expressly rejected the notion that "*the treaties creating the EEC and the EU and allocating competences among European institutions and their Member States, the EU's internal legislation, as subsequently interpreted by the CJEU, could be interpreted in a manner such that a development in the EU's acquis could be employed to undermine the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself*".[140] In the Tribunal's view, "[t]*he alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT*".[141] Given the Tribunal's views, the Committee does not see how the statements of EU law in EC

---

[138] Counter-Memorial on Annulment, ¶274.
[139] C-0330, Procedural Order No. 1 of the Arbitration dated 6 October 2014, ¶16.3.
[140] Award, ¶224.
[141] Award, ¶224.

Decision 7384 and the *Achmea* judgment would have changed the Tribunal's overall analysis.

## V. GROUND 3: FAILURE TO STATE REASONS IN THE AWARD

### A. Spain's Position

207. Spain argues that the Award should be annulled under Article 52(1)(e) of the ICSID Convention as the Tribunal failed to state its reasons for (i) the non-application of EU law to the Parties' dispute; (ii) its conclusions on liability regarding Spain's alleged breaches of the ECT; and (iii) the quantification of the damages awarded by the Tribunal.[142]

> (i)    Applicable standard for failure to state reasons

208. Spain argues that an award may be annulled for a failure to state reasons where it does not allow the reader to "*follow how the tribunal proceeded from Point A. to Point B.*".[143] Even where a tribunal has provided reasons for its decision, annulment may still be appropriate where the reasons given are "*insufficient or inadequate*" in that they "*cannot, in themselves, be a reasonable basis for the solution arrived at*".[144] Likewise, annulment may be justified where the reasons given by the tribunal are contradictory to its other findings.[145]

> (ii)    Whether the Tribunal failed to state reasons for not applying EU law

209. Spain argues that the Tribunal failed to address Spain's submissions that EU law governed the merits of the Claimants' claim as well as the scope of the Tribunal's jurisdiction over the Parties' dispute.[146] Spain, in particular, takes issue with the Tribunal's holding that "*the different concepts of substantive protections under EU law, which would apply to the merits of a dispute brought under EU law, should not be confused with the jurisdiction of the Tribunal*".[147] The Tribunal, Spain submits, did not provide "*a single reason, a single legal authority, which allows the Parties to know on*

---

[142] Memorial on Annulment, ¶201.
[143] Memorial on Annulment, ¶203, citing RL-0086, *Maritime International Nominees Establishment (MINE) v. Government of Guinea (Guinea)*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment, 14 December 1989 ("*MINE*"), ¶ 5.09.
[144] Memorial on Annulment, ¶206, citing RL-0062, *Soufraki*, ¶¶ 122-123.
[145] Memorial on Annulment, ¶¶207-209.
[146] Memorial on Annulment, ¶213.
[147] Award, ¶228.

*what grounds it distinguishes between the law applicable to the merits of the dispute and the law applicable to the determination of its jurisdiction*".[148]

(iii)   Whether the Tribunal failed to state reasons for its findings of liability

210.   Spain contends that the Tribunal failed to provide reasons for a number of findings regarding Spain's liability for the breach of the ECT.

211.   First, Spain argues that the Committee gave no reasons for its finding that Article 10(1) of the ECT requires Spain "*not to alter the essential characteristics of* [Spain's] *legal framework*".[149] This is particularly so given that the Tribunal also found that the ECT "*does not cancel or 'extremely limit' the State's regulatory power*".[150]

212.   Secondly, Spain argues that the Tribunal failed to explain why the Further Measures were a breach of the ECT.[151] In its Award, the Tribunal found that it was "*undisputed that through RDL 9/2013 and Law 24/2013, Spain (a) replaced the FIT system by a remuneration system that allowed certain RE installations to obtain a special payment by reference to a standard installation and (b) withdrew the right of priority of grid access and priority of dispatch for RE installations*". The Tribunal consequently held these measures to be in breach of Article 10(1) of the ECT since they "*dismantled all the regime and therefore all the features of the regime provided for under RD 661/2007*".[152] According to Spain, however, it was not undisputed that the FIT system was replaced or that the rights of priority of grid access and priority of dispatch were withdrawn.[153] The Tribunal's findings of breach were therefore based upon an "*absolutely unsupported conclusion*".[154]

213.   Further, Spain argues that the Tribunal failed to (i) provide "*analysis of each disputed measure and their relationship to the FET standard… [or] with regards to their specific*

---

[148] Memorial on Annulment, ¶217.
[149] Reply on Annulment, ¶262.
[150] Reply on Annulment, ¶260, citing Award, ¶530.
[151] Memorial on Annulment ¶235.
[152] Award, ¶560.
[153] Memorial on Annulment, ¶237.
[154] Memorial on Annulment, ¶239.

*impact on the regime of RD 661/2007*",[155] and to (ii) explain the concept of 'reasonable return' referred to in its Award.[156]

### (iv)     Whether the Tribunal failed to state reasons for its assessment of damages

214. First, Spain complains that the Tribunal did not explain why it adopted the standard of "*fair market value*" in measuring the Claimants' losses.[157] Spain notes that the Tribunal found that the fair market value standard is found in the context of expropriation, but failed to explain why it would also apply to a breach of the ECT's FET obligations.[158]

215. Secondly, Spain argues that the Tribunal failed to explain how it assessed the quantum of the Claimants' loss. Spain says that it is "*materially impossible to follow the reasoning of the Antin Award when it comes to determining why it eliminates historic losses but does not correct the But-For scenario to reflect its conclusions on measures declared not to be in breach of the ECT*".[159] It also argues that the Tribunal never explained how it estimated the difference in damages to be awarded based on its finding that the Claimants' plants had a 25-year (and not 40-year) useful life.[160]

## B.     The Claimants' Position

216. The Claimants argue that Spain is simply taking issue with the correctness of the Tribunal's reasons, and that such grievances are not grounds for annulment. In any event, the Claimants submit that the Tribunal's reasons are well-founded and not contradictory.

### (i)     Applicable standard for failure to state reasons

217. The Claimants stress that an award can only be annulled for a failure to give reasons where it fails to allow "*a good faith reader of the award* [to] *understand the motives that led the Tribunal to adopt its decisions*".[161] All the Committee has to ascertain therefore is that the Tribunal's reasons to support its conclusion can be followed by a

---

[155] Memorial on Annulment, ¶248.
[156] Memorial on Annulment, ¶251; Award, ¶562.
[157] Memorial on Annulment, ¶258.
[158] Memorial on Annulment, ¶¶258-259; Award, ¶675.
[159] Memorial on Annulment, ¶262.
[160] Memorial on Annulment, ¶265.
[161] Counter-Memorial on Annulment, ¶338.

reader. On the contrary, "[t]*he correctness, persuasiveness or adequacy of reasons (or lack thereof) cannot constitute grounds for annulment*".[162]

218.   The Claimants also submit that tribunals are not required to be comprehensive in the reasons provided for their award. Tribunals are "*entitled to be terse*"[163] and have "*no duty to follow the parties in the detail of their arguments*".[164] There is, for instance, "*no need for a Tribunal to provide reasons on issues which have become irrelevant to the outcome of the case*".[165] Nor are tribunals required to state all their reasons explicitly. Its reasons may, for example, be "*implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision*".[166]

219.   Further, the Claimants argue that contradictory reasons do not necessitate annulment. While a small number of committees have opined that contradictory reasons may trigger annulment, the contradictions must be "*such as to be incapable of standing together on any reasonable reading of the decision*."[167] Inconsistencies in an award may only justify annulment where they make it "*impossible to understand the motives that led such tribunal to adopt its solution*".[168]

(ii)   <u>Whether the Tribunal failed to state reasons for not applying EU law</u>

220.   The Claimants submit that the Tribunal "*provided detailed reasons for its conclusion that EU law could not undermine the Tribunal's jurisdiction, because that question could only be determined under the rules of the Treaty and applicable rules of international law*".[169] The Tribunal, applying the rules of treaty interpretation under

---

[162] Counter-Memorial on Annulment, ¶336.

[163] CL-0233, *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and ARB/12/40, Decision on Annulment, 18 March 2019 ("*Churchill Mining*"), ¶254.

[164] CL-0236, *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. The Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Argentina's Application for Annulment, 29 May 2019 ("*Teinver*"), ¶ 210.

[165] CL-0233, *Churchill Mining*, ¶243.

[166] CL-0059/RL-0089, *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4 (Annulment Proceeding), Decision on the Application by the Arab Republic of Egypt for Annulment, 5 February 2002, ¶ 81.

[167] Counter-Memorial on Annulment, ¶343, citing CL-0209, *Continental Casualty Company v. The Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application for Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic, 16 September 2011 ("*Continental Casualty*"), ¶103.

[168] CL-0236, *Teinver*, ¶209.

[169] Counter-Memorial on Annulment, ¶347.

international law, then concluded that Article 26 of the ECT authorised intra-EU arbitration.[170]

221. The Claimants further argue that the Tribunal was not inconsistent in finding that EU law could be relevant to the merits of the Parties' dispute, but not to the question of the Tribunal's jurisdiction under the ECT. The Tribunal assessed <u>both</u> Spain's liability as well as its jurisdiction under the terms of the ECT, but noted that the assessment of Spain's liability may include considerations, as a matter of fact, of aspects of Spanish and EU law.[171]

(iii) <u>Whether the Tribunal failed to state reasons for its findings on liability</u>

222. According to the Claimants, Spain is taking issue with the legal and factual reasoning adopted by the Tribunal, which are not grounds for annulment.[172] In any event, the Claimants argue that Spain's criticisms of the Award are meritless.[173]

223. First, the Claimants argue that the Tribunal had laid out reasons for finding that the fair and equitable treatment ("**FET**") standard under Article 10(1) of the ECT prevents Spain from making significant modifications to its renewable energy regulations. The Tribunal referred to the decisions of prior ECT tribunals that "*stable and equitable conditions are clearly part of the* [FET] *standard under the ECT*".[174] Based on this analysis, the Tribunal found that the ECT's FET standard required a "*balancing process*" which permits interference with "*domestic regulatory and administrative sovereignty*" as long as the interference was required "*in order to upgrade the quality of governance*" and not to become "*excessively interventionist*".[175]

224. Secondly, the Claimants submit that Spain does not challenge the existence of the Tribunal's reasons for why it found Spain liable, but rather challenges the merits of the Tribunal's conclusions.[176] Disagreements with the Tribunal's factual findings cannot give rise to grounds for annulment. Further, and in any event, the Claimants argue that the Tribunal had provided adequate reasons for its conclusions on liability. In short, the

---

[170] Award, ¶¶205-222.
[171] Counter-Memorial on Annulment, ¶352.
[172] Counter-Memorial on Annulment, ¶354.
[173] Counter-Memorial on Annulment, ¶354.
[174] Award, ¶529, citing *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 173.
[175] Award, ¶530, citing C-0329, Spain's Rejoinder in the Arbitration, ¶758.
[176] Counter-Memorial on Annulment, ¶363.

Tribunal found that Spain had made statements giving the Claimants legitimate expectations that the economic regime and incentives provided by Spain would "*remain stable and predictable*".[177] Spain's New Regime eliminated essential features of the original regime, hence constituting a breach of Article 10(1).[178]

225. Thirdly, the Claimants submit that the Tribunal need not have analysed each of the Disputed Measures independently.[179] The Tribunal determined that it was the New Regime (comprising the Further Measures) that eliminated the essential feature of the regulatory framework under which the Claimants had invested, thereby breaching Spain's obligation under ECT Article 10(1). This did not depend on any finding regarding the Earlier Measures. As stated in *Churchill Mining*, there is "*no need for a Tribunal to provide reasons on issues which have become irrelevant to the outcome of the case*".[180]

(iv)   Whether the Tribunal failed to state reasons for its assessment of damages

226. The Claimants submit that the Tribunal's assessment of damages is well-reasoned. First, the Tribunal had explained why and how it arrived at the standard of "*fair market value*" as the appropriate way to value the Claimants' losses.[181] This standard was determined based on international law, as encapsulated in the *Chorzow* case and Article 31 of the ILC Articles of State Responsibility.[182] It was also consistent with the decisions of other tribunals finding a breach of the FET standard.[183]

227. Secondly, the Claimants argue that the Tribunal did not adjust the But-For scenario for the Claimants' future cash flows to include the Earlier Measures because the Earlier Measures were stated to be temporary.[184] Even if the Tribunal was incorrect on this, that is not a ground for annulment.[185]

228. Thirdly, the Claimants point out that the Tribunal had discussed the Parties' expert reports and submissions on damages at length, commenting on their persuasiveness and

---

[177] Award, ¶554.
[178] Award, ¶560.
[179] Counter-Memorial on Annulment, ¶¶374-375.
[180] CL-0233, *Churchill Mining*, ¶243.
[181] Counter-Memorial on Annulment, ¶382.
[182] Award, ¶¶661-663.
[183] Counter-Memorial on Annulment, ¶382.
[184] Counter-Memorial on Annulment, ¶384.
[185] Counter-Memorial on Annulment, ¶385.

adopting them when it considered appropriate.[186] This sets the present case apart from the *TECO* decision cited by Spain, where there was a "*complete absence of any discussion*" by the tribunal "*of the Parties' expert reports*".[187]

## C.    The Committee's Analysis

229.    The Committee finds that the Tribunal has provided reasons for the findings in its Award and there is therefore no ground for annulment under Article 52(1)(e) of the ICSID Convention.

### (i)    Applicable standard for failure to state reasons

230.    The high standards for annulment under the ICSID Convention apply with equal force to Article 52(1)(e). For an award to be annulled, the Committee must be satisfied that the Tribunal's award is impossible to follow "*from Point A. to Point B.*" or that there is a "*significant lacuna in the Award which makes it impossible for the reader to follow the* [Tribunal's] *reasoning*".[188] This does not, and should not, require the Committee to delve into the adequacy or robustness of the Tribunal's reasoning. As explained by the *MINE v. Guinea* committee:[189]

> "...*The adequacy of the reasoning is not an appropriate standard of review under paragraph (1)(e), because it almost inevitably draws an ad hoc Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention. A Committee might be tempted to annul an award because that examination disclosed a manifestly incorrect application of the law, which, however, is not a ground for annulment.*"

231.    It is rare, of course, for tribunals to completely fail to give reasons for their award, and the Committee accepts Spain's argument that the remedy of annulment under Article 52(1)(e) is not restricted to such cases only. However, while frivolous or contradictory reasons may be a basis for annulment, this should only apply where the contradictions cause the award to be "*incapable of standing together **on any reasonable reading** of the decision*" (emphasis added).[190] As stated in *Continental Casualty*, where it is

---

[186] Counter-Memorial on Annulment, ¶392; Award, ¶¶ 677-734.
[187] Counter-Memorial, ¶391, citing RL-0146, *TECO*, ¶130.
[188] RL-0086, *MINE*, ¶5.09; RL-0084, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010, ¶167.
[189] RL-0086, *MINE*, ¶¶5.08-5.09.
[190] CL-0209, *Continental Casualty*, ¶103.

"*merely arguable whether there is a contradiction or inconsistency in the tribunal's reasoning, it is not for an annulment committee to resolve that argument*".[191] Further, the Committee is mindful that "*tribunals must often struggle to balance conflicting considerations… [and] an* ad hoc *committee should be careful not to discern contradiction when what is actually expressed in a tribunal's reasons could more truly be said to be but a reflection of such conflicting considerations*".[192]

232. Further, the Committee accepts the Claimants' submissions that a tribunal is not required to state every reason explicitly, nor is it required to address all the parties' arguments individually. Rather, the Committee takes the same view as that in *Teinver*: that an award "*must be considered in its entirety*" when assessing whether the tribunal has provided reasons for its decisions.[193]

233. The Committee further agrees with the *ad hoc* committees in *MINE v. Guinea* and in *Amco v. Indonesia* in that the ICSID Convention does not require an automatic exercise by an annulment committee of its authority to annul an award even if a ground has been established.[194] This measure of discretion retained by the committee is justified when annulment would "*unjustifiably erode the binding force and finality of ICSID awards*".[195]

234. In summary, the principle is that an award should only be annulled under Article 52(1)(e) where there are gaps in the tribunal's reasoning so large as to make it impossible to follow. An award may contain various errors, omissions, inconsistencies or contradictions but even then, annulment cannot be justified unless they meet the high threshold required. An annulment committee is not authorized to qualify a tribunal's reasoning as deficient, superficial or otherwise faulty and to substitute its own judgement for the tribunal's. This accords with the principle of finality set out in the ICSID Convention, and prevents parties from sieving through an award with a fine-

---

[191] CL-0209, *Continental Casualty*, ¶103.
[192] CL-0203, *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3 (formerly *Compañía de Aguas del Aconquija, S.A. and Compagnie Générale des Eaux v. Argentine Republic*), Decision on Annulment, 3 July 2020, ¶65.
[193] CL-0236, *Teinver*, ¶209.
[194] RL-0086, *MINE*, ¶4.09; CL-0202, *Amco Asia Corporation , et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Applications for Annulment of the 1990 Award and the 1990 Supplemental Award, 17 December 1992, ¶1.20.
[195] RL-0086, *MINE*, ¶4.10.

toothed comb for any errors or logical inconsistencies, however minor, in the hopes of annulling a tribunal's award.

(ii) Whether the Tribunal failed to state reasons for not applying EU law

235. Applying the above principles, the Committee finds that the Tribunal had provided comprehensible reasons for not applying EU law to its determination of jurisdiction.

236. In summary, the Tribunal held that Article 26(1) of the ECT, read in accordance with its ordinary meaning and considering the object and purpose of the ECT, confers the Tribunal with jurisdiction over the Parties' dispute.[196] On their plain and ordinary reading, the ECT provides the Tribunal with the jurisdiction to entertain claims against Spain (a Contracting Party) by investors of Luxembourg and the Netherlands (both Contracting Parties) related to investments made by the Claimants in Spain.[197]

237. The Tribunal also explained its view that the object and purpose of the ECT does not preclude intra-EU arbitration. The Tribunal held that:

a. Other ECT tribunals, including the tribunals in *Charanne v. Spain; Isolux v. Spain; and Eiser v. Spain*, had rejected a similar argument that the context of the ECT results in the exclusion of intra-EU investor-State disputes under the ECT.[198]

b. The ECT's purpose does not support Spain's interpretation. Nothing in Article 2 of the ECT, captioned "Purpose of the Treaty", "*suggests the exclusion of claims by investors who are nationals of an EU Member State who is also a party to the ECT against another EU Member State*".[199]

c. The fact that the EU is also a Contracting Party and a "Regional Economic International Organization" ("**REIO**") as defined in Articles 1(2) and 1(3) of the ECT does not bar the Tribunal's jurisdiction. The ordinary meaning of Articles 1(2), 1(3) and 1(10) recognise the existence of REIOs as possible

---

[196] Award, ¶¶207-225.
[197] Award, ¶212.
[198] Award, ¶214.
[199] Award, ¶216.

Contracting Parties and allows a claim to be brought by an investor in the REIO's defined area.[200]

    d.  The Tribunal's jurisdiction arises from the express terms of the ECT which is binding on the State parties and the EU. The EU treaties creating the EEC and the EU cannot be interpreted in a manner that undermines the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself.[201] The alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT.

238.    Further, the Committee does not agree with Spain that the Tribunal contradicted itself by finding that "*the different concepts of substantive protections under EU law, which would apply to the merits of a dispute brought under EU law, should not be confused with the jurisdiction of the Tribunal*".[202] Whether correct or not, there is on its face no contradiction in the Tribunal's finding that EU law, although relevant to the question of whether there has been a breach of the investor protection provisions of the ECT, is of no import in determining the jurisdiction of the Tribunal.

239.    For the foregoing reasons, the Committee finds that the Tribunal has stated clearly and comprehensibly its reasons for concluding that EU law would not apply to bar its jurisdiction. While Spain may dispute the soundness of the Tribunal's premises and findings, such criticisms do not give rise to a ground for annulment.

    (iii)   <u>Whether the Tribunal failed to state its reasons for its findings on liability</u>

240.    The Committee also finds that the Tribunal has stated its reasons for finding Spain liable for breaches of the ECT.

241.    First, the Tribunal has stated its basis for finding that the FET standard under Article 10(1) of the ECT comprises "*an obligation to afford fundamental stability in the essential characteristics of the legal regime relied upon by the investors in making long-term investments… [and] means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered —i.e., stripped of its key*"

---

[200] Award, ¶218.
[201] Award, ¶224.
[202] Award, ¶228.

51

*features— as applied to existing investments in ways that affect investors who invested in reliance on those regimes*".[203] The Tribunal found that this was the appropriate standard after considering (i) the ordinary meaning of the term 'stable' as found in Article 10(1) of the ECT; and (ii) the findings of other ECT tribunals on the proper FET standard under Article 10(1) of the ECT.[204] There is no difficulty in following the Tribunal's reasoning on this issue.

242.   Spain argues that the Award "*does not include a sufficiently clear reasoning for the Parties to know why, if the State maintains its regulatory power to adjust regulations to the economic situation for the purpose of general interest (point A), a State cannot, for these same reasons, make a significant modification to the regulation, changing essential characteristics thereof (point B)*".[205] The Committee disagrees that there is any contradiction that has not been explained. The Tribunal stated that while Article 10(1) of the ECT does not cancel the State's regulatory power, a State in exercising this power cannot "*suddenly and unexpectedly eliminate the essential features of the regulatory framework in place*" as such unexpected changes undermines the fundamental stability that investors rely on in making long-term investments.[206] Clear reasons have therefore been given for the Tribunal's position.

243.   Secondly, the Committee disagrees with Spain's submission that the Tribunal should have "*analysed each one of the disputed measures under the aforementioned standard of Fair and Equitable Treatment*".[207] To begin, it is well-recognised that tribunals are not required to deal with each and every argument raised by the parties. A tribunal is "*entitled to be terse*"[208] and has "*no duty to follow the parties in the detail of their arguments*".[209]

244.   In any event, the Tribunal has given clear and specific reasons for finding Spain's Further Measures to be in breach of the ECT. The Tribunal specifically found that RDL 9/2013 and Law 24/2013 removed key features of the Original Regime by replacing the FIT system and withdrawing the right of priority of grid access and priority of dispatch

---

[203] Award, ¶532.
[204] Award, ¶¶528-531.
[205] Memorial on Annulment, ¶226.
[206] Award, ¶¶531-532.
[207] Memorial on Annulment, ¶¶235, 247-248.
[208] CL-0233, *Churchill Mining*, ¶254.
[209] CL-0236, *Teinver*, ¶210.

for RE installations.[210] It also found that RDL 9/2013, Law 24/2013 and Ministerial Order IET/1045/2014 "*dismantled all the regime and therefore all the features of the regime provided for under RD 661/2007*".[211] These reasons clearly allow the reader to understand why the above referred measures breached the FET standard set out in Article 10(1) of the ECT.

245.    Spain also argues that the Tribunal committed a "*crucial falsehood*" by finding that it was "*undisputed*" that "*through RDL 9/2013 and Law 24/2013, Spain (a) replaced the FIT system by a remuneration system that allowed certain RE installations to obtain a special payment by reference to a standard installation and (b) withdrew the right of priority of grid access and priority of dispatch for RE installations*".[212] According to Spain, these propositions were contested by Spain in the Arbitration; the Tribunal's assumption that these issues were undisputed is a "*precarious basis to reach an absolutely unsupported conclusion*".[213]

246.    In the Committee's view, Spain's complaint, even if true, is not a basis for annulment. All it would mean is that the Tribunal misunderstood Spain's position and arguments, but such misunderstandings, even if material, are not grounds for annulment. Article 52(1)(e) does not allow the Committee "*to assess the correctness or persuasiveness of the reasoning in the award or to inquire into the quality of the reasons*".[214]

247.    Finally, Spain submits that the Tribunal "*adds a new and unsupported element*" to its reasoning by considering the notion of "*reasonable return*" in assessing whether there has been a breach of the ECT.[215] Spain complains that the Tribunal's conclusions on this concept "*emerges out of the blue*" and lacks any reasoning.[216]

248.    The Committee again disagrees with Spain's analysis. In its Award, the Tribunal states that the concept of reasonable return was raised by Spain, who had argued that the Claimants "*were only entitled to a reasonable return on their investment and could not reasonably have held other expectations*".[217] It is therefore not a novel issue that

---

[210] Award, ¶560.
[211] Award, ¶560.
[212] Memorial on Annulment, ¶¶236-237, citing Award, ¶560.
[213] Memorial on Annulment, ¶239.
[214] RL-0143, *Impregilo*, ¶181.
[215] Memorial on Annulment, ¶¶251-254.
[216] Memorial on Annulment, ¶252.
[217] Award, ¶561.

emerged "*out of the blue*", as Spain contends. The Tribunal then rejected Spain's argument on the basis that the methodology for determining the "*reasonable rate of return*" is "*not based on any identifiable criteria*".[218] Spain has not identified anything objectionable in the Tribunal's analysis that warrants annulment.

249.   In the premises, the Committee finds that the Tribunal has provided reasons for its findings on liability. Spain's unhappiness with the quality of these reasons is not a basis for annulling the Award.

(iv)   <u>Whether the Tribunal failed to state reasons for its assessment of damages</u>

250.   The Committee finds that the Tribunal had provided reasons for its award of damages.

251.   First, the Committee disagrees with Spain's submission that the Tribunal failed to provide reasons for its decision to base damages on the "*reduction of the fair market value of the Claimants' investment*".[219] In its Award, the Tribunal found that the appropriate standard for compensation should be based on international law.[220] International law in turn provides that reparation must "*as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed*".[221] The Tribunal then found that the appropriate method for calculating damages, in light of the above, would be to "*assess the reduction of the fair market value of the Claimants' investment by determining the present value of cash flows claimed to have been lost as a result of the Disputed Measures*".[222] The Tribunal's reasons are, in the Committee's view, clear and comprehensible. There is no basis for annulment.

252.   Secondly, Spain argues that the Tribunal did not explain "*why it eliminates historic losses but does not correct the But-For scenario to reflect its conclusions on measures declared not to be in breach of the ECT*".[223] The Committee finds such criticism unwarranted. To begin, Spain does not appear to have argued that the Claimants' But-For calculations should be adjusted to assume that the Earlier Measures would continue in perpetuity. The Tribunal therefore should not be faulted for not addressing such an

---

[218] Award, ¶¶562-568.
[219] Memorial on Annulment, ¶258, citing Award, ¶675.
[220] Award, ¶662.
[221] Award, ¶¶662-663; citing *Factory at Chorzow*, p. 47; ILC Articles on State Responsibility, Article 31.
[222] Award, ¶675.
[223] Memorial on Annulment, ¶262.

issue. Furthermore, there does not even appear to be evidence led in the Arbitration showing that the Earlier Measures would be continued. On the contrary, Spain's position was, as the Claimants point out, that the effects of the Earlier Measures had been "*absorbed*" or "*neutralised*" by the New Regime.[224] In the Committee's view, the Tribunal's lack of reasoning on an issue not argued before it cannot be a ground for annulment.

253. In any event, even if the Tribunal erred in failing to account for the continuation of the Earlier Measures in its calculation of the Claimants' lost cash flows, this is an error of fact that would not permit annulment.

254. Thirdly, Spain argues that the Tribunal, after finding that the Claimants' plants had a useful life of 25 and not 40 years, did not explain how it "*estimated the difference in value between the possible lifetime scenarios*".[225]

255. The Committee accepts that the Tribunal did not provide a detailed explanation for how it arrived at a figure of €36 million as the estimated difference in value between the possible lifetime scenarios considered. In its Decision on Rectification, the Tribunal explained that this was the Tribunal's own estimate "*based on the evidence in the record and the reports of the experts*".[226] There is no further explanation for how said evidence and reports support this figure.

256. Notwithstanding this lack of detail, the Committee does not consider the Tribunal's conclusion to be unsupported by reasons. Estimates of damages are, by their nature, approximations that a tribunal makes based on its view on the underlying facts and evidence. These are exercises of discretion and judgment that do not lend themselves well to detailed explanation or precise calculation. As stated in *Gemplus v. Mexico*, tribunals "*have a wide margin of appreciation to make reasonable approximations in such circumstances… [t]hese matters are not capable of precise quantification because they depend on the exercise of judgmental factors that are better expressed in approximations or ranges*".[227] It is therefore accepted that "*there is no obligation upon*

---

[224] Counter-Memorial on Annulment, ¶188; C-0329, Spain's Rejoinder in the Arbitration, ¶¶611, 624.
[225] Memorial on Annulment, ¶¶263-264; Award, ¶725; Decision on Rectification, ¶36.
[226] Decision on Rectification, ¶36.
[227] CL-0207, *Gemplus S.A., SLP S.A. and Gemplus Industrial S.A. de C.V. v. The United Mexican States,* ICSID Case No. ARB(AF)/04/3, Award, 16 June 2021, ¶¶12-58.

*a tribunal to provide a detailed point by point justification of every step that it has taken in the course of a valuation such as this*".[228] In view of this, the Committee finds that the Tribunal had not failed its duty to provide reasons for its assessment of damages.

257. In any event, it is clear from the Award that the Tribunal had considered and was attentive to the Parties' evidence and expert reports on damages and the value of the Claimants' lost cash flows.[229] There is no reason to question therefore the Tribunal's explanation that its estimate on damages was "*based on the evidence in the record and the reports of the experts*".[230] Further, the Tribunal's findings show that it took Spain's objections into consideration but found that "*such disagreement* [with the methodology of the Tribunal or its conclusions as regards the estimation of damages related to the lifetime of the plants] *does not give rise to rectification under the ICSID Convention*".[231] Even if Spain contends that the Tribunal should have adopted a different figure, in the Committee's views, such disagreements with the Tribunal's methodology are not grounds for annulment.

258. For the above reasons, the Committee finds that there is no basis to annul the Award under Article 52(1)(e) of the ICSID Convention.

## VI. COSTS

### A. Spain's Cost Submissions

259. Spain requests that the Committee order the Claimants to bear the costs of the annulment proceedings, as well as Spain's costs for legal representation, totalling to EUR 2,816,664.19, broken down as follows:

| Category | Amount in Euros |
|---|---|
| ICSID fees and advances | 569,419.01 |
| Legal fees | 2,158,200 |
| Expert Reports | 82,149 |
| Translations | 3,473.30 |
| Other expenses | 3,422.88 |
| Total amount | 2,816,664.19 |

---

[228] CL-0278, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Decision on the Respondent's Request for a Supplementary Decision, 29 November 2018, ¶ 65.
[229] See Award, ¶¶715-725.
[230] Decision on Rectification, ¶36.
[231] Decision on Rectification, ¶37.

B. **The Claimants' Cost Submissions**

260. The Claimants submit that Spain should bear all the costs and expenses of these proceedings, including the Claimants' legal fees and expenses totalling EUR 2,310,379.38, broken down as follows:

| Category | Amount in Euros |
|---|---|
| Legal fees | 2,222,010.96 |
| Other expenses | 88,368.42 |
| Total amount | 2,310,379.38 |

C. **The Committee's Decision on Costs**

261. Article 61(2) of the ICSID Convention provides:

> *"In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."*

262. This provision, together with Arbitration Rule 47(1)(j) (applied by virtue of Arbitration Rule 53) gives the Committee discretion to allocate all costs of the proceeding, including attorney's fees and other costs, between the Parties as it deems appropriate.

263. The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Committee Members' fees and expenses | |
| President | 116,843.09 |
| Member | 147,375.00 |
| Member | 153,541.77 |
| ICSID's administrative fees | 126,000.00 |
| Direct expenses | 61,678.02 |
| **Total** | **605,437.88** |

264.     The above costs have been paid out of the advances made by Spain pursuant to Administrative and Financial Regulation 14(3)(e).[232]

265.     In exercising the discretion described at paragraph 141 above, the Committee finds that the distribution of costs should be made considering the relative success of submissions made by each of the Parties, together with the circumstances of the case and the conduct of the Parties in the proceedings.

266.     In the present case, the Committee has decided to reject in full Spain's application to annul the Award. The practice of recent ICSID annulment committees has been to order costs to be paid by the annulment applicant when annulment is refused.[233] Spain, in its costs submissions, have also endorsed the principle that costs should be allocated to the losing party.[234] The Committee sees no reason to depart from this practice in the present case. Given that Spain did not succeed on any of the grounds of annulment raised, it would be appropriate for the Claimants to be compensated in full for the fees and expenses incurred in defending against Spain's annulment application.

267.     Accordingly, the Committee orders Spain to bear all the costs of the proceedings, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, and pay €2,310,379.38 to the Claimants in respect of the Claimants' legal fees and expenses.

## VII.     DECISIONS AND ORDERS

268.     For the reasons stated above, the Committee:

a.     Rejects Spain's application for annulment;

b.     Decides that Spain shall bear all the costs of the proceedings, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses (as reflected in ICSID's final financial statement) and pay €2,310,379.38 to the Claimants in respect of the Claimants' legal fees and expenses.

---

[232] The remaining balance will be reimbursed to the Applicant.
[233] *Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/22, Decision on the Annulment Application, 2 February 2018, ¶¶293-294.
[234] Spain's Costs Submissions dated 15 February 2021, ¶6.

_(signature)_

Prof. Dr. Nayla Comair-Obeid
Member of the *ad hoc* Committee

Date: 28 July 2021

Mr. José Antonio Moreno Rodríguez
Member of the *ad hoc* Committee

Date:

Mr. Cavinder Bull *SC*
President of the *ad hoc* Committee

Date:

Prof. Dr. Nayla Comair-Obeid
Member of the *ad hoc* Committee

Date:

Mr. José Antonio Moreno Rodríguez
Member of the *ad hoc* Committee

Date: July 28, 2021

Mr. Cavinder Bull *SC*
President of the *ad hoc* Committee

Date:

59

_____          _____
   Prof. Dr. Nayla Comair-Obeid         Mr. José Antonio Moreno Rodríguez
  Member of the *ad hoc* Committee       Member of the *ad hoc* Committee

Date:                           Date:

           Mr. Cavinder Bull *SC*
      President of the *ad hoc* Committee

Date:  28 JULY 2021

59