# EXHIBIT 50

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**SOLES BADAJOZ GMBH**

**V.**

**KINGDOM OF SPAIN**

**(ICSID CASE NO. ARB/15/38)**

**ANNULMENT PROCEEDING**

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on Annulment dated 16 March 2022 and the English version of the Individual Opinion of Committee Member N. Fernando Piérola-Castro.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., 16 March 2022

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**SOLES BADAJOZ GMBH**

Respondent on Annulment

and

**KINGDOM OF SPAIN**

Applicant

**ICSID Case No. ARB/15/38
Annulment Proceeding**

---

# DECISION ON ANNULMENT

---

**Members of the *ad hoc* Committee**
Mr. Cavinder Bull, SC, President
Mr. Colm Ó hOisín, SC, Member
Mr. Noé Fernando Piérola-Castro, Member

**Secretary of the *ad hoc* Committee**
Mr. Paul Jean Le Cannu

*Date of dispatch to the Parties:* 16 March 2022

## REPRESENTATION OF THE PARTIES

*Representing SolEs Badajoz GmbH*:

Mr. Charles Kaplan
Mr. Tunde Oyewole
Ms. Sarah Lajugie
Orrick Herrington & Sutcliffe (Europe) LLP
31, avenue Pierre 1er de Serbie
75782 Paris Cedex 16
France
  and
Mr. Thomas Hopp
Voigt & Collegen GmbH
Kaistr. 2
40221 Düsseldorf
Germany

*Representing the Kingdom of Spain*:

Ms. Socorro Garrido Moreno
Mr. Alberto Torró Molés
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria Gómez
Ms. Lorena Fatás Pérez
Ms. Elena Oñoro Sainz
Ms. Ana Fernández Daza Álvarez
Ms. Gabriela Cerdeiras Megias
Ms. Ana María Rodríguez Esquivias
Mr. Juan Quesada Navarro
Ms. Estíbaliz Hernández Marquinez
Mr. Javier Comeron Herrero
Ms. María Eugenia Cediel Bruno
Abogacía General del Estado
Ministry of Justice of the Government of
Spain
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

i

TABLE OF CONTENTS

REPRESENTATION OF THE PARTIES ............................................................... i

TABLE OF CONTENTS .................................................................................... ii

TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS ........................... vi

I.      INTRODUCTION AND PARTIES ...................................................... 1

II.     PROCEDURAL HISTORY .................................................................. 2

III.    APPLICABLE STANDARDS ............................................................. 11

        A.    General legal standard applicable to annulments ........................ 11

              (i)    Spain's Position .................................................... 11

              (ii)   The Claimant's Position ......................................... 12

              (iii)  The Committee's Analysis ..................................... 12

        B.    Article 52(1)(b): Whether a tribunal has manifestly exceeded its powers ................... 13

              (i)    Spain's Position .................................................... 13

              (ii)   The Claimant's Position ......................................... 13

              (iii)  The Committee's Analysis ..................................... 14

        C.    Article 52(1)(e): Whether an award has failed to state reasons .................................. 18

              (i)    Spain's Position .................................................... 18

              (iv)   The Claimant's Position ......................................... 19

              (v)    The Committee's Analysis ..................................... 21

        D.    Article 52(1)(d): Whether there has been a serious departure from a fundamental rule of procedure ........................ 23

              (i)    Spain's Position .................................................... 23

              (ii)   The Claimant's Position ......................................... 24

              (iii)  The Committee's Analysis ..................................... 26

IV.     JURISDICTION AND APPLICABLE LAW ...................................... 29

        A.    Whether the Tribunal manifestly exceeded its powers by asserting its jurisdiction .... 30

              (i)    Spain's Position .................................................... 30

              (ii)   The Claimant's Position ......................................... 34

              (iii)  The Committee's Analysis ..................................... 35

        B.    Whether the Tribunal manifestly exceeded its powers by deciding not to apply EU law to the merits of the case .......................... 42

              (i)    Spain's Position .................................................... 42

              (ii)   The Claimant's Position ......................................... 44

(iii) The Committee's Analysis ................................................................. 47

C.   Whether the Tribunal failed to state its reasons when deciding that EU law is not part of the applicable law .................................................................. 52

(i)   Spain's Position ......................................................................... 52

(ii)  The Claimant's Position ............................................................. 53

(iii) The Committee's Analysis ......................................................... 54

V.   THE TRIBUNAL'S ASSESSMENT OF LIABILITY ..................................... 57

A.   Whether the Tribunal failed to state its reasons in respect of its application of RD 661/2007 ............................................................................................. 59

(i)   Spain's Position ......................................................................... 59

(ii)  The Claimant's Position ............................................................. 60

(iii) The Committee's Analysis ......................................................... 62

B.   Whether the Tribunal failed to state its reasons in respect of the Claimant's legitimate expectations ............................................................................. 64

(i)   Spain's Position ......................................................................... 64

(ii)  The Claimant's Position ............................................................. 67

(iii) The Committee's Analysis ......................................................... 69

C.   Whether the reasoning in the Award is contradictory ................................ 73

(i)   Spain's Position ......................................................................... 73

(ii)  The Claimant's Position ............................................................. 75

(iii) The Committee's Analysis ......................................................... 76

VI.   THE TRIBUNAL'S ESTABLISHMENT OF DAMAGES ............................... 77

A.   Whether the Tribunal manifestly exceeded its powers when compensating damages to the Claimant ......................................................................................... 78

(i)   Spain's Position ......................................................................... 78

(ii)  The Claimant's Position ............................................................. 81

(iii) The Committee's Analysis ......................................................... 84

B.   Whether the Tribunal failed to state its reasons on the quantification of damages ...... 90

(i)   Spain's Position ......................................................................... 90

(ii)  The Claimant's Position ............................................................. 91

(iii) The Committee's Analysis ......................................................... 92

VII.  SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE .......... 95

A.   Whether the Tribunal seriously departed from a fundamental rule of procedure when Dr. Alexandrov was part of the Tribunal ..................................................... 95

(i)    Spain's Position ........................................................................ 95

(ii)   The Claimant's Position.......................................................... 98

(iii)  The Committee's Analysis....................................................... 99

B.    Whether the Tribunal seriously departed from a fundamental rule of procedure by allowing the Claimant to admit Document C-189 and the Greatrex Materials.......... 102

(i)    Spain's Position ...................................................................... 102

(ii)   The Claimant's Position........................................................ 104

(iii)  The Committee's Analysis..................................................... 104

VIII. COSTS ................................................................................................ 105

A.    Spain's Position................................................................................ 105

B.    The Claimant's Position.................................................................... 105

C.    The Committee's Decision On Costs ................................................ 106

IX.    DECISION ........................................................................................... 108

## TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| Application | Application for Annulment filed on 1 April 2020 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Award | Award rendered on 31 July 2019 in *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38), as rectified by the Tribunal's Decision on Rectification of the Award on 5 December 2019 |
| ECT | Energy Charter Treaty which entered into force on 16 April 1998 for the Federal Republic of Germany and the Kingdom of Spain |
| C-[#] | SolEs' Exhibit |
| Memorial on Annulment | Applicant's Memorial on Annulment dated 2 October 2020 |
| Reply on Annulment | Applicant's Reply on Annulment dated 15 April 2021 |
| CL-[#] | SolEs' Legal Authority |
| Committee | The *ad hoc* Committee composed of Mr. Cavinder Bull, SC (President), Mr. Colm Ó hOisín, SC, and Mr. Noé Fernando Piérola-Castro |
| Hearing on Annulment or Hearing | Hearing on Annulment held on 13 and 14 October 2021 in Paris, France |
| Hearing on Stay | Hearing on the stay of enforcement of the Award, held on 30 July 2020 by videoconference |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

| R-[#] | Applicant's Exhibit |
|---|---|
| Counter-Memorial on Annulment | SolEs' Counter-Memorial on Annulment dated 15 January 2021 |
| Rejoinder on Annulment | SolEs' Rejoinder on Annulment dated 20 July 2021 |
| RL-[#] | Applicant's Legal Authority |
| Tr. Day [#] [page:line] | Transcript of the Hearing of 13 and 14 October 2021 |
| Tribunal | Arbitral tribunal that rendered the Award, composed of Judge Joan E. Donoghue (President), Prof. Giorgio Sacerdoti, and Sir David A R Williams KNZM, QC |

## I.    INTRODUCTION AND PARTIES

1.    This proceeding concerns an application for annulment (the "**Application**") brought by the Kingdom of Spain with respect to the Award rendered on 31 July 2019 in *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38) (the "**Underlying Arbitration**"), as rectified by the Tribunal's Decision on Rectification of the Award on 5 December 2019 (the "**Award**").

2.    For convenience and notwithstanding paragraph 8.2 of Procedural Order No. 1, this Decision will continue to use the "**Claimant**" or "**SolEs**" to refer to SolEs Badajoz GmbH and "**Spain**" for the Kingdom of Spain, as in the original proceeding. The Claimant and Spain are hereinafter collectively referred to as the "**Parties**", and individually referred to as a "**Party**". The Parties' representatives and their addresses are listed above on page (i).

3.    The Award determined a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 for the Federal Republic of Germany and the Kingdom of Spain (the "**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

4.    The Underlying Arbitration concerned a dispute in the photovoltaic ("**PV**") sector between SolEs and Spain arising out of measures implemented by the latter modifying the regulatory and economic regime applicable to producers of electricity from PV energy sources.

5.    In the Award, the Tribunal upheld the Claimant's objection to jurisdiction with respect to the claim that a 7% tax measure by the Claimant (the "**TVPEE**") violated the ECT. The Tribunal otherwise held that it had jurisdiction under the ICSID Convention and the ECT over the Claimant's claims. The Tribunal also found that Spain failed to accord fair and equitable ("**FET**") treatment to the Claimant pursuant to Article 10(1) of the ECT and awarded the Claimant EUR 40.98 million, with interest (this amount was later rectified to

EUR 40.49 million in the Tribunal's Decision on Rectification of 5 December 2019 (the "**Decision on Rectification**")).

6.      Spain applied for annulment of the Award on the basis of Article 52(1) of the ICSID Convention, identifying three grounds for annulment: (i) the Tribunal manifestly exceeded its powers (Article 52(1)(b)); (ii) there was a serious departure from a fundamental rule of procedure (Article 52(1)(d)); and (iii) the Tribunal failed to state the reasons on which the Award is based (Article 52(1)(e)).

## II.    PROCEDURAL HISTORY

7.      On 1 April 2020, ICSID received Spain's Application together with Annexes 001 to 016.[1] The Application also contained a request under Article 52(5) of the ICSID Convention and Rule 54(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**") for the stay of enforcement of the Award until the Application was decided (the "**Request for Stay**").

8.      On 3 April 2020, pursuant to Rule 50(2) of the ICSID Arbitration Rules, the Secretary-General of ICSID registered the Application. On the same date, in accordance with Arbitration Rule 54(2), the Secretary-General informed the Parties that the enforcement of the Award had been provisionally stayed. On 9 April 2020, Counsel for the Claimant submitted a power of attorney from SolEs for this annulment proceeding.

9.      On 8 May 2020, following an exchange of correspondence between the Parties and the Secretariat,[2] and in accordance with Rules 6 and 53 of the ICSID Arbitration Rules, the Parties were notified that an *ad hoc* Committee composed of Mr. Cavinder Bull, SC, a national of Singapore, designated as President of the Committee, Mr. Colm Ó hOisín, SC, a national of Ireland, and Mr. Noé Fernando Piérola Castro, a national of Peru and Switzerland, had been constituted (the "**Committee**"). On the same date, the Parties were

---

[1]    With its Observations on the European Commission's Application for Leave to Intervene as a Non-Disputing Party of 27July 2020, Spain provided two tables of concordance showing both the Annex number and the R or RL number of exhibits and legal authorities. *See* List of Exhibits (R) and List of Legal Authorities (RL), both dated 27July 2020.

[2]    *See* communications with the Parties of 22, 28 and 30 April, 1 and 5 May 2020.

notified that Mr. Paul-Jean Le Cannu, Team Leader/Legal Counsel, ICSID, would serve as Secretary of the *ad hoc* Committee.

10. On 9 June 2020, pursuant to the calendar agreed by the Parties on 19 May 2020, Spain filed its *Submission in Support of the Continuation of the Stay of Enforcement of the Award*, together with Annexes 017 to 033.

11. On 23 June 2020, SolEs filed its *Response to Applicant's Request to Continue Stay*, together with Legal Authorities[3] CL-0001 to CL-0024.

12. On 24 June 2020, the Committee's First Session was held by teleconference.

13. On the same date, the Committee issued Procedural Order No. 1, including the Procedural Calendar agreed by the Parties, which provided, *inter alia*, for the hearing on stay of enforcement of the Award, on 30 July 2020. By emails of 29 June and 1 July 2020, the Parties proposed a jointly agreed hearing schedule, which the Committee approved through its Secretary on 1 July 2020.

14. On 7 July 2020, Spain filed its *Reply in Support of the Continuation of the Stay of Enforcement of the Award*, together with Annexes 034 to 058.

15. On 17 July 2020, the European Commission (the "**EC**") filed an *Application for Leave to Intervene as a Non-Disputing Party* (the "**EC Application**") seeking the Committee's permission to intervene in the present annulment proceedings, including on Spain's application for the continuation of the stay of enforcement of Award. The EC Application was made pursuant to Rule 37(2) of the ICSID Arbitration Rules.

16. On 21 July 2020, the Claimant filed its *Rejoinder to Applicant's Request to Continue Stay*, together with Exhibits C-0001 to C-0004 and Legal Authorities CL-0025 to CL-0027.

---

[3]  With its Counter-Memorial on Annulment dated 15 January 2021 (resubmitted on 23 February 2021), SolEs provided two tables renumbering the exhibits (C) and legal authorities (CL). *See* List of Exhibits and List of Legal Authorities, both dated 15 January 2021.

17.     On 27 July 2020, the Committee issued Procedural Order No. 2 ("**PO2**") *On the Organization of the Hearing on Stay of Enforcement of the Award*.

18.     On the same date, further to the Committee's invitation, the Parties each submitted observations on the EC Application. Spain filed its observations together with Legal Authority RL-0145.

19.     On 29 July 2020, as contemplated in Section 13 of PO2, SolEs and Spain each submitted a demonstrative exhibit, RD-001 and CD-0001, respectively. On 30 July 2020, the Committee held the hearing on stay of the enforcement of the Award (the "**Hearing on Stay**") by videoconference. In addition to the Members of the Committee and its Secretary, the following Party representatives attended the Hearing on Stay:

On behalf of the Kingdom of Spain:
Mr. Alberto Torró Molés, Abogacía General del Estado
Mr. Pablo Elena Abad, Abogacía General del Estado
Ms. Gabriela Cerdeiras, Abogacía General del Estado

On behalf of SolEs Badajoz GmbH:
Mr. Charles Kaplan, Orrick Herrington & Sutcliffe (Europe) LLP
Mr. Tunde Oyewole, Orrick Herrington & Sutcliffe (Europe) LLP
Ms. Sarah Lajugie, Orrick Herrington & Sutcliffe (Europe) LLP
Mr. Thomas Hopp, Voigt & Collegen GmbH

20.     On 12 August 2020, each Party submitted comments on the other Party's observations on the EC Application. Spain submitted its comments together with Legal Authorities RL-0146 to RL-0152.

21.     On 26 August 2020, the Committee issued its *Decision on the Continuation of the Stay of Enforcement of the Award* (the "**Decision on Stay**"). The Committee decided that the stay of enforcement of the Award should be continued unconditionally until the conclusion of the present annulment proceeding, and held that "*it is unnecessary to consider the EC Application in respect of this issue*".[4] The Committee indicated that it would "*separately*

---

[4]     Decision on Stay, ¶88.

*consider the rest of the EC Application together with the Parties' observations and their comments on each other's observations*".[5]

22. On 17 September 2020, the Committee issued its *Decision on the European Commission's Application for Leave to Intervene as Non-Disputing Party*. The Committee found, *inter alia*, that the EC's proposed submissions mirrored the arguments raised by Spain in support of annulment and, therefore, the EC's intervention could not bring a "*perspective, particular knowledge or insight that is different from that of the disputing parties*" as required under Rule 37(2)(a) of the ICSID Arbitration Rules. In addition, given that the EC's position on the issues it intended to address was substantially the same as Spain's and diametrically opposed to SolEs's, the EC's intervention would have placed an additional procedural burden on SolEs to respond to the EC's submissions. In light of these findings, the Committee decided to deny the EC Application.

23. On 25 September 2020, Spain filed a request under paragraph 15.3 of PO1 to add a new "Tab A1" to Exhibit MGA 16 of Spain's Second Report on Quantum in the Underlying Arbitration dated 15 September 2017.

24. On 2 October 2020, Spain filed its Memorial on Annulment (the "**Memorial on Annulment**"), along with the Expert Report *Assessment of the Damages Payable to the Claimant in light of the Arbitral Award issued on 31 July 2019* of Altran MaC Group together with Exhibits MGA 16 and Table P, Exhibits R-0375 to R-0394, and Legal Authorities RL-0153 to RL-0189. On the same date, SolEs filed its observations regarding Spain's request of 25 September 2020 under paragraph 15.3 of PO1.

25. Further to the Committee inquiry of 26 September 2020, the Parties also confirmed on 2 October 2020 that they were available to hold the Hearing on Annulment on 13 and 14 October 2021, with 15 October 2021 reserved for deliberations (instead of 5-6 October 2021, with 7 October 2021 reserved for deliberations, as the procedural calendar then provided).

---

[5]    Decision on Stay, ¶88.

26.     On 6 October 2020, the Committee decided to provisionally allow Spain's request of 25 September 2020 on the basis that the new "Tab A1" did not contain any new evidence that was not presented in the Underlying Arbitration.

27.     On 8 October 2020, Spain submitted an amended version of the Expert Report *Assessment of the Damages Payable to the Claimant in light of the Arbitral Award issued on 31 July 2019* of Altran MaC Group ("**AMG's New Report**"), dated 7 October 2020, together with Exhibit MGA 16.

28.     On 15 January 2021, SolEs filed its Counter-Memorial on Annulment (the "**Counter-Memorial on Annulment**"), along with Brattle's Analysis of the damages awarded, together with Exhibits BA-0001 to BA-0004; Exhibits C-0198 to C-0215 and Legal Authorities CL-0178 to CL-0238. On 23 February 2021, SolEs resubmitted its Counter-Memorial on Annulment and accompanying documents, with certain clerical corrections, following a communication from the Centre on 11 February 2021.

29.     On 2 April 2021, in response to the Committee's communication of 6 October 2020 and further to SolEs's 15 January 2021 Counter-Memorial on Annulment, SolEs filed a request for the Committee to rule definitively that the updated Exhibit MGA 16 should be removed from the record. On 6 April 2021, Spain filed its observations on SolEs's request of 2 April 2021. On 8 April 2020, the Committee informed the Parties through its Secretary that it saw no need to issue the requested order at this time. In the Committee's view, the concerns raised by SolEs in its request of 15 January and 2 April 2021 could be dealt with by the Parties and the *ad hoc* Committee once it was clear how document MGA 16 bis was being used by Spain.

30.     On 15 April 2021, Spain filed its Reply on Annulment (the "**Reply on Annulment**"), along with the Expert Report of Prof. Ricardo Gosalbo Bono (with Exhibits 01 to 29), the Rebuttal Report of Altran MaC Group ("**AMG's Rebuttal Report**"), Exhibits R-0395 to R-0415, and Legal Authorities RL-0190 to RL-0243. Spain also submitted a corrected version of its Memorial on Annulment.

31.   On 11 May 2021, SolEs requested an amendment to the Procedural Calendar for the submission of its subsequent pleading. On 12 May 2021, Spain confirmed its agreement for an extension of the deadline requested by SolEs. On 14 May 2021, the Committee transmitted an amended Procedural Calendar according to the Parties' agreement.

32.   On 20 July 2021, pursuant to the Procedural Calendar as amended on 14 May 2021, SolEs filed its Rejoinder on Annulment (the "**Rejoinder on Annulment**"), along with Brattle Annulment Rebuttal Report, the Expert Opinion of Prof. Piet Eeckhout (with Exhibits PE-0001 to PE-0045), Exhibits C-0216 and C-0217, and Legal Authorities CL-0239 to CL-0244.

33.   On 28 July 2021, considering the persisting uncertainties related to the current COVID-19 pandemic and bearing in mind the provisions of paragraphs 10.1 and 10.2 of PO1, the Committee invited the Parties to confer on the way they wished to proceed in relation to the Hearing on Annulment, including the possibility of holding the Hearing remotely by video, if necessary, under the circumstances.

34.   By email of 6 August 2021, SolEs submitted that "*everything should be done to preserve the possibility of holding an in-person hearing*" and proposed that the issue be revisited at the beginning of September 2021. By email of the same date, Spain expressed a preference for an in-person hearing and agreed that the issue should be revisited in early September 2021.

35.   On 10 August 2021, the Committee informed the Parties of its acceptance of their joint proposal to revisit the issue of the hearing format in September. As a precautionary step, the Committee also invited the Parties to consider (i) if necessary and subject to paragraph 10 of Procedural Order No. 1, the possibility of holding the hearing in person in a venue other than Paris, including in particular the IDRC in London or the Peace Palace in The Hague, and (ii) what initial preparations might have to be made should the circumstances require that the hearing be held virtually.

36.  By emails of 24, 25, 27 August, and 1 and 2 September 2021,[6] the Centre provided updates as to the availability of hearing venues in Europe for in-person hearings. On 2 September 2021, Spain informed the Centre that it had contacted SolEs with a view to reaching an agreement regarding the Hearing.

37.  By email of 7 September 2021, SolEs inquired on behalf of the Parties whether the Committee would be available to hold the Hearing during the following time periods: from 13 to 17 December 2021; or from 9 to 11 February 2022.

38.  On 8 September 2021, the Committee informed the Parties of its unavailability on the suggested additional hearing dates, and of their inclination to maintain the current dates. In order to facilitate the discussion on the hearing venue and format, the Committee proposed to hold a virtual meeting with the Parties on 15 September 2021. The meeting took place by videoconference.

39.  Further to the discussions held at the 15 September 2021 virtual meeting, the Committee issued the following directions on the same day: (i) the current hearing dates, namely 13-14 October 2021, were confirmed; (ii) the hearing would be held in person in Paris, France; (iii) the hearing venue would be Delos Dispute Resolution; (iv) it was the Committee's understanding that Spain intended to cross-examine the experts for SolEs at the Hearing and that SolEs did not intend to cross-examine the experts for Spain, who therefore would not be required to testify or otherwise address the Committee though they might attend the hearing; (v) the pre-hearing organizational meeting would be held on 27 September 2021 virtually.

40.  On 24 September 2021, Spain filed a request for leave to introduce three new legal authorities into the record under paragraph 15.6 of PO1, namely (i) the Judgment of the Grand Chamber of the Court of Justice of the European Union (CJEU) of September 2, 2021, issued in *Republic of Moldova v. Komstroy* (Case C-741/19) (the "***Komstroy Judgment***"); (ii) the European Commission's communication on State Aid SA.54155 (2021/NN) – Arbitration award to Antin (the "**EC *Antin* Communication**"); and (c) the

---

[6]  Additional information was also provided by the Secretariat by email of September 7, 2021.

Award rendered on August 17, 2021 in *STEAG GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/4) (the "***STEAG* Award**").

41.     On 27 September 2021, the Committee held a pre-hearing organizational meeting with the Parties by videoconference to discuss outstanding procedural, administrative, and logistical matters in preparation for the Hearing on Annulment.

42.     On the same date, SolEs submitted its observations on Spain's request of 24 September 2021 under paragraph 15.6 of PO1.

43.     On 29 September 2021, the Committee issued Procedural Order No. 3 concerning the organization of the Hearing ("**PO3**").

44.     On the same date, the Committee notified the Parties of its decision regarding Spain's request of 24 September 2021 under paragraph 15.6 of PO1. The Committee noted that both the *Komstroy* Judgment and the *STEAG* Award were issued well after Spain filed its Reply on Annulment, and that Spain did not specify when the EC *Antin* Communication was issued. In light of this, the Committee decided to admit the *Komstroy* Judgment and the *STEAG* Award, but not the EC *Antin* Communication. The Committee further held that the Respondent was thus at liberty to refer to the *Komstroy* Judgment and the *STEAG* Award at the Hearing, and that the Claimant could comment on these documents at the Hearing and if necessary, in writing within seven days after the Hearing.

45.     On 13 and 14 October 2021, the Committee held the Hearing in Paris, France. In addition to the Members of the Committee and the Secretary of the Committee, the following persons attended the Hearing:

*For Spain:*
| | |
|---|---|
| Ms. María del Socorro Garrido Moreno | Abogacía general del Estado |
| Ms. Gabriela Cerdeiras Megías | Abogacía general del Estado |
| Mr. Alberto Torró Molés | Abogacía general del Estado |
| Ms. Ana Fernández-Daza Álvarez | Abogacía general del Estado |

*For the Claimant:*
| | |
|---|---|
| Mr. Thomas Hopp | SolEs Badajoz GmbH |
| Mr. Charles Kaplan | Orrick Rambaud Martel |
| Mr. Tunde Oyewole | Orrick Rambaud Martel |

Ms. Sarah Lajugie                    Orrick Rambaud Martel
Ms. Melissa Aourane                  Orrick Rambaud Martel
Mr. Richard Caldwell                 The Brattle Group
Prof. Piet Eeckhout                  University College London

*Court Reporters*[7]*:*
Mr. Trevor McGowan
Mr. Dante Rinaldi

*Interpreters:*
Mr. Jesus Getan Bornn
Ms. Anna Sophia Chapman
Ms. Amalia Thaler-de Klemm

46.    During the Hearing, the Parties submitted copies of their Opening and Closing Statements slides (CD-0002, CD-0003, RD-01; and RD-02) in accordance with paragraphs 29 and 30 of PO3. On 2 November 2021, in response to an inquiry from SolEs, the Committee confirmed that (i) there would be no post-hearing briefs and that Annex A to Procedural Order No. 1 was amended accordingly[8]; (ii) cost submissions were expected to be filed by 22 November 2021 unless otherwise agreed by the Parties; (iii) the Parties were invited to submit their agreed corrections to the hearing transcript, if any, by 17 November 2021; and (iv) it remained committed to issuing the Decision on Annulment on 22 February 2022 and if the Committee was not in a position to issue the Decision by that date, the Parties would be notified accordingly and provided with a status update, as contemplated in paragraph 5.3 of PO1. On 3 November 2021, Spain informed the Committee of the Parties' agreement to submit their agreed corrections to the transcript, if any, by 22 November 2021.

47.    On 22 November 2021, the Parties each submitted their submissions on costs. On 22 and 24 November 2021, they also informed the Committee that they disagreed as to how the hearing transcripts ought to be corrected. On 30 November 2021, the Committee offered two options to the Parties for them to implement their corrections to the transcript.

48.    On 7 December 2021, the Parties informed the Committee that they had agreed on the second option offered by the Committee and jointly filed their corrections to the English

---

[7]    The court reporters joined the hearing remotely.
[8]    Tr. Day 2, 111:20-112:12.

and Spanish-language transcripts, which included the Parties' points of disagreements as to the corrections to be made.

49.    The proceeding was declared closed on 21 February 2022.

50.    Section III of this Decision sets out the standards applicable to the grounds of annulment invoked by Spain. Section IV addresses the claims raised by Spain with respect to the jurisdiction of the Tribunal and the applicable law. Section V deals with the claims relating to the Tribunal's assessment of liability. Section VI addresses the claims concerning the Tribunal's establishment of damages. Section VII addresses Spain's allegations that there has been a serious departure from a fundamental rule of procedure. Finally, Section VIII sets out the Committee's findings on the allocation of costs.

## III.    APPLICABLE STANDARDS

51.    Spain requests the annulment of the Award pursuant to Article 52 of the ICSID Convention on the grounds that:

(i) the Tribunal manifestly exceeded its powers;

(ii) the Award failed to state the reasons on which it is based; and that,

(iii) there has been a serious departure from a fundamental rule of procedure.

52.    Before addressing the specific claims for annulment submitted by Spain, the Committee sets out the legal standard in the light of which those claims are examined.

### A.    GENERAL LEGAL STANDARD APPLICABLE TO ANNULMENTS

### (i)    Spain's Position

53.    Spain recognizes that the annulment proceedings are not a new opportunity to re-arbitrate the dispute and states that it does not intend to do so.[9] That said, Spain emphasizes that

---

[9]    Reply on Annulment, ¶15.

most annulment committees have acknowledged that there is no presumption in favor of or against the annulment in the ICSID Convention.[10]

### (ii)    The Claimant's Position

54.    As a general point, the Claimant stresses that an ICSID annulment is not an appeal. Article 53 of the ICSID Convention states that: "*The award shall be binding on the parties and **shall not be subject to any appeal** or to any other remedy except those provided for in this Convention*"[11] (emphasis added). In the Claimant's submission, annulment (which is provided for in the Convention) is therefore a remedy *other than* an appeal.[12]

55.    According to the Claimant, commentators have noted that an *ad hoc* committee's power to annul an award does not allow it to amend the award or replace it by its own decision. The ICSID annulment process is only concerned with the legitimacy of the process of the decision, not its substantive correctness. Annulment therefore takes as its premise "*the record before the Tribunal*".[13] Unlike an appeal, the ICSID annulment process does not provide an opportunity for a losing party to raise new arguments on the merits or introduce new evidence. A party may not present before the *ad hoc* committee new arguments of fact or law that it failed to raise in the original arbitral proceeding.[14]

### (iii)    The Committee's Analysis

56.    The Committee notes that it is undisputed that an annulment process is distinct from an appeal.[15] Unlike an appellate court, the Committee is limited in its competence to assess the legitimacy of the process leading up to the Tribunal's decision, not its substantive correctness in terms of law or facts. With this in mind, the Committee turns to the applicable legal standard of each specific grounds of annulment raised by Spain below.

---

[10]    Reply on Annulment, ¶17, citing e.g., RL-0239, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3 (formerly Compañía de Aguas del Aconquija, S.A. and Compagnie Générale des Eaux v. Argentine Republic), Decision on Annulment dated 3 July 2002, ¶ 62.

[11]    Counter Memorial on Annulment, ¶11.

[12]    Counter Memorial on Annulment, ¶12.

[13]    Counter Memorial on Annulment, ¶13.

[14]    Counter Memorial on Annulment, ¶13.

[15]    See paragraphs 53-55 above; Memorial on Annulment, ¶¶254, 270.

### B.    ARTICLE 52(1)(B): WHETHER A TRIBUNAL HAS MANIFESTLY EXCEEDED ITS POWERS

#### (i)    Spain's Position

57.    Spain relies on Article 52(1)(b) of the ICSID Convention which authorizes a party to request the annulment of an award if the tribunal "*manifestly exceeds its powers*".[16]

58.    Spain submits that a manifest excess of powers may exist, *inter alia*, when the Tribunal: (i) does not apply the appropriate law, which occurs when the Tribunal ignores the applicable law, or its erroneous interpretation or misapplication of the law is "*so gross or egregious as substantially to amount to failure to apply the proper law*";[17] (ii) exceeds its jurisdiction or has no jurisdiction;[18] or (iii) decides on matters not raised by the parties or when, instead of applying the relevant provision of the BIT, the Tribunal applies standards that are not included in that provision.[19]

59.    With regard to the standard of review, Spain cites, amongst other things, the Updated Background Paper on Annulment for the Administrative Council of ICSID dated 5 May 2016 which summarizes that: "[t]*he 'manifest' nature of the excess of powers has been interpreted by most ad hoc committees to mean an excess that is obvious, clear or self-evident, and which is discernable without the need for an elaborate analysis of the award. However, some ad hoc committees have interpreted the meaning of 'manifest' to require that the excess be serious or material to the outcome of the case*".[20]

#### (ii)    The Claimant's Position

60.    With regard to the standard of review for the specific ground of "*manifest excess of powers*", the Claimant submits that Article 52(1)(b) of the ICSID Convention imposes a

---

[16]    Memorial on Annulment, ¶64.

[17]    Memorial on Annulment, ¶¶64-71.

[18]    Memorial on Annulment, ¶64.

[19]    Memorial on Annulment, ¶¶72, 77-79.

[20]    Reply on Annulment, ¶¶25-27, citing R-0395-ENG, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, 5 May 2016 ("**Updated Background Paper**"), ¶83.

dual requirement for the annulment of an award: (i) there must be an excess of powers, and (ii) this excess must be manifest.[21]

61.  The Claimant submits that the term '*manifest*' is subject to two lines of interpretation, namely, that an excess of powers is manifest if: (i) it can be discerned with little effort and without deep analysis; and/or (ii) it is serious or material to the outcome of the case.[22] The Claimant submits that in practice, there is little practical relevance between these two interpretations as annulment committees would be "*hard pressed to use their discretionary powers to annul the decision if the excess of powers has no material impact vis-à-vis the parties or the dispute*".[23]

62.  Regarding the application of proper law in particular, the Claimant also stresses that many *ad hoc* committees have embraced a distinction between the failure to apply the proper law and the incorrect application of that law, and have found the threshold for the finding of an annullable error of law to be "*very high*".[24]

### (iii)    The Committee's Analysis

63.  Article 52(1)(b) of the ICSID Convention provides that either party may request the annulment of an award on the ground "*that the Tribunal has manifestly exceeded its powers*". Based on this wording, the invocation of this ground requires an annulment committee to examine two issues: (i) whether the tribunal "exceeded" the "powers" conferred upon it by the parties, and, if so, (ii) whether such excess occurred "manifestly".[25]

---

[21]  Counter Memorial on Annulment, ¶21.

[22]  Counter Memorial on Annulment, ¶¶22-23.

[23]  Counter Memorial on Annulment, ¶23.

[24]  Counter Memorial on Annulment, ¶¶24-25.

[25]  Various annulment committees have also read Article 52(2)(a) as encompassing a two-fold analysis. See e.g. RL-0185-ENG, *CDC Group plc v. Republic of the Seychelles,* ICSID Case No. ARB/02/14, Decision of the ad hoc Committee on the Application for Annulment of the Republic of Seychelles dated 29 June 2005 ("**CDC Group**"), ¶39; RL-0173-ENG, *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.,* ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award dated 3 May 1985 ("**Klöckner I**"), ¶4; RL-0108-ENG, *Sempra Energy International v. Argentine Republic,* ICSID Case No. ARB/02/16, Decision on the Argentine Republic's

64.     The first question entails a comparison between, on the one hand, the tribunal's actions as reflected in the award, and on the other, the powers conferred on the tribunal by the ICSID Convention, other applicable norms, and the matters submitted by the parties for the tribunal's decision.[26]

65.     In addressing this question, an annulment committee may find that a tribunal acted within its powers. However, it may also find that the tribunal's actions diverge from those powers, either by excess or by omission in the fulfilment of the assigned duties.

66.     On the question of whether an excess of powers is "*manifest*", the Committee notes that this ground for annulment arises in the context of a limited number of annulment grounds under Article 52(1), [27] and within the confines of a remedial mechanism, which is deemed by the ICSID Convention an exception to the binding and non-appealable nature of awards.[28] In this regard, the Committee's view is that this standard must be understood in the light of the object and purpose of the ICSID Convention, which may be construed as to ensure that mutual consent constitutes a "*binding agreement*" requiring compliance with arbitral awards.[29] Accordingly, to justify annulment, the excess of power at issue must be

---

Request for Annulment of the Award dated 29 June 2010 ("*Sempra*")*,* ¶212; RL-0113-ENG, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide dated 23 December 2010 ("***Fraport***"), ¶¶36-40; RL-0112-ENG, *Occidental Petroleum Corporation & Occidental Exploration and Production Company v. Republic of Ecuador,* ICSID Case No. ARB/06/11, Decision on Annulment of the Award dated 2 November 2015 ("***Occidental***"), ¶57; RL-0184-ENG, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment dated 1 February 2016 ("***Total***"), ¶171; CL-0205-ENG, *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment dated 5 February 2016, ¶191; RL-0145-ENG, *Ioan Micula and others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment dated 26 February 2016 ("***Micula***"), ¶123.

[26]   The Committee notes that a similar approach was taken by the annulment committee in RL-0077-ENG, *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment dated 5 June 2007 ("***Soufraki***"), ¶37.

[27]   See Reply on Annulment, ¶¶14-18.

[28]   ICSID Convention, Article 53.

[29]   ICSID Convention, Preamble.

discernable from a plain reading of the award, and perceived or recognized as such by an annulment committee without difficulty.[30]

67.    The Committee accepts the Parties' submissions that a manifest excess of powers may exist in a variety of situations. In particular, a tribunal's failure to apply the relevant law may be "*manifest*" from the lack of reference to (and reliance on) the law agreed upon by the parties. That failure could also be revealed if the tribunal effectively applies a set of rules other than that agreed upon by the parties.[31] Within this set of circumstances, there is also the special case of the non-application of the applicable law due to a legal error of such a nature or flagrancy as to render that application ineffective. This is a qualified failure as it would require the finding of an erroneous interpretation or misapplication of the law "*so gross or egregious as substantially to amount to failure to apply the proper law*"[32]. It is recognized that distinguishing between non-application of the applicable law and the incorrect application of that law may be a particularly complex task[33] and that the threshold for finding an annullable error of law is very high.[34]

---

[30]   The Committee's understanding of the term "manifestly" within the meaning of Article 52(1)(b) is similar to that held by other annulment committees (see RL-0112-ENG, *Occidental*, ¶57; CL-0194-ENG, *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Annulment dated 19 May 2014, ¶122; CL-0191-ENG, *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Excerpts of Decision on Annulment dated 22 May 2013 ("*Libananco*"), ¶82; RL-0158-ENG, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment dated 30 December 2015 ("*Tulip*"), ¶56; RL-0145-ENG, *Micula*, ¶123. Other annulment committees have provided meanings to the term "manifestly" that are not only related to the obviousness of the excess of powers at issue. (see R-0395-ENG, *Updated Background Paper*, ¶83).

[31]   Memorial on Annulment, ¶¶70, 72; Counter-Memorial on Annulment, ¶24.

[32]   Memorial on Annulment, ¶¶64-65, citing RL-0077-ENG, *Soufraki*¸ ¶86; Counter-Memorial on Annulment, ¶24; Reply on Annulment, ¶27.

[33]   As noted by Spain in its Reply on Annulment, ¶34, fn. 29, the Committee in *Enron* stated that the distinction between non-application of the applicable law and its incorrect application "*may not always be easy to draw*" (citing RL-0176-ENG, *Enron Creditors Recovery Corp. and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Application for Annulment of the Argentine Republic dated 30 July 2010 ("*Enron*") ¶68). See also Counter-Memorial on Annulment, ¶¶25-27; Reply on Annulment, ¶27.

[34]   Counter Memorial on Annulment, ¶25, citing CL-0218-ENG, B. Sabahi, N. Rubins, et al., *Investor-State Arbitration, 2019,* Chapter XXII: Annulment, Set Aside and Refusal to Enforce ("*Sabahi & Rubins*"), p. 786, ¶22.38, referring to the *Soufraki ad hoc* committee decision which held that even a serious error cannot justify annulment (RL-0077-ENG, *Soufraki*, ¶86).

68.    As set out in the *Duke Energy v. Peru* committee's decision, the practical question to ask is whether the opinion of the tribunal is so untenable that it cannot be supported by reasonable arguments:

> "*An ad hoc committee will not therefore annul an award if the tribunal's disposition on a question of law is tenable, even if the committee considers that it is incorrect as a matter of law.* […] **Without reopening debates on questions of fact, a committee can take into account the facts of the case as they were in the record before the tribunal to check whether it could come to its solution, however debatable. <u>Is the opinion of the tribunal so untenable that it cannot be supported by reasonable arguments? A debatable solution is not amenable to annulment, since the excess of powers would not then be 'manifest'</u>**" (emphasis added).[35]

69.    Separately, the Committee accepts that the standard may also apply where a tribunal expands the scope of its powers in its award of damages. As was the case in the *Occidental* decision where the tribunal had "*illicitly expanded the scope of its jurisdiction*" by "*compensating a protected investor for an investment which is beneficially owned by a non-protected investor*".[36]

70.    In that case, the tribunal had awarded the claimant damages based on the 100% present value of the investment's cash flows when the claimant only owned 60% of the investment (with the remainder being owned by a third party that was not protected by the treaty in question).[37] In this context, the annulment committee partially annulled the award, and reduced the compensation owed to the claimant from 100% to 60%, then applied a reduction factor which was explained in the award.[38] In the words of the *Occidental* committee, this entailed a very simple arithmetic calculation:

> "*It is true that annulment committees are not empowered to amend or replace awards. But this is not the task at hand. What is required in this case, in which the Committee is partially annulling the Award, is for the Annulment Committee to substitute the Tribunal's figure of damages*

---

[35]    RL-0178-ENG, *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision on Annulment dated 1 March 2011 ("***Duke***"), ¶99.

[36]    RL-0112-ENG, *Occidental*, ¶266.

[37]    RL-0112-ENG, *Occidental*, ¶¶136, 585.

[38]    RL-0112-ENG, *Occidental*, ¶¶301, 585-586.

*with the correct one. If this task can be performed without further submissions from the Parties and without additional marshalling of evidence, committees should be entitled to do so. Basic reasons of procedural economy speak in favour of this solution.* **There is no need for the parties to incur the additional cost and delay of going through a second investment arbitration, when the correct number can be inserted by the annulment committee,** <u>**after performing a very simple arithmetic calculation**</u> **and without further input from the parties***.*

<u>***This is the case in the present arbitration***</u>**"** (emphasis added).[39]

## C.    ARTICLE 52(1)(E): WHETHER AN AWARD HAS FAILED TO STATE REASONS

### (i)    Spain's Position

71.    Spain argues that annulment committees have uniformly established that Articles 48(3) and 52(1)(e) of the ICSID Convention require, at a minimum, that the ruling allows the reader to "*follow how the tribunal proceeded from Point A. to Point B.*".[40]

72.    According to Spain, the supporting reasons "*must constitute an appropriate foundation for the conclusions reached through such reasons*"[41] and cannot be "*insufficient or inadequate*" in that they "*cannot, in themselves, be a reasonable basis for the solution arrived at*".[42] Further, annulment may be justified where the reasons given by the tribunal

---

[39]    RL-0112-ENG, *Occidental*, ¶¶299-300.

[40]    Memorial on Annulment, ¶174, citing *inter alia*, RL-0110-ENG, *Maritime International Nominees Establishment (MINE) v. Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment dated 14 December 1989, ¶5.09 ("***MINE***"); RL-0178-ENG, *Duke*, ¶203; RL-0115-ENG, *Wena Hotels Ltd. v. Arab Republic of Egypt* ICSID Case No. ARB/98/4, Decision on the Application for Annulment dated 5 February 2002 ("***Wena***"), ¶79; RL-0174-ENG, *Mr. Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment dated 12 February 2015, ¶112; RL-0157-ENG, *Iberdrola Energía, S.A. v. Republic of Guatemala*, ICSID Case, No. ARB/09/5 (Annulment Proceeding). Decision on the Remedy for annulment of the Award submitted by Iberdrola Energía dated 13 January 2015 ("***Iberdrola***"), ¶119; RL-0113-ENG, *Fraport*, ¶249; RL-0183-ENG, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment dated 24 January 2014, ¶181; RL-0184-ENG, *Total*, ¶267; RL-0182-ENG, "*The ICSID Convention: A commentary*", Christoph H. Schreuer and others, (2nd edition 2009), p. 824.

[41]    Memorial on Annulment, ¶174, citing RL-0175-ENG, *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application for Annulment dated 16 May 1986, ICSID Reports, Vol. 1 (1993), p. 509 ("***Amco I***"), ¶43.

[42]    Memorial on Annulment, ¶177, citing *inter alia*, RL-0077-ENG, *Soufraki*, ¶¶122-123.

are contradictory to its other findings[43] or frivolous (in that they are "*manifestly irrelevant and knowingly so to the tribunal*").[44]

73.     Spain further argues that the tribunal is obliged to deal with the problems, arguments and evidence presented. The fact that a tribunal should "*fail[] to address a particular question submitted to it*" or to "*address certain evidence relevant to*" its determination is equivalent to not indicating the reasons and justifies an annulment.[45]

(iv)    **The Claimant's Position**

74.     The Claimant stresses that "*the failure to state reasons must leave the decision on a particular point essentially lacking in any expressed rationale*" and *"that point must itself be necessary to the tribunal's decision*".[46] As a matter of principle, *ad hoc* committees should not look into the adequacy of the tribunal's reasoning,[47] nor should it assess the "*correctness or persuasiveness*" of the reasoning in the award or inquire into the quality or merits of the reasons.[48]

---

[43]    Memorial on Annulment, ¶¶179-181, citing RL-0110-ENG, *MINE*, ¶6.107; RL-0159-ENG, *Victor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment dated 18 December 2012 ("*Pey Casado*"), ¶¶282-286; RL-0109-ENG, *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment dated 27 December 2016 ("*Tidewater*"), ¶189.

[44]    Reply on Annulment, ¶¶425-426, citing RL-0155-ENG, *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application dated 21 February 2014 ("*Caratube*"), ¶102.

[45]    Memorial on Annulment, ¶182, citing RL-0107-ENG (see also R-0395-ENG), *Updated Background Paper*, ¶104.

[46]    Counter-Memorial on Annulment, ¶100, citing CL-0179-ENG, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. (formerly Compañía de Aguas del Aconquija, S.A. and Compagnie Générale des Eaux) v. Argentine Republic (I)*, ICSID Case No. ARB/97/3, Decision on Annulment dated 3 July 2002 ("*Vivendi I*"), ¶¶64-65.

[47]    Counter-Memorial on Annulment, ¶99, citing RL-0110-ENG, *MINE*, ¶¶5.08-5.09. See also RL-0115-ENG, *Wena*, ¶79; RL-0185-ENG, *CDC Group*, ¶75; RL-0156-ENG, *Azurix Corp.v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic dated 1 September 2009, ¶53; RL-0113-ENG, *Fraport*, ¶249; CL-0189-ENG, *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Hungary*, ICSID Case No. ARB/07/22, Decision of the *ad hoc* Committee on the Application for Annulment dated 29 June 2012, ¶37; CL-0191-ENG, *Libananco*, ¶91; CL-0192-ENG, *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited dated 3 July 2013 ("*Malicorp*"), ¶39.

[48]    Counter-Memorial on Annulment, ¶101, citing CL-0199-ENG, H.-T. Shin, "Chapter 50: Annulment", in M. Kinnear, *et al.*, *Building International Investment Law: The First 50 Years of ICSID*, pp. 711-712; CL-0198-ENG, K. Bondar, "*Annulment of ICSID and Non-ICSID Investment Awards: Differences in the Extent of Review*",

75.    According to the Claimant, a handful of *ad hoc* committees have made the mistake of misinterpreting the standard of Article 52(1)(e) to encompass "*insufficient or inadequate*" reasons as a ground for annulment. The Claimant argues that the standard of Article 52(1)(e) is not preceded by any qualifier and therefore, the requirement of "*sufficiently pertinent*" reasons goes against the wording of Article 52(1)(e).[49]

76.    The Claimant further argues that in order to serve as a ground for annulment, "*contradictory reasons*" must be so egregious as to prevent the reader from understanding the tribunal's motives, leading to the conclusion that the tribunal had provided no reasons at all.[50] In other words, a finding of contradiction must be compelling (and not merely arguable) lest the annulment procedure be transformed into an appeal mechanism.[51]

77.    As for "*frivolous*" reasons, the Claimant contends that this standard is a high one and that Spain has selectively omitted to highlight that "*an examination of the reasons presented by a tribunal cannot be transformed into a re-examination of the correctness of the factual and legal premises on which the award is based*".[52] The Claimant stresses that:

> "*Committees do not have the power to review the adequacy of the reasons set forth by the tribunal in its award. Rather, the role of the committee is limited to analyzing whether a reader can understand how the tribunal arrived at its conclusion. Broadening the scope of Article 52(1)(e) to comprise decisions with inadequate reasons would transform the annulment proceeding into an appeal*".[53]

---

Journal of International Arbitration, p. 661 ("*As a matter of principle, annulment committees should not engage in an analysis of whether the reasons put forward by the tribunal are correct or convincing*".); RL-0107-ENG (see also R-0395-ENG), *Updated Background Paper*, ¶105 ("*The correctness of the reasoning or whether it is convincing is not relevant*".); CL-0218-ENG, *Sabahi & Rubins*, p. 794 ("*annulment committees cannot second guess the reasoning of the tribunal or question the quality of its reasoning*".).

[49]    Counter-Memorial on Annulment, ¶102.

[50]    Counter-Memorial on Annulment, ¶104.

[51]    Counter-Memorial on Annulment, ¶106, citing CL-0187-ENG, *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application for Partial Annulment of Continental Casualty Company, and the Application for Partial Annulment of the Argentine Republic dated 16 September 2011 ("**Continental Casualty**"), ¶103; CL-0192-ENG, *Malicorp*, ¶45; CL-0196-ENG, *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic dated 22 September 2014, ¶169; RL-0158-ENG, *Tulip*, ¶110; RL-0145-ENG, *Micula*, ¶300; RL-0181-ENG, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment dated 5 April 2016 ("**TECO**"), ¶¶90, 275, 278.

[52]    Rejoinder on Annulment, ¶198.

[53]    Rejoinder on Annulment, ¶198, citing RL-0155-ENG, *Caratube*, ¶102.

### (v)    The Committee's Analysis

78.    Under Article 52(1)(e) of the ICSID Convention, a party may request the annulment of an award on the ground that it "*has failed to state the reasons on which it is based*".

79.    In the Committee's view, the immediate context provided by the limited number of annulment grounds under Article 52(1), the prohibition set out in Article 53(1) from subjecting an award to an appeal, and the finality of awards sought by the object and purpose of the ICSID Convention, prevent this Committee from ascribing to Article 52(1)(e) an expansive scope or a meaning that might amount to an appellate review. On the other hand, the context provided by Article 48(3), which states that an award "*shall state the reasons upon which it is based*", would also prevent a narrow interpretation of Article 52(1)(e) that might effectively render the obligation contained in Article 48(3) meaningless. These competing considerations must be borne in mind when conducting an evaluation of the scope of annulment under Article 52(1)(e) of the ICSID Convention.

80.    The Committee notes that in practice, annulment committees have considered that the standard of failure to state reasons requires a review of whether a tribunal's conclusion could be followed through the reading of the stated reasons.[54] While various iterations of this test have been espoused, it is well-established that at the minimum, the ruling must allow the reader to "*follow how the tribunal proceeded from Point A. to Point B*."[55]. This minimum standard is undisputed by the Parties.

81.    The Committee accepts that in practice, *ad hoc* committees have considered that a failure to state reasons can arise in varying situations; for example, where:

(a)    there is a complete absence of reasons for the award or for a given conclusion;[56]

---

[54]    Memorial on Annulment, ¶174, fn. 153; Counter-Memorial on Annulment, ¶¶96, 99. See RL-0181-ENG, *TECO*, ¶87; RL-0115-ENG, *Wena*, ¶79; RL-0110-ENG, *MINE*, ¶5.08; CL-0179-ENG, *Vivendi I*, ¶64.

[55]    RL-0110-ENG, *MINE*, ¶5.09.

[56]    RL-0077-ENG, *Soufraki*, ¶122; RL-0159-ENG, *Pey Casado*, ¶86; RL-0108-ENG, *Sempra*, ¶167.

(b)      there is some apparent reasoning, but a critical lacuna in the explanation, which makes it impossible for the reader to follow the reasoning up to the conclusion;[57]

(c)      there are contradictory reasons cancelling each other out to the extent that they could not stand together, thereby undermining the basis of the conclusions;[58] and

(d)      the statement of reasons is unrelated  to the issues before the tribunal[59], not "*sufficiently pertinent*"[60], not "*sufficiently relevant*" or "*capable of providing a basis for the decision*"[61], "*insufficient, inadequate*"[62], or "*frivolous*".[63]

82.     There has been debate between the Parties as to the appropriate standard of review to apply, in particular with regard to whether a committee is entitled to question the "*sufficiency*" or "*frivolousness*" of the reasoning provided.[64] Given its mandate, this Committee is mindful that it cannot conduct an examination of the reasons that may be regarded as an appeal, a *de novo* reconsideration of them, an *ex-post facto* consideration of matters unresolved by the Tribunal, a re-trial of facts, or a "*quality control*" of the Tribunal's reasons. As such, any assessment of the "*sufficiency*" or "*frivolousness*" of the reasoning provided must be extremely measured, and cannot cross into the realm of a review of the adequacy of the Tribunal's reasoning.

83.     That said, neither can this Committee pursue, on the other hand, an approach of full deference to the Tribunal's findings without examining on an unbiased, neutral, and objective basis whether the Tribunal has indeed stated the reasons supporting its relevant conclusions. While a failure to state reasons can take many forms, the ultimate question is

---

[57]   RL-0193-ENG, *CMS,* ¶¶96-97; RL-0176-ENG, *Enron*, ¶¶389-395.

[58]   RL-0173-ENG, *Klöckner I,* ¶116; CL-0179-ENG, *Vivendi I*, ¶65; CL-0187-ENG, *Continental Casualty*, ¶103.

[59]   CL-0179-ENG, *Vivendi I*, ¶64.

[60]   CL-0178-ENG, *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Applications for Annulment of the 1990 Award and the 1990 Supplemental Award ("*Amco II*"), ¶43.

[61]   RL-0173-ENG, *Klöckner I*, ¶120.

[62]   RL-0108-ENG, *Sempra,* ¶167.

[63]   RL-0110-ENG, *MINE,* ¶5.09.

[64]   Memorial on Annulment, ¶¶175, 177; Counter-Memorial on Annulment, ¶¶99-103.

whether the Committee is satisfied that the Tribunal's award is possible to follow "*from Point A. to Point B.*".[65] If so, there can be no basis for annulment on this ground.

84. Where annulment is sought on the grounds of contradictory reasons in particular (as Spain seeks to do on certain grounds in this case), the Committee's view is that such reasons would only be a valid basis of annulment where the contradictions cause the aforementioned reasons in the award to be incapable of standing together *on any reasonable reading* of the decision. Such an approach is consistent with the committee's limited role in an annulment proceeding. On this issue, the Committee agrees with the analysis set out by the *Continental Casualty ad hoc* committee:

> "*The Committee adds that for genuinely contradictory reasons to cancel each other out, they must be such as to be incapable of standing together on any reasonable reading of the decision. […] In cases where it is merely arguable whether there is a contradiction or inconsistency in the tribunal's reasoning, it is not for an annulment committee to resolve that argument. Nor is it the role of an annulment committee to express its own view on whether or not the reasons given by the tribunal are logical or rational or correct*" (emphasis added).[66]

### D.    ARTICLE 52(1)(D): WHETHER THERE HAS BEEN A SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### (i)    Spain's Position

85. Spain relies on Article 52(1)(d) of the ICSID Convention which states that a party may request annulment of the award on the ground that "*there has been a serious departure from a fundamental rule of procedure*".[67]

86. In particular, Spain relies on the fundamental rule that a party to an arbitration must be given a full and fair opportunity to present its case, that is, the "*right to be heard*".[68] According to Spain, the right to be heard is the "*right to state its claim or its defence and*

---

[65]    RL-0110-ENG, *MINE*, ¶5.09.

[66]    Counter-Memorial on Annulment, ¶106, citing CL-0187-ENG, *Continental Casualty*, ¶103.

[67]    Memorial on Annulment, ¶282.

[68]    Memorial on Annulment, ¶283.

*to produce all arguments and evidence in support of it*"[69] and includes the "*fundamental rule of equality of the parties*".[70]

87.    Spain alleges that there are different ways in which the right to be heard can be breached, namely: (i) when a party cannot present all the arguments and all the evidence that it deems relevant;[71] (ii) when one party does not have the opportunity to respond adequately to the arguments and evidence presented by the other party;[72] (iii) the unjustified denial by a tribunal of an applicant's request for production of documents, such as where the tribunal cites lack of evidence as the basis for its decision and has previously denied requests for documents for that evidence as suggested by the committee in *Pey Casado*.[73]

88.    Spain also submits that the applicant for annulment does not have the obligation to demonstrate that the result of the arbitration would have been different if the violated rule of procedure had been respected, but only the severity of the breach.[74] According to Spain, a deviation will be serious if a party is deprived of the protection afforded by the relevant procedural rule.[75]

### (ii)    The Claimant's Position

89.    The Claimant does not dispute that a party may request annulment of the award on the ground that "*there has been a serious departure from a fundamental rule of procedure*" under Article 52(1)(d). According to the Claimant, *ad hoc* committees have taken a strict approach and required both that the departure of the rule be serious and that the rule in question be fundamental.[76]

90.    With regard to the "*serious*" element, the Claimant does not directly rebut Spain's argument that it is not obliged to demonstrate that the *result* of the arbitration would have

---

[69]    Memorial on Annulment, ¶283, citing RL-0115-ENG, *Wena*, ¶57.

[70]    Memorial on Annulment, ¶284, citing RL-0175-ENG, *Amco I*, ¶88.

[71]    Memorial on Annulment, ¶286, citing RL-0158-ENG, *Tulip*, ¶80.

[72]    Memorial on Annulment, ¶287, citing RL-0113-ENG, *Fraport*, ¶200.

[73]    Memorial on Annulment, ¶¶289-291.

[74]    Memorial on Annulment, ¶292 citing RL-0159-ENG, *Pey Casado*, ¶78.

[75]    Memorial on Annulment, ¶282.

[76]    Counter-Memorial on Annulment, ¶170.

been different if the violated rule of procedure had been respected. While the Claimant cites the *Wena ad hoc* committee's decision that "*[i]n order to be a 'serious' departure from a fundamental rule of procedure, the violation of such a rule must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed*",[77] it also recognizes the differing approach taken by the *Vivendi I ad hoc* committee which established that Article 52(1)(d) was concerned with the manner in which the Tribunal proceeded (i.e. whether parties had a full and fair opportunity to be heard at every stage of the proceedings), *not* the content of the decision.[78]

91.  With regard to the "*fundamental*" element, the Claimant submits that previous committees have considered this with reference to Article 18 of the UNCITRAL Model Law, which mentions the equal treatment of parties and the right to be heard.[79] The Claimant also argues that not all ICSID Arbitration Rules are necessarily fundamental rules of procedure.[80] According to the Claimant, some committees have considered Article 52(1)(d) to refer to "*a set of minimal standards of procedure to be respected as a matter of international law*",[81] while others take a more restrictive approach that only rules of natural justice are fundamental.[82]

92.  With regard to the applicable standard in the context of document production requests in particular, the Claimant argues that Spain has misrepresented the standard[83] as the authorities envisage the "*mere possibility that such a situation may amount to an annulment ground, not a rule set in stone as Spain presents*":[84]

(a)  In the Claimant's submission, Spain's reliance on *Pey Casado* is misplaced as: (i) the respondent State's argument that it was treated unfairly and unequally when the tribunal denied all of its discovery requests was ultimately rejected by the

---

[77]  Counter-Memorial on Annulment, ¶172, citing RL-0115-ENG, *Wena*, ¶58.

[78]  Counter-Memorial on Annulment, ¶173, citing CL-0179-ENG, *Vivendi I*, ¶83.

[79]  Counter-Memorial on Annulment, ¶171, citing RL-0110-ENG, *MINE*, ¶5.06.

[80]  Counter-Memorial on Annulment, ¶171, citing RL-0110-ENG, *MINE*, ¶5.06.

[81]  Counter-Memorial on Annulment, ¶174, citing RL-0115-ENG, *Wena*, ¶57.

[82]  Counter-Memorial on Annulment, ¶174, citing RL-0185-ENG, *CDC Group*, ¶49.

[83]  Counter-Memorial on Annulment, ¶¶178-186.

[84]  Counter-Memorial on Annulment, ¶179.

committee;[85] and (ii) the committee entertained the possibility that a denial of a document production request may amount to a serious violation "*only in the event*" that the tribunal then used the absence of evidence on the issues dealt with in the denied evidentiary request to reach its conclusion.[86]

(b)  The Claimant also relies on *Venezuela Holdings* where the committee found that it could not dispute the tribunal's decision without an investigation into the circumstances of the case, which "*lies plainly beyond the functions of an ad hoc annulment committee*".[87] Further, the committee noted that the "*only aspect properly for consideration by the committee is the possible effect of the Tribunal's refusal to order disclosure*".[88]

### (iii)  The Committee's Analysis

93.  It is not disputed that under Article 52(1)(d) of the ICSID Convention, a party may request the annulment of an award on the ground "*that there has been a serious departure from a fundamental rule of procedure*". This wording implies three aspects that need to be examined: (i) whether there is a fundamental rule of procedure affected; (ii) whether there has been a departure from that procedural rule and (iii) whether that departure has been "*serious*".[89]

---

[85]  Counter-Memorial on Annulment, ¶181.

[86]  Counter-Memorial on Annulment, ¶181; RL-0159-ENG, *Pey Casado*, ¶331.

[87]  Counter-Memorial on Annulment, ¶183, citing RL-0177-ENG, *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment dated 9 March 2017 ("***Venezuela Holdings***"), ¶127.

[88]  Counter-Memorial on Annulment, ¶184, citing RL-0177-ENG, *Venezuela Holdings*, ¶132.

[89]  Other annulment committees have read these three aspects of Article 52(1)(d) as comprised into two: (i) the identification of the (fundamental) rule of procedure and (ii) whether the departure from that rule has been serious. For analytical reasons, this Committee considers that the second notion is to be divided into two questions: whether there has been a departure and whether that departure is serious. See e.g. CL-0178-ENG, *Amco II*, ¶9.07; RL-0110-ENG, *MINE*, ¶4.06; RL-0115-ENG, *Wena*, ¶56; RL-0185-ENG, *CDC Group*, ¶48; RL-0109-ENG, *Tidewater*, ¶160; RL-0177-ENG, *Venezuela Holdings*, ¶130.

94.    On the first issue, the "*fundamental rule of procedure*"[90] must be identified at the outset of the analysis.[91] In defining the procedural rule, it is relevant to bear in mind the distinction drawn between a "*rule of procedure*" (in the sense of the process or the manner in which the tribunal proceeded) and the tribunal's decision (in the sense of the outcome of that process or content of the decision).[92] In practice, examples of fundamental rules of procedure identified by *ad hoc* annulment committees concern (i) the equal treatment of the parties, (ii) the right to be heard, (iii) the requirement of an independent and impartial tribunal, (iv) the treatment of evidence and burden of proof, (v) the deliberations among a tribunal's members.[93]

95.    In the present proceedings, Spain essentially relies on its fundamental right to be heard. While Spain makes references to a violation of its "*right of defence*" and "*unequal treatment of the Parties*" throughout its Memorial and Reply, Spain appears to be using these terms interchangeably with the "*right to be heard*", which it asserts includes the "*fundamental rule of equality of the parties*".[94] Notably, Spain's Memorial states that "[i]*n the present case, the Tribunal committed serious violations of the fundamental norms, **and in particular it seriously deviated from Spain's fundamental right to be heard**, as will be seen below*" (emphasis added).[95] The Claimant does not dispute that the right to be heard is a relevant procedural rule within the meaning of Article 52(1)(d).[96] The Committee agrees with the Parties on this issue.

96.    The second issue is the consideration of whether there has been a departure from the rule of procedure concerned. In the context of the right to be heard, the Committee understands

---

[90]    The Committee is mindful of the fact that the English and French versions of Article 52(1)(d) refer to a "fundamental" rule of procedure and a *règle "fondamentale" de procedure*, while the Spanish one refers simply to a *norma de procedimiento* (without qualifying the importance of this rule). As the three versions are equally authentic, and pursuant to the relevant customary rule of treaty interpretation they are presumed to have the same meaning in each authentic language, the Committee is proceeding on the assumption that the three versions reflect the same meaning.

[91]    RL-0115-ENG, *Wena*, ¶56; RL-0185-ENG, *CDC Group*, ¶48.

[92]    CL-0179-ENG, *Vivendi I*, ¶83.

[93]    RL-0107-ENG (see also R-0395-ENG), *Updated Background Paper*, ¶99.

[94]    Memorial on Annulment, ¶284.

[95]    Memorial on Annulment, ¶292

[96]    Memorial on Annulment, ¶283; Counter-Memorial on Annulment, ¶176.

that "*the right* [of a party] *to state its claim or its defense and to produce all arguments and evidence in support of it*"[97], and the provision of a "*full and fair opportunity to be heard at every stage of the proceedings*" and an "*ample opportunity to consider and present written and oral submissions on the issues*"[98] constitute basic features that define the right to be heard in an arbitral proceeding. In the Committee's view, any deviation from those fundamental procedural guarantees would qualify as a "*departure*" for purposes of Article 52(1)(d).

97.    The third issue to be addressed is whether the challenged procedural departure qualifies as "*serious*". As pointed out by the Claimant, there is some variance in the jurisprudence on what this entails. This seriousness may be measured in terms of the material impact on the outcome of the arbitral decision[99] - in the sense of examining the extent to which the proper application of the procedural rule "*could potentially have affected the award*".[100] However, the seriousness of a procedural departure has also been examined on the basis of the extent to which the departure may have "*deprive*[d] *a party of the benefit or protection which the rule was intended to provide*".[101]

98.    The Committee notes that the Claimant has not refuted Spain's argument that it is not obliged to demonstrate that the *result* of the arbitration would have been different if the violated rule of procedure had been respected. The Committee accepts Spain's argument as it is unrealistic to require a party to prove that the outcome of the Award would differ, and further notes that Spain's argument is supported by the *Pey Casado* decision where the committee held that "[t]*he applicant is not required to show that the result would have been different, that it would have won the case, if the rule had been respected*".[102]

99.    The Committee understands that there may be multiple situations in which allegations of a serious departure from the obligation to provide and ensure the right to be heard may arise

---

97    RL-0115-ENG, *Wena*, ¶57.
98    CL-0179-ENG, *Vivendi I*, ¶85.
99    RL-0107-ENG (see also R-0395-ENG), *Updated Background Paper*, ¶100.
100   RL-0181-ENG, *TECO*, ¶85.
101   RL-0110-ENG, *MINE*, ¶5.05.
102   RL-0159-ENG, *Pey Casado I*, ¶78.

in an arbitral proceeding, including circumstances relating to the production and treatment of documents and evidence, and the opportunity that is afforded to the parties to present their case or their defense.[103]

100.     The Committee disagrees with the Claimant's argument that Spain has misrepresented the standard of review pertaining to document requests. Contrary to the Claimant's submissions,[104] Spain does not go so far as to claim that it has a right to be granted all document requests. It is clear to the Committee that Spain was merely arguing that a refusal of a request of document production, where unjustified, can constitute a violation of the right to be heard. In the Committee's view, the assessment of whether such a right has been violated is inevitably a very fact specific exercise.[105]

## IV.    JURISDICTION AND APPLICABLE LAW

101.     In relation to jurisdiction and applicable law, Spain submits that the Award should be annulled on the grounds that: (i) the Tribunal manifestly exceeded its powers by asserting jurisdiction over a dispute between a Member State from the European Union ("**EU**") and investors from another member state (i.e. an intra-EU dispute) and interpreted Article 26 of the ECT contrary to EU law;[106] (ii) the Tribunal manifestly exceeded its powers by failing to apply EU law (in particular EU law on state aid) to the merits of the case;[107] and (iii) the Award failed to state the reasons for not considering EU law as part of the applicable law.[108] The Committee proceeds to address each of these issues in turn.

---

[103]   RL-0113-ENG, *Fraport*, ¶¶227-232; RL-0159-ENG, *Pey Casado*, ¶¶247-269.

[104]   Counter-Memorial on Annulment, ¶178.

[105]   RL-0107-ENG (see also R-0395-ENG), *Updated Background Paper*, ¶100.

[106]   Memorial on Annulment, ¶¶80-114.

[107]   Application for Annulment, ¶25; Memorial on Annulment, ¶62.

[108]   Memorial on Annulment, ¶172.

A.    **WHETHER THE TRIBUNAL MANIFESTLY EXCEEDED ITS POWERS BY ASSERTING ITS JURISDICTION**

**(i)    Spain's Position**

102.    Spain submits that the Tribunal manifestly exceeded its powers because it did not apply EU law (which led, in turn, to the erroneous assertion of its jurisdiction).[109] In support of the argument that EU law ought to apply, Spain relies primarily on the "*principle of primacy of EU law*"[110] and the *Achmea* Judgment,[111] and also makes reference to EU law being "*international law*" that falls under the scope of Article 26(6) of the ECT.[112] Separately, Spain also argues that on "*the understanding that EU law is applicable to the dispute*",[113] the literal text, object and purpose of the ECT confirm that the dispute settlement provision of the ECT, i.e. Article 26,[114] was not intended to cover intra-EU disputes.[115] Accordingly, Spain requests the Committee to determine whether the Tribunal asserted jurisdiction beyond what it was entitled to under the applicable rules.[116]

103.    Spain first argues that EU law should apply to the dispute in light of the "*principle of primacy*" of EU law.[117] In Spain's submission, this principle gives preference to EU law in the event of a conflict between the rules of a Member State and EU law, and also applies to the "*rules that Member States endow themselves through international agreements or treaties, that is, it applies in the context of Public International Law*".[118] Spain argues[119] that this principle of primacy is evidenced by: (i) Article 267 of the TFEU which, according to Spain, provides that the highest judicial instance of each Member State may submit

---

[109]    Reply on Annulment, ¶78.

[110]    Memorial on Annulment, ¶¶80-87; Reply on Annulment, ¶¶64-79, 82-85, 95-111.

[111]    Memorial on Annulment, ¶¶88-104; Reply on Annulment, ¶¶112-132.

[112]    Reply on Annulment, ¶¶86-89; Article 26(6) of the ECT states that: "[a] *tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".

[113]    Reply on Annulment, ¶48.

[114]    Article 26 is titled "*Settlement of Disputes between and Investor and a Contracting Party*". Under Article 26(4), an investor may choose to, amongst other things, submit a dispute for resolution to international arbitration.

[115]    Memorial on Annulment, ¶¶105-112; Reply on Annulment, ¶¶47-60, 133-151.

[116]    Reply on Annulment, ¶45.

[117]    Memorial on Annulment, ¶¶80-87.

[118]    Memorial on Annulment, ¶¶81-82, 113.

[119]    Memorial on Annulment, ¶¶86-87; Reply on Annulment, ¶58.

preliminary ruling procedure questions on EU law to the CJEU;[120] and (ii) Article 344 of the TFEU which prohibits Member States from submitting a dispute that affects the interpretation or application of EU Treaties to a method of dispute resolution other than their national courts.[121]

104.    Spain claims that in the event of a conflict between the ECT and EU law, the conflict will have to be resolved in accordance with the principle of primacy of EU law.[122] However, it contends that in this case the Tribunal ignored the specific rules of conflict contained in EU law and instead relied on a "*biased*"[123] interpretation of Article 16 when it concluded that:

> "[…] *under Article 16 of the ECT, a provision of another treaty can only operate as the rule of decision that supplants the investment protection provisions of Part III of the ECT if that other treaty provides substantive protections that are more favorable to investors than are the investment protection provisions of Part III of the ECT. Claimant has not invoked any such provision in an EU treaty, nor does the Tribunal find one to exist*".[124]

105.    According to Spain, "*Article 16 of the ECT is not a conflict resolution rule but an interpretative precept*".[125] In Spain's submission, if a conflict was deemed to exist between the ECT and EU law, it should have been resolved by application of Article 30 of the Vienna Convention on the Law of Treaties (the "**VCLT**"),[126] under which the primacy of

---

[120]    Memorial on Annulment, ¶86, citing, RL-0001-ENG, Consolidated versions of the Treaty on European Union and the Treaty on the Functioning of the European Union (2012/C 326/01), and Charter on Fundamental Rights (2012/C 326/02), Official Journal of the European Union dated 26 October 2012 ("**TFEU**"), Article 267: "*The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning: a) the interpretation of the Treaties*".

[121]    Memorial on Annulment, ¶87, citing, RL-0001-ENG, TFEU, Article 344: "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein*".

[122]    Reply on Annulment, ¶¶96-98.

[123]    Reply on Annulment, ¶¶67-68.

[124]    Reply on Annulment, ¶67, citing the Award, ¶164.

[125]    Reply on Annulment, ¶98.

[126]    Reply on Annulment, ¶96.

EU law would still prevail as *lex posterior* given that this principle "*was codified in Declaration 17 annexed to the Lisbon Treaty, signed in 2007*".[127]

106.    In the same vein, Spain contends that the Tribunal was "*wrong to reach* [the] *conclusion*"[128] that the *Achmea* Judgment (which is based on *inter alia* the effects of Articles 267 and 344 of the TFEU)[129] did not apply to the dispute. In the *Achmea* Judgment, the CJEU was asked to make a preliminary ruling on whether an arbitration clause in the Slovakia-Netherlands BIT was compatible with the TFEU, and concluded that:

> "*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*".[130]

107.    In Spain's submission, the *Achmea* Judgment is directly applicable to the case at hand as the Tribunal was called upon to apply EU law and the Award is not subject to review by the EU judicial system.[131] Spain argues that the findings in *Achmea* are "*fully extrapolable*" to the present case and if they had been properly analysed by the Tribunal, "*it would have found it necessary to apply EU law to the merits of the dispute, thereby demonstrating its lack of jurisdiction*".[132]

108.    Additionally, in support of its argument that EU law is applicable to the issue of jurisdiction as well as the merits of the dispute,[133] Spain makes reference to Article 26(6) of the ECT which states that: "[a] *tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international*

---

[127]    Reply on Annulment, ¶¶96-98.

[128]    Reply on Annulment, ¶64.

[129]    Memorial on Annulment, ¶91; Reply on Annulment, ¶119.

[130]    RL-0098-ENG, *Republic of Slovakia v. Achmea BV*, Case C-284/16, Judgement of the Court of Justice of the European Union dated 6 March 2018 ("***Achmea* Judgment**"), ¶60.

[131]    Memorial on Annulment, ¶96.

[132]    Reply on Annulment, ¶64.

[133]    Reply on Annulment, ¶¶82-89.

*law*".[134] Relying on its expert, Prof. Gosalbo, Spain argues that EU law (as international law) should be applied in the present case.[135] Spain claims that Article 26(6) incorporates the principle of "*iura novit curia*" into the ECT, directing the Tribunal to determine and specify the international standard applicable to the procedure for resolving not only the issues on the merits, but all "*the issues in dispute*", thus including the issues of jurisdiction, merits and quantum.[136]

109.    On the understanding that EU law is applicable to the dispute, Spain argues that the literal text, object and purpose of the ECT confirm that Article 26 of the ECT cannot confer jurisdiction on an arbitral tribunal to hear an intra-EU dispute:[137]

(a)     First, Spain objects to the Tribunal's conclusion that the literal wording of the ECT does not establish a differentiated treaty for EU Member States. Spain argues that this distinction has been made by Member States which have signed a series of treaties that make up EU law and that prevail over the ECT in accordance with the principle of primacy.[138] Spain further submits that a literal interpretation of the ECT itself, including the proper consideration of notions such as "*Regional Economic Integration Organization*" ("**REIO**"), "*Area*" and "*Contracting Party*", also supports the exclusion of intra-EU disputes from the scope of Article 26 as there is no diversity between the "*Area*" in which the investment is made and the Contracting Parties related to that Area.[139] According to Spain, Articles 1, 10, 16, 25 and 36 of the ECT support this literal interpretation.[140]

(b)     Secondly, Spain argues that the object and purpose of this treaty – which was set out to promote energy development in the former Soviet Republics, not among EU

---

[134]   Reply on Annulment, ¶86.

[135]   Reply on Annulment, ¶86; see also Memorial on Annulment, ¶117.

[136]   Reply on Annulment, ¶87.

[137]   Reply on Annulment, ¶48.

[138]   Memorial on Annulment, ¶107.

[139]   Memorial on Annulment, ¶107; Reply on Annulment, ¶¶49-50, 133-135.

[140]   Reply on Annulment, ¶49.

Member States themselves – shows that EU Member States did not, and could not, consent to submit intra-EU disputes to arbitration.[141]

### (ii) The Claimant's Position

110. As a general point, the Claimant stresses that an annulment proceeding is not an appeal and that Spain's disagreement with the Tribunal's conclusions on the relevance of EU law are not a valid ground for annulment on the basis of a manifest excess of powers.[142] According to the Claimant, Spain is seeking to reargue the dispute, which is contrary to what an ICSID annulment proceeding is concerned with.[143] The Claimant emphasizes that a claim in an annulment proceeding that there was no proper application of the law must be based on a failure "*of such nature or degree as to constitute objectively [...] its effective non-application*".[144] The Claimant submits that, given the applicable standard for the manifest excess of powers, it is under no obligation to address Spain's theories on EU law, nor should the Committee feel obliged to do so.[145]

111. The Claimant notes that, while Spain has invoked the principle of primacy of EU law as the basis for its challenge,[146] this principle was originally developed to resolve internal conflicts between EU law and national laws and "*does not extend* [...] *to other agreements, signed with non-EU Member States or multilateral agreements such as the ECT*".[147] The Claimant further argues that the implications of Spain's arguments based on the *Achmea* Judgment are unacceptable from the perspective of public international law. According to the Claimant, accepting Spain's argument would result in EU law applying to disputes under the ECT involving non-EU investors in which the host State is an EU Member.[148] The Claimant further argues that the *Achmea* Judgment is irrelevant because: (i) the ECT includes no reference to the national law of the host state, contrary to the BIT at issue in

---

[141] Reply on Annulment, ¶¶51-53, 149-151.
[142] Counter-Memorial on Annulment, ¶29.
[143] Rejoinder on Annulment, ¶¶55-56.
[144] Rejoinder on Annulment, ¶61.
[145] Rejoinder on Annulment, ¶68.
[146] Counter-Memorial on Annulment, ¶31.
[147] Counter-Memorial on Annulment, ¶31.
[148] Counter-Memorial on Annulment, ¶¶33-34

the *Achmea* Judgment; and (ii) the ECT is a multilateral treaty that includes amongst its signatories, non-EU Member States and the EU itself, with no exception for intra-EU disputes.[149]

112.    The Claimant further submits that the Tribunal gave consideration to EU law, and applied the choice made by the Parties, i.e. the ECT.[150] According to the Claimant, the Tribunal interpreted Article 26(6) of the ECT as not excluding EU treaties from "*potential sources*" of the applicable law, while acknowledging that Article 16 does not permit derogations from the ECT investor protections if these provisions are more favourable to the investor than those of other international agreements.[151] The Tribunal properly applied Article 16 of the ECT,[152] and could not find that there was an EU treaty provision more favourable to the investor, and therefore it could not derogate from the ECT.[153]

### (iii)    The Committee's Analysis

113.    It is useful to first set out a brief summary of the Tribunal's findings on jurisdiction before turning to the Committee's analysis of the arguments raised by the Parties in this regard. In summary:

(a)    The Tribunal divided its analysis on the issue of jurisdiction into two questions in the light of the preliminary objections raised by Spain in the arbitral proceedings: (i) "[t]*he Contention that the ECT Contains an Implied Exception for 'Intra-EU disputes*'"[154] and (ii) "[t]*he Claim that the TFEU Excludes the Tribunal's Jurisdiction, Taking into Account Achmea v. Slovakia*".[155]

(b)    In respect of the first question, the Tribunal interpreted the ECT "*in accordance with the ordinary meaning of its terms, in their context and in light of the object*

---

[149]    Counter-Memorial on Annulment, ¶¶42-43.

[150]    Counter-Memorial on Annulment, ¶¶28, 47.

[151]    Rejoinder on Annulment, ¶62; Counter-Memorial on Annulment, ¶¶39-41.

[152]    Rejoinder on Annulment, ¶58.

[153]    Rejoinder on Annulment, ¶62.

[154]    Award, Section VI.A.(2)a.

[155]    Award, Section VI.A.(2)b.

*and purpose of the treaty*",[156] before concluding that "*that there is no implied exception to the ECT that excludes intra-EU investments and intra-EU disputes from the Treaty*".[157] Amongst other things, the Tribunal rejected Spain's argument that Article 26(1) of the ECT requires a diversity of nationality and "Area" in the context of a REIO, like the EU (of which both Germany and Spain are Member States).[158]

(c)    As for the second question, the Tribunal answered this by considering three specific sub-questions: (i) whether Article 344 of the TFEU addresses the same subject matter as Article 26 of the ECT; if so (ii) whether there is an inconsistency between the two treaties; and if so (iii) whether the TFEU or the ECT prevails in a conflict situation.[159] The Tribunal considered, *inter alia,* the CJEU's judgment in *Achmea* that Article 3 of the Slovakia-Netherlands BIT was inconsistent with the TFEU and that Articles 267 and 244 of the TFEU had primacy over the BIT, before proceeding on the basis that the first two sub-questions were answered in the affirmative.

(d)    To answer the third sub-question, the Tribunal considered that Article 16 of the ECT "*expressly addresses the relationship between the dispute settlement chapter of the ECT and the provisions of another treaty on that subject matter* […] *in clear terms and comprehensive terms*".[160] Applying Article 16 of the ECT, the Tribunal found that the TFEU would prevail over the ECT "*only if the provisions of the TFEU are more favourable to the Investor than is Part V of the ECT*".[161] However, in the Tribunal's view, the TFEU was not "*more favourable*" than the ECT because the ECT "*adds the mechanism of investor-State dispute settlement to the*

---

[156]  Award, ¶223.
[157]  Award, ¶237.
[158]  Award, ¶226.
[159]  Award, ¶241.
[160]  Award, ¶246.
[161]  Award, ¶247.

*mechanisms that would otherwise be available to an investor*", and thus could not derogate from the ECT.[162]

114. The Committee addresses this ground of annulment on the basis of the arguments put forward by the Parties and the Tribunal's findings as reflected in the Award. As set out above, Spain's case is essentially that, in interpreting Article 26 of the ECT, the Tribunal did not apply or alternatively misinterpreted EU law.[163] The Committee understands that Spain's argument is premised on the notion that a proper reading of Article 26 must contemplate the implications derived from EU law, as reflected in the *Achmea* Judgment (among other documents), and should have led the Tribunal to conclude that Article 26 of the ECT was inapplicable to this intra-EU dispute.[164]

115. At the outset, the Committee reiterates that in order to justify annulment on the ground that there has been a manifest excess of power, the excess of power must be discernable from a plain reading of the award and perceived or recognized as such by an annulment committee without difficulty. The Committee notes that this claim of manifest excess of power encompasses an alleged *misapplication* or *misinterpretation* of the applicable law in respect of the establishment of jurisdiction in the dispute. As noted above, in this type of situation, the threshold for finding an annullable error of law must be very high and should require the finding of an erroneous interpretation or misapplication of the law "*so gross or egregious as substantially to amount to failure to apply the proper law*".[165]

116. Spain argues that Article 26 was not properly interpreted because no relevant consideration was given to EU law, in particular the *Achmea* Judgment and the principle of primacy of EU law in the case of a conflict of laws. However, the Committee is not persuaded that an excess of power is discernible without difficulty from a plain reading of the Award.

---

[162] Award, ¶248.

[163] Memorial on Annulment, ¶¶76, 106; Reply on Annulment, ¶¶48-63.

[164] Memorial on Annulment, ¶¶96-104.

[165] Memorial on Annulment, ¶¶64-65, 67, citing RL-0077-ENG, *Soufraki*, ¶86; RL-0157-ENG, *Iberdrola*, ¶97; Counter-Memorial on Annulment, ¶24; Reply on Annulment, ¶26.

117.    In addressing this matter, the Committee refers to the section in the Award in which the Tribunal dealt with the question of whether its jurisdiction could be excluded by virtue of the TFEU.

118.    As a starting point, the Committee notes that the Tribunal was aware of the issue, and stated the relevant question: "*whether the TFEU operates to change the meaning or validity of the ECT for those ECT Contracting Parties that are also EU Member States*."[166] The Tribunal then proceeded to examine whether the scope of Article 344 of the TFEU affects the scope of Article 26 of the ECT – in the sense of determining whether the two provisions address the same subject matter.

119.    The Tribunal noted that the CJEU in *Achmea* had found that an investor-State arbitration clause in a BIT between two EU Member States was inconsistent with the TFEU.[167] The Tribunal considered it "*prudent to proceed, arguendo on the assumption that a provision of a non-EU treaty in which treaty parties agree to investor-State dispute settlement does fall within the scope of Article 344 of the TFEU, even if the investment treaty is a multilateral treaty to which the EU itself is a party, such as the ECT*". With this assumption, the Tribunal concluded that "*it would follow from the reasoning in Achmea that the consent of EU Member States to investor-State arbitration pursuant to Article 26 of the ECT is in conflict with Article 344 of the TFEU, as the TFEU has been interpreted by the CJEU*".[168] On this basis, the Tribunal concluded that it must therefore determine which treaty takes precedence.

120.    Up to this point, the Committee cannot identify any argument from Spain showing a gross error in the manner in which the Tribunal approached its interpretation of Article 26 of the ECT in the light of EU law and the *Achmea* Judgment.

121.    The Tribunal then faced the question of which treaty – the ECT or the TFEU – should prevail in that presumed situation of conflict. To resolve it, the Tribunal considered the possibility of resorting to the general customary rules on treaty law as reflected in

---

[166]    Award, ¶238.
[167]    Award, ¶243.
[168]    Award, ¶245.

Article 30 of the VCLT.[169] However, the Tribunal identified a provision in the ECT that it considered it more specific to address the issue, i.e. Article 16 of the ECT. The Committee notes that this provision has the title "*Relation* [of the ECT] *to other Agreements*". The Tribunal stated that "*Article 16 of the ECT expressly addresses the relationship between the dispute settlement chapter of the ECT and the provisions of another treaty on that subject matter* [...] *in clear terms and comprehensive terms*".[170] It is clear to the Committee that the Tribunal took into consideration the findings in the *Achmea* Judgment, but simply reached a different conclusion on whether the TFEU ought to prevail over the other investment agreement in question, which was the ECT in this case.

122.     Spain questions the Tribunal's resort to Article 16 because the Tribunal interpreted it in a "*biased*"[171] manner which departs from the logical conclusion that any conflict that might arise must be resolved according to the rules enshrining the principle of primacy,[172] and "*Article 16 of the ECT is not a conflict resolution rule but an interpretative precept*".[173] For the Committee, it is clear that Spain disagrees with the Tribunal's resort to Article 16. However, the Committee has not been able to find in Spain's arguments any explanation of why the Tribunal's interpretation of Article 16 could be characterised as biased or incorrect, let alone sufficiently "*egregious*" to justify annulment. Neither does the Committee find an explanation of the distinction drawn between a "*conflict resolution rule*" and an "*interpretative precept*", and the reason why the Tribunal's reliance on Article 16 – although it is an alleged interpretative precept – would constitute an egregious error. In fact, the Committee notes that in its arguments on the applicable law on the merits, Spain has characterised Article 16 as a provision that would be applicable exclusively, if what Spain intended was the non-application of the ECT.[174] The Committee understands this statement from Spain as suggesting that in certain contexts Article 16 may play the function of a rule of conflict.

---

[169]  Award, ¶246. Spain also recognises this possibility in its submissions. Reply on Annulment, ¶98.
[170]  Award, ¶246.
[171]  Reply on Annulment, ¶68.
[172]  Reply on Annulment, ¶69.
[173]  Reply on Annulment, ¶98.
[174]  Memorial on Annulment, ¶119.

123.    Spain also argues by relying on Article 16, that the Tribunal disregarded the special rule of conflict provided in EU law, by which Spain means the principle of primacy of EU law.[175] The Committee disagrees that this amounts to an annullable error of law. It is clear to the Committee that the Tribunal considered that the conflict ought to be resolved by the special rule in Article 16 of the ECT, as opposed to the principle of primacy of EU law or the more general, "*residual*", rules contained in Article 30 of the VCLT. The Tribunal's view was based on the understanding that Article 16 of the ECT expressly addresses the relationship between the dispute settlement chapter of the ECT and the provisions of another treaty on that subject matter[176] in clear and comprehensive terms.[177] The Committee also understands that the Tribunal considered Article 16 as a rule that prevails over any *lex posterior* or *priori* given that the Tribunal noted that "*Article 16 of the ECT has a comprehensive temporal scope; it applies both to treaties that are subsequent to the ECT (such as the TFEU) and prior EU and European Community treaties*".[178]

124.    In contrast, the Tribunal could not find support for Spain's proposition that the principle of EU primacy over non-EU treaties was "*so obvious*" as of the time of negotiation of the ECT that there was no need for an express exclusion.[179] Against this background, the Committee cannot find in Spain's submissions any challenge to the Tribunal's resort to Article 16 that would demonstrate a severe or egregious error in the manner in which the Tribunal interpreted and applied this provision.

125.    Insofar as Spain argues that EU law is international law, which ought to be applied to the question of jurisdiction pursuant to Article 26(6), the Committee notes that the Tribunal considered Article 26(6) in the context of the other provisions of the ECT before it concluded that the "*issues in dispute*" referred to in Article 26(6) only concerned the law applicable to the merits, *not* jurisdiction.[180] While Spain asserts that "[n]*owhere does*

---

[175] Reply on Annulment, ¶96.
[176] Award, ¶246.
[177] Award, ¶246.
[178] Award, ¶249.
[179] Award, ¶234.
[180] Award, ¶¶156-159.

*Article 26(6) of the ECT indicate that it should not apply to the question of jurisdiction*",[181] the Committee cannot find in Spain's arguments any explanation on how the Tribunal's analysis regarding what constitutes an issue in dispute under Article 26(6) amounts to an egregious error that justifies annulment. As such, the Committee does not consider it necessary to address the Parties' substantive arguments on whether EU law is "*international law*" for the purposes of determining whether there was a manifest excess of powers on the issue of jurisdiction. Instead, these arguments are addressed below in the context of whether there was a manifest excess of powers regarding the determination of the law applicable to the merits.

126.   As for Spain's criticisms in respect of the Tribunal's interpretation of the ECT itself, the Committee notes that Spain disagrees with the manner in which the Tribunal read the treaty terms concerned, in particular the notions of "*Area*" and "*REIO*" under Article 1 of the ECT. However, the Committee notes that, other than expressing divergent views, Spain has not submitted any specific error of such a severe or "*egregious*" character in the Tribunal's interpretation of the terms of Articles 1 and 26 of the ECT so as to call into question the effective application of the ECT.

127.   For the Committee, the fact that the Tribunal allegedly relied on a simple textual interpretation of relevant terms under the ECT is not an interpretative approach that may be characterised in itself as constituting a gross error in the interpretation of a given treaty provision. Rather, the Committee notes that a reading of the relevant section of the Award shows that the Tribunal conducted a complex interpretative task, with various layers of analysis, and certainly went beyond a simple reliance on the ordinary meaning of the terms contained in the ECT.

128.   Therefore, the Committee has not been able to identify a gross or egregious error in the Tribunal's interpretation and application of Article 26 and other related provisions of the ECT in the establishment of the Tribunal's jurisdiction pursuant to the ECT. Accordingly,

---

[181]   Reply on Annulment, ¶87.

the Committee considers that the Tribunal did not exceed its powers within the meaning of Article 52(1)(b) of the ICSID Convention.

**B.    WHETHER THE TRIBUNAL MANIFESTLY EXCEEDED ITS POWERS BY DECIDING NOT TO APPLY EU LAW TO THE MERITS OF THE CASE**

**(i)    Spain's Position**

129.    Spain contends that the Tribunal manifestly exceeded its powers by identifying incorrectly the applicable law and refusing to apply EU law, in particular the provisions of the TFEU on state aid and other EU derivative rules (including European Commission's directives and decisions) for purposes of examining the merits of the dispute.[182] In the alternative, Spain submits that the Tribunal incurred a gross misapplication of EU law.[183]

130.    Spain claims that the Tribunal dispensed with the "*triple nature*" of EU law (as international law, domestic law, and as fact) and considered only the question of whether EU law offers "*applicable rules and principles of International Law*" pursuant to Article 26(6) of the ECT.[184] In Spain's submission, while the Tribunal recognised that EU treaties could be "*potential sources of 'applicable rules and principles of international law'*", it nevertheless discarded their applicability to an intra-EU dispute.[185] According to Spain, it had taken the position that "***together with the rules contained in the ECT itself***, *the reference in Article 26 (6) of the ECT to 'applicable rules and principles of international law' should lead to the application, **also**, of the European Union law*"[186] (emphasis in original). However, the Tribunal failed to examine whether the ECT and EU law could not be interpreted in an integrated manner.[187] Instead, it misconstrued Spain's position and applied Article 16 of the ECT, which would only have been relevant if Spain had sought

---

[182]    Memorial on Annulment, ¶120; Reply on Annulment, ¶¶170, 172, 182-183, 245.
[183]    Memorial on Annulment, ¶116; Reply on Annulment, ¶246.
[184]    Memorial on Annulment, ¶118.
[185]    Memorial on Annulment, ¶118.
[186]    Memorial on Annulment, ¶119.
[187]    Reply on Annulment, ¶167.

the "*non-application of the ECT*".[188] On this basis, Spain argues that the Tribunal incorrectly identified the applicable law and manifestly erred in interpreting it.[189]

131.    Apart from the "*error of assuming that* [EU law]*, if applied, would automatically exclude the ECT*",[190] Spain criticizes the Tribunal for only entertaining the possibility that EU treaties could be "*Applicable International Law*" under Article 26(6) of the ECT, and ignoring the other rules of EU law invoked by Spain.[191] Furthermore, Spain argues that the Tribunal incorrectly addressed the question of primacy of EU law (over other international law) and failed to explain why the rules in respect of state aid found in Articles 107 and 108 of the TFEU should be ignored[192] even though the European Commission's Decision on Spain's regulations in support of renewable energies ("**2017 EC Decision**") concludes that the subsidies granted are "*State Aid*" subject to the corresponding regulations (i.e. Articles 107 and 108 of the TFEU).[193]

132.    In its Reply, Spain further asserts that the Award violated all sources of international law.[194] Treaty law (as reflected in the TFEU and other EU treaties), customary rules (consisting of a recognised, permanent and consistent practice of respect of autonomy and primacy of EU law over any other rules) and the general principles of law (in particular *pacta sunt servanda* with respect to the observance of the EU rules on state aid) imposed on the Tribunal the obligation to accord primacy to EU law over the ECT.[195]

133.    Next, Spain argues that the Tribunal did not address the "*factual aspect*" of Spain's arguments on EU law when it analysed the Claimant's legitimate expectations.[196] According to Spain, the Tribunal contradicted itself by stating that the EU rules on state

---

[188]    Memorial on Annulment, ¶119.

[189]    Memorial on Annulment, ¶120.

[190]    Memorial on Annulment, ¶120.

[191]    Memorial on Annulment, ¶¶120-121.

[192]    Memorial on Annulment, ¶¶122-124.

[193]    Memorial on Annulment, ¶¶125-126, citing RL-0141-ENG, Decision C(2017) 7384 of the European Commission, rendered on 10 November 2017, regarding the Support for electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2015/NN)); Reply, ¶247.

[194]    Reply on Annulment, ¶173.

[195]    Reply on Annulment, ¶¶172-245.

[196]    Reply on Annulment, ¶¶163-164, 251-253, 267, 270.

aid were essential to assess the expectations of the investor while dismissing any analysis of the state aid provisions and its applicability to the case.[197]

134.    In Spain's submission, the fact that the 2017 EC Decision was rejected merely because "*it is later in time than when the measures in dispute were enacted*" highlights the Tribunal's failure to conduct a correct analysis of the content of this decision, which is essential for a proper understanding of the investor's legitimate expectations.[198] Had the Tribunal applied EU law to the dispute, it would have had to consider whether Royal Decree 661/2007 and Royal Decree 1578/2008 were notified to the European Commission and the implication of the non-notification on the investor's legitimate expectations.[199]

135.    With regard to Spain's alternative argument that the Tribunal misapplied EU law, it claims that the Tribunal completely ignored the 2017 EC Decision[200] and "*the Award makes an interpretation directly contrary to EU law (disregarding it both as law and as fact) when it omits to analyse the primacy of Community law over the ECT, without even analysing its relevance to the issues in dispute*".[201]

### (ii)    The Claimant's Position

136.    According to the Claimant, the Tribunal considered EU law to the limited extent that it was relevant to the Parties' dispute (through the prism of the ECT), and made no error in applying the proper law.[202] Accordingly, the Claimant submits that Spain fails to establish the "*exceptional circumstances*" under which a misapplication of law can be a ground for annulment.[203]

137.    According to the Claimant, Spain's challenge to the Tribunal's position on the applicable law rests on the same basis as the jurisdictional argument, i.e. the principle of primacy of

---

[197]    Memorial on Annulment, ¶127.
[198]    Memorial on Annulment, ¶128.
[199]    Memorial on Annulment, ¶132.
[200]    Reply on Annulment, ¶247.
[201]    Reply on Annulment, ¶251.
[202]    Rejoinder on Annulment, ¶¶52, 55.
[203]    Rejoinder on Annulment, ¶99.

EU law.[204] The Claimant submits that if Spain's arguments are accepted, any investment case which (according to EU law) raises issues of state aid is a case in which EU law must be applied, thus resulting in EU Member States' international obligations under the ECT being systematically overridden.[205]

138.    According to the Claimant, the Tribunal turned to the ECT as the Parties' only express choice of law, to determine the law applicable to the merits of the dispute. The Tribunal accepted Spain's argument that EU law formed part of international law, but still considered the ECT as the primary applicable law.[206]  In the Tribunal's view, pursuant to Article 16, the provisions of another treaty could only be envisaged if they provide substantive protections that are more favourable to the investor than the investment protection provisions of the ECT. Applying this, the Tribunal found that the provisions of EU treaties, in particular Articles 107 and 108 of the TFEU, did not afford better protection to the Claimant than the ECT, and were thus not applicable to the dispute.[207]

139.    In response to Spain's argument that *both* the ECT and EU law should apply to this dispute in an integrated manner, the Claimant argues this argument was already rejected by the Tribunal in accordance with the Parties' choice of law as determined by the Tribunal.[208] The Claimant further argues that Spain does not rely on a binding proposition of law in support of this argument.[209]

140.    With regard to Spain's arguments on the primacy of EU law, the Claimant argues that there was no reason to apply the principle of primacy of EU law, or any rule of EU law, because the Tribunal was not a European institution or court.[210]

---

[204]    Counter-Memorial on Annulment, ¶35.
[205]    Counter-Memorial on Annulment, ¶¶35-36.
[206]    Counter-Memorial on Annulment, ¶48.
[207]    Counter-Memorial on Annulment, ¶49.
[208]    Counter-Memorial on Annulment, ¶55.
[209]    Rejoinder on Annulment, ¶¶91-92.
[210]    Counter-Memorial on Annulment, ¶50.

141.    As for Spain's assertion that the Award is "*in violation of all sources of international law*", the Claimant argues that this is new and completely irrelevant.[211] According to the Claimant, Spain only cites sources of EU law focusing on the TFEU and EU state aid provisions in support of this argument.[212] In the Claimant's submission, Spain does not explain how the fact that the EU has a legal system in the area concerned has an impact on the ECT's interpretation,[213] or how the principle of *pacta sunt servanda* imposes a duty on the Tribunal or the Committee to enforce the rules on EU state aid in the context of the ICSID dispute.[214]

142.    As regards the 2017 EC Decision, the Claimant argues that the Tribunal did not ignore this decision as Spain claims, but simply considered that the decision did not include protections that were more favourable than the provisions in the ECT, and thus could not apply to the dispute pursuant to Article 16 of the ECT.[215] As for the "*factual aspect*" of Spain's argument, the Claimant argues that the Tribunal dismissed the relevance of the decision on the establishment of legitimate expectations because it "*could not have operated as law governing [Spain]'s imposition of the Disputed Measures* [...] *in 2010-2013*".[216] In the Claimant's submission, the Tribunal gave the appropriate weight to the 2017 EC Decision and Spain cannot argue now that "*[t]he Award does not consider this issue*".[217]

143.    Regarding Spain's alternative argument on the alleged "*misapplication*" of EU law, the Claimant submits that this is merely a combination of Spain's arguments on the Tribunal's reasons regarding the Claimant's legitimate expectations and the concept of primacy of EU law.[218] The Claimant reiterates that the Tribunal's reasoning was clear, and that Spain has

---

[211]    Rejoinder on Annulment, ¶¶93-94.

[212]    Rejoinder on Annulment, ¶94.

[213]    Rejoinder on Annulment, ¶96.

[214]    Rejoinder on Annulment, ¶97.

[215]    Counter-Memorial on Annulment, ¶51.

[216]    Counter-Memorial on Annulment, ¶53.

[217]    Rejoinder on Annulment, ¶100.

[218]    Rejoinder on Annulment, ¶99.

avoided any attempt to explain how a 2017 document could be relevant to investors' legitimate expectations in 2010-2013.[219]

### (iii)    The Committee's Analysis

144.    The Committee proceeds to assess whether the Tribunal exceeded its powers by deciding not to accept EU law as part of the applicable law, and in particular TFEU Articles 107 and 108 and the 2017 EC Decision. The Committee's analysis is based on the arguments that the Parties put forward and the findings that the Tribunal made in its Award. The Committee understands Spain's claim at issue as focused on the alleged failure by the Tribunal to apply the applicable law (or part of it). Spain does not contest the fact that the ECT is applicable law, but argues that it had to be applied jointly[220] and interpreted in an integrated manner with EU law.[221] The Claimant also notes that the Tribunal considered the ECT as the primary applicable law.[222]

145.    The question before this Committee is therefore whether the Tribunal acted within its powers in concluding that "*EU law is not part of the law applicable in this case*".[223] Article 26(6) of the ECT states that "[a] *tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*". For the Committee, it is undisputed that the ECT is part of the applicable law in the dispute. The question is whether the Tribunal exceeded its authority by interpreting the remaining terms of Article 26(6), i.e. "*applicable rules and principles of international law*", as not including EU law. The Committee understands that it should examine whether the Tribunal made a gross or egregious misinterpretation of the terms "*applicable rules and principles of international law*" in Article 26(6) of the ECT so as to deny applicability to a set of rules (EU law on state aid) that were otherwise applicable in this dispute.

---

[219]    Rejoinder on Annulment, ¶100.

[220]    Memorial on Annulment, ¶119.

[221]    Reply on Annulment, ¶167.

[222]    Counter-Memorial on Annulment, ¶48.

[223]    Award, ¶167.

146.    The Committee notes that the Tribunal was mindful of the interpretative task at issue.[224] It was also mindful of the distinction made by Spain on the "*triple*" nature of EU law. In that respect, it noted that the ECT "*does not identify domestic law as a source of applicable law*". Therefore, the Tribunal decided to set aside the invocation of EU as domestic law or as fact.[225] The Tribunal then found that EU treaties are clearly "*treaties*" and "*agreements*" under the VCLT. Accordingly, the Tribunal considered that "*EU treaties cannot be excluded as potential sources of 'applicable rules and principles of international law' within the meaning of ECT Article 26(6)*".[226]

147.    However, it is important to emphasize that the Tribunal merely identified EU treaties as **_potential_** sources of international law. Contrary to Spain's allegations, the Tribunal did not conclude at that stage that those treaties were necessarily part of the applicable international law to the dispute for purposes of Article 26(6). It must be noted that the Tribunal had already expressed its view that "*treaties other than the ECT could also play a role as applicable law in a variety of ways*", and that "*there are circumstances in which the provisions of a treaty other than the ECT could have an impact on the substantive law to be applied in a dispute in which a breach of Part III of the ECT is alleged and thus can play a role as applicable law*".[227] Thus, the Tribunal had envisaged that not in all circumstances would an international agreement (other than ECT) qualify as part of the applicable law. As a clear example of this possibility, the Tribunal cited Article 16 of the ECT, "*pursuant to which the substantive protections of another 'international agreement' cannot derogate from the investor protections contained in Part III of the ECT if the provisions of the ECT are more favorable to the Investor or the Investment than are the provisions of the other international agreement*".[228] In having proceeded this way, the Committee does not find in the Tribunal's conduct an egregious interpretation or severe

---

[224]    Award, ¶¶160-161.

[225]    Award, ¶161.

[226]    Award, ¶163.

[227]    Award, ¶162.

[228]    Award, ¶162.

error in the application of Article 26(6) of the ECT, such that would amount to a failure to apply the proper law.

148.    The Tribunal then faced the duty of resolving the question of applicability of EU law in the context of having considered itself bound to decide the dispute in accordance with the ECT.[229] The Tribunal resorted to Article 16 of the ECT which is entitled "*Relation [of the ECT] to other Agreements*". The Tribunal followed the wording of Article 16 and found that the provision of another treaty can "*only operate as the rule of decision that supplants the investment protection provisions of Part III of the ECT if that other treaty provides substantive protections that are more favorable to investors than are the investment protection provisions of Part III of the ECT*". Based on this legal standard, the Tribunal exercised its function as the trier of facts of the case. It found that no such (more favourable) provision in an EU treaty was invoked by Spain or was found by the Tribunal in the course of the arbitration process. Similarly, while it made no finding that derivative EU instruments or the 2017 EC Decision may qualify as "*international law*", it found *arguendo* that no provision in that decision was identified in the arbitration as more favourable to the protections afforded by Part III of the ECT.[230]

149.    Spain submits that before concluding that EU law was not part of the applicable law, the Tribunal was required to examine why an integrated interpretation of both the ECT and EU law was not possible.[231] However, the Committee does not see how the absence of an explanation on the manner in which the Tribunal tried to reconcile the application of the ECT and the EU treaties may be regarded as a manifest excess of powers. This is particularly so given the context in which the discussion arose, with Spain arguing that the TFEU prevails over any other rules[232], in particular the ECT.[233] That context did not lend itself for the Tribunal to follow the alternative explanatory approach that Spain suggests in this annulment proceeding.

---

[229]    Award, ¶160.

[230]    Award, ¶¶164-165.

[231]    Reply on Annulment, ¶167.

[232]    Award, ¶152; C-0212-ENG, Spain's Post-Hearing Brief dated 10 September 2018 ("**Spain's PHB**"), ¶17.

[233]    C-0212-ENG, Spain's PHB, ¶38.

150.    Turning to Spain's argument that the Award violated all sources of international law, the Committee notes first that this line of argument is not reflected in the Award summary of Spain's position before the Tribunal.[234] Neither has the Committee been able to find it in Spain's submissions in the Underlying Arbitration.[235] Based on the content of Spain's arguments on this issue, the Committee understands that this is a further expression of Spain's position that EU law prevails over any other set of international rules because of the principle of primacy of EU law.

151.    The Committee notes that Spain's claim is based on the alleged support for the principle of primacy of EU law by various sources of international law. However, the claim is not based on the existence of an egregious error of interpretation or gross misapplication of the ECT. The challenge seems to pursue the effective non-application of the ECT (at least as far as Article 16 is concerned). As such, that approach seems to be difficult to reconcile with the mandate of ECT Article 26(6), according to which, the Tribunal had to "*decide the issues in dispute in accordance with this Treaty*". Thus, in addressing the alleged manifest excess of power arising from the non-application of EU law, Spain's approach would paradoxically lead to the accrual of another potential manifest excess of power arising from the failure to apply the ECT, in particular Article 16.

152.    As for Spain's argument that the Tribunal disregarded the applicability of TFEU Articles 107 and 108, the Committee understands that the Tribunal's considerations, as they relate to EU treaties generally, apply necessarily to particular provisions such as Articles 107 and 108 of the TFEU. The Committee has found no gross error concerning the Tribunal's application of Articles 16 and 26(6) of the ECT with respect to the applicability of EU treaties. Consequently, no gross error can either be found concerning the Tribunal's application of the said provisions of the ECT with respect to the more specific EU treaty provisions of TFEU Articles 107 and 108.

---

[234]    Award, ¶¶151-154.

[235]    R-0375-ENG, Respondent's Counter-Memorial on Merits and Memorial on Jurisdiction of 27 January 2017; R-0376-ENG, Respondent's Rejoinder Memorial on Merits and Reply on Jurisdiction 15 September 2017.

153.    With respect to Spain's arguments relating to the dismissal of the 2017 EC Decision, the Committee notes that Spain's concern seems to be more related to the Tribunal's establishment of the facts, rather than the determination of the applicable law on the basis of which those facts were judged. The Committee further observes that, regardless of the "*binding*" or "*international law*" character that the Tribunal assigned (or not) to the 2017 EC Decision, the Tribunal found that no more favourable provision was identified in that decision (as compared to Part III of the ECT). Thus, the Tribunal found no basis to consider itself required to admit the decision as applicable law. It further noted, as a matter of fact, that even if the decision was "*binding*" upon Spain, it "*could not have operated as law governing [Spain's] imposition of the Disputed Measures* [...] *in 2010-2013*".[236] The Committee does not find an egregious error in the manner in which the Tribunal applied Article 26(6) in respect of the 2017 EC Decision.

154.    As stated earlier, in order for a misinterpretation or misapplication of the proper law to be a manifest excess of powers it would need of such a gross or egregious nature as to amount to a failure to apply the proper law. Based on the foregoing, the Committee has not been able to identify such a gross or egregious error in the Tribunal's interpretation and application of Articles 16 and 26 of the ECT in the determination of the applicable law to decide the issues in dispute. Accordingly, the Committee considers that the Tribunal did not exceed its powers within the meaning of Article 52(1)(b) of the ICSID Convention.

---

[236]    Award, ¶166.

### C.    WHETHER THE TRIBUNAL FAILED TO STATE ITS REASONS WHEN DECIDING THAT EU LAW IS NOT PART OF THE APPLICABLE LAW

### (i)    Spain's Position

155.    Spain submits that the Award must be annulled because it fails to state the reasons why: (i) Articles 107 and 108 of the TFEU were not applied to the merits;[237] and (ii) the reasoning of the 2017 EC Decision has not been assessed.[238]

156.    On the first issue, Spain argues that despite its strong insistence during the proceedings that there was a need to consider the regulations on state aid (i.e. Articles 107 and 108 of the TFEU), the Tribunal did not explain why these provisions – which were deemed as "*applicable rules and principles of international law*" by the Award itself – did not form part of the applicable law.[239] According to Spain, the reference to Article 16 in the Award merely refers to the 2017 EC Decision, but not to the provisions of the TFEU.[240] In any event, the reference to Article 16 constitutes frivolous reasoning because it mixes issues of jurisdiction with those of applicable law.[241] In addition, Spain submits that the alleged reasoning is contradictory because, as noted above, it starts stating that EU treaties are applicable law pursuant to Article 26(6), while ultimately refusing to apply TFEU Articles 107 and 108.[242]

157.    On the second issue, Spain argues that the Award does not address the reasoning of the EC in the 2017 EC Decision even though the relevance of this legal authority is "*plausible*".[243] According to Spain, this document "*studies in detail the impact of the regulations on State Aid in the Spanish system of support for renewable energies - in a study that is also carried out by the competent European institution exclusively set up to authorize State Aid*".[244] In its Reply, Spain further submits that the document is "*essential*"[245] to understand the logic

---

[237]    Memorial on Annulment, ¶¶188-197; Reply on Annulment, ¶¶359-371.
[238]    Memorial on Annulment, ¶¶198-201; Reply on Annulment, ¶¶372-382.
[239]    Reply on Annulment, ¶364.
[240]    Reply on Annulment, ¶366.
[241]    Reply on Annulment, ¶¶368-369.
[242]    Reply on Annulment, ¶370.
[243]    Memorial on Annulment, ¶200.
[244]    Memorial on Annulment, ¶¶198-201.
[245]    Reply on Annulment, ¶373.

of the measures at issue and some factual aspects of the dispute and was extensively discussed by the Parties in the Underlying Arbitration. However, the Tribunal simply left aside this document without providing any reason for having decided not to consider it.[246]

### (ii) The Claimant's Position

158.    The Claimant argues that the Tribunal provided clear reasoning for its decision on the applicable law and Spain's disagreement with that decision is not a ground for annulment.[247]

159.    On the first issue regarding the TFEU, the Claimant argues that the Tribunal's reasoning on the exclusion of EU law was clear and Spain cannot reasonably assert that the Tribunal recognised EU treaties as potential sources of international law and then "*departed – without explaining why – from that conclusion*".[248] In the Claimant's submission, Article 16 of the ECT provides that EU treaty provisions can apply only if they offer more favourable protection to the investor than the ECT provisions.[249] Neither the investor nor the Tribunal itself – after examining the provision of the EU law – found any EU law provision providing more favourable protection than that offered by the ECT. The Tribunal thus explained expressly why EU treaty provisions could not apply to the dispute.[250]

160.    As the Tribunal had rejected the premise that EU law applies to the dispute, the Claimant submits that it need not look further into TFEU Articles 107 and 108.[251] The Claimant submits that because EU state aid rules are necessarily an element of EU treaties, the Tribunal had provided its reasons for deciding that the EU state aid rules contained in Articles 107 and 108 TFEU when it set out its conclusions pursuant to Article 16 of the ECT that EU treaties could not derogate from the ECT since they were not more favourable than the provisions of the ECT.[252]

---

[246]  Reply on Annulment, ¶¶372-382.

[247]  Counter-Memorial on Annulment, ¶114.

[248]  Rejoinder on Annulment, ¶175.

[249]  Counter-Memorial on Annulment, ¶116.

[250]  Counter-Memorial on Annulment, ¶116; Rejoinder on Annulment, ¶175.

[251]  Counter-Memorial on Annulment, ¶118.

[252]  Rejoinder on Annulment, ¶177, referring to Award, ¶164.

161.    On the second issue regarding to the 2017 EC Decision, the Claimant argues that this document was considered by the Tribunal, but was found to be irrelevant because it "*could not have operated as law governing* [the] *imposition of the Disputed Measures* […] *in 2010-2013*".[253]

162.    The Claimant contends that the Tribunal's reasoning was not "*frivolous*" or "*contradictory*" as Spain alleges.[254] Regarding the allegation of frivolousness, the Claimant submits that the Tribunal devoted distinct sections to its analysis of the applicability of EU law to the merits and to jurisdiction.[255] With respect to the allegation of contradiction, the Claimant argues that the status of EU treaties was not dispositive of the issue, and the Tribunal rejected the application of EU law based on the Parties' choice of law under the ECT.[256]

### (iii)    The Committee's Analysis

163.    The Committee understands that Spain's ground for annulment does not relate to a decision for which there is a complete absence of reasons. Rather, Spain's case is based on the allegation of a reasoning that cannot be followed,[257] with gaps,[258] contradictory points[259] and "*frivolous*" or insufficient reasons.[260]

164.    At the outset, the Committee notes that the relevant conclusion by the Tribunal is that "*the applicable law in this case is the Energy Charter Treaty, interpreted pursuant to the law of treaties and supplemented by the customary international law of State responsibility. For the reasons stated in the preceding paragraphs, EU law is not part of the law applicable in this case*".[261] This conclusion is stated in the Award at the end of the sub-

---

[253]    Counter-Memorial on Annulment, ¶118; Rejoinder on Annulment, ¶180.
[254]    Rejoinder on Annulment, ¶178.
[255]    Rejoinder on Annulment, ¶179.
[256]    Rejoinder on Annulment, ¶179.
[257]    Reply on Annulment, ¶360.
[258]    Reply on Annulment, ¶364.
[259]    Memorial on Annulment, ¶¶185-187; Reply on Annulment, ¶362.
[260]    Reply on Annulment, ¶¶368-369.
[261]    Award, ¶167.

section "*The Applicable Law*", "*The Tribunal's Analysis*".[262] The conclusion at issue follows previous paragraphs which contain:

(a)     the introduction of the issue (paragraph 155);

(b)     the discussion on the scope of Article 26(6) of the ECT in respect of the merits and jurisdiction (paragraphs 156-159);

(c)     the starting point of the assessment (i.e. the ECT, the law of treaties and the law of State responsibility, where applicable) and the delimitation of the relevant question (paragraph 160);

(d)     the delimitation of the object of analysis (i.e. EU law as international law and not as domestic law or fact) (paragraph 161);

(e)     the relevance of other treaties in the interpretation and examination of ECT provisions (paragraph 162);

(f)     the characterization of EU treaties as "*international agreements*" and "*potential sources of 'applicable rules and principles of international law'*" (paragraph 163);

(g)     the application of Article 16 of the ECT to determine whether EU treaties could apply instead of the investment protection provisions of Part III of the ECT (paragraph 164);

(h)     the application of Article 16 of the ECT to determine whether an EU instrument that is derived from an EU treaty (such as the 2017 EC Decision) could (hypothetically) apply instead of the investment protection provisions of Part III of the ECT (paragraph 165); and

(i)     the dismissal of the 2017 EC Decision based on its relevance for the Dispute Measures in 2010-2013 (paragraph 166).

---

[262]  Award, Section V.B.

165.     On its face, the Committee finds it difficult to consider that the Tribunal's conclusion cannot be followed through this sequence of steps, from the definition of the issue, through the assessment of the applicability of EU law, up to the final conclusion. Insofar as Spain makes the general assertion that the Award fails to provide reasons for disregarding EU law,[263] the Committee considers that the three paragraphs preceding the conclusion (paragraphs 164, 165 and 166) provide those reasons.

166.     Specifically, with regard to the alleged lack of reasons regarding Articles 107 and 108 of the TFEU, the Committee is of the view that the reasoning stated in the relevant paragraphs, which relate generally to "*EU treaties*", apply specifically to TFEU Articles 107 and 108. Similarly, it is clear that the reason that prevented the Tribunal from applying EU law was the absence of an identified provision in an EU treaty, which under the Tribunal's reading of Article 16 of the ECT, provided protections to investors that are more favourable than those provided in the ECT.

167.     The Committee considers that the alleged contradiction raised by Spain is untenable. The Tribunal's characterization of EU treaties as "*potential sources*" of international law accrues at the outset of the analysis, based on the undeniably international nature of EU treaties. On the other hand, the statement that EU treaties are not part of the applicable law in this case is the result of assessing those "*potential sources*" of international law through the lenses of Article 16 of the ECT. Consequently, there is no contradiction that might cancel out each of the statements of reasons, so as to be equivalent to a finding that no reasons had been provided.

168.     Furthermore, the Committee considers that the Tribunal's reasoning on the basis of Article 16 of the ECT was not frivolous as Spain claims. Article 16 states rules for the application of Parts III and V of the ECT in relation to other international agreements. As such, the provision is applicable for questions that may arise in the application of Part III (including the determination of the applicable law) as well as Part V (including the establishment of the tribunal's jurisdiction). Accordingly, by resorting to Article 16 in the

---

[263]   Reply on Annulment, ¶358.

context of the discussion on the applicable law, the Committee understands that the Tribunal did not mix the scope of those two different issues.

169.   Similarly, the Committee considers that there is no absence of reasons with respect to the treatment of the arguments put forward by Spain in relation to the Articles 107 and 108 of the TFEU and the 2017 EC Decision. In the Committee's view, the Tribunal's decision not to consider these instruments, or to express its views on them, is the result of its finding that EU treaties provide no protection to investors more favourable than those of the ECT. Therefore, the relevant EU treaties were not considered part of the applicable law, nor was their secondary legislation. There was, hence, no room for further reasoning on the relevance of the EU documents concerned.

170.   Moreover, the Committee notes that with regard to the 2017 EC Decision, the Award expressly states that even assuming that the 2017 EC was binding, it is irrelevant because it "*could not have operated as law governing* [the] *imposition of the Disputed Measures* [...] *in 2010-2013*".[264]

171.   For the reasons stated above, the Committee does not consider that the Award failed to state reasons, within the meaning of Article 52(1)(e) of the ICSID Convention, on the determination of the applicable law in the case at hand.


## V.   THE TRIBUNAL'S ASSESSMENT OF LIABILITY

172.   Before addressing the Parties' arguments on whether the Tribunal's assessment on liability provides any basis for annulment, it is useful to first set out a brief summary of the Tribunal's findings in this regard.

173.   In the Underlying Arbitration, the Claimant's case arose out of regulatory changes subsequent to Royal Decree 1578/2008 (collectively referred to as the "**Disputed Measures**"), which the Claimant claimed violated *inter alia* Spain's FET obligation under Article 10(1) of the ECT. The Award refers to the laws and regulations up to and including

---

[264]   Counter-Memorial on Annulment, ¶118; Rejoinder on Annulment, ¶180.

Royal Decree 1578/2008 ("**RD 1578/2008**") (which was in effect at the time of the Claimant's investment) as the "**Original Regulatory Regime**".[265]

174.    The Award divides the Disputed Measures into two sets. The Tribunal found that Spain was not liable for the "**First Set of Disputed Measures**" which comprised of:

   (a)    the TVPEE (which imposed a 7% tax on the value of energy production);

   (b)    Royal Decree Law 14/2010 (which introduced certain tolls and imposed a limit on the equivalent hours of operation for photovoltaic plants) ("**RD 14/2010**"); and

   (c)    Royal Decree Law 2/2013 (which introduced a new CPI to update inflation adjustments) ("**RD 2/2013**").[266]

175.    In particular, the Tribunal found that it did not have jurisdiction over the TVPEE. As for RD 14/2010 and RD 2/2013, the Tribunal concluded that they "*did not change the basic features of the Original Regulatory Regime (the FIT* [i.e. the feed-in tariff]*) and did not undermine Claimant's legitimate expectation*",[267] and thus, Spain's adoption of these measures was "*not inconsistent with its obligation to accord fair and equitable treatment to Claimant's investment*".[268]

176.    However, the Tribunal found that Spain violated its FET obligations by enacting the "**Second Set of Disputed Measures**" (comprising Royal Decree Law 9/2013 ("**RD 9/2013**"), Law 24/2013, Royal Decree 413/2014, and the Ministerial Order IET/1045/2014).[269] With regard to these measures, the Tribunal found that they "*changed the basic features of the regulatory regime that was in place when Claimant made its investment, exceeding the changes that Claimant could have reasonably anticipated at that time*".[270]

---

[265]  Award, ¶113.

[266]  Memorial on Annulment, ¶136.

[267]  Award, ¶450.

[268]  Award, ¶452.

[269]  Award, ¶125.

[270]  Award, ¶462.

177. Turning to the proceedings at hand, Spain seeks to annul the Award on the ground that the Tribunal failed to state reasons: (i) in respect of its application of Royal Decree 661/2007 ("**RD 661/2007**"); (ii) in respect of its findings relating to the Claimant's legitimate expectations; and (iii) because the reasoning in the Award is contradictory. The Committee proceeds to address each of these issues in turn.

### A. WHETHER THE TRIBUNAL FAILED TO STATE ITS REASONS IN RESPECT OF ITS APPLICATION OF RD 661/2007

### (i) Spain's Position

178. Spain argues that it can be inferred from the Award that the Tribunal assumed that RD 661/2007 "*applied in its entirety*" to the Claimant's investment, instead of RD 1578/2008 which had replaced RD 661/2007 and was in force at the time of the Claimant's investment in 2010.[271]

179. According to Spain, the Tribunal simply assumed, without further explanation, that the alleged guarantees of RD 661/2007 could be transferred without further ado to an investment under RD 1578/2008. Specifically, Spain takes issue with the Tribunal's reliance on: (i) a report of the *Comisión Nacional de la Energía* (the "**CNE**") which analyzed RD 661/2007; and (ii) the literal wording of RD 661/2007, in its analysis of the Claimant's expectations as of the date of its investment.[272] In Spain's submission, the Tribunal effectively "*extracted an alleged* stability *commitment*" from RD 661/2007 (emphasis in the original).[273]

180. Spain also takes issue with the Tribunal's findings in respect of the Fifth Additional Provision of RD 1578/2008, entitled "*Modification of the compensation for generation by photovoltaic technology*". The Fifth Additional Provision stated: *"During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by*

---

[271]  Memorial on Annulment, ¶¶210-211; Reply on Annulment, ¶395.

[272]  Memorial on Annulment, ¶212, citing Award, ¶424.

[273]  Memorial on Annulment, ¶212.

*photovoltaic solar technology may be modified*".[274] According to Spain, this provision shows that "*there could not be a legitimate expectation that the tariffs would be maintained indefinitely*".[275]

181.    On this issue, the Tribunal concluded that:

> "*[g]iven that existing PV plants cannot benefit from technological evolution, however, the Tribunal concludes that a prudent investor operating under RD 1578/2008 could reasonably have understood the Fifth Additional provision to contemplate 'downward modification' only for new plants. This conclusion is consistent with the position that the CNE indicated in 2009, in response to an investor query. The preamble of RD 1578/2008 does not detract from this understanding of the Fifth Additional Provision*".[276]

182.    Spain alleges that the Tribunal's reasoning set out above is "*not only scant, but wrong*".[277] First, Spain argues that the reasoning is contradictory with the Tribunal's conclusions that: (i) the First Set of Disputed Measures did not violate the ECT; and (ii) that Spain's regulatory regime generally did not exclude the possibility that regulatory changes would affect the Claimant's investment.[278] Secondly, Spain argues that the Tribunal's reasoning is frivolous because, *inter alia*, it was made "*without support in a single normative or expert opinion*"[279] and appears to be based on a CNE report in 2009 which was "*improperly introduced into the proceedings*".[280]

**(ii)    The Claimant's Position**

183.    The Claimant argues that the Tribunal ultimately considered the reduction of the remuneration the Claimant legitimately expected under RD 1578/2008 (and not

---

[274]    R-0072-ENG, Royal Decree 1578/2008 of September 26, 2008, covering the compensation for the generation of electric power by photovoltaic solar technology for facilities subsequent to the deadline for the maintenance of compensation under Royal Decree 661/2007 of May 25, 2007 ("**RD 1578/2008**"), p. 39122.

[275]    Memorial on Annulment, ¶213. The Committee notes a slight numbering difference between the English and Spanish versions of the Memorial on Annulment, with part of paragraph 213 of the English version corresponding to paragraph 214 of the Spanish version.

[276]    Memorial on Annulment, ¶215, citing Award, ¶425.

[277]    Memorial on Annulment, ¶216.

[278]    Memorial on Annulment, ¶216.

[279]    Memorial on Annulment, ¶217.

[280]    Memorial on Annulment, ¶¶218-219.

RD 661/2007).[281] According to the Claimant, the fact that the Tribunal analyzed RD 661/2007 (the direct predecessor of RD 1578/2008) in order to understand the context in which an investor formed its expectations with regard to RD 1578/2008 does not change this essential fact.[282]

184.    The Claimant submits that the Tribunal amply provided its reasoning which led to its conclusion that Spain violated its FET obligations by enacting the Second Set of Disputed Measures.[283] In particular, the Claimant claims that the Tribunal articulated its findings regarding the relationship between RD 661/2007 and RD 1578/2008 by stating that:

> *"[w]hen Spain concluded that the policy set in RD 661/2007 had generated more investment than had been expected, it made further adjustments, first announcing that the FITs under RD 661/2007 would not be available to new plants and later, in RD 1578/2008, reducing the FITs that would apply to new plants. The reduced FITs for new plants took advantage of technological advances and led to cost reductions that would ultimately benefit consumers. At the same time, RD 1578/2008 increased the target for PV capacity".[284]*

185.    According to the Claimant, this "*leaves no doubt*" that the Tribunal premised its conclusions on its finding that RD 1578/2008 constituted a downward modification (for *new* installations only) relative to RD 661/2007.[285]

186.    In response to Spain's arguments on the Tribunal's interpretation of the Fifth Additional Provision of RD 1578/2008, the Claimant argues that the Tribunal concluded that a prudent investor operating under RD 1578/2008 could reasonably have understood the Fifth Additional provision to contemplate "*downward modification*" only for new plants in light of the Tribunal's finding that existing PV plants could not benefit from such technological evolution.[286] The Claimant also highlights that the Tribunal noted that its conclusion was consistent with the position that the CNE had indicated in 2009 in response to an investor

---

[281]    Counter-Memorial on Annulment, ¶123.

[282]    Counter-Memorial on Annulment, ¶123.

[283]    Counter-Memorial on Annulment, ¶126.

[284]    Award, ¶422.

[285]    Counter-Memorial on Annulment, ¶127.

[286]    Counter-Memorial on Annulment, ¶129.

query, and that it was further supported by numerous statements made by Spain and its officials for the very purpose of attracting investments in renewable energy.[287]

187.    The Claimant contends that while Spain clearly still disagrees with the Tribunal's conclusion, this is *not* a ground for annulment. The Claimant takes the position that the Tribunal addressed the Parties' respective arguments and the evidence before it, and it clearly stated its reasons for its conclusions. In the Claimant's submission, that is dispositive for the purposes of dismissing Spain's annulment application.[288]

**(iii)    The Committee's Analysis**

188.    The Committee is not persuaded that an inference ought to be drawn that the Tribunal applied RD 661/2007 "*in its entirety*" instead of the regulation in force at the relevant time (i.e. RD 1578/2008). In its Memorial, Spain alleges that the Tribunal extracted a stability commitment from (i) a CNE report which analyzed RD 661/2007; and (ii) the literal wording of RD 661/2007 at paragraph 424 of the Award.[289] Paragraph 424 of the Award states:

> "*The regulations and regulatory reports also indicated that adjustments to the FITs (other than annual adjustments for inflation) would apply only to new facilities. In particular:*
>
> *a. The 2007 CNE Report called for 'regular reviews that only affect new facilities.'*
>
> *b. This approach was given effect in Article 44(3) of RD 661/2007, pursuant to which reviews were to be held in 2010 and every four years thereafter, but the revisions of FITs would not affect installations that had been authorized before the revision and for up to two years after the revision.*
>
> *c. The 2008 CNE Report stated that existing facilities would be exempted from periodic reviews.*
>
> *d. When Respondent concluded in 2007 that progress towards the target for PV capacity had been more rapid than expected, it issued an order setting an end-date for applicability of FITs assigned*

---

[287]    Counter-Memorial on Annulment, ¶130.

[288]    Counter-Memorial on Annulment, ¶132.

[289]    Memorial on Annulment, ¶¶211-212, citing Award, ¶424.

> *pursuant to RD 661/2007, but did not reduce the FITs assigned to existing plants. Instead, the reduced FITs established in RD 1578/2008 did not apply to plants that had been assigned higher FITs under RD 661/2007.*
>
> *e. RD 1578/2008 specified a mechanism for quarterly updates of the FITs assigned to be assigned to new plants, such that the 'support framework' could be 'adapted rapidly enough to keep pace with the evolution of technology.' These updates did not affect plants to which a FIT had previously been assigned".*

189.    Contrary to Spain's submissions, the Committee finds that the Award does not support the inference that the Tribunal had applied RD 661/2007 "*in its entirety*" instead of RD 1578/2008. Indeed, the fact that the Tribunal expressly considered rules applicable under RD 1578/2008 at paragraph 424 (d) and (e) indicates that the Tribunal was not applying RD 661/2007 instead of the regulation that was in force at the relevant time. It is clear to the Committee that the Tribunal was considering RD 661/2007 (being the predecessor of RD 1578/2008) as part of its analysis on the legitimate expectations that an investor might have formed under RD 1578/2008.

190.    This conclusion is further supported by the fact that the Award refers to multiple factors which are not limited to RD 661/2007. These include the evolution of the regulatory scheme leading up to the Claimant's investment in 2010 (including the differences between RD 661/2007 and RD 1578/2008), the express wording of RD 1578/2008,[290] Spain's pronouncements on its regulations,[291] the case law of Spain's Supreme Court[292] the economic circumstances as of the date of the Claimant's investment,[293] and the Parties' positions on European Commission decisions on state aid.[294]

191.    It is not unusual for a tribunal to take into account preceding legislation in order to interpret subsequent legislation as part of a continuous regulatory process. In the Committee's view, this is exactly what the Tribunal did in the Underlying Arbitration. As such, Spain's

---

[290]    Award, ¶425.

[291]    Award, ¶426.

[292]    Award, ¶¶427-433.

[293]    Award, ¶¶434-440.

[294]    Award, ¶¶441-442.

argument that the Award ought to be annulled because the Tribunal assumed the full application of a regime which was not applicable to the Claimant[295] has no factual foundation and is consequently dismissed.

192.   Regarding Spain's arguments relating to the Tribunal's interpretation of the Fifth Additional Provision, the Committee's view is that the Tribunal's reasons were clearly articulated. In coming to the conclusion that "*a prudent investor operating under RD 1578/2008 could reasonably have understood the Fifth Additional provision to contemplate 'downward modification' only for new plants*" (as opposed to existing ones), the Tribunal explained that this was because "*existing PV plants cannot benefit from technological evolution*" and expressly stated that this conclusion was consistent with the position that the CNE indicated in 2009 in respect of an investor's query and the preamble of RD 1578/2008.[296]

193.   Insofar as Spain argues that the Tribunal's reasoning was wrong, this cannot constitute a ground of annulment. The function of this Committee is not to review the correctness of a tribunal's decision, but rather to determine whether any of the annulment grounds in Article 52 has been established. As explained above, the Tribunal's reasoning was stated in the Award.

194.   In the premises, the Committee finds no reason to conclude that the Award failed to state reasons relating to its consideration of RD 661/2007 in the Award.

### B.   WHETHER THE TRIBUNAL FAILED TO STATE ITS REASONS IN RESPECT OF THE CLAIMANT'S LEGITIMATE EXPECTATIONS

### (i)   Spain's Position

195.   Spain contends that although the "*scope of the legitimate expectations of the Claimant might have been the core element of the dispute*", the Tribunal "*did not conduct any thorough analysis and, more serious still, did not provide the Parties with the grounds*

---

[295]   Memorial on Annulment, ¶220(a); Reply on Annulment, ¶395.

[296]   Award, ¶425.

*upon such which its conclusions were reached*".[297] Spain raises 4 main grounds of contention.

196.    **First**, Spain argues that the Tribunal does not explain what a legitimate expectation means to a stable feed-in tariff ("**FIT**"). According to Spain, while the Award clarifies that the legitimate expectations in question were not limited to obtaining a reasonable return or *ad eternum* maintenance of the tariffs in force at the time of the investment, it does not actually identify what a "*stable FIT*" or "*stable remuneration*" actually means.[298]

197.    In particular, Spain argues that the Tribunal does not explain: (i) if the "*stable FIT*" had to remain in force and unchanged for 25 years; (ii) if the "*stable FIT*" allowed for some kind of change other than inflation; and (iii) if the "*stable FIT*" did allow changes, which changes are admissible and which are not.[299]

198.    **Secondly**, Spain argues that the Award does not explain the sources of the alleged legitimate expectations. While Spain acknowledges that the functions of the Committee are limited and that it is not an appellate court, it claims that it "*cannot help but ask some questions*" about the sources listed at paragraph 423 of the Award (comprising 2 CNE reports and the preamble of RD 1578/2008).[300] Specifically, Spain questions how to reconcile the Tribunal's finding that Article 10(1) of the ECT does not operate as a stabilization provision with the Tribunal's finding that the "*almost identical statement in the CNE report*" constitutes such a commitment.[301] Spain further also questions why the "*generic mention of a Preamble* [...] *should be assimilated to a limit for the exercise of legislative power by a sovereign State*".[302]

199.    In addition, Spain also takes issue with the sources listed at paragraphs 424 and 426 of the Award (comprising CNE reports and Article 44(3) of RD 661/2007, as well as a press

---

[297]    Memorial on Annulment, ¶223.
[298]    Memorial on Annulment, ¶¶226-232.
[299]    Memorial on Annulment, ¶231.
[300]    Memorial on Annulment, ¶254.
[301]    Memorial on Annulment, ¶254.
[302]    Memorial on Annulment, ¶254.

release by Spain and other statements made by Spain and its officials).[303] According to Spain, "*none of these sources generated the commitment that the Award ends up extracting*".[304] Spain further claims that even though the Tribunal recognized that "*some of the statements introduced by Claimant have insufficient clarity and precision to establish that the FITs would be stable, although they do lend support to* [the Tribunal's] *conclusions*", the Tribunal still assumed that these statements were valid in an "*exercise of probability*"[305] (emphasis in original).

200.  **Thirdly**, Spain contends that the Award does not explain the reasons why it places the investment date in March 2010 (as the Claimant alleged in the Underlying Arbitration) as opposed to May 2010 (as Spain alleged in the Underlying Arbitration). Specifically, Spain alleges that the Award leaves unexplained why the financial transactions of May 2010 should or should not be considered as part of the investment process.[306]

201.  **Fourthly**, Spain argues that the Award does not explain the reasons why it rejects that the legitimate expectations of investors consisted of a reasonable return. Spain acknowledges that the Committee is not an appellate court, but argues that the Committee can annul the Award if the reasoning is "*frivolous*".[307]

202.  In Spain's submission, the Tribunal's rejection of its argument rests solely on a generic reference to "'[Spain's] *regulations and regulatory reports, as well as its pronouncements about those regulations, the case law of Spain's Supreme Court' as well as the 'economic circumstances as of the date of Claimant's investment*'".[308] According to Spain, this is frivolous because: (i) all of the regulations, and regulatory reports and the case law of Spain's Supreme Court alluded to reasonable return as the ultimate objective of the Spanish system to support renewable energy; and (ii) the "*economic circumstances as of the date*

---

[303]  Memorial on Annulment, ¶255.
[304]  Memorial on Annulment, ¶256.
[305]  Memorial on Annulment, ¶256.
[306]  Memorial on Annulment, ¶263.
[307]  Memorial on Annulment, ¶270.
[308]  Memorial on Annulment, ¶269.

*of Claimant's investment*" referred to the "*global economic crisis and the tariff deficit in Spain*" which could hardly justify the perpetuation of the tariffs.[309]

### (ii)    The Claimant's Position

203.    The Claimant alleges that the Tribunal's reasoning on the issue of legitimate expectations reads smoothly from one element to the next without difficulty and is easily understood by reading the paragraphs in the order in which they were written.[310] According to the Claimant, the Tribunal explained these legitimate expectations as follows:[311]

(a)    The Tribunal started its analysis by determining the investment date, i.e. March 2010.

(b)    The Tribunal had to determine whether the Claimant's legitimate expectations were confined to a reasonable return with reference to the cost of money in capital markets (as Spain contended) or embraced specific "*essential elements*" including a stable FIT (as the Claimant contended).

(c)    The Tribunal carried out its analysis of the Claimant's legitimate expectations as of the investment date on the basis of the evidence put before it by the parties. This evidence included: Spanish Royal Decrees, CNE Reports, statements made by Spain, the case law of the Spanish Supreme Court, the economic circumstances at the time of investment, the parties' expert regulatory reports and presentations, and the EC decisions on state aid.

(d)    In light of the above, the Tribunal came to the conclusion that "*the legitimate expectations of a PV investor in March 2010 were not limited to a reasonable return in light of the cost of money in the capital markets, as determined by Respondent. The evidence establishes instead that a PV investor in March 2010 had a legitimate expectation that it would receive a FIT that was stable, once assigned to a PV plant, for the 25-year period specified in RD 1578/2008 (save for*

---

[309]    Memorial on Annulment, ¶270.

[310]    Counter-Memorial on Annulment, ¶137.

[311]    Counter-Memorial on Annulment, ¶136.

> *inflation adjustment). The stable FIT was an essential element of the regulatory regime on which Claimant relied when it made its investment decision, taking into account the capital-intensity, long period of capital recovery and high leverage that is characteristic of investments in PV plants*".[312]

204.    The Claimant alleges that Spain's arguments only display Spain's disagreement with the reasons stated, which is *not* a ground for annulment under the ICSID Convention.[313]

205.    **First,** in response to Spain's contentions that the Award failed to answer three general questions as to what a "*stable FIT*" entails, the Claimant argues that the Tribunal's reasoning sufficiently addressed these issues in order to complete its analysis. According to the Claimant, the Tribunal fulfilled its task to contemplate the Claimant's legitimate expectations and to ascertain whether those concrete legitimate expectations had been violated on the basis of the evidence before the Tribunal.[314]

206.    **Secondly**, in response to Spain's criticisms of the sources of legitimate expectations, the Claimant contends that the Award explains that the "*legitimacy of the investor's expectations and the host State's scope to modify its regulatory regime without violating the FET obligation **must be measured in light of any undertakings of stability that are contained in the laws, regulations and authoritative pronouncements of the host State, upon which the investor relied when it made its investment**"*[315] (emphasis added). Moreover, the weight given to the Preamble of RD 1578/2008 by the Tribunal lies within its discretion and cannot be reviewed by this Committee.[316]

207.    According to the Claimant, the Tribunal did not blindly rely on evidence "*in an exercise of probability*" as alleged by Spain.[317] Instead, the Tribunal concluded that "*[i]n the aggregate, these statements confirm that the stability of remuneration was a key component of the Original Regulatory Regime, which* [was] *emphasized by [Spain] in communications*

---

[312]  Counter-Memorial on Annulment, ¶136, citing Award, ¶¶443-444.
[313]  Counter-Memorial on Annulment, ¶135.
[314]  Counter-Memorial on Annulment, ¶138.
[315]  Counter-Memorial on Annulment, ¶¶141-142.
[316]  Counter-Memorial on Annulment, ¶142.
[317]  Counter-Memorial on Annulment, ¶145.

*intended to attract investments in renewable energy*".[318] According to the Claimant, this shows that the Tribunal confirmed its primary reasoning based on the first group of sources as mutually reinforced by its examination of the second group of sources.[319]

208.    In any case, the Claimant alleges that there is no ground for annulment as this Committee's review does not entail the review of the evidence before the Tribunal.[320]

209.    **Thirdly**, regarding the date of investment, the Claimant argues that the paragraph quoted by Spain explicitly states the Tribunal's reasoning.[321] In any case, the Tribunal affirmed that the debate over the investment date was irrelevant when it concluded that "*there were no developments between March 2010 and May 2010 that could have altered in a material way the legitimate expectations of a PV investor*".[322]

210.    **Fourthly**, in response to Spain's argument that legitimate expectations of investors consisted of a reasonable return, the Claimant argues that Spain is inviting this Committee to review the merits of the dispute.[323] In any case, the Claimant argues that the "*generic*" statement in paragraph 443 of the Award is not the sole basis of the Tribunal's reasoning as Spain alleges, but followed an entire section in which the Tribunal analyzed the Claimant's expectations under RD 1578/2008 and amply set out its all the evidence leadings to its conclusion.[324]

### (iii)    The Committee's Analysis

211.    The Committee also finds that the Tribunal stated its reasons for finding that "*a PV investor in March 2010 had a legitimate expectation that it would receive a FIT that was stable, once assigned to a PV plant, for the 25-year period specified in RD 1578/2008 (save for*

---

[318]    Counter-Memorial on Annulment, ¶144, citing Award, ¶426.
[319]    Counter-Memorial on Annulment, ¶145.
[320]    Counter-Memorial on Annulment, ¶146.
[321]    Memorial on Annulment, ¶262, citing Award, ¶418.
[322]    Counter-Memorial on Annulment, ¶¶147-149.
[323]    Counter-Memorial on Annulment, ¶151.
[324]    Counter-Memorial on Annulment, ¶152.

*inflation adjustment)*" and that "[t]*he stable FIT was an essential element of the regulatory regime on which Claimant relied when it made its investment decision*".[325]

212.  The Tribunal came to this conclusion after considering:

(a)  general commercial considerations related to investments in PV plants, namely, that they are capital-intensive, face a long period for capital recovery and typically have an operating life of 25 years or more;[326]

(b)  the evolution of the regulatory scheme leading up to the Claimant's investment in 2010, including the wording of RD 1578/2008 and its predecessor, RD 661/2007 (i.e. the Original Regulatory Regime), as well as the differences between the two regulations;[327]

(c)  CNE Reports which the Tribunal stated "*indicated that adjustments to the FITs (other than annual adjustments for inflation) would apply only to new facilities*";[328]

(d)  statements made by Spain which the Tribunal stated confirmed "[i]*n the aggregate*" that the "*stability of remuneration was a key component of the Original Regulatory Regime*";[329]

(e)  the extent of the impact that the Judgments of Spain's Supreme Court might have had on a prudent investor at the material time;[330]

(f)  the economic circumstances as of the date of the Claimant's investment, including the global economic crises and tariff deficit in Spain;[331] and

(g)  the EC's decisions on state aid which the Tribunal stated gave "*no basis*" for it to conclude that an investor in March 2010 should have anticipated that the Original

---

[325]  Award, ¶444.
[326]  Award, ¶¶414-417.
[327]  Award, ¶¶418-422.
[328]  Award, ¶¶423-425.
[329]  Award, ¶426.
[330]  Award, ¶¶427-433.
[331]  Award, ¶¶434-440.

Regulatory Regime would eventually have been found to be inconsistent with EU requirements.[332]

213.    In the Committee's view, there is no difficulty in following the Tribunal's reasoning as set out above which led to its findings on the Claimant's legitimate expectations.

214.    Spain's **first argument** is that the Award leaves three questions regarding the "*stable FIT*" unanswered. Essentially, Spain claims that the Tribunal failed to explain precisely what the "*stable FIT*" entails. However, in the Committee's view, the Award does in fact shed light on this issue. As noted by Spain, the Award actually clarifies that the legitimate expectations in question were not limited to obtaining a reasonable return in light of the cost of money in the capital markets (as Spain had argued in the Underlying Arbitration).[333]

215.    Moreover, contrary to Spain's allegations, the Award squarely addressed the question of whether the "*stable FIT*" allowed for a change other than inflation (albeit in the section discussing Spain's liability with regard to the First Set of Disputed Measures). On that issue, the Tribunal found that even though RD 2/2013 (i.e. the change in the method for indexing FITs) and RD 14/2010 (i.e. the imposition of a cap on hours) appeared to reduce the Claimant's revenue during the limited period while the measures were in effect, they "*did not remove the essential features of the regulatory regime in place when Claimant invested*".[334] In the Committee's view, when the Award is taken as a whole, it is clear that the "*stable FIT*" allowed for changes other than inflation. If this were not the case, the changes resulting from Spain's introduction of RD 2/2013 and RD 14/2010 would have attracted liability on Spain's part.

216.    In any case, the Committee agrees with the Claimant that the Tribunal's reasoning sufficiently addressed these issues in order to complete its analysis regarding the Second Set of Disputed Measures. In this regard, the key question before the Tribunal was whether the abolition of the previous regime, which eliminated the FITs that had been assigned to

---

[332]   Award, ¶¶441-442.
[333]   Award, ¶443.
[334]   Award, ¶450.

the Claimant's plants, constituted a breach of Spain's obligations to accord the Claimant FET treatment.

217. As stated in the Award: "*Claimant's case is not that it had a legitimate expectation to a particular rate of return. **It claims instead that it had a legitimate expectation to stable remuneration in the form of the FIT set for each plant pursuant to RD 1578/2008**. It is on this basis that the Tribunal has reached its conclusion on* [Spain's] *liability*"[335] (emphasis added). As such, the Committee is not persuaded that it was necessary for the Award to set out an all-encompassing definition setting out the exact parameters of what a "*stable FIT*" actually means in order to justify the Tribunal's findings on Spain's liability.

218. Spain's **second argument** is that the sources of legitimate expectations were not explained in the Award. The Committee disagrees. As noted by Spain, the Award plainly identifies numerous sources of legitimate expectations (such as CNE Reports, the literal wording of RD 1578/2008 in the light of its predecessor, RD 661/2007, a press release and statements by Spain).

219. While it is clear that Spain disagrees with the contents of the Tribunal's findings regarding these sources, this Committee is not an appellate court and has limited functions (as Spain acknowledges). Article 52(1)(e) simply does not allow the Committee to assess "*the 'correctness or persuasiveness' of the reasoning in the award or inquire into the quality or merits of the reasons*".[336] Spain is essentially asking the Committee to assess whether the Tribunal correctly extracted a commitment from Spain to maintain a stable FIT from these sources.[337] This clearly relates to the merits and is not a valid ground for annulment.

220. Spain's **third argument** is that the Award does not explain the reasons why the Claimant's investment was found to take place in March 2010 instead of May 2010. Again, the Committee disagrees. The Tribunal's reasoning is explicitly stated in the paragraph cited by Spain – as "*Claimant made its investment in Spain in March 2010, when it acquired its*

---

[335] Award, ¶458.

[336] CL-0199-ENG, H.-T. Shin, "Chapter 50: Annulment", in M. Kinnear *et al.*, *Building International Investment Law: The First 50 Years of ICSID*, 2015, p. 711, citing *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision on Annulment dated 24 January 2014, ¶181.

[337] Memorial on Annulment, ¶256.

*interest in Fotones and engaged in financing transactions in May 2010*" and there were "*no developments between March 2010 and May 2010 that could have altered in a material way the legitimate expectations of a PV investor*", the Tribunal "*therefore assessed Claimant's legitimate expectations as of the time when it made its investment, i.e., March 2010*".[338]

221.    The Committee also disagrees with Spain's **fourth argument** that the Award does not explain why the Tribunal rejected Spain's argument that the legitimate expectations of investors consisted of a reasonable return. Spain claims that the Tribunal's rejection of its argument rests solely on a "*generic reference*"[339] in paragraph 443 of the Award. However, as pointed out by the Claimant, this reference was preceded by an entire section wherein the Tribunal analyzed the Claimant's expectations under RD 1578/2008 in detail, with ample reasons as summarized above at paragraph 212.

222.    For the reasons set out above, the Committee finds that the Tribunal has stated its reasons for concluding that "*a PV investor in March 2010 had a legitimate expectation that it would receive a FIT that was stable, once assigned to a PV plant, for the 25-year period specified in RD 1578/2008 (save for inflation adjustment)*" and that "*[t]he stable FIT was an essential element of the regulatory regime on which Claimant relied when it made its investment decision*".[340] The fact that Spain disagrees with the correctness of the Tribunal's explanations does not give rise to a ground for annulment under Article 52(1)(e) of the ICSID Convention.

### C.    WHETHER THE REASONING IN THE AWARD IS CONTRADICTORY

### (i)    Spain's Position

223.    Spain contends that there is an inherent contradiction between the conclusions on liability and quantum in the Award. According to Spain, the Tribunal "seemed to *insist*" that it was "*not its decision that the Spanish renewable energy support regime should remain*

---

[338]    Award, ¶418.
[339]    Memorial on Annulment, ¶269.
[340]    Award, ¶444.

*unchanged throughout the lifespan of the plants*",[341] and that this apparent finding contradicts with its findings on quantum where it assumed that the tariffs contained in RD 1578/2008 would remain unchanged.[342]

224.    Spain further asserts that "*there are infinite reasons in the reasoning that contradict each other*".[343] In addition to the alleged contradiction between liability and quantum, Spain claims that the following stand out:

(a)    the Tribunal makes "*continuous ups and downs*"[344] when defining the Claimant's legitimate expectations in a logic that is impossible to follow. Specifically, the Tribunal's findings that: (i) "*the laws and regulations that were in place when Claimant made its investment in March 2010 did not expressly state that the FIT assigned to a plant would be retained for 25 years. Instead, RD 1578/2008 stated that a FIT assigned to a facility applied 'for a maximum period of twenty-five years*'";[345] (ii) there is no stabilization clause in Article 10(1) of the ECT;[346] and (iii) "*there were 'warning signs' that Spain would act in some manner to correct the tariff deficit, possibly leading to some diminution in the remuneration of existing plants*" conflict with its finding of the existence of a "*stable FIT*" for "*the 25-year period specified in RD 1578/2008*";[347]

(b)    the Tribunal admitted that the Treaties of the European Union were part of the regulations that should be applied to the merits but then excluded them from their consideration as applicable regulations or as part of the factual aspect that configures the Claimant's legitimate expectations;[348]

---

[341]    Memorial on Annulment, ¶203 (emphasis in the original).

[342]    Memorial on Annulment, ¶204. The Committee notes that the same argument is repackaged at ¶279(a).

[343]    Memorial on Annulment, ¶279.

[344]    Memorial on Annulment, ¶279(b) (emphasis in the original).

[345]    Memorial on Annulment, ¶279(b), citing Award, ¶423.

[346]    Memorial on Annulment, ¶279(b), referring to Award, ¶318.

[347]    Memorial on Annulment, ¶279(b), citing Award, ¶¶439, 444.

[348]    Memorial on Annulment, ¶279(c).

(c)    the Tribunal found that RD 14/2010 (which imposed a limitation on the number of hours of equivalent operation) was not inconsistent with Spain's FET obligations but then the limitation of hours was allegedly "*offered as a reason*" for Spain's violation of its FET obligations for the Second Set of Disputed Measures.[349] Spain accepts that the Tribunal was referring to different reforms, but asserts that the Award does not explain why the Tribunal concluded that limiting the number of hours did not infringe the ECT in respect of the first set of measures, but justified the condemnation on the fact that the number of production hours was limited in respect of the second set of measures.[350]

### (ii)    The Claimant's Position

225.    Regarding the alleged contradiction on whether the Spanish renewable energy support regime should remain unchanged,[351] the Claimant argues that while the Tribunal recognized that "*there were 'warning signs' that Spain would act in some manner to correct the tariff deficit, possibly leading to some diminution in the remuneration of existing plants*",[352] this only presents half of the picture. The Claimant points out that the Tribunal went on to state that:[353]

> "*However, the reports attributed to participants in the renewable energy sector do not establish that a prudent PV investor in March 2010 should have expected that [Spain] would decide, as the means to address the tariff deficit, to reduce the FITs of existing plants and to abolish the Special Regime. If [Spain] had contemplated doing so as of the time of Claimant's investment, those intentions were not transparent to investors*".[354]

226.    Regarding the alleged contradiction in the Tribunal's conclusion that the EU treaty provisions invoked by Spain could not take priority over the more favourable provisions of the ECT, the Claimant submits that there is no legitimate debate to be had as to the

---

[349]    Memorial on Annulment, ¶279(d).

[350]    Reply on Annulment, ¶444.

[351]    Counter-Memorial on Annulment, ¶166.

[352]    Award, ¶439.

[353]    Counter-Memorial on Annulment, ¶167.

[354]    Award, ¶439.

Tribunal's reasoning. The status of those provisions was not dispositive of the issue. Rather, the Tribunal rejected the application of EU law to the merits on the basis of the Parties' choice of law, pursuant to the ECT.[355]

227.    With regard to the limitation of the number of hours of equivalent operation, the Claimant argues that there is no contradiction. The Claimant emphasizes that the Tribunal's findings were on two distinct measures which applied during distinct period - the cap on hours implemented by RD 14/2010 (part of the First Set of Disputed Measures) and the cap on hours implemented by Ministerial Order IET/1045/2014 (part of the Second Set of Disputed Measures).[356] According to the Claimant, Brattle's evidence reflects that there can be no correlation between the two caps on hours measures as they were implemented in different regulatory contexts and apply to completely different remuneration schemes.[357]

### (iii)    The Committee's Analysis

228.    The Committee disagrees with Spain's arguments that the Award should be annulled on the basis that it contains "*contradictory*" reasoning in the conclusions on liability and the conclusions on quantum.

229.    As stated above at paragraph 84, in order to serve as ground for annulment, the alleged contradictory reasons must be clear, and so egregious that they cause the said reasons in the award to be incapable of standing together on any reasonable reading of the decision. In the Committee's view, this high standard has not been met.

230.    Spain's first main argument is premised on the Tribunal having made a finding that "*it was not its decision that the Spanish renewable energy support regime should remain unchanged throughout the lifespan of the plants*".[358] However, Spain admits that the Tribunal only "*seemed*" to insist that this was the case. While the Committee is not convinced that the Tribunal made a categorical finding to this effect, it is clear that the

---

[355]    Rejoinder on Annulment, ¶179.

[356]    Counter-Memorial on Annulment, ¶165.

[357]    Rejoinder on Annulment, ¶¶212-213.

[358]    Memorial on Annulment, ¶203.

mere appearance of a conflicting position is not the same as a clear contradiction that would render the reasons in the Award incapable of standing together.

231.  The Committee also struggles to see any contradiction in the Tribunal's conclusion regarding the applicable law. In the Committee's view, there was simply no finding that the TFEU had to be applied to the merits.

232.  As for the point on the limitation of the number of hours of equivalent operation, the Committee considers that there was no clear or obvious contradiction on this issue. The Committee is of the view that the fact that the Tribunal had differing views on the impact of a cap of hours imposed by *distinct* provisions under *distinct* regulatory contexts, taking into account the different amount of evidence adduced, is not unreasonable or unreasoned, and does not provide any ground for annulment within the meaning of Article 52(1)(e) of the ICSID Convention.

## VI.    THE TRIBUNAL'S ESTABLISHMENT OF DAMAGES

233.  To recap, the Award states that "[a]*s a consequence of the breach of Article 10(1) of the ECT, Respondent shall pay Claimant compensation in the amount of EUR 40.98 million*".[359] This quantum of damages was later rectified to EUR 40.49 million in the Tribunal's Decision on Rectification on the basis that there was an arithmetical error.[360]

234.  The Decision on Rectification explains that the figure of EUR 40.98 million was drawn from a table contained in Appendix C to the first expert report of the Claimant's damages expert, Brattle (the "**First Brattle Quantum Report**").[361] However, Brattle had updated the figures contained in Appendix C to reflect an adjustment that it had made to the inflation

---

[359]  Award, ¶576(3).

[360]  R-0361-ENG, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Decision on Rectification of the Award dated 5 December 2019 ("**Decision on Rectification**"), ¶41.

[361]  R-0361-ENG, Decision on Rectification, ¶42.

rate in its working papers[362] that accompanied its second report ("**Second Brattle Quantum Report**").[363]

235.    With regard to the Tribunal's findings on damages, Spain seeks to annul the Award on the grounds that: (i) the Tribunal manifestly exceeded its power when compensating damages to the Claimant; and (ii) there was a failure to state reasons in the Award on the quantification of damages. The Committee proceeds to address each of these issues in turn.

### A.    WHETHER THE TRIBUNAL MANIFESTLY EXCEEDED ITS POWERS WHEN COMPENSATING DAMAGES TO THE CLAIMANT

#### (i)    Spain's Position

236.    Spain argues that the Tribunal exceeded its powers when it adopted the quantification of damages carried out by the Claimant's expert (i.e. Brattle). In doing so, Spain claims that the Tribunal manifestly exceeded its powers by granting compensation on the basis that *all* the disputed measures were contrary to the ECT and no modifications to the regime of RD 661/2007 had been implemented or were ever going to be implemented.[364] In particular, Spain argues that just as the claimants in the *Occidental* case were unable to receive 100% of the damages they sought because a portion of the investment had been made by a party outside the Tribunal's jurisdiction, if a Tribunal determines that the measures in question are outside the scope of that jurisdiction or do not give rise to responsibilities within the treaty in question, it may not grant compensation for such measures without exceeding its powers.[365]

237.    It is argued that the Tribunal adopted the quantification of damages carried out by the Claimant's expert in spite of the fact that Spain was only found liable for the Second Set

---

[362]    See in particular R-0361-ENG, Decision on Rectification, fn 25 which cites TABLES P – Financial Models.xlsb -- SUM SPLIT, Table A(o)_11, Summary of Damages Associated with Separate Measures.

[363]    R-0361-ENG, Decision on Rectification, ¶¶21, 43.

[364]    Memorial on Annulment, ¶136.

[365]    Memorial on Annulment, ¶135, citing *inter alia* RL-0112-ENG, *Occidental,* ¶¶48-49.

of Disputed Measures (comprising RD-Act 9/2013, Act 24/2013, RD 413/2014 and the Ministerial Order) and *not* the First Set of Disputed Measures.[366]

238.    In Spain's words, what it alleges as an "*excess of powers is that the Award does NOT reflect in the <u>future damages</u> awarded to SolEs Badajoz the fact that certain measures had been declared lawful*" (emphasis added).[367]

239.    Spain explains that Brattle's calculations on future damages which the Tribunal relied on were derived from comparing the cash flows of the Plants in two scenarios (i.e. the "*But-For scenario*" and the "*Actual scenario*"),[368] as illustrated in Brattle's graph below:[369]



240.    According to Spain, the Tribunal correctly points out that Brattle's But-For scenario refers to a world without any of the Disputed Measures, but "*forgets*" to correct such an

---

[366]    Memorial on Annulment, ¶¶136-137.

[367]    Reply on Annulment, ¶275.

[368]    Memorial on Annulment, ¶139.

[369]    Memorial on Annulment, ¶140, reproducing Figure 1 of R-0377-ENG, Brattle's First Quantum Report, p. 4.

adjustment when calculating the figure for damages.[370] Instead of assuming that the RD 1578/2008 regime remained unchanged,[371] Spain argues that the Award should have considered a But-For scenario without *some* (and not *all*) of the Disputes Measures. Specifically, the But-For scenario should have assumed that RD 14/2013 (i.e. relating to the cap on hours) and RD 2/2013 (i.e. relating to the change in inflation index) were maintained.[372]

241.    In Spain's submission, the Award is "*limited to showing blind faith*" in the figures set out in the Second Brattle Quantum Report[373] and the Tribunal made a serious error when it rejected the opinion from Spain's expert, AMG, that there was a basis to question the calculations presented by Brattle.[374] In other words, the Award assumes, without any basis, that Brattle appropriately discounted the effects of the RD 14/2013 and RD 2/2013. According to Spain, regardless of the specific appendix or figure, the underlying problem is found in Brattle's model itself as the But-For scenario starts from the absence of any Disputed Measures.[375]

242.    In these proceedings, Spain relies on two new expert reports (i.e. AMG's New Report[376] and AMG's Rebuttal Report[377]) that assess the damages which Spain claims are payable to the Claimant in light of the Award. Spain argues that AMG's evidence supports its contention that the But-For scenario should only assume that the Second Set of Disputed Measures was never implemented. However, the First Set of Disputed Measures "*must be considered effective and in force*" in the But-For scenario and, therefore, their effect on cash flows should be included.[378]

---

[370]    Memorial on Annulment, ¶146.

[371]    Award, ¶532.

[372]    Memorial on Annulment, ¶141.

[373]    Memorial on Annulment, ¶153.

[374]    Memorial on Annulment, ¶142.

[375]    Memorial on Annulment, ¶143.

[376]    Expert Report of Altran Mac Group, *Assessment of the Damages Payable to the Claimant in light of the Arbitral Award issued on 31 July 2019*, 2 October 2020.

[377]    Expert Report of Altran Mac Group, *Rebuttal Report on Annulment of Award*, 15 April 2021.

[378]    Memorial on Annulment, ¶165.

243.  Spain does not deny that in reality, RD 14/2013 and RD 2/2013 were superseded by the enactment of the July 2013 measures.[379] However, Spain contends that these two measures were "*not enacted as temporary rules*" and "*therefore, they can only be assumed to be permanent measures, subject (as always) to the power of the State to amend its own regulations as it sees fit*".[380] In Spain's submission, these measures were "*issued for an indefinite period of time*",[381] and were only repealed because of the entry into force of the 2013-2014 measures. As such, Spain argues "[i]*f in the but-for scenario the 2013-2014 Measures disappear, the reason for the repeal of Royal Decree-Act 14/2010 and Royal Decree-Act 2/2013 also disappears, so that these Measures must necessarily remain in place*".[382]

244.  According to Spain, if the Tribunal had made or requested adjustments to Brattle's But-For scenario (once past damages have been ruled out) to include the effects of the First Set of Disputed Measures, it would have verified that the difference between the cash flows between both scenarios was only 16.15 million euros (being the amount of future damages).[383] Spain argues that a correct quantification of the damages would comprise the aforementioned future damages of 16.15 million euros plus past damages of 2.56 million euros, totaling **18.71 million euros**.[384]

**(ii)     The Claimant's Position**

245.  The Claimant argues that Spain misrepresents the Tribunal's quantification of damages and that the Tribunal had in fact "*adjusted the amount awarded to* [the Claimant] *by removing the entirety of the damages attributable to the First Set of Disputed Measures, consistent with its liability ruling*".[385]

---

[379]  Reply on Annulment, ¶¶285, 300.
[380]  Reply on Annulment, ¶314.
[381]  Reply on Annulment, ¶283(a).
[382]  Reply on Annulment, ¶283(b).
[383]  Memorial on Annulment, ¶166.
[384]  Memorial on Annulment, ¶170.
[385]  Counter-Memorial on Annulment, ¶57.

246.  The Claimant submits that the Tribunal decided that the amount of compensation to be awarded to the Claimant should be adjusted to reflect the damages that resulted from the Second Set of Disputed Measures alone, and relied on Table 21, Row 8, Column C of Appendix C to Brattle's First Quantum Report in order to do this.[386]

247.  In the Claimant's submission, Brattle's calculations enabled the Tribunal both to account for its decision regarding the TVPEE tax and to identify the distinct amount of damages attributable to each of: (i) the December 2010 limit on production hours (Appendix C, Table 21, Row 6); (ii) the February 2013 change in the inflation index (Appendix C, Table 21, Row 7); and (iii) the July 2013 measures (Appendix C, Table 21, Row 8 – i.e. the Second Set of Disputed Measures) – and thereby isolate the damages attributable to the Second Set of Disputed Measures.[387]

248.  In response to Spain's arguments that the But-For scenario should have included RD 14/2010 and RD 2/2013, the Claimant stresses that the factual reality is that these two measures were "*only in place for a limited time*" before being superseded by the July 2013 measures.[388] Accordingly, Appendix C, Table 21, Column C reflects no future damages arising from these two measures as they no longer produced any economic effect after they were superseded.[389] The Claimant contends that "*the Tribunal took the non-controversial view that the superseded, non-existent measures did not impact the damages analysis*".[390]

249.  Regarding RD 2/2013 in particular, the Claimant criticizes AMG's assumption that the annual rate of change of the adjusted inflation/adjusted CPI would consistently grow at an annual rate 1% below the general CPI that originally applied to FITs under RD 1578/2008.[391] The Claimant relies on Brattle's analysis that the adjusted CPI and the general CPI closely tracked one another between 2010 and 2019, and the adjusted CPI

---

[386]  Counter-Memorial on Annulment, ¶66; Rejoinder on Annulment, ¶104. See Table 21 below at paragraph 259.
[387]  Rejoinder on Annulment, ¶104.
[388]  Counter-Memorial on Annulment, ¶74; Rejoinder on Annulment, ¶¶120-122, 125.
[389]  Rejoinder on Annulment, ¶126.
[390]  Rejoinder on Annulment, ¶127.
[391]  Counter-Memorial on Annulment, ¶81.

increased faster than the general CPI between the years 2014 and 2020.[392] Moreover, the Claimant takes issue with the fact that AMG did not quantify the impact of hypothetical changes to the CPI in the Underlying Arbitration.[393]

250.   With regard to damages corresponding to the TVPEE, the Claimant stresses that the Tribunal adopted Brattle's calculations under the "*Generation Tax: Legal*" scenario in Table 21 of Appendix C, and thus, the Tribunal's damages award excluded the effect of the TVPEE both before *and after* July 2013.[394] The Claimant further argues that the 7.65 million euros that AMG calculates as future damages due to the TVPEE corresponds to the 7.65 million euros that Brattle itself attributed to the post-July 2013 effect of the TVPEE in the Underlying Arbitration (as excluded by the "*Generation Tax: Legal*" scenario in Table 21 of Appendix C).[395]

251.   Additionally, the Claimant makes the general point that the Tribunal had all the evidence it required to quantify damages on the basis of its liability decision and ruled accordingly, and that its conclusions were consistent with its findings on liability.[396] In particular, the Claimant highlights that Spain had the opportunity to question Mr. Caldwell (from Brattle) on the "*stand-alone impact of the limit on production hours and of the inflation indexation, rows 2 and 3 [of Table 21 of Appendix C]*"[397] which it now takes issue with. When asked why only past damages relating to these measures were calculated, Mr. Caldwell allegedly replied that this reflected the fact that these two measures had been superseded by the new regime and confirmed that he calculated no future damage for them beyond July 2013.[398]

---

[392]   Counter-Memorial on Annulment, ¶82.
[393]   Counter-Memorial on Annulment, ¶76.
[394]   Counter-Memorial on Annulment, ¶72.
[395]   Counter-Memorial on Annulment, ¶71.
[396]   Rejoinder on Annulment, ¶¶140-147.
[397]   Counter-Memorial on Annulment, ¶88.
[398]   Counter-Memorial on Annulment, ¶88.

252.    Accordingly, the Claimant argues that in addition to being unjustified, Spain's criticism of the Award is an attempt to reargue the damages case based on arguments and evidence that neither Spain nor AMG presented during the arbitration proceedings.[399]

### (iii)    The Committee's Analysis

253.    At the outset, the Committee must emphasize again that the annulment mechanism is not an appeal mechanism. As stated above at paragraph 56, the annulment process is only concerned with the legitimacy of the process of the decision, not its substantive correctness. The Committee is not in a position to review the matter *de novo* and substitute the Tribunal's findings with its own, nor should it allow the Parties to relitigate matters with the benefit of hindsight in order to secure a better outcome.

254.    Against this backdrop and having considered the Parties' arguments, the Committee does not find that the damages awarded by the Tribunal were a manifest excess of its powers. The following analysis reflects the Committee's position by majority.

255.    As a starting point, it is clear to the Committee that the Tribunal was aware that the quantum of damages to be awarded to the Claimant had to be adjusted to take into account that Spain was not found liable for the First Set of Disputed Measures (i.e. the TVPEE, RD 14/2010 and RD 2/2013). This was expressly acknowledged at paragraph 538 of the Award which states:

> *"Having examined the positions of the experts and the Parties in relation to the effect of the Disputed Measures on the fair market value of Claimant's investment, the Tribunal concludes that Brattle's DCF analysis provides a sound basis for the Tribunal to determine the reduction in the fair market value of Claimant's investment.* **However, the amount of damages to be awarded to Claimant must be adjusted to take into account (1) the Tribunal's conclusion that it lacks jurisdiction in respect of Claimant's contention that the TVPEE violates Article 10(1) of the ECT and (2) the Tribunal's finding that Spain is not liable as to the First Set of Disputed Measures"** (emphasis added).

---

[399]    Counter-Memorial on Annulment, ¶92.

256.    After making clear that the amount of damages had to be adjusted to exclude those corresponding to the TVPEE, RD 14/2010 or RD 2/2013, the Tribunal then relied on Appendix C to the First Brattle Quantum Report which presented a figure that corresponded only to the Second Set of Disputed Measures, on the assumption that the TVPEE was legal:

> *"Brattle has indicated the damages that it associates with particular measures in Appendix C to the First Brattle Quantum Report).* ***One set of calculations assumes (as is the case) that the Tribunal has not found the TVPEE to be illegal.*** *On this basis, Brattle presents the damages that it attributes to (i) the limit on production hours, (ii) the change in the inflation index (which, taken together, correspond to the First Set of Disputed Measures) and (iii) the July 2013 measures (corresponding to the Second Set of Disputed Measures).* ***Brattle calculates that the July 2013 measures reduced the fair market value of Claimant's investment by 40.98 million"***[400] (emphasis added).

257.    As stated above, the Tribunal later rectified the Award to change the figure to EUR 40.49 million when it was highlighted to the Tribunal that the figures in Appendix C had been updated to account for inflation.

258.    Spain argues that the Award "*forgets*" that "*in order for its conclusions on damages to be consistent with its conclusions on liability, the Award should have considered a but-for scenario without some Disputed Measures*".[401] However, it is clear from the paragraphs cited above that the Tribunal sought to adjust the damages such that only damages attributed to the Second Set of Disputed Measures were captured.

---

[400]    Award, ¶539.
[401]    Memorial on Annulment, ¶141.

259.    For the majority of the Committee, what Spain is really saying is that the Tribunal was *wrong* to adjust the damages in the manner that it did. However, the Committee notes that the Tribunal's method of adjustment was in line with Brattle's expert evidence which presented a figure that (in Brattle's view) corresponded solely to the Second Set of Disputed Measures. As shown in Table 21 of Appendix C of the First Brattle Quantum Report which is reproduced below, the figure of EUR 40.98 million was the total amount of past and future damage which Brattle attributed to the "*July 2013 Measures*" when one assumes that the TVPEE was legal (see Row [8]). This was distinct from the damage which Brattle attributed to: (i) the limit on production hours (i.e. RD 14/2010) (see Row [6]); and (ii) the change in the inflation index (i.e. RD 2/2013) (see Row [7]).[402]

**Table 21: Damages for Separate Measures**

| | | | Damage as of June 2014 | | | Damage incl. PAI* |
|---|---|---|---|---|---|---|
| Pre-award Interest Index | [1] | See note | 1.27 | | | |
| | | | Past Damage [A] | Future Damage [B] | Total Impact [C] -([A]+[B]) | [D] [C]x[1] |
| **Generation Tax: Illegal** | | | | | | |
| Limit on Production Hours | [2] | See note | -3.36 | | 3.36 | 4.26 |
| FIT Inflation Indexation | [3] | See note | -0.17 | | 0.17 | 0.22 |
| July 2013 Measures | [4] | See note | -5.44 | -44.26 | 49.69 | 62.88 |
| Total | [5] | Sum [2] to [4] | -8.98 | -44.26 | 53.23 | 67.36 |
| **Generation Tax: Legal** | | | | | | |
| Limit on Production Hours | [6] | See note | -3.36 | | 3.36 | 4.26 |
| FIT Inflation Indexation | [7] | See note | -0.16 | | 0.16 | 0.20 |
| July 2013 Measures | [8] | See note | -4.38 | -36.60 | 40.98 | 51.86 |
| Total | [9] | Sum [6] to [8] | -7.90 | -36.60 | 44.50 | 56.32 |

Notes and sources:
In €million.
*PAI: Pre-award interests.
[1] to [4], [6], [8]: Lapuerta-Caldwell workpapers, Tables A - financial model.

260.    In the Committee's view, it is difficult to see how the Tribunal manifestly exceeded its powers in relying on Brattle's evidence set out above which clearly distinguishes between the damages attributable to the Second Set of Dispute Measures (i.e. the "*July 2013 Measures*" and the damages attributable to the First Set of Disputed Measures (i.e. RD 14/2010, RD 2/2013 and the TVPEE).

---

[402]    R-0377-ENG, First Brattle Quantum Report, Appendix C.

261.    Spain's criticizes the methodology employed by Brattle with regard to how the future damages should be calculated on the basis that the But-For scenario should have (but did not) assume that RD 14/2010 (i.e. relating to the cap on hours) and RD 2/2013 (i.e. relating to the change in inflation index) were maintained. However, in the Committee's view, the Tribunal was acting within its powers when it accepted the But-For scenario put forth by Brattle given that RD 14/2010 and RD 2/2013 simply did not exist as of the valuation date for future damages (i.e. June 2014).

262.    While Spain makes assertions in these proceedings regarding the permanence of Spanish legislation once it has been enacted, it does not appear that Spain had adduced proof to support this point or even raise this for the Tribunal's consideration in the Underlying Arbitration. Under these premises, the Committee struggles to see how the Tribunal can be faulted for not making the assumption that in the absence of the Second Set of Disputed Measures the earlier measures would not have been repealed and insisting that the But-For scenario take these into account, especially given the inherently speculative nature of such an argument.

263.    Spain has taken particular objection to the Tribunal's analysis at paragraph 540 of the Award which states:

> "The Tribunal has taken note of the quantum presentation made by AMG at the Hearing, in which AMG contended that Brattle does not divide the individual effects of the Measures in its future damages calculation. In that presentation, AMG stated that the generation tax (i.e., the TVPEE) and the limit on production hours accounted for 44% of the damages claimed by SolES, and "only 56 percent" of the claimed damages result from RDL 9/2013 (which abolished the Special Regime and replaced it with the Specific Regime) and RDL 2/2013 (which changed the inflation index). Respondent made a similar observation in its post-hearing brief. The Tribunal notes that AMG's presentation at the Hearing was based on Figure 1 in Brattle's First Quantum Report, which depicts in general terms the 'three principal steps' that Brattle undertook in its damages calculation. That figure does not isolate the damages attributable to the July 2013 measures from earlier measures, as was done in Appendix C of Brattle's First Quantum Report. The Tribunal does not find in AMG's presentation at the Hearing a basis to

*question the calculations presented by Brattle in Appendix C of its First Quantum Report".[403]*

264. However, the Committee is not persuaded that the above constitutes a "*serious error*" as alleged by Spain.[404] In the Committee's view, it was perfectly reasonable and not a manifest excess of powers for the Tribunal to conclude that AMG had not shown a basis to question Brattle's calculations when AMG itself did not isolate the damages attributable to the Second Set of Disputed Measures.

265. Moreover, the Committee notes that paragraph 540 of the Award is preceded by numerous paragraphs which set out, in considerable detail, the Tribunal's analysis on why it preferred Brattle's method of quantifying the Claimant's investment over AMG's analysis.[405]

266. With the benefit of hindsight, Spain has adduced new expert reports to support its arguments on what the correct quantum of damages ought to be in light of the outcome of the Award. While the Committee accepts Spain's point that the calculations presented are not entirely "*new*" evidence per se given that they were based on the matrix of the Claimant's expert that had been accepted by the Tribunal, the Committee disagrees that this would have "*emerged naturally from the facts and evidence before the Tribunal*" if the proper analysis had been performed.[406]

267. The Tribunal cannot be expected to navigate the complex area of the quantification of damages unaided by experts. While Spain had every opportunity to adduce evidence or raise arguments to guide the Tribunal on what the "*proper analysis*"[407] ought to have been in the Underlying Arbitration, their own expert did not isolate the damages attributable to the different measures which might have enabled the Tribunal to come to a different conclusion on damages.

---

[403]  Award, ¶540.
[404]  Memorial on Annulment, ¶142.
[405]  Award, ¶¶525-539.
[406]  Memorial on Annulment, ¶164.
[407]  Memorial on Annulment, ¶164.

268.    The limitations faced by the Tribunal were canvassed in Professor Giorgio Sacerdoti's individual views set out at paragraphs 544-546 of the Award.[408] In those paragraphs, Professor Sacerdoti expressed regret that the evidence before the Tribunal required it to choose between "*Claimant's valuation, which was based on a 'But-for' scenario with a 25-year duration of the feed-in tariffs set in 2010 under the Special Regime, and* [Spain's] *DCF valuation, […] pursuant to which the regulatory risk in the but-for scenario was so high that Claimant's investment would have increased in value due to the Disputed Measures*".[409] He further stated that he would have "*welcomed evidence on the basis of which the Tribunal could have accepted Claimant's general approach to liability and quantum without also accepting Claimant's premise that the Original Regulatory Regime would remain stable for 25 years*".[410]

269.    In the Committee's view, the elaborate quantifications which Spain has put forth in the present proceedings is a far cry from the *Occidental* decision which Spain attempts to analogize with the present case. In *Occidental*, the *ad hoc* committee found that the tribunal illicitly expanded the scope of its jurisdiction in excess of its powers by compensating a protected investor for an investment which is beneficially owned by a non-protected investor.[411] This is different from the present case where Spain is essentially complaining about the *methodology* used by the Tribunal in calculating future damages. Spain seeks to argue that there was a similar excess of powers in this case because the Tribunal allegedly exceeded its powers by giving compensation for measures (i.e. the First Disputed Set of Measures) which did not give rise to responsibility under the ECT.[412] The Committee disagrees. Unlike *Occidental*, Spain's complaint about the methodology used by the Tribunal to calculate damages does not go towards jurisdiction. In the Committee's view, the Tribunal was not compensating Claimant for any of the First Set of Disputed Measures

---

[408]    Award, ¶¶544-546.

[409]    Award, ¶544.

[410]    Award, ¶545.

[411]    RL-0112-ENG, *Occidental,* ¶266.

[412]    Memorial on Annulment, ¶¶135-136.

when it accepted Brattle's calculations on the appropriate damages attributable to the Second Set of Disputed Measures.

270.    Further, unlike *Occidental* where there was an obvious mistake when the Claimant was granted damages corresponding to 100% of the cash flows of the investment when it only owned 60% of the investment, Spain is not requesting a simple arithmetical calculation. In contrast, Spain is effectively asking the Committee to reconsider the issue of damages based on new arguments which it has formulated with the benefit of reviewing the outcome of the Award.

271.    In view of the foregoing, the Committee is not persuaded that the Tribunal manifestly exceeded its power in respect of the quantification of damages.

272.    A Member of the Committee is concurring with this conclusion on the basis of separate considerations which are set out in the attachment to this decision.

**B.    WHETHER THE TRIBUNAL FAILED TO STATE ITS REASONS ON THE QUANTIFICATION OF DAMAGES**

**(i)    Spain's Position**

273.    Spain alleges that the Tribunal's conclusion on the quantification of damages as condensed at paragraph 540 of the Award presents "*an evident lack of motivation*"[413] and does not "*dedicate a single word to justif*[y] *why it rejects AMG's criticisms*"[414] of Brattle's analysis. According to Spain, the Award simply assumes "*as an act of faith*", that Appendix C of the First Brattle Quantum Report discounted the future effect of the measures considered legal.[415]

274.    Spain further argues that the Award does not explain whether the measures that were found to be legal (i.e. the First Set of Disputed Measures) should be applied permanently in the But-For scenario or whether they should be applied on a provisional basis even though this

---

[413]    Memorial on Annulment, ¶274.
[414]    Memorial on Annulment, ¶276
[415]    Memorial on Annulment, ¶276.

question was posed to the Claimant's damages expert on cross examination and addressed in its Post-Hearing Brief.[416]

**(ii)    The Claimant's Position**

275.    The Claimant argues that paragraph 540 is in itself sufficiently clear as to the reasons for the Tribunal's conclusions.[417] According to the Claimant, the essence of the Tribunal's observation with regard to AMG's quantum presentation at the hearing is that it does not distinguish the two measures from 2013. The distinction between these two measures is crucial, as RD 9/2013 is part of the Second Set of Disputed Measures and RD 2/2013 is part of the First Set of Disputed Measures.[418] As AMG made no effort in the Underlying Arbitration to distinguish these two measures, the Tribunal turned to Brattle's expert report which clearly made such distinction.[419]

276.    The Claimant further asserts that paragraph 540 followed a thorough investigation of the elements leading to that conclusion.[420] According to the Claimant, the Tribunal had determined the best method to quantify the reduction in the fair market value of the Claimant's investment, then proceeded to adjust the damages calculation to reflect its finding that the First Set of Disputed Measures had not violated the ECT. In this regard, the Tribunal reviewed the expert reports from both Parties, referring to them specifically, and ultimately accepted Brattle's calculation.[421]

277.    Regarding Spain's argument that the Award does not explain whether the First Set of Disputed Measures should be applied permanently or temporarily in the But-For scenario, the Claimant argues that the Tribunal addressed the substance of Spain's argument and cannot be faulted for not couching its decision in the terms that Spain now advances in these annulment proceedings.[422]

---

[416]    Reply on Annulment, ¶428.
[417]    Rejoinder on Annulment, ¶202.
[418]    Counter-Memorial on Annulment, ¶158.
[419]    Counter-Memorial on Annulment, ¶159.
[420]    Rejoinder on Annulment, ¶202.
[421]    Counter-Memorial on Annulment, ¶156.
[422]    Rejoinder on Annulment, ¶¶205-206

### (iii)    The Committee's Analysis

278.    The Committee, by majority, is not persuaded that there was a failure to state reasons on the quantification of damages.

279.    The Committee agrees with the Claimant that paragraph 540 of the Award (as reproduced above at paragraph 263) is sufficiently clear as to the reasons for the Tribunal's conclusions. As stated above, the applicable standard for annulment based on a failure to state reasons is whether the ruling to allows the reader to "*follow how the tribunal proceeded from Point A. to Point B.*".[423] In the Committee's view, this standard is clearly met as it is apparent from a cursory read of that paragraph that the Tribunal rejected AMG's evidence in favor of Brattle's since AMG failed to isolate the damages attributable to the July 2013 measures from earlier measures whereas Brattle did.

280.    As for Spain's argument that the Award does not explain whether the First Set of Disputed Measures should be applied permanently or temporarily in the But-For scenario, the Committee disagrees with Spain's suggestion that the Tribunal was obliged address this specific issue in the Award. In this regard, the Committee agrees with the view of previous annulment committees (as summarized in the *TECO* decision) that "*in order to discharge its duty to provide reasons for its decision, a tribunal is not under an obligation to address every piece of evidence in the record or every single argument made by the parties*".[424]

281.    This is especially given the fact that Spain's current formulation of the issue (i.e. whether the legal measures should have been applied permanently in the but-for scenario or whether they should be applied on a provisional basis) was not stated in Spain's Post-Hearing Brief dated 10 September 2018. Instead, Spain's Post-Hearing Brief stated that Brattle's calculations were "*attributable to prior measures such as the generation tax of 7% (that represents 17% of the purported damages) and the Permanent cap on production introduced by RDL 14/2010 (that represents 27% of the purported damages)*"[425] without

---

[423]    RL-0110-ENG, *MINE*, ¶5.09.
[424]    RL-0181-ENG, *TECO*, ¶125.
[425]    R-0396-ENG, Spain's Post-Hearing Brief dated 10 September 2018, ¶197.

advancing arguments to show why the First Set of Disputed Measures should be regarded as permanent when they no longer existed in reality.

282.    Contrary to Spain's claim that this question was "*widely debated*",[426] it appears to the Committee that the duration of the First Set of Disputed Measures was only touched upon briefly on the last day of the hearing on the merits.[427] Indeed, during the Hearing on Annulment, Spain acknowledged that its cross examination of Claimant's damages expert in this regard was "[p]*erhaps a minimal discussion*" and "*perhaps it should have been longer*".[428] Insofar as Spain has suggested that the Tribunal ought to have asked the parties to "*go more deeply into that point*" if it "*had felt that this was relevant*",[429] the Committee disagrees. The burden falls on Spain (not the Tribunal) to adduce evidence to support its criticisms of the assumptions adopted by the Claimant's damages expert.

283.    The lack of evidence from Spain's damages expert was emphasized in Professor Sacerdoti's individual views in the Award where he stated *inter alia* that:

> "***He would have welcomed evidence on the basis of which the Tribunal could have accepted Claimant's general approach to liability and quantum without also accepting Claimant's premise that the Original Regulatory Regime would remain stable for 25 years***. *On the basis of such evidence the Tribunal might have adjusted the analysis of the Claimant's expert to base the calculation of damages (loss of value of the investment due to the reduction of returns under the new regime) on the difference between this adjusted But-for scenario (with a shorter time horizon) and the actual scenario, based on the reduced returns provided under the Disputed Measures.*
>
> *Professor Sacerdoti acknowledges, however, that the Tribunal was unable to perform such complicated calculations on its own motion because* ***neither Party pursued this approach, not even as a fallback, subordinate or alternative argument, and specifically, because [Spain] has not supplied the necessary information***" (emphasis added).[430]

---

[426]    Reply on Annulment, ¶428

[427]    See Reply on Annulment, ¶¶429-432.

[428]    Tr. Day 1, 127:19-20.

[429]    Tr. Day 1, 127:20-24.

[430]    Award, ¶¶545-546.

284. Similarly, the fact that Spain's damages expert had not presented the methodological assertions and calculations at the hearing on the merits (which it now relies on) was highlighted in the Tribunal's Decision on Rectification. In coming to its decision to reject Spain's request for the Award to be rectified on the grounds that the compensation ordered by the Tribunal did not properly reflect the Tribunal's findings on jurisdiction and liability (the "**First Request**"), the Tribunal found that:

> *"[…] the First Request is premised on arguments regarding the methodology for isolating the damages attributable to particular measures that were considered and rejected by the Tribunal, **supported by a series of methodological assertions and calculations that Respondent and AMG did not present at the hearing**, but are described in the AMG Memorandum as 'necessary' in view of the distinction that the Award draws between lawful and unlawful measures. This is not a request to correct an 'arithmetical, clerical or similar error.' Instead, the First Request seeks a change in the substance of the Tribunal's Award **on the basis of complex assertions about the methodology that, in the view of Respondent, should have been used to calculate damages**"* (emphasis added).[431]

285. Against this backdrop, it is unsurprising that a detailed answer to the specific question of whether the legal measures should have been applied permanently or provisionally was not expressly stated in the Award.

286. In any case, the Committee considers that this issue has been implicitly addressed by the Tribunal's adoption of the calculations in Appendix C to the First Brattle Quantum Report in which the First Set of Disputed Measures were only applied for the limited duration when these measures were actually in effect. This is reinforced by Professor Sacerdoti's dissenting comments which make clear that the Tribunal had accepted the Claimant's valuation which was "*based on a 'But-for' scenario with a 25-year duration of the feed-in tariffs set in 2010 under the Special Regime*" and operated on the "*premise that the Original Regulatory Regime would remain stable for 25 years*".[432]

---

[431] R-0361-ENG, Decision on Rectification, ¶38.

[432] Award, ¶¶544-545.

287.    A Member of the Committee dissents on this issue and his views are set out in the attachment to this decision.

## VII.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

288.    Spain submits that there has been a serious departure from a fundamental rule of procedure in: (i) the decisions adopted by the Tribunal during the time when Dr. Stanimir A. Alexandrov ("**Dr. Alexandrov**") was part of the Tribunal, namely the then-Tribunal's decisions on documentary production and the intervention of the EC;[433] and (ii) the Tribunal's decision to allow the Claimant's application to introduce two categories of documents a few weeks before the hearing on the merits, namely, a note from the CNE dated 22 October 2009 ("**Document C-189**") and three emails and a presentation by Grant Greatrex ("**Greatrex Materials**").[434] The Committee proceeds to address each of these issues in turn.

### A.    WHETHER THE TRIBUNAL SERIOUSLY DEPARTED FROM A FUNDAMENTAL RULE OF PROCEDURE WHEN DR. ALEXANDROV WAS PART OF THE TRIBUNAL

#### (i)    Spain's Position

289.    By way of background, the Tribunal was initially made up of Judge Joan E. Donoghue, (the President appointed by the Secretary-General of ICSID), Dr. Alexandrov (appointed by the Claimant), and Ms. Anna Joubin-Bret (appointed by Spain).[435]

290.    In July 2017, Spain learned of facts that suggested that Dr. Alexandrov had maintained a professional relationship with Brattle (i.e. the Claimant's expert on damages), and hence requested Dr. Alexandrov to make disclosures regarding his relationship with Brattle.[436]

291.    Subsequently, on 18 September 2017, Spain proposed the disqualification of Dr. Alexandrov.[437] After written submissions by both Parties were submitted, the two non-

---

[433]    Memorial on Annulment, ¶¶294-320.
[434]    Memorial on Annulment, ¶¶321-339.
[435]    Memorial on Annulment, ¶300.
[436]    Memorial on Annulment, ¶301.
[437]    Memorial on Annulment, ¶303.

challenged arbitrators reported that they were not able to reach an agreement.[438] On 24 October 2017, Dr. Alexandrov submitted his resignation as arbitrator.[439]

292.    Spain relies on the *Eiser* case where Dr. Alexandrov acted as a co-arbitrator.[440] In that case, the award was annulled under Article 52(1)(a) of the ICSID Convention (i.e. on the grounds that "*the Tribunal was not properly constituted*") due to the non-disclosure of the existence of a continuing professional relationship between Dr. Alexandrov and the claimant's expert firm, Brattle, and specifically, one of the claimant's damages expert, Mr. Lapuerta.[441]

293.    The *Eiser* committee found that this relationship gave rise to an appearance of bias that should have been disclosed to the parties, and the failure to disclose this circumstance meant that the respondent, Spain, was deprived of its right to an independent and impartial tribunal and consequently, its right of defence was infringed.[442] According to Spain, the circumstances in the present case are exactly the same as the *Eiser* case as: (i) Dr. Alexandrov was appointed by the Claimant in the Underlying Arbitration; (ii) both Brattle and Mr. Lapuerta intervened as experts for the Claimant; and (iii) in these proceedings, Dr. Alexandrov had not warned of his relationship with Brattle or Mr. Lapuerta.[443]

294.    That said, Spain accepts that Dr. Alexandrov resigned from the Tribunal and that "*consequently, the award made in SolEs Badajoz cannot be annulled due to the improper constitution of the tribunal*".[444] Instead, Spain argues that although Dr. Alexandrov's

---

[438]   Memorial on Annulment, ¶303.

[439]   Memorial on Annulment, ¶304.

[440]   Memorial on Annulment, ¶¶305-308; Reply on Annulment, ¶¶472-477.

[441]   Memorial on Annulment, ¶307, citing RL-0135-ENG, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.À R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment dated 11 June 2020 ("*Eiser*"), ¶¶225-229, 241-242. The Committee notes that RL-0135-ENG contains the Decision on Stay of Enforcement of the Award dated 23 March 2018 in *Eiser* instead of the Decision on Annulment dated 11 June 2020. The English version of the Decision on Annulment in *Eiser* can be found at CL-0241-ENG. The Spanish version of the Decision on Annulment in *Eiser* was correctly filed as RL-0135-SPA.

[442]   Memorial on Annulment, ¶307, citing RL-0135-ENG, *Eiser,* ¶¶225-229, 241-242.

[443]   Memorial on Annulment, ¶308.

[444]   Memorial on Annulment, ¶296.

involvement "*did not affect the drafting of the final award*", it contaminated a good part of the previous procedural decisions of the tribunal.[445]

295.    Specifically, Spain takes issue with: (i) the Tribunal's decisions on documentary production (by way of Procedural Order No. 4 of 14 April 2017);[446] and (ii) the intervention of the European Commission (by way of Procedural Order No. 2 of 23 May 2016, and Procedural Order No. 3 of 21 February 2017).[447]

296.    With regard to the Tribunal's decision on documentary production, Spain argues that this resulted in "*exaggeratedly unequal treatment*" strongly in favor of the Claimant.[448] In particular, the Claimant was granted 100% of its 9 document requests that were disputed by Parties, while Spain was only granted half of its 8 document requests that were disputed by Parties.[449] According to Spain, the "*numbers speak for themselves*".[450]

297.    As for the Tribunal's decisions on the intervention of the EC, Spain raises objections regarding the Tribunal's decision to: (i) reject the EC's first request dated 18 April 2016 to intervene as *amicus curiae* on the grounds that it was premature;[451] and (ii) allow the EC's second request dated 18 May 2017 to intervene as *amicus curiae* on the condition that it provide an undertaking that it will comply with any decision on costs to be issued by the Tribunal,[452] but deny the EC access to the case documents and to intervene at the hearing.[453]

298.    According to Spain, it was deprived of receiving the EC's "*extremely valuable contribution to the resolution of the dispute*", and that "*the way in which the rejection took place is in*

---

[445]    Memorial on Annulment, ¶¶297-298.

[446]    Memorial on Annulment, ¶¶311-314.

[447]    Memorial on Annulment, ¶¶315-320.

[448]    Memorial on Annulment, ¶311.

[449]    Memorial on Annulment, ¶¶312-313.

[450]    Memorial on Annulment, ¶314.

[451]    Memorial on Annulment, ¶¶316, 318.

[452]    Memorial on Annulment, ¶¶316, 319; see also R-0390-ENG, Procedural Order No. 3 dated 21 February 2017, ¶47.

[453]    Reply on Annulment, ¶493.

*itself evidence of a new violation of the fundamental rules of procedure*".[454] Specifically, Spain argues that the rejection of the EC's first request forced it to submit a new application,[455] and the EC ultimately did not intervene due to the Tribunal's persistence that it provide a guarantee.[456] Spain also argues that the Tribunal's decision to deny the EC access to case documents or attend the hearing was unfavourable to Spain.[457]

### (ii)    The Claimant's Position

299.    The Claimant submits that there is no substance to the link that Spain seeks to establish between Dr. Alexandrov's intervention in the Underlying Arbitration from February 2016 to October 2017 and the annulment of the *Eiser* award.[458] In this regard, the Claimant argues that unlike the *Eiser* proceedings, Dr. Alexandrov resigned from the Tribunal nearly two years before the Award was issued.[459]

300.    In addition, the Claimant asserts that although the *Eiser* committee concluded that Dr. Alexandrov's non-disclosure in that case deprived Spain of the opportunity to challenge him, it made no finding that Dr. Alexandrov's relationship was *ipso facto* improper.[460] On this basis, the Claimant submits that Spain's challenge to Dr. Alexandrov and his subsequent resignation in that case do not provide a basis for a finding of lack of impartiality in the first place in the present case.[461]

301.    With regard to the Tribunal's decision on document production, the Claimant argues that absent a close examination of the reasoning and circumstances of a tribunal's ruling on document production, the number and proportion of requests granted provides no indication of the treatment of the parties.[462]

---

[454]    Memorial on Annulment, ¶317.
[455]    Memorial on Annulment, ¶318
[456]    Memorial on Annulment, ¶319.
[457]    Reply on Annulment, ¶493.
[458]    RL-0135-ENG, *Eiser*.
[459]    Counter-Memorial on Annulment, ¶188.
[460]    Counter-Memorial on Annulment, ¶192.
[461]    Counter-Memorial on Annulment, ¶193.
[462]    Counter-Memorial on Annulment, ¶198

302.    According to the Claimant, the Tribunal found that 3 out of 4 of Spain's rejected document requests pertained to matters that were not directly relevant to issues before the Tribunal as they concerned documents relating to investors and plants that were neither party to nor otherwise the subject of the arbitration.[463] As for the remaining request which sought tests performed for accounting impairment purposes, the Tribunal denied this in light of the Claimant's statement that no such tests existed.[464]

303.    With regard to the Tribunal's decisions on the intervention of the EC, the Claimant argues that Spain has adduced no proof of actual bias on the part of Dr. Alexandrov and that it is difficult to see how a ruling on a *third party's* intervention could put in issue the rights of Spain itself. According to the Claimant, this is dispositive, and Spain's allegations can be rejected on this ground alone.[465]

304.    In addition, the Claimant submits that the Tribunal's rejection of the EC's initial application was done without prejudice to the Tribunal's consideration of any application to intervene by the EC filed at a later stage of the proceedings,[466] and that the undertaking for costs imposed by the Tribunal in respect of the EC's second application is consistent with the obligations that the parties to the arbitration themselves have to comply with a costs award.[467]

**(iii)    The Committee's Analysis**

305.    The Committee considers that the Tribunal did not seriously depart from a fundamental rule of procedure. In the Committee's view, Spain has failed to establish that there was any form of bias on the part of Dr. Alexandrov, let alone that Dr. Alexandrov's transient involvement as part of the Tribunal deprived Spain of the full, fair and comparatively equal opportunity to present its case.

---

[463]    Counter-Memorial on Annulment, ¶199.
[464]    Counter-Memorial on Annulment, ¶199.
[465]    Counter-Memorial on Annulment, ¶207.
[466]    Counter-Memorial on Annulment, ¶204.
[467]    Counter-Memorial on Annulment, ¶209.

306. At the outset, it is important to emphasize that Spain accepts that "*the award made in SolEs Badajoz cannot be annulled due to the improper constitution of the tribunal*" given that Dr. Alexandrov resigned from the Tribunal more than two years before the Award was rendered.[468] Instead, Spain's argument is that Dr. Alexandrov's involvement contaminated the procedural decisions of the Tribunal, which is a serious departure of its fundamental right to be heard.

307. As stated above, the Committee agrees with the Parties that the right to be heard is a fundamental rule of procedure. As such, the sole issue to be decided is whether the Tribunal seriously departed from this rule when Dr. Alexandrov was part of the Tribunal. As explained below, the Committee is not persuaded that there was any serious departure from a fundamental rule of procedure on this issue.

308. In the first place, the Committee notes that Spain has provided no basis for finding a lack of impartiality on Dr. Alexandrov's part in the present case. In fact, Spain does not argue that there was any *actual* bias on the part of Dr. Alexandrov. Instead, Spain has sought to analogize the present case to the *Eiser* case, where the *Eiser* committee concluded that Dr. Alexandrov's non-disclosure of his relationship with the Claimant's expert gave rise to an *appearance* of bias that should have been disclosed to the Parties.[469]

309. However, the Committee is of the view that the present case is distinguishable from *Eiser*. Unlike the *Eiser* case where Dr. Alexandrov's relationship with Brattle and Mr. Lapuerta was only discovered after the award was issued, Spain challenged Dr. Alexandrov in the course of the Underlying Arbitration which ultimately led to Dr. Alexandrov's resignation after the remaining co-arbitrators were divided on the issue. This is different from the *Eiser* case where it was found that "*Dr. Alexandrov's absence of disclosure, deprived Spain of the opportunity to challenge him in the arbitration proceedings*" and consequently, deprived Spain "*from seeking the benefit and protection of an independent and impartial tribunal which the right to challenge is intended to provide*".[470]

---

[468]  Memorial on Annulment, ¶296.
[469]  Memorial on Annulment, ¶307.
[470]  RL-0135-ENG, *Eiser*, ¶241.

310.   Moreover, Spain has made no attempt to show that Dr. Alexandrov's involvement in the Tribunal caused the Tribunal to reject four of Spain's document requests, or impose the undertaking as to costs as a condition of the EC's intervention in the proceedings. As such, Spain's argument that Dr. Alexandrov's involvement in the Tribunal "*contaminated*" these decisions is not supported by positive evidence.

311.   In any case, the specific facts of the two decisions which Spain takes issue with do not show that Spain was deprived of a full, fair and comparatively equal opportunity to present its case.

312.   With regard to the decision on documentary production, the Committee is not persuaded by Spain's argument that the Tribunal's allowance of 100% of the requests made by the Claimant, while only allowing half of Spain's requests, evidences a deprivation of Spain's right to an equal opportunity to present its case. Contrary to Spain's suggestion that the "*numbers speak for themselves*", the number of document requests allowed by the Tribunal to one party in comparison to an opposing party cannot be *ipso facto* a valid ground for finding a departure from Spain's right to be heard, let alone a serious one.

313.   On this issue, the Committee agrees with the Claimant's argument that "*one must not confuse the opportunity to present arguments and evidence – the right to be heard – with the acceptance of these arguments and evidence – the Tribunal's discretion*".[471] The Committee's function is not to second guess the Tribunal by judging whether its decision was correct in rejecting the documents sought by Spain. As stated in the *Venezuela Holdings* decision:

> "[t]*he point for decision by the ad hoc Committee in these proceedings is not, however, whether either side was right or wrong in these arguments, or indeed whether the Tribunal was right or wrong in accepting one set of arguments or the other, whether as a matter of law or as a matter of discretionary assessment. **That once again, would constitute appeal. The only aspect properly for consideration by the Committee is the possible effect of the Tribunal's refusal to order disclosure.** Specifically, did that refusal infringe* [the respondent's]

---

[471]   Counter-Memorial on Annulment, ¶178.

*right to be heard, or did it at least deny* [respondent] *a full opportunity to present its case?"* (emphasis added).[472]

314.  In the present case, Spain has not established how the Tribunal's refusal to order disclosure prevented it from being able to present its case, let alone how this was done under the allegedly improper influence of Dr. Alexandrov. Similar to the *Venezuela Holdings* decision, the Committee is of the view that there is nothing in the Award which suggests that the Tribunal's findings had not been fully and amply argued by the Parties. Moreover, the Committee also notes that although Spain had more than two years to make an application for reconsideration of the four document requests after Dr. Alexandrov resigned from the Tribunal on 24 May 2017, it did not make any such application.

315.  As for the EC's application to intervene, the Committee also agrees with the Claimant that it is difficult to see how a ruling on a *third party's* intervention could put in issue the rights of Spain itself. The Committee considers that Spain's allegations can be rejected on this ground alone. The fact that *the EC* decided not to intervene as an *amicus curiae* because of the conditions imposed by the Tribunal for its intervention (i.e. the imposition of an undertaking on costs) is completely distinct from a procedural action affecting *Spain's* right to be heard.

316.  Thus, the Committee concludes that Spain has failed to establish a serious departure from a fundamental rule of procedure in accordance with Article 52(1)(e) of the ICSID Convention.

**B.  WHETHER THE TRIBUNAL SERIOUSLY DEPARTED FROM A FUNDAMENTAL RULE OF PROCEDURE BY ALLOWING THE CLAIMANT TO ADMIT DOCUMENT C-189 AND THE GREATREX MATERIALS**

**(i)  Spain's Position**

317.  Spain argues that its right of defence was seriously affected when the Tribunal allowed the Claimant's request dated 12 April 2018 to admit Document C-189 (i.e. a note from the

---

[472]  Counter-Memorial on Annulment, ¶184, citing RL-0177-ENG, *Venezuela Holdings*, ¶132.

CNE dated 22 October 2009) and the Greatrex Materials into the proceedings "*just a few weeks before the hearing*" which took place in June 2018 despite Spain's objections.[473]

318.  Spain relies on Section 16.3 of Procedural Order No. 1 dated 22 April 2016 ("**2016 PO1**") which states that "[n]*either party shall be permitted to submit additional or responsive documents after the filing of its respective last written submission, unless the Tribunal determines that exceptional circumstances exist based on a reasoned written request followed by observations from the other party*".[474]

319.  With regard to Document C-189, Spain submits that the Tribunal admitted this document despite the absence of exceptional circumstances of any kind.[475] Spain restates its objections to the admission of this document which were previously raised to the Tribunal, namely, that Document C-189 was publicly available since 2009 and that Brattle could have provided the document with their expert reports in the Underlying Arbitration.[476] According to Spain, the introduction of the document prevented it from formulating written allegations regarding it, as would have happened had the Claimant respected the procedural norms and had presented the said document with its memorials.[477]

320.  With regard to the Greatrex Materials, Spain similarly argues that the Tribunal did not justify what exceptional circumstances warranted the introduction of these documents.[478] According to Spain, it was prevented from analyzing and refuting the documents in its written memorials, thus violating its right to be heard.[479]

---

[473]  Memorial on Annulment, ¶323.
[474]  Memorial on Annulment, ¶324.
[475]  Memorial on Annulment, ¶327.
[476]  Memorial on Annulment, ¶324.
[477]  Memorial on Annulment, ¶329(c).
[478]  Memorial on Annulment, ¶333.
[479]  Memorial on Annulment, ¶338(b).

### (ii)    The Claimant's Position

321.    The Claimant contends that Spain has not defined the "*basic principle of compliance with procedural deadlines*" which it claims has been breached.[480]

322.    The Claimant further argues that Spain's restatement of its original objection that no exceptional circumstances justified the admission of Document C-189 and the Greatrex Materials is irrelevant as the Tribunal had already considered both parties' positions when it allowed these documents into the record.[481] Moreover, the Claimant submits that these documents were admitted into the record one month before the hearing, and that Spain had addressed these document as well as Mr. Greatrex's cross examination on the Greatrex Materials in its Post-Hearing Brief.[482]

### (iii)    The Committee's Analysis

323.    The Committee is not persuaded that the admission of Document C-189 and the Greatrex Materials amounts to a serious departure from a fundamental rule of procedure.

324.    In the Committee's view, this issue can be easily disposed of as it is amply clear from the record that Spain had a full opportunity to address these documents. Both Document C-189 and the Greatrex Materials were expressly addressed in Spain's Post-Hearing Brief, and Spain even crossed examined Mr. Greatrex on the Greatrex Materials. As such, there is no basis for Spain's submission that its right to be heard was infringed in any way and that there was a serious departure from a fundamental rule of procedure in accordance with Article 52(1)(e) of the ICSID Convention.

---

[480]    Counter-Memorial on Annulment, ¶212.
[481]    Counter-Memorial on Annulment, ¶219.
[482]    Counter-Memorial on Annulment, ¶¶220-221, 226-227.

## VIII.   COSTS

### A.    SPAIN'S POSITION

325.    Spain requests that the Committee order the Claimant to pay for the legal and arbitration costs of Spain, totaling to EUR 1,224,921.18, broken down as follows:[483]

| CATEGORY | AMOUNT |
|---|---|
| ICSID fees and advance payments | EUR 559,322.74 |
| Legal fees | EUR 600,000 |
| Expert Reports | EUR 55,119 |
| Translations | EUR 4,057.43 |
| Travel expenses | EUR 6,389.72 |
| Other expenses | EUR 32.29 |
| **TOTAL AMOUNT** | **EUR 1,224,921.18** |

326.    Spain further requests that the Claimant be ordered to pay post-award interest on the foregoing sums, at a compound rate of interest to be determined by the Committee, until the date of full satisfaction of the Committee's decision.[484]

### B.    THE CLAIMANT'S POSITION

327.    The Claimant submits that Spain should bear the entirety of the costs of this annulment, including those of the Claimant, which amount to EUR 859,927.73, broken down as follows:[485]

| CATEGORY | AMOUNT |
|---|---|
| Fees of Orrick Herrington & Sutcliffe | EUR 677,900.90 |
| Disbursements of Orrick Herrington & Sutcliffe | EUR 317.79 |
| Fees of The Brattle Group | EUR 137,025 |

---

[483]   Spain's Submission on Costs dated 22 November 2021 ("**Spain's Costs Submissions**"), ¶19(1).

[484]   Spain's Costs Submissions, ¶19(3).

[485]   The Claimant's Submissions on Costs dated 22 November 2021 ("**Claimant's Costs Submissions**"), ¶5.

| CATEGORY | AMOUNT |
|---|---|
| Disbursements of The Brattle Group | EUR 1,144.88 |
| Fees of Professor Eeckhout | EUR 27,000 |
| Disbursements of Professor Eeckhout | EUR 779.76 |
| Fees of Pérez-Llorca | EUR 8,934.30 |
| Translation services | EUR 6,825.10 |
| **TOTAL AMOUNT** | **EUR 859,927.73** |

328.    The Claimant further requests that the Committee order Spain to pay interest at the rate of 1.74% (being the applicable interest rate on all compensation for damages awarded by the Tribunal) on this amount, from the date of the Committee's decision until full payment of the Award, to be compounded quarterly.[486]

### C.    THE COMMITTEE'S DECISION ON COSTS

329.    Article 61(2) of the ICSID Convention provides:

> *"In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award".*

330.    This provision, together with Arbitration Rule 47(1)(j) (applied by virtue of Arbitration Rule 53) gives the Committee discretion to allocate all costs of the proceeding, including attorney's fees and other costs, between the Parties as it deems appropriate.

331.    The costs of the annulment proceedings, including the fees and expenses of the Committee, ICSID's administrative fees, and direct expenses, amount to (in USD):

Committee's fees and expenses        US$ 327,351.15

---

[486]   Claimant's Costs Submissions, ¶16.

| | |
|---|---|
| ICSID's administrative fees | US$ 84,000.00 |
| Direct expenses | US$ 88,547.89 |
| **Total** | **US$ 499,899.04** |

332.  The above costs have been paid out of the advances on costs made by Spain pursuant to Administrative and Financial Regulation 14(3)(e).[487]

333.  In exercising the discretion described above, the Committee notes that both Parties are in agreement that generally, the Committee should be guided by the principle that "*costs follow the event*" unless the circumstances call for a different approach.[488] According to the Claimant, such circumstances must be exceptional. The Committee also notes that both Parties are in agreement that post-award interest ought to be awarded in the present case.

334.  In the present case, the Committee has by majority decided to reject Spain's application to annul the Award in its entirety. The Committee sees no reason to depart from the general principle that "*costs follow the event*" which both Parties have relied on. Given that Spain was not successful on any of the grounds of annulment raised, the Committee considers it appropriate that Spain should bear the entirety of the Claimant's costs of this annulment procedure which amount to EUR 859,927.73. Similarly, Spain should pay the costs of the proceedings.

335.  Given the Parties' alignment on the issue of post-award interest, the Committee sees it fit to allow the Claimant's request for Spain to pay interest at the rate of 1.74% (being the applicable interest rate on all compensation for damages awarded by the Tribunal) on this amount, from the date of the Committee's decision until full payment of the Award, to be compounded quarterly.

---

[487]  The remaining balance will be reimbursed to Spain.

[488]  Spain's Costs Submissions, ¶5; Claimant's Costs Submissions, ¶¶10-12.

336.   Accordingly, the Committee, by majority, orders Spain to bear all the costs of the proceedings, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, and pay EUR 859,927.73 to the Claimants in respect of the Claimants' legal fees and expenses. The Committee further orders that Spain shall pay interest to the Claimant on this sum at the rate of 1.74% on this amount, from the date of the Committee's decision until full payment of the Award, to be compounded quarterly.

337.   Consistent with his concurring and dissenting views in respect of the damages determination, a Member of the Committee has issued a separate opinion on this matter which is attached to this decision.

## IX.   DECISION

338.   For the reasons set forth above, the Committee by majority decides as follows:

   a)   Spain's application for annulment of the Award is rejected in its entirety;

   b)   the stay of enforcement of Award is terminated;

   c)   Spain shall bear all the costs of the proceedings, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses (as reflected in ICSID's final financial statement) and pay EUR 859,927.73 to the Claimants in respect of the Claimants' legal fees and expenses; and

   d)   Spain shall pay interest to the Claimant on the sum awarded in subparagraph (c) above at the rate of 1.74% on this amount, from the date of the Committee's decision until full payment of the Award, to be compounded quarterly.

_____
Mr. Colm Ó hOisín, SC
Member of the *ad hoc* Committee

Date:

_____
Mr. Noé Fernando Piérola-Castro
Member of the *ad hoc* Committee

Date:

Subject to the attached individual opinion

_____
Mr. Cavinder Bull, SC
President of the *ad hoc* Committee

Date: 22 February 2022

_____
Mr. Colm Ó hOisín, SC
Member of the *ad hoc* Committee

Date: 23 February 2022

_____
Mr. Noé Fernando Piérola-Castro
Member of the *ad hoc* Committee

Date:

Subject to the attached individual opinion

_____
Mr. Cavinder Bull, SC
President of the *ad hoc* Committee

Date:

109

_____

Mr. Colm Ó hOisín, SC
Member of the *ad hoc* Committee

Date:

_____

Mr. Noé Fernando Piérola-Castro
Member of the *ad hoc* Committee

Date: 22 February 2022

Subject to the attached individual opinion

_____

Mr. Cavinder Bull, SC
President of the *ad hoc* Committee

Date:

109

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**SolEs Badajoz GmbH**
Respondent on Annulment

v.

**Kingdom of Spain**
Applicant on Annulment

**(ICSID Case No. ARB/15/38)**
**Annulment Proceeding**

---

**INDIVIDUAL OPINION BY COMMITTEE MEMBER**
**N. FERNANDO PIÉROLA-CASTRO**

---

22 February 2022

## TABLE OF CONTENTS

I.     **INTRODUCTION** ............................................................................................. **2**

II.    **DETERMINATION OF DAMAGES** ................................................................. **2**

     A.    **Context of the Determination of Damages** .................................................. **3**

     B.    **Whether the Tribunal manifestly exceeded its powers by granting compensation in excess of the amount due as a result of its findings on liability** ........................... **4**

     C.    **Whether the Award failed to state reasons on which it is based** ............................. **9**

          a.    Contradiction between the findings on liability and quantum ....................... 11

          b.    Lack of motivation of quantum decision based on rejection of AMG's argument ............................................................................ 13

          c.    Failure to state reasons for findings of damages – choice of provisional effect of ECT-consistent measures for the calculation of future damages .............. 14

III.   **DETERMINATION OF COSTS OF THE ANNULMENT PROCEEDINGS** ................. **22**

IV.   **CONCLUSION** ............................................................................................... **24**

## I.     INTRODUCTION

1.     This document sets out the individual opinion of Committee Member N. Fernando Piérola-Castro on the claims brought by the Kingdom of Spain ("**Spain**" or the "**Applicant**") under Articles 52(1)(b) and 52(1)(e) of the ICSID Convention with respect to the Tribunal's determination on damages, as contained in the Award rendered on 31 July 2019 in *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38 (the "**Award**") and the Tribunal's Decision on Rectification of the Award on 5 December 2019 (the "**Rectification Decision**"). Given the sense of this opinion, the Committee Member must also take an individual position on the apportionment of costs. Other than these matters, the Committee Member subscribes fully to the Committee's analysis and rulings in respect of the other matters at issue in these proceedings.

2.     Section II *infra* lays out the Committee Member's individual opinion on the claims brought by Spain under Articles 52(1)(b) and 52(1)(e) of the ICSID Convention in respect of the determination of damages. Section III explains the consequences of this position in the allocation of costs. Section IV sets out his conclusion.

## II.     DETERMINATION OF DAMAGES

3.     The Applicant raises two claims: (a) that the Tribunal manifestly exceeded its powers within the meaning of Article 52(1)(b) of the ICSID Convention by granting compensation in excess of the amount due as a result of the Tribunal's findings on liability [1], and (b) that the Award failed to state the reasons for the Tribunal's endorsement of the amount proposed by SolEs Badajoz GmbH ("**SolEs Badajoz**", the "**Claimant**" or the "**Respondent on Annulment**") and its expert, The Brattle Group ("**Brattle**"), in particular, the reliance on the but-for scenario leading to the calculation of that final amount.[2] For the reasons set out *infra*, the Committee Member concurs with the Committee's decision that the first claim should be rejected (albeit for different

---

[1] Memorial, ¶62(3).
[2] Memorial, ¶172; Reply, ¶323.

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

reasons), while he dissents with the Committee's decision that the second claim should be rejected, and considers that it should be upheld.

## A. Context of the Determination of Damages

4.    The underlying arbitration concerned certain measures imposed by Spain that modified the regulatory regime in force under Royal Decree 1578/2008 [3] (the "**Original Regulatory Regime**"[4] and "**RD 1578**", respectively).

5.    The Tribunal defined the "**Disputed Measures**" as comprising two sets of measures.[5] The "**First Set of Disputed Measures**" included three measures: (i) Royal Decree Law 14/2010 of 23 December 2010, "which imposed a cap on the number of hours per year during which PV installations could sell electricity under the FIT [feed-in-tariff]"[6] ("**RDL 14/2010**"); (ii) Law 15/2012 of 27 January 2012, "imposing a seven percent tax on electric energy production"[7] ("**Law 15/2012**") and (iii) Royal Decree Law 2/2013 of 1 February 2013, "which changed the inflation index used to update FITs"[8] ("**RDL 2/2013**").

6.    The "**Second Set of Disputed Measures**" comprised four measures[9]: (i) Royal Decree Law 9/2013 of 12 July 2013, setting forth "urgent measures to ensure the financial stability of the electricity system"[10] ("**RDL 9/2013**"); (ii) Law 24/2013, which "eliminated the distinction between the Ordinary Regime and the Special Regime and confirmed the changes contained in RDL 9/2013"[11] ("**Law 24/2013**"); (iii) Royal

---

[3] Royal Decree 1578/2008 dated 26 September 2008 covering the compensation for the generation of electric power by photovoltaic solar technology for facilities subsequent to the deadline for the maintenance of compensation under Royal Decree 661/2007 of 25 May 2007. Award, ¶110.

[4] Award, ¶113.

[5] Award, ¶114.

[6] Royal Decree Law 14/2010 dated 23 December 2010, on the Establishment of Urgent Measures for the Correction of the Tariff Deficit in the Electricity Sector. Award, ¶120(1).

[7] Law 15/2012 dated 27 December 2012 on Tax Measures for Energy Sustainability. Award, para. 120(2).

[8] Royal Decree-Law 2/2013 dated 1 February 2013, on Urgent Measures in the Electricity System and in the Financial Industry. Award, ¶120(3).

[9] Award, ¶125.

[10] Royal Decree-Law 9/2013 dated 12 July 2013, on Urgent Measures to Guarantee the Financial Stability of the Electricity System. Award, ¶126.

[11] Law 24/2013 dated 26 December 2013, on the Electricity Sector. Award, ¶129.

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

Decree 413/2014 ("**RD 413/2014**") [12] and (iv) Ministerial Order IET/1045/2014 ("**IET/1045/2014**") [13], both of which provided "greater details regarding the new remuneration scheme applicable to renewable energy facilities."[14]

7.    The Tribunal found that Spain's adoption of the First Set of Disputed Measures was not inconsistent with the Energy Charter Treaty ("**ECT**").[15] However, it considered that "by enacting the Second Set of Disputed Measures, [Spain] violated its obligation under Article 10(1) of the ECT [the obligation to accord to investors fair and equitable treatment]".[16] Accordingly, the Tribunal proceeded on the basis that it was appropriate to establish the damages arising from the Second Set of Disputed Measures.[17]

**B.  Whether the Tribunal manifestly exceeded its powers by granting compensation in excess of the amount due as a result of its findings on liability**

8.    Article 52(1)(b) of the ICSID Convention provides that the annulment of an award may be requested if "the Tribunal has manifestly exceeded its powers". In this case, the Applicant submits that the Tribunal did so by granting compensation beyond what was due on the basis of the measures that it had found to be inconsistent with the ECT. According to the Applicant, for the calculation of damages,

- the Tribunal relied with "blind faith" on the valuation of damages made by Brattle, and in particular on a but-for scenario that assumed that the Original Regulatory Regime under RD 1578 would remain unchanged and that none of the Disputed Measures would be established, including those that were found not to be illegal; and

---

[12] Royal Decree 413/2014 dated 6 June 2014, which Regulates the Activity of Electricity Production from Renewable Energy, Cogeneration and Waste Sources. Award, ¶130.

[13] Order IET/1045/2014 dated 16 June 2014, Approving the Remuneration Parameters of Standard Facilities for Certain Electricity Production Facilities using Renewable Energy, Cogeneration and Waste Sources. Award, ¶130.

[14] Award, ¶130.

[15] Award, ¶452.

[16] Award, ¶463.

[17] Award, ¶¶488 and 538.

- if the Tribunal was not satisfied with Brattle's valuation proposal (as Professor Sacerdoti's opinion suggests), the Tribunal should have requested additional assistance from the experts, as the discretion of an arbitral tribunal in the determination of quantum does not permit it to exceed its powers to this extent.[18]

9.   For the assessment of this claim, the relevant "powers"[19] within the meaning of Article 52(1)(b) are those set out in Article 26(6) of the ECT, which enable a tribunal established under the ECT to "decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." As established by the Tribunal, the granting of compensation for a breach of ECT Article 10(1) is governed by the customary international law on State responsibility. This provides that compensation must "wipe out all the consequences of the illegal act" (as far as possible), and that a "responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act."[20] The Tribunal stated that the claimant had the burden of proving the claimed loss. Relying on *Gemplus*, it also noted that "[i]f that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established."[21]  On this basis, the Tribunal decided that Spain "has an obligation to compensate Claimant for the reduction in the fair market value of its investment that was caused by the Disputed Measures."[22] The Tribunal thus assumed that it had the power to order the payment of compensation for the injury attributable to the illegal act, and that it could do so to the extent that the losses were not "uncertain", "speculative" or "unproven".[23]

---

[18] The Parties' arguments are laid out in detail in the Committee's Decision, Sections VI(A)(i) and (ii).

[19] The term "powers" in general refers to the "authority given or conferred" (Oxford English Dictionary, at https://www.oed.com/view/Entry/149167?rskey=UgBoMt&result=1#eid, visited 30 October 2021) upon a tribunal to fulfil its mandate. It is a term that is unqualified in Article 52(1) of the ICSID Convention.

[20] Award, ¶476.

[21] Award, ¶478.

[22] Award, ¶476. The Tribunal's explanation of the legal standard shows that the Tribunal considered that the relevant injury must be "resulting from and ascribable" to the illegal measures. The Tribunal subscribed to the general notion that the compensable damages must have a "sufficient causal link" – "not too remote" – with the illegal act (Award, ¶476, citing ILC Articles on State Responsibility, Commentary on Article 31, ¶ 10). Thus, the Tribunal implicitly assumed that its ability to order the payment of damages was disciplined by the existence of a link between the damages claimed and the measures that were found to be inconsistent with the ECT.

[23] Award, ¶478, (citing, *Gemplus S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4. Award dated 16 June 2010, ¶¶12-56).

10.     In addition, as noted above, the Tribunal took its decision on damages in the context of its findings that: (i) the investor had a legitimate expectation to a stable FIT[24], (ii) the First Set of Disputed Measures was not inconsistent with Spain's obligation to accord fair and equitable treatment under the ECT[25] and (iii) that the Second Set of Disputed Measures was inconsistent with Article 10(1) of the ECT.[26]

11.     In quantifying the damages, the Tribunal:

(i)     chose the discounted cash flow (DCF) method as "well-suited" to the case. It explained that this choice provided a solid basis to quantify damages given the fact that "the Second Set of Disputed Measures … diminished the revenue that Claimant would have received had the Original Regime been maintained". The Tribunal also explained that the DCF method enabled it "to compare the present value of Claimant's investment in the absence of the Disputed Measures to the present value of [the] investment in light of the Disputed Measures"[27];

(ii)    noted that "the amount of damages to be awarded to Claimant [had to] be adjusted to take into account … the Tribunal's finding that Spain is not liable as to the First Set of Disputed Measures"[28];

(iii)   focused its attention on Appendix C of Brattle's First Quantum Report (Appendix C) and in particular, on the set of calculations that assumed the legality of the 7% TVPEE (the 7% tax). The Tribunal referred to the damages that Brattle had attributed to the Second Set of Disputed Measures (which corresponded to the "**July 2013 measures**" in Appendix C) as distinguished from the damages attributed to the First Set of Disputed Measures[29]; and

---

[24] Award, ¶444.
[25] Award, ¶452.
[26] Award, ¶463.
[27] Award, ¶488.
[28] Award, ¶538.
[29] Award, ¶539.

(iv) noted that "Brattle calculate[d] that the July 2013 measures reduced the fair market value of Claimant's investment by 40.98 million."[30]

12.   There is no indication that in undertaking its quantification efforts to this point, the Tribunal in any way exceeded its powers.

13.   The Tribunal then proceeded to reject the argument raised by the Applicant's expert ("**AMG**") to the effect "that Brattle [did] not divide the individual effects of the Measures in its future damages calculation." The Tribunal rejected this argument as it was premised on a part of Brattle's report (Figure 1) that "[did] not isolate the damages attributable to the July 2013 measures from earlier measures, as was done in Appendix C". [31] Whether that rejection might give rise to a sufficient basis for annulment is discussed *infra* under the next section.

14.   Following the rejection of AMG's argument, the Tribunal concluded that Spain's "breach of its fair and equitable treatment obligation reduced the fair market value of Claimant's investment by EUR 40.98 million."[32] Based on this conclusion, the Tribunal ordered that "[a]s a consequence of the breach of Article 10(1) of the ECT, Respondent shall pay Claimant compensation in the amount of EUR 40.98 million."[33]

15.   The relevant question is whether, by endorsing the amount claimed in Appendix C, and consequently ordering compensation based on this amount, the Tribunal exceeded its powers. As Appendix C ostensibly narrowed the scope of the damage calculation to the losses attributable only to "July 2013 measures" (Second Set of Disputed Measures), the Tribunal would have *prima facie* acted consistently within the boundary of its powers in doing so. However, the Applicant alleges that Appendix C does not *in fact* state only the damages that accrued from the Second Set of Disputed Measures. The assessment of this question requires a deeper assessment of the findings stated in the

---

[30] Award, ¶539.
[31] Award, ¶540.
[32] Award, ¶541.
[33] Award, ¶576(3). This figure was "replaced with [the figure of] 'EUR40.49'" pursuant to the Rectification Decision of 5 December 2019. Rectification Decision, ¶55(2).

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

Award in the light of the Applicant's valuation theory and the Tribunal's consideration of Brattle's valuation reports.

16.     As such, even if the Applicant's assertion were correct, this does not seem to be a failure that may be characterised as "manifest" or "clearly revealed to the eye" of the reviewer. There are certain elements in the Award that cast doubt on whether the Tribunal properly relied on Appendix C in order to attribute damages only to the measures that it had found to be ECT-inconsistent. The Tribunal endorsed the position that compensation could not be granted if the claimed losses remained "unproven", "speculative" or "uncertain". Thus, it considered that its power to grant compensation implied a duty to verify, inquire into, assess objectively, and to question the certainty or probative value of the amount asserted by the Claimant. However, it is unclear whether the Tribunal conducted an examination and verification of the figure proposed by Brattle in Appendix C as being attributable *in fact* to future damages accruing only from the Second Set of Disputed Measures. Rather, the Award describes the counterfactual scenario used for the damage determination as based on "the absence of the Disputed Measures"[34], as if all the measures at issue – even the First Set of Disputed Measures, which were not found to be ECT-inconsistent – had to be removed. The Tribunal rejected AMG's argument based on the argument's own flaws, rather than on the basis of the probative value of Brattle's proposed figure and calculations.[35]

17.     That said, there are also other elements in the Award that show that the Tribunal engaged carefully with the assessment of Brattle's financial model and, in particular, with the following elements: (i) the valuation date[36]; (ii) the periods of operation of the plants as a sufficient basis for the DCF analysis[37]; and (iii) the divergence of the Parties' cashflows estimates and its causes, including their different views on the regulatory risk[38], the illiquidity discount[39], and the inflation rate.[40] The Tribunal thus concluded

---

[34] Award, ¶488.
[35] The Applicant has presented evidence showing that the question of the impact of RDL 14/2010 and RDL 2/2013 on the Claimant's calculation of future damages was raised and discussed during the cross-examination of the expert at the hearing. R-0386, Hearing Transcript, Fourth Day, pp. 44-50.
[36] Award, ¶527.
[37] Award, ¶528.
[38] Award, ¶532.
[39] Award, ¶¶533-534.
[40] Award, ¶¶535-536.

that "Brattle's DCF analysis provide[d] a sound basis for the Tribunal to determine the reduction in the fair market value of Claimant's investment."[41] Furthermore, a review of the hearing record shows that the Tribunal considered the question of the most appropriate manner in which it could deal with potentially multiple "liability permutations" according to the complexity of combining different valuation factors into a DCF calculation.[42]

18.  The standard for annulment under Article 52(1)(b) requires a finding that the Tribunal "manifestly" exceeded its powers. In this case, there is some basis to question the presumption that the Tribunal exercised its discretion and took necessary steps to verify, assess and adjust, if appropriate, the amounts claimed in Appendix C. However, while these indications might raise a valid issue as to whether the Tribunal exceeded its powers, they do not constitute a sufficient evidentiary basis to find that it did so "manifestly" within the meaning of Article 52(1)(b) of the ICSID Convention.

19.  Consequently, while there may be some indication that the Tribunal did not take certain steps that were pertinent for the determination of damages under its own legal standard, there is no conclusive evidence that the Tribunal failed to do so. Accordingly, it is not possible to conclude that the Tribunal "manifestly" exceeded its powers within the meaning of Article 52(1)(b) of the ICSID Convention. Thus, the Committee Member concurs with the Committee's decision, albeit for different reasons, that the Request for Annulment should be rejected with respect to this claim.

### C.  Whether the Award failed to state reasons on which it is based

20.  Article 52(1)(e) of the ICSID Convention provides that the annulment of an award may be requested if "the Award has failed to state the reasons on which it is based". Regarding the determination of the damages or quantum, the Applicant argues that:

---

[41] Award, ¶538.
[42] R-0386, Transcript of Hearing, Fourth Day, pp. 138-140.

Case 1:19-cv-01618-TSC    Document 68-51    Filed 06/09/22    Page 131 of 145

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

- the Award contains contradictory findings on liability and quantum, which render the decision on quantum incoherent and compel the annulment of the Award.[43] The liability findings recognize that the Applicant may benefit from certain regulatory policy space. However, the quantum finding presupposes that the Original Regulatory Regime, which was in place prior to the introduction of any of the Disputed Measures, should be maintained[44];

- the Award contains no explanation for the rejection of AMG's argument regarding the individual impact of the ECT-consistent measures in the but-for scenario and assumes that Appendix C separates the future damages into those attributable to the ECT-consistent measures and the ECT-inconsistent measures, and discounts the effect of the former[45];

- the Award does not explain the Tribunal's decision to include "provisionally" the measures not found to be illegal in the relevant counterfactual to calculate the loss of value. The Tribunal failed to provide a reason for this despite the fact that the issue was raised in the proceeding.[46] There is no explanation for the Tribunal's adoption of Brattle's quantum approach on future damages, which is accepted as an "act of faith", apparently without the Tribunal realizing that by choosing that model, it adopted a limitation in time of the legal measures.[47]

21.  In these circumstances, it must be considered that the decision for which the existence of reasons must be assessed is that, according to which, "[a]s a consequence of the breach of Article 10(1) of the ECT, Respondent shall pay Claimant compensation in the amount of EUR 40.98 million".[48] This order follows the Tribunal's decision "that Respondent's breach of its fair and equitable treatment obligation reduced the fair market value of Claimant's investment by EUR 40.98 million."[49] This decision is based,

---

[43] Annulment Application, ¶57; Memorial, ¶¶208-209.
[44] Memorial, ¶¶202-209.
[45] Memorial, ¶¶274-276.
[46] Reply, ¶¶428-442.
[47] Memorial, ¶¶143 and 153-154; Reply, ¶440.
[48] Award, ¶576(3).
[49] Award, ¶541.

in turn, on the damages figure proposed by Brattle in Appendix C. As noted by the Tribunal, "Brattle calculate[d] that the July 2013 measures reduced the fair market value of Claimant's investment by 40.98 million."[50] As noted above, this figure was finally "replaced with [the figure of] 'EUR40.49'" pursuant to the Rectification Decision of 5 December 2019.[51]

22. The specific grounds for annulment raised by the Applicant are examined below.

a. Contradiction between the findings on liability and quantum

23. The Applicant argues that the Tribunal's decision on quantum contradicts its previous findings on liability, in which it found that, while the investor could legitimately expect a stable FIT[52], it was also expected that Spain could take measures to counter its tariff deficit. In addition, the Tribunal also found that the First Set of Disputed Measures was not ECT-inconsistent.[53] Nevertheless, the Tribunal's approach to quantum assumed that Spain could not exercise this flexibility and that the Original Regulatory Regime had to remain in place. To support its position, the Applicant invokes Dr. Ripinsky's approach to quantum, in an attempt to show it is improper to make, on the one hand, a finding of liability based on the permissibility of regulatory measures, and on the other, a finding of damages based on the absence of that permissibility.

24. From a careful reading of the Award, it is not evident that the findings on liability and quantum are inherently contradictory or cannot be reconciled. The fact that a tribunal finds that a State may exercise its regulatory powers without affecting legitimate expectations does not preclude a subsequent finding on quantum based on an expectation that the State would not exercise those powers. This could well occur if, for instance, the tribunal finds that this scenario is the most likely one in the light of the evidence at issue. In other words, a liability regime envisaging scope for certain state regulatory activity could well coexist with a compensation model in which it is

---

[50] Award, ¶539.
[51] Rectification Decision, ¶55(2).
[52] Award, ¶444.
[53] Award, ¶452.

objectively concluded that the most likely future scenario is to assume a hypothetical situation in which any adjustment measure would be removed.

25.    Thus, the finding that a remuneration regime may be adjustable (as a result of the exercise of the country's regulatory power) does not preclude a subsequent approach to damages based on the assumption of a stable FIT.[54] In fact, the Tribunal itself found that certain measures that reduced the remuneration could coexist with the expectation of a stable FIT. For example, the cap on hours (under RDL 14/2010) and the modified inflation index (under RDL 2/2013) were found to have "reduced Claimant's revenue during the limited period while the measures were in effect, [but] they did not change the basic features of the Original Regulatory Regime (the FIT) and did not undermine Claimant's legitimate expectation."[55]

26.    Furthermore, it is clear that the Applicant's concern relates only to the calculation of *future* damages and the elimination of historical losses linked to measures that were not found to be ECT-inconsistent.[56] Thus, the alleged contradiction would be limited to a portion of the quantum finding, rather than to the finding in its entirety. Moreover, even with respect to that portion of the finding, by referring to Appendix C, the Tribunal intended – whether correctly or not – to limit the compensation only to those damages attributable to the measures found to be inconsistent with the ECT.[57]

27.    Regarding the alleged contradiction expressed in Professor Sacerdoti's individual opinion (i.e. that the "Claimant's general approach to liability and quantum" cannot be reconciled with the "Claimant's premise [on valuation] that the Original Regulatory Regime would remain stable for 25 years")[58], one way of reading his statement is as an expression of preference instead of a contradiction. The context makes clear that Professor Sacerdoti would have preferred to have been able to adjust the premise on

---

[54] Award, ¶440.
[55] Award, ¶450.
[56] AMG's Rebuttal Report on Annulment of Award, ¶34.
[57] Award, ¶¶538-539.
[58] Award, ¶545.

which the counterfactual was based instead of having to assume the Claimant's valuation proposal in its entirety without possible adjustments.

28. Based on the foregoing, the Applicant's argument that there is a contradiction between the findings of liability and damages that prevents the sustainability of both premises should be rejected.

        b. <u>Lack of motivation of quantum decision based on rejection of AMG's argument</u>

29. The second ground supporting the Applicant's claim of failure to state reasons is the contention that the Tribunal improperly rejected AMG's argument and that this was the real basis of the quantum finding. The rejection of AMG's argument (paragraph 540) follows the Tribunal's reference to Brattle's proposed amount of damages (paragraph 539) and precedes its conclusion on the amount to be awarded for compensation (paragraph 541). The insertion of a paragraph on this matter at this point in the Award reflects the significance that the Tribunal accorded to the issue. However, the fact that the Tribunal addressed the issue before its conclusion on quantum does not mean that this was necessarily the motivation of the Tribunal's decision. There may be other relevant reasons stated in other parts of the Award.

30. In any event, the allegation that the rejection of AMG's argument was not properly reasoned rests on two points: (i) the Tribunal's alleged error in assuming that AMG's challenge was based on a figure (Figure 1) that did not separate the isolated effects of the measures[59] and (ii) the Tribunal's assumption that Appendix C did discount the forward-looking effect of the measures found to be ECT-consistent.[60] The fact that the Applicant challenges the relevance of the grounds on which the rejection is based implies an acknowledgment that there are reasons to support such a decision. This fact renders the Applicant's arguments baseless.

---

[59] Memorial, ¶275.
[60] Memorial, ¶276.

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

c. Failure to state reasons for findings of damages – choice
of provisional effect of ECT-consistent measures for the
calculation of future damages

31.    The Applicant also argues that the Award contains no explanation as to why, in
quantifying damages based on a counterfactual scenario, the Tribunal opted for the
"provisional" consideration of the ECT-consistent measures and not for their
"permanent" consideration in the counterfactual framework, despite the fact that the
issue was debated in the arbitration and was critical in the quantification of the
compensation to be paid.[61] The question was whether, for the construction of the
counterfactual regarding future damages, it had to be assumed that the measures
declared lawful: (i) should only be considered in the counterfactual for the period during
which they were in force ("provisional" consideration) or (ii) should be considered as
part of the permanent regulatory regime despite having been repealed by the Second
Set of Measures ("permanent" consideration).

32.    SolEs argues, for its part, that the Applicant's allegation that the issue was exhaustively
discussed goes too far (as any discussion was very limited); that the Tribunal addressed
the substance of the Applicant's argument and rejected it; and that even if there was no
discussion of the issue in the Award, that does not justify its annulment for failure to
state reasons on this point; in addition to the fact that the Applicant formulates this new
angle of the damage analysis only after the issuance of the Award; and that the
Applicant cannot pretend to reduce the quantum decision to the question of whether
"the legal measures should be applied permanently in the but-for scenario or whether
they should be applied on a provisional basis."[62]

33.    A reading of the Award shows that the Tribunal did not address the issue as raised by
the Applicant in these proceedings. The Tribunal rejected AMG's argument on the basis
of AMG's failure to rely on the relevant part of Brattle's report or to put forward an
alternative division of individual effects per Disputed Measure. However, the Tribunal
did not address the issue of the suitability of the counterfactual scenario assumed by

---

[61] Reply, ¶¶428-442.
[62] Rejoinder, ¶¶203-206.

14

Brattle as the starting point for establishing the loss of value caused by the ECT-inconsistent measures.

34.     Only Professor Sacerdoti, in his minority opinion, addresses the issue of the suitability of the counterfactual scenario proposed by Brattle in the light of the finding that it was legitimate to expect Spain to take some action to address the tariff deficit, even though this might have reduced the remuneration for existing investors. Professor Sacerdoti's opinion suggests that it would have been appropriate to adjust Brattle's counterfactual "with a shorter time horizon" to avoid the Tribunal assuming a scenario in which the Original Regulatory Regime would remain stable for 25 years. However, the lack of information and submissions on the matter by either party would have meant that this could not be done. Although this explains why Professor Sacerdoti joined the endorsement of the amount proposed by Brattle, his individual views cannot be considered as the reasoning of the Tribunal as a whole.

35.     In these circumstances, the questions that arise are whether the issue of the counterfactual structure was considered as relevant to the quantification of damages and whether this issue was timely and sufficiently raised so as to merit being addressed by the Tribunal in its Award. On the first issue, the Tribunal adopted the DCF methodology as "well-suited" to the case.[63] The Tribunal explained that the DCF method enabled it "to compare the present value of Claimant's investment in the absence of the Disputed Measures to the present value of [the] investment in light of the Disputed Measures."[64] Under this methodology, damages are calculated as the difference between the amounts established under a "But-For" scenario and the "Actual" scenario. Thus, the But-For scenario is one of the two key pillars for the establishment of the loss in value of the investment concerned.[65]

36.     On the second issue of whether the question of the structure of the counterfactual was timely and sufficiently raised, the Applicant argues that the issue was addressed at the hearing and in its post-hearing brief. SolEs disagrees and argues that this assertion is

---

[63] Award, ¶488.
[64] Award, ¶488.
[65] Award, ¶491.

exaggerated, and that the issue, as now raised by the Applicant, was only raised subsequent to the issuance of the Award.  The Award does not indicate whether the Tribunal paid any particular attention to this issue, as it was instead focused on "the way in which each expert derives the discount rate that is applied to the future stream of cash flows" (in the Tribunal's perception, the difference between the valuations of the Parties was primarily a consequence of the establishment of the discount rate).[66] Moreover, according to Professor Sacerdoti's individual opinion, neither party followed the approach of adjusting the But-For scenario to suggest a different counterfactual, not even as an alternative or subordinate argument.[67] However, the fact that the issue was discussed in Professor Sacerdoti's opinion suggests that the Tribunal as a whole was aware of the matter before it issued its Award.

37.     Thus, the issue is not addressed in the Award. However, it had a bearing on the quantification of damages and the compensation to be paid. Moreover, the Parties maintain conflicting views as to the scope of their approach in the underlying arbitration. In these circumstances, it is appropriate to review the record of the proceedings, in particular the hearing and the cross-examination of the experts to which the Applicant refers in its Reply, in order to determine whether it was sufficiently raised and discussed.

38.     In this regard, the hearing record shows that during the first day, in its opening statement, Spain questioned SolEs's But-For assumption in the sense that:

> [a] valuation, when it's performed with a but-for versus actual scenario scheme, shouldn't either assume liability or deny liability. It should take reasonable economic assumptions, because it's not a matter of assuming or denying liability; it's a matter of real-life assumptions. And that petrification, that royal decree frozen for 25 or 30 years' time is not a real economic assumption, because if this Tribunal grants or understands that the state has the power to regulate, Brattle's damages calculations are totally useless, because actually they do not consider a real regulatory risk.[68]

---

[66] Award, ¶530.
[67] Award, ¶546.
[68] R-0397, Transcript of Hearing, First Day, p. 258.

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

39.    The fourth day of the hearing was scheduled for the discussion of quantum issues. On that day, the dialogue referred to in the Applicant's Reply took place.[69] This dialogue occurred after the expert's presentation and in the framework of so-called "liability permutations" as a result of potentially diverse conclusions on liability. In his presentation, Brattle's expert referred to Appendix C in the sense that it contained "the breakdown of the harm relating to each of the disputed measures" and, in response to the Tribunal's questions, gave an explanation of that appendix.[70] Spain's questions to this expert focused on exploring the implications of the DCF methodology for certain measures and, in particular, with regard to so-called "future damages". However, it does not appear from a reading of this exchange that the issue of the "provisional" or "permanent" consideration of specific measures in the structuring of the counterfactual scenario was addressed directly, as the Applicant has argued in these proceedings. It should also be borne in mind that at the time of the cross-examination, there was uncertainty as to the Tribunal's findings on liability, and therefore to which measures the damage caused to SolEs could or should be attributed. Therefore, it seems unlikely that there could have been a discussion on the provisional or permanent inclusion of the ECT-consistent measures into the But-For scenario during this stage of the proceeding.

40.    The discussion between Spain and the expert led a Tribunal Member to observe that there were "a number of discussions over the course of today related to chart 21, I think it is called Appendix C", and that Appendix 7 constituted "an effort to explain how the damages valuation might be different" if the 7% tax was excluded from the damages calculation. This Member acknowledged that Appendix C facilitated the task of identifying different damage scenarios according to the outcome of the jurisdictional case. However, the Member also noted the constraints imposed by the damages valuation in general (and described the valuation as a "price-fixed menu").[71]

41.    In that sense, the Tribunal Member explored the issue of how to address the possibility of being "persuaded by AMG on one of these components" of the DCF valuation method, considering the level of uncertainty and "less confidence" arising from the

---

[69] Reply, ¶¶429-435.
[70] R-0386, Transcript of Hearing, Fourth Day, p. 31.
[71] R-0386, Transcript of Hearing, Fourth Day, p. 131.

Case 1:19-cv-01618-TSC    Document 68-51    Filed 06/09/22    Page 139 of 145

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

treatment of multiple liability scenarios.[72] Brattle's expert gave his view that, in the face of "various liability permutations", it would be appropriate to "step into the financial model" and "update" the assumptions in the light of the liability findings. He also noted that the model provided "enough flexibility" to make these adjustments.[73] The Tribunal Member further enquired whether there was any additional document "that would present any of the subcategories" and based on which the Tribunal could make reliable calculations.[74] The expert confirmed that not "every single permutation possible" had been provided. He noted that there were "too many variables to run every single permutation", which would give "a whole suite of numbers that would be confusing". While he was willing to consider providing some additional input, he pointed out that, in the interests of efficiency, it would be for the Tribunal to take certain decisions (on liability), to narrow the scope of discussion, and then to engage in the financial model on the remaining issues.[75]

42.    On the other hand, Spain's experts presented "at an illustrative level" a critique of Brattle's calculation of future damages in order to show that a segregation of the impact of different measures was possible, and that this segregation would show a significant reduction of damages if some measures were not declared inconsistent with the ECT.[76] Upon enquiry by the same Tribunal Member as to the feasibility of the Tribunal making these adjustments on its own, taking some of Brattle's and AMG's elements in isolation, one of Spain's experts stated that the "items that made up the difference between their view and ours, are interrelated, so that if we remove one, the effect on the others would most likely change." Therefore, he stressed that it was impossible to take a single element in isolation without assessing the impact or change this could have on the others.[77] The Tribunal Member understood that, in the experts' views, adjustments to the DCF method could not be made on the basis of isolated changes to specific calculation factors without thereby affecting the status of other factors.[78]

---

[72] R-0386, Transcript of Hearing, Fourth Day, p. 132.
[73] R-0386, Transcript of Hearing, Fourth Day, pp. 133-134.
[74] R-0386, Transcript of Hearing, Fourth Day, p. 134.
[75] R-0386, Transcript of Hearing, Fourth Day, p. 134.
[76] R-0386, Transcript of Hearing, Fourth Day, pp. 160-162.
[77] R-0386, Transcript of Hearing, Fourth Day, p. 227.
[78] R-0386, Transcript of Hearing, Fourth Day, p. 227.

43.    From the above, it is clear that while Spain did not raise the issue in the direct and frontal manner as it has in these proceedings, the issue did come up and was discussed before the Tribunal during the session scheduled for the purpose of quantum. The Tribunal made enquiries with a view to getting a more concrete approximation of the damages that would arise under different scenarios of liability. Although Professor Sacerdoti's individual opinion cannot be attributed to the Tribunal, its contents and its inclusion in the Award indicate that the Tribunal was aware of the concern as it has been formulated in these proceedings. It should also be noted that the Tribunal enquired about the possibility of making adjustments on its own and using some factors proposed by one side or the other. The experts' response pointed to methodological constraints that would arise if the Tribunal were to engage in such an exercise.

44.    In the very particular circumstances of the case, it is reasonable to consider that the handling of the issue of the structuring of the counterfactual in light of the various findings of liability deserved a proper consideration by the Tribunal in its Award, beyond the mere adoption of the amount proposed by Brattle and the rejection of AMG's argument based on an alleged incorrect reference. The issue was relevant as it had a direct impact on the scope of an international obligation binding upon Spain. The Tribunal took cognisance of it and even raised some questions with a view to exploring the possibility of making the relevant adjustments. The Tribunal's confirmation of Brattle's proposed amount would indicate that the Tribunal either engaged in the adjustment exercise and concluded that there was nothing to adjust, or did not do so because it considered it unnecessary to make such adjustments for reasons that the Tribunal did not articulate. The lack of an explanation in the Award on this point means that it is impossible to know the reasons that led the Tribunal, by a majority, to adopt Brattle's proposed damages amount without exercising its discretion to make appropriate adjustments or, alternatively, the reasons why those adjustments were not appropriate under the circumstances.

45.    The need to provide a reason for the adoption of the amount proposed by Brattle based on certain counterfactual assumptions became more relevant in light of the context in which the Tribunal had positioned itself for the assessment of the case. The Tribunal had found:

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

(i) an applicable legal standard, according to which compensation for the reduction in market value had to be granted in so far as it could be attributed to ECT-inconsistent measures, in the context of a sufficient causal link and on the basis of facts that could be deemed as certain or proven[79];

(ii) the investor's legitimate expectation of a stable FIT was conditional on the fact that Spain could be expected to take certain measures to address the tariff deficit, including measures that may have had the effect of reducing remuneration for existing investors.[80];

(iii)the findings that the First Set of Disputed Measures was not inconsistent with the ECT[81], despite the fact that the cap on hours and change in the CPI reduced investor income, and that these measures could not be characterised as "unreasonable" for achieving Spain's tariff deficit objectives[82]; as well as the conclusion that the Second Set of Disputed Measures was inconsistent with the ECT.[83]

---

[79] Award, ¶¶475-478.

[80] Award, ¶440.

[81] Award, ¶452.

[82] With respect to the change in inflation indexation, the Tribunal found that "[t]he evidence … establishe[d] that, as of March 2010, there were indications that Spain was considering options for addressing the tariff deficit", and that "[a] prudent PV investor could have anticipated that Respondent might make adjustments leading to modest reductions in the remuneration of existing RE plants, including PV plants operating under RD 1578/2008". As there was no claim "that the regime in place when [the Claimant] invested was immutable, but rather that Respondent had an obligation to retain its essential or core features", the Tribunal found "no basis to conclude that the method for indexing FITs to inflation was … a "core feature" of the regulatory regime" and that "[i]t cannot be said that a prudent investor would have placed particular reliance on that element of the regulatory regime". On this basis, "[t]he Tribunal does not consider that the change in CPI, pursuant to RDL 2/2013, violated Respondent's FET obligation." Award, paras. 447-448.With respect to the cap on hours imposed pursuant to RDL 14/2010, the Tribunal found that it "was superseded by the Second Set of Disputed Measures, effective July 2013." The Tribunal evaluated the evidence before it. It found that "Claimant provide[d] limited information about its consequences (although it does quantify the damages that it associates with this cap). By contrast, in respect of the cap on hours imposed under the Second Set of Disputed Measures (as part of the elimination of the entire Special Regime), Claimant provide[d] considerable detail establishing the loss of the "efficiency premium" that had been available under the Original Regulatory Regime." The Tribunal concluded that "[o]n the record before the Tribunal, there [was] not sufficient evidence to establish that the cap on hours imposed by RDL 14/2010 was a fundamental change to the regulatory regime on which Claimant had relied. Accordingly, the Tribunal conclude[d] that the cap on hours imposed by pursuant to RDL 14/2010 did not violate Article 10(1) of the ECT." Award, para.449.

[83] Award, ¶¶462-463.

*SolEs Badajoz GmbH v. Kingdom of Spain (ICSID Case No. ARB/15/38) – Annulment Proceeding*
Individual Opinion by Committee Member N. Fernando Piérola-Castro

46.     Thus, based on several factors, the Award should have provided an explanation of why the amount of damages was adopted based on counterfactual elements that assumed the maintenance of the Original Regulatory Regime, without consideration of any adjustment to account for the likely/expected adoption of measures that could reduce the remuneration derived from the Original Regulatory Regime. These factors include the standards of attributability, certainty or verifiability of damages; the findings of expectations of a stable FIT but also of a possible regulatory adjustment by Spain; and the findings of liability for the Second Set of Disputed Measures but not for the other measures (some of which were even considered as not "unreasonable" to achieve Spain's public policy objective).

47.     SolEs Badajoz has submitted that possible changes to the Original Regulatory Regime were taken in account in the structuring of the But-For scenario by the consideration of regulatory risk. However, from the manner in which the Tribunal reflected this risk in the Award[84], the regulatory risk with which the Tribunal was concerned was that of fluctuations and defaults in the tariff levels. There is no indication that the Tribunal considered the regulatory risk in relation to potential changes in measures other than the FIT, such as those that were found not to be ECT-inconsistent (i.e., quantitative limits under RD 14/2010 and inflation-related adjustments under RD 2/2013).

48.     Spain presents the problem as one of a lack of explanation of the choice of "provisional" or "permanent" consideration of certain measures in the counterfactual scenario structuring. SolEs Badajoz attempts to downplay the relevance of the issue due to this formulation. However, the key issue is the Tribunal's choice of a likely regulatory scenario from which the level of expected revenue cashflows would be calculated. Regardless of which scenario might have been assumed ("provisional" or "permanent" consideration of ECT-consistent measures), the Tribunal did not explain why it assumed a counterfactual in which Spain would refrain from any measures to deal with its tariff deficit, even from implementing measures that the Tribunal itself considered to be "not unreasonable". The need for this explanation is heightened by the fact that a "but for" scenario presupposes, by definition, the contemplation of a regulatory scenario

---

[84] Award, ¶532.

in which the relevant measures (the Second Set of Disputed Measures) are not present and in which the other measures that were in place at the time the measures to be removed were introduced (e.g. the cap on hours under RDL 14/2010 and the inflation indexation under RDL 2/2013) would remain in place. Furthermore, the fact that Brattle's expert stated that the choice of a counterfactual scenario for the investment lifetime was a legal question left to the Tribunal[85], and that he recognised that his expertise was not in the legal field[86] reinforces the view that an explanation from the Tribunal as to why it endorsed Brattle's choice of counterfactual scenario was necessary under the circumstances.

49.    Based on the foregoing, the Committee Member concludes that the Award failed to state the reasons on which the Tribunal's decision on the amount for damages was based, within the meaning of Article 52(1)(e) of the ICSID Convention.

## III.    DETERMINATION OF COSTS OF THE ANNULMENT PROCEEDINGS

50.    In the light of Article 61(2) of the ICSID Convention and Arbitration Rules 47(1)(j) and 53, the Committee has discretion to allocate the costs of these proceedings between the Parties as it deems it appropriate. In this context, the Parties concur that the principle that "costs-follow-the-event" should guide this task.

51.    Given that this opinion concludes that the Request for Annulment should be upheld under Article 52(1)(e) of the ICSID Convention in respect of the determination of damages, it is reasonable to consider that the Request was financially justified. As the Applicant has prevailed on a claim that would warrant the annulment of the Award, while the Respondent on annulment has prevailed on all the other claims, the outcome of this proceedings would suggest an apportionment of costs.

52.    It must also be noted that the reason for annulment is not imputable to an action or omission of the Claimant or the Claimant's expert. As a matter of fact, as noted above, the Claimant's expert provided his view on the manner in which the Tribunal could have

---

[85] R-0386, Transcript of Hearing, Fourth Day, p. 44.
[86] R-0386, Transcript of Hearing, Fourth Day, p. 35.

addressed the question of various liability permutations, and expressed his willingness to cooperate with the Tribunal, which is an offer that, if considered, might have assisted the Tribunal in avoiding the failure to state reasons with respect to the structuring of the counterfactual scenario in the damages valuation process.

53.    Based on the foregoing, each Party should bear the costs of their own representation in the proceedings (including their legal and expert fees as well as the expenses for translation, trips and other reasons). With respect to the administrative costs of the annulment proceedings (including the Committee's fees and expenses as well as the ICSID's administrative fees), the Parties should bear these costs, as resulting from the final balance to be issued by ICSID, in equal terms, at the rate of 50 per cent each.

## IV.    CONCLUSION

54.    For the reasons stated above, the Committee Member:

(i)    concurs with the Committee's decision that the Request for Annulment must be rejected – albeit for different reasons – in respect of the claim brought under Article 52(1)(b) of the ICSID Convention regarding the determination of damages;

(ii)    respectfully dissents from the Committee's decision that the Request for Annulment must be rejected in respect of the claim brought under Article 52(1)(e) of the ICSID Convention regarding the determination of damages; and

(iii)    consequently, dissents from the Committee's decision on the allocation of the costs of these annulment proceedings.

N. Fernando Piérola-Castro
Member of the *ad hoc* Committee