# EXHIBIT 55

JUDGMENT OF THE COURT (Grand Chamber)

25 January 2022 (*)

(Appeal – State aid – Articles 107 and 108 TFEU – Bilateral Investment Treaty – Arbitration clause – Romania – Accession to the European Union – Repeal of a tax incentives scheme prior to accession – Arbitral award granting payment of damages after accession – European Commission decision declaring that payment to be State aid incompatible with the internal market and ordering its recovery – Competence of the Commission – Application ratione temporis of EU law – Determination of the date at which the right to receive aid is conferred on the beneficiary – Article 19 TEU – Articles 267 and 344 TFEU – Autonomy of EU law)

In Case C‑638/19 P,

APPEAL under Article 56 of the Statute of the Court of Justice of the European Union, brought on 27 August 2019,

**European Commission,** represented by T. Maxian Rusche and P.-J. Loewenthal, acting as Agents,

applicant,

supported by:

**Federal Republic of Germany,** represented by D. Klebs, R. Kanitz and J. Möller, acting as Agents,

**Republic of Latvia,** represented by K. Pommere, acting as Agent,

**Republic of Poland,** represented by D. Lutostańska, B. Majczyna and M. Rzotkiewicz, acting as Agents,

interveners in the appeal,

the other parties to the proceedings being:

**European Food SA,** established in Drăgăneşti (Romania),

**Starmill SRL,** established in Drăgăneşti,

**Multipack SRL,** established in Drăgăneşti,

**Scandic Distilleries SA,** established in Oradea (Romania),

**Ioan Micula,** residing in Oradea,

represented by K. Struckmann, Rechtsanwalt, and G. Forwood, avocat, and by A. Kadri, Solicitor,

**Viorel Micula,** residing in Oradea,

**European Drinks SA,** established in Ştei (Romania),

**Rieni Drinks SA,** established in Rieni (Romania),

**Transilvania General Import-Export SRL,** established in Oradea,

**West Leasing SRL,** formerly West Leasing International SRL, established in Păntăşeşti (Romania),

represented by J. Derenne, D. Vallindas and O. Popescu, avocats,

applicants at first instance,

**Kingdom of Spain,** represented initially by S. Centeno Huerta, acting as Agent, and subsequently by A. Gavela Llopis, acting as Agent,

**Hungary,**

interveners at first instance,

THE COURT (Grand Chamber),

composed of K. Lenaerts, President, A. Arabadjiev, A. Prechal, K. Jürimäe, C. Lycourgos, E. Regan (Rapporteur), S. Rodin and I. Jarukaitis, Presidents of Chambers, M. Ilešič, F. Biltgen, N. Piçarra, L.S. Rossi and A. Kumin, Judges,

Advocate General: M. Szpunar,

Registrar: M. Longar, Administrator,

having regard to the written procedure and further to the hearing on 20 April 2021,

after hearing the Opinion of the Advocate General at the sitting on 1 July 2021,

gives the following

**Judgment**

1    By its appeal the European Commission seeks to have set aside the Judgment of the General Court of the European Union of 18 June 2019, *European Food and Others* v *Commission* (T-624/15, T-694/15 and T-704/15, 'the judgment under appeal', EU:T:2019:423), by which it annulled Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral award *Micula* v *Romania* of 11 December 2013 (OJ 2015 L 232, p. 43) ('the decision at issue').

2    By its cross-appeal the Kingdom of Spain also seeks to have the judgment under appeal set aside.

**Legal context**

***The ICSID Convention***

3    The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, concluded in Washington on 18 March 1965 ('the ICSID Convention'), which entered into force with respect to Romania on 12 October 1975, provides in Article 53(1):

'The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award …'

4    Article 54(1) of the ICSID Convention provides:

'Each Contracting State shall recognise an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State …'

*The Europe Agreement*

5     The Europe Agreement establishing an association between the European Economic Communities and their Member States, of the one part, and Romania, of the other part, concluded and approved on behalf of the Community by Decision 94/907/ECSC, EC, Euratom of the Council and the Commission of 19 December 1994 (OJ 1994 L 357, p. 2, 'the Europe Agreement'), which entered into force on 1 February 1995, provided in Article 64(1) and (2) as follows:

'1.     The following are incompatible with the proper functioning of this Agreement, in so far as they may affect trade between the Community and Romania:

…

(iii)     any public aid which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods.

2.     Any practices contrary to this Article shall be assessed on the basis of criteria arising from the application of the rules of Articles [101, 102 and 107 TFEU]'.

6     Under Articles 69 and 71 of The Europe Agreement, Romania was required to align its national legislation with the *acquis communautaire*.

*The BIT*

7     The Bilateral Investment Treaty concluded on 29 May 2002 between the Swedish Government and the Romanian Government on the Promotion and Reciprocal Protection of Investments ('the BIT'), which entered into force on 1 July 2003, provides, in Article 2(3):

'Each Contracting Party shall at all times ensure fair and equitable treatment of the investments by investors of the other Contracting Party and shall not impair, by means of arbitrary or discriminatory measures, the administration, management, maintenance, use, enjoyment or disposal thereof by those investors'.

8     Article 7 of the BIT provides that any dispute between investors and the Contracting Parties is to be settled, inter alia, by an arbitral tribunal which applies the ICSID Convention ('the arbitration clause').

*The Treaty on the Accession of the Republic of Bulgaria and of Romania to the European Union and the Act of Accession*

9     Under the Treaty on the accession of the Republic of Bulgaria and Romania to the European Union (OJ 2005 L 157, p. 11), signed on 25 April 2005, Romania acceded to the European Union with effect from 1 January 2007.

10     Article 2 of the Act concerning the conditions of accession of the Republic of Bulgaria and Romania and the adjustments to the Treaties on which the European Union is founded (OJ 2005 L 157, p. 203, 'the Act of Accession') states:

'From the date of accession, the provisions of the original Treaties and the acts adopted by the institutions … before accession shall be binding on … Romania and shall apply in [that State] under the conditions laid down in those Treaties and in this Act.'

11     Annex V to the Act of Accession includes Chapter 2, entitled 'Competition policy', which contains, in paragraphs 1 and 5, specific provisions concerning aid schemes and individual aid implemented in Romania before the date of accession to the European Union and still applicable after that date.

*Regulation No 659/1999*

12      Under the heading 'Formal investigation procedure', Article 6 of Council Regulation (EC) No 659/1999 of 22 March 1999 laying down detailed rules for the application of Article 108 [TFEU] (OJ 1999 L 83, p. 1) as amended by Council Regulation (EU) No 734/213 of 22 July 2013 (OJ 2013 L 204, p. 15) ('Regulation No 659/1999') provided in paragraph 1.

'The decision to initiate the formal investigation procedure shall summarise the relevant issues of fact and law, shall include a preliminary assessment of the Commission as to the aid character of the proposed measure and shall set out the doubts as to its compatibility with the [internal] market. The decision shall call upon the Member State concerned and upon other interested parties to submit comments within a prescribed period which shall normally not exceed one month. …'

### The background to the dispute and the decision at issue

13      The background to the dispute, as described in paragraphs 1 to 42 of the judgment under appeal, may be summarised as follows.

14      On 2 October 1998, the Romanian authorities adopted Emergency Government Ordinance No 24/1998 ('EGO 24'), granting certain investors in disadvantaged regions who had obtained permanent investor certificates a series of tax incentives, including, inter alia, facilities such as exemption from customs duties and value added tax for machinery, reimbursement of customs duties for raw materials and exemption from the payment of profit tax which applied for as long as the relevant area was designated as a 'disadvantaged region'.

15      By decision of 25 March 1999, the Romanian Government designated the mining area of Ştei-Nucet, Bihor County (Romania), to be a 'disadvantaged region' for 10 years, with effect from 1 April 1999.

16      In order to comply with the obligation progressively to align Romanian legislation with European Union legislation laid down by the Europe Agreement, Romania adopted in 1999 Law No 143/1999 on State aid, which entered into force on 1 January 2000. That law defined State aid in the same terms as those used in Article 64 of the Europe Agreement and in Article 107(1) TFEU. It also designated the Consiliul Concurenţei (Competition Council, Romania) and the Oficiul Concurenţei (Competition Office, Romania) as the national State aid surveillance authorities competent to assess the compatibility of State aid granted by Romania to undertakings.

17      By Decision No 244/2000 the Competition Council found that several of the tax incentives granted under EGO 24 constituted State aid and consequently had to be revoked.

18      On 1 July 2000, Emergency Government Ordinance No 75/2000 ('EGO 75'), amended EGO 24 while maintaining the tax incentives at issue (together, 'the tax incentives scheme at issue').

19      The Competition Council brought an action before the Curtea de Apel Bucureşti (Court of Appeal, Bucharest, Romania) in which it submitted that, in spite of the adoption of EGO 75, its Decision No 244/2000 had not been implemented. That action was dismissed on 26 January 2001 on the ground that EGO 75 had to be regarded as a legislative act and that consequently its lawfulness could not be contested by the Competition Council pursuant to Law No 143/1999. By a judgment of 19 February 2002 the Înalta Curte de Casaţie şi Justiţie (High Court of Cassation and Justice, Romania) confirmed that decision.

20      Mr Ioan Micula and Mr Viorel Micula, Swedish citizens residing in Romania, are the majority shareholders of the European Food and Drinks Group, whose activities include the production of food and drink in the region of Ştei-Nucet, Bihor County. The company European Food and Drinks Group owns European Food SA, Starmill SRL, Multipack SRL, Scandic Distilleries SA, European Drinks SA, Rieni Drinks SA, Transilvania General Import-Export SRL and West Leasing International SRL.

21     On the basis of the permanent investor certificates, obtained on 1 June 2000 by European Food and on 17 May 2002 by Starmill and Multipack, those three companies made investments in the mining area Ștei-Nucet.

22     In February 2000 the negotiations for the accession of Romania to the European Union started. In those negotiations the European Union noted, in the common position of 21 November 2001, that in Romania there were 'a number of existing as well as new incompatible aid schemes which [had] not been brought into line with the *acquis*', including 'facilities provided under [the tax incentives scheme at issue]'.

23     On 26 August 2004 Romania repealed all the measures granted under the tax incentives scheme at issue with the exception of the exemption from corporate tax, stating that 'in order to meet the criteria in the Community rules on State aid, and also to complete the negotiations under Chapter No 6 – Competition Policy, it [was] necessary to eliminate all forms of State aid in national legislation incompatible with the *acquis communautaire* in this area'. That repeal came into effect on 22 February 2005.

24     On 28 July 2005 Mr Ioan Micula, Mr Viorel Micula, European Food, Starmill and Multipack ('the arbitration applicants'), requested the establishment of an arbitral tribunal pursuant to Article 7 of the BIT, in order to obtain compensation for the damage resulting from the revocation of the tax incentives scheme at issue.

25     On 1 January 2007 Romania acceded to the European Union.

26     By decision of 24 September 2008, the arbitral tribunal found that the arbitration applicants' claims were admissible.

27     In its arbitral award of 11 December 2013 ('the arbitral award') the arbitral tribunal found that, by repealing the tax incentives scheme at issue prior to 1 April 2009, Romania had violated the legitimate expectations of the [arbitration applicants] who thought that those incentives would be available, in substantially the same form, until 31 March 2009 inclusive, had failed to act transparently by failing to inform those applicants in a timely manner and had failed to ensure fair and equitable treatment of the investments of those applicants, within the meaning of Article 2(3) of the BIT. Consequently, the arbitral tribunal ordered Romania to pay the arbitration applicants, by way of damages, the sum of 791 882 452 Romanian lei (RON) (approximately EUR 178 millions), that sum being fixed by taking into account principally the loss allegedly suffered by the applicants in the period from 22 February 2005 until 31 March 2009.

28     On 31 January 2014, the Commission services informed the Romanian authorities that any implementation or execution of the arbitral award would be regarded as constituting new aid and would have to be notified to the Commission.

29     On 20 February 2014, the Romanian authorities informed the Commission services that they had paid part of sum awarded by the arbitral tribunal to the arbitration applicants by way of damages, by offsetting it against taxes owed to the Romanian authorities by European Food.

30     On 26 May 2014, the Commission adopted Decision C(2014) 3192 final, obliging Romania immediately to suspend any action that might lead to the implementation or execution of the arbitral award, on the ground that such action appeared to constitute unlawful State aid, until the Commission had taken a final decision on the compatibility of that State aid with the internal market.

31     On 1 October 2014 the Commission informed Romania that it had decided to initiate the formal investigation procedure laid down in Article 108(2) TFEU in respect of the partial implementation of the arbitral award by Romania that took place in early 2014 as well as in respect of any further implementation or execution of the arbitral award.

32      On 29 May 2015 the Romanian authorities transferred the remainder of the sum due under the arbitral award and, thus, regarded that award as having been fully implemented.

33      On 30 March 2015 the Commission adopted the decision at issue. Article 1 of that decision provides that the payment of the compensation awarded by [the arbitral] award to the single economic unit comprising Ioan Micula, Viorel Micula, European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing constitutes a 'State aid' within the meaning of Article 107(1) TFEU which is incompatible with the internal market. Pursuant to Article 2 of that decision, Romania is required not to pay out any incompatible aid referred to in Article 1 of the decision and to recover such aid which has already been paid out to the entities comprising that economic unit as well as any aid paid out to those entities which was not notified to the Commission pursuant to Article 108(3) TFEU, and any aid paid out after the date of that decision.

### The procedure before the General Court and the judgment under appeal

34      By applications lodged at the Registry of the General Court on 6, 30 and 28 November 2015 respectively, European Food, Starmill, Multipack and Scandic Distilleries, in Case T-624/15, Mr Ioan Micula, in Case T-694/15, and Mr Viorel Micula, European Drinks, Rieni Drinks, Transilvania General Import-Export and West Leasing International, in Case T-704/15, each brought an action pursuant to Article 263 TFEU for annulment of the decision at issue. The General Court granted the Kingdom of Spain and Hungary leave to intervene in support of the form of order sought by the Commission. In application of Article 68 of its Rules of Procedure, the General Court joined the three cases for the purposes of the decision closing the proceedings.

35      The General Court found that in support of their action, the appellants raised seven pleas in law. The first plea alleged the Commission's lack of competence to adopt the decision at issue and an abuse of power as well as failure properly to apply Article 351 TFEU and general principles of law. The second plea alleged infringement of Article 107(1) TFEU. The third plea alleged a breach of the principle of the protection of legitimate expectations. The fourth plea alleged an error in the assessment of the compatibility of the measure at issue with the internal market. The fifth plea alleged an error in the determination of the beneficiaries of the aid and failure to state reasons. The sixth plea alleged an error of law relating to the recovery of the aid. Lastly, the seventh plea alleged a breach of the right to be heard and infringement of Article 108(3) TFEU and Article 6(1) of Regulation No 659/1999.

36      By the judgment under appeal, the General Court upheld the first part of the first plea raised in Case T-704/15 and the first part of the second plea raised in Cases T-624/15 and T-694/15 alleging, first, the Commission's lack of competence to adopt the decision at issue under Article 108 TFEU and, secondly, the absence of advantage, within the meaning of Article 107(1) TFEU, conferred by the payment of damages in that, in particular, the purported advantage was granted before Romania's accession to the European Union. It held, in essence, in paragraphs 59 to 93 of that judgment that, by adopting the decision at issue, the Commission had retroactively applied the powers which it held under Article 108 TFEU and Regulation No 659/1999 to events predating Romania's accession and that the Commission could not therefore classify the measure at issue, namely – according to that decision – the payment of compensation awarded by the arbitral tribunal by way of compensation for the damage that the arbitration applicants allegedly suffered due to the repeal by that State of the tax incentives scheme at issue, as 'State aid' within the meaning of Article 107(1) TFEU.

37      In addition, the General Court upheld the second part of the second plea raised in Cases T-624/15 and T-694/15, and the first part of the second plea raised in Case T-704/15, alleging, in essence, the erroneous legal classification of the award of compensation by the arbitral tribunal as an 'advantage' and 'aid' within the meaning of Article 107 TFEU. In that regard the General Court essentially held, in paragraphs 98 to 111 of the judgment under appeal, that, since EU law did not apply *ratione temporis* and the Commission lacked competence under Article 108 TFEU and Regulation No 659/1999, the decision at issue was unlawful in so far as it classified as an 'advantage' and 'aid', within the meaning of Article 107(1) TFEU,

the award of that compensation, at least in respect of the period predating the entry into force of EU law in Romania.

38    Consequently, the General Court annulled the decision at issue in its entirety, without examining the other parts of those pleas or the other pleas.

**Forms of order sought and procedure before the Court of Justice**

39    By its appeal, the Commission submits that the Court should:

–    set aside the judgment under appeal;

–    reject the first part of the first plea and the first part of the second plea put forward at first instance in Case T-704/15, and the first and second parts of the second plea raised in Cases T-624/15 and T-694/15;

–    refer Joined Cases T-624/15, T-694/15 and T-704/15 back to the General Court for a decision on the remaining pleas in law, and

–    reserve the decision as to costs.

40    European Food, Starmill, Multipack and Scandic Distilleries, and also Mr Ioan Micula (together, 'European Food and Others') contend that the Court should:

–    dismiss the appeal;

–    in the alternative, annul the decision at issue;

–    in the further alternative, refer the cases back to the General Court; and

–    order the Commission and the interveners to bear their own costs and to pay those incurred by European Food and Others in respect of the proceedings at first instance and those on appeal.

41    Mr Viorel Micula, European Drinks, Rieni Drinks, Transilvania General Import-Export and West Leasing (together, 'Viorel Micula and Others') contend that the Court should:

–    dismiss the appeal;

–    in the alternative, uphold the second plea at first instance put forward in Case T-704/15 and, accordingly, annul the decision at issue;

–    in the further alternative, refer the cases back to the General Court;

–    order the Commission to bear its own costs and to pay those incurred by Viorel Micula and Others in respect of the proceedings at first instance and those on appeal; and

–    order the Kingdom of Spain and Hungary to bear their own costs in respect of the proceedings at first instance and those on appeal.

42    The Kingdom of Spain contends that the Court should:

–    allow the appeal, set aside the judgment under appeal and dismiss the action at first instance as inadmissible; and

   –    in the alternative, allow the appeal, set aside the judgment under appeal and dismiss the action at first instance as unfounded.

43    By its cross-appeal, the Kingdom of Spain submits that the Court should:

   –    set aside the judgment under appeal;

   –    dismiss the action at first instance as inadmissible; and

   –    order European Food and Others and Viorel Micula and Others to pay the costs.

44    The Commission submits that the cross-appeal should be allowed.

45    European Food and Others and Viorel Micula and Others contend that the cross-appeal should be dismissed and that the Kingdom of Spain, the Commission and the interveners should be ordered to bear their own costs in respect of the cross-appeal and that the Kingdom of Spain should be ordered to pay the costs incurred by European Food and Others and by Viorel Micula and Others in the context of the cross-appeal.

46    The Republic of Poland and the Republic of Latvia applied, by letters dated 25 November and 5 December 2019 respectively, pursuant to the first paragraph of Article 40 of the Statute of the Court of Justice of the European Union for leave to intervene in support of the Commission.

47    By decisions of the President of the Court of 6 and 9 January 2020 the Republic of Poland and the Republic of Latvia respectively were granted leave to intervene, the latter Member State only, in accordance with Article 129(4) of the Rules of Procedure of the Court, in order to submit its observations at the hearing, should a hearing take place, its application to intervene having been made after the time limit set out in Article 190(2) of those rules had expired.

48    By letters of 17 March 2020, European Food and Others and Viorel Micula and Others requested that the Court exclude the Kingdom of Spain as a party to these proceedings, and, therefore, reject the response to the main appeal lodged by that Member State. In support of that request those parties state that although it is true that, as a Member State, the Kingdom of Spain was not required to demonstrate an interest in order to intervene in the proceedings before the General Court on the basis of the first paragraph of Article 40 of the Statute of the Court of Justice of the European Union, under Article 172 of the Rules of Procedure of the Court, however, any party to the case in question before the General Court – including a Member State – should, in order to be a party to the appeal proceedings, demonstrate an interest in that appeal being allowed or dismissed. That condition, which was introduced at the time those rules were redrafted in 2012 should also apply to Member States.

49    By letter of 29 March 2020, the Court Registry, following the decision taken by the President of the Court of Justice, after hearing the Judge-Rapporteur and the Advocate General, informed the parties that their request had been rejected on the ground that, having been authorised as a Member State to intervene at first instance, under Article 40 of the Statute of the Court of Justice, the Kingdom of Spain was automatically a party to the appeal.

50    By letters of 16 December 2020, the Federal Republic of Germany applied, pursuant to the first paragraph of Article 40 of the Statute of the Court of Justice of the European Union, to intervene in support of the Commission.

51    By decision of the President of the Court of 12 January 2021, that Member State was granted leave to intervene, in accordance with Article 129(4) of the Rules of Procedure of the Court, in order to submit its observations at the hearing, should a hearing take place, its application to intervene having been made after the time limit set out in Article 190(2) of those rules had expired.

**The request for reopening of the oral procedure**

52    By document lodged at the Court Registry on 12 and 14 July 2021, European Food and Others and Viorel Micula and Others requested that the oral part of the procedure be reopened. In support of their request they submitted, in essence, that they disagreed with the Advocate General's Opinion on two points.

53    In the first place they submit that in point 138 of his Opinion the Advocate General incorrectly assessed the consequences for the answer to be given to the first part of the second plea that was advanced in Cases T-624/15 and T-694/14 of the error of law that was made, according to him, by the General Court when it held that the State aid alleged had been granted at the date of the repeal in breach of the BIT of the tax incentives scheme at issue. Admittedly, they submit, that error of law would justify the setting aside of the judgment under appeal, since the right to receive that aid resulted not from the repeal but from an arbitral award that was delivered after the accession of Romanian to the European Union. However, contrary to the Advocate General's proposed answer, the first part of that second plea should be upheld to the extent that it criticises the Commission for having found in the decision at issue that the State aid in question resulted not from the arbitral award but from the payment itself of damages granted under that award, whereas, they submit, the payment of a sum granted on that basis does not confer any additional advantage on top of that award. The precise identification of the State aid measure in question was also a decisive question addressed as part of the second plea in Case T-704/15 with the result that, if the Court should follow the Advocate General's reasoning set out in his Opinion, it would, they submit, have to refer the examination of that question back to the General Court.

54    In the second place they submit that the Advocate General was wrong to consider, in paragraph 135 of his Opinion, that any measure implemented after the arbitral award was delivered, by way of its implementation by Romania, could constitute a State aid. In fact, only that award could lead to the grant of such an aid, since, in accordance with Article 53 of the ICSID Convention, Romania's obligation to pay damages flowed from that award without it being necessary for the Romanian authorities to take any additional administrative or legal steps. In particular, proceedings for recognition of the arbitral award were a mere administrative formality which were only necessary if that State did not comply with the award.

55    In that regard, it should be recalled that, first, the Statute of the Court of Justice of the European Union and the Rules of Procedure of the Court make no provision for parties to submit observations in response to the Advocate General's Opinion (judgment of 15 July 2021, *Commission* v *Poland (Disciplinary regime for judges)*, C-791/19, EU:C:2021:596, paragraph 41 and the case-law cited).

56    Secondly, under the second paragraph of Article 252 TFEU, the Advocate General, acting with complete impartiality and independence, is to make, in open court, reasoned submissions on cases which, in accordance with the Statute of the Court of Justice of the European Union, require the Advocate General's involvement. The Court is not bound either by the Advocate General's conclusion or by the reasoning which led to that conclusion. Consequently, a party's disagreement with the Advocate General's Opinion, irrespective of the questions that he or she examines in his or her Opinion, cannot in itself constitute grounds justifying the reopening of the oral part of the procedure (judgment of 15 July 2021, *Commission* v *Poland (Disciplinary regime for judges)*, C-791/19, EU:C:2021:596, paragraph 42 and the case-law cited).

57    Nevertheless, the Court may at any time, after hearing the Advocate General, order the reopening of the oral part of the procedure, in accordance with Article 83 of its Rules of Procedure, in particular if it considers that it lacks sufficient information or where a party has, after the close of that part of the procedure, submitted a new fact which is of such a nature as to be a decisive factor for the decision of the Court.

58    In this instance, the Court considers, however, after hearing the Advocate General, that it has before it, at the close of the written part of the procedure and the hearing, all the material necessary for it to give judgment in the present case. It observes, moreover, that the requests to reopen the oral part of the

procedure made by European Food and Others and Viorel Micula and Others raise no new fact which is of such a nature as to be a decisive factor for the decision of the Court.

59    In those circumstances, there is no need to order that the oral part of the procedure be reopened.

### The main appeal

60    In support of its appeal the Commission, supported by the Kingdom of Spain and the intervening parties, raises three grounds.

61    By its first ground of appeal, which has two parts, the Commission submits that the General Court erred in law in finding that the Commission lacked competence to adopt the decision at issue. The first part of that ground, relied on principally, alleges an infringement by the General Court of Article 108 TFEU, whilst the second part of that ground, relied on in the alternative, alleges an infringement of Chapter 2 of Annex V to the Act of Accession.

62    By its second ground of appeal, which has two parts, the Commission submits that the General Court erred in law in finding that EU law did not apply to the compensation granted by the arbitral award. The first part of that ground, relied on principally, alleges an infringement by the General Court of Article 2 of the Act of Accession and the rules of application *ratione temporis* of EU law, whilst the second part of that ground, relied on in the alternative, alleges an infringement of the Europe Agreement.

63    By its third ground of appeal, the Commission submits that the General Court erroneously interpreted the concept of advantage and failed to examine all the grounds of the decision at issue when it considered that the compensation in question did not constitute such an advantage.

64    It is appropriate, first of all, to examine the first ground of appeal, in its first part, together with the second ground of appeal.

#### *Admissibility*

*Arguments of the parties*

65    European Food and Others and Viorel Micula and Others submit that the line of argument advanced, in particular, in support of the first ground of appeal, in the first part, and the second ground of appeal, in both parts, is inadmissible, or even ineffective, for a number of reasons.

66    In the first place, the determination of the date on which the State aid in question was granted, which is the subject, in essence, of the first and second grounds, in their first parts, concerns a finding of fact. Consequently, it cannot be the subject of an appeal. The General Court made a sovereign finding that the arbitral award had the aim of compensating the arbitration applicants owing to an event that occurred before the accession of Romania to the European Union, namely the repeal by that State in breach of the BIT of the tax incentives scheme at issue, and that that award did not produce any effect after that accession. The General Court having thus established, as a matter of fact, that the payment of compensation represented merely the implementation of an earlier right, that payment could not constitute an advantage covered by Article 107(1) TFEU, which suffices to justify the annulment of the decision at issue.

67    Furthermore, according to European Food and Others, the Commission's submission regarding the date on which the State aid in question was granted is insufficiently precise. In particular, the appeal failed to indicate which grounds of the judgment under appeal were vitiated by an error of law. It also failed to set out the extent to which that judgment incorrectly interpreted or applied the Court of Justice's case-law and moreover did not indicate the facts that were the subject of an allegedly incorrect classification.

68      In the second place, since the State aid identified in the decision at issue was constituted neither by the right to the compensation in question nor yet by the arbitral award, but by the payment of that compensation, well after Romania's accession to the European Union, the arguments by which the Commission submits, in particular in support of its second ground of appeal, in the second part, that it is competent to examine a measure capable of constituting State aid granted before that accession must be dismissed as ineffective. The same applies to the argument by which the Commission submits, in support of its first ground of appeal, in the first part, that the State aid in question flows from the conversion of that award into an enforceable legal right or the pronouncement of that award. To uphold those arguments would mean that the Commission was wrong in that decision to find that that aid was granted by the payment of the compensation. Any attempt by the Commission to amend or supplement *ex post* its reasoning in that decision is inadmissible.

69      In the third place, the line of argument by which the Commission relies, in support of the second part of its second ground of appeal, on a breach of the Europe Agreement must be rejected as inadmissible or ineffective. First, by that argument, the Commission necessarily accepts that the General Court correctly found that any grant of possible State aid took place, in this case, before Romania's accession to the European Union, which contradicts the wording of the decision at issue. Second, since that decision was adopted on the basis of Articles 107 and 108 TFEU, the Commission cannot, at the stage of this appeal, rely on the Europe Agreement. The EU judicature cannot substitute a different legal base for the legal base of that decision.

70      The Commission submits that the first ground of appeal, in the first part, and the second ground of appeal, in both parts, are admissible.

*Findings of the Court*

71      In the first place, it should be recalled that it is apparent from Article 256(1) TFEU and the first paragraph of Article 58 of the Statute of the Court of Justice of the European Union that an appeal is to be limited to points of law and that the General Court therefore has exclusive jurisdiction to find and appraise the relevant facts and to assess the evidence. The assessment of the facts and evidence does not, save where the facts or evidence are distorted, constitute a point of law, which is subject, as such, to review by the Court of Justice on appeal (judgment of 2 March 2021, *Commission* v *Italy and Others*, C-425/19 P, EU:C:2021:154, paragraph 52 and the case-law cited).

72      However, where the General Court has found or appraised the facts, the Court of Justice has jurisdiction to carry out a review, provided that the General Court has defined their legal nature and determined the legal consequences. The jurisdiction of the Court of Justice to review extends, inter alia, to the question whether the General Court has taken the right legal criteria as the basis for its appraisal of the facts (see to that effect, judgment of 2 March 2021, *Commission* v *Italy and Others*, C-425/19 P, EU:C:2021:154, paragraph 53 and the case-law cited).

73      In the present case, it must be observed that the first parts of the first and second grounds of appeal raise the question whether, in the event that, as in this case, an arbitral award granted damages by way of compensation for harm suffered owing to the repeal in breach of a BIT of a tax incentives scheme, a State aid is 'granted', within the meaning of Article 107(1) TFEU, on the date on which that compensation is actually paid in implementation of that award, as the Commission submits, on the ground that the right to compensation definitively materialises on the date on which that award becomes enforceable in national law; or, on the date of that repeal, as European Food and Others and Viorel Micula and Others submit on the ground, as the General Court held in the judgment under appeal, the right to compensation arose at that latter date.

74      Such a question is manifestly a question of law as it involves the determination of the date on which the aid was 'granted' within the meaning of Article 107(1) TFEU and the review of whether the General Court correctly interpreted and applied Article 107(1) TFEU, as well as the correct legal classification of the facts in order to define the date on which the aid was 'granted', within the meaning of that provision.

75    In addition, with regard to allegation of the imprecise nature of the Commission's argument on this point, it must be recalled that it follows from the second subparagraph of Article 256(1) TFEU and the first paragraph of Article 58 of the Statute of the Court of Justice of the European Union, as well as from Article 168(1)(d) of the Rules of Procedure of the Court of Justice, that an appeal must indicate precisely the contested elements of the judgment which the appellant seeks to have set aside and also the legal arguments specifically advanced in support of the appeal, failing which the appeal or the ground of appeal in question will be dismissed as inadmissible (judgment of 2 March 2021, *Commission* v *Italy and Others*, C-425/19 P, EU:C:2021:154, paragraph 55 and the case-law cited).

76    In the present case, it suffices in that respect to observe that the Commission indicated in its appeal that it challenged, by its first and second grounds of appeal, paragraphs 66 to 80 and 83 to 88 of the judgment under appeal, and that to that end it advanced a clear and detailed submission setting out the reasons why those paragraphs were, according to it, vitiated by errors of law.

77    In the second place, as regards the criticism that the Commission is attempting by its appeal to amend or supplement the decision at issue as to the nature of the State aid it covered, it should be recalled that, in accordance with the case-law of the Court of Justice cited in paragraph 75 of this judgment, a ground of appeal must seek not the annulment of the decision challenged at first instance but rather to have the judgment under appeal set aside by advancing a line of argument specifically identifying the error of law allegedly vitiating that judgment, failing which it is inadmissible. Accordingly, an appellant is entitled to lodge an appeal relying on grounds which arise from the judgment under appeal itself and seek to criticise, in law, its correctness (judgment of 4 March 2021, *Commission* v *Fútbol Club Barcelona*, C-362/19 P, EU:C:2021:169, paragraph 47 and the case-law cited).

78    In the present case, as stated in paragraph 73 of this judgment, the Commission seeks, by its appeal, in particular by its first and second grounds of appeal, in their first parts, to call into question the grounds on which the General Court found in the judgment under appeal that the State aid covered by the decision at issue had been granted at the date on which Romania repealed, purportedly in breach of the BIT, the tax incentives scheme at issue, before the accession of that State to the European Union, with the result that that institution lacked competence to adopt that decision under Article 108 TFEU.

79    Such a line of argument, which concerns the grounds of that judgment, is admissible at the appeal stage, whatever the reasoning of the decision at issue and, in particular, the precise nature of the measure that was considered by the Commission in that decision to be 'State aid' within the meaning of Article 107(1) TFEU.

80    However, it should be noted in that respect that, since the Court of Justice's jurisdiction on an appeal is limited to assessing the findings of law on the pleas argued at first instance (judgment of 4 March 2021, *Commission* v *Fútbol Club Barcelona*, C-362/19 P, EU:C:2021:169, paragraph 47 and the case-law cited), it cannot rule, in the context of this appeal, on grounds or arguments which were not examined by the General Court, in particular those concerning whether the measure in question constituted, in substance, 'State aid' within the meaning of Article 107(1) TFEU.

81    Lastly, in the third place, the line of argument alleging a breach of the Europe Agreement, which is the subject of the second ground of appeal, in its second part, must, in accordance with the case-law recalled in paragraph 77 of this judgment, be regarded as admissible. By that ground, the Commission submits that in paragraph 87 of the judgment under appeal the General Court erred in law when it rejected, in breach of Articles 267 and 344 TFEU, the relevance of the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158) on the ground that the arbitral tribunal was not required to apply EU law to the facts before it which arose before Romania's accession to the European Union. It is, in that regard, irrelevant whether that line of argument lacks, as the case may be, any relationship with the findings made by the Commission in the decision at issue, since that decision is not, as recalled in paragraph 77 of this judgment, the subject of this appeal.

82    Consequently, the first part of the first ground of appeal and both parts of the second ground of appeal are admissible.

**Substance**

*Arguments of the parties*

–    *The first part of the first ground of appeal*

83    By the first part of its first ground of appeal, the Commission submits that the General Court wrongly held, in paragraphs 68 to 80 and 86 of the judgment under appeal, that the arbitration applicants' right to compensation granted by the arbitral award was conferred on them on 22 February 2005, namely before Romania's accession to the European Union, when that State repealed the tax incentives scheme at issue and that therefore the repeal of that scheme constitutes the State aid measure at issue, whereas it is the payment of that compensation which constitutes that aid.

84    It follows that the General Court made an error of law consisting of the misinterpretation and misapplication of the Court's case-law concerning the date on which State aid is granted for the purposes of the exercise of the Commission's competence under Article 108 TFEU. That error stems from another error of law consisting of an incorrect legal classification of the facts concerning the measure by which Romania granted the alleged State aid at issue.

85    The question whether the Commission was competent to adopt the decision at issue under Article 108 TFEU depends on the date on which Romania adopted the measure capable of constituting State aid. In that regard, it is clear from the Court's case-law following the judgment of 21 March 2013, *Magdeburger Mühlenwerke* (C-129/12, EU:C:2013:200, paragraphs 40 and 41), that the existence of a legal entitlement on the basis of which immediate payment of an aid may be demanded constitutes the legal criteria for classification of a State aid.

86    In the present case, however, the arbitration applicants obtained the right to the compensation in question only when the arbitration award became enforceable under national law. The unconditional right to the payment of damages granted as a result of the repeal of the tax incentives scheme at issue flowed from that award, in conjunction with the national law that obliged Romania to implement it. Consequently, the decision at issue was correct in regarding Romania's payment, whether voluntarily made or enforced, of that compensation as constituting a State aid. Since that State aid was granted after Romania's accession to the European Union, the Commission was competent to adopt that decision.

87    In any event, account must be taken of the need to ensure that the prohibition of State aid laid down in Article 64(1)(iii) of the Europe Agreement and Article 107(1) TFEU is not circumvented by means of an arbitration clause contained in a BIT that is binding on Member States. The General Court failed to have regard to that context in the judgment under appeal.

88    European Food and Others and Viorel Micula and Others submit that the General Court correctly applied the principles relating to the date on which State aid is granted, as derived from the case-law of the Court of Justice.

89    They submit that it is apparent from the judgment of 21 March 2013, *Magdeburger Mühlenwerke* (C-129/12, EU:C:2013:200, paragraphs 40 and 41), that State aid must be regarded as granted on the date on which the right to receive it is conferred on the beneficiary under the applicable national rules. As regards damages, it must be held that the right to compensation for damage arises on the date on which the event giving rise to that damage occurred, any subsequent event being incidental and not altering the nature or value of the entitlements established on the date of the event giving rise to the damage.

90    The General Court was therefore, they submit, fully entitled to find, in paragraph 75 of the judgment under appeal, that the right to compensation, confirmed by the arbitral award, arose on 22 February 2005,

when Romania repealed the tax incentives scheme at issue, in breach of the BIT, and that, therefore, the Commission was not competent to adopt the decision at issue under Article 108 TFEU. In making that finding, the General Court held, rightly, that the Commission had wrongly concluded that the alleged State aid had been granted through payment of the compensation granted by that award.

91      In particular, they submit that the date on which the arbitral award was integrated into the national legal order is irrelevant. That award did not give rise to rights which did not exist before Romania's accession to the European Union, since a decision, be it judicial or arbitral, awarding damages for harm caused by an unlawful act did not constitute the right, but was declaratory of rights and obligations arising when that unlawful act was committed. In addition, under Article 54 of the ICSID Convention, Romania is required to recognise and enforce the arbitral award, irrespective of the status of that award under Romanian procedural law.

92      The General Court was therefore correct, they submit, to hold that the implementation of the arbitral award represents only the enforcement of a right which arose on 22 February 2005, since neither that award nor its registration in Romania, nor its subsequent enforcement conferred on the arbitration applicants any additional advantage over and above the rights which they already enjoyed on that date.

93      Moreover, it was not the repeal of the tax incentives scheme at issue, but the infringement of the BIT by Romania that conferred on arbitration applicants the right to receive compensation the payment of which was classified by the decision at issue as constituting State aid. The arbitral tribunal could thus have definitively held Romania liable for that infringement before the accession of that State to the European Union. Neither the arbitration award nor the calculation of the exact amount of damages awarded is therefore relevant for the purposes of determining the date on which the right to receive State aid is conferred on its beneficiaries.

–    *The second ground of appeal*

94      By the first part of the second ground of appeal, the Commission submits that, by holding, in paragraphs 66, 67 and 80 to 88 of the judgment under appeal, that EU law was not applicable *ratione temporis* to the compensation granted by the arbitral award, on the ground that all the events giving rise to that compensation occurred before Romania's accession to the European Union, the General Court infringed Article 2 of the Act of Accession, read in the light of the case-law of the Court of Justice, as it emerges, inter alia, from the judgment of 12 September 2013, *Kuso*, (C-614/11, EU:C:2013:544, paragraph 25) according to which EU law applies to the future effects of a situation which arose under the old rules. In particular, from the date of accession of a new Member State, EU law applies to all existing situations.

95      In the present case, the Commission submits, since the arbitral proceedings were pending on the date of Romania's accession to the European Union, the arbitral tribunal's decision-making process was ongoing at that date. Furthermore, according to the findings made by that tribunal, the arbitration applicants suffered gradually, over the period between 2005 and 2011, the harm for which they sought compensation.

96      It follows that the delivery of the arbitral award entailed the application of EU law, since it created rights which did not exist before Romania's accession to the European Union and it determined, by means of a complex economic assessment, the amount of compensation. The effects of that award thus constitute the future effects of a situation which arose before accession. The Commission submits that that award cannot therefore be regarded as recognition of a right which arose on the date on which Romania repealed the tax incentives scheme at issue.

97      On the contrary, the repeal of that regime and the arbitral award are two separate legal acts, the first ensuring compliance with Article 64(1)(iii) of the Europe Agreement and the second granting compensation for the repeal of a State aid scheme incompatible with that provision. That situation is comparable to that examined in the case which gave rise to the judgment of 29 June 2004, *Commission* v *Council* (C-110/02, EU:C:2004:395), in which the Court held that EU law prohibits the circumvention of a

Commission decision declaring State aid incompatible with the internal market by means of a second legal act granting compensation intended to compensate for the repayments which the beneficiaries of that State aid are obliged to make pursuant to that decision.

98     By the second part of the second ground of appeal, the Commission submits that, in any event, the General Court, by holding that EU law was not applicable *ratione temporis* to the compensation awarded by the arbitral award, infringed the Europe Agreement as that agreement, which is part of EU law, was applicable to all events prior to the accession which gave rise to that compensation. Article 64(1)(iii) of that agreement prohibited Romania from granting State aid which had not been authorised during the period preceding its accession to the European Union.

99     According to the Commission, that error led the General Court to make another error of law, in paragraph 87 of the judgment under appeal, when it held that the situation at issue in the present case was, for that reason, different from that which gave rise to the judgment of 6 March 2018, *Achmea* (C‑284/16, EU:C:2018:158). The arbitral tribunal itself acknowledged that the European Agreement laid down rules of law which it had to apply to the dispute before it. The present case is therefore a case in which private arbitration replaces the EU judicial system for resolving disputes in the field of EU law. Consequently, the General Court infringed Articles 267 and 344 TFEU.

100   European Food and Others and Viorel Micula and Others submit that the first part of the second ground of appeal is based, in its entirety, on the erroneous assertion that the right to compensation, which arose when the BIT was infringed, produces future effects after Romania's accession to the European Union.

101   They submit that it is apparent from the case-law of the Court, in particular from the judgments of 15 June 1999, *Andersson and Wåkerås-Andersson* (C‑321/97, EU:C:1999:307, paragraph 31), and of 10 January 2006, *Ynos* (C‑302/04, EU:C:2006:9, paragraph 36), that EU law, in particular Articles 107 and 108 TFEU, does not apply to aid measures granted before Romania's accession to the European Union. The limited circumstances in which the Commission may examine such aid measures derive from the provisions of the relevant acts of accession and not from a general principle of EU law.

102   In the present case, the arbitral award did not create rights which did not exist before Romania's accession to the European Union, but should be understood as a declaration that rights which existed before Romania's accession were infringed. Nor did payment of damages produce future effects, but represented merely the enforcement of the right to compensation, which was only confirmed and quantified by the arbitral award.

103     The right to the compensation at issue arose, they argue, from Romania's infringement of the BIT on account of the way in which Romania repealed, before its accession to the European Union, the tax incentives scheme at issue. All the events necessary to establish Romania's liability thus occurred before accession. It is irrelevant in that regard that the calculation of the amount of damages required a complex economic analysis.

104     The infringement of the BIT and the award of compensation do not therefore constitute two separate legal acts. Consequently, no analogy may be drawn with the case giving rise to the judgment of 29 June 2004, *Commission* v *Council* (C‑110/02, EU:C:2004:395), in which the Member State concerned had, first, laid down an aid scheme which was repealed following a Commission decision declaring it incompatible with the internal market and requiring that Member State to recover the individual aids granted under that scheme and, second, granted to the beneficiaries of those aids new aid of an equivalent amount intended to neutralise the consequences of the reimbursements that they were required to make. By contrast, the compensation granted by the arbitral award is intended to compensate for damage suffered as a result of the infringement of the BIT. Furthermore, since that award was adopted by an independent arbitral tribunal, it is not an act attributable to the Romanian State.

105   In any event, they submit, the Commission is not competent to require recovery of compensation granted by the arbitral award in so far as that award seeks to make good damage suffered before Romania's

accession to the European Union. If the tax incentives scheme at issue had not been repealed, the aid granted under that scheme during that period would have escaped the Commission's supervisory powers under Article 108 TFEU.

106   As regards the second part of the second ground of appeal, European Food and Others and Viorel Micula and Others submit that the General Court did not err in its interpretation or application of the Europe Agreement. It is true that that agreement, since it constitutes an international agreement concluded by the European Union, its Member States and Romania, forms an integral part of the EU legal order. However, they submit, prior to Romania's accession to the European Union, such an agreement did not form part of EU law for that State; it falls within the scope of EU law only with regard to the European Union itself and the Member States.

107   Furthermore, the General Court did not infringe Articles 267 and 344 TFEU when it held, in paragraph 87 of the judgment under appeal, that the findings made by the Court of Justice in the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), did not apply to the present case. That judgment concerns the situation in which a Member State agrees to remove disputes which concern the interpretation and application of EU law from the judicial system of the European Union. However, that is not the case here, since, first, Romania did not have the status of a Member State when the action was brought before the arbitral tribunal and, secondly, the Europe Agreement did not fall within the scope of EU law for Romania.

*Findings of the Court*

108   By its first and second grounds of appeal, in their first parts, the Commission submits, in essence, that the General Court erred in law in holding that it lacked competence under Article 108 TFEU to adopt the decision at issue. By that decision, the Commission considered that the payment of damages awarded by the arbitral tribunal, in its award delivered after Romania's accession to the European Union, in compensation for the damage which the arbitration applicants claim to have suffered as a result of the repeal by that State – prior to that accession – of the tax incentives scheme at issue, allegedly in breach of the BIT, constitutes State aid, within the meaning of Article 107(1) TFEU, which is unlawful and incompatible with the internal market.

109   It should be recalled that Article 108 TFEU establishes a system of prior control of measures that may constitute 'State aid' within the meaning of Article 107(1) TFEU. In particular, Article 108(3) TFEU establishes a prior control of plans to grant new aid. The aim of that system of prior control is therefore that only State aid compatible with the internal market, within the meaning of Article 107(3) TFEU, is implemented (see, to that effect, judgment of 3 March 2020, *Tesco-Global Áruházak*, C-323/18, EU:C:2020:140, paragraph 31 and the case-law cited).

110   The notification requirement is one of the fundamental features of that system of control. Within that system, Member States are under an obligation, first, to notify to the Commission each measure intended to grant new 'State aid' or to alter 'State aid', within the meaning of Article 107(1) TFEU, and, second, not to implement such a measure, in accordance with Article 108(3) TFEU, until that EU institution has taken a final decision on that measure (judgment of 24 November 2020, *Viasat Broadcasting UK*, C-445/19, EU:C:2020:952, paragraph 19 and the case-law cited).

111   That obligation has direct effect on all the authorities of the Member States (see, to that effect, judgment of 5 March 2019, *Eesti Pagar*, C-349/17, EU:C:2019:172, paragraphs 88 and 90).

112   As the General Court correctly pointed out, in paragraphs 66, 67 and 79 of the judgment under appeal, EU law, and Article 108 TFEU in particular, became applicable in Romania in accordance with Article 2 of the Act of Accession with effect from 1 January 2007, the date on which that State acceded to the European Union, under the conditions laid down in that act (see, by analogy, judgment of 29 November 2012, *Kremikovtzi*, C-262/11, EU:C:2012:760, paragraph 50).

113  It follows that, as the General Court also noted, in paragraphs 67 and 79 of the judgment under appeal, it was from that date that the Commission acquired the power enabling it to review, under Article 108 TFEU, measures taken by that Member State which might constitute 'State aid' within the meaning of Article 107(1) TFEU.

114  On that basis the General Court correctly concluded, in essence, in paragraph 68 of that judgment, that, in order to determine whether the Commission was competent to adopt the decision at issue under Article 108 TFEU, it was necessary to define the date on which the measure that, according to that decision, gave rise to 'State aid', within the meaning of Article 107(1) TFEU, was adopted.

115  According to the settled case-law of the Court of Justice, to which the General Court refers in paragraph 69 of that judgment, State aid must be regarded as being 'granted', within the meaning of Article 107(1) TFEU, on the date on which the right to receive it is conferred on the beneficiary under the applicable national legislation (see, to that effect, the judgments of 21 March 2013, *Magdeburger Mühlenwerke*, C-129/12, EU:C:2013:200, paragraph 40; of 6 July 2017, *Nerea*, C-245/16, EU:C:2017:521, paragraph 32; and of 19 December 2019, *Arriva Italia and Others*, C-385/18, EU:C:2019:1121, paragraph 36).

116  In the present case, as is apparent from the judgment under appeal, in particular from paragraphs 74 to 78 and 80 thereof, the General Court considered that the right to receive the compensation granted by the arbitral award, the payment of which, according to the decision at issue, gave rise to the grant of State aid, arose and began to produce its effects when Romania repealed, allegedly in breach of the BIT, the tax incentives scheme at issue. According to the General Court, that award is only an ancillary element of that compensation, since, by merely determining the exact damage suffered by the arbitration applicants as a result of that repeal, it constitutes the mere recognition of a right which arose at the time of that repeal, whereas the payments made subsequently represent only the enforcement of that right.

117  In that regard, it should be noted that, admittedly, as the General Court found, in paragraphs 72 and 73 of the judgment under appeal, the compensation granted by the arbitral award, since it is intended to compensate for the damage which the arbitration applicants claim to have suffered as a result of the repeal by Romania of the tax incentives scheme at issue, allegedly in breach of the BIT, has its origin in that repeal, which constitutes the event giving rise to the damage for which that compensation was granted.

118  It is also true that it cannot be ruled out that, according to the principles deriving from national law on civil liability, such a right to compensation arises on the date of the repeal of that system, as the General Court held in paragraphs 74 and 75 of the judgment under appeal.

119  It should, however, be recalled that the objective of the rules established by the FEU Treaty in relation to State aid is to preserve competition in the internal market (judgment of 6 November 2018, *Scuola Elementare Maria Montessori* v *Commission, Commission* v *Scuola Elementare Maria Montessori and Commission* v *Ferracci*, C-622/16 P to C-624/16 P, EU:C:2018:873, paragraph 43 and the case-law cited).

120  To that end, the FEU Treaty, in particular Article 108 TFEU, conferred on the Commission, as recalled in paragraphs 109 and 110 of this judgment, the power to determine whether a measure constitutes 'State aid' within the meaning of Article 107(1) TFEU and, therefore, conferred on it the power to ensure that measures meeting the conditions laid down in that provision are not implemented by the Member States or are implemented by them only after such measures have been declared compatible with the internal market.

121  In that regard, it is clear from the case-law that classification as 'State aid' within the meaning of Article 107(1) TFEU requires four conditions to be satisfied, namely that there be intervention by the State or through State resources, that the intervention be liable to affect trade between Member States, that it confer a selective advantage on the beneficiary, and that it distort or threaten to distort competition. Furthermore, that advantage must be attributable to the State (see, to that effect, judgment of 3 March

2021, *Poste Italiane and Agenzia delle entrate–Riscossione*, C-434/19 and C-435/19, EU:C:2021:162, paragraphs 37 and 39 and the case-law cited).

122    It should also be borne in mind that the concept of 'advantage', which is intrinsic to the classification of a measure as State aid, is an objective one, irrespective of the motives of the persons responsible for the measure in question. Accordingly, the nature of the objectives pursued by State measures and their grounds of justification have no bearing whatsoever on whether such measures are to be classified as State aid. Article 107(1) TFEU does not distinguish between the causes or the objectives of State aid, but defines them in relation to their effects (judgment of 4 March 2021, *Commission* v *Fútbol Club Barcelona*, C-362/19 P, EU:C:2021:169, paragraph 61 and the case-law cited).

123    In the light of those considerations, it appears that, as the Advocate General observed in point 125 of his Opinion, the decisive factor for establishing the date on which the right to receive State aid was conferred on its beneficiaries by a particular measure is the acquisition by those beneficiaries of a definitive right to receive that aid and to the corresponding commitment, by the State, to grant that aid. It is at that date that such a measure is liable to distort competition and affect trade between Member States, within the meaning of Article 107(1) TFEU.

124    In the present case, it must be noted that the right to compensation for the loss which the arbitration applicants allege to have suffered as a result of the repeal, allegedly in breach of the BIT, of the tax incentives scheme at issue was granted only by the arbitration award. It was only upon the conclusion of the arbitral proceedings brought for that purpose by the arbitration parties, on the basis of the arbitration clause in Article 7 of the BIT, that the arbitration applicants were able to obtain actual payment of that compensation.

125    It follows that, even if, as the General Court pointed out on numerous occasions in the judgment under appeal, the repeal, allegedly in breach of the BIT, of the tax incentives scheme at issue constitutes the event giving rise to the damage, the right to the compensation in question was granted solely by the arbitral award issued by that court, which, having upheld the claim brought by the arbitration applicants, not only found the existence of that right, but also quantified the amount thereof.

126    It follows that the General Court erred in law when it held, in paragraphs 75 and 78 of the judgment under appeal, that the State aid covered by the decision at issue was granted on the date of repeal of the tax incentives scheme at issue.

127    Consequently, the General Court also erred in law when it held, in paragraphs 79 and 92 of the judgment under appeal, that the Commission lacked competence to adopt the decision at issue under Article 108 TFEU.

128    None of the arguments put forward by European Food and Others and Viorel Micula and Others is capable of calling that assessment into question.

129    In the first place, the argument that the arbitral tribunal, which had been seised before Romania's accession to the European Union, could have delivered its ruling before that accession is purely speculative and must therefore be rejected.

130    In the second place, as regards the argument that the arbitral award, unlike the situation at issue in the judgment of 29 June 2004, *Commission* v *Council* (C-110/02, EU:C:2004:395), is not intended to re-establish a State aid scheme previously declared by the Commission to be incompatible with the internal market pursuant to Article 108(2) TFEU, but grants damages in compensation for loss suffered as a result of the alleged infringement of the BIT and is not, moreover, attributable to the State, with the result that it does not fall within the scope of Article 107(1) TFEU, that argument must be rejected as being irrelevant for the purposes of the examination of this appeal.

131   As is apparent from paragraph 80 of this judgment, the question whether the compensation granted by that award may constitute 'State aid' within the meaning of Article 107(1) TFEU, in particular in the light of the case-law stemming from the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24), according to which such aid is of a fundamentally different legal nature from that of the damages which national authorities may be ordered to pay to individuals in compensation for damage they have caused to those individuals, is not the subject matter of the present appeal and is therefore outside the Court's jurisdiction in this context.

132   Moreover, the power held by the Commission under Article 108 TFEU cannot in any case depend on the outcome of the examination of whether the compensation at issue is capable of constituting 'State aid', within the meaning of Article 107(1) TFEU, since the prior control by the Commission pursuant to Article 108 TFEU is intended, inter alia, as is apparent from paragraphs 109 and 120 of this judgment, to determine whether that is the case.

133   In the third place, as regards the argument that the compensation awarded by the arbitral award seeks, in part, as the General Court noted in paragraphs 89 and 90 of the judgment under appeal, to make good the damage which the arbitration applicants claim to have suffered during a period prior to Romania's accession to the European Union, that argument must also be rejected as irrelevant.

134   That fact, contrary to what the General Court held in paragraph 91 of that judgment, is not such as to call into question the Commission's competence to adopt the decision at issue under Article 108 TFEU, since, as is apparent from paragraphs 124 to 127 of this judgment, the right to that compensation was actually granted after that accession, by the adoption of the arbitral award.

135   In that respect it is irrelevant that the Commission would not have been competent under that provision to monitor, before Romania's accession to the European Union, the tax incentives scheme at issue if it had not been repealed by Romania. It suffices to note in that regard that, by the decision at issue, the Commission examined, in the light of the rules of the FEU Treaty on State aid, not that tax incentives scheme, which had been repealed before that accession and was moreover no longer in force, as European Food and Others and Viorel Micula and Others themselves point out, but the payment of damages made pursuant to the arbitral award issued after that accession.

136   It follows that the judgment under appeal is vitiated by errors of law as regards the determination, first, of the date on which the State aid referred to in the decision at issue was granted and, second, the Commission's competence to adopt that decision under Article 108 TFEU.

137   Moreover, the General Court also erred in law when it held, in paragraph 87 of the judgment under appeal, that the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), is irrelevant for the present case.

138   It should be recalled that in that judgment the Court held that Articles 267 and 344 TFEU must be interpreted as precluding a provision contained in an international agreement concluded between two Member States under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 60).

139   By concluding such an agreement, the Member States which are parties to it agree to remove from the jurisdiction of their own courts and, therefore, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law disputes which may concern the application or interpretation of EU law. Such an agreement is, therefore, capable of preventing those disputes from being resolved in a manner that guarantees the full effectiveness of that law (judgment of 26 October 2021, *PL Holdings*, C-109/20, EU:C:2021:875, paragraph 45 and the case-law cited).

140    In the present case, with effect from the date of Romania's accession to the European Union, EU law, including Articles 107 and 108 TFEU, was applicable to that Member State. As is apparent from the information in the case file referred to in paragraph 27 above, it is common ground that the compensation sought by the arbitration applicants did not relate exclusively to the damage allegedly suffered before that date of accession, with the result that the dispute brought before the arbitral tribunal cannot be regarded as being confined in all respects to a period during which Romania, which had not yet acceded to the European Union, was not yet bound by the rules and principles recalled in paragraphs 138 and 139 above.

141    It is common ground that the arbitral tribunal before which that dispute was brought does not form part of the EU judicial system which the second subparagraph of Article 19(1) TEU requires the Member States to establish in fields covered by EU law, which, with effect from Romania's accession to the European Union, replaced the mechanism for resolving disputes that might concern the interpretation or application of EU law.

142    First, that arbitral tribunal is not a 'court or tribunal of a Member State' within the meaning of Article 267 TFEU and, second, the arbitral award delivered by that court is not subject, in accordance with Articles 53 and 54 of the ICSID Convention, to any review by a court of a Member State as to its compliance with EU law.

143    Contrary to the submissions made at the hearing by European Food and Others and Viorel Micula and Others, that assessment cannot be called into question by the fact that Romania had consented to the possibility of litigation being brought against it in the context of the arbitration procedure provided for by the BIT.

144    Such consent, unlike that which would have been given in commercial arbitration proceedings, does not originate in a specific agreement reflecting the freely expressed wishes of the parties concerned, but derives from a treaty concluded between two States in the context of which they have, generally and in advance, agreed to exclude from the jurisdiction of their own courts disputes which may concern the interpretation or application of EU law in favour of arbitration proceedings (see, to that effect, judgments of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraphs 55 and 56, and of 2 September 2021, *Republic of Moldova*, C-741/19, EU:C:2021:655, paragraphs 59 and 60).

145    In those circumstances, since, with effect from Romania's accession to the European Union, the system of judicial remedies provided for by the EU and FEU Treaties replaced that arbitration procedure, the consent given to that effect by Romania, from that time onwards, lacked any force.

146    In the light of all the foregoing considerations, the first ground of appeal, in its first part, and the second ground, in both parts, must be upheld, without it being necessary to rule either on the other arguments put forward in that context or the second part of the first ground of appeal.

147    As the General Court has, by the judgment under appeal, annulled the decision at issue, as stated in paragraphs 36 to 38 of this judgment, on the sole ground, in essence, that the Commission lacked competence to adopt that decision under Article 108 TFEU because EU law was not applicable *ratione temporis* to the compensation granted by the arbitral award, the errors of law, as set out in paragraphs 126, 127 and 136 of this judgment, which vitiate that reasoning justify in themselves the setting aside of the judgment under appeal in its entirety.

148    In those circumstances, the judgment under appeal must be set aside without there being any need to examine either the third ground of the main appeal or the cross-appeal; the latter, by which the Kingdom of Spain alleges, first, infringement of Article 19 TEU and Articles 267 and 344 TFEU and, second, the inadmissibility of the action at first instance, having become devoid of purpose (see, by analogy, judgment of 22 April 2008, *Commission* v *Salzgitter*, C-408/04 P, C-262/04, EU:C:2008:236, paragraph 17).

**The action before the General Court**

149    In accordance with the second sentence of the first paragraph of Article 61 of the Statute of the Court of Justice of the European Union, if the decision of the General Court is set aside, the Court of Justice may itself give final judgment in the matter, where the state of the proceedings so permits.

150    In the present case that is so for the first part of the first plea in Case T-704/15, alleging that the Commission lacked competence to adopt the decision at issue under Article 108 TFEU, and the first part of the second plea in Cases T-624/15 and T-694/15, alleging that there was no advantage within the meaning of Article 107(1) TFEU conferred by the payment of damages, in so far as that part partially seeks to call into question that competence on the ground that the alleged advantage was granted before Romania's accession to the European Union.

151    For the reasons set out in paragraphs 123 to 127 above, the Commission is competent to adopt the decision at issue under Article 108 TFEU, since the entitlement to the State aid referred to in that decision was granted by the arbitral award after Romania's accession to the European Union.

152    It is irrelevant in that respect that Article 1 of the decision at issue, as European Food and Others and Viorel Micula and Others have pointed out, classifies as 'State aid', within the meaning of Article 107(1) TFEU, not the entitlement to compensation arising from the grant of the arbitral award, as recitals 137 and 144 of that decision might in their view suggest, but the payment of that compensation. Those grounds do not affect the date of delivery of that award and, therefore, cannot call into question the Commission's competence to adopt that decision under Article 108 TFEU.

153    It is necessary therefore to reject the first part of the first pleas raised in Case T-704/15 and the first part of the second plea in Cases T-624/15 and T-694/15, in so far as they seek to call into question the Commission's competence to adopt the decision at issue under Article 108 TFEU.

154    By contrast, the General Court did not examine the other arguments, parts and pleas relied on by European Food and Others and Viorel Micula and Others in support of their actions, which concern the merits of the decision at issue, in particular the question whether the measure referred to in that decision satisfies, from a substantive point of view, the conditions laid down in Article 107(1) TFEU. Examination of that part of the action involves complex assessments of fact, in respect of which the Court does not have all the necessary facts (see, by analogy, judgment of 16 September 2021, *Commission* v *Belgium and Magnetrol International*, C-337/19 P, EU:C:2021:741, paragraph 170).

155    Consequently, the Court considers that, as regards those other arguments, parts and pleas, the state of the proceedings does not permit final judgment to be given and that the case should therefore be referred back to the General Court to give judgment on them.

### Costs

156    Since the case is to be referred back to the General Court, the costs relating to the present appeal proceedings must be reserved.

On those grounds, the Court (Grand Chamber) hereby:

1.    **Sets aside the judgment of the General Court of the European Union of 18 June 2019, *European Food and Others* v *Commission* (T-624/15, T-694/15 and T-704/15, EU:T:2019:423);**

2.    **Declares that there is no need to adjudicate on the cross-appeal;**

3.    **Refers the case back to the General Court of the European Union for it to adjudicate on the pleas and arguments raised before it on which the Court of Justice of the European Union has not given a ruling;**

4.    **Reserves the costs.**

| | | |
|---|---|---|
| Lenaerts | Arabadjiev | Prechal |
| Jürimäe | Lycourgos | Regan |
| Rodin | Jarukaitis | Ilešič |
| Biltgen | | Piçarra |
| Rossi | | Kumin |

Delivered in open court in Luxembourg on 25 January 2022.

A. Calot Escobar                                          K. Lenaerts

Registrar                                                      President

---

*    Language of the case: English.