# EXHIBIT 4

Wolters Kluwer

**Kluwer**Arbitration

Document information

# Publication

○ International
Commercial Arbitration
(Third Edition)

# Bibliographic reference

'Chapter 6: Nonarbitrability
and International Arbitration
Agreements', in Gary B. Born
, International Commercial
Arbitration (Third Edition),
3rd edition (© Kluwer Law
International; Kluwer Law
International 2021) pp. 1027 -
1138

## *Chapter 6: Nonarbitrability and International Arbitration Agreements*

(1)

This Chapter addresses "nonarbitrability" as a basis for challenging the enforceability of an international arbitration agreement. The "nonarbitrability" doctrine applies to categories of
P 1028
disputes or subject matters which are deemed by national law to be incapable of resolution by arbitration, even if the parties have otherwise validly agreed to arbitrate such matters. This Chapter first considers the treatment of the nonarbitrability doctrine in international arbitration conventions, including distinctions between the nonarbitrability doctrine and rules of contractual validity, illegality and public policy. Second, the Chapter considers the treatment of the nonarbitrability doctrine under national law, including the historical evolution and application of the doctrine in leading jurisdictions. The Chapter then considers the application of the nonarbitrability doctrine in a variety of specific contexts, including antitrust, securities regulation, corruption, intellectual property, bankruptcy or insolvency, consumer, employment, corporate disputes and other settings. Finally, the Chapter considers various choice-of-law, procedural and related issues arising from application of the nonarbitrability doctrine.

## §6.01 INTRODUCTION

Arbitration legislation or judicial decisions in many states provide that particular categories of disputes or subject matters are not capable of settlement by arbitration, or "nonarbitrable." In some jurisdictions, this defense is referred to as "objective arbitrability," or "arbitrability *ratione materiae*,"
(2) while, in other jurisdictions, it is termed the "nonarbitrability" doctrine. (3) Both
P 1029
international arbitration conventions (including the New York Convention) and national laws provide that agreements to arbitrate such "nonarbitrable" matters need not be given effect, even if they are otherwise valid, (4) and that arbitral awards concerning such matters also need not be recognized.
(5)

The nonarbitrability doctrine has deep roots and a reasonably well-defined character, both historically and in different contemporary national legal systems. In one commentator's words:

> "All jurisdictions put limits on what can be submitted to arbitration. Customary law in Homeric Greece as in modern Papua Guinea would allow a dispute arising from a killing to be settled by arbitration; but … not sacrilege in Greece, nor adultery in parts of Papua New Guinea … or in Rome." (6)

The New York Convention and other international arbitration conventions recognize, and permit Contracting States to apply, nonarbitrability exceptions of this nature as an exceptional escape mechanism. Although the better view is that the Convention imposes international limits on Contracting States' applications of the nonarbitrability doctrine (as discussed elsewhere), (7) the types of claims that are nonarbitrable differ from nation to nation. Among other things, typical examples of nonarbitrable subjects in different jurisdictions include selected categories of disputes involving criminal matters; domestic relations and succession; bankruptcy; trade sanctions; certain competition claims; consumer claims; labor or employment grievances; and certain intellectual property matters. (8) Over the past several decades, the scope of the non-arbitrability doctrine has materially diminished in most developed jurisdictions.

As these examples suggest, the types of disputes which are nonarbitrable nonetheless almost always arise from a common set of considerations. The nonarbitrability doctrine rests on the notion that some matters so pervasively involve either "public" rights and concerns, or interests of third parties, that agreements to resolve such disputes by "private" arbitration should not be given effect. This rationale was summarized, in evocative terms, by one U.S. appellate court:

> "A claim under the antitrust laws is not merely a private matter. … Anti-trust violations can affect hundreds of thousands – perhaps millions – of people and inflict staggering economic damage. … We do not believe Congress intended such claims to be resolved elsewhere than in the courts." (9)

The court explained that the relevant statute, the Sherman Act, "is designed to promote the national

interest in a competitive economy" and equated a private litigant asserting antitrust claims under the provisions of the Act with an agent of the government, reasoning "thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." [10] Other explanations of the rationale for the non-arbitrability doctrine are similar. [11]

P 1030
As discussed elsewhere, the nonarbitrability doctrine contemplates a peculiar, and limited, type of unenforceability of valid arbitration agreements. When an arbitration agreement is invalid for lack of consent, noncompliance with form requirements, duress, or mistake, then the agreement is invalid: the agreement is not binding or enforceable upon the parties in any circumstances. In contrast, as discussed in greater detail below, the nonarbitrability doctrine provides that an otherwise valid arbitration agreement, which can be enforced as applied to some disputes, may not be given effect as applied to other (typically limited) categories of "disputes" or "subject matters." [12] The focus of analysis under the nonarbitrability doctrine is on the character and status of particular disputes or claims, not on the terms of the parties' arbitration agreement.

# §6.02 NONARBITRABILITY IN INTERNATIONAL ARBITRATION CONVENTIONS

The nonarbitrability doctrine has long been acknowledged, and given effect, in international arbitration conventions. The doctrine's role in leading international arbitration treaties has been broadly consistent, with textual differences providing guidance in interpreting contemporary instruments.

## [A] Geneva Protocol and Geneva Convention

Article 1 of the Geneva Protocol provided for the recognition of international arbitration agreements concerning "commercial matters or … any other matter *capable of settlement by arbitration*." [13] Similarly, the Geneva Convention provided for recognition of arbitral awards where "the subject matter of the award is capable of settlement by arbitration under the law of the country in which the award is sought to be relied upon." [14] These formulations were also employed, with some variations, in most subsequent international arbitration treaties. [15]

## [B] New York Convention: Articles II(1) and V(2)(a)

Drawing on the Geneva Protocol, Article II(1) of the New York Convention provides that an international arbitration agreement shall be recognized if it "*concern[s] a subject matter capable of settlement by arbitration*." [16] Similarly, Article V(2)(a) of the Convention provides that an award need not be recognized or enforced if "*[t]he subject matter of the difference is not capable of settlement by arbitration under the law*" of the country where recognition is sought. [17] Consistent with the character of the nonarbitrability doctrine as an exceptional escape mechanism, Article V(2)(a) permits nonrecognition of an award only where a "difference" is not "capable of settlement by arbitration" under the law of the recognition forum. Together, Articles II(1)
P 1031
and V(2)(a) permit the assertion of "nonarbitrability" defenses to the recognition and enforcement of otherwise valid and binding international arbitration agreements and awards under the Convention.

The drafting history of Article V(2)(a) provides limited guidance in interpreting that provision and its reference to disputes "not capable of settlement by arbitration." The initial drafts of what became Article V(2)(a) referred to the "subject matter of the award," paralleling the Geneva Convention, which used the same formula. [18] That provision was subsequently revised to refer in the final version of Article V(2)(a) to "[t]he subject matter of the difference." These changes do not appear to have a material impact on the meaning of the Convention. [19]

Potentially more significant than this aspect of the Convention's drafting history was the Convention's departure from the Geneva Protocol's treatment of all "commercial matters" as arbitrable, with the possibility of certain additional categories of non-commercial disputes also being regarded as arbitrable. [20] This is different from the approach apparently taken by the text of the New York Convention, which is that any matter – including both "commercial" and other types of subject matters – may be categorized as "nonarbitrable," depending on national law. [21] As discussed below, there is a persuasive argument that the New York Convention's nonarbitrability provisions should be interpreted in light of the Geneva Protocol's terms and the Convention's general objective of enhancing the recognition and enforcement of international arbitration agreements and awards (beyond that provided by the Geneva Protocol and Geneva Convention). [22]

## [C] European and Inter-American Conventions

Other international arbitration conventions contain nonarbitrability provisions that are almost identical to those in the New York Convention. Article VI(2) of the European Convention provides:

"The courts may also refuse recognition of the arbitration agreement if under the law of their country *the dispute is not capable of settlement by arbitration*." [23] Consistent with the character of the nonarbitrability doctrine as an exceptional escape mechanism, Article VI(2) provides only a limited recognition of the doctrine, in those courts where "under the law of *their country*," the dispute is nonarbitrable.

In contrast, Article 5(2)(a) of the Inter-American Convention does not refer to nonarbitrability in the context of arbitration agreements and provides only for the nonrecognition of arbitral awards where "the subject of the dispute *cannot be settled by arbitration* under the
P 1032
law of that State." [24] As with other international arbitration conventions, Article 5(2)(a) treats the nonarbitrability doctrine as an exceptional escape device, allowing a Contracting State to rely on its domestic public policy to deny recognition of an award that it would otherwise be internationally-obliged to recognize. In contrast, the Inter-American Convention does not expressly provide for the unenforceability of arbitration agreements as applied to disputes that are not capable of settlement by arbitration; on the contrary, Article 1 provides broadly that "an agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid," [25] without reference to any "nonarbitrability" exception. [26]

## [D] "Subject Matter Is Not Capable of Settlement by Arbitration"

It is not entirely clear what the Geneva Protocol, New York Convention and European Convention mean when they refer to a subject matter or dispute "not capable of settlement by arbitration." As a factual and logistical matter, it would be possible to settle almost any dispute by arbitration: different cultures have arbitrated all manner of disputes, including criminal, family, inheritance, intellectual property and other matters. There might be situations where indispensable evidence was physically unavailable, preventing any meaningful decision, or where none of the parties could participate in arbitral proceedings. Even these (very) unusual circumstances would not, however, fall comfortably within the exception in Article V(2)(a) of the New York Convention for subjects "not capable of settlement by arbitration" and would instead more readily be covered by Article II(3)'s exception for arbitration agreements that are "incapable of being performed." [27]

Instead, Article V(2)(a)'s exception for subjects that are "not capable of settlement by arbitration" has almost uniformly been applied where there is a legal (as distinguished from a factual or practical) impediment to resolution of a dispute by arbitration. That is, most authorities hold that a matter is "not capable of settlement by arbitration" where national law forbids or restricts the arbitrability of particular claims or disputes. [28] This is also consistent with the Geneva Protocol, which provided for the recognition of arbitration agreements concerning "commercial matters or … any other matter capable of settlement by arbitration" [29] – a formula
P 1033
fairly clearly directed at legal "incapability," particularly given historic national law rules regarding the arbitrability of commercial and non-commercial matters. [30]

## [E] Distinction Between Nonarbitrability and Substantive Invalidity of Arbitration Agreement

A rule of nonarbitrability under the New York Convention (and parallel national arbitration legislation) is distinguishable in important ways from a rule of substantive invalidity of an arbitration agreement. [31] There are a number of key differences between the two types of rules.

First, the two types of rules arise from different types of legal sources. Issues of substantive validity are defined by generally-applicable contract law principles (*i.e.*, unconscionability, fraud, frustration, mistake), while issues of nonarbitrability are defined by legislation directed specifically at application of the arbitration agreement to particular types of disputes or subject matters (*i.e.*, certain categories of consumer, bankruptcy, or criminal legislation) without regard to the terms of the parties' agreement. [32] Rules of substantive validity are derived from (and, under the New York Convention, *must* be derived from [33] ) generally-applicable principles of contract formation and validity, while rules of nonarbitrability are based on specific statutory enactments directed at agreements to arbitrate which, exceptionally, need not be generally-applicable rules of contract law.

Second, a decision that a particular dispute is nonarbitrable is fundamentally different in character from a decision that an agreement to arbitrate is invalid. Application of a rule of contractual invalidity generally results in the arbitration agreement being held invalid, including as applied to all categories of disputes: an unconscionable or forged arbitration agreement is invalid no matter what issues a party seeks to arbitrate. In contrast, a rule of nonarbitrability generally results in a valid agreement to arbitrate being unenforceable as it is applied to a particular dispute or category of disputes: an agreement to arbitrate franchise disputes can be valid, but claims for termination of the franchise contract falling within that arbitration agreement can nonetheless be nonarbitrable. [34]

Finally, the same distinction that applies to rules of substantive validity and nonarbitrability must also

be drawn between rules regarding capacity to enter into an arbitration agreement and nonarbitrability. In some jurisdictions, national law invalidates all (or some categories of) arbitration agreements concluded by certain categories of persons. Examples include minors, bankrupt parties, consumers and employees. [35] These types of legislative provisions
P 1034
are properly regarded as capacity limitations or rules of contractual invalidity, invalidating the arbitration agreement entirely, rather than prohibitions against the arbitration of particular categories of disputes.

## [F] Distinction Between Nonarbitrability and Illegality of Arbitration Agreement

The nonarbitrability doctrine is also closely related to, but distinguishable from, the illegality of the arbitration agreement. As discussed above, there are limited circumstances in which an agreement to arbitrate will be illegal and unenforceable. [36] In many instances, legislation forbidding the enforcement of arbitration agreements will properly be categorized as an application of the nonarbitrability principle: the legislation will forbid arbitration of a particular category of disputes (*i.e.*, franchise, domestic relations, or insolvency matters). [37] These cases do not in fact involve "illegality" of the arbitration agreement, but rather rules that render the arbitration agreement unenforceable as applied to particular claims (that is, those categories of claims that are "not capable of settlement by arbitration").

In contrast, true examples of "illegal" arbitration agreements are very rare and will involve cases where the parties seek to use arbitration as a means to accomplish an illegal purpose (*i.e.*, money laundering) or where arbitration agreements are subject to generally-applicable legal prohibitions (*i.e.*, trade sanctions). In these instances, national criminal legislation will be applied to a particular arbitration agreement and the results that it seeks to produce in specific circumstances. The agreement to arbitrate will be "illegal" and can be denied enforcement. [38]

## [G] Distinction Between Nonarbitrability and Mandatory Law or Public Policy

The nonarbitrability doctrine under the New York Convention is also closely related to – but distinguishable from – principles of mandatory law and public policy. [39] As discussed
P 1035
elsewhere, most developed legal systems treat a limited set of legal rules, based on fundamental public policies, as mandatory: despite general acceptance of party autonomy, parties are ordinarily not permitted to derogate by agreement from the content of these rules, or their underlying public policies, whether with regard to their choice of substantive law, [40] their choice of the procedural law of the arbitration, [41] or their choice of arbitral procedures. [42]

In certain respects, the doctrine of public policy (or mandatory law) parallels the nonarbitrability doctrine: despite the parties' general autonomy to agree to arbitrate their disputes, their agreements to arbitrate may be unenforceable in some jurisdictions as applied to certain, limited categories of issues. Thus, the nonarbitrability doctrine rests on legal rules that, much like the public policy doctrine's invalidation of private agreements, preclude recognition of an arbitration agreement or award, notwithstanding an otherwise valid agreement and arbitral proceeding. In both instances, the nonarbitrability doctrine rests on the premise that there are unacceptable conflicts between the award or arbitration agreement and basic public policies and legal norms of a particular state, which that state is permitted, exceptionally, to invoke as an escape mechanism to justify nonrecognition of an otherwise valid award or agreement. As noted elsewhere, classic examples include certain issues arising in criminal, domestic relations, bankruptcy, real property and governmental sanctions matters. [43]

Nonetheless, the concepts of nonarbitrability and public policy or mandatory law are distinguishable in vitally-important respects. In particular, although public policies or mandatory laws require that particular substantive rules be applied, they do not necessarily preclude the arbitrability of those mandatory law claims; indeed, as discussed below, in the vast majority of cases, mandatory law and public policy claims and defenses are arbitrable. [44]

As discussed below, the arbitrability of particular types of claims, including mandatory law claims, is ordinarily a question of legislative intent (and conflict of laws). [45] If a legislature does not preclude arbitration of a mandatory law provision, by treating it as nonarbitrable, then agreements to arbitrate such matters will almost always be valid and enforceable. That is, merely because a dispute involves matters of mandatory law or public policy does not necessarily mean that the dispute is nonarbitrable – and in practice mandatory law claims are frequently both arbitrable and arbitrated. [46] An early decision of the Paris Cour d'Appel explained this reasoning clearly, concluding that:

> P 1036
> "the impact of public policy on the arbitrability of a dispute does not cause

arbitrators to be prohibited from applying mandatory rules, but only from hearing cases which, because of their subject-matter, can only be heard by courts." [47]

Similarly, a Canadian decision held:

"there are rules of public order that can be applied in arbitrations as easily and as appropriately as they are by courts. … The fact that these regulations are of public order does not deprive the arbitrators of their jurisdiction to hear the disputes or require that they be heard by the ordinary courts." [48]

Virtually all other national court decisions are to the same effect, and have resulted in decisions holding that a wide range of mandatory law claims or defenses are arbitrable, including antitrust, securities, fraud, trade sanctions, insolvency, corruption and the like. [49]

P 1037

The foregoing conclusions are reflected in the provisions of Article V of the New York Convention. Apart from other grounds for nonrecognition of arbitral awards, Article V(2) of the Convention sets forth two exceptional bases for nonrecognition – the public policy of the enforcement forum (in Article V(2)(b)) and the nonarbitrability rules of the enforcement forum (in Article V(2)(a)). [50] Thus, Article V(2)(a) of the Convention provides for the nonrecognition of awards dealing with nonarbitrable matters (*i.e.*, matters "not capable of settlement by arbitration"), [51] while Article V(2)(b) provides that awards need not be recognized if doing so "would be contrary to the public policy" of the state where recognition is sought. [52] The separate treatment of issues of public policy and nonarbitrability within Article V(2)'s "escape" provisions, rather than under the general provisions of Article V(1), both reflects and confirms their common, and exceptional, character.

At the same time, however, Article V(2) treats public policy and nonarbitrability in separate subsections. This reflects the fact that public policy objections to an award are also distinct and separate from the nonarbitrability doctrine. That is consistent with applications of the two principles: the public policy doctrine provides that certain results reached by arbitral awards contradict public policy and cannot be recognized, while the nonarbitrability doctrine provides that the arbitral process itself cannot be used to produce a binding decision in cases related to a particular subject matter (regardless what its results are). [53]

Relatedly, although Article II of the New York Convention contains a nonarbitrability exception (in Article II(1)), Article II does not contain any "public policy" exception (paralleling that in Article V(2)(b)). As discussed elsewhere, a number of national courts have relied on the text of Article II in concluding that public policy does not provide a basis for challenging the validity or enforceability of arbitration agreements. [54] Rather, public policy is held to provide a defense only to the recognition of arbitral awards, not arbitration agreements.

## [H] No Interlocutory Judicial Decision on Mandatory Law

As discussed elsewhere, national court decisions over the past several decades have held that a wide range of mandatory law claims are arbitrable, with courts referring the parties to arbitration while reserving the possibility of a judicial "second look" in annulment, recognition, or other proceedings. [55] Among other things, antitrust or competition law claims, securities law claims, corruption defenses, fraud claims, insolvency disputes and a wide range of other mandatory law issues have been referred to arbitration under Article II of the Convention. [56]

P 1038

In doing so, most courts have held that, if it is unclear whether the arbitral tribunal will actually apply mandatory national law, then the proper course is not to assume that the tribunal will refuse to consider the mandatory law claims, in a manner that violates those mandatory laws or public policies. Instead, the proper course in these circumstances is to stay litigation and allow the arbitration to proceed. [57] The U.S. Supreme Court adopted precisely this approach to the mandatory provisions of the U.S. antitrust laws in its classic decision in *Mitsubishi Motors*. There, notwithstanding the fact that the case involved an agreement to arbitrate in Japan and a Swiss choice-of-law provision, the Supreme Court proceeded on the assumption that the arbitral tribunal would apply the mandatory provisions of the U.S. antitrust laws. [58]

The Supreme Court adopted a similar approach in an analogous context (involving the U.S. Carriage of Goods by Sea Act ("COGSA")), reasoning that "mere speculation that the foreign arbitrators *might* apply Japanese law which … *might* reduce respondents' legal obligations, does not in and of itself" render a COGSA claim nonarbitrable. [59] The Court adopted a very similar view, in a related context involving a domestic Racketeer-Influenced and Corrupt Organizations ("RICO") Act claim:

"since we do not know how the arbitrator will construe the remedial limitations,

the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract[, requiring submission of the matter to arbitration]." [60]

Other U.S. decisions, [61] as well as decisions by courts in other jurisdictions, [62] have reached similar conclusions.

P 1039
Under this analysis, the proper role of courts is not to attempt to predict what the arbitral tribunal will or will not do with regard to mandatory law claims (like antitrust or securities claims). Instead, national courts should permit the arbitration to proceed and then consider any resulting award in recognition, annulment, or other proceedings. This is consistent with the approach, outlined above, generally taken by courts towards claims that arbitration agreements are "illegal" or contrary to "public policy"; under that approach, courts will permit the arbitral proceeding to go forward and reserve judicial review until the award has been made, when courts can consider whether the arbitrators' decision violates applicable mandatory or criminal law or public policies. [63] In one court's words, the mere possibility that

> "'the foreign arbitrators might apply [foreign] law which, depending on the proper construction of [the federal statute in issue], might reduce respondents' legal obligations,' does not provide an adequate basis upon which to declare the relevant arbitration agreement unenforceable." [64]

There are some contrary judicial decisions, which instead refuse to enforce arbitration agreements, at least when coupled with foreign choice-of-law provisions that arguably exclude applicable mandatory statutory protections. [65] For example, a frequently-cited Belgian decision held a dispute involving a mandatory Belgian statutory protection for Belgian distributors nonarbitrable absent sufficient affirmative evidence that the arbitral tribunal would apply Belgian law:

> "The Belgian judge, in order to decide the validity of the arbitration agreement, must set the law chosen by the parties aside and apply immediately the law of 27 July 1961, according to which the dispute is not capable of arbitration if proof/evidence is given that arbitrators are obliged to apply not Belgian law but a foreign law." [66]

Decisions of this nature are exceptions to the general (and correct) approach adopted by national courts, which is to defer to the arbitral process, rather than assuming that the arbitrators' award will violate applicable mandatory laws or public policies. [67] Indeed, the better view is
P 1040
that Article II of the New York Convention requires such an approach, as one aspect of Contracting States' obligations to refer parties to arbitration. [68]

## [I] International Limits on Nonarbitrability Doctrine

As discussed above, Articles II(1) and V(2)(a) of the New York Convention contemplate that Contracting States may exceptionally apply their own law to refuse enforcement of an otherwise valid and binding arbitration agreement or award on nonarbitrability grounds. That is a form of "escape valve" which is available without regard to the generally-applicable choice-of-law rule set forth in Article V(1)(a) of the Convention for arbitration agreements. [69]

Importantly, as again discussed elsewhere, the Convention should also be interpreted to subject application of the nonarbitrability doctrine by Contracting States to international limitations. In particular, consistent with the nonarbitrability doctrine's status as an exceptional dispensation from the Convention's basic structure, choice-of-law regime and purposes, Contracting States should be permitted to adopt nonarbitrability exceptions only when narrowly-tailored to achieve specifically-defined, articulated public policies which are not inconsistent with state practice under the Convention. [70] Consistent with these limits, and as discussed below, courts in most Contracting States have applied the nonarbitrability exception only rarely in international settings.

## [J] "Conditional Nonarbitrability"

Although there is no reference to the concept in the New York Convention (or other international arbitration treaties) or any national arbitration statutes, a few authorities have referred to concepts of "conditional arbitrability." In particular, the *Restatement of the U.S. Law of International Commercial and Investor-State Arbitration* asserts that some matters may be "conditionally nonarbitrable." This suggestion is difficult to reconcile with existing authority, in the United States and elsewhere; similarly, the rationale for the proposal contradicts important principles prescribed

by the New York Convention.

The *Restatement* provides that:

> "Under U.S. law, arbitrability restrictions only exceptionally affect international commercial … arbitration. When limitations are instituted, they are not ordinarily categorical and unqualified. Rather, the prevailing U.S. legislative practice is to make arbitrability depend on prescribed conditions being fulfilled; typical conditions are that consent to arbitrate be given after dispute has arisen or that the agreement to arbitrate take a particular form." [71]

The *Restatement* also asserts that:

> "It is useful to consider arbitration restrictions as falling into one of two broad and analytically distinct categories. First, some matters may be made categorically, or *per se*, nonarbitrable. … By contrast, a matter may be made non-arbitrable only if certain
> P 1041
> conditions are not satisfied; the *Restatement* refers to this second category of restriction as 'conditional arbitrability.'" [72]

The *Restatement* identifies issues relating to the "time or form" of the arbitration agreement as examples of so-called conditional arbitrability – as in cases involving post-dispute arbitration agreements or separately signed arbitration agreements. [73] The *Restatement* apparently envisages particular categories of disputes that would be arbitrable if they were the subject of a conspicuous or separately signed arbitration agreement, but not if they were the subject of an agreement not satisfying these form requirements.

The *Restatement's* analysis of so-called "conditional arbitrability" is unsupported by U.S. (or other) authority; it is also ill-considered and contrary to the Convention's text and structure. Moreover, the *Restatement's* analysis illustrates why it is essential to distinguish carefully in applying the New York Convention and national arbitration legislation between issues of substantive validity and nonarbitrability (as both types of instruments do). [74]

As noted above, neither the New York Convention nor any developed national arbitration statute (including the FAA) refers to the concept of "conditional arbitrability"; likewise, no reported national court decision refers to or applies the concept. That is in large part because nothing in Article II or V of the Convention permits Contracting States to "conditionally" treat categories of disputes as arbitrable and because the application of such a concept would materially undermine the Convention's purposes and uniform international rules.

The concept of "conditional arbitrability" would enable Contracting States to treat particular (and potentially broad) categories of disputes as "not capable of settlement by arbitration," but then to reverse that treatment if requirements or conditions prescribed by national law were satisfied. [75] This would effectively circumvent the Convention's uniform international substantive and choice-of-law rules regarding the formal and substantive validity of international arbitration agreements and "re-nationalize" international dispute resolution, both results being contrary to the Convention's basic objectives. As the U.S. Supreme Court has observed, in rejecting comparable reasoning, "[t]he utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." [76]

More fundamentally, the *Restatement's* analysis confuses issues of non-arbitrability and issues of substantive and formal validity of arbitration agreements. Thus, the *Restatement's* examples of "conditional nonarbitrability" raise issues of substantive and formal validity – specifically, the "timing and form" of arbitration agreements – and not issues of nonarbitrability. These issues of "timing and form" do not concern the nonarbitrability of particular "subject matters" or "differences," as required by the Convention (in Articles II(3) and V(2)(a)) and the Model Law (in Articles 34(2)(b)(i) and 36(1)(b)(i)); rather, these issues involve classic
P 1042
requirements for the formal and substantive validity of the arbitration agreement itself. It is precisely for that reason that these requirements must be governed by the Convention's uniform form requirements and choice-of-law rules, which are applicable to issues of validity, and cannot properly be recharacterized as issues of nonarbitrability.

This conclusion is underscored by the *Restatement's* explanation of its analysis. Surprisingly, the *Restatement* seeks to justify its treatment of "conditional arbitrability" on the basis that it would assertedly permit application of the recognition or enforcement forum's local law to issues of validity

of the arbitration clause:

> "In treating questions of arbitrability under this Section, the Restatement excludes for purposes of choice-of-law analysis the characterization of them as questions of capacity, formal validity, or other categories that might lead unpredictably to application of foreign law." [77]

The *Restatement*'s observation that its treatment of questions of non-arbitrability is intended to "exclude characterization" of particular matters as issues of validity, because doing so "might lead unpredictably to the application of foreign law" is frank, but flatly contrary to the Convention's uniform choice-of-law regime. That choice-of-law regime is central to the Convention's efficacy [78] and cannot properly be circumvented by recharacterizing issues of substantive or formal validity as issues of nonarbitrability. Doing so would undermine one of the Convention's central accomplishments, [79] as well as the Convention's overall efficacy. Virtually no state has adopted the notion of "conditional arbitrability" and there is no justification for U.S. courts, historically at the forefront of implementing the Convention, to follow such a course.

# §6.03 NONARBITRABILITY IN NATIONAL ARBITRATION LEGISLATION

National arbitration legislation and judicial decisions have long provided that there are limits, albeit relatively modest, rarely-invoked ones, on the subject matters and disputes that may be subject to an enforceable agreement to arbitrate. As discussed below, these limits differ from state to state, although they all arise from a common set of concerns regarding the use of arbitration to resolve "public" disputes entailing the exercise of uniquely governmental authority.

The nonarbitrability limits that exist under national law have evolved materially over time, with historic skepticism about the arbitral process' ability to resolve particular categories of disputes eroding substantially in recent decades. This erosion has progressed to the point that most developed jurisdictions now impose only very few and limited restrictions on the subjects that may be arbitrated. As discussed below, that is particularly true in international (as distinguished from domestic) matters, where national courts have generally required clear statements of legislative intention before concluding that a particular subject matter is nonarbitrable.

## [A] Nonarbitrability: International Versus Domestic

Preliminarily, it is essential in considering nonarbitrability issues to distinguish between matters which are nonarbitrable in a domestic context and those which are nonarbitrable in an international context. In many jurisdictions, the categories of disputes that are nonarbitrable
P 1043
are materially broader in domestic than in international matters. [80] As the U.S. Supreme Court reasoned, in one early decision adopting a narrow view of nonarbitrability under the New York Convention, it is "necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration." [81]

Under this analysis, the fact that a particular matter is nonarbitrable in a domestic setting under a particular national law does not necessarily mean that it will also be nonarbitrable in an international setting; rather, local nonarbitrability rules are often interpreted as applicable only in domestic matters. The rationale for this conclusion has been that, in international cases, national conceptions of public policy and mandatory law should be moderated, in light of the more tenuous domestic interest, the existence of competing public policies of other states and the shared international policy of encouraging the resolution of international commercial disputes through arbitration. Consistent with this, and as discussed below, U.S., [82] French, [83] Swiss, [84] Swedish, [85] and other national courts, [86] as well as a substantial body of commentary, [87] have distinguished between the treatment of nonarbitrability in international and domestic contexts.

In general, the question whether a particular international dispute is or is not arbitrable will be a question of national law, with the international character of the dispute affecting the interpretation and application of local law. [88] Nonetheless, as discussed elsewhere, there are instances in which the New York Convention limits the extent to which Contracting States may treat particular subjects as nonarbitrable. [89]

## [B]
P 1044
## Nonarbitrability: Clear Statement of Legislative Intent

In general, national courts have required a clear and express statement of legislative intention before concluding that a subject is nonarbitrable in an international setting. In the words of the U.S.

Supreme Court, in one representative decision, "[w]e must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history" [90] and claims will be treated as arbitrable unless Congress "expressly directed" a contrary result. [91] The Court has also refused to imply (or "deduce") nonarbitrability from a statutory scheme and has required the party resisting arbitration to prove that Congress intended "to preclude a waiver of judicial remedies." [92]

Likewise, the Canadian Supreme Court has held that, "[i]f Parliament had intended to exclude arbitration in copyright matters, it would have clearly done so." [93] Citing this conclusion, a well-reasoned dissenting opinion, in another Canadian decision, reasoned similarly that:

> "It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly. Arbitration in and of itself is no longer considered contrary to public order, and courts ought not to read in the exclusion of arbitration if the legislature has not clearly provided that it is to be excluded." [94]

This general approach has been followed in other jurisdictions, [95] and is reflected in the UNCITRAL Model Law (which contemplates that non-arbitrability exceptions will take the

P 1045

form of legislative enactments). [96] These approaches reflect the policies of restraint adopted by national courts under Article V(2)(a) and the Convention's international limits on the nonarbitrability exception. Among other things, legislative provisions requiring that particular classes of claims or disputes be resolved in specified courts or by prescribed procedures do not render those claims or disputes nonarbitrable. [97]

It is important that this approach to statutory interpretation – requiring a clear, unequivocal statement of non-arbitrability – be applied robustly in cases involving international arbitration agreements under the New York Convention. Failure to do so will inevitably result in courts and legislatures in different states variously declaring different subject matters and categories of disputes nonarbitrable. As the U.S. Supreme Court rightly observed, in one landmark decision:

> "The utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." [98]

This is particularly true because, if non-arbitrability exceptions undermine the ability of commercial parties to resolve all of their disputes in a single, centralized proceeding, those parties will become less willing to use the arbitral process, thereby ultimately undermining and frustrating the Convention's purposes.

## [C] National Arbitration Legislation

National arbitration legislation adopts a variety of different approaches to the subject of nonarbitrability. Nonetheless, as detailed below, the unifying theme of these legislative instruments is the treatment of nonarbitrability as an exception, which is rarely invoked and narrowly applied, based upon a clear statement of legislative intention, with particular reserve being exercised by courts in international cases.

### [1] UNCITRAL Model Law: No Definition of Arbitrability

The UNCITRAL Model Law does not contain provisions prescribing any particular category of disputes as nonarbitrable. [99] That reflects in part the recognition that, as a matter of principle, almost any dispute is capable of resolution by arbitration, [100] and in part, the recognition that there is not yet any uniform or model international principle that would clearly designate particular disputes as nonarbitrable. [101] Instead, paralleling Article V(2) of the New York Convention, the Model Law exceptionally leaves to individual legislatures in particular jurisdictions the articulation of nonarbitrability provisions (subject to international limits imposed by the New York Convention). [102]

P 1046

Thus, Article 1(5) of the Model Law provides that "this Law shall not affect any other law of this State by virtue of which certain disputes may not be submitted to arbitration." [103] In effect, the Model Law recognizes the possibility for states to characterize, as a matter of national law, specified categories of "disputes" as nonarbitrable outside the four corners of their international arbitration statute. As discussed below, this is the approach that a number of states adopt, imposing exclusions from the general scope of their arbitration legislation either on the basis of other statutes or judicial decisions interpreting such statutes. [104]

### [2] Swiss and German Arbitration Legislation: Broad Definitions of Arbitrability

Many civil law systems impose some sort of statutory restriction on the subject-matter of valid international arbitration agreements. As discussed below, recent legislation tends to define arbitrable subjects very broadly, while earlier statutory limitations tend to be somewhat more restrictive in their definitions of arbitrable matters. [105] In both instances, however, most provisions are drafted in broad terms, that leave much to case-by-case judicial interpretation.

Thus, Article 177(1) of the Swiss Law on Private International Law provides that "any dispute involving an economic interest can be the subject-matter of an arbitration." [106] The term used in Article 177(1) – "property" or "economic interest" ("*vermögensrechtlicher Anspruch*") – is not given a statutory definition, but was intended to be interpreted liberally. [107] As noted above, Article 177 provides for a more liberal conception of arbitrability in international matters than that which applies in domestic matters. [108] Swiss courts have interpreted

P 1047

Article 177(1) broadly, to permit arbitration of "any claims that have pecuniary value" for the parties. [109]

Similarly, the 1998 German version of the UNCITRAL Model Law adopts the Swiss approach and provides that any claim for an economic interest ("*vermögensrechtlicher Anspruch*") is arbitrable in arbitrations seated in Germany, absent contrary statutory provisions. [110] As with the Swiss approach, this formulation is intended to be interpreted expansively (and to limit the scope of the nonarbitrability doctrine in Germany). [111]

A variation of this approach is to provide for the arbitrability of any matter subject to the parties' "free disposition." [112] That leaves for judicial resolution the question of what parties are free to "dispose" of, but the legislative intention is again to narrowly limit the scope of the nonarbitrability doctrine.

It is difficult to see how these provisions do not, at least read literally, and not qualified by other legislation, effectively render all commercial, and virtually all non-criminal, disputes arbitrable: even issues such as divorce and marital status or a declaration of bankruptcy involve pecuniary value. Nevertheless, it is very unlikely that disputes regarding marital status, a bankrupt's status, or similar subjects would be deemed arbitrable under existing law, [113] even in international matters. [114] Equally, as discussed below, some civil law jurisdictions retain

P 1048

nonarbitrability rules in specific contexts involving consumers, employees, securities purchasers, or distributors (often in response to local political considerations) which clearly involve pecuniary value. [115] Despite these exceptions, statutory provisions affirmatively permitting arbitration of all "pecuniary matters" or all matters subject to the parties' "disposition" underscore the intended narrow limits on any application of the nonarbitrability doctrine.

### [3] France: Evolution of Nonarbitrability Doctrine

In France, existing statutory restrictions on the arbitrability of disputes date to the 19th century and, read literally, would impose significant limitations on the arbitrability of disputes concerning public policy matters. With regard to domestic arbitration, Article 2059 of the French Civil Code provides that "all persons may submit to arbitration those rights which they are free to dispose of," while Article 2060(1) provides that "[o]ne may not enter into arbitration agreements in matters of status and capacity of the persons, in those relating to divorce and judicial separation or to disputes concerning public bodies and institutions and more generally in all matters in which public policy is concerned." [116]

Read literally, the language of this latter provision is problematic, most obviously because "all areas which concern public policy" is an undefined, potentially expansive field, while the mere fact that an issue "concerns" public policy (however that term is defined) extends this category even more widely and unpredictably. [117] Competition, securities law and intellectual property, as well as disputes involving state entities and regulated industries, all "concern" public policy in various ways – as, for that matter, do most claims in tort/delict. Nonetheless, the suggestion that all such matters are nonarbitrable does not accord with either the New York Convention or French judicial decisions over the past several decades. [118]

Consistent with this, French judicial decisions progressively dispensed with the nonarbitrability provisions of Articles 2059 and 2060 in international matters (in the context of what one commentator correctly termed a "progressive elaboration of a specific liberal regime of international arbitration, as opposed to domestic arbitration" [119] ). In 1961, the Orléans Cour d'Appel held that a claim for breach of contract, where the defense relied on a legislative trade embargo, was nonarbitrable, on the grounds that "this dispute concerns public policy, and the arbitration agreement is void [sic] whenever the resolution of the arbitration entails interpreting and applying a rule of public policy." [120] This approach adopted a broad view of the nonarbitrability doctrine, apparently treating any dispute requiring interpretation and

P 1049

application of "public policy" standards as nonarbitrable – which could readily include most or all antitrust, securities law, trade controls, intellectual property and similar matters.

Over time, French courts rejected the foregoing view. [121] The Paris Cour d'Appel held, only a few years later, that:

> "although it is forbidden to enter into arbitration agreements concerning disputes implicating public policy, that rule does not mean that every case which in some respect depends on regulations based on public policy will be held nonarbitrable on those grounds." [122]

Subsequently, French courts concluded that Articles 2059 and 2060 of the Civil Code do not apply to international arbitration agreements. [123] Thereafter, in 1991, the Paris Cour d'Appel held that, in the international context, claims of illegality and violations of public policy could be arbitrated, including where they involved the validity of the parties' contract. The court reasoned:

> "[I]n international arbitration, an arbitrator … is entitled to apply the principles and rules of public policy and to grant redress in the event that those principles and rules have been disregarded. … [A]s a result, except in cases where the nonarbitrability is a consequence of the subject-matter – in that it implicates international public policy and absolutely excludes the jurisdiction of the arbitrators because the arbitration agreement is void – an international arbitrator, whose functions include ensuring that international public policy is complied with, is entitled to sanction conduct which is contrary to the good faith required in relations between partners in international trade." [124]

The same analysis was applied by the Paris Cour d'Appel in 1993, which upheld the validity of an international arbitration agreement as applied to civil claims arising under EU competition law:

> "if the character of the economic policy of Community competition law rules prohibits arbitrators from granting injunctions or levying fines, they may nonetheless assess the civil consequences of conduct held to be illegal with respect to public order rules that can be directly applied to the parties' relations." [125]

P 1050

In subsequent decisions, French courts have repeatedly upheld the arbitrability of competition law (and other public law) claims in emphatic terms. [126]

The result of the past five decades' judicial developments in France has been a substantial retrenchment of nonarbitrability limits in the international context. [127] Notwithstanding potentially expansive (and archaic) nonarbitrability provisions of the Civil Code, and almost equally expansive historic judicial interpretations of those provisions, French courts have progressively narrowed the scope of nonarbitrable matters. The end result is that they have apparently categorized matters as nonarbitrable only where mandatory statutory text expressly requires this result.

More recently, the Conseil d'Etat, the highest administrative body in France, has suggested that, when reviewing arbitral awards, it would determine as a threshold matter whether the subject-matter of the dispute is susceptible of being resolved through arbitration. Among other things, the Conseil d'Etat held that it could annul an arbitral award "if it verifies that the dispute is nonarbitrable." [128] The Conseil d'Etat's ruling does not alter the course of the last several decades of French international arbitration law: it merely confirms judicial authority over interpretation and application of the nonarbitrability doctrine, without implying any expansion of that doctrine or departure from prior French authority.

### *[4]* U.S. Federal Arbitration Act: Evolution of Nonarbitrability Doctrine

Developments in the United States over the past several decades have been very similar to those in France, albeit with their own accent. The text of the FAA does not address the subject of arbitrability, either directly or by implication. [129] Both historically and today, questions whether or not a particular dispute is arbitrable under U.S. law turn almost entirely on judicial interpretation of other statutes (*e.g.*, antitrust, securities or bankruptcy legislation), most of which do not expressly address issues of arbitrability.

Until the 1980s, federal law in the United States treated a substantial number of claims as nonarbitrable. The U.S. Supreme Court's first modern treatment of the nonarbitrability doctrine was *Wilko v. Swan*. [130] There, an investor brought a damages action in a federal district court against his brokers for alleged misrepresentations under the federal securities laws. The Supreme Court rejected the defendants' application to stay the action, based upon an arbitration clause, reasoning that Congress "has enacted the Securities Act to protect the rights

P 1051

of investors and has forbidden a waiver of any of those rights, by means of a specific statutory anti-waiver provision." [131] The Court concluded that:

> "Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act." [132]

Relying on *Wilko*, U.S. lower courts fashioned a variety of applications of the nonarbitrability doctrine during the 1960s and 1970s, predominantly in domestic cases, designed to protect perceived U.S. public values or legislative objectives. Claims touching on patent rights were deemed to involve the public interest, and thus to be inappropriate for arbitration. [133] Likewise, courts concluded that a wide variety of other federal statutory claims, including federal antitrust, [134] Racketeer-Influenced and Corrupt Organizations ("RICO") Act, [135] bankruptcy, [136] Carriage of Goods by Sea Act ("COGSA") [137] and race discrimination [138] claims, were "too important" to be left to "private" arbitration.

In many of these cases, the U.S. courts emphasized the "public" rights at issue and the perceived inability of the arbitral process satisfactorily to resolve disputes concerning such rights. [139] In one particularly expansive formulation of the approach of U.S. courts to the subject of nonarbitrability, "although arbitration is well suited to resolving contractual disputes

P 1052

… it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights." [140]

Although many of these decisions occurred in the domestic context, U.S. courts generally applied the same nonarbitrability principles to international arbitration agreements. [141] In one lower court's words:

> "[T]o permit arbitration by an international tribunal of a Sherman Act claim would be particularly inappropriate considering the public interest in private enforcement of the antitrust laws. These factors, uncertainty as to the scope of the arbitration clause and utilization of a foreign tribunal, were not present in [other case law]." [142]

During the 1970s and 1980s, however, U.S. courts moved decisively to limit the nonarbitrability doctrine in a wide range of areas, beginning with international arbitration agreements, but subsequently extending to the domestic context (as also occurred at roughly the same time in France [143] ). Thus, in *Scherk v. Alberto-Culver Co.*, decided in 1974, the U.S. Supreme Court distinguished *Wilko* and held that claims under the federal securities laws were arbitrable, provided they arose from an "international" transaction. [144] Thereafter, in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the Court held that federal antitrust claims were also arbitrable, again provided that they arose from an "international" transaction. [145]

In both cases, the Court stressed the importance of the United States' (and other Contracting States') commitment to the New York Convention:

> "A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate [the Convention's] purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." [146]

P 1053

Likewise, the Court in *Mitsubishi Motors* emphasized "the utility of forum-selection clauses in international transactions." [147] It also stressed that "adaptability and access to expertise are hallmarks of arbitration," [148] and that "there is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism" [149] to enforce the U.S. antitrust laws. Using language that has subsequently been repeatedly cited by other national courts, the Court reasoned:

> "The utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." [150]

As a consequence, the Court declared that "it will be necessary for national courts to subordinate

domestic notions of arbitrability to the international policy favoring commercial arbitration." [151]

Given these considerations, the Supreme Court's *Mitsubishi Motors* opinion formulated a demanding standard for holding a statutory claim nonarbitrable: "We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." [152] The Court also said that claims will be deemed arbitrable unless Congress "expressly directed" a contrary result. [153] (This general approach of restraint and confidence in the international arbitral process has also found favor outside the United States, [154] as well as in better-reasoned academic commentary. [155] )

Subsequently, the U.S. Supreme Court overruled *Wilko v. Swan*, holding that claims – either domestic or international – under both RICO legislation and the Securities Exchange Act are arbitrable. [156] In another decision, after remarking that "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement," [157] the Court held that claims under the Age Discrimination in Employment Act are arbitrable. [158] More recently, the Supreme
P 1054
Court held that federal employment legislation did not require treating employment claims as nonarbitrable, declaring that "we have made clear that even a statute's express provision for collective legal action does not necessarily mean that it precludes 'individual attempts at conciliation' through arbitration." [159] Similarly, with little debate, lower U.S. courts have extended *Mitsubishi* beyond international matters and permitted the arbitration of antitrust claims in purely domestic matters. [160]

There have been occasional U.S. statutory enactments, adopting nonarbitrability rules for particularly categories of disputes, but these are typically both narrowly-limited and domestically-focused. Examples include disputes under certain "motor vehicle franchise contracts," limited types of claims by employees of specified public companies, and disputes concerning certain consumer lending agreements. [161] The narrow scope of these provisions is consistent with the Supreme Court's insistence on clear legislative direction regarding issues of nonarbitrability: where Congress has prescribed nonarbitrability, it has done so specifically and narrowly.

In sum, as in France, the past five decades have witnessed a substantial evolution of the nonarbitrability doctrine in the United States. In contrast to a relatively expansive, judicially-created nonarbitrability doctrine in the early 1970s, most categories of statutory (and other) claims are now treated as arbitrable by U.S. courts, and a claim will only be deemed nonarbitrable under the FAA's statutory regime where federal legislation expressly requires this result. [162] This is particularly true in international contexts, but also increasingly applicable in domestic settings.

### [5] English Arbitration Act

The English Arbitration Act, 1996, is entirely silent concerning the subject of nonarbitrability. Although few reported cases have addressed the issue, English courts have generally had little sympathy for attempted nonarbitrability arguments: in one decision, the court affirmed the arbitrability of competition law claims in unhesitating, almost dismissive, terms. [163] The
P 1055
English Court of Appeal has also rejected arguments that minority shareholder claims under the Companies Act are nonarbitrable. [164]

More generally, English courts recently held that a dispute that could be characterized in several ways, including in ways that would render the dispute nonarbitrable, should nonetheless be treated as arbitrable. The Court reasoned that "in each case the essential dispute is the same, regardless of the label. This is a dispute which arbitrators can determine." [165]

English courts have only rarely held matters nonarbitrable. [166] In one unusual case, a first instance judge held that a "constitutional claim to invalidate" a Jordanian statute based on its purported incompatibility with the Jordanian constitution was nonarbitrable. [167] Apart from such (unusual) circumstances, English courts have construed the nonarbitrability doctrine very narrowly.

### [6] Other Jurisdictions

Legislation in other developed jurisdictions adopts approaches which are broadly comparable to France, the United States and England in their treatment of the topic of nonarbitrability, with only a few exceptions. Similarly, decisions in other developed jurisdictions are broadly comparable in their treatment of nonarbitrability issues. [168]

In Canada, for example, a decision of the Québec Court of Appeal held
P 1056
that claims under the Canadian Copyright Act were nonarbitrable, relying on a grant of jurisdiction over copyright claims to the Canadian federal courts and the public policies reflected in the Copyright Act. [169] On appeal, however, the Canadian Supreme Court reversed, holding in emphatic terms that claims under the Copyright Act were arbitrable, and declaring: "If Parliament had intended to exclude arbitration in copyright matters, it would have clearly done so." [170] Similarly, an Ontario court recently held that tort claims were arbitrable, cautioning that courts should

be "wary of cases in which a party to an arbitration agreement seeks to avoid it by pleading a common law tort." [171]

Courts in Singapore have taken a similar approach. Holding that minority shareholder oppression claims are arbitrable, the Singapore Court of Appeals reasoned that:

> "There is certainly nothing in the text of [the Companies Act] to suggest an express or implied preclusion of arbitration. Nor does the legislative history and statutory purpose of the provision suggest that a dispute over minority oppression or unfair prejudice is of a nature which makes it contrary to public policy for the dispute to be adjudicated by an arbitral tribunal." [172]

Likewise, a Swedish court reasoned that, under the Swedish Arbitration Act:

> "[A]n arbitration award is invalid if it includes an assessment of an issue that, according to Swedish law, may not be settled by arbitrators (nonarbitrable). The fact that there are mandatory provisions in a certain area, however, does not automatically imply that disputes in this area are nonarbitrable. As regards international disputes relating to foreign legislation, it should be determined from case to case whether the applicable foreign law is of such a nature that a settlement of the case in a Swedish court would not be accepted. When it comes to an economic-political regulation in a foreign state, there is often no reason to have the mandatory rules affect settlement possibilities in Sweden and therefore arbitrability according to Swedish law. This opinion is in line with a tendency internationally to accept that an international dispute may be resolved by arbitration proceedings even if a similar national dispute would fall outside the arbitration area." [173]

Some national arbitration legislation similarly limits the scope of nonarbitrability defenses, particularly in international cases. In New Zealand's enactment of the UNCITRAL Model Law, nonarbitrability is statutorily-prescribed in more limited terms than those in the Model Law:

> P 1057
> "Any dispute which the parties have agreed to submit to arbitration under an arbitration agreement may be determined by arbitration unless the arbitration agreement is contrary to public policy or, under any other law, such a dispute is not capable of determination by arbitration." [174]

Likewise, Article 806 of the Italian Code of Civil Procedure provides that:

> "The parties may have disputes which have arisen between them decided by arbitrators provided the subject matter does not concern rights which may not be disposed of, except in case of express prohibition by law. Disputes provided for in Article 409 [certain labor disputes] may be decided by arbitrators only if so provided by law or by collective labor contracts or agreements." [175]

Other national arbitration legislation in developed jurisdictions is similar to these statutory approaches. [176] These narrow statutory definitions of the nonarbitrability doctrine reflect contemporary confidence in the arbitral process and are again consistent with the New York Convention's requirement that nonarbitrability exceptions rest on clear legislative direction.

Arbitral tribunals have reached similar conclusions. In one well-publicized international arbitration, a state-owned Indonesian party argued that Indonesian law provided for the nonarbitrability of claims of termination of a contract, absent an express and specific waiver of recourse to national courts. [177] Not surprisingly, the argument was rejected out of hand by the arbitral tribunal as "extraordinarily perverse." [178]

P 1058
Despite the overwhelming weight of authority, particularly in recent years, there are occasional decisions holding particular matters nonarbitrable. One Australian decision held a claim that contractual licensing arrangements between two parties were "unfair," in breach of §106 of the then Australian Trade Practices Act, 1986, was not capable of settlement by arbitration. [179] The Australian decision (by an administrative appellate tribunal) reasoned that:

> "[T]he subject matter of the proceedings under [the Industrial Relations Act] concerns the fairness of the licensing agreement having regard to its alleged representations and the provisions dealing with the termination of the agreement. We are satisfied that this is not a matter 'that is … capable of settlement by arbitration.' … An 'unfair contract' is defined firstly as a contract which is 'unfair, harsh or unconscionable,' but also includes contracts which are 'against the public interest' or which provides remuneration less than that available to an employee or which are designed to avoid an industrial instrument[, which are not capable of application by arbitral tribunals]." [180]

This reasoning is an anomaly, reminiscent of some 19th century decisions, denying the parties' autonomy to resolve their disputes by arbitration, and contrary to both modern conceptions of arbitrability and the obligations imposed by Article II of the New York Convention. [181] In contrast, more recent Australian decisions have held that Trade Practices Act claims were to be referred to international arbitration. [182]

A similarly misconceived conclusion was reached by a Pakistani decision, holding that all claims of fraud are nonarbitrable. [183] Again, that decision is contrary to Pakistan's commitments under the New York Convention, which requires the recognition and enforcement of international arbitration agreements as applied to differences "whether contractual or not." [184] That formulation, and the policies it reflects, make clear the Convention's requirement that the nonarbitrability doctrine be applied as an exception, based on and tailored to advance specific and articulated local public policies. [185]

Finally, an anomalous English High Court decision apparently suggested (without serious analysis) that claims under mandatory provisions of EU law are nonarbitrable. [186] That
P 1059
decision has attracted well-reasoned criticism and is clearly out-of-step with the weight of both European and English authority; it is unlikely that the decision will survive more considered review by English trial and appellate courts. [187] The decision nonetheless reflects the apparently enduring allure of the nonarbitrability doctrine, and generalized notions of public policy, even in developed jurisdictions which have otherwise generally confined the doctrine to narrow settings.

# §6.04 APPLICATIONS OF NONARBITRABILITY DOCTRINE

There is a substantial body of national case law and international arbitral authority addressing claims of nonarbitrability in different contexts. As already outlined, judicial and legislative decisions over the past several decades have progressively narrowed the scope of the nonarbitrability doctrine and the subjects which are considered to be nonarbitrable. [188] This reflects growing experience of national courts with, and confidence in, the international arbitral process, which is increasingly regarded as capable of settling virtually every type of transnational commercial or civil dispute; it also reflects the continuing commitment of national courts, in almost all jurisdictions, to effective and robust application of the New York Convention in international commercial settings.

As discussed above, in many cases, both national arbitration legislation and regulatory statutes do not expressly address the subject of nonarbitrability – particularly in international matters. [189] U.S. and EU antitrust/competition laws are leading examples, where neither statutory instrument makes any reference to arbitration. [190] In these circumstances, national courts must resolve issues of nonarbitrability by reference to implied legislative intent and the competing policies of the New York Convention (and national arbitration legislation) and a particular regulatory regime. [191]

In doing so, courts in different jurisdictions have typically focused on the text of the relevant national legislation, as well as on a common core of recurrent factors. These factors include the "public values" or "public interests" at issue, [192] the extent to which arbitral procedures (as distinguished from judicial or administrative procedures) are suited to resolution of the dispute, [193] whether such disputes involve unacceptable, systemic disparities of bargaining
P 1060
power between the parties, [194] the effect of a decision on third party rights, [195] the ability of an arbitral tribunal to grant legislatively-mandated relief [196] and (most generally) legislative intent. [197] In the words of one representative expression of these views:

> "Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the

requirements of enacted legislation. … Other facts may [also] render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. … Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. … Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." [198]

P 1061

The premise of most contemporary nonarbitrability analysis, however, is that arbitral tribunals have the competence to consider and satisfactorily decide disputes involving "public law" claims reflecting important national and international public policies. [199] Moreover, national courts have held with increasing clarity and conviction that "nonarbitrability" is an exception to Article II of the New York Convention, which should be interpreted very narrowly – with particular care being taken to prevent tendencies towards local parochialism from undermining the Convention's purposes. Again, the U.S. Supreme Court captured these perspectives well when it reasoned in *Mitsubishi:*

> "There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism. … The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. … [W]e decline to subvert the spirit of the United States' accession to the Convention by recognizing subject matter exceptions where Congress has not expressly directed the courts to do so." [200]

This analysis is best considered as reflecting a mandatory obligation, arising from the structure and purposes of the Convention (*i.e.*, "utility of the Convention" and "spirit of the United States' accession"), rather than a purely voluntary decision. As discussed above, that obligation requires Contracting States to treat nonarbitrability as an exceptional defense, requiring a specific and clearly-articulated justification in mandatory local public policy. [201] Consistent with this view, most recent national judicial decisions have been unwilling to hold matters nonarbitrable in international cases absent clear and specific legislative direction. As detailed below, this legislative direction is not present in the vast majority of settings.

## [A] Antitrust and Competition Claims

The development of the nonarbitrability doctrine in the context of competition law claims is a paradigm for the doctrine's broader application. During the early decades after such legislation was enacted, U.S. [202] and European [203] courts consistently held that antitrust claims were nonarbitrable, as did (less clearly) arbitral tribunals. [204] One U.S. court explained the nonarbitrability of antitrust claims as follows:

P 1062

"The reasoning is fourfold: (1) governance of the realm of antitrust law, so vital to the successful functioning of a free economy, is delegated by statute to both government and private parties, the latter being given special incentive to supplement efforts of the former, the work of both being equally the grist of judicial decisions; (2) the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract; (3) antitrust issues are – an understatement – 'prone to be complicated, and the evidence extensive and diverse,' and, we may add, the economic data subject to rigorous analysis dictated by a growing and increasingly sophisticated jurisprudence, with the subject correspondingly ill-adapted to strengths of the arbitral process, *i.e.*, expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity; and (4) the notion, suggestive of the proposition that

issues of war and peace are too important to be vested in the generals, that decisions as to antitrust regulation of business are too important to be lodged in arbitrators chosen from the business community – particularly those from a foreign community that has had no experience with or exposure to our law and values." [(205)]

This general approach prevailed for nearly half a century, following the enactment of the FAA, in the United States, and for several decades following the enactment of modern competition laws in Europe. In the mid-1980s, however, judicial and legislative attitudes began to shift. This occurred in parallel in a number of developed jurisdictions, including the United States, the European Union, France and elsewhere.

### [1] U.S. Antitrust Law

As discussed above, in *Mitsubishi Motors*, the U.S. Supreme Court held that, in international matters, federal antitrust claims could be validly subjected to an arbitration agreement. [(206)] Refusing to follow a uniform body of U.S. lower court authority holding antitrust claims nonarbitrable in the domestic context, [(207)] the Supreme Court held that, absent clear legislative direction, it would not conclude that statutory antitrust claims were nonarbitrable in the international context. [(208)] In the wake of *Mitsubishi*, U.S. courts have repeatedly held antitrust claims arbitrable in both international and domestic cases. [(209)]

P 1063
As discussed below, the *Mitsubishi* Court nonetheless acknowledged the public importance of antitrust claims. It made clear that U.S. courts would take a "second look" at an arbitral tribunal's decision applying the antitrust laws at the stage of award annulment and/or recognition, concluding that: "Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." [(210)] The content of this "second look" doctrine is discussed in detail below. [(211)]

Relatedly, U.S. regulatory authorities have recently displayed willingness to resort to arbitration to resolve antitrust disputes with private parties. In 2019, for example, after filing suit in a U.S. court seeking to block an acquisition on antitrust grounds, the Department of Justice agreed to submit the dispute (about application of the antitrust laws) to arbitration. [(212)]

P 1064
Of course, arbitrators may not exercise uniquely governmental or administrative functions, either under the U.S. antitrust laws or otherwise. An arbitral tribunal may not purport to approve (or disapprove) a merger, grant antitrust immunity from governmental prosecution or civil suits, or conduct a criminal investigation. These are matters reserved to governmental regulatory authorities (*e.g.*, the U.S. Department of Justice's Antitrust Division), and cannot be the subject of arbitral authority.

### [2] EU Competition Law

In parallel with developments in the United States, a series of judicial decisions in Europe during the past three decades held that EU competition claims are arbitrable (subject to subsequent judicial review). Early judicial decisions and arbitral awards raised questions regarding the arbitrability of EU competition claims. [(213)] As in the United States, however, attitudes shifted substantially in the late 20th century.

In *Eco Swiss China Time Ltd v. Benetton Int'l NV*, [(214)] the European Court of Justice ("ECJ") made clear in dicta that an arbitration agreement could validly be given effect with respect to EU competition claims (subject to judicial review of any resulting award). [(215)] More explicitly,
P 1065
national court decisions in France, Switzerland, Germany, Italy, Sweden, Spain and England have repeatedly held that EU and Member State competition law claims may validly and enforceably be the subject of an international arbitration agreement. [(216)] In the words of a leading decision of the Swiss Federal Tribunal:

> "The Swiss judge or arbitrator who has to decide on the validity of a contractual agreement concerning markets in the European Union examines this issue in the light of Art. 81 Rome Treaty [Art. 85 of the former Rome Treaty]. He must do so notwithstanding the fact that the parties agreed on the application of Swiss law to their contractual relationship." [(217)]

Similarly, the Madrid Court of Appeals held that:

> "We cannot see any reason … that precludes us from concluding that the

subjective rights of individuals that arise from Community competition law are susceptible to being waived (and thus of being subject to an arbitration agreement). … The application
P 1066
of public policy provisions to this case does not constitute a circumstance that renders the issue nonarbitrable." [(218)]

The arbitrability of competition law claims has also been confirmed by the 2014 EU Damages Directive. Recital 48 of that Directive provides that:

> "[I]nfringers and injured parties should be encouraged to agree on compensating for the harm caused by a competition law infringement through consensual dispute resolution mechanisms, such as out-of-court settlements (including those where a judge can declare a settlement binding), arbitration, mediation or conciliation. Such consensual dispute resolution should cover as many injured parties and infringers as legally possible. The provisions in this Directive on consensual dispute resolution are therefore meant to facilitate the use of such mechanisms and increase their effectiveness." [(219)]

At the same time, however, both the ECJ and Member States' courts have emphasized that arbitral awards deciding EU competition law claims will be subject to subsequent judicial review, [(220)] analogous to that under *Mitsubishi*'s "second look" doctrine in the United States. [(221)]

Despite the foregoing developments, the ECJ recently adopted an anomalous and ill-considered approach towards interpretation of a choice-of-court provision in a case concerning application of the jurisdiction clause to claims arising from an alleged cartel:

> "[T]he referring court must … regard a clause which abstractly refers to all disputes arising from contractual relationships as not extending to a dispute relating to the tortious liability that one party allegedly incurred as a result of the other's participation in an unlawful cartel. Given that the undertaking which suffered the loss could not reasonably foresee such litigation at the time that it agreed to the jurisdiction clause and that that undertaking had no knowledge of the unlawful cartel at that time, such litigation cannot be regarded as stemming from a contractual relationship. Such a clause would not therefore have validly derogated from the referring court's jurisdiction." [(222)]

The ECJ's analysis does not conclude that claims for damages arising from a cartel are nonarbitrable. Instead, the court implausibly construed a broad forum selection clause narrowly – contrary to the consistent approach of courts in European (and other) jurisdictions. [(223)]

An appellate court in the Netherlands has extended the ECJ's reasoning to arbitration agreements, holding that a claim for damages under EU competition law, arising from an alleged cartel, did not fall within the parties' arbitration agreement. [(224)] The appellate court held that:

> P 1067
> "[T]he wording of the present dispute resolution clause is clear in that it does not relate to disputes concerning liability for breach of the competition law. Instead, it refers in general (abstract) terms to disputes that may arise in contractual relationships …The [competition] dispute cannot therefore be considered to have its origin in the contractual relationship." [(225)]

Surprisingly, the analysis of the ECJ and the Dutch court made no reference to the text of the parties' choice-of-court and arbitration clauses, nor to the parties' evident commercial objective (of centralizing disputes arising from their relationship in a single forum). The Dutch decision also ignored the pro-arbitration canon of construction which, as discussed elsewhere, is mandated by the New York Convention and almost uniformly applied to international arbitration agreements. [(226)] The better approach is that of the U.S. Supreme Court, which held in *Mitsubishi Motors* that an international arbitration agreement should be interpreted expansively to encompass antitrust claims. [(227)]

*[3]* Other National Competition Laws

Likewise, decisions outside the United States and the EU have largely rejected arguments that particular competition law claims are nonarbitrable, including in Australia, New Zealand and

Canada. [228] As one court reasoned with respect to Australia's competition law:

> "[T]here is no reason in principle why the parties to a commercial contract cannot agree to submit to arbitration disputes which have arisen between them in relation to their rights and obligations under the Trade Practices Act. Indeed, it is consistent with the modern policy of encouragement of various forms of alternative dispute resolution, including arbitration, mediation and conciliation, that courts should facilitate, rather than impede, agreements for the private resolution of all forms of dispute, including disputes involving claims under statutes such as the Trade Practices Act." [229]

P 1068

In contrast, there are very few reported contemporary decisions holding competition claims nonarbitrable. One unusual exception was a recent decision from the Chinese Supreme People's Court that held that domestic competition law disputes were nonarbitrable, [230] following an earlier Chinese lower court decision that had held Chinese competition law claims nonarbitrable. [231] The Chinese courts cited the public law character of competition claims and the governmental interests associated with such claims. The decision of the Chinese Supreme Court does not address, and is out of step with, the overwhelming majority of contemporary international authorities addressing the arbitrability of competition law claims.

### [4] Arbitral Awards

Consistent with developments in national courts, arbitral tribunals have uniformly affirmed their power to entertain and decide competition law disputes. [232] Indeed, there appears to be no reported instance in the past four decades where an arbitral tribunal has held that an antitrust or competition law claim is nonarbitrable.

### [5] "Second Look" Doctrine and Judicial Review of Arbitral Awards

At the same time they have recognized the arbitrability of antitrust/competition law claims, national courts have emphasized that arbitral awards dealing with antitrust or competition law issues will be subject to subsequent judicial review. As noted above, in *Mitsubishi Motors*, the U.S. Supreme Court adopted a so-called "second look" doctrine, reasoning that "[h]aving permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." [233]

Similarly, in *Eco Swiss*, the ECJ made clear that Article 81 of the EU Treaty is a matter of public policy and that:

> "a national court to which application is made for annulment of an arbitration award must grant that application if it considers that the award in question is in fact contrary to Article 81 EC (ex. Art 85) where its domestic rules of procedure require it to grant an application for annulment founded on failure to observe national rules of public policy." [234]

In this context, the ECJ held that "the ordinary courts may have to examine those questions [of Community law], in particular during review of the arbitration award, which may be more
P 1069
or less extensive depending on the circumstances." [235] Decisions by EU Member State courts similarly confirm the availability of judicial review of arbitral awards addressing competition law claims. [236]

In both the United States and EU, national courts thus retain the opportunity to take a so-called "second look" at the application of the competition laws by the arbitrators. [237] As discussed below, the nature and extent of this subsequent judicial review is unsettled: in particular, it is unclear to what extent national courts can (or must) reexamine the substantive merits of the arbitrator's decisions on competition law matters.

Thus, U.S. courts have interpreted the "second look" doctrine narrowly, not to authorize extensive judicial review of arbitral tribunals' dispositions of antitrust issues. In one illustrative example, an appellate court held that "*Mitsubishi* did not contemplate that, once arbitration was over, the federal courts would throw the result in the waste basket and litigate the antitrust issues anew. That would just be another way of saying that antitrust matters are not arbitrable." [238] The application of the second look doctrine is discussed in detail below. [239]

A comparable approach has been adopted by the Swiss Federal Tribunal, which has held that review of an award made in Switzerland in an annulment proceeding will not consider the correctness of the arbitrators' application of mandatory law (at least where EC competition law is

concerned). In the Federal Tribunal's words:

> "There can be no doubt any longer: the provisions of any competition law whatsoever are not part of the essential and largely recognized values, which, according to the conception prevailing in Switzerland, should form the basis of every legal system. Therefore, the violation of such a provision does not trigger the application of SLPIL, Art. 190(2)(e) [providing for annulment of awards made in Switzerland]." [240]

P 1070
It is unclear, however, whether Swiss courts would adopt the same approach to awards made in Switzerland applying mandatory provisions of the applicable law chosen by the parties or of Swiss mandatory law (as distinguished from EC or EU law). [241]

*[6] Advance Waivers of Antitrust and/or Competition Law Claims*

Some national courts have also indicated that they may not give effect to dispute resolution arrangements that produce advance waivers of statutory antitrust and competition law protections. In *Mitsubishi Motors*, the U.S. Supreme Court reasoned in a footnote that:

> "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." [242]

The Court's apparent rationale was that parties could validly agree to submit their antitrust claims to international arbitration, but not to entirely waive those claims in advance. As discussed below, most subsequent U.S. decisions have concluded that this qualification concerning advance waivers of statutory rights is relatively narrow and does not sanction expansive application of notions of nonarbitrability or public policy. [243]

Recently, for example, the Supreme Court held that the U.S. antitrust laws do not invalidate waivers of rights to assert antitrust claims in a class arbitration: "[t]he antitrust laws do not 'evinc[e] an intention to preclude a waiver' of class-action procedure." [244] The Court also rejected the argument that a waiver of rights to assert claims in a class arbitration was invalid because it imposed financial obstacles that allegedly made the pursuit of antitrust claims untenable. [245] The Court recognized that, in some circumstances, an arbitration agreement might effectively preclude assertion of federal statutory rights and indicated, in those circumstances, that the agreement would be unenforceable. [246] But the Court confined such cases narrowly to contractual restrictions on the "right to pursue" claims, such as prohibitions against asserting such claims or "perhaps" impracticable filing or administrative fees. [247] The Court refused to
P 1071
extend this analysis to waivers of class actions rights that made it unattractive or uneconomical as a practical matter to pursue a claim. [248]

*[a] No Interlocutory Judicial Decision on Application of Antitrust Laws by Arbitral Tribunal*

Most U.S. courts have held that, if it is unclear whether the arbitral tribunal will actually apply U.S. antitrust (or other mandatory U.S.) laws, then the appropriate course is to stay U.S. litigation and allow the arbitration to proceed, rather than assuming that the arbitrators will not consider antitrust claims. [249] As noted above, *Mitsubishi Motors* involved an agreement to arbitrate in Japan and a Swiss choice-of-law provision, which arguably excluded application of U.S. antitrust claims by the arbitral tribunal. Nonetheless, the Supreme Court proceeded on the assumption that the tribunal would give appropriate effect to mandatory U.S. antitrust law. [250]

Applying this analysis, U.S. lower courts have generally refused to entertain claims that an arbitral tribunal (including a foreign-seated tribunal) will violate U.S. public policy or mandatory law by refusing to apply U.S. statutory protections. [251] There are some contrary U.S. lower court authorities, but these are exceptions to the general (and correct) rule adopted by U.S. courts. [252] Other national courts have reached conclusions similar to those of most U.S. courts. [253]

*[b] Effect of Waiver of U.S. Statutory Rights*

Despite language in *Mitsubishi* condemning advance waivers of U.S. statutory rights, U.S. courts have also generally upheld agreements to arbitrate notwithstanding choice-of-law provisions that concededly provide for the application of a foreign substantive law, including to the exclusion of U.S. antitrust or other statutory protections. In these cases, it is not uncertain, but instead conceded (or entirely clear), that a foreign arbitral tribunal will not apply U.S.
P 1072
statutory protections, and U.S. courts have considered whether, nonetheless, to give effect to the

agreement to arbitrate and choice-of-law provision.

In these circumstances, U.S. courts have frequently given effect to arbitration agreements, even when combined with conceded waivers of U.S. statutory protections, but have generally done so only after considering the content of the foreign law chosen by the parties' choice-of-law agreement and concluding that it is broadly similar to U.S. law. That is best illustrated by a series of U.S. lower court decisions upholding the enforceability of arbitration and foreign choice-of-law agreements that had the conceded effect of excluding more favorable U.S. federal securities law protections. [254] In enforcing contractual dispute resolution provisions that had the effect of excluding otherwise applicable U.S. federal law, the U.S. courts emphasized that the selected foreign law provided comparable substantive protections to those of U.S. law. [255]

The same analysis has been adopted in other statutory contexts, with a number of U.S. courts holding that waivers or exclusions of U.S. statutory rights would be upheld, provided that the parties' chosen law provided broadly similar protections to those available under U.S. law. [256] Lower court authority, although limited, suggests that the same result would apply to U.S. federal antitrust claims. [257]

*[c] Effect of Waiver or Loss of Statutory Damage Claims*

It is unclear how U.S. courts will treat arbitration agreements or awards involving claims for statutory damages in excess of compensatory damages (*e.g.*, treble damages under the U.S.
P 1073
antitrust or RICO legislation). In *Shearson/American Express Inc. v. McMahon*, [258] the U.S. Supreme Court rejected the argument that RICO claims were nonarbitrable because of the availability of treble damages in a civil RICO action. It was not clear, however, whether the Court concluded that treble damage claims could be pursued in arbitration or that they could not be; the Court held only that the availability of compensatory damages in arbitration sufficed to permit enforcement of the arbitration agreement.

In subsequent decisions, the Supreme Court has made clear, however, that the decision whether or not to award treble damages (or similar sorts of relief) is in the first instance for the arbitrators, subject to later judicial review in an annulment or recognition action. [259] As noted above, under this analysis, U.S. courts are not to deny effect to arbitration agreements based upon the possibility that arbitrators may not apply mandatory U.S. statutory protections or award treble (or other) damages required by mandatory U.S. law. [260] Moreover, lower U.S. courts have suggested that the unavailability of the same remedies in arbitral proceedings as may be available in U.S. litigation, does not prevent recognition of an award. [261]

\* \* \* \* \*

The result of the foregoing developments in most developed jurisdictions has generally been to confine the nonarbitrability doctrine, in the context of antitrust or competition law claims, to those matters as to which regulatory bodies are plainly assigned exclusive jurisdiction (*e.g.*, granting exemptions from antitrust laws, approving mergers or other transactions). As to the civil law consequences of competition law violations between individual parties, it is now almost universally recognized that such matters may validly be submitted to international arbitration. National courts also generally hold that subsequent judicial review of awards dealing with public policy and mandatory law claims is necessary, but the extent and nature of this review is generally limited. [262]

## [B] Securities Claims

Securities issuances and transactions are highly-regulated in most developed jurisdictions and frequently include provisions forbidding or limiting waivers of applicable judicial or
P 1074
administrative remedies. [263] As a consequence, disputes involving securities laws and regulations have not infrequently raised nonarbitrability issues.

### [1] U.S. Securities Law

The most extensive decisions concerning the arbitrability of securities law claims are in the United States, where the case law mirrors developments in the antitrust/competition fields. As discussed above, the U.S. Supreme Court's 1953 decision in *Wilko v. Swan* held that statutory claims for securities law violations were nonarbitrable:

> "When the security buyer, prior to any violation of the Securities Act, waives his right to sue in court, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts and venue. He thus surrenders one of the advantages the Act gives him." [264]

The *Wilko* Court also criticized the procedures available in an arbitration of securities law claims, declaring, in terms reminiscent of language used by some 19th century judicial critics of arbitration,

that the arbitral tribunal would receive no "judicial instructions on the law," that their "award may be made without explanation of their reasons and without a complete record of their proceedings," and that judicial "power to vacate an award is limited." [265]

Despite this, only two decades later, the U.S. Supreme Court held in *Scherk v. Alberto-Culver Co.* that a statutory federal securities law claim was arbitrable, at least in an international arbitration subject to the New York Convention. The Court reasoned that, while a domestic securities buyer might be waiving procedural advantages in agreeing to arbitrate, "in the context of an international contract, … these advantages become chimerical since … an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice." [266] As discussed above, the Court also stressed the significance of the New York Convention and the damage that expansive applications of the nonarbitrability doctrine by national courts would cause to the Convention's objectives. [267]

Paralleling developments in the antitrust field, [268] *Scherk* was followed by subsequent U.S. Supreme Court decisions overruling *Wilko v. Swan*, even in the purely domestic context. Thus, the Court declared in *Rodriguez de Quijas v. Shearson/American Express Inc.* that *Wilko* had reflected "the old judicial hostility to arbitration" which could no longer be accepted. [269] U.S.

P 1075

courts have similarly held that so-called "RICO" claims, in both international and domestic settings, are arbitrable. [270]

## [2] Advance Waivers of U.S. Securities Claims

As noted above, U.S. courts have held in many contexts that the determination whether or not an arbitration agreement and choice-of-law provision operate to violate U.S. public policy is to be made *after* an arbitral award is rendered. [271] U.S. courts decline to hold particular claims or disputes nonarbitrable based upon the possibility that the arbitrators will not apply U.S. statutory protections, or will not apply adequate foreign protections, in future arbitral proceedings. Rather, they generally hold that the arbitration should proceed and that a decision regarding possible violations of U.S. public policy or mandatory law protections be made subsequently, after an award has been made, in an enforcement or annulment proceeding. [272]

Despite this general approach, U.S. courts have considered a series of cases in which U.S. securities purchasers agreed to arbitration seated in England, subject exclusively to English law (which was interpreted to exclude statutory U.S. securities law protections). The result of these choice-of-law provisions was to substitute less expansive English common law fraud principles for more expansive statutory U.S. protections. U.S. decisions considering these arrangements almost unanimously concluded that the combination of arbitration/choice-of-law provisions did not render the dispute nonarbitrable or otherwise violate U.S. public policy. [273]

P 1076

Central to most of these courts' analyses, however, was a conclusion that the foreign law selected by the parties to govern their dispute would provide "available remedies and potential damages recoveries [sufficient] to deter deception of American investors." [274] Where foreign law fails to provide such remedies (with respect to transactions otherwise subject to the U.S. federal securities laws), [275] some U.S. courts have suggested that they would decline to give effect to an arbitration/choice-of-law clause which excludes the application of U.S. statutory provisions. [276] The weight of authority holds, however, that the appropriate course is to permit the arbitrators to decide the parties' dispute (including interpreting any applicable choice-of-law clause and mandatory national laws) and reserve issues of public policy until award annulment and recognition. [277]

## [3] Other National Securities Laws

Under German law, arbitration agreements in securities transactions involving merchants, including securities professionals and state entities are valid and the underlying securities law claims are arbitrable. [278] Historically, a series of German judicial decisions held that securities disputes involving non-merchants were arbitrable provided that the arbitral seat was in Germany and that German law was applicable; in contrast, agreements to arbitrate under foreign law in a foreign arbitral seat were apparently unenforceable on the grounds that mandatory German securities laws could be disregarded without the possibility of subsequent German judicial review. [279]

In 2002, German securities legislation was amended to provide that arbitration agreements involving consumers are valid only if concluded after the dispute has arisen. [280] The new German legislation was designed to end discrimination against foreign tribunals. It has, however, correctly been criticized on the grounds that the different treatment of existing and future disputes is incompatible with Article II(1) of the New York Convention. [281]

P 1077

The German Bundesgerichtshof has nonetheless upheld the German securities legislation, reasoning that its restrictions should be characterized as matters of capacity (to agree validly to arbitrate) and that Articles II and V(1)(a) permit application of the personal law of a party to questions of capacity. [282] Accordingly, the Bundesgerichtshof held that an agreement by a German

consumer to arbitrate future securities disputes outside Germany, although presumptively governed by the law of the arbitral seat, can be invalidated under German law, on the theory that German law governs the capacity of a German consumer to conclude an arbitration agreement.

The Bundesgerichtshof's decision is deeply flawed and contrary to the New York Convention. As discussed above, it is impossible to characterize prohibitions against the arbitration of particular categories of future disputes as "capacity" limitations; such prohibitions are, instead, properly regarded as rules of substantive validity of arbitration agreements (or, less clearly, nonarbitrability rules).

The characterization of rules invalidating agreements to arbitrate future securities disputes as issues of "capacity" purportedly permits German courts to deny recognition of agreements to arbitrate under local (German) law. The German rule does not do so, however, on the basis of a generally-applicable rule of capacity (that affects the capacity of securities purchasers generally to conclude contractual relations); rather, the German rule is directed specifically at the validity of one particular type of agreement (*i.e.*, certain types of arbitration agreements). Treating such a rule as an issue of "capacity," as the German legislation does, plainly circumvents Article V(1)(a)'s uniform choice-of-law regime for the law governing arbitration agreements, contrary to the text and obvious purpose of the Convention. [283]

Moreover, as discussed above, Article II(1) of the Convention does not permit Contracting States to differentiate between existing and future disputes, whether in nonarbitrability rules or otherwise. [284] The German legislation improperly does precisely this, again in violation of Germany's commitments under the Convention.

## [C] Corruption and Bribery [285]

Disputes involving claims of corruption, bribery, or similar illegality have long raised issues of arbitrability. In the same fashion as antitrust and securities claims, however, the scope of
P 1078
the nonarbitrability doctrine as applied to corruption claims has progressively narrowed in the past several decades. Apart from the adjudication of criminal and administrative liability, and the imposition of associated sanctions, civil claims and defenses of corruption, bribery and related wrongdoing are now capable of settlement by arbitration under virtually all legal systems.

As discussed above, early judicial decisions frequently concluded that challenges to the legality of the parties' underlying contract also implicated the associated arbitration clause, requiring judicial resolution of the dispute. [286] Similarly, arbitral tribunals historically evidenced considerable reluctance to resolve matters involving claims of corruption or bribery.

An early arbitral award by a well-known Swedish arbitrator (Gunnar Lagergren) apparently declined jurisdiction over a claim for commissions owed to an agent who had been retained to bribe Latin American government officials. Lagergren relied on "general principles denying arbitrators the power to entertain disputes of this nature," rather than a specific national law, reasoning:

> "It cannot be contested that there exists a general principle of law recognized by civilized nations that contracts which seriously violate *bonos mores* or international public policy are invalid or at least unenforceable and that they cannot be sanctioned by courts or arbitrators." [287]

Accordingly, Lagergren held that "parties who ally themselves in an enterprise of the present nature must realize that they have forfeited any right to ask for assistance of the machinery of justice (national courts or arbitral tribunals) in settling their disputes," [288] and concluded "jurisdiction must be declined in this case." [289]

More recent awards and national court decisions have correctly rejected Lagergren's analysis as overbroad, and instead confirmed the competence of arbitrators to resolve claims of illegality, including bribery and corruption. Accordingly, arbitral tribunals have frequently considered disputes where one party claims that the parties' underlying contract was tainted by, or invalid because of, illegality, or that it is not obligated to perform an illegal contract. [290] Rather than dismissing such disputes on jurisdictional or nonarbitrability grounds, tribunals have ordinarily entertained illegality/corruption claims and made awards on the merits, either upholding those claims or rejecting them. [291]

P 1079
National courts have also generally made clear that arbitral tribunals may consider and resolve claims of corruption, bribery and related illegality. [292] A decision of the English Court of Appeal held that this was a logical corollary of the separability presumption. The court reasoned that "if arbitrators can decide that a contract is void for initial illegality, there is no reason why they should not decide whether a contract has been procured by bribery." [293] In another case, the Court of Appeal was even more categorical, holding that:

> "in the ordinary way an arbitrator has jurisdiction to find facts which constitute a criminal offence (fraud being an all too common example) or that in an appropriate case an arbitrator also has jurisdiction to find that a criminal offence has been committed ... it is necessary to distinguish between a finding of criminal conduct and a conviction which provides the basis for a penal sanction." [(294)]

Similarly, the Swiss Federal Tribunal has held that an arbitral tribunal is empowered to examine, as a preliminary question, whether criminal acts were committed that affected the main contract. [(295)]

One exception to this approach is a Pakistani Supreme Court judgment, which apparently concluded that claims of fraud could not be arbitrated. [(296)] That decision will hopefully not survive Pakistan's ratification of the New York Convention, and clearly contradicts the Convention's requirements that applications of the nonarbitrability doctrine be narrowly-tailored to achieve specific and non-idiosyncratic local public policies. [(297)] On any view, a prohibition against the arbitrability of fraud or tort claims must be considered inconsistent with state practice under the Convention (where virtually all Contracting States permit arbitration of such claims) and with the Convention's structural requirements that the nonarbitrability doctrine be applied with restraint, as an exception to the Convention's policies. [(298)]

P 1080

## [D] Intellectual Property Claims [(299)]

Patent, copyright and trademark claims have also raised questions of nonarbitrability, because of the state's substantial involvement in granting and regulating such intellectual property rights. As with competition, securities and corruption claims, [(300)] the past several decades have witnessed a progressive retrenchment of historic nonarbitrability principles in the intellectual property field. This is graphically illustrated by the establishment of the institutional arbitration mechanism of the World Intellectual Property Organization ("WIPO"), specifically for the arbitration of intellectual property claims. [(301)]

The most delicate arbitrability issues in this context arise with claims concerning the validity of patents, copyrights, or trademarks, aspects of which are deemed nonarbitrable in many jurisdictions. In Europe, EU law provides that disputes directly concerning the validity or existence of registered intellectual property rights are nonarbitrable, instead being subject to the exclusive jurisdiction of specified national courts. [(302)] Aside from this core area of nonarbitrability, disputes involving patent and other intellectual property claims are generally arbitrable in the EU. [(303)] Swiss law is similar in permitting a broad range of intellectual property claims to
P 1081
be arbitrated. [(304)] Other civil law jurisdictions are generally similar. [(305)]

In the United States, the historic rule was that patent disputes were nonarbitrable. [(306)] In 1983, however, federal legislation was enacted which reversed this position and provided that patent disputes (including issues of validity, infringement and ownership) are arbitrable. [(307)] Outside the patent context, U.S. lower courts have also held that copyright disputes (including issues of validity, infringement and ownership) [(308)] and trademark issues [(309)] are arbitrable.

Similarly, in a landmark 2003 ruling, the Supreme Court of Canada overturned a Québec Court of Appeal decision and held that intellectual property matters, including particularly copyright issues, are arbitrable. [(310)] The court correctly held that the lower court's contrary ruling was "inconsistent with the trend in case law and legislation, which has been, for several decades, to accept and even encourage the use of civil and commercial arbitration, particularly in modern western legal systems, both common law and civil law." [(311)] The court concluded:
P 1082
"If Parliament had intended to exclude arbitration in copyright matters, it would have clearly done so." [(312)]

Legislative developments have also expanded the arbitrability of intellectual property claims. In 2018, Hong Kong amended its arbitration legislation to provide expressly that intellectual property claims are arbitrable. [(313)] The legislation also provides that certain arbitral awards that deal with intellectual property rights may not be challenged on public policy grounds. [(314)]

There are very few exceptions to these international developments. One contrary decision was by the Indian Supreme Court, which recently held that certain disputes involving patents, trademarks and copyrights are nonarbitrable. [(315)] The court's decision, which arose in a domestic setting, was based on local precedents and did not address the weight of authority in other jurisdictions. [(316)] Moreover, the decision's meaning is uncertain, resting on a distinction between allegations of fraud (which are arbitrable) and serious fraud (which are assertedly nonarbitrable). [(317)]

Arbitral tribunals have reached similar results in deciding the scope of the nonarbitrability doctrine

as applied to intellectual property disputes. Most tribunals have had little difficulty concluding that they have the competence to resolve disputes about the performance of contracts concerning intellectual property rights (*e.g.*, patent, copyright and trademark licenses). [318] On the other hand, arbitrators have occasionally shown reluctance to resolve disputes involving the validity or existence of intellectual property rights. [319]

Nonetheless, in principle, there is no reason that issues of patent, copyright and trademark validity cannot be resolved by arbitration – but only insofar as the parties to the arbitration are concerned. An arbitral tribunal obviously cannot effect registrations of intellectual property

P 1083

rights or invalidate a patent generally, thereby affecting the rights or obligations of the public or third parties. There is no reason, however, that an arbitral tribunal cannot apply rules of intellectual property law in other contexts to decide claims between the contracting parties that a particular intellectual property right is invalid or does not exist, as well as whether such rights have been infringed. Indeed, determining the validity or invalidity, and legal effects, of intellectual property rights as between the parties to the arbitration is fundamental to the tribunal's mandate of resolving their dispute in accordance with applicable law and cannot properly be disregarded or omitted.

## [E] Trade Sanctions, Embargoes and Controls

It is also sometimes argued that disputes implicating national or international trade sanctions, embargoes, or export controls are nonarbitrable. Some early national court decisions contained broad language suggesting that any dispute requiring consideration of trade regulations was nonarbitrable. [320] As in other fields, however, most contemporary national courts and arbitral tribunals have rejected this view and concluded that arbitrators may consider the consequences of trade regulations and embargoes for the parties' contracts. [321] Of course, even under this view, arbitral tribunals may not purport to impose administrative or criminal sanctions associated with trade embargoes or regulations.

A striking example of the decline of the nonarbitrability doctrine in this field involves claims under U.S. law requesting U.S. governmental regulatory investigation of allegedly unfair trade practices. [322] Although the investigation is conducted by an administrative agency (rather

P 1084

than a private party), with the power to impose administrative sanctions, the statute allows investigations to be suspended pursuant to an agreement to arbitrate between the parties. [323]

## [F] Bankruptcy and Insolvency [324]

Parties to international arbitration agreements sometimes become subject to some form of bankruptcy or insolvency, either in their home jurisdiction or elsewhere. [325] In most jurisdictions, only national courts (often specialized courts) have the authority to commence, administer and wind-up bankruptcy proceedings, including proceedings that liquidate a bankrupt company, reschedule its liabilities, operate it under some form of receivership or administration, or distribute pro rata payments to designated creditors and owners. Disputes concerning these "core" bankruptcy functions are almost universally considered nonarbitrable, whether in domestic or international arbitrations, under the laws of developed jurisdictions. [326]

P 1085

It is much more controversial, however, whether and when disputes merely involving a bankrupt entity as a party, or raising questions of bankruptcy law (*e.g.*, the continued effect of a contract), may be resolved in arbitration. Different national legislative regimes and judicial decisions have reached different conclusions about these types of disputes. In many such cases, the desirability of a centralized forum for resolving all disputes involving the bankrupt entity is weighed against that entity's preexisting commitment to resolve disputes with a contractual counter-party by international arbitration, with different legal systems adopting different resolutions of these competing interests. Again, however, the weight of authority, particularly in recent years, supports narrow nonarbitrability rules in this context.

### *[1]* National Legislation Imposing Absolute Prohibition Against Arbitration by Insolvent Entities

In some jurisdictions, the bankruptcy of a party is treated as an issue of the continued validity and efficacy of the bankrupt entity's arbitration agreement, while in other jurisdictions it is treated as a matter of nonarbitrability. As noted above, in a few states (*e.g.*, Latvia), [327] local law purportedly invalidates all arbitration agreements to which a bankrupt entity is party. [328] These national law rules can be characterized as either rules of substantive validity, having the effect of invalidating a previously-valid arbitration agreement, or as rules of capacity, assertedly having the effect of withdrawing the insolvent entity's capacity. [329]

Other national bankruptcy legislation adopts a somewhat different approach. Under Dutch law, any monetary claim against the bankrupt must mandatorily be resolved in special bankruptcy proceedings, rather than arbitration, apparently reflecting a rule of nonarbitrability. [330] Similarly, in

Italy, all monetary claims against an insolvent company must be brought exclusively in a specialized bankruptcy court. [(331)] Slightly differently, in Portugal, the effects of arbitration agreements to which an insolvent entity is party, and which may affect the validity

P 1086

of that party's estate, are suspended during the bankruptcy proceedings. [(332)] A few other jurisdictions also appear to impose automatic stays of arbitral proceedings, or similar suspensions, involving a party that has entered insolvency. [(333)]

*[2]* National Legislation Imposing No Prohibitions Against Arbitration by Insolvent Entities

In other jurisdictions, the bankruptcy or insolvency of a party does not affect its obligations under preexisting arbitration agreements, which remain binding on the company and any bankruptcy trustee or administrator. That is the case in Switzerland, at least with regard to international arbitration agreements. [(334)] Likewise, aside from "core" bankruptcy issues, contractual disputes involving a bankrupt company remain subject to arbitration, pursuant to the bankrupt's preexisting arbitration agreements, in France [(335)] and Germany. [(336)]

P 1087

Even where an insolvent party's arbitration agreement remains valid following commencement of bankruptcy proceedings, and even if disputes involving the insolvent entity are arbitrable, it is sometimes argued that, any arbitral proceedings should be stayed as a discretionary matter. [(337)] In some jurisdictions, public policy is relied upon as a basis for requiring a mandatory stay of arbitration against the insolvent/bankrupt party. [(338)] Other jurisdictions leave decisions whether to stay arbitral proceedings to the arbitral tribunal's discretion. [(339)]

*[3]* National Legislation Providing Case-by-Case Rules Regarding Arbitration by Insolvent Entities

In a number of jurisdictions, courts adopt what is best described as a case-by-case approach, considering the circumstances of particular insolvent parties and the arbitration agreements and proceedings to which they are party. That is true, for example, in Spain, where Spanish insolvency legislation provides that arbitration agreements may be suspended during the pendency of the insolvency on the order of the bankruptcy court. [(340)] Similarly, in England, the trustee for the bankrupt entity's affairs is granted the power to disclaim the bankrupt's contracts; alternatively, a bankruptcy tribunal is granted discretion to require that otherwise

P 1088

arbitrable disputes be decided in the context of judicial bankruptcy proceedings. [(341)] Similarly, an English court has held that, in some instances, arbitration legislation "trumps" insolvency rules, and that liquidators therefore must arbitrate disputes which the bankrupt party had agreed to resolve by arbitration. [(342)]

Likewise, in Singapore, the Court of Appeal recently held that if arbitration of a dispute would "affect the substantive rights of other creditors," or arise from "the operation of the statutory provisions of the insolvency regime *per se*," then the dispute would be nonarbitrable; conversely, the dispute would be arbitrable when it does not. [(343)] Citing a prior edition of this Treatise, the court also observed that, with respect to disputes resolved pursuant to pre-insolvency agreement to arbitrate, there would generally be no reason not to give effect to the parties' agreement:

> "[I]n instances where the agreement is only to resolve the prior private *inter se* disputes between the company and another party there will usually be no good reason not to observe the terms of the arbitration agreement. … [A]llowing a creditor to arbitrate his claim against an insolvent company in such circumstances does not undermine the insolvency regime's underlying policy aims." [(344)]

The clearest example of a jurisdiction requiring case-by-case analysis of particular bankruptcy and arbitration proceedings, in order to determine whether to give effect to the arbitration agreement, is the United States. Under U.S. law, companies seeking bankruptcy protection generally remain bound by their preexisting international arbitration agreements, the filing of bankruptcy proceedings does not, in and of itself, invalidate the bankruptcy applicant's existing contracts (including their arbitration agreements). [(345)]

P 1089

Nonetheless, although the bankruptcy applicant's arbitration agreements remain binding, the "automatic stay" provision of U.S. federal bankruptcy law suspends all legal proceedings against the putatively bankrupt company, subject to court order which can permit particular proceedings to continue. [(346)] In deciding whether to permit particular proceedings to go forward, U.S. courts generally require debtors to perform their pre-existing arbitration agreements, [(347)] particularly as to claims that do not involve "core" bankruptcy matters. [(348)] That is

P 1090

especially true with respect to international arbitration agreements. One frequently-cited U.S. lower court decision explained this approach, ordering an insolvent party to honor its international arbitration agreement because:

> "In weighing the strong public policy favoring international arbitration with any countervailing potential harm to bankruptcy policy upon the present facts, the Court finds the scales weighed in favor of arbitration. … [N]o major bankruptcy issues will be implicated in valuing contract damages and the international arbitration panel requires no special expertise to accomplish their task. While international arbitration will require a temporary and limited incursion into the Bankruptcy Court's exclusive jurisdictional bailiwick, no bankruptcy policies will suffer adverse impact. Conversely, the very image of the United States in the international business community stands to be tarnished. It is important and necessary for the United States to hold its domiciliaries to their bargains and not allow them to escape their commercial obligations by ducking into statutory safe harbors." [349]

Nevertheless, there are exceptions, where U.S. courts have refused to compel arbitration on the grounds that the dispute at issue concerns a "core" bankruptcy matter promised on the provisions of the Bankruptcy Code and arbitral proceedings against the debtor would conflict with the purposes of the Bankruptcy Code. [350] In an influential decision, *In re United States Lines, Inc.*, [351] the Second Circuit attempted to prescribe generally-applicable rules for the treatment of arbitration agreements involving an insolvent company. In so doing, the court articulated a pro-arbitration standard in determining whether the automatic stay should be lifted in order to allow an arbitration involving the debtor to proceed. Among other things, the *United States Lines* court held that "the [FAA] as interpreted by the Supreme Court dictates that an arbitration clause should be enforced unless doing so would seriously jeopardize the objectives of the [Bankruptcy] Code." [352] The court also held:

> P 1091
> "even a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration … not all core bankruptcy proceedings are premised on provisions to the Code that 'inherently conflict' with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code." [353]

Consistent with this approach, a number of U.S. lower courts have conducted case-by-case analyses as to whether the circumstances of particular bankruptcy proceedings, and particular arbitrations, justified overriding the parties' agreement to arbitrate; even in so-called "core bankruptcy" proceedings, a case-by-case assessment of the needs of the bankruptcy process is required to overcome an otherwise valid arbitration agreement. [354]

Lower courts have also held that a particular showing of need is required to overcome an international, as distinguished from a domestic, arbitration agreement. In the words of one court, "[w]ith respect to international agreements, the Court has less discretion to deny motions to arbitrate than it does with respect to domestic agreements." [355] U.S. courts have also
P 1092
upheld the validity of international arbitration agreements notwithstanding pending foreign bankruptcy proceedings. [356]

Under U.S. bankruptcy law, the bankruptcy trustee or debtor-in-possession may assume or reject any executory contracts – that is, contracts with substantial obligations remaining unperformed on both sides – that it has with creditors. [357] There is scant authority as to whether a debtor or trustee remains bound by a pre-existing arbitration clause when the trustee rejects the executory contract containing that arbitration clause. Some lower courts have held that the arbitration agreement survives rejection of the underlying contract, [358] basing their decision on long-standing principles that rejection of an executory contract "does not alter the substantive rights of the parties." [359] With respect to a nonexecutory contract, meaning one that is fully performed at least on one side, the trustee does not have a choice to reject the contract and remains bound to the debtor's pre-petition obligations, including any arbitration agreement contained within the nonexecutory contract. [360]

### [4] Effect of Foreign Insolvency Legislation on Arbitrations Seated Abroad

International arbitral proceedings occasionally present the question whether rules in an insolvent party's home jurisdiction, providing for the invalidity of arbitration agreements or nonarbitrability of claims of an insolvent entity, should be given effect in other jurisdictions. For example, if a Polish (or Portuguese) company agrees to arbitrate in Switzerland (or England) then Polish (or Portuguese)

bankruptcy legislation will likely be invoked in Swiss (or English) arbitral proceedings and, potentially, in annulment or similar Swiss (or English) judicial proceedings. Although different courts have reached different results, both national courts and arbitral tribunals have generally been reluctant to give automatic effect to foreign bankruptcy legislation that forbids arbitration by an insolvent party.

A representative approach was that of the English Court of Appeal in an arbitration, seated in England, involving an insolvent Polish entity which argued that, under Polish law, it lacked
P 1093
the capacity to continue to arbitrate. [361] (As noted above, prior Polish bankruptcy legislation provides that "[a]n arbitration agreement concluded by the bankrupt shall lose its force from the date of the declaration of bankruptcy and pending proceedings shall be subject to discontinuance." [362] ). The English court upheld the arbitral tribunal's refusal to discontinue arbitral proceedings against the insolvent Polish entity; the English court reasoned that the Polish legislation addressed issues of capacity and that the applicable EU Insolvency Regulation provided for application of English, not Polish, law to the capacity of a party to English-seated arbitral proceedings. [363] The English court concluded that, under English law, the Polish company retained its capacity to arbitrate, notwithstanding Polish legislation allegedly withdrawing that capacity. [364]

In contrast, the Swiss Federal Tribunal reached (largely) the opposite result, in an arbitration seated in Switzerland involving the same insolvent Polish entity, which again argued that it no longer possessed the capacity to participate in arbitral proceedings. [365] The Federal Tribunal reasoned, based on the expert evidence submitted to it, that the Polish insolvency legislation should be characterized as a matter of capacity, to which (under Article V(1)(a) of the Convention and Swiss law) the insolvent company's personal law was applicable. [366] Upholding the arbitral tribunal's similar conclusion, the Federal Tribunal held that, in the case of a Polish company, its personal law was Polish law, which denied it capacity to participate in arbitral proceedings. [367]

The decision of the Swiss Federal Tribunal attracted a measure of criticism, [368] reflected by the observation by a Swiss practitioner that "[t]he Swiss Federal Supreme Court got it wrong, wrong, wrong, and wrong a fourth time." [369] In a subsequent decision, involving ap
P 1094
plication of Portugal's insolvency legislation (providing for effects arguably similar to that of Poland's legislation), the Swiss Federal Tribunal emphasized that its previous interpretation of the Polish bankruptcy law was narrowly limited, [370] and refused to characterize Portuguese law as withdrawing Portuguese companies' capacity to participate in arbitral proceedings. [371] According to the Federal Tribunal:

> "When the foreign entity is a legal person according to its status at the place of incorporation, it is also capable of standing as a party in an international arbitration seated in Switzerland. Possible limitations of the legal status as a person or a legal entity that are specific to the arbitral proceedings and leave the legal personality of the foreign entity untouched, are fundamentally irrelevant from the point of view of the capacity to be a party to an arbitration seated in Switzerland. … [I]f Art. 87 p-IL [the relevant provision of the Portuguese Insolvency Law] prevented an insolvent Portuguese entity from appearing as a party in a Portuguese arbitration, this would have no influence on its capacity to be a party in an international arbitration seated in Switzerland. It is decisive in this respect that Portuguese law affords the Appellant a legal personality through which it may be allocated rights and obligations." [372]

The Federal Tribunal instead applied Swiss law (as the law of the arbitral seat) to the substantive validity of the arbitration agreement, upholding the agreement's validity and requiring the insolvent Portuguese party to honor its agreement to arbitrate in Switzerland. [373] This subsequent holding of the Swiss Federal Tribunal, like that of the English Court of Appeal, reflects the general reluctance of national courts to give automatic effect to foreign bankruptcy legislation purporting to invalidate international arbitration agreements. [374]

### [5] Arbitral Awards

In practice, most international arbitral tribunals have proceeded with arbitrations notwithstanding the pendency of bankruptcy proceedings involving one of the parties in that party's home jurisdiction. [375] Tribunals have usually rejected arguments, based on national insolvency
P 1095
law, that the arbitration agreement became invalid or that the arbitration could not proceed, [376] often requiring at a minimum clear and convincing evidence that a foreign law applicable to a party prohibits its continuing participation in bankruptcy proceedings and that this law should be recognized. [377]

Tribunals have also generally been reluctant to stay arbitral proceedings based on a pending insolvency involving one of the parties:

> "Even in circumstances in which the suspension seems mandatory, if the other party – with full awareness of the relevant particulars – requests to proceed with the arbitration, the arbitrator should refuse to suspend the proceedings, for no one knows best what suits the party's interests than the party itself." [378]

Arbitral awards are almost uniformly consistent with this view. [379]

*[6]*
P 1096
Future Directions: Insolvency and Nonarbitrability

The correct analysis of the effects of the bankruptcy of a party on an international arbitration agreement, and application of the nonarbitrability doctrine in these circumstances, is complex. The insolvency of parties in these circumstances presents both choice-of-law and nonarbitrability issues.

Where the law governing the bankruptcy of a party to an international arbitration agreement provides for the invalidity of the bankrupt's arbitration agreements, a choice-of-law analysis is necessary. In general, only where the law governing the bankruptcy also governs the arbitration agreement, and provides for its invalidity, or (arguably) the incapacity of the bankrupt party, will the agreement potentially be invalid. That is, where a bankruptcy law does not govern either the substantive validity of the arbitration agreement or the capacity of the insolvent entity, then there is no basis for applying that law to suspend or terminate the arbitral proceedings or invalidate the arbitration agreement.

The better view is also that the effects of bankruptcy or insolvency legislation should generally not be characterized as issues of capacity, governed by the personal law of a party (typically, the law of the insolvent party's home jurisdiction). As discussed above, the scope of the concept of "capacity" for purposes of the New York Convention should not be governed by national law, but rather by a uniform international definition of the concept; [380] under that international definition, the consequences of insolvency should not be regarded as affecting the "capacity" of a party, but rather should be characterized as an issue concerning the substantive validity of that party's contractual rights and obligations.

This conclusion avoids the undesirable possibility that every Contracting State would be free, through application of local insolvency legislation (and otherwise [381] ), to invalidate the international arbitration agreements of local parties – which would materially undercut the purposes of the Convention and frustrate parties' legitimate commercial expectations. This analysis is consistent with that of the Swiss Federal Tribunal, discussed above, holding that Portuguese bankruptcy legislation which putatively "prevented an insolvent Portuguese entity from appearing as a party in a Portuguese arbitration … would have no influence on its capacity to be a party in an international arbitration seated in Switzerland." [382]

Even where a foreign bankruptcy law governs an arbitration agreement, the applicable bankruptcy law would be required to be consistent with the New York Convention's prohibitions against discriminatory national legislation. In particular, a law singling out only arbitration agreements (or, worse, only international arbitration agreements), but not other contracts, for invalidity or similar consequences in bankruptcy would contradict these prohibitions and be precluded by Article II of the Convention. [383] The better view is that the Convention requires, consistent with the prevailing practice of most states, a reasoned, case-by-case analysis of the needs of a particular insolvency proceeding and the impact of enforcement of an international arbitration agreement on those proceedings, before the agreement to arbitrate may be denied effect. [384] Moreover, again consistent with the weight of better-reasoned national court
P 1097
authority, there should be a strong presumption in cases involving international arbitration agreements that such agreements will be given effect. [385]

Exceptionally, a state might, consistent with the nonarbitrability exception in Articles II(1) and V(2)(a) of the Convention, treat some or all of the disputes involving a bankrupt party as nonarbitrable and deny effect to the arbitration agreement or arbitral award in its own courts. This would not, however, require other states to give effect to such results, although they may exceptionally do so for reasons of their own public policy. [386] This result is consistent with the approach of most arbitral tribunals, which continue arbitral proceedings, notwithstanding foreign bankruptcy laws, leaving open the possibility of nonrecognition of the arbitral award in the state whose bankruptcy legislation and proceedings are at issue. [387]

# [G] Employment and Labor Disputes [388]

There is substantial diversity among states in their treatment of agreements to arbitrate employment

and labor disputes. Some states regard arbitration as unsuitable for labor or employment-related disputes, and hold agreements to arbitrate such disputes unenforceable, while other states consider that arbitration is superior to judicial and other forms of dispute resolution for labor disputes and both enforce and therefore encourage agreements to arbitrate in employment settings.

*[1] Jurisdictions Treating Labor Disputes as Nonarbitrable*

Historically, many national legal systems treated various sorts of labor or employment-related claims as nonarbitrable. Despite the evolution of the nonarbitrability doctrine in other contexts, that remains the case in many European jurisdictions, including Belgium, [389] Italy, [390]
P 1098
England [391] and France. [392] Similar legislation exists in other jurisdictions. [393]

Moreover, despite the general approach of French courts to the allocation of jurisdictional competence, it appears to be settled law that it is for French courts, not arbitral tribunals, initially to determine whether or not a dispute involves a nonarbitrable employment matter. In the words of a recent Cour de cassation decision, "the competence-competence principle, pursuant to which it is for the arbitrator to decide by priority on his own jurisdiction, does not apply in employment matters." [394]

*[2]*
P 1099
Jurisdictions Treating Labor Disputes as Arbitrable

In contrast, a very different approach is taken in the United States and a few other jurisdictions. In these jurisdictions, arbitration of labor or employer-employee disputes is often not merely permitted but sometimes affirmatively encouraged.

In general, U.S. federal law and policy has long encouraged arbitration of many domestic labor disputes, [395] regarding labor arbitration as a specialized mode of dispute resolution that is superior in many respects to that of litigation, while imposing only narrow nonarbitrability limits on some forms of employer-employee disputes. [396] Thus, §1 of the U.S. FAA excludes from the Act's coverage agreements arising from a limited range of employment relations – involving "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." [397] Consistent with its text, this exclusion has been held to apply only to employees engaged in transportation (and not other) industries. [398]

Thus, the U.S. Supreme Court has repeatedly upheld the validity and enforceability of arbitration agreements in the domestic employment context, declaring that "mere inequality in bargaining power … is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." [399] Likewise, the Supreme Court recently held that employees did not have a statutory right to assert claims in a class action when they had entered into individual arbitration agreements with their employers. [400]

Consistent with this, U.S. courts have also routinely held that a wide variety of domestic employment-related claims are arbitrable. This includes claims under the Employee Retirement Income Security Act, [401] the Age Discrimination in Employment
P 1100
Act, [402] the Fair Labor Standards Act, [403] the National Labor Relations Act, [404] legislation protecting seamen, [405] employment discrimination claims under Title VII [406] and employment discrimination or wage claims under state law. [407]

As discussed above, several U.S. lower courts have held that §1's exclusion for transportation workers applies only to domestic U.S. transportation workers and not to employment
P 1101
relations in international transportation. [408] Relying on the analysis of the New York Convention in *Mitsubishi Motors* and *Scherk*, these decisions have held that the U.S. ratification of the Convention contemplated abandoning domestic rules of nonarbitrability in the international context. [409] Thus, holding that an arbitration agreement in a foreign seaman's contract was enforceable under the Convention, a U.S. appellate court reasoned:

> "[T]he language of the Convention, the ratifying language, and the [provisions of the FAA] implementing the Convention do not recognize an exception for seamen employment contracts. On the contrary, they recognize that the only limitation on the type of legal relationship falling under the Convention is that it must be considered 'commercial,' and we conclude that an employment contract is 'commercial.'" [410]

Some U.S. lower courts have imposed procedural limits on domestic arbitration agreements that employees are required to accept as part of an employment relationship. [411] Even under this approach, where employment contracts are negotiated, procedural matters are generally left to the

parties' agreement (subject to general unconscionability and procedural regularity safeguards). [412] Moreover, subsequent Supreme Court decisions reaffirmed the autonomy of parties to an arbitration agreement to agree on procedural matters, [413] significantly restricting the possibility of procedural limits on the arbitration of federal statutory claims. [414]

P 1102
In 2012, the National Labor Relations Board ("NLRB") (an administrative agency responsible for administering various U.S. labor laws) issued a ruling forbidding the inclusion of class action waivers in arbitration agreements contained in employment contracts. [415] The NLRB reasoned that the class action waivers unfairly restricted statutory rights granted to employees by U.S. federal labor laws. The NLRB's decision was overturned, however, in subsequent litigation, which underscored the limited nature of the nonarbitrability doctrine in the United States: on appeal, the U.S. Supreme Court held that the NLRB's decision exceeded its statutory authority, reasoning that "the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act." [416]

In part because of asserted concerns about the fairness of employment (and consumer) arbitration, legislative proposals have been made in the U.S. Congress to amend the FAA to treat some or all types of consumer (and employment) disputes as nonarbitrable. As discussed above, proposals have been made to preclude mandatory agreements to arbitrate future consumer disputes. The most recent of these efforts was titled the so-called "Arbitration Fairness Act of 2018." [417]

Among other things, these legislative proposals would amend the FAA to provide that "no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of an employment dispute, consumer dispute, antitrust dispute, or civil rights dispute." [418] It is uncertain whether these proposals will ever be adopted, even in the purely domestic context, in the United States; [419] if they were, however, these proposals would reverse the historic treatment of domestic labor and employment disputes in the United States and would generally make agreements to arbitrate such disputes unenforceable.

P 1103
A few other jurisdictions also permit arbitration of at least some types of labor disputes. That includes Germany, [420] the Netherlands, [421] Switzerland [422] and Hong Kong. [423]

# [H] Consumer Claims [424]

As with employment disputes, different national legal systems take significantly different approaches towards the arbitration of "consumer" disputes. "Consumer" disputes are defined generally as disputes between a consumer (or a non-merchant) and a merchant or commercial party, sometimes with a limited amount in controversy. [425]

P 1104
In broad outline, U.S. law currently recognizes the validity of agreements to arbitrate between consumers and businesses and permits the arbitration of both existing and future consumer disputes, subject to restrictions based on principles of unconscionability and due notice. In contrast, other jurisdictions adopt a wide variety of different approaches to agreements to arbitrate future consumer disputes. In some jurisdictions, statutory provisions invalidate all such agreements, at least in domestic cases, while other jurisdictions impose a variety of restrictions on consumer arbitration agreements.

The restrictions imposed in some states on the arbitration of consumer disputes appear to be better categorized as rules of substantive validity than nonarbitrability rules. As discussed below, legislation in some states appears to invalidate specified categories of arbitration agreements (*e.g.*, arbitration agreements between consumers and merchants), rather than to provide for the unenforceability of arbitration agreements as applied to particular categories of claims, disputes, or subject matters. As such, these statutory provisions are better regarded as prescribing rules of substantive validity than nonarbitrability.

## [1] U.S. Federal Arbitration Act

In the United States, the FAA clearly extends to agreements between consumers and merchants; there is nothing in §§2, 3 or 4 of the FAA that excludes consumer transactions or agreements from the general scope of the rule that arbitration agreements are presumptively enforceable. Consistent with that statutory text, the U.S. Supreme Court has repeatedly and unambiguously upheld both the validity of such agreements and the arbitrability of consumer claims. [426]

In an illustrative example, the Supreme Court took the unusual step of summarily reversing a decision of a state supreme court which held, as a "matter of public policy" in West Virginia, that predispute arbitration agreements in nursing home contracts were unenforceable
P 1105
as applied to claims of personal injury or wrongful death. [427] The U.S. Supreme Court declared that "[t]he [FAA's] text includes no exception for personal-injury or wrongful-death claims," [428] and emphatically reiterated its prior holdings, that the FAA precludes state law rules purporting to hold

particular categories of disputes, including consumer disputes, nonarbitrable. [(429)]

Despite this, a few U.S. lower courts have criticized, and sought to limit, the arbitrability of consumer disputes. According to one especially sweeping critique:

> "The reality that the average consumer frequently loses his/her constitutional rights and rights of access to the court when he/she buys a car, household appliance, insurance policy, receives medical attention or gets a job rises as a putrid odor which is overwhelming to the body politic." [(430)]

Academic commentary is also frequently critical of rules giving effect to predispute arbitration agreements in the context of consumer and employee claims. [(431)] Among other things, some commentators have observed that even the most conspicuous forms of arbitration clause will seldom actually be considered, much less understood and negotiated, by consumers:

> "To the extent that one does not understand the terms of the agreement, requiring the same to be printed in bold letters is like yelling at a deaf man." [(432)]

Similarly, academic commentary has been critical of consumer contracts that include arbitration agreements, particularly when coupled with class-action waivers: "[t]he providers [have] won the power to impose a mandatory, no-opt-out system in their own private 'courts' designed to preclude aggregate litigation." [(433)]

Despite this criticism, the U.S. Supreme Court has upheld the validity of class action waivers, including in consumer (and employment) contexts. Most recently, for example, the Court
P 1106
held that the FAA preempted the application of state law to invalidate a class action waiver on unconscionability grounds. [(434)]

Some U.S. lower courts have invoked the unconscionability doctrine or related principles to impose heightened standards of notice [(435)] or procedural fairness [(436)] on the terms of arbitration agreements in consumer contracts. These decisions do not challenge the basic arbitrability of consumer disputes, but seek to protect presumptively less sophisticated parties against perceived overreaching or systemic bias. This has been particularly true in disputes involving federal statutory claims (almost exclusively in purely domestic settings). [(437)] Applying this analysis, U.S. courts require an arbitration agreement to be both substantively and procedurally unconscionable in order to find them void, but sometimes employ a "sliding scale" approach such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." [(438)]

P 1107
Some U.S. states have also sought to exclude certain types of consumer contracts from state laws that otherwise favor arbitration. For example, Texas, Massachusetts, Montana and Georgia prohibit arbitration for consumer contracts which involve consideration less than a certain dollar amount [(439)] or particular types of contracts. [(440)] These types of state law provisions are very likely preempted by the FAA in both domestic and international settings in the United States. [(441)]

As discussed above, in part because of asserted concerns about the fairness of consumer arbitration, legislative proposals have periodically been made in the U.S. Congress to amend the FAA to treat some or all types of consumer (and employment) disputes as nonarbitrable. Although these proposals have been uniformly unsuccessful, legislation rendering claims by consumers nonarbitrable has been adopted in specific (and narrowly defined) areas, including certain financial services for consumers [(442)] and warranty protections for specific consumer products. [(443)]

In addition, as noted above, more general proposals have also periodically been made to preclude or restrict the use of so-called "mandatory" agreements to arbitrate future consumer disputes, including the "Arbitration Fairness Act of 2018." [(444)] Among other things, these proposals would amend the FAA to provide that "no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of … [a] consumer dispute." [(445)] Previous legislative proposals of this character have failed and it is uncertain whether such proposals will be adopted in the future, even in the purely domestic context. [(446)]

Those legislative proposals have also prompted U.S. arbitral institutions to review their institutional rules and policies with the aim of ensuring fair procedures in consumer (and employment) disputes. As discussed below, the AAA is a leading example of these developments.

P 1108
Initially, the AAA issued a Consumer Due Process Protocol, which set out procedural guidelines for fair and efficient consumer arbitration. [(447)] Subsequently, the AAA issued a set of Consumer Arbitration Rules, [(448)] which implement the objectives set out in the Protocol. [(449)] Among other

things, the AAA's Rules and Protocol provide for conducting proceedings at a reasonable cost, in reasonably convenient locations, within a reasonable time and without delay, taking into account the right of each party to be represented by a person of their choosing. In contrast, other arbitral institutions have not adopted comparable protocols and, in some cases, their procedures and awards in consumer arbitrations have encountered considerable judicial and other skepticism. [450]

U.S. legislative and regulatory proposals for nonarbitrability or invalidity rules in the context of consumer arbitration agreements have generally recognized the limitations imposed by the New York Convention. Thus, most legislative proposals for an "Arbitration Fairness Act" have excluded international arbitration agreements, subject to the New York and Inter-American Conventions, from the legislation's coverage. [451] If they were adopted, as previously proposed and without limitations with respect to international arbitration agreements, these proposals would place the United States in violation of its obligations under the New York Convention. [452]

Similarly, the U.S. Federal Reserve Board excluded international arbitration agreements (subject to chapters 2 and 3 of the FAA) from the scope of federal regulations of arbitration agreements in retail foreign exchange transactions. [453] The federal regulations forbid binding predispute arbitration agreements in specified foreign exchange transactions with consumers, but, at the (well-considered) urging of the U.S. Department of State, the regulation expressly excluded arbitration agreements subject to the New York and Inter-American Conventions. [454]
P 1109

## [2] EU Consumer Regulations

In Europe, statutory protections either forbid or regulate the use of arbitration clauses covering future disputes in consumer contracts. [455] Under the EU's Unfair Terms in Consumer Contracts Directive, the provisions of standard form consumer contracts are subject to statutory fairness requirements. [456] Among other things, the Directive provides that a provision is *prima facie* unfair, and therefore invalid, if it "requir[es] the consumer to take disputes exclusively to arbitration not covered by legal provision." [457]

The critical phrase – arbitration "not covered by legal provision" – is not defined in the Directive. The apparent intention of the phrase is to permit arbitration of some consumer disputes, but to invalidate other categories of consumer arbitration agreements (*i.e.*, those "not covered by legal provision"). The most obvious meaning of that formula would be to invalidate arbitration agreements that imposed waivers of legal protections or required arbitration *ex aequo et bono*. Despite this, various EU Member States have implemented the Directive by adopting legislation that deems arbitration clauses in standard form contracts unfair (and therefore invalid) if they require binding arbitration of future disputes involving claims for less than specified sums (*e.g.*, approximately $10,000). [458]

The European Court of Justice has held that the Unfair Terms in Consumer Contracts Directive prescribes binding EU public policy and that national courts must ensure that the Directive's purposes are achieved. [459] A Member State court may (and apparently must) address the fairness of a consumer contract term even if the consumer does not raise the issue. [460] Moreover, if the Directive renders an arbitration agreement contained in a consumer contract
P 1110
unenforceable, the arbitral tribunal may (and apparently must) hold the agreement unenforceable, even if the consumer does not raise the issue. [461]

In the words of the ECJ:

> "[T]he result sought by Article 6 of the Directive which … requires the Member States to ensure that consumers are not bound by unfair terms, could not be achieved if the court seized of an action for annulment of an arbitration award was unable to determine whether that award was void solely because the consumer did not plead the invalidity of the arbitration agreement in the course of the arbitration proceedings. … [T]he Directive must be interpreted as meaning that a national court seized of an action for annulment of an arbitration award must determine whether the arbitration agreement is void and annul that award where that agreement contains an unfair term, even though the consumer has not pleaded that invalidity in the course of the arbitration proceedings, but only in that of the action for annulment." [462]

The ECJ has also held that Member State courts, when deciding whether to enforce an arbitral award, are "obliged to assess of [their] own motion whether that [arbitration] clause is unfair in the light of Article 6 of [the Directive]." [463]

On a Member State level, different jurisdictions have adopted a variety of different approaches towards consumer arbitration agreements. French law historically imposed relatively strict statutory prohibitions on domestic arbitration clauses between persons involved in commercial activities

(*commerçants*) and individuals who are not involved in these activities (so-called "*acte (contrat) mixte*," or "mixed agreements"). [(464)] These domestic prohibitions on arbitration do not apply in the context of international-consumer contracts. [(465)]

Similarly, Swedish law provides for the nonarbitrability of consumer arbitration agreements as to defined categories of future disputes. Notably, the Swedish legislation provides that its terms do not apply where they would be contrary to Sweden's international obligations (in particular, the New York Convention). [(466)] This exception produces results similar to French (and U.S.) limitations of many nonarbitrability rules to domestic transactions.
P 1111

German [(467)] and Austrian [(468)] law contain specialized rules regarding the arbitration of future consumer disputes, recognizing the validity of such provisions apparently as to both future and existing disputes only if they are recorded in a separate arbitration agreement signed by the consumer (as is the case in some U.S. state legislation [(469)] ). Other European jurisdictions have similar types of statutory provisions. [(470)]

A different approach is adopted under English law. There, the Arbitration Act, amended in part in 2015 by the Consumer Rights Act, provides that an arbitration agreement in a consumer context may be "unfair where modest amount" is sought. [(471)] This is consistent with previous case law, which had concluded that consumer arbitration agreements (whether they relate to present or future disputes) are invalid if they are either below a specified monetary sum (roughly $5,000) or if they are "unfair." [(472)] This unfairness standard in turn requires inquiry into the substantive fairness of a provision's terms and the drafting history of the provisions. [(473)]

*[3]* Other Jurisdictions

Other jurisdictions also adopt a variety of different approaches to the arbitration of consumer claims. In New Zealand, an arbitration agreement will be enforceable against a consumer only
P 1112
if "the consumer, by separate written agreement, certifies that, having read and understood the arbitration agreement, the consumer agrees to be bound by it" and the arbitration agreement discloses that he or she is waiving various protections. [(474)] As with German and Austrian law, this approach parallels that of various U.S. states (likely preempted by the FAA [(475)] ), which require specific evidence of informed consent to arbitration provisions on the part of consumers and a separate arbitration agreement. [(476)]

In broadly similar fashion, Québec adopted amendments to its Consumer Protection Act, providing flatly that "[a]ny stipulation that obliges the consumer to refer a dispute to arbitration … is prohibited." [(477)] British Columbia legislation adopts a comparable approach to domestic agreements to arbitrate future consumer disputes, [(478)] which has been upheld by Canadian courts. [(479)] In the words of the Canadian Supreme Court, §172 of the British Columbia Business Practices and Consumer Protection Act offers "remedies different in scope and quality from those available from an arbitrator and constitutes a legislative override of the parties' freedom to choose arbitration." [(480)] That decision drew a well-reasoned dissent, which concluded:

> "Access to justice in Canada no longer means access just to the public court system. Historically, judges were reluctant to relinquish their grasp on dispute resolution, and they even viewed alternative dispute resolution as antithetical to the parties' interests. This era is gone. It is the role of the legislature, not the courts, to limit access to alternative dispute resolution mechanisms. Unlike several other provinces, British Columbia has not limited the resolution of consumer disputes to a single procedural regime. On the contrary, it has left room for arbitration and allowed arbitrators to exercise broad remedial powers, subject to the agreement of parties to a dispute. Given the current structure of consumer protection legislation in British Columbia, submitting a consumer's dispute with their mobile phone service provider to arbitration is entirely consistent with the important public purposes of protecting consumers, vindicating their rights and promoting access to justice." [(481)]

P 1113
Ontario courts have reached similar conclusions to those of the Canadian Supreme Court, holding arbitration agreements in consumer contracts invalid. [(482)]

In a recent decision, the Canadian Supreme Court also held that the restrictions on consumer arbitration agreements imposed by consumer protection legislation did not extend to contracts between merchants, even if they sued jointly with consumers:

> "The business customers, however, do not qualify as 'consumers' under the

*Consumer Protection Act,* and as such they cannot invoke the protections that consumers enjoy. … If non-consumers bound by a valid arbitration agreement could do an end run around the … *Arbitration Act* simply by joining their claim with that of a consumer. … [T]his provision would become a vehicle for 'piggybacking' non-consumer claims onto consumer claims. Indeed, if such an interpretation were accepted, a class action proceeding brought on behalf of millions of non-consumers who are each bound by an arbitration agreement would, if certified, be permitted to proceed in court *in its entirety* so long as a single consumer joined the class." [(483)]

In yet another variation, Japan's Arbitration Law provides that consumer arbitration agreements are valid, but that, "for the time being," consumers may cancel their agreements to arbitrate future disputes with businesses prior to the first oral hearing of the arbitral tribunal (or if the consumer is the claimant). [(484)] Similarly, for a time, Alberta also attempted a novel approach (allowing for binding pre-dispute consumer arbitration agreements, provided that the terms of the agreements had been approved by a consumer protection authority). [(485)]

Finally, the Indian Supreme Court recently held that consumer disputes are nonarbitrable, even when it is the consumer who initiates the claim. [(486)] It is difficult to reconcile this decision with either the purposes of most consumer protection regimes or the exceptional character of the non-arbitrability doctrine.

## *[4]* Future Directions: Arbitrability of Consumer Disputes

The arbitration of consumer disputes raises special concerns, both because of the presumptively substantial disparity of sophistication and bargaining power of the parties during contract formation and the procedural challenges of implementing the cost-effective resolution of disputes involving modest financial stakes. These concerns are partially reflected in the various invalidity and nonarbitrability rules in Europe, and elsewhere, as well as in legislative proposals in the United States. [(487)] The differing nature of these concerns are not, however, always clearly addressed or implemented in legislative and judicial responses.

First, a number of national law statutory provisions regarding consumer arbitration are not properly characterized as nonarbitrability rules. Rather, statutes such as the Québec legislation and EU Directive are rules of contractual validity, that purport to invalidate all of certain defined categories of arbitration agreements (rather than to forbid their enforcement as to
P 1114
certain categories of disputes). Thus, various legislative provisions (or proposals) invalidate either all pre-dispute consumer arbitration agreements or specified consumer arbitration agreements not satisfying heightened form requirements (*e.g.,* a separate or notarized agreement). These types of provisions are properly categorized as rules of substantive validity, not rules of nonarbitrability.

There are reasons to doubt both the wisdom of these national rules of contractual invalidity and, in international settings, their compatibility with Article II of the New York Convention. In particular, there is a compelling argument that the blanket invalidation of all pre-dispute consumer arbitration agreements (as in Québec) is, again in international settings, contrary to both Article II's requirements of neutrality for rules of contractual validity, [(488)] and the
P 1115
Convention's uniform choice-of-law rules. [(489)] Indeed, as discussed above, precisely these concerns have resulted in exceptions to U.S., French, Swedish and other legislation for consumer transactions containing international arbitration agreements. [(490)]

The invalidity rule prescribed by EU, Quebec and other similar national legislative instruments applies regardless of the terms of a consumer arbitration agreement (including where it is entirely even-handed or even pro-consumer) and regardless of the extent of negotiation or inequality of bargaining power (including where an arbitration agreement is specifically negotiated or where a "consumer" in fact has equal or greater bargaining power and sophistication than a merchant). [(491)] It is doubtful that a blanket rule of invalidity of agreements to arbitrate of this sort comports with the Convention's requirement that agreements to arbitrate be subject to the same rules of validity as other categories of contracts: it is obvious that consumers are, as a general matter, able to conclude binding sale and purchase, financial and other contracts and it is difficult to see why, subject to unconscionability defenses, consumers ought not also be able to conclude valid arbitration agreements.

There are less blunt, more nuanced means of addressing concerns about unequal bargaining power or sophistication than blanket invalidity rules. For example, English legislation (adopting a case-by-case inquiry into the fairness of particular agreements over a specified monetary value), German and Austrian legislation (permitting consumer arbitration agreements in separate instruments), and former Alberta legislation (previously permitting regulatory-approved consumer arbitration agreements), adopt approaches to contractual invalidity which are less susceptible to

challenge under the New York Convention. These legislative solutions are by no means perfect, but provide more constructive and proportionate mechanisms for addressing concerns about consumer protection and unequal bargaining power than blanket prohibitions on all pre-dispute consumer arbitration agreements.

Statutory provisions invalidating consumer arbitration agreements are also potentially inconsistent with the Convention's uniform choice-of-law rules (in Articles II and V(I)(a) of the Convention). [492] Most consumer arbitration agreements are purely domestic (and not subject to the Convention). Where a consumer arbitration agreement is international, however, the Convention's uniform choice-of-law rules would apply and, where national law rules invalidating such arbitration agreements purported to override the Convention's rules, a Contracting State would likely violate its obligations under the Convention.

Second, a separate, but related, set of concerns about consumer arbitration agreements involves the process by which consumer disputes are arbitrated. In particular, restrictions on the arbitrability of consumer disputes often arise from concerns that such disputes cannot, as a financial matter, realistically be arbitrated effectively or fairly by consumers (owing to costs of filing fees, location of the arbitral seat, etc.) or that businesses will enjoy systemic advantages over consumers (*e.g.*, because they are repeat players). These are legitimate concerns and can provide valid grounds for either nonarbitrability rules or due process requirements for fair arbitral procedures. Such nonarbitrability and contractual validity rules would need to be tailored towards the objective of safeguarding the ability of consumers to pursue their claims in an effective and affordable manner, but in principle would be permitted by the Convention. [493]

It is important to note that litigation of consumer disputes in national courts raises serious procedural challenges, particularly in international transactions (where issues of jurisdiction, language and enforcement may make small claims uneconomic to pursue). [494] In many instances, "preserving" recourse to national courts may therefore offer little of real benefit to consumers, while inhibiting the development of mechanisms that would provide better alternatives. Of course, it makes little sense to forbid parties from agreeing to arbitrate if the alternatives which they are required to pursue suffer from the same (or worse) defects.

A more constructive approach would be to develop neutral, efficient arbitral procedures capable of resolving consumer and similar disputes in a fairer, more cost-effective manner than currently available in national courts. [495] Indeed, some skeptics of the arbitral process as applied to consumers have recognized this possibility. [496] A goal of developing means of arbitration for consumer disputes, which address concerns about the fairness of the arbitral process, is suggested by Alberta's previous consumer protection legislation, which permitted regulatory-approved consumer arbitration agreements, and by Japan's arbitration legislation, which does not invalidate consumer arbitration agreements outright, but rather permits, "for the time being," consumers to cancel consumer arbitration agreements. [497]

P 1116
Consistent with this, some arbitral institutions have adopted specialized rules tailored to encourage cost-effective resolution of smaller disputes, which are well-suited for consumer and employment disputes, including (as noted above) the AAA's Consumer Arbitration Rules and due process protocols. [498] This includes rules regarding class action arbitrations, which offer possible avenues for relief which may be unavailable to consumers under many national legal systems. [499] It also includes protocols for handling consumer and employment claims in a fair manner. [500]

Empirical studies of these sorts of neutral procedural regimes, and accompanying protections, suggest that they are effective in providing efficient and fair mechanisms for resolving consumer disputes. [501] The procedural protections that these regimes prescribe are a critical step towards overcoming mistrust of the arbitral process in this context. [502]

A related set of proposals involve online dispute resolution, aimed at providing an efficient mechanism for resolving low monetary value disputes involving consumers. A UNCITRAL working group is exploring mechanisms for providing online dispute resolution for consumer disputes and has proposed a set of "technical notes" on online dispute resolution. [503] This initiative has the merit of addressing directly the fundamental problem of most consumer disputes, namely the difficulty of providing a cost-effective means of fairly resolving a dispute with low monetary value (and, often, a commercially unsophisticated party).

## [I] Natural Resources

Some developing nations historically viewed international arbitration with considerable reserve and occasional hostility. [504] Among other things, international arbitration was seen as dominated by Western or capital-exporting interests and arbitrators, supposedly inadequately-sensitive to the policies and needs of developing countries, and unacceptably expensive for
P 1117
non-Western entities. [505] In particular, these voices have urged that disputes involving significant sovereign interests (like natural resource development projects) be deemed nonarbitrable. [506]

Courts and legislatures in most developed countries have consistently rejected claims that disputes involving issues of sovereignty or natural resources are inherently nonarbitrable. [507] In the United States, the Foreign Sovereign Immunities Act contains detailed provisions concerning the enforcement of arbitration agreements and awards against foreign states, including in matters involving natural resources. [508] Further, federal legislation was enacted in 1988 [509] to ensure that the act of state doctrine was not applied to prevent enforcement of arbitral awards against foreign states in U.S. courts. [510]

Legislation and judicial decisions in other developed jurisdictions are similar. For example, the European Convention on State Immunity [511] and national legislation in most European jurisdictions, [512] provides for the recognition and enforcement of international arbitration agreements and arbitral awards against foreign states, again in matters involving natural resources. Similar legislation has been enacted in other developed states. [513] In recent years, many developing states have also rejected historic notions of nonarbitrability in the context of con
P 1118
cession agreements and natural resources projects, both through widespread acceptance of bilateral and multilateral investment treaties [514] and enactment of national legislation. [515]

## [J] Carriage of Goods by Sea

The carriage of goods by sea is regulated by a framework of international treaties and national legislation, generally designed to ensure that shippers are provided with adequate remedies in specified forums against shipping enterprises. [516] This regulatory framework has resulted in claims that arbitration agreements, customarily included in ocean shipping contracts, are unenforceable on nonarbitrability or related public policy grounds.

In *Vimar Seguros y Reaseguros, SA v. MV Sky Reefer*, the U.S. Supreme Court rejected lower court authority holding that claims under the U.S. Carriage of Goods by Sea Act ("COGSA") were nonarbitrable. [517] The Court held that "COGSA does not forbid selection of [a] foreign [arbitral] forum," reasoning, much like the *Mitsubishi* Court in the antitrust context, [518] that arbitration is merely a procedural mechanism which does not compromise COGSA's substantive statutory protections. [519] The *Vimar* Court also concluded that it was improper for U.S. courts to speculate about the substantive decisions that arbitral tribunals might reach, including as to whether or not they would apply mandatory U.S. COGSA protections: "mere speculation that the foreign arbitrators *might* apply Japanese law which, depending on the proper construction of [the U.S. Carriage of Goods by Sea Act], *might* reduce respondents' legal obligations, does not in and of itself" render a COGSA claim nonarbitrable. [520]

Consistent with this, U.S. lower courts have virtually always upheld agreements to arbitrate COGSA claims, including in circumstances where a combination of a foreign choice-of-law clause and arbitration agreement appeared likely to exclude the application of statutory COGSA protections. [521] There are contrary results under the so-called Carmack Amendment,
P 1119
with a few lower courts holding that the Amendment mandatorily requires disputes to be resolved in statutorily-specified U.S. judicial districts. [522]

There is limited authority from other jurisdictions. Some national courts have suggested less receptive views towards the enforceability of forum selection agreements as applied to claims by shippers against ocean shippers, but these decisions do not appear to apply to arbitration agreements. [523] A few other decisions have, however, refused to enforce arbitral awards on the grounds that COGSA claims are nonarbitrable. [524] These decisions are ill-considered and inconsistent with the New York Convention's objectives.

## [K] Corporate Governance [525]

Arbitration of corporate governance disputes between shareholders or between a company and its officers, directors, or shareholders is sometimes claimed to involve nonarbitrable matters. In almost all jurisdictions, such claims have been rejected, save for unusual cases involving requests for relief that cannot be granted by arbitral tribunals (such as liquidation or winding up of a company, disqualification of a director, or, in some instances, invalidation of a shareholders resolution). [526]

The approach towards corporate governance disputes in the United States is representative. Historically, U.S. courts viewed agreements to arbitrate corporate disputes with disfavor, holding them unenforceable on various grounds (including that they did not really involve disputes, that they were non-justiciable, or that they interfered with statutorily-mandated
P 1120
corporate governance rules). [527] More recently, U.S. courts abandoned that hostility, first with closely-held corporations [528] and later more widely, with U.S. courts now holding broadly that disputes regarding corporate matters are arbitrable under the FAA. As one court put it, "[t]he FAA does not carve out disputes relating to the internal affairs of corporations as an exception to the

general enforceability of arbitration agreements." [(529)]

German courts followed a similar pattern. Historically, there was disagreement regarding the arbitrability of the validity of shareholder resolutions, which was eventually resolved in favor of arbitrability, provided that all shareholders in the company were party to the arbitration. [(530)] Other types of disputes among shareholders to a German company are in principle

P 1121

arbitrable. [(531)] Given these developments, the leading German arbitral institution (DIS) adopted specialized arbitration rules governing corporate disputes in 2009, updated in 2018. [(532)]

Decisions in other jurisdictions also treat most corporate and company law disputes as arbitrable, including in England, [(533)] Austria, [(534)] Switzerland, [(535)] Canada, [(536)] Singapore, [(537)] Hong Kong [(538)] and elsewhere. [(539)] In a few jurisdictions, legislation provides for the validity and enforceability of agreements to arbitrate contained in corporate constitutive instruments (*e.g.*,

P 1122

articles of association). [(540)] More generally, UNCITRAL is engaged in efforts to clarify and confirm the arbitrability of intra-corporate disputes. [(541)]

Despite this general principle, some jurisdictions appear to disfavor agreements to arbitrate in the constitutive instruments of public companies (with large numbers of public shareholders). As discussed below, for example, in the United States, the Securities and Exchange Commission has an informal policy of discouraging the registration of securities whose documentation includes mandatory arbitration provisions. [(542)] Despite that, there are a number of U.S.-registered securities, virtually all by non-U.S. companies, that include mandatory arbitration agreements. [(543)] It is unusual, but not unheard of, in other jurisdictions, for corporate charters of publicly-traded companies to contain arbitration agreements. [(544)]

## [L] Trust Disputes

The arbitrability of disputes arising from trusts paralleled that of corporate law disputes. Historically, trust disputes were frequently treated as nonarbitrable. [(545)] More recently, however, courts in a number of jurisdictions, however, have upheld the arbitrability of trust disputes in a variety of contexts. [(546)] In a few jurisdictions, legislation provides specifically for the arbitration of trust disputes. [(547)]

P 1123

## [M] Distributorship and Commercial Agent Claims

Legislation in some jurisdictions provides statutory protections for distributors or commercial agents, typically by requiring payment of specified amounts in the event of termination of their distributorship, agency, or franchise. In some cases, these statutory regimes are accompanied by provisions requiring that all claims under such legislation be resolved under local law, in local courts. The compatibility of these statutory provisions with the New York Convention is subject to serious doubts.

In the United States, some state laws purport to invalidate agreements to arbitrate in distributorship agreements [(548)] and franchise agreements. [(549)] These legislative provisions are almost always preempted, even in purely domestic settings, by the FAA. [(550)] In contrast, U.S. federal law renders certain disputes involving motor vehicle franchises nonarbitrable. [(551)]

In Europe, a few jurisdictions have adopted restrictions on the validity of arbitration agreements as applied to certain categories of distribution agreements. A leading example of such legislation is Belgium's Law of 27 July 1961, granting legal protections to exclusive sales distributors, based in Belgium, against unilateral termination of their franchise. [(552)]

An early Belgian judicial decision appeared to interpret the Law of 27 July 1961 as permitting arbitration of distributorship termination claims, provided that the arbitral tribunal would apply Belgian law. [(553)] Similarly, the Belgian Cour de Cassation apparently concluded that the Law rendered claims by Belgian distributors against foreign principals nonarbitrable absent evidence that the arbitral tribunal would apply Belgian law. [(554)] The court reasoned that the New York Convention permitted it to apply Belgian law, as the law of the forum, to issues of nonarbitrability, [(555)] and concluded:

> "Articles 4 and 6 of the Law of 27 July 1961, intending to give to the distributor a legal protection, are mandatory rules applicable whatever the law chosen by the parties if the distribution agreement in dispute produces its effects in Belgium. As a consequence of these provisions, a dispute related to the termination of an exclusive distribution agreement producing effects on the whole or on a part of the Belgian territory is not capable of arbitration when the parties agreed on arbitration before the end of
> P 1124

their agreement and when the arbitration agreement aims to or produces the effect of applying a foreign law. … The Belgian judge, in order to decide the validity of the arbitration agreement, must set the law chosen by the parties aside and apply immediately the law of 27 July 1961, according to which the dispute is not capable of arbitration if proof/evidence is given that arbitrators are obliged to apply not Belgian law but a foreign law." [556]

These decisions are retrograde and contrary to the Convention. The Belgian Cour de Cassation's refusal to permit the arbitration to proceed, and its speculation that the arbitrators would not apply mandatory Belgian law, are out-of-step with the Convention and other national court authority. In particular, the Belgian approach contradicts that of courts in other jurisdictions in the context of competition, securities and other mandatory national laws, [557] as well as the Convention's requirement to enforce valid agreements to arbitrate (with resulting awards being subject to nonrecognition). [558]

Other authorities have refused to give effect to the provisions of Law of 27 July 1961. An arbitral tribunal that considered the effect of the Belgian legislation held that it was ineffective to invalidate an arbitration agreement in a sales distribution agreement (covering Belgium, Luxembourg and Zaire), where the place of arbitration was Germany. [559] The tribunal reasoned that the parties had chosen Italian law to govern their disputes, and their arbitration agreement, and that, under Italian law, the arbitration clause was valid. [560]

That conclusion is well-considered, if imprecisely phrased. As discussed above, the nonarbitrability doctrine is an exceptional escape device, which permits courts of Contracting States to deny enforcement of otherwise valid arbitration agreements, based on local law. [561] Importantly, these decisions are not interpretations of the Convention's uniform international rules nor decisions about the validity of the arbitration, but are instead simply exceptional refusals to enforce an otherwise valid arbitration agreement. [562] These refusals are escape devices which Contracting States are permitted to adopt by Article II(1) and V(2)(a), but which neither other Contracting States nor arbitral tribunals are permitted, much less required, to adopt. Thus, while Articles II(1) and V(2)(a) may exceptionally permit Belgian courts to rely on the Law of 27 July 1961 in some circumstances, arbitral tribunals seated outside Belgium, and courts in other Contracting States, are not required, or permitted, to adopt the same view.

P 1125
A German appellate decision considered comparable issues under §89b of the German Commercial Code, which guarantees statutory protections to certain commercial agents. Like the Belgian Cour de Cassation, the German court held that the combined effect of a foreign choice-of-law clause (selecting California law) and foreign arbitration agreement (specifying a California seat) rendered the arbitration agreement unenforceable, because it might compromise or nullify the protections afforded by §89b. [563] Again, that is an ill-considered and parochial decision, which violates Germany's obligations under the New York Convention: by preempting the arbitral process, and denying enforcement of an otherwise valid arbitration agreement based on speculation about the arbitral process, the German court disregarded the mandatory requirements of Article II(3) and the weight of well-reasoned authority in other Contracting States. [564]

More recently, the Austrian Oberster Gerichtshof reached similar conclusions. It held that an arbitration agreement in a distribution contract was not enforceable because the arbitral tribunal, in a partial award, had indicated that New York law was applicable and because that law did not provide a mandatory right of indemnification for the agent. [565] Like the German decision discussed above, this holding is contrary to the Convention and the weight of authority in other Contracting States.

## [N] Fraud Claims

The overwhelming weight of authority holds that claims of fraud, fraudulent inducement, intentional misrepresentation and the like are capable of settlement by arbitration. [566] These decisions are consistent with Article II(1) of the New York Convention, providing for recognition of agreements to arbitrate disputes "whether contractual or not" – a formulation that is most readily directed towards, and certainly encompasses, disputes involving claims of fraud. [567]

P 1126
There are only a few contrary decisions, which are inconsistent with both the Convention and the conclusions of most national courts. For example, as noted above, Pakistani decisions have held that all claims of fraud are nonarbitrable. [568] Again, that decision is contrary to Pakistan's commitments under Article II of the Convention: as detailed above, national law rules holding that all fraud claims are nonarbitrable are contrary to the Convention's requirement that the nonarbitrability doctrine be applied as an exception, based on and tailored to advance specific and articulated local public policies. [569] That is particularly true where the national law rule applies to commercial

disputes, between commercial parties, and where the almost unanimous weight of state practice is to treat fraud claims as arbitrable.

Indian courts have adopted a comparable, albeit less expansive, treatment of fraud claims, at least in a domestic context. The Indian Supreme Court has held that at least some claims of "serious fraud," in a domestic setting, are nonarbitrable, [570] while claims of "ordinary" fraud are arbitrable. The Indian approach, although undesirable from a policy perspective and out-of-step with that of most national courts, is arguably consistent with the Convention's treatment of the nonarbitrability doctrine. [571]

## [O] Miscellaneous Other Claims

National courts and arbitral tribunals have also occasionally considered the arbitrability of a wide range of other claims that can only be briefly catalogued. Courts and arbitral tribunals have generally upheld the arbitrability of claims involving product liability claims, [572] insurance
P 1127
regulatory disputes, [573] construction liens, [574] import regulations, [575] whistleblower protections, [576] real property issues, [577] relations between lawyers and clients, [578] succession disputes, [579] tax disputes, [580] and miscellaneous other subjects. [581] On the other hand, as noted above, a few categories of claims have been held nonarbitrable, including certain franchise disputes, [582] issues concerning some categories of publicly-registered titles and security interests, [583] some
P 1128
constitutional issues, [584] issues of family law and succession, [585] claims under international conventions regarding the carriage of goods by road, [586] retail lease disputes [587] and issues concerning the status of states under international law. [588]

## [P] State Law Claims in United States

Many of the U.S. Supreme Court's nonarbitrability decisions, including those in *Scherk*, *Mitsubishi*, *Vimar* and *PacifiCare*, concerned arguments that claims under particular U.S. *federal* statutes were nonarbitrable. [589] U.S. state statutes and judicial decisions also sometimes purport to render certain types of claims nonarbitrable. That is true, for example, under various U.S. state laws with respect to tort claims, [590] real estate claims, [591] insurance claims, [592] labor
P 1129
disputes [593] and consumer claims. [594]

The U.S. Supreme Court has summarily rejected arguments under both the domestic FAA and the New York Convention that state law may properly preclude arbitration of particular categories of claims. In a 1984 decision, *Southland Corp. v. Keating*, [595] the Court considered a California state statute that invalidated certain arbitration agreements relating to franchise investments. The California Supreme Court had held that, notwithstanding the parties' agreement to arbitrate, the state statute rendered the agreement unenforceable. [596] The U.S. Supreme Court rejected that view, holding that "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." [597] The Court left open the possibility of asserting "general contract defenses such as fraud to avoid enforcement of an arbitration agreement." [598]

Not long thereafter, in *Perry v. Thomas*, [599] the Supreme Court again rejected a claim that state employment law rendered a claim nonarbitrable. The Court held that the FAA preempted a California statute requiring judicial resolution of claims for "wages." Emphasizing the "unmistakable conflict" between the two legislative regimes, the Court concluded that "under the Supremacy Clause, the state statute must give way." [600]

Similarly, in *Allied-Bruce Terminix Co. v. Dobson*, the Supreme Court again held that the FAA preempts state laws purporting to render particular claims or disputes nonarbitrable (in this case, all agreements to arbitrate future disputes). [601] That conclusion has been repeatedly cited in subsequent Supreme Court decisions, which emphatically affirmed that the FAA preempted state law nonarbitrability rules. [602] Lower U.S. court decisions have held that a wide range of other state legislative efforts to foreclose or limit arbitration of particular categories of claims are preempted by the FAA. [603]

P 1130
In another decision, the Supreme Court took the relatively unusual step of summarily reversing a decision of a state supreme court (the Supreme Court of Appeals of West Virginia) which held, as a "matter of public policy" in West Virginia, that predispute arbitration agreements were unenforceable as applied to claims concerning personal injury or wrongful death in West Virginia. [604] The Supreme Court held

"The West Virginia court's interpretation of the FAA was both incorrect and inconsistent with clear instruction in the precedents of this Court. The FAA provides that a 'written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of

such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' The statute's text includes no exception for personal-injury or wrongful-death claims. It 'requires courts to enforce the bargain of the parties to arbitrate.'" [605]

The Court concluded by holding that "[t]hat rule resolves these cases": "West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA." [606]

More recently, the Supreme Court reversed a decision that had refused to enforce class action waivers in contracts containing arbitration clauses on grounds of unconscionability under state law. The Court held that state unconscionability rules had been applied in a manner that singled out arbitration clauses for discriminatory treatment (compared with other types
P 1131
of contracts) and were therefore preempted. [607] The Court's decision reflects both the U.S. federal policy in favor of arbitration and the perennial attraction of nonarbitrability and antiarbitration positions, notwithstanding clear and emphatic national policies to the contrary.

# §6.05 CHOICE OF LAW GOVERNING NONARBITRABILITY

The nonarbitrability doctrine raises potentially complex choice-of-law questions in determining what law(s) apply to determine whether a claim or dispute is nonarbitrable. These issues arise under both the New York Convention (in particular, Article V(2)(a)) and national arbitration legislation. Related to these choice-of-law issues is the question whether the New York Convention places international limits on the ability of Contracting States to apply nonarbitrability exceptions to disputes under international arbitration agreements. The choice-of-law issues under the nonarbitrability doctrine and related questions of the Convention's international limits are discussed in detail above. [608]

# §6.06 SUA SPONTE CONSIDERATION OF NONARBITRABILITY ISSUES BY ARBITRAL TRIBUNAL

A few authorities have raised the question whether arbitral tribunals may (or must) independently raise issues of nonarbitrability and public policy, even if the parties have not done so. For example, as discussed above, in one classic arbitration, Judge Lagergren *sua sponte* raised the question of corruption, which had not been identified or relied upon by the parties, reasoning:

> "[B]oth parties affirmed the binding effect of their contractual undertakings and my competence to consider and decide their case in accordance with the terms of reference. However, in the presence of a contract in dispute of the nature set out hereafter, condemned by public policy, decency and morality, I cannot in the interest of the administration of justice avoid examining the question of jurisdiction on my own motion." [609]

A few other awards are to the same effect, affirming the arbitral tribunal's right (and responsibility) to raise issues of nonarbitrability or illegality *ex officio*. [610]

P 1132
Notwithstanding the importance of party autonomy in international arbitration, and the tribunal's mandate to resolve those disputes which are submitted to it (but not others), [611] these decisions are correct. The arbitral tribunal's adjudicative mandate is to resolve the disputes that are submitted to it in accordance with applicable law – including applicable mandatory law [612] – and to render an award on such matters that is binding and enforceable.

Where the parties' contract raises issues of illegality, violations of public policy or mandatory law, or performance of administrative functions, then the tribunal's mandate must necessarily include consideration of those issues insofar as they would affect its decision or the enforceability of its award. For an obvious example, the parties' request that the tribunal decide whether to grant a patent or declare a party bankrupt should not prevent the tribunal from considering *sua sponte* whether or not such claims are arbitrable; equally, if granting one party's substantive claims (or defenses) would violate applicable mandatory criminal, competition, intellectual property, or other laws, then the tribunal both can and must consider those mandatory law issues on its own motion. [613] Of course, as discussed elsewhere, it is an essential element of the arbitrators' mandate and

the parties' procedural rights that any *sua sponte* consideration of nonarbitrability or similar issues by a tribunal be accompanied by notice to the parties and an opportunity to be heard on the issue. (614)

# §6.07 JUDICIAL "SUPERVISION" OF ARBITRAL CONSIDERATION OF PUBLIC LAW CLAIMS

Application of the nonarbitrability doctrine can give rise to procedural issues concerning the relationship between arbitral proceedings and national court litigation. Under most contemporary arbitration statutes, national courts are generally forbidden from intervening in or considering interlocutory challenges to ongoing arbitrations, save in the most exceptional circumstances. (615) Nevertheless, some lower U.S. courts have ordered the parties to submit U.S. statutory claims to arbitration and to furnish periodic reports on the progress of the arbitration. (616) Such "judicial supervision" has occurred even with respect to arbitrations seated outside the United States. (617)

This sort of judicial supervision of an ongoing arbitration is generally contrary to Article II of the Convention. As discussed below, Article II(3) requires Contracting States to "refer the parties to arbitration," and does not admit ongoing judicial supervision of the arbitral
P 1133
proceedings. (618) The same rule of judicial non-interference is set forth in the UNCITRAL Model Law (in Article 5) (619) and other national arbitration laws. (620) Where a claim is capable of settlement by arbitration, the proper role of national courts is to refer the parties to arbitration; if the arbitrators misconduct themselves, or render an award that violates the concerned state's public policy, Article V permits that state's courts to deny recognition (or to annul an award made locally) – but the Convention does not allow for interlocutory judicial supervision of ongoing arbitral proceedings.

Consistent with this analysis, U.S. courts have more recently rejected requests that they decline to order or delay ordering arbitration until it is clear that the arbitral tribunal will hear claims that are allegedly nonarbitrable under the law of the arbitral seat. As discussed above, they have instead held that doubts about the arbitral process should be resolved in favor of arbitration, with any objections being reserved for consideration in challenges to the tribunal's award. (621) The same rationale precludes judicial supervision of the consideration of public law claims in the arbitral proceedings.

# §6.08 FUTURE DIRECTIONS: NONARBITRABILITY DOCTRINE

The past four decades have witnessed a substantial evolution and maturation of the nonarbitrability doctrine. During the 1950s and 1960s, judicial decisions in a number of states adopted expansive interpretations of national regulatory regimes that rendered important categories of commercial disputes entirely or partially nonarbitrable. (622) This departed from the historic autonomy of business enterprises to resolve their commercial business disputes through the arbitral process, as reflected in the Geneva Protocol's provisions for the arbitrability of all "commercial" disputes and in state practice. (623) The expansive application of judicially-created "nonarbitrability" rules also contradicted the objectives of the New York Convention and most national arbitration legislation. (624)

More recently, national legislatures and courts in most jurisdictions have adopted more restrained views of the nonarbitrability doctrine, abandoning mistrust of the arbitral process and reaffirming the vital role of party autonomy, particularly in international commercial matters. (625) This evolution has been reflected in U.S., European, Asian, Latin American and other
P 1134
national court decisions (626) and in legislative enactments (627) from all parts of the world. There have been a few exceptions to this trend (*e.g.*, the Chinese Supreme People's Court's treatment of Chinese competition law claims), but these have been isolated and typically in purely domestic settings.

Some commentators have criticized the evolution, and substantial diminution, of the nonarbitrability doctrine over the past three decades. They have urged that "'a-legality' informs the arbitral decisional law of the United States Supreme Court and the French courts alike," and warned that "[l]aw will be generated within the confines of a fully privatized system that is unaccountable to any public organization or process." (628)

That criticism is misconceived, on multiple grounds, in the international context. It ignores the fact that the demise of the nonarbitrability doctrine has occurred exclusively in the field of private rights of action, almost always in commercial disputes between business entities: (629) it is hardly surprising, nor proper ground for objection, that national courts and legislatures have been prepared to give effect to agreements between sophisticated business parties for the resolution of

commercial disputes regarding these types of rights by arbitration. On the contrary, this is precisely consistent with historic respect, and contemporary need, for party autonomy in commercial matters. [630] It is also consistent with how commercial disputes were historically treated (as evidenced by the Geneva Protocol's provisions regarding "commercial" disputes [631]). More generally, the limited role of the nonarbitrability doctrine reflects contemporary respect for private autonomy and freedom of association, basic human rights recognized widely in both national and international instruments. [632]

P 1135

The foregoing criticisms also rest fundamentally on the (incorrect) perception that international arbitral procedures are suspect or defective means to resolve public law claims. [633] This premise is not sustainable, and contradicts the policies underlying both the New York Convention and modern arbitration legislation, judicial decisions in almost all developed jurisdictions and the experience of several decades of contemporary international arbitration practice. [634]

In fact, as compared with virtually all national courts as forums for international litigation, international arbitration offers significant benefits for private parties (including efficiency, neutrality and the enhanced enforceability of any final decision). [635] Practical experience with international arbitral tribunals and procedures, dealing with complex factual and legal issues since the 1970s, leaves no serious doubt as to the competence of these tribunals to deal with such issues no less competently and fairly than national courts; indeed, arbitral tribunals typically offer benefits of enhanced neutrality, technical or legal expertise and commercial or regulatory experience. And, even if one ignored these benefits, enforcement of national court decisions applying local mandatory laws is seldom practicable: "in the context of an international contract … these advantages become chimerical since … an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice." [636] Given these considerations, there is no legitimate reason to distrust the arbitral process in cases involving commercial disputes between business entities, and on the contrary, substantial reason to facilitate and give effect to arbitration as a dispute resolution mechanism.

Moreover, even outside the context of commercial parties (*e.g.*, in settings involving consumers and employees), international arbitration has the potential to provide benefits of cost, speed and enforceability that are not readily replicated in most national courts. Moreover, many consumer and employment disputes involve commercial issues, which are squarely within the traditional areas of competence and expertise of arbitral tribunals. Insofar as concerns about one-sided or unfair arbitral procedures are concerned, these are readily addressed by application of principles of unconscionability, duress and guarantees of equal treatment and procedural fairness in the arbitral proceedings. The reality is that, in many instances, arbitration of consumer and employment disputes provide more efficient, fair and beneficial results for consumers and employees than traditional litigation processes. [637]

Criticisms of the contemporary disavowal of the nonarbitrability doctrine also omit consideration of the continuing role of national courts in reviewing arbitral awards (including the "second look" doctrine adopted in both U.S. and EU decisions [638]), which provides a material restraint on arbitral decision-making. At the same time, these critiques neglect the broad (and expanding) role of regulatory enforcement authorities and regulatory standards in contemporary international commercial affairs, which provide effective and appropriate mechanisms for safeguarding public interests. [639]

P 1136

Developments over the past decade also raise fundamental questions about the proper scope of the nonarbitrability doctrine, as distinguished from the public policy doctrine. As discussed elsewhere, there are now more than 3,000 bilateral and multilateral investment treaties in force, pursuant to which most states have undertaken to arbitrate a vast range of disputes with foreign investors, often affecting public interests and third party rights in profound ways. [640] At the same time, national laws and institutional arbitration rules have provided for the arbitration of class action claims, [641] small claims by consumers and employees, [642] human rights claims, [643] tax claims, [644] claims involving financial institutions and instruments, [645] intellectual property claims, [646] environmental claims, [647] sport disputes [648] and other "new" [649] categories of disputes. [650]

The question raised by the extension of arbitration to investor-state, tax, intellectual property, human rights and similar disputes is what the continuing role of the nonarbitrability doctrine should be. In principle, the notion that a dispute is not "capable of settlement by arbitration" should be applied exceptionally, with great restraint and as a last resort, particularly in commercial settings: [651] as the use of the arbitral process in diverse fields demonstrates, the arbitral process is entirely "capable" of resolving a wide range of international disputes. Indeed, the flexibility of the arbitral process can often make it *more* capable than many national litigation regimes for resolving particular categories of international disputes.

There are important categories of cases in which the nonarbitrability doctrine is appropriate. These include, for example, requests that an arbitral tribunal declare a company bankrupt, impose a

criminal sentence, approve a merger, or issue similar administrative acts. These decisions necessarily dictate the rights and obligations of third parties and involve the exercise of prosecutorial or administrative discretion which must reside in democratically-accountable decision-makers and regulatory authorities. Matters of this nature are not ordinarily "capable of settlement" by arbitration, which is a consensual process between specified parties.

Beyond such matters, however, the nonarbitrability doctrine should only rarely be applied in international matters, and virtually never in commercial settings. The experience of the past decades, in multiple contexts and jurisdictions, is that arbitration provides a neutral, workable and fair dispute resolution mechanism for almost all types of disputes. Inadequacies in the arbitral process can, in most instances, be addressed through the application of traditional
P 1137
contract law principles (*e.g.*, unconscionability, duress), through application of public policy doctrines in the context of recognition and enforcement of awards, or through well-tailored legislative or regulatory efforts aimed at improving the arbitral process (as with Alberta's previous legislative framework for regulatory approval of predispute consumer arbitration agreements [652]). What neither the New York Convention nor the objectives of contemporary national arbitration legislation contemplate is the wholesale nonarbitrability of important categories of international disputes or the application of idiosyncratic rules designed to favor local parties at the expense of foreign entities.

When the nonarbitrability doctrine is applied, it must be within the limits imposed by Article II(3) and Article V(2)(a) of the New York Convention. The nonarbitrability doctrine is an exception, contrary to the uniform choice-of-law regime established by Article V(1)(a) and contrary to the Convention's objectives, which should be applied with restraint, in a narrowly-tailored and non-idiosyncratic fashion, [653] and generally not on an interlocutory basis (*e.g.*, prior to a final arbitral award). [654] Moreover, consistent with an appropriate choice-of-law analysis, national courts should not apply foreign nonarbitrability rules (save in unusual cases), and should instead give effect to Article V(1) (a)'s choice-of-law regime. [655] Even if a state is permitted by the Convention to adopt local nonarbitrability rules as an escape device, other Contracting States generally should not (and may not) give such rules effect. [656]
P 1137

## References

[1)]

For commentary, *see* H. Arfazadeh, *Ordre Public et Arbitrage International à l'Épreuve de la Mondialisation* 79-109 (2d ed. 2006); Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73 (2001); Baker & Stabile, *Arbitration of Antitrust Claims: Opportunities and Hazards for Corporate Counsel*, 48 Bus. L. 395 (1993); Baron & Liniger, *A Second Look at Arbitrability: Approaches to Arbitration in the United States, Switzerland and Germany*, 19 Arb. Int'l 27 (2003); Bedell, Harrison & Grant, *Arbitrability: Current Developments in the Interpretation and Enforceability of Arbitration Agreements*, 13 J. Cont. L. 1 (1987); Beechey, *Arbitrability of Anti-Trust/Competition Law Issues: Common Law*, 12 Arb. Int'l 179 (1996); Blessing, *Arbitrability of Intellectual Property Disputes*, 12 Arb. Int'l 191 (1996); Böckstiegel, *Public Policy and Arbitrability*, in P. Sanders (ed.), *Comparative Arbitration Practice and Public Policy in Arbitration* 177 (1987); Borris, *Arbitrability of Corporate Law Disputes in Germany*, 2012 Int'l Arb. L. Rev. 161; Brekoulakis, *Arbitrability and Conflict of Jurisdictions: The (Diminishing) Relevance of Lex Fori and Lex Loci Arbitri*, in F. Ferrari & S. Kröll (eds.), *Conflict of Laws in International Arbitration* (2019); Brekoulakis, *On Arbitrability: Persisting Misconceptions and New Areas of Concern*, Queen Mary, University of London, 2009 School of Law Legal Studies Research Paper No. 20/2009 (2009); Buzbee, *When Arbitrable Claims Are Mixed with Nonarbitrable Ones: What's A Court to Do?*, 39 S. Tex. L. Rev. 663 (1998); Caivano, *Arbitrabilidad y Orden Público*, 12 Foro Jurídico 22 (2013); Calavros, *The Application of Substantive Mandatory Rules in International Commercial Arbitration from the Perspective of An EU UNCITRAL Model Law Jurisdiction*, 34 Arb. Int'l 219 (2018); Carbonneau, *Liberal Rules of Arbitrability and the Autonomy of Labor Arbitration in the United States*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 143 (2009); Carbonneau, *Shattering the Barrier of Inarbitrability*, 22 Am. Rev. Int'l Arb. 573 (2011); Carbonneau, *The Exuberant Pathway to Quixotic Internationalism: Assessing the Folly of* Mitsubishi, 19 Vand. J. Transnat'l L. 265 (1986); Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193 (1994); Cheng, *New Tools for An Old Quest: A Commentary on Kleinheisterkamp, The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 121 (2009); de Oliviera, *Arbitrability Under the New Brazilian Arbitration Act: A Real Change*, 33 Arb. Int'l 295 (2017); de Oliviera & Miranda, *International Public Policy and Recognition and Enforcement of Foreign Arbitral Awards in Brazil*, 30 J. Int'l Arb. 49 (2013); Dharmananda, *Arbitrability: International and Comparative Perspectives*, 5 Asian Int'l Arb. J. 223 (2009); Drličková, *Arbitrability and Public Interest in International Commercial Arbitration*, 17 Int'l & Comp. L. Rev. 55 (2017); V. Fernandez Andrade, *Arbitrabilidad de los Actos Administrativos Contractuales* (2018); French, *Arbitration*

*and Public Policy: 2016 Goff Lecture,* 24 Asia Pac. L. Rev. 1 (2016); Ghodoosi, *Arbitrating Public Policy: Why the Buck Should Not Stop at National Courts,* 20 Lewis & Clark L. Rev. 237 (2016); Gruner, *Accounting for the Public Interest in International Arbitration: The Need for Procedural and Structural Reform,* 41 Colum. J. Transnat'l L. 923 (2003); Hanotiau, *L'Arbitrabilité,* 296 Recueil des Cours 29 (2002); Hanotiau, *The Law Applicable to Arbitrability,* in A. van den Berg (ed.), *Improving the Efficiency of Arbitration Agreements and Awards: 40 Years of Application of the New York Convention* 146 (1999); Hanotiau, *What Law Governs the Issue of Arbitrability?,* 12 Arb. Int'l 391 (1996); Hanotiau & Caprasse, *Arbitrability, Due Process, and Public Policy Under Article V of the New York Convention,* 25 J. Int'l Arb. 721 (2008); Kerr, *Arbitrability of Securities Claims in Common Law Nations,* 12 Arb. Int'l 171 (1996); Kirry, *Arbitrability: Current Trends in Europe,* 12 Arb. Int'l 373 (1996); Klein, *Arbitrability of Company Law Disputes,* 2007 Austrian Arb. Y.B. 29; Kleinheisterkamp, *Overriding Mandatory Laws in International Arbitration,* 67 Int'l Comp. L.Q. 903 (2018); Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 91 (2009); Korzun, *Arbitrating Antitrust Claims: From Suspicion to Trust,* 48 N.Y.U. J. Int'l L. & Pol'y 867 (2016); Kozubovska, *Trends in Arbitrability,* 1 IALS Stud. L. Rev. 1, 22 (2014); Kurt, *Comment: An Unstoppable Mandate and An Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide,* 43 UCLA L. Rev. 999 (1996); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe,* 13-14 Concorrenza e Mercato 455 (2005-06); Lowenfeld, *The* Mitsubishi *Case: Another View,* 2 Arb. Int'l 178 (1986); Mante, *Arbitrability and Public Policy: An African Perspective,* 33 Arb. Int'l 275 (2016); McLaughlin, *Arbitrability: Current Trends in the United States,* 12 Arb. Int'l 113 (1996); Mourre, *Arbitration and Criminal Law. Reflections on the Duties of the Arbitrator,* 22 Arb. Int'l 95 (2006); Mourre, *Arbitrability of Antitrust Law From the European and US Perspectives,* in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3 (2011); Park, *Arbitrability and Tax,* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 179 (2009); 2010 OECD Arbitration and Competition; Park, *Private Adjudicators and the Public Interest: The Expanding Scope of International Arbitration,* 12 Brooklyn J. Int'l L. 629 (1986); Poser, *Arbitrability of International Securities Disputes,* 12 Brook. J. Int'l L. 675 (1986); Quinke, *Objective Arbitrability: Article V(2)(a),* in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 380 *et seq.* (2012); Rau, *The Arbitrator &* "*Mandatory Rules of Law,*" 18 Am. Rev. Int'l Arb. 51 (2007); Segan, *Arbitration Clauses and Competition Law,* 9 J. Euro. Comp. L. & Prac. 423 (2018); Smit, *Mandatory Law in Arbitration,* 18 Am. Rev. Int'l Arb. 155 (2008); Smit, Mitsubishi: *It Is Not What It Seems to Be,* 4(3) J. Int'l Arb. 7 (1987); Sterk, *Enforceability of Agreements to Arbitrate: An Examination of the Public Policy Defense,* 2 Cardozo L. Rev. 481 (1981); van Otterloo, *Arbitrability of Corporate Disputes: A Cross-Jurisdictional Analysis* (unpublished paper 2013); Vincent, *Oh, What A Tangled Web We Weave: The Implications of Conflicting Domestic Policy on Arbitrability and Award Enforcement,* 38 Hastings L.J. 141 (2015); Wai, *Transnational Private Law and Private Ordering in A Contested Global Society,* 46 Harv. Int'l L.J. 471 (2005); Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy,* 67 Minn. L. Rev. 595 (1983); Youssef, *The Death of Inarbitrability,* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International and Comparative Perspectives* 47 (2009).

2)

*See, e.g.,* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶389 (3d ed. 2015); E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶¶5-59 *et seq.* (1999); J. Lew, L. Mistelis & S. Kröll, *Comparative International Commercial Arbitration* ¶¶9-35 *et seq.* (2003).

3)

U.S. courts have also occasionally used the term "arbitrable" more broadly to include any question whether or not a particular dispute should be arbitrated. For example, some U.S. courts have treated questions about the scope of the arbitration clause, compliance with predispute conditions to commencing arbitration and the arbitral tribunal's jurisdiction (including the application of the competence-competence principle) as issues of "arbitrability." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (U.S. S.Ct. 1995); §7.03[E][2]. *See also Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S.Ct. 524 (U.S. S.Ct. 2019) ("When a dispute arises, the parties sometimes may disagree not only about the merits of the dispute but also about the threshold arbitrability question. … Under the [Federal Arbitration] Act and this Court's cases, the question of who decides arbitrability is itself a question of contract. The Act allows parties to agree by contract that an arbitrator, rather than a court, will resolve the threshold arbitrability questions as well as underlying merits disputes."). This terminology is imprecise, even in the U.S. context, and should be avoided in international settings.

4)

*See* §§6.02-6.03.

5)

*See id.*

6)

D. Roebuck & B. de Fumichon, *Roman Arbitration* 104-05 (2004). *See also* D. Roebuck, *Mediation and Arbitration in the Middle Ages: England 1154-58* (2013) (various crimes, including murder, subject to arbitration).

7)

*See* §4.05_[A][2]; §6.02[I].

8)

*See* §§6.04 *et seq.*

9)

*Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826-27 (2d Cir. 1968).

10)

*Id.* at 826.

11)

*See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 646-50 (U.S. S.Ct. 1985) (Stevens, J., dissenting); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 744 (U.S. S.Ct. 1981); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 58 (U.S. S.Ct. 1974); §6.03_[C][4]; §6.04.

12)

*See* §6.02[D]. This is consistent with the text of the New York Convention and most national arbitration legislation. New York Convention, Arts. II(1), V(2)(a) ("*subject matter of the difference* is not capable of settlement by arbitration") (emphasis added); European Convention, Art. VI(2) ("*dispute* is not capable of settlement by arbitration") (emphasis added); UNCITRAL Model Law, Art. 1(5) ("certain *disputes* may not be submitted to arbitration") (emphasis added).

13)

Geneva Protocol, Art. 1(1) (emphasis added).

14)

Geneva Convention, Art. 1(b).

15)

§§1.01[C][1]-[2]; §5.01[B][1].

16)

New York Convention, Art. II(1).

17)

*Id.* at Art. V(2)(a).

18)

*Report of the Committee on the Enforcement of International Arbitral Awards,* U.N. Doc. E/AC.42/4/Rev. 1, 2 (1955) (Article IV(a)).

19)

Also during the negotiations, the French delegation proposed omitting Article V(2)(a) entirely, on the basis that it might be used to apply purely domestic rules to international awards. *Consideration of the Draft Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, U.N. Doc. E/Conf.26/SR.11, 7 (1958) (French delegate). That proposal was, however, not accepted by the New York Conference. *See also* Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73 (2001); Paulsson, *Arbitrability, Still Through A Glass Darkly,* in ICC*, Arbitration in the Next Decade* 95 (1999) ("In the international context it is not easy to determine what rule of arbitrability should be applied … the New York Convention, for all its merit in other ways, leaves something to be desired in the way it treats this issue").

20)

As noted above, the Geneva Protocol applied to all international arbitration agreements concerning "commercial matters or … any *other* matter capable of settlement by arbitration." Geneva Protocol, Art. 1(1) (emphasis added). The apparent meaning of Article 1(1) was to treat all "commercial matters" as arbitrable, while contemplating that other "non-commercial matters" might be either arbitrable or non-arbitrable."

21)

*See* §6.02[B].

22)

*See* §1.04_[A][1]; §2.01[A][1][a]; §25.02[B].

23)

European Convention, Art. VI(2) (emphasis added).

24)

Inter-American Convention, Art. 5(2) (emphasis added).

25)

*Id.* at Art. 1.

26)

The Inter-American Convention has not yet been frequently applied, but the effect of its text is to require recognition of arbitration agreements even if they may concern matters that cannot be resolved by arbitration, while permitting states subsequently to refuse recognition of resulting awards on this ground. This is a sensible result, consistent with the approach taken by courts in developed nations towards many other issues relating to the validity of arbitration agreements. *See* §26.05[C][10]. On the other hand, there is at least a credible argument that a nonarbitrability exception could be implied into Article 1.

27)

*See* §5.06[B][1][e].

28)

*See* Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73 (2001); Böckstiegel, *Public Policy and Arbitrability*, in P. Sanders (ed.), *Comparative Arbitration Practice and Public Policy in Arbitration* 177 (1987); Hanotiau, *L'Arbitrabilité*, 296 Recueil des Cours 29 (2002); Hanotiau & Caprasse, *Arbitrability, Due Process, and Public Policy Under Article V of the New York Convention*, 25 J. Int'l Arb. 721 (2008); Mourre, *Arbitration and Criminal Law: Reflections on the Duties of the Arbitrator*, 22 Arb. Int'l 95 (2006); Schramm, Geisinger & Pinsolle, in H. Kronke *et al.* (eds.), *Recognition and Enforcement of Foreign Arbitral Awards: A Global Commentary on the New York Convention* Art. II, 68 (2010) ("a subject matter is arbitrable when there is no mandatory jurisdiction of a national court").

29)

Geneva Protocol, Art. 1.

30)

*See* §1.01[C][1].

31)

*See* §5.06; Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73, 79-80 (2001) ("clear distinction that arbitration laws draw between arbitrability, on the one hand, and the validity of the arbitration clause, on the other hand"); Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 382-83 (2012).

32)

Hanotiau, *The Law Applicable to Arbitrability,* 26 Sing. Acad. L.J. 874 (2014) ("there seems to be a general agreement to the effect that the subjective arbitrability of international disputes to which a State, a public collectivity or entity or a public body is a party, is, notwithstanding the contents of the domestic law of the State or entity concerned, a principle of public policy of the law of international arbitration").

33)

*See* §5.06[B][1][a].

34)

Similarly, an arbitration agreement in a joint venture agreement may generally be valid, including as applied to contract, tort and some competition claims, but may be unenforceable as applied to certain nonarbitrable disputes under competition or intellectual property legislation (*e.g.*, where regulatory actions are required). *See* §§6.04[A] & [D].

35)

*See* §5.03[B].

36)

*See* §5.06[D][11].

37)

*See* §6.04.

38)

*See* §5.06[D][11].

39)

As discussed below, there is a close relationship between principles of mandatory law and public policy. *See* §19.04[B]. A mandatory law is typically a statutory (or constitutional) directive, reflecting fundamental public policies, that dictates particular rules and results, regardless of the parties' agreement. *See* §19.04[B][1]. A public policy is the legislative or other policy that underlies such mandatory laws, or that finds independent recognition in judicial decisions (particularly in common law systems). *See* §19.04[B][1]. *See also* Caivano, *Arbitrabilidad y Orden Público,* 12 Foro Jurídico 22 (2013); Calavros, *The Application of Substantive Mandatory Rules in International Commercial Arbitration from the Perspective of An EU UNCITRAL Model Law Jurisdiction,* 34 Arb. Int'l 219 (2018); Cheng, *New Tools for An Old Quest: A Commentary on Kleinheisterkamp, The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 121 (2009); de Oliviera & Miranda, *International Public Policy and Recognition and Enforcement of Foreign Arbitral Awards in Brazil,* 30 J. Int'l Arb. 49 (2013); Drličková, *Arbitrability and Public Interest in International Commercial Arbitration,* 17 Int'l & Comp. L. Rev. 55 (2017); French, *Arbitration and Public Policy: 2016 Goff Lecture,* 24 Asia Pac. L. Rev. 1 (2016); Ghodoosi, *Arbitrating Public Policy: Why the Buck Should Not Stop at National Courts,* 20 Lewis & Clark L. Rev. 237 (2016); Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 91 (2009); Kleinheisterkamp, *Overriding Mandatory Laws in International Arbitration,* 67 Int'l Comp. L.Q. 903 (2018); Kramer, *EU Overriding Mandatory Law and the Applicable Law on the Substance in International Commercial Arbitration,* in F. Ferrari (ed.)*, The Impact of EU Law on International Commercial Arbitration* 285 (2017) ("the importance of international commercial arbitration as a dispute resolution method … gives these tribunals a responsibility to at least consider EU overriding mandatory law of a fundamental nature"); Mante, *Arbitrability and Public Policy: An African Perspective,* 33 Arb. Int'l 275 (2016); Rau, *Comment: Mandatory Law and the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 133 (2009).

40)

*See* §19.04[B][4].

41)

*See* §11.05[B][2][b].

42)

*See* §15.04.

43)

*See* §5.06._[D][10]; §6.04; §26.05[C][9][h].

44)

*See* §5.06[D][12].

45)

*See* §6.03[B]. In practice, legislatures not infrequently couple rules of mandatory law with nonarbitrability rules, typically in an effort to ensure the enforcement of such rules. *See* §6.03[C].

46)

For example, competition or securities law claims involve matters of public policy and/or mandatory law, but will generally be arbitrable. *See* §§6.04[A]-[B]; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626-27 (U.S. S.Ct. 1985); *Judgment of 20 March 2008, Jacquetin v. SA Intercaves,* 2008 Rev. Arb. 341 (Paris Cour d'Appel); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace,* 1993 Rev. Arb. 645 (Paris Cour d'Appel); *Judgment of 23 June 1992,* DFT 118 II 353 (Swiss Fed. Trib.) (Iraq sanctions were mandatory laws for arbitrators to apply); *Judgment of 18 October 2003,* Case No. AAP M 1988/2013 (Madrid Audiencia Provincial); *Final Award in Chamber of National and International Arbitration of Milan of 23 September 1997,* XXIII Y.B. Comm. Arb. 93 (1998).

47)

*Judgment of 16 February 1989, Almira Films v. Pierrel*, 1989 Rev. Arb. 711, 714-15 (Paris Cour d'Appel). *See also Mitsubishi Motors*, 473 U.S. 614; *Judgment of 20 March 2008, Jacquetin v. SA Intercaves*, 2008 Rev. Arb. 341 (Paris Cour d'Appel); *Judgment of 12 September 2002, Macron v. Cartonnages de Pamfou*, 2002 Rev. Arb. 173 (Paris Cour d'Appel); *Judgment of 20 September 1995, Matra Hachette v. Reteitalia*, 1996 Rev. Arb. 87, 90-91 (Paris Cour d'Appel); *Judgment of 7 December 1994, V 2000 v. Project XL 220 ITD*, 1996 Rev. Arb. 245, 249 (Paris Cour d'Appel); *Judgment of 14 October 1993, Aplix v. Velcro*, 1994 Rev. Arb. 164, 167 (Paris Cour d'Appel) ("arbitrability of a dispute is not excluded solely because public policy rules are applicable to this dispute; in international arbitration, an arbitrator decides on its own jurisdiction with regard to arbitrability of the dispute, taking into account the rules of international public order, has the power to apply these rules and principles and order sanctions for violation of these rules, subject to subsequent control by the annulment judge"); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace*, 1993 Rev. Arb. 645 (Paris Cour d'Appel); *Judgment of 29 March 1991, Ganz v. Nationale des Chemins de Fer Tunisiens*, 1991 Rev. Arb. 478, 480 (Paris Cour d'Appel) ("in international arbitration, an arbitrator ... is entitled to apply rules of [international] public policy and to grant redress in the event that those rules have been disregarded ..."); *Judgment of 15 November 2005, Arkhangelskoe Geologodobychnoe Predpriyatie v. Archangel Diamond Corp.*, Case No. T-2277-04 (Svea Ct. App. 2005) ("The fact that there are mandatory provisions in a certain area, however, does not automatically imply that disputes in this area are nonarbitrable"); *Judgment of 5 July 2006, Terra Armata Srl v. Tensacciai SpA*, 25 ASA Bull. 618, 623-24 (Milan Corte di Appello) (2007); *Judgment of 13 September 2002*, 2004 Rev. Arb. 105 (Milan Corte di Appello); Mourre, *Arbitrability of Antitrust LawFrom the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 11 (2011) ("There is nowadays ... a general consensus that arbitrators have the power to apply mandatory rules, either principally or incidentally, and to draw the civil consequences of a violation of said rules, under the control of the judge who will be called upon to assess the award's validity and/or enforceability").

Some national arbitration statutes expressly recognize this. *See, e.g.*, Québec Civil Code, Art. 2639(2) ("An arbitration agreement may not be opposed on the ground that the rules applicable to settlement of the dispute are in the nature of rules of public order").

48)

*Judgment of 9 November 1990, Condominiums Mont Saint-Sauveur Inc. v. Constrs. Serge Sauvé Ltée*, [1990] RJQ 2783, 2789 (Québec Cour d'Appel).

49)

*See, e.g., Mitsubishi Motors*, 473 U.S. at 626-27; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 515-16 (U.S. S.Ct. 1974); *London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.); *Judgment of 20 March 2008, Jacquetin v. SA Intercaves*, 2008 Rev. Arb. 341, 341 (Paris Cour d'Appel) ("arbitrators decide on their jurisdiction in relation to arbitrability with regard to international public policy and have authority to apply principles and rules arising from the latter, as well as to sanction their eventual violation; arbitrability is not excluded solely because public policy regulation is applicable to the legal relationship subject of the dispute"); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace,* 1993 Rev. Arb. 645, 645 (Paris Cour d'Appel) ("arbitrability of a dispute is not excluded solely because public policy regulation is applicable to the legal relationship subject of the dispute; in international arbitration, arbitrators decide on their jurisdiction in relation to arbitrability of the dispute with regard to international public policy, and have authority to apply principles and rules arising from the latter, as well as to sanction their eventual violation, subject to control by the annulment judge"); *Judgment of 19 July 2004*, II ZR 65/03 (German Bundesgerichtshof) (arbitrability does not depend on whether award might violate mandatory rules of law); *Tomolugen Holding Ltd v. Silica Investors Ltd*, [2015] SGCA 57, ¶84 (Singapore Ct. App.); *Judgment of 23 December 2004, Can Taulina SL v. Totalfinalelf España*, Case No. AAP M 11350/2004 (Madrid Audiencia Provincial) (application of mandatory rules of EU competition law does not render dispute nonarbitrable; arbitrators are bound to apply those rules). *See also* Vincent, *Oh, What A Tangled Web We Weave: The Implications of Conflicting Domestic Policy on Arbitrability and Award Enforcement*, 38 Hastings L.J. 141 (2015).

50)

New York Convention, Art. V(2); §§26.05[C][9]-[10].

51)

New York Convention, Art. V(2)(a); §26.05[C][10].

52)

New York Convention, Art. V(2)(b); §26.05[C][9]. *See also* Kleinheisterkamp, *Overriding Mandatory Laws in International Arbitration*, 67 Int'l Comp. L.Q. 903 (2018).

53)

*See* §§25.04[G]-[H]. *See also* Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 386-88 (2012).

54)

*See* §5.06_[D][12]; §6.08.

55)

*See* §§6.04[A][1] & [5].

56)

*See* §§6.04[A]-[C] & [F].

57)

*See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999); *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir. 1995) (rejecting (on ripeness grounds) argument that rules governing Zurich arbitration proceeding would be prospective waiver of statutory rights to treble damages "because it is not clear what law the Zurich tribunal will apply"). *See also Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409 (5th Cir. 1984).

58)

*See* §6.04[A][1].

59)

*Vimar Seguros y Reaseguros, SA v. MV Sky Reefer*, 515 U.S. 528, 541 (U.S. S.Ct. 1995) (emphasis in original).

60)

*PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 (U.S. S.Ct. 2003).

61)

*See, e.g., Dillon v. BMO Harris Bank, NA,* 856 F.3d 330, 334 (4th Cir. 2017) ("When there is uncertainty whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies, the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies. … In such a case, the prospective waiver issue would not become ripe for final determination until the federal court is asked to enforce the arbitrator's decision."); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1289 (11th Cir. 2015) ("any claim that an arbitration agreement prospectively waived a party's right to pursue U.S. statutory remedies must be brought at the award-enforcement stage, not at the arbitration-enforcement stage"); *Aggarao v. MOL Ship Mgt Co.*, 675 F.3d 355, 373 (4th Cir. 2012) ("Aggarao is not entitled to interpose his public policy defense, on the basis of the prospective waiver, doctrine until the second stage of the arbitration-related court proceedings – the award-enforcement stage"); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999) ("[I]t is possible that the Swiss Tribunal might apply U.S. antitrust law to the dispute. … Moreover, even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection."); *Suzlon Structure, Ltd v. Pulk*, 2010 WL 3540951 (S.D. Tex.) (staying litigation of RICO claims notwithstanding fact that parties' choice of (English) law might preclude assertion of RICO claims in foreign-seated arbitration).

62)

*See, e.g., Judgment of 2 June 2004*, 2005 Rev. Arb. 674, 677 (Paris Cour d'Appel); *Casaceli v. Natuzzi SpA*, [2012] FCA 691, ¶¶31-33 (Australian Fed. Ct.) (rejecting argument that arbitral tribunal seated in Italy would not apply mandatory Australian law, citing expert evidence that: "an arbitral tribunal sitting in Italy and deciding under the Rules of the Milan Arbitration Chamber a dispute involving the market of a third country would consider the applicability of the mandatory rule of that country, even if the law governing the merits of the dispute chosen by the parties were a different law. … First, as a matter of policy, it is recognized that arbitration should not be perceived as a means to avoid or circumvent the application of such mandatory rules. Secondly, arbitrators must consider the enforceability of their awards in countries where the parties wish [to seek enforcement].").

63)

*See* §5.06[D][12].

64)

*Dziennik v. Sealift, Inc.*, 2010 WL 1191993, at *7 (E.D.N.Y.) (quoting *Vimar Seguros y Reaseguros*, 515 U.S. at 541).

65)

*See, e.g.*, *Lindo v. NCL (Bahamas), Ltd*, 652 F.3d 1257, 1292 (11th Cir. 2011) (Barkett, J., dissenting) ("null and void" standard in Article II provides a public policy defense at the arbitration agreement enforcement stage); *Judgment of 17 May 2006*, 7 U 1781/06, 1556 (Oberlandesgericht München) (combined effect of foreign choice-of-law clause (selecting California law) and foreign arbitration agreement (specifying California seat) rendered arbitration agreement unenforceable, because it might compromise or nullify protections afforded by §89b of German Commercial Code); *Judgment of 16 November 2006*, Case No. C.02.0445.F, 9 (Belgian Cour de Cassation); *Judgment of 22 December 1988, Gutbrod Werke GmbH v. Usinorp de Saint-Hubert*, 1988 Journal des Tribunaux 458 (Belgian Cour de Cassation) ("an arbitration clause could only be valid if it specified that the arbitrators are obligated to apply Belgian law [and] that, if that is not the case, the clause could not stand"). *See also* Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 91, 99-103 (2009); §5.06[C][13][d].

66)

*Judgment of 16 November 2006*, Case No. C.02.0445.F, 9 (Belgian Cour de Cassation).

67)

*Compare* Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 386-88 (2012) (national court may refuse to recognize arbitration agreement where there is "reasonable certainty," but not "reasonable threat," that arbitral tribunal will not apply mandatory law).

68)

See §4.05[C][4].

69)

*See* §4.05_[A][1]; §6.02[B]. As discussed above, Article V(1)(a)'s conflicts rules are generally-applicable rules with universal application. *See* §4.04[A][1][b]; §4.04[B][2][b].

70)

*See* §4.05[A][2].

71)

*Restatement of the U.S. Law of International Commercial and Investor-State Arbitration* §2.16 comment b (2019).

72)

*Id.*

73)

*Id.* at comment a ("The arbitrability limitations that Congress has chosen to impose have ordinarily been of the conditional type, and the conditions established often involve timing or form of consent. For example, arbitrability may depend on post-dispute consent having been given or a pre-dispute agreement to arbitrate having been conspicuous or separately signed, or a 'cooling off' period having elapsed.").

74)

*See* §5.06; §6.02.

75)

Thus, under the *Restatement's* concept of conditional arbitrability, a Contracting State could treat all tort claims, all fraud claims, or all shareholder disputes as conditionally nonarbitrable, while also providing that such claims or disputes could be arbitrated if the parties' arbitration agreement satisfied elevated form requirements (*e.g.*, large font, separate and signed instrument) or unusual substantive requirements (*e.g.*, local arbitral seat or local arbitral institution, heightened standard of proof), in each case imposed by local law.

76)

*Mitsubishi Motors*, 473 U.S. 639.

77)

*Restatement of the U.S. Law of International Commercial and Investor-State Arbitration* §2.16 comment c (2019).

78)

*See* §1.04_[A][1]; §4.04[A][1][b].

79)

*See* §1.04_[A][1]; §4.04[A][1][b].

80)

*See* §6.03[C][2] (Switzerland); §6.03[C][3] (France); §6.03[C][4] (United States).

81)

*Mitsubishi Motors*, 473 U.S. at 639.

82)

*See* §6.03_[C][4]; *Mitsubishi Motors*, 473 U.S. 614; *Scherk*, 417 U.S. at 515-16; *Cvoro v. Carnival Corp.*, 2019 WL 5257962 (11th Cir.); *Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1060 (9th Cir. 2018); *Suazo v. NCL (Bahamas), Ltd*, 822 F.3d 543, 547 (11th Cir. 2016); *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 730-32 (5th Cir. 2009); *Antillean Marine Shipping Corp. v. Through Transp. Mut. Ins., Ltd*, 2002 U.S. Dist. LEXIS 26363, at *7-8 (S.D. Fla.) (rejecting nonarbitrability objection under McCarran-Ferguson Act, which "does not apply to international insurance contracts made under the Convention"); *Assuranceforeningen Skulld (Gjensidig) v. Apollo Ship Chandlers, Inc.*, 847 So.2d 991, 993 (Fla. Dist. Ct. App. 2003) (rejecting nonarbitrability objection under McCarran-Ferguson Act "because the parties' dispute involves foreign commerce").

83)

*See* §6.03_[C][3]; *Judgment of 29 March 1991, Ganz v. Nationale des Chemins de Fers Tunisiens*, 1991 Rev. Arb. 478 (Paris Cour d'Appel); *Judgment of 20 June 1969, Impex v. Malteria Adriatica*, 1969 Rev. Arb. 95 (Paris Cour d'Appel).

84)

*See* §6.03_[C][2]; *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.).

85)

*Judgment of 22 February 2019,* Case Nos. T 8538-17 & T 12033-17 (Svea Ct. App.) (underlying dispute was arbitrable and ECJ's *Achmea* decision, regarding validity of intra-EU BITs, did not render award incompatible with Swedish public policy). *See also Judgment of 15 November 2005,* Case No. T-2277-04, 7 (Svea Ct. App.) ("a tendency internationally to accept that an international dispute may be resolved by arbitration proceedings even if a similar national dispute would fall outside the arbitration area").

86)

*See* §§6.03[C][5]-[6].

87)

*See* E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶575 (1999); Mourre & Radicati di Brozolo, *Towards Finality of Arbitral Awards: Two Steps Forward and One Step Back*, 23 J. Int'l Arb. 171 (2006); J.-F. Poudret & S. Besson, *Comparative Law of International Arbitration* ¶¶326, 342, 348 (2d ed. 2007); A. van den Berg, *The New York Arbitration Convention of 1958* 153 (1981) ("the field of nonarbitrable matters in international cases may … be smaller than that in domestic ones").

88)

*See* §§6.03[A] & [C].

89)

*See* §4.05[A][2]. *See Judgment of 15 November 2005,* Case No. T-2277-04, 7 (Svea Ct. App.).

90)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018) ("In many cases over the years, this Court has heard and rejected efforts to conjure conflicts between the [FAA] and other federal statutes. … Throughout, we have made clear that even a statute's express provision for collective legal actions does not necessarily mean that it precludes 'individual attempts at conciliation' through arbitration. … And we've stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act.") (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (U.S. S.Ct. 1991)). *Compare id.* at 1628 (Ginsburg, J., dissenting) ("Even assuming the FAA and the NLRA were inharmonious, the NLRA should control. Enacted later in time, the NLRA should qualify as 'an implied repeal' of the FAA, to the extent of any genuine conflict.").

91)

*Mitsubishi Motors*, 479 U.S. at 639-40 n.21. *See also Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (U.S. S.Ct. 1987).

92)

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 483 (U.S. S.Ct. 1989). *See also CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (U.S. S.Ct. 2012) (rejecting claim that Credit Repair Organization Act rendered CROA claims nonarbitrable: "Had Congress meant to prohibit these very common [arbitration] provisions in the CROA, it would have done so in a manner less obtuse than what respondents suggest. When it has restricted the use of arbitration in other contexts, it has done so with a clarity that far exceeds the claimed indications in the CROA.").

93)

*Editions Chouette Inc. v. Desputeaux*, 2003 SCC 17, ¶46 (Canadian S.Ct.).

94)

*Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15, ¶103 (Canadian S.Ct.) (Lebel, J., dissenting). *See also Rinehart v. Welker*, [2012] NSWCA 95, 96 (N.S.W. Ct. App.) (discussing arbitrability of disputes under trust deed: "only in extremely limited circumstances that a disputes which the parties have agreed to refer to arbitration will [be] held to be non-arbitrable").

95)

*See* authorities cited §6.03_[C][4]; §6.03_[C][5]; *Larsen Oil & Gas Pte Ltd v. Petroprod Ltd*, [2011] SGCA 21 (Singapore Ct. App.) ("we accept that there is ordinarily a presumption of arbitrability where the words of an arbitration clause are wide enough to embrace a dispute, unless it is shown that parliament intended to preclude the use of arbitration for the particular type of dispute in question (as evidenced by the statute's text or legislative history), or that there is an inherent conflict between arbitration and the public policy considerations involved in that particular type of dispute"); *Rinehart v. Welker*, [2012] NSWCA 95, ¶167 (N.S.W. Ct. App.) ("it is only in extremely limited circumstances that a dispute which the parties have agreed to refer to arbitration will be held to be nonarbitrable").

96)

UNCITRAL Model Law, Art. 1(5).

97)

*See, e.g., BWV Invs. Ltd v. Saskferco Prods. Inc.*, [1994] CanLII 4557 (Saskatchewan Ct. App.); *Union Charm Dev. Ltd v. B&B Constr. Co.*, [2001] HKCFI 779 (H.K. Ct. First Inst.).

98)

*Mitsubishi Motors*, 473 U.S. 639.

99)

*See* UNCITRAL Model Law, Art. 1(5). *See also* Bantekas & Ortolani, *Definition and Form of Arbitration Agreement*, in I. Bantekas *et al.* (eds.), *UNCITRAL Model Law on International Commercial Arbitration: A Commentary* 127 (2020); Sanders, *UNCITRAL's Model Law on International Commercial Conciliation*, 23 Arb. Int'l 105 (2007).

100)

*See* §6.02[D].

101)

*See* §4.05[A][2].

102)

*See id.*

103)

UNCITRAL Model Law, Art. 1(5). *See* Bantekas & Ortolani, *Definition and Form of Arbitration Agreement*, in I. Bantekas *et al.* (eds.), *UNCITRAL Model Law on International Commercial Arbitration: A Commentary* 127 (2020); H. Holtzmann & J. Neuhaus, *A Guide to the UNCITRAL Model Law on International Commercial Arbitration: Legislative History and Commentary* 26 (1989).

104)

*See* §6.03[C][1].

105)

*See* §§6.03[C][2] *et seq*.

106)

Swiss Law on Private International Law, Art. 177(1). *See, e.g., Judgment of 15 March 1993*, DFT 119 II 271, 275 (Swiss Fed. Trib.); *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.) (Article 177(1) of SLPIL reflects legislative intention to permit easier access to international arbitration); B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶¶207 *et seq.* (3d ed. 2015); Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257 (2006); Oetiker, in M. Müller-Chen & C. Widmer Lüchinger (eds.), *Zürcher Kommentar zum IPRG* Art. 177, ¶¶18 *et seq.* (3d ed. 2018).

107)

Swiss Expert Committee, *Final Report on the Draft Bill for the Private International Law Act*, SSIR 13, 46-47 (1979); Swiss Federal Council (Bundesrat), *Report of 10 November 1982 Regarding the Private International Law Act*, Bundesblatt 301 (1983). Article 177(1) applies to any international arbitration seated in Switzerland and subject to the Swiss Law on Private International Law. *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.); Briner, in S. Berti *et al.* (eds.), *International Arbitration in Switzerland* Art. 177, ¶11 (2000) ("Arbitrability is therefore governed by the *lex arbitri* without any consideration for the possibly stricter rules of the *lex causae* or of the national law of the parties").

108)

*Compare* Swiss Code of Civil Procedure, Art. 354 (in domestic matters: "Any claim over which the parties may freely dispose may be the object of an arbitration agreement"). *See Judgment of 23 June 1992*, DFT 118 II 353, 356 (Swiss Fed. Trib.) ("Art. 177 PIL does not subordinate the arbitrability of a dispute to the fact that the parties can freely dispose of the related right, so that it is erroneous to equate the '*nature patrimoniale*' [*i.e.*, pecuniary value], in the sense of this provision, to the freedom to dispose mentioned in Art. 5 CIA. … These are two distinct criteria. The legislator voluntarily left aside the second of the two, which would presuppose a conflict-of-laws solution since, in international matters, the definition of the nature of legal relationships submitted to arbitration requires examination of the material law applicable to them.").

109)

*See Judgment of 30 June 2014*, DFT 5A_22/2013, ¶2.4.1 (Swiss Fed. Trib.); *Judgment of 23 June 1992*, DFT 118 II 353, 356 (Swiss Fed. Trib.) (Article 177(1) "covers all claims which have an either active or passive financial value for the parties or, in other words, all rights which, at least as far as one of [the parties] is concerned, can be appreciated in money"). *See also* Baron & Liniger, *A Second Look at Arbitrability: Approaches to Arbitration in the United States, Switzerland and Germany*, 19 Arb. Int'l 27 (2003); D. Dardel, *Trust in Arbitration: Schweizerische Schiedsgerichtsbarkeit in Trustrechtlichen Angelegenheiten* ¶693 (2009); Fluor, *Die Entsendung des Arbeitnehmers in die Schweiz und nach China*, 85 Schriften zum Schweizerischen Arbeitsrecht 88, 113 (2019); Schwander, in R. Zäch (ed.), *KG Kommentar* Arts. 12-15, ¶34 (2018).

110)

*See* German ZPO, §1030 I(1) ("Any claim involving an economic interest (*vermögensrechtlicher Anspruch*) can be the subject of an arbitration agreement. An arbitration agreement not involving an economic interest shall have legal effect to the extent that the parties are entitled to include a settlement on the issue."). Section 1030 applies to arbitrations seated in Germany. *See Judgment of 7 July 2014*, 2014 SchiedsVZ 262 (Oberlandesgericht München).

111)

*See* K.-P. Berger, *The New German Arbitration Law in International Perspective* 7 (2000) ("notion of arbitrability implemented in both acts is extremely liberal"); Bundestags-Drucksache No. 13/5274 of 12 July 1996, reprinted in K.-P. Berger, *The New German Arbitration Law* 140, 179 (1998). A number of German statutory provisions that previously excluded certain categories of disputes from arbitration have been repealed.

112)

French Code of Civil Procedure, Art. 2059; Spanish Arbitration Act, Art. 2(1). *See also* Austrian ZPO, §582 ("[A]ny claim involving an economic interest that lies within the jurisdiction of the courts of law can be the subject of an arbitration agreement. An arbitration agreement on claims which do not involve an economic interest shall be legally effective insofar as the parties are capable of concluding a settlement on the issue in dispute.").

113)

For decisions involving arbitration of divorce matters, *see, e.g., Cohoon v. Cohoon*, 784 N.E.2d 904 (Ind. 2003); *Kelm v. Kelm*, 749 N.E.2d 299 (Ohio 2001); *Faherty v. Faherty*, 477 A.2d 1257 (N.J. 1984); *In re Marriage of Barker*, 251 P.3d 591 (Colo. App. 2010); *Kirshenbaum v. Kirshenbaum*, 929 P.2d 1204 (Wash. Ct. App. 1997); *Dick v. Dick,* 534 N.W.2d 185 (Mich. Ct. App. 1995); *Judgment of 3 December 1986*, 1987 NJW 651 (German Bundesgerichtshof); *Judgment of 8 February 1995*, 1996 NJW-RR 500 (Landgericht Giessen).

114)

Huber, *Schiedsvereinbarungen im Scheidungsrecht*, 2004 SchiedsVZ 280, 281. The concept of allowing disputes in connection with divorce to be resolved by arbitration has thoughtful proponents in a number of jurisdictions. *See, e.g.,* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶222 (3d ed. 2015); McGuane, *Model Marital Arbitration Act: A Proposal*, 14 J. Am. Acad. Matrimonial Law 393, 396 (1997); Oetiker, in M. Müller-Chen & C. Widmer Lüchinger (eds.), *Zürcher Kommentar zum IPRG* Art. 177, ¶142 (3d ed. 2018); Schlissel, *A Proposal for Final and Binding Arbitration of Initial Custody Determinations*, 26 Fam. L.Q. 71, 73, 76-79 (1992); Wagner, *Schiedsgerichtsbarkeit in Scheidungssachen*, in *Festschrift Schlosser* 1025, 1035-48 (2005).

115)

*See* §6.04[B][3] (securities disputes under German law); §6.04[H][2] (consumer disputes under EU law); §6.04[M] (distributorship claims in Belgium and Germany).

116)

French Civil Code, Arts. 2059, 2060(1). These provisions are essentially preserved from the 1806 Code of Civil Procedure. E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶560 (1999).

117)

J.-P. Gridel, *Notions Fondamentales de Droit et Droit Français, Introduction, Méthodologie, Synthèses* 7-8 (1992); Level, *L'Arbitrabilité*, 1992 Rev. Arb. 213, 219.

118)

*See* §4.05_[A][2]; §6.03[C][3].

119)

Mourre, *Arbitrability of Antitrust Law from the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 7-8 (2011).

120)

*Judgment of 15 May 1961, Jean Tardits et Cie v. Jydsk Andels Foderstof Forretning*, 89 J.D.I. (Clunet) 140, 148 (Orléans Cour d'Appel) (1962). The court held that claims for breach of contract raised issues "that could only be resolved by interpreting and applying rules of French economic public policy, which governed the performance of the contract," which were nonarbitrable.

121)

For a disapproving U.S. account of the erosion of the French nonarbitrability doctrine, *see* Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193, 194 (1994).

122)

*Judgment of 21 February 1964, Meulemans et Cie v. Robert*, 92 J.D.I. (Clunet) 113, 116 (Paris Cour d'Appel) (1965). The court held that a claim for damages, where an export license had not been obtained, was arbitrable, provided that it did not concern the legality of the underlying transaction. *See also Judgment of 11 October 1954*, 1982 Dalloz 388 (French Cour de Cassation) (tort claims may be arbitrable); *Judgment of 28 November 1950, Tissot v. Neff*, 1950 Bull. Civ. No. 316, 154 (French Cour de Cassation); *Judgment of 11 December 1981, Bureau de Recherches Géologiques et Minières v. Patina Int'l NV*, 1982 Rev. Arb. 311 (Paris Cour d'Appel) (tort claims arbitrable).

123)

*See Judgment of 20 June 1969, Impex v. Malteria Adriatica*, 1969 Rev. Arb. 95 (Paris Cour d'Appel).

124)

*Judgment of 29 March 1991, Ganz v. Nationale des Chemins de Fers Tunisiens*, 1991 Rev. Arb. 478, ¶¶13-14 (Paris Cour d'Appel). Applying this analysis, the court concluded that "the allegation of fraud or spoliation [was] not in itself such as to exclude the jurisdiction of the arbitral tribunal." *Id.* at 480.

125)

*Judgment of 14 October 1993, Aplix v. Velcro*, 1994 Rev. Arb. 164 (Paris Cour d'Appel) (arbitrators may apply EC competition law provisions and, where appropriate, award relief for wrongful conduct). *See also Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace*, 1993 Rev. Arb. 645, 650 (Paris Cour d'Appel).

126)

*See, e.g., Judgment of 4 June 2008, SNF v. Cytec*, 2008 Rev. Arb. 473 (French Cour de Cassation Civ. 1); *Judgment of 20 March 2008, Jacquetin v. SA Intercaves*, 2008 Rev. Arb. 341, 341 (Paris Cour d'Appel) ("arbitrators decide on their jurisdiction in relation to arbitrability with regard to international public policy and have authority to apply principles and rules arising from the latter, as well as to sanction their eventual violation; arbitrability is not excluded solely because public policy regulation is applicable to the legal relationship subject of the dispute"); *Judgment of 23 March 2006, SNF v. Cytec*, 2007 Rev. Arb. 100 (Paris Cour d'Appel); *Judgment of 18 November 2004, SA Thalès Air Défense v. GIE Euromissile*, 2004 Rev. Arb. 986 (Paris Cour d'Appel) (2005); *Judgment of 12 September 2002, Macron v. Cartonnages de Pamfou*, 2003 Rev. Arb. 173 (Paris Cour d'Appel).

127)

For good discussions, *see* E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶¶560, 567 (1999); Mourre, *Arbitrability of Antitrust Lawfrom the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 6-8 (2011).

128)

*Judgment of 9 November 2016,* Decision No. 388806 (French Conseil d'Etat).

129)

The only exception to this is 9 U.S.C. §15, which provides that the U.S. Act of State doctrine does not permit non-enforcement of arbitration agreements or awards. U.S. FAA, 9 U.S.C. §15.

130)

*See Wilko v. Swan*, 346 U.S. 427 (U.S. S.Ct. 1953).

131)

The Court relied principally on the text of U.S. securities legislation, which provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." 15 U.S.C. §77n.

132)

*Wilko*, 346 U.S. at 438.

133)

*See, e.g., Hanes Corp. v. Millard*, 531 F.2d 585 (D.C. Cir. 1976); *Tire & Rubber Co. v. Jefferson Chem. Co.*, 182 U.S.P.Q. 70 (2d Cir. 1974); *Zip Mfg Co. v. Pep Mfg Co.*, 44 F.2d 184, 186 (D. Del. 1930); *Diematic Mfg Corp. v. Packaging Indus. Inc.*, 381 F.Supp. 1057 (S.D.N.Y. 1974). In 1982 and 1984, U.S. legislation rendering most categories of patent disputes arbitrable was enacted. 35 U.S.C. §294. *See* §6.04[D].

134)

*See, e.g., Martin v. Yasuda,* 829 F.3d 1118, 1125 (9th Cir. 2016); *Lake Commc'ns, Inc. v. ICC Corp.,* 738 F.2d 1473 (9th Cir. 1984); *Univ. Life Ins. Co. v. Unimarc Ltd,* 699 F.2d 846 (7th Cir. 1983); *Cobb v. Lewis,* 488 F.2d 41 (5th Cir. 1974); *Helfenbein v. Int'l Indus., Inc.,* 438 F.2d 1068 (8th Cir. 1971); *Am. Safety Equip. v. J.P. Maguire,* 391 F.2d 821 (2d Cir. 1968). *Compare*§6.04[A] [1].

135)

*SA Mineracao da Trindade-Samitri (Brazil) v. Utah Int'l Inc.,* 576 F.Supp. 566 (S.D.N.Y. 1984). §6.04[C].

136)

*See, e.g., Crawford v. Halsey,* 124 U.S. 648 (U.S. S.Ct. 1888); *Zimmerman v. Cont'l Airlines, Inc.,* 712 F.2d 55, 59-60 (3d Cir. 1983) ("[B]ecause of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the [Federal] Arbitration Act. Thus, while a bankruptcy court would have the power to stay proceedings pending arbitration, the use of this power is left to the sound discretion of the bankruptcy court."); *Allegaert v. Perot,* 548 F.2d 432 (2d Cir. 1977) (bankruptcy claims nonarbitrable where trustee asserts claims for the benefit of the estate's creditors, who would not be bound by arbitration agreement, rather than on behalf of the bankrupt); *Fallick v. Kehr,* 369 F.2d 899, 904-06 (2d Cir. 1966). *Compare*§6.04[F][3].

137)

*See, e.g., State Est. for Agric. Prod. Trading v. MV Wesermunde,* 838 F.2d 1576 (11th Cir. 1988) (declining to enforce foreign arbitration clause, reasoning that such enforcement would violate COGSA). *See* §6.04[J].

138)

*Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (U.S. S.Ct. 1974) ("collective bargaining agreement could not waive covered workers' rights to a judicial forum for causes of action created by Congress").

139)

*See* §6.04_[A][1]; §6.04_[F][3]; *Alexander,* 415 U.S. at 57 ("[O]ther facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land."). *Compare*§6.04[K].

140)

*McDonald v. City of W. Branch,* 466 U.S. 284, 290 (U.S. S.Ct. 1984). For an early, somewhat excited, argument in favor of a broad nonarbitrability doctrine, *see* Kronstein, *Business Arbitration: Instrument of Private Government,* 54 Yale L.J. 36 (1944).

141)

*See, e.g., State Est. for Agric. Prod. Trading v. MV Wesermunde,* 838 F.2d 1576 (11th Cir. 1988) (declining to enforce international arbitration agreement to COGSA claims); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 723 F.2d 155 (1st Cir. 1983), *aff'd,* 473 U.S. 614 (U.S. S.Ct. 1985); *NV Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.,* 532 F.2d 874 (2d Cir. 1976).

142)

*Nationale Pour La Recherche v. Gen. Tire & Rubber Co.,* 430 F.Supp. 1332, 1332 (S.D.N.Y. 1977).

143)

*See* §6.03[C][3].

144)

*See Scherk,* 417 U.S. at 515-16.

145)

*See Mitsubishi Motors,* 473 U.S. 614. For some of the considerable commentary on *Mitsubishi, see* Allison, *Arbitration of Private Antitrust Claims in International Trade: A Study in the Subordination of National Interests to the Demands of A World Market,* 18 N.Y.U. Int'l L. & Pol. 361 (1986); Carbonneau, *The Exuberant Pathway to Quixotic Internationalism: Assessing the Folly of* Mitsubishi, 19 Vand. J. Transnat'l L. 265 (1986); Cloud, Mitsubishi *and the Arbitrability of Antitrust Claims: Did the Supreme Court Throw the Baby out with the Bathwater?,* 18 L. & Pol'y Int'l Bus. 341 (1986); Fox, Mitsubishi v. Soler *and Its Impact on International Commercial Arbitration,* 19 J. World Trade L. 579 (1985); Lipner, *International Antitrust Laws: To Arbitrate or Not to Arbitrate,* 19 Geo. Wash. J. Int'l L. & Econ. 395 (1985); McLendon, *Subject-Matter Arbitrability in International Cases:* Mitsubishi Motors *Closes the Circle,* 11 N.C.J. Int'l L. & Com. Reg. 81 (1986); Posner, *Arbitration and the Harmonization of International Commercial Law: A Defense of* Mitsubishi, 39 Va. J. Int'l L. 647 (1999); Radicati di Brozolo, *Antitrust: A Paradigm of the Relations Between Arbitration and Mandatory Rules: A Fresh Look at the "Second Look,"* 2004 Int'l Arb. L. Rev. 23; Rau, *The Arbitrator & "Mandatory Rules of Law,"* 18 Am. Rev. Int'l Arb. 51 (2007); Smit, *Mandatory Law in Arbitration,* 18 Am. Rev. Int'l Arb. 155 (2008); Smit, Mitsubishi: *It Is Not What It Seems to Be,* 4(3) J. Int'l Arb. 7 (1987).

146)

*Scherk*, 417 U.S. at 517-18.

147)

*Mitsubishi Motors*, 473 U.S. at 629.

148)

*Id.* at 633.

149)

*Id.* at 636. The Court reasoned that "the tribunal … should be bound to decide [the parties'] dispute in accord with the national law giving rise to the claim." *Id.* at 636-37.

150)

*Id.* at 639 n.21.

151)

*Id.* at 639.

152)

*Id.* at 628.

153)

*Id.* at 639-40 n.21. *See also Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226-27 (U.S. S.Ct. 1987).

154)

*See* authorities cited §6.03_[C][3]; §6.03_[C][5]; Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193, 194 (1994) ("study of arbitrability in United States law is also occurring in France and other European civil law jurisdictions"); Radicati di Brozolo, *Antitrust: A Paradigm of the Relations Between Arbitration and Mandatory Rules: A Fresh Look at the "Second Look,"* 2004 Int'l Arb. L. Rev. 23.

155)

*See* E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶575 (1999); Mourre & Radicati di Brozolo, *Towards Finality of Arbitral Awards: Two Steps Forward and One Step Back*, 23 J. Int'l Arb. 171 (2006); J.-F. Poudret & S. Besson, *Comparative Law of International Arbitration* ¶¶326, 342, 348 (2d ed. 2007).

156)

*See, e.g., Shearson/Am. Express, Inc.*, 482 U.S. 220; *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (U.S. S.Ct. 1989) (overruling *Wilko v. Swan*, 346 U.S. 427 (U.S. S.Ct. 1953)).

157)

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (U.S. S.Ct. 1991).

158)

*Id.* at 26. *See also 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 258-60, 274 (U.S. S.Ct. 2009) ("a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate [ADEA] claims is enforceable as a matter of federal law").

159)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018) (quoting *Gilmer*, 500 U.S. at 32). *See also Lambert v. Tesla, Inc.,* 923 F.3d 1246 (9th Cir. 2019) ("no conflict between Title VII and arbitration, [because] 'the view that compulsory arbitration weakens Title VII conflicts with the Supreme Court's stated position that arbitration affects only the choice of forum, not substantive rights'") (quoting *Gilmer*, 500 U.S. at 26).

160)

*See* §6.04_[A][1]; *Lindo v. NCL (Bahamas), Ltd*, 652 F.3d 1257, 1266 (11th Cir. 2011); *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168 (7th Cir. 1988) (antitrust claim arbitrable in domestic context).

161)

*See, e.g.,* 15 U.S.C. §1226(a)(2) ("motor vehicle franchise contract" disputes nonarbitrable except where post-dispute agreement to arbitrate exists); Dodd-Frank Wall Street Reform and Consumer Protection Act, §748 ("No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section"), §921(a) (adding similar provisions to §15(o) to Securities Exchange Act of 1934 and §205(f) to Investment Advisers Act of 1940), §922(c) (adding similar provision to 18 U.S.C. §1514A(e), applicable to whistle-blower claims of employees of publicly registered companies and nationally recognized statistical rating organizations), §1057(d) (prohibiting predispute arbitration agreements that affect employee protection rights of person employed by entity subject to CFPB regulation), §1414 (amending §129C of Truth in Lending Act to prohibit predispute arbitration agreements with respect to residential mortgage loans and home equity loans).

162)

For a somewhat exaggerated assessment, *see* Rau, *The Culture of American Arbitration and the Lessons of ADR*, 40 Tex. Int'l L.J. 449, 452 (2005) ("I think … the category of 'inarbitrable' disputes is now a null set"). *See also* Shore, *The United States' Perspective on "Arbitrability,"* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 69 (2009).

163)

*See ET Plus SA v. Jean-Paul Welter* [2005] EWHC 2115, ¶51 (Comm) (English High Ct.) ("no realistic doubt that such competition or antitrust claims are arbitrable"). *See also Microsoft Mobile OY (Ltd) v. Sony Euro. Ltd* [2017] EWHC 374 (Ch) (English High Ct.) (cartel damages claims arbitrable).

164)

*Fulham Football Club (1987) Ltd v. Richards* [2011] EWCA Civ 855, ¶78 (English Ct. App.) ("nothing in the scheme of these provisions which … ma[de] the resolution of the underlying dispute inherently unsuitable for determination by arbitration on grounds of public policy"). *See also Re Vocam Euro. Ltd* [1998] BCC 396 (Ch) (English High Ct.) (summarily rejecting arguments that disputes concerning minority shareholder rights under §459 of English Companies Act, 1985, are nonarbitrable).

165)

*Nori Holding Ltd v. PJSC "Bank Otkritie Fin. Corp."* [2018] EWHC 1343, ¶63 (Comm) (English High Ct.). *See also London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.).

166)

*London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.); *Aqaba Container Terminal (Pvt) Co. v. Soletanche Bachy France sas* [2019] EWHC 471, ¶36 (Comm) (English High Ct.); *Accentuate Ltd v. Asigra Inc.* [2009] EWHC 2655, ¶89 (Comm) (English High Ct.).

167)

*Aqaba Container Terminal (Pvt) Co. v. Soletanche Bachy France sas* [2019] EWHC 471, ¶36. *See also Accentuate Ltd* [2009] EWHC 2655, ¶89 ("arbitration clause would be 'null and void' and 'inoperative' within the meaning of Article 9(4) of the Arbitration Act, in so far as it purported to require the submission to arbitration of 'questions pertaining to' mandatory provisions of EU law").

168)

*See, e.g.*, *Judgment of 19 April 2012*, 6 Ob 42/12p (Austrian Oberster Gerichtshof) (arbitrability of claim regarding resolution of limited liability company's annual general meeting not affected by need for factual findings regarding third party); *Judgment of 5 October 1994, Van Hopplynus v. Coherent Inc.*, XXII Y.B. Comm. Arb. 637 (Brussels Tribunal de Commerce) (1997) (upholding arbitrability of disputes concerning termination of distributorship despite mandatory character of Belgian Law on Termination of Exclusive Distributorships); *Lightsource Tech. Australia Pty Ltd v. Pointsec Mobile Tech. AB*, [2011] ACTSC 59 (Australian Cap. Terr. Sup. Ct.) (statutory claims arbitrable in principle); *Judgment of 22 October 1976, SA Tradax Exp. v. Spa Carapelli*, III Y.B. Comm. Arb. 279 (Florence Corte di Appello) (1978) (tort claims may be arbitrable, even if facts could also provide grounds for criminal liability).

169)

*Desputeaux v. Editions Chouette (1987) Inc.*, [2001] JQ No. 1510 (Québec Ct. App.), *rev'd*, [2003] 1 SCR 178 (Canadian S.Ct.). The Court of Appeal also cited Article 2639 of the Québec Civil Code, which provides: "[A] dispute regarding status and legal capacity of natural person, family matters or other questions involving public policy [cannot be submitted to arbitration]. However, the arbitration agreement should not be barred from application because the applicable rules to decide on the dispute have a public policy character." Québec Civil Code, Art. 2639. *See also Booz Allen & Hamilton Inc. v. SBI Home Fin. Ltd*, Civil Appeal No. 5440/2002, ¶22 (Indian S.Ct. 2011) (*in personam* rights are arbitrable but rights *in rem* are not).

170)

*Editions Chouette Inc. v. Desputeaux*, 2003 SCC 17, ¶46 (Canadian S.Ct.). *See also Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15 (Canadian S.Ct.) (Lebel, J., dissenting) ("It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly. Arbitration in and of itself is no longer considered contrary to public order, and courts ought not to read in the exclusion of arbitration if the legislature has not clearly provided that it is to be excluded.").

171)

*Haas v. Gunasekaram*, [2016] ONCA 744, ¶35 (Ontario Ct. App.).

172)

*Tomolugen Holding Ltd v. Silica Investors Ltd*, [2015] SGCA 57, ¶84 (Singapore Ct. App.) (citing G. Born, *International Commercial Arbitration* 945 (2d ed. 2014)).

173)

*Judgment of 15 November 2005, Arkhangelskoe Geologodobychnoe Predpriyatie v. Archangel Diamond Corp.*, Case No. T-2277-04, 7 (Svea Ct. App. 2005). *See also Judgment of 23 November 2012*, Case No. T 4982-11, ¶16 (Swedish S.Ct.) ("According to the parties' agreement, Swedish law governs the loan agreement. The dispute related to the liability to make the payment as such, and is thus amenable to out-of-court settlement. When the arbitral award was rendered, there was no Swedish peremptory currency legislation. … The foreign currency regulations – former or current – referenced in the case, are not of such nature as to affect the parties' rights to settle out-of-court in Sweden.").

174)

New Zealand Arbitration Act, Art. 10(1).

175)

Italian Code of Civil Procedure, Art. 806. Italian courts have interpreted the exceptions in Article 806 of the Italian Code of Civil Procedure narrowly. *See* M. Rubino-Sammartano, *International Arbitration Law* 104 (1990). *See also Final Award in Chamber of National and International Arbitration of Milan of 23 September 1997*, XXIII Y.B. Comm. Arb. 93 (1998) (issues involving mandatory provisions of Italian law are arbitrable).

176)

*See, e.g.*, Norwegian Arbitration Act, §9 ("Disputes concerning legal relations in respect of which the parties have an unrestricted right of disposition may be determined by arbitration"); Chinese Arbitration Law, Art. 3 (permitting arbitration of "[c]ontractual disputes and other disputes over rights and interests in property" and making exception only for "(1) marital, adoption, guardianship, support and succession disputes; (2) administrative disputes that laws require to be handled by administrative authorities"); Japanese Arbitration Law, Art. 13(1) (arbitration agreement valid "when its subject matter is a civil dispute that is capable of being settled by the parties"); Malaysian Arbitration Act, §4 ("Any dispute which the parties have agreed to submit to arbitration under an arbitration agreement may be determined by arbitration unless the arbitration agreement is contrary to public policy. … The fact that any written law confers jurisdiction in respect of any matter on any court of law but does not refer to the determination of that matter by arbitration shall not, by itself, indicate that a dispute about that matter is not capable of determination by arbitration."); South African Arbitration Act, §2 (making exception only for "(a) any matrimonial cause or any matter incidental to any such cause; or (b) any matter relating to status"); Argentine Arbitration Act, Art. 6 (commercial matters are arbitrable: "[A]ny legal relation, contractual or extracontractual, governed by private law or preponderantly by private law under Argentinian law, will be considered commercial. This interpretation will be broad and, in case of doubt, it should be held that the relation is commercial."); Brazilian Arbitration Law, Art. 1 ("Those who are capable of entering into contracts may make use of arbitration to resolve conflicts regarding freely transferable property rights. (1) Direct and indirect public administration may use arbitration to resolve conflicts regarding transferable public property rights."); Latvian Civil Procedure Law, Art. 487(1) ("a dispute, the adjudication of which may infringe the legal rights or interests of a person that is not a party to the arbitration agreement [is not arbitrable]"); Uruguayan Arbitration Law, Art. 1(7) ("The term 'commercial' must be interpreted broadly so that it covers the issues that arise in all commercial relations, contractual or otherwise").

177)

*Himpurna Cal. Energy Ltd v. PT (Persero) Perusahaan Listruik Negara, Final Award in Ad Hoc Case of 4 May 1999*, XXV Y.B. Comm. Arb. 13, 30-31 (2000).

178)

*Id. See also Final Award in Chamber of National and International Arbitration of Milan of 18 March 1999*, XXV Y.B. Comm. Arb. 382 (2000) (upholding arbitrability of extracontractual claims).

179)

*Metrocall Inc. v. Elec. Tracking Sys. Pty Ltd*, [2000] NSW IR Comm. 136 (N.S.W. Indus. Relations Comm'n).

180)

*Id.* at ¶54.

181)

As discussed below, the New York Convention is best understood as imposing limits on a Contracting State's ability to declare subjects nonarbitrable, requiring that the nonarbitrability doctrine be applied as an exception, based on specific and articulated local public policies. *See* §4.05_[A][2]; §25.04_[G]; §26.05[C][10]. A decision reserving to national courts or administrative agencies determinations whether a particular contract was "unfair" contradicts these limitations, by establishing an overbroad rule of nonarbitrability, rather than an exception grounded in specific public policies. That result is particularly true given the long-standing and unquestioned competence of arbitral tribunals to apply doctrines such as unconscionability or changed circumstances in contractual settings.

182)

*See, e.g., Comandate Mardoine Corp. v. Pan Australia Shipping Pty Ltd*, [2006] FCAFC 192 (Australian Fed. Ct.); *Transfield v. PacifiCare Hydro Ltd*, [2006] VSC 175 (Victoria Sup. Ct.).

183)

*Hub Power Co. v. Pakistan WAPDA*, 16 Arb. Int'l 439 (Pakistan S.Ct. 2000) (2000). *See* §6.04[N]. *See also Oyugi v. Law Soc'y of Kenya*, Civil Case No. 482/2004 (Nairobi High Ct. 2005) (tort claims nonarbitrable under Kenyan law).

184)

New York Convention, Art. II(1); §6.04[N].

185)

*See* §4.05[A][2].

186)

See Accentuate Ltd v. Asigra Inc. [2009] EWHC 2655, ¶89 (Comm) (English High Ct.) (suggesting that "arbitration clause would be 'null and void' and 'inoperative' within the meaning of Article 9(4) of the Arbitration Act, in so far as it purported to require the submission to arbitration of 'questions pertaining to' mandatory provisions of EU law"). The English court misunderstood both the character of the nonarbitrability doctrine (treating it as an issue of substantive validity under Article II(3), rather than nonarbitrability under Article II(1)) and the scope of the doctrine (treating it as extending to any issue of mandatory law).A similar approach was followed in relation to forum selection clauses. *See* Fern Computer Consultancy Ltd v. Intergraph Cadworx & Analysis Solutions Inc. [2014] EWHC 2908, ¶127 (Ch) (English High Ct.) ("That primacy [of EU law], in my view, justifies the court in determining that it is the proper place to determine the dispute and in declining to give effect to the jurisdiction clause in this context, where it is not clear that the alternative court would give effect to the Regulation at all").

187)

See Global Legal Group, *International Comparative Legal Guide to International Arbitration 2012* 253 (9th ed. 2012); Weiniger & Byrne, *Mandatory Rules, Arbitrability and the English Court Gets It Wrong*, 2010 Paris J. Int'l Arb. 201.

188)

See §6.03[C].

189)

See id.

190)

See §§6.04[A][1]-[2].

191)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018).

192)

See, e.g., *Wilko*, 346 U.S. at 435 n.18 ("We … proceed to the question decided below, namely, whether the 1933 Act evidences a public policy which forbids referring the controversy to arbitration"); *Judgment of 18 July 1987*, XVII Y.B. Comm. Arb. 534 (Bologna Tribunale) (1992). *See also* Kronstein, *Business Arbitration: Instrument of Private Government*, 54 Yale L.J. 36 (1944).

193)

See, e.g., *Wilko*, 346 U.S. at 438 ("Congress has afforded participants in transactions subject to its legislative power an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration *if the parties are willing to accept less certainty of legally correct adjustment*. … Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act.") (emphasis added); *Mitsubishi Motors*, 473 U.S. at 640 (Stevens, J., dissenting); *Alexander*, 415 U.S. at 58.

194)

See, e.g., *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 723 F.2d 155, 162 (1st Cir. 1983) ("strong possibility that contracts which generate antitrust disputes may be contracts of adhesion"), *aff'd*, 473 U.S. 614, 646-50 (U.S. S.Ct. 1985).

195)

See, e.g., *Zimmerman v. Cont'l Airlines, Inc.*, 712 F.2d 55, 59-60 (3d Cir. 1983) ("because of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the [FAA]"); *Benton v. Singleton*, 40 S.E. 811 (Ga. 1902) ("While the law favors the submission to arbitration of disputes arising between individuals over private matters as to which they alone are concerned, the submission to arbitrators of questions in which the public at large is interested, is not only discountenanced but positively forbidden").

196)

See, e.g., *Alexander*, 415 U.S. at 53 ("The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties"); *Harrington v. Brown*, 1865 WL 4687, at *1 (Mass.) ("arbitrators to whom a matter in dispute and also all accounts outstanding between parties have been submitted have no authority to award concerning the costs of a criminal prosecution instituted by one of the parties against the other, and growing out of the matter in dispute"; since this was a matter in which the Commonwealth was concerned, "it would be against public policy to permit these parties to settle the question of liability as a private question between them"); *Wyatt v. Benson*, 23 Barb. 327 (N.Y. Sup. 1857) ("A religious corporation, not having the power to sell its real estate without the consent of the supreme court, cannot submit the question of sale to any other tribunal").

197)

See *Mitsubishi Motors*, 473 U.S. at 627.

198)

*Alexander*, 415 U.S. at 58. *But see Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 233 (U.S. S.Ct. 1987) ("the mistrust of arbitration that formed the basis for the *Wilko* opinion in 1953 is difficult to square with the assessment of arbitration that has prevailed since that time"). *See also Epic Sys.*, 138 S.Ct. at 1627.

199)

*See* §19.04[B][3] for a discussion of arbitrators' power to consider and decide claims based on mandatory laws and public policy. *See also* §19.04[B][4].

200)

*Mitsubishi Motors*, 473 U.S. at 636, 639 n.21.

201)

The grounds for these international obligations are discussed above. *See* §4.05_[A][1]; §6.02[B].

202)

*See, e.g., Lake Commc'ns, Inc. v. ICC Corp.*, 738 F.2d 1473 (9th Cir. 1984); *Univ. Life Ins. Co. v. Unimarc Ltd*, 699 F.2d 846 (7th Cir. 1983); *Cobb v. Lewis*, 488 F.2d 41 (5th Cir. 1974); *Helfenbein v. Int'l Indus., Inc.*, 438 F.2d 1068 (8th Cir. 1971); *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968). *See also Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 835 (7th Cir. 2003) (Cudahy, J., dissenting) ("For some considerable time not long in the past, … antitrust disputes were not arbitrable").

203)

*See, e.g., Judgment of 18 July 1987*, XVII Y.B. Comm. Arb. 534 (Bologna Tribunale) (1992) ("the nullity of the [arbitration] clause concerns the clause's conflict with imperative provisions [of EC competition law] and cannot, therefore … be capable of settlement by arbitration").

204)

*See, e.g., Award in ICC Case No. 1397*, in J.-J. Arnaldez, Y. Derains & D. Hascher (eds.), *Collection of ICC Arbitral Awards 1974-1985* 179, 181 (1990) (although considering EU competition law claims to evaluate challenge to validity of contract, tribunal reasoned: "a dispute relating essentially to the validity or nullity of a contract under Article 85 of the Treaty of Rome would be beyond the jurisdiction of an arbitrator and no arbitration agreement could substitute a private judge for a public judge to resolve a dispute concerning public policy *in se* and *per se*"). *Compare Final Award in ICC Case No. 7673*, 6(1) ICC Ct. Bull. 57 (1995); *Final Award in ICC Case No. 7097*, in ICC, *International Commercial Arbitration in Europe* 38 (1993); *Award in ICC Case No. 4604*, 112 J.D.I. (Clunet) 973 (1985); *Award in ICC Case No. 2811*, 106 J.D.I. (Clunet) 984 (1979).

205)

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 723 F.2d 155 (1st Cir. 1983), *aff'd*, 473 U.S. 614, 646-50 (U.S. S.Ct. 1985).

206)

*See Mitsubishi Motors*, 473 U.S. at 626-27. The Court explained that "concerns of international comity, respect for the capacities of foreign and international tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context." *Id.* at 629. *See* §6.04[A].

207)

*See Mitsubishi Motors*, 473 U.S. at 628-29, 655-56 (Stevens, J., dissenting) (citing lower court decisions); §6.03[C][4].

208)

*See Mitsubishi Motors*, 473 U.S. at 627-28. The Court's decision provoked a vigorous dissent by Justice Stevens. Among other things, Justice Stevens reasoned:"The Court's repeated incantation of the high ideals of 'international arbitration' creates the impression that this case involves the fate of an institution designed to implement a formula for world peace. But just as it is improper to subordinate the public interest in enforcement of antitrust policy to the private interest in resolving commercial disputes, so is it equally unwise to allow a vision of world unity to distort the importance of the selection of the proper forum for resolving this dispute. … In my opinion, the elected representatives of the American people would not have us dispatch an American citizen to a foreign land in search of an uncertain remedy for the violation of a public right that is protected by the Sherman Act. This is especially so when there has been no genuine bargaining over the terms of the submission, and the arbitration remedy provided has not even the most elementary guarantees of fair process. Consideration of a fully developed record by a jury, instructed in the law by a federal judge, and subject to appellate review, is a surer guide to the competitive character of a commercial practice than the practically unreviewable judgment of a private arbitrator." *Id.* at 665-66 (Stevens, J., dissenting).

209)

*See, e.g., Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S.Ct. 524 (U.S. S.Ct. 2019); *In re Cox Enter. Inc. Set-Top Cable Television Box Antitrust Litg.,* 835 F.3d 1195, 1201 (10th Cir. 2016) (federal antitrust claims arbitrable); *Lindo v. NCL (Bahamas), Ltd,* 652 F.3d 1257, 1266 (11th Cir. 2011) (international antitrust claim arbitrable); *TradeComet.com LLC v. Google, Inc.,* 435 F.App'x 31 (2d Cir. 2011); *JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163, 181 (2d Cir. 2004) (international antitrust claim arbitrable notwithstanding its asserted complexity); *Seacoast Motors of Salisbury, Inc. v. DaimlerChrysler Motors Corp.,* 271 F.3d 6, 11 (1st Cir. 2001) (domestic antitrust claims arbitrable); *Kotam Elecs., Inc. v. JBL Consumer Prods., Inc.,* 93 F.3d 724, 728 (11th Cir. 1996); *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH,* 55 F.3d 1206, 1210 (6th Cir. 1995) (international antitrust claim arbitrable "even if there is a chance that United States antitrust statutory rights will not be fully recognized"); *Sanjuan v. Am. Bd of Psychiatry & Neurology,* 40 F.3d 247, 250 (7th Cir. 1994) ("Producers may agree to arbitrate their antitrust disputes – certainly so for international transactions … and likely so for domestic transactions"); *Nghiem v. NEC Elecs. Inc.,* 25 F.3d 1437, 1441-42 (9th Cir. 1994) (domestic antitrust claims arbitrable); *Swensen's Ice Cream Co. v. Corsair Corp.,* 942 F.2d 1307, 1310 (8th Cir. 1991) (suggesting, without deciding, that domestic as well as international antitrust claims are arbitrable); *In re Auto. Parts Antitrust Litg.,* 2017 WL 3579753, at *2, 6 (E.D. Mich. 2017) (federal antitrust claims arbitrable); *Spinelli v. Nat'l Football League,* 96 F.Supp.3d 81, 103 (S.D.N.Y. 2015) (federal antitrust conspiracy claims arbitrable); *Animal Science Prods., Inc. v. China Minmetals, Corp.,* 34 F.Supp.3d 465, 518 (D.N.J. 2014); *In re A2P SMS Antitrust Litg.,* 972 F.Supp.2d 465 (S.D.N.Y. 2013) (federal antitrust claims arbitrable); *In re Titanium Dioxide Antitrust Litg.,* 962 F.Supp.2d 840, 846 (D. Md. 2013); *HCI Techs., Inc. v. Avaya, Inc.,* 446 F.Supp.2d 518, 525 (D. Va. 2006) (suggesting that domestic, as well as international, antitrust claims are arbitrable); *In re Currency Conversion Fee Antitrust Litg.,* 265 F.Supp.2d 385, 410 (S.D.N.Y. 2003); *Automated Tech. Machs., Inc. v. Diebold,* 2002 U.S. Dist. LEXIS 9146 (D. La.); *Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 837 (E.D.N.Y. 1995); *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 757 F.Supp. 283, 286 (S.D.N.Y. 1991), *aff'd,* 946 F.2d 883 (2d Cir. 1991); *Cindy's Candle Co. v. WNS Inc.,* 714 F.Supp. 973 (N.D. Ill. 1989); *In re Hops Antitrust Litg.,* 655 F.Supp. 169 (E.D. Mo. 1987) (requiring arbitration of antitrust claims against foreign defendants); *Genna v. Lady Foot Int'l, Inc.,* 1986 WL 1236 (E.D. Pa.) (domestic antitrust claim arbitrable); *Standard Petroleum Co. v. Faugno Acquisition LLC,* 191 A.3d 147 (Conn. Super. Ct. 2018). *See also* Korzun, *Arbitrating Antitrust Claims: From Suspicion to Trust,* 48 N.Y.U. J. Int'l L. & Pol'y 867 (2016).

210)

*Mitsubishi Motors,* 473 U.S. at 638.

211)

*See* §6.04[A][5].

212)

*See* U.S. Department of Justice, *Press Release* (4 Sept. 2019) ("The Department of Justice filed a civil antitrust lawsuit today seeking to block Novelis Inc.'s proposed acquisition of Aleris Corporation in order to preserve competition in the North American market for rolled aluminum sheet for automotive applications … The Antitrust Division's lawsuit alleges that the transaction would combine two of only four North American producers of aluminum auto body sheet … The Antitrust Division has agreed with defendants to refer the matter to binding arbitration should certain conditions be triggered. The arbitration would resolve the issue of product market definition. … This would mark the first time the Antitrust Division is using this arbitration authority to resolve a matter."); U.S. Department of Justice, *Press Release* (9 Mar. 2020) ("The Department of Justice prevailed in a first-of-a-kind arbitration, which will resolve a civil antitrust lawsuit challenging Novelis's proposed merger with Aleris Corporation. As a result, Novelis must divest Aleris's entire aluminum auto body sheet operations in North America, which will fully preserve competition in this important industry.").

213)

*See, e.g., Judgment of 28 April 1992*, XVIII Y.B. Comm. Arb. 143, 144 (Swiss Fed. Trib.) (1993); *Judgment of 18 July 1987*, XVII Y.B. Comm. Arb. 534 (Bologna Tribunale) (1992). *See also* Bensaude, *Defining the Limits of Scrutiny of Awards Based on Alleged Violations of European Competition Law,* 22 J. Int'l Arb. 239 (2005); Dalhuisen, *The Arbitrability of Competition Issues,* 11 Arb. Int'l 151 (1995); de Groot, *The Impact of the* Benetton *Decision on International Commercial Arbitration*, 20 J. Int'l Arb. 365 (2003); Dempegiotis, *EC Competition Lawand International Arbitration in Light of EC Regulation 1/2003*, 25 J. Int'l Arb. 365 (2008); Dhunèr, *EC Competition Lawand National Arbitration Procedure*, 2000:1 Stockholm Arb. Rev. 24; Komninos, *Arbitration and EU Competition Law*, in J. Basedow, S. Francq & L. Idot (eds.), *International Antitrust Litigation: Conflict of Laws and Coordination* 191, 192 (2012); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe*, 13-14 Concorrenza e Mercato 455 (2005-06); Landolt, *Arbitration and Antitrust: An Overviewof EU and National Case Law*, in N. Charbit *et al.* (eds.), *Competition Case LawDigest: A Synthesis of EU and National Leading Cases* 232 (2012); Liebscher, *Arbitration and EC Competition Law: The NewCompetition Regulation: Back to Square One?*, 2003 Int'l Arb. L. Rev. 84; Liebscher, *European Public Policy After* Eco Swiss, 10 Am. Rev. Int'l Arb. 81 (1999); 2010 OECD Arbitration and Competition; Radicati di Brozolo, *Arbitration and Competition Law: The Position of the Courts and of Arbitrators,* 27 Arb. Int'l 1 (2011).

214)

*Eco Swiss China Time Ltd v. Benetton Int'l NV*, Case No. C-126/97, [1999] ECR I-3055 (E.C.J.). One commentator has concluded that "*Eco Swiss* extends *Mitsubishi*, which held that claims arising out of competition laws *may* be arbitrated, by holding that they *must* be arbitrated and if they are not, any award is subject to challenge, presumably not only in an action to annul under domestic law but also in an action under the New York Convention." von Mehren, *The* Eco-Swiss *Case and International Arbitration*, 19 Arb. Int'l 465 (2003) (emphasis in original). *See also* Blanke, *Defining the Limits of Scrutiny of Awards Based on Alleged Violations of European Competition Law,* 23 J. Int'l Arb. 249 (2006); Zekos, Eco Swiss China Time Ltd v. Benetton International NV*: Courts' Involvement in Arbitration*, 17(2) J. Int'l Arb. 91 (2000).

215)

*See also Genentech Inc. v. Hoechst GmbH,* [2016] Case No. C-567/14 (E.C.J.) (refusing to set aside arbitral award based on purported violations of EU competition law; EU Advocate General opined that the "task of arbitrators in international commercial arbitration is to interpret and apply the contract binding the parties correctly. In the performance of this task, arbitrators may naturally find it necessary to apply EU law, if it forms part of the law applicable to the contract (*lex contractus*) or the law applicable to the arbitration (*lex arbitri*). However, the responsibility for reviewing compliance with European public policy rules lies with the courts of the Member States and not with arbitrators, whether in the context of an action for annulment or proceedings for recognition and enforcement.").

216)

*See, e.g., Attheraces Ltd v. British Horseracing Bd* [2007] EWCA Civ 38, ¶7 (English Ct. App.) ("The nature of these difficult questions suggests that the problems of gaining access to essential facilities and of legal curbs on excessive and discriminatory pricing might, when negotiations between the parties fail, be solved more satisfactorily by arbitration or by a specialist body equipped with appropriate expertise and flexible powers. The adversarial procedures of an ordinary private law action, the limited scope of expertise in the ordinary courts and the restricted scope of legal remedies available are not best suited to helping the parties out of a deadlocked negotiating position or to achieving a business-like result reflecting both their respective interests and the public interest."); *Microsoft Mobile OY (Ltd) v. Sony Euro. Ltd* [2017] EWHC 374 (Ch) (English High Ct.); *ET Plus SA v. Jean-Paul Welter* [2005] EWHC 2115, ¶51 (Comm) (English High Ct.) ("There is no realistic doubt that such 'competition' or 'anti-trust' claims are arbitrable; the issue is whether they come within the scope of the arbitration clause, as a matter of its true construction"); *Judgment of 4 June 2008, SNF v. Cytec,* 2008 Rev. Arb. 473 (French Cour de Cassation Civ. 1) (confirming award where arbitrators applied EU competition law); *Judgment of 18 November 2004, SA Thalès Air Défense v. GIE Euromissile,* 2004 Rev. Arb. 986 (Paris Cour d'Appel); *Judgment of 14 October 1993, Aplix v. Velcro*, 1994 Rev. Arb. 164 (Paris Cour d'Appel); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace*, 1993 Rev. Arb. 645, 650 (Paris Cour d'Appel) (competition disputes arbitrable in international matters); *Judgment of 13 November 1998*, XXV Y.B. Comm. Arb. 511 (Swiss Fed. Trib.) (2000); *Judgment of 28 April 1992*, XVIII Y.B. Comm. Arb. 143 (Swiss Fed. Trib.) (1993) (EU competition law claim arbitrable); *Judgment of 21 December 1991, SpA Coveme v. Compagnie Française des Isolants*, XVIII Y.B. Comm. Arb. 422 (Bologna Corte di Appello) (1993) (EU competition claims arbitrable); Swedish Arbitration Act, §1(3) ("arbitrators may rule on the civil law effects of competition law as between the parties"). *See also* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶¶227 *et seq.* (3d ed. 2015); Carron, *L'Arbitre Suisse Face au Droit de la Concurrence: Une Partition sans Accord ni (Position) Dominante,* in L. Hammoud, C. von Wunschheim & M.N. Zen-Ruffinen (eds.), *Concerto Arbitral en Trois Mouvements pour Pierre Tercier: Témoignange d'Une Jeunesse Sous Influence Tercierienne* 35 (2013); Kühn, *Arbitrability of Anti-Trust Disputes in the Federal Republic of Germany*, 3 Arb. Int'l 230 (1987); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe*, 13-14 Concorrenza e Mercato 455 (2005-06); Mourre, *Arbitrability of Antitrust Law From the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 35-42 (2011); von Segesser & Schramm, *Swiss International Arbitration Act,* in L. Mistelis (ed.), *Concise International Arbitration* 911, 915 (2d ed. 2015) ("arbitral tribunal must decide upon the (in)validity of the contract under antitrust law, regardless of the state authorities' exclusive competence …").

217)

*Judgment of 8 March 2006,* DFT 132 III 389, 398 (Swiss Fed. Trib.).

218)

*Judgment of 18 October 2003,* Case No. AAP M 1988/2013 (Madrid Audiencia Provincial).

219)

EU Directive 2014/104/EU.

220)

*See* §6.04_[A][5]; *Eco Swiss China Time Ltd v. Benetton Int'l NV*, Case No. C-126/97, [1999] ECR I-3055 (E.C.J.); *Judgment of 4 June 2008, SNF v. Cytec,* 2008 Rev. Arb. 473 (French Cour de Cassation Civ. 1); *Judgment of 23 March 2006, SNF v. Cytec,* 2007 Rev. Arb. 100 (Paris Cour d'Appel); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe*, 13-14 Concorrenza e Mercato 455 (2005-06).

221)

*See* §6.04[A] (especially §6.04[A][5]). *See also* Segan, *Arbitration Clauses and Competition Law*, 9 J. Euro. Comp. L. & Prac. 423 (2018).

222)

*CDC v. Akzo Nobel*, [2015] Case No. C-352/13, ¶¶69-70 (E.C.J.).

223)

*See* §§6.03[C][2]-[3].

224)

*Judgment of 21 July 2015*, Case No. ECLI:NL:GHAMS:2015:3006 (Amsterdam Ct. App.). *See also* Goldsmith, *Arbitrating Antitrust Follow-on Damages Claims: A European Perspective (Part 1),* Kluwer Arb. Blog (22 Sept. 2015) ("[T]he Amsterdam Court of Appeals extended the CJEU's reasoning to the interpretation of agreements to arbitrate, upholding a 2014 decision of the Amsterdam District Court, which had refused to dismiss cartel damages follow-on claims, despite the fact that such claims were based on contracts containing broadly worded agreements to arbitrate. According to the Amsterdam Court of Appeals, there was no reason to depart from the CJEU's interpretive approach to jurisdiction clauses when confronted with the same question in relation to arbitration agreements."); Nazzini, *Are Claims for Tortious Damages for Breach of the Antitrust Rules Arbitrable in the European Union? Some Reflections on the CDC Case in the Court of Justice*, 1 Italian Antitrust Rev. 70 (2016).

225)

*Judgment of July 2015,* Case No. ECLI:NL:GHAMS:2015:3006, ¶2.14 (Amsterdam Ct. App).

226)

*See* §9.02[D][1].

227)

*Mitsubishi Motors,* 473 U.S. at 638.

228)

*See, e.g., Murphy v. Amway Canada Corp.,* [2014] 3 FCR 478 (Canadian Fed. Ct. App.); *Recyclers of Australia Pty Ltd v. Hettinga Equip. Inc.,* (2000) 175 ALR 725 (Australian Fed. Ct.); *Hi-Fert Pty Ltd v. Kiukiang Maritime Carriers Inc.,* 12(7) Mealey's Int'l Arb. Rep. C-1 (Australian Fed. Ct. 1997) (1997) (rejecting argument that claims under Australian Trade Practices Act are nonarbitrable); *Stericorp. Ltd v. Stericycle Inc.,* XXXI Y.B. Comm. Arb. 549, 556 (Victoria Sup. Ct. 2005) (2006) (disputes under Australian Trade Practices Act are arbitrable); *IBM Australia Ltd v. Nat'l Dist. Serv. Ltd,* (1991) 22 NSWLR 466 (N.S.W. Sup. Ct.) (Australian antitrust claim arbitrable); *N.Z. v. Mobil Oil N.Z. Ltd,* XIII Y.B. Comm. Arb. 638, 651-54 (Wellington High Ct. 1987) (1988) (New Zealand competition law claims arbitrable); Beechey, *Arbitrability of Anti-Trust/Competition Law Issues: Common Law,* 12 Arb. Int'l 179 (1996).

229)

*Francis Travel Mktg Pty Ltd v. Virgin Atl. Airways Ltd,* [1996] 131 FLR 422, 428 (N.S.W. Ct. App.). *See also Comandate Marine Corp. v. Pan Australia Shipping Pty Ltd,* [2006] FCAFC 192, ¶240 (Australian Fed. Ct.) ("There is nothing inimical to Australian public policy or to the terms of the Trade Practices Act in commercial parties agreeing to commercial arbitration. … There is no relevant Australian statutory provision … that might affect its operation. … The Trade Practices Act is not being undermined; rather, another law of the Parliament [*i.e.,* the Australian International Arbitration Act] is in operation.").

230)

*Judgment of 21 August 2019, Shell China Co. Ltd v. Huili Hohhot Co., Ltd,* [2019] Zhi Min Xia Zhong No. 47 (Chinese S.Ct.).

231)

*Judgment of 29 August 2016,* [2015] Su Zhi Min Xia Zhong Zi No. 00072 (Jiangsu Higher People's Ct.).

232)

*See, e.g., Final Award in ICC Case No. 8423,* XXVI Y.B. Comm. Arb. 153 (2001) (considering but rejecting argument that non-competition clause violated EC competition law); *Final Award in ICC Case No. 7673,* 6(1) ICC Ct. Bull. 57 (1995); *Partial Award in ICC Case No. 7146,* XXVI Y.B. Comm. Arb. 119 (2001) (considering but rejecting claims that agreements violated EC competition law); *Final Award in ICC Case No. 7097,* in ICC, *International Commercial Arbitration in Europe* 38 (1993); *Award in ICC Case No. 4604,* 112 J.D.I. (Clunet) 973 (1985); *Award in CAS Case No. 98/200 of 20 August 1999,* XXV Y.B. Comm. Arb. 393 (2000) (considering and partially granting claims based on EU competition laws); *Final Award in Chamber of National and International Arbitration of Milan of 23 September 1997,* XXIII Y.B. Comm. Arb. 93 (1998) (issues involving mandatory provisions of Italian law are arbitrable).

233)

*Mitsubishi Motors,* 473 U.S. at 638.

234)

*Eco Swiss China Time Ltd v. Benetton Int'l NV,* Case No. C-126/97, [1999] ECR I-3055, ¶3 (E.C.J.).

235)

*Id.* at ¶32.

236)

*See, e.g., Judgment of 4 June 2008, SNF v. Cytec,* XXXIII Y.B. Comm. Arb. 489, 493 (French Cour de Cassation Civ. 1) (in case involving award applying EU competition law to supply agreement, lower court's decision was "within the limits of its powers, that is, without reviewing the merits of the arbitral award – [the court] reviewed the awards in light of the application of the community rules on competition, [and] correctly held that their recognition and enforcement were not contrary to international public policy"); *Judgment of 18 November 2004, SA Thalès Air Défense v. GIE Euromissile,* 2004 Rev. Arb. 986 (Paris Cour d'Appel) (issues of EC competition law are arbitrable but subject to review by national courts applying national and EU law); *Judgment of 24 March 2005, Mktg Displays Int'l Inc. v. VR Van Raalte Reclame BV,* XXXI Y.B. Comm. Arb. 808, 820 (Hague Gerechtshof) (2006) (refusing to recognize award made in United States, under Michigan law, because it supposedly violated EU competition laws). *See also* Bensaude, *Thalès Air Defence BV v. GIE Euromissile: Defining the Limits of Scrutiny of Awards Based on Alleged Violations of European Competition Law,* 22 J. Int'l Arb. 239 (2005).

237)

*See* Radicati di Brozolo, *Antitrust: A Paradigm of the Relations Between Arbitration and Mandatory Rules: A Fresh Look at the "Second Look,"* 2004 Int'l Arb. L. Rev. 23. From a procedural perspective, it is not clear that particular courts will necessarily have an opportunity to take a "second look" at an arbitrator's antitrust decision. For example, awards made outside the United States, but dealing with the U.S. antitrust laws, ordinarily will be subject to review in an annulment action only where they were made, and not in United States courts. *See* §22.04. The prevailing party may seek enforcement of the award outside the United States, and not in U.S. courts. Ultimately, the sole opportunity for a second look might be in a renewed antitrust action in U.S. courts, where the prevailing party in the arbitration would be obliged to raise the award as preclusive.

238)

*Baxter Int'l, Inc. v. Abbott Labs.,* 315 F.3d 829, 830 (7th Cir. 2003).

239)

*See* §26.05[C][10][g].

240)

*Judgment of 8 March 2006*, DFT 132 III 389, 398 (Swiss Fed. Trib.). *See also Judgment of 1 February 2002*, 20 ASA Bull. 337, 348 (Swiss Fed. Trib.) (2002); *Judgment of 13 November 1998*, XXV Y.B. Comm. Arb. 511, 513 (Swiss Fed. Trib.) (2000); Oetiker, in M. Müller-Chen & C. Widmer Lüchinger (eds.), *Zürcher Kommentar zum IPRG* Art. 177, 41 (3d ed. 2018) ("In BGE 132 III 389, the [Swiss Federal Tribunal] finally ruled that competition law provisions were not part of the international public order"); N. Shelkoplyas, *The Application of EC Law in Arbitration Proceedings* 313-15 (2003) ("It is submitted that non-application or incorrect application of EC competition law cannot by itself be contrary to public policy because, if it were, there should be a corresponding positive obligation on arbitrators to enforce certain laws, which there is not"); P. Tercier, L. Bieri & B. Carron, *Les Contrats Spéciaux* 270 (2016).

241)

*Judgment of 19 April 1994*, DFT 120 II 155, 167 (Swiss Fed. Trib.) ("the arbitral tribunal is required, in all cases, to respect the public policy of the domestic law that it is obliged to apply").

242)

*Mitsubishi Motors*, 473 U.S. at 637 n.19.

243)

*See* §6.04[A][6][b].

244)

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (U.S. S.Ct. 2013) (quoting *Mitsubishi Motors*, 473 U.S. at 628). *See also In re A2P SMS Antitrust Litg.,* 972 F.Supp.2d 465 (S.D.N.Y. 2013) (federal antitrust claims arbitrable).

245)

*Am. Express,* 570 U.S. at 236 ("The class-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938. Or, to put it differently, the individual suit that was considered adequate to assure 'effective vindication' of a federal right before adoption of class-action procedures did not suddenly become 'ineffective vindication' upon their adoption.").

246)

*Id.* at 235 (*Mitsubishi Motors* "expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operat[e] … as a prospective waiver of a party's *right to pursue* statutory remedies'") (emphasis in original).

247)

*Id.* ("[T]he exception finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies.' That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights. And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable.") (emphasis in original).

248)

*Id.* at 236 ("the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy") (emphasis in original).

249)

*See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999); *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir. 1995) (rejecting (on ripeness grounds) argument that rules governing Zurich arbitration would serve as prospective waiver of statutory rights to treble damages "because it is not clear what law the Zurich tribunal will apply"); *Rappaport v. Fed. Sav. Bank,* 341 F.Supp.3d 1039, 1043 (D. Ariz. 2018); *Loewen v. Lyft, Inc.,* 129 F.Supp.3d 945, 965 (N.D. Cal. 2015). *See also Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409 (5th Cir. 1984).

250)

*See* §6.02[H].

251)

*See, e.g.*, *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999) ("[I]t is possible that the Swiss Tribunal might apply U.S. antitrust law to the dispute. … Moreover, even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection."); *Suzlon Structure, Ltd v. Pulk*, 2010 WL 3540951 (S.D. Tex.) (staying litigation of RICO claims notwithstanding fact that parties' choice of (English) law might preclude assertion of RICO claims in foreign-seated arbitration); *Dziennik v. Sealift, Inc.*, 2010 WL 1191993, at *7 (E.D.N.Y.).

252)

*See, e.g.*, *Lindo v. NCL (Bahamas), Ltd*, 652 F.3d 1257, 1292 (11th Cir. 2011) (Barkett, J., dissenting) ("null and void" standard in Article II provides a public policy defense at the arbitration agreement enforcement stage); §6.02[G].

253)

*See, e.g.*, *Casaceli v. Natuzzi SpA*, [2012] FCA 691, ¶¶31-33 (Australian Fed. Ct.) (rejecting argument that arbitral tribunal seated in Italy would not apply mandatory Australian law).

254)

*See, e.g.*, *MBC Fin. Servs. Ltd v. Boston Merchant Fin., Ltd*, 704 F.App'x 14, 18 (2d Cir. 2017); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1295 (9th Cir. 1998); *Haynsworth v. The Corp.*, 121 F.3d 956, 969 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir. 1996); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993); *Ortho-Clinical Diagnostics v. Mazuma Capital Corp.*, 2019 WL 108298, at *5 (W.D.N.Y.); *Lazare Kaplan Int'l Inc. v. KBC Bank NV*, 337 F.Supp.3d 274, 292 (S.D.N.Y. 2018).

255)

*See* §6.04[B][2]. *See also* Stein, Thomas v. Carnival Corporation: *Has the Eleventh Circuit Set International Arbitration off Course?*, 27 J. Int'l Arb. 529, 535 (2010) (suggesting that *Mitsubishi* would invalidate choice-of-law/choice-of-forum clause only "if there were evidence that the law and seat of arbitration were chosen specifically to prevent pursuing U.S. statutory claims"); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279 (11th Cir. 2015).

256)

*See, e.g.*, *Hiotakis v. Celebrity Cruises Inc.*, 2011 WL 2148978, at *7 (S.D. Fla.) (plaintiff's "failure to make any showing regarding Greek law, including the recognition or foreign statutory causes of action such as the Wage Act and the remedies available to seamen seeking overtime wages, and the opportunity for review of arbitral awards, preclude this Court from making the finding that the public policy affirmative defense voids the arbitration provisions"); *Williams v. Royal Caribbean Cruises, Ltd*, 2011 WL 1467179, at *2 (S.D. Fla.) ("An arbitration clause is null and void as a matter of public policy where it deprives the plaintiff of a U.S. statutory right"; compelling arbitration of plaintiff's Jones Act claims in St. Vincent or the Bahamas, after invalidating Norwegian choice-of-law provision and requiring application of U.S. law); *Shaw v. Carnival Cruise Lines*, 2011 WL 2160617 (S.D. Fla.) (compelling arbitration in Panama, after severing Bahamian choice-of-law clause with respect to plaintiff's Jones Act claims and requiring application of U.S. law); *Suzlon Infrastructure, Ltd v. Pulk*, 2010 WL 3540951 (S.D. Tex.); *Cardoso v. Carnival Corp.*, 2010 WL 996528, at *4 (S.D. Fla.) ("the appropriate remedy is to sever the Panamanian choice-of-law provision" from the agreement to arbitrate); *Mosqueda v. Offshore Specialty Fabricators, Inc.*, 2010 WL 1416786, at *2 (S.D. Tex.) ("A party seeking to avoid an international arbitration clause on public policy grounds must meet a 'heavy burden of proof'") (quoting *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 905 (5th Cir. 2005)).

257)

*See, e.g.*, *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999) ("even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection"); *Rappaport v. Fed. Sav. Bank*, 341 F.Supp.3d 1039, 1043 (D. Ariz. 2018); *Loewen v. Lyft, Inc.*, 129 F.Supp.3d 945, 965 (N.D. Cal. 2015).

258)

*See Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 240-41 (U.S. S.Ct. 1987).

259)

*See, e.g.*, *PacifiCare*, 538 U.S. 401; *Vimar Seguros*, 515 U.S. 528; *Larry's United Super, Inc. v. Werries*, 253 F.3d 1083, 1086 (8th Cir. 2001) ("[whether waiver of punitive damages] violates the public policy underlying RICO's treble damages provision is a matter for the arbitrators in the first instance").

260)

*See, e.g.*, *Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409, 412 (5th Cir. 1984) (declining to decide in action to compel arbitration whether treble damages were awardable under state law: "Until arbitration establishes that Life of America is entitled to damages but must be denied treble damages, its asserted rights under Texas law have not been impaired"); §6.04[A][6][a]. *Compare PPG Indus., Inc. v. Pilkington plc*, 825 F.Supp. 1465 (D. Ariz. 1993) ("the Court directs that any damages determination, or arbitral award, made by the arbitrators shall be determined according to U.S. antitrust law irrespective of any conflict that may exist between those laws and the laws of England").

261)

*See* §4.05_[C][4]; *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 (9th Cir. 1999) ("remedies in a foreign forum need not be identical"); *Hopkinton Drug, Inc. v. CaremarkPCS LLC*, 77 F.Supp.3d 237, 247 (D. Mass. 2015) (some contractual restrictions on statutory remedies are valid). *See also Shipman Agency, Inc. v. TheBlaze Inc.*, 315 F.Supp.3d 967 (S.D. Tex. 2018) (contractual remedies limitations are valid, but court would sever unconscionable remedies limitation from arbitration clause); *Whitney v. Alltel Comm'ns, Inc.*, 173 S.W.3d 300, 309 (Mo. Ct. App. 2005) (contractual limitations on remedies coupled with class-action waiver unconscionable).

262)

*See also* §26.05[C][9][i].

263)

*See* U.S. Securities Act of 1933, 15 U.S.C. §77n; German Securities Exchange Act, §28, replaced by German Securities Trading Act, §37h; German Securities Exchange Act, §§53, 61. *See* Kerr, *Arbitrability of Securities Claims in Common LawNations*, 12 Arb. Int'l 171 (1996); Poser, *Arbitrability of International Securities Disputes*, 12 Brook. J. Int'l L. 675 (1986); van Houtte, *Arbitration Involving Securities Transactions*, 12 Arb. Int'l 405 (1996).

264)

*Wilko*, 346 U.S. at 435. *See* §6.03[C][4].

265)

*Id.* at 436. *See* §6.03[C][4]. *See also* Graziano & Trisotto, *Keeping Investors out of Court: The Looming Threat of Mandatory Arbitration*, Harv. L. Sch. Forum on Corp. Gov. (18 Feb. 2019) ("Mandatory arbitration provisions have the potential to undermine investors' ability to prosecute securities claims in court and hold companies accountable for their misconduct. Under the Federal Rules of Civil Procedure, investors can institute a class action to hold companies liable for their violations of securities laws in federal court. But, if limited to arbitration and subjected to class action waivers, individual investors may not be able to afford to pursue their claims unless they have very large losses."); Scott & Silverman, *Stockholder Adoption of Mandatory Individual Arbitration for Stockholder Disputes*, 36 Harv. J. L. & Pub. Pol'y 1187, 1194 (2013).

266)

*Scherk*, 417 U.S. at 518.

267)

*See id.* at 516-17; §6.03[C][4].

268)

*See* §6.04_[A]; *Scherk*, 417 U.S. 506.

269)

*See Rodriguez de Quijas v. Shearson/Am. Express Inc.,* 490 U.S. 477, 484 (U.S. S.Ct. 1989).

270)

*See PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 404 (U.S. S.Ct. 2003) ("there is nothing in the text of the RICO statute that even arguably evinces congressional intent to exclude civil RICO claims from the dictates of the Arbitration Act"). *See also Torres v. Simpatico, Inc.,* 781 F.3d 963, 970 (8th Cir. 2015) (RICO claims arbitrable even if arbitration agreement excludes treble damages); *Grand Wireless, Inc. v. Verizon Wireless, Inc.,* 748 F.3d 1, 9 (1st Cir. 2014) (RICO claims arbitrable); *Tech. in P'ship, Inc. v. Rudin,* 894 F.Supp.2d 274, 278 (2d Cir. 2013); *JLM Indus., Inc. v. Stolt-Nielsen SA,* 387 F.3d 163, 174 (2d Cir. 2004); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840 (2d Cir. 1987); *Spinelli v. Nat'l Football League,* 96 F.Supp.3d 81, 103 (S.D.N.Y. 2015) (antitrust conspiracy claims arbitrable); *Vento v. Crithfield,* 2012 WL 3758432, at *4 (D.V.I.) ("Courts have held that the civil claims brought under the [RICO] Act … are arbitrable").

271)

*See* §6.04_[A][5]; *PacifiCare*, 538 U.S. 401.

272)

*See PacifiCare*, 538 U.S. 401; *Vimar Seguros*, 515 U.S. at 541 ("mere speculation that the foreign arbitrators *might* apply Japanese law which, depending on the proper construction of COGSA, *might* reduce respondents' legal obligations, does not in and of itself" render a COGSA claim nonarbitrable) (emphasis in original); *Escobar v. Celebration Cruise Operator, Inc.,* 805 F.3d 1279, 1285 (11th Cir. 2015); *Aggarao v. MOL Ship Mgt Co.,* 675 F.3d 355, 373 (4th Cir. 2012) ("Aggarao is not entitled to interpose his public policy defense, on the basis of the prospective waiver, doctrine until the second stage of the arbitration-related court proceedings – the award-enforcement stage").

273)

*See, e.g., Richards v. Lloyd's of London*, 135 F.3d 1289, 1295 (9th Cir. 1998) (en banc); *Haynsworth v. The Corp.*, 121 F.3d 956, 969 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir. 1996); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993). *See also S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 712 (2d Cir. 2010) (speculation as to application of U.S. law by foreign court did not justify non-enforcement of forum selection clause); *Ortho-Clinical Diagnostics v. Mazuma Capital, Corp.*, 2019 WL 1082987, at *5 (W.D.N.Y.); *Lazare Kaplan Int'l Inc. v. KBC Bank NV*, 337 F.Supp.3d 274, 292 (S.D.N.Y. 2018); *Int'l Chartering Serv. Inc. v. Eagle Bulk Shipping Inc.*, 138 F.Supp.3d 629, 638 (S.D.N.Y. 2015); *BMR & Assocs. LLP v. SFW Capital Partners, LLC*, 92 F.Supp.3d 128, 138 (S.D.N.Y. 2015).Some U.S. commentary has been critical of the *Lloyd's* decisions, arguing that they undermine the protections of the U.S. securities laws and ignore the "anti-waiver" provisions of those laws. Eck, *Turning Back the Clock: A Judicial Return to Caveat Emptor for U.S. Investors in Foreign Markets*, 19 N.C. J. Int'l & Com. Reg. 313 (1994); McConnaughay, *The Risks and Virtues of Lawlessness: A "Second Look" at International Commercial Arbitration*, 93 N.W. U. L. Rev. 453 (1999).

274)

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1365 (2d Cir. 1993). *See also Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir. 1996); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993).

275)

Like most other mandatory national laws, the U.S. federal securities laws apply only to conduct falling within their jurisdictional scope (*i.e.*, having sufficient connections to the United States). *See* G. Born & P. Rutledge, *International Civil Litigation in United States Courts* 694-705 (6th ed. 2018).

276)

*See, e.g., Cardoso v. Carnival Corp.*, 2010 WL 996528, at *3 (S.D. Fla.) (Panamanian choice-of-law clause was, in tandem with Philippines arbitration clause, unenforceable as applied to Jones Act claims: "foreign choice-of-law and arbitration clauses can – if enforced in tandem – constitute a prospective waiver of statutory rights in violation of public policy"; ordering: "Paragraph 8 [*i.e.*, the parties' choice of law clause] is hereby STRICKEN from Plaintiff's Seafarer's Agreement and shall be treated by the parties as null and void").

277)

*See* §6.02[G].

278)

*See Judgment of 26 February 1991*, XI ZR 349/89 (German Bundesgerichtshof) (recognizing Dutch award against German company on liability under futures contract); Zimmer, in E. Schwark & D. Zimmer (ed.), *Kapitalmarktrechtskommentar* §37h WpHG nn.1 *et seq.* (5th ed. 2020).

279)

*See Judgment of 6 June 1991*, 1991 NJW 2215 (German Bundesgerichtshof). This is only true to the extent that German securities law applies to protect the consumer in question. *See, e.g., Judgment of 21 September 1993*, 1993 NJW-RR 1519 (German Bundesgerichtshof) (German national residing in Italy not protected by German securities law and therefore arbitration agreement with national providing for arbitration in New York under New York law held valid).

280)

*See* German Securities Trading Act, §37h. *See Judgment of 9 March 2010*, 2010 RIW 391 (German Bundesgerichtshof) (denying enforcement of arbitration clause in consumer contract); *Judgment of 16 June 2008*, I-9 U 17/08 (Oberlandesgericht Düsseldorf) (same).

281)

*See* Lehmann, *Wertpapierhandel als Schiedsfreie Zone? Zur Wirksamkeit von Schiedsvereinbarungen nach §37h WpHG*, 2003 SchiedsVZ 219.

282)

*See Judgment of 8 June 2010*, 2011 SchiedsVZ 46 (German Bundesgerichtshof) (German Securities Trading Act, §37h is limitation on capacity and New York Convention allows application of party's personal law to issues of capacity).

283)

*See* §4.07_[A]; §5.03[B].

284)

*See* §6.04[B][3]. *See also* Lehmann, *Wertpapierhandel als Schiedsfreie Zone? Zur Wirksamkeit von Schiedsvereinbarungen nach §37h WpHG*, 2003 SchiedsVZ 219.

285)

For commentary, *see* Gaillard, *La Corruption Saisie par les Arbitres du Commerce International*, 3 Rev. Arb. 818 (2017); Kosheri & Leboulanger, *L'Arbitrage Face à la Corruption et aux Trafics d'Influence*, 1984 Rev. Arb. 3; Kreindler, *Aspects of Illegality in the Formation and Performance of Contracts*, in A. van den Berg (ed.), *International Commercial Arbitration: Important Contemporary Questions* 209 (2003); R. Kreindler, *Competence-Competence in the Face of Illegality in Contracts and Arbitration Agreements* 342 (2013); Lalive, *Ordre Public Transnational (ou Réellement International) et Arbitrage International*, 1986 Rev. Arb. 329, 336-41; Mourre, *Arbitration and Criminal Law: Jurisdiction, Arbitrability and Duties of the Arbitral Tribunal*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 207 (2009); Mourre, *Arbitration and Criminal Law: Reflections on the Duties of the Arbitrator*, 22 Arb. Int'l 95, 98 (2006); Rosell & Prager, *Illicit Commissions and International Arbitration: The Question of Proof*, 15 Arb. Int'l 329 (1999); Wetter, *Issues of Corruption Before International Arbitral Tribunals: The Authentic Text and True Meaning of Judge Gunnar Lagergren's 1963 Award in ICC Case No. 1110*, 10 Arb. Int'l 277 (1994).

286)

*See* §3.02; *Heyman v. Darwins Ltd* [1942] AC 356 (House of Lords). As also discussed above, these decisions have been overtaken by the separability doctrine. *See* §3.02[B][3].

287)

*Award in ICC Case No. 1110*, 10 Arb. Int'l 282, 293 (1994).

288)

*Id. See also* Wetter, *Issues of Corruption Before International Arbitral Tribunals: The Authentic Text and True Meaning of Judge Gunnar Lagergren's 1963 Award in ICC Case No. 1110*, 10 Arb. Int'l 277 (1994).

289)

*Award in ICC Case No. 1110*, 10 Arb. Int'l 282, 293 (1994). To avoid any misunderstanding, the arbitrator also declared "[i]n concluding that I have no jurisdiction, guidance has been sought from general principles denying arbitrators jurisdiction to entertain disputes of this nature rather than from any national rules on arbitrability." *Id.* Some commentators have suggested that Lagergren might have rejected the claimant's request for relief on substantive, rather than jurisdictional, grounds (noting Lagergren's references that the claims were non-justiciable). Mourre, *Arbitration and Criminal Law: Reflections on the Duties of the Arbitrator*, 22 Arb. Int'l 95, 98 (2006). This would have been the more appropriate result, but is very difficult to reconcile with much of the language of the award.

290)

*See, e.g.*, *Partial Award on Jurisdiction and Admissibility in ICC Case No. 6474*, XXV Y.B. Comm. Arb. 279 (2000) (dispute involving claims of corruption and illegality is arbitrable (applying Swiss law)); *Partial Award in ICC Case No. 6286*, XIX Y.B. Comm. Arb. 141 (1994); *Interim Award in ICC Case No. 4145*, XII Y.B. Comm. Arb. 97 (1987) (rejecting claim of illegality as unsubstantiated).

291)

*See* Gaillard, *La Corruption Saisie par les Arbitres du Commerce International*, 3 Rev. Arb. 818 (2017) ("there is perfect unanimity today between arbitral and court case-law that an arbitrator who finds that the contract covers corrupt activities should not declare the issue nonarbitrable and decline jurisdiction, but rather uphold jurisdiction and determine the nullity or non-effectiveness of the contract because it breaches international public order"); R. Kreindler, *Competence-Competence in the Face of Illegality in Contracts and Arbitration Agreements* 342 (2013); Schwartz, *The Domain of Arbitration and Issues of Arbitrability: The View from the ICC*, in *Tenth Joint ICC/AAA/ICSID Colloquium on International Arbitration* 4 n.6 (1998).

292)

*See, e.g.*, *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 854 (2d Cir. 1987); *Altshul Stern & Co. v. Mitsui Bussan Kaisha*, 385 F.2d 158, 159 (2d Cir. 1967); *Philippines v. Westinghouse Elec. Corp.*, 821 F.Supp. 292, 298 (D.N.J. 1993); *Fiona Trust & Holding Corp. v. Privalov* [2007] UKHL 40 (House of Lords); *Westacre Inv. v. Jugoimport-SPDR Holding Co. Ltd* [1992] 2 Lloyd's Rep. 65 (1999) (English Ct. App.); *Judgment of 2 September 1993, Nat'l Power Corp. v. Westinghouse*, DFT 119 II 380, 384 (Swiss Fed. Trib.); *Judgment of 22 October 1976*, III Y.B. Comm. Arb. 279, 280 (Florence Corte di Appello) (1978); *Sarawak Shell v. PPES Oil & Gas*, (1998) Arb. & Disp. Resol. L.J. 356 (Kuala Lumpur Ct. App.); *Judgment of 6 June 2018*, Case No. A.I. No. 49 (Asunción Tribunal de Apelación). *See also* §6.02[G].U.S. courts have consistently held that private damages claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which frequently involve claims of corruption and comparable alleged wrongdoing, are arbitrable. *See Kerr-McGee Refining Corp. v. MT Triumph*, 924 F.2d 467 (2d Cir. 1991); Kühn, *RICO Claims in International Arbitration and Their Recognition in Germany*, 11(2) J. Int'l Arb. 37 (1994); §6.02[G].

293)

*Fiona Trust & Holding Corp. v. Privalov* [2007] EWCA Civ 20, ¶29 (English Ct. App.), *aff'd*, [2007] UKHL 40 (House of Lords).

294)

*London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.).

295)

*Judgment of 19 February 2007*, DFT 133 III 139, 142 (Swiss Fed. Trib.).

296)

*Hub Power Co. v. Pakistan WAPDA*, 16 Arb. Int'l 439 (Pakistan S.Ct. 2000) (2000).

297)

*See* §4.05_[A][2]; §6.02[H].

298)

That is particularly true in light of Article II(1)'s requirement that international arbitration agreements be recognized as to differences whether "contractual or not," which plainly contemplates recognition of arbitration agreements as applied to non-contractual fraud claims. *See* §2.02[A].

299)

For commentary, *see* Blessing, *Arbitrability of Intellectual Property Disputes*, 12 Arb. Int'l 191 (1996); Caron, *The World of Intellectual Property and the Decision to Arbitrate*, 19 Arb. Int'l 441 (2003); Caron, *Le Contentieux Arbitral du Droit d'Auteur,* 2014 Rev. Arb. 331; Certilman & Lutzker, *Arbitrability of Intellectual Property Disputes,* in T. Halket (ed.), *Arbitration of International Intellectual Property Disputes* 55 (2012); T. Cook & A. Garcia, *International Intellectual Property Arbitration* 49 (2010); Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40; Dessemontet, *Arbitration of Intellectual Property Rights and Licensing Contracts,* in E. Gaillard & D. di Pietro (eds.), *Enforcement of Arbitration Agreements and International Arbitral Awards: The New York Convention 1958 in Practice* 555 (2008); Fortunet, *Arbitrability of Intellectual Property Disputes in France,* 26 Arb. Int'l 281 (2010); ICC, *Extracts from ICC Awards on Intellectual Property Rights: Part I*, 4(2) ICC Ct. Bull. 70 (1993); Lew, *Intellectual Property Disputes and Arbitration, Final Report of the Commission on International Arbitration*, 9(1) ICC Ct. Bull. 37 (1998); Mantakou, *Arbitrability and Intellectual Property Disputes*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 263 (2009); Plant, *Binding Arbitration of U.S. Patents*, 10(3) J. Int'l Arb. 79 (1993); Racine, *Arbitrage et Contentieux de l'Exploitation Contractuelle des Droits de Propriété Industrielle*, 2014 Rev. Arb. 287; Rivoire, *L'Arbitrabilité du Droit d'Auteur: Le Cas du Droit Francais,* 4 McGill J. Disp. Resol. 43 (2017-18); Simms, *Arbitrability of Intellectual Property Disputes in Germany*, 15 Arb. Int'l 193 (1999); Vicente, *Arbitrability of Intellectual Property Disputes: A Comparative Survey*, 31 Arb. Int'l 163 (2015).

300)

*See* §§6.04[A]-[C].

301)

*See* §1.04[C][6]. *See also* Vicente, *Arbitrability of Intellectual Property Disputes: A Comparative Survey*, 31 Arb. Int'l 163 (2015).

302)

*See* EC Regulation 44/2001, Art. 22(4); EC Regulation 1215/2012, Art. 24(4). *See also* T. Cook & A. Garcia, *International Intellectual Property Arbitration* 65 (2010); Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40, 45; Simms, *Arbitrability of Intellectual Property Disputes in Germany*, 15 Arb. Int'l 193 (1999); Voit, in H.-J. Musielak (ed.), *Kommentar zur Zivilprozessordnung* §1030, ¶3 (9th ed. 2012).

303)

*See Interim Award in ICC Case No. 6097*, 4(2) ICC Ct. Bull. 76 (1993) (tribunal seated in Geneva declares German patent null and void, but emphasizes that award was only binding on parties and could not serve as basis for revocation of patent and had no *erga omnes* effect); *Judgment of 28 February 2008, Hidravlika DOO v. SA Diebolt*, 2008 Rev. Arb. 167 (Paris Cour d'Appel) (disputes regarding exploitation of patents, relating to interpretation or execution of patent license, are arbitrable); *Judgment of 24 March 1994, Deko v. Dingler*, 1994 Rev. Arb. 515 (Paris Cour d'Appel) (upholding award concerning patent and license rights). *See also* Fortunet, *Arbitrability of Intellectual Property Disputes in France*, 26 Arb. Int'l 292 (2010); Papenberg, *The Arbitrability of Intellectual Property Disputes in Germany*, in WIPO & AAA, *Worldwide Forum on the Arbitration of Intellectual Property Disputes* 81 (1994).

304)

*See, e.g., Judgment of 19 May 2003*, DFT 4C.40/2003 (Swiss Fed. Trib.) (claim for assignment of patent and naming inventor); *Judgment of 7 October 1933*, DFT 59 I 177 (Swiss Fed. Trib.) (claim for recognition of patent claims). *See also* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶¶225 *et seq.* (3d ed. 2015); Blessing, *Arbitrability of Intellectual Property Disputes*, 12 Arb. Int'l 191 (1996) (patent and trademark validity issues arbitrable under Swiss law); Wenger, in S. Berti *et al.* (eds.), *International Arbitration in Switzerland* Art. 177, ¶15 (2000).

305)

*See, e.g., Judgment of 21 June 2017*, XLIV Y.B. Comm. Arb. 182 (Brazilian Superior Tribunal de Justiça) (2019) (rejecting Article V(2)(a) defense that film exploitation and distribution rights were non-arbitrable under law of recognition forum).

306)

*See Lear, Inc. v. Adkins*, 395 U.S. 653, 677 (U.S. S.Ct. 1969) ("The national policy expressed in the patent laws, favoring free competition and narrowly limiting monopoly, cannot be frustrated by private agreements among individuals, with or without the approval of the state").

307)

35 U.S.C. §294 authorizes arbitration of disputes as to validity and infringement of a U.S. patent pursuant to a written agreement between the parties. In addition, 35 U.S.C. §135(d) provides statutory authorization for arbitration of "any aspect" of a U.S. patent interference contest. For U.S. decisions, *see In re Med. Eng'g Corp.*, 1992 WL 217763 (Fed. Cir.) (patent infringement dispute arbitrable); *Rhone-Poulenc Specialities Chiniques v. SCM Corp.*, 769 F.2d 1569 (Fed. Cir. 1985) (patent infringement claim arbitrable); *Apple Inc. v. BYD Co. Ltd*, 2016 WL 1212638 (N.D. Cal.) (dispute concerning "non-assert" provisions arbitrable). *See also* Plant, *Binding Arbitration of U.S. Patents*, 10(3) J. Int'l Arb. 79 (1993).

308)

*See, e.g., Cortés-Ramos v. Sony Corp. of Am.*, 889 F.3d 24, 25 (1st Cir. 2018) (Copyright Act claims arbitrable); *McMahan Sec. Co. v. Forum Capital Mkts*, 35 F.3d 82 (2d Cir. 1994) (complex copyright issues arbitrable); *Folkways Music Publ'rs, Inc. v. Weiss*, 989 F.2d 108 (2d Cir. 1993) (copyright ownership arbitrable); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir. 1987) (copyright validity arbitrable); *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228 (2d Cir. 1982); *Pegasus Int'l Inc. v. Champagne*, 2012 WL 5616095 (W.D. La.) (compelling arbitration of copyright infringement claim); *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 273 F.Supp.2d 1168, 1172 (D. Colo. 2003); *Danisco AS v. Novo Nordisk A*S, 2003 U.S. Dist. LEXIS 1842 (S.D.N.Y.) (staying action for patent infringement on basis of arbitration agreement); *LDS Inc. v. Metro Canada Logistics*, 28 F.Supp.2d 1297 (D. Kan. 1998) (copyright infringement claims arbitrable); *Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.*, 186 Cal.App.4th 696, 716 (Cal. Ct. App. 2010).

309)

*See, e.g., Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 571-72 (4th Cir. 1998); *Necchi Sewing Mach. Sales Corp. v. Necchi SpA*, 369 F.2d 579 (2d Cir. 1966) (trademark dispute arbitrable); *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, 1992 WL 26932 (N.D. Ill.) (same); *Givenchy SA v. William Stuart Indus. (Far E.) Ltd*, 1986 WL 3358 (S.D.N.Y.); *Saucy Susan Prod., Inc. v. Allied Old English*, 200 F.Supp. 724 (S.D.N.Y. 1961). *See also Aerojet-Gen. Corp. v. Mach. Tool Works, Oerlikon-Buehrle, Ltd*, 895 F.2d 736 (Fed. Cir. 1990) (trade secrets dispute arbitrable), *overruled on other grounds, Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826 (U.S. S.Ct. 2002).

310)

*Editions Chouette Inc. v. Desputeaux*, 2003 SCC 17 (Canadian S.Ct.). *See also* Boivin & Mariani, *Highest Court Rules in Favour of Broad Interpretation of Arbitrability*, 20 J. Int'l Arb. 507 (2003).

311)

*Editions Chouette Inc.*, 2003 SCC 17, ¶38.

312)

*Id.* at ¶46.

313)

Hong Kong Arbitration Ordinance, §103.D(1) ("An IPR dispute is capable of settlement by arbitration as between the parties to the IPR dispute").

314)

*Id.* at §103.G(2) ("it is not contrary to public policy of Hong Kong to enforce an award only because the award is in respect of a matter that relates to an IPR dispute").

315)

*Ayyasamy v. Paramasivam*, Civil Appeal Nos. 8245 & 8246 of 2016, ¶5 (Indian S.Ct.).

316)

Several recent Indian lower court decisions have held that disputes relating to intellectual property rights are nonarbitrable. *See, e.g., Eros Int'l Media Ltd v. Telemax Links India Pvt Ltd,* Suit No. 331/2013, ¶14 (Bombay High Ct. 2016) ("the rights to a trade mark and in connection therewith are matters *in rem* and by their very nature are not amenable to private forum chosen by the parties").

317)

*Ayyasamy v. Paramasivam*, Civil Appeal Nos. 8245 & 8246 of 2016, ¶51 (Indian S.Ct.) ("It, thus, follows that those cases where there are serious allegations of fraud, they are to be treated as non-arbitrable and it is only the civil court which should decide such matters. However, where there are allegations of fraud simplicitor and such allegations are merely alleged, we are of the opinion it may not be necessary to nullify the effect of the arbitration agreement between the parties as such issues can be determined by the Arbitral Tribunal.").

318)

*See, e.g., Partial Award in ICC Case No. 6709*, in J.-J. Arnaldez, Y. Derains & D. Hascher (eds.), *Collection of ICC Arbitral Awards 1991-1995* 435, 437 (1997) ("[French law] gives the national courts exclusive jurisdiction over disputes involving public policy, *i.e.*, the issuance, cancellation or validity of patents; yet it is nevertheless clear that disputes relating to the exploitation of a patent remain beyond doubt arbitrable"); *Award in ICC Case No. 4491*, 112 J.D.I. (Clunet) 966 (1985); *Award in ICC Case No. 2048*, discussed in Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40, 45; *IBM Corp. v. Fujitsu Ltd, Award in AAA Case No. 13T-117-0636-85 of 15 September 1987*, 4(4) J. Int'l Arb. 153 (1987).

319)

*See, e.g., Interim Award in ICC Case No. 6097*, 4(2) ICC Ct. Bull. 76 (1993) (award regarding patent invalidity described by arbitral tribunal as having no *erga omnes* effects); *Award in ICC Case No. 1912*, discussed in Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40, 46.

320)

*Judgment of 15 May 1961, Jean Tardits et Cie v. Jydsk Andels Foderstof Forretning*, 89 J.D.I. (Clunet) 140 (Orléans Cour d'Appel) (1962). As discussed above, the court held that claims for breach of contract raised issues "that could only be resolved by interpreting and applying rules of French economic public policy, which governed the performance of the contract," which were nonarbitrable. *See* §6.03[C][3].

321)

*See* §§6.03[C][3]-[4]; *Ministry of Def. & Support for Iran v. Cubic Def. Sys. Inc.,* 665 F.3d 1091, 1098 (9th Cir. 2011); *Belship Navigation Inc. v. Sealift, Inc.*, 1995 WL 447656 (S.D.N.Y.); *Judgment of 21 February 1964, Meulemans et Cie v. Robert*, 92 J.D.I. (Clunet) 113 (Paris Cour d'Appel) (1965); *Judgment of 13 November 1998*, XXV Y.B. Comm. Arb. 511 (Swiss Fed. Trib.) (2000); *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.); *Partial Award in ICC Case No. 6719*, 121 J.D.I. (Clunet) 1071, 1074 (1994) ("The mere fact that the nature of the dispute may lead the arbitrator to apply various rules of law implicating public policy does not mean that the dispute becomes nonarbitrable as a result. The arbitrator must comply with the rules of international public policy, but he need not decline jurisdiction."); *Judgment of 24 November 2015*, XLI Y.B. Comm. Arb. 50 (Italian Corte di Cassazione) (2016). *See also* M. Azeredo da Silveira, *Trade Sanctions and International Sales: An Inquiry into International Arbitration and Commercial Litigation* 353 (2014); Moitry, *L'Arbitre International et l'Obligation de Boycottage Imposée par un Etat*, 118 J.D.I. (Clunet) 349 (1991). *Compare Judgment of 7 May 1994, Fincantieri-Cantieri Navali Italiani SpA v. Ministry of Defence, Armement & Supply Directorate of Irak*, XXI Y.B. Comm. Arb. 594 (Genoa Corte di Appello) (1996) (holding dispute regarding arms supply agreement nonarbitrable because of UN and EU regulations forbidding delivery of arms to Iraq); *Judgment of 15 June 2006, Legal Dep't of Ministry of Justice of Irak v. Fincantieri Cantieri Navali Italiani,* 2007 Rev. Arb. 87, 89-90 (Paris Cour d'Appel) (refusing to recognize decision of Genoa Corte di Appello: "[a court] decision which concludes, after review on the merits, that arbitration clauses contained in contracts between the Iraqi government and the companies … are unenforceable because of embargo regulations enacted by the UN Resolution 661 of 1990, has been rendered by an incompetent court, and such decision cannot be recognized in France").

322)

*See* 19 U.S.C. §1337. Section 1337 authorizes the International Trade Commission to conduct an administrative investigation into alleged unfair trade practices and impose regulatory sanctions. *See also Interdigital Commc'ns LLC v. Int'l Trade Comm'n,* 718 F.3d 1336, 1344 (Fed. Cir. 2013) ("When Congress amended the jurisdictional statute that broadly provides the Court of Appeals with exclusive jurisdiction to hear appeals of any 'final determinations … relating to unfair practices in import trade …' to permit the International Trade Commission (ITC) to terminate an investigation on the basis of 'an agreement between the private parties to the investigation, including an agreement to present the matter for arbitration,' it was envisioning a situation where the parties indisputably agreed to arbitrate, not a situation where there is a serious disagreement as to whether the dispute is subject to arbitration. Tariff Act of 1930, §337(c).").

323)

*See* 19 U.S.C. §1337(c). *See also* Brand, *International Trade Law and the Arbitration of Administrative Law Matters: Farrel Corp. v. U.S. International Trade Commission*, 31 Colum. J. Transnat'l L. 181 (1993).

324)

For commentary, *see* Baizeau, *Arbitration and Insolvency: Issues of Applicable Law*, in C. Müller & A. Rigozzi (eds.), *New Developments in International Commercial Arbitration* 97-120 (2009); Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257 (2006); Kaufmann-Kohler, Lévy & Sacco, *The Survival of the Arbitration Agreement and Arbitration Proceeding in Cases of Cross Border Insolvency: An Analysis from the Swiss Perspective*, 2010 Paris J. Int'l Arb. 371, 383; Kröll, *Arbitration and Insolvency: Selected Conflict of Laws Problems*, in F. Ferrari & S. Kröll (eds.), *Conflict of Laws in International Commercial Arbitration* 211 (2d ed. 2019); Kurt, *Comment: An Unstoppable Mandate and An Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide*, 43 UCLA L. Rev. 999 (1996); Landolt, *Switzerland: Supreme Court Should Recalibrate Its Review Following Bankruptcy Case Decision*, Global Arb. Rev. (23 Oct. 2009); V. Lazic, *Insolvency Proceedings and Commercial Arbitration* (1998); Liebscher, *Insolvency and Arbitrability*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 165 (2009); Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51 (1995); Marković, *Impact of EU Insolvency Regulations on Process of Resolving Disputes Before International Commercial Arbitration*, in T. Petrašević & D. Duić (eds.), *Procedural Aspects of EU* 127, 142 (2017); Moyano, *Impecuniosity and Validity of Arbitration Agreements* 34 J. Int'l Arb. 631 (2017); Naegeli, *The Impact of Bankruptcy on A Pending Arbitral Proceeding: Comments on A Recent Decision of the Swiss Federal Supreme Court*, 14(2) Arb. News 57 (2009); Penadés Fons, *International Arbitration and Vis Attractiva Concursus*, in J. Schmidt, C. Esplugues Mota & R. Arenas Garcia (eds.), *EU Law After the Financial Crisis* 237 (2016); Penadés Fons, *El Arbitraje Internacional en el Reglamento Europeo de Insolvencia,* 32 Anuario de Derecho Concursal 265 (2014); Rosell & Prager, *International Arbitration and Bankruptcy: United States, France and the ICC*, 18 J. Int'l Arb. 417 (2001); Soo, *Impact of Insolvency on Hong Kong Arbitration*, 3 Int'l L. Rev. 103 (2000); Vidal, *Arbitration and Insolvency Proceedings: Comments on ICC Awards and Other Recent Decisions*, 20(1) ICC Ct. Bull. 51 (2009); Wagner, *When International Insolvency Law Meets International Arbitration*, 3 Disp. Resol. Int'l 56 (2009); Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 Minn. L. Rev. 595 (1983).

325)

*See* Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51 (1995) (roughly 5% of awards and proceedings studied at ICC during selected periods involved issues relating to some form of insolvency).

326)

*See* Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257, 262-63 (2006); Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 65 (1995) (quoting from unpublished award: "only those issues that have a direct connection with the insolvency proceedings, that is the issues that arise out of the application of rules particular to those proceedings" are nonarbitrable); A. Samuel, *Jurisdictional Problems in International Commercial Arbitration* 143 (1989) ("an arbitrator cannot officially declare someone bankrupt").

327)

Prior versions of the Polish Bankruptcy Law invalidated (or suspended) arbitration agreements of bankrupt companies. Polish Bankruptcy Law, Art. 142 ("An arbitration agreement concluded by the bankrupt shall lose its force from the date of the declaration of bankruptcy and pending proceedings shall be subject to discontinuance"). That legislation has been repealed and the current Polish Bankruptcy and Restructuring Act provides that arbitration agreements remain valid after bankruptcy proceedings are commenced against a party. Polish Bankruptcy and Restructuring Act, 2015, Art. 147 (arbitration agreement of debtor remains binding after bankruptcy proceedings are commenced).

328)

Latvian Civil Procedure Law, Art. 487(8) (disputes "regarding the rights and obligations of persons that have been declared insolvent before the making of the award by the arbitral tribunal" are not arbitrable); Polish Bankruptcy Law, Art. 142). *See also Judgment of 31 May 2009,* 28 ASA Bull. 104 (Swiss Fed. Trib.) (2010).

329)

*See* §5.06[D][10].

330)

*See* Netherlands Bankruptcy Act, Art. 122; Lazic, *Arbitration and Insolvency Proceedings: Claims of Ordinary Bankruptcy Creditors*, 3.3 E.J.C.L., 1., 4.3.2.2.1 (1999) ("the wording of Art. 122 [of Netherlands Bankruptcy Act] seems to imply that an arbitration agreement concluded prior to the bankruptcy may not be successfully invoked by or against the trustee (or another party contesting the claim)").

331)

*See, e.g., Award in ICC Case No. 12421*, 20 ICC Ct. Bull. 88 (2009) (pursuant to Article 52 of Italian Bankruptcy Law all monetary claims against insolvent company must be brought exclusively in Bankruptcy Court). For claims that do not seek a declaration that the insolvent party owes a debt, the arbitration clause remains valid. *See, e.g., Judgment of 13 February 1991, Adda Officine Elettromeccaniche e Meccaniche v. Alsthom Atlantique SA*, XXI Y.B. Comm. Arb. 580, ¶6 (Lodi Tribunale) (1996). In addition, the Italian Bankruptcy Law provides that the trustee may terminate any contract of the bankrupt party that has not been fully performed; if he does so, arbitral proceedings which are already pending cannot be continued. Italian Bankruptcy Law, Art. 83bis.

332)

*See* Portuguese Bankruptcy Law, Art. 87 ("Without prejudice to provisions contained in applicable international treaties, the efficacy of arbitral agreements relating to disputes that may potentially affect the value of the insolvency estate and to which the insolvent is party shall be suspended"). As discussed below, such legislation will not necessarily be given effect in foreign-seated arbitrations (or judicial proceedings in a foreign arbitral seat). *See Judgment of 16 October 2012*, 31 ASA Bull. 354 (Swiss Fed. Trib.) (2013) (Article 87 of Portuguese Law on Insolvency did not withdraw capacity of insolvent entity to be party to Swiss-seated arbitration).

333)

*See, e.g.,* French Bankruptcy Law, Art. 47 (all proceedings, including arbitration, stayed by commencement of French bankruptcy proceeding); Austrian Insolvency Act, §7 (arbitral proceedings stayed by commencement of insolvency proceedings).

334)

*See, e.g., Judgment of 16 October 2012*, 31 ASA Bull. 354 (Swiss Fed. Trib.) (2013) (where law of place of incorporation of company does not deprive it of legal capacity in insolvency proceedings, company may participate in arbitral proceedings seated in Switzerland; restrictions (other than those relating to company's capacity) that law of its place of incorporation may impose on such arbitral proceedings are irrelevant); *Judgment of 8 December 2009*, DFT 136 III 107 (Swiss Fed. Trib.); *Judgment of 9 April 1991*, DFT 117 II 94 (Swiss Fed. Trib.) (dicta); *Judgment of 9 July 1986*, 5 ASA Bull. 203 (Valais Kantonsgericht) (1987); *Judgment of 8 October 1981*, 1(3) ASA Bull. 27 (Jura Tribunal) (1983). *Contra Judgment of 26 October 1907*, DFT 33 II 648, 653 *et seq.* (Swiss Fed. Trib.) (arbitration clause nullified by declaration of bankruptcy).

335)

*See, e.g., Judgment of 6 May 2009, Jean X. v. Int'l Co. for Commercial Exchanges*, XXXV Y.B. Comm. Arb. 353 (2010) (French Cour de Cassation Civ. 1) (legal proceedings against insolvent party should be stayed until claimant has filed its claim with liquidator; thereafter, proceedings should be limited to validation and quantification of claim); *Judgment of 5 February 1991, Almira Films v. Pierrel*, 1991 Rev. Arb. 625 (French Cour de Cassation Civ. 1), Note, Idot ("The principles of the halting of individual claims by creditors, of the exclusion of the debtor and of the interpretation of actions in the case of bankruptcy are a matter of both internal and international public policy"); *Judgment of 8 March 1988, Thinet v. Labrely*, 1989 Rev. Arb. 473 (French Cour de Cassation Civ. 1); *Judgment of 12 January 1993, République de Côte d'Ivorie v. Norbert Beyrard*, 1994 Rev. Arb. 685 (Paris Cour d'Appel) (ICC arbitral tribunal seated in Paris may proceed with arbitration notwithstanding bankruptcy of party in home jurisdiction). *See also* Rosell & Prager, *International Arbitration and Bankruptcy: United States, France and the ICC*, 18 J. Int'l Arb. 417, 422 (2001) ("It is widely recognized under French jurisprudence and doctrine that principles of comity and equality of creditors require that all proceedings, including arbitrations, be stayed by virtue of the commencement of a French bankruptcy proceeding. However, pursuant to Article 48 of the French Bankruptcy Law, proceedings are only stayed until a creditor has filed a declaration of its claim. Thereafter, the proceedings may continue, and, in practice, proceedings, including international arbitrations, can often be resumed quite quickly. However, the object of the arbitration is generally considered to be transformed. Article 48 of the French Bankruptcy Law provides, in pertinent part, that the continuation of the proceedings leads 'only to the validation of debts and the quantifying of their amount. … Therefore, although the arbitral tribunal may still decide the case, it is generally considered that the purpose of the arbitral award in these circumstances should be solely to liquidate the amount of the claim, rather than order its payment.").

336)

*See, e.g.*, *Judgment of 20 November 2003*, 2004 ZInsO 88 (German Bundesgerichtshof) ("It is generally accepted that the insolvency trustee is bound by an arbitration agreement concluded by the debtor [prior to the commencement of insolvency proceedings]"); *Judgment of 28 February 1957*, 24 BGHZ 15, 18 (German Bundesgerichtshof) ("The trustee in bankruptcy is bound … by an arbitration agreement concluded by the common debtor"); *Judgment of 9 July 1932*, RGZ 137, 109, 111 (German Reichsgericht) ("The legal validity [of an arbitration agreement] is not destroyed by the commencement of insolvency proceedings, it rather is extended to the trustee in bankruptcy. The Insolvency Act assumes that the trustee in bankruptcy is generally bound by the legal situation as it exists when the [insolvency] proceedings are commenced."); *Judgment of 25 September 1998*, 11 Sch 01/98 (Oberlandesgericht Dresden). *See also* Hanefeld, *Germany*, in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* 9.9 (3d ed. 2019) ("The German courts have constantly ruled that an arbitration agreement extends to … [the] trustee and remains unaffected by the insolvency of one party."); K.-H. Schwab & G. Walter, *Schiedsgerichtsbarkeit* ¶16-49 (7th ed. 2005) ("[The arbitration proceedings] are not affected by insolvency").Under German law, if a party becomes unable to fund its share of the arbitration, it is entitled to terminate the arbitration agreement; however, its counter-party has the right (but not the duty), before termination may be effected, to pay all the costs of the arbitration. *Judgment of 12 November 1987*, 1988 NJW 1215 (German Bundesgerichtshof).

337)

Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 56-58 (1995) (describing various cases of mutually-agreed consent to stay arbitration pending insolvency proceedings).

338)

This appears to be the case in France. *See Judgment of 2 June 2004, Gaussin v. Alstom Power Turbo-machines*, 2004 Rev. Arb. 593 (French Cour de Cassation Com.) ("the public policy principle of stay of individual proceedings by creditors precludes referral of creditor's claims to arbitral tribunal where such claims arose prior to judgment initiating insolvency proceedings"); *Judgment of 4 February 1992, Saret v. SBBM*, 1992 Rev. Arb. 663 (French Cour de Cassation Com.); *Judgment of 5 February 1991, Almira Films v. Pierrel*, 1991 Rev. Arb. 625 (French Cour de Cassation Civ. 1) ("the principles of stay of individual proceedings by creditors, of dispossession of the debtor, and of interruption of the case in the event of bankruptcy are matters of both domestic and international public policy: they apply even where the arbitration, while being held in France, is not subject to French law"); *Judgment of 7 April 2011*, 2011 Rev. Arb. 747 (Paris Cour d'Appel).

339)

*See Judgment of 29 December 1967*, DFT 93 III 84, 89 (Swiss Fed. Trib.), discussed in Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency LawReform in the 21st Century* 257, 270 (2006).

340)

*See* Spanish Insolvency Act, Art. 52(1) ("The commencement of an insolvency proceeding, by its own, does not affect the mediation agreements or arbitration agreements entered into by the insolvent. When a court understands that such agreements could undermine the insolvency proceeding, they can order the suspension of their effects without prejudice of the established international treaties.").

341)

*See* English Insolvency Act, 1986, §349A(3) (trustee may affirm arbitration agreement; failing affirmance, bankruptcy court has discretion to decide whether to refer matter to arbitration under agreement); *Salford Estates (No. 2) Ltd v. Altomart Ltd* [2014] EWCA Civ 1575, ¶41 (English Ct. App.) ("Exercise of the discretion [to compel arbitration] otherwise than consistently with the policy underlying the 1996 Act would inevitably encourage parties to an arbitration agreement – as a standard tactic – to by-pass the arbitration agreement and the 1996 Act by presenting a winding up petition. The way would be left open to one party, through the draconian threat of liquidation, to apply pressure on the alleged debtor to pay up immediately or face the burden, often at short notice on an application to restrain presentation … of a winding up petition, of satisfying the Companies Court that a debt is bona fide disputed on substantial grounds. That would be entirely contrary to the parties' agreement as to the proper forum for the resolution of such an issue and to the legislative policy of the 1996 Act."). *See also* Burn & Grubb, *Insolvency and Arbitration in English Law*, 2005 Int'l Arb. L. Rev. 124, 126-27 (discussing procedure).

342)

*Philpott v. Lycee Francais Charles De Gaulle School* [2015] EWHC 1065 (Ch) (English High Ct.).

343)

*Larsen Oil & Gas Pte Ltd v. Petroprod Ltd,* [2011] SGCA 21, ¶¶46, 50 (Singapore Ct. App.) ("[T]he insolvency regime's objective of facilitating claims by a company's creditors against the company and its pre-insolvency management overrides the freedom of the company's pre-insolvency management to choose the forum where such disputes are to be heard. The courts should treat disputes arising from the operation of the statutory provisions of the insolvency regime *per se* as nonarbitrable even if the parties expressly included them within the scope of the arbitration agreement."). *See also Lasmos Ltd v. S.W. PacifiCare Bauxite (HK) Ltd,* [2018] HKCFI 426 (H.K. Ct. First Inst.) (winding-up petition issued on insolvency grounds should generally be dismissed when there is arbitration agreement in contract giving rise to claimed debt).

344)

*Larsen Oil & Gas Pte Ltd v. Petroprod Ltd,* [2011] SGCA 21, ¶¶18, 51 (Singapore Ct. App.) (citing G. Born, *International Commercial Arbitration* 1083 (2009)).

345)

*See In re Anderson* 884 F.3d 382, 387 (2d Cir. 2018); *In re Tribune Co. Fraudulent Conveyance Litg.,* 818 F.3d 98, 116 (2d Cir. 2016); *In re Robert Plan Co.* 777 F.3d 594, 596 (2d Cir. 2015); *In re Eber* 687 F.3d 1123, 1130 n.6 (9th Cir. 2012); *Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc.,* 479 F.3d 791, 796 (11th Cir. 2007) ("In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding. … However, even if a proceeding is determined to be a core proceeding, the bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the bankruptcy code."); *MBNA Am. Bank, NA v. Hill,* 436 F.3d 104 (2d Cir. 2006) (reversing bankruptcy court and remanding with directions to stay proceedings in favor of arbitration of core claim).

346)

11 U.S.C. §362(a).

347)

*See, e.g., In re Anderson,* 884 F.3d 382, 387 (2d Cir. 2018); *In re Tribune Co. Fraudulent Conveyance Litg.,* 818 F.3d 98, 116 (2d Cir. 2016); *In re Robert Plan Co.,* 777 F.3d 594, 596 (2d Cir. 2015); *In re Eber,* 687 F.3d 1123, 1130 n.6 (9th Cir. 2012); *Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc.,* 479 F.3d 791, 796 (11th Cir. 2007) ("In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding. … However, even if a proceeding is determined to be a core proceeding, the bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the bankruptcy code."). *See also MBNA Am. Bank, NA v. Hill,* 436 F.3d 104 (2d Cir. 2006) (reversing bankruptcy court and remanding with directions to stay proceedings in favor of arbitration of core claim); *In re Mor-Ben Ins. Mkts Corp.,* 73 B.R. 644 (9th Cir. B.A.P. 1987); *In re Morgan,* 28 B.R. 3 (9th Cir. 1983); *Hart Ski Mfg Co. v. Maschinenfabrik Hennecke,* 711 F.2d 845 (8th Cir. 1983); *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512 (2d Cir. 1975); *In re Salander-O'Reilly Galleries, LLC,* 475 B.R. 9, 26 (S.D.N.Y. 2012); *In re SW BACH & Co.,* 425 B.R. 78, 90-92 (Bankr. S.D.N.Y. 2010); *Cibro Petroleum Prods., Inc. v. City of Albany,* 270 B.R. 108, 126 (S.D.N.Y. 2001) (reversing bankruptcy court's denial of motion to compel arbitration of core matter because arbitration of dispute "would not jeopardize an underlying purpose of the Bankruptcy Code"). *Compare Vesta Fire Ins. Corp. v. NewCap Reins. Corp.,* 2000 U.S. Dist. LEXIS 1257 (S.D.N.Y.) (staying arbitration of claims against bankrupt); *Bigelow v. Green Tree Fin. Serv. Corp.,* 2000 WL 33596476 (E.D. Cal.) (compelling arbitration as court perceived no adverse effects on purposes of Bankruptcy Code from compelling arbitration); *In re Beckemeyer,* 206 B.R. 466 (Bankr. W.D. Tenn. 1997) (staying adversary proceeding before Bankruptcy Court, based on parties' arbitration agreement, after concluding that debtor would suffer little prejudice from being required to participate); *In re R.M. Cordova Int'l, Inc.,* 77 B.R. 441 (Bankr. D.N.J. 1987) (same).

348)

See, e.g., In re Eber, 687 F.3d 1123, 1130 n.6 (9th Cir. 2012) ("generally, bankruptcy judges do not have discretion to refuse to compel arbitration of non-core matters because they are generally only tangentially related to a bankruptcy case"); MBNA Am. Bank, NA v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) (in resolving conflicts between Bankruptcy Code and FAA, "courts distinguish between claims over which bankruptcy judges have discretion to refuse arbitration and those that they must send directly to arbitration. Bankruptcy courts generally do not have discretion to refuse to compel arbitration of 'non-core' bankruptcy matters, or matters that are simply 'related to' bankruptcy cases"); Crysen/Montenay Energy Co. v. Shell Oil Co., 226 F.3d 160, 166 (2d Cir. 2000) ("The unmistakable implication is that bankruptcy courts generally do not have discretion to decline to stay non-core proceedings in favor of arbitration, and they certainly have authority to grant such a stay") (emphasis in original); Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989); In re MF Global Holdings Ltd, 571 B.R. 80, 95 (Bankr. S.D.N.Y. 2017) ("if a claim is 'non-core,' the court generally lacks discretion and must refer the claim to arbitration"); In re Residential Capital LLC, 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016); In re Harrelson, 537 B.R. 16, 23, 27 (M.D. Ala. 2015); In re Salander-O'Reilly Galleries, LLC, 475 B.R. 9, 26 (S.D.N.Y. 2012) ("As to non-core proceedings, bankruptcy courts usually do not have the discretion to refuse to compel arbitration, as 'the strong national policy favoring the enforcement of arbitration agreements,' generally trumps 'the lesser interest of bankruptcy courts in adjudicating non-core proceedings that could otherwise be arbitrated'") (quoting Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (U.S. S.Ct. 1987) and Crysen/Montenay Energy Co., 226 F.3d at 166); In re Barney's Inc., 206 B.R. 336 (S.D.N.Y. 1997); In re U.S. Lines, Inc., 199 B.R. 465 (S.D.N.Y. 1996); In re Spectrum Info. Tech., Inc., 183 B.R. 360 (Bankr. E.D.N.Y. 1995); In re Hupp Indus., Inc., 157 B.R. 360, 362 (N.D. Ohio 1993) ("submission of … noncore matters to arbitration presents no conflict with the Bankruptcy Code").

349)

Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp., 80 B.R. 606, 614 (D. Mass. 1987).

350)

See, e.g., In re Gandy, 299 F.3d 489, 498-99 (5th Cir. 2002) (where dispute "intimately implicates a central purpose of the Bankruptcy Code" and claims "appear to represent very nearly the entirety of Debtor's bankruptcy estate," dividing case such that some claims be sent to arbitration "would be of disservice to the parties and defeat the purposes of the Bankruptcy Code"); Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgt Corp., 118 F.3d 1056, 1069 (5th Cir. 1997) ("where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by the debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders"); In re SW BACH & Co., 425 B.R. 78, 90-92 (Bankr. S.D.N.Y. 2010) (distinguishing between core claims which were "procedural" – "garden variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved" – and "substantive" – claims that are "not based on the parties' pre-petition relationship, and involve rights created under the Bankruptcy Code" are core for substantive reasons, and are usually nonarbitrable); Braniff Airways, Inc. v. United Air Lines, Inc., 33 B.R. 33 (Bankr. N.D. Tex. 1983); Coar v. Brown, 29 B.R. 806 (Bankr. N.D. Ill. 1983).

351)

In re U.S. Lines, Inc., 197 F.3d 631 (2d Cir. 1999).

352)

Id. at 640. See also Harwood, Bankruptcy Arbitration and the Unwilling Debtor, 48 Disp. Resol. J. 28 (1993); Kurt, Comment: An Unstoppable Mandate and An Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide, 43 UCLA L. Rev. 999 (1996); Rosell & Prager, International Arbitration and Bankruptcy: United States, France and the ICC, 18 J. Int'l Arb. 417 (2001); Ware, ADR Meets Bankruptcy: Cross-Purposes or Cross-Pollination? Bankruptcy Law's Treatment of Creditors' Jury-Trial and Arbitration Rights, 17 Am. Bankr. Inst. L. Rev. 479 (2009).

353)

See In re U.S. Lines, Inc., 197 F.3d at 640 (quoting Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgt Corp., 118 F.3d 1056, 1067 (5th Cir. 1997)).

354)

See, e.g., In re Anderson, 884 F.3d 382, 387 (2d Cir. 2018) ("If the bankruptcy court determines that arbitration would create a 'severe conflict' with the purposes of the Bankruptcy Code, it has discretion to conclude that 'Congress intended to override the Arbitration Act's general policy favoring the enforcement of arbitration agreements'") (quoting MBNA Am. Bank, NA v. Hill, 436 F.3d 104, 108 (2d Cir. 2006)); In re Tribune Co. Fraudulent Conveyance Litg., 818 F.3d 98, 116 (2d Cir. 2016); In re Robert Plan Co., 777 F.3d 594, 596 (2d Cir. 2015); MBNA Am. Bank, NA v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) (court may deny motion to compel arbitration only when there is a "severe conflict" between FAA and Bankruptcy Code); Winton v. Trans Union LLC, 2019 WL 1932342, at *4 (E.D. Pa.) ("A bankruptcy discharge extinguishes only 'the personal liability of the debtor.' ... While personal liability for the underlying debt is discharged, a bankruptcy discharge does not render a valid arbitration agreement unenforceable."); Crooks v. Wells Fargo, NA, 312 F.Supp.3d 932, 938 (S.D. Cal. 2018); Sidney v. Verizon Commc'ns, 2018 WL 1459461 (E.D.N.Y.) (same); McMahan v. Byrider Sales of Ind. S., LLC, 2017 WL 4077013, at *4 (W.D. Ky.); AmeriCorp, Inc. v. Hamm, 2012 WL 1392927, at *3-4 (M.D. Ala.) ("the party opposing arbitration ... [must] meet its burden of showing that arbitration of the core proceeding inherently conflicts with the Bankruptcy Code"); In re Garrido Jimenez, 455 B.R. 51, 71 (D.P.R. 2011) ("where a conflict exists between the Bankruptcy Code and the FAA, a bankruptcy court retains discretion to decide whether and when to compel arbitration if the at-issue proceeding is core"); In re Rarities Group, Inc., 434 B.R. 1 (D. Mass. 2010) ("For both core and non-core claims, then, a bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the Bankruptcy Code"); In re Bethlehem Steel Corp., 390 B.R. 784, 794 (Bankr. S.D.N.Y. 2008) (preferential transfer claims brought under 11 U.S.C. §547 are clearly "core proceedings": "In core proceedings, a further determination is needed to show that arbitrating the dispute would severely conflict with relevant provisions of the Bankruptcy Code. 'If a severe conflict is found, then the court can properly conclude that, with respect to the particular Code provision involved, Congress intended to override the Arbitration Act's general policy favoring enforcement of arbitration agreements.'") (quoting MBNA Am. Bank, 436 F.3d at 108).

355)

In re Bethlehem Steel Corp., 390 B.R. 784, 794 (Bankr. S.D.N.Y. 2008). See also In re JSC BTA Bank, 434 B.R. 334, 340 (Bankr. S.D.N.Y. 2010) (denying debtor's motion to stay foreign arbitral proceedings having no connection to the United States; "[Chapter 15] stays actions against a foreign debtor within the United States and applies in other countries only to the extent that such actions affect property of the debtor that is 'within the territorial jurisdiction of the United States.' ... The automatic stay does not afford broad anti-suit injunctive relief to the debtor entity outside the territorial jurisdiction of the United States upon entry of an order of recognition in a chapter 15 case. ... [A] broadly expansive interpretation ... would improperly centralize global control of dispute resolution within an ancillary case in the United States that is meant to support, not supplant, a main proceeding in a foreign jurisdiction."); In re Nu-Kote Holding, Inc., 257 B.R. 855, 863 (Bankr. M.D. Tenn. 2001) (considering whether arbitration provision was "international" as factor in compelling arbitration).

356)

See, e.g., Ingenieria, Maquinaria y Equipos de Colombia SA v. ATTS, Inc., 2017 WL 6316632 (D.N.J.) (pending bankruptcy proceedings in Colombia did not render dispute nonarbitrable or invalidate arbitration agreement).

357)

See 11 U.S.C. §365(a). Rejection of an executory contract by a bankruptcy trustee gives rise to potential breach of contract claims. See Stewart Foods, Inc. v. Broecker, 64 F.3d 141, 144 (4th Cir. 1995) ("The rejection of an executory contract constitutes a breach of the contract, and a party's damages resulting from that rejection are treated as a pre-petition claim and receive the priority provided to general unsecured creditors"). See also 11 U.S.C. §365(g)(1).

358)

See, e.g., In re Fleming Cos., 2007 WL 788921, at *3 (D. Del.) (arbitration clause in contract rejected by trustee survives rejection); Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp., 80 B.R. 606, 609 (D. Mass. 1987) (where rejection of executory contract is itself a breach of that contract, arbitration clause may be considered "separable" and survives rejection of contract in which it appears).

359)

Megafoods Stores, Inc. v. Flagstaff Realty Assocs., 60 F.3d 1031, 1034 (3d Cir. 1995). Accord Cinicola v. Scharffenberger, 248 F.3d 110, 119 n.8 (3d Cir. 2001).

360)

*See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153-55 (3d Cir. 1989) (trustee is bound by arbitration clause contained in nonexecutory contract when standing in shoes of debtor; claims which derive not from any claims debtor would have had but rather from powers established by Bankruptcy Code are not subject to arbitration); *In re Paragon Offshore plc*, 588 B.R. 735, 748 (Bankr. D. Del. 2018); *Janvey v. Alguire*, 2014 U.S. Dist. LEXIS 193394, at *109 (N.D. Tex.); *Cohen v. Ernst & Young LLP*, 372 B.R. 530, 540 (Bankr. S.D. Ga. 2007) ("as the party asserting these causes of action derived from the Debtors, the Trustee stands in the shoes of the Debtors and is subject to the same defenses that could have been asserted against the Debtors had they brought the causes of action, including exposure to the arbitration clauses").

361)

*Elektrim SA v. Vivendi Universal SA* [2009] EWCA Civ 677 (English Ct. App.).

362)

Polish Bankruptcy Law, Arts. 142, 147. *See* §5.06[C][11].

363)

*See Elektrim SA* [2009] EWCA Civ 677.

364)

*See Id. See also Nori Holding Ltd v. PJSC "Bank Otkritie Fin. Corp."* [2018] EWHC 1343, ¶63 (Comm) (English High Ct.).

365)

*See Judgment of 31 March 2009, Vivendi SA v. Deutsche Telekom AG*, 28 ASA Bull. 104 (Swiss Fed. Trib.) (2010) (confirming award holding that bankruptcy of Polish company deprived company of capacity to arbitrate, under Article 142 of Polish Bankruptcy Law, and that Polish law of capacity applied in arbitration seated in Switzerland). *See also* Landolt, *Switzerland: Supreme Court Should Recalibrate Its ReviewFollowing Bankruptcy Case Decision*, Global Arb. Rev. (23 Oct. 2009); Naegeli, *The Impact of Bankruptcy on A Pending Arbitral Proceeding: Comments on A Recent Decision of the Swiss Federal Supreme Court*, 14(2) Arb. News 57, 58 (2009).

366)

*Judgment of 31 March 2009, Vivendi SA v. Deutsche Telekom AG*, 28 ASA Bull. 104, 108 (Swiss Fed. Trib.) (2010). In contrast to the English decision, cited above, the EU Insolvency Regulation was not applicable in the Swiss proceedings, leaving the choice of law governing capacity to Swiss law, which was held to provide for application of the personal law of the Polish company (Polish law). *Id.*

367)

In contrast to the English Court of Appeal, the arbitral tribunal refused to interpret the EU Insolvency Regulation to require application of the law of the arbitral seat to issues of capacity. *See Award in ICC Case No. 12421*, 20(1) ICC Ct. Bull. 88, 89 (2009) ("We also have misgivings about the meaning and effect of Article 15 of the Insolvency Regulation. In the first place, it is not clear that an arbitration is a 'lawsuit pending': the phrase might only refer to court proceedings which are pending"). In any event, as noted above, the Swiss arbitral tribunal and Swiss Federal Tribunal concluded that the EU Insolvency Regulation was inapplicable in a Swiss-seated arbitration.

368)

*See* Kaufmann-Kohler, Lévy & Sacco, *The Survival of the Arbitration Agreement and Arbitration Proceeding in Cases of Cross Border Insolvency: An Analysis from the Swiss Perspective*, 2010 Paris J. Int'l Arb. 371, 383 (disagreeing with Swiss Federal Tribunal's characterization of Polish Bankruptcy Law as addressing "subjective capacity" and instead concluding that it "points to issues of substantive validity of the arbitration agreement and the conduct of the arbitration proceedings").

369)

Karrer, *Views on the Decision by the Swiss Supreme Court of March 31, 2009, Vivendi. v. Deutsche Telekom*, 28 ASA Bull. 111, 111 (2010).

370)

*Judgment of 16 October 2012*, 31 ASA Bull. 354, 362-63 (Swiss Fed. Trib.) (2013) ("The *Vivendi* judgment must rather be seen in the specific context of Polish law and the legal writing developed thereunder, as expressed in the legal opinions of Polish law professors. It may neither be generalized nor extend the observations made there as to Polish law to other legal orders."). *See also* Naegeli, *The Capacity of A Bankrupt Party to Be or Remain A Party to International Arbitral Proceedings: A Landmark Decision of the Swiss Federal Supreme Court*, 31 ASA Bull. 372, 380 (2013).

371)

*Judgment of 16 October 2012*, 31 ASA Bull. 354, 366 (Swiss Fed. Trib.) (2013). *See also* Naegeli, *The Capacity of A Bankrupt Party to Be or Remain A Party to International Arbitral Proceedings: A Landmark Decision of the Swiss Federal Supreme Court*, 31 ASA Bull. 372, 379 (2013).

372)

*Judgment of 16 October 2012*, 31 ASA Bull. 354, 366 (Swiss Fed. Trib.) (2013).

373)

*Id.* (Article 37 of Portuguese Law on Insolvency did not withdraw capacity of insolvent entity to be party to Swiss-seated arbitration). The Swiss Federal Tribunal's subsequent decision did not address many of the choice-of-law arguments raised in its decision involving Poland's insolvency legislation which had characterized that legislation as involving issues of capacity. *See* §6.04[F][4].

374)

*See also Judgment of 20 March 2015,* Case No. T 8043-13 (Svea Ct. App).

375)

The ICC (and most other arbitral institutions) will continue to administer arbitrations that are conducted against allegedly insolvent parties, notwithstanding arguments that insolvency terminates or discharges the arbitration agreement. *See* Fry, *Extracts from ICC Arbitral Awards: Arbitration and Insolvency Proceedings*, 20(1) ICC Ct. Bull. 71 (2009); Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 53-54 (1995); Vidal, *Arbitration and Insolvency Proceedings: Comments on ICC Awards and Other Recent Decisions*, 20(1) ICC Ct. Bull. 51 (2009).

376)

*See, e.g., Interim Award in ICC Case No. 7337*, XXIV Y.B. Comm. Arb. 149, 154 (1999) ("[T]he bankruptcy estate is bound by the agreement to arbitrate in the exclusive distributorship contract. … Consequently, he has jurisdiction to try claimant's claims against [the bankruptcy estate], although any award on the merits in favour of claimant would be binding on the bankruptcy estate only as the basis for claimant's dividend as a creditor in the bankruptcy."); *Award in ICC Case No. 6192*, excerpted in Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 65 (1995) (rejecting argument that trustee for bankrupt company could not assert claim in arbitration); *Award in ICC Case No. 5877*, excerpted in *id.* at 67 (rejecting argument that claimant could not pursue arbitration against insolvent company, and could instead proceed only against its insolvency trustees); *Award in ICC Case No. 4415*, 111 J.D.I. (Clunet) 952 (1984) (tribunal proceeding with arbitration notwithstanding respondent being declared bankrupt and stricken from company register in home jurisdiction); *Award in ICC Case No. 2139*, 102 J.D.I. (Clunet) 929 (1975) (same).

377)

*See, e.g., Award in ICC Case No. 7563*, 121 J.D.I. (Clunet) 1054 (1994) (international public policy would preclude enforcement of award against insolvent party for duration of bankruptcy proceedings); *Award in ICC Case No. 7205*, 122 J.D.I. (Clunet) 1031 (1995); *Partial Award in ICC Case No. 6697*, 1992 Rev. Arb. 135, 141 ("[T]he fact that one of the parties is subject to bankruptcy proceedings is not in itself sufficient to render a dispute nonarbitrable *per se*. … The only disputes which are excluded are those which have a direct link with the bankruptcy proceedings, namely those disputes arising from the application of rules specific to those proceedings."); *Award in ICC Case No. 6057*, 120 J.D.I. (Clunet) 1016 (1993) (bankruptcy proceedings in France do not affect pending arbitral proceedings in Syria; tribunal relied on Syrian law, as applicable law, which does not recognize French bankruptcy proceedings). *Compare Award in ICC Case No. 9163*, 2003 Rev. Arb. 227, 230 ("[T]he insolvency law of the country where the insolvency proceedings take place has all the characteristics of a mandatory rule of law to which the arbitral tribunal must have regard, by reason of this law's 'close links' with the dispute and the 'legitimate interests' that it purports to safeguard. The place of the arbitration and the laws applicable to the merit or the arbitral procedure matter little.").

378)

Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 57 (1995). The same author rejects the applicability of *lis pendens* principles in arbitral proceedings. *Id.* at 61. *See also* §27.03.

379)

*See, e.g., Award in ICC Case No. 11876*, 20 ICC Ct. Bull. 85 (2009) ("In light of the above mentioned French doctrine and case law, we consider that the commencement of liquidation proceedings in relation to the Respondent [a French company] cannot deprive us, the Arbitral Tribunal [seated in England], of jurisdiction"); *Interim Award in ICC Case No. 7337*, XXIV Y.B. Comm. Arb. 149, 153 (1999) (with regard to bankrupt Swedish company: "Although an arbitration may be pursued against the debtor, the bankruptcy estate is the proper law to all post-bankruptcy legal proceedings as it has assumed, by universal succession, all rights and obligations of the debtor"); *Award in ICC Case No. 6057*, 120 J.D.I. (Clunet) 1016 (1993) (regardless of French law, arbitral tribunal, sitting in Damascus and applying Syrian law, "considers that its mission … is not to be affected by a Court's decision rendered subsequently in France which, without more, is not intended to produce effects" outside France), quoted in Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 58 (1995); *Award in ICC Case No. 4415*, 111 J.D.I. (Clunet) 952 (1984); *Award in ICC Case No. 2139*, 102 J.D.I. (Clunet) 929 (1975); *Award in ICC Case No. 1350*, 102 J.D.I. (Clunet) 931 (1975); *Award in SCAI Case No. 25 of 25 January 2016,* 34 ASA Bull. 394 (2016); *Award in CAM Case of 21 September 2016,* summarized in *A Contribution by the ITA Board of Reporters*.

380)

See §5.03[B].
381)

The German Bundesgerichtshof's conclusion that German securities legislation invalidating agreements to arbitrate future securities disputes concerned matters of "capacity" is an example of such (wrongful) application of the Convention. See §6.04[B][3].
382)

Judgment of 16 October 2012, 31 ASA Bull. 354, 366 (Swiss Fed. Trib.) (2013). See §6.04[F][4].
383)

See §4.05[C][5].
384)

See §6.04[F][3].
385)

See §6.04[F][3].
386)

For a more detailed discussion of this choice-of-law analysis, see §4.05[B].
387)

See §6.02[G].
388)

For commentary, see Aubert, L'Arbitrage en Droit du Travail, 18 ASA Bull. 2 (2000); Bingham, Emerging Due Process Concerns in Employment Arbitration: A Look at Actual Cases, 47 Lab. L.J. 113 (1996); Bingham, Employment Arbitration: The Repeat Player Effect, 1 Empl. Rts. & Employ. Pol'y J. 189 (1997); Carbonneau, Liberal Rules of Arbitrability and the Autonomy of Labor Arbitration in the United States, in L. Mistelis & S. Brekoulakis (eds.), Arbitrability: International & Comparative Perspectives 143 (2009); Castellane, Arbitration in Employment Relationships in France, 26 J. Int'l Arb. 293 (2009); Cole, Incentives and Arbitration: The Case Against Enforcement of Executory Arbitration Agreements Between Employers and Employees, 64 U.M.K.C.L. Rev. 449 (1996); Courtois-Champenois, L'Arbitrage des Litiges en Droit du Travail: À la Redécouverte d'Une Institution Française en Disgrâce, 2003 Rev. Arb. 349; Craver, The Use of Non-Judicial Procedures to Resolve Employment Discrimination Claims, 11 Kan. J.L. & Pub. Pol'y 141 (2001); Estreicher, Predispute Agreements to Arbitrate Statutory Employment Claims, 72 N.Y.U. L. Rev. 1352 (1997); Johnson & Wildhaber, Arbitrating Labor Disputes in Switzerland, 27 J. Int'l Arb. 631 (2010); Kirry, Arbitrability: Current Trends in Europe, 12 Arb. Int'l 373 (1996); Nickson, Closing U.S. Court to Foreign Seamen: The Judicial Excision of the FAA Seamen's Arbitration Exemption from the New York Convention Act, 41 Tex. Int'l L.J. 103 (2006); Rogers, The Arrival of the "Have-Nots" in International Arbitration, 8 Nev. L.J. 341 (2007); Sternlight, Is the U.S. out on A Limb? Comparing the U.S. Approach to Mandatory Consumer and Employment Arbitration to That of the Rest of the World, 56 U. Miami L. Rev. 831 (2002); St. Antoine, Mandatory Arbitration of Employee Discrimination Claims: Unmitigated Evil or Blessing in Disguise?, 15 T.M. Cooley L. Rev. 1 (1998).
389)

See Belgian Judicial Code, Art. 1676(5).
390)

See Italian Code of Civil Procedure, Art. 806; Judgment of 30 April 1980, V Y.B. Comm. Arb. 342 (Genoa Pretore) (1980); F. Emanuele & M. Molfa, Selected Issues in International Arbitration: The Italian Perspective 86 (2014) ("The disputes envisaged in Article 409 [of the Code of Civil Procedure] [employment disputes] may be submitted to arbitration only to the extent that is allowed by statute or by individual or collective contracts of employment").
391)

See U.K. Employment Rights Act, 1996, §203(1)(b); Clyde & Co. LLP v. van Winkelhof [2011] EWHC 668 (Comm) (English High Ct.) (claims under Employment Rights Act, 1996 are nonarbitrable).

392)

French courts have consistently held employment disputes nonarbitrable on the basis of Article L1411-4 of the French Employment Code. Article L1411-4 provides that "*Conseil des prud'hommes* [*i.e.,* court specialized in employment disputes] has exclusive jurisdiction, regardless of the amount claimed, to rule on the disputes arising out of the performance or termination of employment contracts; any agreement to the contrary is without effect." *See, e.g., Judgment of 30 November 2011, Conseil v. Serant*, 2012 Rev. Arb. 433 (French Cour de Cassation Soc.); *Judgment of 28 June 2005, Taiphoon Ltd v. Bobinet*, 2005 Rev. Arb. 799 (French Cour de Cassation Soc.) (dispute involving international employment contract is nonarbitrable, regardless of law applicable to employment contract); *Judgment of 9 October 2001, SA Kis France v. Lopez-Alberdi*, 2002 Rev. Arb. 347 (French Cour de Cassation Soc.) (same); *Judgment of 16 February 1999, Chateau Tour Saint Christophe v. Asthorn,* and *Judgment of 4 May 1999, Picquet v. Sacinter*, 1999 Rev. Arb. 290 (French Cour de Cassation Soc.) (disputes involving international employment agreement are nonarbitrable; arbitration agreement is not null and void, but cannot be enforced against employee); *Judgment of 12 February 1985*, 1986 Rev. Arb. 47 (French Cour de Cassation Soc.); *Judgment of 10 January 2012, Serant v. Deloitte Conseil*, 2012 Rev. Arb. 337 (Paris Cour d'Appel). *See also* Boucaron-Nardetto, *La Réforme de l'Article 2061 du Code Civil Français,* 10 Arbitraje: Revista de Arbitraje Comercial y de Inversiones 109, 124 (2017); Clay, *La Réforme des Articles du Code Civil sur l'Arbitrage en France*, 35 ASA Bull. 40, 48 (2017); Jarrosson & Racine*, Les Dispositions Relatives à l'Arbitrage dans la Loi de Modernisation de la Justice du XXie Siècle*, 2017 Rev. Arb. 1007, 1021.One lower court decision held that an arbitration clause in an international labor contract is valid and enforceable. *See Judgment of 13 September 1993*, XX Y.B. Comm. Arb. 656 (Grenoble Cour d'Appel) (1995) ("arbitration agreement included in an international individual employment agreement is valid").

393)

*See, e.g.,* Chinese Arbitration Law, Art. 77 (providing for arbitration of labor disputes to be separately regulated outside ambit of Chinese Arbitration Law); Japanese Arbitration Law, Supplementary Provisions, Art. 4 ("for the time being," agreements to arbitrate certain "individual labor-related disputes" shall be "null and void"); Libyan Code of Civil Procedure, Art. 740; *Kingfisher Airlines Ltd v. Captain Prithvi Malhotra,* Writ Petition No. 2585/2012, ¶11 (Bombay High Ct. 2012) (labor disputes nonarbitrable: "'Adjudication of certain categories of proceedings are reserved by the legislature exclusively for public fora as a matter of public policy. Certain other categories of cases, though not expressly reserved for adjudication by public fora … may by necessary implication stand exclude from the purview of private fora. Consequently, where the cause/dispute is inarbitrable, the Court where a suit is pending, will refuse to refer the parties to arbitration, under §8 of the Act, even if the parties might have agreed upon arbitration as the forum for settlement of such disputes.'") (quoting *Booz Allen & Hamilton Inc. v. SBI Home Fin. Ltd*, Civil Appeal No. 5440/2002, ¶22 (Indian S.Ct. 2011)); *Judgment of 18 March 2010, Xerox Comercio e Indústria LTDA v. Guimaraes Neto,* Case No. TST-RR-79500-61.2006.5.05.0028 (Trabalho Tribunal Superior) (although collective labor disputes are arbitrable, individual labor disputes (involving claims for rescission of a labor contract) are nonarbitrable). *See also Korat v. Innoviti*, Writ Petition No. 34537/2015 (Karnataka High Ct. 2017); Sitaram, *Arbitration of Labor Disputes in India: Towards A Public Policy Theory of Arbitrability*, Kluwer Arb. Blog (26 Nov. 2017).

394)

*Judgment of 30 November 2011, Deloitte Conseil v. Serant,* 2012 Rev. Arb. 333, 337 (French Cour de Cassation Soc.).

395)

*See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (U.S. S.Ct. 1960); T. Bornstein, A. Gosline & M. Greenbaum, *Labor and Employment Arbitration* §1.04 (2007); Corrada, *The Arbitral Imperative in Labor and Employment Law,* 47 Cath. U. L. Rev. 919 (1998); Nolan & Abrams, *American Labor Arbitration: The Early Years*, 35 Fla. L. Rev. 373 (1983); Nolan & Abrams, *American Labor Arbitration: The Maturing Years*, 35 Fla. L. Rev. 557 (1983).

396)

*See* T. Bornstein, A. Gosline & M. Greenbaum, *Labor and Employment Arbitration* §§1.01, 45.01 (2007); Carbonneau, *Liberal Rules of Arbitrability and the Autonomy of Labor Arbitration in the United States,* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 143 (2009); Corrada, *The Arbitral Imperative in Labor and Employment Law,* 47 Cath. U. L. Rev. 919 (1998); Malin & Ladenson, *Privatizing Justice: A Jurisprudential Perspective on Labor and Employment Arbitration from the* Steelworkers *Trilogy to* Gilmer, 44 Hastings L.J. 1187 (1993).

397)

U.S. FAA, 9 U.S.C. §1.

398)

*See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 107 (U.S. S.Ct. 2001) ("As for the residual exclusion of 'any other class of workers engaged in foreign or interstate commerce,' it would be rational for Congress to ensure that workers in general would be covered by the FAA, while reserving for itself more specific legislation for transportation workers"). It is unclear what scope of commerce Congress envisaged in 1925, and in particular whether §1 excluded only a limited class of specialized transportation workers or, instead, most employees engaged in what was considered at the time to be the full reach of interstate commerce (*e.g.*, transportation).

399)

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (U.S. S.Ct. 1991).

400)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018).

401)

*See, e.g., Dorman v. Charles Schwab Corp.,* 780 F.App'x 510, 513 (9th Cir. 2019); *Prime Healthcare Serv.-Landmark LLC v. United Nurses & Allied Profls, Local 5067,* 848 F.3d 41, 48 (1st Cir. 2017) (ERISA claims arbitrable); *Woods v. Tex. Aggregates, LLC,* 459 F.3d 600, 603-04 (5th Cir. 2006) (ERISA claims arbitrable); *Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359, 1367 (11th Cir. 2005); *Chappel v. Lab. Corp. of Am.,* 232 F.3d 719, 726 (9th Cir. 2000) (ERISA claims arbitrable); *Kramer v. Smith Barney,* 80 F.3d 1080 (5th Cir. 1996) (same); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1117 (3d Cir. 1993) ("duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded upon statutory rights [such as ERISA]"); *Bird v. Shearson Lehman/Am. Express, Inc.,* 926 F.2d 116 (2d Cir. 1991); *Peruvian Connection, Ltd v. Christian,* 977 F.Supp. 1107, 1113-14 (D. Kan. 1997) ("Having conceded that an arbitrator is competent to decide sophisticated breach of fiduciary duty claims under ERISA, [defendant] cannot be heard to assert this case is somehow beyond the competence of an arbitrator"); *Bevere v. Oppenheimer,* 862 F.Supp. 1243 (D.N.J. 1994); *Fox v. Merrill Lynch & Co.,* 453 F.Supp. 561 (S.D.N.Y. 1978).

402)

*See, e.g., 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 258-60, 274 (U.S. S.Ct. 2009) ("a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate [ADEA] claims is enforceable as a matter of federal law"); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (U.S. S.Ct. 1991); *Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 837 (8th Cir. 1997) ("Title VII claims, like ADEA claims, are subject to individual consensual agreements to arbitrate").

403)

*See, e.g., Walthour v. Chipio Windshield Repair, LLC,* 745 F.3d 1326, 1334 (11th Cir. 2014) (arbitration agreement containing FLSA class action waiver is valid); *Sutherland v. Ernst & Young LLP,* 726 F.3d 290, 296 (2d Cir. 2013); *Owen v. Bristol Care, Inc.,* 702 F.3d 1050, 1052 (8th Cir. 2013) ("the FLSA contains no 'contrary congressional command' as required to override the FAA"); *Albertson's, Inc. v. United Food & Commercial Workers Union,* 157 F.3d 758, 762 (9th Cir. 1998) ("under the FAA the employee's individual agreement to arbitrate all disputes was enforceable with respect to disputes over claims covered by the FLSA"); *Kuehner v. Dickinson & Co.,* 84 F.3d 316, 319-20 (9th Cir. 1996); *Bell v. S.E. Pa. Transp. Auth.,* 2012 WL 4479272, at *6 (E.D. Pa.) ("FLSA claim required arbitration when the plaintiff alleged certain activities were considered work under the FLSA") *rev'd on other grounds,* 733 F.3d 490, 495 (3d Cir. 2013); *DeLock v. Securitas Sec. Servs. USA, Inc.,* 883 F.Supp.2d 784, 788 (E.D. Ark. 2012) ("Nothing in the FLSA's text or legislative history indicates that Congress excepted those claims from the FAA's mandate" to enforce arbitration agreements according to their terms); *D'Antuono v. Serv. Road Corp.,* 789 F.Supp.2d 308, 319 (D. Conn. 2011).

404)

*Epic Sys.,* 138 S.Ct. at 1627.

405)

*See Estibeiro v. Carnival Corp.,* 2012 WL 4718978, at *5 (S.D. Fla.) ("Plaintiff maintains that a 2008 amendment to the Jones Act, which deleted the statute's venue provision, renders the Bermuda forum selection clause unlawful and contrary to public policy and, as such, … Jones Act claim is inarbitrable. This argument has been expressly rejected by the Eleventh Circuit."); *Lazarus v. Princess Cruise Lines, Ltd,* 2011 WL 6070294, at *2 (S.D. Fla.).

406)

See, e.g., *Lambert v. Tesla, Inc.*, 923 F.3d 1246, 1248 (9th Cir. 2019); *Ashbey v. Archstone Prop. Mgt*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Anthony v. Affiliated Computer Serv. Inc.*, 621 F.App'x 49, 51 (2d Cir. 2015); *Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113 (2d Cir. 2011) (Title VII claims arbitrable); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1364 (11th Cir. 2005) (same); *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 744 (9th Cir. 2003) (same); *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 837 (8th Cir. 1997) ("Title VII claims, like ADEA claims, are subject to individual consensual agreements to arbitrate"); *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir. 1991) (Title VII claims arbitrable); *Bright-Asante v. Saks & Co. Inc.*, 242 F.Supp.3d 229, 241 (S.D.N.Y. 2017); *Hagan v. Katz Commch Inc.*, 200 F.Supp.3d 435, 442 (S.D.N.Y. 2016); *DeGroff v. Mascotech Forming Techs. – Fort Waynes, Inc.*, 179 F.Supp.2d 896, 907 (N.D. Ind. 2001) ("Agreements that require arbitration of statutory claims, including discrimination and retaliation claims under Title VII, are generally enforceable under the FAA"); *Johnson v. Hubbard Broadcasting, Inc.*, 940 F.Supp. 1447 (D. Minn. 1996) (same); *Cherry v. Wertheim Schroder*, 868 F.Supp. 830 (D.S.C. 1994) (same).

407)

See, e.g., *Perry v. Thomas*, 482 U.S. 483 (U.S. S.Ct. 1987) (claim for wages under state law, forbidding arbitration of such claims, arbitrable under FAA); *Patterson v. Tenet Healthcare, Inc.*, 1996 WL 33674550 (W.D. Mo.) (employee's claims under Title VII and Missouri Human Rights Act subject to arbitration); *Fletcher v. Kidder, Peabody & Co.*, 601 N.Y.S.2d 686 (N.Y. 1993) (state employment discrimination claims held arbitrable); *Rembert v. Ryan's Family Steak Houses, Inc.*, 596 N.W.2d 208, 230 (Mich. App. 1999) (state statutory employment discrimination claims held arbitrable so long as arbitral process is fair and employee waives no substantive statutory rights or remedies).

408)

See §2.03[B][2][b]; §6.04_[G][2]; *Thomas v. Carnival Corp.*, 573 F.3d 1113, 1117 (11th Cir. 2009); *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1155-59 (9th Cir. 2008); *Bautista v. Star Cruises*, 396 F.3d 1289, 1300 (11th Cir. 2005); *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 274-75 (5th Cir. 2002).

409)

See *Bautista*, 396 F.3d at 1300; *Francisco*, 293 F.3d at 274-75.

410)

*Francisco*, 293 F.3d at 274. *See also Lobo v. Celebrity Cruises, Inc.*, 488 F.3d 891, 894 (11th Cir. 2007) (dismissing claim brought under Seamen's Wage Act and enforcing arbitration agreement contained in employment agreement because Congress' intent when implementing New York Convention was to promote "uniform enforcement of arbitration agreements, despite the potential presence of parochial policies present in other parts of the U.S. Code … to nullify the arbitration provision here would hinder the purpose of the Convention and subvert congressional intent"). The "commercial" requirement under the Convention is discussed above. *See* §§2.03[B][1]-[2]).

411)

See, e.g., *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1 (1st Cir. 1999) (employer did not provide employee with rules explaining what disputes were subject to arbitration); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C. Cir. 1997) (arbitration agreement, required as condition of employment, cannot validly require former employee to pay any portion of arbitrators' fees); *Prudential v. Lai*, 42 F.3d 1299 (9th Cir. 1994) (in deciding whether arbitration clause waived claims for civil action over sexual harassment and discrimination, notice of waiver required); *Clinton v. Oppenheimer & Co. Inc.*, 214 F.Supp.2d 476, 458 (S.D.N.Y. 2011); *Bennet v. Dillard's Inc.*, 849 F.Supp.2d 616, 619 (E.D. Va. 2011); *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F.Supp.2d 985, 998 (S.D. Ind. 2001) (employment arbitration agreement consisting of three separate documents, one of which was not given to employee; not sufficient to apprise employee of rights and obligations regarding arbitration); *Prevot v. Phillips Petroleum Co.*, 133 F.Supp.2d 937, 940-41 (S.D. Tex. 2001) (English-language arbitration agreements unconscionable where they were not translated for non-English-speaking employees and employees were pressured into signing them); *Hoffman v. Kamhi, Inc.*, 927 F.Supp. 640 (S.D.N.Y. 1996) (in deciding whether arbitration clause encompassed employee's statutory claims, court required that clause put employee on notice of waiver of such claims).

412)

See, e.g., *Semcken v. Genesis Med. Interventional, Inc.*, 2004 WL 2203561 (N.D. Cal.) (arbitration clause in negotiated, executed employment agreement fully enforceable); §15.02.

413)

See *Penn Plaza LLC v. Pyett*, 556 U.S. 247, 258 (U.S. S.Ct. 2009); *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 92 (U.S. S.Ct. 2000) ("where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs").

414)

*See Campbell v. Gen. Dynamics Gov't Sys. Corp.,* 407 F.3d 546, 552 (1st Cir. 2005); *Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359, 1375 (11th Cir. 2005); *Gold v. Deutsche AG,* 365 F.3d 144, 147 (2d Cir. 2004); *Brown v. Wheat First Sec.,* 257 F.3d 821, 826 (D.C. Cir. 2001) ("[The Supreme Court] framed the question as whether dispute resolution under the FAA was consistent with the federal right-creating statute in question. … For a common law claim under District of Columbia law, any such inconsistency would be resolved in favor of the only federal law involved, the FAA."); *Andresen v. IntePros Fed. Inc.,* 240 F.Supp.3d 143, 152 (D.D.C. 2017); *Ellerbee v. GameStop, Inc.,* 604 F.Supp.2d 349, 354 (D. Mass. 2009).

415)

*In re D.R. Horton, Inc.,* 357 NLRB No. 184 (N.L.R.B. 2012) (agreement waiving employee's right to bring class action "unlawfully restricts employees' §7 right [under National Labor Relations Act] to engage in concerted action for mutual aid or protection, notwithstanding the [FAA], which generally makes employment-related arbitration agreements judicially enforceable").

416)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018). *See also Owen v. Bristol Care, Inc.,* 702 F.3d 1050 (8th Cir. 2013) ("given the absence of any 'contrary congressional command' from the FLSA that a right to engage in class actions overrides the mandate of the FAA in favor of arbitration, we reject Owen's invitation to follow the NLRB's rationale in *D.R. Horton* and join our fellow circuits that have held that arbitration agreements containing class waivers are enforceable in claims brought under the FLSA"); *D.R. Horton, Inc. v. NLRB,* 737 F.3d 344 (5th Cir. 2013) ("Caselaw under the FAA points us in a different direction than the course taken by the Board. As an initial matter, arbitration has been deemed not to deny a party any statutory right. … The use of class actions procedures, though, is not a substantive right. … The issue here is narrow: do the rights of collective action embodied in this labor statute make it distinguishable from cases which hold that arbitration must be individual arbitration? … We have explained the general reasoning that indicates the answer is 'no.'").

417)

Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2017-18).

418)

*Id.* at §402(a).

419)

*See* §1.04[B][1][e][viii]; §3.03[A][2][b][iii].

420)

*See* German Labor Court Act, §101 (providing, as a statutory exception to arbitrability pursuant to German ZPO, §1030(3), for detailed system for arbitration regarding collective wage agreements); Hanefeld, *Germany,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* 475, ¶9.38 (3d ed. 2019).Other employment disputes are nonarbitrable under German law. *See* Trittmann & Hanefeld, *§1030: Arbitrability,* in K.-H. Böckstiegel, S. Kröll & P. Nacimiento (eds.), *Arbitration in Germany: The Model Lawin Practice* 93 (2d ed. 2014).

421)

*See* Meijer & Lazic, *Netherlands,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* ¶11.13 (3d ed. 2019).

422)

*Judgment of 18 April 2018,* DFT 4A_7/2018 (Swiss Fed. Trib.) (domestic employment disputes cannot be submitted to arbitration if dispute concerns mandatory claims (*e.g.*, claims regarding employee's termination, overtime, or reference letters) under Swiss law). *See also* Bohnet, *Arbitrabilité des Conflits de Travail: Le Tribunal Federal Renforce sa Ligne – Commentaire de l'Arret du Tribunal Federal 4A-&/2018,* Newsletter DroitDuTravaila.ch (June 2018); D. Girsberger & N. Voser, *International Arbitration: Comparative and Swiss Perspectives* 119 (3d ed. 2016) ("Disputes relating to employment agreements normally involve an economic interest in the sense of Art. 177(1) SPILA and are considered arbitrable. … [H]owever, the question arises as to whether arbitrability may be affected by mandatory provisions outside of Chapter 12 SPILA. This issue is of considerable importance in domestic arbitration. The Swiss Supreme Court held that an arbitration agreement cannot be enforced against an employee who invokes claims which cannot be waived according to the applicable Swiss employment legislation."); Johnson & Wildhaber, *Arbitrating Labor Disputes in Switzerland,* 27 J. Int'l Arb. 631 (2010); Karrer & Straub, *Switzerland,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* ¶14.33 (3d ed. 2019); D. Mavromati & M. Reeb, *The Code of the Court of Arbitration for Sport: Commentary, Cases and Materials* 46 (2015) ("the arbitrability is given not only for commercial disputes arising out of a contract of employment between a club and a player but also for disciplinary cases (like anti-doping rule violations) due to their potential economic consequences").

423)

*See, e.g., Paquito Lima Buton v. RainbowJoy Shipping Ltd Inc.*, [2008] HKCFA 30 (H.K. Ct. Fin. App.).

424)

For commentary, *see* Alderman, *Consumer Arbitration: The Destruction of the Common Law,* 2 J. Am. Arb. 1 (2003); Alqudah, *Enforceability of Arbitration Clauses in Online Business-to-Consumer Contracts,* 28 J. Int'l Arb. 67 (2011); Bates, *A Consumer's Dream or Pandora's Box: Is Arbitration A Viable Option for Cross-Border Consumer Disputes?,* 27 Ford. Int'l L.J. 823 (2003); Drahozal & Friel, *Consumer Arbitration in the European Union and the United States,* 28 N.C. J. Int'l L. & Comm. Reg. 357 (2002); Drahozal & Zyontz, *Private Regulation of Consumer Arbitration,* 79 Tenn. L. Rev. 289 (2012); Rogers, *The Arrival of the "Have-Nots" in International Arbitration,* 8 Nev. L.J. 341 (2007); Saumnier, *Consumer Arbitration in the Evolving Canadian Landscape,* 113 Penn St. L. Rev. 1203 (2009); Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in An Age of Compelled Arbitration,* 1997 Wisc. L. Rev. 33; Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration,* 74 Wash. U. L.Q. 637 (1996); Stipanowich, *The Arbitration Fairness Index: Using A Public Rating System to Skirt the Legal Logjam and Promote Fairer and More Effective Arbitration of Employment and Consumer Disputes,* 60 U. Kan. L. Rev. 985 (2012); Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001 (1996).

425)

*See, e.g.,* Bates, *A Consumer's Dream or Pandora's Box: Is Arbitration A Viable Option for Cross-Border Consumer Disputes?,* 27 Ford. Int'l L.J. 823 (2003); Drahozal & Friel, *Consumer Arbitration in the European Union and the United States,* 28 N.C. J. Int'l L. & Comm. Reg. 357 (2002); Horton, *Arbitration About Arbitration,* 70 Stan. L. Rev. 363 (2018); Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 323 (2013); Resnik, Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L.J. 2804, 2900–10 (2015); Resnik, Fairness in Numbers: A Comment on AT&T v. Concepcion, Wal–Mart v. Dukes, and Turner v. Rogers, 125 Harv. L. Rev. 78 (2011); Rogers, The Arrival of the "Have-Nots" in International Arbitration,* 8 Nev. L.J. 341 (2007); Stanley, *Sixth Time's the Charm: Rethinking the Arbitration Fairness Act to Achieve Practical Reform,* 10 Arb. L. Rev. 199 (2018); Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements,* 19 Cardozo J. Conflict Resol. 653 (2017); Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001 (1996).

426)

*See DirecTV Inc. v. Imburgia,* 136 S.Ct. 463 (U.S. S.Ct. 2015) (upholding agreement to arbitrate consumer claims); *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79 (U.S. S.Ct. 2000) (mobile home financing agreement); *Allied-Bruce Terminix Co. v. Dobson,* 513 U.S. 265 (U.S. S.Ct. 1995) (consumer contract for pest control); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477 (U.S. S.Ct. 1989) (brokerage agreement); *Walton v. Rose Mobile Homes, LLC,* 298 F.3d 470, 477 (5th Cir. 2002) (Magnuson-Moss Warranty Act claims arbitrable: "consumers can still vindicate their rights under warranties in an arbitral forum"); *In re Marcia L. Pate,* 198 B.R. 841 (Bankr. S.D. Ga. 1996) (FAA preempts Georgia state statutory bar against arbitration clauses in consumer transactions); *Borowiec v. Gateway 2000, Inc.,* 808 N.E.2d 957, 967 (Ill. 2004) (Magnuson-Moss Warranty Act does not indicate "congressional intent to bar arbitration of written warranty claims"); *In re Am. Homestar of Lancaster, Inc.,* 50 S.W.3d 480 (Tex. 2001) (same). *Compare DirecTV Inc. v. Imburgia,* 575 U.S. at 9111 (Ginsburg, J., dissenting) ("Today's decision steps beyond *Conception* and *Italian Colors.* There, as here, the Court misread the FAA to deprive consumers of effective relief against powerful economic entities that write no-class-action arbitration clauses in their form contracts. … These decisions have predictably resulted in the deprivation of consumers' rights to seek redress for losses, and, turning the coin, they have insulated powerful economic interests from liability for violations of consumer-protection laws.").Most U.S. state laws also give effect to arbitration clauses in consumer contracts. Cole, *Uniform Arbitration: "One Size Fits All" Does Not Fit,* 16 Ohio St. J. Disp. Resol. 759, 787 (2001).

427)

*Marmet Health Care, Inc. v. Brown,* 565 U.S. 530 (U.S. S.Ct. 2012). *See also Smith v. Lindemann* 710 F.App'x 101 (3d Cir. 2017) (state-law rule precluding inclusion of arbitration agreements in attorney-client contracts is preempted by FAA).

428)

*Marmet Health Care,* 565 U.S. at 532.

429)

*Id.* at 532-33 ("West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA").

430)

*In re Knepp,* 229 B.R. 821, 827 (N.D. Ala. 1999). The same court *sua sponte* raised the validity of the arbitration clause in question and held it unconscionable. *Id.*

431)

See Carrington, *Regulating Dispute Resolution Provisions in Adhesion Contracts*, 35 Harv. J. Legis. 225 (1998); Carrington & Haagen, *Contract and Jurisdiction*, 1996 Sup. Ct. Rev. 331; Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L.J. 2804, 2900–10 (2015); Resnik, Fairness in Numbers: A Comment on AT&T v. Concepcion, Wal-Mart v. Dukes, and Turner v. Rogers, 125 Harv. L. Rev. 78, 133 (2011); Schwartz, Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in An Age of Compelled Arbitration*, 1997 Wisc. L. Rev. 33; Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration*, 74 Wash. U. L.Q. 637 (1996). *See also* Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 323 (2013)* ("powerful economic entities can impose no-class-action-arbitration clauses on people with little or no bargaining position – through adhesion contracts involving securities accounts, credit cards, mobile phones, car rentals, and many other social amenities and necessities").

432)

Baum, *Medical Malpractice Arbitration: A Patient's Perspective*, 61 Wash. U. L.Q. 123, 148 n.198 (1983).

433)

Barnes, *How Mandatory Arbitration Agreements and Class Action Waivers Undermine Consumer Rights and Why We Need Congress to Act,* 9 Harv. L. & Pol'y Rev. 329 (2015); Resnik, *Fairness in Numbers: A Comment on AT&T v. Concepcion, Wal-Mart v. Dukes, and Turner v. Rogers, 125 Harv. L. Rev. 78, 133 (2011).*

434)

*DirecTV Inc. v. Imburgia,* 136 S.Ct. 463, 476 (U.S. S.Ct. 2015). *See also* Blumenthal, *Circumventing* Concepcion*: Conceptualizing Innovative Strategies to Ensure the Enforcement of Consumer Protection Laws in the Age of the Inviolable Class Action Waiver,* 103 Cal. L. Rev. 700 (2015); Downing, *An Important Time for the Future of Class Action Waivers and the Power Struggle Between Businesses and Consumers,* 81 Mo. L. Rev. 1151 (2016).

435)

*See Metro. Reg'l Info. Sys. Inc. v. Am. Home Realty Network Inc.,* 722 F.3d 591, 602 (4th Cir. 2013); *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 123 (2d Cir. 2012); *Campbell v. Gen. Dynamics Gov't Sys. Corp.,* 407 F.3d 546, 558-59 (1st Cir. 2005) (email notification of new arbitration requirement failed to put employee on notice that there was a new, unilateral contract which required arbitration of disputes, where no reply to the email was required and typical personnel decisions were communicated in paper); *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17 (2d Cir. 2002) (where reasonable person would not have had notice of existence of license terms containing arbitration clause because terms were not immediately visible upon acceptance of offer, arbitration clause not part of contract); *Bekele v. Lyft, Inc.,* 199 F.Supp.3d 284, 294 (D. Mass. 2016); *Cabi v. Boston Children's Hosp.,* 161 F.Supp.3d 136, 161 (D. Mass. 2016); *Payne v. WBY, Inc.,* 141 F.Supp.3d 1344, 1349 (N.D. Ga. 2015); *Hudyka v. Sunoco, Inc.,* 474 F.Supp.2d 712, 717-19 (E.D. Pa. 2007) (email notification to employee of new arbitration requirement gave insufficient notice where terms of arbitration agreement were not clearly set forth in email, employer could not prove that employee received email notification, and employee did not receive arbitration program booklet containing definite terms); *Klocek v. Gateway 2000, Inc.,* 104 F.Supp.2d 1332 (D. Kan. 2000); *Reedy v. Cincinnati Bengals, Inc.,* 758 N.E.2d 678 (Ohio Ct. App. 2001) (subsequent document containing arbitration agreement did not constitute part of contract between parties and dispute was therefore nonarbitrable); *Brower v. Gateway 2000, Inc.,* 246 A.D.2d 246, 254 (N.Y. App. Div. 1998) (ICC clause in domestic U.S. contract unconscionable).

436)

*See* §5.06[D][4].

437)

*See Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 90 (U.S. S.Ct. 2000) (arbitration agreement may be invalid if it "preclude[s] litigant ... from effectively vindicating her statutory rights in the arbitral forum" because of, *e.g.*, costs or waiver of non-waivable remedies); *Dale v. Comcast Corp.,* 498 F.3d 1216, 1223 (11th Cir. 2007) (class action waiver in arbitration agreement held unconscionable as it precluded state claims based on federal statute); *Kristian v. Comcast Corp.,* 446 F.3d 25 (1st Cir. 2006) (denial of class action arbitration of antitrust claims prevented plaintiffs from vindicating statutory rights; provision held invalid and was severed); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 21 (1st Cir. 1999) ("Our conclusion that a union waiver of employee rights to a federal judicial forum for employment discrimination claims must be clear and unmistakable means that, absent a clear waiver, it is not 'appropriate' ... to find an agreement to arbitrate").

438)

*Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260-54 (9th Cir. 2017). Some decisions hold that a contract may be procedurally unconscionable if it is a standard form contract whose terms the consumer has no opportunity to negotiate. *See Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002) ("The [arbitration agreement] is procedurally unconscionable because it is a contract of adhesion: a standard-form contract, drafted by the party with superior bargaining power, which relegates to the other party the option of either adhering to its terms without modification or rejecting the contract entirely"); *Harold Allen's Mobile Home Factory Outlet, Inc. v. Butler*, 825 So.2d 779 (Ala. 2002); Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001 (1996).

439)

*See* Georgia Code Annotated 2017 §9-9-2(c)(5) ($25,000); Montana Code Annotated 2019, §27-5-114 ($5,000); Texas Civil Practice & Remedies Code Annotated §171.002(a)(2) ($50,000). In Texas, for a consumer contract over $50,000, an arbitration clause will only be enforced if signed by each party to the contract and signed by each party's attorney. Texas Civil Practice & Remedies Code Annotated §171.002(b)(2).

440)

*See* Massachusetts "Lemon Law," Massachusetts General Laws Ch. 90, §7N1/2 (providing for compulsory fast-track arbitration, at consumer's request, of consumer claims against automobile manufacturers, with arbitrators appointed by Secretary of Consumer Affairs; consumer may accept award or sue *de novo* in state court).

441)

*See* §1.04[B][I][e][viii]; *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265 (U.S. S.Ct. 1995); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (U.S. S.Ct. 1989) (brokerage agreement).

442)

*See* Dodd-Frank Wall Street Reform and Consumer Protection Act, §921 ("(o) Authority to Restrict Mandatory Predispute Arbitration – The Commission, by rule, may prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them arising under the Federal securities laws, the rules and regulations thereunder, or the rules of a self-regulatory organization if it finds that such prohibition, imposition of conditions, or limitations are in the public interest and for the protection of investors").

443)

*See* Magnuson-Moss Warranty Act, 15 U.S.C. §§2301-2312 (allowing warrantors to require that consumers attempt to resolve claims by alternative dispute resolution mechanisms, but providing that any decisions be non-binding and that consumer be permitted to assert claims in court if dissatisfied).

444)

Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2017-18). *See* §6.04[G][2].

445)

Arbitration Fairness Act of 2018, S. 2591, §402(a), 115th Cong. (2017-18).

446)

As discussed above, various of these legislative proposals have been limited to domestic matters, excluding international arbitration agreements subject to the New York and Inter-American Conventions. *See* §6.03[C][4].

447)

*See* 1998 AAA Consumer Due Process Protocol Statement of Principles. Judicial Arbitration and Mediation Services ("JAMS") has adopted a set of "Streamlined Arbitration Rules and Procedures," which apply upon agreement of the parties or if the claim is worth less than $250,000. *See* 2014 JAMS Streamlined Arbitration Rules and Procedures.

448)

2014 AAA Consumer Arbitration Rules.

449)

*Id.* at Introduction ("These Rules were drafted and designed to be consistent with the minimum due process principles of the *Consumer Due Process Protocol*").

450)

For example, the National Arbitration Forum ("NAF"), a provider of consumer debt collection arbitration administration services, did not adopt the AAA Protocols. The NAF was prosecuted by the Attorney General of the State of Minnesota and is no longer administering consumer arbitrations. *See* Salzwedel & Wells, *National Arbitration Forum Settlement with Minnesota Attorney General*, 1(4) State AG Tracker (2009).

451)

The Arbitration Fairness Act would not have amended FAA Chapter 2 of the FAA. *See* Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2017-18); Arbitration Fairness Act of 2017, H.R. 1374, 115th Cong. (2017-18); Arbitration Fairness Act of 2015, S. 1133, 114th Cong. (2015-16).

452)

*See* §1.04[B][1][e][iii]; §3.03[A][2][b][iii].

453)

*See* Board of Governors of the Federal Reserve System, Retail Foreign Exchange Transactions (Regulation NN), 78 Fed. Reg. 21027 (9 Apr. 2013).

454)

*See Id.* ("The Department of State has advised that transactions between the foreign branch or office of a banking institution and a U.S. customer could be cross-border transactions subject to the New York and Panama Conventions. These Conventions, implemented in the United States by chapters 2 and 3 of the Federal Arbitration Act (FAA), create treaty obligations to enforce international commercial arbitration agreements and to recognize and enforce international commercial arbitral awards. The Board is amending section 240.16 to provide that it will not apply to transactions covered by chapters 2 or 3 of the FAA.").

455)

*See* European Commission, *Recommendation on the Principles Applicable to the Bodies Responsible for Out-of-Court Settlement of Consumer Disputes (98/257/EC)*, 1998 O.J. (L 115) 31 ("access to courts is a fundamental right that knows no exceptions … whereas out of court procedures cannot be designed to replace court procedures; whereas therefore, use of the out of court alternative may not deprive consumers of their right to bring the matter before the courts unless they expressly agree to do so, in full awareness of the facts and only after the dispute has materialized"). *See also* European Commission, *Recommendation of 4 April 2001 on the Principles for Out-of-Court Bodies Involved in the Consensual Resolution of Consumer Disputes (C(2001) 1016)*, 2001 O.J. (L 109) 56; C. Hodges, I. Benöhr & N. Creutzfeldt, *Consumer ADR in Europe* (2012); Piers, *Consumer Arbitration in the EU: A Forced Marriage with Incompatible Expectations*, 2 J. Int'l Disp. Sett. 209 (2011).The EU has also adopted legislation requiring mandatory mediation for disputes arising from consumer contracts and establishing online non-judicial dispute resolution proceedings for consumer claims. *See* EU Directive 2013/11/EU amending EC Regulation 2006/2004 and EC Directive 2009/22/EC and EU Regulation 524/2013, amending EC Regulation 2006/2004 and EC Directive 2009/22EC; Reich, *Party Autonomy and Consumer Arbitration in Conflict: A "Trojan Horse" in the Access to Justice in the E.U. ADR-Directive 2013/11*, 4 Penn St. J. L. & Int'l Aff. 292 (2015).

456)

*See* EU Directive 93/13/EEC.

457)

*See id.* at Annex 1(q) ("Requiring the consumer to take disputes exclusively to arbitration not covered by legal provision").

458)

*See* U.K. Office of Fair Trading, *Unfair Contract Terms Guidance* ¶¶5.29.2-6 (2017) ("a compulsory arbitration clause as defined is automatically unfair if it relates to claims of £5,000 or less"); German ZPO, §1031(5) ("Arbitration agreements to which a consumer is a party must be contained in a document which has been personally signed by the parties. No agreements other than those referring to the arbitral proceedings may be contained in such a document; this shall not apply in the case of a notarial certification."); Swedish Arbitration Act, §6 ("If a dispute between a business entity and a consumer concerns goods, services, or any other products supplied principally for private use, an arbitration agreement may not be invoked where such was entered into prior to the dispute").

459)

*See Asturcom Telecomunicaciones SL v. Nogueira*, Case No. C-40/08, [2009] ECR I-9579 (E.C.J.); *Mostaza Claro v. Centro Móvil Milenium SL*, Case No. C-168/05, [2006] ECR I-10421. (E.C.J.).

460)

*See Asturcom Telecomunicaciones*, [2009] ECR I-9579; *Mostaza Claro*, [2006] ECR I-10421.

461)

*See Mostaza Claro*, [2006] ECR I-10421 (arbitrators must terminate arbitral proceedings *ex officio* under E.U. Unfair Contract Terms Directive even if consumer appears in proceedings). This would apparently contemplate that challenges to the validity or enforceability of arbitration agreements would be submitted to the arbitrators in the first instance. *See also* Bermann, *Navigating EU Law and the Law of International Arbitration*, 28 Arb. Int'l 397, 416-17 (2012).

462)

*Mostaza Claro*, [2006] ECR I-10421.

463)

*Pohotovost' sro v. Korčkovská,* Case No. C-76/10, [2010] E.C.R. I-11557 (E.C.J.).

464)

These prohibitions do not apply to arbitration agreements entered into to resolve an existing dispute. *See Judgment of 25 February 2010, Guichard v. AGPM*, 2011 Rev. Arb. 139 (French Cour de Cassation Civ. 1).Further, French courts held that this prohibition did not apply where the individual not involved in commercial activities had waived the right to invoke it. *See Judgment of 21 November 2002, Gromelle v. Institut International des Techniques d'Organisation*, 2004 Rev. Arb. 287 (French Cour de Cassation Civ. 2) (participation in arbitration without reservation is waiver of right to invoke nullity of arbitration agreement in an *acte mixte*).

465)

*See, e.g., Judgment of 12 May 2010, El Assidi v. Nest*, 2010 Rev. Arb. 391 (French Cour de Cassation Civ. 1); *Judgment of 5 January 1999, Zanzi v. de Coninck*, 1999 Rev. Arb. 260 (French Cour de Cassation Civ. 1); *Judgment of 7 December 1994, V 2000 v. Project XJ 220 ITD*, 1996 Rev. Arb. 245 (Paris Cour d'Appel).

466)

*See* Swedish Arbitration Act, §6 ("If a dispute between a business entity and a consumer concerns goods, services, or any other products supplied principally for private use, an arbitration agreement may not be invoked where such was entered into prior to the dispute. … The first paragraph shall not apply where the dispute concerns an agreement between an insurer and a policy-holder concerning insurance based on a collective agreement or group agreement and handled by representatives of the group. Nor shall the first paragraph apply where Sweden's international obligations provide to the contrary.").

467)

*See* German ZPO, §1031(5) ("Arbitration agreements to which a consumer is a party must be contained in a document which has been personally signed by the parties. … No agreements other than those referring to the arbitral proceedings may be contained in such a document; this shall not apply in the case of a notarial certification."); Mäsch, *Schiedsvereinbarungen mit Verbrauchern*, in B. Bachmann *et al*. (eds.), *Grenzüberschreitungen: Beiträge zum Internationalen Verfahrensrecht und zur Schiedsgerichtsbarkeit – Festschrift für Peter Schlosser zum 70. Geburtstag* 529, 534-35, 539 (2005).

468)

*See* Austrian ZPO, §617 ("(2) Arbitration agreements to which a consumer is a party must be contained in a document signed personally by him. This document must not contain any agreements other than those relating to the arbitral proceedings. (3) In arbitration agreements between an entrepreneur and a consumer, the consumer shall, prior to concluding the arbitration agreement receive written legal advice on the relevant differences between arbitral and court proceedings."); Riegler, in S. Riegler *et al*. (eds.), *Arbitration Lawof Austria: Practice and Procedure* §617, ¶¶8-15, 23 (2007). *See also Judgment of 22 July 2009*, 3 Ob 144/09m (Austrian Oberster Gerichtshof) (although violations of consumer protection law might constitute a violation of Austrian public policy in some cases, conclusion of arbitration agreements with consumers are not public policy violations if they are negotiated separately).

469)

*See* §6.04[H][1].

470)

*See, e.g.*, Italian Civil Code, Arts. 1341-1342 (requiring separate signature on arbitration agreement); Slovenian Arbitration Law, Arts. 45(1)-(2) (requiring separate signature on arbitration agreement; agreement valid only if concluded with respect to dispute that has already arisen). *See also* Mauritius International Arbitration Act, Art. 8 (same).

471)

English Arbitration Act, 1996, §91.

472)

*Id.* at §§89-91; U.K. Unfair Terms in Contracts Regulations, Reg. 5, SI 1999 No. 2083. These sections are mandatory rules that apply "whatever the law applicable to the arbitration agreement." English Arbitration Act, 1996, §89(3).

473)

*See, e.g.*, Consumer Rights Act, Schedule 2 ("Consumer Contract Terms Which may be Regarded as Unfair": "A term which has the object or effect of excluding or hindering the consumer's rights to take legal action or exercise any other legal remedy"). *See also Director Gen. of Fair Trading v. First Commercial Bank plc* [2001] UKHL 52 (House of Lords) (unfairness resulting from lack of good faith in relation to predispute consumer arbitration clause can be either substantive or procedural); *Bryen & Langley Ltd v. Boston* [2005] EWCA Civ 973 (English Ct. App.) (determining whether consumer arbitration agreement is substantively unfair involves consideration of both fairness of arbitration provision itself and whether term was imposed on consumer); *Heifer Int'l Inc. v. Christiansen* [2007] EWHC 3015 (QB) (English High Ct.).

474)
New Zealand Arbitration Act, §11. Brazilian legislation is broadly similar. *See* Brazilian Arbitration Law, Art. 4(2) ("In adhesion contracts, the arbitration clause will only be valid if the adhering party initiates arbitral proceedings or if it expressly agrees to arbitration by means of an attached written document, or if it signs or initials the corresponding contractual clause, inserted in boldface type").

475)
*See* §6.04[H][1].

476)
*See id.*

477)
Québec Consumer Protection Act, §11(1) The Act permits post-dispute agreements to arbitrate consumer claims. *Id.*

478)
*See* British Columbia Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2, §172.

479)
*See Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15 (Canadian S.Ct.) (actions under British Columbia Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2 are nonarbitrable because "clear intention of the legislature is to supplement and multiply the efforts of the Director under the BPCPA to implement province-wide standards of fair consumer practices by enlisting the efforts of a whole host of self-appointed private enforcers"; "to the extent the arbitration clause purports to take away a right, benefit or protection conferred by the BPCPA, it will be invalid, and to that extent, [a consumer] will retain her individual cause of action under the BPCPA in the Supreme Court of British Columbia").

480)
*Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15, ¶40 (Canadian S.Ct.).

481)
*Id.* at ¶54 (Lebel, J., dissenting) ("We endorse the view that a clear statement of legislative intent is necessary for a court to conclude that a particular category of disputes cannot be submitted to arbitration. To hold otherwise would be to revert to the former judicial hostility towards arbitration, and to the pre-*Zodiak* view that there is a right to bring an action in the public court system that cannot be waived.").

482)
*See* Ontario Consumer Protection Act, S.O. 2002, c. 30, §§7, 8; *Griffin v. Dell Canada Inc.*, [2010] ONCA 29 (Ontario Ct. App.) (applying Ontario Consumer Protection Act to deny enforcement of arbitration clauses (which included class action waivers) in consumer contracts). *See also* Saumier, *Consumer Arbitration in the Evolving Canadian Landscape*, 113 Penn. St. L. Rev. 1203 (2009).

483)
*TELUS Commc'ns Inc. v. Wellman*, [2019] SCC 19, ¶98 (Canadian S.Ct.).

484)
*See* Japanese Arbitration Law, Supplementary Provisions, Art. 3. As discussed above, Japanese legislation adopts a similar approach to employee-employer arbitration agreements. *See* §6.04[H][4].

485)
*See* Alberta Fair Trading Act, §16.

486)
*MS Emaar MGF Land Ltd v. Singh*, Review Petition Nos. 2629 & 2630 of 2018 (Indian S.Ct.).

487)
*See* §6.04[H][1].

488)
*See* §5.06[B][1].

489)
*See* §4.02[A][1][b].

490)
*See* §§6.04[H][1]-[2]; U.S. Board of Governors of the Federal Reserve System, Retail Foreign Exchange Transactions (Regulation NN), 78 Fed. Reg. 21019 (9 Apr. 2013); Swedish Arbitration Act, §6 ("Nor shall the first paragraph apply where Sweden's international obligations provide to the contrary").

491)
It is clear that most national law rules providing for the invalidity of consumer arbitration agreements are addressed towards concerns about unequal bargaining power and sophistication of the parties during the contract formation process. That is the reason that these invalidity rules apply generally to predispute agreements to arbitrate, and not to post-dispute arbitration agreements.

492)
*See* §1.04_[E][7]; §2.04_[A]; §4.02[A][1][b].

493)

*See* §4.05 (especially §4.05[A][2]). A rule providing for the nonarbitrability of claims beneath a specified monetary threshold (as in the EU) is arguably a reasonably well-tailored mechanism for denying effect to arbitration agreements that would make it uneconomical for consumers to pursue their claims. As discussed below, however, a preferable approach would be to develop arbitral mechanisms that provide more efficient and effective ways of resolving consumer claims than national courts. Nonetheless, given the widespread existence of nonarbitrability rules in the context of consumer disputes, it is difficult to characterize such rules as idiosyncratic. *See* §6.04[H].

494)

*See* Dam, *Class Actions: Efficiency, Compensation, Deterrence and Conflict of Interests*, 4 J. Legal Studies 47 (1975); Matthews & Stewart, *Online Arbitration of Cross-Border: Business to Consumer Disputes*, 56 U. Miami L. Rev. 1111 (2002).

495)

*See* Rogers, *The Arrival of the "Have-Nots" in International Arbitration*, 8 Nev. L.J. 341 (2007); Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001 (1996).

496)

Matthews & Stewart, *Online Arbitration of Cross-Border, Business to Consumer Disputes*, 56 U. Miami L. Rev. 1111, 1136 (2002) ("As the difficulty inherent in applying domestic laws to electronic commerce has become more apparent, many consumer groups have changed sides on the issue and are now in favor of establishing fair procedural standards for international arbitration") (citing Bureau of Consumer Protection, Federal Trade Commission, *Consumer Protection in the Global Electronic Marketplace: Looking Ahead* (2000)).

497)

*See* §6.04_[H][3]; Japanese Arbitration Law, Supplementary Provisions, Art. 3. In Spain, since 1993, consumers have been permitted to submit disputes with merchants at no cost to the Juntas Arbitrales de Consumo, a domestic arbitration institution whose role is to supervise consumer arbitrations. *See* Kirry, *Arbitrability: Current Trends in Europe*, 12 Arb. Int'l 373 (1996).

498)

For example, the AAA has enacted a separate set of procedures for consumer-related disputes between "individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers" and the product is for personal use. *See* 2014 AAA Consumer Arbitration Rules; 1998 AAA Consumer Due Process Protocol.

499)

*See* §10.08.

500)

*See, e.g.*, 2017 AAA Employment Arbitration Rules and Mediation Procedures; 2014 AAA Consumer Arbitration Rules; 1995 AAA Employment Due Process Protocol; 1997 National Academy of Arbitrators Guidelines on Arbitration of Statutory Claims Under Employer-Promulgated Systems.

501)

Drahozal & Zyontz, *Private Regulation of Consumer Arbitration*, 79 Tenn. L. Rev. 289 (2012) (concluding that AAA's enforcement of its Consumer Due Process Protocol is effective); Horton & Chandrasekher, *After the Revolution: An Empirical Study of Consumer Arbitration*, 104 Geo. L.J. 57 (2015); Sovern *et al.*, *"Whimsy Little Contracts" with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements,* 75 Md. L. Rev. 4 (2015).

502)

2005 AAA Consumer-Related Disputes Supplementary Procedures; ICC, *Guidelines for Arbitrating Small Claims Under the ICC Rules of Arbitration*, 14(1) ICC Ct. Bull. 29 (2003).

503)

*Report of Working Group III (Online Dispute Resolution) on the Work of Its Thirty-Third Session,* U.N. Doc. A/CN.9/868 (2016). *See also* UNCITRAL, *Report of Working Group III (Online Dispute Resolution) on the Work of Its Twenty-Sixth Session*, U.N. Doc. A/CN.9/762, ¶15 (2012).

504)

*See* §1.04_[B][2]; §5.01[C][5]. This hostility was particularly pronounced in many communist and other totalitarian states. *See, e.g.*, Osakwe, *A Soviet Perspective on Foreign Sovereign Immunity: Lawand Practice*, 23 Va. J. Int'l L. 13 (1982); People's Republic of China Ministry of Foreign Affairs, *Aide Mémoire of 2 February 1983*, 22 I.L.M. 81 (1983).

505)

*See* §1.04_[B][2]; Kassis, *The Questionable Validity of Arbitration and Awards Under the Rules of the International Chamber of Commerce*, 6(2) J. Int'l Arb. 79 (1989); Sornarajah, *The UNCITRAL Model Law: A Third World Viewpoint*, 6(4) J. Int'l Arb. 7 (1989).

506)

Sornarajah, *The UNCITRAL Model Law: A Third World Viewpoint*, 6(4) J. Int'l Arb. 7, 16 (1989).

507)

J. Dellapenna, *Suing Foreign Governments and Their Corporations* 241-43, 460-63 (2d ed. 2003); Fox, *States and the Undertaking to Arbitrate*, 37 Int'l & Comp. L.Q. 1, 4 (1988); Kessedjian, *Court Decisions on Enforcement of Arbitration Agreements and Awards*, 18 J. Int'l Arb. 1 (2001); Meyer-Fabre, *Enforcement of Arbitral Awards Against Sovereign States, A New Milestone: Signing ICC Arbitration Clause Entails Waiver of Immunity from Execution Held French Court of Cassation in* Creighton v. Qatar, 15(9) Mealey's Int'l Arb. Rep. 48 (2000); Moury, *L'Incidence de la Stipulation d'Une Clause Compromissoire sur l'Immunité d'Exécution de l'Etat Étranger*, 2001 Dalloz 2140.

508)

28 U.S.C. §§1605(a)(1), 1605(a)(6), 1610(c), 1610(d); J. Dellapenna, *Suing Foreign States and Their Corporations* 241-43, 460-63 (2d ed. 2003); Turck, *French and US Courts Define Limits of Sovereign Immunity in Execution and Enforcement of Arbitral Awards*, 17 Arb. Int'l 327 (2001).

509)

In the early 1980s, one lower U.S. court held that, even where the Foreign Sovereign Immunities Act permits enforcement, the Act of State Doctrine does not allow the enforcement of an arbitral award concerning claims of expropriation. In *Libyan Am. Oil Co. (LIAMCO) v. Socialist People's Libyan Arab Jamahirya*, 482 F.Supp. 1176 (D.D.C. 1980), *vacated mem.*, 684 F.2d 1032 (D.C. Cir. 1981), the district court denied enforcement of an arbitration award after concluding that the expropriation dispute between the parties underlying the award was within the scope of the act of state doctrine. The lower court decision in *LIAMCO* was plainly wrong. Following submissions from the U.S. Government, the opinion was vacated. *See* 684 F.2d 1032 (D.C. Cir. 1981). The FAA was nonetheless amended to ensure that the error was not repeated. U.S. FAA, 9 U.S.C. §15.

510)

*See* U.S. FAA, 9 U.S.C. §15 ("Enforcement of arbitral agreements, confirmation of arbitral awards, and execution upon judgments based on orders confirming such awards shall not be refused on the basis of the Act of State Doctrine").

511)

European Convention on State Immunity (1972), Arts. 12(1), 17(1); Blessing, *Sovereign Immunity and Transnational Arbitration*, 3 Arb. Int'l 28 (1987); Goh, *Court-Ordered Interim Relief Against States in Aid of Arbitration: Sovereign Immunity, Waiver and Comity*, 34 J. Int'l Arb. 679 (2017).

512)

*See, e.g.*, U.K. State Immunity Act, 1978, §9(1); French Code of Civil Procedure, Art. 1514; Bowett, *The State Immunity Act 1978*, 1978 Cambridge L.J. 37; Mann, *The State Immunity Act 1978*, 50 Brit. Y.B. Int'l L. 43 (1979); *Judgment of 6 June 2000, Creighton Ltd v. Qatar*, 2001 Rev. Arb. 114 (French Cour de Cassation Civ. 1). *See also* Turck, *French and US Courts Define Limits on Sovereign Immunity in Execution and Enforcement of Arbitral Awards*, 17 Arb. Int'l 327, 327-32 (2001).

513)

*See, e.g.*, Australian Foreign States Immunities Act, §17; Singapore State Immunity Act, §11; South African Foreign States Immunity Act, §10.

514)

*See* §1.04_[A][7]; C. Schreuer *et al.*, *The ICSID Convention: A Commentary* Art. 25, ¶71 (2d ed. 2009).

515)

*See* K.-H. Böckstiegel, *Acts of State and Arbitration* (1997); Idornigie, *The Principle of Arbitrability in Nigeria Revisited*, 21 J. Int'l Arb. 279 (2004); Kroeger, Kautz & Acikel, *Turkey Revisited: Developments in Energy Project Arbitration in the Context of Bilateral Investment Treaties and ICSID*, 14(9) Mealey's Int'l Arb. Rep. 32 (1999); Reddy & Nagaraj, *Arbitrability: The Indian Perspective*, 19 J. Int'l Arb. 117 (2002). *But see Judgment of 17 July 2001, Etat Libanais v. FTML*, 2001 Rev. Arb. 855 (Libyan Conseil d'État) (arbitration clause in administrative contract held invalid).

516)

*See* T. Schoenbaum, *Admiralty and Maritime Law* 837-50 (5th ed. 2011).

517)

*Vimar Seguros y Reaseguros, SA v. MV Sky Reefer*, 515 U.S. 528 (U.S. S.Ct. 1995).

518)

*See* §6.04[A][1].

519)

*See Vimar Seguros*, 515 U.S. at 536.

520)

*Id.* at 541.

521)

*See, e.g.*, *Royal SMIT Transformers BV v. Onego Shipping & Chartering BV*, 898 F.3d 543, 549 (5th Cir. 2018); *Liberty Woods Int'l v. Motor Vessel Ocean Quartz*, 889 F.3d 127, 129 (3d Cir. 2018); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1289 (11th Cir. 2015) ("any claim that an arbitration agreement prospectively waived a party's right to pursue U.S. statutory remedies must be brought at the award-enforcement stage, not at the arbitration-enforcement stage"); *Ambraco, Inc. v. Bossclip BV*, 570 F.3d 233 (5th Cir. 2009) (rejecting claim that forum selection clause violated public policy because English courts would supposedly not apply COGSA, pursuant to parties' choice-of-law clause); *Mitsui & Co. v. Mira MV*, 111 F.3d 33, 36 (5th Cir. 1997) (extending *Vimar* to forum selection clauses); *Am. Home Assur. Co. v. MV Hanjin Marseilles*, 2004 U.S. Dist. LEXIS 9705, at *8-9 (S.D.N.Y.) (collecting U.S. cases showing that "[s]ince [*Vimar*], courts have consistently held that forum selection clauses (including foreign arbitration clauses) in bills of lading are valid under COGSA").

522)

*See Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115 (9th Cir. 2011) (arbitration clauses are unenforceable under Carmack Amendment, which affords shippers right to sue in one of Amendment's enumerated judicial districts, unless he or she agrees to arbitrate elsewhere after dispute arises).

523)

*See Judgment of 30 May 1983*, 1983 NJW 2772 (German Bundesgerichtshof) (agreement on exclusive jurisdiction of foreign court in maritime freight agreement, pursuant to §662 of German Commercial Code, invalid if it relieves carrier of mandatory liability under Hague Rules).

524)

*Dampskibsselskabet Norden AS v. Beach Bldg & Civil Group Pty Ltd*, [2012] FCA 696 (Australian Fed. Ct.) (denying recognition of two awards on ground that arbitration clause was void under Carriage of Goods by Sea Act).

525)

For commentary, *see* Borris, *Arbitrability of Corporate LawDisputes in Germany*, 2012 Int'l Arb. L. Rev. 161; Caprasse, *Les Decisions Sociales*, 2013 Rev. Arb. 673; Caprasse, *Objective Arbitrability of Corporate Disputes: Belgium and France*, in C. Klaassen *et al.* (eds.), *Onderneming en ADR* 79 (2011); Cohen & Staff, *The Arbitration of Trust Disputes*, 7 J. Int'l Tr. & Corp. Plan. 203 (1999); Conaglen, *The Enforceability of Arbitration Clauses in Trusts*, 74 Cambridge L.J. 450 (2015); Gibirila, *La Validité de la Clause Compromissoire Soumettant a l'Arbitrage les Litiges nés de l'Évaluation des Parts Sociales de l'Associé Exclu*, 170 Journal des Sociétés 34 (2018); Herzfeld, *Prudent Anticipation? The Arbitration of Public Company Shareholder Disputes*, 24 Arb. Int'l 297 (2008); Kraft, *German Federal Court of Justice Refines the Criteria for the Admissibility of Arbitration Clauses*, 2010 Int'l Arb. L. Rev. 13; Meijer & Guzman, *The International Recognition of An Arbitration Clause in the Articles of Association of A Company*, in C. Klaassen *et al.* (eds.), *Onderneming en ADR* 117 (2011); Note, *Madrid Update: Corporate Battles: The Amendment of Dispute Resolution Clauses in Company Bylaws*, 23(2) Mealey's Int'l Arb. Rep. 21 (2008); Note, *Madrid Update: Arbitration Clause in Organization's By-Laws*, 23(5) Mealey's Int'l Arb. Rep. 26 (2008); Pilar Perales Viscasillas, *Arbitrability of (Intra-) Corporate Disputes*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 273 (2009); Quinke, *Schiedsklauseln in SPE-Satzungen*, 2011 GmbHR R168; Ravanides, *Arbitration Clauses in Public Company Charters: An Expansion of the ADR Elysian Fields Or A Descent into Hades?*, 18 Am. Rev. Int'l Arb. 371 (2007); Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517 (1989).

526)

In 2015 the Russian International Commercial Arbitration Law was amended to, among other things, address the arbitrability of so-called "corporate disputes." The scope of arbitrability for corporate law disputes was expanded further through the 2018 Russian Federal Law on the Incorporation of Amendments to the Federal Law on Arbitration in the Russian Federation.

527)

*See, e.g.*, *In re Burkin*, 1 N.Y.2d 570 (N.Y. 1956) (disputes over corporate management and control are "nonjusticiable"), *superseded by statute*, N.Y. Civ. Prac. L. & R. §§7501; *Long Park, Inc. v. Trenton-NewBrunswick Theatres Co.*, 297 N.Y. 174 (N.Y. 1948) (agreement to arbitrate corporate disputes unenforceable because it "sterilizes" corporate board), *superseded by statute*, N.Y. Bus. Corp. Law §620(b); *In re Fletcher*, 237 N.Y. 440 (N.Y. 1924) (agreement among shareholders in close corporation to determine transfer price of shares unenforceable because valuation is not "controversy" subject to arbitration), *superseded by statute*, Act of April 15, 1952, ch. 757, 1952 N.Y. Laws 1632. *See also* Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517 (1989).

528)

Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517, 525-26 (1989) ("Although arbitration of shareholder claims is a novelty for the public corporation, this dispute resolution system is well established in the context of another class of corporate entities, that of the privately held or 'close' corporation").

529)

*See Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 827 (6th Cir. 2015) (disputes regarding company's corporate structure arbitrable); *PureWorks, Inc. v. Unique Software Solutions, Inc.*, 554 F.App'x 376, 380 (6th Cir. 2014); *In re Petrobras Sec. Litg.*, 116 F.Supp.3d 368, 387 (S.D.N.Y. 2015); *JSC Surgutneftegaz v. President & Fellows of Harvard College*, 2005 WL 1863676, at \*4 (S.D.N.Y.); *Stewart v. Mitchell Madison Group, LLC*, 1999 U.S. Dist. LEXIS 3711 (S.D.N.Y.); *James & Jackson LLC v. Willie Gary LLC*, 906 A.2d 76 (Del. 2006); *In re Peter Herrero*, 562 N.Y.S.2d 665 (N.Y. App. Div. 1990) (corporate dissolution dispute arbitrable); *Banores v. Riviere*, 1999 Conn. Super. LEXIS 1985 (Conn. Super. Ct.) (statutory claims arbitrable in shareholder dispute); *Faustini v. Faustini Food Servs., Inc.*, 1996 Conn. Super. LEXIS 2949 (Conn. Super. Ct.) (corporate dissolution dispute arbitrable). *See also* Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517 (1989).Early U.S. decisions had generally held corporate governance disputes nonarbitrable on various grounds. *See, e.g., In re Burkin*, 136 N.E.2d 862 (N.Y. 1956) (dispute over removal of director nonarbitrable); *In re Ades*, 177 N.Y.S.2d 582, 584 (N.Y. Sup. 1958) (same); *In re Scuderi*, 39 N.Y.S.2d 422, 423 (N.Y. Sup. 1943) (validity of director's election nonarbitrable). *See also* Kessler, *Arbitration of Intra-Corporate Disputes Under New York Laws*, 19 Arb. J. 1 (1964).

530)

*Judgment of 6 April 2017,* 2017 SchiedsVZ 194 (German Bundesgerichtshof) (disputes concerning validity of shareholders' resolutions of partnerships are arbitrable, provided arbitral procedures require for participation of all shareholders and company and preclude contradictory awards); *Judgment of 6 April 2009*, 2009 NJW 1962 (German Bundesgerichtshof) (disputes concerning validity of shareholders' resolutions in limited liability companies are arbitrable, provided arbitral procedures provide for participation of all shareholders and company and preclude contradictory awards); *Judgment of 29 March 1996*, 1996 NJW 1753 (German Bundesgerichtshof) (suggesting that corporate disputes are arbitrable, provided arbitral procedures provide for participation of all shareholders and company and preclude contradictory awards). *See also Judgment of 6 April 2017*, I ZB 32/16, ¶22 (German Bundesgerichtshof) (although disputes regarding corporate law issues of partnerships (*Personengesellschaften*) are generally arbitrable, several provisions must be included in arbitration agreements to make disputes between company and its shareholders or between shareholders, arbitrable). *See also* Borris, *Arbitrability of Corporate Law Disputes in Germany*, 2012 Int'l Arb. L. Rev. 161 ("main source of debate in this area has been the issue of synchronising the mandatory *inter omnes* effect of the arbitral award with the right of all parties bound by the arbitral award to participate in the arbitral proceedings"); Borris, *Die Schiedsfähigkeit Gesellschaftsrechtlicher Streitigkeiten in der Aktiengesellschaft*, 2010 NZG 481; Borris, *Gesellschaftsrechtliche Streitigkeiten in der Schiedspraxis,* 2018 SchiedsVZ 242; Geimer, in R. Zöller (ed.), *Zivilprozessordnung* §1030, ¶9 (32d ed. 2018). *See also* Hertel & Covi, *Arbitrability of Shareholder Disputes in Germany*, Kluwer Arb. Blog (7 Feb. 2018).

531)

Geimer, in R. Zöller (ed.), *Zivilprozessordnung* §1030, ¶¶1, 8 *et seq.* (32d ed. 2018).

532)

2018 DIS Arbitration Rules, Annex 5 ("Supplementary Rules for Corporate Law Disputes"); 2009 DIS Supplementary Rules for Corporate Law Disputes. *See* Borris, *Die "Ergänzenden Regeln für Gesellschaftsrechtliche Streitigkeiten" der DIS*, 2009 SchiedsVZ 299; Wolff, *Die Ergänzenden Regeln für Gesellschaftsrechtliche Streitigkeiten der DIS: Bilanz der DIS-ERGeS 2009 und Vorstellung der DIS-ERGeS 2018,* 2018 SchiedsVZ 246.

533)

*See, e.g., Fulham Football Club (1987) Ltd v. Richards* [2011] EWCA Civ 855, ¶28 (English Ct. App.) (claim for "unfair prejudice" or breach of fiduciary duty by director arbitrable; "there is no express provision in either the [English Arbitration Act, 1996 or the English Companies Act, 2006] which excludes arbitration as a possible means of determining disputes of this kind"); *Re Vocam Euro. Ltd* [1998] BCC 396 (Ch) (English High Ct.).

534)

*See, e.g., Judgment of 21 December 2017*, 6 Ob 104/17p (Austrian Oberster Gerichtshof); *Judgment of 26 June 2014*, 6 Ob 84/14t (Austrian Oberster Gerichtshof); *Judgment of 10 July 2007*, 4 Ob 108/07v (Austrian Oberster Gerichtshof); *Judgment of 17 June 2003*, 5 Ob 112/03m (Austrian Oberster Gerichtshof); *Judgment of 10 December 1998*, 7 Ob 221/98w (Austrian Oberster Gerichtshof); *Judgment of 19 October 1989*, 7 Ob 681/89 (Austrian Oberster Gerichtshof).

535)

*See, e.g., Judgment of 8 December 2009*, DFT 136 III 107 (Swiss Fed. Trib.) (implicitly assuming arbitrability of derivative suits). *See also Award in ICC Case No. 16369*, in J.-J. Arnaldez, Y. Derains & D. Hascher (eds.), *Collection of ICC Arbitral Awards 2012-2015* 313 (2018).

536)

*See, e.g., Investissement Charlevoix Inc. v. Gestion Pierre Gingras Inc.*, [2010] QCCA 1229 (Québec Ct. App.); *1640895 Ontario, Inc. v. Harvey*, [2009] ONCA 76 (Ontario Ct. App.); *Acier Leroux Inc. v. Tremblay*, [2004] CanLII 28564 (Québec Ct. App.).

537)

*Tomolugen Holding Ltd v. Silica Investors Ltd*, [2015] SGCA 57, ¶84 (Singapore Ct. App.) (minority shareholder claims are arbitrable) (citing G. Born, *International Commercial Arbitration* 945 (2d ed. 2014)).

538)

*See Re Quiksilver Glorious Sun JV Ltd*, [2014] 4 HKLRD 759, ¶23 (H.K. Ct. First Inst.) ("In the present case the dispute between the parties concerns the basis upon which the joint venture is to end. … These issues can be determined by arbitration. If the arbitrators conclude that Quicksilver is correct an application can then be made to the Court for winding-up orders.").

539)

*See Judgment of 19 April 2012*, 6 Ob 42/12p (Austrian Oberster Gerichtshof) (claim regarding resolution of limited liability company's annual general meeting arbitrable); *L Capital Jones Ltd v. Maniach Pte Ltd*, [2017] SGCA 3, ¶32 (Singapore Ct. App.) (shareholder agreement "regulate[d] the relationship between [the Respondent] and the only other shareholder of [JtGGH] in their capacity as shareholders"; shareholder disputes arbitrable); *Tomolugen Holdings Ltd v. Silica Investors Ltd*, [2015] SGCA 57, ¶84 (Singapore Ct. App.) ("There is certainly nothing in the text of §216 to suggest an express or implied preclusion of arbitration. Nor does the legislative history and statutory purpose of the provision suggest that a dispute over minority oppression or unfair prejudice is of a nature which makes it contrary to public policy for the dispute to be adjudicated by an arbitral tribunal."). *Compare Judgment of 26 November 2010, Silver Lining Fin. v. Perstorp Waspik*, 2011 NJ 55 (Netherlands Hoge Raad) (claims involving validity of shareholder resolutions capable of settlement by arbitration); *Judgment of 21 January 2011*, Case No. T 2375-08 (Svea Ct. App.) (validity of decision to remove member of board of company (and related consultancy agreement) is arbitrable); Colombian Arbitration Act, Art. 1; Ukrainian Commercial Procedural Code, Art. 6(1) (corporate disputes nonarbitrable); Bernardini, *The Problem of Arbitrability in General*, in E. Gaillard & D. di Pietro (eds.), *Enforcement of Arbitration Agreements and International Arbitral Awards: The New York Convention in Practice* 503 (2008) (Italy). *See also Powell Duffryn plc v. Petereit*, Case No. C-0214.89, [1992] ECR I-1745 (E.C.J.) (jurisdiction clause in company's articles of association binding on shareholders); Shah, *Arbitrability of Minority Shareholder Disputes: Extending the Reach*, Thomson Reuters Arb. Blog (1 Mar. 2017); Shmatenko & Bevz, *The Arbitrability of Corporate Disputes in Ukraine*, 36 ASA Bull. 53 (2018).

540)

*See, e.g.*, Austrian ZPO, §581(2); Finnish Arbitration Law, §4.

541)

*Report on the Work of Its Thirty-Ninth Session, Supp. No. 17*, U.N. Doc. A/61/17, ¶183 (2006); UNCITRAL, *Report of Working Group II (Arbitration) on the Work of Its Forty-Fourth Session*, U.N. Doc. A/CN.9/592, ¶¶89-95 (2006). *See also* Russian Arbitrazh Procedure Code, Art. 225(1) (dividing corporate disputes into three categories based on arbitrability).

542)

*See* Ravanides, *Arbitration Clauses in Public Company Charters: An Expansion of the ADR Elysian Fields or A Descent into Hades?*, 18 Am. Rev. Int'l Arb. 371 (2007); Sockol, *A Natural Evolution: Compulsory Arbitration of Shareholder Derivative Suits in Publicly Traded Corporations*, 77 Tul. L. Rev. 1095, 1111 (2003); §10.07.

543)

Ravanides, *Arbitration Clauses in Public Company Charters: An Expansion of the ADR Elysian Fields or A Descent Into Hades?*, 18 Am. Rev. Int'l Arb. 371, 389-407 (2007).

544)

Some major corporations nonetheless include such provisions in their articles of association. *See, e.g., Royal Dutch Shell Articles of Association (adopted on 17 May 2005), as amended by written resolution on 18 July 2005*, Arts. 152-54, reprinted in Herzfeld, *Prudent Anticipation? The Arbitration of Public Company Shareholder Disputes*, 24 Arb. Int'l 297, 326-29 (2008).

545)

*See Meredith's Estate*, 266 N.W. 351 (Mich. 1936); *Schoneberger v. Oelze*, 96 P.3d 1078, 1082-83 (Ariz. Ct. App. 2004); *In re Jacobovitz' Will*, 295 N.Y.S.2d 527, 529 (Nassau County Surety Ct. 1968); *Shah v. Shah*, [2016] 8 SCC 788, ¶¶58-61 (Indian S.Ct.) (trust disputes nonarbitrable). *See also* Nueber & Puschmann, *Arbitration of Foundation and Trust Disputes in Liechtenstein and the United Kingdom: A Comparative Analysis*, 24(5) Trusts & Trustees 418 (2018); Strong, *Arbitration of International Trust Disputes: The Next Frontier for International Commercial Arbitration?*, in J. Kalicki & M. Abdel Raouf (eds.), *Evolution and Adaptation: The Future of International Arbitration* 971 (2019); Strong, *Arbitration of Trust Disputes: Two Bodies of Law Collide*, 45 Vand. J. Trans. L. 1157 (2012); Strong, *The European Succession Regulation and the Arbitration of Trust Disputes*, 103 Iowa L. Rev. 2205 (2018); S. Strong & T. Molloy (eds.), *Arbitration of Trust Disputes* (2016); von Segesser & Bell, *Arbitration of Trust Disputes*, 35 ASA Bull. 10 (2017).

546)

*See Laughton v. CGI Tech. & Solutions, Inc.,* 602 F.Supp.2d 262, 265 (D. Mass. 2009) (upholding arbitrability of trustee's claim); *Rachal v. Reitz,* 2013 WL 1859249 (Tex.) (upholding validity of arbitration clause in trust); *Rinehart v. Welker,* [2012] NSWCA 95 (N.S.W. Ct. App.). *See also* Spitko, *The Will as An Implied Unilateral Arbitration Contract,* 68 Fla. L. Rev. 49 (2016); Strong, *Arbitration of International Trust Disputes: The Next Frontier for International Commercial Arbitration?,* in J. Kalicki & M. Abdel Raouf (eds.), *Evolution and Adaptation: The Future of International Arbitration* 971 (2019); Strong, *Arbitration of Trust Disputes: Two Bodies of Law Collide,* 45 Vand. J. Trans. 1157 (2012); Strong, *Mandatory Arbitration of Internal Trust Disputes: Improving Arbitrability and Enforceability Through Proper Procedural Choices*, 28 Arb. Int'l 591 (2012).

547)

*See, e.g.,* New Zealand Trusts Bill, §138 ("A trustee may, with the agreement of each party to the matter, refer the matter to an ADR process").

548)

*See* Arkansas Code Annotated §16-108-201; Puerto Rico Dealers Act, 10 L.P.R.A. §278.

549)

*See* §6.03_[C][4]; California Corporations Code, §31512 (rendering void any provision which purported to bind a franchisee to waive compliance with any provision of Californian franchise law).

550)

The U.S. Supreme Court has held that these types of provisions conflict with §2 of the FAA and hence violate the Supremacy Clause. *See Southland Corp. v. Keating*, 465 U.S. 1 (U.S. S.Ct. 1984).

551)

*See* §6.03_[C][4]; U.S. Motor Vehicle Franchise Contract Arbitration Fairness Act, 15 U.S.C. §1226.

552)

*See* Belgian Law of 27 July 1961, as amended by Belgian Law of 13 April 1971 (titled "Law on the Unilateral Rescission of Exclusive Sales Concessions Concluded for an Unlimited Period of Time"), Art. 4 ("The aggrieved grantee, at the time of the termination of a concession of sale taking effect in whole or in part in the Belgian territory, can in any case bring an action against the grantor in Belgium, either before the judge of his own domicile, or before the judge of the domicile or the seat of the grantor. If the case is brought before a Belgian court, it will exclusively apply Belgian law."); §6.03[C][2].

553)

*Judgment of 18 June 1976, Audi NSU v. Adelin Petit SA*, 1979 Journal des Tribunaux 626 (Belgian Cour de Cassation).

554)

*See Judgment of 16 November 2006,* Case No. C.02.0445.F (Belgian Cour de Cassation) (dispute governed by Belgian law regarding distributors nonarbitrable).

555)

*See id.* at 9 (Belgian Cour de Cassation) ("A consistent interpretation of the New York Convention, in particular of Articles II and V(2)(a) requires determining whether the dispute is arbitrable under the *lex fori*, whenever the question is raised").

556)

*Judgment of 16 November 2006,* Case No. C.02.0445.F, 9 (Belgian Cour de Cassation). *See also Judgment of 22 December 1988, Gutbrod Werke GmbH v. Usinorp de Saint-Hubert et Saint Hubert Gardening,* 1988 Journal des Tribunaux 458 (Belgian Cour de Cassation) ("an arbitration clause could only be valid if it specified that the arbitrators are obligated to apply Belgian law [and] that, if that is not the case, the clause could not stand"); Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 91, 94-99 (2009).

557)

*See* §6.02[G].

558)

*See* §2.01[A][1][a].

559)

*See Final Award in ICC Case No. 6379*, XVII Y.B. Comm. Arb. 212 (1992).

560)

*See id.* at 215-16. *Compare* Keutgen & Dal, *National Report for Belgium (2007)*, in J. Paulsson (ed.), *International Handbook on Commercial Arbitration* 1, 9 (1984 & Update 2007) ("Arbitration is also possible regarding exclusive distributorship contracts. However, one must note that when a dispute concerns a unilateral termination of an exclusive distributorship contract of unspecified (indeterminate) duration in Belgium, the Law of 27 July 1961 allocates important indemnities to the concessionaire. For such disputes, one can have recourse to arbitration when the dispute arises and even when it has not yet arisen and one can also conclude an arbitration agreement but in such cases the arbitrator will have to apply Belgian law.").

561)

*See* §4.05[C][5].

562)

*See id.*

563)

*Judgment of 17 May 2006*, 2006 IHR 166, 167-68 (Oberlandesgericht München). *See also* Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 91, 99-103 (2009).

564)

*See* §1.04[A][1][c][i]. *See also* Quinke, *Schiedsvereinbarungen und Eingriffsnormen*, 2007 SchiedsVZ 246; Rau, *Comment: Mandatory Law and the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 133 (2009); Ruhl, *Extending Ingmar to Jurisdiction and Arbitration Clauses: The End of Party Autonomy in Contracts with Commercial Agents?*, 2007 Euro. Rev. Priv. L. 891. *See also Judgment of 21 June 2017*, XLIV Y.B. Comm. Arb. 463 (Brazilian Superior Tribunal de Justiça) (2019) (rejecting Article V(2)(a) defense that film exploitation and distribution rights were non-arbitrable under law of recognition forum).

565)

*Judgment of 1 March 2017*, 5 Ob 72/16y (Austrian Oberster Gerichtshof).

566)

*See, e.g., London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.); *Westacre Inv. Inc. v. Jugoimport-SPDR Holding Co.* [1999] 3 All ER 864 (English Ct. App.) (award enforced despite alleged illegality of "consulting fee"); *Judgment of 8 July 2010, Doga v. HTC Sweden AB*, Case No. 09-67013 (French Cour de Cassation Civ. 1) (tort claims under mandatory French law held arbitrable*); Agrawest v. BMA*, [2005] PESCTD 36 (Prince Edward Island S. Ct.). *See also Ayyasamy v. Paramasivam*, Civil Appeal Nos. 8245 & 8246 of 2016, ¶5 (Indian S.Ct.) (mere allegation of fraud does not render dispute nonarbitrable, but also holding: "When the case involves serious allegations of fraud, the dicta contained in the aforesaid judgments would be understandable. However, at the same time, mere allegation of fraud in the pleadings by one party against the other cannot be a ground to hold that the matter is incapable of settlement by arbitration and should be decided by the civil court. The allegations of fraud should be such that not only these allegations are serious that in normal course these may even constitute criminal offence, they are also complex in nature and the decision on these issues demand extensive evidence for which civil court should appear to be more appropriate forum than the Arbitral Tribunal.").

567)

New York Convention, Art. II(1). *See* §9.02[F][1].

568)

*See, e.g., Hub Power Co. v. Pakistan WAPDA*, 16 Arb. Int'l 439 (Pakistan S.Ct. 2000) (2000); §6.03[C][6].

569)

*See* §4.05[C][5].

570)

*Radhakrishnan v. MS Maestro Eng'rs*, Civil Appeal No. 7019/2009, ¶6 (Indian S.Ct.) (apparently holding claims nonarbitrable because they involved complex allegations of fraud and serious misconduct, requiring that dispute "must be tried in court and the Arbitrator could not be competent to deal with such matters which involved an elaborate production of evidence to establish the claims relating to fraud and criminal misappropriation").

571)

It is unclear whether Indian courts would apply this nonarbitrability rule to disputes subject to international arbitration agreements. As discussed above, a number of courts have applied nonarbitrability exceptions more narrowly in international than in domestic settings. *See* §6.03[A].

572)

*See, e.g.,* Kreindler, *The Arbitration Clause: The Validity of An Arbitration Clause in Matters of Product Liability*, in M. Blessing (ed.), *The Arbitration Agreement: Its Multifold Critical Aspects* 123 (1994); Thornburg, *Contracting with Tortfeasors: Mandatory Arbitration Clauses and Personal Injury Claims*, 67 Law & Contemp. Prob. 253, 256-60 (2004) (discussing cases). *See also Leong v. Kaiser Found. Hosp.*, 788 P.2d 164, 169 (Haw. 1990) (enforcing clause in health care plan calling for binding arbitration of "[a]ny claims for damages for personal injury … arising out of the rendition of or failure to render services under this contract"); *Doyle v. Giuliucci*, 401 P.2d 1, 3 (Cal. 1965) ("The arbitration provision in such contracts [for medical care] is a reasonable restriction, for it does no more than specify a forum for the settlement of disputes").

573)

*Compare McDonnel Group LLC v. Great Lakes Ins. SE,* 923 F.3d 427, 431 (5th Cir. 2019) (relying on Convention to uphold arbitration agreement despite state insurance regulation invalidating agreement); *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714 (5th Cir. 2009) (same); *Bennett v. Liberty Nat'l Fire Ins. Co.,* 968 F.2d 969 (9th Cir. 1992); *Life of Am. Ins. Co. v. Aetna Life Ins. Co.,* 744 F.2d 409 (5th Cir. 1984); *Floyd v. Kelly Serv. Inc.,* 2019 WL 4452309 (N.D. Tex.); *First United Methodist Church of Corinth, Inc. v. Certain Underwriters at Lloyds,* 2019 WL 4197595 (N.D. Miss.); *Antillean Marine Shipping Corp. v. Through Transp. Mut. Ins., Ltd,* 2002 U.S. Dist. LEXIS 26363, at *7-8 (S.D. Fla.) (rejecting nonarbitrability objection under McCarran-Ferguson Act, which "does not apply to international insurance contracts made under the Convention"); *Philipps v. Lincoln Nat'l Health & Cas. Ins. Co.,* 774 F.Supp. 1297 (D. Colo. 1991); *Triton Lines, Inc. v. Steamship Mut. Underwriting Ass'n,* 707 F.Supp. 277 (S.D. Tex. 1989) (McCarran-Ferguson Act does not create exception to FAA permitting state nonarbitrability statute to render agreement to arbitrate unenforceable); *Assuranceforeningen Skulld (Gjensidig) v. Apollo Ship Chandlers, Inc.,* 847 So.2d 991, 993 (Fla. Dist. Ct. App. 2003) (rejecting nonarbitrability objections under McCarran-Ferguson Act "because the parties' dispute involves foreign commerce") *with ESAB Group Inc. v. Zurich Ins. plc,* 685 F.3d 376, 390 (FAA does not preempt anti-arbitration provisions under McCarran-Ferguson Act); *Stephens v. Am. Int'l Ins. Co.,* 66 F.3d 41, 45-46 (2d Cir. 1995); *Foresight Energy LLC v. Certain London Mkt Ins. Cos.,* 311 F.Supp.3d 1085, 1099 (E.D. Mo. 2018); *Washburn v. Corcoran,* 643 F.Supp. 554 (S.D.N.Y. 1986) (relying on McCarran-Ferguson Act and New York statute to hold claims by state insurance liquidators nonarbitrable); *Corcoran v. Ardra Ins. Co.,* 566 N.Y.S.2d 575 (N.Y. 1990) (New York Convention and FAA do not require arbitration of claims by state insurance liquidator).

574)

*See, e.g., BWV Invs. Ltd v. Saskferco Prods. Inc.,* [1994] CanLII 4557 (Saskatchewan Ct. App.); *Automatic Sys. Inc. v. Bracknell Corp.,* [1994] CanLII 1871 (Ontario Ct. App.).

575)

*See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.,* 369 F.3d 645 (2d Cir. 2004) (compelling arbitration of claims for moral damages under Brazilian import/export regulations).

576)

*See, e.g., Orcutt v. Kettering Radiologists, Inc.,* 199 F.Supp.2d 746 (S.D. Ohio 2002) (False Claims Act whistle-blower claims arbitrable). *Contra Nguyen v. City of Cleveland,* 121 F.Supp.2d 643 (N.D. Ohio 2000) (False Claims Act claims nonarbitrable).

577)

*See, e.g., Judgment of 28 February 2008,* RG No. 05/10577 (Paris Cour d'Appel) (disputes over industrial property licenses are arbitrable); *Judgment of 15 November 2005,* Case No. T-2277-04 (Svea Ct. App.) (dispute over Russian real property rights arbitrable notwithstanding Russian Subsoil Law); *Judgment of 26 May 2011,* Russian Gazette No. 5498 (Russian Const. Ct.) (upholding arbitrability of real estate disputes (including disputes over transfers and security interests)). *Compare Judgment of 22 February 2008, Alloys Trading Ltd v. AvangardTorgRos LLC,* Case No. A56-44076/2007 (N.W. Fed. Arbitrazh Ct.) (disputes over real estate in Russia held nonarbitrable). *See also* Azzi, *Arbitrabilité et Validité du Titre en Droit Francais,* 2014 Rev. Arb. 319.

578)

*See, e.g., Jean Estate v. Wires Jolley LLP,* [2009] ONCA 339 (Ontario Ct. App.) (fact that Solicitor's Act grants Superior Court jurisdiction does not mean that disputes arising between solicitor and client cannot be submitted to arbitration); *Fung v. Henry Wai & Co.,* [2018] HKCFI 31 (H.K. Ct. First Inst.) (disputes over legal fees are arbitrable).

579)

*See, e.g., Judgment of 17 May 2017,* 2017 NJW 2112 (German Bundesgerichtshof); *Judgment of 16 March 2017,* 2017 NJW 2115 (German Bundesgerichtshof); *Judgment of 16 March 2017,* 2017 ZEV 413 (German Bundesgerichtshof). *See also* Karrer & Straub, *Switzerland,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* ¶14.33 (3d ed. 2019); Lazić & Meijer, *Netherlands,* in *id.* at ¶9.54.

580)

*See, e.g., Final Awards in ICC Case Nos. 6515 & 6516,* XXIV Y.B. Comm. Arb. 80, 84 (1999) (dispute over contractual allocation of Greek taxes did not implicate Greek sovereignty and was arbitrable); Park, *Income Tax Treaty Arbitration,* 10 George Mason L. Rev. 803 (2001). *Compare* Carbonneau & Sheldrick, *Tax Liability and Inarbitrability in International Commercial Arbitration,* 1 J. Transnat'l L. & Pol'y 23, 38 (1992); Chambon, *L'Arbitrabilité des Litiges a Tonalite Fiscal,* 2017 Revue Européene et Internationale de Droit Fiscal 351.

*See, e.g.*, *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723-24 (9th Cir. 1999) (Lanham Act); *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir. 1997) (Lanham Act); *Saari v. Smith Barney, Harris Upham & Co.*, 968 F.2d 877 (9th Cir. 1992) (Employee Polygraph Protection Act claim is arbitrable). *See also Judgment of 3 March 2015*, Case No. A41-60951/13 (Russian S.Ct.) (public procurement dispute nonarbitrable due to public interest).

582)

*See* 15 U.S.C. §1226(a)(2) ("motor vehicle franchise contract" disputes nonarbitrable except where post-dispute agreement to arbitrate exists); *Arch Reins. Ltd v. Akay Holdings Sdn Bhd,* [2019] 1 CLJ 305 (Malaysian Fed. Ct.) (disputes regarding statutory foreclosure proceedings under Malaysian National Land Code are nonarbitrable).

583)

*See, e.g.*, *Judgment of 9 March 2006, N.K. Belavia v. O.J.S.C. Aviakompaniya Sibir*, Case No. 04-786/2006 (W. Siberian Dist. Fed. Arb. Ct.) (disputes over title to aircraft held nonarbitrable).

584)

*See, e.g.*, *Aqaba Container Terminal (Pvt) Co. v. Soletanche Bachy France SAS* [2019] EWHC 471, ¶36 (Comm) (English High Ct.); *Union of India v. Tantia Constr. Pvt Ltd*, [2011] INSC 410, ¶27 (Indian S.Ct.) (at least some constitutional claims nonarbitrable in domestic dispute: "the constitutional powers vested in the High Court or the Supreme Court cannot be fettered by any alternative remedy available to the authorities").

585)

*See* French Civil Code, Art. 2060 (divorce and separation claims nonarbitrable); Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 396 (2012) (divorce and child custody issues nonarbitrable in Germany; matrimonial claims arbitrable). *Compare A.I. v. M.T.* [2013] EWHC 100, ¶33 (Fam) (English High Ct.) (court granted parties' request to refer all issues (including those relating to financial settlement, status of parties' marriage and care and parenting of children) to arbitration by Jewish religious court (New York Beth Din): "it was an integral aspect of the process of arbitration that it took place under the auspices of the *Beth Din*. It was a profound belief held by both parties, and their respective extended families, that the marriage which had been solemnised in accordance with the tenets of their faith should be dissolved within those tenets"). *See also S v. S* [2014] 1 WLR 2299 (Fam) (English High Ct.) (claims for post-divorce ancillary relief are arbitrable).

586)

*AB Bofors-Uva CAV Ltd v. AB Skandia Transp.* [1982] 1 Lloyd's Rep. 410 (Comm) (English High Ct.) (refusing to recognize arbitration agreement that was contrary to Convention on Contracts for the International Carriage of Goods by Road; interpreting Convention as requiring "express provision that the tribunal shall apply the Convention," which arbitration agreement failed to do).

587)

*Subway Sys. Australia Pty Ltd v. Ireland*, [2013] VSC 550, ¶63 (Victoria Sup. Ct.) ("the effect of §94 of the [Retail Leases Act 2003] is to render a dispute to which §94 … applies, a matter which may not be the subject of arbitration in Victoria"); *Himangni Enters. v. Kamaljeet Singh Ahluwalia*, Civil Appeal No. 16850/2017 (Indian S.Ct.) (disputes relating to tenancy, eviction and rent are non-arbitrable). *But see Ambuja Neotia Holdings Pvt Ltd v. MS Planet M Retail Ltd*, AP No. 9/2015 (Calcutta High Ct.) (lease deed disputes are arbitrable and only those eviction or tenancy matters governed by special statute are non-arbitrable). *See also* Susan & Malhotra, *Arbitrability of Lease Deed Disputes in India: The Apex Court Answers*, Kluwer Arb. Blog (19 Feb. 2018).

588)

*See, e.g.*, *Serbia v. Imagesat Int'l BV* [2009] EWHC 2853 (Comm) (English High Ct.) (question whether state is "successor" state is not nonarbitrable).

589)

*See* §6.03[C][4].

590)

*See* Arkansas Code Annotated §16-108-201(b)(2); Iowa Code Annotated §679A.1(2)(c); Kansas State Annotated §5-401(c) (recognized as preempted by FAA in *Skewes v. Shearson Lehman Bros.*, 829 P.2d 874, 874 (Kan. 1992)); S.C. Code Annotated §15-48-10(b)(4); Texas Civil Practice & Remedies Code Annotated §171.002(a)(3)(c) (recognized as preempted by FAA in *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005)).

591)

*See* Louisiana Revised State Annotated §22:868 ("A. No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state … shall contain any condition, stipulation, or agreement: … (2) Depriving the courts of this state of the jurisdiction of action against the insurer. … Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract."); Michigan Franchise Investment Law, Michigan Compiled Laws Annotated §600.5005; Montana Code Annotated 2019, §27-5-114(2)(b) (when consideration for real estate is less than $5000); Ohio Revised Code Annotated §2711.01(B)(1).

592)

*See* Arkansas Code Annotated §16-108-201(b)(2) (recognized as preempted by Federal Crop Insurance Act in *IGF Ins. Co. v. Hat Creek P'ship*, 76 S.W.3d 859, 866 (Ark. 2002)); Kansas State Annotated §5-401(c)(3).

593)

*See Perry v. Thomas*, 482 U.S. 483 (U.S. S.Ct. 1987); Iowa Code Annotated §679A.1(2)(b); Kansas State Annotated §5-401(c)(2) (recognized as preempted by FAA in *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1151-52 (10th Cir. 2007)).

594)

*See* §6.04_[H][1]; Cole, *Uniform Arbitration: "One Size Fits All" Does Not Fit*, 16 Ohio St. J. Disp. Resol. 759, 787 (2001); Spitko, *Federal Arbitration Act Preemption of State Public-Policy Based Employment Arbitration Doctrine: An Autopsy and An Argument for Federal Agency Oversight*, 20 Harv. Negot. L. Rev. 1 (2015).

595)

*See Southland Corp. v. Keating*, 465 U.S. 1 (U.S. S.Ct. 1984).

596)

*See Keating v. Super. Ct. of Alameda County*, 645 P.2d 1192, 1203-04 (Cal. 1982).

597)

*Southland*, 465 U.S. at 16.

598)

*Id.* at 16 n.11.

599)

*Perry*, 482 U.S. 483.

600)

*Id.* at 488.

601)

*Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 269-71 (U.S. S.Ct. 1995) (preempting Alabama statute invalidating agreements to arbitrate future disputes). The state statute, Alabama Code §8-1-41, provided: "The following obligations cannot be specifically enforced: … (3) An agreement to submit a controversy to arbitration."

602)

*See, e.g., KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (U.S. S.Ct. 2011) (FAA preempts state law rule denying enforcement of arbitration agreement where dispute involved non-arbitrable claims); *Preston v. Ferrer*, 552 U.S. 346 (U.S. S.Ct. 2008) (FAA preempts state law granting exclusive jurisdiction over particular claims to state administrative agency); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (U.S. S.Ct. 2006); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (U.S. S.Ct. 1996) ("Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions") (emphasis in original); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (U.S. S.Ct. 1995).

603)

*See* §4.02[A][2][d]; *Generational Equity LLC v. Schomaker,* 602 F.App'x 560, 562 (3d Cir. 2015) (Pennsylvania statute barring unregistered foreign business from utilizing state courts preempted by FAA); *THI of N.M. at Hobbs Ctr LLC v. Patton,* 741 F.3d 1162, 1165 (10th Cir. 2014) (FAA preempted New Mexico law of unconscionability of arbitration for contracts governed by FAA); *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714, 723-25 (5th Cir. 2009); *Lewis v. Circuit City Stores, Inc.,* 500 F.3d 1140, 1151-52 (10th Cir. 2007) (FAA "preempts Kansas's statute rendering disputes between an employer and employee nonarbitrable"); *S+L+H SpA v. Miller-St. Nazianz, Inc.,* 988 F.2d 1518 (7th Cir. 1993) (Wisconsin Fair Dealership Law's prohibition on arbitration of certain disputes preempted); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd (London),* 923 F.2d 245, 250 (2d Cir. 1991) ("state statutes such as the Vermont statute [requiring that any agreement to arbitrate be displayed prominently in the contract and signed by the parties] directly clash with the Convention and with the [FAA] because they effectively reincarnate the former judicial hostility towards arbitration"); *Saturn Distrib. Corp. v. Williams,* 905 F.2d 719 (4th Cir. 1989); *Sec. Indus. Ass'n v. Connolly,* 883 F.2d 1114 (1st Cir. 1989); *Perez v. Qwest Corp.,* 883 F.Supp.2d 1095, 1113 (D.N.M. 2012); *JSC Surgutneftegaz v. President & Fellows of Harvard College,* 2005 WL 1863676, at \*4 (S.D.N.Y) ("To the extent that New York law would exempt matters going to the internal affairs of corporations from arbitration, it is preempted by the FAA"); *In re Marcia L. Pate,* 198 B.R. 841 (Bankr. S.D. Ga. 1996) (FAA preempts Georgia state statutory bar against arbitration clauses in consumer transactions); *In re Nexion Health at Humble, Inc.,* 173 S.W.3d 67, 69 (Tex. 2005) (FAA preempts provision of Texas statute rendering tort claims nonarbitrable if arbitration agreement not signed by counsel); *Skewes v. Shearson Lehman Bros.,* 829 P.2d 874, 874 (Kan. 1992) (FAA preempts Kansas' statute rendering tort claims nonarbitrable); *Dahiya v. Talmidge Int'l Ltd,* 931 So.2d 1163, 1173 (La. Ct. App. 2006) (New York Convention and FAA preempt state law making pre-dispute arbitration agreements in employment contracts unenforceable); *Wells Fargo Auto Fin., Inc. v. Wright,* 698 S.E.2d 17 (Ga. Ct. App. 2010) (FAA preempted state law purportedly invalidating arbitration agreement contained in vehicle purchase contract). *But see Sakkab v. Luxottica Retail N. Am. Inc.,* 803 F.3d 425, 427 (9th Cir. 2015) (FAA did not preempt California rule barring waiver of representative Private Attorneys General Act claims).

604)

*Marmet Health Care, Inc. v. Brown,* 565 U.S. 531 (U.S. S.Ct. 2012).

605)

*Id.* at 532-33 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U. S. 213, 217 (U.S. S.Ct. 1985)).

606)

*Id.* at 533.

607)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018) ("In many cases over the years, this Court has heard and rejected efforts to conjure conflicts between the FAA and other federal statutes. … Throughout, we have made clear that even a statute's express provision for collective legal actions does not necessarily mean that it precludes 'individual attempts at conciliation' through arbitration. … And we've stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act.") (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32 (U.S. S.Ct. 1991)). *Compare id.* at 1678 (Ginsburg, J., dissenting) ("Even assuming the FAA and the NLRA were inharmonious, the NLRA should control. Enacted later in time, the NLRA should qualify as 'an implied repeal' of the FAA, to the extent of any genuine conflict").

608)

*See* §4.05.

609)

*Award in ICC Case No. 1110,* 10 Arb. Int'l 282, 291 (1994). *See also* §6.04[C].

610)

*See, e.g., Final Award in ICC Case No. 8423,* XXVI Y.B. Comm. Arb. 153, 154 (2001) ("The first issue for the Arbitral Tribunal is whether disputes concerning the application of community competition law are arbitrable. As community law pertains to international public policy, the Arbitral Tribunal must examine this issue *ex officio,* even if the parties do not raise an objection."); *Award in ICC Case No. 7539,* 123 J.D.I. (Clunet) 1030 (1996). *See also* Mourre, *Arbitration and Criminal Law. Reflections on the Duties of the Arbitrator,* 22 Arb. Int'l 95 (2006).

611)

*See* §26.05[C][4][c].

612)

*See* §19.04[B].

613)

National law in some jurisdictions may require an arbitrator to do more than raise nonarbitrability issues *sua sponte.* Ottolenghi, *National Report for Israel (1984),* in J. Paulsson (ed.), *International Handbook of Commercial Arbitration* 1, 5 (1984) (arbitrator required to report suspected criminal activity to Attorney General). *See* §13.04[A][5].

614)

*See* §15.04[B][3].

615)

The principle of judicial non-interference in arbitral proceedings is discussed below. *See* §15.06.

616)

*See, e.g., Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) (conditioning arbitrability of Title VII dispute on various "procedural safeguards" in arbitration proceedings, including "more than minimal discovery," punitive damages and employee's exemption from paying arbitrators' fees); *Rodriguez v. Sim*, 2009 WL 975457, at *4 (N.D. Cal.) (compelling arbitration in "compliance with the [FAA] and the California Code of Civil Procedure, and the FAA's mandatory and permissive rights to discovery" with "the employer bear[ing] … any cost of the arbitration that the employee would not have incurred had the claim been filed in court").

617)

*See PPG Indus., Inc. v. Pilkington plc*, 825 F.Supp. 1465 (D. Ariz. 1993); *MEL v. Gotaas-Larsen Shipping Corp.*, 837 F.Supp. 1207 (S.D. Fla. 1993) (requiring reports every three months on progress of arbitration of federal securities law claims in London).

618)

*See* §§8.03[B]-[C]; §15.06.

619)

*See* §8.03_[A][2]; §8.03_[C]; UNCITRAL Model Law, Art. 5.

620)

*See* §8.03_[A][2]; §8.03[C].

621)

*See* §6.02_[G]; *Howard v. Anderson*, 36 F.Supp.2d 183, 187 (S.D.N.Y. 1999) ("[G]iven defendants' desire to arbitrate this case and reach a resolution that will be enforced by the Court, they should make every effort to ensure that Howard is afforded all of her statutory rights. However, if Howard is unable to vindicate her rights in the arbitral forum, she will have recourse to the Court.").

622)

*See* §6.03_[C]; §6.04.

623)

*See* §1.01_[B]; §1.01[C][1].

624)

*See* §1.04_[A][1]; 1.04[B][1].

625)

*See* §6.03[C]. *See also* Brekoulakis, *The Protection of the Public Interest in Public Private Arbitrations*, Kluwer Arb. Blog (8 May 2017) ("The last forty years has witnessed a remarkable growth in the rise of public-private contracts and related disputes. The growth owes to two concurrent developments. One the one hand, with the collapse of the non-arbitrability doctrine, the scope of arbitration has greatly expanded to include not only claims pertaining to the formation, interpretation and performance of commercial contracts, but crucially statutory claims that may have crucial social implications. Today, international arbitral tribunals routinely review disputes associated with public policy, including (in investment law) disputes arising out of the exercise of regulatory sovereignty of host states.").

626)

*See* §6.03_[C]; §6.04.

627)

*See* §6.03[C].

628)

Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193, 222 (1994). *See also* Abraham & Montgomery, *The Lawlessness of Arbitration*, 9 Conn. Ins. L.J. 355 (2003); Comrie-Thomson, *A Statement of Arbitral Jurisprudence: The Case for A National Law Obligation to Publish International Commercial Arbitral Awards*, 34(2) J. Int'l Arb. 275 (2017); McConnaughay, *The Risks and Virtues of Lawlessness: A "Second Look" at International Commercial Arbitration*, 93 N.W. U. L. Rev. 453 (1999); Park, *Private Adjudicators and the Public Interest: The Expanding Scope of International Arbitration*, 12 Brooklyn J. Int'l L. 629 (1986); Silberman, *International Arbitration: Comments from A Critic*, 13 Am. Rev. Int'l Arb. 9, 12, 18 (2002) ("Broader protection for mandatory laws in the context of international arbitration could give greater integrity in the process"; "Important legal issues – whether they fall within the public or private sphere – deserve public attention and debate. Arbitration of certain private disputes may be appropriate, but particular issues in the private sector have public resonance and should be left to the formal adjudication processes of courts that are entrusted with those responsibilities and accountability.").

629)

As discussed above (and in greater detail below), U.S., EU and other nonarbitrability decisions have all concerned private rights to enforce, *inter alia*, competition, securities, trade and other statutory rights, without affecting the authority of regulatory agencies to enforce the same statutory provisions. *See* §§6.04[A]-[B] & [E].

630)

Considered from an historical perspective, many of the statutory rights which are involved in disputes over nonarbitrability arise from modern legislation, such as competition, securities, intellectual property, consumer, civil rights, employment and similar statutory regimes. Suggestions that such rights were historically nonarbitrable, and have recently become arbitrable, are therefore confused. *See, e.g., Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829 (7th Cir. 2003) (Cudahy, J., dissenting) ("For some considerable time not long in the past, the law of the land was that antitrust disputes were not arbitrable"). In fact, such rights were historically nonexistent and only recently became either litigable or arbitrable.

631)

*See* §1.01[C][1].

632)

Born, *Right to Arbitrate: Historical and Contemporary Perspectives,* 17 Asian Disp. Rev. 56 (2015).

633)

*See* §1.04[B][2].

634)

*See* §§6.03-6.04.

635)

*See* §1.02[B].

636)

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 518 (U.S. S.Ct. 1974).

637)

*See also* Drahozal & Zyontz, *Private Regulation of Consumer Arbitration*, 79 Tenn. L. Rev. 289 (2012).

638)

*See* §6.04[A][5].

639)

*See* Fox, *Antitrust and Regulatory Federalism: Races Up, Down, and Sideways*, 75 N.Y.U. L. Rev. 1781 (2000) (discussing increasing antitrust regulation globally); Prentice, *The Inevitability of A Strong SEC*, 91 Cornell L. Rev. 775, 778 (2006) ("It was reasonably clear before the Enron scandal, and is even clearer now, that substantial federal government regulation of securities transactions in the United States will continue"); Waller, *Prosecution by Regulation: The Changing Nature of Antitrust Enforcement*, 77 Or. L. Rev. 1383 (1998) (explaining increasingly regulatory nature of U.S. antitrust enforcement efforts). *See also Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 832 (7th Cir. 2003) ("Treating Baxter as bound (*vis-à-vis* Abbott) by the tribunal's conclusion that the license (as construed to provide strong exclusivity) is lawful does not condemn the public to tolerate a monopoly. If the three-corner arrangement among Baxter, Maruishi and Abbott really does offend the Sherman Act, the United States, the FTC, or any purchaser of sevoflurane is free to sue and obtain relief.").

640)

*See* §§1.04[A][4]-[7].

641)

*See* §10.08.

642)

*See* §6.04_[G][2]; §6.04[H].

643)

*See* Alford, *Arbitrating Human Rights,* 83 Notre Dame L. Rev. 505 (2008).

644)

*See* §6.04_[O]; Chambon, *L'Arbitrabilité des Litiges a Tonalite Fiscal,* 2017 Revue Européene et Internationale de Droit Fiscal 351; Park, *Income Tax Treaty Arbitration*, 10 Geo. Mason L. Rev. 803 (2001).

645)

*See* §6.04[K].

646)

*See* §6.04[D].

647)

*See* 2002 PCA Optional Rules for Conciliation of Disputes Relating to the Environment and/or Natural Resources.

648)

*See* §1.04[C][6][o].

649)

Born, *A New Generation of International Adjudication*, 61 Duke L.J. 775 (2012).

650)

*See* §6.04[O] for discussion of the arbitrability of domestic relations disputes.

651)

As discussed above, such restraint is required by the New York Convention. *See* §4.05_[A][2]; §6.02[I].

652)

*See* §6.02_[G]; §6.04[H][3].

653)

*See* §4.05_[A][2]; §6.02[I].

654)

*See* §6.02[G].

655)

*See* §4.05[C][3].

656)

Equally, it is critical, in assessing asserted applications of the nonarbitrability doctrine, to ascertain clearly whether or not such rules are intended to apply in international, as distinguished from domestic, matters. As discussed above, a recurring feature of decisions over the past several decades has been recognition that domestic nonarbitrability rules often do not apply to international disputes. *See* §6.03[A].

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Arbitration is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwerarbitration.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer

Kluwer**Arbitration**