**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                          :
NEXTERA ENERGY GLOBAL HOLDINGS            :
B.V. and NEXTERA ENERGY SPAIN             :
HOLDINGS B.V.,                            :
                                          :
                          Petitioners,    :
                                          :   Civil Action No. 19-cv-01618-TSC
                    v.                    :
                                          :
KINGDOM OF SPAIN                          :
                                          :
                          Respondent      :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
```

**DECLARATION OF PROFESSOR GEORGE A. BERMANN**

Pursuant to 28 U.S.C. § 1746, I, GEORGE A. BERMANN, declare as follows:

## I.  **INTRODUCTION**

1.    I submit this Expert Declaration at the request of counsel for NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (together, "NextEra"), the two Petitioners in this action, in connection with the current proceeding to enforce an arbitral award and to respond to certain matters raised by Professor Dr. Steffen Hindelang, LLM in his Expert Declaration dated May 2, 2022 ("Hindelang Declaration") (ECF No. 62-1), the Kingdom of Spain ("Spain") in its renewed Motion to Dismiss ("Spain Renewed MTD") (ECF No. 62-78), and the European Commission (the "EC") in its *amicus* brief (the "EC *amicus*") (ECF No. 67).

2.     Professor Hindelang and I have previously submitted expert testimony in this action.[1]  However, I understand that Professor Hindelang's most recent declaration is intended to combine his prior declarations and discuss relevant developments,[2] and so I do not respond to his prior testimony here.  Correspondingly, this Declaration supersedes my prior one.

3.     This is an action to enforce an arbitral award (the "Award") rendered in an arbitration (the "Arbitration") conducted under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID").[3]  The Award resolved a dispute between NextEra and Spain concerning Spain's obligations arising under the Energy Charter Treaty (the "ECT"),[4] a treaty to which the United States, Spain and the Netherlands[5] are all Contracting Parties.  The Award was preceded by a Decision on Jurisdiction, Liability and Quantum Principles dated March 12, 2019 (the "Liability Decision"),[6] in which the ICSID arbitral tribunal hearing the dispute (the "Tribunal") held that Spain violated its obligation to provide fair and equitable treatment to NextEra's investments under Article 10(1) of the ECT.  The Award has since been upheld in its

---

[1]    My previous declaration was dated December 20, 2019 (ECF No. 22).  Professor Hindelang's declarations were dated October 11, 2019 (ECF No. 15-6) and February 7, 2020 (ECF No. 25).

[2]    Third Declaration of Professor Dr. Steffan Hindelang ("Hindelang 2022 Decl.") (ECF No. 62-1) ¶ 1.

[3]    *See NextEra Energy Global Holdings B.V. v. Spain*, ARB/14/11, Award (ICSID 2019) ("Award") (ECF No. 1-4).  The Award is correspondingly governed by the ICSID Convention, a treaty that lies at the heart of this case.  Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S. 159 (the "ICSID Convention") (ECF No. 1-5).  The ICSID tribunal and *ad hoc* annulment committee that adjudicated this dispute were duly appointed pursuant to the ICSID Convention.

[4]    Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95 (the "ECT") (ECF No. 1-6).

[5]    Petitioners are both nationals of the Netherlands.

[6]    *NextEra Energy Global Holdings B.V. v. Spain*, ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles (ICSID 2019) ("Liability Decision") (ECF No. 1-4, Annex A).

entirely by an ICSID *ad hoc* annulment committee (the "Annulment Committee") in a unanimous decision issued on March 18, 2022 (the "Annulment Committee Decision").[7]

4.      In preparing this Expert Declaration, I reviewed the briefing submitted by Professor Hindelang, Spain, NextEra, and the European Commission in this proceeding.  I also reviewed the Liability Decision, the Award, the Annulment Committee Decision, and the other documents from the Arbitration and annulment proceeding on which Professor Hindelang relied, including the European Commission's *amicus* briefs submitted therein.

5.      The questions I have been asked to address are the following:[8]

*(a)*      ***As a matter of international law, including the law of treaties:***

(i)      Does Spain's accession to the ICSID Convention evince an acceptance by Spain that the courts of ICSID Convention Contracting States (including the courts of the United States) have jurisdiction to enforce awards made under the ICSID Convention?

(ii)      In view of Spain's accession to the ICSID Convention and ratification of the ECT, has Spain agreed to submit disputes with nationals of other ECT Contracting Parties to ICSID Convention arbitration?

(iii)      Does the Award in this case arise from a valid arbitration agreement?

*(b)*      ***As a matter of international law, what weight, if any, should be ascribed to:***

(i)      Spain's claim (and that of the European Commission) that European Union ("EU") law – including the decisions of the European Court of Justice in *Slovak Republic v. Achmea B.V.*, No. C-284/16 (CJEU Mar. 6, 2018) ("*Achmea*") (ECF No. 62-47) and *Republic of Moldova v. Komstroy LLC,*

---

[7]      *NextEra Energy Glob. Holdings B.V. v. Spain*, ARB/14/11, Decision on Annulment (ICSID 2022) ("Annulment Committee Decision") (Riviere Decl. Ex. 1).

[8]      As I understand it, the answers to these questions may assist this Court in determining whether it has subject matter jurisdiction under either the waiver or arbitration exceptions in the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602-1611.  *See id.* § 1605(a)(1) (waiver); *id.* § 1605(a)(6) (arbitration).  While I am an expert in these areas of FSIA and statutory construction, and am willing to express my views on these issues if this Court requires, the opinions expressed in this Expert Declaration are limited to issues of international law, including the law of treaties.  Where relevant, I also deal with matters of EU law.

No. C-741/19 (CJEU Sep. 2, 2021) ("*Komstroy*") (ECF No. 62-67) – negates the jurisdiction of the Tribunal;

(ii)     The findings of the Tribunal and Annulment Committee (as reflected in the Liability Decision, Award, and Annulment Committee Decision);

(iii)     Spain's claim (and that of the European Commission) that payment of the Award would constitute an illegal State aid under EU law; and

(iv)     Other contentions advanced by Spain, its experts (including Professor Hindelang) and/or the European Commission in this proceeding, the Arbitration, and the annulment proceeding?

## II.    SUMMARY OF CONCLUSIONS

6.    My conclusions on each of these questions are the following:

(a)    ***On the effect of Spain's accession to the ICSID Convention and ratification of the ECT:***

(i)     By acceding to the ICSID Convention, Spain categorically undertook to comply with ICSID awards rendered against it and acknowledged that other ICSID Contracting States, such as the United States, are obligated to enforce the pecuniary obligations of those awards if they remain unpaid. This necessarily entails Spain accepting that the courts of the United States have the power (indeed the obligation) to recognize and enforce all ICSID awards, including those rendered against Spain.

(ii)     By signing and ratifying the ECT, Spain agreed that, in the event an investor from another ECT Contracting Party claimed that Spain had violated any of the substantive investment protections in Part III of the ECT (including Article 10), that claim could be submitted to arbitration before a tribunal constituted under the ICSID Convention.[9]

(iii)     The facts confirm that NextEra validly invoked its right under the ECT to arbitrate claims against Spain under the ICSID Convention, and that accordingly the Tribunal was duly constituted.

(b)    ***On Spain's assertions concerning the application of the ECT to "intra-EU" disputes, and Spain's related EU law arguments:***

(i)     Even if Spain were entitled to challenge the validity of the parties' arbitration agreement in an application to recognize an ICSID award under

---

[9]    The option of arbitration under the ICSID Convention – expressed in Article 26 of the ECT – is further subject to: (i) the investor being a national of an ICSID Contracting State; and (ii) Spain being an ICSID Contracting State. Both of those conditions were satisfied in this case.

the ICSID Convention (which it cannot), Spain's arguments would fail. In particular, Spain alleges that no valid arbitration agreement exists because the ECT does not authorize arbitration of intra-EU investment disputes. But there is no basis in the ECT for positing a carve-out for intra-EU disputes.

(ii)     Moreover, under international law, a State may not invoke its internal law to relieve itself of its international treaty obligations. A State may choose, as a matter of domestic law, to disobey its treaty obligations, but that does not relieve it of international legal responsibility for doing so. Nor may a State expect other States – including the United States – to disrespect their own international treaty obligations out of deference to that State's internal law.

(iii)    Spain's imposition of any such carve-out on the basis of the asserted "autonomy" of EU law (which purports to bar any court or tribunal outside the EU orbit from interpreting or applying EU law) does not alter the force and effect of international law. Whatever one thinks of this notion of autonomy, it is a notion entirely internal to the EU, whereas the validity of the agreement between Spain and NextEra – like the validity of any international agreement – is governed on the international plane by international law, not domestic law.

(iv)     Spain further claims that its payment of the Award would constitute a form of unlawful State aid under EU law, and that the Award should for that reason be regarded as unenforceable. However, EU State aid law – like the principle of EU law autonomy – constitutes domestic law and cannot justify any violation of an EU Member State's international legal obligations.

(v)      Even if EU State aid law could be invoked to defeat Spain's international obligations, enforcement of the Award would not constitute State aid. State aid under EU law is a measure by which a State gratuitously confers a benefit on a private enterprise and, in so doing, risks distorting the market. However, enforcement of the Award in this case is not a measure taken by Spain at all; it is a measure taken by this Court by virtue of its own ICSID Convention obligations. It is precisely because Spain has *not* paid the Award that recognition and enforcement is necessary. Furthermore, and in any event, even by voluntarily paying the Award, Spain would not be gratuitously conferring a benefit on NextEra, but merely doing what its international law obligations require it to do. Nor would such payment produce a market distortion; it would simply restore NextEra to the position it would have been in had Spain not violated its ECT obligations.

(vi)     Moreover, the European Commission has made no determination that the Spanish incentives that precipitated the arbitration constitute unlawful State aid, nor has it even launched any such inquiry. Unless the underlying incentives are in fact found to be an illegal State aid, compensation for their wrongful revocation cannot constitute an illegal State aid either.

## III.     <u>BACKGROUND AND QUALIFICATIONS</u>

7.      I am a Professor of Law at Columbia Law School in New York, where I hold the Jean Monnet Professorship in European Union Law and the Walter Gellhorn Professorship.  As a member of the Columbia faculty since 1975, I have taught, among others, the following subjects: international commercial and investment arbitration, transnational litigation, conflicts of law, EU law, World Trade Organization (WTO) law and contracts.

8.      At Columbia, I founded and direct the Center for International Commercial and Investment Arbitration (CICIA).  I also founded and was the first director of the European Legal Studies Center (ELSC).  I am co-editor-in-chief of the *American Review of International Arbitration* (ARIA), which is produced at Columbia, as well as President of the Executive Editorial Board of the *Columbia Journal of European Law* (CJEL), which I also established.

9.      I have other regular teaching engagements at the Institut des Sciences Politiques (Sciences Po) in Paris, where I am *professeur affilié* and teach in the LL.M. program in international dispute resolution.  I also teach regularly in the Masters of International Dispute Settlement (MIDS) program at the University of Geneva.  In addition, I teach as an adjunct professor at the Georgetown University Law Center in Washington, D.C.

10.      Over the past 40 years, I have served regularly as international arbitrator in both commercial and investor-State cases, and have frequently rendered expert opinions for courts and arbitral tribunals on the law of international arbitration, transnational litigation, European Union law and the law of multiple European jurisdictions.

11.      I am Chief Reporter of the American Law Institute's *Restatement of the US Law of International Commercial and Investment Arbitration*, which received final approval in May 2019. I am also the author of numerous books, including, most recently, the following: the *UNCITRAL Secretariat Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral*

6

*Awards (New York 1958)* (2016) (co-authored with Emmanuel Gaillard); *International Arbitration and Private International Law* (General Course in Private International Law of Hague Academy of International Law) (published by the Academy in *Recueil des cours* of the Academy and in paperback by Brill Nijhoff) (2017); *Interpretation and Application of the New York Convention by National Courts* (Springer Pub. 2017); *Mandatory Rules in International Arbitration* (2d ed., Juris Pub. 2021); and *Cases and Materials on European Union Law* (West Pub. 4th ed. 2015) (co-authored).

12.     I am the author of numerous articles, including: *Understanding ICSID Article 54*, 35 ICSID Review – Foreign Inv. L. J. 1-2 (2020); *The Energy Charter Treaty and European Union Law*, in *International Arbitration in the Energy Sector* (M. Scherer, ed., 2018); *What Does it Mean to be "Pro-Arbitration?"*, 34 Arb. Int'l 341 (2018); *The Role of National Courts at the Threshold of Arbitration*, 28 Am. Rev. Int'l Arb. 291 (2018); *European Union Law as a Jurisdictional and Substantive Defense in Investor-State Arbitration*, in *The Impact of EU Law on International Commercial Arbitration* (Franco Ferrari, ed., 2017); *Res Judicata in International Arbitration*, in *Cambridge Compendium of International Commercial and Investment Arbitration* (A. Bjorklund et al., eds., forthcoming 2022); *"International Standards" as a Choice of Law Option in International Commercial Arbitration*, 27 Am. Rev. Int'l Arb. 423 (2017); *The* Yukos *Annulment: Answered and Unanswered Questions*, 27 Am. Rev. Int'l Arb. 1 (2016); *Limits to Party Autonomy in Composition of the Arbitral Panel*, in *Limits to Party Autonomy in International Commercial Arbitration* 83 (F. Ferrari, ed., 2016); *International Commercial Arbitration: Present Challenges and Future Prospects*: Festschrift for John Beechey (2017); *The "Gateway Problem" in International Commercial Arbitration*, 37 Yale J. Int'l L. 1 (2012); *Navigating EU Law and the*

*Law of International Arbitration*, 28 Arb. Int'l 397 (2012); and *Arbitrability Trouble*, 23 Am. Rev. Int'l Arb. 367 (2012).

13.     As a member of the international arbitration community, I hold and have held positions in numerous international arbitration institutions.  These include as chair of the New York International Arbitration Center (NYIAC), member of the Governing Board of the International Court of Arbitration at the International Chamber of Commerce (ICC) in Paris, and member of the ICC's Standing Committee and International Arbitration Commission.  At the American Arbitration Association (AAA), I am a member of the Council, and at the Center for Conflict Prevention and Resolution (CPR) I am a member of the Board of Directors.

14.     I hold honorary degrees from: the University of Fribourg, Switzerland; Université de Versailles-St. Quentin, France; Universidad César Vallejo, Lima, Perú; and Universidade Nova de Lisboa, Lisbon, Portugal.

## III.     OPINION

### A.     Spain Consented to ICSID Jurisdiction in this Case

15.     I understand that Spain denies that this Court has subject matter jurisdiction over the case on the ground that it allegedly does not fall within any of the exceptions of the FSIA. Without commenting on the terms of the FSIA or case law decided thereunder, which I understand will be addressed by the parties' respective counsel in this case,[10]  I address below the international law implications of Spain having become bound by the two treaties which lie at the heart of this case – the ICSID Convention and the ECT.

---

[10]     *See supra* note 8.

16.     The ICSID Convention is a multi-party treaty that was finalized in 1965 under the auspices of the World Bank.  Its aim is to create a framework for resolving disputes between signatory States and private investors.  Among other things, the ICSID Convention establishes an arbitration institution, ICSID (or the "Centre"), to administer arbitration between "Contracting States" and "nationals of other Contracting States."[11]  It creates rules for the appointment of arbitrators, the powers vested in appointed arbitrators, the conduct of arbitration, and the rendering and enforcement of awards in cases governed by the ICSID Convention

17.     A very common means by which an ICSID Contracting State expresses consent to the arbitration of an investment dispute is through a reciprocal investment treaty or trade treaty with one or more other States.  Under such treaties, each Contracting State incurs substantive obligations to protect investments made on its territory by a national of another Contracting State by ensuring a given level of treatment (e.g., "fair and equitable treatment," "full protection and security," and compensation in the event of expropriation).  These treaties then typically provide for ICSID Convention arbitration of investor-State disputes that might arise, in the event an investor from another Contracting State contends that the host country has violated those substantive treaty protections.  More specifically, each State is understood by such a treaty to make a "standing offer" to those investors to submit to arbitration claims that it failed to comply with its treaty obligations.  An investor from the other State may then "accept" that offer by initiating arbitration of a dispute arising under the treaty.[12]

---

[11]   ICSID Convention art. 1.

[12]   *See* ECT art. 26(3)(a) (Contracting Parties give their "unconditional consent to the submission of a dispute to international arbitration . . . in accordance with the provisions of this Article"); *id.* art. 26(4)(a)(i) (ICSID Convention arbitrations are available under the ECT where "the Contracting Party of the [i]nvestor and the Contracting Party . . . to the dispute" are parties to the ICSID Convention and the investor elects ICSID Convention arbitration).

18.    Article 25 of the ICSID Convention confers jurisdiction on an ICSID tribunal to hear and determine any investment claim initiated under the Convention.  Article 41(1) of the Convention provides that, once an ICSID tribunal is formed, "[t]he Tribunal shall be the judge of its own competence."  Article 41(2) of the ICSID Convention continues:

> Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

19.    Among the ICSID Convention's most distinctive provisions are those concerning the enforcement of ICSID awards.  They include the following:

> Article 53:
>
> (1)    [An ICSID] award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.  Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.
>
> Article 54:
>
> (1)    Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.  A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.
>
> (2)    A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General.

20.    These provisions give an ICSID Convention award a special status.  They reflect an understanding that the ICSID Convention has among its central purposes to ensure (a) that Contracting States treat as binding, and thereby comply with, ICSID awards rendered against them

in favor of an investor and (b) that if a Contracting State fails to do so, any and every other Contracting State to which the investor brings that award for enforcement will enforce it.[13]  Thus, under Article 53(1) of the ICSID Convention, Contracting States agreed not only to comply with ICSID awards rendered against them, but also to refrain from exercising "any appeal or [ ] any other remedy except those provided for in [the] Convention."  Those remedies include the possibility for an ICSID award to be subject to annulment proceedings conducted before a so-called "*ad hoc* committee" established under Article 52 of the ICSID Convention.  Under Article 53 of the ICSID Convention, the post-award remedies within the Convention (principally, the option of seeking annulment) are the exclusive remedies for reviewing ICSID awards.  Thus, courts of Contracting States lack authority to set aside ICSID awards.

21.    Moreover, courts of Contracting States may not interfere with the enforcement of ICSID awards.  Neither the jurisdiction of an ICSID tribunal nor the merits of an ICSID award may be questioned at the enforcement stage.  In sum, ICSID Convention awards, unlike awards governed by the New York Convention on Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 330 U.N.T.S. 3 (the "New York Convention"), are not subject to scrutiny by national courts.[14]  Due to these important limitations on national court authority, the ICSID

---

[13]    *See* Christoph H. Schreuer et al., *The ICSID Convention: A Commentary* 1125 (2d ed. 2009) (Ex. 1 hereto) ("Failure of a State party to the Convention to recognize and enforce an award would be a breach of a treaty obligation.").

[14]    *See Tethyan Copper Co. v. Islamic Republic of Pak.*, No. 1:19-CV-02424 (TNM), 2022 WL 715215, at *4 (D.D.C. Mar. 10, 2022) ("After ratifying the ICSID Convention, Congress passed legislation to implement the Convention's provisions . . . Congress also prohibited courts from using the more robust form of judicial review available under the Federal Arbitration Act to analyze ICSID awards. These provisions mandate an 'exceptionally limited' role for the Court in enforcing an ICSID award." (citation omitted)).

Convention is consistently described as "self-contained"[15] and as a "closed legal system."[16] Shielding ICSID awards from judicial review was among the ICSID Convention's prime objectives.

22.  Article 54 makes enforcement of ICSID awards subject to two simple conditions, and only those conditions.  The first, found in paragraph (1), requires States to enforce ICSID awards in the same manner in which they enforce judgments of their own courts.  The second, found in paragraph (2), requires that a party seeking enforcement produce a copy of the Award certified by the Secretary-General.  Subject to these two conditions, enforcement by a Contracting State is obligatory.[17]

23.  Efforts were made during the negotiations that led to what became Article 54(1) of the ICSID Convention to introduce exceptions to the absolute enforcement obligation of Contracting States, but they were all rejected.[18]  One proposal was to subject the enforcement of

---

[15]  *See* Schreuer, *supra* note 13 at 1139 ("The system of review under the Convention is self-contained and does not permit any external review.").

[16]  The United States has implemented ICSID's unique framework through the Convention on the Settlement of Investment Disputes Act of 1966, 22 U.S.C. § 1650a(a), which states relevantly:

> An award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.  The Federal Arbitration Act (9 U.S.C. [§§ 1 to 16]) shall not apply to enforcement of awards rendered pursuant to the convention.

[17]  *See* George Bermann, *Understanding ICSID Article 54*, 35 ICSID Rev. 311 (2020) – Foreign Inv. L. J. 1-2, at 2, 11-13 (2020) (Ex. 2 hereto) ("[T]he inquiry that may properly be made pursuant to Article 54 should be strictly limited to the procedure by which enforcement is achieved.").

[18]  *See* ICSID, II *History of the ICSID Convention* 346, 426-27, 466, 575, 900-04 (1968) (Ex. 3 hereto).

ICSID awards to the same defenses to enforcement applicable to New York Convention awards.[19] This proposal was expressly rejected.[20]  The proponents' "fall back" suggestion was that at least a public policy defense should be inserted.[21]  This suggestion, too, was expressly rejected.[22]  Article 54(1) was adopted with no such exceptions at all.

24.    Thus, Spain, in acceding to the ICSID Convention, not only affirmed that it would consider itself bound by an ICSID award rendered against it, but also recognized that, pursuant to Article 54(1) of the ICSID Convention, all other Contracting States – including the United States – are *required* to enforce any such awards in the same manner in which they enforce judgments of their own courts, without discretion to apply any "public policy" exception, much less conduct merits review.  Spain thus necessarily consented to the jurisdiction of a court of any Contracting State over an action to enforce an ICSID award rendered against it and forswore any possibility of recourse to a national court to challenge the Tribunal's jurisdiction.

25.    In my opinion, a request for a national court (including this Court) to revisit the issue of ICSID Convention jurisdiction, which was already conclusively held to be sufficient by

---

[19]    *See id.* at 425-26, 429, 521.

[20]    *See* Bermann, *supra* note 17, at 6 ("[ICSID Convention drafters] expressly abandoned the idea of subjecting enforcement of ICSID awards to the New York Convention defenses" following a failed proposal that "favored giving ICSID awards in any given State the most favorable treatment afforded under either domestic law, the Geneva Convention of 1927 or the then recently signed New York Convention.").

[21]    *See History of the ICSID Convention*, *supra* note 18, at 345-47, 427, 521, 575.

[22]    *See id.* at 900-04; *see also* Bermann, *supra* note 17, at 7 ("While some delegates supported retaining only the public policy exception, others urged a wider set of allowable defenses . . . [u]ltimately, the only action the committee took was to vote, by a margin of 25 to nine, to reject any public policy defense to enforcement, even in courts of third Contracting States.").

the Tribunal and the Annulment Committee, is unquestionably "[an] appeal or . . . other remedy" against an ICSID award and is foreclosed by Article 53(1) of the Convention.

26.     Accordingly, I conclude that, as a matter of international law, Spain has waived any objection to the jurisdiction of the courts of an ICSID Contracting State when those courts are asked to enforce the pecuniary obligations of an ICSID award, such as the Award at issue in this case.  This includes the courts of the United States.

**B.     Spain Agreed to Arbitrate NextEra's Claims under the ECT**

27.     Although the disputes adjudicated in an ICSID arbitration most often arise under a bilateral investment treaty ("BIT"), they may also arise under a multilateral treaty such as the ECT, as in the present case.  Article 26(3)(a) of the ECT states that "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article," including arbitration under the ICSID Convention.[23]  Article 26(5) of the ECT states that this combination of a State's consent to arbitrate, coupled with an investor's initiation of arbitration in writing, constitutes an agreement to arbitrate which satisfies the ICSID Convention's requirement of written consent to arbitrate.[24]  Thus, Spain also consented to ICSID Convention arbitration when it signed and ratified the ECT as an ICSID Contracting State.[25]

---

[23]    *See* ECT art. 26(4)(a)(i).

[24]    *See id.* art. 26(5)(a)(i).

[25]    Spain signed the ECT on December 17, 1994.  It ratified the ECT on December 11, 1997.  The ECT (including the agreement to ICSID Convention arbitration) was expressed to become "provisionally applicable" upon signing, meaning that some states were immediately bound by its provisions even before they ratified the ECT.  I will not address this issue in this Declaration because there is no dispute that Spain ratified the ECT well before the present dispute arose.

28.     This is what occurred here.  The Liability Decision and the Annulment Committee Decision both indicate that NextEra instituted an ICSID Convention arbitration against Spain, claiming that Spain had violated the substantive protections in Articles 10(1) and 10(7) of the ECT.[26]  In doing so, NextEra accepted Spain's standing offer; and as a result, both NextEra and Spain consented to ICSID Convention arbitration of the present dispute.

29.     Accordingly, it is my opinion that Spain and NextEra have, since at least 2014 when NextEra initiated arbitration, been party to an arbitration agreement pursuant to which all of NextEra's ECT-related claims were subject to arbitration by a tribunal constituted under the ICSID Convention.  This agreement is reflected in the plain text of the ECT's arbitration provision, of which there has been no formal amendment by the Contracting Parties (or recognized withdrawal by Spain).[27]  Thus, Spain's ratification of the ECT and ICSID Convention, coupled with NextEra's subsequent consent to arbitration embodied in its submission of the dispute to ICSID, established a valid and enforceable agreement to arbitrate the present dispute.

**C.     The ECT is Fully Applicable to "Intra-EU" Disputes**

**1.     Spain's "Intra-EU" Argument Cannot be
Revisited at the Award Enforcement Stage**

30.     Professor Hindelang contends (and so too, I understand, do both the European Commission and Spain) that the ECT does not apply to "intra-EU" investment disputes, i.e., disputes between an investor of one Member State against another Member State.  He maintains that "Article 26 of the ECT cannot be applied between EU Member States,"[28] and that "Article 26

---

[26]  *See* Liability Decision ¶ 180.

[27]  *See infra* ¶¶ 49, 51, 98-99.

[28]  Hindelang 2022 Decl. ¶ 49.

has been inoperative *ab initio* for intra-EU disputes."[29]   Accordingly, "Spain did not make a legally permissible offer to arbitrate based on Article 26(3) of the ECT to investors from another EU Member State, such as NextEra,"[30] and NextEra could not validly accept any such offer.  Due to the invalidity of the arbitration agreement between Spain and NextEra, the Tribunal lacked jurisdiction to render the Award in this case.[31]

31.    In analyzing Spain's intra-EU argument at this enforcement stage of the parties' dispute, attention must be paid to the precise language and meaning of the ICSID Convention itself.  As previously noted,[32] Article 53 of the ICSID Convention lays down two principles: (i) the finality of ICSID awards and (ii) an unconditional obligation of Contracting States to comply with such awards.  The first sentence plainly states that an ICSID "award shall be binding on the parties and *shall not be subject to any appeal or to any other remedy except those provided for in this Convention.*"[33]   In this case, Spain positively invoked its available remedy (to seek annulment under Article 52 of the ICSID Convention) and the Annulment Committee rejected its claims in their entirety.  The second limb of Article 53 is set out in the next sentence, which reads: "Each

---

[29]   *Id.* ¶ 50.

[30]   *Id.* ¶ 50.

[31]   *See* Spain Renewed MTD at 34-37.  As I understand it, this argument is being advanced in an effort to deny subject matter jurisdiction on the basis that the "waiver" or "arbitration" exceptions under the FSIA allegedly have not been met.  Based on my expert knowledge of the FSIA's rules concerning international arbitration, I consider these arguments to be based on an erroneous premise.  I believe that the FSIA's provisions were not intended to allow issues of arbitral jurisdiction (particularly ICSID arbitral jurisdiction) to be re-litigated at the award enforcement stage.  However, since my opinions in this Declaration are confined to issues of international law, including the law of treaties, I will not address issues of FSIA interpretation unless this Court so directs.

[32]   *See supra* ¶¶ 19-22.

[33]   ICSID Convention art. 53(1) (emphasis added).

16

party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."[34]  Here, enforcement has not been stayed – on the contrary, the Annulment Committee lifted its temporary stay of enforcement and upheld the Award in full.

32.     Moving beyond Article 53 of the ICSID Convention (which applies to the parties to the arbitration), Article 54 imposes obligations on all ICSID Contracting States to enforce an ICSID award as if it were a final local judgment, provided the petitioner produces a duly certified copy of the award.[35]

33.     As noted, under Articles 53 and 54 of the ICSID Convention a national court may not, in an action to enforce an ICSID award, review the substance of the award or question a tribunal's authority to render it.[36]  This precludes consideration of Spain's intra-EU argument at the enforcement stage.

---

[34]  I understand that Spain expressly recognized its obligations under Article 53 of the ICSID Convention in support of its request to stay the enforcement of the ICSID Award. In its submission to the ICSID Secretary-General, Spain underscored that it "takes its international commitments seriously, and it intends to honor them. That includes its obligation under Article 53 of the ICSID Convention to abide by and comply with the terms of the Award in this case." *NextEra Energy Global Holdings B.V. v. Spain*, ARB/14/11, Submission of the Kingdom of Spain in Support of the Continuation of the Stay of Enforcement of the Award at ¶ 25 (ICSID 2020) (Riviere Decl. Ex. 3).

[35]  As noted above, Article 54 has been implemented through US law.  *See supra* note 16.

[36]  *See* Schreuer, *supra* note 13, at 1139 ("A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID Tribunal's jurisdiction. It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID Tribunal.").  I note that US courts have followed this rule.  *See Mobil Cerro Negro, Ltd. v. Venezuela*, 863 F.3d 96, 102, 118 (2d Cir. 2017) (An "ICSID-award debtor [is] not permitted to make substantive challenges to the award," and an enforcing court is "not permitted to examine an ICSID award's merits, its compliance with international law, *or the ICSID tribunal's jurisdiction to render the award*" and hence "may do no more than examine the [award's] authenticity and enforce the obligations imposed by the award." (emphasis added)); *accord TECO Guatemala Holdings, LLC v. Guatemala*, No. 17-102 (RDM), 2018 WL 4705794, at *2

34.    Accordingly, I conclude that this Court, in enforcing this Award may not enter into a re-examination of the Tribunal's jurisdiction to adjudicate NextEra's claims.  This means that the lengthy arguments set out by Professor Hindelang, Spain and the EC challenging the applicability of the ECT to intra-EU disputes under EU law are simply irrelevant.  The treaty obligation of this United States Court to enforce the Award under the ICSID Convention is clear and does not permit it to revisit the Tribunal's finding of jurisdiction.

### 2.    Properly Interpreted, the ECT is Applicable to Intra-EU Disputes

35.    In my opinion, even if an enforcing court could entertain the intra-EU objection under the ICSID Convention, that objection would fail because there is no basis whatsoever for excluding intra-EU investment disputes from the ECT's scope of application.

36.    The ECT specifically states that "*each* Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article."[37]  The ECT further requires that "*[e]ach* Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."[38]  The term "each Contracting Party" in both Article 26(3) and Article 26(8) of the ECT means what it says: each Contracting Party, including Contracting Parties that are EU Member States.  Spain and the Netherlands are both Contracting

---

(D.D.C. Sept. 30, 2018); *Tethyan*, 2022 WL 715215 at *3, 8-9.  According to the United States Court of Appeals for the Second Circuit, Article 54 "reflects an expectation [under the ICSID Convention] that the courts of a member nation will treat the award as final."  *Mobil Cerro Negro*, 863 F.3d at 102.

[37]    ECT art. 26(3)(a) (emphasis added).

[38]    *Id.* art. 26(8) (emphasis added).

Parties in their own right; each undertook the ECT's obligations; and each consented to arbitration to resolve any related claims against it by investors from the other.

37.    I observe that there is nothing in the text of the ECT – and Professor Hindelang has not pointed to anything (and neither has Spain) – to suggest that the obligation of any Contracting Party to comply with an ECT award differs depending on the nationality of the investor, so long as the investor is a national of another Contracting Party.  Professor Hindelang and Spain instead rely on decisions rendered by the CJEU, including *Komstroy*, to argue in favor of a separate treatment for intra-EU Disputes under the ECT.[39]  Every arbitral tribunal analyzing *Komstroy* has, however, rightly found that the CJEU's interpretation of the ECT was "clearly inappropriate" and "not supported by the provisions of the ECT, nor in the objectives of the ECT."[40]

38.    I find it telling that not a single ECT tribunal considering the question of intra-EU jurisdiction has followed *Komstroy* since it was issued (just as not a single ECT tribunal has ever declined jurisdiction on the basis of *Achmea* since it was issued[41]).  In my opinion, the interpretation of ECT Article 26 advanced by the CJEU in *Komstroy* cannot prevent arbitral tribunals from assuming jurisdiction, consistent with their obligation under the ECT itself and public international law.

---

[39]  Hindelang 2022 Decl. ¶¶ 38, 45-74; Spain Renewed MTD at 15, 32, 47.

[40]  *E.g.*, *Infracapital F1 S.à r.l. v. Spain*, ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objection and the Merits ¶¶ 111-13 (ICSID 2022) ("*Infracapital* (Reconsideration)") (Ex. 4 hereto); *see also infra* ¶¶ 115-119.

[41]  *See Watkins Holdings S.à r.l. v. Spain*, ARB/15/44, Award ¶ 207 (ICSID 2021) ("*Watkins* Award") (Ex. 28 hereto) ("Arbitral tribunals having to deal with intra-EU investment cases have consistently rejected the idea that the *Achmea* judgment of the CJEU could have a bearing on their own jurisdiction.").

39.    The EC points out that the CJEU held in *Komstroy* that "Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State."[42]  I note, however, that the EC also indicates that "the interpretation the CJEU set forth in *Komstroy* may not be the only possible interpretation of Article 26 of the ECT, [but] it is the only interpretation that prevents a conflict with primary law (*i.e.,* the EU Treaties) and therefore must be preferred as an expression of the principle of conformity through interpretation."[43]  Indeed, the CJEU only advanced that interpretation of Article 26 after expressing the need for "preservation of the autonomy and of the particular nature of EU law [which] precludes the same obligations under the ECT from being imposed on Member States as between themselves."[44]  In my view, while these concerns may be valid within the EU legal order, they cannot govern the interpretation of Article 26 ECT under public international law.  As I explained above, such an interpretation must be performed in accordance with the Vienna Convention on the Law of Treaties (the "VCLT"), with the result that Article 26 ECT plainly applies to intra-EU disputes.

40.    Arbitral tribunals analyzing *Komstroy* have observed that the CJEU failed to adopt the perspective of international law,[45] and did not perform the type of interpretative exercise that

---

[42]    European Commission's May 22, 2022 Brief on Behalf of the European Union as *Amicus Curiae* in Support of Spain ("EC *amicus*") (ECF No. 67) at 12 (citing *Komstroy* ¶ 66).

[43]    EC *amicus* at 15.

[44]    *Komstroy* ¶ 65.

[45]    *Sevilla Beheer B.V. v. Spain*, ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum ¶ 669, 676 (ICSID 2022) ("*Sevilla Beheer* (Jurisdiction)") (Ex. 29 hereto) (Stating that "the Tribunal cannot accept the CJEU's interpretation of Article 26(2)(c) of the ECT as persuasive, as the reasoning of the *Komstroy* Judgment does not provide any analysis of this provision and its alleged inapplicability in an intra-EU context from the perspective of international law," and holding that "the Tribunal maintains its conclusion regarding the

the VCLT requires.[46]   In particular, they have found that the CJEU's interpretation of Article 26 ECT (according to which that provision is given a distinct meaning only as far as intra-EU disputes are concerned) is irreconcilable with the principles of treaty interpretation in the VCLT.  As one tribunal found:

> The ECT must be interpreted in accordance with the well-established principles of international law on treaty interpretation, as reflected in the Vienna Convention on the Law of Treaties. Moreover, it is axiomatic that the express words of the text of the ECT cannot have different meanings as between different configurations of EU and non-EU Contracting Parties and their investors. Contracting Parties may, of course, agree to amend the ECT so that it has differential application, in accordance with the procedure set out in ECT Article 42.[47]

41.    In any case, arbitral tribunals are certainly not bound by the jurisprudence of the CJEU, whose reach is confined to the EU legal order.  By contrast, ECT tribunals are "required to

---

applicability of Article 26 of the ECT in an intra-EU context despite the findings made in the *Komstroy* Judgment.").

[46]   *Infracapital* (Reconsideration) ¶ 111 ("The Tribunal agrees with Claimants that in interpreting Article 26 ECT the CJEU made no effort to conduct an interpretive exercise under the VCLT -as would be required under public international law- but rather relied on an alleged need to "*preserv*[e] *the autonomy and* [...] *the particular nature of EU law"* in order to justify its decision. This is clearly inappropriate.").

[47]   *Kruck v. Spain*, No. ARB/15/23, Decision on Request for Reconsideration ¶ 37 (ICSID 2021) ("*Kruck* (Reconsideration)") (Ex. 30 hereto); *see also id.* ¶ 40 ("The Tribunal cannot accept, however, that the consequence is that the interpretation of the ECT must either be determined authoritatively by the EU and its courts, or that the ECT may have a different meaning in the context of intra-EU disputes from that which it has in non-intra-EU disputes (whether between non-EU investors and EU States, or between non-EU investors and non-EU States, or between EU investors and non-EU States). Such an inherently discriminatory structure cannot be reconciled with the affirmation of the ECT Contracting Parties, including the EU, that they "attach the utmost importance to the effective implementation of full national treatment and most favoured nation treatment."); *see also Sevilla Beheer* (Jurisdiction) ¶ 670 ("Indeed, the ECT is a multilateral agreement signed by the EU and its Member States as well as a number of other States not members of the EU. As long as there is no evidence that the Respondent's interpretation of Article 26 of the ECT is supported by *all the parties* to the ECT (including its non-EU signatories), it cannot guide the Tribunal's interpretation under Article 31(2)(a)-(b) of the VCLT.").

operate in the international legal framework of the ECT and the ICSID Convention, outside the EU and the dictates of EU law".[48]  Tribunals confronted with *Komstroy* have made this abundantly clear.[49]

42.    Further, contrary to the EC's position,[50] the fact that the EU acceded to the ECT as a Regional Economic Integration Organization ("REIO") does not, in any way, suggest that intra-EU disputes were intended to be carved-out.  As the Tribunal in this case itself observed, the EU's accession as a REIO simply means that the EU has standing in an ECT dispute brought against it. This does not, however, supersede the consent that EU Member States such as Spain have individually given under the ECT.[51]  To my knowledge, not a single ECT tribunal has ever

---

[48]  *Eskosol S.p.A. v. Italy,* ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes ¶ 184 (ICSID 2019) ("*Eskosol v. Italy* (Jurisdiction)") (Ex. 9 hereto);  *see also Landesbank Baden-Württemberg v. Spain*, ARB/15/45, Decision on the Intra-EU Jurisdictional Objection ¶ 102 (ICSID 2019) ("*Landesbank* (Jurisdiction)") (Ex. 31 hereto) ("Of course, a statement of EU law by the CJEU is entitled to great respect as a statement of that law and is likely to be followed by other EU national courts, although they remain entitled (and, unless the matter is *acte claire*, in some cases required) to seek a fresh ruling from the CJEU. This Tribunal, however, derives its authority not from national or EU law but from an international agreement and from the rules of public international law. There is therefore no question of it being bound by the CJEU *Achmea* Judgment, although it will, of course, give great weight to that Judgment as an expression of the position under EU law.").

[49]  *Sevilla Beheer* (Jurisdiction) ¶ 668 ("Furthermore, the Tribunal recalls that it is empowered to provide *its own* interpretation of the jurisdictional requirements of the ECT by virtue of the principle of *compétence de la compétence*. The CJEU's jurisprudence is not binding on the Tribunal in this respect."); *RENERGY S.à.r.l. v. Kindgom of Spain*, ARB/14/18, Award ¶ 359 (ICSID 2022) ("*RENERGY v. Spain* Award") (Ex. 32 hereto) ("The ECT, which prohibits reservations and provides for a closed system of withdrawal and amendments (see above) is, as a matter of principle, ignorant of, and unaffected by, judgments and evolving legal interpretations in another legal order such as the EU, as well as in national legal orders, no matter how forcefully those orders argue their applicability.").

[50]  EC *amicus* at 9-10.

[51]  *See* Liability Decision ¶ 342 ("Therefore, in absence of a disconnection clause and a revision of the ECT by the Contracting Parties, the Tribunal cannot conclude that presence of the EU as REIO consenting to the provisions of the ECT would supersede the consent given by each

accepted that the EU's accession as a REIO supports a claim that ECT Article 26 does not apply to intra-EU disputes, despite Spain having advanced that argument in numerous arbitration proceedings.[52]

43.    Moreover, when the EU sought special treatment for EU Member States as ECT parties, it knew how to do so.  The EU saw to it that a special provision – Article 25 – was inserted into the ECT to ensure that parties to a REIO are not required under the ECT's most-favored-nation ("MFN") clause to extend to other ECT Contracting Parties the benefits that they confer on one another as members of that REIO.  In other words, the EU did not want non-EU parties to the ECT (or their nationals) to be able to avail themselves of the extra benefits that EU Member States extend to one another under EU law.  The EU evidently cared enough about excluding this possibility that it negotiated, and saw to it that the ECT contained, a provision reflecting the special relationship between and among EU Member States as a matter of EU law.  This clearly shows the will and capacity of the EU to negotiate an EU carve-out when that is its intention.  Yet it did not do so in connection with Article 26 of the ECT.

44.    That the EU is also an ECT Contracting Party does not alter the fact that each and every EU Member State became a full-fledged party to the ECT in its own right, with the same

---

EU Member State individually to the ECT.  Rather, a good faith interpretation of the terms of the ECT leads to the conclusion that a REIO, such as the EU, may have standing under the ECT in arbitration proceedings.").

[52]    For a recent rejection of Spain's argument, *see RENERGY v. Spain* Award ¶ 407 ("However, nothing in Articles 26(1), 1(2), 1(3), 1(10), or 36(7) ECT can lead the Tribunal to interpret these provisions in a way other than following the clear meaning of their text: these Articles, in short, show that a REIO can be a Contracting Party to the ECT. If there is a conflict between an Investor and a Contracting Party that is a REIO, the Area in the sense of Article 26(1) ECT is the totality of the Areas of the member states of that REIO, and if there is a conflict between an Investor and a State that is a Contracting Party, as is the case here, the Area in the sense of Article 26(1) ECT is the Area of that State.").

treaty-based obligations vis-à-vis nationals of every other Contracting Party.[53]  That the EU is a party only reflects the fact that, because the subject matter of the ECT falls within the competence of both the EU and the EU Member States, it had to be concluded, on the EU side, as a so-called "mixed agreement."[54]

45.    Professor Hindelang emphasizes that EU law offers a degree of protection to nationals of one Member State who invest in the territory of another Member State, enabling them to assert those protections in the courts of the Member States.[55]  He is correct that in appropriate circumstances, a Member State investor can invoke the EU law principles of free movement of goods, persons, services and capital,[56] as well as freedom of establishment,[57] against the authorities of another Member State.  They may also invoke the principles, such as protection of property, enshrined in the European Charter of Fundamental Rights[58] and the European Human Rights

---

[53]  *See Republic of Moldova v. Komstroy LLC*, No. C-741-19, Opinion of Advocate General Szpunar ¶ 4 (Mar. 3, 2021) ("*Komstroy* AG Opinion") (Ex. 56 hereto) ("The ECT was signed by the European Union on 17 December 1994, and approved on behalf of the European Union by Decision 98/181. All the Member States, with the exception of the Italian Republic, are also parties to the ECT, as are 28 third countries.").  Italy's withdrawal from the ECT has no impact on the current analysis.

[54]  *See generally* Opinion 2/15, ECLI:EU:C:2017:376, ¶¶ 29, 305 (CJEU May 16, 2017) (Ex. 5 hereto) (Finding that a potential free trade agreement between the European Union and the Republic of Singapore fell within the "competence shared between the European Union and the Member States," and, as such, "will have to be signed and concluded both by the European Union and by each of its Member States (a 'mixed' agreement).").

[55]  Hindelang 2022 Decl. ¶¶ 39-44.

[56]  *Id.* ¶¶ 39-40, 54.

[57]  *Id.* ¶ 39, 54.

[58]  *Id.* ¶ 40.

Convention,[59] as well as important general principles of law recognized by the CJEU, including the principles of proportionality, legitimate expectations and legal certainty.[60]  Moreover, Member States are required to afford remedies to investors that effectively enable them to assert the rights accorded them by EU law.[61]

46.     However, the fact that EU nationals can claim some protection of their investments under the internal law of the EU in no way means that they are not entitled to claim protection under treaties into which their home States have entered precisely to guarantee them investment protection.  There is nothing in any of the above-mentioned instruments or principles to suggest that they represent the sole and exclusive source of investment protection that an investor from one EU Member State enjoys vis-à-vis another EU Member State.  Nor is there any basis in the text of the ECT for asserting the exclusivity or superiority of investment protection rights under EU law.  To the contrary, as I explain in more detail below,[62] ECT Article 16 makes clear that none of the rights granted to EU nationals under the EU Treaties (or any other agreement that an ECT Contracting Party has entered into) can deprive them of their rights under the ECT.

47.     According to Article 31(1) of the VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."[63]

---

[59]   *Id.* ¶¶ 43-44.

[60]   *Id.* ¶ 40.

[61]   *Id.* ¶ 41.

[62]   *See infra* ¶¶ 74-76.

[63]   Vienna Convention on the Law of Treaties art. 31(1), May 23, 1969, 1155 U.N.T.S. 331 (the "VCLT") (Ex. 6 hereto).

48.     The ECT clearly contains no "intra-EU carve-out" and there is not the slightest textual basis for reading the ECT as if it did.  On the contrary, where the ECT Contracting Parties wanted to disapply the investor-State dispute mechanism under Part V of the ECT in favor of other treaties, they did so expressly – even where it concerned treaties of less obvious significance, such as the Svalbard Treaty, which relates to an archipelago in the Arctic.[64]  This careful attention to detail by the ECT drafters stands in stark contrast to the alleged "implicit" carve-out now urged by Professor Hindelang, Spain and the Commission.  Prior ECT tribunals have also rightly (and regularly) recognized the importance of the availability of arbitration under the ECT for the resolution of intra-EU investment disputes.[65]

49.     The only way a disconnection clause could be introduced into the ECT is through amendment of the ECT.  Under Article 42 of the ECT, the text of proposed amendments must first be adopted by the Charter Conference and distributed to all Contracting Parties for approval.  Amendments cannot become effective without adoption by a three-quarters majority of

---

[64]   *See* Eur. Energy Charter Conf., *Decisions with Respect to the Energy Charter Treaty*, Decision 1 (ECF No. 1-6, at *227) ("In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty.  In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.").

[65]   *See, e.g.*, *Masdar Solar & Wind Cooperatief U.A. v. Spain*, ARB/14/1, Award ¶ 311 & n.208 (ICSID 2018) ("*Masdar* Award") (Ex. 26 hereto) ("It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty Exception, an exception with regard to intra-EU relations would be of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-State arbitration, would not apply among a significant number of Contracting Parties without the treaty drafters addressing this exception." (citation removed)); *see also infra* ¶¶ 115-119.

Contracting Parties.[66]  Even under the VCLT, a subset of contracting states cannot modify a treaty

by a separate agreement among themselves without "notify[ing] the other parties of their intention

to conclude the agreement and of the modification to the treaty for which it provides."[67]  None of

the above has occurred.

50.    Faced with these realities, Spain argues that a disconnection clause should

nevertheless be inferred from the circumstances of the ECT's conclusion despite its absence from

the treaty text.  In my opinion, however, there is no basis whatsoever for any such inference in

either the ECT's context or its object and purpose, within the meaning of Article 31(1) of the

VCLT.[68]  The context in which the ECT was produced was a determination, led by the EU itself,

to establish a uniform regime for regulation of the energy sector.  The establishment of a uniform

regime in the energy sector sits poorly with the notion of carve-outs for pairs of EU Member States.

The object and purpose of the ECT's arbitration provisions in particular was to put in place a system

for arbitrating all energy-related disputes between any Contracting Party and a national of any

other Contracting Party.  The notion of an intra-EU carve-out is inconsistent with this object and

purpose as well.

51.    It is especially significant that the ECT expressly prohibits the making of any

reservations by Contracting Parties.[69]  If the EU is barred from introducing a disconnection clause

by means of a reservation to the ECT, it is necessarily also barred from finding a disconnection

---

[66]  ECT art. 42.

[67]  VCLT art. 41(2).

[68]  *See id.* art. 31(1) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.").

[69]  ECT art. 46 ("No reservations may be made to this Treaty.").

clause in the ECT, in which such a clause is conspicuously absent. This is all the more true where, as here, the treaty says the very opposite, i.e., that the consent given to arbitration by "each Contracting Party" is "unconditional."[70]

52.     But even if one were to turn to a supplementary source on the ground that the meaning of the treaty is ambiguous and therefore consult the ECT's negotiating history,[71] the result would be no different. During the ECT's negotiation, the European Commission specifically proposed that a disconnection clause applicable to Article 26 be included.[72] That proposal was rejected. The ECT, as signed, contains no such provision.[73]

53.     In sum, I conclude that neither the text, nor the context, nor the object and purpose of the ECT – much less its negotiating history – supports Spain's, Professor Hindelang's, and the EC's intra-EU argument.

**D.    Professor Hindelang Gives an Accurate Exposition of EU Law**

54.     Professor Hindelang argues that, even if the ECT, properly construed, does cover intra-EU disputes, it cannot validly do so. To that end, he embarks on a detailed discussion of the EU law principles that lead him to that conclusion. These basic principles are also set out in the EC *amicus*.[74] Professor Hindelang and the EC purport to rely on the CJEU's application of these

---

[70]   *Id.* art. 26(3)(a).

[71]   *See* VCLT art. 32 ("Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31 . . . [l]eaves the meaning ambiguous or obscure.").

[72]   *See* Draft, Basic Agreement for the European Energy Charter, at 84 (Aug. 12, 1992) (Ex. 7 hereto); *see also* Liability Decision ¶ 298.

[73]   *See* Liability Decision ¶ 342; *see also id.* ¶ 298.

[74]   *See* EC *amicus* at 5-8.

basic principles in *Achmea* and *Komstroy* to support their contention that ECT Article 26 does not apply to intra-EU disputes.[75]

55.     As will be seen, I generally agree with Professor Hindelang's explication of these tenets as a matter of EU law.  However, as will also be seen, I fundamentally disagree with his assumption that EU law (including CJEU judgments) is determinative of the matters that this Court is called upon to decide – matters that arise under the ICSID Convention, the ECT and US statutory law.

56.     Professor Hindelang correctly identifies and defines the fundamentals of EU law as articulated by the EU's highest court, the Court of Justice of the European Union ("CJEU").[76] These include the EU's institutions and sources of law, as well as the hierarchy of EU legal norms. He observes that the treaties establishing the EU, which is in effect the EU's Constitution, operate as the highest norms of EU law,[77] and that they and the law made pursuant to them enjoy "primacy" over the law of the EU's constituent Member States, such that in the event of a conflict between EU law and Member State law, the former takes precedence.[78]

57.     One means of ensuring the primacy of EU law is the preliminary reference procedure set out in Article 267 of the Treaty on the Functioning of the European Union, (the "TFEU").[79] This provision permits, and in some cases requires, Member State courts to obtain

---

[75]   For its part, the EC claims that *Komstroy* is "a final and binding interpretation of the ECT as international law as it applies between EU Member States."  EC *amicus* at 4.

[76]   Hindelang 2022 Decl. ¶ 19.

[77]   *Id.* ¶¶ 52-53.

[78]   *Id.* ¶¶ 22-30.

[79]   *Id.* ¶¶ 32-35; Treaty on the Functioning of the European Union (consolidated version), March 25, 1957, 2012 O.J. (C 326) 47 (the "TFEU") (ECF No. 62-9).

rulings from the CJEU before deciding a case where they find that the interpretation or validity of one or more relevant EU law instruments is less than clear. The intended result is that the CJEU enjoys exclusive jurisdiction to make authoritative interpretations of EU law that are binding on the courts of the Member States.[80]

58.    In its decision in *Slovakia v. Achmea B.V.*,[81] arising under a BIT between the Netherlands and Slovakia, the CJEU affirmed and applied in the investor protection context the principle of "autonomy" of EU law,[82] according to which the CJEU and the Member State courts have exclusive authority to interpret and apply EU law.[83]  In *Achmea*, the court observed that, in adjudicating disputes between an investor of a Member State and another Member State ("intra-EU" disputes), arbitral tribunals would have occasion to interpret and apply EU law without the possibility – since they are not courts or tribunals of a Member State – of making preliminary references to the CJEU on the interpretation or validity of EU law.[84]  Professor Hindelang cites to *Achmea* for the proposition that "to violate EU law, it is not necessary that a tribunal actually apply and interpret any of the substantive provisions of EU law in the case before it."  He goes on to say,

---

[80]    Hindelang 2022 Decl. ¶ 20.

[81]    *Slovak Republic v. Achmea B.V.*, No. C-284/16 (CJEU Mar. 6, 2018) ("*Achmea*") (ECF No. 62-47) ¶¶ 58-59 (cited in Hindelang 2022 Decl. ¶¶ 46-49, 53-57).  The fact that UNCITRAL arbitration was chosen (and not arbitration under the ICSID Convention) meant that the *Achmea* award was *not* subject to the unique ICSID Convention regime that I describe in paragraphs 15 to 26 above.  Indeed, it meant that the arbitration proceedings were subject to a degree of scrutiny at the national court level, in the form of: (i) German arbitration law, to the extent it governed an international arbitration proceeding seated in Frankfurt, and (ii) the New York Convention.

[82]    Hindelang 2022 Decl. ¶¶ 31-38.

[83]    *Id.* ¶ 45.

[84]    *Id.* ¶ 45.

"[r]ather, it suffices that such a tribunal '*may*' do so."[85]  Similarly, Professor Hindelang cites the *Achmea* ruling for the proposition that national court review of ECT awards in annulment and enforcement actions is insufficient to ensure the primacy and autonomy of EU law "because the review by national courts is limited in scope under national laws . . . [and] will not cover all issues decided by the arbitral tribunal."[86]

59.    As Professor Hindelang points out, the CJEU in *Komstroy* later extended *Achmea*'s disapproval of arbitrating intra-EU disputes under BITs to arbitrating intra-EU disputes under the ECT.[87]  The CJEU saw no difference in this regard between bilateral and multilateral treaties.[88]  In its view, the arbitration of intra-EU disputes under the ECT is as deleterious to the primacy and autonomy of EU law as the arbitration of intra-EU disputes under BITs.  Further, for the CJEU, the fact that the EU is itself a Contracting Party to the ECT makes no difference.[89]

---

[85]    *Id.* ¶ 54 (emphasis in original).

[86]    *Id.* ¶ 57.

[87]    *See id.* ¶ 59 (citing, inter alia, *Republic of Moldova v. Komstroy LLC*, No. C-741/19 (CJEU Sep. 2, 2021) ("*Komstroy*") (ECF No. 62-67) ¶ 66).  Like *Achmea*, *Komstroy* was an arbitration governed by the UNCITRAL arbitration rules.  As such, the *Komstroy* award was *not* subject to the unique ICSID Convention regime that I describe in paragraphs 15 to 26 above.  The CJEU, in fact, relied on the parties' choice of the UNCITRAL rules and of the Paris seat of arbitration to justify its jurisdiction over this dispute.  *See Komstroy* ¶ 33 ("That choice, made freely by those parties, has the effect of rendering applicable French law as the *lex fori* to the dispute in the main proceedings under the conditions and within the limits laid down by that law.").

[88]    *See Komstroy* 64; *see also* Hindelang 2022 Decl. ¶ 63.

[89]    *See Komstroy* ¶¶ 62-63; *see also* Hindelang 2022 Decl. ¶ 65.  In further support of the autonomy principle, Professor Hindelang also cites Article 344 of the TFEU, in which Member States "undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."  *See* Hindelang 2022 Decl. ¶ 33.

60.     Consequently, in the CJEU's eyes, the adjudication of intra-EU disputes by arbitral tribunals creates an unacceptable risk that EU law will be misunderstood or misapplied, with detriment to the uniformity of EU law:[90]

> [T]he possibility of submitting [intra-EU] disputes to a body which is not part of the judicial system of the EU … call[s] into question … the preservation of the particular nature of the law established by the [EU] Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and … has an adverse effect on the autonomy of EU law.[91]

61.     On this basis, the CJEU held that intra-EU BITs were invalid, that arbitral tribunals lacked jurisdiction to adjudicate intra-EU disputes, and that consequently any intra-EU award was invalid and unenforceable as well.

**E.      *Achmea*, *Komstroy* and the Principle of Autonomy are Irrelevant to this Case**

62.     Professor Hindelang accurately sets out the CJEU's understanding of the fundamentals of EU law, including in the *Achmea* and the *Komstroy* decisions. However, neither those decisions nor the EU law principles (including the principle of autonomy of EU law) on which they are based, is relevant or applicable to this case.  They cannot justify his conclusion that, despite the arbitration agreement entered into by Spain and NextEra selecting ICSID Convention arbitration for the resolution of NextEra's ECT claims in this case, their dispute cannot, as a matter of law, be submitted to arbitration.

1.      EU Law Cannot Override Spain's Binding International Law Obligations to Arbitrate ECT Disputes and Abide by the ICSID Convention

---

[90]    *See* Hindelang 2022 Decl. ¶¶ 50, 54-56.

[91]    *Achmea* ¶¶ 58-59.

63.     Professor Hindelang's argumentation relies entirely and exclusively upon EU law itself (including its interpretation by the CJEU),[92] rather than the ECT, the ICSID Convention, or public international law generally, even though those are the instruments from which the tribunal in this case derives its authority.  EU law is the sole basis of Professor Hindelang's assertion that no courts other than those within the EU can interpret and apply EU law and that, for that reason, intra-EU disputes cannot validly be submitted to an ICSID tribunal for determination.[93]  Implicit in this argumentation is the supposition that if EU law prohibits the arbitration of intra-EU investment disputes, then an international treaty, such as the ECT, cannot authorize the arbitration of such disputes, even if that is precisely the ECT's purpose.  Moreover, EU law not only prevails over treaties to which both Spain and the EU are parties,[94] but also requires a third-country court, such as a US court, to subordinate its international obligations to the dictates of EU law.

64.     Spain and Professor Hindelang justify their reliance on EU law on the ground that because the EU is itself the product of an international treaty, international law necessarily includes

---

[92]     *See* Hindelang 2022 Decl. ¶ 6.  Spain similarly relies on the inapposite application of EU law. *See* Spain Renewed MTD at 34-35 ("It is axiomatic that the EU Treaties constitute rules of international law.  Thus, any dispute resolved under Article 26(6) of the ECT, including a dispute on the existence or validity of the arbitration agreement, must be decided in accordance with EU law, giving priority to the EU Treaties." (citation omitted)).

[93]     *See* Hindelang 2022 Decl. ¶¶ 32-33; *see also* Spain Renewed MTD at 36 ("Here, in particular, tribunals formed under Article 26 of the ECT are neither courts nor tribunals within the EU legal system, and they therefore lack the requisite 'links with the judicial systems of the Member States.'" (citation omitted)).

[94]     *See* Hindelang 2022 Decl. ¶ 26 ("The principle of primacy of EU law also applies to *international agreements or treaties between EU Member States*. EU law therefore takes precedence over the rules created by EU Member States in international agreements or treaties concluded between them." (emphasis in original)).

EU law.[95]  So, too, does the EC.[96]  On that basis, ECT Article 26(6), which identifies "[the] Treaty and applicable rules and principles of international law" as the law applicable to the ECT,[97] subjects claims under that treaty to EU law, such that EU law's prohibition on the arbitration of intra-EU disputes must be given effect.[98]  The Commission similarly recalls that in *Komstroy*, the CJEU's opposition to intra-EU arbitration pursuant to ECT Article 26 was premised on the notion that ECT tribunals are required to interpret and apply EU law "not least because the ECT itself— as an agreement to which the EU and its Member States are party—forms part of EU law."[99]

       65.     This argument is untenable for multiple reasons.

---

[95]    Hindelang 2022 Decl. ¶ 18 ("The fact that the EU Treaties may be more limiting on the Member States' sovereign powers than other international agreements does not change the fact that EU law is public international law when applied between the EU Member States; albeit with a *superior rank* in relation to other public international law applicable between the EU Member States." (emphasis in original)).  I note that Professor Hindelang invokes the CJEU decision in *Budějovický Budvar v. Rudolf Ammersin GmbH*, No. C-478/07 (Sept. 8, 2009) (ECF No. 62-38) in support of this proposition.  Yet the holding in *Budějovický Budvar* dealt with a treaty between two EU Member States that regulated the use of certain trade names in the sale of beer, in a manner "contrary" to EU law, "in particular the rules on the free movement of goods."  *Id.* ¶ 98.  That case is not comparable to the present situation.

[96]    EC *amicus* at 17 ("But EU law is itself public international law binding on all EU Member States.  The EU legal order derives from international treaties that create binding obligations between their Member States on the international plane.").

[97]    ECT art. 26(6).

[98]    *See* Spain Renewed MTD at 4-5, 33 ("As a matter of EU law, the law to which Spain and Petitioners are both subject, no arbitration agreement exists between Spain and Petitioners because any such agreement would violate core tenets of EU sovereignty as set out in the EU Treaties.").

[99]    EC *amicus* at 13.  Indeed, in *Komstroy*, the CJEU reasoned that since "the ECT itself is an act of EU law," "[i]t follows that an arbitral tribunal such as that referred to in Article 26(6) is required to interpret, and even apply, EU law" simply on the basis that the EU signed the ECT. *Komstroy* ¶¶ 49-50.

66.     *First*, it is highly questionable whether EU law qualifies as a set of "applicable rules and principles of international law," within the meaning of Article 26(6).  When the drafters of investment treaties intend for the law of a signatory State, such as the EU or an EU Member State, to form part of the applicable law, they explicitly so state,[100] for example by identifying among the bodies of law applicable to those treaties "the law in force of the Contracting Party concerned," or an equivalent phrase.  This is the language of the applicable law clause in the Netherlands-Slovakia BIT underlying the *Achmea* case.[101]  Such language is conspicuously absent from the above-quoted applicable law provision of the ECT.

67.     Moreover, if EU law governs ECT disputes simply because it was founded by a treaty and so must necessarily constitute international law, then the meaning and effect of the ECT would be subject to *all* international treaties, not just the treaties establishing the EU.  Under this view, every time States that are parties to an international treaty choose to enter into an agreement touching on the same matters, their new agreement overrides the prior treaty.  ECT Contracting Parties would too easily be able to lessen or otherwise alter their obligations under the ECT by entering into other international agreements among themselves purporting to amend such obligations.

68.     If EU law is relevant to an ECT arbitration, it is relevant only as a factual matter upon which the question of whether a violation of the ECT has occurred may in some respect depend.  In other contexts, the CJEU has taken precisely this position. In its Opinion 1/17,[102] the

---

[100]  *See, e.g.*, Netherlands-Slovakia BIT art. 8(6) (Ex. 8 hereto).

[101]  *See id.*  Indeed, in the *Achmea* case, the CJEU declined to find that EU law fell within the scope of the phrase "general principles of international law" in Article 8(6) of that BIT.

[102]  Opinion 1/17, ECLI:EU:C:2019:341 (CJEU Apr. 30, 2019) (ECF No. 62-68).

CJEU had to determine whether the EU's entry into the Comprehensive Economic and Trade Agreement with Canada ("CETA") was permissible inasmuch as CETA tribunals may interpret and apply EU law without the benefit of preliminary rulings from the CJEU under Article 267. The Court held that the EU could validly enter into CETA as a matter of EU law, notwithstanding the Article 267 problem, because CETA tribunals would treat and apply EU law as fact, a position that numerous investment tribunals have taken.[103]  But exactly the same may be said of tribunals constituted under the ECT.  Why, if CETA tribunals treat EU law as fact only and therefore pose no threat to the primacy or autonomy of EU law, do ECT tribunals – which likewise treat EU law as fact only – pose a threat to the primacy and autonomy of EU law? Professor Hindelang fails to appreciate this inconsistency when he submits that ECT tribunals would have to assess an alleged breach of ECT Article 10(1) by applying EU law.[104]

69.    Notwithstanding its position in Opinion 1/17, the CJEU in *Komstroy* reverted to its assertion that in investment disputes EU law operates as law.  Referring to ECT Article 26(6), the CJEU reasoned that "the ECT itself is an act of EU law"[105] (on the basis that the EU signed the

---

[103]  *See, e.g.*, *Cube Infrastructure* (Jurisdiction) ¶ 160 ("Spanish law and EU law are relevant only as facts in the light of which the rights and duties of the Parties under the ECT and international law are to be determined."); *Infracapital*, Decision on Jurisdiction, Liability and Directions on Quantum ¶ 493 (2021) ("*Infracapital* (Jurisdiction)") (Ex. 33 hereto) ("Given that EU law only governs the relations between Member States, EU law cannot form part of the international law applicable between EU Member States and non-EU countries.  Under the EU Treaties, EU law forms part of the internal law of Member States.  In this respect, the role of the Tribunal is to apply the provisions of the ECT, and principles of public international law as may be applicable. The Tribunal may, however, take into account EU law as a matter of internal law in the application of the relevant international standards of protection under the ECT.") (ICSID 2021); *RENERGY v. Spain* Award ¶ 591 ("In addition, and for the avoidance of doubt, the Tribunal notes that it has no hesitation in finding that EU law can and must be taken into account as a relevant fact").

[104]  Hindelang 2022 Decl. ¶ 55.

[105]  *Komstroy* ¶¶ 48-49.

ECT and, therefore, the ECT forms part of EU law[106]), such that "an arbitral tribunal . . . is required to interpret, and even apply, EU law."[107]  Even apart from the inconsistency with Opinion 1/17, it cannot be the case that the mere signing of an international agreement by the EU makes that agreement subordinate to EU law.  As one tribunal found:

> From an international law perspective, i.e. the perspective of the ECT, with its Contracting Parties from all over the world, the EU status as Contracting Party does nothing to the position of the ECT in the hierarchy of norms between different international treaties and regimes.[108]

70.    The CJEU's reasoning also ignores the fact that numerous ECT tribunals have assessed intra-EU disputes without needing to apply, much less interpret, EU law.  This was the case for the Tribunal here, which was seized of claims that NextEra brought under ECT Article 10(1), not EU law.  As a result, the Tribunal assessed these claims under "the ECT and any rules of international law relevant to its interpretation and application."[109]  Its findings (most notably those regarding the applicable law) were later upheld by the Annulment Committee.[110]

71.    *Second,* ECT tribunals have consistently, and correctly, read the words "applicable rules and principles of international law" in Article 26(6) as signifying general rules and principles of international law (applicable to all ECT Contracting Parties), and neither "a special species of

---

[106]  *Komstroy* ¶ 23.

[107]  *Komstroy* ¶ 50.

[108]  *RENERGY v. Spain* Award ¶ 401.

[109]  Liability Decision ¶ 390.

[110]  Annulment Committee Decision ¶¶ 250, 267.

international law"[111] nor a purely "regional [as distinct from] a worldwide system of law" (applicable only to a subset of ECT Contracting Parties).[112]  As one tribunal observed:

> To say that EU law is a part of international law and yet has supremacy over other, non-EU components of international law is . . . to mischaracterize EU law and confuse questions belonging to two different legal orders.  The EU treaties are, certainly, international agreements of a kind familiar in international law, binding as between the States Parties . . . .  The rules established by EU secondary legislation are essentially supra-national regulations rather than part of the corpus of international law as such. Similarly, EU law has supremacy *within the EU legal system* over the national laws of the States that are Members of the EU and accordingly subscribe to the EU legal system.  But EU law is only one among several regional, and many national, legal systems . . . .  Within the system of international law, EU law does not have supremacy, and has no hierarchical priority over the laws of non-Member States, or over rules of international law, including the ECT.[113]

72.    When the drafters subjected ECT disputes to international law, they plainly had in mind general principles of law, not principles deriving from one out of thousands of treaties separately entered into by ECT Contracting Parties.  The ECT, like any treaty, would have no teeth if Contracting Parties could, by any treaty they might enter into, derogate from the ECT and thereby deprive the persons (in this case investors from Contracting Parties in another Contracting Party) of the rights the treaty was meant to protect.  Under Professor Hindelang's view a slice of international law – the law of the European Union – supersedes all the rest of international law, including the duty of States to abide by the international treaties into which they have entered.

---

[111]  *Eskosol v. Italy* (Jurisdiction) ¶ 115.

[112]  *Id.* ¶ 121.  To the same effect, *see Cube Infrastructure Fund SICAV v. Spain*, ARB/15/20, Decision on Jurisdiction, Liability, and Partial Decision on Quantum ¶¶ 129-30, 158 (ICSID 2019) ("*Cube Infrastructure* (Jurisdiction)") (Ex. 10 hereto); *Rockhopper Italian S.p.A. v. Italy*, ARB/17/14, Decision on the Intra-EU Jurisdictional Objection ¶ 174 (ICSID 2019) ("*Rockhopper* (Jurisdiction)") (Ex. 11 hereto).

[113]   *Cube Infrastructure* (Jurisdiction) ¶ 130.

73.     There is no reason – and Professor Hindelang gives none – why the EU's opposition to the arbitration of such intra-EU disputes should override the ECT's express authorization of it. If an international treaty confers certain rights and obligations, but the law of a signatory State seeks to curtail them – i.e., if they are in conflict – why should the latter take precedence?  A plausible characterization of EU law as "international law" cannot mean that EU law can prohibit what an international law instrument prescribes.

74.     According to the EU's own founding treaties,[114] the EU is committed to "respect for . . . international law"[115] and considers international agreements to be "binding upon the institutions of the Union and on its Member States."[116]  The notion that an EU Member State can invoke EU law to defeat its international treaty obligations is therefore antithetical to a fundamental principle that the EU itself professes.

75.     *Third*, even if EU law were to be considered part of the law applicable to "the issues in dispute" in an ECT claim, that does not mean that EU law determines the validity of the treaty or a tribunal's jurisdiction under it.  Professor Hindelang fails to appreciate this when he submits that "[a]t a minimum, a tribunal constituted under Article 26 ECT would have to decide whether and how EU law affects its jurisdiction to arbitrate an intra-EU investment dispute – a decision that itself requires the interpretation and application of EU law."[117]

---

[114]  TFEU; Treaty on European Union (consolidated version), February 7, 1992, 2012 O.J. (C 326) 13 (the "TEU") (ECF No. 62-10).

[115]  TEU art. 21(1).

[116]  TFEU art. 216(2).  The EU is also bound to "strict observance and the development of international law."  TEU art. 3(5).

[117]  Hindelang 2022 Decl. ¶ 55.

76.     The Tribunal in this case owes its existence to, and derives its authority from, the legal regime under which it is established and operates.  It was organized under an international treaty (the ICSID Convention) and empowered to decide a dispute under another international treaty (the ECT), thus operating under international law and the law of treaties.  Under those bodies of law, the arbitration agreement between NextEra and Spain is entirely valid, the Tribunal had jurisdiction and the resulting award is entitled to recognition and enforcement.  EU law cannot be allowed to override the general public international principles of the ECT and the ICSID Convention under which Contracting States incur international obligations.  As every arbitral tribunal faced with these questions has held, the jurisdiction of an ICSID tribunal enforcing rights under the ECT must be examined exclusively from an international law perspective.[118]

77.     *Fourth*, under Article 26(1), the "dispute" entrusted to an ECT tribunal can only be one which "concern[s] an alleged breach of an obligation of [the respondent State] under Part III" of the ECT, which sets out the treaty's substantive investment protections.  But the issue raised by Spain in this proceeding has nothing to do with the scope or content of those protections.  Rather, Spain invokes EU law solely for purposes of challenging the ECT's validity as applied to intra-EU investment disputes, and thereby the jurisdiction of the tribunal in this case.  Those are not issues to which the designation of applicable law in Article 26(6) of the ECT refers.  Several ECT tribunals have made this precise observation in holding Article 26(6), while applicable to the merits of an investment dispute, inapplicable to matters of jurisdiction.[119]

---

[118] *See infra* ¶¶ 115-119.

[119] The tribunal in *Vattenfall AB v. Germany*, ARB/12/12, Decision on the *Achmea* Issue ¶ 207 (ICSID 2018) ("*Vattenfall* (*Achmea* Dec.)") (Ex. 12 hereto), stated "Article 26(6) . . . applies only to the merits of a dispute between the Parties.  It does not apply to issues or questions relating to the Tribunal's jurisdiction."  *Vattenfall* (*Achmea* Dec.) ¶ 121; *accord Eskosol v. Italy* (Jurisdiction) ¶ 113.  *See also, e.g.*, *Hydro Energy 1 S.à r.l. v. Spain*, ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum ¶ 502(4) (ICSID 2020) ("*Hydro Energy*

78.     Moreover, viewing Article 26(6) of the ECT as applicable to matters of interpretation and application comports with the principle of harmonious interpretation, which demands that apparently conflicting provisions of a legal instrument, such as a treaty, be read in harmony with one another whenever possible. I note that tribunals, in any event, have found – in my view, correctly – that, regardless of the proper construction of Article 26(6), EU law cannot be invoked in order to counter the ordinary meaning of Article 26 ECT, which plainly grants tribunals jurisdiction to decide upon intra-EU disputes.[120] Indeed, as I explained above, there is no basis whatsoever to read a carve-out of intra-EU disputes within the ECT.[121]

79.     *Fifth*, but not least, the drafters of the ECT expressly addressed the relationship under international law between the ECT and EU law. Article 16 of the ECT provides that, where Contracting Parties have also entered into another international agreement on investment protection:

> nothing in . . . the other agreement shall be construed to derogate from any provision of [the ECT on investment protection] or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.[122]

---

(Jurisdiction)") (Ex. 34 hereto) ("The issues in dispute are those concerning alleged breaches of obligations under the ECT relating to investments: Article 26(1) ECT. Accordingly, Article 42(1) of the ICSID Convention and Article 26(6) of the ECT do not determine jurisdiction, and are not relevant for present purposes.").

[120] *See Landesbank* (Jurisdiction) ¶ 160 ("[ECT Article 26(6)] thus requires a tribunal to begin with the provisions of the ECT; it does not direct it to adopt an interpretation of the ECT which goes against the ordinary meaning of the words used on the basis that a rule of international law, applicable only between some of the Contracting Parties to the ECT, may run counter to that ordinary meaning."). Most recently, the *Renergy* tribunal refused to resort to EU law in determining its jurisdiction since ECT Articles 25 and 26 are clear, and the conditions they lay out were satisfied by the claimants there. *See RENERGY v. Spain* Award ¶ 343.

[121] *See supra* ¶¶ 45-47.

[122] ECT art. 16.

80.     The import of ECT Article 16 is clear.  The ECT prevails over all other treaties between or among the Contracting Parties to the extent that it affords greater investment protection than they do.  Thus, the EU Treaties, to which both Spain and the Netherlands are parties, cannot operate to lessen the level of investment protection that nationals of those countries enjoy under the ECT.  The assertion that EU law can invalidate an arbitration agreement giving an investor a "right to dispute resolution" pursuant to the ECT flies in the face of Article 16.  The drafters of the ECT could not have made it plainer that no treaty can derogate from the rights conferred by the ECT, even though such a treaty (like the EU Treaty) might form part of international law.

81.     Even in the absence of Article 16, EU law cannot override the provisions of the ECT due to the principle of *lex posterior derogate priori*, according to which, in the event of conflict, the later of two instruments on the same subject matter prevails over the earlier one.  The provisions of the TFEU on which Spain relies in this proceeding were already part of the 1957 Treaty Establishing the European Community ("TEC").[123]  The Netherlands became a party to the TEC when it came into effect in 1958 and Spain acceded to the EU in 1986.  The ECT only entered into force in 1998.

82.     Even assuming that *Komstroy* interpretation of the EU Treaties prevents arbitral tribunals from assuming jurisdiction over "intra-EU" ECT disputes going forward (which it does not), this cannot possibly apply retroactively to arbitral disputes in which consent was already

---

[123]  The current Article 344 of the TFEU was originally Article 219 of the TEC.  When the TEC was amended by the 1992 Maastricht Treaty, it was renumbered as Article 292.  Article 267 was originally Article 177 of the TEC.  When the TEC was amended by the Maastricht Treaty, it was renumbered as Article 234.  These later became Articles 344 and 267 as a result of the 2007 Treaty of Lisbon.  However, throughout this renumbering, the language of neither Article 344 nor 267 was changed.  On that basis, the *Vattenfall* tribunal refused to view the EU Treaties as being a "later treaty" than the ECT.  *See Vattenfall* (*Achmea* Dec.) ¶ 218.

perfected (in this case, after the filing of the request for arbitration).[124]  Here, *Komstroy* was

decided more than two years after the Award, and the Annulment Committee made clear that since

*Komstroy* was issued after the Award, the Tribunal's jurisdictional determination could not be

overturned on the basis of *Komstroy*.[125]

83.    The EC attempts to overcome this limitation on the retroactive application of

*Komstroy* by noting that EU law applies CJEU judgments *ex tunc*, such that the CJEU's

interpretation of the impact of the EU Treaties on intra-EU arbitration in *Achmea* and *Komstroy*

necessarily alters the interpretation of the ECT under international law "from the moment EU law

entered into force for the Parties involved."[126]  The EC's position yet again  asserts the primacy of

---

[124]  *Infracapital* (Reconsideration) ¶ 115 ("Further, and in any event, it would be improper to affect
Claimants by removing the jurisdiction of the Tribunal to decide their claims based on
the Komstroy Judgment when the latter was issued several years after the Claimants filed their
Request for Arbitration, and ICSID registered it. Indeed, Respondent's consent to arbitration
in the present case was perfected in June 2016 and cannot be invalidated retroactively by
the Komstroy Judgment."); *Kruck* (Reconsideration) ¶ 45 ("The Claimants have under ECT
Part V a right to ECT arbitration, and neither the *Komstroy* decision nor the principles of EU
law on which it is based can deprive them of that right – particularly when the decision
postdates the critical date for the establishment of jurisdiction and the Tribunal's decision
thereon."); *Renergy v Spain* Award ¶ 348 ("With a view to the arguments of amendment,
suspension, or regarding the alleged effects of the EU Member States Declarations, the
Tribunal further adds and recalls that even if suspension or amendment was the argued effect
of either the EU Member States Declarations or the *Achmea* and *Komstroy* Judgments, any
such effect would come too late in this case to affect or invalidate the consent perfected by the
Parties at the relevant time, i.e. the date of the Request.").

[125]  Decision on Annulment ¶ 233 ("The Committee finds that the CJEU judgment *Moldova v.
Komstroy* was rendered more than two years after the Tribunal's Award.  Art. 52(1)(b) is
limited to assessing a tribunal's decision based on the record and law at the time it was rendered.
This precludes the Committee from considering the CJEU judgment and it cannot serve as a
basis for annulment.").

[126]  *See* EC *amicus* at 15.

43

EU law notwithstanding the ECT's plain text directing that its provisions are to be construed according to international – and not EU – law.[127]

2.    Professor Hindelang and Spain Wrongly Conflate Invalidity under Domestic Law with Invalidity under International Law

84.    However, the fallacy in Professor Hindelang's and Spain's arguments runs much deeper. Both base their entire analyses on an assumption that the validity and enforceability in the U.S. of an ICSID award on an ECT claim is to be determined in accordance with EU law. But the validity of a treaty on the international plane is not and cannot be determined by reference to the internal law of any of the contracting states.[128]

85.    In other words, Professor Hindelang and Spain fail to appreciate the difference between the validity of a treaty *under the law of a signatory State* and the validity of that treaty *on the international plane*. If a signatory State finds that its own law prevents it, for any reason, from giving effect to an international agreement to which it is a party, it may presumably, purely as a matter of domestic law, decline to give it effect. It may even go so far as to invalidate domestic law measures that are based on that agreement. That is why – following the CJEU's *Achmea* ruling – the German Supreme court annulled the *Achmea* award,[129] and why the French Court of Appeals recently granted annulment of two intra-EU awards in *Slot Group v. Poland* and *Strabag v.*

---

[127]    *See Cube Infrastructure* (Jurisdiction) ¶ 130 ("Within the system of international law, EU law does not have supremacy, and has no hierarchical priority over the laws of non-Member States, or over rules of international law, including the ECT.").

[128]    *See supra* ¶¶ 71-75. Similarly, ICSID Convention awards are not subject to scrutiny by national courts due to "the extreme diversity of results" that "would result" from subjecting the enforcement of international obligations to disparate national law regimes. S*ee* II *History of the ICSID Convention*, *supra* note 18, at 903-04.

[129]    *See Slovakia v. Achmea B.V.*, I ZB 2/15 (Ger. Fed. Ct. Just. Oct. 31, 2018) (ECF No. 62-59).

44

*Poland*.[130] These annulments are undoubtedly valid under EU law. Significantly, these awards concerned non-ICSID awards (i.e., awards which, as I explained above,[131] were subject to challenge in domestic courts where the tribunals were seated, notably on the ground that the tribunal lacked jurisdiction). In this case, the Award already was subject – at Spain's initiative – to the only form of scrutiny that could have called the Tribunal's jurisdictional findings into question (viz. the ICSID annulment proceeding), and the Annulment Committee unanimously rejected Spain's bid for annulment.

86.     However, the fact that the CJEU requires Member State courts to disregard their international obligations does not mean that international law sanctions their doing so. Quite simply, a signatory State does not, by denying effect domestically to an international agreement, itself escape its international obligations under that agreement. Nor can it impose its views on the validity of a treaty under its own law on the other parties to the treaty, as Spain attempts to do in seeking to persuade this Court to decline subject matter jurisdiction.

87.     This is all in keeping with the fundamental principle of international law that a State remains bound by its international law obligations even if performance of those obligations would run afoul of that State's internal law. Article 27 of the VCLT puts the proposition plainly: "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."[132] Under this principle, the EU, as an ECT Contracting Party, cannot rely on its own law to avoid its treaty obligations. Neither can EU Member States do so (inasmuch as EU law is part

---

[130]   *See Slot Group v. Poland*, No. RG 20/14581 (Paris Ct. App. Apr. 19, 2022) (ECF No. 62-74); *Strabag SE v. Poland*, Cour d'appel, No. RG 20/13085 (Paris Ct. App. Apr. 19, 2022) (Ex. 57 hereto).

[131]   *See supra* notes 81, 87.

[132]   VCLT art. 27.

of their internal law), and characterizing EU law as "international law" does not alter this fact. By virtue of another fundamental principle of international law, *pacta sunt servanda*,[133] ECT Contracting Parties that also are EU Member States, such as Spain, are bound by their ECT obligations notwithstanding any other (even possibly competing) obligations imposed upon them by the EU Treaties.[134]

88.     Not to be overlooked is the fact that the EU is itself a party to the ECT and – like every Contracting Party – derives its rights and responsibilities from that treaty. Although the EU may be the product of an international treaty, when it entered into the ECT, it entered into it on the same footing as every other Contracting Party. No one would maintain that, as a matter of international law, the ECT is subordinate to the internal law of any other of the Contracting Parties. There is no reason why the EU should be singled out, among all ECT Contracting Parties, as the one and only participant privileged to have its internal law take precedence over the ECT.

89.     Nor can the CJEU declare an international agreement invalid *as a matter of international law*, as the CJEU made clear in the case of *Kadi v. Council of the European Union*[135]

---

[133]  Which is enshrined at VCLT art. 26 ("Every treaty in force is binding upon the parties to it and must be performed by them in good faith.").

[134]  Following *Komstroy*, the *Sevilla Beheer v. Spain* tribunal dismissed Spain's attempt to escape its ECT obligations by claiming reliance on the *pacta sunt servanda* principle, because, "by virtue of the exact same principle[,] the ECT's Contracting Parties are obliged to comply with the terms of the ECT." *Sevilla Beheer* (Jurisdiction) ¶ 672. Prior to *Komstroy*, the *Infracapital* tribunal had made a similar finding. *See Infracapital* (Jurisdiction) ¶ 296 ("But the principle [*pacta sunt servanda*] applies clearly in respect to Article 26(1) of the ECT where, despite other treaties already in force, the EU Member States, and even the EU, when they signed and ratified, failed to exclude from the *"irrevocable consent"* to arbitration any dispute involving its Member States.").

[135]  *Kadi v. Council of the European Union*, Joined Cases C-402/05 P & C-415/05 P, 2008 E.C.R. I-6352 (CJEU Sept. 3, 2008) ("*Kadi*") (Ex. 13 hereto).

46

(which Professor Hindelang relies upon in his opinion).[136]  In that case, the claimants challenged a series of regulations of the Council of the EU implementing a UN Security Council resolution requiring the freezing of assets of certain individuals alleged to be associated with Al Qaeda.  The claimants argued that the EU measures violated their fundamental rights under EU law.  The EU Court of First Instance sustained the measures on the ground that the EU and its Member States were bound to respect the primacy of their obligations under the UN Charter.[137]

90.    In the appeal, in *Kadi*, Spain argued that the lower court decision giving priority to the EU's obligations under UN Charter should be upheld in its entirety,[138] a position it effectively abandons here.  Even though the CJEU reversed the lower court, thus declining to subordinate EU law to the UN Charter,[139] it drew a sharp distinction between the validity of the measures *under EU law*, on the one hand, and their validity *under international law*, on the other.  The CJEU emphasized that while it had authority to treat the EU measure as invalid within the EU, it had no authority to treat the UN Resolution itself as invalid:

---

[136]  *E.g.*, Hindelang 2022 Decl. ¶¶ 13, 21, 28.

[137]  The EU Court of First Instance ruled that "[f]rom the standpoint of international law, the obligations of the Member States of the United Nations under the Charter of the United Nations clearly prevail over every other obligation of domestic law or of international treaty law including, for those of them that are members of the Council of Europe, their obligations under the ECHR and, for those that are also members of the Community, their obligations under the EC Treaty." *Kadi v. Council & Commission*, No. T-315 [2005] ECR II-3649, ¶ 181 (CFI 2005) ("*Kadi* (CFI)") (Ex. 14 hereto).  As a result, the EU Member States, as Members of the United Nations, were bound to accept the principle of the primacy of their obligations under the Charter of the United Nations, including as enshrined in Article 103 thereof.  *Id.* ¶¶ 181-184; U.N. Charter art. 103 (Ex. 15 hereto).  Article 103 of the U.N. Charter provides that "[i]n the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail."

[138]  *Kadi* ¶ 113.

[139]  *Id.* ¶ 285.

> In this regard it must be emphasised that, in circumstances such as those of these cases, the review of lawfulness [under EU law] … to be ensured by the Community judicature applies to the Community act intended to give effect to the international agreement at issue, *and not to the latter as such*.[140]
>
> . . .
>
> [A]ny judgment given by the Community judicature deciding that a Community measure intended to give effect to [a U.N.] resolution is contrary to a higher rule of law in the Community legal order *would not entail any challenge to the primacy of that resolution in international law*.[141]

91.     Applying the CJEU's principle here, the EU and its Member States may favor domestic over international law *as a matter of internal law*, but *may not* escape their international law obligations under the ECT and the ICSID Convention, nor expect other States to do so.

92.     However powerful the notion of the "autonomy of the EU legal order" may appear to be, it is nothing more than a legal principle internal to the EU and to the EU Member States.  It is as "internal" as any internal law that a State, in the wording of the VCLT, "may not invoke . . . as justification for its failure to perform a treaty."[142]  Accordingly, it cannot be determinative of the matters before this Court.  The same may be said of the principle of primacy, which is a notion even more "internal" to the EU.  That principle states that EU law prevails over any inconsistent EU Member State law, even its constitutional law.[143]  Primacy is essentially a federalism principle, not unlike the principle of supremacy in US constitutional law.  It has nothing to do with the

---

[140]  *Id.* ¶ 286 (emphasis added).

[141]  *Id.* ¶ 288 (emphasis added).

[142]  VCLT art. 27.

[143]  *See, e.g.*, Hindelang 2022 Decl. ¶ 17 ("[I]n case of a conflict between a rule created by the EU Member States and EU law, EU law takes precedence and overrides such a rule.") (citing *Amministrazione delle Finanze dello Stato v. Simmenthal SpA*, No. 106/77, 1978 E.C.R. 630 (CJEU 1978) (ECF No. 62-18)); *see also* Hindelang 2022 Decl. ¶¶ 22-26.

relationship between EU law and international law, which is the issue at hand here. I am, therefore, in fundamental disagreement with Professor's Hindelang's affirmation that the principle of primacy is an "all-encompassing conflict rule established by the EU Treaties [which] also prevails over any customary international law conflict rules governing the relationships between international treaties."[144] The TFEU itself contains a "Declaration concerning primacy," which leaves no doubt as to the intended reach of that principle:

> The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties *have primacy over the law of Member States,* under the conditions laid down by the said case law.[145]

93.     Professor Hindelang and Spain have in effect transposed the principle of EU primacy from the internal constitutional sphere, where it originated, to the international plane, where it does not belong. As a matter of international law "EU law does not and cannot 'trump' public international law."[146]

---

[144]  Hindelang 2022 Decl. ¶ 30.

[145]  Declaration 17 (emphasis added). *See also RENERGY v. Spain* Award ¶ 399 ("The text of this 'codifying' declaration [i.e., Declaration 17] is thus focussed [sic.] on establishing supremacy of EU law over the law of EU Member States. This is a far cry from establishing supremacy over the obligations in another treaty belonging to another international legal order"); *Hydro Energy* (Jurisdiction) ¶ 502(17) ("The fact that EU law has primacy under the principle in *Costa v ENEL* does not affect the position. The principle is concerned with primacy over national law and not international law, whether customary law or treaty law."); *Landesbank* (Jurisdiction) ¶ 190 ("Declaration 17, however, addresses the primacy of EU law over the national laws of the Member States, whereas the issue here is the relationship between EU law and a multilateral treaty concluded between over fifty parties, including the EU, all the EU Member States and a large number of non-EU States. An international agreement concluded by one or more EU Member States produces legal effects in two different ways: in the national legal order of the States concerned and in public international law.").

[146]  *RREEF Infrastructure (G.P.) Ltd. v. Spain*, No. ARB/13/30, Decision on Jurisdiction ¶ 87 (ICSID 2016) ("*RREEF* (Jurisdiction)") (Ex. 27 hereto).

94.    Even assuming that the principle of primacy was intended to operate as a conflict rule in the international legal order (which is not the case), the ECT contains a more specific conflict rule – Article 16.  Any tribunal constituted under the ECT would, therefore, have to apply this provision, which "embodies a clear and specific, written, agreement on this particular subject, [whereas] the principle of supremacy, on the other hand, could at best be considered a vague catch-all provision, which would have to be interpreted as having been implied (rather than expressly agreed) into the ECT by only some of the Contracting Parties".[147]    As I explained above,[148] Article 16 clearly bars use of the EU Treaties to deprive EU investors of their right to dispute resolution under ECT Article 26.

95.    I note that the United States District Court for the District of Columbia very recently faced an *Achmea* objection in the case of *Micula v. Romania*.  There, Romania, like Spain here, as well as the Commission, invoked *Achmea* to challenge the court's subject matter jurisdiction to entertain an action to enforce an intra-EU award.[149]  The Court squarely rejected the effort and proceeded to enforce the award.[150]

96.    The autonomy principle, in and of itself, is a truly remarkable one.  Its premise is that the CJEU has a monopoly over the interpretation and application of EU law, and no adjudicatory body outside the EU orbit may presume either to interpret or apply it.  To this author's knowledge, there is no other jurisdiction in the world that attempts to bar either the courts of other countries or international tribunals from interpreting or applying its law when pertinent to cases

---

[147]  *RENERGY v. Spain* Award ¶ 402.

[148]  *See supra* ¶¶ 79-80.

[149]  *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 276-80 (D.D.C. 2019).

[150]  *Id.*

before them.  If anything, they are more likely gratified to see their law given effect by the courts

of other jurisdictions or by international tribunals, despite the risk that their law may on occasion

be misinterpreted or misapplied.  In asserting autonomy, so defined, the EU is wholly unique.  Of

course, only courts within the EU, notably the CJEU itself, can render *authoritative* interpretations

of EU law.  But when foreign courts and international tribunals interpret and apply EU law, they

do not even purport to do so authoritatively.  The point is that the CJEU would bar them from

interpreting or applying EU law *at all*.

>    3.    The Commission Communication and EU Member State Declarations Do
>          Not Alter the Analysis

97.    In support of their position, Professor Hindelang (as well as Spain and the European

Commission) cite a communication from the European Commission to the European Parliament

and Council, informing them of the inferences they believe should be drawn from *Achmea*,

including the asserted invalidity of intra-EU BITs.[151]    In that communication, the European

Commission clarified that it considered *Achmea* to be as applicable to intra-EU disputes under the

ECT as well as under intra-EU BITs.  Spain further cites a Declaration by 22 EU Member States

to the effect that the ECT's dispute resolution provisions in Article 26 can have no application to

intra-EU investment disputes.[152]    In the same Declaration, those EU Member States directed their

nationals not to initiate arbitration of intra-EU disputes, undertook to inform arbitral tribunals of

---

[151]  Communication from the Commission to the European Parliament and the Council: Protection
of Intra-EU Investment, COM (2018) 547 final, at 2-3 & n.6, 26 (Eur. Comm'n July 19, 2018)
(ECF No. 62-51).

[152]  Declaration of the Representatives of the Governments of the Member States on the Legal
Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection
in the European Union (Jan. 15, 2019) (ECF No. 62-53) (signed by Austria, Belgium, Bulgaria,
Croatia, Cyprus, the Czech Republic, Denmark, Estonia, France, Germany, Greece, Ireland,
Italy, Latvia, Lithuania, the Netherlands, Poland, Portugal, Romania, Slovakia, Spain and the
United Kingdom).

the legal consequences of *Achmea*, instructed their courts to annul or deny enforcement of intra-EU awards, and urged third-country courts to do likewise. They also committed themselves to terminating their intra-EU BITs.

98.     In my opinion, these developments are not material to the present case. The European Commission communication is just another statement of the European Commission's long-held views, expressed through many amicus briefs and elsewhere, on the invalidity of provisions for the arbitration of intra-EU investment disputes. As for the EU Member States' Declarations, they do not terminate the ECT, nor could they do so. Termination of, or withdrawal from, the ECT requires an entirely different and formal legal procedure under that treaty. In any event, as the Tribunal concluded in its Decision in this case,[153] neither the European Commission communication nor the Member State Declaration has any greater force and effect than the *Achmea* judgment that they echo.

99.     Even if the EU Member States' Declarations did somehow terminate the ECT, NextEra still accepted the ECT standing offer of arbitration prior to this attempted termination – and where parties consent to arbitration under the ICSID Convention, "no party may withdraw its consent unilaterally."[154]     Neither the Commission communication nor the Member State Declarations can invalidate this consent retroactively.[155]

---

[153] *See* Liability Decision ¶ 354 ("The Tribunal notes that the internal constitutional laws of the EU and its constant changes and interpretations by the CJEU, as the Member States seek to minimize their mutual obligations in another context, are of no relevance for the present Tribunal.").

[154] ICSID Convention art. 25(1).

[155] *See, e.g.*, *Magyar Farming Co. v. Hungary*, ARB/17/27, Award ¶ 214 (ICSID 2019) (Ex. 16 hereto) ("*Magyar Farming* Award") ("Thus, the consent to arbitrate, in the sense of a meeting of the minds, which is perfected by the investor's acceptance of the State's offer to arbitrate expressed in the BIT would not be retroactively invalidated by a subsequent termination of the BIT. In other words, even if the Tribunal were to regard the 2019 Declarations as an agreement

4.    Other EU Advisory Opinions Cited by Professor Hindelang Are Neither Relevant Nor Applicable

100.    *Achmea* is not the first occasion on which the CJEU has manifested its preoccupation with the autonomy of EU law.  In numerous cases outside the foreign investment realm, the CJEU has rendered formal Opinions disallowing the EU's entry into treaties that establish courts or tribunals that are in a position to interpret and apply EU law without capacity to make preliminary references to the CJEU.[156]  Spain and Professor Hindelang refer to these Opinions in their discussion of whether, in their view, the arbitration agreement in this case is compatible with EU law.[157]  In my view, however, the present case is very different from the situations covered in those Opinions.  The Opinions to which I refer were rendered by the CJEU pursuant to a treaty provision, Article 218(11) of the TFEU, expressly authorizing the European Commission to solicit a ruling by the CJEU on the compatibility with EU law of a proposed treaty between the EU and other States.  If the CJEU finds the treaty to be incompatible with EU law, it cannot be concluded.  In other words, the Opinion mechanism is essentially prophylactic.  It keeps the EU from entering into a treaty that it cannot perform without violating EU law.  The treaty

---

to terminate the BIT, *quod non*, that agreement could not have invalidated the consent to arbitrate because it was entered after the consent was formed.").

[156]  *See, e.g.*, Opinion 1/91, 1991 E.C.R. I-6099, I-6112 (CJEU Dec. 12, 1991) (ECF No. 62-25) (addressing European Economic Area Agreement); Opinion 1/00, 2002 E.C.R. I-3498, I-3528 (CJEU Apr. 18, 2002) (ECF No. 62-31) (addressing European Common Aviation Area); Opinion 1/09, 2011 E.C.R. I-1142, I-1175 (CJEU Mar. 8, 2011) (ECF No. 62-40) (addressing European and Community Patents Court); Opinion 2/13, ECLI:EU:C:2014:2454, ¶ 258 (CJEU Dec. 18, 2014) (ECF No. 62-43) (accession of the EU to the European Convention for the Protection of Human Rights and Fundamental Freedoms).

[157]  *See, e.g.*, Hindelang 2022 Decl. ¶ 21 ("For example, the jurisprudence of the CJEU establishes that 'an international agreement cannot affect the allocation of powers fixed by the [EU] Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the [CJEU].'" (citation omitted) (modifications in original)).

therefore never comes into being, and disputes over its compatibility with EU law cannot thereafter arise.

101.    The posture of the present case is altogether different.  Here, the treaty in question (the ECT) was signed and ratified many years ago by the EU and the EU Member States. Therefore, the effect of *Achmea*, as asserted by Spain, is not to prevent the EU's entry into a treaty, but rather to justify – indeed require – the violation of a treaty into which the EU and the EU Member States long ago entered without the European Commission having sought an Opinion of the CJEU on the ECT's compatibility with EU law.  It is in reliance on the ECT that NextEra made its investment in Spain.  NextEra, as with all investors from ECT Contracting Parties, had a legitimate basis to assume that it would be able to avail itself of the ECT in the event an investment dispute with Spain arose.

102.    Not even the constitutional norms of a State operate to negate the obligations that that State has incurred by virtue of its international treaty commitments.[158]  If domestic constitutional norms do not free a State of its international law obligations, neither can that State's self-serving pretensions to autonomy do so.  Nothing obliges the EU to enter treaties it considers to be contrary to EU law but, having entered into them, it is bound internationally to respect them.[159]

---

[158] *See* Restatement (Fourth) of Foreign Relations Law § 307, Reporters' Note 4 (2018) (Ex. 17 hereto) ("Under international law, a state cannot invoke a conflict with its domestic law as a basis for invalidating its consent to be bound by a treaty unless the domestic law concerns the 'competence to conclude treaties,' and the violation of that law was 'manifest.' . . . As a result, if the United States agrees by treaty to do something that would violate an individual constitutional right, it likely would remain bound by international law to fulfill that obligation, even though courts in the United States and other government actors will lack the authority to enforce such an obligation." (citing VCLT art. 46)).

[159] The *Renergy* tribunal most recently explained as follows: "Therefore, from the perspective of international law, the *Achmea* and *Komstroy* Judgments cannot mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered

## F.    Spain's State Aid Argument is Without Merit

103.    Spain and Professor Hindelang invoke the EU's prohibition on State aid as a further basis for denying enforcement of the present Award, apparently arguing that the Tribunal exceeded its jurisdiction, again rendering an award that is not entitled to Full Faith and Credit.[160]  According to Spain, if this Court enforces the Award, Spain will be required to pay the Award, and that act would in itself amount to payment of a State aid that is illegal under EU law.[161]  For the following reasons, this position is untenable.

104.    *First*, I return once again to the overriding theme of my Declaration.  The EU's prohibition on the payment of unnotified or unauthorized State aid is a norm entirely internal to the EU and has no bearing on the jurisdiction of an arbitral tribunal nor the validity of an arbitral award arising out of a State's international treaty obligations under the ECT and ICSID.  Both Spain and the EU are Contracting Parties to the ECT.  They cannot justify a treaty violation by reference to their own internal law.[162]  What Professor Hindelang also fails to recognize is that, while internal EU law is binding on the Member States and their courts, it is not binding on the

---

into, even if performing them would violate EU law. In addition, from that same perspective, a judgment of the CJEU cannot direct a tribunal impanelled under the ECT to "leave unapplied" the arbitration clause under which it is constituted."  *Renergy v. Spain* Award ¶ 360.

[160]  *See* Spain Renewed MTD at 44 ("By ignoring, and usurping, the [European] Commission's exclusive jurisdiction [to determine whether a given payment constitutes State aid], the Tribunal's *ultra vires* award exceeds any jurisdiction it could have under Article 26 of the ECT. The Award is therefore void and not entitled to full faith and credit."); *see also* Hindelang 2022 Decl. ¶¶ 75-78 (asserting that payment of the Award would violate EU law).

[161]  *See* TFEU art. 107(1) ("[A]ny aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.").

[162]  VCLT art. 27.

US or its courts. What is binding on the US and its courts, including this Court, is performance of their international law obligations under the ECT and ICSID Convention.[163]

105.    *Second*, payment of this Award by Spain does not constitute State aid – much less illegal State aid – within the meaning of EU law. EU law forbids EU Member States to grant subsidies to private actors ("State aid," as defined in the TFEU)[164] without notice to and authorization by the European Commission.[165] According to Professor Hindelang, were Spain to pay the award rendered against it to NextEra, it would be conferring an illegal State aid. Professor

---

[163] While Professor Hindelang does not also invoke principles of international comity, the EC mistakenly does. *See* EC *amicus* at 4, 12, 21-24. Such principles cannot possibly justify refusing enforcement of the Award. International comity under US law is a purely prudential doctrine, driven by what the Supreme Court has called "courtesy" towards other nations. It cannot possibly take precedence over US legal obligations, such as those under the ICSID Convention, to which the US is a Contracting State and has affirmatively implemented in federal law. 22 USC. § 1650a(a).

[164] According to Article 107(1) of the TFEU:

[A]ny aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States be incompatible with the internal market.

[165] Article 108(3) of the TFEU provides that:

The Commission shall be informed, in sufficient time to enable it to submit its comments, of any plans to grant or alter aid. If it considers that any such plan is not compatible with the internal market having regard to Article 107 [of the TFEU], it shall without delay initiate the procedure [provided for in this article]. The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision.

Hindelang refers to decisions to this effect by the EC[166] and the CJEU,[167] as well as Member State court decisions refusing to enforce arbitral awards on that ground.[168]

106.    Professor Hindelang endorses this position on the basis of the supposed breadth of the term "State aid" under EU law, viz., "advantages granted by public authorities which, in various forms, mitigate the charges which are normally included in the budget of an undertaking."[169] However, as he himself states, a payment must (among other conditions) be imputable to a Member State *and* be financed through State resources before it can constitute a State aid.[170]  Enforcement of the Award in this case is not a measure imputable to Spain; it is a measure taken *by this Court* by virtue of its own ICSID Convention obligations.  It is precisely because Spain has *not* paid the Award that recognition and enforcement has become necessary.  In circumstances where Spain has refused to pay and has objected to enforcement, I find it impossible to see how this Court's recognition and enforcement of the Award would amount to an action imputable to Spain.   The imputability criterion for EU State aid law is therefore lacking.

107.    Moreover, even if Spain and Professor Hindelang could conflate the distinction between enforcement and voluntary payment, in an effort to plead a State aid defense, in my opinion even payment of an ICSID Convention award cannot fairly be imputed to Spain, in the

---

[166]  European Commission, Case SA.54155 (2021/C) (May 11, 2021) (ECF No. 62-73).

[167]  *Eur. Comm'n v. Eur. Food*, *S.A.,* No. C-638/19 P, ¶ 131 (Jan. 25, 2022) ("*European Food*") (Ex. 55 hereto).

[168]  *See, e.g.*, *Romania v. Viorel Micula*, No. A 2550-1 (Nacka Dist. Ct. Jan. 23, 2019) ("*Micula* (Nacka)") (ECF No. 62-66).

[169]  *Italy v. Eur. Comm'n*, No. C-310/99, ¶ 51 (CJEU Mar. 7, 2002) ("*Italy v. European Commission*") (ECF No. 62-30).

[170]  Hindelang 2022 Decl. ¶ 75.

sense of conferring a selective discretionary benefit under EU law.  In paying an ICSID award, the State is not doing so as a matter of choice or policy.  Rather, it is merely carrying out an obligation imposed upon it by its own international commitments.  Moreover, to be condemnable, any aid "must distort or threaten to distort competition and have the potential to affect trade between EU Member States."[171]  It cannot plausibly be said that payment of the Award distorts or threatens to distort competition.  Far from it.  The Award simply restores NextEra to the place it would have been in had Spain not acted wrongfully.

108.    Case law of the CJEU itself establishes that the payment of compensatory damages by an EU Member State to a private party does not constitute a State aid.  In the case of *Asteris v. Greece*[172] the CJEU was faced with the question whether any damages that Greece might be ordered to pay to the plaintiff companies as compensation for harm done to them should be regarded as a State aid within the meaning of EU law.  After noting that the EU's State aid prohibition was only concerned with "State interventions which might have the effect of distorting the normal conditions of trade between Member States,"[173] the Court ruled as follows:

> State aid, that is to say measures of the public authorities favouring certain undertakings or certain products, is fundamentally different in its legal nature from damages which the competent national authorities may be ordered to pay to individuals in compensation for the damage they have caused to those individuals. . . .  [Thus], damages which the national authorities may be ordered to pay to individuals in compensation for damage they have caused to those individuals do not constitute aid within the meaning of [the Treaty].[174]

---

[171]  *Id.*

[172]  *Asteris AE v. Greece,* Joined Cases 106-120/87, 1988 E.C.R. 5531 (CJEU Sept. 27, 1988) ("*Asteris*") (Ex. 18 hereto).

[173]  *Id.* at 5539.

[174]  *Id.* at 5540.

109.    The distinction between the payment of damages by a Member State to an individual and an illegal State aid under the European treaties came to the fore in *European Food S.A. v. European Commission*.[175] In *European Food*, the European General Court annulled a European Commission decision which had condemned Romania's payment of an ICSID award as an illegal State aid[176] on the sole basis that, because the ICSID award related to measures taken by a European Member State (Romania) in 2005, prior to its accession to the EU in 2007, the European Commission lacked competence *ratione temporis* to make a determination over them.[177] The CJEU later disagreed on that specific temporal finding, and remanded the case to the European General Court for further adjudication.[178]  The CJEU, however, did not adopt a general rule pursuant to which the payment of an investment arbitration award by a Member State of the European Union automatically qualifies as illegal State aid under EU law.

110.    In the present case, NextEra neither requested nor was granted the promised aid; it was awarded compensation for losses attributable to Spain's wrongful cancellation of an

---

[175]  Joined Cases T-624/15, T-694/15 & T-704/15 (Gen. Ct. EU June 18, 2019) ("*European Food* (Gen. Ct.)") (Ex. 19 hereto).  I note that Professor Hindelang's Declaration seeks to relegate this important ruling to one footnote in his opinion, stating only that it "does not change [his] conclusion in any way."  Hindelang 2022 Decl. ¶ 80 n.10.  Insofar as Professor Hindelang cites to related decisions in the EU courts, these have now been superseded by this ruling annulling the European Commission's State aid decision in the *Micula* case.  *See* Hindelang 2022 Decl. ¶ 84 (discussing *Micula* (Nacka); *Romania v. Viorel Micula*, No. 71/18 - VII p REF (Lux. Ct. App. Mar. 21, 2018) ("*Micula* (Lux.)") (ECF No. 62-58); *Romania v. Viorel Micula*, Nos. 2016/AR/393 & 2016/AR/394 (Brussels Ct. App. Mar. 12, 2019) ("*Micula* (Belg.)") (ECF No. 62-60)).  Moreover, these were all rulings by EU Member State courts which were bound to give effect to the European Commission's decision and EU law more generally.  They have no bearing on the treatment of ICSID awards by the courts of countries outside the EU.

[176]  *European Food* (Gen. Ct.) ¶¶ 94, 109.

[177]  *Id.* ¶¶ 65-67, 104.

[178]  *European Food* ¶ 156.

investment incentive program in breach of the ECT. Furthermore, in its approach to liability and damages, the Tribunal made clear that it was not replicating original tariffs and premiums that Spain had offered under its former regime for solar plants. It awarded compensation on a different basis, and at a lower amount than that which NextEra's experts had quantified using the original tariffs and premiums.[179]

111.    But even if compensation for the harm caused by cancellation of allegedly illegal State aid could be regarded as the equivalent of an illegal State aid, Spain's argument cannot succeed. Unless an EU Member State measure *is* an illegal State aid, payment of compensation to an investor for its cancellation *cannot be* one either. At no point has the European Commission launched an investigation into the legality of the incentive scheme whose cancellation underlies NextEra's claims in this case, much less made a formal determination that that scheme amounted to an illegal State aid. EU law imposes on the European Commission very strict procedures before it can find that an EU Member State measure constitutes an illegal State aid (i.e., aid that is incompatible with the EU internal market),[180] and, to my knowledge, the European Commission

---

[179]  Liability Decision ¶¶ 645, 647, 648-50.

[180]  *See* TFEU arts. 107-09. Article 108(2)-(3) of the TFEU provides that if the European Commission "consider[s] that any [Member State] plan is not compatible with the internal market," the following procedure shall apply:

If, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the internal market . . . it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission.

If the State concerned does not comply with this decision within the prescribed time, the Commission or any other interested State may . . . refer the matter to the Court of Justice of the European Union direct.

On application by a Member State, the Council may, acting unanimously, decide that aid which that State is granting or intends to grant shall be considered to be compatible with the internal market . . . if such a decision is justified by exceptional circumstances.

has not engaged in any such procedure to determine whether the incentive scheme under which NextEra invested is a form of illegal State aid.  I note that both Professor Hindelang and the EC refer to the 2017 Commission's State aid decision concerning the 2014 support scheme for electricity generation from renewable energy sources, cogeneration and waste in Spain.  In my view, their reliance on this decision either for the proposition that the support scheme under which NextEra invested,[181] or that the Award constitutes State aid,[182] is misplaced.  That decision addressed the incentive scheme that replaced that under which NextEra invested (which the Commission found to be compatible with the internal market).[183]  Nothing in that document finds that the scheme under which NextEra invested was a form of illegal State aid.

112.    Lastly, the question of whether an award arising out of an EU Member State's termination of an incentive scheme would violate the EU State aid law is a merits issue; it is not for determination by a court in an action to enforce an award.  The impropriety of a judicial inquiry into whether an award or its payment constitutes an illegal State aid, or even a State aid in the first

---

If, as regards the aid in question, the Commission has already initiated the procedure provided for [here], the fact that the State concerned has made its application to the Council shall have the effect of suspending that procedure until the Council has made its attitude known.

If, however, the Council has not made its attitude known within three months of the said application being made, the Commission shall give its decision on the case.

[181] EC *amicus* at 25.

[182] Hindelang 2022 Decl. ¶ 78.

[183] *See* European Commission, Case SA.40348, Decision 2017/7384 (Nov. 10, 2017) (ECF No. 62-50).

place, is all the more apparent in the case of an ICSID Convention award, which is subject to no substantive judicial review whatsoever on the occasion of its enforcement.[184]

113.    Spain apparently also has an altogether different state-aid-based argument to make, namely that in issuing its Award, the Tribunal somehow encroached upon the European Commission's exclusive authority to determine whether a measure is or is not a State aid.[185]  Of course, this is just another attempt to subordinate Spain's international law obligations to internal EU law.  But the premise of this argument is itself fatally flawed.  The Tribunal never made any determination, or purported to make any determination, of whether the measure taken by Spain constituted a State aid under EU law, much less that any such aid was legal or illegal.  It confined itself, as it was required to, to deciding whether Spain's cancellation of the incentive scheme was or was not a breach of its obligation of fair and equitable treatment under the ECT.  Nothing remotely resembling an encroachment on the European Commission's State aid authority took place, even assuming that any such encroachment would justify a refusal to enforce the present Award.

114.    For all these reasons, I consider that enforcement of the Award in this case cannot be defeated on the alleged ground that its eventual payment would constitute an illegal State aid under EU law.

---

[184]  *See, e.g.*, *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 16-1533(ABJ), 2019 WL 2185040, at *4 (D.D.C. May 21, 2019) ("[A]ll [the enforcing court] may do is 'examine the [ICSID] judgment's authenticity and enforce the obligations imposed by the award.'" (citation omitted)).

[185]  *See* Spain Renewed MTD at 42-43 ("Specifically, EU law provides that only the European Commission may authorize Member States to provide State aid . . . .  In other words, European law explicitly prohibits arbitral tribunals from doing so.").

G.    **The Vast Majority of Arbitral Tribunals Addressing these Same Questions Reject Spain's Position**

115.    In a great many arbitrations over recent years, respondent EU Member States, and the European Commission as *amicus curiae*, have unfailingly argued that the ECT does not apply to disputes arising between EU nationals and other EU states (in effect, arguing for an implied disconnection clause), but never to any avail.  *Every* ICSID tribunal and *ad hoc* annulment committee[186] presented with this issue has rejected any such claim.[187]

---

[186] The multitude of ICSID tribunals and annulment committees that have addressed (and rejected) this argument includes arbitrators from approximately 30 different nationalities – including nationals of various EU Member States, including three Spanish arbitrators.  This diversity underscores that the prevailing international conclusion – which aligns with NextEra's position in this proceeding – is that EU law-based objections to the arbitration of intra-EU disputes under the ECT are inapplicable to ICSID Convention arbitrations.  Spain's arguments to the contrary should be dismissed out of hand.

[187] *See, e.g.*, *Blusun S.A. v. Italy*, ARB/14/3, Award ¶ 291 (ICSID 2016) (Ex. 20 hereto) ("[T]he Tribunal holds that the *inter se* obligations in the ECT have not subsequently been modified or superseded by later European law."); *Belenergia S.A. v. Italy*, ARB/15/40, Award ¶ 321 (ICSID 2019) (Ex. 21 hereto) ("[T]his Tribunal finds that Article 26 ECT on investor-State arbitration is complementary rather than incompatible to the remedies of the EU legal order."); *Vattenfall* (*Achmea* Dec.) ¶ 207 ("[T]he Tribunal finds that a Contracting Party to the ECT in Article 26 ECT includes EU Member States and non-EU Member States without distinction."); *accord RREEF* (Jurisdiction) ¶¶ 78-89; *Eiser Infrastructure Ltd. v. Spain*, ARB/13/36, Award ¶ 207 (ICSID 2017) (Ex. 25 hereto); *Masdar* Award ¶¶ 306-24; *Infrastructure Services Luxembourg S.à.r.l. v. Spain*, ARB/13/31, Award ¶¶ 204-30 (ICSID 2018) ("*Antin* Award") (Ex. 35 hereto); *Rockhopper* (Jurisdiction) ¶¶ 172-75; *OperaFund Eco-Invest SICAV PLC v. Spain*, ARB/15/36, Award ¶¶ 327-30 (ICSID 2019) (Ex. 22 hereto); *Magyar Farming* Award ¶¶ 200-248; *Cube Infrastructure* (Jurisdiction) ¶¶ 118-38; *Eskosol v. Italy* (Jurisdiction) ¶ 93; *SolEs Badajoz GmbH v. Spain*, ARB/15/38, Award ¶ 235-37 (ICSID 2019) (Ex. 23 hereto); *9REN Holding S.À.R.L. v. Spain*, ARB/15/15, Award ¶ 147 (ICSID 2019) (Ex. 24 hereto); *InfraRed Environmental Infrastructure GP Ltd. v. Spain*, ARB/14/12, Award ¶¶ 256-274 (ICSID 2019) (Ex. 36 hereto); *Landesbank* (Jurisdiction) ¶¶ 100-194; *Adamakopoulos v. Cyprus*, ARB/15/49, Award ¶¶ 150-187 (ICSID 2020) (Ex. 37 hereto); *ESPF Beteiligungs GmbH v. Italy*, ARB/16/5, Award  ¶¶ 266-339 (ICSID 2020) (Ex. 38 hereto); *Addiko Bank AG v. Croatia*, ARB/17/37, Decision on Croatia's Jurisdictional Objection Related to the Alleged Incompatibility of the BIT with the EU Acquis ¶¶ 49 (ICSID 2020) (Ex. 39 hereto); *Cavalum SGPS, S.A. v. Spain*, ARB/15/34, Decision on Liability and Quantum ¶¶ 301-371 (ICSID 2020) (Ex. 40 hereto); *Hydro Energy* (Jurisdiction) ¶¶ 446-502 (2020); *RWE Innogy GmbH v. Spain*, ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum ¶¶ 309-350 (ICSID 2019) (Ex. 41 hereto); *Micula v. Romania*, ARB/14/29 ("*Micula II*"), Award ¶¶ 259-

116.    In the ICSID case of *Infrastructure Services Luxembourg S.à.r.l. v. Spain* (referred to as "*Antin*"),[188] both the ICSID tribunal and the *ad hoc* annulment committee rejected Spain's attempt to rely on EU law to deprive it of jurisdiction to adjudicate claims arising under the ECT.[189] The *Antin* tribunal underscored that:

> First, the jurisdiction of this Tribunal derives from the express terms of a treaty —the ECT— that is binding under international law on the State parties thereof and on the EU.  Second, the ECT is a multilateral treaty to which the EU itself is a party.  Third, the EU and each EU Member State granted its consent to submit to arbitration any claim against it.  Fourth, nothing in the text, context, purpose and object of the ECT suggests that the inclusion of the reference to "rules and principles of international law" in the applicable law clause was intended to mean that the treaties creating the EEC and the EU and allocating competences among European institutions and their Member States, the EU's internal legislation, as subsequently interpreted by the CJEU, could be interpreted in a manner such that a development in the EU's *acquis* could be employed to undermine the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself.[190]

117.    In the case of *Cube Infrastructure*, the ICSID tribunal similarly rejected Spain's attempt to rely on EU law to preclude its jurisdiction under the ECT.  The ICSID tribunal

289 (ICSID 2020) (Ex. 42 hereto); *Silver Ridge Power BV v. Italy*, ARB/15/37, Award ¶¶ 191-238 (ICSID 2021) (Ex. 43 hereto); *Watkins* Award ¶¶ 180-226; *Eurus Energy Holdings Corp. v. Spain*, ARB/16/4, Decision on Jurisdiction and Liability ¶¶ 206-215 (ICSID 2021) (Ex. 44 hereto); *STEAG GmbH v. Spain*, ARB/15/4, Decision on Jurisdiction, Liability, and Principles of Quantum ¶¶ 227-298 (ICSID 2021) (Ex. 45 hereto); *Infracapital* (Jurisdiction) ¶¶ 211-228, 283-307; *BayWa r.e. Renewable Energy GmbH v. Spain*, ARB/15/16, Decision on Jursdiction, Liability and Directions on Quantum ¶¶ 244-283 (ICSID 2019) (Ex. 46 hereto); *Antin*, Decision on Annulment ¶¶ 148-160 (ICSID 2021) ("*Antin* (Annulment)") (Ex. 47 hereto); *UP & C.D Holding Internationale v. Hungary*, ARB/13/35, Decision on Annulment ¶ 179 (ICSID 2021) (Ex. 48 hereto); *Sevilla Beheer* (Jurisdiction) ¶¶ 613-678; *Infracapital* (Reconsideration) ¶¶ 95-116; *RENERGY v. Spain* Award ¶¶ 325-418.

[188] *Antin* Award ¶¶ 204-230.

[189] *Antin* Award ¶ 224; *Antin* (Annulment) ¶ 206.

[190] *Antin* Award ¶ 224.

underscored that "[a]n arbitral tribunal under the ECT and the ICSID Convention receives its mandate exclusively from the provisions specified in these instruments" and that its jurisdiction under those instruments "could only be challenged if it could be established that the three States involved lacked the legal capacity to conclude a treaty for the establishment of an arbitral body acting outside the EU legal order."[191]  Relying on years of unchallenged enforcement of the ECT, the ICSID tribunal concluded that "there [was] no evidence demonstrating that the" States in this dispute "exceeded the limits of their treaty-making power . . . ."[192]  The *Cube Infrastructure* tribunal noted that the European treaties, in fact, "[n]owhere" required that any "procedural mechanisms" be used to address any eventual incompatibilities between the ECT and EU law, and that, "[a]pparently, the negotiators were of the view that the system of investment protection, as it had evolved over decades, had stood the test of time and should be transformed only step by step in a process without any disturbing ruptures."[193]  An ICSID *ad hoc* annulment committee later upheld those findings.[194]

---

[191]  *Cube Infrastructure* (Jurisdiction) ¶ 147.

[192]  *Id.* ¶ 147.

[193]  *Id.* ¶ 150.

[194]  *Cube Infrastructure Fund SICAV v. Spain*, ARB/15/20, Decision on Annulment ¶¶ 217-35 (ICSID 2022) (Ex. 49 hereto).  Another ICSID *ad hoc* annulment committee similarly rejected Spain's application for annulment against an ICSID award in *SolEs Badajoz GmbH v. Kingdom of Spain* ("*SolEs*"), Case No. ARB/15/38, Decision on Annulment ¶¶ 109, 113-128 (ICSID 2022) (Ex. 50 thereto).

118.    To my knowledge, all investor-State tribunals constituted under other arbitral rules[195] to have addressed the "intra-EU" objection also have rejected that argument as well – again unanimously.[196]

119.    In total, therefore, more than forty ECT tribunals have independently examined this issue and *all* of them have concluded that the ECT applies to intra-EU investment disputes.  The sheer weight of international authority rejecting Spain's and the European Commission's same objections rooted in domestic EU law should be considered as further persuasive evidence of the firm footing of the Award and NextEra's arguments for enforcement.

## V.    <u>CONCLUSION</u>

For all the reasons stated above, I adhere to the conclusions that appear in the body of this Expert Declaration and are summarized at paragraph 6 above.

---

[195] For example, the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce ("SCC") and the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL"), both of which are also provided as options for arbitration in Article 26 of the ECT.

[196] *See, e.g.*, *Isolux Infrastructure Neth. B.V. v. Spain*, No. 2013/153, Final Award ¶ 656 (SCC 2016) (Ex. 51 hereto); *Charanne B.V. v. Spain*, No. 062/2012, Final Award ¶ 437 (SCC 2016) (Ex. 52 hereto); *SICAR v. Spain*, No. 2015/063, Final Arbitral Award ¶¶ 459-62 (SCC 2018) ("*Novenergia II*") (Ex. 53 hereto).  As noted several times above (*see supra* ¶¶ 20 & n.14, 22, 23 & n.20, n.81, n.87), SCC and UNCITRAL awards are not subject to the same unique status as an ICSID award, and some are subject to challenges in the national courts of the arbitral seat, on the grounds that the tribunal lacked jurisdiction.  Nevertheless, the jurisdictional reasoning of the tribunals in those cases remains, in my view, valid and relevant.  *See, e.g.*, *PV Investors v. Spain*, PCA No. 2012-14, Preliminary Award on Jurisdiction ¶¶ 174-207 (UNCITRAL 2014) (Ex. 54 hereto).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of June 2022,
in Princeton, New Jersey, USA

_____

George A. Bermann