# EXHIBIT 4

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**INFRACAPITAL F1 S.À R.L. AND INFRACAPITAL SOLAR B.V.**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/16/18**

---

# DECISION ON RESPONDENT'S REQUEST FOR RECONSIDERATION REGARDING THE INTRA-EU OBJECTION AND THE MERITS

---

*Members of the Tribunal*
Mr. Eduardo Siqueiros T., President
Prof. Peter D. Cameron
Mr. Luis González García

*Secretary of the Tribunal*
Mrs. Mercedes Cordido-Freytes de Kurowski

*Date of dispatch to the Parties:* February 1, 2022

## REPRESENTATION OF THE PARTIES

*Representing Infracapital F1 S.à r.l.*
*and Infracapital Solar B.V.:*

Mr. Jeffrey Sullivan QC
Ms. Sarah Wazen
Ms. Ankita Ritwik
Ms. Nadia Wahba
**Gibson, Dunn & Crutchner LLP**
Telephone House
2-4 Temple Avenue
London EC4Y 0HB
United Kingdom

and

Mr. Antonio Vázquez-Guillén
Mr. David Ingle
Mr. Pablo Torres
Ms. Millicent Domínguez
**Allen & Overy LLP**
Calle Pedro de Valdivia 10
28006 Madrid
Spain

*Representing the Kingdom of Spain:*

Ms. Amparo Monterrey Sánchez
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatas López
Ms. Ana Fernández-Daza Álvarez
Ms. Mª del Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria
Ms. Elena Oñoro Sainz
Mr. Juan Antonio Quesada Navarro
Ms. Ana María Rodriguez Esquivias
Mr. Javier Comerón Herrero
Ms. Eugenia Cediel Bruno
**Abogacía General del Estado**
Depto. Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16,
2ª planta
28004 Madrid
Spain

i

TABLE OF CONTENTS

I.    INTRODUCTION & PROCEDURAL HISTORY ................................................................. 1

II.   THE PARTIES' POSITIONS ............................................................................................... 1

     A.   Respondent's Position ............................................................................. 1

     B.   Claimants' Position ............................................................................... 11

III.  THE TRIBUNAL'S ANALYSIS ..................................................................................... 19

     A.   Admissibility of Respondent's Request ....................................................... 19

     B.   Is the *Komstroy* Judgment a New and Decisive Fact for the Decision?....................... 22

IV.  DECISION ....................................................................................................................... 31

### TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

Except for the terms defined below, or otherwise indicated in this Decision, all other terms defined in the Decision on Jurisdiction, Liability and Directions on Quantum and used herein shall have the same meaning ascribed to them therein.

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 2006 |
| Claimants | Infracapital F1 S.à.r.l. and Infracapital Solar B.V. |
| Claimants' Response | The response submitted by Claimants on 12 November 2021, named "*Claimants' Response to Respondent's Petition for Reconsideration Regarding the Intra-EU Objection and the Merits*". |
| Decision | Decision on Jurisdiction, Liability and Directions on Quantum of 13 September 2021 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| *Komstroy* Judgment | The Court of Justice of the European Union in the Case C-741/19, ECLI:EU:C:2021:655 in in *Republic of Moldova v Komstroy LLC* |
| Request for Reconsideration | The request submitted by Respondent on 15 October 2021 titled "*Respondent's Petition of Reconsideration Regarding the Intra-EU Objection and the Merits on the basis of the CJEU Decision in the Case C-741/19, Republic of Moldova [Komstroy* Judgment*], ECLI:EU:C:2021:655*" for the Tribunal to declare its lack of jurisdiction for this case |
| Respondent | Kingdom of Spain |

## I.  INTRODUCTION & PROCEDURAL HISTORY

1.  On 13 September 2021, the Tribunal issued its Decision on Jurisdiction, Liability and Directions on Quantum (hereinafter the "**Decision**").

2.  On 15 October 2021, the Kingdom of Spain (the "**Respondent**") submitted a request entitled "*Respondent's Petition of Reconsideration Regarding the Intra-EU Objection and the Merits on the basis of the CJEU Decision in the Case C-741/19, Republic of Moldova, ECLI:EU:C:2021:655*" to declare the Tribunal's lack of jurisdiction for this case (the "**Request for Reconsideration**").

3.  The decision mentioned in the preceding paragraph involved the case *Republic of Moldova v Komstroy LLC,* (the "***Komstroy* Judgment**").[1]

4.  On 16 October 2021, the Tribunal invited Claimants to submit any comments to the request by 12 November 2021.

5.  On November 12, 2021, Infracapital F1 S.à.r.l. and Infracapital Solar B.V ("**Claimants**") submitted their response entitled "*Claimants' Response to Respondent's Petition for Reconsideration Regarding the Intra-EU Objection and the Merits*" (hereinafter "**Claimants' Response**").

## II.  THE PARTIES' POSITIONS

### A.  RESPONDENT'S POSITION

6.  Respondent submitted the Request of Reconsideration of the Decision which, in its view, should be reconsidered as manifestly erroneous and, in any case, on the basis of the *Komstroy* Judgment under two arguments: (1) the lack of jurisdiction *ratione personae* and *ratione materia,* as the ECT does not apply to disputes relating to intra-EU investments; and (2) the lack of application by the Tribunal of the EU State Aid rules in the Decision.

7.  Respondent first addresses whether the Tribunal can reconsider its Decision and concludes that the Tribunal can and should.

8.  First, it points out a distinction under the ICSID Convention between awards (or decisions regarding interpretation, revision or annulment of a previously issued award) and the rest of decisions issued along an arbitration, and interprets Article 53 of the ICSID Convention *sensu contrario,* to mean that only awards are final (except if there is a revision or annulment) but the rest of the decisions in an arbitration procedure, including those deciding on a particular objection, are not.

---

[1]  **RL-0151**, European Union Court of Justice Judgment of 2 September 2021 in the case C-741/19, *Republic of Moldova v. Komstroy LLC* ("***Komstroy* Judgment**").

9.   Respondent draws support from *Standard Chartered Bank v.* Tanesco[2] which ruled that decisions rendered in an arbitration proceeding, unlike awards, do not have the force of *res judicata,* but even if they had the force of *res judicata* (*quod non*), they should be subject to reconsideration at least in the cases and where the requirements demanded by Article 51 of the ICSID Convention for the review of awards concur.[3] The *Standard Chartered Bank* tribunal reconsideration decision was confirmed in the annulment proceedings, where the *ad hoc* Committee concluded: "*The Committee is of the view that the reconsideration of the Decision did not disregard the res judicata principle, nor undermine Article 53 of the Convention, since that provision expressly establishes that it applies to awards only, not to decisions".*[4]

10.  Respondent also draws support from *Waste Management, Inc. v the United States of America* Tribunal which stated: "…*it had the power, while still exercising its functions and prior to the closure of the proceedings, to give any necessary interpretation of any of its decisions, to make any necessary supplementary decision, and to correct any error in the translation of a decision.*"[5]

11.  According to Respondent, the Decision on the intra-EU objection and on the applicable law (initial point on the liability holdings) are manifestly wrong, and presents four arguments to support its position:

     a)  In accordance with the international custom, the Tribunal lacks jurisdiction to hear this intra-EU dispute;

     b)  There is a practice of observance and respect for the autonomy and primacy of EU Law and of the binding effect of the decisions of the CJEU;

     c)  According to the Law of Treaties, the Tribunal lacks jurisdiction to hear this dispute; and

     d)  Under General Principles of Law, the Tribunal lacks jurisdiction to hear this dispute.

12.  <u>First</u>, Respondent deems that this Tribunal lacks jurisdiction to hear this intra-EU dispute based on international custom, which is not only a source of international law, but it argues it is traditionally considered the first source of International Law. Since international custom is "*evidence of a general practice accepted as law*", two elements are required to be deemed

---

[2]  Request for Reconsideration, ¶ 14, citing *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited* (ICSID Case No. ARB/10/20), Award, 12 September 2016, ("***Standard Chartered Bank v. TANESCO, Award***") ¶ 322. Note: Although Respondent cites the *Standard Chartered Bank v. TANESCO* Award, it was actually introduced by Claimants into the record as **CL-213**).

[3]  Request for Reconsideration, ¶ 13.

[4]  **RL-0152**, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited,* ICSID Case No. ARB/10/20, Decision on the Application of Annulment, 22 August 2018, ("***Standard Chartered Bank v. TANESCO,* Decision on Annulment**")¶ 324.

[5]  Request for Reconsideration, ¶ 17, making reference to **RL-0153** *Waste Management, Inc. v. United Mexican States*, ARB(AF)/00/3, Award, 30 April 2004, para. 17.

as such: (a) the material element or repeated practice and (b) the subjective element or *opinio iuris*.[6]

13.  In connection with the material element, Respondent cites different authors and some precedents to support that the practice of States must be "*consistent*", "*constant*" or "*established*", but time itself is not a necessary requirement; adding that "*practice can be consolidated in a short period of time, and it is not necessary to wait centuries for that consolidation*."[7]

14.  The subjective element, on the other hand, "concludes the formation of a customary rule of international law", and Respondent also submits several authors and precedents to conclude that the element of *opinio iuris* is, in brief, the belief that a practice has become mandatory.[8]

15.  It follows, according to Respondent, that the legal framework of the EU has autonomy and primacy, and therefore in accordance with Article 38 of the Statute of the ICJ the customary international law of the EU must not only be respected, but "*the recognition of the binding effects of the decisions of the CJEU is also customary international law of the EU*".[9] Respondent concludes that the EU and Member States are disconnected from the ECT for the purpose of intra-EU investment arbitrations, while the ECT nevertheless continues to remain in force for relations with third States.

16.  Respondent contends that since the 1964 decision of the Court of Justice of the European Union in *Costa v Enel*,[10] there is "… *no doubt about the autonomy and primacy of EU Law*", and that it must necessarily be respected as well as the binding effect of the decisions of the CJEU in application of international custom.[11] It cites cases where international conventions which do not contain a disconnection clause have nonetheless been replaced by European Regulations favouring EU Law, even if those conventions are multilateral and included third States as parties, concluding that "… *a reiteration of the practice accepted by Member States and by third States of the fact that EU Law allows the EU and its Member States to detach themselves from international conventions for intra-EU matters, without having to rely on a disconnection clause, thanks to the autonomy and primacy of community law*". This, Respondent adds, is "… *[e]xactly the opposite of what the Tribunal's Decision says.*"[12]

17.  Respondent concludes that "… *the practice of accepting the application of EU Law for intra-community matters versus the existence of an international treaty without a disconnection clause is not only a practice of the EU, but rather a practice accepted by the States of the investors, by the Kingdom of Spain, by all Member States of the EU and by third countries, by all the international community, given that the stated conventions have been ratified by over 70 States and none of them have raised an objection to this practice*,"[13] adding that the

---

[6]  Request for Reconsideration, ¶ 24.
[7]  Request for Reconsideration, ¶¶ 25-35.
[8]  Request for Reconsideration, ¶¶ 36-41.
[9]  Request for Reconsideration, ¶¶ 36-41.
[10]  **RL-0162** Judgment of the CJEU of 15 July 1964, rendered in Case 6/64, *Flaiminio Costa v. ENEL*.
[11]  Request for Reconsideration, ¶¶ 42-45.
[12]  Request for Reconsideration, ¶¶ 46-54.
[13]  Request for Reconsideration, ¶ 55.

majority of the conventions listed in Article 69 of the Regulation 44/2001 or Brussels I Regulation do not contain any disconnection clause, but the parties, the signing Member States, have detached themselves from them in favour of EU Law.[14]

18.    Further, Respondent states that there is a uniform and constant practice whereby, "*once the EU believes that it has its own legal framework on a matter*, *EU Law replaces the bilateral and multilateral conventions on the same matter in intra-EU relationships*", and that this practice has been respected by Member States, but also by third countries.[15]

19.    Respondent argues that disconnection only has two possible reasons, "*which can act separately or cumulatively: (i) the first is that derived or secondary law of the EU (and of course the EU Treaties) can supersede the application of a convention because the practice of the international community considers all regulations of the EU to be at the same level as international conventions; or (ii) the second is that Member States of the EU have created a practice between them, recognized as a rule by them and by third States, to give primacy and autonomy to EU law to the point of replacing the application of international conventions for intra-EU matters, even if such conventions do not have a disconnection clause.*"[16]

20.    Second, Respondent argues that after having "*… effectively demonstrated that a generally accepted practice exists that, as a rule, the EU can dissociate itself from an international convention for intra-EU affairs, even if the convention in question does not contain a disconnection clause*", Respondent contends "*that principles of autonomy and primacy of EU law have been accepted as Law by the member states as well as by third countries, as they meet all of the requirements of article 38.1 (b) of the ICJ to create a binding source of international law*".[17]

21.    According to Respondent, evidence that the requirement of *opinio iuris* is met in respect to the autonomy of EU Law declared by the CJEU in 1964 in the *Van Gend & Loos* case[18] has been ratified since then and accepted as Law by the EU itself and its Member States. Evidence of this is "*… the large number of CJEU judgements that have applied this autonomy*".[19]

22.    In connection with the primacy of EU law, which ensures that the application of EU Law is guaranteed in situations where applicable national or international law between the Member States would deprive EU Law of its full and effective application,[20] Respondent adds that the principle has been constantly maintained by the CJEU since the "historical ruling" in the *Costa/ENEL* case, and it is now also explicitly enshrined in Declaration 17 attached to the Final Act of the Inter-Governmental Conference that adopted the Lisbon Treaty – which

---

[14] Request for Reconsideration, ¶¶ 56-57, citing that Article 69 sets forth that *"this Regulation shall, as between Member States, supersede the following conventions and treaty concluded between two or more of them"*.
[15] Request for Reconsideration, ¶ 63.
[16] Request for Reconsideration, ¶ 58.
[17] Request for Reconsideration, ¶¶ 69-71.
[18] **RL-0183** Judgment of the CJEU of 5 February 1963 in Case C-26/62. *Gend & Loos v. Nederlandse administratie der belastingen*.
[19] Request for Reconsideration, ¶ 73.
[20] Request for Reconsideration, ¶ 73.

Respondent recalls has been ratified by The Netherlands, Luxembourg (States of the Claimants) and by the Respondent.[21]

23.  Respondent asserts that "*the practice of autonomy and primacy of EU Law in its relations with international conventions has not only been accepted as Law by the Member States, but also by the third countries*", which "*has allowed the disconnection, in favor of EU Law and for intra-community affairs, of international conventions without disconnection clauses*", and concludes that the autonomy and the primacy of EU Law are an applicable international custom. [22]

24.  Finally on this point, Respondent contends disconnection "*is inherent to the regional integration process and does not require the acceptance or express act of any Member State or third country*" and is only performed on the understanding by the EU that its legal system is sufficient on the matter to which the Convention refers, and that the disconnection from an international convention does not require another convention; the primary or community derived law or a mere declaration in this sense is sufficient to cause the disconnection. [23]

25.  Further, Respondent argues that the Tribunal lacks jurisdiction in accordance with international custom, but it also lacks jurisdiction in accordance with the Law of Treaties, and that reading of the ECT according to its *literality, purpose and context* leads to the conclusion that EU Member States did not make an offer to arbitrate under Article 26 ECT to investors from other EU Member States signatories to the ECT.  If this interpretation is not adopted in accordance with EU Law as postulated by Respondent, it finds that there is a conflict between the ECT and EU Law that should be resolved in favor of EU Law as the per the CJEU precedent.[24] In the event of conflict between the ECT and EU Law, Respondent further contends that the conflict will have to be resolved in accordance with the principle of primacy of EU Law, and this is so because no international agreement between EU Member States can be contrary to Articles 267 and 344 TFEU and Article 26(3) ECT, interpreted as an intra-EU arbitration submission clause.[25]

26.  An interpretation under Articles 30 and 39 of the VCLT should reach the conclusion that the objective and purpose of the ECT and the objective and purpose of the EU Treaties makes it clear that EU Law should prevail over the ECT.[26]

27.  Primacy of EU law also prevails as *lex posterior* since, as stated in the First Declaration on *Achmea*, the principle of primacy of EU Law was codified in Declaration 17 annexed to the Treaty of Lisbon, signed in 2007, and therefore subsequent to the ECT. It should be remembered that Article 16 of the ECT is not a conflict resolution rule but rather an interpretative precept.

---

[21] Request for Reconsideration, ¶ 74.
[22] Request for Reconsideration, ¶¶ 76-77.
[23] Request for Reconsideration, ¶¶ 79-80.
[24] Request for Reconsideration, ¶¶ 83-85.
[25] Request for Reconsideration, ¶ 89.
[26] Request for Reconsideration, ¶ 86.

28.   According to Respondent, the same solution is reached by starting from the basis that the Lisbon Treaty assigned exclusive foreign investment competences to the EU. The essential part of the foreign investment regime is the investment protection regime. Therefore, by ratifying the Lisbon Treaty, the Member States accepted that the foreign investment protection regime could not be the one that may have been signed bilaterally between the Member States, either as a BIT or through multilateral treaties. Instead, the regime became the one used by the EU itself. The Lisbon Treaty would be here not only *lex poster*ior but also *lex specialis*.[27]

29.   Respondent contends that if it is not considered that the disconnection of the EU and its member States from Article 26 ECT took place upon ratification of the ECT, this disconnection occurred subsequently "… *as a necessary effect of the ratification of the Lisbon Treaty by the member states*". The Lisbon Treaty granted exclusive competences to the EU in the field of foreign direct investment,[28] and Respondent asserts that the essential part of the foreign direct investment regulation is always the protection of these investments. Thus, when the Treaty of Lisbon was ratified, this protection, including mechanisms for resolving disputes relating to intra-EU investments, was allocated to the exclusive competences of the EU. Further, in any case, after the rendering of the *Komstroy* Judgment that is binding for all the Member States, there is no room to say that Article 26 of the ECT can be applied for intra-EU affairs.[29]

30.   In addition, Respondent argues that just as Article 103 of the Charter of the United Nations, which states that "*In the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail*",[30] the Lisbon Treaty declares the primacy, not only of the Treaty on the Functioning of the European Union ("**TFEU**"), but also of all EU legislation over the national or international laws of the Member States. In the same way that the Charter of the United Nations declared that its primacy shall be respected due to its specific nature, the primacy of EU Law must be respected due to its constitutional nature.[31]

31.   Through the ratification of the Lisbon Treaty, adds Respondent, the Member States have accepted the commitment (*pacta sunt servanda*) to respect the exclusive competence of the EU over foreign investment and the principles of autonomy and primacy of EU Law. They have also accepted the jurisdictional system of the EU and the full acceptance and application of the CJEU decisions, including decisions such as the *Komstroy* Judgment.[32]

32.   Respondent concludes that the aforesaid arguments are applicable, *mutatis mutandi*, to the Decision regarding the applicable law, and concludes that it is "… not understandable how the Decision has stated that "*EU Law cannot form part of the international law applicable*

---

[27] Request for Reconsideration, ¶ 91.
[28] Articles 206 and 207 of the Treaty on the Functioning of the European Union.
[29] Request for Reconsideration, ¶ 93.
[30] **RL-0184** Charter of the United Nations of 26 June 1945.
[31] Request for Reconsideration, ¶¶ 95-96.
[32] Request for Reconsideration, ¶ 102.

*between EU Member States and non-EU countries*"[33] when, as we have explained and demonstrated above the practice is the full application of EU Law in intra-EU affairs regardless the existence of any international convention that includes third parties and that has no disconnection clause".[34]

33. Respondent further asserts that even if the Decision is not considered *per se* wrong, the requirements of Article 51 of the ICSID Convention are fulfilled,[35] and therefore the Decision must be reconsidered, and the intra-EU objection must be upheld.

### The *Komstroy* Judgment

34. Respondent examines the *Komstroy* Judgment, which originates from an annulment procedure before the Court of Appeal of Paris of an award issued against the Republic of Moldova by a tribunal who asserted jurisdiction in an ECT case. Moldova contested the award because it deemed that there was properly no "*investment*" protected under the ECT, but rather involved a strictly commercial relationship not covered by the ECT. The Court of Appeal of Paris sought a prejudicial question to the CJEU asking for the proper interpretation of the ECT.

35. Respondent claims that the CJEU addressed for the first time the question of the compatibility with EU Law of the possible submission to arbitration of intra-EU investment disputes under the ECT. Whereas the CJEU had previously decided in the *Achmea* case on the compatibility of investment arbitration under a bilateral investment treaty with the EU legal framework, declaring that such an investment arbitration was not possible, the CJEU decided, for the first time, that investment arbitration under the ECT is not possible either.[36]

36. According to Respondent, the *Komstroy* Judgment should be read as follows:

a) The CJEU begins with a fundamental finding; it recalls that, as the ratification of the ECT is an act adopted by one of its institutions, the provisions of the ECT are part of the EU's legal framework. The *Komstroy* Judgment adds that, within that legal framework, the CJEU is competent to decide prejudicially on its interpretation. Moreover, it clarifies that this conclusion is not altered by the fact that the ECT is a mixed agreement. Respondent adds that the *Komstroy* Judgment underlines that with the Lisbon Treaty, "… *the EU has acquired exclusive competences in the field of foreign direct investment being the Investors State Dispute Settlement ("ISDS") mechanisms part of that exclusive competence on foreign direct investment*".[37]

---

[33] Decision, ¶ 493.
[34] Request for Reconsideration, ¶ 104.
[35] The requirements under Article 51 of the ICSID Convention to seek a revision of an award: (i) a discovery of some fact of such a nature as decisively to affect the award; (ii) that the fact was unknown by the Tribunal and by the party requesting the review; and (iii) and that the ignorance by the party that urges the review is not due to its own negligence.
[36] Request for Reconsideration, ¶¶ 113-114.
[37] Request for Reconsideration, ¶ 116, referring to *Komstroy* Judgment, ¶¶ 23-27.

b) The *Komstroy* Judgment then addresses the issue where two parties from outside the EU (a Ukrainian company and the Republic of Moldova) are involved, and rules out that this excludes the jurisdiction of the CJUE, based on the following reasons: (i) there is interest in a uniform interpretation of the ECT as it can be applied to situations governed by EU law; and (ii) in that case the seat of the arbitration is Paris, so French law is applicable as *lex fori*, and EU law is part of the law in force in France and in all Member States.[38]

c) The *Komstroy* Judgment makes a categorical statement dealing with the seat of the arbitration: "*the establishment of the seat of arbitration on the territory of a Member State, in this case France, entails, for the purposes of the proceedings brought in that Member State, the application of EU law, compliance with which the court hearing the case is obliged to ensure in accordance with Article 19 TEU.*"[39]

d) The CJEU states that the autonomy of the EU legal framework is reflected in particular in the EU own jurisdictional system with exclusive competence for the interpretation of EU Law, and based on a dialogue mechanism between national courts and the CJEU, which has the last word in the interpretation of the EU legal framework;[40]

e) Then the CJEU analyzes the possibility that an arbitral tribunal under Article 26 of the ECT is called to resolve intra-EU investment disputes. That arbitration tribunal would have to interpret and even apply EU Law without being part of the EU jurisdictional system;[41]

f) The *Komstroy* Judgment understands that the intra-EU investment arbitration would allow the subtraction of disputes related to the application of EU Law to bodies outside its jurisdictional system, contrary to the principle of autonomy. In other words, the intra-EU investment arbitration is not allowed, and it is not compatible with the EU Treaties and with the autonomy principle;[42]

g) The *Komstroy* Judgment adds, for the first time, that this is applicable also in a multilateral agreement, which ultimately generates bilateral obligations between two of the Contracting Parties, so there is no substantial difference with the bilateral investment treaty analyzed in *Achmea* and the ECT (paragraphs 64 and 65). In other words, all the holdings made by the CJEU regarding *Achmea* are reproduced in the *Komstroy* Judgment. Further, all the allegations made by Respondent regarding *Achmea* are applicable to the case at hand;[43] and

h) The CJEU concludes with this straightforward statement that necessarily must lead the Tribunal to review the Decision: "*it must be concluded that Article 26, paragraph 2, letter c), of the [ECT] must be interpreted in the sense that it is not applicable to the disputes between a Member State and an investor from another*

---

[38] Request for Reconsideration, ¶ 117, referring to *Komstroy* Judgment, ¶¶ 29-34.
[39] Request for Reconsideration, ¶ 118, referring to *Komstroy* Judgment, ¶ 34.
[40] Request for Reconsideration, ¶ 122, referring to *Komstroy* Judgment, ¶¶ 42-46.
[41] Request for Reconsideration, ¶ 123, referring to *Komstroy* Judgment, ¶¶ 48-59.
[42] Request for Reconsideration, ¶ 124, referring to *Komstroy* Judgment, ¶¶ 60-63.
[43] Request for Reconsideration, ¶ 125, referring to *Komstroy* Judgment, ¶¶ 64-65.

*Member State in relation to an investment made by the latter in the first Member State*"[44]

37. Respondent highlights the following issues of the *Komstroy* Judgment, which are examined below:[45]

    1)  the application of EU Law is mandatory, foreign direct investment (including the ECT) is part of the EU competences, and EU Law and national courts in the EU have to ensure such application;

    2)  the autonomy of the EU legal framework must be respected;

    3)  intra-EU investment arbitration is not allowed and the ECT cannot be interpreted as allowing it; and

    4)  the concept of "*economic activity in the energy sector*" must be carefully assessed on case by case basis.

38. <u>Mandatory application of the EU Law in intra-EU cases</u>. Respondent states that the *Komstroy* Judgment underlines that as far as there is an EU act authorizing the ratification of an international agreement, this forms part of the EU legal framework, and since the ECT was ratified by the EU, there is an EU act, and therefore the ECT forms part of the EU legal framework and must be interpreted, for intra-EU affairs, in conformity with the totality of the EU legal framework.[46]

39. Respondent further argues that the CJEU underlines that foreign direct investment is an exclusive competence of the EU since the entry into force of the Lisbon Treaty and, consequently, Articles 10 and 26 of the ECT fall under the exclusive competence of the EU.

40. Under this line of argument, since the ECT is part of the EU legal framework and must be interpreted, in intra-EU affairs, in accordance with that EU legal framework, according to Respondent, this must be applied not only for jurisdictional purposes, but also regarding the EU State Aid laws that are territorial and must be applied to any controversy where the host country is an EU Member State.[47]

41. <u>The autonomy of the EU legal framework must be respected</u>. Respondent asserts what it believes to be an essential point: that the *Komstroy* Judgment reiterates that an international agreement cannot affect the allocation of powers laid down by the Treaties and, hence, the autonomy of the EU legal system.[48] The autonomy is consubstantial to the integration process of the EU.[49]

42. Respondent contends that, even under the general principles of law of civilized nations – which is a source of international law under Article 38 of the ICJ Statute– the autonomy of

---

[44] Request for Reconsideration, ¶ 126, referring to *Komstroy* Judgment, ¶ 66.
[45] Request for Reconsideration, ¶ 128.
[46] Request for Reconsideration, ¶¶ 130-131.
[47] Request for Reconsideration, ¶¶ 132-133.
[48] Paragraph 43 of the Komstroy Judgment states: "*autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the European Union and its law, relating in particular to the constitutional structure of the European Union and the very nature of that law.*"
[49] Request for Reconsideration, ¶¶ 134-135.

the EU legal framework must be respected. The principle of *pacta sunt servanda* implies that all the Member States (which includes The Netherlands, Luxembourg and Spain) who have ratified the Lisbon Treaty, have accepted its principles, including the autonomy and primacy of the EU law and the compulsory effect of the CJEU rulings.[50]

43. <u>Intra-EU investment arbitration is not allowed, and the ECT cannot be interpreted as allowing it</u>. Respondent asserts that the *Komstroy* Judgment is clear on this point: the ECT cannot be interpreted as allowing intra-EU investment arbitration. The CJEU states: "*the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed. Such a possibility would, as the Court held in the case giving rise to the judgment of 6 March 2018, Achmea (C 284/16, EU:C:2018:158, paragraph 58) and as the Advocate General observed in essence in point 83 of his Opinion, call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU*"[51]

44. Respondent concludes with a syllogism: (a) the ECT, foreign direct investment and state aid are EU Law; (b) EU Law must be exclusively interpreted by national courts and the CJEU; (c) therefore, no intra-EU investment arbitrations under the ECT are possible.[52]

45. <u>Effects of the *Komstroy* Judgment in this arbitration</u>. According to Respondent, the value of the *Komstroy* Judgment is the value of a preliminary ruling. Preliminary rulings have in EU Law the value of *res judicata*: the judgment is final and is no longer subject to an appeal. Furthermore, it applies to any existing intra-EU arbitration under the ECT. It is "*… binding for the Netherlands, Luxembourg and Spain and Dutch and Luxembourg investors cannot have any rights different than the rights and legal framework that is applicable to their own countries*".[53]

46. In conclusion, Respondent requests the Tribunal "*to reconsider its September 13, 2021 Decision and declare its lack of jurisdiction for this intra-EU investment arbitration and, subsidiarily, that the Tribunal reconsider its Decision on liability dismissing the Claimants' claim by the application to the merits of the EU Law.*"[54]

---

[50] Request for Reconsideration, ¶ 138.
[51] Request for Reconsideration, ¶ 140, citing *Komstroy* Judgment, ¶¶ 62-63.
[52] Request for Reconsideration, ¶ 142.
[53] Request for Reconsideration, ¶¶ 143-147.
[54] Request for Reconsideration, ¶ 149.

## B. CLAIMANTS' POSITION

47. In essence, Claimants believe the Request for Reconsideration submitted by Respondent is "*devoid of any merit*", and Respondent has failed to demonstrate how the *Komstroy* Judgment warrants reconsideration of the Decision,[55] and request the Tribunal:

    (a) To dismiss Respondent's request for reconsideration in full;

    (b) To confirm that its Decision stands in its entirety, and that the *Komstroy* Judgment, even if it had been issued prior to the Decision, would have no influence on the outcome of the Decision; and

    (c) To order Respondent to pay all costs incurred by the Claimants in responding to Spain's Petition for Reconsideration.[56]

48. Claimant's position is addressed in four topics:

    (a) There is no newly discovered fact of a nature as to decisively affect the Decision, and no inherent power for a tribunal to revisit a pre-award decision under Article 51 of the ICSID Convention, absent exceptional circumstances;

    (b) The *Komstroy* Judgment is irrelevant to the Decision;

    (c) The *Komstroy* Judgment has no bearing on the Tribunal's jurisdiction; and

    (d) The *Komstroy* Judgment is not relevant to the Tribunal's findings on liability

**There is no basis for the Tribunal to revisit the Decision**

49. Claimants contend that, to the extent that international tribunals have acknowledged that they have an inherent power to reconsider their decisions, including in the precedents cited by Respondent, that power has been exercised only in exceptional circumstances upon the discovery of a decisive new (or previously unknown) fact which would have led the tribunal to a different conclusion. Claimants challenge the claim of Respondent that the *Komstroy* Judgment warrants reconsideration of the Decision under Article 51 of the ICSID Convention, because the ECJ Decision "*could have decisively influence*[d] *the Tribunal's Decision*" since the provision has no applicability to a pre-award decision. In any case, it points to the precedents cited by Respondent which recognize that the reconsideration of a decision is an "*exceptional remedy*", one that is available only in carefully defined and limited circumstances.[57]

50. Claimants contend that there is no provision contained in the ICSID Convention or ICSID Arbitration Rules expressly conferring upon a tribunal the power to revisit a pre-award decision, and argue that tribunals have taken one of two approaches when confronted with such a request. They have either (i) treated pre- award decisions as having *res judicata* force, and therefore declined to revisit such decisions during the proceedings, or (ii) alternatively, have determined that, irrespective of whether the principle of *res judicata* applies, absent

---

[55] Claimants' Response, ¶ 4.
[56] Claimants' Response, ¶ 104.
[57] Claimants' Response, ¶¶ 10-12.

very exceptional circumstances, such decisions remain final and binding upon the parties and should not be revisited.[58]

51.     Claimants indicate that tribunals have provided "*clear and consistent guidance*" on what constitutes "*exceptional circumstances*", justifying the reconsideration of a pre-award decision only when there has been the discovery of crucial facts which would have decisively led the tribunal to a different conclusion, and assert that this approach is evident in the decisions of both the tribunal and the subsequent annulment committee in *Standard Chartered*, upon which Spain heavily relies in its Request for Reconsideration, adding that even though said tribunal was willing to reconsider jurisdictional decisions simply because they lacked *res judicata* force, the tribunal was only willing to do so in "*certain limited circumstances*", and cautioned against any "*unconstrained*" use of the power[59]. In the *Standard Chartered* case, even the annulment committee noted that the grounds to reopen the tribunal's decision were met "*under the exceptional circumstance where the* [t]*ribunal was* <u>*deliberately misled as to facts, the knowledge of which the*</u> [t]<u>*ribunal*</u> <u>*would have reached a different decision*</u>"; as such, revisiting the decision was necessary to safeguard the efficiency and integrity of the proceedings.[60]

52.     Claimants also make reference to *Burlington v. Ecuador*, for example, where the tribunal considered pre-award decisions as *res judicata*, but was open to the idea that they could be revisited on the very limited ground articulated in Article 51 of the ICSID Convention, which it considered by analogy, adding that the tribunal found it inappropriate, however, to consider revisiting a decision based on a point of law or any of the grounds contained in Article 52 of the ICSID Convention. Claimants indicate that the *Burlington* tribunal rejected the request for reconsideration, concluding that the new document contained nothing that had not already been addressed by the parties and their experts in the proceedings, and was not "*susceptible of decisively influencing the outcome of the* [d]*ecision on Liability.*"[61]

53.     Further, Claimants contend that it is clear that international tribunals will only revisit a decision upon a showing of some material, outcome-determinative fact which would have led the tribunal to a different conclusion. Since the threshold is high, and Respondent has pointed to just a single case (*Standard Chartered*) where this threshold has been met (although it was acknowledged that the tribunal had been "*deliberately misled as to facts, the knowledge of which the* [t]*ribunal would have reached a different decision*"), Claimants

---

[58] Claimants' Response, ¶ 13, citing **CL-215**, *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on the Respondent's Request for Reconsideration, 10 March 2014, ¶ 21 ("*It is established as a matter of principle and practice that such decisions that resolve points in dispute between the Parties have* res judicata *effect.*"), and **CL-214**, *Burlington Resources, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Reconsideration and Award, 7 February 2017, ("**Burlington v. Ecuador**"), ¶¶ 91, 108; **CL-213**, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited*, ICSID Case No. ARB/10/20, Award, 12 September 2016, ("**Standard Chartered Bank v. TANESCO, Award**") ¶¶ 347-348; **RL-0152(2)**, *Standard Chartered Bank v. TANESCO*, Decision on Annulment, ¶ 173.
[59] Claimants' Response, ¶¶ 14-15, **CL-213**, citing *Standard Chartered Bank v. TANESCO, Award*, ¶ 320.
[60] Claimants' Response, ¶ 17, citing **RL-0152(2)**, *Standard Chartered Bank v. TANESCO*, Decision on Annulment, ¶ 173 (emphasis added).
[61] Claimants' Response, ¶¶ 20-21, citing **CL-214**, *Burlington v. Ecuador*, ¶ 122.

state that, absent a finding of exceptional circumstances such as those present in the *Standard Chartered* case, reconsideration of a decision is not warranted.[62]

**The *Komstroy* Judgment is irrelevant to the Decision.**

54. Claimants provides background to the *Komstroy* Judgment, recalling that the basic issues under the referral by the Paris Court of Appeals to the CJEU dealt with whether a contract for the sale of electricity can be deemed an 'Investment' within the meaning of Articles 1(6) and 26(1) ECT, and an investment made in the area of another Contracting Party for purposes of the ECT.[63]

55. Claimant further recalls that the questions referred to the CJEU did not include whether Article 26 ECT must be interpreted as excluding intra-EU disputes, although that question was raised separately by certain EU Member States (including Spain) that participated in the proceedings as third parties. Despite this issue not being a question of referral by the Paris Court of Appeals, the CJEU nonetheless addressed its interpretation. On the basis on what Claimants deemed as a "flawed" reasoning in *Achmea*, the CJEU examined whether, from the perspective of EU law, the investor-State arbitration mechanism provided at Article 26(2)(c) should be considered to cover intra-EU disputes. To this end, the CJEU (i) started by recalling that the autonomy of the EU legal system is ensured by the ECJ itself, such that pursuant to Article 344 TFEU, the Member States cannot submit a dispute concerning the interpretation or application of the EU treaties to any method of settlement other than those provided in those treaties, and it then (ii) stressed the particular nature of EU law (notably its primacy over the laws of the Member States and its direct effect), and (iii) the fact that this autonomy is assured through the preliminary ruling procedure under Article 267 TFEU.[64]

56. Claimants describe[65] that the CJEU: (i) held that pursuant to Article 26(6) ECT, arbitral tribunals must resolve disputes in accordance with the ECT and with applicable rules and principles of international law; (ii) considered that an ECT arbitral tribunal cannot be regarded as a court or tribunal of a Member State under Article 267 TFEU, meaning that it cannot make reference to the ECJ for a preliminary ruling; (iii) acknowledged that an international agreement providing for the establishment of a court responsible for the interpretation of its provisions is not, in principle, incompatible with EU law (even where this results in decisions binding on the EU institutions), finding, however, that "*the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed*";[66] and (iv) considered that the multilateral nature of the ECT did not affect its analysis, on the basis that "*Article 26 ECT is intended, in reality, to govern bilateral relations*

---

[62] Claimants' Response, ¶ 22 (footnotes omitted).
[63] Claimants' Response, ¶¶ 30-32.
[64] Claimants' Response, ¶¶ 33-36.
[65] Claimants' Response, ¶¶ 36-41.
[66] Claimants' Response, ¶ 40, citing **RL-0151**, *Komstroy* Judgment, ¶ 62.

*between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the [Achmea] judgment".*[67]

57.    Claimants contend that the CJEU's reliance on what it claims is the "reality" of the ECT "…*makes no sense and is inconsistent with the object and purpose of the ECT itself* …", which imposes obligations on all Contracting Parties with equal force. In any event, the ECJ found that while the ECT "*may require*" Member States to comply with the dispute-settlement mechanism with respect to disputes brought by investors from non-EU States, "*preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves*" and found that Article 26(2)(c) ECT must be interpreted as not applying intra-EU as it would be incompatible with EU law".[68]

58.    However, according to Claimants, the CJEU's reasoning, "…*only adopts the vantage point of EU law and does not make any reference to public international law or the principles of treaty interpretation under the VCLT,* [and therefore] *contains numerous flaws*". First, in order to limit the reach of its ruling to apply solely to intra-EU investment treaty arbitration (to which the EU is opposed as a matter of policy) and not impact commercial arbitration (which the EU apparently does not oppose), the ECJ maintains its dubious distinction between commercial and investment arbitration, on the basis that only the former "*originate*[s] *in the freely expressed wishes of the parties concerned",* which Claimants deem incorrect as both types of arbitration proceedings are based on the parties' consent.[69] Second, according to Claimants, the CJEU claims to offer a so-called "*interpretation*" of Article 26 ECT but it made no effort to conduct an interpretive exercise under the VCLT as would be required under public international law. Instead, the ECJ relies exclusively on an alleged need to "*preserv*[e] *the autonomy and* […] *the particular nature of EU law*" in order to justify what it refers to as an "*interpretation*" of Article 26(6) ECT. This is no doubt because, had it done so, it would have reached the conclusion that Article 26 must be interpreted as applying intra-EU.[70] In the view of Claimants, the CJEU completely disregarded the multilateral nature of the ECT, which "… *runs afoul of another basic principle of treaty interpretation: that it is the common intention of all parties to a treaty, and not only some of them (such as the EU Member States), that must be established pursuant to Article 31 VCLT*".[71]

59.    Claimants also question the CJEU's analysis of Article 26(6) ECT and, its position that the reference to "*this Treaty*" (i.e., the ECT) in Article 26(6) must be viewed as a reference to EU law, on the sole basis that the EU is a signatory to the ECT, which Claimants affirm "*makes no sense*". If, on the CJEU's interpretation, an ECT tribunal must apply EU law simply because the EU has signed the ECT, it follows that *any* ECT tribunal, not just those in intra-EU disputes, would be "*required to interpret, and even apply, EU law*". Claimants conclude that there is no sound basis for the distinction between intra-EU and extra-EU

---

[67] Claimants' Response, ¶ 41, citing **RL-0151**, *Komstroy* Judgment, ¶ 64.
[68] Claimants' Response, ¶ 41, referring to **RL-0151**, *Komstroy* Judgment, ¶ 65.
[69] Claimants' Response, ¶¶ 42-43, citing **RL-0151**, *Komstroy* Judgment, ¶ 59.
[70] Claimants' Response, ¶¶ 44-45, citing **RL-0151**, *Komstroy* Judgment, ¶ 65.
[71] Claimants' Response, ¶ 47 (footnote omitted).

disputes, other than the CJEU's "*willingness to favour the application of principles of EU law over the ordinary meaning of Article 26 ECT*".[72]

60.  Claimants also contend, more fundamentally, that the ECJ's position ignores the ECT tribunals (including this Tribunal) that have repeatedly held that they are only applying the ECT and rules of public international law, not EU law.[73]

**The *Komstroy* Judgment has no bearing on the Tribunal's jurisdiction.**

61.  Claimants assert that Respondent overlooks two threshold reasons why the *Komstroy* Judgment does not and cannot deprive the Tribunal of its jurisdiction. *First*, this judgment was issued by the ECJ within the EU internal order and based solely on EU law and, as such, it is not binding on the Tribunal. *Second*, Respondent's consent to arbitration in the present case was perfected years ago and cannot be invalidated retroactively by the *Komstroy* Judgment.[74]

62.  According to Claimants, an arbitral tribunal established under the ECT, on the one hand, and the CJEU, on the other hand, sits within two different legal orders: the former under the ECT; the latter under the EU treaties. The ECJ's views on the ECT are limited solely to the perspective of EU law and, as such, do not control the Tribunal's interpretation of the ECT pursuant to public international law (namely, the VCLT). Citing a passage of the Decision, Claimants argue that the Decision issued by this Tribunal made this clear,[75] and confirm this same approach has been taken by other tribunals.[76]

63.  Besides, Claimants contend that the jurisdiction of this Tribunal to hear the dispute was perfected in June 2016 when the Claimants presented their Request for Arbitration, and the Centre registered it. At that point, Respondent's "*unconditional consent*" to arbitration under Article 26(3) ECT became irrevocable pursuant to Article 25(1) ICSID Convention.[77]

64.  Claimants challenge the argument made by Respondent to the effect that since the CJEU has found in the *Komstroy* Judgment that the ECT is an act of EU law, and it follows that the ECT must be interpreted in accordance with EU law, and has the further effect that EU law is applicable to the Tribunal's jurisdiction. Conversely, Claimants support the Decision, where this Tribunal determined that, although Article 26(6) ECT (i.e., the choice-of-law clause that the ECJ has – wrongly – interpreted as bringing EU law into play) may apply to the merits of the dispute, it is not relevant to the Tribunal's jurisdiction.[78] Claimants gather

---

[72] Claimants' Response, ¶¶ 48-49.
[73] Claimants' Response, ¶ 50.
[74] Claimants' Response, ¶¶ 53-55.
[75] Claimants' Response, ¶58, citing the Decision, ¶ 493: "[u]*nder EU treaties, EU law forms part of the internal law of Member States ... the role of the Tribunal is to apply the provisions of the ECT, and principles of public international law as may be applicable*".
[76] Claimants' Response, ¶¶ 59, referring to **CL-222**, *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection, 7 May 2019, ¶ 184; and **CL-223**, *Landesbank Baden-Württemberg et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019, ("***Landesbank v. Spain***"), ¶ 102.
[77] Claimants' Response, ¶ 62.
[78] Claimants' Response, ¶¶ 66-67, referring to the Decision, ¶ 289.

support from *Vattenfall*, *Foresight* and *Antin* (cited by the Tribunal in the Decision[79]); *RREEF*, *Noveneria*, *Foresight* and *Charanne* (also cited by the Tribunal in the Decision[80]) as well as in *Hydro v. Spain*[81] and in *FREIF v. Spain,* which dismissed Respondent's intra-EU objection*: "considering the issues in dispute in this Arbitration, EU law is not applicable and cannot be relied upon to deprive the* [t]*ribunal of the jurisdiction it derives from the ECT"*.[82]

65.    Claimants allege that Respondent attempts to overturn the Tribunal's jurisdictional findings by "… *making various new arguments for the very first time on the law of treaties and customary international law*", and that such arguments have nothing to do with the *Komstroy* Judgment, aside from the fact that they have no merit.[83]

66.    Respondent's argument, Claimants allege, may contend that the *Komstroy* Judgment "*clearly stated the principles of autonomy and primacy of the EU Legal framework over the ECT*", and that this so-called principle of primacy of EU law over the ECT is "*an applicable international custom*" which permits "*disassociation from international conventions, even if they do not have a disconnection clause*" and, further, that this "*disassociation*" from an international treaty "*may be made unilaterally by the EU and requires no new convention or treaty.*" Thus, according to Claimants, Respondent concludes that, as a matter of what it refers to as "international custom", the "*EU and Member States are disconnected from the ECT for the purpose of intra-EU investment arbitrations*".[84]

67.    Claimants affirm that this assertion is inconsistent with the most basic notions of international law including, in particular, the principle of *pacta sunt servanda* enshrined in Article 26 VCLT: "*Every treaty in force is binding upon the parties to it and must be performed by them in good faith*",[85] which Claimants recall was the reasoning of this Tribunal in the Decision.[86]

68.    Claimants contend that the EU or its Member States could have included a disconnection clause in the ECT; they did not.[87]

69.    Claimants note that the issue before this Tribunal in determining whether to apply EU law to the question of jurisdiction (or the merits), is a question of interpretation of Article 26 ECT. Further, they note that such question of interpretation is governed by the VCLT, adding that,

---

[79] Claimants' Response, ¶ 68, making reference to the Decision, ¶ 289.

[80] Claimants' Response, ¶ 71, making reference to the Decision, ¶ 303.

[81] Claimants' Response, ¶ 70, relying on **RL-0150**, *Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020, (**Hydro Energy v. Spain**), ¶ 500.

[82] Claimants' Response, ¶ 71, citing **RL-0152(1)**, *FREIF Eurowind Holdings Ltd v. Kingdom of Spain*, SCC Case No. 2017/060, Final Award, 8 March 2021, ¶ 327.

[83] Claimants' Response, ¶ 73.

[84] Claimants' Response, ¶ 74, referring to the Request for Reconsideration, ¶¶ 41, 81 and 82.

[85] Claimants' Response, ¶ 76 (footnotes omitted).

[86] Claimants' Response, ¶ 77, referring to the Decision, ¶ 296: *"[This] principle [of pacta sunt servanda] applies clearly in respect of Article 26(1) of the ECT where, despite other treaties already in force, the EU Member States, and even the EU, when they signed and ratified, failed to exclude from the 'irrevocable consent' to arbitration any dispute involving its Member States"*.

[87] Claimants' Response, ¶ 78.

although Respondent accepts that the ECT must be interpreted in accordance with the principles of treaty interpretation under the VCLT, in its Request for Reconsideration, however, Respondent makes a series of confused assertions about "*customary international law*" and "*uniform and constant practice*", with no reference to the VCLT at all. [88]

70.   In connection with the international practices which Respondent cites in support of "*respect for the autonomy and primacy of EU Law for intra-EU affairs allowing the disconnection of international conventions, even if they have no disconnection clause*,"[89] Claimants contend that if it were correct that there was an established state practice under those treaties that EU law takes precedence (which Claimants do not accept), the VCLT makes clear that any State practice relevant to one treaty (such as the Hague Convention on International Child Abduction to which Respondent makes reference) has no relevance to the interpretation of an entirely different treaty (such as the ECT). This is clear from the terms of the VCLT, which provides as follows at Article 31(3): "*3. There shall be taken into account, together with the context: […] (b) <u>any subsequent practice in the application of the treaty which establishes the</u> <u>agreement of the parties regarding its interpretation</u>*".[90]

71.   Relevant to Claimants is that Respondent offers no evidence of consistent practice in the application of the ECT to show that EU law is relevant to the question of jurisdiction and asserts that "*every single ECT tribunal that has ever considered the intra-EU jurisdictional objection has rejected it*".[91]

72.   Claimants further address Respondent's claims based on Articles 30 and 59 VCLT. In respect to the latter, they simply discard it because Article 59 deals with the termination of a treaty where "<u>*all*</u> *the parties to it conclude a later treaty relating to the same-subject matter*", it is evident this does not apply to the ECT, since the ECT Contracting Parties are not all EU Member States.[92]

73.   In connection with Respondent's position on Article 30 VCLT, Claimants argue that it has "*several fundamental flaws*". <u>*First,*</u> the principle of primacy of EU law over the ECT cannot be deemed to be as *lex posterior* because it was "*codified*" in the Lisbon Treaty since this is merely an amendment to the earlier Treaty on the European Union of 1992.[93] <u>*Second*</u>, it is flawed because Respondent "*… has not even purported to establish that the ECT and the Lisbon Treaty relate to the same subject matter, which is a necessary prerequisite for Article 30 to apply*".[94] <u>*Third*</u>, it is flawed because the principle of primacy to resolve any conflict between the ECT and EU law relates to the primacy of EU law <u>over national laws</u>, not international law or treaties to which the EU is a party, which is acknowledged by the CJEU itself in the *Komstroy* Judgment, which stated that "*EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the*

---

[88] Claimants' Response, ¶ 80, where Claimants indicate the Tribunal "*correctly explained*" this matter in the Decision, ¶¶ 212-215 and 294.
[89] Claimants' Response, ¶ 82, referring to the Request for Reconsideration, ¶ 67.
[90] Claimants' Response, ¶¶ 81-83.
[91] Claimants' Response, ¶ 85.
[92] Claimants' Response, ¶ 89.
[93] Claimants' Response, ¶ 90(a).
[94] Claimants' Response, ¶ 90(b).

*Member States.*"[95]<u>*Fourth,*</u> *Respondent's position is flawed* because, while it is uncontroversial that EU law prevails over the laws of the Member States, that principle is entirely irrelevant under public international law, as identified in the *Hydro*[96] and *Landesbank Baden-Württemberg*[97] cases.[98]

74. Claimant further contends that, pursuant to Article 16 ECT, EU Member States cannot construe the EU treaties so as to derogate from them the Claimants' right to dispute resolution under Article 26 ECT, adding that "[*i*]*n contrast to Spain's unsupported assertion*" that "*Article 16 of the ECT is not a conflict resolution rule but rather an interpretive precept*", numerous tribunals have found that Article 16 is, indeed, the relevant conflict rule, and confirmed that the EU treaties – whenever they were adopted– cannot derogate from Article 26 ECT. The Tribunal has a duty to apply the ECT in accordance with public international law.[99]

75. Finally, regarding Respondent's allegation concerning the principle of *pacta sunt servanda*, according to Claimants, the Decision already disposed of this issue when dismissing Respondent's argument that EU law prevails over the ECT by virtue of the principle of primacy.[100]

#### The *Komstroy* Judgment is not relevant to the Tribunal's findings on liability

76. Claimants finally contend that Respondent's assertion that the Tribunal's finding on the law applicable to the merits is also "*manifestly wrong*", on the basis that "*it is really not understandable how the Tribunal's Decision has stated that 'EU law cannot form part of the international law applicable between EU Member States and non-EU countries,*"[101] this is in no way related to the *Komstroy* Judgment  as it does not address the law applicable to the merits of ECT claims, and fails to offer any legitimate basis for this Tribunal to reconsider its Decision "*… as it does not suggest that it has discovered some new fact that would decisively influence the Decision*". Thus, Claimants request that this argument also be rejected "without further analysis".[102]

---

[95] Claimants' Response, ¶ 90(c), referring to *Komstroy* Judgment, ¶ 43.
[96] **RL-0150**, *Hydro Energy v. Spain*, ¶ 502(17).
[97] **CL-223**, *Landesbank v. Spain*, ¶ 190.
[98] Claimants' Response, ¶ 90.
[99] Claimants' Response, ¶ 92.
[100] Claimants' Response, ¶ 95, referring to the Decision, ¶ 296.
[101] Claimants' Response, ¶ 97, referring to Request for Reconsideration, ¶ 104, citing the Decision, ¶ 493.
[102] Claimants' Response, ¶¶ 97-103.

# III. THE TRIBUNAL'S ANALYSIS

## A. ADMISSIBILITY OF RESPONDENT'S REQUEST

77.   Before the Tribunal examines the merits of Respondent's Request, the Tribunal needs to address whether such a request for reconsideration of a decision issued by an ICSID tribunal –such as this one– is available to Respondent.

78.   Respondent has claimed that the Tribunal has authority to do so based on the principles of Article 51(1) of the ICSID Convention, which reads:

> "*Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence.*"

79.   The first issue that arises is that neither the ICSID Convention nor the ICSID Arbitration Rules define the meaning of an "award", to answer a basic question of whether a decision adopted by the Tribunal before the final award falls within the scope of the provision. It is possible to identify the meaning of "award" by reading Rule 47 (The Award) of the ICSID Arbitration Rules, which provides that an award shall be in writing and shall contain, *inter alia*, "*the decision of the Tribunal on every question submitted to it, together with the reasons upon which the decision is based.*"[103] This Tribunal interprets this to mean that an award must address and decide on a final basis <u>every</u> issue in conflict brought to it by the parties in the relevant case.

80.   Based on such interpretation, the Tribunal easily discerns that the Decision is not an "*award*" insofar as it deals only with jurisdiction, liability and provides certain guidelines on *quantum*. It does not deal finally with each, and all of the issues brought to the Tribunal by the Parties. Regardless of the relevance of the matters decided, for purposes of this discussion, it is merely an interim decision rendered during the arbitration proceedings.

81.   Rule 16 (Decisions of the Tribunal) of the ICSID Arbitration Rules generically refers, on the other hand, to "*decisions*", to describe all decisions made throughout an arbitral proceeding, without establishing any difference between decisions of a procedural nature or those of substance. Thus, the Decision could be well placed within this term.

82.   Hence, the first threshold to address is whether "*decisions*" of the nature of the Decision can also be subject to reconsideration by the Tribunal. For the reasons stated below, the Tribunal believes that the Decision is of such substance as to qualify for reconsideration.

83.   Respondent has drawn support from several precedents, among which is *Standard Chartered Bank v. TANESCO* that examined whether the tribunal had authority to reconsider its

---

[103] Rule 47(1)(i) of the ICSID Rules of Procedure for Arbitration Proceedings ("**ICSID Arbitration Rules**").

decision on jurisdiction, and Respondent suggests an analogy with the principles of Article 51 of the ICSID Convention, arguing that a tribunal "*should be guided by, although not bound by, the limitations on reopening that apply to awards*".[104]

84.    In reaching its position, the *Standard Chartered Bank v. TANESCO* tribunal rejected the characterization of <u>decisions</u> issued by ICSID tribunals as *res judicata*, as opposed to <u>awards</u>, stating that "decisions" are binding within the scope of the proceedings but do not impose obligations upon the parties or on other Contracting States outside the proceedings. On the other hand, *Standard Chartered Bank v. Tanesco* tribunal deemed that "awards" are *res judicata*,[105] adding that whatever the power the tribunal has to reconsider a decision, that power must at least extend to the grounds for reopening an award in Article 51, and that "*such a power should not be seen as unlimited*".[106] The Tribunal agrees. ICSID tribunals have the authority to re-examine a decision when some fact of decisive importance is discovered on a point already decided by a tribunal. The essence of the recourse is to remedy a possible injustice without losing the definite nature of a decision, as in this case, on jurisdiction and liability. Given the exceptional nature of the remedy, the Tribunal considers that the strict conditions required by Article 51 of the ICSID Convention for the review of awards, should equally apply, by analogy, for pre-award decisions.[107]

85.    The Annulment Committee established to review the *Standard Chartered Bank v. Tanesco* award agreed with this position,[108] and confirmed the tribunal's decision on reconsideration, concluding: "*The Committee is of the view that the reconsideration of the Decision did not disregard the* res judicata *principle, nor undermine Article 53 of the Convention, since that provision expressly establishes that it applies to awards only, not to decisions*".[109] This Tribunal equally agrees.

86.    The second threshold deals with whether the *Komstroy* Judgment meets the elements for reconsideration. Indeed, as indicated above, the *Standard Chartered Bank v. TANESCO* tribunal noted that decisions rendered in an arbitration proceeding, unlike awards, do not have the force of *res judicata,* but even if they did (*quod non*), they should be subject to reconsideration under the strictly limited revision mechanism established by Article 51 of the ICSID Convention for the review of awards concur.[110]

87.    In this respect, the Tribunal notes that a request for revision of an award under Article 51 of the ICSID Convention is premised on the basis of "*the discovery of some fact of such nature as decisively to affect the award*", and "*provided that when the award was rendered that fact was unknown to the Tribunal and the applicant, and that the applicant's ignorance of that*

---

[104] **CL-213**, *Standard Chartered Bank v. TANESCO,* Award, ¶ 322.
[105] **CL-213**, *Standard Chartered Bank v. TANESCO,* Award, ¶ 318.
[106] **CL-213**, *Standard Chartered Bank v. TANESCO,* Award, ¶ 322.
[107] The Tribunal notes that the Parties do not dispute that Article 51 of the ICSID Convention may be a useful guidance by analogy to the present situation.
[108] **RL-0152**, *Standard Chartered Bank v TANESCO*, Decision on Annulment, ¶¶ 150-173
[109] **RL-0152**, *Standard Chartered Bank v TANESCO*, Decision on Annulment, ¶ 324.
[110] **CL-213**, *Standard Chartered Bank v. TANESCO,* Award, ¶¶ 318-321.

*fact was not due to negligence*". On that basis, can the issuance of the *Komstroy* Judgment qualify as a cause for reconsideration?

88.    In applying by analogy, the test for revision provided in Article 51, Respondent is required to demonstrate: (a) the discovery of a fact; that such fact was unknown to the Tribunal, and the applicant's lack of knowledge not being the result of negligence; and (b) that the new fact would have decisively affected the Decision.

89.    The first requirement implies the existence of a "fact" and that it was unknown to the Tribunal at the time of the decision.  The first question is whether the *Komstroy* Judgment itself can constitute a "new fact". The Tribunal considers that new facts are not strictly limited to the discovery of factual situations that do not comport with the record but may also involve issues of law. Legal developments on a point of law material to the applicable legal rules may qualify, in principle, as *new facts*, especially when these may be deemed relevant or material. There is no question that a new ruling by the CJEU is strictly speaking a new fact but this is not sufficient to justify the reopening and correction of a decision.  For a decision to be rectified it must be shown that the legal development is of such a nature that it would have led to a different legal conclusion had it been available to the Tribunal. This will be examined further below.

90.    The second question is whether the *Komstroy* Judgment was known to both the Tribunal and the applicant (i.e., Respondent) before the Decision. It is clear that the *Komstroy* Judgment did not exist at the time of the Decision, and therefore it amounts in effect to a newly discovered fact.[111]

91.    The third requirement is that the fact must be *"of such nature as decisively affect"* the Decision. This condition is essential for the consideration of the Request for Reconsideration. It means that if the fact had been available to the Tribunal the outcome would have been substantially different.

92.    Despite the fact that Claimants have argued that questions referred to the CJEU by the Paris Court of Appeals did not include in its petition the question whether Article 26 ECT must be interpreted as excluding intra-EU disputes, but rather dealt with the question whether a contract for the sale of electricity can be deemed as an 'Investment' within the meaning of Articles 1(6) and 26(1) ECT, and an investment made in the area of another Contracting Party for purposes of the ECT, this Tribunal believes that the relevance of the *Komstroy* Judgment resides in the fact that it is the first time the CJEU has examined the issue of submitting intra-EU disputes under the ECT to arbitral tribunals under Article 26 ECT. Perhaps the initial framework in which said case was referred to the CJEU was not directly related to the matter, but the CJEU noted that several Member States which participated in the proceedings subsequently requested the CJEU to "… *specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment*

---

[111] The Tribunal also notes that the Decision was ready the day before, and that on 3 September 2021 the ICSID Secretariat provided notice to the Parties that it would be rendering the Decision one week later.

*made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Article 26 ECT.*"[112]

93.   It is not in dispute between the Parties that the *Komstroy* Judgment is a relevant decision on the interpretation by the CJEU of EU treaties and that although the Paris Court of Appeals initially referred to the CJEU certain limited issues for preliminary ruling, the *Komstroy* Judgment extended its analysis to consider the relationship among the ECT and EU Law. Whether or not such judgment has a decisive impact on the jurisdiction of the Tribunal is another question that will be examined below.

94.   It is therefore established that the Tribunal has the authority to consider Respondent's Request based on the powers granted to it by Article 44 of the ICSID Convention ("*If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question*") and Rule 19 of the ICSID Arbitration Rules ("*The Tribunal shall make the orders required for the conduct of the proceeding*"), and will thus examine whether the nature of the *Komstroy* Judgment was such that it could have a decisive effect on the Decision.

**B.   IS THE *KOMSTROY* JUDGMENT A NEW AND DECISIVE FACT FOR THE DECISION?**

95.   Respondent claims that the Decision should be reconsidered as "manifestly erroneous"[113], primarily under two arguments arising from the *Komstroy* Judgment: (i) the lack of jurisdiction *ratione personae* and *ratione materia,* as the ECT does not apply to disputes relating to intra-EU investments; and (ii) the lack of application by the Tribunal of the EU State Aid rules in the Decision.

96.   Respondent is seeking the Tribunal to reconsider its decision on the intra-EU objection and on the applicable law. Respondent puts much emphasis on international custom to argue that there is a uniform and constant practice (comprising both the <u>material</u> element or repeated practice as well as the <u>subjective</u> element or *opinio iuris*) where EU Law replaces the bilateral and multilateral conventions on the same matter in intra-EU relationships.

97.   However, this is not a claim that arises from the *Komstroy* Judgment, but rather a novel allegation –albeit intrinsically related to other arguments by the Respondent already made. Thus, the Tribunal is prevented from examining a late objection to its jurisdiction, whether this is a novel objection as Claimants contend, or simply an extension to another objection previously filed to support the disconnection of the ECT. Rule 41(1) of the ICSID Arbitration Rules provides that any objection to its jurisdiction "… *shall be made as early as possible … [but] no later than the expiration of the time limit fixed for the filing of the counter-memorial* …", and clearly this objection would be outside of the time limit established.

98.   The Tribunal has already addressed essentially all of the issues raised in Respondent's Request and believes the objections on the basis of *ratione personae* and the lack of application by the Tribunal of the EU State Aid rules were appropriately examined and dismissed in the Decision. Indeed, the Tribunal recalls that the Decision addressed –as a

---

[112] **RL-0151**, *Komstroy* Judgment, ¶ 40.
[113] Request for Reconsideration, ¶ 5.

second objection to jurisdiction– the arguments submitted by Respondent alleging lack of jurisdiction *ratione materiae* pursuant to the application of EU Law and principles (then, and hereinafter referred to as the "**Intra-EU Objection II**").

99.    The Intra-EU Objection II submitted by Respondent in the early stages of the arbitration was supported by four separate arguments: (i) the primacy of EU Law and its application in the dispute as international law; (ii) intra-EU State Aid disputes should be excluded from arbitration pursuant to Article 26(6) of the ECT; (iii) the relevance of the *Achmea* Judgment; and (iv) the argument that an effective interpretation of the ECT supports the lack of consent to arbitration involving the interpretation and application of EU Law.[114] Each of these arguments has been essentially repeated in the Request for Reconsideration.

100.    After carefully considering each of the four arguments in the Decision, the Tribunal has ruled to reject the Intra-EU Objection II. The following issues were examined:

(a)    Whether Article 26 of the ECT is applicable to intra-EU disputes, and whether or not it applies to breaches of obligations set forth in Part III of the ECT;

(b)    Whether, in the context of Article 26(6) of the ECT, the Tribunal is required to decide the issues "*in accordance with this Treaty and applicable rules and principles of international law*" to determine the jurisdiction of the Tribunal;

(c)    Whether the principles of autonomy and primacy of EU Law mean that EU courts have exclusive jurisdiction to address intra-EU disputes under the ECT;

(d)    Whether, in the absence of an express disconnection clause in the ECT, it should nonetheless be deemed that there is an implicit disconnection clause or reservation that would require the Tribunal to disregard the ECT dispute settlement provisions in an intra-EU dispute;

(e)    What impact, if any, do the *Achmea* Judgment issued by the CJEU,[115] the Twenty Two Member States Declaration[116] and the Five Member States Declaration[117] have on this case; and

(f)    What effect, would the *Achmea* Judgment have had if it had addressed the question of the ECT.[118]

---

[114] Decision, ¶¶ 229-256.

[115] **CL-151 / RL-0080**, *Achmea* Judgment.

[116] Declaration of the Representatives of the Governments of the Member States, dated 15 January 2019, on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union signed by the Representatives of the Governments of Belgium, Bulgaria, Czech Republic, Denmark, Germany, Estonia, Ireland, Greece, Spain, France, Croatia, Italy, Cyprus, Latvia, Lithuania, Netherlands, Austria, Poland, Portugal, Romania, Slovakia and United Kingdom of Great Britain and Northern Ireland

[117] Declaration of the Representatives of the Governments of the Member States, dated 16 January 2019, on the enforcement of the Judgment of the Court of Justice in *Achmea* and on the investment protection in the European Union signed by the Representatives of the Governments of Finland, Luxembourg, Malta, Slovenia and Sweden.

[118] Decision, ¶ 306.

101. The Tribunal's reasoning is transcribed below, not only for purposes of providing a framework of the analysis but also for ease of subsequent reference in this Decision. The footnotes in the quoted text are intentionally omitted:

> 289. *In respect to the argument that EU Law should be applied to determine jurisdiction, the Tribunal believes that the terms of Article 26(6) of the ECT* ("A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law") *apply only to the merits of a dispute, and therefore agrees with Claimants in the sense that questions of jurisdiction are not necessarily subject to the law applicable to the merits of the case, which was confirmed by the tribunal in* Vattenfall v. Germany, *as well as others involving Respondent, such as* Greentech and Antin, *which found that Article 26(6) of the ECT applies only to the merits of the dispute and not to issues or questions relating to the tribunal's jurisdiction.*

> 290. *But even under Respondent's contention that Article 26(6) requires the Tribunal to* "interpret and apply" *EU Law since the dispute affects the EU fundamental freedoms and State Aid, this is not an argument to object to the jurisdiction of the Tribunal insofar as the provision deals with deciding on the merits of the dispute.*

> 291. *The ECT contains no language to exclude intra-EU investor-State disputes based on the ECT, and it may not be implicitly deemed to exist from an interpretation of the ECT, as suggested by Respondent when it raises the allegation of a transfer of competence by a Regional Economic Integration Organization (or REIO) to the organization pursuant to Article 1(3) of the ECT. Indeed, the fact that the EU is also a Contracting Party and a REIO, does not bar the Tribunal's jurisdiction. Just as each of the Contracting Parties to the ECT (including, of course, Spain, the Netherlands and Luxembourg) granted their* "unconditional consent to the submission of a dispute to international arbitration", *so did the EU when it signed and ratified the ECT. But each such consent should be deemed to be individually granted by each Member State and the EU, and not deemed that upon adhesion by the EU the others were superseded.*

> 292. *Regarding Respondent's allegation that Claimants cannot invoke arbitration under the ECT Article 26(1) because both Claimants and Respondent are located within the same "Area" and are not from the territory of another Contracting Party, the Tribunal rejects the argument and recalls that when the provision refers to* "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former […]"), *the claim is not being brought against the EU but rather against Spain, and it should be understood that the relevant "area" is the territory of Spain. Other tribunals have reached the same conclusion.*

> 293. *There is no solid support to the contention by Respondent that the Tribunal cannot examine the claims made by Claimants because (i) the terms of Article 26(6) of the ECT give primacy to EU Law, and (ii) it is only the CJEU –along*

24

*with other courts of the EU– who can decide on the interpretation of EU Law, preclude the existence of a mechanism for dispute resolution between EU investors and EU Member States other than the ones provided for under EU treaties.*

294.    *As expressed in the prior intra-EU objection dealing with the nationality of Claimants as investors, the ordinary meaning of the terms of Article 26, "in their context" and "in the light of its object and purpose" as required interpretation under the VCLT leads to conclude that the jurisdiction of the Tribunal derives from the ECT itself.*

295.    *Since the ECT was signed by both EU Member States and the EU itself, this makes it a "mixed agreement" under EU Law. But the EU only gained the exclusive competence on foreign direct investment (as part of the common commercial policy) with the Lisbon Treaty in December 2009 –when it entered into force. Therefore, the argument that the EU could not deal with dispute resolution of foreign investment issues at the time it entered into the ECT is wrong, since the EU signed and ratified the ECT in December 1994 and December 1997, respectively.*

296.    *Respondent has also referred to the principle of* pacta sunt servanda *to support its position that all the Member States who ratified any EU Treaty since 1963 agreed on the principle of autonomy of EU Law, and that all the Member States who have ratified an EU Treaty since 1964 agreed on the principle of primacy of EU Law. But the principle applies clearly in respect to Article 26(1) of the ECT where, despite other treaties already in force, the EU Member States, and even the EU, when they signed and ratified, failed to exclude from the "irrevocable consent" to arbitration any dispute involving its Member States.*

297.    *It is clear that the exclusion had been done before in respect to other treaties. Had Spain desired to make a reservation at the time it signed and later ratified the ECT as a Contracting Party, it could have done so. But there is no evidence submitted by Respondent to the effect that either Spain or any other of the signatory States made any such effort to do so through a disconnection clause, to ensure that the provisions of a mixed agreement only apply* vis-à-vis *third parties and not as between EU Member States.*

298.    *Respondent contends that there is no need for a disconnection clause since the principles of autonomy and primacy imply that they disconnect from the international convention, and supports its view by stating that an exercise of comparing the aim and purpose of the ECT with the aim and purpose of the EU Treaties and, even more so, to the Treaty of Lisbon, which acts as a "lex posterior", it is clear that the EU Treaties should prevail over the ECT under Articles 30 and 59 of the VCLT. In support, Spain cites Opinion 1/03 of the CJEU of 7 February 2006 where it found that* "the existence of a disconnection clause is entirely without relevance," *to conclude that such* "reflection by the EU Commission" *is in itself sufficient to justify the reason*

*why the introduction in the ECT, signed by the EU itself, of a disconnection clause, should not be necessary.*

299. *However, contrary to that contention, the ECT expressly contains an "irrevocable consent" to arbitration. The disconnection clause would need to be express, and could not have effect if simply implied, as has been suggested by Respondent.  As the Antin tribunal noted*:

> "The ECT's purpose does not support the Respondent's interpretation. Article 2, captioned 'Purpose of the Treaty,' declares that '[t]his Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.' […] Nothing in this wording suggests the exclusion of claims by investors who are nationals of an EU Member State who is also a party to the ECT against another EU Member State. Moreover, such context does not call into question the ordinary meaning of Article 26."

> "If the arbitration clause, which is at the very heart of the Treaty to which the EU consented, were to exclude the variety of treaties and legislation mentioned by Spain, then the EU, which the Tribunal must assume acted in good faith when it negotiated and signed the ECT, would have, under international law, provided a formal warning, or an express exclusion or a reserve." (*Emphasis added*)

300. *The Tribunal also disagrees with Respondent's argument in respect to the alleged lack of consent to submit to arbitration the resolution of disputes on matters that require the interpretation and application of EU Law because: (i) EU Member States cannot not be obligated under Part III of the ECT since this represents an infringement of the EU's principle of primacy, and (ii) because the ECT itself recognises, in its Article 25, the principle of primacy of EU Law. The contention that Article 25 of the ECT recognises the principle of primacy of EU Law in intra-EU relations and prevents that, under the MFN clause, said right is to be extended to nationals of ECT signatory States that are not members of the EU is irrelevant to the discussion in light of the above considerations.*

301. *Respondent cites the Achmea Judgment to provide ample discussion and support to its contention of lack of jurisdiction by the Tribunal. However, the Tribunal fails to find any substance to such allegations. Simply put, the* Achmea *and this case are totally different and there can be no analogies found.*

302. *Whereas the treaty in discussion in* Achmea *was a bilateral investment treaty among the Netherlands and Slovakia –before the Slovak Republic acceded to the EU, this dispute arises under the ECT, and the EU is a party to the ECT. The CJEU also distinguished that case by the fact that it applies to a treaty concluded by Member States and not the EU itself. The CJEU also questioned the ability of Member States to submit disputes to a body which is not part of*

*the judicial system of the EU to interpret both of the treaty and EU Law. This dispute, however, relates to the ECT where the EU accepted the terms of Article 26 to granting* "unconditional consent to the submission of a dispute to international arbitration".

303.   *In* Achmea, *the BIT called on the tribunal to apply the laws of the contracting party concerned, and other relevant agreements among the parties, and therefore the ECJ found that* "the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU Law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital", *and since: (i) the arbitral tribunal is not an EU court or a court of an EU Member State, and (ii) its findings on EU Law are not subject to review by a court of an EU Member State, said mechanism for settling disputes established in the treaty is not capable of ensuring that those disputes will be decided by a court within the judicial system of the EU. As such, the CJEU concluded that the BIT had an* "adverse effect on the autonomy of EU Law*." However, no such concerns are present in this case, because the powers of this Tribunal are limited to determining whether or not there is a breach of Articles 10 to 17 (Part III) of the ECT, and the Tribunal can only apply the terms of the ECT and international law, without authority to apply EU Law. This same conclusion has been reached, among other tribunals, by those in* RREEF, Novenergia, Greentech *and even* Charanne.

304.   *Although the above reasoning is sufficient in the eyes of the Tribunal to reject the argument of the* Achmea *Judgment, the Tribunal notes that other reasons have been expressed by tribunals who have been faced with the same objection from Spain. These include the fact that, contrary to the* Achmea *case –where the arbitral proceedings were seated in Germany and subject to German law provisions on annulment of arbitral awards– the cases were subject to the ICSID Convention.*

305.   *Multiple other tribunals have also analysed and rejected the relevance of the* Achmea *Judgment to disputes under the ECT. For example, the* Masdar v. Spain *tribunal, which concluded that* "the Achmea Judgment does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party*", *as well as the* Greentech*, and* Vattenfall *tribunals.*

306.   *Although Respondent places relevance on the January 2019 Declarations by 22 EU Member States and the subsequent January 2019 Declaration by 5 EU Member States, the undisputed fact is that they show: (i) that the EU Member States are not in agreement themselves as to whether the* Achmea *Judgment applies to the ECT; (ii) that, at best, they make an interpretation as to the effect under EU Law, and not public international law; (iii) since the first referenced Declaration by 22 Member States makes a clear distinction between* <u>bilateral</u> *investments treaties and the ECT, and declares that* "all investor-State arbitration clauses contained in bilateral investment treaties concluded

27

between Member States are contrary to Union law and thus inapplicable*", it fails to address any effect on* <u>*multilateral*</u> *treaties such as the ECT, and simply indicates that they "*will discuss without further delay whether any additional steps are necessary to draw all the consequences from the Achmea Judgment in relation to the intra-EU application of the Energy Charter Treaty*". Five Member States went further declaring that "*it would be inappropriate ... to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty*".   *The absence of uniformity in the EU's position is further evidenced by a separate Declaration made by Hungary, an EU Member State, on 16 January 2019. Even if the Declaration had been signed by all EU Member States and the Achmea decision addresses the status of the ECT, they do not deprive the Tribunal of jurisdiction. Respondent made an offer to covered investors under the ECT consenting to arbitration, and Claimants accepted the valid offer when they submitted this dispute thus a binding and formal consent had been formed. That agreement to arbitrate is subject to public international law. Furthermore, Article 25(1) of the ICSID Convention provides that once consent has been given it cannot by withdrawn unilaterally."* [Footnotes omitted]

102.  Although strictly speaking the CJEU *Komstroy* Judgment is a new fact because the judgment itself was not known to the Tribunal at the time of the Decision, the issues raised by the CJEU *Komstroy* Judgment have already been addressed by the Parties and the Decision made it clear that even if the *Achmea* Judgment could be extended to the ECT, this would not affect the Tribunal's jurisdiction. The Tribunal therefore concludes that there is no material fact which would have led this Tribunal to a different result.

103.  Further, except for those issues which have been newly examined by the CJEU in the *Komstroy* Judgment, and raised by Respondent in its Request for Reconsideration, the Tribunal considers the reasoning and conclusions in the Decision continue to be equally applicable. The Tribunal now examines whether the findings of the *Komstroy* Judgment merit reconsideration of the Decision.

104.  The CJEU sets out a couple of premises from which to reach a conclusion. <u>First</u>, it states that "*… it should be noted that, in accordance with Article 26(6) ECT, the arbitral tribunal provided for in paragraph 4 of that article is to rule on the issues in dispute in accordance with the ECT and with the applicable rules and principles of international law*". Se<u>cond</u>, that since the EU is a party to the ECT, the ECT itself is an act of EU law, and thereafter immediately concludes: "*It follows that an arbitral tribunal such as that referred to in Article 26(6) ECT is required to interpret, and even apply, EU law*".[119]

105.  The CJEU then makes a finding that subsequently supports its decision which this Tribunal finds appropriate to note: *"... if the provisions of Article 26 ECT allowing such* [an arbitral] *tribunal to be entrusted with the resolution of a dispute were to apply as between an investor of one Member State and another Member State, it would mean that, by concluding the ECT, the European Union and the Member States which are parties to it established a mechanism*

---

[119] **RL-0151**, *Komstroy* Judgment, ¶¶ 23, 48-50.

*for settling such a dispute that could exclude the possibility that that dispute, notwithstanding the fact that it concerns the interpretation or application of EU law, would be resolved in a manner that guarantees the full effectiveness of that law*." [120]

106.　The CJEU appears to find that an ECT tribunal (such as this one) must apply EU law simply because the EU has signed the ECT. This could imply that any tribunal constituted under the ECT even those in non-intra-EU disputes would be required to interpret, and even apply, EU law.

107.　From the outset, the Tribunal makes it clear that, as it affirmed in the Decision,[121] EU law is not applicable to jurisdiction. As a result, the *Komstroy* Judgment is irrelevant to the question of jurisdiction. The applicable law to jurisdiction and the merits of the dispute is international law, and not principles of sub-systems of international law such as EU treaties.

108.　This is a distinguishing element that separates and limits the authority of the Tribunal and the CJEU. This Tribunal accepts that it has no authority to apply EU Law, and respects the analysis made by the CJEU in the *Komstroy* Judgment, which established that:

> "*It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the EU institutions, including the Court of Justice of the European Union, is not in principle incompatible with EU law. The competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the European Union and its legal order is respected.*"[122]

109.　This first distinguishing factor among the Tribunal and the CJEU should be sufficient to conclude that the findings of the CJEU in the *Komstroy* Judgment do not apply to the Decision, and that therefore they cannot deprive this Tribunal of its jurisdiction to examine this dispute.

110.　However, there is another cause of concern. Although the CJEU expressly acknowledges the possibility of investors residing in a non-intra EU jurisdiction to submit their claims under the ECT to arbitration, it interprets that treatment of investors from EU Member States and those who are not should be treated differently:

> *It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the EU institutions, including the Court of Justice of the European Union, is not in principle incompatible with EU law. The competence of the European Union in*

---

[120] **RL-0151**, *Komstroy* Judgment, ¶ 60.
[121] Decision, ¶¶ 289, 303.
[122] **RL-0151**, *Komstroy* Judgment, ¶ 61, citing judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, ¶ 57.

> *the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the European Union and its legal order is respected*".[123]

> *However, the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed.*[124]

111.    The CJEU then goes on to conclude that "*Such a possibility would ... call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU.*"[125]  The Tribunal agrees with Claimants that in interpreting Article 26 ECT the CJEU made no effort to conduct an interpretive exercise under the VCLT –as would be required under public international law– but rather relied on an alleged need to "*preserv*[e] *the autonomy and* [...] *the particular nature of EU law*" in order to justify its decision. This is clearly inappropriate.

112.    The last premise essentially proposes that there be a separate treatment for intra-EU disputes (i.e., where investors and the host State are part of the EU) and non-intra-EU disputes. This would imply that investors of an EU Member State could not access arbitration against a Member State for claims relating to a breach of the ECT and international law. But such interpretation is not supported by the provisions of the ECT, nor in the objectives of the ECT.

113.    In the Tribunal's view, nothing in the ECT gives an ECT tribunal the authority to disregard or modify the explicit provisions of the ECT and decline jurisdiction on the basis of a Contracting Party's status or its obligations under a different legal order.

114.    As regards disconnection from the provisions relating to arbitration in Article 26(2)(c) of the ECT, this Tribunal found in the Decision that there is no evidence that the EU and Member States are disconnected from the ECT for the purpose of intra-EU investment arbitrations, and again rejects the claim by Respondent that the EU and its Member States disconnected from Article 26 ECT subsequent to the ratification of the ECT "*... as a necessary effect of the ratification of the Lisbon Treaty by the member states*"[126].

115.    Further, and in any event, it would be improper to affect Claimants by removing the jurisdiction of the Tribunal to decide their claims based on the *Komstroy* Judgment when the latter was issued several years after the Claimants filed their Request for Arbitration, and

---

[123] The CJEU refers to *Achmea*, ¶ 57 and the case-law cited therein.
[124] **RL-0151**, *Komstroy* Judgment, ¶¶ 61 and 62.
[125] **RL-0151**, *Komstroy* Judgment, ¶ 63.
[126] Request for Reconsideration, ¶ 93.

ICSID registered it. Indeed, Respondent's consent to arbitration in the present case was perfected in June 2016 and cannot be invalidated retroactively by the *Komstroy* Judgment.[127]

116. In conclusion, the Tribunal does not consider that the *Komstroy* Judgment has any relevance to the Tribunal's conclusions of the applicable law of the dispute. Therefore, it finds the judgment entirely irrelevant to the Tribunal's rulings on jurisdiction and on liability.

## IV. DECISION

117. For the reasons given above, the Tribunal DECIDES:

    (1).    That Respondent's Request for reconsideration regarding the intra-EU objection and the merits of the Decision on Jurisdiction, Liability and Directions of Quantum issued by the Tribunal on 13 September 2021, is rejected; and

    (2).    That any determination of costs shall be made in the Award.

_____
Prof. Peter D. Cameron
Arbitrator

_____
Mr. Luis González García
Arbitrator

_____
Mr. Eduardo Siqueiros T.
President of the Tribunal

---

[127] Decision ¶ 306.