# EXHIBIT 5



# Reports of Cases

OPINION 2/15 OF THE COURT (Full Court)
16 May 2017

Table of contents

I –   The request for an opinion ................................................................... 4

II –  The envisaged agreement ................................................................... 4

III – The Commission's appraisal set out in its request for an opinion ................................ 5

IV – Summary of the main observations submitted to the Court ...................................... 6

V –  Position of the Court ...................................................................... 7

   The competence referred to in Article 3(1)(e) TFEU ............................................ 8

      The commitments relating to market access ................................................. 9

      The commitments relating to investment protection .......................................... 13

      The commitments relating to intellectual property protection ................................. 17

      The commitments concerning competition .................................................... 19

      The commitments concerning sustainable development ........................................ 20

   The competence referred to in Article 3(2) TFEU .............................................. 24

      The commitments concerning services in the field of transport ............................... 24

         – Rail transport ....................................................................... 25

         – Road transport ....................................................................... 25

         – Internal waterways transport .......................................................... 25

      The commitments concerning public procurement in the field of transport ..................... 31

      The commitments concerning non-direct investment .......................................... 32

   Competence to approve the institutional provisions of the envisaged agreement .................. 36

      Exchange of information, notification, verification, cooperation, mediation and decision-making
      power ................................................................................... 36



OPINION 2/15 (EU-SINGAPORE FREE TRADE AGREEMENT) OF 16. 5. 2017
OPINION PURSUANT TO ARTICLE 218(11) TFEU

Transparency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

Dispute settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

– Investor-State dispute settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

– Dispute settlement between the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

Answer to the request for an opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

(Opinion pursuant to Article 218(11) TFEU — Free Trade Agreement between the European Union and the Republic of Singapore — 'New generation' trade agreement negotiated after the entry into force of the EU and FEU Treaties — Competence to conclude the agreement — Article 3(1)(e) TFEU — Common commercial policy — Article 207(1) TFEU — Trade in goods and services — Foreign direct investment — Public procurement — Commercial aspects of intellectual property — Competition — Trade with third States and sustainable development — Social protection of workers — Environmental protection — Article 207(5) TFEU — Services in the field of transport — Article 3(2) TFEU — International agreement which may affect common rules or alter their scope — Rules of secondary EU law concerning freedom to provide services in the field of transport — Non-direct foreign investment — Article 216 TFEU — Agreement necessary in order to achieve one of the objectives of the Treaties — Free movement of capital and of payments between Member States and third States — Succession of treaties concerning investment — Replacement of the investment agreements between Member States and the Republic of Singapore — Institutional provisions of the agreement — Investor-State dispute settlement — Dispute settlement between the Parties)

In Opinion procedure 2/15,

REQUEST for an opinion pursuant to Article 218(11) TFEU, made on 10 July 2015 by the European Commission,

THE COURT (Full Court)

composed of K. Lenaerts, President, A. Tizzano, Vice-President, R. Silva de Lapuerta, M. Ilešič (Rapporteur), L. Bay Larsen, T. von Danwitz, J.L. da Cruz Vilaça, E. Juhász, M. Berger, A. Prechal, M. Vilaras and E. Regan, Presidents of Chambers, A. Rosas, A. Borg Barthet, J. Malenovský, J.-C. Bonichot, A. Arabadjiev, C. Toader, D. Šváby, E. Jarašiūnas, C.G. Fernlund, C. Vajda, F. Biltgen, K. Jürimäe and C. Lycourgos, Judges,

Advocate General: E. Sharpston,

Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 12 and 13 September 2016,

after considering the observations submitted on behalf of:

— the European Commission, by U. Wölker, B. De Meester, R. Vidal-Puig and M. Kocjan, acting as Agents,

— the Belgian Government, by J. Van Holm and C. Pochet, acting as Agents,

ECLI:EU:C:2017:376

— the Bulgarian Government, by E. Petranova and L. Zaharieva, acting as Agents,

— the Czech Government, by M. Smolek, E. Ruffer and M. Hedvábná, acting as Agents,

— the Danish Government, by C. Thorning and N. Lyshøj, acting as Agents,

— the German Government, by T. Henze, B. Beutler and K. Stranz, acting as Agents,

— Ireland, by E. Creedon and J. Quaney, acting as Agents, and S. Kingston, Barrister-at-Law,

— the Greek Government, by G. Karipsiadis, K. Boskovits and S. Chala, acting as Agents,

— the Spanish Government, by S. Centeno Huerta and M. Sampol Pucurull, acting as Agents,

— the French Government, by G. de Bergues, D. Colas, F. Fize and D. Segoin, acting as Agents,

— the Italian Government, by G. Palmieri, acting as Agent, and S. Fiorentino and C. Colelli, avvocati dello Stato,

— the Cypriot Government, by E. Zachariadou and E. Symeonidou, acting as Agents, and I. Roussou, dikigoros,

— the Latvian Government, by I. Kalniņš and D. Pelše, acting as Agents,

— the Lithuanian Government, by D. Kriaučiūnas and R. Dzikovič, acting as Agents,

— the Luxembourg Government, by A. Germeaux, acting as Agent, and P. Kinsch, avocat,

— the Hungarian Government, by Z. Fehér, G. Koós, M. Bóra and M. Tátrai, acting as Agents,

— the Maltese Government, by A. Buhagiar and J. Ciantar, acting as Agents,

— the Netherlands Government, by M.K. Bulterman, M. Gijzen, C. Schillemans and J. Langer, acting as Agents,

— the Austrian Government, by C. Pesendorfer and M. Klamert, acting as Agents,

— the Polish Government, by B. Majczyna and A. Miłkowska, acting as Agents,

— the Portuguese Government, by L. Inez Fernandes, M. Figueiredo and J.P. Salgado, acting as Agents,

— the Romanian Government, by R.-H. Radu, R.-M. Mangu, A. Voicu and E. Gane, acting as Agents,

— the Slovenian Government, by A. Grum, acting as Agent,

— the Slovak Government, by M. Kianička, acting as Agent,

— the Finnish Government, by J. Heliskoski, acting as Agent,

— the United Kingdom Government, by M. Holt, acting as Agent, D. Beard QC and G. Facenna, Barrister,

— the European Parliament, by R. Passos, A. Neergaard, A. Auersperger Matić and J. Etienne, acting as Agents,

— the Council of the European Union, by S. Boelaert, R. Wiemann and B. Driessen, acting as Agents,

after hearing the Advocate General at the sitting on 21 December 2016,

gives the following

**Opinion**

I – **The request for an opinion**

1. The request for an opinion submitted to the Court by the European Commission is worded as follows:

   'Does the Union have the requisite competence to sign and conclude alone the Free Trade Agreement with Singapore? More specifically,

   1. which provisions of the agreement fall within the Union's exclusive competence?

   2. which provisions of the agreement fall within the Union's shared competence? and

   3. is there any provision of the agreement that falls within the exclusive competence of the Member States?'

2. The Commission annexed to its request for an opinion the text of the agreement as envisaged on 10 July 2015, the date on which the request was made.

II – **The envisaged agreement**

3. On 8 December 2006, the Commission addressed a recommendation to the Council of the European Communities seeking its authorisation to open negotiations with a view to the conclusion of a free trade agreement with the countries of the Association of Southeast Asian Nations (ASEAN). The Council acceded to the recommendation.

4. The authorisation to negotiate thereby issued by the Council provided that, should it not be possible to reach an agreement with all the countries that were members of ASEAN, the Council could authorise the Commission to negotiate bilaterally.

5. On 22 December 2009, the Council thus authorised the Commission to negotiate bilaterally with the Republic of Singapore.

6. The negotiations with the Republic of Singapore began in March 2010 and were conducted in consultation with the Trade Policy Committee, acting as a special committee appointed by the Council pursuant to Articles 207(3) and Article 218(4) TFEU.

7. In February 2011 the Commission addressed a recommendation to the Council seeking modification by it of the negotiating directives so as to include investment protection. In September 2011 the Council decided to supplement the negotiating directives to that effect.

8. In December 2012 negotiations were concluded on all chapters except the investment protection chapter. The negotiations on that last chapter were completed in October 2014.

9.  On 26 June 2015, the Commission informed the Trade Policy Committee that the envisaged agreement had been initialled.

10. The envisaged agreement contains 17 chapters:

— Chapter 1 sets out the subject matter and objectives of the agreement and includes a set of generally applicable definitions;

— Chapter 2 concerns the import and export of goods;

— Chapter 3 relates to antidumping measures, countervailing measures and safeguard measures;

— Chapters 4 and 5 concern non-tariff barriers to trade in goods resulting from technical regulations and from sanitary and phytosanitary measures;

— Chapter 6 contains provisions concerning customs;

— Chapter 7 concerns non-tariff barriers to trade and investment in the field of renewable energy generation;

— Chapter 8 relates to services, establishment and electronic commerce;

— Chapter 9 relates to investment;

— Chapter 10 concerns public procurement;

— Chapter 11 relates to intellectual property;

— Chapter 12 relates to competition;

— Chapter 13 concerns trade and sustainable development;

— Chapter 14 lays down rules on transparency applicable to the matters covered by other chapters;

— Chapters 15 and 16 establish, respectively, a dispute settlement mechanism and a mediation mechanism;

— Chapter 17 establishes a Trade Committee and several specialised committees. It also contains general and final provisions.

11. Since differences of opinion became apparent in consultations within the Trade Policy Committee on the nature of the European Union's competence to conclude the envisaged agreement, the Commission made the present request for an opinion.

### III – **The Commission's appraisal set out in its request for an opinion**

12. In the Commission's view, the European Union has exclusive competence to sign and conclude the envisaged agreement.

13. It contends, first, that all the provisions of the envisaged agreement, with the sole exception of those concerning cross-border transport services and non-direct foreign investment, fall within the scope of the common commercial policy as defined in Article 207(1) TFEU and, therefore, within the European Union's exclusive competence pursuant to Article 3(1)(e) TFEU.

14. It maintains, secondly, that cross-border transport services fall within the European Union's exclusive competence referred to in Article 3(2) TFEU, in the light of the rules of secondary EU law which are in force in that field.

15. In this connection, the Commission cites in particular:

— Council Regulation (EEC) No 4055/86 of 22 December 1986 applying the principle of freedom to provide services to maritime transport between Member States and between Member States and third countries (OJ 1986 L 378, p. 1);

— Regulation (EC) No 1071/2009 of the European Parliament and of the Council of 21 October 2009 establishing common rules concerning the conditions to be complied with to pursue the occupation of road transport operator and repealing Council Directive 96/26/EC (OJ 2009 L 300, p. 51);

— Regulation (EC) No 1072/2009 of the European Parliament and of the Council of 21 October 2009 on common rules for access to the international road haulage market (OJ 2009 L 300, p. 72);

— Regulation (EC) No 1073/2009 of the European Parliament and of the Council of 21 October 2009 on common rules for access to the international market for coach and bus services, and amending Regulation (EC) No 561/2006 (OJ 2009 L 300, p. 88); and

— Directive 2012/34/EU of the European Parliament and of the Council of 21 November 2012 establishing a single European railway area (OJ 2012 L 343, p. 32).

16. It submits, finally, that, in so far as the envisaged agreement relates to non-direct foreign investments, the European Union likewise has exclusive competence pursuant to Article 3(2) TFEU, because of the overlap between (i) the commitments contained in that agreement concerning those investments and (ii) the prohibition of restrictions on movements of capital and on payments between Member States and third States that is laid down in Article 63 TFEU.

## IV – Summary of the main observations submitted to the Court

17. The European Parliament highlights that the envisaged agreement is one of the first 'new generation' bilateral free trade agreements, that is to say, a trade agreement which contains, in addition to the classical provisions on the reduction of customs duties and of non-tariff barriers to trade in goods and services, provisions on various matters related to trade, such as intellectual property protection, investment, public procurement, competition and sustainable development.

18. Having regard to the wording of the provisions of the EU and FEU Treaties on the European Union's external action generally and the common commercial policy in particular, the Parliament states that it agrees with the Commission's appraisal and, like the Commission, takes the view that the envisaged agreement falls within the exclusive competence of the European Union.

19. On the other hand, the Council, and all the Member States which have submitted observations to the Court, contend that certain provisions of the envisaged agreement do not fall within the exclusive competence of the European Union, the agreement having the characteristics of a 'mixed agreement'.

20. It is submitted that the provisions relating to the field of transport contained in Chapter 8 of the envisaged agreement fall within the common transport policy. Contrary to the assertions of the Commission and the Parliament, those provisions, for the most part, cannot 'affect common rules or alter their scope', within the meaning of Article 3(2) TFEU. They therefore fall not within the

exclusive competence of the European Union referred to in that provision of the FEU Treaty, but within a competence shared between the European Union and the Member States pursuant to Article 4(2)(g) TFEU.

21. Still with regard to Chapter 8 of the agreement, Ireland refers to the Protocol (No 21) on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, annexed to the EU and FEU Treaties. It states that Chapter 8 affects that protocol.

22. According to the Council and the Member States which have submitted observations to the Court, the provisions concerning environmental protection, social protection and intellectual property protection, set out in Chapters 7, 11 and 13 of the envisaged agreement, fall within the competences shared between the European Union and the Member States in those fields. Those provisions have no specific link with international trade. The reference in those chapters to international agreements which are not directly linked to trade illustrates this point.

23. The envisaged agreement is said to contain, moreover, provisions which fall within competences of the Member States alone.

24. That is so inter alia in the case of the provisions of Chapter 14 of the agreement, which lay down rules on transparency, and of the provisions of Chapter 9 in so far as they relate to non-direct foreign investment.

25. In that regard, the Council and the Member States which have submitted observations to the Court state that the FEU Treaty does not confer any competence on the European Union in the field of investment which does not come under 'direct investment'. They add that, contrary to the Commission's submissions, 'common rules' within the meaning of Article 3(2) TFEU cannot consist of rules of primary EU law, such as Article 63 TFEU. The Commission's line of argument is not consistent with the Court's case-law concerning implied external competences of the European Union.

26. In support of its line of argument relating to the lack of exclusive EU competence in respect of Chapter 9 of the envisaged agreement, the Council cites certain provisions of that chapter which, in its submission, fall within the competence of the Member States, such as those relating to public order, public security and other public interests, to taxation, to compensation in the event of investments being destroyed by the armed forces, to the exceptions to the freedom to transfer funds that are justified on the basis of legislation concerning criminal or penal offences, social security or retirement, to expropriation and to the replacement, by the envisaged agreement, of the bilateral investment treaties concluded between the Member States and the Republic of Singapore.

27. The Council and some of the Member States which have submitted observations to the Court state, furthermore, that Chapter 9 of the envisaged agreement relates only to investment protection and not to the admission of investments. It follows that, even in so far as that chapter relates to foreign direct investment, it cannot be approved by the European Union alone. As investment protection is not specifically linked to international trade, it does not fall within the common commercial policy.

V – **Position of the Court**

28. As provided in Article 196(2) of the Rules of Procedure of the Court of Justice, and in accordance with settled case-law (see, inter alia, Opinion 1/03 (New Lugano Convention) of 7 February 2006, EU:C:2006:81, paragraph 112 and the case-law cited), a request for an opinion pursuant to Article 218(11) TFEU may relate both to whether the envisaged agreement is compatible with the provisions of the Treaties and to whether the European Union or any institution of the European Union has the power to conclude that agreement.

29. In the present instance, the request for an opinion relates to whether the envisaged agreement can be signed and concluded by the European Union alone or whether, on the contrary, it will have to be signed and concluded both by the European Union and by each of its Member States (a 'mixed' agreement).

30. Consequently, this opinion of the Court relates only to the nature of the competence of the European Union to sign and conclude the envisaged agreement. It is entirely without prejudice to the question whether the content of the agreement's provisions is compatible with EU law.

31. This initial clarification having been provided, it must be examined whether the provisions of the envisaged agreement fall within the exclusive competence of the European Union, a competence shared between the European Union and the Member States, or a competence of the Member States alone.

32. In the light of the subject matter and objectives of the envisaged agreement, which, as stated in Articles 1.1 and 1.2 thereof, consist in 'establish[ing] a free trade area' and 'liberalis[ing] and facilitat[ing] trade and investment between the Parties', it should be examined at the outset to what extent the agreement's provisions fall within the exclusive competence of the European Union — referred to in Article 3(1)(e) TFEU — relating to the common commercial policy.

The competence referred to in Article 3(1)(e) TFEU

33. Under Article 3(1)(e) TFEU, the European Union is to have exclusive competence in the area of the common commercial policy.

34. As set out in Article 207(1) TFEU, that policy 'shall be based on uniform principles, particularly with regard to changes in tariff rates, the conclusion of tariff and trade agreements relating to trade in goods and services, and the commercial aspects of intellectual property, foreign direct investment, the achievement of uniformity in measures of liberalisation, export policy and measures to protect trade such as those to be taken in the event of dumping or subsidies. The common commercial policy shall be conducted in the context of the principles and objectives of the Union's external action'.

35. It follows from that provision, in particular from its second sentence, according to which the common commercial policy belongs within the context of 'the Union's external action', that that policy relates to trade with third States (judgments of 18 July 2013, Daiichi Sankyo and Sanofi-Aventis Deutschland, C-414/11, EU:C:2013:520, paragraph 50, and of 22 October 2013, Commission v Council, C-137/12, EU:C:2013:675, paragraph 56).

36. It is settled case-law that the mere fact that an EU act, such as an agreement concluded by it, is liable to have implications for trade with one or more third States is not enough for it to be concluded that the act must be classified as falling within the common commercial policy. On the other hand, an EU act falls within that policy if it relates specifically to such trade in that it is essentially intended to promote, facilitate or govern such trade and has direct and immediate effects on it (see, inter alia, judgments of 18 July 2013, Daiichi Sankyo and Sanofi-Aventis Deutschland, C-414/11, EU:C:2013:520, paragraph 51, and of 22 October 2013, Commission v Council, C-137/12, EU:C:2013:675, paragraph 57, and Opinion 3/15 (Marrakesh Treaty on access to published works) of 14 February 2017, EU:C:2017:114, paragraph 61).

37. It follows that only the components of the envisaged agreement that display a specific link, in the above sense, with trade between the European Union and the Republic of Singapore fall within the field of the common commercial policy.

38. Therefore, it must be established whether the commitments contained in that agreement are intended to promote, facilitate or govern such trade and have direct and immediate effects on it.

39. The commitments contained in the envisaged agreement relate to (i) market access, (ii) investment protection, (iii) intellectual property protection, (iv) competition and (v) sustainable development.

The commitments relating to market access

40. Chapter 2 of the envisaged agreement, entitled 'National Treatment and Market Access for Goods', provides that each Party is to grant non-discriminatory treatment to goods from the other Party and is to reduce or to eliminate, depending on the specific commitments annexed to that chapter, its import and export duties. It also provides that each Party is to refrain from adopting or maintaining non-tariff restrictions on the import and export of goods.

41. Chapter 2 is thus composed of 'tariff and trade [commitments] relating to trade in goods', within the meaning of Article 207(1) TFEU. It therefore falls within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU.

42. Chapter 3 of the envisaged agreement, entitled 'Trade Remedies', specifies the manner in which each Party may, where the requirements resulting from the rules of the World Trade Organisation (WTO) are met, adopt antidumping and countervailing measures and safeguard measures concerning imports from the other Party.

43. That chapter thus relates to 'measures to protect trade', within the meaning of Article 207(1) TFEU. It therefore also falls within the exclusive competence of the European Union referred to in Article 3(1)(e) TFEU.

44. Chapters 4 and 5 of the envisaged agreement, entitled 'Technical Barriers to Trade' and 'Sanitary and Phytosanitary Measures' respectively, lay down rules which, while permitting each Party to apply its technical and sanitary standards in accordance with WTO rules, are intended to reduce as far as possible the resulting barriers to trade in goods between the Parties. It is apparent, in particular, from these chapters that, first, products exported by a Party must meet the standards laid down by the Party importing them and, secondly, that products imported by the latter must not be made subject to standards that are discriminatory or disproportionate compared with those that are applied to its own products.

45. Chapters 4 and 5 are accordingly specifically intended to facilitate trade in goods between the European Union and the Republic of Singapore. Furthermore, their provisions and the specific commitments which are annexed thereto ease considerably the conditions for the import of those goods and are therefore such as to have direct and immediate effects on international trade. Consequently, these chapters satisfy the criteria recalled in paragraph 36 of this opinion and fall within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU.

46. Chapter 6 of the envisaged agreement, entitled 'Customs and Trade Facilitation', provides that the customs legislation of each Party will be non-discriminatory and that the fees and charges imposed for services provided when those goods are imported or exported will not exceed the approximate cost of those services. In addition, it obliges the Parties to simplify, preferably by means of single window systems, the requirements and formalities for release, clearance, transhipment and transit. It also requires the possibility to be offered both of effecting advance submission and of receiving advance rulings.

47. That chapter is therefore essentially intended to govern and facilitate trade in goods between the Parties.

48. It has, moreover, the direct and immediate effect of rendering trade in goods between the European Union and the Republic of Singapore more fluid and less onerous. It accordingly satisfies the criteria recalled in paragraph 36 of this opinion and therefore falls within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU.

49. Whilst Chapters 2 to 6 of the envisaged agreement concern trade in goods between the European Union and the Republic of Singapore, trade in services between the Parties is governed by Chapter 8 of the agreement.

50. Chapter 8, entitled 'Services, Establishment and Electronic Commerce', contains the commitments of each Party to reduce, for the benefit of economic operators of the other Party, barriers to the cross-border supply of services, to establishment and to the temporary presence of natural persons.

51. Whilst excluding citizenship, residence, employment on a permanent basis and, generally, access to the employment market from its scope, Chapter 8 obliges each of the Parties to accord services, establishments and entrepreneurs of the other Party treatment no less favourable than that which it accords to its own services, establishments and entrepreneurs, having regard to the terms and limitations specified in the schedule of specific commitments in the agreement and subject to the general exceptions which the agreement lays down.

52. It follows that Chapter 8 of the envisaged agreement is essentially intended to open up the Singapore market, to a certain extent, to EU service providers, and vice versa. It is therefore intended to promote, facilitate and govern trade.

53. The commitments relating to market access contained in that chapter are, furthermore, such as to have direct and immediate effects on trade in services between the European Union and the Republic of Singapore. As the Advocate General has set out in points 204 and 205 of her Opinion, and contrary to the assertions of some of the Member States which have submitted observations to the Court, this finding applies to all the articles of that chapter, including those relating to financial services and to the mutual recognition of professional qualifications.

54. Moreover, as the Court has already observed, the four modes of supply of services corresponding to the classification used by the WTO, that is to say, the supply of a service from the territory of one WTO Member into the territory of another Member (mode 1), the supply of a service in the territory of one Member to the consumer of another Member (mode 2), the supply of a service by a service provider of one Member through commercial presence in the territory of another Member (mode 3) and the supply of a service by a service provider of one Member through presence of natural persons of a Member in the territory of another Member (mode 4), all fall within the common commercial policy (Opinion 1/08 (Agreements modifying the Schedules of Specific Commitments under the GATS) of 30 November 2009, EU:C:2009:739, paragraphs 4, 118 and 119). That interpretation, which was provided in the context of examination by the Court of the competence of the Community to participate in the conclusion of agreements referred to in Article 133 EC, and which therefore related to the concept of 'trade in services' ['commerce des services'] in that provision of the EC Treaty, can be applied to the concept of 'trade in services' ['échanges de services'] in Article 207(1) TFEU, whose meaning is essentially identical.

55. Consequently, there is no reason to distinguish between the provisions of Chapter 8 of the envisaged agreement which relate to the cross-border supply of services ('mode 1' and 'mode 2' services for the purposes of the WTO's classification of types of supply of services) and the provisions of that chapter relating to the supply of services by establishment ('mode 3' services) or by the presence of natural persons ('mode 4' services).

56. Notwithstanding the foregoing, the competence of the European Union to approve Chapter 8 of the envisaged agreement cannot be covered by Article 3(1)(e) TFEU alone.

57. Indeed, that chapter relates, inter alia, to the supply of services in the field of transport. This field is excluded from the common commercial policy by Article 207(5) TFEU, according to which the negotiation and conclusion of 'international agreements in the field of transport' is to be subject to 'Title VI of Part Three [of the FEU Treaty] …'. That title concerns the common transport policy.

58. Called upon to interpret the third subparagraph of Article 133(6) EC, the Court observed that that provision sought to maintain, with regard to international trade in transport services, a fundamental parallelism between internal EU competence, whereby EU rules are unilaterally adopted, and external EU competence, which operates through the conclusion of international agreements, each competence remaining — as previously — anchored in the title of the Treaty specifically relating to the common transport policy (Opinion 1/08 (Agreements modifying the Schedules of Specific Commitments under the GATS) of 30 November 2009, EU:C:2009:739, paragraph 164).

59. Article 207(5) TFEU corresponds, in essence, to the third subparagraph of Article 133(6) EC. Furthermore, it is not apparent either from the FEU Treaty or from factors relating to the history, broad logic or aims of that Treaty that its framers had the intention of altering the division of competences between the European Union and the Member States as regards the negotiation and conclusion of international agreements relating to trade in the field of transport.

60. The Commission's view that the field of transport is excluded under Article 207(5) TFEU from the common commercial policy solely so far as concerns the cross-border supply of services, that is to say, mode 1 and mode 2 services, is unfounded. Such a view disregards the wording of that provision, which excludes 'international agreements in the field of transport' from that policy in their entirety.

61. In the light of the scope of Article 207(5) TFEU, it must next be determined which commitments contained in Chapter 8 of the envisaged agreement are, under that provision, excluded from the common commercial policy. For this purpose, account is to be taken of the case-law according to which the concept of services 'in the field of transport' encompasses not only transport services in themselves, but also other services, provided, however, that the latter are inherently linked to a physical act of moving persons or goods from one place to another by a means of transport (see, to that effect, judgment of 15 October 2015, Grupo Itevelesa and Others, C-168/14, EU:C:2015:685, paragraphs 45 and 46).

62. In the present instance, the services consisting in moving persons or goods from one place to another are listed in point 11 of Appendices 8-A-1 and 8-B-1 and point 16 of Appendices 8-A-2 and 8-A-3 in the annexes to Chapter 8 of the envisaged agreement. They relate to international maritime transport, rail transport, road transport and internal waterways transport; on the other hand, domestic and international air transport services are not covered by the agreement, as stated in Articles 8.3(c) and 8.9(e) thereof.

63. Services inherently linked to maritime, rail, road and internal waterway transport services are listed in point 12 of Appendix 8-A-1, point 17 of Appendices 8-A-2 and 8-A-3 and point 11 of Appendix 8-B-1 in those annexes.

64. 'Aircraft repair and maintenance services during which an aircraft is withdrawn from service', 'the selling and marketing of air transport services' and 'computer reservation system services' are mentioned in Articles 8.3 and 8.9 of the envisaged agreement as being, unlike air transport services as such, included within the scope of Chapter 8 of the agreement.

65. In the appendices of the annexes to Chapter 8, those aircraft repair and maintenance services and those services for the reservation and sale of air transport services are not included in the points which list auxiliary services in the field of transport, but are classified as 'business services' falling outside that field.

66. Neither 'aircraft repair and maintenance services during which an aircraft is withdrawn from service' nor services for the sale, marketing or reservation of air transport services, whether they are supplied by travel agencies or by other commercial service-providers, are inherently linked to transport services, within the meaning specified by the case-law recalled in paragraph 61 of this opinion.

67. First, 'aircraft repair and maintenance services during which an aircraft is withdrawn from service' have, at most, a remote link with the act of moving persons or goods from one place to another. Secondly, as regards services for the sale, marketing or reservation of air transport services, it is apparent from recital 33 of Directive 2006/123/EC of the European Parliament and of the Council of 12 December 2006 on services in the internal market (OJ 2006 L 376, p. 36) that the services covered by that directive, which has Articles 47(2) and 55 EC as its legal basis, also encompass travel agencies, which are the principal suppliers of such services.

68. Since 'aircraft repair and maintenance services during which an aircraft is withdrawn from service', 'the selling and marketing of air transport services' and 'computer reservation system services' consequently do not fall within Article 207(5) TFEU, they are among the services covered by Article 207(1) TFEU.

69. It is apparent from paragraphs 50 to 68 of this opinion that Chapter 8 of the envisaged agreement falls within the common commercial policy, except in so far as the commitments which it contains relate to the services listed in points 11 and 12 of Appendix 8-A-1, points 16 and 17 of Appendices 8-A-2 and 8-A-3 and point 11 of Appendix 8-B-1 in the annexes to that chapter.

70. The question whether, in respect of those commitments, the European Union has exclusive competence by virtue of other provisions of the FEU Treaty, so that it would be able to approve by itself Chapter 8 of the envisaged agreement, is examined in paragraphs 168 to 217 of this opinion.

71. Finally, respective access to the EU market and the Singapore market for goods and services from the other Party is also governed by the provisions of Chapters 7 and 10 of the envisaged agreement.

72. Chapter 7 of the envisaged agreement, entitled 'Non-Tariff Barriers to Trade and Investment in Renewable Energy Generation', is intended to govern and facilitate market access in the sector of energy generation from sustainable non-fossil sources.

73. Indeed, that chapter, which does not establish any environmental standard on the matter, stipulates that each Party must refrain from adopting measures requiring the formation of partnerships with local companies in the sector, must ensure that any rules concerning authorisation, certification and licensing do not discriminate against economic operators from the other Party and must accept declarations of conformity issued by the other Party.

74. Since it seeks thereby to open up the market of each of the Parties, Chapter 7 is also such as to have a direct and immediate effect on trade in goods and services between the European Union and the Republic of Singapore in this sector, within the meaning of the case-law recalled in paragraph 36 of this opinion. It consequently falls within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU.

75. Chapter 10 of the envisaged agreement, entitled 'Government Procurement', contains the commitments by which each Party is to treat the other Party's suppliers of goods and services no less favourably than its own economic operators in procurement for governmental purposes. It also contains a vast body of rules designed to lay down a framework for public procurement, in both Singapore and the European Union, by providing that public contracts will be awarded only after an award procedure involving a full notice of procurement which will have been readily accessible to the candidates and including appropriate conditions governing participation and selection.

76. That chapter accordingly has the specific aim of determining the arrangements under which the economic operators of each Party may participate in procurement procedures organised by the other Party's public authorities. Furthermore, as those arrangements are founded on considerations of non-discriminatory access, transparency and efficiency, they are such as to have direct and immediate effects on trade in goods and services between the Parties.

77. Chapter 10 of the envisaged agreement consequently falls within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU, subject to the same proviso, however, as that expressed in paragraph 69 of this opinion so far as concerns the services listed in points 11 and 12 of Appendices 8-A-1 and 8-B-1 and points 16 and 17 of Appendices 8-A-2 and 8-A-3 in the annexes to Chapter 8 of the envisaged agreement. The nature of the competence of the European Union to approve the commitments relating to public procurement in respect of international maritime transport services, rail transport services, road transport services and internal waterways transport services, and to public procurement in respect of services inherently linked to those transport services, is examined in paragraphs 219 to 224 of this opinion.

The commitments relating to investment protection

78. Chapter 9 of the envisaged agreement concerns, as Article 9.1 states, 'every kind of asset which has the characteristics of an investment, including such characteristics as the commitment of capital or other resources, the expectation of gain or profit, the assumption of risk or a certain duration', in so far as that asset is 'owned, directly or indirectly, or controlled, directly or indirectly, by a [natural or legal person] of one Party in the territory of the other Party'.

79. It is apparent from that article that Chapter 9 relates both to direct investment and to any other type of investment.

80. It is settled case-law that direct investment consists in investments of any kind made by natural or legal persons which serve to establish or maintain lasting and direct links between the persons providing the capital and the undertakings to which that capital is made available in order to carry out an economic activity. Acquisition of a holding in an undertaking constituted as a company limited by shares is a direct investment where the shares held by the shareholder enable him to participate effectively in the management of that company or in its control (see, inter alia, judgments of 12 December 2006, Test Claimants in the FII Group Litigation, C-446/04, EU:C:2006:774, paragraphs 181 and 182; of 26 March 2009, Commission v Italy, C-326/07, EU:C:2009:193, paragraph 35; and of 24 November 2016, SECIL, C-464/14, EU:C:2016:896, paragraphs 75 and 76).

81. Article 207(1) TFEU provides that EU acts concerning 'foreign direct investment' fall within the common commercial policy.

82. It follows that the European Union has exclusive competence, pursuant to Article 3(1)(e) TFEU, to approve any commitment vis-à-vis a third State relating to investments made by natural or legal persons of that third State in the European Union and vice versa which enable effective participation in the management or control of a company carrying out an economic activity.

83. The use, by the framers of the FEU Treaty, of the words 'foreign direct investment' in Article 207(1) TFEU is an unequivocal expression of their intention not to include other foreign investment in the common commercial policy. Accordingly, commitments vis-à-vis a third State relating to other foreign investment do not fall within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU.

84. This definition of the scope of the common commercial policy so far as concerns foreign investment reflects the fact that any EU act promoting, facilitating or governing participation — by a natural or legal person of a third State in the European Union and vice versa — in the management or control of a company carrying out an economic activity is such as to have direct and immediate effects on trade between that third State and the European Union, whereas there is no specific link of that kind with trade in the case of investments which do not result in such participation.

85. The Council and some of the Member States which have submitted observations to the Court contend that, even in so far as Chapter 9 of the envisaged agreement relates to direct investment, it cannot fall within the common commercial policy, given that that chapter concerns only the protection of direct investments and not their admission.

86. It is true that, as those participants in the present procedure have highlighted, the only substantive provisions of Chapter 9 of the envisaged agreement are contained in Section A of that chapter and that that section, entitled 'Investment Protection', relates only to the treatment of investments after their admission under the legislation in force in the Republic of Singapore or the European Union, as the case may be. The fact that the admission of investments falls outside the scope of the envisaged agreement is indeed borne out by Article 9.2 thereof, according to which 'this Chapter shall apply to … investments made in accordance with the applicable law …'.

87. However, that fact in no way precludes the legal rules agreed between the European Union and the Republic of Singapore concerning protection of direct investments from falling within the common commercial policy when they display a specific link with trade between the European Union and that third State. Article 207(1) TFEU refers generally to EU acts concerning 'foreign direct investment', without drawing a distinction according to whether the acts concern the admission or the protection of such investments.

88. In the present instance, the protection conferred by Chapter 9 of the envisaged agreement consists, first, in the obligation on each Party, under Article 9.3 of the agreement, to accord to investors of the other Party 'treatment … no less favourable than the treatment it accords, in like situations, to its own investors and their investments with respect to the operation, management, conduct, maintenance, use, enjoyment and sale or other disposal of their investments'.

89. The protection involves, secondly, the obligation, set out in Article 9.4 of the envisaged agreement, to accord to investors of the other Party and their investments fair and equitable treatment and full protection and security; that treatment, protection and security must be characterised, inter alia, by the absence of arbitrary conduct and of any harassment or coercion, and by observance of the legitimate expectations of investors and of their right to effective judicial protection.

90. Thirdly, investment protection is provided by the obligation on each Party, laid down in Article 9.5 of the envisaged agreement, to treat investors of the other Party in the same way as its own investors so far as concerns losses suffered owing to war or other armed conflict, revolution, a state of emergency, revolt, insurrection or riot, including in the event of destruction of an investment by the public authorities or armed forces.

91. Fourthly, the envisaged agreement protects investors of the European Union and of the Republic of Singapore against any arbitrary expropriation or expropriation without compensation in the territory of the other Party, by laying down, in Article 9.6, that neither Party is to nationalise or expropriate, or subject to measures having effect equivalent to nationalisation or expropriation, the covered investments of investors of the other Party, except for a public purpose, in accordance with due process of law, on a non-discriminatory basis and against payment of prompt, adequate and effective compensation.

92. Fifthly, the envisaged agreement provides, in Article 9.7, that transfers relating to an investment, such as contributions to capital to increase the investment and the taking of dividends or other returns, may be made without restriction, in a freely convertible currency.

93. Sixthly and finally, Article 9.8 of the envisaged agreement obliges each Party to recognise subrogations, transfers of rights or title and assignments of claims in respect of investments made in its territory by natural or legal persons of the other Party.

94. That set of commitments providing for 'no less favourable treatment' and of prohibitions of arbitrary treatment — which relate in particular to natural and legal persons of each Party exploiting, increasing and selling their holdings in companies that are carrying out economic activities and are located in the territory of the other Party — contributes to the legal certainty of investors. The establishment of such a legal framework is intended to promote, facilitate and govern trade between the European Union and the Republic of Singapore, within the meaning of the case-law recalled in paragraph 36 of this opinion.

95. Furthermore, in so far as the provisions of Section A of Chapter 9 of the envisaged agreement relate to direct investment, they are such as to have direct and immediate effects on that trade, since they concern the treatment of the participation of entrepreneurs of one Party in the management or control of companies carrying out economic activities in the territory of the other Party.

96. It follows that those provisions display, in accordance with the criteria recalled in paragraph 36 of this opinion, a specific link with that trade.

97. The fact, pointed out by the Council and some of the Member States which have submitted observations to the Court, that Section A of Chapter 9 of the envisaged agreement includes provisions which enable the Member States to assess whether application of the envisaged agreement is consistent with their requirements as to public order and public security and with other objectives of public interest or which concern property law, criminal law, tax law and social security has no effect in this regard.

98. As regards, first, the power of each Member State of the European Union to assess whether those requirements and those other objectives are safeguarded so far as it is concerned, the Council and the aforesaid Member States refer to Article 9.3.3 of the envisaged agreement, which — like similar provisions in other chapters of the agreement — states that, notwithstanding the obligation of 'no less favourable treatment' imposed in Article 9.3.1 and Article 9.3.2, less favourable treatment may be applied if it does not constitute a disguised restriction and is necessary to maintain public order, to protect public security or to protect one of the other public interests listed in Article 9.3.3.

99. The Council and those Member States also refer to Article 9.5 of the envisaged agreement, which guarantees investors no less favourable treatment so far as concerns compensation for losses suffered owing to one of the situations listed in that article, which include a state of war, a state of national emergency and the destruction of an investment by the public authorities or armed forces.

100. They submit, in that regard, that the European Union cannot enter into commitments instead of the Member States in matters which inherently fall within an exclusive Member State competence.

101. However, Article 9.3.3 of the envisaged agreement lays down not a commitment but the possibility of applying a derogation. Under that derogation, a Member State will be able, for overriding reasons relating to public order, public security or one of the other public interests referred to in Article 9.3.3, to treat Singapore investors less favourably than its own investors. In authorising such a derogation, that provision does not establish any international commitment concerning public order, public security or other public interests.

102. Article 9.3.3 of the envisaged agreement requires any less favourable treatment of Singapore investors to be 'necessary' and not to constitute a 'disguised restriction'. Those two requirements make it possible to ensure that the commitment as to 'no less favourable treatment', laid down in Article 9.3.1 and Article 9.3.2, is not rendered redundant. As the Advocate General has explained in point 335 of her Opinion, the limitation on the discretion of the Member States that results from Article 9.3.3 is inherent in the conduct of international trade, and international trade falls within the exclusive competence of the European Union. The common provision noting those requirements accordingly falls within that competence.

103. It follows that Article 9.3.3 of the envisaged agreement does not encroach upon the competences of the Member States regarding public order, public security and other public interests, but obliges the Member States to exercise those competences in a manner which does not render the trade commitments entered into by the European Union under Article 9.3.1 and Article 9.3.2 of that agreement redundant.

104. A similar conclusion must be reached so far as concerns Article 9.5 of the envisaged agreement. That article does not affect the Member States' discretion as to the use of their armed forces or declaration of a national state of emergency, but merely stipulates that, if losses have been suffered on investments owing to one of the situations which it lists, the same indemnification or compensation rules must be applied to Singapore investors and EU investors.

105. As regards, secondly, the provisions relating to property law, criminal law, tax law and social security, the Council and the Member States which have submitted observations to the Court refer to Articles 9.6 and 9.7 of the envisaged agreement. The first of those articles is designed to protect investors of each Party against any arbitrary expropriation or expropriation without compensation in the territory of the other Party whilst the second, which concerns the ability of investors to make transfers relating to their investments without restrictions, stipulates, in paragraph 2, that 'nothing in this Article shall be construed to prevent a Party from applying in an equitable and non-discriminatory manner its law relating to ... criminal or penal offences ... social security, ... retirement or compulsory savings [and] taxation'.

106. The Council submits, in particular, that Article 9.6 of the envisaged agreement falls within the competences of the Member States alone in the field of property law. It cites in that context Article 345 TFEU, according to which the Treaties are in no way to prejudice the rules in Member States governing the system of property ownership.

107. As the Court has already pointed out, Article 345 TFEU expresses the neutrality of the European Union in relation to the rules existing in Member States governing the system of property ownership, but does not mean that those rules are not subject to the fundamental rules of the European Union (see judgment of 22 October 2013, Essent and Others, C‑105/12 to C‑107/12, EU:C:2013:677, paragraphs 29 and 36). In the present instance, Article 9.6 of the envisaged agreement, the content of which is set out in essence in paragraph 91 of this opinion, does not contain any commitment relating to the rules in Member States governing the system of property ownership. That article seeks solely to make any nationalisation or expropriation decisions subject to limits which are intended to guarantee investors that such a decision will be adopted under equitable conditions and in compliance with general principles and fundamental rights, in particular with the principle of non-discrimination. It therefore reflects the simple fact that, whilst the Member States remain free to exercise their competences regarding property law and to amend accordingly the rules governing the system of property ownership so far as they are concerned, they are nonetheless not absolved from compliance with those principles and fundamental rights.

OPINION 2/15 (EU-SINGAPORE FREE TRADE AGREEMENT) OF 16. 5. 2017
OPINION PURSUANT TO ARTICLE 218(11) TFEU

108. Article 9.7 of the envisaged agreement does not contain any commitment for the Member States relating to their criminal law, tax law or social security, but in essence merely provides that, in the European Union or Singapore, relevant legislation must in each case be applied to an investor of the other Party 'in an equitable and non-discriminatory manner', as is specified in Article 9.7.2.

109. It follows from all of the foregoing that the provisions of Section A of Chapter 9 of the envisaged agreement fall within the common commercial policy in so far as they relate to foreign direct investment between the European Union and the Republic of Singapore.

110. However, that finding is not sufficient to conclude that the European Union has competence to approve by itself that section of Chapter 9. That section also relates to non-direct foreign investment. The effect which the application of that section to non-direct foreign investment has on the nature of the competence of the European Union to approve that part of the envisaged agreement is examined in paragraphs 226 to 243 of this opinion.

The commitments relating to intellectual property protection

111. As provided in Article 207(1) TFEU, the common commercial policy includes 'the commercial aspects of intellectual property'.

112. International commitments concerning intellectual property entered into by the European Union fall within those 'commercial aspects' when they display a specific link with international trade in that they are essentially intended to promote, facilitate or govern such trade and have direct and immediate effects on it (judgment of 18 July 2013, Daiichi Sankyo and Sanofi-Aventis Deutschland, C‑414/11, EU:C:2013:520, paragraphs 49 to 52, and Opinion 3/15 (Marrakesh Treaty on access to published works) of 14 February 2017, EU:C:2017:114, paragraph 78).

113. The commitments concerning intellectual property contained in the envisaged agreement are set out in Chapter 11 thereof and, as Article 11.2 states, complement the rights and obligations of the Parties under the Agreement on Trade-Related Aspects of Intellectual Property Rights (Annex 1C to the Agreement establishing the WTO, signed in Marrakesh on 15 April 1994 and approved by Council Decision 94/800/EC of 22 December 1994 concerning the conclusion on behalf of the European Community, as regards matters within its competence, of the agreements reached in the Uruguay Round multilateral negotiations (1986-1994) (OJ 1994 L 336, p. 1) ('the WTO Agreement')) and other multilateral agreements in the field of intellectual property that have been concluded by them.

114. With regard to copyright and related rights, the envisaged agreement recalls, in Article 11.4 entitled 'Protection Granted', the obligations of the Parties under various international agreements, including the Berne Convention for the Protection of Literary and Artistic Works, signed in Berne on 9 September 1886 (Paris Act of 24 July 1971), as amended on 28 September 1979, and the World Intellectual Property Organisation (WIPO) Copyright Treaty, signed on 20 December 1996 in Geneva, which was approved on behalf of the European Union by Council Decision 2000/278/EC of 16 March 2000 (OJ 2000 L 89, p. 6). In addition, it essentially lays down legal rules relating to the minimum term of protection for various categories of works (Article 11.5) and the obligation to protect authors against circumvention of the technological measures that they apply to prevent unauthorised acts (Article 11.9).

115. With regard to trade marks, the envisaged agreement lays down, in Article 11.13, that each Party is to provide a publicly available electronic database of trade mark applications and trade mark registrations. In addition, each Party must ensure that any refusal of registration is the subject of a reasoned decision in writing that is amenable to appeal. Third parties are to have the ability to oppose trade mark applications.

116. With regard to geographical indications, Article 11.17.1 of the envisaged agreement obliges each Party to establish 'systems for the registration and protection of geographical indications in its territory, for such categories of wines and spirits and agricultural products and foodstuffs as it deems appropriate'. Those systems must include certain procedural routes, described in Article 11.17.2, which in particular enable the legitimate interests of third parties to be taken into account. Article 11.17.3 adds that the geographical indications protected by each Party will be entered on a list maintained by the Trade Committee established by the envisaged agreement. Under Article 11.19 of the agreement, the geographical indications on that list are to be protected by each Party in such a way that the entrepreneurs concerned can prevent third parties from misleading the public or carrying out other acts of unfair competition.

117. With regard to designs, under Articles 11.24 to 11.26 of the envisaged agreement each Party must protect independently created designs that are new or original for a term of at least ten years from the date of the application for protection. Article 11.24 states that designs dictated essentially by technical or functional considerations and designs which are contrary to public policy or to accepted principles of morality are excluded from such protection.

118. With regard to patents, the envisaged agreement recalls, in Article 11.29, the obligations of the Parties under certain international instruments and it contains a commitment to co-operate. Also, Article 11.31 states that 'the Parties recognise that pharmaceutical products protected by a patent in their respective territories may be subject to an administrative marketing approval process before being put on their respective markets', that they 'shall make available an extension of the duration of the rights conferred by the patent protection to compensate the patent owner for the reduction in the effective patent life as a result of the administrative marketing approval process' and that 'the extension of the duration of the rights conferred by the patent protection may not exceed five years'.

119. Article 11.33 of the envisaged agreement adds that, 'when a Party requires the submission of test data or studies concerning the safety and efficacy of a pharmaceutical product prior to granting approval for the marketing of such product, the Party shall not, for a period of at least five years from the date of approval in that Party, permit third parties to market the same or a similar product, on the basis of the marketing approval granted to the party which had provided the test data or studies, unless the party which had provided the test data or studies has given its consent'. Article 11.34 of the agreement sets out similar rules intended to protect test data submitted to obtain an administrative marketing approval to put an agricultural chemical product on the market.

120. Finally, with regard to plant varieties, Article 11.35 of the envisaged agreement recalls the obligations of the Parties under an international agreement.

121. That set of provisions relating to copyright and related rights, trade marks, geographical indications, designs, patents, test data and plant varieties, consisting of, first, a reminder of existing multilateral international obligations and, secondly, bilateral commitments, has as its basic aim, as stated in Article 11.1.1(b) of the envisaged agreement, to guarantee entrepreneurs of the European Union and Singapore an 'adequate ... level' of protection of their intellectual property rights.

122. The provisions of Chapter 11 of the envisaged agreement referred to above enable entrepreneurs of the European Union and Singapore to enjoy, in the territory of the other Party, standards of protection of intellectual property rights displaying a degree of homogeneity and thus contribute to their participation on an equal footing in the free trade of goods and services between the European Union and the Republic of Singapore.

123. The same is true of Articles 11.36 to 11.47 of the envisaged agreement, which oblige each Party to provide for certain categories of procedures and of civil judicial measures enabling the persons concerned to rely on and enforce their intellectual property rights. Those provisions ensure a degree of homogeneity between the levels of judicial protection available to holders of intellectual property rights in the European Union and Singapore respectively.

124. The same is also true of Articles 11.48 to 11.50 of the agreement, which oblige each Party to establish methods for identification of counterfeit or pirated goods by the customs authorities and to provide for the possibility for holders of intellectual property rights to obtain suspension of the release of such goods if infringement or piracy is suspected. Those provisions create a degree of homogeneity between the tools available to protect holders of intellectual property rights against the entry of counterfeit or pirated goods into the European Union and Singapore respectively.

125. It follows from all of those factors, first, that the provisions of Chapter 11 of the envisaged agreement do seek, as Article 11.1 of the agreement states, to 'facilitate the production and commercialisation of innovative and creative products and the provision of services between the Parties' and to 'increase the benefits from trade and investment'.

126. It is apparent, secondly, from those factors that Chapter 11 of the envisaged agreement in no way falls within the scope of harmonisation of the laws of the Member States of the European Union, but is intended to govern the liberalisation of trade between the European Union and the Republic of Singapore.

127. It is clear, finally, that, in the light of the key role — noted by the Advocate General in point 436 of her Opinion — that the protection of intellectual property rights plays in trade in goods and services in general, and in combatting unlawful trade in particular, the provisions of Chapter 11 of the envisaged agreement are such as to have direct and immediate effects on trade between the European Union and the Republic of Singapore.

128. It follows, under the criteria recalled in paragraphs 36 and 112 of this opinion, that Chapter 11 of the envisaged agreement relates to 'commercial aspects of intellectual property' within the meaning of Article 207(1) TFEU.

129. Some of the Member States which have submitted observations to the Court contend that Chapter 11 of the envisaged agreement also covers non-commercial aspects of intellectual property on the ground that Article 11.4 refers, with regard to copyright and related rights, to multilateral conventions which include a provision relating to moral rights. However, the reference by the envisaged agreement to those conventions is not sufficient, with a view to determining the nature of the competence of the European Union to conclude the envisaged agreement, for that subject to be regarded, in its own right, as a component of that agreement, which does not mention moral rights.

130. It follows from all the foregoing that Chapter 11 of the envisaged agreement is essentially intended to facilitate and govern trade between the European Union and the Republic of Singapore, and that its provisions are such as to have direct and immediate effects thereon, within the meaning of the case-law recalled in paragraphs 36 and 112 of this opinion. That chapter consequently falls within the exclusive competence of the European Union pursuant to Article 3(1)(e) TFEU.

The commitments concerning competition

131. As stated in Article 12.1.1 of the envisaged agreement, the Parties recognise both 'the importance of free and undistorted competition in their trade relations' and 'that anti-competitive business conduct or anti-competitive transactions have the potential to distort the proper functioning of their markets and undermine the benefits of trade liberalisation'.

132. Article 12.1.2 of that agreement obliges each Party, to that end, to maintain legislation which effectively addresses agreements between undertakings, decisions by associations of undertakings and concerted practices having as their object or effect the prevention, restriction or distortion of competition, as well as abuses of dominant positions and concentrations between undertakings resulting in a substantial lessening of competition or significantly impeding it, in so far as those agreements, decisions, practices, abuses and concentrations affect trade between the European Union and the Republic of Singapore.

133. Article 12.2 of the agreement adds that each Party undertakes to maintain authorities responsible for the enforcement of its respective legislation referred to in Article 12.1.2, and to apply its legislation in a transparent and non-discriminatory manner and in observance of the principles of procedural fairness and of rights of the defence.

134. Those provisions of the envisaged agreement unequivocally form part of the liberalisation of trade between the European Union and the Republic of Singapore. Indeed, they relate specifically to the combatting of anti-competitive activity and of concentrations whose object or effect is to prevent trade between the European Union and that third State from taking place in healthy conditions of competition.

135. Those provisions consequently fall within the field of the common commercial policy and not the field of the internal market. The fact that the envisaged agreement does not relate in the slightest to harmonisation of the laws of the Member States of the European Union or to trade between Member States is, moreover, borne out by the first sentence of Article 12.2 of the agreement, according to which 'each Party shall maintain its autonomy in developing and enforcing its law', and the clarification provided in Article 12.1 that Chapter 12 covers anti-competitive agreements, decisions, practices, abuses and concentrations only in so far as they affect trade between the European Union and the Republic of Singapore.

136. Articles 12.3 and 12.4 of the envisaged agreement also display a specific link with trade between the European Union and the Republic of Singapore. Those provisions stipulate, in essence, that any public undertaking, any undertaking entrusted with special or exclusive rights and any State monopoly is to accord non-discriminatory treatment to goods and to service suppliers of the other Party.

137. Chapter 12 of the envisaged agreement also includes provisions on subsidies. Those provisions recall the obligations of the Parties under the Agreement on Subsidies and Countervailing Measures that forms part of Annex 1A to the WTO Agreement, determine which subsidies related to trade in goods and services between the European Union and the Republic of Singapore are prohibited, and oblige each Party to use its best endeavours to remedy or remove the effects on trade with the other Party of subsidies that are not prohibited.

138. It follows from the foregoing that, under the criteria recalled in paragraph 36 of this opinion, Chapter 12 of the envisaged agreement falls within the exclusive competence of the European Union referred to in Article 3(1)(e) TFEU.

The commitments concerning sustainable development

139. As is apparent from paragraph 5 of this opinion, authorisation to open negotiations with the Republic of Singapore with a view to the conclusion of a free trade agreement was given on 22 December 2009.

OPINION 2/15 (EU-SINGAPORE FREE TRADE AGREEMENT) OF 16. 5. 2017
OPINION PURSUANT TO ARTICLE 218(11) TFEU

140. As the Parliament has pointed out in its observations, the aim of those negotiations was to reach agreement on a 'new generation' free trade agreement, that is to say, a trade agreement including — in addition to the classical elements in such agreements, such as the reduction of tariff and non-tariff barriers to trade in goods and services — other aspects that are relevant, or even essential, to such trade.

141. The EU and FEU Treaties entered into force on 1 December 2009. In the case of the common commercial policy, the FEU Treaty differs appreciably from the EC Treaty previously in force, in that it includes new aspects of contemporary international trade in that policy. The extension of the field of the common commercial policy by the FEU Treaty constitutes a significant development of primary EU law (see judgment of 18 July 2013, Daiichi Sankyo and Sanofi-Aventis Deutschland, C-414/11, EU:C:2013:520, paragraphs 46 and 48).

142. One of the features of that development is the rule laid down in the second sentence of Article 207(1) TFEU that 'the common commercial policy shall be conducted in the context of the principles and objectives of the Union's external action'. Those principles and objectives are specified in Article 21(1) and (2) TEU and, as is stated in Article 21(2)(f) TEU, relate inter alia to sustainable development linked to preservation and improvement of the quality of the environment and the sustainable management of global natural resources.

143. The obligation on the European Union to integrate those objectives and principles into the conduct of its common commercial policy is apparent from the second sentence of Article 207(1) TFEU read in conjunction with Article 21(3) TEU and Article 205 TFEU.

144. Indeed, as provided in Article 21(3) TEU, the European Union is to 'pursue the objectives set out in paragraphs 1 and 2 in the development and implementation of the different areas of the Union's external action covered by this Title and by Part Five of the [FEU Treaty] …'. Part Five of the FEU Treaty includes, inter alia, the common commercial policy.

145. Article 205 TFEU expresses the same obligation, stating that 'the Union's action on the international scene, pursuant to [Part Five of the FEU Treaty], shall be guided by the principles, pursue the objectives and be conducted in accordance with the general provisions laid down in Chapter 1 of Title V of the [EU Treaty]'. Chapter 1 of Title V of the EU Treaty contains, inter alia, Article 21 TEU.

146. Account must, furthermore, be taken of Articles 9 and 11 TFEU, which respectively provide that, 'in defining and implementing its policies and activities, the Union shall take into account requirements linked to … the guarantee of adequate social protection' and 'environmental protection requirements must be integrated into the definition and implementation of the Union's policies and activities, in particular with a view to promoting sustainable development' (see, by analogy, judgment of 21 December 2016, AGET Iraklis, C-201/15, EU:C:2016:972, paragraph 78). In addition, Article 3(5) TEU obliges the European Union to contribute, in its relations with the wider world, to 'free and fair' trade.

147. It follows that the objective of sustainable development henceforth forms an integral part of the common commercial policy.

148. In the present instance, the Parties declare, in the preamble to the envisaged agreement, that they are 'determined to strengthen their economic, trade, and investment relations in accordance with the objective of sustainable development, in its economic, social and environmental dimensions'. In that context, Chapter 13 of the agreement states, in Articles 13.1 and 13.2, that sustainable development, of which the social protection of workers and environmental protection are mutually reinforcing components, forms part of the objectives of trade relations between the European Union and the Republic of Singapore.

149. As regards the social protection of workers, Articles 13.3 to 13.5 of the envisaged agreement include, in addition to various commitments of the Parties to cooperate, exchange information and take account of scientific information, the obligation on each of them to implement effectively the principles concerning the fundamental rights at work. Those principles are listed in Article 13.3.3 of the agreement and cover, under the instruments adopted within the framework of the International Labour Organisation (ILO), 'freedom of association and the effective recognition of the right to collective bargaining', 'the elimination of all forms of forced or compulsory labour', 'the effective abolition of child labour' and 'the elimination of discrimination in respect of employment and occupation'. Those principles correspond to the principles of the ILO Declaration on Fundamental Principles and Rights at Work and its Follow-up, adopted on 18 June 1998 in Geneva (Annex revised 15 June 2010), and, as the third recital in the preamble to that declaration states, are associated with the objective of sustainable development.

150. So far as concerns environmental protection, Articles 13.6 to 13.10 of the envisaged agreement include, in addition to various commitments of the Parties to cooperate, exchange information and take account of scientific information, the obligation on each of them to implement effectively the multilateral environmental agreements to which they are party (Article 13.6.2), to address trade in illegally harvested timber and timber products (Article 13.7(b)), to comply with sustainable exploitation of fish stocks as defined in the international instruments ratified by the Parties (Article 13.8(a)), to combat illegal, unreported and unregulated fishing (Article 13.8(b)) and to adopt effective monitoring and control measures to ensure compliance with conservation measures (Article 13.8(c)).

151. Article 13.6.4 of the envisaged agreement states that the Parties are prohibited from applying measures adopted or maintained to implement a multilateral environmental agreement in a manner that would constitute a means of arbitrary or unjustifiable discrimination between the Parties or a disguised restriction on trade.

152. By the above provisions of Chapter 13 of the envisaged agreement, the European Union and the Republic of Singapore undertake, essentially, to ensure that trade between them takes place in compliance with the obligations that stem from the international agreements concerning social protection of workers and environmental protection to which they are party.

153. That finding is not called into question by the fact that the international commitments recalled in Chapter 13 of the envisaged agreement, that is to say, in particular those set out in paragraphs 149 and 150 of this opinion, cover not only trade between the European Union and the Republic of Singapore. Having regard to the difficulty in distinguishing, for the purpose of compliance with those commitments, between products and services which are traded between the European Union and that third State and those that are not, the need to ensure in an effective manner that those commitments are complied with in the course of such trade justifies them covering all the activities in the sectors concerned.

154. In addition, the scope of the obligations stemming from the international agreements to which the envisaged agreement refers is a matter covered by the interpretation, mediation and dispute settlement mechanisms that are in force for those international agreements. The envisaged agreement safeguards the application of those external mechanisms by stating in Article 13.16 that its own dispute settlement rules and its own mediation mechanism, set out in Chapters 15 and 16, are not applicable to Chapter 13.

155. It follows that Chapter 13 concerns neither the scope of the international agreements to which it refers nor the competences of the European Union or the Member States relating to those agreements. On the other hand, it displays a specific link with trade between the European Union and the Republic of Singapore.

156. Indeed, Chapter 13 governs that trade by ensuring that it takes place in compliance with those agreements and that no measure adopted under them is applied so as to create arbitrary or unjustifiable discrimination or a disguised restriction on such trade.

157. Chapter 13 is also such as to have direct and immediate effects on that trade.

158. Such effects result, first, from the commitment of the Parties, stemming from Article 13.1.3 of the envisaged agreement, on the one hand, not to encourage trade by reducing the levels of social and environmental protection in their respective territories below the standards laid down by international commitments and, on the other, not to apply those standards in a protectionist manner.

159. Secondly, the provisions laid down in Chapter 13 of the envisaged agreement are such as to have direct and immediate effects on trade between the European Union and the Republic of Singapore since they reduce the risk of major disparities between the costs of producing goods and supplying services in the European Union, on the one hand, and Singapore, on the other, and thus contribute to the participation of EU entrepreneurs and entrepreneurs of the Republic of Singapore in free trade on an equal footing.

160. Thirdly, as regards in particular the commitments, referred to in paragraph 150 of this opinion, to address trade in illegally harvested timber and timber products and to combat illegal, unreported and unregulated fishing, the Parties undertake in the envisaged agreement to implement or encourage documentation, verification and certification schemes. Schemes of that kind are such as to have a direct impact on trade in the products concerned (see, to that effect, judgment of 12 December 2002, Commission v Council, C-281/01, EU:C:2002:761, paragraph 40).

161. Finally, the link which the provisions of Chapter 13 of the envisaged agreement display with trade between the European Union and the Republic of Singapore is also specific in nature because a breach of the provisions concerning social protection of workers and environmental protection, set out in that chapter, authorises the other Party — in accordance with the rule of customary international law codified in Article 60(1) of the Convention on the law of treaties, signed in Vienna on 23 May 1969 (United Nations Treaty Series, vol. 1155, p. 331; 'the Vienna Convention'), which applies in relations between the European Union and third States (see, in respect of the applicability of the customary rules codified in the Vienna Convention to the external relations of the European Union, judgments of 25 February 2010, Brita, C-386/08, EU:C:2010:91, paragraphs 41 and 42, and of 21 December 2016, Council v Front Polisario, C-104/16 P, EU:C:2016:973, paragraphs 100, 107, 110 and 113) — to terminate or suspend the liberalisation, provided for in the other provisions of the envisaged agreement, of that trade.

162. Indeed, Chapter 13 plays an essential role in the envisaged agreement.

163. It would, moreover, not be coherent to hold that the provisions liberalising trade between the European Union and a third State fall within the common commercial policy and that those which are designed to ensure that the requirements of sustainable development are met when that liberalisation of trade takes place fall outside it. The conduct of trade in accordance with the objective of sustainable development — as has been stated in paragraph 147 of this opinion — forms an integral part of that policy.

164. It is true that the exclusive competence of the European Union referred to in Article 3(1)(e) TFEU cannot be exercised in order to regulate the levels of social and environmental protection in the Parties' respective territory. The adoption of such rules would fall within the division of competences between the European Union and the Member States that is laid down, in particular, in Article 3(1)(d) and (2) and Article 4(2)(b) and (e) TFEU. Article 3(1)(e) TFEU does not prevail over these other

provisions of the FEU Treaty, Article 207(6) TFEU indeed stating that 'the exercise of the competences conferred … in the field of the common commercial policy shall not affect the delimitation of competences between the Union and the Member States …'.

165. In the present instance, however, it is apparent from Article 13.1.4 of the envisaged agreement that it is not the Parties' intention 'to harmonise the labour or environment standards of the Parties' and from Article 13.2.1 thereof that the Parties recognise their mutual right to establish their own levels of environmental and social protection, and to adopt or modify accordingly their relevant laws and policies, consistent with their international commitments in those fields.

166. It follows from all of those factors that the provisions of Chapter 13 of the envisaged agreement are intended not to regulate the levels of social and environmental protection in the Parties' respective territory but to govern trade between the European Union and the Republic of Singapore by making liberalisation of that trade subject to the condition that the Parties comply with their international obligations concerning social protection of workers and environmental protection.

167. In the light of all the foregoing, Chapter 13 of the envisaged agreement falls, in accordance with the criteria recalled in paragraph 36 of this opinion, within the common commercial policy and, therefore, within the exclusive competence of the European Union referred to in Article 3(1)(e) TFEU.

The competence referred to in Article 3(2) TFEU

The commitments concerning services in the field of transport

168. For the reasons set out in paragraphs 56 to 68 of this opinion, in so far as the commitments contained in Chapter 8 of the envisaged agreement relate to international maritime transport services, rail transport services, road transport services and internal waterways transport services, and to services inherently linked to those transport services, they do not fall within the common commercial policy, but must be approved in accordance with the division of competences between the European Union and the Member States in the field of the common transport policy.

169. That common policy is governed by Title VI of Part Three of the FEU Treaty, a title which comprises Articles 90 to 100 TFEU. Article 100 TFEU states, in paragraph 1, that the provisions of Title VI are to apply to transport by rail, road and inland waterway and, in paragraph 2, confers upon the EU legislature the power to lay down any appropriate provision for sea and air transport. Article 91(1) TFEU authorises the EU legislature to adopt 'common rules' within the framework of the common transport policy.

170. In paragraph 17 of its judgment of 31 March 1971, Commission v Council (22/70, EU:C:1971:32), the Court stated that, when the European Union adopts provisions laying down common rules, whatever form these may take, the Member States no longer have the right, acting individually or even collectively, to undertake obligations with third States which affect those rules (see also, inter alia, judgment of 5 November 2002, Commission v Denmark, C-467/98, EU:C:2002:625, paragraphs 77 to 80).

171. In line with that case-law, Article 216 TFEU grants to the EU competence to conclude, inter alia, any international agreement which 'is likely to affect common rules or alter their scope'.

172. Under Article 3(2) TFEU, the competence of the European Union to conclude such an agreement is exclusive.

173. The Commission submits that the commitments contained in Chapter 8 of the envisaged agreement that relate to the field of transport may affect common rules or alter their scope. The Parliament shares that view, unlike the Council and the Member States which have submitted observations to the Court.

174. This question should be examined for all of the methods of transport referred to in the schedules of commitments annexed to Chapter 8 of the envisaged agreement. In the light of the particular attention paid by the agreement to maritime transport, that form of transport should be examined first.

— Maritime transport

175. Whilst Chapter 8 of the envisaged agreement, in Articles 8.3 and 8.9, and in point 11.A of Appendices 8-A-1 and 8-B-1 and point 16.A of Appendices 8-A-2 and 8-A-3 in the annexes to that chapter, excludes national maritime cabotage from its scope, on the other hand it devotes a sub-section to international maritime transport services. This sub-section consists of Article 8.56 of the agreement, which is worded as follows:

'1. This Sub-Section sets out the principles regarding the liberalisation of international maritime transport services pursuant to Sections B (Cross-border Supply of Services), C (Establishment) and D (Temporary Presence of Natural Persons for Business Purposes).

2. For the purposes of this Sub-Section:

"international maritime transport" includes door-to-door and multi-modal transport operations, which is the carriage of goods using more than one mode of transport, involving a sea-leg, under a single transport document, and to this effect the right to directly contract with providers of other modes of transport.

3. As regards international maritime transport, the Parties agree to ensure effective application of the principles of unrestricted access to cargoes on a commercial basis, the freedom to supply international maritime transport services, as well as national treatment in the framework of the supply of such services.

In view of the existing levels of liberalisation between the Parties in international maritime transport:

(a) the Parties shall effectively apply the principle of unrestricted access to the international maritime transport markets and trades on a commercial and non-discriminatory basis; and

(b) each Party shall grant to ships flying the flag of the other Party or operated by service suppliers of the other Party treatment no less favourable than that accorded to its own ships or those of any third country, whichever are the better, with regard to, inter alia, access to ports, the use of infrastructure and auxiliary maritime services of the ports, as well as related fees and charges, customs facilities and access to berths and facilities for loading and unloading.

4. In applying these principles, the Parties shall:

(a) not introduce cargo-sharing arrangements in future agreements with third countries concerning maritime transport services, including dry and liquid bulk and liner trade, and terminate, within a reasonable period of time, such cargo-sharing arrangements in case they exist in previous agreements; and

(b) upon the entry into force of this Agreement, abolish and abstain from introducing any unilateral measures and administrative, technical and other obstacles which could constitute a disguised restriction or have discriminatory effects on the free supply of services in international maritime transport.

5. Each Party shall permit international maritime transport service suppliers of the other Party to have an establishment in its territory under conditions of establishment and operation in accordance with the conditions inscribed in its Schedule of Specific Commitments.

6. The Parties shall make available to international maritime transport suppliers of the other Party on reasonable and non-discriminatory terms and conditions the use of the following services at the port:

(a) pilotage;

(b) towing and tug assistance;

(c) provisioning;

(d) fuelling and watering;

(e) garbage collecting and ballast waste disposal;

(f) port captain's services;

(g) navigation aids; and

(h) shore-based operational services essential to ship operations, including communications, water and electrical supplies, emergency repair facilities, anchorage, berth and berthing services.'

176. Article 8.56 of the envisaged agreement must be read in conjunction with the specific commitments which are annexed to Chapter 8 thereof. Articles 8.7 and 8.12 of the agreement state that 'the sectors liberalised by a Party … and, by means of reservations, the … limitations … are set out in [that Party's] Schedule of Specific Commitments'.

177. It is apparent from point 11.A of Appendices 8-A-1 and 8-B-1 in the annexes to Chapter 8 that the European Union and the Republic of Singapore have not coupled the commitments referred to in Article 8.56 with any limitation so far as the cross-border supply of international maritime transport services (modes 1 and 2) is concerned.

178. As regards, on the other hand, the supply of international maritime transport services by the presence of natural persons (mode 4), the envisaged agreement maintains the status quo in relations between the European Union and the Republic of Singapore. It is apparent from point 16.A of Appendix 8-A-3 in the annexes to Chapter 8 of the agreement, according to which nationality conditions may be maintained in the European Union, and from point 11.A of Appendix 8-B-1 in those annexes, according to which the Republic of Singapore is not required to liberalise the supply of such services under mode 4, that the Parties do not undertake to liberalise this mode of supply of services.

179. So far as concerns the supply of international maritime transport services through commercial presence in the territory of the other Party (mode 3), the commitment set out in Article 8.56.5 of the envisaged agreement, according to which each Party is to permit international maritime transport service suppliers of the other Party to have an establishment in its territory, is limited by point 16.A of Appendix 8-A-2 and point 11.A of Appendix 8-B-1 in the annexes to Chapter 8 of the envisaged agreement, which restrict the ability of suppliers of the other Party to establish themselves with a view to operating vessels flying the flag of the State of establishment.

OPINION 2/15 (EU-SINGAPORE FREE TRADE AGREEMENT) OF 16. 5. 2017
OPINION PURSUANT TO ARTICLE 218(11) TFEU

180. In order to assess whether those commitments in respect of services supplied under modes l and 2 and the — limited — commitments in respect of services supplied under mode 3 'may affect common rules or alter their scope', within the meaning of Article 3(2) TFEU, regard must be had to the Court's settled case-law according to which there is a risk of that where those commitments fall within the scope of those rules (see, inter alia, judgment of 4 September 2014, Commission v Council, C-114/12, EU:C:2014:2151, paragraph 68; Opinion 1/13 (Accession of third States to the Hague Convention) of 14 October 2014, EU:C:2014:2303, paragraph 71; judgment of 26 November 2014, Green Network, C-66/13, EU:C:2014:2399, paragraph 29; and Opinion 3/15 (Marrakesh Treaty on access to published works) of 14 February 2017, EU:C:2017:114, paragraph 105).

181. A finding that there is such a risk does not presuppose that the area covered by the international commitments and that covered by the EU rules coincide fully. The scope of the common EU rules may also be affected or altered by those commitments where the latter fall within an area which is already covered to a large extent by those rules (see Opinion 1/03 (New Lugano Convention) of 7 February 2006, EU:C:2006:81, paragraph 126; judgment of 4 September 2014, Commission v Council, C-114/12, EU:C:2014:2151, paragraphs 69 and 70; Opinion 1/13 (Accession of third States to the Hague Convention) of 14 October 2014, EU:C:2014:2303, paragraphs 72 and 73; and Opinion 3/15 (Marrakesh Treaty on access to published works) of 14 February 2017, EU:C:2017:114, paragraphs 106 and 107).

182. In the present instance, the area within which the aforementioned commitments contained in the envisaged agreement fall is covered to a large extent by the common rules laid down by Regulation No 4055/86, which governs application of the principle of the freedom to provide services to maritime transport between Member States and between Member States and third States.

183. Under that regulation, two categories of persons, defined in Article 1, enjoy freedom to provide international maritime transport services, namely, first, nationals of a Member State who are established in a Member State other than that of the person for whom the services are intended and, secondly, nationals of a Member State who are established in a third State and shipping companies established in a third State which are controlled by nationals of a Member State.

184. The EU legislature also set out a requirement for a connection with the Member State concerned by providing — in using the words 'if their vessels are registered in that Member State in accordance with its legislation' in Article 1(2) of Regulation No 4055/86 — that nationals of a Member State who operate from an establishment situated in a third State are excluded from the freedom to provide services if their vessels do not fly the flag of that Member State (see judgment of 8 July 2014, Fonnship and Svenska Transportarbetareförbundet, C-83/13, EU:C:2014:2053, paragraph 34).

185. In that delimited manner, Regulation No 4055/86 extends freedom to provide services to international maritime transport services.

186. It states, furthermore, in Article 1(3), that 'the provisions of Articles [51 to 54 TFEU] shall apply to the matters covered by this Regulation'.

187. Article 6(1) and (2) of Regulation No 4055/86 adds the following:

'1. If a Member State's nationals or shipping companies … are experiencing, or are threatened by, a situation where they do not have an effective opportunity to ply for trade to and from a particular third country, the Member State concerned shall inform the other Member States and the Commission as soon as possible.

2. The Council, … on a proposal of the Commission, shall decide on the necessary action. Such action may include … the negotiation and conclusion of cargo-sharing arrangements.'

OPINION 2/15 (EU-SINGAPORE FREE TRADE AGREEMENT) OF 16. 5. 2017
OPINION PURSUANT TO ARTICLE 218(11) TFEU

188. The supply of maritime transport services between the European Union and the Republic of Singapore is covered by the common rules laid down by Regulation No 4055/86. Those rules have the effect, inter alia, of conferring upon suppliers of such services who are established in a Member State and upon nationals of a Member State who control a shipping company which is located in Singapore and is supplying such services by means of vessels flying the flag of a Member State access to traffic to and from that third State that is in principle free. On the other hand, suppliers of maritime transport services between the European Union and that third State who do not fulfil those conditions requiring a connection do not enjoy such access.

189. The commitments contained in the envisaged agreement affect, or even alter, considerably, as regards maritime transport services between the European Union and the Republic of Singapore, the scope of those common rules established by Regulation No 4055/86.

190. Indeed, it follows from Article 8.56.3 of that agreement that EU suppliers of maritime transport services and nationals of a Member State controlling a shipping company established in Singapore will have free access to traffic to and from that third State, without a requirement that the EU nationals' vessels fly the flag of a Member State. That regime differs appreciably from the regime established by Regulation No 4055/86.

191. The rules laid down in Article 6 of Regulation No 4055/86 are also affected by the envisaged agreement. Whilst it is apparent from Article 6 of the regulation that the Council may authorise the negotiation and conclusion of cargo-sharing arrangements if a Member State's nationals or shipping companies encounter difficulties in obtaining access to traffic to and from a third State, Article 8.56.4 of the agreement provides for the gradual abolition of such arrangements.

192. Consequently, the commitments in the envisaged agreement relating to maritime transport services between the European Union and the Republic of Singapore may affect, or even alter, the common rules laid down by Regulation No 4055/86, which apply to the supply of those services.

193. The competence of the European Union to approve those commitments is, therefore, exclusive pursuant to Article 3(2) TFEU.

194. The same is necessarily true of the commitments intended to couple access to those transport services with free access to the auxiliary services that are inherently linked thereto, as listed in Article 8.56.6 of the envisaged agreement and in point 12 of Appendix 8-A-1, point 17 of Appendices 8-A-2 and 8-A-3 and point 11 of Appendix 8-B-1 in the annexes to Chapter 8 of that agreement.

– Rail transport

195. It is apparent from the principles — summarised in paragraph 51 of this opinion — that are set out in Chapter 8 of the envisaged agreement, read in conjunction with point 11.C of Appendix 8-A-1, point 16.C of Appendices 8-A-2 and 8-A-3 and point 11.B of Appendix 8-B-1 in the annexes to that chapter, that the latter liberalises rail transport services as between the European Union and the Republic of Singapore supplied under modes 2 and 3.

196. Consequently, in that service sector, the European Union undertakes to permit Singapore service providers to have access to rail networks and activities in the European Union and, as the case may be, to establish themselves there, under conditions no less favourable than those which apply to EU service providers. The Republic of Singapore gives similar undertakings in respect of EU service providers so far as access to rail networks and activities in its territory is concerned.

197. Those commitments of the European Union fall within an area largely covered by common EU rules.

ECLI:EU:C:2017:376

198. Indeed, the no less favourable conditions from which Singapore service providers will benefit, in accordance with those commitments, in order to have access to rail transport networks and activities in the European Union, and in order to establish themselves there, correspond to the matters, laid down by Directive 2012/34, that are governed by the rules of the single European railway area.

199. That directive, which was adopted on the basis of Article 91 TFEU, states in recital 7 that 'the principle of freedom to provide services [is] applied to the railway sector, taking into account that sector's specific characteristics'. The directive, as is apparent from Article 1 thereof, 'applies to the use of railway infrastructure for … rail services' and lays down, inter alia, 'the rules applicable to the management of railway infrastructure and to rail transport activities of the railway undertakings established or to be established in a Member State' and 'the criteria applicable to the issuing, renewal or amendment of licences by a Member State intended for railway undertakings which are or will be established in the Union'.

200. Upon the entry into force of the envisaged agreement, rail transport services supplied in the European Union by Singapore service providers will, in accordance with the commitments resulting from that agreement, come under a regime governing access and establishment that will cover the same matters as the regime established by Directive 2012/34 and is not to be less favourable than that regime.

201. As the Court has already determined, where an agreement between the European Union and a third State provides for the application, to the international relations covered by that agreement, of rules that will overlap to a large extent with the common EU rules applicable to intra-Community situations, that agreement must be regarded as capable of affecting or altering the scope of those common rules. Despite there being no contradiction with those common rules, the meaning, scope and effectiveness of the latter may be affected (see, inter alia, Opinion 1/03 (New Lugano Convention) of 7 February 2006, EU:C:2006:81, paragraphs 143 and 151 to 153; Opinion 1/13 (Accession of third States to the Hague Convention) of 14 October 2014, EU:C:2014:2303, paragraphs 84 to 90; and judgment of 26 November 2014, Green Network, C‑66/13, EU:C:2014:2399, paragraphs 48 and 49).

202. Since the commitments contained in the envisaged agreement concerning rail transport services fall within an area which is already covered to a large extent by common EU rules and the scope of those rules may be affected or altered by those commitments, the competence of the European Union to approve those commitments is exclusive, pursuant to Article 3(2) TFEU.

203. The same is necessarily true of the commitments intended to couple access to those transport services with free access to the auxiliary services that are inherently linked thereto, as listed in point 12 of Appendix 8-A-1, point 17 of Appendix 8-A-2 and point 11 of Appendix 8-B-1 in the annexes to Chapter 8 of the envisaged agreement.

   – Road transport

204. It is apparent from the principles — summarised in paragraph 51 of this opinion –that are set out in Chapter 8 of the envisaged agreement, read in conjunction with point 11.D of Appendix 8-A-1, point 16.D of Appendices 8-A-2 and 8-A-3 and point 11.C of Appendix 8-B-1 in the annexes to that chapter, that the latter liberalises without limitation road transport services in the European Union and Singapore supplied under mode 2 and liberalises to a certain extent those supplied under modes 3 and 4.

205. The European Union undertakes to permit Singapore service providers to engage, in the European Union, in activities for the transport of passengers and goods by road under conditions no less favourable than those which apply to EU service providers. The Republic of Singapore gives similar undertakings so far as EU service providers are concerned.

206. Those commitments of the European Union fall within an area largely covered by common EU rules.

207. The no less favourable conditions from which Singapore service providers will benefit, in accordance with those commitments, in order to supply road transport services in the European Union correspond to a large extent to the matters governed by the common rules laid down in Regulations No 1071/2009, No 1072/2009 and No 1073/2009.

208. Those regulations, which fall within the common transport policy, respectively establish, pursuant to Article 1 thereof, common rules relating to admission to, 'and the pursuit of, the occupation of road transport operator', to access to the 'international carriage of goods by road [in the European Union]' and to access to the 'international carriage of passengers by coach and bus [in the European Union]'.

209. Upon the entry into force of the envisaged agreement, road transport services supplied in the European Union by Singapore service providers must, in accordance with the commitments contained in that agreement, come under an access regime that will cover the same matters as the regimes established, in particular, by Regulations No 1072/2009 and No 1073/2009 and is not to be less favourable than those regimes.

210. For the same reasons as those set out in paragraph 201 of this opinion, it must be held that such international commitments fall within an area which is already covered to a large extent by common EU rules and that they may affect or alter the scope of those rules.

211. The competence of the European Union to approve the commitments relating to road transport services is accordingly exclusive, pursuant to Article 3(2) TFEU.

212. The same is necessarily true of the commitments relating to the auxiliary services inherently linked to those transport services, as listed in point 12 of Appendix 8-A-1, point 17 of Appendix 8-A-2 and point 11 of Appendix 8-B-1 in the annexes to Chapter 8 of the envisaged agreement.

– Internal waterways transport

213. Internal waterways transport which remains confined within the territory of a Member State of the European Union or of the Republic of Singapore is not mentioned in the envisaged agreement and therefore, in accordance with Articles 8.7 and 8.12 of the envisaged agreement, is not covered by the liberalisation provided for in Chapter 8 of the agreement.

214. Whilst internal waterways transport between Member States of the European Union is mentioned in the schedule of specific commitments of the European Union for services supplied under modes 1 to 3, it is not liberalised either. On account of the limitations set out in point 11.B of Appendix 8-A-1 and point 16.B of Appendix 8-A-2 in the annexes to Chapter 8 of the envisaged agreement, Singapore entrepreneurs essentially do not have a right of access to those transport activities.

215. Those appendices specify, in particular, that nationality conditions are to be maintained. Furthermore, the territories of 13 Member States are excluded from the cross-border supply of those transport services. On account of the geographical situation of those Member States, the internal waterways between Member States that are not affected by that exclusion are limited essentially to the internal waterways linking Germany, Austria, France, Luxembourg and the Netherlands and those linking Belgium, France and the Netherlands. Access to those waterways is, however, reserved under existing agreements the maintenance of which, without any extension in favour of Singapore entrepreneurs, is expressly provided for in those appendices.

216. It follows that the mention in the envisaged agreement of internal waterways transport is accompanied, at most, by commitments of extremely limited scope.

217. It is settled case-law that, when examining the nature of the competence to conclude an international agreement, there is no need to take account of the provisions of that agreement which are extremely limited in scope (see, inter alia, Opinion 1/08 (Agreements modifying the Schedules of Specific Commitments under the GATS) of 30 November 2009, EU:C:2009:739, paragraph 166 and the case-law cited). Accordingly, in the present instance, the nature of the competence of the European Union so far as concerns the commitments contained in Chapter 8 of the envisaged agreement in the field of transport should be determined by taking account of the commitments relating to maritime, rail and road transport. Since, for the reasons set out in paragraphs 175 to 212 of this opinion, the European Union has exclusive competence, pursuant to Article 3(2) TFEU, to approve those commitments, it follows, from that conclusion in conjunction with the conclusion set out in paragraph 69 of this opinion, that it has exclusive competence in respect of Chapter 8 in its entirety.

218. Contrary to Ireland's submissions, that conclusion is not affected by the Protocol (No 21) on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, annexed to the EU and FEU Treaties. It is sufficient to note that the common commercial policy and the common transport policy are not covered by that protocol and to bear in mind that it is the aim and the content of the measure in question which determine the protocols that may be applicable, and not vice versa (see, by analogy, judgment of 22 October 2013, Commission v Council, C-137/12, EU:C:2013:675, paragraphs 74 and 75). Since the envisaged agreement does not relate to the matters governed by Title V of Part Three of the FEU Treaty, that protocol is irrelevant in the present procedure. The same is true of Protocol (No 22) on the position of Denmark, annexed to the EU and FEU Treaties, as the Kingdom of Denmark indeed stated at the hearing.

The commitments concerning public procurement in the field of transport

219. As has been stated in paragraph 77 of this opinion, in so far as the commitments contained in Chapter 10 of the envisaged agreement relate to public procurement in respect of international maritime transport services, rail transport services, road transport services and internal waterways transport services, and to public procurement in respect of services inherently linked to those transport services, they do not fall within the common commercial policy.

220. That being so, it must be examined whether, for the commitments relating to public procurement in respect of those services, the European Union has exclusive external competence pursuant to Article 3(2) TFEU.

221. As has been noted in paragraphs 75 and 76 of this opinion, Chapter 10 of the envisaged agreement contains a body of rules designed to lay down a framework for public procurement in the European Union and Singapore, so as to ensure that the principles of non-discrimination and transparency are observed when public procurement procedures take place.

222. Directive 2014/24/EU of the European Parliament and of the Council of 26 February 2014 on public procurement and repealing Directive 2004/18/EC (OJ 2014 L 94, p. 65) and Directive 2014/25/EU of the European Parliament and of the Council of 26 February 2014 on procurement by entities operating in the water, energy, transport and postal services sectors and repealing Directive 2004/17/EC (OJ 2014 L 94, p. 243) establish a body of common rules designed, in essence, to guarantee that public procurement inter alia in the transport sector is consistent, in the European Union, with those principles, as is stated in recital 1 and Article 18 of Directive 2014/24 and recital 2 and Article 36 of Directive 2014/25.

223. Upon the entry into force of the envisaged agreement, access of Singapore service providers to public procurement within the European Union in the field of transport will therefore fall within the scope of commitments covering the same matters as those governed by Directives 2014/24 and 2014/25.

224. Therefore, in accordance with the case-law recalled in paragraph 201 of this opinion, the European Union has exclusive external competence pursuant to Article 3(2) TFEU in respect of the international commitments contained in Chapter 10 of the envisaged agreement concerning public procurement for services in the field of transport, as those commitments fall within an area which is already covered to a large extent by common EU rules and they may affect or alter the latter's scope.

The commitments concerning non-direct investment

225. For the reasons set out in paragraphs 80 to 109 of this opinion, the commitments contained in Section A of Chapter 9 of the envisaged agreement relating to investment protection fall within the common commercial policy of the European Union and, therefore, within the latter's exclusive competence pursuant to Article 3(1)(e) TFEU in so far as they concern 'foreign direct investment', within the meaning of Article 207(1) TFEU, between the European Union and the Republic of Singapore.

226. It must now be determined whether the European Union also has exclusive competence pursuant to Article 3(2) TFEU in so far as Section A of Chapter 9 relates to other foreign investment between the European Union and the Republic of Singapore.

227. It should be recalled that non-direct foreign investment may, inter alia, take place in the form of the acquisition of company securities with the intention of making a financial investment without any intention to influence the management and control of the undertaking ('portfolio' investments), and that such investments constitute movements of capital for the purposes of Article 63 TFEU (see, inter alia, judgments of 28 September 2006, Commission v Netherlands, C-282/04 and C-283/04, EU:C:2006:208, paragraph 19; of 21 October 2010, Idryma Typou, C-81/09, EU:C:2010:622, paragraph 48; and of 10 November 2011, Commission v Portugal, C-212/09, EU:C:2011:717, paragraph 47).

228. As the Advocate General has observed in point 367 of her Opinion, types of investment other than the acquisition of company securities, such as certain categories of real-estate investment or the use of loans, are also investments covered by Chapter 9 of the envisaged agreement and may, like acquisition of company securities, involve capital movements or payments.

229. Relying essentially on the case-law recalled in paragraph 201 of this opinion, according to which, even if there is no contradiction with common EU rules, an agreement concluded by the European Union may 'affect' those rules, within the meaning of Article 3(2) TFEU, the Commission submits that Section A of Chapter 9 of the envisaged agreement may affect Article 63 TFEU and accordingly falls within the exclusive competence of the European Union referred to in Article 3(2) TFEU.

230. However, as has been maintained by the Council and the Member States which have submitted observations to the Court, that case-law cannot be applied to a situation where the EU rule referred to is a provision of the FEU Treaty and not a rule adopted on the basis of the FEU Treaty.

231. First, that case-law, the substance of which is expressed in the final limb of Article 3(2) TFEU, has its origins in the judgment of 31 March 1971, Commission v Council (22/70, EU:C:1971:32).

232. In paragraphs 17 to 19 of that judgment, the Court held as follows:

'17    In particular, each time the Community, with a view to implementing a common policy envisaged by the Treaty, adopts provisions laying down common rules, whatever form these may take, the Member States no longer have the right, acting individually or even collectively, to undertake obligations with third countries which affect those rules.

18   As and when such common rules come into being, the Community alone is in a position to assume and carry out contractual obligations towards third countries affecting the whole sphere of application of the Community legal system.

19   With regard to the implementation of the provisions of the Treaty the system of internal Community measures may not therefore be separated from that of external relations.'

233. It is clear from this passage of the judgment of 31 March 1971, Commission v Council (22/70, EU:C:1971:32), that provisions of secondary law which the Community, now the European Union, has progressively laid down are 'common rules' and that, when the European Union has thus exercised its internal competence, it must, in parallel, have exclusive external competence in order to prevent the Member States from entering into international commitments that could affect those common rules or alter their scope.

234. Regard would not be had to the reasoning inherent in the rule as to exclusive internal competence contained in the judgment of 31 March 1971, Commission v Council (22/70, EU:C:1971:32), a judgment confirmed by the Court's subsequent case-law (see, inter alia, judgment of 5 November 2002, Commission v Denmark, C-467/98, EU:C:2002:625, paragraphs 77 to 80), if the scope of that rule, currently laid down in the final limb of Article 3(2) TFEU, were extended to a situation which, as in the present instance, concerns not rules of secondary law laid down by the European Union in the exercise of an internal competence that has been conferred upon it by the Treaties, but a rule of primary EU law adopted by the framers of those Treaties.

235. Secondly, in the light of the primacy of the EU and FEU Treaties over acts adopted on their basis, those acts, including agreements concluded by the European Union with third States, derive their legitimacy from those Treaties and cannot, on the other hand, have an impact on the meaning or scope of the Treaties' provisions. Those agreements accordingly cannot 'affect' rules of primary EU law or 'alter their scope', within the meaning of Article 3(2) TFEU.

236. The conclusion of an international agreement — in the present instance with the Republic of Singapore — concerning non-direct foreign investment is, as EU law currently stands, likewise not 'provided for in a legislative act of the Union', within the meaning of Article 3(2) TFEU.

237. Furthermore, as the Commission has expressly stated in its observations submitted to the Court, the conclusion of such an agreement does not appear 'necessary to enable the Union to exercise its internal competence', within the meaning of Article 3(2) TFEU.

238. It follows that the European Union does not have exclusive competence to conclude an international agreement with the Republic of Singapore in so far as it relates to the protection of non-direct foreign investments.

239. On the other hand, the conclusion by the European Union of an international agreement relating to such investments may prove 'necessary in order to achieve, within the framework of the Union's policies, one of the objectives referred to in the Treaties', within the meaning of Article 216(1) TFEU.

240. In particular, in the light of the fact that the free movement of capital and payments between Member States and third States, laid down in Article 63 TFEU, is not formally binding on third States, the conclusion of international agreements which contribute to the establishment of such free movement on a reciprocal basis may be classified as necessary in order to achieve fully such free movement, which is one of the objectives of Title IV ('Free movement of persons, services and capital') of Part Three ('Union policies and internal actions') of the FEU Treaty.

241. Title IV falls within the competence relating to the internal market that is shared between the European Union and the Member States pursuant to Article 4(2)(a) TFEU.

242. The competence conferred on the European Union by Article 216(1) TFEU in respect of the conclusion of an agreement which is 'necessary in order to achieve, within the framework of the Union's policies, one of the objectives referred to in the Treaties' is also shared, since Article 4(1) TFEU provides that the European Union 'shall share competence with the Member States where the Treaties confer on it a competence which does not relate to the areas referred to in Articles 3 and 6', which is the case here.

243. It is apparent from paragraphs 80 to 109 and 226 to 242 of this opinion that the commitments contained in Section A of Chapter 9 of the envisaged agreement fall within the common commercial policy of the European Union and, therefore, within the latter's exclusive competence pursuant to Article 3(1)(e) TFEU in so far as they concern foreign direct investment of Singapore nationals in the European Union and vice versa. On the other hand, those commitments fall within a competence shared between the European Union and the Member States pursuant to Article 4(1) and (2)(a) TFEU in so far as they concern other types of investment.

244. It follows that Section A of Chapter 9 of the envisaged agreement cannot be approved by the European Union alone.

245. It is necessary finally, in respect of Section A of Chapter 9, to examine the view, expressed by a number of Member States in their written observations and oral submissions to the Court, that Article 9.10 of the envisaged agreement cannot fall within either an exclusive competence of the European Union or a competence shared by it with the Member States and accordingly falls within the competence of the Member States alone.

246. Article 9.10, entitled 'Relationship with other Agreements', is the final provision of Section A of Chapter 9 and states in paragraph 1 the following:

'Upon the entry into force of this Agreement, the [bilateral investment] agreements between Member States of the Union and Singapore … including the rights and obligations derived therefrom, shall cease to have effect and shall be replaced and superseded by this Agreement.'

247. The fact that the European Union and the Republic of Singapore have inserted in the envisaged agreement a provision making expressly clear that bilateral investment agreements between Member States and that third State are terminated and accordingly no longer give rise to rights and obligations upon the entry into force of the agreement concluded with that third State at EU level cannot be regarded as encroaching upon a competence of the Member States, in so far as that provision relates to a field in respect of which the European Union has exclusive competence.

248. When the European Union negotiates and concludes with a third State an agreement relating to a field in respect of which it has acquired exclusive competence, it takes the place of its Member States. It has been undisputed since the judgment of 12 December 1972, International Fruit Company and Others (21/72 to 24/72, EU:C:1972:115, paragraphs 10 to 18), that the European Union can succeed the Member States in their international commitments when the Member States have transferred to it, by one of its founding Treaties, their competences relating to those commitments and it exercises those competences.

249. It follows that from 1 December 2009, the date on which the FEU Treaty, which confers on the European Union exclusive competence regarding foreign direct investment, entered into force, the European Union has competence to approve, by itself, a provision of an agreement concluded by it with a third State which stipulates that the commitments concerning direct investment contained in bilateral agreements previously concluded between Member States of the European Union and that third State must, upon the entry into force of that agreement concluded by the European Union, be regarded as replaced by the latter.

OPINION 2/15 (EU-SINGAPORE FREE TRADE AGREEMENT) OF 16. 5. 2017
OPINION PURSUANT TO ARTICLE 218(11) TFEU

250. It should be noted in this regard that, by virtue of Article 2(1) TFEU, the Member States, unless so empowered by the European Union, are prohibited from adopting acts producing legal effects in areas which fall within an exclusive competence of the European Union. It is true that Regulation (EU) No 1219/2012 of the European Parliament and of the Council of 12 December 2012 establishing transitional arrangements for bilateral investment agreements between Member States and third countries (OJ 2012 L 351, p. 40) empowers the Member States, subject to strict conditions, to maintain in force, or even to conclude, bilateral agreements with a third State concerning direct investment as long as an agreement between the European Union and that third State concerning direct investment does not exist. On the other hand, as soon as such an agreement between the European Union and that third State enters into force, that authorisation ceases to exist.

251. Consequently, the line of argument that the Member States should have the ability to adopt, after commitments concerning foreign direct investment contained in an agreement concluded by the European Union have entered into force, acts which determine what happens to commitments concerning this matter that are contained in the bilateral agreements which they have previously concluded with the same third State cannot succeed.

252. It follows from the foregoing that Article 9.10 of the envisaged agreement, like the other provisions of Section A of Chapter 9 of that agreement, falls within the exclusive competence of the European Union in so far as it relates to the commitments concerning foreign direct investment contained in the bilateral investment agreements concluded between Member States and the Republic of Singapore.

253. Since it is apparent from Annex 9-D to the envisaged agreement that a number of Member States concluded a bilateral investment agreement with the Republic of Singapore before their accession to the European Union, it should be made clear that the conclusion set out above is not affected by Article 351 TFEU, according to which 'the rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties'.

254. It should be noted in this respect that Article 351 TFEU is intended to permit the Member States to respect the rights which third States derive, in accordance with international law, from those earlier agreements (see, with regard to Articles 234 EEC and 307 EC, the wording of which is essentially reproduced in Article 351 TFEU, judgments of 14 October 1980, Burgoa, 812/79, EU:C:1980:231, paragraph 8; of 4 July 2000, Commission v Portugal, C-84/98, EU:C:2000:359, paragraph 53; and of 3 March 2009, Commission v Austria, C-205/06, EU:C:2009:118, paragraph 33). However, in the present instance, there is no need to permit the Member States to respect the rights that the Republic of Singapore would wish in the future to derive from the bilateral agreements referred to. It is in fact apparent from Article 9.10 of the envisaged agreement that third State expresses the wish that those bilateral agreements come to an end upon the entry into force of the envisaged agreement.

255. Whilst it is clear from all of the foregoing matters that the European Union replaces the Member States so far as concerns international commitments entered into in fields which, like that of foreign direct investment, fall within its exclusive competence, the fact remains that, in the version of Section A of Chapter 9 of the envisaged agreement that has been submitted to the Court in the present opinion procedure, Article 9.10 of the agreement also relates to the commitments which, in the bilateral investment agreements concluded between Member States and the Republic of Singapore, might concern types of non-direct investment.

256. For all the reasons set out in paragraphs 245 to 255 of this opinion, the line of argument that a provision such as Article 9.10 of the envisaged agreement cannot be included in an agreement concluded by the European Union since it falls within a competence of the Member States alone

cannot succeed. The nature of the competence of the European Union to approve Article 9.10 corresponds to that established in paragraph 243 of this opinion so far as concerns approval of the other provisions of Section A of Chapter 9 of the agreement.

Competence to approve the institutional provisions of the envisaged agreement

Exchange of information, notification, verification, cooperation, mediation and decision-making power

257. The envisaged agreement establishes various obligations and procedures concerning exchange of information, notification, verification, cooperation and mediation, as well as decision-making powers. It creates for this purpose a specific institutional framework, consisting of a Trade Committee and four specialised committees that will be attached to it, namely a Committee on Trade in Goods, a Committee on Sanitary and Phytosanitary Measures, a Committee on Customs and a Committee on Trade in Services, Investment and Government Procurement. The establishment of the Trade Committee and of those specialised committees is provided for in Articles 17.1 and 17.2 of the agreement respectively.

258. Chapter 2 of the envisaged agreement, relating to trade in goods, obliges each Party, in Article 2.11, to notify the Committee on Trade in Goods of its export licensing procedures and lays down the manner in which a response is to be given to enquiries from the other Party regarding any import or export licensing procedures.

259. In addition, pursuant to Articles 2.13 and 2.15 of the agreement, that specialised committee will meet at the request of a Party or of the Trade Committee, will monitor the implementation of Chapter 2 and will be able, by decision, to amend the annexes to that chapter.

260. Chapter 3 of the envisaged agreement, relating to trade remedies, lays down, in Articles 3.2, 3.7 and 3.11, the procedural rules for imposing antidumping measures, countervailing measures and safeguard measures. Articles 3.12 and 3.13 of the agreement require consultations concerning the application of such measures.

261. Chapter 4 of the envisaged agreement, relating to technical barriers to trade, provides, in Articles 4.4 to 4.11, for the exchange of information and cooperation in the area of standardisation and conformity assessment, in order to facilitate market access. In addition, Article 4.12 of the agreement provides that the Parties may, by decision of the Committee on Trade in Goods, adopt any measure implementing Chapter 4.

262. Chapter 5 of the envisaged agreement, which deals with sanitary and phytosanitary measures, sets out, in Articles 5.8 and 5.9, the procedures under which a Party may, in its capacity as a Party importing goods from the other Party, carry out verification visits of the latter or require information from it.

263. In addition, Article 5.10 of the envisaged agreement imposes rules in relation to cooperation and acceptance so far as concerns the determination of areas reflecting the state of health of the animals and the state of the plants present in those areas. That provision describes the tasks which the Committee on Sanitary and Phytosanitary Measures must perform in that regard. Other tasks of that committee are set out in Articles 5.15 and 5.16 of the agreement.

264. Articles 5.11 and 5.12 of the envisaged agreement lay down obligations to exchange information and notification obligations.

265. Chapter 6 of the envisaged agreement, relating to customs and trade facilitation, obliges the Parties, in Articles 6.3, 6.4 and 6.11, to ensure that their authorities cooperate and exchange information, in particular as to customs valuation. It also sets out, in Article 6.17, the tasks of the Committee on Customs and authorises the Parties to take certain decisions in that committee.

266. Article 7.7 of the envisaged agreement provides for cooperation in the context of Chapter 7, which relates to renewable energy generation, and for the possibility of adopting implementing decisions in the Trade Committee.

267. Chapter 8 of the envisaged agreement, which deals with services, establishment and electronic commerce, envisages, in Article 8.16, that the competent authorities in the European Union and in Singapore will develop a joint recommendation on the mutual recognition of professional qualifications and provide it to the Committee on Trade in Services, Investment and Government Procurement. That chapter also provides for cooperation regarding telecommunications (Article 8.48) and electronic commerce (Article 8.61).

268. Article 9.4.3 of the envisaged agreement provides that the Parties may, by decision in the Trade Committee, agree that certain types of measures must, like those set out in Article 9.4.2, be regarded as a breach of the obligation to accord fair and equitable treatment to investments falling within Chapter 9 of the agreement.

269. Articles 10.18 to 10.20 of the envisaged agreement set out the consultations which may take place and the decisions which may be taken, in the Committee on Trade in Services, Investment and Government Procurement, in respect of the matter governed by Chapter 10 on public procurement.

270. Chapter 11 of the envisaged agreement, relating to intellectual property, provides, in Article 11.8, for cooperation between collective copyright management societies. In addition, in Article 11.23 of the agreement, it confers decision-making powers on the Trade Committee and, in Articles 11.51 and 11.52, it obliges the Parties to exchange information.

271. Chapter 12 of the envisaged agreement, concerning competition and related matters, provides for cooperation regarding enforcement of the law of the Parties (Article 12.11) and lays down a duty to consult when one of the Parties so wishes (Article 12.13).

272. Article 13.15 of the envisaged agreement imposes an obligation on the Parties to designate an office as a contact point with the other Party for the purposes of implementing Chapter 13 on trade and sustainable development. It also requires establishment of a Board on Trade and Sustainable Development in order to oversee the implementation of Chapter 13. Article 13.16 specifies the tasks which those contact points and that board must perform in the event of disagreement between the Parties on a matter relating to Chapter 13. Article 13.17 adds that, if such a disagreement is not resolved satisfactorily by that board, a panel of experts will have to examine it. That article sets out the procedural rules for that examination.

273. Other provisions of Chapter 13 of the envisaged agreement provide for numerous methods of cooperation and exchange of information relating to social protection of workers (Article 13.4) and environmental protection (Articles 13.7 and 13.10).

274. Chapter 16 of the envisaged agreement establishes a mechanism for mediation between the Parties. By virtue of Article 13.16 of the agreement, that mechanism does not apply to Chapter 13. Chapter 16 enables the Parties to seek mutually agreed solutions in the event of a divergence of views on Chapters 2 to 12 of the envisaged agreement.

275. The provisions and mechanisms referred to in paragraphs 257 to 274 of this opinion are intended to ensure the effectiveness of the substantive provisions of the envisaged agreement, by establishing, essentially, an organisational structure, methods of cooperation, obligations to exchange information and certain decision-making powers.

276. The Court has already had occasion to point out that the competence of the European Union to enter into international commitments includes competence to couple those commitments with institutional provisions. Their presence in the agreement has no effect on the nature of the competence to conclude it. Those provisions are of an ancillary nature and therefore fall within the same competence as the substantive provisions which they accompany (see to that effect, inter alia, Opinion 1/76 (Agreement on the establishment of a European Laying-up Fund for Inland Waterway Vessels) of 26 April 1977, EU:C:1977:63, paragraph 5; Opinion 1/78 (International Agreement on Natural Rubber) of 4 October 1979, EU:C:1979:224, paragraph 56; and judgment of 22 October 2013, Commission v Council, C-137/12, EU:C:2013:675, paragraphs 70 and 71).

277. Since it is apparent from this opinion that all the substantive provisions of Chapters 2 to 8 and 10 to 13 of the envisaged agreement fall within the exclusive competence of the European Union, the provisions referred to in paragraphs 258 to 267 and 269 to 273 of this opinion also fall within that competence, for the reason set out in the previous paragraph. The same is true of Chapter 17 of the envisaged agreement, in so far as it relates to the Committee on Trade in Goods, the Committee on Sanitary and Phytosanitary Measures and the Committee on Customs.

278. Article 9.4.3 of the envisaged agreement, referred to in paragraph 268 of this opinion, forms part of Section A of Chapter 9 of the agreement and is therefore covered by the findings made in paragraphs 243 and 244 of this opinion.

279. Chapter 16 of the envisaged agreement, relating to the mediation mechanism, as well as the institutional and final provisions, other than those relating to the Committee on Trade in Goods, the Committee on Sanitary and Phytosanitary Measures and the Committee on Customs, which are set out in Chapter 17 of the agreement relate inter alia to the provisions of Section A of Chapter 9 of the agreement and therefore cannot, for the reasons stated in paragraphs 243 and 244 of this opinion, be concluded by the European Union alone. The same is, furthermore, true of Chapter 1 of the envisaged agreement, since that chapter sets out the subject matter and the objectives of the agreement as a whole and therefore concerns, inter alia, Section A of Chapter 9 of the agreement.

Transparency

280. Chapter 14 of the envisaged agreement, entitled 'Transparency', lays down rules which apply to the fields covered by the other chapters of the agreement, without prejudice to the more specific provisions concerning transparency in those other chapters.

281. By the commitments contained in Chapter 14, the Parties guarantee, first, that any measure of general application connected with a matter covered by the envisaged agreement will be clear and readily available and that there will be sufficient time between the publication and entry into force of such a measure (Article 14.3). They undertake, secondly, to facilitate communication on any matter covered by the envisaged agreement by establishing contact points and by responding to certain types of requests for information (Article 14.4). They guarantee, finally, that any proceeding conducted in the context of the envisaged agreement and affecting the interests of persons, goods or services of the other Party will be consistent with the principles of good administration and capable of forming the subject matter of an action before an impartial and independent tribunal (Articles 14.5 to 14.7).

282. Those commitments apply to the measures that the Parties will adopt in the fields covered in Chapters 2 to 13 of the envisaged agreement. The transparency rules with which they are coupled are intended to ensure the effectiveness of the substantive provisions of those chapters. Those rules are therefore of an ancillary nature and fall within the same competence as the substantive provisions. Since the latter fall, to the extent stated in paragraph 243 of this opinion, within a competence that the European Union shares with the Member States, Chapter 14 of the envisaged agreement cannot be approved by the European Union alone.

283. On the other hand, the specific rules concerning transparency that are laid down for just one of Chapters 2 to 8 and 10 to 13 of the envisaged agreement, such as those contained in Articles 4.8, 6.15, 8.17, 8.45, 12.9 and 13.3 of the agreement, fall within the exclusive competence of the European Union.

284. In so far as certain Member States have submitted that the aforesaid transparency rules, in that they oblige the authorities in the European Union, including those of the Member States, to observe the principles of good administration and of effective judicial protection, fall within the competences of the Member States alone concerning administrative and judicial procedure, it need only be observed that the rules contained in Chapter 14 of the envisaged agreement and in the provisions referred to in the previous paragraph of this opinion do not involve any commitment relating to the administrative or judicial organisation of the Member States, but reflect the fact that both the European Union and the Member States will, when applying the agreement, have to observe the general principles and fundamental rights of the European Union, such as those of good administration and effective judicial protection. Chapter 14 cannot therefore be regarded as encroaching upon the competences of the Member States alone.

Dispute settlement

– Investor-State dispute settlement

285. As Article 9.11.1 of the envisaged agreement states, Section B of Chapter 9 of the agreement establishes a regime for settlement of a 'dispute between a claimant of one Party and the other Party concerning treatment alleged to breach the provisions of Section A (Investment Protection) which breach allegedly causes loss or damage to the claimant or its locally established company'.

286. It is clear from Article 9.11.2(a) and (e) of the agreement that not only the European Union but also the Member States of the European Union can be parties to such disputes, as the respondent, whether they have been designated as such by the European Union, under Article 9.15.2 of the agreement, or whether they must be the respondent pursuant to Article 9.15.3.

287. If a dispute cannot be resolved amicably or by means of consultations under Article 9.12 or Article 9.13 of the envisaged agreement, the investor concerned may, in accordance with Article 9.15 of that agreement, give notice of his intention to submit the claim to arbitration. Article 9.16.1 of the agreement states that, after the expiry of a period of three months from the date of that notification, the investor may 'submit the claim to one of the … dispute settlement mechanisms' which it lists.

288. Article 9.16.2 of the envisaged agreement states that Article 9.16.1 is to 'constitute the consent of the respondent to the submission of a claim to arbitration'.

289. Article 9.17 of the agreement lists all the conditions which must be satisfied in order for a dispute to be capable of being submitted to arbitration. As provided in Article 9.17.1(f), one of those conditions is that the claimant 'withdraws any pending claim submitted to a domestic court or tribunal concerning the same treatment as alleged to breach the provisions of Section A (Investment Protection)'.

290. Without prejudice to what is stated in paragraph 30 of this opinion, the Court has the task of ruling on the nature of the competence to establish such a dispute settlement regime. In that regard, whilst it is true that, as is clear from Article 9.17 thereof, the envisaged agreement does not rule out the possibility of a dispute between a Singapore investor and a Member State being brought before the courts of that Member State, the fact remains that that is merely a possibility in the discretion of the claimant investor.

291. The claimant investor may indeed decide, pursuant to Article 9.16 of the envisaged agreement, to submit the dispute to arbitration, without that Member State being able to oppose this, as its consent in this regard is deemed to be obtained under Article 9.16.2 of the agreement.

292. Such a regime, which removes disputes from the jurisdiction of the courts of the Member States, cannot be of a purely ancillary nature within the meaning of the case-law recalled in paragraph 276 of this opinion and cannot, therefore, be established without the Member States' consent.

293. It follows that approval of Section B of Chapter 9 of the envisaged agreement falls not within the exclusive competence of the European Union, but within a competence shared between the European Union and the Member States.

– Dispute settlement between the Parties

294. Chapter 15 of the envisaged agreement has the aim of preventing and settling disputes that might arise between the Parties. As provided in Article 15.2 of the envisaged agreement, Chapter 15 applies with respect to 'any difference concerning the interpretation and application of the provisions of [that agreement], except as otherwise expressly provided'.

295. As has been stated in paragraph 154 of this opinion, the dispute settlement regime laid down in Chapter 15 of the envisaged agreement does not apply to Chapter 13. On the other hand, that regime may apply between the Parties to resolve differences relating, in particular, to the interpretation and application of the substantive provisions of Chapters 2 to 12 of the envisaged agreement.

296. Article 15.4 of the envisaged agreement provides that, where the Parties have failed to resolve their dispute by means of consultations, the complaining Party may request the establishment of an arbitration panel. Under Article 15.19 of the agreement, any ruling of such a panel is binding on the Parties.

297. Article 15.21 of the envisaged agreement states that it is permissible for the complaining Party not to apply this dispute settlement regime, by bringing an action instead within the framework of the WTO. Where a proceeding has been initiated under one of the two available dispute settlement regimes, no proceeding having the same subject matter may be initiated under the other regime.

298. As regards the competence of the European Union to approve Chapter 15 of the envisaged agreement, it should be recalled at the outset that the competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions (Opinion 1/91 (First Opinion on the EEA Agreement) of 14 December 1991, EU:C:1991:490, paragraphs 40 and 70; Opinion 1/09 (Agreement creating a Unified Patent Litigation System) of 8 March 2011, EU:C:2011:123, paragraph 74; and Opinion 2/13 (Accession of the European Union to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 182).

299. In the same way, the competence of the European Union to conclude international agreements necessarily entails the power to submit to the decisions of a body which, whilst not formally a court, essentially performs judicial functions, such as the Dispute Settlement Body created within the framework of the WTO Agreement.

300. As has been stated in paragraph 30, and recalled in paragraph 290, of this opinion, the present procedure does not relate to the question whether the provisions of the envisaged agreement are compatible with EU law.

301. Accordingly, contrary to the situation in the opinion procedures cited in paragraph 298 of this opinion, it is not appropriate to examine whether the dispute settlement regime laid down by Chapter 15 of the envisaged agreement fulfils the criteria set out by those other opinions, in particular the criterion relating to the autonomy of EU law.

302. As Chapter 15 of the envisaged agreement relates to disputes between the European Union and the Republic of Singapore regarding the interpretation and application of that agreement, neither does this opinion cover the issue of the jurisdiction of the Court so far as concerns the settlement of disputes within the European Union relating to the interpretation of EU law (see inter alia, in respect of that jurisdiction, judgment of 30 May 2006, Commission v Ireland (MOX plant), C-459/03, EU:C:2006:345, paragraph 132, and Opinion 1/09 (Agreement creating a Unified Patent Litigation System) of 8 March 2011, EU:C:2011:123, paragraph 78).

303. In the present procedure, it need only be stated that the dispute settlement regime laid down by that chapter forms part of the institutional framework for the substantive provisions of the envisaged agreement. Since that regime relates to disputes between the European Union and the Republic of Singapore, it, unlike the investor-State dispute settlement regime laid down in Section B of Chapter 9 of the envisaged agreement, is not liable to remove disputes from the jurisdiction of the courts of the Member States or of the European Union. Accordingly, the rule laid down in the case-law, recalled in paragraph 276 of this opinion, is applicable.

304. Disputes governed by Chapter 15 may relate, inter alia, to the provisions of Section A of Chapter 9 of the envisaged agreement. Consequently, for the same reasons as those stated in paragraphs 243 and 244 of this opinion, Chapter 15 cannot be approved by the European Union alone.

Answer to the request for an opinion

305. It follows from all the foregoing considerations that the envisaged agreement falls within the exclusive competence of the European Union, with the exception of the following provisions, which fall within a competence shared between the European Union and the Member States:

— the provisions of Section A (Investment Protection) of Chapter 9 (Investment) of that agreement, in so far as they relate to non-direct investment between the European Union and the Republic of Singapore;

— the provisions of Section B (Investor-State Dispute Settlement) of Chapter 9; and

— the provisions of Chapters 1 (Objectives and General Definitions), 14 (Transparency), 15 (Dispute Settlement between the Parties), 16 (Mediation Mechanism) and 17 (Institutional, General and Final Provisions) of that agreement, in so far as those provisions relate to the provisions of Chapter 9 and to the extent that the latter fall within a competence shared between the European Union and the Member States.

Consequently, the Court (Full Court) gives the following Opinion:

**The Free Trade Agreement between the European Union and the Republic of Singapore falls within the exclusive competence of the European Union, with the exception of the following provisions, which fall within a competence shared between the European Union and the Member States:**

— **the provisions of Section A (Investment Protection) of Chapter 9 (Investment) of that agreement, in so far as they relate to non-direct investment between the European Union and the Republic of Singapore;**

— **the provisions of Section B (Investor-State Dispute Settlement) of Chapter 9; and**

— **the provisions of Chapters 1 (Objectives and General Definitions), 14 (Transparency), 15 (Dispute Settlement between the Parties), 16 (Mediation Mechanism) and 17 (Institutional, General and Final Provisions) of that agreement, in so far as those provisions relate to the provisions of Chapter 9 and to the extent that the latter fall within a competence shared between the European Union and the Member States.**

Lenaerts  Tizzano  Silva de Lapuerta

Ilešič  Bay Larsen  von Danwitz

Da Cruz Vilaça  Juhász  Berger

Prechal  Vilaras  Regan

Rosas  Borg Barthet  Malenovský

Bonichot  Arabadjiev  Toader

Šváby  Jarašiūnas  Fernlund

Vajda  Biltgen

Jürimäe  Lycourgos

Delivered in open court in Luxembourg on 16 May 2017.

A. Calot Escobar  K. Lenaerts

Registrar  President