# EXHIBIT 11

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**ROCKHOPPER ITALIA S.P.A., ROCKHOPPER MEDITERRANEAN LTD, AND ROCKHOPPER EXPLORATION PLC**

Claimants

and

**ITALIAN REPUBLIC**

Respondent

**ICSID Case No. ARB/17/14**

---

# DECISION ON THE INTRA-EU JURISDICTIONAL OBJECTION

---

***Members of the Tribunal***
Mr. Klaus Reichert SC, President of the Tribunal
Dr. Charles Poncet, Arbitrator
Prof. Pierre-Marie Dupuy, Arbitrator

***Secretary of the Tribunal***
Ms. Anna Toubiana

*Date of dispatch to the Parties: 26 June 2019*

## REPRESENTATION OF THE PARTIES

*Representing the Claimants*:

Mr. Thomas K. Sprange QC
Mr. Ben Williams
Ms. Flora Jones
King & Spalding International LLP
125 Old Broad Street
London, EC2N 1AR
United Kingdom

and

Mr. Viren Mascarenhas
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
United States of America

*Representing the Respondent*:

Ms. Gabriella Palmieri
Vice Avvocato Generale dello Stato
Avvocato dello Stato Giacomo Aiello
Avvocato dello Stato Sergio Fiorentino
Avvocato dello Stato Paolo Grasso
Avvocatura Generale dello Stato
Via dei Portoghesi 12
00186 Rome
Italy

and

Prof. Avv. Maria Chiara Malaguti
External Counsel to the Legal Service of the
Ministry of Foreign Affairs
Piazzale della Farnesina, 1
00135 Rome
Italy

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................. 1

II.   PROCEDURAL HISTORY ......................................................................... 1

III.  THE PARTIES' ARGUMENTS ................................................................. 10

      A.   Applicability of the ECT to Intra-EU Disputes ........................................ 10

           (1)  Respondent's Position ......................................................................... 10

                a.   The Terms of the ECT ................................................................ 10

                b.   The Context and Purpose of the ECT ......................................... 14

                c.   The Evolution of EU Law ........................................................... 15

           (2)  Claimants' Position ............................................................................. 17

                a.   The Terms of the ECT ................................................................ 17

                b.   The Context and Purpose of the ECT ......................................... 19

                c.   The Evolution of EU Law ........................................................... 20

      B.   Relevance of the *Achmea* Judgment ....................................................... 22

           (1)  Respondent's Position ......................................................................... 22

                a.   Impact of the *Achmea* Judgment on the Tribunal's Jurisdictional Analysis under the ECT ...................................................................... 22

                b.   Effects of the *Achmea* Judgment upon Enforcement of Awards ................... 23

           (2)  Claimants' Position ............................................................................. 24

                a.   Impact of the *Achmea* Judgment on the Tribunal's Jurisdictional Analysis under the ECT ...................................................................... 24

                b.   Effects of the *Achmea* Judgment upon Enforcement of Awards ................... 25

      C.   Relevance of the *Vattenfall* Decision ..................................................... 25

           (1)  Respondent's Position ......................................................................... 25

           (2)  Claimants' Position ............................................................................. 28

      D.   The Effects of the Declaration of the EU Member States ........................... 30

           (1)  Respondent's Position ......................................................................... 30

           (2)  Claimants' Position ............................................................................. 34

IV.   THE TRIBUNAL'S ANALYSIS ............................................................... 37

      A.   Introduction – the Sequence of Analysis .................................................. 37

      B.   The ECT, EU Law and Intra-EU Disputes ................................................ 38

      C.   The Effect of the *Achmea* Judgment ...................................................... 45

      D.   The Effect of the Declaration ................................................................. 54

E.   The Overall Position in Light of the Foregoing ........................................................ 62

**V.**   THE RESPONDENT'S REQUEST FOR SUSPENSION OF THE PROCEEDINGS ....... 62

A.   The Respondent's Position ........................................................................................ 62

B.   The Claimants' Position ............................................................................................ 63

C.   The Tribunal's Analysis ............................................................................................ 66

**VI.**   DECISION ........................................................................................................................ 66

**TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| Additional Declaration | Declaration of the Representatives of the Governments of the Member States, of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ECT | Energy Charter Treaty |
| C-[#] | Claimants' Exhibit |
| CJEU | Court of Justice of the European Union |
| Cl. Observations on *Vattenfall* | Claimants' Observations on the *Vattenfall* Tribunal Decision on the *Achmea* Issue dated 4 October 2018 |
| Cl. PHB | Claimants' Post Hearing Brief dated 4 March 2019 |
| Cl. Rejoinder on the Intra-EU Jurisdictional Objection | Claimants' Rejoinder on Respondent's Objections to Jurisdiction under Article 41(1) of the Arbitration Rules dated 1 June 2018 |
| Cl. Response on the Intra-EU Jurisdictional Objection | Claimants' Response on Respondent's Objections to Jurisdiction under Article 41(1) of the Arbitration Rules dated 4 May 2018 |
| CL-[#] | Claimants' Legal Authority |
| Declaration | Declaration of the Member States, of 15 January 2019 on the Legal Consequences of the Court of Justice in *Achmea* and on Investment Protection in the European Union |
| Hearing | Hearing on Jurisdiction and Merits held on 4 to 8 February 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other |

| | |
|---|---|
| | States, which entered into force on 14 October 1966 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Lisbon Treaty | Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community, signed at Lisbon, 13 December 2007 |
| R-[#] | Respondent's Exhibit |
| Request for Arbitration | Request for Arbitration dated 14 April 2017 |
| Resp. Intra-EU Jurisdictional Objection | Respondent's Objection to Jurisdiction under Article 41(1) of the Arbitration Rules dated 28 March 2018 |
| Resp. Observations on *Vattenfall* | Respondent's Observations on the *Vattenfall* Tribunal Decision on the *Achmea* Issue dated 4 October 2018 |
| Resp. Observations on *Masdar* | Respondent's Brief Commentary over *Masdar* and the Relevance of *Achmea* Decision over the current proceedings dated 11 June 2018 |
| Resp. PHB | Respondent's Post Hearing Brief dated 28 February 2019 |
| Resp. Reply on the Intra-EU Jurisdictional Objection | Respondent's Reply on Objections to Jurisdiction under Article 41(1) of the Arbitration Rules dated 25 May 2018 |
| Resp. Request for Termination | Respondent's Request for Termination of the Proceedings dated 29 January 2019 |
| RL-[#] | Respondent's Legal Authority |
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 26 September 2017 |
| VCLT | Vienna Convention on the Law of Treaties |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998 (the "**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.    The Claimants are Rockhopper Italia S.p.A., a company incorporated under the laws of the Italian Republic, Rockhopper Mediterranean Ltd, a company incorporated under the laws of the United Kingdom, and Rockhopper Exploration Plc, a company incorporated under the laws of the United Kingdom (together, "**Rockhopper**" or the "**Claimants**").

3.    The Respondent is the Italian Republic ("**Italy**" or the "**Respondent**").

4.    The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

5.    This dispute relates to Italy's alleged failure to fulfil the legislative and regulatory commitments made in relation to the Claimants' investments in the Ombrina Mare oil and gas field located off the Italian coast in the Adriatic Sea.

## II.    PROCEDURAL HISTORY

6.    On 14 April 2017, ICSID received a request for arbitration from the Claimants against Italy (the "**Request for Arbitration**") filed under the ECT and the ICSID Convention. On 5 May 2017, the Centre sent a communication to the Claimants with some questions about the Request for Arbitration. On 12 May 2017, the Claimants responded to the Centre's questions.

7.    On 19 May 2017, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to

constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.  The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party, and the third and presiding arbitrator to be appointed by agreement of the two co-arbitrators.

9.  On 26 September 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. The Tribunal is composed of Mr. Klaus Reichert SC, a national of Germany and Ireland, President, appointed by his co-arbitrators in consultation with the Parties; Dr. Charles Poncet, a national of Switzerland, appointed by the Claimants; and Prof. Pierre-Marie Dupuy, a national of France, appointed by the Respondent. Ms. Marisa Planells-Valero, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

10. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 22 November 2017 by teleconference.

11. Following the first session, on 8 December 2017, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and set out, in Annex A, a schedule for the written and oral phase of the proceedings, with the Hearing on Jurisdiction, Merits and Quantum (the "**Hearing**") scheduled to take place from 4 to 8 February 2019, in Paris (France).

12. On 22 December 2017, pursuant to the procedural calendar in Annex A to Procedural Order No. 1, the Claimants submitted their Memorial on Jurisdiction, Liability and Quantum, together with accompanying documentation.

13. On 28 March 2018, the Respondent submitted an Objection to Jurisdiction under

2

Article 41(1) of the Arbitration Rules and a Request for Bifurcation of the proceedings together with Legal Authorities RL-001 to RL-011 (the "**Resp. Intra-EU Jurisdictional Objection**" and "**Request for Bifurcation**"). The Respondent's objection was that the ECT and the ICSID Convention could not provide jurisdiction between nationals of one European Union ("**EU**") Member State and another EU Member State. By separate communication of that same date, the Respondent also requested a 3-month extension for the filing of its Counter-Memorial, originally due on 13 April 2018 (the "**Request for Extension**").

14.    On 3 April 2018, the Claimants submitted observations to the Respondent's Request for Bifurcation together with Exhibits C-146 to C-152 and Legal Authority CL-120, and on the Respondent's Request for Extension. On 9 April 2018, the Respondent submitted comments on the Claimants' observations of 3 April 2018 together with Legal Authorities RL-011 to RL-017.

15.    On 10 April 2018, the Tribunal granted a 30-day extension of the deadline for the Respondent's Counter-Memorial and invited the Parties to collaborate on a revised timetable and revert to the Tribunal with an agreed schedule.

16.    On 19 April 2018, the Centre received a communication from the Respondent dated 12 April 2018, which the Centre transmitted to the Tribunal on that same date. By this communication, the Respondent requested that the Tribunal reconsider its decision to grant a 30-day extension for the submission of its Counter-Memorial. The Respondent also informed the Tribunal that it had received notice on 10 April 2018 that the European Commission (the "**EC**") would be applying to intervene in this proceeding and file observations on the Judgment of the Court of Justice of the EU (the "**CJEU**") in *Slovak Republic v. Achmea B.V.* (Case C-284/16)[1] (the "***Achmea* Judgment**"). According to the Respondent, this new development supported the need for a bifurcation of the proceeding and for the scheduling of a procedural calendar on the Intra-EU Jurisdictional Objection only.

---

[1] Judgment of the CJEU, *Slovak Republic v. Achmea B.V.*, Case C-284/16, 6 March 2018 (RL-011).

17.    On 19 April 2018, the Tribunal informed the Parties that, after considering their arguments on the Request for Bifurcation, it had decided not to suspend the proceedings, but to prioritize for resolution of the following set of specific questions related to the Respondent's Intra-EU Jurisdictional Objection:

> *Whether or not on the date of the Request for Arbitration was there a valid offer on the part of the Respondent to arbitrate, and if the answer to that question is yes, with the consequence that an arbitration agreement came into existence as between the parties, was that arbitration agreement vitiated at a later point in time? If so, when, and how.*

18.    By this same communication, the Tribunal invited the Parties to confer as to a briefing schedule on these specific questions within the context of the existing timetable and Hearing dates. On 23 April 2018, the Tribunal reiterated its invitation to the Parties.

19.    On 25 April 2018, the Claimants submitted to the Tribunal's consideration the Parties jointly proposed modification of the procedural calendar, including the Parties' submissions regarding the Respondent's Intra-EU Jurisdictional Objection.

20.    On 1 May 2018, the Tribunal confirmed its decision (a) to grant the Respondent a 30-day extension for the submission of its Counter Memorial, (b) not to suspend the proceedings but to prioritize the resolution of the specific set of questions in its communication of 19 April 2018 and, taking into consideration the Parties' joint proposal of 25 April 2018, issued an amended procedural calendar (the "**Amended Procedural Calendar**").

21.    On 4 May 2018, pursuant to the Amended Procedural Calendar, the Claimants submitted a Response to Italy's Objections to Jurisdiction under Article 41(1) of the Arbitration Rules together with Exhibits C-153 and C-154 ("**Cl. Reply on the Intra-EU Jurisdictional Objection**").

22.    On 14 May 2018, the Claimants transmitted to the Tribunal the Parties' communications regarding the Respondent's request for access to a data room regarding the reserves in the Ombrina Mare oil and gas field.

23.    On 15 May 2018, the Respondent submitted its Counter-Memorial on Jurisdiction,

Liability and Quantum, with accompanying documentation.

24. On 25 May 2018, the Respondent's submitted its Response to the Claimants' Reply on Jurisdictional Objections of 4 May 2018 together with Legal Authorities RL-025 to RL-031 ("**Resp. Reply on the Intra-EU Jurisdictional Objection**").

25. On that same date, the Claimants informed the Parties of their agreement to extend the deadline for document requests. On 31 May 2018, the Tribunal issued an Amended Annex A to Procedural Order No. 1 reflecting the agreed changes.

26. On 1 June 2018, the Claimants submitted their Rejoinder to the Respondent's Reply on the Intra-EU Jurisdictional Objection ("**Cl. Rejoinder on the Intra-EU Jurisdictional Objection**") including comments on the award rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (ICSID Case No. ARB/14/1)[2] (the "***Masdar Award***").

27. On 11 June 2018, pursuant to the Tribunal's instructions, the Respondent submitted observations on the Claimants' submission regarding the *Masdar* Award and the relevance of the *Achmea* Judgment ("**Resp. Observations on *Masdar***").

28. On 14 June 2018, the Claimants informed the Tribunal of the Parties' agreement to subject the Respondent's access to a data room relating to the Ombrina Mare field reserves to confidentiality and of the Parties' joint proposal to adopt a confidentiality order.

29. On 2 July 2018, the Tribunal issued Procedural Order No. 2 on confidentiality.

30. On 6 August 2018, the Tribunal issued Procedural Order No. 3 on the Parties' document production requests.

31. On 15, 22, and 29 August 2018, the Parties submitted communications regarding the Respondent's alleged difficulties to access to the Claimants' data room. On 31 August 2018 the Tribunal invited the Respondent to submit its report on the Ombrina Mare reserves by

---

[2] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (RL-030).

21 December 2018, and the Claimants to serve an expert report in response, together with any updates required to the report of its quantum expert, by 18 January 2019.

32.     On 21 September 2018, the Tribunal invited the Parties to submit their respective observations on the Decision on the *Achmea* Issue in *Vattenfall AB and others v. Federal Republic of Germany* (ICSID Case No. ARB/12/12)[3] (the "***Vattenfall* Decision**") by 4 October 2018.

33.     On 1 October 2018, the EC submitted an Application for Leave to Intervene as a Non-Disputing Party (the "**EC Application**"). The Tribunal invited the Parties to submit observations on the EC Application by 9 October 2018.

34.     On 4 October 2018, the Parties submitted their observations on the *Vattenfall* Decision (the "**Observations on *Vattenfall***"). In its submission, the Respondent renewed its Request for Bifurcation (the "**Renewed Request for Bifurcation**") and incorporated Legal Authorities RL-032 to RL-036 into the record. On 8 October 2018, the Claimants requested an opportunity to respond to the Respondent's argument introduced in its Observations on *Vattenfall* that the Tribunal should declare the claim inadmissible under the doctrine of *forum non conveniens*. On 10 October 2018, the Tribunal invited the Claimants to submit comments on the Respondent's *forum non conveniens* argument by 30 October 2018.

35.     On 11 October 2018, the Parties submitted their observations on the EC Application. The Claimants' observations were submitted together with Exhibits C-155 to C-156 and Legal Authorities CL-150 to CL-157. On that same date, the Tribunal invited the Parties to submit a response to the other Party's observations on the EC Application by 30 October 2018.

36.     On 24 October 2018, the Claimants submitted their Reply Memorial on Jurisdiction, Liability and Quantum together with accompanying documentation. On 1 November 2018, the Claimants submitted an Addendum to their Reply, with minor clarifications in respect of certain paragraphs.

---

[3] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018.

37.    On 30 October 2018, the Respondent submitted comments on the Claimants' response to the EC Application, and the Claimants submitted comments on (i) the Respondent's response to the EC Application; and (ii) the Respondent's Observations on *Vattenfall* ("**Cl. Additional Comments on the EC Application and on Respondent's Observations on *Vattenfall*** ").

38.    On 7 December 2018, the Tribunal issued Procedural Order No. 4 granting the EC's Application to intervene as it considered that the requirements of ICSID Arbitration Rule 37(2)(a) were satisfied. The Tribunal concluded that the EC should be allowed to intervene only in writing, without access to the record of the case nor to the oral hearing and confined to the EC answering the set of questions that the Tribunal submitted to the Parties on 19 April 2018. Furthermore, the EC's intervention was subject to the provision of a written undertaking by 14 December 2018 that it would comply with any decision on costs ordered by the Tribunal. In view of the EC's possible intervention and in the interest of procedural efficiency, the Tribunal further decided that the Parties' specific briefings on the 19 April 2018 questions, which were filed in parallel to the other briefings in the case, were now to be considered, along with all other matters, at the Hearing. As a result, the Renewed Request for Bifurcation was rejected.

39.    On 12 December 2018, the Tribunal invited the Parties to confer and submit to the Tribunal's consideration by 7 January 2019 a joint statement advising of the agreements regarding the hearing logistics, or of their respective positions in case of disagreement.

40.    On 14 December 2018, the EC submitted a request to reconsider and alter Procedural Order No. 4.

41.    On 15 December 2018, the Respondent submitted a request for an extension of the deadline for the submission of its Rejoinder on Jurisdiction, Liability and Quantum, originally due on 21 December 2018, to 11 January 2019. On 17 December 2018, the Claimants submitted a response to the Respondent's request for an extension of the deadline for the submission of the Rejoinder. On 18 December 2018, the Respondent submitted a reply to the Claimants' response.

42.   On 18 December 2018, the Tribunal issued Procedural Order No. 5 rejecting the EC's request to reconsider and alter Procedural Order No. 4.

43.   On 19 December 2018, the Tribunal granted an extension to the Respondent for the submission of its Rejoinder on Jurisdiction, Liability and Quantum by 9 January 2019. By this same communication, the Tribunal invited the Claimants' expert to submit a rebuttal report in response to Italy's report on the Ombrina Mare reserves, together with any necessary update to its *quantum* Report, originally due on 18 January 2019, by 31 January 2019.

44.   On 9 January 2019, the Respondent submitted its Rejoinder on Jurisdiction, Liability and Quantum, with accompanying documentation.

45.   On 14 January 2019, the Claimants informed the Tribunal of the Parties' joint agreement regarding certain aspects of the Hearing organization, together with a tentative schedule.

46.   On 21 January 2019, the Tribunal issued a decision concerning certain organizational matters on which the Parties had not reached agreement.

47.   On 29 January 2019, the Respondent submitted a Request for Termination of the Proceedings (the "**Request for Termination**") together with the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (the "**Declaration**"). By this communication, the Respondent requested the Tribunal to issue an award recognizing its lack of competence and terminating the proceedings. Alternatively, the Respondent requested a hearing on jurisdictional issues.

48.   On 30 January 2019, the President of the Tribunal and the Parties held a conference call regarding certain pending matters related to the organization of the Hearing.

49.   On 31 January 2019, the Tribunal, *inter alia*, rejected the Respondent's Request for Termination and the Respondent's alternative request for a hearing on jurisdictional issues only. In doing so, the Tribunal confirmed that the dates for the Hearing and invited the

Parties to address the contents of the Declaration in their oral statement at the Hearing. On that same date, the Claimants submitted Mr. David Wilson's Rebuttal Expert Report to the Respondent's a report on the Ombrina Mare reserves together with supporting documents.

50.    The Hearing was held in Paris from 4 to 8 February 2019.

51.    At the beginning of the Hearing on 4 February 2019, the Tribunal suggested, in the interest of procedural efficiency, to issue a ruling on the Intra-EU Jurisdictional Objection prior to any other ruling.[4] The Parties agreed with the Tribunal's suggested way of proceeding.[5]

52.    Before the conclusion of the Hearing on 8 February 2019, the Tribunal instructed the Parties to submit Post-Hearing Briefs exclusively on the issue of whether the Declaration changed the answer to the Tribunal's questions of 19 April 2018 and invited the Parties to confer and reach agreement as to the date for this submission.

53.    On 13 February 2019, the Parties informed the Tribunal that they had agreed to submit Post-Hearing Briefs on the Declaration by Thursday, 28 February 2019.

54.    On 28 February 2019, the Respondent submitted its Post-Hearing Brief on the Declaration together with Legal Authorities RL-066 to RL-068 (the "**Resp. PHB**"). On that same date, the Claimants requested an extension until 4 March 2019 to file their Post-Hearing Brief on the Declaration and gave an undertaking not to open and read the Respondent's PHB and accompanying documents until after their submission of their own Post-Hearing Brief. On that same date, the Tribunal granted the Claimants' request for an extension. On 4 March 2019, the Claimants submitted their Post-Hearing Brief on the Declaration together with Legal Authorities CL-204 to CL-214 (the "**Cl. PHB**").

55.    The Parties filed submissions on costs on 26 March 2019.

56.    On 23 April 2019, the Tribunal and the Parties were advised that Ms. Anna Toubiana, ICSID Legal Counsel, would be replacing Ms. Marisa Planells-Valero as Secretary of the

---

[4] Tr. Day 1, 9:11-10:10.
[5] Tr. Day 1, 13:7-11 (Claimants); 15:9-18 (Respondent).

Tribunal.

57.    On 18 June 2019, the Respondent submitted a Request for Suspension of the proceedings (the "**Request for Suspension**"). On the same date, the Tribunal invited the Claimants to submit any comments they may have on the Respondent's Request for Suspension by 24 June 2019. On 24 June 2019, the Claimants submitted their Response to the Request for Suspension.

58.    The members of the Tribunal have deliberated by various means of communication and have taken into consideration the Parties' entire written and oral arguments and submissions regarding the Intra-EU Jurisdictional Objection. To the extent that these arguments are not referred to expressly, they have been subsumed into the Tribunal's analysis. This Decision is rendered without prejudice to the Tribunal's determinations regarding all other issues of jurisdiction, admissibility or merits in these proceedings.

## III.    THE PARTIES' ARGUMENTS

### A.    APPLICABILITY OF THE ECT TO INTRA-EU DISPUTES

### (1) Respondent's Position

#### a.    The Terms of the ECT

59.    According to Italy, the terms of the ECT take to the conclusion that "the EU is recognized by the ECT as an [sic] unified legal system, based on an international treaty whose provisions on the same matters as those covered by the ECT prevail over the ECT itself." Consequently, Contracting Parties signed the ECT under the mutual understanding that it would not apply to disputes between an investor of an EU Member State and another EU Member State.[6]

60.    In support of this conclusion, the Respondent first looks at the text of Article 26(6) of the ECT, which indicates the legal basis under which tribunals should decide a dispute under the ECT. According to the Respondent, the term "dispute" in Article 26 of the ECT

---

[6] Resp. Intra-EU Jurisdictional Objection, ¶ 19.

encompasses any dispute, with no exemption to disputes over jurisdiction, and the expression "applicable rules […] of international law" include EU law when commitments between EU Member States are at stake.[7]

61.    The Respondent explains that protection of investments carried out by an EU investor in another EU Member State is governed by EU law.[8] Under EU law, EU Member States are prohibited from concluding agreements between themselves that might affect rules of EU law, alter their scope, or affect the EU legal order; it follows – the Respondent argues – that EU Member States lack the competence to conclude agreements concerning the protection of intra-EU investments.[9]

62.    In support of this argument, the Respondent relies on Opinion 1/09 of the CJEU of 8 March 2011 ("**Opinion 1/09**"),[10] which addressed the creation of a unified patent litigation system for resolving disputes between private parties.[11] The Respondent argues that, in that Opinion, the CJEU found that EU Member States are prohibited from conferring to an international court the jurisdiction to resolve matters that national courts of the EU Member States would normally resolve.[12] While Opinion 1/09 does not deal with the position of investment tribunals, it illustrates "the narrow margins" that the CJEU leaves for allowing international tribunals to operate within the EU legal order.[13] Furthermore, the CJEU has severely restricted the freedom of the EU Member States by rejecting the contents of international agreements that were found to be incompatible with the EU Treaties or the nature of the European legal order.[14]

63.    The Respondent also refers to the Judgment of the CJEU of 30 May 2006 (the "**MOX plant case**"),[15] where the EC brought an infringement procedure against Ireland before the CJEU

---

[7] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 5-9; Tr. Day 1, 100:10-17.
[8] Resp. Intra-EU Jurisdictional Objection, ¶ 4.
[9] *Id*., ¶ 4; Resp. Reply on the Intra-EU Jurisdictional Objection, ¶ 10.
[10] Opinion 1/09 of the Court (Full Court) 8 March 2011 - Opinion delivered pursuant to Article 218(11) TFEU – Draft agreement – Creation of a unified patent litigation system – European and Community Patents Court – Compatibility of the draft agreement with the Treaties (RL-025).
[11] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶ 13.
[12] *Id*., ¶ 16.
[13] *Id*., ¶ 17; Tr. Day 1, 103:18-22.
[14] *Id*., ¶ 18.
[15] Case C-459/03, Commission of The European Communities v. Ireland, Judgment of the Court (Grand Chamber) of 30 May 2006, [2006] ECR I-4635 (RL-026).

for bringing action that concerned an intra-EU dispute before an international arbitral tribunal.[16] The Respondent highlights that, in that case, the CJEU made clear that EU Member States "are prevented from letting a dispute that potentially involves EU law aspects be resolved by an international arbitral tribunal."[17]

64.     Accordingly, an *ad hoc* international arbitral tribunal's potential interpretation and application of EU law or international treaty obligations that are part of the EU legal order – as is the case of the ECT – is "sufficient to trigger the fundamental argument of the *sui generis* nature of EU law and the exclusive jurisdiction of the CJEU."[18] The Respondent concludes that EU Member States are prevented from using international arbitration unless previously approved by the CJEU.[19]

65.     Because of the alleged incompatibility of an arbitration mechanism with the primacy of the CJEU in the application of EU law, the offer to arbitrate by Italy included in Article 26 of the ECT "has to be considered inapplicable to intra-EU disputes since the signing of the Treaty."[20] The Respondent further notes that that would be the case here, since "even considering that this would be of relevance only once substantive EU law [were] at stake," EU Internal Market rules were completed before the Claimants made their investment and before they submitted their Request for Arbitration.[21] Because EU law binds both Italy and the United Kingdom, the Claimants' offer to arbitrate would also be "inapplicable" as UK investors "are not covered by the reciprocal commitment established by Article 26(3) [of the] ECT."[22]

66.     In addition, the Respondent refers to three specific Articles of the ECT – Articles 1, 16 and 25 – to further its argument that the terms of the ECT recognizes the EU as a unified legal system whose provisions prevail over the ECT itself.[23]

---

[16] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 23-25.
[17] *Id.*, ¶ 26; Tr. Day 1, 104:20-105:2.
[18] *Id.*, ¶ 28.
[19] *Id.*, ¶ 29.
[20] *Id.*, ¶ 38.
[21] *Id.*, ¶ 38.
[22] *Id.*, ¶ 39.
[23] Resp. Intra-EU Jurisdictional Objection, ¶ 19.

67.    First, the Respondent alleges that Article 1 of the ECT recognizes the EU as a single and unified territory for purposes of the ECT.[24] According to the Respondent, this recognition of an overlap of territories between the EU Member States and the EU is also a recognition of an allocation of competences within the EU that rather than relying on geographical areas, relies on competences by matter.[25]

68.    The Respondent subsequently addresses Article 25 of the ECT and argues that it recognizes the specificity of the relations among EU Member States.[26] Through this Article, the ECT acknowledges that the EU has the scope of "'substantially liberalizing […] trade and investment', that is to say the same subject matter as the ECT."[27] Additionally, the Respondent alleges that Article 25 of the ECT can only be reasonably interpreted under the understanding that between Contracting Parties that are party to the EU, "a 'preferential treatment' does exist and is fully recognized by the ECT."[28]

69.    Lastly, the Respondent addresses Article 16 of the ECT and refers to it as a conflict rule.[29] The Respondent explains that Italy and the UK entered into EU Treaties that concern the subject matter of Parts III and V of the ECT prior to signing the ECT. Consequently, "nothing in Part III or V of the ECT must be construed to derogate from any provision of the EU Treaties as for investment promotion and protection, or from any right to dispute resolution with respect thereto under the EU Treaties."[30]

70.    Finally, the Respondent alleges that the lack of an explicit disconnection clause in the ECT does not prove the lack of intent of the Contracting Parties to limit the scope of the ECT and adds that, pursuant to Articles 31 and 32 of the Vienna Convention on the Law of Treaties (the "**VCLT**"), the interpretation of a treaty and of the intent of the contracting parties is an exercise that includes "both textual and contextual elements, including the

---

[24] *Id.*, ¶¶ 10-11.
[25] *Id.*, ¶ 13.
[26] *Id.*, ¶ 14.
[27] *Id.*, ¶ 15.
[28] *Id.*, ¶ 16.
[29] *Id.*, ¶ 17.
[30] *Id.*, ¶ 18.

existence of other treaties between the relevant parties."[31]

### b. *The Context and Purpose of the ECT*

71. The Respondent alleges that the context, declarations and understanding of the Contracting Parties of the ECT support the conclusion that the ECT is inapplicable to intra-EU disputes.[32] As to the context of the ECT, the Respondent points, *inter alia*, at the Decision with respect to Articles 24(4)(a) and 25 of the ECT included in Annex 2 to the Final Act of the European Energy Charter Conference (the "**Decision in Annex 2**").[33]

72. First, the Respondent states that the Decision in Annex 2 "clearly shows that Contracting Parties that took part into [sic] the Conference had clear in mind the issue of treatment of investors from a country that was a Contracting Party of the ECT but not a member of the EU", and felt the need to establish that "once a non-EU Investor is established within the EU under the criteria established in the Decision, it will benefit [from] EU rules."[34] For the Respondent, "it is obvious that this Decision means that in such case[s] the investor would have no right to apply Article 26 [of the ECT] to protect its position," but would be covered by EU law and refer to the internal dispute resolution mechanisms afforded by the EU. The Respondent concludes that "[this] principle cannot but confirm the intention of the Contracting Parties to cover only situations external to the EU."[35]

73. The Respondent also considers "preparatory work of the treaty and the circumstances of its conclusion" – primarily the European Energy Charter – to be a necessary tool of interpretation of the ECT.[36] The Respondent states that the Charter process "was intended to integrate the energy sector of the Soviet Union and Eastern Europe" as well as regulate their relationship, and not to regulate the internal EU energy market.[37] The Respondent adds that, at the time of the creation of the Charter, EU Directives in the energy sector had

---

[31] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 43-46 citing *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (CL-125) ("*Blusun*") and *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 (CL-116) ("*Electrabel*").
[32] Resp. Intra-EU Jurisdictional Objection, ¶ 20.
[33] *Id.*, ¶ 21.
[34] *Id.*, ¶ 22.
[35] *Id.*, ¶ 23.
[36] *Id.*, ¶ 27.
[37] *Id.*, ¶ 28.

already been adopted or were in the process of being adopted. This would confirm "the intention of the EU institutions and the EU Member States to regulate intra-EU situations exclusively within the Internal Market rules."[38]

74.    Lastly, the Respondent relies on the practice of the EU and EU Member States.[39] The Respondent argues that since *Electrabel*, the first intra-EU investment arbitration that was instituted under the ECT in 2007, "the EU and Member States generally objected against the jurisdiction of arbitral tribunals, as well as the Commission repeatedly asked to intervene as *amicus curiae* to [that] same end."[40] The Respondent submits that this confirms the intention of the EU and its Member States for the ECT not to cover intra-EU disputes.[41]

### c.  The Evolution of EU Law

75.    The Respondent submits that, even if the Tribunal was to consider that the ECT applied to intra-EU disputes at one time, it should nevertheless conclude that, after the adoption of the Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community (the "**Lisbon Treaty**"),[42] it no longer applies to such disputes.[43]

76.    The Respondent explains that, with the Lisbon Treaty, direct foreign investments ("**DFI**") were added to the common commercial policy, an exclusive competence of the EU. Thus, since then, EU Member States cannot enter into *inter se* agreements in those matters that are included in DFI, which only EU law can regulate.[44] Consequently, by adhering to the Lisbon Treaty, EU Member States modified their obligations under the ECT as to DFI within the EU.[45]

77.    The Respondent explains the interplay between the ECT and the Lisbon Treaty relying on Article 30 of the VCLT and on the Report on Fragmentation of International Law of the

---

[38] *Id.*, ¶ 30.
[39] *Id.*, ¶ 31.
[40] *Id.*, ¶¶ 32-33.
[41] *Id.*, ¶ 34.
[42] Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community, signed at Lisbon, 13 December 2007 (RL-004).
[43] Resp. Intra-EU Jurisdictional Objection, ¶ 36.
[44] *Id.*, ¶ 37.
[45] *Id.*, ¶ 38.

International Law Commission (the "**ILC**") and concludes that both Treaties apply to the same subject matter, regardless of the lack of an exact coincidence of provisions or even of their objectives.[46] Although EU provisions on internal market and rules on economic integration "do not 'deal' technically with promotion and protection of investments as it is usually understood to be the scope of investment agreements in international trade law, they share the same efforts of integration."[47] The Respondent adds that the Claimants' statement that the exact same terms of protection in investment law incorporated into the ECT should also be found in EU law in order to apply to the conflict rule in Article 16 of the ECT misses the essence of EU law.[48] For the Respondent, "concerning the same subject matter" must be read in the context of the scope of the Treaties to compare and that adds exact coincide is not the rule.[49]

78.     The Respondent then submits that EU law represents a more developed and articulated legal system and is therefore "more favorable to the investor and the investment than the ECT."[50] First, investors can address national courts of the EU for all issues that would arise in an ECT arbitration.[51] Second, "[f]inal recourse to the CJEU by domestic Courts permits the CJEU to ensure consistency of application of case law throughout Europe."[52] Furthermore, EU law widely protects legitimate expectations and applies principles of reasonableness and proportionality of public acts.[53]

79.     Finally, in response to the Claimants' allegation that Article 41 of the VCLT would prohibit EU Member States from establishing a different regime among them because this would eliminate the right of Contracting Parties to grant access to international arbitration to their investors, the Respondent argues that Article 41 of the VCLT protects the rights of those Contracting Parties that do not take part into the new agreement. Member States can "fully abrogate to any rule whatsoever."[54] Accordingly, the derogation of Article 26 of the

---

[46] *Id.*, ¶¶ 46-48.
[47] *Id.*, ¶¶ 49-50.
[48] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶ 50.
[49] *Id.*, ¶ 51.
[50] Resp. Intra-EU Jurisdictional Objection, ¶ 53.
[51] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶ 48.
[52] *Id.*, ¶ 54.
[53] *Id.*, ¶ 49.
[54] *Id.*, ¶ 57.

ECT would only apply to intra-EU disputes and would not affect the rights of investors of third countries.[55]

### (2) Claimants' Position

#### a. *The Terms of the ECT*

80. The Claimants argue that as of the date of the Request for Arbitration submitted on 14 April 2017, there was a valid offer to arbitrate on the part of the Respondent included in Article 26 of the ECT, which the Claimants accepted when "they sent their letter dated 31 March 2016 to Italy seeking amicable settlement, and submitted their Request for Arbitration on 14 April 2017."[56] The Respondent is now seeking to retroactively withdraw their valid offer to arbitrate.[57]

81. The Claimants submit that, contrary to what the Respondent argues, the term "applicable rules and principles of international law," refers to "public international law, and not the regional law of the EU."[58] The Claimants recognize that EU law "is a species of international law," as it deals with the relations between EU Member States, but it is not the type of international law contemplated under Article 26 of the ECT.[59]

82. The Claimants argue that the Opinion 1/09 and the MOX plant case are distinguishable from disputes that arise under the ECT.[60] First, the Claimants recall that Opinion 1/09 related to the creation of a Unified Patent Litigation System that would have exclusive jurisdiction to address a significant number of patent actions; in order to do this, that court would be called upon to interpret and apply EU law and decide disputes on the basis of the fundamental rights and basic principles of EU law.[61] In contrast, the ECT does not call on tribunals to apply EU law, but rather the provisions of the ECT and the principles of public international law. Moreover, the ECT does not grant exclusive jurisdiction in this Tribunal over certain disputes, as investors with rights under the ECT are not precluded from seeking

---

[55] *Id.*, ¶ 57; Tr. Day 1, 121:7-12.
[56] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 5 (footnote omitted).
[57] Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶ 3.
[58] *Id.*, ¶ 6.
[59] Tr. Day 3, 199:8-16.
[60] Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶ 18.
[61] *Id.*, ¶ 19.

relief in EU courts for violations of domestic and EU law. Accordingly, Opinion 1/09 is not applicable to the present case.[62]

83.     Second, the Claimants argue that the MOX plant case relates to disputes that require the interpretation and application of EU law. The Claimants reiterate that under the ECT the applicable law to this dispute are the terms of the ECT and public international law. Rockhopper's claims in this case are not claims under EU law as they are based on alleged violations of the substantive provisions of Articles 10 and 13 of the ECT.[63]

84.     The Claimants add that "the ECT text provides no limitations or exceptions such that investors from certain Contracting Parties (*e.g.* the United Kingdom, as is the case here) may not resolve their disputes against certain other Contracting Parties (*e.g.* Italy)." In fact, the Claimants note, no exceptions could have been made as Article 46 of the ECT prohibits reservations to the ECT.[64]

85.     Furthermore, there is no legal basis to imply that certain provisions of the ECT, particularly Articles 16 and 25 of the ECT upon which the Respondent based its argument, mean that the arbitration agreement in Article 26 of the ECT, does not apply in intra-EU disputes.[65]

86.     First, the Claimants explain that Article 16 of the ECT is applicable when two international agreements between the same Contracting Parties and subject matter are in force in order to give preference to more favourable provisions for investors and investments, and cannot be used to deny investors the benefit of access to international arbitration provided by the ECT.[66] According to the Claimants, the right to arbitrate against a State is fundamental to the ECT and, therefore, Article 16 of the ECT cannot be applied to allow another treaty in which no right to international arbitration is granted to investors, to serve as a basis to deprive investors of that right.[67]

87.     The Claimants state that the Respondent's argument that Article 25 of the ECT recognises

---

[62] *Id.*, ¶ 20.
[63] *Id.*, ¶¶ 21-23.
[64] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 14.
[65] *Id.*, ¶ 18.
[66] *Id.*, ¶ 20.
[67] *Id.*, ¶ 21.

the existence of "preferential treatment" among EU Member States is misplaced. According to the Claimants, Article 25 of the ECT merely confirms that one party to an Economic Integration Agreement ("**EIA**") is not obliged to extend MFN treatment to a non-party of the EIA and says nothing about the treatment that EU Member States should afford investors of other EU Member States or about the dispute resolution mechanisms available to investors of EU Member States, or any Contracting Party to the ECT.[68]

88.    Finally, the Claimants argue that ECT Contracting Parties that were also EU Member States had the possibility of negotiating a disconnection clause excluding the dispute resolution mechanism in Article 26 of the ECT for intra-EU disputes.[69] On this point, the Claimants note that since 1988, the EU and its Member States concluded more than 20 treaties under public international law that did include a disconnection clause, yet no such clause was included in the ECT.[70] The Claimants conclude that if EU Member State parties to the ECT intended to limit the ECT they would have added language to reflect their intention and not rely on an "implied" disconnection clause or the analysis of other treaties.[71]

### b.  The Context and Purpose of the ECT

89.    The Claimants describe the Respondent's interpretation of the ECT's context and purpose as "inaccurate and misleading."[72] First, the Claimants submit that the Decision in Annex 2 to the ECT simply clarifies that EU Member States that are Contracting Parties to the ECT must afford the same treatment to non-EU investments that maintain business activities within the EU. The Claimants add that it "says nothing that would imply a prohibition on EU investors seeking redress in international arbitration against an EU Member State."[73]

90.    While recognizing that the ECT resulted from the need for economic recovery in Eastern Europe and the Soviet Union, the Claimants submit that "nothing in the ECT limits it to

---

[68] *Id*., ¶ 24; Tr. Day 3, 192:16-193:10.
[69] *Id*., ¶ 16.
[70] Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶¶ 7-8, citing *Electrabel*, ¶ 4.158 (CL-116); *Blusun*, ¶ 280 (CL-125).
[71] *Id*., ¶ 10.
[72] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 22.
[73] *Id*., ¶ 23.

that purpose."[74] Moreover, "the ECT's recitals do not create a distinction between the [EU] internal market and the adoption of the ECT" as "they simply refer to Europe as a geographical element, as part of a reference for the energy sector, and as a support system in consideration of the European Community's strength."[75] According to the Claimants, "[t]hese provisions cannot be read as somehow creating a different regime for the EU, which is not otherwise found in the ECT."[76]

91.     Furthermore, the Claimants highlight that at least 19 investment treaty arbitration tribunals – 10 of which have involved various intra-EU BITs and 9 of which have involved the ECT – have rejected the same intra-EU jurisdictional objection that the Respondent raises,[77] and add that their reasoning did not hinge upon, nor is impacted by, any interpretation of EU law offered by the CJEU to date.[78]

### c.   The Evolution of EU Law

92.     According to the Claimants, numerous tribunals and scholars have concluded that EU law and intra-EU investment treaties – including the ECT – do not share the same subject-matter.[79] Since Article 30 of the VCLT is only applicable if treaties are found to share the same subject matter, the Claimants submit that no further analysis of this argument is needed.[80]

93.     Furthermore, even if it were to be found that the Lisbon Treaty and the ECT do relate to

---

[74] *Id.*, ¶ 25.

[75] *Id.*, ¶ 26.

[76] *Id.*; Tr. Day 3, 196:18-197:1.

[77] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 30, referring, in particular, to the awards issued recently in *Blusun* (CL-125); *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-130); *JSW Solar (zwei) GmbH & Co. KG v. Czech Republic*, PCA Case No. 2014-03, Final Award, 11 October 2017 (CL-139)*; and Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-140).

[78] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 83.

[79] *Id.*, ¶ 46, referring, in particular, to Tomas Fecák, *Chapter 5: Intra-EU International Investment Agreements, in International Investment Agreements and EU Law*, KLUWER L. INT'L 467–68 (2016) (CL-148); *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-041); *AES Summit Generation Ltd. and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (CL-122); *Electrabel*, ¶ 4.176 (CL-131); *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, ¶ 159 (CL-128); *Achmea B.V. (formerly known as "Eureko B.V.") v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 (CL-121) ("*Achmea Award*").

[80] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 47.

the same subject-matter, Articles 30(3) and 30(4)(a) of the VCLT "confirm that an earlier-in-time treaty (*e.g.* the ECT) applies unless it is found to be incompatible with the later-in-time treaty (*e.g.* the Lisbon Treaty)." According to the Claimants, "as many arbitral tribunals and domestic courts have confirmed, the ECT and the Lisbon Treaty are not incompatible, and no conflicts arise between the ECT and any part of EU law."[81] Following this consistent line of jurisprudence, "it is simply beyond doubt that there is no incompatibility between the ECT and EU law, even if they were found to cover the same subject matter, which they do not."[82]

94.    In any case, the application of Article 30 of the VCLT would be limited by Article 41 of the VCLT, which governs the conditions under which a multilateral treaty may be amended.[83] According to the Claimants, Article 41 of the VCLT "prohibits an interpretation that the Lisbon Treaty has modified the ECT by 'de-activating' the investor protection and dispute resolution clauses between Italy and the United Kingdom because such a construction would eliminate the rights of Contracting Parties, granted to their investors, to bring disputes to international arbitration, and it would be incompatible with the object and purpose of the ECT, which is to promote foreign energy investments by ensuring investors' rights to arbitration."[84]

95.    Furthermore, Article 16 of the ECT "confirms the predominance of the ECT's provisions on investment protection and dispute resolution mechanisms over prior or subsequent agreements that are less favorable."[85] The Claimants add that the application of Article 16 of the ECT requires specific showing – which the Respondent fails to provide – of how EU law would grant a stronger level of protection to foreign investments and thus prevail over the ECT,[86] and, in particular, more favourable provisions than the substantive protections

---

[81] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 48-53, referring, in particular, to *Electrabel*, ¶¶ 4.146-4.147 (CL-131); *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 72–75 (CL-144); *Achmea Award*, ¶¶ 245, 281-82 (CL-121); *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction, 6 June 2007, ¶¶ 63, 65-66 (CL-124).
[82] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 54.
[83] *Id.*, ¶ 55.
[84] *Id.*, ¶ 57.
[85] *Id.*, ¶ 60.
[86] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 61-62; Cl. Rejoinder on the Intra-EU Jurisdiction Objection, ¶ 12.

afforded to investments in Part III of the ECT and the right of investors to access arbitration in Part V of the ECT.[87]

96.    On this point, the Claimants add that "there are no direct or comparable provisions of EU law in respect of full protection and security, fair and equitable treatment and expropriate [sic]"[88] nor does it afford the right to investors to resolve legal disputes with Contracting Parties through international arbitration, a fundamental right granted by the ECT.[89]

97.    In response to Italy's allegation that access to international arbitration is unnecessary in intra-EU disputes because access to justice is ensured by the institutional features of the EU, the Claimants argue this does not take away from the point that EU law does not afford investors the ability to bring action against a State directly in international arbitration, which the ECT does.[90]

## B.    RELEVANCE OF THE *ACHMEA* JUDGMENT

### (1) Respondent's Position

98.    The Respondent argues that its intra-EU Jurisdictional Objection is supported by the reasoning of the *Achmea* Judgment, on which the CJEU "confirmed that arbitration clauses on investment agreements covering intra-[EU] situations are not compatible with EU law", as they would "jeopardize the integrity of EU law."[91]

#### a.    *Impact of the* **Achmea** *Judgment on the Tribunal's Jurisdictional Analysis under the ECT*

99.    First, the Respondent submits that "in the application of *Achmea* no distinction can be drawn between treaties exclusively undertaken between [M]ember States (like the BITs) and agreements signed also by the EU (like the ECT)."[92] In particular, the Respondent contends that paragraph 62 of the *Achmea* Judgment refers to agreements concluded

---

[87] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 62.
[88] *Id.*, ¶ 63.
[89] *Id.*, ¶¶ 63-64.
[90] Cl. Rejoinder on the Intra-EU Jurisdiction Objection, ¶ 13.
[91] Resp. Intra-EU Jurisdictional Objection, ¶¶ 107, 112.
[92] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶ 64.

between Member States "with the evident intention to refer to obligations reciprocally undertaken between member States irrespective of the kind of treaty."[93]

100. The fact that the EU is a Party to the ECT does not affect the bilateral nature of the offer to arbitrate and, although the ECT is a multilateral treaty, "the obligations that are relevant to the present dispute are those obligations that Italy assumed towards UK investors."[94] Paragraph 57 of the *Achmea* Judgment "makes it clear that the EU, when entering into an international agreement, has to '[respect] the autonomy of the EU and its legal order.'"[95] Furthermore, the *Achmea* Judgment confirms that, in an intra-EU BIT dispute, the main element to take into consideration "is that EU law needs to be applied."[96] For the Respondent, this is equally the case with the ECT, since "in order to assess the reciprocal obligations of the relevant (member) States, EU law needs to be considered both as international law and as the law of the host state."[97]

101. Finally, the Respondent addresses the treatment of the *Achmea* Judgment in the *Masdar* Award and submits that the Tribunal should adopt a different approach. The Respondent criticizes the *Masdar* tribunal's reliance on Advocate General Wathelet's Opinion in *Achmea* (the "**Advocate General's Opinion**") and notes that this Opinion does not reflect the law mainly because it was rejected by the CJEU and it draws unwarranted inferences from the CJEU's silence on the alleged distinction between BITs and ECT.[98]

### b. *Effects of the* **Achmea** *Judgment upon Enforcement of Awards*

102. The Respondent explains that the principles confirmed in the *Achmea* Judgment, also (but not exclusively) concern the phase of enforcement of the award. In particular, the Respondent submits that, in this case, "if the Tribunal resolved to proceed to the merits phase and issue an award, the latter would be unenforceable and subject to non-recognition duties."[99] The Respondent refers to the arbitrators' duty to ensure that their awards are

---

[93] *Id.*, ¶ 65.
[94] *Id.*, ¶ 69.
[95] *Id.*, ¶ 70.
[96] *Id.*, ¶ 74.
[97] *Id.*
[98] *Id.*, ¶¶ 84-89. Resp. Observations on *Masdar*, ¶¶ 20-26.
[99] Resp. Reply on the Intra-EU Jurisdictional Objection, ¶ 77.

unenforceable, and concludes that the Tribunal should refuse to exercise jurisdiction based on its inability to produce an enforceable award.[100]

**(2) Claimants' Position**

103.   The Claimants argue that the *Achmea* Judgment is neither relevant in the context of the current ECT arbitration, nor persuasive in its reasoning,[101] for three reasons: (i) the Tribunal's jurisdiction is based on the express jurisdictional provisions of the ECT, regardless of what the CJEU has to say; (ii) even if *Achmea* were relevant to certain BIT disputes "which remains a very open question as a matter of public international law," it is not relevant to disputes under the ECT, of which the EU is a party; and (iii) its "theoretical future impact" on the enforceability of an award is not a relevant concern for the Tribunal.[102]

   *a.  Impact of the* **Achmea** *Judgment on the Tribunal's Jurisdictional Analysis under the ECT*

104.   The Claimants argue that this case is distinguishable from *Achmea* for two reasons: (i) *Achmea* involved an intra-EU BIT, while the ECT involves the EU and, separately, every EU Member State as a Party; and (ii) *Achmea* turned on two provisions in the Netherlands-Slovakia BIT's applicable law clause that are not present in the ECT's governing law clause.[103]

105.   The Claimants highlight that in *Achmea*, the CJEU limited its ruling to arbitration agreements contained in certain BITs concluded between EU Member States and "indicated that its ruling in *Achmea* would not apply to an investment protection treaty to which the EU is a Contracting Party."[104]

106.   In particular, the CJEU in *Achmea* concluded that "the dispute settlement mechanism in Article 8(6) of the Netherlands-Slovakia BIT was incompatible with EU law because it

---

[100] *Id.*, ¶¶ 78-80.
[101] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 68.
[102] *Id.*, ¶ 74.
[103] *Id.*, ¶ 85.
[104] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 87, 88; Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶ 27.

required an arbitral tribunal to interpret and apply EU law, but the tribunal did not constitute a *'tribunal or court'*" for purposes of EU law, that would be able to refer questions of interpretation or application of EU law to the CJEU, thereby preventing the effectiveness of the EU legal order.[105] Conversely, the Claimants add, Article 26(6) of the ECT makes no such reference to EU law, but rather specifically provides that the Tribunal shall decide disputes arising in accordance with the terms of the ECT and international law.[106]

107. The Claimants state that the *Masdar* tribunal's reliance on the Advocate General's Opinion is reasonable and logical and note that the *Achmea* Judgment failed to address some of the issues addressed in the Advocate General's Opinion – including the application of the ruling to multilateral treaties. This does not result in the CJEU's automatic "rejection" of the Advocate General's Opinion.[107]

### b. Effects of the Achmea *Judgment upon Enforcement of Awards*

108. The Claimants argue that, given how recent the *Achmea* Judgment is, its specific impact (if any) upon enforcement of awards issued under intra-EU BITs is "highly uncertain."[108] On this point, the Claimants note that the tribunal in *Micula* explained that it is not a tribunal's task to engage in speculation about enforcement.[109] The Tribunal in this case should do likewise.[110] Furthermore, the Respondent ignores that even if enforcement within the EU were to be denied, "enforcement outside of the EU may still be possible."[111]

## C.    RELEVANCE OF THE *VATTENFALL* DECISION

### (1) Respondent's Position

109. First, the Respondent argues that the *Vattenfall* tribunal distorted the wording of Article 26 of the ECT to circumvent the indication that "issues in dispute" be decided in accordance

---

[105] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶¶ 91, 96 (emphasis in the original); Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶ 28.
[106] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 92.
[107] Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶ 39.
[108] Cl. Reply on the Intra-EU Jurisdictional Objection, ¶ 98.
[109] *Id.*, ¶ 99.
[110] *Id.*, ¶ 100, citing *Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-041).
[111] Cl. Rejoinder on the Intra-EU Jurisdictional Objection, ¶ 32.

with "the applicable rules and principles of international law."[112] According to the Respondent, the Tribunal did so by "coming to the odd conclusion that the jurisdiction of the Tribunal is not one of the 'issues in dispute' before it."[113]

110. The Respondent then explains that the *Vattenfall* tribunal's interpretation of Article 26 of the ECT incorrectly conflated Article 26(6) of the ECT and Article 42(1) of the ICSID Convention,[114] as "[t]he former is not one of the elements that, under Art[icle] 31(1) VCLT, should be taken into account to interpret the latter"[115] and "the function of the two clauses is not comparable."[116] The Respondent submits that "[t]he ICSID Convention governs the function and jurisdiction of the Centre but cannot operate without the application of other norms that establish the competence of the specific tribunal to hear a specific dispute."[117] The Respondent adds that the only provision that determines the law under which the jurisdiction of an ECT-based arbitral tribunal is determined is Article 26(6) of the ECT.[118]

111. Furthermore, an analysis of Article 26(6) of the ECT reveals that "the word 'dispute' has a generic connotation of disagreement and is not the specific 'dispute' described in Art[icle] 26(1) [of the] ECT."[119] For the Respondent, the correct interpretation of Article 26(6) of the ECT is that "all issues on which a controversy exists, the determination of which requires the application of the law, will be resolved applying the sources listed in the clause",[120] which includes the rules and principles of EU law.[121]

112. The Respondent also addresses the *Vattenfall* tribunal's finding that the reading of Articles 267 and 344 of the TFEU provided in the *Achmea* Judgment does not apply to ECT-based arbitration on the basis that "the ECT is a multilateral treaty, to which the EU Member States and the EU are parties, while the BIT is not."[122] Here, the Respondent

---

[112] Resp. Observations on *Vattenfall*, ¶ 7.
[113] *Id.*, ¶ 8.
[114] *Id.*, ¶ 11.
[115] *Id.*, ¶ 12.
[116] *Id.*, ¶ 13.
[117] *Id.*, ¶ 13.
[118] *Id.*, ¶ 14.
[119] *Id.*, ¶ 22.
[120] *Id.*, ¶ 24.
[121] *Id.*, ¶ 34.
[122] *Id.*, ¶¶ 37, 38.

reiterates that the *Achmea* principles apply equally to BITs and to multilateral treaties such as the ECT.[123]

113. Second, the Respondent argues that EU law prevented *Vattenfall* (and the Claimants here) from bringing the claim to arbitration and stipulated the exclusive forum of the EU courts.[124] Accordingly, the *Vattenfall* tribunal should have declined jurisdiction under the principles of international comity and *forum non conveniens*.[125] The Respondent explains that, pursuant to these principles and even when the formal elements of jurisdiction are met, tribunals retain "a margin of manoeuvre to dismiss inadmissible claims – under the general principles of law that govern the coordination of competing or concurrent *fora.*"[126]

114. Additionally, the Respondent argues that the *Vattenfall* tribunal failed to consider the protections granted by EU law to all investors operating across the borders between EU Member States when it mistakenly found that "depriving EU Investors of the right to invoke the arbitration provision of the ECT, where the respondent State is an EU Member State, would be counterproductive to the flow of international investment in the energy field."[127]

115. Finally, the Respondent addresses the *Vattenfall* tribunal's finding that the lack of a disconnection clause in the ECT "was intended to create obligations between Member States of the EU, including in respect of potential Investor-State dispute settlement."[128] Such a clause is not necessary in matters already governed by EU law, like those covered by the ECT.[129] Lastly, the Respondent addresses the *Vattenfall* tribunal's holding that even if there was a conflict between the ECT and EU law, the ECT would prevail under Article 16 of the ECT and refers to the arguments raised in its previous memorials – see paragraph 78 above – to argue that "EU law derogates from the ECT, by providing more

---

[123] *Id.*, ¶ 39.
[124] *Id.*, ¶ 56.
[125] *Id.*, ¶ 58.
[126] Resp. Observations on *Vattenfall*, ¶ 62-70, referring to *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines* (ICSID Case No. ARB/02/6) Decision on Jurisdiction, 29 January 2004 (RL-035) and *Ireland v. United Kingdom* (PCA) Order No. 3, Suspension of Proceedings on Jurisdiction and Merits, and Request for further Provisional Measures 24 June 2003 (RL-034).
[127] Resp. Observations on *Vattenfall*, ¶¶ 72, 73, quoting *Vattenfall* Decision ¶ 198.
[128] *Id.*, ¶ 75, quoting *Vattenfall* Decision ¶ 206.
[129] *Id.*, ¶¶ 75-76.

favourable treatment to foreign investors and investments from EU countries."[130]

### (2) Claimants' Position

116.    The Claimants submit that the *Vattenfall* Decision fully supports the arguments put forward in their Reply and Rejoinder in response to the questions posed by the Tribunal to the Parties on 19 April 2018.[131]

117.    In particular, the Claimants focus their analysis on the following three determinations in the *Vattenfall* Decision: First, the *Vattenfall* tribunal distinguished the ECT from an intra-EU BIT on the same bases as submitted by the Claimants.[132] In particular, the Claimants note that the *Vattenfall* tribunal identified two main factors that differentiate the BIT and the ECT: (i) "the ECT is a 'mixed' agreement between both Member States, the EU itself and third party states, unlike the Dutch-Slovak BIT;" and (ii) "the wording of Article 26 ECT is different from Article 8 of the Dutch-Slovak BIT."[133] Furthermore, the Claimants highlight that the *Vattenfall* tribunal, taking into consideration the *Masdar* Award, and the silence of the *Achmea* Judgment on the compatibility of intra-EU investor-state dispute settlement under the ECT with EU law, determined that "it was not in a position to extrapolate new rules from the *Achmea* Judgment."[134]

118.    Second, the *Vattenfall* tribunal also found that the ECT is more favourable to investors than EU law. In particular, the *Vattenfall* tribunal found that the plain language of Article 16 of the ECT contradicted Germany's and the EC's proposed interpretation of the ECT. First, the *Vattenfall* tribunal did not agree with the argument pursuant to which EU law concern the same subject matter as Part III or Part V ECT. Furthermore, even if did so, Article 16 of the ECT would apply and prevent derogation from the more favourable terms included in the ECT.[135]

119.    Third, the *Vattenfall* tribunal described that the lack of a disconnection clause in the ECT

---

[130] *Id.*, ¶¶ 77-88.
[131] Cl. Observations on *Vattenfall*, ¶ 4.
[132] *Id.*, ¶ 7.
[133] *Id.*, ¶ 9.
[134] *Id.*, ¶ 10, quoting *Vattenfall* Decision, ¶¶ 162-164.
[135] *Id.*, ¶¶ 12-14.

was "telling," and noted that if the Contracting Parties to the ECT intended for intra-EU arbitration not to be available to investors under the ECT, then it would have been necessary to make such an intention explicit.[136] The *Vattenfall* tribunal concluded that the absence of such clause confirmed the intention of the Contracting Parties to create the same obligations between EU Member States in respect of potential investor-State dispute settlement.[137]

120.   The Claimants highlight four additional points made in the *Vattenfall* Decision.[138] First, the *Vattenfall* tribunal found that EU law and the *Achmea* Judgment do not apply under Article 26(6) of the ECT and 42(1) ICSID Convention. In particular, the *Vattenfall* tribunal held that the language "issues in dispute" included in Article 26(6) of the ECT refer to Part III of the ECT – the substantive standards of treatment and protection of investments – and not to provisions on disputes of settlement included in Part V of the ECT.[139]

121.   When interpreting Article 26(6) of the ECT in terms of under Article 42(1) of the ICSID Convention, the *Vattenfall* tribunal noted that Article 42(1) of the ICSID Convention only concerns the merits of a dispute.[140] The *Vattenfall* tribunal further rejected Germany's argument that the tribunal lacked jurisdiction under the ICSID Convention on the basis that Article 26(6) of the ECT applied only to the merits of a dispute between the parties and did not apply to issues or questions relating to the Tribunal's jurisdiction.[141]

122.   Second, the Claimants explain that the *Vattenfall* tribunal held that "the mere mention" in Article 1(3) of the ECT that EU Member States have "transferred competence over certain matters" to the EU does not result in a non-application of the ECT between EU Member States.[142] Furthermore, the *Vattenfall* tribunal rejected the EC's argument pursuant to which an investment made by an investor from one EU Member State in the area of another EU Member State is made within the "Area" of the same Contracting Party, *i.e.* the EU itself. For the *Vattenfall* tribunal, the two definitions of "Area" found within Article 1(10)

---

[136] *Id*., ¶¶ 17-18, quoting *Vattenfall* Decision ¶ 202.
[137] *Id*., ¶ 18.
[138] *Id*., ¶ 19.
[139] *Id*., ¶ 21.
[140] *Id*., ¶ 22.
[141] *Id*., ¶ 22.
[142] *Id*., ¶ 26.

of the ECT do not exclude one over the other as the EU Member States that are Contracting Parties of the ECT do not cease to have their own areas.[143] Accordingly, the above dispositions cannot be interpreted as carving intra-EU disputes from its dispute settlement provisions.[144]

123.    Third, the *Vattenfall* tribunal's found that EU Treaties are international law.[145] The Claimants submit that, although they do not accept the finding of the *Vattenfall* tribunal on this point, "such classification will not have any impact on the outcome of the jurisdictional decision," because, as the *Vattenfall* tribunal concluded, "EU law does not fall within the scope of the 'relevant rules of international law applicable in the relations between the parties' under [Article 31(3)(c) of] the VCLT."[146]

124.    Finally, the Claimants address the Respondent's argument pursuant to which the Tribunal should decline exercise of its jurisdiction under the doctrines of international comity and/or *forum non conveniens*. As found in the *Vattenfall* Decision, the circumstances for the application of these doctrines do not exist in this case because this Tribunal is the only forum available to redress Rockhopper's specific ECT grievances.[147] No provision exists in either the ECT or any other agreement between the Parties that requires that Italian courts or EU courts must decide any aspect of this case first.[148] As to *forum non conveniens,* the Respondent has failed to identify "an alternative forum that has jurisdiction over the ECT claims brought by Rockhopper against Italy; nor are parallel proceedings underway concerning the same set of facts and claims."[149]

### D.    THE EFFECTS OF THE DECLARATION OF THE EU MEMBER STATES

#### (1) Respondent's Position

125.    The Respondent argues that the Declaration is a binding instrument emanating from sovereign States that "can formally be broken down into a bundle of unilateral shared

---

[143] *Id.*, ¶ 27.
[144] *Id.*, ¶ 28.
[145] *Id.*, ¶ 30.
[146] *Id.*, ¶ 34.
[147] Cl. Additional Comments on the EC Application and on Respondent's Observations on *Vattenfall*, ¶ 2.
[148] *Id.*, ¶ 9.
[149] *Id.*, ¶ 13.

declarations amounting to agreement between the 22 Member States," and which provides an interpretation of the scope of application of Article 26 of the ECT as far as its signatories are concerned.[150] According to the Respondent, "[t]his bears the consequence that each signing Contracting Party confirms simultaneously that it does not recognise having ever been bound by Article 26 ECT as for intra-EU disputes, as well as that its own investors are not covered by the ECT against any of the other signing Contracting Part[ies]."[151]

126.    The Respondent further contends that, as a result of the Declaration, the interpretation of the *Achmea* Judgment is no longer "a matter of discussion."[152] Instead, the Respondent submits, it now needs to be acknowledged that "the EU Member States having signed [the] Declaration interpret *Achmea* as applying also to the ECT," thus resulting in a prohibition of any pending or future ECT arbitration.[153]

127.    The Respondent refers to the functions of "[h]ead of mission" under Article 1 of the Vienna Convention on Diplomatic Relations (1961) and argues that the "rules on missions in another State equally apply to permanent representations to an international organization."[154] Thus, the Respondent concludes, by signing the Declaration, the Permanent Representatives were "legitimately signing a legal instrument of a sovereign State of a binding nature."[155]

128.    Moreover, the language of the Declaration, as well as the circumstances under which it was agreed, demonstrate the will of the signatories to be bound by it.[156] First, the language of the Declaration provides a clear illustration of "the consequences Member States draw from European Law as confirmed by the *Achmea* decision."[157] In particular, the Respondent refers to the future steps that the States have to take "to give concrete effect to

---

[150] Resp. PHB, ¶ 4. Tr. Day 5, 210:19-25
[151] *Id.*, ¶¶ 54-55.
[152] *Id.*, ¶ 7.
[153] *Id.*, ¶ 7.
[154] *Id.*, ¶ 22.
[155] *Id.*, ¶¶ 23-24, citing Guideline 2.4.5. of the 2011 ILC Guide to Practice on Reservations to Treaties; Tr. Day 5, 208:25-210:2.
[156] Resp. PHB, ¶ 25; Tr. Day 5, 210:3-11.
[157] *Id.*, ¶ 28.

it in all contexts where the Declaration is relevant."[158]

129.    The Respondent adds that (i) no other Contracting Party to the ECT objected to the Declaration; (ii) a minority of EU Member States simultaneously signed the 16 January Declaration, which is not an objection, as they "only declared that the signatories prefer to wait for an express decision by the CJEU," specifically on the compatibility of the ECT; and, (iii) non-EU Contracting States have "never objected in general to Member States' practice to object to an application of Article 26 ECT covering intra-EU disputes, nor showed any interest in the issue."[159]

130.    Furthermore, the Respondent refers to the Declaration of the Representatives of the Governments of the Member States, of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (the "**Additional Declaration**"). The Respondent argues that both its language and rationale confirm that the five signatories "agree on the application of *Achmea* to any intra-EU BITs," and also on "the fact that they exclusively rely on the judgement of the CJEU to decide on the issue."[160] In turn, this "would take to conclude that arbitral tribunals lack jurisdiction, since only domestic courts can refer a question to the CJEU, which is the prerequisite to obtain a pronouncement by the CJEU on the matter."[161]

131.    The Respondent then addresses the Claimants' argument pursuant to which the Declaration was not issued in accordance with any provision of the ECT, and submits that "[n]either the language nor the multilateral nature of the ECT modify the qualities of the Declaration."[162] The Respondent cites the Commentary to the 2011 ILC Guide on Reservations to submit that "it is undisputed that States can attach to their expression of consent to be bound by a multilateral treaty declarations whereby they indicate the spirit in which they agree to be bound."[163] Pursuant to Article 31.3 (a) and (b) of the VCLT, authentic interpretations by contracting parties are primary means of interpretation of a

---

[158] *Id.*, ¶ 30. See also, Tr. Day 5, 220:7-13.
[159] *Id.*, ¶ 34.
[160] *Id.*, ¶ 41.
[161] *Id.*, ¶ 40.
[162] *Id.*, ¶¶ 58-59.
[163] *Id.*, ¶ 61.

treaty and cannot be "underrate[d] by the fact that a mechanism to settle dispute exists."[164]

132.  The Respondent further submits that the Declaration is not a reservation that was meant to exclude or modify certain provisions, nor an amendment of the ECT under Article 42 of the ECT. The Declaration is an "interpretative declaration" to clarify the sole scope that a treaty like the ECT can have to be consistent with EU law, confirming the primacy of European law.[165]

133.  The Respondent states that the Claimants' argument pursuant to which "the Declaration would retroactively apply a reservation" is a misconstruction of the nature and content of the Declaration.[166] Pursuant to Article 31.2 of the VCLT, interpretative declarations following the signature of a treaty are "relevant as confirmation of an interpretation of such treaty."[167]

134.  Furthermore, the Respondent reiterates that every time that an ECT arbitration has been brought against one of the 22 Member States that signed the Declaration, the respondent State objected on jurisdiction – consistently with the content on the Declaration – thus, "[p]revious practice […] confirms the content of the Declaration."[168] Consequently, "by referencing back to *Achmea*, Member States do not operate any 'retroactive withdrawal' of consent, but confirm how the ECT should have always been interpreted in their understanding."[169] The Respondent adds that "such reading is binding on the Tribunal."[170]

135.  The Respondent concludes by providing a summary of the "series of actions that the Member States further commit themselves to undertake in order to give concrete effect to the Declaration in the contexts where this is needed."[171] In particular, the Respondent submits that (i) Action 1 (as to pending cases) and Action 3 (as to future cases) are "meant

---

[164] *Id.*, ¶ 62.
[165] *Id.*, ¶¶ 66-67, 70, 73-75; Tr. Day 5, 217:4-22. The Respondent adds that it is possible to have an interpretation that applies only to some Contracting Parties of the ECT. See Tr. Day 5, 218:18-19.
[166] Resp. PHB, ¶ 85.
[167] *Id.*, ¶ 89.
[168] *Id.*, ¶ 90.
[169] *Id.*, ¶ 93.
[170] *Id.*
[171] *Id.*, ¶ 95.

to inform of the legal consequences that are set out in the previous pages of the Declaration;"[172] (ii) Action 2 refers to the different procedural steps required to achieve the legal consequences set out in the Declaration;[173] (iii) Action 4 refers to the undertaking to "directly withdraw from arbitration in those cases where the claimant is a publicly owned company";[174] (iv) Action 7 states that those awards that cannot be annulled or set aside should not be challenged;[175] (v) Actions 5, 8 and 9 refer to the termination of intra-EU BITs;[176] and (vi) Action 6 reaffirms the EU Member State's commitment under the EU Treaties "to give legal protection against State measures currently challenged by investors in pending cases."[177]

### (2) Claimants' Position

136.    The Claimants describe the Declaration as "at its highest" an "interpretative declaration."[178] However, contrary to the Respondent, the Claimants argue that "interpretative declarations" are incapable as such of modifying legal obligations.[179] Furthermore, the Claimants reject the Respondent's argument that the Declaration clarifies that Member States did not intend for the ECT to apply to intra-EU disputes from the inception of the ECT.[180]

137.    The Claimants submit that the relevant question here is whether the language of a declaration reveals a clear intention. The Claimants argue that no such clear intention derives from the Declaration,[181] and bases its conclusion on three grounds: (i) the Declaration "does not include any explicit wording that could be taken to mean that the ECT was never intended, and has never applied, to intra-EU disputes;"[182] (ii) the Declaration "does not include any explicit wording that could be taken as confirmation that ECT tribunals lack, and have always lacked, jurisdiction to determine

---

[172] *Id*., ¶¶ 100-103.
[173] *Id*., ¶¶ 104-107.
[174] *Id*., ¶ 108.
[175] *Id*., ¶ 109.
[176] *Id*., ¶¶ 110-114.
[177] *Id*., ¶¶ 115-116.
[178] Cl. PHB, ¶ 4.
[179] *Id*., ¶ 4.
[180] *Id*., ¶ 7.
[181] *Id*., ¶ 8.
[182] *Id*., ¶ 9.

intra-EU disputes under the ECT;"[183] and (iii) in contrast to the promise of the Member States to terminate intra-EU BITs, "the Declaration does not purport to terminate the ECT."[184]

138. The Claimants further argue that of the future actions to be undertaken by Member States that are included in the Declaration, only action points 1 and 9 are related to the ECT.[185] As to action point 1, the Claimants state that it "is simply the Member States' interpretation of the impact of *Achmea* on intra-EU ECT disputes", with no legal or binding effect. They add that this issue "continues to be the subject of many decisions of arbitration tribunals, all of which confirm that they do have jurisdiction."[186] As a result, "Member States have no legal consequences of the *Achmea* judgment, with respect to the ECT, to relay to investment tribunals."[187] This is further supported by the Additional Declaration, "in which five Member States recognised that the *Achmea* judgment is silent on the investor-state clause in the ECT" and that it would be inappropriate to "express views on the intra-EU application of the ECT and its compatibility with EU law."[188] According to the Claimants, this would show that the signatories of the Additional Declaration "recognise that the declarations are non-binding opinions of the States."[189] In addition, action point 9, requires EU Member States to have additional discussions about the effects of *Achmea* on the ECT.[190]

139. The Claimants submit that the Declaration "is only an opinion that does not amount to either a rule or a principle of international law," and that it is not for the EU Member States to determine what EU law is and whether the ECT is compatible with it.[191] The Claimants add that the CJEU is the only organ that can interpret EU law and its treaty compatibility. However, the CJEU is not capable of taking away the competence of the tribunals to determine their own competence, directly derived from the ECT, as well as the rules and

---

[183] *Id.*, ¶ 11.
[184] *Id.*, ¶ 12.
[185] *Id.*, ¶ 13.
[186] *Id.*, ¶ 16.
[187] *Id.*, ¶ 15-16.
[188] *Id.*, ¶ 16.
[189] *Id.*, ¶ 16.
[190] *Id.*, ¶ 17.
[191] *Id.*, ¶ 18.

principles of international law.[192]

140.    In addition, even if the Respondent's interpretation of the Declaration was accurate, it would be incapable of having any legal or binding effect on the Tribunal's jurisdiction under the ECT, for the following five reasons:

- First, in accordance with the general presumption of non-retroactivity in international law, and as confirmed by CJEU judgments, the Declaration cannot have a retroactive effect.[193] If the Declaration was meant to have a retroactive effect, it would have to provide clear statements to rebut the presumption of non-retroactivity.[194] Accordingly, the Declaration cannot vitiate consent given by Italy to this arbitration on 14 April 2017.[195]

- Second, the Declaration must be unanimous to have an effect on the interpretation of the ECT. The Claimants rely on Section 4.7.3 of the Guide on Reservations, legal commentary and the ILC to establish that in order for the Declaration to constitute an agreement between Member States interpreting the ECT, all contracting parties and organizations must approve it. The Claimants highlight that the Declaration has not been signed by the non-EU Member State Contracting Parties, by all Member States, nor by the ECT; thus, the necessary agreement of all Contracting Parties and organizations does not exist.[196]

- Third, the Declaration must contain clear and specific obligations, however its content of the Declaration is not clear and specific enough to create binding obligations with respect to the ECT.[197]

- Fourth, the Respondent must be a contracting Party of the ECT. As a result of the Respondent's withdrawal from the ECT – which took effect on 1 January 2016 – the Respondent has no right to partake in the interpretative declarations that concern the ECT.[198] The Claimants add that, according to Article 47 of the ECT, its provisions are

---

[192] *Id.*, ¶ 18.
[193] *Id.*, ¶¶ 22-23.
[194] *Id.*, ¶¶ 24-25.
[195] *Id.*, ¶ 26.
[196] *Id.*, ¶¶ 29-33.
[197] *Id.*, ¶¶ 34-35.
[198] *Id.*, ¶ 36.

frozen as of the date of the Respondent's withdrawal (1 January 2016) and that, on that date, the ECT did not include any provision that "limited the scope of EU Member States' obligations with respect to intra-EU disputes under the ECT."[199] Accordingly, the provisions of the ECT will continue to apply to Italy until 1 January 2036, as they were on the date of the withdrawal itself.[200]

- Fifth, the Declaration must be made by an authority vested with the power to do so, typically the Head of State and the Minister of the Foreign Officer.[201] The Claimants argue that Diplomats are not lawmakers, nor do they have power to bind states, and that there is no evidence that the 22 Member States included in the Declaration have authorized their Permanent Representatives to sign the Declaration on behalf of the State.[202] In particular, the Respondent has not provided evidence to support its statement that Ambassador Maurizio Massari had authority vested in him by the Italian Ministry of Foreign Affairs.[203]

## IV.    THE TRIBUNAL'S ANALYSIS

### A.    INTRODUCTION – THE SEQUENCE OF ANALYSIS

141.    Taking into account the foregoing positions of the Parties, the Tribunal has decided to arrange its analysis in the following sequence of issues and matters: **(a)** the ECT, EU law and intra-EU disputes prior to the *Achmea* Judgment; **(b)** the effect of the *Achmea* Judgment on issue (a); **(c)** the effect of the Declaration on issue (a); and **(d)** a summary of the overall position in light of the three foregoing issues and matters. While the Tribunal does enjoy procedural discretion in how it arranges its analysis, the foregoing sequence appears to it to be both chronological and logical. The Tribunal has separated issues (a) and (b) not because they are of entirely different subject-matters (which they are not), but rather this separation reflects the evolution of the arguments surrounding the ECT, EU law

---

[199] *Id.*, ¶ 37.
[200] *Id.*, ¶ 37
[201] *Id.*, ¶ 39.
[202] *Id.*, ¶ 40.
[203] *Id.*, ¶ 41.

and intra-EU disputes in the investor-state context.

## B.    THE ECT, EU LAW AND INTRA-EU DISPUTES

142.    As a starting point, the Tribunal considers it appropriate to recall, in relevant part, the text of the provision of the ECT which is invoked by the Claimants for the purpose of jurisdiction:

> *Article 26: Settlement of Disputes between an Investor and a Contracting Party* […]
>
> *(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:* […]
>
> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.* […]
>
> *(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*
>
> *(a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention;* […]

> *(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*[204]

143.    The Tribunal also recalls the set of specific questions it asked of the Parties on 19 April 2018 (recorded above at paragraph 17) and, for present purposes, refines these further into the following issue: on the date of the Request for Arbitration (14 April 2017) was Article 26 of the ECT in force as regards the Respondent, as an EU Member State, insofar as the option for arbitration under the ICSID Convention was concerned.

144.    The issue identified by the Tribunal just above has, in substance, been discussed by many other tribunals in prior cases. While there is no system of binding precedent in the field of investor-state dispute resolution, the Tribunal does consider it of assistance to see the reasoning adopted by other tribunals in relation to intra-EU jurisdiction and the ECT. The Respondent has, at paragraph 63 of the Respondent's Reply on the Intra-EU Jurisdictional Objection, made particular reference to *Blusun* (particularly as the Respondent was also the respondent in that case) as support for the proposition that EU law should be applied both as national law and as international treaty law. Further, *Blusun* was rendered prior to the *Achmea* Judgment and, therefore, is of assistance to the Tribunal in this part of the Decision to assess the position up to the moment when the CJEU issued that judgment.

145.    The Tribunal, therefore, records now what the tribunal in *Blusun* discussed and decided (in relevant part):

> *B. EU Law and the* inter se *issue*
>
> *(a) Admissibility of the* inter se *argument*
>
> *277.* […]
>
> *(b) The applicable law*
>
> *278. The Parties in effect agree that the applicable law in determining this issue is international law, and specifically the relevant provisions of the VCLT. The Tribunal agrees, but would*

---

[204] ECT, Article 26.

*observe that this does not exclude any relevant rule of EU law, which would fall to be applied either as part of international law or as part of the law of Italy. The Tribunal evidently cannot exercise the special jurisdictional powers vested in the European courts, but it can and where relevant should apply European law as such.*

*(c) The original scope of the ECT*

*279. As a matter of international law, the first question is whether the ECT applied to relations* inter se *of EU Member States as at the date of its conclusion (December 1994) in accordance with Articles 31-33 of the VCLT.*

*280. On its face there is nothing in the text of the ECT that carves out or excludes issues arising between EU Member States. (1) The preamble to the ECT records that it intends 'to place the commitments contained in [the European Energy Charter] on a secure and binding international legal basis.' This implies that the scope of the (non-binding) European Energy Charter of 17 December 1991 was replicated in binding form in the ECT. There is no indication of any* inter se *exclusion in the Charter, which refers to a 'new desire for a European-wide and global co-operation based on mutual respect and confidence', and further refers to the 'support from the European Community, particularly through completion of its internal energy market' (Preamble, paras. 6, 14). The EC and Euratom were signatories to the Charter. This was of course before the Treaty of Maastricht, let alone the Lisbon Treaty. (2) Article 1(2) of the ECT defines 'Contracting Party' as 'a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force. EU Member States and the EU are all Contracting Parties. Prima facie at least, a treaty applies equally between its parties. It would take an express provision or very clear understanding between the negotiating parties to achieve any other result. Thus when Great Britain was asserting 'the diplomatic unity of the British Empire', it was argued from time to time that multilateral treaties to which the Dominions were separately parties had no* inter se *application. The* inter se *doctrine was not however accepted, being unsupported by express provision or clear understanding to the contrary. (3) There is no express provision (or 'disconnection clause', to adopt recent parlance) in the ECT. (4) While the Respondent and the EC relied on the* travaux préparatoires *to justify reading in a disconnection clause, this is not permissible in a context in which the terms of the treaty are clear. In any case, the* travaux préparatoires *seem to point against implying a disconnection clause:*

40

*one was proposed during the course of the Energy Charter Treaty negotiations, but was rejected.*

*281. Neither is there anything in the text to support the EC's argument that the ECT did not give rise to* inter se *obligations because the EU Member States were not competent to enter into such obligations. The mere fact that the EU is party to the ECT does not mean that the EU Member States did not have competence to enter into* inter se *obligations in the Treaty. Instead, the ECT seems to contemplate that there would be overlapping competences. The term 'regional economic integration organization (or REIO) is defined in Article 1(3) of the ECT to mean an 'organization constituted by states to which they have transferred competence over certain matters a number of which are governed by the ECT, including the authority to take decisions binding on them in respect of those matters.' The Area of the REIO is also defined by Article 1(10) with reference to EU law. But nothing in Article 1, nor any other provision in the ECT, suggests that the EU Member States had then transferred exclusive competence for all matters of investment and dispute resolution to the EU.*

*282. The EC argues that the 'Member States... are ... presumed to be aware of the rules governing the distribution of competences in a supranational organisation they have themselves created.' But if the Member States thought they did not have competence over the* inter se *obligations in the ECT, this would have been made explicit by including a declaration of competence to set out the internal division of competence between the EC and its Member States, as has been done in many other treaties with mixed membership. Nothing in the text of the ECT supports the implication of such a declaration of competence.*

*283. Pursuant to Article 6 of the VCLT, every State possesses capacity to conclude treaties and is bound by those obligations pursuant to the principle of* pacta sunt servanda. *No limitation on the competence of the EU Member States was communicated at the time that the ECT was signed. Article 46 of the VCLT provides that a State may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance. While EU law operates on both an internal and international plane, a similar principle must apply. Even if, as a matter of EC law, the EC has exclusive competence over matters of internal investment, the fact is that Member States to the EU signed the ECT without qualification or reservation. The* inter se *obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that*

*the EC says can be inferred from a set of EU laws and regulations dealing with investment. The more likely explanation, consistent with the text of the ECT, is that, at the time the ECT was signed, the competence was a shared one.*

284. *The EC relied on its competence argument to argue that there was also no diversity of territory among the investors and the host State as required by Article 26, since both are part of the same 'Contracting Party' for its purposes. It is not necessary for the Tribunal to deal with this argument, since it has held that the European Member States remain 'Contracting Parties' and that the ECT does create* inter se *obligations for European Member States.*

*(d) Subsequent modification of the ECT as to* inter se *matters*

285. *The Respondent and the EC also argue that, even if the ECT had originally concerned* inter se *matters, this was modified by the fact that the Member States of the EU subsequently entered into other agreements that covered both the investment and dispute resolution aspects of the ECT. The EC states that subsequent EU treaties, such as the Treaty of Amsterdam, the Treaty of Nice, and the Treaty of Lisbon, implicitly repealed the earlier ECT under the* lex posterior *rule in Article 30 of the VCLT, whereby 'successive treaties relating to the same subject-matter' will prevail over the earlier to the extent that the treaties are not compatible.*

286. *Turning first to the substantive investment obligations, it is not clear how these are incompatible with the investment rights protected under European law. The EC points to the rules establishing the European internal market, with free movement of goods, persons, services and capital. It states that discriminatory measures or expropriation are not permitted under European law. But these obligations are arguably broader than those in the ECT, and are complementary to them. There is no discrimination unless the same benefits are not accorded to other EU States, but there is nothing in the ECT that requires such a result. Were a national of a European State not party to the ECT to bring international arbitration proceedings against a European host State that was a party to the ECT and had breached investment obligations protected under it, that host State would have to determine whether it could, consistent with its EU obligations, decline to consent to such jurisdiction. Nothing in the ECT would prevent the host State from extending its protections beyond those States that are party to it, if this were required to meet these obligations. As the tribunal found*

42

*in* Electrabel v. Hungary, *EU law can be presumed not to conflict or otherwise be inconsistent with the ECT.*

*287. The only example the EC pointed to where an inconsistency might arise between EU and investment law was the award in* Micula v. Romania. *In* Micula, *however, the tribunal concluded that EU law was not applicable to the dispute, as Romania had not yet acceded to the EU at the time the impugned measures were taken (although the EC appears to have taken the view that EU rules on state aid did apply during the accession negotiations). Any conflict thus arose not out of incompatibility of the relevant BIT with EU law, but out of a disagreement on whether EU rules applied prior to accession. After the* Micula *award was issued, the EC notified Romania that it would be in breach of the EU rules on state aid if it complied with its obligation under the award to pay damages to the investors for a breach of the fair and equitable treatment standard. In that context, any conflict related to the implications of enforcement, not to direct contradictions between the substantive rules themselves. This was also the conclusion of both the* Micula *tribunal and the* Micula ad hoc *committee.*

*288. The Respondent and the EC also argue that the dispute resolution clause, Article 26 of the ECT, is itself incompatible with Article 344 of the TFEU, which provides that 'Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.'*

*289. In the view of the Tribunal, there is no such incompatibility. The dispute before this Tribunal is not an inter-State dispute. It is a dispute, in the words of Article 26, 'between a Contracting Party and an Investor of another Contracting Party'. It is not necessary for this Tribunal to decide whether Article 27, which concerns inter-State disputes, would be incompatible with Article 344 of the TFEU. Even if there were such an inconsistency, this would not also void Article 26, since the later Treaty will supersede the earlier one only to the extent of any incompatibility. To find otherwise would disadvantage investors, who have no ability under European law to protect their investment by suing the host State directly for breaches of the ECT. Neither does anything in European law expressly preclude investor-State arbitration under the ECT and the ICSID Convention.*

*290. As noted (paragraph 260(e) above), the Claimants also relied on the combined effect of the* lex specialis *and* lex posterior

*presumptions, the ECT being both more specific than the EU legal order and subsequent to it. Having concluded that there is no incompatibility between the TFEU and the ECT, the Tribunal does not need to address this argument.*

*291. For these reasons, the Tribunal holds that the* inter se *obligations in the ECT have not subsequently been modified or superseded by later European law.*

*(e) The state of the authorities*

*292. The intra-EU issue has been canvassed in greater or lesser depth by previous investment tribunals, which have reached practically common conclusions.*

[…]

*302. Despite the fact that the EC has intervened in many other intra-EU arbitrations, as far as has been publicly reported, no tribunal yet has upheld this objection to jurisdiction.*

*303. Overall the effect of these decisions is a unanimous rejection of the intra-EU objection to jurisdiction. The tribunal in each case has found that the relevant BIT or the ECT was intended to bring about binding obligations between EU Member States. The tribunals found no contradiction between the substantive provisions of EU law and the substantive or dispute resolution provisions of the BITs. No such system for investor- State arbitration exists in EU law, and it would be incorrect to characterise such disputes as inter-State disputes such that Article 267 of the TFEU could be said to preclude jurisdiction. These conclusions support those adopted by the Tribunal in this case.*[205]

146. Having considered the matter and also reflecting on the fact that, to the Tribunal's knowledge based on the materials put before it, no other tribunal has upheld the objections advanced by any EU Member State in connection with the ECT (as was noted at paragraphs 302-303 of *Blusun* and remains the case), the Tribunal adopts the reasoning in *Blusun* as a correct articulation of the position. The Tribunal does not consider it necessary to add or subtract in any way from the *Blusun* reasoning.

---

[205] *Blusun*, ¶¶ 277-292, 302-303.

147.    The Tribunal extrapolates, for present purposes, two discrete points from *Blusun* for the purposes of this aspect of its jurisdictional analysis.

148.    First, the interpretation argument advanced by Respondent which is referenced as the "disconnection clause," in shorthand parlance, does not stand up to scrutiny when the ECT is interpreted (as the *Blusun* tribunal did) in an entirely regular and ordinary manner according to the provisions of the VCLT.

149.    Secondly, nothing in EU law subsequent to the ECT has the effect of the former superseding (insofar as Respondent is concerned) the latter.

150.    Finally, in this part of the Decision the Tribunal briefly addresses two other aspects of EU law relied upon by the Respondent: (a) Opinion 1/09 (as noted above at paragraph 62, an issue concerning the compatibility of a unified patent litigation system and operating within the EU legal order); and (b) the MOX plant case (when the EC took action before the CJEU against Ireland for bringing an arbitration against the United Kingdom under the United Nations Convention for the Law of the Sea (UNCLOS)). These are matters which, temporally, fall within the ambit of matters pre-*Achmea.* However, properly understood, these are arguments which are analogous to the *Achmea* issue, *i.e.* is the dispute resolution system in question compatible with EU law. That is in an issue which will be addressed later in this Decision.

151.    By way of completeness, the Tribunal appreciates from the submissions of the Respondent that neither Opinion 1/09 or the MOX plant case are relied upon in and of themselves, whether individually or collectively, to argue that an EU Member State cannot make an unconditional offer to arbitrate a dispute coming within the ambit of the ECT.

## C.    THE EFFECT OF THE *ACHMEA* JUDGMENT

152.    The Tribunal now turns to the *Achmea* Judgment which has, until the Declaration, been at the heart of the Respondent's objections to jurisdiction. As with the intra-EU issue, in the relatively short time since the CJEU issued its judgment, no investor-state arbitral tribunal has come to the conclusion that *Achmea* represents a sustainable objection to jurisdiction.

153.    Given the importance which the Respondent has attached to *Achmea*, and also given what will be discussed later in this Decision as regards the Declaration, the Tribunal considers it appropriate to examine the judgment in detail.

154.    First, briefly as to the context of *Achmea*, a dispute arose between Achmea B.V., a Dutch company, and the Slovak Republic due to certain governmental changes in the market for private health insurance. An UNCITRAL tribunal was constituted pursuant to Article 8 of the Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic (the "**Achmea BIT**"). Frankfurt am Main, Germany, was chosen as the legal seat of that UNCITRAL tribunal and the arbitral proceedings. The Slovak Republic raised an objection of lack of jurisdiction, namely, that, as a result of its accession to the European Union, recourse to an arbitral tribunal provided for in Article 8(2) of the Achmea BIT was incompatible with EU law. Achmea B.V. was awarded damages in the principal amount of EUR 22.1 million by that UNCITRAL tribunal. The Slovak Republic brought an action to set aside that arbitral award before the German courts, ultimately arriving on appeal at the German Federal Supreme Court (the "**Bundesgerichtshof**").

155.    The Bundesgerichtshof decided to stay the appeal before it and ask the following questions of the CJEU for a preliminary ruling:

> *(1) Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?*
>
> *If Question 1 is to be answered in the negative:*
>
> *(2) Does Article 267 TFEU preclude the application of such a provision?*
>
> *If Questions 1 and 2 are to be answered in the negative:*

> *(3) Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?*[206]

156.    The Tribunal notes that the first question, in particular, was posed in wide terms by the Bundesgerichtshof and is not confined to the Achmea BIT.

157.    Rather than answering the widely-drawn question 1 posed by the Bundesgerichtshof, the CJEU combined questions 1 and 2, but also added a qualifying phrase (emphasis added):

> *31.    By its first and second questions, which should be taken together, the referring court essentially asks whether Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, **such as Article 8 of the BIT**, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[207]

158.    The CJEU then set out a number of general considerations found in EU law which are now quoted in full:

> *32.    In order to answer those questions, it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 201 and the case-law cited).*

> *33.    Also according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the*

---

[206] European Court of Justice Case C-284/16, *Slowakische Republik v, Achmea B.V.*, Judgment, 6 March 2018, ¶ 23 (CL-120)
[207] *Id.*, ¶ 31 (emphasis added).

*constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other (see, to that effect, Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 165 to 167 and the case-law cited).*

*34.     EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 168 and 173 and the case-law cited).*

*35.     In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 174).*

*36.     In that context, in accordance with Article 19 TEU, it is for the national courts and tribunals and the Court of Justice to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law (see, to that effect, Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, paragraph 68; Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 175; and judgment of 27*

> *February 2018, Associação Sindical dos Juízes Portugueses, C-64/16, EU:C:2018:117, paragraph 33).*
>
> *37.     In particular, the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 176 and the case-law cited).*
>
> *38.     The first and second questions referred for a preliminary ruling must be answered in the light of those considerations.*[208]

159.     The Tribunal notes that, having set out a number of general considerations (which are of general application in EU law), the CJEU then discusses the precise circumstances of the Achmea BIT. This analysis of the Achmea BIT is particularly important as it informs the exact rationale for the answers given by the CJEU to the Bundesgerichtshof.

160.     The CJEU, first, sought to ascertain whether the disputes which a tribunal established according to Article 8 of the Achmea BIT might be called on to resolve <u>are liable to relate to the interpretation or application of EU law</u> (emphasis added, and this is language particularly relied upon by Respondent). In that regard it refers to Article 8(6) of the Achmea BIT (emphasis added):

> *6.     The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:*
>
> *– **the law in force of the Contracting Party concerned**;*
>
> *– **the provisions of this Agreement, and other relevant agreements between the Contracting Parties**;*
>
> *– the provisions of special agreements relating to the investment;*

---

[208] *Id.*, ¶¶ 32-38.

*– the general principles of international law.*[209]

161.    This precise language led the CJEU to the conclusion that a tribunal established pursuant to Article 8 of the Achmea BIT may, in two respects, be called on to interpret or, indeed, to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital.

162.    The Tribunal notes that the use of the word "shall" in the introductory paragraph of Article 8(6) of the Achmea BIT compels the conclusion that any such tribunal was inevitably going to decide a dispute according to EU law, amongst others. The two emphasised sub-paragraphs recorded just above are not options, but part of the matters to which such a tribunal would mandatorily be taking into account.

163.    The CJEU, secondly, analysed whether a tribunal established pursuant to Article 8 of the Achmea BIT was a court or tribunal within the meaning of Article 267 of the TFEU. The answer was readily found, namely, that it was not such a court or tribunal.

164.    Thirdly, the CJEU analysed the extent of judicial review available at the seat, namely, Frankfurt am Main. It noted that paragraph 1059(2) of the Code of Civil Procedure (part of Germany's *lex arbitri*) provides only for limited review, concerning in particular the validity of the arbitration agreement under the applicable law and the consistency with public policy of the recognition or enforcement of the arbitral award. Specifically, in relation to commercial arbitration, the CJEU has held that the requirements of efficient arbitration proceedings justify the limited review of arbitral awards by courts of EU Member States, "**provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the Court for a preliminary ruling**"[210] (the Tribunal's emphasis, and arising from the landmark 1999 decision of the CJEU in what is routinely referred to as *Eco Swiss*).

165.    However, the CJEU found (for reasons which do not readily emerge from its reasoning) that the circumstances of Article 8 of the Achmea BIT do not permit a similar review of

---

[209] *Id.*, ¶ 6 (emphasis added).
[210] *Id.*, ¶ 54 (emphasis added).

awards which attach to commercial arbitrations (in the manner mandated by *Eco Swiss*). The Tribunal infers from this, in the specific instance of dispute between Achmea B.V. and the Slovak Republic, that even if the German courts could examine the arbitral award of 7 December 2012 in light of fundamental provisions of EU law (which they can do due to *Eco Swiss*), that was not a satisfactory (for the CJEU) answer to the reformulated questions.

166.    The CJEU then articulated its conclusion, which is now recorded in full:

> 56.    *Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT and set out in paragraphs 39 to 55 above, it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.*[211]

167.    The Tribunal makes two observations which arise from this conclusion of the CJEU. The reasoning stems entirely from the specific circumstances of the Achmea BIT, and is not based on any other BIT or a wider ISDS enquiry (particularly, not the ECT); and, secondly, the recourse which might be had against the arbitral award of 7 December 2012 before the German courts, which includes (as a matter of *Eco Swiss*) an examination in light of fundamental principles of EU law, is, in the view of the CJEU, insufficient to ensure the full effectiveness of EU law, and, further, could prevent such full effectiveness. It is unclear from the reasoning of the CJEU as to why this is the case, but, given that *Achmea* does not address the ECT, the Tribunal does not dwell any further on this point.

168.    The further conclusion which the CJEU then draws is as follows:

> *Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above*

---

[211] *Id.*, ¶ 56.

[…] *In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.*[212]

169. Having reached these conclusions, the CJEU answers the question which it reformulated (as recorded above) from the questions posed by the Bundesgerichtshof in the following manner:

> *Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[213]

170. The Tribunal notes that the predicate word for the answer given by the CJEU to the question it posed itself is "consequently" which, thus, plainly draws on the preceding analysis of Article 8 of the Achmea BIT, and not (as question 1 posed by the Bundesgerichtshof sought) a wider discussion of ISDS clauses in BITs. The Tribunal, further, notes that the CJEU also qualified the answer with the phrase "*such as Article 8 of the BIT.*"[214]

171. Considering the *Achmea* Judgment, thus, in full, the Tribunal draws a number of conclusions as follows:

> (a) the answer given by the CJEU is confined, on a full, rather than selective, analysis of the whole judgment, to the specific context of Article 8 of the Achmea BIT only;

> (b) the question, of wider application to ISDS clauses, posed by the Bundesgerichtshof was not answered so, therefore, no view can be inferred as to the compatibility of such clauses with EU law insofar as the opinion of the CJEU is concerned. Had the CJEU wished to

---

[212] *Id.*, ¶¶ 58, 59.
[213] *Id.*, ¶ 60.
[214] *Id.*, ¶ 60.

answer the widely-drawn questions posed by the Bundesgerichtshof, then presumably it would have done so;

(c) the mandatory requirement in Article 8(6) of the Achmea BIT for a tribunal constituted under that treaty to decide a dispute according, amongst others, to (i) "the law in force of the Contracting Party concerned" and (ii) "the provisions of this Agreement, and other relevant agreements between the Contracting Parties" was the treaty language which transgressed EU law;

(d) the CJEU does not go so far as to say that the Slovak Republic or the Kingdom of the Netherlands are barred from offering to enter into arbitration agreements. Rather, the Tribunal understands the position to be more correctly that the objection by Respondent forming of what it says is the gravamen of *Achmea* is to the extent of the authority given to such a tribunal to decide a dispute. Put another way, it appears that EU Member States may bring such arbitral tribunals into being, but, according to the position adopted by Respondent, they are not allowed by EU law to authorise such arbitral tribunals to interpret or apply such law; and

(e) the CJEU does not make any comment on, nor does it gainsay the authority of that UNCITRAL tribunal to rule according to the general principles of international law. Its sole concern revolves around the two parts of Article 8(6) of the Achmea BIT which it says engage the application or interpretation of EU law.

172.   Drawing upon the foregoing conclusions from *Achmea* for the purposes of this case, the Tribunal agrees with the tribunal in *Vattenfall* (amongst others, including, for example, *Masdar*) that the judgment is, in of itself, of limited application (only, insofar as EU law is concerned, to the Achmea BIT) and, further, of no application as such to the ECT.

173.   The Tribunal considers that a proper reading of the *Achmea* does not lead to the conclusion

that it is in any way a relevant consideration for the investor-State arbitration mechanism established in Article 26 of the ECT as regards intra-EU relations.

174. The Tribunal notes that it is called, in this dispute, to resolve the alleged breaches by the Respondent of the ECT on the basis of principles of public international law relevant to the interpretation and application in the present case of the ECT. The application of EU law to this dispute does not, in the Tribunal's appreciation of the position, arise for consideration. In this latter regard, the Tribunal notes that the Respondent argues that EU law is international law. EU law is a system of obligations entered into as between EU Member States to regulate the manner (in many, but not all respects) by which they each govern their respective jurisdictions. In that sense, EU law is indeed public international law to that particular extent. However, EU law does not go further than that and constitutes, in the Tribunal's view, international law as a *lex specialis*, the application of which is restricted to those cases which fall into its particular scope. In any event, it is to be recalled that, as rightly stated in particular in *Blusun* (at paras. 286 to 289 of the Award) as quoted above (at para. 145 *supra*), there is no ground of incompatibility between the ECT and EU law for the purposes of this type of cases.

175. In summary, therefore, the Tribunal dismisses the Respondent's objections to jurisdiction based on *Achmea*. Consequently, also, the reliance on the part of the Respondent on Opinion 1/09 or the MOX plant case fails, by analogy, with the dismissal of the *Achmea* argument.

### D. THE EFFECT OF THE DECLARATION

176. The Tribunal now turns to the Declaration which was presented by the Respondent as a reason to immediately stop the arbitration. The Tribunal's appreciation of the Declaration is that it has become the corner-stone of the Respondent's jurisdictional objection (a position it shares in the wider context of investor-state arbitration with other EU Member States and the EC).

177. The Tribunal considers it, in the circumstances, appropriate to record the full text of the Declaration (without footnotes):

*DECLARATION OF THE REPRESENTATIVES OF THE GOVERNMENTS OF THE MEMBER STATES, OF 15 JANUARY 2019 ON THE LEGAL CONSEQUENCES OF THE JUDGMENT OF THE COURT OF JUSTICE IN ACHMEA AND ON INVESTMENT PROTECTION IN THE EUROPEAN UNION THE REPRESENTATIVES OF THE GOVERNMENTS OF THE MEMBER STATES, HAVE ADOPTED THE FOLLOWING DECLARATION*

*In its judgment of 6 March 2018 in Case C-284/16, Achmea v Slovak Republic ('the Achmea judgment'), the Court of Justice of the European Union held that "Articles 267 and 344 [... of the Treaty on the Functioning of the European Union] must be interpreted as precluding a provision in an international agreement concluded between Member States, [...] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept" ("investor-State arbitration clauses"). Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law. Union law takes precedence over bilateral investment treaties concluded between Member States. As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so called sunset or grandfathering clauses). An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty. Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied. When investors from Member States exercise one of the fundamental freedoms, such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by those freedoms and, as the case may be, by the relevant secondary legislation, by the Charter of Fundamental Rights of the European Union, and by the general*

*principles of Union law, which include in particular non-discrimination, proportionality, legal certainty and the protection of legitimate expectations. Where a Member State enacts a measure that derogates from one of the fundamental freedoms guaranteed by Union law, that measure falls within the scope of Union law and the fundamental rights guaranteed by the Charter also apply. Member States are obliged to provide remedies sufficient to ensure the effective legal protection of investors' rights under Union law. In particular, every Member State must ensure that its courts or tribunals, within the meaning of Union law, meet the requirements of effective judicial protection. Member States underline the importance of providing guidance on how Union law protects intra-EU investments, including on legal remedies. In this context, Member States take note of the Communication "Protection of intra-EU investment" adopted by the Commission on 19 July 2018. In light of the ECOFIN Council conclusions of 11 July 2017, Member States and the Commission will intensify discussions without undue delay with the aim of better ensuring complete, strong and effective protection of investments within the European Union. Those discussions include the assessment of existing processes and mechanisms of dispute resolution, as well as of the need and, if the need is ascertained, the means to create new or to improve existing relevant tools and mechanisms under Union law. This declaration is without prejudice to the division of competences between the Member States and the Union. Taking into account the foregoing, Member States declare that they will undertake the following actions without undue delay:*

*1. By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the Achmea judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.*

*2. In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.*

56

*3. By the present declaration, Member States inform the investor community that no new intra-EU investment arbitration proceeding should be initiated.*

*4. Member States which control undertakings that have brought investment arbitration cases against another Member State will take steps under their national laws governing such undertakings, in compliance with Union law, so that those undertakings withdraw pending investment arbitration cases.*

*5. In light of the Achmea judgment, Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.*

*6. Member States will ensure effective legal protection pursuant to the second subparagraph of Article 19(1) TEU under the control of the Court of Justice against State measures that are the object of pending intra-EU investment arbitration proceedings.*

*7. Settlements and arbitral awards in intra-EU investment arbitration cases that can no longer be annulled or set aside and were voluntarily complied with or definitively enforced before the Achmea judgment should not be challenged. Member States will discuss, in the context of the plurilateral Treaty or in the context of bilateral terminations, practical arrangements, in conformity with Union law, for such arbitral awards and settlements. This is without prejudice to the lack of jurisdiction of arbitral tribunals in pending intra-EU cases.*

*8. Member States will make best efforts to deposit their instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating bilateral investment treaties between Member States no later than 6 December 2019. They will inform each other and the Secretary General of the Council of the European Union in due time of any obstacle they encounter, and of measures they envisage in order to overcome that obstacle.*

*9. Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the Achmea judgment in relation to the intra-EU application of the Energy Charter Treaty.*

*Further signatories may be added at any time.*

*Done in Brussels on 15 January 2019*[215]

178. As a preliminary question, the Tribunal needs to understand the nature of the Declaration, or, put another way, what it actually is (and is not).

179. First, it is noted that the Declaration is only one of the three declarations signed on 15 and 16 January 2019. Each of the three declarations are cast in slightly different terms, but none of the three are signed by the representatives of <u>all</u> the EU Member States. Thus, the Declaration cannot be even at an initial level of analysis considered as a common view (insofar as a view might be expressed in those documents) of all the EU Member States. That fact renders it conceptually and legally impossible that the Declaration can be considered within the EU legal order.

180. More particularly, the Tribunal cannot see how the Declaration can be said to have an interpretative effect on the scope and content of EU law regarding investment protection and treaties concluded, *inter alia*, between EU Member States. That is because the Declaration was not adopted within the EU legal order and is not an EU legal instrument. The Declaration is, at best, a general expression of certain views and intentions (as discussed below) by the representatives of governments of some EU Member States. Although the representatives who signed the Declaration were gathered for that purpose by the EC (the Respondent states as follows: "Commissioner Valdis Dombrovskis invited the Permanent Representatives into the premises of the European [Commission] to sign the Declaration declaring the readiness of the Commission to organize signature in the afternoon of 15 January"[216]), the mere existence of three (3) distinct declarations enouncing three (3) distinct sets of views and intentions on the same issues by three (3) distinct groups of EU Member States confirms the following. None of the declarations can be attributed to the COREPER or, for that matter, to any other organ of the EU. In particular, the CJEU, which is the highest judicial body in charge of the interpretation of EU law, has not taken so far, any position (and any such position can only be insofar as EU law is concerned) as

---

[215] Declaration of the Representatives of the Governments of the EU Member States, 15 January 2019.
[216] Resp. PHB, ¶ 16 and footnote 2.

to the applicability of its judgment in the *Achmea* case to arbitral tribunals the jurisdiction of which is based on the ECT. Taken for what they are, *i.e.* declarations signed by the representatives of sovereign states made within the framework of the general international legal system, the Declaration cannot be considered as a source of an authentic interpretation of the part of EU law on which they purport to opine.

181. With the foregoing in mind, namely that the Declaration has no effect as a matter of EU law, the Tribunal will now examine its text to ascertain what it seeks to achieve.

182. The Declaration, signed by the Representatives of 22 EU Member States including the Respondent and the United Kingdom, appears to comprise an introductory part and then nine specific actions to be taken. The Tribunal will now carefully consider each.

183. The introductory part of the Declaration itself falls into a number of sub-parts, and commences with a quotation from *Achmea* which suggests that the judgment is of wide application to any investor-state arbitration provision. However, as noted above at paragraph 171, that part of the judgment is, when fully considered, of much more limited application to specific circumstances, such as the Achmea BIT.

184. The next sub-part of the introductory text of the Declaration records the positions or views of the EU Member States whose representatives signed the document as regards a number of consequences of investor-state arbitration proceedings. These positions or views broadly follow the arguments made by the Respondent (and insofar as the Tribunal is aware, other EU Member States and the EC) in the context of the intra-EU jurisdictional objections discussed earlier in this Decision.

185. Importantly, the final sub-part of the introductory text evinces an intention to intensify certain discussions and to take certain specified actions. Those discussions and actions are said to flow from or be consequent on the preceding part of the introductory text.

186. As regards the nine actions which are to be taken, the first three state that EU Member States will <u>inform</u> (*i.e.* convey, or make submissions) investment tribunals and courts seised of set-aside or enforcement applications as to the matters set out in the Declaration. The Tribunal sees that, when implemented, these actions are simply a conveying of a

position (which was likely to be already known in pending cases) rather than anything more specific or of legal effect.

187.    The fourth action states that any state-owned/controlled enterprise presently pursuing an investor-state arbitration will withdraw such action. The Tribunal does not see that withdrawal of cases by such enterprises can have a wider effect than beyond the confines of the individual disputes.

188.    The fifth action states that bilateral investment treaties will be terminated, whether by a putative plurilateral treaty, or if more expedient in individual cases by means of a bilateral treaty. Two points occur to the Tribunal in the present context: first, the ECT would not fall within the ambit of this action as it is not a bilateral investment treaty; and, secondly, an intention to terminate a treaty suggests, strongly, that the treaty itself remains in force as why else would a sovereign state set about the formal process of termination if it presently considered the state of the law (*e.g.* EU law) to preclude the binding effect of such a treaty.

189.    The sixth action evinces an intention to provide municipal law recourse for investors against measures which presently are stated to transgress investor-state protections. This suggests to the Tribunal that the Declaration intimates that there is further work to be done in the EU Member States in this regard and this reflects a part of the introductory text ("Member States and the Commission will intensify discussions without undue delay with the aim of better ensuring complete, strong and effective protection of investments within the European Union."[217])

190.    The seventh action concerns existing awards which are no longer capable of being challenged.

191.    The eighth action evinces an intention to deposit instruments of ratification to the putative plurilateral treaty by the end of 2019.

---

[217] Declaration of the Representatives of the Governments of the EU Member States, 15 January 2019.

192.    Finally, the ninth action concerns the ECT and is repeated in full:

> *Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the Achmea judgment in relation to the intra-EU application of the Energy Charter Treaty.*[218]

193.    The Tribunal appreciates from the text of this action that the ECT is considered to be quite separate and distinct from intra-EU bilateral investment treaties, and what might be done to achieve the stated aims of the EU Member States whose Representatives signed the Declaration remains unclear and up for further discussion.

194.    In summary, whether considering the individual parts and sub-parts of the Declaration, or looking at the Declaration as a whole, the Tribunal finds it difficult to ascertain any collective declaration of interpretation.

195.    Even if the Tribunal were to consider the Declaration to purport to be a collective declaration of interpretation in the sense of general international law (which it is not), judged by its terms if read in that sense, it purports to bring about an effect akin to an amendment of Article 25 of the ECT, or, at the very least, a reservation by the sovereign states whose representatives signed the Declaration. This would present considerable difficulties as such an interpretation would breach the prohibition made at Article 36 of the ECT which forbids the formulation of any reservation to that multilateral treaty. The Respondent's position, if taken to its logical conclusion, would effectively mean that the "disconnection clause" would be imported into the ECT by means of the Declaration; such a wholesale change goes far beyond the boundaries, as understood in public international law, of an interpretation.

196.    Finally, in passing, the Tribunal does have doubts as to the effects of the Respondent's interpretation of the ECT at this time, a treaty from which it withdrew as of 1 January 2016.

---

[218] Declaration of the Representatives of the Governments of the EU Member States, 15 January 2019, ¶ 9.

E.    THE OVERALL POSITION IN LIGHT OF THE FOREGOING

197.   Taken all of the foregoing into account, the Tribunal finds that none of the objections raised
       by the Respondent, whether the intra-EU position prior to *Achmea*, the *Achmea* Judgment
       properly construed in the wider circumstances of public international law, or the
       Declaration, either individually or collectively to have the effect of nullifying (whether at
       the time, or retrospectively) the offer to arbitrate on the part of the Respondent as of the
       date of the Request for Arbitration and consequently do not affect the jurisdiction of the
       Arbitral Tribunal.

V.     THE RESPONDENT'S REQUEST FOR SUSPENSION OF THE PROCEEDINGS

198.   The Tribunal addresses below the Respondent's Request for Suspension submitted on 18
       June 2019.

A.    THE RESPONDENT'S POSITION

199.   The Respondent requests the suspension of the proceedings to "avoid a conflict of
       judgments by this Tribunal and the Court of Justice of the European Union."[219] The
       Respondent argues that the legitimate expectations at issue in the present case in light of
       Article 10 ECT and in relation to the effects of Article 26 of Legislative Decree No.
       91/2014 is subject to examination by the CJEU in Joined Cases C-798/18 and C-799/18.[220]

200.   The Respondent explains that the "preliminary question was raised by two referral orders
       of the Italian administrative Court of Lazio (TAR Lazio), respectively No. 11206 of 20
       November 2018 and No. 11124 of 16 November 2018, in which it was stated that the ECT,
       as signed on 17.12.1994 by the then European Community, must be considered 'an integral
       part of Union law.'"[221] On that basis, the Respondent submits that "decisions on the
       assessment of the same measures under the very same legal basis could be judged
       inconsistently by this Tribunal and the EU Court of Justice," which would "strongly impair

---

[219] Respondent's Request for Suspension, p. 1.

[220] *Id.*

[221] *Id.*

certainty of law."[222]

201.    For the Respondent, giving room to the CJEU to decide on these issues would ensure a homogeneous application of the ECT provisions by different Member States, including Spain, Italy, and the Czech Republic "for which no homogeneity has yet been granted under a plurality of diverging arbitral awards."[223] It would also "ensure a level playing field within the European Union" and an equal treatment among foreign investors.[224]

202.    The Respondent explains that because the written phase in the above-mentioned EU cases is concluded since 21 May 2019, the Respondent is now in the position to introduce its Request for Suspension in the present case.[225] In the Respondent's view, the Tribunal should "at least wait" for the CJEU's decision on the application of the standards of Article 10 ECT to the contested measures. The Respondent adds that its Request for Suspension is not to prejudice its position on the Tribunal's lack of jurisdiction to hear this case.

## B.    THE CLAIMANTS' POSITION

203.    The Claimants submit that the Respondent's Request for Suspension must be denied.[226] In Claimants' view, the Respondent's request is not only "unjustifiably late, it also has no legal merit."[227]

204.    First, the Claimants argue, "the Respondent's justification for submitting this request in June 2019 is nonsensical, when it was or ought to have been aware of TAR Lazio's referrals to the European Court of Justice ("ECJ") in November 2018."[228] For Claimants, the Respondent has had plenty of opportunities since November 2018 to raise this objection, such as in its Rejoinder in January 2019 or during the hearing in February 2019.[229] The Claimants add that it is "certainly not clear" why the Respondent had to wait until the

---

[222] *Id.*

[223] *Id.*, p. 2.

[224] *Id.*

[225] *Id.*

[226] Claimants' Response to Respondent's Request for Suspension, p. 2.

[227] *Id.*

[228] *Id.*

[229] *Id.*

expiration of the written phase of the proceedings' deadline of 21 May 2019 before submitting its request and why it waited a further month after the expiration date to do so.

205.    Second, the Claimants' acknowledge that the Tribunal has the power to suspend the proceedings but note that "the circumstances as laid out by the Respondent do not warrant exercise of that power."[230] Tribunals have an inherent power to suspend proceedings based on Article 44 of the ICSID Convention but such power "cannot be exercised in conflict with express statutes or rules" such as the tribunal's "ability to determine its own jurisdiction and competence under Article 41 of the ICSID Convention."[231] Citing to arbitral case law, the Claimants argue that a tribunal "must have 'truly compelling reasons' to exercise its inherent powers. It must exercise them sparingly because they are 'special and extraordinary.'"[232] The Claimants add that because of the exceptional nature of this remedy, "suspending the proceedings mostly arises in circumstances where a tribunal is adjudicating a dispute that is concurrently being decided by another tribunal or court."[233]

206.    In light of the above, the Claimants argue that the Tribunal should deny the Respondent's request for two reasons: "(1) the exercise of its inherent powers would be in direct conflict with its express duty to determine its own jurisdiction; and (2) even if the Tribunal was not precluded by its express duty under Article 41 of the ICSID Convention, the reasons provided by the Respondent are not compelling and do not satisfy the tests for determining whether the disputes are the same."[234]

207.    With regard to the first reason, the Claimants cite to *ICRS v. Jordan* in which the tribunal "carried out an analysis of exactly when and how suspending proceedings would interfere with a tribunal's right to determine its own jurisdiction."[235] Based on that decision, the Claimants submit that "[o]nce the parties had consented in writing to submit their dispute to ICSID arbitration, they are precluded from pursuing any other remedy until and unless

---

[230] *Id.*

[231] *Id.*, p. 3.

[232] *Id.*

[233] *Id.*

[234] *Id.*, p. 4.

[235] *Id.*

the tribunal explicitly refuses to take jurisdiction."[236] For the Claimants, if this Tribunal were to suspend the proceedings, "it would undermine its duty to determine its own jurisdiction under Article 41 of the ICSID Convention, which is pending."[237]

208. With regard to the second reason, the Claimants submit that the Respondent has failed to provide "'truly compelling reasons'" to justify a suspension of the proceedings.[238] The Claimants dismiss the Respondent's argument of a possible risk that the Tribunal and the CJEU will assess the same measures inconsistently under the same legal basis.[239] In the Claimants' view, no such risk exists as the referrals cited by the Respondent "have absolutely nothing to do with the Claimants' claims and these proceedings."[240] First, the Claimants argue, the claimants in those cases are Italian and not foreign investors.[241] Second, such cases involve public contributions to photovoltaic electric production and "the claimants in those proceedings seek to claim that if Italian law breaches the ECT it amounts to a breach of EU law. In other words, the ECT is invoked in that case as part of EU law whereby EU law prevails over domestic legislation."[242] For the Claimants, the Respondent's fear of an inconsistency is "misdirected because it is not the availability of different fora to a claimant that creates potential inconsistency."[243] Inconsistencies arise only if the same claimant pursues the same dispute in various courts at the same time, and such is not the case in the present proceedings.[244]

209. The Claimants also dismiss the Respondent's suggestion that once the arbitration is suspended, the Claimants will have the right to pursue their claims under the ECT in national courts.[245] The Claimants argue that "requiring the Claimants to resubmit claims in domestic courts and to restart the whole process four months after the ICSID Hearing

---

[236] *Id.*, pp. 4-5.
[237] *Id.*, p. 5.
[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] *Id.*, p. 6.
[243] *Id.*
[244] *Id.*
[245] *Id.*

concluded would be contrary to common sense and would undermine the integrity of the ICSID proceedings."[246] They add that in any event, there is no basis for such suggestion as the Tribunal has jurisdiction over the Claimants' claims as submitted in the Claimants' briefs.[247]

## C.    THE TRIBUNAL'S ANALYSIS

210.    In light of the Parties' submissions, the Tribunal at this stage sees no reason to suspend the proceedings. First, on the basis of the evidence provided, the Tribunal is not convinced that the present ICSID arbitration proceeding and the cases pending before the CJEU would lead to conflicting decisions. As described by the Respondent in its Request for Suspension, the present proceeding and the cases pending before the CJEU appear to be fully distinct; the parties involved and the subject-matter at issue are different. Second, as mentioned by the Claimants, the Respondent had the opportunity to present such request since November 2018. Therefore, the Respondent's Request for Suspension is denied.

## VI.    DECISION

211.    For the reasons set forth above, the Tribunal decides as follows:

(1)  The Respondent's Intra-EU Jurisdictional Objection is hereby denied;

(2)  The Tribunal will address separately in its Award the remaining jurisdictional and/or merits issues in this case;

(3)  The Respondent's Request for Suspension is hereby denied; and

(4)  Decisions regarding costs are deferred until a later time in these proceedings.

---

[246] *Id.*, p. 7.

[247] *Id.*

Dr. Charles Poncet
Arbitrator

Prof. Pierre-Marie Dupuy
Arbitrator

Mr. Klaus Reichert SC
President of the Tribunal

67