# EXHIBIT 19

JUDGMENT OF THE GENERAL COURT (Second Chamber, Extended Composition)

18 June 2019 (*)

(State aid — Award made by an arbitral tribunal established under the auspices of the International Centre for Settlement of Investment Disputes (ICSID) — Payment of compensation granted to certain economic operators — Decision declaring the aid incompatible with the internal market and ordering its recovery — Competence of the Commission)

In Cases T-624/15, T-694/15 and T-704/15

**European Food SA,** established in Drăgăneşti (Romania),

**Starmill SRL,** established in Drăgăneşti,

**Multipack SRL,** established in Drăgăneşti,

**Scandic Distilleries SA,** established in Oradea (Romania),

represented by K. Struckmann, G. Forwood, lawyers, and A. Kadri, Solicitor,

applicants in Case T-624/15,

**Ioan Micula,** residing in Oradea (Romania), represented by K. Struckmann, G. Forwood and A. Kadri,

applicant in Case T-694/15,

**Viorel Micula,** residing in Oradea,

**European Drinks SA,** established in Ştei (Romania),

**Rieni Drinks SA,** established in Rieni (Romania),

**Transilvania General Import-Export SRL,** established in Oradea,

**West Leasing International SRL,** established in Păntăşeşti (Romania),

represented initially by J. Derenne, D. Vallindas, lawyers, A. Dashwood, Barrister, and V. Korom, Solicitor, and subsequently by J. Derenne, D. Vallindas and A. Dashwood,

applicants in Case T-704/15,

v

**European Commission,** represented by P.-J. Loewenthal and T. Maxian Rusche, acting as Agents,

defendant,

supported by

**Kingdom of Spain,** represented by S. Centeno Huerta and A. Rubio González, acting as Agents,

and by

**Hungary,** represented initially by M. Fehér, G. Koós and M. Bóra, and subsequently by M. Fehér and G. Koós, acting as Agents,

interveners,

THREE APPLICATIONS under Article 263 TFEU for annulment of Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — Arbitral award Micula v Romania of 11 December 2013 (OJ 2015 L 232, p. 43),

THE GENERAL COURT (Second Chamber, Extended Composition),

composed of M. Prek (Rapporteur), President, E. Buttigieg, F. Schalin, B. Berke and M.J. Costeira, Judges,

Registrar: P. Cullen, Administrator,

having regard to the written part of the procedure and further to the hearing on 20 March 2018,

gives the following

**Judgment**

**Background to the disputes**

1    The applicants, European Food SA, Starmill SRL, Multipack SRL and Scandic Distilleries SA, in Case T-624/15, Mr Ioan Micula, in Case T-694/15, Mr Viorel Micula, European Drinks SA, Rieni Drinks SA, Transilvania General Import-Export SRL and West Leasing SRL, in Case T-704/15, were named in Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — Arbitral award Micula v Romania of 11 December 2013 (OJ 2015 L 232, p. 43; 'the contested decision') as the beneficiaries of the compensation granted by an arbitral award ('the arbitral award') made on 11 December 2013 in Case ARB/05/20 *Micula and Others* v *Romania*, by an arbitral tribunal ('the arbitral tribunal') established under the auspices of the International Centre for Settlement of Investment Disputes (ICSID).

2    Mr Ioan Micula and Mr Viorel Micula, Swedish citizens residing in Romania, are the majority shareholders of the European Food and Drinks Group (EFDG), whose activities include the production of food and drink in the region of Ștei-Nucet, Bihor County, in Romania. European Food, Starmill, Multipack, Scandic Distilleries, European Drinks, Rieni Drinks, Transilvania General Import-Export and West Leasing International belong to the EFDG.

*The Romanian legislation and the applicants' investment*

3    The Europe Agreement establishing an association between the European Economic Communities and their Member States, of the one part, and Romania, of the other part (OJ 1994 L 357, p. 2; 'the Europe Agreement'), entered into force on 1 February 1995. Article 64(1)(iii) of the Europe Agreement declared incompatible with the proper functioning of the Europe Agreement any public aid which distorted or threatened to distort competition by favouring certain undertakings or the production of certain goods, in so far as it might affect trade between the European Communities and Romania. By virtue of Article 64(2) of the Europe Agreement, any practices contrary to that article were to be assessed 'on the basis of criteria arising from the application of the rules of Articles 85, 86 and 92 of the [EEC Treaty, now Articles 101, 102 and 107 TFEU]'. Moreover, Articles 69 and 71 of the Europe Agreement obliged Romania to harmonise its domestic legislation with the *acquis communautaire*.

4    In order to comply with its harmonisation obligation under the Europe Agreement, Romania adopted, in 1999, Law No 143/1999 on State aid, which entered into force on 1 January 2000. That law, which

included the same definition of State aid as that contained in Article 64 of the Europe Agreement and under EU law, designated the Consiliul Concurenței (Competition Council, Romania) and the Oficiul Concurenței (Competition Office, Romania) as national State aid surveillance authorities competent for assessing the compatibility of State aid granted by Romania to undertakings.

5       On 2 October 1998, the Romanian authorities adopted Emergency Government Ordinance No 24/1998 ('EGO 24'), granting certain investors in disfavoured regions who had obtained permanent investor certificates a series of incentives, including, inter alia, facilities such as exemption from customs duties and value added tax for machinery, reimbursement of customs duties for raw materials and exemption from the payment of profit tax for as long as the relevant area was designated as a disfavoured region.

6       The Romanian Government determined which regions should be designated as disfavoured and for how long, up to a maximum of 10 years. By decision of 25 March 1999, the Government declared the mining area of Ștei-Nucet, Bihor County, to be a disfavoured region for 10 years, effective from 1 April 1999.

7       On 15 May 2000, the Competition Council adopted Decision No 244/2000, by which it found that several of the incentives offered under EGO 24 had to be regarded as State aid for operating purposes leading to distortion of competition and that they therefore had to be revoked.

8       On 1 July 2000, Emergency Government Ordinance No 75/2000 ('EGO 75'), amending EGO 24 (together, 'EGO'), entered into force.

9       Before the Curtea de Apel București (Court of Appeal, Bucharest, Romania), the Competition Council disputed that, in spite of the adoption of EGO 75, its Decision No 244/2000 had not been implemented. That application was rejected on 26 January 2001 on the ground that EGO 75 had to be regarded as a legislative — not an administrative — measure and that consequently its lawfulness could not be contested by the Competition Council pursuant to Law No 143/1999. That decision was confirmed by the Înalta Curte de Casație și Justiție (High Court of Cassation and Justice, Romania) on 19 February 2002.

10      On the basis of permanent investor certificates, obtained on 1 June 2000 by European Food and on 17 May 2002 by Starmill and Multipack, those companies made certain investments in the mining area Ștei-Nucet.

11      In February 2000, Romania began accession talks with the European Union. In those negotiations, the European Union, in the common position of 21 November 2001, noted that there were in Romania 'a number of existing as well as new incompatible aid schemes which [had] not been brought into line with the *acquis*', including 'facilities provided under [EGO]'.

12      On 26 August 2004, stating that 'in order to meet the criteria in the Community rules on State aid, and also to complete the negotiations under Chapter No 6 — Competition Policy it [was] necessary to eliminate all forms of State aid in national legislation incompatible with the *acquis communautaire* in this area', Romania repealed all the incentives provided under EGO, except the profit tax facility. That revocation took effect on 22 February 2005.

13      On 1 January 2007, Romania acceded to the European Union. Neither EGO 24 nor EGO 75 is referred to in paragraph 1 of Title 2 'Competition Policy' in Annex V to the Act concerning the conditions of accession of the Republic of Bulgaria and Romania and the adjustments to the Treaties on which the European Union is founded (OJ 2005 L 157, p. 203, 'the Act of Accession') as State aid measures that would be considered existing aid upon Romania's accession.

*The arbitration proceedings*

14      The bilateral investment treaty concluded on 29 May 2002 between the Government of the Kingdom of Sweden and the Government of Romania on the Promotion and Reciprocal Protection of Investments ('the BIT') entered into force on 1 July 2003. That treaty granted investors of both countries (including for

investments entered into prior to the entry into force of the BIT) certain protections when the investors of one country invested in the other country. Article 2(3) of the BIT provides, inter alia, that 'each Contracting Party shall at all times ensure fair and equitable treatment of the investments by investors of the other Contracting Party and shall not impair, by means of arbitrary or discriminatory measures, the administration, management, maintenance, use, enjoyment or disposal thereof by those investors'. Furthermore, Article 7 of the BIT provides that any dispute between investors and the Contracting Parties is to be settled, inter alia, by an arbitral tribunal under the auspices of ICSID.

15    On 28 July 2005, following the repeal of the investment incentives under EGO, five of the applicants, namely, Mr Ioan Micula, Mr Viorel Micula, European Food, Starmill and Multipack ('the arbitration applicants'), requested the establishment of an arbitral tribunal pursuant to Article 7 of the BIT.

16    By decision of 24 September 2008, the arbitral tribunal found that the arbitration applicants' claims were admissible. The arbitration applicants had initially requested the re-establishment of the revoked investment incentives. Subsequently, they partially withdrew their claim and instead requested compensation for the damage resulting from the revocation of those incentives. Those applicants alleged that by revoking the incentives, Romania had infringed the investors' legitimate expectations that those incentives would be available, in essence, until 1 April 2009. Thus, according to the arbitration applicants, Romania had not complied with its obligation of fair and equitable treatment owed to the Swedish investors under Article 2(3) of the BIT.

17    In the course of the arbitration proceedings, the European Commission intervened as amicus curiae. In its intervention of 20 July 2009, it submitted that the EGO 24 incentives were 'incompatible with the Community rules on regional aid', observing, in particular, that 'the incentives did not respect the requirements of Community law as regards eligible costs and aid intensities [and that] the facilities [had] constituted operating aid which [was] proscribed under regional aid rules'. The Commission thereby submitted that 'any ruling reinstating the privileges abolished by Romania, or compensating the [arbitration applicants] for the loss of these privileges, would lead to the granting of new aid which would not be compatible with the [FEU] Treaty' and that the 'execution of [any award requiring Romania to re-establish investment schemes which have been found incompatible with the internal market during accession negotiations could] not thus take place if it would contradict the rules of EU State aid policy'.

18    By the arbitral award, the arbitral tribunal awarded the arbitration applicants compensation payable by Romania in the amount of 791 882 452 Romanian Lei (RON) (approximately EUR 178 million). The arbitral tribunal concluded as follows:

'By repealing the EGO 24 incentives prior to 1 April 2009, Romania did not act unreasonably or in bad faith (except that [it] acted unreasonably by maintaining investors' obligations after terminating the incentives). The [arbitral tribunal], however, [concluded] … that Romania had violated the [arbitration applicants'] legitimate expectations that those incentives would be available, in substantially the same form, until 1 April 2009. Romania also failed to act transparently by failing to inform [those applicants] in a timely manner that the regime would be terminated prior to its stated date of expiration. As a result, the tribunal finds that Romania failed to "ensure fair and equitable treatment of the investments" of the [arbitration applicants] [within] the meaning of Article 2(3) of the BIT.'

19    In particular, the arbitral tribunal granted the arbitration applicants compensation allocated as follows:

–    RON 85 100 000 for the revocation of the facilities for raw materials and the increased cost of sugar that followed;

–    RON 17 500 000 for the increased cost of other raw materials;

–    RON 18 133 229 for the loss of the ability to stockpile sugar at lower prices;

–    RON 255 700 000 for lost profit deriving from lost sales of finished goods;

    –     in addition, the arbitral tribunal ordered Romania to pay interest, calculated from 1 March 2007 in respect of the increased cost of sugar and other raw materials, from 1 November 2009 in respect of the loss of ability to stockpile sugar, and from 1 May 2008 in respect of lost profits.

20     On 18 April 2014, Romania filed an application for the annulment of the arbitral award on the basis of Article 52 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 18 March 1965 ('the ICSID Convention') before an ad hoc committee. In that context, on 7 September 2014, the ad hoc committee lifted the stay of enforcement of the arbitral award, which it had previously approved, because Romania, having consulted the Commission on that subject, was not in a position to provide, as the committee had required of it, the unconditional commitment that it would implement the arbitral award even if that entailed a violation of its obligations under, in particular, EU law and regardless of any decision adopted by the Commission.

21     On 15 October 2014, the Commission submitted an application to the ad hoc committee for leave to intervene as a non-disputing party in the annulment proceedings. Leave to intervene was granted by the ad hoc committee on 4 December 2014 and the Commission submitted its amicus curiae brief in those proceedings on 9 January 2015. When the contested decision was adopted, the proceedings for annulment of the arbitral award were still in progress.

### *The actions brought by the arbitration applicants before national courts for recognition and execution of the arbitral award*

22     On 18 March 2014, four of the applicants (European Food, Starmill, Multipack and Mr Ioan Micula) initiated court proceedings in Romania with a view to enforcing the arbitral award in accordance with Article 54 of the ICSID Convention, requesting payment of 80% of the outstanding amount and the corresponding interest.

23     On 24 March 2014, the Tribunal București (Regional Court, Bucharest, Romania) allowed the execution of the arbitral award, considering that, on the basis of Article 54 of the ICSID Convention, the arbitral award was a directly enforceable act and was to be treated as a final domestic judgment, thus obviating the procedure to recognise that award on the basis of the Romanian Procedural Civil Code. On 30 March 2014, an executor started the procedure for the enforcement of the arbitral award by setting the Romanian Ministry of Finance a deadline of six months in which to pay 80% of the amount owed to the four applicants, in accordance with the arbitral award, plus interest and other costs.

24     Romania challenged the forced execution of the arbitral award before the Tribunal București (Regional Court, Bucharest) and applied for the adoption for interim measures, namely, a temporary suspension of execution until the case had been decided on the merits. On 14 May 2014, that court temporarily suspended the execution of the arbitral award until a decision on the merits of the challenge and request to suspend the forced execution had been taken. On 26 May 2014, the Commission intervened in the proceedings in accordance with Article 23a(2) of Council Regulation (EC) No 659/1999 of 22 March 1999 laying down detailed rules for the application of Article [108 TFEU] (OJ 1999 L 83, p. 1). The Commission invited the Tribunal București (Regional Court, Bucharest) to suspend and annul the forced execution of the arbitral award and to refer two questions to the Court of Justice of the European Union for a preliminary ruling in accordance with Article 267 TFEU.

25     On 23 September 2014, the Tribunal București (Regional Court, Bucharest), in the interim measure case, lifted the suspension and rejected Romania's request to suspend the execution of the arbitral award, on the ground that the ICSID ad hoc committee had lifted the stay of enforcement of the award on 7 September 2014 (see paragraph 20 above). On 30 September 2014, Romania lodged an appeal against the judgment of 23 September 2014. On 13 October 2014, the Tribunal București (Regional Court, Bucharest) rejected the request to send questions to the Court of Justice of the European Union for a preliminary ruling. On 17 October 2014, following the Commission's decision of 1 October 2014 to open the formal investigation procedure laid down in Article 108(2) TFEU, in the context of the case pending before the Tribunal

București (Regional Court, Bucharest), Romania again requested interim measures in the form of the suspension of the forced execution of the arbitral award.

26    On 24 November 2014, the Tribunal București (Regional Court, Bucharest) rejected Romania's main action against the execution order of 24 March 2014, including the request for interim measures of 17 October 2014. On 14 January 2015, Romania appealed against that judgment.

27    On 24 February 2015, the Curtea de Apel București (Court of Appeal, Bucharest) set aside the judgment of the Tribunal București (Regional Court, Bucharest) of 23 September 2014 and suspended the forced execution until the appeal against the decision of that court of 24 November 2014 had been decided. The Commission decided to seek leave to intervene in those appeal proceedings on the basis of Article 23a(2) of Regulation No 659/1999.

28    Mr Viorel Micula lodged several applications for recognition of the arbitral award in the context of exequatur or *ex parte* proceedings before courts in Belgium, France, Luxembourg, the United Kingdom of Great Britain and Northern Ireland and the United States. Mr Ioan Micula, European Food, Starmill and Multipack also lodged an application for recognition of the arbitral award in the context of *ex parte* proceedings in the United States. During the written part of the procedure before the Court, those proceedings were still in progress.

### Execution of the arbitral award, the formal investigation procedure and the contested decision

29    On 31 January 2014, the Commission services informed the Romanian authorities that any implementation or execution of the arbitral award would constitute new aid and would have to be notified to the Commission.

30    On 20 February 2014, the Romanian authorities informed the Commission services that they had paid part of the compensation that the arbitral tribunal had awarded the arbitration applicants by offsetting a portion of the compensation awarded to the applicants by the tribunal against taxes owed by one of the applicants (European Food) to the Romanian authorities. The tax debt that was thus offset amounted to RON 337 492 864 (approximately EUR 76 000 000). In addition, Romania sought further clarification from the Commission services as to the possibility of paying the outstanding amount to a natural person (to Mr Viorel Micula and Mr Ioan Micula or to any other natural person to whom the claim might be assigned).

31    On 12 March 2014, the Commission services requested further information from Romania regarding the envisaged further implementation or execution of the arbitral award, which Romania provided by letter of 26 March 2014.

32    By letter of 1 April 2014, the Commission services alerted the Romanian authorities to the possibility that the Commission would issue a suspension injunction to ensure that no further incompatible State aid would be paid out and sought Romania's comments thereon. By letter of 7 April 2014, Romania declared that it did not wish to comment on that possibility.

33    On 26 May 2014, the Commission adopted Decision C(2014) 3192, obliging Romania, pursuant to Article 11(1) of Regulation No 659/1999, immediately to suspend any action which may lead to the implementation or execution of the arbitral award, on the ground that such action appeared to constitute unlawful State aid, until the Commission has taken a final decision on the compatibility of that State aid with the internal market.

34    By letter dated 1 October 2014, the Commission informed Romania that it had decided to initiate the formal investigation procedure laid down in Article 108(2) TFEU in respect of the partial implementation of the arbitral award by Romania that took place in early 2014 (see paragraph 30 above) as well as in respect of any further implementation or execution of the arbitral award. In that decision, which was

published in the *Official Journal of the European Union* on 7 November 2014, the Commission invited interested parties to submit their comments.

35      On 31 October 2014, an executor appointed by the Tribunal București (Regional Court, Bucharest) issued an order to seize the accounts of the Romanian Ministry of Finance and sought execution of 80% of the arbitral award. At the time of the adoption of the contested decision, the Romanian Ministry of Finance's state treasury and bank accounts were frozen.

36      On 26 November 2014, Romania submitted its comments on the decision to open the formal investigation procedure laid down in Article 108(2) TFEU. The applicants submitted comments as interested parties on 8 December 2014, after the rejection, by the Commission, of their request to have a longer period of time available for submitting their comments. The applicants' comments were forwarded to Romania, which was given the opportunity to respond to them. Romania's observations on the applicants' comments were lodged on 27 January 2015.

37      The applicants also requested access to all correspondence between the Commission and Romania contained in the case file. That request was rejected on 19 December 2014 and the rejection was affirmed on 2 March 2015.

38      On 5 January 2015, an executor seized RON 36 484 232 (approximately EUR 8 100 000) from the accounts of the Romanian Ministry of Finance. The executor subsequently transferred RON 34 004 232 (approximately EUR 7 560 000) in equal parts to three of the five arbitration applicants, and kept the remainder as compensation for execution costs. Between 5 and 25 February 2015, the executor seized an additional RON 9 197 482 (approximately EUR 2 000 000) from the accounts of the Romanian Ministry of Finance. On 9 March 2015, that ministry voluntarily transferred the balance of the amount due under the arbitral award, RON 472 788 675 (approximately EUR 106 500 000, including the costs of the court-appointed executor, that is to say, RON 6 028 608) into a blocked account in the name of the five arbitration applicants. The beneficiaries of the account can withdraw the money only if the Commission decides that the State aid granted on the basis of the award is compatible with the internal market.

39      By letters of 9 and 11 March 2015, the Romanian authorities informed the Commission of the amounts seized between 5 and 25 February 2015 and the voluntary payment to a blocked account opened in the name of the five arbitration applicants, representing the balance of the amount due under the arbitral award.

40      According to the Romanian authorities, the arbitral award has been fully implemented.

41      On 30 March 2015, the Commission adopted the contested decision.

42      The contested decision reads as follows:

'*Article 1*

The payment of the compensation awarded by the arbitral tribunal … by [the arbitral] award … to the single economic unit comprising Viorel Micula, Ioan Micula, … European Food, … Starmill, … Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing constitutes State aid within the meaning of Article 107(1) [TFEU] which is incompatible with the internal market.

*Article 2*

1. Romania shall not pay out any incompatible aid referred to in Article 1 and shall recover any incompatible aid referred to in Article 1 which has already been paid out to any one of the entities constituting the single economic unit benefiting from that aid in partial implementation or execution of the [arbitral] award … as well as any aid paid out to any one of the entities constituting the single economic

unit benefiting from that aid in further implementation of the [arbitral] award … that the Commission has not been made aware of or that is paid out after the date of this Decision.

2. Viorel Micula, Ioan Micula, … European Food, … Starmill, … Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing shall be jointly liable to repay the State aid received by any one of them.

3. The sums to be recovered are those resulting from the implementation or execution of the [arbitral] award … (principal and interest).

4. The sums to be recovered shall bear interest from the date on which they were put at the disposal of the beneficiaries until their actual recovery.

5. Romania shall provide the exact dates on which the aid provided by the state was put at the disposal of the respective beneficiaries.

6. The interest shall be calculated on a compound basis in accordance with Chapter V of Commission Regulation (EC) No 794/2004.

7. Romania shall ensure that no further payments of the aid referred to in Article 1 shall be effected with effect from the date of adoption of this Decision.

*Article 3*

1. Recovery of the aid referred to in Article 1 shall be immediate and effective.

2. Romania shall ensure that this Decision is implemented within four months following the date of notification of this Decision.

*Article 4*

1. Within two months following notification of this Decision, Romania shall submit the following information:

(a)     the total amount of aid received by each entity mentioned in Article 1 of this Decision;

(b)     a detailed description of the measures already taken and planned to comply with this Decision;

(c)     documents demonstrating that the beneficiaries have been ordered to repay the aid.

2. Romania shall keep the Commission informed of the progress of the national measures taken to implement this Decision until recovery of the aid referred to in Article 1 has been completed. It shall immediately submit, on simple request by the Commission, information on the measures already taken and planned to comply with this Decision. It shall also provide detailed information concerning the amounts of aid and recovery interest already recovered from the beneficiaries.

*Article 5*

This Decision is addressed to Romania.'

**Procedures and forms of order sought**

43    By applications lodged at the Court Registry on 6 (Case T-624/15), 30 (Case T-694/15) and 28 November 2015 (Case T-704/15), the applicants brought the present actions.

44    By respective decisions of 18 March and 21 April 2016 (Case T-624/15), 18 March and 22 April 2016 (Case T-694/15) and 25 May and 21 April 2016 (Case T-704/15), the President of the Fourth Chamber of the General Court granted the Kingdom of Spain and Hungary leave to intervene in support of the form of order sought by the Commission.

45    On 13 and 14 July 2016 (Cases T-624/15 and T-694/15), and 14 July 2016 (Case T-704/15), the Kingdom of Spain and Hungary lodged their respective statements in intervention at the Court Registry. The applicants lodged their observations on those statements within the prescribed time limits.

46    Following a change in the composition of the Chambers of the General Court, the Judge-Rapporteur was assigned to the Second Chamber, to which the present cases were accordingly allocated.

47    By document lodged at the Court Registry on 27 February 2017, the applicants requested that Cases T-624/15, T-694/15 and T-704/15 be joined for the purposes of the oral part of the procedure. In its observations of 14 March 2017 on the application for joinder, the Commission agreed to the joinder of Cases T-624/15 and T-694/15 but opposed the joinder of those two cases with Case T-704/15.

48    By documents lodged at the Court Registry on 21 February 2017 by the applicants in Cases T-624/15 and T-694/15 and on 4 May 2017 by the Commission in Cases T-624/15, T-694/15 and T-704/15, those parties applied for priority treatment. Priority treatment was granted by decision of the President of the Second Chamber of 22 May 2017.

49    Acting upon a proposal of the Second Chamber, the Court decided, pursuant to Article 28 of the Rules of Procedure of the General Court, to refer the case to a Chamber sitting in extended composition.

50    By decision of the President of the Second Chamber, Extended Composition, of the General Court of 7 February 2018, Cases T-624/15, T-694/15 and T-704/15 were joined for the purposes of the oral part of the procedure in accordance with Article 68(2) of the Rules of Procedure.

51    On the proposal of the Judge-Rapporteur, the Court (Second Chamber, Extended Composition) decided to open the oral part of the procedure.

52    The parties presented oral argument at the hearing on 20 March 2018.

53    By order of 28 May 2018, the Court (Second Chamber, Extended Composition), taking the view that it was appropriate to invite the main parties to submit their observations on the potential joinder of Cases T-624/15, T-694/15 and T-704/15 for the purposes of the decision closing the proceedings, ordered the reopening of the oral part of the procedure in accordance with Article 113 of the Rules of Procedure. The main parties submitted their observations within the prescribed period.

54    The applicants in Cases T-624/15 and T-694/15 claim that the Court should:

–    annul the contested decision;

–    in the alternative, annul the contested decision in so far as it:

    –    concerns each of the applicants in those two cases;

    –    prevents Romania from complying with the arbitral award;

    –    orders Romania to recover any incompatible aid;

    –    orders that they are to be jointly liable to repay aid received by any of the entities identified in Article 2(2) thereof;

–    order the Commission to pay the costs.

55      The applicants in Case T-704/15 claim that the Court should:

–      annul the contested decision;

–      in the alternative, annul the contested decision in so far as it:

–      identifies Mr Viorel Micula as an 'undertaking' and considers him to be part of the economic unit constituting the beneficiary of the aid;

–      identifies the beneficiary of the aid as an economic unit comprising Mr Viorel Micula and Mr Ioan Micula, European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing International;

–      orders, in Article 2(2) thereof, that Mr Viorel Micula and Mr Ioan Micula, European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing International are to be jointly liable to repay the State aid received by them;

–      order the Commission to pay the costs.

56      In Cases T-624/15, T-694/15 and T-704/15, the Commission, supported by the interveners, contends that the Court should:

–      dismiss the actions as unfounded;

–      order the applicants to pay the costs.

**Law**

57      Pursuant to Article 68 of the Rules of Procedure, the present cases are joined for the purposes of the decision closing the proceedings.

58      In support of each of the actions, the applicants put forward eight pleas in law, some of which are set out in several parts, which it is appropriate to group together as seven pleas and present in the following order: first, the plea alleging a lack of competence on the part of the Commission to adopt the contested decision and abuse of power as well as failure properly to apply Article 351 TFEU and general principles of law; second, the plea alleging infringement of Article 107(1) TFEU; third, the plea alleging breach of the principle of the protection of legitimate expectations; fourth, the plea alleging an error in the assessment of the compatibility of the measure at issue with the internal market; fifth, the plea alleging an error in the determination of the beneficiaries of the aid and failure to state reasons; sixth, the plea alleging an error of law relating to the recovery of the aid and, seventh, the plea alleging breach of the right to be heard and infringement of Article 108(3) TFEU and Article 6(1) of Regulation No 659/1999.

*The Commission's lack of competence and the inapplicability of EU law to a situation predating Romania's accession*

59      Under the first part of the first plea put forward in Case T-704/15, the applicants rely, in essence, on the Commission's lack of competence and on the inapplicability of EU law to a situation predating Romania's accession. Moreover, under the first part of the second plea put forward in Cases T-624/15 and T-694/15, the applicants maintain that any advantage had been granted before Romania's accession to the European Union. The Court considers that, by their arguments, the applicants in Cases T-624/15 and T-694/15 are also disputing the Commission's competence to adopt the contested decision. In any event, since the question of the Commission's competence falls within the scope of an absolute bar to proceeding, it must be examined of the Court's own motion (see judgment of 13 July 2000, *Salzgitter* v *Commission*, C-210/98 P, EU:C:2000:397, paragraph 56 and the case-law cited).

60      According to the applicants, first, the Commission was not competent to adopt the contested decision, since all the acts and omissions comprising the international wrongs Romania was found by the arbitral tribunal to have committed against the applicants and which caused the damage compensated for by the arbitral award occurred before Romania's accession to the European Union. Secondly, during that period, EU law, including the rules on State aid, did not apply to Romania as such, and the Commission's powers under Article 108 TFEU and Regulation No 659/1999 could not be exercised with binding legal effect in respect of State aid granted by the Romanian authorities. Thirdly, it is immaterial that the payment of the compensation for international wrongs that were committed by Romania within the legal framework that applied prior to its accession to the European Union took place, as in the present case, subsequent to accession.

61      In that regard, the applicants in Case T-704/15 submit that the arbitral award was made by the arbitral tribunal because of the actions of the Romanian authorities in the context of the repeal of EGO in 2005, which infringed the legitimate expectations of the arbitration applicants and did not act transparently as regards the revocation of the incentives while maintaining the applicants' corresponding obligations. At the time of those events, EGO was subject neither to the EU State aid rules nor to the Commission's competence. The contested decision is based on the incorrect premiss that EGO was State aid prohibited by EU law.

62      According to the applicants in Cases T-624/15 and T-694/15, the unconditional right to receive compensation for the infringements committed by Romania and therefore any possible advantage had been granted either at the time of Romania's infringement of the BIT stemming from the repeal of the incentives laid down by EGO, or when the BIT entered into force, giving rise to Romania's obligations towards the applicants, but in any event before accession. Accordingly, any payment on the basis of the arbitral award should be regarded as the payment of existing aid under Article 15(3) of Regulation No 659/1999 that can no longer be recovered.

63      The Commission disputes those arguments and contends that it was indeed competent to adopt the contested decision. Given that the arbitral award was rendered, was partially implemented and risks being fully implemented after Romania's accession to the European Union, the applicants could have obtained an unconditional right to the compensation awarded to them under the applicable national legislation only after Romania's accession to the European Union. The fact that EGO was never directly subject to scrutiny under EU State aid rules and that the alleged infringement of the BIT was committed before that accession is also irrelevant for determining the Commission's competence in the present case. The Commission contends that, in the contested decision, it did not order Romania to recover the aid initially granted to the arbitration applicants under EGO. In addition, EGO, which was repealed on 22 February 2005, cannot serve as a legal basis for the payment of the compensation awarded to the applicants. While the applicants may have had a claim against Romania under the BIT as soon as the EGO incentives were revoked, the unconditional right to the full compensation subsequently awarded could have arisen only after Romania's accession to the European Union.

64      According to the Commission, the aid at issue was therefore indeed granted after Romania's accession to the European Union, either through the conversion of the arbitral award, by means of its recognition, into a valid legal right under national law, or through Romania's implementation of the arbitral award.

65      In recitals 130 to 140 of the contested decision, the Commission examined whether the measure at issue, defined in recital 39 of that decision as being the 'payment of the compensation awarded to the applicants by the [arbitral] tribunal by virtue of the [arbitral] award, whether by implementation or execution of that award, plus the interest that has accrued since [that] award was issued', had to be classified as new aid. In that regard, it stated that, following the revocation, on 22 February 2005, of the scheme set up by EGO, no right to aid under that scheme could be obtained by any company and that, consequently, the applicants' claim for compensation from the Romanian State derived only from 'the arbitral award in conjunction with Romanian domestic law giving it legal effect in Romania's domestic legal order'. As the arbitral award was rendered and risks being implemented or executed after Romania's accession to the European Union, the unconditional right under Romanian domestic law to receive the compensation awarded by the arbitral

tribunal was conferred on the applicants only after Romania's accession to the European Union. The Commission considered that the fact that neither the Act of Accession nor the FEU Treaty were applicable in Romania at the time when, as the applicants put forward during the administrative procedure, Romania breached its obligations under the BIT by revoking the aid scheme established by EGO or when the applicants brought the action before the arbitral tribunal was irrelevant, because at neither point had the applicants obtained an unconditional right to the payment of the compensation awarded by the arbitral tribunal, a measure which was under consideration by the Commission. In addition, the Commission noted that the arbitral award had granted the applicants compensation in an amount corresponding to the advantages provided for under the revoked EGO scheme until the scheduled date of its expiry and compensation for loss of the opportunity to stockpile sugar in 2009 and for lost profit and that, for the vast majority or even the entirety of the periods concerned, Romania had been a full member of the European Union and had been directly subject to the State aid rules laid down in the FEU Treaty. It also observed that the system of incentives laid down by EGO was not referred to as existing aid in the Act of Accession. The Commission concluded that payment of the compensation awarded to the applicants by the arbitral tribunal, whether through the implementation or the execution of the arbitral award, constituted new aid and was thus subject to the full State aid review mechanism set out in Articles 107 and 108 TFEU.

66    Under Article 2 of the Act of Accession, the provisions of the original Treaties and the acts adopted by the institutions before accession are binding on Romania as from that accession and apply in that State under the conditions laid down in those Treaties and in that act.

67    Thus, EU law became applicable in Romania only as from its accession to the European Union on 1 January 2007. It is therefore only on that date that the Commission acquired the competence enabling it to review Romania's actions pursuant to Article 108 TFEU (see, to that effect, judgment of 20 March 2013, *Rousse Industry* v *Commission*, T-489/11, not published, EU:T:2013:144, paragraphs 63 and 64).

68    The applicants' arguments alleging that the Commission lacked the competence to adopt the contested decision are based on the premiss that all the events occurred, and any possible advantage was granted, before Romania's accession to the European Union. It follows that, in order to assess the merits of those arguments, it is necessary first to define the date on which the alleged aid was granted.

69    In that regard, it should be noted that, according to the case-law, State aid must be considered to be granted at the time that the right to receive it is conferred on the beneficiary under the applicable national rules, taking account of all the conditions laid down by national law for obtaining such aid (see, to that effect, judgments of 21 March 2013, *Magdeburger Mühlenwerke*, C-129/12, EU:C:2013:200, paragraphs 40 and 41, and of 6 July 2017, *Nerea*, C-245/16, EU:C:2017:521, paragraph 32).

70    In the present case, first, according to the contested decision, the implementation or execution of the arbitral award was intended to re-establish the situation in which the applicants would have, in all likelihood, found themselves had the EGO scheme not been repealed (recitals 95 and 146 and footnote 83 of the contested decision).

71    It is apparent from the background to the disputes (see paragraphs 5 to 15 above) that all the events relating to EGO, namely Romania's adoption of EGO, the applicant companies' obtaining of the licences enabling them to benefit from the incentives laid down by EGO, the entry into force of the BIT, the revocation of the incentives laid down by EGO and the infringements committed by Romania on that occasion and the initiation of the proceedings brought before the arbitral tribunal by the arbitration applicants, took place before Romania's accession to the European Union on 1 January 2007.

72    Secondly, it should be noted in that regard that, in the arbitral award, the arbitral tribunal concluded that, by repealing the EGO incentives prior to 1 April 2009, Romania had undermined the arbitration applicants' legitimate expectations and had failed to acted transparently towards them. Therefore, the repeal of the EGO incentives constitutes the event giving rise to the damage for which the compensation at issue was awarded to the applicants in the arbitral award.

73      As is apparent from recital 146 and footnote 83 of the contested decision, the arbitral award was thus intended to compensate 'retroactively' the revocation of EGO in 2005, that is to say that the compensatory effects which it produces are applicable to the past.

74      It follows that, by the arbitral award, the arbitral tribunal confined itself to determining the exact damage suffered by the applicants on the basis of the repeal of EGO and calculated the amount of damages corresponding to a right to compensation which arose at the time of the infringements committed by Romania in 2005.

75      Consequently, the right to receive compensation for the purposes of the case-law referred to in paragraph 69 above arose at the time when Romania repealed the EGO incentives in 2005. Contrary to what the Commission stated, inter alia, in recital 134 of the contested decision, the right to receive the compensation awarded by the arbitral tribunal was therefore not conferred on the applicants only after Romania's accession to the European Union (see paragraph 65 above).

76      Thirdly, it is true that the arbitral award, stating the infringements committed by Romania when EGO was repealed and determining the damages to be paid to the applicants on that basis, was issued in 2013 and therefore after that accession.

77      However, as has been stated in paragraph 74 above, the arbitral tribunal confined itself to determining the exact damage suffered by the applicants on the basis of the infringements committed by Romania in 2005. Since the arbitral award is thus merely an ancillary element of the compensation at issue and is not, as such, severable from the earlier tax incentives, it cannot be classified as new aid and serve as a basis for the competence of the Commission and the applicability of EU law for all the events occurring in the past, namely the events giving rise to the disputes which predate Romania's accession to the European Union (see, to that effect and by analogy, judgment of 20 March 2013, *Rousse Industry* v *Commission*, T-489/11, not published, EU:T:2013:144, paragraph 55 and the case-law cited, confirmed on appeal by the judgment of 20 March 2014, *Rousse Industry* v *Commission*, C-271/13 P, not published, EU:C:2014:175).

78      In the light of the foregoing, it must be concluded that the applicants' right to receive the compensation at issue arose and began to take effect at the time when Romania repealed EGO 24, that is to say, before Romania's accession to the European Union, and therefore at the time that that right was conferred on the applicants, within the meaning of the case-law cited in paragraph 69 above, predated accession. First, the arbitral award is simply the recognition of that right and, second, the payments made in 2014 merely represent the enforcement of that right which arose in 2005.

79      As EU law and, more specifically, Articles 107 and 108 TFEU were not applicable in Romania before its accession to the European Union (see, to that effect, judgment of 1 October 2015, *Electrabel and Dunamenti Erőmű* v *Commission*, C-357/14 P, EU:C:2015:642, paragraph 64 and the case-law cited), the Commission could not exercise the powers conferred on it by Article 108 TFEU and could not, in particular, censure the incentives laid down by EGO for the period predating that accession. It is only as from Romania's accession that the Commission acquired the competence enabling it to review Romania's actions pursuant to Article 108 TFEU (see, to that effect, judgment of 20 March 2013, *Rousse Industry* v *Commission*, T-489/11, not published, EU:T:2013:144, paragraph 63, confirmed on appeal by the judgment of 20 March 2014, *Rousse Industry* v *Commission*, C-271/13 P, not published, EU:C:2014:175).

80      It should also be noted, as the applicants have done, that the fact that the compensation was paid after that accession is irrelevant in that context, because those payments made in 2014 represent the enforcement of a right which arose in 2005.

81      Fourthly, the Commission defined the purpose of the measure at issue as the 'payment of the compensation awarded to the applicants by the [arbitral] tribunal by virtue of the [arbitral] award, whether by implementation or execution of that award, plus the interest that has accrued since the award was issued' (recital 39 of the contested decision).

82    It should be noted that, although, in the contested decision, the Commission did not expressly rule on the lawfulness of EGO, it is apparent, inter alia, from recitals 24, 25, 95 and 146 of the contested decision that it considered that the payment of the compensation awarded to the applicants by the arbitral tribunal was incompatible with EU law, since it was intended to re-establish the EGO incentives that were contrary to EU law. It is thus clearly apparent from the contested decision that the Commission made a direct link between that payment and the incentive scheme laid down by EGO and that the Commission's conclusion that the payment of the compensation constituted State aid within the meaning of Article 107(1) TFEU was underpinned by the idea that the EGO incentives were themselves incompatible with EU law.

83    According to settled case-law, new rules apply, as a matter of principle, immediately to the future effects of a situation which arose under the old rule (see judgment of 11 December 2008, *Commission* v *Freistaat Sachsen*, C-334/07 P, EU:C:2008:709, paragraph 43 and the case-law cited).

84    In the present case, due to the specific nature of the arbitral award, which is apparent, inter alia, from recital 146 of the contested decision, it cannot be considered that the effects of that award constitute the future effects of a situation arising prior to accession within the meaning of the case-law cited in paragraph 83 above, since that award retroactively produced definitively acquired effects which it merely 'stated' for the past, that is to say, effects which, in part, were already established before accession.

85    In recital 146 of the contested decision, the Commission took the view that 'the implementation of the [arbitral] award [would re-establish] the situation in which the [applicants] would have, in all likelihood, found themselves if [EGO] had never been repealed by Romania [and that this] constituted operating aid'.

86    However, as the EGO incentives were repealed in 2005 and thus before Romania's accession to the European Union, the Commission was by no means competent to assess their alleged unlawfulness in the light of EU law, at least with regard to the period predating accession. Likewise, as the right to the compensation at issue arose at the time of that repeal (see paragraph 75 above), nor could the Commission rule on the compatibility of the repeal for that period.

87    In that regard, it must be pointed out that, in the present case, the arbitral tribunal was not bound to apply EU law to events occurring prior to the accession before it, unlike the situation in the case which gave rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158, paragraphs 38 to 41).

88    Furthermore, given that all the events of the dispute taken into account by the arbitral tribunal took place before that accession, the arbitral award cannot have the effect of making the Commission competent and EU law applicable to those earlier events in so far as they produced their effects before that accession (see, to that effect and by analogy, judgment of 10 January 2006, *Ynos*, C-302/04, EU:C:2006:9, paragraphs 25 and 36).

89    As the Commission stated in recital 135 of the contested decision, it is apparent from the arbitral award that the amounts granted as compensation for the damage resulting from the infringements committed by Romania were calculated by the arbitral tribunal from the moment that EGO was repealed, on 22 February 2005, until its scheduled expiry, on 1 April 2009. Admittedly, that period covers 27 months during which Romania was already a member of the European Union and the opportunity to stockpile sugar in 2009 and the lost profits for the period from 1 January 2005 to 31 August 2011.

90    It must, however, be stated that the amounts granted as compensation for the period predating Romania's accession to the European Union, that is to say, the period from 22 February 2005 to 31 December 2006, cannot constitute State aid within the meaning of EU law. Therefore, in accordance with the case-law cited in paragraphs 69, 79 and 88 above, it must be held that the Commission exercised its powers retroactively in relation to a situation predating Romania's accession to the European Union, at least with regard to those amounts.

91    Furthermore, as regards the amounts granted as compensation for the period subsequent to Romania's accession to the European Union, namely, the period from 1 January 2007 to 1 April 2009, even assuming

that the payment of compensation relating to that period could be classified as incompatible aid, given that the Commission did not draw a distinction between the periods of compensation for the damage suffered by the applicants before or after accession, the Commission has, in any event, exceeded its powers in the area of State aid review.

92      In the light of all the foregoing, it must be concluded that, by adopting the contested decision, the Commission retroactively applied the powers which it held under Article 108 TFEU and Regulation No 659/1999 to events predating Romania's accession to the European Union. Therefore, the Commission could not classify the measure at issue as State aid within the meaning of Article 107(1) TFEU.

93      Consequently, the first part of the first plea put forward in Case T-704/15 and the first part of the second plea put forward in Cases T-624/15 and T-694/15 must be upheld.

### The error in classifying the arbitral award as an advantage and aid within the meaning of Article 107 TFEU

94      Under the second part of the second plea put forward in Cases T-624/15 and T-694/15 and the first part of the second plea put forward in Case T-704/15, the applicants claim that the arbitral award does not confer an economic advantage on them, but is intended solely to compensate them for the damage they have suffered. In that regard, they submit that that award does not reinstate EGO, but grants them compensation for Romania's breach of its obligations under the BIT and in particular for the fact that it maintained the corresponding obligations on investors even though the incentives had been repealed. The applicants, which had initially applied to the arbitral tribunal to re-establish EGO, expressly amended the form of order sought to that effect. The Commission incorrectly focused on how the arbitral tribunal had calculated the compensation rather than the reason for awarding it. That calculation of compensation is not relevant in the present case. Furthermore, the Commission does not have the power to re-examine compensation on the ground that it disapproves of the chosen calculation method. In any event, the Commission has not shown that the amounts allocated corresponded to the exact amount of the reimbursements and exemptions that the applicants would have obtained under EGO for the period concerned or that the arbitral award had therefore effectively reinstated that regime. Therefore, in accordance with the case-law of the Court of Justice (judgment of 27 September 1988, *Asteris and Others*, 106/87 to 120/87, EU:C:1988:457), execution of the arbitral award does not grant them an advantage within the meaning of Article 107(1) TFEU.

95      Moreover, the arbitral award does not have the effect of compensating the applicants for the revocation of an incompatible State aid measure. The Commission departed from the incorrect premiss that EGO constituted State aid prohibited by EU law. The applicants submit that, at the time of the events referred to in the arbitral award, EGO was not subject to EU State aid rules and that the Commission is attempting to exercise its powers on those events retroactively. In any event, according to the applicants, it was an advantage obtained 'under normal market conditions', because the payment was the automatic consequence of the order imposed by the arbitral award. Finally, the view that the BIT is invalid is incorrect.

96      The Commission, supported by the Kingdom of Spain, contests those arguments. In its view, it is clear that the payment of compensation awarded following a decision favourable to the applicants, which is equal to the sum of the amounts of unlawful and illegal aid that was envisaged to be granted, constitutes itself an indirect grant of State aid. In that regard, the Commission states that it never maintained that the arbitral award reinstated *de jure* EGO, but rather concluded in the contested decision that the award reinstated de facto the EGO incentives, given that the arbitral award was limited to placing the arbitration applicants back in the position in which they would, in all probability, have been if EGO had not been repealed in 2005. The arbitral tribunal pointed to the causal link between the infringement of the BIT and the compensation awarded, referring exclusively to the revocation of the EGO incentives, but made no reference to any damage arising from the maintenance of the investors' obligations or the lack of transparency. The present case differs fundamentally from the case which gave rise to the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457).

97     The Kingdom of Spain adds that the compensation at issue is indeed State aid, since the arbitral tribunal was seised shortly after the repeal of EGO and that the compensation was calculated in a very similar manner to that set out in EGO. It is precisely the early revocation of that scheme that is the fundamental reason for the whole dispute. Furthermore, no person has an individual right to State aid, whatever its form and regardless of what the State has granted that person previously.

98     In recital 95 of the contested decision, the Commission concluded as follows:

'It is clear that through the implementation or execution of the award, Romania grants the [arbitration applicants] an amount corresponding exactly to the advantages foreseen under the abolished [EGO] scheme from the moment it was repealed (22 February 2005) until its scheduled expiry (1 April 2009). More precisely, implementing or executing the award de facto reimburses customs duties charged on imported sugar and other raw materials between 22 February 2005 and 31 March 2009, as well as the customs duties charged on imported sugar that the [arbitration applicants] would have avoided if they had had the opportunity to stockpile sugar before the [scheduled] expiration of the [EGO] facilities on 31 March 2009. In addition, to ensure that the [arbitration applicants] fully benefit from an amount corresponding to that of the abolished scheme and are "placed back in the position [they] would have been 'in all probability'", the [arbitral tribunal] also awarded interest and compensation for the allegedly lost opportunity and lost profit. In effect, the implementation or execution of the award re-establishes the situation the [arbitration applicants] would have, in all likelihood, found themselves in if the [EGO] scheme had never been repealed.'

99     The Commission also noted, in recital 99 of the contested decision, that, 'in justifying its decision to award compensation for increased prices and the loss of the ability to stockpile, as well as lost profits, the [arbitral tribunal had] referred only to damages incurred by the [arbitration applicants] as a result of the revocation of the [EGO] incentives'.

100    In that regard, Article 107(1) TFEU provides that 'save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market'.

101    According to settled case-law, for a measure to be classified as 'aid' for the purposes of Article 107(1) TFEU, all the conditions set out in that provision must be fulfilled. Thus, first, there must be an intervention by the State or through State resources; second, the intervention must be liable to affect trade between Member States; third, it must confer an advantage on the recipient and, fourth, it must distort or threaten to distort competition (see judgment of 16 July 2015, *BVVG*, C-39/14, EU:C:2015:470, paragraphs 23 and 24 and the case-law cited).

102    State aid, as defined in the FEU Treaty, is a legal concept which must be interpreted on the basis of objective factors. For that reason, the European Union judicature must, in principle and having regard both to the specific features of the case before it and to the technical or complex nature of the Commission's assessments, carry out a comprehensive review as to whether a measure falls within the scope of Article 107(1) TFEU (see judgment of 21 June 2012, *BNP Paribas and BNL* v *Commission*, C-452/10 P, EU:C:2012:366, paragraph 100 and the case-law cited).

103    In addition, compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid (see, to that effect, judgment of 27 September 1988, *Asteris and Others*, 106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24), as recalled by the Commission in recital 104 of the contested decision. That recital 104 confirms that the Commission considers the arbitral award to be incompatible aid because it compensates for the withdrawal of a measure which it considers to be aid which is incompatible with EU law.

104    However, it follows from the analysis of the first part of the first plea put forward in Case T-704/15 and the first part of the second plea put forward in Cases T-624/15 and T-694/15 that EU law is not applicable

to the compensation for the withdrawal of EGO, at least in respect of the period predating accession, because the arbitral award, which found that a right to compensation arose in 2005, did not have the effect of triggering the applicability of EU law and the Commission's competence to that earlier period.

105    Therefore, the compensation for the withdrawal of the EGO scheme, at least in respect of the amounts relating to the period from 22 February 2005 to 1 January 2007, cannot be regarded as compensation for the withdrawal of aid which is unlawful or incompatible with EU law.

106    In so far as EU law is not applicable to the compensation for the withdrawal of EGO, at least in respect of the period predating accession, the applicants may, at least for that period, rely on the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457).

107    However, it follows from the analysis of the first part of the first plea put forward in Case T-704/15 and the first part of the second plea put forward in Cases T-624/15 and T-694/15 that the Commission is not competent and that EU law is not applicable to the EGO scheme, to its revocation or to the compensation for that revocation, because the arbitral award, which found that there was a right to compensation in 2013, did not have the effect of triggering the applicability of EU law and the Commission's competence to the earlier EGO tax incentives and, accordingly, to the compensation at issue which resulted therefrom.

108    Therefore, as the compensation at issue covered, at least in part, a period predating accession (from 22 February 2005 to 1 January 2007) and as the Commission did not draw a distinction, among the amounts to be recovered, between those falling within the period predating accession and those falling within the period subsequent to accession, the decision by which it classified the entirety of the compensation as aid is necessarily unlawful.

109    It follows that the contested decision is unlawful in so far as it classified as an advantage and aid within the meaning of Article 107 TFEU the award, by the arbitral tribunal, of compensation intended to compensate for the damage resulting from the withdrawal of the tax incentives, at least in respect of the period predating the entry into force of EU law in Romania.

110    Consequently, the second part of the second plea put forward in Cases T-624/15 and T-694/15 and the first part of the second plea put forward in Case T-704/15 must also be upheld.

111    In the light of all the foregoing, the contested decision must be annulled in its entirety, without it being necessary to examine the other parts of those pleas or the other pleas.

### Costs

112    Under Article 134(1) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings.

113    Since the Commission has been unsuccessful, it must be ordered to bear its own costs and pay those incurred by the applicants, in accordance with the form of order sought by them.

114    Under Article 138(1) of the Rules of Procedure, the Member States which intervened in the proceedings are to bear their own costs. Consequently, the Kingdom of Spain and Hungary are to bear their own costs.

On those grounds,

THE GENERAL COURT (Second Chamber, Extended Composition)

hereby:

1.    **Joins Cases T-624/15, T-694/15 and T-704/15 for the purposes of the judgment;**

2.    **Annuls Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — Arbitral award Micula v Romania of 11 December 2013;**

3.    **Orders the European Commission to bear its own costs and to pay those incurred by European Food SA, Starmill SRL, Multipack SRL, Scandic Distilleries SA, Mr Ioan Micula and Mr Viorel Micula, European Drinks SA, Rieni Drinks SA, Transilvania General Import-Export SRL and West Leasing International SRL;**

4.    **Orders the Kingdom of Spain and Hungary to bear their own costs.**

| | | |
|---|---|---|
| Prek | Buttigieg | Schalin |
| Berke | | Costeira |

Delivered in open court in Luxembourg on 18 June 2019.

| | |
|---|---|
| E. Coulon | E. Buttigieg |
| Registrar | President |

---

\*     Language of the case: English.