# EXHIBIT 24

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the Matter of

## 9REN HOLDING S.À.R.L.,

Claimant

v.

## THE KINGDOM OF SPAIN,

Respondent

## (ICSID Case No. ARB/15/15)

---

## AWARD

---

### Members of the Tribunal
The Honorable Ian Binnie C.C., Q.C., President
Mr. David R. Haigh, Q.C., Arbitrator
Mr. V.V. Veeder, Q.C., Arbitrator

### Secretary of the Tribunal
Ms. Catherine Kettlewell, ICSID

Date of dispatch to the Parties: **May 31, 2019**

## REPRESENTATION OF THE PARTIES

*Representing the Claimant*:

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Heloise Herve
Ms. Isabel San Martin
King & Spalding LLP
12, cours Albert Ier
75008 Paris
France

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
U.S.A.

Mr. Enrique Molina
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
U.S.A.

Mr. Christopher Smith
King & Spalding LLP
1180 Peachtree St NE
Atlanta, GA 30309
U.S.A.

Ms. Verónica Romaní Sancho
Mr. Gonzalo Ardila Bermejo
Mr. Luis Gil Bueno
Ms. Inés Vázquez García
Ms. Beatriz Fernández-Miranda de León
Ms. Cristina Matia Garay
King & Spalding LLP
Castellana, 216
28046 Madrid
Spain

*Representing the Respondent*:

Mr. José Manuel Gutiérrez Delgado
Mr. Francisco Javier Torres Gella
Mr. Javier Castro López
Ms. Amaia Rivas Kortázar
Mr. Antolín Fernández Antuña
Ms. María Jose Ruiz Sánchez
Mr. Roberto Fernández Castilla
Ms. Patricia Froehlingsdorf Nicolás
Ms. Elena Oñoro Sainz
Abogacía General del Estado
The Ministry of Justice of the
Government of Spain
Calle Ayala 5
28001 Madrid
Spain

# TABLE OF CONTENTS

PART 1.     OVERVIEW AND THE PARTIES.................................................................1

    A.     The Investment...................................................................................... 1

    B.     Spain's Renewable Energy Initiatives ................................................... 2

    C.     Spain's General Response is That the Claimant Made its Investment in the Context of a "Dynamic" and Flexible Regulatory Scheme Which at all Relevant Times Limited Investors in the Electricity Sector to a "Reasonable Return" on Invested Capital................................ 3

    D.     Did Spain Breach an Enforceable Undertaking? .................................... 4

    E.     The Tribunal's Conclusion ................................................................... 5

PART 2.     PROCEDURAL HISTORY ..................................................................7

PART 3.     FUNDAMENTALS OF THE DISPUTE.................................................15

    A.     The Regulatory Framework ................................................................ 16

    B.     The Regulators ................................................................................... 16

    C.     Introduction of the Feed-In Tariff Premiums ...................................... 17

    D.     The Development of European Community Policy ................................ 18

    E.     A New Comprehensive Law Governing the Transmission and Distribution of Electricity 18

PART 4.     THE FOUR STAGES OF THE SPANISH INCENTIVE PROGRAMS .................19

    A.     Stage One: The Pre-Investment Stage ................................................. 20

    B.     Stage Two: The Regulatory Environment at the Time of the Claimant's Investment.. 22

        (a)     The New Incentives to Potential Investors ....................................... 22

        (b)     The Process of Registration of New Renewable Energy Facilities ................. 24

        (c)     Impact of the 2007 Inducements..................................................... 25

        (d)     The Importance of Bank Financing in the Achievement of Spain's Renewable Energy Goals................................................................ 26

        (e)     The Modified Regime (RD 1578/2008)........................................... 27

        (f)     Comparison of "Stability" Provisions in RD 661/2007 and RD 1578/2008 .... 28

        (g)     The Claimant's Investment in PV Projects ....................................... 28

    C.     Stage Three: Spain Reduces the Benefits Provided Under RD 661/2007 and RD 1578/2008 ..................................................................... 29

        (a)     Reducing the Period of Full Tariff Remuneration ............................ 30

        (b)     Limiting the Number of Paid Operating Hours ................................ 30

        (c)     Imposition of an "Access" Toll...................................................... 31

    (d)    In Late 2012, Spain Imposed a 7% "Energy Tax" ........................................... 31

    (e)    In 2013, Spain Eliminated the "Objective" CPI Indexation ......................... 31

D.    Stage Four: In 2013-2014, Spain Adopted a New Regulatory Regime and Abolished the Previous Regulatory Incentives .................................................................. 31

PART 5.    JURISDICTION .................................................................................................33

A.    Was the Claimant "an Investor of Another Contracting State"? ................................... 34

B.    The Claimant Made a Qualifying Investment in Spain ................................. 36

C.    The Dispute Must Involve a Covered "Investment"...................................... 37

D.    Both Parties Consented to ICSID Jurisdiction ............................................. 37

E.    The Dispute Concerns a Legal Dispute Arising Directly out of an Investment and Concerning an Alleged Breach of Part III of the ECT.......................................... 38

F.    An Effort Was Made to Settle This Dispute Amicably ................................. 39

PART 6.    SPAIN'S ADDITIONAL OBJECTIONS TO JURISDICTION ..............................40

A.    The EU Law and Membership Arguments ................................................... 42

    (a)    Spain's "Governing Law" Argument................................................ 43

    (b)    The Tribunal's Ruling on Spain's "Governing Law" Argument..................... 44

    (c)    Spain's EU Institutional Argument.................................................. 45

    (d)    The Claimant's Response ................................................................ 45

    (e)    The Tribunal's Ruling on Spain's EU Institutional Argument........................ 45

    (f)    Spain's "Application of EU Law" Argument ..................................... 48

    (g)    The Claimant's Response ................................................................ 49

    (h)    The Tribunal's Ruling...................................................................... 52

B.    Spain's "Denial of Benefits" Objection (Article 17) ................................... 54

    (a)    Spain's Objection............................................................................ 54

    (b)    The Claimant's Response ................................................................ 55

    (c)    The Tribunal's Ruling on Denial of Benefits ................................... 57

C.    The Corporate Pyramid Objection – Spain Contends That if any Loss has Been Suffered, it has Been Suffered by the Subsidiary Spanish Companies which Owned and Operated the Facilities, not by the Claimant Who is a Mere Shareholder ................................................. 57

    (a)    Spain's Objection............................................................................ 57

    (b)    The Claimant's Response ................................................................ 58

    (c)    The Tribunal's Ruling on the Corporate Pyramid Issue ................... 58

D.    The Tribunal Lacks Jurisdiction to Deal with an Alleged Breach of Article 10(1) of the ECT in Respect of the TVPEE Tax ............................................................................. 59

    (a)    Spain's Objection............................................................................ 59

(b)    The Claimant's Response ................................................. 60

(c)    The Tribunal's Ruling on the TVPEE Tax Issue .......................... 63

PART 7.    LIABILITY FOR BREACH OF ECT OBLIGATIONS .........................................67

PART 7(1). VIOLATION OF THE FAIR AND EQUITABLE STANDARD ...........................68

A.    The Claimant's Argument on the Facts ...................................... 70

B.    The Claimant's Legal Arguments ............................................ 76

C.    The Respondent's Argument in Opposition to the Existence of Any "Legitimate Expectation" ............................................................................ 80

    (a)    Spain Argues that the Claimant Could Have No Legitimate Expectation of Irrevocability in Light of the Clear and Consistent Jurisprudence of the Spanish Supreme Court    81

    (b)    The Tribunal's Ruling on the Relevance of the Spanish Supreme Court Jurisprudence ................................................................. 84

    (c)    Spain Argues Not Only That it Had the Right but the Duty to Regulate its Energy Sector in the Public Interest ................................................ 84

    (d)    The Tribunal's Ruling on Spain's Reliance on a Sovereign Duty to Evolve Regulations in the Public Interest ............................................... 88

    (e)    Spain Argues that the Claimant Misconstrues the Terms of RD 661/2007 by Ignoring the Words "Defined in this Royal Decree" or "indicated in this Section"..... 90

    (f)    The Tribunal's Ruling on Spain's Purposive and Textual Interpretation of RD 661/2007 ..................................................................... 91

    (g)    The Tribunal's Ruling on the Claimant's Reliance on the RD 661/2007 "Guarantee".................................................................... 93

    (h)    In Any Event, Spain Contends that the Claimant's Investment was Made in Stages, and Legitimate Expectations are Assessed as of the Date of the Final Step. Therefore the Claimant's Investments Were Made Under RD 1578/2008 not RD 661/2007, and RD 1578/2008 did not Grandfather "Existing Facilities"................... 94

    (i)    The Tribunal Rules that the Claimant's Investment was made in April 2008 in Reliance on RD 661/2007 .................................................... 97

D.    The Tribunal Concludes That the Claimant Reasonably Relied Upon a Legitimate Expectation that the FIT Benefits of RD 661/2007 Would Continue for the Useful Life of Seven of its Eight Facilities ................................................. 98

PART 7(2). WERE THE LEGITIMATE EXPECTATIONS OF THE CLAIMANT UNDER RD 661/2007 FRUSTRATED?.........................................................................100

A.    The New Regulatory Regime (10 June 2014).......................................... 102

B.    The Respondent's Argument ...................................................... 102

C.    The Tribunal Rules the Claimant's Legitimate Expectations Were Frustrated .......... 103

v

D.    The Tribunal Rules that the Frustration of the Claimant's Legitimate Expectation Violated the Standard of Fair and Equitable Treatment .................................... 104

PART 7(3). DID SPAIN BREACH THE FET STANDARD BY FAILING TO TREAT THE CLAIMANT'S INVESTMENTS TRANSPARENTLY AND FREE FROM IMPAIRMENT BY UNREASONABLE OR DISCRIMINATORY MEASURES ................................................... 105

A.    The Claimant's Argument ................................................................ 105

B.    The Respondent's Position .............................................................. 107

C.    The Tribunal's Ruling on Transparency and Discrimination ................................. 107

PART 7(4). THE UMBRELLA CLAUSE ........................................................ 108

A.    The Claimant's Argument ................................................................ 109

B.    The Respondent's Argument ............................................................. 112

C.    The Tribunal's Ruling on the Umbrella Clause ........................................... 114

PART 7(5). EXPROPRIATION ............................................................... 116

A.    The Claimant's Argument ................................................................ 116

B.    The Respondent's Position .............................................................. 119

C.    The Tribunal's Ruling with Respect to Expropriation ..................................... 123

PART 8.    QUANTUM ..................................................................... 124

A.    Quantification of Compensation ......................................................... 126

B.    The Date of Assessment ................................................................ 126

C.    Positions of the Parties on Quantum .................................................... 126

       (a)    The Claimant's Approach to Quantum .............................................. 126

       (b)    The Respondent's Methodology ................................................... 129

       (c)    FTI's Response .................................................................. 130

D.    The Tribunal's Ruling on the Quantum of Compensation ................................... 141

E.    Pre- and Post-Award Compound Interest .................................................. 149

       (a)    The Claimant's Argument on Compound Interest .................................... 150

       (b)    The Respondent's Argument ...................................................... 152

       (c)    The Tribunal's Ruling on Compound Interest ...................................... 152

F.    Rate of Interest ...................................................................... 153

       (a)    The Claimant's Position ......................................................... 153

       (b)    The Respondent's Position ....................................................... 154

       (c)    The Tribunal's Ruling ........................................................... 154

PART 9.    COSTS ....................................................................... 154

vi

A.   The Parties' Submissions on Costs ............................................................ 154

B.   The Tribunal's Ruling on Costs ................................................................. 156

C.   The Tribunal's Ruling on Costs of the Arbitration ..................................... 158

PART 10.   THE OPERATIVE PART (DISPOSITIF) ................................................ 159

## LIST OF DEFINED TERMS AND ACRONYMS

| | |
|---|---|
| 9Ren España | 9Ren España S.L. |
| APPA 2003 Report | Renewable Energy Producers Association (APPA), Report Introduction to Remuneration Schemes of Renewable Energy in the EU. The Vision of Producers, February 2003 |
| APV | Adjusted Present Value |
| Aragón First Expert Report | First Expert Report of Dr. Manuel Aragón Reyes on Successive Reforms of the Legal Framework Applicable to Renewable Energy, dated 7 July 2016 |
| Aragón Second Expert Report | Second Expert Report of Dr. Manuel Aragón Reyes on the Constitutional Ruling, dated 5 May 2017 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Asociación de Productores de Energías Renovables or APPA | Renewable Energies' Producers Association |
| *Bear Creek* Award | *Bear Creek Mining Corporation v. Rep. of Peru*, ICSID Case No. ARB/14/2, Award (30 November 2017) |
| C-[#] | Claimant's Exhibit |
| CL-[#] | Claimant's Legal Authority |
| Claimant or 9REN | 9REN Holding S.À.R.L. |
| FTI Second Regulatory Report | Second Expert Report of FTI Consulting (Dr. Boaz Moselle and Dr. Dora Grunwald) on Regulatory Regime in Spain, dated 19 May 2017 |

| | |
|---|---|
| *Foresight* Award | *Foresight Luxembourg Solar 1 Sarl, Greentech Energy Systems A/S and others v. Kingdom of Spain*, SCC Arb V 2015/150, Award of November 14, 2018 |
| Claimant's Cost Submission | Claimant's Cost Submission dated 25 January 2019 |
| Claimant's Memorial | Claimant's Memorial on the Merits dated 22 July 2016 |
| Claimant's Post-Hearing Brief | Claimant's Post-Hearing Brief dated 26 March 2018 |
| Claimant's Rejoinder | Claimant's Rejoinder on Jurisdiction dated 29 September 2017 |
| Claimant's Reply | Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction dated 19 May 2017 |
| Claimant's Reply Post-Hearing Brief | Claimant's Reply Post-Hearing Brief dated 23 April 2018 |
| CNE or *Comisión Nacional de Energía* | National Energy Commission |
| CPI | Consumer Price Index |
| DCF | Discounted Cash Flow |
| ECJ | European Court of Justice |
| Econ One First Expert Report | Expert Report of Econ One Research Inc. (Dr. Daniel Flores) on Quantum, dated 7 November 2016 |
| Econ One Second Expert Report | Second Expert Report of Econ One Research Inc. (Dr. Daniel Flores) on Quantum, dated 28 July 2017 |
| ECT or Treaty | *Energy Charter Treaty* |

| Electricity Law 1997 | Spain's Electricity Power Law of 1997 |
|---|---|
| Electricity Law 2013 | Spain's Electricity Power Law of 2013 |
| EU | European Union |
| FIT | Feed-In Tariff |
| FR Solar JVCo | FR Solar Luxco JVCo S.à.r.l. |
| FTI First Quantum Report | First Expert Report of FTI Consulting (Richard Edwards) on Quantum, dated 22 July 2016 |
| FTI Regulatory Report | First Expert Report of FTI Consulting (Dr. Boaz Moselle and Dr. Dora Grunwald) on the Regulatory Regime in Spain, dated 22 July 2016 |
| FTI Second Quantum Report | Second Expert Report of FTI Consulting (Richard Edwards) on Quantum, dated 19 May 2017 |
| Gamesa Solar | Gamesa Solar, S.A. |
| Giuliani First Witness Statement | First Witness Statement of Mr. Francesco Giuliani, dated 18 July 2016 |
| Giuliani Second Witness Statement | Second Witness Statement of Mr. Francesco Giuliani, dated 19 May 2017 |
| Hydrocarbons Sector Act | Act 34/1998, of 7 October 1998, on the Hydrocarbons Sector |
| Hearing | Hearing Merits and Jurisdiction held from December 4 to 8, 2017 |
| ICJ | International Court of Justice |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |

| | |
|---|---|
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IDAE | Institute for the Diversification and Saving of Electricity |
| IMF | International Monetary Fund |
| Law 2/2011 | Law 2/2011, of March 4, 2011, on Sustainable Economy, published in the Official Gazette no. 55 of 5 March 2011 |
| Law 24/2013 | Law 24/2013 dated 26 December 2013, on the electricity sector |
| MO 1045 | Ministerial Order IET/1045/2014, of 16 June 2014, approving the remuneration parameters of standard facilities applicable to certain facilities of electrical power generation by means of renewable energy, cogeneration and waste sources, published in the Official Gazette (BOE) No. 150 of 20 June 2014 |
| Margarit First Expert Report | First Expert Report of Mr. Jaume Margarit on the Regulatory Framework to Promote Renewable Energy before RDL 9/2013 and its Determining Factors, dated 7 July 2016 |
| Margarit Second Expert Report | Second Expert Report of Mr. Jaume Margarit on Specific Aspects of the Regulatory Framework for the Promotion of Renewable Energy in Spain, dated 15 May 2017 |
| Ministry | Ministry of Industry, Energy and Tourism |
| Montoya First Witness Statement | First Witness Statement of Mr. Carlos Montoya, dated 4 November 2016 |
| Montoya Second Witness Statement | Second Witness Statement of Mr. Carlos Montoya, dated 18 July 2017 |

| | |
|---|---|
| *Pac Rim* Decision | *Pac Rim Cayman LLC v. El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections (1 June 2012) |
| PEN 1991 | Spain's National Energy Plan of 1991 |
| PER | *Plan de Energía Renovable* (Renewable Energy Plan) |
| Press Release for RD 1578/2008 | Ministry Industry, Tourism and Trade, Press Release, New Economic Regime for Installations Photovoltaic Solar Technology, 26 September 2008 |
| PV | Photovoltaic |
| R-[#] | Respondent's Exhibit |
| RAIPRE | *Registro Administrativo de Instalaciones de Producción de Régimen Especial* |
| RD | Royal Decree |
| RD 2818/1998 | Royal Decree 2818/1998 of 23 December 1998 on electricity generation by facilities supplied by renewable energy resources, waste, and cogeneration, published in the Official Gazette No. 312 of 30 December 1998 |
| RD1578/2008 | Royal Decree 1578/2008, of 26 September 2008, on the remuneration of electricity generation using photovoltaic solar technology for facilities after the deadline for maintaining the remuneration stipulated under Royal Decree 661/2007, for such technology, published in the Official Gazette ("BOE") No. 234 of 27 September 2008 |
| RDL | Royal Decree Law |

| | |
|---|---|
| RDL 14/2010 | RDL 14/2010, Exhibit C-102. At the same time, Spain also enacted Royal Decree 14/2010, of 7 December 2010, regulating and modifying certain aspects relative to the activity of electricity generation from solar thermal and wind technologies, published in the Official Gazette (BOE) No. 298 on 8 December 2010 |
| RDL 2/2013 | Royal Decree-Law 2/2013, of 1 February 2013, on urgent measures in the electricity system and in the financial sector |
| RDL 9/2013 | Royal Decree-Law 9/2013, of 12 July 2013, enacting urgent measures to ensure the financial stability of the electricity system, published in the Official Gazette (BOE) No. 167 of 13 July 2013 |
| RDL 413/2014 | Royal Decree 413/2014, of 6 June 2014, regulating the activity of electrical power generation by means of renewable energy, cogeneration and waste sources published in the Official Gazette (BOE) No. 140 of 10 June 2014 |
| Request | Request for Arbitration dated 30 March 2015 |
| Respondent or Spain or the Government | The Kingdom of Spain |
| Respondent's Cost Submission | Respondent's Cost Submission dated 25 January 2019 |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 7 December 2016 |
| Respondent's First Regulatory Expert Report | Opinion of Professor Marcos Vaquer Caballería and Professor Pablo Pérez Tremps on the Regulatory Regime, dated 25 July 2016 |
| Respondent's Post-Hearing Brief | Respondent's Post-Hearing Brief dated 26 March 2018 |

| | |
|---|---|
| Respondent's Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 2 August 2017 |
| Respondent's Reply Post-Hearing Brief | Respondent's Reply Post-Hearing Brief dated 23 April 2018 |
| Respondent's Second Regulatory Expert Report | Supplementary Opinion of Professor Marcos Vaquer Caballería and Professor Pablo Pérez Tremps Compliance with Spanish Law of Regulatory Changes in the Remuneration of Renewable Energies, dated 19 June 2017 |
| RL-[#] | Respondent's Legal Authority |
| Secretaría de Estado de Energía | Secretary of State for Energy |
| SES | Spanish Electricity System |
| Solaica | Solaica Power S.L.U. |
| SR | Special Regime |
| Sun European | Sun European S.À.R.L. |
| TEU | Treaty on the European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Toler | Toler Inversiones 2007 S.L. |
| Tr. Day [#], [(Speaker)], [page:line] | Transcript of the Hearing, as revised by the Parties (only English version) on 18 January 2019 |
| Tribunal | Arbitral tribunal constituted on 8 February 2016 |
| TVPEE | Tax on the Value of the Production of Electrical Energy |

| UNCITRAL | United Nations Commission on International Trade Law |
|----------|------------------------------------------------------|
| WACC | Weighted Average Cost of Capital |

## PART 1.    OVERVIEW AND THE PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the *Energy Charter Treaty* which entered into force on 16 April 1998 as between Luxemburg and Spain (the "**ECT**" or "**Treaty**") and the *Convention on the Settlement of Investment Disputes between States and Nationals of Other States*, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.    This dispute relates to measures implemented by the Respondent, the Kingdom of Spain, (the "**Respondent**" or "**Spain**" or the "**Government**") which modified, to the disadvantage of the Claimant and other producers, the regulatory and economic regime applicable to renewable energy projects, and in particular, electricity produced by solar photovoltaic cells ("**PV**").

3.    The Claimant, 9REN Holding S.À.R.L. (the "**Claimant**" or "**9REN**"), is a renewable energy company with headquarters in Luxembourg. It seeks compensation pursuant to the ECT arising out of its investment in PV facilities in Spain, which it says, was induced by Spain's guarantee of a premium Feed-In Tariff ("**FIT**") and related benefits irrevocable by Spain for the life of the facilities. The promise, the Claimant argues, gave rise to reasonable and legitimate expectations (and to other enforceable obligations under the ECT) that Spain would keep its word, which, according to the Claimant, Spain failed to do.

4.    In addition to the ECT's "fair and equitable treatment" provision, the Claimant relies on the ECT "impairment" clause, its "umbrella" clause and its prohibition against illegal expropriation.

### A.    The Investment

5.    The Claimant began investing in Spain in 2008 when it acquired a Spanish company, Gamesa Solar, S.A. ("**Gamesa Solar**"), which was developing renewable energy facilities and projects at various stages of completion, and a related engineering, procurement, and construction business, among other associated investments.[1]

---

[1] See Giuliani First Witness Statement, paras. 16, 23-25.

6.      Spain disputes the jurisdiction of this Tribunal on multiple grounds and contends that in any event, as a responsible elected government, it took the disputed measures in furtherance of the proportionate and rational exercise of its sovereign powers. The electricity market in Spain is a regulated industry. The entitlement of the renewable energy investors was *always* limited by Spanish law to a "reasonable return" on their invested capital and nothing more. Before, during and after the "disputed measures" the Claimant received *at least* a reasonable return on its investment.

## B.      Spain's Renewable Energy Initiatives

7.      The Claimant's investment took place in the context of Spain's ambitious program to attract significant investment to build capacity in renewable energy during the mid-2000s. The program, Spain says, was adopted to meet a mandate for renewable energy from the European Union ("**EU**") to increase rapidly the generation of energy from renewable sources including PV,[2] solar facilities as well as wind and "mini-hydro" projects. The Claimant's primary investments were in PV facilities.

8.      Following a number of relatively unsuccessful initiatives to attract foreign investment, Spain, according to the Claimant, dramatically sweetened its offer in 2007. Royal Decree ("**RD**") 661/2007, the Claimant says, held out to potential investors guaranteed premium rates for the lifetime of their renewable energy facilities (adjusted for inflation during the initial 25 years and thereafter at the rate of 80% of the premium tariff throughout the remaining life of the generating facilities). This was followed by less generous, but equally irrevocable FIT benefits under RD 1578/2008. In the case of large PV plants (over 100 kW), Spain increased fixed tariff rates around 82% in the 2007 reforms.[3]

9.      According to the Claimant, the guarantees "promised" by RD 661/2007 and RD 1578/2008 were important to enable investors to obtain long term financing for their projects. Major capital costs of renewable energy generators are overwhelmingly committed at the outset of a project,

---

[2] Photovoltaics are best known as a method for generating electric power by using solar cells to convert energy from the sun into a flow of electrons. A typical photovoltaic system employs solar panels, each comprising a number of solar cells.

[3] See Expert Report Jaume Margarit dated 7 July 2016 ("**Margarit First Expert Report**"), p. 25**;** see also Exhibit C-099.

and are thereafter "sunk" beyond recall. If, contrary to what actually happened, Spain had made clear to potential investors that it retained the authority to modify unilaterally key features of its FIT program for *existing* PV facilities to the detriment of investors (including modification of tariff rates, the duration of the incentives period, operating hours and grid access), few investors (and few bankers) would have found Spain's proposal attractive.

10.     In effect, according to the Claimant, RD 661/2007 and later RD 1578/2008 functioned as the equivalent of a specific regulatory representation or offer open to potential investors. The fixed tariffs (or market premiums) were spelled out in great detail and acceptance was open to all investors whose facilities met Spain's eligibility criteria and were registered before the regulatory deadline Spain established. The arrangement was consummated when the investor committed the capital to a facility that met the eligibility criteria by the applicable deadline and obtained registration under the administrative process called "*Registro Administrativo de Instalaciones de Producción de Régimen Especial*", known by its Spanish acronym as **RAIPRE**. Spain's registration of a renewable energy facility confirmed compliance of the project with the terms of the regulatory offer. At that point, the Claimant says, Spain assumed the obligation under the ECT not to reduce the RD 661/2007 and (later) RD 1578/2008 benefits. Subsequent impoverishment of the FIT program may have been valid as a matter of Spanish domestic law, but nevertheless, the Claimant contends, constituted a breach of Spain's international treaty obligations under the ECT and the breach entitles the Claimant to compensation.

## C.     Spain's General Response is That the Claimant Made its Investment in the Context of a "Dynamic" and Flexible Regulatory Scheme Which at all Relevant Times Limited Investors in the Electricity Sector to a "Reasonable Return" on Invested Capital

11.     In addition to its objection to the jurisdiction of this Tribunal, Spain contends that the Claimant knowingly made its investment in a "dynamic" regulatory environment, (including the **Special Regime** ("**SR**") applicable to renewable energy) which was ever-evolving within the following framework:

(a)     subsidies to the Special Regime constituted a cost to the **Spanish Electricity System** ("**SES**"), whose technical and economic sustainability constituted paramount public policy;

(b)      Special Regime remuneration had always been structured and based on "**standard**" facilities, rewarded by the market price for electricity plus a subsidy, with the aim of allowing renewable energy facilities to achieve no more than a **reasonable return** in line with the return on capital placed in other low risk investments;

(c)      the principle of reasonable return requires regulators to adjust rates as circumstances change and such changeability was (or ought to have been) known to the Claimant at the time of its investment had it performed due diligence;

(d)      the various regulatory changes in FIT benefits in the period 2010 to 2014 were undertaken either to (i) correct situations of excess profits to investors, or (ii) to respond to the deterioration in the economic circumstances of Spain[4] including the unforeseen and unforeseeable financial downturn in 2008/9, the consequent drop in employment and economic activity, which led to reduced electricity demand and an electricity "tariff deficit" which required Spain, as a responsible regulator, to make adjustments in the FIT programs. The resulting modifications nevertheless provided investors with a "reasonable rate of return" (as distinguished from excess profits);

(e)      the validity of Spain's flexible and ever-evolving regulatory system has been repeatedly affirmed by the Spanish Supreme Court both before and after the date of the Claimant's investment; and

(f)      in short, the Claimant got exactly what it bargained for.

**D.      Did Spain Breach an Enforceable Undertaking?**

12.      The Claimant expresses the nub of its complaint as follows:

---

[4] In 2010, when Spain adopted the first contested measures, and in 2012, prior to its adoption of the remaining contested measures, windfall profits were evident and the growing accumulated tariff deficit, was unsustainable. Spain was undergoing a profound economic crisis. The unemployment rate was at almost 20% in 2010 and it continued to escalate up to around 25% in 2012. This had a negative effect on the electricity demand, which fell to levels that were below its expected evolution: Econ One First Expert Report, p. 133, figure 38 (Spanish Electricity Demand 2000-2012).

> Thus, by early 2013, the pattern was clear: through nicks and scrapes, Spain was steadily eroding the value of the incentives it had promised to investors in RD 661/2007 and RD 1578/2008, just a few years after Spain had reaped all the policy benefits of the newly-added renewable energy capacity and once investors were effectively trapped into ownership of assets with large up-front capital investments.[5]

13.    More specifically, the Claimant notes that in a series of regulatory measures enacted between 2010 and June 2014, the FIT scheme established by RD 661/2007 and RD 1578/2008 was dismantled and replaced by a new legislative and regulatory framework that required PV and other renewable facilities to sell electricity on the wholesale market. The revenues from such sales were supplemented by new "incentives", to bridge the difference in cost of generating renewable energy over conventional sources but the Claimant says these "new incentives" were far less valuable than the previous incentives that Spain had (according to the Claimant) "guaranteed" under RD 661/2007 and RD 1578/2008. The new regulatory regime was explicitly made subject to ongoing and unilateral adjustment.

## E.    The Tribunal's Conclusion

14.    Despite Spain's able and comprehensive argument, the Tribunal has unanimously concluded for the reasons that follow that:

(a)    the Tribunal is competent to hear and determine the Claimant's claims against Spain under Article 25 of the ICSID Convention and Article 26 of the ECT;

(b)    Spain's argument based on the proposition that the reduction in benefits was valid at Spanish law provides no defence to the breach of its *international* obligations;

(c)    under RD 661/2007 (but not RD 1578/2008), Spain generated legitimate expectations under the FET standard in Article 10(1) of the ECT in terms of *international* obligations that non-revocation of benefits was guaranteed in respect of existing and registered renewable energy facilities. Such expectations were

---

[5] Claimant's Memorial, para. 267.

induced by the clear and specific representation in Article 44(3) of RD 661/2007 as follows:

> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph **shall not affect facilities for which the deed of commissioning shall have been granted** prior to January 1 of the second year following the year in which the revision shall have been performed. (emphasis added)

RD 1578/2008 lacked the explicit grandfathering clause that RD 661/2007 provided and in fact, as will be seen, explicitly contemplated ongoing review and potential modification;

(d)   Spain's generation of such expectations was made in the context of a concerted drive to attract foreign and other investments which had not been attracted by the earlier Spanish schemes which lacked equivalent benefits including any "stability" guarantee;

(e)   viewing the text of RD 661/2007 in the context of Spain's statements redoubling its efforts to attract reluctant foreign investors, Spain created a reasonable and legitimate expectation, upon which the Claimant reasonably relied, that Spain's promises of benefits under RD 661/2007 were irrevocable in respect of facilities registered by a deadline unilaterally fixed by Spain at 29 September 2008;

(f)   the Claimant's interpretation of the text of RD 661/2007 was confirmed at the time it was issued by contemporaneous communiques authored by the Spanish cabinet;

(g)   Spain's legislative roll-back violated its ECT obligations of fair and equitable treatment under the FET standard in Article 10(1);

(h)   the Claimant has not established that its interest in renewable energy plants were unlawfully expropriated in violation of Article 13 of the ECT; and

(i)   the Claimant has established its entitlement to compensation under the FET standard in Article 10(1) of the ECT.

15.    The Tribunal by a majority of its members assesses the quantum of such compensation at €41.76 million as at 30 June 2014.

16.    The Award of €41.76 million is to carry interest compounded annually at a rate equivalent to the yield on Spanish Government 5-year bonds from 30 June 2014 to the date of payment.

17.    The Claimant is entitled to its costs assessed at US$4,814,570 and €562,458.

18.    In addition, the Tribunal assesses the arbitration costs payable by the Respondent at US$299,908.16.

## PART 2.    PROCEDURAL HISTORY

19.    On 31 March 2015, ICSID received a Request for Arbitration dated 30 March 2015 from 9REN against Spain (the "**Request**").

20.    On 21 April 2015, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's *Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings*.

21.    The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

22.    The Tribunal is composed of the Honourable Ian Binnie, C.C., Q.C., a national of Canada, President, appointed by agreement of the Parties; Mr. David R. Haigh, Q.C., a national of Canada, appointed by the Claimant; and Mr. V.V. Veeder, Q.C., a national of the United Kingdom, appointed by the Respondent.

23.    On 8 February 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID *Rules of Procedure for Arbitration Proceedings* (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore

deemed to have been constituted on that date. Mr. Francisco Grob, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

24.     In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 4 April 2016 by teleconference.

25.     Following the first session, on 14 April 2016, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English and Spanish, and that the place of proceeding would be Washington, D.C.  Procedural Order No. 1 also sets out the procedural calendar for this proceeding.

26.     On 22 July 2016, the Claimant filed a Memorial on the Merits ("**Claimant's Memorial**") together with Exhibits C-001 through C-215 and Legal Authorities CL-001 through CL-094; a Witness Statement of Mr. Francesco Giuliani, and the Expert Reports of Mr. Richard Edwards (FTI Consulting) with Exhibits RE-01 to RE-89, Dr. Boaz Moselle and Dr. Dora Grunwald (FTI Consulting) with Exhibits BMDG-1 to BMDG-88, and Dr. Manuel Aragón Reyes and Mr. Jaume Margarit. The Claimant filed the corresponding translations on 15 August 2016.

27.     On 7 November 2016, the Respondent filed a Counter-Memorial on the Merits and a Memorial on Jurisdiction ("**Respondent's Counter-Memorial**") together Exhibits R-001 through R-233, Legal Authorities RL-001 through RL-075, with a Witness Statement from Mr. Carlos Montoya, and Expert Reports of Econ One with Exhibits EO-1 through EO-124, and of Professor Pablo Pérez Tremps and Professor Marcos Vaquer Caballería. The Respondent filed the corresponding translations on 29 November 2016.

28.     On 17 November 2016, the Parties communicated to the Tribunal their agreement to extend some deadlines for the document production phase. On 18 November 2016, the Tribunal took note of the Parties' agreement to extend deadlines.

29.     On 16 January 2017, the Parties further agreed that both Parties would submit the Redfern Schedule only in English. On the same date, each party filed a request for the Tribunal to decide on production of documents.

30.     On 2 February 2017, the Parties agreed to remove the requirement to provide to the opposing party with hard copies of the exhibits when they submit their pleadings, therefore amending section 13.3.2 of Procedural Order No. 1. On 9 February 2017, the Tribunal confirmed the agreement of the Parties by letter.

31.     On 3 February 2017, after hearing both Parties, the Tribunal issued Procedural Order No. 2 on document production.

32.     On 19 May 2017, the Claimant filed a Reply on the Merits and Counter-Memorial on Jurisdiction ("**Claimant's Reply**") together with Exhibits C-216 through C-251, Legal Authorities CL-095 through CL-159, a Second Witness Statement of Mr. Francesco Giuliani, and Second Expert Reports of Mr. Richard Edwards (FTI Consulting) with Exhibits RE-90 to RE-113, Dr. Boaz Moselle and Dr. Dora Grunwald (FTI Consulting) with Exhibits BMDG-89 to BMDG-118, Dr. Manuel Aragón Reyes and Mr. Jaume Margarit. On 20 June 2017, the Claimant filed the corresponding translations.

33.     On 22 July 2017, the Parties communicated to the Tribunal their agreement to extend the deadline for the submission of the Respondent's Rejoinder on the Merits and Reply on Jurisdiction instead of 28 July 2017 to be 2 August 2017. On 24 July 2017, the Tribunal took note of the Parties' agreement on the deadline extension.

34.     On 2 August 2017, the Respondent filed a Rejoinder on the Merits and Reply on Jurisdiction ("**Respondent's Rejoinder**") together with Exhibits R-234 through R-333, Legal Authorities RL-076 through RL-095, a Second Witness Statement by Mr. Carlos Montoya, and Rebuttal Expert Report from Econ One with Exhibits EO-125 to EO-152, and a Supplementary Expert Report from Professor Pablo Pérez Tremps and Professor Marcos Vaquer Caballería. The Respondent filed the corresponding translations on 23 August 2017.

35.     By letter dated 25 August 2017, the Centre informed the Tribunal and the Parties that Ms. Catherine Kettlewell, ICSID Counsel, had been appointed as Secretary of the Tribunal in replacement of Mr. Francisco Grob.

36.     On 29 September 2017, the Claimant filed a Rejoinder on Jurisdiction ("**Claimant's Rejoinder**") together with Exhibits C-252 through C-270 and Legal Authorities CL-160 through CL-176.

37.     On 30 October 2017, the Tribunal held a pre-hearing meeting with the Parties by telephone conference for purposes of organization of procedural rules for the Hearing.

38.     On 3 November 2017, the Tribunal issued Procedural Order No. 3 containing the Parties' agreements and the Tribunal's decisions of disputed matters regarding the organization of the Hearing.

39.     On 22 November 2017, the Respondent requested the Tribunal to introduce new relevant documentation pursuant to Section 17.5 of Procedural Order No. 1. On 27 November 2017, the Claimant commented on the Respondent's request.

40.     On 23 November 2017, the Tribunal issued Procedural Order No. 4 containing the agenda and other procedural matters related to the Hearing.

41.     On 24 November 2017, the Claimant requested the addition of specific documents to the record pursuant to Sections 16.3 and 17.5 of Procedural Order No. 1 and Section 30 of Procedural Order No. 3. The Respondent submitted its comments to the Claimant's request on 28 November 2017.

42.     On 28 November 2017, the Tribunal admitted the new evidence of both Parties into the record pursuant to Section 17.5 of Procedural Order No. 1 and Section 30 of Procedural Order No. 3.

43.     A hearing on jurisdiction and the merits was held at the World Bank facilities in Paris from 4 December 2017 to 8 December 2017 (the "**Hearing**"). The following persons were present at the Hearing:

*Tribunal:*

| | |
|---|---|
| The Honorable Ian Binnie C.C., Q.C. | President |
| Mr. David R. Haigh, Q.C. | Arbitrator |
| Mr. V.V. Veeder, Q.C. | Arbitrator |

*ICSID Secretariat:*

    Ms. Catherine Kettlewell            Secretary of the Tribunal

*For the Claimant:*

| | |
|---|---|
| Mr. Kenneth R. Fleuriet | King & Spalding |
| Mr. Reginald R. Smith | King & Spalding |
| Mr. Kevin D. Mohr | King & Spalding |
| Mrs. Amy Frey | King & Spalding |
| Mr. Enrique J. Molina | King & Spalding |
| Mr. Luis Antonio Gil Bueno | Gómez-Acebo & Pombo |
| Ms. Inés Vázquez García | Gómez-Acebo & Pombo |
| Ms. Beatriz Fernández-Miranda de León | Gómez-Acebo & Pombo |
| Mr. Francesco Giuliani | First Reserve Corp. (Managing Director) |
| Mr. Jaume Margarit | Independent Consultant, formerly Director of Renewable Energy at the IDAE |
| Dr. Manuel Aragón Reyes | Autonomous University of Madrid (Professor of Constitutional Law) |
| Dr. Boaz Moselle | Cornerstone Research |
| Dr. Dora Grunwald | FTI Consulting |
| Mr. Richard Edwards | FTI Consulting |
| Mr. Joel Franks | FTI Consulting |
| Mr. Song-ee Kim | FTI Consulting |
| Mr. Jose Alzate | FTI Consulting |

*For the Respondent:*

| | |
|---|---|
| Mr. Javier Castro López | State Attorney's Office |
| Mr. Javier Torres Gella | State Attorney's Office |
| Mr. Antolín Fernández Antuña | State Attorney's Office |
| Ms. Amaia Rivas Kortazar | State Attorney's Office |
| Ms. Elena Oñoro Sainz | State Attorney's Office |
| Mr. Francisco Javier Bartolomé Zofio | State Attorney's Office |
| Ms. Raquel Vázquez Meco | IDAE |
| Mr. Carlos Montoya Rasero | |
| Dr. Daniel Flores | Econ One Expert |
| Mr. Jordan Heim | Econ One Expert |
| Ms. Amalia Martínez | Econ One Expert |
| Prof. Marcos Vaquer Caballería | |
| Prof. Pablo Pérez Tremps | |

*Court Reporter(s):*

| | |
|---|---|
| Mr. Trevor McGowan | Court Reporter |
| Mr. Leandro Lezzi | DR-ESTENO |
| Ms. Luciana Sosa | DR-ESTENO |

*Interpreters*:

| | |
|---|---|
| Mr. Juan María Burdiel Pérez | English-Spanish Interpreter |
| Mr. Jesus Getan Bornn | English-Spanish Interpreter |

Ms. Amalia Thaler-de Klemm                English-Spanish Interpreter

44.     During the Hearing, the following persons were examined:

*On behalf of the Claimant*:

<u>Fact Witness</u>
Mr. Francesco Giuliani                    First Reserve Corp. (Managing Director)

<u>Expert Witnesses</u>
Mr. Jaume Margarit                        Independent Consultant, formerly Director
                                          of Renewable Energy at the IDAE
Dr. Manuel Aragón Reyes                   Autonomous University of Madrid
                                          (Professor of Constitutional Law)
Dr. Boaz Moselle                          Cornerstone Research
Dr. Dora Grunwald                         FTI Consulting
Mr. Richard Edwards                       FTI Consulting

*On behalf of the Respondent*:

<u>Fact Witness</u>
Mr. Carlos Montoya Rasero

<u>Expert Witnesses</u>
Dr. Daniel Flores                         Econ One Expert
Prof. Marcos Vaquer Caballería
Prof. Pablo Pérez Tremps

45.     During the Hearing, the Claimant submitted Exhibits C-271 to C-277, and the Respondent submitted Exhibits R-334 to R-342. The Respondent also submitted an English translation of Exhibit R-105.

46.     On 11 December 2017, the Secretary of the Tribunal informed the Parties that the sound recordings and transcripts were available to the Parties in the sharing platform.

47.     On 8 January 2018, the Respondent requested the introduction of two new legal authorities into the record, *Pac Rim Cayman LLC v. El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections (1 June 2012) ("***Pac Rim* Decision**"), and *Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/2, Award (30 November 2017) ("***Bear Creek* Award**"). On 9 January 2018, the Tribunal decided as follows:

> In light of the fact the two cases have already been discussed at some length in the Respondent's oral submissions on Day 5 of the hearing without objection on the part of the Claimant, the Tribunal thinks it appropriate to have before it the actual text of the decisions in *Pac Rim* and *Bear Creek*. Accordingly, the Respondent is at liberty to add the two decisions to its exhibits.

48.    The *Pac Rim* Decision was introduced as Legal Authority RL-97 and the *Bear Creek* Award was introduced into the record as Legal Authority RL-98.

49.    On 18 January 2018, the Parties submitted the agreed corrections to the Hearing transcripts in English.

50.    On 19 January 2018, the Tribunal decided on a procedural calendar for the Parties' simultaneous post-hearing brief submission, notification of reply, and reply. In its letter, the Tribunal also invited the Parties to address certain issues and respond to questions. On 2 February 2018, the Tribunal amended the procedural calendar for the post-hearing submissions. On 6 February 2018, the Parties communicated to the Tribunal that they agreed that the post-hearing brief and reply would be submitted in English only and proposed an extension to the deadlines decided by the Tribunal. On 7 February 2018, the Tribunal confirmed the agreed extension to the deadlines. On 23 March 2018, the Parties informed of a further extension to the deadlines which the Tribunal confirmed on the same date.

51.    The Parties filed simultaneous post-hearing briefs on 26 March 2018. On the same date, the Respondent requested leave to introduce several legal authorities to the record. On 28 March 2018, the Tribunal granted leave to introduce the legal authorities RL-99 to RL-116.

52.    On 19 April 2018, the Respondent notified the Tribunal, pursuant to the procedural calendar as amended, that it would submit a Reply to Claimant's Post-Hearing Submission. On 20 April 2018, the Claimant submitted its notification to the same effect. On 23 April 2018, the Respondent objected to the late notification from the Claimant and, on the same date, the Claimant responded to the objection. After further exchanges, the Tribunal decided that no prejudice had been caused to the Respondent and rejected the Respondent's request to strike the Claimant's Reply Post-Hearing Submission from the record.

53.     The Parties filed simultaneous Reply post-hearing briefs on 23 April 2018.

54.     On 5 June 2018, the Claimant requested the Tribunal for leave to add the *Masdar v. Spain* award on which the parties submitted their respective comments on 29 June 2018.

55.     On 18 June 2018, the Tribunal introduced into the record the *Masdar v. Spain* Award as exhibit CL-192 and invited the Parties to simultaneously submit comments on the *Masdar v. Spain* Award.

56.     On 29 June 2018, the Parties submitted their respective comments on the *Masdar v. Spain* Award.  The Respondent's comments were accompanied by Exhibits RL-117 to RL-121.

57.     On 31 October 2018, the Centre received an Application for Leave to Intervene as a Non-Disputing Party in this proceeding from the European Commission dated 24 October 2018 (the "**EC Application**").   On 1 November 2018, the Tribunal invited the Parties to submit their observations on the EC Application.   On 8 November 2018, each Party filed its respective observations to the EC Application.  The Claimant's comments were accompanied by Exhibits CL-193 to CL-201 and the Respondent's observations were accompanied by Exhibit RL-122.   On 26 November 2018, the Tribunal issued Procedural Order No. 5 rejecting the EC Application.

58.     On 23 November 2018, the Claimant requested that the Tribunal take note of the *Foresight Luxembourg Solar 1 Sarl, Greentech Energy Systems A/S and others v. Kingdom of Spain*, SCC Arb V 2015/150, Award of November 14, 2018 ("***Foresight* Award**"), specifically on the decision with respect to "fair and equitable treatment."  On 26 November 2018, the Respondent commented on the Claimant's communication on the *Foresight* Award.   On 27 November 2018, the Tribunal decided that it did not require any additional authorities or submissions at this point of the proceeding.

59.     On 21 December 2018, the Tribunal closed the proceeding pursuant to Arbitration Rule 38(1) and invited the Parties to file costs submissions which were simultaneously filed on 25 January 2019.

60.     On 25 January 2019, the Respondent requested the Tribunal's leave to reopen the procedure pursuant to Rule 38 of the ICSID Arbitration Rules in order to introduce a new legal

authority and allow the Parties to comment.  On 26 January 2019, the Tribunal invited the Claimant to comment on the Respondent's request.  On 21 February 2019, the Tribunal decided that the Respondent's request did not meet the test under Rule 38(2) of the ICSID Arbitration Rules and the request was therefore dismissed.

61.    On 30 January 2019, the Respondent submitted comments to the Claimant's Cost Submission.  On 31 January 2019, the Tribunal invited the Respondent to identify the provision of Procedural Order No. 1 relied upon to file its comments on the Claimant's Cost Submission.  The Respondent submitted a clarification on 1 February 2019.  The Tribunal invited the Claimant to submit comments on the Respondent's Cost Submission.  The Claimant submitted its comments on 8 February 2019.

62.    On 8 April 2019, the Tribunal communicated to the Parties that it had decided to extend the 120 day period after the closure of the proceeding to draw up and sign the award by a further 60 day period in accordance with ICSID Arbitration Rule 46.

## PART 3.    FUNDAMENTALS OF THE DISPUTE

63.    The fundamental difference between the parties is the insistence by the Claimant on restricting its focus to incentives provided by RD 661/2007 and RD 1578/2008 and related public pronouncements by Spanish Government authorities, and the Respondent's equal and opposite insistence that those measures and pronouncements must be viewed in the broader historical and regulatory context which entitled the Claimant to no more than a "reasonable rate of return" on its investment. What constituted a "reasonable rate of return" is always to be assessed by Spain by reference to "the cost of money in the capital market" as adjusted from time to time.

64.    The Tribunal is therefore required to consider the "evolution" in Spain's subsidies to renewable energy facilities and to determine whether the Claimant's entitlement was fixed (as it claims) by RD 661/2007 and RD 1578/2008 or evolutionary and subject to diminution (as Spain contends) in successive regulatory modifications between 2010 to 2014.

## A.      The Regulatory Framework

65.      The general right of a host State to regulate sectors of its economy is undoubted. When an investor enters a regulated industry, it cannot, in general, exclude the risk of legal or regulatory changes. As stated by the tribunal in *EDF v. Romania*:

> The idea that legitimate expectations, and therefore FET, imply the stability of the legal and business framework, may not be correct if stated in an overly-broad and unqualified formulation. **The FET might then mean the virtual freezing of the legal regulation of economic activities, in contrast with the State's normal regulatory power and the evolutionary character of economic life.** Except where specific promises or representations are made by the State to the investor, the latter may not rely on a bilateral investment treaty as a kind of insurance policy against the risk of any changes in the host State's legal and economic framework. Such expectation would be neither legitimate nor reasonable. (emphasis added)

66.      Spain sets energy policy through a variety of laws and regulations, including:

- *Statute Law* enacted by the legislature;

- *Royal-Decree Laws* enacted by the government, which have the force of law (but may only be i s s u e d in cases of extraordinary and urgent need, and which the legislature must validate within 30 days); and

- *Regulations* issued by the Council of Ministers, which cannot be contrary to any Law. Regulations may be in the form of *Royal Decrees* issued by the Council of Ministers, or *Ministerial Orders* issued by individual ministries.

## B.      The Regulators

67.      The Ministry of Industry, Energy and Tourism (the "**Ministry**") has primary responsibility for the regulation of energy matters. Within the Ministry, the Secretary of State for Energy ("***Secretaría de Estado de Energía***") exercises specific responsibility for energy policy.[6] The Ministry also houses the Institute for the Diversification and Saving of Electricity

---

[6] See Margarit First Expert Report, pp. 2-3; see also Ministry of Industry, Energy and Tourism, Webpage Excerpt – Organization Chart, as accessed on 4 March 2016, Exhibit C-022.

(known by the Spanish acronym "**IDAE**"), which is the repository of "subject-matter" expertise, providing advice to policymakers on technical and economic issues and drafting legislation, etc. The IDAE also functions as a liaison between the government and industry, with a mandate (among other responsibilities) to promote investment in the renewable energy sector.[7]

68.    At the same time, the Ministry of Economy and Competition housed an advisory agency known from 1998 until 2013, as the National Energy Commission ("***Comisión Nacional de Energía***") (known by the Spanish acronym "**CNE**")[8] with oversight of competition in the market, settlement of the regulated costs of the electricity system (including costs for renewable energy facilities), and monitoring the technical compliance of both conventional and renewable power facilities.[9]

69.    Additionally, the regional government in each Autonomous Community was competent to authorize power generation facilities under 50MW in its territory.[10]

## C.    Introduction of the Feed-In Tariff Premiums

70.    In 1991, Spain's National Energy Plan for the following decade ("**PEN 1991**") made express provisions for the development of renewable energy.[11] The objective was to increase greatly the share of total primary energy consumption from non-hydro renewable sources pursuant to that objective, Spain enacted **Royal Decree 2366/1994**, which created what was called "**Special Regime**" for electricity generated from renewable energy sources. The 1994 modifications introduced a **FIT**[12] which compensates a producer at a fixed tariff rate for the electricity that the producer "feeds" into the electricity grid.

---

[7] See Margarit First Expert Report, pp. 3-6; see also Institute for the Diversification and Saving of Electricity (IDAE), *Annual Report – 2007*, 2008, pp. 5-6; Exhibit C-088.

[8] See Act 34/1998, of 7 October 1998, on the Hydrocarbons Sector ("**Hydrocarbons Sector Act**"), Additional Provision Eleven, as published on 8 October 1998 in the Official State Gazette, Eleventh Additional Provision, Exhibit C-023.

[9] *Ibid.*; see also Margarit First Expert Report, pp. 5-6.

[10] See Act 54/1997 of 27 November 1997, Article 27 *seq.*; Exhibit C-066A. Since 2014, Law 24/2013, Article 3, Exhibit C-180.  See also Margarit First Expert Report, pp. 7-8.

[11] See National Energy Plan ("**PEN 1991**") 1991 pp. 26-27; Exhibit C-044.

[12] Royal Decree 2366/1994, dated 9 December 1994, Article 7, Exhibit C-045.

71.     However, RD 2366/1994 did not include any guarantee against downward adjustment of the feed-in tariff. The tariffs were subject to discretionary adjustment by ministerial order.[13] The offer proved insufficient to attract the level of hoped-for investment.

## D.     The Development of European Community Policy

72.     In 1994, the *Declaration of Madrid* established the principles incorporated in the *European Energy Charter*, and called on the European Union to establish the goal that renewable energy would satisfy 15% of the EU's energy requirements by 2010.[14]

73.     In 1998, Spain agreed to ambitious targets, and later became subject to European Union mandates to increase its share of energy produced from renewable sources.

## E.     A New Comprehensive Law Governing the Transmission and Distribution of Electricity

74.     In 1997, Spain enacted the ***Electricity Power Law*** ("***Electricity Law 1997***") which regulated activities in the electricity industry under which prices and compensation for services were set by the government. At the same time, the *Electricity Law 1997* liberalized electricity generation and supply subject to a broad requirement that government incentives to producers should provide "**reasonable rates of return [in line with] the cost of money in the capital markets.**"[15] **Royal Decree 2818/1998** elaborated more specific details for the application of *Electricity Law 1997* to the Special Regime.[16]

75.     Again, however, the 1997/1998 sweeteners did not attract the desired level of investment. According to the Claimant, the vague guarantee of a "reasonable" rate of return was deficient because it exposed investors to the uncertainty of the regulators' view of what return would be

---

[13] *Ibid.*, Article 12, Exhibit C-045.

[14] See European Commission, Press Release Database, *Renewable energy action plan to be examined at Madrid conference*, 16 March 1994, and Declaration of Abel Matutes, March 1994, Exhibit C-050; see also European Commission, Press Release, *Action plan on renewable energy sources in Europe: Conference proceedings*, 15 April 1994, Exhibit C-049.

[15] See *ibid.*, Article 30.4, second para., Exhibit C-066.

[16] See Royal Decree 2818/1998 of 23 December 1998 on electricity generation by facilities supplied by renewable energy resources, waste, and cogeneration, published in the Official Gazette No. 312 of 30 December 1998 ("**RD 2818/1998**"), Exhibit C-067.

"reasonable." Moreover, there was no guarantee that future rate reductions would not be applied retroactively to already-completed and registered facilities.[17]

## PART 4.    THE FOUR STAGES OF THE SPANISH INCENTIVE PROGRAMS

76.    Subsequent events can conveniently be described in four stages:

(a)    the regulatory incentives prior to the Claimant's investment;

(b)    the regulatory incentives at the time of the Claimant's investment;

(c)    the regulatory modification stage (2010 to 2014);

(d)    the New Regulatory Regime (2014).

77.    The Claimant's expert, FTI Consulting, provided the following chart to demonstrate the timeline of the evolving regulatory regime:



(FTI Regulatory Report, para. 6.4 – Figure 6.1)

---

[17] Investors (and their financers) could only rely upon the generic clause contained in the Preamble of  RD 2818/1998, which read that "for facilities based on renewable and waste energies, the incentive  established has no time limit placed on it because its environmental benefits need to be internalized and because its special characteristics and technological standards entail higher costs that make such facilities unable to compete in  a free market", Exhibit C-067.

## A.  Stage One: The Pre-Investment Stage

78.    By 1997, it was evident that Spain's strategies to attract more investment in renewable energy projects were inadequate. Participants in the renewable energy industry were vocal in their demands. In 2003, an association that represented over 500 Spanish renewable energy companies, the Renewable Energies' Producers Association ("***Asociación de Productores de Energías Renovables***" or "**APPA**"), published a report that, amongst other things, expressed what the Claimant considers to have been the industry view that a vague guarantee of a "reasonable rate of return," *where specific rates were subject to retroactive revision after the completion of investments*, did not provide sufficient certainty to attract investors.[18]

79.    On 1 April 2003, the **CNE** proposed that the Special Regime incentives[19] be amended to be **predictable throughout the facilities' useful life**. Any adjustment mechanisms were to be both transparent and indexed to objective variables (*e.g.*, the Consumer Price Index). Further, the CNE concluded that any reviews or amendments to the incentive scheme should affect new facilities only.[20] Existing facilities would be grandfathered. Spain points out that the role of the CNE was advisory only. The CNE did not make the rules.

80.    In March 2004, Spain replaced RD 2818/1998 with a further new regulatory framework for renewable energy in the form of **RD 436/2004** which, amongst other things, specified that any rate revisions would apply only to new facilities, and would "not have a backdated effect on any previous tariffs and premiums."[21]

81.    However, despite the sweetening of incentives, investment continued to lag. Even by 2006, installed capacity of PV facilities amounted to just 84 MW, which was less than a quarter of

---

[18] See Renewable Energy Producers Association (APPA), *Report Introduction to Remuneration Schemes of Renewable Energy in the EU. The Vision of Producers*, February 2003 ("**APPA 2003 Report**"), Exhibit C-070.
[19] See Luis Jesús Sánchez de Tembleque and Gonzalo Sáenz de Miera, "La regulación de las energías renovables", *Tratado de Regulación del Sector Eléctrico* (Vol. 2), Coord. Fernando Becker, Javier López García de la Serrana, Julián Martínez-Simancas, Jose Manuel Sala Arquer, Aranzadi, (2009), pp. 557-558, Exhibit C-063.
[20] *Ibid.*, p. 560; see also Claimant's Memorial, para. 124.
[21] See RD 436/2004 of 12 March 2004, Article 40.3, Exhibit C-075.

Spain's target of 371 MW by 2010.[22] According to Spain's Secretary General for Energy, Ignasi Nieto Magaldi, it was necessary to raise further the incentive rates for renewable energy. He stated:

> …[T]he premiums need to be revised upwards so that they meet the targets. I think that we will comply with the 30 percent of renewable energies in terms of electricity in 2010.[23]

82.    In February 2007, the CNE published a further advisory report affirming the following key principles to govern a new regulatory regime:

- economic incentives must be recognized as an essential regulatory instrument to reach the renewable energy targets set by the government;

- the regulation must offer the necessary guarantees of transparent, stable, and predictable pricing of energy **for the entire life of the facility**;

- any modification of the economic regime must be applicable **exclusively to new facilities**;

- new provisions may be applied retroactively only where transitional provisions assured investors of compensation that is adequate in light of expectations generated by earlier regulations;

- the next program should include greater efforts to promote the least developed technologies contemplated in the Government's targets (such as solar power). To provide incentive for the development of those immature technologies such as solar power, **the feed-in tariffs should provide a return above what would otherwise be considered reasonable**.[24]

---

[22] See e.g. 2006 Progress Report pp. 12, 17, Exhibit C-080.

[23] See Ignasi Nieto Magaldi (Secretary General for Energy), Appearance before the Congress of Deputies of November 8, 2006, Journal of Sessions of the Congress of Deputies, 2006, VIII Legislature, No. 264, Commission of Industry, Trade and Tourism, Session 42 of 8 November 2006, p. 6, Exhibit C-085.

[24] See National Commission of Energy ("**CNE**"), Report 3/2007 regarding the proposal of royal decree governing the activity of electrical energy production in special regime and of certain facilities of comparable technology, 14 February 2007, pp. 16, 18, 20 and 54, Exhibit C-061.

21

83.    The Claimant contends that these CNE recommendations foreshadowed RD 661/2007 and provide important background to its interpretation.

**B.    Stage Two: The Regulatory Environment at the Time of the Claimant's Investment**

*(a)    The New Incentives to Potential Investors*

84.    On 25 May 2007, Spain enacted fresh incentives in the form of **RD 661/2007**. The improvement was dramatic, especially in PV facilities of over 100 kW, which established feed-in tariffs for photovoltaic installations 82% greater than the rate previously offered in RD 436/2004.[25] Of equal importance, according to the Claimant, the incentives were protected (or "stable") throughout the operating lives of the facilities.[26]

85.    The improved offer was sufficient to attract the Claimant, 9REN, which is a subsidiary of First Reserve, a U.S.-based partnership which was founded in 1983 to invest in the energy sector.[27] In the then view of First Reserve, the minimum return on equity that venture capital would require to put money into renewable energy projects in Spain was in the range of 11-12%.[28]

86.    RD 661/2007 created upper and lower limits to the total compensation for producers eligible under the FIT program, (i.e., the sum of the market price plus the premium) received in payment for electricity.[29]

87.    The Claimant relies in particular on what it interprets to be a guarantee of "stability" or non-revocation in respect of existing facilities, found in Article 44(3) of RD 661/2007 (mentioned above) which (for ease of reference) provides as follows:

> **During the year 2010**, in view of the results of the monitoring reports on the degree of fulfillment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, **there shall be a review of the**

---

[25] See Press Release for RD 661/2007, Exhibit C-099.
[26] As further explained below, RD 661/2007 set a base tariff that was guaranteed for an initial period (e.g., twenty-five years for photovoltaic facilities) with a percentage of the base tariff (e.g., 80% for photovoltaic facilities) being paid in remaining years throughout the operating life of the facility.
[27] See Official Website of First Reserve – About www.firstreserve.com, last accessed 20 July 2016, Exhibit C-193; Giuliani First Witness Statement, para. 5.
[28] See First Reserve Presentation on Project Gasol, 17 December 2007, p. 8, Exhibit C-015.
[29] See RD 661/2007, Preamble para. 8 and Article 36, Exhibit C-098.

> **tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree** with regard to the costs associated with each of these technologies, the degree of participation of the Special Regime in covering the demand, and its impact on the technical and economic management of the system, and **a reasonable rate of profitability shall always be guaranteed** with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.
>
> **The revisions to the regulated tariff and the upper and lower limits [under the premium option] <u>indicated in this paragraph shall not affect facilities</u> for which the deed of commissioning shall have been granted p r i o r to January 1 of the second year following the year in which the revision shall have been performed.**[30] (emphasis added)

88.     The Claimant contends that RD 661/2007 contemplated a "grandfathering" of benefits for facilities registered (known as the deed of commissioning) before any authorized "revisions". Facilities not thereby "grandfathered" would be subject to the specified periodic revisions which were to reflect a "reasonable" rate of profitability. Spain contends that the underlined words "indicated in this section" limit the scope of irrevocability to the listed revisions.

89.     Some commentators viewed RD 661/2007 as a new paradigm:

> [With RD 661/2007,] the predictability and legal security of the economic incentives are guaranteed. The right to receive economic incentives (rates and premiums) is stated **during the entire lifetime of the installation**, with annual updates tied to the variation in the CPI and with modifications every four years **that only affect new facilities**. For this reason, the Royal Decree possesses great value in regulatory stability.[31] (emphasis added)

90.     Article 36 of RD 661/2007 set out fixed values and duration of the FIT:

---

[30] See RD 661/2007, Article 44, Exhibit C-098.

[31] See Luis Jesús Sánchez de Tembleque and Gonzalo Sáenz de Miera, *The Regulation of Renewable Energy*, *in* Treaty of Electricity Sector (Vol. 2), Coord. Fernando Becker, Javier López García de la  Serrana, Julián Martínez-Simancas, Jose Manuel Sala Arquer, Aranzadi, pp. 539-564 (2009) and p. 560, Exhibit C-063.

| Sub group | Power | Duration _____ First [--] years As from then | Regulated tariff c€/kWh | Premium of Reference c€/kWh | Upper limit c€/kWh | Lower limit c€/kWh |
|---|---|---|---|---|---|---|
| Subgrupo | Potencia | Plazo | Tarifa regulada c€/kWh | Prima de referencia c€/kWh | Limite Superior c€/kWh | Limite Inferior c€/kWh |
| b.1.1 | P ≤ 100 kW | primeros 25 años | 44,0381 | | | |
| | | a partir de entonces | 35,2305 | | | |
| | 100 kW<P≤10 MW | primeros 25 años | 41,7500 | | | |
| | | a partir de entonces | 33,4000 | | | |
| | 10<P≤50 MW | primeros 25 años | 22,9764 | | | |
| | | a partir de entonces | 18,3811 | | | |

(See RD 661/2007, Art. 36, C-98)

91.    Article 36 of RD 661/2007, the Claimant alleges, and the Respondent denies, thereby confirmed **a fixed duration for the fixed incentives** granted to each type of renewable facility.[32] For PV facilities, the base fixed tariff (adjusted for inflation) was, the Claimant says, guaranteed to remain in effect for twenty-five years, and thereafter ("a partir de entonces") would drop to 80% of the base tariff (adjusted for inflation) throughout the remaining life of the projects.[33] The Claimant asserts that the productive life of its PV facilities would average 35 years.

*(b)    The Process of Registration of New Renewable Energy Facilities*

92.    Under Article 17 of RD 661/2007, registration under RAIPRE was a condition precedent to entitlement:

> The right to receive the regulated tariff, or if appropriate the premium, **shall be subject to final registration** of the facility in the Register of production facilities under the special regime…[i.e., the RAIPRE].[34] (emphasis added)

93.    With limited exceptions, the authority to authorize construction of facilities eligible under the Special Regime, and then to bring the facilities within entitlement to the Special

---

[32] Further, the Press Release of RD 661/2007 stated that "The new regulations will not be of a retroactive nature", Exhibit C-099.
[33] See RD 661/2007, Article 36, Exhibit C-098.
[34] *Ibid.*, Article 17.

Regime, was within the jurisdiction of the regional government in which the facility was located.[35]

94.    The right of a facility to be included in the Special Regime vested on the first day of the month following the date of issuance of the **Deed of Commissioning Certificate** after final registration in the RAIPRE.[36] The Claimant argues that registration constituted an additional source of Spain's obligation. Spain responds that registration was nothing more than a matter of program administration.

*(c)    Impact of the 2007 Inducements*

95.    The installed capacity of PV projects reached 85% of the target in just four months.[37] Between 2006 and 2007, PV capacity increased almost 600%; from 2007 to 2008, that figure

---

[35] **The procedure for inclusion in the Special Regime** is set out in RD 661/2007 and consisted of several staged steps, including:

• Submitting an application to the competent authority demonstrating that the operating and technical characteristics of the planned facility met the requirements of one of the categories (or subcategories) eligible under RD 661/2007 (e.g., a PV facility of 100 kW capacity);

• Obtaining permission from the transmission or distribution grid operator to connect to the grid;

• Providing a bank guarantee of €500/kW (for most projects) guaranteeing completion, which would be released up on final commissioning of the facility;

• Obtaining an "Administrative Authorization" and "Approval of the Project for Execution of Works," which authorized construction to commence;

• Upon completion of construction, obtaining a non-mandatory "Provisional Commissioning Certificate" that authorized functioning and performance tests necessary to obtain final commissioning of the facility. Upon obtaining the Provisional Commissioning Certificate, facilities could obtain provisional registration with the regional Administrative Registry for Special Regime Generation Facilities (the "RAIPRE");

• After successfully completing functioning and performance tests, and upon submission of a works completion certificate confirming that the facility complied with the approved Project for Execution of Works and applicable regulations, the facility would obtain a "Final Commissioning Certificate," along with final registration in the RAIPRE. Achieving all prior steps was a prerequisite for the certificate of final registration with the RAIPRE being issued. See RD 661/2007 Articles 6-13, Exhibit C-098.

[36] See RD 661/2007, Article 14, Exhibit C-098.

[37] According to the CNE, 91% of the target had been reached by 31 August 2007. As mentioned e.g. in Resolution of 27 September 2007, of the General Secretariat of Energy establishing the deadline for the regulated tariff of photovoltaic technology, pursuant to Article 22 of Royal Decree 661/2007, of 25 May, published in Spain's Official Gazette (BOE) No. 234 of 29 September 2007, Exhibit C-151.

increased by about 3,000%.[38] It was reported in the media that Spain accounted for half of the solar power installed globally in 2008.[39]

*(d)    The Importance of Bank Financing in the Achievement of Spain's Renewable Energy Goals*

96.    The Spanish government in **PER 2005** anticipated that debt financing would provide nearly 80% of the total capital investment needed to meet Spain's objectives.[40] Accordingly, the ability to attract bank financing was an important objective if Spain was serious about attracting the desired level of investment.

97.    Following introduction of RD 661/2007, some banks offered financing on a non-recourse basis (i.e., without personal guarantees from the equity investors). The Claimant says the banks' willingness to do so pre-supposed that the revenues generated by the projects were expected by the banks (who were sophisticated lenders) to be not only sufficient to repay the bank loans but were stable, fixed and predictable.[41] **PER 2005 anticipated that the leverage ratios of project finance to equity could be as high as 80:20.**[42] According to the Claimant, the "buy-in" of the banks and other shrewd financial institutions shows that the sophisticated international financial

---

[38] Claimant's Memorial, para. 184, fn. 316. ("In 2001, before Spain had established any meaningful incentives program, Spain's photovoltaic sector had a total installed capacity of less than 5 MW. By 2006, however, the installed capacity slightly exceeded 100 MW, and by the end of 2007, it had reached 690 MW. By 2008, PV installed capacity increased to well over 3,000 MW.") citing IDAE, Statistical Report – Renewable Energy (Evolution of Electricity Installed Capacity Per Year), as updated on December 2015, Exhibit C-137; see also 2006 Progress Report, 19, Exhibit C-080, and 2009-2010 Progress Report, p. 3, Exhibit C-132.

[39] See e.g. Elisabeth Rosenthal, Press Article, "Solar Industry Learns Lessons in Spanish Sun," The New York Times, 3 August 2010, Exhibit C-141; see also Invest in Spain and Ministry of Industry, Tourism and Trade, Report, *Foreign Investment in Spain – 2009* (stating that 10% of projects receiving foreign investment related to renewable energy, with a total increase of 88.5% of new projects in renewables as compared to 2007), pp. 26-28, Exhibit C-135.

[40] See Summary 2005 PER, pp. 55-58 (at p. 55 "With regard to external sources of financing, this section does not list the different modalities and possibilities of adequacy to types of projects according to their degree of implementation, but only points out that **the financial market continues to respond…to the economic profitability factor in a stable regulatory framework**. Hence, once again, the importance of public [authorities'] initiatives in order to facilitate and encourage the fulfillment of the established objectives."; at p. 58: "The external financing required in order to accomplish investments for the period 2005-2010 is estimated at p. 18,198 million euros, 77,1 % of those investments, and this is why it is essential to put the different technologies in a position of economic profitability which make them **attractive for investment and, additionally, facilitates access to bank financing**"), Exhibit C-084; see also IDAE, Presentation, *The Sun Can Be Yours. Response to all Key Questions on Solar Photovoltaic Energy*, November 2007, slide 17, Exhibit C-177.

[41] Margarit First Expert Report, p. 31; see FTI Regulatory Report, paras. 6.24, 6.37.

[42] Margarit First Expert Report, p. 34 (citing a slide from IDAE's Presentation: "Investment/Initial payment of the titleholder (20%); Bank loan (80%)…").

community read RD 661/2007 to provide the solid stability guarantee as asserted by the Claimant in this proceeding.

98.    Spain announced on 27 September 2007, that RD 661/2007 would close to new investments in PV projects one year later,[43] i.e. new PV facilities would have to obtain final registration under RAIPRE before **29 September 2008**[44] in order to be "grandfathered" under RD 661/2007.

*(e)    The Modified Regime (RD 1578/2008)*

99.    Spain enacted **RD 1578/2008** on 26 September 2008, a few days before the cut-off date for new PV projects under RD 661/2007. The new Royal Decree extended the FIT program but in important aspects modified RD 661/2007.[45] The premiums were reduced but nevertheless remained significant to attract new photovoltaic facilities that missed the registration deadline of 29 September 2008.[46] In respect of new investments,[47] (i) it established limited annual quotas of power capacity that would be eligible for the feed-in-tariff, which gave Spain more control over the number of facilities that would benefit from the new regime;[48] (ii) it offered lower feed-in tariff rates; and (iii) granted Spain more flexibility to adjust the tariffs for new projects.[49]

---

[43] See Resolution of 27 September 2007, of the General Secretariat of Energy establishing the deadline for the regulated tariff of photovoltaic technology, pursuant to Article 22 of Royal Decree 661/2007, of 25 May, published in Spain's Official Gazette (BOE) No. 234 of 29 September 2007, Exhibit C-151.

[44] *Ibid.*

[45] Royal Decree 1578/2008, of 26 September 2008, on the remuneration of electricity generation using photovoltaic solar technology for facilities after the deadline for maintaining the remuneration stipulated under Royal Decree 661/2007, for such technology, published in the Official Gazette (BOE) No. 234 of 27 September 2008 ("**RD 1578/2008**"), Exhibit C-046.

[46] *Ibid.*, Article 2, according to which, the tariff regime under RD 1578/2008 applies to "facilities of the group b.1.1 of Article 2 of Royal Decree 661/2007 of 25 May 2008, [that is to those] photovoltaic facilities that obtained definitive registration after 29 September 2008…", Exhibit C-046; see also Ministry Industry, Tourism and Trade, Press Release, *New Economic Regime for Installations Photovoltaic Solar Technology*, 26 September 2008 ("**Press Release for RD 1578/2008**"), Exhibit C-138.

[47] See RD 1578/2008, Article 1, Exhibit C-046.

[48] For 2009, power capacity quota was of 400 MW, 267 MW of which in facilities installed in buildings and 133 MW for ground-mounted facilities. See RD 1578/2008, Article 5, Exhibit C-046. In RD 1578/2008's transitory provision, additional 100 MW of power capacity was to be added to the quota for facilities of type II in 2009.

[49] See Aragón First Expert Report, p. 28 (explaining that the preamble and Article 1 of RD 1578/2008 reiterate Spain's promise of non-retroactivity to plants benefitting from the remuneration regime).

100.    At the time, the cost of PV technology was decreasing rapidly.[50] The pre-allocation auction system under RD 1578/2008 enabled Spain to modify the tariffs for new projects quarterly in response to changes in the market.[51] RD 1578/2008 provided that the tariffs fixed each quarter would remain in force for "a **maximum** [i.e. not minimum] period of 25 years."[52]

*(f)     Comparison of "Stability" Provisions in RD 661/2007 and RD 1578/2008*

101.

| RD 661/2007 Article 44(3) | RD 1578/2008 (Fifth Additional Provision) |
|---|---|
| The revisions to the regulated tariff and the upper and lower limits **indicated in this paragraph shall not affect facilities** for which the deed of commissioning shall have been granted prior to January 1 of the second year following the year in which the revision shall have been performed. (emphasis added) | During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology **may be modified**. (emphasis added) |

102.    It is evident that the critical language giving rise to the "stability guarantee" in RD 661/2007 is not replicated in RD 1578/2008.

*(g)     The Claimant's Investment in PV Projects*

103.    As mentioned earlier, the cut-off date for registration under RD 661/2007 was 29 September 2008. The evidence establishes that the Claimant and its Spanish subsidiaries, Solaica Power S.L.U. ("**Solaica**") and 9REN España, constructed, commissioned and registered with the RAIPRE seven PV projects before that date.[53]

---

[50] See Press Release for RD 1578/2008, Exhibit C-138.
[51] *Ibid.*
[52] See RD 1578/2008, Article 11(5), Exhibit C-046.
[53] These seven projects were:

- Project **El Soldado**, which comprises of eight 100 kW PV facilities located in Cordoba. These plants obtained their final registrations in the RAIPRE on 25 June 2008 (Certificate of final registration in RAIPRE – El Soldado, 25 June 2008, Exhibit C-209);
- Project **El Paso**, which is composed of seven 100 kW PV plants located in Tenerife. These facilities obtained their final registrations in the RAIPRE on 4 September 2008 (Certificate of final registration in the RAIPRE – El Paso, 25 June 2008, Exhibit C-208);

28

104.    The Claimant did some re-financing of these projects in 2009, with some corporate restructuring, but in the result the investments were owned directly or indirectly by the Claimant at the date of the RAIPRE registration and Deed of Commissioning as well as at the date of Spain's alleged violations of the ECT between 2010 and 2014.[54]

105.    In 2011, 9REN España completed its eighth self-owned plant, Formiñena, and registered it under the RAIPRE on 23 March 2011.[55] The Claimant acknowledges that due to the late date of registration, the Formiñena facility was entitled to payment of the tariff established under RD 1578/2008[56] **not** RD 661/2007.

## C.    Stage Three: Spain Reduces the Benefits Provided Under RD 661/2007 and RD 1578/2008

106.    According to the Claimant, Spain enacted the measures said to violate its obligations under the ECT commencing in November 2010.

---

- Project **La Gineta II**, which comprises twenty-four 100 kW PV facilities located in Albacete. These plants obtained their final registrations in the RAIPRE on 25 August 2008 (Certificate of final registration in the RAIPRE – La Gineta II, 3 June 2008, Exhibit C-210);
- Project **Siruela**, which is composed of twenty-four 100 kW PV plants located in Badajoz. These facilities obtained their final registrations in the RAIPRE on 9 September 2008 (Certificate of final registration in the RAIPRE – Siruela, 6 August 2008, Exhibit C-211);
- Project **Alcaudete**, which comprises a 7.2 MW facility located in Jaen. This facility obtained its final registration in the RAIPRE on 1 July 2008 (Certificate of final registration in RAIPRE – Alcaudete, 1 July 2008, Exhibit C-212);
- Project **Gibraleón**, which is composed of one 100 kW PV plant located in Andalusia. This facility obtained its final registration in the RAIPRE on 17 July 2008 (Certificate of final registration in RAIPRE – Gibraleón, 18 August 2008, Exhibit C-213);
- Project **Yecla**, which comprises one 100 kW PV facility located in Murcia, which obtained its final registration in the RAIPRE on 3 July 2008 (Certificate of final registration in RAIPRE – Yecla, 3 July 2008, Exhibit C-214).

[54] The Claimant indicated that it obtained bank financing in 2009 on the five large plants that had been completed and registered under RD 661/2007 (El Soldado, El Paso, La Gineta II, Siruela, and Alcaudete). It then transferred those five plants to Solaica, a Spanish company currently owned by the Luxembourg-based Solaica Power S.à r.l., which in turn is wholly-owned by 9REN. Solaica then entered into a €69.5 million non-recourse facility agreement with a bank consortium comprised of Natixis, Barclays, Lloyds, and Santander. Tr. Day 1 (Mr. Fleuriet), p. 68:5-15.

[55] Certificate of final registration in the RAIPRE – Formiñena RAIPRE Registration dated 14 April 2011, Exhibit C-215.

[56] *Ibid*. See also Claimant's Memorial, para. 237.

*(a)     Reducing the Period of Full Tariff Remuneration*

107.    In November 2010, Spain enacted **RD 1565/2010**, which terminated the right of PV facilities to receive a guaranteed tariff after the twenty-fifth year of operation[57] (later increased to 30 years).[58]

*(b)     Limiting the Number of Paid Operating Hours*

108.    A few weeks later, on 23 December 2010, Spain enacted **RDL 14/2010**[59] which limited the annual operating hours for which PV facilities could receive feed-in tariffs.[60] The effect of the "operating hours limit" was to reduce the total quantity of electricity for which investors' facilities could receive RD 661/2007 and RD 1578/2008 tariffs.[61] Excess production would simply be sold on the wholesale electricity market at lesser rates.

---

[57] See Claimant's Memorial, para. 246, citing RD 1565/2010 stated:

   Royal Decree 661/2007, of 25 May, by which the activity of electricity production under the special regime is regulated, the following modifications are made…Table 3 of Article 36, the values of the regulated tariffs indicated for type b.1.1 facilities, **from the twenty-sixth year are deleted**. (emphasis added)

See RD 1565/2010, Article 1, Tenth ("Ten. In table En 3 of Article 36 [of RD 661/2007], the values of the feed-in tariffs indicated for type b.1.1 facilities are removed as from the year twenty-six."), Exhibit C-129. **Subsequently, Spain lengthened the period of time under which PV projects could receive the full tariff**— first from 25 years to 28 years, and finally to 30 years. The duration of the tariff became moot when Spain abolished the RD 661/2007 and RD 1578/2008 regimes in 2013.

[58] Law 2/2011, of March 4, 2011, on Sustainable Economy, published in the Official Gazette no. 55 of 5 March 2011 ("**Law 2/2011**"), 44th Final Provision (which amends First Final Provision of RDL 14/2010 and extends the remuneration rate under RD 661/2007 to year 30), Exhibit C-95.

[59] See RDL 14/2010, Exhibit C-102. At the same time, Spain also enacted Royal Decree 14/2010, of 7 December 2010, regulating and modifying certain aspects relative to the activity of electricity generation from solar thermal and wind technologies, published in the Official Gazette (BOE) No. 298 on 8 December 2010 ("**RDL 14/2010**") which contained similar provisions for wind and solar thermoelectric facilities. See also Exhibit C-75.

[60] RDL 14/2010, First additional disposition, Exhibit C-102.

[61] Margarit First Regulatory Report, para. 6.44 says that in the case of a 1 MW fixed-axis plant registered under RD 661/2007, the producer would only receive the feed-in tariff set out in RD 661/2007 for the first 1,250 MWh of electricity produced, regardless of the plant's actual production in a given year. Thus, if such a plant had 1,500 effective operating hours (i.e., it generated 1,500 MWh of electricity in a year), the plant would receive the RD 661/2007 tariff for the first 1,250 MWh only, and would receive the much lower wholesale price for the additional 250 MWh of electricity production. Wholesale prices in 2011-2013 were a very small fraction of the guaranteed feed-in tariff. The impact of the effective hours limitation was greater on the most productive PV facilities.

*(c)    Imposition of an "Access" Toll*

109.    **RDL 14/2010** also created a new "access toll" of €0.5/MWh on all electricity that a producer delivered into the grid.[62] The Claimant argues that RD 661/2007 "guaranteed" producers the right to deliver their entire net electricity production into the grid, and receive the tariffs and other compensation provided by that law, without having to pay any such toll.[63] That toll thus effectively reduced the compensation which the Claimant says was guaranteed in the original regulatory framework, and thus violated Article 44(3) of RD 661/2007.

*(d)    In Late 2012, Spain Imposed a 7% "Energy Tax"*

110.    On 27 December 2011, Spain imposed a new 7% "tax" (the "**TVPEE**") by **Act 15/2012** on all *revenue* received from the generation of electricity. The Claimant contends that by design and as applied, the 7% "energy tax" was not a tax in any meaningful sense of the word. It constituted a straightforward 7% reduction in the tariff rates set out in RD 661/2007 and RD 1578/2008.[64]

*(e)    In 2013, Spain Eliminated the "Objective" CPI Indexation*

111.    The base tariffs of the RD 661/2007 and RD 1578/2008 were defined in eurocents per kWh, and were indexed to the general Consumer Price Index ("**CPI**"). By **RD 2/2013**, introduced an "amended CPI" that excluded price changes in food, energy products, and certain tax effects from the calculation of inflation.[65] The Claimant contends that the effect of this change was to reduce the inflation adjustment by about three percentage points (from +2.98% to -0.03%).[66]

**D.    Stage Four: In 2013-2014, Spain Adopted a New Regulatory Regime and Abolished the Previous Regulatory Incentives**

112.    On 14 July 2013, Spain enacted **RDL 9/2013**, which abolished the SR for renewable energy that had governed the sector since 1994, including the feed-in tariff regimes set out in RD

---

[62] RDL 14/2010, First transitory provision, Exhibit C-102.
[63] RD 661/2007, Article 17(b) and (c), Exhibit C-098.
[64] Request for Arbitration, para. 30.
[65] See Royal Decree-Law 2/2013, of 1 February 2013, on urgent measures in the electricity system and in the financial sector ("**RDL 2/2013**"), Article 1, Exhibit C-083.
[66] FTI Regulatory Report, para. 6.48.

661/2007 and RD 1578/2008.[67] In its place, a **New Regulatory Regime** for renewable energy facilities required facilities to sell electricity on the wholesale market. Spain supplemented that revenue with "specific remuneration" based on the investment and operating costs of what Spain regarded as a "standard" renewable energy facility, plus a rate of return tied to the historical average yield of 10-year Spanish Government bonds plus 300 basis points. The precise details of this new regime were not announced at that time.

113.    In December 2013, Spain enacted *Electricity Power Law 2013* (**"*Electricity Law 2013*"**), to address its expanding electricity "**tariff deficit**"[68] between the costs and revenues of the regulated electricity system. The new law allowed Spain to defer "specific remuneration" payments to renewable energy facilities in order to balance annual costs and revenues of the system.

114.    In June 2014, Spain enacted **RD 413/2014** (establishing the new regime) and **Ministerial Order IET/1045/2014** (establishing details of the new compensation formulae).[69] The New Regulatory Regime provided for an amount of "specific remuneration" (on top of market revenue) to provide investors with a "**reasonable rate of return**" as calculated by the regulator for a "standard installation." The "specific remuneration" consisted of two components: (1) an "investment incentive" calculated per MW of installed capacity to compensate investors for the capital cost of their investment; and (2) an "operating incentive"[70] designed to compensate facilities for the gap between the operating costs of a renewable energy facility and the wholesale price of electricity. **The New Regulatory Regime set the initial target rate of return (7.398%) based on the historical average yield of 10-year Spanish treasury bonds.** Periodic review would be made of the target rate of return based on the two-year historical

---

[67] See Royal Decree Law 9/2013, of 12 July 2013, enacting urgent measures to ensure the financial stability of the electricity system, published in the Official Gazette (BOE) No. 167 of 13 July 2013 ("**RDL 9/2013**"), Preamble II, pp. 6-9 and derogatory provision (2), Exhibit C-091.

[68] Law 24/2013, of 26 December 2013, on the Electric Sector ("**Law 24/2013**"), Exhibit C-180.

[69] See Royal Decree 413/2014, of 6 June 2014, regulating the activity of electrical power generation by means of renewable energy, cogeneration and waste sources published in the Official Gazette (BOE) No. 140 of 10 June 2014 ("**RD 413/2014**"), Preamble, pp. 1-7, Exhibit C-090; and Ministerial Order IET/1045/2014, of 16 June 2014, approving the remuneration parameters of standard facilities applicable to certain facilities of electrical power generation by means of renewable energy, cogeneration and waste sources, published in the Official Gazette (BOE) No. 150 of 20 June 2014 ("**MO 1045**"), Exhibit C-179.

[70] RDL 9/2013, Preamble and Article 1.2, Exhibit C-091, and RD 413/2014, Article 11, Exhibit C-090.

average yield of those bonds.[71] In the meantime, Spain modified compensation to reflect what Spain regarded as over-payment in the earlier period (referred as **the clawback**).[72]

115.    The Claimant says that as a result of the foregoing measures it has suffered loss, damages and expense in respect of its entire Spanish investment in renewable energy including:

(a)    eight Solaica PV Plants;

(b)    three 9REN España PV Plants.

## PART 5.    JURISDICTION

116.    It is convenient at the outset to deal with the basic requirements of ECT jurisdiction. Similar requirements arise separately under Article 25 of the ICSID Convention. However, the Tribunal takes the view that if the Claimant can establish jurisdiction in this case under Article 26 of the ECT, it would follow that the Claimant has also met the requirements of Article 25 of the ICSID Convention. Hence, the latter requires no specific further consideration by the Tribunal for the purpose of this Award.

117.    Article 26 of the *Energy Charter Treaty* sets out the conditions precedent to the availability of ECT arbitration as follows:

> Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if [not] settled amicably…be submitted [to, *inter alia*,] ICSID arbitration.

---

[71] FTI Regulatory Report, para. 6.59.

[72] See testimony of Dr. Moselle, Amended Tr, Day 4, p. 134:11-23 (emphasis added):

…when I said "clawback", or we say "clawback", we refer to the fact that rather than having a scheme which says, "Starting here in 2013, we will ensure that from now on you earn a return of 7.398%'", the scheme says, "We stand here in 2013, we will ensure that over your lifetime you will earn a return of 7.398%, and since in our opinion you got paid more than that in the past, we're going to have to give you less in the future.
So it's a clawback in the sense that **the payments that the PV plants receive now are lower because the government believes that the payments that they received prior to 2013 were, in that sense, excessive.**

### A.    Was the Claimant "an Investor of Another Contracting State"?

118.    Article 1(7) of the ECT provides that the term "investor" means "a company or other organization organized in accordance with the law applicable in that Contracting Party." The domestic laws of each Contracting State determine nationality.[73]

119.    The Respondent acknowledges that Spain is a Contracting Party to the ECT[74] and a Contracting State to the ICSID Convention.[75]

120.    On 27 February 2008, prior to the incorporation of the Claimant, FR Solar Luxco S.à.r.l. a subsidiary of First Reserve (the U.S. venture capital firm previously referred to) acquired the Spanish company, Toler Inversiones 2007 S.L. ("**Toler**") to serve as its acquisition vehicle in Spain for renewable energy projects being developed by another Spanish company, Gamesa Solar.[76]

121.    Spain accepts[77] as authentic the purchase contract of 28 February 2008 for the shares of Gamesa Solar by Toler but notes, at the same time, the prominent involvement in the acquisition process of US personnel.

122.    The shares in Toler were then transferred to FR Solar Luxco JVCo S.à.r.l. ("**FR Solar JVCo**") – 9REN's Luxembourg-based parent company. The Claimant was incorporated as a further subsidiary of the First Reserve group in Luxembourg on 26 March 2008. In December

---

[73] Article 1(7) of the Energy Charter Treaty ("**ECT**") defines Investor to mean (Exhibit C-001):

    (a) with respect to a Contracting Party:
        (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;
        (ii) a company or other organization organized in accordance with the law applicable in that Contracting Party.

[74] See *Energy Charter*: Members and Observers – Spain, Exhibit C-004. Spain signed the ECT on 17 December 1994, and ratified it on 11 December 1997. Spain deposited its instrument of ratification on 16 December 1997. The ECT entered into force for Spain on 16 April 1998.

[75] ICSID: List of Contracting States and Other Signatories of the Convention, Exhibit C-005. Spain signed the ICSID Convention on 21 March 1994, and deposited its ratification of the Convention on 18 August 1994. The ICSID Convention entered into force for Spain on 17 September 1994.

[76] See Share Purchase Agreement entered into between FR Solar Luxco S.à r.l. (Purchaser) and Rino Gestion S.L. (Seller) of Toler Inversiones 2007, S.L. dated 27 February 2008, Exhibit C-201.

[77] Respondent's Counter-Memorial, para. 141.

2008, FR Solar JVCo transferred the investment in Spanish renewable energy projects to the Claimant, 9REN.

123.    In October 2008, the two Spanish companies, Gamesa Solar and Toler merged. Finally, on 2 December 2008, 9REN's parent companies transferred to 9REN the shares in the Spanish company, which was renamed 9REN España. The result of this process was that on 2 December 2008, 9REN directly or indirectly owned 96.5% of the Spanish projects at issue in this arbitration. (At a later date, its interest in 9REN España was reduced to 51% when the vendor's loan provided at the time of sale by Gamesa was converted into equity.)

124.    At the conclusion of the share transactions, the corporate organization was as follows:



(Source: FTI Consulting Report)

125.    Spain contends that 9REN is a "letterbox" company in Luxembourg which does no substantial business activity in Luxembourg. The real investor, Spain argues, is the U.S. First

Reserve Group, which is not the Claimant and is not eligible to initiate an ECT arbitration. The nominal Claimant, 9REN, lacking substance, is not the real investor.

126.    For reasons addressed below in relation to the Article 17 ("the denial of benefits") objection, the Tribunal's view is that the Claimant *does* substantive business in Luxembourg and qualifies as "an investor of another contracting state".

## B.    The Claimant Made a Qualifying Investment in Spain

127.    On 23 April 2008, according to the Claimant, its investment of €211 million in Spanish renewable energy projects assets was complete, as explained by one of its directors (and an officer of First Reserve), Mr. Francisco Giuliani:

> Q. There has been some discussion – or what I say "confusion" – about when the investment occurred. Can you expand on that?
>
> A. Yes, it was interesting to hear that, and I may even understand the rationale for the confusion. But **the investment was made in April 2008, period, full stop. There was no other money – not one cent – that was invested after April 2008.**
>
> Just to be clear, it's important to distinguish the multiple layers. **The Claimant, the company that I am representing today, and I was on the board and I'm on the board of, made the investment in April 2008: €211 million, just to be clear. €211 million. Then the company that we acquired, Gamesa Solar, was a living organism, and that company made investments.**
>
> So maybe when you see in FTI language that talks about the continuation of the investment, it has to do with what Gamesa Solar, underneath our investment, was making. **But the investment of the Claimant was made in one equity cheque that was invested in April 2008.**[78] (emphasis added)

---

[78] Tr. Day 2, Giuliani, p. 68:19-25 to 69:1-13. The Request for Arbitration recites that the total acquisition price was €211 million, comprised of a cash payment of €116 million, a €60 million vendor loan granted by Gamesa Energia S.A. (to mature after 4 years), and a €35 million deposit into an escrow account. Once the acquisition was complete, First Reserve restructured and carried out share transfers that resulted in 9REN obtaining full ownership of the former Gamesa Solar through 9REN's holding company, 9REN España S.L. ("**9REN España**"). In October 2008, Gamesa Solar merged into Toler. Finally, on 2 December 2008, 9REN's parent companies transferred to 9REN the resulting company, which was renamed 9REN España.

128.    The Tribunal accepts the evidence of Mr. Giuliani on that point. Accordingly, the Tribunal is satisfied that at the material times the Claimant was "an investor of a contracting state".

## C.    The Dispute Must Involve a Covered "Investment"

129.    The definition of investment in ECT Article 1(6) is very broad.[79] The Claimant lists a number of different "investments" in the Spanish energy sector. [80] Equally, the definition in Article 1(6) of the Treaty includes "every kind of asset owned or controlled directly or indirectly by an investor" and includes both "tangible and intangible, and immovable property and any property rights" as well as "any right conferred by law or contract or by virtue of any licences or permits."[81]

130.    The Tribunal is satisfied that the dispute concerns a "covered investment".

## D.    Both Parties Consented to ICSID Jurisdiction

131.    9REN consented to ICSID arbitration by filing a Request for Arbitration on 30 March 2015, as provided in ECT Article 26(4), which states:

> In the event that an Investor chooses to submit the dispute for resolution [in international arbitration], **the Investor shall further provide its consent** in writing for the dispute to be submitted to:

---

[79] ECT, Article 1(6) defines "investment" as follows (Exhibit C-001):

(6) Investment means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:
[E]very kind of asset, owned or controlled directly or indirectly by an Investor and includes:
(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;
(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;
(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;
(d) Intellectual Property;
(e) returns;
(f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

[80] 9REN's investments include: (i) the Claimant's ownership of tangible and intangible property and property rights; (ii) the Claimant's ownership of shares and equity participation in Spanish companies and business enterprises, as well as debt obligations; (iii) the Claimant's right to returns, claims to money, and claims to performance pursuant to contracts having economic value and related to the investments; (iv) rights conferred by law, including, but not limited to, the rights to fixed feed-in tariffs conferred through RD 661/2007 and RD 1578/2008; and (v) rights conferred by licenses and permits.

[81] See ECT, Article 1(6), (Exhibit C-001).

(a) (i) The International Centre for Settlement of Investment Disputes … if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention… (emphasis added)

132.    In its Request for Arbitration, 9REN affirmed in writing its consent to ICSID jurisdiction.[82]

133.    The Claimant argues that Spain gave its "unconditional consent" to the submission of this dispute to ICSID arbitration in Article 26(3)(a) of the ECT, which provides that:

subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.[83]

134.    The exception does not apply and the Tribunal is satisfied that both parties have consented to this arbitration (subject to resolution of Spain's "additional" objections to jurisdiction discussed below).

**E.    The Dispute Concerns a Legal Dispute Arising Directly out of an Investment and Concerning an Alleged Breach of Part III of the ECT**

135.    The Claimant alleges that Spain breached firm commitments it made to 9REN in respect of the Claimant's investments in PV plants in Spain in violation of Article 10(1)[84] of the ECT which

---

[82] Request for Arbitration, para. 59.

[83] ECT, Article 26(3)(a), (Exhibit C-001). While that provision contains some limitations to consent, none of those limitations are applicable in the present case.

[84] ECT, Article 10, (Exhibit C-001): Promotion, Protection and Treatment of Investments:

(1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions of Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

(2) Each Contracting Party shall endeavor to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3).

(3) For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.

(4) …

provides: 1) a requirement that Spain treat the Claimant's investments fairly and equitably; 2) a prohibition against unreasonable or discriminatory measures that impair the management, maintenance, use, enjoyment, or disposal of investments; and 3) a requirement to observe any obligations that Spain entered into with an investment or an investor. Article 13[85] of the ECT protects the Claimant's investments against unlawful expropriation and measures having equivalent effect. The Tribunal therefore finds the dispute arises out of a covered investment in respect of alleged breaches of the ECT.

136. The Claimant asserts, and Spain denies, that Spain violated each of those protections.

## F.    An Effort Was Made to Settle This Dispute Amicably

137. Before submitting a dispute to arbitration, Article 26 of the ECT contemplates that disputing parties will endeavor to settle their disputes amicably.[86] The Claimant argues that compliance with this provision is not a jurisdictional prerequisite to arbitration. Nevertheless,

---

[85] The ECT provides in Article 13, (Exhibit C-001):

Expropriation:
(1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:
    (a) for a purpose which is not in the public interest;
    (b) not discriminatory;
    (c) carried out under due process of law; and
    (d) accompanied by the payment of prompt, adequate and effective compensation.
Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").
Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.
    (2) …

[86] ECT, Article 26, (Exhibit C-001). The Claimant's contention is that the majority view of tribunals and commentators considers such provisions to be procedural in nature, and thus subject to waiver or excuse in appropriate circumstances. See e.g. *Wena Hotels v. Egypt*, ICSID Case No. ARB/98/4, Summary Minutes of the Session of the Tribunal, 25 May 1999, Exhibit CL-003 (the Tribunal noted that the respondent's jurisdictional objections based upon the claimant's alleged noncompliance with a three-month waiting period imposed by the Egypt-United Kingdom bilateral investment treaty would have served no useful purpose because "even if these procedural objections were granted, they could have been easily rectified and would have had little practical effect other than to delay the proceedings"); Campbell McLachlan et al., *International Investment Arbitration: Substantive Principles* para. 3.18 (2008), Exhibit CL-004 (explaining that "the majority of tribunals have not penalized claimants for failing to observe these cooling-off periods"). As demonstrated above, however, this distinction is immaterial in this case because the Claimant satisfied the requirement.

the Claimant sent a letter to Spain on 14 October 2014, notifying it of this dispute and offering to settle the dispute amicably.[87] Spain did not respond to the Claimant's letter. The Claimant filed its Request for Arbitration with ICSID more than five months later on 30 March 2015.

## PART 6.    SPAIN'S ADDITIONAL OBJECTIONS TO JURISDICTION

138.    Spain complains that the Claimant's interpretation of the ECT is one-sidedly in favour of investors and leaves out of account the legitimate interest of the host state:[88]

> 1052. Nonetheless, the Claimant sets out the violations of 10(1) ECT from a single viewpoint, exclusively in favour of the investor. That is, after referring to the objective and aim of the ECT, they claim that protection for the investor is an absolute value, above the general interest needs of the States. However, this theory is not admissible and has not been admitted by any Precedent that has applied the ECT.

139.    In this respect, Spain relies on the final award of the *Electrabel* case:[89]

> The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance…even assuming that Electrabel had an expectation that it would be awarded the maximum compensation…, once weighed against Hungary's legitimate right to regulate in the public interest, such an expectation does not appear reasonable or legitimate.[90]

140.    Spain relies on a similar point made in the *Charanne v. Spain* award:

> ...in the absence of a specific stability commitment, an investor cannot have the legitimate expectation that a regulatory framework like the one disputed in this arbitration would never be modified in order to adapt it to market needs and the public interest.[91]

---

[87] Notice of Legal Dispute Arising Under the *Energy Charter Treaty* and Offer of Amicable Settlement,  Exhibit C-007.
[88] Respondent's Counter-Memorial, para. 1052.
[89] Respondent's Counter-Memorial, para. 1070.
[90] *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, paras. 165-166, Exhibit RL-0048.
[91] *Charanne B.V. and Construction Investments S.À.R.L. v. the Kingdom of Spain*, SCC V 062/2012, Final Award, 21 January 2016, and dissenting vote, paras. 493, 510, Exhibit RL-0049.

141.    Spain therefore raises a number of jurisdictional objections beyond the basic pre-requisites to ECT jurisdiction:

(a)    an ECT tribunal has no jurisdiction to deal with an investment dispute where the ECT contracting parties are both EU members[92] [the "*Achmea*" issue]. Luxembourg, the "ostensible" country of the Claimant, and the Kingdom of Spain are Member States of the EU. Article 26 of the ECT is not applicable to an *intra*-EU dispute. The Claimant is therefore not a protected investor within the scope of Article 26 of the ECT;

(b)    the Tribunal lacks jurisdiction *rationae voluntatis*. Spain exercised in its Counter-Memorial its right to deny the Claimant the benefits of Part III of the ECT [the "denial of benefits" issue]. The conditions precedent to Article 17 of the ECT have therefore been fulfilled and the Tribunal is without authority to proceed;

(c)    the Tribunal lacks jurisdiction because any claim for compensation in respect of the photovoltaic plants belongs exclusively to the operating companies that directly own the plants and the Claimant, as an upstream parent, does not fit in that category [the "corporate payment" issue]. A parent company cannot claim a compensable loss in respect of an asset owned by its subsidiary; at most it can claim a diminution in share value, but the Claimant has not presented a case based on diminution of share value;

(d)    the Tribunal lacks jurisdiction to deal with an alleged breach of Article 10(1) of the ECT related to the 7% Tax on the Value of the Production of Electrical Energy ("**TVPEE**") by Act 15/2012 of 27 December 2011 [the "TVPEE" issue]. Article 10 of the ECT denies remedies in respect of taxation measures of Contracting Parties.

---

[92] ECJ Judgment, *Slovak Republic v. Achmea BV*, Case C-2084/16, Ruling, 6 March 2018, Exhibit RL-0100.

## A.    The EU Law and Membership Arguments

142.    Spain relies on the recent decision of the European Court of Justice ("**ECJ**") in *Slovak Republic v. Achmea BV*,[93] which arose out of a bilateral treaty concluded between two EU Member States. Spain concedes that the *Achmea* decision did not concern an international treaty such as the ECT to which both non-members of the EU and the EU itself are also parties. However, Spain contends that the reasoning behind *Achmea* is fully applicable because the effect of the ECT arbitration clause as interpreted by the Claimant is to remove the dispute between an EU investor and an EU Member State from the jurisdiction of their respective domestic courts and therefore prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law.[94]

143.    Both Luxembourg and Spain are members of the EU. Spain points out that the Claimant's investment was made (so far as Spain is concerned) pursuant to the framework of the Internal Market in Electricity of the EU. Within this framework, Spain says, the EU system confers particular protection upon the EU-national investor to the exclusion, Spain contends, of non-EU dispute resolution mechanisms.

144.    Spain's contention that an ECT tribunal has no jurisdiction to deal with the present dispute by reason of the EU connection falls broadly into three areas of contention:

(a)    *the governing law argument*: Spain contends that EU law governs the determination by the Tribunal of its own jurisdiction under Article 26(6) of the ECT and Article 42(1) of the ICSID Convention;

(b)    *the institutional argument*: EU law does not permit the existence of any institutional dispute mechanism (including an ECT tribunal) other than an institution established by the EU treaties to resolve their investment disputes;

(c)    *the application of EU law argument*: the Tribunal has no jurisdiction under the BIT or the ECT to apply EU law to determine the rights of *intra*-EU investors, including alleged ECT violations arising from Spain's participation in the EU Internal Market

---

[93] *Ibid*.
[94] Respondent's Post-Hearing Brief, para. 81.

in Electricity including rules governing State Aid. To do so would inevitably infringe on the *exclusive* competence of the judicial system of the EU to interpret EU law.

*(a)*    *Spain's "Governing Law" Argument*

145.    Spain contends that Article 26 of the ECT requires the Tribunal to determine its jurisdiction in this case on the basis of EU law.[95]

146.    In Spain's view, the reference in Article 26(6) to the "applicable rules and principles of international law" includes EU law, and indeed prioritizes EU law over other more general principles of international law. However, as the tribunal in *Vattenfall et al. v. Germany*[96] pointed out, Article 26(6) refers both to governance of the "issues in dispute" not jurisdiction and to Part III ("Investment Promotion and Protection") not Part V ("Dispute Resolution").[97] Equally, Article 42(1) of the ICSID Convention[98] refers the decision of a "dispute" which, in context, refers to the

---

[95] ECT, Article 26, (Exhibit C-001):

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former **under Part III** shall, if possible, be settled amicably.
>
> (2) …
>
> (3) …
>
> (4) In the event that an Investor chooses to submit **the dispute** for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:
>
>    (a)(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes…
>
> (5) …
>
> (6) A tribunal established under paragraph (4) shall decide the **issues in dispute** in accordance with this Treaty and applicable rules and principles of international law. (emphasis added)

[96] *Vattenfall AB, Vattenfall GmbH, Vatenfall Europe Nuclear Energy Gmbh, Kernkraftwek Krümmel GmbH & Co. oHG and Kernkraftwerk Brunsbüttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, Exhibit CL-196.

[97] *Vattenfall AB, Vattenfall GmbH, Vatenfall Europe Nuclear Energy Gmbh, Kernkraftwek Krümmel GmbH & Co. oHG and Kernkraftwerk Brunsbüttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 116, Exhibit CL-196.

[98] ICSID Convention, Article 3:

> Powers and Functions of the Tribunal
>
> Article 41
>
> (1) The Tribunal shall be the judge of its own competence.
>
> (2) Any objection by a party to the dispute that the dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

substantive dispute between the parties, not a jurisdictional objection.[99] Although EU law, comprised of and derived from treaties between EU Member States, is properly characterized as international law,[100] it does not displace the general rule of interpretation in Article 31(1) VCLT, i.e., "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms in their context and in the light of its object and purpose." To the extent that EU law may be "taken into account, together with the context" under Article 31(3)(c), it does not displace the plain reading of Article 26 of the ECT because otherwise "the same words in the same treaty provision may have a different meaning depending on the independent legal obligations entered into by one State or another, and depending on the parties to a particular dispute. An ECT dispute between an Australian claimant and Spain, for example, would be subject to different rules than an ECT dispute between a German claimant and Spain. The need for coherence, and for a single unified interpretation of each treaty provision, is reflected in the priority given to the text of the treaty itself over other contextual elements under Article 31 VCLT."[101]

*(b)    The Tribunal's Ruling on Spain's "Governing Law" Argument*

147.    The exclusion of intra-EU disputes from the scope of ECT would not be consistent with the plain language of the ECT or the ICSID Convention.[102] Spain's objection in this respect is rejected.

---

[99] *Vattenfall AB, Vattenfall GmbH, Vatenfall Europe Nuclear Energy Gmbh, Kernkraftwek Krümmel GmbH & Co. oHG and Kernkraftwerk Brunsbüttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 119, Exhibit CL-196.

[100] *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, para. 4.120. See also ECJ Judgment, *Slovak Republic v. Achmea BV*, Case C-2084/16, Ruling, 6 March 2018, para. 41 (EU law "must be regarded…as deriving from an international agreement between the Member States"), Exhibit RL-100.

[101] *Vattenfall AB, Vattenfall GmbH, Vatenfall Europe Nuclear Energy Gmbh, Kernkraftwek Krümmel GmbH & Co. oHG and Kernkraftwerk Brunsbüttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 156, Exhibit CL-196.

[102] As noted by the *Vattenfall* tribunal at para. 187:

> It would have been a simple matter to draft the ECT so that Article 26 does not apply to disputes between an Investor of one EU Member State and another EU Member State as respondent. That was not done; and the Tribunal has been shown no indication in the language of the ECT that any such exclusion was intended.

*Vattenfall AB, Vattenfall GmbH, Vatenfall Europe Nuclear Energy Gmbh, Kernkraftwek Krümmel GmbH & Co. oHG and Kernkraftwerk Brunsbüttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 187, Exhibit CL-196

*(c)    Spain's EU Institutional Argument*

148.    The starting point of Spain's institutional argument is that the decision of an ECT tribunal is final (Article 53 of the ICSID Convention), subject only to the possibility of annulment by an *ad hoc* committee. Such a committee does not belong to the judicial system of the EU.[103] Accordingly, the ECJ judgment in *Achmea* precludes acceptance of jurisdiction by an ECT tribunal because as an institution it is foreign to the EU and acceptance of jurisdiction would prevent the ECJ from exercising its function "to ensure the full application of the EU law in all member States and to ensure judicial protection of the rights of individuals under that law" through the provision for a reference for a preliminary ruling established in **Article 267** of the **Treaty on the Functioning of the European Union** ("**TFEU**").[104]

*(d)    The Claimant's Response*

149.    The ECJ's *Achmea* decision is irrelevant to the present dispute for four principal reasons. **First** (and foremost), the tribunal's jurisdiction is exclusively based on the *express* jurisdictional provisions of the ECT. If a claimant satisfies those express provisions, that is the "end" of the matter.  **Second**, eighteen (18) investment treaty tribunals have rejected the *"intra-EU"* objection to date – not a single treaty tribunal has ever accepted it – and the reasoning of those 18 treaty tribunals in rejecting the objection is as applicable and persuasive today as it was prior to *Achmea*. **Third**, even if *Achmea* were relevant to certain BIT disputes – which remains an open question – *Achmea* is decidedly not relevant to this dispute under the ECT, to which the EU is a party. Indeed, perhaps with the ECT in mind, the ECJ clearly differentiated the "intra-EU BIT" situation at issue in *Achmea* from a situation involving a treaty to which the EU is a party. **Fourth** and finally, *Achmea*'s theoretical future impact (if any) upon a claimant's ability to *enforce* an award in certain EU jurisdictions is simply not a relevant concern for this Tribunal.

*(e)    The Tribunal's Ruling on Spain's EU Institutional Argument*

150.    The Tribunal has attempted, with the Parties' assistance, to understand the truncated reasoning in the ECJ's decision in *Achmea*. There is much to understand. However, for this case,

---

[103] ICSID Convention, Article 53; Respondent's Post-Hearing Brief, para. 82.
[104] Respondent's Post-Hearing Brief, ,paras. 37, 82.2.

this Tribunal's perspective as an international tribunal applying international law, together with the terms and membership of the ECT, make it possible to address Spain's arguments within a relatively narrow compass.

151.    Nonetheless, whilst the Tribunal has reached a consensus in rejecting Spain's additional objection to jurisdiction, it should not be assumed that it's three members share equally the same identical perspective or attach equal importance to the issues raised by the objection.

152.    The ECJ's decision in *Achmea* itself drew attention to the institutional difference between a bilateral investment treaty between two EU member states and a multilateral international treaty (such as the ECT) to which the EU itself as well as EU and non-EU states are parties. In joining the ECT, the European Union (then the "European Communities") itself agreed to submit to the jurisdiction of arbitral tribunals under Part V ("Dispute Settlement").[105] In *Achmea*, the ECJ affirmed the treaty making authority of the EU to enter into treaties which include a dispute resolution mechanism *outside* the framework of the EU courts. The ECJ stated in *Achmea* that:

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. **The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected**…[106] (emphasis added)

Spain notes that in this passage (in English), the ECJ refers to a "*court* which is created or designated by such agreements." It does not refer to "a tribunal", i.e. an arbitration tribunal. It is correct that in the language of the case (German), the ECJ's judgment appears to refer to a court (Gericht). In the Tribunal's view, however, this is a distinction without a difference. The applicable principle is the same.

---

[105] See also the European Communities' Statement under Article 26(3)(b)(ii) of the ECT as a Contracting Party to the ECT.
[106] Judgment of the European Court of Justice, *Slovak Republic v. Achmea BV*, Case C-2084/16, Decision, 6 March 2018, para. 57, Exhibit RL-100.

153.    The ECJ itself thus recognized in *Achmea* that the EU enjoys no immunity in respect of non-EU dispute resolution mechanisms under the international treaties to which the EU itself has made itself a party, and may therefore be sued as a respondent in an ECT case. The ECJ's affirmation of the scope of the EU treaty making power in *Achmea* carries within it the rebuttal of Spain's position that EU laws exist in a bubble subject to interpretation and consideration only by EU courts (and tribunals).

154.    ECT membership of course includes countries remote from the EU including, for example, Australia. Spain's notion that within the remedial provisions of the ECT there are different categories of members with different access to different remedies, and that EU members ought to be considered to constitute a subset of countries with investor rights and remedies different to the rights and remedies available generally to ECT arbitral parties, has no basis in the text of the ECT itself or in the *Achmea* decision. Spain's argument in this respect has been addressed in other awards that pre-date *Achmea*[107] in terms which are still applicable post-*Achmea*, and in decisions subsequent to *Achmea* such as *Masdar v. Spain* and *Vattenfall v. Germany*.[108]

155.    Disputes under a BIT between EU member states (to which the EU is **not** a party) is subject to a different analysis as the ECJ noted:

---

[107] See e.g. *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, paras. 74-75, Exhibit CL-101:

> [T]his Tribunal has been established by a specific treaty, the ECT, which binds both the EU and its Member States on the one hand and non-EU States on the other hand. As for the latter, EU law is *res inter alios acta* and it cannot be upheld that, by ratifying the ECT, those non-EU States have accepted that EU law as prevailing over the ECT. The ECT is the 'constitution' of the Tribunal, and, to use the terminology of the UNCITRAL tribunal in *PV Investors v. Spain*, [redacted]. This is what the Parties to the ECT agreed amongst themselves, it is not within the jurisdiction of the Tribunal to alter this.
>
> Therefore, in case of any contradiction between the ECT and EU law, the Tribunal would have to insure the full application of its 'constitutional' instrument, upon which its jurisdiction is founded. This conclusion is all the more compelling given that Article 16 of the ECT expressly stipulates the relationship between the ECT and other agreements – from which there is no reason to distinguish EU law. It follows from this that, if there must be a 'hierarchy' between the norms to be applied by the Tribunal, it must be determined from the perspective of public international law, not of EU law. Therefore, the ECT prevails over any other norm (apart from those of *ius cogens* – but this is not an issue in the present case).

[108] *Masdar Solar and Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, Exhibit RL-117, paras. 678-683; *Vattenfall AB, Vattenfall GmbH, Vatenfall Europe Nuclear Energy Gmbh, Kernkraftwek Krümmel GmbH & Co. oHG and Kernkraftwerk Brunsbüttel GmbH & Co. oHG v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 177-184, Exhibit CL-192.

> In the present case [*Achmea*], however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, **which was concluded not by the EU** but by the Member States.[109]

156.    EU member states are as much parties to the ECT as the EU itself and are entitled to invoke the ECT dispute resolution provisions. As the *Eiser* tribunal pointed out:

> [A]lthough the EU is a party to the ECT, EU Member States also remain contracting parties to the ECT. Both the EU and [its] Member States can have legal standing as respondents in a claim under the ECT.[110]

157.    There is nothing in the *Achmea* decision that suggests the ECJ contemplated ECT claims against the EU itself while at the same time (as Spain argues) immunizing from such claims EU Member States. Spain is as firmly bound by the ECT dispute resolution mechanism as is the EU itself.

158.    For these reasons, the **institutional** objection to the jurisdiction of an ECT arbitral tribunal in any dispute involving EU members is rejected.

*(f)    Spain's "Application of EU Law" Argument*

159.    The ECJ in *Achmea* held that "the autonomy of the EU and its legal order" must be respected.[111]

160.    Spain contends that an ECT tribunal, even if it would otherwise have jurisdiction, cannot set itself up as an interpreter of EU law, which is the exclusive province of EU courts. Spain relies on Article 26(6) which, it says, would require an ECT tribunal to apply EU law as a component of "international law":

---

[109] ECJ Judgment, *Slovak Republic v. Achmea BV*, Case C-2084/16, Ruling, 6 March 2018, para. 58, Exhibit RL-100.
[110] *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 194 citing *Charanne v. Spain*, Exhibit CL-158.
[111] ECJ Judgment, *Slovak Republic v. Achmea BV*, Case C-2084/16, Ruling, 6 March 2018, para. 58, Exhibit RL-100.

> (6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules **and principles of international law**. (emphasis added)

161.    Spain contends that this dispute is largely about EU law. The reference to "international law" includes EU law.[112] Spain put in place its support scheme for renewable energy in compliance with EU law not only with regard to the objectives established by the EU Directives, but also subject to the limits provided for **EU Guidelines on State Aid**. Spain's objection to jurisdiction therefore invokes fundamental EU principles, it says, of the "freedom of establishment, freedom to provide services, free movement of capital and free movement of workers of EU law."[113] Unavoidably this Tribunal, if it accepts jurisdiction, would be called on to interpret and apply EU law in respect of the important EU regulatory regime governing State Aid pursuant to Article 107 of the **TFEU**.

162.    Spain notes that the opinion of the EU Advocate General, while overtaken by the decision of the ECJ in *Achmea* in some respects, nevertheless recognized that "neither *Achmea* nor the Slovak Republic based their claims and defence on provisions of EU law." In the present case, Spain's defence relates *directly* to subsidies to renewable energy facilities which are State Aid under EU law.[114]

*(g)*    *The Claimant's Response*

163.    Spain is wrong to attempt to circumvent the logic of the ECJ's *Achmea* decision by introducing EU law through a *"back door"* application of the ECT's "governing law" provision in Article 26(6). Spain's attempt is misconceived. Multiple tribunals have held that the reference to

---

[112] Article 40 of the ICSID Report of the Executive Directors states that:

> …the term "international law" as used in this context should be understood in the sense given to it by Article 38(1) of the Statute of the International Court of Justice, allowance being made for the fact that Article 38 was designed to apply to inter-State disputes.

The Statute's definition includes:

> …international conventions, whether general or particular, establishing rules expressly recognized by the contesting states.

[113] Respondent's Post-Hearing Brief, para. 38.
[114] *Ibid.*, para. 104.

"this Treaty and applicable rules *and principles of international law*" in Article 26(6) refers to public international law, not regional law such as EU law (as interpreted by the ECJ).

164.    This is necessarily so because the ECT is a multilateral instrument to which many non-EU Member States are Contracting Parties. The drafters could not have intended the phrase "applicable rules and principles of international law" to vary from one party to another. This would be the result if Article 26(6) is interpreted as being subordinate to EU law, thereby distinguishing between EU Member States and Non-EU Member States under the same provisions of the ECT. The result would be the creation of different classes of members for which no textual basis is found in the ECT. If the parties had intended such a differentiated and multi-categorized result, they would have so specified in very clear terms. But as the *Novenergia*[115] tribunal observed, the parties to the ECT did not do so.

165.    The Claimant says it is worth noting that eighteen (18) investment treaty tribunals have now rejected the "intra-EU" objection – not a single treaty tribunal it says, has ever accepted it. On the other hand, numerous investment treaty tribunals have held that they are *not* tasked with deciding the disputes before them on the basis of EU law.[116]

---

[115] *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arbitration 2015/063, Final Award, 15 February 2018, Exhibit CL-177.

[116] See *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, Exhibit CL-105; *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction, 6 June 2007, Exhibit CL-104; *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010, Exhibit CL-160; *Achmea B.V. (formerly Eureko) v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, Exhibit CL-103; *European American Investment Bank AG (EURAM) v. Slovak Republic*, UNCITRAL, Award on Jurisdiction, 22 October 2012, Exhibit CL-161; *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, Exhibit CL-020; *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (Decision on Jurisdiction not public), Exhibit CL-181; *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, Exhibit CL-095; *EDF International S.A. v. Republic of Hungary, UNCITRAL* (Award not public), Exhibit CL-102; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, Exhibit CL-101; *Charanne B.V. & Construction Investments S.À.R.L. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, Exhibit CL-109; *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC V2013/153, 17 July 2016, Exhibit CL-110; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, Exhibit CL-162; *WNC Factoring Ltd. v. Czech Republic*, UNCITRAL, PCA Case No. 2014-34, Award, 22 February 2017, Exhibit CL-108; *I.P. Busta & J.P. Busta v. Czech Republic*, SCC Case V 2015/014, Final Award, 10 March 2017, Exhibit CL-107; *Anglia Auto Accessories Ltd. v. Czech Republic*, SCC Case V 2014/181, Final Award, 10 March 2017, Exhibit CL-106; *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, Exhibit CL-158; *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018, Exhibit CL-177.

166.    In any event, there is no need in this case for the Tribunal to address the EU law on State Aid as neither the EU nor Spain regarded the RD 661/2007 regime as State Aid. Spain did not notify the EU of the RD 661/2007 and RD 1578/2008 programs as would have been required if Spain understood these measures to constitute "State Aid".[117] In the Tribunal's view, Spain was correct *not* to consider the incentives to be State Aid, as confirmed by a January 2008 report by the EU itself. The EU was well aware of the Spanish incentives and indeed in 2010 EU officials did not applaud but criticized Spain for its manner of reducing the incentive schemes provided by RD 661/2007 and RD 1578/2008, a position which is entirely opposed to Spain's position that reductions in the FIT benefits were made to satisfy the EU. The EU officials wrote:

> [T]he retroactive nature of [RDL 14/2010] has raised great preoccupation. We wish to inform you of it and express our reserves in relation to these measures. This should be no surprise, if you consider the indications that the Commission made in prior occasions on that matter.
>
> We do not question that the adjustment of the tariffs or the cost reductions [in relation to] technical evolution might be justified or necessary. Nevertheless, we are convinced that those adjustments need to be made while thinking in the future, hence in a predictable manner, instead of having a retroactive effect. **It shall not be forgotten that negative consequences for investors' confidence of retroactive changes in the economic conditions of a certain type of renewable facility may spread and produce similar effects in other types of facilities and in other countries, which may lead to a loss of confidence** in the domestic and European legislations concerning energy from renewable sources.[118] (emphasis added)

167.    Accordingly, the Claimant contends, Spain's argument based on EU law is without merit.[119]

---

[117] See extract from EC website presented by the Claimant in Closing Submissions at Slide 50:

EU State Aid control requires prior notification of all new aid measures to the Commission. Member States must wait for the Commission's decision before they can put the measure into effect. There are a few exceptions to mandatory notification…"

The Claimant notes in its Slide 50 that Spain never notified the RD 661 or RD 1578 incentive schemes to the EC for a State aid analysis. As to "why not", the Claimant says that Spain did not consider those schemes to be "State Aid".

[118] Claimant's Closing Argument, Slide 56; Letter from Gunter H. Oettinger and Connie Hedegaard to Mr. Miguel Sebastian, Spanish Minister of Industry, Tourism and Trade, dated 22 February 2011, Exhibit C-092.

[119] See Exhibit BMDG-36: *The support of electricity from renewable energy sources*, EC, 23 January 2008:

Spain continues to achieve the highest growth rates in terms of the effectiveness indicator and at the same time offers an adequate profit. The expected profit here is higher than in most of the other feed-in countries in the analysis. This is not because of a high support level but rather because of the relatively low electricity generation costs due to good resource conditions on the hand and relatively low investment costs on the other.

*(h)*     *The Tribunal's Ruling*

168.    The Claimant's case does not rest on EU law. The Tribunal is not required to interpret and apply EU law. The Claimant's claims turn on the ECT and the jurisprudence of ECT tribunals and decisions of the International Court of Justice ("**ICJ**") in respect of rights and obligations under international law. Spain, on the other hand, *does* invoke EU law. Spain asks the Tribunal to examine EU regulatory provisions dealing with State Aid both to justify Spain's' reduction of the FIT benefits from and after 2010 as well as to support its contention that the Claimant knew or ought to have known (had it exercised due diligence) that the Spanish subsidies were part of the EU renewable energy scheme and thus subject to modification.

169.    Spain says "there is no right to State Aid under EU law".[120] However, the Claimant is not asserting a right to State Aid under EU law.[121] Nor is the Tribunal deciding upon any such right in this Award. The Claimant is asserting an entitlement to compensation for breach of Articles 10 and 13 of the ECT by reason not of the conduct of the EU but of the conduct of the Spanish State. The status of Spain's compliance with the EU law is, so far as the Claimant is concerned, *res inter alios acta*.

170.    As a matter of international law, the notion that EU law may be considered only by EU judges is misconceived. In this case, the Tribunal, in the application of international law, may have regard from time to time to national law (e.g. with respect to the Claimant's corporate status) as well as to EU law (e.g. Spain's justification for its regulatory steps). International courts and tribunals are frequently required to consider the laws of domestic or regional jurisdictions. Their conclusions, of course, are not binding on the courts or tribunals of the home jurisdiction (in this case, the EU and the ECJ). Nevertheless, consideration of "foreign" law may be essential to the *international* law analysis where a party (in this case Spain) insists on its relevance. The award of an ECT tribunal does not in any way represent a threat or challenge to the autonomy or authority of the jurisdiction (or courts) where the "foreign" laws originated, in this case the EU and the ECJ.

---

[120] Respondent's Post-Hearing Brief, para. 109.
[121] Article 27 of the Vienna Convention (Exhibit CL-008):
    "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."

171.    At times, Spain portrays this case as an attack on Spain's regulatory system whereas in fact the claim only exists because of the way in which the Spanish regulatory systems was (apparently) *validly* exercised to the detriment of the Claimant.[122] At the stage of a jurisdictional objection the Tribunal is prepared to accept, *arguendo*, that Spain's' modifications of the FIT benefits in 2010 and the following years were permitted under both EU law and Spanish law. The Claimant is not seeking to reverse the modifications to the FIT benefits. On the contrary, the changes in tariff and modifications of the FIT benefits under Spanish domestic law is the legal basis for its ECT claim. If the modifications to the regulations were not valid, the Claimant would more properly be engaged in a Spanish court seeking their annulment.

172.    The Tribunal therefore concludes that having properly taken jurisdiction to resolve this dispute it is within that jurisdiction to consider EU law to the extent necessary for the resolution of the dispute under *international* law. For the purpose of its decision on jurisdiction, the Tribunal does not consider that EU law is materially incompatible with the applicable international law, including the EU treaties and Article 26 of the ECT as to investor-State arbitration under the ICSID Convention.

173.    In summary, (i) the ECJ's judgment in *Achmea* does not extend to the ECT, a multilateral treaty to which both EU Member States and the EU are signatory parties, including (especially) Article 26 of the ECT; (ii) there was and is no material conflict between the ECT and EU law (including the EU treaties, particularly the Treaty of the European Union ("**TEU**") and **TFEU**); (iii) EU law does not modify Spain's obligations under the ECT, including Article 26 of the ECT; (iv) this Tribunal's jurisdiction and its exercise in the present case rests upon the ECT (with international law as the

---

[122] Spain draws the Tribunal's attention to the decision of the Spanish Supreme Court of 3 December 2009 in rejecting a challenge to the Transitory Provision of RD 661/2007, and confirming its previous case law:

> there are no grounds for challenging Transitory provision one, section 4 of the RD contested, of infringing the principle of legitimate expectations, given that the mercantile companies appealing, as companies that operate in the electricity production business…do not have a right for the remunerative regime of the electricity sector to remain unaltered...as we upheld in the judgement of this Chamber of Contentious-Administrative Matters of the Supreme Court of 15 December 2005, "there is no legal obstacle to prevent the Government, in the exercise of regulatory powers and broad entitlements that it has in such a strongly regulated matter as electricity, from modifying a specific system of remuneration providing that this remains within the framework established through the *Electricity Sector Act*."

Respondent's Counter-Memorial, para. 554.

applicable law) and not EU law; and (v) this is an ICSID arbitration under the ICSID Convention without a seat or legal place in any national jurisdiction, still less in any EU Member State.

**B.    Spain's "Denial of Benefits" Objection (Article 17)**

174.    Spain objects to jurisdiction *rationae voluntatis* under Article 17 of the ECT. Spain contends that the Claimant is a shell company – little more than a post-box in Luxembourg, and is therefore not entitled to bring this claim[123] under the ECT.

175.    Article 17 of the ECT states, in relevant part:

> Each Contracting Party reserves **the right to deny** the advantages of [Part III of the ECT, regarding Investment Promotion and Protection] to:
>
> (1) a legal entity if citizens or nationals of a third state own or control such entity **and if that entity has no substantial business activities** in the Area of the Contracting Party in which it is organized.[124] (emphasis added)

*(a)    Spain's Objection*

176.    Spain's objection raises two distinct questions:

    (a)    when can Spain invoke this right?

    (b)    did 9REN have "substantial business activities" in Luxembourg at the material times?

---

[123] ECT, Article 17, (Exhibit C-001) provides as follows:

…Non-application of Part III in certain circumstances" which states the following:

Each Contracting Party reserves the right to deny the advantages of this Part to:

1. A legal entity if citizens or nationals of a third state own or control such entity **and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized**; or

2. an Investment, if the denying Contracting Party establishes that such Investment is an Investment of an Investor of a third state with or as to which the denying Contracting Party:

    (a) does not maintain a diplomatic relationship, or

    (b) adopts or maintains measures that:

      (i) prohibit transactions with investors of that state, or

      (ii) would be violated or circumvented if the benefits of this Part were accorded to Investors of that state or to their Investments (emphasis added)

[124] Claimant's Closing Argument, Slide 69, citing ECT, Article 17, Exhibit C-001.

177.     Spain acknowledges that it did not "deny" benefits until delivery of its Counter-Memorial. However, it argues that the belated timing of its objection does not present a problem. 9REN is a legal entity controlled or possessed by citizens or nationals of a third-party country (the United States).[125] Luxembourg is simply a national flag of convenience. The Claimant "has no substantial business activities in the Area of the Contracting Party in which it is organized."[126]

*(b)     The Claimant's Response*

178.     The Claimant contends that once (as here) a dispute emerges, Spain cannot retroactively withdraw its consent *nunc pro tunc*, and relies on ECT case law disposing of the timing issues, including the award of the *Isolux* tribunal. The Claimant contends that:

> [T]he solution is so obvious…the activation of the denial of benefits clause can never function retroactively. As emphasized by the Arbitral Tribunal in the case of [*Stati*] *v. Kazakhstan* in order to activate the denial of benefits under Article 17 ECT, **the notification of such denial must be prior to the commencement of the dispute**. In the case at hand, there is no dispute that the Kingdom of Spain did not activate the denial of benefits clause prior to its Statement of Defence, during the course of the arbitration proceeding… As a result, the Tribunal reject[s] the Respondent's jurisdictional objection…[127] (emphasis added)

179.     Similarly, in *Liman Caspian Oil v. Kazakhstan*, the ICSID tribunal observed that "the option of retroactive notifications would not be compatible with the object and purpose of the ECT."[128]

---

[125] Respondent's Counter-Memorial, para. 136. Spain points out that the Claimant is 100% owned by the Luxembourg company FR Solar Luxco JVCo S.C.A. which, in turn, is 99.4% owned by the Luxembourg company FR Solar Luxco S.à r.l. which is 100% owned by the Cayman Islands entity FR XI Offshore AIV L.P. which is one of the Limited Partners of the Limited Partnership into which First Reserve is organised, a US venture capital firm. Another First Reserve affiliate is the General Partner is responsible for making decisions.

[126] Respondent's Counter-Memorial, para. 127, citing ECT, Article 17, (Exhibit C-001).

[127] Claimant's Closing Argument, Slide 70, citing *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain* Arbitration SCC V2013/153, Award, 12 July 2016, paras. 715-716, Exhibit CL-110. See also *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, para. 165, Exhibit CL-099; *Yukos Universal Limited v. The Russian Federation*, PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility, 30 November 2009, para. 458, Exhibit CL-112; *Khan Resources Inc., Khan Resources B.V. and CAUC Holding Company Ltd. v. The Government of Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012, para. 429, Exhibit CL-113; *Liman Caspian Oil B.V. and NCL Dutch Investment B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of Award, 22 June 2010, para. 745, Exhibit CL-006.

[128] *Liman Caspian Oil B.V. and NCL Dutch Investment B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of Award, 22 June 2010, para. 225, CL-114:

180.    In this case, it is not necessary for the Tribunal to address the issue of timeliness. The evidence is clear that 9REN carried on "substantial business operations" in Luxembourg. Mr. Giuliani testified that:

> 9REN Holding has carried out normal business activities in Luxembourg since its founding. 9REN has leased office space and has maintained at least one locally-based employee in Luxembourg since July 2009. 9REN Holding has also maintained bank accounts there, since incorporation, with ING Luxembourg. I understand that a sample of 9REN Holding's bank statements have been produced to Spain in partial response to this allegation. Further 9REN Holdings pays taxes in Luxembourg.
>
> In addition to those normal business activities, meetings of the boards of 9REN Holding and its Luxembourg parent companies are regularly held in Luxembourg. All of the major decisions about the companies' investments and their operations are made there. 9REN Holding currently has six managers that serve on the board of directors, three of whom permanently reside in Luxembourg, two of whom reside in London, and one of who resides in Italy. Over the years, eighteen different directors have served on 9REN Holding's board, including nine directors based in Luxembourg and six based elsewhere in Europe (including London, Spain and Italy). In its history, only three of 9REN Holding's directors were based in the U.S.[129]

181.    The Claimant argues that such business activities in Luxembourg are not formalistic or lacking in substance, citing in support *Limited Liability Company Amto v. Ukraine*:

> The ECT does not contain a definition of "substantial" nor does the Final Act of the European Energy Charter Conference that would serve as guidance for interpretation. As stated above, the purpose of Article 17(1) is to exclude from ECT protection investors which have adopted a nationality of convenience. Accordingly, "substantial" in this context means "of substance and not merely of form". It does not mean "large",

---

"Accepting the option of a retroactive notification would not be compatible with the object and purpose of the ECT, which the Tribunal has to take into account according to Article 31(1) of the VCLT, and which the ECT, in its Article 2, expressly identifies as "to promote long-term co-operation in the energy field" Such long-term co-operation requires, and it also follows from the principle of legal certainty, that an investor must be able to rely on the advantages under the ECT, as long as the host state has not explicitly invoked the right to deny such advantages. Therefore, the Tribunal finds that Article 17(1) of the ECT does not have retroactive effect."

Claimant's Closing Argument, Slide 74.
[129] Giuliani Second Witness Statement, paras. 3-4. See also, Claimant's Closing Argument, Slide 78.

and **the materiality not the magnitude of the business activity is the decisive question**.[130] (emphasis added)

*(c)*    *The Tribunal's Ruling on Denial of Benefits*

182.    The test of substantial business activities must take its colour from the nature of the business. Bricks and mortar are not of the essence of a holding company, which is typically pre-occupied with paperwork, board meetings, bank accounts and cheque books. Accordingly, quite apart from the timeliness issue, Spain has failed to establish that 9REN lacks substantial business activities in Luxembourg. Article 17 of the ECT has no application to the facts of this case and the "denial of benefits" objection is rejected.

**C.    The Corporate Pyramid Objection – Spain Contends That if any Loss has Been Suffered, it has Been Suffered by the Subsidiary Spanish Companies which Owned and Operated the Facilities, not by the Claimant Who is a Mere Shareholder**

*(a)*    *Spain's Objection*

183.    Spain argues that under orthodox corporate law, a corporation (in this case, the Claimant) has no compensable interest in the assets of a subsidiary (in this case assets owned by 9REN España and its operating subsidiaries).[131] At most, 9REN can claim in respect of an alleged

---

[130] Claimant's Closing Argument, Slide 76, citing *Limited Liability Company Amto v. Ukraine*, Arbitration No. 080/2005, Final Award 26 March 2008, para. 69, Exhibit CL-048.

[131] As stated in the Respondent's Counter-Memorial:

In accordance with the above, in the present case, it must be concluded that the Claimant in this arbitration lacks legal standing to claim for alleged damages to the assets (photovoltaic plants) of the companies that own these plants and in whose capital the Claimant has a stake. (Respondent's Counter-Memorial, para. 187)

* * * * *

The Claimant…attributes as his own supposed rights to receive incomes that do not correspond to him. It is income that the photovoltaic plants will receive by virtue of the principle of reasonable return. The shareholders in the companies that own the photovoltaic plants will receive a revenue, if the case, from their investment through the distribution of profits if the companies are properly managed. Consequently, the Claimant will receive the profits that, as a shareholder, correspond to him. (Respondent's Counter-Memorial, para. 195)

* * * * *

…the Claimant is not entitled to claim for alleged damages to the photovoltaic plants that are the subject of this arbitration, given that the legitimation for such claim corresponds exclusively to the companies that own those plants, and who are not claimants in this arbitration. Hence, with all due respect, the Arbitral Tribunal lacks jurisdiction to hear such dispute. (Respondent's Counter-Memorial, para. 204)

57

diminution in the value of its equity, but that is a different claim than the claim now presented to the Tribunal.

*(b)    The Claimant's Response*

184.    The Claimant's loss is a direct function of the loss suffered by the operating companies and has been appropriately discounted where appropriate to reflect its percentage shareholding.

185.    The Claimant's expert, Mr. Edwards of FTI Consultants, explicitly took into account the indirect nature of the Claimant's loss:

> I have been instructed to assess 9REN's loss resulting from the diminution **in the value of its investments** in the Solaica Plants and the 9REN España Plants caused by the Regulatory Changes on, or shortly after, the date the details of the new regime were announced.[132] (emphasis added)

As did Spain's expert, Dr. Flores:

> This matter involves the **shareholding interests** of 9REN Holding S.à.r.l. in a number of solar photovoltaic plants located in Spain. (emphasis added)[133]

*(c)    The Tribunal's Ruling on the Corporate Pyramid Issue*

186.    At the material times the Claimant was part of a foreign group of companies, and was the immediate shareholder and beneficial owner directly or indirectly of a group of renewable energy companies in Spain, including those at the operating level of electrical generation. Spain's attempt to deny jurisdiction on the basis of a common (if not almost universal) type of corporate structure, where an actual financial loss to the operating subsidiaries necessarily causes loss of share value to the owner (in this case the Claimant) has been consistently rejected by investor state tribunals.

187.    Spain, of course, argues that the quantum of loss in respect of reduced share value is not necessarily the same as the direct loss to the operating companies,[134] but the Tribunal notes that

---

[132] FTI First Quantum Report, para. 1.18.
[133] Econ One First Quantum Report, 7 November 2016, p. 1, para. 1.
[134] Spain states in its Counter-Memorial at para. 205:

none of the valuation experts on either side retained to assess *the Claimant's* loss considered the corporate pyramid to impede their assessment of quantum. In this case, the experts were dealing with wholly (or majority) owned subsidiary economically integrated into the parent company. The experts collectively proceeded on the basis that the loss flowed thorough from the operating companies to 9REN. The expert witnesses (including Spain's expert, Dr. Flores) were instructed by legal counsel to calculate the loss (if any) suffered by the Claimant not the loss of the downstream operating companies, yet all experts proceeded on the common ground that the loss to the operating companies equated (proportionately) to the loss in value of the Claimant's shareholding.

188.   The Respondent's "corporate pyramid" objection is misconceived and, with respect, is rejected by the Tribunal.

### D. The Tribunal Lacks Jurisdiction to Deal with an Alleged Breach of Article 10(1) of the ECT in Respect of the TVPEE Tax

189.   Spain challenges the Tribunal's jurisdiction in respect of the Claimant's claims arising out of the TVPEE tax of 7% (**Act 15/2012**) on the production of electrical energy effective 1 January 2013. The 7% tax is sometimes referred to as a "levy".

*(a)    Spain's Objection*

190.   Spain submits that Article 21 of the ECT contains a general exclusion of taxation measures from the scope of application of the ECT (the taxation "carve-out") which only permits ECT tribunals jurisdiction in the exceptional circumstances expressly stipulated in Article 21,[135] none

---

The jurisdiction of the Arbitral Tribunal must be limited to hearing the dispute relating to alleged damages caused to the Claimant in its shares or stakes in the capital of the companies that own the photovoltaic plants.

[135] ECT, Article 21 provides as follows (Exhibit C-001):

1. Except as otherwise provided in this Article, **nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures** of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency. (emphasis added)
2. etc.

of which exceptions are relevant to the case presented by the Claimant.[136] The Spanish courts have upheld the validity of the TVPEE tax as a legislative measure properly characterized as a tax.

191.    Spain acknowledges the TVPEE objection applies only to a FET claim under Article 10(1), not to the illegal expropriation complaint under Article 13. However, in Spain's view, "expropriation" is irrelevant because there is enough excess fat in Spain's renewable energy subsidies to permit investors to pay TVPEE and still obtain a reasonable return. Moreover, Spain contends, the regulations treat TVPEE as an expense reimbursable by Spain:

> The impact of TVPEE in renewable energy producers such as the ones of this arbitration has been neutralised, since the TVPEE is one of the costs remunerated to such producers through the specific remuneration they receive…That is to say, the specific remuneration received by renewable producers allows them, in addition to obtaining a reasonable rate of return, to recover certain costs which, unlike with the conventional technologies, they cannot recover on the market. The TVPEE, precisely, is one of those costs.[137]

*(b)    The Claimant's Response*

192.    The levies imposed by Law 15/2012 do not correspond to the accepted criteria for what constitutes a "tax". The TVPEE simply reduces the incentive tariffs guaranteed under the FIT program. This is clear from the fact that the "tax" applies to revenues not profits. Article 21 of the ECT does not afford Spain any defence.

193.    The Tribunal is required to look behind the "taxation" label at the actual purpose and effect of the TVPEE which is confiscatory in its nature and, according to the expert testimony of Dr. Boaz Moselle, discriminatory in its application as between renewable energy producers and conventional producers.[138]

---

[136] Respondent's Counter-Memorial, para. 228.
[137] Respondent's Counter-Memorial, para. 860.
[138] Dr. Moselle testified as follows:

"Spain introduced a 7% tax on the revenue from electricity generation, which applied to all types of plants, but would, for reasons we could discuss, have a much more serious impact on solar PV than it would on conventional plants. So, in brief, I would say that conventional plants could pass this tax through to their customers, but solar PV plants were receiving a tariff from the government and had no ability to pass anything

194.    In its Reply Memorial, the Claimant lists the reasons why, in its view the TVPEE does not meet the essential criteria of a "Taxation Measure" within the meaning of Article 21(1):

(i)      "Spain has wrongly disguised reductions to the incentive tariffs that is granted to 9REN's plants as "taxes", which Spain now uses to attempt to avoid liability under the ECT."[139]

(ii)     "While [TVPEE] purported to tax the value of electricity, it actually reduced the value of the incentives that Spain granted to Claimant's plants to induce their development."[140]

(iii)    "Law 15/2012 also provided that the revenue raised from [TVPEE] would not flow into the state treasury, like normal taxes would, but instead would flow into the electricity system in order to reduce the tariff deficit. Thus, Law 15/2012 reduced the incentives guaranteed to 9REN's facilities so that electricity consumers could pay less for electricity."[141]

(iv)     "[W]hile the domestic characterization of a disputed measure as a tax may be helpful in ascertaining its nature, domestic law is not determinative."[142]

(v)      "Under the Second Additional Provision of Law 15/2012, the amount Spain obtains each year from the TVPEE does not raise general revenue for the state, as Spain itself admits. According to that Provision, the annual General Budget Act of the State earmarks an amount to finance the costs of the electricity system that is equivalent to the sum of the annual revenue derived from the TVPEE.

---

through. So it was simply a tax on them, and because their tariff was much higher, 7% of the large tariff is a much bigger number than 7% of the market price."

Tr. Day 4, (Moselle), p. 8:11-21.

[139] Claimant's Reply, para. 114.

[140] *Ibid.*, para 116.

[141] *Ibid.*

[142] *Ibid.*, para 117.

Consequently, the money Spain obtains from the TVPEE is syphoned into the electricity system."[143]

(vi)     "[TVPEE] does not serve a general public purpose, but instead reduces the costs of certain Spanish consumers in commercial transactions for the purchase of electricity."[144]

(vii)    "Moreover, Law 15/2012 does not even advance its stated purpose of harmoniz[ing Spain's] tax system with more efficient, respectful, and sustainable use of the environment with its purported goal of internationalizing environment costs arising from the production of electricity. Spain's suggestion that Law 15/2012 advances these goals is laughable."[145]

(viii)   "Renewable plants received tariff revenue precisely because their total production costs were higher than conventional plants. By applying the "tax" to all revenue including incentive tariffs, and without deducting depreciation, renewable plants paid a much higher "tax" on the same amount of electricity production than conventional plants."[146]

(ix)     "By raising market prices, conventional energy producers are able to recover a substantial proportion of their annual 7% payment directly from consumers. Under RD 661/2007 and RD 1578/2008, renewable energy producers could not raise prices to recover the tax because their tariffs were fixed."[147]

(x)      "In design and effect, these measures are not materially different from a straightforward reduction of the tariffs that RD 661/2007 and RD 1578/2008 guaranteed to Claimant's plants."[148]

---

[143] *Ibid.*, para 124.
[144] *Ibid.*
[145] *Ibid.*, para 127.
[146] *Ibid.*, para 129.
[147] *Ibid.*, para 130.
[148] *Ibid.*, para 131.

*(c)    The Tribunal's Ruling on the TVPEE Tax Issue*

195.    Spain proceeds on the basis that TVPEE is a tax. The Claimant's principal argument is that TVPEE is not a tax. Period. While *Masdar* recently rejected an investor's attack on TVPEE as part of a series of measures imposed **in bad faith** that individually and collectively violate the ECT, the Claimant 9REN picks up the prior question of whether the TVPEE satisfies the **four traditional tests of a "tax"**, namely a levy established by law that imposes obligations on a defined class of persons, generates revenues going to the State and these revenues are used for public purposes. If established, these criteria would qualify the TVPEE as a 'Taxation Measure' under ECT Article 21(7)[149] but, the Claimant argues, the criteria are not established.

196.    The Claimant says *Masdar* did not explicitly consider the four "tax" requisites. However, in the Tribunal's view, the reality is that if the TVPEE levy was not an exercise of the State's taxing power there would have been no reason for the *Masdar* or *Eiser* Tribunals to go on to consider if the taxing power had been abused.

197.    In its commentary on *Masdar* dated June 29, 2018, the Claimant again made it clear that it was not alleging against Spain either bad faith or an intent to abuse the taxation power. This aspect of the Claimants' tax argument is important and worth reproducing in full:

> 5. The *Masdar* tribunal also considered Spain's objection based on the so-called 7% "energy tax". The tribunal found that it did not have jurisdiction to decide whether the 7% "levy" breached the ECT, because the tribunal was not willing to agree with Masdar that Spain's motives behind the measure were in bad faith. **However, Claimant's position as to why the present Tribunal has jurisdiction to rule on its claims related to the so-called 7% "energy tax" does not turn on Spain's intentions and does not require a finding of bad faith. Instead, it simply requires an assessment of whether this measure has the characteristics needed to fall within the meaning of "taxation measures" in ECT Article 21.** No tribunal to date has assessed the energy "levy" as a taxation measure according to the three-prong test accepted by a long line of investment treaty case law, as Claimant has requested. (emphasis added)
>
> * * * * *
>
> *Masdar* relies on the findings in *Isolux* and *Eiser,* but those tribunals also considered the allegedly improper motives and obscured purpose behind

---

[149] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 266, Exhibit CL-158.

> the measures and did not apply the taxation measure "test" to determine
> whether the measures were *bona fide* taxes in the first place.[150]

198.    On the first branch of the test, there is no doubt that TVPEE was established by law. The Spanish Supreme Court so held.[151] While the Tribunal is not bound by the domestic court's characterization of TVPEE as a "taxation measure",[152] there is no reason to doubt the Spanish Court's conclusion that TVPEE met Spain's constitutional requirements for the enactments of valid legislation.

199.    The raising of revenue for public purposes is an important function of State sovereignty. (So important, obviously, that the ECT, as a matter of policy, excluded Taxation Measures from ECT arbitral jurisdiction).

200.    On the second branch of the test, TVPEE is imposed "on a defined group of persons" namely producers who sell electricity to the SES. The power to tax includes the power to determine *who* is to pay the tax and Spain was within its sovereign authority to render producers subject to the tax on the sale of electricity to the State.

201.    The Claimant objects that the tax is imposed on revenue rather than profits. In the Tribunal's view, there is nothing objectionable to a tax on revenue rather than profit. Multinational corporations can structure themselves to allocate profits to different jurisdictions to suit their corporate purposes, which may not align with the legitimate interest of the host country. Indeed in the present case Dr. Flores, of Econ One, Spain's quantum expert, testified that the corporate group to which the Claimant belongs manipulated O&M costs to transfer profits within the group. The current EU controversies over taxes paid (or not paid) by such multinationals as Amazon and Google are testament to that concern. The Claimant does business in Spain and can expect to pay tax there. TVPEE is no less a tax because it is a tax on revenue.

---

[150] Claimant's Comments on *Masdar*, 29 June 2018, para. 5, footnote 11.
[151] Decision of the Spanish Supreme Court 183/2014, 6 November 2014, Exhibit R-0018.
[152] See e.g., *Murphy Exploration & Production Company - International v. Republic of Ecuador*, Partial Final Award, 6 May 2016, para. 185, (stating that "the domestic characterization of a measure is not determinative at international law"), Exhibit CL-144.

202.    As to the third branch of the test, the revenues from TVPEE go to the Spanish State. As Spain explained in its Counter Memorial an amount **equivalent** to the tax collected under Act 17/2012, including TVPEE, is afterwards appropriated by "the State General Budget"[153] to finance the costs of the electricity system specifically relating to the promotion of renewable energy. The Tribunal therefore rejects the Claimant's assertion that "the [TVPEE] revenue would not flow into the state treasury, like normal taxes would, but instead would flow into the electricity system."[154] The proceeds *do* flow to the State treasury and then (as is quite explicit in Act 15/2012) an **equivalent** amount is appropriated by the State budget to a specific purpose, which is the normal function of a budget, and there is nothing inherently improper or unusual in making a budget appropriation in support of the electricity system. As to the Claimant's suggestions that the connection of TVPEE to renewable energy is "laughable", the evidence is clear that the cost of the electricity system to which the subvention is granted arose to a significant extent from Spain's commitment to renewable energy.

203.    It is true, of course, that from the taxpayer's point of view, Spain giveth in RD 661/2007 and in part Spain taketh away under Act 15/2012 and the net effect is reduced revenue to the Claimant as taxpayer. Yet the Claimant has not demonstrated that (absent any allegation of bad faith) reduction of the tariff deficit is not a "public purpose". A tobacco tax may be directed to funding health costs associated with smokers' health issues. A fuel tax may be used to repair highways. It is not the function of an ECT tribunal to micromanage Spain's tax policy.

---

[153] See Respondent's Counter Memorial, paras. 295-296:

It is worth adding that the second additional provision of Act 15/2012 provides that an amount **equivalent** to the estimated annual collection of the State arising from the taxes included in Act 15/2012, among which is the TVPEE, will be allocated each year in the Spanish General State Budgets Acts to finance the costs of the electricity sector:

"*Additional provision two. Costs of the electricity system.*
*In the General State Budgets Acts of each year an amount equivalent to the sum of the following will be used to finance the costs of the electricity system provided for in Article 13 of the Electricity Sector Act:*
*a)The estimate of the annual collection derived from taxations and fees included in this Act.*
*b)The estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of €500 million. (emphasis added)*

* * * * *

…the fifth additional provision of Act 17/2012 … establishes that an amount equivalent to the estimated annual collection arising from the taxes included in Act 15/2012, among which is the TVPEE, will be allocated to finance, among the costs of the electricity system provided by the Electricity Sector Act, specifically those relating to the promotion of renewable energy…"

[154] Claimant's Reply, para. 116.

204.    The argument that TVPEE is not a tax because in practice it may fall differently on taxpayers who can pass on the cost (in whole or in part) to their customers, whereas other taxpayers cannot, is not persuasive. It is well known and commonly understood that a tax may sometimes be absorbed (voluntarily or otherwise) by the taxpayer on which it is levied, in which case it operates as a direct tax, or passed on to a third party, in which case it operates as an indirect tax. Absent bad faith, variation in the incidence of a tax does not mean it is not a tax.

205.    In effect, the Claimant contends that it was guaranteed RD 661/2007 and RD 1578/2008 benefits free of tax, but there is no basis for that position in RD 661/2007 or RD 1578/2008, and so far as the ECT is concerned, Article 21 manifests a deliberate policy decision *not* to limit a State's taxation power in this way.

206.    To take a common example, old age pensioners may be granted a statutory right to a fixed sum of money but, absent a legislative exemption, the amount will usually be subject to taxation. Persons in a high tax bracket may not keep much of the old age pension to which by law they are entitled to receive (and *do* receive), just as the Claimant's operating companies are entitled to receive and do receive revenue from the sale of their electricity to the SES but the receipt is not free of tax.

207.    In short, TVPEE is a tax and in the absence of any allegation (let alone demonstration) of bad faith, Article 21 withdraws the TVPEE issue from the Tribunal's consideration. On this point, the Tribunal agrees with the conclusion of the ICSID tribunal in *Eiser*[155] (in a passage also adopted by the *Masdar* tribunal) as follows:

> 270. **The power to tax is a core sovereign power that should not be questioned lightly.** The ECT Article 21(1) tax 'carve-out' and the corresponding provisions in many other bilateral and multilateral investment treaties reflect States' determination that tax matters not become a subject of investor-State arbitration, save perhaps in carefully limited circumstances. (ECT Article 21(5)(a) thus allows claims for expropriation effected through taxation, but subject to limiting procedures requiring consideration of the claim by national tax authorities.) **The present case does not on the facts reach a situation where the tax enforcement measures are found to have been used as part of a pattern of behavior aimed at destroying Claimants** and therefore the

---

[155] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, paras. 266, 270-271, Exhibit CL-158.

Tribunal does not reach a view on the availability of such an exception, were such a case to be made out.

271. **The Tribunal cannot disregard the ECT's clear terms on the strength of the record here, which falls well short of demonstrating any improper or abusive use of the power to tax.** The Tribunal therefore finds that it does not have jurisdiction to decide Claimants' claim with respect to the alleged inconsistency of the TVPEE with Spain's obligations under Article 10(1) of the ECT. (emphasis added)

This Tribunal agrees with *Eiser* and *Masdar*[156] in this respect.

208.    Whether or not, taken with other measures, the TVPEE tax amounted to expropriation requires an analysis of TVPEE in the context of the other measures complained of by the Claimant. This is an analysis that will be further undertaken in the discussion of the allegation of illegal expropriation contrary to Article 13 of the ECT.

## PART 7.        LIABILITY FOR BREACH OF ECT OBLIGATIONS

209.    For ease of reference, Article 10(1) provides as follows:

> **Article 10: Promotion, Protection and Treatment of Investments**
>
> (1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create **stable, equitable, favourable and transparent conditions** of Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contacting Parties **fair and equitable treatment**. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way **impair by unreasonable or discriminatory measures** their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party. (emphasis added)

210.    Furthermore, Article 13 of the ECT provides as follows:

---

[156] As the *Masdar* tribunal stated:

Nonetheless, the Tribunal does not consider that the circumstances of the introduction of the Levy could be said to reach the high bar set by the cases in which a tribunal has concluded that the conduct of a State is such as to merit the loss of the benefit of the Article 21(1) "*carve out*".

**Article 13: Expropriation**

(1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

> (a) for a purpose which is in the public interest;
> (b) not discriminatory;
> (c) carried out under due process of law; and
> (d) accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

(2) The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).

(3) For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.

211.    The Claimant relies on the ECT's Article 10 "fair and equitable treatment" provision; it's "impairment" clause; its "umbrella" clause; and the ECT's Article 13 prohibition against illegal expropriation.

## PART 7(1). VIOLATION OF THE FAIR AND EQUITABLE STANDARD

212.    The fundamental controversy between the parties is whether under international law Spain did indeed owe, as the Claimant contends but Spain denies, an irrevocable obligation to the Claimant to pay the feed-in tariff established by RD 661/2007 for 25 years and thereafter at 80% of the original base rate for the life of the facility.

213.    The Claimant also claims irrevocable benefits under RD 1578/2008 but, as earlier stated, RD 1578/2008 is somewhat differently structured[157] and as counsel for Spain noted, the Fifth Additional Provision of RD 1578/2008 expressly warned investors of the possibility that remuneration to existing PV facilities could be modified.[158] The Claimant points out (somewhat weakly) that RD 1578/2008 did not explicitly state that it did **not** grandfather the benefits to registered facilities. However, there is no obligation on Spain to meet such a reverse onus.

214.    The threshold issue is whether the facts of this case are capable of giving rise to the legitimate expectation asserted by the Claimant that the benefits set out in RD 661/2007 were irrevocable within the scope of the ECT's FET standard. Spain points out that:

> …the ECT is not a kind of *insurance policy* in favour of the investor against the risk of changes in the regulatory framework, and therefore:
>
> a) It is necessary to have specific commitments made to an investor that the regulation in force is going to remain immutable. This was declared in the *Plama Case* and ratified by other precedents of the ECT, such as the *AES Summit*, *EDF* and *Charanne* Cases.
>
> b) The investor's Expectations must be reasonable and justified in relation to any changes in the laws of the host country. This requires an assessment of the "background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State".[159]

---

[157] The most relevant portions of RD 1578/2008 provided as follows (Exhibit CL-046):

Article 2. This royal decree will apply to facilities of the group b.1.1 [solar PV facilities] of Article 2 of Royal Decree 661/2007, of 25 May 2008, [that is to those] photovoltaic facilities that obtained definitive registration after 29 September 2008 in the Administrative Registry of Electricity Power Generation Facilities of the Energy Policy and Mines General Department.

Article 11(5). The applicable regulated tariff applicable to a facility, in accordance with this royal decree, shall be maintained for a maximum duration of twenty-five years, as from the latest of the two following dates: the date of commissioning, or the date of the registration of the facility in the Compensation Pre-Allocation Registry. Such compensation shall never applicable prior to the date of such registration.

Article 12: The rates provided in Article 11 shall be updated as provided in Article 11 shall be updated as provided in Article 44.1 of Royal Decree 661/2007, of 25 May [ICP], for subgroup b..1.1 facilities, as from 1 January, of the second year subsequent to the notice in which they are fixed.

[158] RD 1578/2008 provided in part as follows:

**Fifth additional provision**. Amendment to the Retribution of the Activity Electricity Generation from Photovoltaic Technology.

In the course of 2012, in light of the technological developments in the sector and in the market, and of the performance of the remunerative framework, the compensation for electricity power generation with solar photovoltaic technology, may be amended.

[159] Respondent's Counter-Memorial, para. 1108.

215.    Spain's view that the legitimacy of the expectation must focus on a particular investor, and the need for specific undertaking to *that* investor, is not shared by UNCTAD which in 2012 reported that:

> Arbitral decisions suggest in this regard that an investor may derive legitimate expectations either from (a) specific commitments addressed to it personally, for example, in the form of a stabilization clause, **or** (b) rules that are **not** specifically addressed to a particular investor but which are put in place with a **specific aim to induce foreign investments and on which the foreign investor relied in making his investment**. (emphasis added)[160]

216.    The Claimant argues that Spain's "clear commitments in its legislative and regulatory framework", the "well-known purposes and motivations" of its RD 661/2007 and RD 1578/2008 regimes, the manner in which those regimes "specifically addressed the concerns of PV investors (based on the significant upfront costs of PV installations)", Spain's need to aggressively promote PV and other renewable energy investments to meet its EU commitments and domestic policy goals, and the "clear, repeated statements and conduct" of Spanish officials concerning the "total legal certainty" and other features of RD 661/2007 and RD 1578/2008 all gave rise to legitimate expectations on the part of Claimant that it would continue to benefit from the 2007/2008 feed-in tariffs for the periods specified in RD 661/2007 and RD 1578/2008.

## A.    The Claimant's Argument on the Facts

217.    The Claimant contends that once Spain enrolled a photovoltaic plant into the RD 661/2007 and RD 1578/2008 programs, the tariff benefits were fixed according to their terms. There was no provision that permitted Spain to refuse to pay the full, guaranteed value of those tariffs for **all** of the electricity the plants produced.

218.    In particular, the Claimant contends that:

---

[160] UNCTAD, *Fair and Equitable Treatment* (2012), n 263, p. 69, Exhibit CL-148.

(a)    the terms of RD 661/2007 were clear in offering a stable pricing mechanism of tariff rates over the full operating life of a facility (one rate for the first twenty-five years of operation and a reduced rate thereafter);[161]

(b)    Spain needed significant renewable energy investments to ensure that it would meet binding EU targets for renewable energy, as well as to reduce its dependence on non-renewable and foreign energy sources. The fundamental purpose and basic logic of RD 661/2007 and RD 1578/2008 required the stable and predictable nature of the promised tariffs;

(c)    in the PV sector, upfront costs of constructing a facility are significant, and thus both investors and their lenders needed to have security that those costs would be recovered (and the facility would thereafter generate a profit). Spain knew this well, the Claimant argues, as its officials publicly stated that the best legal framework to encourage investments "are [those] most predictable and stable and best

---

[161] The Claimant contends that the guarantee was explicit in the legal framework and relies on the following chart in respect of "b.1." facilities (PV facilities), which was incorporated into RD 661/2007, Article 36, Table 3, Exhibit C-098:

| Grupo | Subgrupo | Potencia | Plazo | Tarifa regulada c€/kWh |
|-------|----------|----------|-------|------------------------|
| b.1 | b.1.1 | P ≤ 100 kW | primeros 25 años | 44,0381 |
| | | | a partir de entonces | 35,2305 |
| | | 100 kW<P≤10 MW | primeros 25 años | 41,7500 |
| | | | a partir de entonces | 33,4000 |
| | | 10<P≤50 MW | primeros 25 años | 22,9764 |
| | | | a partir de entonces | 18,3811 |

The Claimant contends that RD 1578/2008 was equally clear as, upon enrollment of a facility into the pre-allocation registry, Spain confirmed the specific tariff that would apply to the facility for twenty-five years. In the case of 9Ren's Formiñena's plant, Spain confirmed the rate to be 0.2908570 c€/kWh. See Certificate of final registration in the RAIPRE for Formiñena, 14 April 2011, at p. 3, Exhibit C-215; FTI Quantum Report, para. 3.14.

adapted to the needs of long-term, capital intensive investments, such as renewable energy facilities";[162]

(d)     in terms of reliance, Mr. Giuliani, a director of 9REN, and an officer of First Reserve testified that guaranteed stability tariff was a condition precedent to the Claimant's investment decision:[163]

> 9REN Holding would not have made this investment if it had known that Spain might retroactively change the tariffs for completed projects.[164]

Mr. Giuliani was encouraged by the willingness of large banks to provide non-recourse finance at ratios of 80% or higher, secured by the future cash flows of the solar PV plants. This confirmed his interpretation of the regulatory measures as providing security for investments in the Spanish renewable energy regime;[165]

(e)     Spain was fully aware that the return on investment under RD 661/2007 was well in excess of the 7.398% that it now argues is reasonable. The regulator CNE projected returns at between 9.1% for fixed installation (like those of the Claimant) and 9.8% for sun-tracking facilities;[166]

(f)     the Claimant states that Spanish officials repeatedly made explicit promises to investors that the support they would receive through the RD 661/2007 incentives and other elements of the regulatory regime would remain constant throughout the operating lives of the PV facilities. While these "promises" were framed in terms

---

[162] See Luis Jesús Sánchez de Tembleque and Gonzalo Sáenz de Miera, "La regulación de las energías renovables," In Tratado del Sector Eléctrico (Vol. 2), Ed. Fernando Becker, Javier López García de la Serrana, Julián Martínez-Simancas, Jose Manuel Sala Arquer, Aranzadi, 2009, p. 41, Exhibit C-63.
[163] Giuliani First Witness Statement, para. 16.
[164] Giuliani First Witness Statement, para. 23.
[165] Giuliani First Witness Statement, para. 20.
[166] CNE 30/2008 Report, Exhibit C-111, states at p. 17:

> These figures have been used to calculate the return, taking into account the regulatory tariff currently in force in RD 661/2007 and the tariff contemplated in the draft Royal Decree for type II. The regulatory tariff that would be necessary to achieve a return of 7%, which was the reference used in the economic calculations of RD 661/2007.
> The returns obtained by considering current costs (first half of 2008) and the tariff in place under Royal Decree 661/2007 vary between 9.1% for fixed installations and 9.8% for sun tracking installations.

of legal stability rather than explicitly in terms of non-revocability, Spanish officials did promote the stability and security of the RD 661/2007 regime on numerous occasions to induce investment;[167]

(g)    the Claimant's "plain reading" of RD 661/2007 and RD 1578/2008, it says, was confirmed prior to the Claimant's investment to be an exceptional measure to deal with an exceptional situation by multiple statements of persons of authority in the Spanish Government. The Claimant says that the CNE and *Invest in Spain* conducted what the Claimant calls "roadshows"[168] for investors around the world, including in China, France, Germany, Israel, Austria, Algeria, and Colombia and,

---

[167] The Claimant relies upon the following:

• A representative of the CNE asserted that "the predictability and legal security of the economic incentives are guaranteed…the Royal Decree has a very important quality, that of regulatory stability." See Luis Jesús Sánchez de Tembleque and Gonzalo Sáenz de Miera, "La regulación de las energías renovables," In Tratado del Sector Eléctrico (Vol. 2), Coord. Fernando Becker, Javier López García de la Serrana, Julián Martínez-Simancas, Jose Manuel Sala Arquer, Aranzadi, pp. 539-564 (2009), p. 560, Exhibit C-63;

• Before its enactment, the Minister of Industry, Tourism and Commerce stated that RD 661/2007 would not cause "any lack of legal security for renewable energies." See El Economista, Press Article, Clos Stresses that the Government "Will Not Cause Any Lack of Legal Security for Renewables, 21 March 2007, Exhibit C-113;

• The Secretary of Energy claimed that the regime ensured "total legal certainty." See Cinco Dias, Press Article "Nieto dice que la nueva regulación eólica ofrece 'total seguridad jurídica," 10 May 2007, Exhibit C-115;

• The Ministry of Industry, Energy and Tourism stated that RD 661/2007 provided "legal safety to the producer, providing stability to the sector and promoting its development." See Press Release RD 661/2007 (stating that the legal provision against retroactive reviews of support offered under RD 661/2007 would provide "legal security for the producer, providing stability for the sector and promoting its development. The new regulation will not have a retroactive nature."), Exhibit C-99;

• It also asserted that the regime created "stability over time that [will] allow businessmen to carry out the medium- and long-term scheduling" and that any future regulations would "not be retroactive." See Press Release for RD 661/2007, Exhibit C-99;

• Over subsequent months, officials made repeated statements of the same nature. The Minister of Industry affirmed that there was no "lack of legal safety" with the legal regime applicable to photovoltaic energy. See Joan Clos i Matheu (Minister of Industry, Tourism and Trade), Appearance before the Senate on 9 October 2007, Journal of Sessions of the Senate. VIII Legislature. Commissions No. 515. Commission of Industry, Trade and Tourism. Presidency of Excmo. Sr. D. Francisco Xabier Albistur Marín, 9 October 2007, p. 24 (assertion reiterated three times), Exhibit C-103; see also Europa Press, Press Article, Clos refutes that there is "legal uncertainty in the photovoltaic activity" - Industry prepares a strategic plan 2008-2016, which is currently under public discussion, 9 October 2007 (declarations echoed in the press), Exhibit C-117; and

• A representative of the CNE asserted that "the predictability and legal security of the economic incentives are guaranteed.... the Royal Decree has a very important quality, that of regulatory stability." See Luis Jesús Sánchez de Tembleque and Gonzalo Sáenz de Miera, The Regulation of Renewable Energies, IN Tratado del Sector Eléctrico (Vol. 2), Coord. Fernando Becker, Javier López García de la Serrana, Julián Martínez-Simancas, Jose Manuel Sala Arquer, Aranzadi, (2009), p. 560, Exhibit C-63.

[168] Claimant's Memorial, para. 181.

of course, in Spain.[169] In these roadshow presentations, Spanish representatives stressed two characteristics of the RD 661/2007 regime: profitability and stability.[170] This was understood (and meant to be understood) by the investment community as a promise of irrevocability;

(h)     the Claimant particularly relies upon a **Cabinet Office Press Release** concerning RD 661/2007 and a contemporary "*Referencia*" stating that the legal provisions against retroactive reviews of support offered under RD 661/2007 would provide "legal security for the producer, providing stability for the sector and furthering its development. *The new regulation will not have a retroactive nature*."[171] (emphasis added)

219.    The Claimant says it relied in particular upon the explicit representation in **Article 44(3) of RD 661/2007** stating that any future revisions to the remuneration would not be retroactive. That provision, already mentioned, is reproduced here again for ease of reference:

> During the year 2010, on sight of the results of the monitoring reports on the degree of fulfillment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall **be a review**

---

[169] See INTERES Invest in Spain, Press Release, *Major Spanish Presence at CIFIT*, 9 September 2007, Exhibit C-124; see also INTERES Invest in Spain, Press Release, *INTERES Unveils the Opportunities Available in the Spanish Wind Power Sector for Foreign Investors at the Husumwind (Germany) International Trade Fair*," 18 September 2007, Exhibit C-125; Manuela García (Invest in Spain, Investor Service Manager), Presentation, *Opportunities in the Renewable Energy in Spain*, presented in Graz (Austria), 15 November 2007, slide 2, Exhibit C-126; Javier Peón Torre (CNE, Counselor), Presentation, *Legal Aspects of Renewable Energy*, presented at the "V Edicion del Curso ARIAE de Regulación Energética," sponsored by ARIAE, CNE and Spain's Agency of International Cooperation-Ministry of Foreign Affairs, in Cartagena de Indias (Colombia), 19-23 November 2007, Exhibit C-107; Carlos Solé and José Miguel Unsión (Directors of the CNE), Presentation, *Models for Pricing of Renewable Generation: The International Experience*, presented in "Generación Renovable ARESEP" at San José de Costa Rica (Costa Rica), 22 April 2008 (slide 27 "Fees and premiums in force in the implementation: throughout the service life of the installation."), Exhibit C-127; Carlos Solé Martín (CNE, Electricity Director), Presentation, *International Renewable Energy Regulation. The Spanish Case*, presented in Eilat (Israel), December 2008, Exhibit C-128.

[170] See e.g., Carlos Solé and José Miguel Unsión (Directors of the CNE), Presentation, *Models for Pricing of Renewable Generation: The International Experience*, presented in "Generación Renovable ARESEP" at San José de Costa Rica (Costa Rica). 22 April 2008, slide 27, Exhibit C-127; see Jaume Margarit, Renewable Energies (Director of the IDAE), Presentation, *Economic Aspects of development of renewable energy. Investment costs, Profitability and Incentives of solar thermo-electric technology (Madrid)*, in Jornada sobre Perspectiva Actual y Evolución de las Energías Renovables en España organized by the CNE in Madrid, 11 December 2007, p. 10, Exhibit C-120.

[171] Exhibit C-99.

**of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree** with regard to the costs associated with each of these technologies, the degree of participation of the Special Regime in covering the demand, and its impact upon the technical and economic management of the system, **and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets**. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.

**The revisions to the regulated tariff and the upper and lower limits [under the premium option] <u>indicated in this paragraph</u> <u>shall not affect facilities for which the deed of commissioning shall have been granted prior to January 1 of the second year following the year in which the revision shall have been performed.</u>**[172] (emphasis added)

220.    The Claimant argues that its interpretation of these words was confirmed by Spanish Government officials, previously referred to, and (as stated) were also confirmed in unambiguous terms by **press releases issued by the Cabinet Office** contemporaneously with RD 661/2207 and **the Referencia** as follows:

> Every four (4) years the tariffs will be revised, bearing in mind compliance with the targets set. This will allow an adjustment to the tariffs in line with the new costs and the degree of compliance with the targets. **The tariff revisions carried out in the future will not affect those installations already operating.** This guarantee affords legal safety [security] to the producer, providing stability to the sector and promoting its development.[173] (emphasis added)

> \* \* \* \* \*

> It will be in 2010 that the tariffs and premiums set out in the proposal will be revised in accordance with the targets set out in the Renewable Energies Plan 2005-2010 and in the Energy Efficiency and Savings Strategy and in line with the new targets included in the following Renewable Energies Plan for the period 2011-2020.

> **The revisions carried out in the future of the tariffs will not affect those Installations already in operation.** This **guarantee** provides legal safety [security] for the producer, affording stability to the sector and fostering its development.[174] (emphasis added)

---

[172] RD 661/2007, Article 44, Exhibit C-98.
[173] Press Release for RD 661/2007, Exhibit C-99.
[174] *Ibid*., and see also Reference from the Council of Ministers, Exhibit C-274.

221.    The word "guarantee" is clear and explicit. Thus, Spain's promises and aggressive promotion of RD 661/2007 were not only designed to generate expectations on the part of equity investors; they were also intended to reassure the sophisticated financial community whose financing was required for the vast majority of the PV projects.[175]

222.    In summary, the Claimant's submission is that Spain created a legitimate expectation among investors (and their lenders) that the RD 661/2007 and RD 1578/2008 tariffs and benefits, once granted to a particular facility, would be honored for the duration stated in the Royal Decrees.

## B.    The Claimant's Legal Arguments

223.    The applicable legal principle was stated in the *Total S.A. v. Argentine* Award as follows:

> [T]he expectation of the investor is undoubtedly "legitimate", and hence subject to protection under the fair and equitable treatment clause … when public authorities of the host country have made the private investor believe that such an obligation existed through conduct or by a declaration. **Authorities may also have announced officially their intent to pursue a certain conduct in the future, on which, in turn, the investor relied in making investments or incurring costs.**[176] (emphasis added)

224.    Arbitral jurisprudence (in the form of "*jurisprudence constante*") recognizes that State conduct and policy goals can create expectations on the part of investors that induce them to invest.[177] In this respect, the Claimant relies upon the analysis of legitimate expectations by the

---

[175] 2005 PER Summary, pp. 55-56, Exhibit C-082. ("With regard to sources of external financing, this section does not intend to list  the **different modalities** or possibilities of projects according to their degree of implementation, but rather to point out that the financial market continues to respond... to factors **of** financial profitability staged within **a stable** regulatory framework. Hence, once again, here lies the importance of public [authorities'] initiative in order to facilitate **and achieve the** established  objectives.") The Claimant notes that many  financing  institutions provided financing, often on a non-recourse basis, requiring no additional security from investors, as a result of the apparent clarity and stability of the RD 661/2007 and RD 1578/2008 frameworks. See Claimant's Memorial, para. 353, see also Margarit First Expert Report, p. 31; see also FTI Regulatory Report paras. 6.24, 6.37. This was the method by which the Claimant largely financed its own investment.
[176] *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, paras. 117-118, Exhibit CL-009.
[177] See *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 677, Exhibit CL-020;  see also *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December  2010, paras. 117-121, Exhibit CL-009.

*Micula v. Romania* tribunal. In the late 1990s, Romania was in "a deep economic and social crisis" and it "undertook serious efforts to attract investment, both foreign and domestic."[178] Romania passed a series of tax incentives with the stated goal of inducing investment in some of the most under- developed regions of the country.[179] The *Micula* claimants invested in reliance on those regulatory incentives and, in particular, on the expectation that they would be maintained for a 10-year period.[180] Romania then changed its mind.

225.    The *Micula* tribunal found that "an interplay of the purpose behind the [incentives] regime, the legal norms, the [administrative certificate granting the incentives to specific investors], <u>and</u> Romania's conduct" gave rise to a legitimate expectation that the incentives would endure substantially unchanged throughout their stated duration.[181]

226.    Similarly, the *El Paso v. Argentina* tribunal stated that "a reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely."[182] The *El Paso* tribunal further observed in terms similar to the UNCTAD Report previously cited, at paragraph 375:

> 375. A reasonable general regulation can be considered a violation of the FET standard if it violates a specific commitment towards the investor. The Tribunal considers that a special commitment by the State towards an investor provides the latter with a certain protection against changes in the legislation, but it needs to discuss more thoroughly the concept of 'specific commitments'. In the Tribunal's view, **no general definition of what constitutes a specific commitment can be given, as all depends on the circumstances.** However, it seems that two types of commitments might be considered 'specific': those specific as to their addressee and those **specific regarding their object and purpose.**[183] (emphasis added)

---

[178] *Ioan Micula et al.  v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, paras. 137-138, Exhibit CL-020.

[179] *Ibid.*, paras. 138-139.

[180] *Ibid.*, paras. 131, 201.

[181] *Ibid.*, para. 677.

[182] *El Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 377, Exhibit CL-012.

[183] *Ibid.*, para. 375.

227.     Promises or assurances from the State can be explicit or implicit and still create "legitimate expectations." Explicit promises can be made in the legal or regulatory framework of the host State at the time the investor made its investment.[184] This was the case of RD 661/2007 and RD 1578/2008. Much of the jurisprudence arising out of the 1999 Argentine economic crisis confirms that observation.[185] For example, in both the *Enron* and *LG&E* cases, the respective tribunals found that guarantees set forth in domestic law constituted a State promise to foreign investors and were deemed sufficient to create legitimate expectations.[186]

228.     The Claimant argues that "*Masdar* is the third award in a rapidly developing *jurisprudence constant* confirming that Spain's abrogation of the RD 661/2007 incentive tariffs constitutes a violation of the ECT. To date, four ECT tribunals have found against Spain in cases involving nearly identical facts. Those cases are *Eiser*, *Novenergia*, *Masdar* and *Antin*."[187]

229.     The Claimant argues that at international law, a State is not permitted to point to competing government interests to justify legislative or regulatory changes that undermine investors'

---

[184] *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, para. 119, Exhibit CL-009; see also *El Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 377 (finding that "a reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely"), Exhibit CL-012.

[185] These cases all involved a 1991 Argentinean law that indexed the peso to the US dollar while also providing for the convertibility of the former to the latter. In reliance on this law, foreign investors invested heavily in Argentina's newly-privatized gas sector. For a time, prices were calculated in US dollars and adjusted twice a year on the basis of the US production price index. But as a result of a financial crisis, Argentina declared a state of emergency and passed a series of new laws in early 2002, abolishing the peso-US dollar indexation, converting all US dollar obligations into pesos, and stipulating that all prices would from then on be calculated in pesos, not US dollars.

[186] *Enron Corp. and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case. No. ARB/01/3, Award, 22 May 2007, paras. 260-266, Exhibit CL-022; *LG&E Energy Corp., LG&E Capital Corp., and LG&E Int'l, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, paras. 130-133, Exhibit CL-023.

[187] *Eiser Infrastructure Limited Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, Exhibit CL-158; *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018, Exhibit CL-177; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain, ICSID Case No. ARB/14/1*, Award, 16 May 2018, Exhibit CL-192; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, 15 June 2018, available at: https://www.ecestaticos.com/file/71b98cd7ee3ef91528a353808fd58323/1529778081-documento-1.pdf.

legitimate expectations. That is particularly true when the investments in question require substantial upfront costs that can only be recovered over a substantial period of time.[188]

230.    The jurisprudence of the Spanish Supreme Court concerned the domestic legal situation under the Spanish Constitution. It did not address, as there was no need to do so, the impact of changes in the Spanish regulatory system on Spain's obligations under *international* law.

231.    The Claimant relies on the advice of the Spanish law firm Garrigues Abogados which was retained to conduct **due diligence** on the proposed investment.[189] In its report, Garrigues summarized the key provisions of RD 661/2007, and confirmed that in its opinion:

(a)    the tariff rates would be "updated annually taking as a reference the increase in the CPI less 0.25 until 31/12/2012 and 0.50 thereafter";

(b)    the tariff rates would be revised in 2010 in light of changes in the "costs associated with each of these technologies, the degree of participation of the special system in covering demand and the effect on the technical and economic management of the system";

(c)    but [quoting Article 44(3) of RD 661/2007] that "**such revisions of the regulated tariff … will not affect facilities commissioned before 1 January of the second year following the year the revision has been made**."[190] (emphasis added)

---

[188] As the *Perenco Ecuador Ltd. v. Republic of Ecuador,* ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and Liability, 12 September 2014, para. 564, tribunal explained (Exhibit CL-024):

> Particularly after changes in government occur, States must seek to act consistently with, and governments cannot willfully repudiate, long- term commercial relationships with foreign investors concluded by their predecessors. New governments must bear in mind why the State engaged in such relationships in the first place, because resource extraction and other capital-intensive investments with substantial 'up-front' costs generally require a medium to long-term period of operations in order to be able to generate a reasonable return on investment. Such investments must be able to withstand deviations in governmental policy that could undermine their contractual framework.

[189] Giuliani First Witness Statement, para. 17; see Garrigues Administrative and Environmental Due Diligence Report, 22 January 2008, Exhibit C-197.

[190] Garrigues Administrative and Environmental Due Diligence Report, 22 January 2008, p. 20-21, Exhibit C-197.

232.    The Claimant's legal expert, Professor Aragón testified that Article 44(3):

> expressly guarantees facilities that have satisfied the procedures [required to benefit from RD 661/2007] and therefore their investors, that the remuneration model that led them to realize **their investment would not change, armoring that model against revisions of tariffs, premiums, supplements, duration and limits**…[191] (emphasis added)

## C.    The Respondent's Argument in Opposition to the Existence of Any "Legitimate Expectation"

233.    Spain relies on its general position regarding its sovereign authority to amend regulations within the limits of the parent statute, *The Electricity Act, 1997*, and in particular:

- any investor who performed due diligence in 2008 would know that under Spanish law the regulator had no authority to make irrevocable commitments in respect of FIT benefits. It would know that the FIT tariff and other benefits could be modified by a subsequent regulation authorized by the underlying law. No mere Royal Decree was (or could be) entrenched beyond modification or repeal by subsequent measures equally authorized by the underlying statute namely the *Electricity Law 1997*;

- the Claimant would also have understood Spain's sovereign authority and responsibility to regulate the electricity sector, an essential public service, in the *public* interest;

- the Claimant has misconstrued Article 44(3) of RD 661/2007 by ignoring the words "indicated in this section" or "defined in this Royal Decree" [depending on the translation];

- in any event, the Claimant's investment was made in stages. Legitimate expectations are assessed as of the date of the final step, which was not taken by the Claimant until 2011. As such, all of the Claimant's investments come under RD

---

[191] Aragón First Expert Report, p. 27.

1578/2008 not RD 661/2007, and RD 1578/2008 did not grandfather "existing facilities".

*(a)*     *Spain Argues that the Claimant Could Have No Legitimate Expectation of Irrevocability in Light of the Clear and Consistent Jurisprudence of the Spanish Supreme Court*

234.    Spain rejects the contention that RD 661/2007 and RD 1578/2008 should be considered as exceptions to the general regulatory framework. In terms of the hierarchy of laws, no regulation can prevent subsequent modifications that comply with the provisions of the parent statute. Article 30.4 of the *Electricity Law 1997* allows investors to expect only "reasonable rates of return with reference to the cost of money in the capital market" or "reasonable remuneration for their investments." The Spanish government's authority to modify premiums that foster electricity production has been consistently affirmed by the **Spanish Supreme Court** before, during and after the date of the Claimant's investment and the Claimant could have had no legitimate expectation to the contrary.

235.    Spain rejects the Claimant's reliance on RD 661/2007 because the Claimant knew or ought to have known that the Spanish regulatory system promised nothing more than a reasonable rate of return. The **Spanish Supreme Court Judgment of 25 October 2006,**[192] rendered before the Claimant made any investment in Spain, established that the Spanish regulatory framework *allows* regulatory changes that: (i) affect the economics of **existing** installations and; (ii) modify the formulas used for fixing the subsidies to renewable facilities. The Court said that:

> … the payment regime under examination does **not** guarantee to special regime electricity producers that a certain level of profits or revenues will [be] unchanged relative to those obtained in previous years, or the formulas for fixing the premiums will stay unchanged.

> Just as in terms of an economic policy with many different aspects (the promotion of renewable energy but also the planning of electricity networks, and other considerations regarding energy saving and efficiency) grants and incentives for the production of electricity under the special regime **may increase from one year to another, but they may also decrease when those same considerations warrant it**.[193]

* * * * *

---

[192] Judgment from the Third Chamber of the Supreme Court, 25 October 2006 (Appeal 12/2005), Exhibit R-0118.
[193] *Ibid.*, p. 4.

> Companies that freely decide to enter a market such as electricity generation under the special regime, knowing that is largely dependent on the setting of economic incentives by public authorities, are or should be aware that they may be modified within legal guidelines, by those same authorities. **One of the "regulatory risks" to which they submit and which they must take into account, is precisely the variation of parameters for premiums or incentives**, something which the Electricity Sector Law limits, as previously discussed, but does not preclude.[194] (emphasis added)

236.    Therefore, Spain argues, the investors in this economic activity knew or ought to have known that their investment would be subject to a "*regulatory risk*" of a reduced tariff.[195]

237.    The 2006 Spanish Supreme Court Judgment went on to observe that investors could expect only "reasonable returns with reference to the cost of money in the capital market" or, to put it again in the words of the preamble to Royal Decree 436/2004, "reasonable compensation for their investment."[196] The Supreme Court pointed out that the limits to the regulatory powers do not reside in the regulations which are subject to changes in the government's discretion but in the governing statute, being the *Electricity Law 1997*. Spain contends that anyone investing in Spain with due diligence would (or ought to) have been aware of the Supreme Court's authoritative pronouncements as of the date of the investment.[197]

238.    The Spanish Supreme Court reiterated the principles of its 2005 and 2006 decision in 2009 when faced with additional claims about the immutability of the remuneration regime.[198]

---

[194] *Ibid*.

[195] It is noted that the Spanish Supreme Court was referring in this Judgment to a prior regulatory decree (RD 436/2004) which did not contain the language of RD 661/2007 which, according to the Claimant, provides the guarantees of stability it relies upon.

[196] Judgment from the Third Chamber of the Supreme Court, 25 October 2006 (Appeal 12/2005), p. 4, Exhibit R-0118.

[197] Respondent's Post-Hearing Brief, para. 185 citing Draft of the CNE regarding the proposed Royal Decree regulating electricity generation in the special regime and specific technological facilities equivalent to the ordinary regime, of 14 February 2007, pp. 21-22, (PDF pp. 153-154), Exhibit R-0101. Thus, the CNE itself, shortly before the Claimant's investment on 23 April 2008 reminded everyone that the Spanish Supreme Court's Judgment of 25 October 2006 had affirmed the modification of "premiums that foster electricity production" does not violate the principle of either legal certainty or of legitimate expectation.

[198] Judgment of the Third Chamber from the Supreme Court, 9 December of 2009, Legal Ground 6, p. 4., Exhibit R-0122:

> (The Claimant) does not pay enough attention to the case law of this Chamber specifically referred to with regard to the principles of legitimate expectation and non-retroactivity applied to the successive incentives' regimes for electricity generation. This involves the considerations set out in our decision dated October 25,

239.    As recently as 2017, the Supreme Court reiterated the same principle:

> …**the only thing guaranteed to the owners of the facilities is a right to a reasonable return on their investments - not a right to the prevailing remuneration framework when they made their investment remaining unchanged**. (emphasis added)

* * * * *

> …the analysed remuneration regime did not ensure owners of facilities under the special regime "the intangibility of a certain level of profits or revenues relative to those obtained in previous years, nor formulas used to set feed-in tariffs remaining unchanged indefinitely."[199]

240.    Arbitral tribunals also uniformly acknowledge a State's sovereign right to regulate its economy in the interest of its citizens. In *Parkerings v. Lithuania*, the tribunal decided:

> It is each State's undeniable right and privilege to exercise its sovereign legislative power. A State has the right to enact, modify or cancel a law at its own discretion.[200]

241.    In *AES v. Hungary*, the tribunal decided, in considering the application of Article 10(1) of the ECT to changes in electricity pricing:

> …any reasonably informed business person or investor knows that laws can evolve in accordance with the perceived political or policy dictates at the time.[201]

---

2006 and repeated in that issued on March 20, 2007, inter alia, about the legal situation of the owners of electrical energy production installations under a special regime to whom it is not possible to acknowledge for the future an "unmodifiable right" to the maintenance unchanged of the remuneration framework approved by the holder of the regulatory authority provided that the stipulations of the Law on the Electricity Sector are respected in terms of the reasonable return on investments.

[199] Judgment of the Supreme Court, 18 May 2017 (Appeal 4953/2016), p. 13, Exhibit R-0253.

[200] *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, para. 332, Exhibit CL-019.

[201] *AES Summit Generation Limited and AES-Tisza Erömü Kft v. the Republic of Hungary,* ICSID Case No. ARB/07/22, Award, 23 September 2010, para. 9.3.34, Exhibit RL-0039.

*(b)*     *The Tribunal's Ruling on the Relevance of the Spanish Supreme Court Jurisprudence*

242.     The jurisprudence of the Spanish Supreme Court in relation to Spain's domestic law is entitled to great respect, but the judgments relied upon by the Respondent address a different issue than the issue before this Tribunal, which is concerned only with *international law* obligations.

243.     It is not surprising that the Spanish Supreme Court should affirm that regulatory measures under domestic Spanish law may be modified in the exercise of Spanish sovereignty. The question before the Tribunal however is whether such changes can be made by Spain **without financial consequences** under the ECT.

244.     The views of the Spanish Supreme Court concerning legal certainty or legitimate expectation may dispose of the issue of government liability at domestic law, but the Claimant does not rely on Spanish domestic law. It relies on Article 26(6) of the *Energy Charter Treaty* which mandates this Tribunal, not the Spanish Supreme Court, to determine whether the Claimant had a legitimate expectation of irrevocability and if so, whether that legitimate expectation was violated, and if so the legal consequences as a matter of international law. This is clear from Article 27 of the Vienna Convention which states that a "party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."

*(c)*     *Spain Argues Not Only That it Had the Right but the Duty to Regulate its Energy Sector in the Public Interest*

245.     Spain contends that the better view taken by some prior tribunals is that Article 44(3) is not a stabilisation clause[202] and in any event is not a clog on Spain's regulatory responsibility to evolve in response to changing conditions. Spain rejects the Claimant's position as explained by FTI from "an economic and regulatory perspective, there were better options available to the Spanish Government." FTI is wrong to claim that:

> Spain did not need to shift part of the burden of its tariff deficit to renewable energy investors, and doing so was not wise policy. The measures introduced by the Spanish Government increase regulatory uncertainty in Spain increasing the risk of investments not only in the renewables sector but also in other sectors that are dependent on regulated payments. As discussed in Section 5, the EC and other authorities

---

[202] Respondent's Counter-Memorial, para. 595 *et seq.*

> cautioned that retroactive changes undermine investor confidence and should be avoided. Investors will be likely to require higher rates of return on their investments to be compensated for the increased regulatory risks increasing the costs of achieving Spain's renewable electricity generation targets.[203]

246.    According to Spain, the ECT clearly permits the adoption of reasonable and proportionate macroeconomic control measures, provided that they are motivated in the public interest, as explained in *Plama v. Bulgaria*:

> [T]he Tribunal believes that the ECT does not protect investors against any and all changes in the host country's laws. Under the fair and equitable treatment standard, the investor is only protected if (at least) reasonable and justifiable expectations were created in that regard. It does not appear that Bulgaria made any promises or other representations to freeze its legislation on environmental law to the Claimant or at all.[204]

247.    Among other relevant facts, in this case, Spain emphasizes:

(a)    the public interest in the financial sustainability of the SES;

(b)    the awareness of the renewable energy investors of Spain's *'ius variandi'* powers within the statutory limit of ensuring a reasonable rate of return on the investment;

(c)    Many of the so-called "representations" by the Spanish government have no official status, as in the case of the CNE, an advisory body whose statements cannot be taken as government policy. Counsel for Spain submitted:

> [W]e need to understand what the role of the CNE is within the Spanish regulatory framework. The CNE was mainly a consulting body. Its reports are not binding. Consultants describe its influence capacity towards policy making as low compared to industry stakeholders…considering that it was an advisory board and its reports were not binding, it didn't have authority on decision making at all.[205]

---

[203] FTI First Regulatory Report, para. 7.25.
[204] *Plama Consortium Limited v. the Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 219, Exhibit RL-0034.
[205] Tr. Day 1, (Castro) p. 202:9-14 and 17-19.

Moreover, Spain says that the CNE PowerPoint presentations relied upon by the Claimant were for "training courses" given by CNE personnel not to promote foreign investment;[206]

(d)     the worsening of the international crisis from 2009 to 2012, resulted in an *exceptional* decrease in electricity demand. Spain's risk premium compared to Germany reached 575 points on 18 June 2012, and 637 points on 24 July 2012;

(e)     the international commitments undertaken by the Kingdom of Spain in July 2012 in relation to the bailout of the Spanish financial sector;

(f)     the adoptions of macroeconomic control measures to ensure the sustainability of the SES and to avoid an excessive burden on consumers.[207]

248.     Spain relies in particular on the Award in *Charanne B.V and Construction Investments S.A.R.L v. Kingdom of Spain*[208] which held that:

> In this case, the Claimants could not have the legitimate expectation that the regulatory framework laid down by RD 661/2007 and RD 1578/2008 would remain unchanged during the entire lifespan of their plants. **Accepting such an expectation would, in fact, amount to freezing the regulatory framework applicable to eligible plants, even though the circumstances may change.** Any modification to the tariff amount or any limitation in the number of eligible hours would thus constitute a violation of International Law. In practice, the situation would be equivalent to that resulting from the signing by a State of a stabilisation agreement, or of a commitment to never modify the regulatory framework. **The Arbitral Tribunal cannot accept such a conclusion. In fact, the Claimants themselves have clearly stated that they could not reasonably expect that the regulatory framework would remain unchanged.** (emphasis added)

\* \* \* \* \*

---

[206] Respondent's Counter-Memorial, paras. 635-636:

635. The PowerPoint presentations submitted by the Claimant form part of training courses given by CNE personnel, most of which are in Spanish. These courses were run within the scope of activities by other international Regulatory authorities and Universities, and were not aimed at foreign investors.

636. The two presentations in English found by the Claimant were also not intended for foreign investors, but were delivered within the framework of training courses or meetings between regulatory authorities. It is denied that they were delivered as part of an international promotion to capture foreign investors by the CNE.

[207] Respondent's Counter-Memorial, para. 1197.

[208] Respondent's Counter-Memorial, para. 595, *Charanne B.V. and Construction Investments S.À.R.L. v. the Kingdom of Spain* (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 503, Exhibit RL-0049.

The Tribunal does not agree with the Claimants that said decisions [of the Spanish Supreme Court] are irrelevant or out of context. Although they refer to different rules, those judgments clearly lay down the principle that domestic law can modify, in compliance with the LSE, an economic regime, such as the one provided in RD 661/2007 and RD 1578/2008, aimed at fostering renewable energy production. **To the Tribunal's understanding, at the time of making the investment in 2009 the Claimants could have carried out an analysis of their investment's legal framework in Spanish law and understood that the regulations** enacted **in 2007 and 2008 could be modified.** At least that is the degree of diligence that could be expected from a foreign investor in a heavily regulated sector like the energy industry. In such a sector, thorough prior analysis of the legal framework applicable thereto is essential to make an investment.[209] (emphasis added)

(Note: The decisions referred to in the Award are the Judgment of the Supreme Court of 15 December 2005 (Exhibit R-117) and the Judgment of the Supreme Court of 25 October 2006 (Exhibit R-118).)

249.    Spain also notes the observation by the arbitral panel in *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain* that:

Without requiring a reasonable investor to perform an extensive legal investigation at the time of investing, knowledge of important decisions from the highest authority regarding the regulatory framework for investment may be assumed.[210]

250.    As in the *Charanne* Award, the *Isolux* tribunal quotes the Supreme Court Judgments of 2005[211] and 2006[212] as decisions from the highest authority regarding the dynamic and flexible regulatory framework. Such knowledge should be attributed to the investors by reason of their due diligence obligations.

251.    Spain further contends that the Claimant has not furnished any proof of ever having knowledge of the Government presentations or statements now relied upon and in particular of the Cabinet press release and the *Referencia*.[213]

---

[209] *Ibid.*, para. 507.
[210] *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain* (Arbitration SCC V2013/153), Award, 12 July 2016, paras. 793-794, Exhibit RL-0024.
[211] *Ibid.*, para. 789.
[212] *Ibid.*, para. 790.
[213] Respondent's Counter-Memorial, paras. 1143-1144, citing *Charanne* and *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-5, Award of 19 September 2013, para. 4.771, Exhibit RL-0045.

252.    In any event, the tribunal in *AES Summit v. Hungary* rejected the argument that the existence of a *stability clause* can be deduced from a general regulatory framework:

> The stable conditions that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, it is not a stability clause. **A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts.**
>
> Therefore, to determine the scope of the stable conditions that a state has to encourage and create is a complex task given that it will always depend on the **specific circumstances** that surround the investor's decision to invest and the measures taken by the state in the public interest.[214] (emphasis added)

and *Charanne v. the Kingdom of Spain*:

> in the absence of **a specific commitment** an investor cannot have the legitimate expectation that the regulation in place is going to remain unchanged.[215] (emphasis added)

*(d)*    *The Tribunal's Ruling on Spain's Reliance on a Sovereign Duty to Evolve Regulations in the Public Interest*

253.    In the Tribunal's respectful view, for the reasons already discussed, the *Charanne* tribunal placed too much emphasis on the domestic jurisprudence of the Spanish Supreme Court. This Tribunal does not doubt the constitutional authority of Spain to evolve its regulatory system to keep abreast of changing circumstances. The question is whether under the ECT the cost of such changes should fall on the investors who were attracted to Spain's renewable energy by *specific* promises of stability rather than fall on Spanish consumers or Spanish taxpayers generally.

254.    Tribunals have been quite consistent on the need to balance a State's regulatory autonomy against international obligations freely undertaken. In *Saluka*, the tribunal decided:

> No investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged. In order to determine whether frustration of the foreign investor's expectations was justified and reasonable, the host State's legitimate right subsequently to

---

[214] *AES v. Hungary*, ICSID Case No. ARB/07/22), Award, 23 September 2010, paras. 9.3.29 and 9.3.30, Exhibit RL-0039.

[215] *Charanne BV & Construction Investment S.À.R.L. v. Kingdom of Spain*, Arbitration No. 062/2012, Final Award, 21 January 2016 para. 499, Exhibit RL-0049.

regulate domestic matters in the public interest must be taken into consideration as well. As the *S.D. Myers* tribunal has stated, the determination of a breach of the obligation of "fair and equitable treatment' by the host State 'must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders"[216]

255.    In *El Paso v Argentina*, the tribunal decided: "There can be no legitimate expectation for anyone that the legal framework will remain unchanged in the face of an extremely severe economic crisis. No reasonable investor can have such an expectation **unless very specific commitments have been made towards it or unless the alteration of the legal framework is total**."[217] (emphasis added)

256.    In *Glamis v. USA*, the tribunal decided that, **without a specific undertaking** to the contrary, "a claimant cannot have a legitimate expectation that the host country will not pass legislation that will affect it."[218]

257.    In this case, Article 44.3 of RD 661/2007 was a *specific* undertaking within the contemplation of the jurisprudence. A representation is no less "specific" if (as here) it is addressed to an identifiable class of persons, namely prospective investors whose money was solicited by Spain's FIT program.

258.    The effect of an ECT award in favour of the Claimant would simply be to transfer back to Spain the cost of the tariff modifications without in any way putting in question the validity at Spanish law of the disputed measures.

259.    While unforeseen events understandably created serious difficulty for the Spanish regulators and the Spanish economy, Spain accepted international obligations under the ECT and the Tribunal's obligation is not to rewrite history but to give effect to the RD 661/2007 embodiment of government policy to the extent RD 661/2007 created *legitimate* expectations of stability in accordance with its terms.

---

[216] *Saluka Invs. B.V. v. Czech Republic*, UNCITRAL-PCA, Partial Award, 17 March 2006, para. 305, Exhibit CL-0014
[217] *El Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 374, Exhibit CL-0012.
[218] *Glamis Gold, Ltd. v. The United States of America*, UNCITRAL, 8 June 2009, para. 813, Exhibit CL-0011.

*(e)*     *Spain Argues that the Claimant Misconstrues the Terms of RD 661/2007 by Ignoring the Words "Defined in this Royal Decree" or "indicated in this Section"*

260.     Spain says the Claimant's argument misconstrues the terms of RD 661/2007 which (put at its highest) deals only with an expected 2010 review of "tariffs, premiums, supplements and lower and upper limits **defined in this Royal Decree** [RD 661/2007]" and it is only those listed revisions that were not to be applied to previously commissioned facilities. The "disputed measures" are not on the list of investor protections.

261.     The expert witness, Carlos Montoya, described RD 661/2007 as a measure designed to *limit* compensation, not *expand* it. Speaking of the earlier RD 436/2004 regime, Mr. Montoya testified:

> Not only did the link between the TMR [the "Average Reference Tariff"] and the regulated tariffs and premiums cause excess remuneration across all technologies, it also had an unfavourable effect on the economic sustainability of the SES. This effect on the sustainability became acuter once the renewable energy implementation targets established in the PER 2005-2010, and the real installed power of some technologies are taken into account.
>
> RD 661/2007 implemented a new remuneration regime to avoid this perverse effect, **which caused an increase in unjustified remuneration due** to the simple commissioning of new generation facilities.[219] (emphasis added)

262.     On this point, Spain argues that the Claimant's argument distorts reality:

> The Claimant conveys a misinterpretation on the reason that justified the approval of RD 661/2007. It inaccurately claims that the only reason for the enactment was to improve incentives to achieve the objectives set by the EU. This statement is not supported by any evidence provided by the Claimant.
>
> As stated above, RD 661/2007 was motivated by the need to ensure the economic sustainability of the SES, which could be affected by a system of subsidies linked to the TMR.[220]

---

[219] Respondent's Counter-Memorial, paras. 516, 519. Accordingly, RD 7/2006 of 23 June 2006 noted the inefficiency of the then existing remuneration system and froze the renewable energy subsidies until a new remuneration system was implemented by RD 661/2007.
[220] *Ibid.*, paras. 525, 541-542.

263.    The text of Article 44(3) of RD 661/2007 must be read in light of these realities and not so as to handcuff Spain in dealing with a situation of over-remuneration.

*(f)    The Tribunal's Ruling on Spain's Purposive and Textual Interpretation of RD 661/2007*

264.    In plain terms, Article 44(3) specifically represented to potential investors that:

(a)    there would be a review in 2010 of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree;

(b)    but regardless of any revisions resulting from the 2010 review, a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in capital markets;

(c)    subsequently, a further review shall be performed every four years, maintaining the same criteria as previously;

(d)    the revisions to the tariffs, etc. "defined in RD 661/2007" shall not affect facilities for which the deed of commissioning shall have been granted prior to January 1 of the second year following the year in which the revision shall have been performed.

265.    The above interpretation of Article 44(3) of RD 661/2007 was affirmed with crystal clarity by the Spanish Cabinet in its press release accompanying RD 661/2007 that assured investors of the stability guarantee:

> Every 4 years, the tariffs will be revised, bearing in mind compliance with the targets set. This will allow an adjustment to the tariffs in line with the new costs and the degree of compliance with the targets. **The tariff revisions carried out in the future will not affect those installations already operating. This guarantee affords legal safety to the producer**, providing stability to the sector and promoting its development.[221] (emphasis added)

266.    The terms of Article 44 of RD 661/2007 must be read not only with a close regard to its text but also the broader context in which it was made and its clear and obvious paramount purpose

---

[221] Press Release for RD 661/2007, Exhibit C-099.

which was (in the Tribunal's view) the inducement of investment in renewable energy that Spain's earlier incentives had failed to attract.

267.    The existence of the listed revisions contemplated to occur in 2010 and periodically thereafter show that the financial terms applicable to the FIT program were not entirely frozen. Nevertheless, if even such relatively modest revisions[222] would not apply to existing facilities, it is not credible to conclude that the text of RD 661/2007 was intended to convey the message that even more sweeping revisions or wholesale repeal of benefits *would* apply to existing facilities (as happened from 2010 onwards).

268.    Moreover, if the Spanish Government had really intended to make such a limited "offer" in RD 661/2007, and had said so in plain language, the evidence shows that RD 661/2007 would not have accomplished its legislative purpose. Prior offers had failed to attract the necessary investment in renewable energy. Spain was under time pressure from the EU to meet its renewable energy targets. By 2007, Spain recognized that its offer to potential investors had to be dramatically improved, and Spain reacted (possibly, in the government's current view, over-reacted) with RD 661/2007.

269.    The Tribunal does not accept Spain's reading of RD 661/2007 as plausible. The Claimant's interpretation of RD 661/2007, taken in the context of its creation, is persuasive.

---

[222] The Claimant argues in the alternative that the categories of revisions indicated in this section are broad enough to include the disputed measures which were thereby expressly excluded from application to existing PV facilities, as follows:

| Considerations in "Planned" Revisions listed in RD 661/2007, Article 44(3) | Spain's Current Justification for Regulatory Changes |
|---|---|
| "costs associated with each of these technologies" | Investment costs declined thereby increasing investors' profits |
| "reasonable rate of profitability" | Returns are excessive |
| "with reference to the cost of money in the capital markets" | Interest rates declined |
| "impact upon the technical and economic management of the system" | Economic sustainability of the system |

(Claimant's Closing Submission, Slide 13)

*(g)    The Tribunal's Ruling on the Claimant's Reliance on the RD 661/2007 "Guarantee"*

270.    While there is no evidence the Claimant was aware prior to its investment of the Spanish Cabinet Press Release and *Referencia* which stated that:

> **The revisions carried out in the future of the tariffs will not affect those Installations already in operation.** This **guarantee** provides legal safety [security] for the producer, affording stability to the sector and fostering its development.[223] (emphasis added)

There is no doubt that the Claimant independently arrived at this understanding of RD 661/2007 prior to its investment, and relied on the clear undertaking in RD 661/2007 in deciding to invest €11 million in Spanish renewable energy projects.

271.    As mentioned, Mr. Giuliani, a director of 9REN, and an officer of First Reserve testified that guaranteed stability tariff was a *condition precedent* to the Claimant's investment decision:[224]

> 9REN Holding would not have made this investment if it had known that Spain might retroactively change the tariffs for completed projects.[225]

272.    Mr. Giuliani's plain text reading of RD 661/2007 was reinforced by the "due diligence" opinion obtained from Garrigues Abogados which reported that in its opinion "such revisions of the regulated tariff…will not affect facilities commissioned before 1 January of the second year following the year the revision has been made."[226]

273.    There is no persuasive evidence that undermines the evidence of such reliance, and it stands to reason that investors would (and did) require such a guarantee before committing the very large, up-front costs of renewable energy projects. The Claimant's investment of €11 million was not made unless and was only made when such a guarantee was entrenched in a regulation.

---

[223] Press Release for RD 661/2007, Exhibit C-99; and see also Reference from the Council of Ministers, Exhibit C-274.
[224] Giuliani First Witness Statement, para. 16.
[225] Giuliani First Witness Statement, para. 23.
[226] Garrigues Administrative and Environmental Due Diligence Report, 22 January 2008, pp. 20-21, Exhibit C-197.

(h)     *In Any Event, Spain Contends that the Claimant's Investment was Made in Stages, and Legitimate Expectations are Assessed as of the Date of the Final Step. Therefore the Claimant's Investments Were Made Under RD 1578/2008 not RD 661/2007, and RD 1578/2008 did not Grandfather "Existing Facilities"*

274.   The text of RD 1578/2008 contains no explicit "grandfathering" of existing renewable energy facilities. It therefore becomes critical to identify the effective date of the Claimant's investment. The cut-off date for RAIPRE registration under RD 661/2007 was 29 September 2008. Thereafter, RD 1578/2008 provides for compensation "**for a *maximum* [not *minimum*] period of 25 years** from the last of the start-up dates or the date of registration." (emphasis added)

275.   Spain contends that the Claimant continued its investment in stages from 2008 to 2011. Once it is established that investment decisions were being made by the Clamant as late as 2011, the appropriate date to ascertain the legitimacy of the expectation is when the whole of the investments were complete, i.e. 2011,[227] at which point RD 1578/2008 had already made it clear that existing FIT benefits could be reduced by regulatory modification.

276.   The **Fifth Additional Provision** of RD 1578/2008 explicitly warned of the potential modification of rates as follows:

> during the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology **may be modified**.[228] (emphasis added)

---

[227] In this respect, the Respondent refers to Professor Schreuer's Opinion that:

It follows from this consistent case law that tribunals, when examining the existence of an investment for purposes of their jurisdiction, have not looked at specific transactions but at the overall operation. Tribunals have refused to dissect an investment into individual steps taken by the investor, even if these steps were identifiable as separate legal transactions. What mattered for the identification and protection of the investment was the entire operation directed at the investment's overall economic goal.

C Schreuer and U Kriebaum, "At What Time Must Legitimate Expectations Exist?" in: J Werner and A Hyder Ali (eds), A Liber Amicorum: Thomas Wälde (2009), pp. 273-74, Exhibit RL-0111.
[228] RD 1578/2008, p. 6, Exhibit R-0072.

277.    Spain says the Claimant's current position that its investment was complete in April 2008 is contradicted by the Claimant's own words in its Memorial on the Merits.[229] The evidence is clear that 9REN España projects continued to be developed until at least 2011.

278.    It is common ground that at least PV Plant of Formiñena was registered in 2011, i.e. after 29 September 2008, even though the registration document refers to RD 661/2007 not RD 1578/2008.[230]

279.    The Claimant's current position is contradicted by its own instructions to its experts that its investments were made in successive tranches between 2008 and 2011. The FTI Consulting Group stated in its 2016 report:

> 2.2 In 2007 and 2008, Spain enacted two successive incentive schemes for renewables technologies including solar PV (through RD 661/2007 and RD 1578/2008, the First Regulatory Framework). **Between 2008 and 2011, the Claimant invested in the Spanish PV generation sector under those schemes.**[231] (emphasis added)

280.    The Claimant's legal expert, Professor Aragón was similarly instructed that investment "occurred between April 2008 and March 2011."[232]

281.    Professor Aragón confirmed that he received such instructions from the Claimant:

---

[229] In its Memorial on the Merits, the Claimant states:

> 2. After the acquisition, 9REN España developed and operated its own facilities **in reliance on RD 661/2007 and RD 1578/2008**.
> 231. After the acquisition, **9REN INVESTED FURTHER in Spain** through its wholly-owned subsidiary, 9REN España, by developing eight solar parks in the former Gamesa Solar's "pipeline" of projects. These projects had a combined nominal capacity of approximately 15 MW.
> 232. 9REN España successfully constructed, commissioned, and registered with the RAIPRE seven of its own projects before the September 29, 2008 cut-off date for registration under RD 661/2007…
> 233. Although 9REN originally intended to sell these PV facilities after completing them, the market for M&A transactions was not strong in 2009 due to the global financial crisis and ensuing recession. Because it did not want to sell the projects at deflated prices, 9REN decided to retain these assets, at least momentarily…
> 237. In 2011, 9REN España commissioned and registered its eighth self-owned plant, Formiñena, located in Aragon, under the RAIPRE on March 23, 2011. The 1.0 MW Formiñena facility was entitled to payment of the RD 1578/2008 fixed tariff for 25 years from the date of commissioning.

Claimant's Memorial, paras. 231, 237.
[230] Claimant's Memorial, para. 237.
[231] FTI Regulatory Report, para. 2.2.
[232] Aragón Second Expert Report, p. 8.

> In your second report you say that investment was made, that the Claimant invested between April 2008 and March 2011. Did you review that, did you confirm that, or that's a data that your clients gave you?
>
> A. Those information were *provided by those who commissioned* this report.[233]

282.    The Certification in the Registry of Installations on Special Regime of Formiñena Plant establishes that the license to *build* the plant was not issued until 6 November 2008 well after the 29 September 2008 deadline for RD 661/2007.[234] The Formiñena PV Plant was not finished until January 2011.

283.    Spain argues that once it is established that at least part of the Claimant's investment fell outside the RD 661/2007 regime and engaged the RD 1578/2008 regime, the Claimant's entire entitlement fails to be considered under RD 1578/2008. As counsel for Spain put it in the post-hearing brief:

> …*all* RD 1578/2008 [Fifth] Additional Provisions [warning of future tariff modifications] were applicable to Royal Decrees and Ministerial Orders different than RD 1578/2008…the literal wording of this [Fifth] Additional Provision clearly includes all the "*photovoltaic solar technology*" and does not exclude the registered PV Plants.

284.    Spain contends that arbitral jurisprudence establishes that the correct **timing** for determining an investor's legitimate expectations is not the historical moment of the investor's *initial commitment of capital* in respect of a *particular project*, but rather its expenditure throughout the course of the investment as a whole.[235]

---

[233] Tr. Day 3, (Aragón), p. 109: l. 21 to p. 110: l. 1.

[234] Exhibit C-0215, Spanish original version, page 4 <u>not translated part by the Claimant</u>:

Resultando que con fecha 6 de noviembere de 2008 del Director del Servicio Provincial de Industria Comercio y Turismo se autoriza la instalación de producción de energía "Fotovoltaica 1 MV "Formiñena" de Gamesa en Tardienta" según lo establecido en la Orden de 25 de junio de 2004 del Departamento de Industria, Comercio y Turismo.

Proving that, on 6 November 2008, the Provincial Director of the Ministry of Industry, Trade and Tourism <u>has authorized the construction of the electricity production facility</u> called "Fotovoltaica 1 MW "Formiñena" owned by Gamesa in Tardienta", according to the Order of 25 June 2004 of the Department of Industry, Trade and Tourism. [Tribunal's translation]

[235] *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 paras 9.3.13 and 9.3.16, Exhibit RL-0039. The Award examines whether the claimants had legitimate expectations not only at the time of their first investment but also at the time when they made subsequent

285.     *Ulysseas v. Ecuador* established that legitimate expectations can only arise at the time the investment is *actually* made:

> In order for an "investment" to arise in this sense, there must be an actual transfer of money or other economic value from a national (whether a physical or a judicial person) of a foreign State to the host State through the assumption of some kind of commitment ensuring the effectiveness of the contribution and its duration over a period of time.[236]

286.     Spain points out that the Claimant's acquisition of Gamesa Solar's shares included a "pipeline" of eight "projects" which were not yet developed and according to Spain, this "implied" that *further* investment decisions were necessary to complete the investment beyond the RD 661/2007 cut-off. This is confirmed by 9REN España's 2011 financial statement.[237]

*(i)     The Tribunal Rules that the Claimant's Investment was made in April 2008 in Reliance on RD 661/2007*

287.     Spain's argument conflates the date of the **investment** by the Claimant (23 April 2008) and the dates when various projects were **registered** (2008-2011). Thus Spain contends that:

> …it is totally contradictory that the Claimant, on the one hand, appeals against RD 1565/2010 and RDL 14/2010 on the grounds that it considers that the Kingdom of Spain violated the ECT in 2010 and, on the other, built a new PV plant which became operational in April 2011. This contradiction is insurmountable.[238]

288.     As stated, some of this confusion was created by the Claimant's own pleadings as reflected in the First FTI report and statements by the Claimants' own expert witnesses.

---

investments. See also: *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, para. 557, Exhibit RL-0109:

> A legitimate expectation is normally said to arise "at the time of making the investment". In the Tribunal's eyes, this is logical, as it is the investor's reliance on a promise which may prompt, or contribute to, its decision to invest and proceed with that investment, and which makes in turn the expectation worthy of legal protection. In certain cases, however, "**investments are made through several steps, spread over a period of time**". As the tribunal in *Frontier Petroleum v. Czech Republic* noted, in these instances "**legitimate expectations must be examined for each stage at which a decisive step is taken towards the creation, expansion, development, or reorganization of the investment**." (emphasis added)

[236] *Ulysseas, Inc. v. Ecuador*, UNCITRAL, Final Award, 12 June 2012, para. 252, Exhibit RL-0110.
[237] Gamesa and 9REN investment agreement, 29 June 2012, pp. 76-77, which contains 9REN España's 2011 financial statement, Exhibit RE-0044.
[238] Respondent's Counter-Memorial, para. 1130.

289.    The critical date for purposes of assessing the reasonableness and legitimacy of the Claimant's expectations is the date the Claimant *invested*, which on the evidence is 23 April 2008.

290.    The fact the investment was used to finance projects in stages thereafter is not relevant as by those dates the investment funds had already been remitted under the protection of the ECT and (in part) RD 661/2007.

291.    However, the fact the Formiñena Plant was covered by RD 1578/2008 rather than RD 661/2007 is relevant to quantum because while the Formiñena Plant was part of the Claimant's protected investment, the entitlement to a continuing revenue stream from Formiñena was not protected by the RD 661/2007 stability guarantee.

**D.    The Tribunal Concludes That the Claimant Reasonably Relied Upon a Legitimate Expectation that the FIT Benefits of RD 661/2007 Would Continue for the Useful Life of Seven of its Eight Facilities**

292.    It is true, as Spain argues, that in this case the Claimant is unable to point to any specific communication *to it* (as opposed to *erga omnes*) from an official authorized to bind the Spanish government affirming in the Claimant's case the irrevocability of RD 661/2007 entitlements. Although, as mentioned, there was a specific government to investor communication in respect of 9REN's Formiñena Plant regarding the rate of 0.2908570 c€/kWh.[239]

293.    The relative absence of direct government to investor communications is a factor of some weight although, as the Claimant points out, the specific "in person" communications in *Masdar*[240] and some of the other cases did little more than repeat what was already plain on the face of RD 661/2007, and in any case *post*-dated rather that *pre*-dated the investment.

---

[239] See Certificate of final registration in the RAIPRE for Formiñena, 14 April 2011, p. 3, Exhibit C-215, FTI First Quantum Report, para. 3.14.

[240] The Tribunal acknowledges the helpful analysis in *Masdar Solar and Wind Cooperatif U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/18 dated 16 May 2018 which identifies a *spectrum* from situations where a claimant relies only on a bare regulatory measure addressed to the entire world, which lies at the weaker end of the spectrum, to clear and specific undertakings to a particular investor, which is generally enforceable under the FET. In Spain's view, the key difference between *Masdar* and the present case is the existence in *Masdar* of direct government assurances to the investor.

294.    At the same time, the Tribunal accepts as correct the observation of UNCTAD (2012) that legitimate expectations may arise from "rules *not* specifically addressed to a particular investor but which are put in place with a specific arm to induce foreign investments and on which the foreign investor relied on making his investment".[241] To similar effect, the *El Paso* tribunal distinguished between "**two types of commitments… those specific as to their addressee and those specific regarding their object and purpose**."[242] Article 44(3) of RD 661/2007 falls into the latter category. It is true that the Claimant's projects proceeded in stages with the first stage under RD 661/2007 and the second [much smaller] stage under RD 1578/2008 but the *investment* was made (according to Mr. Giuliani's testimony) on 23 April 2008. Mr. Giuliani's statement was not successfully challenged on cross-examination.

295.    There is no doubt that an enforceable "legitimate expectation" requires a clear and specific commitment, but in the view of this Tribunal there is no reason in principle why such a commitment of the requisite clarity and specificity cannot be made in the regulation itself where (as here) such a commitment is made for the purpose of inducing investment, which succeeded in attracting the Claimant's investment and once made resulted in losses to the Claimant.

296.    In these circumstances, there is no principled reason to deny that the investor's expectations of performance by the State are legitimate.

297.    As of the date of the investment on 23 April 2008 of €211 million, the Claimant therefore had a reasonable and legitimate expectation that provided its projects complied with FIT requirements (including timely registration under RAIPRE)[243] and continued to comply throughout the life of the facility, it would receive the benefits set out in RD 661/2007.

---

[241] UNCTAD *Fair and Equitable Treatment*, (2012) n. 263, p. 69.

[242] *El Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 375, Exhibit CL-0012.

[243] Spain is correct to dispute the Claimant's position that RAIPRE is an independent source of obligation. As Spain points out:

Registration in the RAIPRE is not, therefore, a State commitment to indefinitely and unalterably maintain the future return of the FV sector, but rather an administrative register that makes it possible to control and know those involved in the SES. This has been the aim of entry in this register since 1998.

The set of conditions and requirements for enjoying the special regime was not simply limited to entry in an administrative register. The requirements were much greater.

At the same time, Spain acknowledges that registration affirms compliance:

298.    As to the Formiñena plant registered in 2011, the RD 1578/2008 tariff was promised for a maximum (not minimum) of 25 years, and a revision of "compensation" was explicitly contemplated "during the year 2012".[244] There was no clear and specific representation of irrevocability. While the Formiñena plant was part of the Claimant's protected investment, there was no legitimate expectation that the output of the Formiñena plant would continue to be compensated at the 2012 level throughout its active lifetime.

299.    The Tribunal notes the helpful legal analysis in *Masdar* which identifies a spectrum of situations where a claimant relies only on a bare regulatory measure addressed to the entire world, which lies at the weaker end of the spectrum, to clear and specific undertakings to a particular investor, which lies at the strongest end.[245] In *Masdar*, the claimant had (as this Claimant does not) specific letters of commitment from the government. However, as earlier noted, those letters simply confirmed what was already in RD 661/2007 and were issued *after* not before the claimant in that case made its investment. In the Tribunal's view, the clear and specific "guarantee" in RD 661/2007 satisfies the requisite degree of "specificity".

## PART 7(2). WERE THE LEGITIMATE EXPECTATIONS OF THE CLAIMANT UNDER RD 661/2007 FRUSTRATED?

300.    The frustration of the Claimant's legitimate expectations is said by the Claimant to have occurred in two stages:

    (a)    *the initial violations of 2010 to 2014:*

        (i)    cancelling the right of the Claimant's RD 661/2007 projects to receive the tariffs after Year 25 of their operating lives (which Spain subsequently lengthened to Year 28 and finally to Year 30), despite the representation

---

        Furthermore, registration can be revoked if the facility ceases to comply with the requirements to be included in the special regime.

      This is confirmed by Spain in its Counter-Memorial at paragraph 617:

        Anyone who complies with the objective requirements could be registered. There is no specific or special commitment with any facility to keep it registered or to maintain the applicable regime. If the requirements are no longer fulfilled, the registration is revoked.

[244] See Fifth Additional Provision, RD 1578/2008, Exhibit R-0072.
[245] See *Masdar Solar and Wind Cooperatief U.A. v. Kingdom of Spain,* ICSID Case No. ARB/14/1, Award, 16 May 2018, paras. 503-504, 511, Exhibit RL-117.

in RD 661/2007 that facilities would be eligible for specific tariff rates for the first twenty-five years of operation and 80% of those rates for the remainder of their operating lives;[246]

(ii)    limiting the amount of electricity eligible for feed-in tariffs by imposing annual operating hour restrictions on all PV facilities, despite the fact that RD 661/2007 guaranteed fixed feed-in tariffs to the Claimant's qualifying facilities for their entire electricity production;[247]

(iii)    reducing all of the income earned by the Claimant's facilities from electricity production, including revenue from the RD 661/2007 incentives themselves, by a 7% levy wrongfully labeled a "tax"; and

(iv)    altering the method for updating the compensation in RD 661/2007 by de-linking the tariffs from the CPI and substituting a lower index of Spain's creation, despite the clear language in RD 661/2007 that "the values of the tariffs … as defined in this Royal Decree…shall be updated on an annual basis using as a reference the increase in the [retail price index (RPI)]."[248]

The Claimant argues that each of those measures served to reduce what had been granted to the Claimant as fixed, guaranteed tariffs to be paid throughout the operating lives of their plants and thereby, the Claimant contends, violated its legitimate expectations. The "violations" were presented as a package. (The Claimant's quantum expert FTI did not endeavor to quantify the financial impact of each individual "measure").[249]

---

[246] RD 661/2007, Article 36, Table 3, Exhibit C-098.

[247] *Ibid.*, Article 17 (granting eligible facilities the rights "… (b) to transfer to the system…their net production of electrical energy or energy sold [and] (c) to receive, for the total or partial sale of th[e] net electricity generated…the compensation provided in the economic regime set out by this Royal Decree.") (emphasis added).

[248] *Ibid.*, Article 44.1, Exhibit C-098.

[249] As FTI (Richard Edwards) testified:

> I don't set out anywhere the financial impact of each measure individually, but it's worth bearing in mind that the impact of some of these measures is interrelated. So it's not necessarily straightforward to isolate the impact of each measure. I could do that, I could go away and do that if that was required, but it's not actually set out in my reports.

301.    Spain's decision to abolish the right of RD 661/2007 facilities to receive 80% of the full RD 661/2007 tariff after Year 25 (and then Year 30) of operation was inconsistent with the clear terms of RD 661/2007 that granted tariffs for the entire operating life of a facility.

## A.    The New Regulatory Regime (10 June 2014)

302.    The New Regulatory Regime that Spain unilaterally imposed on the Claimant after repeal of RD 661/2007 and RD 1578/2008 is fundamentally different from the framework that Spain promised and that induced the Claimant to invest. According to the *Frontier Petroleum* tribunal:

> Transparency means that the legal <u>framework</u> for the investor's operations is readily apparent and that any decisions of the host state affecting the investor can be traced to that legal framework…**[A]n arbitrary reversal of [that framework] will constitute a violation of fair and equitable treatment**…[250] (emphasis added)

303.    The New Regulatory Regime frustrates the Claimant's legitimate expectations in multiple respects. First, the Claimant did not invest in Spain in the expectation of receiving a "reasonable rate of return" as unilaterally defined by Spain from time to time. Rather, the Claimant invested in Spain in the legitimate expectation its facilities would receive the precise tariffs established in RD 661/2007 and RD 1578/2008 for all of the electricity produced by its installations, which the Claimant concluded based on its own criteria and judgment would offer a sufficient return to justify the risks of investment.

## B.    The Respondent's Argument

304.    Spain essentially adopts the reasoning of the Spanish Supreme Court in justifying the limits on RD 661/2007 compensation. The Supreme Court reasoned as follows:

---

* * * * *

I think we've done a very significant amount of work already. The incremental work that would be involved in not just doing two valuation exercises and a lost profits thing, but replicating that at a series of different points in time, would mean producing reports that are potentially four times the size or five times the size of the ones we have already.

Tr. Day 4, (Edwards), p. 164:l-19 to p. 166:l- 12.

[250] *Frontier Petroleum Services Ltd. v. Czech Republic*, UNCITRAL, Final Award, 12 November 2010, para. 285, Exhibit CL-031; see *also Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, para. 154, Exhibit CL-015.

> One of said implicit constraints is that the promotional measures (in this case, the receipt of a very favourable regulated tariff) cannot be regarded as "lifelong" or unlimited over time. It is not reasonable to assume that Royal Decree 661/2007 guarantees the receipt of the regulated tariff for an infinite period, in other words, without any time limit. On the contrary, even when there is talk –in its original version – of a period "subsequent" to the 25 years, it can easily be assumed that this implicitly set as a ceiling or termination the final date of the working life of the photovoltaic facilities, taken as an average, a time frame which, according to the majority of technical opinions issued at that time – in particular, according to the estimates of the Institute for the Diversification and Saving of Energy – did not exceed thirty years (including within this timeframe any appropriate preventive and corrective maintenance operations)…

> Even when in some unique cases said reference period could, in the future, exceed 30 years, the attendant official economic remuneration calculations must comply with the average of the whole…[251]

305.    The Claimant is not deprived of any of the assets acquired through investment that it chose to retain. It has always earned *at least* a "reasonable return" on the invested funds which is all that Spain ever offered.

306.    The "clawback" was a legitimate response to the excess profits obtained by the Claimant prior to 2014.

## C.    The Tribunal Rules the Claimant's Legitimate Expectations Were Frustrated

307.    The Tribunal concludes that:

    (a)    Spain's representation of non-retroactivity in Article 44(3) of RD 661/2007 was clear and specific (excluding the potential adjustments referred to in RD 661/2007 itself);

    (b)    the Claimant's legitimate expectation under RD 1578/2008 in respect of the Formiñena plant did not include the irrevocability of the existing tariff;

    (c)    the Claimant's expectations of tariff stability were reasonable and legitimate in the circumstances;

---

[251] Judgment from the Third Chamber of the Supreme Court, 12 April 201, rec. 40/2011, EDJ 2012/65328, Exhibit R-0125.

(d)    the Claimant reasonably relied upon Spain's representation when it made its investment; and

(e)    in the result, the Claimant suffered the loss complained of.

308.    Of course, in addition to deciding that its legitimate expectations have been frustrated by the host State, a claimant must also prove a breach of the FET standard. The former does not necessarily lead to the latter. "Legitimate expectations" based upon a specific representation are only "a relevant factor" in assessing whether or not the Respondent violated the FET standard in Article 10(1) of the ECT.[252]

309.    Having rejected the Respondent's view that the extent of the Claimant's legitimate expectation was limited to a "reasonable rate of return", and having accepted the Claimant's interpretation of RD 661/2007, and Mr. Giuliani's evidence of the actual expectation the Claimant possessed, and the reasonableness of the Claimant's reliance in the circumstances, the Tribunal concludes that the Respondent denied the Claimant fair and equitable treatment. In this respect, the Tribunal substantially adopts the list of violations alleged by the Claimant set out in paragraphs 299 to 301 above.

310.    At the same time, the Tribunal notes that the Claimant's Formiñena plant, was not registered until 23 March 2011, after the date for potential revision (2010) contemplated in RD 1578/2008. There was therefore no breach of fair and equitable treatment in relation to the Formiñena plant.

## D.    The Tribunal Rules that the Frustration of the Claimant's Legitimate Expectation Violated the Standard of Fair and Equitable Treatment

311.    The financial vulnerability of renewable energy projects is the heavy up-front capital costs. Once money is "sunk" in the PV facilities, the funds of the developer (and its bankers) are locked into the FIT contracts with their investments effectively (as the Claimant put it) long-term hostages. If energy prices rise, the benefit accrues to Spain not the operators who, in Spain's view, will recover only what Spain unilaterally declares to be a reasonable return by reference to the

---

[252] *Glamis Gold, Ltd. v. The United States of America*, UNCITRAL (1976), 8 June 2009, Exhibit CL-0011.

bond market. On the other hand, if energy prices fall, Spain claims the right to resile from what the Tribunal has concluded was a regulatory guarantee of price stability. Spain's position is that it alone should benefit from rising prices, but the burden of falling prices is to be off-loaded onto investors. As a matter of Spanish domestic law, such treatment of local investors has been held to be constitutional, but in the Tribunal's view, such one-sided treatment is neither fair nor equitable. Under the ECT, the Claimant, as a foreign investor, was entitled to fair and equitable treatment and in this case did not receive it.

## PART 7(3). DID SPAIN BREACH THE FET STANDARD BY FAILING TO TREAT THE CLAIMANT'S INVESTMENTS TRANSPARENTLY AND FREE FROM IMPAIRMENT BY UNREASONABLE OR DISCRIMINATORY MEASURES

312.    A State's duty of "transparency" requires the legal framework that will apply to  an investment to be readily apparent. [253] Article 10(1) of the ECT provides in part that:

> (1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create **stable**, equitable, favourable **and transparent conditions** for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. (emphasis added)

## A.    The Claimant's Argument

313.    A State may violate the "fair and equitable treatment" standard either by violating an investor's "legitimate expectations" or by failing to treat an investor or its investment transparently and free from impairment by unreasonable or discriminatory measures. The Claimant, citing *Metalclad*, argues that, "investors must be able to know and understand the legal regime that will govern their investments...[T]here should be no room for doubt or uncertainty on such matters."[254] The Claimant points to *Micula v. Romania* as an example of  a tribunal

---

[253] See Rudolf Dolzer and Christoph Schreuer, *Principles of International Investment Law*, pp. 149-151 (2d ed. 2012), Exhibit CL-018.
[254] *Metalclad Corp. v. United Mexican States*, ICSID Case No. ARB/96/3, Award, 30 August 2000, para. 76,  Exhibit CL-029.

finding that a State may violate the "fair and equitable treatment" standard twice — first by undermining "legitimate expectations" and second by failing to act transparently and consistently.[255] Thus, "legitimate expectations" and "transparency/consistency" are "stand alone" claims the Claimant argues, and it says, the violation of either of them gives rise to liability under the ECT and international law.

314.    Spain replaced the "clear and transparent pricing formulas" under RD 661/2007 and RD 1578/2008 with remuneration under the New Regulatory Regime based on the general notion of a "reasonable rate of return," which pursuant to **MO 1945**, is to be determined by reference to various formulas (one of over 578 "standard" PV installations) which can be revised and imposed on existing facilities at Spain's discretion.[256]

315.    Spain thereby made the investment environment entirely uncertain, unreasonable, and future remuneration impossible to predict. That uncertainty led to an unsatisfactory sale price for 9REN's Solaica plants that was only a fraction of what they would have been worth without Spain's revisionist measures.

316.    In terms of discrimination, the Claimant contends that not only is the TVPEE not a genuine tax, but it discriminates between renewable and conventional energy producers. The so-called "tax" discriminated against renewable energy producers like 9REN. When a tax is imposed on producers who sell their goods in a competitive market, the producers typically can pass on some portion – often a large portion – of the tax to consumers. Tariff rates, however, were fixed by law, such that 9REN's plants could not increase prices to pass on the "tax" to consumers."[257]

317.    Spain's regulatory activity 2010 to 2013 is precisely the opposite of the sort of rational, balanced decision-making process that the *LG&E* tribunal required for a State to fulfill its obligations under the impairment clause.

---

[255] *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 872, Exhibit CL-020; see also *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, para. 557, Exhibit CL-028.
[256] In addition to the 3- and 6-year reviews mandated under the New Regulatory Regime, under Act 24/2013, Claimant's investments are also subject to further payment reductions as needed to cover Spain's long-running tariff deficit. Law 24/2013, C-180. This allows Spain to unilaterally decide if and when it would like to reduce tariffs in the future, further underlining the lack of transparency pervasive in the New Regulatory Regime.
[257] Claimant's Memorial, para. 263.

### B.    The Respondent's Position

318.    Spain notes the Claimant's acknowledgement that the RD 661/2007 and RD 1578/2008 regimes were "clear and transparent". In Spain's view, the New Regulatory Regime could hardly be more specific and detailed. All told, MO 1045 is a 1,761-page document that defines parameters for 1,517 different "standard installations," including 578 "standard installations" in the PV sector alone.[258] In its quantum report, the Claimant's expert FTI acknowledged that:

> [f]or PV plants, an IT Code existed for **every possible combination** of the factors set out above. For example, the IT Code IT-00014 was assigned to any PV plant that: (i) was granted its final commissioning certificate in 2007; (ii) was registered under RD 661; (iii) used single axis trackers; and (iv) had an installed capacity of less than or equal to 5kW. If a plant matching all of these characteristics was granted its final commissioning certificate one year later in 2008, it would have been assigned a different IT Code (IT-00015).[259]

319.    Spain argues that it spelled out in meticulous detail the compensation rules complained of by the Claimant. Moreover, for the reason previously explained, the disputed measures were neither discriminatory nor arbitrary in light of the "tariff deficit" and the general financial situation in which Spain found itself.

### C.    The Tribunal's Ruling on Transparency and Discrimination

320.    The Claimant's case rests on RD 661/2007 (and perhaps RD 1578/2008) being a clear, specific and binding representation. Thus, they are "transparent". The fact that under the New Regulatory Regime, regulated tariffs now may be varied from time to time in accordance with stated criteria under MO 1045, does not mean the New Regulatory Regime lacks transparency. Different regulators adopt different methodologies. Complexity is not necessarily the enemy of transparency. Complexity may simply be a function of the subject matter.

---

[258] See MO 1045, Preamble, Exhibit C-179. Although MO 1045 formally entered into force on the day following its publication in the Official Gazette, the provisions included therein were actually effective as of 14 July 2013, the date of entry into force of RDL 9/2013. Remunerations received by the installations from 14 July 2013 to 21 June 2014 were in the form of payments on account, which should be regularized in the first nine assessments carried out pursuant to the new remuneration scheme.

[259] FTI First Quantum Report, para. 3.35.

321.    The fact that MO 1045, issued in conjunction with the New Regulatory Regime, attempts to address in an explicit way the different variables in arriving at compensation levels is not an ECT violation. The fact the Claimant disagrees with parts of the methodology does not rob Spain of its regulatory authority.

322.    The financial crash of 2008/2009, now known as the Great Recession, created serious challenges. As the Claimant's expert testified on cross-examination by Ms. Rivas Kortazar:

> Q. In this paragraph -- and I am reading out loud -- you establish: "Clearly there are legitimate policy concerns that might lead a government to keep prices low, in particular for the most vulnerable consumers and for companies facing international competition." So do you agree that it's a legitimate policy concern to protect somehow vulnerable consumers and the competitiveness?
>
> A. (Dr Moselle) That's what the sentence says. So, yes, that's exactly what we say.[260]

323.    A regulatory measure rationally connected to a legitimate State objective, where the means chosen are proportionate to achievement of the objective which Spain says was avoidance of SES insolvency, is neither unreasonable nor arbitrary. The Tribunal also rejects 9REN's argument that the regulatory regime 2010 to 2014 lacked transparency within the limits permitted by the ECT. Whether Spain's "disputed measures" violated *other* provisions of Article 10(1) is of course a different question.

324.    The Claimant's argument on discrimination relates to the incidence of the TVPEE tax, which, as explained above, is withdrawn from the Tribunal's jurisdiction by Article 21 of the ECT and is, in any event, unconvincing.

325.    The Tribunal accordingly rejects the Claimant's argument on transparency and discrimination.

**PART 7(4). THE UMBRELLA CLAUSE**

326.    The ECT provides in Article 10(1) in part as follows:

---

[260]Tr. Day 4, (Moselle) p. 141:23 to p. 142 8.

> Each Contracting Party shall observe **any** obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party. (emphasis added)

327.    The expression "any" obligations is very broad. The Claimant asserts and Spain denies, that obligations undertaken through law or regulation (and not just contractual obligations) fall within its scope.[261]

## A.    The Claimant's Argument

328.    Investment treaty tribunals have adopted broad interpretations of similarly worded umbrella clauses, finding that they cover not only contractual obligations, but also obligations undertaken through law or regulation.[262] For example, in *LG&E v. Argentina,* the tribunal considered that the obligations undertaken by Argentina under its Gas Law and its regulatory tariff scheme "were not legal obligations of a general nature [but] were very specific in relation to LG&E's investment in Argentina so that their abrogation would be a violation of the umbrella clause."[263] As in the *LG&E* case, Spain's incentive tariffs were not of a general nature; rather, they were **individually granted** to specific photovoltaic plants that qualified under the terms of the legal regime, were granted a Final Commissioning Certificate, and were **individually registered** in the RAIPRE. In the case of Formiñena, the fixed tariff rate was confirmed by

---

[261] It is common ground that umbrella clauses cover contractual obligations. See *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 187, Exhibit CL-042; *Bosh Int'l, Inc. and B&P Ltd. Foreign Investment Enterprise v. Ukraine*, ICSID Case No. ARB/08/1, Award, 25 October 2012, paras. 246-247, Exhibit CL-043; *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 19 August 2005, paras. 244, 246 ("The plain meaning- the "ordinary" meaning" – of a provision prescribing that a State "shall observe any obligation it may have entered into" with regard to certain foreign investments is not obscure. The phrase, "shall observe" is imperative and categorical. "Any" obligations is capacious; it means not only obligations of a certain type, but "any" –that is to say, all- obligations entered into with regard to investments of investors of the other Contracting Party"), Exhibit CL-044; *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, para. 85 ("breaches of a contract into which the State has entered are capable of constituting a breach of international law *by virtue of the breach of the umbrella clause*"), Exhibit CL-045; *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 17 January 2007, para. 205, Exhibit CL-046.

[262] See e.g., *EDF Int'l S.A., SAUR Int'l S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Award, 11 June 2012, paras. 938-939, 1035, Exhibit CL-050; *Sempra Energy Int'l v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007, paras. 313-14, Exhibit CL-033; *Enron Corp. and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case. No. ARB/01/3, Award, 22 May 2007, paras. 275-277, Exhibit CL-022; *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 19 August 2005, paras. 251-260, Exhibit CL-044; *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, paras. 53, 61-62, Exhibit CL-045.

[263] *LG&E Energy Corp., LG&E Capital Corp., and LG&E Int'l, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, para. 174, Exhibit CL-023.

Spain upon the facility's enrollment in the pre-allocation registry. Spain's grant of specific rights was limited to those investors, like the Claimant, who properly qualified their individual plants under the regime.[264]

329.    Similarly, in *Khan Resources v. Mongolia*, the tribunal held that a breach by Mongolia of any provision of its Foreign Investment Law would constitute a breach of the ECT's "umbrella clause."[265] The tribunal concluded that Mongolia had breached its Foreign Investment Law and was therefore "liable towards the Investor through operation of the umbrella clause."[266]

330.    The tribunal in *Al-Bahloul v. Tajikistan* confirmed that the umbrella clause in the ECT "is broadly stated, referring as it does to 'any obligation' and, as such, by the ordinary meaning of the words, includes **both statutory and contractual obligations**."[267] In *Plama v. Bulgaria*, the tribunal analyzed the ordinary meaning of the term "any obligation" in the last sentence of Article 10(1) of the ECT and concluded that its wide ambit encompassed "any obligation regardless of its nature, *i.e.*, **whether it be contractual or statutory**."[268]

331.    With respect to the facts, the Claimant contends that RD 661/2007 and RD 1578/2008 created a number of explicit obligations regarding the tariffs that Spain undertook to pay for the electricity produced by qualifying facilities:

- the obligation to pay "the compensation provided in the economic regime [of RD 661/2007 and RD 1578/2008]" to the Claimant's facilities "for the total or partial

---

[264] The Claimant also notes, curiously, that according to Professor Aragón, RD 661/2007 and RD 1578/2008 granted specific property rights under Spanish law to eligible investors, including Claimant. (Aragón First Expert Report at 16, 26, 41-43) Elsewhere the Claimant argues that Spanish law is irrelevant to the modification issues.
[265] *Khan Resources Inc., Khan Resources B.V. and Cauc Holding Company Ltd. v. Government of Mongolia and Monatom Co. Ltd.*, PCA Case No. 2011-09, Award on Merits, 2 March 2015, para. 366, Exhibit CL-049.
[266] See also *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010, para. 167, Exhibit CL-051, the tribunal interpreted an umbrella clause as creating "an obligation for the State to constantly guarantee observance of its commitments entered into with respect to investments of investors of the other party. The obligation has no limitations on its face – it apparently applies to all such commitments, whether established by contract or by law, unilaterally or bilaterally, etc."
[267] *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009, para. 257 (emphasis added), Exhibit CL-047.
[268] *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 186, Exhibit CL-042. See also *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008, para. 110, Exhibit CL-048.

sale of the net electricity generated" (Article 17 of RD 661/2007, also applicable to, the Claimant says, RD 1578/2008);

- the obligation to pay fixed tariffs of 44.0381c€ to the Claimant's El Paso, El Soldado, La Gineta II, Siruela, Gibraleón and Yecla facilities and 41.75c€ to the Claimant's Alcaudete plant, per kWh of electricity produced for the first twenty-five years of those facilities' operation (Article 36 of RD 661/2007);

- the obligation to pay fixed tariffs of 35.2305c€ per kWh of electricity produced by the Claimant's El Paso, El Soldado, La Gineta II, Siruela, Gibraleón and Yecla facilities and 33.400c€ per kW of electricity produced by the Claimant's Alcaudete plant, for the remaining operating lives of those facilities (Article 36 of RD 661/2007);

- the obligation to pay fixed tariffs of 0.2908570c€ to Formiñena PV facility per kWh of electricity produced for the first twenty-five years of operation (Article 11 of RD 1578/2008 and the specific resolution issued to Formiñena upon enrollment in the RD 1578/2008 pre-allocation registry);

- the obligation to update the value of the RD 661/2007 and RD 1578/2008 tariffs "on an annual basis using as a reference the increase in the CPI" (Article 44.1 of RD 661/2007 and Article 12 of RD 1578/2008); and

- the obligation to ensure that "revisions to the regulated tariff…shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed" (Article 44(3) of RD 661/2007, which the Claimant argues is also applicable to RD 1578/2008).

332.   Starting in 2010, Spain began to violate the obligations it had undertaken in respect of the Claimant's investments, progressively reducing the remuneration it had agreed to provide in

its regulatory framework and in specific commitments regarding 9REN's facilities. In summary:[269]

    (a)    2010 Operating Hour Restrictions violated Spain's obligation to pay incentives on all electricity an eligible plant could produce;[270]

    (b)    2010 Duration Restrictions violated Spain's obligation to pay incentives for the full life of facilities;[271]

    (c)    2012 "Taxes" violated Spain's obligation to pay fixed incentive rates;[272]

    (d)    2013 Change in CPI Inflation Index violated Spain's obligation to adjust RD 661/2007 incentives according to the CPI;[273] and

    (e)    2013-2014 "New Regulatory Regime" violated Spain's obligation to pay fixed incentive rates for the lifetime of plant operation.[274]

## B.    The Respondent's Argument

333.    The Claimant errs in stressing the word "*any*", which due to its broad nature, would open the floodgates to all types of state activity to be included in the concept of obligations. The words "entered into" in the last sentence in Article 10(1) of the ECT require a State's *assumption of specific obligations regarding a certain investor or a certain investment*.[275]

---

[269] Claimant's Closing Argument, Slide 41.

[270] RD 661/2007, Article 17 provides that:

[P]roprietors of production facilities under the special regime shall enjoy the following rights:…
(c) Receive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree…

RD 661/2007, Article 17, Exhibit C-098.

[271] *Ibid*., Article 36.

[272] *Ibid.*

[273] *Ibid*., Article 44.1.

[274] *Ibid*., Article 36.

[275] Citing *Noble Ventures, Inc. v. Romania* where the tribunal concluded:

…considering the wording of…"any obligation [a party] may have entered into with regard to investments," it is difficult not to regard this as a clear reference to investment contracts. In fact, one may ask what other obligations can the parties have had in mind as having been "entered into" by a host State with regard to an investment. The employment of the notion "entered into" indicates that specific commitments are referred to

334.    The words "entered into" appear, in context, as "…obligations it [the host State] entered into with an Investor." The ECT was signed in multiple languages. The French reads "respecte les obligations **qu'elle a contractées** vis-à-vis du'un investisseur"; and the Spanish reads: "cumplirá las obligaciones **que haya contraido** con los inversores." All these terms suggest that a bilateral obligation must have been agreed between the investor and the host State.

335.    The Claimant wrongly invokes the award of *Plama Consortium v. Bulgaria* as a precedent in its favour. The *Plama* tribunal held explicitly that:

> Since the Parties are exclusively concerned with the application of the last sentence of Article 10(1) ECT to [contractual obligations], the Tribunal need not extend its analysis any further.[276]

336.    Equally *Khan Resources v. Mongolia* is distinguished because in that case the Foreign Investment Law was passed specifically for foreign investors. Therefore, the obligations analyzed in the award do not arise from regulations of general nature, *erga omnes*, as is the case here. RD 661/2007 is a regulation applicable to *any* investor, regardless of nationality.

337.    The Claimant's stance is not supported by *Al-Bahloul v. Tajikistan* either. Reading the entire paragraph from which the Claimant extracts the quote in fact undermines the Claimant's position:[277]

> This protection is broadly stated, referring as it does to "any obligation" and, as such, by the ordinary meaning of the words, includes both statutory and contractual obligations. The ICSID Ad Hoc Committee, in annulling the decision in *CMS v Argentina*, took a narrower view and considered

---

and not general commitments, for example, by way of legislative acts. This is also the reason why Art. II (2)(c) would be very much an empty base unless understood as referring to contracts…

*Noble Ventures, Inc v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, para. 51, Exhibit RL-0026. See also *SGS v. The Philippines*:

[T]he host State must have assumed a legal obligation, and it must have been assumed vis-à-vis the specific investment-not as a matter of the application of some legal obligation of a general character. This is very far from elevating to the international level all the 'municipal legislative or administrative or other unilateral measures of a Contracting Party.

Respondent's Counter-Memorial, para. 1238, citing *Société Générale de Surveillance S.A. v. the Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004, para. 166, Exhibit RL-0024.
[276] *Plama Consortium Limited v. the Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 187, Exhibit CL-042.
[277] Claimant's Memorial, para. 390.

that the words "entered into" suggest that the obligation is limited to those of a consensual nature. In both cases, however, it is clear that the obligation must have been entered into "with" an Investor or an Investment of an Investor. **Therefore, this provision does not refer to general obligations of the State arising as a matter of law.**[278] (emphasis added)

338.    Equally, *AMTO v. Ukraine*[279] concerned the question of whether a *contractual* obligation undertaken by the State with a parent company could be extended to a subsidiary. In the present case, there is no allegation of any contractual obligation between the Claimant and Spain.

339.    The Claimant also invokes various awards involving Argentina including *LG&E v. Argentina* and *Enron v. Argentina*.[280] But in these cases there were specific commitments between the State and investors by way of concessions or licences

340.    The Claimant also cites *Noble Ventures, Inc. v. Romania*, but that award indicates, to the contrary, that

the employment of the notion "*entered into*" indicates that specific commitments are referred to and not general commitments, for example by way of legislative acts. This is also the reason why Article II (2)(c) would be very much an empty base [sic] unless understood as referring to contracts…[281]

341.    The Claimant's claims under the umbrella clause in Article 10(1) of the ECT should therefore be dismissed.

## C.    The Tribunal's Ruling on the Umbrella Clause

342.    The Tribunal is sensitive to the implications of Spain's "floodgates" argument. The ECT uses the term "any obligation". The term "any obligation" must be interpreted according to the words used in Article 10(1) of the ECT. It is used in the context of an obligation "entered into" by the State "with an Investor". That context is apt for a bilateral contract, such as a concession or licence agreement. It is not apt to describe a State's public legislation or administrative regulations.

---

[278] *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009, para. 257. Exhibit CL-047.
[279] *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008, par. 110, Exhibit CL-048.
[280] Claimant's Memorial, para. 393.
[281] *Noble Ventures Inc. v Romani*a, ICSID Case No. ARB/01/11, Award, 12 October 2005, para. 51, Exhibit RL-0026.

A State does not "enter into" such legislation with a private party. In any event, a legitimate expectation, divorced from its anchorage in the FET standard, is itself not a free standing "obligation" in the sense of Article 10(1) of the ECT.

343.    The Claimant's case has been pleaded throughout as a "legitimate expectations" case based on

(a)    Spain undertaking to accept the "total or partial" output of the Claimant's RD 661/2007 plants in accordance with the prescribed FIT tariff and terms. There was to be no limitation with respect to operating hours or imposition of an access toll;

(b)    the obligation was to continue for a period of 25 years and at 80% thereof for the balance of the useful life of the facility. The Tribunal notes that "the useful life of the facility" is undefined;

(c)    to adjust compensation by reference to an objective CPI.

344.    On the other hand, the Tribunal has concluded that Spain did **not** assume any obligation to the Claimant

(a)    to refrain from imposing the 7% TVPEE tax;

(b)    to refrain from modification of the compensation payable under RD 1578/2008.

345.    In the circumstances, it would be both problematic and superfluous to give effect to the Claimant's argument under the umbrella clause; problematic because it would conflate an investor's protection under FET with the protection sought to be extended by the umbrella clause and twist the latter out of shape, and it would be superfluous because the umbrella clause adds nothing in the way of relief to what has already been granted under FET.

346.    The Claimant contends that "there is an additional level of obligations in the form of the RAIPRE registration for each of 9REN's investments"[282] but on this point, the Tribunal agrees

---

[282] Claimant's Closing Argument, Slide 2. The Claimant relies on the evidence in cross-examination of Spain's legal expert, Professor Vaquer:

with Spain that RAIPRE registration is just an administrative precondition to the FIT benefits and not a source of those benefits.[283]

## PART 7(5). EXPROPRIATION

347.    The issue is whether the cumulative effect of all of Spain's measures was to substantially deprive the Claimant of its investment in the PV facilities. The issues are:

- was there any expropriation?

- if so, was it lawful?

### A.    The Claimant's Argument

348.    Investment treaty jurisprudence is replete with support for the principle that discrete legal rights – be they rights to money or otherwise – are independent "investments" capable of expropriation in cases where the relevant treaty defines "investments" to include such rights.[284]

349.    A measure is expropriatory when a State interferes with a protected investment in a way that significantly or substantially deprives the investor of the use, benefit, or value of the investment, to an extent that is more than ephemeral.[285]

---

Q. Could a plant benefit from the economic regime of RD 661 without having obtained registration in the RAIPRE?

A. It shouldn't have. It shouldn't have, because the royal decree said: prior registration in the RAIPRE.

Tr. Day 3, (Vaquer) p. 212:4-8.

[283] As indeed seemed to be the position of the Claimant's legal expert, Professor Aragón:

…the right to the remuneration has its source of course in the regulation, in 661 itself, but it enters into force, it is enforced for the operator of an installation when their installation is registered. And the regulation is very clear: it is a necessary condition to operate under the remuneration regime of this royal decree, it is a necessary condition to be registered with RAIPRE. This is perfectly clear, unequivocal. If this condition is not met, the subjective right to benefit from that regime is not in existence.

Tr. Day 3, (Aragón) pp. 104:5-15.

[284] Further, at least one scholar has argued that "a taking of acquired rights…is considered as much as a  wrong a taking or destruction of tangible property. The taking of acquired rights entitles the victim to  compensation." Lone Wamdahl Mouyal, *International Investment Law and the Right to Regulate, A Human Rights Perspective*, 45 (2016), Exhibit CL-057.

[285] See e.g., *Técnicas Medioambientales Tecmed S.A. v. United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003,  Exhibit CL-015; *Middle East Cement Shipping and Handling Co. S.A. v.*

350.    International tribunals have held that the form of the measures is not decisive of whether an expropriation has occurred: the measures may vary from an immediate and comprehensive taking to a series of measures that gradually chips away an investment's value by incremental steps, culminating in a substantial deprivation of the investment (often referred to as "creeping expropriation").[286] In short: "Expropriation can be direct, indirect, regulatory, creeping, *de facto*, or a government act may be 'tantamount to,' 'equivalent to,' or 'have similar effects as' expropriation."[287]

351.    As a matter of international law, it is not necessary that Spain expropriate the entire business operation to have violated Article 13 of the ECT.[288] For example, in *Middle East Cement*, the tribunal separately analyzed whether the claimant's license, its tangible property (in that case, a ship), and other rights that qualified as "investments" had been expropriated, reaching different conclusions **based on the impact of the State's measures on each separate**

*Arab Republic of Egypt,* Award, 12 April 2002, para. 114, CL-054; *CME Czech Rep. B.V. v. Czech Republic.*, UNCITRAL, Partial Award, 13 September 2001, ss. 604-5, Exhibit CL-036; Christoph Schreuer, *The Concept of Expropriation Under the ECT and Other Investment Protection Treaties*, in *Investment Arbitration and the Energy Charter Treaty* 126-133 (Clarisse Ribeiro ed., 2006), Exhibit CL-067.

[286] See *Compañía del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000 paras. 76-77, Exhibit CL-068; Christoph Schreuer, *The Concept of Expropriation Under the ECT and Other Investment Protection Treaties*, in *Investment Arbitration and the Energy Charter Treaty* 126-133 (Clarisse Ribeiro ed., 2006), Exhibit CL-067; Rudolf Dolzer, *Indirect Expropriations: New Developments?* 11 N.Y.U. ENIRON. L. J. 64 (2002) p. 79, Exhibit CL-069.

[287] Christopher Dugan et al., *Investor-State Arbitration* 450 (2008), Exhibit CL-070.

[288] See, e.g., *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 17 January 2007, para. 267 (noting that "there is a long judicial practice that recognizes that expropriation is not limited to tangible property"), CL-46; *Methanex Corp. v. United States of America*, UNCITRAL, Final Award on Jurisdiction and Merits, 3 August 2005, para. 17 (holding that the narrow understanding of the concept of  property "as a material 'thing' is obsolete and has ceded its place to contemporary conception"), Exhibit CL-052; *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Award, 13 March 2015, para. 118, Exhibit CL-053 (acknowledging that "good-will" and  "know-how" – as covered investments – are capable of being expropriated). Moreover, the concept of partial expropriation exists under international law, as demonstrated in the Guidelines *for the Treatment of Foreign Direct Investment*, adopted by  the Development Committee of the Board of Governors of the International Monetary Fund  and the World Bank, which states: "A State may not expropriate or otherwise take <u>in whole or in part</u> a foreign private investment in its territory, or take measures which have similar effects…" (*Guidelines on the Treatment of Foreign Direct Investment Issued by the Development Committee*, 7  ICSID REV.-F.I.L.J. 295 (1992), s. IV (emphasis added), Exhibit CL-060) While the form of expropriatory measures may vary, the determining factor as to whether an expropriation has occurred is the consequential impact of the measures on the investor's "investment." The question is whether the investor has been deprived — in  whole or in substantial part – of the use, benefit, or value of its "investment." See e.g., *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No.  ARB(AF)/00/2, Award, 29 May 2003, paras. 115-116, Exhibit CL-015; see also Christoph Schreuer, *The Concept of  Expropriation Under the ECT and Other Investment Protection Treaties*, in *Investment Arbitration and the Energy Charter Treaty* 126-133 (Clarisse Ribeiro ed., 2006), para. 119, Exhibit CL-067.

**investment**.[289] Further, in *Eureko v. Poland*, the tribunal found that the claimant's <u>right</u> to acquire further shares in a company was an investment capable of being expropriated, although the underlying business operation remained unaffected by the state's expropriatory measures.[290]

352.    The *EnCana v. Ecuador* tribunal reached a similar conclusion with respect to expropriation of claimant's "claims to money."[291] That case concerned claims for the refund of VAT in connection with contracts for the exploration and exploitation of oil and gas.[292] The tribunal first rejected a claim that the overall business operation had been expropriated.[293] It then proceeded to examine separately the question of whether the denial of the VAT refund **amounted to an expropriation of that specific right**.[294] Noting that the applicable bilateral investment treaty contained "claims to money" in its definition of "investment," the tribunal found that "a law which **cancels a liability** the State already has to an investor…is capable of amounting to expropriation."[295] The Claimant argues that its rights under its FIT contracts amount to property rights.[296]

353.    Specifically, RD 661/2007 conferred a bundle of rights on seven of 9REN's projects as set out in Articles 17, 36, and 44 of RD 661/2007. For its part, RD 1578/2008 provided similar rights to a fixed tariff for twenty-five years for 9REN's Formiñena plant. Professor Aragón testified that rights granted to those facilities under RD 661/2007 and RD 1578/2008 were legal rights under Spanish law and protected as such.[297]

---

[289] *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, Exhibit CL-054; see also *Gami Investments, Inc. v. United Mexican States*, UNCITRAL, Final Award, NAFTA - UNCITRAL, Final Award, 15 November 2004 paras. 126-127 ("The taking of 50 acres of a farm is equally expropriatory whether that is the whole farm or just a fraction."), Exhibit CL-055.

[290] *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 19 August 2005, paras. 239-241, Exhibit CL-044.

[291] *EnCana Co. v. Republic of Ecuador*, UNCITRAL, Award, 3 February 2006, paras. 182-183, Exhibit CL-056.

[292] *Ibid*. paras. 172-178.

[293] *Ibid*. para. 179 *et seq*.

[294] *Ibid*. para. 182.

[295] *Ibid*. para. 183.

[296] In the 1929 case of *German Interests in Polish Upper Silesia Case (Germany v. Poland)*, the PCIJ held: "the principle of respect of vested rights forms part of generally accepted international law." (*German Interests in Polish Upper Silesia Case (Germany v. Poland)*, PCIJ Case 1926, Series A, No 7 22, p. 42, Exhibit CL-058) In addition, scholars have understood that "the fundamental premise for [the] international minimum standard governing treatment of foreign property is respect for acquired rights." (Samuel Asante, *International Law and Foreign Investment: A Reappraisal*, 37 INT'L & COMP. L.Q. 595 (1988), Exhibit CL-059).

[297] Aragón First Expert Report, paras. 16 and 39-40.

354.    Spain substantially interfered with 9REN's rights to receive the **full value** of the  RD 661/2007 and RD 1578/2008 tariffs on all of the electricity that its facilities produced when, between 2010 and 2013, Spain enacted the disputed measures previously discussed.[298]

355.    Those acts of **substantial interference**[299] were followed by Spain's abrogation of RD 661/2007 and RD 1578/2008 in their entirety in 2013/2014, with the New Regulatory Regime which entirely deprived the Claimant of each of its rights under the aforementioned regimes.

356.    For all of these reasons, Spain expropriated the Claimant's "investments" in the sense of Article 13 of the ECT. Moreover, the expropriation was unlawful, because it did not satisfy each of the four cumulative requirements for a lawful expropriation contained in Article 13 of the ECT. The Tribunal should therefore conclude that Spain's measures violated Article 13 of the ECT.

## B.    The Respondent's Position

357.    Spain contends that a regulatory modification that affects the value of a right does not amount to an expropriation of that right and is well within the sovereign regulatory power of the State.

358.    There has been no expropriation. The photovoltaic plants are guaranteed by statute a reasonable rate of return, protected from market uncertainty and fluctuations. An investment that remains in the possession and control of the investor with a reasonable rate of return guaranteed

---

[298] FTI First Quantum Report, para. 8.

[299] It is well-accepted that a host state may "interfere" with the investor's property through  regulatory actions, including through taxation measures, which can amount to expropriation. At least one tribunal has found a state liable for expropriation when the state interfered with an investor's rights under a license, **while the license itself remained with the investor and was not itself expropriated**. Furthermore, a government decree or pronouncement that makes clear that the investor will not be able to exploit its investment in the future may be expropriatory if it deprives the investor of the ability to make  reasonable use of the property or sell the investment at a reasonable price. See *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No.  AA 227, Award, 18 July 2014 paras. 1579, 1580, Exhibit CL-071; Restatement (Third) of the Foreign  Relations Law of the United States s. 712 n.6, cmt. g. (1987), Exhibit CL-072. See e.g., *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, Award, 12 April 2002 para. 107, Exhibit CL-054; *Compañia del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1,  Award, 17 February 2000, Exhibit CL-068.

by law cannot be considered expropriated, despite being deprived in part of its hoped-for regulatory premium.

359.    Future returns on an investment do not qualify as "an asset" subject to expropriation within the terms of Article 13(3) of the ECT. The Claimant does not "*possess or control directly or indirectly*" the returns it expected to receive *in future* via a tariff regulated under the Spanish legislative framework within the meaning of Article 1(6) of the ECT.

360.    According to Spain, the Claimant is consistently wrong in denying the importance of Spanish law. Any investment capable of being expropriated must consist in a right or asset that is duly constituted, defined, formed and recognised under the laws of the host State.[300] This is so because the international law on expropriation is only concerned with the protection of property rights or other economic interests and does not regulate the process of the *creation* of such rights.[301]

361.    The Claimant had an acquired right to receive only the remuneration under RD 661/2007 in relation to **energy already sold**. Under no circumstances was there an acquired right capable of expropriation to a **future** income stream.[302]

---

[300] UNCTAD Series on Issues in International Investment Agreements, Expropriation, United Nations Series, New York and Geneva, 2012, page 22, ("UNCTAD Expropriation Report"), Exhibit RL-0030.

[301] *EnCana Corporation v Rep. of Ecuador*, UNCITRAL, Award 3 February 2006, para. 184, Exhibit RL-0027:

…to have been an expropriation of an investment or return (in a situation involving legal rights or claims as distinct from the seizure of physical assets) the rights affected must exist under the law which creates them, in this case, the law of Ecuador.

See also *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAgua Servicios Integrales del Agua S.A. v. the Republic of Argentina*, Decision on Liability of 30 July 2010, para.151, Exhibit RL-028, where the tribunal stated:

To assess the nature of these rights in a case of alleged expropriation of contractual rights, one must look to the domestic law under which the rights were created. AASA's and the Claimants' contractual rights in the Concession, which the Claimants allege were expropriated, were created by the legal framework and the Concession Contract described above.

[302] *Charanne B.V. and Construction Investment S.À.R.L. v. the Kingdom of Spain*, Final Award, 21 January 2016, paras. 494, 458 and 459, Exhibit RL-0049. As the *Charanne* tribunal held:

The subject of the investment were [sic] not the returns, but rather the company X…an investment protected under Article 1(6) must be owned or controlled by the investor, and that the Claimants neither own nor control the future returns on the plants, which do not constitute vested rights. Therefore, the Tribunal considers that the Claimants invested in shares (Article 1(6)(b) ECT), and not in returns.

362.    In any event, the contested measures are regulatory acts that do not generate the obligation to compensate. They result from Spain's power to legislate in the public interest in a highly regulated industry. State acts are not subject to compensation when they are an expression of the police powers of the State.[303]

363.    Arbitration tribunals that have interpreted the ECT have shown that, in order for Article 13(1) to characterize a measure as equivalent to expropriation, it must prevent the investor from continuing to enjoy its investment or from using it, or it must restrict some property right attaching to the investment in a severe and devastating manner.[304]

364.    Despite the Claimant's litany of complaints, it is assured recovery of the *cost of the investment* and the *operating* costs and is guaranteed a *reasonable rate of return* linked to the 10-year Spanish bond plus 300 basis points. The challenged measures are neither disproportionate nor unreasonable in relation to the objective they are intended to achieve.

365.    In *AES v. Hungary*, the tribunal ruled that, as AES maintained control over AES and continued to profit from its investment, the measures adopted by Hungary could not be considered measures equivalent to expropriation.[305]

---

[303] UNCTAD Expropriation Report, p. 78, Exhibit RL-0030.

[304] In *Electrabel S.A. v. the Republic of Hungary*, the tribunal established that the measures adopted by Hungary, as they neither prevented Electrabel from continuing to operate the plant, nor prevented it from operating on the Hungarian electricity market, could not be considered measures equivalent to an expropriation under Article 13 ECT:

> As regards indirect expropriation, the Tribunal considers that the wording of Article 13(1) ECT requires Electrabel to establish that…its investment lost all significant economic value with the PPA's early termination…In short, the Tribunal considers that the accumulated mass of international legal materials, comprising both arbitral decisions and doctrinal writings, describe for both direct and indirect expropriation, consistently albeit in different terms, the requirement under international law for the investor to establish the substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment…Conversely, arbitral tribunals have rejected claims for expropriation under international law where the investor has failed to meet this test for "substantial" deprivation…the Tribunal also interprets the terms of Article 13(1) ECT as requiring Electrabel to meet the test for substantial deprivation both for direct expropriation and indirect expropriation having the equivalent effect to direct expropriation or nationalisation.

*Electrabel S.A. v. the Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Act and Liability, 30 November 2012, paras. 6.53-6.62, 6.63, Exhibit RL-0002.

[305] *AES Summit Generation Ltd and AES-Tisza Erömü Kft v. Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, paras. 14.3.1-14.3.4, Exhibit RL-0039:

> a state's act that has a negative effect on an investment cannot automatically be considered an expropriation. For an expropriation to occur, it is necessary for the investor to be deprived, in whole or significant part, of

366.    The *El Paso v. Argentina* award held:

> …for an expropriation to exist, the investor should be substantially deprived not only of the benefits, but also of the use of its investment. **A mere loss of value, which is not the result of an interference with the control or use of the investment, is not an indirect expropriation**.[306] (emphasis added)

367.    Likewise, the *Charanne* case requires a loss equal to deprivation of ownership:

> 465. …For a measure to be considered equivalent to an expropriation, its effects have to be so significant that it can be considered that the investor has been deprived, in full or in part, of its investment. Therefore, **a mere decrease in the value of the shares subject to the investment cannot qualify as an indirect expropriation**, unless the loss of value is such that it could be considered equivalent to a deprivation of property.[307] (emphasis added)

368.    In summary, the challenged measures did not take control of the shares or management of the Claimant's plants, or destroy the value of the operating companies. Therefore, (i) the Claimant continues to control its shares in the Plants, (ii) the plants continue to operate, producing and selling photovoltaic energy on the market, and (iii) the Claimant continues to obtain a reasonable rate of return from the plants. The future returns from the plants do not fall under the concept of an investment protected under Article 1(6) ECT. The Claimant does not "possess or control directly or indirectly" the returns it expects to receive in future via tariffs regulated under the Spanish legislative framework.

---

the property in or effective control of its investment: or for its investment to be deprived, in whole or significant part, of its value.

But, in this case, the amendment of the 2001 Electricity Act and the issuance of the Price Decrees did not interfere with the **ownership or use** of Claimants' property. Claimants retained at all times the control of the AES Tisza II plant, thus there was no deprivation of Claimants' ownership or control of their investment.

Moreover, Claimants continued to receive substantial revenues…which proves that the value of their investment was not substantially diminished and that they were not deprived of the whole or a significant part of the value of their investments.

In these circumstances, the Tribunal concludes that the effects of the reintroduction of the Price Decrees do not amount to an expropriation of Claimants' investment(s). (emphasis added)

[306] *Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 256, Exhibit RL-0041.

[307] *Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain*, Final Award, 21 January 2016, para. 465, Exhibit RL-0049.

### C.    The Tribunal's Ruling with Respect to Expropriation

369.    The Claimant's investments are properly characterized as corporate shares. The downstream operating companies had a right to revenue from electricity sold to the SES, but the Claimant did not itself have any right to the income stream, though the value of its shares was directly or indirectly impacted by a modification of the income stream. Nevertheless, when the Claimant speaks of expropriation as distinguished from loss of value (or at least loss of value mounting to virtual destruction), the Tribunal must focus on the fate of the shares held by the Claimant as investments. The Claimant does not allege a loss of control of the shares. Nor does it dispute that it continued to hold the shares until the sale of five plants to Sun European S.À.R.L. ("**Sun European**") in 2015. That was a voluntary alienation.

370.    While regulatory modifications between 2010 and 2014 significantly reduced the share value, the reduction in value is better analyzed in terms of a violation of the Claimant's legitimate expectation. Accordingly, the Tribunal finds a number of the authorities cited by the Claimant as distinguishable and of little assistance.

371.    In *Deutsche Bank v. Sri Lanka*, for example the tribunal found that State measures to prevent payments owed to the claimant constituted an expropriation. Deutsche Bank claimed that Sri Lanka had expropriated its rights to payments owed under a Hedging Agreement. The Sri Lankan Supreme Court issued an order that no further payments should be made under the Hedging Agreement, an act that "deprived Deutsche Bank of the economic value of the Hedging Agreement since it was deprived as a matter of fact and under Sri Lankan law of payment under the Hedging Agreement."[308] Spain has never denied payments. It has reduced the value of the Claimant's shares, but the income stream still represents a return in the order of 7.9% (depending of course on the variables, as will be discussed under quantum).

372.    In the circumstances, the Tribunal rejects the Claimant's allegation that its investment was expropriated.

---

[308] *Deutsche Bank v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, 31 October 2012, para. 521, Exhibit CL-073.

# PART 8.        QUANTUM

373.     The only explicit guidance to quantum in the ECT concerns expropriation in Article 13. The Tribunal has concluded that there has been no expropriation. In the case of other violations of the ECT, resort is had to the customary international law principle of full compensation.[309] There is no real dispute about the measure of applicable compensation. The Claimant is still entitled to "reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[310] As stated in Article 31 of the ILC Articles on the Responsibility of States of International Wrongful Acts,

Article 31. Reparation

1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.

2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.

374.     In *AAPL v. Sri Lanka*, the tribunal held that Sri Lanka had violated its obligation to provide full protection and security and stated:

Both Parties are equally in agreement about the principle, according to which, in case of **property destruction**, the amount of the compensation due has to be calculated in a manner that adequately reflects the full value of the investment lost as a result of said destruction and the damages incurred as a result thereof.[311] (emphasis added)

375.     The tribunal in *Vivendi v. Argentina* observed that "[b]ased on these principles, and absent limiting terms in the relevant treaty, it is generally accepted today that, regardless of the type of investment, and **regardless of the nature of the illegitimate measure**, the level of damages

---

[309] *Amoco Int'l Finance Corporation v. Iran*, Case No. 56, Partial Award, 14 July 1987, paras. 112, 189, 193-199, Exhibit CL-075.

[310] *Case Concerning Factor at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928, (1928 PCIJ, Series A. No. 17) p. 47, Exhibit CL-076.

[311] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June  1990, paras. 87-88, Exhibit CL-078.

awarded in international investment arbitration is supposed to be sufficient to **compensate the affected party fully and to eliminate the consequences of the state's action**."[312]

376.    As mentioned, these basic principles for the assessment of compensation are not in dispute. They are grounded in the decision the Permanent Court of International Justice in the case of *Chorzów Factory* between Germany and Poland, which dealt with Poland's unlawful seizure of a factory owned by a German national. The Permanent Court of International Justice held in a passage already cited in part:

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that **reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed**. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[313] (emphasis added)

377.    The customary international law principle is regularly applied by arbitral tribunals, as in the decision of the Iran-US Claims Tribunal in *Amoco v. Iran* which held:

> [*Chorzów Factory*] is widely regarded as the most authoritative exposition of the principles applicable in this field and is still valid today…[unlawful] expropriation gives rise to an obligation of reparation of all the damages sustained by the owner of expropriated property…The rules of international law relating to international responsibility of States apply in such a case. They provide for *restitutio in integrum*: restitution in kind or, if impossible, its monetary equivalent. If need be, "damages for loss sustained which would not be covered by restitution" should also be awarded. [314]

---

[312] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3, Award II, 20 August 2007, para. 8.2.7, Exhibit CL-079.
[313] *Case Concerning Factor at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928, (1928 PCIJ, Series A. No. 17)p. 47, Exhibit CL-076.
[314] *Amoco Int'l Fin. Corp. v. Iran*, Case No. 56, Partial Award No. 310-56-3, 14 July 1987, paras. 191-193, Exhibit CL-075.

125

A.    **Quantification of Compensation**

378.    The Claimant seeks the diminution in the fair market value[315] of its investments in the five Solaica plants, and its  lost profits on its investments in the three 9REN España plants, that can be shown to have been caused by Spain's  violations of the ECT.

379.    The Claimant retained **FTI Consulting** (Mr. Richard Edwards) to calculate the *quantum* of these losses.

380.    The Respondent retained **Econ One Research Inc.** (Dr. Daniel Flores) to provide expert evidence on the appropriate *quantum* should liability be established.

B.    **The Date of Assessment**

381.    The Claimant proposed that the impact of the challenged measures on the value of the Claimant's investments should be assessed as of 30 June 2014 (the "**Date of Assessment**").[316] The date of 30 June 2014 was chosen because it marked the end of the quarter in which Spain finalized the terms of the *New Regulatory Regime* (i.e. the enactment of RD 413/2014 on 10 June 2014, and the publication of MO 1045 on 20 June 2014). At that point, the full impact of Spain's measures was manifest.

382.    Dr. Flores performed his calculations as at two dates: 30 June 2014, (to correspond to the Date of Assessment FTI was instructed to use); and 19 June 2015, the date that the Solaica plants were sold to Sun European.

C.    **Positions of the Parties on Quantum**

*(a)    The Claimant's Approach to Quantum*

383.    FTI presented a "but for" analysis, i.e. "but for" Spain's regulatory changes 2010 to 2014, what *would have been* the value of the Claimant's investment as of the date of assessment (30 June

---

[315] The International Valuation Standards Council (also referred as **IVSC**) defines market value as: "the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgably, prudently, and without compulsion."
[316] FTI First Quantum Report, para. 1.18.

2014). In its view, the "disputed measures" had the impact of reducing the revenues of the plants by approximately 24%. On that basis, FTI concluded that the Claimant's investment in Solaica would have been worth €60 million on the Date of Assessment,[317] but was instead worth just under €9 million. Adding a calculated loss of approximately €1 million on its investment in the 9REN España Plants retained by the Claimant, FTI calculated the total loss of value incurred by the Claimant at €52.2 million.[318]

384.    FTI employed the Discounted Cash Flow ("**DCF**") method which values an investment based on the stream of future cash flows that the investment is expected to generate, "discounted" to a present value to account for the time value of money and the uncertainties inherent in the forecast of future cash flows.[319] The DCF method also allows the valuer to take into account the specific characteristics of particular assets and, in the opinion of FTI, to measure

---

[317] In FTI First Quantum Report, it is stated at paras. 4.37, 4.38 and 6.39:

4.37 In the Counterfactual Position the Regulatory Changes would not have been implemented, and consequently there is no reason to suppose that a significant number of companies owning PV plants would have been in distress in mid or late 2014. Nor is there any reason to suppose that traditional investors in such assets would have considered the sector more risky in mid-2014, and sought to reduce (or at a minimum maintain) their exposure to it.

4.38 Consequently, I consider that in the Counterfactual Position the market for Spanish PV assets would have been undisturbed, and that the rates of return demanded by investors in these assets would have reflected the highly predictable revenues offered by the FiTs under RD 661 and RD 1578. I have, therefore, assessed the value of 9REN's investments in the Counterfactual Position using a cost of capital commensurate with low risk investments.

**6.39 In the Counterfactual Position the Solaica Plants would have received the remuneration they were entitled to under RD 661 from the start of the operation until the Date of Assessment. That is, where all electricity produced by the plants would have been sold for the appropriate FIT.** (emphasis added)

[318] FTI First Quantum Report, paras. 2, 18.

[319] See testimony of Richard Edwards (FTI), Tr. Day 4 (Edwards), p. 41:8 to p. 42:2:

In my view, businesses like PV plants lend themselves very well to discounted cash flow valuation. Why is that? It's because their performance is very predictable. Although the weather varies a little bit from year to year -- it varies by, at least according to the records of this company, less than 5%, plus or minus -- but there's very little market risk that these companies are exposed to. They can sell all of their production, and they can sell it at a price that is very largely known well in advance. The operating costs are relatively small compared to revenues, but they are also largely determined by long-term contracts. So the financial performance of these assets is highly predictable compared to almost any other company that I could imagine. Very little market risk. Not only that, but the DCF method allows me to reflect very specifically in my valuation performance of these particular plants. Consequently, to come up with, if you like, a valuation of a hypothetical scenario, in my view this is far and away the best method.

with some precision the impact of the disputed measures introduced by Spain between 2010 and 2014.[320]

385.     The amount calculated by FTI (€52.2 million) is then carried forward with interest for a total loss ranging from €53 million to €56.2 million depending on the post-June 2014 interest rate that is selected.

386.     The FTI calculation (on counsel's instruction) treats the Claimant as exempt from the 7% TVPEE tax on revenue obtained on the sale of electricity to the SES, and extends the "useful life" of the PV plants to 35 years from the 30 years said by Spain to be appropriate.

387.     More specifically, FTI calculated the quantum of compensation in respect of the five Solaica plants, which the Claimant sold to Sun European in an unrelated party transaction in 2015, based on the difference between:

(a)     the value that the Claimant's investments in Spain would have had if Spain had **not** introduced the disputed measures that the Claimant contends violated the ECT (the "**Counterfactual Position**"); and

(b)     the market value of those investments *after the* introduction of those disputed measures as reflected by the proceeds that the Claimant actually received from the sale of the five plants to Sun European in 2015 (the "**Actual Position**").[321]

388.     For the Claimant's 51% equity in the three small plants that 9REN España continues to own (which collectively had less than a tenth of the generating capacity of the Solaica plants), FTI calculated damages based on the present value of the *additional* cash flows that those plants would have earned but for the disputed measures,[322] and after discounting to account for the Claimant's 51% equity, calculates the loss at €1 million.

---

[320] FTI First Quantum Report, para. 4.23.

[321] FTI First Quantum Report, paras. 2.6, 4.10. The specific investments that FTI values are 9REN's equity in Solaica, and a shareholder loan that it extended to Solaica. Because the shareholder loan is junior to Solaica's third-party debt, FTI says it is effectively the same as an equity investment for purposes of FTI's analysis. *Ibid.*, paras. 4.18-4.19.

[322] *Ibid.*, para. 2.7.

*(b)    The Respondent's Methodology*

389.    Much of the Econ One methodology is premised on Spain's argument that the Claimant was entitled only to a "reasonable return" or "reasonable profit" on its investment as reflected in the 2005 PER, a position which the Tribunal has rejected. Dr. Daniel Flores thus took the position that:

> from an economic perspective, the correct way to establish whether the Measures have had an economic impact on Claimant's interests in the PV Plants is to determine **whether the return that those plants can be expected to yield after the enactment of the Measures is lower than the reasonable return for renewable energy projects**. We find that the project IRR for the PV Plants after the enactment of the Measures is higher than **the reasonable rate of return** for renewable energy projects. Therefore, we conclude that the Measures have **not** had a negative impact on the PV Plants.[323]

390.    Dr. Flores calculated the post-tax internal rate of return on the investment in the Solaica plants in the Actual Position to be between 10.90% and 11.48%, and estimated the "reasonable rate of return for renewable energy projects" to be 7%. Because he considered the actual return *despite* the disputed measures to be higher than the "reasonable rate of return", Dr. Flores concluded that the Claimant had suffered **no loss** as a result.

391.    Spain argued in its Counter-Memorial that the DCF method was not appropriate[324] but Dr. Flores appears to disagree with his client's assertion that there is a "high dependency of the cash flows on external, volatile and unpredictable elements." Dr. Flores testified that that "PV Plants have fixed operating costs and a relatively stable level of electricity generation."[325]

392.    The Tribunal concludes, on the evidence that the DCF method was appropriate.

---

[323] Econ One First Quantum Report, para. 11. It should be noted that FTI concludes on the contrary that even on the "reasonable return" basis, the Claimant has suffered a loss:

if one assumes that returns would have been regulated down to 7%, 8% or 9%, and depending on whether those cash flows would be earned over 25 years, 30 years or 35 years…indicatively the Claimant might have lost anything between €20 million and €60 million, depending on what one assumes the reasonable rate of return would have been and the useful life of the plant...(Tr., Day 4 (Edwards), p. 57:7-13)

[324] Respondent's Counter-Memorial, para. 1327.
[325] Econ One First Quantum Report, para. 176.

393.    However, Dr. Flores went on to criticize elements of the FTI implementation of the DCF method as set out below. For example, Dr. Flores criticizes FTI for assuming that "the Solaica plants paid and will continue to pay corporate taxes when in fact they never have." [326] Moreover, according to Dr. Flores, FTI's estimate of the investment costs of the Solaica plants is skewed.[327] The various calculations of Dr. Flores were vigorously tested in cross-examination by Mr. Kevin Mohr on behalf of the Claimant.

*(c)     FTI's Response*

394.    FTI argues that Dr. Flores' proposed adjustments to its discounted cash flow model, and his conclusion, are dominated by a **proposed risk adjustment** to revenues. In FTI's view, Dr. Flores either assumes that Spain had the right to amend the FIT terms (and his analysis is thereby unresponsive to the Tribunal's conclusion on liability) or Dr. Flores has materially overstated the risk of Spanish default.[328]

395.    For reasons to be discussed, the Tribunal **by majority** agrees with Dr. Flores that a proper valuation would take into account the *risk* that Spain *could* lawfully make adjustments to RD 661/2007 without violating the ECT (as contemplated by the *Charanne* and *Isolux* tribunals). Investment in a regulated industry is not a risk free proposition, but the risk should not be assessed at the elevated discount levels Dr. Flores proposes. The dissenting member of the Tribunal would not make such an adjustment.

*(i)     The FTI Analysis Proceeded in the Following Steps*

1.   Solaica Plants

---

[326] Econ One Second Quantum Report, para. 116.

[327] Econ-One points out when analysing the investment costs in the plants included in the financial sphere of Solaica:

> The initial investment costs of the Solaica PV Plants appear to be in excess of the costs that would be incurred in an arm's length transaction. We have not seen any documents that would explain why the initial investment costs of the Solaica PV Plants, as reported in the Solaica financial statements, are significantly higher than the typical installed costs in the photovoltaic industry. We do not have access to detailed cost information for the Solaica PV Plants to evaluate the reasonableness of their initial investment costs. As a result, we have not been able to determine whether there are some initial investment costs that should be excluded from our calculations. To the extent that PV Plants' initial investment costs represent payments to the shareholders, or non-arm's length transactions between related parties, they would need to be excluded from our calculations.

Econ One First Quantum Report, para. 72.

[328] FTI Second Quantum Report, para. 2.3(3).

396.    FTI calculated the *initial investment cost* of the Solaica project companies at €116.5 million.[329]

397.    The DCF method was used to calculate the actual value of the Claimant's investments as of the Date of Assessment namely 30 June 2014.[330] A comparison was made between the **Actual Position**, i.e. the real world result after absorbing the impact of the disputed measures, and the **Counterfactual Position**, the theoretical universe where no such regulatory changes had been made. The FTI calculation assumed that the Claimant's various companies in Spain were legally entitled to sell all of their electricity production at the tariff rates set out in the regulations.

398.    With respect to the **Actual Position** (i.e. after taking into account the impact of the disputed measures), FTI concluded that the Claimant's *equity* in the Solaica plants had declined from €60 million to €9 million, producing a calculated loss of €51 million.[331] As stated, Econ One concluded that those plants were still able to achieve reasonable profitability and therefore according to that measure the Claimant had not been denied anything to which it was entitled.

399.    A number of important differences of opinion emerged between Mr. Edwards and Dr. Flores respecting the application of the DCF model to the Counterfactual (i.e. theoretical or "but for") Position:

| The Expert Opinion of FTI (Richard Edwards) | The Expert Opinion of Econ One (Dr. Daniel Flores) |
| --- | --- |
| *Initial Investment Cost* | |
| FTI estimates the Claimant's initial investment costs at €116.5 million.[332] FTI points out that Dr. Flores' estimate is unrealistic as it is materially lower than the costs used by Spain in MO 1045 as described by Spain's expert, Mr. Carlos Montoya in his witness statement. According to FTI, Dr. Flores' conclusion that 9REN has suffered no loss is almost entirely | Dr. Flores estimates €68.3 million (in part because the Claimant excludes labour and other relevant costs borne by an affiliated company). However, errors were discovered in the calculation. In his Second Report, Dr. Flores used an adjusted figure of €78.6 million.[334] |

[329] Tr. Day 4 (Edwards), p. 44:10-14.
[330] FTI Second Quantum Report, para. 2.11.
[331] Tr. Day 4 (Edwards), p. 44:19-25.
[332] FTI Second Quantum Report, para. 4.3.
[334] Tr. Day 4 (Flores), p. 265:19 to p. 266:14 and p. 276:11-16.

| dependent on this erroneous estimate of the initial investment costs of the Solaica plants.[333] | |
|---|---|
| *Electricity Production* | |
| FTI projects future electricity production based on each company's average historical production from the start of each plant's operation through the end of 2014 (a period of 5+ years for most of the plants).[335] FTI then applies a degradation rate of 0.5% per annum to account for future declines in the efficiency of the solar panels.[336] | Dr. Flores calculates future electricity production based on the regulator's "standard" parameters, e.g. operations eligible for the premium limited to 1,250 hours per year.[337] (As noted earlier however, the Tribunal has already concluded that the limitation to 1,250 hours per year violated the Claimant's ECT rights.) |
| *Inflation* | |
| Under RD 661/2007, the tariffs were to be adjusted annually based on the Spanish CPI (less 0.25% until 2012 and 0.5% thereafter). FTI projects future inflation in the near term (through 2019) based on forecasts published by the International Monetary Fund ("**IMF**"), and in the longer term based on the European Central Bank's inflation target.[338] | Econ One says the European and IMF projections are unrealistic in light of Spain's particular economic circumstances. Dr. Flores projects "long term inflation in Spain at 1.48%."[339] FTI agreed and made a €10 million adjustment of its calculation in Spain's favour.[340] |
| *Operating Life* | |
| FTI projects that Claimant's plants will continue to operate, and thus continue to receive the tariffs and other benefits guaranteed by RD 661/2007, for 35 years from inception.[341] A useful life expectancy of 35 years is supported by a study published by the European Commission in 2011 and the lending model adopted by the bank consortium | Econ One considers a 30-year useful life is more realistic. The studies relied upon by FTI provide wide ranges and the choice of 35 years is at the high end of the studies.[344] A more likely *average* range is 20 to 30 years.[345] |

---

[333] FTI Second Quantum Report, para. 3.16.

[335] FTI Second Quantum Report, para. 6.8.

[336] FTI Second Quantum Report, Appendix 3-4, paras. A3-5.3(1).

[337] Econ One Second Quantum Report, para. 137.

[338] FTI Second Quantum Report, paras. 6.65-6.66.

[339] Econ One Second Quantum Report, para. 134.

[340] Tr. Day 4 (Edwards), p. 46:24.

[341] FTI Second Quantum Report, para. 6.6.

[344] Econ One First Quantum Report, para. 154.

[345] Econ One First Quantum Report, para. 157. See also para. 77:

> In June 2012, following the loan conversion, Gamesa held a 49% interest in the 9REN España PV Plants, but not in the Solaica PV Plants. Now there was an incentive to reduce O&M costs, because for every €1.00 reduction in the O&M cost of the Solaica Plants, Claimant would achieve a €1.00 increase in operating profits from Solaica and only a €0.51 decline in operating profits from 9REN España.

| | |
|---|---|
| in the Solaica financing transaction as well as the testimony of Mr. Giuliani.[342] FTI notes that its estimate of loss on the Solaica plants would decrease by approximately €7.5 million from €51.2 million to €43.7 million if FTI were to assume a useful life of 30 years.[343] | |
| *Operating Costs* | |
| FTI projects future O&M costs based on the average historical costs from 2011 to 2014, which FTI projects to grow with inflation.[346] FTI estimates that if the adjustment to O&M costs advocated by Dr. Flores is made, FTI's estimate of loss on the Solaica plants would actually increase by €1.9 million from €51.2 million to €53.2 million.[347] | Econ One points out that operations and maintenance services were provided by a company affiliated with the Claimant and represent transfer pricing other than a market rate[348] and were "abnormally high".[349] The true operating costs are evidenced by the contract negotiated in 2011 after the Claimant's equity interest was reduced to 51%.[350] |
| *Income Tax* | |
| FTI projects future corporate income tax based on the tax code in effect as of the Date of Assessment (incorporating future changes to the tax code that had been announced as of the Date of Assessment),[351] namely 30% expected to be reduced to 28% in 2015 and to 25% in 2016. | Econ One considers it significant that the Solaica plants never paid corporate tax.[352] Econ One asserts that FTI's calculation of the IRR was skewed by assuming a fictitious tax burden. However, FTI noted in its Second Report that by taking into account corporate taxes, FTI *reduced* revenue rather than increasing it[353] and thereby diminished the final quantum. |
| *Operating Hours* | |
| FTI assumes that regulatory limits in RDL 14/2010 on operating hours eligible for the tariff do not apply. FTI estimates that if it were | Econ One identified operating hours as "the largest source of economic impact" during the years 2011 to June 2014[355] and (as stated) |

---

[342] FTI Second Quantum Report, para. 6.6, see also Giuliani First Witness Statement, para. 38 and Exhibit RE-057 (Study on photovoltaic panels supplementing the impact assessment for a recast of the WEEE Directive, European Commission, 14 April 2011, page 13) and Exhibit RE-089 (Alcaudete Model 2008).
[343] FTI Second Quantum Report, para. 6.8.
[346] FTI Second Quantum Report, paras. 6.20-6.29. FTI was instructed to exclude the impact the access toll imposed by Royal Decree 14/2010 and the 7% energy tax imposed by Law 15/2012.
[347] FTI Second Quantum Report, para. 6.59.
[348] Econ One First Quantum Report, para. 76.
[349] Econ One Second Quantum Report, para. 140, Tr. Day 4 (Flores), p. 279, ll. 14-18.
[350] Econ One Second Quantum Report, para. 26.
[351] FTI Second Quantum Report, paras. 6.30-6.33.
[352] Econ One Second Quantum Report, Annex C, paras. 245-248.
[353] FTI Second Quantum Report, Appendix 3-5.
[355] Econ One First Quantum Report, paras. 150-153.

133

| | |
|---|---|
| appropriate to reflect the caps in the Counterfactual Position, Dr. Flores' proposed adjustment would decrease FTI's estimate of loss on the Solaica plants by €6.6 million from €51.2 million to €44.6 million.[354] | applies the regulator's standard 1,250 hours per year. |

*Risk Adjustment to Revenue*

| | |
|---|---|
| FTI assumes that the regulatory regime of RD 661/2007 and RD 1578/2008 would continue over the life of the facilities, and that the only risk applicable to the PV plants "was the general default risk of Spain" which FTI estimates at 2.1%.[356] In any event, FTI criticizes Dr. Flores' regulatory risk scenario for assuming the possibility that *all* regulatory support would be removed. This would imply that most (if not all) Spanish PV plants built under RD 661/2007 and RD 1578/2008 would become loss making and likely cease operations. Dr. Flores' hypothetical is thus more severe than the regulatory revisions actually introduced. There was no realistic risk that Spain would revise regulatory support in ways that resulted in a significant proportion of its renewable energy assets ceasing operations.[357] | Econ One says FTI's assessment of risk is unrealistic. In 2008, a bid for one of the Solaica plants "implicitly" incorporated a 2.5% annual probability that the regulated premium would be eliminated.[358] In Econ One's opinion, had Spain not taken the measure in 2010-2014 to stabilize the Spanish electricity system, it is reasonable to assume as of the date of assessment (30 June 2014) there would have been a tariff deficit crisis looming, and a 10% probability of a severe regulatory reduction.[359]

As regards the risk of Spain being unable to meet its obligations, Dr. Flores was of the view that this risk was not altered materially by the regulatory changes. |

*Discount for Lack of Liquidity*

| | |
|---|---|
| An "illiquidity discount" is a function of marketability (how long it would take to sell the assets) and the potential discount required to facilitate the sale. FTI does not make an adjustment for the fact that the Claimant's investment consisted of assets that might be difficult to sell on the date of assessment.[360] | Econ One estimates that considering the nature of the Claimant's assets and the Spanish market, it would take about 6 months to sell the plants (based on the time taken for 9REN to sell its plants to Sun European in 2015). Accordingly, in the view of Dr. Flores, there should be an "liquidity discount" of 18% in the |

---

[354] FTI Second Quantum Report, para. 6.10.

[356] FTI Second Quantum Report, para. 6.42 and Appendix A6-2.26.

[357] FTI Second Quantum Report, para. 2.36.

[358] Econ One First Quantum Report, para. 183.

[359] Econ One First Quantum Report, para. 202.

[360] Tr. Day 4 (Edwards), p. 52:12 to p. 53:22:

Second, there was a very active market for these sorts of assets. I think Dr Flores's own first report shows that there were hundreds of transactions across Europe in renewables assets. There were 140 between 2007 and 2014 in Spain. There were 80 transactions in majority interests in solar PV plants before 2014. And the Claimant themselves, when they were considering selling these plants in the height of the financial crisis, got 10 offers for these plants.

134

| | |
|---|---|
| Mr. Edwards was optimistic that a market for these assets existed in 2014. In any event, Mr. Edwards considered the discounts proposed by Dr. Flores to be "overstated".[361] | prevailing [i.e. actual] scenario[362] and 26% in the "but for" scenario.[363] Dr. Flores testified that there is general consensus among investors and market players that some illiquidity discount is necessary with this type of asset.[364] |

*Discount Rate to Arrive at the Present Value on the Date of Assessment*

| | |
|---|---|
| FTI discounted its calculated future cash flows to present value on the Date of Assessment using the Weighted Average Cost of Capital ("**WACC**").[365] FTI calculates the applicable WACC to be 5.3%, which it rounds up to 5.5%.[366] | Econ One considers the "Adjusted Present Value" ("**APV**") methodology more appropriate than WACC, and calculates a discount rate of 4.94% for the PV plants.[367] Econ One accepts that in the result, the impact of this difference in of opinion with FTI is "relatively small".[368] |

*Counterfactual Value on the Date of Assessment*

| | |
|---|---|
| To arrive at the value of the Claimant's investment in Solaica in the Counterfactual Position, FTI subtracted the net *third-party* debt held by Solaica from its enterprise value. FTI also subtracted the value of the additional cash that the companies *would* have held on the Date of Assessment but for the challenged | Econ One contented itself with the observation that FTI's calculations were flawed. |

---

So these are not assets that are hard to sell. They are well understood; there is an active market and a high number of transactions in these assets. When the Claimant came to sell their assets in 2015, they contacted a number of companies that had been in touch with them back in 2008...So it's my view, anyway, that private equity companies, when they buy and sell businesses, they're not routinely accepting a 20% to 25% discount on the value of that business if it were held for its duration. There's no way, I don't think, that 140 investors would have sold their assets in Spain and happily taken a 20% discount, other than those that were in financial distress. That's just a proposition that doesn't make sense.

[361] FTI Second Quantum Report, para. 6.28-6.39.
[362] Econ One First Quantum Report, para. 219.
[363] Econ One First Quantum Report, para. 222.
[364] Tr. Day 4 (Flores), p. 231:11 to p. 232:6:

…If you own a renewable energy plant, you cannot sell it on the spot.

The evidence is we have seen this on transactions in this arbitration, and we have seen it in other arbitrations...It takes months to sell these plants, and that has to have an economic effect. It's more valuable to have $100 that I can sell in five minutes than $100 that I need six months to sell.

That's what we have done. The literature supports us, experts in other arbitrations by claimants – I will say for the record, I have been in ten arbitrations relating to renewable energy in Spain. I have seen other experts retained by this counsel and many other counsel. I am not alone. People do agree that physical assets do have less value than publicly traded shares of stocks in the London Stock Exchange. So we do apply an illiquidity discount in our analysis.

[365] FTI First Quantum Report, para. 2.66.
[366] FTI Second Quantum Report, Appendix 6-2.
[367] Econ One First Quantum Report, para. 168.
[368] Econ One Second Quantum Report, para. 154.

135

| | |
|---|---|
| measures, which FTI calculates to be €6.7 million (e.g. Solaica's historical losses from the challenged measures before 30 June 2014).[369] FTI also includes the value of the interest rate swaps that Solaica entered into in 2009. Based on these calculations, FTI assessed the value of the Claimant's investment in Solaica in the Counterfactual situation at €60 million. | |
| **Actual Value of the Investment in Solaica on the Date of Assessment** | |
| In the Actual Value Assessment, FTI relied on the actual proceeds that the Claimant received from its sale of Solaica on 19 June 2015 to Sun European for €9.5 million.[370] FTI understood the sale to Sun European was an arms' length transaction and therefore a "strong indicator of the market value of 9REN's investment in Solaica at the time of sale."[371]<br><br>There is evidence that dividends were paid to 9REN in the year prior to the acquisition of Solaica by Sun European. FTI therefore responds that the consideration paid by Sun European in 2015 reflected both the expected cash flows and the cash earned in the year prior and no such further adjustment is appropriate.[372]<br><br>In the absence of significant regulatory changes between the Date of Assessment and the date of sale, FTI considered the sale price in June 2015 to be a good indicator of the actual market value of 9REN's investment a year earlier in Solaica as of the Date of Assessment,[373] discounted by the Claimant's cost of equity for one year, resulting in FTI's valuation of the Claimant's interest in Solaica in the Actual position (as of the Date of Assessment) of €8.8 million.[374] | Econ One agrees that the appropriate measure of the value of the Solaica investment is the proceeds of the sale of the PV plants to Sun European in June 2015 for €9.5 million,[375] but would adjust for cash flows between 30 June 2014 and 19 June 2015. |

---

[369] FTI First Quantum Report, para. 6.38-6.44.

[370] FTI First Quantum Report, para. 5.3. See also Giuliani First Witness Statement, para. 37.

[371] FTI First Quantum Report, para. 5.4.

[372] FTI Second Quantum Report, para. 6.50.

[373] FTI First Quantum Report, para. 5.7.

[374] FTI First Quantum Report, para. 2.13.

[375] Econ One Second Quantum Report, para. 213.

| Conclusion | |
|---|---|
| Consequently, in FTI's First Quantum Report dated 12 July 2016, the Claimant's losses on its investment in Solaica as a result of Spain's measures were calculated as the difference between the value of its investments in Solaica in the Counterfactual and Actual Positions, set forth in Table 7.1 of FTI's Quantum Report as follows: | Econ One calculates that the disputed measures created no diminution of value of the Claimant's investment. As Dr. Flores stated in cross-examination: |

*Table 7-1: 9REN's loss on its investment in Solaica (EUR millions)*

| | Solaica |
|---|---|
| Value of Solaica in[A] Counterfactual Position | 60.0 |
| Value of Solaica in[B] Actual Position | 8.8 |
| Losses    [C]=[A]-[B] | 51.2 |

*Source: FTI Appendix 6-1.*

In its subsequent Report dated 19 May 2017, FTI stated:

> …applying Dr. Flores' APV method using my estimate of the unlevered cost of equity of 5.9% and Dr. Flores' estimate of the value of the interest tax shield, would increase the value of the Solaica Plants in the Counterfactual Position as at the Date of Assessment by EUR 0.7 million, and consequently my assessment of the loss incurred on the Solaica Plants would increase by EUR 0.7 million from EUR 51.2 million to EUR 52.0 million.

However, in later calculations (e.g. the interest calculation at Table 8.3) FTI reverted to its estimated loss on the Solaica Plants of €51.2 million.

Q. So in your view, as long as the IRR, with the measures in place – what you call the "prevailing scenario" – is greater than 7%, then you think that there is no compensable economic impact?

A. Again, I don't know if "compensable economic impact" has a legal meaning that escapes me. I think that would show that there's no – in my report I never have used the term "compensable". I would just say there's no economic impact.[376]

400.    FTI illustrates what it says are the various impacts of the differences between its calculations (using a loss estimate of €51 million) and the calculations of Econ One with respect to the Solaica Plants as follows:

---

[376] Tr. Day 4 (Flores), p. 240:7-15.

Figure 6-1: FTI's Estimated Impact on Claimant's Loss on Solaica of Dr Flores' adjustments (EUR million)



(Sources: RE1: Appendix 6-1; and Exhibit EO-3)

401.    In this chart, FTI did not break out a figure for the impact on its valuation that would result from the application to the Claimant of the 7% revenue tax.

## 2.    Calculation of Compensation in Respect of the 9REN España Plants

402.    A different methodology was used by FTI to value the Claimant's losses in respect of the three plants that 9REN España continues to own, for two main reasons. First, 9REN España has not sold those facilities, and thus there is no market transaction on which to base actual value. Second, the financial data for those plants (e.g., cost data in particular) are consolidated with 9REN España's other business activities in its financial accounts in such a way that it is impractical for FTI or Econ One to construct a complete cash flow model for those facilities. As Mr. Edwards of FTI testified in cross-examination:

> Q. As I said, you distinguished between those two sets of plants, and you calculate a DCF for the Solaica plants, but for the 9REN plants you used another kind of valuation method, right?
>
> A. It's more of a loss assessment method, I'd say. So I didn't derive values for the plants; what I estimated was the loss of profits arising from reduced

> revenues and slightly increased costs, and I discounted that loss of profits.
> But I didn't value those plants, no.[377]

403.    Accordingly, with respect to the 9REN España plants, the experts had the following differences:

| Evidence of FTI | Evidence of Econ One |
|---|---|
| *Actual Versus Counterfactual Situations* | |
| FTI estimates revenue **in the Actual Situation** based on the remuneration parameters established in MO 1045 for each plant, taking into account how those parameters are likely to change during the periodic reviews based on forward yield curves for Spanish government bonds.[378]<br><br>FTI calculates the incremental costs based on the application of the 7% TYVEE revenue tax to its estimated revenue in the Actual Position and the Access Toll to estimated electricity production.[379]<br><br>FTI estimated the lost profits that the Claimant incurred on its investment in those three plants as a result of the disputed measures based on the projected revenue of the plants in the **Counterfactual Position** *less* the projected revenue of the plants in the Actual Position, *plus* the incremental costs allegedly arising from the challenged measures.[380]<br><br>In the **Counterfactual Position**, FTI estimates the revenues for the three 9REN España plants employing the same methodology summarized above for the Solaica plants, namely:<br><br>(i) the plants' average historical production;<br><br>(ii) an annual degradation factor of 0.5%; | Dr. Flores does not assess the Claimant's loss on its investment in the 9REN España plants as he states that he does not have sufficient information to analyze and forecast their financial performance.[385]  Notwithstanding that, Dr. Flores considers that he has "not seen anything to indicate that [his] conclusions for those plants would be anything different than [his] conclusions for the Solaica PV plants."[386]  Dr. Flores concludes, therefore, that based on his assumptions about a reasonable rate of return, the Claimant is unlikely to have suffered a loss on its investment in the 9REN España plants. |

---

[377] Tr. Day 4 (Edwards), p. 189:15-24.
[378] FTI First Quantum Report, para. 8.13 and Appendix 8-1.
[379] FTI First Quantum Report, para. 8.16.
[380] FTI First Quantum Report, para. 8.21.
[385] Econ One First Quantum Report, para. 133.
[386] *Ibid.*

(iii) tariffs based on the applicable tariff rates under RD 661/2007 and RD 1578/2008 (adjusted for inflation); and

(iv) operating life of 35 years from inception.[381]

FTI concludes that the three 9REN España plants (together) will earn around €200,000 less per year under the New Regulatory Regime than they would have received under RD 661/2007 and RD 1578/2008.[382]

FTI then deducts the corporate income tax that 9REN España would have owed on those incremental profits.[383]

Finally, FTI calculates the present value of those lost profits by adding interest to those losses that were incurred before the Date of Assessment (at the 12 month EURIBOR rate), and by discounting the losses that will be incurred after the Date of Assessment at the WACC rate of 5.5%.[384]

The result of these calculations, presented in Table 8-4 of FTI's Quantum Report, is that the present value of 9REN España's lost profits on the Date of Assessment is approximately €2 million:

Table 8-4: Present value of the post-tax lost profits of the 9REN España Plants (EUR millions)

| Plant | 9REN España Plants |
|---|---|
| Present value of losses after Date of Assessment [A] | 1.7 |
| Present value of losses before Date of Assessment [B] | 0.3 |
| Present value of losses [C]=[A]+[B] | 2.0 |

In 2012 however, the Claimant restructured its holdings in 9REN España, converting Gamesa's €60 million loan to 9REN España (e.g. the seller financing that Gamesa provided

---

[381] FTI First Quantum Report, para. 8.4-8.9.
[382] FTI First Quantum Report, para. 8.15.
[383] FTI First Quantum Report, para. 8.17.
[384] FTI First Quantum Report, para. 8.18-8.19.

| | |
|---|---|
| when the Claimant bought Gamesa Solar) into a 49% equity interest. Consequently, the Claimant owns a 51% interest in 9REN España and FTI reduces its calculation of the Claimant's damages for the 9REN España plants to €1 million accordingly.[387] | |
| **Conclusion re: Quantum of Compensation** | |
| Thus, in total, FTI assesses damages as of the date of Assessment of €52.2 million. | Dr. Flores assesses the damage to the Claimant's investment as of the Date of Assessment, even using DCF's methodology at ZERO. |

## D.    The Tribunal's Ruling on the Quantum of Compensation

404.    The Tribunal proceeds on the basis that the quantum must be "sufficient to compensate the [Claimant] fully and to eliminate the consequences" of Spain's' wrongful conduct.[388]

405.    In this respect, the Claimant bears the legal burden of proving its case on compensation. This general principle is well established under international law: *onus probandi actori incumbit.* If and to the extent that the Claimant does not prove its case on the assessment of compensation, it follows that its claim for compensation must be reduced or, where no loss is established, altogether dismissed by the Tribunal. Assessment of loss is not a simple exercise in arithmetic. Complex issues in the assessment of compensation that divide the Parties' expert witnesses justify a margin of appreciation for the Tribunal under the ECT and international law. The required exercise is acknowledged to be less than an exact science.

406.    The Tribunal accepts 30 June 2014 as an appropriate Date of Assessment, having regard to the enactment of the New Regulatory Regime on 10 June 2014 and the convenience of evaluating data as of the end of the second quarter of the 2014 financial year.

407.    The Econ One methodology premised on the "reasonable rate of return" interpretation put forward by Spain is of little assistance given that the Tribunal has rejected Spain's interpretation as inconsistent with the text and context of RD 661/2007 and RD 1578/2008. The Tribunal accepts

---

[387] FTI First Quantum Report, para. 8.20.
[388] *Compañia de Aguas Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, para. 8.2.7, Exhibit CL-79.

as appropriate the DCF methodology applied by FTI but taking due account of the objections of Econ One.

408.    In undertaking quantification, the Tribunal recognizes that while the DCF method presents a picture of mathematical precision, its output is wholly dependent on the quality of the inputs, many of which are necessarily (to borrow Mr. Edwards' phrase) "judgmental and subjective".[389] As noted by the tribunal in *Gold Reserve v. Venezuela*,[390] the assessment of damages is often a difficult exercise. Such assessments will usually involve some degree of estimation and the weighing of competing (but equally legitimate) facts, valuation methods and opinions. The element of imprecision reinforces the inevitability of a certain amount of approximation when assessing damages.[391]

409.    As is seen in the points above listing the differences between Mr. Edwards and Dr. Flores, in many cases (e.g. Mr. Edwards testimony that if an illiquidity discount were to be applied, it should be "no more than 10% and *probably* less"),[392] the experts were often working not so much with specific figures but a range of figures, which, when combined one with the others potentially unleashed a multiplier effect that could lead to a wide range of outcomes.

410.    Nevertheless, having made its findings of jurisdiction and liability, the Tribunal is obliged to arrive at an award based on the materials the parties have chosen to put before it, remembering always that it is for the Claimant to prove its loss on a balance of probabilities. In this respect, as the *Crystallex* tribunal observed:

> Claimant only needs to provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss.[393]

---

[389] Tr. Day 4 (Edwards) p. 39:16 - 40:23.
[390] *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, para. 686, Exhibit CL-010.
[391] *Ibid*.
[392] FTI Second Quantum Report, para. 6.39.
[393] *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, para. 868, Exhibit RL-109, citing *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, para. 246, Exhibit CL-025. The *Crystallex* tribunal went on to cite *SPP v. Egypt* where "the tribunal noted that "it is well-settled that the fact that damages cannot be assessed with certainty is no reason to award damages when a loss had been incurred."" And in *Tecmed*, the tribunal observed that "any difficulty in determining the compensation does not prevent the assessment of such compensation where the existence of damage is certain."

411.    To repeat, a tribunal is necessarily given a "margin of appreciation", as noted in the *Rusoro Mining*[394] award:

> Any assessment of damages in a complex factual situation, involving revenue-generating enterprises, includes some degree of estimation – the same degree which is also applied by (private and government) actors in the real world when valuing enterprises. Because of this difficulty, tribunals retain a certain margin of appreciation. This should not be confused with acting *ex aequo et bono*, because the Tribunal's margin of appreciation can only be exercised in a reasoned manner and with full respect of the principles of international law for the calculation of damages.

412.    With respect to the points of the FTI analysis in dispute between Mr. Edwards and Dr. Flores:

(a)     the Tribunal accepts FTI's projection of electricity production based on historical performance plus a degradation factor of 0.5% per annum, subject to the "operating hours" limitation discussed below;

(b)     the **rate of inflation** of 1.48% proposed by Dr. Flores and accepted by Mr. Edwards is appropriate;

(c)     with respect to the **operating life of the facilities**, the Tribunal prefers the 30 years suggested by Dr. Flores. The studies referred to by both witnesses suggest that the 35 years used by FTI is towards the most optimistic end of the range, whereas 30 years is a more realistic estimate of "average" longevity;

(d)     in terms of **operating costs**, FTI did not take into account that the historical operating and maintenance cost was provided by a company affiliated with the Claimant, and dropped significantly when the Claimant acquired a 49% outside partner in Gamesa Solar S.A. in 2012. The post-2012 level of costs were more appropriate. However, FTI argues that this adjustment would marginally *increase* the compensation to the Claimant;

---

[394] *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016, paras. 642, Exhibit RL-076.

(e)     **corporate income tax** is a reality that should be reflected in the calculation of the value of the investments to the Claimant in the shares of the operating companies over the 30-year life of the facilities;

(f)     the Tribunal accepts that RD 661/2007 refers to "all or part of the electricity generated", as used in the calculation of Mr. Edwards, not just 1,250 **operating hours** accepted by Dr. Flores. The Tables set out in RDL 14/2010 illustrated the severity of the "cap" on hours during which energy can be produced at the subsidized rate which vary in their application to a "fixed facility" (such as the Claimant's) from 1,232 to 1,753 hours:

| Technology | Equivalent reference hours/year | | | | |
|---|---|---|---|---|---|
| | Zone I | Zone II | Zone III | Zone IV | Zone V |
| ***Fixed facility*** | ***1,232*** | ***1,362*** | ***1,492*** | ***1,632*** | ***1,753*** |
| One-axis tracking facility | 1,602 | 1,770 | 1,940 | 2,122 | 2,279 |
| Two-axis tracking facility | 1,664 | 1,838 | 2,015 | 2,204 | 2,367 |

This is to be compared with the 1,250 hour cap imposed by RDL 14/2010 until 1 January 2014 on the facilities covered by RD 661/2007 as follows:

| Technology | Equivalent reference hours/year |
|---|---|
| ***Fixed facility*** | ***1,250*** |
| One-axis tracking facility | 1,644 |
| Two-axis tracking facility | 1,707 |

(Source: Spain's Counter-Memorial, p. 178, para. 772)

(g)     as to **the TVPEE tax,** introduced on 27 December 2012, the Tribunal concludes that the ECT afforded no immunity. Mr. Edwards confirmed that if TVPEE was **not** properly imposed:

> the Revenue Tax would have had the effect of reducing the revenues of the Solaica Plants by 7% over this period, and would have reduced the cash flows by marginally less than this in most years.[395]

---

[395] FTI Second Quantum Report, Appendix A-4-2, para. A4-2.4.

(h)    as to **the regulatory risk of revision to the benefits of RD 661/2007**, the FTI position is that the only applicable risk to investors was "the general default risk of Spain".[396]

The opinion of Dr. Flores, on the other hand, is that if the disputed regulatory changes had not been imposed, "the Spanish electricity system would have remained in a state that was perceived to be unsustainable."[397] This would have given rise, according to Dr. Flores, to a 10% probability of a "regulatory revision" (that is, that the regulatory support would be removed in whole or in substantial part) in each year. Spain could not have afforded to do otherwise. Now, however, "[a]s a result of the stabilization of the tariff deficit, the broader Spanish economy, as well as the consistency between the prevailing regulatory regime and the stated objective of the law", the risk is lower;[398]

The **Second FTI Report** rejects the appropriateness of a "regulatory risk" other than risk of a general failure of Spain to meet its financial obligations but this approach is expressly based on the instructions of counsel:

> …I understand that it is a tenet of the Claimant's case that Spain did not have a right to change or suspend the payment of the FiTs voluntarily, or to choose not to fund or guarantee any shortfall between consumer tariffs and the regulated cost base (such as the tariff deficit). **As I have been**

---

[396] FTI Second Quantum Report, para. 5.19:

As I explain in my First Report, I have captured macroeconomic risks, including the risk of a government not being able to meet its obligations, by including a country risk premium of 2.1% in my estimates of the cost of capital. The country risk premium included in my calculation of Solaica's cost of capital is based on the spread of Spanish bond yields over German government bond yields (the latter being a proxy for the risk-free rate). In other words, the country risk premium included in my cost of capital reflects the market consensus of the cost associated with the risk of Spanish default, plus a further adjustment to reflect the risk to equity investors. In my view no further adjustment to cash flows or the cost of capital is necessary to capture the effect on value of Spanish default risk.

[397] Econ One First Quantum Report, paras. 201-202:

201. In the absence of the Measures, the Spanish electricity system would have remained in a state that was perceived to be unsustainable. Investors would have faced considerably higher regulatory risk than in 2008, when the tariff deficit began to accelerate. It is unreasonable to assume, as FTI does, that specific regulations applicable to the PV Plants would have stayed in place as they existed at one precise point in time.
202. Given the condition of the Spanish electricity market in the absence of the Measures, a 10% probability of regulatory revision affecting the PV Plants' revenue is reasonable in the "But For" Scenario. We model a probability of revision beginning in 2013, when the first of the substantial Measures were put in place.

[398] Econ One First Quantum Report, para. 203.

**instructed to calculate the loss on the basis of the Claimant's case as pleaded, I do not consider it appropriate to reflect the risk of Spain choosing to change the remuneration, or choosing not to fund or guarantee the tariff deficit, in my counterfactual valuation.**[399] (emphasis added)

In light of counsel's instructions to calculate the loss on the basis of the Claimant's case as pleaded, FTI concluded that the relevant risk left open by counsel's instructions was "country risk":

…the risk that Spain would be **unable** to fund any shortfall or deficit, is a relevant consideration, however. This is because ultimately the risk of non-payment of renewable energy producers' remuneration comes down to whether Spain is willing and able to meet any shortfall between revenues and costs in the electricity system should a shortfall occur. **If the Claimant is correct, and Spain did not have a right to change or suspend the payment of the FiTs voluntarily**, or to choose not to fund or guarantee any shortfall between consumer tariffs and the regulated cost base, then the risk that Spain will be unable to meet the funding requirement of the system is the risk that Spain will default on its financial obligations.[400] (emphasis added)

**In the Tribunal's view**, reasonable investors on the Date of Assessment, 30 June 2014 would have expected that Spain would honour the obligations it had undertaken in RD 661/2007, but **in the majority view**, there was a risk that Spain would not perform as promised and that (as some international tribunals, notably *Charanne* and *Isolux*[401] have held), Spain's tariff reductions would **not** be considered violations of the ECT. The *Charanne* award was quite explicit that any investor who had done due diligence with respect to the Spanish legal system was put on notice that the FIT tariff in both RD 661/2007 and RD 1578/2008 could be reduced, and that such investors could have no legitimate expectation of a "stability guarantee" that if violated, could give rise to an ECT claim:

---

[399] FTI Second Quantum Report, para. 5.17.
[400] FTI Second Quantum Report, para. 5.18.
[401] *Isolux Infrastructure Netherlands B.V. v. the Kingdom of Spain* (Arbitration SCC V2013/153), Award, 12 July 2016, paras. 793-794, Exhibit RL-0083.

> In this case, the Claimants could not have the legitimate expectation that the regulatory framework laid down by RD 661/2007 and RD 1578/2008 would remain unchanged during the entire lifespan of their plants.[402]

While the Tribunal appreciates that FTI acted on counsel's instructions, a **majority** of the Tribunal agrees with Econ One that a proper analysis of quantum must take into account as of the Date of Assessment the risk that a regulatory reduction in the FIT tariff would eventually be found by an investor state Tribunal **not** to have violated the ECT and therefore **not** to give rise to compensation.

A **majority** of the Tribunal therefore considers that some measure of "regulatory risk" should be reflected in the Award because a prudent and well-informed investor would have been alive to the risk that Spain might reduce the FIT tariff and be held (despite the ECT) to be within its rights under international law to do so without compensation;

(i)    as to a discount for **lack of liquidity**, Mr. Edwards testified that as of 30 June 2014 there was a steady market for PV facilities in Spain, although he accepts that a €100 investment in stocks was more readily disposable than an €100 investment in Spanish renewable energy facilities. On the other hand, the Tribunal concludes that Dr. Flores' suggestion of an 18 to 26% discount for "illiquidity" is not supported by the evidence. Accordingly, the Tribunal accepts Dr. Flores' evidence that an "illiquidity discount" is appropriate but accepts Mr. Edwards' evidence that in light of the fact it took the Claimant 6 months to sell the Solaica plants, an illiquidity discount rate based on a 6 month marketing period is sufficient. Mr. Edwards, employing the "Finnerty Model", arrived at what he calls a likely illiquidity discount that would result from a 6 month marketing delay to be 3.4%;[403]

---

[402] Respondent's Counter-Memorial, para. 596, *Charanne B.V. and Construction Investments S.À.R.L. v. the Kingdom of Spain* (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 503, Exhibit RL-0049.
[403] FTI Second Quantum Report, para. 6.33.

(j)     as to the **appropriate discount rate**, FTI used 5.5%. Dr. Flores used 4.94% but acknowledged that the differences to the end result would be "relatively small".[404] The Tribunal accepts the 5.5% proposed by Mr. Edwards.

413.    The Tribunal is of the view, for the reasons stated, that the FTI calculation of a €52.2 million loss failed to take into account a number of significant contingencies, including the 7% TVPEE revenue tax, the lack of a "stability guarantee" in RD 1578/2008, the increase in O&M costs after 2012 and an illiquidity discount. The Tribunal **by majority** would also include a discount for regulatory risk.

414.    On the other hand, the Tribunal does not agree with Dr. Flores with respect to his calculation of zero loss which rests on a number of contingencies which the Tribunal has rejected, including the operating restriction to 1,250 hours a year, and an exaggerated regulatory risk adjustment.[405]

415.    The diminution in the value of the Claimant's investment in the Solaica Plants and the 9REN España Plants is not capable of precise calculation on the basis of the materials before the Tribunal. There are too many contingencies and contingencies within contingencies. However, the Tribunal must work as best it can with the tools provided to it by the Parties.

416.    In the circumstances, having regard to the onus on the Claimant to prove the quantum of its claim, the Tribunal, on the evidentiary record before it, reduces the quantum asserted by the Claimant by 20% from €52.2 million to €41.76 million by removing the claim to reimbursement of the 7% TVPEE, reducing the expected useful operating life of the facilities from 35 to 30 years (which Mr. Edwards calculated would itself reduce the claim by €7.5 million), eliminating the tariff protection for the Formiñena plant in light of the explicit warning of potential tariff reductions in RD 1578/2008, and incorporating a discount for illiquidity and regulatory risk.

417.    In the circumstances, the Tribunal therefore concludes that the Claimant has established a loss of €52.2 million less 20% for a net quantum of €41.76 million.

---

[404] Econ One Second Quantum Report, para. 154.
[405] Econ One Second Quantum Report, paras. 103-104.

### E.    Pre- and Post-Award Compound Interest

418.    FTI's calculation of €52.2 million includes interest up to and including the Date of Assessment of 30 June 2014. In its second report, FTI calculated interest from the Date of Assessment to the date of its Second Report, 19 May 2017, based on the Spanish 5-year government bond yield, which the Tribunal considers appropriate because (i) it represents the interest the Claimant would have received had the money been loaned to the Respondent and (ii) the claim was, until now, an unliquidated amount and therefore not in the power of the Respondent to accurately assess prior to this Award. Taking the FTI figure of €53 million[406] and applying a 20% discount, the net quantum is €42.4 million including interest to 19 May 2017.

419.    Nevertheless, for the purpose of this Award, the Tribunal prefers to start with the net quantum of €41.76 million **as of the agreed Date of Assessment**, 30 June 2014, and then fix an appropriate rate of interest based on the Spanish 5-year Government bond yield to be applied to €41.76 million from 30 June 2014 until the Award is paid. The calculation is to be made using the methodology employed by FTI in its calculation of interest from 30 June 2014 to 19 May 2017.

---

[406] FTI Second Quantum Report at Figure 8-3.

Table 8-3: FTI calculation of interest on the Claimant's loss based on the Spanish 5 year government bond yields (EUR million)

|  | Calculations | Jun 14 - Dec 14 | Jan 15 - Dec 15 | Jan 16 - Dec 16 | Jan 17 - May 17 |
|---|---|---|---|---|---|
| Opening balance | [A] | 52.2 | 52.5 | 52.8 | 52.9 |
| Period length (years) | [B] | 0.5 | 1.0 | 1.0 | 0.4 |
| Interest rate (pre-tax) | [C] | 1.4% | 0.8% | 0.3% | 0.4% |
| Period interest rate (pre-tax) | $[D]=((1+[C])^{[B]})-1$ | 0.7% | 0.8% | 0.3% | 0.2% |
| Tax rate | [E] | 30.0% | 28.0% | 25.0% | 25.0% |
| Period adjusted post-tax interest rate | $[F]=[D]\times(1-[E])$ | 0.5% | 0.5% | 0.2% | 0.1% |
| Interest | $[G]=[A]\times[F]$ | 0.2 | 0.3 | 0.1 | 0.1 |
| Closing Balance | $[H]=[A]+[G]$ | 52.5 | 52.8 | 52.9 | 53.0 |

*(a)*     *The Claimant's Argument on Compound Interest*

420.     The Claimant contends that "interest becomes an integral part of the compensation itself, and should run consequently from the date when the State's international responsibility became engaged."[407] The Claimant requests that the Tribunal grant an appropriate interest rate based on international commercial rates.[408]

421.     The Claimant further requests that any award of interest granted by this Tribunal be compounded as the most accepted and appropriate method of making a claimant whole. Since 2000, the majority of BIT tribunals have awarded compound interest in cases involving diverse countries, different facts, and various industries.[409] Thus, according to the Claimant,

---

[407] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, para. 114, Exhibit CL-078.

[408] *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, para. 348 ("[T]he most appropriate benchmark which will compensate adequately an international company such as PSEG Global is the 6 month average LIBOR plus 2 percent per year for each year during which amounts are owing."), Exhibit CL-027; *Enron Corp. and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case. No. ARB/01/3, Award, 22 May 2007, para. 452 ("The Tribunal will therefore order the payment of interest at the 6 month average LIBOR rate plus 2 percent for each year."), Exhibit CL-022; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, para. 250 ("This being an international tribunal assessing damages under a bilateral investment treaty in an internationally traded currency related to an international transaction, it would seem in keeping with the nature of the dispute that the applicable rate of interest be the annual LIBOR."), Exhibit CL-032.

[409] See e.g, *Compañía del Desarrollo de Santa Elena, S.A. v. Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, para. 104 ("[W]here an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then becomes due to him, the amount of compensation should reflect (…) the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest (…) [Compound interest] is a mechanism to ensure that the compensation awarded the Claimant is appropriate in the circumstances."), Exhibit CL-068; *Wena Hotels v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4/, Award, 8 December 2000, para. 129, Exhibit CL-081; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award II, 20 August 2007, paras. 9.2.6-.8, Exhibit CL-079; *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, para. 174, Exhibit CL-054; *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, 522, Exhibit CL-077; *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, para. 440, Exhibit CL-038; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, para. 251, Exhibit CL-032; *Técnicas Medioambientales Tecmed v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, para. 196, Exhibit CL-015; *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 17 January 2007, para. 399, Exhibit CL-046; *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, para. 348, Exhibit CL-027; *Continental Casualty Co. v. Argentine Republic*, ICSID Case No. ARB/03/90, Award, 5 September 2008, para. 313, Exhibit CL-082; *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, para. 595, Exhibit CL-083; *Bernardus Henricus Funnekotter and ors v. Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009, para. 120, Exhibit CL-084; *National Grid PLC v Argentine Republic, Award*, Ad hoc—UNCITRAL Arbitration Rules; Case 1:09-cv-00248-RBW, IIC 361, 3 November 2008, para. 96, Exhibit CL-085*; BG Group Plc. v. Argentine*

international law now recognizes the awarding of compound interest as the generally accepted standard for compensation in international investment arbitrations.

422. In *Compañía del Desarrollo de Santa Elena v. Costa Rica*, the tribunal, in awarding compound interest to the claimant, noted that compound interest serves two distinct goals: (i) to ensure that the claimant receives "the full present value of the compensation that it should have received at the time of the taking" and (ii) to prevent "the State [from being] unjustly… enrich[ed]…by reason of the fact that the payment of compensation has long been delayed."[410] Had the Claimant been compensated on the Date of Assessment, it could have received compound interest merely by placing its money in a readily available and commonly used investment vehicle. In the circumstances, it is neither logical nor equitable to award the Claimant only simple interest.

423. In *Vivendi v. Argentina*, the tribunal stated that "a number of international tribunals have recently expressed the view that compound interest should be available as a matter of course if economic reality requires such an award to place the claimant in the position it would have been in had it never been injured."[411]

424. The payment of interest furthers the principle of full compensation because it aids in restoring the claimant to the position in which it would have been had the respondent not committed the breach.[412] Moreover, compound interest prevents unjust enrichment of the

---

*Republic*, UNCITRAL, Final Award, 24 December 2007, para. 456-57, Exhibit CL-037; *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, para. 818, Exhibit CL-086; *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Award, 22 April 2008, para. 732, Exhibit CL-087; *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL, Second Partial Award of 21 October 2002, para. 306-307, 312 and Final Award (on costs) of 30 December 2002, para. 55 ("Canada shall pay (…) interest (compounded annually)."), Exhibit CL-088; *Pope & Talbot, Inc. v. Government of Canada,* (UNCITRAL) (NAFTA), Award in Respect of Damages, 31 May 2002, paras. 89-90, Exhibit CL-089; *Metalclad Corp. v. United Mexican States*, ICSID Case No. ARB/96/3, Award, 30 August 2000, para. 128 ("So as to restore the Claimant to a reasonable approximation of the position in which it would have been if the wrongful act had not taken place, interest has been calculated at 6% p.a., compounded annually."), Exhibit CL-029.

[410] *Compañía del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, para. 101, Exhibit CL-068.

[411] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3, Award II, 20 August 2007, paras. 9.2.6, Exhibit CL-079.

[412] See Gotanda, *A Study of Interest* at 4, Exhibit CL-090; Gotanda, Compound Interest at 397, Exhibit CL-091; see also Jeffrey Colón & Michael Knoll, *Prejudgment Interest In International Arbitration*, Vol. 4, Issue 6, *Transnational Dispute Management 10* (November 2007) (hereinafter "Colón & Knoll") ("Because the goal of prejudgment interest is to place parties in the same position that they would have been had the award been made

respondent by requiring it to pay compensation for the benefits received from using the money it wrongfully withheld.[413]

425.    Compound interest more accurately reflects what the Claimant would have been able to earn on the sums owed if they had been paid in a timely manner.[414]

*(b)      The Respondent's Argument*

426.    Spain's financial expert, Econ One, contented itself at paragraph 228 of its Second Quantum Report dated 28 July 2017 with the observation that "we maintain that should compensation with interest have to be awarded to [the] Claimant, a short-term, risk-free rate would be appropriate to calculate interest, which is generally consistent with FTI's position in its first report."[415]

*(c)      The Tribunal's Ruling on Compound Interest*

427.    The Tribunal accepts as correct the approach taken in *Compañía del Desarrollo de Santa Elena v. Costa Rica*[416] on the need to compound interest in such a way as to make "whole" the Claimant:

> In particular, where an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest. It is not the purpose of compound interest to attribute blame to, or to punish, anybody for the delay in the payment made to the expropriated owner; it is a mechanism to ensure that the compensation awarded the Claimant is appropriate in the circumstances. As to the compounding period, depending on the circumstances of the case and the conduct of the parties, tribunals have also, in many recent investment cases, determined that interest should be compounded annually, semi-annually, quarterly or monthly.

---

immediately after the cause of action arose, awarding simple interest fails to fully compensate claims. All awards of prejudgment interest should therefore be computed using compound interest."), Exhibit CL-093.
[413] See Gotanda, *A Study of Interest*, Exhibit CL-090; see also Colón & Knoll at 8 ("Awarding simple interest generally fails to compensate claimants fully and can create strong incentives for respondents to delay arbitration proceedings and cause harms, thereby wasting resources."), Exhibit CL-093.
[414] Gotanda, *A Study of Interest* at 31, Exhibit CL-090.
[415] Econ One Second Quantum Report, at para. 228.
[416] *Compañía del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, para. 104, Exhibit CL-068.

428.    As to when compounding interest should be annual or semi-annual or even more frequently, the Tribunal notes the observation of Professor James Crawford:

> Care is however needed since allowing compound interest could result in an inflated and disproportionate award, with the amount of interest greatly exceeding the principal amount owed.

429.    In the circumstances, the Tribunal concludes that an annual compounding of interest is appropriate for both pre-award and post-award interest.

## F.    Rate of Interest

### (a)    The Claimant's Position

430.    FTI in its first report stated that:

> I have estimated the present value of post-tax lost profits that would have been earned before the Date of Assessment by adding interest. I have assumed that interest would have been earned at the 12 month EURIBOR rate and that this interest would have been taxed at the prevailing rate of corporate tax in each year.[417]

FTI then calculated the Claimant's notional borrowing costs on the Date of Assessment, 30 June 2014 at 4% based on the 6 month EURIBOR rate of 0.3% plus a spread of 3.5%.[418] FTI did not rely on the Claimant's *actual* debt experience, whatever it may have been.

---

[417] FTI First Quantum Report, at para. 8-19.

[418] FTI First Quantum Report, Appendix 6-2, para. A6-2.28:

Based on my discussions with the Claimant, I understand that Solaica would (with the capital structure I assume) have been able at the Date of Assessment to raise debt with an interest rate equal to approximately 4%. This is based on an estimate of 6 month Euribor on the Date of Assessment of 0.3% plus a "spread" of approximately 3.5%. Therefore, I assess the post-tax cost of debt of 3% (assuming a corporate tax rate of 25%). My calculations are set out in Table A6-1-4 below.

Table A6-2-4: Post-tax cost of debt

| Parameter | Calculation | Value |
|---|---|---|
| Pre-tax cost of debt | [A] | 4.0% |
| Effective tax rate | [B] | 25.0% |
| **Post-tax cost of debt** | **([A]) x (1- [B])** | **3.0%** |

(Source: Exhibit RE-69: Spain to cut taxes in bid to boost economic recovery, FT website, 20 June 2014)

431.    In its second report, FTI changed the basis of its interest calculation "**pursuant to my instructions**"[419] to assess the Claimant's loss, as of 30 June 2014 using two different measures, namely Spanish 5 year Government bonds and the actual cost to the Claimant of its debt.[420]

*(b)    The Respondent's Position*

432.    Dr. Flores objects to the "amended" FTI interest calculation based on "the instruction of [the Claimant's] counsel", and reaffirms his concurrence with FTI's initial calculation.

*(c)    The Tribunal's Ruling*

433.    In the circumstances, the Tribunal orders interest from 30 June 2014 until payment of the Award at an interest rate equivalent to 5-year Spanish Government bond yields during the relevant period compounded annually.

434.    As the amount of compounded interest will not be ascertainable until an actual date of payment by the Respondent is established, the Tribunal necessarily has to specify a method rather than a fixed amount. It has done so. The calculation is to be made according to the yield from time to time during the relevant period on 5-year Spanish Government bond.

## PART 9.    COSTS

## A.    The Parties' Submissions on Costs

435.    In response to the Tribunal's request the Claimant filed a statement of costs fees and expenses in the amount of US$6,334,961.01 added to €740,076.42 (approximately US$839,359.89) making a total claim of US$7,174,320.80. The Claimant was represented by eight lawyers from two firms at the hearing on the merits. The lawyers recorded 8010 hours of work on

---

[419] FTI Second Quantum Report, para. 8.7.

[420] FTI Second Quantum Report, para. 8.8, Table 8-5: FTI calculation of the Claimant's loss including interest (EUR millions)

|  | Spanish 5 year government bonds | Claimant's cost of debt |
|---|---|---|
| Total loss excluding interest | 52.2 | 52.2 |
| Interest on loss | 0.7 | 3.9 |
| Total loss including interest | 53.0 | 56.2 |

(Note that figures do not sum exactly due to rounding.)
(Sources: Table 8-3 and Table 8-4)

the Claimant's case. While the hourly rates of lawyers of different seniority are not set out, the blended rates for the work of King & Spalding vary from about US$744 per hour for work on the Reply on the Merits and Counter Memorial on Jurisdiction, to about US$925 per hour for work on the Rejoinder on Jurisdiction. The blended rate for work at the hearing and post-hearing submissions is about US$812 per hour. By way of comparison, the Claimant's Spanish co-counsel at Gomez-Acebo & Pombo charged blended rates that vary from about US$561 per hour on work prior to the Request for Arbitration, to US$760 per hour for their work on the Reply on the Merits and Counter Memorial on Jurisdiction.

436.    At the same time, the Respondent filed a claim for costs of €1,401,037.36 (which, at current rates, equates to US$1,588,990.72). In large part, the discrepancy is accounted for by the fact that the Respondent was represented by counsel employed by the Spanish Ministry of the Attorney General.

437.    The Claimant's request for US$7,174,320.80 is higher than might be expected in a case of medium complexity involving investor-state disputes in respect of Spain's renewable energy program where these firms (and experts) have already participated in a number of comparable renewable energy claims against Spain and thus possess considerable prior experience and accumulated knowledge of the Spanish electricity system and the evolution of the FIT tariffs.

438.    The Claimant acknowledges that ICSID tribunals "enjoy wide discretion to allocate costs between the parties as they see fit."[421] While the successful party will usually receive an award of costs, there is no entitlement. Moreover, while a party is free to spend as much money as it sees fit in pursuing or defending a claim, there is no corresponding obligation on the unsuccessful party (or the Tribunal) to accept as reasonable or justified the resulting bill of costs.

439.    The Parties appear to agree that the correct approach is for the Tribunal to take into account (1) the relative success of the claims and defences of each of the parties (2) together with the circumstances of the case and (3) the conduct of the Parties to the proceedings.[422]

---

[421] Claimant's Cost Submission, para. 3.
[422] Claimant's Cost Submission, para. 6, citing *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB 13/31, Award, 15 June 2018.

**B.      The Tribunal's Ruling on Costs**

440.    The Tribunal here addresses two separate issues on costs: (i) the allocation of costs as between the Claimant and the Respondent (comprising both the Parties' respective legal costs and the costs of the arbitration); and (ii) subject to this first issue, the assessment of the amount of recoverable legal costs. As to this second issue, the Tribunal notes that the Parties' claims for legal costs are both made under Article 61(2) of the ICSID Convention and with ICSID Arbitration Rule 47(1)(j), and not as compensation for an internationally wrongful act subject to the *Chorzów Factory* and other principles of international law.[423]

441.    There is no reason in this case to deny any element of the claim for costs based on the Parties' conduct of these proceedings. On the contrary, in the Tribunal's view, the case was well conducted, in good faith, at all stages by counsel for both the Claimant and the Respondent, whose efforts were all of great assistance to the Tribunal, and much appreciated.

442.    As to the allocation of costs as between the Parties, with respect to relative success, the Claimant has been successful in establishing jurisdiction and liability, but it had divided success in respect of quantum, where the Claimant's claim has been reduced by 20% for the reasons discussed earlier in this Award. This reduction does not warrant any award of costs in favour of the Respondent, however the divided success on the quantum issues should be reflected in a corresponding reduction in the assessment of the largely successful Claimant's legal costs to be recovered from the Respondent (as further addressed below).

443.    As to the assessment of the Claimant's legal costs, the Tribunal bears in mind two particular factors. First, the "loser pays" practice under Article 61 of the ICSID Convention is, in Schreuer's words "neither clear nor uniform."[424] There is no entitlement under the ICSID Convention for a successful party to receive a full indemnity for its legal costs from the losing party. Moreover, the principle of "loser pays" derives historically from certain common law jurisdictions where a percentage of the winning party's legal costs was traditionally "shifted" to the losing party but only on a "party and party" or "taxed" basis. Such a basis does not provide a full indemnity to the winning party. Costs may be further reduced in situations of divided success. In common law

---

[423] Schreuer, *The ICSID Convention* (2nd ed), pp. 1223ff; and Article 36 of the ILC Articles on State Responsibility.
[424] Schreuer, *The ICSID Convention* (2nd ed), p. 1229.

jurisdictions an award of costs is often taxed in amounts that are considerably less than a party's actual costs. Exceptionally, these common law jurisdictions *could* order indemnity costs in special situations, usually based upon the status of the claiming party (such as a trustee) or the gross misconduct of the losing party (for example, where that party had improperly pleaded fraud against its opponent). There is no such special situation in the present case. In the result, there being no presumption in favour of full indemnity costs, or indeed any other "default" position with respect to costs, it is for the Tribunal to determine by whom and in what amount (if any) the costs incurred by a party for lawyers and experts are to be added to the award.  The Tribunal, in the exercise of its discretion in respect of costs concludes by majority that it will not direct a full indemnity to the Claimant for its full legal costs.

444.    Second, with respect to the circumstances of this case, it is of course true that every claim presents its own difficulties and challenges (in this case, the *Achmea* decision presented a significant added twist). Yet the Spanish renewable energy claims have a public common history in many respects and public common elements. Moreover, the prior experience of the Claimant's law firms in numerous other arbitrations in this sector could be expected to result in a greater familiarity than in the situation of an isolated one-off case (as also, but still more so, the Respondent's legal representatives). The Tribunal does not doubt that the hours claimed by the Claimant were spent by its law firms. Moreover, the hours were spent with the full approval of the Claimant, as the client, at a time when it was not assured that it would recover any part of its legal costs from the Respondent. In making its assessment the Tribunal therefore intends no criticism of the Claimant or its law firms.

445.    The issue remains whether the Respondent should be required to reimburse the Claimant for its full legal costs in the form of a full indemnity under the ICSID Convention and ICSID Arbitration Rules. The Tribunal decides that such an outcome would not do justice in the circumstances of this case. The Tribunal therefore disposes of the claim for legal costs as follows (i) as regards assessment, a majority of the Tribunal considers applicable the principle that the decision of a party to mount a generously funded case does not impose on the unsuccessful party a corresponding obligation to make full reimbursement. Partial reimbursement may well be more appropriate. A majority also thinks relevant the number of similar claims publicly known and the involvement of the Claimant's lawyers in many of them. Taking into account all the circumstances

the Tribunal thinks appropriate a modest reduction of 5 % from the Claimant's claimed sums of US\$6,334,961.01 and €740,076.42 resulting in sums of US\$6,018,213 and €703,073 respectively and (ii) as regards allocation, the Tribunal majority concludes that that the Claimant's divided success on quantum should be reflected in a 20% reduction in these two sums, resulting in a net award for legal costs of US\$4,814,570 and €562,458 in favour of the Claimant and against the Respondent.

## C.    The Tribunal's Ruling on Costs of the Arbitration

446.    The costs of this arbitration are as follows:

Arbitrators' fees and expenses:

| | |
|---|---|
| Judge Ian Binnie: | US\$ 134,231.65 |
| Mr. David Haigh: | US\$ 85,765.40 |
| Mr. V.V. Veeder: | US\$ 46,347.83 |

| | |
|---|---|
| Other direct expenses: | US\$ 185,471.45 |
| ICSID's administrative fees: | US\$ 148,000.00 |
| *Total* (estimate) | US\$ 599,816.33 |

447.    The above costs have been paid out of the advances made by the Parties in equal parts.[425] Each Party has made the following advance payments: the Claimant US\$350,000.00, the Respondent US\$349,883.00.

448.    With respect to the allocation of the costs of the proceedings under Article 61(2) of the ICSID Convention, the Tribunal decides the Respondent to pay 100% of the ICSID costs of Claimant in the amount of US\$299,908.16.

---

[425] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

**PART 10.        THE OPERATIVE PART (DISPOSITIF)**

449.    For the reasons stated herein, the Tribunal grants the following relief:

(1)      a declaration that the Tribunal has jurisdiction under the ECT and the ICSID
Convention;

(2)      a declaration that Spain has violated the FET standard in Article 10(1) of the ECT
with respect to the Claimant's investments;

(3)      compensation under the ECT and international law to the Claimant in the sum of
€41.76 million plus interest at a rate equivalent to the 5-year Spanish Government
bond yield compounded annually from 30 June 2014 until Spain's full and final
satisfaction of the Award; and

(4)      costs of this proceeding, including (but not limited to) the Claimant's legal fees and
expenses, plus the fees and expenses of the Claimant's experts for a total of
US$4,814,570 and €562,458, and the fees and expenses of the Tribunal and ICSID
in the sum of US$299,908.16.

450.    The Tribunal dismisses all other claims.

159

Mr. David R. Haigh, Q.C.
Arbitrator
Date: May 30, 2019

Mr. V.V. Veeder, Q.C.
Arbitrator
Date: May 30, 2019

The Honorable Ian Binnie C.C., Q.C.
President of the Tribunal
Date: May 30, 2019