# EXHIBIT 29

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**Sevilla Beheer B.V. and others**
(Claimants)

and

**The Kingdom of Spain**
(Respondent)

**ICSID Case No. ARB/16/27**

---

**DECISION ON JURISDICTION, LIABILITY AND THE PRINCIPLES OF QUANTUM**

---

***Members of the Tribunal***
Dr. Raëd M. Fathallah, President of the Tribunal
Professor Peter Cameron, Arbitrator
Professor Attila Tanzi, Arbitrator

***Secretary of the Tribunal***
Mr. Marco Tulio Montañés-Rumayor

11 February 2022

*This page intentionally left blank*

*These proceedings were saddened by the unexpected passing in April 2020 of Professor Rudolf Dolzer, an outstanding professional and pioneer of international investment law, who served as one of the initial members of this Arbitral Tribunal. All the participants in this arbitration will always keep the fondest memories of him.*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1
II.     PROCEDURAL HISTORY ................................................................................... 2
III.    FACTUAL BACKGROUND ............................................................................... 19
        A.   Overview of the Claimants and their investments ............................. 19
             1.    The structure of the Claimants' investments ......................................... 19
             2.    The Claimants' decision to invest in Spain ........................................... 21
        B.   The regulatory framework at the time of the Claimants' investments ......... 29
             1.    General remarks ................................................................................... 29
             2.    Law 54/1997, RD 2818/1998, and the 2000-2010 PER ........................ 32
             3.    RD 436/2004 and the beginning of the Claimants' investment process......... 38
             4.    Cross Retail and the first Spanish Project Companies are incorporated;
                   RDL 7/2006 is adopted ......................................................................... 48
             5.    The Claimants' first EPC contract is signed; the Supreme Court issues another
                   judgment concerning RD 436/2004 ....................................................... 53
             6.    RD 661/2007 ......................................................................................... 57
             7.    RD 1578/2008 ....................................................................................... 75
             8.    RDL 6/2009 ........................................................................................... 87
             9.    Subsequent factual developments prior to the adoption of the Disputed Measures . 92
        C.   The Disputed Measures and other (non-impugned) regulations ................. 109
             1.    RD 1565/2010 – Disputed Measure ..................................................... 109
             2.    RDL 14/2010 – Disputed Measure ....................................................... 110
             3.    Law 2/2011– Disputed Measure .......................................................... 119
             4.    RDL 1/2012 ......................................................................................... 127
             5.    CNE Report dated 7 March 2012 ......................................................... 129
             6.    Supreme Court Judgments regarding challenges against RD 1565/2010 and
                   RDL 14/2010 ....................................................................................... 131
             7.    National Reform Program and Memorandum of Understanding with the EU ....... 134
             8.    Law 15/2012 – Disputed Measure ....................................................... 135
             9.    RDL 2/2013 – Disputed Measure ......................................................... 139
             10.   RDL 9/2013 – Disputed Measure ......................................................... 142
             11.   Law 24/2013 – Disputed Measure ....................................................... 150
             12.   RD 413/2014 and Ministerial Order IET/1045/214 – Disputed Measures ........... 156
             13.   The assessment of the Disputed Measures by the Spanish courts ........ 162
             14.   The assessment of the New Regime by the European Commission ....... 164
IV.     REQUESTS FOR RELIEF ................................................................................ 166
V.      PRELIMINARY ISSUES .................................................................................. 169
        A.   Applicable law ................................................................................... 169
             1.    The Parties' positions ......................................................................... 169
             2.    The Tribunal's analysis ....................................................................... 171
        B.   Burden of proof and other evidentiary matters ............................... 174
VI.     JURISDICTION ................................................................................................ 175
        A.   The Intra-EU Objection ...................................................................... 175
             1.    The Parties' positions ......................................................................... 175
             2.    The Tribunal's analysis ....................................................................... 192
        B.   The TVPEE Objection ......................................................................... 213

iv

|  | 1. | The Parties' positions .......................................................... | 213 |
|  | 2. | The Tribunal's analysis ....................................................... | 219 |
| **VII.** | **LIABILITY** ................................................................................. | | **224** |
| **A.** | **Interpretation of Article 10(1) of the ECT** ............................... | | **224** |
|  | 1. | The Parties' positions .......................................................... | 224 |
|  | 2. | The Tribunal's analysis ....................................................... | 226 |
| **B.** | **Whether there was a violation of Article 10(1) of the ECT** ....... | | **226** |
|  | 1. | Whether Spain violated the Claimants' legitimate expectations ......... | 230 |
|  | 2. | Whether the Disputed Measures were unreasonable or disproportionate... | 297 |
|  | 3. | Whether Spain breached the guarantee of transparency...................... | 303 |
|  | 4. | Whether the Disputed Measures violated the ECT's "Umbrella Clause" ... | 307 |
| **VIII.** | **ASSESSMENT OF THE ECONOMIC IMPACT OF THE DISPUTED MEASURES ON THE CLAIMANTS' INVESTMENTS AND QUANTUM OF DAMAGES** .............................................. | | **311** |
| **A.** | **Assessment of the economic impact of the Disputed Measures on the Claimants' investments** ............................................ | | **311** |
|  | 1. | The Parties' positions .......................................................... | 311 |
|  | 2. | The Tribunal's analysis ....................................................... | 319 |
| **B.** | **Income-based valuations of the Claimants' damages** ................. | | **335** |
|  | 1. | The Parties' positions .......................................................... | 335 |
|  | 2. | The Tribunal's analysis ....................................................... | 352 |
| **C.** | **Tax gross-up** ............................................................................. | | **353** |
|  | 1. | The Parties' positions .......................................................... | 353 |
|  | 2. | The Tribunal's analysis ....................................................... | 355 |
| **D.** | **Arbitration Costs** .................................................................... | | **357** |
| **IX.** | **OPERATIVE PART** ................................................................... | | **358** |

## REPRESENTATION OF THE PARTIES

*Representing Sevilla Beheer B.V. and others*

Mr. Antonio Vázquez-Guillén
Ms. Marie Stoyanov
Ms. Marieke van Hooijdonk
Mr. David Ingle
Mr. Pablo Torres
Mr. Alexandre Fichaux
Allen & Overy LLP
Pedro de Valdivia, 10
28006, Madrid
Spain

*Representing the Kingdom of Spain*

Mr. Rafael Gil Nievas
Mr. Alberto Torró Molés
Ms. Elena Oñoro Sainz
Ms. María del Socorro Garrido Moreno
Mr. Juan Antonio Quesada Navarro
Ms. Ana María Rodríguez Esquivias
Mr. Javier Comerón Herrero
Ms. María Eugenia Cediel Bruno
Ms. Estibaliz Hernández Marquinez
Ms. Gabriela Cerdeiras Megías
Ms. María de Lourdes Martínez de Victoria
Ms. Lorena Fatás Pérez
Abogacía General del Estado
Dpto. Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004 Madrid
Spain

## FREQUENTLY USED ABBREVIATIONS

| | |
|---|---|
| **2000-2010 PER** | 2000-2010 plan for the promotion of renewable energies elaborated by the IDAE |
| **2005 Supreme Court Judgment** | Spanish Supreme Court's Judgment concerning an appeal against RD 436/2004, dated 15 December 2005 |
| **2005 Solar Plaza Report** | Report prepared by Solar Plaza (a consultancy company of the Claimants' legal advisor, Mr. Koot), dated January 2005 |
| **2005-2010 PER** | 2005-2010 plan for the promotion of renewable energies elaborated by the IDAE |
| **2006 Supreme Court Judgment** | Spanish Supreme Court's Judgment concerning an amendment to RD 436/2004, dated 25 October 2006 |
| **2017 EC State Aid Decision** | Decision of the European Commission regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2014/NN)), dated 10 November 2017 |
| ***Achmea* Judgment** | Judgment of the Court of Justice of the European Union, Case C-284/16, Republic of Slovakia/Achmea BV, 6 March 2018 |
| **AEE** | *Asociación Empresarial Eólica* (Wind Energy Association) |
| **APPA** | *Asociación de Productores de Energías Renovables* (Association of Renewable Energy Producers) |
| **ASIF** | *Asociación de la Industria Fotovoltaica* (Photovoltaic Industry Association) |
| **Arbitration Rules** | ICSID Rules of Procedure for Arbitration Proceedings (2006) |
| **CAPM** | Capital Asset Pricing Model |
| **Claimants** | Sevilla Beheer B.V., Cordoba Beheer B.V., as well as 57 Spanish entities listed in Annex 1 |
| **CNE** | National Energy Commission |
| **CNE Report 3/2007** | Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and |

|  | specific technologies under the Ordinary Regime, dated 14 February 2007 |
|---|---|
| **CNE Report 30/2008** | Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, dated 29 July 2008 |
| **CNMC** | National Markets and Competition Commission |
| **CIT** | Corporate income tax |
| **DCF** | Discounted Cash Flow |
| **Directive 2001/77/EC** | EU Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources in the internal electricity market |
| **Directive 2009/28/EC** | EU Directive 2009/28/EC on the promotion of the use of energy from renewable sources |
| **EC or Commission** | European Commission |
| **CJEU** | Court of Justice of the European Union |
| **ECT** | Energy Charter Treaty |
| **EU** | European Union |
| **EV/EBITDA** | Enterprise Value to Earnings Before Interest, Taxes, Depreciation, and Amortization Ratio |
| **FCFE** | Free Cash Flows to the Equity |
| **FCFF** | Free Cash Flows to the Firm |
| **FiT** | Feed-in Tariff |
| **Hearing** | Hearing on jurisdiction and the merits held on 18-22 March 2019 in Paris |
| **ICSID** | International Centre for Settlement of Investment Disputes |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 18 March 1965 |
| **IDAE** | Instituto para la Diversificación y Ahorro de la Energía (Institute for Energy Diversification and Savings) |

| | |
|---|---|
| **IRR** | Internal Rate of Return |
| **Law 54/1997** | Law 54/1997 on electric power, dated 27 November 1997 |
| **Law 15/2012** | Law 15/2012 on fiscal measures for energy sustainability, dated 27 December 2012 |
| **Law 2/2011** | Law 2/2011 on sustainable economy, dated 3 March 2011 |
| **Law 24/2013** | Law 24/2013 on the electricity sector, dated 26 December 2013 |
| **Order IET/1045/2014** | Ministerial Order IET/1045/2014, dated 16 June 2014 |
| **Natec** | Natec Energy España |
| **New Regime** | RDL 9/2013 and related subsequent measures including Law 24/2013, Order IET/1045/2014, and Royal Decree 413/2014 |
| **NREAP** | National Renewable Energy Action Plan 2011-2020 |
| **Parties** | The Claimants and the Respondent |
| **PV** | Photovoltaic |
| **PV Plants** | Claimants' photovoltaic plants: Mahora PV, Villar de Cañas PV, Ronda PV, Matapozuelos PV, and Fuentes de Año PV |
| **Ra Solar** | Ra Solar Systems & Solutions España S.L. |
| **RAIPRE** | Administrative Register of Electricity Generation Installations created by Law 54/1997 |
| **RD 1578/2008** | Royal Decree 1578/2008 covering the compensation for the generation of electric power by photovoltaic solar technology for facilities subsequent to the deadline for the maintenance of compensation under Royal Decree 661/2007, dated 26 September 2008 |
| **RD 436/2004** | Royal Decree 436/2004 establishing the methodology for updating and systemising the legal and economic regime for electric power production in the Special Regime, dated 12 March 2004 |
| **RD 1565/2010** | Royal Decree 1565/2010 on the regulation and modification of certain aspects of the electricity production |

|  | activities under the Special Regime, dated 19 November 2010 |
|---|---|
| **RD 1614/2010** | Royal Decree 1614/2010 regulating and modifying certain aspects of the activity of electrical power production through solar thermoelectric and wind technologies, dated 8 December 2010 |
| **RD 413/2014** | Royal Decree 413/2014 regulating the production of electricity from renewable energy sources, cogeneration and waste, dated 6 June 2014 |
| **RD 661/2007** | Royal Decree 661/2007 regulating the activity of electricity production under the special regime, 25 May 2007 |
| **RDL 6/2009** | Royal Decree-Law 6/2009 adopting certain measures within the energy industry and approving the discount rate, dated 30 April 2009 |
| **RDL 7/2006** | Royal Decree-Law 7/2006 establishing urgent measures in the energy sector, dated 23 June 2006 |
| **RDL 1/2012** | Royal Decree-Law 1/2012 implementing the suspension of the remuneration pre-assignment procedures and the elimination of economic incentives for new electrical energy production installations based on cogeneration, renewable energy sources and waste, dated 27 January 2012 |
| **RDL 14/2010** | Royal Decree Law 14/2010 on the establishment of urgent measures for the correction of the tariff deficit, dated 23 December 2010 |
| **RDL 2/2013** | Royal Decree Law 2/2013, concerning urgent measures within the electricity system and the financial sector, dated 2 February 2013, dated 2 February 2013 |
| **RDL 9/2013** | Royal Decree-Law 9/2013 setting forth urgent measures to ensure the financial stability of the electricity system, 14 July 2013 |
| **RE** | Renewable energy |
| **Respondent** | The Kingdom of Spain |
| **SES** | Spanish electricity system |
| **Spanish Project Companies** | Claimants' Spanish entities listed in Annex 1 under numbers 4-59 |

| | |
|---|---|
| **TFEU** | Treaty on the Functioning of the European Union |
| **TVPEE** | The 7% tax on the value of the production of electricity established by Law 15/2012 |
| **VCLT** | Vienna Convention on the Law of Treaties (1969) |
| **WACC** | Weighted average cost of capital |

## I.    INTRODUCTION

1.    The claimants in this arbitration are Sevilla Beheer B.V. ("**Sevilla Beheer**") and Cordoba Beheer B.V. ("**Cordoba Beheer**"), two private limited liability companies incorporated under the laws of the Netherlands, as well as 57 Spanish companies listed at paragraph 109 below and in Annex 1 to this Decision (the "**Claimants**"). The claimant entities are ultimately controlled by a Dutch national, Mr. Reinier Bouman, the majority owner of the Claimants and the CEO of Sevilla Beheer. The minority stake is held by his daughter.

2.    The respondent in this arbitration is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

3.    The Claimants and the Respondent are collectively referred to as the "**Parties**"; the names of their representatives are set out on page vi above.

4.    This arbitration concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty (the "**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**"). The ECT entered into force for the Netherlands and Spain on 16 April 1998. The ICSID Convention entered into force on 14 October 1966 for the Netherlands, and on 17 September 1994 for Spain.

5.    In this matter, the Claimants allege that the Respondent's legislative and regulatory measures enacted in respect of the renewable energy (the "**RE**") sector in Spain in 2010-2014 and described in detail in Section III.C below (the "**Disputed Measures**") violated Article 10(1) of the ECT and caused damages to the Claimants' investments in photovoltaic ("**PV**") plants. The Respondent argues that the Tribunal lacks jurisdiction over the present dispute and that in any event the Disputed Measures did not breach the ECT.

## II.    PROCEDURAL HISTORY

6.    On 1 August 2016, ICSID received a request for arbitration from the Claimants (the "**Request**").

7.    On 12 August 2016, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.    On 5 September 2016, the Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator, to be appointed by agreement of the Parties.[1]

9.    On 20 September 2016, following appointment by the Claimants, Professor Rudolf Dolzer, a national of Germany, accepted his appointment as arbitrator.

10.    On 9 October 2016, following appointment by the Respondent, Professor Attila Tanzi, a national of Italy, accepted his appointment as arbitrator.

11.    On 25 November 2016, the Parties appointed Sir Franklin Berman as the presiding arbitrator. On 28 November 2016, the Centre sought Sir Franklin Berman's acceptance, who declined on 29 November 2016. By letter of the same date, the Centre invited the Parties to reach an agreement on another candidate.

12.    On 9 December 2016, the Claimants requested that the Secretary-General of ICSID appoint the presiding arbitrator pursuant to the Parties' agreement of 5 September 2016. The Respondent confirmed its agreement to this request by communication of the same date.

---

[1] The Parties also agreed that the ICSID Secretary-General "shall make its appointment after having consulted both parties under a ballot procedure with candidates who may be from outside the Panel of Arbitrators and shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute."

13.   On 11 January 2017, ICSID initiated the ballot selection process as requested by the Parties in their communications of 9 December 2016 and as initially agreed in their communications of 5 September 2016.

14.   On 23 January 2017, ICSID confirmed receipt of the Parties' completed ballot forms. ICSID informed the Parties that the ballot process had not resulted in the selection of a mutually agreeable candidate and that it would proceed to appoint the presiding arbitrator in accordance with the Parties' agreement.

15.   On 26 January 2017, the Secretary-General of ICSID proposed to appoint Dr. Raëd M. Fathallah, a national of Lebanon and Canada,[2] as the presiding arbitrator, and invited the Parties to submit any observations related to this proposal.

16.   On 7 February 2017, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date.

17.   The Tribunal was composed of Dr. Raëd M. Fathallah, President, appointed by the Secretary-General; Professor Rudolf Dolzer, appointed by the Claimants; and Professor Attila Tanzi, appointed by the Respondent. Ms. Anneliese Fleckenstein, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

18.   On 4 April 2017, in accordance with Arbitration Rule 13(1), the Tribunal held a first session with the Parties by teleconference.

19.   Following the first session, on 12 April 2017, the Tribunal issued Procedural Order No. 1 ("**PO1**") recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. PO1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be

---

[2] Subsequently to his appointment as the President of the Tribunal, Dr. Raëd M. Fathallah acquired French nationality of which the Parties were duly notified.

Washington, D.C., United States. PO1 also sets out the procedural calendar for this proceeding.

20.   On 30 June 2017, the Claimants filed a Memorial on the Merits (the "**Memorial**") together with the witness statements of Mr. Reiner Bouman and Ms. Yolanda Paniego; the expert reports of Mr. Pablo T. Spiller (Compass Lexecon) and Mr. Carlos Solé Martín (KPMG); Exhibits C-2 through C-152; and Legal Authorities CL-1 through CL-95.

21.   On 24 November 2017, the Respondent filed a Counter-Memorial on the Merits and a Memorial on Jurisdiction (the "**Counter-Memorial**") together with a witness statement of Mr. Carlos Montoya; the expert report of Dr. Daniel Flores (Econ One Research, Inc.); Exhibits R-1 through R-231; and Legal Authorities RL-1 through RL-65.

22.   On 9 February 2018, and pursuant to the procedural calendar, the Parties filed a joint request for the Tribunal to decide on production of documents.

23.   On 2 March 2018, the Tribunal issued a decision on the Parties' request for production of documents of 9 February 2018.

24.   On 13 June 2018, the Centre informed the Tribunal and the Parties that Mr. Marco Tulio Montañés-Rumayor, ICSID Counsel, had been appointed as Secretary of the Tribunal in replacement of Ms. Anneliese Fleckenstein.

25.   On 12 July 2018, the Claimants filed a Reply on the Merits and Counter-Memorial on Jurisdiction (the "**Reply**"), together with Appendices 1 through 5; the second witness statements of Mr. Reiner Bouman and Ms. Yolanda Paniego; rebuttal expert reports of Mr. Pablo T. Spiller (Compass Lexecon) together with exhibits CLEX-001 through CLEX-602, and of Mr. Carlos Solé Martín (KPMG) together with exhibits 24 through 58; Exhibits C-153 through C-251; and Legal Authorities CL-22 through CL-160.

26.   On 10 October 2018, the Respondent filed a Rejoinder on the Merits and Reply on Jurisdiction (the "**Rejoinder**") accompanied by Exhibits R-232 through R-336; and Legal Authorities RL-66 through RL-110; the second witness statement of Mr. Carlos Montoya with Exhibits W-0005 through W-0796; the second expert report of Dr. Daniel Flores (Econ One Research, Inc.), with exhibits EO-123 through EO-185.

27.   On 5 November 2018, the European Commission (the "**EC**" or the "**Commission**") filed an application for leave to intervene as a non-disputing party pursuant to Arbitration Rule 37(2) (the "**EC Application**").

28.   On 9 November 2018, the Tribunal invited the Parties to make simultaneous submissions regarding the EC Application by 26 November 2018.

29.   On 26 November 2018, each Party filed observations on the EC Application.

30.   On 13 December 2018, the Tribunal issued Procedural Order No. 2 ("**PO2**") concerning the EC Application. In PO2, the Tribunal held as follows:

> The Commission's Application is granted in part;
>
> The Commission is granted leave to participate in the present arbitration as a non-disputing party, subject to the requirement that the Commission provide within a week from the issuance of this Order a written undertaking stating that the Commission undertakes to bear the costs arising from its intervention in ICSID Case No. ARB/16/27 (*Sevilla Beheer B.V. and others v. Kingdom of Spain*), including its own costs as well as reasonable institutional and Tribunal costs, as determined by the Tribunal at a later stage;
>
> Thereafter, the Commission is invited to submit a single, written submission of no more than ten (10) pages on the two issues set out in its Application by 4 January 2019;
>
> Thereafter, the Parties are invited to submit their written observations on the Commission's written submission within four weeks of the Commission's filing;
>
> The Commission's request to access documents filed in these proceedings is denied; and
>
> The Commission's request for leave to attend the hearing in this case and make oral argument and answer questions by the Tribunal is denied.

31.   On 19 December 2018, the Claimants filed a Rejoinder on Jurisdiction (the "**Rejoinder on Jurisdiction**"), together with Appendices 1 and 2; Exhibits C-252 and C-253; and Legal Authorities CL-164 through CL-174.

32.   On 20 December 2018, the EC filed a request to alter PO2 (the "**EC Request for Reconsideration**") to remove the condition of providing the cost undertaking for institutional and Tribunal costs. Alternatively, the Commission requested that the EC Application be added to the record if the Tribunal were to decide not to alter PO2.

5

33. On 21 December 2019, the Tribunal invited the Parties to comment on the EC Request for Reconsideration.

34. On 27 December 2018, both Parties filed observations on the EC Request for Reconsideration.

35. On 3 January 2019, the Tribunal issued its decision on the EC Request for Reconsideration, concluding as follows:

> […] the Tribunal has decided to maintain the relevant language in paragraph 24(2) of Procedural Order No. 2 which provides that the Commission is granted leave to participate in the present arbitration as a non-disputing party, subject to the requirement that the Commission provide a written undertaking stating that the Commission undertakes to bear the costs arising from its intervention in ICSID Case No. ARB/16/27, namely its own costs as well as reasonable institutional and Tribunal costs, as determined by the Tribunal at a later stage (the "Cost-Undertaking").
>
> […]
>
> Regarding the European Commission's request that its Application to intervene as non-disputing party dated 29 October 2018 be added to the record of this case in the event its Request were rejected (set forth at paragraph 42 of the Request), the Tribunal defers its decision until after 7 January 2019.

36. On 4 January 2019, the EC informed the Tribunal that it was not in a position to comply with the cost undertaking and hence, would not file its *amicus curiae* submission. However, it requested that the Tribunal maintain the EC Application on the record.

37. On 8 January 2019, the Tribunal held that "given that the Tribunal has already reviewed… the [EC Application], as well as the Parties' comments thereon, the Tribunal decides that the… [EC Application] is included in the record of the present proceedings."

38. On 25 January 2019, the Respondent requested the Tribunal's leave to file a new legal authority, namely the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (the "**Declaration of 22 EU Member States on *Achmea***"). On the same date, the Tribunal invited the Claimants to submit any comments they may wish to make on the Respondent's request.

39.    On 30 January 2019, the Claimants confirmed that they did not oppose the Respondent's request of 25 January 2019. Additionally, they requested the Tribunal's leave to introduce into the record three new legal authorities, namely: (i) the Declaration of the Representatives of the Governments of the Member States, of 16 January 2019, on the enforcement of the Judgment of the Court of Justice in *Achmea* and on investment protection in the European Union (the "**Declaration of Finland, Luxembourg, Malta, Slovenia and Sweden on *Achmea***"); (ii) the Declaration of the Representative of the Government of Hungary, of 16 January 2019, on the legal consequences of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union (the "**Hungary *Achmea* Declaration**"); and (iii) the *amicus curiae* brief submitted by MOL Hungarian Oil and Gas PLC in enforcement proceedings before the US courts (the "**MOL Brief**").[3]

40.    On 1 February 2019, the Tribunal invited the Respondent to comment on the Claimants' request of 30 January 2019 by 6 February 2019.

41.    On 6 February 2019, the Respondent confirmed that it did not oppose the Claimants' requests (i) and (ii) above. However, it objected to request (iii), i.e., the MOL Brief.

42.    On 14 February 2019, the Tribunal granted all of the Parties' requests of 25 and 30 January 2019 and invited the Parties to file a 5-page simultaneous submission on the relevance of the recently admitted legal authorities by 22 February 2019.

43.    On 15 February 2019, the Parties agreed to the appointment of Ms. Maria Kiskachi as Assistant to the Tribunal.

44.    On 18 February 2019, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

---

[3] The Declaration of 22 Member States on *Achmea*, the Declaration of Finland, Luxembourg, Malta, Slovenia and Sweden on *Achmea* and the Hungary *Achmea* Declaration are collectively referred to as the "January 2019 *Achmea* Declarations".

45. On 21 February 2019, the Respondent informed the Tribunal that one of its witnesses, Mr. Carlos Montoya, would not be able to attend the forthcoming hearing on jurisdiction and the merits scheduled on 18-22 March 2019 (the "**Hearing**").

46. On 22 February 2019, the Parties submitted comments on the relevance of the January 2019 *Achmea* Declarations and the MOL Brief.[4]

47. On 25 February 2019, the Claimants requested the Tribunal to strike Mr. Montoya's two witness statements and the exhibits cited therein from the record pursuant to Section 19.3 of PO1.

48. On 26 February 2019, the Tribunal invited Spain to reply to the Claimants' request of 25 February 2019, by 28 February 2019.

49. On 28 February 2019, the Respondent objected to the Claimants' request of 25 February 2019 because of the following reasons. First, Section 19.3 of PO 1 referred to *disregard*, not to "strike from the record". Second, Mr. Montoya's decision not to attend the Hearing was "only to be attributed to the witness; the Respondent holds as much interest as the Claimants in Mr. Montoya's examination." Third, when Spain asked Mr. Montoya for an explanation, it was told that Mr. Montoya was "not in disposition to participate in the arbitration proceeding due to personal and work reasons." Finally, Spain argued that if the Tribunal were to disregard the witness statements, Mr. Montoya's exhibits should be kept on the record.

50. On 4 March 2019, the Tribunal transmitted to the Parties for their comments Procedural Order No. 3 in draft form ("**Draft PO3**") regarding the organization of the Hearing.

51. On 5 March 2019, the Tribunal invited the Claimants to comment on the Respondent's letter of 28 February 2019 by 6 March 2019.

---

[4] Respondent's Comments on (i) the declarations of the representatives of the governments of the European Union Member States with regard to the Judgment of the European Union Court of Justice in *Achmea* and on investment protection in the European Union and (ii) on the brief of MOL Hungarian Oil and Gas PLC as *amicus curiae*, 22 February 2019 (the "Respondent's Comments on the January 2019 Declarations and the MOL Brief"); Claimants' comments on the declarations of the EU Member States on the consequences of the *Achmea* Judgment and the MOL Brief (the "Claimants' Comments on the January 2019 Declarations and the MOL Brief").

52.  On 6 March 2019, the Claimants replied to the Respondent's communication of 28 February 2019, reiterating their request to strike Mr. Montoya's witness statements and exhibits from the record because of the following reasons. First, pursuant to Section 19.3 of PO1 and Article 4.7 of the IBA Rules on the Taking of Evidence, witness statements are to be disregarded where a witness fails to appear for cross-examination absent a valid reason. Second, Spain did not provide a "valid" reason for Mr. Montoya's failure to attend the Hearing, merely asserting that there were "personal and work reasons" underlying his refusal to appear, without specifying what those reasons were. Third, Spain sought to create "a formalistic distinction between disregarding a witness statement and striking it from the record." Finally, Spain's request to disregard Mr. Montoya's witness statements but not the accompanying exhibits, which did not qualify as "witness statement" as such was "overly formalistic and lack[ed] any merit."

53.  Also on 6 March 2019, the Parties agreed to extend by one day (i.e., until 7 March 2019) the deadlines in Draft PO3 to (i) indicate to the Tribunal whether they objected to any of the documents proposed by the other Party and the reason for their objection; and (ii) explain the relevance of the documents objected to the other Party.

54.  On 6 March 2019, the Claimants identified eleven documents that they intended to introduce as new exhibits pursuant to Section 16.7 of PO1 and Section L of Draft PO3.

55.  On 7 March 2019, the Respondent objected to seven documents from the Claimants' request of 6 March 2019. On the same date, the Claimants submitted an explanation of the relevance of the seven objected documents.

56.  On 10 March 2019, the Tribunal dismissed the Claimants' request to strike from the record Mr. Montoya's witness statements and exhibits cited therewith. Having noted the Claimants' concerns related to Mr. Montoya's non-appearance, the Tribunal nonetheless observed that cross-examination was not the only means to test written witness testimony, especially in view of the fact that Mr. Montoya testified on the content and evolution of Spain's regulatory framework for RE producers. The Tribunal further emphasized its power to determine the evidentiary value of testimony which has not been tested on cross-examination. Therefore, the Tribunal decided that it was impracticable to disregard Mr. Montoya's witness statements, but that in the assessment of the probative value of

said witness statements, the Tribunal would take into account that Mr. Montoya was not available for cross-examination. For the same reasons, the Tribunal also decided not to disregard the exhibits accompanying Mr. Montoya's witness statements. The Tribunal additionally noted that it would be unduly formalistic to strike the remaining Montoya-exhibits from the record given that Spain would have previously been able to introduce them with its written submissions (with or without a witness statement) or could potentially still apply to introduce them in the course of the proceedings.

57.    On 11 March 2019, the Tribunal decided to grant the Claimants' request of 6 March 2019 to enter eleven new documents into the records, subject to the respective conditions stipulated by the Respondent.

58.    Also on 11 March 2019, Spain requested to introduce into the record the Decision on Responsibility and on the Principles of Quantum issued on 30 November 2018 in ICSID Case No. ARB/13/30 *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l v. Kingdom of Spain* (the "***RREEF v. Spain* Decision**"). It also clarified that it had proposed to the Claimants to introduce several exhibits and legal authorities and that none of them were objected by the Claimants.

59.    On 12 March 2019, the Claimants accepted Spain's request to enter on the record the *RREEF v. Spain* Decision on the condition that the dissenting opinion of Professor Robert Volterra was also included on the record.

60.    On 12 March 2019, the Claimants submitted a communication to the Tribunal stating their concern that the Tribunal's decision regarding Mr. Montoya's statement and exhibits could give rise to a procedural inequality that could unduly prejudice the Claimants. Therefore, the Claimants requested that the Tribunal grant an additional 15 minutes to Mr. Carlos Solé, the Claimants' regulatory expert, to address Mr. Montoya's testimony in his presentation.

61.    On 15 March 2019, the Tribunal granted the Claimants' request of 12 March 2019. Accordingly, Mr. Carlos Solé was accorded an additional 15 minutes to address Mr. Montoya's testimony in his presentation at the Hearing.

62.    On 16 March 2019, the Tribunal issued Procedural Order No. 3, regarding the organization of the Hearing ("**PO3**").

63.   On 17 March 2019, the Tribunal decided to admit into the record the *RREEF v. Spain* Decision, including Professor Volterra's dissenting opinion. It also directed the Parties to write jointly to the tribunal in the *RREEF v. Spain* proceeding to request leave for the said decision and dissenting opinion to be submitted in this proceeding.

64.   The Hearing was held at the World Bank Paris Conference Center in Paris, France, from 18 March through 22 March 2019. The following persons were present at the Hearing:

*Tribunal*:
Dr. Raëd M. Fathallah                                    President
Professor Rudolf Dolzer                                 Arbitrator
Professor Attila Tanzi                                     Arbitrator

*Assistant to the Tribunal*:
Ms. Maria Kiskachi

*ICSID Secretariat*:
Mr. Marco Tulio Montañés-Rumayor            Secretary of the Tribunal

*For the Claimants*:
Ms. Marie Stoyanov                                       Allen & Overy
Mr. Antonio Vazquez-Guillén                        Allen & Overy
Mr. Antonio Jiménez-Blanco                         Allen & Overy
Mr. David Ingle                                              Allen & Overy
Mr. Alexandre Fichaux                                  Allen & Overy
Mr. Tomasz Hara                                           Allen & Overy
Mr. Pablo Torres                                            Allen & Overy
Ms. Patricia Rodríguez                                  Allen & Overy
Ms. Carmen de la Hera                                 Allen & Overy

*For the Respondent*:
Mr. Pablo Elena Abad                                    Abogacía General del Estado
Ms. Patricia Elena Fröhlingsdorf Nicolás     Abogacía General del Estado
Ms. María José Ruiz Sánchez                        Abogacía General del Estado
Ms. Gloria María de la Guardia Limeres         Abogacía General del Estado

*Court Reporters*:
Mr. Trevor McGowan                                      English Court Reporting
D-R Esteno                                                     Spanish Court Reporting

11

*Interpreters*:
| | |
|---|---|
| Mr. Jesus Getan | English-Spanish interpreter |
| Ms. Amalia Klemm-Thaler | English-Spanish interpreter |
| Mr. Marc Viscovi | English-Spanish interpreter |

During the Hearing, the following persons were examined:

*On behalf of the Claimants*:
| | |
|---|---|
| Mr. Reinier Bouman | Sevilla Beheer B.V. |
| Ms. Yolanda Paniego | Ra Solar Systems & Solutions España, S.L. |
| Mr. Carlos Solé | KPMG |
| Mr. Pablo T. Spiller | Compass Lexecon |

*On behalf of the Respondent*:
| | |
|---|---|
| Mr. Daniel Flores | Quadrant (former Econ One) |

65. On 16 April 2019, the Tribunal confirmed that, as agreed by the Parties, the post-hearing briefs should not exceed 50 pages and shall be filed simultaneously by 21 May 2019. The Tribunal also provided the Parties with a list of questions and invited the Parties to address in their post-hearing briefs these questions and new case law that may be relevant to the present case, including, as agreed, the *RREEF. v. Spain* Decision.

66. On 22 April 2019, the Parties submitted the agreed-upon corrections to the Hearing transcript.

67. On 21 May 2019, the Parties filed simultaneous post-hearing briefs (the "**Claimants' Post-Hearing Brief**" and "**Respondent's Post-Hearing Brief**").

68. On 27 May 2019, the Parties confirmed their agreement to submit rebuttal post-hearing briefs by 14 June 2019.

69. On 14 June 2019, the Parties filed simultaneously rebuttal post-hearing briefs (the "**Claimants' Reply Post-Hearing Brief**" and "**Respondent's Second Post-Hearing Brief**").

70.    On 17 June 2019, the Respondent requested the Tribunal to remove from the record several factual exhibits (C-267 and C-268) and legal authorities (CL-182 and CL-183) submitted by the Claimants together with their Post-Hearing Briefs. The Respondent argued that the submission of new exhibits and legal authorities had not been authorized by the Tribunal and contradicted Section 17.4 of PO1. Spain further contended that pursuant to the Tribunal's invitation to address in the Post-Hearing Briefs "new Spanish case law" made at the end of the Hearing[5], the Claimants were not allowed to introduce case law that was not related to the Kingdom of Spain.

71.    On 21 June 2019, the Claimants argued that the introduction of new authorities was contemplated at the Hearing and referred to the exchange on "housekeeping matters" between the Claimants' counsel and the Tribunal.[6] The Claimants further contended that Section 17.4 of PO1 did not prohibit the Parties from filing additional documents, as long as they were submitted together with, but not after, the last written submissions, which, according to the Claimants, means post-hearing briefs.

72.    On 27 June 2019, the Tribunal decided as follows regarding the Respondent's request of 17 June 2019:

> [T]he Tribunal denies the Respondent's request to remove from the record legal authorities CL-182 and CL-183. The Tribunal's invitation to address "new Spanish case law" was not intended to serve as a limitation on the types of authorities that could be relied upon by the Parties in their Post-Hearing Briefs. Moreover, the possibility to submit additional legal authorities was secured by the Claimants' counsel at the end of the Hearing on Jurisdiction and the Merits [Hearing Tr., Day 5, 158:1-16] and was not challenged by the Respondent.
>
> The Tribunal however grants the Respondent's request to remove from the record the two new factual exhibits (C-267 and C-268). The Tribunal is not of the view that the reference to "the last written submissions" in Section 17.4 of Procedural Order No. 1 was intended to address post-hearing briefs or allow the submission of additional evidence with the post-hearing briefs. Indeed, it is common practice that post-hearing briefs should not serve as an opportunity for the Parties to introduce new evidence. As the Tribunal stated at the hearing: "the post-hearing memorial is also for you to put forward whatever you wish, in terms of making use of what has been said and established during the hearing, by way of cross-examination and by way of advocacy." [Hearing Tr., Day 5, 160:5-10] The Tribunal's invitation to utilize post-hearing briefs as the

---

[5] Hearing Tr., Day 5, 22 March 2019, 163:12-20 (President).

[6] Hearing Tr., Day 5, 22 March 2019, 158:1-6 (Stoyanov/President).

> Parties deem fit, made in the letter dated 16 April 2019, concerned the post-hearing briefs' organization and structure as well as the choice of issues to be addressed in addition to answering the questions put by the Tribunal.
>
> The Tribunal thus decides to remove exhibits C-267 and C-268 from the record of these proceedings.

73.   On 31 July 2019, the Parties filed their cost statements.

74.   On 2 August 2019, Spain requested leave to comment on the Claimants' cost statement.

75.   On 8 August 2019, the Tribunal invited the Parties to briefly comment on each other's cost statements by 16 August 2019.

76.   On 16 August 2019, the Parties filed their rebuttal cost submissions.

77.   On 4 December 2019, Spain requested leave to introduce into the record the award rendered in the ICSID Case No. ARB/15/1 *Stadtwerke München GmbH, RWE Innogy GmbH and Others v. Kingdom of Spain* (the "***Stadtwerke München v. Spain Award***") and the Decision on Jurisdiction, Liability and Directions on Quantum issued in the ICSID Case No. ARB/15/16 *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain* (the "***BayWa v. Spain* Decision**").

78.   On 5 December 2019, the Tribunal invited the Claimants to comment on the Respondent's request of 4 December 2019.

79.   On 6 December 2019, the Claimants opposed the Respondent's request to submit additional legal authorities. In the alternative, the Claimants requested leave to also submit additional legal authorities.[7]

---

[7] *I.e.,* the Award dated 31 May 2019 rendered in *9REN Holding S.À.R.L.v Kingdom of Spain* (ICSID Case No. ARB/15/15); the Decision on Jurisdiction, Liability and Quantum Principles dated 12 March 2019 rendered in *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain* (ICSID Case No. ARB/4/11); the Award dated 31 May 2019 rendered in *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V.v. Kingdom of Spain* (ICSID Case No. ARB/4/11); the Decision on Jurisdiction, Liability and a Partial Decision on Quantum dated 19 February 2019 rendered in *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20); the Final Award dated 15 July 2019 rendered in *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20); the Final Award dated 31 July 2019 rendered in *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38); the Final Award dated 6 September 2019 rendered in *Operafund Eco-Invest Sicav Plc and another v. Kingdom of Spain* (ICSID Case No. ARB/15/36); the Final Award dated 2 August 2019 rendered in *InfraRed Environmental Infrastructure GP Limited and others v. the Kingdom of Spain* (ICSID Case No. ARB/14/12); the

80.    On 10 December 2019, the Tribunal decided to admit all of the additional legal authorities, as requested by both Parties, to the record of these proceedings.

81.    On 15 February 2020, the Claimants requested that a new legal authority, namely the award rendered in the ICSID Case No. ARB/15/44 *Watkins Holding S.à.r.l. and others v. Kingdom of Spain* (the "**Watkins v. Spain** Award") be admitted into the record of these proceedings.

82.    On 27 February 2020, in light of the Parties' respective observations, the Tribunal decided to admit into the record the *Watkins v. Spain* Award, together with the dissenting opinion of Professor Dr. Hélène Ruiz Fabri.

83.    On 5 March 2020, the Respondent requested that a new legal authority be admitted into the record of these proceedings, namely the award rendered on 28 February 2020 in the UNCITRAL Arbitration PCA Case No. 2012-14 *The PV Investors v. Kingdom of Spain* (the "**The PV Investors v. Spain** Award").

84.    On 12 March 2020, the Claimants confirmed that they did not object to the Respondent's request, provided that the dissenting opinion of the Honorable Charles N. Brower would also be admitted into the record.

85.    On 25 March 2020, the Tribunal decided to admit to the record the *The PV Investors v. Spain* Award, as well as the dissenting opinion of the Honorable Charles N. Brower.

86.    On 8 April 2020, following the passing away of arbitrator Rudolf Dolzer, the Secretary-General notified the Parties of the vacancy on the Tribunal and the proceeding was suspended pursuant to Arbitration Rule 10(2).

87.    On 7 May 2020, the Tribunal was reconstituted as follows: Dr. Raëd Fathallah, President of the Arbitral Tribunal, appointed by the Secretary-General; Professor Peter D. Cameron,

---

Decision on the "Intra-EU" Jurisdictional Objection dated 25 February 2019 rendered in *Landesbank Baden-Württemberg et al. v. Kingdom of Spain* (ICSID Case No. ARB/15/45); the Dissenting Opinion of Dr Horacio A. Grigera Naón to the *BayWa* Decision; and the Dissenting Opinion of Prof. Kaj Hobér to the *Stadtwerke München* Award.

appointed by the Claimants; and Professor Attila Tanzi, appointed by the Respondent. The proceeding was resumed pursuant to Arbitration Rule 12.

88.    On 12 May 2020, the Respondent stated that it "would like to respectfully suggest the possibility of holding a short supplementary hearing once Professor Cameron has had the opportunity to review the Parties' written submissions" in order to "allow the newly appointed Arbitrator to address any issues that he could not raise during the oral phase of these proceedings and at the same time contribute to finalize the Tribunal's deliberation process."

89.    On 18 May 2020, the Claimants opposed the Respondent's suggestion on the grounds that: (i) as a general rule, the proceedings must be resumed immediately after the filling of the vacancy on the Tribunal; (ii) it is a "discretionary right" of the new arbitrator alone to require that the oral procedure be recommenced pursuant to Arbitration Rule 12; and that (iii) holding a supplementary hearing would be wasteful and inefficient.

90.    On 22 May 2020, the Tribunal directed the Parties to prepare a joint electronic bundle of the case file to be uploaded to ICSID's file sharing platform and also sent by courier to Professor Cameron in a USB drive.

91.     On 11 June 2020, the Claimants confirmed that the joint electronic bundle had been uploaded to ICSID's platform and sent to Professor Cameron.

92.    On 30 July 2020, the Tribunal informed the Parties that Professor Cameron "has had the opportunity to familiarize himself with the record and decided not to require that the oral procedure be recommenced. The Tribunal therefore decided that there will be no recommencement of the oral procedure in this matter."

93.    On 22 March 2021, the Respondent requested leave to submit the following authorities to the record: (i) the Decision on Jurisdiction, Liability and Directions on Quantum issued on 31 August 2020 in *Cavalum SGPS, S.A. v. the Kingdom of Spain*, ICSID Case No. ARB/15/34 (the "***Cavalum v. Spain* Decision**"); (ii) the Award rendered on 8 March 2021 in *FREIF Eurowind Holdings Ltd. v. the Kingdom of Spain*, SCC Case V 2017/060 (the "***FREIF Eurowind* Award**"); and (iii) the Decision on Jurisdiction and Liability issued on 17 March 2021 in *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4 (the "***Eurus Energy v. Spain* Decision**").

94.   On 29 March 2021, the Claimants objected to the Respondent's request to submit the above new legal authorities. Firstly, the Claimants argued that there were no exceptional circumstances that would justify adding these new authorities to the record. Secondly, the Claimants contended that Spain's argument that these new legal authorities evidenced the "consistency of the new approach adopted by Arbitral Tribunals" was a misrepresentation of the current status relevant jurisprudence. Thirdly, the Claimants submitted that "continuing to allow the submission of additional authorities would only disrupt the proceedings and cause additional delays and costs." Finally, the Claimants observed that the Respondent's request was in breach of paragraph 17.4.1 of PO1 because, *inter alia*, it set out a summary of each of the authorities Spain sought to add to the record, with explicit mention to the tribunals' main conclusions and reasoning.

95.   On 30 March 2021, the Tribunal decided to admit all of the new legal authorities referenced in the Respondent's 22 March 2021 letter, together with any dissenting or separate opinions into the record, noting that these new arbitral decisions were widely commented, publicly available documents. Having agreed with the Claimants that the Respondent's request to submit new authorities was made at a very advanced stage of the proceedings, the Tribunal nevertheless considered that the admission of these publicly available documents did not create any prejudice to the Claimants and would not affect the prompt resolution of the Parties' dispute.

96.   On 9 September 2021, the Respondent requested leave to submit a new legal authority to the record, namely the Judgment of the Grand Chamber of the Court of Justice of the European Union, issued on 2 September 2021 in the Case C-741/19 *Republic of Moldova v. Komstroy* (the "***Komstroy* Judgment**"). The Respondent argued that the *Komstroy* Judgment was "a landmark ruling that the investor-state arbitration clause in the Energy Charter Treaty does not cover intra-EU investment disputes" such as the present one. On this basis, the Respondent asserted that in view of these "exceptional circumstances" the *Komstroy* Judgment must be admitted into the record pursuant to Section 17.4 of PO1.

97.   On 20 September 2021, the Claimants objected to the Respondent's request of 9 September 2021 because of the following reasons. First, the Claimants argued that there were no exceptional circumstances under PO1 that would justify adding this authority to the record. In their view, EU law (including the *Komstroy* Judgment) was not relevant to the question of the Tribunal's jurisdiction. Second, the request was made "very late" in

17

the proceeding and continuing to allow the submission of additional authorities would only "disrupt the proceedings." Third, the Respondent breached Section 17.4.1 of PO1 because its letter contained a summary of the *Komstroy* Judgment.

98. On 22 September 2021, the Tribunal decided to admit the *Komstroy* Judgment into the record because it was available publicly and its admission would not cause any prejudice to the Claimants.

99. On 23 September 2021, the Respondent requested leave to submit a new legal authority to the record, namely the Decision issued on 13 September 2021 in ICSID Case No. ARB/16/18 *Infracapital F1 S.À.R.L. et al v. Kingdom of Spain* (the "**Infracapital v. Spain Decision**").

100. On 29 September 2021, the Claimants objected to Spain's request arguing that there were "no 'exceptional circumstances'" that justified adding the *Infracapital v. Spain* Decision onto the record. The Claimants argued that "new decisions and awards in ECT cases against Spain see light on a regular basis." Moreover, "should the Tribunal rely on the *Komstroy* Judgment to uphold Spain's intra-EU objection […] the Claimants will suffer prejudice" and that "this outcome would be in breach of the Claimants' right to be heard."

101. On 4 October 2021, the Tribunal decided to admit the *Infracapital v. Spain* Decision to the record because it was a publicly available document. The Tribunal also concluded that:

> […] for the sake of good order and with a view to providing both Parties the full opportunity to be heard, the Tribunal has decided to invite the Parties to comment on both, the *Komstroy* Judgment and *Infracapital* Decision. Being mindful of the very advanced stage of these proceedings, the Parties' positions regarding these two new legal authorities shall be presented in the following manner: the Respondent shall present its comments on the *Komstroy* Judgment and *Infracapital* Decision by 8 October 2021 and the Claimants shall respond by 15 October 2021.

102. On 8 October 2021, the Respondent submitted its comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision.

103. On 15 October 2021, the Claimants submitted their reply comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision.

104. On the same day, the President of the Tribunal informed the Parties that he had recently acquired French nationality, in addition to his Canadian and Lebanese nationalities.

105. The Tribunal has deliberated by various means of communication, including numerous exchanges in writing, as well as virtual meetings held on 20 May 2020, 22 October 2020, 19 November 2020 and 14 April 2021. The Tribunal has taken into account all of the pleadings, documents and testimony submitted in this case.

## III.    FACTUAL BACKGROUND

106. This section summarizes the facts that are largely uncontested, including the description of the Claimants' investment process, the evolution of the regulatory framework under which the Claimants made their investments in Spain and the Disputed Measures. The aim of the summary below is not to give an exhaustive account of all the factual and regulatory developments presented by the Parties in the course of these proceedings, but to set the context for the Tribunal's subsequent analysis.

### A.    Overview of the Claimants and their investments

### 1.    The structure of the Claimants' investments

107. Sevilla Beheer and Cordoba Beheer are private liability companies established under the laws of the Netherlands[8] which fully own Cross Retail S.L. ("**Cross Retail**"), a company incorporated in Spain.[9]

108. Cross Retail and Sevilla Beheer also fully own 56 Spanish limited liability companies (the "**Spanish Project Companies**").[10]

---

[8] Extract from the Dutch commercial register (C-15.1); Extract from the Dutch commercial register (C-15.2).

[9] Extract from the Spanish commercial register (C-15.3). *See also* Memorial, paras. 8-9.

[10] *See* Annex 1 of this Decision.

109.  The Claimants provided the following chart depicting their corporate structure:[11]



110.  The Claimants are controlled by a Dutch national, Mr. Reinier Bouman, who is the majority owner of the Claimant entities and a CEO of Sevilla Beheer.[12]

111.  Mr. Bouman explains in his Second Witness Statement that he took all of the investment decisions for the Claimant entities, which were used as investment vehicles.[13]

112.  The Tribunal understands that none of the above-mentioned facts regarding the identity of the Claimants, their structure, and their control by Mr. Bouman has been contested by the Respondent.

113.  As further described at paragraphs 127-132 and 214-216, 226, 241 below, through Ra Solar, Cross Retail and the Spanish Project Companies Mr. Bouman acquired interests in the following five PV plants between 2007 and 2010: Mahora PV, Villar de Cañas PV, Ronda PV, Matapozuelos PV, and Fuentes de Año PV (the "**PV Plants**"), which had a total installed capacity of approximately 8.8 megawatts ("**MW**").[14]

---

[11] Memorial, para. 9, *referring to* Valuation of Damages to Sevilla Beheer B.V., Cordoba Beheer B.V., Cross Retail, S.L. and The Spanish Project Companies' Investments in Spain by Professor Pablo T. Spiller, dated 30 June 2017 ("First Compass Lexecon Report"), p. 17, Figure 1.

[12] Memorial, para. 10; Witness Statement of Mr. Reinier Bouman, dated 30 June 2017 ("First Bouman Statement"), paras. 1-2.

[13] Second Witness Statement of Mr. Reinier Bouman, dated 12 July 2018 ("Second Bouman Statement"), para. 9.

[14] Memorial, para. 12.

114.  Prior to that, from January 2006 onwards, Mr. Bouman and Sevilla Beheer had started to take measures in preparation of the financing and construction of the PV Plants, such as the incorporation of Cross Retail and the Spanish Project Companies.[15] It was Cross Retail, which between 2006 and 2010 entered into agreements with Engineering Procurement and Construction (EPC) contractors who, according to the Claimants, were in charge of leasing the relevant parcels of land, obtaining the relevant permits and administrative authorizations and constructing the PV Plants.[16] In parallel, Ra Solar (as defined below) oversaw the development and the commissioning of the PV Plants.[17] Ra Solar was also a part of the *Asociación de la Industria Fotovoltaica* (the Photovoltaic Industry Association or "**ASIF**").[18]

## 2.    The Claimants' decision to invest in Spain

115.  According to Mr. Bouman's First Witness Statement, he began investigating the possibility of investing in the solar energy sector in different countries in February 2005.[19] Specifically, these countries included Germany and Spain.[20] For that purpose Mr. Bouman hired an advisor, Mr. Edwin Koot, whom he considered a specialist in solar energy.[21] Mr. Bouman explains that he instructed Mr. Koot to compare the options of a solar investment in Germany with one in Spain.[22] According to Mr. Bouman, "[i]n analyzing the Spanish option, Edwin provided me with a report confirming that the Spanish [Feed-in Tariff or the "**FiT**"] scheme was specifically designed to attract

---

[15] *See* paras. 127-132 below.

[16] Witness Statement of Ms. Yolanda Paniego, dated 30 June 2017 ("First Paniego Statement"), paras. 14 and 23. *See also* First Bouman Statement, para. 30.

[17] First Paniego Statement, paras. 9-10.

[18] First Paniego Statement, para. 49.

[19] First Bouman Statement, paras. 17-18.

[20] First Bouman Statement, paras. 18-19 *referring to* Feedback on initial investment opportunities, 16 June 2015 (C-136).

[21] First Bouman Statement, paras. 17-18.

[22] First Bouman Statement, para. 19.

investors and stimulate, among others, the PV solar energy market, which was 'still in its infancy'."[23]

116. This "report" mentioned by Mr. Bouman, is a document dated January 2005 and prepared by one of Mr. Koot's consultancy companies, Solar Plaza (the "**2005 Solar Plaza Report**").

117. In its introduction, the 2005 Solar Plaza Report lays out the information on which it was based:

> The report content is based on intensive research of a number of sources: documents discovered on the Internet (most are in Spanish), general literature about the country, PV and market developments and information provided by several Spanish PV companies. These sources have provided SolarPlaza with information on import market trends and market volume forecasts.[24]

118. In his First Witness Statement, Mr. Bouman notes that the 2005 Solar Plaza Report stated that under Royal Decree 436/2004 ("**RD 436/2004**") the FiT was guaranteed for the lifetime of a PV installation and was subject to a 20% decrease only after the first 25 years of operation.[25] As further explained by Mr. Bouman, "with this in mind, I decided to gauge the financial market for PV investment in Spain."[26]

119. The passage from the 2005 Solar Plaza Report on which Mr. Bouman relies reads in full as follows:

> The feed-in tariff is highly generous for the following reasons:
>
> - The feed-in tariff is guaranteed for the lifetime of the PV-system. This is unique in the world. The tariff remains constant for 25 years after which it is only reduced by 20 per cent.
>
> - The rates are high for systems up to 100 kWp. This feed-in tariff, together with the high insolation in most of the Spanish regions means that a PV system is almost registering a profit for Spanish investors from day one.

---

[23] First Bouman Statement, para. 19 *citing* Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29), p. 6. *See also* Memorial, paras. 174-175; Counter-Memorial, para. 640; Claimants' Post-Hearing Brief, para. 35; Claimants' Reply Post-Hearing Brief, para. 25.

[24] Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29), p. 7.

[25] First Bouman Statement, para. 20.

[26] First Bouman Statement, para. 21.

- The feed-in tariff has no constraints with respect to grants obtained for the system.

The only problem with the current feed-in tariff seems to be the presence of a ceiling at 150 MWp and 200 MWp for systems up to 100 kW respectively larger systems th[a]n 100 kWp. This could result in the dramatic interruption of the rapid PV market development as the ceiling is approached. It is difficult to predict when this will happen because the ceiling could itself be one of the reasons for a slowdown in market growth.[27]

120.  In its conclusions, the 2005 Solar Plaza Report contains the following observation:

The new national State financial incentive provided by IDAE is expected to be published in March 2005. So far few changes are expected to the regulations of last year. This together with the stable political situation will create healthy conditions for further market growth. There is still much uncertainty concerning the regional (investment) subsidies for 2005. So far there is nothing to indicate a movement in direction of structural cooperation and tuning. This situation can serve to feed the Spanish PV paradox: a worldwide unbeaten attractive feed-in tariff structure but a market development hindered by (budget) limited national and regional grant and loans programs.[28]

121.  The 2005 Solar Plaza Report also states that "[t]he Spanish Solar Industry Association ASIF (Asociación de la Industria Fotovoltaica) plays an important role in the market development and already represents 112 PV companies in Spain."[29]

122.  In November 2005, Mr. Bouman participated in a business tour to Spain organized by Solar Plaza.[30] During the tour, Mr. Bouman attended a presentation at the *Instituto para la Diversificación y Ahorro de la Energía* (the Institute for Energy Diversification and Savings or the "**IDAE**"), an advisory body within the Spanish Government.[31] According to Mr. Bouman, the presentation focused on promoting RE investments in Spain and presented "the Government's plans for the PV sector."[32]

---

[27] Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29), pp. 64-65.

[28] Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29), p. 72.

[29] Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29), p. 63 *referred to* in Counter-Memorial, para. 331.

[30] First Bouman Statement, paras. 22-25, *referring to* Solar Plaza, "PV Business Tour Spain 2005 – Itinerary", 14 November 2005 (C-34); Solar Plaza, Internal Report, "PV Business Tour Spain 2005", 20 November 2005 (C-35). *See also* Memorial, para. 174; Claimants' Post-Hearing Brief, para. 52; Claimants' Reply Post-Hearing Brief, para. 33; Respondent's Post-Hearing Brief, para. 103.

[31] Memorial, para. 86.

[32] First Bouman Statement, para. 23.

123. As stated by Mr. Bouman, IDAE's message at the time was clear: the FiT would be guaranteed for the entire operational lifetime of a PV plant, with no limits on production.[33] The business tour also involved a presentation on certain technical aspects by the *Centro de Investigaciones Energéticas, Medioambientales y Tecnológicas* – the Center for Energy, Environmental and Technological Research (the "**CIEMAT**").[34]

124. During one of the networking events of the business tour, Mr. Bouman met a Dutch couple – Mrs. Linda and Mr. Bart Goossens – who operated a small solar company in Madrid called "Natec Energy España" ("**Natec**").[35] After a number of discussions about the Spanish PV market, the Goossens proposed Mr. Bouman to make an investment in a 2.8 MW PV Plant in the province of Albacete.[36] The Goossens' proposal was formalized in a "Proposal for a Photovoltaic Plant, Executive Summary", a document of 11 pages (including annexes), dated December 2005 (the "**Natec Proposal**").[37]

125. The Natec Proposal, in a section named "Legislation", states the following:

> LEGISLATION
>
> Spanish Legislation […]
>
> - Law 54/1997 of the electric sector.
>
> It is established that renewable sources of energy will receive a premium (prima) over the electric tarif[f] with the aim of promoting a reasonable rentability.
>
> - [Royal Decree] 1955/2000
>
> Regulates the transport, distribution, com[m]ercialization and supply and legal requirements for electrical instal[l]ations.
>
> - [Royal Decree] 1432/2002

---

[33] First Bouman Statement, para. 23.

[34] First Bouman Statement, para. 24.

[35] First Bouman Statement, para. 26.

[36] First Bouman Statement, para. 26.

[37] First Bouman Statement, para. 26, *referring to* Natec Energy España, Business Plan 2006, PV Proposal, December 2005 (C-36). *See also* Counter-Memorial, para. 431; Claimants' Post-Hearing Brief, para. 25; Respondent's Post-Hearing Brief, para. 103.

Establishes the methodology for modifying the electric cost of reference. (Primas) Premium depend on the type of installations.

- [Royal Decree] 436/2004 (Photovoltaic)

Up to date of methodology. It determines that instal[l]ations of solar photovoltaic of no more than 100 kW will have a prima over the electric tarif[f] (cost) established on 575% on the first 25 years from its starting point and 460 % after.

National Energy Plan (Plan Energético Español, PEN)

- The new energy plan was signed in September this year and raised the targets for photovoltaic this year from 150 [MW] to 400 [MW] until 2010.[38]

126. As recalled by Mr. Bouman, the Natec Proposal referred to projected profit and loss accounts for 25 years.[39]

127. Sometime between the end of 2005 and early 2006, having studied the Natec Proposal, "and in reliance on the predictability of the future revenues of the project", Mr. Bouman purchased a 75% stake in Natec which was subsequently renamed Ra Solar Systems & Solutions España S.L. ("**Ra Solar**").[40]

128. According to Mr. Bouman, the Goossens became his "people on the ground".[41] As Mr. Bouman explains, Ra Solar also instructed an external lawyer, Mr. Richard Wicke (of Dikeos Abogados Law firm), who provided advice on regulatory aspects relating to investments in the PV farms contemplated by Mr. Bouman.[42] One of the reports prepared by Dikeos Abogados with respect to the Ronda PV farm, dated 28 April 2009, contained the following conclusion: "[t]here are no reasons to doubt the definitive character of the allocation of [the FiT] throughout the whole lifespan of the Project."[43]

---

[38] Natec Energy España, Business Plan 2006, PV Proposal, December 2005 (C-36), p. 5. In its introduction, the Natec Proposal also noted: "[t]his project arises from the opportunity brought up by the [Royal Decree] 436/2004, 12th March that states that anyone interested can become a producer of electricity from the solar energy." Ibid., p. 2.

[39] First Bouman Statement, para. 27; Natec Energy España, Business Plan 2006, PV Proposal, December 2005, Annex 1 (C-36). With respect to "Gross IRR (Owners equity)", the Natec Proposal provided: "15 years 6,02%[;] 20 years 8,09%[;] 25 years 9,97%." *See* ibid.

[40] First Bouman Statement, paras. 27-28.

[41] First Bouman Statement, para. 28.

[42] First Bouman Statement, paras. 28 and 30; ibid., footnote 13.

[43] Dikeos Abogados, Report on the degree of approval of the Ronda (Málaga) Project, of 1,440 kilovolts of nominal power, promoted by Inversiones Solares Sunergy, S.L., 28 April 2009 (C-81), p. 23. *See also* Memorial, para. 172;

129. According to the Claimants, the original financing of the construction was provided by Mr. Bouman himself.[44] Specifically, between 2007 and 2010, Mr. Bouman invested EUR 56.6 million in the construction of five PV plants.[45] Bank financing (up to 80%, via loans to the Spanish Project Companies) was obtained from Triodos Bank[46] only after the construction phase in order to exclude additional financing costs that would have been borne by the Claimants due to construction risk and in order to ensure that the PV Plants could be commissioned as rapidly as possible.[47] Triodos Bank was advised on certain legal matters related to the Claimants' projects by Gómez-Acebo & Pombo.[48]

130. Mr. Bouman emphasizes that he decided to develop the PV Plants through the companies he controlled (i.e., Sevilla Beheer, Cross Retail and Ra Solar) instead of acquiring already operational plants,[49] and then caused the Spanish Project Companies to purchase the PV Plants with the aid of bank loans. To that end, Cross Retail entered into Engineering, Procurement and Construction ("**EPC**") contracts to build the individual PV installations.[50] Ra Solar supplied the PV panels and other equipment for the construction

---

Reply, para. 113; Claimants' Post-Hearing Brief, para. 37; Claimants' Reply Post-Hearing Brief, para. 31; Respondent's Post-Hearing Brief, para. 103; Respondent's Second Post-Hearing Brief, para. 15.

[44] Memorial, para. 170; First Bouman Statement, para. 32.

[45] Hearing Tr., Day 2, 19 March 2019, 176:7-177:08 (Bouman).

[46] As explained by Mr. Bouman in his First Statement, in early 2006 Mr. Bouman's former accountant, Mr. Henk Pals, contacted a number of banks including Triodos, Caja Madrid, Barclays and ING in order to learn about the financing conditions. *See* First Bouman Statement, para. 31, *referring to* Email between Henk Pals and Triodos Bank regarding the potential financing of a PV project in Albacete, 26 January 2006 (C-39); Email between Henk Pals and Banesto regarding the potential financing of a PV project in Albacete, 25 January 2006 (C-38); Email between Henk Pals and Caja Madrid regarding the potential financing of a PV project in Albacete, 15 March 2006 (C-41). *See also* Counter-Memorial, para. 632; Correspondence between Henk Pals and Triodos Bank regarding the financing of the Mahora Plant, 6 May 2006 (C-44).

[47] Memorial, para. 170; First Bouman Statement, para. 32; First Paniego Statement, para. 28.

[48] Memorial, para. 172, *referring to* Gómez-Acebo & Pombo, Due Diligence Report issued in connection with the PV Plants called "Fuentes de Año" (Ávila) and "Matapozuelos" (Valladolid), 4 July 2012 (C-138). *See also* Counter-Memorial, para. 1061.

[49] First Bouman Statement, para. 30.

[50] Memorial, para. 170.

of the PV Plants.[51] Ra Solar was also used to organize the permitting process.[52] In October 2007, Ra Solar hired a project manager, Ms. Yolanda Paniego,[53] in order to make sure that all of the Claimants' PV projects were executed according to plan.[54]

131. In 2007-2010, following their construction, Cross Retail sold the PV Plants to the 56 Spanish Project Companies.[55] Cross Retail retained less than 1% in each of the Spanish Project Companies and the remaining shares were held by Sevilla Beheer.[56]

132. A detailed account of the construction, registration and financing steps undertaken in respect of each PV plant is set out in Corrected Appendix 4 to the Claimants' Memorial.[57]

---

[51] First Bouman Statement, paras. 28-30. The EPC contractors received legal advice from Ramón y Cajal: Second Due Diligence Report from Ramón y Cajal on Matapozuelos, "Report of legal revision in relation to solar photovoltaic plants of 925 KW in the municipal term of Matapozuelos (Valladolid)", 6 August 2007 (C-63); Due Diligence Report from Ramón y Cajal on Matapozuelos, "Report of legal revision in relation to the solar photovoltaic plant of 925 KW in the municipal term of Matapozuelos (Valladolid)", 23 February 2009 (C-79); Due Diligence Report from Ramón y Cajal on Fuentes de Año, "Report of legal revision in relation to the solar photovoltaic plant of 2,500 KW in the municipal term of Fuentes de Año (Avila)", November 2009 (C-88). *See also* Memorial, para. 172; Reply, para. 113. *See also* Rejoinder, para. 705; Respondent's Post-Hearing Brief, para. 103.

[52] First Bouman Statement, para. 30.

[53] Since March 2010, Ms. Paniego remains the General Manager of Ra Solar. First Paniego Statement, paras. 2, 18.

[54] First Paniego Statement, paras. 8-9.

[55] First Compass Lexecon Report, para. 21; First Paniego Statement, para. 25; Mahora EPC Contract, 15 June 2007 (C-143); Villar de Cañas EPC Contract, 1 August 2007 (C-145); Ronda EPC Contract, 4 October 2007 (C-148); Fuentes de Año EPC contract, 25 November 2009 (C-151); Matapozuelos O&M Contract But-for, 17 September 2009 (CLEX−175), pp. 14-17. *See also* Appendix 4 to the Memorial; Claimants' Post-Hearing Brief, para. 64.

[56] Memorial, para. 9; First Compass Lexecon Report, para. 21.

[57] *See* Corrected Appendix 4 to the Memorial and Report of Econ One Research, Inc., prepared by Dr. Daniel Flores, 24 November 2017 ("First Econ One Report"), paras. 49-70.

133. The Claimants also provided the following table summarizing the main characteristics of their PV Plants and indicating the relevant Royal Decree applicable to each plant:[58]

| PV Farm | Technology | Number of plants | Capacity per plant | Total Farm Capacity | Commissioning Date | Applicable Royal Decree |
|---------|------------|------------------|--------------------|--------------------|--------------------|-------------------------|
| Mahora | Fixed PV | 28 | 100 kW | 2.8 MW | 5-Jul-07 | RD 661/2007 |
| Villar de Cañas | 2 axis PV | 11 | 100 kW | 1.1 MW | 11-Jul-08 | RD 661/2007 |
| Ronda | Fixed PV | 15 | 96 kW | 1.44 MW | 10-Sep-08 | RD 661/2007 |
| Matapozuelos | Fixed PV | 1 | 925 kW | 0.925 MW | 9-Feb-10 | RD 1578/2008 |
| Fuentes de Año | Fixed PV | 1 | 2,500 kW | 2.5 MW | 4-Nov-10 | RD 1578/2008 |

134. As of the date of this Decision, the Claimants still own and operate all of the above-listed PV Plants.[59]

135. The Respondent does not contest the facts related to the making and development of the Claimants' investments in Spain (other than the reasonableness of the Claimants' alleged investment costs; see paragraphs 964-972 below). The Respondent however argues that the Claimants' decision to invest in the first PV Plant was not taken under the legal regime created by RD 661/2007 (as defined below), but under the previous legal regime put in place by RD 439/2004 (as defined below).[60]

136. Moreover, the Respondent challenges the Claimants' assertion that the legal advice provided by Mr. Wicke and the due diligence reports prepared by Ramón y Cajal and Gómez-Acebo & Pombo for third parties were sufficient for the purposes of meeting the investor's obligation to perform due diligence.[61]

137. The following section describes, amongst others, the measures adopted by Spain in 2010-2014 and challenged by the Claimants in these proceedings. According to the Claimants, the main adverse effect of the measures was that they deprived the PV plants of the FiT and limited the remuneration to which the investors were entitled to a "reasonable return" calculated by reference to a "standard installation." A detailed discussion of the economic

---

[58] Memorial, para. 12, *referring to* First Compass Lexecon Report, para. 20, Table 2.
[59] Hearing Tr., Day 2, 19 March 2019, 175:1-19 (Bouman).
[60] Respondent's Post-Hearing Brief, para. 87.
[61] Hearing Tr., Day 5, 22 March 2019, 91:1-97:13 (Fröhlingsdorf Nicolás).

impact of the Disputed Measures on the Claimants' investments is set out at Section VIII.A. below.

## B.   The regulatory framework at the time of the Claimants' investments

### 1.   General remarks

138.   As a preliminary matter, the Tribunal deems it important to set out the sources of Spanish law and their respective positions in the hierarchy of norms. Though such legal framework has been the object of several awards in recent times, some of which will be referred to below, the Tribunal deems that its function as an adjudicative body requires it to "make its own determination of the facts and then apply the relevant rules of international law to the facts which it has found to have existed",[62] irrespective of findings of fact and related to the determination of law made by other tribunals.

139.   The Spanish Constitution of 1978 is the supreme law of Spain and the Spanish Constitutional Court is its supreme interpreter.[63] Subordinate to the Constitution are legislative acts, which themselves supersede regulatory acts.

140.   There are two types of legislative acts: (i) organic laws governing such matters as, *inter alia*, human rights and freedoms and general electoral regimen (their adoption requires an absolute majority of the votes of the Congress of Deputies); and (ii) ordinary laws regulating all other matters not reserved for the organic acts; their adoption requires a simple majority of the Congress of Deputies.[64] In addition, Royal Decree-Laws ("**RDLs**") which can only be adopted by the Government in cases of extraordinary need or urgency have the force of a legislative act.[65] However, their validity requires subsequent parliamentary validation.[66]

---

[62] *Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v. Uganda)*, Judgment, I.C.J. Reports 2005, p. 168, at 200, para 57; *Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Judgment, I.C.J. Reports 2010, p. 14, at 71, para 162.

[63] Counter-Memorial, para. 219.

[64] Counter-Memorial, para. 219.

[65] Counter-Memorial, para. 555.

[66] Counter-Memorial, para. 219.

141. Royal Decrees ("**RDs**"), which are hierarchically subordinate to legislative acts, are adopted by the Government for purposes of supplementation and implementation of legislative acts.[67] Further subordinate regulatory acts include ministerial orders and resolutions.[68]

142. According to Spain, a Royal Decree can only regulate matters within the authorization granted by a law and cannot supersede or infringe the provisions set out in a law.[69] Spain further explains that the principle of hierarchy of norms implies that Royal Decrees (as any regulatory act) cannot contradict the provisions of a hierarchically superior law and that no regulatory provision may impede regulatory changes aimed at fulfilling a mandate set forth in a legislative act.[70]

143. Further, as a Member State of the European Union (the "**EU**") since 1986, Spain is bound by the EU primary legislation, i.e., the treaties and notably the Treaty on the Functioning of the European Union (the "**TFEU**"), as well as EU secondary legislation such as regulations and directives and, to the extent they are addressed to Spain, decisions.[71]

144. In addition, according to the Respondent, the Supreme Court's application and interpretation of Spanish law is binding on all other courts and the administration.[72]

145. The Parties appear to agree on the existence of the principle of the hierarchy of norms under Spanish law.[73] However, as discussed below, the Parties disagree as to the consequences that flow from this principle in the case at hand.

146. According to the Respondent, Royal Decrees (including those on which the Claimants allegedly relied when making their decision in invest in Spain, i.e., RD 436/2004, RD 661/2007 and RD 1578/2008, as defined below) must be interpreted within the confines of Law 54/1997 on electric power ("**Law 54/1997**"), which, under the

---

[67] Counter-Memorial, para. 219.
[68] Counter-Memorial, paras. 219-220.
[69] Counter-Memorial, para. 219.
[70] Rejoinder, para. 254.
[71] Counter-Memorial, para. 224.
[72] Counter-Memorial, paras. 225-226.
[73] *See* Hearing Transcript Day 1, 18 March 2019, 120:17-24 (Stoyanov).

Respondent's case, "has always established that the aim of [a] Royal Decree could never include a stabilization commitment".[74] It is for this reason, the Respondent argues, that investors in the RE sector were, in 2007, requesting that the premiums for RE producers be regulated by means of a legislative rather than an executive act.[75]

147. The Respondent further argues that the execution of certain legislative acts, such as Law 54/1997 required the Government to develop a detailed plan in order to assess, amongst others, the costs imposed by the roll-out of renewable energies.[76] These plans were generally referred to as "renewable energy plans."[77]

148. According to the Claimants, the principle of hierarchy of norms does not preclude Royal Decrees (including RD 436/2004, RD 661/2007 and RD 1578/2008, as defined below) from defining what constitutes a "reasonable return" referred to under Law 54/1997 and from "grandfathering" a commitment towards investors.[78]

149. The Claimants also challenge the weight attached by the Respondent to the Spanish renewable energy plans. According to the Claimants, such plans constitute "advisory document[s] drafted by IDAE", which cannot be characterized as "regulatory instrument[s]", and shall be considered as devoid of "any legal or regulatory force."[79]

150. The Parties further disagree about the legal effect, if any, ascribed to the press releases issued by the Council of Ministers as well as reports, studies and presentations prepared by various administrative authorities, including the Ministry of Industry, Trade and Tourism, the Secretary of State for Energy, the National Energy Commission

---

[74] Hearing Tr., Day 1, 18 March 2019, 245:10-16 (Fröhlingsdorf Nicolás).

[75] Rejoinder, para. 266, *referring to* CNE, Draft report to the proposal of Royal Decree 661/2007 regulating the activity of production of electric power under special regime and certain installations of similar technologies of the ordinary regime, 25 January 2007 (R-232), [SP], pp. 70, 77 and 83.

[76] Counter-Memorial, paras. 312-313 and 393-394.

[77] Ibid. *See also* Rejoinder, paras. 399-405. In this regard, three documents are relevant in the case at hand: (i) the 2000-2010 Plan for the Promotion of Renewable Energies (the "2000-2010 PER", as defined below at paragraph 165) (R-67), (ii) the 'Plan de energias renovables en Espana' (the "2005-2010 PER", as defined below at paragraph 193) (R-69), and (iii) the 'Plan de energias renovables 2011-2020' (the "2011-2020 PER") (C-171), which was largely based on the 'National Renewable Energy Action Plan 2011-2020' ('*Plan de Acción Nacional de Energías Renovables de España 2011-2020*') (the "NREAP", as defined below at paragraph 352) (R-70). *See also* Counter-Memorial, para. 328.

[78] Hearing Tr., Day 1, 18 March 2019, 121:08-21 (Stoyanov); Reply, para. 161.

[79] Reply, para. 156.

(the "**CNE**") (replaced by the National Markets and Competition Commission (the "**CNMC**") in 2013), the IDAE, and the Spanish agency "Invest in Spain."

### 2. Law 54/1997, RD 2818/1998, and the 2000-2010 PER

#### a. Law 54/1997

151. In November 1997, Spain enacted Law 54/1997, the primary aim of which was to liberalize the Spanish electricity market.[80]

152. The promotion of renewable energies was another crucial goal of Law 54/1997. For that purpose, Law 54/1997 established two separate legal regimes for electricity generation, "ordinary" and "special". The so-called "**Ordinary Regime**" governed the generation of electricity from non-renewable energy sources, which was remunerated based on market prices.[81]

153. By contrast, the "**Special Regime**" applied to facilities with an installed capacity of no greater than 50 MW that use, *inter alia*, renewable energy sources, such as, for example, solar energy.[82]

154. Renewable energy generators under the Special Regime were entitled to specific additional rights, such as, for example, the priority of access to the transmission and distribution networks.[83]

155. The remuneration of electricity generation under the Special Regime was governed by Articles 16 and 30(3)/30(4) of Law 54/1997. Article 16(1) provided for the principle of remuneration on the basis of market prices. Article 16(7) further specified that in addition to a remuneration under Article 16(1), the remuneration for electricity generated under

---

[80] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Preamble. *See also* Memorial, paras. 15, 63, 65, 105, 219; Reply, paras. 18, 423, 424, 557; Counter-Memorial, paras. 229, 238-245, 305-317, 282, 393, 517, 534, 835, 860; Rejoinder, paras. 281, 284, 286, 363, 400, 560, 806, 883, 891, 957; Claimants' Post-Hearing Brief, para. 103; Respondent's Post-Hearing Brief, paras. 26, 53, 65.

[81] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Articles 23-24 and 26(1). *See also* Memorial, para. 65; Counter-Memorial, para. 230.

[82] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 27(1). *See also* Memorial, para. 65.

[83] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 30.2. *See also* Reply, para. 93, n. 154 and Appendix 5.

the Special Regime shall "where applicable, [include] a premium that will be determined by the Government […] as set out in article 30.4."[84]

156.  Article 30, sub-paragraphs (3) and (4) provided in relevant part as follows:

> 3. The remuneration arrangements for electric power generation installations under the special regime shall satisfy the stipulations of point 1 of article 16 for electric power generators.
>
> 4. The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations […].
>
> To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets.[85]

157.  Both legal regimes required the prior registration with the Administrative Register of Electricity Generation Installations (the "**RAIPRE**"[86]) created by Law 54/1997.[87] According to the Respondent, this registry would "allow the government to control the tariffs and premiums" and "to keep track of the evolution of the electrical energy produced, the energy transferred to the network and the primary energy used."[88]

158.  In addition, the Twenty-fifth additional provision to Law 54/1997 recalled the objectives to "be taken into consideration when setting the premiums" for PV installations:

> The Government shall modify the [PER] in order to adapt it to the objectives established by the European Union of 20% by 2020 and shall maintain the

---

[84] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 16(7).

[85] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 30(4). *See also* Article 16(7): "[t]he remuneration for electricity generated, as measured at the power station busbars, by generators under the special regime, shall be the remuneration corresponding to the generation of electric power in accordance with point 1 of this article and, where applicable, a premium that will be determined by the Government after seeking the views of the Autonomous Regions as set out in article 30.4."

[86] Which in Spanish stands for *Registro Administrativo de Instalaciones de Producción en Régimen Especial.*

[87] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Articles 21(4) and 31.

[88] Counter-Memorial, para. 380 *referring to* RD 2818/1998, 23 December 1998 (C-23)/(R-46), Article 9(1). *See also* Memorial, paras. 17, 70-72; Respondent's Post-Hearing Brief, para. 65.

> Plan's commitment to 12% by 2010. These objectives shall be taken into
> consideration when setting the premiums for these types of installations.[89]

159. Law 54/1997 further provided that until the adoption of implementing regulations, a
number of transitory provisions would continue to apply.[90] Amongst them was the
Sixteenth transitional provision, which read as follows:

> In order for renewable energy sources to cover at least 12% of Spain's total
> energy demand by the year 2010, a plan shall be drawn up to promote
> renewable energies and whose objectives shall be taken into account in the
> setting of premiums.[91]

160. According to the Claimants, Law 54/1997 is a "framework law" that leaves it to the
Government to determine the specific premiums which must ensure, but may not
necessarily be limited to a reasonable return (Article 30(4) of Law 54/1997).[92] On the
Claimants' case, Spain was thus free to commit to grant investors a more favorable
entitlement by means of a Royal Decree. The Claimants moreover state that Law 54/1997
does not define the proxy it uses for the cost of money on capital markets referred to in
Article 30(4).[93]

161. According to the Respondent, Law 54/1997 must be read against the background of two
principles, i.e. (i) that the supply of electricity is a service of strategic importance and
(ii) that guaranteeing the supply of electricity requires the financial sustainability of the
Spanish electricity system (the "**SES**").[94] Such sustainability, according to the
Respondent, rests on the financial self-sufficiency of the SES.[95] On the Respondent's
case, the sustainability of the SES, which is also recognized in Law 54/1997, would be
jeopardized if hierarchically inferior acts such as Royal Decrees were able to commit to

---

[89] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Twenty-fifth additional provision.

[90] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), First transitional provision.

[91] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Sixteenth transitional provision. *See also* 2005-2010 Renewable Energy Plan (C-32), [SP], Section 2.2, p. 18.

[92] Hearing Tr., Day 1, 18 March 2019, 120:19-23, 151:15-21 (Stoyanov).

[93] Hearing Tr., Day 1, 18 March 2019, 151:7-14 (Stoyanov) "Article 30.4 talks about reasonable return and it talks about reference to cost of money on capital markets. You do not know what proxy it uses for cost of money on capital markets, and some of the experts May tell you, 'I don't know what that means. It could be work, it could be bond yields, it could be whatever'. Or we heard in another case it can be EURIBOR."

[94] Counter-Memorial, para. 238.

[95] Counter-Memorial, para. 244.

a level of subsidies in excess of the reasonable rate of return guaranteed by Article 30(4) of Law 54/1997.[96]

b. **RD 2818/1998**

162. On 23 December 1998, Spain passed Royal Decree 2818/1998 "regarding production of electric energy for facilities supplied by renewable, waste and cogeneration resources or sources of energy" ("**RD 2818/1998**").

163. In its preamble, RD 2818/1998 noted that:

> This Royal Decree develops [Law 54/1997] […], and promotes the development of special plan facilities by creating a new supportive framework without entering into discriminatory practices that could be limiting to a free market; although establishing differentiating situations for those energy systems that are highly effective in contributing to the aforementioned objectives.
>
> To achieve that goal, a system of temporary incentive is set up for those facilities that require them to put themselves in a competitive position in an open market.
>
> For facilities based on renewable energies and wastes, there is no time limit for incentives established given the need to internalize its environmental benefits and to which, because of its special characteristics and level of technology, its high costs prohibit them from competing in an open market.
>
> The incentives established for renewable energies are such as to contribute 12% to Spain's energy demand in 2010, as is established in the 16th transitory provision of [Law 54/1997].[97]

164. In addition to providing detailed rules regarding the registration of electricity generating installations and the conditions of delivery of electricity under the Special Regime, RD 2818/1998 set forth the economic regime applicable to installations falling under the Special Regime. Article 23 of RD 2818/1998 notably recognized the right of owners of installations generating electricity of 50 MW or lower from renewable energies and finally registered in the RAIPRE to "sell their surplus or, if applicable, their electrical production, to distributors at the final average price for electric power, plus any premiums

---

[96] Hearing Tr., Day 1, 18 March 2019, 245:6-16 (Fröhlingsdorf Nicolás).
[97] RD 2818/1998, 23 December 1998 (C-23)/(R-46), Preamble. *See also* Memorial, paras. 70-71.

or incentives based on the amounts indicated in [Chapter IV 'Economic Regime']."[98] Article 28 of RD 2818/1998 allowed such installations to choose between either a feed-in premium on the market price or a fixed regulated feed-in tariff (the FiT).[99] Article 32 of RD 2818/1998 provided that premiums would be revised every four years, taking into account the evolution of the electricity market price, the qualifying installations' demand coverage and their impact on the technical management of the SES.[100]

c.   **The 2000-2010 PER**

165.  On 30 December 1999, the Council of Ministers approved the 2000-2010 Plan for the Promotion of Renewable Energies that had been elaborated by the IDAE (the "**2000-2010 PER**"), in accordance with the Sixteenth Transitory Provision of Law 54/1997.[101]

166.  The 2000-2010 PER, *inter alia*, proposed basic financial and technical conditions as well as a methodology for a remuneration scheme for RE producers to be developed through regulations.

167.  As regards the methodology used, the 2000-2010 PER explained that:

> Based on the proposed energy objectives, the financing needs for each technology have been determined based on their profitability, defining a range of standard projects for the calculation model. These standard projects have been characterized by technical parameters related to their size, equivalent operating hours, unit costs, implementation periods, useful life, operation and maintenance costs and sales prices per final energy unit. Likewise, financing assumptions and a series of financial measures or aid have been applied.[102]

---

[98] RD 2818/1998, 23 December 1998 (C-23)/(R-46), Article 23. *See also* Memorial, paras. 70-71; Counter-Memorial, paras. 375-392.

[99] RD 2818/1998, 23 December 1998 (C-23)/(R-46), Article 28.

[100] RD 2818/1998, 23 December 1998 (C-23)/(R-46), Article 32.

[101] The Sixteenth Transitory Provision of Act 54/1997 stated that "[i]n order for renewable energy sources to cover at least 12% of Spain's total energy demand by the year 2010, a plan shall be drawn up to promote renewable energies and whose objectives shall be taken into account in the setting of premiums." Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27) (emphasis added).

[102] 2000-2010 Plan for the Promotion of Renewable Energies in Spain, 19 December 1999 (R-67), p. 180 (emphasis in the original). *See also* Counter-Memorial, paras. 393, 430, 444, 460; Rejoinder, paras. 292, 380, 417, 419, 885, 901; Respondent's Post-Hearing Brief, para. 35.

168. The 2000-2010 PER was based on the following assumption regarding the targeted return: "a return for standard projects amounting to 7% with own resources, before financing and after tax."[103]

d. **Directive 2001/77/EC**

169. Spain's initiatives to promote RE were undertaken in a broader context of intergovernmental efforts to tackle climate change that resulted in the adoption of the 1992 United Nations Framework Convention on Climate Change and the 1997 Kyoto Protocol. The EU was also receptive to the environmental concerns and adopted in 1997 a White Paper for a Community Strategy and Action Plan entitled "Energy for the future: renewable sources of energy".[104]

170. On 27 September 2001, the European Parliament and Council passed Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources in the internal electricity market ("**Directive 2001/77/EC**") that mandated EU Member States to "take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources in conformity with the national indicative targets".[105] Spain's indicative target for RE was set at 29.4% of its total electricity consumption by 2010.[106]

---

[103] Respondent's Opening Statement on the Facts, slide 74, *referring to* 2000-2010 Plan for the Promotion of Renewable Energies in Spain, 19 December 1999 (R-67), p. 182.

[104] Communication from the European Commission, "Energy for the Future: Renewable Sources of Energy, White Paper for a Community Strategy and Action Plan", COM (97) 599 final, 26 November 1997 (C-18). *See also* Memorial, paras. 57-58.

[105] Directive 2001/77/EC of the European Parliament and Council on the promotion of electricity produced from renewable energy sources, 27 September 2001 (C-24), Article 3(1). *See also* Memorial, paras. 18, 72-74, 45; Reply, paras. 34, 47; Claimants' Reply Post-Hearing Brief, para. 16.

[106] Directive 2001/77/EC of the European Parliament and Council on the promotion of electricity produced from renewable energy sources, 27 September 2001 (C-24), Annex.

**3.    RD 436/2004 and the beginning of the Claimants' investment process**

a.    **RD 436/2004**

    *i.    RD 436/2004: Preparation and most relevant provisions*

171.  On 22 January 2004, prior to adopting RD 436/2004, the CNE issued a report on a draft text of RD 436/2004. The report observed, *inter alia*, as follows:

> The production facilities included in the special regime have the right to receive a certain remuneration for energy sold, but logically they only have the acquired right to receive said remuneration with respect to the energy already sold, but not regarding the energy they forecast selling in the future, which only constitutes an expectation.[107]

172.  Prior to the issuance of RD 436/2004, the Ministry of Industry, Trade, and Tourism prepared an economic memorandum. With respect to the determination of a reasonable rate of return, the economic memorandum provided as follows:

> Parameter A (the investment, operating and maintenance costs of each technology) is heavily weighted in setting the amount of the regulated tariff for sale to the distributor. Thus, any plant of the special scheme installed in Spain, as long as it is equal to or better (than the standard plant of its group), will succeed in earning reasonable profitability.[108]

173.  As regards project financing, the same economic memorandum observed that:

> Project financing: in all cases, 100% of the financing is assumed to have been through equity capital. Leveraging and the percentage between equity capital and external funds are specific decisions to each project and each promoter. If made wisely, they should provide better ratios than those estimated here.[109]

174.  On 12 March 2004, the Spanish Government adopted RD 436/2004, which replaced RD 2818/1998.[110]

---

[107] CNE Report 4/2004, 22 January 2004 (R-76)/(C-26), p. 42. *See also* Memorial, para. 77; Reply, para. 76; Counter-Memorial, paras. 410-412; Rejoinder, paras. 870, 878, 1369.

[108] Ministry of Industry, Trade, and Tourism, Economic report on RD 436/2004 (R-32), p. 4 (emphasis in the original). *See also* Counter-Memorial, paras. 809, 830, 404; Rejoinder, para. 903.

[109] Ministry of Industry, Trade, and Tourism, Economic report on RD 436/2004 (R-32), p. 5 (emphasis in the original). *See also* Counter-Memorial, para. 830.

[110] RD 436/2004, 12 March 2004 (C-27)/(R-32), Sole repeal provision. *See also* Memorial, paras. 18, 77-79, 81-83; Reply, 49, 54-58, 295, 308; Counter-Memorial, paras. 334, 354, 403-420, 519; Rejoinder, paras. 308, 538, 543, 562.

175. RD 436/2004 was based on a new methodology to calculate the *Tarifa Eléctrica Media* (the average or reference electricity tariff or the "**TMR**"), which had been introduced by Royal Decree 1432/2002, on the methodology of the average reference tariff, of 27 December 2002 ("**RD 1432/2002**").[111]

176. The TMR determined the sale price of electricity to consumers. It was to be set annually by the Government and published in advance. The TMR was to be based on estimated consumer demand[112] and costs to remunerate projected electricity supply[113] as well as inflation and cost of capital.[114]

177. According to Mr. Bouman, RD 436/2004 was the first regulation he relied on when making his decision to invest in the Spanish PV sector.[115]

178. In its preamble, RD 436/2004 affirmed the pursuit of "the dual goal of protecting the environment and guaranteeing quality electricity supply for all consumers which is the premise underlying [Law 54/1997]."[116]

179. The preamble of RD 436/2004 further provided that:

> From the perspective of remuneration, the salient characteristic of electricity production as an activity covered under the special regime is that its remuneration arrangements can be supplemented by the payment of a premium under the statutory terms and conditions set out in regulations. This premium is to be determined by taking into account factors such as the voltage level for delivery of the power to the network, the effective contribution made to environmental improvements, to primary energy saving and any investment costs incurred.[117]

---

[111] Which entered into force on 1 January 2003.

[112] RD 1432/2002, 27 December 2002 (R-47), Article 3. *See also* Counter-Memorial, para. 411.

[113] RD 1432/2002, 27 December 2002 (R-47), Article 4.

[114] RD 1432/2002, 27 December 2002 (R-47), Article 8.

[115] *See, e.g.*, Hearing Tr., Day 2, 19 March 2019, 157:03-07; 157:19-21; 158:03-10; 161:17-162:14 (Bouman/Fröhlingsdorf Nicolás).

[116] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble.

[117] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble.

180.  The preamble further stated that the operators of qualified installations could opt for either a wholesale-market price with a premium or a regulated tariff "taking into account the criteria mentioned in article 30.4 of [Law 54/1997]".[118] It further observed:

> Whichever remuneration mechanism is chosen, the Royal Decree guarantees operators of special regime installations fair remuneration for their investments and an equally fair allocation to electricity consumers of the costs that can be attributed to the electricity system although incentives are offered for market participation.[119]

181.  The preamble of RD 436/2004 also noted that "the security and stability offered by this new methodology to calculate the special regime remuneration should help it to foster investment in this kind of plants."[120]

182.  The purposes of RD 436/2004 were set out in its Article 1. One of the declared purposes was to:

> [e]stablish a lasting economic regime for the plants eligible to be under the special regime, based on an objective, transparent methodology to calculate the remuneration that is compatible with the methodology to approve or amend the average electricity or reference tariff regulated by Royal Decree 1432/2002.[121]

183.  The FiT under RD 436/2004 was calculated by reference to the TMR.[122] The FiT was set at a particular rate for the first 25 years from the installation's commissioning and at a reduced rate thereafter.[123]

184.  Article 40(1) of RD 436/2004 envisaged that tariffs and other incentives would be revised every four years starting from 2006:

> During 2006, in light of the result of the follow-up reports on the level of compliance with the Renewable Energies Development Plan, the tariffs, premiums, incentives and supplements defined in this Royal Decree will be revised, thereby considering the costs associated with each of these

---

[118]  RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble. *See also* RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 22(1).

[119] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble.

[120] Memorial, para. 83, *referring to* RD 436/2004, 12 March 2004 (C-27)/(R-32), p. 11.

[121] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 1.

[122] TMR represents the total of revenues received by the electricity system (excluding taxes) divided by the total electricity supplied Hearing Tr., Day 1, 18 March 2019, 37:22-25 (Vazquez-Guillén).

[123] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 33.

> technologies, the level of participation of the special regime in covering demand and its impact on the technical and economic management of the system. A further revision will be conducted every four years as from 2006.[124]

185. In respect of the temporal application of such revisions, Article 40(3) of RD 436/2004 stated as follows:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.[125]

186. On 19 April 2004, the *Asociación de Productores de Energías Renovables* (the Association of Renewable Energy Producers or "**APPA**") published an analysis of RD 436/2004.[126] Among the advantages of RD 436/2004, APPA mentioned Article 40: "Art. 40. Revisions at previously established time intervals, period for applying them and no retroactivity."[127]

187. At the same time, APPA was concerned with the "retroactive" application of the Decree to existing facilities: "[d]eadlines starting from 'commissioning' instead of after the date of entry into force of the Decree."[128]

### ii.    Article 40(3) of RD 436/2004: the Parties' positions

188. The Parties disagree on the interpretation of Article 40(3).

### (a)    The Claimants

189. According to the Claimants, this provision guarantees that any changes to the FiT will apply to new installations only, which effectively committed Spain to not alter the FiT scheme.[129]

---

[124] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 40(1).

[125] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 40(3).

[126] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162). *See also* Counter-Memorial, para. 418; Rejoinder, paras. 603-605.

[127] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162), slide 6.

[128] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162), slide 25.

[129] Hearing Tr., Day 1, 18 March 2019, 39:3-7 (Vazquez-Guillén).

190. The Claimants also submitted a report of the CNE, dated 14 February 2007 containing the following statements regarding the alleged stability and predictability of the regime implemented through RD 436/2004:

> b) Regulatory stability
>
> The production facilities in the special regime capital-intensive and have long recovery periods. Royal Decree 436/2004 minimises the regulatory risk by granting stability and predictability to the economic incentives during the service life of the facilities. This is done by establishing a transparent annual adjustment mechanism, associating incentives to trends in a robust index such as the average or reference tariff (TMR), and by exempting existing facilities from the four-year review because only new incentives affect new facilities.
>
> The developers who have invested in special regime production facilities during the validity of Royal Decree 436/2004 have done so in stable regulatory conditions, fundamentally based on a secure and predictable regulated tariff during the entire service life of the facility. The guarantees covered in Royal Decree 436/2004 have allowed cheaper financing, with lower project costs and a lower impact on the electricity tariff ultimately paid by the consumer.[130]

*(b)* *The Respondent*

191. The Respondent argues that Article 40(3) of RD 436/2004 is not a "stabilization commitment", because it does not apply to "any" revisions of the tariffs, premiums, and incentives, but only to those "provided for in [Article 40(1)]" of the Decree.[131] This, according to the Respondent, is apparent from the reference in the discussed provision to "the revisions provided for in this section".[132] As the Respondent further explains, the revisions envisaged in Article 40 have the limited aim of ensuring the renewable energy promotion plan's goals.[133] Thus, any other revisions are not prevented by Article 40(3) and are permissible pursuant to the principle of hierarchy of laws.[134]

---

[130] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51)/(R-78), pp. 23-24. *See also* Memorial, paras. 82, 128, 331, 355; Reply, paras. 8, 12, 61-82, 105-106, 154, 190, 295, 298, 346, 734; Counter-Memorial, para. 545; Rejoinder, paras. 466, 864, 940; Claimants' Post-Hearing Brief, paras. 50, 182; Respondent's Post-Hearing Brief, para. 167; Respondent's Second Post-Hearing Brief, para. 57.

[131] Hearing Tr., Day 5, 22 March 2019, 88:14-89:7 (Fröhlingsdorf Nicolás).

[132] Counter-Memorial, para. 421.

[133] Counter-Memorial, para. 421.

[134] Counter-Memorial, para. 422.

192. The Respondent also references the analysis of RD 436/2004 that was published by APPA (and referenced at paragraphs 186-187 above).[135] The Respondent notably refers to the fact that APPA was concerned with the "retroactive" application of the RD 436/2004 to existing facilities regulated by the previous Royal Decree.[136]

b.   **The 2005-2010 PER**

193. On 26 August 2005, the Spanish Council of Ministers adopted the *Plan de energias renovables en Espana*, the plan for the promotion of renewable energies prepared by the IDAE (the "**2005-2010 PER**").[137] The 2005-2010 PER, *inter alia*, noted that the development of electricity generated by photovoltaic installations had been limited by some economic, technological, legislative and social barriers.[138] According to the 2005-2010 PER, one economic barrier consisted in the fact that:

> With the prices and the yield in force until now, the facilities are amortized over long time periods. For this reason, the photovoltaic energy has been developed in association with aid schemes, both by the Autonomous Regions as well with state funds.
>
> At present, it is considered that the market growth is going to enable a progressive lowering of the prices of the facilities, such that if the premium is maintained on the conditions defined in Royal Decree 436/2004, the facilities can be improving their profitability.[139]

---

[135] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162). *See also* Counter-Memorial, para. 418; Rejoinder, paras. 603-605.

[136] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162), slide 25.

[137] Ministry of Industry, Trade and Tourism and IDAE, Summary of the Spanish Renewable Energy Plan 2005-2010, August 2005 (C-31); Ministry of Industry, Trade and Tourism and IDAE, Renewable Energy Plan in Spain 2005-2010, August 2005 (C-32)/(R-69). *See also* Memorial, paras. 71, 79, 85-88, 94-95; Reply, paras. 8, 152, 622; Counter-Memorial, paras. 328, 335, 434, 460, 583, 830; Rejoinder, paras. 292, 417, 419, 428, 757, 806; Respondent's Post-Hearing Brief, paras. 35, 56, 155; Respondent's Second Post-Hearing Brief, para. 57.

[138] Renewable Energy Plan in Spain 2005-2010, August 2005, pp. 170-190 (C-32).

[139] Renewable Energy Plan in Spain 2005-2010, August 2005 (C-32), p. 170. The Plan also mentioned technological barriers such as the fact that "[t]he current situation on the market and the current aid schemes do not present sufficient incentives for carrying out pioneering projects from the technical viewpoint, with architectonic integration, etc." Renewable Energy Plan in Spain 2005-2010, August 2005 (C-32), p. 17. *See also* Memorial, para. 90.

194. The 2005-2010 PER further identified a legislative barrier, namely the fact that RD 436/2004 "established a limit of 135 MW, which implies a very clear limitation on the development of the photovoltaic industry."[140]

195. Amongst the measures suggested for overcoming the aforementioned barriers, the 2005-2010 PER noted the following, amongst others:

> Maintenance of the economic conditions established in [RD 436/2004]
>
> […]
>
> Modification of the criteria for aid. With the level of return via the current premium, it is considered that, except in cases of isolated facilities of the network, the aid is not necessary.
>
> […]
>
> Realization of promotional campaigns aimed at society in general.[141]

196. Thus, the 2005-2010 PER recommended to maintain the existing guarantees and to increase Spain's PV installed capacity by an additional 363 MW.[142]

197. Among one of its technical and financial assumptions, the 2005-2010 PER listed a return on a standard project "calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in legal tender and for each standard project, around 7%, on equity (before financing) and after taxes."[143]

198. The Claimants rely on the 2005-2010 PER for the proposition that the Spanish "PV sector was not developing at a sufficient pace" and that "RD 436/2004 offered PV investors an 'insufficient return.'"[144]

---

[140] Renewable Energy Plan in Spain 2005-2010, August 2005 (C-32), p. 171.

[141] Renewable Energy Plan in Spain 2005-2010, August 2005 (C-32), p. 175.

[142] Renewable Energy Plan in Spain 2005-2010, August 2005 (C-32), [SP], pp. 175, 177; Ministry of Industry, Trade and Tourism and IDAE, Summary of the Spanish Renewable Energy Plan 2005-2010, August 2005 (C-31), p. 58. *See also* Memorial, paras. 86-94; Reply, paras. 101, 155.

[143] 2005-2010 Renewable Energy Promotion Plan, August 2005 (R-69)/(C-32 [SP]), pp. 274-274. *See also* Counter-Memorial, para. 460.

[144] Memorial, paras. 88, 90.

199.  The Claimants however argue that the 2005-2010 PER, as such, did not form part of the regulatory framework but was merely a plan,[145] and that neither RD 661/2007, nor RD 1578/2008 were based directly on the 2005-2010 PER.[146]

200.  The Respondent argues that "in general, the 2005-2010 PER envisaged that the 2000-2010 PER subsidies set out in RD 436/2004 would be maintained."[147]

201.  The Respondent also suggests that "there is a clear relationship between [Law 54/1997], the [2005-2010 PER] and Royal Decree 661/2007" and that the Claimants' argument that there is no reference to the 2000-2010 PER in Law 54/1997 is incorrect.[148] According to the Respondent, the Twenty-fifth additional provision to Law 54/1997 "establishes that the Renewable Energy Plan has to define […] installation types […] used to determines the tariffs and premiums of Royal Decree 661/2007," and that the 2000-2010 PER had the same relationship with RD 436/2004.[149]

202.  In October 2005, ASIF issued a report on the development of photovoltaic energy in Spain (the "**October 2005 ASIF Report**").[150] With respect to the regulation of PV development, the report noted the following:

> An important change has occurred in photovoltaic development in Spain with the approval of RD 436/2004, which has had a wide-ranging and varied impact on the sector.
>
> In terms of the economic impact, we could say that, before the decree, photovoltaic facility owners in Spain had no legal certainty of receiving a premium per photovoltaic kWh fed into the grid during the years needed to secure a return on investment. The market needed large subsidies to counter

---

[145] Claimants' Post-Hearing Brief, paras. 103-106. The Claimants refer to the Response to EC information request in matter SA.40348 2014/N, 22 April 2016 (C-160) where Spain stated at p. 6: "it cannot be said that the assumptions used to determine the tariffs and premiums were in line with those of the [2005-2010 Renewable Energy Promotion Plan]."

[146] Claimants' Reply Post-Hearing Brief, paras. 7-9, *referring to* Response to EC information request in matter SA.40348 2014/N, 22 April 2015 (C-160). *See also* Reply, paras. 157, 166, 333, 679; Claimants' Post-Hearing Brief, para. 106; Claimants' Reply Post-Hearing Brief, para. 8.

[147] Counter-Memorial, para. 460.

[148] Hearing Tr., Day 1, 18 March 2019, 234:17-25 (Fröhlingsdorf Nicolás).

[149] Hearing Tr., Day 1, 18 March 2019, 235:01-13 (Fröhlingsdorf Nicolás).

[150] ASIF, Report "Towards environmentally friendly electricity", October 2005 (R-262)/(W-213). *See also* Rejoinder, paras. 603 and 904.

this uncertainty, subsidies that limited the market to the few MW per year for which there was support.

RD 436/2004 has given the majority of investors the certainty of receiving a reasonable rate of return. In 2005, alongside a general interest in this technology thanks to its environmental suitability, simplicity and reliability. This contributed to an increase in the number of projects and in the average size of PV facilities, with a higher average than the 3 kW of only two or three years before.

The facilities created in 2004 are estimated at a little over 10 MW. In 2005, this volume will be greatly surpassed, if we take into account the large number of projects being started and the numerous requests for connection points to the distribution network.

This new context of greater dynamism and larger volumes has led to a drop in prices, compensating for the price increase of some of the system components, as is the case with the abovementioned photovoltaic modules.[151]

203. The October 2005 ASIF Report further noted that:

> *It is considered fundamental to maintain RD 436/2004* in the coming years so that the economy that controls photovoltaic development in Spain is efficiently structured. This regulation provides a reasonable rate of return on investment for an average standard facility. This reasonable rate of return is considered to be ten years or, taking another investment analysis parameter and as pointed out by the Plan for Renewable Energies, having an internal rate of return on the own equity invested of between 5 and 7%.[152]

204. Around the same time, Mr. Bouman decided to go on a business tour in Spain, having already previously "decided to gauge the financial market for PV investment in Spain" (see also paragraph 115 above).[153]

c.    **The 2005 Supreme Court Judgment**

205. On 15 December 2005, the Spanish Supreme Court issued a judgment concerning an appeal brought by the *Asociación de pequeños productores y autogeneradores de electricidad con fuentes de energía removable* (the Association of small producers and autogenerators of electricity with renewable energy sources) against RD 436/2004 (the "**2005 Supreme Court Judgment**"). Amongst other arguments, the claimants

---

[151] ASIF, Report "Towards environmentally friendly electricity", October 2005 (R-262)/(W-213), p. 7.

[152] ASIF, Report "Towards environmentally friendly electricity", October 2005 (R-246), p. 9, *referred to* in Rejoinder, para. 406.

[153] First Bouman Statement, para. 21.

contended that RD 436/2004 did not set forth any mechanism to update the "fixed tariff" pricing option (i.e., one of the two pricing options provided for under RD 2818/1998). The claimants in that case further argued that RD 436/2004 provided for stricter technical requirements than RD 2818/1998, which applied not merely to new, but also to existing PV installations.[154]

206. Relying on an earlier judgment dated 5 July 2005, the Supreme Court provided the following analysis of the normative relationship between RD 2818/1998, RD 436/2004 and Law 54/1997:

> […] the right to the annual update of the premium of the facilities under the special regime does not arise directly from the Law of the Electric Sector, since its article 30 is to be subjected to Government's power of determination, attributes a margin of freedom within the parameters in that precept established, in order at the time of its application, and even its subsequent modification. There is, therefore, no imperative mandate of the legislator regarding the periodicity of the update, but simply an authorization to the holder of the Executive Power for the determination of the right to the premium, an authorization that positively reflects through Royal Decree 2818/98. Given the normative range of this Royal Decree, nothing prevents another standard of the same hierarchical level from modifying it. This does not preclude that the latter has the category of basic in accordance with its First Final Provision, since this character does not make it intangible to its subsequent alteration, when operating the basics in the relationship State/Autonomous Communities, but not in what concerns the system of hierarchy of sources within the state system.[155]

207. With respect to the imposition of more restrictive technical requirements by RD 436/2004, the Supreme Court held that:

> There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration, provided that it remains within the framework of [Law 54/1997].[156]

---

[154] Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93), pp. 10-11. *See also* Counter-Memorial, paras. 349, 546, 1043; Reply, para. 197.

[155] Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93), p. 10 (Tribunal's translation).

[156] Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93), p. 11 (Tribunal's translation).

208.  As further explained below, the Parties' positions differ as to the significance to be given to this and other judgments of the Spanish Supreme Court.[157]

209.  Between the end of 2005 and early 2006, Mr. Bouman purchased a 75 % stake in Natec, a company subsequently renamed Ra Solar and which was later used to purchase PV panels and other equipment for the construction of PV Plants.[158]

**4.    Cross Retail and the first Spanish Project Companies are incorporated; RDL 7/2006 is adopted**

a.    **RDL 7/2006: Preparation and most relevant provisions**

210.  On 16 January 2006, Cross Retail was incorporated.[159] According to Ms. Paniego, one of Claimants' fact witnesses, Cross Retail was "the entity of the Sevilla Beheer group that entered into the EPC contracts."[160] As further explained by Ms. Paniego, the Claimants' method for identifying investment opportunities was to "look[] for opportunities on offer by EPC contractors".[161]

211.  On 25 January 2006, Mr. Henk Pals, Mr. Bouman's former accountant[162], wrote to the ING UK Bank asking for a meeting and stating that "[w]e are in the process of investing in a solar farm in the near of Albacete."[163]

212.  On 22 February 2006, IDAE published another presentation titled "The Sun Can Be Yours", which contained the following statements regarding the RE investments' potential profitability:

> The PROFITABILITY of your investment is reasonable and occasionally may reach up to 9%, considering a period of 25 years.

---

[157] *See* paras. 750, 758-760 below.

[158] First Bouman Statement, paras. 27-28.

[159] Extract from the Spanish commercial register (C-15.3).

[160] First Paniego Statement, para. 25.

[161] First Paniego Statement, para. 23.

[162] First Bouman Statement, para. 31.

[163] Email between Henk Pals and Banesto regarding the potential financing of a PV project in Albacete, 25 January 2006 (C-38) *referred to in* First Bouman Statement, para. 31.

With bank support, there is SUBSTANTIAL FINANCING for the investment (80%).

When you decide to make this type of installation, YOU ARE CONTRIBUTING TO THE SUSTAINABLE DEVELOPMENT OF YOUR COMMUNITY, SINCE YOU ARE PREVENTING THE EMISSION OF CO2 TO THE ATMOSPHERE.[164]

213. On 30 March 2006, Messrs. Pablo del Rio and Miguel A. Gual, two Spanish economists, published an article titled "An integrated assessment of the feed-in tariff system in Spain", which conducted a quantitative analysis regarding FiTs in Spain for the period 1999-2003 and identified a number of "risks" relating to the Spanish PV sector:

> 4.9. Uncertainty for investors
>
> Factors at different institutional levels affect risk and uncertainty for investors which, in turn, influence the effectiveness and cost-effectiveness of a RES-E promotion scheme. The [FiT] under RD2818 combines both risky and security elements.
>
> Security for the investor depends on the existence of an institutional commitment to RES-E deployment. This was the case in Spain where, at least since 1994, RES-E promotion has been a major policy priority. This is a necessary albeit not a sufficient condition, however. Policy makers have to give real signs of their commitment. The backing of the [FiT] system by policy makers and its certainty for the investor in Spain.
>
> Changes in the level of support are another factor affecting investors' risk. This has been a negative aspect of the [FiT] under RD2818. Annual revisions of the support granted have not been based on a transparent objective formula and have been deemed unpredictable and arbitrary. Investors ignored the level of support in the next years and even in the following year, and no price floor was set.[165]

214. On 20-21 April and 10 May 2006, the first 28 Spanish Project Companies were incorporated by the Claimants.[166]

215. On 24 May 2006, Gamesa Energia, S.A., the project developing company in charge of developing PV installations in Fuentes de Año (which Claimants would subsequently

---

[164] IDAE, Presentation: "The sun can be yours", 22 February 2006 (C-227), p. 43. *See also* IDAE, Presentation: "The sun can be yours", 24 May 2005 (KPMG Exhibit-6), mentioning a reasonable return of "up to 15%" *referred to* in Reply, paras. 94, 108, 295.

[165] P. del Río and M.A. Gual, "An Integrated Assessment of the Feed-in Tariff System in Spain", first published 30 March 2006 (2007) 35 Energy Policy 994 (C-42), pp. 1009-1010. *See also* Memorial, paras. 17, 45-48, 79.

[166] *See* Annex 1 to this Decision.

acquire in 2010),[167] entered into an agreement over the lease of a parcel of land for the purpose of constructing and operating PV installations. The agreement provided amongst others:

> [Termination] of the Contract
>
> […]
>
> B. Once the solar photovoltaic facility is installed:
>
> If regulation of the [electricity] sector is modified, in such a way that operating facilities is not economically profitable.[168]

216.  On 9 June 2006, another eleven Project Companies were set up.[169]

b.  **RDL 7/2006: Most relevant provisions**

217.  On 23 June 2006, the Spanish government adopted Royal Decree-Law 7/2006 'establishing urgent measures in the energy sector' ("**RDL 7/2006**").[170]

218.  RDL 7/2006 was adopted in order to urgently address inefficiencies of the existing RE remuneration system.[171]

219.  As noted in the preamble of RDL 7/2006:

> [R]egulations in place since 2003 governing the approval or amendment of average or benchmark electricity tariffs limit the maximum annual increase of such tariffs and of certain costs to be included in the tariff calculations.
>
> The experience gained from these regulation, particularly since 2005 […] has shown the need to empower the Government to amend the costs included in such calculations and to relax restrictions on the variation of tariffs and of

---

[167] *See* Ramon y Cajal, Report on legal revision in relation to the solar photovoltaic plant of 2,400kW in the municipal own of Fuentes de Año (Avila), November 2009 (C-88), p. 2; Gómez-Acebo & Pombo, Due Diligence Report issued in connection with the PV Plants "Fuentes de año" (Ávila) and "Matapozuelos" (Valladolid), 4 July 2012, (C-138), p. 6; First Econ One Report, para. 66. *See also* Memorial, para. 172; Reply, para. 113; Rejoinder, para. 702; Respondent's Post-Hearing Brief, para. 101; First Bouman Statement, para. 30.

[168] Agreement between Gamesa Energia, S.A. and Mr. Herminio Senovilla Arenas and Ms. Amparo Muñoyerro García, 24 May 2006 (R-327), Clause 6 (relating to a parcel named "Poligono 11") *referred to* in Rejoinder, para. 712.

[169] *See* Annex 1 to this Decision.

[170] RDL 7/2006, 23 June 2006 (C-45)/(R-36). *See also* Memorial, paras. 99, 382; Reply, para. 59; Counter-Memorial, para. 448; Rejoinder, para. 541.

[171] Counter-Memorial, para. 448. *See* Article 1(12), RDL Law 7/2006, 23 June 2006 (C-45)/(R-36).

different tariff groups. In view of the 1 July 2006 tariff review deadline, these reforms are urgently needed.[172]

220. RDL 7/2006 suspended the revision regime for renewable electricity installations and temporarily froze the applicable TMR for purposes of calculating the FiT under RD 436/2004 until the adoption of a revised remuneration regime[173] As explained by the Parties at the Hearing, the TMR mechanism envisaged in RD 436/2004 had to be modified in view of a "feedback loop" that was causing an artificial increase of the subsidies paid to RE producers.[174]

221. In addition, RDL 7/2006 empowered the Government to implement and develop its provisions by means of regulation and mandated the Government to elaborate a new remuneration regime within six months.[175]

222. As further explained below, RD 661/2007 was adopted based on this mandate.

c.    **RDL 7/2006: Public criticism**

223. In reaction to RDL 7/2006, on 26 July 2006, several associations in the Spanish RE sector, including APPA and ASIF, addressed a joint letter to the Ministry of Industry, Trade and Tourism, which stated:

> [The undersigned] business associations can only express their rejection, their deepest discontent and their utmost concern about the substance and the form in which this process is being carried out.
>
> RDL 7/2006 breaches substantially the regulation of renewable energies established by [Law 54/1997], which was the product of a consensus between all political parties and a model for the rest of the world, not only for being the most effective, but also the cheapest for consumers.
>
> RDL 7/2006 abolishes the objective parameters that established minimum remuneration for the different renewable energies collected by said Law. These minimums were the guarantee of stability, predictability and durability

---

[172] Preamble, RDL 7/2006, 23 June 2006 (C-45)/(R-36).

[173] RDL 7/2006, 23 June 2006 (C-45)/(R-36), [SP], Second Transitory Provision.

[174] As explained by Counsel for the Claimants, Mr. Vazquez-Guillén: "[…] one of the components of that TMR is precisely the special regime FiT. So as you can imagine, the higher the installed capacity of renewable energy, the higher the cost of the special regime; and as a result, the higher the TMR. Likewise, the higher the TMR would also lead to an increase of the FiTs, which would again lead to another increase of the TMR. It generated sort of a feedback loop." Hearing Tr., Day 1, 18 March 2019, 45:10-17 (Vazquez-Guillén). *See also* Counter-Memorial, paras. 443-447.

[175] RDL 7/2006, 23 June 2006 (C-45)/(R-36), Second Final Provision.

that have attracted investment to the sector and that have made Spain a benchmark international in the field, especially in wind technology; They have also generated more than 200,000 jobs only within our borders.

[…]

This situation, already […] is further aggravated when there is knowledge that the planned revision of Royal Decree 436/2004 is becoming the birth of a new regulatory framework - in which none of the signatory associations has been able to take part before it will be made public through the CNE - whose remuneration criteria are manifestly and objectively discouraging to encourage the development of planned projects with the Renewable Energy Plan 2005-2010 (PER), approved by the Council of Ministers on August 25, 2005.

This way of proceeding would provoke an adverse generalized reaction of the investments and the financial entities of very difficult rectification, which can lead to the deactivation of the renewable energy sector and to the breach of the planning objectives foreseen in the Sectorial Law. It is necessary to remember that the companies that are members of the sector are disbursing the almost 25,000 million euros that PER requires for its execution, and that the amortization of this important invention requires more than 10 years in a stable, predictable and sufficient regulatory environment. [176]

224. At the end of July 2006, APPA published a note criticizing RDL 7/2006 in the following terms:

The RD-L 7/2006 came to light in a manner reminiscent of days gone by - with obscurity and premeditation - without prior consultation with the agents involved, backtracking on reiterated words and changing the rules of play while the game is underway. With retroactivity, acquired rights have been amended.

What is more, after passing the RD-L 7/2006, the sector was told that the reform of the Royal Decree 436/2004 - the benchmark legislation for renewable energy in Spain, the reformed version of which should have been in effect two years ago and is urgently required for some renewable technologies - is to become the new regulatory framework, which bears little resemblance to the original regulation. To top it off, it was announced that the economic actors, those who will be affected by the new regulatory framework, are excluded from the drafting process. Because that is just the way it is.[177]

---

[176] Letter sent by APPA, AEE and ASIF to the Minister for Industry on 26 July 2006, *reproduced in* APPA Info Journal no. 22, May-July 2006 (R-140), [SP] (Tribunal's translation). *See also* Counter-Memorial, paras. 455-456; Rejoinder, paras. 603, 606, 618.

[177] APPA Info Journal no. 22, May-July 2006 (R-140). *See also* APPA, Report "Review of the Economic Regime for Renewable Energies", 1 November 2006 (R-190), p. 4 (stating as follows: "RD-L 7/2006, approved in June by the current Government and urgently ratified in Parliament given that it included the elimination of the Competition Transition Costs, contains a <u>frontal attack against this policy aimed at supporting renewables: it does away with the 80-90% range and the remunerative stability mechanisms and what's more, it does so without even</u>

225.  As discussed further below, the Parties disagree as to the relevance of contemporaneous statements made by these business associations.[178]

## 5.  The Claimants' first EPC contract is signed; the Supreme Court issues another judgment concerning RD 436/2004

226.  On 10 August 2006, according to the Claimants, the very first EPC Contract for the construction the Mahora Plant was concluded.[179] The Claimants argue that this is the first relevant date for the purposes of assessing their legitimate expectations, as after the signing of the EPC contract, the commitment to invest had become irreversible.[180]

### a.  2006 Supreme Court Judgment

227.  On 25 October 2006, the Spanish Supreme Court rendered a judgment in a case brought by six market operators against the Spanish Government and, amongst others, several electricity distribution companies, regarding an amendment to RD 436/2004, which was introduced by a subsequent decree that has not been put in issue in the present arbitration (i.e., RD 2351/2004) (the "**2006 Supreme Court Judgment**").[181] In that case, the

---

taking into consideration the guarantees and the deadlines that had been established. The regulation, which changes the rules halfway through the game, also orders that a new Remuneration Decree should be put in place. The text that was proposed initially introduces retroactivity and seriously undermines the legitimate expectation of the investors." (emphasis in the original)); Info APPA Journal no. 23, August-December 2006, "RD-L 7/06 and review of RD 436/04. Storm in the renewables sector", August-December 2006 (R-198) ("Royal Decree-Law 7/2006 was passed last June and entails a frontal act against national policy on renewable energy development: it eliminates the 80-90% band and the remuneration stability mechanisms, without considering the guarantees or timeframes established. The legislation, which tears up the rules half way through play, introduces retroactivity and seriously destroys legitimate investor confidence.") *See also* Counter-Memorial, paras. 453, 457; Rejoinder, paras. 432, 603, 606, 618.

[178] *Compare* Claimants' Post-Hearing Brief, paras. 146-148 *and* Rejoinder, Section IV.I; Respondent's Post-Hearing Brief, para. 66 (stating that "[the business associations in the Renewables Sector] accepted the possibility of regulatory changes; these agents were aware that the regulatory changes would be motivated by the need to ensure the economic sustainability of the SES or to correct situations of excess remuneration, and all the Agents were aware that the Government's margin for appreciation in the exercise of its regulatory powers was limited by one essential principle: to guarantee investors a fair return over standard facilities in accordance with the cost of money in the capital markets.").

[179] Claimants' Post-Hearing Brief, para. 30. The Tribunal notes that the copy of the EPC contract submitted into the record shows the date of 10 August 2006 is crossed out manually and replaced with 15 June 2007. *See* Mahora EPC contract, 10 August 2006 (C-143). However, in light of the Claimants' position, the Tribunal accepts 10 August 2006 as the date of the contract.

[180] Claimants' Post-Hearing Brief, paras. 27-30.

[181] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94). *See also* Counter-Memorial, paras. 343-352, 360, 388, 546, 866, 1044, 1203; Rejoinder, paras. 263, 295, 392, 699, 937, 964; Reply, para. 197; Respondent's Post-Hearing Brief, para. 62.

claimants had argued that RD 2351/2004 had altered the legal regime for calculating the premiums under the Special Regime by modifying the methodology for revising premiums in the future and by raising the minimum capacity requirement set forth in RD 436/2004 from 10 MW to 15 MW, and that this violated the legitimate expectations based on which they had made their investments.[182] The Supreme Court rejected the appeal, holding that:

> [E]lectricity producers under the special regime do [not] have an 'unalterable right' to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future.
>
> It is true that in this case the setting of premiums is subject to certain normative standards, as stated above, but is also so that the Council of Ministers may, respecting them, introduce quantitative variations in the formulas by which the premiums are from time to time adjusted, or in the calculation of them. If the change has not deviated from these legal guidelines and, again, there is no allegation of infringement of Article 30 of [Law 54/1997], it can hardly be considered unlawful.
>
> […]
>
> Until it is replaced by another, the above outlined legal regulation (Article 30 of [Law 54/1997]) allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining 'reasonable rates of return with reference the cost of money in the capital market' […]. However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.[183]

228. The Parties disagree as to the relevance of this Judgment.

229. According to the Respondent, this Judgment is part of a string of well-established case law confirming that Royal Decrees did not guarantee a specific return and that the only limit for any regulatory change is the principle of reasonable return enshrined in Article 30 of Law 54/1997.[184] This, the Respondent argues, must be considered part of the Spanish legal system, which must serve as the benchmark for assessing the Claimants'

---

[182] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94), pp. 2-3.

[183] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94), pp. 3, 5.

[184] Counter-Memorial, paras. 345-361, 388, 546, 1044. *See also* Hearing Tr., Day 1, 18 March 2019, 220:2-10, 233:4-7 (Fröhlingsdorf Nicolás).

claim of legitimate expectations.[185] Referring to later judgments of the Spanish Supreme Court, the Respondent also argues that the concept of reasonable return is "dynamic", i.e., "[d]epending on the change of financial circumstances and circumstances of other types, a percentage of profitability could be 'reasonable' at that first moment and could require subsequent adjustment to precisely maintain that 'reasonableness' due to the modification of other financial or technical factors."[186]

230.  According to the Claimants, the 25 October 2006 Judgment of the Spanish Supreme Court is irrelevant for the purpose of assessing the Claimants' expectations.[187] The Claimants also argue that neither the 2005 and 2006 Supreme Court Judgments, nor the two subsequent judgments "could have enabled the Claimants to anticipate the Disputed Measures."[188] The Claimants further argue that neither of these judgments provided any interpretation of RD 436/2004 or RD 661/2007 and RD 1578/2008 (as defined below).[189]

b.  **Parliamentary debates**

231.  On 26 October 2006, the Spanish Minister of Industry, Mr. Joan Clos i Matheu, addressed the Spanish Senate on several topics. With respect to the remuneration of renewable energies, he stated:

> The Government's first responsibility in this regard is to establish calmness and perspective in the regulatory framework, and this is included in our adherence to the key principles of the European regulatory framework. It is important for all operators to receive this message and to be aware that our road map entails adapting to this framework as quickly as possible, which involves generating more market that we hope will be efficient, because it is not always so, and obviously, the tariffs are not going to pay for anyone's

---

[185] *See*, *e.g.*, Counter-Memorial, para. 1073; Respondent's Post-Hearing Brief, para. 62.

[186] Third Chamber of the Supreme Court, App. 71/2011, Judgment, 25 September 2012 (R-105), Legal Ground Three *referred to* in Counter-Memorial, para. 340.

[187] Reply, Part III.4.4.

[188] Reply, para. 197, *referring to* Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93); Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94); Third Chamber of the Supreme Court, App. 11/2004, Judgment, 20 March 2007 (R-95); Third Chamber of the Supreme Court, App.13/2006, Judgment, 9 October 2007 (R-96).

[189] Reply, para. 197.

party. Tariffs by law can only take into account energy costs, and shareholder ventures are not energy costs.[190]

232. Mr. Clos i Matheu further noted that:

> [T]here shall be no further criteria other than objective energy costs and, obviously, the market price is not included; the stock market price is a mixture of future remuneration expectations, etc. You may believe what you like regarding the rational expectations or not, regarding the future of these companies and their value, however the tariff framework will be strictly bound to what the regulations state, that is to say, only the costs shall be taken into account, and this shall be our principle of action.[191]

233. On 8 November 2006, the Secretary of Energy, Mr. Nieto Magaldi, addressed the Spanish Congress of Deputies, stating specifically in relation to the remuneration of wind-generated electricity:

> The regulation of wind power in 2004 was rather unfortunate. In 2004, the current Royal Decree, 436, established premiums based on market price expectations. For example, for the wind power, the expectation of prices in that year in the market was of 36 Euros/MW-hour and therefore a subsidy of 30 Euros was fixed, which with those 36, with 66 of total remuneration, it recovered his investments. What has happened? That the price of market now is of 55 or of 60 and the wind power has a total remuneration of almost 100 Euros/MW-hour. This remuneration has an IRR of around 20 percent. I believe in renewable energies as much as anyone, but I also believe that we have to do things reasonably. Technologies, that is my opinion, whose investment is guaranteed through a premium—their risk is practically zero, the only risk they have is the financial risk of debt in the project—they cannot have returns of 20 per cent; nobody has those. Some speculators do have them. We must be reasonable.[192]

---

[190] Appearance before the Senate of Joan Clos i Matheu, Minister for Industry, Energy and Tourism, 26 October 2006 (R-240), p. 24. *See also* Rejoinder, paras. 529, 681, 727.

[191] Appearance before the Senate of Joan Clos i Matheu, Minister for Industry, Energy and Tourism, 26 October 2006 (R-240), p. 24. *See also* Rejoinder, para. 529.

[192] Appearance by Mr. Ignasi Nieto Magaldi, Secretary General of Energy, before the Congress, 8 November 2006 (R-195), p. 27. *See also* Counter-Memorial, paras. 450-452; Rejoinder, paras. 529, 682.

## 6.    RD 661/2007

a.    **RD 661/2007: Preparation**

234.    On 28 November 2006, the Ministry of Industry, Trade and Tourism circulated a Proposal of a Royal Decree "regulating the activity of electricity production under the Special Regime, and specific installations of analogous technologies", which ultimately would become RD 661/2007 (as defined below) (the "**Initial Draft RD 661/2007**"). Article 40 of the Initial Draft RD 661/2007 dealt with the issue of tariff revisions in the following manner:

> 3. In 2010, in view of the results of the monitoring reports on the degree of compliance with the Renewable Energy Plan (PER) 2005-2010, of the Strategy for Energy Saving and Efficiency in Spain (E4), and of the new targets to be included in the next Renewable Energy Plan for the period 2011-2020, there will be a review of the tariffs, premiums, supplement and lower and upper limits defined in this Royal Decree for implementation from January 2011 onwards. This revision will take into account the costs associated with each of these technologies, the degree of participation of the special regime in covering demand and its impact on the technical and economic management of the system. Every four years, a new revision will be conducted.[193]

235.    The Initial Draft RD 661/2007 did not contain a provision exempting "tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section" from revisions similar to Article 40(3) of RD 436/2004.[194]

236.    On 19 January 2007, the *Asociación Empresarial Eólica* (the Spanish Wind Energy Association or "**AEE**") published an article expressing the following criticisms of the provision addressing revisions in the Initial Draft RD 661/2007:

> The recent economic regulation (RD 437/2004) of these activities [RE production] has established a scheme that gives more stability through an

---

[193] Initial Draft of RD 661/2007, 28 November 2006 (C-158), Article 40(3) *referred to in* the Reply, para. 77; Claimants' Post-Hearing Brief, para. 109.

[194] See Reply, para. 77, referring to Initial Draft of RD 661/2007, 29 November 2006, (C-158), Article 40(3), which states as follows: "[i]n 2010, in view of the results of the monitoring reports on the degree of compliance with the Renewable Energy Plan (PER) 2005-2010, of the Strategy for Energy Saving and Efficiency in Spain (E4), and of the new targets to be included in the next Renewable Energy Plan for the period 2011-2020, there will be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree for implementation from January 2011 onwards. This revision will take into account the costs associated with each of these technologies, the degree of participation of the special regime in covering demand and its impact on the technical and economic management of the system. Every four years, a new revision will be conducted."

economic regime that is lasting, non-retroactive and predictable in its reviews. […] The proposal is puzzling as it even advocates amending it for facilities already in operation and for investments in progress, while removing the right to receive the remuneration established, recognised by the current regulation, which would seriously affect the legal certainty and legitimate expectations that were generated based on the sustainability that this regulation guarantees.[195]

237. On 25 January 2007, the Ronda installations were initially registered by the Claimants with the RAIPRE.[196] The final registration occurred in September 2008.[197]

238. On 14 February 2007, the CNE issued a report addressing the Initial Draft RD 661/2007 ("**CNE Report 3/2007**") and containing the following statements:

The [CNE] understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, incentivizing investments in new capacity and minimizing the cost of financing projects, thus reducing the final cost to the consumer. The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.

[…] although it is difficult to defend the petrification of regulations, it is necessary to try to achieve sufficient legal certainty to counteract regulatory uncertainty and risk as much as possible; only in this way can there be sufficient investment.

[CNE's] assessment of the proposed Royal Decree in terms of this criteria is positive, given that, firstly, remuneration is substantially increased for energies and technologies that are further away from the planning targets (biomass, biodigestion biogas, photovoltaic and thermoelectric solar power, and cogeneration). Secondly, the rates of return calculated for the regulated tariffs for energies and technologies developed in recent years (wind, photovoltaic, hydropower, landfill biogas and cogeneration with natural gas) in general exceed 7 %.

[…] what the [CNE] proposes is regulatory stability to recover investments, maintaining regulated tariffs during the service life of existing facilities (with a transparent annual adjustment mechanism).[198]

---

[195] The Gaceta AEE, "Shadows of a contradiction", 19 January 2007 (R-267) *referred to in* Rejoinder, para. 608.

[196] Excerpts of the RAIPRE certificates (C-8) *referred to in* Memorial, para. 180; Reply, paras. 97, 255, 639.

[197] RONDA Inscription (CLEX-198).

[198] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), pp. 15-16, 19, 23, 25.

239.  At the same time, CNE Report 3/2007 also stated:

> […] the principle of legal certainty is not by definition an anti-evolutionary or conservative principle; it does not mean that legislation is resistant or immune to reform. In this sense, these principles do not impede dynamic innovation, nor that new regulatory provisions be applied retroactively to existing situations, but that they should continue upon entry into force of the new regulations.[199]

240.  In preparing CNE Report 3/2007, the CNE referred to the 2006 Supreme Court Judgment discussed above. As stated in the preliminary draft report:

> [T]he recent Ruling of the Supreme Court dated 25 October 2006 is very enlightening relating to the challenging to the Royal Decree 2351/2005 of 23 December. This particularly analyses the legal change that the afore-mentioned Royal Decree makes to the system of calculating the bonuses which encourage the production of electricity energy in the special regime. In the ruling the High Court came to the conclusion that this modification does not breach either the principle of legal certainty or of legitimate expectation.[200]

241.  On 26 February 2007, RA Solar Operaciones España, S.L. was incorporated for the stated purpose of exploiting the Matapozuelos plant.[201]

242.  On 19 March 2007, a new draft of RD 661/2007 (the "**Second Draft RD 661/2007**") was released by the Ministry of Industry, Trade, and Tourism.[202]

243.  On 20 March 2007, the Spanish Supreme Court issued another judgment relating to a modification of the transitory regime provided under RD 436/2004 (the "**March 2007 Supreme Court Judgment**") and confirming the conclusions reached in the 2006 Supreme Court Judgment to the effect that there was no guarantee of intangibility of a particular remuneration regime.[203] On 9 October 2007, the Spanish Supreme Court rendered another decision concerning a modification for the remuneration regime for gas

---

[199] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 18.

[200] Preliminary Draft of CNE Report 3/2007, at R-232, p. 9 [EN] and R-232, p. 153 of PDF [SP].

[201] Extract from the Spanish Commercial Register (C-15.4).

[202] Second Draft of RD 661/2007, 19 March 2007 (C-159) *referred to in* Reply, para. 78.

[203] Third Chamber of the Supreme Court, App. 11/2005, Judgment, 20 March 2007 (R-95) *referred to in* Counter-Memorial, paras. 360, 352; Reply, para. 197; Respondent's Post-Hearing Brief, para. 62. *See also* para. 227 above.

cogeneration facilities which had been established by RD 436/2004, where it adopted a similar reasoning (the "**October 2007 Supreme Court Judgment**").[204]

244. On 21 March 2007, the Ministry of Industry, Trade and Tourism issued its *Memoria Económica* (economic report) for what would become the future RD 661/2007, stating, *inter alia*, as follows:

> The regulated tariff has been calculated in order to guarantee a return of 7-8% depending on the technology. The premiums have been calculated by following the criteria found in Royal Decree, i.e., the premium has been calculated as the difference between the regulated tariff and the average futures market price for these technologies.[205]

245. On 29 March 2007, the Solicitor General of the State (*Abogado del Estado Jefe*) issued a legal report considering the proposed changes to the Special Regime.[206] Relying on the jurisprudence of the Spanish Supreme and Constitutional Courts, this legal report noted that the proposed reform could not be characterized as "retroactive", as it was not "intended to be a restriction of individual rights."[207] The legal report further elaborated:

> […] the so-called reform does not involve either the abolition of the promotion measures, nor a total alteration of the special regime. The reform respects the construction of the economic regime established in Royal Decree 436/2004. Moreover, the reform is based on the need for stability of the system by maintaining the premises that inspired its establishment and the need to ensure a reasonable return to owners of the plants that benefit from the special regime.[208]
>
> […] the modification of Royal Decree 436/2004 introduces reforms that, going beyond a simple review of the premiums constitute an adaptation of the plants covered by this regime to the current social and economic reality trying to correct, update and complete the regulation for the promotion of renewable

---

[204] Third Chamber of the Supreme Court, App. 13/2006, Judgment, 9 October 2007 (R-96) ("It is also claimed that [an acquired right] for payment of the premium is being [infringed]. The argument must be rejected [because] what would have existed in favour of the appellant would be an expectation of obtaining said right as it had not come to form part of their patrimony, a right which elsewhere is being questioned through administrative channels, and the rejection of this is being debated with the Courts, as the party states in its brief"). See also Counter-Memorial, para. 353; Reply, para. 197; Respondent's Post-Hearing Brief, para. 62.

[205] Ministry of Industry, Tourism, and Commerce, Report on the draft of the Royal Decree whereby electricity production under the special regime and for certain facilities with similar technologies under the ordinary regime is regulated, 21 March 2007 (C-163), p. 13. *See also* Reply, paras. 79, 191, 346, 622, 734.

[206] Spain State Legal Service, Report on Industry and Energy, 29 March 2007 (R-243), *referred to* in Rejoinder, paras. 449, 467, 530.

[207] Spain State Legal Service, Report on Industry and Energy, 29 March 2007 (R-243), p. 9.

[208] Spain State Legal Service, Report on Industry and Energy, 29 March 2007 (R-243), p. 9.

energy sources, as well as trying to prevent the dysfunctions observed in its implementation. For this reason, the intention of establishing a lasting economic regime is reinforced with the modification and the anticipation of reviews established in art. 40 and would not prevent the reform now being undertaken. Therefore, an initial conclusion has been reached, which is that even considering that the measure would have a certain retroactive nature, the rule is not restrictive of individual rights […][209]

246. On 3 April 2007, APPA issued a public complaint about the Second Draft RD 661/2007:

Distrust in the new model

It is essential for the Government to respect the regime stipulated in [RD 436/2004] for the facilities put into operation before 1 January 2009, also from a second perspective.

[…]

If the Government fails to do so, it will no longer be credible in the future: any rational investor, when planning facilities of this type, must bear in mind not only the costs and the foreseeable remuneration, but it also must consider the risk that such remuneration could be lowered; because, if the Government does not respect now the compromise assumed in 2004, what investor could discard that for example next year, the Government may lower again the maximum and minimum limits of the remuneration for the facilities that may join the market?

Could such investor in their forecasts rule out that the profit rates for their facilities will not fall once the renewable energy plants are large enough?[210]

247. On 9 April 2007, the Claimants established another 13 Spanish Project Companies for the purposes of developing their PV Plants.[211]

248. On 8 May 2007, the Minister of Industry, Tourism and Trade addressed the *Cortes Generales* (the Spanish Parliament) and made the following statement concerning the adoption of the future RD 661/2007:

[...] the solution we are preparing is balanced and reasonable. In any case, please know that what is driving me is nothing other than finding a balance between promoting renewable energy and an electricity price that is well-balanced. That is my only interest [...] With regards to regulatory stability, believe me that I am doing it to protect the cost of the electricity bill and not because of any other interests. given that we all pay for it, we have to decide where to draw the line, and there's no need to stretch the gum out so far that it

---

[209] Spain State Legal Service, Report on Industry and Energy, 29 March 2007 (R-243), p. 9.

[210] APPA, Claims against the RD 661/2007 draft, 3 April 2007 (R-265), pp. 6-7. *See also* Rejoinder, para. 607.

[211] *See* Annex 1 to this Decision.

breaks. I think that the premiums we are giving now and the regulatory framework entail a very reasonable agreement. [...] we are talking about premiums, the framework does not talk about anything other than premiums and capital gains. I's OK, I understand, it is reasonable for those receiving a premium to want it to be high and last as long as possible, but we have to balance things out a little and do it in the best possible way.[212]

249. On 25 May 2007, the Government adopted Royal Decree 661/2007 ("**RD 661/2007**") to supersede RD 436/2004.

250. The Parties disagree as to the significance of the replacement of RD 436/2004 by RD 661/2007 in view of Article 40(3) of RD 436/2004.

251. The Respondent argues that Article 40(3) of RD 436/2004 did not prevent the Government from replacing RD 436/2004 with RD 661/2007 that was applicable to existing plants.[213]

252. The Claimants respond that there was no harm done to PV investors by passing from RD 436/2004 to RD 661/2007, as further discussed below.[214] Consequently, the differences in the wording between Article 40(3) of RD 436/2004 and the corresponding provision in RD 661/2007, on which the Respondent relies, are devoid of relevance, according to the Claimants.

b.    **RD 661/2007: Relevant provisions**

i. *Text*

253. The preamble of RD 661/2007 provided, *inter alia*, as follows:

> Spanish society today, in the context of reducing dependence on foreign energy, better use of available energy sources, and a greater awareness of the environment, is increasingly demanding the employment of renewable sources of energy and efficiency in the generation of electricity as basic principles in the achievement of sustainable development from an economic, social, end environmental point of view. […]
>
> The creation of the special regime for the generation of electricity meant an important milestone in the energy policy of our country. The targets in respect

---

[212] Appearance before the Congress of Mr. Joan Clos i Matheu, Minister of Energy and Tourism, 8 May 2007 (R-242) *referred to in* Rejoinder, paras. 312, 529, 683.

[213] Hearing Tr., Day 1, 18 March 2019, 245:24-246:6 (Fröhlingsdorf Nicolás), Day 5, 22 March 2019, 89:8-18 (Fröhlingsdorf Nicolás); Counter-Memorial, paras. 522-523.

[214] Hearing Tr., Day 5, 22 March 2019, 46:14-15 (Stoyanov); Rejoinder, para. 81.

of the promotion of renewable energy and combined heat and power are covered in the Renewable Energy Plan 2005-2010 and in the Strategy for Energy Saving and Efficiency in Spain (E4), respectively. In view of the above, it can be seen that although the growth seen overall in the special regime for electricity generation has been outstanding, in certain technologies the targets posed are still far from being reached. […]

In view of the behaviour of the prices in the market, where certain variables which were not considered in the cited compensation system for the special regime have, over recent times, acquired greater importance, the economic circumstances established by Royal Decree 436/2004, of 12 March, make it necessary to modify the compensation system and de-link it from the [TMR], which has been used to date. […]

The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997 […] guaranteeing the owners of facilities under the special regime a reasonable return on their investments […].

To this effect, a system which is analogous to that provided in Royal Decree 436/2004 […] is maintained, in which the owner of the facility may opt to sell their energy at a regulated tariff, which will be the same for all scheduling periods or alternatively to sell this energy directly on the daily market, the term market, or through a bilateral contract, in this case receiving the price negotiated in the market plus a premium.

Furthermore, in order to safeguard the security and quality of the supply of electricity in the system, and in order to minimise the restrictions on production in those technologies which are today considered not manageable, certain reference installed power targets are established which coincide with the targets of the Renewable Energy Plan 2005-2010.[215]

254. Under RD 661/2007, photovoltaic installations were classified as "Group b.1" ("Facilities which use solar energy as their primary energy") and, within that group, as "Sub-group b.1.1" ("Facilities which use solar radiation alone as their primary energy by means of photovoltaic technology").[216]

255. Contrary to other types of RE installations, photovoltaic installations were immediately subject to RD 661/2007, without any option of electing to remain under the previous legal regime.[217]

---

[215] RD 661/2007, 25 May 2007 (C-54)/(R-49), pp. 2-3. *See also* Memorial, paras. 19, 21, 45, 101-116, 186, 235, 255, 330, 381-388, 402, 424; Reply, paras. 29, 65-98, 156, 174, 210, 228, 295, 308, 402, 437, 719; Claimants' Post-Hearing Brief, paras. 82, 109, 130, 132, 156; Counter-Memorial, paras. 336, 354, 471, 474-490, 509, 534; Rejoinder, paras. 257, 309, 403, 437, 438, 493, 512, 550, 684; Respondent's Post-Hearing Brief, paras. 24-26.

[216] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 2(b).

[217] RD 661/2007, 25 May 2007 (C-54)/(R-49), First Transitory Provision, para. 4.

256. Contrary to RD 436/2004, which had defined the FiT with reference to the TMR (the level of which was eventually fixed at a particular level by RDL 7/2006), RD 661/2007 defined the FiT as a specific income figure over a period of 25 years (subject to an adjustment based on price inflation, as explained in the following paragraph). After the first 25 years of operation of a PV facility, the FiT would decrease, as it follows from the below table provided in Article 36 of RD 661/2007:[218]

| Group | Sub-Group | Power | Term | Regulated Tariff, c€/kWh | Reference premium, c€/kWh | Upper Limit, c€/kWh | Lower Limit, c€/kWh |
|---|---|---|---|---|---|---|---|
| b.1 | b.1.1 | P≤100 kW | first 25 years | 44,0381 | | | |
| | | | thereafter | 35,2305 | | | |
| | | 100 kW<P≤10 MW | first 25 years | 41,7500 | | | |
| | | | thereafter | 33,4000 | | | |
| | | 10<P≤50 MW | first 25 years | 22,9764 | | | |
| | | | thereafter | 18,3811 | | | |

257. As stated in its preamble, RD 661/2007 provided for a FiT adjustment formula that was linked to the consumer price index (the "**CPI**"),[219] and no longer to the TMR.

258. Article 17 of RD 661/2007 contained the following provision regarding the rights to RE producers:

> Without prejudice to the provisions of Article 30.2 of Law 54/1997, of 27 November, the proprietors of production facilities under the special regime shall enjoy the following rights:
>
> a) To connect their generating unit or units in parallel to the grid of the distribution or transport company.
>
> b) Transfer to the system their net production of electrical energy or energy sold, by way of the distribution or transport company upon condition that it is technically possible for it to be absorbed by the grid.
>
> c) Receive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree. The right to receive the regulated tariff, or if appropriate the premium, shall be subject to final registration of the facility in the Register of production facilities under the

---

[218] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 36.
[219] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 44(1).

special regime of the General Directorate of Energy Policy and Mines [the RAIPRE], prior to the final date set out in Article 22.

d) To sell all or part of their net production by way of direct lines.

e) To enjoy priority in access and connection to the electricity grid […].[220]

259. RD 661/2007 increased the installed capacity target for PV installations from 150 MW to 371 MW.[221] In view of this, RD 661/2007 provided that once 85% of such capacity was reached, the government would establish a time limit (no earlier than 12 months after the 85% target was reached) for PV project entitlement to the incentives under the Decree before a new regulation was passed (the so-called "**Tariff Window**").[222]

260. Moreover, Article 44(3) of RD 661/2007 established the following rule concerning future FiT revisions:

> 3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of [the 2005-2010 Renewable Energy Promotion Plan], and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.
>
> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[223]

261. On the same day, the Ministry of Industry, Trade and Tourism issued a press-release announcing the adoption of RD 661/2007:

> The aim of this Royal Decree is to increase remuneration for facilities using newer technologies, such as biomass and solar-thermal, in order to comply with targets outlined under the Renewable Energies Plan 2005-2010 and those agreed upon between Spain and the European Union. […]

---

[220] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 17.
[221] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 37.
[222] RD 661/2007, 25 May 2007 (C-54)/(R-49), Articles 22, 37.
[223] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 36.

High power photovoltaic facilities will practically double their remuneration, whereas that of smaller plants shall remain the same, with a guaranteed profitability of 7% […]

Tariffs shall be reviewed every 4 years, taking into account compliance with the established targets. Such a revision shall allow for adjustments to be made to the tariff in virtue of new costs and the level of compliance with the targets. Future tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, thereby favouring development. The new legislation shall not be applied retroactively. Facilities with a start-up date prior to 1 January 2008 may operate under the previous framework in accordance with the fixed-tariff option for the duration of the facility's working life.[224]

## ii. Textual comparison between Article 40(3) of RD 436/2004 and Article 44(3) of RD 661/2007

262. In view of the importance attached by both Parties to the formulations of Article 40 of RD 436/2004 and Article 44 of RD 661/2007, the Tribunal deems it useful to provide the following textual comparison between the two provisions.

| Article 40 of RD 436/2004 | Article 44 of RD 661/2007 |
|---|---|
| 1. During 2006, in view of the findings of the monitoring reports on the degree of performance of the renewable energies promotion Plan, the tariffs, premiums, incentives and supplements defined in this Royal Decree shall undergo revision. This shall bear in mind the costs associated with each one of these technologies, their degree of participation in the special regime in demand coverage and their impact on the technical and economic management of the system. Every four years, starting from 2006, a new revision shall take place. | 1. The tariffs and premiums for Sub-Groups a.1.1 and a.1.2 shall undergo a quarterly update as a function of the variations in the reference values of the fuel price indices defined in Annex VII and the national retail price index (RPI) for the same period. Such updating shall be effected following the procedure provided in Annex VII of this Royal Decree.<br><br>Such facilities in Sub-Groups a.1.1 and a.1.2 as have completed ten years of operation shall have a correction for length of service in the updates in respect of the subsequent years, in accordance with the provisions of Section c) Annex VII.<br><br>Notwithstanding the above, such facilities as at time of the entry into force of the present Royal Decree are already in service shall not apply the indicated correction for length of service until the earlier of either the lapse of fifteen years since the date of commissioning, or the lapse of ten years |

---

[224] Ministry of Industry, Trade and Tourism, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new RD on renewable energy and combined heat and power", 25 May 2007 (C-53). *See also* Memorial, paras. 124, 125, 334; Reply, paras. 64, 153, 191, 236, 295; Claimants' Post-Hearing Brief, paras. 50, 101; Rejoinder, para. 727; Respondent's Post-Hearing Brief, para. 109; Respondent's Second Post-Hearing Brief, para. 17.

since the entry into force of the present Royal Decree.

For Sub-Groups a.2 and a.1.4, compensation shall be updated on an annual basis as a function of the change in the RPI and the price of coal, respectively, in accordance with the provisions of the cited Annex VII.

The values of the tariffs, premiums, supplements, and lower and upper limits to the hourly price of the market as defined in this Royal Decree, for Category b) and Sub-Group a.1.3, shall be updated on an annual basis using as a reference the increase in the RPI less the value set out in the Additional Provision One of the present Royal Decree.

The tariffs and premiums for facilities in Groups c.1, c.2, and c.3 shall be maintained for a period of fifteen years from the date of commissioning of the facility, with those relating to Groups c.1 and c.3 being updated on an annual basis in reference to the RPI, and those relating to Group c.2 being updated in the same manner as co-generators in Group a.1.2 for the range of power range between 10 and 25 MW fuelled by fuel oil. For facilities in Group c.4, the tariffs and premiums shall be updated on an annual basis, with reference to the RPI and the change in the electricity market and the price of coal in the international markets.

2. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall come into force on January 1st of the second year subsequent to the year that the revision has been carried out.

2. The values of the tariffs, premiums, supplements and lower and upper limits to the hourly price of the market which derive from any of the updates covered in the preceding point shall be applicable to all of the facilities in each group, regardless of the date of commissioning of each facility.

3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.

3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be

performed every four years, maintaining the same criteria as previously.

The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.

4. The National Energy Commission is empowered to establish by means of a circular the definition of standard or typical technologies and installations or plants as well as to compile information on investments, costs, income and other parameters of the different actual plants making up standard or typical technologies.

4. The National Energy Commission is hereby authorised to set out the definition of the technologies and standard facilities, in a Circular, and to gather information on the investments, costs, revenues, and other parameters of the various different actual facilities which make up the standard technologies.

5. The revisions envisaged in this article shall be approved by the Government by means of a Royal Decree before December 31st in the year in which the revision is to be carried out in accordance with the provisions of this article.

### iii. *Parties' interpretations of Article 44(3) of RD 661/2007*

#### (a) *The Claimants*

263. According to the Claimants, this provision confirmed the right to a guaranteed FiT, exempted from future revisions. Similarly to Article 40(3) of RD 436/2004, Article 44(3) of RD 661/2007 guaranteed that future revisions of the FiT would only apply to new facilities ("[t]he revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed").[225] In support of this interpretation, the Claimants refer to the *Memoria Económica* (economic report) issued by the Ministry of Industry, Trade, and Tourism on 21 March 2007 (referred to above at paragraph 244), which according to the Claimants indistinctly refers to "any" revisions of "regulated tariffs, premiums, [and] supplements":

> Revisions to the tariffs, premiums, and supplements will be done in the following manner:
>
> In 2010, in light of the monitoring reports on the degree of compliance with the Renewable Energy Plan (PER) 2005-2010 and the Spanish Strategy for

---

[225] Hearing Tr., Day 1, 18 March 2019, 54:7-16 (Vazquez-Guillén).

Electricity Savings and Efficiency (E4), as well as the new objectives that are included in the following Renewable Energy Plan for the 2011-2020 period, the tariffs, premiums, supplements, and upper and lower limits defined in this Royal Decree will be revised, their application starting on 1 January 2011, attending to the costs associated with each of these technologies, to the degree of participation in the special regimen in the coverage of demand, and to their incidence in the technical and economic management of the system. A new revision will be carried out every four years from then.

The regulated tariffs, premiums, supplements, and limits derived from any of these revisions will be applicable only to those facilities that have been registered definitively in the [RAIPRE] after 1 January of the year following the year in which the revision is made.[226]

264. The Claimants further refer to CNE Report 3/2007 on the Initial Draft RD 661/2007, where the CNE proposed to maintain "regulated tariffs during the service life of existing facilities (with a transparent annual adjustment mechanism)".[227] The Claimants moreover refer to an excerpt from a press release of 25 May 2007 issued by the Government and announcing the adoption of RD 661/2007:

Tariffs shall be reviewed every 4 years, taking into account compliance with the established targets. Such a revision shall allow for adjustments to be made to the tariff in virtue of new costs and the level of compliance with the targets. Future tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, thereby favouring development. The new legislation shall not be applied retroactively. Facilities with a start-up date prior to 1 January 2008 may operate under the previous framework in accordance with the fixed-tariff option for the duration of the facility's working life.[228]

---

[226] Ministry of Industry, Tourism, and Commerce, Report on the draft of the Royal Decree whereby electricity production under the special regime and for certain facilities with similar technologies under the ordinary regime is regulated, 21 March 2007 (C-163), p. 10. *See also* Reply, paras. 79-80.

[227] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 25.

[228] Ministry of Industry, Trade and Tourism, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power", 25 May 2003 (C-53), p. 1.

265. In support of their interpretation of RD 661/2007, the Claimants also submitted three presentations by the CNE dated 29 October 2008, February 2009,[229] and February 2010.[230] The 29 October 2008 presentation provided, for instance, as follows:

> b. Regulatory stability: Predictability and certainty of economic incentives for the duration of the facility's life span (encourages investors and lower financial costs): no retroactive effect.[231]

266. The same presentation also stated that the economic incentives guaranteed a reasonable return, but "incentives that provide greater returns [were] justified."[232]

267. The Claimants further referred to a presentation of the Ministry of Industry, Trade and Tourism and InvestInSpain[233] dated November 2009 that stated: "subsequent revisions of the tariffs will not affect the installations which have already been commissioned [this guarantee] provides legal certainty to the producer, ensuring the stability and development of the sector."[234] A similar statement was also made in a presentation of InvestInSpain in November 2007.[235]

---

[229] One of the two authors of this presentation C-75 is the Claimants' regulatory expert, Mr. Solé, who at the time was with the CNE.

[230] CNE, Presentation: "Legal and Regulatory Framework for Renewable Energy Sector", 29 October 2008 (C-72); CNE, Presentation: "Renewable Energy Regulation", February 2009 (C-75); CNE, Presentation: "Renewable Energy Regulation in Spain", February 2010 (C-92). *See also* Memorial, paras. 131-139, 334; Reply, paras. 76, 191, 228, 295; Claimants' Post-Hearing Brief, para. 145; Rejoinder, para. 723; Respondent's Post-Hearing Brief, para. 109; Respondent's Second Post-Hearing Brief, para. 17.

[231] CNE, Presentation: "Legal and Regulatory Framework for Renewable Energy Sector", 29 October 2008 (C-72), p. 6.

[232] CNE, Presentation: "Legal and Regulatory Framework for Renewable Energy Sector", 29 October 2008 (C-72), p. 25. *See also* CNE presentation, "Renewable Energy Regulation", February 2009 (C-75), p. 21.

[233] A State-owned company with the mandate of promoting investment in Spain. Memorial, para. 136, *referring* to Invest in InvestInSpain Website (C-139).

[234] Ministry for Industry, Tourism and Commerce, Presentation: "Legal Framework for Renewable Energies in Spain" (C-265), p. 4. *See also* Respondent's Post-Hearing Brief, para. 109; Respondent's Second Post-Hearing Brief, para. 17.

[235] Manuela García, INTERES InvestinSpain, Presentation: "Opportunities in Renewable Energy in Spain", 16 November 2007 (C-67), p. 32. *See also* Memorial, para. 334; Reply, paras. 108-109; 236-238; Counter-Memorial, paras. 430, 584, 641; Rejoinder, paras. 723, 1083; Claimants' Post-Hearing Brief, paras. 50, 52.

*(b)*    *The Respondent*

268.  The Respondent advances four reasons why Article 44(3) is neither a stabilization clause nor a basis for any expectation of the freezing of the regulatory framework

269.  First, the Respondent argues that the second paragraph of Article 44(3) covers only the compulsory review of 2010 and does not apply to other possible revisions.[236] This, according to the Respondent, is evidenced by the reference to "this section" (or "in this paragraph", depending on the translation), which necessarily only refers to Article 44 and the reviews mentioned therein.[237] Moreover, the first sub-paragraph of Article 44 does not prohibit or otherwise exclude revisions other than the quarterly ones explicitly mentioned therein.[238] In any event, Article 44(3) has a limited scope. It refers only to revisions "of the regulated tariff and of the upper and lower limits".[239] It does not refer to any other types of updates such as (i) updates to the CPI, (ii) the hours of operation for which premiums are paid, and (iii) does not refer to the possibility of introducing tax or other measures that might directly or indirectly impact the profitability of PV plants.[240] Thus, Article 44(3) cannot be read as a commitment to shield the FiT from the type of revision undertaken by the Disputed Measures.

270.  Second, the Respondent argues that the Claimants' interpretation disregards the principle of regulatory hierarchy, which provides that no regulatory act can contravene the provisions of a law. In the case at hand, Law 54/1997 sets forth the basic principle of the sustainability of the Spanish Electricity System (the "**SES**"). Since subsidies received by RE producers constitute a cost of the SES their payment needs to be regulated subject to Law 54/1997.[241] Furthermore, Article 30(4) of Law 54/1997 explicitly provides that the aim of any subsidy granted by regulation shall consist in achieving a reasonable rate of

---

[236] Counter-Memorial, paras. 510-511.

[237] Counter-Memorial, paras. 510-511 and 515.

[238] Counter-Memorial, para. 512.

[239] Counter-Memorial, para. 513.

[240] Counter-Memorial, para. 514.

[241] Counter-Memorial, paras. 516-517.

return.[242] This, according to the Respondent, creates a clear limit and is incompatible with the Claimants' assertion of the right to receive a FiT that remains "frozen" for decades.[243]

271.  Third, the Respondent argues that Article 44(3) "is no new feature in the Spanish regulatory framework".[244] To the contrary, Article 44(3) of RD 661/2007 closely resembles Article 40(3) of RD 436/2004, which read:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.[245]

272.  According to the Respondent, both Article 40(3) of RD 436/2004 and Article 44(3) of RD 661/2007 refer to revisions "provided for in this section", which implies that any other changes to the regulatory regime (including the possibility of adopting new Royal Decrees in place of the ones in force) were not addressed in these provisions.[246]

273.  The Respondent further argues that Article 44(3) of RD 661/2007 in any event is less restrictive in respect of tariff revisions than Article 40(3) of RD 436/2004.[247] This is allegedly so, because Article 40(3) (unlike Article 44(3)) uses the term "retroactive"[248]. Furthermore, the guarantee against future revisions under Article 40(3) applied to "tariffs, premiums, incentives and supplements", whereas the same guarantee under Article 44(3) applied only to "the regulated tariff and the upper and lower limits", thus excluding "premiums, incentives and supplements" from its scope.[249]

---

[242] "The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations […]. To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets." Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 30(4).

[243] Counter-Memorial, para. 518.

[244] Counter-Memorial, para. 519.

[245] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 40(3).

[246] Counter-Memorial, para. 520.

[247] Counter-Memorial, para. 521.

[248] "backdated effect", according to the Claimants' translation.

[249] Counter-Memorial, para. 521.

274. Furthermore, the Respondent argues that the adoption of RD 661/2007 represented an unfavorable change for certain RE producers, which Article 40 of RD 436/2004 did not preclude.

275. According to the Respondent, Article 44(3) of RD 661/2007 brought a reduction in the profitability of operating wind farms and the elimination of the "pool plus premium" option for photovoltaic facilities.[250] This regulatory change from RD 436/2004 to RD 661/2007 gave rise to a number of administrative suits which resulted in Supreme Court judgments that yet again confirmed, according to the Respondent, that regulatory changes of this sort were permissible as long as they respected Law 54/1997 and the principle of a reasonable return.[251] Specifically, the Respondent refers to the following ruling:

> [...] [The claimant] does not pay sufficient attention to the case-law of this Chamber issued specifically in relation to the principles of legitimate expectations and non-retroactivity applied to successive incentives regimes for electricity generation. These are the considerations expressed in our Judgment of 25 October 2006 and reiterated in that of 20 March 2007, inter alia, on the legal status of the owners of facilities producing electricity under the special regime, for whom it is not possible to recognize pro futuro an "unalterable right" to the maintenance of the remuneration framework approved by the holder of regulatory power, provided that the requirements of the Electricity Sector Act are respected as regards the reasonable rate of return on investment.[252]

---

[250] Counter-Memorial, para. 522; Rejoinder, para. 541. The Respondent argues in its Rejoinder that "as regards all the types of photovoltaic technology, RD 661/2007 led to a 13.76 % decrease from the regulated tariff that the photovoltaic plants would have received if RD 436/2007 had been in force." Rejoinder, para. 510. The Claimants and their regulatory expert, Mr. Solé, contest this as being the result of an incorrect calculation by Mr. Montoya, who failed to appear at the hearing to explain his method. Claimants' Post-Hearing Brief, paras. 99-101. In response, the Respondent argues that "it is a fact (not a calculation by Mr. Montoya) that the TMR was 7.3304 cents of EUR/kWh in 2005, 7.6588 cents of EUR/kWh in 2006 and 8.8809 cents of EUR/kWh in 2007 [referring to CNE Report 39/2006, p. 24]. These increases were, as a matter of fact, well beyond the alleged 2 % cap."

[251] Counter-Memorial, para. 523; Rejoinder, para. 542, *referring to* Third Chamber of the Supreme Court, App. 152/2007, Judgment, 9 December 2009 (R-98), Sixth Legal Ground. *See also* Third Chamber of the Supreme Court, App. 151/2007, Judgment, 3 December 2009 (R- 97). *See also* Counter-Memorial, paras. 360, 361, 866, 867, 1109; Rejoinder, paras. 464, 542, 965, 1044, 1046; Reply, para. 197.

[252] Rejoinder, para. 542, *referring to* Third Chamber of the Supreme Court, App. 152/2007, Judgment, 9 December 2009 (R-98), Sixth Legal Ground.

276. The Respondent further relies on certain statements made by industry associations, such as AEE, which took a critical view on RD 661/2007.[253] According to the Respondent, a diligent investor could not have been unaware of these industry views.[254] The Respondent also refers to a regulatory impact report on RD 661/2007, which, *inter alia*, provides as follows:

> The regulated tariff has been calculated for the purpose of guaranteeing a return of between 7% and 8% depending on the technology. […]

> For facilities of up to 10 MW, these regulated tariff values provide a reasonable IRR at 25 years of approximately 7%.[255]

277. Finally, the Respondent refers to the *Charanne v. Spain* and *Isolux v. Spain* awards as supporting its interpretation of RD 661/2007.[256]

c.    **RD 661/2007: Public comments**

278. Following the publication of RD 661/2007, ASIF made the following statement:

> The photovoltaic economic system is basically being developed due to the support it has under Royal Decree 661/2007 [...] A reasonable rate of return is sought, but what is a reasonable rate of return for an investment in renewable energy, specifically in photovoltaic energy? [...] It is considered rather reasonable that a period of return on investment is around ten years, and an internal rate of return of the project (without leverage) is around 7%, which is aligned with other regulated investments.[257]

279. The AEE also specifically deplored the retroactive reduction in the remuneration of wind power facilities that RD 661/2007 introduced:

> The new decree also foresees the allocation of remuneration in a long-lasting manner; specifically, for 20 years. However, the system of revisions and

---

[253] Rejoinder, paras. 608-609. *See also* AEE, Press release on draft RD 661/2007, 9 May 2007 (R-266): "The 'stable' nature of the twenty-year period proposed by the new Royal Decree for the allocation of remuneration is fictional if the premium amendments are retroactive as is contradictorily regulated now" (emphasis in the original).

[254] Rejoinder, para. 626.

[255] Counter-Memorial, paras. 462, 496-497, *referring to* Report on draft RD 661/2007, undated (R-29). *See also* Rejoinder, paras. 402, 433, 808.

[256] Counter-Memorial, paras. 524-529, *referring to Charanne B.V. and Construction Investments S.A.R.L. v. Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016 (RL-32), *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-70).

[257] Javier Anta Fernández (ASIF), *Visión desde la Asociación de la Industria Solar Fotovoltaica*, *in* Universidad Pontificia de Comillas, Report: "Solar energy: current status and immediate perspective", 2007 (R-272), p. 197. *See also* Rejoinder, para. 620.

updates set out in this decree, despite restoring the non-retroactivity of modifications to the regulated tariff and of the upper and lower limits of remuneration values, excludes premiums and supplements from this guarantee, as article 44.3 allows for the retroactive application to past and current investments of new premiums and supplements upon subsequent modification.[258]

280. In November 2007, the IDAE published a new version of its presentation "The Sun Can Be Yours", which stated that a FiT of 0.440381 EUR/kWh would apply to PV installations below 100 kWh for the first 25 years, subject to annual updates based on the CPI. The presentation further noted that "[t]he tariffs will be applicable to those facilities definitely registered in the [RAIPRE] prior to 29 September 2008."[259] According to the Claimants, these statements demonstrate that the RAIPRE registration confirmed the right to receive the FiT under RD 661/2007.[260]

## 7.    RD 1578/2008

### a.    RD 1578/2008: Preparation

281. In August 2007, Spain exceeded 85% of the target installed capacity of 371 MW set by Article 37 of RD 661/2007 (see paragraph 259 above).[261]

282. This triggered the mechanism provided for under the Tariff Window. On 27 September 2007, the Secretary General of Energy issued a resolution setting the deadline by which RE generators could still register for the FiT on 29 September 2008.[262]

283. On 19 October 2007, the PV installations of the Mahora Plant were registered by the Claimants in the RAIPRE.[263]

---

[258] AEE, Industry Yearbook, Analysis and Data, 2007 (R-135), p. 3. *See also* Counter-Memorial, para. 481; Rejoinder, para. 603.

[259] IDAE, Presentation: "The sun can be yours", November 2007 (C-167), p. 19. (emphasis in the original).

[260] Reply, paras. 93-94.

[261] Memorial, para. 21, *referring to* Secretary General of Energy, Resolution establishing the maintenance period of the regulated rate for PV technology, pursuant to Article 22 of RD 661/2007, 29 September 2007 (C-64).

[262] Secretary General of Energy, Resolution establishing the maintenance period of the regulated rate for PV technology, pursuant to Article 22 of RD 661/2007, 29 September 2007 (C-64). *See also* Memorial, para. 29; Reply, para. 253.

[263] Excerpts of the RAIPRE certificates of the Mahora photovoltaic installations (C-6). The PV installations of the Villar de Cañas and the Ronda Plants were registered on 5 and 10 September 2008, respectively. *See* Excerpts of

284. On 13 December 2007, the CNE published Report 38/2007 "on Royal Decree draft proposal on remuneration for electrical energy production at photovoltaic solar energy facilities dating from after the deadline for remuneration maintenance for this particular technology", which stated, *inter alia*, as follows:

> The Commission considers that it must prioritise the principle of regulatory stability and therefore the Commission considers it necessary that until 30 September 2008 every installation that complies with the requirements of RD 661/2007 will have the right to the remuneration contemplated therein.[264]

285. In January 2008, two more of the Claimants' Spanish Project Companies were set up in Spain.[265]

286. In February 2008, the IDAE released a further revised version of the presentation "*The Sun Can Be Yours*".[266] The presentation *inter alia* commented on the Resolution of 27 September 2007, stating that it

> ESTABLISHES A PERIOD OF 12 MONTHS, STARTING ON 29 SEPTEMBER 2007, FOR THE MAINTENANCE OF THE TARIFFS UNDER RD 661/2007. INSTALLATIONS THAT ACHIEVE DEFINITIVE REGISTRATION IN THE SPECIAL SCHEME REGISTRY (RIPRE) PRIOR TO 29 SEPTEMBER 2008 WILL HAVE THE RIGHT TO THOSE TARIFFS.[267]

287. In August 2008, the last one of the Spanish Project Companies was set up by the Claimants.[268]

---

the RAIPRE certificates of the Villar de Cañas installations (C-7); Excerpts of the RAIPRE certificates of the Ronda installations (C-8).

[264] CNE, Report 38/2007 on Royal Decree draft proposal for PV technology, 13 December 2007 (C-68), p. 7. *See also* Reply, paras. 69, 90.

[265] *See* Annex 1 to this Decision.

[266] Ministry of Industry, Commerce and Tourism and IDAE presentation, "The Sun Can be Yours – Responses to all Key Questions about Solar Photovoltaic Energy", February 2008 (C-69). *See also* Memorial, para. 127; Reply, paras. 94, 108, 151, 295; Counter-Memorial, para. 583; Rejoinder, para. 723; Claimants' Post-Hearing Brief, para. 50; Claimants'Reply Post-Hearing Brief, para. 33; Respondent's Post-Hearing Brief, para. 109; Respondent's Second Post-Hearing Brief, para. 17.

[267] Ministry of Industry, Commerce and Tourism and IDAE presentation, "The Sun Can be Yours – Responses to all Key Questions about Solar Photovoltaic Energy", February 2008 (C-69), p. 34 (emphasis in the original).

[268] *See* Annex 1 to this Decision.

288. On 29 July 2008, the CNE published report No. 30/2008 regarding the draft of what would become RD 1578/2008 ("**CNE Report 30/2008**").[269] The CNE observed:

> [A]fter being considered at the Electricity Consultative Council and a report being issued with a negative assessment, a new draft Royal Decree was sent ten months after the mechanism in question was activated, and when there were only two months to reach the deadline of finalizing the current tariff. This long absence of regulation introduces uncertainties in an industrial sector that has placed itself among the world leaders, not to mention the confusion it generates among potential investors, mostly natural persons.[270]

289. CNE Report 30/2008 also discussed the principles of legal certainty and protection of legitimate expectations:

> b) *Legal certainty and the protection of legitimate expectations*. Stability and predictability of economic incentives (tariffs and premiums) reduce regulatory uncertainty, which encourages investments in new capacity to address their projects, while minimizing the cost of financing and thereby reducing the final cost to the consumer. The current regulation has established annual updates of economic incentives, based on robust indexes (such as the IPC, ten-year bonds, etc.), and periodic reviews every four years, which in this case only affect the new facilities.
>
> Certainly, the principles of legal certainty and the protection of legitimate expectations (Article 9.3 EC) do not constitute insurmountable obstacles to the innovation of the legal system and cannot therefore be used as instruments to petrify the legal framework in force at any given time. In this sense, these principles do not prevent the dynamic innovation of the regulatory frameworks, nor of new normative provisions which can be applied pro-future to situations initiated before it comes into force. But these principles do require that regulatory innovation - especially if it is abrupt, unforeseeable or unexpected - is carried out with certain guarantees and cautions (transitional periods to adapt to the new regimes, where appropriate compensatory measures, etc.) that dampen, moderate and minimize, as far as possible, the disappointing of any expectations generated by the previous regulations.[271]

---

[269] CNE, Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, 29 July 2009 (R-233)/(C-70). *See also* Memorial, paras. 22, 130-151, 382; Reply, paras. 12-16, 76-91, 105-106, 132-135, 176, 191-192, 211; Rejoinder, para. 466; Claimants' Post-Hearing Brief, paras. 50, 110, 115, 138, 244.

[270] CNE, Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, 29 July 2009 (R-233)/(C-70), p. 8.

[271] CNE, Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, 29 July 2009 (R-233)/(C-70), p. 10.

The report further notes, with respect to RD 661/2007: "Special-regime production facilities are often capital-intensive and have long recovery times. The regulation of the generation facilities under the special regime established in RD 661/2007, has tried to minimize the regulatory risk of this group, providing security and

290. According to the CNE, the Spanish PV market had been "over-incentivized" by RD 661/2007, which resulted in the passing of additional cost to the consumer despite a situation where market demand for photovoltaic models should have led to (but failed to result in) a reduction in costs:

> We are faced with a photovoltaic solar technology market in a situation of sudden expansion (with an increase of 350% in 2007 compared to 2006, and an estimated 180% in 2008 compared to 2007) and where the supply has been internationalized and is capable of meeting this demand. […]
>
> This unexpected growth has consequences for the electricity consumer. The extra cost to the consumer for its economic support to the special regime is increasing, from 8.6% in 2007 to 8.9% in 2008. In this extra cost, the support to the photovoltaic technology represented 189 M EUR in 2007, and may amount of 524 M EUR in 2008 for a capacity of 1.800 MW, which assumes 335 M EUR of additional cost, which leads to the need to increase the electricity tariff in 2008 from 1.3% in order to satisfy the increase in the extra photovoltaic cost.
>
> […]
>
> [T]he expansion of the demand for photovoltaic modules should have led to a reduction in costs, derived from economies of scale and the learning curve of the technology, whereas this reduction in costs is not being transferred to the owners of the facilities.
>
> The explanation for this effect could be that in this sector, the promoters of the facilities are not usually the same as their owners, which is why the cost reductions obtained by the former are transferred to the latter at a much slower rate than the one in which the market is changing.
>
> […]
>
> In this specific situation, it is necessary to adapt the methodology for determining tariffs, bonuses and incentives, trying to stimulate the technological evolution and competitiveness of the facilities in the medium and long term, based on reduced initial tariffs and their evolutionary path, according to the real change in demand in the short term.[272]

---

predictability to economic incentives during the useful life of the facilities, by establishing transparent mechanisms to update them annually, and by exempting existing installations from the four-year review, since the new incentives that are being set out only affect the new installations." (ibid., p. 20).

[272] CNE, Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, 29 July 2009 (R-233)/(C-70), p. 13 (emphasis added).

b.    **RD 1578/2008: Relevant provisions**

291.  On 26 September 2008, the Government adopted Royal Decree 1578/2008 "covering the compensation for the generation of electric power by photovoltaic solar technology for facilities subsequent to the deadline for the maintenance of compensation under [RD 661/2007]" ("**RD 1578/2008**").[273]

292.  RD 1578/2008 did not change the incentives applicable to the PV installations registered under RD 661/2007, as it applied exclusively to new installations registered in the RAIPRE after 29 September 2008, i.e., after the Tariff Window.[274]

293.  RD 1578/2008 stated in its preamble as follows:

> The growth of installed capacity experienced by the photovoltaic solar technology has been much greater than expected.
>
> […]
>
> This rapid evolution has been due to numerous industrial investments related to photovoltaic solar technology, from the manufacture of polysilicon, wafers and modules to followers or inverters, so that all of the elements of the chain involved in a photovoltaic solar facility can currently be produced in Spain.
>
> […]
>
> It has become necessary to provide continuity and expectations to these investments, as well as to establish progressive guidelines for the implementation of this type of technology, which, in addition, can contribute to achieving the goals of the 2005-2010 Renewable Energy Plan and those set in the new 2011-2020 Renewable Energy Plan, based on the objectives assigned to Spain in the new Renewable Energy Directive. Therefore, it has been determined that it would be appropriate to raise the current goal of 371 MW of installed capacity connected to the network, set in [RD 661/2007].[275]

294.  Regarding the compensation under the Special Regime, the preamble of RD 1578/2008 further noted:

> In addition, the support framework for this technology, represented by [RD 661/2007], which regulates the generation of electric power under a special regime, which has demonstrated its effectiveness should also be

---

[273] Royal Decree 1578/2008, 26 September 2008 (C-3)/(R-50).

[274] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Article 2. *See also* Memorial, paras. 22, 140, 146, 150, 186; Reply, paras. 295, 402, 719; Claimants' Post-Hearing Brief, paras. 82, 132; Counter-Memorial, paras. 297, 298, 564; Rejoinder, paras. 314, 315, 584; Respondent's Post-Hearing Brief, para. 26.

[275] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Preamble.

adapted rapidly enough to keep pace with the evolution of technology, in order to ensure its effectiveness. Just as insufficient compensation would make the investments nonviable, excessive compensation could have significant repercussions on the costs of the electric power system and create disincentives for investing in research and development, thereby reducing the excellent medium-term and long-term perspectives for this technology. Therefore, it is felt that it is necessary to rationalize compensation and, therefore, the Royal Decree that is approved should modify the economic regime downward, following the expected evolution of the technology, with a long-term perspective.[276]

295. RD 1578/2008 provided for the following key developments for the Special Regime:

a) RD 1578/2008 created a new subsection in the RAIPRE, monitoring the installations that intended to qualify for the Special Regime (the "**Compensation pre-assignment registry**");[277] such pre-registered installations then were given one year for their final registration in the RAIPRE to be completed. RD 1578/2008 further provided that pre-assignment registration was to take place by time periods. The "first call" for registration in the Compensation pre-assignment registry was set for the time period of 2009.[278]

b) RD 1578/2008 introduced a cost adjustment mechanism by time period for pre-assignment registration. The adjustment, downwards or upwards, was to be based on the amounts of subsidies paid during a previous time period.[279] The *Memoria Justificativa* (explanatory report) for RD 1578/2008 referred to this mechanism as the "tariff reduction curve":

> [T]he tariff reduction curve will follow the cost reduction path for this technology. This mechanism, linked to the increase in capacity in the same percentage as the reduction in remuneration, will encourage manufacturers and installers to reduce their costs to increase their production, and will help consumers, who in the end are financing these technologies, to avoid incurring an unnecessary cost.[280]

---

[276] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Preamble.

[277] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Article 4.

[278] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Article 6.

[279] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Articles 11(1), 11(2), 12.

[280] *Memoria Justificativa*, RD 1578/2008 (C-164), p. 2. *See also* Reply, paras. 85-86, 622; Claimants' Post-Hearing Brief, paras. 115-117.

As a result, the FiT would vary depending on the call period during which a PV installation was registered in the Compensation pre-assignment registry.

c) RD 1578/2008 provided for a lower FiT than under the regime set forth in RD 661/2007. The FiT for the "first call" period of 2009 was set at 0.34 EUR/kWh, whereas the FiT under RD 661/2007 was 0.440361 EUR/kWh.[281]

d) Moreover, the FiT was provided for a maximum period of 25 years.[282]

e) RD 1578/2008 also contained the following statement concerning future modification of compensation:

> *Fifth additional provision. Modification of the compensation for generation by photovoltaic technology.*
>
> During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology may be modified.[283]

## c.    RD 1578/2008: Public comments and subsequent developments leading up to RDL 6/2009

296.  On 16 October 2008, the Secretary General of Energy, Mr. Pedro Luis Martín Uribe, made the following statement before the Senate:

> I met some foreign investors who told me that if the premiums were maintained the next year they would invest billions of euros in Spain, but it is very easy to invest when the electricity consumers are remunerating you. [...] We want to obtain investments that generate wealth, not just ones that absorb the consumers' resources. [..] we must be aware of the economic sustainability of the cost of the energy [...] and that it is important for the families and for the productive sector.[284]

297.  On 29 October 2008, the Vice President of the CNE, Mr. Fernando Marti Scharfhausen made a presentation titled "Legal and Regulatory Framework for the Renewable Energy

---

[281] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Article 11(1).

[282] RD 1578/2008, 26 September 2008 (C-3)/(R-50), Article 11(5).

[283] RD 1578/2008, 26 September 2008 (C-3)/(R-50).

[284] Appearance before the Senate by Mr. Pedro Luis Martín Uribe, Secretary General of Energy, 16 October 2008 (R-194). *See also* Counter-Memorial, paras. 486, 487; Rejoinder, paras. 317, 685.

Sector".[285] In that presentation, Mr. Marti Scharfhausen, *inter alia*, commented on the tariff regulation regimes set forth under RD 661/2007 and RD 1578/2008. With respect to RD 661/2007, Mr. Marti Scharfhausen stated, amongst others:

> CNE Methodology: 4 standards under Royal Decree-Law 661/2007
>
> a. <u>Reach planning targets</u> (29% demand in 2010):
>
> Economic incentives constitute an environment and energy policy tool
>
> (sufficient to guarantee reasonable return, but […] incentives that provide greater returns are justified)
>
> b. <u>Regulatory stability</u>: Predictability and certainty of economic incentives
>
> for the duration of the facility's life span (encourages investors and lower financial costs): <u>no retroactive effect</u>[.][286]

298. Mr. Marti Scharfhausen's presentation did not contain similar language regarding RD 1578/2008.[287]

299. In November 2008, Banco Santander released a presentation titled "The Importance of Feed In Tariffs to Attract Financial Resources".[288] Amongst the features of RD 1578/2008, the presentation mentioned an "[i]mportant reduction of the feed-in tariff".[289]

300. In the same month, the economic consultancy Pyöry released a report analyzing current and future trends in the Spanish solar industry. It stated:

> In fact, RD 661 has proved to be too generous with regards to the level of the feed in tariff and this has lead to un-sustainable levels of growth. As a result, the Government has recently issued a Royal Decree that is specific to the solar

---

[285] CNE, Presentation: "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008 (C-72).

[286] CNE, Presentation: "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008 (C-72), slide 25 [SP]/6 [EN] (emphases in the original).

[287] CNE, Presentation: "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008 (C-72), slides 30-31 [SP].

[288] Banco Santander, Presentation: "The Importance of Feed-in Tariffs to Attract Financial Resources", November 2008 (C-183). *See also* Reply, paras. 202-203.

[289] Banco Santander, Presentation: "The Importance of Feed-in Tariffs to Attract Financial Resources", November 2008 (C-183), slide 10.

PV industry (Royal Decree 1578/2008) in an attempt to slow the growth of the market.

[…]

Solar PV projects that were not fully permitted and operational before the 28th of September 2008 (RD 661), are forced on to the recently published RD 1578. In essence the tariffs under RD 1578 have been reduced by about 25% compared to RD 661. RD 1578 also tries to control the growth levels by capping the number of projects that can achieve the feed in tariff on a yearly basis.[290]

301. On 9 and 13 February 2009, CNE officials Messrs. Carlos Solé and Luis Jesús Sánchez de Tembleque made presentations in Barcelona, Spain and Cartagena, Colombia. With respect to the legal regime under RD 661/2007, these presentations provided the following information regarding the basic criteria of the CNE's methodology:

– <u>Reach the planning objectives</u>: Economic incentives constitute an instrument of energy and environmental politics (sufficient for <u>reasonable profitability</u>, but […] incentives that obtain profitability greater than is reasonable are justified):

– <u>Regulatory stability</u>. Predictability and security in economic incentives throughout the lifetime of the installation (to [encourage] investors and have a lower financial cost): <u>no retroactivity</u>

– <u>Facilitate the operation of the system</u>. Complementary regulation for improving the quality of the energy produced (better security in the system).[291]

302. The presentations also discussed RD 1578/2008, but did not make similar comments regarding profitability or non-retroactivity.[292]

303. On 1 March 2009, another commentator made the following observations regarding the modifications introduced by RD 1578/2008:

---

[290] Pöyry, Report: "Current and future trends in the Spanish solar industry", November 2008 (R-234), pp. 2, 3. *See also* ibid., p. 29: "As we will see in this report, the Spanish Government has under estimated the growth potential for Solar PV and CSP, and this has lead to a boom in the industry that is without precedent anywhere in the world. The Government, only too aware of the impact that higher feed in tariffs have on the system costs (leading to higher tariff deficit) has put in place desperate measures to try to cool the industry down while not inflicting lasting damage. As we will see in section 3.6.2 the Government has once again acted in a lethargic and inefficient manner." *See also* Rejoinder, para. 527.

[291] CNE, Presentation: "Renewable Energy Regulation", February 2009 (C-75), slide 23 (emphases in the original). *See also* CNE, Presentation: "Renewable energies – The case of Spain", February 2009 (C-76), slide 69. *See also* Memorial, paras. 135, 334; Reply, paras. 228, 236, 295.

[292] *See* CNE, Presentation: "Renewable Energy Regulation", February 2009 (C-75), slides 45-46.

In short, although the current regulation on remuneration for photovoltaic technology has receive[d] numerous criticisms due to the notable reduction it represents regarding the price of the electricity generated, we must conclude by saying that the change has been positive. This is because it already introduces us into a system with a tighter remuneration, that will prevent the uncontrolled growth of photovoltaic facilities all over Spain. On the other hand, the fact that facilities built on farming-type structures have been included is seen as positive, which was left out of the regulation for RD 661/2007. Finally, it also prevents the possibility of committing fraud at the photovoltaic facilities, as was the case when, de facto, a 1 Mw. facility was considered as divided into small facilities with power less than 20 Kw.

On the less positive side, it should be indicated that legal insecurity has not been done away with completely, above all due to the fact that revision of the tariffs remains an authority of the Ministry of Industry through the General Secretariat of Energy. Furthermore, as I finish writing this brief article, protests have arisen from photovoltaic employers' associations (the ASIF) as regards how the Remuneration Pre-assignment Register works, as before the second public notice was launched since RD 1578/2008 entered into effect, the final results are still not known for the first because of delays in processing the requests.[293]

304.  On 22 October 2009, the CNE issued a report in response to a query made by an individual in relation to the Fifth additional provision (the "**2009 CNE Report**"). Indeed, a request had been made "for clarification on the Fifth additional provision of RD 1578/2008 in relation to the update of the financial payment for photovoltaic facilities starting in 2012."[294]

305.  In response, the CNE stated:

Given that Section 5 of Article 11 [of RD 1578/2008] provides for a maximum duration of 25 years for the financial payment allocated to a facility registered under the scope of application of RD 1578/2008, the judgement of this Commission is that the modification of the remuneration scheme to which the 5th Additional Provision refers should be applicable to new facilities that are registered starting in 2012. However, it should be noted that the Government has the competency to determine the application of the fifth additional provision of Royal Decree 1578/2008.

This regulation is consistent with the regulation established in Article 44.3 of Royal Decree 661/2007, where it provides for a revision of the remuneration

---

[293] Pedro Gómez Ibarguren, "The new photovoltaic solar power remuneration following Royal Decree 1578/2008 of 26 September", Noticias Jurídicas, 1 March 2009 (R-86). *See also* Counter-Memorial, para. 1070; Rejoinder, paras. 587, 663.

[294] CNE, Response to a query from an individual regarding the Fifth additional provision of RD 1578/2008, 22 October 2009 (C-85), pp. 1-2. *See also* Memorial, paras. 154, 333; Reply, paras. 87, 88, 295, 308, 402.

scheme in 2010, which would be applicable to those facilities commissioned starting on 1 January 2012.[295]

306. On 23 April 2009, Directive 2009/28/EC on the promotion of the use of energy from renewable sources was adopted. It superseded Directive 2001/77/EC and set new targets for the EU Member States. Spain was required to obtain from RE 20% of its total energy consumption by 2020.[296]

307. A report of 28 April 2009, prepared by Dikeos Abogados with respect to the Ronda PV farm, contained the following conclusion: "[t]here are no reasons to doubt the definitive character of the allocation of [the FiT] throughout the whole lifespan of the Project."[297]

d. **RD 1578/2008: The Parties' positions**

308. The Parties disagree on the interpretation to be given to these modifications introduced by RD 1578/2008.

309. According to the Claimants similarly to RD 661/2007, RD 1578/2008 provided for the stability of a fixed FiT over 25 years (at least implicitly).[298] The Claimants rely on the statement in the 2009 CNE Report, which had stated in respect of the Fifth additional provision of RD 1578/2008 (providing that the compensation mechanism would be subject to revisions from 2012 onwards) that it was "consistent with the regulation established in Article 44.3 of [RD 661/2007]."[299] According to the Claimants, the Fifth additional provision "aimed to provide certainty to investors […] that there might be a new payment system for PV in 2012 that would affect newly built plants registered after

---

[295] CNE, Response to a query from an individual regarding the Fifth additional provision of RD 1578/2008, 22 October 2009 (C-85), pp. 1-2 (emphasis added).

[296] Directive 2009/28/EC on the promotion of the use of renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, 23 April 2009 (C-80), Annex I. *See also* Memorial, para. 159.

[297] Dikeos Abogados, Report on the degree of approval of the Ronda (Málaga) Project, of 1,440 kilovolts of nominal power, promoted by Inversiones Solares Sunergy, S.L., 28 April 2009 (C-81), p. 23. *See also* Memorial, para. 172. Reply, para. 113; Claimants' Post-Hearing Brief, para. 37; Claimants' Reply Post-Hearing Brief, para. 31; Respondent's Post-Hearing Brief, para. 103; Respondent's Second Post-Hearing Brief, para. 15.

[298] *See, e.g.*, Memorial, paras. 140-158; Reply, paras. 10, 84-92; Hearing Tr., Day 1, 18 March 2019, 77:5-79:6 (Vazquez-Guillén).

[299] CNE, Response to a query from an individual regarding the Fifth additional provision of RD 1578/2008, 22 October 2009 (C-85), pp. 1-2.

that date."[300] The Claimants thus conclude that the Fifth additional provision of RD 1578/2008 "had the same effect" as Article 44(3) of RD 661/2007.[301]

310. The Claimants further rely on a passage from the *Memoria Justificativa* of RD 1578/2008, which provided that:

> During 2012, the percentage of reduction will be reviewed and, if necessary, modified upwards, if, in view of the technological evolution of the sector, it is found that the costs of this technology have fallen below the maximum expected rate of decrease, in which case the installed capacity target for the following call will be increased by the same percentage as the regulated tariff will be reduced.[302]

311. In the Claimants' view, this type of revision could only be forward-looking.[303]

312. As regards the fact that the new FiT was lower than under RD 661/2007, the Claimants note that "that made sense since by the time RD 1578/2008 was passed, new installations could benefit from the reduction in the price of PV panels."[304]

313. The Claimants also rely on a publication from industry analysts published in 2010 that discusses feed-in tariffs worldwide, and which stated that "tariff degression stimulated investors to speed up the planning process: the sooner you get connected to the grid, the higher will be the payment for the power plant."[305]

314. Finally, according to the Claimants:

> As the RD 1578/2008 [FiTs] were automatically modified for each new wave of installed capacity, <u>the regulation had no need for an express stability provision</u>. Under RD 1578/2008, although [FiTs] were constantly being reviewed for new installations, it was clear that once an installation was listed in the Pre-assignment Register it locked-in the right to a specific [FiT] for 25

---

[300] Memorial, para. 155.

[301] Memorial, para. 333.

[302] Claimants' Post-Hearing Brief, para. 117, *referring to Memoria Justificativa*, RD 1578/2008 (C-164).

[303] Claimants' Post-Hearing Brief, para. 118.

[304] Memorial, para. 147.

[305] M. Mendonça, D. Jacobs, B. Sovacool, "Powering the Green Economy – The Feed-In Tariff Handbook" (Earthscan, 2010) (commenting on German PV regulation), p. 82, *quoted at* Memorial, paras. 22, 45, 119, 145-148; Reply, paras. 72, 180.

years. This was how the tariff degression mechanism established by the regime worked.[306]

315. According to the Respondent, RD 1578/2008 contained no stability commitment. Disagreeing with the Claimants' interpretation of the Fifth additional provision of RD 1578/2008, the Respondent argues that this provision "announced that an amendment of the subsidies for photovoltaic facilities was possible in 2012, depending on their impact on the economic stability of the SES."[307] According to the Respondent, the wording of the Fifth additional provision is "clear" and has to be interpreted and applied without recourse to any additional means of interpretation.[308]

316. The Respondent further refers to the preamble of RD 1578/2008 to the effect that this regulation was guided by the principle of economic sustainability.[309]

## 8.    RDL 6/2009

### a.    RDL 6/2009: Relevant provisions

317. On 30 April 2009, Spain enacted Royal Decree-Law 6/2009 which "adopted certain measures within the energy industry and approved the discount rate" ("**RDL 6/2009**").[310]

318. The preamble of RDL 6/2009 stated in its first paragraph:

> Law 54/1997 […] introduced the liberalisation of activities involving the generation and sale of electricity. However, the commercial activity has in fact been greatly conditioned by the tariff system. In this way, the difference between the regulated tariffs and the energy prices has threatened the primary objective that was sought in using market prices to achieve greater efficiency and has caused prejudicial effects which are increasing as time goes by, undermining the very base of the liberalisation of the electricity systems and, in parallel, leading to an erroneous belief with respect to the price of a scarce resource such as energy, which does not contribute to encouraging savings and energy efficiency.[311]

---

[306] Memorial, para. 152 (emphasis added).

[307] Rejoinder, para. 315.

[308] Hearing Tr., Day 1, 18 March 2019, 253:25-254:8 (Fröhlingsdorf Nicolás).

[309] Rejoinder, para. 314. The Respondent also relies on the public statement made by the Secretary General of Energy, Mr. Uribe for support of this argument. *See* Appearance before the Senate by Mr Pedro Luis Martín Uribe, Secretary General of Energy, 16 October 2008 (R-194). *See also* para. 296 above.

[310] RDL 6/2009, 30 April 2009 (C-82)/(R-37). *See also* Memorial, para. 162; Counter-Memorial, para. 556; Rejoinder, paras. 289, 686.

[311] RDL 6/2009, 30 April 2009 (C-82)/(R-37), preamble, para. 1.

319. The main purpose of RDL 6/2009 was to tackle the **Tariff Deficit**[312] that existed in the electricity sector since the early 2000s and had significantly increased after 2008, as shown on the below chart:[313]



320. In this regard, the preamble of RDL 6/2009 noted:

> The growing tariff deficit, that is to say, the difference between revenue from the regulated tariffs that are set by the Administration and that consumers pay for their regulated supply and from the access tariffs that are set in the liberalised market and the real costs associated with these tariffs, is causing serious problems which, in the current context of international financial crisis, is having a profound effect on the system and placing at risk not only the financial situation of the companies that make up the Electricity Industry, but also the very sustainability of the system. This imbalance is unsustainable and has serious consequences, as it undermines the security and the capacity to fund the investments needed for the supply of electricity at the levels of quality and security that Spanish society requires.[314]

321. As a consequence, the preamble of RDL 6/2009 called for the need to adopt urgent measures:

> [D]ue to the growing impact on the tariff deficit, mechanisms are established with respect to the remunerative system of special regime facilities. The trend that these technologies are following could place system sustainability at risk in the short term, both from the economic point of view due to its impact on the electricity tariff and from the technical point of view, also compromising the economic viability of already completed facilities whose operation depends on the suitable balance between manageable and non-manageable generation. Therefore there is a need to adopt an urgent measure that serves to

---

[312] The situation when the costs of the SES exceed the income from selling electricity to consumers at the established tariffs. *See* RDL 6/2009, 30 April 2009 (C-82)/(R-37), preamble.

[313] KPMG Asesores, S.L., Regulatory Expert Witness Report, 30 June 2017 ("First KPMG Report"), para. 237, figure 12. *See also* First Econ One Report, figure 28.

[314] RDL 6/2009, 30 April 2009 (C-82)/(R-37).

guarantee the necessary legal security of those who have made investments, and lays down the bases for establishing new economic regimes that encourage compliance with the intended objectives: the achievement of certain power objectives from technology at a reasonable cost for the consumer and the technological evolution thereof, which makes possible a gradual reduction in their cost and consequently their concurrence with conventional technologies.[315]

322. With respect to the impact of the Special Regime, the preamble of RDL 6/2009 noted:

> The current regulation of the special regime does not establish sufficient mechanisms to make it possible to plan facilities that use this type of energy, nor indeed the amount and the distribution over time of the remuneration premiums and therefore the impact on costs that are attributed to the tariff system. The measure envisaged in the Royal Decree-Law, by creating the Remuneration Pre-assignment Registry, makes it possible to correct the situation described above from the very moment of its coming into effect. It will make it possible to know within the deadlines envisaged in the Royal Decree-Law, the facilities that are not only currently projected but which meet the conditions for start-up and for accessing the electricity system with all legal and statutory requirements, the volume of power associated with them and the impact on the costs of the electricity tariff and its calendar. In any event, the rights and expectations of the owners of the facilities are respected, with the necessary caution being exercised and the necessary transitional regime for adaptation being envisaged.[316]

323. The key provision of RDL 6/2009 consisted in modifying the Twenty first additional provision to Law 54/1997, which governed the average benchmark tariff.[317] As revised, it provided for an obligation to verify the sufficiency of access fees and revenue imbalances. Specifically, it provided that "[a]s of 1 January 2013, access fees shall be sufficient to satisfy the entire costs of the regulated activities without the possibility of any ex ante deficit appearing."[318]

324. RDL 6/2009 also provided for a maximum limit of the Tariff Deficit.[319] It also adopted a so-called social tariff for certain consumer classes.

---

[315] RDL 6/2009, 30 April 2009 (C-82)/(R-37).

[316] RDL 6/2009, 30 April 2009 (C-82)/(R-37).

[317] RDL 6/2009, 30 April 2009 (C-82)/(R-37), Article 1.

[318] RDL 6/2009, 30 April 2009 (C-82)/(R-37), Article 1 (revised paragraph 1 to the Twenty first additional provision to Law 54/1997).

[319] RDL 6/2009, 30 April 2009 (C-82)/(R-37), Article 1 (revised paragraph 3 to the Twenty first additional provision to Law 54/1997): "[n]otwithstanding, for 2009, 2010, 2011 and 2012, the revenue deficit in the settlements of the regulated activities of the Electricity Industry shall be no greater than 3.5 billion euros, 3 billion euros, 2 billion euros and 1 billion euros respectively."

325. In addition, RDL 6/2009 put in place a so-called remuneration pre-assignment registry (the "**Remuneration Pre-assignment Registry**"), similarly to the Compensation pre-assignment registry created by RD 1578/2008, subject to more stringent administrative requirements.[320]

326. On 13 November 2009, the Council of Ministers adopted an agreement 'which proceeds the organisation of projects or installations presented to the administrative register for attribution of payment for the production of electrical power installations, provided for in [RDL 6//2009]'. This agreement was published on 19 November 2009 by the Secretary of State of Energy.[321] It supplemented the regulation of the new Remuneration Pre-assignment Registry in that it granted the Government the power to provide restrictions to the number of registrations on an annual basis. [322]

327. RDL 6/2009 was subject to public criticism. For example, in May 2009, APPA published an editorial stating:

> The RDL 6/2009 may paralyse the renewable energy sector
>
> The renewable energy associations condemn some of the requirements that Article 4 of RDL 6/2009 demands as being practically impossible to achieve, preventing many projects from being carried out and which will subsequently lead to an industrial standstill and job loss. A clear and disastrous example can be seen in Royal Decree 1578, which regulates activity relating to solar photovoltaic technology and has caused the sector to grind to a halt, leading to factory closures and investment relocation.
>
> The new RDL may have the same impact on other renewable technologies and even affect wind energy, the most developed.
>
> […]
>
> APPA, ADAP, APREAN, EolicCat, Gi Watt and the Energy Cluster of Extremadura recognise that the growth of the Special Regime, and more specifically that of renewable energy with its aim of accounting for 20% of total energy by 2020, requires broad discussion and imagination to equip it with adequate regulation, and on that basis they object to it being handled with the urgency of a RDL.

---

[320] Article 4, RDL 6/2009, 30 April 2009 (C-82)/(R-37).

[321] Secretary of State of Energy, Resolution, 19 November 2009 (R-65). *See also* Counter-Memorial, para. 559.

[322] Secretary of State of Energy, Resolution, 19 November 2009 (R-65), para. I.

<u>Renewables need legal stability and certainty</u>

The frequent change in criteria made by the Ministry of Industry regarding the rules regulating renewable energy development, without consulting agents in the sector or the regulatory body, continues to characterise this form of electricity production by its legal weakness and uncertainty amid any investment project, determining its development and specific influence in the production mix of the Spanish energy and electricity system.[323]

b.    **RDL 6/2009: The Parties' positions**

328.    The Parties' positions differ regarding the significance of RDL 6/2009.

329.    The Claimants contend that RDL 6/2009 sought to address the Tariff Deficit, which, according to the Claimants, had been created by the Government's "repeated failures to set the regulated retail price of electricity at a level sufficient to recover the costs of all regulated activities, including (but not limited to) the costs of the Special Regime."[324] The Claimants further emphasize that the Government did not tackle the Tariff Deficit by cutting the FiTs, "because Spain understood, as did numerous investors that invested under such regimes, that the [FiTs] could not be reviewed for existing installations."[325]

330.    The Respondent argues that RDL 6/2009 was adopted as an extraordinarily urgent measure, "necessary to try to rebalance the sustainability of the SES."[326] According to the Respondent, the modifications adopted under RDL 6/2009 had to affect the Claimants' "expectations […] concerning the evolution of the SES."[327] The Respondent points to the vocal criticism from the industry associations in support of this argument.[328]

---

[323] APPA Info Journal, "Europe, a new directive. Spain, a new decree that does not have the support of the majority", May 2009 (R-141), p. 4 (emphasis in the original). *See also* Counter-Memorial, paras. 561-564.

[324] Memorial, para. 161.

[325] Memorial, para. 163.

[326] Counter-Memorial, para. 555.

[327] Counter-Memorial, para. 560.

[328] Counter-Memorial, paras. 560-564.

**9.    Subsequent factual developments prior to the adoption of the Disputed Measures**

a.    **The APPA/Greenpeace Draft Law Proposal**

331.  On 21 May 2009, APPA and Greenpeace submitted a proposal for a draft bill for a Renewable Energies Development Law to the Ministry of Industry, Trade and Commerce (the "**APPA/Greenpeace Draft Law Proposal**").[329]

332.  The APPA/Greenpeace Draft Law Proposal provided, *inter alia*, for the determination of a regulated tariff based on the concept of a "reasonable return":

> Article 23. Determination of regulated tariffs, premiums and supplements
>
> 4. The Government shall set the rate of regulated tariffs, premiums and supplements, in all cases considering the costs of operation and maintenance and the investment costs that the owners of the facility may incur, with an end to ensuring reasonable rates of return with reference to the cost of money on the capital market. The capital return rate shall be set at an annual percentage rate equivalent to the previous year's average yield on 10-year Spanish government bonds, plus a spread of 300 basis points.[330]

333.  The APPA/Greenpeace Draft Law Proposal also contained the following provisions regarding the entitlement to the proposed support scheme:

> Article 27. Entitlement to the adopted support scheme
>
> 1. The facilities and uses of renewable energy to which the present law applies shall be entitled to benefit from the support schemes in force at the time of initiating the prior authorisation procedures or upon commencing operation, as applicable, and during the term of application for which each support scheme was designed, which shall depend on the estimated useful life of each technology and shall in no case be less than twenty years.
>
> […]
>
> 5. Changes to compensation amounts from support schemes resulting from any of the reviews contemplated in this article shall apply to the facilities and uses which initiate prior authorisation procedures or commence operation, as applicable, after the date on which the corresponding modification to the support scheme enters into force, as indicated in the previous section. In any

---

[329] APPA/Greenpeace, Bill for the Promotion of Renewable Energies, 21 May 2009 (R-191) *referred to in* Counter-Memorial, paras. 330, 571-574, 806, 834, 1096, 1139; Rejoinder, paras. 267, 868; Respondent's Post-Hearing Brief, para. 31; Reply, paras. 146-148, 159. *See also* Press Release, APPA/Greenpeace, Bill for the Promotion of Renewable Energies, 20 May 2009 (R-172) *referred to in* Counter-Memorial, paras. 569, 572, 1140; Reply, paras. 144-148, 159.

[330] APPA/Greenpeace, Bill for the Promotion of Renewable Energies, 21 May 2009 (R-191), p. 12 [EN].

case, it is not permitted for modifications made to support schemes to be extended to facilities or uses that were enjoying the benefits of previous support schemes, which shall be retained unless an express replacement request is submitted by the respective beneficiary.[331]

334. The Parties disagree with respect to the significance of the APPA/Greenpeace Draft Law Proposal.

335. According to the Respondent (who first referred to this Proposal), the substance of the APPA/Greenpeace Draft Law Proposal, which was widely reported on in the Spanish press, reflects the substance of the New Regime (as defined below).[332] Amongst others, the APPA/Greenpeace Draft Law Proposal suggested that the estimation of investment costs be carried out by reference to "standard installations."[333] In addition, the APPA/Greenpeace Draft Law Proposal reflected the awareness of RE market participants that the governing principles for the remunerative regime of the SES "were contained in the Law (not the implementing regulations)."[334] Further, the APPA/Greenpeace Draft Law Proposal showed that "any investor in Spain was aware of or should have been aware of the *dynamic* nature of the fair return guaranteed under article 30.4 of Law 54/1997 and the need for *sustainability* of the SES."[335]

336. The Claimants advance essentially four objections to the Respondent's arguments. First, according to the Claimants, Spain's argument "entirely disregards the dates on which the Claimants' investments were made" because the APPA/Greenpeace Draft Law Proposal did not exist at the time when the Claimants invested in the Mahora, Villar de Cañas and Ronda PV Plants.[336] Regarding the Claimants' remaining two PV Plants (Matapozuelos and Fuentes de Año), the Claimants argue that the APPA/Greenpeace Draft Law Proposal had no bearing on their expectations when investing in these two PV Plants.[337] Second, the Claimants rely on Article 27(5) of the APPA/Greenpeace Draft Law Proposal (quoted above at paragraph 333) to argue that the APPA/Greenpeace Draft Law Proposal "would

---

[331] APPA/Greenpeace, Bill for the Promotion of Renewable Energies, 21 May 2009 (R-191), pp. 13-14 [EN].
[332] Counter-Memorial, paras. 568-575.
[333] Counter-Memorial, para. 574.
[334] Counter-Memorial, para. 576.
[335] Counter-Memorial, para. 578 (emphasis in the original).
[336] Reply, para. 145.
[337] Reply, para. 146.

only apply prospectively", not retroactively,[338] and that the APPA/Greenpeace Draft Law Proposal "reiterate[d] the necessity for RE support schemes to be underpinned by stability and predictability."[339] Third, the Claimants argue that Spain exaggerated on the relevance of the nomenclature used ("law" as opposed to "Royal Decree"). According to the Claimants, the use by APPA and Greenpeace of the term draft Law merely served to "indicate that, if enacted, the law would have a higher constitutional rank than other forms of legislation or regulations."[340] Fourth, the Claimants contend that the views of RE associations had no bearing on the Claimants' expectations, which under the Claimants' case were based solely on what Spain was alleged to be saying "about the stability of RD 661/2007."[341] The Claimants rely on the findings of the *Novenergia II v. Spain* tribunal which found that "none of the documents originate from the Respondent or any Spanish state entity, but from private associations."[342]

337. On 17 September 2009, Cross Retail signed an EPC contract with Enerpal S.A. for the turnkey development of the Matapozuelos Plant.[343] A couple of months later, Cross Retail signed another EPC contract with Enerpal S.A. for the turnkey development of the Fuentes de Año Plant[344], which was amended on 10 March 2010 due to the delay of the plant's construction.[345]

### b.    December 2009 Supreme Court Judgments

338. On 3 December 2009, the Spanish Supreme Court rendered a judgment regarding a challenge brought against RD 661/2007 by operators of PV installations.[346] The claimants in that case had lodged an administrative appeal against the exclusion of PV facilities (as opposed to wind farm installations) from the transitional regime established under

---

[338] Reply, para. 146.

[339] Reply, para. 147.

[340] Reply, para. 148.

[341] Reply, para. 149.

[342] Reply, para. 150, *citing Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144), para. 676.

[343] Matapozuelos O&M Contract But-For, 17 September 2009 (CLEX-175).

[344] Fuentes de Año EPC contract, 25 November 2009 (C-151.1). *See also* Memorial, Appendix 4.

[345] Fuentes de Año EPC contract, 25 November 2009 (C-151.1).

[346] Third Chamber of the Supreme Court Judgment, App. 151/2007, Judgment, 3 December 2009 (R-97) *referred to in* Counter-Memorial, para. 743.

RD 661/2007, which allowed wind farm operators (but not the operators of PV installations) to opt for the remuneration system available under the previous legal regime set forth by RD 436/2004,[347] an option which was very frequently exercised in practice. According to the plaintiffs in that case, paragraph 4 of the first transitional provision of RD 661/2007[348] violated the principles of legal security and legitimate expectations because it disregarded the guarantee of non-retroactivity allegedly set forth in Article 40(3) of RD 436/2004.[349]

339. The Supreme Court rejected the appeal, noting that:

> The request for annulment of the first transitional Provision (4), in Royal Decree 661/2007 [...] must be repealed, since the setting in stone or freezing of the remuneration system cannot be gathered from the prescriptive content of Law 54/1997, of 27 November, on the Electric Sector for titleholders of electric power facilities under the special scheme; or a recognition of the right of producers under the special scheme to the scheme unchangeability of the said scheme. The reason for it is that the Government, in compliance with the legislator's plan, has a degree of discretion to determine the energy yields offered, on the basis of the clear objectives inherent to the implementation of economic, energy and environmental policies, and taking into account - on exercising its regulatory power - the obvious, essential general interests involved in the proper functioning of the electricity production and distribution system, and specifically, users' rights.[350]

340. The Supreme Court further held that:

> The argument that the transitional Provision under appeal represents a weakening of the principle of legal certainty enshrined in Article 9.3 of the Constitution must be rejected - because it produces, as it is claimed, a situation of uncertainty in the legal system regarding the regulation of the activity of electrical energy producers under the special scheme. Hence it cannot be followed that the said regulation does not meet the requirements of the principle of legal certainty, which does not include any right whatsoever to freeze the existing law.[351]

---

[347] Third Chamber of the Supreme Court Judgment, App. 151/2007, Judgment, 3 December 2009 (R-97), p. 6 [SP].

[348] This provision provides: "[f]acilities of Group b.1 of RD 436/2004, of 12 March [i.e., PV installations] shall not be subject to this Transitory Provision, and shall be deemed to have been automatically included under this Royal Decree, maintaining their registry entry, category, and power to the effects of determining the economic regime of the compensation for which they were authorised in the corresponding Public Authority Register." *See* RD 661/2007, 25 May 2007 (C-54)/(R-49).

[349] Third Chamber of the Supreme Court Judgment, App. 151/2007, Judgment, 3 December 2009 (R-97), p. 6 [SP].

[350] Third Chamber of the Supreme Court Judgment, App. 151/2007, Judgment, 3 December 2009 (R-97), p. 6 [SP], p. 1 [EN] and p. 6 [SP].

[351] Third Chamber of the Supreme Court Judgment, App. 151/2007, Judgment, 3 December 2009 (R-97), p. 6 [SP], p. 1 [EN] and p. 6 [SP].

341. On 9 December 2009, the Supreme Court issued another judgment in relation to an administrative appeal lodged to request the repeal of certain provisions of RD 661/2007, which granted the government discretion whether to grant a premium to gas cogeneration facilities with an installed capacity about 50 MW (i.e., Articles 28 and 45(4) and 45(5) of RD 661/2007), on the grounds that these provisions contravened EU law and principles of legal certainty and non-retroactivity under Spanish law. The Supreme Court rejected the appeal, *inter alia*, on the grounds that the gas cogeneration facilities of the claimants in that case were not included in the scope of the Special Regime.

342. The Supreme Court also added the following dictum:

> Furthermore, both in the claim and in the findings document (the latter undoubtedly contains a somewhat more detailed reference), [the claimant] does not pay enough attention to the case law of this Chamber specifically referred to with regard to the principles of legitimate expectation and non-retroactivity applied to the successive incentives' regimes for electricity generation. This involves the considerations set out in our decision dated October 25, 2006 and repeated in that issued on March 20, 2007, inter alia, about the legal situation of the owners of electrical energy production installations under a special regime to whom it is not possible to acknowledge for the future an 'unmodifiable right' to the maintenance unchanged of the remuneration framework approved by the holder of the regulatory authority provided that the stipulations of the Law on the Electricity Sector are respected in terms of the reasonable return on investments.[352]

343. On 19 February 2010, commentators published an analysis of the Supreme Court's above-mentioned case law relating to the remuneration of RE producers:

> [T]his retroactivity in premiums was already given and explained by the Supreme Court [...]. As we have been saying, it is nothing new, and we will now look at why: Recently the [...] Judgment dated 3 December 2009, [...] [based on] a judgment from 15 December 2005, literally states that: 'the appellant commercial entities have no right to the remuneration regime of the electricity sector remaining unchanged, [...] the existing situation, which can be modified at the discretion of the institutions and public authorities to impose new regulations taking into account the needs of the general interest. [The appeal was rejected as] the return of the generation activity from this technology was higher than that considered sufficient and reasonable remuneration'.[353]

---

[352] Third Chamber of the Supreme Court Judgment, App. 152/2007, Judgment, 9 December 2009 (C-90). *See also* Memorial, para. 80.

[353] Suelo Solar, "There is a clear history of retroactivity regarding photovoltaic premiums", 19 February 2010, (R-254). *See also* Rejoinder, para. 477.

344.   In February 2010, the CNE made another presentation on RE regulation in Spain, which contained, *inter alia*, the following observation regarding the methodology underlying the RE incentives:

> [s]ecurity and predictability of the economic supports -> To eliminate the regulatory risk (warranty by law). Non-retroactive-> Less uncertainties to investors (and Banks) and less cost to the consumers.
>
> -[e]conomic incentives are assured during the life of the installation (existing capacity)
>
> -[e]very 4 years or when planning is fulfilled, economic incentives are updated (only for new capacity).[354]

345.   In April 2010, APPA presented its comments on the Supreme Court's case-law (the "**April 2010 APPA Report**"):

> 5.) The matters of fact examined by the Supreme Court
>
> [I]t should be reiterated that the rulings examined do not deal specifically and directly with the subject that concerns us, viz. the legality of possible retroactive regulations that would modify downwards the regulated tariff or the premiums that are received by renewables installations already in operation. It should be noted that the rulings of 9 December refer to power stations outside of the special regime and that these are not renewables, that the ruling of 3 December 2009, although it does refer to renewables, the question of fact examined does not refer to a retroactive reduction of tariff or premiums, but to the option mechanism in the first transitory provision of [RD 661/2007], and neither does the ruling of 30 November 2009 refer to the retroactive reduction of premiums and neither does those originated by the contentious action taken by BECOSA refer to renewables. I highlight the above because it gives a small hope that the above rulings have not mentioned in their reasoning the second paragraph of article 44.3 of [RD 661/2007] […].[355]

346.   However, APPA also made the following observations regarding the temporal application and impact of potential regulatory reforms:

> 6.) The validation of retroactivity by the rulings examined
>
> e) The ruling of 9 December 2009 (Nueva Generadaora del Sur, S.A.) […]
>
> [T]he Supreme Court's jurisprudence is conclusive: It openly and resoundingly justified the retroactive nature of the law that regulate or could

---

[354] Memorial, para. 134, *referring to* CNE, Presentation: "Renewable Energy Regulation in Spain", February 2010 (C-92), p. 29.

[355] Suelo Solar, "APPA report. Retroactivity summary", 29 April 2010 (R-252). *See also* Rejoinder, paras. 472-477, 616.

regulate the economic regime of the special regime, whilst respecting the principles established in the law, leading in the end to the famous rates of 'reaonsable return with reference to the cost of money on the capital markets'. In this way, neither the principle whereby laws are not retroactive, nor the maintenance of legitimate confidence in the administration for citizens prevent the modification of the remuneration regime for renewable energies in a retroactive manner, i.e., applicable to the installations already functioning at the time the aforementioned modification came into effect.

[…]

In any case one has to state clearly the advisability of fleeing from any optimism when it comes to an appeal in the courts of law. Despite what we are saying, an eventual practical demonstration that a certain modification to the premiums would put the IRR for an installation below that 7 per cent and would thereby cease to guarantee these 'reasonable rates of return', might perfectly be 'ratified' by a court simply by maintaining that the 'reasonableness' of the rates of return in 2006 or 2007 could be at the aforementioned 7 per cent, but they do not have to coincide with this figure when making this modification, with which another route of attack to the adjustment to law of retroactive modifications to tariffs and premiums would be frustrated once again."[356]

347. Moreover, APPA noted with respect to the modifications of Article 44(3) of RD 661/2007:

> 7) The incidence of article 44.3 of the [RD 661/2007]
>
> As is known, this precept establishes that successive reviews of the tariffs shall only apply to installations entering service subsequent to 1 January for the second year following the modification.
>
> It should be noted, however: One, that what has been said is valid for the successive reviews carried out within the period of validity of the Royal Decree, but does not need to be maintained in a possible new Royal Decree to replace and derogate [RD 661/2007]. Two, that with the omission of the word 'premiums' in the second paragraph of the rule, one has to see that its jurisprudential interpretation does not justify the retroactive application to these premiums, even though not to the 'regulated tariff' and the 'upper and lower limits'.[357]

---

[356] Suelo Solar, "APPA report. Retroactivity summary", 29 April 2010 (R-252), pp. 3, 7 and 8.

[357] Suelo Solar, "APPA report. Retroactivity summary", 29 April 2010 (R-252), pp. 3, 7 and 8.

Case 1:19-cv-01618-TSC   Document 69-30   Filed 06/09/22   Page 111 of 423

c.   **Consultations between the Ministry of Industry, Trade and Tourism and representatives of the Spanish RE sector**

348.  In the Spring of 2010, the Ministry of Industry, Trade and Tourism was reported to have held consultations with representatives of the Spanish RE sector regarding a reduction of RE subsidies proposed by the Ministry:

> The Ministry of Industry intends to cut back the premiums of renewable energies by EUR 2,500 million from the tariff of last year in which the incentives totalled over EUR 6,000 million, according to business sources. Miguel Sebastián, head of the department, conveyed this information to the various associations that met last Thursday, and he asked which part of the cutback each of them would be willing to undertake.
>
> The associations of photovoltaic producers (APPA, ASIF and AEF), wind power companies (AEE) and solar thermal companies (Protermosolar) participated in the successive meetings held on the same day. Sebastián justified the cutback as a need to put an end to some incentives which, in his opinion, jeopardise the goal to suppress the tariff deficit that last year exceeded the EUR 3,500 million permitted by the Law for this tax year by up to EUR 4,616 million, from which EUR 372 million must be deducted for the cost of CO2 set aside for the companies in 2009.
>
> The mechanism of the disputed cutback of the premiums has been prepared by Sebastián's team and already figures in a preliminary Royal Decree draft, to which content CincoDías has had access. The strategy is to establish a remuneration that is different to the current one for all the renewable technologies, although the measure would primarily affect solar thermal energy, followed by photovoltaic and wind power.
>
> The remuneration would not be linked to market prices (as is currently the situation with wind energy), it would be linked to a 'reasonable' rate of return. This retribution system would be similar to that of Enagás and Red Eléctrica, whose profitability is determined in accordance with the evolution of the bonus over 10 years. Nonetheless, the remuneration for renewable energies would be more favourable than that of the latter, according to insider sources of the proposal close to the Government.
>
> One of the consequences of the new system is that the depreciation of the investment of photovoltaic installations (there are more than 51,000 in operation), which is now situated at about seven years, would extend over time. According to industry sources, the problem worsens in the case of plants that have changed hands at least once, which has caused the investment to be more expensive and, therefore, created a bubble.[358]

---

[358] Carmen Monforte Martín, Cinco Días, "[Ministry of] Industry proposes to cut back the premiums of renewable energies by €2,500 million", 8 May 2010 (R-269) *referred to in* Rejoinder, para. 612.

*See also* El Mundo, Industry insists: 'green' premiums must be cut -- Sebastián enters into dialogue with all employers' organizations and asks for their collaboration, 7 May 2010 (R-279) *referred to in* Rejoinder, para. 626;

349. The Parties disagree on the characterization of these discussions.

350. According to the Claimants, the discussions were limited to exchanges with operators of wind power installations and concentrated solar power ("**CSP**") installation.[359] They ultimately resulted in an agreement dated 2 July 2010,[360] which was subsequently implemented by RD 1614/2010 (addressed at paragraph 355 below).

351. According to the Respondent, the discussions involved various RE associations.[361]

d.    **The National Renewable Energy Action Plan 2011-2020**

352. On 30 June 2010, the Government approved the "National Renewable Energy Action Plan 2011-2020" ("*Plan de Acción Nacional de Energías Renovables de España 2011-2020*") (the "**NREAP**") elaborated by the Ministry of Industry, Trade and Tourism and the IDAE in view of implementing Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources ("**Directive 2009/28/EC**").[362] Directive 2009/28/EC set the general targets of

---

Carmen Monforte Martín, CincoDias, The Ministry of Industry will reduce the premiums to all the renewable sources of energy operating, 14 June 2010 (R-269); Expansion, Industry looks where to use the green scissors, 13 May 2010 (R-270), *referred to in* Rejoinder, para. 613; PROTERMOSOLAR Response to Ministry of Industry's proposal, 18 May 2010 (R-300); Tomás Díaz (ASIF), Retroactivity?, Energias Renovlables Journal, June 2010 (R-273), *referred to in* the Rejoinder, para. 621; Carlos Mate, Suelosolar, Reasonable rate of return on photovoltaic energy?, 1 June 2010 (R-256); *See also* Rejoinder, paras. 477, 486, 665; Submissions from AEE to the CNE during hearing proceedings with the Electricity Advisory Board concerning Draft Royal Decree 1614/2010 that regulates and modifies certain aspects relating to the special regime, 30 August 2010 (R-116), p. 6; Counter-Memorial, paras. 710-711 and Rejoinder, paras. 475, 615, 756, 951.

[359] Memorial, para. 165.

[360] Ministry of Industry, Trade, and Tourism, Press release: "The Ministry of Industry, Trade, and Tourism reaches an agreement with the solar thermal and wind power sectors to revise their rate structures," 2 July 2010 (C-94), p. 2: "[w]ith this measure, which does not jeopardise the profitability of the existing facilities, it will be guaranteed that the production of renewable energy above the expected amounts will benefit consumers and not jeopardise the financial sustainability of the system. This pact furthermore assumes the reinforcement of the visibility and stability of the regulation of these technologies in the future, guaranteeing the current incentives and rates of RD 661/2007 for the facilities in operation (and for those included in the pre-registration) starting in 2013." *See also* Memorial, para. 165.

[361] Rejoinder, paras. 611-612.

[362] Ministry of Industry, Trade and Tourism/IDAE, National Renewable Energy Action Plan 2011-2020, 30 June 2010 (R-70). See also Counter-Memorial, paras. 328, 672, 828, 894; Rejoinder, paras. 300-302, 443, 781, 900. See also Answer given by Commissioner Oettinger to question from European Parliament, 10 July 2010 (C-221): "It is not clear at this stage what kind of modifications will finally be introduced in the Spanish scheme. On the basis of the information currently available to the Commission, it does not perceive any indication of a violation of the abovementioned Directives. In transposing Directive 2009/28/EC, the Spanish authorities and ultimately the Spanish courts have to ensure that the principles of Community law, including legal certainty and the protection of legitimate expectations, are respected."

(i) 20% share of RE in gross final consumption of energy in the EU and (ii) a 10% target for energy from renewable sources to be achieved by all EU Member States in energy consumption in the transportation sector by 2020.[363] It also required the preparation of a NREAP, which Spain at the time stated it did in parallel with preparing its new Renewable Energy Plan, as provided by RD 661/2007.[364] The NREAP, amongst others, provided an overview of RE targets and measures to achieve them. Regarding the financial aid granted to the RE sector, the NREAP noted:

> 4.3.2 Financial aid for electricity generation using renewable energies
>
> [...]
>
> Electricity generation using renewable energies is considered Special Regime production in the terms laid down in the Electricity Sector Act, Law 54/1997. This Special Regime is based on system of direct support for production and provides for higher remuneration than under the Ordinary Regime through a regulated tariff scheme and specific premiums which are justified on the basis of environmental and supply diversification and security benefits. This scheme has proven to be highly effective in the development of electricity using renewables both in Spain and the rest of the world.
>
> The costs arising from the support network are included in the tariff structure together with system-related costs.
>
> [...]
>
> The support mechanism takes account of the evolution of electricity market prices so as to strike a balance between the need to guarantee minimum remuneration levels and the desirability that electricity generation from renewable sources be able to compete on an equal footing with conventional generation, including external factors, while at the same time contributing as far as possible to lower system costs.[...].[365]

353. Regarding the review of remuneration, the NREAP stated as follows:

> Review of remuneration
>
> Royal Decree 661/2007 provides for reviews of remuneration amounts every four years, which may be modified on the basis of technological developments within the sectors, market behaviour, degree of compliance with renewable

---

[363] Ministry of Industry, Trade and Tourism/IDAE, National Renewable Energy Action Plan 2011-2020, 30 June 2010 (R-70), p. 4.

[364] Ministry of Industry, Trade and Tourism/IDAE, National Renewable Energy Action Plan 2011-2020, 30 June 2010 (R-70), p. 4.

[365] Ministry of Industry, Trade and Tourism/IDAE, National Renewable Energy Action Plan 2011-2020, 30 June 2010 (R-70), p. 112.

energy targets, percentage of demand covered by special regime facilities and their effect on the technical and economic management of the system, while always guaranteeing reasonable rates of return. In any event, these reviews take account of cost trends associated with each technology with three objectives in mind: to see that renewable technologies become as competitive as possible with Ordinary Regime generation, to foster a technological development balance and to see that the remunerative scheme moves in the direction of minimising socio-economic and environmental costs.[366]

354. As regards future developments in support schemes for electricity generation from renewable energies, the NREAP also noted:

> Also, effective administrative supervision is required to assure that gains from the development of these technologies in terms of relative cost competitiveness are passed on to society, thus minimising the speculative risks posed in the past by excessive rates of return, which not only hurts consumers but is also damaging to the industry in general in terms of the perception people have of it. Therefore, it will be necessary to devise sufficiently flexible and transparent systems that permit the issue and reception of economic and market signals so as to minimise the risks associated with investment and its remuneration and those caused by fluctuations in the energy markets.[367]

355. In July 2010, the Ministry of Industry, Trade, and Tourism announced that it reached an agreement with the CSP and wind power sectors pursuant to which the respective RE producers agreed to certain limitations such as, for example, a fixed number of operating hours for which installations could enjoy the FiT (the "**July 2010 Agreement**").[368]

356. On 22 July 2010, the Spanish Council of State issued an opinion on the legal nature of a registration in the RAIPRE:

> In essence, neither the resolution of registration in the Special Regime Register, nor the actual act of registration imply a declaration of the right to receive the premiums. Therefore, the right to a certain regime of premiums depends on compliance with the corresponding requirements and conditions, including, as indicated in the report of the National Energy Commission and in the report on regulatory impact, that of having the necessary equipment for the production of electrical energy on the corresponding date.[369]

---

[366] Ministry of Industry, Trade and Tourism/IDAE, National Renewable Energy Action Plan 2011-2020, 30 June 2010 (R-70), p. 114.

[367] Ministry of Industry, Trade and Tourism/IDAE, National Renewable Energy Action Plan 2011-2020, 30 June 2010 (R-70), p. 118. *See also* Counter-Memorial, para. 672; Rejoinder, para. 781.

[368] Ministry of Industry, Trade and Tourism, Press Release, "The Ministry of Industry, Trade, and Tourism Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks", 2 July 2010 (C-94).

[369] Opinion 1155/2010 of the Council of State, 22 July 2010 (R-295) *referred to* in Rejoinder, para. 500.

e.    **Public comments on contemplated draft regulations**

357.  In August 2010, AEE presented its comments on a draft Royal Decree modifying certain aspects relating to the Special Regime:

> [i]t is true that the Supreme Court has stated, in relation to such retroactive modifications, that there is no 'unalterable right' to the economic regime remaining unchanged [...] thus recognising a relatively wide margin of "*ius variandi*" by the Government in a regulated sector affected by general interest. [...] the case-law has established limits [...] regarding the retroactive modification of that compensation framework, especially [...] "that the requirements of the Electricity Act be respected as regards the reasonable return on the investments."[370]

358.  On 4 November 2010, the Ministry of Industry, Trade, and Tourism published the regulatory impact report of what would become RD 1614/2010. The report provided, *inter alia*, as follows:

> This Royal Decree provides a series of austerity measures to contribute to transferring to society the gain from the proper evolution of these technologies in terms of competitiveness in relative costs, reducing the deficit of the power system, while safeguarding the legal security of investments and the principle of reasonable profitability.[371]

f.    **Adoption of RD 1565/2010**

359.  On 19 November 2010, the Government of Spain adopted Royal Decree 1565/2010 "for the regulation and modification of certain aspects of the electricity production activities under the Special Regime" ("**RD 1565/2010**").[372] RD 1565/2010 is one of the Disputed Measures addressed in the relevant section at paragraphs 376-380 below.

---

[370] AEE, Submissions to the CNE during hearing proceedings with the Electricity Advisory Board concerning draft Royal Decree 1614/2010 that regulates and modifies certain aspects relating to the special regime, 30 August 2010 (R-116), p. 6.

[371] Ministry of Industry, Trade, and Tourism, Report on regulatory impact analysis of the draft Royal Decree regulating and amending certain aspects related to electrical energy production using solar thermal and wind power technologies, 4 November 2010 (R-30), p. 4. *See also* Counter-Memorial, para. 706; Rejoinder, para. 821.

[372] RD 1565/2010, 19 November 2010 (C-96)/(R-52). *See also* Memorial, paras. 25, 195; Counter-Memorial, paras. 362, 671.

360.  The preamble of RD 1565/2010 stated:

> The growth in the number of electric power installations within the special regime through renewable energy sources, co-generation and residues, has been very important in the last years. Thus, Spain has become one of the leading countries in the development of these technologies.
>
> It is a very dynamic sector with a very fast pace of technological evolution. Currently, approximately 25 per cent of the produced electric energy comes from renewable energies. These facts, linked to the structural characteristics of our electric system, require the establishment of additional technical requisites to guarantee the functioning of the system and enable the growth of these technologies.[373]

361.  RD 1565/2010 implemented the following changes to the legal regime under RD 661/2007:

(i)  RD 1565/2010 reduced the number of years during which qualified installations could receive the FiT to 25 years[374];

(ii)  RD 1565/2010 capped the quantity of electricity produced by PV installations eligible to receive the FiT[375]; and

(iii) RD 1565/2010 introduced additional technical requirements.[376]

362.  RD 1565/2010 also introduced changes to the regime created under RD 1578/2008, amongst others, by modifying the values of the rates of PV installations applicable during the next call period following RD 1565/2010.[377]

363.  As further explained below, the Claimants argue that RD 1565/2010 is part of the measures that violate the Respondent's international obligations, at issue in the present arbitration.[378]

---

[373] RD 1565/2010, Preamble (C-96)/(R-52). *See* Memorial, para. 195.

[374]  RD 1565/2010, (C-96)/(R-52), Article 1. Ten. (Tribunal's translation): "[i]n Table 3 of Article 36 [RD 661/2007], the values of the regulated tariffs indicated for installations of type b.1 .1 are deleted from the twenty-sixth year."

[375] RD 1565/2010, (C-96)/(R-52), Article 1. Five.

[376] *See e.g.*, RD 1565/2010, (C-96)/(R-52), Article 1. Three and Four.

[377] RD 1565/2010, Fourth Additional Provision (C-96)/(R-52).

[378] *See e.g.*, Memorial, paras. 195-196; Reply, paras. 326-327.

g.    **Council of State opinion on future RD 1614/2010**

364.    On 29 November 2010, the Spanish Council of State issued an opinion on what was to become RD 1614/2010 (see paragraph 365 below). With respect to the interpretation of article 44(3) of RD 661/2007, the Council of State noted:

> In any case, the forecasts contained on the exclusion of the review in the future of the equivalent reference hours and the bonuses of certain thermal and wind power facilities warrant special consideration (Arts. 2.5, 4 and 5.3).

> In relation to that forecast, reference should be made to the wording of Article 44 of [RD 661/2007], which reads as follows:

> '3. During the year 2010, in view of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, bonuses, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of return shall always be guaranteed with reference to the cost of money in the capital markets. Every four years, thereafter, there will be a further review, maintaining the above criteria.

> The reviews referred to in this section of the regulated tariff and the upper and lower limits will not affect facilities whose commissioning certificate was awarded before 1 January of the second year following the year in which the review was carried out.'

> In accordance with this precept, a review of tariffs, bonuses and the lower and upper limits provided for in that Royal Decree (in particular, with regard to the limits, see Art. 27 of that regulation) must be carried out in 2010; according to the rule contained in the second paragraph, the review of the 'regulated tariff and lower and upper limit' does not affect the authorised facilities before the review is carried out, which indicates that they could be affected as far as the review of the bonuses is concerned.[379]

---

[379] Council of State, Opinion 2408/2010 regarding the draft RD 1614/2010, 29 November 2010 (R-321), pp. 21-22, *referred in* Rejoinder, para. 469.

h.    **Adoption of RD 1614/2010**

365.  On 8 December 2010, the Government adopted Royal Decree 1614/2010 "regulating and modifying certain aspects of the activity of electrical power production through solar thermoelectric and wind technologies" ("**RD 1614/2010**"). Although this Royal Decree was not concerned with PV installations, both Parties referred to it for the purposes of giving a complete account of the principles underpinning regulatory developments in the RE sector.[380]

366.  The preamble of RD 1614/2010 stated:

> In recent years, Spain has become one of the countries in the lead in developing certain electrical power production technologies from sources of renewable energy. Currently more than 25 % of electrical power produced is from renewable energies.
>
> This growth has been brought about thanks to the existence of a solid, stable and predictable economic and legal scheme and to the contribution of all the parties involved, government bodies, technical and economic operators of the system and companies.
>
> The growth of wind, solar thermo-electric and photovoltaic technologies is especially remarkable, having reached and even surpassed the installed power objectives planned for the year 2010.
>
> Thus is the legal framework, which as is recognised in its formulation must be adapted to the dynamic reality of the learning curves of the various technologies and to the technical conditions that arise with increased share in the generation mix, safeguarding the legal security of investments and the [principle] of reasonable return to thereby maintain a necessary and sufficient support that is coherent with market conditions and with the strategic energy objectives and to contribute to the transfer the benefits of the suitable evolution of these technologies to society.
>
> This Royal Decree intends to resolve certain inefficiencies in the application of the cited [RDL 6/2009], for the wind and solar thermo-electric technologies, which intended to ensure the economic scheme in effect in [RD 661/2007], which regulates the activity of electrical power production in the special scheme for projects at an advanced stage.
>
> This Royal Decree arose from the report of the National Energy Commission and the process of hearings through its Consultative Electricity Council, as

---

[380] *See* Memorial, paras. 165-167; Counter-Memorial, paras. 705-708.

well as an examination by the Government Commission for Economic Affairs in its meeting on 23 September 2010.[381]

367. Article 2 of RD 1614/2010 established limitations on the operating hours for thermo-solar (or CSP) and wind installations.[382]

368. Article 4 of RD 1614/2010 set out the following rule regarding revisions of the economic regime for thermo-solar and wind installations:

> For solar thermoelectric technology facilities that fall under [RD 661/2007], revisions of tariffs, premiums and upper and lower limits referred to in article 44.3 of [RD 661/2007], shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009, nor those that were to have been registered in the Remuneration Pre-assignment Registry under the fourth transitional provision of [RDL 6/2009], and that meet the obligation envisaged in its article 4.8, extended until 31 December 2013 for those facilities associated to phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009.[383]

369. The Parties disagree about the significance of RD 1614/2010.

370. According to the Claimants, RD 1614/2010 formalized the July 2010 Agreement.[384] Further, Articles 4 and 5 of RD 1614/2010 allegedly "reconfirmed that any future changes to the RD 661/2007 economic regime would not be applied to duly registered existing wind and CSP installations."[385]

371. According to the Respondent, RD 1614/2010 (similarly to RD 436/2004 and RD 661/2007) applied to existing plants that were already registered under an earlier Royal Decree (subject to the principle of respecting a reasonable return).[386] RD 1614/2010 also allegedly sought to preserve the sustainability of the SES.[387]

---

[381] RD 1614/2010, 7 December 2010 (R-53)/(C-97), Preamble. *See also* Memorial, para. 167; Counter-Memorial, paras. 705, 818; Rejoinder, para. 820.

[382] RD 1614/2010, 7 December 2010 (R-53)/(C-97).

[383] RD 1614/2010, 7 December 2010 (R-53)/(C-97), Article 4.

[384] Memorial, para. 167.

[385] Memorial, para. 167.

[386] Counter-Memorial, para. 712

[387] Counter-Memorial, para. 705.

In support of its position, the Respondent refers to a regulatory impact report prepared for draft RD 1614/2010:

> The installed power targets set out in the 2005-2010 Renewable Energies Plan have been reached or exceeded for the solar energy and wind technologies. Although this development may be considered a very important achievement by all players involved […] it has also caused problems that need to be addressed before they represent an irreversible risk for the economic and technical sustainability of the system.[388]

372. On 16 December 2010, the CNE issued its Report 39/2010 "on the draft ministerial order approving access tariff reform in the electrical energy sector as of 1 January 2011" ("**CNE Report 39/2010**")[389], and which noted:

> It is true that presenting tariff proposals a year ahead of time is a forecasting exercise and therefore subject to unforeseen and unexpected factors. However, based on the forecast access costs for 2011, an application of the access tariffs proposed in the [Order] under scrutiny would saddle the electrical energy sector with an annual deficit of as much as EUR 5,048,000,000. In other words, EUR 3,048,000,000 over the deficit upper limit, as per current legislation. Taking into account the increased capacity payments included in this draft [Order], and the possible eventuality that the resulting revenue might not be sufficient to cover the payments provided in Royal Decree 134/2010, the estimated settlement deficit in respect of regulated activities for 2011 could exceed the legally established upper limit by up to EUR 1,972,000,000. Therefore, the access tariffs proposed under this Mandate are clearly insufficient and will not cover the estimated access costs; nor will said access tariffs sufficiently comply with the sector's legally defined limits in terms of the 2011 deficit.[390]

373. The Claimants rely on this excerpt from CNE Report 39/2010 to argue that "Spain had kept Network Access Tolls artificially low", thereby aggravating the problem of the tariff deficit and the sustainability of the SES.[391]

---

[388] Ministry of Industry, Tourism and Trade, Regulatory Impact Report on draft RD 1614/2010, 4 November 2010 (R-30). *See also* Counter-Memorial, para. 706.

[389] CNE, Report 39/2010 based on the draft ministerial order approving access tariff reform in the electrical energy sector as of 1 January 2011, 16 December 2010 (C-201). *See* Reply, para. 426.

[390] CNE, Report 39/2010 based on the draft ministerial order approving access tariff reform in the electrical energy sector as of 1 January 2011, 16 December 2010 (C-201), p. 2.

[391] Reply, paras. 424-426.

374. Without addressing CNE Report 39/2010 directly, the Respondent argues that the CNE subsequently stated that "the solution to the problem of the economic unsustainability of the SES could not exclusively be addressed by increasing the access tolls paid by Spanish consumers."[392]

### C. The Disputed Measures and other (non-impugned) regulations

375. According to the Claimants, RD 1565/2010 and RDL 14/2010 (as defined below) constituted the "initial measures" that harmed their investments.[393]

### 1. RD 1565/2010 – Disputed Measure

376. As explained in detail at paragraph 361 above, RD 1565/2010 altered the duration of the FiT scheme.

### a. RD 1565/2010: The Parties' positions

377. The Claimants challenge RD 1565/2010, on the grounds that it cancelled the purported entitlement, granted under RD 661/2007 to receive the FiT after the first 25 years of the PV installations' operation.[394] The Claimants acknowledge that this 25-year period was subsequently extended to 28 years in 2010,[395] and to 30 years in 2011 by Law 2/2011.[396] The Claimants however maintain that "Spain has been inconsistent in its alleged understanding of PV installations' operational life and it has subjected those installations to a significant lack of stability in this regard."[397] The Claimants further argue that Spain has provided no support for its argument that RD 1565/2010 involved no alteration of the right to a reasonable return.[398]

---

[392] Rejoinder, para. 770, *referring to* CNE, Report, 7 March 2012 (R-82) p. 9. *See also* Counter-Memorial, paras. 681, 742-745, 785, 842; Rejoinder, paras. 413, 759, 766, 769, 770, 774, 779, 784-786, 791-792, 838.

[393] *See e.g.*, Memorial, para. 187.

[394] RD 1565/2010, 19 November 2010 (C-96)/(R-52), Article 1(10).

[395] RDL 14/2010, 23 December 2010 (C-98)/(R-38), First Final Provision. *See also* Memorial, paras. 25, 204; Reply, para. 329; Counter-Memorial, paras. 683-731; Rejoinder, para. 803.

[396] Law 2/2011, 4 March 2011 (C-101)/(R-24), First Final Provision. *See also* Memorial, paras. 206-210; Counter-Memorial, para, 733; Rejoinder, paras. 297, 689.

[397] Reply, para. 327.

[398] Reply, para. 328.

378. In sum, according to the Claimants, "RD 1565/2010 augured a new era of regulatory instability", "[t]he stable regulatory regime that had been central to Spain's RE policy and to the Claimants' investment decisions was suddenly in a state of flux."[399]

379. The Respondent argues that "[a]s with previous measures, the measures adopted during 2010 (Renewable Energies Action Plan, Royal Decree 1565/2010, Royal Decree 1614/2010 and the subsequent Royal Decree Act 14/2010) responded to the need to guarantee the technical and economic sustainability of the SES, as well as to correct any detected situations of over-remuneration."[400] The Respondent moreover argues that the criticism, for instance by AEE, directed against previous drafts of RD 1565/2010 demonstrated that the regulatory framework was understood as allowing for the possibility of regulatory changes, provided that the reasonable return is guaranteed.[401]

380. The Respondent further refers to the findings of the *Charanne v. Spain* tribunal that rejected Spain's liability under the ECT on account of adopting RD 1565/2010.[402]

## 2.    RDL 14/2010 – Disputed Measure

### a.    RDL 14/2010: Context and relevant provisions

381. On 23 December 2010, Spain adopted Royal Decree-Law 14/2010 on the establishment of urgent measures for the correction of the tariff deficit on the electricity sector ("**RDL 14/2010**").[403] In its preamble, RDL 14/2010 specifically observed:

> 2. Since the adoption of [RDL 6/2009], there have been a series of supervening circumstances that have had a direct impact on the anticipated tariff deficit in the electricity system and it has been determined that the capped ex ante deficit limits, as established in the aforementioned Twenty-First Additional Provision [of Law 54/1997], have been largely overcome. The impact of the global crisis, which traverses the Spanish economy, has led to a significant decline in the demand for electric energy, however, supply has been impacted by aspects such as the evolution of the price of fuels on the international markets during the current year, 2010 and the favourable climatic conditions that have led to increased electric energy production from

---

[399] Memorial, para. 25.

[400] Counter-Memorial, paras. 33, 362, 573-681.

[401] Counter-Memorial, para. 711; Rejoinder, para. 615.

[402] Counter-Memorial, para. 682.

[403] RDL 14/2010, 23 December 2010 (C-98)/(R-38).

renewable sources. The current economic situation has not had symmetrical consequences in all electric power sectors: while the ordinary regime (traditional electric power plants) have seen a reduction in their operating hours and income, due to the decline in Wholesale market prices, however, producers under the special regime are found to be in a different circumstance, as this specific regime ensures the sale of generated electricity at preferential rates within the system.

3. In consequence, the objective of this Royal Decree-Law is to urgently address the correction of the tariff deficit in the electricity sector. […].[404]

382.    The preamble of RDL 14/2010 further observed:

4. In addition, this Royal Decree-Law holds the objective of eliminating the appearance of a new deficit in the electricity system, as of 2013, and ensures an avenue for its reduction, enforcing a set of measures with immediate effect, allowing for the economic situation to be addressed and to strengthen the consideration of the electrical system in the financial and debt markets, being of great importance at present. Thus, a set of provisions is established, so that all industry agents contribute, in a further and combined effort, to the reduction of the deficit of the electricity system.

In formulation of these measures, care has been taken to ensure the safeguard of the supply of electricity, in terms of universality, quality, safety and continuity and to ensure the protection of consumer rights for electrical power supply, under equitable terms, as well as to ensure compliance of the targets regarding energy efficiency and the promotion of renewable energies. In parallel, special attention and care has been taken not to affect the economic-financial balance of companies within the sector, and not solely for large companies, preserving the principles of a free market, which are governed under [Law 54/1997], but also for sets of power generation facilities, monitoring such, because, especially in the case of power generation companies under the special regime, these have secured adequate and reasonable compensation.

Therefore, firstly, payment exemptions on the use of transmission and distribution networks for pumping consumption are annulled and an obligation on electricity producers for the payment of such access fees is established, which shall allow for a fair evolution thereof. As generation facilities, especially under the special regime, have experienced significant growth, there has been greater investment in the electricity transmission and distribution networks, in order to carry electricity therein. In the current context of the crisis and tariff deficiency, it is deemed justified the producers contribute, through the payment of access fees for the expenditures attributable to the required investments[.]

Secondly, in order to reduce the costs attributable to the tariff, it is established that the producers of electricity, under the ordinary regime, finance Action

---

[404] Preamble, RDL 14/2010, 23 December 2010 (C-98)/(R-38), paras. 2 and 3.

Plan 2008-2012, approved by Resolution of the Council of Ministers, of 8 July 2005[.]

Thirdly, and as stated in the Second Section, it is deemed reasonable that producers under the special regime also make a contribution to mitigate the additional costs on the system, and such contribution must be proportionate to the characteristics of each technology, to the degree of participation in the generation of such additional costs and to the current extent for compensation, whose reasonable return, nonetheless, is guaranteed. Thus, for the same purpose, there has been Government approval, over recent months, for regulatory measures directed at producers of wind, solar thermal and co-generation electricity.

Thus, in consideration of the rate of growth of photovoltaic installations, and for safeguarding the principle of sufficiency for compensation, due to the special impact that the deviations in the forecast generation of this energy source have caused to the tariff deficit, it is established, in general terms, the possibility for limiting the recognised equivalent operating hours entitled by the prevailing economic system. Thus, such reference values are expressly fixed according to the values used for the compensation calculation, as established in the Renewable Energy Plan 2005-2010, and by those reflected in [RD 661/2007][.] In parallel, and in order to ensure reasonableness for any compensation, any references with regard to the first 25-year period, as established by Royal Decree 661/2007, of 25 May, shall be extended to 28 years for installations of type b.1.1.[405]

383. Thus, RDL 14/2010 introduced a new access toll, applicable to electricity producers under the Ordinary and the Special Regimes, for the use of the transportation and distribution grids of the SES.[406]

384. Moreover, RDL 14/2010 introduced limitations on operating hours. Installations covered by RD 661/2007 were subject to: (i) a temporary limitation applicable until 31 December 2013[407] and (ii) a permanent limitation applicable from 2014.[408] Installations covered by RD 1578/2008 were subject to a permanent limitation from 1 January 2011.[409] Any quantities of electricity produced in excess of these hours were thus not eligible for the FiT and had to be sold at market rates.

385. Further, RDL 14/2010 set additional limits for the revenue deficit.[410]

---

[405] Preamble, RDL 14/2010, 23 December 2010 (C-98)/(R-38), para. 4.
[406] RDL 14/2010, 23 December 2010 (C-98)/(R-38), Article 1, paras. 1, 7.
[407] RDL 14/2010, 23 December 2010 (C-98)/(R-38), Second Transitional Provision.
[408] RDL 14/2010, 23 December 2010 (C-98)/(R-38), First Additional Provision.
[409] RDL 14/2010, 23 December 2010 (C-98)/(R-38), First Additional Provision,
[410] RDL 14/2010, 23 December 2010 (C-98)/(R-38), Article 1(8).

386. The regulatory impact report for RDL 14/2010, dated 23 December 2010, stated as follows:

> As has already been pointed out, since the approval of [RDL 6/2009], a series of unexpected events has taken place which have had a direct impact on the estimated tariff deficit in the electricity system and which have meant that the maximum deficit limits established ex ante in the above-mentioned additional ruling 21 have been greatly exceeded.
>
> The first of these events was the effective fall in demand recorded in the second half of 2008, which was greater than the estimates handled by the government when [RDL 6/2009] was issued. Demand directly affects the deficit given that it determines the unit costs (costs per unit for demand consumed) budgeted in the tariffs fixed at the beginning of each fiscal year. A downwards difference in this factor (the denominator of the formula), as happened in this case, caused a deficit in financing which as can be seen in the following figure, reached 600M EUR up to 2010: [...]
>
> The second unexpected factor that significantly affected the estimate of the tariff deficit is related to wholesale market prices and the indirect effect they have on system costs through the equivalent bonuses under the special regime.
>
> In effect, given that renewable technologies enjoy a guaranteed minimum compensation and tariff income should cover the part of this compensation that is not covered by the market, regulated costs go up when market prices fall and vice versa.[411]

387. The regulatory impact report pursued:

> The estimated temporary imbalance for 2010 in the settlement of regulated activities as a consequence of the above factors should be acknowledged in the access tariff review order for 1 January 2011, which is compulsory and is issued at the end of December in each year as set forth in Royal Decree 1202/2010, dated 24 September, which establishes the review periods for electricity transmission and distribution access tariffs. This would involve an impact on access tariffs that would eventually be paid exclusively by consumers, and in the short term and at a time of economic crisis like the present one, would affect household economies and the competitiveness of companies.
>
> Hence there is an urgent need to establish in this Royal Decree Law that the temporary imbalances of settlements in the electricity system that are produced in 2010, up to a maximum value of 2,500 million Euros, are classified as a deficit in income for the electricity settlement system for 2010[.][412]

---

[411] Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88), pp. 5-6.

[412] Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88), pp. 7-8.

388.  With respect to network access costs, the regulatory report observed:

> Given that generation facilities, especially those under the special regime, have experienced significant growth, there has been an increase in investment in electricity transmission and distribution grids to evacuate the electricity pumping into the same. In the current context of crisis and tariff deficiency, it is fair that generators should contribute by paying the costs attributable to the investment they require.
>
> Consequently, producers of electricity are therefore obliged to pay said costs, which will enable a reasonable evolution thereof.
>
> For this purpose, [Law 54/1997 has] been amended, in order to fix the obligation for generators, both under the ordinary regime and the special regime, to pay for the use of the grids, to make it possible for transmitters and distributors to charge the owners of facilities for such services and to declare the revenue from said invoicing realizable income for the NEC.[413]

389.  Regarding the modifications with respect to PV installations, the regulatory impact report specifically noted:

> In the current context it seems reasonable for producers under the special regime to also make a contribution to mitigate the extra costs. This contribution should be proportional to the characteristics of each technology, its degree of participation in the generation of these extra costs and the margin existing in the compensation whose reasonable profitability shall remain in any case guaranteed. Hence, for the same purpose, in recent months the government has approved measures aimed mainly at wind and thermo-solar electricity producers. These measures include, firstly, a provisional contribution of cost reduction for the system, and secondly, a limit on the number of subsidized hours, depending on the amount used in the REP 2005-2010, in order to calculate reasonable compensation, and without prejudice to compensation for other hours at the price fixed by the market.
>
> In the field of photovoltaic technology, taking into account the rhythm of growth in this kind of facility, and mainly the number of subsidized hours, a general possibility is established for limiting the equivalent operating hours with a right to the economic bonus regime as acknowledged, safeguarding the principle of self-sufficiency in compensation, because of the heavy impact that imbalances in generation forecasts from this energy source cause in the tariff deficit and in the cost of energy for consumers and companies.[414]

---

[413] Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88), p. 10.

[414] Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88), pp. 11-12.

390. The regulatory impact report further commented on the modifications to the remuneration regime under RD 661/2007:

> 2. Secondly, and in accordance with the same principle, in order to avoid greater than forecast profitability, the number of equivalent subsidized hours has been limited, at the same time as this was done under [RD 1614/2010] for wind and thermoelectric solar facilities.
>
> The compensation values in [RD 661/2007] were calculated in order to obtain reasonable profitability rates and using as a hypothetical starting point the average operating hours for facilities in these three technologies.
>
> These operating hours can be found in the Renewable Energies Plan 2005-2010 for all technologies.
>
> Subsequently, in the actual operation of the system, it has been shown that there are more operating hours at the facilities than initially planned in some cases. There are diverse reasons for this – technical improvement, overinstallation, etc. In any case, this means that for these facilities the compensation obtained is more than reasonable. […]
>
> In order to compensate the reduction that these measures could cause, the period for receiving compensation for photovoltaic facilities under [RD 661/2007] has been extended from 25 to 28 years.[415]

391. The regulatory impact report made the following statements regarding the anticipated general economic impact of the measures introduced by RDL 14/2010:

> The economic impact of the saving on extra costs from limiting the number of equivalent operating hours at photovoltaic facilities under the special regime until 31 December 2013 is estimated at 2,220 million Euros, i.e., 740 million Euros per year in said period. This can be seen in the following table:
>
> […]
>
> Reasonable profitability is guaranteed by the amendment to clause 36 of [RD 661/2007], which regulates electricity production under the special regime, replacing the references to the first 25 years with the first 28 years for [illegible] facilities. The impact of the measure is equivalent to an actual net value of 4,409.34 million Euros in January 2011, which more than compensates producers' loss of earnings for the period 2011-2013.[416]

---

[415] Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88), pp. 13-14. *See also* Counter-Memorial, para. 691; Rejoinder, para. 803.

[416] Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88), p. 19.

392. Also in December 2010, the following provision was included by Triodos Bank in one of the loan agreements used for the purposes of financing the Claimants' investments:

> The electric power tariff contemplated in the previous point for the plant to be financed under the regime contained in RD 1578/2008, the number of equivalent hours paid for, the investments due to technological requirements and other investments and project expenses, have been considered by the Bank in drawing up the CASE BASE (Annex VI of this document), which is the fundamental document containing the economic forecasts of the income and expenses of the project, from which result the cash flow necessary for the restitution of the loan and which constitute the fundamental guarantees for the bank on which the financing is based. In view of the foregoing, any alteration in the regulatory system of the essential elements of the remuneration of the energy produced, the assigned tariff itself, the limitation of the production of the plant that is paid for the aforementioned tariff (by reduction of equivalent paid hours or any other formula), the period of application of said tariff, or its indexation (periodic revision, in accordance with a pre-established index), the investments and expenses necessary for the operation of the financed installation, and any negative regulatory modification in general and RD 1578/2008 in particular, or any other regulatory element that could affect the income foreseen for the installation to be financed in the CASE BASE (Annex VI of this document), implies an essential alteration of the fundamental economic circumstances of the project, which should lead to the non-granting of the loan or to modifications of its essential elements (amount of the loaned capital, terms, relation of own or outside resources, personal or real guarantees and cover for the bank, risk premiums in terms of commissions and interest rates, etc.).[417]

393. According to the Respondent, this provision expressly acknowledged the possibility of regulatory changes of which the Claimants should have been aware at the time.[418]

---

[417] Counter-Memorial, paras. 1033-1034, *referring to* Triodos Loan Agreement, 29 December 2010 (Exhibit CLEX-255) (Tribunal's translation).

[418] Counter-Memorial, para. 1034.

b.  **RDL 14/2010: The Parties' positions**

394.  According to the Claimants, RDL 14/2010 was, in essence, a tariff cut.[419] The Claimants further argue that the consequences of setting a cap on operating hours were drastic, as it immediately impacted the available cash flows.[420] Moreover, the Claimants argue that the three-year extension of the temporal cap on FiT availability from 25 to 28 years was "an explicit recognition by Spain that it had caused harm to the Claimants' investments," whilst nevertheless constituting "inadequate" compensation.[421] The Claimants further criticize the alleged absence of "any discussion of Spain's obligation to increase the regulated income of the Electricity System by raising Network Access Tolls."[422]

395.  In their Reply, the Claimants dispute Spain's contention that RDL 14/2010 was adopted in order to preserve the economic sustainability of the SES and correct situations of over-remuneration whilst still guaranteeing a reasonable return.[423] According to the Claimants, Spain had failed to put forward "any evidence that Spain considered that to be the case at the time."[424]

396.  The Claimants also dispute the Respondent's defense argument according to which the PER 2005-2010, which set forth the relevant information on standard facilities used to determine the tariff set under RD 661/2007, used a certain benchmark of operating hours, equivalent to the number of capped operating hours introduced by RDL 14/2010.[425] According to the Claimants, such an interpretation defeats the understanding "held by all investors, lenders and legal advisors at the time."[426]

397.  According to the Respondent, RDL 14/2010 "introduced several measures that potentially affected the Claimants [i.e.] (i) the limitation on the hours of performance with

---

[419] Memorial, para. 198.
[420] Memorial, para. 200.
[421] Memorial, para. 203.
[422] Memorial, para. 205.
[423] Reply, para. 329.
[424] Reply, para. 329.
[425] Reply, para. 331.
[426] Reply, para. 332.

the right to receive the subsidy; and (ii) the implementation of a toll to be paid by all SES producers for use of the transport and distribution grids".[427]

398.  As regards the limitation of operating hours with a right to the FiT, the Respondent states that this measure was required to guarantee the economic sustainability of the SES, with the correction of situations of excessive remuneration.[428] The Respondent notably refers to the regulatory impact analysis for RDL 14/2010 and its preamble in support for this argument.[429] The Respondent further argues that the number of maximum subsidized operating hours were "exactly the equivalent" of the operating hours used in the standard facilities assumptions set forth in the 2005-2010 PER.[430] The Respondent moreover explains that the Spanish Supreme Court, in its judgment of 25 July 2013, considered the limitation of maximum subsidized operating hours as permissible.[431] In addition, the Respondent argues, the limitation of subsidized hours was also applied to thermo-solar and wind power installations and that industry representatives from those sectors were aware that regulatory modifications might affect preexisting power installations.[432] The Respondent also refers to *Charanne v. Spain* as having rejected claims against RDL 14/2010.[433]

---

[427] Counter-Memorial, para. 683.

[428] Counter-Memorial, para. 690.

[429] Counter-Memorial, paras. 691-693.

[430] Counter-Memorial, para. 695.

[431] Counter-Memorial, para. 698, *citing* Third Chamber of the Supreme Court, App. 259/2012, 25 June 2013 (R-107): "The forecasts of the 2005-2010 Renewable Energies Plan on which the remuneration regime of Royal Degree 661/2007 was based for photovoltaic technology installations were based on performance hours (1250 equivalent hours per year for a fixed installation of less than 100 kW connected to the grid, and 1644 equivalent hours per year for an installation of less than 100 kW with axis tracking), which are similar to those set out in Transitory Provision Two of Royal Decree-Act 14/2010. The 'reasonable return' of these installations under the economic regime created through Royal Decree 661/2007 could not, therefore, either be disassociated from the objectives set out in the 2005-2010 Renewable Energies Plan or be unaware of the provisions of this with regard to equivalent hours of operation on which the corresponding remunerative values were based." (emphasis originally added by the Respondent). *See also* Counter-Memorial, paras. 718-721.

[432] Counter-Memorial, paras. 705-717.

[433] Counter-Memorial, para. 722.

399. As regards the introduction of a toll payable by all electricity producers, the Respondent argues that this modification was required under EU law, as recognized in the afore-cited judgment of the Supreme Court of 25 July 2013.[434]

**3.    Law 2/2011– Disputed Measure**

a.    **Law 2/2011: Context and most relevant provisions**

400. On 3 March 2011, the Spanish legislator adopted law 2/2011 on sustainable economy ("**Law 2/2011**"),[435] which concerned a variety of economic sectors, including energy producers. Article 34 of 2/2011 announced that the General Administration of the State would adopt a "plan of austerity".[436]

401. Law 2/2011 also set out the principles of energy policy:

> Article 77. Principles of the energy policy.
>
> 1. The energy policy shall be oriented towards guaranteeing supply, economic efficiency and environmental sustainability. In particular, the model of energy consumption, generation and distribution should be compatible with EU regulations and targets, and with international efforts in the struggle against climate change.
>
> 2. For this purpose, this Law fixes certain national targets for energy saving and for the participation of renewable energies, establishes the procedural framework for drawing up a global planning for the energy model, sets the basis for drawing up plans for saving and energy efficiency and develops the appropriate conditions for the existence of a competitive energy market.
>
> 3. With this goal in mind, the government shall promote the diversification of energy supply sources, the efficient development of smart infrastructures and networks, the transparency and competence of the energy markets, the sufficiency of compensation, the growing incorporation of renewable energies and saving and efficiency policies.[437]

402. Based on these principles, Article 79 of Law 2/2011 further provided for the following cornerstones of Spain's energy planning:

> Article 79. Preliminary energy planning.

---

[434] Counter-Memorial, paras. 725-730.
[435] Law 2/2011, 4 March 2011 (C-101)/(R-24).
[436] Law 2/2011, 4 March 2011 (C-101)/(R-24) [SP].
[437] Law 2/2011, 4 March 2011 (C-101)/(R-24), Article 77 [EN].

1. The government, within three months of the coming into force of this law, after a report has been received from the Energy Sector Conference and after the corresponding public information process, shall approve a planning document, which shall establish an energy generation and distribution model in accordance with the principles set forth in [Article] 77 and with the goals established.

2. The planning shall include various indicative scenarios for the future evolution of energy demand, the resources necessary to satisfy said demand, needs for new power and in general, useful previsions for taking decisions on investment by private initiative and for decisions on energy policies, encouraging an appropriate balance between the efficiency of the system, a guaranteed supply and the protection of the environment.

[…]

4. In accordance with this planning, the legislation shall order the necessary public incentives to satisfy the goals fixed in the previous section, in accordance with the following principles:

a) The guarantee of a suitable return on investment in technologies under the special regime, promoting an installation volume that is compatible with the goals established in the energy plans.

b) Consideration of the learning curves in the different technologies until a point of competitiveness is reached with the cost of energy consumption, in order to encourage technological changes to improve the stability of the contribution of renewable energies to the electricity system.

c) The progressive internalization of costs assumed by the energy system to guarantee the sufficiency and stability of supply, encouraging, furthermore, the replacement of technologies which due to their low economic, technical and environmental efficiency, have become obsolete, provided that this implies general savings in the system.

d) The prioritization of facilities that incorporate technological or management innovations, which optimize efficiency in production, transmission and distribution, contributing to local electricity consumption by increasing the generation distributed, which contribute greater manageability to energy systems and reduce the emission of greenhouse gases, analysing in particular the rhythm of incorporation in time.

e) In all cases goals should be reached taking into account the principles of economic efficiency among the different alternatives and the economic sustainability of the measures adopted.[438]

---

[438] Law 2/2011, 4 March 2011 (C-101)/(R-24), Article 79 [EN].

403.  Finally, Law 2/2011 amended certain provisions of RDL 14/2010 (and thus indirectly, RD 661/2007) as follows:

> Forty-fourth final provision. Modification of [RDL 14/2010] […].
>
> The following modifications are introduced in [RDL 14/2010] […].
>
> One. Section 4 of the additional provision is first worded as follows:
>
> '4. The Government is authorized to modify by means of Royal Decree the provisions of section 2 [relating to the number of reference hours for subsidies granted to PV installations], to adapt it to the evolution of technology. The possible modifications will only affect the facilities that are not in operation at the time of the entry into force of said Royal Decree, for what is considered the date of registration in the register of pre-allocation of remuneration for photovoltaic installations.'
>
> Two. The first final provision is worded in the following terms:
>
> 'First final provision. Modification of [RD 661/2007] […].
>
> Table 3 of Article 36 of [RD 661/2007], by which the activity of electricity production under the special regime is regulated, is amended, substituting, for the facilities of category b.1.1, the references in the first 25 years' term for the first 30 years.'
>
> Forty-fifth final provision. Access of photovoltaic technology to the liquidity lines of the ICO.
>
> Within the framework of the impulse operations of renewable energies, the titles of the installations of production of electrical energy with photovoltaic technology can access the current liquidity lines of the ICO to facilitate adaptation to its regulatory framework.[439]

b.  **Law 2/2011: The Parties' positions**

404.  According to the Claimants, Law 2/2011 "attempted to provide compensation to PV installations and reassure investors that the regime was stable" by extending the period during which the FiT was payable to 30 years.[440]

405.  The Claimants further argue that Law 2/2011 "also provided another admission that the [FiT] extension to 30 years was insufficient."[441] Specifically, the Claimants contend that

---

[439] Law 2/2011, 4 March 2011 (C-101)/(R-24), First final provision. *See also* Memorial, para. 209 (emphasis in the original).

[440] Memorial, para. 206.

[441] Memorial, para. 207.

the 45th final provision of Law 2/2011 (quoted above) "recognised that the RDL 14/2010 measures may have impacted negatively the terms of the financing obtained by investors in developing their PV installations", and that "Law 2/2011 therefore extended soft loans or so-called liquidity lines of credit through the Instituto de Crédito Oficial […], a public entity that acts as a lender."[442]

406.  The Claimants also argue that the first paragraph of the 44th additional provision was "patently introduced in order to reassure and re-establish investors' expectations that the regulatory regime for PV in Spain was stable."[443]

407.  According to the Respondent, Law 2/2011 set out the legal criteria for energy regulation, to be followed in the context of the Spanish economic crisis at that time.[444]

408.  The Respondent relies on Article 79(2) of Law 2/2011 (cited above) to the effect that the regulation of the SES was obliged to take into account different energy demand scenarios and resources required.[445]

409.  Moreover, relying on Article 79(4) (cited above), the Respondent contends that Law 2/2011 "emphasizes the immediate link between the planning and the legislation that regulates public subsidies[.]"[446] Consequently, "an alteration of the basic economic data on which the subsidies are established will necessarily entail an alteration of the level of said subsidies."[447] At the same time, such alterations to subsidies must, according to the Respondent, ensure the guarantee of a reasonable return.[448] In any event, this provision required that the regulatory objectives set out in Law 2/2011 be "<u>achieved taking into account the principles of economic efficiency</u> between the various alternatives and the <u>economic sustainability</u> of the measures taken."[449]

---

[442] Ibid.
[443] Memorial, para. 210. *See also* ibid., para. 209.
[444] Rejoinder, para. 297.
[445] Rejoinder, paras. 297-298.
[446] Rejoinder, para. 299.
[447] Rejoinder, para. 299.
[448] Rejoinder, para. 299.
[449] Rejoinder, para. 299 (emphasis in the original).

c.   **Subsequent developments**

410.  On 10 March 2011, Mr. Salvador Armendáriz, a member of the *Cortes Generales*
      affiliated with the Navarrese People's Union, a regional conservative party, made the
      following critical statement during parliamentary debates:

> [I]n our opinion the Royal Decree and the cutback infringes acquired rights,
> causes legal uncertainty and discourages future investment in that sector. As
> an example of the problems its approval has caused, look at what it says in the
> letter we have seen, signed by two European Commissioners and sent to the
> Minister of Industry, Tourism and Trade, on the retroactive nature of the
> measure and also the announcement of claims for millions in some foreign
> Court - in London to be precise - by foreign investment funds. In the
> third place, in our judgment it makes it impossible in many cases for any
> investment such as that which has been approved here to be reasonably
> profitable. In the fourth place, we consider the measure radically unfair, unfair
> because it is disproportionate and unfair because it seems to blame all the
> problems of the world of electricity, of which there are many - the tariff deficit
> included - on a sector like the photovoltaic industry, which until a few days
> ago was a synonym for technological innovation, respect for the environment,
> commitment to independent energy and new jobs. In the fifth place, because
> any cutback should be preceded by fraud controls, checks on anyone who
> entered the sector illegally, on the one hand, and therefore sanctions which
> ought to have been applied, on the other. This, ladies and gentlemen, ought to
> have been the Government's first concern, but it has been overwhelmed by
> the extent of the loss of control caused by its own energy policy and has opted
> to make the people who are least responsible pay for its own mistakes. And
> finally, ladies and gentlemen, in the sixth place, because the cutback - as we
> have said on previous occasions - means a change, halfway through the game,
> of the rules laid down by the Government itself, which may cause the ruin of
> thousands of small photovoltaic energy producers, who in my community, of
> course, in the Statutory Community of Navarre, acted with the strictest
> regard for the law, fair competition and confidence in what had been agreed.[450]

411.  Mr. Delgado Arce, from the People's Party, another conservative political party, similarly
      considered RDL 14/2010 amounted to "real arbitrariness", which had been imposed on
      the PV sector "with no dialogue [with] a sector that had invested in these energies because
      the Government had asked [it] to do so."[451]

---

[450] Minutes of the Congress of Deputies, IX Legislature, Number 229, 10 March 2011 (C-102). *See also* Memorial,
para. 28.

[451] Minutes of the Congress of Deputies, IX Legislature, Number 229, 10 March 2011 (C-102). *See also* Memorial,
para. 28.

412.  In April 2011, the Ministry of Territorial Policies and Public Administration published an Evaluation of the 2005-2010 PER.[452] This document noted, amongst others:

> Aside from other considerations that will be examined later, according to forecasts by the REP managers, photovoltaic technology will be in a condition to produce under a market parity regimen by around 2020. And, according to the REP managers, the lowering of related costs that is occurring is good news for this purpose.
>
> In 2007, photovoltaic technology had already met its overall targets for the period. According to the REP managers, this early completion was due to the fact that a regulated tariff system was chosen (up to almost 45 euro cents per kW/h for facilities with less a 100 kW of installed power), which was an excess incentive since this is a technology with a great added value in manufacturing. The solar photovoltaic technology market experienced rapid expansion during the two intervals of 2006-2007 (350%) and 2007-2008 (180%), as a result of the aforementioned excess incentive situation which, although it allowed the REP's installed power targets to be met three years prior to the plan's conclusion, it has caused two pernicious effects that have to be corrected:
>
> The first, an effect of inhibition of investment in technological innovation due to the existence of profitability ratios for the projects higher (9.1% for permanent facilities and 9.3% for facilities with monitoring) than those estimated for calculation of the tariff in RD 661/2007 (7%).
>
> The second, an effect of excess cost for the electricity consumer, which could involve, according to CNE estimates, between 8.3% and 8.9% in 2007 and 2008, respectively.
>
> This situation, in which the major increase in demand for components for photovoltaic facilities has not gone hand-in-hand with a similar decrease in operating costs of facilities, originates in the passing of RD 1578/2008 which, with the aim of limiting high costs being passed on to electricity consumers, aims on the one hand to decrease the number of new beneficiary facilities of the special remuneration regimen, through the established pre-assignment system and, on the other, to reduce tariffs by adapting them to the evolution of the technological learning curve.
>
> The players agree with that set out above. The believe that the key to explaining the targets being exceeded early was the existence of a very generous premium that guaranteed high profitability for investments in this sector. In addition, the professional associations state that there has been a lot

---

[452] Ministry for Territorial Administrations, Evaluation of the 2005-2010 Spanish Renewable Energy Plan, Madrid, April 2011 (R-68), pp. 75-76. *See also* Counter-Memorial, para. 747; Rejoinder, para. 782.

of technological development, which would seem contradictory to the tariff's scare incentive for R&D+1 until 2008.[453]

413. On 23 May 2011, the consultancy Deloitte issued a report to Grupo T. Solar Global S.A. for the purpose of assessing the impact of RD 1565/2010 on certain projects of that company.[454]

> Concept of reasonable return
>
> • The regulations governing the implementation of the Special Regime are based on the concept of reasonable return, which is mentioned in Act 54/1997 on the Electricity Sector yet assigned no specific value.
>
> • In this report, reasonable return shall be defined as profitability of 7% (before financing) and after taxes, which is the reference value used in PER 2005-2010 and by the CNE in its reports.[455]

414. In December 2011, a new version of the "Invest in Spain" report was published, which, *inter alia*, stated that the Spanish regulatory framework was "stable, but adaptable to the current status of each technology as it matures" and that other aids were also available.[456]

415. On 19 December 2011, the newly elected Prime Minister, Mr. Mario Rajoy of the *Partido Popular*, gave his speech of investiture before the Spanish Parliament, in which he referred to the following circumstances, amongst others:

> It is important for us to realise Spain has a major energy problem, especially in the electricity sector, with an annual deficit in excess of 3,000 million Euros, and an accrued tariff deficit of more than 22,000 million. Electricity tariffs for domestic consumers are the third most expensive in Europe, and the fifth highest for industrial consumers. [...]
>
> If reforms are not made, the imbalances will be unsustainable, and increases in prices and tariffs will place Spain at the greatest disadvantage in terms of energy costs in the entire developed world. We must therefore introduce policies based on putting a brake on and reducing the average costs of the system, take decisions without demagoguery, employ all the technologies

---

[453] Ministry for Territorial Administrations, Evaluation of the 2005-2010 Spanish Renewable Energy Plan, Madrid, April 2011 (R-68), p. 74. *See also* Counter-Memorial, para. 747; Rejoinder, para. 782.

[454] Deloitte, Expert Report, 23 May 2011 (R-193). *See also* Counter-Memorial, paras. 504-505; Rejoinder, paras. 412, 654.

[455] Deloitte, Expert Report, 23 May 2011 (R-193), p. 57. *See also* Rejoinder, para. 412.

[456] Minutes of the Congress of Deputies, IX Legislature, Number 229, 10 March 2011 (C-102). *See also* Memorial, para. 51.

available, without exception, and regulate with the competitiveness of our economy as our prime objective.[457]

416. On 28 December 2011, the CNE issued a press release stating that the CNE was analyzing the revision of access tolling and certain tariffs and premiums under the Special Regime:

> The lack of convergence between the income and costs of regulated activities in the last ten years has generated a growing debt in the electrical system which has entailed a progressive increase in the payments for its financing through the present and future access tolling of electricity consumers as well as a temporary impact on the indebtedness of those companies that are obliged to finance the system deficit.
>
> Consequently, the CNE is repeating the need to immediately implement, amongst other measures, proposals for the regulation of activities, aimed at getting rid of the system's structural deficit and mitigating debt financing costs. Notwithstanding, to attain sufficiency it would be necessary to make larger scale additional adjustments to the costs of the activities regulated and to the tolling paid by consumers. An analysis could also be carried out of the introduction of measures to finance the costs of activities regulated externally to the access tolling. With this in mind, in its report 18/2011 the Commission indicated that for the purposes of lessening the impact on the [electricity] sector of the financing of premiums under a special regime, one possible option for mitigating the tariff deficit could consider other sources of financing besides electricity access tolling, debiting other energy sectors or other sources of income such as the income generated from the auctions of $CO_2$ emission licenses as from 2013.
>
> In addition, it is deemed necessary to use the quarterly revisions in access tolling to keep the deficit on the right track and attain sufficiency as soon as possible as laid down by the regulations in force.[458]

---

[457] Transcription of the inaugural speech of the Prime Minister Mariano Rajoy, Congress of Deputies, 19 December 2011 (R-144). *See also* Counter-Memorial, para. 736; Rejoinder, para. 690.

[458] CNE, Press release, 28 December 2011 (R-175). *See also* Counter-Memorial, para. 737.

## 4.    RDL 1/2012

417.    On 27 January 2012, Spain adopted Royal Decree-Law 1/2012 "implementing the suspension of the remuneration pre-assignment procedures and the elimination of economic incentives for new electrical energy production installations based on cogeneration, renewable energy sources and waste" ("**RDL 1/2012**").[459]

418.    This measure does not appear to have been challenged by the Claimants. However, for the sake of chronological completeness, the Tribunal recounts below its content.

419.    The Respondent notes that RDL 1/2012 was the first measure with the rank of a Law adopted with regard to reviewing the electricity sector.[460]

420.    The statement of reasons of RDL 1/2012 provided as follows:

> In recent years, the growth achieved thanks to the technologies included in the special regime has allowed in 2010 the outperformance of the installed power targets foreseen in the Renewable Energies' Plan 2005-2010 for wind technology and in particular for solar thermoelectric and solar photovoltaic technologies.
>
> However, this high level of development has not been without its critics. Outperforming the targets has made it clear that there is an imbalance between the production costs and the value of the premiums, entailing an increase in the additional cost for the system in terms of premiums for solar technologies of more than 2000 million in 2010, a figure that will increase by 2000 million Euros per year as from 2014.
>
> […] However, the measures adopted to date have not proven sufficient, putting at risk the ultimate aim of eliminating the tariff deficit as from 2013.
>
> The tariff deficit constitutes, per se, a barrier to the proper development of the sector as a whole and, in particular for the continuation of the policies to promote electrical production from high-efficiency and renewable energy sources.
>
> On the other hand, the power targets for 2020 set out in the recently approved Renewable Energies' Plan give the Government significant room for manoeuvre when setting the implementation schedule for electrical energy production installations from renewable sources from now on.
>
> It must be added that the present installed generation capacity is enough to cover the demand expected for the coming years. […]

---

[459] RDL 1/2012, 27 January 2012 (R-39). *See also* Counter-Memorial, para. 739.
[460] Counter-Memorial, para. 738.

The complex economic and financial situation would recommend the temporary elimination of the incentives to build these installations at least until solving the main problem threatening the economic sustainability of the electrical system: The tariff deficit of the electrical system.

These measures are consistent with the adjustment measures being undertaken with a view to getting our economy back on the path to growth.

[…]

In view of the above, it has been deemed opportune to eliminate the incentivising economic regimes for certain installations under a special regime and for certain installations under an ordinary regime for the same technologies as well as the suspension of the remuneration pre-assignment procedure for them in such a way that the problem of the high tariff deficit in the electrical system could be tackled in a more favourable environment. Adopting said measure, the Government opted to limit its remit to installations under a special regime that have not yet been entered on the Remuneration pre-assignment Register, with the exception of those assumptions whereby said circumstance is the consequence of a breach of the relevant resolution timeframe by the Administration. In a similar way, as far as installations under an ordinary regime are concerned, not submitted to the pre-assignment mechanism, it was decided to limit the scope of the measure under terms that exclude its impact on investments that have already been made.

This measure must be adopted urgently. […]

This Royal Decree maintains the remuneration regime set out in the legislation for installations which are up and running and for those that have been entered on the Remuneration pre-assignment Register.[461]

421. The scope of application of RDL 1/2012 was limited to new RE installations, and did not apply to installations that had been finally registered in the RAIPRE[462], such as the Claimants' PV installations. RDL 1/2012 eliminated the economic incentives for new RE installations.[463]

---

[461] RDL 1/2012, 27 January 2012 (R-39).

[462] RDL 1/2012, 27 January 2012 (R-39), Article 2.

[463] RDL 1/2012, 27 January 2012 (R-39), Articles 1 and 3.

422.  On the same day of the issuance of RDL 1/2012, the Cabinet of Ministers published a press release stating, *inter alia*, as follows:

> The standard is not retroactive, in other words it will not affect installations that are already operating, premiums that have already been authorised or installations which are already registered at the pre-assignment registers.[464]

423.  Moreover, on the same day, the Secretary of State for Energy requested the CNE to propose measures for regulatory adjustment, to address the increase of the Tariff Deficit in the electricity sector and to decide on the remuneration of regulated activities in this sector, amongst others.[465]

424.  On 23 February 2012, the president of Iberdrola S.A., Mr. Sánchez Galán, reportedly took a position in favor of Government reform and called for the reduction of RE subsidies, whilst noting:

> Premiums and feedback: Everything can be modified. We just have to ensure that the installation has a reasonable return. But this does not mean that the return should be the cost of capital multiplied by two or three [as is the case with the present system of premiums].[466]

**5.    CNE Report dated 7 March 2012**

425.  On 7 March 2012, the CNE issued the report on the Spanish Energy Sector, which was requested on 27 January 2012 by the Ministry of Industry, Energy and Tourism.[467] The report contained, *inter alia*, the following conclusion:

> In conclusion, the transition to a retail market model without regulated prices does not depend on a few isolated conditions, but on the implementation of a comprehensive set of consistent measures for effective supervision, efficient operation of contracting and switching mechanisms, and active consumer participation. Amon the conditions required for this transition to take place as soon as possible, the following are worth noting:

---

[464] Cabinet of Ministers, Press release, 27 January 2012 (R-81). *See also* Counter-Memorial, para. 740; Rejoinder, para. 886.

[465] CNE, Report on the Spanish Energy Sector, 7 March 2012 (C-196)/(R-82), p. 24, *referred to* in Memorial, para. 408; Reply, paras. 387-388, 427, 431, 689; Claimants' Post-Hearing Brief, para. 153.

[466] Libre Mercado, "Iberdrola calls for premiums on renewables to stop now 'Every month that passes, the bubble gets bigger'", 23 February 2012 (R-281). *See also* Rejoinder, para. 633.

[467] CNE, Report on the Spanish Energy Sector, 7 March 2012 (C-196)/(R-82).

- Determine the regulatory framework for ensuring economic and financial sustainability of the system[.] Comparably, while costs to be incorporated with access fees are established, they should be determined on the basis of a cost-allocation-based methodology that is objective, stable over time and that provides for a path of progressive sufficiency of tolls.[468]

426. With respect to the cost of the Special Regime subsidies, the CNE's report noted as follows:

> The following measures, which are proposed to be done urgently, would entail some savings in 2012 […].
>
> INCREASE OF THE X FACTOR IN THE RATES AND PREMIUMS DISCOUNTING INDEX […] MEASURE APPLIED SINCE 2012. TYPE OF ACTION: ROYAL DECREE. AFFECTS ALL TECHNOLOGIES
>
> The rate or premium that incentivizes those facilities that use renewable energy sources is updated based on the CPI corrected by an efficiency factor X. […]
>
> The proposed measure, which would require a rule with the range of a Royal Decree, would consist of increasing the value of the efficiency factor X. This measure maintains the principle of obtaining a reasonable profit contained in the Law.
>
> Given that the values of the rates and premiums are calculated every year (or quarter) in reference to the values from the previous period, this measure has a cumulative economic impact: It would entail an annual reduction of the overall amount of the equivalent premium of the special regime to the tune of 200 million cumulative Euros starting in 2013.[469]

427. The CNE report also proposed to consider a cap and floor of the premiums:

> 3.2.3 CONSIDERATION OF THE CAP AND FLOOR OF THE PREMIUM, SO THAT WHEN THE MARKET PRICE IS ABOVE THE CAP, THE PREMIUM IS RETURNED AS TAXABLE INCOME OF THE SYSTEM. TYPE OF ACTION: LAW
>
> Currently, for various renewable technologies (this is not the case for photovoltaic, that is remunerated at a tariff rate) a "market plus premium scheme" is offered whose sum is subject to a cap and floor. The aim is that consumers and producers share risks in situations where market prices are stressed upwards or downwards, respectively.
>
> However, effective application of this mechanism is now asymmetric to the detriment of the consumer: for very high market prices that by themselves are above the cap, there would be no return of the excess on the cap, as the producer would retain all of the market price. On the contrary, with depressed

---

[468] CNE, Report on the Spanish Energy Sector, 7 March 2012 (C-196)/(R-82), p. 9.

[469] CNE, Report on the Spanish Energy Sector, 7 March 2012 (C-196)/(R-82), pp. 41-42.

market prices, the premium is complemented to the extent necessary to achieve the floor level.

The measure proposed, that would require a regulation with the force of a law […], would consist in applying the full return to the system as taxable income of all the amounts that exceeded the cap. This measure preserves the principle contained in the law of obtaining a reasonable return. […]

The economic impact of this measure has not been valued, as its application presupposes a situation of very high prices that would distort the scenarios of evolution of taxable income normally used, but in this case, the measure would mean lower costs for the access tariff.

Notwithstanding the foregoing, its economic impact has been partially tested through the following example based on wind in 2008: wind power facilities under the market option are remunerated with a premium that varies depending on the market price; if in a specific time it is greater or equal to the cap, the facility does not receive a premium, but retains the full market price for this time.[470]

428. The Claimants contend that the CNE report of 2011 recognized numerous less harmful ways of addressing the Tariff Deficit, including "a tax on the sale of petrol and gas, a tax on CO2 emissions, and FiT profiling".[471]

429. The Respondent contends that the CNE, after having consulted the whole Spanish energy sector, stated that the solution to the problem of the economic unsustainability of the SES could not exclusively be addressed by increasing the access tolls paid by Spanish consumers.[472] Furthermore, the Respondent states that "the CNE considered it essential to adopt different regulatory measures that affected […] multiple cost and income items of the SES, which include the cost of the subsidies for renewables."[473]

**6.    Supreme Court Judgments regarding challenges against RD 1565/2010 and RDL 14/2010**

430. From April 2012 onwards, the Supreme Court rendered a series of decisions in appeal proceedings brought by RE producers against RD 1565/2010 and RDL 14/2010.[474]

---

[470] CNE, Report on the Spanish Energy Sector, 7 March 2012 (C-196)/(R-82), pp. 101-102.

[471] Reply, para. 387.

[472] Rejoinder, para. 770.

[473] Rejoinder, para. 770.

[474] *See* paragraphs 377-399 above.

431. Amongst others, RE producers contended that the changes introduced by RD 1565/2010 and RDL 14/2010 were retroactive and violated the principle of legitimate expectations under Spanish law.

432. The Supreme Court rejected these challenges. Regarding the allegation of illegal retroactivity, it held that:

> The concept of 'prohibited retroactivity' is much more limited than that of mere 'retroactivity' even though the latter is used frequently in the non-legal debate […].
>
> Furthermore, it is true that for those who are not familiar with the use of legal categories, the distinctions between a minimum, medium or maximum level of retroactivity or the adjectives 'proper' and 'improper' applied to said term, are usually ignored and everything is encompassed within an undifferentiated notion of negative connotations, applied to regulatory measures endowed with a very different remit. […]
>
> [T]he remit of prohibited retroactivity does not include provisions which, lacking any ablative or pejorative effects towards the past (they do not require the revision nor removal of past facts, they do not alter the reality already experienced over time and they do not annul the legal effects exhausted), they deploy their immediate effectiveness looking towards the future even if this means impacting a relationship or legal situation which are still in progress.
>
> Based on this premise, a regulatory measure such as the one challenged in the present litigation, whose effectiveness is not planned 'back' in time but rather 'forward', once it has been approved, does not fall within the remit of prohibited retroactivity. The projection towards the future is worthy of particular note in this case, simply notifying that the 'real' effects of the measure will occur within thirty years, until which time the regulated tariff, in line with its original terms, is maintained for the owners of photovoltaic installations. Classifying as retroactive over time something which, approved today, will not be fully effective within thirty years is an example of an inappropriate use of said adjective. Retroactivity would occur if the new regulation required the owners of photovoltaic installations to return the amount of those tariffs already received in previous financial years, but not when it merely stipulates that their receipt will cease within thirty years. Strictly speaking, it could not even be classified as a retroactive measure and all the less so if we use this legal concept in its 'proper' sense.[475]

[475] Third Chamber of the Supreme Court, App. 59/2011, Judgment, 12 April 2012 (R-101), pp. 3-4. *See also* Third Chamber of the Supreme Court, App. 35/2011, Judgment, 12 April 2012 (R-102); Third Chamber of the Supreme Court, App. 62/2011, Judgment, 19 June 2012 (R-103); Third Chamber of the Supreme Court, App 60/2011, Judgment, 24 September 2012 (R-104); Third Chamber of the Supreme Court, App. 71/2011, 25 September 2012 (R-105). *See also* Counter-Memorial, paras. 340, 363-364, 678, 679, 887-888, 1229; Rejoinder, paras. 288, 296, 795, 927, 1381.

433. Regarding producers' legitimate expectations claim, the Supreme Court noted that the regulatory regime provided under RD 661/2007, including the provisions relating to the regulated tariff for an indefinite period of time after 25 years of operation of a PV facility, were limited by the "implicit" restriction arising from the (limited) operating life of a standard RE facility:

> [T]he owners of electrical energy production installations under a special regime do not have an 'unmodifiable right' to maintain unchanged the economic regime regulating the receipt of its remunerations when they themselves have decided not to opt for the market (a possibility which is still open to them) but rather to benefit from a public system setting said remunerations.

> The virtual elimination of the entrepreneurial risk involved when subjected to the regulated tariff, without competing pricewise with the other agents on the market is, per se, an advantage over those electricity sector operators subject to the fluctuations of free competition, an advantage whose reverse it is precisely, *inter alia*, the possibility of altering the administrative measures in the event of changes to subsequent circumstances (respecting some minimum returns which are not relevant here).

> Private operators or agents who 'renounce' the market, even if they do so more or less 'induced' by the generous remuneration offered to them by the regulatory framework, without any recompense for assuming major risks, were aware or should have been aware that said public regulatory framework, approved at a given time, in the same way as it was consistent with the conditions of the economic scenario in force at that time and with the electricity demand forecasts made at that time, could not subsequently be immune to any relevant modifications to basic economic data in the light of which it is logical for the public authorities to keep in step with the new circumstances. If these entail adjustments in many other production sectors, with obvious difficulties for their activity, it is not unreasonable for them also to extend to the renewable energies' sector which wished to keep receiving the regulated tariffs instead of opting for the market mechanisms (bilateral contracting and sale on the organised market). And this is all the more so in the event of situations involving a widespread economic crisis and, in the case of electrical energy, in view of the growth in the tariff deficit which, to a certain degree, derives from the impact that the remuneration of the former has on the calculation of access fees by way of the regulated tariff insofar as it is a cost imputable to the electricity system.

> The economic regime stipulated administratively endeavours to promote the use of renewable energies by incorporating incentivising measures which, as their permanence without any modifications in the future is not ensured, as we have just set out, is based on a series of implicit assumptions which any diligent market operator - or who had opted for prior quality consulting – could not be unaware of.

> One of said implicit constraints is that the promotional measures (in this case, the receipt of a very favourable regulated tariff) cannot be regarded as 'lifelong' or unlimited over time. It is not reasonable to assume that [RD 661/2007] guarantees the receipt of the regulated tariff for an infinite

period, in other words, without any time limit. On the contrary, even when there is talk – in its original version – of a period 'subsequent' to the 25 years, it can easily be assumed that this implicitly set as a ceiling or termination the final date of the working life of the photovoltaic installations[.][…]

[…] Hence, the updating and revision system for tariffs, premiums and complements set out in article 44 of [RD 661/2007] and specified in article 36 of the same Royal Decree for category b) installations may be modified by [RD 1565/2010] whose determinations are not subject to that laid down by the previous one. As there are no regulatory hierarchy relations between both, it can hardly be asserted that the precept contained in one Royal Decree 'breaches' precepts of another which is just as equally binding: it does not breach them but rather it derogates or modifies them, a clearly distinct legal effect.[476]

434. Challenges against the new access toll introduced by RDL 14/2010 were dismissed by the Supreme Court based on similar grounds.[477]

## 7.    National Reform Program and Memorandum of Understanding with the EU

435. On 27 April 2012, the Government adopted the National Reform Programme.[478]

436. The National Reform Programme set forth strategic decisions regarding a variety of economic sectors, including the energy sector. With respect to the electricity sector, the National Reform Programme provided for the correction of certain imbalances,[479] in particular the tariff deficit in the SES. As regards RE, the National Reform Programme provided for the elimination of economic incentives for new Special Regime Facilities[480], a revision of the Plan for Renewable Energies (PER) 2011-2020[481], the modification of

---

[476] Third Chamber of the Supreme Court, App. 59/2011, Judgment, 12 April 2012 (R-101), pp. 4,5-7. *See also* Third Chamber of the Supreme Court, App. 35/2011, Judgment, 12 April 2012 (R-102); Third Chamber of the Supreme Court, App. 62/2011, Judgment, 19 June 2012 (R-103): "According to the claim, by reference to the report issued at the behest of the Photovoltaic Business Association, the 'the significant loss in returns' resulting from Royal Decree 1565/2010 must be viewed by comparing the rates of return resulting from this Decree with those resulting from the regulations prior to this Decree. […] The idea that the 'reasonable rate of return' estimated at a particular moment in time must remain unaltered, at other moments in time, cannot be shared. Depending on changing economic and other circumstances, a rate of return percentage viewed as 'reasonable' in a first instance, May require subsequent adjustments precisely in order to maintain the 'reasonableness' when faced with the modification of other economic and technical factors."

[477] Third Chamber of the Supreme Court, App. 259/2012, Judgment, 25 June 2013 (R-107); Third Chamber of the Supreme Court, App. 252/2012, Judgment, 25 June 2013 (R-199). *See also* Counter-Memorial, paras. 365, 698, 719, 730.

[478] Government of Spain, National Reform Programme 2012 (R-71). *See also* Counter-Memorial, para. 748.

[479] Government of Spain, National Reform Programme 2012 (R-71), p. 206.

[480] Government of Spain, National Reform Programme 2012 (R-71), p. 209.

[481] Government of Spain, National Reform Programme 2012 (R-71), p. 210.

remuneration of distribution and transport[482], and remuneration by capacity[483], amongst others.

437. According to the Respondent, Spain's structural reform plans were also supported by the International Monetary Fund and the Council of the European Union.[484]

438. On 20 July 2012, Spain signed a memorandum of understanding with the European Union, in the context of the need for a bailout of certain Spanish banks.[485] One of the structural reforms mentioned in this document was Spain's commitment to "address the electricity tariff deficit in a comprehensive way."[486]

## 8.    Law 15/2012 – Disputed Measure

### a.    Law 15/2012: Context and most relevant measures

439. On 14 September 2012, the Ministry of Industry, Energy and Tourism published the regulatory impact analysis report on what would become Law 15/2012 (as defined below).[487]

440. According to the regulatory impact analysis, the prospective law created three different taxes, a tax on the value of electric power production, tax on the production and storage of spent nuclear fuel and radioactive waste, and a levy on the use of water in the production of electricity.[488] It also modified the tax rates for natural gas and coal.[489] The stated objectives pursued by the measure were "[t]o harmonize [the] tax system with a

---

[482] Government of Spain, National Reform Programme 2012 (R-71), p. 210.

[483] Government of Spain, National Reform Programme 2012 (R-71), p. 211.

[484] Counter-Memorial, paras. 749-750.

[485] Memorandum of Understanding on Financial-Sector Policy Conditionality suscribed with EU 20 July 2012: "VI. Public Finances, Macroeconomic Imbalances and Financial Sector Reform", 20 July 2012 (RL-49). *See also* Counter-Memorial, para. 752.

[486] Memorandum of Understanding on Financial-Sector Policy Conditionality suscribed with EU 20 July 2012: "VI. Public Finances, Macroeconomic Imbalances and Financial Sector Reform", 20 July 2012 (RL-49), p. 15. *See also* Counter-Memorial, para. 752.

[487] Ministry of Industry, Energy and Tourism, Regulatory Dossier, Law 15/2012, tax measures for energy sustainability, 14 September 2012 (C-215). *See also* Reply, paras. 574-581.

[488] Ministry of Industry, Energy and Tourism, Regulatory Dossier, Law 15/2012, tax measures for energy sustainability, 14 September 2012 (C-215), p. 1.

[489] Ministry of Industry, Energy and Tourism, Regulatory Dossier, Law 15/2012, tax measures for energy sustainability, 14 September 2012 (C-215), p. 1.

more efficient and respectful use of energy resources with the environment and sustainability."[490]

441.    The regulatory impact analysis report contained a chapter titled "legal analysis", which noted that the tax on the value of the production of electric power "taxes the realization of energy production activities in the Spanish electricity system, which will mean greater tax revenues and will promote a balanced budget."[491]

442.    On 14 October 2012, the Minister of Industry, Energy and Tourism, Mr. Jose Manuel Soria gave an interview in which he made the following statements:

> [Q] The Secretary of State for Energy acknowledged this week that the Minister had been under 'tremendous pressure' to reform the electric sector.
>
> [A] It's normal that the measures we have taken to tighten the reins on the electric deficit haven't pleased the companies, both with regard to the ordinary arrangements as well as special arrangements. Why? Because there is part of the deficit that they are going to take on, just as there is part of it that is going to be taken on by the State and the consumers. The Government has to defend the general interest, which is to have an electric system that is sustainable from the environmental point of view, as well as economically and financially. If we do not control the deficit, it will keep accumulating in the financial balances of the companies, which are not obliged to absorb the cost, and the State is committed to paying off interest of more than EUR2,000 million each year. Therefore, although no one likes these measures, they are totally essential. [...]
>
> [Q] Is the Government able to prevent the electric companies from passing on the increased costs in the bills they send to consumers?
>
> [A] The taxes on the electric system have not been established in such a way that the adjustment the companies have to bear would be passed on to the consumers. The measures are there so that the companies pay the taxes and so that they are they are the ones that bear the adjustment. We are going to make the market work.
>
> [Q] All energy sector stakeholders agree that what has been approved so far is not a reform of the sector, but only tax rises.
>
> [A] When the reform to introduce fiscal measures was put in place, this was done to put an end to the generation of new deficit rates in 2013 and

---

[490] Ministry of Industry, Energy and Tourism, Regulatory Dossier, Law 15/2012, tax measures for energy sustainability, 14 September 2012 (C-215), p. 1.

[491] Ministry of Industry, Energy and Tourism, Regulatory Dossier, Law 15/2012, tax measures for energy sustainability, 14 September 2012 (C-215), p. 6.

subsequent years. The reform of the sector comes now, after generation of deficit is controlled, and we can get into the regulatory framework.

[Q] Was there no other way?

[A] The Supreme Court has supported the reduction in the number of hours paid at a premium rate for photovoltaic energy. We could have opted for a reduction in premiums but we opted instead for the fiscal measures. There were distinct alternatives on the table, it's true, but finally the one that I took to the Council of Ministers was the one for a tax on generation, of a fixed type. It's true that the possibility of a variable type was considered, one that functions in various ways, not by technology, but according to the price to the consumer.

[Q] Will these measures put an end to the deficit rate in 2013?

[A] Yes.

[…]

[Q] And do these measures make it possible to lower premiums on renewable energy?

[A] That issue has not been raised at the moment, but certainly the Supreme Court has opened a door.[492]

443.  On 27 December 2012, the Cortes Generales passed Law 15/2012 on fiscal measures for energy sustainability and which entered into force on 1 January 2013 ("**Law 15/2012**").

444.  Amongst others, Law 15/2012 introduced a 7% tax on the value of the production of electricity (the "**TVPEE**"[493]) that was applicable to all revenues (including the FiT) received by both traditional and RE producers.[494]

445.  In its preamble, Law 15/2012 stated, *inter alia*, as follows:

> The objective of this Law is to harmonise our tax system with a more efficient and respectful use of the environment and sustainable development, values which inspire this tax reform, and as such, bring it into line with the basic principles that govern the tax, energy and of course the environmental policy of the European Union.

---

[492] La Gaceta, Interview with the Minister of Industry, 14 October 2012 (C-110), pp. 1-2. *See also* Memorial, 212(d).

[493] This abbreviation is used without prejudice to the question of characterization of this measure as a 'taxation measure' under Article 21 of the ECT. *See* paras. 695-703 below.

[494] Law 15/2012, 27 December 2012 (C-111)/(R-3), Articles 1, 4(1), 8. *See also* Memorial, paras. 211-213; Reply, paras. 334, 556-596; Counter-Memorial, paras. 120-214; Rejoinder, paras. 187-236, 831.

> […] one of the linchpins of this tax reform shall be the internalization of the
> environmental costs that derive from the production of electricity […].[495]

446.  With respect to the TVPEE, the preamble of Law 15/2012 pursued:

> For this purpose and also with a view to favouring budgetary balance, Title I
> of this Act establishes a tax on the value of the production of electrical energy,
> of a direct and real nature, which is levied on the performance of activities of
> production and incorporation into the electricity system of electrical energy in
> the Spanish electricity system.
>
> This tax will be levied on the economic capacity of electrical energy producers
> whose installations give rise to significant investments in the electrical energy
> transport and distribution networks in order to be able to evacuate the energy
> loaded thereto, and entail, by themselves or as results of the existence and
> development of the said networks, unquestionable environmental effects, as
> well as the generation of highly significant costs necessary for maintaining the
> guarantee of supply. The tax will be applied to the production of all generation
> installations.[496]

b.  **Law 15/2012: The Parties' positions**

447.  According to the Claimants, the TVPEE "amounts to a disguised tariff cut" for RE
installations and to "an additional limitation to the RD 661/2007 and RD 1578/2008
economic regimes."[497]

448.  Specifically, the Claimants argue that the TVPEE is not a *bona fide* taxation measure of
general application. First, according to the Claimants, the fact that Law 15/2012 applies
to all RE producers is inconsistent with the stated objective of the Law, which was to
harmonize the Spanish tax system "with a more efficient and respectful use of the
environment and sustainable development" (preamble).[498] Second, Law 15/2012 was
particularly harmful to RE producers, as they operate in a regulated regime and cannot
pass the effect of the TVPEE to the consumer.[499] Third, the TVPEE has effects equivalent
to a further limitation to the FiTs under RD 661/2007 and RD 1578/2008, and the real
purpose of the tax was to balance the budget of the SES, a measure that the government

---

[495] Law 15/2012, 27 December 2012 (C-111)/(R-3).
[496] Law 15/2012, 27 December 2012 (C-111)/(R-3), p. 2.
[497] Memorial, para. 211; Reply, para. 334; Claimants' Post-Hearing Brief, para. 233; Claimants' Reply Post-Hearing Brief, para. 80.
[498] Memorial, para. 212(a); Reply, paras. 561-563.
[499] Memorial, para. 212(b); Reply, para. 570.

could have, but chose not to, achieve by cutting the FiT directly, as shown in the interview of Minister Soria.[500] Fourth, Spain's conduct allegedly demonstrated that the TVPEE was not a real tax measure, but a tariff cut, because the money raised by the TVPEE went to the State budget and an identical amount was then returned to the electricity system.[501]

449. According to the Respondent, the TVPEE is a measure of general application that affects both renewable and conventional energy producers.[502] The Respondent further argues that the impact of the TVPEE has been neutralized, as the TVPEE is one of the costs remunerated to RE producers through the specific remuneration (premiums) that they receive.[503]

## 9.   RDL 2/2013 – Disputed Measure

### a.   RDL 2/2013: Context and most relevant provisions

450. On 1 February 2013, the Government adopted Royal Decree-Law 2/2013 on urgent measures in the energy sector and in the financial sector ("**RDL 2/2013**").[504]

451. The preamble of RDL 2/2013 stated:

> The main source of revenue of the electricity system, in order to finance the various cost items, are access tolls applied to the final consumers of electricity.
>
> In recent years, the expansive evolution of cost items of the electricity system has been causing the appearance of imbalances between these costs and the revenues from regulated prices. In order to correct the imbalances, in 2012 a series of urgent measures affecting both items were taken.
>
> The data reported by the National Energy Commission in its report 35/2012 of the 20th of December on the order proposal establishing the access tolls are established from the 1st of January 2013 and tariffs and premiums of special regime facilities, has revealed the appearance of new deviations in estimates of costs and revenues caused by various factors, both for the end of 2012 and 2013, that in the current economic context, would render almost unfeasible their coverage with electric tolls and the items prescribed from the State General Budget.

---

[500] Memorial, para. 212(c), Reply, paras. 581-590.

[501] Memorial, para. 212(d), Reply, paras. 581-590.

[502] Counter-Memorial, para. 777; Rejoinder, paras. 204-207.

[503] Counter-Memorial, para. 779; Rejoinder, para. 834.

[504] RDL 2/2013, 1 February 2013 (R-42)/(C-113). *See also* Memorial, para. 30; Reply, para. 380; Counter-Memorial, para. 780; Rejoinder, para. 784.

These deviations are due largely to a higher growth in the cost of the special regime, due to an increase in the operation hours exceeding the projected and an increase in the compensation values after indexing to the Brent price, and a reduction of toll revenues due to a very sharp drop in demand which is consolidated for this exercise.

The proposed alternative would be a further increase in access tolls paid by electricity consumers. This measure would affect directly household economies and corporal competitiveness, both in a delicate situation, given the current economic situation.

Given this scenario, in order to alleviate this problem the Government has decided to adopt certain cost-reduction urgent measures to avoid the assumption of a new effort by consumers; helping them, through consumption and investment, to collaborate as well for the economic recovery.

Consequently, with the purpose of using a more stable index which is not affected by the volatility of unprocessed foods no those from domestic fuels, all those remuneration updating methodologies that are linked to CPI shall substitute it by the Consumption Price Index to constant taxes with no unprocessed food nor energy products.[505]

452. On this basis, RDL 2/2013 replaced the CPI in the FiT inflation adjustment formula under RD 661/2007 and RD 1578/2008 with the Consumer Price Index "at constant taxes excluding unprocessed foods or energy products".[506]

b.   **RDL 2/2013: The Parties' positions**

453. According to the Claimants, RDL 2/2013 had "a limited effect in practice as a result of: (a) the existence of deflation in Spain after February 2013; and (b) the fact that the new index was in force only for six months. The intention was nevertheless clear: to cut the [FiT]."[507]

454. Elsewhere in their Memorial the Claimants state that "the new index reduced [FiTs] for PV plants by about three percentage points."[508]

---

[505] RDL 2/2013, 1 February 2013 (R-42)/(C-113).

[506] Article 1, RDL 2/2013, of 1 February, on urgent measures in the electricity system and in the financial sector, 1 February 2013 (R-42)/(C-113).

[507] Memorial, para. 344. *See also* Reply, para. 335: "[c]ompared to the wholesale withdrawal of the Special Regime in 2013, the impact of RDL 2/2013 was relatively minor."

[508] Memorial, para. 189.

455. According to the Respondent, the amendment of the consumer price index introduced by RDL 2/2013 was justified from both scientific and legal standpoints.[509] Indeed, the only methodological change introduced by RDL 2/2013 consisted in "modifying the general CPI for a type of underlying CPI at constant taxes."[510] According to the Respondent, the use of consumer price indexes at constant taxes is "broadly provided for in world economics doctrine", as recognized by the International Monetary Fund.[511] A CPI at constant taxes also avoids distortions of the general index, which may be caused by the volatility of some of its elements, as recognised, *inter alia*, by the Organisation for Economic Co-operation and Development.[512]

456. The Respondent further argues that the modification of the CPI had been recommended by the CNE, amongst others, in its report dated 7 March 2012 (referred to above at paragraph 425).[513]

457. The Respondent also relies on the fact that the Spanish Supreme Court subsequently ruled that RDL 2/2013 was in compliance with the Spanish Constitution because the price indexes "have no reason to be the same for the different activities or to remain unaltered over time."[514]

458. In March 2013, the Commission issued a renewable energy progress report, which contained the following observation:

> Many national reforms have had a negative impact on the investment climate. Most critical have been changes that reduce the return on investments already made. Such changes alter the legitimate expectations of business and clearly discourage investment, at a time when significantly more investment is needed. Thus there is a need for guidance on the reform process itself, to ensure support schemes are cost effective but not disruptive.[515]

---

[509] Counter-Memorial, para. 782.

[510] Counter-Memorial, para. 783.

[511] Counter-Memorial, para. 783 and ibid., footnote 477.

[512] Counter-Memorial, para. 783 and ibid., footnote 478.

[513] Counter-Memorial, para. 785.

[514] Supreme Court, Administrative App. 33/2013, Judgment, 26 March 2015 (R-110), Ground five. *See also* Counter-Memorial, paras. 780 and 786-787.

[515] European Commission, Renewable energy progress report (COM (2013) 175 final), 27 March 2013, (C-261), p. 9. *See also* Hearing Tr., Day 5, 22 March 2019, 48:4-9 (Stoyanov).

**10.    RDL 9/2013 – Disputed Measure**

a.    **RDL 9/2013: Context and most relevant provisions**

459.  On 12 July 2013, the Government adopted Royal Decree-Law 9/2013 "which sets forth urgent measures to ensure the financial stability of the electricity system" and which entered into force on 14 July 2013 ("**RDL 9/2013**").[516]

460.  In its preamble, RDL 9/2013 stated, *inter alia*, as follows:

> Since [Law 54/1997] began the process of liberalisation in the activities of electricity generation and marketing, the electricity sector model in Spain has been articulated on the principles of revenue sufficiency and receiving an adequate remuneration for the various actors involved.
>
> The ratification by Spain of the European Energy Charter Treaty dated 11 December 1997 and the continuous incorporation in our domestic law of the Community legal system has involved, in turn, the assumption of the principles that are its essence, and, therefore, the promotion of renewable energies, the creation of conditions that promote the use of energy in the most economical manner with utmost respect for the environment and the encouragement of energy efficiency.
>
> Together with these principles that define the model, the public intervention through the regulation aims to ensure the security of supply, assuming that the functioning of the market enables the economic and financial sustainability of the electricity sector, and that the various actors involved must accommodate the specific circumstances of a changing sector, if necessary for the sake of guaranteeing the former.
>
> Notwithstanding the foregoing, the Spanish electricity system has generated a tariff deficit for a decade, which, over the passage of time, has adopted a structural nature, due to the fact that the actual costs related to regulated activities and the operation of the electricity sector are higher than the collection of the tolls set by the Government, which are paid by consumers
>
> Between 2004 and 2012, the electricity system's income from consumer fees has increased by 122%, while the increase in the system's regulated costs in the same period has been 197 percent. Prominent among the cost items that have most contributed to such an increase are the special scheme premiums and the accumulated deficit annual payments, items that have multiplied by six and nine respectively during the said period.
>
> According to the latest data provided by the National Electricity Commission, as of 10 May 2013 there is an accumulated debt of 26,062.51 million euros.

---

[516] RDL 9/2013, 12 July 2013 (R-43)/(C-115), Ninth final provision: "This Royal Decree-Law shall come into force the day following its publication in the 'Official State Gazette'." *See also* Memorial, paras. 31, 191, 215-219, 221-242, 398; Reply, para. 380; Counter-Memorial, paras. 323, 655-663, 791-814, 899, 907, 1164, 1207; Rejoinder, paras. 225, 838-849, 861-888, 948.

In addition to the calculation of the electricity system debt, the Commission notes that from 2003 to 10 May 2013 the amount paid out to fund the deficit of the electricity system by means of the annual payments which are included in consumers' access fees, in current prices for each year, amounts to 11,823 million euros.

These figures testify to the unsustainable nature of the electricity sector debt and to the need to adopt urgent and immediately-applicable measures that make it possible to bring such a situation to an end.

Based on the fundamental issues that justify public intervention in the industry, and in order to correct the imbalances produced by the rapid growth of the electricity system's costs, in recent years a series of urgent measures have been adopted which have affected both costs and revenues.[517]

461.  Based on the foregoing, the preamble pursued:

First of all, the Government is empowered to adopt a new legal and economic scheme for the existing electricity production facilities based on renewable energy sources, cogeneration, and waste. Therefore, the Government amends Article 30.4 of [Law 54/1997], in order to introduce the specific principles that shall articulate such regime, in order to narrow the scope of action of the Government in the development of remuneration systems for these facilities. It shall be based on receiving the revenue derived from participation in the market, with an additional return that, if necessary, shall cover those investment costs that an efficient and well-managed company does not recover in the market. In this sense, according to community case law, a company shall be deemed as being efficient and well-managed if it has the necessary means for the development of its field, whose costs are those of an efficient enterprise in that field and considering the corresponding revenue and a reasonable profit for the execution of its functions. The aim is to ensure that the high costs of an inefficient company are not taken as reference.

In this way the goal is to cover the additional costs of these facilities those of the rest of technologies in the market.

This framework shall articulate a remuneration that shall allow renewable energy, cogeneration, and waste facilities to cover the costs necessary to compete in the market at an equal level with the rest of technologies and get a reasonable rate of return.

In order to calculate the specific remuneration, the following shall be considered for a standard facility: the proceeds from the sale of the energy generated, valued at the market production price, the medium operating that are necessary to carry out the activity, and the value of the initial investment of the standard facility, all of this for an efficient and well-managed company. This establishes a remuneration scheme on standard parameters per the various standard facilities that are established.

---

[517] RDL 9/2013, 12 July 2013 (R-43)/(C-115), p. 1.

[…]

Furthermore, [Law 54/1997], stipulates the regulation on the concept of reasonable rate of return, setting it, in line with the legal principles on the particular case law developed within the last few years, within project profitability that will be focused, prior to taxes, on the average yield in the secondary market of State Obligations within ten years, by applying the appropriate differential.[518]

462. Thus, RDL 9/2013 amended Article 30(4) of Law 54/1997, providing, *inter alia*, that the Special Regime facilities "may receive a specific remuneration … composed of an amount per unit of installed capacity. Such amount shall cover, as appropriate, the investment costs of a standard installation that cannot be recovered through the sale of energy, as well as an amount for the operation of the installation to cover, as the case may be, the difference between exploitation costs and the revenues obtained from the participation of such a standard installation in the market"[519] (the "**Special Payment**").

463. RDL 9/2013 consequently repealed RD 661/2007, thereby eliminating the FiT and premiums for both new and existing RE installations.[520]

464. As regards the new economic regime, the second final provision of RDL 9/2013 provided:

At the proposal of the Minister of Industry, Energy and Tourism, the Government, shall approve a Royal Decree of regulation of the legal and economic schemes for electricity production facilities from renewable sources of energy, cogeneration and waste with feed-in remuneration which shall amend the remuneration model of the existing facilities.

This new model shall be adjusted to the criteria laid down in Article 30 of [Law 54/1997], introduced by this Royal Decree-Law and shall be implemented from the entry into force of this Royal Decree-Law.

Notwithstanding the foregoing, the specific remuneration schemes set for the facilities of solar thermal energy technology awarded the scheme provided for in the third additional provision of [RD 1565/2010], which regulates and modifies certain aspects related to the field of the production of electricity under special regimes, shall consist of a single term of the operation whose value shall be the result of the economic offer for which they are the successful bidders.[521]

---

[518] RDL 9/2013, 12 July 2013 (R-43)/(C-115), p. 6.

[519] RDL 9/2013, 12 July 2013 (R-43)/(C-115), Article 1(two).

[520] RDL 9/2013, 12 July 2013 (R-43)/(C-115), Third transitory provision.

[521] RDL 9/2013, 12 July 2013 (R-43)/(C-115), Second final provision.

465. RDL 9/2013 and related subsequent measures (including Law 24/2013, Order IET/1045/2014, and Royal Decree 413/2014)) are hereinafter referred to as the **New Regime**.

466. The Special Payment remuneration regime introduced by the modified Article 30(4) of Law 54/1997 was not to exceed the minimum level required to allow RE producers to obtain a reasonable return which henceforth was to be defined every six years "by reference to the standard installation" and over the regulatory life of PV facilities.[522] Such reasonable return was to be determined by reference to the average return in the secondary market of Spain's ten-year bonds increased by 300 basis points[523] (and which was ultimately fixed at 7.398%[524]). RDL 9/2013 also provided that the remuneration schemes established by RD 661/2007 and RD 1578/2008 would continue to apply on a temporary basis until the adoption of a new legal framework.[525] This was referred to as the "interim period."[526]

467. On 4 September 2013, the CNE issued its Report 18/2013 on the Royal Decree proposal regulating the activity of electricity production from renewable energy sources, cogeneration and waste, i.e., the draft regulations that were to be adopted based on RDL 9/2013 ("**CNE Report 18/2013**").[527]

468. With respect to the new proposed methodology, CNE Report 18/2013 noted:

> The proposal develops the change of the remuneration model applicable to facilities that produce electricity from renewable energy sources, cogeneration and waste which is already established in the recent [RDL 9/2013]. This

---

[522] RDL 9/2013, 12 July 2013 (R-43)/(C-115), Article 1(two).

[523] RDL 9/2013, 12 July 2013, p. 23 (R-43)/(C-115), First aditional provision.

[524] See para. 507 below.

[525] RDL 9/2013, 12 July 2013, p. 24 (R-43)/(C-115), Third transitional provision.

[526] Claimants' Memorial, para. 225; First KPMG Report, para. 302. This interim period started on 13 July 2013 and ended with the publication of Order IET/1045/2014 on 20 June 2014. As explained by Mr. Solé, "[u]pon publication of Order IET/1045/2014 a settlement process began whereby facilities were required to refund, with backdated effect, any regulated incentive collected in excess of the specific remuneration corresponding to the … interim period." First KPMG Report, para. 302. Prof. Spiller further explains that upon the adoption of Order IET/1045/2014, "a 'claw-back' payment was implemented requiring power plants or Spain, as applicable, to return the difference between the payments actually received in the Interim Period and the payments that the power plants would have received under the June 2014 Order." First Compass Lexecon Report, para. 28.

[527] CNE, Report 18/2013 on the proposed Royal Decree regulating activities of electrical energy production from renewable energy, cogeneration and waste sources, 4 September 2013 (C-117). *See also* Memorial, paras. 216, 238, 341; Reply, paras. 26, 342, 367, 375.

model is new, as it is not reflected in the EU and must be developed by ministerial order that will set some parameters which are difficult to specify and quantify, particularly for existing facilities.

[…]

The economic incentives were envisaged in [Law 54/1997], such that the facilities that use renewable energy sources, cogeneration and waste attain reasonable profitability, taking into account the cost of money in the capital markets. At the same time, these incentives were designed to incentivise electricity production through innovative and immature technologies.

However, Royal Decree-Law 9/2013 modifies the structure of these incentives: it establishes specific remuneration with a fixed term per installed power unit, completed, as applicable, with an operation term, so that the facilities receive the market price signal more clearly. The new methodology aims to promote these energies by means of economic incentives calculated so that the facility obtains reasonable profitability financed with its own funds. This profitability is defined before taxes as the rate on ten-year state bonds in the secondary market, increased with a spread of 300 basis points.[528]

469.    As regards the design of the economic incentives under the New Regime, the CNE noted:

This Commission considers that the design of the aforementioned economic incentives must be based on the definition of some adequate efficacy (achievement of the objectives set) and efficiency parameters (ensuring that said achievement is performed at the lowest possible cost). In this sense, it must be indicated that there is no record of a remuneration model similar to that reflected in the proposal in any jurisdiction of the European Union, or in other countries whose support systems are known through international associations of regulatory bodies. The new methodology could ensure reasonable profitability insofar as it offers additional remuneration to facilities during their useful lifespan, which would level the playing field so that they can participate in the market, also receiving the market price signal with no distortions.

The new methodology incorporates regular reviews of the specific remuneration in order to ensure the obtainment of the so-called reasonable profitability, avoiding under-remunerations and also over-remunerations; however, it also presents great uncertainties for its application to the approximately 60,000 existing facilities, as its application depends on a series of standard parameters which will be defined in the implementing order of the Royal Decree.

The specific remuneration is composed of two terms: one relating to the investment and another to the operation. The first is a term per installed power unit which aims to cover the investment costs of a standard facility which cannot be recovered by the sale of energy, while the second is a term per

---

[528] CNE, Report 18/2013 on the proposed Royal Decree regulating activities of electrical energy production from renewable energy, cogeneration and waste sources, 4 September 2013 (C-117), p. 3.

energy unit to cover the larger operation costs in relation to the revenue from the participation of said standard facility in the market.[529]

470. CNE Report 18/2013 also criticized the time span initially allotted for the public consultation process relating to the regulations that were to implement the New Regime whilst stating that it had previously not raised objections to the new remuneration mechanism adopted under RDL 9/2013 during the preparation of RDL 9/2013:

> It is considered that, with the urgent procedure with which the query is raised, coinciding in time with an Electricity Sector Draft Bill and several Royal Decrees and orders, the effective participation of the different agents involved is not guaranteed.
>
> On 31 July 2013, the Board of the Spanish National Energy Commission approved Report 16/2013 on the 'Electricity Sector Draft Bill', which included the 'specific remuneration' mechanism contained in [RDL 9/2013] on which the proposal is based. The [CNE] did not raise any objections to this mechanism, although it proposed to amend its form in the sense that the incentives established only had a set component (per unit of installed power), in order to make the market price signal more transparent for the owners.[530]

b.    **RDL 9/2013: The Parties' positions**

471. The Claimants argue that RDL 9/2013 "wipe[d] out the existing economic regime for RE installations including, of course, the PV farms."[531] The Claimants criticize the fact that the New Regime was implemented by means of a Royal Decree-Law, which meant that "the Government avoided the mandatory public consultation process", including consultations with the CNE.[532] According to the Claimants, when the CNE finally issued its opinion, it observed that "the New Regime marked a 'comple[te] change' of the regulatory framework for the RE sector," noting the absence of an effective involvement of all relevant stakeholders in the rulemaking process as of 2013.[533]

---

[529] CNE, Report 18/2013 on the proposed Royal Decree regulating activities of electrical energy production from renewable energy, cogeneration and waste sources, 4 September 2013 (C-117), p. 4. *See also* Memorial, para. 216.

[530] CNE, Report 18/2013 on the proposed Royal Decree regulating activities of electrical energy production from renewable energy, cogeneration and waste sources, 4 September 2013 (C-117), p. 5.

[531] Memorial, para. 215; Reply, paras. 340-353.

[532] Memorial, para. 216; Reply, paras. 362-371.

[533] Memorial, para. 216. *See also* ibid., paras. 217-218, *referring to* CNE, Report 18/2013 on the proposed Royal Decree regulating activities of electrical energy production from renewable energy, cogeneration and waste sources, 4 September 2013 (C-117), p. 19.

472. The Claimants further argue that RDL 9/2013 "also made substantial modifications" to Law 54/1997 and in particular, Article 30(4) of Law 54/1997, which "significantly altere[d] the regime that was in place at the time the Claimants made their investment and upon which they legitimately relied."[534]

473. Specifically, the Claimants emphasize the following features of the amended Article 30(4) of Law 54/1997.

474. First, according to the Claimants, the concept of "reasonable return" had no defined meaning under Law 54/1997. Rather, the reasonable profitability was guaranteed by the Special Payment provided for under "the Royal Decrees implemented pursuant to the 1997 Electricity Law."[535] The New Regime constituted a radical change that bears no relation to the prior regime. Under the New Regime, Spain has set the reasonable return at 7.398% pre-tax return on the costs of a standard installation.[536] Under the amended text, the reception of a remuneration in addition to the market price for PV installations is at the Government's discretion, rather than constituting a "legal obligation."[537]

475. Second, the Claimants argue that under the New Regime, Spain implemented a "hitherto non-existent cap on profitability" (citing Law 24/2013), whereas the previous legal framework had granted the Government "broad discretion to decide how the goal to allow RE generators to earn a 'reasonable return' would be achieved[,] which in practice was implemented by incentivizing production."[538]

---

[534] Memorial, paras. 219-220; Reply, paras. 340-353.

[535] Memorial, para. 221(a).

[536] Memorial, para. 221(a); Reply, paras. 345-347, 404.

[537] Memorial, para. 221(b). *See also* Reply, paras. 340-359.

[538] Memorial, para. 221(c). *See also* Reply, paras. 340-359.

476. Third, the Claimants submit that whilst RD 661/2007 and 1578/2008 had incentivized the owners of PV plants to maximize efficiency and productivity when constructing their plants, the New Regime "operates to appropriate any efficiencies that Claimants may have achieved" under the previous regime, by calculating the Special Payment by reference to the investment costs of a Standard Installation, which are based on benchmarks that are too low and are applied with hindsight.[539]

477. Fourth, the enjoyment of the Special Payment, according to the Claimants, is now subject to "certain conditions" and based "only in part" on energy production, "unlike the [FiTs], which were solely based on energy production."[540]

478. Fifth, "RDL 9/2013 puts a definitive end to the stability of the regime[,]" in that the Special Payment is "subject to governmental discretion" and may be changed every six years, with certain calculation parameters subject to change every three years.[541]

479. According to the Respondent, the measures adopted in 2013 and 2014, including RDL 9/2013, were reasonable, proportionate and otherwise lawful, because the New Regime maintains the essential elements of the remuneration system envisaged by Law 54/1997, in particular, by guaranteeing a reasonable return to the investors.[542] As regards specifically RDL 9/2013, the Respondent posits that it embodies the principle of proportionality, as Article 1(two) of this act provides that the remuneration under the New Regime "shall not exceed the minimum required level to cover the costs that are necessary for installations to compete on an equal footing with the rest of the technologies in the market in order to allow those installations to obtain a reasonable return [...]"[543]

---

[539] Memorial, para. 221(d). *See also* Reply, paras. 340-359.

[540] Memorial, para. 221(e). *See also* Reply, paras. 340-359.

[541] Memorial, para. 221(f). *See also* Reply, 340-359.

[542] Rejoinder, paras. 835-970.

[543] Rejoinder, para. 849 (emphasis added).

480. As regards the Claimants' criticism regarding the alleged lack of consultation, the Respondent points, *inter alia*, to a report by the Council of State, in which the latter references CNE Report 18/2013 as having "contained multiple observations on the contents of the draft bill, many of which were accepted into the draft[.]"[544]

## 11.  Law 24/2013 – Disputed Measure

### a.  Law 24/2013: Context and most relevant provisions

481. On 1 October 2013, the Government instructed consultancy companies Roland Berger and Boston Consulting Group to assist in defining assumptions under the new legal regime for RE producers.[545]

482. On 17 December 2013, the newly-created CNMC (defined above at paragraph 150), which replaced the CNE, adopted a report on the decree proposal regulating the activity of electricity production from renewable energy sources, cogeneration and waste (the "**2013 CNMC Report**").[546]

483. The CNMC Report noted that the new proposed draft text contained improvements:

> This Commission looks favourably on the consideration of the observations made by the former National Commission of Energy, now known as CNMC, which were produced in the Report 18/2013. In particular, in the project:
>
> - Some remuneration groups/sub-groups considered in Royal Decree 661/2007 have been recovered.
>
> - It is now unequivocally specified to what electricity production refers; this aspect is not expressly defined in the previous version.
>
> [...]

---

[544] Counter-Memorial, para. 916 and footnote 555 *referring to* the Council of State, Decision of the Council of State 39/2014, Administrative enquiry relating to the Draft Royal Decree that regulates the production of electricity from renewable energy, cogeneration and waste sources (Royal Decree 413/2014), 6 February 2014 (R-74).

[545] IDAE's Director General, Resolution appointing BCG and Roland Berger to assist MINETUR, 1 October 2013 (C-119). *See also* Memorial, para. 227.

[546] CNMC, Report on the proposal of a Royal Decree that Regulates the Production of Electricity using Renewable Sources, Cogeneration and Waste, 17 December 2013 (C-121)/(R-302). *See also* Memorial, para. 48; Reply, para. 100; Rejoinder, para. 985.

- Details have been provided by the processing of the extremes of the remuneration useful life, with details of how to deal with the months relating to the initial and final years of the same.

- Progressiveness has been introduced to the treatment of the number of equivalent operating hours. On the other hand, this treatment has been made more flexible, relating it to the possibility of communicating the report to the specific remuneration regime.

- The definition of an average market price, significant for the adjustment of the net investment values in each semi-period, is more accurate now, and it is expressly cited as a further remuneration parameter.[547]

484. On 26 December 2013, Spain enacted Law 24/2013 on the electricity sector ("**Law 24/2013**").[548]

485. The preamble of Law 24/2013 provides, *inter alia*, as follows:

Sixteen years on from the coming into force of Law 54 enacted on November 27th 1997, a large part of its aims can essentially be said to have been fulfilled. The safety and quality level of supply is high, in view of the level of investment made in networks in recent years and the existence of a mixture of diversified energy sources, especially if we bear in mind the isolated nature of the system owing to the physical configuration of the territory itself. In turn, the liberalisation process has developed more quickly than that required by European Directives, enabling consumers to choose their own supplier. Finally, this whole process has been framed within the environmental protection principles of a modern society.

With this in mind, Law 54 enacted on November 27th 1997 made a notable contribution to compliance with the commitments set out in the Energy and Climate change package which set as targets for 2020 a reduction in greenhouse gas effects by 20 percent in the European Union compared with the 1990 figure, the attainment of a 20 percent contribution by renewable energies to primary energy and the accomplishment of a 20 percent improvement in energy efficiency.[549]

---

[547] CNMC, "Report on the proposal of a Royal Decree that Regulates the Production of Electricity using Renewable Sources, Cogeneration and Waste", 17 December 2013, p. 6 (C-121)/(R-302).

[548] Law 24/2013, 26 December 2013 (C-122)/(R-26). *See also* Memorial, paras. 221-224, 323, 348-349; Reply, paras. 340, 380; Counter-Memorial, paras. 238-243, 323, 660, 791-797, 814, 836-837, 895-202; Rejoinder, paras. 226, 257, 470, 836, 841, 858, 879-887, 1031-1039, 1335.

[549] Law 24/2013, 26 December 2013 (C-122)/(R-26), p. 1.

486.  At the same time, the preamble notes:

> Notwithstanding, during this period <u>there have been fundamental changes in the [Electricity] Sector which have brought about continuous action by the legislator and have led to the need to endow the electrical system with a new normative framework</u>. In this regard, it is worth highlighting the high level of investment in transmission and distribution networks, the high penetration of renewable electrical generation technologies, the evolution of the wholesale electricity market with the appearance of new agents and an increase in the complexity of the offers and the emergence of excess capacity at combined cycle gas thermal power stations, also required to back up the system. <u>A decisive element for undertaking this reform was also the accumulation during the last decade of annual imbalances between the income and costs of the electrical system which has brought about the appearance of a structural deficit</u>.

> The causes of this imbalance lie in the excessive growth of certain costs' items owing to energy policy decisions without ensuring their correlative income from the system. This has all been exacerbated by the lack of growth in electrical demand, essentially the consequence of the economic crisis.[550]

487.  In addition, the preamble continues:

> Law 54 enacted on November 27th 1997 has proven insufficient to ensure the financial balance of the system, amongst other reasons because the remuneration system for regulated activities has lacked the flexibility required for its adaptation to major changes in the electrical system or in the evolution of the economy.

> Hence, the experience of the last decade has made it clear that the economic and financial instability of the electrical system, brought about by the tariff deficit, has prevented the assurance of a stable regulatory framework which is necessary for the smooth carrying out of an activity like the electrical business which is very capital intensive.

> Hence, the economic unsustainability of the electrical system, along with the continuous evolution in the sector during the last sixteen years, has required the legislator to adapt, on numerous occasions, Law 54 enacted on November 27th 1997 regarding the [Electricity] Sector, often through the approval of urgent measures by Royal Decree and at present there is a normative dispersion which is not desirable in such a relevant economic sector.

> […]

> Essentially, <u>the continuous normative changes have entailed an important distortion to the normal operation of the electrical system and which needs to be corrected through action by the legislator which lends the regulatory stability that electrical activity requires</u>. This regulatory safety, combined with the need to undertake the reforms needed to ensure the sustainability of system in the long-term and to resolve the existing shortcomings in system operation

---

[550] Law 24/2013, 26 December 2013 (C-122)/(R-26), p. 2 (emphasis added).

would recommend the approval of an overall reform of the sector, based on <u>a new income and expenses regime for the electrical system which tries to return to the system the financial sustainability it lost a long time ago</u> and whose eradication has not been achieved to date through the adoption of partial measures.[551]

488.  Moreover, the preamble announces the abolition of the distinction between the Ordinary and the Special Regime based on the following grounds:

> The high penetration of production technologies deriving from renewable energy sources, cogeneration and waste, included in the so-called special regime for electrical energy production, has meant that its unique regulation connected with power and its technology lacks any object. By contrast, it makes it necessary for regulation to consider these installations in a similar way to those of other technologies which will be integrated into the market and, in any case, for them to be considered because of their technology and impacts on the system, rather than because of their power which is why the differentiated concepts of ordinary and special regime are abandoned. This is why unified regulation is being carried out without prejudice to any unique considerations which need to be established.[552]

489.  Based on these considerations, Law 24/2013 provides that remuneration under the new legal regime should be "compatible with the need to guarantee the technical and economic sustainability of the electric[ity] system as a whole."[553] Further, Law 24/2013 provides that:

> The remuneration regime will not exceed the minimum level required to cover costs which allow production installations from renewable energy sources, high-efficiency and waste cogeneration to compete on an equal footing with the other technologies on the market and which allows a reasonable return to be earned on the installation type in each applicable case. This reasonable return will refer, before tax, to the mean yield on the secondary market for Ten-Year State Bonds, applying the appropriate differential.[554]

490.  Law 24/2013 further provided for a mechanism meant to cover temporary mismatches between system income and costs:

> 1. It will be assumed there have been temporary mismatches between the income and costs of the electrical system if, as a result of the closing settlements of the electrical system in a financial year, there is an income deficit or surplus.

---

[551] Law 24/2013, 26 December 2013 (C-122)/(R-26), pp. 2, 4 (emphasis added).

[552] Law 24/2013, 26 December 2013 (C-122)/(R-26), pp. 6-7.

[553] Law 24/2013, 26 December 2013 (C-122)/(R-26), p. 8.

[554] Law 24/2013, 26 December 2013 (C-122)/(R-26), Article 14(7).

> 2. In the event that there is a mismatch owing to an income deficit in a financial year, its amount may not exceed 2 percent of the estimated income of the system for said financial year.
>
> In addition, the accumulated debt owing to mismatches from previous financial years cannot exceed 5 percent of the estimated income of the system for said financial year.
>
> Any relevant tolling, where applicable, or debits will be revised at least for a total equivalent to the amount by which they exceed said limits.
>
> 3. That part of the mismatch which, without exceeding said limits, is not offset by an increase in tolling and debits will be financed by the legal entities of the settlement system in a manner proportional to the remuneration pertaining to them for the activity they carry out […][555]

491. While maintaining the reference made in RDL 9/2013 to the ten-year government bonds increased by 300 basis points for purposes of calculating the reasonable return, Law 24/2013 also confirmed that the reasonable return would be determined based on the "regulatory life of the installation":

> Under the terms foreseen in Royal Decree 9 enacted on July 12th 2013, whereby urgent measures were adopted to ensure the financial stability of the electrical system, to out into place this new remuneration regime the reasonable return throughout the regulatory life of the installation will be based, before tax, on the mean yield on the secondary market for the ten years prior to the coming into force of Royal Decree 9 enacted on July 12th 2013 regarding 10-year State Bonds plus 300 base points, all without prejudice to its subsequent revision under the terms foreseen by law.[556]

492. This is what the Claimants challenge in their submissions as the "claw back" effect of the New Regime, as in practice this provision means that past payments exceeding the periodically redefined reasonable rate of return must be discounted from future payments.[557]

493. Law 24/2013 also confirmed the possibility of periodical revisions of the remuneration under the New Regime.[558]

---

[555] Law 24/2013, 26 December 2013 (C-122)/(R-26), Article 19.

[556] Law 24/2013, 26 December 2013 (C-122)/(R-26), Third Final Provision (3).

[557] *See* para. 788 below.

[558] Law 24/2013, 26 December 2013 (C-122)/(R-26), Article 14(4), Third Final Provision (5).

494. Finally, as regards the remuneration already received by RE producers, Law 24/2013 states that "[i]n no case may the new regime model result in claims on amount received for power produced prior to 14 July 2013, even if it is noted that on this date, said return could have been exceeded."[559] This provision, according to the Respondent, is a guarantee against retroactivity.[560]

b.    **Law 24/2013: the Parties' positions**

495. According to the Claimants, Law 24/2013 "introduced further harmful measures" by abolishing the distinction between the Ordinary and the Special Regime and depriving RE installations of priority of grid access and priority of dispatch.[561] However, the "most harmful aspect" of Law 24/2013 was the introduction of a reasonable return calculated based on the "regulatory life of the plant", which according to the Claimants results in a "'maximum degree' retroactivity as it essentially claws back plants' prior earnings."[562]

496. According to the Respondent, the measures adopted in 2013 and 2014, including RDL 9/2013, were reasonable, proportionate and otherwise lawful, because the New Regime maintains the essential elements of the remuneration system envisaged by Law 54/1997, in particular, by guaranteeing a reasonable return to the investors.[563] As regards specifically Law 24/2013, the Respondent argues that according to the preamble of Act 24/2013:

> The parameters for setting the remunerations shall remain in force for six years and in the review thereof, which will take place before the beginning of the regulatory period, the cyclical situation of the economy will be taken into account, along with electricity demand and a fair return for these activities.[564]

497. The Respondent also argues that pursuant to Article 26 of the Law, the priority of access and dispatch was maintained under the New Regime.[565] Furthermore, the Respondent

---

[559] Law 24/2013, 26 December 2013 (C-122)/(R-26), Third Final Provision (4).

[560] *See* paras. 903-907 below.

[561] Memorial, para. 222. *See also* Appendices 3 and 5 to the Reply.

[562] Memorial, para. 223. *See also* Reply, para. 342.

[563] Counter-Memorial, para. 323; Rejoinder, paras. 835-970.

[564] *See* Counter-Memorial, para. 909, *referring to* Law 24/2013, 26 December 2013 (C-122)/(R-26), Preamble and Article 14.

[565] Counter-Memorial, para. 797; Rejoinder, paras. 967-970.

emphasizes that Law 24/2013 contains guarantees of the continuity of the regime by prohibiting the revisions of the standard installation value and its regulatory useful life.[566]

## 12. RD 413/2014 and Ministerial Order IET/1045/214 – Disputed Measures

498. As indicated at paragraphs 467-483 above, CNE Report 18/2013 and the CNMC Report were released in September and December 2013 respectively.

499. In December 2013, a few days before the issuance of the 2013 CNMC Report Protermosolar[567] presented its observations on what was later adopted as RD 413/2014 to the CNMC.[568] Protermosolar stated, *inter alia*, as follows:

> This draft, as well as the draft Proposal for Royal Decree sent to the former [CNE] on 16 July 2013, do not provide for any transitional regime to move from an economic regime to another, as did [RD 661/2007] which regulates the activity of production of electrical energy in special regime (RD 661/2007) concerning [RD 436/2004] which establishes the methodology for the updating and systemization of the legal and economic regime of the electric energy production activity in special regime and, likewise, this RD 436/2004 regarding the Royal Decree 2818/1998, of 23 December 1998, for the production of electric energy by installations supplied by renewable energy resources or sources, waste or cogeneration.
>
> Not only is the transitional regime not foreseen but, according to the Royal Decree-Law 9/2013, of 12 July 2013, which adopts urgent measures to guarantee the financial stability of the electricity system ("RDL 9/2013"), the new regime is already in force although the Royal Decree that will determine its content has not yet been approved and against which we are arguing, and, much less, the orders that would fully develop it and that would ultimately determine the viability of the regulated activities.
>
> Moreover, in the calculation of the applicable [Special Payment], income already received by each of the facilities from the date of their [commissioning] are included. This implies a substantial retroactive reduction in the remuneration to which existing facilities are entitled to because in the calculation of future remuneration (calculated in accordance with the provisions of the draft Proposal for Royal Decree) the remuneration already received are included (calculated according to the special scheme of RD 661/2007 and RD 1578/2008).

---

[566] Counter-Memorial, para. 837, *referring to* Article 14.4(1) of Law 24/2013 stating as follows: "[i]n no case, once the regulatory useful life or the standard value of the initial investment of an installation has been recognised May said values be reviewed".

[567] Spanish Association for the Promotion of the Solar Thermal Industry.

[568] Rejoinder, para. 978, *referring to* Protermosolar, Submissions regarding Draft RD 413/2014, presented before the CNMC, 11 December 2013 (R-122). *See also* Counter-Memorial, para. 824.

The wording of article 30.4 of [Law 54/1997] in force until its modification by the RDL 9/2013 established that the special regime facilities were entitled to a "reasonable profitability" but did not determine its calculation parameters. Although in some documents, the IDAE guaranteed a return close to 15%, the PER 2005-2010 set it at 7%. Now the First Additional Provision of RDL 9/2013 establishes that for those facilities that at the date of its entry into force were entitled to the economic premium regime "the reasonable profitability will be based, before taxes, on the average yield in the secondary market of the ten years prior to the entry into force of this Royal Decree-Law of the ten-year State Bonds increased by 300 basis points". To the extent that this calculation includes the income received by the installation throughout its regulatory useful life, i.e., the tariffs received since the entry into service of each installation, the new concept of reasonable profitability is extending its effects to the past, thus undermining rights acquired by the owners of the facilities. In this way, we find ourselves before restrictive regulatory modifications of rights that incur retroactivity of maximum degree, prohibited in article 9.3 of the Spanish Constitution, to the extent in which its effectiveness is projected "backwards". This has been stated by jurisprudence of the Supreme Court: "Retroactivity would occur if the new rule required to the owners of the photovoltaic installations to return the amount of the tariffs already received in previous years" (STS of April 12, 2012, JUR 2012/146154).

Infringement of the principle of legal certainty

The draft Proposal of the Royal Decree clearly violates the principle of legal certainty, linked in turn to the principle of legitimate trust protection, recognized by article 9.3 of the Spanish Constitution.[569]

500. APPA and AEE also presented their comments on the draft regulation.[570]

501. On 9 January 2014, the Technical Secretary-General of the Ministry of Industry issued a report, which, *inter alia*, defined the concept of "efficient and well-managed company"[571] that was used throughout draft legislation and in RDL 9/2013:

> The indeterminate legal concept of an efficient and well-managed company is used in the application of European Union standards for state aid to the compensations given for providing general economic interest services (GEIS) in order to avoid not taking the elevated costs of an inefficient company as a reference. According to the Communication from the Commission (2012/C8/02) the mere fact of generating a return is not sufficient to obtain

---

[569] Protermosolar, Submissions regarding Draft RD 413/2014, presented before the CNMC, 11 December 2013 (R-122), pp. 1-3 (Tribunal's translation).

[570] Rejoinder, para. 981, *referring to* Index of administrative file for RD 413/2014, 6 June 2014 (R-33).

[571] "For purposes of calculating this [Special Payment], the Law shall consider the following for any standard facility throughout its useful life and in reference to the business activity carried out by an efficient and well-managed company [...]" Article 30(4) of Law 54/1997 as amended by RDL 9/2013, 12 July 2013 (C-115)/(R-43) (emphasis in the original).

this classification, but rather objective criteria must be applied that are economically recognisable as representative of satisfactory management: compliance with accounting standards and analytic coefficients representative of productivity and supply quality. On the other hand, reasonable return is understood to be the capital return coefficient, i.e., the one that an average company would require in order to provide GEIS as a function of the risk level of the activity. Capital return coefficient is understood to mean the IRR (Internal rate of return) that the company achieves on its capital invested in the life of the project.[572]

a.    **RD 413/2014 and Ministerial Order IET/1045/214: Context and most relevant provisions**

502.    On 6 June 2014, the Government adopted Royal Decree 413/2014 "regulating the production of electricity from renewable energy sources, cogeneration and waste" ("**RD 413/2014**").[573]

503.    The stated purpose of RD 413/2014 was to develop and implement the principles established in RDL 9/2013 and Law 24/2013:

> [RDL 9/2013] …presented an important measure in this area within the process of reform of the electricity sector. This is so, given that it incorporates a mandate to the Government to approve a new legal and economic regime for the existing installations that produce electricity from renewable energy sources, cogeneration and wastes, explicitly stating the concrete principles upon which the regime applicable to these installations will be defined, the terms of which have been further integrated in [Law 24/3013], and which are developed in the present Royal Decree. Both regulations assume continuously one of the main principles as per its original wording, as stated in Article 30.4 of [Law 54/1997]: that the defined remuneration regimes must allow these types of installations to cover the necessary costs to compete in the market equally with the other technologies and obtain a reasonable return on the whole project.[574]

504.    As regards the specific parameters of the New Regime, RD 413/2014, *inter alia*, described the components of the Special Payment.[575] RD 413/2014 also developed the relevant parameters of a standard installation necessary for the calculation of the Special Payment:

---

[572] Rejoinder, para. 988, *referring to* Technical Secretary-General of the Ministry of Industry, Report on draft RD 413/2014, 9 January 2014 (R-235), p. 5.

[573] RD 413/2014, 6 June 2014 (C-124)/(R-58). *See also* Memorial, paras. 221-243; Reply, para. 369 and Appendix 4; Counter-Memorial, paras. 791, 797, 899-901, 908; Rejoinder, paras. 836, 892; 949.

[574] RD 413/2014, 6 June 2014 (C-124)/(R-58), p. 3.

[575] RD 413/2014, 6 June 2014 (C-124)/(R-58), Article 11.

Each standard installation shall be assigned a set of remuneration parameters which will be calculated depending on the activity carried out by an efficient and well-managed company. These parameters will define the specific remuneration regime and permit the application of this regime to the installations corresponding to this standard installation. The most relevant remuneration parameters necessary for the application of a specific remuneration regime shall be, as applicable. the following:

a) Remuneration to the investment (Rinv).

b) Remuneration to the operation (Ro).

c) Incentive to the investment for reduction of the generation cost (linv).

d) Regulatory useful life.

e) Number of minimum operation hours.

f) Operating threshold.

g) Number of maximum hours of operation for the purpose of receiving the remuneration to the operation where applicable.

h) Higher and lower yearly limits of the market price.

i) Annual average market price, daily and intraday.

Moreover, all the parameters needed to calculate the previously mentioned ones, inclusive but not limitative, shall be remuneration parameters. The most relevant ones are:

a) Standard value of the initial investment of the standard installation.

b) Estimate of the daily and intraday market price.

c) Number of hours of operation of the standard installation.

d) Estimate of future income for participation in the production market.

e) Other operating revenue defined in Article 24.

f) Estimate of the future cost of operation.

g) Readjustment rate that takes the rate of reasonable return as a value.

h) Adjustment rate of the standard installation.

i) Net value of the asset.[576]

---

[576] RD 413/2014, 6 June 2014 (C-124)/(R-58), Article 13(2).

505. RD 413/2014 further provided that a classification of standard installations shall be established by a ministerial order.

506. On 16 June 2014, the Ministry of Industry, Energy and Tourism adopted Order IET/1045/2014 ("**Order IET/1045/2014**") to further develop the regime established by Law 24/2013.

507. In sum, RD 413/2014 and Order IET/1045/2014 defined the precise parameters of the new remuneration regime for RE producers that was based on the following principles:

   a) in addition to the market price, RE producers were also entitled to the Special Payment "which would allow them to compete at an equal level with the rest of the technologies in the market and to obtain a reasonable return" during their useful regulatory life fixed at 30 years;[577]

   b) the Special Payment was based on the parameters of a "standard installation"[578] and consisted of (i) the "remuneration to the investment" ("that covers the investment costs of each standard installation that cannot be recovered by selling electricity on the market"[579]) and (ii) the "remuneration to the operation" ("which covers […] the difference between the operating costs and the revenue generated from the participation in the market of this standard installation";[580]

   c) the pre-tax reasonable rate of return was set at 7,398% for the 2013-2019 regulatory period;[581]

---

[577] RD 413/2014, 6 June 2014 (C-124)/(R-58), Article 11(2); Order IET/1045/2014, 16 June 2014 (C-125)/(R-64), Article 5.

[578] Article 11(4)(5), RD 413/2014, 6 June 2014 (C-124)/(R-58).

[579] Order IET/1045/2014, 16 June 2014 (C-125)/(R-64), p. 3. *See also* Memorial, paras. 242, 226; Claimants' Counter-Memorial, paras. 779, 791, 823, 893; Counter-Memorial, paras. 779, 791, 823, 893; Rejoinder, paras. 227, 800, 836, 892.

[580] RD 413/2014, 6 June 2014 (C-124)/(R-58), Articles 11(6), 16, 17.

[581] Order IET/1045/2014, 16 June 2014 (C-125)/(R-64), Appendix I, para. 1.3.

d) RD 413/2014 and Order IET/1045/2014 also established a minimum number of operating hours for PV installations that made them eligible to receive remuneration to the investment, as well as a maximum operating hours threshold beyond which no special remuneration was payable on the energy produced.[582]

e) RD 413/2014 also provided that at the end of a 3-year period of each 6-year regulatory period "the standard revenue estimate from the standard installation from the sale of energy valued at market price, as well as the remuneration parameters directly related to these, may be reviewed."[583]

508. On 22 December 2014, the New Regime was notified by the Spanish authorities before the Commission, pursuant to Article 108(3) of the TFEU.[584] As Spain had implemented the measures before the notification, the Commission "transferred the case to the register of unlawful aid."[585]

b. **RD 413/2014 and Order IET/1045/214: The Parties' positions**

509. In addition to the arguments summarized at paragraphs 471-473 and 495 above, the Claimants criticize RD 413/2014 and Order IET/1045/214 for implementing the minimum and maximum operating hours thresholds.[586]

510. The Respondent reiterates its position that the measures adopted in 2013 and 2014, including RD 413/2014 and Order IET/1045/214, were reasonable, proportionate and otherwise lawful, because the New Regime maintains the essential elements of the

---

[582] Memorial, para. 234, *referring to* RD 413/2014, 6 June 2014 (C-124)/(R-58), Article 21; Order IET/1045/2014, 16 June 2014 (C-125)/(R-64), Articles 7-8.

[583] RD 413/2014, 6 June 2014 (C-124)/(R-58), Article 20(4).

[584] European Commission, Decision regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2014/NN)), 10 November 2017 (RL-57), para. 1. *See also* Counter-Memorial, paras. 65, 112, 288; Rejoinder, paras. 73-77, 854, 855, 875, 876, 932, 953, 1063, 1138, 1158. *See also* Reply, paras. 440-449, 521-526.

[585] Decision of the European Commission regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2014/NN)), 10 November 2017 (RL-57), para. 1.

[586] Memorial, para. 234, *referring to* Article 21, RD 413/2014, 6 June 2014 (C-124)/(R-58); *see also* Order IET/1045/2014, 16 June 2014 (C-125)/(R-64), Article 7.

remuneration system envisaged by Law 54/1997, in particular, by guaranteeing a reasonable return to the investors.[587]

## 13.  The assessment of the Disputed Measures by the Spanish courts

511.  In its Judgment of 17 December 2015, the Spanish Constitutional Court dismissed an application concerning the unconstitutionality of certain provisions of RDL 9/2013 submitted by the Government Council of the Autonomous Community of the Region of Murcia.[588] In respect of the alleged violation of the principles of certainty and legitimate expectations, the Constitutional Court ruled as follows:

> The respect of said principle [of consistency in the application of legal standards], and its corollary, the principle of legitimate expectations, is compatible with the changes in the remuneration regime of renewable energies conducted through RDL 9/2013, more so -as occurs in this case- in a sphere subject to high administrative intervention by virtue of its impact on general interests, and to a complex regulatory system that makes it unfeasible to claim that the most favorable elements be vested with permanence or unalterability [...] that obliges the public powers to adapt said regulation to a changing economic reality.
>
> [...]
>
> Said modification cannot be described as unexpected given the changing circumstances affecting this sector of the economy, which made it necessary to make adjustments to this regulatory framework, as an effect of the difficult circumstances that the sector as a whole was experiencing and the necessity to ensure the required economic balance and proper management of the system. It is not therefore possible to argue that the modification of the remunerative regime which is under examination was unforeseeable for a "diligent and prudent economic operator", attentive to the economic circumstances and to the inadequacy of the measures taken to reduce a persistent and continually increasing electricity system deficit that had not been adequately tackled by previous provisions.
>
> The preamble of the [Royal Decree-Law] determines that its purpose is to avoid the "over-remuneration" of certain special regime plants.[589]

---

[587] Rejoinder, paras. 835-970.

[588] Constitutional Court, App. 5347/2013, Judgment, 17 December 2015 (R-112). *See also* Counter-Memorial, paras. 945-956; Rejoinder, paras. 1044, 1058-1059.

[589] Constitutional Court, App. 5347/2013, Judgment, 17 December 2015 (R-112), Legal ground seven (a).

512. The Constitutional Court equally did not find a violation of the principle of non-retroactivity of laws:

> The owners of plants that produce electricity in a premium regime are subject to this new remunerative regime from the effective date of Royal Decree-[Law] 9/2013, [...] such subjection does not however entail an unfavorable effect on their acquired rights, from a constitutional perspective, i.e., it does not impinge on patrimonial rights that have been previously and definitively consolidated and incorporated into the patrimony of the recipient, or on legal situations that have already been exhausted or consumed.[590]

513. At the same time, the Constitutional Court observed that "it [was] not for this [c]ourt to determine the compatibility or otherwise of a legal rule with an international treaty, nor can they be set up in fundamental regulations and constitutional standards."[591]

514. The Spanish Supreme Court also issued several decisions confirming the legality of the Disputed Measures.[592] For example, the Spanish Supreme Court dismissed a claim for damages allegedly caused by RD 1565/2010 and RDL 14/2010.[593] In another case, the Spanish Supreme Court ruled by majority that RD 413/2014 was not inconsistent with the principles of non-retroactivity and legitimate expectations.[594]

---

[590] Constitutional Court, App. 5347/2013, Judgment, 17 December 2015 (R-112), Legal ground seven (c).

[591] Constitutional Court, App. 5347/2013, Judgment, 17 December 2015 (R-112).

[592] Supreme Court, Administrative App. 627/2012, Judgment 63/2016, 21 January 2016 (R-111). *See also* Counter-Memorial, paras. 365, 721, 957, 958; Supreme Court, App. 649/2014, Judgment, 1 June 2016 (R-92); Supreme Court, App. App. 564/2014, Judgment, 1 June 2016 (R-151); Supreme Court, Administrative App. 650/2014, Judgment 1259/2016, 1 June 2016 (R-163); Supreme Court, Administrative App. 653/2014, Judgement 1261/2016, 1 June 2016 (R-164); Supreme Court, Administrative App. 657/2014, Judgement 1264/2016, 1 June 2016 (R-165). *See also* Counter-Memorial, para. 959.

[593] Counter-Memorial, para. 957; Supreme Court, Administrative App. 627/2012, Judgment 63/2016, 21 January 2016 (R-111).

[594] Supreme Court, Administrative App. 500/2014, Judgement 1964/2016, 22 July 2016 (R-171) dismissing the appeal filed by Protermosolar against RD 413/2014 and Ministerial Order 1045/2014R-171. *See* Counter-Memorial, paras. 959-960. Rejoinder, paras. 464, 1053.

**14.    The assessment of the New Regime by the European Commission**

515.    In November 2017, the European Commission issued a decision on State aid assessing the New Regime from the perspective of the EU rules on State aid (the "**2017 EC State Aid Decision**").[595] In this decision, the Commission noted:

> In 2015, the total cost of the scheme amounted to EUR 6 666.3 million. 46,88% (EUR 3 125.8 million) was financed from the State budget and 53.11 % (EUR 3 540.6 million) from charges, of which 33 % were imposed on electricity consumption and 67 % on the connection capacity.[596]

516.    The Commission concluded that the remuneration scheme envisaged by the New Regime constitutes State aid within the meaning of Article 107(1) of the TFEU.[597]

517.    As mentioned above, since Spain notified the Commission only after it had started implementing the remuneration scheme, the Commission found Spain in breach of the standstill-obligation set forth under Article 108(3) of the TFEU.[598]

518.    However, the Commission also found that the incentives paid under the New Regime and the Special Regime were compatible with Article 107(3) TFEU:

> The Commission has assessed the compensation that facilities receive under the scheme over their entire lifetime. For existing facilities, this includes the payments received under the [Special Regime]. On the basis of the aforementioned assessment, it has decided not to raise objections to the aid on the grounds that it is compatible with the internal market pursuant to Article 107(3)(c) of the TFEU.[599]

519.    Regarding the position of beneficiaries of the Special Regime and the New Regime, the Commission made the following observations:

> As a general comment, the Commission recalls that there is 'no right to State aid'. A Member State may always decide not to grant an aid, or to put an end to an aid scheme. Where the aid has not been authorized by the Commission, the Member State is obliged to suspend the scheme until the Commission has

---

[595] European Commission, Decision regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2014/NN)), 10 November 2017 (RL-57) noting that "[p]ayments under the [Special Regime] are covered by the [Decision] in order to assess proportionality […]" Ibid., para. 4.

[596] 2017 EC State Aid Decision (RL-57), para. 9.

[597] 2017 EC State Aid Decision (RL-57), para. 88.

[598] 2017 EC State Aid Decision (RL-57), p. 33.

[599] 2017 EC State Aid Decision (RL-57), p. 33.

declared it compatible with the internal market pursuant to Article 108(3) TFEU.

In the present decision, the Commission has assessed the measure notified by Spain […]. As Spain has decided to replace the premium economic scheme with the notified aid measure it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not.[600]

520. In addition, the Commission noted:

The investors argue, both before investor-State arbitration tribunals and in their submissions to the Commission, that by modifying the support scheme with regard to existing installations, Spain has violated the general principles of Union law of legal certainty and legitimate expectations.

In the very specific situation of the present case, where a Member State grants State aid to investors, without respecting the notification and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded. That is because according to the case-law of the Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.[Footnote 64 citing "Case C-24/95 Land Rheinland-Pfalz v Alcan Deutschland, EU:C:1997:163, paragraph 25, in which the Court of Justice has concluded that 'In view of the mandatory nature of the supervision of State aid by the Commission under Article [108] of the Treaty, undertaking to which aid has been granted may not, in principles [sic], entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent businessman should normally be able to determine whether that procedure has been followed.' (paragraphs 13 and 14)[.]"].[601]

521. The Commission made the following observations on the compatibility of the Disputed Measures with the fair and equitable treatment ("**FET**") standard:

[N]o investor could have, as a matter of fact, a legitimate expectation stemming from illegal State aid. This has been expressly recognised by Arbitration Tribunals. It is in any event settled case-law that a measure that does not violate domestic provisions on legitimate expectation generally does not violate the fair and equitable treatment provision.[602]

522. The Commission also stated:

[…] any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the [Special Regime] by the

---

[600] 2017 EC State Aid Decision (RL-57), paras. 155 and 156 (footnotes omitted).

[601] 2017 EC State Aid Decision (RL-57), paras. 157, 158.

[602] 2017 EC State Aid Decision (RL-57), para. 164.

[New Regime] would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in *Eiser v. Spain*, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.[603]

523. Finally, as regards the legal effect of the 2017 EC State Aid Decision , the Commission stated that "this Decision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law."[604] The Commission added that the validity of the 2017 EC State Aid Decision may only be challenged in "the European courts."[605]

## IV.    REQUESTS FOR RELIEF

524. In their Memorial, the Claimants seek the following relief:

(a) DECLARING that Spain has breached Article 10(1) of the ECT; and

(b) ORDERING that Spain:

(i) provide full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered before restitution; or

(ii) in the alternative, pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT; and in any event:

(iii) pay the Claimants pre-award interest at a rate of 7.58% compounded monthly; and

(iv) pay the Claimants post-award interest, at a rate of 7.58% compounded monthly from the date of the award until full payment thereof; and

(v) pay the Claimants the costs of this arbitration on a full-indemnity basis, including all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel, experts and consultants; and

(vi) any other relief that the Tribunal may deem just and proper.[606]

525. In their Reply, the Claimants seek the following relief:

---

[603] 2017 EC State Aid Decision (RL-57), paras. 164-165.
[604] 2017 EC State Aid Decision (RL-57), para. 166.
[605] 2017 EC State Aid Decision (RL-57), para. 166.
[606] Memorial, para. 488.

(a) DISMISSING: (i) Spain's Intra-EU Objection; and (ii) Spain's Tax Objection;

(b) DECLARING that Spain has breached Article 10(1) of the ECT; and

(c) ORDERING that Spain:

(i) provide full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered before restitution; or

(ii) in the alternative, pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT;

and in any event:

(iii) pay the Claimants pre-award interest at a rate of 7.58% compounded monthly; and

(iv) pay the Claimants post-award interest, at a rate of 7.58% compounded monthly from the date of the award until full payment thereof; and

(v) pay the Claimants the costs of this arbitration on a full-indemnity basis, including the tax gross-up, all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel, experts and consultants [...][607]

526.    In addition to the above relief, the Claimants request in their Rejoinder on Jurisdiction that the Tribunal:

(a) dismiss both of Spain's jurisdictional [o]bjections; and

(b) order that Spain bears the Claimants' costs associated with these jurisdictional [o]bjections.[608]

527.    In their Post-Hearing Brief, the Claimants additionally request that "any amounts to be awarded net of taxes" in Spain and that the Respondent "indemnify the Claimants with regard to any Spanish taxes imposed on the compensation awarded."[609]

528.    In its Counter-Memorial, the Respondent seeks the following relief:

a) Declare a lack of jurisdiction to hear the Claimants' claims, or depending on the case their inadmissibility.

---

[607] Reply, para. 791.

[608] Rejoinder on Jurisdiction, para. 106.

[609] Claimants' Post-Hearing Brief, para. 229. The Claimants also maintain their request for a tax gross-up in respect of any sums awarded to Sevilla Beheer that would attract taxation in the Netherlands.

b) Secondarily in the event that the Arbitral Tribunal were to decide that it has jurisdiction to hear this controversy, reject all the claims of the Claimants on the merits, since the Kingdom of Spain has not breached in any way, the ECT, in accordance with what is set forth in section V of this Statement, regarding the Substance of the Matter.

c) Secondarily, dismiss all of the compensation claims of the Claimants in as much as they do not have a right to compensation, in accordance with what is set forth in section VI of this Statement; and

d) Sentence the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the arbitrators' fees and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.[610]

529.  In its Rejoinder, the Respondent seeks the following relief:

i. Declare its lacks of jurisdiction to hear the claims of the Claimant, or if applicable their inadmissibility, in accordance with what is set forth in Section III of the present Memorial, referring to Jurisdictional Objections;

ii. Subsidiarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the Claimants' claims regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to Sections IV and V herein, referring to the Facts and the Merits, respectively;

iii. Secondarily, to dismiss all the Claimant's claims for damages, as said Claimant is not entitled to compensation, in accordance with section VI of this Document; and

iv. Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.[611]

530.  In its Post-Hearing Brief, the Respondent seeks the following relief:

a) It declares its lack of jurisdiction to hear the claims of the Claimant, or where appropriate, their inadmissibility, in accordance with what is stated in section II of this Respondent's Skeleton in reference to Jurisdictional Objections;

b) Secondarily in the event that the Arbitration Tribunal were to decide that it has jurisdiction to hear the present dispute, that it rejects all the claims of the

---

[610] Counter-Memorial, para. 1271.

[611] Rejoinder, para. 1457.

Claimant on the merits, since the Kingdom of Spain has not in any way breached the ECT, in accordance with what is set forth in sections III of the present Brief, regarding the Facts and the Merits of the case.

c) Secondarily, that it dismisses all of the Claimant's compensatory claims, as the Claimant has no right to compensation, pursuant to that stated in section III.E herein; and

d) It orders Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.[612]

## V.     PRELIMINARY ISSUES

### A.     Applicable law

531.   The Parties agree that the ECT is the basic legal instrument that this Tribunal is bound to apply in accordance with Article 42(1) of the ICSID Convention and Article 26(6) of the ECT.[613] At the same time, the Parties' positions regarding the role of Spanish law and EU law differ.

### 1.     The Parties' positions

#### a.   Spanish law

532.   The Parties also seem to be in agreement regarding the characterization of Spanish law as a fact to be taken into account, *inter alia*, when assessing the Claimants' legitimate expectations.[614] At the same time, the Parties disagree on the significance of Spanish law in the context of the present dispute.

533.   The Claimants argue that "Spanish law may be relevant in assessing legitimate expectations but it does not define them."[615] In particular, it means, from the Claimants' perspective, that if they had an expectation to be protected against retroactive changes to

---

[612] Respondent's Post-Hearing Brief, para. 207.

[613] Hearing Tr., Day 2, 19 March 2019, 16:23-24 (Elena Abad); Claimants' Post-Hearing Brief, para. 19.

[614] Hearing Tr., Day 2, 19 March 2019, 4:1-4 (Elena Abad); Claimants' Post-Hearing Brief, para. 20.

[615] Hearing Tr., Day 5, 22 March 2019, 15:23-16:2 (Stoyanov).

the FiT scheme under the relevant Royal Decrees, it does not matter that they did not have a constitutional protection against "medium retroactivity."[616]

534. The Respondent argues that "Spanish law defines the expectations of the investor."[617] Specifically, the Respondent contends that "domestic law as a fact has to define the expectations of the investor, because domestic law has to be known or should have been known by the investor who is going to invest in a country."[618] According to the Respondent, this includes legal interpretations made by host State courts, and especially supreme courts. Such interpretation, the Respondent argues, must be assumed to be known by the investor at the time of his investment.[619]

b. **EU law**

535. The Parties' positions on whether EU law forms part of the applicable law under Article 26(6) of the ECT differ.

536. The Claimants argue that EU law does not apply to the merits of this dispute, as none of their claims has been pleaded or brought under EU law.[620] Moreover, the Claimants contend that EU law regardless of its characterization "is not relevant" to the merits of this case.[621]

537. The Respondent argues that EU law is applicable to the merits as a "special kind of international law"[622] but also as a fact shaping legitimate expectations.[623]

---

[616] Hearing Tr., Day 5, 22 March 2019, 16:1-25 (Stoyanov).

[617] Hearing Tr., Day 2, 19 March 2019, 11:12-13 (Elena Abad).

[618] Hearing Tr., Day 2, 19 March 2019, 11:12-13 (Elena Abad).

[619] Hearing Tr., Day 2, 19 March 2019, 11:16-22 (Elena Abad).

[620] Claimants' Rejoinder on Jurisdiction, paras. 35-38; Hearing Tr., Day 5, 22 March 2019, 17:12-16 (Stoyanov); Claimants' Post-Hearing Brief, para. 22.

[621] Hearing Tr., Day 5, 22 March 2019, 17:12-16 (Stoyanov); Claimants' Closing Statement, slide 22; Claimants' Rejoinder on Jurisdiction, paras. 35-38.

[622] Hearing Tr., Day 2, 19 March 2019, 16:14-24 (Elena Abad); Respondent's Second Post-Hearing Brief, para. 3.

[623] Hearing Tr., Day 2, 19 March 2019, 12:24-13:7 (Elena Abad); Respondent's Second Post-Hearing Brief, para. 3.

## 2.    The Tribunal's analysis

538.    Pursuant to Article 42(1) of the ICSID Convention, "[t]he Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties." According to Article 26(6) of the ECT, the Tribunal "shall decide the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law." Whilst the ECT does not specifically define the term "dispute", Article 26(1) of the ECT makes clear that Article 26 applies to disputes relating to alleged breaches of an obligation under Part III of the ECT, which governs "Investment Promotion and Protection".

539.    As recalled above, the Parties agree that the ECT is the basic legal instrument that this Tribunal is bound to apply.[624] The Parties also seem to be in agreement regarding the characterization of Spanish law as a fact to be taken into account, *inter alia*, when assessing the Claimants' legitimate expectations.[625]

540.    The Parties' positions on whether EU law forms part of the applicable law under Article 26(6) of the ECT differ. The Claimants argue that EU law does not apply to the merits of this dispute, as none of their claims has been pleaded or brought under EU law.[626] The Respondent submits that EU law has a dual nature as it qualifies as international law within the meaning of Article 26(6) of the ECT whilst also constituting a fact that shapes the Claimants' expectations when investing in Spain.[627]

541.    The Tribunal concludes that in order to adjudicate the present dispute, which has been brought under the ECT and which seeks to determine the question whether the Respondent's international responsibility is engaged, it must apply the ECT and the ICSID Convention (subject to the rules of treaty interpretation set forth in the 1969 Vienna Convention on the Law of Treaties (the "**VCLT**")) as well as other applicable rules and principles of international law.

---

[624] Hearing Tr., Day 2, 19 March 2019, 16:23-24 (Elena Abad); Claimants' Post-Hearing Brief, para. 19.

[625] Hearing Tr., Day 2, 19 March 2019, 4:1-4 (Elena Abad); Claimants' Post-Hearing Brief, para. 20.

[626] Claimants' Rejoinder on Jurisdiction, paras. 35-38; Hearing Tr., Day 5, 22 March 2019, 17:12-16 (Stoyanov); Claimants' Post-Hearing Brief, para. 22.

[627] Hearing Tr., Day 2, 19 March 2019, 16:14-24 (Elena Abad); Hearing Tr., Day 2, 19 March 2019, 12:24-13:7 (Elena Abad).

542.  As regards Spanish law, the Tribunal agrees that for the purposes of this arbitration, Spanish law, being the national law of the host State, is treated as a fact. However, to the extent that the Claimants' claims under the ECT are based on promises allegedly made under Spanish law, the latter will inform the existence and the content of the commitments (if any) made by Spain towards the Claimants. As summarized by the tribunal in *El Paso v. Argentina*, "[t]he fact that the BIT and international law govern the issue of Argentina's responsibility for violation of the treaty does not exclude that the domestic law of Argentina has a role to play too" which is "to inform the content of those commitments made by Argentina […] that the [claimant] alleges to have been violated."[628] That tribunal went on to conclude as follows:

> [I]n order to establish which rights have been recognised by Argentina to the Claimant as a foreign investor, resort will have to be had to Argentina's law. However, whether a modification or cancellation of such rights, even if legally valid under Argentina's law, constitutes a violation of a protection guaranteed by the BIT is a matter to be decided solely on the basis of the BIT itself and the other applicable rules of international law."[629]

543.  Whilst Spanish law cannot *per se* govern the question of whether or not Spain's international responsibility is engaged, the Tribunal notes that the present case involves claims based on alleged expectations that purportedly had their basis in Spanish law, and that Spain's international responsibility is sought with respect to the treatment of those alleged expectations and the changes the Spanish legal framework underwent. The Tribunal is of the view that the vantage point for resolving these claims consists in analyzing the Spanish legal framework that created the purported rights which the Claimants are seeking to vindicate under the ECT. Thus, the Tribunal's analysis of the Respondent's obligations under the ECT requires a detailed assessment of the Spanish legal and regulatory framework in order to identify the existence and content of any commitment made by Spain towards the Claimants.

544.  As regards EU law, the Tribunal is of the view that EU law must, in principle, be classified as constituting both international law and as national law (and, in the latter situation, be

---

[628] *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (RL-27), para. 135.

[629] *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (RL-27), paras. 235-238; *See also Electrabel S.A. v. The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RL-5), para. 4.128.

treated as a fact). In that regard, the Tribunal agrees with the tribunal in *Electrabel v. Hungary*, which discussed this very question in great detail and concluded that "EU law is international law because it is rooted in international treaties [i.e.] the EU Treaties," thus becoming "part of the international legal order" irrespective of whether an EU law rule is of primary (*droit primaire*, such as the EU Treaties) or derivative nature (*droit dérivé*, such as secondary legal acts).[630] At the same time, as also noted in *Electrabel v. Hungary*, EU law must be considered as being part of the national law of its Member States[631] and hence can constitute a "fact".[632]

545. Based on the foregoing, the Tribunal concludes that, as a matter of principle, EU law sets forth "rules and principles of international law" within the meaning of Article 26(6) of the ECT.

546. The Tribunal also concurs with the below statement by the *Blusun v. Italy* tribunal:

> The Parties in effect agree that the applicable law in determining this issue is international law, and specifically the relevant provisions of the VCLT. The Tribunal agrees, but would observe that this does not exclude any relevant rule of EU law, which would fall to be applied either as part of international Law or as part of the law of Italy. The Tribunal evidently cannot exercise the special jurisdictional powers vested in the European courts, but it can and where relevant should apply European law as such.[633]

547. In the case at hand, the Respondent argues that EU law is "applicable" to two issues, the question of the jurisdiction of the Tribunal[634], on the one hand, and the question of the existence and extent of the Claimants' legitimate expectations[635], on the other hand. The Tribunal will limit its analysis under EU law to these two issues, in Sections VI.A.2 and VII.B.1. below.

---

[630] *Electrabel S.A. v. The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RL-5), para. 4.120 and paras. 4.122-123.

[631] *Electrabel S.A. v. The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RL-5), paras. 4.125-4.126.

[632] *Electrabel S.A. v. The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RL-5), paras. 4.127-4.129.

[633] *Blusun*, para. 278. *See also Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, paras. 4.126 et seq., and *BayWa*, paras. 553-570.

[634] *See* paragraph 537 above.

[635] *See* paragraph 537 above.

**B.    Burden of proof and other evidentiary matters**

548.   The Parties do not seem to have a disagreement on the allocation of the burden of proof in these proceedings. Therefore, the Tribunal's analysis will be guided by the maxim *actori incumbit onus probandi*.

549.   At the same time, during the Hearing, the Claimants' counsel expressed their concern that the Tribunal's decision to keep Mr. Montoya's Witness Statement in the record of this arbitration despite his failure to attend the Hearing might result in a reversal of the burden of proof.[636]

550.   The Tribunal takes note of the fact that the Claimants were unable to test Mr. Montoya's testimony at the Hearing despite their request to that effect, and that no valid explanation for Mr. Montoya's inability to attend the Hearing has been provided. Accordingly, the Tribunal has decided to make use of its discretionary power in matters of evidence under ICSID Arbitration Rule 34(1) in order not to rely on Mr. Montoya's testimony at face value and to draw, if necessary, adverse inferences from his failure to appear at the Hearing.

551.   The Tribunal also recalls its considerations on its power to freely assess the probative value of evidence, as referred to above at paragraph 138.

552.   Furthermore, the Tribunal wishes to stress that it may "take judicial notice of, refer to, or rely on, any relevant legal principles or judicial or arbitral decisions in accordance with the principle of *jura novit curia*",[637] even if those principles or judicial or arbitral decisions have not been referred to by the Parties.

---

[636] Hearing Tr., Day 1, 18 March 2019, 8:1-23 (Stoyanov).

[637] *Bosh International, Inc and B&P Ltd Foreign Investments Enterprise v. Ukraine*, ICSID Case No. ARB/08/11, Award, 25 October 2012, para. 30. To the same effect *RSM Production Corp v. Grenada*, ICSID Case No ARB/05/14, Preliminary Ruling, 7 December 2009, para. 23; *Garanti Koza LLP v. Turkmenistan*, ICSID Case No ARB/11/20, Decision on Jurisdiction, 3 July 2013, para. 152.

## VI.    JURISDICTION

## A.    The Intra-EU Objection

## 1.    The Parties' positions

## a.    The Respondent

553.    The Respondent submits that the Tribunal has no jurisdiction over this dispute because both the Claimants' home State, the Netherlands, and Spain are Member States of the European Union. The Respondent argues on the basis of Articles 267 and 344 of the TFEU that the power to resolve disputes involving EU law issues (concerning, for example, State aid) is reserved exclusively for dispute settlement mechanisms that belong to the EU's legal order and that can guarantee the autonomy and primacy of EU law. Investor-State arbitration under the ECT, in the Respondent's view, does not belong to such mechanisms. At the same time, Article 26(6) of the ECT requires this Tribunal to apply EU law among other sources of international law. Thus, the Respondent submits that this Tribunal must decline its jurisdiction over the present dispute in accordance with the above-referenced principles of EU law. This jurisdictional objection is referred to throughtout this Decision as the "**Intra-EU Objection**".

554.    In support of its Intra-EU Objection, the Respondent draws on the judgment of the Court of Justice of the European Union (the "**CJEU**") in Case No. C-284/16 (the "***Achmea Judgment***"),[638] as well as subsequent declarations made by certain EU Member States discussed further below in more detail and more recently the *Komstroy* Judgment.

555.    The Respondent summarizes its position as to why the Claimants are not investors "of another Contracting Party" within the meaning of Article 26(1) of the ECT as follows:

> The Netherlands, the home States of the Claimants, like Spain, are EU Member States; [the] Claimants, like [the] Respondent, are therefore investors from States that are part of a Regional Economic Integration Organization [a "**REIO**"] as defined by Article 1(3) ECT. Since the EU is a Contracting Party of the ECT as defined by its Article 1(2) [of the ECT], [the] Claimants are not

---

[638] CJEU, Case C-284/16, *Republic of Slovakia/Achmea BV*, 6 March 2018 (RL-93).

from "another Contracting Party" but rather from the same Contracting Party as [the] Respondent.[639]

556. The Respondent further argues that EU law has to be applied by the Tribunal when deciding on its jurisdiction[640] and that Article 26(3) of the ECT must be interpreted consistently with the "basic principles of EU law (such as the principle of primacy of the EU legal framework, the principle of competence of the CJEU or the EU regulations of State Aid as a matter of public order)."[641]

557. The Respondent asserts that EU law is also applicable to the merits of this dispute.[642] In particular, the Respondent contends that any intra-EU investment is *per se* affected by the fundamental freedoms guaranteed by EU law ("free movement of capital, freedom of establishment, freedom to provide services and free movement of workers") and that the present dispute involves the issue of State aid which is "an essential institution of the EU."[643] The fact that EU law applies to the merits "determines the lack of jurisdiction of this Arbitral Tribunal", according to the Respondent.[644]

558. In support of this position, the Respondent relies on the *Achmea* Judgment where the CJEU ruled as follows:

> Articles 267 and 344 of the TFEU must be interpreted as precluding a provision in an international agreement concluded between Member states […] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[645]

---

[639] Respondent's Post-Hearing Brief, para. 5; Counter-Memorial, para. 52; Rejoinder, para. 49; Hearing Tr., Day 2, 19 March 2019, 80:21-81:3 (Fröhlingsdorf Nicolás).

[640] Hearing Tr., Day 2, 19 March 2019, 83:2-12 (Fröhlingsdorf Nicolás).

[641] Respondent's Post-Hearing Brief, para. 6.

[642] Hearing Tr., Day 2, 19 March 2019, 12:24-13:7 (Elena Abad); Respondent's Second Post-Hearing Brief, para. 3.

[643] Rejoinder, para. 65.

[644] Respondent's Post-Hearing Brief, para. 10; Rejoinder, paras. 59-62.

[645] Rejoinder, para. 112, *referring to Achmea* Judgment (RL-93) and para. 60, *referring to* C-459/03, Judgment 30 May 2006, Action for failure to fulfil obligations under Article 226 EC and Article 141 EA, brought on 30 October 2003, Commission of the European Communities supported by United Kingdom of Great Britain and Northern Ireland, v. Ireland (RL-98) (the "*Mox Plant* case"); Judgment of the Court of the European Communities (Grand Chamber) of 3 September 2008, Yassin Abdullah Kadi, Al Barakaat International Foundation v. Council and Commission in joined Cases C-402/05 P and C-415/05 P (RL-96) (the "*Kadi* case") ; and Opinion 2/13 of the UE Court of Justice of the European Union (Full Court) of 18 December 2014, pursuant to Article 218(11) TFEU (RL-

176

559. The Respondent argues that the *Achmea* Judgment is applicable not only to intra-EU BITs but also to multilateral treaties such as the ECT since its dispute settlement clause "excludes disputes between an investor and a Member State of the EU from the jurisdiction of their own courts" thereby preventing "these disputes, to which Community law must be applied, from being resolved in a manner that guarantees the full enforceability of [EU law], as required by [A]rticle 344 [of the] TFEU."[646]

560. The Respondent further contends that the EU's participation in the ECT does not affect the applicability of the *Achmea* Judgment to the present dispute despite the following statements of the CJEU:

> 57. It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected.
>
> [...]
>
> 58. In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States.[647]

561. The Respondent argues that the first sentences of paragraphs 57 and 58 cannot be interpreted in isolation from the second sentence of paragraph 58, which provides that "Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in

---

97) ("Opinion 2/13"), the Respondent alleges that the *Achmea* Judgment "confirms a trend [in the jurisprudence of the CJEU] that dates back to the beginning of the year 2000." *See* Rejoinder, para. 96.

[646] Rejoinder, para. 120.

[647] Rejoinder, paras. 138-145, *referring to Achmea* Judgment (RL-93), paras. 57-58 (emphases added).

Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation […]."[648]

562. Thus, the Respondent concludes that an agreement establishing a dispute settlement mechanism for intra-EU disputes that is not part of the European legal order would be "in principle" compatible with EU law only if "the autonomy of the EU and its legal order is respected."[649]

563. The Respondent argues that its Intra-EU Objection is thus supported by the following "four steps of reasoning" of the CJEU in the *Achmea* Judgment:

> (i) EU law must be applied and interpreted by [this Tribunal] to resolve [this] dispute; (ii) [this Tribunal] does not form part of the judicial system of the EU and cannot make reference to the [CJEU] for a preliminary ruling; (iii) the lack of control from the judicial system of the EU cannot be remedied in the stages of annulment or enforcement […]; (iv) this renders the provision of the ECT providing for arbitration incompatible with EU law and its basic principle of autonomy.[650]

564. The Respondent admits that the ECT does not contain a "disconnection clause", i.e., a provision that would ensure the priority of EU law over the rules of the ECT in case of conflict.[651] At the same time, the Respondent argues that it is the autonomy of EU law that has "the effect of disconnecting even without a disconnection clause."[652]

565. In addition to the jurisprudence of the CJEU, the Respondent also invokes the Communication of the European Parliament and Council of 19 July 2018 where the Commission concluded that:

> EU investors cannot invoke intra-EU BITs, which are incompatible with Union law and no longer necessary in the single market. They cannot have recourse to arbitration tribunals established by such intra-EU BITs or, for intra-EU litigation, to arbitration tribunals established under the Energy Charter Treaty. However, the EU legal system offers adequate and effective protection for cross-border investors in the single market, while ensuring that other legitimate interests are duly and lawfully taken into account. When

---

[648] *Achmea* Judgment (RL-93), para. 58.
[649] Rejoinder, paras. 139-141, *referring to* CJEU, Opinion 2/13, 18 December 2014 (RL-97); CJEU, Opinion 1/09, 8 March 2011 (RL-108).
[650] Respondent's Post-Hearing Brief, para. 10.
[651] Hearing Tr., Day 2, 19 March 2019, 110:23-111:1 (Fröhlingsdorf Nicolás).
[652] Respondent's Opening Statement, slide 248; Respondent's Post-Hearing Brief, fn. 11.

investors exercise one of the fundamental freedoms such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by that law. Member States have the responsibility and the power to enforce EU law in general and EU investors' rights, in particular. The Commission strives to increase the effectiveness of the enforcement system in the EU, including actions to support administrative capacity building or to strengthen justice systems, and to tackle breaches of EU law by national authorities.[653]

566. Further in support of its jurisdictional objection, the Respondent relies on the Declaration of 22 Member States on *Achmea* and investment protection in the EU, the Declaration of Finland, Luxembourg, Malta, Slovenia and Sweden on *Achmea* and investment protection in the EU, as well as the Hungary *Achmea* Declaration.[654]

567. According to the Respondent, the January 2019 Declarations confirm that the conclusions of the *Achmea* Judgment are relevant for intra-EU investment arbitration proceedings, acknowledge the EC's position on the incompatibility of intra-EU investment proceedings with EU law, endorse the precedence of EU law over BITs, and, finally, recognize such fundamental principles of EU law as the principle of distribution of competences between the EU and its Member States, the principle of autonomy and primacy of EU law, the obligation of the Member States to submit to EU law.[655]

568. In particular, the Respondent refers to the following statement from the Declaration of 22 Member States on *Achmea* and investment protection in the EU:

> […] international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause

---

[653] Rejoinder, para. 148.

[654] Declaration of the Representatives of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, 15 January 2019 (RL-112); Declaration of the Representatives of the Governments of the Member States on the enforcement of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union, 16 January 2019 (RL-113); Declaration of the Representative of the Government of Hungary on the legal consequences of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union, 16 January 2019 (RL-114).

[655] Respondent's Comments on the January 2019 Declarations and the MOL Brief, paras. 4-6.

would be incompatible with the Treaties and thus would have to be disapplied.[656]

569. This statement, in the Respondent's view, supports its argument that the EU Member States "never interpreted Article 26 of the ECT as a valid offer to arbitrate" intra-EU investment disputes due to its incompatibility with EU law.[657]

570. As regards the Declaration of Finland, Luxembourg, Malta, Slovenia and Sweden on *Achmea* and investment protection in the EU and Declaration of Hungary on *Achmea* and investment protection in the EU, the Respondent submits that these Declarations do not express a position different from that expressed in the Declaration of 22 Member States on *Achmea* and investment protection in the EU.[658]

571. In respect of relevant arbitral case-law, the Respondent argues that the awards that dismissed the intra-EU objection do not contain "an adequate analysis of the principle of primacy of EU law in Intra-EU relations."[659] In support of its criticism, the Respondent refers to the decision of the Swedish Court of Appeal on the stay of enforcement of the *Novenergia II v. Spain* award.[660]

572. The *amicus curiae* brief submitted by MOL Hungarian Oil and Gas PLC in the *Novenergia II v. Spain* enforcement proceedings before the US Courts referred to by the Claimants in support of their arguments is, according to the Respondent, irrelevant and should in any event be read together with the position on the intra-EU investment disputes expressed by Hungary in other cases, including *Electrabel*, *AES Summit*, and *UP and CD Holding International*.[661]

573. Finally, as regards the *Komstroy* Judgment, the Respondent submits that the CJEU's reasoning in that case is "identical to that followed in the *Achmea* Judgment".[662]

---

[656] Declaration of the Representatives of the Governments of the Member States on the enforcement of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union, 16 January 2019 (RL-113), p. 2.

[657] Respondent's Comments on the January 2019 Declarations and the MOL Brief, para. 8.

[658] Respondent's Comments on the January 2019 Declarations and the MOL Brief, para. 19.

[659] Rejoinder, para. 53.

[660] Rejoinder, para. 55.

[661] Respondent's Comments on the January 2019 Declarations and the MOL Brief, paras. 23-24.

[662] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 12, 39.

The Respondent thus reiterates its arguments made in support of the *Achmea* Judgment.[663] In addition to these arguments, the Respondent submits that the autonomy of EU law must be respected in accordance with the principle of *pacta sunt servanda*, which implies that the EU Member States (including the Netherlands and Spain) "have accepted […] the autonomy and primacy of EU law and the compulsory effect of the CJEU rulings".[664] The Respondent also invokes the principle of *venire contra factum proprium non valet* to argue that the practice of respecting the principles of EU law "have created a reliance in the Member States that they will be always observed".[665]

574.   The Respondent further contends that the autonomy of EU law is respected "not only by the Netherlands and Spain and by all the Member States of the EU, but by all the [S]tates of the international community who have never opposed to the respect of that autonomy".[666]

575.   Finally, the Respondent asserts that the *Komstroy* Judgment is binding on the Netherlands and that "Dutch investors cannot have any rights different that the rights and legal framework that is applicable to the Netherlands".[667]

b.   **The Claimants**

576.   The Claimants argue that the Tribunal has jurisdiction under both the ECT and the ICSID Convention.

577.   The Claimants submit that Article 26 of the ECT provides the Contracting Parties' unconditional consent to arbitration which is subject only to the restrictions explicitly set out in the ECT none of which is concerned with the intra-EU character of investor-State arbitrations that may be initiated under the Treaty. According to the Claimants, EU law does not govern the Tribunal's jurisdiction. The Claimants also state that none of the tribunals constituted under the ECT to hear intra-EU investor-State disputes concerning the RE sector sustained the Intra-EU Objection. Finally, as regards the *Achmea* Judgment,

---

[663] Ibid.

[664] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 34.

[665] Ibid.

[666] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 41.

[667] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 44.

the Claimants emphasize that it does not address the ECT and thus cannot apply to the present dispute.

*(a)    Jurisdictional requirements under the ECT and ICSID Convention*

578.  The Claimants argue that the requirement *ratione personae* is satisfied under the ECT because Spain is a "Contracting Party" to the ECT and each of the Claimants is an "investor of another Contracting Party." In particular, Sevilla Beheer and Cordoba Beheer are incorporated in the Netherlands (a Contracting Party to the ECT) whereas Cross Retail and the Spanish Project Companies are fully owned and controlled by the two Dutch companies. Thus, Cross Retail and the Spanish Project Companies shall be treated as nationals of another Contracting Party by virtue of Article 26(7) of the ECT.

579.  With respect to jurisdiction *ratione materiae,* the Claimants submit that they made "investments" associated with "an Economic Activity in the Energy Sector", "which include, without limitation, the Claimants' direct and indirect shareholding and debt interests in the Spanish Project Companies that own and operate the PV plants (Article 1(6)(b)[of the ECT]); claims to money (Article 1(6)(c)[of the ECT]); returns (Article 1(6)(e)[of the ECT]); and rights conferred by law […] (Article 1(6)(f))[of the ECT])."[668] The Claimants further submit that their investments were made in Spain after the ECT entered into force for both Spain and the Netherlands, i.e., after the "Effective Date" in compliance Article 1(6) of the ECT.

580.  Regarding Spain's consent to arbitration under the ECT, the Claimants state that in compliance with Article 26(3) of the ECT the present dispute concerns "an alleged breach of an obligation of a Contracting Party under Part III" of the ECT that includes Article 10.[669]

581.  The Claimants assert that they also complied with the three-month negotiation period established by Article 26(1) of the ECT before serving their Request for Arbitration in these proceedings. Specifically, the Claimants claim to have made a request for

---

[668] Memorial, para. 267.
[669] Memorial, para. 271.

negotiations addressed to Spain in relation to the present dispute on 15 July 2016.[670] However, to date, Spain has not responded to the Claimants' request.[671]

582. The Claimants further argue that the jurisdictional requirements of Article 25 of the ICSID Convention are also met because the present dispute is a "legal dispute arising directly out of an investment", both Spain and the Netherlands are Contracting States, and each of the Claimants is a "national of another Contracting State."[672] Finally, Spain's consent to arbitration given in Article 26(3) of the ECT together with the Claimants' consent provided in their Request for Arbitration satisfy the requirement for "written consent".[673]

*(b)    Claimants' position on the Intra-EU Objection*

583. The Claimants argue that the Intra-EU Objection must be dismissed, as the intra-EU character of the present dispute does not affect the interpretation of Article 26 of the ECT in accordance with the rules of treaty interpretation as set out in the VCLT. In support, the Claimants, *inter alia*, rely on prior arbitral awards and emphasize the fact that not a single tribunal composed to hear an intra-EU investment dispute declined its jurisdiction on the basis of the Intra-EU Objection.[674]

584. The Claimants disagree with Spain's interpretation of Article 26 of the ECT as "a model of consent to restricted arbitration" limited by various provisions of the ECT.[675] In the Claimants' view, Article 26 "applies to disputes between any Contracting Party to the ECT and an Investor of any other Contracting Party" and provides that the Contracting Parties' "unconditional consent" to arbitration is "subject only to subparagraphs (b) and (c) [of Article 26(3) of the ECT]".[676] Apart from these limitations, the ECT does not

---

[670] Memorial, para. 273.

[671] Memorial, para. 273.

[672] Memorial, paras. 277-278.

[673] Memorial, para. 282.

[674] Rejoinder on Jurisdiction, para. 7. As regards the *Novenergia* annulment proceedings involving the stay of enforcement decision by the Swedish courts (see para. 571 above), the Claimants submit that contrary to the Respondent's position, the Swedish Court of Appeal has not made any pronouncements regarding the validity of the Intra-EU Objection in its ruling on the stay of enforcement. *See* Rejoinder on Jurisdiction, para. 14.

[675] Rejoinder on Jurisdiction, paras. 20-21.

[676] Reply, para. 479.

contain any other exceptions to the Contracting Parties' consent given in Article 26. There is no need, in the Claimants' opinion, to explore the subjective intentions of the EU and its Member States regarding the ECT, as the ordinary meaning of the text of Article 26 is unambiguous and does not warrant recourse to any supplementary means of interpretation.[677]

585.  Thus, the Claimants conclude that in accordance with the ordinary meaning of Article 26 of the ECT, "there is no Intra-EU exception to the Contracting Parties' unconditional consent to arbitration."[678]

586.  The Claimants further address a number of specific arguments made by the Respondent.

587.  The Claimants argue that EU law is not applicable to determine the Tribunal's jurisdiction.[679]

588.  The Claimants do not dispute that the ECT recognizes that REIOs can be party to the ECT. At the same time, the Claimants contend that there is nothing in the ECT "to support the idea that the ECT does not apply amongst REIO members" absent a "disconnection clause", i.e., a provision ensuring that the rules of the regional organisation prevail over the rules established by a multilateral treaty to which the members of the regional organisation are also party.[680]

---

[677] Reply, paras. 489-492.

[678] Reply, para. 479.

[679] Hearing Tr., Day 2, 19 March 2019, 127:21-128:5 (Ingle); Claimants' Post-Hearing Brief, para. 230.

[680] Claimants' Rejoinder on Jurisdiction, para. 27; Reply, para. 482. The Claimants cite as an example Article 27 of the 1988 Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters: "Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community." Reply, para. 512.

589.   Furthermore, the Claimants emphasize that the EU is not the Respondent in this arbitration and that the relevant "Area" referred to in Article 26 (1) of the ECT is the territory of Spain only.[681] Thus, according to the Claimants, the "REIO Area definition simply does not apply unless the REIO itself […] is the party to the dispute."[682] In this connection, the Claimants refer to *Novenergia II v. Spain* where the Tribunal made the following statement:

> [I]n making this argument, the Respondent fails to recognise the fact that, even though the EU itself is a Contracting Party of the ECT, this does not eliminate the EU Member States' individual standing as respondents under the ECT. The Tribunal is convinced that with a correct application of Article 26(1) of the ECT, interpreted in light of the VCLT, there is no basis for any requirements other than that the investor shall be a national of an ECT Contracting State other than the host State. Put differently, the Tribunal cannot deduce from Article 26(1) of the ECT a limitation to the effect that an investor is not a national of an ECT Contracting Party to the extent that such a Contracting Party is also a member of the same REIO (i.e., the EU) as the host State. The Tribunal therefore rejects the Respondent's argument that the Tribunal lacks jurisdiction on the basis of Article 26(1) of the ECT.[683]

590.   The Claimants also cite the following passage from *Antin v. Spain:*

> Moreover, the Tribunal considers that the fact that the EU is also a Contracting Party and a 'Regional Economic International Organization' as defined in Articles 1(2) and 1(3) of the ECT does not bar the Tribunal's jurisdiction. Neither does the use of the terms 'relating to an Investment of the latter in the Area of the former' in Article 26 of the ECT, nor the definition of 'Area' in Article 1(10) of the Treaty. The ordinary meaning of Articles 1(2), 1(3) and 1(10) recognize the existence of REIOs as possible Contracting Parties and identify that the 'Area' of a REIO, such as the EU, to mean the 'Areas of the member states of such [REIO].' Under the terms of the ECT, a claim could thus be brought against a REIO, regarding a dispute arising out of an 'Investment' made by an 'Investor' in that REIO's defined 'Area'.[684]

591.   In addition, throughout their arguments the Claimants repeatedly assert that EU law is irrelevant to the present dispute and that the Tribunal is not called upon to apply or

---

[681] Rejoinder on Jurisdiction, para. 26; Reply, para. 484.

[682] Rejoinder on Jurisdiction, para. 26.

[683] Rejoinder on Jurisdiction, para. 24, *referring to Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144), para. 453.

[684] Rejoinder on Jurisdiction, para. 25, *referring to Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 218.

interpret any of its provisions.[685] Thus, there is no conflict between the ECT and EU law in the present case and the principle of primacy of EU law invoked by the Respondent is inapplicable.

592. Moreover, the Claimants argue that EU law and the ECT cover different subject-matters: "[i]nvestment protection under EU law is primarily focused on ensuring access to the market of another [EU] Member State" whereas the ECT provides for a broad, sector-specific protection after the making of an investment that includes, for example, the FET guarantee.[686] The Claimants also emphasize that Article 26 of the ECT is another example of an additional guarantee that has no equivalent under EU law.[687] Thus, the Claimants conclude that there is no conflict between EU law and the ECT.[688] In the alternative, the Claimants argue that the ECT must prevail over EU law pursuant to Article 16 of the ECT, which provides that in case of conflict the provision more favorable to the investor shall apply.[689]

593. As regards the issue of State aid, in the Claimants' view, the question of whether an award rendered by this Tribunal may be considered by the EU as State aid and thus face difficulties at the enforcement stage is irrelevant as it does not affect this Tribunal's jurisdiction.[690]

594. The Claimants note from the outset that the *Achmea* Judgment is not binding on this Tribunal and that the CJEU's findings are case-specific and cannot be interpreted extensively.[691] They further submit that the *Achmea* Judgment is irrelevant to this arbitration for the following reasons.

595. First, the *Achmea* Judgment dealt with one agreement – the Netherlands-Slovakia BIT.[692]

---

[685] Reply, para. 523; Rejoinder on Jurisdiction, para. 63.

[686] Reply, para. 494; Rejoinder on Jurisdiction, para. 39.

[687] Rejoinder on Jurisdiction, paras. 41-44.

[688] Reply, para. Rejoinder on Jurisdiction, para. 41.

[689] Reply, para. 500; Rejoinder on Jurisdiction, para. 42.

[690] Rejoinder on Jurisdiction, paras. 73-77, *referring to, inter alia, UP and C.D Holding Internationale v. Hungary,* ICSID Case No. ARB/13/35, Award, 9 October 2018 (CL-166), para. 226.

[691] Reply, para. 460.

[692] Reply, para. 467; Rejoinder on Jurisdiction, para. 49.

596. Second, Article 26(6) of the ECT unlike Article 8(6) of the Netherlands-Slovakia BIT does not require that the tribunal apply the law in force of the contracting party and other relevant agreements between the contracting parties.[693] The ECT provides that disputes shall be resolved solely on the basis of the Treaty itself and applicable rules and principles of international law.[694] Thus, the Tribunal, according to the Claimants, is not called to apply EU law, which is in any event irrelevant for the resolution of the present dispute.[695] At the same time, even if EU law is relevant, this fact alone cannot preclude intra-EU investment disputes as that would equally exclude from the scope of the ECT non-intra-EU disputes where EU issues also might arise.[696] That, in the Claimants' view, would strip Article 26 of the ECT of its purpose as no investment dispute could ever be brought against the EU or any of its Member States.[697]

597. Third, the Claimants state that these proceedings are brought under the ICSID Convention and, unlike the *Achmea* Arbitration, are not seated in an EU Member State, governed by the law of that State, and subject to review by its courts.[698]

598. Fourth, the Claimants emphasize the fact that the EU is party to the ECT and that the EU played a central role in the conclusion of this multilateral Treaty. This "critical difference", according to the Claimants, was expressly acknowledged by the CJEU which drew a distinction between an international dispute resolution mechanism established with the EU's participation and the one without.[699] In the *Achmea* Judgment the latter situation was considered.[700]

599. Fifth, the ECT was signed by Spain and the Netherlands after both states had acceded to the EU, unlike the Netherlands-Slovakia BIT that had been signed before Slovakia

---

[693] Reply, paras. 461-466; Rejoinder on Jurisdiction, para. 53.

[694] Reply, paras. 461-466; Rejoinder on Jurisdiction, para. 53.

[695] Reply, paras. 461-466; Rejoinder on Jurisdiction, para. 53.

[696] Rejoinder on Jurisdiction, para. 56.

[697] Rejoinder on Jurisdiction, para. 57.

[698] Reply, 471; Rejoinder on Jurisdiction, para. 54.

[699] Rejoinder on Jurisdiction, para. 55.

[700] As it is stated in the Masdar Solar v. Spain award to which the Claimants refer: "[t]he Achmea Judgment does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party." See Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 679.

became an EU Member State.[701] Finally, the Claimants identify "numerous flaws" in the *Achmea* Judgment's reasoning, including, *inter alia*, the "erroneous distinction between commercial and investment-treaty arbitration" made by the CJEU as well as the lack of guidance regarding the consequences of the *Achmea* Judgment.[702] In support of their arguments on the consequences of the *Achmea* Judgment for this arbitration, the Claimants also rely on the *amicus curiae* brief submitted by MOL Hungarian Oil and Gas PLC in the *Novenergia II v. Spain* enforcement proceedings before the US Courts.[703]

600. The Claimants also challenge the relevance of some other acts of the CJEU relied upon by the Respondent in support of the Intra-EU Objection. In particular, the Claimants submit that in its Opinion 1/91, the CJEU, *inter alia*, stressed that an international dispute settlement mechanism established by a treaty to which the EU itself is party is compatible with EU law.[704] Therefore, given that the EU is party to the ECT, Opinion 1/91 does not support the Intra-EU Objection in the present dispute.

601. The Claimants further submit that the *Mox Plant* case, mentioned by the Respondent, is irrelevant because it concerned a dispute between two EU Member States that also involved issues of EU law, whereas "[t]his ECT arbitration is between an investor and an EU Member State and does not concern the application or interpretation of [EU law]."[705] For the same reason Opinion 2/13 of the CJEU is also inapplicable from the Claimants' point of view.[706] The Claimants contend that the *Kadi* case is equally irrelevant as it does not concern a treaty to which the EU is party.[707]

---

[701] Reply, para. 472.

[702] Reply, para. 476.

[703] Claimants' Comments on the January 2019 Declarations and the MOL Brief, paras. 11-14, *referring to* Brief of MOL Hungarian Oil and Gas PLC as *Amicus Curiae* in Support of Petitioner's Response to the Respondent Kingdom of Spain's Motion to Dismiss and to Deny Petition to Confirm Foreign Arbitral Award, 7 December 2018 (CL-175).

[704] Rejoinder on Jurisdiction, para. 60.

[705] Rejoinder on Jurisdiction, paras. 62-63. In the same paragraph the Claimants state that in the *Iron Rhine* arbitration the tribunal noted that disputes between EU Member States not involving EU law would not be prohibited by the *Mox Plant* decision. *See The Arbitration Regarding the Iron Rhine ("Ijzeren Rijn") Railway, The Kingdom of Belgium v. The Kingdom of the Netherlands*, Award, 24 May 2005 (CL-173), paras. 97-106, 119. *See also Mox Plant (Ireland v. United Kingdom of Great Britain and Northern Ireland), Commission of the European Communities v. Ireland*, Judgment of the Court (Grand Chamber), 30 May 2006 (CL-172).

[706] Rejoinder on Jurisdiction, paras. 67-69.

[707] Rejoinder on Jurisdiction, paras. 64-66.

602.  As regards the EC Communication of 19 July 2018, the Claimants assert that it has no bearing on the interpretation of the ECT and that it is not binding on the Tribunal.[708] The Claimants also challenge the relevance of the 2017 EC State Aid Decision on the grounds that the Tribunal is not called upon to apply EU law.[709]

603.  Finally, the Claimants state that the EU as a party to the ECT is under an obligation to "make provision for the effective enforcement in its Area" of an arbitral award issued by the Tribunal under the ECT.[710] Thus, the EU will be legally obliged to enforce the awards of the Tribunal as the ECT prevails over acts of the EU.[711]

604.  The Claimants argue that the January 2019 Declarations are equally irrelevant for this arbitration.

605.  In particular, the Claimants submit that the Declaration of 22 Member States on Achmea and investment protection in the EU is "a mere political statement containing the steps that EU Member States will take in the future to draw the pertinent consequences from the Achmea Judgment (i.e., to seek to set aside awards and terminate bilateral investment treaties)."[712] The Claimants also contend that the Declaration of Finland, Luxembourg, Malta, Slovenia and Sweden on Achmea and investment protection in the EU as well as the Declaration of Hungary on Achmea and investment protection in the EU demonstrate that EU Member States "do not agree on whether the ECT is incompatible with EU law."[713] The Claimants further argue that the January 2019 Declarations confirm that the exclusion of intra-EU application of investment treaties was not the original intention of the EU Member States and that "additional steps are required to 'disapply' these treaties" as, *inter alia*, the CJEU is not competent to "nullify the provisions in international treaties."[714] The Claimants allege that the Respondent cannot submit any evidence proving the intention of the EU Member States to exclude intra-EU disputes from the

---

[708] Rejoinder on Jurisdiction, paras. 70-72.

[709] Reply, paras. 521-526.

[710] Reply, para. 474.

[711] Reply, para. 475.

[712] Claimants' Comments on the January 2019 Declarations and the MOL Brief, para. 7.

[713] Claimants' Comments on the January 2019 Declarations and the MOL Brief, para. 7.

[714] Claimants' Comments on the January 2019 Declarations and the MOL Brief, para. 8.

scope of the ECT at the time of its signing.[715] Finally, the Claimants argue that the Declaration of 22 Member States on Achmea and investment protection in the EU has no bearing on the Tribunal's jurisdiction in view of the principle that jurisdiction must be assessed by reference to the date on which the proceedings were instituted.[716] Thus, the Declaration of 22 Member States on Achmea and investment protection in the EU cannot retroactively deprive the Tribunal of its jurisdiction.[717]

606. As regards the *Komstroy* Judgment, the Claimants argue that it contains "serious flaws"[718] and has "no bearing on the Tribunal's jurisdiction".[719]

607. In particular, the Claimants criticize the CJEU's reasoning for adopting "the vantage point of EU law".[720] According to the Claimants, the CJEU "has conspicuously not even purported to interpret [Article 26 of the ECT] in accordance with the rules of treaty interpretation laid down in [the VCLT]."[721] The Claimants also contend that the CJEU's "complete disregard for the multilateral nature of the ECT runs afoul of another basic principle of treaty interpretation: that it is the common intention of *all* parties to a treaty […] that must be established pursuant to Article 31 of [the VCLT]."[722] The Claimants also point to a number of other alleged flaws in the CJEU's reasoning, such as a "dubious distinction between commercial and investment arbitration" as well as the finding that the ECT itself is an act of EU law made by the CJEU solely on the basis that the EU is a signatory to the ECT.[723]

---

[715] Claimants' Comments on the January 2019 Declarations and the MOL Brief, para. 9.

[716] Claimants' Comments on the January 2019 Declarations and the MOL Brief, para. 9, *referring to Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, I.C.J. Reports 2002, p. 3 (CL-177), para. 26.

[717] Claimants' Comments on the January 2019 Declarations and the MOL Brief, para. 10, *referring to Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007 (CL-76), para. 386.

[718] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 15-19.

[719] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 20-39.

[720] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 15.

[721] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 16.

[722] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 17.

[723] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 15-19.

608. Furthermore, the Claimants submit that "irrespective of its many flaws […] the *Komstroy* Judgment has no bearing on this Tribunal's jurisdiction"[724] for the following reasons.

609. From the outset, the Claimants note that the CJEU's views on whether Article 26 of the ECT applies to intra-EU investment disputes "were expressed merely *obiter* [*dicta*] and, as such, are devoid of binding force."[725] The Claimants further assert that the *Komstroy* Judgment is in any event "not binding upon this Tribunal (or, indeed, any tribunal established under the ECT)" because a tribunal constituted under the ECT and the CJEU "sit within two different legal orders: the former under the ECT; the latter under the EU treaties."[726]

610. The Claimants also argue that the *Komstroy* Judgment cannot retroactively deprive the Tribunal of its jurisdiction "since consent to arbitration was perfected in August 2016, when the Claimants introduced their Request for Arbitration."[727] In support of this argument, the Claimants refer to the *RREEF v. Spain* Decision, where the tribunal found that "[n]o post-hoc decision of the CJEU can somehow undo that consent once given."[728]

611. Furthermore, the Claimants submit that the Tribunal "must interpret the ECT in accordance with international law, not EU law."[729] According to the Claimants, the Tribunal is not required to apply EU law "to determine whether Spain breached the ECT", as their claims "concern breaches of the ECT only; they do not rely on EU law in support of these claims".[730] The Claimants further contend that "even if EU law were applicable to the merits, it would still not apply to the Tribunal's jurisdiction", as Article 26(6) of

---

[724] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 20.

[725] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 4-8.

[726] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 21-24, *referring to Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection, 7 May 2019 (CL-183), paras. 181-182; *Landesbank Baden-Württemberg et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019, para. 102 (CL-102).

[727] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 26.

[728] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 27, *referring to RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (CL-180), para. 213; *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection, 7 May 2019 (CL-183), para. 201.

[729] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 29-39.

[730] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 30-32.

the ECT is irrelevant in the context of establishing jurisdiction.[731] The Claimants thus conclude that the Tribunal is only "bound to apply Article 25 of the ICSID Convention and Article 26 of the ECT, and to interpret them in accordance with the rules of international law codified in the [VCLT]."[732] In the Claimants' view, "the ordinary meaning of Article 26 [of the ECT] leaves no doubt that it applies intra-EU."[733]

612. Finally, the Claimants argue that to the extent their interpretation of Article 26 of the ECT were contrary to EU law, "the Tribunal would still be bound to uphold its jurisdiction" pursuant to Article 16 of the ECT, but also due to the fact that "EU law does not take precedence over the ECT".[734]

## 2.    The Tribunal's analysis

### a.    Applicable law and general principles

613. The Tribunal recalls that these proceedings were commenced on the basis of Article 26 of the ECT, which provides in relevant part as follows:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
> […]
>
> in accordance with the following paragraphs of this Article.
>
> (3) (a) […] each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

---

[731] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 33-34.

[732] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 35.

[733] Ibid.

[734] Claimants' Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 38-39, *referring, inter alia, to RREEF Infrastructure (G.P.) Limited and RREEF Pan European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-149), para. 87.

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

[…]

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

614. These proceedings were initiated also pursuant to the ICSID Convention, which establishes the following jurisdictional requirements in its Article 25(1)-(2):

1. The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

2. "National of another Contracting State" means:

[…]

(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

615. The Parties do not dispute that the conditions of Article 25 of the ICSID Convention are satisfied except for the requirement that the Parties must consent in writing to submit the dispute to ICSID.

616. The Tribunal further recalls that by virtue of the principle of *compétence de la compétence*, "[t]he Tribunal shall be the judge of its own competence."[735] As confirmed at the Hearing, the Respondent does not take issue with this principle.[736]

617. According to Spain, Article 26 of the ECT cannot be invoked by the Claimants to prove the Respondent's consent to submit this dispute to arbitration due to its Intra-EU character.[737] In other words, the Respondent argues that Article 26 of the ECT does not apply to disputes between an investor from one EU Member State who made an investment in another EU Member State.

618. As a preliminary step in deciding on the Intra-EU Objection, the Tribunal must determine the law governing its jurisdiction.

619. As recalled above, the Parties disagree in this respect. The Respondent argues that EU law, to the extent it is part of international law, must be applied by the Tribunal to its jurisdiction pursuant to Article 26(6) of the ECT, which provides that "[a] tribunal […] shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[738] According to the Claimants, this provision is only concerned with the law applicable to the merits.[739] Thus, even if EU law is relevant, it shall not be applied to the issues of jurisdiction.

620. The Respondent's interpretation of Article 26(6) of the ECT as requiring this Tribunal to apply directly EU law when ascertaining its jurisdiction cannot be upheld. Article 26(6) is indeed concerned with the law applicable to the merits, as is made clear by sub-paragraph (1) of Article 26, as observed at paragraph 538 above).[740] Thus, the question

---

[735] Article 41(1) of the ICSID Convention.

[736] Hearing Tr., Day 2, 19 March 2019, 96:16-19 (Fröhlingsdorf Nicolás).

[737] Counter-Memorial, para. 119.

[738] Hearing Tr., Day 2, 19 March 2019, 81:24-83:19 (Fröhlingsdorf Nicolás).

[739] Rejoinder on Jurisdiction, paras. 36-18.

[740] *See also*, *e.g.*, *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 218; *Vattenfall AB and Others v. Federal Republic of Germany (II)*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018 (CL-168), para. 116; *Landesbank Baden-Württemberg, HSH Nordbank AG, Landesbank Hessen-Thüringen Girozentrale and Norddeutsche Landesbank-Girozentrale v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019 (CL-192), para. 159.

whether the Tribunal has jurisdiction under Article 26 of the ECT must be established first and foremost pursuant to the terms of Article 26(1)-(5) of the ECT as interpreted pursuant to Articles 31 and 32 of the VCLT.[741]

b.    **Jurisdictional requirements of Article 26 of the ECT interpreted in good faith in accordance with the ordinary meaning of the terms of the treaty in their context and in the light of its object and purpose**

621.    Under Article 26(1)-(3) of the ECT, an arbitration may be initiated for the resolution of "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III […]"[742] The terms used in Article 26(1) of the ECT are defined in Article 1 of the Treaty. According to Article 1(2), "'Contracting Party' means a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force." An investor is "a company or other organization organized in accordance with the law applicable in that Contracting Party" (Article 1(7) of the ECT). An "investment" means "every kind of asset, owned or controlled directly or indirectly by an Investor and includes: […] a company or business enterprise […]" (Article 1(6) of the ECT). Finally, according to Article 1(10), "'Area' means with respect to a state that is a Contracting Party: (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea […]."

622.    Article 26(7) of the ECT additionally provides as follows:

> [a]n Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting

---

[741] *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 218; *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-185), para. 341. *See also RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-149), para. 74, where the tribunal characterizd the ECT as its "constitution"; *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 14 October 2014 (CL-167), paras. 54-56; *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 137.

[742] *See* para. 613 above.

> Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State'.

623. It is not suggested that either Spain or the Netherlands is not a Contracting Party to the ECT.

624. The Tribunal also notes that the Respondent did not raise any objections concerning the Claimants' investment process and corporate structure.[743]

625. Sevilla Beheer and Cordoba Beheer are private liability companies incorporated under the laws of the Netherlands and shall be considered as "investors of another Contracting Party" *vis-à-vis* the Respondent.[744]

626. Sevilla Beheer and Cordoba Beheer fully own and control Cross Retail, which is incorporated in Spain.[745] Sevilla Beheer and Cross Retail in turn fully own and control the Spanish Project Companies.[746] Thus, by virtue of Article 26(7) of the ECT,[747] Cross Retail and the Spanish Project Companies shall also be considered as "investors of another Contracting Party" and as "nationals of another Contracting State" *vis-à-vis* the Respondent for the purposes of Article 25(2)(b) of the ICSID Convention.

627. It is equally uncontested by the Respondent that the present dispute has arisen in respect of Spain's obligations under Part III of the ECT, namely, its Article 10(1) towards the Claimants' PV investments in Spain.

628. The jurisdictional requirements of Article 26(1)-(3) of the ECT thus appear to have been fully satisfied. However, according to the Respondent, the fact that both Spain and the Netherlands are member States of the EU (which, in turn, is party to the ECT) should

---

[743] Counter-Memorial, paras. 53-57.

[744] Extracts from the Dutch commercial register (C-15.1-2).

[745] Memorial, paras. 261-262; Extracts from the Spanish commercial register (C-15.3-59). *See also* paras. 107-108 above.

[746] Memorial, paras. 261-262; Extracts from the Spanish commercial register (C-15.3-59). *See also* paras. 107-108 above

[747] "An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State."

preclude this Tribunal from concluding that Claimants are from "another Contracting Party."[748] In the Respondent's view, Article 26 of the ECT does not apply in an intra-EU context.[749]

629.    The Tribunal notes that the Respondent agrees that there is no "disconnection clause" in the Treaty,[750] i.e., there is no provision that would exempt the rules established by the regional organization, the EU, from the application of the rules established by the ECT. In the Tribunal's view, this is important. Given the EU's participation in the drafting of the ECT, the absence of such a clause suggests that at the time of the ECT's signing the EU did not consider Article 26 of the ECT inapplicable as between the EU Member States. In this regard, the Tribunal finds instructive the below observation made by the tribunal in *The PV Investors v. Spain*:

> […] the ECT shows that where the Contracting Parties deemed it necessary to address the relationship with other treaty regimes, they did so expressly. One example is contained in Annex 2 to the Final Act of the European Energy Charter Conference which provides that in the event of a conflict between the Svalbard Treaty and the ECT, the former shall prevail. It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty exception, an exception with regard to the intra-EU relations would be of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-state arbitration, would not apply among a significant number of Contracting Parties without the Treaty drafters addressing this exception. In the Tribunal's view, it is irreconcilable with the ordinary meaning of the Treaty to read into it an implicit intra-EU disconnection clause.[751]

---

[748] *See*, for example, Respondent's Post-Hearing Brief, para. 5.

[749] Counter-Memorial, para. 118.

[750] Hearing Tr., Day 2, 19 March 2019, 110:23-111:1 ("[…] there is no express disconnection clause; I think there's no debate on that. We think the disconnection clause is not necessary; that's the argument of the Kingdom of Spain" (Fröhlingsdorf Nicolás)).

[751] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 14 October 2014 (CL-167), para. 187 (emphasis added). *See also BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 247; *Landesbank Baden-Württemberg, HSH Nordbank AG, Landesbank Hessen-Thüringen Girozentrale and Norddeutsche Landesbank-Girozentrale v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019 (CL-192), para. 123.

630. The *Landesbank Baden Württemberg v. Spain* tribunal having analyzed the ECT's drafting history similarly concluded that the latter does not support the Intra-EU Objection:

> What the *travaux préparatoires* do make clear is that the EU proposed that a disconnection clause be included in a Ministerial Declaration to be attached to the ECT. The draft proposed that a declaration include the following provision: In their mutual relations, Contracting Parties which are Members of the European Communities shall apply Community rules and shall not therefore apply the rules arising from [the ECT] except insofar as there is no Community rule governing the particular subject concerned. While we do not know why this proposal was not adopted, the fact is that it was not and, to the extent that reference to the travaux préparatoires is permissible, the fact that it was proposed and yet not adopted militates against the interpretation advanced by the [r]espondent.[752]

631. The Tribunal thus concurs with the conclusion reached in *Stadtwerke München v. Spain* that "it cannot be concluded" from the fact that the EU is a member to the ECT as a REIO that "the EU Member States when signing the ECT in 1994 have transferred competence for the adjudication of energy disputes under the ECT to the EU", as "[a]n express stipulation to that effect would be necessary."[753]

632. Thus, the fact that EU is a party to the ECT as a REIO does not deprive Spain and the Netherlands of their status as Contracting Parties and as potential parties to a dispute that may be initiated pursuant to Article 26. Indeed, as it was rightly observed by the *Cube Infrastructure v. Spain* tribunal: "the words found in Article 26(1) of the ECT do not differentiate between different classes of Contracting Parties."[754] Consequently, the ECT, when interpreted "in good faith in accordance with the ordinary meaning to be given to" its terms does not exclude the EU Member States from the application of Article 26. Therefore, the Claimants should be considered as being from "another Contracting Party"

---

[752] *Landesbank Baden-Württemberg, HSH Nordbank AG, Landesbank Hessen-Thüringen Girozentrale and Norddeutsche Landesbank-Girozentrale v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019 (CL-192), para. 123.

[753] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 129.

[754] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain; ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum*, 19 February 2019 (CL-187), para. 124. *See also Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 129.

under Article 26 of the Treaty regardless of whether the respondent State is a member of the EU or not.

\* \* \*

633. Although the jurisdictional requirements of Article 26 of the ECT clearly confer jurisdiction on this Tribunal, it will nevertheless consider whether Article 26 of the ECT can be interpreted as incompatible with EU law, and whether such a conflict (if it existed) could deprive the Tribunal of its jurisdiction over the present dispute.

c.    **Is there a conflict between Article 26 of the ECT and EU law?**

634. Spain argues that by virtue of Article 344 of the TFEU any matters related to the interpretation or application of EU law cannot be referred to investor-State arbitration, because such matters are within the exclusive jurisdiction of the courts referred to in Article 267 of the TFEU.[755]

635. Article 344 of the TFEU provides as follows:

> Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

636. The Tribunal notes that regardless of whether the present dispute involves issues of EU law a number of arbitral tribunals ruled in the past that this provision does not encompass disputes between a national of an EU Member State and another EU State.[756] This position found support, *inter alia*, in the Preliminary Award on Jurisdiction rendered in *The PV Investors v. Spain*:

> Upon a plain reading of Article 344 TFEU, it is clear that such provision applies only to disputes involving **two or more EU member states** but does not prohibit the submission of disputes between other actors to a different method of settlement not contemplated in the EU Treaties. Because there is

---

[755] Counter-Memorial, paras. 86-110; Rejoinder, paras. 131, 145.
[756] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 337; Opinion of the Advocate General M. Wathelet in Case C-284/16, *Slovak Republic v. Achmea b.v.*, 19 September 2017 (R-323), paras. 138-159; *Operafund Eco-Invest Sicav Plc. and another v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Final Award, 6 September 2012 (CL-190), para. 382.

no provision in the EU Treaties dealing with investor -state arbitration, the principle set out in Article 344 TFEU is not applicable to that mechanism.[757]

637. The *Stadtwerke München v. Spain* tribunal equally found that "Article 344 of the TFEU only applies to disputes between Member States of the EU, and not between individual or corporate investors and a Member State."[758]  Both tribunals concluded that the scope of the obligation undertaken by EU Member States under the TFEU was different from that of the ECT.  As summarized by the tribunal in *The PV Investors*, "[b]ecause there is no provision in the EU Treaties dealing with investor-state arbitration, the principle set out in Article 344 TFEU is not applicable to that mechanism." [759]

638. The Tribunal concurs with the above view. It is not persuaded of the existence of a conflict between the mechanism envisaged in Article 26 of the ECT and the provisions of the TFEU. Nevertheless, out of an abundance of caution, the Tribunal will further consider the impact of the alleged conflict between EU law and Article 26 of the ECT on these proceedings.

d.  **Assuming, arguendo, that EU law prohibits intra-EU investment arbitration under the ECT, which "law" should prevail?**

639. Assuming *arguendo* that EU law nevertheless contains a prohibition for intra-EU investment disputes to be initiated pursuant to Article 26 of the ECT, the Tribunal will further consider whether this assumption would lead to a conclusion different from that reached in the preceding paragraphs.

640. First of all, the Tribunal shall analyze whether the alleged conflict between EU law and the ECT can be resolved on the basis of Article 16(2) of the ECT, as suggested by the Claimants.[760]

---

[757] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 14 October 2014 (CL-167), para. 189. *See also Landesbank Baden-Württemberg, HSH Nordbank AG, Landesbank Hessen-Thüringen Girozentrale and Norddeutsche Landesbank-Girozentrale v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional objection, 25 February 2019 (CL-192), para. 154.

[758] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 135.

[759] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 14 October 2014 (CL-167), para. 189.

[760] Claimants' Rejoinder on Jurisdiction, para. 39; Reply, paras. 493-501.

641.   Article 16 of the ECT provides as follows:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
>
> (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.

642.   The Tribunal notes that despite the unanimous rejection of the Intra-EU Objection by ECT-based investment tribunals, there is no consensus regarding the applicability of Article 16 of the ECT to the relationship between EU law and the ECT. A number of tribunals, including, for example, *Vattenfall v. Germany (II)* and *RREEF v. Spain* ruled that Article 16 is applicable and resolves the conflict between EU law and the ECT in favor of the latter.[761] However, a different conclusion was reached, for example, by the *BayWa v. Spain* and *Electrabel v. Hungary* tribunals on the grounds that the ECT and EU law do not share the same subject matter.[762]

643.   The *BayWa v. Spain* tribunal concluded that it would be inclined to hold that "Article 10 of the ECT, in conjunction with Part V, is more favorable to the Investor or the Investment", as "[n]othing in the TFEU allows a direct challenge by an Investor to a State measure harmful to it on grounds specified in Article 10, or on more favorable grounds [nor] does the TFEU provide for an international tribunal to decide disputes directly between investors and host States, as Part V of the ECT does."[763] However, the first condition of the applicability of Article 16 namely, that the other agreement be concerned

---

[761] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-149), para. 75; *Vattenfall AB and Others v. Federal Republic of Germany (II)*, ICSID Case No. ARB/12/12, Decision on the Achmea issue, 31 August 2018 (CL-168), para. 195.

[762] *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-33), para. 4.176.

[763] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 271

with the subject matter of Part III or V of the ECT, was not met, according to the *BayWa v. Spain* tribunal.[764]

644.  At the same time, for the reasons that follow, even if Article 16 of the ECT does not apply to the relationship between EU law and the ECT as the two regimes are not concerned with the same subject matter, the Tribunal cannot support the conclusion that the former shall prevail pursuant to the general law of treaties as codified in the VCLT.

645.  The Respondent's argument on the supremacy of EU law[765] is based, *inter alia*, on Article 30 of the VCLT on the application of successive treaties relating to the same subject-matter, which provides in relevant part as follows:

> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one:
>
> (a) As between States parties to both treaties the same rule applies as in paragraph 3;
>
> (b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.
>
> 5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

---

[764] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 271.

[765] Hearing Tr., Day 2, 19 March 2019, 114:1-7 (Fröhlingsdorf Nicolás); Respondent's Opening Statement on Intra-EU Objection and Tax Measure Objection (presentation), p. 41.

646. However, if the Tribunal decides that Article 16 of the ECT does not apply to the alleged inconsistency between the ECT and EU law, this would inevitably lead to the conclusion that Article 30 of the VCLT is not applicable to this situation either, as it only applies to treaties relating to the same subject matter.[766] At the Hearing, the Respondent has eventually agreed with this proposition:

> PROFESSOR DOLZER: [...] The articles of the [VCLT] deal with conflict of treaties inasmuch as the treaties cover the same subject matter. If they don't cover the same subject matter, then we have no conflict. That's the way I understand them. I guess you would agree with me that if they don't cover the same subject matter, then we have no conflict. So the rules on conflict only operate when we have treaties that relate to the same subject matter?
>
> MS. FRÖHLINGSDORF NICOLÁS: On this point I must agree. And this is precisely the reason why we consider that Article 16 of the ECT is not applicable [...][767]

647. Therefore, even if the two regimes were to be considered as having the same subject-matter,[768] then Article 16 of the ECT resolves the conflict in favor of the ECT, as it applies to both prior and subsequent agreements entered into by the Contracting Parties. Conversely, if the ECT and EU law are considered as having different subject matters (as per the *Electrabel* approach advocated by the Respondent[769]) neither Article 16 of the ECT, nor Article 30 of the VCLT is applicable.

648. The Tribunal will now turn to Article 41 of the VCLT, which concerns agreements to modify multilateral treaties between certain of the parties only and which may indeed

---

[766] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 273.

[767] Hearing Tr., Day 2, 19 March 2019, 115:25-116:11 (Fröhlingsdorf Nicolás) (emphasis added).

[768] In this scenario, the Tribunal would be minded to find that the ECT is more favorable to the investors than the TFEU, as the latter does not allow a direct claim to be brought by an investor against a State on the grounds similar to those provided in Article 10 of the ECT or on more favourable grounds.

[769] Respondent's Opening Statement on Intra-EU Objection and Tax Measure Objection (presentation), p. 42; *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-33), para. 4.176 ("As regards the substantive protections in Part III of the ECT, the Tribunal does not consider that the ECT and EU law share the same subject-matter; and, accordingly, it considers that Article 16 ECT is inapplicable").

have the effect of excluding the application of the ECT as between the EU Member States if the circumstances of its application are met.[770]

649. Article 41 of the VCLT provides as follows:

> 1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
> (a) the possibility of such a modification is provided for by the treaty; or
>
> (b) the modification in question is not prohibited by the treaty and:
>
> (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>
> (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> 2. Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

650. Unlike Article 30 of the VCLT, the above-quoted rule is not limited to treaties with the same subject matter.[771] At the same time, the Tribunal was not presented with any proof that, as required by Article 41(2) of the VCLT, the EU Member States notified the other parties to the ECT of their intention to conclude an agreement that would modify the terms of the ECT as between the EU Member States. Furthermore, the Tribunal agrees with *BayWa v. Spain* that "it is very doubtful whether the abrogation *inter se* of the ECT as between EU Member States is compatible 'with the effective execution of the object and purpose of the [ECT] as a whole'."[772] The Tribunal thus concludes that Article 41 of

---

[770] *Referred to at* Respondent's Opening Statement on Intra-EU Objection and Tax Measure Objection (presentation), p. 35.

[771] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 276.

[772] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 276. *See also SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-189), para. 251; *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-185), para. 352.

the VCLT cannot be relied upon to exclude the application of the ECT, including its Article 26, as between the EU Member States.

651.  The Respondent has also referred to Article 59 of the VCLT (termination or suspension of the operation of a treaty implied by conclusion of a later treaty) as a provision resolving the alleged conflict between the ECT and EU law in favor of the former.[773] In this regard, the Tribunal observes that Article 59 of the VCLT applies only if: (i) *all the parties* to the earlier treaty have entered into the later treaty (the congruence of the personal scope of the two treaties follows, *inter alia*, from the general rule on the termination of a treaty enshrined in Article 54 of the VCLT); and (ii) both treaties share the same subject matter. At least one of the conditions of the application of Article 59 is clearly unmet in the present case, as the ECT's Contracting Parties include both EU and non-EU countries. This argument is therefore dismissed.

652.  Finally, at the Hearing, the Respondent also suggested that it would be contrary to the rules of treaty interpretation to consider that "the European Union would have […] concluded a treaty, which, by itself, goes against the principle[s] of autonomy of the primacy and of the mutual trust", as that would be "an absurd result".[774] The Tribunal agrees that, as a matter of principle, EU law can be taken into account for the purposes of interpreting Article 26 of the ECT by virtue of Article 31(3)(c) of the VCLT as "rules of international law applicable in the relations between the parties".[775] The Tribunal however considers that it would be inappropriate to use Article 31(3)(c) of the VCLT in order to essentially re-write the clear terms of Article 26 of the ECT and deprive the latter of any effect in an intra-EU context. This is not the purpose of treaty interpretation, especially when the suggested interpretation is not supported by *all* of the ECT signatories.[776]

---

[773] Rejoinder, paras. 168-171.

[774] Hearing Tr., Day 2, 19 March 2019, 107:4-20 (Fröhlingsdorf Nicolás).

[775] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 138.

[776] For the same reasons, the views expressed by certain EU Member States and the European commission in the aftermath of the *Achmea* Judgment cannot inform the Tribunal's interpretation of Article 26 of the ECT. *See* European Commision, Communication to the European Parliament and the Council on the Protection of intra-EU investment, COM (2018) 547/2, 19 July 2018 (RL-106); Declaration of 22 Member States on *Achmea* and investment protection in the EU (RL-112), p. 2.

653. In view of the foregoing, the Tribunal concludes that the Respondent has not succeeded at demonstrating that EU law prevails over the terms of Article 26 of the ECT. The Tribunal thus sees no other solution but to dismiss the Intra-EU Objection.

654. The fact that as of the date of this Decision, the Intra-EU Objection has not been granted by any tribunal constituted under the ECT comforts the Tribunal's conclusion.

e.   **The impact of the CJEU's jurisprudence (the *Achmea* and *Komstroy* Judgments)**

655. The Tribunal will first of all address the *Achmea* Judgment, the relevance and impact of which has been hotly debated by the Parties in the course of these proceedings.[777]

656. The Tribunal recalls that in the *Achmea* Judgment, the CJEU reached the following conclusion:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[778]

657. The Respondent stated at the Hearing that the *Achmea* Judgment as such is not binding on this Tribunal.[779] Rather the Respondent's argument seems to be that the Tribunal should follow the Judgment's logic when interpreting the ECT and conclude that its Article 26 is incompatible with the fundamental principles of EU law.[780] The question therefore is whether the *Achmea* Judgment is relevant in the ECT context. As Respondent's counsel put it at the Hearing: "the question is to decide whether the *Achmea* Judgment, as it is now, has to be applied to the ECT."[781]

---

[777] Rejoinder on the Merits, paras. 93-145; Claimants' Rejoinder on Jurisdiction, paras. 46-58; Hearing Tr., Day 2, 19 March 2019, 92:22-108:10 (Fröhlingsdorf Nicolás).

[778] *Achmea* Judgment (RL-93), *Dispositif*.

[779] Hearing Tr., Day 2, 19 March 2019, 94:16-17 (Fröhlingsdorf Nicolás).

[780] Rejoinder, paras. 117-131.

[781] Hearing Tr., Day 2, 19 March 2019, 96:10-13 (Fröhlingsdorf Nicolás).

658. The Tribunal has not been persuaded that the *Achmea* Judgment's reasoning is "applicable" to ECT-based investor-State arbitrations. *A fortiori*, the Tribunal is not convinced that the *Achmea* Judgment's reasoning implies an incompatibility of the ECT's investor-State dispute settlement regime with EU law.

659. The first distinguishing factor is the multilateral and "mixed" nature of the ECT. Indeed, the Tribunal cannot ignore the fact that the ECT was entered into with the participation of the EU, an element that appears to have been acknowledged in the *Achmea* Judgment's reasoning:

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected.[782]

660. Further, the Tribunal has already established that the ECT does not contain a disconnection clause exempting intra-EU relations from the scope of the Treaty.

661. Based on the foregoing, the Tribunal endorses the conclusion reached in *the Masdar Solar v. Spain* award, according to which "the Achmea Judgment […] cannot be applied to multilateral treaties, such as the ECT, to which the EU itself is a party."[783]

662. The Tribunal also finds it noteworthy that in rendering the *Achmea* Judgment, the CJEU abstained from addressing the below observation of the Advocate General Wathelet:

> [the ECT] operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the

---

[782] *Achmea* Judgment (RL-93), para. 57 (emphasis added).

[783] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 679.

<u>Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.</u>[784]

663. Thus, this Tribunal agrees with other arbitral awards that concluded that the *Achmea* Judgment is "of limited application" to ECT-based arbitrations.[785]

664. The Tribunal will further address the *Komstroy* Judgment where the CJEU, according to the Respondent, has applied the *Achmea* Judgment's reasoning to investor-State arbitral proceedings brought under Article 26 of the ECT.[786]

665. The *Komstroy* Judgment was rendered upon a request for a preliminary ruling made by the Paris Court of Appeal in the context of an annulment proceeding in *Komstroy (formerly Energoalians) v. Moldova*, an arbitration initiated under the ECT by a Ukrainian investor. The Paris Court of Appeal posed the following questions before the CJEU:

> [(1)] Must [Article 1(6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?
>
> [(2)] Must [Article 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?
>
> [(3)] Must [Article 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?

---

[784] Opinion of the Advocate General M. Wathelet in Case C-284/16, *Slovak Republic v. Achmea B.V.*, 19 September 2017 (R-323), para. 43 (emphasis added).

[785] *See, for example, Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 220; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 679. *See also Operafund Eco-Invest Sicav Plc. and another v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Final Award, 6 September 2012 (CL-190), paras. 381-385.

[786] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, paras. 11-12.

666. The Tribunal observes that none of these questions concerned the alleged incompatibility of intra-EU investor-State dispute settlement clauses with the TFEU. The Tribunal further notes that neither of the parties to the *Komstroy v. Moldova* arbitration is an EU Member State or a national of an EU Member State. Despite these circumstances and in addition to answering the questions posed to it by the Paris Court of Appeal, the CJEU found that "Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State".[787] This conclusion however was not set out in the operative paragraph of the *Komstroy* Judgment, which only addressed the questions referred to the CJEU for a preliminary ruling:

> On those grounds, the Court (Grand Chamber) hereby rules:
>
> Article 1(6) and Article 26(1) of the Energy Charter Treaty, signed at Lisbon on 17 December 1994, approved on behalf of the European Communities by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997, must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions.[788]

667. Therefore, the CJEU's finding regarding the incompatibility between Article 26(2)(c) of the ECT and EU law can only be considered as an *obiter dictum*.

668. Furthermore, the Tribunal recalls that it is empowered to provide *its own* interpretation of the jurisdictional requirements of the ECT by virtue of the principle of *compétence de la compétence*. The CJEU's jurisprudence is not binding on the Tribunal in this respect. This is uncontested by the Respondent in principle.[789]

669. In any event, the Tribunal cannot accept the CJEU's interpretation of Article 26(2)(c) of the ECT as persuasive, as the reasoning of the *Komstroy* Judgment does not provide any analysis of this provision and its alleged inapplicability in an intra-EU context from the perspective of international law. Although it is true that the provisions of the ECT "form

---

[787] *Komstroy* Judgment (RL-136), para. 66.

[788] *Komstroy* Judgment (RL-136).

[789] As stated in respect of *Achmea* at Hearing Tr., Day 2, 19 March 2019, 94:16-17 (Fröhlingsdorf Nicolás).

an integral part of the legal order of the European Union,"[790] this does not prevent both the ECT and EU law from also being part of the international legal order.

670. Indeed, the ECT is a multilateral agreement signed by the EU and its Member States as well as a number of other States not members of the EU. As long as there is no evidence that the Respondent's interpretation of Article 26 of the ECT is supported by *all the parties* to the ECT (including its non-EU signatories), it cannot guide the Tribunal's interpretation under Article 31(2)(a)-(b) of the VCLT. Furthermore, as the Tribunal has already observed, if the EU Member States wished to amend the terms of Article 26 of the ECT *inter se*, they would have to follow the procedure provided for in Article 42 of the ECT in accordance with Article 41 of the VCLT (see paragraphs 648-650 above). There is however no evidence that this procedure was followed.

671. In its comments on the *Komstroy* Judgment, the Respondent presents a number of additional arguments in support of the CJEU's findings.[791] For the sake of good order, the Tribunal will consider each of these additional arguments although it shall be emphasized that none of these arguments features in the *Komstroy* Judgment's reasoning and thus cannot be considered as affecting the Tribunal's conclusion regarding the lack of persuasiveness of the CJEU's analysis.

672. In its comments on the *Komstroy* Judgment the Respondent submits that pursuant to the principle of *pacta sunt servanda* the EU Member States (including the Netherlands and Spain) "have accepted […] the autonomy and primacy of EU law and the compulsory effect of the CJEU rulings".[792] The Tribunal agrees with the Respondent that the principle of *pacta sunt servanda* ("every treaty in force is binding upon the parties to it and must be performed by them in good faith"[793]) indeed imposes an obligation of the EU Member States to observe the TFEU and other sources of EU law. However, by virtue of the exact same principle the ECT's Contracting Parties are obliged to comply with the terms of the

---

[790] *Komstroy* Judgment (RL-136), paras. 49, 23.

[791] *See* paras. 573-575 above.

[792] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 34.

[793] VCLT, Article 26.

ECT. The *pacta sunt servanda* principle thus does not further Spain's Intra-EU Objection, as it does not resolve the alleged conflict between the ECT's Article 26 and EU law.

673. For the same reason, the Respondent's assertion that the *Komstroy* Judgment is binding on the Netherlands and that "Dutch investors cannot have any rights different that the rights and legal framework that is applicable to the Netherlands"[794] cannot assist the Tribunal in its analysis of the Intra-EU Objection, as the ECT is equally binding on both Spain and the Netherlands and provides their nationals with access to investor-State arbitration.

674. The Respondent also invokes the principle of *venire contra factum proprium*, which allegedly implies that the practice of respecting the principles of EU law has created "a reliance in the Member States that they will be always observed".[795] The Tribunal notes that the Respondent's allegations pertain to the *relations among the EU Member States*, whereas the present proceedings were initiated to resolve a dispute between a State (Spain) and multiple Dutch *investors*. The Claimants' home State (the Netherlands) is not a participant in these proceedings. The Tribunal therefore does not need to consider this issue any further.

675. Spain further contends that the autonomy of EU law is respected "not only by the Netherlands and Spain and by all the Member States of the EU, but by all the [S]tates of the international community who have never opposed to the respect of that autonomy."[796] Although the Respondent has failed to articulate its position in terms of the law of treaties, in the Tribunal's view the Respondent's argument can be understood as referring to the *subsequent practice* of States in relation to the principle of the autonomy of EU law. Such practice could indeed be taken into account for the purposes of treaty interpretation under Article 31(3)(b) of the VCLT ("[t]here shall be taken into account, together with the context […] any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation"). At the same time, in the course of these proceedings the Tribunal has not been presented with any evidence or any detailed argumentation regarding this alleged subsequent practice of the non-EU Parties to the

---

[794] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 44.

[795] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 34.

[796] Respondent's Comments on the *Komstroy* Judgment and the *Infracapital v. Spain* Decision, para. 41.

ECT in respect of the principle of the autonomy of EU law. The Tribunal thus cannot conclude, based on the Respondent's statement made for the first time in its comments on the *Komstroy* Judgment, that Spain's interpretation of Article 26 of the ECT is reflective of the subsequent practice of the ECT's Contracting Parties and that it does not amount to an impermissible amendment of the ECT's terms by the EU Member States *inter se* outside of the established procedure.

676. In view of the above, the Tribunal maintains its conclusion regarding the applicability of Article 26 of the ECT in an intra-EU context despite the findings made in the *Komstroy* Judgment.

### f.    Issues of enforcement do not affect the Tribunal's jurisdiction

677. The Respondent submits that any award rendered by this Tribunal may constitute State aid under EU law and may be refused enforcement on public policy grounds by national courts of the EU Member States.[797] The Tribunal is of the view that the enforceability issues are irrelevant for the purposes of deciding on this jurisdictional objection.[798]

### g.    Conclusion on the Intra-EU Objection

678. In the preceding paragraphs the Tribunal has established that: (1) the jurisdictional requirements of Article 26(1)-(3) of the ECT and Article 25 of the ICSID Convention are satisfied (subject to the validity of the Respondent's Intra-EU Objection); (2) the ECT does not exclude, either expressly or by implication, intra-EU investor-State disputes from the application of its Article 26(3); (3) the TFEU does not seem to contain an explicit prohibition to refer investor-State disputes to arbitration under an investment treaty; (4) even if there was a prohibition (i.e., a conflict between EU law and the ECT), EU law would not have been able to displace the terms of Article 26 of the ECT (under which this Tribunal was constituted) either by virtue of Article 30 or Article 41 of the VCLT. The Intra-EU Objection is therefore rejected.

---

[797] Reply on Jurisdiction, paras. 178-185.

[798] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018 (CL-168), para. 230; *Marfin Investment Group Holdings S.A., Alexandros Baka Tselos and others v. Republic of Cyprus*, ICSID Case No. ARB/13/27, Award, 26 July 2018 (CL-165), para. 596.

**B.    The TVPEE Objection**

**1.    The Parties' positions**

a.    **The Respondent**

679.    The Respondent argues that pursuant to Article 26(1) of the ECT Spain consented to arbitrate investor-State disputes that concern "an alleged breach of an obligation" existing under the relevant part of the ECT.[799] The Respondent however insists that it has no obligations under Article 10(1) the ECT with respect to the TVPEE because the latter is a taxation measure exempted from the scope of the ECT by virtue of its Article 21.[800] Thus, the Tribunal has no jurisdiction over the TVPEE claim.

680.    The Respondent submits that the TVPEE falls under the definition of a "taxation measure" under the ECT as the relevant provisions of Law 15/2012 that introduced the TVPEE are "provision[s] relating to taxes of the domestic law of the Contracting Party", in accordance with Article 21(7)(a)(i) of the ECT.[801]

681.    The Respondent argues that the TVPEE is a tax from the perspective of Spanish law.[802] In this regard, the Respondent first of all relies on Article 1 of Law 15/2012 which explicitly characterizes the TVPEE as "a tax of direct character and real nature."[803] Referring to Article 2 of Law 58/2003 on General Taxation which defines the concept, purposes and classes of taxes, the Respondent then enumerates the elements of the TVPEE (the tax base, taxable period, applicable rate).[804] The taxation nature of the TVPEE, according to the Respondent, has also been recognized by the Institute of

---

[799] Counter-Memorial, paras. 120-214 (emphasis added); Rejoinder, paras. 187-247.

[800] Counter-Memorial, paras. 120-214; Rejoinder, paras. 187-247. While acknowledging the fact that Article 21 of the ECT contains a number of exceptions the Respondent asserts that none of these exceptions applies to Article 10(1) of the ECT.

[801] Counter-Memorial, paras. 152-159; Rejoinder, paras. 192-194.

[802] Counter-Memorial, paras. 160-173.

[803] Counter-Memorial, para. 161, *referring to* Law 15/2012, 27 December 2012 (R-3).

[804] Counter-Memorial, paras. 162-163, *referring to* Law 58/2003, 17 December 2003 (R-202).

Accounting and Auditing of Accounts[805], the General Directorate of Taxes of the Kingdom of Spain[806], and the Spanish Constitutional Court.[807]

682. In the Respondent's view, the TVPEE also meets all of the defining characteristics of a tax under international law, namely: (i) the TVPEE is established by law – Law 15/2012; (ii) such Law imposes an obligation on a class of people – "all those who perform the activities of production and incorporation into the electric system", and (iii) said obligation involves paying money to the State for public purposes – the TVPEE is listed as a type of State revenue in the General State Budget which is used to finance public expenditures.[808] Additionally, the Respondent emphasizes that the Commission has confirmed the taxation nature of the TVPEE and its compliance with EU law.[809]

683. The Respondent insists that the above analysis is sufficient to characterize the TVPEE as a taxation measure for the purposes of Article 21 of the ECT. The Respondent argues that the only exceptions to the carve-out are those provided in paragraphs 2 to 5 of Article 21 of the ECT.[810] For example, Article 21(5) of the ECT expressly carves out Article 13 of the ECT on expropriation from the scope of Article 21(1). The Respondent emphasizes that none of the exceptions provided in paragraphs 2 to 5 of Article 21 of the ECT is applicable to the Claimants' case.[811]

---

[805] Counter-Memorial, para. 166, *referring to* Law 58/2003, 17 December 2003 (R-202).

[806] Counter-Memorial, para. 169, *referring to* Response from the General Directorate for Taxes, of 23 December 2014, to Binding Tax Query V3371-14, 23 December 2014 (R-211).

[807] Counter-Memorial, para. 171, *referring to* Constitutional Court, App. 1780/2013, Judgement 183/2014, 6 November 2014 (R-212).

[808] Counter-Memorial, paras. 180-199, *referring to EnCana Corporation v. Republic of Ecuador*, UNCITRAL Case No. UN 3481, Award, 3 February 2006 (RL-22); *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008 (RL-54); *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction 2 June 2010 (RL-55).

[809] Counter-Memorial, paras. 200-212.

[810] Counter-Memorial, paras. 141-144, *referring to* Energy Charter Secretariat, "The Energy Charter Treaty: A Reader's Guide", June 2002 (RL-36), pp. 38-39.

[811] Hearing Tr., Day 2, 19 March 2019, 117:1-6 (Fröhlingsdorf Nicolás).

684.  The *bona fide* analysis of the taxation measure is inapplicable to the present case as the dispute where such an analysis was performed in the past, namely in the *Yukos* arbitrations,[812] concerned extraordinary circumstances, in which taxation measures were used to destroy a company and eliminate a political opponent.[813] According to the Respondent, the Claimants failed to discharge their burden of proof in respect of the lack of the *bona fide* character of the TVPEE.[814]

685.  Referring to *EnCana v. Ecuador* the Respondent argues that the economic effects of a taxation measure do not form part of the *bona fide* analysis.[815] Further, or in the alternative, the Respondent submits that the TVPEE lawfully did not distinguish between the traditional and RE producers, that the TVPEE was not discriminatory and that it did not constitute a disguised tariff cut but a tax designed to raise Spain's income to finance public expenditure.[816] Specifically, the Respondent asserts that the lack of distinction between the traditional and RE producers was a choice of the legislator that was within its wide margin of appreciation as confirmed by the Spanish Constitutional Court.[817] As regards the non-discriminatory nature of the TVPEE, the Respondent alleges that the TVPEE "does not discriminate against renewable producers in terms of repercussion."[818] In particular, the TVPEE is one of the costs that is compensated through the specific remuneration regime established for the RE producers.[819]

---

[812] The reference to the "Yukos" arbitrations is to the following three arbitrations: *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, UNCITRAL, PCA Case No. 2005-03/AA226 (RL-79), *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227 (CL-162), (CL-163), and *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 228.

[813] Rejoinder, para. 198, *referring to Hulley Enterprises Limited (Cyprus) v. Russian Federation*, PCA Case No. AA 226, Final Award, 18 July 2014 (RL-79), para. 1407.

[814] Rejoinder, para. 201.

[815] Rejoinder, para. 198, *referring to EnCana Corporation v. Republic of Ecuador*, UNCITRAL Case No. UN 3481, Award, 3 February 2006 (RL-22).

[816] Rejoinder, paras. 202-236.

[817] Rejoinder, para. 210, *referring to* Judgement 183/2014 of the plenary session of the Constitutional Court, of 6 November 2014, (Appeal on grounds of unconstitutionality 1780/2013) (R-212).

[818] Rejoinder, paras. 215-221.

[819] Rejoinder, paras. 222-228.

686. Finally, the Respondent emphasizes that its position on the lack of jurisdiction over the TVPEE claim is shared by the arbitral tribunals in the *Isolux v. Spain*, *Eiser v. Spain*, *Novenergia II v. Spain*, *Masdar Solar v. Spain*, and *Antin v. Spain* arbitrations.[820]

b.  **The Claimants**

687. The Claimants submit that the ECT carves out only *bona fide* taxation measures.[821] Thus, it is insufficient for the assessment of the TVPEE from the perspective of Article 21 of the ECT to assert that the TVPEE is a "tax" under Spanish law.[822] In the Claimants' view, in order to determine whether a measure falls within Article 21 of the ECT, State's conduct must be assessed in its totality under the balance of probabilities standard, because no State would "expressly declare that [its] taxation measure is a sham."[823]

688. The application of this standard to the present case, according to the Claimants, requires the Tribunal to determine whether the implementation of the TVPEE is more consistent with the conclusion that it forms part of a series of measures designed to deprive the Claimants of their rights under the Special Regime.[824] The Claimants further submit that if there is *prima facie* evidence that the TVPEE is "arbitrary and discriminatory, the Tribunal may draw inferences in favor of the Claimants"[825], and that the burden of proof shifts to the Respondent.[826]

---

[820] Rejoinder, paras. 237-245, *referring to Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain,* Arbitration SCC V2013/153, Award, 12 July 2016 (RL-70); *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À R.I. vs. The Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (RL-56); *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC ARBITRATION (2015/63), Final Award, 15 February 2018 (RL-95); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (RL-99); *Antin Infrastructure Services Luxembourg s.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID CASE No. ARB/13/31. Award, 15 June 2018 (RL-107). *See also* Hearing Tr., Day 2, 19 March 2019, 117:13-21 (Fröhlingsdorf Nicolás).

[821] Reply, paras. 550-590.

[822] Reply, paras. 592-598, *referring to Yukos Universal Limited v. Russia*, PCA Case No. AA 227, Final Award, 18 July 2014, para. 1433 (CL-163), *Quasar v. Russia*, para. 179, and Article 3 of International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, 2001 (RL-75).

[823] Reply, paras. 550-551, *referring to Yukos Universal Limited (Isle of Man) v. The Russian Federation*, Case PCA No. AA 227, Final Award (CL-163), para. 514.

[824] Reply, para. 552.

[825] Reply, para. 554.

[826] Reply, para. 554.

689. Among other precedents pertaining to the application of Article 21 of the ECT, the Claimants particularly emphasize *Antaris v. Czech Republic* where an ECT-based tribunal found itself competent to hear a claim brought against the Czech Republic by PV investors in relation to the so-called "Solar Levy".[827] The Claimants attach particular importance to the following paragraph of the *Antaris v. Czech Republic* tribunal's analysis:

> If an ECT tribunal were to consider only the form of the measure rather than its substance, it would provide the scope for abuse of the ECT's tax carve-out, as the contracting states would be able to escape their obligations under Part III of the ECT, and thus liability from their violations thereof, simply by labelling governmental actions as "taxation" measures. There is no indication in the ECT that an ECT tribunal's jurisdiction does not encompass the determination of whether a particular measure constitutes a "Taxation Measure" for the purpose of Article 21 of the ECT. An ECT tribunal must therefore make a substantive determination of the measure in light of the relevant facts rather than simply adopting the contracting state's own, formal characterization of that measure.[828]

690. Thus, the Claimants submit that the Tribunal "must determine in substance whether or not [the TVPEE] has the characteristics of a tax."[829]

691. The following facts are referred to by the Claimants to demonstrate that the TVPEE does not have said features of a tax and lacks the *bona fide* character. First, the Claimants point out that the sum identical to the amount collected via the TVPEE (i.e., 7%) is subsequently returned to the Electricity System. Thus, the TVPEE serves the purpose of a tariff cut, which is "channeled" through the State budget.[830] The Claimants further assert that the TVPEE "was intended" as a tariff cut. Prior to the introduction of the TVPEE, Mr. José Manuel Soria, the then Minister of Industry, Energy and Tourism stated that the Ministry "could have opted for a reduction in premiums but [it] opted

---

[827] A measure similar in its effect to the TVPEE. *See* Hearing Tr., Day 2, 19 March 2019, 129:14-18 (Ingle), *referring to Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98).

[828] Hearing Tr., Day 2, 19 March 2019, 129:20-23 (Ingle), *referring to Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98), para. 249.

[829] Hearing Tr., Day 2, 19 March 2019, 130:1-3 (Ingle).

[830] Reply, para. 556; Rejoinder on Jurisdiction, para. 92; Hearing Tr., Day 2, 19 March 2019, 130:18-131:14 (Ingle).

instead for fiscal measures".[831] The Claimants further mention the fact that at the time when the TVPEE was implemented, Spain was already facing several investor-State disputes concerning the changes to the Special Regime.[832] The Claimants thus conclude that "[t]he inference must be that [the TVPEE] was framed as a tax with the purpose of avoiding liability for breaching investors' rights under the ECT."[833]

692.  Additionally, the Claimants assert that the TVPEE is discriminatory and unrelated to its purported rationale.[834] The TVPEE's discriminatory character, in the Claimants' view, is due to the fact that the RE producers (unlike the traditional ones) had no ability to pass on the TVPEE costs on the consumer.[835] The Claimants also argue that the TVPEE is arbitrary and *mala fide* as it runs against the aim declared in Law 15/2012 that introduced the alleged tax:

> The objective of this Law is to harmonise our tax system with a more efficient and respectful use of the environment and sustainable development, values which inspire this tax return, and as such, bring it into line with the basic principles that govern the tax, energy and of course the environmental policy of the European Union.[836]

693.  According to the Claimants, the introduction of the TVPEE does the opposite of what Law 15/2012 claims to achieve by adversely affecting RE installations.[837] The Claimants further submit that Spain has not considered any alternative measure to reach the declared environmental goal and that it did not demonstrate any rational link between the TVPEE and its professed aim.[838] Thus, the Claimants submit that the TVPEE is not an environmental measure.

---

[831] Reply, para. 564, *referring to* P. Carmona y C. Mesones, "Interview with the Minister of Industry Energy and Tourism", *La Gaceta*, 14 October 2012 (C-214); Claimants' Rejoinder on Jurisdiction, para. 94.

[832] Reply, paras. 566-567; Claimants' Rejoinder on Jurisdiction, para. 94.

[833] Reply, para. 567; Claimants' Rejoinder on Jurisdiction, para. 94.

[834] Reply, paras. 569-580.

[835] Reply, paras. 571-572.

[836] Reply, para. 574, *referring to* Law 15/2012, 27 December 2012 (C-111).

[837] Reply, para. 575.

[838] Reply, paras. 576-578, *referring to* Request for information of the European Commission to Spain regarding Law 15/2012, "EU pilot 5526/13/TAXU" (C-216), where the European Commission states that the TVPEE "does not pursue any particular purpose" *See also* Expert Commission for Spanish Tax System Reform Report, February 2014 (KPMG Exhibit 18), para. 345; Reply, para. 599, *referring to* Supreme Court (Administrative Chamber), App. 2554/2014, Procedural Decision, 10 January 2018 (C-217).

694. Finally, relying upon *Quasar v. Russia*, the Claimants reiterate that the analysis of the TVPEE requires "a comprehensive assessment of the factual circumstances that have led to the loss of which a claimant complains."[839] Therefore, the Claimants challenge the TVPEE, not as a discrete taxation measure, but as part of a series of the Disputed Measures "that were intended to roll back the binding Government incentives that had induced the Claimants to invest."[840]

## 2.    The Tribunal's analysis

695. Article 21 of the ECT provides in relevant part as follows:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> […]
>
> (3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:
>
> (a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; or
>
> (b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty.
>
> (5) (a) Article 13 shall apply to taxes.
>
> (b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
> (i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is

---

[839] Reply, paras. 586-587, *referring to Renta 4 S.V.S.A, Ahorro Corporacion Emergentes F.I., Quasar de Valors SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A., ALOS 34 S.L v. The Russian Federation*, SCC No. 24/2007, Award, 20 July 2012 (CL-148), para. 181.

[840] Reply, para. 590.

discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

[…]

(iii) Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv) Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

[…]

(7) For the purposes of this Article:

(a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic Law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

(c) A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

(d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

696. Article 21(1) of the ECT provides for an exception to the jurisdiction of this Tribunal with respect to "Taxation Measures" (the "**Taxation Carve-Out**"). The purpose of the Taxation Carve-Out in the ECT is to preserve the Contracting Parties' power to impose taxes, which is an essential sovereign prerogative. This prerogative is subject to certain limitations, as explicitly stated in Article 21. For instance, Article 21(5) of the ECT

provides that Article 13 of the ECT (which relates to expropriation) shall apply to "taxes", thereby limiting the Taxation Carve-Out set out at Article 21(1) of the ECT (the "**Tax Claw-Back**"). In addition to such explicit limitations to the Taxation Carve-Out, there is a question whether and to what extent the Taxation Carve-Out may be subject to implicit limitations, such a requirement that in order to qualify as a "Taxation Measure", a State measure must constitute a *bona fide* taxation-related action that is not adopted with the aim to achieve an entirely unrelated purpose.

697.  This was one of the issues in the "*Yukos*" arbitrations.[841] In that case, the tribunal found that the Taxation Carve-Out in Article 21(1) did not apply to the multitude of impugned tax collection measures which were ultimately found to have caused the bankruptcy of Yukos Oil Company in pursuit of an ulterior political purpose.[842] In reaching its conclusion, one of the considerations by the *Yukos* tribunal was that an interpretation under which the Tax Claw-Back was narrower than the Taxation Carve-Out would lead to "a gaping hole in the ECT where investors would stand completely unprotected from expropriatory taxation."[843] The case at hand bears no resemblance to the *Yukos* arbitrations as it neither involves the characterization of a multitude of measures relating to the assessment or collection of taxes claims (as opposed to the legality of a "tax"), nor allegations of illegal expropriation (as opposed to allegations of unfair and inequitable treatment).

698.  The Claimants are not arguing that the TVPEE as such is not a tax under Spanish law.[844] Thus, the Tribunal notes at the outset that there is no dispute between the Parties regarding the characterization of the TVPEE as a tax under Spanish law.

---

[841] The Tribunal's reference to the "Yukos" arbitrations is to the following three parallel, joined ECT-based UNCITRAL arbitrations: *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, UNCITRAL, PCA Case No. 2005-03/AA226 (RL-79), *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227 (CL-162), (CL-163), and *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 228.

[842] *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, UNCITRAL, PCA Case No. 2005-03/AA226, Final Award, 18 July 2014 (RL-79), paras. 1444-1445.

[843] *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, UNCITRAL, PCA Case No. 2005-03/AA226, Final Award, 18 July 2014 (RL-79), para. 1413.

[844] *See* Rejoinder on Jurisdiction, paras. 80-105; Reply, paras. 592-600.

699.  In the Tribunal's view, the TVPEE satisfies the largely accepted criteria of a tax: it was established by law (Law 15/2012), in respect of a class of persons (conventional and RE electricity producers), and imposed an obligation to pay money to the State for public purposes.[845] In light of these circumstances, the Tribunal is not prepared to inquire whether or not the TVPEE achieved the end for which it was purportedly adopted (i.e., an environmental purpose and budgetary balance[846]).

700.  The Tribunal is also of the view that the present circumstances differ from the facts relating to the so-called "Solar Levy"[847] that was at issue in the *Antaris v. Czech Republic* arbitration, which, in the Claimants' view, provides a "better test" that the Tribunal should follow when deciding on the TVPEE Objection.[848] In that case, the parties engaged in a lengthy discussion on the characterization of the Solar Levy under Czech law that was spurred by the conflicting positions of the Czech courts and authorities.[849] The *Antaris v. Czech Republic* tribunal ultimately found that the Solar Levy did not constitute a tax under Czech law.[850] As it follows from the text of the award and as confirmed by HE Judge Peter Tomka in his Declaration appended to the award, the decision of 10 July 2014 of the 9th Chamber of the Czech Supreme Administrative Court in which it found that the Solar Levy was not a tax, was "the main basis" for the tribunal's conclusion.[851]

---

[845] These criteria were applied, *inter alia*, in *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 255; *Burlington*, paras. 164-165.

[846] *See* Law 15/2012, Preamble.

[847] The solar levy was initially set by the Czech Republic at 26% and subsequently at 10% for solar energy producers under the [FiT] system. It was withheld by the grid operator who paid the [FiT] to the energy producers. *See Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98), paras. 97-98.

[848] Hearing Tr., Day 2, 19 March 2019, 135: 22-25 (Ingle).

[849] *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98), paras. 175-214.

[850] *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98), paras. 241-243.

[851] *Antaris Solar GmbH and Dr. Michael Göde v. The Czech Republic*, PCA Case No. 2014-01, Declaration of Judge Tomka, para. 2. This was also referred to as a distinguishing factor in *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, para. 307.

701. In any event, regardless of whether the Tribunal can analyze the purpose of the challenged tax, the Claimants submitted no evidence that in the present case the TVPEE was construed as a tax with the purpose of avoiding international liability.[852]

702. Based on the above, this Tribunal concludes that the TVPEE qualifies as a "tax" under Spanish law and, consequently, as a "tax" within the meaning of Article 21(7) of the ECT.[853]

703. Having established that the TVPEE constitutes a tax within the meaning of Article 21(7) of the ECT, the Tribunal finds that the TVPEE is covered both by the Taxation Carve-Out under Article 21(1) as well as the Tax Claw-Back under Article 21(5) (which the Claimants are not invoking). Based on the foregoing, the Tribunal is satisfied that the TVPEE does not fall within its jurisdiction.

---

[852] *Cf. Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98), paras. 152-153 and *Antaris Solar GmbH and Dr. Michael Göde v. The Czech Republic*, PCA Case No. 2014-01, Declaration of Judge Tomka, para. 12.

[853] *See also Watkins Holdings S.à r.l. and others v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020 (CL-195), paras. 266-274; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), paras. 301-302; *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 171*; OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 (CL-190), para. 404; *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019 (CL-191), para. 319; *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-189), para. 277; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and a Partial Decision on Quantum, 19 February 2019 (CL-188), paras. 221-233; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), para. 198; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 185; *Foresight Luxembourg Solar I S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-179), para. 258; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 312; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 295; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144), para. 525.

## VII.    LIABILITY

### A.    Interpretation of Article 10(1) of the ECT

### 1.    The Parties' positions

#### a.    The Claimants

704.    The Claimants argue that the five sentences of Article 10(1) of the ECT embody commitments towards investments none of which is "merely preambular or hortatory".[854] The Claimants further submit that Article 10(1) of the ECT provides for the FET standard of treatment that must be assessed on the basis of the following non-cumulative criteria:

> (a) whether the host State breached the investor's reasonable and legitimate expectations […];
>
> (b) whether the State failed to provide a stable and predictable legal and business framework in relation to the investment;
>
> (c) whether the State's conduct was transparent;
>
> (d) whether the State acted in an arbitrary or unreasonable manner; and
>
> (e) whether the actions of the State were disproportionate.[855]

705.    The Claimants argue that the FET standard enshrined in Article 10(1) of the ECT is an autonomous standard which is not limited to the minimum standard under customary international law.[856] The Claimants also contend that the FET standard is absolute, as it "provides a fixed reference point regardless of the treatment others receive."[857] The motive and bad faith, according to the Claimants, need not to be established to find an

---

[854] Hearing Tr., Day 1, 18 March 2019, 129:1-24, Ms. Stoyanov *quoting from Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (RL-58), para. 319. *See also Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 533.

[855] Memorial, para. 365.

[856] Memorial, paras. 357-358, *referring to Liman Caspian Oil B.V. & NCL Dutch Investment B.V. v. The Republic of Kazakhstan*, Award, 22 June 2010 (CL-52), para. 263.

[857] Memorial, para. 361.

FET breach.[858] Conversely, if an FET violation was committed in good faith or for a legitimate cause – that does not excuse the Respondent.[859]

706. Finally, the Claimants argue that the Tribunal must assess the Disputed Measures collectively "to arrive at the conclusion that the totality of those measures, cumulatively, fell below the FET standard, irrespective as to whether or not Spain can find any pretext to justify any (or all) of the measures individually."[860]

b. **The Respondent**

707. The Respondent argues that Article 10(1) of the ECT contains only one commitment: the FET standard of treatment.[861] At the same time, the Respondent does not appear to be taking issue with the elements of the FET standard identified by the Claimants. In particular, the Respondent does not dispute that the FET standard embodies the obligation to not upset the Claimants' legitimate expectations.[862]

708. The Respondent further submits that "the main objective of the ECT is to grant foreign investors domestic or non-discriminatory treatment, no lower than the minimum protection standards admitted in international law."[863] The Respondent also argues that the standard enshrined in Article 10(1) of the ECT requires a "balancing exercise" and that there will be no violation of the FET standard if the host State "exercises its regulatory power in a reasonable manner when pursuing a public interest."[864]

---

[858] Memorial, para. 366.

[859] Memorial, para. 366.

[860] Claimants' Post-Hearing Brief, para. 56-58, *referring, inter alia, to El Paso International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (CL-32), paras. 516 *et seq*.

[861] Hearing Tr., Day 2, 19 March 2019, 6:11-19 (Elena Abad), *referring to Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-6), para. 765; *Plama Consortium Limited v. The Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award 27 August 2008 (RL-64), para. 162.

[862] Counter-Memorial, paras. 1025-1085; Rejoinder, paras. 1183-1269.

[863] Post-Hearing Brief, para. 77.

[864] Hearing Tr., Day 2, 19 March 2019, 6:16-19 (Elena Abad), *referring to Saluka Investments B.V. (The Netherdlands) v. The Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 (RL-115), paras. 305-309; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain, SCC Arbitration (2015/63)*, Final Award, 15 February 2018 (RL-95), para. 660; Hearing Tr., Day 2, 19 March 2019, 6:20-24 (Elena Abad), *referring to Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Final Award 8 July 2016 (RL-83), para. 423.

709. The Respondent also asserts that each of the Disputed Measures must be assessed individually under the FET standard.[865]

## 2.    The Tribunal's analysis

710. Article 10(1) of the ECT provides as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

711. The Parties agree that Article 10(1) enshrines the obligation to provide fair and equitable treatment (FET) (in addition to a so-called "umbrella clause" – the last sentence of Article 10(1)).

712. The Parties also seem to agree that the FET standard includes the following elements: the protection of reasonable and legitimate expectations; the protection against arbitrary or unreasonable, or disproportionate measures as well as the obligation to act in a transparent manner.[866] This list is also reflective of the obligations forming part of the FET standard identified by other tribunals.[867]

---

[865] Respondent's Post-Hearing Brief, para. 80; Respondent's Second Post-Hearing Brief, paras. 18-21.

[866] Memorial, para. 365; Counter-Memorial, para. 1018.

[867] *See*, for example, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 260; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 459 (*referring to Antaris Solar GmbH and Dr. Michael Göde v. The Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018, para. 360); *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 256; *AES Solar and others (PV Investors) v. Spain, PCA Case No. 2012-14*, Final Award, 28 February 2020 (RL-129), para. 565.

713. The Tribunal needs to consider separately the language "shall, in accordance with the provisions of the Treaty, encourage and create stable […] conditions for Investors of other Contracting Parties", which is contained in Article 10(1) of the ECT. The Tribunal notes that neither of the Parties argues that the obligation to ensure stable conditions (regardless of whether it is considered as an autonomous standard or not) requires the State to "freeze" its legal system.[868] The Parties appear to be equally in agreement that the obligation to ensure stable conditions would only be breached if the disputed regulatory changes were "drastic" and "unexpected".[869] To that effect, the Respondent refers to the *Blusun v. Italy* award where the tribunal found that "the fair and equitable treatment standard which, by virtue of the second sentence, is at the core of the obligation of stability under the first sentence [of Article 10(1) ECT]" the obligation of stability imposes "a relatively high" threshold. The tribunal in *Blusun v. Italy* cited with approval *El Paso v. Argentina* where the tribunal spoke of "a total alteration of the entire legal setup for foreign investments" as well as *LG&E v. Argentina* where the tribunal mentioned a complete dismantling of the legal framework constructed to attract investors.[870]

714. In addition, the Tribunal adheres to the position expressed by a large number of authorities that the first sentence of Article 10(1) of the ECT mentioning "stable conditions" cannot be interpreted in isolation from the second sentence of the same provision, which refers to the obligation to accord fair and equitable treatment.[871] It is also widely accepted that

---

[868] Counter-Memorial, para. 1087, *referring to* Ch. Schreuer, "Fair and Equitable Treatment in Arbitral Practice", 6 Journal of World Investment and Trade 357, at p. 374 (RL-39); Hearing Tr., Day 2, 19 March 2019, 2:8-17 (Elena Abad); Memorial, para. 329; Reply, paras. 307, 310; Hearing Tr., Day 1, 18 March 2019, 28:4-17 (Stoyanov).

[869] Reply, para. 307.

[870] Hearing Tr., Day 2, 19 March 2019, 27:1-25 (Elena Abad); *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (RL-58), para. 363, *referring to El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Final Award 31 October 2011 (RL-27), para. 517 and *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (CL-50), para. 139.

[871] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 458, *referring to Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award 27 December 2016 (RL-58), para. 315; *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award (CL-98), para. 365; *Novenergía II – Energy & Environment (SCA) Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. V 2015/063, Award (CL-144), paras. 642-646; *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 565; *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case

the FET standard does not prevent sovereign States from exercising their regulatory powers in a manner consistent with international law.[872] In this connection, having analyzed the object and purpose of the ECT, in *The PV Investors v. Spain* the tribunal persuasively concluded as follows:

> […] the Parties to the ECT aimed at realizing a balance between the sovereign rights of the State over energy resources and the creation of a climate favorable to the flow of investments on the basis of market principles. In other words, while the purpose of "promot[ing] long-term cooperation in the energy field" which is stipulated in Article 2 of the Treaty may be facilitated by stability of the investment framework, the requirement of stability is not absolute; it must be balanced with other principles, including those that are directly derived from "State sovereignty", e.g., the State's right to regulate and to adapt the regulatory framework to changed circumstances. More generally, the protection of investments and the right to regulate operate in a balanced way under the ECT as in all other investment treaties.[873]

715. The Tribunal concurs with the authorities referred to above which found that legal stability does not constitute an obligation separate from the fair and equitable treatment standard under Article 10(1) of the ECT.[874] Rather, Article 10(1) of the ECT, which includes the obligation to protect legitimate expectations, subsumes an obligation of stability. Thus, the Tribunal will analyze the first and second sentences of Article 10(1) together in the context of the Claimants' legitimate expectations claim.

716. Professor Cameron disagrees with the Tribunal's majority. In Professor Cameron's view, stability has a special meaning under the ECT: "the treaty protection of stability is […] stronger under the ECT than under any other international investment treaty".[875] This is so because of an alleged "emphasis" on stable conditions in the text of Article 10(1) ECT, which, according to Professor Cameron, is a an example of a deliberate "legal recognition of a sector-specific investment feature", acting as a constraint on the State's right to

---

No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021 (RL-137), para. 520.

[872] Which does not seem to be contested by the Claimants: Hearing Tr., Day 1, 18 March 2019, 53:9-13 (Vazquez-Guillén: "Article 97 of the Spanish Constitution sets out very clearly the power to regulate of the state. So no one is saying at all that there is no ability to regulate. So regulation – and of course the [FiT] – can change").

[873] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 565 (emphasis added).

[874] Above fn. 871.

[875] Partial Dissenting Opinion by Professor Cameron, para. 12.

regulate, which is allegedly necessary to achieve the objectives of promoting investments in the energy sector.[876]

717. The majority wishes to note in this respect that even if the ECT's protection of stability is stronger than under other investment agreements, the practical implications of such a conclusion on the analysis of the Claimants' claims are unclear as long as it is not alleged that the guarantee of stability is absolute.[877] Therefore, in order to decide whether there has been a breach of this obligation the Tribunal would still be required to analyze Spain's conduct through the prism of the FET standard, which, as rightly noted by the *BayWa v Spain* tribunal, takes into account <u>both</u> the prerogatives and responsibilities of governments and the rights and interests of investors.[878] As part of its balancing exercise[879], the Tribunal would thus need to assess the Claimants' expectations in respect of the alleged guarantees of stability of the host State's regulatory framework. In sum, the majority believes that even if the arguments set out at paragraphs 8-17 of the Partial Dissenting Opinion were accepted, the Tribunal would not have been dispensed from analyzing the regulatory framework under which the Claimants' made their investments and from which they derived their alleged expectations. In this regard, the majority agrees with Professor Cameron that "a central question for determination is whether the Disputed Measures introduced by the Respondent in its energy law breached the Claimants' legitimate expectations".[880]

---

[876] Partial Dissenting Opinion by Professor Cameron, para. 12.
[877] Indeed, the State's right to regulate *per se* does not seem to be challenged by either the Claimants or Professor Cameron.
[878] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, para. 458.
[879] *Saluka Investments BV v. The Czech Republic*, PCA Case No. 2001-04, Partial Award, 17 March 2006, para. 306 ("The determination of a breach of [the FET standard] therefore requires a weighing of the [c]laimant's legitimate and reasonable expectations on the one hand and the [r]espondent's legitimate regulatory interests on the other"); *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, para. 165.
[880] Partial Dissenting Opinion by Professor Cameron, Section B, introductory paragraph.

**B.     Whether there was a violation of Article 10(1) of the ECT**

**1.     Whether Spain violated the Claimants' legitimate expectations**

a.     **The Parties' positions on the law**

*i. The Claimants*

718.   The Claimants propose the following test for the assessment of the Claimants' legitimate expectations: (i) the expectations must be assessed at the time of the investment; (ii) the expectations must be legitimately and reasonably held; and (iii) the expectations may be derived from the host-State's regulatory framework.[881]

719.   As regards due diligence, the Claimants argue that "due diligence that informs an investor's subjective understanding of the regulatory framework is not determinative" for a legitimate expectations claim[882] and that "the only relevant enquiry is whether the investor's understanding was objectively reasonable."[883] The Claimants also argue that the Tribunal must take into account the expertise of a particular investor as well as the level of complexity of the provisions in reliance on which the investment was made.[884]

720.   The Claimants further argue that it is irrelevant from the international law perspective whether a commitment was made in a law or in a regulation, as any kind of domestic act can be amended by the State at will.[885]

---

[881] Reply, para. 319.

[882] Claimants' Post-Hearing Brief, para. 33.

[883] Claimants' Post-Hearing Brief, para. 33.

[884] Reply, paras. 125-126, *referring to Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award (CL-99), para. 537 and *Novenergía II – Energy & Environment (SCA) Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. V 2015/063, Award, 25 February 2018 (CL-144), para. 679; Hearing Tr., Day 5, 22 March 2019, 35:2-6 (Vazquez-Guillén).

[885] Hearing Tr., Day 1, 18 March 2019, 118: 1-7 (Stoyanov).

*ii. The Respondent*

721.    The Respondent submits that the general approach to be followed in the assessment of the Claimants' legitimate expectations is the one proposed in *Invesmart v. Czech Republic*,[886] according to which "the test of whether […] an expectation can give rise to a successful claim at international law is an objective one."[887]

722.    Based on *Invesmart v. Czech Republic*, the Respondent argues that the Tribunal is required to investigate the regulatory framework and the objective circumstances under which the Claimants made their investments in Spain.[888] The Tribunal, according to the Respondent, must also take into account the subjective circumstances of the investor, in particular, the due diligence performed when the investor made its investment.

723.    Finally, the Respondent asserts that State conduct, i.e., how State officials and various State entities dealt with the investor must be assessed as well.[889] In this regard, the Respondent endorses the *Invesmart v. Czech Republic* award where it states that "it is important to distinguish between the various entities of the [S]tate […] One entity of the [S]tate not vested with actual decision-making authority cannot be taken to bind the entity which by law possesses the actual authority."[890]

724.    At the Hearing, the Respondent also argued that provisions of general legislation are not sufficient to generate legitimate expectations that there would be no regulatory changes.[891] In support of this position, the Respondent quoted the following excerpt from the *Phillip Morris v. Uruguay* award:

---

[886] Hearing Tr., Day 2, 19 March 2019, 8:21-9:4 (Elena Abad).

[887] *Invesmart, B.V. v. Czech Republic*, UNCITRAL Case, Award 26 June 2009 (RL-17), para. 250.

[888] Hearing Tr., Day 2, 19 March 2019, 9:1-4 (Elena Abad), *referring to Invesmart, B.V. v. Czech Republic*, UNCITRAL Case, Award 26 June 2009 (RL-17), paras. 250-258.

[889] Hearing Tr., Day 2, 19 March 2019, 9:1-4 (Elena Abad), *referring to Invesmart, B.V. v. Czech Republic*, UNCITRAL Case, Award 26 June 2009 (RL-17), para. 258.

[890] *Invesmart, B.V. v. Czech Republic*, UNCITRAL Case, Award 26 June 2009 (RL-17), paras. 250-258.

[891] Hearing Tr., Day 2, 19 March 2019, 20:3-5 (Elena Abad), *referring to Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-6) and *Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7. Final Award, 8 July 2016 (RL-83).

> [p]rovisions of general legislation applicable to a plurality of persons or of category of persons, do not create legitimate expectations that there will be no change in the law.[892]

725.  The Respondent equally invokes the principle of hierarchy of norms to argue that regulatory acts cannot be the source of investors' expectations in the absence of a commitment provided in a law.[893]

726.  As regards the level of required due diligence, the Respondent argues that in a highly-regulated sector the investor should enquire specifically about the prospects of changes in the regulatory framework.[894]

b.    **The Parties' positions on the facts**

*i.   The relevant date for assessing the Claimants' expectations*

727.  The Parties agree that the alleged legitimate expectations should be assessed at the time of the making of an investment.[895]

*(a)   The Claimants*

728.  According to the Claimants, the investment was made when the decision to invest had become irrevocable, i.e., when the EPC contracts were signed for each of the Claimants' PV Plants:[896]

| Name | Installed Capacity | Date of EPC Contract | Economic Regime |
|------|--------------------|----------------------|-----------------|
| Mahora | 2.8 MW | 10 August 2006 | RD 661/2007 |
| Villar de Cañas | 1.5 MW | 1 August 2007 | RD 661/2007 |
| Ronda | 1.9 MW | 4 October 2007 | RD 661/2007 |
| Matapozuelos | 0.925 MW | 17 September 2009 | RD 1578/2008 |
| Fuentes de Año | 2.5 MW | 25 November 2009 | RD 1578/2008 |

---

[892] *Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Final Award, 8 July 2016 (RL-83), para. 426.

[893] Respondent's opening on the merits, p. 16.

[894] Hearing Tr., Day 2, 19 March 2019, 21:12-25 (Elena Abad); Respondent's Opening Statement on the Merits, slides 23-24.

[895] Hearing Tr., Day 2, 19 March 2019, 8:1-10 (Elena Abad); Hearing Tr., Day 5, 22 March 2019, 29:25-30:17 (Vazquez-Guillén). *See also Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain, SCC ARBITRATION (2015/63)*, Final Award, 15 February 2018 (RL-95), para. 539.

[896] Claimants' Post-Hearing Brief, para. 30; Hearing Tr., Day 5, 22 March 2019, 30:18-24 (Vazquez-Guillén); Hearing Tr., Day 2, 19 March 2019, 8:1-2 (Elena Abad).

729. However, elsewhere in their submissions, the Claimants stated that "RD 436/2004 [was] the regime that was in place at the time the Claimants made their initial investment in the PV Farms."[897] This is despite the fact that none of the Claimants' PV Plants was registered under this Royal Decree.

*(b) The Respondent*

730. The Respondent argues that the Claimants' investment process began in 2005, when Mr. Bouman made his decision to invest in the PV sector in Spain.[898] Thus, in the Respondent's view, the period of time the Tribunal must consider extends from 2005 to 2010.[899] The Respondent's position implies that (i) the Claimants' initial expectations could not have been based only on RD 661/2007 as this regulation was issued almost two years after Mr. Bouman's decision to invest in Spain and that (ii) the Claimants' expectations could not have remained unchanged throughout 2005-2010 due to the regulatory developments and announcements of further regulatory changes made during this period.[900]

## ii. *The content of the alleged expectations and their reasonableness*

*(a) The Claimants*

731. The Claimants argue that their expectations were twofold: (i) regarding the nature, amount, and duration of the FiTs under RD 661/2007 and RD 1578/2008; and (ii) regarding the stability of the economic regimes under said Royal Decrees.[901]

732. As regards the nature, amount, and duration of the incentives, the Claimants allegedly expected that the installations registered in the RAIPRE would be able to: (i) sell electricity at a FiT for the amounts indicated in RD 661/2007 and RD 1578/2008; (ii) benefit from, the FiT on all of the electricity produced; (iii) benefit from the FiT during the entire operational life of the installations registered under RD 661/2007 and

---

[897] Reply, paras. 204-205.
[898] Respondent's Post-Hearing Brief, para. 87, *referring to* First Bouman Statement, paras. 17-28.
[899] Respondent's Post-Hearing Brief, paras. 86-89.
[900] Respondent's Post-Hearing Brief, paras. 88-89.
[901] Memorial, para. 378.

during 25 years for the installations registered under RD 1578/2008; (iv) benefit from the CPI index provided in said Royal Decrees.[902]

733. Furthermore, the Claimants argue that the alleged stability commitment was core to their expectations; absent such a commitment the Claimants would not have invested in the Spanish RE sector.[903] This element of the Claimants' expectations was based on the following alleged guarantees of RD 661/2007 and RD 1578/2008: (i) the provisions establishing a specific FiT and the period during which it would apply (see paragraphs 254, 295 above and (ii) the commitment not to subject existing installations to future tariff revisions.[904]

734. The commitment not to subject existing installations to future tariff revisions, according to the Claimants, was provided in Article 44(3) of RD 661/2007, which states as follows:

> During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of [the 2005-2010 PER], and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.
>
> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[905]

735. According to the Claimants, the second paragraph of Article 44(3) of RD 661/2007 protected duly-registered installations from the changes introduced in 2010-2012 and "most certainly from Spain's complete withdrawal of the Special Regime in July 2013."[906]

---

[902] Memorial, para. 379.

[903] Memorial, para. 381, *referring to* First Bouman Statement, para. 43.

[904] Memorial, para. 382.

[905] RD 661/2007, 25 May 2007 (C-54)/(R-49) (emphasis added).

[906] Memorial, paras. 118, 382.

736. In support of their interpretation of Article 44(3) of RD 661/2007, the Claimants refer to the *Memoria Económica* of the Ministry of Industry, Trade, and Tourism in relation to RD 661/2007, which allegedly confirmed that Article 44(3) was specifically included as a guarantee against "any" revisions of the regulated tariffs, premiums and supplements contained in RD 661/2007:

> Revisions to the tariffs, premiums, and supplements will be done in the following manner:
>
> In 2010, in light of the monitoring reports on the degree of compliance with the Renewable Energy Plan (PER) 2005-2010 and the Spanish Strategy for Electricity Savings and Efficiency (E4), as well as the new objectives that are included in the following Renewable Energy Plan for the 2011-2020 period, the tariffs, premiums, supplements, and upper and lower limits defined in this Royal Decree will be revised, their application starting on 1 January 2011, attending to the costs associated with each of these technologies, to the degree of participation in the special regimen in the coverage of demand, and to their incidence in the technical and economic management of the system. A new revision will be carried out every four years from then.
>
> The regulated tariffs, premiums, supplements, and limits derived from any of these revisions will be applicable only to those facilities that have been registered definitively in the [RAIPRE] after 1 January of the year following the year in which the revision is made.[907]

737. To demonstrate that their expectations were reasonable, legitimate, and objective, the Claimants further refer to the 14 February 2007 report of the CNE on the draft RD 661/2007 where the CNE proposed to maintain "regulated tariffs during the service life of existing facilities (with a transparent annual adjustment mechanism)."[908] The Claimants also refer to an excerpt from a press release of 25 May 2007 issued by the Government and announcing the adoption of RD 661/2007:

> Tariffs shall be reviewed every 4 years, taking into account compliance with the established targets. Such a revision shall allow for adjustments to be made to the tariff in virtue of new costs and the level of compliance with the targets. Future tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, thereby favouring development. The new legislation shall not be applied retroactively. Facilities with a start-up date prior to 1 January 2008

---

[907] Ministry of Industry, Tourism, and Commerce, Report on the draft of the Royal Decree whereby electricity production under the special regime and for certain facilities with similar technologies under the ordinary regime is regulated, 21 March 2007 (C-163), p. 10. *See also*, para. 263 above.

[908] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 25.

> may operate under the previous framework in accordance with the fixed-tariff option for the duration of the facility's working life.[909]

738. In addition to the above, the Claimants submitted three presentations of the CNE dated 29 October 2008, February 2009, and February 2010 in support of their interpretation of Article 44(3) of RD 661/2007.[910] Two of the three presentations stated that the economic incentives guaranteed a reasonable return, but "incentives that provide greater returns [were] justified."[911]

739. The Claimants further referred to a joint presentation of the Ministry of Industry, Trade and Tourism and InvestInSpain, dated November 2009, that stated as follows:

> […] subsequent revisions of the tariffs will not affect the installations which have already been commissioned [this guarantee] provides legal certainty to the producer, ensuring the stability and development of the sector.[912]

740. A similar statement was also made in a presentation of InvestInSpain of November 2007.[913]

741. Although RD 1578/2008 did not contain a provision similar to Article 44(3) of RD 661/2007, the Claimants argue that the CNE interpreted RD 1578/2008, at the time of its passing, as exempting existing facilities from future revisions.[914] In particular, the Claimants refer to the following written response provided by the CNE to a query regarding the Fifth additional provision of RD 1578/2008:

---

[909] Ministry of Industry, Trade and Tourism, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power", 25 May 2003 (C-53), p. 1.

[910] CNE, Presentation: "Legal and Regulatory Framework for Renewable Energy Sector", 29 October 2008 (C-72); CNE, Presentation: "Renewable Energy Regulation", February 2009 (C-75); CNE, Presentation: "Renewable Energy Regulation in Spain", February 2010 (C-92).

[911] CNE presentation, "Legal and Regulatory Framework for Renewable Energy Sector", 29 October 2008 (C-72), p. 25; CNE Presentation: "Renewable Energy Regulation", February 2009 (C-75), p. 21.

[912] Ministry for Industry, Tourism and Commerce, Presentation: "Legal Framework for Renewable Energies in Spain" (C-265), p. 4.

[913] Manuela García, INTERES InvestinSpain, Presentation: "Opportunities in Renewable Energy in Spain", 16 November 2007 (C-67), p. 32.

[914] CNE, Response to a query from an individual regarding the Fifth additional provision of RD 1578/2008, 22 October 2009 (C-85), pp. 1-2; CNE, Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, 29 July 2008 (C-70), p. 21.

> This regulation is consistent with the regulation established in Article 44.3 of Royal Decree 661/2007, where it provides for a revision of the remuneration scheme in 2010, which would be applicable to those facilities commissioned starting on 1 January 2012.[915]

742. Furthermore, the Claimants state that according to the *Memoria Justificativa* of RD 1578/2008, potential reviews would only affect the percentage by which the FiT could be reduced (or increased) between quarterly calls (2.5%):

> During 2012, the percentage of reduction will be reviewed and, if necessary, modified upwards, if, in view of the technological evolution of the sector, it is found that the costs of this technology have fallen below the maximum expected rate of decrease, in which case the installed capacity target for the following call will be increased by the same percentage as the regulated tariff will be reduced.[916]

743. By definition this kind of revision, in the Claimants' view, can only be forward-looking.[917]

744. The Claimants also attach importance to the registration of all of the PV plants in the RAIPRE.[918] According to the Claimants, the RAIPRE registration certificates "constitute a direct link" between the Claimants' plants and the Government.[919] The Claimants note that the *Antin v. Spain* and *Masdar Solar v. Spain* tribunals agreed that the registration in the RAIPRE was not a mere formality but a circumstance that had "real value as a matter of international law."[920]

745. The Claimants insists that their expectations were reasonable and objective in view of the following facts: (i) the Special Regime was part of a wider international and domestic policy to promote renewable energy sources; (ii) RD 661/2007 and RD 1578/2008 provided for specific guarantees that were "sufficiently attractive to encourage the

---

[915] CNE response to a query from an individual regarding the Fifth additional provision of RD 1578/2008, 22 October 2009 (C-85), pp. 1-2.

[916] Claimants' Post-Hearing Brief, para. 117, *referring to Memoria Justificativa*, RD 1578/2008 (C-164).

[917] Claimants' Post-Hearing Brief, para. 118.

[918] Hearing Tr., Day 1, 18 March 2019, 125:8-16 (Stoyanov).

[919] Hearing Tr., Day 1, 18 March 2019, 125:8-16 (Stoyanov).

[920] Hearing Tr., Day 1, 18 March 2019, 125:8-16 (Stoyanov), *referring to Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 552 and *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 512.

necessary investments in RE projects"; the Special Regime was advertised by Spain through presentations and promotional advertising materials.[921] The FiT scheme implemented by RD 661/2007 and RD 1578/2008, according to the Claimants, was reasonable as it was also consonant with good regulatory practice.[922] Specifically, the Claimants referred to the support schemes introduced in Denmark, Germany, and the United Kingdom.[923]

746. Furthermore, the Claimants argue that their expectations were not limited to obtaining a "reasonable return."[924] Specifically, they assert that "[i]n the event that the Tribunal were to agree that the Claimants' legitimate expectations were limited by Spain's concept of a 'reasonable return' (which the Claimants maintain they were not), the Claimants' legitimate expectations were to receive the reasonable return that was implicit in the specific FIT scheme under which they invested, not to a 'dynamic' and ever-changing return."[925] According to the Claimants, even if their expectations were found to be limited to a reasonable rate of return, the specific return they were entitled to was "at least in the region of 7.2%-8.2% after tax – not 7.398% before tax, as Spain contends."[926] As further discussed below, the Claimants' quantum expert argues that the CNE considered the rate of return of 7.9%-8.2% (post-tax) as reasonable under RD 661/2007 and the rate of return of 7% (post-tax) under RD 1578/2008.[927]

747. The Claimants assert that contrary to Spain's arguments, the regulatory framework contained "no warning" of the Disputed Measures.[928] In this connection, the Claimants contend that the Respondent presented no proof of its allegation that RD 661/2007 was introduced not to attract investment, but to resolve the situation of overcompensation that was caused by the "loop effect" of the remuneration mechanism established under

---

[921] Memorial, paras. 382-383.

[922] Hearing Tr., Day 1, 18 March 2019, 137:15-138:18 (Stoyanov).

[923] Hearing Tr., Day 1, 18 March 2019, 20:1-5 (Stoyanov).

[924] Reply, paras. 168-177, 320, 345; The Claimants emphasize that Spain failed to point out to a provision in the text of RD 661/2007 that would contain a reference to 7%. Claimants' Post-Hearing Brief, para. 111, *referring to* Hearing Tr., Day 4, 21 March 2019, 4:58:1-7 (Flores).

[925] Reply, para. 189.

[926] Reply, para. 190. See also, ibid., para. 193.

[927] Second Compass Lexecon Report, para. 149.

[928] Claimants' Post-Hearing Brief, section 6.2.

RD 436/2004.[929] Moreover, the Claimants submit that Spain itself characterized Royal Decree 661/2007 as increasing remuneration when it announced the adoption of the Decree.[930] Therefore, the Claimants conclude that the adoption of RD 661/2007 could not have warned them that harmful regulatory changes would be adopted.

748.  The Claimants further argue that Spain omitted to mention that RD 1578/2008 (which lowered the FiT) applied only to new installations in compliance with the "grandfathering" principle.[931] Thus, the Claimants emphasize that before 2010 Spain did not implement harmful regulation to existing plants without a proper transition or compensation.[932]

749.  The principle of regulatory hierarchy, according to the Claimants, has no impact on their legitimate expectations because from the international law perspective it is irrelevant whether a commitment was made in a law or in a decree; both can be changed by the State.[933] It is equally irrelevant whether the Spanish state organs were authorized under domestic law to make stabilization commitments.[934] Furthermore, the Claimants note that in any event neither RD 661/2007[935] nor RD 1578/2008 were inconsistent with Law 54/1997.[936]

750.  The Claimants further submit that the judgments of the Spanish Supreme Court referred to by the Respondent were irrelevant to the formation of their legitimate expectations as none of the judgments provides an interpretation of the key provisions of RD 436/2004,

---

[929] Claimants' Post-Hearing Brief, para. 98.

[930] Claimants' Post-Hearing Brief, para. 101, *referring to* Ministry of Industry, Trade and Tourism, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new RD on renewable energy and combined heat and power", 25 May 2007 (C-53); Email between Henk Pals and Caja Madrid regarding the potential financing of a PV project in Albacete, 15 March 2006 (C-41), p. 21.

[931] Claimants' Post-Hearing Brief, para. 114; Claimants' Reply Post-Hearing Brief, paras. 10-12.

[932] Memorial, paras. 341-350; Reply, paras. 24, 233 and 309.

[933] Hearing Tr., Day 1, 18 March 2019, 119:23-120:6 (Stoyanov).

[934] Claimants' Post-Hearing Brief, para. 131.

[935] For example, the Claimants argue that the preamble of RD 661/2007 expressly states that it is compliant with Law 54/1997: "[t]he economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments […]". *See* Claimants' Post-Hearing Brief, para. 130.

[936] Claimants' Post-Hearing Brief, para. 130, *referring to* Hearing Tr., Day 4, 21 March 2019, 106:4-10 (Flores/Stoyanov).

RD 661/2007, or RD 1578/2008.[937] The Claimants contend that the "macroeconomic circumstances" as well as the Tariff Deficit were equally irrelevant to the Claimants' legitimate expectations, as the Respondent made a deliberate choice to develop its RE sector despite those circumstances.[938] Moreover, the Claimants argue that the investor could not forecast which policies future governments would adopt to solve the aggravating Deficit.[939]

751. In the Claimants' view, the 2017 EC State Aid Decision does not affect the Claimants' legitimate expectations claim (see paragraphs 911-912 below).

752. At the Hearing, the Claimants were asked by the Tribunal to clarify the impact of the "good regulatory practice" of other EU Member States including Germany, the United Kingdom, Denmark, in legal terms on the facts of the present dispute.[940] The Claimants replied that such practice confirms the reasonableness of their expectations.[941]

*(b) The Respondent*

753. The Respondent submits that RD 436/2004, RDL 7/2006, RD 661/2007 and RD 1578/2008 do not contain any self-standing "guarantee or promise to freeze their regime in favor of the Claimants or their investments" that would exist independently from the legal framework set out under Law 54/1997.[942] According to the Respondent, the regulatory framework only guaranteed a "reasonable profitability" of RE facilities during their useful life.[943] The post-tax reasonable rate of return, according to the Respondent, was around 7% at the time when the Claimants made their investments.[944]

---

[937] Reply, para. 197, *referring to* Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93); Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94); Third Chamber of the Supreme Court, App. 11/2004, Judgment, 20 March 2007 (R-95); Third Chamber of the Supreme Court, App.13/2006, Judgment, 9 October 2007 (R-96); Claimants' Post-Hearing Brief, para. 124.

[938] Reply, paras. 200-203.

[939] Claimants' Post-Hearing Brief, para. 43, *referring to Saluka Investments B. V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006 (CL-73), para. 332.

[940] Hearing Tr., Day 1, 18 March 2019, 135:14-17 (Arbitrator Dolzer); 137:6-14 (Arbitrator Tanzi).

[941] Hearing Tr., Day 1, 18 March 2019, 135:18-138:18 (Stoyanov).

[942] Counter-Memorial, para. 1049; Respondent's Post-Hearing Submission, para. 60.

[943] Counter-Memorial, para. 1049.

[944] Hearing Tr., Day 5, 22 March 2019, 83:17-23 (Fröhlingsdorf Nicolás); First Econ One Report, paras. 128-140.

754. The Respondent further argues that Article 40(3) of RD 436/2004 did not contain any "stabilization commitment".[945] According to the Respondent, Article 40(3) does not apply to "any" revisions of the tariffs, premiums, and incentives, but only to those "provided for in [Article 40(1)]" of the Decree, which is allegedly apparent from the reference in the discussed provision to "the revisions provided for in this section".[946] As the Respondent explains, the revisions envisaged in Article 40 have a limited scope of ensuring the renewable energy promotion plan's goals.[947] Thus, the Respondent concludes that any other revisions were not prevented by Article 40(3) and were permissible pursuant to the principle of hierarchy of laws.[948]

755. The Respondent also relied on the analysis of RD 436/2004 that was published by APPA (and referenced at paragraphs 186-187 above).[949] The Respondent notably refers to the fact that APPA was concerned with the "retroactive" application of the Decree to existing facilities.[950]

756. The Respondent moreover argues that Article 44(3) of RD 661/2007 did not contain any stabilization commitments either due to essentially the same reasons as those summarized above regarding RD 436/2004.[951] In addition, the Respondent states that Article 44(3) of RD 661/2007 in any event does not cover all of the parameters of RD 661/2007 such as, for example, the CPI.[952]

757. The Respondent submits that its interpretation of RD 436/2004 and RD 661/2007 is consistent with the jurisprudence of the Spanish courts.[953] In particular, the Respondent refers to the following observation made in the 2005 Supreme Court Judgment:

---

[945] Hearing Tr., Day 5, 22 March 2019, 88:14-89:7 (Fröhlingsdorf Nicolás).

[946] Counter-Memorial, para. 421.

[947] Counter-Memorial, para. 421.

[948] Counter-Memorial, para. 422.

[949] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162). *See also* Counter-Memorial, para. 418; Rejoinder, paras. 603-605.

[950] APPA, Presentation "New Special Regime Decree", 19 April 2004 (R-162), slide 25.

[951] Counter-Memorial, paras. 422, 1068.

[952] Hearing Tr., Day 1, 18 March 2019, 244:12-23 (Fröhlingsdorf Nicolás). *See also* Counter-Memorial, paras. 510-512.

[953] Rejoinder, paras. 461-464; Counter-Memorial, paras. 345-372.

> There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration, provided that it remains within the framework of [Law 54/1997].[954]

758. The Respondent further refers to the 2006 Supreme Court Judgment where the highest Spanish court ruled, *inter alia*, as follows:

> […] the owners of electric power production facilities under the special regime have no "unmodifiable right" to the financial regime that regulates the receipt of premiums remaining unaltered. Indeed, said scheme attempts to promote the use of renewable energies through an incentivising mechanism that, like all mechanisms of this kind, has no assurance that it will remain without being modified in the future.
>
> The remuneration regime that we analyse does not guarantee, [...] owners of facilities under the special regime the intangibility of a determined level of profit or income in relation to those obtained in previous financial years, nor the indefinite permanence of the formulas used to set the premiums.[955]

759. The Respondent argues that in the same 2006 Supreme Court Judgment, it was confirmed that regulatory changes are permissible as long as the principle of reasonable profitability enshrined in Law 54/1997 is respected.[956]

760. The Respondent contends that subsequent case-law of the Supreme Court confirmed and developed the principles stated above. Therefore, the only two limitations on the State's regulatory power recognized by the Supreme Court were: (i) "that the change does not affect earnings already received" and (ii) "that the principle of reasonable returns is not infringed."[957]

761. As regards RD 1578/2008, the Respondent refers to the text of the Fifth additional provision which provides as follows:

---

[954] Counter-Memorial, para. 349, *referring to* Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93), p. 11 (emphases added).

[955] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94) (emphasis added). *See also* Counter-Memorial, para. 350.

[956] Counter-Memorial, para. 352.

[957] Counter-Memorial, paras. 353-363, *referring to* Third Chamber of the Supreme Court, App. 151/2007, Judgment, December 2009 (R-97), Legal Ground Three. *See also* Third Chamber of the Supreme Court, App. 152/2007, of 9 December 2009 (R-98), Legal Ground Six.

> *Fifth additional provision. Modification of the compensation for generation by photovoltaic technology.*
>
> During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology may be modified.[958]

762. The Respondent contends that this provision has to be interpreted and applied without recourse to any additional means of interpretation.[959] In other words, the Fifth additional provision does not provide any stabilization guarantees. On the contrary, it clearly envisages the possibility of changing the FiTs granted under RD 1578/2008.

763. With respect to the legal effect of registration with the RAIPRE, the Respondent submits, relying on *Charanne v. Spain*, that the registration in the RAIPRE was a mere administrative requirement which "by no means implied that registered facilities had a vested right to a certain remuneration."[960]

764. In support of its interpretation, the Respondent refers to *Charanne v. Spain* where the tribunal recognized the absence of a specific commitment regarding the "freezing" of the regulatory framework and *Isolux v. Spain* where the tribunal stated that the claimant's "only legitimate expectation was that of a reasonable return on their investment."[961] The Respondent also relies on *Blusun v. Italy* where the tribunal stated that "[i]n the absence of a specific stability commitment, the State has no obligation to grant subsidies such as feed-in-tariffs, or to maintain them unchanged once granted."[962]

765. The Respondent argues that the Claimants' expectations are unreasonable, unjustified, and not objective. The Respondent denies that there has been an "aggressive campaign to

---

[958] RD 1578/2008, 26 September 2008 (C-3)/(R-50).

[959] Hearing Tr., Day 1, 18 March 2019, 253:25-254:8 (Fröhlingsdorf Nicolás).

[960] Rejoinder, para. 1367, *referring to Charanne BV y Construction Investment S.A.R.L. v. Kingdom of Spain,* Arbitration SSCC V 062/2012, Final Award de 21 January 2016 (RL-32)*,* para. 510; Hearing Tr., Day 1, 18 March 2019, 249:4-25 (Fröhlingsdorf Nicolás).

[961] Counter-Memorial, paras. 1050-1057, *referring to Charanne BV y Construction Investment S.A.R.L. v. Kingdom of Spain,* Arbitration SSCC V 062/2012, Final Award de 21 January 2016 (RL-32)*,* paras. 504, 508; *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-6).

[962] Counter-Memorial, para. 1092, *referring to Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award 27 December 2016 (RL-58), para. 372.

attract foreign investors" and submits that none of the presentations invoked by the Claimants can be considered as ensuring "the immutability of the [remuneration] regime."[963] Moreover, the Respondent argues that the Claimants cannot rely on these presentations as they did not see them at the time before or at the time of making their investments in Spain.[964]

766.    The Respondent submits that the Claimants should have been aware of the basic principles of the Spanish electricity system, including, *inter alia*, the principle that the remuneration regime established for RE producers guarantees a reasonable return "on the investment cost of standard-facilities and in accordance with the cost of money in capital markets."[965] According to the Respondent, this is a "dynamic" concept, in the sense that "[d]epending on the change of financial circumstances and circumstances of other types, a percentage of profitability could be 'reasonable' at that first moment and could require subsequent adjustment to precisely maintain that 'reasonableness' due to the modification of other financial or technical factors."[966] Thus, the Claimants, in the Respondent's view, could not reasonably expect that Spain would not attempt to correct the situation of over-remuneration once it had arisen in the RE sector.[967]

767.    The Respondent also alleges that the Claimants' expectations could not exist in isolation from the principle of economic sustainability of the Spanish electricity system.[968]

768.    The Respondent further contends relying on the *Isolux v. Spain* award that the Claimants should have been aware of the relevant decisions of the Supreme Court and which are

---

[963] Counter-Memorial, paras. 1076-1080; Respondent's Post-Hearing Submission, para. 109, *referring, inter alia, to* Ministry of Industry, Trade and Tourism and InvestInSpain presentation, "Opportunities in Renewable Energy in Spain", November 2008 (C-73); CNE, Presentation: "Legal and Regulatory Framework for Renewable Energy Sector", 29 October 2008 (C-72); CNE, Presentation: "Renewable Energies: The Spanish Case", 9-13 February 2009 (C-76); CNE, Presentation: "Renewable Energy Regulation", February 2009 (C-75); CNE, Presentation: "Renewable Energy Regulation in Spain", February 2010 (C-92); Ministry of Industry, Commerce and Tourism and IDAE, Presentation, "The Sun Can be Yours – Responses to all Key Questions about Solar Photovoltaic Energy", February 2008 (C-69).
[964] Respondent's Post-Hearing Brief, para. 110.
[965] Respondent's Post-Hearing Brief, para. 53; Counter-Memorial, para. 1061.
[966] Third Chamber of the Supreme Court, App. 71/2011, Judgment, 25 September 2012 (R-105), Legal Ground Three *referred to* in Counter-Memorial, para. 340.
[967] Counter-Memorial, para. 1062.
[968] Rejoinder, para. 1225.

equally relevant for the Claimants' expectations.[969] The Spanish Supreme Court jurisprudence, according to the Respondent, proves that the Disputed Measures were foreseeable and consistent with the essential elements of the RE remuneration scheme at the time of the Claimants' investment.[970]

769. The Respondent states that its understanding of the regulatory framework under which the Claimants invested was also supported by various business associations (e.g., ASIF), investors, analysts and law practitioners.[971]

770. The Respondent further argues that the Claimants should have been aware and should have taken into account the highly subsidized nature of the market as 86% of the total income of the Claimants' plants was supposed to be coming from subsidies.[972]

771. In addition to the above, the Respondent relies on the 2017 EC State Aid Decision that assess the New Regime and where the Commission states that there is "no right to State Aid".[973] According to the Respondent, this 2017 EC State Aid Decision confirms that the State always maintains the power to change or to adjust subsidies.[974] Thus, no investor can have an expectation that a specific amount of State aid, i.e., the remuneration under the Special Regime, would remain unchanged.[975] The Respondent contends that the 2017 EC State Aid Decision takes into account payments under RD 661/2007 and RD 1578/2008. Therefore, it is equally relevant for the assessment of the Claimants' expectations under said Royal Decrees.[976]

---

[969] Counter-Memorial, paras. 1041-1042; Hearing Tr., Day 2, 19 March 2019, 11:12-22 (Elena Abad).

[970] Respondent's Post-Hearing Brief, para. 63.

[971] Respondent's Post-Hearing Brief, para. 66.

[972] Rejoinder, paras. 1217-1218, *referring to* Second Statement of Mr. Carlos Montoya, dated 10 October 2018 ("Second Montoya Statement"), Figure 16.

[973] Counter-Memorial, para. 292, *referring to* the 2017 EC State Aid Decision (RL-57), para. 155; Respondent's Post-Hearing Brief, paras. 40-48.

[974] Hearing Tr., Day 1, 18 March 2019, 228:1-8 (Fröhlingsdorf Nicolás); Respondent's Post-Hearing Brief, paras. 40-48.

[975]Counter-Memorial, para. 300.

[976] Respondent's Second Post-Hearing Brief, paras. 23-24.

### iii. *Due diligence/ assumption of risk of regulatory changes*

### (a) *The Claimants*

772. The Claimants argue that they were acting diligently throughout the investment process, as Mr. Bouman was assisted by experienced advisors, Mr. Koot and Mr. Wicke (see paragraphs 110-133 above).[977] Additionally, the Claimants note that before making his investments Mr. Bouman travelled to Spain "in order to gain first-handed understanding of the regulatory framework from key stakeholders" including IDAE.[978] IDAE, for instance, stated that "PV installations would receive a guaranteed FiT for their entire operational lifetime, with no limits on production."[979] Finally, the Claimants submit that the provisions of RD 661/2007 and RD 1578/2008 were sufficiently clear and did not require any particularly sophisticated analysis,[980] as Mr. Bouman stated during the Hearing: "[t]here was a guaranteed FiT […] the framework was pretty clear and there was no reason to doubt about that."[981]

773. Apart from the regulatory framework and its contemporaneous understanding by the Respondent organs and entities,[982] the reasonableness of Mr. Bouman's expectations, in the Claimants' view, was also confirmed by the EPC contractors' lawyers and Triodos Bank's lawyers.[983] The Claimants emphasize that none of the involved legal advisors raised a "red flag".[984] The Claimants submit that the clause in the loan agreement for Fuentes de Año plant that provided for the possibility of alteration of the conditions of the loan in case of regulatory changes was prepared after the initial Disputed Measures

---

[977] Reply, para. 128; First Bouman Statement, para. 30; Second Bouman Statement, paras. 7-10; Claimants' Post-Hearing Brief, paras. 35-37.

[978] Reply, para. 129, *referring to* First Bouman Statement, paras. 22-24.

[979] First Bouman Statement, para. 23.

[980] Reply, paras. 126-131, *referring to Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144), para. 679 where the tribunal stated that RD 661/2007 "was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis."

[981] Claimants' Post-Hearing Brief, para. 32, *referring to* Hearing Tr., Day 2, 19 March 2019, 163:2-7 (Bouman).

[982] Claimants' Reply Post-Hearing Brief, paras. 32-34.

[983] Claimants' Post-Hearing Brief, paras. 33, 39.

[984] Claimants' Post-Hearing Brief, para. 40, *referring to Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. The Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018 (CL-164), para. 380.

had been enacted (RD 1565/2010 and RDL 14/2010).[985] Thus, in the Claimants' view, no radical change to the Special Regime was foreseeable at the time when the investments were made.[986]

*(b)    The Respondent*

774.    The Respondent emphasises that Mr. Bouman had no prior experience in PV investments and made his decision to invest right after meeting the Goossens during the business tour in November 2005 (see paragraphs 122-124 above).[987] In the Respondent's view, this conduct manifests "a notoriously irresponsible" approach.[988]

775.    The Respondent further submits that the Claimants failed to properly analyze the applicable legal framework "and the macroeconomic circumstances" before making their investments in Spain.[989] In this connection, the Respondent refers to *Charanne v. Spain* where the tribunal ruled that "in order to rely on legitimate expectations, the Claimants should have conducted a diligent analysis of the legal framework applicable to their investment."[990] The Respondent submits that since the PV sector is highly regulated, any diligent investor should have enquired specifically about the prospects of regulatory changes.[991] According to the Respondent, the Claimants have not done so.

776.    In particular, the Respondent argues that the Solar Plaza Report, dated January 2005, is not a legal report and in any case it does not address RD 661/2007 on which the Claimants allegedly relied.[992] The Respondent further submits that Mr. Wicke's legal advice was sought principally prior to the enactment of RD 661/2007.[993] But even those reports that were received after RD 661/2007 address exclusively administrative issues and do not

---

[985] Claimants' Reply Post-Hearing Brief, para. 14.

[986] Claimants' Reply Post-Hearing Brief, para. 14.

[987] Respondent's Post-Hearing Brief, paras. 25, 93.

[988] Respondent's Post-Hearing Brief, para. 94.

[989] Counter-Memorial, paras. 1027-1046; Rejoinder, paras. 1205-1208; Respondent's Post-Hearing Brief, para. 93.

[990] Counter-Memorial, para. 1030.

[991] Hearing Tr., Day 2, 19 March 2019, 21:12-23:13 (Elena Abad).

[992] Respondent's Post-Hearing Brief, paras. 95-100.

[993] Respondent's Post-Hearing Brief, para. 103, *referring to* Solar Plaza, "PV Business Tour Spain 2005 – Itinerary", 14 November 2005 (C-34); Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29); Dikeos Abogados, Report on the trip to the Mahora Project, Toledo, 30 March 2006 (C-43); Natec Energy España, Business Plan 2006, PV Proposal, December 2005 (C-36).

even mention RD 661/2007.[994] As regards the due diligence reports obtained by the EPC contractors, the Respondent argues that those reports focus exclusively on the "status" of the projects and in any event they were never seen by Mr. Bouman.[995]

777. In respect of Triodos Bank's due diligence, the Respondent submits that it was performed in 2012 (i.e. almost two years after the last of the Claimants' PV plants, Fuentes de Año, had been commissioned) and in any event a bank and a "non-financial investor", like Mr. Bouman, assess different risks.[996] Alternatively, the Respondent states that in one of the loan agreements Triodos Bank expressly acknowledged the possibility of regulatory changes by including a provision according to which the conditions of financing could be altered in case of any changes to the FiT scheme.[997]

### iv. Breach of the alleged expectations

#### (a) The Claimants

778. The Claimants contend that the Disputed Measures frustrated all their legitimate expectations by radically changing the applicable regulatory framework (see paragraphs 459-510 above).[998] According to the Claimants, the tribunal in *Micula v. Romania* found

---

[994] Respondent's Post-Hearing Brief, para. 103.

[995] Respondent's Post-Hearing Brief, para. 101; Respondent's Second Post-Hearing Brief, para. 17.

[996] Respondent's Post-Hearing Brief, para. 102.

[997] Counter-Memorial, paras. 1033-1034, *referring to* Triodos Loan Agreement, 29 December 2010 (Exhibit CLEX-255: "The electric power tariff contemplated in the previous point for the plant to be financed under the regime contained in Royal Decree 1578/2008, the number of equivalent hours paid for, the investments due to technological requirements and other investments and project expenses, have been considered by the Bank in drawing up the CASE BASE (Annex VI of this document), which is the fundamental document containing the economic forecasts of the income and expenses of the project, from which result the cash flow necessary for the restitution of the loan and which constitute the fundamental guarantees for the bank on which the financing is based. In view of the foregoing, any alteration in the regulatory system of the essential elements of the remuneration of the energy produced, the assigned tariff itself, the limitation of the production of the plant that is paid for the aforementioned tariff (by reduction of equivalent paid hours or any other formula), the period of application of said tariff, or its indexation (periodic revision, in accordance with a pre-established index), the investments and expenses necessary for the operation of the financed installation, and any negative regulatory modification in general and RD 1578/2008 in particular, or any other regulatory element that could affect the income foreseen for the installation to be financed in the CASE BASE (Annex VI of this document), implies an essential alteration of the fundamental economic circumstances of the project, which should lead to the non-granting of the loan or to modifications of its essential elements (amount of the loaned capital, terms, relation of own or outside resources, personal or real guarantees and cover for the bank, risk premiums in terms of commissions and interest rates, etc.)" (emphasis added).

[998] Memorial, paras. 384-389; Reply, paras. 321-359.

in similar circumstances that Romania's premature revocation of economic support schemes created by legislation was in breach of the FET standard.[999]

779.   Specifically, the Claimants submit that Spain started with introducing significant cuts to the economic incentives under the Special Regime and ultimately "dismantled" the Special Regime via RDL 9/2013 in July 2013.[1000] The Claimants contend that "the New Regime was fundamentally different in that, inter alia, production [was] no longer incentivized."[1001] As a result, the Claimants had to "change the manner in which they manage their plants."[1002]

780.   Moreover, according to the Claimants, the instability persisted after July 2013 for 11 months as the Respondent defined the specific parameters of the New Regime only in June 2014.[1003] The Claimants note that the situation is still aggravating as "it is now expected that the rate of return under the New Regime will be further reduced in 2019."[1004]

781.   Furthermore, the Claimants argue that the New Regime amounted to a retroactive change to the FiT scheme that was applicable to existing facilities.[1005] The Claimants submit that it is irrelevant whether this kind of retroactivity was characterized as "medium", as suggested by Spain, and thus permissible under Spanish law because under international law such concepts do not exist.[1006]

---

[999] Memorial, para. 386.

[1000] Reply, para. 309; Memorial, para. 345; Hearing Tr., Day 1, 18 March 2019, 112:10-12, 168:20-23 (Stoyanov).

[1001] Claimants' Post-Hearing Brief, para. 55, *referring to* Hearing Tr., Day 2, 19 March 2019, 209:14-16 (Paniego/Fröhlingsdorf Nicolás).

[1002] Claimants' Post-Hearing Brief, para. 55, *referring to* Hearing Tr., Day 2, 19 March 2019, 204:5-25 (Paniego/Fröhlingsdorf Nicolás).

[1003] Reply, para. 309; Memorial, para. 346.

[1004] Reply, para. 309, *referring to* M. A. Patiño, "Discomfort among electricity companies because of the Government's new cuts", Expansión, 16 September 2017 (C-192); Transcript of the Spanish Parliamentary Session No. 13 on Energy, Tourism and Digital Agenda, 28 June 2017 (C-193); C. Monforte, "Nadal is planning to cut in half the remuneration of renewable plants", Cinco Días, 26 June 2017 (C-176).

[1005] Reply, para. 317.

[1006] Claimants' Post-Hearing Brief, para. 141.

782. The Claimants also contend that each of the "initial measures" adopted in 2010-2013, before the implementation of the New Regime equally harmed the Claimants' investments.[1007] In particular, RD 1565/2010 reduced the number of years during which the PV plants could receive the FiT under RD 661/2007 to 25 years although initially the support scheme was applicable "for the entire useful life" of the PV plant.[1008] The Claimants furthermore note that the Respondent subsequently extended this period twice, firstly to 28 years and then to 30 years which demonstrates that "Spain has been inconsistent in its […] understanding of PV installations' operational life."[1009] Therefore, it is irrelevant whether the Claimants' installations could operate for more than 30 years.[1010]

783. In respect of RDL 14/2010, the Claimants argue that contrary to Spain's contentions, no investor should have expected that a cap on operating hours covered by the FiT would be imposed as the Special Regime offered the FiT for every kilowatt hour of electricity produced in line with the Respondent's goal to maximize production.[1011] Law 15/2012, in the Claimants' view, introduced a tariff cut in the form of the TVPEE.[1012] Finally, regarding RDL 2/2013, the Claimants submit that even if the new FiT adjustment mechanism could have become beneficial for them, "it was no longer applicable to [the Claimants] as it had been overridden by the New Regime."[1013]

784. The Claimants further argue that the Respondent itself recognized the unprecedented character of the New Regime and the remuneration regime envisaged therein.[1014] For example, CNE Report 18/2013 stated as follows:

> […] it must be indicated that there is no record of a remuneration model similar to that reflected in the proposal in any jurisdiction of the European

---

[1007] Reply, paras. 321-339.

[1008] Reply, paras. 324-326.

[1009] Reply, para. 327.

[1010] Reply, para. 327.

[1011] Reply, paras. 329-333.

[1012] *See* para. 447 above. *See* First Bouman Statement, para. 41 where Mr. Bouman explains that unlike conventional energy producers "PV generators obtain their income from [FiTs], and so are unable to pass through even a portion of this levy to consumers […] this equated to a 7% reduction in the [FiT]."

[1013] Reply, para. 337.

[1014] Reply, paras. 342-343.

Union, or in other countries whose support systems are known through international associations of regulatory bodies.[1015]

785. The Council of State also allegedly acknowledged the exceptional character of the New Regime.[1016] The Claimants state that the significant character of the changes introduced by the New Regime was acknowledged by the *Antin v. Spain* and *Eiser v. Spain* tribunals.[1017] In general, a violation of the investors' legitimate expectations was found in *Novenergia II v. Spain*, *Masdar Solar v. Spain*, and *Antin v. Spain* to which the Claimants refer in support of their claims.[1018]

786. In respect of the argument that the New Regime provides for a "reasonable return", the Claimants submit, relying on *Antin v. Spain*, that the relevant inquiry must be not "whether the New Regime provides for a 'reasonable return' but rather how such 'reasonable return' is determined."[1019] The Claimants further state that the *Antin v. Spain* tribunal found the following features of the New Regime to be in contrast with the Special Regime "which provided for objective and identifiable criteria for determining the remuneration":

> (i) the New Regime does not provide "an identifiable basis for determining" what reasonable return means; (ii) there is no evidence "as to which parameters were considered in determining what is an standard installation"; (iii) there are mandatory revisions of "the reasonable rate of return" and no "identifiable set of criteria for the revision"; and (iv) the "rate of return under

---

[1015] Hearing Tr., Day 1, 18 March 2019, 21:3-16 (Stoyanov), *referring to* CNE, Report 18/2013 on the proposed Royal Decree regulating activities of electrical energy production from renewable energy, cogeneration and waste sources, 4 September 2013 (C-117), p. 4 (emphasis added); Claimants' Post-Hearing Brief, para. 54, *referring to* Decision of the Permanent Commission of the Council of State number 937/2013 on the Electricity Sector Bill, 12 September 2013, (R-73), p. 16; RDL 9/2013, 12 July 2013 (C-115), p. 2; Law 24/2013, 26 December 2013 (C-122)/(R-26), p. 1.

[1016] Reply, para. 343, *referring to* Decision of the Permanent Commission of the Council of State number 937/2013 on the Electricity Sector Bill, 12 September 2013, (R-73).

[1017] Reply, para. 344, *referring to Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 568; *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-31), para. 391.

[1018] Reply, paras. 354-358, *referring to Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141); and *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99).

[1019] Reply, para. 314.

the New Regime may apply to periods preceding the establishing of the New Regime."[1020]

787.  The Claimants also posit that Spain in any event failed to provide the reasonable return that was guaranteed under the Special Regime.[1021] In addition, the Claimants note that the "newly-defined"[1022] 7.398% rate of return referred to by the Respondent is set on a pre-tax basis. If one estimates the post-tax rate using the nominal tax rate of 30%, the result would be 5.2%.[1023] Furthermore, according to the Claimants' quantum expert Compass Lexecon, the actual internal rate of return with the Disputed Measures in place and the Claimants' actual costs constitutes 4.75% (with 31 May 2018 expectations), which is in any case below the reasonable rate of return suggested by Spain.[1024] Furthermore, the Claimants submit that the concept of "reasonable return" is subject to change under the New Regime and the Spanish authorities have already declared their intention to set it at as low a rate as 4.2%.[1025]

788.  Finally, the Claimants submit that the New Regime is retroactive, because of the so-called "claw back" effect.[1026] As explained by Claimants' regulatory expert, Mr. Solé, "[t]he new scheme applies from the start of the regulatory life of the facilities, rather than since the entry into force of RD-L 9/2013…[it] is calculated so as to theoretically ensure the target return for standard facilities over their entire regulatory lifespan…if the return obtained by a facility prior to July 2013 (according to the government's methodology for its calculation) exceeds the new *ex post* target return, this facility will no longer be entitled to regulated revenue, irrespective of whether or not it has reached the end of its regulatory life."[1027] According to Mr. Solé, "the value of the overall regulated remuneration to which

---

[1020] Reply, para. 315, *referring to Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), paras. 562-567.

[1021] Reply, para. 345.

[1022] Memorial, para. 235.

[1023] Claimants' Post-Hearing Brief, para. 180.

[1024] Reply, para. 346; Valuation of Damages to Sevilla Beheer B.V., Cordoba Beheer B.V., Cross Retail, S.L. and The Spanish Project Companies' Investments in Spain, Second Expert Report by Pablo T. Spiller, dated 12 July 2018 ("Second Compass Lexecon Report"), paras. 135-139; Compass Lexecon Errata, para. 7.

[1025] Reply, para. 347, *referring, inter alia, to* M. A. Patiño, "The Government is preparing a new wave of cuts to the electricity sector", Expansión, 20 September 2017 (C-180); First KPMG Report, para. 191.

[1026] See, paras. 475-476, 491-492 and 495 above.  See also, Claimants' Post-Hearing Brief, para. 59, First KPMG Report, paras. 295-302; Second KPMG Report, paras. 180-185.

[1027] First KPMG Report, paras. 295-297.

existing facilities are entitled over their regulatory life is now the same as if they had been subject to the new economic regime since their commissioning and the Feed-in scheme had never been in force."[1028] The Claimants further argue that Spain's Council of State was concerned with this aspect of calculating the Special Payment under the New Regime[1029] and that this type of claw-back of past remuneration was "unprecedented" in Europe.[1030] The Claimants also note that the *Eiser v. Spain*, *Antin v. Spain*, and *Greentech v. Spain* tribunals were very critical of this effect of the New Regime, whereas in *RREEF v. Spain* the tribunal found that this element alone amounted to a breach of the ECT.[1031]

(b)   *The Respondent*

789.   The Respondent argues that there was no breach of the Claimants' legitimate expectations, because the applicable legal framework did not contain any guarantees of immutability of the FiT-based support schemes provided under RD 661/2007 and RD 1578/2008.[1032]

790.   The Respondent further submits that the Disputed Measures were adopted in order to maintain the sustainability of the electricity system and did not change the "essential characteristics of the regulatory framework in which the Claimants invested,"[1033] as the Claimants continued perceiving significant subsidies. The Respondent has provided the below chart demonstrating the correspondence between the alleged essential characteristics of the renewables support scheme guaranteed to the investors under Law 54/1997 and the New Regime:[1034]

---

[1028] First KPMG Report, para. 299.

[1029] Claimants' Post-Hearing Brief, para. 60, *referring to* Decision of the Permanent Commission of the Council of State number 937/2013 on the Electricity Sector Bill, 12 September 2013, (R-73), p. 17.

[1030] Claimants' Second Post-Hearing Brief, para. 40.

[1031] Claimants' Post-Hearing Brief, paras. 62-65, *referring to Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-31), para. 402; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 567; *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 395; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), paras. 328-330.

[1032] Counter-Memorial, paras. 1049-1098.

[1033] Counter-Memorial, paras. 1093-1095.

[1034] Respondent's Opening Statement on the Merits, slide 29.

| | Act 54/1997 | RD-L 9/2013 Act 24/2013 |
|---|---|---|
| Priority for access and dispatch | YES | YES |
| Methodology based on Standards Facilities | YES | YES |
| Right to the market price without limitation | YES | YES |
| Right to Subsidies | YES | YES |
| Reasonable Return on investment as an objetive | YES | YES |
| Capital markets as the judge of the reasonability of the returns | YES | YES |
| Dynamism in order to guarantee the economic sustanbility of the SES and the reasonable return principle. | YES | YES |

791.  As regards the periodically-defined reasonable return targeted by the New Regime, the Respondent argues that the pre-tax reasonable rate of return of 7.398% guaranteed under the New Regime "would be about 7% post-tax."[1035] According to the Respondent, this is due to numerous tax deductions enjoyed by RE projects in Spain that allow RE investors to apply an effective discounted tax rate of about 5.8% instead of the marginal corporate tax rate of 25%.[1036] Thus, the New Regime, in the Respondent's view, maintains the same post-tax reasonable rate of return of around 7% that has been guaranteed to the RE investors since 2000 (see paragraphs 960-972 below).

792.  Finally, as regards the alleged retroactivity of the Disputed Measures, Spain argues that under international law a regulation is retroactive if it damages or eliminates acquired rights.[1037] The New Regime is not retroactive, according to the Respondent, as its provisions "apply to future facts in relation to legal situations in progress" without affecting rights already acquired (the so-called "medium retroactivity").[1038] In particular, RDL 24/2013 contains an express guarantee against retroactivity in its Third final

---

[1035] Respondent's Post-Hearing Brief, para. 73.

[1036] The application of the effective tax rate of 5.8% gives a post-tax reasonable rate of return under the New Regime of 6.969% (that is, 7.398% x (1-5.8%) = 6.969%. *See* Respondent's Post-Hearing Brief, paras. 69-73.

[1037] Rejoinder, paras. 936-966; Respondent's Post-Hearing Brief, paras. 113-114, *referring to Nations Energy Inc. And Others v. Republic of Panama,* ICSID Case No. ARB/06/19, 24 November 2010 (RL-26), paras. 642, 644, 646; *Charanne BV and Construction Investment S.A.R.L. v. the Kingdom of Spain*, SSCC Arbitration Case No. V 062/2012, Final Award of 21 January 2016 (RL-33), paras. 546, 548; Counter-Memorial, paras. 1101-1108.

[1038] Respondent's Post-Hearing Brief, para. 114.

provision.[1039] Respondent asserts that medium retroactivity is permissible under Spanish law pursuant to the jurisprudence of the Spanish Constitutional Court.[1040]

c.    **The Tribunal's analysis**

i.    *Legal standard*

793.    The Parties agree that an investor cannot have legitimate expectations that the regulatory framework will remain unchanged ("frozen") in the absence of a specific commitment.[1041] As noted above, the Parties also appear to agree that an expectation to benefit from stable conditions would only be breached if the disputed regulatory changes were "drastic" and "unexpected".[1042] Moreover, the Parties do not dispute that the Claimants' alleged legitimate expectations should be assessed at the time when the relevant investments were made.[1043] However, on the facts, whilst not requiring a "freezing" of the Spanish regulatory regime,[1044] the Claimants argue that RD 661/2007 and RD 1578/2008 contained a commitment "to keep the fixed tariff" set out therein[1045] (see also, e.g., paragraph 816 below). The Parties also disagree as to the timing of when an investment is "made". The Claimants argue that an investment is made when an investor "irreversibly

---

[1039] Respondent's Post-Hearing Brief, para. 115, *referring to* Law 24/2013, Third Final Provision, 26 December 2013 (C-122), para. 4.

[1040] Counter-Memorial, paras. 1110-1111, *referring to* Constitutional Court, App. 5347/2013, Judgment, 17 December 2015 (R-112); Constitutional Court, App. 6031/2013, Judgment, 18 February 2016 (R-114).

[1041] *See*, for example, *Charanne BV and Construction Investment S.A.R.L. v. the Kingdom of Spain*, SCC Arbitration Case No. V 062/2012, Final Award of 21 January 2016 (RL-33), para. 499; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 460; *InfraRed Environmental Infrastructure GP Limited and others v. the Kingdom of Spain*, ICSID Case No. ARB/14/12, Final Award, 2 August 2019, para. 360; *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 264; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 538. *See also* Counter-Memorial, para. 1087, *referring to* Ch. Schreuer, "Fair and Equitable Treatment in Arbitral Practice", 6 Journal of World Investment and Trade 357 (RL-39), at p. 374; Hearing Tr., Day 2, 19 March 2019, 2:8-17 (Elena Abad); Memorial, para. 329; Reply, paras. 307, 310; Hearing Tr., Day 1, 18 March 2019, 28:4-17 (Stoyanov).

[1042] Reply, para. 307.

[1043] Hearing Tr., Day 2, 19 March 2019, 8:1-10 (Elena Abad); Hearing Tr., Day 5, 22 March 2019, 29:25-30:17 (Vazquez-Guillén). *See also Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144), para. 539.

[1044] Claimants' Post-Hearing Brief, para. 136.

[1045] Claimants' Post-Hearing Brief, para. 138.

committed" to invest.[1046] According to the Claimants, the relevant dates here were the dates the PV plants' EPC contracts were signed.[1047] Following the Hearing and relying on Mr. Bouman's evidence, the Respondent argued in its Post-Hearing Briefs that the date of the Claimants' investment was the end of 2005 when Mr. Bouman took the decision to invest in Spain.[1048] The Claimants disagreed with this position, arguing in response that "it was not until August 2006 that he made the first significant capital commitment by entering into the EPC contract for the Mahora PV Farm. It is at this point that the decision to invest became irreversible."[1049]

794.  In order to ground the legitimate character of an investor's expectations, the case law prevailingly requires some specific kind of representation by the host State *vis-à-vis* the investor.[1050] In the case at hand it is undisputed that before making their investments the Claimants had not received any representations from the Spanish authorities addressed to them personally. As Mr. Bouman stated at the Hearing, "Spain didn't [make] an offer; they set a set of regulations where investors could join. And that's what I did."[1051]

795.  Therefore, one of the questions that needs to be resolved by the Tribunal from the outset is whether the investor must show an individualized representation made by the State in order to succeed in its claim for breach of the FET standard,[1052] or whether it is possible

---

[1046] Hearing Tr., Day 5, 22 March 2019, 29:25-30:17 (Vazquez-Guillén).

[1047] Hearing Tr., Day 5, 22 March 2019, 30:18-21 (Vazquez-Guillén).

[1048] Respondent's Second Post-Hearing Brief, para. 87.

[1049] Claimants' Second Post-Hearing Brief, para. 25.

[1050] *See*, for example, *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (RL-117), para. 360; *AES Solar and others (PV Investors) v. The Kingdom of Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 577; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 463; *Charanne B.V. and Construction Investments S.a.r.l. v. Spain*, SCC Case No. 062/2012, Award, 21 January 2016, (RL-32), para. 490; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, paras. 459-461; *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-189), para. 313; *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 263; *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-189), paras. 588-593; *Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020, para. 584.

[1051] Hearing Tr., Day 2, 19 March 2019, 146:2-3 (Bouman).

[1052] *See*, for example, *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 264.

to consider a regulatory act as setting forth a clear and unequivocal commitment addressed to a plurality of potential investors.[1053]

796. The Tribunal accepts that in principle "an expectation may arise from what are construed as specific guarantees in legislation" depending on the circumstances of a particular case.[1054] Consequently, the absence of a representation addressed specifically to the Claimants will not be sufficient for the Tribunal to dismiss the legitimate expectations claim.

797. At the same time, as held by the *Philip Morris v. Uruguay* tribunal, provisions of general legislation applicable to a plurality of persons as such "do not create legitimate expectations that there will be no change in the law."[1055] The *Antaris v. Czech Republic* tribunal similarly held:

> Provisions of general legislation applicable to a plurality of persons or a category of persons, do not create legitimate expectations that there will be no change in the law; and given the State's regulatory powers, in order to rely on legitimate expectations the investor should inquire in advance regarding the prospects of a change in the regulatory framework in light of the then prevailing or reasonably to be expected changes in the economic and social conditions of the host State.[1056]

---

[1053] *See*, for example, *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (CL-187), para. 388: "in the case of a highly-regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them." (emphasis added).

[1054] *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (RL-117), para. 360. *See also See BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 459. *See also 9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, para. 295; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and a Partial Decision on Quantum, 19 February 2019, para. 388.

[1055] *Philip Morris Brand Sàrl (Switzerland), Philip Morris Products S.A. (Switzerland) and Abal Hermanos S.A. (Uruguay) v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016 (RL-83), para. 426.

[1056] *Antaris Solar GmbH and Dr. Michael Göde v. The Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (RL-117), para. 360(6).

798. The Tribunal agrees that in the absence of a specific commitment addressed personally to the investor, it must "conduct an objective examination of the legislation and the facts surrounding the making of the investment to assess whether a prudent and experienced investor could have reasonably formed a legitimate and justifiable expectation of the immutability of such legislation."[1057]

799. In accordance with the above principles, the Tribunal will analyze the content of the relevant regulatory framework in place at the time when the Claimants' investments were made. It is against this background that the Tribunal will assess whether the Claimants' expectations can be considered as legitimate and reasonable. The Tribunal will further analyze whether and to what extent the disputed regulatory changes adopted in the context of the New Regime were "drastic" and "unexpected" so as to violate an investor's general expectation of stability. As part of the relevant analysis, the Tribunal will need to inquire whether and to what extent the regulatory framework at the time of the Claimants' investments contained signs of future unfavorable changes or regulatory risk.

800. In order to perform this analysis, the Tribunal must establish the following: (i) the dates of the Claimants' investment process and (ii) the content and meaning of the provisions of domestic laws and regulations relied upon by the Claimants during their investment process. During this latter step, the Tribunal will be mindful of the principle that "municipal laws are merely facts which express the will and constitute the activities of States, in the same manner as do legal decisions or administrative measures."[1058]

801. Such factual background is of particular relevance in the presence of a legitimate expectations claim. Indeed, in order to be legitimate, expectations must be "objective", i.e. based on the investors' prudent evaluation of the factual and legal background, which also encompasses the hierarchy of legal sources in the Spanish legal system.[1059]

---

[1057] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 264.

[1058] *Certain German Interests in Polish Upper Silesia (Germany v. Poland)* (Merits), PCIJ Series A. No 7, Judgment, 25 May 1926, p. 19.

[1059] *Charanne B.V. and Construction Investments S.a.r.l. v. Spain*, SCC Case No. 062/2012, Award, 21 January 2016, (RL-32), paras. 495, 505; *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, para. 444; *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019

802. The Parties also extensively debated the requirement of due diligence, which the Tribunal addresses separately at paragraphs 881-896 below.

803. Every tribunal that previously ruled on a case arising from the Respondent's abolition of the FiT-based incentive regime for RE installations has provided its understanding of the Spanish regulatory framework. Some tribunals concluded that on the evidence before them, the Spanish regulatory framework gave rise to the expectation that the FiT scheme will remain unchanged during the projected lifetime of the facilities.[1060] Other tribunals found that the investors could only expect to be protected from radical changes to the Special Regime (and concluded that the abolition of the Special Regime altogether amounted to such a radical change).[1061] There is also a third line of reasoning suggesting that the only expectation that the claimants could have was that of a "reasonable return".[1062] Finally, the Tribunal is aware of only one case, *Stadtwerke München v. Spain*, where it was held that the Spanish regulatory framework did not give rise to any expectations of stability regarding the FiT scheme.[1063]

---

(CL-191), paras. 361-363; *Sun Reserve Luxco Holdings SRL v. Italy*, SCC Case No. 132/2016, Award, 25 March 2020, para 693. *See also Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021 (RL-137), para. 585 ("The Tribunal considers relevant the hierarchy of the Spanish legal system in the analysis of Claimants' claims").

[1060] *Operafund Eco-Invest Sicav Plc and another v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Final Award, 6 September 2019 (CL-190), para. 485; *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Final Award, 31 July 2019 (CL-189), paras. 419-444; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (CL-187), para. 400; *9REN Holding S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), paras. 269-273; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), paras. 503, 516-520.

[1061] *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-185), para. 600; *Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 667; *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-31), para. 418.

[1062] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), paras. 384-386; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 463; *The PV Investors v. The Kingdom of Spain*, UNCITRAL, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), paras. 616-620.

[1063] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 308. *See also OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Dissenting Opinionon on Liability and Quantum by Arbitrator Philippe Sands, para. 44.

804.   The Tribunal recalls that, even though the above decisions  may bear some relevance for the instant case, it is its duty to "make its own determination of the facts and then apply the relevant rules of international law to the facts which it has found to have existed."[1064] Thus, the Tribunal is fully allowed to reach findings of facts and determination of law other than those of other tribunals, based on the specificities of the facts before it.

### ii.  Assessment of the facts in view of the legal standard

#### (a)   Timing of investments

805.   As explained above, the Tribunal needs to establish the dates when the Claimants' investments were made in order to identify the laws and regulations relevant to the formation of the Claimants' alleged expectations.

806.   The Parties disagree on what constitutes the relevant period of the Claimants' investment process.

807.   The Claimants propose to consider the signing dates of the respective EPC contracts, which would limit the relevant dates to the period from 10 August 2006 to 25 November 2009.[1065]

808.   The Respondent insists that the Claimants' investment process spans the period between 2005 and 2010, as Mr. Bouman started exploring the Spanish PV sector in 2005, whilst the last RAIPRE certificate (for Fuentes de Año) was received in 2010.[1066]

---

[1064] *Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v. Uganda)*, Judgment, I.C.J. Reports 2005, p. 168, at 200, para 57; *Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Judgment, I.C.J. Reports 2010, p. 14, at 71, para. 162.
[1065] Claimants' Post-Hearing Brief, para. 30; Hearing Tr., Day 5, 22 March 2019, 30:18-24 (Vazquez-Guillén); Hearing Tr., Day 2, 19 March 2019, 8:1-2 (Elena Abad).
[1066] Respondent's Post-Hearing Brief, paras. 86-89.

809. The Tribunal agrees with the Claimants that the RAIPRE registrations must be considered as post-dating the actual <u>making</u> of the investments in the present case because the Claimants' funds had already been remitted by then. However, the Tribunal is not convinced that the events preceding the signing of the first EPC contract (see paragraphs 101-122 above) should be ignored when determining the timing of the Claimants' investments.

810. First, it must be recalled that according to the Claimants themselves, all of the claimant entities "could be considered an *alter ego* of Mr. Bouman" and that "each of the 59 claimant entities share the expectations of Mr. Bouman."[1067] Therefore, it is the expectations of Mr. Bouman that the Tribunal must analyze.

811. Second, the Claimants rely on events prior to the conclusion of the first EPC contract, including the November 2005 business tour to Spain, during which Mr. Bouman attended a presentation at the offices of IDAE.[1068] Mr. Bouman also seems to have attached particular importance to the terms of RD 436/2004 when making his investment decision, as it follows from his First Witness Statement.[1069] The Tribunal finds that Mr. Bouman's First Witness Statement deserves special consideration, in line with the prevailing international case law, which gives superior credibility to statements "contrary to the interests or contentions of the [Party] to which the witness owes allegiance."[1070]

812. In particular, Mr. Bouman claims to have found favorable the then existing FiT-based support scheme and "with this in mind … decided to gauge the financial market of PV investment in Spain."[1071] Mr. Bouman further recounts that during the November 2005 business tour, at the offices of IDAE "the characteristics of the FIT regime in place at the time, RD 436/2004" were discussed.[1072] During the same business tour, Mr. Bouman also met the Goossens who presented him with a proposal to invest in a PV plant in the

[1067] Reply, para. 118.
[1068] First Bouman Statement, para. 23. *See also* Hearing Tr., Day 1, 18 March 2019, 101:9-20 (Stoyanov).
[1069] First Bouman Statement, para. 20. *See also* para. 118 above.
[1070] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, I.C.J. Reports 1986, p. 14, at 43, para. 70.
[1071] First Bouman Statement, paras. 20-21.
[1072] First Bouman Statement, para. 23.

province of Albacete.[1073] Soon after that, sometime between the end of 2005 and early 2006, following the above-mentioned business tour, Mr. Bouman "in reliance on the predictability of the future revenues of the project"[1074] purchased from the Goossens Natec, the company that was subsequently renamed Ra Solar and was later used to buy and develop the Claimants' PV Plants.

813. Additional steps towards making the Claimants' investments prior to the adoption of RD 661/2007 also included the incorporation of Cross Retail on 16 January 2006, initial negotiations with banks regarding financing and the setting-up of the first 39 of the Spanish Project Companies.[1075] Therefore, it clearly follows from the Claimants' own witness testimony and documentary evidence that the Claimants' investment process was started under RD 436/2004.

814. In any event, even on the Claimants' own case theory, the very first investment was made at the time when RD 436/2004 was still in force.[1076] The first EPC contract (for the Mahora Plant) was signed in August 2006, i.e., almost one year before the entry into force of RD 661/2007.[1077]

815. For these reasons, the Tribunal finds that the Claimants' investment process had started under the legal regime of RD 436/2004 and subsequently continued under RDL 7/2006, which led to the adoption of RD 661/2007 and RD 1578/2008. It follows that the Tribunal must analyze each of these Royal Decrees as well as other relevant elements from the legal framework for the purpose of assessing the content of the Claimants' legitimate expectations.

---

[1073] First Bouman Statement, para. 26.

[1074] First Bouman Statement, para. 28.

[1075] *See* paragraphs 130-131 above.

[1076] *See* paragraphs 226 above.

[1077] Claimants' Post-Hearing Brief, para. 30.

*(b)   Content of expectations*

816.  According to the Claimants, the stability of the FiT-based support scheme was critical for their decision-making.[1078] As Mr. Bouman noted in his First Witness Statement regarding RD 661/2007, "[t]he regulations set out a fixed, specific tariff in Euro cents per kWh […] I understood it to be a stable and predictable regime – which was crucial to my investment decision."[1079]  The Claimants further submit that Article 40(3) of RD 436/2004 and Article 44(3) of RD 661/2007 "set out, in unqualified terms, Spain's undertaking not to modify the FiT regime for plants that had already been commissioned as of the date of any future reforms."[1080]

817.  The Tribunal will thus begin its analysis of the regulatory framework by considering relevant Royal Decrees under which the investors were entitled to a particular FiT. As it has been stated earlier, the Tribunal considers that the Claimants' investment process (and the formation of their legitimate expectations) began under RD 436/2004 and continued under RD 661/2007 and then RD 1578/2008 (see paragraph 815 above). Therefore, the Tribunal will consider the provisions of each of these Royal Decrees to verify whether a stabilization commitment (i.e., an undertaking not to modify the FiT regime, see paragraph 821 below) could be derived from their texts, as suggested by the Claimants.

818.  Under RD 436/2004, the FiT was calculated by reference to the TMR.[1081] The FiT was set at a particular rate for the first 25 years from the installation's commissioning and at a reduced rate thereafter.[1082]

819.  Article 40(1) of RD 436/2004 envisaged that tariffs and other incentives would be revised every four years starting from 2006:

> During 2006, in light of the result of the follow-up reports on the level of compliance with the Renewable Energies Development Plan, the tariffs, premiums, incentives and supplements defined in this Royal Decree will be revised, thereby considering the costs associated with each of these

---

[1078] Reply, paras. 120-122.

[1079] First Bouman Statement, para. 33.

[1080] Reply, para. 215.

[1081] TMR represents the total of revenues received by the electricity system (excluding taxes) divided by the total electricity supplied Hearing Tr., Day 1, 18 March 2019, 37:22-25 (Vazquex-Guillén).

[1082] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 33. *See also* para. 183 above.

> technologies, the level of participation of the special regime in covering demand and its impact on the technical and economic management of the system. A further revision will be conducted every four years as from 2006 [...].[1083]

820. In respect of the temporal application of such revisions, Article 40(3) of RD 436/2004 stated as follows:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.[1084]

821. According to the Claimants, Article 40(3) of RD 436/2004 must be read as an undertaking not to modify the FiT regime for the plants that had been commissioned under that Royal Decree.[1085] According to the Respondent, Article 40(3) of RD 436/2004 is not a "stabilization commitment"[1086], as it does not apply to "any" revisions of the tariffs, premiums, and incentives, but only to those "provided for in [Article 40(1)]" of the Decree, which according to the Respondent is apparent from the reference in the discussed provision to "the revisions provided for in this section".[1087] As explained by the Respondent, the revisions envisaged in Article 40 have a limited scope of ensuring the renewable energy promotion plan's goals.[1088] Thus, any other revisions are not prevented by Article 40(3) and are permissible pursuant to the principle of hierarchy of laws.[1089]

822. The Tribunal by majority is minded to agree with the Respondent's interpretation of Article 40(3) of RD 436/2004 for the following reasons.

823. In order to establish the actual meaning of Article 40(3) of RD 436/2004, it must be analyzed in the context of the regulatory framework considered as a whole.[1090] The

---

[1083] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 40(1). *See also* para. 184 above.

[1084] RD 436/2004, 12 March 2004 (C-27)/(R-32), Article 40(3). *See also* para. 185 above.

[1085] Reply, para. 215; Hearing Tr., Day 1, 18 March 2019, 38:18-39:7 (Vazquez-Guillén).

[1086] Hearing Tr., Day 5, 22 March 2019, 88:14-89:7 (Fröhlingsdorf Nicolás).

[1087] Counter-Memorial, para. 421.

[1088] Counter-Memorial, para. 421.

[1089] Counter-Memorial, para. 422.

[1090] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 601.

Spanish regulatory framework for RE producers consists of legislative acts, notably Law 54/1997, and regulatory acts such as Royal Decrees (including RD 436/2004) that are hierarchically subordinate to legislative acts. In addition, there are Royal Decree-Laws – regulatory acts with immediate effect adopted for emergency purposes.[1091] Royal Decree-Laws require subsequent parliamentary approval.[1092] The Spanish legal system also includes inferior regulatory acts such as ministerial orders and resolutions.[1093] Thus, Royal Decrees, including RD 436/2004 are adopted within the framework of Law 54/1997, the only legal act with the status of a law on the matter.[1094]

824. Law 54/1997 established two legal regimes governing energy producers: the Ordinary Regime that applies to conventional energy producers and the Special Regime that applies to RE producers registered with the RAIPRE (see paragraphs 151-159 above).

825. Under the Special Regime, qualifying facilities are entitled to a premium on top of the remuneration earned at market prices. Such a premium is set in a governmental regulation (i.e., a Royal Decree):

> 4. The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations […].[1095]

826. Here the Tribunal must emphasize that regulatory regimes for energy differ from those for most economic activities (finance, manufacturing, IT) because of the pervasive role the State has, and which is commensurate with the strategic interests and policy considerations involved in that sector. At the same time, investments in the energy sector are usually highly capital-intense, which usually leads investors to favour legal environments that place certain elements of constraint on State action. This applies across the various energy industries: oil, gas, nuclear, renewables. The PV sector is particular, in that the production costs of PV plants usually exceed those of traditional energy

---

[1091] Rejoinder, para. 275.

[1092] Rejoinder, para. 275.

[1093] Counter-Memorial, paras. 219-220.

[1094] *See* paras. 138-142 above.

[1095] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 30(4). *See* paras. 151-161 above.

producers. Without a premium, investments in the PV sector could hardly be made profitably. Hence, Law 54/1997 needed to assure a premium.

827. Law 54/1997 further defines the criteria for fixing said premium in the following terms:

> To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets.[1096]

828. As it follows from the Tribunal's analysis of Law 54/1997, the only remuneration criterion that was fixed on the legislative level was that of reasonable profitability profitability rates with reference to the cost of money on capital markets. The factual record corroborates this analysis.[1097]

829. RD 436/2004 was one of the Royal Decrees adopted in implementation of Law 54/1997 (following RD 2818/1998). In its preamble, RD 436/2004 affirmed the pursuit of "the dual goal of protecting the environment and guaranteeing quality electricity supply for all consumers which is the premise underlying [Law 54/1997]."[1098]

830. The preamble of RD 436/2004 further clarified that the operators of qualified installations could opt for either a wholesale-market price with a premium or a regulated tariff "taking into account the criteria mentioned in article 30.4 of [Law 54/1997]."[1099] It further observed that:

> Whichever remuneration mechanism is chosen, the Royal Decree guarantees operators of special regime installations fair remuneration for their investments and an equally fair allocation to electricity consumers of the costs that can be attributed to the electricity system although incentives are offered for market participation[.][1100]

---

[1096] Law 54/1997 on the electric power sector, 27 November 1997 (C-19)/(R-27), Article 30(4). *See also* paras. 151-161 above.

[1097] *See* paras. 151-316 above.

[1098] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble (emphasis added).

[1099] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble.

[1100] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble. *See* paras. 171-187 above.

831.  The preamble of RD 436/2004 also noted that "the security and stability offered by this new methodology to calculate the special regime remuneration should help it to foster investment in this kind of plants."[1101]

832.  One of the declared purposes of RD 436/2004 according to its Article 1 was to:

> [e]stablish a lasting economic regime for the plants eligible to be under the special regime, based on an objective, transparent methodology to calculate the remuneration that is compatible with the methodology to approve or amend the average electricity or reference tariff regulated by Royal Decree 1432/2002 [...][1102]

833.  The normative relationship between Law 54/1997 and RD 436/2004 was analyzed in the 2005 Supreme Court Judgment concerning a case, which involved a factual pattern (and claims)[1103] different from the present dispute,[1104] but which ultimately pertained to the characterization of rights granted by Royal Decrees. Having applied the principle of regulatory hierarchy, the Supreme Court concluded that electricity "[p]roducers [did] not have an un modifiable right that the economic scheme which regulates modifications to premiums [would] stay the same", that "[s]aid regime [was] not guaranteed to remain unaltered in the future" and that "[t]here is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration [...]".[1105]

834.  RD 436/2004 was further analyzed in the 2006 Supreme Court Judgment.[1106] The case was brought by six market operators against the Spanish Government and, amongst others, several electricity distribution companies, regarding an amendment to RD 436/2004, which was introduced by subsequent RD 2351/2004 (which is not

---

[1101] Memorial, para. 83, *referring to* RD 436/2004, 12 March 2004 (C-27)/(R-32), p. 11.

[1102] RD 436/2004, 12 March 2004 (C-27)/(R-32), Preamble.

[1103] Claimants in that case, *inter alia*, contended that RD 436/2004 did not set forth any mechanism to update the "fixed tariff" pricing option (i.e., one of the two pricing options provided for under previously available RD 2818/1998). The claimants also argued that RD 436/2004 provided for stricter technical requirements than RD 2818/1998, which applied not merely to new, but also to existing PV installations.

[1104] *See* Appendix 4 to the Reply, p. 1.

[1105] Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93). *See also* paras. 205-209 above.

[1106] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94).

challenged in these proceedings). The claimant parties in that case argued that RD 2351/2004 had altered the legal regime for calculating the premiums under the Special Regime by modifying the methodology for revising premiums in the future and by raising the minimum capacity requirement set forth in RD 436/2004 from 10 MW to 15 MW in violation of their legitimate expectations.[1107] The Supreme Court rejected the appeal, holding similarly to its 2005 Judgment that:

> [E]lectricity producers under the special regime do [not] have an 'unalterable right' to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future.
>
> It is true that in this case the setting of premiums is subject to certain normative standards, as stated above, but is also so that the Council of Ministers may, respecting them, introduce quantitative variations in the formulas by which the premiums are from time to time adjusted, or in the calculation of them. If the change has not deviated from these legal guidelines and, again, there is no allegation of infringement of Article 30 of [Law 54/1997], it can hardly be considered unlawful.
>
> [...] Until it is replaced by another, the above outlined legal regulation (Article 30 of [Law 54/1997]) allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining 'reasonable rates of return with reference the cost of money in the capital market' [...]. However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.[1108]

835. Similar conclusions were reached in the March and October 2007 Supreme Court Judgments.[1109]

---

[1107] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94), pp. 2-3.

[1108] Third Chamber of the Supreme Court, App. 12/2005, Judgment, 25 October 2006 (R-94), pp. 3, 4 (emphases added). *See also* paras. 227-230 above.

[1109] Third Chamber of the Supreme Court, App. 11/2004, Judgment, 20 March 2007 (R-95); Third Chamber of the Supreme Court, App.13/2006, Judgment, 9 October 2007 (R-96) ("It is also claimed that a right acquired for payment of the premium is being damaged. The argument must be rejected given up what would have existed in favor of the appellant would be an expectation of obtaining said right as it had not come to form part of their patrimony, a right which elsewhere is being questioned through administrative channels, and the rejection of this is being debated with the Courts, as the party states in its brief"). *See also* Counter-Memorial, para. 353; Reply, para. 197; Respondent's Post-Hearing Brief, para. 62. *See also* para. 243 above.

836. Although the above judgments of the Spanish Supreme Court did not specifically address Article 40(3) of RD 436/2004, the Tribunal nevertheless finds them relevant for the purposes of proper legal characterization of the state of Spanish law and the expectations the investors could form thereunder.[1110] In the Tribunal's view, the Spanish Supreme Court confirmed that RD 436/2004 did not establish an intangible legal framework. Contrary to the Claimants' argument, RD 436/2004 could not be considered as having contained an undertaking not to modify the FiT scheme. That being noted, the Spanish Supreme Court systematically referred to the principle of reasonable profitability as being enshrined in Article 30(4) of Law 54/1997.

837. It is in fact accepted by the Respondent (in line with the jurisprudence of the Spanish Supreme Court) that "(1) the regulatory changes must enable plants to achieve a reasonable return and (2) that return will only be reasonable if it is consistent with the cost of money in the capital market."[1111]

838. Moreover, some of the Spanish Supreme Court's judgments referred to above were issued either before or during the very first stages of the Claimants' investment process. They were indicative of the fact that premiums granted under Royal Decrees were not unalterable and that Article 30 of Law 54/1997 provided the framework of what RE investors were entitled to. These judgments therefore should have been considered as "red flags" by a diligent investor. Consequently, the Tribunal by majority finds that the legal regime under RD 436/2004 could not have given rise to the type of expectations the Claimants are invoking in this case.

839. The next Royal Decree that was extensively relied upon by the Claimants in their pleadings in order to demonstrate an alleged undertaking not to modify the FiT is RD 661/2007.[1112] The drafting history and the context in which RD 661/2007 was

---

[1110] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), paras. 605-608; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 472; *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Dissenting Opinion on Liability and Quantum by Arbitrator Philippe Sands, para. 21.
[1111] Respondent's First Post-Hearing Brief, paras. 53-54.
[1112] Memorial, paras. 100-157; Reply, paras. 73-83.

adopted, and notably the provisions of RDL 7/2006, are described in detail at paragraphs 212-249 above.

840.   The reasons for adopting RD 661/2007 in place of RD 436/2004 were also set out in the preamble of RD 661/2007:

> Spanish society today, in the context of reducing dependence on foreign energy, better use of available energy sources, and a greater awareness of the environment, is increasingly demanding the employment of renewable sources of energy and efficiency in the generation of electricity as basic principles in the achievement of sustainable development from an economic, social, end environmental point of view. […]
>
> In view of the behaviour of the prices in the market, where certain variables which were not considered in the cited compensation system for the special regime have, over recent times, acquired greater importance, the economic circumstances established by Royal Decree 436/2004, of 12 March, make it necessary to modify the compensation system and de-link it from the [TMR], which has been used to date. […]
>
> The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997 […] guaranteeing the owners of facilities under the special regime a reasonable return on their investments […].
>
> To this effect, a system which is analogous to that provided in Royal Decree 436/2004 […] is maintained, in which the owner of the facility may opt to sell their energy at a regulated tariff, which will be the same for all scheduling periods or alternatively to sell this energy directly on the daily market, the term market, or through a bilateral contract, in this case receiving the price negotiated in the market plus a premium.[1113]

841.   Thus, according to the preamble of RD 661/2007, one of the aims of this regulation was to adopt corrective mechanisms relating to the regime previously in place under RD 436/2004 and the transitory regime created by RDL 9/2006.

---

[1113] RD 661/2007, 25 May 2007, pp. 2-3 (C-54)/(R-49) (emphases added). *See also* Memorial, paras. 19, 21, 45, 101-116, 186, 235, 255, 330, 381-388, 402, 424; Reply, paras. 29, 65-98, 156, 174, 210, 228, 295, 308, 402, 437, 719; Claimants' Post-Hearing Brief, paras. 82, 109, 130, 132, 156; Counter-Memorial, paras. 336, 354, 471, 474-490, 509, 534; Rejoinder, paras. 257, 309, 403, 437, 438, 493, 512, 550, 684; Respondent's Post-Hearing Brief, paras. 24-26.

842. Under RD 661/2007, photovoltaic installations were classified as "Group b.1" ("Facilities which use solar energy as their primary energy") and, within that group, as "Sub-group b.1.1" ("Facilities which use solar radiation alone as their primary energy by means of photovoltaic technology").[1114]

843. Contrary to RD 436/2004, which defined the FiT with reference to the TMR, RD 661/2007 defined the FiT as a specific income figure over a period of 25 years (subject to an adjustment based on the CPI). After the first 25 years of operation of a PV facility, the FiT would decrease.[1115]

844. RD 661/2007 similarly to RD 436/2004 contained a provision concerning future FiT revisions – Article 44(3):

> 3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of [the 2005-2010 Renewable Energy Promotion Plan], and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.
>
> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[1116]

845. This provision, according to the Claimants, is another undertaking not to modify the FiT for existing facilities.[1117] The Respondent essentially reiterates its arguments made in respect of Article 40(3) of RD 436/2004.[1118]

---

[1114] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 2(b).

[1115] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 36.

[1116] RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 36. *See* para. 260 above.

[1117] Reply, para. 215; *see also* Hearing Tr., Day 1, 18 March 2019, 54:7-16 (Vazquez-Guillén). *See also* paras. 263-267 above.

[1118] Counter-Memorial, paras. 509-515, 1068.

846. In the Tribunal's view, by majority, RD 661/2007 cannot be read as altering the conclusions reached earlier regarding RD 436/2004, namely that these Royal Decrees did not guarantee that the subsidy scheme would remain unmodified: the hierarchical position of these Royal Decrees as well as the relevant provisions of Law 54/1997 remained unchanged.[1119]

847. Moreover, as it was rightly pointed out by the Respondent, RD 661/2007 by itself represented a "retroactive" (in the Claimants' terminology) change, because its provisions were immediately applicable to PV installations already commissioned under RD 436/2004.[1120] The record also indicates that RD 661/2007 was adopted following the transitory regime enacted under RDL 7/2006, which had sought to address the TMR mechanism envisaged in RD 436/2004 because of a "feedback loop" that was causing an artificial increase of the subsidies paid to RE producers.[1121] In the Tribunal's view, by majority, these facts were also indicative of potential adverse regulatory changes in the future.

848. Finally, the last two of the Claimants' PV plants, namely Matapozuelos and Fuentes de Año, were regulated by RD 1578/2008.[1122]

849. The Tribunal observes that unlike RDs 436/2004 and 661/2007, RD 1578/2008 does not contain any language regarding the inadmissibility of tariff revisions for existing installations.[1123] The Fifth additional provision that concerns tariff revisions merely states

---

[1119] *See* paras. 819-838 above.

[1120] RD 661/2007, 25 May 2007 (C-54)/(R-49), First Transitory Provision. *See also* paras. 278-280 above.

[1121] As explained by Counsel for the Claimants, Mr. Vazquez-Guillén: "[…] one of the components of that TMR is precisely the special regime [FiT]. So as you can imagine, the higher the installed capacity of renewable energy, the higher the cost of the special regime; and as a result, the higher the TMR. Likewise, the higher the TMR would also lead to an increase of the [FiT]s, which would again lead to another increase of the TMR. It generated sort of a feedback loop." Hearing Tr., Day 1, 18 March 2019, 45:10-17 (Vazquez-Guillén). *See also* Counter-Memorial, paras. 443-447. *See also* paragraph 220 above.

[1122] Memorial, para. 184. *See also* paras. 281-307 above.

[1123] *See* paras. 816-844 above. *See also Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021 (RL-137), para. 582.

that FiTs may be changed in 2012 depending on the technological evolution of the sector and the market:

> *Fifth additional provision. Modification of the compensation for generation by photovoltaic technology*
>
> During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, <u>compensation for the generation of electric power by photovoltaic solar technology may be modified.</u>[1124]

850. Therefore, the text of RD 1578/2008 does not contain any representation of irrevocability of the FiTs granted under this Decree.[1125] This was emphasized by the Respondent in its pleadings[1126] and at the Hearing.[1127]

851. The Claimants nevertheless insist that, according to the interpretation provided by the CNE, RD 1578/2008 must be interpreted similarly to RD 436/2004 and RD 661/2007.[1128] Specifically, the Claimants refer to CNE Report 30/2008, which provides in relevant part as follows:

> Production facilities under the special regime usually are capital-intensive and have long recovery periods. The regulation of generation facilities under the special regime established in Royal Decree 661/2007 has tried to minimize regulatory risk for this group, offering security and predictability for economic incentives during the lifespan of the facilities, establishing transparent mechanisms for the annual updates of said incentives and exempting existing facilities from revision every four years because the new incentives that are being put into place only affect new facilities.
>
> The guarantees provided for in this regulation make it possible to find better financing, lower costs for projects and less impact on the electrical tariff that consumers ultimately pay.[1129]

---

[1124] RD 1578/2008, 26 September 2008 (C-3)/(R-50) (emphases added).

[1125] *See also 9REN Holding S.À.R.L.v Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), para. 298.

[1126] Rejoinder, paras. 314-317.

[1127] Hearing Tr., Day 1, 18 March 2019, 254:1-7 (Fröhlingsdorf Nicolás). *See also* paras. 315-316.

[1128] Hearing Tr., Day 1, 18 March 2019, 76:5-12 (Stoyanov).

[1129] CNE, Report 30/2008 regarding the proposed Royal Decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007, 29 July 2008 (C-70), p. 21, referred to at Hearing Tr., Day 1, 18 March 2019, 76:5-12 (Stoyanov).

852. The Claimants also refer to the CNE's written response to a query regarding the Fifth additional provision of RD 1578/2008:

> This regulation is consistent with the regulation established in Article 44.3 of Royal Decree 661/2007, where it provides for a revision of the remuneration scheme in 2010, which would be applicable to those facilities commissioned starting on 1 January 2012.[1130]

853. Other documents that allegedly interpret RD 1578/2008 as guaranteeing that there will be no changes to the FiT regime are summarised at paragraphs 308-314 above.

854. In the Tribunal's view, by majority, none of these documents is capable of modifying the express terms of the Fifth additional provision of RD 1578/2008 (and the absence of any stabilization guarantee). Moreover, even if RD 1578/2008 contained a provision similar to Article 40(3) of RD 436/2004 or Article 44(3) of RD 661/2007, the Claimants' argument would have been rejected nevertheless, as the Tribunal has found earlier that both RD 436/2004 and RD 661/2007 fall short of providing a stabilization commitment.[1131]

855. In view of the above analysis, it does not appear necessary to discuss the legal effect of the registration of the Claimants' PV Plants with the RAIPRE, as the Tribunal has already concluded that the applicable regulatory framework did not contain the guarantees of non-alteration of the FiT as alleged by the Claimants. Nevertheless, for the sake of completeness, the Tribunal will now address the Parties' arguments regarding the RAIPRE certificates.

856. The Claimants argue that "registration in the RAIPRE confirmed that an […] installation had the right to receive the RD 661/2007 FiT."[1132] The Claimants make a similar observation regarding the RD 1578/2008 FiT.[1133] In other words, the Claimants' position

---

[1130] CNE response to a query from an individual regarding the Fifth additional provision of RD 1578/2008, 22 October 2009 (C-85), pp. 1-2.

[1131] *See also Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021 (RL-137), para. 584.

[1132] Reply, para. 93.

[1133] Reply, para. 96.

is that registration in the RAIPRE crystallized the economic rights under RD 661/2007 and RD 1578/2008.[1134]

857. The Respondent contends that the RAIPRE was just an administrative tool, a requirement that needed to be met by facilities whishing to become part of the SES.[1135] Spain also emphasizes the fact that both conventional and RE producers had to register with the RAIPRE.[1136]

858. The Tribunal, by majority, agrees with the Respondent that the registration of the Claimants' PV installations with the RAIPRE must be considered as an administrative requirement that did not generate any vested rights for the investors. This conclusion finds support, *inter alia*, in a document issued by the Spanish Council of State in 2010, which provides in respect of the legal nature of the RAIPRE registration as follows:

> In essence, neither the resolution of registration in the Special Regime Register, nor the actual act of registration imply a declaration of the right to receive the premiums. Therefore, the right to a certain regime of premiums depends on compliance with the corresponding requirements and conditions, including, as indicated in the report of the National Energy Commission and in the report on regulatory impact, that of having the necessary equipment for the production of electrical energy on the corresponding date.[1137]

859. The same conclusion was reached by investment tribunals.[1138]

---

[1134] *See also* paras. 280, 744 above.

[1135] Counter-Memorial, paras. 530-549. *See also* Rejoinder, paras. 1362-1368; Hearing Tr., Day 2, 19 March 2019, 41:4-14 (Elena Abad).

[1136] Counter-Memorial, paras. 534. *See also* paras. 157, 763 above.

[1137] Opinion 1155/2010 of the Council of State, 22 July 2010 (R-295) *referred to* in Rejoinder, para. 500 (emphasis added). *See also* para. 356 above.

[1138] *Charanne B.V. and Construction Investments S.A.R.L. v. Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016 (RL-32), para. 510; *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 413; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, para. 679; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), para. 346; *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-185), para. 585.

860. In addition, the Claimants argue that the legitimate character of their expectations is underlined by the fact that the Special Regime was part of a wider international and domestic policy of promoting renewable energy.

861. The Tribunal is generally sympathetic to this argument but finds it unpersuasive in the instant case. The Tribunal agrees with the reasoning expressed in *Allard v. Barbados*, according to which "consideration of a host State's international [environmental] obligations may well be relevant in the application of [a] standard to particular circumstances."[1139] This is in line with the general consideration that obligations stemming from a treaty with investment provisions, such as the ECT, "has to be construed in harmony with other rules of international law of which it forms part."[1140]

862. However, the fact that a State is bound by international obligations in the field of environmental law and participates in the international debate concerning renewable energy sources does not as such give rise to a "State representation." A fortiori, such a participation can hardly be construed as creating an expectation that FiTs granted under a host State's legal framework at a given time could not be modified or replaced by another subsidy system in the future. At best, such a participation could be said to reinforce an expectation that any adjustment measures taken by a host State remain within the realm of reasonableness.

863. The Tribunal will further address certain documents that are not normative acts or judicial decisions, but that, according to the Claimants, confirm their interpretation of RDs 436/2004, 661/2007, and 1578/2008.

864. The Claimants refer to CNE Report 3/2007 where the CNE proposed to maintain "regulated tariffs during the service life of existing facilities (with a transparent annual adjustment mechanism)."[1141] However, the Tribunal is unable to conclude that this document could have been read as corroborating the existence of any guarantee of immutability of the FiT scheme provided under RD 661/2007. Indeed, CNE Report

---

[1139] *Peter A. Allard v. The Government of Barbados*, PCA Case No. 2012-06, Award, 27 June 2016, para. 244.

[1140] *Urbaser S.A. and Consorcio de Aguas Bilbao Biskaia, Bilbao Biskaia Ur Partzuergoa v. Argentine Republic*, ICSID Case No. ARB/07/26, Award, 8 December 2016, para. 1200.

[1141] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 25.

3/2007 clearly states that even retroactive changes of the regulatory regime are not precluded:

> […] the principle of legal certainty is not by definition an anti-evolutionary or conservative principle; it does not mean that legislation is resistant or immune to reform. In this sense, these principles do not impede dynamic innovation, nor that new regulatory provisions be applied retroactively to existing situations, but that they should continue upon entry into force of the new regulations.[1142]

865.  The same holds true for CNE Report 30/2008, which noted that the Spanish PV market had been "over-incentivized" by RD 661/2007.[1143] CNE Report 30/2008 further observes that:

> Certainly, the principles of legal certainty and the protection of legitimate expectations (Article 9.3 EC) do not constitute insurmountable obstacles to the innovation of the legal system and cannot therefore be used as instruments to petrify the legal framework in force at any given time. In this sense, these principles do not prevent the dynamic innovation of the regulatory frameworks, nor of new normative provisions which can be applied pro-future to situations initiated before it comes into force. But these principles do require that regulatory innovation - especially if it is abrupt, unforeseeable or unexpected - is carried out with certain guarantees and cautions (transitional periods to adapt to the new regimes, where appropriate compensatory measures, etc.) that dampen, moderate and minimize, as far as possible, the disappointing of any expectations generated by the previous regulations.[1144]

866.  If anything, rather than contributing to creating any positive expectation, the Tribunal, by majority, considers that this language should have cautioned the Claimants.

867.  Moreover, contrary to the Claimants' contentions, the record contains numerous other statements which seem to be drawing attention to potential risks contained in the Spanish legal regime for the RE sector. For instance, as stated by APPA in its draft complaint about the Second Draft of RD 661/2007:

> […] any rational investor, when planning facilities of this type, must bear in mind not only the costs and the foreseeable remuneration, but it also must

---

[1142] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 18. *See also* paras. 238-240 above.

[1143] *See* paras. 288-290 above.

[1144] CNE Report 30/2008 in relation to the Draft Royal Decree on Subsidising Electricity Production Activity through Solar Photovoltaic Technology for Facilities subsequent to the Maintenance Deadline of the Retribution of RD 661/2007, of 25 May, for this Technology (R-233)/(C-70), p. 10. *See also* paras. 288-290 above.

consider the <u>risk that such remuneration could be lowered</u>; because, <u>if the Government does not respect now the compromise assumed in 2004, what investor could discard that for example next year, the Government may lower again the maximum and minimum limits of the remuneration</u> for the facilities that may join the market?[1145]

868.   The Tribunal must also address various presentations by InvestInSpain, IDAE and the Ministry of Industry, Commerce and Tourism[1146] extensively referred to by the Claimants in support of their primary claim based on the non-alteration of the FiT Regime under RD 661/2007 and RD 1578/2008.[1147] As it is acknowledged by the Claimants themselves, they "did not see all of these presentations at the time of their investments."[1148] Therefore, the Claimants could not have relied on or even taken into account the documents that were not available to them at the relevant times.

869.   In fact, the only presentation on the record that Mr. Bouman allegedly saw and reviewed is the IDAE's presentation "The Sun Can be Yours", dated February 2008.[1149] This document warrants several remarks. First of all, the Tribunal cannot disregard the fact that the original language of the presentation is Spanish, while according to Mr. Bouman's own testimony at the Hearing, his knowledge of the language is rather limited.[1150] Secondly, the presentation was issued in February 2008 and <u>post-dates</u> the signing of <u>the three out of five of the Claimants' EPC contracts</u> – the events that,

---

[1145] APPA, Claims against the RD 661/2007, 3 April 2007 (R-265), pp. 6-7 'emphases added). *See also* Rejoinder, para. 607. *See also* para. 246 above.

[1146] Manuela García, INTERES InvestinSpain presentation "Opportunities in Renewable Energy in Spain", 15 November 2007 (C-66); Manuela García, INTERES InvestinSpain, Presentation: "Opportunities in Renewable Energy in Spain", 16 November 2007 (C-67); Manuela García, Ministry of Industry, Tourism and Commerce and InvestInSpain presentation, "Opportunities in Renewable Energy in Spain", November 2008 (C-73); Ministry of Industry, Tourism and Commerce and InvestInSpain, "Spain for Renewable Energies", October 2011 (C-103); IDAE, Presentation: "The sun can be yours", 24 May 2005 (KPMG Exhibit 6); Ministry of Industry, Commerce and Tourism and IDAE presentation, "The Sun Can be Yours – Responses to all Key Questions about Solar Photovoltaic Energy", February 2008 (C-69); IDAE, Presentation: "The Sun Can be yours", November 2008 (C-74), p. 16; IDAE, Presentation: "The sun can be yours", 22 February 2006 (C-227).

[1147] Memorial, para. 84; Reply, paras. 108-109; First Bouman Statement, para. 37; Hearing Tr., Day 1, 18 March 2019, 40:3-25; 64:1-25 (Vazquez-Guillén).

[1148] Reply, para. 109.

[1149] First Bouman Statement, para. 37, *referring to* Ministry of Industry, Commerce and Tourism and IDAE presentation, "The Sun Can be Yours – Responses to all Key Questions about Solar Photovoltaic Energy", February 2008 (C-69).

[1150] "- Do you understand Spanish? - A little bit. I wouldn't say very good, but I understand some" see Hearing Tr., Day 2, 19 March 2019, 153:10-12 (Bouman/ Fröhlingsdorf Nicolás).

according to the Claimants themselves, marked the making of their investments.[1151] The presentation also post-dates the November 2005 business tour during which Mr. Bouman apparently formed his understanding of the applicable regulatory framework and took the initial steps towards investing in Spain.[1152] Finally, Mr. Bouman also acknowledged that he had not personally analyzed the text of the presentation.[1153] There is thus no evidence of any reliance on the February 2008 presentation by the Claimants.

870. Therefore, the Tribunal, by majority, cannot accept that the February 2008 presentation made by the IDAE or any other presentations, promotional materials and the like, especially those materials that were issued after the Claimants' decision to invest had been made, could alter the Tribunal's interpretation of the applicable regulatory framework based on the language of the applicable laws and regulations and the contemporaneous jurisprudence of the Spanish Supreme Court (see paragraphs 818-838 above).

871. To conclude, neither RD 436/2004, RD 661/2007 nor RD 1578/2008 could have served as the basis for the types of expectations the Claimants seek to vindicate in this arbitration, namely that the FiTs they had initially enjoyed would remain in place as originally set.

872. Rather, the Tribunal considers that the basis for the Claimants' expectations is set out in Law 54/1997 – the cornerstone of the Spanish electricity system as applicable at the time of the Claimants' investments. As discussed above, Law 54/1997 provided for the right to a reasonable return.

873. The Parties' positions on the quantification of such a reasonable return differ. The Claimants, on the one hand, argue that the reasonable return was defined by the specific premiums set forth under RDs 436/2004, 661/2007 and 1578/2008 or, alternatively, by the average WACC for the RE sector calculated for the relevant period (see paragraphs 731-743 and 975-976 of this Decision).[1154] The Respondent, on the other hand, argues that the reasonable rate of return contemplated in Law 54/1997 was around 7%, as, *inter*

---

[1151] Claimants' Post-Hearing Brief, para. 30.
[1152] Bouman First Statement, paras. 23-28.
[1153] Hearing Tr., Day 2, 19 March 2019, 153:13-22 (Bouman/ Fröhlingsdorf Nicolás).
[1154] *See also* Reply, paras. 188-193.

*alia*, was set forth in the successive PERs.[1155] Following a detailed review of the evidence on the record,[1156] the Tribunal is not satisfied with the argument of the Claimants. To the contrary, the record amply corroborates the Respondent's approach (see paragraphs 983-995 below).

874. Indeed, Law 54/1997 enshrined the principle that RE investors were entitled to receive a reasonable rate of return. This right was to be given effect through the various regulatory acts which Spain adopted between 1998 and 2009. These included RD 436/2004, RD 661/2007 and RD 1578/2008. The subsidy regimes created in these Royal Decrees constituted an implementation of the reasonable return principle. They did not themselves define the (unalterable) amount of such a return.[1157] The Tribunal agrees with the observation made in *BayWa v. Spain* that "[t]he stream cannot rise higher than its source, or commit the state to more than the legislative framework allows."[1158] Spain was thus free to modify the applicable framework in the exercise of its regulatory powers, as long as the reasonable return principle guaranteed by Law 54/1997 remained respected.

875. For these reasons, the Tribunal, by majority, concludes that the Claimants' primary claim based on the non-alteration of the FiT regime under RD 661/2007 and RD 1578/2008 cannot be upheld. Rather, the Tribunal considers that Spanish law contained indicators such as, for example, the 2005 Supreme Court Decision, which noted explicitly that:

> There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system

---

[1155] *See* para. 753 above.

[1156] *See* paras. 168, 197, 203, 261, 276 above.

[1157] *See also BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, 2 December 2019 (RL-125), para. 473; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 384; *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 638; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, para. 549. *See also Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021 (RL-137), para. 587.

[1158] *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, 2 December 2019 (RL-125), para. 473.

of remuneration, provided that it remains within the framework of [Law 54/1997].[1159]

876. In that sense, the replacement of the FiT scheme with the New Regime based on a different methodology was not prohibited under Spanish law. To the contrary, Spanish law explicitly allowed for the modification of a specific system of remuneration, subject to respecting the conditions set by Law 54/1997, namely the guarantee of a reasonable rate of return. Thus, the replacement of the FiT regime does not *per se* qualify as a modification so "drastic" or "unexpected" so as to constitute a violation of the FET obligation under the ECT and the stability obligation it subsumes.[1160]

877. At the same time, considering that reasonable profitability has indeed been guaranteed to the investors under Law 54/1997, the Claimants could legitimately expect to receive a reasonable rate of return. The Tribunal's determination, by majority, of the specific rate that was guaranteed, and which the Tribunal sets at 7%, is discussed at paragraphs 983 to 995 below. Given that the Parties disagree on whether such profitability is maintained under the New Regime, the Tribunal will need to further analyze the economic impact of the Disputed Measures (see Section VIII.A.2 below) in order to answer the question of whether the Disputed Measures continued to assure a reasonable rate of return or whether they undermined the Claimants' expectations by not doing so.

878. The above analysis is not supported by Professor Cameron. Professor Cameron, *inter alia*, asserts that "[t]he Tribunal's emphasis upon immutability in relation to stability does not fit with the statements of the parties in the case itself, not least the statements about expectations made by the Claimants".[1161] In the majority's view, this is erroneous, as, according to the Claimants themselves, their expectations concerned "the nature, amount and duration of the FITs offered under RD 661/2007 and RD 1578/2008"[1162] and "that any future changes to the RD 661/2007 and RD 1578/2008 FIT would only apply prospectively".[1163] In essence, this amounts to an expectation that the FiT-based scheme

---

[1159] Third Chamber of the Supreme Court, App. 73/2004, Judgment, 15 December 2005 (R-93) (Tribunal's translation). *See also* paras. 205-209 above.

[1160] *See* para. 713 above.

[1161] Partial Dissenting Opinion by Professor Cameron, para. 26.

[1162] Memorial, para. 378 (emphasis added).

[1163] Memorial, para. 380 (emphasis added).

would remain unchanged (or immutable). This is also reflected in the Claimants' case on damages, which is based on the assumption that the FiT and other elements of the initial investment framework would be maintained. For the reasons provided above, the majority was unable to endorse the Claimants' primary case. At the same time, the majority did find sufficient evidence in the record of these proceedings supporting Spain's proposition that the regulator has always aimed at providing the investors with a reasonable rate of return.

879. Professor Cameron also criticizes the majority's reliance on the jurisprudence of the Spanish Supreme Court as one of the elements defining the Claimants' legitimate expectations, *inter alia*, on the grounds that the Spanish Supreme Court did not analyze the issue of regulatory changes under international law.[1164] The majority notes that neither Article 10(1) of the ECT, nor any other rule of international law defines the scope and content of the Claimants' expectations. It is not disputed that the alleged expectations were formed on the basis of the texts of the relevant Royal Decrees and other sources of Spanish law. The jurisprudence of the Spanish Supreme Court is therefore relevant to the extent it provides the interpretation of the laws and regulations relied upon by the Claimants at the time or prior to the Claimants' investment in Spain. For the reasons stated earlier in this section at paragraphs 836-838, when assessing the limitations set out in Spanish law at the time of the Claimants' investment, the Tribunal cannot substitute its interpretation of the domestic legal framework for that adopted by the Respondent's highest court. By contrast, and as stated at paragraph 904 regarding the Tribunal's analysis of the Respondent's alleged claw-back of past remuneration previously received by the Claimants, the Tribunal is not bound by the Spanish courts' characterization of the Disputed Measures for the purpose of assessing their international legality.

880. Lastly, in disagreement with the Tribunal's majority, Professor Cameron takes the view that the registration of the investors' facilities with the RAIPRE had legal significance ("[o]nce registered, the necessary pre-conditions in terms of planning, financing, constructing, and commissioning within a specific time-period were fulfilled, and Spain's duty to carry out the promised inducements was activated. Registration, at this point,

---

[1164] Partial Dissenting Opinion by Professor Cameron, para. 37.

initiated Spain's obligations under Article 10(1) of the ECT and made them binding on the Respondent.").[1165] The majority notes that this view is based on the premise that RD 436/2004, RD 661/2007 and RD 1578/2008 contained guarantees of stability, which has been rejected for the reasons stated above. Moreover, in the Claimants' own words, the RAIPRE registration <u>confirmed</u> the rights provided under the applicable Royal Decree.[1166] This is indeed correct, as by the time of the registration with the RAIPRE, the EPC contracts had already been signed and the investments had been made.[1167]

*(c)    Claimants' due diligence/ assumption of risk of regulatory changes*

881.  The Parties dispute the relevance and sufficiency of the Claimants' due diligence. According to the Claimants, the investor's due diligence is not decisive for their claim as long as the alleged expectations were otherwise reasonable and objective.[1168] This approach has been endorsed, for example, by the *Cube Infrastructure v. Spain* tribunal.[1169] By contrast, the Respondent argues that adequate due diligence is essential and the Claimants ought to have enquired specifically about the prospects of regulatory changes, in view of the highly-regulated nature of the RE sector in Spain.[1170]

882.  The Tribunal observes that many tribunals indeed considered the requirement of due diligence as part of their assessment of the facts under Article 10(1) of the ECT.[1171] The *Stadtwerke München v. Spain* tribunal held that for an expectation to be reasonable it must "arise from a <u>rigorous due diligence process</u> carried out by the investor."[1172] The *Masdar*

---

[1165] Partial Dissenting Opinion by Professor Cameron, para. 66.

[1166] Reply, para. 93.

[1167] Memorial, Appendix 4.

[1168] Claimants' Post-Hearing Brief, para. 33.

[1169] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (CL-187), para. 396.

[1170] Hearing Tr., Day 2, 19 March 2019, 21:12-25 (Elena Abad); Respondent's Opening Statement on the Merits, slides 23-24.

[1171] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 264, *OperaFund*, para. 487, *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-185), para. 595; *9REN Holding S.À.R.L.v Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), para. 272; *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 308, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), paras. 479-499.

[1172] *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 264 (emphasis added).

*Solar v. Spain* tribunal similarly found that "[i]f the general legislation is to be regarded as a source of an investor's legitimate expectations, <u>the investor must demonstrate</u> that it has exercised <u>appropriate due diligence</u> and that it has familiarised itself with the existing laws."[1173]

883. The Tribunal also notes that a different view was articulated by other tribunals, for example, the *RREEF v. Spain* and *The PV Investors v. Spain* tribunals, on the grounds that regardless of whether the investor's due diligence was sufficient, the Spanish regulatory framework did not provide for any alleged guarantees except for that of a reasonable return.[1174]

884. As it was succinctly put by the *RREEF v. Spain* tribunal:

> The Claimants' diligence might have been due. However, due or not, the Claimants were made aware that the Respondent's legal regime was subject to possible changes in the future. This is evidence of the fact that any expectation of the Claimants that the applicable legal regime was never subject to any change whatsoever was not legitimate.[1175]

---

[1173] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 494 (emphases added).

[1174] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 613; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 398.

[1175] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 398. The *PV Investors v. Spain* tribunal similarly held: "this debate lacks relevance for present purposes. Indeed, <u>whether the [c]laimants engaged in diligence or not and whether that diligence was "due" or not, cannot alter the fact that on the basis of the law and the jurisprudence the [c]laimants knew or should have known that changes to the regulatory framework could happen</u>. As a consequence, expectations that they would not happen cannot be deemed legitimate." *See AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 613 (emphasis added).

885. The Tribunal would be minded to agree with the view that if it is already apparent that the regulatory framework did not contain any alleged stabilization guarantees, the sufficiency or insufficiency of the investor's due diligence becomes somewhat less relevant. That being noted, the Tribunal considers that the deliberate assumption of the risk of regulatory changes may need to be taken into account when assessing an investor's alleged expectations.[1176]

886. In any event, as the Tribunal finds in the below paragraphs, even if the Claimants' due diligence is considered as a relevant factor, the record indicates that no specific attention was paid to the fact that the Spanish legal framework has been in constant evolution and displayed signs of regulatory risk (i.e., of potentially unfavourable regulatory changes) before Mr. Bouman first started considering an investment in the Spanish PV sector. The alleged expectations therefore cannot be regarded as legitimate, reasonable or objective.

887. The Claimants have submitted a number of documents in an attempt to show that the necessary due diligence was carried out at the initial stages of the investment process.[1177] The Tribunal observes that during the period preceding the signing of the first EPC contract on 10 August 2006,[1178] the Claimants received only the following documents presented as forming part of their alleged due diligence:

- Solar Plaza, Report "The Spanish Solar PV Market", January 2005 (C-29);

---

[1176] *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-6), para. 781.

[1177] *See* Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29); Email from Richard Wicke regarding the Solar project 28 units of 100kW in Mahora, Albacete, 3 March 2006 (C-40); Dikeos Abogados, Report on the trip to the Mahora Project, Toledo, 30 March 2006 (C-43); Email from Richard Wicke to Henk Pals regarding the Mahora Project, 6 July 2006 (C-47); Dikeos Abogados, Due Diligence Report on Villar de Cañas, Report on the legal situation of the Villar de Cañas (Cuenca) project, 13 July 2007 (C-62); Ramón y Cajal, Second Due Diligence Report on the Matapozuelos plant, "Report of legal revision in relation to solar photovoltaic plants of 925 KW in the municipal term of Matapozuelos (Valladolid)", 6 August 2007 (C-63); Report on the degree of legalization of the Ronda (Malaga) project, of 1,440 kilowatts of nominal power, 2 October 2007 (C-65); Dikeos Abogados, Report on the legal feasibility of an improvement of the Mahora Project, Madrid, 11 February 2009 (C-77); Ramón y Cajal, Due Diligence Report from on the Matapozuelos plant, 23 February 2009 (C-79); Dikeos Abogados, Report on the degree of approval of the Ronda (Málaga) Project, 28 April 2009 (C-81); Ramón y Cajal, Due Diligence Report on Fuentes de Año, November 2009 (C-88); Dikeos Abogados, Report on the legal situation of the Villar de Cañas (Cuenca) project, 16 June 2010 (C-93); Gómez-Acebo & Pombo, Due Diligence Report issued in connection with the PV Plants called "Fuentes de Año" (Ávila) and "Matapozuelos" (Valladolid), 4 July 2012 (C-138).

[1178] Which is, according to the Claimants, the date of their first investment. *See* para. 226 above.

- Email from Richard Wicke regarding the Solar project 28 units of 100kW in Mahora, Albacete, 3 March 2006 (C-40);

- Report from Dikeos Abogados on the trip to the Mahora Project, Toledo, 30 March 2006 (C-43); and

- Email from Richard Wicke to Henk Pals regarding the Mahora Project, 6 July 2006 (C-47).[1179]

888. The Tribunal notes that the e-mails and report issued by Mr. Wicke and his firm, Dikeos Abogados[1180] are focused on various administrative procedures and the overall progress on the Mahora PV Plant project. Those documents neither contain any analysis nor, at a minimum, a description of the applicable regulatory framework. The Dikeos Abogados report, dated 30 March 2006, contains the following conclusion:

> The very firm attitude of Mrs. Gallardo[1181] on the individual transformator for each 100 kW-unit being the only decisive criteria for the assignment of the high remuneration tariff was convincing. She has a broad and close view on the practice of the competent authorities in this question. The example of the Iberdrola wind farm and her conclusion of a self-binding rule for the administration was also convincing. My personal conclusion of the conversation was that there are no serious doubts as to the assignment of the high remuneration tariff in Castilla – La Mancha where one transformator is installed for each 100 kW-unit.[1182]

889. This document reveals that at the initial stages of the Mahora Project, the Claimants' legal advisor was primarily concerned with the assignment (rather than stability) of the FiT. The other two e-mails, dated 3 March 2006 and 6 July 2006, discuss permits, leases, construction deadlines, and other formalities that were necessary to build and put in operation the Mahora Plant.[1183] Therefore, these three documents cannot be considered as proof of any relevant due diligence regarding the Respondent's alleged commitment not to modify the FiT regime for existing PV installations.

---

[1179] *See also* paras. 115-120 above.

[1180] Email from Richard Wicke regarding the Solar project 28 units of 100kW in Mahora, Albacete, 3 March 2006 (C-40); Dikeos Abogados, Report on the trip to the Mahora Project, Toledo, 30 March 2006 (C-43); Email from Richard Wicke to Henk Pals regarding the Mahora Project, 6 July 2006 (C-47).

[1181] A person from the Ministry of Industry and Energy of the Government of Castilla – La Mancha who was responsible for the RAIPRE.

[1182] Dikeos Abogados, Report on the trip to the Mahora Project, Toledo, 30 March 2006 (C-43) (emphasis added).

[1183] Email from Richard Wicke regarding the Solar project 28 units of 100kW in Mahora, Albacete, 3 March 2006 (C-40); Email from Richard Wicke to Henk Pals regarding the Mahora Project, 6 July 2006 (C-47).

890. The very first document, the 2005 Solar Plaza Report, prepared by Solar Plaza, Mr. Koot's consultancy company, consists of 93 pages examining the Spanish PV market (see paragraphs 115-120 above).[1184] However, the Tribunal notes that this report was issued long before the adoption of RD 661/2007 and even before Mr. Bouman's decision to invest. Therefore, the 2005 Solar Plaza Report does not evidence any kind of due diligence with respect to the provisions of RD 661/2007 and RD 1578/2008 on which, according to the Claimants' own position, they allegedly relied when making their investments in Spain.[1185]

891. Furthermore, the 2005 Solar Plaza Report does not include any legal inquiry into the overall stability of the contemporaneous Special Regime regulations. At the same time, it contains some critical remarks, such as the following:

> The only problem with the current feed-in tariff seems to be the presence of a ceiling at 150 MWp and 200 MWp for systems up to 100 kW respectively larger systems th[a]n 100 kWp. <u>This could result in the dramatic interruption of the rapid PV market development as the ceiling is approached.</u> It is difficult to predict when this will happen because the ceiling could itself be one of the reasons for a slowdown in market growth.[1186]

892. In sum, none of these four documents adduced as proving the Claimants' due diligence can serve as evidence for any sort of prudent analysis of the Spanish regulatory framework.

893. Moreover, according to the 2005-2010 PER referred to by the Claimants,[1187] the PV sector was not developing at a sufficient pace at the time when Mr. Bouman started investigating the Spanish renewables market.[1188] RD 436/2004, under which the Claimants' investment process began,[1189] was considered as offering PV investors an "insufficient return".[1190] Despite this characterization of the existing remuneration model, the Claimants decided

---

[1184] Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29).

[1185] *See* paras. 128, 772 above.

[1186] Solar Plaza, "The Spanish Solar PV Market", January 2005 (C-29), pp. 64-65 (emphasis added). *See also* paras. 115-120 above.

[1187] Memorial, paras. 88-90; Renewable Energy Plan in Spain 2005-2010 (C-32), p. 160.

[1188] Memorial, paras. 88, 90; Renewable Energy Plan in Spain 2005-2010 (C-32), p. 170.

[1189] *See* paras. 810-815 above.

[1190] Memorial, paras. 88, 90.

to carry on with their investments without asking for legal or other advice regarding the prospects of the regulatory framework's evolution.

894. Based on the above, the Tribunal, by majority, finds it difficult to support the Claimants' position regarding the alleged sufficiency of their due diligence. Rather, the Tribunal, by majority, considers that the investors' conduct was not deterred by the signs of risk of potentially unfavourable regulatory changes that were apparent between 2005 and 2006, when Mr. Bouman started considering to invest in the Spanish market.

895. In any event, the Tribunal observes that the possibility of regulatory changes was envisaged by some of the economic actors involved in the RE sector, which is evidenced, for example, by the contemporaneous land lease agreement, signed by Gamesa (developer of the PV plant) in Fuentes de Año, dated 25 May 2006 (see paragraph 215 above). This agreement contained the following provision:

> [Termination] of the Contract
>
> […]
>
> B. Once the solar photovoltaic facility is installed:
>
> If regulation of the [electricity] sector is modified, in such a way that operating facilities is not economically profitable.[1191]

896. Thus, it follows quite clearly from the analysis of the record that the Claimants did not enquire specifically about regulatory risks in connection with their investments made under any of the Royal Decrees. In fact, at the Hearing Mr. Bouman confirmed that he never asked his legal advisor to analyze the Royal Decree on which his expectation was allegedly based:

> MS. FRÖHLINGSDORF NICOLÁS: Did you ask Mr. Wicke to make a legal report or due diligence report on the content of Royal Decree 436/2004?
>
> MR. BOUMAN: Not that I remember.[1192]

---

[1191] Agreement between Gamesa Energia, S.A. and Mr. Herminio Senovilla Arenas and Ms. Amparo Muñoyerro García, 24 May 2006 (R-327), clause 6 (relating to a parcel named "Poligono 11") (emphasis added).

[1192] *See* Hearing Tr., Day 2, 19 March 2019, 157:1-6 (Bouman/Fröhlingsdorf Nicolás).

897. As already indicated,[1193] the Tribunal considers this statement to be of high probative value, since, *mutatis mutandis*, it is "contrary to the interests or contentions of the [Party] to which the witness owes allegiance."[1194]

898. In light of the foregoing, the Tribunal, by majority, concludes that the Claimants must be found to have made their investment without displaying a specific preoccupation about the risk of unfavourable regultory changes.

899. Professor Cameron dissents on the majority's assessment of the Claimants' due diligence. Specifically, Professor Cameron emphasizes the fact that none of the legal advisers involved in the process of setting up and financing the Claimants' investments "signaled that there were regulatory risks such as a possible withdrawal of RD 661/2007 or RD 1578/2008".[1195] Professor Cameron also notes that Mr. Bouman's decision-making style "reflected the fact that investors come in different shapes and sizes: in this case, as the sole investor with no management board to report to, the style had a simplicity that was in his view appropriate to that kind of ownership structure."[1196] Professor Cameron moreover underscores the "highly cooperative" character of the relationship between the investor and the host State in relation to the development of the renewables and concludes that it would be inappropriate to require investors "in newer forms of energy to adopt a sceptical stance vis-à-vis the Respondent's integrity […]"[1197]

900. The majority observes that the absence of any "signals" or "red flags" as such cannot be decisive or indicative of the fact that the Claimants performed proper due diligence before or while investing in the renewables market in Spain. As stated earlier, especially at paragraph 896, the risks of adverse regulatory changes were never explored, which explains the absence of any caveats regarding the stability of the FiT-based regime in the due diligence documents provided by the Claimants. In the majority's view, this fact cannot be disregarded depending on the investor's "size", its ownership and management

---

[1193] *See* para. 811 above.

[1194] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, I.C.J. Reports 1986, p. 14, at 43, para. 70.

[1195] Partial Dissenting Opinion by Professor Cameron, para. 60.

[1196] Partial Dissenting Opinion by Professor Cameron, para. 62.

[1197] Partial Dissenting Opinion by Professor Cameron, para. 63.

structure. After all, it has never been suggested that Mr. Bouman is not a professional investor or that the risks shall be re-allocated in this particular case in view of the Claimants' management style. Finally, the majority has never suggested that Mr. Bouman should have questioned the "Respondent's integrity". However, the majority believes a higher degree of caution would have been appropriate in a regulatory context that constantly evolved from the adoption of RD 436/2004 to the signing of the Claimants' first EPC Contract in 2006[1198], and where the Spanish Supreme Court had adopted the position that the government retained the power to modify a specific system of remuneration provided that it remained within the framework of Law 54/1997.[1199]

*(d)    Breach of the Claimants' expectations*

901.  In view of the Tribunal's earlier findings, by majority, that the only expectation that the Claimants could have legitimately had was the expectation of a reasonable return (see paragraphs 816-874 above), the Tribunal is therefore called to determine whether such a return was maintained for the Claimants' PV Plants despite the changes in the remuneration scheme introduced by the New Regime. In this regard, the Tribunal finds pertinent the following conclusion from *The PV Investors v. Spain*:

> […] the principle of reasonable return serves as the limit of ECT-compliant regulatory changes. If changes cross the "reasonable return" line, that is if they deprive investors of a reasonable return, the State conduct transgresses the standards contained in Article 10(1) of the ECT.[1200]

902.  Since this analysis requires assessing the actual performance of the Claimants' PV Plants under the New Regime, the Tribunal will address this issue as part of the discussion on quantum at Section VIII.A.2 below.

d.    **The alleged retroactivity (or the "claw back" effect) of the New Regime**

903.  There is an additional aspect the Tribunal has to address here as part of its liability analysis, i.e., the so-called alleged "claw back" effect of the New Regime. As explained

---

[1198] See sections III.B.3-III.B.5 above.

[1199] See, paragraph 207 above.

[1200] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 638.

above, the claw-back effect consists in discounting the past remuneration received by the PV installations that was in excess of the reasonable rate of return in the period since their commissioning until July 2013 against the periodically defined rate of return (i.e., 7.398%) to which the installations have become entitled under the New Regime.[1201]

904. The Tribunal cannot agree with the Respondent, who based on decisions by the Spanish Constitutional Court,[1202] argues that this element of the New Regime is not unlawfully retroactive and that it applies "to future facts in relation to legal situations in progress" without affecting rights already acquired.[1203] Under RD 661/2007 and RD 1578/2008, there was an unlimited possibility to earn returns that could have been in excess of the reasonable rate of return (whether the rate of 7% guaranteed under Law 54/1997 or the 7.398% defined under the New Regime). There were no limitations on the amount of energy that could be produced and sold by the PV installations.[1204] On the contrary, the regime implemented via RD 661/2007 and RD 1578/2008 incentivized production: "the more electricity is produced, the higher the remuneration" – as it was on several occasions emphasized by the Claimants and their experts.[1205]

905. Furthermore, the Tribunal is not convinced that the jurisprudence relied upon by the Respondent in support of its position regarding retroactivity, such as *Nations Energy v. Panama* is directly applicable to the case at hand.[1206] As observed by the *BayWa v. Spain* tribunal, *Nations Energy v. Panama* "concerned a situation remote from the present one: it involved an expropriation claim under a BIT, not a claim to breach of the legal stability

---

[1201] Claimants' Memorial, paras. 223, 225 and 349; First KPMG Report, paras. 295-302; Respondent's Counter-Memorial, paras. 951 and 1099-1112; Claimants' Reply, para. 342; Second KPMG Report, paras. 180-185; Respondent's Rejoinder, paras. 1029-1032; Claimants' Post-Hearing Brief, para. 59; Respondent's Post-Hearing Brief, paras. 115-116; Claimants' Second Post-Hearing Brief, para. 39; Respondent's Second Post-Hearing Brief, para. 35.

[1202] See paragraph 512 above.

[1203] Respondent's Post-Hearing Brief, para. 114.

[1204] *See* RD 661/2007, 25 May 2007 (C-54)/(R-49), Article 17.

[1205] Memorial, paras. 78, 109; Reply, paras. 71-72. *See also* First KPMG Report, paras. 47, 195 and KPMG Asesores, S.L., Rebuttal Regulatory Expert Witness Report, 12 July 2018 ("Second KPMG Report"), paras. 103, 121 and 167.

[1206] Counter-Memorial, paras. 1102-1103, *referring to Nations Energy v. Panama*, Award, 24 November 2010 (RL-26), paras 642, 644, 646.

guarantee in Article 10 of the ECT."[1207] Nevertheless, even if this Tribunal did apply the approach of the *Nations Energy v. Panama* tribunal, the outcome would not necessarily be favorable to the Respondent. The *Nations Energy v. Panama* tribunal considered that the disputed legislation in that case would have had retroactive effects if it, *inter alia*, had reintroduced the tax deductions previously granted in the form of income tax.[1208] In the Tribunal's view, this situation may indeed be seen as analogous to the present case where future entitlements to subsidies are determined – and decreased – by reference to subsidies that exceeded the statutorily defined rate of return in the past, but that were nevertheless lawfully granted and paid.[1209]

906.   The Tribunal thus agrees with the *BayWa v. Spain* tribunal that taking the investors' past returns for the purposes of calculating the amount of subsidies under the New Regime would amount to penalizing them for the successful operation of the plants before the adoption of the New Regime:

> […] the subsidies paid in earlier years were duly paid and duly taken into account in the operation of the SPVs, in their financing and (presumably) their taxation arrangements. To claw back those profits on the basis of a subsequent judgment that they were 'excessive' was inconsistent with the principle of stability in Article 10.1 of the ECT and has not been shown to have been necessary to resolve the tariff deficit problem, which would have been solved in any event by the Disputed Measures without much further delay and without the element of claw-back of payments earlier lawfully made. It may have been reasonable to take into account, in calculating subsidies going forward, the 7,398% that the Plants were deemed to be entitled to under the Disputed Measures. To count against them the amounts previously earned in excess of that threshold was to penalise the Plants for their successful operation during those years.[1210]

---

[1207] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 492.

[1208] *Nations Energy v. Panama*, Award, 24 November 2010 (RL-26), para. 647.

[1209] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 492.

[1210] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 496. *See also RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 330.

907. For these reasons, the Tribunal finds that, as a matter of principle, this "claw back" operation of the New Regime amounts to a violation of Article 10(1) of the ECT. As discussed below, no specific quantification in this respect has been submitted by the Claimants.[1211]

e.   **The impact of the 2017 EC State Aid Decision**

908. As mentioned above (paragraph 515), in November 2017, the European Commission issued its 2017 EC State Aid Decision containing a number of findings in respect of the Spanish RE incentive schemes. Specifically, the 2017 EC State Aid Decision characterized the New Regime as State aid under Article 107(1) of the TFEU. Since Spain notified the Commission of the New Regime only after its implementation, the Commission found Spain to be in breach of its stand-still obligation under Article 108(3) of the TFEU. At the same time, the Commission found that the incentives accorded by the New Regime and the Special Regime were not as such incompatible with the internal market.

909. The Commission also opined on whether the incentives provided by Spain to its RE investors created any legitimate expectations on their part. In the EC's view, The Commission recalled that "there is 'no right to State aid' [a] Member State may always decide not to grant an aid, or to put an end to an aid scheme."[1212] The Commission further explained as follows:

> In the very specific situation of the present case, where a Member State grants State aid to investors, without respecting the notification and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded. That is because according to the case-law of the Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.[1213]
>
> […]

---

[1211] Save to the extent that Prof. Spiller quantifies "claw-back payments" that he notes were "implemented requiring power plants or Spain, as applicable, to return the difference between the payments actually received in the Interim Period and the payments that the power plants would have received under the June 2014 Order." First Compass Lexecon Report, para. 28 and Exhibits CLEX-1 (tab 9) and CLEX-331 (tab 9). See also, FN526 above.

[1212] 2017 EC State Aid Decision (RL-57), paras. 155, 156 (footnotes omitted).

[1213] 2017 EC State Aid Decision (RL-57), paras. 157, 158.

[N]o investor could have, as a matter of fact, a legitimate expectation stemming from illegal State aid. This has been expressly recognised by Arbitration Tribunals. It is in any event settled case-law that a measure that does not violate domestic provisions on legitimate expectation generally does not violate the fair and equitable treatment provision.[1214]

910. The Parties disagree on the impact of EU law and the 2017 EC State Aid Decision on the resolution of the present dispute.

### i. The Claimants

911. The Claimants argue that the 2017 EC State Aid Decision has no impact on the existence of their legitimate expectations for the following reasons: (i) the Decision was issued in 2017, whereas the Claimants' expectations were shaped in 2005-2009; (ii) the Decision gives assessment of the New Regime, not RD 661/2007 or RD 1578/2008;[1215] (iii) the applicable law in this arbitration is in any event international law, in particular, the ECT;[1216] (iv) moreover, Spain led investors to believe that RD 661/2007 and RD 1578/2008 were not only compliant with EU law but implemented pursuant to EU law.[1217]

912. Furthermore, the Claimants argue that Spain was not required to notify the FiT scheme as at the time of its implementations FiTs were not considered as State aid under EU law.[1218] The Claimants note that the Respondent itself has pointed out that the characterization of FiTs was only clarified on 22 October 2014 when the CJEU issued its preliminary ruling in *Elcogás S.A. v. Administración del Estado, Iberdrola S.A.*[1219] The Claimants submit that Spain's failure to notify the FiT scheme to the commission cannot have any impact on their expectations as ex-post interpretations, according to the

---

[1214] 2017 EC State Aid Decision (RL-57), para. 164.

[1215] Reply, paras. 204-213; Claimant's Post-Hearing Brief, para. 74. The Claimants emphasize that the Decision expressly states: "it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not."

[1216] Claimants' Post-Hearing Brief, para. 76.

[1217] Claimants' Post-Hearing Brief, para. 82.

[1218] Reply, para. 212; Claimants' Post-Hearing Brief, paras. 84-86, *referring to* CJEU, Case C-379/98 *PreussenElektra AG v. Schleswag*, Judgment, 13 March 2001 (CL-145); EC State Aid Scoreboard 2016, Results, trends and observations regarding EU 28 State Aid expenditure reports for 2015, 16 November 2016 (C-185); Claimants' Reply Post-Hearing Brief, paras. 20-21.

[1219] The Claimants refer to para. 930 of the Counter-Memorial, *referring to* CJEU, Case C-275/13, *Elcogás S.A. v. Administración del Estado, Iberdrola S.A.*, Order, 22 October 2014 (RL-52).

Respondent's own argument, do not define ex-ante expectations and, according to *Micula v. Romania*, "[i]nvestors are entitled to believe that the government is acting legally."[1220] Finally, the Claimants argue that Spain should not be allowed to benefit from its own wrongdoing – i.e., from its own failure to notify the incentive scheme to the EC.[1221]

### ii. The Respondent

913. The Respondent relies on the 2017 EC State Aid Decision to argue that there is "no right to State Aid" and that a non-notified support scheme cannot create any legitimate expectations as to its immutability.[1222] According to the Respondent, the State always maintains the power to change or to adjust a support scheme.[1223] Thus, no investor can have an expectation that a specific amount of State aid including the remuneration under the Special Regime, could remain unchanged.[1224] The Respondent contends that the 2017 EC State Aid Decision takes into account payments under RD 661/2007 and RD 1578/2008 and thus it is equally relevant for the assessment of the Claimants' expectations under said Decrees.[1225]

### iii. The Tribunal's analysis

914. From the outset, the Tribunal must recall its earlier finding (see paragraphs 525-528 above) that EU law may be either taken into account as a fact (if the relevant provision of EU law is accepted as being part of the national law of the Member States) or applied as international law (if the relevant rule belongs to the international legal order). Therefore, the Claimants' argument that EU law, including the 2017 EC State Aid Decision, is irrelevant for these proceedings initiated under the ECT[1226] must be rejected.

---

[1220] Claimants' Post-Hearing Brief, paras. 88-90, *referring to* Hearing Tr., Day 2, 19 March 2019, 8:11-20 (Elena Abad) *and to Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-44), para. 706.

[1221] Claimants' Post-Hearing Brief, para. 91.

[1222] Counter-Memorial, para. 292, *referring to* the 2017 EC State Aid Decision (RL-57), para. 155; Respondent's Post-Hearing Brief, paras. 40-48.

[1223] Hearing Tr., Day 1, 18 March 2019, 228:1-8 (Fröhlingsdorf Nicolás); Respondent's Post-Hearing Brief, paras. 40-48.

[1224] Counter-Memorial, para. 300.

[1225] Respondent's Second Post-Hearing Brief, paras. 23-24.

[1226] Claimants' Post-Hearing Brief, para. 76.

915.  The content of the 2017 EC State Aid Decision is recapitulated at paragraphs 494-502 above. As it follows from this Decision, the Special Regime, including the RDs on which the Claimants allegedly relied when making their investment constituted unnotified State aid and thus could not, according to the Commission, give rise to legitimate expectations.[1227] At the same time, the Tribunal deems it important to emphasize that the 2017 EC State Aid Decision did not make a finding on whether the Special Regime (including RD 436/2004, RD 661/2007, or RD 1578/2008) was (despite lack of notification) compatible with the EU State aid rules.[1228] Instead, the Commission provided its assessment of the compatibility of the New Regime, i.e., the Disputed Measures in this arbitration, with 2017 EC State Aid Decision and concluded that "the aid does not exceed what is required to recover the initial investment costs and the relevant operational costs, plus a margin of reasonable return, based on the past and estimated costs and market prices."[1229] The Commission ultimately decided not to raise objections to the aid scheme envisaged by the New Regime on the grounds that it was compatible with the internal market pursuant to Article 107(3)(c) of the TFEU.[1230] Therefore, the Tribunal's finding that the Claimants' only expectation was the expectation to a reasonable return is not necessarily inconsistent with the 2017 EC State Aid Decision, which appears to have endorsed Spain's current support scheme as long as the guaranteed returns remain within the range of reasonableness.

916.  The Tribunal further notes the following statement of the Commission regarding arbitral awards rendered against Spain in connection with the adoption of the New Regime:

> […] any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the [Special Regime] by the [New Regime] would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission. If they

---

[1227] 2017 EC State Aid Decision (RL-57), paras. 157, 158. *See also BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 591(b).

[1228] *See also AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 635; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 569.

[1229] 2017 EC State Aid Decision (RL-57), para. 120.

[1230] 2017 EC State Aid Decision (RL-57), p. 33.

award compensation, such as in *Eiser v. Spain*, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.[1231]

917.  The Tribunal agrees with the award rendered in *The PV Investors v. Spain*, which concluded in this respect that the Commission's statement appears to have been premised on the possibility of awarding compensation along the lines of the investors' primary claim based on the immutability of the FiT scheme.[1232] Given that this Tribunal has already rejected the Claimants' primary claim and that the Commission's decision does not suggest that maintaining the reasonable return would result in granting incompatible State aid, the Tribunal concludes that it does not need to address any further the consequences of a potential award in the Claimants' favor. In any event, the Tribunal recalls that the present dispute must be resolved first and foremost pursuant to the ECT.

## 2.    Whether the Disputed Measures were unreasonable or disproportionate

### a.    The Parties' positions on the law

918.  The Parties seem to be in agreement that a measure is reasonable if it "bears a reasonable relationship to some rational policy."[1233] Referring to *Micula v. Romania*, the Claimants further add that the measure must be "appropriately tailored to the pursuit of [the] rational policy with due regard for the consequences imposed on investors."[1234]

919.  As regards proportionality, the Respondent argues that a measure is proportionate if "it takes into account all the interests involved in a balanced way."[1235] According to the

---

[1231] 2017 EC State Aid Decision (RL-57), paras. 164-165.

[1232] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), paras. 636-637.

[1233] *Saluka B. V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006 (RL-76), para. 460; Hearing Tr., Day 2, 19 March 2019, 33 :18-25 (Elena Abad); Memorial, para. 399.

[1234] Memorial, para. 399, *referring to Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-44), para. 525.

[1235] Hearing Tr., Day 2, 19 March 2019, 33:18-25 (Elena Abad); *Saluka B. V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006 (RL-76), para. 309; *Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Final Award 8 July 2016 (RL-83), paras. 322, 424; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award 8 October 2009 (RL-24), para. 219; *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (RL-117), para. 361; *Electrabel S.A. v. The*

Claimants, proportionality requires "a reasonable relationship between the burden imposed on the foreign investor and the aim sought to be realized by the State measure."[1236]

b.  **The Parties' positions on the facts**

i.  *The Claimants*

920.  The need to tackle the Tariff Deficit cannot, in the Claimants' view, justify the reasonable character of the Disputed Measures as the existence of the Deficit is attributable to the Respondent who "has consistently failed to raise regulated tariffs to the level necessary to cover the costs of the Electricity System."[1237] Moreover, the Claimants contend that the Tariff Deficit emerged before the development of the PV sector which made only a limited contribution to the Deficit.[1238] According to the Claimants, the return guaranteed by the FiT-based incentive scheme was reasonable, and there was no evidence of any over-remuneration of PV investors.[1239]

921.  The Claimants further argue that there is no reasonable relationship between the burden imposed on them by the Disputed Measures and their objective to address the Tariff Deficit.[1240] In this connection, the Claimants submit that: (i) the FiT for PV installations played only a limited role in the accumulation of the Deficit;[1241]and (ii) less intrusive measures could have been used to achieve the pursued goal.[1242] The Claimants emphasize that in March 2012 the CNE itself proposed various alternatives that would have reduced the Tariff Deficit and included "a tax on the sale of petrol and gas, a tax on CO2 emissions,

---

*Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RL-31), paras. 179, 180.

[1236] Memorial, para. 405, *referring to Técnicas Medioambientales Tecmed S. A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 (CL-82), para. 122; and *Case concerning the Gabcikovo-Nagymaros Project (Hungary v. Slovakia)*, ICJ Rep. 1997, Judgment, 25 September 1997 (CL-17), para. 85.

[1237] Memorial, paras. 402-404; Hearing Tr., Day 1, 18 March 2019, 27: 4-11 (Stoyanov). *See also* Claimants' Closing Statement, slides 65-66, 71-74.

[1238] Memorial, paras. 403-404, *referring to* First KPMG Report, para. 246.

[1239] Hearing Tr., Day 5, 22 March 2019, 49:17-18 (Stoyanov).

[1240] Memorial, paras. 405-410; Reply, paras. 386-389.

[1241] Reply, para. 406.

[1242] Memorial, para. 408, *referring to* First KPMG Report, paras. 249-251 and Table 4; Reply, para. 387; Hearing Tr., Day 3, 20 March 2019, 4:7-12 (Solé).

and FiT profiling."[1243] However, according to the Claimants, "the Government chose to ignore" [1244] the CNE's proposals. Thus, the Disputed Measures failed to meet the requirement of proportionality.

922. The "claw back" effect (see paragraphs 491-492 above) is another element of the New Regime, which, in the Claimants' view, is unreasonable and disproportionate.[1245]

## ii. *The Respondent*

923. The Respondent argues that the Disputed Measures complied with the requirements of reasonableness and proportionality in view of the following circumstances:

> [...] (1) the existence of an international economic crisis that led to a reduction in electricity demand; (2) the rise in consumer tariffs, (3) the existence of excess remuneration in the RE sector and (4) the existence of expectations of growth of the tariff deficit. All of these circumstances involved the economic non-sustainability of the [Spanish Electricity System].[1246]

924. The Respondent further states that "[t]he need to protect both consumers, already affected by increases in their electricity bills, and the very sustainability of the [Spanish Electricity System] compelled" Spain to adopt, *inter alia*, the Disputed Measures.[1247] The Respondent notes that the reasonableness of the Disputed Measures was confirmed by the *Charanne v. Spain* and *Isolux v. Spain* tribunals.[1248]

925. The Respondent contends that the Disputed Measures were proportionate as RE producers were enabled to recover their CAPEX and OPEX and achieve reasonable profitability.[1249] The Respondent also emphasized that it is inappropriate to analyze the

---

[1243] CNE, Report on the Spanish Energy Sector, 7 March 2012 (C-196), p. 76.

[1244] Memorial, para. 408; Reply, para. 388, *referring to* El País, "Soria reprimands the National Energy Commission for the report on the tariff deficit", *El País*, 9 March 2012 (C-229).

[1245] Claimants' Post-Hearing Brief, para. 66.

[1246] Counter-Memorial, para. 1132.

[1247] Counter-Memorial, para. 1154.

[1248] Rejoinder, paras. 1295-1297, *referring to Charanne BV y Construction Investment S.A.R.L. v. Kingdom of Spain,* Arbitration SSCC V 062/2012, Final Award de 21 January 2016 (RL-32)*,* paras. 536; *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-6), para. 823.

[1249] Counter-Memorial, paras. 1163-1164; Rejoinder, para. 1316; Hearing Tr., Day 2, 19 March 2019, 37:16-38:13 (Elena Abad); Day 5, 22 March 2019, 104:14-106:10 (Fröhlingsdorf Nicolás).

alternative solutions proposed by the Claimants as the Tribunal should not "*second-guess*" the legislative policy measures of the Respondent.[1250]

c. **The Tribunal's analysis**

926. From the outset, the Tribunal deems it necessary to make the following observations in relation to the Claimants' argument that Spain cannot invoke the necessity defence under customary international law in order to justify the Disputed Measures.[1251] Firstly, as confirmed by the Respondent's counsel at the Hearing, Spain is not pleading necessity as a circumstance precluding wrongfulness in these proceedings.[1252]

927. Secondly, the Tribunal is of the view that the question of whether the Disputed Measures were necessary, reasonable and proportionate is in any event different from the question of whether there was a state of necessity (which, as recalled above, is not being invoked by Spain).[1253] Therefore, the Tribunal does not need to analyze whether the requirements for invoking necessity under international law were met in the present case.

928. As regards the factual circumstances surrounding the adoption of the Disputed Measures, the Tribunal recalls that the changes to the Special Regime under which the Claimants invested were made in the aftermath of the global financial crisis of 2008. By 2009, Spain's GDP had become negative, which, in turn, led to a decrease in the demand for electricity.[1254] The imbalance between the income and the costs of the SES resulted in a significant increase of the Tariff Deficit.[1255] Therefore, the Tribunal finds it rather uncontroversial that at the time Spain's SES and the economy as a whole had been facing serious problems that called for immediate action. The Tribunal also emphasizes that the

---

[1250] Rejoinder, para. 1318; Hearing Tr., Day 5, 22 March 2019, 105:18-106:10 (Fröhlingsdorf Nicolás).

[1251] Reply, paras. 406-411.

[1252] *See* Hearing Tr., Day 2, 19 March 2019, 45:3-8 (Elena Abad).

[1253] *See also RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, para. 561.

[1254] Counter-Memorial, para. 685, *referring to* Ministry of Industry, Tourism and Trade, Regulatory impact report on draft RDL 14/2010 "establishing urgent measures for correction of the tariff deficit in the electricity sector", 27 December 2010 (R-88); Rejoinder, paras. 753-754, *referring to* 'The Spanish Electricity System' (2015), available at:
https://www.ree.es/sites/default/files/downloadable/the_spanish_electricity_system_2015.pdf.

[1255] *See* para. 295 above. *See also* Rejoinder, para. 758.

ultimate reform implemented by Spain to tackle the Tariff Deficit and other related problems appears to have been an attempt to find a middle ground solution, which would, *inter alia*, allow the investors to maintain a reasonable return.[1256]

929. Although, as noted by the Claimants,[1257] different options were available to Spain, it is not for this Tribunal to judge which of these options was the most appropriate one to pursue. Indeed, the Tribunal agrees with the case law which pays considerable deference to the exercise of regulatory jurisdiction in matters of public interests, which includes national economic regulation.[1258] As it was observed by the *Antaris v. Czech Republic* tribunal and subsequently cited with approval in *BayWa v. Spain*:

> The host State is not required to elevate the interests of the investor above all other considerations, and the application of the FET standard allows for a balancing or weighing exercise by the State and the determination of a breach of the FET standard must be made in the light of the high measure of deference which international law generally extends to the right of national authorities to regulate matters within their own border.[1259]

930. The *RREEF v. Spain* tribunal similarly held:

> […] the Respondent enjoys a margin of appreciation in conducting its economic policy; therefore, it will not substitute its own views either on the appropriateness of the measures at stake or on the characterization of the situation which prompted them; in particular, the Tribunal will abstain to take any position on the issue of the existence of other or more appropriate possible measures to face this situation.[1260]

---

[1256] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 628.

[1257] *See* para. 796 above.

[1258] *Saluka Investments BV (The Netherlands) v. The Czech Republic*, PCA Case No. 2001-04, Partial Award, 17 March 2006, para. 262.

[1259] *Antaris Solar GmbH and Dr. Michael Göde v. The Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-98), para. 360; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (CL-125), para. 459.

[1260] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 468, *cited with approval by AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 626.

931. Bearing these considerations in mind, the Tribunal will proceed to analyze the Claimants' claims of the alleged unreasonableness and disproportionality of the Respondent's Disputed Measures.

932. The Tribunal notes that the Claimants' allegations regarding the unreasonableness and disproportionality of the Disputed Measures are partially based on the assumption that the RD 661/2007 and RD 1578/2008 regimes would not be altered in significant respect. For instance, the Claimants assert that Spain's "dismantling of the entire legal and business framework applicable to the Claimants' investments is <u>contrary to the expectations of the Claimants</u> and, indeed, of any reasonable person" and "[i]t was thus unreasonable <u>to strip the Claimants of the key guarantees</u> upon which their investments were based."[1261]

933. Given that the Tribunal has already considered (and, by majority, dismissed) the Claimants' claims regarding the immutability of the FiTs they had enjoyed under the Special Regime under which their investments were made (see paragraphs 816-874 above), this aspect of the alleged unreasonableness or disproportionality of the Disputed Measures need not be addressed any further. Thus, the Tribunal dismisses the allegation that the abolition of RD 661/2007 and RD 1578/2008 and other regulations forming part of the Special Regime was in itself unreasonable or disproportionate.

934. In order to assess the overall proportionality and reasonableness of the Disputed Measures, the Tribunal needs to verify that there is "an appropriate correlation between the policy sought by the State and the measure"[1262]; that a reasonable correlation also exists "between the burden imposed on the foreign investor and the aim sought to be realized by the State measure."[1263] Such a verification, in view of the Tribunal's earlier finding that, in addition to the expectation that previously received subsidies would not be "clawed back", the only legitimate expectation the Claimants could have had was that

---

[1261] Memorial, para. 401 (emphases added).

[1262] *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 (RL-5), para. 180; Hearing Tr., Day 2, 19 March 2019, 33:18-25 (Elena Abad); Memorial, para. 399. *See also AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 626.

[1263] Memorial, para. 405, *referring to Técnicas Medioambientales Tecmed S. A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 (CL-82), para. 122; and *Case concerning the Gabcikovo-Nagymaros Project (Hungary v. Slovakia)*, ICJ Rep. 1997, Judgment, 25 September 1997 (CL-17), para. 85.

of a reasonable return, ultimately depends on the assessment of the economic impact of the Disputed Measures on the Claimants' investments. Indeed, if the Disputed Measures ensure that the reasonable profitability is achieved by the Claimants' PV Plants, there will be no finding of either unreasonableness or disproportionality of the Respondent's Disputed Measures (see Section VIII.A. below).[1264]

935.  Therefore, the Tribunal reserves its further decision on the Claimants' claim regarding the alleged unreasonableness or disproportionality of the Disputed Measures under Article 10(1) of the ECT.

## 3.    Whether Spain breached the guarantee of transparency

### a.    The Parties' positions on the law

#### i.  The Claimants

936.  The Claimants argue that under the FET standard, the State's conduct towards investors as well as its "legal environment" must be transparent, i.e., "free from ambiguity and uncertainty."[1265] The Claimants rely, *inter alia*, on *Electrabel v. Hungary* where the tribunal stated as follows:

> The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations.[1266]

---

[1264] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 472; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, para. 599; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 503.

[1265] Memorial, para. 393.

[1266] *Electrabel S.A. v. The Republic of Hungary, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability*, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-33), para. 7.79.

### ii.    The Respondent

937.    The Respondent argues that transparency is not an autonomous obligation[1267] and that it cannot be interpreted as a "perfection" standard.[1268] Relying on *AES Summit v. Hungary*, the Respondent submits that there can only be a breach of the transparency standard if "State's acts or procedures, procedural omissions, have been manifestly unfair or unreasonable."[1269] The Respondent also refers to the same finding of the *Electrabel v. Hungary* tribunal referred to by the Claimants stating that the State must be forthcoming with information about intended changes.[1270]

### b.    The Parties' positions on the facts

### i.    The Claimants

938.    The Claimants argue: (i) the Respondent needlessly implemented some of the Disputed Measures in the form of Royal Decree-Laws which deprived "stakeholders of the possibility to influence or challenge the measures";[1271] (ii) after the adoption of RDL 9/2013 the Claimants were "left completely in the dark" for 11 months in respect of the applicable parameters of the New Regime.[1272] This period, according to the Claimants, demonstrates that there was no "extraordinary and urgent need" and hence no need to use the form of a Royal Decree-Law.[1273]

939.    The Claimants further argue that the New Regime is in itself opaque and unpredictable.[1274] The Claimants point out the lack of transparency regarding the calculation of the incentives under the New Regime (e.g., it is unclear how the spread of

---

[1267] *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (RL-95), paras. 646, 657.

[1268] Hearing Tr., Day 2, 19 March 2019, 31:13-24 (Elena Abad), *referring AES Summit Generation Limited and AES-Tisza Erömü Kft. v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (RL-25), para. 9.3.40.

[1269] Hearing Tr., Day 2, 19 March 2019, 31:13-24 (Elena Abad).

[1270] Respondent's Opening Statement on the Merits, slide 35.

[1271] The Claimants explain that Royal Decree Laws have the same rank as parliamentary acts but unlike Royal Decrees are "enacted without prior consultation" and cannot be challenged by the affected persons before the Spanish Courts. *See* Reply, para. 362.

[1272] Memorial, para. 398 (a)-(b); Reply, paras. 362-371.

[1273] Reply, para. 362, *referring to* Constitution of Spain, 27 December 1978 (C-16), section 86.

[1274] Memorial, para. 398 (c)-(f).

300 base points was calculated in 2014; it is unclear how it will be calculated today).[1275] The Claimants also criticize the New Regime, *inter alia*, for empowering the Respondent to change the remuneration parameters through the 3-year and 6-year regulatory reviews.[1276] Specifically, the Claimants denounce the absence of a predictable methodology for conducting such reviews.[1277]

### ii.    The Respondent

940.   The Respondent argues that it followed the legally established procedures without incurring undue delays and by ensuring participation of the stakeholders.[1278] For example, before RDL 9/2013 was enacted, a public consultation had been held in February 2012 with 477 submissions of national and international stakeholders.[1279] The Respondent also sought comments on draft RD 413/2014 in July-December 2013 before its enactment.[1280]

### c.    The Tribunal's analysis

941.   The Tribunal notes that the Claimants' arguments regarding the alleged lack of transparency pertain not only to the manner in which the Disputed Measures were adopted, but also to the content of the guarantees under the New Regime.[1281] As regards the content of the guarantees, the Tribunal has already found that the Claimants' legitimate expectations would be infringed and the measures unreasonable and disproportionate if the New Regime failed to maintain the reasonable return guaranteed under Law 54/1997.[1282]

---

[1275] Hearing Tr., Day 1, 18 March 2019, 118:17-124:12 (Stoyanov).

[1276] Memorial, para. 398.

[1277] Memorial, para. 398, *referring to* First KPMG Report, paras. 322-326; Reply, para. 372, *referring to* Second KPMG Report, para. 191.

[1278] Counter-Memorial, para. 1118; Rejoinder, para. 1274; Hearing Tr., Day 2, 19 March 2019, 31:25-32:22 (Elena Abad); Respondent's Post-Hearing Brief, para. 122.

[1279] Respondent's Opening Statement on the Merits, slide 36; Copy of the certificate of the Agreement of the Inter ministerial Commission of Article 16 of RD 437/2010 at the session held on 26 November 2012 (R-150). *See also* CNE, Report, 7 March 2012 (R-82).

[1280] Hearing Tr., Day 2, 19 March 2019, 32:9-15 (Elena Abad); Respondent's Opening Statement on the Merits, slide 36; AEE, Submissions regarding Draft RD 413/2014 presented before the CNE, 1 August 2013 (R-117); Spanish Photovoltaic Union UNEF, Submissions against RD 413/2014 before the CNE, 30 July 2013 (R-127); APPA, Submissions regarding draft RD 413/2014 before the CNMC, 30 July 2013 (R-131).

[1281] Memorial, para. 398(b)-(e); Reply, paras. 372-377.

[1282] *See* paras. 926-934 above.

942. As regards the manner in which the New Regime was adopted, in the Tribunal's view, by majority, the record does not show a lack of transparency in Spain's conduct either. Quite the contrary, the parameters of the New Regime had been discussed by various stakeholders before the enactment of both RDL 9/2013 and RD 413/2014 as well as subsequent regulations.[1283] Therefore, it cannot be held that Spain was not "forthcoming with information about intended changes."[1284]

943. Consequently, the Tribunal, by majority, rejects the Claimants' claim regarding the breach of the transparency guarantee under Article 10(1) of the ECT.[1285]

---

[1283] *See* Information about the public consultation on adjustment measures in the energy sector on 2 February 2012 and 9 March 2012, published at: www.cne.es (R-146); E-mail from Protermosolar to CNE 10 February 2012 (R-275); Protermosolar, Submissions to the Public Consultation at the CNE, 10 February 2012 (R-121); CNE, Report, 7 March 2012 (R-82); AEE, Submissions from to the CNE during hearing proceedings with the Electricity Advisory Board concerning the Draft RD that regulates and modifies certain aspects relating to the special regimen, 30 August 2009 (R-116); AEE, Submissions regarding Draft RD 413/2014 presented before the CNE, 1 August 2013 (R-117); AEE, Submissions regarding Draft RD 413/2014 presented before the CNMC, 11 December 2013 (R-118); AEE, Submissions regarding Order ITE/1045/2014 presented before the CNMC, 28 February 2014 (R-119); AEE, Submissions regarding draft Order ITE/1045/2014 presented before the Council of State, 26 May 2014 (R-120); Protermosolar, Submissions regarding Draft RD 413/2014, presented before the CNMC, 11 December 2013 (R-122); Protermosolar, Submissions regarding Draft RD 413/2014, presented before the Council of State, 27 May 2014 (R-123); Protermosolar, Submissions against Ministerial Order OIET 1045/2014 presented before the National Competition Commission (CNMC), 25 February 2014 (R-124); Protermosolar, Submissions against Ministerial Order OIET 1045/2014 presented before the Council of State, 27 May 2014 (R-125); Spanish Photovoltaic Union UNEF, Submissions against RD 413/2014 before the CNE, 30 July 2013 (R-127); Spanish Photovoltaic Union UNEF, Submissions against RD 413/2014 before the CNMC, 11 December 2013 (R-128); Spanish Photovoltaic Union (UNEF), Submissions regarding the Draft Ministerial Order OIET 1045/2014 before the CNMC, 25 February 2014 (R-129); Submissions of the Spanish Photovoltaic Union (UNEF) regarding the Draft Ministerial Order OIET 1045/2014 before the Council of State, 26 May 2014 (R-130); APPA, Submissions regarding draft RD 413/2014 before the CNMC, 3 March 2014 (R-132); APPA, Submissions regarding draft Order IET/1045/2014 presented to the CNMC, 30 July 2013 (R-131); APPA, Submissions regarding draft Order IET/1045/2014 presented to the Council of State, 29 May 2014 (R-133).

[1284] *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-33), para. 7.79, *referred to* by the Claimants at para. 394 of the Memorial.

[1285] The breach of the transparency guarantees was also dismissed by the following similarly situated tribunals: *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 632; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 416; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, para. 325; *Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 315.

4.    **Whether the Disputed Measures violated the ECT's "Umbrella Clause"**

a.    **The Parties' positions on the law**

i.  *The Claimants*

944.    The Claimants argue that Article 10(1) of the ECT covers both contractual and legislative or regulatory undertakings.[1286]

945.    In support of their interpretation of said provision, the Claimants rely, *inter alia*, on *Khan Resources v. Mongolia* where the tribunal confirmed the applicability of the umbrella clause to obligations that Mongolia had under its foreign investment law.[1287] The Claimants also refer to *SGS v. Philippines* where the tribunal found that Article X(2) of the Swiss-Philippines BIT (which is similar to Article 10(1) of the ECT) was "not limited to contractual obligations."[1288]

ii. *The Respondent*

946.    The Respondent argues that Article 10(1) of the ECT only applies to obligations deriving either from a bilateral arrangement between an investor and a State or a unilateral act specifically aimed at that investor or its investment.[1289] In support of its position, the Respondent refers to a number of arbitral awards including, *inter alia*, *Noble Ventures v. Romania* where the tribunal concluded, in a non-ECT context, that "the notion 'entered into' indicates that specific commitments are referred to and not general commitments, for example, by way of legislative acts." [1290]

---

[1286] Memorial, paras. 416-422; Reply, paras. 391-400; Hearing Tr., Day 1, 18 March 2019, 125:2-17 (Stoyanov).

[1287] Reply, para. 393, *referring to Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v. The Government of Mongolia*, UNCITRAL, Decision on Jurisdiction, 25 July 2012 (CL-136), para. 438: "Given the ordinary meaning of the term 'any' obligation in Article 10(1) […] it follows that a breach by Mongolia of any obligations it May have under the Foreign Investment Law would constitute a breach of the provisions of Part III of the Treaty."

[1288] Reply, para. 397.

[1289] Rejoinder, para. 1345; Hearing Tr., Day 2, 19 March 2019, 40:10-25 (Elena Abad).

[1290] *Noble Ventures, Inc v. Romania*, ICSID Case No. ARB/01/11, Award 12 October 2005 (RL-21), para. 51. The Respondent also refers to *SGS v. Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004 (RL-20), para. 166; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award 27 December 2016 (RL-58); *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the Ad Hoc Committee on the Application for Annulment of the Argentine Republic, 25 September 2007 (RL-23), para. 90.

947.  The Respondent emphasizes that the above analysis was supported in the *Isolux v. Spain* award that dismissed the claim brought under the final sentence of Article 10(1) of the ECT on the grounds that the applicable provisions of the Spanish legislative framework were not specifically aimed at foreign investors but applied to both domestic investors and those of another Contracting Party to the ECT.[1291]

### b.  The Parties' positions on the facts

### i.  The Claimants

948.  The Claimants argue that the "umbrella clause" applies to the commitments assumed by Spain under RD 661/2007 and RD 1578/2008.[1292] Those commitments, according to the Claimants, were also reflected in the RAIPRE certificates issued for each of the plants.[1293] The Disputed Measures, in the Claimants view, violated the Respondent's commitments under the Special Regime and thus breached the last sentence of Article 10(1) of the ECT.

### ii.  The Respondent

949.  The Respondent argues that RD 661/2007 and RD 1578/2008 were addressed to "the public in general, not to promote specifically foreign investments."[1294] Therefore, the final sentence of Article 10(1) of the ECT does not cover these Decrees. [1295]

950.  The Respondent further submits that the registration of the PV plants in the RAIPRE is a mere administrative requirement which does not create specific obligations towards the Claimants.[1296] The Respondent emphasizes that by 2016 the Register contained more than 64,000 facilities owned by over 44,600 owners.[1297]

---

[1291] Rejoinder, para. 1347, *referring to Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (RL-70), paras. 767-771.

[1292] Memorial, para. 423; Reply, para. 390; Hearing Tr., Day 1, 18 March 2019, 125:1-16 (Stoyanov).

[1293] Reply, para. 390; Hearing Tr., Day 1, 18 March 2019, 125:1-16.

[1294] Counter-Memorial, paras. 1201-1213; Rejoinder, paras. 1348-1366; Hearing Tr., Day 2, 19 March 2019, 41:4-14 (Elena Abad).

[1295] Rejoinder, paras. 1348-1366.

[1296] Rejoinder, paras. 1362-1368; Hearing Tr., Day 2, 19 March 2019, 41:4-14 (Elena Abad).

[1297] Rejoinder, para. 1367.

c.    **The Tribunal's analysis**

951.  The final sentence of Article 10(1) of the ECT provides as follows:

> "[e]ach Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."

952.  The Tribunal, by majority, agrees with the Respondent's interpretation of this provision. Indeed, as it was persuasively explained by the *BayWa v. Spain* tribunal:

> "[w]hen enacting legislation, the State establishes binding rules of conduct, but it does not make specific promises to each person entitled to claim under the law, nor does it enter into obligations to specific investors or their investments even when these entities are numbered among the beneficiaries of the law. <u>A general law is not a promise</u>.[1298]

953.  Therefore, legislative and regulatory acts addressed to a plurality of persons do not fall within the ambit of the final sentence of Article 10(1) of the ECT.

954.  The Claimants' assertion that under international law unilateral declarations of States may have the effect of creating legal obligations,[1299] does not change the above conclusion. Indeed, unlike the domestic legislative and regulatory measures of the Respondent addressed in this Decision, the unilateral acts discussed in the jurisprudence of the International Court of Justice referred to by the Claimants[1300] operate on the international plane. The facts of these cases bear no resemblance to the present dispute. Furthermore, in its Guiding Principles applicable to unilateral declarations of States capable of creating

---

[1298] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), paras. 442-446 (emphasis added). *See also Stadtwerke München GmbH and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (RL-127), para. 384; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (CL-187), para. 452; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), para. 342; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-144), para. 715; *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018, para. 413; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, para. 679.

[1299] Reply, para. 394.

[1300] Reply, para. 394, *referring to Nuclear Tests (Australia v. France)*, ICJ Rep 1974, Judgment, 20 December 1974 (CL-61), para. 43, p. 267; *Case concerning the Temple of Preah Vihear (Cambodia v. Thailand)*, ICJ Rep 1961, Preliminary Objections, Judgment, 26 May 1961, p. 17 (CL-18); *Case Concerning the Frontier Dispute (Burkina Faso v. Republic of Mali)*, ICJ Rep 1986, Judgment, 22 December 1986, p. 554 (CL-16).

legal obligations, the International Law Commission (the "**ILC**") defines unilateral unilateral acts *stricto sensu* as "those taking the form of formal declarations formulated by a State <u>with the intent to produce obligations under international law</u>."[1301] In this regard, the *BayWa v. Spain* tribunal observed as follows:

> Neither the [ILC Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations] nor the commentaries allude to the possibility of characterizing domestic laws as binding unilateral acts. In the ordinary course of events, a domestic law providing for subsidies for renewable energy generation is no more made 'on the international plane' or 'with the intent to produce obligations under international laws' than a law on any other subject.[1302]

955.  Therefore, absent any evidence that the regulatory framework discussed in this Decision was adopted with the intent to produce obligations under international law and given that RDs 436/2004, 661/2007 and 1578/2008 did not distinguish between foreign and domestic investors, the Claimants' position cannot be supported.

956.  The Tribunal, by majority, is equally unpersuaded that the registration of the Claimants' plants with the RAIPRE can be considered as creating any "obligations [Spain] has entered into with" the Claimants within the meaning of the final sentence of Article 10(1) of the ECT, as the Claimants do not seem to be arguing that the RAIPRE certificates conferred any additional rights besides those provided in RD 661/2007 and RD 1578/2008.[1303] Furthermore, this Tribunal has already decided (see paragraphs 858-859 above) that registration with the RAIPRE was a mere administrative requirement that it did not generate vested rights for registered PV investors.[1304]

---

[1301] ILC, Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations (2006) UN Document A/CN.4/L.703 (emphasis added).

[1302] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), paras. 449.

[1303] Memorial, para. 106; Reply, paras. 93-98.

[1304] *See also Charanne B.V. and Construction Investments S.A.R.L. v. Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016 (RL-32), para. 510; *Foresight Luxembourg Solar 1 S.À.R.L., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 (CL-164), para. 413; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, para. 679; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-184), para. 346; *Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019 (CL-185), para. 585.

957.  As explained in 2010 by the Spanish Council of State:

> In essence, <u>neither the resolution of registration in the Special Regime Register, nor the actual act of registration imply a declaration of the right to receive the premiums</u>. Therefore, the right to a certain regime of premiums depends on compliance with the corresponding requirements and conditions, including, as indicated in the report of the National Energy Commission and in the report on regulatory impact, that of having the necessary equipment for the production of electrical energy on the corresponding date.[1305]

958.  For these reasons, the Tribunal, by majority, rejects the Claimants' "umbrella clause" claim under the final sentence of Article 10(1) of the ECT.

## VIII.  ASSESSMENT OF THE ECONOMIC IMPACT OF THE DISPUTED MEASURES ON THE CLAIMANTS' INVESTMENTS AND QUANTUM OF DAMAGES

### A.  Assessment of the economic impact of the Disputed Measures on the Claimants' investments

959.  In accordance with its earlier conclusion that the assessment of the lawfulness of the Disputed Measures under the ECT depends on whether the New Regime maintains a reasonable return (see paragraphs 877, 934 above), the Tribunal will now turn to the assessment of the economic impact of the Disputed Measures on the Claimants' PV Plants.

### 1.  The Parties' positions[1306]

### a.  Respondent

960.  Econ One argues that in order to assess the economic impact of the Disputed Measures on the Claimants' investments, it is necessary to determine whether the Claimants' internal rate of return (the "**IRR**") after the enactment of the Disputed Measures is lower than the reasonable return for renewable energy projects in Spain.[1307]

---

[1305] Opinion 1155/2010 of the Council of State, 22 July 2010 (R-295) (emphasis added).

[1306] This Section starts with the summary of the Respondent's position because the calculation of the Claimants' internal rate of return was first submitted into the record by the Respondent, to which the Claimants' expert, Professor Pablo Spiller from Compass Lexecon, responded together with the Claimants' Reply.

[1307] First Econ One Report, para. 19.

i.    *The reasonable rate of return*

961.  According to Econ One, the reasonable rate of return for RE projects in Spain "has been around 7% since the early 2000s."[1308] In support of its conclusion, Econ One relies on the following publicly available sources:[1309]

**Table 5**
**Summary of Market References and Benchmarks for**
**Reasonable Rates of Return in Renewable Energy**[188]

| Date (1) | Description (2) | Reference Rate of Return (3) |
|---|---|---|
| December 1999 | Spanish 2000 Renewable Energy Promotion Plan | 7% |
| August 2005 | Spanish 2005-2010 Renewable Energy Promotion Plan | 7% |
| October 2007 - October 2009 | Spanish Electricity Market Operator, OMEL, Presentation to APEX (Association of Power Exchanges) Conference | Average 7% |
| March 2009 | Statement from a member of the German Bundestag | 5-7% |
| May 2011 | Deutsche Bank - German Feed in Tariff for PV (Solar) | 5-7% |
| October 2012 | Heinrich Böll Foundation - "Energy Transition" Report on Germany | 5-7% |
| June 2013 | Renewables International Magazine - Onshore wind in Germany | 5-7% |

962.  Econ One also emphasizes in its Report that the average rate of 7% is consistent with reasonable rates of return in other countries.[1310] For example, as reported by *Renewables International*, the return on investment for onshore wind and PV installations Germany is calculated at 5-7%.[1311] Econ One notes in this connection that "the reasonable rate of return is not a static figure, but a dynamic one that can change over time."[1312]

---

[1308] Second Report of Econ One Research, Inc., prepared by Dr. Daniel Flores, 18 September 2018 ("Second Econ One Report"), paras. 100-114; First Econ One Report, paras. 128-139.
[1309] First Econ One Report, Table 5.
[1310] First Econ One Report, paras. 132-134.
[1311] First Econ One Report, para. 132.
[1312] First Econ One Report, para. 135.

963.  The Respondent further submits that it "does have a principled objection" against the use of the weighted average cost of capital (the "**WACC**") as a benchmark for the reasonable return as proposed by the Claimants.[1313] In any event, in respect of Compass Lexecon's use of the average WACC in 2007-2010 to calculate the reasonable rate of return, Econ One argues that Compass Lexecon relied on data not specific to the RE industry in Spain.[1314] Moreover, according to Econ One, "the average WACC calculated by [Compass Lexecon] is skewed by the WACC from 2007", if the WACC from 2007 is excluded "the average [WACC] would be about 7%", which is consistent with the Respondent's assumption.[1315]

### ii.    The IRR

964.  In order to calculate the Claimants' IRR, Econ One uses typical installed costs of PV plants "based on publicly available sources, to estimate the initial investment costs of the [Claimants' PV plants]."[1316] According to Econ One, this approach is consistent with the objectives of the State support scheme: "[i]f a subsidy was established to give a reasonable 7% rate of return on actual initial investment costs, regardless of whether those costs were efficient or inefficient, that would give an incentive to build installations at inflated costs, since that would result in higher remuneration."[1317]

965.  Econ One argues that the Claimants' actual initial investment as well as historical operating costs are significantly higher than those of typical PV plants.[1318] In particular, regarding the initial investment costs, Econ One notes that the financial statements used by Compass Lexecon (EUR 56.6 million) are not reflective of the Claimants' construction costs.[1319] Rather, these costs reflect the price that the Spanish Project Companies paid to Cross Retail, a related entity, and that these costs do not capture "the costs expected from a true arm's length transaction between two unrelated

---

[1313] Respondent's Post-Hearing Brief, para. 158.

[1314] Second Econ One Report, para. 112. *See also* Respondent's Post-Hearing Brief, para. 158.

[1315] Second Econ One Report, para. 113.

[1316] Second Econ One Report, para. 12(iv); First Econ One Report, paras. 93-99.

[1317] First Econ One Report, para. 142. *See also* Hearing Tr., Day 4, 21 March 2019, 30:1-31:25 (Flores).

[1318] First Econ One Report, paras. 13-17; Second Econ One Report, paras. 12-13.

[1319] First Econ One Report, para. 71.

parties."[1320] In addition, Econ One concludes that construction delays experienced by the Claimants increased the initial investment costs.[1321]

966. Econ One also submits that the Claimants' documents indicate that "the initial investment costs of the PV Plants include brownfield premiums."[1322] Brownfield investments, as explained by Econ One, "are investments that are either nearly or completely developed and operational."[1323] Thus, "[b]rownfield costs can also include payments to the developers of a project before it actually becomes operational."[1324] Econ One also notes that brownfield costs "can be significantly different from greenfield costs due to the lower risk implied in the operational phase of the project" and that "[a]n investor can pay significant premiums compared to the greenfield investment costs."[1325]

967. Therefore, according to Econ One, brownfield premiums should be excluded from the analysis of reasonable profitability,[1326] as the inclusion of brownfield costs would incentivize investors to inflate their initial investment costs.[1327]

968. Econ One further argues that the Claimants' operating costs (operations and management fees, general administration fees, insurance and land fees) were also abnormally high.[1328] Thus, throughout its calculations Econ One uses the prices for operation and managements services as re-negotiated in 2015 and 2017, as in Econ One's view, there is no reason to believe that the same prices were not available earlier.[1329]

969. At the Hearing Econ One also suggested that the Claimants "overpaid for the [PV] plants" due to lack of prior experience in the industry.[1330]

---

[1320] Second Econ One Report, para. 12(i); First Econ One Report, para. 75.
[1321] Second Econ One Report, para. 12(ii).
[1322] Second Econ One Report, para. 55; First Econ One Report, paras. 86-90.
[1323] First Econ One Report, para. 83.
[1324] First Econ One Report, para. 83.
[1325] First Econ One Report, para. 83.
[1326] Second Econ One Report, para. 56; First Econ One Report, paras. 87-90.
[1327] Second Econ One Report, para. 57.
[1328] First Econ One Report, paras. 100-108.
[1329] First Econ One Report, para. 108; Second Compass Lexecon Report, para. 13(i).
[1330] Hearing Tr., Day 4, 21 March 2019, 25:1-8 (Flores).

970.  Thus, the initial investment costs applied by Econ One for its IRR calculation are set at EUR 43.8 million.[1331]

971.  Furthermore, Econ One argues that its calculation of an "exit" rate of return using an enterprise value at a given valuation date is more appropriate than the Claimants' "holding" rate of return "because it represents the return under the scenario of a hypothetical buyer acquiring the PV Plants as of the valuation date, which is consistent with the approach used by Compass Lexecon to calculate damages in this case."[1332] Econ One also notes that the "holding" IRR "ignores all valuation dates and assumes a stream of cash flows until the end of the useful life of the PV Plants."[1333]

972.  Based on the above assumptions, Econ One then concludes that the Claimants' IRR was 11.6% post-tax as at 20 June 2014.[1334] Thus, according to the Respondent's expert, the Disputed Measures did not have any negative economic impact on the Claimants' PV plants.

b.  **Claimants**

973.  The Claimants' three criticisms of Respondent's calculations of the Reasonable and Internal Rates of Return were succinctly formulated by Professor Spiller from Compass Lexecon at the Hearing:

> My last point on Dr. Flores [from Econ One] is the IRR analysis [...] I have three issues. Dr Flores uses the IRR to check whether the actual returns are consistent with a benchmark return of 7% that he computes. There are three problems with his IRR test: first of all, <u>he has the wrong investment cost;</u> <u>second, he has the wrong methodology to compute the IRR; and third, he has</u> <u>the incorrect benchmark</u>.[1335]

---

[1331] First Econ One Report, para. 144; Second Econ One Report, para. 123. *See also* Hearing Tr., Day 4, 21 March 2019, 242:12-14 (Flores).

[1332] Second Econ One Report, paras. 119-120.

[1333] Second Econ One Report, paras. 119-120.

[1334] Second Econ One Report, para. 15.

[1335] As Professor Spiller from Compass Lexecon observed at Hearing Tr., Day 3, 20 March 2019, 146:7-14 (Spiller) (emphasis added).

### i.    *The reasonable rate of return*

974.  Compass Lexecon submits that Econ One uses an incorrect average benchmark of 7%.[1336] Compass Lexecon observes that Econ One's analysis does not differentiate between returns of different types of technologies and wrongly refers to reasonable rates in Germany, as the risk of investing in Germany is lower than the risk of investing in Spain.[1337]

975.  According to Compass Lexecon, the minimum reasonable return should be calculated by reference to the average WACC for a renewable energy project in Spain:[1338]

> Corporate finance theory states that an investment only makes economic sense if the expected return is greater than or equal to the rate of return required by the investor (known as the hurdle rate). It follows that the return that would be deemed reasonable by an investor would be the hurdle rate. […] As Damodaran notes, "the cost of capital is the minimum acceptable hurdle rate that will be used to determine whether to invest in a project." Consequently, the minimum reasonable return would be the cost of capital for a renewable energy investment in Spain, or WACC.[1339]

976.  Compass Lexecon states that the average WACC for renewable energy investments in Spain in 2007-2010 was 8.01% post-tax.[1340] Contrary to the Respondent, the Claimants argue that there is no basis to exclude the 2007 WACC, as the Mahora plant was built in 2007.[1341]

---

[1336] Second Compass Lexecon Report, paras. 140-144.

[1337] Second Compass Lexecon Report, para. 119.

[1338] Second Compass Lexecon Report, para. 141.

[1339] Second Compass Lexecon Report, para. 141.

[1340] Second Compass Lexecon Report, para. 141.

[1341] Claimants' Reply Post-Hearing Brief, para. 64.

### ii.    The IRR

977.    Compass Lexecon criticizes Econ One's IRR calculation methodology for using an "exit" IRR, which assumes that the investor would exit the project as at the valuation date (June 2014) rather than operate it until the end of its useful life.[1342] In Compass Lexecon's view, this is inconsistent with the concept of reasonable rate of return that represents long-term returns.[1343] According to Compass Lexecon, an "operational" (rather than "exit") IRR should be preferred, as it "represents the return from operating the plants until the end of their useful life."[1344] In support of its position, Compass Lexecon refers, *inter alia*, to the EU Communication "On the application of the European Union State aid rules to compensation granted for the provisions of services of general economic interest" where the rate of return is defined as "the Internal Rate of Return (IRR) that the undertaking makes on its invested capital over the lifetime of the project."[1345]

978.    Compass Lexecon also criticizes the use of "reasonable" investment costs by Econ One in their IRR calculations instead of the actual investment costs of EUR 56.6 million incurred by the Claimants.[1346] As regards the criticism regarding the inclusion of the brownfield costs in the Claimants' initial investment costs, Compass Lexecon observes that Econ One "ignores the fundamental fact that greenfield projects are subject to substantially more risk than brownfield projects, such as construction risk", "[t]herefore, if the Spanish regulation were to only target greenfield investments, it should incorporate in the allowed rate of return the additional construction risk inherent to greenfield projects — which the regulation does not do."[1347]

979.    Compass Lexecon's criticism is essentially two-fold. First, Compass Lexecon argues that Econ One's reasonable costs are below and thus contradicted by the standard investment

---

[1342] Second Compass Lexecon Report, para. 135.

[1343] Second Compass Lexecon Report, para. 136; Hearing Tr., Day 3, 20 March 2019, 149:1-150:4 (Spiller).

[1344] Second Compass Lexecon Report, para. 136.

[1345] Hearing Tr., Day 3, 20 March 2019, 149:1-150:4 (Spiller); Communication from the Commission on the application of the European Union State aid rules to compensation granted for the provision of services of general economic interest (2012/C 8/02), 11 January 2012 note 3 (RL-81).

[1346] Second Compass Lexecon Report, paras. 123-134; Hearing Tr., Day 3, 20 March 2019, 146:15-148:25 (Spiller); Claimants' Post-Hearing Brief, para. 176. *See* Exhibit CLEX-1, Tab 10 "Depreciation."

[1347] Second Compass Lexecon Report, para. 131.

costs set by Spain in the 2014 June Order.[1348] Second, Professor Spiller also argues that the renewable energy projects used by Econ One are not comparable to the Claimants' PV Plants:[1349]

> Of the [29] sources cited [by Econ One] there are 17 based on projects outside of Spain and cannot be compared to the Claimants' Plants in Spain, as recognized by Spain's IDAE cited by Econ One, stating that "[d]uring the completion of the report, it was found that there may be differences with the costs to which the modules can be obtained in other countries." This is also highlighted by IRENA, indicating that "[t]he total installed cost of PV systems can vary widely within individual countries, and between countries and regions. These variations reflect the maturity of domestic markets, local labour and manufacturing costs, incentive levels and structures, and a range of other factors."
>
> 13 of the sources are based on estimates of a "model" PV plant and do not reflect actual cost like the Claimants' Plants incurred.
>
> 19 of the sources do not specify the technology, fixed or axis, of the PV project being reviewed.
>
> 7 of the sources relate to small scale projects that are not comparable to the Claimants' Plants.
>
> Only one of the sources is for the actual cost of a utility scale PV project in Spain that can be compared to the Claimants' Plants. However, this source is for plants constructed in 2011, after the Claimants' Plants had been constructed.[1350]

980. Compass Lexecon further adds that in any case Econ One did not provide any concrete evidence that the Claimants' transactions were not reflective of arm's length transactions; Econ One equally did not provide an independent benchmark that would represent an arm's length transaction cost for a PV plant in Spain.[1351]

981. The Claimants' operational IRR, calculated based on their actual investments costs is set out in the below table:[1352]

---

[1348] Second Compass Lexecon Report, paras. 125-126, Figure 3. Order IET/1045/2014 (C-125/R-64).
[1349] Second Compass Lexecon Report, para. 127.
[1350] Second Compass Lexecon Report, para. 127. Footnotes omitted.
[1351] Second Compass Lexecon Report, para. 130.
[1352] Second Compass Lexecon Report, paras. 135-139; Compass Lexecon Errata, para. 7.

**Table 5. Updated Tables 1 and 9 of Second Expert Report – Claimants' Plants' IRRs after Correction with Actual Claimants' Plants' Costs**

| | Exit IRR (20-Jun-2014 expectations) | | Operational IRR (20-Jun-2014 expectations) | Operational IRR (31-May-2018 expectations) |
|---|---|---|---|---|
| | With Econ One's hypothetical costs | With Claimants' actual costs | With Claimants' actual costs | With Claimants' actual costs |
| Actual | 11.85% | 5.15% | 5.44% | 4.75% |
| But For | 16.82% | 10.29% | 7.79% | 7.96% |

*Source: Amended June 2014 IRR Calculations (CLEX-334.1) and Amended May 2018 IRR Calculations (CLEX-334.2).*

## 2.    The Tribunal's analysis

982.    In order to decide whether the New Regime maintains a reasonable return, the Tribunal needs to perform the following analysis: (a) first, it must identify the benchmark – the reasonable rate of return to which the Claimants were entitled; (b) second, it must determine the internal (actual) rate of the investors' PV installations – the IRR; and (c) third, the Tribunal needs to compare the Claimants' IRR with the reasonable rate of return. If the IRR is below the reasonable rate of return, there will be a finding of liability because the Disputed Measures will be considered as having violated Claimants' legitimate expectations and as imposing a disproportionate burden on the Claimants.

### a.    Reasonable rate of return

983.    By way of introduction, the Tribunal recapitulates the Parties' positions regarding the reasonable rate of return.[1353] According to the Respondent, the reasonable rate of return for RE projects in Spain was around 7% from the beginning of the 2000s, whereas according to the Claimants the reasonable rate of return at the time when they made their investments was 8.01%.[1354] The Parties disagree not only on the specific figure, but also on the methodology for calculating the reasonable rate of return. The Respondent refers to a number of publicly available sources providing for rates of return in the range of 5-

---

[1353] *See also* paras. 961-963 and 974-976 above.

[1354] *See* paras. 961-963 and 974-976 above. At paragraph 190 of the Reply, the Claimants also stated that "the relevant rate of reasonable return for the purposes of assessing [their] expectations would be at least 7.2% post tax".

7%, whereas the Claimants calculate the reasonable return by reference to the average WACC for renewable energy projects in Spain in 2007-2010.

984. In the Tribunal's view, it would be more appropriate to set the relevant benchmark for measuring any alleged harm caused to the Claimants by the Disputed Measures based on the analysis of the laws and regulations as well as other contemporaneous documents that were publicly available during the Claimants' investment process (February 2005 – November 2009[1355]) and should have been informing their decision-making process. This is especially so, as in the present case (unlike in *RREEF v. Spain* where both parties seem to have calculated the WACC for such purposes[1356]) the Respondent has submitted a principled objection against the use of the WACC as a benchmark.[1357]

985. First of all, the Tribunal recalls that the 2000-2010 PER was based on the assumption of a minimum return of 7% after taxes:

> Profitability of the type project: calculated on the basis of maintaining an Internal Rate of Return (IRR) […] a minimum of 7%, with own resources, before financing and after taxes. [1358]

986. Similarly, the 2005-2010 PER listed a return on a standard project "calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in legal tender and for each standard project, <u>around 7%</u>, on equity (before financing) and after taxes."[1359] Commenting on this source at the Hearing, Professor Spiller from Compass Lexecon noted that it seemed reasonable to him.[1360]

---

[1355] *See* paras. 805-815 above.

[1356] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 574.

[1357] Respondent's Post-Hearing Brief, para. 158.

[1358] 2000-2010 Plan for the Promotion of Renewable Energies in Spain, 19 December 1999 (R-67), p. 182 (Tribunal's translation).

[1359] 2005-2010 Renewable Energy Promotion Plan, August 2005 (R-69)/(C-32 [SP]), pp. 274-274 (emphasis added).

[1360] Hearing Tr., Day 3, 20 March 2019, 152:6-7 (Spiller: "The second one is the [PER] 2005-2010: that seems reasonable").

987. The *Memoria Económica* issued by the Ministry of Industry, Trade and Tourism on 21 March 2007 in preparation of the future RD 661/2007 referenced the following rates of return:

> The regulated tariff has been calculated in order to guarantee a return <u>of 7-8% depending on the technology</u>. The premiums have been calculated by following the criteria found in Royal Decree, i.e., the premium has been calculated as the difference between the regulated tariff and the average futures market price for these technologies.
>
> […]
>
> 3.2.1. Solar Photovoltaic Sector
>
> A new definition of power is drafted in Article 3 in terms of the applicable economic regime in order to avoid inefficient configurations due to the large number of transformers.
>
> The payment for the regulated tariff is increased for 100 kW to 10 MW and is maintained with the rest in order to adequately reflect the costs of these facilities.
>
> The market option is not considered for these facilities.
>
> The payment corresponding to the solar photovoltaic sector is found in Table 3, Sub-Group b.1.1.
>
> For facilities of up to 10 MW, these values of the regulated tariff provide a reasonable IRR over 25 years of approximately 7%.
>
> An IRR lower than 7% is considered within the power rating greater than 10 MW. Photovoltaic facilities of this size are not typical, and if there were, they would not respond solely to criteria on returns.
>
> The power targets considered to date were increased, establishing 371 MW as the reference installed power target with right to payment for photovoltaic plants.[1361]

988. In its press-release announcing the adoption of RD 661/2007 the Ministry of Industry, Energy and Tourism made the following statement regarding profitability rates guaranteed to PV installations: "[h]igh power photovoltaic facilities will practically

---

[1361] Ministry of Industry, Tourism, and Commerce, Report on the draft of the Royal Decree whereby electricity production under the special regime and for certain facilities with similar technologies under the ordinary regime is regulated, 21 March 2007 (C-163), pp. 13, 16 (emphasis added).

double their remuneration, whereas that of smaller plants shall remain the same, with a guaranteed profitability of 7%."[1362]

989. In its report 3/2007 (addressing the Initial Draft RD 661/2007) the CNE also mentioned that the rate "proposed by the Ministry" was of 7%.[1363] The Claimants refer to this CNE Report 3/2007 in support of their claim that the guaranteed reasonable return was above 7%.[1364] Specifically, the Claimants refer to the following table[1365]:

| TECHNOLOGY | REMUNERATION WITHOUT SUPPLEMENTS | DRAFT RD | | NEC PROPOSAL | |
|---|---|---|---|---|---|
| | | €c/kWh | IRR | €c/kWh | IRR |
| Fixed photovoltaic < 100 kW (32 facilities) | Tariff (1 -25 years) | 44.04 | 7.6% | 44.92 | 7.9% |
| Photovoltaic segment < 100 kW (53 facilities) | Tariff (1 -25 years) | 44.04 | 8.0% | 44.92 | 8.2% |

990. The Tribunal notes that these rates of return were calculated by the CNE on the basis of actual data received from 85 facilities for the purposes of demonstrating the level of profitability that such PV installations would reach with the tariffs proposed under draft Royal Decree.[1366] Thus, these figures are not meant to embody a promise or projection of

---

[1362] Ministry of Industry, Trade and Tourism, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power", 25 May 2003 (C-53), p. 1.

[1363] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 21.

[1364] *See,* for example, Claimants' Post-Hearing Brief, paras. 182-187.

[1365] Claimants' Post-Hearing Brief, paras. 182-187, *referring to* p. 53 of CNE Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51).

[1366] CNE, Report 3/2007 on the proposed Royal Decree regulating electric power generation under the Special Regime and specific technologies under the Ordinary Regime, 14 February 2007 (C-51), p. 52: "[a]ccording to Article 40 of Royal Decree 436/2004, the NEC should propose the economic incentives to be applied to facilities that start operation from 1 January 2008, and these should be calculated based on the actual costs of the facilities started-up from the entry into force of the Royal Decree. For these purposes, the NEC is authorised to collect this economic information, as published in Circular 3/2005. This Circular brings together the actual costs of the facilities started-up in the period between the years 2004, 2005 and the first half of 2006. Therefore, it is possible to calculate the average rate of return of the tariffs and the premiums contained in the proposed Royal Decree for more developed technologies during this period, such as wind energy, photovoltaic, hydropower, landfill biogas and small cogeneration with natural gas. As an element of contrast and analysis of the tariffs and premiums contained in proposed Royal Decree and also in compliance with the provisions of Article 40 of Royal Decree 436/2004, below we show the regulated tariffs that the NEC proposes to be applied to new facilities implemented from 1 January 2008 (once conveniently updated with the corresponding index). This proposal is compared with

a guaranteed rate of return. It seems that the only purpose of these calculations was to demonstrate how the new tariffs would affect the profitability of PV installations and in this respect, it is not necessarily surprising that the increase in FiTs would result in a higher internal rate of return. The Tribunal however has already decided, by majority, that the Claimants were not entitled to any fixed level of the FiT under RD 436/2004, RD 661/2007 or RD 1578/2008. Therefore, these CNE calculations cannot serve as benchmarks for the purposes of determining the reasonable rate of return referenced in Law 54/1997.

991. At the Hearing, Compass Lexecon also referred to a number of sources besides CNE Report 3/2007 that allegedly support the Claimants' contention that the guaranteed level of return was above 7% at the relevant times.[1367] In the Tribunal's view, the EC Commission's decision SA N414/2008-UK indicating a rate of 15% is not applicable to the present case, as it concerns the support system existing in the United Kingdom, which, as explained by Econ One, is quite different from the one that was set up by Spain.[1368] Another document from the CNE dated 2009 similarly to CNE Report 3/2007 seems to be setting out a calculation of rates of return based on a survey of existing facilities.[1369] The Tribunal, by majority, has already provided its explanation in the preceding paragraphs as to why such calculations cannot be taken into account for the purposes of establishing a guaranteed rate of return.

992. Finally, Compass Lexecon refers to four versions of IDAE's presentation "The Sun Can Be Yours". The Tribunal notes that the calculations of rates of return in these presentations depend on a number of variables, such as sources of financing of the project (whether, for example, bank financing is used or not) and on the types of technology used.

---

the tariffs contained in the proposed Royal Decree and the resulting profitability." *See* Rejoinder, paras. 936-956; Hearing Tr., Day 4, 21 March 2019, 16-17 (Flores).

[1367] Pablo T. Spiller, Direct Testimony on Quantum, 20 March 2019, slide 30, *referring to* European Commission, Decision SA N414/2008-UK, 2008 (C-170), Table 6 and para. 68; CNE, *Estudio Económico de las Energías Renovables*, 2009 (Exhibit CLEX-366), p. 49; IDAE, Presentation: "The Sun Can be yours" (Exhibit KPMG-6), p. 43; IDAE, Presentation: "The Sun Can be yours", February 2006 (C-227), p. 18; IDAE, Presentation: "The Sun Can be yours", November 2007 (C-167), p. 16; IDAE, Presentation: "The Sun Can be yours", February 2008 (C-69), p. 17; IDAE, Presentation: "The Sun Can be yours", November 2008 (C-74), p. 16.

[1368] Hearing Tr., Day 4, 21 March 2019, 19:1-25 (Flores).

[1369] CNE, *Estudio Económico de las Energías Renovables*, 2009 (CLEX-366), p. 49.

Moreover, it is noteworthy that these presentations are formulated in cautious terms, when discussing the reasonable return. For instance, the presentation dated 22 February 2006 states that the rate of profitability "occasionally may reach up to 9%".[1370] Therefore, the Tribunal is not convinced that IDAE's presentations accurately reflect the rate of return that was guaranteed to the investors under the Special Regime.

993.  In addition to the sources referred to in the preceding paragraphs, the 7% rate of return was also mentioned in the October 2005 ASIF Report concerning the development of the PV sector in Spain:

> It is considered fundamental to maintain RD 436/2004 in the coming years so that the economy that controls photovoltaic development in Spain is efficiently structured. This regulation provides a reasonable rate of return on investment for an average standard facility. This reasonable rate of return is considered to be ten years or, taking another investment analysis parameter and as pointed out by the Plan for Renewable Energies, having an internal rate of return on the own equity invested of between 5 and 7%.[1371]

994.  In the April 2010 APPA Report it was stated that the 7% rate of return was used in the jurisprudence of the Supreme Court to measure the reasonable profitability.[1372]

995.  In view of the available information, and although the reasonable rate of return has at times been characterized as a "dynamic" concept, the Tribunal, by majority, concludes that the Claimants could legitimately expect a reasonable rate of return for RE projects in Spain of 7% after taxes. The Tribunal's conclusion is comforted by the findings made in similar cases. For example, the tribunal in *The PV Investors v. Spain* concluded that the reasonable rate of return for photovoltaic plants in Spain was in the range of 7%.[1373] The *RWE v. Spain* tribunal found that a return figure of 7% post-tax has long been associated with the renewables regime in Spain.[1374] In *FREIF Eurowind v. Spain,* the tribunal

---

[1370] IDAE, Presentation: "The sun can be yours", 22 February 2006 (C-227) (emphasis added).

[1371] ASIF, Report: "Towards environmentally friendly electricity", October 2005 (R-246), p. 9 (emphasis added), *referred to* in Rejoinder, para. 406.

[1372] Suelo Solar, "APPA report. Retroactivity summary", 29 April 2010 (R-252), p. 6.

[1373] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 709.

[1374] *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019, para. 599(d).

similarly held that it saw "no difficulty with proceeding with 7% as the benchmark understood by FREIF when it invested."[1375]

b.   **The IRR**

996.   The Tribunal first observes that neither Party seems to have calculated an IRR separately for each PV Plant. Rather, both Parties' experts calculated a single IRR for all of the Claimants' plants. As summarised above, according to the Claimants, their IRR under the Disputed Measures is 5.44% as at 20 June 2014,[1376] whereas according to the Respondent, the Claimants' IRR is 11.6% as at the same date.[1377]

997.   The difference between the two figures provided by the Parties' experts is largely driven by their disagreement on: (i) whether the IRR should be calculated as an "operational" or "exit" rate and (ii) the investment costs to be assumed for the purposes of the calculation of the IRR.[1378]

998.   The Tribunal will address each of these parameters in turn, but before doing so, it must fix the date for performing the valuation of the Claimants' IRR. Since the goal of this analysis is to decide whether Spain ultimately breached its international obligations by changing its regulatory framework, the appropriate date should be set at 20 June 2014 – the date when the alleged breach was consummated by Order IET/1045/2014, according to the Claimants.[1379] The same date was also used by the Respondent to calculate the Claimants' IRR.[1380]

---

[1375] *FREIF Eurowind Holdings Ltd v. Kingdom of Spain*, SCC Case No. 2017/060, Final Award, 8 March 2021, para. 566.

[1376] Second Compass Lexecon Report, paras. 135-139; Compass Lexecon Errata, para. 7.

[1377] Second Econ One Report, para. 15.

[1378] Hearing Tr., Day 4, 21 March 2019, 242:5-244:10 (Flores/Spiller).

[1379] Hearing Tr., Day 1, 18 March 2019, 169:24-170:4 (Stoyanov: "The reason we have picked June 2014 is because that is when, as I said, the parameters of the new regime, which we say is the most outrageous of the measures that were taken, was implemented. So this is, as it were, when the final straw broke the camel's back."). *See also* Memorial, paras. 226, 461-462.

[1380] Counter-Memorial, para. 1250.

### i. *"Operational" or "Exit" IRR?*

999.  To recall, as explained by Compass Lexecon, the "exit" IRR calculated by Econ One is based on the assumption that the investor would sell the project at the valuation date, whereas the "operational" IRR assumes that the investors would operate the PV plants until the end of their useful life.[1381]

1000. In the Tribunal's view, it seems more appropriate for the purposes of the present analysis to calculate the so-called "operational" IRR, as it reflects the returns earned over the lifetime of the project. This Tribunal agrees with the *RREEF v. Spain* tribunal, which observed that "it is assumed that the profitability will be calculated during the whole life of the investment, that is the lifetime of the plant".[1382] In *The PV Investors v. Spain,* the tribunal similarly held that "for purposes of assessing the alleged harm to the Claimants' investments, it is logical to have regard to the IRR that an investor would receive throughout the entire regulatory lifetime of the plant", "[b]y contrast, the Tribunal sees little justification in assuming that an investor sells its investment at some point, effectively cashing out the estimated fair market value of the assets through the sale."[1383] Similar reasoning was also followed by tribunals in *Hydro v. Spain,*[1384] *BayWa v. Spain*[1385] and *Cavalum v. Spain.*[1386] Based on the foregoing, the Tribunal agrees with Compass Lexecon's approach on this count.

---

[1381] Second Compass Lexecon Report, para. 135.

[1382] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-122), para. 548.

[1383] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 714.

[1384] *Hydro Energy 1 S.à.r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on jurisdiction, liability and directions on quantum, 9 March 2020, paras. 748-752.

[1385] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), para. 505.

[1386] *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, para. 698(f).

ii.    *Investment costs*

1001. In the course of these proceedings three types of investment costs were addressed in the Parties' pleadings. First, the Claimants argued that the actual costs of EUR 56.6 million must be used for the purposes of calculating their actual IRR.[1387] Second, the Respondent argued that hypothetical "reasonable" costs of EUR 43.8 million must be used instead, as the regulatory framework guaranteed a return only on the costs that were reasonable.[1388] Third, Econ One also provided an additional calculation based on the standard facility installed costs (calculated on the basis of Order IET/1045/2014) of EUR 52.2 million. This last figure of EUR 52.2 million does not seem to be in dispute between the Parties' experts.[1389]

1002. Since the Tribunal's task at this stage is to assess the impact of the Disputed Measures on the Claimants' plants, the Tribunal would have been minded to use the Claimants' actual costs to the extent that such costs are within the range of market prices and actual construction costs. At the same time, there are certain indications on the record that suggest that the Claimants' costs might have been indeed above the average, reasonable costs.

1003. For example, as pointed out by Econ One, in December 2009 Ra Solar (owned by the Claimants) purchased the Matapozuelos PV plant from Cross Retail (also owned by the Claimants) for EUR 4,847,876,[1390] whereas the price of the EPC contract for this plant between Cross Retail and Enerpal was EUR 4,340,776 in September 2009.[1391] Thus, the declared purchase price for Matapozuelos incorporates an increase by EUR 507,099 that

---

[1387] Second Compass Lexecon Report, paras. 123-134; Hearing Tr., Day 3, 20 March 2019, 146:15-148:25 (Spiller); Claimants' Post-Hearing Brief, para. 176.

[1388] Second Econ One Report, para. 12(iv); First Econ One Report, para. 142. *See also* Hearing Tr., Day 4, 21 March 2019, 30:1-31:25 (Flores).

[1389] *See* Econ One's calculations at Tab "Figure 3 – CAPEX" in Exhibit EO-124, based on Table 4 of the First Compass Lexecon Report, p. 27. Professor Spiller from Compass Lexecon also mentioned the standard costs of EUR 52.2 million at the Hearing. *See* Hearing Tr., Day 4, 21 March 2019, 243:6-11 (Spiller: "So if you tell us what the investment cost is, if you think that what we did, which is to use the financial statements, is correct, or you think his is, <u>or the government own, which I believe is 52.2,</u> we can directly compute for you an operational IRR and give you the number.") (emphasis added).

[1390] First Econ One Report, para. 76; Matapozuelos Sale and Purchase Agreement, 18 December 2009 (C-150). *See also* Appendix 4 to the Memorial.

[1391] Matapozuelos EPC contract, 17 September 2009 (C-149). *See also* Appendix 4 to the Memorial.

occurred between September and December 2009. Similarly, the purchase price paid for the Fuentes de Año plant incorporates an increase by EUR 1.8 million.[1392] Furthermore, as noted by Econ One, Cross Retail sold Ronda PV and Villar de Cañas PV to individual project companies for EUR 10,691,460 and EUR 7,472,096, respectively.[1393] These amounts, rather than the turnkey project costs, are recorded as the initial capital expenses in the 2013 financial statements for each of the Spanish Project Companies. Econ One further explains in this respect:

> Related companies can be incentivized to overstate the value of their assets, as this may allow them to acquire more favorable third-party financing terms and higher loans. In addition, related companies may have an incentive to maximize their third-party debt in order to increase tax shields that may become available to the Project Companies.[1394]

1004. Moreover, as observed by Econ One, the initial book value reported in the 2013 financial statements that were used to assess the Claimants' initial investment costs "represents the price that the Spanish Project Companies paid to acquire the PV plants from Cross Retail, a related entity, and does not capture a true arm's length cost resulting from a transaction between two unrelated parties".[1395]

1005. Furthermore, Econ One refers to the following circumstances as demonstrating that the Claimants' initial investment costs included brownfield premiums:

> A draft of the 2012 Due Diligence Report for Matapozuelos PV by Gómez-Acebo & Pombo established that Gamesa was the original promoter of the project. As the original promoter, Gamesa acquired an "authorization for the exceptional use of rural land for the [Matapozuelos] photovoltaic installation" from the Regional Commission for Urban Development of Valladolid […]. Gamesa was also responsible for the construction, installation and works tax […] for the Matapozuelos installation and bore the cost of the Medium Tension Works installation for the project, before it was ever owned by Claimants. After these costs were incurred, Enerpal acquired the permits from Gamesa, presumably at a premium, and proceeded to develop the legal

---

[1392] Fuentes de Año EPC contract (C-151); Fuentes de Año sale and purchase agreements (C-151). *See also* Appendix 4 to the Memorial.

[1393] First Econ One Report, para. 77, *referring to* Ronda Sale and Purchase Agreements, 24 February 2009 (C−148.1 to C−148.14), p. 3 of PDF; Villar de Cañas Sale and Purchase Agreements, 24 February 2009 (C−146.1 to C−146.11), p. 3 of PDFs.

[1394] First Econ One Report, para. 77.

[1395] First Econ One Report, para. 75.

prerequisites for the facilities before the involvement of Claimants in the project.[1396]

The due diligence report further states that the "estimate for the execution of the PV Plants provided by Enerpal amounts to EUR 140,363.7 for each 100Kw, including the photovoltaic generator. For that reason, the estimate for the 925Kw, taking into account the PV modules, according to Enerpal, ascends to EUR 1,298,358.4." The final turnkey EPC price between Enerpal and Cross Retail, however, was EUR 4,340,776, that is, 234% higher than the original estimate provided by Enerpal.[1397]

[…]

Similarly, the Due Diligence Report for Fuentes de Año PV, prepared by Ramón & Cajal, states that the original promoter of that project was also Gamesa. Enerpal, the future EPC Contractor for the PV Plant, bought the rights to develop the project from Gamesa for an unknown amount in 2007. At that time, Gamesa had already acquired permits, such as the contract for the right to the surface of the land and the administrative authorization from the Fuentes de Año municipality. At the time of the due diligence report, Enerpal was the promoter and holder of the permits for the construction of the facility, and had already invested capital in the project, for which it sought compensation. Specifically, the due diligence report states that Enerpal "intends to go ahead with the sale of the Project" to another entity. As mentioned above, sales price includes premiums that compensate the promoters for their work in the first phase of project development. This raises the possibility that the reported costs of the EPC contract for the PV Plants do not measure a true greenfield cost.[1398]

1006. Notwithstanding these criticisms, Econ One was unable to provide an alternative calculation of the Claimants' actual initial investments because the expert did not have access to the entire cost information for the PV Plants,[1399] despite the fact that during the document production phase of this arbitration, the Claimants were ordered to produce "[d]etail on the historical capital expenditures breakdown for each of the five PV Plants and the 56 Spanish Project Companies including, but not limited to, the costs of the

---

[1396] First Econ One Report, para. 87 (footnotes omitted), *referring to* Gómez-Acebo & Pombo, Due Diligence Report issued in connection with the PV Plants called "Fuentes de Año" (Ávila) and "Matapozuelos" (Valladolid), 4 July 2012 (C-138); Due Diligence Report from Ramón y Cajal on Matapozuelos, "Report of legal revision in relation to the solar photovoltaic plant of 925 KW in the municipal term of Matapozuelos (Valladolid)", 23 February 2009 (C-79).

[1397] First Econ One Report, para. 88 (footnotes omitted), *referring to* Gómez-Acebo & Pombo, Due Diligence Report issued in connection with the PV Plants called "Fuentes de Año" (Ávila) and "Matapozuelos" (Valladolid), 4 July 2012 (C-138).

[1398] First Econ One Report, para. 90 (footnotes omitted), *referring to* Due Diligence Report from Ramón y Cajal on Fuentes de Año, "Report of legal revision in relation to the solar photovoltaic plant of 2,500 KW in the municipal term of Fuentes de Año (Avila)", November 2009 (C-88).

[1399] Second Econ One Report, paras. 35, 92.

photovoltaic modules, the installation costs, and any data and information regarding cost overruns and delays during the construction phase of the PV Plants."[1400] Econ One states that "in response to this request, [the] Claimants submitted limited new information about the PV Plants' historical capital expenditures" and that "[the] Claimants have not produced sufficient cost information that could be used to assess the reasonableness of the initial investment costs reported in the PV Plants' 2013 financial statements."[1401]

1007. In response, the Claimants argue that (i) their costs were generally in line with the standard costs set out by Spain under the New Regime; and (ii) "if the Spanish regulation were to only target greenfield investments, it should incorporate in the allowed rate of return the additional construction risk inherent to greenfield projects."[1402] Thus, the Claimants do not seem to be engaging directly with the specific criticisms made by Econ One regarding their initial investment costs. Rather, the Claimants' response is based on the assumption that they did not have any incentives to inflate the initial costs, as "a higher investment cost means lower profitability for the investors."[1403] Therefore, Compass Lexecon concludes that "investors had all the incentives to minimize investment expenses, for the same quality of infrastructure and construction risk".[1404]

1008. The Tribunal considers the Claimants' arguments insufficient to explain their failure to produce the documentary evidence requested by the Tribunal in the document production phase. This prevents the Tribunal from assessing with certainty the investment costs and, thus, the economic impact of the disputed measures on the investment.

1009. Notwithstanding the above, the Tribunal considers that its "duty is to make the best estimate that it can of the amount of the loss, on the basis of the available evidence"; "[t]hat must be done even if there is no absolute documentary proof of the precise amount lost."[1405]

---

[1400] *See* Respondent's request No. 32.

[1401] *See* Respondent's request No. 32.

[1402] Reply, para. 730; Second Compass Lexecon Report, paras. 131-132.

[1403] Second Compass Lexecon Report, para. 132.

[1404] Second Compass Lexecon Report, para. 132.

[1405] *Ioannis Kardassopoulos and Ron Fuchs v. Republic of Georgia*, ICSID Case Nos ARB/ 05/18 and ARB/07/15, Award, 3 March 2010, para. 594. Similarly, *Southern Pacific Properties (Middle East) Ltd v. Arab Republic of*

1010. Accordingly, the Tribunal finds that, as a matter of principle, the Claimants' initial "greenfield" costs must be considered for the purposes of calculating the IRR. This approach has also been upheld in *The PV Investors v. Spain* for the following reasons:

> The Tribunal considers that greenfield investment costs are the costs borne at the beginning of a project's lifecycle that are necessary to bring a plant into operation. This includes the engineering, procurement, and construction (EPC) costs associated with the photovoltaic modules and the civil works required to put them in place, the cost to connect the facility to the electricity grid, initial inventory required for normal operation, permitting and licensing fees. The Tribunal agrees with Spain that other costs that may be borne by investors are not strictly necessary for the operation of the plant. These include costs associated with debt financing, acquisition premiums paid to developers or for brownfield assets (investments that are either nearly or completely developed and operational).[1406]

1011. However, in the circumstances, the Tribunal deems it appropriate to use for the purposes of estimating the Claimants' initial investment costs the figure that seems to be accepted by both experts, namely EUR 52.2 million, which reflects the standard construction costs for the Claimants' PV Plants calculated pursuant to Order IET 1045/2014.

1012. In the absence of an alternative calculation of the Claimants' actual greenfield investment costs from the Respondent, the Tribunal believes that the standard installation costs provide the best benchmark for estimating the cost that the Claimants could have reasonably expected to recover. As acknowledged by Spain, the parameters that were taken into account for the purposes of calculating the initial investment costs under Order IET 1045/2014 were consistent with those that were taken into account when fixing the FiT rates under RD 661/2007.[1407] Spain also emphasizes that the parameters of Order IET 1045/2014 are consistent with the 2000-2010 PER and the 2005-2010 PER.[1408] The Tribunal also notes the Respondent's position on initial investment in *The PV Investors v. Spain*, where Spain argued that "the typical costs of the standard facilities included in

---

*Egypt*, ICSID Case No ARB/84/3, Award, 20 May 1992, para. 215; *Archer Daniels Midland Co and Tate & Lyle Ingredients Americas Inc v. United Mexican States*, ICSID Case No ARB(AF)/04/05, Decision on the Requests for Correction, Supplementary Decision and Interpretation, 10 July 2008, para. 38; *Antoine Goetz and Others and SA Affinage des Metaux v. Republic of Burundi*, ICSID Case No ARB/01/2, Award, 21 June 2012, para. 298.

[1406] *AES Solar and others (PV Investors) v. The Kingdom of Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 819

[1407] Rejoinder, paras. 896-897.

[1408] Rejoinder, para. 898.

the Parameters' [Order IET/1045/2014] are [...] <u>representative of the real costs in the market at the time of construction of the PV Plants</u>".[1409] Thus, the Tribunal concludes that EUR 52.2 million must be used as the appropriate estimate for the Claimants' initial investment costs for the purposes of the IRR analysis.

1013. Based on the foregoing, the Tribunal has resolved the two major areas of disagreement between the Parties regarding the calculation of the Claimants' IRR, deciding that (i) the "operational" IRR must be used and (ii) the Claimants' initial investment costs must be set at EUR 52.2 million.

1014. The Tribunal will now address some other areas of disagreement between the Parties that manifested themselves in the course of the discussion on quantum and that appear to be relevant for the analysis of the actual performance of the Claimants' PV Plants.[1410]

### iii.    Operating costs

1015. Respondent's expert, Econ One, argues that the historical operating and maintenance costs of the Claimants' PV Plants were "unreasonably high".[1411] Therefore, Econ One uses the operating costs as per the re-negotiated operating and maintenance agreements.[1412] The Claimants' expert, Compass Lexecon, denies using the re-negotiated operating and maintenance agreements in the but-for scenario, as the re-negotiation was the Claimants' response to the Disputed Measures.[1413]

1016. Since the Tribunal's task here is to assess the actual economic impact of the Disputed Measures on the Claimants' PV Plants, it seems appropriate to use the actual prices of the operating and maintenance agreements. Therefore, the adjustment that resulted from the re-negotiation must be applied.

---

[1409] *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 740 (emphasis added).
[1410] *See* Exhibit EO-124 Tab "Control Panel".
[1411] First Econ One Report, paras. 100-108; Second Econ One Report, paras. 68-79.
[1412] Second Econ One Report, para. 79.
[1413] Second Compass Lexecon Report, para. 56.

### iv.    *The tax effect of debt*

1017. The Tribunal notes that both experts seem to be in agreement that the tax effect of debt needs to be accounted for.[1414] The Tribunal thus directs the Parties and their experts to endeavor to agree on a joint approach to account for the tax effect of debt pursuant to the process outlined below at paragraphs 1019 and 1080.

### v.    *Revisions of the reasonable rate of return*

1018. Econ One assumed that no revision to the 7.398% rate of return guaranteed under the New Regime would take place in 2020,[1415] whereas Compass Lexecon's forecast was that the New Regime rate would be reduced to 6.79% in the course of the 2020 revision.[1416] The Tribunal observes that the information about the revision of the 7.398% rate of return is now publicly available. The Tribunal thus directs the Parties and their experts to take into account the actual revision of the targeted reasonable rate of return to the extent necessary to implement the process outlined below at paragraphs 1019 and 1080.

### c.    **Conclusion on the economic impact of the Disputed Measures on the Claimants' investments**

1019. In view of the foregoing, the Parties are directed to provide a joint calculation of the IRR of the Claimants' PV Plants (the "**Joint IRR Calculation**") that shall be based on the following parameters:

(i)    the Parties shall calculate an "operational" rather than an "exit" IRR, which will be reflective of the profitability of the plants calculated throughout their entire regulatory lifetime;

(ii)    the Parties shall assume the initial investment costs in the amount of EUR 52.2 million;

(iii)    the Parties shall use the re-negotiated operating and maintenance contracts for the purposes of calculating the Claimants' historical operating costs;

---

[1414] Second Compass Lexecon Report, para. 5; Second Econ One Report, paras. 174-181.
[1415] Second Econ One Report, para. 152.
[1416] Second Compass Lexecon Report, para. 46.

    (iv) the Parties shall endeavor to agree on a common approach to calculating the tax effect of debt; and

    (v) the Parties shall apply (to the extent necessary) the actual revision of the 7.398% rate of return.

1020. The Parties shall also attempt to agree on any other outstanding issues that may arise in the course of the preparation of the Joint IRR Calculation.

1021. Based on the Tribunal's conclusions in the preceding sections, the Tribunal, by majority, holds as follows:

    (i) In the event that the Joint IRR Calculation yields a rate of return equal or in excess of 7%, the Respondent will not have any obligation to compensate the Claimants for the effects of the New Regime on their investment, except for the "claw back" retroactive element of the New Regime (see paragraphs 903-907 above).

    (ii) As regards the "claw back" retroactive element of the New Regime, the Tribunal has not been presented with the requisite information allowing it to calculate the effect of the unlawful retroactive application of the Disputed Measures to the Claimants' investments. Therefore, the Parties are directed to endeavor to agree on the amount of compensation due to the retroactive element of the New Regime alone.

## B.    Income-based valuations of the Claimants' damages

### 1.    The Parties' positions

a.    **The Claimants**

1022. The Claimants request restitution of the regulatory framework that existed before the Disputed Measures. In the alternative, the Claimants request compensation for the decrease in fair market value ("**FMV**") of their investments caused by the Disputed Measures as per the standard of full reparation formulated by the PCIJ in the *Chorzów Factory* case.[1417] In order to calculate the amount of compensation due, the Claimants' quantum expert, Compass Lexecon implements the discounted cash flow ("**DCF**") approach and calculates the loss in value of the Claimants' investments at two different dates: 20 June 2014 (date of the alleged harm) and 31 May 2018 (used as a proxy for the date of the award). The Claimants submit that the latter date should be used as the valuation date. Compass Lexecon also performs an alternative valuation on the assumption that the Claimants were only entitled to a return that was considered reasonable at the time when the Special Regime was established. According to Compass Lexecon, the Claimants suffered losses under the alternative scenario as well.

1023. The Claimants also request pre-award interest that must be compounded monthly and established by reference to the Claimants' cost of equity which Compass Lexecon estimates at 7.58%. Post-award interest, in the Claimants' view should be higher than 7.58% in order to ensure timely compliance with the award.

1024. The Claimants' valuation of damages consists of the following elements: (i) the Claimants' lost historical cash flows incurred between November 2010[1418] and the valuation date; and (ii) the loss to the Claimants' equity and debt stakes as of the valuation date (lost value).[1419]

---

[1417] Memorial, para. 429.

[1418] When the first of the Disputed Measures, RD 1565/2010, was implemented.

[1419] Reply, paras. 648-649. Compass Lexecon calculates the Claimants' damages "as the damage to Cordoba Beheer's direct equity investment in Cross Retail, Sevilla Beheer's direct equity investments in Cross Retail and the Spanish Project Companies, and Sevilla Beheer's participative loans provided to the Spanish Project Companies." *See* First Compass Lexecon Report, para. 64, fn. 66.

335

1025. In their Memorial, the Claimants argue that their damages must be valued as of 20 June 2014, the date of the publication of Order IET/1045/2014.[1420] This date represents "the date of the harm", when the Claimants allege to have lost 41% of the FMV of their stake in the Spanish Project Companies.[1421] However, in their Reply, the Claimants argue that their losses must be valued at the date of this Tribunal's award and use 31 May 2018 as a proxy for that date.[1422] The Claimants submit that the latter approach should be preferred as it is more consistent with the principle of full reparation and enhances the accuracy of the calculation by using updated production figures, market information and macroeconomic data from 20 June 2014 to 31 May 2018.[1423]

1026. In order to assess the decrease in FMV of the Claimants' investments as of 20 June 2014, in its First Report, Compass Lexecon calculates the difference in the value of the Claimants' investments in the "**But For**" (had the Disputed Measures not existed) and "**Actual**" (with the Disputed Measures in place) scenarios.[1424] In its calculations, Compass Lexecon uses the DCF methodology implemented through two approaches: a) the Free Cash Flows to the Firm (the "**FCFF**") approach; and b) the Free Cash Flows to the Equity (the "**FCFE**") approach.[1425]

1027. In order to assess the Claimants' losses prior to the valuation date of 20 June 2014, Compass Lexecon calculates the difference in the value of the cash flows to the Claimants as equity holders in the But For and Actual scenarios capitalized at the cost of equity as of the valuation date.[1426]

---

[1420] Memorial, para. 452.

[1421] Memorial, paras. 459-463.

[1422] Reply, para. 661.

[1423] Reply, paras. 39, 656-660; Claimants' Reply Post-Hearing Brief, paras. 66-76.

[1424] First Compass Lexecon Report, para. 7.

[1425] First Compass Lexecon Report, para. 8.

[1426] First Compass Lexecon Report, para. 151.

1028. The below table summarizes Compass Lexecon's calculations under the FCFF approach (in million euros):

| Total Damages to Claimants | | | |
|---|---|---|---|
| € Million as of 20/6/2014 | But-for | Actual | Damages |
| **1. Historical Cash Flows to Claimants** | **10.2** | **5.3** | **4.9** |
| **2. Claimants' Equity Investments** | **28.4** | **12.0** | **16.4** |
| Enterprise Value | 59.8 | 45.4 | 14.4 |
| Cash Available | 8.1 | 8.1 | 0.0 |
| Debt Value | 39.6 | 41.5 | (2.0) |
| *Debt with Third Parties* | *27.5* | *28.9* | *(1.4)* |
| *Debt with Claimants* | *12.1* | *12.6* | *(0.5)* |
| Equity Value | 28.4 | 12.0 | 16.4 |
| **3. Claimants' Debt Investments** | **12.1** | **12.6** | **-0.5** |
| **Total** | **50.7** | **29.9** | **20.7** |

1029. An alternative calculation under the FCFE approach prepared by Compass Lexecon estimates the lost value at EUR 20.5 million.[1427]

1030. In its calculations of the net present value of the cash flows, Compass Lexecon relies on the following assumptions:

> Claimants' investment lifespan. Compass assumes that in both But For and Actual scenarios, the plants operate until the end of their technical life, after which they would be dismantled, that is a life of 30 years.
>
> Revenues. In the But For scenario, Compass calculates revenues as the product of electricity production and the unitary remuneration. To achieve this, Compass projects the regulated tariff using the most recent inflation forecast for Spain from the International Monetary Fund (IMF) minus 0.5%. For the Actual scenario, Compass calculates the revenues as the sum of the investment payment, the operating payment, and the revenues received from the wholesale market as the plants receive no operating payment. In the Actual scenario, Compass has also considered the claw-back payment intended for repayment of the revenues collected during the Interim Period in excess of or below the revenues that the plants were entitled to under the New Regime. As part of the revenues, Compass has also considered the revenues for reactive energy.
>
> Electricity prices. In the Actual scenario, Compass has projected pool prices for 2014- 2017 using future contracts traded in OMIP. Then, it assumes that prices will converge to the variable costs of combined cycle gas turbine generators in 2025, and that thereafter, prices will grow at the inflation rate.

---

[1427] First Compass Lexecon Report, para. 13.

In the case of the But For scenario, Compass uses the same prices, but adjusting for the effect of the 7% Tariff Levy.

Inflation. Until 2019, Compass uses the inflation forecasts of the IMF. After 2019, as IMF forecasts are not available, Compass uses the European Central Bank target inflation rate of 2%.

OPEX. Compass has projected the same operating expenses in both the But For and Actual scenarios and has adjusted them pursuant to the inflation, with the following exception (i) Compass has only considered the 7% Tariff Levy in the Actual scenario; and (ii) certain of the plants operational maintenance costs are different between the two scenarios.

Capital Expenditures. Compass projects no additional capital expenditures in either the But For or the Actual for each project until the end of its useful life.

Financial Debt. Compass computes the present value of all scheduled debt service at the company's cost of debt of 7.58%. Compass also assumes no further issuance of debt.

Taxation. Compass calculates the income tax expense of the Claimants' investments as 30%, the statutory Spanish income tax rate in force as of the date of valuation.

Regulatory Rate of Return. In the Actual scenario, Compass adopts the 7.398% rate of return for the first regulatory period. For the following regulatory periods, it has used the one-year average return of the ten-year Spanish sovereign bond of 3.79% observed as up to 20 June 2014, plus 300 bps, which results in a pre-tax rate of return of 6.79%.[1428]

1031. Under the FCFF approach, Compass Lexecon uses the WACC of 6.03% as the discount rate.[1429]

1032. In order to calculate the cost of equity, one of the elements of the WACC,[1430] Compass Lexecon uses the Capital Asset Pricing Model (the "**CAPM**") and estimates the cost of equity of 7.58%.[1431] The CAPM calculation is based on the following parameters: (i) a risk-free rate of 1.61% representing the average yield on ten-year German sovereign bonds during the 12 months prior to 20 June 2014;[1432] (ii) the beta coefficient is estimated at 0.76 on the basis of Bloomberg's betas for RE companies adjusted to account for the

---

[1428] Memorial, para. 471 (footnotes omitted).

[1429] First Compass Lexecon Report, paras. 115, 139.

[1430] The weight of debt relative to total capital, the cost of debt, the marginal tax rate applicable to the investment, the weight of equity relative to total capital, and the cost of equity. *See* First Compass Lexecon Report, para. 115.

[1431] First Compass Lexecon Report, para. 118.

[1432] First Compass Lexecon Report, para. 123.

"revision-to-one" effect and the optimal capital structure in the industry;[1433] (iii) the market rate premium of 5% representing Damodaran's implicit equity risk premium for mature markets in 2014;[1434] (iv) the country risk premium of 2.18% calculated as the difference in the 12-month average yield on the ten-year Spanish and German euro-denominated bonds between May 2013 and June 2014.[1435]

1033. The cost of debt, another element of the WACC, "measures the cost for an efficiently financed firm to borrow funds to finance its operations and investments."[1436] Compass Lexecon calculates the cost of debt at the rate of 5.79% (pre-tax) and 4.05% (post-tax) on the basis of an approach that "adds the country risk and industry risk faced by lenders to the risk-free rate."[1437]

1034. Under the FCFE approach, the cost of equity is used as the discount rate.[1438]

1035. In its Second Report, Compass Lexecon updates the initial calculations in view of the new valuation date chosen by the Claimants (31 May 2018) and the information that has become available since the publication of the June 2014 Order. Compass Lexecon summarizes the adjustments to the initial calculations as follows:

> a) Financial and operational information: I have updated operational and financial information for 2014–2017 based on the financial accounts of the Spanish Project Companies.
>
> b) Ministerial Order ETU/130/2017: this Order contains the remuneration parameters for the second regulatory semi-period of 2017-2019, affecting the plants' remuneration under the actual scenario.
>
> c) Historical generation: I have incorporated the actual volumes of energy generated by the Claimants' Plants up to and including 2017.
>
> d) Electricity spot prices: I have added actual spot price information up to May 31, 2018. Thereafter, I apply the same forecasting methodology as in my First Report using the futures contracts traded in OMIP (the Iberian Energy Derivatives Exchange) for the May 2018–2022 period, assuming that prices

---

[1433] First Compass Lexecon Report, paras. 124-128.

[1434] First Compass Lexecon Report, para. 123.

[1435] First Compass Lexecon Report, para. 135.

[1436] First Compass Lexecon Report, para. 137.

[1437] First Compass Lexecon Report, paras. 137-139.

[1438] Memorial, para. 477.

will converge to the variable cost of combined cycle gas turbine ("CCGT") generators by 2025.

e) New macroeconomic information: I have included annual inflation information up to and including 2017, and information on yields to maturity on Spanish sovereign bonds up to May 31, 2018.

f) Corporate tax rates: I have updated the corporate tax rates to reflect the changes in 2015 to 28% and 2016 to 25%.

g) Debt financing: I have incorporated in the actual scenario the fact that the Claimants' pre-paid the third-party debt outstanding, and in exchange issued additional intercompany loans to the Spanish Project Companies.

h) Discount rate: I have updated the WACC and the cost of equity to incorporate data available as of May 31, 2018. As of May 31, 2018, the resulting WACC is 3.87% while the cost of equity is 5.36%.[1439]

1036. The below table summarizes the overall assessment of the Claimants' losses as at 31 May 2018 under the FCFF approach:[1440]

| Total Damages to Claimants | | | |
|---|---|---|---|
| € Million as of 31/05/2018 | But-for | Actual | Damages |
| **1. Historical Cash Flows to Claimants** | **20.2** | **-16.3** | **36.5** |
| **2. Claimants' Equity Investments** | **33.0** | **12.8** | **20.2** |
| Enterprise Value | 59.6 | 35.7 | |
| Cash Available | 8.1 | 8.1 | |
| Debt Value | 34.7 | 31.1 | |
| *Debt with Third Parties* | *21.8* | *0.0* | |
| *Debt with Claimants* | *12.8* | *31.1* | |
| Equity Value | 33.0 | 12.8 | |
| **3. Claimants' Debt Investments** | **12.8** | **31.1** | **-18.2** |
| **Total** | **66.1** | **27.6** | **38.5** |

1037. Under the FCFE approach, the Claimants' damages as at 31 May 2018 are quantified at EUR 37.2 million.[1441]

1038. Additionally, the Claimants presented damages sensitivities to their assessment of damages to account for the possibility where the Tribunal were to find that the limitation of hours imposed by RDL 14/2010, the TVPEE, and the change to inflation factor

---

[1439] Second Compass Lexecon Report, para. 109 (footnotes omitted).
[1440] Second Compass Lexecon Report, Table 4.
[1441] Reply, para. 669.

imposed under RDL 2/2013 were lawful.[1442] The Claimants' sensitivities analyses was done on two alternative assumptions.

1039. According to the first assumption, the abovementioned measures would only apply until July 2013 (when RDL 9/2013 was enacted) in the but-for scenario:

| Damages with Measures applicable in but-for scenario until July 14, 2013 | | |
|---|---|---|
| € Million as of 20/06/2014 | FCFF | FCFE |
| Base Case | 20.7 | 20.5 |
| **Individual Measures** | | |
| 1. RDL 14/2010 (Hours Limitation) | 17.7 | 17.6 |
| 2. Law 15/2012 (7% *Ad-Valorem* Tax) | 20.5 | 20.3 |
| 3. RDL 2/2013 (CPI Change) | 20.6 | 20.4 |
| **Combined Measures** | | |
| Measures 1 + 2 | 17.5 | 17.4 |
| Measures 1 + 3 | 17.6 | 17.5 |
| Measures 2 + 3 | 20.4 | 20.2 |
| Measures 1 + 2 + 3 | 17.4 | 17.3 |

*Source: June 2014 DCF Valuation Model (CLEX-001).*

| Damages with Measures applicable in but-for scenario until July 14, 2013 | | |
|---|---|---|
| € Million as of 31/05/2018 | FCFF | FCFE |
| Base Case | 38.5 | 37.2 |
| **Individual Measure** | | |
| 1. RDL 14/2010 (Hours Limitation) | 34.7 | 33.4 |
| 2. Law 15/2012 (7% *Ad-Valorem* Tax) | 38.2 | 36.9 |
| 3. RDL 2/2013 (CPI Change) | 38.4 | 37.1 |
| **Combined Measures** | | |
| Measures 1 + 2 | 34.4 | 33.2 |
| Measures 1 + 3 | 34.5 | 33.3 |
| Measures 2 + 3 | 38.1 | 36.8 |
| Measures 1 + 2 + 3 | 34.3 | 33.1 |

*Source: May 2018 DCF Valuation Model (CLEX-331).*

---

[1442] Second Compass Lexecon Report, paras. 170-175.

341

1040. According to the second assumption, the pre-New Regime measures would apply permanently:

| Damages with Measures applicable in but-for scenario permanently | | |
| --- | --- | --- |
| € Million as of 20/06/2014 | FCFF | FCFE |
| Base Case | 20.7 | 20.5 |
| **Individual Measures** | | |
| 1. RDL 14/2010 (Hours Limitation) | 13.8 | 13.5 |
| 2. Law 15/2012 (7% Ad-Valorem Tax) | 16.0 | 16.0 |
| 3. RDL 2/2013 (CPI Change) | 18.9 | 18.7 |
| **Combined Measures** | | |
| Measures 1 + 2 | 9.4 | 9.2 |
| Measures 1 + 3 | 12.1 | 11.8 |
| Measures 2 + 3 | 14.3 | 14.3 |
| Measures 1 + 2 + 3 | 7.8 | 7.6 |

*Source: June 2014 DCF Valuation Model (CLEX-001).*

| Damages with Measures applicable in but-for scenario permanently | | |
| --- | --- | --- |
| € Million as of 31/05/2018 | FCFF | FCFE |
| Base Case | 38.5 | 37.2 |
| **Individual Measure** | | |
| 1. RDL 14/2010 (Hours Limitation) | 28.3 | 27.2 |
| 2. Law 15/2012 (7% Ad-Valorem Tax) | 31.1 | 30.3 |
| 3. RDL 2/2013 (CPI Change) | 38.1 | 36.8 |
| **Combined Measures** | | |
| Measures 1 + 2 | 21.3 | 20.9 |
| Measures 1 + 3 | 27.9 | 26.9 |
| Measures 2 + 3 | 30.8 | 30.0 |
| Measures 1 + 2 + 3 | 21.0 | 20.5 |

*Source: May 2018 DCF Valuation Model (CLEX-331).*

1041. In order to confirm the reasonableness of these calculations, Compass Lexecon implements a relative valuation analysis "by comparing the EV/EBITDA multiple implicit in the DCF valuation[1443] with the EV/EBITDA multiple of a sample of

---

[1443] Compass Lexecon explains that "[t]hese implied multiples mean that in the but-for (actual) scenario a €1 million in EBITDA translates into approximately €10.2 (€11.2) million in enterprise value as of June 20, 2014." *See* First Compass Lexecon Report, para. 14, fn. 7.

transactions involving target PV companies operating in Spain."[1444] On the basis of nine comparable transactions, Compass Lexecon concludes that the Enterprise Value to Earnings Before Interest, Taxes, Depreciation, and Amortization Ratio ("**EV/EBITDA**") multiples from the DCF approach of 10.2x in the But For scenario and 11.5x in the Actual scenario "fall within the range of multiples from comparable transactions."[1445]

1042. Compass Lexecon further argues that the selected transactions satisfy the comparability criteria mentioned by Econ One.[1446] In particular, all of the selected PV plants are subject to the same regulatory regime and hence similar regulatory risks.[1447] As regards the timeframe, Compass Lexecon submits that if market conditions (i.e., interest rates) have not changed "there is no reason to believe that EV/EBITDA ratios would change either."[1448] In respect of the other criteria, Compass Lexecon, *inter alia*, argues that the EV/EBITDA ratio is used to control of the differences.[1449]

1043. The Claimants have also provided an alternative DCF valuation, which is based on the assumption that they were only entitled "to earn the returns that the Spanish regulator considered reasonable" at the time of the implementation of RD 661/2007 and RD 1578/2008.[1450] Thus, in 2011, instead of introducing the Disputed Measures, the Respondent would have reviewed the level of the FiT "so as to assure that plants would not obtain more than their respective allowed rate of return."[1451] Compass Lexecon accordingly calculates an alternative "but-for FiT" relying on the rates of return that were considered as reasonable by the CNE:[1452]

---

[1444] First Compass Lexecon Report, para. 108; Second Compass Lexecon Report, para. 91.

[1445] First Compass Lexecon Report, para. 111.

[1446] Second Compass Lexecon Report, para. 100. *See* para. 1060 below.

[1447] Second Compass Lexecon Report, para. 100(b).

[1448] Second Compass Lexecon Report, para. 100(d).

[1449] Second Compass Lexecon Report, para. 100.

[1450] Reply, para. 739; Second Compass Lexecon Report, para. 147.

[1451] Second Compass Lexecon Report, para. 148.

[1452] Second Compass Lexecon Report, para. 150, Table 10.

| Plant | IT | CNE 3/2007 & RD 1578/2008 returns | Applicable FiT Under RD 661/2007 & RD 1578/2008 (€/MWh) | Alternative FiT (€/MWh) |
|-------|-----|-----|-----|-----|
| Mahora | IT-00061 | 7.9% | 475.6 | 454.3 |
| Villar de Cañas | IT-00058 | 8.2% | 475.6 | 474.6 |
| Ronda | IT-00048 | 7.9% | 475.6 | 477.2 |
| Matapozuelos | IT-00421 | 7.0% | 326.7 | 287.2 |
| Fuentes de Año | IT-00442 | 7.0% | 296.9 | 265.4 |
| Average | | 7.59% | 409.60 | 389.99 |

1044. By reference to this alternative but-for FiT, Compass Lexecon then calculates the impact of the Disputed Measures on the Claimants' investments as at 31 May 2018 (under the FCFF approach, in million euros):[1453]

| Total Damages to Claimants | | | |
|-----|-----|-----|-----|
| € Million as of 31/05/2018 | But-for | Actual | Damages |
| 1. Historical Cash Flows to Claimants | 18.2 | -16.3 | 34.4 |
| 2. Claimants' Equity Investments | 30.2 | 12.8 | 17.4 |
| Enterprise Value | 56.5 | 35.7 | |
| Cash Available | 8.1 | 8.1 | |
| Debt Value | 34.5 | 31.1 | |
| Debt with Third Parties | 21.8 | 0.0 | |
| Debt with Claimants | 12.6 | 31.1 | |
| Equity Value | 30.2 | 12.8 | |
| 3. Claimants' Debt Investments | 12.6 | 31.1 | -18.4 |
| Total | 61.0 | 27.6 | 33.4 |

1045. Under the alternative FCFE approach the amount of the lost historical cash flows remains unchanged, whereas the total of the Claimants' losses constitutes EUR 32.4 million.[1454]

1046. Compass Lexecon expressed the following criticisms regarding Econ One's Adjusted Present Value ("**APV**") approach. Compass Lexecon states that the APV method is also a variant of the income approach.[1455] However, unlike the FCFF or the FCFE, the use of the APV approach requires to separately estimate the expected probability of bankruptcy

---

[1453] Second Compass Lexecon Report, paras. 152-154, Table 11.

[1454] Second Compass Lexecon Report, para. 154, Table 12.

[1455] Second Compass Lexecon Report, para. 23.

and associated costs.[1456] According to Compass Lexecon, the APV approach thus introduces a high level of subjectivity in the valuation analysis, as the probability of bankruptcy and its associated costs cannot be estimated directly.[1457] Compass Lexecon adds that Econ One "does not even attempt to value either the probability of bankruptcy or the bankruptcy costs associated to the leverage used to compute the tax shield."[1458]

1047. Compass Lexecon also disagrees with the need to apply the illiquidity discount on the grounds that prior to the Disputed Measures, the Spanish Project Companies did not have any major sources of cash flow volatility, as the tariffs, production and costs were reasonably foreseeable and steady.[1459] Compass Lexecon also argues that if the application of an illiquidity discount had been indeed necessary, Spain would have incorporated it into its calculation of the allowed pre-tax rate of return, which it did not.[1460] Compass Lexecon argues that Econ One's estimates of the illiquidity discount are not supported by market data. For example, the time between announcement and closure of a transaction in renewable assets was on average 3.5 months prior to the Disputed Measures and 4 months between June 2014-May 2018, which was normal. Hence, no illiquidity discount is necessary.[1461]

1048. Professor Spiller also criticizes the method that Econ One uses to calculate the illiquidity discount. According to Professor Spiller, the Longstaff Method can only be used as a proxy for a maximum estimate.[1462] Professor Spiller equally finds unconvincing the assumption that in the but-for scenario the Claimants' possibility to find buyers would be reduced due to the Tariff Deficit. Professor Spiller contends that such an assumption contradicts market data, according to which the transaction activity was stable despite the growing Tariff Deficit.[1463]

---

[1456] Second Compass Lexecon Report, para. 24.
[1457] Second Compass Lexecon Report, paras. 24-25.
[1458] Second Compass Lexecon Report, para. 24.
[1459] Second Compass Lexecon Report, para. 73.
[1460] Second Compass Lexecon Report, para. 75.
[1461] Second Compass Lexecon Report, para. 77.
[1462] Second Compass Lexecon Report, para. 78.
[1463] Second Compass Lexecon Report, paras. 80-86.

1049. Compass Lexecon accounts for risk in the discount rate (see paragraph 1032 above). Specifically, Compass Lexecon uses the CAPM, which "postulates that the opportunity cost of equity is equal to the return representing a company's risk."[1464] Compass Lexecon contends that its calculations capture the risks affecting the market as a whole (via the risk-free rate and market risk premium), the specific risks faced by RE generators (via the *beta* parameter) and the risks related to investing in Spain (via the country risk premium).[1465]

1050. Finally, Compass Lexecon criticizes Econ One's risk adjustment on the grounds that: (i) it introduces in the but-for scenario the probability of retroactive changes to the FiT scheme – the very measure in dispute; (ii) Econ One provides no support for the conclusion that in the but-for scenario the risk of negative changes should be higher than in the Actual scenario; (iii) in fact, due to the Respondent's measures, the regulatory risks have only increased.[1466] At the Hearing, Professor Spiller from Compass Lexecon also stated that "there is a fundamental principle in finance, in valuation, which is: you don't double-count the risk", "[e]ither you put it in the cash flows or you put it in the discount rate, but not in both."[1467]

b.   **The Respondent**

1051. The Respondent seems to be in agreement with the Claimants that the standard of full reparation (*Chorzow Factory*) applies in the present case. At the same time, the Respondent argues that the Tribunal "should be careful to apply it properly and consistently with the rest of its findings and avoid overcompensating the Claimants."[1468]

1052. The Respondent criticizes both valuation dates selected by the Claimants, without proposing any alternative date.[1469] The Respondent argues that, in any event, an *ex-ante* date (20 June 2014) is the appropriate one, as it is "more consistent with the only legal

---

[1464] Second Compass Lexecon Report, para. 30.

[1465] Second Compass Lexecon Report, para. 32.

[1466] Second Compass Lexecon Report, paras. 33-37. *See also* Hearing Tr., Day 4, 21 March 2019, 221:10-224:9 (Spiller/Flores).

[1467] Hearing Tr., Day 4, 21 March 2019, 221:14-17 (Spiller).

[1468] Respondent's Post-Hearing Brief, para. 131.

[1469] Day 5, 22 March 2019, 113:12-22 (Ruiz Sánchez/President).

standard under the ECT (Article 13, for Expropriation), with the principles of causation and attribution, and with the principles of equality between the parties and legal certainty."[1470]

1053. Econ One calculates the Claimants' losses using the APV approach, a variant of the DCF method.[1471] Econ One explains that the main difference between the APV approach and the FCFF and FCFE approaches "is their treatment of debt"[1472], in particular, the FCFF and FCFE approaches implemented by Compass Lexecon are based on the assumption of a constant ratio of debt to equity, whereas the APV approach allows to account for tax savings that the Claimants can make by deducting interest on debt and thus have declining levels of debt over time.[1473]

1054. Econ One summarizes its corrections to Compass Lexecon's valuation of the Claimants' damages as at 20 June 2014 as follows:

> (i) In the historical period, we assume that transitory limits on operating hours for which financial incentives can be received apply in both the [Actual and But For scenarios, according to Royal Decree 14/2010].
>
> (ii) We assume in the [Actual scenario] a remuneration consistent with [Royal Decree] 413/2014 and Order IET 1045/2014, without speculating about contingent future reasonable rate of return revisions.
>
> (iii) We correct the inflation rate projections. […] We project long-term inflation using an average of three long-term inflation forecasts. Based on these sources, we project long-term inflation in Spain at 1.6%.
>
> (iv) We correct the projected [operating and maintenance] costs in [the Actual and But For scenarios] to reflect the lower prices of the renegotiated agreements.
>
> (v) We apply the expected corporate tax rate in Spain as of [20 June 2014]. […] in 2014 Spain reduced the corporate tax rate to 28%, effective January 2015, and to 25% effective January 2016. These reforms were announced in June 2014, so they were known as of the ex ante Valuation Date. We also correct Compass Lexecon's unlevered income tax expense calculation for Mahora, Villar de Cañas, and Ronda in the "But For" Scenario.

---

[1470] Respondent's Post-Hearing Brief, para. 145.

[1471] Second Econ One Report, para. 25.

[1472] First Econ One Report, para. 185.

[1473] First Econ One Report, paras. 192-194.

(vi) We use an unlevered cost of equity of 5.05%. We apply this discount rate to the future operating cash flows of the PV Plants in our APV approach.

(vii) We assume that the bank debt prepayment occurs in [the Actual and But For scenarios]. In 2017, Claimants paid their third-party debt outstanding and replaced it with intercompany debt. Compass Lexecon assumes this occurs in the [Actual] Scenario only.

(viii) We account for the tax effect of debt. To properly value the PV Plants, we incorporate the value of the tax benefit of interest payments on loans that can be expected over the PV Plants' useful life.

(ix) Compass Lexecon does not account for regulatory risk in its model. It is inappropriate to assume that the regulations affecting the revenue of the PV Plants in the [But For scenario] would be frozen in perpetuity, as Compass Lexecon does. We conclude that the [Disputed] Measures have reduced the risk applicable to the PV Plants relative to the [But For scenario] and, therefore, the risk adjustment in the [Actual scenario] must be lower than in the "But For" Scenario. We apply a risk adjustment to the revenues of the PV Plants of 2% in the [Actual scenario] and 10% in the "But For" Scenario.

(x) Compass Lexecon does not account for the lack of liquidity of the PV plants in its model. Since the PV Plants are illiquid physical assets, the value of the equity interests must be adjusted for their lack of liquidity. To account for the lack of liquidity of the PV Plants, we follow Longstaff's options pricing method. We also show that after the enactment of the Measures, the market for renewable energy assets in Spain has become more liquid. We apply an illiquidity discount of 18% in the [Actual scenario] and of 26% in [the But For scenario].

(xi) We correct Compass Lexecon's working capital calculations in the [But For Scenario]. In the [But For scenario], Compass Lexecon incorrectly relies on operating expenditure values from the PV Plants' [Actual scenario] to model working capital.[1474]

---

[1474] Second Econ One Report, para. 26.

1055. The below table summarizes the results of Econ One's subsidiary valuation as at 20 June 2014:[1475]

| | Historical Impact | Future Impact | | | Total Impact |
|---|---|---|---|---|---|
| | | But-For | Prevailing | Impact | |
| | | (€ Millions) | | | |
| | (1) | (2) | (3) | (3) - (2) (4) | (1) + (4) (5) |
| Econ One | -0.5 | 10.8 | 21.8 | 11.0 | 10.6 |
| Compass Lexecon | -4.3 | 40.5 | 24.6 | -15.8 | -20.1 |

1056. Econ One argues that the Spanish Project Companies are illiquid assets (as they are not publicly traded) and therefore a discount must be applied in order to account for their inability to be readily converted into cash.[1476] Econ One estimates a discount for illiquidity of 18% in the Prevailing Scenario and of 26% in the but-for scenario.[1477]

1057. According to Econ One, Compass Lexecon's application of the risk is insufficient. Econ One argues that the CAPM-based model only measures the risks that affect the market as a whole (e.g., "the risk of an economic recession"), while not capturing any company-specific risks (e.g., "the flooding risk of an oil refinery located near the coast").[1478] Econ One argues that the main company-specific risk of a PV plant – the risk of an unfavorable "regulatory revision" to revenues – is on the revenue side that thus must be accounted as part of the income calculations, instead of the discount rate.[1479] Econ One also insists that in the Actual scenario the risk adjustment should be larger than in the but-for scenario, as in the former the chances of a downward revision were higher than in the latter.[1480] Thus, Econ One applies a 10% downward adjustment to the Claimants' revenues in the but-for scenario and a 2% downward adjustment in the Actual scenario.[1481]

---

[1475] Second Econ One Report, Table 10.

[1476] First Econ One Report, paras. 224-227.

[1477] First Econ One Report, paras. 243, 246; Second Econ One Report, para. 225.

[1478] First Econ One Report, para. 195.

[1479] First Econ One Report, paras. 197, 221.

[1480] First Econ One Report, para. 223.

[1481] First Econ One Report, paras. 222-223.

1058. Econ One summarizes its corrections to Compass Lexecon's valuation of the Claimants' damages as at 31 May 2018 as follows:

> (i) In the historical period, we assume that transitory limits on operating hours for which financial incentives can be received apply in both the [Actual and But For scenarios], according to Royal Decree 14/2010].

> (ii) We assume a standard facility reasonable rate of return of 7.398%, i.e., with no downward adjustments in 2020 or thereafter.

> (iii) We correct the inflation rate projections.

> (iv) We correct the projected [operating and maintenance] costs in the [Actual and But For scenarios].

> (v) We correct Compass Lexecon's double counting of the [7% TVPEE].

> (vi) We remove non-recurring cost categories from the non-renegotiated CPI driven OPEX from Compass Lexecon's projection.

> (vii) We use an unlevered cost of equity of 3.59% in our APV approach.

> (viii) We assume that the bank debt prepayment occurs in the [Actual and But For scenarios]. We account for the tax effect of debt.

> (ix) We apply a 2% risk adjustment to the revenues of the PV Plants in the [Actual scenario] and a 10% risk adjustment in the [But For] Scenario.

> (x) We apply an illiquidity discount of 18% in the [Actual scenario] and 26% in the [But For] Scenario.

> (xi) We correct Compass Lexecon's working capital calculations in the [But For] Scenario.[1482]

---

[1482] Footnotes omitted. Second Econ One Report, para. 276.

1059. The below table summarizes the results of Econ One's subsidiary valuation as at 31 May 2018:[1483]

| | Historical Impact | Future Impact | | | Total Impact |
|---|---|---|---|---|---|
| | | But-For | Prevailing | Impact | |
| | | (€ Millions) | | | |
| | (1) | (2) | (3) | (3) - (2) (4) | (1) + (4) (5) |
| **Econ One** | -2.4 | 26.8 | 46.4 | 19.7 | 17.3 |
| **Compass Lexecon** | -32.8 | 45.8 | 43.9 | -2.0 | -34.8 |

1060. Finally, Econ One submits that the comparable transaction analysis implemented by Compass Lexecon to check the reasonableness of the DCF valuations is generally unreliable and in any event "fails to adhere to basic criteria for comparability."[1484] In particular, Econ One asserts that Compass Lexecon "ignores the technology, location, and the regulatory regime of each plant being sold" and that the selected transactions "occur in a very broad time frame and include the sale of plants with varying installed capacity."[1485]

1061. Econ One further contends that Compass Lexecon's alternative calculation[1486] suffers from flaws similar to those that can be found in the principal valuation.[1487] In particular, Econ One lists the following alleged errors:

(i) it overestimates the reasonable rate of return in the [But For] Scenario;

(ii) it underestimates the reasonable rate of return in the [Actual scenario] as of the beginning of the next Regulatory Period, 2020;

(iii) it double-counts the 7% [TVPEE] in its estimated operating expense in the [Actual scenario];

---

[1483] Second Econ One Report, Table 12.

[1484] Second Econ One Report, para. 28.

[1485] Second Econ One Report, paras. 240-247.

[1486] *See* paras. 1043-1045 above.

[1487] Second Econ One Report, para. 249.

(iv) it excludes the operating hour cap for the Mahora, Villar de Cañas, and Ronda PV Plants for 2011 through 2013; and

(v) it uses an incorrect tax rate to calculate its alternative FiT.[1488]

1062. In particular, regarding the tax rate used to calculate the alternative FiT, Econ One argues that companies generally do not pay the marginal tax rate of 30% used by Compass Lexecon due to a variety of tax deductions existing in Spain, including depreciation, investment tax credits, interest on shareholder loans, and interest on third-party debt.[1489] Once those deductions are taken into account, the effective tax rate is around 12% for all companies.[1490] Econ One further argues that over their useful life RE projects "pay relatively little corporate tax" and that it tends to be higher in the projects' later years as the tax benefits of depreciation and debt diminish.[1491] Thus, Econ One concludes that for a typical RE project the effective discounted[1492] tax rate is about 5.8%.[1493] Finally, Econ One asserts that if the above flaws of the Claimants' alternative calculation are corrected, the valuation will show that the Claimants have not suffered economic damages as a result of the Disputed Measures.[1494] In its corrected valuation Econ One assumes the reasonable rate of return of 7% for all of the Claimants' Plants.

## 2. The Tribunal's analysis

1063. In view of the fact that it cannot be determined at this stage whether the Disputed Measures (with the exception of the "claw back" retroactive element of the New Regime) violated the ECT (see paragraphs 1019-1020 above), the Tribunal, by majority, reserves its decision regarding compensation and interest.

---

[1488] Second Econ One Report, para. 249 (footnotes omitted).

[1489] Second Econ One Report, para. 253.

[1490] Second Econ One Report, para. 253.

[1491] Second Econ One Report, para. 254.

[1492] Accounting for the time value of money. *See* Second Econ One Report, paras. 256-257.

[1493] Second Econ One Report, para. 257.

[1494] Second Econ One Report, para. 258, *referring to* Exhibit EO-129 (corrected alternative FiT), Exhibit EO-130 (corrected alternative claim June 2014), and Exhibit EO-131 (corrected alternative claim May 2018).

**C.  Tax gross-up**

**1.  The Parties' positions**

a.  **The Claimants**

1064. The Claimants request the Tribunal to award their claim for gross-up "to reflect the taxes payable on an award of damages" and to ultimately achieve full reparation.[1495] The Claimants submit that depending on the recipient of the payment of the award, they will be subject to corporate taxation either in Spain or in the Netherlands.[1496]

1065. The Claimants posit that in Spain the award will be treated as taxable income subject to the Spanish corporate income tax (the "**CIT**") at a rate of 25%.[1497] In support, the Claimants refer to a tax opinion provided by EY Abogados titled "Spanish CIT treatment of a compensation payable by the Kingdom of Spain to the Spanish Project Companies as a result of an ECT arbitration proceeding."[1498] The Claimants add that for the sake of fairness they have applied in their tax gross-up calculations the impact derived from the offset of carry-forward tax losses generated in previous years (subject to the limitations established under the Spanish CIT law).[1499]

1066. The Claimants submit that Sevilla Beheer is a Dutch taxpayer and the award will be subject to the Dutch CIT at a rate of 25% as an ordinary taxable profit.[1500]

1067. In response to the Respondent's counter-arguments, the Claimants contend that they will not be able to benefit from the "participation exception" in the Netherlands as Sevilla Beheer has "a right of its own" under the ECT, according to the Dutch tax authorities.[1501] The Claimants further assert that although Sevilla's right is connected with its shareholdings in the Spanish Project Companies, "this is not sufficient for it to qualify as

---

[1495] Memorial, para. 486; Reply, para. 759.

[1496] Reply, paras. 769-790.

[1497] Reply, paras. 796-778.

[1498] EY Abogados, Tax Opinion: "Spanish CIT treatment of a compensation payable by the Kingdom of Spain to the Spanish Project Companies as a result of an ECT arbitration proceeding", 12 July 2018 (C-230).

[1499] Reply, para. 779.

[1500] Reply, paras. 781-787.

[1501] Reply, para. 783.

an 'exempt benefit' from a qualifying participation."[1502] In support of this contention, the Claimants refer to Dutch jurisprudence.[1503] The Claimants thus conclude as follows:

> The Tribunal should therefore award damages, including a tax gross-up of an appropriate amount, in order to achieve full reparation of the harm suffered by Sevilla Beheer B.V. as Claimant. As for the Spanish tax gross-up, the Claimants have offset the carried-forward tax losses currently available. Therefore, the additional amount requested only refers to the Dutch CIT liability that would imply a cash-out payment for Sevilla Beheer BV based on the current carry-forward position, after applying such carried-forward tax losses.[1504]

1068. In response to the Respondent's jurisdictional objection, the Claimants submit that the Tribunal is competent to decide on the tax gross-up issue as it is unrelated to the question of whether any of the Disputed Measures is a taxation measure under Article 21 of the ECT.[1505]

b. **The Respondent**

1069. The Respondent submits that pursuant to Article 21 of the ECT the Tribunal has no jurisdiction to hear the tax gross-up claim.[1506] In the alternative, the Respondent argues that the tax gross-up claim is unfounded for the following reasons. First, Spain cannot be held responsible for the decision of another sovereign State (the Netherlands) to impose any taxes on the Claimants.[1507] In support of its position, the Respondent refers to *Rusoro v. Venezuela* where the tribunal made the following observation:

> In its Memorial and Reply, Rusoro sought indemnity in respect of any double taxation of the Award that may rise in Canada (or elsewhere), to the extent this liability would not have arisen had Venezuela observed its international commitments under the Treaty. This claim seems to have been abandoned in Rusoro's Post Hearing Brief. In any case, the claim lacks merit. Any tax liability arising under Canadian tax laws (or from any other fiscal regime, other than the Venezuelan), does not qualify as consequential loss arising from

---

[1502] Reply, para. 783.

[1503] *See* Dutch Supreme Court, Case No. 22 572, 6 March 1985 (C-247). *See also* Dutch Higher Court of Amsterdam, Case No. 04/00604, 1 June 2005 (C-248).

[1504] Reply, para. 789.

[1505] Reply, para. 762.

[1506] Counter-Memorial, para. 1270.

[1507] Rejoinder, paras. 1429-1432.

> Venezuela's breach of the Treaty and does not engage Venezuela's liability.[1508]

1070. Second, the Respondent submits that it is not responsible for the "acts or private decisions of the Claimant[s] […] within the scope of [their] freedom of business."[1509]

1071. Third, the Respondent argues that any future award in this arbitration will be exempt pursuant to the "participation exemption."[1510]

1072. Fourth, the Respondent submits that the tax gross-up claim is speculative and uncertain.[1511]

## 2.    The Tribunal's analysis

1073. The Tribunal dismisses the Respondent's jurisdictional objection regarding the tax gross-up claim under Article 21(1) of the ECT, because this provision is not concerned with the issue of awarding a tax gross-up payment on the amount of compensation due as a result of a breach of the ECT.[1512]

1074. On the merits, the Tribunal is not convinced that it would be appropriate to award any tax gross-up payment on the sums that may be taxable in the Netherlands. As it was observed by the *Rusoro v. Venezuela* tribunal, "[a]ny tax liability arising under [the home State's] tax laws (or from any other fiscal regime, other than the [respondent State]), does not qualify as consequential loss arising from [the respondent's] breach of the Treaty and does not engage [the respondent's] liability."[1513] The Tribunal also finds that the evidence

---

[1508] *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016 (RL-77), para. 854.

[1509] Rejoinder, para. 1429.

[1510] Rejoinder, paras. 1446-1449.

[1511] Rejoinder, paras. 1453-1454, *referring to Venezuela Holdings, B.V., Mobil Cerro Negro holding, LTD., Mobil Venezolana de Petróleos Holdings, INC.., Mobil Cerro Negro, LTD and Mobil Venezolana de Petróleos v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award, 9 October 2014 (RL-84), para. 388; *Abengoa, S.A. and COFIDES, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/09/2, Award, 18 April 2013 (RL-68), paras. 775-777.

[1512] *See AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129); *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Award, 11 December 2019 (RL-122).

[1513] *Rusoro Mining Limited v. Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016 (RL-77), para. 854. *See also* Respondent's Rejoinder, paras. 1443-1444.

Claimants provided in support of their tax gross-up claim to be insufficient. In light of Claimants' failure to sufficiently substantiate their tax gross-up claim based on the Dutch CIT, the Claimants must be considered as not having met their burden of proof. In any event, their claim must be rejected due to the lack of a showing of the requisite causation.[1514]

1075. As regards the tax gross-up claim in relation to the Spanish CIT, the Tribunal observes that the tax opinion of EY Abogados submitted by the Claimants is based on a number of assumptions regarding future events. For example, at paragraph 3.5 the tax opinion mentions the following assumption "the Spanish Project Companies do not have material tax credits pending to be applied nor will generate tax credits in the financial year of accrual of the Compensation and/or of the Compensation being due."[1515] Based on this and other assumptions, EY Abogados conclude as follows:

> 4.20. Once the Spanish Project Companies have determined their CIT taxable base, as partially offset by the corresponding carry-forward tax losses (if applicable), the CIT tax due should be obtained by applying the ordinary CIT rate.
>
> 4.21. In this regard, according to Article 29 of the Spanish CIT Act, the ordinary Spanish CIT rate is of 25%.
>
> 4.22. Therefore, the Spanish Project Companies should apply a 25% rate over their final CIT taxable base to obtain the CIT due which could be reduced if tax credits were applicable. However, as assumed under 3.5 above, no material tax credits are available to the Spanish Project Companies.[1516]

1076. This tax opinion confirms the Tribunal's view that the extent of the Claimants' tax liabilities under Spanish law cannot be established with sufficient certainty at this

---

[1514] See also, *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 863. *See also SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-189), para. 550 ("There is reason to question the general proposition that a respondent State that is found liable for an FET violation should be required to compensate a claimant for increased taxes that claimant will owe its home State.")

[1515] EY Abogados Tax Opinion, "Spanish CIT treatment of a compensation payable by the Kingdom of Spain to the Spanish Project Companies as a result of an ECT arbitration proceeding", 12 July 2018 (C-230).

[1516] EY Abogados, Tax Opinion: "Spanish CIT treatment of a compensation payable by the Kingdom of Spain to the Spanish Project Companies as a result of an ECT arbitration proceeding", 12 July 2018 (C-230).

356

moment. The tax opinion also rightly states that it "does not provide assurance that a court or other tribunal, or any relevant tax authority, will not form a different conclusion."[1517]

1077. The Tribunal joins the long line of decisions that found similar tax gross-up claims uncertain and speculative.[1518]

1078. Therefore, the Tribunal dismisses the Claimants' tax gross-up claim.

## D.    Arbitration Costs

1079. The Tribunal reserves its decision on the arbitration costs.

---

[1517] EY Abogados, Tax Opinion: "Spanish CIT treatment of a compensation payable by the Kingdom of Spain to the Spanish Project Companies as a result of an ECT arbitration proceeding", 12 July 2018 (C-230), para. 2.4.

[1518] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (RL-125), paras. 621-628; *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020 (RL-129), para. 859; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Award, 11 December 2019 (RL-122), para. 55; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-141), para. 660; *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-189), para. 554; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-99), para. 673; *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019 (RL-127), para. 598.

## IX.  OPERATIVE PART

1080. For these reasons, the Tribunal decides as follows:

  (i)  Unanimously, that the Tribunal has jurisdiction over the Parties and the subject-matter of this dispute with the exception that it has no jurisdiction to determine whether the TVPEE breached Spain's obligations under the ECT;

  (ii)  Unanimously, that the Respondent breached Article 10(1) of the ECT to the extent that it applied the New Regime retroactively to the remuneration already received by the Claimants' PV Plants under RD 661/2007 and RD 1578/2008;

  (iii)  By majority, that the Respondent has breached Article 10(1) of the ECT to the extent (if any) that the New Regime does not provide a reasonable return to the Claimants' PV Plants at a rate of 7% after taxes; and

  (iv)  By majority, that all other claims under Article 10(1) of the ECT are dismissed.

1081. The procedure to be followed by the Parties for the purposes of quantifying damages (if any) resulting from the majority's findings on liability and the principles of quantum will be set out by the Tribunal in a separate procedural order.

1082. The issues of damages (if any) and costs are reserved for the Award.

_____          _____
Professor Peter Cameron                          Professor Attila Tanzi
Arbitrator                                                     Arbitrator
*Subject to the attached*
*Partial Dissenting Opinion*

_____
Dr. Raëd M. Fathallah
President of the Tribunal

**Annex I – The Claimants' details**

| No. | Claimant | Address | Place and date of incorporation | Exhibit No. |
|---|---|---|---|---|
| 1. | Cordoba Beheer B.V. | Voorstraat 2, Kraggenburg, The Netherlands | The Netherlands, 04/01/1995 | C-15.02 |
| 2. | Sevilla Beheer B.V. | Voorstraat 2, Kraggenburg, The Netherlands | The Netherlands, 27/12/2002 | C-15.01 |
| 3. | Cross Retail S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 16/01/2006 | C-15.03 |
| 4. | Planta Solar Bayliss, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 20/04/2006 | C-15.09 |
| 5. | Planta Solar Ainsworth, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.06 |
| 6. | Planta Solar Almunza, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.07 |
| 7. | Planta Solar Aramboles, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.08 |
| 8. | Planta Solar Borkowski, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.10 |
| 9. | Planta Solar Bullington, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.12 |
| 10. | Planta Solar Cummings, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.14 |
| 11. | Planta Solar Ligtenberg, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.22 |
| 12. | Planta Solar Markwell, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.23 |
| 13. | Planta Solar Narveson, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.24 |
| 14. | Planta Solar Oriolias, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.26 |
| 15. | Planta Solar Oropesa, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.27 |

1

| No. | Claimant | Address | Place and date of incorporation | Exhibit No. |
|---|---|---|---|---|
| 16. | Planta Solar Oxpring, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.28 |
| 17. | Planta Solar Pichardo, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.30 |
| 18. | Planta Solar Procopec, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.31 |
| 19. | Planta Solar Slusarski, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.32 |
| 20. | Planta Solar Duckworth, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.33 |
| 21. | Planta Solar Foulke, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.34 |
| 22. | Planta Solar Fussel, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.35 |
| 23. | Planta Solar Gaillard, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.36 |
| 24. | Planta Solar Gowdy, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.37 |
| 25. | Planta Solar Heilman, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.38 |
| 26. | Planta Solar Majewski, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.39 |
| 27. | Planta Solar Linebrink, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.41 |
| 28. | Planta Solar Koronka, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.42 |
| 29. | Planta Solar Journell, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 21/04/2006 | C-15.43 |
| 30. | Planta Solar Perlozzo, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 10/05/2006 | C-15.29 |
| 31. | Planta Solar Maddon, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 10/05/2006 | C-15.40 |

| No. | Claimant | Address | Place and date of incorporation | Exhibit No. |
|---|---|---|---|---|
| | | | | |
| 32. | Planta Solar Afanasenkov, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.05 |
| 33. | Planta Solar Bourque, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.11 |
| 34. | Planta Solar Chimera, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.13 |
| 35. | Planta Solar Frolov, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.15 |
| 36. | Planta Solar Gelinas, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.16 |
| 37. | Planta Solar Hordichuk, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.17 |
| 38. | Planta Solar Ibister, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.18 |
| 39. | Planta Solar Kovalchuk, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.19 |
| 40. | Planta Solar Kvasha, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.20 |
| 41. | Planta Solar Laaksonen, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.21 |
| 42. | Planta Solar Nedorost, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/06/2006 | C-15.25 |
| 43. | RA Solar Operaciones España, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 26/02/2007 | C-15.04 |
| 44. | Generador F. Peñas RA Bart, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.44 |
| 45. | Generador F. Peñas RA Bas, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.45 |
| 46. | Generador F. Peñas RA Henk, SL. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.46 |

3

| No. | Claimant | Address | Place and date of incorporation | Exhibit No. |
|---|---|---|---|---|
| | | | | |
| 47. | Generador F. Peñas RA Jeroen, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.47 |
| 48. | Generador F. Peñas RA Linda, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.48 |
| 49. | Generador F. Peñas RA Mani, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.49 |
| 50. | Generador F. Peñas RA Miguel, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.50 |
| 51. | Generador F. Peñas RA Minke, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.51 |
| 52. | Generador F. Peñas RA Raúl, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.52 |
| 53. | Generador F. Peñas RA Reinier, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.53 |
| 54. | Generador F. Peñas RA Richard, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.54 |
| 55. | Generador F. Peñas RA Rober, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.55 |
| 56. | Generador F. Peñas RA Sergio, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 19/04/2007 | C-15.56 |
| 57. | Planta Solar Juanjo 14, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/01/2008 | C-15.57 |
| 58. | Planta Solar Yolanda 15, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 09/01/2008 | C-15.58 |
| 59. | Parque Empresarial de Brafin FV, S.L. | Paseo de la Habana 5, 1ª-der, 28036 Madrid | Spain, 25/08/2009 | C-15.59 |

SEVILLA BEHEER B.V. et al v The Kingdom of Spain
ICSID Case No ARB/16/27

# Partial Dissenting Opinion

# By Professor Peter D Cameron

11 February 2022

## Table of Contents

**Summary** ...................................................................................................................... **1**

**A.    What Stability means in relation to Article 10(1) of the ECT** ................................. **3**
   (i)    The Meaning of Stability ................................................................................................. 3
   (ii)   Stability in relation to Low Carbon Energy Investments ...................................................... 7

**B.    Expectations of Stability vs The Assumption of Risk** ......................................... **11**
   (i)    The Legal Standard ...................................................................................................... 11
   (ii)   The Timing of the Investment ....................................................................................... 16
   (iii)   The Content of the Expectations ................................................................................... 17
   (iv)   The Evolution of the Three Royal Decrees ...................................................................... 28
   (v)   Non-normative Acts ..................................................................................................... 30
   (vi)   Due Diligence/Assumption of Risk ................................................................................ 32
   (vii)  RAIPRE ....................................................................................................................... 35

**C.    The Effect of 'drastic' and 'unexpected' Changes on the Expectation of Stability** ............ **37**

**D.    The Expectation of an RRR** ............................................................................... **44**

**E.    Conclusions** .................................................................................................... **48**

## Summary

1.  It has been an honour to serve on this Tribunal alongside two arbitrators of the highest standing, and from whom I have learned much. I am not however entirely in agreement with the views set out in the Decision on Jurisdiction, Liability and the Principles of Quantum (the 'Decision') and set out below in summary form the points on which I agree and those where I differ with my colleagues. My reasons for differing are set out in extended form in this Partial Dissenting Opinion.

2.  The Tribunal has taken a view on jurisdiction with which I am in agreement, including its assessment of the relevance of the *Komstroy* Judgment[1]. This Tribunal does, in my view, have jurisdiction over the claims brought before it. Further, I agree with the Tribunal on its finding on the TVPEE: it lacks jurisdiction to hear this element of the claim.

3.  I also agree that the Respondent is in breach of the ECT and specifically Article 10(1). This finding of liability is in line with almost all the cases that have been brought under the ECT that concern the Respondent's Disputed Measures. Specifically, I agree that the retroactive application of the New Regime to the remuneration already received by the Claimants' PV plants under RD 661/2007 and RD 1578/2008 is in breach of Article 10(1) of the ECT, for which compensation is due.

4.  However, I do not agree with several of the Tribunal's conclusions on liability (Section VII) and the reasoning adopted to reach those conclusions. As a result, I also differ from the Tribunal on the principles applicable to quantum (Section VIII).

5.  In summary form, the differences are:
    (i)   our understanding of 'stability' in relation to Article 10(1) of the ECT, sentences one and two (Section VII.A and B of the Decision).
    (ii)  our assessment of the legitimate expectations of Sevilla Beheer B.V. et al. in relation to Claimants' investments and the protection they deserved under the ECT (Section VII.B).
    (iii) our assessment of the significance of the registration requirement (Section VII.B).
    (iv)  our assessment of the reasonableness and proportionality of the Disputed Measures (Section VII.B.2).

---

[1] Case C-741/19 *Republic of Moldova v Komstroy*, 2 September 2021.

(v) our assessment of the RRR in the 1997 Act, its relation to subsequent legislation and the majority's conclusion that the RRR was around 7% post-tax (Section VIII).

6. Given the above, my views on the principles governing damages to be awarded to Claimants (Section VIII of the Decision) differ from those of the majority. These views will however only be noted in the dissent since I do not consider their elaboration to be necessary in the light of the majority's findings.

7. Despite the above noted differences, I acknowledge and accept my duty to work with the Tribunal in the following stages of the process after this Decision.

## A. What Stability means in relation to Article 10(1) of the ECT

*The meaning of stability in relation to the ECT and in the context of investments in low carbon sources of energy.*

### (i) The Meaning of Stability

8. The basic legal instrument that the Tribunal is bound to apply in this dispute is the ECT, in accordance with the ICSID Convention, taking into account other applicable rules and principles of international law[2]. Given the centrality of Article 10(1) of the ECT to the claims, the Tribunal begins its discussion of liability with an analysis of the relationship between sentences one and two. In sentence one, Article 10(1) of the ECT requires contracting parties "to encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments…". It continues in the second sentence to add that "(S)uch conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment". Interpretation of these two

---

[2] Decision, ¶ 538.

3

sentences has provoked much discussion among arbitral tribunals[3] . The ECT's requirement that contracting parties "encourage and create" stable and other conditions for investors in sentence one is expressly linked to the FET standard in sentence two ("Such conditions…" in sentence two). Following the practice of "a large number of authorities", the Tribunal decides to analyse the two sentences together in the context of the Claimants' legitimate expectations claim[4].

9.  In my view, this choice is more than a worthy demonstration of pragmatism to a task of treaty interpretation. The ECT's requirement that contracting parties "encourage and create" stable conditions for investors has its corollary in the investor's legitimate expectation to a stable legal and business framework in the host State. This is usually understood as part of the FET standard. Both the requirement and the expectation are provided for in the first and second sentences of the ECT. This double-sided protection of stability in Article 10(1) post-dates the drafting of the ECT since the emphasis upon the stability aspect in the FET standard emerged in arbitral jurisprudence several years after the ECT was concluded. Whatever weight one gives to each side of the protection it offers to investors, the drafters of the ECT considered the notion of stability sufficiently important to long-term investments in the energy sector (defined broadly in the ECT[5]) to include it as an express term in the treaty itself, rather than in the recitals, as some treaties do. The fact that the wording implies a looser arrangement than the notion of 'stabilization' often found in investor-state contracts does not detract from this conclusion. Subsequent arbitral jurisprudence has

---

[3] For example, *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v The Kingdom of Spain*, ICSID Case No ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶¶ 457-463; The *PV Investors v The Kingdom of Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020, ¶¶ 566-571; *Novenergia II Energy and Environment (SCA)(Grand Duchy of Luxembourg) v The Kingdom of Spain*, SICAR, SCC Case No. 2015/063, Final Award, 15 February 2018*, ¶¶ 642-646; *Infrastructure Services Luxembourg S.a.r.l. and Energia Termosolar B.V.* v The Kingdom of Spain (formerly Antin Infrastructure Services Luxembourg S.a.r.l. and Antin Energia Termosolar B.V.), ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶ 529-530; *Blusun S.A. Jean-Pierre Lecorcier and Michael Stein v The Italian Republic,* ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 315, 319; contrast with *Plama Consortium Ltd v Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 163.
[4] Decision, ¶ 714.
[5] Renewable forms of energy are expressly mentioned in (b) of the Understanding with respect to Article 1(5).

4

done much to incorporate the protection of investors' legal stability in the FET standard since the 1990s[6].

10. It is worth probing a little into what 'stability' means in the ECT context. The wording is not precise enough to suggest it means that a legal order or a special regulatory regime within it is *immutable* or that a State is giving an undertaking to prospective investors never in any circumstances to change it. Rather, it seems that a different conception of stability is implied here.

11. Article 10(1) contains important words that supplement its express reference to stable conditions. The contracting party must "encourage and create stable … conditions for Investors of other Contracting Parties to make Investments in its Area". The conditions are established for a purpose and such conditions are, in the words of the second sentence, to include a commitment to always accord FET to investments made. This notion of inducement of investment is therefore a central element in what we might call the stability paradigm of the ECT. The overriding purpose of stability under the ECT is to induce foreign investors to make commitments in the territories of contracting States. We may recall the stated purpose of the ECT in Article 2: it establishes a legal framework "in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter".

12. The Tribunal's reading of Article 10(1) is rather different, sketching out in a preliminary way a relationship between the stability requirement (in sentences one and two), the right to regulate and the scope of an investor's legitimate expectation, in which two propositions seem to me to be evident. First, in its view the stability obligation in

---

[6] The most pertinent awards to mention the protections espoused in the FET standard include *Occidental Exploration & Production Co. v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004: "[A]n obligation not to alter the legal and business environment in which the investment has been made", and to guarantee "the stability and predictability of the governing legal framework", ¶¶183, 191; *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, ¶¶ 274-276; *Metalclad Corporation v. United Mexican States*, ICSID Case No. ARB/(AF)/97/1, Award, 30 August 2000, ¶ 199; *MTD Equity Sdn. Bhd and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 29 May 2003, ¶ 113; *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶¶ 124–126.

sentence one is not only linked to the FET obligation in sentence two but is *subsumed* by it. Second, the FET standard does not prevent a sovereign State from exercising its regulatory power in a manner consistent with international law. The latter proposition is prima facie uncontroversial, but the quotation which follows from *PV Investors* v *Spain* adds the additional nuance that this limitation on the FET standard includes a State's right "to adapt the regulatory framework to changed circumstances". This is expressly designed to support the notion that stability of the investment framework "is not absolute". Rather, stability is, on the *PV Investors'* view, a principle that needs to be balanced against principles directly derived from State sovereignty. The result of this initial interpretation of the applicable law is to *reduce* the stability requirement to that of one consideration among several associated with State sovereignty that must be considered by the Tribunal in a balancing exercise when assessing the compatibility of State actions under international law. The linkage between stability and the promotion of long-term cooperation (the ECT's purpose) and by implication inward investment, recedes into the background. On this view, at least by implication (and expressly in the *PV Investors* quotation), there is no difference between the ECT and any other investment treaty in the way it balances investor protection and the State's right to regulate. Yet, if economic activity in the energy sector were not in some way different from other economic activities, why would so many States have agreed to draft, sign and ratify an international treaty instrument dedicated specifically to it? And, if there *are* differences between such economic activities and non-energy ones, would we not expect to find them reflected in the treaty text in some ways? In my view, the emphasis on stable conditions is one such example of legal recognition of a sector-specific investment feature, acting as a constraint on contracting parties' right to regulate, and relevant to achieving the purpose of the ECT in Article 2 of "promot[ing] long-term cooperation in the energy field".[7] As a matter of international law, and contrary to the view in *PV Investors* on this point, the treaty protection of stability is stronger under the ECT than under any other international investment treaty that I am aware of.

---

[7] A view supported by the Energy Charter Secretariat's publication, *The Energy Charter Treaty – A Reader's Guide*, p. 6 (https://is.muni.cz/el/1422/jaro2017/MVV2368K/um/ECT_Guide_ENG.pdf).

(ii)     Stability in relation to Low Carbon Energy Investments

13. Even if we were not to accept the proposition that the origin of this unique treaty emphasis lies in an assessment by the ECT drafters that the political risk in this sector was unusually significant, a number of the documents provided to the Tribunal[8] and analyses of tribunals' findings in similar cases[9] suggest that with respect to the class of investments in *renewable* forms of energy the State plays an unusually important role in encouraging, creating and supporting the context for inward investment on a large scale. In a nutshell, the market alone cannot deliver these investments, so the State steps in to improve the benefits to investors, enhancing their long-term prospects, and simultaneously generating advantages in social welfare and meeting commitments under EU and international climate change law and policy. As a result, the triangular relationship between the regulatory State, investor expectations and stability takes on a more specific aspect in this area of energy investment than in conventional, well-established energy sectors. These are – especially in the PV sector – investments in 'new' rather than 'old' energy.

14. Investments of the kind that the Respondent was seeking through the regime set up by Law 54/1997[10] were being sought by governments in States across the EU and

---

[8] Claimants' Request for Arbitration, ¶ 5; Cl. Memorial, ¶¶ 16-17, 45-49; Counter-Memorial, para 285; Claimants' Reply, ¶ 48.

[9] See, for example: *Antin Infrastructure Services Luxembourg S.a.r.l and Antin Energia Termosolar S.A. v The Kingdom of Spain*, ICSID Case No ARB/13/31, Award, 15 June 2018, ¶¶ 540-544, 548, 553-554; *Watkins Holding S.a.r.l, Watkins (NED) B.V., Watkins Spain S.L., Redpier S.L., Northsea Spain S.L., Parque Eolico Marmellar S.L. and Parque Eolico La Boga S.L. v. The Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020, ¶ 451; *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶¶; 515, 516; *Sunreserve Luxco Holdings S.a.r.l. v The Italian Republic, SCC Arbitration V (2016/32), Award, 25 March 2020, ¶¶ 684, 685; Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.77. *In SolEs Badajoz GmbH v The Kingdom of Spain,* ICSID Case No. ARB/15/38, Award, 31 July 2019, the tribunal found that "Spain has provided public aid to the renewable energy sector in order to meet its objectives for renewable energy, which it has set against the backdrop of EU targets. This aid has included large subsidies to PV plants… Within the Special Regime that was established pursuant to the 1997 LSE, the key instrument for subsidizing investment in PV facilities was a premium in the form of a FiT", ¶¶ 420, 519.

[10] For an overview of the policy reasons for evolution in Spain's Renewable Energy legal framework from 1994-2008, see *Cube Infrastructure Fund SICAV et al v Kingdom of Spain*, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019, ¶¶ 234-272; *Novenergia II v. Spain*, SCC Arbitration (2015/063), Award, 15 February 2018, ¶¶ 663 – 669; *Foresight Luxembourg Solar 1 S.a.r.l. et al v. Kingdom of Spain*, SCC Arbitration (2015/150), Final Award, 14 November 2018, ¶¶ 62 – 93.

indeed in other parts of the world. Within the EU the policy goals were usually to reduce emissions and to meet targets for renewable energy as a generator of electricity as part of a wider climate change action policy. Often the resulting schemes depended upon the attraction of private capital, foreign and domestic, for them to take off. Yet there were barriers. Common problems encountered were higher cost and significantly higher risk than were present in energy investment in the conventional electricity market, which generated power by drawing on relatively cheap but highly polluting supplies of fossil fuels. Often such investments were project financed, with the lender requiring long-term guarantees of tariffs since this feature was the single source of repayment of costs and return. To address this and particularly to incentivise investment, a common solution among the EU States was the adoption of the so-called Feed-in Tariff mechanism (FiT), designed to offer a premium to investors in renewable energies and over time to guarantee repayment of investment costs and offer a return to the investor over the operational life of the installations, secure against periodic reviews and competitive relative to opportunities that investors may have elsewhere.[11] To combat fluctuations in demand for electricity from these sources, they were often given priority of despatch. While each government within the EU, encouraged by its legislation and institutions, designed a bespoke regulatory regime to suit its circumstances and policy choices with respect to low carbon energy, a set of common regulatory conditions emerged and proved effective. From the record of this case, such commonality in regulatory behaviour among EU States permitted an early comparison by the owner of the Claimant entities, Mr Bouman, between the FiT mechanisms in Germany and Spain prior to making an investment and is also evident as a technique in the data collections assembled and analysed in the expert reports of both parties.[12]

---

[11] For an analysis of the FiT regime, and why it is there: *9REN Holding S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, ¶¶ 70 – 95, 99-102; *SolEs Badajoz GmbH v Spain*, ¶¶ 414-425. In the context of this case, the observation of the Spanish regulatory body, the CNE, may be noted: "(i)t should be remembered that the reason for the existence of the economic incentives for production from renewable energy sources, cogeneration and waste is to correct one of the so-called 'market flaws' by compensating for the long-term environmental, social and supply costs which other forms of generation do not fully internalise": C-0117, Report 18/2013 of the Spanish National Energy Commission on the Royal Decree Proposal regulating the activity of electricity production from renewable energy sources, cogeneration and waste.

[12] Expert Report of Econ One Research Inc., 24 November 2017, ¶¶ 132-136, and Table 5; KPMG, Regulatory Expert Witness Report, 30 June 2017, ¶¶ 129-132, 160-161.

15. The Respondent joined with other EU States that were seeking to attract investment into this new sector by designing a national regime, driven in part by international policy commitments on climate change and targets in EU legislation. As a first step, the Respondent established a Special Regime by Law 54/1997 to distinguish the renewable energy sector from the conventional electricity sector, emphasising the centrality of a premium to the market price as an incentive to investment in it. Yet, for the regime to achieve its goals, it needed to attract foreign investment, and subsequent legal measures addressed the need for solutions to the three problems outlined above: lack of commerciality; tariff-based revenue dependence over the long term and novelty. By ensuring financial support and reducing risk exposure, the FiT mechanism addressed the core problems faced by any PV regulatory regime and played a major part in offering investors signals that drove investment on the desired scale. It lay at the core of an inter-related system of regulation that when offered to investors provided them with significant incentives. Such mechanisms were not unique to Spain or any other State seeking to expand its renewables sector but were a readily recognizable set of legal and regulatory conditions with a proven track record that had a good chance of inducing a class of investors to commit capital to a host State that offered them, while addressing the high risk-profile specific to these new forms of energy.

16. In taking this already well-trodden path, the Respondent faced a common concern rooted in the novelty of some of the newer forms of energy, especially PV. If investments were to be forthcoming on the desired scale, in the face of heavy front-end capital costs, then constraints (along the above lines) on the State's right to regulate were required, along with guarantees about the remuneration over the long term. However, the evolution of the sector could be expected to be rapid and therefore some adjustment of the regulatory regime was likely to be required in the near future[13]. The result is that guarantees of stable conditions have tended to be

---

[13] As the Tribunal in *Antin Infrastructure v Spain* put it: "(t)he purpose of subsidization in this context is to allow the technologies to be developed in the hope that over time the costs associated therewith will decline, thus making RE technologies more competitive": ¶ 540.

limited in scope to distinct waves of investments, allowing States to review progress to date and adapt the terms of future investments if necessary. Arguably, however, another consequence is that scrutiny of State behaviour in this sector has to be greater than usual to ensure that a State's response to sector evolution is proportionate and reasonable.

17. In the language of the ECT's Article 10(1), this approach to remuneration was central to the encouragement and creation of 'stable conditions' that many EU States were offering in order to attract foreign (and domestic) investment. It did not require a petrification of the regulatory regime, which could be expected to evolve with the impact of lower costs, a phenomenon expected in the PV segment of the renewable energy market[14]. Indeed, in Spain's case, investors seeking to benefit from RD 2007 were faced with a timetable and a clear message that if they wished to benefit from a specific group of incentives, they would have to register by a certain date in the RAIPRE, after which this 'round' of FiT benefits might no longer be available. It was therefore consciously designed as an evolving regime to ensure that the balance of benefits between *new* investors and the State could be recalibrated to reflect a different risk profile from that of investors who had already made commitments but on more demanding business conditions. In conclusion, the fragility of the renewables sector and its especially high dependence upon the assurances of stability from the host State for its very viability suggests that the guarantees of the ECT in Article 10(1) have a particular importance for this class of investments and require a scrutiny of any State measures that may have a potentially adverse effect on investments made in a still-evolving segment of the energy economy.

---

[14] This point has been noted by several tribunals in cases involving Spain such as *Antin Infrastructure v. Spain*, ibid., ¶¶ 530-532, 540-54, 548 and 553-554; *OperaFund Eco-Invest SICAV PLC & Schwab Holding AG v The Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019, ¶¶ 508-53; *AES Summit Generation Limited v Republic of Hungary*, ICSID Case No ARB/07/22, Award, 23 September 2010, ¶ 9.3.25. See also: *Enron Corporation and Ponderosa Assets, L.P. v The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 261.

## B. Expectations of Stability vs The Assumption of Risk

*A central question for determination is whether the Disputed Measures introduced by the Respondent in its energy law breached the Claimants' legitimate expectations and therefore were in breach of Article 10(1) of the Energy Charter Treaty (ECT).*

18. The Tribunal has carried out a detailed and comprehensive analysis of the legitimate expectations claim, guided by the non-controversial assumption that for an expectation to be legitimate, it must be based on objective criteria[15]. Where such expectations are found to be unjustified, the Tribunal's analysis draws upon the notion of 'assumption of investor risk', which leads to its conclusion that the Claimant entities and their owner, Mr Bouman, in proceeding with their series of investments, took upon themselves a considerable risk of future changes in law. As a result, the Tribunal concludes that the primary claim of the Claimants, based on the non-alteration of the FiT regime in RD 661/2007 and RD 1578/2009, cannot be upheld[16]. The replacement of the FiT regime did not, in its view, amount to a modification so drastic or unexpected "as to constitute a violation of the FET obligation under the ECT and the stability obligation it subsumes"[17]. I do not agree with this conclusion or the reasoning which leads to it. In the following paragraphs I explain why.

### (i)    The Legal Standard

19. The building block in the Tribunal's analysis of legitimate expectations is the 'legal standard' that it sets out in paragraphs 793 to 799. Essentially, this is a view about the kind of specificity required in the representation by a host State to the investor for an expectation to be legitimate. A legitimate expectation can arise, it argues, from a specific guarantee in legislation but not necessarily one that is addressed specifically

---

[15] A view summarized by the late Professor Rudolf Dolzer thus: "(i)t is generally recognized today that legitimate expectations arise out of the objective conduct of the host state and not out of subjective postulates of the investor… A point that remains to be decided concerns *the manner in which the investor must show* that the state's objective conduct gave rise to expectations on the part of the investor" (my emphasis), 12 *Santa Clara J of Int'l L* 7 (2013), 16.

[16] Decision, ¶ 875.

[17] Decision, ¶ 875.

to the investor concerned[18]. Where the latter is lacking, the Tribunal believes it must carry out an objective examination of the legislation and the facts relevant to the making of the investment to assess whether, in the words of the *Stadtwerke v Spain* tribunal, "a prudent and experienced investor could have reasonably formed a legitimate and justifiable expectation of the *immutability* of such legislation" (my emphasis)[19].

20. In my view, this approach is unsatisfactory because of its characterisation of both the specific commitments and the object of the expectation. With respect to the first, the Tribunal's view is that a legitimate expectation need not require a specific representation to each individual claimant, but, following the tribunals in *Philip Morris v Uruguay*, and *Antaris v Czech Republic*, it finds that provisions of general legislation applicable to a plurality of persons cannot create a legitimate expectation that *no change in law will take place,* thereby imposing limits on the scope of the expectation that may arise from legislation. Such views are contested[20] and seem particularly vulnerable with respect to a highly regulated industry with a bespoke legal regime, as outlined above. In such cases, of which the regime established in Spain by Law 54/1997 and subsequent decrees is surely a good example, the views of the tribunal in *Cube Infrastructure v Spain* are on point:

> "… it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively

---

[18] Decision, ¶ 796.

[19] Decision, ¶ 798.

[20] For several tribunals, what constitutes a specific commitment will depend on the circumstances in each case: *9REN Holding v Spain*, ¶¶ 292-297; *Novenergia II v Spain*, Award, ¶¶ 665-667 (especially at 666) and *Cube Infrastructure Fund SICAV et al v Spain*, ¶ 388. Note, too, that in *Electrabel v Hungary*, Award, 30 November 2012, the tribunal observed that while specific assurances given by the host State may reinforce the investor's expectations, such an assurance is not always indispensable: see ¶ 7.78.

reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them."[21]

21. The regime in question here is one that may not contain specific commitments to individual investors but is specific regarding its object and purpose and applies to prospective investors with capital that may be attracted by the FiT mechanism in that regulatory regime.[22]

22. I note that among the specific provisions in the regulatory regime that were included to incentivize investors to make commitments to the sector in Spain include the following:

(1) In Law 54/1997 renewable energy facilities in the Special Regime were to be authorized to incorporate all the energy produced by them into the system, obtaining "reasonable rates of return" set by the government[23].

(2) Under Royal Decree 436/2004 an express aim was to "provide those who have decided or will decide in the near future to opt for the special regime with a durable, objective, and transparent framework"[24].

(3) Under Royal Decree 661/2007, PV plants that were registered in the RAIPRE before the cut-off date were entitled to incorporate all their net production into the grid; to benefit from a FiT that would be updated only in line with the CPI and receive the fixed FiT for the duration of the operational life of the plants[25].

23. All these provisions were in force when the Claimants made their series of investments. They are representations to a category of investors with respect to certain features of

---

[21] *Cube Infrastructure Fund SICAR et al. v Spain*, ¶ 388; *Charanne B.V. v The Kingdom of Spain*: Dissenting Opinion of Prof. Guido Santiago Tawil, SCC 062/2012, 21 January 2016, ¶¶ 5-8.

[22] *El Paso Energy International Company v The Argentine Republic*, ICSID Case No ARB/03/15, Award, 31 October 2011, ¶ 375.

[23] Law 54/1997, 27 November 1997, Article 30(4).

[24] RD 436/2004, 12 March 2004, p.10.

[25] RD 661/2007, 25 May 2007, Arts 9-15, 17, 24-30, 37, 44.

the regulatory regime that had as their goal the encouragement of investments in the renewable energy sector.[26] I have more to say on this below.

24. With respect to the *object* of the expectation, my disagreement with the Tribunal's approach is different. For the *Stadtwerke v Spain* tribunal, the object of an investor's expectation of the host State's legislation is *immutability.* In this case, however, the Tribunal understands the parties to be in agreement that legitimate expectations cannot be held unless there is some specific commitment on which to base them, and that the expectations are "that the regulatory framework will remain unchanged ("frozen")". Yet this interpretation of the expectation sought does not fit a simple reading of the language of the ECT or at least some of the statements by the parties in the record of this case[27].

25. If we review the language in Article 10(1) of the ECT, it is about encouraging and creating *stable conditions* for investors to invest. Under FET in the second sentence, it is, by inference and following a line of cases, about meeting an investor's expectation of a stable legal and business environment[28]. Neither of these requirements appear to be framed in such strict or precise language as to prohibit a contracting party from making *any and every* change in the regulatory framework applicable to an investment. Rather, they appear to require that a State provide and subsequently respect the kind of legislative framework that would underpin continuity and predictability in the host State's business environment for investments made by a foreign investor. If stability is offered, we would expect to find evidence of factors such as: benefit, duration, specificity, mutuality and consistency over time. On this view, investors could expect

---

[26] I note that this insight has already been present in several cases involving the same disputed measures: for example, *Novenergia II v Spain*, ¶ ¶ 666-667; *Antin Infrastructure v Spain*, ¶ 538, and *SolEs Badajoz v Spain*, ¶ 313: "(a)s has been widely recognized, an investor's legitimate expectations can also arise from provisions of law and regulations and from statements made by or on behalf of the State for the purpose of inducing investment by (a) class of investors".

[27] For example, Claimants' Memorial, ¶ 329: "…it is not the Claimants' position that the obligation to accord "*stable*" and "*transparent*" conditions in the ECT means that a host State must completely freeze its regulatory regime"; Claimants' Reply, ¶ 310.

[28] *Novenergia II v Spain,* ¶ 654; *Antin Infrastructure v. Spain*, ¶¶ 530-533; *Ioan Micula, Viorel Micula, European Food S.A, Starmill S.R.L.and Multipack S.R.L v. Romania*, (Micula I), ICSID Case No. ARB/05/20, Award, 11 December 2013), ¶ 529; *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.77.

a limited rather than an absolute form of 'stability' from a contracting party to the ECT. The corollary of this is that the host State would refrain from taking legislative measures that would undermine or abolish such stable conditions or the stability of the legal and business framework on which investors had based their decisions when making their investments. With respect to the PV sector in Spain, this meant that the investor would base its expectations on information provided by the State about – among other things - the level of the incentive or premium offered, the duration of such incentive and the frequency and terms of any review. Unless it was clear that the State was in fact making this offer, such expectations would be unreasonable, and not benefit from the protection of Article 10(1) of the ECT.

26. The Tribunal's emphasis upon immutability in relation to stability does not fit with the statements of the parties in the case itself, not least the statements about expectations made by the Claimants[29]. There is therefore a risk of divergence in the way the Tribunal has chosen to define the expectation of a reasonable investor. Essentially, the investor in this case expected something other than immutability from the legal order.

27. These considerations about the character and scope of stability need to be borne in mind when examining the features of the Special Regime, especially Decrees 2004, 2007 and 2008, and the effects of the disputed measures in relation to the legitimate expectations claim. They play a role in the way the Tribunal responds to the three questions it identifies as central to the potential success of that claim: given the content of the relevant regulatory framework in place at the time the Claimants' investments were made, were their expectations legitimate and reasonable; were the disputed regulatory changes 'drastic' and 'unexpected' so as to violate the Claimants' "general expectation of stability", and if so, to what extent; did the regulatory framework at the time of the Claimants' investments contain signs of future unfavourable changes or regulatory risk and if so, to what extent.

---

[29] See Note 27.

(ii)     The Timing of the Investment

28. In this case, the Claimants' investments were made over a period of several years, from 2006 to 2009, and covered five PV plants, involving several dozen corporate vehicles. The Tribunal recognizes that a legitimate expectation should be based on the time when an investment was made at which the decision to invest became irreversible[30]. The key dates here are therefore those on which the EPC contracts were signed for the construction of each of the five plants between 10 August 2006 and 25 November 2009. At each of these points, the decision to invest in each of the five plants constituted a point of no return. However, the Tribunal adds that "it is not convinced that the events preceding the signing of the first EPC contract… should be ignored when analysing the Claimants' investment process"[31]. This is surely a reasonable approach, as would be the argument that actions occurring *after* these dates could not inform the investor's expectations. I note therefore that not even one of the 'disputed measures' had been adopted at the time that these investments were made, a feature which distinguishes this case from several others involving the Respondent's measures.[32]

29. The Tribunal's interpretation of events at this pre-investment stage is guided not only by a search for evidence of the expectations that the investor relied upon when making the investment, but also for evidence that the regulatory framework at this time "contained signs of future unfavourable changes or regulatory risk."[33] If so, the investor's decision to proceed would suggest an assumption of risk that is relevant in the Tribunal's assessment of the claim under Article 10(1) of the ECT. In this instance,

---

[30] Decision, ¶ 809. It follows a line of authorities: see *9REN Holding v Spain*, ¶¶ 289, 290, 297; *Novenergia II v Spain*, ¶¶ 531, 532, 536-539; *SolEs Badajoz v Spain*, ¶ 418; *Ulysseas v Ecuador*, Award, 12 June 2012, ¶ 252; *Crystallex v Venezuela*, Award, 4 April 2016, ¶ 557; *AES Summit Generation v Hungary*, Award, 23 September 2010, ¶¶ 9.3.12 to 9.3.17.

[31] Decision, ¶ 809.

[32] For example, *Infracapital F1 S.a.r.l. and Infracapital Solar B.V v Kingdom of Spain*, ICSID Case No ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021, and *Cube Infrastructure v Spain*. In the former case, the final decision on the PV investments was made in 2011, while in the latter, the hydro investments were made in 2011 and 2012; in both cases, *after* the initial disputed measures were introduced by the Respondent. Clearly, this timing has relevance to an assessment of the investor's legitimate expectations.

[33] Decision, ¶ 799.

16

the Tribunal concludes that due to the restructuring of business entities to make the investment in construction of solar plants and the date of the first investment, "the Claimants' investment process had started under RD 436/2004"[34]. I will discuss the Tribunal's comments on the due diligence carried out by the Claimants in section (vi) below.

(iii)    The Content of the Expectations

30. In its assessment of Claimants' expectations, the Tribunal examines the provisions of each of the Royal Decrees relevant to the Claimants' investments "to verify whether a stabilization commitment could be derived from their texts".[35] It is unclear what exactly such a commitment means to the Tribunal, however. In my view, some changes in the overall regulatory regime are likely to be compatible with the ECT requirements so long as core elements such as – in this case - the FiT remuneration mechanism remain in place as one of the conditions of stability offered to and therefore expected by foreign investors.[36] I shall examine the Tribunal's views below in relation to each of these Decrees.

a)  Decree RD 436/2004

31. In RD 436/2004 a FiT was provided for that would have a duration lasting the entire operating life of the facilities, with a formula for an annual update of the incentives linked to a reference electricity price. The key provision in RD 436/2004 that, according to the Claimants, provides an undertaking not to modify the FiT regime for plants that had been commissioned under that Decree is Article 40(3). It states:

> "The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred

---

[34] Decision, ¶ 815.
[35] Decision, ¶ 817.
[36] See *Cube Infrastructure v Spain,* ¶¶ 408-409; *Foresight v Spain,* ¶ 356; *AES v Hungary,* ¶¶ 9.3.29-9.3.30; *Micula v Romania,* ¶ 666, and *Electrabel v Hungary* ¶ 7.77.

17

to in the paragraph above (i.e., Article 40(1)) and shall not have a backdated effect on any previous tariffs and premiums". [37]

32. Separately, in its Preamble, RD 436/2004 stated that its purpose was to establish a "durable, objective, and transparent framework" to promote investment in the renewable energy sector, and in doing so, to provide "security and stability" to investors, since "this new methodology to calculate the special regime remuneration should help it to foster investment in this kind of plants".[38]

33. In the Tribunal's view, the provisions of RD 436/2004 and particularly Article 40(3) "did not give rise to the type of expectations the Claimants are invoking in this case".[39] It sees the limitation on revisions as applying only to revisions provided for in Article 40. Its reasons are rooted not so much in the text of the Decree itself as in the relationship the Decree has to the *overall* regulatory scheme and the operation of 'the principle of hierarchy of laws'. In reaching this conclusion, the Tribunal attaches some weight to the jurisprudence of the Spanish Supreme Court which has asserted the existence of a right to modify any specific system of remuneration under Spanish law, especially in a Supreme Court decision of 2005. I do not agree with this conclusion or the reasoning by which it is reached.

34. If we take first the relationship between RD 436/2004 and the regulatory regime, there appears to be agreement that Article 40(3) required that any revisions to tariffs, premiums, incentives and supplements as envisaged in Article 40(1) are not to have a backdated effect on previous tariffs and premiums. The logic of this in relation to the overall goal of attracting long-term investment into the renewable energy sector is clear enough. The prospective investor needed to be able to calculate its costs and how the Special Regime rates were to be established. The limitation on the scope of subsequent revisions to tariffs for existing investors would greatly facilitate their

---

[37] Quoted in Decision, ¶ 820.

[38] RD 436/2004, 12 March 2004, p.10; Decision, ¶ 831. See *Foresight v Spain*, ¶ 73: "The purpose of RD 436/2004 as articulated in its preamble was to provide "security and stability" and to establish a "long-lasting, objective, transparent regulatory framework" in order to promote investment in renewable electricity generation".

[39] Decision, ¶ 838.

forward calculations about remuneration and could be relied upon when deciding whether to invest in this sector in Spain rather than elsewhere.

35. Indeed, this provision was contained in the legal form of a Royal Decree, a regulatory measure in contrast to a legislative one, such as Law 54/1997. It was also clearly a subsidiary and more specific part of a regulatory structure with Law 54/1997 at its base and aimed at encouraging foreign investors to make significant capital commitments into the renewable energy sector in line with Spain's energy policy at the time. As such, it seems entirely reasonable that a prospective investor should seek to rely upon its content and should form expectations about the regulation of any future investment. In my view, it contained the factors to be expected in a functioning notion of stability (see para 25 above): there was a benefit to the investor, limited in time, specific in character, with mutual advantages and to be applied consistently over the 25-year period. Provision for review was constrained and retroactivity was prohibited.

36. The second aspect of the Tribunal's reasoning which I am unable to agree with is the weight it accords to the principle of the hierarchy of laws within the Spanish domestic legal regime, and statements by the higher courts on this characterisation of laws in that system. Such statements are certainly relevant as a source of fact, as several tribunals have noted[40]. However, the Tribunal acknowledges the limits of the various Supreme Court judgments it refers to even in this respect. The judgments examined in paragraphs 833 to 835 did not specifically address Article 40(3) of RD 436/2004, which undermines the Tribunal's claim that the judgments "issued either before or during the very first stages of the Claimants' investment processes … should have been considered as 'red flags' by a diligent investor".[41] The judgments also addressed fact patterns different from the present dispute and challenges to regulations that are not at issue in the present dispute, differences that are noted by the Tribunal. Indeed, the claimants in these cases were owners of facilities based on *non*-renewable energy

---

[40] *SolEs Badajoz v. Spain*, ¶¶ 428-433; *Foresight v. Spain*, ¶¶ 370-375.
[41] Decision, ¶ 838.

technologies, such as cogeneration plants[42]. I do not see such fact patterns as likely to give signals to a reasonable investor that a possible regulatory overhaul of this regime was imminent or probable. Their relevance however is said to lie in "the purposes of proper legal characterization of the state of Spanish law and the expectations the investors could form thereunder". However, the applicable law in this dispute is international law and the relationship between certain legal measures taken in Spain and that body of law, especially the ECT.

37. In the Tribunal's view, the line of judgments by the Spanish Supreme Court has "confirmed that RD 436/2004 did not establish an intangible legal framework"[43]. By this it presumably means a regime that could not be modified. However, the issue is not what the Supreme Court held but rather how the provisions in that Decree concerning the stability of the remuneration regime relate to the requirements of international law, and specifically Article 10(1) of the ECT. Indeed, in these paragraphs 833 to 845, there is a surprising lack of reference to the applicable law in this case, the ECT and international law. I note with approval the remarks by the tribunal in *9REN Holding v Spain* that the jurisprudence of the Spanish Supreme Court is entitled to great respect in relation to Spain's domestic law but "the judgments relied upon by the Respondent address a different issue than the issue before this Tribunal, which is concerned only with *international law* obligations"[44]. It added perceptively:

> "It is not surprising that the Spanish Supreme Court should affirm that regulatory measures under domestic Spanish law may be modified in the exercise of Spanish sovereignty. The question before the Tribunal however is whether such changes can be made by Spain **without financial consequences** under the ECT.
>
> The views of the Spanish Supreme Court concerning legal certainty or legitimate expectation may dispose of the issue of government liability at

---

[42] Some of the claims challenged the application of new requirements linked to the technical management of the electricity system. None of them concerned the loss of an entitlement by a renewable energy facility (or a PV one) to a regulated incentive: KPMG Asesores, Rebuttal Regulatory Expert Witness Report, 12 July 2018, ¶ 113.
[43] Decision, ¶ 836. Intangibility is a form of freezing. Typically, it is used to describe a prohibition of unilateral changes to an investment agreement and requires the consent of both parties before changes may be made.
[44] *9 REN Holding v Spain*, ¶ 242. The emphasis is in the original.

domestic law, but the Claimant does not rely on Spanish domestic law. It relies on Article 26(6) of the *Energy Charter Treaty* which mandates this Tribunal, not the Spanish Supreme Court, to determine whether the Claimant had a legitimate expectation of irrevocability, and if so, whether that legitimate expectation was violated, and if so the legal consequences as a matter of international law. This is clear from Article 27 of the Vienna Convention which states that a "party may not invoke the provisions of its internal law as a justification for its failure to perform a treaty"".[45]

38. There is another aspect to the Tribunal's analysis that relies upon the principle of the hierarchy of laws. It appears to suggest that the host State can introduce a law of a kind higher than that of a Royal Decree in the hierarchy and modify the lower kind of law if it so chooses. Theoretically, this is of course correct, as is the proposition that such a change could also be made by the State in Law 54/1997, even though it is a legislative instrument and therefore located higher than a Royal Decree in the hierarchy of laws (which did in fact occur). That a host State has a power to amend or repeal a legal norm in its domestic system is hardly in question. In his analysis of this feature in *Eurus Energy Holdings v Spain*, Mr Oscar Garibaldi made what seems to me a correct statement of the issue which arises here:

> "whether as a matter of application of the standards of the ECT, the mere existence of that general power under domestic law is enough to foreclose any objectively reasonable expectations based on a state commitment that such power will not be exercised in certain respects and for a certain period".[46]

39. I agree entirely that the answer must be negative. On the assumption that the Respondent acted in good faith (and there is no suggestion that it did not), it surely made these commitments with the intention of complying with them on their terms. A reasonable investor would surely conclude that the host State had every intention of honouring its commitments and refraining from exercising its power to revoke them.

---

[45] *9 REN Holding v Spain*, ¶ ¶ 243-244.
[46] *Eurus Energy Holdings Corporation v The Kingdom of Spain*, ICSID Case No ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021: Partial Dissent by Mr Oscar M. Garibaldi, ¶ ¶ 88-92 at 90.

The alternative would seem to invite the investor to treat with suspicion the legal acts made by a State that contain incentives, a sort of *caveat investor* atmosphere. If such a context prevailed in international investment, commitments such as those in RD 436/2004 and other Royal Decrees would have failed to achieve their purpose of attracting large-scale inward investment into the renewable energy sector in Spain. As Mr Garibaldi wisely notes, "(a)n incentive on which no investor can rely is not an incentive".[47]

40. Of course, the Tribunal is also arguing that RD 436/2004 did not contain any promise of long-term stability for the remuneration regime. In my view, however, on a plain reading the text insulates *existing* installations from the impacts of later reviews of tariffs, premiums and incentives. A prospective investor must also have found further assurance in the words in the Preamble of the text. Even if such wording were deemed insufficiently specific or explicit, I recall and support the view of the tribunal in *Cube Infrastructure v Spain,* that there is "no reason to view (that) representation as being subject to the implied qualification that it would remain effective only until the State exercises its undoubted legislative power to override it. If it were otherwise, it would be practically impossible for a State ever to give an undertaking upon which anyone could rely, or for legitimate expectations ever to arise."[48]

b) *Decree RD 661/2007*

41. The Tribunal notes that RD 661/2007 was also "extensively relied upon by the Claimants… to demonstrate an alleged undertaking not to modify the FiT"[49]. It states that one of the Decree's aims was to provide "corrective mechanisms" relating to the regulatory regime set up by RD 436/2004, and the transitory regime of RDL 9/2006. Nothing in the text of this Decree, however, changes the conclusions the Tribunal reached with respect to RD 436/2004, that there is no "guarantee that the subsidy

---

[47] *Eurus Energy Holdings Corporation v The Kingdom of Spain*: Partial Dissent, ¶ 90(d).
[48] *Cube Infrastructure v Spain*, ¶ 289 (the remarks are addressed to RD 661/2007).
[49] Decision, ¶ 839.

scheme would remain unmodified"[50]. Further, the manner of its adoption should in its view have given concern to the Claimants: its immediate application to PV installations already commissioned under Decree 436/2004 was "indicative of potential adverse regulatory changes in the future"[51].

42. This interpretation of RD 661/2007 overlooks the clear statement in the Preamble that "a system which is analogous to that provided in Royal Decree 436/2004 … is maintained", with commitments to remuneration that offered investors a choice of a regulated tariff (a fixed payment) or a premium payment over the market price, permitted investors a long duration of 25 years and, on my reading of Article 44.3, made it clear that such changes in law as were contemplated ("revisions") "shall not affect" certain classes of facility that have already received a certificate: that is, they shall not apply to power plants that were already in operation or were commissioned shortly after the revision. The Tribunal's view takes a different basis than the text however and is justified largely by reference to the hierarchy of laws principle which I have already discussed above, and refrain from revisiting. In my view, following the *Novenergia II* tribunal, the wording of RD 661/2007 is "adamantly clear"[52], containing an express commitment to offer 'stable conditions' to a prospective investor. It could be relied upon to base an expectation that there would be no radical or fundamental changes to the Special Regime as set out in this Decree.[53]

43. With respect to the specificity of the commitments in RD 661/2007, I agree with the summary provided by Mr Oscar Garibaldi in *Eurus Energy v Spain*, when he concludes that they

> "are highly specific in respect of the content of the commitments: the *quantum* of the remuneration to which the producers were entitled, the *duration* of the

---

[50] Decision, ¶ 846.

[51] Decision, ¶ 847. However, the tribunal in *Cube Infrastructure Fund SICAR et al v Spain* characterized the changes quite differently: "The new regulations will not be of a retroactive nature. *The installations that are operational by January 1, 2008, may continue to adopt the previous regulations under the fixed tariff option throughout their operating life.* When they take part in the market, they may maintain their prior regulation until December 31, 2012. These installations may voluntarily opt to abide by this new Royal Decree as from its publication" (my emphasis), ¶¶ 262-264, 282.

[52] *Novenergia II v Spain,* ¶ 874.

[53] Ibid., ¶ 878. Similarly, see *OperaFund v Spain*, Award, ¶ 485; *Antin Infrastructure v Spain*, ¶¶ 552-553.

specified quantum, and the *exemption* of existing plants from future revisions to certain key components of the specified remuneration. Those commitments were also highly specific in respect of the *beneficiaries* of the commitment, i.e. the class of producers validly registered in the RAIPRE as beneficiaries of the special regime".[54]

44. The idea that RD 661/2007 prefigured a sweeping away of the FiT regime or other adverse regulatory changes in the future is contradicted by the facts. Consider, first, the overall context in which RD 661/2007 was introduced. As the tribunal in *9REN Holding* observed:

> "The terms of Article 44 of RD 661/2007 must be read not only with a close regard to its text but also the broader context in which it was made and its clear and obvious paramount purpose which was (in the Tribunal's view) the inducement of investment in renewable energy that Spain's earlier incentives had failed to attract."[55]

45. The earlier measure, RD 436/2004, had enjoyed less success in attracting inward investment into renewable energy than Spain was seeking, so one of the goals of RD 661/2007 was to address that shortcoming. Insufficient stability was deemed to be one of the reasons for this limited success (but not failure) to meet the ambitious policy targets for expansion of renewable energy, so RD 661/2007 was aimed at enhancing that stability in the legal framework as part of its general attractiveness.[56] To prospective investors it would be entirely reasonable to rely upon this improved offer of stable conditions, especially given the way in which the PV sector was highlighted in RD 661/2007 as comprising facilities of particular note[57]. These representations as to the stability of RD 661/2007 are ultimately not a matter of

---

[54] *Eurus Energy Holdings Corporation v Kingdom of Spain*, Partial Dissent of Mr. Oscar M. Garibaldi, ¶ 76. The emphasis is in the original.

[55] *9 REN Holding v Spain*, ¶ 266.

[56] See National Renewable Energy Action Plan 2005-2010 (NREAP), IDAE, August 2005, p.171; see also *Foresight v Spain*, ¶ 79. The NREAP also contained updated and more ambitious targets for 2010 which required greater stimulus if they were to be met.

[57] The designation of Group b.1 and Sub-group b.1.1, is noted in the Decision, ¶ 842.

domestic law but of international law, operating in the context of Article 10(1) of the ECT.[58]

c) *Decree RD 1578/2008*

46. The last two plants among the Claimants' investments were regulated by RD 1578/2008. For the Tribunal, "the text of RD 1578/2008 does not contain any representation of irrevocability of the FiTs granted under this Decree"[59]. The Decree introduced several changes to the regulatory regime available to investors: among other things, it offered a lower FiT for PV plants than under RD 661/2007, but this applied to new plants only and did not affect existing installations that had obtained final registration in the RAIPRE by the deadline under RD 661/2007. The change in the FiT made sense since new investors could benefit from reductions in the price of solar panels and hence the subsidy offered could be reduced accordingly. An emphasis on continuity and forward planning was evident throughout the text. The Preamble, for example, noted that the Decree's provisions helped "to ensure the continuity of the support system". The Preamble also refers to the need "to provide the necessary legal certainty for promoters in relation to the remuneration to be obtained by the facility, once commissioned". The context of this reassurance to investors is notable. In a press release issued at the same time as RD 1578/2008, the Government announced that Spain had a target of installed PV capacity of 10,000 MW by 2020[60]. This would require continued investment by foreign investors to be achievable.

47. The kind of express language of stability in RD 436/2004 and RD 661/2007 was indeed absent in RD 1578/2008, although such language was already deemed by the Tribunal to be insufficient to provide a basis for the Claimants' expectations[61]. This lacuna was largely in response to a shift in the method of deploying installed capacity according to quarterly calls: once installations were registered, the right they enjoyed to a

---

[58] *9REN Holding v Spain*, ¶¶ 242-244; *SolEs Badajoz v Spain*, ¶¶ 161-162.
[59] Decision, ¶ 850.
[60] Ministry of Industry, Tourism and Commerce: Announcement of RD 1578/2008, 'The Government approves the new economic regime for PV installations', 26 September 2008, p.1.
[61] Decision, ¶ 854.

specific FiT was locked-in for up to 25 years, subject to updates in line with the consumer price index.[62]

48. With respect to future revisions of the tariff, the Fifth Additional Provision of RD 1578/2008 provides that in 2012 "payment for the activity of electricity production using solar photovoltaic technology may be modified", according to technological development in the sector and market and the operation of the payment regime. On my reading, this reference to technological development applies to possible declines in costs to investors but that cannot apply to investors who have already made commitments to the sector and whose costs are sunk for their projects. The wording therefore must apply to future plants and not existing ones. The explanatory memorandum (*Memoria Justificativa*) that accompanied the Decree also makes it clear that this planned review was to have a limited scope, affecting only the percentage variation rate of the tariff adjustment mechanism.[63] For the Tribunal, however, neither this provision nor any other part of the text of RD 1578/2008 contains "any representation of irrevocability of the FITs granted under this Decree"[64]. In the light of the foregoing comments on RD 1578/2008, this is a puzzling conclusion to draw. RD 1578/2008 sets out a more sophisticated approach to FiTs than in RD 436/2004 and RD 661/2007; it emphasises in its text and supporting government statements that there is continuity between that text and the preceding Decrees; and it tries to clarify the differences in the operation of the regulatory regime between various FiTs, according to the date on which they were granted. Throughout, Spain was taking care to adapt the benefits for each generation of FiTs granted to a set of changing circumstances that lowered costs and risks to the investor. In this respect, the progressive reductions in the FiT followed the example of other EU states such as Germany, another signal to investors that Spain was following an established pattern in its approach to regulatory design.

---

[62] The FiT under RD 1578/2008 was a more complex instrument than under its predecessor. Using 'tariff degression', the level of FiTs would gradually be reduced for new PV installations. RD 1578/2008 only included the rates applicable to the first quarterly call. The next call would include remuneration calculated on the results of the previous quarterly call: depending on those results (capacity registered in relation to capacity targeted), the FiT level could be lowered, maintained or raised, at the Government's discretion.

[63] C-164, p.7. See Decision, ¶ 310.

[64] Decision, ¶ 850.

49. Not surprisingly, as the Tribunal notes, the CNE made several statements in which it clarified the text of the new Decree, such as CNE Report 30/2008, and a written response to a query about the Fifth Additional Provision, which applied to modification of the compensation for generation in the PV sector. The Tribunal's response to this documentation is that none of it "is capable of modifying the express terms of the Fifth additional provision of RD 1578/2008 (and the absence of any express stabilization guarantee)" [65]. My understanding of the documentation's significance is different. The statements by government bodies helped to assure prospective investors about the continuity of the regulatory regime. These statements, as the tribunal in *Cube Infrastructure v Spain* observed, have value: "…because all legislation is necessarily open to the possibility of change, such statements can give assurances that transcend assurances that are set out or are implicit in legislation".[66] Further, the Claimants legitimately relied upon CNE's clarification or interpretation of the law, given that it is (or was) an entity affiliated to the Respondent with responsibility for certain energy policy matters. This is legitimate and reasonable since it is objective. The risk of ambiguity with respect to the competence of the CNE or the correctness of its opinions lies with the Respondent rather than the foreign investor who is hardly able to understand in detail the inner workings of the different governmental entities and their official relationship to each other.[67]

*d) Conclusions*

50. From the above, irrespective of their differences, each of the Decrees contained specific commitments to investors, so that this was a regulatory regime characterized by the kind of stability common to renewable energy investments in the rest of Europe,

---

[65] Decision, ¶ 854.

[66] *Cube Infrastructure Fund v Spain*, Award, ¶ 275.

[67] This point was eloquently explained and elaborated by Professor Thomas W. Wälde in his Separate Opinion in *International Thunderbird Gaming Corporation v The United Mexican States,* UNCITRAL, Award, 1 December 2005: "If official communications cause, visibly and clearly, confusion or misunderstanding with the foreign investor, then the government is responsible for pro-actively clarifying its position. The government cannot rely on its own ambiguous communications, which the foreign investor could and did justifiably rely on, in order to later retract and reverse them…", ¶ 4.

recognizable to experienced investors. Based on the plain and ordinary meaning of their provisions, the expectations of stability – not immutability – of the regulatory regime were in my view objectively based, legitimate and reasonable. Claimants were therefore induced to invest in reliance upon the Respondent's offer.

(iv)    The Evolution of the Three Royal Decrees

51. The regulatory regime based on the Royal Decrees examined above is one that in the Tribunal's view demonstrated signs of the kind of sweeping change that the Respondent introduced in 2013-14[68]. The Claimants, on this view, chose to ignore these warnings and proceed regardless, taking thereby a *deliberate* risk.[69] I cannot agree with this interpretation of the evolution of the regulatory regime. In my opinion, it exaggerates the significance of minor changes in the regulatory regime that were *evolutionary* in character (that is, changes which respected the fundamentals or core of the regime itself), thereby eroding the difference between such changes in law and those changes that would modify or replace core features with the effect of creating a new kind of regulatory regime. The former may in some circumstances prove compatible with Article 10(1) of the ECT since they respect the expectations on which investors have relied. The latter are highly unlikely to do so. In this case, the investments were made under the regime applicable between 2006 and 2009, before any of the 'Disputed Measures' were introduced and during a period when the only changes made were positive in character for investors, or relatively minor in effect, demonstrating an awareness of mutual interest on the part of the Respondent. The risk to a prudent investor could only appear to be low.

52. Indeed, there *is* evidence of change in the regulatory regime, demonstrating that it was not immutable. RD 1578/2008 set regulated tariffs that were lower than those offered under RD 661/2007 and provided that the tariff would be maintained for a maximum of 25 years, instead of the entire operational life of the plant. This was for

---

[68] Decision, ¶¶ 847, 891.
[69] Decision, ¶¶ 882, 889, 895.

new investments however and was not applicable to those already made. The only measure that had effects that were retroactive (RD 661/2007) was one with effects that were beneficial and not adverse in their impact on the value of existing investments. It did not reduce the PV tariffs. Similarly, in the Fifth Additional Provision of RD 1578/2008, a review was anticipated of tariff adjustment in the light of PV investment costs and their trend. This was likely to be limited in its effects however and did not extend to existing investments: the change respected the terms on which the investments had been made. The overall planning and timetable were clear: once the projected capacity objective of 85% for PV had been achieved in August 2007, a further Royal Decree (RD 1578/2008) was developed to address the needs of the next stage in renewable energy expansion.

53. If the question were to be asked - why is an evolution in the regulatory regime likely in this case - the answer lies in the specific features of this new kind of energy (outlined earlier). A 'special regime' was always going to develop differently from a conventional one. As knowledge of the regulation of renewable energy grew, it was logical that the Respondent should review its elements and if necessary, introduce changes to their operation. For that reason, it was important to assure prospective investors that any such changes would be forward-looking so that the up-front costs incurred in plant construction would be recovered based on the regime under which the initial investment was made. For future investments, the economic consequences were a different matter, since such investments could be expected to benefit from lower costs. In that context, the assurances contained in Article 40.3 of RD 436/2004, Article 44.3 of RD 661/2007 and the Fifth Additional Provision of RD 1578/2008 had great significance in the attraction of foreign investment. Revisions could indeed be expected – and a mechanism for making changes through reviews at regular intervals was expressly provided for in Article 44.3 of RD 661/2007 - but these were accompanied by wording that emphasised that such future changes in law would not adversely affect investments already made, thereby guaranteeing stability to the

investor. Such future revisions were also intended to improve the attractiveness of the regulatory regime to prospective investors rather than act as a warning to them.[70]

54. Taken together, these changes respected the obligation of the Respondent to provide 'stable conditions'. There was no negative measure taken vis-à-vis foreign investors and no warning of the kind of measures that were taken by Respondent from 2010 onwards. To recall what such subsequent measures entailed: the entire regulatory regime was replaced with one based on quite different economic assumptions that had no parallel with any remuneration schemes for renewable energy elsewhere in the EU and was therefore utterly unfamiliar to foreign investors in its design, its operation and its business consequences. I can find no evidence whatsoever that a warning of such sweeping measures was made in the years when the Claimants made their investments.

55. None of the above detracts from the Respondent's capacity as a sovereign State to introduce measures that contradict expectations based on the regulatory regime established between 2004 and 2008 on Law 54/1997. It merely supports the argument that such actions, if taken, engage the provisions of the ECT and particularly Article 10(1).

(v)    Non-normative Acts

56. The relevance of various documents that are not normative in character is the subject of analysis of the Claimants' legitimate expectations by the Tribunal, which concludes that such documents cannot impact on its conclusions about the expectations that can arise from the three Decrees.[71] The introduction of these documents has a supportive character but no more than that, with a view to confirming an interpretation of the three Decrees. Their origin is hardly in doubt, emanating from government agencies with competence over energy matters, such as the CNE and

---

[70] My interpretation of PER 2005-2010 is the opposite to that preferred by the Tribunal: Decision, ¶ 893.
[71] Decision, ¶¶ 863-871.

30

IDAE. They are among many that were issued by the Respondent to encourage and promote foreign investment in pursuit of its policy goals, and included reports, press releases and presentations, as is well known[72]. They refer to principles which were included in the texts of the Decrees themselves and shed light on the Respondent's intentions at the time. The effects on prospective investors of such reiteration of language about guarantees would have been cumulative and reinforcing, playing a significant role in the creation of expectations about the regulatory regime.

57. I acknowledge that such material could include remarks that note the State's sovereign power to make changes to its laws, including the Decrees that set out the detail of the regulatory regime. However, such remarks not only stated the obvious – that no regulatory regime can be regarded as 'immutable'[73] - but also were not at all the driver behind publication of the various documents.

58. There are striking examples of how documents such as the CNE Report 3/2007 sought to convey to investors a different message from that which the Tribunal finds in the same report. I note only one example:

> "5.3. On the criteria that inform regulation of the special regime.
>
> [...]
>
> (b) Minimise regulatory uncertainty. The [CNE] understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, incentivising investments in new capacity and minimizing the cost of financing projects, thus reducing the final cost to the consumer. The regulation must offer sufficient guarantees *to ensure that the economic incentives are stable and predictable throughout the service life of the facility...*" (emphasis added by the relevant tribunal)).[74]

---

[72] Among many examples of discussions in cases that address Respondent's measures, see *Foresight v Spain*, Award, ¶¶ 89 and 90, on the significance of the public relations campaigns in inducing foreign investors.
[73] Decision, ¶ 864, where the immutability conception of stability appears again.
[74] Cited in *Antin Infrastructure v Spain*, Award, 15 June 2018, ¶ 541; see generally in this respect ¶¶ 544, 548, 553-554.

(vi)    Due Diligence/Assumption of Risk

59. The Tribunal's analysis of due diligence essentially addresses the question of whether a deliberate assumption of risk was made by the Claimants in making their investment. It concludes that "the investors' conduct was not deterred by the signs of regulatory risk apparent between 2005 and 2006, when Mr Bouman started to consider investing in the Spanish market" [75], and so the Claimants "must be found to have made their investment without displaying a specific preoccupation about investment risk" [76]. Indeed, "no specific attention was paid to the fact that the Spanish legal framework has been in constant evolution and displayed signs of regulatory risk. The alleged expectations therefore cannot be regarded as legitimate, reasonable or objective". [77]

60. Yet, a review of the record suggests a very different interpretation. When we examine the pre-investment actions that might have contributed to the formation of the Claimants' expectations, several appear notable. Mr. Reinier Bouman, a Dutch entrepreneur in clean energy and sustainable business, and the majority owner of the various Claimant entities, was interested in making an investment in the EU solar energy sector and sought information on the various regulatory regimes in operation and potential investment partners [78]. Eventually, he relied upon a report from an expert on solar energy, whom he had engaged with this investment in mind, which compared the FiT regimes in Spain and in Germany and concluded that the guarantee of a high fixed tariff and absence of a limit on production offered by Spain for the operational life of the PV plant gave it a comparative advantage to a foreign investor like himself. During a business tour of Spain that followed in 2005, this positive view of the regulatory framework and the FiT mechanism in RD 436/2004 was confirmed to him, not least by two government bodies, the IDAE and the CIEMAT. Advice on the specifics of investment into the PV sector in Spain, and administrative and local requirements, was given to him by two Dutch nationals resident in Spain, with whom

---

[75] Decision, ¶ 894.
[76] Decision, ¶ 898.
[77] Decision, ¶ 881.
[78] Witness Statement of Reinier Bouman, ¶¶ 17-19.

he formed a business association, and an external lawyer, who advised on regulatory matters. Further, he sought financing of at least eighty percent of the investment costs post-construction: the lender was a specialist in sustainable banking and had its own legal advisers, as did the EPC contractor. None of the legal advisers, including the Spanish law firms advising the bank and the contractor, respectively Gomez Azebo y Pombo and Ramon y Cajal, signalled that there were regulatory risks such as a possible withdrawal of RD 661/2007 or RD 1578/2008. [79] Moreover, as the tribunal in *Novenergia v Spain* has noted:

> "In any event, the Tribunal remains unconvinced that the type of legal due diligence into the stability of the Spanish renewables regime called for by the Respondent would have revealed t*he kind of changes which were later implemented by the Respondent through its introduction of the Specific Regime*" (emphasis added).[80]

61. In its analysis of the Claimants' due diligence, the Tribunal notes that when the Claimants were considering their initial investment under RD 436/2004 the existing remuneration model "was considered as offering PV investors an "insufficient return""[81]. This characterization of the remuneration model under RD 436/2004 did in fact originate from a government document, the Plan for the Promotion of Renewable Energies in Spain (PER) 2005-2010, prepared by the IDAE, an advisory body in the Spanish government located inside the Ministry of Industry, Tourism and Commerce. 'Sufficiency' is of course a relational term and so it is worth considering to what the return was insufficient. After noting the "unquestionable advantages in energy, manufacturing, environmental, and social terms, etc" of solar energy, the PER 2005-2010 – a body with no regulatory powers but with power to make recommendations – states that the implementation of solar power "on as wide a scale as possible will contribute to the future development of the technology", leading to

---

[79] Second Witness Statement of Mr Reinier Bouman, ¶ 8: since the lenders had no recourse to the shareholder, "it is difficult to imagine how any bank would have agreed to finance the plants unless they also believed that the FIT regime would apply during the term of financing".
[80] *Novenergia v Spain*, ¶ 679.
[81] Decision, ¶ 893.

greater competitiveness in relation to alternatives[82]. Yet, the development of solar power "has fallen a long way short of the target initially set for the current decade", a fact that may be reversed[83]. This is the context in which the same document referred to an "insufficient return"[84]. What was in place was not attractive enough to foreign investors to achieve the levels of inward investment that the Respondent was seeking, and which were in the view of the IDAE, entirely within their grasp if the regime was further incentivised. In my view, this puts the Claimants' initial (and at that stage it was an initial) interest in investment in a more positive light.

62. As noted above, the record indicates that the Claimants consulted directly and indirectly a range of investment specialists and took note of what statements were emerging from government bodies, directed at foreign investors. Yet the Tribunal finds that the Claimants proceeded to invest "without asking for legal or other advice regarding the prospects of the regulatory framework's evolution"[85]. The point here is not so much one of different interpretations of the record, but rather in the level of specificity that a tribunal should be expecting with respect to due diligence of a regulatory regime prior to making a commercial investment. In his Witness Statements, Mr Bouman is clear: at no point did any of the diverse parties above give him any signal that there was anything wrong about the FiT that formed the basis for the remuneration of any investments he might make in this sector in Spain[86]. This applied to the FiT in RD 661/2007 as well as that in RD 436/2004. I note that his decision-making style reflected the fact that investors come in different shapes and sizes: in this case, as the sole investor with no management board to report to, the style had a simplicity that was in his view appropriate to that kind of ownership structure. In taking a positive view of the due diligence carried out here, as I do, I am comforted by the approach of the majority of the tribunal in *Cube Infrastructure v Spain* when it examined a similar issue. Where investors have reached an understanding of the significance of representations about regulatory stability, "their

---

[82] Summary of the PER 2005-2010, August 2005, p.27.
[83] Ibid.
[84] Ibid., Sections 3.5.3 and 3.5.4, pp. 175-177.
[85] Decision, ¶ 893.
[86] Second Witness Statement of Reinier Bouman, ¶ 14.

entitlement to rely upon that understanding does not depend upon evidence that their understanding was provided or confirmed on every point by external counsel, nor does it depend upon evidence of a detailed written legal due diligence report upon the revocability of the regulatory regime".[87]

63. Finally, on this subject, there is much in the record of this case that suggests the relationship between the investor and the host State in a prospective long-term investment in renewable energy development is one that is highly cooperative in character, driven on both sides not solely by commercial goals in which both parties seek to secure advantages for themselves, but also by a common interest in promoting certain kinds of energy that offer or are thought to offer the population of the host State greater benefits than conventional forms of power generation, and more widely a public good in terms of climate change mitigation. Here, the Respondent was acting to create a new market for solar powered generation where none had existed before, and where conventional market incentives would prove insufficient, and do so by inviting foreign investors to bring it to life. A similar awareness of the 'public good' aspect of these investments is also evident in the record on the part of Mr Bouman and the various specialist advisers that he approached to assist him. It seems inappropriate then to require such investors in newer forms of energy to adopt a sceptical stance vis-à-vis the Respondent's integrity, and in the event of subsequent adverse events, to conclude in effect: 'caveat investor'.

(vii)    RAIPRE

64. The legal effect of RAIPRE is briefly considered by the Tribunal, at the end of which it agrees with the Respondent that RAIPRE is merely "an administrative requirement

---

[87] *Cube Infrastructure v Spain*, ¶ 396; see also *OperaFund v Spain*, when, following *Novenergia*, it accepted that the requirement of "an adequate due diligence prior to making its investment" was met when it held that the investor did "carry out a reasonable analysis of the Spanish regulatory framework prior to its investment": ¶¶ 486, 487. In approaching this issue of adequate due diligence, the tribunal in *Antin v Spain* cautioned: "tribunals must attempt to place themselves at the time of the investment and consider the information and conditions available at such time, and to refrain from appraising the investor's expectations with the benefit of hindsight": *Antin Infrastructure. v Spain*, ¶ 537.

that did not generate any vested rights for the investors". [88] It cites five legal authorities for this view, but I note that there are other cases involving the Disputed Measures in which the tribunals have reached a different assessment of the significance of RAIPRE in the regulatory regime. [89] I incline to their view that registration in the RAIPRE had legal significance and was more than a mere administrative step.

65. From a review of the operation of the regulatory regime and its evolution (see Section B (iii) above), the registration requirement appears to have had a key role in certifying that certain generations of installations had met the necessary requirements and were eligible for a specific FiT. RD 661/2007, for example, contained a deadline by which PV installations had to be registered to qualify for the FiT (that is, 28 September 2008). It also played a role in characterizing the Special Regime under Law 54/1997 as one that was aimed at a special category of investors, rather than 'all investors' such as would typically be addressed by a Foreign Investment Act. This is implicit from the analysis of the relevant Decrees by several tribunals.[90] Registration was required to obtain the benefits of this Special Regime, within a time frame and after completion of several investment conditions. It was not automatic in the sense that obtaining a permit in administrative law might normally be and carried with its grant a special significance within the regulatory regime.

66. In the regulatory design, a failure to comply with the registration requirements would mean that the Claimants' expectation to receive what had been promised would fail, and it would be unable to benefit from a FiT regime. I therefore agree with the interpretation of Mr David R. Haigh, when he argues that its significance went beyond that of an administrative measure, and "changed the relationship from one that was

---

[88] Decision, ¶ 858.

[89] In *Antin Infrastructure v Spain*, *Masdar v Spain*, *Novenergia v Spain*, and *OperaFund v Spain*, the tribunals found that registration gave the claimant a specific right to claim regulated payments from Spain. I note also the Dissenting Opinion by David R. Haigh in *Cavalum SGPS, S.A. v Spain, ICSID Case No ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020*.

[90] *Cube Infrastructure v. Spain*, ibid., ¶¶ 241-283, especially at ¶ 275; *R9 Holding v. Spain*, ¶¶ 257 and 294-296; Dissenting Opinion of Guido Tawil in *Charanne*, ¶¶ 6-8; see also the Preamble of RD 6/2009 (C-0082).

executory to one that had become executed".[91] Once registered, the necessary pre-conditions in terms of planning, financing, constructing, and commissioning within a specific time-period were fulfilled, and Spain's duty to carry out the promised inducements was activated. Registration, at this point, initiated Spain's obligations under Article 10(1) of the ECT and made them binding on the Respondent. This is the correct assessment of the registration requirement.

## C.  The Effect of 'drastic' and 'unexpected' Changes on the Expectation of Stability

*The Disputed Measures had deep and wide-ranging impacts on the Claimants' investments with implications for the calculations used in making those investments.*

67. The Respondent's replacement of the FiT mechanism in its regulatory regime was not, in the Tribunal's view, a "drastic" or "unexpected" modification to the extent that it amounted to a violation of the ECT. In its view, there were signs of regulatory risk as early as 2005 and 2006.[92]

68. As is clear from this partial dissent, I do not share my colleagues' conclusion. Specifically, I disagree with three propositions in their argument:

    (1) It relies on a notion of stability ('stability equals immutability'), not present in the ECT itself, with the effect that minor, even inconsequential changes are elevated to ones of legal and commercial significance, when they may in fact respect the requirement to preserve the stability of the business environment.

    (2) It takes a view of the evolution of the Royal Decrees between 2005 and 2009 such that minor changes are not distinguished from major ones ('evidence of changes in their content demonstrates the risk of major changes that had a negative character and effect'). Such minor changes as occurred did not

---

[91] *Cavalum*, ibid.: Dissenting Opinion of David R. Haigh Q.C., ¶ 52; see also *Masdar v Spain*, ¶ 512.
[92] Decision, ¶ 894.

appear to question the policy assumptions on which the Special Regime was based and especially its commitment to build up a robust renewable energy sector by relying upon inward investment.

(3) In relation to early signs of regulatory risk, it accords considerable weight to the relationship of the regulatory regime established by the Respondent with the wider Spanish legal order and judicial interpretations thereof in the context of inducements to foreign investment. Beyond matters of fact, these interpretations have no relevance in this matter and cannot in my view be interpreted as an early indicator of future risk to investments by foreign investors in the Respondent's renewable energy sector.

(i)    The Changes and their Effects

69. What then was 'drastic' about the modification to the regulatory regime and in what way was this conduct so 'unexpected' as to frustrate the Claimants' expectations and lead to a breach of Article 10(1) of the ECT? The Disputed Measures are described by the Tribunal in detail and therefore my comments address only five features of particular relevance to the above question.[93] Among the various 'Disputed Measures', those adopted from 2013 such as RDL 9/2013 and Law 24/2013 had particularly negative consequences for the regulatory regime under which the Claimants' investments were made. Notably, the New Regime they introduced had effects that contrasted with those of its predecessor with respect to:

(1) *Benefits*. The new remuneration scheme abolished the FiT, replacing it with a Special Payment, or remuneration paid on top of the market price, granted at the Respondent's discretion and calculated by reference to a 'standard installation' instead of the actual investment made, and applied to existing as well as new installations over a six-year regulatory period. Linked to the costs of a standard installation, a 'reasonable rate of return'

---

[93] Decision, ¶¶ 375-523.

would be set by the Respondent as a cap on the amount of the Special Payment, limiting profitability, and a new feature. In effect, the investors' benefit was no longer based on financial support wholly linked to the amount of electricity generated by the investor, but instead to imputed rather than actual costs and capped by a designated pre-tax target rate of return based on those costs.

(2) *Duration*. The remuneration scheme was liable to change every three or six years with effects on existing installations. In contrast to the previous link of remuneration to the entire useful life of the facility or a maximum of 25 years, the New Regime linked it to the 'regulatory life' of the facility, which was set at 20 years.

(3) *Predictability*. The Special Payment is subject to various reviews, removing the predictable revenue stream that had been a feature of the Special Regime. The New Regime introduced variables *ex post* that are unilaterally set by the Respondent at its discretion and refers to a standardised model that is removed from the specific conditions of the Claimants' investments and operations. Its effect is to prevent the Claimants from predicting future costs and investment standards, and ultimately from making calculations of rates of return in the future. So, the investment, remuneration and cost criteria on which investors had relied to calculate their liabilities and their profits were removed and a limit set on investor returns, creating an unpredictable revenue stream for the Claimants. By contrast, the success of the Special Regime was predicated on the predictability of long-term revenue streams.

(4) *Transparency*. The manner of introducing the New Regime was lacking in transparency with a transitory regime lasting more than eleven months. In this period investors had no notion of the precise remuneration to which qualifying facilities would be entitled. The underlying criteria or

39

calculations behind the Special Payment or those that would support future updates of the New Regime were not explained.

(5) *Retroactivity*. The New Regime applies to the start of the regulatory life of the facilities and not the entry into force of RDL 9/2013. So, if under the Special Regime a plant earned a rate of return higher than the one deemed to be reasonable by the Respondent under the New Regime, the cumulative return that exceeds the new target would be offset against the financial incentives that the plant would be entitled to under the New Regime. The benefits of efficiencies achieved by a generator under the Special Regime would therefore be 'clawed back' and the actual rate of return would be capped at the level the regulator now deemed reasonable.

70. In the light of the foregoing, it can hardly be correct to describe the New Regime as a 'modification' of the Special Regime, with the implication that stability in some form is being preserved. The scale and the sweep of the changes are better understood as a wholesale replacement of the Special Regime by another, premised on different principles. Taking the above features into account, we may conclude that remuneration ceases to be output-based and instead becomes a sum given to the generator on top of the market price which represents a unilaterally decided 'reasonable return' on the standard investment costs of a model installation (linked to the ten-year Spanish sovereign bond yield plus a differential). Moreover, the New Regime is likely to be unfamiliar to an international investor, and untested. As the CNE noted in a report in 2013,

"… there is no record of a remuneration model similar to that reflected in the Proposal in any jurisdiction of the European Union, or in other countries whose support systems are known through our international associations of

regulatory bodies … (It) completely changes the remuneration mechanism applicable to date".[94]

71. While the applicable law, the ECT, rightly allows some flexibility to States in the way they provide stable conditions to investors, this cannot accommodate a wholesale rejection of the conditions on which investors have been persuaded to invest. That regime, I have argued, contained specific commitments to provide stability in a certain manner and over a defined period from which the Claimants could derive objectively reasonable expectations. It is the removal of that Special Regime and the specific commitments on which investors relied when making their investments rather than the deprivation of a specific rate of return that is a breach of the Respondent's obligations under the first and second sentences of Article 10(1) of the ECT and requires full compensation.

(ii)    Reasonableness and Proportionality

72. The Tribunal's approach to the claim based on the unreasonableness and disproportionality of the Disputed Measures is in two parts. To the extent that the claim is based on the expectation that the Special Regime would remain in place, the claim is rejected. [95] To the extent that the claim turns on the relationship between the economic impact of the Disputed Measures on the Claimants' investments and the expectation of a reasonable return, the Tribunal reserves its judgment on the question of whether the Disputed Measures were unreasonable and disproportionate.[96]

73. Given my views on the legitimate expectations aspect of the claim and the stability guarantees in the Special Regime, my view of the 'policy-measure correlation' test is also different from that of my colleagues. Irrespective of the rationale presented by the Respondent for the Disputed Measures, it should be recalled that the rationale for the entire Special Regime set up in Law 54/1997 was to promote renewable energy in

---

[94] C-0117, Report 18/2013 of the Spanish National Energy Commission on the Royal Decree Proposal Regulating the Activity of Electricity Production from Renewable Energy Sources, Cogeneration and Waste, pp. 4, 8.
[95] Decision, ¶ 933.
[96] Decision, ¶¶ 934-935.

41

Spain and achieve a variety of benefits, environmental, strategic and social. None of the core elements in this regime (such as the FiT) would make sense if that were not the case. As the record of this case abundantly demonstrates, this specific legal order was represented to foreign investors as being driven by one paramount policy objective, a common one among the member states of the EU at the time. The rationale offered by the Respondent – in terms of the Tariff Deficit – needs to be understood in that light.

74. In considering the reasonableness or not of the Disputed Measures, it is striking that there is little or no environmental concern evident in their motivation. Indeed, the overall effect of the New Regime is *not to maximize the production of renewable energy but to reduce costs*, in contrast to the design of the original regulatory regime and the policies behind it. To an objective observer, it would seem unreasonable to dismantle a regulatory regime expressly designed to achieve one policy objective and replace it with another that appears to be based on principles yet untested in relation to that policy objective in any location in Europe or indeed elsewhere. With respect to the problems arising from the Tariff Deficit, the primary justification offered by the Respondent for the Disputed Measures, there is no serious suggestion that those problems can be resolved by the effects of the Disputed Measures on the nascent PV sector (that is, by requiring PV installations to bear a proportion of the lack of revenues in the electricity system as a whole).

75. With respect to the allegation of disproportionality in relation to the Disputed Measures, the Respondent's attempt to justify these measures by reference to the Tariff Deficit is unconvincing since the Deficit had its origins in events both outside the development of the PV sector and predated that development. Essentially, the Respondent chose to set end-user electricity prices at levels that did not cover regulated costs. Based on the CNE Report of 2012 and proposals from the European Commission at the time, alternative instruments were available to the Respondent to tackle the Tariff Deficit, and ones that would have honoured commitments to existing

investors in the PV sector without shifting a proportion of the costs to foreign investors.

76. I therefore agree with the tribunal in *Watkins v Spain* that the Respondent's conduct in adopting the Disputed Measures "does not bear a reasonable relationship to Spain's policy" [97], and was therefore harmful to the Claimants' investments. Further, by removing the core elements of the regulatory regime on which Claimants' investments were made, and imposing significant burdens on them, the Disputed Measures are not proportionate in relation to the problem they seek to address.

(iii)    The Expectation of Stability

77. In my view, the Respondent's conduct created expectations of a stable legal and business environment, that were legitimate and reasonable, and that the Claimants relied upon that conduct and the representations accompanying it when making their investments. More specifically, the Respondent created a special legal order that was aimed at attracting large-scale foreign investment from a specific class of investor into a form of energy that was well-known to have a high-risk profile and required guarantees of stability in a specific form that foreign investors would recognize (with the FiT at its core). This was bolstered by the supporting statements by Respondent's officials who represented to investors that the entire legal edifice was a response to a policy of promoting renewable energy to shift the energy mix in Spain in ways that met its international and EU obligations. An investment in this sector therefore appeared to be mutually beneficial in design and effect.

78. Given my views on the legitimate expectations claim on the breach of the requirement to provide stable conditions and fair and equitable treatment, which would lead to the finding of full compensation for the Claimants, there is no need for me to examine

---

[97] *Watkins Holding et al v Kingdom of Spain*, ICSID Case No ARB/15/44, Award, 21 January 2020, ¶ 604.

the claims based on the transparency guarantee[98] and on the fourth sentence of Article 10(1) ECT (the umbrella clause)[99], and I shall not do so.

## D.  The Identification of an RRR

*The absence of any specific rate of return in Law 54/1997 points to important features in the design of the Special Regime.*

79. For the Tribunal, "the basis for the Claimants' expectations is set out in Law 54/1997" which "provided for the right to a reasonable rate of return"[100]. It then asserts that the reasonable rate of return (RRR) is the "relevant benchmark" for measuring any alleged harm caused by the disputed measures and should be "based on the analysis of the laws and regulations as well as other contemporaneous documents that were publicly available during the Claimants' investment process (February 2005- November 2009)"[101]. This exercise leads the Tribunal to conclude that the Claimants were only entitled to a reasonable return of 7%. I do not agree with this conclusion.

80. The open-ended character of Law 54/1997 appears to me to be significant. It does not specify any actual rate of return, only a principle in Article 30(4) that links an eventual return to the cost of money on the capital markets. Nor does it include a mechanism that would allow for the calculation of any such return. Reliance upon the Law itself to calculate a reasonable rate of return would therefore seem likely to encounter serious difficulties. Even more challenging is the fact that, as the Tribunal notes, the relevant subordinate legislation, the three Royal Decrees, does not provide a value for a benchmark rate of return. These are important lacunae in the primary and secondary legislation that suggest that a different understanding of the provisions of Law 54/1997 is appropriate.

---

[98] Decision, ¶¶ 936-943.
[99] Decision, ¶¶ 944-958.
[100] Decision, ¶ 872.
[101] Decision, ¶ 984.

81. The answer to the puzzle of the missing rate of return is that the core element of a feed-in tariff scheme is the fixed payment per unit of electricity fed into the grid (i.e., sold). The way in which the value of these payments is defined is critical since the payment (or tariff) is the only economic signal given to investors. As the preamble to RD 661/2007 states:

> "The economic framework set out in this royal decree develops the principles established in Act 54/1997, of 27 November, on the Electricity Sector, guaranteeing owners of facilities under the Special Regime a reasonable remuneration to their investments".

82. This remuneration, not limited by any threshold on annual generation, was not dependent on the level of return the investor would obtain or on demand for the electricity it generated. Taking the fixed payment in c€/KWh as a starting point, investors could design their own financial model based on assumptions appropriate to their specific project and take investment decisions accordingly. The regulatory scheme left investors to take the risk of building and operating specific projects that would deliver the maximum electricity output to achieve their own target rate of return on which they had made their decision to invest.

83. The effect of the Special Regime was that the more electricity the investor generated, the greater the remuneration received and ultimately the higher the return for the investors. This gave the investor an incentive to generate more electricity to feed into the grid and supply the market. In this way, more renewable energy would supplant electricity from conventional, less environmentally-friendly sources.

84. In seeking to put a value on the RRR, the Tribunal considers the publicly available sources that the Respondent notes and concludes that a figure of "around 7%" is supported by various – but not all [102] - of these sources. This is the amount "contemplated in Law 54/1997", and "given effect by the various regulatory acts

---

[102] A higher figure was given in an EC document, a CNE report and IDAE: Decision, ¶¶ 988-989.

which Spain adopted between 1998 and 2009".[103] This figure is to be used by the Tribunal as a benchmark against the Claimants' IRR to determine whether there is liability or not.[104]

85. In my view, this is not a satisfactory solution. Indeed, there are documents in the record in which specific figures were used, and some of these do refer to a value or range of around 7%. Investors may have been aware of some of the documents that the Tribunal refers to, but these were not legally binding documents, and were motivated rather by requirements of energy planning and making recommendations to government.[105] Any figures they included were not capped rates of return or specific target values. Indeed, since this technology was quite new, and the investment hardly a typical commercial one, the achievement of a higher-than-average rate of return would have been unsurprising. For example, the IDAE source cited by the Tribunal considered a return at 9% as adequate, indicating the range of figures that were under consideration, no doubt influenced by the range of different technologies involved, and their different state of development.[106]

86. The wider significance of the Tribunal's analysis of the expected RRR is that in suggesting that a violation of Article 10(1) might lie in or be linked to the deprivation of a specific, expected rate of return[107], it sets to one side what in my view is the real source of the violation: the removal of the Special Regime on which the investor relied to make its investments. Indeed, for the reasons set out above about the character of the regulatory regime, I share the concerns of Mr David R. Haigh, in his Dissenting Opinion in *Cavalum v Spain*, when he predicts that when a tribunal sets itself the task of determining what a RRR in such cases, this will "lead us far afield from assessing what the state explicitly promised and the investor relied upon."[108] I agree with his conclusion that the damages to which an investor is entitled "are shown in the

---

[103] Decision, ¶¶ 874, 875.
[104] Decision, ¶ 995.
[105] Decision, ¶¶ 983-995.
[106] Decision, ¶ 992.
[107] Although each investor will have had an expectation based on its understanding of how the remuneration offered would translate into a return in a specific instance.
[108] *Cavalum v Spain*: Dissenting Opinion of David R. Haigh, ¶ 77.

difference between what was promised and what was ultimately done by the state in relation to Claimant's plants".[109]

87. For the reasons set out in this Opinion, I believe the system of renewable energy regulation was deliberately described as a 'special regime' since its rules were distinct in Spanish electricity law and established to offer a certain category of investors the specific incentives for defined periods that they needed if they were to commit to a new sector that was not otherwise commercially viable. The fact that many of those investors were foreign and relied upon Respondent's commitments activates the protections of Article 10(1) of the ECT. Given that prospective investors such as the Claimants in this case would have considered the regime as a whole, and that the regulatory regime itself was targeted at a specific class of investors capable of understanding the core elements such as the FiT, there is a plausible argument that the Claimants' expectation of stability derives not only from the particular Decrees but from the special regime itself, a bespoke legal order created by the Respondent for the purpose of inducing investment.

88. I nonetheless do not disagree with the Tribunal that there was a legitimate expectation to an RRR based on the Law 54/1997, even if the same Law did not provide any details as to what that expectation might mean or how it is to be calculated. In my view, however, the Claimants were offered and relied upon incentives that were expressly contained in RD 436/2004, 661/2007, and RD 1578/2008. Further, I agree with the Tribunal that the so-called 'clawback' measure, by subtracting past remuneration due under the previous regime from future remuneration, constituted a breach of Article 10(1), and requires compensation for the damage caused to the Claimants.

---

[109] Ibid.

## E. Conclusions

89. The ECT allows a state to evolve its regulatory regime for energy investments without being in breach of the requirement to offer 'stable conditions'. However, a complete replacement of that regime by another that is different, unfamiliar and contains adverse economic effects on the Claimants' investments is a different matter. It is particularly serious when the investment concerns one of the newer forms of energy, characterised by a higher than usual risk profile for the investor after the initial capital commitment.

90. In my view, Spain breached Article 10(1), first and second sentences, when in 2013 it imposed an entirely new legal regime on the Claimants' PV investments, which had been made over several years based on expectations that any changes in law would be made within the framework of the Special Regime, thereby preserving stable conditions for those investments and upholding the treatment standard. Spain is therefore liable for full compensation to the Claimants.

Date: <u>11 February 2022</u>

Peter D. Cameron