# EXHIBIT 30

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

**MATHIAS KRUCK AND OTHERS**
Claimants

and

**KINGDOM OF SPAIN**
Respondent

**ICSID Case No. ARB/15/23**

---

**DECISION ON THE RESPONDENT'S REQUEST FOR RECONSIDERATION OF THE TRIBUNAL'S DECISION DATED 19 APRIL 2021**

---

*Members of the Tribunal*
Professor Vaughan Lowe, QC, President
Dr. Michael Pryles AO, PBM, Arbitrator
Prof. Zachary Douglas, QC, Arbitrator

*Secretary of the Tribunal*
Mr. Paul-Jean Le Cannu

*Date of dispatch to the Parties:* 6 December 2021

TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ........................................................................... 1

II.   SUMMARY OF THE PARTIES' POSITIONS ......................................... 1

      A.   The Respondent's Position ............................................................... 1

      B.   The Claimants' Position ................................................................... 5

III.  THE ANALYSIS OF THE TRIBUNAL ................................................... 9

      A.   The Admissibility of the Request for Reconsideration of the Tribunal's Decision of
           19 April 2021 ................................................................................... 9

      B.   The Substance of the Request for Reconsideration ....................... 13

IV.   DECISION ................................................................................................. 26

## I.    PROCEDURAL HISTORY[1]

1.    On 19 April 2021, the Tribunal issued a Decision on Jurisdiction and Admissibility in which it found, *inter alia*, that "its jurisdiction under the ECT and the ICSID Convention [was] not precluded or excluded by provisions of EU law, and dismisse[d] [the intra-EU] objection."[2]

2.    On 30 September 2021, the Kingdom of Spain ("**Spain**" or the "**Respondent**") filed a Request for Reconsideration of the Tribunal's Decision dated 19th April 2021, dated 30 September 2021 (the "**Request for Reconsideration**"), along with the Consolidated List of Legal Authorities (RL) dated 30 September 2021 and legal authorities RL-0171 and RL-0172. As indicated in paragraph 3 below, the Respondent requested that the Tribunal reconsider its decision on the intra-EU jurisdictional objection.

3.    On 29 October 2021, the Claimants filed their Response to Spain's Request for Reconsideration of the Tribunal's Decision of April 19, 2021, along with their Consolidated Legal Authorities (Index) and legal authorities CL-230 to CL-238. The Claimants requested that the Tribunal reject the Request for Reconsideration.

## II.    SUMMARY OF THE PARTIES' POSITIONS

### A.    THE RESPONDENT'S POSITION

4.    The Respondent requests that the Tribunal (i) reconsider its Decision on Jurisdiction and Admissibility dated 19 April 2021 (the "**Decision of 19 April 2021**" or "**Decision on Jurisdiction and Admissibility**") in light of the judgment issued by the Court of Justice of the European Union (the "**CJEU**") on 2 September 2021 in Case C-741/19, *Republic of*

---

[1]    This Section describes the steps in the procedural history that the Tribunal has deemed relevant for purposes of the present Decision. It does not purport to be an exhaustive narrative of the procedural history in this arbitration.

[2]    Decision on Jurisdiction and Admissibility, ¶ 295. *See also ibid.*, ¶ 326(1).

*Moldova v. Komstroy LCC* ("**Komstroy**"), and (ii) declare that it lacks jurisdiction over this intra-EU dispute.[3]

5.      Having offered a summary of *Komstroy*, the Respondent highlights the following holdings, the first three being in its view relevant to its Request for Reconsideration:

> *(1) the application of the EU Law is mandatory, foreign direct investment (including the ECT) is part of the EU competences and EU Law and, in cases where the seat of the arbitration is in a member state of the EU, the national courts have to ensure such application; (2) the autonomy of the EU legal framework must be respected; (3) intra-EU investment arbitration is not allowed and the ECT cannot be interpreted as allowing it; and (4) the concept of "economic activity in the energy sector" must be carefully assessed on case by case basis.*[4]

6.      In connection with the first point – the mandatory application of EU law in intra-EU cases – the Respondent argues that the ECT was ratified by the EU, is "an EU act"[5] and is part of the EU legal framework and must be interpreted in accordance with that framework.[6] This is true not only for jurisdictional purposes but also for purposes of applying EU state aid law to the dispute.[7]

7.      The second point, namely that an international agreement cannot affect the autonomy of the EU legal system,[8] is "essential" in the eyes of the Respondent.[9]   The reason is, according to the Respondent, that "[this] autonomy is consubstantial to the integration process of the EU and in fact that kind of autonomy is consubstantial to any integration process."[10]   The Respondent argues that both international custom and general principles of law of civilized nations require that the autonomy of the EU legal framework be

---

[3]    Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021 (the "**Request for Reconsideration**"), ¶ 1.

[4]    Request for Reconsideration, ¶ 26.

[5]    Request for Reconsideration, ¶ 28.

[6]    Request for Reconsideration, ¶ 30.

[7]    Request for Reconsideration, ¶ 30.

[8]    Request for Reconsideration, ¶ 31.

[9]    Request for Reconsideration, ¶ 32.

[10]   Request for Reconsideration, ¶ 32.

respected.[11]  The Respondent concludes that "under all sources of international law, the autonomy of the EU legal framework must be respected by the Member States."[12]

8.    As to the third point, the CJEU is very clear in Spain's view: "the ECT cannot be interpreted as allowing intra-EU investment arbitration."[13]  The Respondent explains the reasoning leading to that conclusion as follows:

> *(1) the ECT, foreign direct investment and state aid are EU law; (2) EU Law must be exclusively interpreted by national courts and the CJEU; (3) therefore no intra-EU investment arbitrations under the ECT are possible. Consequently, it is obvious that, respectfully, the honorable tribunal lacked jurisdiction for the controversy at hand.[14]*

9.    The Respondent further submits that this Tribunal has the power to reconsider its Decision on Jurisdiction and Admissibility. In its view, the ICSID Convention and Rules do not expressly contemplate reconsideration of tribunal decisions but do not expressly prohibit it either.[15]  The Respondent relies on the tribunal's decision in *Standard Chartered Bank v. TANESCO* ("**Standard Chartered Bank**") to argue that the Decision on Jurisdiction and Admissibility is binding within the scope of the proceedings but does not have *res judicata* and can be later reviewed by the Tribunal in light of new evidence submitted by a Party.[16]  The Respondent also contends that exercising this power to reconsider decisions is in the interest of efficiency and procedural economy in that "'[i]t avoids having the Tribunal decide issues on the merits on the basis of a decision which has been seriously called into question, and then have the parties wait until the whole matter has been included in its final award before having its decision reopened or subject to annulment....'"[17]

---

[11]   Request for Reconsideration, ¶¶ 33-34.

[12]   Request for Reconsideration, ¶ 35.

[13]   Request for Reconsideration, ¶ 36, citing Case C-741/19, *Republic of Moldova* v. *Komstroy LCC* ("**Komstroy**") (RL-171), ¶¶ 62-63.

[14]   Request for Reconsideration, ¶ 38.

[15]   Request for Reconsideration, ¶ 39.

[16]   Request for Reconsideration, ¶ 41, citing *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited* (ICSID Case No. ARB/10/20), Award, 12 September 2016 ("**Standard Chartered Bank**") (RL-172), ¶¶ 313-314.

[17]   Request for Reconsideration, ¶ 42, citing *Standard Chartered Bank* (RL-172), ¶ 320.

10. The Respondent argues that *Komstroy* calls into question the Tribunal's decision on the intra-EU jurisdictional objection.[18]  In the Respondent's view, while it has insisted throughout this proceeding on the relevance of EU law, *Komstroy* is "of particular significance" for this proceeding because "the CJEU has expressly ruled on Article 26 ECT."[19]

11. In addition, having noted that *Komstroy* abundantly refers to the CJEU's decision in *Achmea*, the Respondent submits that this Tribunal did not analyse *Achmea* in its Decision on Jurisdiction and Admissibility even though both Parties addressed it in their submissions.[20]  For the Respondent, the importance of both the CJEU judgments warrants a reconsideration of the Decision on Jurisdiction and Admissibility and a decision that this Tribunal lacks jurisdiction.[21]  In its view, *Komstroy* "confirms that, although the dispute settlement mechanism through recourse to arbitration provided for in Article 26 of the [ECT] binds the Member States in relation to investors from third States that are parties to the ECT in respect of investments made in the territory of those Member States, the ECT cannot impose the same obligations on the Member States among themselves, since this would be contrary to the principle of the autonomy of Union law."[22]  This principle of autonomy must be respected and entails "the disconnection from international treaties with no disconnection clause in order to apply the EU law for intra-EU affairs."[23]  *Komstroy*, says the Respondent, is "crystal clear that the ECT cannot be interpreted as accepting intra-EU investment arbitration";[24] it is "binding for Germany and Spain and German investors cannot have any rights different than the rights and legal framework that is applicable to Germany."[25]

---

[18]  Request for Reconsideration, ¶ 43.

[19]  Request for Reconsideration, ¶ 44.

[20]  Request for Reconsideration, ¶¶ 45, 47.

[21]  Request for Reconsideration, ¶ 45.

[22]  Request for Reconsideration, ¶ 49; *Komstroy* (RL-171), ¶ 65.

[23]  Request for Reconsideration, ¶ 51.

[24]  Request for Reconsideration, ¶ 52.

[25]  Request for Reconsideration, ¶ 53.

**B.    THE CLAIMANTS' POSITION**

12.    The Claimants request that the Tribunal deny the Request for Reconsideration[26] for the following reasons:

    a.    First, "Spain has not even attempted to demonstrate that 'exceptional circumstances' justify the submission of new evidence at this late stage of the proceeding, despite Procedural Order No. 1 requiring such a showing at Section 16.3…";[27]

    b.    Second, Spain has failed to demonstrate "any legal basis for the Tribunal revisiting a jurisdictional determination it has made that has *res judicata* effect";[28] and

    c.    Third, "given that the Tribunal already issued its Decision after several rounds of extensive briefing and a hearing and that no new 'fact of such a nature as decisively to affect' that Decision exists under Article 51(1) of the ICSID Convention, the Tribunal should reject Spain's request to effectively re-open this issue."[29]

13.    The Claimants oppose Spain's contention that *Komstroy* is a sufficient basis for the Tribunal to reconsider its decision on the intra-EU objection in the Decision on Jurisdiction and Admissibility.[30]  The Claimants offer three reasons in support of its opposition:

    *(1)* Komstroy*, like any decision from any other court of an ECT Contracting Party, is not binding on this Tribunal and cannot serve to deprive the Tribunal of jurisdiction or invalidate Spain's "unconditional consent" to arbitration; (2) the CJEU's purported interpretation of ECT Article 26(2)(c) in* Komstroy *was made purely according to EU law principles and without any international law analysis, which is the only relevant interpretative analysis that could be at all useful to this Tribunal (although it still would not be binding); and (3) the Tribunal already concluded that EU law-based*

---

[26]    DSG Claimants' Response to Spain's Request for Reconsideration of the Tribunal's Decision of 19 April 2021 (the "**DSG Claimants' Response**"), ¶ 26.

[27]    DSG Claimants' Response, ¶ 2.

[28]    DSG Claimants' Response, ¶ 2.

[29]    DSG Claimants' Response, ¶ 2.

[30]    DSG Claimants' Response, ¶ 3.

> *considerations cannot serve to deprive the Tribunal of jurisdiction*
> *or alter the plain meaning of the explicit text of the ECT, which*
> *requires the Tribunal to exercise jurisdiction over this dispute.*[31]

14. The Claimants further contend that Spain found only one case – *Standard Chartered Bank* – to support its position that this Tribunal can revisit its Decision on Jurisdiction and Admissibility.[32]  In addition to being an outlier, this case results from facts that are not present in this dispute.[33]  According to the Claimants, the difference is that the present case has been fully pled and this Tribunal is now close to rendering its Award, a situation which does not raise the issue of procedural economy that existed in *Standard Chartered Bank*.[34]

15. In the Claimants' view, Spain also fails to mention "the body of ICSID jurisprudence finding that Article 51(1) of the ICSID Convention 'strongly suggests that once the tribunal has decided the issues before it, its decision becomes *res judicata* and cannot be revised unless a very specific situation which calls out for the tribunal to revisit its prior findings is presented.'"[35]  Contrary to Spain's allegation, *Komstroy* does not call for the Tribunal to revisit its jurisdictional findings; rather, it is irrelevant to the issue of jurisdiction in this case.[36]  The Claimants submit that this is so for at least three reasons:

    a. First, this Tribunal's jurisdiction is exclusively established by the terms of the ECT – terms that may be informed, if necessary for their interpretation, by rules of international law, which do not include EU law.[37]  This Tribunal is not constituted under EU law or subject to the regional rules of the EU legal order and the decisions of its courts, such as *Komstroy*.[38]  For the Claimants, "[t]he fact that the CJEU in *Komstroy* has interpreted ECT Article 26(2)(c), based solely on principles of EU

---

[31] DSG Claimants' Response, ¶ 3. The Claimants also refer to paragraphs 294 and 287 of the Decision on Jurisdiction and Admissibility.

[32] DSG Claimants' Response, ¶ 6.

[33] DSG Claimants' Response, ¶ 6.

[34] DSG Claimants' Response, ¶ 7.

[35] DSG Claimants' Response, ¶ 8, citing *Perenco Ecuador Limited v. Republic of Ecuador* (ICSID Case No. ARB/08/6), Decision on Ecuador's Reconsideration Motion, 10 April 2015 (CL-230), ¶ 42.

[36] DSG Claimants' Response, ¶ 8.

[37] DSG Claimants' Response, ¶ 9.

[38] DSG Claimants' Response, ¶ 9.

law, as not applying to intra-EU disputes does nothing, under international law, to (i) amend the terms or plain meaning of the ECT, (ii) invalidate the ECT, or (iii) alter the unconditional consent that Spain freely gave when concluding the ECT."[39]

b.  Second, the Tribunal is bound to interpret Article 26 of the ECT as written. *Komstroy* is irrelevant to its interpretation, is not binding upon this Tribunal and has not even "immediate or automatic consequence for the ECT … under EU law."[40]  This is also true of the *Achmea* decision itself, which "had no impact on the BIT at issue in *Achmea* or intra-EU BITs generally, but instead required agreements by the EU Member States to determine how to implement *Achmea*."[41]

c.  Third, Article 26(6) of the ECT cannot be used as a "back door" for the application of EU law, because it would be contrary to Articles 26(3)(a) and 26(1); the phrase "rules and principles of international law" has been held not to include EU law and Article 26(6) itself has been held not to apply to jurisdictional matters.[42]

16.  In any event, even the above arguments were unsuccessful, the Claimants contend that *Komstroy* would remain irrelevant for the following reasons:

a.  In the event of a conflict (here between the ECT and the EU treaties according to the CJEU), Article 16 of the ECT applies and "the more favorable provision to the investor provides the relevant legal rule."[43]  The Claimants emphasize that "no ECT tribunal has ever concluded that a less favorable rule of EU law with respect to dispute resolution could or would survive an application of ECT Article 16."[44]  This conflict scenario has already been considered by the Tribunal and the Tribunal's

---

[39]  DSG Claimants' Response, ¶ 10.

[40]  DSG Claimants' Response, ¶ 11.

[41]  DSG Claimants' Response, ¶ 12.

[42]  DSG Claimants' Response, ¶ 14.

[43]  DSG Claimants' Response, ¶ 17.

[44]  DSG Claimants' Response, ¶ 18. The Claimants cite *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38), Award, 31 July 2019 (CL-216), ¶¶ 247-250; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (ICSID Case No. ARB/14/1), Award, 16 May 2018 (CL-207), ¶ 332; *Vattenfall AB et al. v. Federal Republic of Germany* (ICSID Case No. ARB/12/12), Decision on the *Achmea* Issue, 31 August 2018 (CL-204), ¶¶ 202, 229.

finding that Article 16 ensures the exercise of its jurisdiction is *res judicata*.[45] *Komstroy* does not even address Article 16 of the ECT.[46]

b.  The tribunal in *RREEF v Spain* was faced with an almost identical question and, on the basis of Articles 26 and 16 of the ECT, rejected Spain's attempt to rely on the *Achmea* decision to request that the tribunal reconsider its decision on the intra-EU jurisdictional objection.[47]  The Claimants suggest that this Tribunal should take the same approach.[48]

c.  Lastly, leaving aside Article 16 of the ECT, the Claimants argue that "*Komstroy* still would remain irrelevant to this particular dispute because this Tribunal's jurisdiction was established at the date the arbitration was commenced, which is March 19, 2015."[49]

17.    The Claimants conclude with the following requests:

> *... the Tribunal should reject Spain's attempt to re-open an issue that the Tribunal already has decided in its well-reasoned Decision after several extensive rounds of briefing and a hearing. Claimants therefore respectfully request that the Tribunal deny Spain's Request for Reconsideration.*
>
> *If the Tribunal nevertheless decides to re-open this part of the proceeding, Claimants request an opportunity to comment on any additional submissions that may be required, noting that Spain bears the burden of proof with respect to its jurisdictional objections and that Claimants should be afforded an opportunity to rebut any further arguments Spain may wish to make.*[50]

---

[45]    DSG Claimants' Response, ¶¶ 19-20; Decision on Jurisdiction and Admissibility, ¶ 293.

[46]    DSG Claimants' Response, ¶ 20.

[47]    DSG Claimants' Response, ¶ 21; *RREEF Infrastructure (G.P.) Ltd. & RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (CL-201), ¶¶ 208-209.

[48]    DSG Claimants' Response, ¶ 22.

[49]    DSG Claimants' Response, ¶ 23.

[50]    DSG Claimants' Response, ¶¶ 26-27.

## III.    THE ANALYSIS OF THE TRIBUNAL

### A.    THE ADMISSIBILITY OF THE REQUEST FOR RECONSIDERATION OF THE TRIBUNAL'S DECISION OF 19 APRIL 2021

18.    First the Tribunal addresses the admissibility of this Request. The Tribunal has considered the Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021, in the light of the Parties' respective communications dated 30 September 2021 and 29 October 2021 and also of their previous submissions on what has come to be known as the '*Achmea* question'.

19.    The Tribunal notes that there is in the ICSID Convention and Rules no express provision concerning the reconsideration during the course of an arbitration by Tribunals of their earlier Decisions. It notes also the increasing frequency of requests for reconsideration.[51]

20.    The Tribunal has given careful consideration to the awards cited by each of the Parties on the question of the power of tribunals to reconsider decisions made prior to the issuing of a final award. It agrees with the conclusion in the award of the distinguished tribunal in the *Standard Chartered Bank* case that

> [d]*ecisions of tribunals are of course binding within the scope of the proceedings, but this does not make them res judicata. ... An essential feature of res judicata is that the judgment in question produces effects on the parties outside the proceedings in which it is granted. But decisions of tribunals only have effect within the proceedings until they have been incorporated into the final award.*[52]

21.    While there may appear to be an element of circularity in that reasoning, the conclusion is, as the *Standard Chartered Bank* tribunal explained, supported by the architecture of the ICSID Convention, which treats only issued awards as having legal consequences outside

---

[51]    Cf., Jeffery Commission and Rahim Moloo, *Procedural Issues in International Investment Arbitration* (2018), ¶¶ 9.55-9.66.

[52]    *Standard Chartered Bank* (RL-172), ¶ 313.

ICSID proceedings,[53] and also by considerations of efficiency and procedural economy.[54] This Tribunal shares that view.

22.    Moreover, the Tribunal notes that the ICSID Arbitration Rules distinguish between "Decisions of the Tribunal" (Rule 16) and "The Award" (Chapter VI). Furthermore, ICSID Rule 38 provides that

> *(1) When the presentation of the case by the parties is completed, the proceeding shall be declared closed.*
>
> *(2) Exceptionally, the Tribunal may, before the award has been rendered, reopen the proceeding on the ground that new evidence is forthcoming of such a nature as to constitute a decisive factor, or that there is a vital need for clarification on certain specific points.*

23.    Rule 38 refers to the period before the award is rendered. Rule 38 would be deprived of much of its practical utility if new evidence could be admitted or new clarification provided, but Decisions taken earlier in the proceedings which might decisively affect them could not be reconsidered.

24.    The Tribunal therefore agrees with the *Standard Chartered Bank* tribunal[55] (and with the Committee in the annulment proceeding in that case[56]) that in exceptional circumstances Decisions may be reconsidered before the award in a case has been rendered.

25.    Moreover, the Tribunal does not consider that the power of reconsideration is confined to instances in which questions of a tribunal's jurisdiction are at stake. The logic of the reasoning in *Standard Chartered Bank* is applicable to prior decisions in general.

26.    In the present case, the Tribunal issued a Decision, and not an Award. In the Decision of 19 April 2021, it invited the DSG Claimants and the Respondent to make supplementary submissions, in the following terms:

---

[53]    *Standard Chartered Bank* (RL-172), ¶ 314, referring to ICSID Convention Articles 54(1), 54(2), 52, and 48(3).

[54]    *Standard Chartered Bank* (RL-172), ¶ 320.

[55]    *Standard Chartered Bank* (RL-172), ¶¶ 307-324.

[56]    *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited* (ICSID Case No. ARB/10/20), Decision on Annulment, 22 August 2018, ¶¶ 150-173.

242.    ... [T]he Tribunal has considered what steps, if any, are necessary to ensure that each Party has had a proper opportunity to present its case in respect of the DSG claims. While the Tribunal considers that with diligent analysis, greatly assisted by the Parties' respective Post-Hearing Briefs, it is possible to obtain a full picture of each Party's case in respect of the DSG claims, it also considers that it is in the interests of the sound administration of justice that, before it decides upon the merits of the DSG claims, the DSG Claimants be afforded the opportunity to make a short written submission which summarizes the position concerning the DSG claims that they have presented in their previous written and oral submissions. Similarly, the Respondent will be afforded the opportunity to make a short written submission which summarizes the position concerning the DSG claims that it has presented in its previous written and oral submissions. Thus, each Party will have the opportunity to explain briefly how it would have presented differently its case on the merits and quantum if it had been addressing only the DSG claims.

243.    The written submissions should be as concise as possible and should focus on explaining clearly any features of the Party's case that are specific to one or more of the DSG Claimants, and which the Party considers that it did not have an adequate opportunity to emphasize and distinguish from the submissions that it has made in relation to the DSG and TS claims as a whole. The submissions should assume (i) that the Tribunal is familiar with all of the written and oral submissions already made, and (ii) that it is unnecessary to make any further submissions in relation to matters that are not affected by the identities of the Claimants, such as the status and interpretation of Spanish laws and decrees. The DGS Claimants should file their submission by Monday, 31 May 2021, and the Respondent should file its submission by Monday, 12 July 2021.

244.    Existing submissions stand in the record, and these written submissions are intended to serve as aids to understanding them properly in the context of a case confined to the DSG claims. This is not intended to be an opportunity to present a wholly new case, materially different from that already put before the Tribunal. Any request to introduce or respond to any novel arguments or new evidence should be made separately to the Tribunal. The Tribunal will proceed to

*address the merits of the DSG claims once any submissions*
*have been received.* (Emphasis and footnote omitted.)

27.     It is implicit in that invitation that the Tribunal was and is prepared to reconsider any aspects of its Decision and its thinking on the forthcoming award that could be affected by submissions made by either Party in response to that invitation.

28.     The tribunal in *Standard Chartered Bank* reconsidered an earlier decision on the basis that new facts, which were material and would have had an impact on its earlier decision,[57] had come to light. That was the exceptional circumstance. That tribunal accordingly did not need "to consider whether it should reopen its Decision on the basis of an alleged error of law",[58] as had also been submitted by the claimant in that case.[59]

29.     It would be an absurd waste of time and money if some such legal development, neglect of which might lead to the annulment of an award, were to be wilfully ignored by a tribunal simply because it had already taken a decision on the point, even though the tribunal had not yet rendered its award. For example, if certain contracts that a tribunal had decided were the basis of an 'investment' were subsequently determined by a competent court to have been void *ab initio*, that is not something that a tribunal should ignore when writing its award, whether or not the tribunal has issued a preliminary 'decision' on the existence of the investment.

30.     This Tribunal accordingly considers that in principle it is possible that a change in or misunderstanding of the law that has formed the basis of a Decision of a tribunal made earlier in the proceedings could in principle be of a nature to warrant the step of reconsidering that Decision. It could be so only exceptionally: the development would have to be material to the pending award; and its materiality would have to be decisive, in the sense that it would necessitate a significant alteration in the reasoning or conclusions of the tribunal. In particular, routine developments in case-law whose long-term impact upon

---

[57]     *Standard Chartered Bank* (RL-172), ¶ 347.

[58]     *Standard Chartered Bank* (RL-172), ¶ 349.

[59]     *Standard Chartered Bank* (RL-172), ¶ 233.

relevant jurisprudence is inevitably unpredictable, will not fall within this exceptional category.

31.    A tribunal may not simply refuse even to consider a submission from a party that there has been a material legal development. Plainly, it cannot be known if an alleged legal development has this exceptional character unless the alleged development is first examined by the tribunal. That examination may appear to be very similar to a 'reconsideration', but it is a distinct stage in the proceedings. If a tribunal finds that there is no ground that warrants a full reconsideration, it will deny the Request for Reconsideration; whereas if there is such a ground it might seek or permit further submissions for the parties. Accordingly, this Tribunal, exercising its powers under Article 44 of the ICSID Convention and Rule 19, decides that has the power to consider the Request for Reconsideration of its Decision of 19 April 2021 and that it will do so.

B.    THE SUBSTANCE OF THE REQUEST FOR RECONSIDERATION

32.    The Request for Reconsideration is, as was noted above, based on the *Komstroy* Judgment of the Grand Chamber of the Court of Justice of the European Union, rendered on 2 September 2021, and the implications of that judgment for the 'intra-EU' or '*Achmea* question'.

33.    It is true that the paragraphs of the Decision of 19 April 2021 that set out the Tribunal's analysis of the 'intra-EU Objection'[60] do not refer to the *Achmea* decision *eo nomine*. The arguments made by the Parties and by the European Commission on the basis of the *Achmea* decision were, however, recorded[61] and were addressed in the Decision.

34.    The Tribunal recalls its analysis of the '*Achmea* objection' in paragraphs 280-295 of its Decision of 19 April 2021, and reproduces it here for convenience:

> 280.    *The Tribunal is established under the ICSID Convention, pursuant to the dispute settlement provisions of the ECT and the consent of the parties to this arbitration. It is axiomatic that the competence of the Tribunal is determined by those*

---

[60]    Decision on Jurisdiction and Admissibility, ¶¶ 280–295.
[61]    Decision on Jurisdiction and Admissibility, ¶¶ 254–279.

*instruments. Both the ICSID Convention and the ECT have States Parties located in many parts of the world; but the question here concerns the operation of the ICSID Convention and the ECT in the context of a dispute involving a member State (Spain) of an REIO (the EU) and nationals of another member State of that REIO (Germany).*

281.   *The Respondent's objection is based upon the proposition that the ECT is not applicable. The Tribunal must approach that question by applying the provisions of the relevant instruments – the ECT and the ICSID Convention – construing them in accordance with the rules of international law as reflected in the familiar terms of Articles 30-32 of the Vienna Convention on the Law of Treaties ("VCLT").*

282.   *ECT Article 26 sets out the dispute settlement provisions pursuant to which the Claimants' application in this case has been filed. Because of its importance, it is quoted (in part) again here.*

Article 26
Settlement of Disputes between an Investor and a
Contracting Party

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

14

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

…

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

> (a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention;

....

283. *The question whether this is a "dispute" (in the singular) was addressed in the section above on the 'multi-party objection'. The next question is whether the dispute is, in the words of ECT Article 26(1), a dispute "between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III [of the ECT]." The only question here is whether the Claimants are "Investors" of "another Contracting Party." If they are, the remaining requirements in Article 26(1) are plainly met.*

284. *It is argued that the Claimants are all "Investors" of the EU, of which Spain is a Member State, and are therefore not "Investors" of 'another Contracting Party' to the ECT. This is the "intra-EU" argument, according to which the ECT does not operate in the context of intra-EU States but only in the context of a dispute involving an EU State and a non-EU State.*

15

285.    *The Tribunal understands the thinking and the policy behind the intra-EU argument, and the relevant principles of EU law; but it is bound to interpret and apply the instruments to which it owes its existence and its powers and, in the words of ECT Article [26(6)], to do so "in accordance with [the ECT] and applicable rules and principles of international law."*

286.    *The starting point is the rule of interpretation set out in VCLT Article 31(1): "1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."*

287.    *Both Spain and Germany are ECT Contracting Parties. On the face of it, and giving the terms of ECT Article 26(1) their ordinary meaning, this is plainly a dispute "between a Contracting Party and an Investor of another Contracting Party." The question is whether this conclusion is vitiated by the fact that the EU is also a Contracting Party to the ECT.*

288.    *Clearly, it is not the simple fact that the EU is an ECT Contracting Party that is relevant: it is the relationship between the EU and the two States involved in this case. But nothing in the wording of ECT Article 26 points to the conclusion that because the EU is itself a Contracting Party, Germany and Spain cease to be distinct Contracting Parties vis-à-vis one another. Provision could have been made to that effect in ECT Article 26; or an additional "Understanding" of the kind attached to many ECT Articles (including Article 26 itself) could have been adopted in relation to Article 26; or some other provision in the ECT could have made plain the relationship between EU Law and the ECT; or an instrument of the EU could have made explicit to EU States how they and their nationals were to act in relation to disputes covered by the substantive provisions of the ECT, and perhaps have invited other ECT Contracting Parties to agree to what would have been a regional derogation from the terms of the Treaty.*

289.    *No such step was taken. The argument that the ECT cannot apply rests on the interpretation of general provisions of EU Law, notably Article 3(2) of the TFEU, which stipulates that the Union has "exclusive competence for the conclusion of an international agreement when its conclusion ... may*

16

*affect common rules or alter their scope." But nothing in the TFEU addresses the question of the continuing validity of the ECT when investment was brought under Union competence, in 2007, after the ECT had been ratified and entered into force for the EU, Germany and Spain.*

290.  *The principles of the supremacy of EU Law and of Union competence are well understood to be principles of fundamental importance within the EU; but it is far from being 'manifest' that a treaty concluded by the EU itself, alongside its Member States, without any reservation or any declaration of how the express provisions of that treaty were to be interpreted and applied, should be regarded as incompatible with EU law. Indeed, the legal test of incompatibility appears to be one whose application will in many cases be unclear until the Union's Court has made a determination: as the EU Brief put it, "it is also important to recall that the ECJ considers that international investment treaties breach Union law already when they present the risk of conflict with potential Union measures, without it being necessary to demonstrate actual conflict."*

291.  *The 'incompatibility' of the ECT and the TFEU may have been the result of an oversight at the time that the ECT was adopted or at the time that the TFEU was adopted. But if a treaty does not say what one or more of the parties wished (or has come to wish) it to mean, the remedy cannot be for one or some of the parties to impose a different meaning upon the treaty by a unilateral declaration of its position.*

292.  *There is a further point of great importance. The ECT itself does make provision for circumstances where two treaties appear to be in conflict. ECT Article 16, together with the Decision relating to its application, reads as follows:*

Article 16
Relation to Other Agreements

[DECISION] With respect to the Treaty as a whole

In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as

17

to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.*

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.

*Decision n. 1 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

293.    *The ordinary meaning of these words is plain. Applied in this context they mean that nothing in the ECT derogates from any provision of any of the EU treaties in relation to investment promotion and protection (ECT Part III) or from any right to dispute resolution; and nothing in the EU treaties derogates from any provision of any of the ECT in relation to investment promotion and protection (ECT Part III) or from any right to dispute resolution. The explicit reference to the Svalbard Treaty highlights the silence of Article 16 in relation to the EU treaties. It is difficult to see that any reader of the ECT and of Article 16 in particular could fail to draw from it an understanding that the ECT and the EU treaties were intended by ECT Contracting Parties (including the EU) to co-exist, with investors entitled to take the benefit of the more favourable treaty provision in any particular case.*

294.    *The Tribunal was referred by the Parties and by the European Commission as amicus curiae to the awards of other tribunals on this point and to the relevant decisions of the Court of Justice of the European Union, and it has*

> *considered them carefully. The Tribunal understands that the EU, as an REIO, will decide for itself on the relationship between its legal order and international law, as must any system of municipal law. But just as the Union Court may consider itself bound to uphold the supremacy of EU law, this Tribunal must apply the rules and principles of international law, in accordance with ECT Article 26(6). EU law, like municipal laws, has a very important role in the development and the application of international law; but it cannot prevail over it.*
>
> 295. *The Tribunal accordingly finds that its jurisdiction under the ECT and the ICSID Convention is not precluded or excluded by provisions of EU law, and dismisses this objection.* (Footnotes omitted.)

35.     The Tribunal recognizes that the fact that the *Komstroy* judgment postdates the Decision of 19 April 2021 is not in itself a barrier to an argument that the Tribunal's decision on jurisdiction was wrong, both at the date of the Decision and at the date at which the arbitration was commenced, and that the Decision can therefore properly be reconsidered.

36.     The Tribunal has serious doubts as to whether the arrival of new case-law bearing on the *Achmea* objection from the CJEU is a sufficient ground for reconsideration, because (a) it is not a new fact, and (b) the central legal questions are essentially the same as those addressed by the Parties in their submissions on *Achmea* and decided by the Tribunal in its Decision of 19 April 2021. Nonetheless, the fact that in *Komstroy* the CJEU for the first time directly addresses the question of intra-EU disputes under the ECT is a very specific and particular feature of the *Komstroy* judgment which the Tribunal considers, on balance, warrants reconsideration in this case.

37.     The Tribunal reaffirms that the Tribunal must determine its jurisdiction within the legal framework of the ECT and of international law. The ECT must be interpreted in accordance with the well-established principles of international law on treaty interpretation, as reflected in the Vienna Convention on the Law of Treaties. Moreover, it is axiomatic that the express words of the text of the ECT cannot have different meanings as between different configurations of EU and non-EU Contracting Parties and their investors.

Contracting Parties may, of course, agree to amend the ECT so that it has differential application, in accordance with the procedure set out in ECT Article 42.

38.    The Tribunal notes the observations of the CJEU in *Komstroy* that

> 25    *It should be noted that the questions referred concern the concept of 'investment' within the meaning of the ECT.*
>
> 26    *Since the entry into force of the Treaty of Lisbon, the European Union has exclusive competence, as regards foreign direct investment, pursuant to Article 207 TFEU and, as regards investments that are not direct, it has shared competence (Opinion 2/15 (*EU-Singapore Free Trade Agreement*), of 16 May 2017, EU:C:2017:376, paragraphs 82, 238 and 243).*
>
> 27    *In those circumstances, the Court has jurisdiction to interpret the ECT, in particular, as has been pointed out in paragraph 23 of this judgment, in the context of a reference for a preliminary ruling.*
>
> 28    *It is true that the Court does not, in principle, have jurisdiction to interpret an international agreement as regards its application in the context of a dispute not covered by EU law. That is the case in particular where such a dispute is between an investor of a non-member State and another non-member State.*
>
> 29    *However, first, the Court has held that, where a provision of an international agreement can apply both to situations falling within the scope of EU law and to situations not covered by that law, it is clearly in the interest of the European Union that, in order to forestall future differences of interpretation, that provision should be interpreted uniformly, whatever the circumstances in which it is to apply (see to that effect, judgments of 17 July 1997,* Giloy*, C-130/95, EU:C:1997:372, paragraphs 23 to 28; of 16 June 1998,* Hermès*, C-53/96, EU:C:1998:292, paragraph 32; and of 14 December 2000,* Dior and Others*, C-300/98 and C-392/98, EU:C:2000:688, paragraph 35).*[62]
>
> ...

---

[62]    *Komstroy* (RL-171), ¶¶ 25-29.

60    *Having regard to all the characteristics of the arbitral tribunal set out in paragraphs 48 to 59 of the present judgment, it must be considered that, if the provisions of Article 26 ECT allowing such a tribunal to be entrusted with the resolution of a dispute were to apply as between an investor of one Member State and another Member State, it would mean that, by concluding the ECT, the European Union and the Member States which are parties to it established a mechanism for settling such a dispute that could exclude the possibility that that dispute, notwithstanding the fact that it concerns the interpretation or application of EU law, would be resolved in a manner that guarantees the full effectiveness of that law (see, by analogy, judgment of 6 March 2018,* Achmea, *C‑284/16, EU:C:2018:158, paragraph 56).*

61    *It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the EU institutions, including the Court of Justice of the European Union, is not in principle incompatible with EU law. The competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the European Union and its legal order is respected (judgment of 6 March 2018,* Achmea, *C‑284/16, EU:C:2018:158, paragraph 57 and the case-law cited).*

62    *However, the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed.*

63    *Such a possibility would, as the Court held in the case giving rise to the judgment of 6 March 2018,* Achmea *(C‑284/16, EU:C:2018:158, paragraph 58) and as the Advocate General observed in essence in point 83 of his Opinion, call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties,*

21

> *ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU.*
>
> 64    *It should be noted in that regard that, despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018,* Achmea *(C-284/16, EU:C:2018:158, paragraph 58).*
>
> 65    *It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves.*
>
> 66    *In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.*[63]

39.    The Tribunal agrees that "where a provision of an international agreement can apply both to situations falling within the scope of EU law and to situations not covered by that law, it is clearly in the interest of the European Union that, in order to forestall future differences of interpretation, that provision should be interpreted uniformly, whatever the circumstances in which it is to apply." That is an axiomatic proposition, inherent in the notion that a treaty is an international *agreement*, in which the parties *agree* on the words and meaning of the text that binds them all.

40.    The Tribunal cannot accept, however, that the consequence is that the interpretation of the ECT must either be determined authoritatively by the EU and its courts, or that the ECT may have a different meaning in the context of intra-EU disputes from that which it has in non-intra-EU disputes (whether between non-EU investors and EU States, or between non-

---

[63]    *Komstroy* (RL-171), ¶¶ 60–66.

EU investors and non-EU States, or between EU investors and non-EU States). Such an inherently discriminatory structure cannot be reconciled with the affirmation of the ECT Contracting Parties, including the EU, that they "attach the utmost importance to the effective implementation of full national treatment and most favoured nation treatment."[64]

41.    The Respondent argues that "(1) the ECT, foreign direct investment and state aid are EU law; (2) EU Law must be exclusively interpreted by national courts and the CJEU; (3) therefore no intra-EU investment arbitrations under the ECT are possible."[65] The Tribunal accepts that the ECT may be considered to be a part of EU law and thus of the law of EU Member States, in the sense that the provisions of the ECT are applicable within the EU as a part of the applicable EU law. But that does not mean that the ECT is transformed into EU law, losing its character as an international agreement subject to and applicable as part of public international law, or that the text and meaning of ECT must be interpreted through the optic of EU law and applied in conformity with EU law and the principles of the European Union as interpreted by EU national courts and the CJEU. Nor does it alter the fact that EU law is (like the domestic laws of sovereign States) a *source* of international law and is not in itself a *part* of international law, and *a fortiori* is not a part of international law that has primacy over all other rules of international law, which is the body of law governing relations between all States and jurisdictions in the world.

42.    Moreover, unlike the arbitration in question in *Komstroy*, the present arbitration does not have its seat in an EU Member State. EU law cannot be said to be part of the *lex fori* of this ICSID arbitration,[66] as it was in *Komstroy* (para 33). It is questionable, and unnecessary to decide here, whether any ICSID tribunal has a *lex fori* other than the ICSID Convention and international law; but in any event the 'place of proceeding' in this case is expressly stipulated to be Washington D.C., so that there can be no possible basis for a claim that EU law is part of *the lex fori*.

---

[64]    ECT, Preamble; and cf., Articles 10 and 25 concerning the right of Contracting Parties to extend *preferential* (but not disadvantageous) treatment in consequence of membership of Economic Integration Agreements.

[65]    Request for Reconsideration, ¶ 38.

[66]    The Tribunal takes no position on the question of the *lex fori* of ICSID arbitrations, but only on the point that it is plainly not the law of any EU Member State.

43.     The ECT, as signed and ratified by Spain, Germany, and the EU itself, provides explicitly in Articles 16 and 42 for the relationship between the ECT and later agreements such as the TFEU, as well as prior agreements made by ECT Contracting Parties, and for the amendment of that relationship. Article 16, it will be recalled, stipulates that

> *Where two or more Contracting Parties ... enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty ...* nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment. (emphasis added)

44.     The provision is explicit. All of the provisions on which the Claimants rely are contained in ECT Part III ('Investment Promotion and Protection') and Part V ('Dispute Settlement'); and the Claimants' entitlement to exercise the right to dispute resolution is specifically spelled out. There is no ambiguity or room for doubt. Those provisions were set out in the ECT in 1994. Germany, Spain and the EU signed the ECT on 17 December 1994 and subsequently ratified it and became bound by its provisions as of 16 April 1998.[67] They were bound by those provisions, including Article 16, when they were negotiating the TFEU and when they ratified the TFEU. It has not been argued that it is 'more favourable' to the Claimants to deprive them of the right to dispute settlement under the ECT than to allow them to exercise it; and in the view of the Tribunal no such argument could credibly be made out.

45.     As the Tribunal pointed out in its Decision on Jurisdiction and Admissibility, special provision could have been made in the ECT for intra-EU disputes, by way of a Decision or Declaration or Understanding of the Contracting Parties or by way of a subsequent amendment of the Treaty pursuant to ECT Article 42. That was not done. The Contracting Parties did not provide arbitral tribunals constituted under ECT Part V with any legal basis for refusing to interpret and apply the ECT in accordance with its plain terms. Nor can unilateral interpretations of the ECT that are contrary to its plain meaning, determined in

---

[67]  *See* https://www.energycharter.org/process/energy-charter-treaty-1994/energy-charter-treaty/signatories-contracting-parties/.

accordance with the applicable principles of international law, have that effect. The Claimants have under ECT Part V a right to ECT arbitration, and neither the *Komstroy* decision nor the principles of EU law on which it is based can deprive them of that right – particularly when the decision postdates the critical date for the establishment of jurisdiction and the Tribunal's decision thereon.

46. The Tribunal recognizes that there is here a clash of *Grundnormen*. The CJEU has its role and authority within the EU legal order. The CJEU itself has made clear that ECT arbitration tribunals are not part of that legal order.[68] Their role and their authority is established by an international treaty, concluded by sovereign States and by the EU. The ECT Contracting Parties do not merely permit Investors to make their own agreements to arbitrate: the Contracting Parties give Investors an immediate legal right to choose to arbitrate or conciliate disputes under the mechanisms established by the Contracting Parties in ECT Article 26. The mandate of this Tribunal, and its authority, derive from the agreement of the ECT Contracting Parties in accordance with international law and are invoked by the Parties to the dispute. It is deeply regrettable that parties to disputes should find themselves caught up in a clash of *Grundnormen* that could have been foreseen and resolved in advance. But this Tribunal has the duty to fulfil its mandate under the ECT, and has no legal right or capacity to do otherwise. The solution lies in the hands of the Contracting Parties to the ECT.

47. In view of the relatively unusual nature of the Request for Reconsideration, and the specific relevance of the *Komstroy* Judgment the Tribunal has set out its reasoning at greater length that might have been expected. Its conclusion is, however, simple and clear. The rendering of the *Komstroy* Judgment does not warrant the reopening of the '*Achmea* / intra-EU' question, and the Tribunal's Decision of 19 April 2021 stands. The Tribunal will now proceed to finalize and render its Award.

---

[68] *Komstroy* (RL-171), ¶ 62.

## IV.    DECISION

48.    For the reasons given above, the Tribunal DECIDES:

(i)    That the Judgment of the CJEU in the *Komstroy* case does not warrant the reopening of the questions addressed and decided in the Tribunal's Decision of 19 April 2021; and

(ii)    That it will not alter its Decision of 19 April 2021.

_____
Dr. Michael Pryles AO, PBM
Arbitrator

_____
Prof. Zachary Douglas QC
Arbitrator

_____
Prof. Vaughan Lowe QC
President of the Tribunal

26