# EXHIBIT 31

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**LANDESBANK BADEN-WÜRTTEMBERG ET AL.**
Claimants

and

**KINGDOM OF SPAIN**
Respondent

**ICSID Case No. ARB/15/45**

---

# DECISION ON THE "INTRA-EU" JURISDICTIONAL OBJECTION

---

***Members of the Tribunal***
Sir Christopher Greenwood, GBE, CMG, QC, President of the Tribunal
Mr Rodrigo Oreamuno, Arbitrator
Dr Charles Poncet, Arbitrator

***Secretary of the Tribunal***
Ms Luisa Fernanda Torres

*Date of dispatch to the Parties:* 25 February 2019

### REPRESENTATION OF THE PARTIES

*Representing the Claimants:*

Dr Sabine Konrad
Mr Arne Fuchs, LL.M. (GWU)
McDermott Will & Emery
Rechtsanwälte Steuerberater LLP
Feldbergstrasse 35
60323 Frankfurt am Main
Germany

*Representing the Respondent*:

Mr José Manuel Gutiérrez
Ms Mónica Moraleda
Ms Patricia Froehlingsdorf
Ms Elena Oñoro
Mr Roberto Fernández
Ms María Ruiz
Ms Gloria de la Guardia
Mr Javier Comerón
Ms Estibaliz Hernández
Mr Juan Quesada
Ms Ana Rodríguez
Mr Pablo Elena Abad
Abogacía General del Estado
Ministry of Justice of the Government of
Spain
Calle Ayala 5
28001, Madrid

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

    A.    Procedural History ..................................................................................... 1

    B.    Background ................................................................................................. 9

    C.    The Issue before the Tribunal in the Present Phase of the Proceedings ...................... 11

II.   THE ARGUMENTS OF THE PARTIES AND THE EUROPEAN COMMISSION ........ 15

    A.    The Respondent ........................................................................................ 15

    B.    The Claimants ........................................................................................... 22

    C.    The European Commission ....................................................................... 26

III.  DEVELOPMENTS SINCE THE HEARING ................................................... 28

IV.   THE ANALYSIS OF THE TRIBUNAL ............................................................. 33

    A.    The Extent of the Tribunal's *Compétence de la Compétence* ..................................... 34

    B.    The Relationship Between the Claimants and Germany ............................ 35

    C.    Is the Issue "Settled Law"? ..................................................................... 37

    D.    Does the ECT Confer Jurisdiction in the Present Case? ............................ 40

        (1)   Principles of Interpretation .................................................................. 40

        (2)   Provisional Interpretation of Article 26 of the ECT ............................ 42

        (3)   Is It Contrary to EU Law for an EU Member State to Make an Offer of
              Arbitration Under the ECT to an Investor from Another EU Member State? ...... 49

        (4)   The Effect on the Interpretation of Article 26 of the ECT of a Prohibition Under
              EU Law of Arbitration in an Intra-EU Dispute ................................. 58

        (5)   Does EU Law Take Priority Over the ECT for the Purposes of Determining the
              Jurisdiction of the Tribunal? ................................................................. 66

V.    FUTURE DISPOSITION OF THE CASE ....................................................... 72

VI.   COSTS ....................................................................................................... 72

VII.  DECISION .................................................................................................. 73

## I.    INTRODUCTION

### A.    PROCEDURAL HISTORY[1]

1.    The proceedings are brought by Landesbank Baden-Württemberg ("**LBBW**"), HSH Nordbank AG ("**HSH Nordbank**"), Landesbank Hessen-Thüringen Girozentrale ("**Helaba**") and Norddeutsche Landesbank-Girozentrale ("**NORD/LB**") (collectively "**the Claimants**").  LBBW, Helaba and NORD/LB are public law institutions (*Anstalt des öffentlichen Rechts*) established under the laws of Germany, while HSH Nordbank is a joint stock company (*Aktiengesellschaft*) incorporated in Germany.  Each Claimant maintains that it operates as a commercial bank but also as a *Landesbank* for one or more of the states (*Länder*) of Germany.  For the purposes of the present phase of the proceedings, it is not disputed that all the Claimants have German nationality.  The Claimants maintain that the jurisdiction of the arbitration Tribunal is derived from the Energy Charter Treaty (the "**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**"), both of which have at all material times been in force for both Germany and Spain (*see infra,* paragraphs 36 and 38).

2.    The Respondent is the Kingdom of Spain (the "**Respondent**" or "**Spain**").

3.    On 22 October 2015, ICSID received a Request for Arbitration dated 20 October 2015, accompanied by exhibits C-0001 to C-0062.  On 9 November 2015, the Centre formulated a question to the Claimants concerning the Request for Arbitration, and the Claimants submitted a response on 11 November 2015.  In accordance with Article 36(3) of the ICSID Convention, the case was registered by the Secretary-General of the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on 12 November 2015.

4.    In accordance with Article 37(2)(a) of the ICSID Convention, the Parties agreed that the Tribunal should consist of three arbitrators, one appointed by each Party and a President

---

[1] This Section describes the steps in the Procedural History that the Tribunal has deemed relevant for purposes of the present Decision.  It does not purport to be an exhaustive narrative of the entire Procedural History up to this point in the arbitration.

appointed by agreement of the Parties.  Pursuant to the Parties' agreed method, failing an agreement on the President, he or she would be appointed by the Secretary-General of ICSID, at the request of either Party.

5.    On 30 December 2015, the Claimants appointed Dr Charles Poncet, a national of Switzerland, as arbitrator.  On 29 January 2016, the Respondent appointed Mr Rodrigo Oreamuno, a national of Costa Rica, as arbitrator.  The Parties having failed to agree upon a presiding arbitrator, the Claimants requested the Secretary-General to make the appointment.    On 1 June 2016, the Secretary-General appointed Sir Christopher Greenwood, a national of the United Kingdom, as President of the Tribunal.  He confirmed his acceptance of that appointment by letter dated 6 June 2016.  Accordingly, on 7 June 2016, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings ("**ICSID Arbitration Rules**"), the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was deemed constituted on that date.  Ms Luisa Fernanda Torres, ICSID Legal Counsel, was appointed Secretary of the Tribunal.

6.    In accordance with ICSID Arbitration Rule 13(1), the First Session of the Tribunal was held by conference call on 1 July 2016 and involved only the Members of the Tribunal and the Secretary of the Tribunal.  In accordance with ICSID Arbitration Rule 20, a preliminary procedural consultation was held between the President and the Parties on 26 July 2016. Procedural Order No. 1 was adopted on 12 August 2016.  Procedural Order No. 1 established, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington, DC.  It also laid down the Procedural Calendar for this arbitration.

7.    On 16 March 2017, the Claimants filed a Memorial on the Merits, accompanied by: exhibits C-0013, C-0035, C-0049 and C-0063 to C-0080; legal authorities CL-0001 to CL-

0034; and an expert report by Ms. Laura Hardin of Alvarez & Marzal Global Forensic and Dispute Services, LLC with Appendixes 1 to 52 and exhibits AM-0001 to AM-1478.[2]

8.     On 1 September 2017, the Respondent notified the Tribunal and the Claimants that it intended to raise objections to the jurisdiction of the Tribunal and that it would seek an order for bifurcation of the proceedings, so that its various jurisdictional objections would be heard in a preliminary phase of the proceedings.

9.     On 5 September 2017, the Claimants objected that such a request would be a violation of a prior procedural agreement between the Parties.  On 8 September 2017, the Respondent filed a Request for Bifurcation, with exhibits R-0001 to R-0002 and legal authorities RL-0001 to RL-0022.  One of the Respondent's jurisdictional objections was that the ECT and the ICSID Convention could not provide jurisdiction between nationals of one European Union ("**EU**") Member State and another EU Member State (the "**Intra-EU Jurisdictional Objection**").  By its Procedural Order No. 4, dated 8 September 2017, among other matters, the Tribunal fixed a schedule for pleadings on the issue of bifurcation.

10.     In accordance with this schedule, on 22 September 2017, the Claimants filed their Observations on Spain's Request for Bifurcation opposing bifurcation, with exhibits C-0081 to C-0084 and legal authorities CL-0035 to CL-0039.  On 6 October 2017, the Respondent filed a Reply on Bifurcation.  On 13 October 2017, the Claimants filed a Rejoinder on Bifurcation, with exhibits C-0085 to C-0089 and legal authority CL-0040.

11.     By its Procedural Order No. 5, dated 6 November 2017, the Tribunal rejected the Request for Bifurcation, laid down the date for submission of the Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction (later extended by letters of 16 and 26 November 2017), and it invited the Parties to agree on the schedule for the remainder of the proceeding.

12.     On 5 December 2017, the Parties informed the Tribunal that they had agreed on a revised Procedural Calendar, including proposed Hearing dates.  In Procedural Order No. 7, dated 12 December 2017, the Tribunal approved the revised Procedural Calendar for the

---

[2] On 30 November 2017, a revised set of AM exhibits was filed, now containing AM-0001 to AM-1613.

remaining stages and, confirmed that the Hearing should take place at the premises of the Centre in Washington, DC on the dates agreed by the Parties, that is, from 23 September 2019 to 4 October 2019.

13.  On 15 December 2017, the Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction, accompanied by: exhibits R-0003 to R-0174; legal authorities RL-0023 to RL-0079; an expert report by Econ One Research Inc., with exhibits EO-0001 to EO-0155.

14.  On 6 March 2018 the Court of Justice of the European Union (the "**CJEU**") delivered its Judgment in Case No. C-284/16, *Republic of Slovakia v. Achmea BV*[3] (the "**Achmea Judgment**") concerning the compatibility with EU law of the arbitration provision in a bilateral investment treaty between two EU Member States.

15.  On 27 July 2018, the Claimants filed a communication requesting that an unscheduled submission from the Respondent entitled "*Respondent's comments on Achmea Ruling and related matters*" dated 26 July 2018 and accompanying documents be struck from the record. On 1 August 2018, the Tribunal informed the Parties that neither the Centre, nor the Tribunal had received the Respondent's submission at issue. The Tribunal added that it would not accept unscheduled submissions unless prior permission from the Tribunal had been sought and obtained. On 4 September 2018, the Respondent sought authorization from the Tribunal to add a number of documents to the record, including the *Achmea* Judgment, and to file written submissions concerning their relevance to the Intra-EU Jurisdictional Objection. On 5 September 2018, the Claimants protested again about the Respondent's conduct, but agreed with some of Spain's requests subject to a number of conditions, including that the Tribunal should then render a separate ruling on the Intra-EU Jurisdictional Objection following the Parties' written submissions on this issue. On 10 September 2018, the Tribunal rejected the request to establish a separate phase to deal with the Intra-EU Jurisdictional Objection, considering that it would not serve the efficient conduct of the proceeding. The Parties were asked to submit their arguments concerning

---

[3] **RL-0091**, Judgment of the CJEU, *Republic of Slovakia v. Achmea B.V.*, Case C-284/16, 6 March 2018 (the "*Achmea Judgment*").

that objection with their scheduled Reply on Jurisdiction and Rejoinder on Jurisdiction, respectively.

16.    By emails dated 20 September 2018, the Parties jointly requested the Tribunal to bifurcate the proceedings and establish a separate pleading schedule and hearing on the Intra-EU Jurisdictional Objection.  This request was followed by correspondence between the Parties and the Tribunal regarding the schedule for such a preliminary phase, in the course of which the Parties "*encourage*[d]" the Tribunal to "*render its decision by 28 February 2019 at the latest.*"[4]  The Parties also informed the Tribunal (i) that they had agreed to suspend the deadlines for other submissions until a ruling on the Intra-EU Jurisdictional Objection was rendered; and (ii) that they "*disagree*[d] *about the procedural effects of such a decision with regard to subsequent developments in the case law (or otherwise)*" and considered that it was "*a legal question*, […] *for the Tribunal to decide whether the issue can be reopened should such a situation arise in the future.*"[5]  Given the Parties' agreement, on 4 October 2018 the Tribunal confirmed that a separate phase concerning the Intra-EU Jurisdictional Objection would be conducted.

17.    On 8, 12 and 15 October 2018, the Parties communicated to the Tribunal their agreed Procedural Calendar for the bifurcated phase on the Intra-EU Jurisdictional Objection.  By Procedural Order No. 14, dated 16 October 2018, the Tribunal confirmed its approval of the Parties' joint request for bifurcation, it laid down a Procedural Calendar for written submissions, and confirmed the date for oral argument (20 December 2018).  The Tribunal made clear that it could not guarantee that it would deliver its ruling by the end of February 2019, although it would use its best endeavours to do so.[6]

18.    Pursuant to the Procedural Calendar, the Respondent filed its Statement on the Intra-EU Jurisdictional Objection (the "**Respondent's Statement**") on 24 October 2018 (in Spanish), accompanied by exhibits R-0175 to R-0178 and legal authorities RL-0079bis to RL-0099; with an English translation filed on 31 October 2018.  The Claimants filed their

---

[4] Respondent's email of 20 September 2018, affirmed by the Claimants.
[5] Claimants' email of 28 September 2018, affirmed by the Respondent.
[6] Tribunal's letter of 21 September 2018.

Response on the Intra-EU Jurisdictional Objection (the "**Claimants' Response**") on 26 November 2018 (in English), accompanied by exhibits C-0090 to C-0097 and legal authorities CL-0041 to CL-0077; with a Spanish translation filed on 7 December 2018.

19. On 31 October 2018, the European Commission (the "**EC**") wrote to the Tribunal requesting leave to intervene in the proceedings as a non-disputing Party under ICSID Arbitration Rule 37(2). In accordance with the provisions of ICSID Arbitration Rule 37(2), on 2 November 2018, the Tribunal consulted the Parties about this request. On 8 November 2018, the Respondent replied that it should be granted, while on 7 November 2018 the Claimants objected to the request. On 12 November 2018, the Tribunal issued Procedural Order No. 15, by which it rejected the request of the EC to intervene in the present phase of the proceedings because that request was made too late to be accommodated within the schedule set out in Procedural Order No. 14. Nevertheless, the Tribunal stated:

> […] *the detailed submissions already contained in the Application* [*to intervene*]*, paras. 18-37, are a sufficient statement of the Commission's views and should form part of the record in the case. The Claimants will be able to respond to them in their submissions due on 26 November 2018 and both Parties will be able to comment on them at the hearing.*[7]

20. In addition, the Tribunal expressly left open the possibility of the EC being permitted to renew its request to intervene in any future phase of the proceedings with regard to the State aid issue, in the event that the present phase did not lead to the dismissal of the case for want of jurisdiction.[8]

21. On 5 December 2018, the Respondent filed a request for leave to add a document to the record. On that same day, the President and the Secretary of the Tribunal held a conference call with the representatives of the Parties to discuss arrangements for the forthcoming Hearing, in the course of which the Claimants also provided observations with respect to the Respondent's request of 5 December 2018. The Tribunal issued Procedural Order No.

---

[7] Procedural Order No. 15, para. 20.
[8] Procedural Order No. 15, paras. 22 and 24(c).

16 concerning both matters also on 5 December 2018.  Accordingly, on 10 December 2018, the Respondent introduced legal authority RL-0101 to the record.

22.    On 12 December 2018, the Claimants filed a request for leave to add a document to the record.  The Respondent filed a response on 13 December 2018.  Also on 13 December 2018, the Tribunal was informed that the Parties had agreed to add to the record a number of other authorities cited in the pleadings, which had inadvertently not been filed.  On 14 December 2018, the Tribunal authorized both applications.   Accordingly, on 14 and 15 December 2018, the Claimants submitted legal authorities CL-041(a) to CL-041(f) and CL-0078, respectively.

23.    A Hearing on the Intra-EU Jurisdictional Objection was held on 20 December 2018 at the International Dispute Resolution Centre, 70 Fleet Street, London.[9]  The following were present at the Hearing:

Tribunal
Sir Christopher Greenwood, President
Mr Rodrigo Oreamuno, Arbitrator
Dr Charles Poncet, Arbitrator
Ms Luisa Fernanda Torres, Secretary of the Tribunal

For the Claimants
Dr Sabine Konrad, McDermott Will and Emery LLP
Mr Arne Fuchs, McDermott Will and Emery LLP
Ms Pauline Walde, McDermott Will and Emery LLP
Mr Maximilian Pika, McDermott Will and Emery LLP
Ms Azar Tayebi, HSH Nordbank
Ms Katrin Ebel, NORD/LB

For the Respondent
Ms Mónica Moraleda Saceda, *Abogacía General del Estado*, Kingdom of Spain
Ms Sonsoles Centeno Huerta, *Abogacía General del Estado*, Kingdom of Spain
Mr José Manuel Gutiérrez Delgado, *Abogacía General del Estado*, Kingdom of Spain
Mr Roberto Fernández Castilla, *Abogacía General del Estado*, Kingdom of Spain

Interpreters
Mr Jesús Getan Born
Ms Amalia Klemm-Thaler
Ms Anna Sophia Chapman

---

[9] The venue for the Hearing was agreed upon by the Parties.  *See* Parties' emails of 20 September 2018.

Court Reporters
Ms Claire Hill, The Court Reporter Ltd.
Mr Dante Rinaldi, DR-Esteno

24.     Each Party submitted demonstrative exhibits at the Hearing, as follows:   C-0098
        (Claimants' Opening Presentation); and R-0179 (Respondent's Opening Presentation).[10]

25.     On 3 January 2019, following authorization received at the Hearing,[11] the Claimants
        submitted to the record additional legal authorities CL-0079 to CL-0081.

26.     On 15 January 2019 twenty-two Member States of the EU issued a declaration regarding
        the effect of the *Achmea* Judgment (*see infra*, Part III).   On 17 January 2019, the Tribunal
        invited the Parties to file brief observations on this declaration and two declarations made
        at the same time by other EU Member States, and it asked for the Parties' views as to
        whether Germany (the Claimants' state of nationality) should also be invited to make a
        submission on the significance of these declarations.   The Parties filed their observations
        on 28 January 2019.   The Claimants' observations were accompanied by legal authorities
        CL-0084 to CL-0088.   Having heard the Parties, on 30 January 2019, the Tribunal decided
        to invite Germany to communicate its views.   On 6 February 2019, Germany filed a brief
        statement.   On 8 February 2019, the Parties informed the Tribunal that they did not have
        further comments in response to Germany's letter.

27.     On 18 January 2019, each Party filed a Statement of Costs for the Intra-EU Jurisdictional
        Objection Phase.   The Claimants' statement was accompanied by legal authority CL-0082.
        On 25 January 2019, each Party filed a reply to the other Party's statement. The Claimants'
        reply was accompanied by legal authority CL-0083.   Following authorization by the
        Tribunal, on 8 February 2019, the Respondent filed an additional rejoinder to the
        Claimants' reply.

---

[10] A revised electronic version of R-0179 was submitted on 9 January 2019, pursuant to the Tribunal's instructions at
the Hearing.  Transcript, pp. 80-81, 192-193.
[11] Transcript, p. 193.

28.   Pursuant to a procedure agreed upon by both Parties at the Hearing, on 7 and 8 February 2019, the Parties also filed with ICSID under seal cost submissions for the entire arbitration.[12]   On 12 February 2019, the Tribunal informed the Parties that the costs submissions for the entire arbitration had been received by the Secretariat, who had been instructed by the Tribunal to follow the procedure agreed at the Hearing, pursuant to which: "*each party's submission will be held by* [ICSID] *until the Tribunal has decided on the outcome of this phase of the proceedings, and it will be opened by* [the Tribunal] *only in the event that the ruling is going to be in favour of Spain*;"[13] and only in this last hypothesis, these submissions would be "*distributed to the parties together with the award*."[14] The Tribunal's directions with respect to these under seal submissions are further discussed *infra,* Part VI.

**B.    BACKGROUND**

29.   Since the present phase of the proceedings concerns solely the Intra-EU Jurisdictional Objection and the Parties have expressly requested that the Tribunal give its ruling on that objection by the end of February 2019, the Tribunal will give only a very brief outline of the factual background.  Moreover, that background is given solely to make what follows easier to understand.  The Tribunal makes no findings of fact in the present Decision and anything said in this part of the Decision is without prejudice to the right of the Parties to dispute allegations of fact at the next stage of the proceedings.

30.   Beginning in the late 1990's the Respondent implemented extensive legislation to establish a special regime for renewable energy production and sought to encourage and promote foreign investment in the renewable energy sector in Spain.  According to the Claimants, an important element of this special regime was a guarantee that renewable energy plants would be able to sell their electricity to the Spanish electricity grid at a fixed price for the entire operating lifetime of each plant.  The Claimants maintain that, in reliance on what

---

[12] Transcript, pp. 199, 202-204.
[13] Transcript, p. 203.
[14] Transcript, p. 199.

they saw as a commitment from Spain, between 2006 and 2011 they financed 78 renewable energy plants through 225 loans with an overall value of approximately 1.76 billion euros.

31.    The Claimants complain that Spain subsequently enacted substantial changes to the special regime, culminating in its abolition, as a result of which there was a serious negative impact on their investments.  They claim that Spain's actions violated its obligations to the Claimants under Article 10(1) of the ECT which provides:

> *Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.  Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.  Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.*[15]

32.    In the Request for Arbitration, the Claimants also accused the Respondent of violating its obligations towards them under Article 13 of the ECT, the relevant part of which provides:

> *(1)    Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as 'Expropriation') except where such Expropriation is:*
> *(a)    for a purpose which is in the public interest;*
> *(b)    not discriminatory;*
> *(c)    carried out under due process of law; and*
> *(d)    accompanied by the payment of prompt, adequate and effective compensation.*

---

[15] **RL-0002**, ECT, Art. 10(1); Request for Arbitration, para. 130; Claimants' Memorial on the Merits, Section V.

> *Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the 'Valuation Date'). […].*[16]

Both Article 10 and Article 13 fall within Part III of the ECT.

33.    The Respondent denies any breach of these obligations.

### C.    THE ISSUE BEFORE THE TRIBUNAL IN THE PRESENT PHASE OF THE PROCEEDINGS

34.    The present phase of the proceedings is concerned solely with the Respondent's Intra-EU Jurisdictional Objection. To understand that objection, it is first necessary to review the provisions on which the Claimants maintain jurisdiction is based.

35.    The Claimants seek to found the jurisdiction of the Tribunal on the relevant provisions of the ICSID Convention and the ECT. Article 25 of the ICSID Convention provides in relevant part:

> *(1)    The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*

> *(2)    'National of another Contracting State' means*

> *[…]*

> *(b)    any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the*

---

[16] **RL-0002**, ECT, Art. 13; Request for Arbitration, para. 130. The claim for violation of Article 13 of the ECT does not feature again in the Claimants' Memorial on the Merits.

> *parties have agreed should be treated as a national of another*
> *Contracting State for the purposes of this Convention.*

36. The ICSID Convention entered into force for Germany on 18 May 1969 and for Spain on 17 September 1994.[17]

37. In conjunction with Article 25 of the ICSID Convention, the Claimants rely upon Article 26 of the ECT, which, taken together with their Request for Arbitration, they maintain constitutes the written consent to submit their dispute to the Centre required by Article 25 of the ICSID Convention.  Article 26 of the ECT, which is entitled "*Settlement of Disputes between an Investor and a Contracting Party*," provides, in relevant part that:

> *(1)  Disputes between a Contracting Party and an Investor of*
> *another Contracting Party relating to an Investment of the*
> *latter in the Area of the former, which concern an alleged*
> *breach of an obligation of the former under Part III shall, if*
> *possible, be settled amicably.*
>
> *(2)  If such disputes cannot be settled according to the provisions*
> *of paragraph (1) within a period of three months from the date*
> *on which either party to the dispute requested amicable*
> *settlement, the Investor party to the dispute may choose to*
> *submit it for resolution:*
> *(a)  to the courts or administrative tribunals of the*
> *Contracting Party party to the dispute;*
> *(b)  in accordance with any applicable previously agreed*
> *dispute settlement procedure; or*
> *(c)  in accordance with the following provisions of this*
> *Article.*
>
> *(3)  (a) Subject only to subparagraphs (b) and (c), each*
> *Contracting Party hereby gives its unconditional consent to*
> *the submission of a dispute to international arbitration or*
> *conciliation in accordance with the provisions of this Article.*
> *(b) (i) The Contracting Parties listed in Annex ID do not*
> *give such unconditional consent where the Investor*
> *has previously submitted the dispute under*
> *subparagraph (2)(a) or (b).*
> *(ii) For the sake of transparency, each Contracting*
> *Party that is listed in Annex ID shall provide a*
> *written statement of its policies, practices and*

---

[17] **C-0058**, List of ICSID Contracting States.

*conditions in this regard to the Secretariat not later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*

(c)    *A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).*

(4)    *In the event that an Investor chooses to submit the dispute for resolution under subparagraph 2(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*

     (a)    (i)    *The International Centre for the Settlement of Investment Disputes established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the 'ICSID Convention'), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or*

         (ii)    *The International Centre for the Settlement of Investment Disputes established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the 'Additional Facility Rules'), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;*

     (b)    *a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as 'UNCITRAL'); or*

     (c)    *an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.*

(5)    (a)    *The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:*

         (i)    *written consent of the parties to a dispute for the purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;*

13

> (ii) *an 'agreement in writing' for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the 'New York Convention'); and*
>
> (iii) *'the parties to a contract [to] have agreed in writing' for the purposes of article 1 of the UNCITRAL Arbitration Rules.*
>
> (b) *Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article 1 of that Convention.*
>
> (6) *A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.* […].[18]

38. Spain and Germany both ratified the ECT on 16 December 1997 and it entered into force for them on 16 April 1998. The European Communities approved the ECT on 16 December 1997 and the ECT entered into force for them on 16 April 1998; the ECT is currently in force for the EU as the successor to the European Communities.[19] At all relevant times, Germany and Spain have been Member States of the European Communities or, later, of the EU.[20]

39. Spain maintains that Article 26 of the ECT is incapable of constituting an offer to arbitrate by one EU Member State to an investor of another EU Member State and thus cannot provide a basis for the jurisdiction of the Tribunal. It contends that a treaty between two EU Member States is not capable of conferring jurisdiction upon an arbitration tribunal in proceedings brought by a national of one EU Member State against another EU Member State in the field of investor protection, since for EU Member States to create such a mechanism for hearing "*intra-EU*" cases would be contrary to EU law.

---

[18] **RL-0002**, ECT, Art. 26.

[19] **C-0057**, United Nations Treaty Collection, List of ECT Contracting Parties.

[20] Although it was the European Communities which became party to the ECT, for ease of reference the Tribunal will use the term "EU" throughout this Decision to refer to the European Union and to the European Communities.

40.    That is the sole issue before the Tribunal in the present phase of the proceedings.  Since the ECT is the only basis on which it is said that the Respondent has made an offer to arbitrate upon which the jurisdiction of the Tribunal can be founded, it follows that if the Tribunal upholds Spain's argument on this issue, it must find that it lacks jurisdiction and the case must come to an end.  On the other hand, if the Tribunal rejects Spain's arguments, it will be necessary to hear the other jurisdictional objections and the merits of the case in later proceedings.

## II.    THE ARGUMENTS OF THE PARTIES AND THE EUROPEAN COMMISSION

### A.    THE RESPONDENT

41.    Although Spain initially raised this issue in its Request for Bifurcation of 8 September 2017 and its subsequent pleadings submitted under Procedural Order No. 4 (*see supra*, paragraphs 8-9), and in its Memorial on Jurisdiction dated 15 December 2017, the principal exposition of the Respondent's argument is to be found in the Statement on the Intra-EU Jurisdictional Objection which it filed on 24 October 2018, in accordance with Procedural Order No. 14 (the "**Respondent's Statement**"), and in its submissions at the Hearing of 20 December 2018.  The following summary of the Respondent's position is therefore taken from those two latter sources.

42.    Spain asserts that its objection is in no way frivolous and that its rejection by a number of other arbitral tribunals is due to their misunderstanding of the provisions of EU law, the remedies which that law provides and the nature of the relationship between EU law, national law and international law.[21]

43.    The Respondent maintains that EU law establishes its own system of investor protection within the context of the internal market, which is superior to the protection offered by the ECT or any bilateral investment treaty ("**BIT**").[22]  In Spain's view, that protection system "*prevails over that of any other international treaty*," including the ECT,[23] with the result

---

[21] Transcript, pp. 8-9.
[22] Respondent's Statement, paras. 14-25.
[23] Respondent's Statement, para. 26.

that, when the ECT was signed, the Member States were unable to enter into obligations between themselves as regards the internal market because they had transferred their sovereignty in that area to the EU.[24]  That conclusion is supported, according to Spain, both by the text of the ECT and its object and purpose,[25] which makes special provision for membership by a regional economic integration organisation ("**REIO**"), and recognizes that there are matters in which EU Member States have transferred their competence to the REIO.

44.     Spain maintains that the ECT, as a treaty governed by international law, has to be interpreted in accordance with the international law principles of interpretation set out in the Vienna Convention on the Law of Treaties (the "**VCLT**"), Articles 31 and 32.  It places great emphasis on the requirement that a treaty be interpreted in good faith and in accordance with its object and purpose.[26]  Spain refers to the fact that the ECT was an initiative of the EU and its Member States designed to ensure that investment could be made by the EU Member States and other developed countries in the emerging economies of eastern Europe and central Asia, and was never intended to provide for arbitration by an investor of one EU Member State against another EU Member State.[27]  Indeed, it could not have done so, as the EU Member States had already transferred their competence in such matters to the EU, so that both the principle of good faith and the requirement to take account of the object and purpose of the treaty would preclude an interpretation running counter to the division of powers within the EU and the primacy of EU law.[28]

45.     According to Spain, the primacy of EU law in intra-EU relations is expressly recognized by the ECT itself.[29]  In this context, Spain refers to Article 25 of the ECT, paragraph 1 of which provides that:

> *The provisions of this Treaty shall not be so construed as to oblige*
> *a Contracting Party which is a party to an Economic Integration*

---

[24] Respondent's Statement, para. 27.

[25] Respondent's Statement, paras. 28-44.

[26] Transcript, pp. 40-48.

[27] Transcript, pp. 45-48.

[28] Respondent's Statement, para. 32.

[29] Respondent's Statement, para. 42 *et seq*.; Transcript, pp. 60-61 and 64-67.

> *Agreement (hereinafter referred to as 'EIA') to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.*[30]

For Spain, the reference in Article 25(1) to "*preferential treatment*" shows that the ECT gives preference to the provisions of the EIA and, therefore, in this case to EU law.[31]

46.    Spain maintains that Article 26(6) of the ECT (the text of which is set out *supra,* paragraph 37) requires that the Tribunal "*decide the issues in dispute*" whether jurisdiction, merits or quantum in accordance with the ECT and other applicable rules and principles of international law and that, in intra-EU disputes, the relevant international law is EU law.[32] According to Spain, this conclusion is supported by the Decision on Jurisdiction in the *Electrabel* case,[33] as well as a number of other arbitral authorities in cases involving Spain.[34]  It argues that EU law is binding not only on the EU Member States but on all EU nationals, and it emphasizes what it describes as the "*principle of loyal co-operation*" within the EU which, for Spain, means that "*when signing and when applying the ECT,* [the EU Member States] *have to respect the principles and obligations of the legal order of the Union.*"[35]

47.    For Spain, Article 344 of the Treaty on the Functioning of the European Union (the "**TFEU**") is fundamental to the Intra-EU Jurisdictional Objection.  Article 344 provides that:

---

[30] **RL-0002**, ECT, Art. 25.

[31] Transcript, pp. 64-67.

[32] Respondent's Statement, paras. 45-48; Transcript, pp. 10-12.

[33] **RL-0024**, *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("*Electrabel*"), para. 4.20.

[34] **RL-0079bis**, *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC V2013/153, Award, 12 July 2016 ("*Isolux*"), paras. 654-655; **RL-0080**, *Charanne B.V. v. Kingdom of Spain*, SCC 062/2012, Final Award, 21 January 2016 ("*Charanne*"), paras. 444 *et seq.*; and **CL-0043 / RL-0095**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 ("*Masdar*"), paras. 339-341.

[35] Transcript, pp. 16-17.

> *Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided therein.*[36]

48.     Spain argues that the present dispute concerns the interpretation and application of the Treaties for two reasons: first, because it concerns the fundamental freedoms guaranteed by EU law under which the Claimants were enabled to make their investments in Spain, and, secondly, because the Claimants are demanding payment of compensation in relation to a subsidy system which the European Commission has determined constituted State aid under EU law.  Accordingly, the Respondent is not permitted to allow a tribunal that is not part of the legal system of the EU to hear the case.[37]

49.     Spain notes the provisions of Article 16 of the ECT, which states:

> *Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or Part V of this Treaty,*
> *(1)   nothing in Part III or Part V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
> *(2)   nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or Part V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty*
> *where any such provision is more favourable to the Investor or Investment.*[38]

Spain maintains, however, that this provision is not applicable, since the provisions of Article 16 have to be read in light of the provisions of Article 26(6) of the ECT (quoted *supra,* paragraph 37), which Spain contends operates as a "*disconnection clause*" safeguarding the autonomy of EU law.[39]  In addition Spain argues that the provisions of EU law which have to be applied are not related to Part III or Part V of the ECT and that

---

[36] **RL-0009**, Treaty on the Functioning of the European Union ("**TFEU**"), Art. 344.

[37] Respondent's Statement, paras. 55-71.

[38] **RL-0002**, ECT, Art. 16.

[39] Respondent's Statement, para. 79.

the system of investor protection in Part V of the ECT is not more favourable to the investor or the investment.[40]  Finally, Spain contends that, in accordance with the principle of *lex posterior* embodied in Article 30 of the VCLT, the provisions of the TFEU prevail over the ECT as between the States which are parties to both treaties.[41]

50.    The decision of the Grand Chamber of CJEU in the *Achmea* Judgment, delivered on 6 March 2018, is also fundamental to Spain's argument.[42]  *Achmea*  concerned a reference from the Bundesgerichtshof in Germany seeking a preliminary ruling on the following questions:

> *(1)   Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?*

> *If Question 1 is to be answered in the negative:*

> *(2)   Does Article 267 of the TFEU preclude the application of such a provision?* […][43]

51.    The background to the *Achmea* case was that Achmea BV, a Netherlands company, had obtained an award from an arbitration tribunal sitting under the UNCITRAL Rules with its seat in Frankfurt, Germany, ruling that Slovakia had violated various provisions of the BIT between the Netherlands and Slovakia.  The arbitration tribunal had held that it possessed jurisdiction under the dispute settlement provision of the BIT.  In doing so, it had rejected an argument that such a provision in a BIT could not afford jurisdiction in a claim between an investor from one EU Member State and another EU Member State.  The Republic of

---

[40] Respondent's Statement, paras. 77-82.

[41] Transcript, pp. 74-75.

[42] Respondent's Statement, paras. 83-138; Transcript, pp. 27-39.

[43] **RL-0091**, *Achmea Judgment, supra*, n. 3, para. 23.  The German court asked a third question which the CJEU considered did not require a reply since it was asked only in the event that the first and second questions were answered in the negative.  *Id.*, para. 61.

Slovakia brought proceedings in the German courts to set aside the award for want of jurisdiction.

52.     The CJEU, whose reasoning will be considered in greater detail below, answered Questions 1 and 2 together, in the following terms:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[44]

53.     That judgment, which was binding on the referring court, was subsequently implemented by the Bundesgerichtshof, which set aside the arbitration award.[45]

54.     According to Spain, the Judgment of the CJEU and the subsequent Judgment of the Bundesgerichtshof confirmed earlier authorities and constitute a definitive ruling that investor-State arbitration provisions in intra-EU cases are incompatible with EU law and therefore cannot afford a basis for jurisdiction where an EU Member State is taken to arbitration by an investor from another EU Member State.  The fact that the *Achmea* case concerned a BIT, rather than the multilateral ECT, and that the EU itself is a party to the ECT does not, in Spain's view alter the effect of the *Achmea* ruling which, Spain maintains, has to be applied to the ECT in the same manner as to a BIT.  For Spain, the ruling of the CJEU, which is given the last word in relation to determining the meaning and effect of EU law, renders the argument that this Tribunal has jurisdiction untenable.

55.     Spain also notes that its position has been confirmed by the EC in its capacity as "*Guardian of the* [EU] *Treaties*."[46]   Spain relies upon the EC Communication to the European

---

[44] **RL-0091**, *Achmea Judgment*, *supra*, n. 3, para. 62.

[45] **RL-0101**, Federal Court of Justice (*Bundesgerichtshof*), Case 1 ZB 2/15, Judgment, 31 October 2018.

[46] Respondent's Statement, paras. 139-141.

Parliament in July 2018[47] (as to which, *see infra,* paragraph 75) and on the position adopted by the EC in its Request to Intervene in the present proceedings. Spain further relies for support on doctrinal writings.[48]

56.     The position adopted by Germany, in its capacity as respondent in the *Vattenfall* proceedings,[49] is also invoked by Spain.[50] That case was an ICSID arbitration brought by five companies, each of which was incorporated in an EU Member State, against Germany under the ECT. The *Vattenfall* tribunal issued a preliminary decision on the applicability of the *Achmea* Judgment to the ECT. In that case Germany eventually adopted the position which the Respondent espouses in the present case, namely that the ECT provisions on arbitration are inapplicable in intra-EU disputes. Spain suggests that the fact that Germany adopted this position in the *Vattenfall* proceedings is especially important, given that Germany is the State of nationality of the Claimants in the present case, and that the Claimants have to be equated with the Federal Republic of Germany for certain purposes, including the application of Article 344 of the TFEU.[51] Moreover, Spain also invokes the position taken by Germany and a number of other EU Member States as respondents, the *Achmea* Judgment and the practice of the EC as subsequent practice in the application of the ECT, which has to be taken into account in its interpretation in accordance with Article 31(3)(b) of the VCLT.[52]

57.     With regard to the decision of the tribunal in *Vattenfall*, which rejected Germany's Intra-EU Objection, Spain advances a number of reasons why it considers that decision flawed.[53] It maintains that the *Vattenfall* tribunal erred in holding that Article 26(6) of the ECT is concerned only with the law applicable to the merits of a dispute and not to the

---

[47] **RL-0096**, *Communication from the European Commission to the European Parliament and the Council on the Protection of intra-EU Investment*, COM (2018) 547 final, 19 July 2018.

[48] Respondent's Statement, paras. 142-146.

[49] **RL-0098**, *Vattenfall AB et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 ("***Vattenfall***").

[50] Respondent's Statement, paras. 147-156.

[51] Respondent's Statement, paras. 209-223, Transcript, pp. 23-27.

[52] Transcript, pp. 40-43.

[53] Respondent's Statement, paras. 157-208.

determination of a tribunal's jurisdiction.[54]  Spain also criticizes the *Vattenfall* tribunal's approach to the principle, stated in Article 31(3)(c) of the VCLT, that, in interpreting a treaty, it is necessary to take into account "*any relevant rules of international law applicable in the relations between the parties*" and contends that EU law should have been taken into account as part of this exercise.[55]  Lastly, it maintains that the *Vattenfall* tribunal failed to take proper account of the remedies offered by EU law to investors in an intra-EU context,[56] failed to see that a "*disconnection clause*" was unnecessary given that the ECT dealt with a matter in which the EU already possessed exclusive competence,[57] and misapplied Article 16 of the ECT.[58]  Spain also criticizes the *Vattenfall* decision for ignoring the rules of *ordre public* of the EU Member States.

## B.    THE CLAIMANTS

58.    The Claimants begin by noting that Spain (and certain other EU Member States) have raised the intra-EU Objection in numerous previous arbitrations but have never met with success.  The Claimants point to twenty instances[59] prior to the *Achmea* Judgment and a further seven[60] since then in which the argument has been rejected.

59.    The Claimants rely, in particular, upon the recent decisions in *Vattenfall* (31 August 2018),[61] and *Greentech* (14 November 2018).[62]  In both of these cases the tribunals analysed the intra-EU Objection in the light of the *Achmea* Judgment and in relation not to a BIT but to the ECT.  Both tribunals concluded that Article 26 of the ECT constituted a valid offer of arbitration by all the States parties to the ECT to investors of any other Party, irrespective of whether the case was an "intra-EU" one.  The Claimants quote the

---

[54] Respondent's Statement, paras. 165-184.

[55] Respondent's Statement, paras. 185-200.

[56] Respondent's Statement, para. 202.

[57] Respondent's Statement, paras. 203-204.

[58] Respondent's Statement, paras. 205-207.

[59] Claimants' Response, para. 2, n. 2.

[60] Claimants' Response, para. 4, n. 4.

[61] **CL-0045 / RL-0098**, *Vattenfall*, *supra*, n. 49.

[62] **CL-0047**, *Greentech Energy Systems A/S et al. v. Kingdom of Spain*, SCC V2015/150, Final Award, 14 November 2018 ("*Greentech*").

conclusion of the *Greentech* tribunal that it was "*not aware of a single award that has found 'intra-EU' disputes to be excluded from the scope of Article 26(1) ECT.*"[63]

60.     On this basis alone the Claimants contend that the Tribunal should dismiss the Intra-EU Jurisdictional Objection as devoid of merit and contrary to what one tribunal described as "*a consistent pattern of decision-making by international tribunals.*"[64]   The Claimants describe the Respondent's Intra-EU Jurisdictional Objection as an "*attempt to use EU law to undermine the foundations of public international law and to escape a review of its actions by an independent judicial body.*"[65]

61.     Nevertheless, the Claimants offer two more detailed alternative arguments.  First, they maintain that the ECT has to be interpreted and applied as it is, on the basis of the normal interpretation of the text.

62.     According to the Claimants, Article 26 of the ECT is a valid offer of arbitration by Spain to investors from Germany, which the Claimants accepted when they submitted their Request for Arbitration.  That offer is contained in a treaty which is valid and binding under international law, irrespective of what EU law might say.[66]  They reject the Respondent's argument that the Member States of the EU had no power to enter into a treaty binding themselves *inter se* with regard to energy matters because of the competence of the EU and point to other "*mixed agreements*" in which both the EU Member States and the EU itself are parties.[67]

63.     The Claimants emphasize that there is no disconnection clause – express or implied – in the ECT.[68]  In this regard, they quote the definition of a disconnection clause drawn up by the Committee of Legal Advisers on Public International Law of the Council of Europe which states that such a clause is used "*to refer to a provision in a multilateral treaty*

---

[63] **CL-0047**, *Greentech*, *supra,* n. 62, para. 221.

[64] **CL-0041**, *RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Spain*, ICSID Case No. ARB/13/20, Decision on Jurisdiction, 6 June 2016 ("***RREEF***"), para. 89.

[65] Claimants' Response, para. 10; Transcript, pp. 109-112.

[66] Claimants' Response, paras. 13-24.

[67] Claimants' Response, para. 24.

[68] Claimants' Response, paras. 25-41.

*allowing certain parties to the treaty not to apply the treaty in full or in part in their mutual relations, while other parties remain free to invoke the treaty fully in their relations with these parties*."[69]  Had the EU and its Member States intended that the ECT provisions on arbitration should not apply between EU Member States, it would have been easy to add a clause to that effect; yet there was none.  The Claimants dismiss the Respondent's argument that Article 26(6) becomes the disconnection clause as contrary both to the position Spain has taken in earlier cases and to the decisions of past arbitration tribunals.  Moreover, the Claimants maintain that the EU had proposed to include a disconnection clause in the ECT but that the proposal had not been accepted.[70]

64.     According to the Claimants, neither Article 42(1) of the ICSID Convention nor Article 26(6) of the ECT provides for any "*supremacy*" of EU law in relation to the arbitration agreement concluded between the Parties.[71]   Article 42(1) of the ICSID Convention provides:

> *The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties.  In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on conflict of laws) and such rules of international law as may be applicable.*

65.     Article 26(6) of the ECT has already been quoted (*see supra,* paragraph 37).  For the Claimants, Article 26(6) is an agreement (within the meaning of Article 42(1) of the ICSID Convention) as to the law to be applied to the merits of the dispute.  In their view, neither that provision, nor Article 42(1) of the ICSID Convention, relates to the determination of the jurisdiction of the Tribunal.

66.     The Claimants maintain that Article 16 ECT is applicable in the present case, because EU law does not offer the same degree of protection to the investor as that afforded by Parts

---

[69] **CL-0049**, Council of Europe, *Report on the Consequences of the So-Called "Disconnection Clause" in International Law in General and for Council of Europe Conventions, Containing Such a Clause, In Particular*, 8 October 2008, para. 10.

[70] Claimants' Response, paras. 29-30; **CL-0052**, Draft Ministerial Declarations to the Energy Charter Treaty, versions 2-7, 1 May 1993-17 March 1994.

[71] Claimants' Response, paras. 42-60.

III and V of the ECT. The *lex posterior* rule in Article 30 of the VCLT does not lead to a different conclusion. The relevant provisions of the TFEU have their origin in earlier EU treaties which predate the ECT and, in any event, this rule applies only to treaties having the same subject-matter.[72]

67.  The Claimants' second argument is that, in any event, there is no conflict between the ECT and EU law and the latter does not preclude an EU Member State from making a valid offer of arbitration in Article 26 of the ECT to investors from other EU Member States.[73]

68.  According to the Claimants, the *Achmea* Judgment applies only to intra-EU BITs and, as several arbitration tribunals have held, has no application to the different, multilateral context of the ECT. The *Achmea* Judgment was given in relation to a request for a preliminary reference which was concerned only with a BIT[74] and its language makes clear that it was concerned with bilateral treaties containing clauses on dispute settlement, such as that in the Netherlands-Slovak BIT, which was at issue in that case.[75] That BIT did not provide for ICSID arbitration.[76]

69.  Moreover, the Claimants maintain that, correctly understood and applied, EU law does not conflict with the Claimants' reading of the ECT. The EU itself has been a party to the ECT from the inception of the ECT. The Claimants refer to the fact that the EC submitted a statement to the Energy Charter Secretariat in accordance with Article 26(3)(b)(ii) of the ECT, which provides:

> *For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat not later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*[77]

---

[72] Claimants' Response, paras. 61-73.

[73] Claimants' Response, paras. 84-120.

[74] Claimants' Response, paras. 87-93.

[75] Claimants' Response, paras. 94-104.

[76] Claimants' Response, para. 107.

[77] **RL-0002**, ECT, Art. 26(3)(b)(ii).

That statement (the full text of which is set out *infra,* paragraph 128) declares that, "[t]*he Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party.*"[78]  According to the Claimants, there was no suggestion that the investor had to be from a "*non-EU*" Contracting Party.[79]

70.    The Claimants reject the suggestion that they are to be equated with Germany.  They point out that they are not all wholly owned by *Länder* and that, in any event, there is no basis for treating a bank owned by one of the *Länder* as though it were an organ of the German State.[80]

71.    Although it was not raised in the Claimants' written submissions, the Claimants maintained at the Hearing that there were limits to the extent to which the Tribunal was entitled to inquire into the validity of the offer to arbitrate contained in Article 26 of the ECT.  In effect, the Claimants contend that there are limits to the *compétence de la compétence* of the Tribunal and that it is not entitled to consider certain aspects of the Respondent's arguments.[81]

## C.    THE EUROPEAN COMMISSION

72.    In its Request to Intervene, the EC suggests that "*while the starting point of* [the Tribunal's] *analysis, in accordance with Article 26(6) ECT, is one of international law, it is also one of European Union law, which forms part of the public international law order for the purposes of this proceeding.*"[82]

73.    According to the EC, the *Achmea* Judgment endorses the views expressed by the EC in its Decision of 10 November 2017[83] and the views of a number of arbitral tribunals, starting

---

[78] **CL-0075**, Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter, Official Journal of the EU, L 69/115, 9 March 1998, p. 115.

[79] Claimants' Response, para. 113.

[80] Claimants' Response, paras. 117-118; Transcript, p. 82.

[81] Transcript, pp. 89-101.

[82] EC Request to Intervene, para. 21.

[83] **RL-0056**, European Commission, State Aid SA. 40348 (2015/NN)-Spain, C(2017) 7384 final, 10 November 2017.

with the *Electrabel* tribunal,[84] that "*Union law takes precedence over the Energy Charter Treaty in case of conflict, at the very least in intra-EU situations* […]."[85]  An intra-EU arbitration tribunal, acting in accordance with Article 31(3)(c) of the VCLT, should take EU law into account in determining the scope of the offer to arbitrate and determine that Spain had made no offer to investors from other EU Member States.

74.  Moreover, if an intra-EU tribunal were to reject such an interpretation of Article 26 of the ECT, there would be a conflict between EU law and the ECT which would have to be resolved in favour of EU law.[86]  The EC takes issue with the decisions in *Vattenfall* and other arbitrations which have reached different conclusions and invites the present Tribunal to depart from them.[87]  It notes that the *Vattenfall* tribunal did not exclude the possibility that the CJEU Judgment in *Achmea* might have been intended to apply to the ECT as well as to BITs, and contends that that tribunal misunderstood the nature of EU law and its primacy.[88]

75.  In this context, it is also appropriate to refer to the EC Communication of 19 July 2018 to the European Parliament and Council, which is relied upon by the Respondent.  In that Communication, the EC stated its view about the *Achmea* Judgment in the following terms:

> *The Achmea judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations.  This provision, if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member State[] of the EU and another Member States [sic] of the EU.  Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable.  Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU.  The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in*

---

[84] **RL-0024**, *Electrabel*, *supra*, n. 33, paras. 4.178-4.191.

[85] EC Request to Intervene, para. 24.

[86] EC Request to Intervene, para. 26.

[87] EC Request to Intervene, paras. 27-37.

[88] EC Request to Intervene, para. 33 and para. 35.

> *that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States.*[89]

## III.    DEVELOPMENTS SINCE THE HEARING

76.    On 15 January 2019 twenty-two EU Member States, including both Germany and Spain, signed a Declaration on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (the "**Declaration of Twenty-Two Member States**").  After quoting the *dispositif* of the *Achmea* Judgment (set out *supra,* paragraph 52), the Declaration stated that:

> *Member States are bound to draw all necessary consequences from that judgment pursuant to Union law.*
>
> *Union law takes precedence over bilateral investment treaties concluded between Member States.  As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable.  They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses).  An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment treaty.*
>
> *Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties.  Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States.  Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied.*[90]

---

[89] **RL-0096**, *Communication from the European Commission to the European Parliament and the Council on the Protection of intra-EU Investment*, COM (2018) 547 final, 19 July 2018, pp. 3-4.

[90] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgement of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019 ("**Declaration of Twenty-Two Member States**"), pp. 1-2.

The statement that "*Union law takes precedence over bilateral investment treaties concluded between Member States*" was accompanied by a footnote citing two decisions of the CJEU, and adding "[t]*he same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of Treaties and customary international law (lex posterior).*"[91]

77.    Having summarized the protections accorded by EU law to an EU investor exercising the freedom of establishment in another EU State, the Declaration continued:

> *Taking into account the foregoing, Member States declare that they will undertake the following actions without undue delay:*
>
> 1.    *By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the Achmea Judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.*
>
> 2.    *In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.*
>
> 3.    *By the present declaration, Member States inform the investor community that no new intra-EU investment arbitration proceeding should be initiated.*
>
> 4.    *Member States which control undertakings that have brought investment arbitration cases against another Member State will take steps under their national laws governing such undertakings, in compliance with Union law, so that those undertakings withdraw pending investment arbitration cases.* […].[92]

---

[91] Declaration of Twenty-Two Member States, n. 1.

[92] Declaration of Twenty-Two Member States, pp. 3-4.

After stating that Member States would take steps to terminate their intra-EU bilateral investment treaties and making provision for awards that could no longer be annulled or set aside, the declaration concluded:

> 9. *Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the Achmea judgment in relation to the intra-EU application of the Energy Charter Treaty.*[93]

78.     On the day following the adoption of this declaration, five Member States which had not signed it adopted a declaration of their own (the "**Declaration of Five Member States**").[94] The Declaration of Five Member States drew the same inferences from the *Achmea* Judgment as regards bilateral investment treaties as those set out in the Declaration of Twenty-Two Member States but took a different course as regards the ECT, stating:

> *The Achmea case concerns the interpretation of EU law in relation to an investor-State arbitration clause in a bilateral investment treaty between Member States. The Member States note that the Achmea Judgment is silent on the investor-[S]tate arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the Achmea Judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State. Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra-EU application of the Energy Charter Treaty.*[95]

79.     Also on 16 January 2019, the Representative of the Government of Hungary to the European Union issued a declaration (the "**Hungarian Declaration**"). This declaration again drew from *Achmea* inferences similar to that in the Declaration of Twenty-Two

---

[93] Declaration of Twenty-Two Member States, p. 4.

[94] Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 16 January 2019, signed by Finland, Luxembourg, Malta, Slovenia and Sweden ("**Declaration of Five Member States**").

[95] Declaration of Five Member States, p. 3.

Member States as regards bilateral investment treaties but disagreed regarding the ECT. The relevant part of the Hungarian Declaration stated:

> 8. *Hungary further declares that in its view, the Achmea Judgment concerns only the intra-EU bilateral investment treaties. The Achmea Judgment is silent on the investor-State arbitration clause in the Energy Charter Treaty (hereinafter: 'ECT') and it does not concern any pending or prospective arbitration proceedings initiated under the ECT.*
>
> 9. *Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its views as regards the compatibility with Union law of the intra-EU application of the ECT. The ongoing and future applicability of the ECT in intra-EU relations requires further discussion and individual agreement amongst the Member States.*[96]

80. On 17 January 2019 the Tribunal wrote to the Parties inviting them to comment on the three declarations and on whether Germany should be invited to convey its views to the Tribunal. Both Parties filed submissions on 28 January 2019.

81. In its submission (the "**Respondent's Supplementary Statement**"), the Respondent notes that all three statements from the EU Member States concurred in finding that arbitration provisions in intra-EU BITs are incompatible with EU law and, in reaching that conclusion, took note of the Commission's Communication of 19 July 2018[97] which expressly referred to the application of the *Achmea* Judgment to ECT arbitrations, and reaffirmed the propositions of EU law upon which Spain relies in these proceedings. Spain highlights the Declaration of Twenty-Two Member States as unequivocal support for its argument that Article 26 of the ECT cannot provide jurisdiction in intra-EU arbitration both as a matter of EU law and international law. In that context, Spain refers to footnote 1 to that Declaration, which is quoted above. Spain maintains that "*under the auspices of the Vienna Convention, the Achmea EU States Declaration constitutes a true and authentic*

---

[96] Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 16 January 2019 ("**Hungarian Declaration**"), p. 3.

[97] *See supra,* para. 75.

*interpretative criterion of the Energy Charter Treaty between the signatory parties*," in particular as between Germany and Spain.[98]

82.     In addition, Spain draws attention to numbered paragraph 4 of the Declaration of Twenty-Two Member States, which it contends is of particular relevance "*given the nature of Claimant Landesbank BWB as a 'public company'*" and Spain's argument that "*Claimants are considered the Federal Republic of Germany for the purposes of* [A]*rticle 344 TFEU and also for all the consequences that might derive from this procedure*."[99]

83.     In their submission (the "**Claimants' Supplementary Statement**"), the Claimants take a very different view, maintaining that the Declaration of Twenty-Two Member States "*is a political declaration without any legal effect*" and "*without relevance for the legal assessment of the public international law issues to be decided by the Tribunal in this bifurcated phase*."[100]  They contend that the ECT remains valid and effective between all its parties and that, even if the Declaration was to be seen as terminating the ECT as between the signatories to the Declaration, the "*sunset*" provision in Article 47(3) of the ECT would protect the rights of the Claimants, as would the European Convention on Human Rights.[101]  The Claimants argue that the Declaration of Twenty-Two Member States violates the principles of the rule of law and the separation of the powers, as Hungary points out in its Declaration,[102] and is an attack on arbitral independence.[103]

84.     With regard to numbered paragraph 4 of the Declaration of Twenty-Two Member States, the Claimants assert that it is of no relevance as the Claimants are not controlled by Germany, and that any interference by Germany with their rights would be ineffective under international law and give rise to a duty to pay compensation.[104]

---

[98] Respondent's Supplementary Statement, para. 13.
[99] Respondent's Supplementary Statement, para. 14.
[100] Claimants' Supplementary Statement, p. 1.
[101] Claimants' Supplementary Statement, p. 2.
[102] Claimants' Supplementary Statement, p. 2.
[103] Claimants' Supplementary Statement, pp. 3-4.
[104] Claimants' Supplementary Statement, p. 5.

85.    On 30 January 2019 the Tribunal informed the Parties that it considered it appropriate to ask Germany whether there was any communication which it wished to address to the Tribunal pursuant to numbered paragraph 2 of the Declaration of Twenty-Two Member States.   By a letter of that date addressed to the Head of the Legal Division of the Federal Ministry for Foreign Affairs, the Tribunal invited Germany to make any such communication not later than close of business, Washington DC time, on 8 February 2019. The Respondent wrote to the Tribunal requesting that Germany be allowed more time but that request was opposed by the Claimants.   In view of the timetable to which the Parties had encouraged the Tribunal to adhere, the Tribunal rejected the request.

86.    On 6 February 2019, the Director General of the Federal Ministry for Economic Affairs and Energy of the Federal Republic of Germany submitted a brief document in which he stated:

> The Federal Republic of Germany wishes to emphasise the statements made in the Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, which was signed by Germany, the Kingdom of Spain and 20 other member States of the European Union on 15 January 2019 ('the Declaration'), and which, as we note, is already in the possession of the Tribunal.[105]

87.    Both Parties indicated that they did not have any further observations to submit upon this document.

## IV.    THE ANALYSIS OF THE TRIBUNAL

88.    The issue before the Tribunal is a short – though far from simple – one.   Under Article 25 of the ICSID Convention, the Tribunal possesses jurisdiction if, but only if, the Parties have consented in writing to submit to the Centre.   Where a claimant seeks to bring a case on the basis of an arbitration provision contained, not in a contract to which it and the respondent are parties, but in a treaty between the respondent and another State or States,

---

[105] Letter from Dr. Eckhard Franz (Director General, Federal Ministry for Economic Affairs and Energy), 6 February 2019.

it is well established that the arbitration provision in the treaty acts as an offer by the respondent which is accepted by the claimant filing its request for arbitration.[106]  In the present case, the issue which has to be decided in the present phase of the proceedings is whether Article 26 of the ECT constitutes a valid offer by Spain to the Claimants which they are able to accept.  Spain's case is that, because of EU law, Article 26 does not and could not constitute such an offer.

89.   The Tribunal wishes to make clear at the outset that it accepts Spain's submission (*see supra*, paragraph 42) that the Intra-EU Jurisdictional Objection is not a frivolous one and that it has been advanced in good faith.  Especially in light of the *Achmea* Judgment, the Tribunal considers that the relationship between the provisions of the ECT and EU law gives rise to important questions which Spain is entitled to raise before the Tribunal as a jurisdictional objection.  While the consequences of accepting Spain's argument – or, for that matter, of rejecting it – may be far-reaching, the Tribunal does not accept that Spain, or the EC, has tried to undermine the foundations of international law or the independence of the Tribunal by challenging the jurisdiction of the Tribunal in this way.

## A.   THE EXTENT OF THE TRIBUNAL'S *COMPÉTENCE DE LA COMPÉTENCE*

90.   The Tribunal will first consider the Claimants' argument that there are limits to the extent to which it can inquire into whether the Respondent has made a valid offer to arbitrate.  At the Hearing, the Claimants argued that, while the Tribunal's *compétence de la compétence* empowered it to determine the interpretation of the ECT and whether it was contrary to a norm of *jus cogens* (something which has not been suggested by either Party or by the EC), it was not entitled to inquire into more fundamental issues of validity.[107]  As counsel for the Claimants put it, "**[**t]*he supremacy of an extraneous body of law is out of bounds*."[108]

91.   The Tribunal is not persuaded by this argument.  It notes, in passing, that the Appeals Chamber of the International Criminal Tribunal for the Former Yugoslavia held that, in addressing a challenge to its jurisdiction, it was entitled to determine whether the Security

---

[106] *See* J. Paulsson, *Arbitration without Privity*, 10 ICSID Review, Foreign Investment Law Journal 232 (1995).
[107] Transcript, pp. 89-101 and 179-187.
[108] Transcript, p. 187.

Council resolution by which it was established was valid.[109]  What the Tribunal is asked to do in the present case is far less dramatic.  The Tribunal derives its authority and its *compétence de la compétence* from the ICSID Convention, but that Convention gives it jurisdiction over the case only if the Parties have consented in writing.  As explained above, the basis on which the Claimants maintain that this requirement is satisfied is that Article 26 of the ECT constitutes an offer to arbitrate which the Claimants were entitled to accept.  If there was no such offer, then there could have been no valid acceptance and the requirement of consent is not satisfied.  The Tribunal has a duty to satisfy itself that it has jurisdiction and therefore that there was a valid offer by Spain to investors from other EU Member States.  To discharge that duty it must consider not just the interpretation of the ECT but also whether, as a matter of the obligations existing between Germany and Spain, EU law overrides the terms of the ECT so as to preclude an offer by Spain to investors from other EU Member States.

92.  The Tribunal therefore considers that its *compétence de la compétence* extends to all aspects of the objection raised by Spain.

## B.  THE RELATIONSHIP BETWEEN THE CLAIMANTS AND GERMANY

93.  During the course of the proceedings, Spain has raised two arguments which it is convenient to address together, since both concern the Claimants' relationship with Germany.

94.  First, in earlier pleadings and then, albeit very cursorily, in paragraph 1 of Respondent's Statement in the present phase, Spain has argued that the Claimants are not from another Contracting Party.  That argument is based on the thesis that the EU and its Member States have to be treated as a common entity for certain purposes under the ECT.

95.  The Tribunal does not accept that argument.  While the voting rights of the EU and its Member States are the subject of special provision in the ECT and the statement made by

---

[109] **CL-0080,** *Prosecutor v. Dusko Tadić a/k/a "Dule,"* ICTY Case IT-94-1, Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction of the Appeals Chamber, 2 October 1995.

the EC under Article 26(3)(b)(ii) of the ECT[110] shows that the EU and its Member States are entitled to determine which of them should be the respondent in an action, there is nothing in the ECT to suggest that a German company is not from a different Contracting Party from Spain. On the contrary, since both Spain and Germany (as well as the EU) are Contracting Parties to the ECT, the natural reading of the treaty is that the Claimants, as juridical persons incorporated in Germany, are from a different Contracting Party from Spain.

96.    The Tribunal notes that this argument has been rejected at greater length in other arbitrations, most recently *Greentech*, where the tribunal stated, in relation to claims by investors from Denmark, Italy and Luxembourg against Spain, that "*Article 26(1) ECT requires that a dispute between a Contracting Party and an Investor must relate to 'an Investment of the latter in the Area of the former'. Article 1(10) ECT defines 'Area' as 'the territory under* [a Contracting Party's] *sovereignty* [...]' *Again, the Tribunal considers that this requirement is clearly met.*"[111] The present Tribunal agrees and addresses the issue further *infra,* paragraphs 124-127.

97.    Secondly, Spain has argued that the Claimants are, in effect, to be equated to Germany because they are owned by various *Länder*. On this argument, Germany is thus responsible for their actions and the case should be seen as an inter-State case, rather than one between a German investor and Spain.

98.    The Tribunal does not agree. Quite apart from the fact that not all the Claimants are wholly owned by one or more of the *Länder*, they are all legal entities possessing juridical personality separate from that of the Federal Republic of Germany. They therefore qualify as investors of a Contracting Party, rather than being the Contracting Party itself. The Tribunal notes that when Spain's counsel displayed a slide headed "*The Claimants are a contracting party to the European Union*" and was challenged on this statement, she conceded that "*maybe that was a title that was a little bit too strong.*"[112] Nor was counsel

---

[110] *See infra*, para. 128.

[111] **CL-0047**, *Greentech*, *supra,* n. 62, para. 211.

[112] Transcript, p. 25.

able to show a basis on which the acts of the Claimants would be attributable to Germany under the principles of international law laid down in the International Law Commission's Articles on State Responsibility.[113]  Finally, the Tribunal notes that, in its statement to the Tribunal (*see supra,* paragraph 86), Germany itself nowhere suggests that the Claimants are to be equated with the German State.

99.    The Tribunal cannot therefore accept that the Claimants are to be equated to Germany or that the present case should be considered an inter-State case (over which this Tribunal would necessarily lack jurisdiction).

## C.    Is the Issue "Settled Law"?

100.    Both Parties suggest to the Tribunal that it should consider the issue before it to have been settled by prior decisions.

101.    The Respondent maintains that the *Achmea* Judgment has settled the question of whether an EU Member State has the capacity to agree to arbitration with an investor from another EU Member State, and that this decision applies to arbitration under the ECT as much as it does to arbitration under a BIT.  For the Respondent, the CJEU Judgment in *Achmea* is binding on all EU Member States[114] and, it would seem, upon this Tribunal.[115]

102.    The Tribunal does not find this argument persuasive.  A judgment of the CJEU in response to a reference from a national court for a preliminary ruling is binding only upon the court making the reference.  EU law has no concept of *stare decisis*, so such a judgment would not bind other courts.  Indeed, even the Declaration of Twenty-Two Member States affirms only that "*Member States are bound to draw all necessary consequences from that Judgment*"; it does not assert that the *Achmea* Judgment is binding as such upon all the EU Member States.  Of course, a statement of EU law by the CJEU is entitled to great respect as a statement of that law and is likely to be followed by other EU national courts, although they remain entitled (and, unless the matter is *acte claire*, in some cases required) to seek

---

[113] **RL-0065**, International Law Commission, *Articles on Responsibility of States for Internationally Wrongful Acts, see*, in particular, Arts. 4-8.
[114] Transcript, pp. 29-31.
[115] Transcript, pp. 158-159.

a fresh ruling from the CJEU. This Tribunal, however, derives its authority not from national or EU law but from an international agreement and from the rules of public international law. There is therefore no question of it being bound by the CJEU *Achmea* Judgment, although it will, of course, give great weight to that Judgment as an expression of the position under EU law.

103.   Moreover, the *Achmea* Judgment was not directly concerned with the ECT – or, indeed, with any multilateral agreement – but with a BIT between two EU Member States. The Tribunal cannot, therefore, regard it as having automatically settled the issue currently before it. The Tribunal must give careful consideration to whether or not the reasoning in the *Achmea* Judgment is applicable to the ECT (as the EC and twenty-two of the EU Member States assert) and, if it is, how, if at all, it impacts upon the jurisdiction of the Tribunal under international law. That is what the Tribunal will do in the remainder of this Decision.

104.   By contrast, the Claimants suggest that the long line of arbitral authority, both before and after *Achmea*, rejecting the Intra-EU Jurisdictional Objection whenever it has been raised by Spain or by other respondent States, has created a settled and consistent body of arbitral jurisprudence which the Tribunal could follow without the need to examine the issue afresh.[116]

105.   The Tribunal is aware that some twenty-seven awards and decisions have now been issued in which the Intra-EU Jurisdictional Objection has been rejected and that, so far as its own researches and those of both Parties have revealed, not one tribunal has upheld this objection, whether under the ECT or a BIT. Nevertheless, the Tribunal does not consider that it can rely upon those earlier precedents to avoid the task of examining the issue currently before it and coming to its own conclusion thereon.

106.   First, there is no doctrine of binding precedent in international law and, although an arbitral tribunal should be aware of earlier rulings on the point it has to decide, it is not bound by them. As the *Wirtgen* tribunal explained, a tribunal "*should pay due respect to such*

---

[116] Claimants' Response, para. 8. *See also*, the Claimants' email of 5 September 2018, in which it contends that these decisions have "*put an end to the so-called intra-EU objection in ECT based proceedings.*"

*decisions*" and "[u]*nless there are reasons to the contrary*" and "*subject, of course, to the specifics of the Treaty and to the circumstances of the actual case*," it should "*adopt the approach established in a series of consistent cases.*"[117]  But that is a far cry from absolving the Tribunal from the responsibility to conduct its own analysis, especially in view of recent developments.

107.    Secondly, although the number of arbitral precedents cited by the Claimants is impressive, most of these pre-date the *Achmea* Judgment and therefore shed no light upon its effects. Of those decided after *Achmea*, only three – *Masdar*,[118] *Vattenfall*,[119] and *Greentech*[120] – discuss the implications of *Achmea* for the ECT.  The others either decline for procedural reasons to reopen proceedings in order to take account of *Achmea*,[121] or they concern BITs rather than the ECT.[122]  That does not make them irrelevant, but it does mean that they are not entirely on point.

108.    Lastly, while the awards and decisions referred to by the Claimants are consistent in arriving at the same conclusion, in that they reject the Intra-EU Jurisdictional Objection, they are not always consistent in their reasoning.  For example, the *Electrabel* decision concludes that, in the event of inconsistency between the ECT and EU law, EU law must prevail.[123]  By contrast, the *RREEF* decision concludes that, in such a case, the ECT prevails – "*EU law does not and cannot 'trump' public international law.*"[124]

---

[117] **RL-0090**, *Mr. Jürgen Wirtgen et al. v. Czech Republic*, PCA Case No. 2014-3, Final Award, 11 October 2017 ("***Wirtgen***"), para. 181.

[118] **CL-0043 / RL-0095**, *Masdar, supra,* n. 34.

[119] **CL-0045 / RL-0098**, *Vattenfall, supra,* n. 49.

[120] **CL-0047**, *Greentech, supra,* n. 62.

[121] **CL-0042**, *Novenergia II – Energy & Environment (SCA), SCIAR (Luxembourg) v. Kingdom of Spain*, SCC V2015/063, Procedural Order No. 17, 9 April 2018 ("***Novenergia PO17***"); and **RL-0097**, *Antin Infrastructure Services Luxembourg S.a.r.l et al. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 ("***Antin***"), paras. 56-58.

[122] **CL-0044**, *Marfin Investment Group Holding S.A. et al. v. Republic of Cyprus*, ICSID Case No. ARB/13/27, Award, 26 July 2018 ("***Marfin***"); and **CL-0046**, *UP and C.D. Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35, 9 October 2018 ("***UP***").

[123] **RL-0024**, *Electrabel, supra,* n. 33, para. 4.191.

[124] **CL-0041**, *RREEF, supra,* n. 64, para. 87.

109.    In these circumstances, the Tribunal considers that it must make its own analysis of the
        issue put before it and arrive at its own conclusions.  In doing so, it will obviously take full
        account of the reasoning in earlier decisions and awards, but it cannot abdicate
        responsibility for deciding whether there is a valid offer to arbitrate in the present case by
        relying on the existing jurisprudence.

**D.    DOES THE ECT CONFER JURISDICTION IN THE PRESENT CASE?**

110.    As the Tribunal has already explained, it can derive jurisdiction only from Article 25 of the
        ICSID Convention and Article 26 of the ECT.  These provisions have been set out (*supra,*
        paragraphs 35 and 37).  Since they are the basis of any powers which the Tribunal may
        possess, it is necessary and appropriate to start with them.  Article 25 of the ICSID
        Convention gives rise to no controversy in the present phase of the proceedings but the
        Parties differ about both the correct interpretation of Article 26 of the ECT and its effect.

111.    The Tribunal will therefore begin (Section (1)) by considering the principles of
        interpretation which it is required to apply.  It will then (Section (2)) examine Article 26 of
        the ECT in the light of those principles, so as to arrive at a provisional interpretation.  Next,
        it will consider (Section (3)) whether there is a conflict between that interpretation and EU
        law and, if there is such a conflict, whether it can be resolved through a different
        interpretation of Article 26 (Section (4)).  Lastly, the Tribunal will examine whether, if
        there is a conflict which cannot be resolved by techniques of interpretation, EU law should
        take priority over the ECT or vice versa (Section (5)).

**(1)     Principles of Interpretation**

112.    The ECT is a treaty governed by international law and must therefore be interpreted in
        accordance with the principles of international law regarding treaty interpretation.  It is
        generally agreed – and not disputed in the present case – that these principles are today
        embodied in Articles 31 to 33 of the VCLT.  No issue has been raised regarding Article 33,
        but it is necessary to set out the text of Articles 31 and 32.

113.    Article 31 provides as follows:

### *General rule of interpretation*

1.   *A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*
2.   *The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*
     (a)   *any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;*
     (b)   *any instrument which was made by one or more of the parties in connection with the conclusion of the treaty.*
3.   *There shall be taken into account, together with the context:*
     (a)   *any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*
     (b)   *any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*
     (c)   *any relevant rules of international law applicable in the relations between the parties.*
4.   *A special meaning shall be given to a term if it is established that the parties so intended.*[125]

114.   Article 32 provides as follows:

### *Supplementary means of interpretation*

*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of Article 31, or to determine the meaning when the interpretation according to Article 31:*
(a)   *leaves the meaning ambiguous or obscure; or*
(b)   *leads to a result which is manifestly absurd or unreasonable.*[126]

115.   While the Parties agree that these provisions state the principles to be applied to the interpretation of the ECT, they differ as to the weight to be accorded to the various factors contained in Articles 31 and 32.  The Claimants emphasize the importance of the reference

---

[125] **CL-0033**, Vienna Convention on the Law of Treaties, 23 May 1969 ("**VCLT**"), Art. 31.
[126] **CL-0033**, VCLT, Art. 32.

in Article 31(1) to "*the ordinary meaning to be given to the terms of the treaty.*"  The Respondent places greater emphasis on the duty of good faith and the object and purpose of the ECT.  With regard to Article 32, both Parties refer to the *travaux préparatoires* of the ECT but draw very different conclusions therefrom.

### (2)    Provisional Interpretation of Article 26 of the ECT

116.    The Tribunal considers that Article 31 of the VCLT, as its title suggests, states a single, general rule of interpretation with the result that all of its provisions have to be applied together.  Nevertheless, it is necessary to start somewhere and the obvious place to begin is with the ordinary meaning of the terms of the treaty.

117.    In the case of Article 26, there is no difficulty in concluding that the ordinary meaning of the terms used is that each Contracting Party to the ECT, including the EU and its Member States (all of whom are Contracting Parties to the ECT), makes the same offer of arbitration to investors from any other Contracting Party.  There is nothing in the language of Article 26 to suggest that the offer by the EU and the EU Member States is limited to investors from non-EU States.  Moreover, there is no "*disconnection clause*" in the ECT to the effect that some of its provisions do not apply in an intra-EU context.  The Tribunal agrees with the *Vattenfall* tribunal that the absence of such a clause is telling, particularly since the EU had already included such clauses in other treaties.[127]  In the words of the *Blusun* tribunal "[o]*n its face there is nothing in the text of the ECT that carves out or excludes issues arising between EU Member States.*"[128]

118.    The Respondent does not challenge that conclusion.  Its argument is that the Tribunal must get away from the wording of the treaty and look at other factors.[129]  It maintains that the

---

[127] **CL-0045 / RL-0098**, *Vattenfall, supra,* n. 49, paras. 202-203.  Other treaties concluded between EU Member States and third countries after the ECT also include disconnection clauses.  *See, e.g.,* **CL-0050**, Convention on Choice of Court Agreements, 30 June 2005, Art. 26(6), which provides: "*This Convention shall not affect the application of the rules of a Regional Economic Integration Organisation that is a Party to this Convention, whether adopted before or after this Convention – (a) where none of the parties is resident in a Contracting State that is not a Member State of the Regional Economic Integration Organisation; (b) as concerns the recognition or enforcement of judgments as between Member States of the Regional Economic Integration Organisation.*"

[128] **RL-0057**, *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 ("*Blusun*"), para. 280.

[129] "*Articles 31 and 32 of the Vienna Convention on the Law of Treaties are not telling you just to stay to the strict wording of the Treaty.*"  Transcript, p. 48.

ECT resulted from an initiative of the EU; that its object and purpose was to open up the energy market in the former Communist countries of eastern Europe and that it was never intended to create rights for investors from an EU Member State to bring arbitration proceedings against another EU Member State.

119.  The Tribunal does not doubt the central role played by the EU in the creation of the ECT,[130] nor the importance of opening up the energy sector in the former Communist States.[131] However, that does not mean that the object and purpose of the ECT was confined in the way suggested by the Respondent.  The best guide to the object and purpose of the ECT is Article 2 of the ECT, entitled "*Purpose of the Treaty*," which provides:

> *This Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and purposes of the Charter.*[132]

Nothing here supports the suggestion that the provisions of the ECT as a whole, or of Part V on dispute settlement in particular, were intended to apply only to western investment in eastern Europe.  Moreover, it is accepted by the Respondent and by the EC that Part V of the ECT applies to an investor from, *e.g.*, Australia or Japan who invests in the energy sector in a west European EU Member State such as Spain or Germany.  If the object and purpose of the ECT was as restricted as the Respondent suggests, then arbitration between such an investor and the EU Member State concerned would also fall outside that object and purpose.

120.  The "*Charter*" referred to in Article 2 of the ECT is the European Energy Charter, a non-binding document adopted by the Hague Conference on the European Energy Charter on 17 December 1991.[133]  That document and the accompanying declaration do indeed make reference to the importance of the energy sector in the former Communist States, but there

---

[130] That role is described in some detail in **RL-0024**, *Electrabel*, *supra*, n. 33, paras. 4.131 to 4.141, and in an article by the late Thomas Wälde. Transcript, p. 47.

[131] *See, e.g.*, **RL-0002**, *The Energy Charter Treaty and Related Documents* (2004), Introduction, p. 13.

[132] **RL-0002**, ECT, Art. 2.

[133] **RL-0002**, ECT, Art. 1(1).  For the text of the Charter, *see* **RL-0002**, *The Energy Charter Treaty and Related Documents* (2004), European Energy Charter, pp. 211 *et seq*.

is nothing in the Charter which suggests that it was intended to apply exclusively to investment in those States. On the contrary, Title III of the Charter refers to the possibility of special transitional arrangements for those States, implying that other States would be subject to obligations which would not be phased in in this fashion.

121. The Respondent has also suggested that it was understood by all concerned that the ECT, or at least Part V, was not to apply to investments by investors from one EU Member State in the territory of another. Yet there is no hint of any such understanding in the text of the ECT and the Tribunal agrees with the observation of the *Blusun* tribunal that "[w]*hile the Respondent and the EC relied on the* travaux préparatoires *to justify reading in a disconnection clause, this is not permissible in a context in which the terms of the treaty are clear.*"[134]

122. Moreover, the materials which the Respondent has put before the Tribunal to support its argument that there was such an understanding and that a disconnection clause was implicit do not in fact make that case. The Respondent refers to an EC internal note which states that "*it is a certain complementarity of energy resources and markets, technology and capital between Eastern and Western Europe, and the consequent opportunities for investment and trade, which is the main raison d'être of the Energy Charter.*"[135] But this note is the text of an article which the author was about to publish in a journal; there is no indication that the note was seen outside the EC and it cannot constitute part of the *travaux préparatoires* of the ECT. In addition, the text of the note as a whole does not support the narrow view of the object and purpose of the ECT advanced by the Respondent or give any indication that the ECT, which was then only in the early stages of negotiation, was being negotiated on the basis of an implicit understanding that all or part of it would not apply to intra-EU relations.

---

[134] **RL-0057**, *Blusun*, *supra*, n. 128, para. 280(4).

[135] **CL-0072**, Commission of the European Communities, Note from RH Greenwood for the attention of Mr. Jones and Mr. Gulbal, 9 April 1992. For the avoidance of doubt, the President of the Tribunal wishes to make clear that he is not connected to RH Greenwood.

123.   What the *travaux préparatoires* do make clear is that the EU proposed that a disconnection clause be included in a Ministerial Declaration to be attached to the ECT.  The draft proposed that a declaration include the following provision:

> *In their mutual relations, Contracting Parties which are Members of the European Communities shall apply Community rules and shall not therefore apply the rules arising from this Agreement except insofar as there is no Community rule governing the particular subject concerned.*[136]

While we do not know why this proposal was not adopted, the fact is that it was not and, to the extent that reference to the *travaux préparatoires* is permissible, the fact that it was proposed and yet not adopted militates against the interpretation advanced by the Respondent.

124.   The Respondent also advances a different argument to the effect that the ECT treats the EU and its Member States as a single entity, with the result that a German company investing in Spain does not fall within the definition of an investor making an investment in the territory of another Contracting Party.[137]  Since the entire territory of the EU is to be treated as a single entity for this purpose, Spain argues, the German investor is not making an investment in the Area of another Contracting Party and thus falls outside the entire scope of the ECT.  In support, the Respondent relies upon the fact that the EU and its Member States acted as a bloc in the ECT negotiations and on the provisions of Article 36(7) of the ECT, which provides:

> *A Regional Economic Integration Organization shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organization shall not exercise its right to vote if its member states exercise theirs, and vice versa.*[138]

125.   The Tribunal is not persuaded by this argument. The ECT is a mixed agreement concluded by the EU and its Member States.  That the EU and its Member States acted as a bloc in

---

[136] **CL-0052**, Draft Ministerial Declarations to the Energy Charter Treaty, versions 2-7, 1 May 1993-17 March 1994.
[137] Transcript, pp. 63-64.
[138] **RL-0002**, ECT, Art. 36(7).

the preceding negotiations does not alter the fact that both the EU and the Member States are Contracting Parties to the ECT. Article 36(7) does not treat the EU and the Member States as a single entity. On the contrary, it recognizes that either the EU, or the Member States may vote. The only limitation that it imposes is that they may not both do so. There is nothing in this provision which would lend support to an argument that an investor from one EU Member State investing in the territory of another is not investing in another Contracting Party.

126. Most importantly, the argument is not sustained by the text of Article 1 of the ECT. Article 1(10) defines "*Area*" as follows:

> *'Area' means with respect to a state that is a Contracting Party:*
>
> *(a)  the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and*
>
> *(b)  subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.*
>
> *With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions in the agreement establishing the Organization.*[139]

127. Under this provision, if proceedings are brought against the EU by an investor from a non-EU State such as Australia or Japan, the investment will qualify if it was made within the territory or sea and seabed of any of the Member States of the EU. The provision does not affect the separate nature of the "*Area*" of each EU Member State in proceedings against that State.[140]

---

[139] **RL-0002**, ECT, Art. 1(10).

[140] The Tribunal also notes that an argument substantially the same as that advanced on this point by the Respondent was rejected in **CL-0047**, *Greentech*, *supra*, n. 62, para. 211; **CL-0045 / RL-0098**, *Vattenfall*, *supra*, n. 49, paras. 181-183; **RL-0057**, *Blusun*, *supra*, n. 128, para. 284; and **CL-0035**, *Eiser Infrastructure Ltd. et al. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 ("*Eiser*"), paras. 194-195.

128.   It is also important to bear in mind the Statement made by the EU to the ECT Secretariat pursuant to Article 26(3)(b)(ii) of the ECT (the text of which provision is set out *supra*, paragraph 37).  This Statement is sufficiently important that it is worth quoting at some length.[141]  In relevant part, it provides:

> *The European Communities, as Contracting Parties to the Energy Charter Treaty, make the following statement concerning their policies, practices and conditions with regard to disputes between an investor and a Contracting Parties* [sic] *and their submission to international arbitration or conciliation:*
>
> *'[1] The European Communities are a regional economic integration organisation within the meaning of the Energy Charter Treaty. The Communities exercise the competences conferred on them by their Member States through autonomous decision-making and judicial institutions.*
>
> *[2] The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.*
>
> *[3] The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days.*[Footnote 1]
>
> *[Footnote 1] This is without prejudice to the right of the investor to initiate proceedings against both the Communities and their Member States.*
>
> *[4] The Court of Justice of the European Communities, as the judicial institution of the Communities, is competent to examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder, including international agreements concluded by the Communities, which under certain conditions may be invoked before the Court of Justice.*
>
> *[5] Any case brought before the Court of Justice of the European Communities by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls under Article 26(2)(a) of the*

---

[141] The Tribunal has added paragraph numbers for ease of reference.

*Energy Charter Treaty.*[Footnote 2] *Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation.*

*[Footnote 2] Article 26(2)(a) is also applicable in the case where the Court of Justice of the European Communities may be called upon to examine the application or interpretation of the Energy Charter Treaty on the basis of a request for a preliminary ruling submitted by a court or tribunal of a Member State in accordance with Article 177 of the EC Treaty.*

*[6] As far as international arbitration is concerned, it should be stated that the provisions of the ICSID Convention do not allow the European Communities to become parties to it. The provisions of the ICSID Additional Facility also do not allow the Communities to make use of them. Any arbitral award against the European Communities will be implemented by the Communities' institutions, in accordance with their obligation under Article 26(8) of the Energy Charter Treaty.*'[142]

129.    This Statement clearly qualifies as an instrument made by one of the Contracting Parties to the ECT in connection with the conclusion of the ECT, and accepted by the other Contracting Parties as an instrument related to the ECT, within the meaning of Article 31(2)(b) VCLT.

130.    For the Claimants, what matters is paragraph [3] which plainly envisages the possibility of arbitral proceedings against either or both of the EU and the Member States.  The Claimants stress that no hint appears in this Statement that such proceedings are confined to proceedings brought by investors from outside the EU or that Article 26 was not meant to apply to intra-EU proceedings.  It is also significant that paragraph [2] expressly recognizes that the EU and the EU Member States are Contracting Parties to the ECT and have international responsibility for the fulfilment of the obligations thereunder.

131.    The Tribunal agrees with the views of the *Vattenfall* tribunal on this Statement:

[…] *paragraphs [2] and [3] of the EU Statement demonstrate that while the EU and its member States are recognized as having their 'respective  competences', there is no suggestion that such division*

---

[142] **CL-0075**, Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter, Official Journal of the EU, L 69/115, 9 March 1998, p. 115.

> *of competences has rendered, or could render, EU Member States ineligible to be respondent parties to an arbitration under Article 26 ECT commenced by an Investor of another EU Member State. […] [I]t is expressly contemplated that either the EU or an EU Member State may be party to an arbitration initiated by an Investor of 'another Contracting Party.' There is no basis to read a qualification that 'another' Contracting Party only includes non-EU Member States.*[143]

132.   The Tribunal's provisional interpretation of Article 26 of the ECT is thus that it appears to constitute an offer of arbitration by each EU Member State to Investors from any other Contracting Party without any limitation regarding intra-EU disputes.

133.   That interpretation must, however, be provisional because the Respondent also advances a powerful argument that EU law debars an EU Member State from making such an offer to an Investor from another EU Member State and that the interpretation of Article 26 of the ECT must take account of this limitation.  This argument has several different strands to it and will be considered in Section 4 of this Part of the Decision.  Since, however, each of these strands of argument is based on the premiss that an interpretation of Article 26 of the ECT which included intra-EU disputes is contrary to EU law, it will first be necessary to examine whether that is in fact the case.

### (3)   Is It Contrary to EU Law for an EU Member State to Make an Offer of Arbitration Under the ECT to an Investor from Another EU Member State?

134.   It is appropriate to begin discussion of this issue by examining more closely the CJEU Judgment in *Achmea,* since it is that Judgment which prompted the Parties to agree to bifurcate the present proceedings and because it is the principal reference point of the Respondent's argument.

135.   The *dispositif* of the *Achmea* Judgment has already been set out (*supra,* paragraph 52).  The case concerned a BIT between two EU Member States.  However, the *dispositif* is couched in language which suggests that the Judgment might have repercussions for the ECT, since

---

[143] **CL-0045 / RL-0098**, *Vattenfall*, *supra* n. 49, para. 189.  The Tribunal also endorses the view expressed in paras. 190-191 of the *Vattenfall* decision that the other paragraphs of the Statement do not suggest a limitation upon the acceptance of arbitration.

the CJEU found that Articles 267 and 344 TFEU must be interpreted "*as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the* [Netherlands-Slovak BIT],"[144] which provides for arbitration between an investor from one EU Member State and another EU Member State. While the ECT is not simply an agreement concluded between Member States, in that both the EU and a number of non-EU States are also Contracting Parties, the language of the *dispositif* is not so clear that it can be said unambiguously to rule out application to the ECT. The Tribunal must, therefore, look at the reasoning of the Court.

136.  The CJEU began by emphasizing three important principles of EU law, namely the autonomy of EU law, its primacy over the laws of EU Member States and the principle of sincere or loyal co-operation between EU Member States. Thus:

> 32.  […] *it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties (Opinion 2/13 (Accession of the EU to the* [European Convention on Human Rights] *) of 18 December 2014, EU:C:2014:2454, paragraph 201 and the case-law cited therein).*
>
> 33.  *Also according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding*

---

[144]  **RL-0091**, *Achmea Judgment, supra,* n. 3, *Dispositif* (emphasis added).

> *its Member States to each other (see to that effect Opinion 2/13 (Accession of the EU to the* [European Convention on Human Rights]*) of 18 December 2014, EU:C:2014:2454, paragraphs 165 to 167 and the case-law cited therein).*

> *34. EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognizes that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognized, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere co-operation set out in the first paragraph of Article 4(3) TFEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure the fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU (Opinion 2/13 (Accession of the EU to the* [European Convention on Human Rights]*) of 18 December 2014, EU:C:2014:2454, paragraphs 168 and 173 and the case-law cited therein).*[145]

137. The CJEU then noted that, to ensure that the specific characteristics and autonomy of EU law are preserved, the Treaties had devised a judicial system intended to ensure consistency and uniformity in the interpretation of EU law.[146] To that effect, national courts and the Court of Justice, acting in partnership in accordance with the preliminary reference system in Article 267 TFEU, had to ensure the full application of EU law.[147]

138. In light of these principles, the CJEU then posed three questions. First, were the disputes which could be referred to arbitration under the BIT liable to relate to the interpretation or application of EU law? Secondly, was an arbitration tribunal such as that for which the

---

[145] **RL-0091**, *Achmea Judgment, supra,* n. 3, paras. 32-34.

[146] **RL-0091**, *Achmea Judgment, supra,* n. 3, para. 35.

[147] **RL-0091**, *Achmea Judgment, supra,* n. 3, paras. 36-37.

BIT provided "*situated within the judicial system of the EU*"?  Lastly, were the awards of such a tribunal subject to review by a court of a Member State?[148]

139.    With regard to the first question, the CJEU considered:

> 40.    Even if, as Achmea in particular contends, that tribunal, despite the very broad wording of Article 8(1) of the BIT, is called on to rule only on possible infringements of the BIT, the fact remains that in order to do so it must, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties.
>
> 41.    Given the nature and characteristics of EU law, mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.
>
> 42.    It follows that on that twofold basis the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed apply EU law, particularly the provisions concerning the fundamental freedoms, including the freedom of establishment and free movement of capital.[149]

140.    With regard to the second question, the CJEU held that "*a tribunal such as that referred to in Article 8 of the BIT cannot be regarded as a 'court or tribunal of a Member State'* […] *and is not therefore entitled to make a reference to the Court for a preliminary ruling*."[150]

141.    On the third question which it had identified, the CJEU concluded that, although the arbitral tribunal in *Achmea* had had its seat in Frankfurt and was therefore subject to the supervisory jurisdiction of the German national courts, that supervisory role was not sufficient to ensure the consistent and uniform application of EU law.[151]

142.    The CJEU concluded:

---

[148] **RL-0091**, *Achmea Judgment, supra,* n. 3, paras. 39, 43, 50.

[149] **RL-0091**, *Achmea Judgment, supra,* n. 3, paras. 40-42.

[150] **RL-0091**, *Achmea Judgment, supra,* n. 3, para. 49.

[151] **RL-0091**, *Achmea Judgment, supra,* n. 3, paras. 50-55.

56. *Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT and set out in paragraphs 39 to 45 above, it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.*

57. *It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected.* […]

58. *In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal* […] *may relate to the interpretation both of that agreement and of EU law, the possibility of submitting these disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 344 TFEU, and is not therefore compatible with the principle of sincere co-operation referred to in paragraph 34 above.*

59. *In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.*[152]

143.  The question for the Tribunal is whether the logic of this reasoning, although crafted in relation to a BIT, is also applicable to Article 26 of the ECT insofar as that provision is invoked in an intra-EU dispute. Some parts of the CJEU's reasoning are susceptible of

---

[152] **RL-0091**, *Achmea Judgment*, *supra,* n. 3, paras. 56-59.

application to the ECT.  Just as an arbitral tribunal established under Article 8 of the Netherlands-Slovak BIT is confined to ruling on whether or not there has been a breach of that BIT, an arbitral tribunal established in accordance with Article 26 of the ECT is called upon to rule only on possible infringements of the ECT.  In doing so, however, a tribunal established under Article 26 may have to interpret and apply EU law as part of international law applicable between the respondent and the claimant's State of nationality.[153]

144.    Moreover, the decision of the CJEU that an arbitral tribunal is not competent to request a preliminary ruling from the CJEU would appear to be as applicable to a tribunal established under the ECT as to one established under a BIT.

145.    Finally, the Tribunal notes that both the EC (in its 19 July 2018 Communication to the Parliament[154] and in its Request to Intervene in the present proceedings[155]), as well as a clear majority of the EU Member States (as indicated by the Declaration of Twenty-Two Member States[156]) consider that the *Achmea* Judgment is applicable to ECT arbitration proceedings and is not confined to BIT cases.

146.    Nevertheless, the Tribunal considers that the differences between its situation, as a tribunal established under Article 25 of the ICSID Convention and Article 26 of the ECT, and that of the tribunal in *Achmea* are more significant than the similarities.

147.    First, the CJEU placed great stress on the fact that in *Achmea*, "*the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States.*"[157]  That is not the case here.  The ECT is a "*mixed agreement*" concluded both by the EU and by its Member States.  There is, therefore, no question of the possibility of a tribunal established under Article 26 of the ECT having been provided for without the knowledge and, indeed, the participation of the EU.  Moreover, as has been seen, the EU did not insist upon the

---

[153] *See* **RL-0002**, ECT, Art. 26(6), set out *supra*, para. 37, and considered in greater detail below.

[154] *See supra*, para. 75.

[155] *See supra*, paras. 72-74.

[156] *See supra*, para. 76.

[157] **RL-0091**, *Achmea Judgment*, *supra*, n. 3, para. 58.

draft disconnection provision,[158] but instead signed up to an international agreement which, on its face, is just as applicable in intra-EU disputes as in disputes between the EU, or an EU Member State, and an Investor from outside the EU. Nor did the EU, in its statement under Article 26(3)(b)(ii) of the ECT,[159] suggest that there was any difference.

148.    Secondly, the ECT, as a multilateral treaty, involves obligations by each Contracting Party towards all other Contracting Parties; it is more than just a network of bilateral relationships and is therefore quite different from a BIT. The nature of the ECT as a single legal instrument in force in the same terms and to the same effect between all its Contracting Parties is reinforced by the fact that reservations to the ECT are expressly prohibited by Article 46 of the ECT.

149.    Thirdly, in a BIT between two EU Member States, the only arbitration proceedings which can usually occur are between a national of one of the EU Member States which is party to the BIT and the other EU Member State which is party; *i.e.* all proceedings will necessarily have an intra-EU character. That is not the case with the ECT. Leaving aside proceedings which have no connection with the EU at all, it is common ground between the Parties that the ECT can furnish a basis for jurisdiction in proceedings between an Investor from outside the EU and an EU Member State or the EU itself, or between an Investor from an EU Member State and a State outside the EU. Thus, Spain does not contest that, even on its own view of EU law, EU law would be no obstacle to the jurisdiction of this Tribunal if the Claimants were from Japan or Australia rather than from Germany. Yet in such a case, issues of EU law (as part of the law of Spain) would be just as likely to arise and yet could not be referred to the CJEU for a preliminary ruling.

150.    Fourthly, the *Achmea* tribunal had its seat in Germany. By contrast, the present Tribunal is an ICSID tribunal, deriving its authority from Article 25 of the ICSID Convention, having no national "seat" and subject to the jurisdiction of no national court. The difference between an ICSID tribunal and one with a national seat was considered by another arbitration tribunal as sufficient grounds to hold the reasoning in *Achmea* inapplicable,

---

[158] *See supra*, para. 123.
[159] *See supra*, para. 128.

even though the tribunal's jurisdiction in that case was, like that of the *Achmea* tribunal, derived from a BIT.[160]  The reasoning of the CJEU in paragraphs 52 and 53 of the *Achmea* Judgment regarding the role of a national court is inapplicable here.  ICSID is a self-contained system with its own recourse, through applications for annulment, replacing the supervisory role normally carried out by the courts of the seat.

151.    Fifthly, the Advocate-General in *Achmea* considered that the existence of jurisdiction under Article 26 of the ECT in an intra-EU dispute was not incompatible with EU law.  The Advocate-General opined:

> [The ECT] *operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.*[161]

While the CJEU did not follow the advice of the Advocate-General, it is noticeable that it said nothing about this passage in his Opinion.[162]

152.    Lastly, the Tribunal notes that the CJEU has not ruled out the possibility of a court established by an international agreement and thus rooted in public international law being able to rule in a dispute involving an EU Member State, notwithstanding that in doing so it had to take account of EU law.  That is expressly recognized in paragraph 57 of the *Achmea* Judgment and, although the CJEU added the rider "*provided that the autonomy of the EU and its legal order is respected*," it gave no indication as to how that was to be done.  The jurisdiction of the European Court of Human Rights covers all EU Member

---

[160] **CL-0046**, *UP*, *supra*, n. 122, paras. 252-267.

[161] **R-0178**, Opinion of Advocate-General Wathelet, Case C-284/16, *Slovak Republic v. Achmea B.V.*, 19 September 2017, para. 43.

[162] *See* the discussion of that omission in **CL-0043 / RL-0095**, *Masdar*, *supra*, n. 34, paras. 679-682.

States (and many States outside the EU) and the European Court of Human Rights has held that an EU Member State may be held responsible for a violation of the European Convention on Human Rights even when that State is applying EU law.[163]  Moreover, in determining in such a case whether or not the respondent State has violated the European Convention on Human Rights, the European Court of Human Rights may well have to interpret EU law.  For example, there appears to be no barrier to an investor from one EU Member State bringing a claim for expropriation against another EU Member State before the European Court of Human Rights as a complaint under Article 1 of the First Protocol to the Convention.

153.    The Tribunal accepts that some parts of the *Achmea* Judgment, taken in isolation, could suggest that Article 26 of the ECT is incompatible with EU law if applied in an intra-EU dispute.  However, it agrees with an observation made by the Respondent (albeit to a different purpose) that one cannot "*cherry pick*" from the Judgment but should take it as a whole.[164]  Doing so, the Tribunal concludes that the *Achmea* Judgment does not imply that the exercise of jurisdiction under Article 26 of the ECT in an intra-EU dispute is incompatible with EU law.  The Tribunal reaches that conclusion for the reasons given above but it notes that the same conclusion has been arrived at by the tribunals in *Vattenfall*, *Masdar* and *Greentech.*

154.    Nor is the Tribunal persuaded that such a conflict has been identified without reference to *Achmea*.  The argument that there is such a conflict turns on the same points examined by the CJEU in *Achmea.*  While the Tribunal notes the Respondent's arguments regarding the effect of Article 344 TFEU (*supra,* paragraph 47), it considers that an EU Member State does not contravene that provision by concluding an agreement to which all EU Member States and the EU itself are parties simply because that agreement provides for arbitration between that State and an investor from another Member State.  Nor, for the reasons set out *supra,* paragraphs 147 and 149-150, does the Tribunal accept that the conclusion of such an agreement is contrary to the principle of the autonomy of EU law.  As for the

---

[163] **CL-0068**, *Avotiņš v. Latvia*, ECHR Application No. 17502/07, Judgment, 23 May 2016, para. 101: "*even when applying European Union law, the Contracting States remain bound by the obligations they freely entered into on acceding to the Convention.*"
[164] Transcript, p. 148.

principle of sincere (or loyal) co-operation, the Tribunal sees nothing incompatible between that principle and the interpretation of Article 26 of the ECT at which the Tribunal has provisionally arrived.  In short, the Tribunal agrees with the analysis of the position before the *Achmea* Judgment in numerous other arbitration awards and decisions.

155.    The Tribunal is therefore of the view that there is no conflict between EU law and a finding that Article 26 of the ECT constitutes an offer of arbitration by an EU Member State to an Investor from another EU Member State.  Nevertheless, the Tribunal cannot ignore the fact that the EC and a majority of EU Member States have reached a different conclusion.  The Tribunal will therefore proceed, in the next two sections of the Decision, to analyse whether, if such a conflict did exist, it would compel a different interpretation of Article 26 (Section 4, below) or would have the effect of disapplying Article 26 in an intra-EU case (Section 5, below).

### (4)    The Effect on the Interpretation of Article 26 of the ECT of a Prohibition Under EU Law of Arbitration in an Intra-EU Dispute

156.    For the purposes of this Section, the Tribunal will assume (contrary to what is decided above) that EU law does prohibit an EU Member State from submitting to ICSID arbitration a dispute regarding alleged violations of Part III of the ECT between that State and an Investor from another EU Member State.  In those circumstances, the question would be whether such a rule of EU law would lead to an interpretation of Article 26 different from that at which the Tribunal provisionally arrived in Section 2.

157.    The Respondent's principal argument that a different interpretation can and should be reached in that event turns upon Article 26(6) of the ECT (set out *supra,* paragraph 37).  The Respondent maintains that by requiring the Tribunal to decide any issue before it in accordance with applicable rules and principles of international law, which it interprets as including the EU Treaties and other rules of EU law, Article 26(6) operates as a form of implied disconnection clause, because it requires the Tribunal to apply in an intra-EU case the rule of EU law prohibiting an EU Member State from submitting such intra-EU dispute to arbitration.

158.    The Tribunal accepts that EU law is to be regarded as international law for this purpose. Although the CJEU has frequently emphasized the differences between EU law and international law, the EU is created and sustained by a series of treaties between its Member States. Those treaties derive their binding force from international law and must be regarded as part of international law. The position is less straightforward when one turns to other aspects of EU law, particularly the legislation adopted by the EU institutions. However, that legislation is adopted pursuant to powers conferred by the EU Treaties and thus ultimately derives its legal force from international law instruments. The Tribunal considers it would be artificial to distinguish between the EU Treaties and other EU laws in relation to Article 26(6).[165]

159.    Nevertheless, the Tribunal agrees with the tribunals in *Vattenfall*[166] and *Greentech*[167] that Article 26(6) indicates the law which the Tribunal must apply to the merits of the dispute before it, and has no relevance to its jurisdiction, which is derived from the ECT and Article 25 of the ICSID Convention. Article 26(1) to (5) of the ECT define the scope of the jurisdiction of a tribunal under the ECT to determine "[d]*isputes* […] *which concern an alleged breach of an obligation of* [the Respondent] *under Part III* […]." Article 26(6) then directs the Tribunal as to the law to be applied to such disputes once it has established that it has jurisdiction. The Tribunal notes the Respondent's argument that the *Vattenfall* analysis misreads Article 26(6) because it suggests that that provision applies to the "*dispute*" whereas the language actually used is "*the issues in dispute*" but it does not accept that this is sufficient to render Article 26(6) applicable to the determination of the existence and scope of the Tribunal's jurisdiction. The "*issues in dispute*" to which Article 26(6) refers are those issues which are in dispute on the merits of the case; the provision becomes applicable only once the jurisdiction of the Tribunal has been established over a "*dispute*" falling within the provisions of Article 26(1) to (5). The Tribunal does not accept that the difference in wording between this provision and Article 27(3)(g) of the ECT – which directs a tribunal in an inter-State case to "*decide the dispute in accordance with this*

---

[165] *See* **CL-0045 / RL-0098**, *Vattenfall, supra,* n. 49, para. 146 and **RL-0024**, *Electrabel, supra,* n. 33, para. 4.120-4.123.

[166] **CL-0045 / RL-0098**, *Vattenfall, supra,* n. 49, para. 121.

[167] **CL-0047**, *Greentech, supra,* n. 62, paras. 218-219.

*Treaty and applicable rules and principles of international law*" – indicates a broader scope of application for Article 26(6).  The Respondent has not directed the Tribunal to any materials – whether in the *travaux préparatoires*, subsequent practice, case-law or commentary – which would support the inference which it seeks to draw from the slight difference in wording between the two provisions.

160.   Moreover, even if it were applicable, Article 26(6) would not have the effect for which the Respondent contends.  That provision does not require the Tribunal to accord primacy to EU law even in an inter-State case.  When applicable, Article 26(6) directs a tribunal to "*decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*."  It thus requires a tribunal to begin with the provisions of the ECT; it does not direct it to adopt an interpretation of the ECT which goes against the ordinary meaning of the words used on the basis that a rule of international law, applicable only between some of the Contracting Parties to the ECT, may run counter to that ordinary meaning.

161.   Nor is the Tribunal persuaded by the Respondent's reference to Article 42(1) of the ICSID Convention.  Article 42(1) provides that:

> *The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties.  In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.*

This provision is also directed to the law applicable to the merits of the dispute and not to jurisdiction.[168]  Moreover, it is of limited relevance to the present case since Article 26(6) of the ECT constitutes an agreement between the Parties regarding the applicable law.

162.   The fact that Article 26(6) is not applicable is not, however, decisive.  The ECT is a treaty and must therefore be interpreted and applied in accordance with the relevant rules and principles of international law.  The Tribunal must therefore consider an alternative argument of the Respondent, based upon Article 31(3)(c) of the VCLT (set out *supra*,

---

[168] *See* **CL-0061**, C. Schreuer, *The ICSID Convention: A Commentary* (2ⁿᵈ ed., Cambridge, 2009), pp. 550-551.

paragraph 113). That argument is that, in interpreting the ECT, the Tribunal must take into account EU law as part of the "*relevant rules of international law applicable in the relations between the parties*."  For the Respondent, the effect of Article 31(3)(c) is that the Tribunal must take account of the EU law prohibition on arbitration of this kind of dispute in intra-EU cases and thus interpret Article 26 as inapplicable in cases between an EU Investor and an EU Member State.

163.    However, EU law is applicable between only some of the Contracting Parties to the ECT and the Tribunal agrees with the observation of the *Vattenfall* tribunal that:

> *States party to a multilateral treaty are entitled to assume that the treaty means what it says, and that all States parties will be bound by the same terms.  It cannot be the case that the same words in the same treaty provision have a different meaning depending on the independent legal obligations entered into by one State or another, and depending on the parties to a particular dispute.  The need for coherence, and for a single unified interpretation of each treaty provision, is reflected in the priority given to the text of the treaty itself over other contextual elements under Article 31 VCLT.*[169]

164.    Moreover, Article 31(3)(c) does not give primacy to other rules of international law.  All that it directs is that they shall be "*taken into account*" together with the context of the treaty and in connection with the application of the general rule of interpretation in Article 31 VCLT as a whole.  Even if EU law did indeed prohibit an EU Member State from agreeing to submit a dispute of the kind identified in Article 26(1) of the ECT to arbitration, a requirement to "*take into account*" that prohibition could not prevail over the ordinary meaning of the text of Article 26, interpreted in its context and in the light of the other considerations identified in Section 2, above.

165.    The Respondent also invokes Article 31(3)(b) of the VCLT which requires that "*any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation*" shall be taken into account together with the context of the treaty.  Spain argues that the practice of the EU – as expressed by the EC and the CJEU – and of a large number of EU Member States – noticeably Germany (in arguing in

---

[169] **CL-0045 / RL-0098**, *Vattenfall*, *supra*, n. 49, para. 156.

*Vattenfall* that the ECT is inapplicable to intra-EU disputes), Spain (in raising the same argument in the present proceedings and a number of other cases), and the States which signed the Declaration by Twenty-Two Member States – constitute subsequent practice pointing to an interpretation of Article 26 ECT which excludes intra-EU disputes.

166.   The problem with this argument is that Article 31(3)(b) requires practice that "*establishes the agreement of the parties*" to the relevant treaty.  The body of practice relied upon by Spain comes nowhere near establishing such an agreement.  There is no indication of the practice of States Contracting Parties to the ECT which are not Members of the EU or of their reaction to the positions taken by the EC, and those EU Member States which have so far taken a position regarding the ECT.  Even the Declarations adopted on 15 and 16 January 2019 cannot be said to establish an agreement between the parties to the ECT regarding its interpretation.  While the Declaration of Twenty-Two Member States, supported by the EU, is the practice of a majority of EU Member States, it does not reflect an agreement even among the EU Member States about the ECT since one State (Hungary) expressly rejected the part of the Declaration regarding the ECT and five other States considered that no position on the interpretation of the ECT should be taken.  The Tribunal has been shown no practice at all by ECT Contracting Parties from outside the EU which might be said to support the approach taken in the Declaration of Twenty-Two Member States.  The practice referred to by Spain is thus too fragile a foundation on which to construct an agreement between the ECT Contracting Parties that Article 26 means something radically different from what it appears to say.

167.   The Respondent also refers to Article 25(1) of the ECT in support of its argument that the ECT has to be interpreted in a way which gives primacy to EU law in an intra-EU dispute.  Article 25(1) provides that:

>   *The provisions of this Treaty shall not be so construed as to oblige*
>   *a Contracting Party which is a party to an Economic Integration*
>   *Agreement (hereinafter referred to as 'EIA') to extend, by means of*
>   *most favoured nation treatment, to another Contracting Party which*
>   *is not a party to that EIA, any preferential treatment applicable*

> *between parties to that EIA as a result of their being parties thereto.*[170]

Spain argues that the reference to "*preferential treatment*" in this provision implies that the ECT is to be construed so as to accord preference to the rules of an EIA as between the parties to the ECT who are members of that EIA and thus to give priority to a prohibition in EU law of arbitration in intra-EU disputes. But that is not what Article 25(1) says. All that Article 25(1) does is to ensure that the most favoured nation provisions of the ECT (*e.g.* Article 10(3)) shall not be interpreted as requiring a Contracting Party which is a member of an EIA to extend to a Contracting Party which is not a member of that EIA the treatment which the EIA's rules require it to extend to other States which are members of the EIA. Thus, the effect of Article 25(1) is that Spain is not required by the ECT to extend to Japan or Australia the treatment as regards matters such as free movement and freedom of establishment which EU law requires it to extend to France or Germany; it says nothing at all about whether Spain is offering arbitration under Article 26 to an investor from within the EU.

168.    Finally, the Tribunal considers that the Respondent's arguments that the ECT must be interpreted in accordance with EU law cannot be reconciled with the provisions of Article 16 of the ECT, which provides:

> *Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,*
> *(1)    nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
> *(2)    nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,*

---

[170] **RL-0002**, ECT, Art. 25(1).

> *where any such provision is more favourable to the Investor or the Investment.*[171]

Part III of the ECT contains the substantive provisions on which the Claimants base their case. Part V contains the dispute settlement provisions, including Article 26.

169. Applying the general rule of interpretation in Article 31 of the VCLT, the ordinary meaning of this provision is that the EU Treaties (which constitute a series of international agreements between Spain and Germany *inter alia*), whether considered to have been adopted prior or subsequent to the ECT, do not derogate from any right of the Claimants to dispute resolution under Article 26 of the ECT if Article 26 is more favourable to the Claimants or their Investment.

170. Spain denies that Article 16 of the ECT is applicable. It submits that the EU Treaties do not deal with the same subject matter as Parts III or V of the ECT and that, in any event, the ECT is not more favourable than EU law to the Claimants of their Investment.[172]

171. With regard to the first of Spain's objections, the EU Treaties obviously cover a vast range of subjects which are nowhere touched upon by the ECT. Article 16 of the ECT is not, however, confined to treaties which cover only the same subject matter as the ECT; it applies to any treaty "*whose terms* […] *concern the subject matter of Part III or V*" of the ECT. It is a central pillar of Spain's case in these proceedings that the EU Treaties (and subordinate legislation) cover matters which concern the subject matter of Part III of the ECT. That is why it maintains that the Tribunal cannot decide on whether there has been a breach of Part III without necessarily having to consider and apply rules of EU law on the market in energy, state aid etc. Moreover, Spain's argument sits ill with its reliance upon Article 30 of the VCLT (considered *infra,* paragraph 180). That provision, which is also relied on in the Declaration of Twenty-Two Member States,[173] deals with "*successive treaties relating to the same subject-matter.*" The Tribunal cannot see how two treaties

---

[171] **RL-0002**, ECT, Art. 16.

[172] Respondent's Statement, paras. 81-82.

[173] See the footnote quoted *supra,* para. 76.

can "*relate to the same subject-matter*" for the purposes of Article 30 VCLT but not for the purposes of Article 16 ECT.

172.    The Tribunal's view that Article 16 of the ECT is applicable is confirmed by the disconnection provision proposed by the EU during the negotiation of the ECT (*supra,* paragraph 123). That provision would have added to the ECT a statement that "[i]*n their mutual relations, Contracting Parties which are Members of the European Communities shall apply Community rules and shall not therefore apply the rules arising from this Agreement except insofar as there is no Community rule governing the particular subject concerned*." Although that provision was not adopted, the fact that it was put forward at all shows that the EU considered that "*Community rules*" concerned the subject matter of the ECT. Moreover, it is not necessary that Article 344 or Article 267 TFEU should concern the same subject matter as Part III or Part V of the ECT. What matters is that the EU Treaties as a whole should contain provisions which concern that subject matter.

173.    The Tribunal is conscious that the *Electrabel* tribunal[174] reached a different conclusion but, for the reasons given above, it prefers the conclusion reached by the *Vattenfall* and *Masdar* tribunals[175] on this point.

174.    Spain also contends that Article 16 of the ECT is inapplicable because the right to dispute resolution under the ECT is not more favourable to the Investor or the Investment than the remedies available under EU law. The Tribunal does not agree. EU law does not afford a right for an Investor to bring arbitration proceedings against a State under international law.

175.    The Tribunal thus concludes that Article 16 of the ECT is applicable and that its effect is that the ECT cannot be interpreted in such a way as to run counter to the ordinary meaning of the terms of Article 26, in order to give effect to any rule of EU law that might prohibit

---

[174] **RL-0024**, *Electrabel, supra,* n. 33, para. 4.176.
[175] **CL-0045 / RL-0098**, *Vattenfall, supra,* n. 49, paras. 192-196; **CL-0043 / RL-0095**, *Masdar, supra,* n. 34, para. 332.

an EU Member State from making an offer of arbitration by way of Article 26 to an Investor from another EU Member State.

176.    For all these reasons, the Tribunal therefore rejects Spain's argument that Article 26 of the ECT can and should be construed as inapplicable to an intra-EU dispute and confirms the interpretation at which it provisionally arrived in Section 2 above.    The proper interpretation of Article 26 is that each Contracting Party to the ECT extends to Investors from any other Contracting Party, an offer of arbitration within the limits laid down in that Article.

**(5)    Does EU Law Take Priority Over the ECT for the Purposes of Determining the Jurisdiction of the Tribunal?**

177.    The Tribunal therefore turns to the following question: given that Article 26 of the ECT has to be interpreted as an offer of arbitration extended by Spain to Investors from Germany, and if (contrary to what the Tribunal has held above), EU law prohibits Spain from making such an offer, does EU law take priority over the ECT as between Spain and Germany and thus deprive the Tribunal of jurisdiction?

178.    The argument that EU law must be accorded priority as between EU Member States over the provisions of an international agreement is one which has frequently been accepted by the CJEU as a matter of EU law and is recognized in the Declaration by Twenty-Two Member States of 15 January 2019.    This Tribunal does not, however, operate under EU law but under international law and, in particular, the terms of the ECT.    As the *Eiser* tribunal put it:

> *The Tribunal's jurisdiction is derived from the express terms of the ECT, a binding treaty under international law.    The Tribunal is not an institution of the European legal order, and it is not subject to the requirements of this legal order.*[176]

---

[176] **CL-0035**, *Eiser*, *supra*, n. 140, para. 199.

179. It follows that, if EU law is to be accorded priority by this Tribunal, it can only be on the basis that international law requires the Tribunal to accord priority to EU law in the event of a conflict between Spain's obligations under that law and its obligations under the ECT.

180. The Respondent advances three arguments to support its view that international law requires the Tribunal to accord primacy to EU law. The first is based upon Article 30 of the VCLT, the relevant part of which provides as follows:

> ### Application of successive treaties relating to the same subject matter
>
> 1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.
>
> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one:
>    (a) as between States Parties to both treaties the same rule applies as in paragraph 3;
>
> […]
>
> 5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.[177]

---

[177] **CL-0033**, VCLT, Art. 30.

181.    According to Spain, the *lex posterior* rule laid down in this provision should be applied here with the result that, as between EU Member States, the ECT applies only to the extent that it is compatible with the relevant provisions of EU law.  The footnote to the Declaration of Twenty-Two Member States invokes the same argument, although without any explanation.

182.    There are two problems with this argument.  First, it is by no means clear that the provisions of EU law on which the Respondent relies are *lex posterior*.  While the TFEU post-dates the ECT, the provisions on which the Respondent relies – Articles 267 and 344 – are taken verbatim from earlier versions of the EU Treaties which pre-date the ECT.  Indeed, these earlier provisions are invoked by the Respondent in support of its argument that Spain lacked the capacity to make the offer to arbitrate when it concluded the ECT.

183.    Secondly, the Tribunal agrees with the *Vattenfall* tribunal that "*the general rule of lex posterior in Article 30 VCLT is a subsidiary one*" and that "*where a treaty includes specific provisions dealing with its relationship to other treaties* […] *the lex specialis will prevail.*"[178]  In the present case, the specific provision which deals with the relationship between the ECT and subsequent treaties is Article 16, which the Tribunal has already considered.[179]  If the EU Treaties and the ECT relate to the same subject matter – and unless they do, then Article 30 VCLT does not apply in any event – then Article 16 of the ECT is necessarily applicable.

184.    The Tribunal considers this second point to be decisive and to require rejection of the argument based upon the provisions of Article 30 VCLT and the doctrine of *lex posterior*.  It does not, therefore, find it necessary to determine whether or not the TFEU provisions are to be considered *lex posterior*, because even if they are, they will not prevail due to the operation of Article 16 of the ECT.

185.    Spain's second argument is based upon Article 41 of the VCLT, which provides:

> ***Agreements to modify multilateral treaties between certain of the parties only***

---

[178] **CL-0045 / RL-0098**, *Vattenfall, supra,* n. 49, para. 217.

[179] *See supra,* paras. 168-175.

> 1. *Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:*
>    *(a)  the possibility of such a modification is provided for by the treaty; or*
>    *(b)  the modification in question is not prohibited by the treaty and:*
>      *(i)  does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;*
>      *(ii)  does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*
> 2. *Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.*[180]

186.   Spain maintains that the relevant provisions of EU law must be deemed to be a modification *inter se* by the EU Member States of the provisions of the ECT.  This argument, however, must fail for the same reason as that based on Article 30 VCLT; it is contrary to Article 16 of the ECT.  Moreover, it is completely unclear what modification of the ECT is deemed to have taken place and there has been no notice to the other Contracting Parties to the ECT as required by Article 41(2) of the VCLT.

187.   The Tribunal notes that, in paragraph 9 of the Declaration of Twenty-Two Member States, the signatory States noted that they would discuss with the Commission whether any further actions were necessary "*to draw all the consequences from the Achmea judgment in relation to the intra-EU application of the Energy Charter Treaty.*"  The Tribunal must, however, deal with the legal position as it is at present; it cannot anticipate actions which may be taken by the EU and some or all of its Member States in the future.

188.   Finally, the Respondent relies upon Article 351 TFEU, which provides:

> *The rights and obligations arising from agreements concluded before 1 January 1958, or for acceding States, before the date of their accession, between one or more Member States on the one*

---

[180] **CL-0033**, VCLT, Art. 41.

> *hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.*
>
> *To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where appropriate, adopt a common attitude.*
>
> *In applying the agreements referred to in the first paragraph, member States shall take into account the fact that the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.*[181]

189.   Article 351 is not, of course, applicable to these proceedings, because it addresses the issue of legal relations between an EU Member State and third countries arising from agreements concluded by a State before it became a Member of the EU, whereas the issue before the Tribunal concerns the effects of the ECT between two EU Member States – Germany and Spain – both of which were EU Member States when they concluded the ECT.  The Respondent's case on Article 351 would appear to be an *a contrario* argument, namely that Article 351 implies that EU law must prevail over international agreements concluded by EU Member States after they became parties to the EU Treaties and as between themselves. In support of that argument, the Respondent invokes Declaration 17 to the Treaty of Lisbon, which provides:

> *The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States, under the conditions laid down by the said case law.*[182]

190.   Declaration 17, however, addresses the primacy of EU law over the national laws of the Member States, whereas the issue here is the relationship between EU law and a multilateral treaty concluded between over fifty parties, including the EU, all the EU

---

[181] **RL-0009**, TFEU, Art. 351.

[182] **C-0097**, Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon, signed on 13 December 2017, Official Journal of the European Union C 326/337.

Member States and a large number of non-EU States.   An international agreement concluded by one or more EU Member States produces legal effects in two different ways: in the national legal order of the States concerned and in public international law.

191.   According to the constitutions of the Member States concerned, such an agreement may have a legal effect within the national legal orders of those States.  As is well known, the nature and extent of that effect varies from one State to another; in some EU States, a treaty concluded by the State is automatically incorporated into the national legal order and may or may not take precedence over other national laws, whereas in other States, a treaty may require domestic legislation to take effect as a matter of national law. Whatever the national constitution may provide, however, Declaration 17 appears to be a recognition by all EU Member States that EU law takes priority over the agreements they have concluded insofar as those agreements take effect within national law.

192.   The Tribunal, however, is concerned – for purposes of determining the existence and extent of its jurisdiction – not with the possible effect of the ECT within the national legal orders of States but with its legal effect in international law.   Within international law, a declaration by the EU Member States cannot alter or set aside obligations assumed by those States under a treaty many of whose parties are not EU States and are not bound by Declaration 17.  Similarly, the recent Declaration of Twenty-Two Member States regarding the effects of the *Achmea* Judgment cannot by itself alter the obligations of those States under the ECT even *inter se*.  To hold otherwise would be to ignore the effects of Article 16 of the ECT and the clear intention of the Contracting Parties to the ECT that the same text should apply to all Contracting Parties – an intention manifested in their agreement not to permit reservations to the ECT.

193.   As for the *a contrario* argument, the Tribunal agrees with the *Vattenfall* tribunal that "*the clearer conflict rule in Article 16 ECT must prevail over a rule derived from an a contrario interpretation of Article 351 TFEU which cannot be found in the text of the TFEU itself.*"[183]

---

[183] **CL-0045 / RL-0098**, *Vattenfall*, *supra*, n. 49, para. 227.

It considers this analysis more persuasive than that adopted *obiter* by the *Electrabel* tribunal.[184]

194. For these reasons, the Tribunal concludes that, if EU law is incompatible with the Tribunal's interpretation of Article 26 ECT, then this Tribunal must accord priority to the ECT, the legal instrument which is the basis for the Tribunal's jurisdiction.

## V.   FUTURE DISPOSITION OF THE CASE

195. For the reasons set out in Part IV of this Decision, the Tribunal rejects the Intra-EU Jurisdictional Objection advanced by Spain. The case will therefore proceed to the next phase, during which the Tribunal will consider Spain's other jurisdictional objections and, if those are dismissed, the merits of the case. A fresh Procedural Order dealing with the schedule of pleadings will be issued following the publication to the Parties of this Decision.

196. The Tribunal wishes to stress that its decision is without prejudice to the other jurisdictional objections, any issue of fact and the merits of the case.

## VI.   COSTS

197. With regard to the costs incurred by the Parties and the costs of the proceeding, the Tribunal has adopted a two-track approach, making separate provision for submissions regarding the costs of the present phase of the proceedings and the entire costs incurred hitherto. That approach was rendered necessary by the fact that, if the Tribunal had upheld the Intra-EU Jurisdictional Objection, then that would have disposed of the entire case, whereas dismissal of the objection would have meant that the case would proceed to another phase.

198. The Parties agreed that the costs of the present phase of the proceedings should be the subject of separate submissions. In accordance with the instructions of the Tribunal at the Hearing, as subsequently modified with the agreement of the Parties, each Party filed its

---

[184] **RL-0024**, *Electrabel*, *supra*, n. 33, para. 4.177 *et seq*.

submissions on the costs of the present phase of the proceedings on 18 January 2019. According to these submissions, the costs incurred by the Respondent were EUR 296,441.45 and those incurred by the Claimants EUR 327,359.84. Each Party filed observations to the other Party's costs submission on 25 January 2019, and the Respondent filed a further rejoinder on 8 February 2019.

199.    With regard to the overall costs incurred to date, the Claimants objected that they should not be required at this stage to disclose these costs to the Respondent if the proceedings were to continue. At the Hearing, the Parties agreed and the Tribunal therefore directed that the Parties' submissions regarding these costs were to be filed under seal and kept by the Secretary, to be communicated to the Tribunal only in the event that the Tribunal notified the Secretary that it intended to uphold the Intra-EU Jurisdictional Objection.[185] In accordance with this direction, the submissions of the Parties were filed with the Secretary on 7 and 8 February 2019.

200.    Since the Tribunal has decided to reject the Intra-EU Jurisdictional Objection, it is unnecessary to consider the sealed submissions on costs.

201.    With regard to the costs of the present phase of the proceedings, the Tribunal has carefully considered the submissions of the Parties and has concluded that it will address the issue of costs incurred in the present phase when it gives its final Award. Accordingly, it makes no order for costs in the present Decision.

## VII.    DECISION

202.    For the reasons given above, the Tribunal DECIDES:

(1)    that the Intra-EU Jurisdictional Objection advanced by the Respondent is rejected;

(2)    that the case will now proceed to the next phase, which will deal with all remaining issues not decided in this Decision, in accordance with the Procedural Calendar to be set forth in a subsequent Procedural Order; and

---

[185] Transcript, pp. 199, 202-204.

(3)    that the costs incurred by the Parties in the present phase of the proceedings will be addressed in the final Award.


_____
Mr Rodrigo Oreamuno
Arbitrator

_____
Dr Charles Poncet
Arbitrator


_____
Sir Christopher Greenwood, GBE, CMG, QC
President of the Tribunal


74