# EXHIBIT 33

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**INFRACAPITAL F1 S.À R.L. AND INFRACAPITAL SOLAR B.V.**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/16/18**

---

# DECISION ON JURISDICTION, LIABILITY AND DIRECTIONS ON *QUANTUM*

---

*Members of the Tribunal*
Mr. Eduardo Siqueiros T., President
Prof. Peter D. Cameron
Mr. Luis González García

*Secretary of the Tribunal*
Mrs. Mercedes Cordido-Freytes de Kurowski

*Date of dispatch to the Parties:* 13 September 2021

## REPRESENTATION OF THE PARTIES

*Representing Infracapital F1 S.à r.l.*
*and Infracapital Solar B.V.*:

Mr. Jeffrey Sullivan QC
Ms. Sarah Wazen
Ms. Ankita Ritwik
Ms. Nadia Wahba
**Gibson, Dunn & Crutcher LLP**
Telephone House
2-4 Temple Avenue
London EC4Y 0HB
United Kingdom

and

Mr. Antonio Vázquez-Guillén
Mr. David Ingle
Mr. Pablo Torres
Ms. Millicent Domínguez
**Allen & Overy LLP**
Calle Pedro de Valdivia 10
28006 Madrid
Spain

*Representing the Kingdom of Spain:*

Mr. José Manuel Gutiérrez Delgado
Mr. Javier Castro López
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Ms. Antolín Fernández Antuña
Ms. Patricia Froehlingsdorf Nicolás
Mr. Roberto Fernández Castilla
Ms. Ana Fernández-Daza Álvarez
Ms. María del Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria Gómez
Ms. Elena Oñoro Sainz
Mr. Mariano Rojo Pérez
Ms. Mª José Ruiz Sánchez
Ms. Alicia Segovia Marco
Mr. Javier Torres Gella
Mr. Alberto Torró Molés
Mr. Luis Vacas Chalfoun
**Abogacía General del Estado**
Depto. Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16,
2ª planta
28004 Madrid
Spain

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................. 1

II.   PROCEDURAL HISTORY ......................................................................... 1

III.  FACTUAL BACKGROUND ....................................................................... 15

      A.   Overview ...................................................................................... 15

      B.   Relevant Spanish Legal Framework............................................. 15

           (1)   The Initial Regulatory Framework.................................... 15

           (2)   Regulatory Developments in 2007-2009 .......................... 21

           (3)   Regulatory Developments in 2010-2012 .......................... 27

           (4)   The Disputed Measures...................................................... 29

      C.   Claimants' Investments in PV Plants ........................................... 32

IV.   THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ........................... 34

V.    JURISDICTION ...................................................................................... 36

      A.   First Objection: Lack of Jurisdiction *Ratione Personae* – Intra-EU  Objection I ........ 38

           (1)   The Parties' Positions ....................................................... 38

           (2)   The Tribunal's Analysis .................................................... 40

      B.   Second Objection: Lack of Jurisdiction *Ratione Materiae* – Intra-EU Objection II.... 44

           (1)   The Parties' Positions ....................................................... 44

           (2)   The Tribunal's Analysis .................................................... 59

      C.   Third Objection: Lack of Jurisdiction *Ratione Temporis* ........................... 65

           (1)   The Parties' Positions ....................................................... 65

           (2)   The Tribunal's Analysis .................................................... 71

      D.   Fourth Objection: Lack of Jurisdiction *Ratione Voluntatis* Over Claims Under Article 10(1) of the ECT Arising out of the TVPEE ........................... 73

           (1)   The Parties' Positions ....................................................... 73

           (2)   The Tribunal's Analysis .................................................... 77

      E.   Fifth Objection: Lack of Notice of Controversy and of a Good Faith Request of an Amicable Solution ........................... 82

           (1)   The Parties' Positions ....................................................... 82

           (2)   The Tribunal's Analysis .................................................... 84

      F.   Sixth Objection: Lack of a Power of Attorney ................................ 86

           (1)   The Parties' Positions ....................................................... 86

           (2)   The Tribunal's Analysis .................................................... 87

G.  Seventh Objection: Lack of Clean Hands in Claimants ............................... 88

    **(1)**  The Parties' Positions ............................................................. 88

    **(2)**  The Tribunal's Analysis .......................................................... 97

**VI.**  LIABILITY ........................................................................................... 104

A.  Applicable Law ............................................................................. 104

    **(1)**  The Parties' Positions ............................................................. 104

    **(2)**  The Tribunal's Analysis .......................................................... 105

B.  The Article 10(1) Obligations ...................................................... 106

C.  Spain's Alleged Failure to Provide a Stable and Predictable Regulatory Regime ..... 108

    **(1)**  The Parties' Positions ............................................................. 108

    **(2)**  The Tribunal's Analysis .......................................................... 112

D.  Spain's Alleged Breach to Claimants' Legitimate Expectations ............................. 116

    **(1)**  The Parties' Positions ............................................................. 116

    **(2)**  The Tribunal's Analysis .......................................................... 123

E.  Spain's Alleged Failure to Provide Transparent Conditions ................................... 135

    **(1)**  The Parties' Positions ............................................................. 135

    **(2)**  The Tribunal's Analysis .......................................................... 138

F.  Alleged Impairment of Claimants' Investments through Unreasonable, Disproportionate and Discriminatory Measures ................................... 140

    **(1)**  The Parties' Positions ............................................................. 140

    **(2)**  The Tribunal's Analysis .......................................................... 148

G.  The Reasonable Rate of Return ...................................................... 160

    **(1)**  The Parties' Positions ............................................................. 160

    **(2)**  The Tribunal's Analysis .......................................................... 165

H.  Alleged Breach to the Umbrella Clause ........................................ 170

    **(1)**  The Parties' Positions ............................................................. 170

    **(2)**  The Tribunal's Analysis .......................................................... 177

I.  Conclusions Regarding Liability ................................................... 179

**VII.** DAMAGES ........................................................................................... 180

    **(1)**  The Parties' Positions ............................................................. 180

    **(2)**  The Tribunal's Analysis .......................................................... 182

**VIII.** DECISION ........................................................................................... 184

TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| 5 Member States Declaration | Declaration of the Representatives of the Governments of the Member States, dated 16 January 2019, on the enforcement of the Judgment of the Court of Justice in *Achmea* and on the investment protection in the European Union signed by the Representatives of the Governments of Finland, Luxembourg, Malta, Slovenia and Sweden |
| 22 Member States Declaration | Declaration of the Representatives of the Governments of the Member States, dated 15 January 2019, on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union signed by the Representatives of the Governments of Belgium, Bulgaria, Czech Republic, Denmark, Germany, Estonia, Ireland, Greece, Spain, France, Croatia, Italy, Cyprus, Latvia, Lithuania, Netherlands, Austria, Poland, Portugal, Romania, Slovakia and United Kingdom of Great Britain and Northern Ireland |
| 1977 Electricity Law or Law 54/1997 | Law 54/2007 on the Electricity Sector of 27 November 1997 |
| 2001 Directive | Directive 2001/77/CE "*on the promotion of electricity produced from renewable energy sources in the internal electricity market*" |
| 2009 Renewable Energy Directive | Directive 2009/28/EC approved by the European Parliament and Council of 23 April 2009 "*on the promotion of the use of energy from renewable sources and subsequently repealing Directives 2001/77/EC and 2003/30/EC*" |
| *Achmea* Judgment | *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court, 6 March 2018, Exhibit CL-151 |
| Alternative Tariff | An alternative damages calculation prepared in Brattle's Second Quantum Report, presenting a reasonable return that assumes an entitlement not to the FIT Tariffs under the Original Regime, but rather to the "reasonable return" that was implicit in the FIT Tariff under Royal Decree 1578/2008 |

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 2006 |
| BDO's First Report | BDO's First Expert Report dated 9 July 2018, submitted with Respondent's Counter-Memorial |
| BDO's Second Report | BDO's Rejoinder Expert Report dated 13 February 2019, submitted with Respondent's Rejoinder |
| Brattle's First Quantum Report | Brattle's quantum expert report "Financial Damages to Investors" dated 29 March 2018, submitted with Claimants' Memorial |
| Brattle's First Regulatory Report | Brattle's first regulatory expert Report entitled "Changes to the Regulation of Photovoltaic Installations in Spain since December 2012" dated 29 March 2018, submitted with Claimants' Memorial |
| Brattle's Rebuttal Regulatory Report | Brattle's rebuttal regulatory expert report entitled "Rebuttal: Changes to the Regulation of Photovoltaic Installations in Spain since December 2012" dated 28 November 2018, submitted with Claimants' Reply |
| Brattle's Second Quantum Report | Brattle's second expert report entitled "Report: Financial Damages to Investors" dated 28 November 2018, submitted with Claimants' Reply |
| C-[#] | Claimants' Exhibit |
| CJEU | European Union Court of Justice |
| CL-[#] | Claimants' Legal Authority |
| Cl. Memorial | Claimants' Memorial on the Merits dated 29 March 2018 |
| Cl. PHB | Claimants' Post-Hearing Brief dated 11 May 2020 |
| Cl. Rejoinder on Jurisdiction | Claimants' Rejoinder on Jurisdiction dated 25 April 2019 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 29 November 2018 |
| Cl. Reply PHB | Claimants' Reply Post-Hearing Brief dated 17 June 2020 |
| Claimants | Infracapital F1 S.à.r.l. and Infracapital Solar B.V. |

| Claimants' PV Plants | Jointly, the First and Second Investment Plants |
|---|---|
| Clean Hands Objection | Respondent's Objection to Jurisdiction dated 20 December 2019 |
| CNE | *Comisión Nacional de Energía* or National Energy Commission |
| CPI | Consumer Price Index |
| Disputed Measures | Measures adopted by Spain between 2012 and 2014, including Law 15/12, Royal Decree-Law 2/2013, Royal Decree-Law 9/2013, Law 24/2013, Royal Decree 413/2014 and the June 2014 Order |
| EC | European Commission |
| EC's Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party dated 29 October 2018 |
| EC Decision | Decision C(2017) 7384 of the European Commission, rendered on 10 November 2017, regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2015/NN), Legal Authority RL-0060 |
| ECT | Energy Charter Treaty |
| EU | The European Union |
| First Investment Plants | Jointly, the Tordesillas Plants and the Valtierra I, II and & III Plants |
| FIT | "*feed-in-tariff*" which represents the tariff that has a right to receive a premium payment over and above the market price per kWh produced |
| Fontellas Plants | PV installations acquired by Claimants from OPDE Investment España S.L. (Spanish-incorporated company) via Promociones Fotovoltaicas Castanea, S.L., Promociones Fotovoltaicas Fagus, S.L., Promociones Fotovoltaicas Corylus, S.L., and Promociones Fotovoltaicas Betula, S.L. |
| Hearings | The Hearing on Jurisdiction and the Merits held on 24-28 June 2019 in Paris (the **June Hearing**"), and the |

|  | Hearing held at the International Dispute Resolution Centre Ltd (IDRC) in London on 27 February 2020 (the "**Second Hearing**"). |
|---|---|
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IDAE | "*Instituto de Diversificación y Ahorro de Energía*" or Institute for the Diversification and Saving of Energy |
| Intra-EU Objection I | Objection raised by Respondent to the jurisdiction of the Tribunal *ratione materiae*, arguing that Claimants are not investors protected under the ECT, because Article 26 of the ECT, which establishes the dispute settlement mechanism, does not apply to disputes arising between an investor of an EU Member State and an EU Member State. |
| Intra-EU Objection II | Objection raised by Respondent to the jurisdiction of the Tribunal *ratione materiae*, arguing that the Tribunal is "*called upon to interpret and apply*" EU law since the dispute affects the EU fundamental freedoms and State Aid. |
| June 2014 Order | Ministerial Order IET/1045/2014 issued on 16 June 2014 by the Ministry of Industry, Energy and Tourism to further implement the New Regime |
| June Hearing | Hearing on Jurisdiction and the Merits held on 24-28 June 2019 in Paris |
| Lasesa Plants | PV installations acquired by Claimants from Dalkia Solar, S.L, Forcimsa Empresa Constructora, S.A. and Forcimsa AOC Obra Civil, S.L. (Spanish entities), through Sariñena Solar, S.L. (Spanish-incorporated company) via its 40 Spanish subsidiaries, Lasesa Solar I 1, S.L. to Lasesa Solar I 40, S.L |
| Law 15/2012 | Law 15/2012 adopted on 27 December 2012 "*Tax Measures for Energy Sustainability*," which entered into effect on 1 January 2013 |
| Law 2/2011 | Law 2/2011 on Sustainable Economy of 4 March 2010 |

| | |
|---|---|
| Law 24/2013 | Law 24/2013 of 26 December 2013 on the Electricity Sector, which superseded Law 54/1997 |
| Lief WS1 | Witness Statement of Mr. Mathieu Lief dated 22 March 2018, submitted with Claimants' Memorial |
| Lief WS2 | Second Witness Statement of Mr. Mathieu Lief dated 26 November 2018, submitted with Claimants' Reply |
| Montoya WS | Witness Statement of Mr. Carlos Montoya dated 5 July 2018, submitted with Respondent's Counter-Memorial |
| New Regime | Regime for compensation introduced under Royal Decree-Law 9/2013 whereby renewable energy producers received: (i) a payment of the wholesale market price for the electricity produced; (ii) a possible additional "*specific remuneration*" based on the electricity produced to compensate operating costs not covered by the wholesale market price; and (iii) a payment per MWh of installed capacity based on the net investment costs of a "standard facility" or "*instalación tipo*" during its "*useful life.* |
| Ordinary Regime | Chapter I of the 1997 Electricity Law, which applies to conventional electricity generation plants |
| R-[#] | Respondent's Exhibit |
| RAIPRE | Administrative Registry for Electricity Production Facilities ("*Registro Administrativo de Instalaciones de Producción de Energía Eléctrica*") kept by the Ministry of Energy and Tourism |
| *Ratione Temporis* Objection | Objection made by Respondent to the jurisdiction of the Tribunal, arguing that Claimants cannot prove the ownership of their investment before the Disputed Measures were adopted |
| *Ratione Temporis* Objection | Objection made by Respondent to the jurisdiction of the Tribunal to hear Claimants' claim in respect to part of their investment that was made during and after the Disputed Measures were adopted. |
| RD 1565/2010 | Royal Decree 1565/2010 dated 19 November 2010 "*regulating and modifying certain aspects of the electricity generation activity under the Special Regime*" |

| | |
|---|---|
| RD 1578/2008 | Royal Decree 1578/2008 dated 26 September 2008 "*on the remuneration for electric energy production using photovoltaic technology for plants subsequent to the deadline for maintenance of the remuneration under RD 661/2007*" |
| RD 1614/2010 | Royal Decree 1614/2010 dated 7 December 2010 "*regulating and modifying certain aspects relating to the production of electricity based on thermoelectric and wind technologies*" |
| RD 2818/1998 | Royal Decree 2818/1998 dated 30 December 1998 to promote the development of renewable energy facilities under the Special Regime |
| RD 413/2014 | Royal Decree 413/2014 dated 6 June 2014 "*regulating the activity of electric power production from renewable energy sources, cogeneration and waste*" |
| RD 436/2004 | Royal Decree 436/2004 dated 12 March 2004 "*establishing the methodology for the updating and systemization of the legal and economic regime for electric power production in the Special Regime*" |
| RD 661/2007 | Royal Decree 661/2007 dated 25 May 2007 "*regulating the activity of electricity production under the Special Regime*" |
| RDL | Royal Decree Law |
| RDL 14/2010 | Royal Decree-Law 14/2010 dated 23 December 2010 on "*urgent measures to correct the tariff deficit in the electricity sector*" |
| RDL 2/2013 | Royal Decree-Law 2/2013 dated 1 February 2012 concerning "*urgent measures within the electricity system and the financial sector*" |
| RDL 6/2009 | Royal Decree-Law 6/2009 dated 30 April 2009, adopting certain measures within the energy sector and approving the social bond |
| RDL 7/2006 | Royal Decree-Law 7/2006 of 24 June 2006, on the "*adoption of urgent measures for the energy sector*" |

| | |
|---|---|
| RDL 9/2013 | Royal Decree-Law 9/2013 of 12 July 2013 on "*urgent measures to ensure the financial stability of the electricity system*" |
| RE | Renewable Energy |
| Report 30/2008 | Report 30/2008 issued by the CNE dated July 29, 2008 on "*the royal decree proposal to reward the production of electrical energy using photovoltaic solar technology in plants subsequent to the cut-off date for maintaining the rewards set forth by royal decree 661/2007, of the 25th of May, for said technology*" |
| Request for Arbitration | Request for Arbitration from Claimants against Respondent dated 15 June 2016, and supplemented on 29 June 2016 |
| Resp. C-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 9 July 2018 |
| Resp. PHB | Respondent's Post-Hearing Brief dated 3 June 2020 |
| Resp. Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 14 February 2019 |
| Resp. Reply PHB | Respondent's Reply Post Hearing Brief dated 26 June 2020 |
| RL-[#] | Respondent's Legal Authority |
| RRR | Reasonable Rate of Return |
| Resp. Second Submission on the New Objection | Submission by Respondent on 19 March 2020 in respect to its Clean Hands Objection, entitled Lack of Clean Hands by Claimants as a Jurisdictional Objection, and subsidiarily, of Inadmission. Validity of the allegation in respect to timeliness and merits." ("*Falta de manos limpias de los Demandantes como Objeción de Jurisdicción y, subsidiariamente, de Inadmisión: Procedencia de la alegación en cuanto al tiempo y al fondo*") |
| Second Hearing | A one-day hearing held at the International Dispute Resolution Centre Ltd (IDRC) in London on 27 February 2020. |

| Second Investment Plants | Jointly, the Fontanellas and Lasesa Plants |
|---|---|
| SES | Spanish Electricity System |
| Special Regime | Chapter II of the 1997 Electricity Law, which covers electricity generators from non-consumable renewable energies, carried out in power plants with an installed capacity that does not exceed 50 MW |
| TMR | "*tarifa media de referencia*" or average electricity tariff fixed by the Spanish Government on an annual basis |
| Tordesillas Plants | PV installations acquired by Claimants from OPDE Investment España S.L., a Spanish-incorporated company, through Tordesillas Solar, S.A. (Spanish entity) via its ten subsidiaries, Tordesillas Solar FV 1, S.L. to Tordesillas Solar FV 10, S.L. |
| Tr. Day [#], [page:line] [Speaker(s)] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 24 October 2017 |
| TVPEE | "*Impuesto sobre el valor de la producción de energía eléctrica*", a 7% tax introduced by Law 15/2012, levied on "*the total amount that corresponds to the tax payer for the production of electricity and its incorporation into the electricity system, measured at power station bus bars, for each facility, in the tax period.*" |
| TVPEE Objection | Objection made by Respondent to the jurisdiction of the Tribunal to hear Claimants' claim for breach of Article 10(1) deriving from Spain's introduction of the TVPEE in Law 15/2012, arguing that, pursuant to Article 21 of the ECT, Article 10(1) does not apply to tax measures |
| UNFCCC | United Nations Framework Convention on Climate Change of 1992 |
| Valtierra I & II Plants | PV installations acquired by Claimants from Valsingula S.L. (Spanish-incorporated company) via Promociones Fotovoltaicas Azara, S.L.U. and Promociones Fotovoltaicas Articulata, S.L.U. |
| Valtierra III Plants | PV installations acquired by Claimants from Valsingula S.L. (Spanish-incorporated company) via Promociones Fotovoltaicas Daphne, S.L.U., Promociones |

| | Fotovoltaicas Retama, S.L.U. and Promociones Fotovoltaicas Faginea, S.L.U. |
|---|---|

## I.     INTRODUCTION AND PARTIES

1.     This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998, for Spain, Luxembourg and the Netherlands (the "**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, dated 14 October 1966 (the "**ICSID Convention**").

2.     The claimants are Infracapital F1 S.à.r.l., a private limited liability company incorporated under the laws of Luxembourg, and Infracapital Solar B.V., a private limited liability company incorporated under the laws of the Netherlands (together, "**Claimants**").

3.     The respondent is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

4.     Claimants and Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

5.     This dispute relates to the alleged breaches by Spain of its obligations under the ECT. Claimants contend that the Government of Spain implemented measures which modified and altered the regulatory and economic framework for renewable energy projects, which Claimants had relied on when making their investments.

## II.     PROCEDURAL HISTORY

6.     On 20 June 2016, ICSID received a request for arbitration dated 15 June 2016, from Claimants against the Kingdom of Spain, which was supplemented on 29 June 2016 (the "**Request for Arbitration**").

7.     On 29 June 2016, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.     On 1 September 2016, the Parties informed the Centre of their agreement to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention, as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party, and the presiding arbitrator to be appointed by agreement of the Parties. Pursuant to the Parties' agreement, either Party could request the Secretary-General of ICSID to appoint the arbitrator(s) not yet appointed, expressly excluding the provision set under Article 38 of the ICSID Convention.

9.     On 5 October 2016, Claimants appointed Prof. Peter D. Cameron, a national of the United Kingdom, as arbitrator. Prof. Cameron accepted his appointment on 6 October 2016.

10.  On 3 November 2016, Respondent appointed Mr. Luis González García, a national of Mexico, as arbitrator. Mr. González García accepted his appointment on 7 November 2016.

11.  On 2 June 2017, pursuant to the Parties' agreement, Claimants requested the Secretary-General of ICSID to proceed with the appointment of the presiding arbitrator. On that same date, the Centre acknowledged its receipt and informed the Parties that a ballot procedure would follow.

12.  On 30 June 2017, the Centre sent a ballot of five candidates for the Parties' consideration. On 17 July 2017, the Parties were informed that the ballot did not result in the selection of a mutually agreeable candidate. As a result, and pursuant to the Parties' agreement of 1 September 2016, the Secretary-General would proceed with the appointment of the presiding arbitrator.

13.  On 16 October 2017, the Centre informed the Parties of its intention to appoint Dr. José Emilio Nunes Pinto, a national of Brazil, as the presiding arbitrator. On 20 October 2017, Claimants informed the Centre that they had no objections regarding the appointment, and no comments were received from Respondent. On 23 October 2017, the Parties were informed that the Secretary-General would proceed with the appointment of Dr. Nunes Pinto as the presiding arbitrator.

14.  On 24 October 2017, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mrs. Mercedes Cordido-Freytes de Kurowski, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

15.  In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 19 December 2017, by teleconference.

16.  Also on 19 December 2017, Respondent requested the Tribunal to order Claimants to disclose and identify any intervention of a Third-Party Funder in this proceeding, if applicable.

17.  Following the first session, on 27 December 2017, the Tribunal issued Procedural Order No. 1, recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English and Spanish, and that the place of proceeding would be Washington D.C. Procedural Order No. 1 also sets out a schedule for the jurisdictional/merits phase of the proceedings.

18.  On 29 December 2017, Claimants informed the Tribunal that they had no Third-Party Funder arrangements in this proceeding.

19.  On 29 March 2018, Claimants filed their Memorial on the Merits together with the witness statement of Mr. Mathieu Lief ("**Lief WS1**"), Brattle's Regulatory and Quantum Expert

Reports ("**Brattle's First Regulatory Report**" and "**Brattle's First Quantum Report**") along with its corresponding exhibits, indexes of exhibits and legal authorities, Exhibits C-035 to C-138, and Legal Authorities CL-002 to CL-095 ("**Cl. Memorial**").

20.   On 8 June 2018, the Parties informed the Tribunal of their agreement to amend the procedural calendar. On 12 June 2018, the Tribunal granted the Parties' agreement.

21.   On 9 July 2018, Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction together with the witness statement of Mr. Carlos Montoya and its supporting documentation ("**Montoya WS**"), the Expert Report of BDO and its supporting documentation ("**BDO's First Report**"), indexes of exhibits and legal authorities, Exhibits R-001 to R-229, and Legal Authorities RL-001 to RL-088 ("**Resp. Counter-Memorial**").

22.   On 27 September 2018, each Party filed a request for production of documents. On 22 October 2018, the Tribunal issued Procedural Order No. 2 deciding on the Parties' document production requests.

23.   On 26 October 2018, Claimants informed the Tribunal of the Parties' agreement to extend the procedural calendar. Respondent's confirmation was subsequently received. On this same date, the Tribunal granted the extension agreed by the Parties.

24.   On 5 November 2018, in accordance with Article 37(2) of the ICSID Arbitration Rules, the European Commission ("**EC**") submitted an Application for Leave to Intervene as a Non-Disputing Party ("**EC's Application**").

25.   On 14 November 2018, each Party filed its observations on the EC's Application. Respondent's observations were filed together with an index of legal authorities and Legal Authority RL-089.

26.   On 28 November 2018, the Tribunal issued its decision, granting the EC's Application and inviting the EC to file a written submission by 17 December 2018.

27.   On 29 November 2018, Claimants filed their Reply on the Merits and Counter-Memorial on Jurisdiction together with the second witness statement of Mr. Mathieu Lief ("**Lief WS2**"), the witness statement of Mr. Nikolaus Roessner ("**Roessner WS**"), Brattle's Rebuttal Regulatory and Quantum Expert Reports ("**Brattle's Rebuttal Regulatory Report**" and "**Brattle's Second Quantum Report**") together with their corresponding exhibits, indexes of exhibits and legal authorities, Exhibits C-139 to C-243, and Legal Authorities CL-096 to CL-165 ("**Cl. Reply**").

28.   On 19 December 2018, Claimants requested information regarding the EC's written submission which was due on 17 December 2018. On this same date, the Parties were informed that the EC did not file a written submission in this proceeding.

29.   On 10 February 2019, Respondent informed the Tribunal of the Parties' agreement to amend the procedural calendar, and a subsequent confirmation by Claimants was received. On this same date, the Tribunal granted the extension agreed by the Parties.

30. On 14 February 2019, Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction together with the Second Expert Report of BDO along with its supporting documentation ("**BDO's Second Report**"), indexes of exhibits and legal authorities, Exhibits R-230 to R-394 and Legal Authorities RL-090 to RL-121 ("**Resp. Rejoinder**").

31. On 6 March 2019, Respondent informed the Tribunal of the Parties' agreement to amend the procedural calendar. Subsequent confirmation from Claimants was received by the Centre. On this same date, the Tribunal confirmed the Parties' agreement to amend the procedural calendar.

32. On 8 April 2019, the Secretary of the Tribunal, on instructions of the President, circulated the Organizational Meeting Draft Agenda to the Parties ("**Draft Agenda**").

33. On 25 April 2019, Claimants filed a Rejoinder on Jurisdiction, together with indexes of exhibits and legal authorities, and Exhibits C-244 to C-248 ("**Cl. Rejoinder on Jurisdiction**").

34. On 30 April 2019, the Parties submitted to the Tribunal's consideration a reviewed Draft Agenda and Hearing schedules agreed by the Parties, reflecting the Parties' respective positions on points of disagreement.

35. On 7 May 2019, pursuant to Procedural Order No. 1 and the revised procedural calendar, each Party provided a notification of the names of the fact witnesses and experts to be called for cross-examination at the June Hearing.

36. On 13 May 2019, the Tribunal held Pre-Hearing Organizational Meeting with the Parties by teleconference.

37. On 20 May 2019, the Tribunal issued Procedural Order No. 3 concerning the organization of the June Hearing.

38. On 3 June 2019, Claimants filed a request for the Tribunal to disregard Mr. Montoya's witness statement pursuant to Section 18.3 of Procedural Order No. 1, given that, in Claimants' view, Respondent had failed to provide a valid reason for him not to testify at the June Hearing. Subsequently, on 10 June 2019, Respondent filed observations on Claimants' request for the exclusion of evidence, and on 18 June 2019 the Tribunal informed the Parties of its decision on this matter.

39. On 18 June 2019, Respondent filed an application, requesting the admission of ten new documents into the record. On 19 June 2019, Claimants filed observations on Respondent's request for the Tribunal to decide on the admissibility of new evidence. This was followed by Respondent's response of 20 June 2019. On the same date, the Tribunal informed the Parties of its decision on this matter.

40. A hearing on Jurisdiction and the Merits was held in the World Bank Group facilities in Paris, France, from 24 June to 27 June 2019 (the "**June Hearing**"). The following persons were present at the June Hearing:

*Tribunal*:
  Dr. José Emilio Nunes Pinto                  President
  Prof. Peter D. Cameron                       Arbitrator
  Mr. Luis González García                     Arbitrator

*ICSID Secretariat*:
  Mrs. Mercedes Cordido-Freytes de             Secretary of the Tribunal
  Kurowski

*For Claimants*:
  *Counsel:*
  Mr. Jeffrey Sullivan                         Gibson, Dunn & Crutcher UK LLP
  Ms. Sarah Wazen                              Gibson, Dunn & Crutcher UK LLP
  Ms. Nadia Wahba                              Gibson, Dunn & Crutcher UK LLP
  Mr. Antonio Vázquez-Guillén                  Allen & Overy LLP (Madrid)
  Mr. David Ingle                              Allen & Overy LLP (Madrid)
  Ms. Millicent Domínguez                      Allen & Overy LLP (Madrid)

  *Parties:*
  Mr. Martin Lennon                            Infracapital
  Mr. Mathieu Lief                             Infracapital
  Mr. Nikolaus Roessner                        Infracapital

  *Experts*:
  Mr. Carlos Lapuerta                          The Brattle Group
  Mr. Richard Caldwell                         The Brattle Group
  Mr. José Antonio García                      The Brattle Group
  Ms. Sara Vojvodic                            The Brattle Group
  Ms. Annika Opitz                             The Brattle Group

*For Respondent*:
  *Counsel:*
  Mr. José Manuel Gutiérrez Delgado            Abogacía General del Estado
  Ms. Mª José Ruiz Sánchez                     Abogacía General del Estado
  Mr. Rafael Gil Nievas                        Abogacía General del Estado
  Ms. Alicia Segovia Marco                     Abogacía General del Estado
  Mr. Alberto Torró Molés                      Abogacía General del Estado
  Mr. Mariano Rojo Pérez                       Abogacía General del Estado
  Ms. Gloria de la Guardia Limeres             Abogacía General del Estado

  *Experts*:
  Mr. Gervase MacGregor                        BDO
  Mr. Eduardo Pérez                            BDO
  Mr. Javier Espel                             BDO
  Mr. David Mitchell                           BDO

5.

|  |  |
|---|---|
| Mr. Manuel Vargas | BDO |
| Mr. Adam Cuthbertson | BDO |
| Ms. Susan Blower | BDO |

*Court Reporters*:
| Mr. Trevor McGowan | English Court Reporter |
|---|---|
| Ms. Elizabeth Cicoria | Spanish Court Reporter |
| Ms. Luciana Sosa | Spanish Court Reporter |

*Interpreters*:
| Mr. Jesus Getan Bornn | English-Spanish Interpreter |
|---|---|
| Ms. Amalia Klemm-Thaler | English-Spanish Interpreter |
| Ms. Luciana Sosa | English-Spanish Interpreter |

41.   During the June Hearing, the following persons were examined:

*On behalf of Claimants*:
*Witnesses*:
| Mr. Mathieu Lief | Infracapital |
|---|---|
| Mr. Nikolaus Roessner | Infracapital |

*Experts*:
| Mr. Carlos Lapuerta | The Brattle Group |
|---|---|
| Mr. Richard Caldwell | The Brattle Group |
| Mr. José Antonio García | The Brattle Group |

*On behalf of Respondent*:
*Experts:*
| Mr. Gervase MacGregor | BDO |
|---|---|
| Mr. David Mitchell | BDO |

42.   By letter of 11 July 2019, the Tribunal made reference to two matters that remained pending after the June Hearing, namely: (i) Claimants' objections to the content and reliance of certain slides of Respondent's Opening PowerPoint presentations, noting that the Parties had been unable to reach an agreement in that regard; and (ii) the additional objections to jurisdiction raised for the first time by Respondent during the June Hearing. The Tribunal provided directions to the Parties with regard to the former, and as to the latter, the Tribunal informed the Parties that it would decide on this matter in an award or decision, together with the previously submitted objections.

43.   On 15 July 2019, Respondent filed an electronic copy of six slides from its Opening PowerPoint presentation, and one written submission in that regard.

44. On 16 July 2019, Claimants requested leave from the Tribunal to submit together with their list of the objected PowerPoint slides, a 3-page submission. On the same date, Respondent noted that it did not object, and Claimants' request was granted by the Tribunal.

45. On 19 July 2019, Claimants filed a submission in relation to Respondent's Opening PowerPoint presentation.

46. On 2 August 2019, Claimants filed a list of the corrections to the June Hearing transcripts where the Parties disagreed.

47. On 13 August 2019, the Tribunal issued Procedural Order No. 4 on Claimants' request to strike certain slides from Respondent's Opening PowerPoint Presentation.

48. On 20 August 2019, Respondent filed (i) a revised Opening PowerPoint presentation titled: *"00 Abstract, 01 Facts, 03 Political and Eco Field, 04 Jurisdiction and 05 Merits"*, and (ii) a submission titled *"Response to PO-4"*, including a request for exclusion of evidence (certain exhibits filed by Claimants with their Memorial and Reply, because the translations were provided much later and not within the 15-day time-limit provided under Procedural Order No. 1).

49. On 29 August 2019, at the Tribunal's invitation, Claimants filed observations on Respondent's submission of 20 August 2019 titled *"Response to PO-4"*.

50. On 5 September 2019, the Tribunal issued Procedural Order No. 5 concerning Respondent's request for exclusion of evidence and further objections to jurisdiction.

51. On 12 September 2019, Respondent filed a proposal for disqualification of arbitrator Dr. José Emilio Nunes Pinto. The proceeding was suspended in accordance with ICSID Arbitration Rule 9(6).

52. On 13 September 2019, the Secretary of the Tribunal informed the Parties that Dr. José Emilio Nunes Pinto had submitted his resignation in accordance with ICSID Arbitration Rule 8(2), attaching his letter of resignation. The Parties were informed that pursuant to ICSID Arbitration Rule 11(1), the vacancy resulting from the resignation of Dr. Nunes Pinto was to be filled by the same method by which his appointment had been made (*i.e.*, direct appointment by the Secretary-General).

53. On 25 September 2019, the Parties were informed of the Secretary-General's intention to appoint Dr. Ronald E. M. Goodman, a United States national, as the third arbitrator and President of the Tribunal, to replace Dr. José Emilio Nunes Pinto. This was followed by Claimants' letter of 26 September 2019, Respondent's communication of 1 October 2019, Claimants' letter of 2 October 2019 and Respondent's email of 3 October 2019.

54. On 3 October 2019, the Secretary of the Tribunal informed the Parties that Dr. Goodman would not be available to accept this appointment.

55.   On 9 October 2019, the Parties were informed of the Secretary-General's intention to appoint Mr. Eduardo Siqueiros, a national of Mexico, as President of the Tribunal, to replace Dr. José Emilio Nunes Pinto.  This was followed by questions from Respondent to Mr. Siqueiros submitted on 15 and 21 October 2019, and by Mr. Siqueiros' responses of 16 and 22 October 2019.  Claimants did not file observations on the proposal to appoint Mr. Siqueiros.

56.   On 23 October 2019, the Secretary-General informed the Parties that she would proceed with the appointment of Mr. Eduardo Siqueiros and would notify the Parties once the Tribunal was reconstituted.

57.   On 24 October 2019, following the resignation of arbitrator Dr. José Emilio Nunes Pinto, Mr. Eduardo Siqueiros accepted his appointment as arbitrator, appointed by the Secretary-General, pursuant to the Parties' agreement. The Tribunal was reconstituted, with its members being Eduardo Siqueiros (Mexican), President, appointed by the Secretary-General pursuant to the Parties' agreement; Peter D. Cameron (British), appointed by Claimants; and Luis González García (Mexican), appointed by Respondent. The proceeding was resumed pursuant to ICSID Arbitration Rule 12.

58.   On 24 October 2019, Respondent filed a submission proposing to the Tribunal to hold a new hearing, and requested that "(a) the new President of the Tribunal requires for a new hearing; (b) that a date for a new hearing [be] agreed in the next weeks between the Parties and the Tribunal; and (c) that there [be] a fair and flawless hearing where the rights of the Respondent are not openly violated". Respondent attached to its submission a copy of its Disqualification Proposal against the former President of the Tribunal.

59.   By email of 25 October 2019, Respondent supplemented its petitions of 24 October 2019, expressing its understanding (i) that there was no need to file post-hearing briefs as far as a new hearing was necessary, and (ii) that the deadline for the filing of post-hearing briefs would be stayed until the new President had taken his decision.

60.   On the same date, the Tribunal invited Claimants to comment on Respondent's request of 24 October 2019, by 1 November 2019.

61.   On 1 November 2019, Claimants filed a submission entitled 'Claimants' Response to Spain's Request for a Re-Hearing and Intention to Publish the Disqualification Proposal'.

62.   On 5 November 2019, Respondent requested leave from the Tribunal to file brief comments in response to Claimants' submission of 1 November 2019.

63.   In that regard, on 5 November 2019, the Tribunal invited Respondent to file a reply submission by 12 November 2019, to be followed by Claimants' rejoinder submission by 19 November 2019.  Respondent was invited to comment in its reply on why certain allegations made were relevant and material to the outcome of the present case, to which Claimants would be allowed to respond in their rejoinder.

64.  On 11 November 2019, Respondent informed the Tribunal of the Parties' agreement to a short two-day extension of the deadlines (*i.e.*, Respondent's reply submission would be due by 14 November 2019 and Claimants' rejoinder submission by 21 November 2019).

65.  On 14 November 2019, Respondent filed a submission entitled 'Reply Regarding the Fair Hearing Request'. This was followed on 21 November 2019 by Claimants' 'Rejoinder on Spain's Request for a Re-Hearing and Intention to Publish the Disqualification Proposal'.

66.  On 14 November 2019, the Tribunal informed the Parties of its availability for a one-day hearing, providing different options, and inviting the Parties to confirm their availability by 17 December 2019.

67.  On 11 December 2019, the Tribunal issued Procedural Order No. 6: (i) rejecting Respondent's new hearing request; (ii) ordering that a new hearing, limited to Opening Presentations by the Parties, would take place at the earliest possible date available to the Parties and the Tribunal members; (iii) noting that the new hearing should be subject to the same terms contemplated in Procedural Order No. 3, as applicable exclusively to the Opening Statements of the Parties, and that demonstrative exhibits would also be subject to the rules established in Section 16.7 of Procedural Order No. 1; those under Section 32 of Procedural Order No. 3; and Procedural Order No. 4; (iv) ordering (to avoid aggravation or exacerbation of the dispute) that both Parties abstain from publishing, during the course of this proceeding, any document produced in this arbitration that might impact the integrity or fairness of the procedure, including, but not limited to, the Disqualification Proposal; and (v) rejecting the request to reconsider and amend the terms of Procedural Order No. 5.

68.  On 14 December 2019, Respondent requested an extension of the 17 December deadline for Respondent to confirm its availability on the Tribunal's proposed dates until six days after the dispatch of the Spanish version of Procedural Order No. 6.

69.  On 16 November 2019, the Tribunal informed the Parties that (i) it deemed Procedural Order No. 6 as valid from the date it was issued in English; (ii) the selection of a date for a new hearing – requested by Respondent – was not a matter for which the translated text was needed; and (iii) it nonetheless granted both Parties until 20 December 2019 to agree on one of the proposed dates for the hearing.

70.  On 18 November 2019, Claimants informed the Tribunal of their availability during the proposed dates for the hearing.

71.  On 20 December 2019, Respondent filed a new objection to jurisdiction, together with (i) Exhibits R-385SP and R-386SP (both in Spanish); (ii) a consolidated list of exhibits; (iii) Legal Authorities Nos. RL-014 to RL-0138 (of which RL-0124 through RL-0136 were provided only in English and RL-0137 through RL-0138 were provided only in Spanish); (iv) a consolidated list of legal authorities; and four expert reports (in Spanish) of (a) Prof. Alejandro Garro, (b) Dr. Francisco Javier Álvarez García, (c) Prof. Dr. Luis Antonio Velasco San Pedro, and (d) Dr. José Carlos Fernández Rozas and Dr. Sixto Sánchez Lorenzo ("**Clean Hands Objection** ").

9.

72.  On the same date, the Tribunal invited Claimants to submit any initial comments that they might have on Respondent's Clean Hands Objection by 10 January 2020.

73.  On 10 January 2020, Claimants filed 'Claimants' Initial Comments on Spain's New Objection to Jurisdiction'.

74.  By letter of 16 January 2020, the Tribunal  (i) informed the Parties that it admitted the Clean Hands Objection  and had taken note of the Parties' submissions to date; (ii) confirmed its desire to hold the hearing ordered under Procedural Order No. 6 on either 26 or 27 February 2020, as agreed by the Parties, inviting the Parties to confirm their agreement by 21 January 2020; and (iv) informed the Parties that it would soon provide instructions on any further submissions on Respondent's Clean Hands Objection.

75.  On 21 January 2020, the Parties confirmed their agreement on holding the one-day hearing on 27 February 2020, and on changing the venue from Paris to London.

76.  On 22 January 2020, the Tribunal confirmed that the one-day hearing would be held on 27 February 2020 in London, as agreed by the Parties, with the venue to be communicated at a later date. The Tribunal circulated its proposed hearing schedule, inviting the Parties to submit any comments they might have by 27 January 2020.

77.  On 24 January 2020, the Tribunal fixed the procedural schedule for the subsequent submissions on Respondent's Clean Hands Objection.

78.  On 27 January 2020, Claimants submitted their comments on the Tribunal's proposed schedule for the subsequent submissions on Respondent's Clean Hands Objection, and Respondent filed its observations on the Tribunal's letters of 22 and 24 January 2020. The Tribunal invited Claimants to file a response by 31 January 2020 and Respondent to comment thereon by 5 February 2020.

79.  On 31 January 2020, the Parties were informed of the logistical arrangements for the one-day hearing.

80.  As scheduled, on 31 January 2020, Claimants filed 'Claimants' Response to Spain's Comments of 27 January 2020 on the Schedule for the Clean Hands Objection and the hearing', dated 31 January 2020. This was followed on 5 February 2020 by 'Respondent's Response to Claimants' Comments Regarding Schedules Proposed by the Tribunal for the Clean Hands Objection and for the hearing'.

81.  On 7 February 2020, the Parties were advised that the Tribunal (i) had decided to maintain the hearing, as scheduled, for 27 February 2020; (ii) would allow the Parties, if they so wished, to argue the Clean Hands Objection within their respective time allotted for the hearing; (iii) would allow Claimants to make a rebuttal at the end of Respondent's presentation, not to exceed 20 minutes, from their allotted time, with the possibility for Respondent to follow, if it so wished, with a response to the rebuttal from Claimants, also not to exceed 20 minutes, and from Respondent's time allotted; and (iv) that, considering Respondent's request and the arguments made, the Tribunal extended the deadline for

Respondent's submission on the Clean Hands Objection until 16 March 2020, and for Claimants' submission until 6 April 2020.

82. On 27 February 2020, the Tribunal held a one-day Hearing with the Parties, to hear the Parties' Opening Presentations, and the Parties' oral arguments on Respondent's Clean Hands Objection (the "**Second Hearing**"). The Second Hearing was held at the International Dispute Resolution Centre Ltd (IDRC) in London.

83. The following persons were present at the Second Hearing:

*Tribunal*:

| | |
|---|---|
| Mr. Eduardo Siqueiros T. | President |
| Prof. Peter D. Cameron | Arbitrator |
| Mr. Luis González García | Arbitrator |

*ICSID Secretariat*:

| | |
|---|---|
| Mrs. Mercedes Cordido-Freytes de Kurowski | Secretary of the Tribunal |

*For Claimants*:

| | |
|---|---|
| Mr. Jeffrey Sullivan | Gibson, Dunn & Crutcher UK LLP |
| Ms. Sarah Wazen | Gibson, Dunn & Crutcher UK LLP |
| Ms. Nadia Wahba | Gibson, Dunn & Crutcher UK LLP |
| Mr. Antonio Vázquez-Guillén | Allen & Overy LLP (Madrid) |
| Mr. David Ingle | Allen & Overy LLP (Madrid) |
| Ms. Millicent Domínguez | Allen & Overy LLP (Madrid) |
| Ms. Joanne Horridge | Infracapital |
| Ms. Sara Vojvodic | The Brattle Group |

*For Respondent*:

| | |
|---|---|
| Mr. José Manuel Gutiérrez Delgado | Abogacía General del Estado |
| Ms. María del Socorro Garrido Moreno | Abogacía General del Estado |
| Mr. Rafael Gil Nievas | Abogacía General del Estado |
| Mr. David Mitchell | BDO |

*Court Reporters*:

| | |
|---|---|
| Mr. Trevor McGowan | English Court Reporter |
| D-R Estreno | Spanish Court Reporter |

*Interpreters*:

| | |
|---|---|
| Mr. Juan María Pérez | English-Spanish Interpreter |
| Ms. Marta Buján | English-Spanish Interpreter |

Ms. Pilar Fernández                    English-Spanish Interpreter

84.  On 27 February 2020, the Second Hearing transcripts were released by the court reporters.

85.  On 6 March 2020, Counsel to Claimants uploaded to the ICSID Box the opening PowerPoint slides for the Second Hearing together with certain demonstratives utilized, advising that some changes had been made, identifying those on 7 March 2020 at Respondent's request.

86.  On 9 March 2020, Respondent objected to the uploading of the PowerPoint presentation, indicating that, in Respondent's view, these were not "minor corrections to the opening slides", and further objected that Claimants should be permitted to make substantive changes or to add new "information" as they were attempting to do in certain slides. On the same date, Claimants clarified and identified the minor corrections made for correct identification and consistency.

87.  On 10 March 2020, the Tribunal took note of those slides with typographical changes where there was no objection from Respondent, and also decided that, in light of Respondent's objection to the two slides in question, and without regard to the changes introduced, the slides to be uploaded should mirror those presented at the Second Hearing. On the same date, Claimants complied.

88.  On 16 March 2020, the Parties advised the Tribunal that they had reached an agreement to extend the deadlines to file the submissions on the Clean Hands Objection until 19 March 2020 for Respondent's filing, and 14 April 2020 for Claimants' filing. On the same date, the Tribunal indicated that it had no objection to the revised schedule.

89.  On 19 March 2020, Respondent filed its submission on the jurisdictional objection regarding the lack of clean hands in Claimants' investment, entitled in Spanish, '*Falta de Manos Limpias de los Demandantes como Objeción de Jurisdicción y, Subsidiariamente, de Inadmisión: Procedencia de la Alegación en Cuanto al Tiempo y al Fondo*', along with additional legal authorities and Respondent's updated list of Legal Authorities.

90.  On 1 April 2020, the Parties informed the Tribunal that they had agreed to extend the date for presenting the agreed transcript corrections, which the Tribunal acknowledged and confirmed its agreement. On the following day, the Parties submitted their agreed corrections to the English and Spanish transcripts of the Second Hearing.

91.  On 8 April 2020, Claimants requested the Tribunal's intervention in respect to the Parties' failure to agree on the number of rounds, length and format of the post-hearing briefs, noting that an agreement was reached on the same issues after the June Hearing in June 2019. On the same date, Respondent expressed its views, and indicated that the COVID-19 pandemic had seriously affected business-as-usual in Spain, for which reason an extension for filing of the post-hearing brief(s) would be required.

92.  On 11 April 2020, the Tribunal acknowledged the Parties' positions; their points of agreement and disagreement, in respect to which it decided that the Parties would be permitted to submit a second round of submissions after their respective Post-Hearing Briefs, and indicated the timetable, length and format of such submissions.

93.  On 14 April 2020, Claimants submitted their '*Response to Spain's New Objection to Jurisdiction – the Clean Hands Objection*', along with new factual exhibits and legal authorities.

94.  On 4 May 2020, the President of the Tribunal communicated to the Parties the following:

> *I recently learned that in an non-ICSID investor-State arbitration case, administered by the ICC, where I had been appointed by Claimant, Respondent has designated Dr. José Emilio Nunes Pinto as arbitrator. I don't believe that this circumstance affects my independence and impartiality to serve as an arbitrator in this case, but I nevertheless wish to disclose it in the abundance of caution.*

No observations were filed by the Parties in this regard.

95.  On 7 May 2020, Claimants offered to have the quantum experts work together to provide corrected figures in light of a question posed by Mr. Luis González García during the Second Hearing in relation to a pre-tax IRR figure proposed by BDO –Respondent's quantum expert– during the June Hearing. The Tribunal invited Respondent to submit any comments by 14 May 2020.

96.  On 11 May 2020, Claimants submitted their Post-Hearing Brief.

97.  On 14 May 2020, Respondent submitted its comments to Claimants' offer relating to the quantum experts working together to address the alleged errors in the pre-tax IRR figure proposed by BDO, and rejected the need for such new calculations.

98.  On 23 May 2020, the Tribunal advised Claimants' Counsel that it appreciated the offer included in their letter of 7 May 2020 to have the experts work together, but that the Tribunal did not require additional information from them on the subject.

99.  On 26 May 2020, the Parties informed the Tribunal that they had reached an agreement to extend the dates for submission of the Post-Hearing Briefs in light of health issues arising from the ongoing pandemic. On the same date, the Tribunal advised that it had no objection to such agreed extension.

100. As scheduled, on 3 June 2020, Respondent submitted its Post-Hearing Brief, together with additional legal authorities and an updated list of Legal Authorities.

101. On 17 June 2020, Claimants submitted their Reply Post-Hearing Brief, together with an updated index of Legal Authorities.

13.

102. On 26 June 2020, Respondent submitted its Rejoinder Post-Hearing Brief, as well as additional legal authorities and Respondent's updated list of Legal Authorities.

Legal Authorities introduced to the record post-Hearing

103. On 18 March 2021, Respondent requested leave from the Tribunal to introduce new legal authorities into the record, namely: (i) the Final Award in *FREIF Eurowind Holdings Ltd. (United Kingdom) v. the Kingdom of Spain* (SCC Case V 2017/060) rendered on 8 March 2021;[1] and (ii) the Decision on Jurisdiction and Liability in *Eurus Energy Holdings Corporation v. Kingdom of Spain* (ICSID Case No. ARB/16/4) issued on 17 March 2021.[2]

104. On 26 March 2021, Claimants objected to Respondent's request of 18 March 2021, indicating that, should the Tribunal were to allow Respondent's request, Claimants should also be allowed to introduce new legal authorities into the record, namely: (i) Decision on Jurisdiction, Liability and Directions on Quantum in *Cavalum SGPS, S.A. v. Kingdom of Spain* (ICSID Case No. ARB/15/34) issued on 31 August 2020;[3] (ii) the Decision on Jurisdiction, Liability and Directions on Quantum in *STEAG GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/4) issued on 8 October 2020;[4] (iii) the Award in *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain* (ICSID Case No. ARB/14/34) rendered on 18 December 2020;[5] and (iv) the Award in *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/16) rendered on 25 January 2021.[6]

105. On 27 March 2021, the Tribunal consented to the Parties' requests, and further allowed both Parties to make subsequent submissions as to the relevance of the legal authorities.

106. On 31 March 2021, Respondent introduced the *FREIF* Award and the *Eurus* Decision together with the Partial Dissent of Mr. Oscar M. Garibaldi, as legal authorities, together with a submission on their relevance.

107. On 7 April 2021, Respondent submitted its comments on the relevance of the *Cavalum* Decision, the *STEAG* Decision, the *RWE* Award and the *BayWa* Award.

108. Also, on 7 April 2021, Claimants submitted as Claimants' new legal authorities: the *Cavalum* Decision, including the dissenting Opinion of David R. Haigh Q.C., the *STEAG*

---

[1] **RL-0152**, <u>*Freif Eurowind Holdings LTD.(United Kingdom) v. The Kingdom of Spain*</u>, SCC Case V 2017/060. Final Award. 8 March 2021.

[2] **RL-0153**, *Eurus Energy Holdings Corporation v. The Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability. 17 March 2021.

[3] **CL-207**, *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020.

[4] **CL-209**, *STEAG GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/4, Decision on Jurisdiction, Liability and Directions on Quantum, 8 October 2020.

[5] **CL-210**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Award, 18 December 2020.

[6] **CL-212**, *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Award, 25 January 2021.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

Decision, the *RWE* Award including the Separate Opinion of Mr. Judd L. Kessler, and the *BayWa* Award. Claimants filed a submission of the same date on the Claimants' and Respondent's new legal authorities. Claimants invited the Tribunal to disregard certain paragraphs of Respondent's submission of 7 April 2021 for the reasons indicated therein.

## III.  FACTUAL BACKGROUND

### A.  OVERVIEW

109.  The following factual summary provides an overview of the underlying facts in the present dispute. This section does not purport to be an exhaustive narrative of all the matters of fact that have been discussed in this proceeding or of all factual allegations made by the Parties. The Tribunal has considered the entirety of the Parties' submissions of fact in their Overview

110.  This case concerns investments made in photovoltaic ("**PV**") energy plants in Spain. The dispute revolves around measures put in place by Respondent modifying the regulatory and economic regime of renewable energy projects in Spain and their effect on Claimants' investments.

111.  The First Claimant, **Infracapital F1**, is a private limited liability company incorporated under the laws of Luxembourg.[7] The Second Claimant, **Infracapital B.V.**, is a private limited company incorporated under the laws of the Netherlands.[8] The Second Claimant is directly and wholly owned by the First Claimant.

112.  On the basis of the materials submitted by the Parties, the Tribunal describes below the relevant Spanish legal framework (Section III.B), and Claimants' investments (Section III.C).

### B.  RELEVANT SPANISH LEGAL FRAMEWORK

#### (1) The Initial Regulatory Framework

113.  The development of renewable energy ("**RE**") in Spain dates back to the 1992 United Nations Framework Convention on Climate Change ("**UNFCCC**").[9] The European Union ("**EU**") and Spain signed the 1997 Kyoto Protocol, which was negotiated to implement the

---

[7] **C-025**, Extract from the Registre de Commerce et des Sociétés (Companies Register) in respect of incorporation of Infracapital F1 S.à r.l., 17 March 2014.

[8] **C-023**, Extract from the Netherlands Chamber of Commercial Register in respect of incorporation of Infracapital Solar B.V., 14 November 2013.

[9] **C-036**, United Nations Framework Convention on Climate Change, 9 May 1992.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

UNFCCC.[10] The Protocol was signed by Spain on 29 April 1998 and ratified on 31 May 2002. It entered into force on 16 February 2005.

### a.  *The 1997 Electricity Law*

114. In the above context, on 27 November 1997, Spain adopted Law No. 54/1997 on the Electricity Sector ("*Ley del Sector Eléctrico*") known as "**1997 Electricity Law**" or "**Law 54/1997**".[11] The 1997 Electricity Law regulated the supply of power, including generation, transmission and distribution. Anticipating the development of a specific regulatory regime applicable to RE, it reformed the electricity sector in Spain. The 1997 Electricity Law introduced two separate regulatory regimes distinguishing between electricity generation under the "*Ordinary Regime*" (Chapter I) and the "*Special Regime*" (Chapter II).

115. Conventional generation plants became subject to the Ordinary Regime. Their remuneration derived solely from the wholesale market price of electricity. In contrast, the Special Regime covered electricity generators from non-consumable renewable energies.[12] Specifically, pursuant to Article 27 of Law 54/1997, electricity generation activities were considered as falling under the Special Regime whenever they were "*carried out in power plants with an installed capacity that does not exceed 50 MW.*"[13]

116. Under the Special Regime, generators benefited from a supplementary premium over and above the market price.[14] Article 30(4) of the 1997 Electricity Law provided that:

> "*4. [...] the production of electrical energy from non-hydro renewable energy, biomass as well as that generated by hydroelectric plants, with an operating power capacity equal or inferior to 10MW shall be subsidised with a premium established by the Government whereby the price of electricity sold by these plants shall fall into a percentage category between 80 and 90 percent of an average electricity price; this shall be calculated by dividing the revenue collected from the supply of electrical energy by the energy supplied. The items to be used in calculating said price shall be determined without the Value Added Tax and free of any other tax that might levy electrical energy consumption.*
>
> *To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the*

---

[10] **C-039**, Kyoto Protocol to the United Nations Framework Convention on Climate Change, 11 December 1997 (entered into force on 16 February 2005).

[11] **C-001 / R-0025**, Law 54/1997, on the electricity sector (the "**Electricity Law**" or "**Law 54/1997**"), 27 November 1997 (published on 28 November 1997).

[12] Electricity Law, Art. 27(1).

[13] Electricity Law, Art. 27.

[14] Electricity Law, Art. 30(4).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

> *investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets."[15]*

117. Article 31 of the 1997 Electricity Law required facilities under the Special Regime to register in an Administrative Registrer of Electricity Generation Installations ("*Registro Administrativo de Instalaciones de Producción de Energía Eléctrica*"), in the Ministry of Industry and Energy and ,[16] which became the primary regulator. The 1997 Electricity Law required that facilities specify the remunerative regime adopted in each case.[17]

118. The 1997 Electricity Law also provided that a plan be drawn up to promote RE so that renewable sources would cover at least 12% of Spain's total energy demand by 2010.[18] According to the law, the plan's objectives would be taken into account to set the premiums.[19]

### b. *1998-2006 Regulations*

119. On 23 December 1998, Spain enacted Royal Decree 2818/1998 ("**RD 2818/1998**") to promote the development of RE facilities under the Special Regime.[20] RD 2818/1998 regulated the requirements and procedures for facilities to qualify under the Special Regime, the registration procedure, the conditions for electricity delivery, and the applicable economic regime.[21] RD 2818/1998 also established the Administrative Registry for Production Facilities under the Special Regime ("*Registro Administrativo de Instalaciones de Producción en Régimen Especial*" or "**RAIPRE**") to facilitate the management and control of the compensation under RD 2818/1998.[22] Article 23 provided for a "*premium*" or "*reward*" in addition to the market price of electricity, for facilities with capacity equal to or less than 50MW that were registered in the RAIPRE.[23] The premium would be revised every four years.[24]

120. Complying with the 1997 Electricity Law's requirement that a plan be drawn up to promote renewable energy sources, on 30 December 1999, Spain's Council of Ministers approved

---

[15] Electricity Law, Art. 30(4).
[16] Electricity Law, Art. 31.
[17] Electricity Law, Art. 31.
[18] Electricity Law, Sixteenth Transitory Provision.
[19] Electricity Law, Sixteenth Transitory Provision.
[20] **C-041 / R-0044**, Royal Decree 2818/1998, on electricity production installations supplied by renewable energy, waste incineration or combined heat and electric resources or sources ("**RD 2818/1998**"), 23 December 1998 (published on 30 December 1998).
[21] RD 2818/1998 Art. 1.
[22] RD 2818/1998 Art. 9.
[23] RD 2818/1998 Art. 23.
[24] RD 2818/1998 Art. 32.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

the 2000-2010 Renewable Energy Plan.[25] The Plan set forth the principal elements and guidelines to reach the 12% target by 2010.

121. On 27 September 2001, the European Parliament and Council adopted Directive 2001/77/CE "*on the promotion of electricity produced from renewable energy sources in the internal electricity market*" ("**2001 Directive**").[26] The 2001 Directive set obligations for the EU Member States to implement targets for future electricity consumption derived from RE sources.[27] This Directive also recognised the "*need for public support in favour of renewable energy sources ... in the Community guidelines for State aid for environmental protection*".[28]

122. In that context, on 12 March 2004, Spain enacted Royal Decree 436/2004 ("**RD 436/2004**"), which derogated and replaced RD 2818/1998.[29] The goal of RD 436/2004 was to update and systemize the legal and economic regime for RE production. Pursuant to RD 436/2004, qualifying installations could sell electricity (i) at market prices and receive a premium "*feed-in-tariff*" ("**FIT**") payment over and above the market price per kWh produced; or (ii) at a regulated fixed tariff. Both options were calculated by reference to a percentage of the average electricity tariff or the "*tarifa media de referencia*" ("**TMR**"), fixed by the Government on an annual basis.[30] Because the tariff and premium were linked to the average cost of electricity, both values were subject to market fluctuations.

123. On 26 August 2005, Spain's Council of Ministers approved the 2005-2010 Renewable Energy Plan, revising the earlier 2000-2010 Renewable Energy Plan adopted in 1999.[31] The revised Renewable Energy Plan sought to maintain Spain's commitment to cover at least 12% of the total energy demand with renewable sources by 2010 and incorporated the other two objectives for 2010, namely: (i) 29.4% electricity generation using renewable energy; and (ii) 5.75% biofuels in transport.[32]

124. At the same time, in August 2005, the Ministry of Industry, Tourism and Commerce and the Institute for the Diversification and Saving of Energy ("*Instituto de Diversificación y Ahorro de Energía*" or "**IDAE**") published a summary of the 2005-2010 Renewable Energy Plan.[33]

---

[25] **C-003**, Ministry of Science and Technology and IDAE, "Plan for the Promotion of Renewable Energy in Spain 2000-2010", December 1999.

[26] **C-004 / RL-0018**, Directive 2001/77/EC of the European Parliament and of the Council, on the promotion of electricity produced from renewable energy, Official Journal of the European Communities, Series L 283 (the "**2001 Directive**"), 27 September 2001 (published and entered into force on 27 October 2001).

[27] 2001 Directive, Art. 3.2.

[28] 2001 Directive, Recital (12).

[29] **C-043 / R-0046**, Royal Decree 436/2004, establishing the methodology for the updating and systemisation of the legal and economic regime for electric power production in the Special Regime ("**RD 436/2004**"), 12 March 2004 (published on 12 March 2004).

[30] RD 436/2004, Arts. 22-24.

[31] **C-005**, Ministry of Industry, Tourism and Commerce and IDAE, "Renewable Energy Plan in Spain 2005-2010", August 2005.

[32] *Id.*, p. 9.

[33] **C-045**, Summary of the Renewable Energy Plan in Spain 2005-2010, August 2005.

125. On 15 December 2005, Spain's Supreme Court rejected a direct challenge against RD 436/2004, holding that:

> *"There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration."*[34]

126. On 24 June 2006, the Government published Royal Decree-Law 7/2006 ("**RDL 7/2006**"), whose objective was to "urgent[ly] introduc[e] a clear and encouraging legal regime … in order to address the Government's ambitious energy and environmental objectives."[35] Article 1(12) of RDL 7/2006 amended Law 54/1997 by affording qualifying installations priority access to the transport and distribution networks.[36] The Royal Decree also temporarily removed the linkage between future reviews of the TMR and RE incentives.

127. On 25 October 2006, the Supreme Court ruled on another challenge against some amendments to RD 436/2004.[37] The Supreme Court held:

> *""*"…" *electricity producers under the special regime do have an "unalterable right" to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future".*

> *"(…) the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged."*[38]

128. The Supreme Court's position was reiterated through later decisions dated 20 March 2007 and 9 October 2007 in which the Court held that owners of facilities under a Special Regime "*are not guaranteed the intangibility of a given benefit or income regime in*

---

[34] **R-0091**, Judgment from the Third Chamber of the Supreme Court of 15 December 2005 (Appeal 73/2004). (Emphasis omitted).

[35] **C-046 / R-0034**, Royal Decree Law 7/2006, on the adoption of urgent measures in the energy sector ("RDL 7/2006"), 23 June 2006 (published on 24 June 2006).

[36] RDL 7/2006, Article 1(12).

[37] **R-0092**, Judgment from the Third Chamber of the Supreme Court, 25 October 2006 (Appeal 12/2005), reference El Derecho EDJ 2006/282164.

[38] *Id.*, pp. 3-4.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*relation to those obtained in previous years, nor are they guaranteed the indefinite permanence of the formulas used to fix premiums.*"[39]

129. On 14 February 2007, Spain's National Energy Commission or *Comisión Nacional de Energía* ("**CNE**") issued Report 3/2007, which addressed a draft Royal Decree "regulating electricity generation in the special regime and specific technological facilities equivalent to the ordinary regime"[40] (which later became Royal Decree 661/2007). The Report noted that:

> *"The future application of the new special regime for the production of electricity to all facilities, including those already existing that already enjoy the tariffs, Premium, incentives and complements of the prior regime ... does not imply the loss of acquired or patrimonialized rights.*[41]

> *[...] ... the proposed Royal Decree in terms of this criteria is positive, given that, firstly, remuneration is substantially increased for energies and technologies that are further away from the planning targets (biomass, biodigestion biogas, photovoltaic and thermoelectric solar power, and cogeneration)."*[42]

130. The CNE further noted:

> *"[...]* ***(b) Minimising regulatory uncertainty***. *The [CNE] understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, incentivising investments in new capacity and minimizing the cost of financing projects, thus reducing the final cost to the consumer. The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility."*[43]

---

[39] **R-0093**, Judgment from the Third Chamber of the Supreme Court of 20 March 2007 (App. 11/2005) (emphasis omitted); **R-0094**; Judgment from the Third Chamber of the Supreme Court, of 09 October 2007 (App. 13/2006).

[40] **C-048 / R-0076**, CNE Report 3/2007, 14 February 2007, regarding the proposed Royal Decree, regulating the activity of electricity production under the special regime and of certain facilities of comparable technology under the ordinary regime.

[41] *Id.*, p. 18. Free translation of the Tribunal. Neither Party submitted a translation of the relevant paragraph of the Report 3/2007. The original Spanish text reads: *"La aplicación pro futuro del nuevo régimen económico de la producción de energía eléctrica en régimen especial a todas las instalaciones, incluidas aquellas ya existentes que vienen disfrutando del anterior régimen de tarifas, primas, incentivos y complementos ... [n]o implica la privación de derechos adquiridos o patrimonializados.*"

[42] *Id.*, p. 23.

[43] *Id.*, pp. 15-16.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

### (2) Regulatory Developments in 2007-2009

#### a. *Royal Decree 661/2007*

131. On 25 May 2007, Spain passed Royal Decree 661/2007 "*regulating the activity of electricity production under the special regime*" ("**RD 661/2007**").[44] RD 661/2007 replaced the existing regime under RD 436/2004. The Preamble of the Decree set out the objectives of the new policy:

> "*[A]lthough the growth seen overall in the special regime for electricity generation has been outstanding, in certain technologies the targets posed are still far from being reached.*
>
> *From the point of view of compensation, the business of the production of electrical energy under the special regime is characterised by the possibility that the compensation system can be supplemented by the receipt of a premium under the terms and conditions established in the regulations, in order to determine which such factors as the voltage level of the energy delivered into the grid, the contribution to the improvement in the environment, primary energy saving, energy efficiency, and the investment costs incurred, may all be taken into account.*"[45]

132. Article 2.1 sets out the scope of application of RD 661/2007 and provides that the electricity production facilities under Article 27.1 of the 1997 Electricity Law "*may avail themselves of the special regime*" under RD 661/2007.[46] PV facilities fall under "Category b)" which covers "*facilities which employ any non-consumable renewable energies, biomass, or any type of biofuel, as their primary energy, upon condition that the owner does not carry out any production activity under the ordinary regime.*"[47] Within this category, subgroup b.1.1 refers to "[f]*acilities which use solar radiation alone as their primary energy by means of photovoltaic technology.*"[48]

133. Pursuant to Article 9(1) of the Decree, facilities producing electricity under the Special Regime need to be registered in the RAIPRE:

> "*... facilities for the production of electrical energy under the special regime shall be subject to compulsory registration in Section Two of the Public Authority Register of facilities for the production of electrical energy indicated in Article 21.4 of Law 54/1997, which*

---

[44] **C-050 / R-0047**, Royal Decree 661/2007 of 25 May 2007 regulating the activity of electricity production under the special regime ("**RD 661/2007**").
[45] RD 661/2007, Preamble.
[46] RD 661/2007, Art. 2(1).
[47] RD 661/2007, Art. 2(1)b).
[48] RD 661/2007, Art. 2(1)b).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*is a part of the Ministry of Industry, Tourism, and Trade. Section Two of the Public Authority Register indicated above shall hereinafter be known as the Public Authority Register for production facilities under the Special Regime."*[49]

134. Pursuant to Article 24(1) of RD 661/2007, producers under the Special Regime had the option to:

- "[s]ell the electricity to the system through the transport or distribution grid, receiving for it a regulated tariff, which shall be the same for all scheduling periods expressed in Euro cents per kilowatt/hour;" (the FIT) or

- "[s]ell the electricity in the electrical energy production market" at "the price obtained in the organised market or the price freely negotiated by the proprietor or the representative of the facility, supplemented where appropriate by a premium, in Eurocents per kilowatt/hour."[50]

135. Article 25 defines the "regulated tariff" as "a fixed sum which shall be the same for all scheduling periods and … determined as a function of the Category, Group, of Sub-Group to which the facility belongs, and the installed power, and where applicable the length of time since the date of commissioning."[51]

136. For PV electricity producers (subgroup b.1.1), the regulated tariff is set out in Table 3 of Article 36:[52]

| Group | Sub-Group | Power | Term | Regulated Tariff, c€/kWh | Reference premium, c€/kWh | Upper Limit, c€/kWh | Lower Limit, c€/kWh |
|---|---|---|---|---|---|---|---|
| b.1 | b.1.1 | P≤100 kW | first 25 years | 44.0381 | | | |
| | | | thereafter | 35.2305 | | | |
| | | 100 kW<P≤10 MW | first 25 years | 41.7500 | | | |
| | | | thereafter | 33.4000 | | | |
| | | 100<P≤50 MW | first 25 years | 22.9764 | | | |
| | | | thereafter | 18.3811 | | | |

137. Article 44(1) of RD 661/2007 provides for revision of tariffs, premiums and supplements. Regarding tariff updates, the first paragraph states that:

*"[…] The values of the tariffs, premiums, supplements, and lower and upper limits to the hourly price of the market as defined in this Royal Decree, for Category b) […] shall be updated on an annual*

---

[49] RD 661/2007, Art. 9(1).
[50] RD 661/2007, Art. 24(1).
[51] RD 661/2007, Art. 25.
[52] RD 661/2007, Art. 36.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*basis using as a reference the increase in the CPI less the value set out in the Additional Provision One of the present Royal Decree."[53]*

138. Contrary to what was established under RD 436/2004, tariffs for PV producers were delinked from the TMR and indexed to the consumer price index ("**CPI**"). Article 44(3) defined the matters of tariffs, premiums, supplements and lower and upper limits as follows:

> *"During the year 2010 … there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.*
>
> *The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed."[54]*

139. RD 661/2007 provided a limit up until which the facilities could benefit from the regulated tariffs and premiums. Pursuant to Article 22, once the PV sector reached 85% of Spain's goal of 371 MW for that sector, there would be a time limit of at least 12 months, within which PV installations would be required to register with the RAIPRE to benefit from RD 661/2007's economic regime.[55] The final registration with the RAIPRE was a "*necessary requirement for the application of the economic regime*" under RD 661/2007.[56]

140. Shortly after the enactment of RD 661/2007, Spain surpassed the 85% capacity target set out in Article 22. On 27 September 2007, the General Secretary of Energy issued a Resolution affirming that "*the percentage production target for solar photovoltaic technology attained as of 31 August 2007 was 91 % and that 100 % of the target would be attained in October 2007.*"[57] In light of that, the General Secretary for Energy decided to set the 12-month deadline for investors to register at the RAIPRE to qualify for the RD

---

[53] RD 661/2007, Art. 44(1).
[54] RD 661/2007, Art. 44(3).
[55] RD 661/2007, Art. 22.
[56] RD 661/2007, Art. 14.
[57] **C-052**, Resolution of the General Secretary of Energy, establishing the maintenance of the regulated tariff for photovoltaic technology, established by virtue of article 22 of the Royal Decree 661/2007 of 25 May, 27 September 2007 (published on 29 September 2007) p. 1.

661/2007 tariff.[58] The deadline for investors to register was 29 September 2008, after which, facilities could no longer benefit from the economic regime established in RD 661/2007.[59]

141. Subsequently, Spain decided to develop further regulations for facilities registered after the 29 September 2008 deadline. The CNE issued Report 30/2008 dated 29 July 2008 on "*the royal decree proposal to reward the production of electrical energy using photovoltaic solar technology in plants subsequent to the cut-off date for maintaining the rewards set forth by royal decree 661/2007, of the 25th of May, for said technology*" ("**Report 30/2008**").[60] Report 30/2008 observed:

> "*b) **Legal security and protection of legitimate expectations.** Stability and predictability of economic incentives (tariffs and premiums) reduce regulatory uncertainty, which encourages investments in new capacity to address their projects, while minimizing the cost of financing and thereby reducing the final cost to the consumer. The current regulation has established annual updates of economic incentives, based on robust indexes (such as the IPC, ten-year bonds, etc.), and periodic reviews every four years, which in this case only affect the new facilities.*
>
> *Certainly, the principles of legal certainty and the protection of legitimate expectations (Article 9.3 EC) do not constitute insurmountable obstacles to the innovation of the legal system and cannot therefore be used as instruments to petrify the legal framework in force at any given time. In this sense, these principles do not prevent the dynamic innovation of the regulatory frameworks, nor of new normative provisions which can be applied pro-future to situations initiated before it comes into force. But these principles do require that regulatory innovation - especially if it is abrupt, unforeseeable or unexpected - is carried out with certain guarantees and cautions (transitional periods to adapt to the new regimes, where appropriate compensatory measures, etc.) that dampen, moderate and minimize, as far as possible, the disappointing of any expectations generated by the previous regulations.*"[61]

---

[58] *Id*.

[59] *Id*.

[60] **C-054 / R-0213**, CNE, "Report 30/2008 regarding the proposed royal decree for regulating the economic incentives for PV Installations not subject to the economic regime defined by Royal Decree 661/2007" ("**CNE Report 30/2008**"), 29 July 2008.

[61] *Id*., Section 4.2(b).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

### b. *Royal Decree 1578/2008*

142. In the above context, on 26 September 2008, Spain enacted Royal Decree 1578/2008 "on the remuneration for electric energy production using photovoltaic technology for plants subsequent to the deadline for maintenance of the remuneration under RD 661/2007" ("**RD 1578/2008**").[62] The aim of RD 1578/2008 was to maintain the promotion of electricity generation through photovoltaic sources for facilities that could not benefit from RD 661/2007 but at the same time, reducing the incentives provided in RD 661/2007.

143. The Preamble of RD 1578/2008 observed that:

> "... *The growth of installed capacity experienced by photovoltaic solar technology has been much greater than expected.*
>
> ... *It has become necessary to provide continuity and expectations to these investments, as well as to establish progressive guidelines for the implementation of this type of technology, which, in addition, can contribute to achieving the goals of the 2005-2010 Renewable Energy Plan and those set in the new 2011-2020 Renewable Energy Plan, based on the objectives assigned to Spain in the new Renewable Energy Directive. Therefore, it has been determined that it would be appropriate to raise the current goal of 371 MW of installed capacity connected to the network, set in Royal Decree 661/2007 of May 25, 2007.*
>
> *To that end, it has been proposed that an annual output target be set which will evolve upwards in coordination with technological advancements instead of using the total accumulated power to set the market limits for this technology. This must be accompanied by a new economic arrangement which stimulates the long-term technological development and competitiveness of photovoltaic facilities in Spain.*
>
> ... *Just as insufficient compensation would make the investments nonviable, excessive compensation could have significant repercussions on the costs of the electric power system and create disincentives for investing in research and development, thereby reducing the excellent medium-term and long-term perspectives for this technology. Therefore, it is felt that it is necessary to rationalize compensation and, therefore, the royal decree that is approved should modify the economic regime downward, following the*

---

[62] **C-007 / R-0048**, Royal Decree 1578/2008, on the remuneration for electric energy production using photovoltaic technology for plants subsequent to the deadline for maintenance of the remuneration under RD 661/2007 ("**RD 1578/2008**"), 26 September 2008 (published on 27 September 2008).

*expected evolution of the technology, with a long-term perspective.*"[63]

144. The scope of application of RD 1578/2008 covered installations of subgroup b.1.1 of RD 661/2007 Article 2 (PV facilities) registered with the RAIPRE after the 29 September 2008 deadline.[64]

145. Article 4 of RD 1578/2008 provided that, to be eligible to receive the remuneration established under RD 1578/2008, "*facilities w[ould] need to pre-register in the remuneration pre-assignment Registry.*"[65] Article 8.1 added that facilities were to register with the remuneration Pre-Assignment Register and obtain a final registration with the RAIPRE within 16 months to benefit from the RD 1578/2008 regime and start selling electricity.[66]

146. Unlike RD 661/2007, which established a fixed compensation, RD 1578/2008 provided for a regulated tariff that varied based on quarterly calls.[67] Article 11 established a regulated tariff for the first call (32 cent € x KW/h).[68] The successive tariffs were determined by a formula provided in Article 11(2) according to the results of the previous call.[69]

147. RD 1578/2008 also provided that the regulated tariff applicable to a given installation was to be "*maintained for a maximum period of twenty-five years after the date of the last of the following to occur: the start-up date or the date of the registration of the facility in the compensation preassignment registry. Such compensation shall never be applicable to it before the date of the registration therein.*"[70]

148. Finally, Article 12 stated that the regulated tariff for subgroup b.1.1 (PV installations) were subject the updates provided for in Article 44.1 of RD 661/2007 "*starting on January 1 of the second year after the call in which they are set.*"[71]

### c. *Royal Decree-Law 6/2009*

149. On 23 April 2009, the European Parliament and Council approved Directive 2009/28/EC "*on the promotion of the use of energy from renewable sources and subsequently repealing Directives 2001/77/EC and 2003/30/EC*" ("**2009 Renewable Energy Directive**").[72] This new directive established "*mandatory national targets consistent with a 20 % share of*

---

[63] RD 1578/2008, p. 1.
[64] RD 1578/2008, Art. 2.
[65] RD 1578/2008, Art. 4.
[66] RD 1578/2008, Art. 8.1.
[67] RD 1578/2008, Art. 11.
[68] RD 1578/2008, Art. 11.1.
[69] RD 1578/2008, Art. 11.
[70] RD 1578/2008, Art. 11.5.
[71] RD 1578/2008, Art. 12.
[72] **C-009 / RL-0019**, Directive 2009/28/EC on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, Official Journal of the European Union, Series L 140 ("**2009 Renewables Directive**"), 23 April 2009 (entered into force 25 June 2009).

*energy from renewable sources and a 10 % share of energy from renewable sources in transport in Community energy consumption by 2020.*"[73]

150. Shortly after, on 30 April 2009, Royal Decree-Law 6/2009 ("**RDL 6/2009**") was enacted. The Preamble of RDL 6/2009 observed the existence of a "*growing tariff deficit*" in Spain, described as the "*… the difference between that collected from the regulated tariffs set by the government and that which the consumers pay for their regulated supply and from the access tariffs set by the liberalised market, and the real costs associated with these tariffs.*"[74] RDL 6/2009 noted that the deficit was having a "*profoundly affecting the system*" and putting at risk "*not only the financial situation of the companies* in the electricity sector, but also the sustainability of that system.*"[75]

151. RDL 6/2009 further noted that the imbalance weakened "the security and capacity of the financing of investment needed for the supply of electricity at the levels of quality and security that Spanish society demands."[76] As such, RDL 6/2009 indicated that "*it has become necessary to adopt a measure of urgency to guarantee the necessary legal security for those who have made investments.*"[77]

152. Article 4 of RDL 6/2009 also introduced a Pre-Assignment Enrolment mechanism and stated that enrolment in the Pre-Assignment Enrolment was "*necessary to obtain the right to the economic scheme established in Royal Decree 661/2007, of 25 May.*"[78] Pursuant to RDL 6/2009, projects had to meet certain criteria in order to be registered and qualify for the RD 661/2007 tariffs.[79] Once registered with the Pre-Assignment Register, facilities had a limit of 36 months to have a final registration with RAIPRE and enter into commercial operation, in order to benefit from the RD 661/2007 economic regime.[80]

### (3) Regulatory Developments in 2010-2012

#### a. *Royal Decree 1565/2010*

153. On 19 November 2010, Spain promulgated Royal Decree 1565/2010 "*regulating and modifying certain aspects of the electricity generation activity under the Special Regime*" ("**RD 1565/2010**").[81] RD 1565/2010 modified the regime under RD 661/2007 and provided that PV facilities could no longer benefit from tariffs after their 25th year of operation.[82] Accordingly, PV plants would benefit from the tariffs established under RD

---

[73] 2009 Renewables Directive, Preamble ¶ (13) and Art. 3.1.
[74] **C-060 / R-0035**, Royal Decree Law 6/2009, adopting certain measures within the Energy Sector and approving the social bond, ("**RDL 6/2009**"), 30 April 2009 (published on 7 May 2009), Preamble, p.1.
[75] RDL 6/2009, Preamble, p. 1.
[76] RDL 6/2009, Preamble, p. 1.
[77] RDL 6/2009, Preamble, p. 2.
[78] RDL 6/2009, Art. 4.2.
[79] RDL 6/2009, Art. 4.3.
[80] RDL 6/2009, Art. 4.8.
[81] **C-014 / R-0050**, Royal Decree 1565/2010, regulating and modifying certain aspects of the electricity generation activity under the Special Regime, 19 November 2010 (published on 23 November 2010).
[82] RD 1565/2010, Art. 1.10.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

661/2007 for the first 25 years of operation, but would subsequently lose such benefits until the end of the facility's life.

### b.  *Royal Decree 1614/2010*

154.  On 7 December 2010, Spain enacted Royal Decree 1614/2010 on "regulating and modifying certain aspects relating to the production of electricity based on thermoelectric and wind technologies" ("**RD 1614/2010**").[83] RD 1614/2010 concerned solar, thermoelectric and wind technologies (thus excluding PV facilities) and introduced, *inter alia*, a limit on operating hours benefitting from premiums or premium equivalents.[84]

### c.  *Royal Decree-Law 14/2010*

155.  On 23 December 2010, Spain enacted Royal Decree-Law 14/2010 on "*urgent measures to correct the tariff deficit in the electricity sector*" ("**RDL 14/2010**").[85] As its title indicates, the objective behind RDL 14/2010 was to address the Tariff Deficit. This measure established, *inter alia,* that (i) producers of electricity in the special regime "*make a contribution to mitigate the additional costs on the system*;" (ii) for PV facilities, there would be a limit to the "*recognised equivalent operating hours entitled by the prevailing economic system*;" and (iii) "*in order to ensure reasonableness for any compensation, any references with regard to the first 25-year period*" established by RD 661/2007 would be extended to 28 years for PV installations.[86]

### d.  *Law 2/2011*

156.  On 4 March 2011, Spain adopted Law 2/2011 on Sustainable Economy ("**Law 2/2011**").[87] Law 2/2011 amended the time limit during which a PV plant could operate and benefit from the regulated tariff. Law 2/2011 increased the limit of 28 years, which had previously been established by RDL 14/2010, to 30 years.[88]

157.  In addition, the Forty-fourth Final Disposition (One) of Law 2/2011 amended RDL 14/2010 in the following terms:

> "*4. The Government is empowered to amend the provisions of paragraph 2 by Royal Decree to adjust it to technological developments. Any amendments shall only affect the facilities that are not in operation at the time said Royal Decree enters into force,*

---

[83] **C-088 / R-0051**, Royal Decree 1614/2010, regulating and modifying certain aspects relating to the production of electricity based on thermoelectric and wind technologies ("**RD 1614/2010**"), 7 December 2010 (published 8 December 2010) .

[84] RD 1614/2010, Art. 2.

[85] **C-015 / R-0036**, Royal Decree Law 14/2010, on urgent measures to correct the tariff deficit in the electricity sector, 23 December 2010 (published on 24 December 2010) ("**RDL 14/2010**").

[86] RDL 14/2010, pp. 2-3.

[87] **C-018 / R-0022**, Law 2/2011, on a sustainable economy, 4 March 2011 (published on 5 March 2011).

[88] Law 2/2011, Forty-fourth Final Disposition (One).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*which will be considered to be the date that they are enrolled in the register of pre-allocation of payment for photovoltaic facilities.*"[89]

**(4) The Disputed Measures**

**a.** *Law 15/2012*

158. On 27 December 2012, Spain adopted Law 15/2012 on "*Tax Measures for Energy Sustainability*," which entered into effect on 1 January 2013 ("**Law 15/2012**").[90] Law 15/2012's objective, pursuant to its Preamble, was to "*harmonise*" Spain's tax system *"... with a more efficient use which greater respects the environment and sustainability, values which have inspired this reform of the tax system, and as such in line with the basic principles governing the tax, energy and, of course, environmental policies of the European Union*."[91]

159. Among other measures, Law 15/2012 introduced a 7% tax levied on "*... the total amount that the taxpayer is to receive for the production of electrical energy and its incorporation into the electricity system, measured in power station busbars, at each installation, in the taxable period*."[92] This levy, the "Impuesto sobre el valor de la producción de energía eléctrica" ("**TVPEE**") applied to all electricity production facilities, whether they were registered under the Ordinary Regime or Special Regime.

**b.** *Royal Decree-Law 2/2013*

160. On 1 February 2012, Spain enacted Royal Decree-Law 2/2013 concerning "*urgent measures within the electricity system and the financial sector*" ("**RDL 2/2013**").[93]

161. RDL 2/2013 adopted several measures, including an amendment to the inflation index applicable to the FIT. RDL 2/2013 provided that, as of 1 January 2013, tariffs applicable to the electricity sector would no longer be updated by reference to the CPI but rather, to the "*CPI at constant tax rates, excluding unprocessed foods and energy products*"[94]

162. On 19 February 2015, the Spanish Constitutional Court dismissed a challenge against RDL 2/2013.[95] In its decision, the Court upheld the constitutionality of RDL 2/2013.[96]

---

[89] *Id.*

[90] **C-117 / R-0002**, Law 15/2012 on tax measures for energy sustainability, 27 December 2012 (published on 28 December 2012) ("**Law 15/2012**").

[91] Law 15/2012, Preamble.

[92] Law 15/2012, Arts. 6 and 8.

[93] **C-118 / R-0040**, Royal Decree Law 2/2013, concerning urgent measures within the electricity system and the financial sector, 1 February 2013 (published on 2 February 2013).

[94] RDL 2/2013, Art. 1.

[95] **R-0104**, Judgment of the Constitutional Court of the Kingdom of Spain 28/2015, 19 February 2015, Appeal of Unconstitutionality 6412-2013, Point of Law 3.

[96] *Id. See also* **R-0106**, Judgment from the Supreme Court, of 26 March 2015, appeal 133/2013. CENDOJ Judgment from the Supreme Court, of 26 March 2015, appeal 133/2013. CENDOJ 28079130032015100087.

c. *Royal Decree-Law 9/2013*

163. Royal Decree-Law 9/2013 on "*urgent measures to ensure the financial stability of the electricity system*" was enacted on 12 July 2013 ("**RDL 9/2013**").[97] RDL 9/2013 aimed at introducing:

> "*as a matter of urgency, a series of measures that are balanced, proportionate and wide-ranging, aimed at ensuring the financial stability of the electricity system as indispensable premise of its economic sustainability and the security of its supply, and addressed at all the activities of the electricity sector.*"[98]

164. RDL 9/2013 established a new remuneration regime for RE facilities, which applied to both existing and new installations. Under RDL 9/2013's regime ("**New Regime**"), RE producers received: (i) a payment of the wholesale market price for the electricity produced; (ii) a possible additional "*specific remuneration*" based on the electricity produced to compensate operating costs not covered by the wholesale market price; and (iii) a payment per MWh of installed capacity based on the net investment costs of a "standard facility" or "*instalación tipo*" during its "*useful life*"[99]

165. For the purposes of calculating the specific remuneration, RDL 9/2013 provided that the following elements would be taken into account: (i) the "*standard revenue for the sale of the energy generated, valued at the production market price*"; (ii) the "*standard operating costs*;" and (iii) the "*standard value of the initial investment*."[100] RDL 9/2013 also provided that the parameters of the remuneration regime could be revised every six years.[101]

166. Pursuant to RDL 9/2013, "*the reasonable rate of return*" for facilities that had a right to benefit from the FIT regime as of the effective date of RDL 9/2012:

> "*shall focus, before taxes, on the average yield in the secondary market for ten years prior to the entry into force of this Royal Decree-Law of the Obligations of the State within ten years increased by 300 basic points, without prejudice to the revision envisaged in the last paragraph of that article.*"[102]

167. By 14 July 2013, when RDL 9/2013 entered into effect, neither the values for the specific and investment-based remunerations nor the "*standard facility*" category had been defined. Thus, the FIT regime established under RD 661/2007 continued operating until June 2014.

---

[97] **C-021 / R-0041**, Royal Decree Law 9/2013, adopting urgent measures to guarantee the financial stability of the electricity system, 12 July 2013 (published on 13 July 2013) ("**RDL 9/2013**").
[98] RDL 9/2013, p. 5.
[99] RDL 9/2013, Art. 1.
[100] RDL 9/2013, Art. 1.
[101] *Id*.
[102] RDL 9/2013, Art. 9.

However, the payments made during this transitional period were "*on account*" of the payments that would be received under the New Regime.[103]

168. On 17 December 2015 and 18 February 2016, Spain's Constitutional Court dismissed challenges against certain provisions of RDL 9/2013.[104]

### d. *Law 24/2013*

169. On 26 December 2013, Spain enacted Law 24/2013 on the Electricity Sector, which superseded Law 54/1997 ("**Law 24/2013**").[105] According to Preamble of Law 24/2013, Law 54/1997 "*has proven insufficient to ensure the financial balance of the system, amongst other reasons because the remuneration system for regulated activities has lacked the flexibility required for its adaptation to major changes in the electrical system or in the evolution of the economy.*"[106]

170. Fundamentally, Law 24/2013 eliminated the distinction between the Ordinary and Special Regimes, and reiterated and expanded the regime established by RDL 9/2013.[107]

171. Article 14(4) provided that, in the New Regime, "*remuneration parameters*" for RE projects would remain valid for regulatory periods of six years, and could be "*revised before the start of the regulatory period*."[108] According to Article 14(7), the remuneration mechanism would be calculated to provide a reasonable return for the installations in each case and would be based on (i) the standard revenue from the energy produced (revised every three years for the rest of the regulatory period); (ii) the standard operating costs; and (iii) the standard value of the initial investment.[109]

### e. *Royal Decree 413/2014 and Ministerial Order IET/1045/2014*

172. On 6 June 2014, Royal Decree 413/2014 "*regulating the activity of electric power production from renewable energy sources, cogeneration and waste*" was enacted ("**RD 413/2014**").[110] This regulation was adopted to implement the new regime set forth by Law 23/2014. On 16 June 2014, Ministerial Order IET/1045/2014 was issued by the Ministry

---

[103] RDL 9/2013, Third Transitory Provision.

[104] **R-0108**, Judgment from the Constitutional Court of 17 December 2015, passed in unconstitutionality appeal No. 5347/2013; **R-0109**, Judgment from the Constitutional Court of 18 February 2016, passed in unconstitutionality appeal no. 5852-2013.

[105] **C-122 / R-0024**, Law 24/2013, on the Electricity Sector ("**Law 24/2013**"), 26 December 2013 (published on 27 December 2013).

[106] Law 24/2013, p. 2.

[107] Law 24/2013, Article 14.

[108] Law 24/2013, Article 14(4).

[109] Law 24/2013, Article 14(7).

[110] **C-123 / R-0056**, Royal Decree 413/2014, regulating the activity of electric power production from renewable energy sources, cogeneration and waste ("**RD 413/2014**"), 6 June 2014 (published on 10 June 2014).

of Industry, Energy and Tourism to further implement the New Regime ("**June 2014 Order**").[111]

173. The measures adopted by Spain between 2012 and 2014 described above are collectively referred to as the "**Disputed Measures**."

## C.    CLAIMANTS' INVESTMENTS IN PV PLANTS

174. According to Claimants, they "*began looking at investment opportunities in Spain in 2009.*"[112] On 2 June 2010, Claimants signed three share purchase agreements ("**SPAs**") for the following PV facilities:

175. "**Tordesillas Plants**:" PV installations owned by OPDE Investment España S.L., a Spanish-incorporated company, through Tordesillas Solar, S.A. (Spanish entity) via its ten subsidiaries, Tordesillas Solar FV 1, S.L. to Tordesillas Solar FV 10, S.L.[113] Claimants purchased the entire share capital of the Tordesillas Plants in addition to intercompany loans through Earth and Wind Energías Renovables, S.L. ("**Wind Energías**"), its wholly owned Spanish subsidiary.[114] RAIPRE registration was finalized on 28 September 2010.[115]

176. "**Valtierra I & II Plants**:" PV installations owned by Valsingula S.L., (Spanish-incorporated company) via Promociones Fotovoltaicas Azara, S.L.U. and Promociones Fotovoltaicas Articulata, S.L.U (Spanish entities).[116] Through the Second Claimant, Claimants purchased 50% of the share capital of Promociones Fotovoltaicas Azara, S.L.U. and Promociones Fotovoltaicas Articulata, S.L.U, in addition to intercompany loans.[117] RAIPRE registration was finalized on 23 January 2009 and on 6 November 2009.[118]

177. "**Valtierra III Plants**:" PV installations owned by Valsingula S.L., (Spanish incorporated-company), via Promociones Fotovoltaicas Daphne, S.L.U., Promociones Fotovoltaicas Retama, S.L.U. and Promociones Fotovoltaicas Faginea, S.L.U. (Spanish entities).[119] Claimants purchased the entire share capital of Promociones Fotovoltaicas Daphne, S.L.U., Promociones Fotovoltaicas Retama, S.L.U. and Promociones Fotovoltaicas Faginea,

---

[111] **C-124 / R-0062**, Order IET 1045/2014, 16 June 2014.
[112] Cl. Memorial, ¶ 106.
[113] **C-075**, Share Purchase Agreement of the share capital in Tordesillas Solar, S.A between OPDE Investment España, S.L. (seller) and Earth and Wind Energías Renovables, S.L. (purchaser) ("**Tordesillas SPA**"), 2 June 2010, Recitals I and II.
[114] Tordesillas SPA, Recitals I and II.
[115] **C-013**, RAIPRE Certificates for Tordesillas Plants, 28 September 2010.
[116] **C-076**, Share Purchase Agreement of a shareholding stake in the companies Promociones Fotovoltaicas Azara, S.L.U. and Promociones Fotovoltaicas Articulata S.L.U., between Valsingula, S.L. (seller) and Infracapital E&W B.V. (purchaser) ("**Valtierra I & II SPA**"), 2 June 2010, Recitals I, II and III.
[117] Valtierra I & II SPA, Recitals I, II and III.
[118] **C-008**, RAIPRE Certificates for Valtierra I & II Plants (Phase I), 23 January 2009; **C-010**, RAIPRE Certificates for Valtierra I & II Plants (Phase II), 6 November 2009.
[119] **C-077**, Share Purchase Agreement of the share capital in companies Promociones Fotovoltaicas Daphne, S.L.U., Promociones Fotovoltaicas Faginea, S.L.U. and Promociones Fotovoltaicas Retama, S.L.U., between Valsingula, S.L. (seller) and Earth and Wind Energías Renovables, S.L. (purchaser) ("**Valtierra III SPA**"), 2 June 2010, Recitals I, II and III.

S.L.U. through Wind Energías in addition to intercompany loans.[120] RAIPRE registration was finalized on 7 May 2010.[121]

178. The purchase of the above-listed plants (the "**First Investment Plants**") was conditional upon certain regulatory conditions. Specifically, (i) "*a new regulation on the FIT of the First Investment Plants being enacted without any retroactivity of the FIT*;" and (ii) no new regulation that could affect the First Investment Plants' value negatively by more than 0.75% (the "**Regulatory Conditions**").[122] Claimants negotiated with the First Investment Plants' sellers a final long stop date (the "**Final Longstop Date**") of 28 February 2011 after which the SPAs would terminate automatically if the Regulatory Conditions were not satisfied or waived.[123] This deadline was later extended until the end of October 2011.[124] On 9 March 2011, Claimants finalized their investment in the First Investment Plants.[125]

179. Between June and October 2011, Claimants invested in two additional groups of PV facilities:

180. "**Fontellas Plants**:" PV installations owned by OPDE Investment España S.L. (Spanish-incorporated company) via Promociones Fotovoltaicas Castanea, S.L., Promociones Fotovoltaicas Fagus, S.L., Promociones Fotovoltaicas Corylus, S.L., and Promociones Fotovoltaicas Betula, S.L. (Spanish project companies).[126] Claimants' investment in the Fontellas Plants was made through Wind Energías, acquiring the entire share capital of the project companies and shareholder loans. RAIPRE registration was finalized on 30 May 2011.[127]

181. "**Lasesa Plants**:" PV installations owned by Dalkia Solar, S.L, Forcimsa Empresa Constructora, S.A. and Forcimsa AOC Obra Civil, S.L. (Spanish entities), through Sariñena Solar, S.L. (Spanish-incorporated company) via its 40 Spanish subsidiaries, Lasesa Solar I 1, S.L. to Lasesa Solar I 40, S.L.[128] The First and Second Claimant purchased

---

[120] Valtierra III SPA, Recitals I, II and II**.**

[121] **C-011**, RAIPRE Certificates for Valtierra III Plants, 7 May 2010.

[122] Cl. Memorial, ¶ 122.

[123] **C-079**, Infracapital, Minutes of Investment Committee meeting, attaching "Investment Committee Update Report", 6 September 2010 ("**6 September 2010 IC Paper**"), p. 1; **C-075**, Tordesillas SPA, 2 June 2010, clause 4.3; **C-076**, Valtierra I & II SPA, 2 June 2010, clause 4.3; **C-077**, Valtierra III SPA, 2 June 2010, clause 4.3.

[124] 6 September 2010 IC Paper.

[125] **C-099**, Amended and Restated Tordesillas SPA, 2 June 2010 as amended on 21 December 2010, 28 February 2011 and 9 March 2011; **C-100**, Amended and Restated Valtierra I & II SPA, 2 June 2010 as amended on 21 December 2010, 28 February 2011 and 9 March 2011; **C-101**, Amended and Restated Valtierra III SPA, 2 June 2010 as amended on 21 December 2010, 28 February 2011 and 9 March 2011.

[126] **C-107**, Share Purchase Agreement of the share capital in the companies Promociones Fotovoltaicas Betula, S.L., Promociones Fotovoltaicas Castanea, S.L., Promociones Fotovoltaicas Corylus, S.L. and Promociones Fotovoltaicas Fagus, S.L., between OPDE Investment España, S.L. (seller) and Earth and Wind Energías Renovables, S.L. (purchaser), 22 June 2011 (the "**Fontellas SPA**"), Recitals I-V.

[127] **C-019**, RAIPRE Certificate for Fontellas Plants, 30 May 2011.

[128] **C-110**, Share Purchase Agreement of the shares in Sariñena Solar, S.L., between Dalkia Solar, S.L., Forcimsa Empresa Constructora, S.A. and Forcimsa AOC Obra Civil, S.L. (sellers) and Infracapital E&W B.V. and Infracapital F1 S.A.R.L (purchasers), 18 October 2011 (the "**Lasesa SPA**"), Recitals I, III.

together 50% of the share capital of Sariñena Solar, S.L. via the 40 subsidiaries and acquired shareholder loans. RAIPRE registration was finalized on 13 May 2010.[129]

182. Claimants finalized their investments in the Fontanellas Plants and the Lasesa Plants on 22 June 2011 and 18 October 2011, respectively (the "**Second Investment Plants**").[130]

183. On 13 October 2016, Claimants sold their interest in the six PV plants.[131]


## IV.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

184. Claimants ask the Tribunal to:

> "[E]nter an Award in their favour and against Spain as follows:
>
> (a) declaring that Spain has violated Article 10 of the ECT, as well as its obligations under the applicable rules and principles of international law;
>
> (b) requiring that Spain make full reparation to the Claimants for the injury or losses to their investments arising out of Spain's violations of the ECT and international law, by way of:
>
>> (i) full restitution to the Claimants by reinstating the legal and regulatory framework in place at the time the Claimants made their investments in its territory and compensating the Claimants for their losses suffered prior to such reinstatement; or
>>
>> (ii) full compensation to the Claimants for all losses suffered by them as a result of Spain's violations of the ECT and international law, in an amount to be determined, including interest on all amounts awarded at a reasonable rate;
>
> (c) directing Spain to pay all costs incurred in connection with these arbitration proceedings, including the costs of the arbitrators and ICSID, as well as the legal and other expenses incurred by the Claimants, including but not limited to the fees of their legal counsel, experts and

---

[129] **C-012**, RAIPRE Certificate for Lasesa Plants, 13 May 2010. On 29 January 2014 "Infracapital Solar B.V. purchased the remaining 50% of Sariñena Solar, S.L. pursuant to a put/call option structure." Cl. Memorial, ¶ 155. *See also* **C-108**, Infracapital, Final Investment Committee Report, 21 July 2011.

[130] Fontellas SPA; Lasesa SPA. *See also* **C-109**, Infracapital, Minutes of Investment Committee meeting, 21 July 2011.

[131] **C-127**, Sale and Purchase of Shares and Assignment of Intragroup Loans Agreement, between Infracapital Solar B.V. (seller) and Renovalia Energy Group, S.L. (purchaser) (I), 13 October 2016; **C-128**, Sale and Purchase of Shares and Assignment of Intragroup Loans Agreement, between Infracapital Solar B.V. (seller) and Renovalia Energy Group, S.L. (purchaser) (II), 13 October 2016.

*consultants and those of the Claimants' own employees, on a full indemnity basis, plus interest thereon at a reasonable rate;*

(d) *directing Spain to pay post-award interest, compounded monthly, on the amounts awarded until full payment thereof; and*

(e) *any other relief that the Arbitral Tribunal may deem appropriate in the circumstances."*[132]

185. Respondent, in turn, has asked the Tribunal in its Post-Hearing Brief[133] the following:

*"In view of the arguments put forward in its Memorials, during the Hearings and in the PHB, the Kingdom of Spain respectfully requests that the Arbitral Tribunal:*

a) *Declares its lack jurisdiction regarding two EU Claimants' claims due to the lack of notice of controversy and lack of a Claimants' good faith attempt to seek an amicable solution;*

b) *Declares its lack of jurisdiction due to the lack of clean hands in the Claimants as it is evidenced that they committed gross wrongdoings in their investment;*

c) *Declares its lack of jurisdiction due to the intra-EU objection;*

d) *Declares its lack of jurisdiction regarding the 50% of the Lasesa plants are they were subject to anew negotiation and agreement freely executed by the Claimants after the Disputed Measures;*

e) *Declares its lack of jurisdiction regarding the TVPEE;*

f) *In the event that the Tribunal were to decide that it has jurisdiction to hear this all or part of the controversy, it rejects all the claims of the Claimants on the merits, since (i) we are in front of an investment made with no clean hands and (ii) in front of an improperly fabricated claim that has no actual merits and, (iii) in any case, the Kingdom of Spain has not breached in any way, the ECT.*

g) *Secondarily, dismisses all of the compensation claims of the Claimants in as much as they do not have a right to compensation; and*

---

[132] Cl. Memorial, ¶ 400, Cl. Reply, ¶ 720 and Cl. PHB, ¶ 140.
[133] Resp. PHB, ¶ 175.

> *h) Orders the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the arbitrators' fees and the fees of the legal representatives of the Kingdom of Spain, their experts and advisers, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment."*

186. The Parties' positions are summarized in the various sections below. The Tribunal has considered the entirety of the Parties' positions and arguments, as stated in their written submissions and during the Hearings, irrespective of whether an argument is mentioned in the summaries of the Parties' positions included in this Decision. The Tribunal has also given due consideration to the facts of the present case, as well as to the legal arguments presented by the Parties in their written and oral submissions. Finally, in the Tribunal's analysis, the Tribunal has expressed its reasons, without repeating the arguments that have been advanced by the Parties, and only repeats certain aspects when appropriate for its conclusions.

## V.    JURISDICTION

187. In its Counter-Memorial on Merits and Memorial on Jurisdiction, Respondent raised four objections to jurisdiction, and subsequently an additional three during the proceedings. These objections are:

188. *First,* that the Tribunal lacks jurisdiction *ratione personae* because Claimants are not protected investors under the ECT, as the ECT is not applicable to disputes between an EU Member State, and nationals of another EU Member State ("**Intra-EU Objection I**").[134]

189. *Second,* that the Tribunal lacks jurisdiction *ratione materiae* since EU Law precludes the dispute from being referred to arbitration pursuant to ECT Article 26(6) ("**Intra-EU Objection II**").[135]

190. *Third,* that the Tribunal lacks jurisdiction *ratione temporis* because part of Claimants' investments was made during and after the Disputed Measures ("**Ratione Temporis Objection**").[136]

---

[134] Resp. C-Memorial, § III.A; Resp. Rejoinder, § III.A. *See also* June Hearing, Resp. Opening Slide Presentation, in particular, 04 Jurisdiction, slides 9-12. June Hearing, Tr. Day 1, 219:14-23 (Gil Nievas). *See also* Second Hearing, Resp. Opening Slide Presentation, slide 37, and Second Hearing, Tr. Day 1, 152:20-153:4 (Gil Nievas).

[135] Resp. C-Memorial, § III.B; Resp. Rejoinder, § III.B; Resp. PHB, ¶¶ 36-44. *See also* June Hearing, Resp. Opening Slide Presentation, in particular, 04 Jurisdiction, slides 13-41; and June Hearing, Tr. Day 1, 220:2-234:22 (Gil Nievas). *See also* Second Hearing, Resp. Opening Slide Presentation, slides 31-45, and Second Hearing, Tr. Day 1, 153:5-156:6 (Gil Nievas).

[136] Resp. C-Memorial, § III.C; Resp. Rejoinder, § III.C; Resp. PHB, ¶¶ 46-47. *See also* Second Hearing, Resp. Opening Slide Presentation, slides 46-48, and Second Hearing, Tr. Day 1, 156:7-157:5 (Gil Nievas).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

191. *Fourth,* that the Tribunal lacks jurisdiction *ratione voluntatis* to hear Claimants' claim for breach of Article 10(1) of the ECT deriving from Spain's introduction of the TVPEE in Law 15/2012, because, pursuant to Article 21 of the ECT, Article 10(1) does not apply to tax measures (**"TVPEE Objection"**).[137]

192. *Fifth and sixth*, that the Tribunal lacks jurisdiction for breaches of pre-requirements for arbitration: (i) lack of power of attorney to represent Claimants; and (ii) lack of proper notice of controversy, the latter because Article 26(2) ECT subjects arbitration to the condition precedent of a "request for amicable settlement", and Claimants submitted their notice in English and not in Spanish, Respondent's official language.[138]

193. *Seventh*, that the Tribunal lacks jurisdiction because Claimants' *lack clean hands*, insofar as they committed wrongdoings and Spanish legislation was breached at the same time that the investment was made, which is in violation of the principle of good faith and fair dealing, contrary to the principles of Article 48 of the ICSID Convention and Rule 41 of the ICSID Arbitration Rules.[139]

194. Of the seven jurisdictional objections, Spain only argued five of them in its Post-Hearing Briefs, failing to address the one relating to jurisdiction *ratione personae* (*i.e.*, the Intra-EU Objection I) and that of lack of power of attorney to represent Claimants. Nonetheless, the Tribunal shall examine each of them, as it should.

195. The first four have been raised by Respondent in essentially every case that has been commenced as a consequence of Disputed Measures enacted regarding the renewable energy. Although there would appear to be a substantial number of cases that have examined equal or very similar objections under the same or analogous context, and the issues are quite similar, the Tribunal shall examine them independently, making reference to prior awards and decisions when necessary or useful.

---

[137] Resp. C-Memorial, § III.D; Resp. Rejoinder, § III.D; Resp. PHB, ¶ 45. *See also* June Hearing, Resp. Opening Slide Presentation, in particular, 04 Jurisdiction, slides 42-51; and June Hearing, Tr. Day 1, 234:23-236:19 (Gil Nievas). *See also* Second Hearing, Resp. Opening Slide Presentation, slides 49-57, and Second Hearing, Tr. Day 1, 157:5-161:3 (Oñoro Sainz).

[138] Raised for the first time during the June Hearing. *See also* June Hearing, Resp. Opening Slide Presentation, 04 Jurisdiction, slides 3-8 and*e* June Hearing, Tr. Day 1, 216:25-219:13 (Gil Nievas). *See also* June Hearing, Tr. Day 4, 189:11-207:23 (Gil Nievas). *See also,* Resp. PHB, ¶¶ 30-31. *See* Second Hearing, Resp. Opening Slide Presentation, slides 8-23, and Second Hearing, Tr. Day 1, 145:9-16 (regarding withdrawal of the jurisdictional objection related to the power of attorney) (Gil Nievas), and Second Hearing, Tr. Day 1, 145:16-149:15 (Gil Nievas).

[139] Clean Hands Objection submitted on 20 December 2019, and further submission of 19 March 2020. *See* Resp. PHB, ¶¶ 32-35. *See* Second Hearing, Resp. Opening Slide Presentation, slides 24-30, and Second Hearing, Tr. Day 1, 150:3-151:6 (Gil Nievas).

A. FIRST OBJECTION: LACK OF JURISDICTION *RATIONE PERSONAE* – INTRA-EU
OBJECTION I

(1) The Parties' Positions

a. *Respondent's Position*

196. Respondent contends that Claimants are not investors protected under the ECT, because Article 26 of the ECT, which establishes the dispute settlement mechanism, does not apply to disputes arising between an investor of an EU Member State and an EU Member State (*i.e.*, "intra-European Union" or "intra-EU").[140]

197. As both the Netherlands and Luxembourg were EU Member States at the time they became Contracting Parties to the ECT, and the EU is also a Contracting Party to the ECT, Respondent argues that Claimants are not investors of another Contracting Party, "*which inevitably implies the exclusion*" of Article 26 of the ECT.[141] Respondent adds that "*Article 26 of the ECT does not generate any obligations between the Member States. The intra-EU investor, with a protection level provided by EU Law, is protected by the judicial system of the EU.*"[142]

198. Respondent argues that the Tribunal must apply Article 20 of the Treaty on the Functioning of the EU ("**TFEU**") to determine the nationality of EU investors.[143] Pursuant to Article 20 of the TFEU, Respondent contends that "*all citizens of a Member State, whether natural or legal persons, simultaneously hold European nationality. This nationality is concurrent and does not exclude the nationality of the Member State to which it belongs.*"[144]

199. Spain adds that under the ICSID Convention, as provided in Article 25(2)(a), "investors who hold the nationality of the Host State, in addition to the nationality of another Contracting State, are excluded from the scope of protection of the treaty."[145] In Respondent's view, Claimants are dual nationals who have the nationality of the respondent State and cannot seek ICSID arbitration.[146]

200. Respondent contends that although the precept in Article 25.2(a) of the ICSID Convention "refers to natural persons" it "must also be extrapolated to legal entities with dual nationality, as occurs in the case of the national legal entities of the Member States of the EU, and therefore, they do not meet the dual nationality requirement of article 26 ECT by this means [sic] either."[147] Respondent points out that the EU and Member States made a

---

[140] Resp. C-Memorial, ¶ 52. Resp. Rejoinder, ¶¶ 48-54. *See also* June Hearing, Resp. Opening Slide Presentation, in particular, 04 Jurisdiction, slides 9-12. June Hearing, Tr. Day 1, 219:14-23 (Gil Nievas).  *See* also Second Hearing, Resp. Opening Slide Presentation, slide 37, and Second Hearing, Tr. Day 1, 152:20-153:4 (Gil Nievas).
[141] Resp. C-Memorial, ¶¶ 52, 54.
[142] Resp. C-Memorial, ¶ 54.
[143] Resp. C-Memorial, ¶ 55.
[144] Resp. C-Memorial, ¶ 55.
[145] Resp. C-Memorial, ¶ 56.
[146] Resp. C-Memorial, ¶ 57.
[147] Resp. C-Memorial, ¶ 58.

declaration with regard to Article 25 of the ECT on the Economic Integration Agreements to "clarify that legal persons incorporated in accordance with the legislation of any Member State should be treated in the same way as natural persons who are nationals of the Member States."[148]

201. On that point, Respondent concludes that (i) any investor of the EU is a dual-national, holding both the nationality of its Member State and that of the EU; (ii) pursuant to Article 25(2)(a) of the ICSID Convention, natural and legal persons of the EU are excluded from the protection of the ICSID Convention; (iii) no EU investor which has invested in another Member State may qualify as a "foreign investor" under Article 1(7) of the ECT because it will hold a European nationality, in addition to its nationality of origin.[149]

202. Respondent draws support for this argument from the award in *Terra Raf Trans v. Kazakhstan*, where the tribunal held that the ECT was applicable to Gibraltar because it is part of the EU, which itself is a party to the ECT.[150]

**b.** *Claimants' Position*

203. Claimants oppose Respondent's objection, and reject its arguments.[151]

204. In Claimants' view, the exclusion of dual nationals in Article 25(2)(a) of the ICSID Convention is irrelevant.

205. *First*, Article 25(2)(a) of the ICSID Convention is only applicable to natural persons and, given that Claimants are juridical persons, the question of dual nationality is not at issue.[152] Claimants argue that Article 20 of the TFEU, on which Spain relies, is also inapplicable because it establishes European citizenship only with regard to natural persons.[153]

206. Further, under Article 1(7)(a)(ii) of the ECT, Claimants would have to be companies established as a "*Societas Europaea*" to be considered entities organized in accordance with the law applicable in the EU. However, in this case, Claimants are companies registered in Luxembourg and the Netherlands.[154]

207. For Claimants, Spain's assertion that the express declaration made to Article 25 of the ECT provides that juridical persons should be treated in the same way as natural persons who are nationals of Member States is incorrect. Claimants note that said declaration is for the purposes of the ECT, Part 3, Title III, Chapter 2, that addresses the right of establishment under EU Law.[155]

---

[148] Resp. C-Memorial, ¶ 59.
[149] Resp. C-Memorial, ¶¶ 60, 61.
[150] Resp. C-Memorial, ¶ 62.
[151] Cl. Reply, ¶¶ 125-133. Cl. Rejoinder on Jurisdiction, ¶ 12.
[152] Cl. Reply, ¶ 127.
[153] Cl. Reply, ¶ 128.
[154] Cl. Reply, ¶ 129.
[155] Cl. Reply, ¶ 130.

208. *Second*, in Claimants' view, Spain's argument that Claimants are excluded under Article 25 of the ICSID Convention is flawed because it is premised on the EU being the respondent State and not the Kingdom of Spain.[156]

209. *Third*, Claimants argue that European nationality does not constitute a "*nationality of a Contracting State*" as provided in Article 25 of the ICSID Convention since the EU is not a Contracting State.[157]

210. Claimants contend that, had the Contracting Parties to the ECT desired to exclude intra-EU disputes from the scope of Article 26, they would have included an exception to that effect; but they did not. And this has been acknowledged by other tribunals. It adds that the "[…] *objection has* […] *been dismissed by all investment treaty tribunals and national courts seized of this objection, including ECT tribunals in cases involving Spain itself, such as the RREEF decision, the Eiser award and, more recently, Antin, Novenergia, Masdar and Greentech*" and, add, that the fact that "*Spain is persisting with a jurisdictional objection that has never succeeded is remarkable and should, in the Claimants' view, have cost consequences.*"[158]

### (2) The Tribunal's Analysis

211. The essence of Respondent's objection to the jurisdiction of the Tribunal is that Claimants do not come from the territory of another Contracting Party since the Netherlands, Luxembourg and Spain are Member States of the EU, and the ECT does not apply to disputes relating to intra-EU investments. The Tribunal shall therefore examine whether or not Claimants are deemed to be investors protected under the ECT, and can therefore benefit from the dispute settlement mechanism under Article 26 of said treaty.

212. The Tribunal believes that the ECT itself provides the answers to address and resolve the issue. To start, the Tribunal recalls that the jurisdiction of a tribunal to examine disputes arising among an investor and a State is found in Article 26 of the ECT, which provides:

> "*(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*

---

[156] Cl. Reply, ¶ 131.
[157] Cl. Reply, ¶ 133.
[158] Cl. Reply, ¶¶ 31 and 37. Claimants cite 21 cases that, as of the date of their Reply, whose tribunals had rejected Spain's intra-EU objections.

> *(a) to the courts or administrative tribunals of the Contracting Party to the dispute;*
>
> *(b) in accordance with any applicable, previously agreed dispute settlement procedure; or*
>
> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3) (a) Subject only to subparagraphs (b) and (c), <u>each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration</u> or conciliation in accordance with the provisions of this Article. [...]*[159]*"* (Emphasis added)

213. Although both Claimants and Respondent have supported their respective arguments on a reading of the various applicable provisions of the ECT, they reach different positions. They disagree on whether Claimants can be deemed to be "investors of another Contracting Party" which, by definition, requires to determine the meaning of "Contracting Party".

214. To determine the meaning, this Tribunal finds it useful to reach out to the rules of interpretation under the Vienna Convention on the Law of Treaties ("**VCLT**"). Article 31(1) of the VCLT provides:

> *"Article 31. General Rule of Interpretation*
>
> *1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose"*[160].  (Emphasis added)

215. These rules first direct the Tribunal: (a) to interpret the provisions in "good faith", and then to seek (b) the ordinary meaning of terms "*in their context*" and "*in the light of its object and purpose*". Supplementary Means of Interpretation (Article 32) would only be accessed if the meaning is not reached by applying the rules under Article 31.[161]

216. The terms "Contracting Party" and "Investor" are defined in Article 1(2) and 1(7)(a)(ii) of the ECT:

---

[159] **CL-001 / RL-0013**, The Energy Charter Treaty and Related Documents. Energy Charter Secretariat ("ECT"), September 2004, Art. 26 (1-3).

[160] **RL-0017**, Vienna Convention on the Law of Treaties ("VCLT"), 23 May 1969, Art. 31.

[161] VCLT, Art. 32: *Supplementary Means of Interpretation. Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31: (a) Leaves the meaning ambiguous or obscure; or (b) Leads to a result which is manifestly absurd or unreasonable".*

217. "Contracting Party" is defined as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force";[162] and

218. "Investor", with respect to a Contracting Party, is defined as "a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law" or "a company or other organization organized in accordance with the law applicable in that Contracting Party."[163]

219. Since Spain, Luxembourg and the Netherlands signed, and thereafter ratified the ECT,[164] they are therefore to be deemed as "Contracting Parties".

220. Further, since Claimants are companies that have been incorporated under the laws of the Netherlands and Luxembourg, as has been evidenced in the record and not challenged by Spain, they are deemed to be "Investors" of a "Contracting Party".

221. However, Respondent contends that Claimants should be deemed to have European nationality *in addition to* that of the Netherlands and Luxembourg, as may be the case with each. Hence, as holders of European nationality, they cannot sue the Kingdom of Spain, a territory of the European Union pursuant to Article 20 of the TFEU, 1(7) of the ECT and 25 of the ICSID Convention. In short, according to Respondent, because they hold European nationality Claimants cannot be deemed as "foreign investors" and seek protection under Article 1(7) of the ECT.

222. The Tribunal believes that the European nationality argument expressed by Respondent is flawed. Stating that under Article 20 of the TFEU all citizens of a Member State, whether natural or legal persons, simultaneously hold European nationality, which is concurrent and does not exclude the nationality of the Member State to which it belongs, fails to address the fact that neither of Claimants is organized as a "*Societas Europaea*" in order to be considered entities organized in accordance with applicable EU Law. Claimants cannot be placed into the exclusion of dual nationality under Article 25(2)(a) of the ICSID Convention for several reasons:

223. *First*, contrary to natural persons, legal persons such as Claimants cannot have the nationality of the EU, in addition to that under which laws they have been established. Article 20 of the TFEU[165] provides for European nationality only in respect to natural persons. Not juridical entities. When this provision allocates the European citizenship, it does so in the context of the grant of rights to individuals, such as the right to vote and

---

[162] ECT, Art. 1(2).

[163] ECT, Art. 1(7)(a).

[164] By the time the ECT had entered into force with respect to Spain on 16 April 1998, both Luxembourg and the Netherlands had already signed and ratified. Luxembourg signed the ECT on 17 December 1994 and ratified it on 7 February 1997; the Netherlands signed the ECT on 17 December 1994 and ratified it on 11 December 1997, while Spain signed the ECT on 17 December 1994, and ratified it on 11 December 1997.

[165] **RL-0008**, Consolidated Version of the Treaty on the Functioning of the European Union ("**TFEU**"), Art. 20(1): "Every person holding the nationality of a Member State shall be a citizen of the Union". (Emphasis added).

stand as a candidate, which is incompatible with legal persons.[166] It is therefore without merit to argue that this article also grants the European citizenship to legal entities established with the nationality of a Member State.

224. Further, the argument expressed by Respondent to the effect that companies established in accordance with the law of a Member State shall be treated in the same way as natural persons who are nationals of Member States (Declaration 5 to Article 25 of the ECT and Article 54 TFEU) is flawed because it misconstrues the meaning of the provision. The treatment is merely granted only for the purposes of EC Treaty Part 3, Title III, Chapter 2, now found at TFEU Part 3, Title IV, Chapter 2, that deals with the right of establishment under EU Law.

225. *Second*, even assuming that Claimants were incorporated as a "*Societas Europaea*" or could be deemed to have both the nationality of their respective State (the Netherlands and Luxembourg) <u>and</u> be a *Societas Europaea*, it would require that Claimants bring the claim against the EU in order to be excluded. Clearly, this is not the case in this arbitration.

226. *Third*, the European Union cannot be identified as a "Contracting State" for purposes of Article 25(2) of the ICSID Convention, since it has not executed the ICSID Convention.

227. Spain is wrong when it contends that Article 25(2)(a) of the ICSID Convention provides that investors who hold the nationality of the host State, in addition to the nationality of another Contracting State, are excluded from the scope of protection of the treaty. This Tribunal believes that it is clear that Article 25(2)(a) of the ICSID Convention refers to natural persons, and the reference to "natural person" cannot be "extrapolated" to legal entities such as Claimants, when this is interpreted with section (2) *"National of another Contracting State" means: (a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute."*[167] Had the drafters of the ICSID Convention intended to enable to "extrapolate" as Respondent suggests, they would have simply drafted the text accordingly.

228. For the reasons stated above, the Tribunal rejects the objection to the jurisdiction based on the arguments submitted by Respondent, and shares the conclusion of the *Antin* tribunal, which noted that "*Spain made a standing offer to 'Investors' of other 'Contracting Parties' to settle disputes through international arbitration. The Claimants in this case, as 'Investor[s] of another Contracting Party' accepted such an offer, and submitted their consent to arbitration, by filing their Request for Arbitration.*"[168] The Tribunal notes that

---

[166] TFEU, Art. 20(2)(b).
[167] **RL-0064**, ICSID Convention Regulations and Rules, 2006, Art. 25(2)(a).
[168] **RL-0116**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 230.

multiple other tribunals in RE cases involving Spain as respondent where Spain has attempted this objection have equally rejected this objection.[169]

**B. SECOND OBJECTION: LACK OF JURISDICTION *RATIONE MATERIAE* – INTRA-EU OBJECTION II**

### (1) The Parties' Positions

#### a. *Respondent's Position*

229. Spain submits that the Tribunal lacks jurisdiction *ratione materiae* pursuant to the application of EU Law and principles, and addresses its position in four arguments: (i) Primacy of EU Law and its Application in the Dispute as International Law; (ii) Intra-EU State Aid Disputes Should be Excluded from Arbitration Pursuant to Article 26(6) of the ECT; (iii) relevance of the *Achmea* Judgment; and (iv) that an Effective Interpretation of the ECT Supports the Lack of Consent to Arbitration Involving the Interpretation and Application of EU Law.[170]

### (i) Primacy of EU Law and its Application in the Dispute as International Law

230. In Respondent's view, Article 26(6) of the ECT orders the Tribunal to determine the international law applicable regulations to the dispute at issue.[171] Spain sustains that the Tribunal is "*called upon to interpret and apply*" EU Law since the dispute affects the EU fundamental freedoms and State Aid.[172]

231. The principle that EU Law, characterized as international law and applicable over any other law in intra-EU relationships, has been clearly recognised by the of the European Union Court of Justice ("**CJEU**"), notably in its Judgment of 6 March 2018 in *Republic of Slovakia v. Achmea*[173] ("***Achmea* Judgment**").[174]

232. Spain refers to the following excerpts of the decision:

---

[169] **CL-122**, *Greentech Energy Systems A/S and others v. Kingdom of Spain, SCC Case No. V (2015/150), Final Award, 14 November 2018, ¶¶ 219-222;* **CL-139**, *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 166-177; **RL-0081**, *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, Arbitration SCC 2015/063, Final Arbitral Award, 15 February 2018, ¶¶ 459-466.

[170] For Respondent's Second Objection *see* Resp. C-Memorial, § III.B; Resp. Rejoinder, § III.B; Resp. PHB, ¶¶ 36-44. *See also* June Hearing, Resp. Opening Slide Presentation, in particular, 04 Jurisdiction, slides 13-41, and June Hearing, Tr. Day 1, 220:2-233:18 (Gil Nievas). *See* also Second Hearing, Resp. Opening Slide Presentation, slides 31-45, and Second Hearing, Tr. Day 1, 151:7-156:6 (Gil Nievas).

[171] Resp. C-Memorial, ¶ 71.

[172] Resp. C-Memorial, ¶ 72.

[173] **CL-151 / RL-0080**, *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court ("***Achmea* Judgment**"), 6 March 2018.

[174] Resp. C-Memorial, ¶ 74.

> *"[…] According to settled case-law of the Court, the autonomy of EU Law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU Law is characterized by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other.*

> *"[…] EU Law is thus based on the fundamental premise that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premise implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU Law, and to take for those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU."*[175]

233. According to Respondent, the application of EU Law as international law under Article 26 of the ECT has also been recognised by tribunals in investment arbitration.[176] Respondent cites in support of its argument the awards in *Electrabel v. Hungary* and *Blusun v. Italy*.[177] Spain further refers to the award in *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Ms. Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic* of 11 October 2017, and argues that it "*does not apply to the ECT, but […] the Arbitral Tribunal concluded that EU Law was International Law applicable to the dispute under the principle of proximity enshrined in Article 31.3 of the Vienna Convention.*"[178]

---

[175] Resp. C-Memorial, ¶ 74; *Achmea* Judgment, ¶¶ 33, 34.
[176] Resp. C-Memorial, ¶ 75.
[177] Resp. C-Memorial, ¶¶ 75-76.
[178] Resp. C-Memorial, ¶ 77.

### (ii) Intra-EU State Aid Disputes Should be Excluded from Arbitration Pursuant to Article 26(6) of the ECT

234. Respondent contends that the only judicial body competent to decide on intra-EU matters of State Aid is the CJEU, relying, *inter alia,* on the CJEU Opinion 1/91.[179] Spain also cites to the CJEU judgment in *ELCOGAS* to argue that "'*the amounts financed by all end users of electricity established in the country and distributed to companies in the power sector by a public body under predetermined legal criteria,' constitute State Aid.*"[180] In fact, the EC has expressly ruled that the benefits granted by RD 661/2007 and RD 1578/2008 constitute State Aid ("**EC Decision**").[181] Respondent draws significant support from the EC Decision and argues that the issue at hand is whether the "*Tribunal should make a judgment on whether the Claimant's* [sic] *plants are entitled to receive sine die a specific amount of State Aid.*"[182]

235. For Respondent, should the Tribunal decide on a State Aid matter, "it would represent a radical breach of the order of competence set forth in the Union Treaties and the autonomy of its legal order."[183] Spain also relies, inter alia, on a Commission Decision of 13 November 2017 in which it is stated that:

> "*any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme by the notified scheme would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorize the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in Eiser v. Spain, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.*
>
> *[...] Finally, the Commission recalls that this Decision is part of Union Law, and as such also binding on Arbitration Tribunals, where they apply Union Law. The exclusive forum for challenging its validity are the European Courts.*"[184]

### (iii) The *Achmea* Judgment

236. Spain draws significant support for its objection from the CJEU *Achmea* Judgment of 6 March 2018. As background to the *Achmea* Judgment, Spain cites to various EU authorities, including the Court's judgment of 30 May 2006 in a case between Ireland and

---

[179] Resp. C-Memorial, ¶ 79; **R-0097**, CJEU Opinion 1/91, 14 December 1991.

[180] Resp. C-Memorial, ¶ 80.

[181] Resp. C-Memorial, ¶¶ 82-95; **RL-0060**, Decision C(2017) 7384 of the European Commission, rendered on 10 November 2017, regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A. 40348 (2015/NN).

[182] Resp. C-Memorial, ¶ 86.

[183] Resp. C-Memorial, ¶ 88.

[184] Resp. C-Memorial, ¶¶ 89, 95. (Emphasis omitted).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

the United Kingdom of Great Britain and Northern Ireland[185] and argues that an international agreement cannot alter the assignment of responsibilities defined in treaties.[186] In that context, Spain also refers to the Court's Judgment in *Yassin Abdullah Kadi and others v. the Council of the European Union* of 3 September 2008.[187] That decision makes clear that the obligations imposed by an international agreement cannot undermine the constitutional principles of the European Community Treaty ("**EC Treaty**").[188]

237. Reference is also made by Respondent to Opinion 2/13 in which, *inter alia*, the CJEU (i) observed that the submission of an application to the control mechanisms of the Convention for the Protection of Human Rights and Fundamental Freedoms and the European Court of Human Rights ("**ECHR**") was liable in itself to undermine the autonomy and primacy of EU Law; and (ii) found an infringement of Article 344 TFEU pursuant to the draft accession agreement to the ECHR, since EU Member States were able to bring proceedings before the ECHR against each other or the EU for alleged breaches of the ECHR when implementing EU Law.[189]

238. For Spain, this position has been confirmed by other EU authorities, including Opinion 1/09 and Opinion 2/13, both cited by the *Achmea* Judgment and the EC's Communication to the European Parliament and Council of 19 July 2019 on "*Protection of Intra-EU Investment.*"[190]

239. Spain further contends that pursuant to the *Achmea* Judgment, "an arbitration clause in a bilateral investment treaty concluded between EU Member States (intra-EU BIT) is incompatible with European Union Law and the autonomy of the EU legal order."[191] Spain relies on the *Achmea* Judgment's conclusion according to which:

> "*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States…, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter*

---

[185] **CL-140**, *Mox Plant* (Ireland v. United Kingdom of Great Britain and Northern Ireland), Commission of the European Communities v. Ireland, Judgment of the Court (Grand Chamber), 30 May 2006).
[186] Resp. C-Memorial, ¶¶ 107-111; **RL-0084**, C-459/03, Judgment 30 May 2006, Action for failure to fulfil obligations under Article 226 EC and Article 141 EA, brought on 30 October 2003, Commission of the European Communities supported by United Kingdom of Great Britain and Northern Ireland, v. Ireland.
[187] Resp. C-Memorial, ¶¶ 112-117; **RL-0082 / CL-163**, Judgment of the Court of the European Communities (Grand Chamber) of 3 September 2008, *Yassin Abdullah Kadi, Al Barakaat International Foundation v. Council and Commission* in joined Cases C-402/05 P and C-415/05 P.
[188] Resp. C-Memorial, ¶ 113.
[189] Resp. C-Memorial, ¶¶ 113-125; **RL-0083**, Opinion 2/13 of the CJEU (Full Court) of 18 December 2014, pursuant to Article 218(11) TFEU (Accession of the EU to the ECHR), ¶¶ 180-186, 194, 201-214.
[190] Resp. Rejoinder, ¶¶ 121-122, 126-132; **RL-0115**, Communication from The European Commission to the European Parliament and the Council on the Protection of intra-EU investment. COM (2018) 547/2, 19 July 2018.
[191] Resp. C-Memorial, ¶ 104.

> *Member State before an arbitral tribunal whose jurisdiction that*
> *Member State has undertaken to accept.*"[192]

240. Respondent highlights that the CJEU establishes four principles in the *Achmea* Judgment:
(i) EU treaties have established a judicial system to ensure consistency and uniformity in
the interpretation of EU Law; (ii) pursuant to Article 19 of the TEU, national courts and
tribunals and the CJEU are responsible for ensuring the application of EU Law in the EU
Member States; (iii) the preliminary ruling system established in Article 267 of the TFEU
is intended to guarantee uniformity in the interpretation of EU Law; and (iv) EU Law is
both part of the legislation of each EU Member State and also arises from an international
agreement between Member States.[193]

241. Spain further explains that the CJEU has concluded that the above-listed principles are not
fulfilled through the establishment of an international investment arbitration proceeding
for the following reasons: (i) the tribunal is not a part of the EU judicial system; (ii) the
tribunal is not a court or tribunal of an EU Member State within the meaning of Article 267
of the TFEU, and as such, said tribunal cannot raise a preliminary ruling before the CJEU;
(iii) the tribunal's decision is final and judicial review limited by national law; and (iv)
investment arbitration based on BITs involves disputes that may concern the application or
interpretation of EU Law, but that system does not allow disputes to be resolved in a way
that ensures the full effectiveness of EU Law.[194]

242. Respondent's view is that the conclusions mentioned above are also applicable in the
context of the present dispute under the ECT.[195] Spain contends that the grounds for the
*Achmea* Judgment are not limited to the bilateral nature of the applicable treaty. Rather,
the reasoning behind the *Achmea* Judgment applies to this arbitration because:

> *"the arbitration clause of the ECT excludes disputes between an*
> *investor and a Member State of the EU from the jurisdiction of their*
> *own Courts. Thus, following the reasoning of the Judgment as*
> *regards preliminary judgments, it prevents these disputes, to which*
> *Community Law must be applied, from being resolved in a manner*
> *that guarantees the full enforceability of EU Legislation, as required*
> *by article 344 TFEU.*"[196]

243. Respondent observes that the *Achmea* Judgment does not refer to "*bilateral investment*
*treaties*" but rather, to "*international agreements*."[197] It further notes that the judgment
does not reference an "*international agreement concluded between two Member States*"

---

[192] Resp. C-Memorial, ¶ 126; *Achmea* Judgment.
[193] Resp. C-Memorial, ¶ 127.
[194] Resp. C-Memorial, ¶ 128.
[195] Resp. C-Memorial, ¶ 131.
[196] Resp. C-Memorial, ¶ 134.
[197] Resp. C-Memorial, ¶ 135.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

but rather, an "*international agreement concluded between Member States*," which includes multilateral treaties.[198]

244. Spain further supports its argument by referring to the content of the judgment and states that the *Achmea* Judgment applies in the present instance because: (i) the Tribunal is called upon to interpret and/or apply EU Law, namely State Aid; (ii) the EU principle of autonomy would not be upheld because the CJEU cannot have full knowledge and control over the application of EU Law in all Member States and ensure judicial protection of rights by means of a request for preliminary ruling established in Article 267 TFEU; and (iii) the award issued by the Tribunal is not subject to review by a judicial court of any Member State.[199]

245. Respondent takes the view that the principle that arbitral tribunals established under the ECT are not part of the EU judicial system for the purposes of Article 267 TFEU is recognised by numerous tribunals, including the decisions in *Blusun v. Italy* and *Eiser v. Spain*.[200]

246. Respondent further contends that the CJEU's reference in the Achmea Judgment to the fact that "an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, **is not in principle** incompatible with EU Law" does not contradict Respondent's position in that regard.[201] It is Spain's view that the use of "in principle" in the above excerpt must be linked to the second sentence of that same paragraph, which states that "provided that the autonomy of the EU and its legal order is respected."[202] Spain explains that "in cases in which the autonomy and legal order of the European Union is not guaranteed, these treaties […] would be incompatible with European Union regulations."[203]

247. In support of its position, Spain notes that the Svea Court of Appeal in Stockholm has "*welcomed*" this position in its stay of enforcement decision of the *Novenergia* award.[204]

248. Respondent also relies on the 15 January 2019 declaration issued by 22 Member States ("**22 Member States Declaration**"), and the declaration of 16 January 2019 by five Member States ("**5 Member States Declaration**") on the legal effects of the *Achmea* Judgment in support of its position.[205] (The 22 Member States Declaration together with

---

[198] Resp. C-Memorial, ¶ 135.

[199] Resp. C-Memorial, ¶¶ 138-142.

[200] Resp. C-Memorial, ¶¶ 142-144.

[201] **RL-0080**, ¶ 57 (emphasis added); Resp. C-Memorial, ¶¶ 147-155.

[202] Resp. C-Memorial, ¶ 153; **RL-0080**, ¶ 57.

[203] Resp. C-Memorial, ¶ 153.

[204] Resp. Rejoinder, ¶ 57; **RL-0113**, *The Kingdom of Spain v. Novenergia II – Energy & Environment*, SCC Case No. V (2015/063), Summons Application and Request for Suspension, 14 May 2018.

[205] Resp. Rejoinder, ¶¶ 133-147; **RL-0118**, Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the legal consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union ("**22 Member States Declaration**"); **RL-0119**, Declaration of the

the 5 Member States Declaration referred to as the "**January 2019 Declarations**"). Respondent refers to the January 2019 Declarations to argue that Member States validate the Court's position on the incompatibility of the intra-EU arbitration clauses with EU Law and acknowledge the validity of EU Law principles.[206] Respondent concludes this point by noting that intra-EU disputes only have an internal dimension, governed by EU Law, which prevails over international law.[207]

> **(iv)    An Effective Interpretation of the ECT Supports the Lack of Consent to Arbitration Involving the Interpretation and Application of EU Law**

249.  Spain maintains that Article 26 of the ECT applies only to breaches of obligations set forth in Part III of the ECT on Investment Protection and Promotion.[208] For Spain, EU Member States cannot "*obligate themselves under Part III of the ECT*," which makes clear that the dispute resolution mechanism established in Article 26 of the ECT is not applicable to intra-EU disputes.[209] In Spain's view, neither the Kingdom of Spain, the Netherlands nor Luxembourg can be bound by Part III of the ECT because their inclusion in the EU meant their acceptance of the primacy of EU Law.[210]

250.  For Respondent, Article 1.3 of the ECT definition of an Regional Economic Integration Organization ("**REIO**") implies that matters such as fundamental freedoms and State Aid should be negotiated by the EU because its Member States do not have competence over them, and therefore, could never grant consent to submit such matters to arbitration.[211] Spain cites as support Article 25 of the ECT, which provides that the obligation to accord most-favoured-nation treatment ("**MFN**") does not oblige a Contracting Party to an Economic Integration Agreement ("**EIA**") to grant preferential treatment to investors that are not part of the EIA.[212] The primacy of EU Law is also recognised in Articles 1(3) and 36(7) of the ECT.[213]

251.  In Spain's view, there is no need for the introduction of a disconnection clause to arrive to that conclusion,[214] and draws support from the CJEU Opinion 1/03 of 7 February 2006 on "*Community competence to conclude the new Lugano Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters.*"[215] Specifically, Spain relies on the Court's statement that "[i]*n its view, given that the*

---

Representatives of the Governments of the Member States, of 16 January 2019, on the enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union signed by the Representatives of the Governments of Finland, Luxembourg, Malta, Slovenia and Sweden ("**5 Member States Declaration**").
[206] Resp. Rejoinder, ¶¶ 134-136.
[207] Resp. C-Memorial, ¶ 156.
[208] Resp. C-Memorial, ¶ 160.
[209] Resp. C-Memorial, ¶ 160.
[210] Resp. C-Memorial, ¶ 161.
[211] Resp. C-Memorial, ¶¶ 163-164.
[212] Resp. C-Memorial, ¶¶ 165-167.
[213] Resp. C-Memorial, ¶¶ 170-172.
[214] Resp. C-Memorial, ¶ 190.
[215] Resp. C-Memorial, ¶¶ 190, 191; **R-0218**, Opinion 1/03 of the plenary session of the CJEU, 7 February 2006.

*agreement envisaged covers areas for which a complete harmonisation has been carried out, the existence of a disconnection clause is entirely without relevance.*"[216]

252. Moreover, based on Article 26(6) of the ECT, which makes it mandatory to resolve disputes in line with the ECT and rules of international law, tribunals should apply EU Law and the ECT under "*equal conditions*."[217] Spain adds that the primacy of EU Law over the ECT's substantive protections, as recognised by the *Electrabel v. Hungary* tribunal, is the only conclusion consistent with a good faith interpretation of the ECT.[218]

253. In its Post-Hearing Brief, Respondent raises and argument relating to autonomy and primacy of EU Law for intra-EU affairs under international custom that is deemed to be a source of international law under Article 38.1.c). of the ICJS. In this respect, it argues that there is a "[…] *reiterated practice of all the States of the international community accepted by law of respecting the primacy and autonomy of the EU Law. No State has ever complained against that primacy and autonomy of the EU Law* […]"[219], and that this includes both the Netherlands and Luxembourg.

254. It also states that "the EU is a regional integration organization [that,] in accordance with its basic functioning rules, once the EU has rules on a matter, the EU get competences not only on the internal EU Law but also on the international laws on that matter. […] Member States and the EU ratified the ECT at the same time. Each one on the field of their competences. The EU ratified because the renewables support scheme was a matter of its competence in accordance with article 192 of the TFEU (former article 175)". Further, the approval of the EU Directive 2001/77[220] that "establishes the framework of the renewables subsidies scheme, made this field an EU competence. Therefore, according to article 1.3 of the ECT, the ECT party on this matter was the EU and not the Member States."[221]

255. Respondent indicates that the "Lisbon Treaty gave exclusive competences to the EU in the field of foreign direct investment (Articles 206 and 207 of the TFEU)", and that an "[e]ssential part of the foreign direct investment regulation is always the protection of those investments." Therefore, it concludes, "since the ratification of the Lisbon Treaty (lex posterior to the ECT in accordance with the VCLT) there are no doubts that ISDS are EU competences"[222]. This is why foreign direct investment "cannot be ruled for intra-EU affairs with non- EU mechanisms."[223] This is why –Respondent argues– "the Achmea decision has clarified that there is no room for intra-EU foreign direct investment protection regulation with non-EU mechanisms. Moreover, the posterior Treaty, the TFUE, has a Declaration (number 17) underlining the primacy of the EU Law […] because international

---

[216] Resp. C-Memorial, ¶ 191; **R-0218**, Opinion 1/03 of the plenary session of the CJEU, 7 February 2006, ¶¶ 83, 84.
[217] Resp. C-Memorial, ¶ 194.
[218] Resp. C-Memorial, ¶ 195.
[219] Resp. PHB, ¶ 37.
[220] **RL-0018**, Directive 2001/77/EC of the European Parliament and the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market. Official Journal of the European Communities 27 October 2001.
[221] Resp. PHB, ¶¶ 39, 40.
[222] Resp. PHB, ¶ 41.
[223] Resp. PHB, ¶ 42.

treaties require an act of law to be in force in a State party. The declaration of EU Law primacy over the Law of the EU Member States embraces the primacy of EU Law over the international treaties that EU Member States may ratify."[224]

256. Respondent concludes that in accordance with the general principles of law recognized by civilized nations (38.1.c. of the ICJS), that the Tribunal has no jurisdiction regarding Claimants, because, in accordance with the principle *pacta sunt servanda*, it is obvious that: (1) all the Member States who have ratified any EU Treaty since 1963 agreed on the principle of autonomy of EU Law[225]; and (2) all the Member States who have ratified an EU Treaty since 1964 agreed on the principle of primacy of EU Law. This became, it adds, even more evident since the ratification of the Lisbon Treaty as it includes the principle of primacy of EU Law.[226]

### b. *Claimants' Position*

257. Claimants oppose Respondent's objection, which they deem meritless,[227] and query the making of the objection by Spain despite having been "*dismissed by all investment treaty tribunal and national courts seized of this objection, including ECT tribunals involving Spain itself* […]", citing then a few of those cases.[228] They address the objection through four arguments as well: (i) EU Law is irrelevant to determine the Tribunal's jurisdiction and the merits of the dispute; (ii) the text of the ECT expresses Spain's consent to arbitrate intra-EU disputes; (iii) EU authorities do not support the objection; and (iv) the ECT would prevail over EU Law if there were a conflict.

### (i) EU Law Is Irrelevant to Determine the Tribunal's Jurisdiction and the Merits of the Dispute

258. For Claimants, Spain wrongly suggests that EU Law is international law applicable for the purposes of determining the Tribunal's jurisdiction and the merits of the dispute.[229]

259. Claimants first note that the Tribunal's jurisdiction is derived from Article 26 of the ECT, which can be interpreted through the principles of treaty interpretation embodied, in

---

[224] *Id.*, ¶ 42, footnote 29.

[225] Respondent cites RL-0009, the EUCJ decision *Van Geend en Loos* that sets the principle.

[226] *Id.*, ¶ 43.

[227] Cl. Rejoinder on Jurisdiction, ¶ 14.

[228] Cl. Rejoinder on Jurisdiction, ¶ 7. Claimants cite **CL-148,** *RREEF Infrastructure (G.P.) Limited and RREEF Pan European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, **CL-029,** *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A R.L v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, **CL-100,** *Antin Energia Termosolar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/13/31, Award, 15 June 2018, **CL-055,** *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, **CL-139,** *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018, and **CL-122,** *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. The Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018.

[229] Cl. Reply, ¶ 38; Cl. Rejoinder on Jurisdiction, ¶ 20.

particular, in Article 31 of the VCLT.[230] On the contrary, as recognised by the *Vattenfall v. Germany* tribunal, EU Law does not contain rules of interpretation for Article 26 of the ECT.[231] In addition, in the context of investment treaty law, questions of jurisdiction are not governed by the law applicable to the merits of the case, but rather, by the system established by the instruments to which the parties consented to jurisdiction.[232]

260.  Drawing support from the *Vattenfall, Eiser, Antin* and *Greentech* tribunals, Claimants contend that Article 26(6) of the ECT applies solely to the merits of the dispute between the Parties, contained in Part III of the ECT.[233] Claimants argue that any other interpretation would "*lead to an extension of a tribunal's jurisdiction in a manner patently rejected by the States party to the treaty.*"[234] As an illustration of their argument, Claimants rely on a NAFTA decision in which the tribunal ruled that it had limited jurisdiction under NAFTA and had "*no mandate to decide on claims based on treaties other than NAFTA.*"[235] In that regard, the Tribunal in this dispute has no authority to apply EU Law because its powers are limited to determining whether there is a breach of the provisions under Part III of the ECT.[236]

261.  In connection with Spain's argument that the Tribunal is "*called upon to interpret and apply EU Law because the dispute affects the EU fundamental freedoms and State Aid,*" Claimants sustain that, even assuming this were correct, it could only apply to the merits of the dispute and not to the Tribunal's determination of its jurisdiction.[237] Even on the merits, Claimants argue, the record shows that "*neither Spain nor the European Commission had the slightest concern that RD 661/2007 and RD 1578/2008 granted State Aid.*"[238] Further, Claimants' claims are not based on EU Law, but rather, the ECT and customary international law.[239] Therefore, the Tribunal should not be deciding on issues of EU Law to render its award, as confirmed in *RREEF*, *Eiser*, *Novenergia*, *Greentech* and *Charanne*.[240]

---

[230] Cl. Reply, ¶¶ 39-40.

[231] Cl. Reply, ¶ 40; **CL-0160**, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018,¶ 133.

[232] Cl. Reply, ¶ 42; Cl. Rejoinder on Jurisdiction, ¶ 20.

[233] Cl. Reply, ¶¶ 43, 44; Cl. Rejoinder on Jurisdiction, ¶ 21.

[234] Cl. Rejoinder on Jurisdiction, ¶ 22.

[235] Cl. Rejoinder on Jurisdiction, ¶ 22; **CL-171**, *Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, ICSID, Award, 12 January 2011, ¶ 71.

[236] Cl. Rejoinder on Jurisdiction, ¶ 23.

[237] Cl. Reply, ¶ 45.

[238] Cl. Rejoinder on Jurisdiction, ¶ 24.

[239] Cl. Reply, ¶ 46.

[240] Cl. Reply, ¶¶ 46-48; **CL-148**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶ 87; **CL-029**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶¶ 198-199; **CL-055**, *Novenergia II – Energy & Environment (SCA) Grand Duchy of Luxembourg, SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, ¶¶ 461, 465.

### (ii) The Text of the ECT Expresses Spain's Consent to Arbitrate Intra-EU Disputes

262. For Claimants, the ordinary meaning of Article 26 of the ECT demonstrates unambiguously that the ECT applies to "*disputes between <u>any</u> Contracting Party to the ECT and an investor of <u>any</u> other Contracting Party*."[241] There is no intra-EU exception to the Contracting Parties' "*unconditional consent to arbitration*."[242] No indication is found in the text of the ECT that the Contracting Parties have restricted their consent to arbitration based on whether the Contracting Parties belong to the same REIO.[243] Article 26, by its express terms allows arbitration between a Contracting Party (Spain) and investors from another Contracting Party (Luxembourg and the Netherlands).[244] Claimants refer to the *Vattenfall* tribunal to conclude that any other interpretation would be contrary to the meaning of the terms of Article 26 of the ECT.[245]

263. Claimants object to Spain's interpretation of the ECT according to which, EU Member States "*could not obligate themselves under Part III of the ECT*" because they conferred that competence on the EU.[246] In that regard, Claimants indicate that the ECT is a "*mixed agreement*" under EU Law, which implies that the EU and its Member States have shared competence to conclude the ECT and as such, Spain signed and ratified the ECT without making any reservation to be bound by the ECT.[247]

264. Claimants refute Spain's argument that the ECT's recognition of REIO's such as the EU, demonstrates that the EU Member States could not accept arbitration for intra-EU disputes.[248] The tribunals in *Eiser*, *Charanne*, *Isolux*, *Masdar*, and *Antin* have rejected Spain's position.[249] Article 1(3) of the ECT defines REIO's and Article 1(2) of the ECT lists REIO's as part of the definition of Contracting Party. For Claimants, the "*simple reference in a multilateral treaty to the existence of a regional organisation that is also a party to that same treaty does not establish that the multilateral treaty does not apply within the regional organisation*."[250]

---

[241] Cl. Reply, ¶ 49 (emphasis in the original).
[242] Cl. Reply, ¶ 51.
[243] Cl. Reply, ¶¶ 51-52.
[244] Cl. Reply, ¶ 52.
[245] Cl. Reply, ¶ 53; **CL-160**, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, ¶ 167.
[246] Cl. Reply, ¶ 55.
[247] Cl. Reply, ¶¶ 56-57.
[248] Cl. Reply, ¶ 59.
[249] Cl. Reply, ¶ 59; **CL-029**, ¶¶ 193-196; **CL-019**, *Charanne B.V and Construction Investments S.A.R.L. v. The Kingdom of Spain*, SCC Case No. 062/2012 Award, 21 January 2016, ¶¶ 427-432; **CL-043**, *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration SCC V 2013/153, Award, 12 July 2016, ¶¶ 633-636 and 640; **CL-139**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018, ¶¶ 319-324; **CL-100**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶ 204-230.
[250] Cl. Reply, ¶ 60.

265. Claimants contend that Spain is wrong in arguing that Article 25 of the ECT expressly recognises the principle of primacy of EU Law.[251] Article 25 of the ECT does not even refer to a REIO.[252] It establishes the obligation to accord MFN treatment, in the context of the EU, and notes that *"MFN treatment does not oblige EU Member States to extend the rights of the EU internal market to investors from beyond the EU*."[253] This proves that when the Contracting Parties meant to restrict investors' rights, they did so expressly in the context of the ECT interaction with the EU.[254]

266. With relation to Article 26(1) of the ECT, Claimants note that in the phrase "*in the Area of the former* [Contracting Party]," "*Area*" refers to that of the Contracting Party "*that is party to the Dispute*."[255] In this case, the relevant "*Area*" would be the territory of Spain and not the EU.[256] The situation would be different if the EU would be a party to the dispute: in that case, the relevant "*Area*" would be the entire EU.[257]

267. Claimants also observe that the ECT contains no express disconnection clause or a reservation that would allow the Tribunal to disregard the ECT provisions in an intra-EU dispute.[258] Drawing support from the *Eiser* tribunal, Claimants dismiss Spain's position that no disconnection clause is indeed necessary because of the "*complete harmonisation*" between the ECT and the EU.[259] Claimants note that: (i) disconnection clauses have been widely used by the EU even before the ECT was negotiated; (ii) when no disconnection clause exists, a multilateral treaty applies between all the Contracting Parties; (iii) despite the EU's experience with disconnection clauses, the ECT does not contain such clause for their *inter se* relationships, and therefore, it is unequivocal that the ECT applies to intra-EU disputes; and (iv) the tribunals in *PV Investors*, *Masdar*, and *Electrabel* have dismissed the proposition of an implicit disconnection clause contained in the ECT.[260]

268. Finally, Claimants note that the ECT must be interpreted in good faith. In that sense, there would have to be an express exclusion by the ECT Contracting Parties that would indicate a limit on intra-EU disputes.[261]

---

[251] Cl. Rejoinder on Jurisdiction, ¶ 33.
[252] Cl. Rejoinder on Jurisdiction, ¶ 33.
[253] Cl. Reply, ¶ 61.
[254] Cl. Reply, ¶ 61.
[255] Cl. Reply, ¶ 62.
[256] Cl. Reply, ¶ 62.
[257] Cl. Reply, ¶ 62.
[258] Cl. Reply, ¶ 63.
[259] Cl. Reply, ¶ 63; **CL-029**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 201.
[260] Cl. Reply, ¶¶ 64-71; **CL-154**, *PV Investors v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014, ¶ 183; **CL-139**, *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018, ¶¶ 310-313; and **CL-031**, *Electrabel S.A. v. The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 5.37.
[261] Cl. Reply, ¶ 72.

### (iii) EU Authorities Do Not Support the Objection

269.  In Claimants' view, the *Achmea* Judgment relied on by Spain does not apply to the ECT. Claimants contend that:

- the judgment itself makes clear that it applies only to a treaty concluded by Member States, not the EU, and the case related to a BIT concluded between the Netherlands and Slovakia before Slovakia became a Member State;

- the applicable choice of law at issue in *Achmea* is considerably different from that of Article 26(6) if the ECT and, contrary to Spain's assertion, the Tribunal is not called upon to apply EU Law but rather, the ECT and customary international law;

- the question referred to the CJEU in *Achmea*, whether the Netherlands-Slovakia BIT provisions were compatible with the TFEU, has no relevance in this arbitration as the Netherlands and Luxembourg had already acceded to the EU when they ratified the ECT;

- the present dispute has been brought before an ICSID tribunal whereas the arbitral tribunal in *Achmea* was subject to German law provisions and EU Law arguments have no place within the ICSID framework; and

- this Tribunal's jurisdiction derives from the ECT provisions and is not bound by the decisions of European institutions.[262]

270.  Claimants also dismiss Spain's reliance on Opinion 1/91, arguing that said decision also stresses that "an international dispute settlement mechanism set forth by an international treaty to which the EU is itself a party, is compatible with EU Law, and that the decisions of the court with jurisdiction to decide disputes under that treaty will be binding on the ECJ."[263] Claimants equally distinguish the MOX Plant case relied upon by Spain to contend that, unlike the present dispute, the MOX Plant decision concerned the interpretation of two EC's Directives on which Ireland based its arguments. The reasoning in that case is not applicable to this dispute, given that this Tribunal is not ruling on issues of EU Law between two Member States.[264]

271.  Further, Spain's reliance on the *Kadi* judgment and Opinion 2/13 is, in Claimants' view, misplaced,[265] and argue that: (i) the *Kadi* judgment does not "*concern the interpretation of an international treaty to which the EU is a party, such as the ECT, and therefore has no bearing on the issues in dispute;*"[266] and (ii) that the principal concern in Opinion 2/13 related to non-EU bodies, such as the ECHR, would have a binding effect on the EU and

---

[262] Cl. Reply, ¶¶ 73-94; Cl. Rejoinder on Jurisdiction, ¶¶ 37-39.
[263] Cl. Reply, ¶ 96.
[264] Cl. Reply, ¶¶ 97-98.
[265] Cl. Reply, ¶¶ 99-105.
[266] Cl. Reply, ¶ 101.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

its institutions with regard to a particular interpretation of EU Law, which is irrelevant in the context of the present dispute.[267]

272. Claimants also dismiss Spain's arguments based on the EC Decision contending that the remuneration under RD 661/2007 and RD 1578/2008 constitutes State Aid under EU Law.[268] For Claimants, the EC Decision does not rule on whether RD 661/2007 and RD 1578/2008 are incompatible State Aid within the meaning of Article 107(1) TFEU.[269] In addition, this Tribunal is being called upon to decide on matters deriving from the ECT and the ICSID Convention and not whether or not to grant State Aid under EU Law.[270] The only binding part of the Commission's decision is its ruling on the compatibility of the New Regime with Article 107(3)(c) TFEU, and as such, the EC Decision has no relevance in the presence dispute, as confirmed by the *Novenergia* tribunal.[271]

273. Claimants also contest Spain's reliance on Opinion 1/09, Opinion 2/15, the EC Communication of 19 July 2018 and the January 2019 Declarations by 22 EU Member States.[272]

274. *With regard to Opinion 1/09*, Claimants note that this decision concerns a draft international agreement to create the European and Community Patents Court.[273] In that context, the CJEU stated that the draft agreement was not compatible with EU Law as the Patents Court would have exclusive jurisdiction "*to hear a significant number of actions brought by individuals in the field of the Community patent and to interpret and apply the European Union law in that field,*" depriving Member States courts of their powers in that regard.[274] In Claimants' view, this decision is unrelated to the dispute before the Tribunal as the ECT does not require the Tribunal to interpret or apply EU Law.[275]

275. *With regard to Opinion 2/15*, Claimants observe that the issues in that case concerned distribution of competences between EU Member States and the EU to conclude Free Trade Agreements between the EU and the Republic of Singapore.[276] Claimants note that the CJEU found that "*it is not appropriate to examine whether the dispute settlement regime laid down by* [the Free Trade Agreement fulfils] *the criterion relating to the autonomy of EU Law*" as the Court observed that the case did not relate to the settlement of disputes on

---

[267] Cl. Reply, ¶ 105.
[268] Cl. Reply, ¶¶ 117-124; Decision of the European Commission regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste (S.A: 40348 (2015/NN)), 11 November 2017, **RL-0060**.
[269] Cl. Reply, ¶ 119.
[270] Cl. Reply, ¶ 120.
[271] Cl. Reply, ¶ 122.
[272] Cl. Rejoinder on Jurisdiction, ¶¶ 40-66.
[273] Cl. Rejoinder on Jurisdiction, ¶ 41.
[274] Cl. Rejoinder on Jurisdiction, ¶¶ 42-43 (emphasis omitted); **CL-180**, Opinion 1/09 of the Court (Full Court), 8 March 2011, ¶ 89.
[275] Cl. Rejoinder on Jurisdiction, ¶ 44.
[276] Cl. Rejoinder on Jurisdiction, ¶ 46.

the interpretation of EU Law.[277] In that context, Claimants maintain that this Opinion does not support Spain's case.[278]

276. *With regard to the EC Communication to the European Parliament and the Council of 19 July 2018*, Claimants argue that Spain's reliance on this authority is misplaced.[279] Claimants observe that although the EC participated in the ECT negotiations, "*it has no particular authority to interpret the ECT.*"[280] Claimants add that the EC Communication has no relevance to the issues at stake in the present dispute since the objective of the EC Communication is to: "*(i) 'provide guidance on existing EU rules for the treatment of cross-border EU investments'; and (ii) seek to reassure investors that the absence of intra-EU investment treaties does not mean that investors within the EU are not protected.*"[281]

277. *With regard to the EU Member States Declarations*, Claimants contend that none of the January 2019 Declarations are favourable to Spain's arguments.[282] Claimants first argue that the 22 Member States Declaration draws distinctions between the legal consequences of the *Achmea* Judgment for bilateral investment treaties and the ECT (which Spain fails to mention).[283] On that basis, the Member States merely announced with regard to the ECT that they "*will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the* Achmea *Judgment in relation to the intra-EU application of the Energy Charter Treaty.*"[284] Claimants further note that Spain failed to address Hungary's Declaration of 16 January 2019 which states that the "*the Achmea Judgment concerns only the intra-EU bilateral investment treaties*" and "*does not concern any pending or prospective arbitration proceedings initiated under the ECT.*"[285]

278. Claimants contend that the January 2019 Declarations are irrelevant in the context of this arbitration as they do not constitute agreements on the interpretation of Article 26 of the ECT and have not been signed by all the Contracting Parties of the ECT.[286] In any event, Claimants argue, the January 2019 Declarations postdate the commencement of this arbitration proceeding and thus, can have no bearing on the Tribunal's jurisdiction.[287]

### (iv) The ECT Would Prevail Over EU Law If There Were a Conflict

279. For Claimants, the protection of EU Member States' nationals offered by EU Law is different from that of the ECT, in that only the ECT allows investors to bring a direct claim

---

[277] Cl. Rejoinder on Jurisdiction, ¶ 46; **CL-181**, Opinion 2/15 of the Court (Full Court), 16 May 2017, ¶ 301.
[278] Cl. Rejoinder on Jurisdiction, ¶ 46.
[279] Cl. Rejoinder on Jurisdiction, ¶ 49.
[280] Cl. Rejoinder on Jurisdiction, ¶ 49.
[281] Cl. Rejoinder on Jurisdiction, ¶ 50.
[282] Cl. Rejoinder on Jurisdiction, ¶ 51.
[283] Cl. Rejoinder on Jurisdiction, ¶ 53.
[284] Cl. Rejoinder on Jurisdiction, ¶ 53; **RL-0118**, 22 Member States Declaration, ¶ 9.
[285] Cl. Rejoinder on Jurisdiction, ¶ 57; **RL-0120**, Declaration of the Government of Hungary, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the EU, 16 January 2019 ("**Hungary's Declaration**"), ¶ 8.
[286] Cl. Rejoinder on Jurisdiction, ¶¶ 63-64.
[287] Cl. Rejoinder on Jurisdiction, ¶ 65.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

against Contracting States through international arbitration.[288] Because of those additional rights under the ECT, there can be no conflict between the ECT and EU Law.[289] Claimants refer to the decisions in *Novenergia*, *Electrabel*, *Eastern Sugar*, *Charanne*, *RREEF* and *Vattenfall* to contend that EU Law and the ECT coexist without interfering with each other.[290]

280.  Even if the Tribunal were to consider that there is a risk of incompatibility between the ECT and EU Treaties, the ECT would prevail.[291] This is supported by (i) the plain language the ECT's conflict-of-laws clause of Article 26; (ii) the fact that treaties to which the EU is a party prevail over EU Law, as provided by the TFEU and decided by the CJEU; and (iii) the fact that ECT would also prevail under Articles 30 and 59 of the Vienna Convention.[292] As found by the *RREEF* tribunal, the ECT would prevail over EU Law in case of a conflict because EU Law cannot "*trump public international law.*"[293]

281.  Claimants dismiss Spain's argument that the protection that investors receive through EU judicial system is not less favourable than that offered by arbitration.[294] Citing to the awards in *Novenergia* and *Masdar*, Claimants take the view that the right for qualifying investors to bring their claims under the ECT is more favourable because that process "*de-politicises the dispute by removing it from the purview of Spain's national courts.*"[295]

282.  Claimants also highlight that Article 26(3) of the ECT is clear in that it provides that "*each Contracting Party* 'unconditionally consents' *to international arbitration*'" and in that sense, the ECT "*certainly does not deprive an investor of its right to obtain redress in international arbitration.*"[296]

### (2) The Tribunal's Analysis

283.  This objection has several issues to be addressed by the Tribunal, namely:

284.  Whether Article 26 of the ECT is applicable to intra-EU disputes, and whether or not it applies to breaches to obligations set forth in Part III of the ECT;

285.  Whether, in the context of Article 26(6) of the ECT, that requires the tribunal to decide the issues "*in accordance with this Treaty and applicable rules and principles of international*

---

[288] Cl. Reply, ¶¶ 107-109.
[289] Cl. Reply, ¶ 109.
[290] Cl. Reply, ¶ 109.
[291] Cl. Reply, ¶ 110.
[292] Cl. Reply, ¶¶ 111-115.
[293] Cl. Reply, ¶ 116.
[294] Cl. Rejoinder on Jurisdiction, ¶ 72.
[295] Cl. Rejoinder on Jurisdiction, ¶¶ 73-74; **CL-055**, *Novenergia II – Energy & Environment (SCA) Grand Duchy of Luxembourg, SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, ¶ 445; **CL-139**, *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018, ¶ 332.
[296] Cl. Rejoinder on Jurisdiction, ¶ 82.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*law*", this implies that EU Law should be applied to determine the jurisdiction of the Tribunal;

286. Whether the principles of autonomy and primacy of EU Law, that Respondent contends derive from Article 25 of the ECT, mean that EU courts have exclusive jurisdiction to address intra-EU disputes;

287. Whether, in the absence of an express disconnection clause in the ECT, it should nonetheless be deemed that there is an implicit disconnection clause or reservation that would require the Tribunal to disregard the ECT dispute settlement provisions in an intra-EU dispute; and

288. What impact, if any, do the *Achmea* Judgment issued by the CJEU,[297] the 22 Member States Declaration and the 5 Member States Declaration have on this case.

289. In respect to the argument that EU Law should be applied to determine jurisdiction, the Tribunal believes that the terms of Article 26(6) of the ECT ("*A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*") apply only to the merits of a dispute, and therefore agrees with Claimants in the sense that questions of jurisdiction are not necessarily subject to the law applicable to the merits of the case, which was confirmed by the tribunal in *Vattenfall v. Germany,*[298] as well as others involving Respondent, such as *Greentech*[299] and *Antin,*[300] which found that Article 26(6) of the ECT applies only to the merits of the dispute and not to issues or questions relating to the tribunal's jurisdiction.

290. But even under Respondent's contention that Article 26(6) requires the Tribunal to "*interpret and apply*" EU Law since the dispute affects the EU fundamental freedoms and State Aid, this is not an argument to object to the jurisdiction of the Tribunal insofar as the provision deals with deciding on the merits of the dispute.

291. The ECT contains no language to exclude intra-EU investor-State disputes based on the ECT, and it may not be implicitly deemed to exist from an interpretation of the ECT, as suggested by Respondent when it raises the allegation of a transfer of competence by a Regional Economic Integration Organization (or REIO) to the organization pursuant to Article 1(3) of the ECT. Indeed, the fact that the EU is also a Contracting Party and a REIO, does not bar the Tribunal's jurisdiction. Just as each of the Contracting Parties to the ECT (including, of course, Spain, the Netherlands and Luxembourg) granted their "*unconditional consent to the submission of a dispute to international arbitration*", so did the EU when it signed and ratified the ECT. But each such consent should be deemed to

---

[297] *Achmea* Judgment.
[298] **CL-160**, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, ¶ 121.
[299] **CL-122**, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. The Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018, ¶¶ 218-219.
[300] **CL-100**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 224.

be individually granted by each Member State and the EU, and not deemed that upon adhesion by the EU the others were superseded.

292. Regarding Respondent's allegation that Claimants cannot invoke arbitration under the ECT Article 26(1) because both Claimants and Respondent are located within the same "Area" and are not from the territory of another Contracting Party, the Tribunal rejects the argument and recalls that when the provision refers to "*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former [...]*"), the claim is not being brought against the EU but rather against Spain, and it should be understood that the relevant "area" is the territory of Spain. Other tribunals have reached the same conclusion.[301]

293. There is no solid support to the contention by Respondent that the Tribunal cannot examine the claims made by Claimants because (i) the terms of Article 26(6) of the ECT give primacy to EU Law, and (ii) it is only the CJEU –along with other courts of the EU– who can decide on the interpretation of EU Law, preclude the existence of a mechanism for dispute resolution between EU investors and EU Member States other than the ones provided for under EU treaties.

294. As expressed in the prior intra-EU objection dealing with the nationality of Claimants as investors, the ordinary meaning of the terms of Article 26, "*in their context*" and "*in the light of its object and purpose*" as required interpretation under the VCLT leads to conclude that the jurisdiction of the Tribunal derives from the ECT itself.

295. Since the ECT was signed by both EU Member States and the EU itself, this makes it a "*mixed agreement*" under EU Law. But the EU only gained the exclusive competence on foreign direct investment (as part of the common commercial policy) with the Lisbon Treaty[302] in December 2009 –when it entered into force. Therefore, the argument that the EU could not deal with dispute resolution of foreign investment issues at the time it entered into the ECT is wrong, since the EU signed and ratified the ECT in December 1994 and December 1997, respectively.[303]

296. Respondent has also referred to the principle of *pacta sunt servanda* to support its position that all the Member States who ratified any EU Treaty since 1963 agreed on the principle of autonomy of EU Law, and that all the Member States who have ratified an EU Treaty since 1964 agreed on the principle of primacy of EU Law. But the principle applies clearly in respect to Article 26(1) of the ECT where, despite other treaties already in force, the EU Member States, and even the EU, when they signed and ratified, failed to exclude from the "*irrevocable consent*" to arbitration any dispute involving its Member States.

---

[301] **CL-154**, *PV Investors v. the Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014, ¶¶ 179-180;  and **CL-139**, *Charanne B.V. and Construction Investment S.A.R.L. v. the Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, ¶ 429.
[302] TFEU, Arts. 206-207.
[303] The EU signed the ECT on 17 December 1994 and ratified it on 16 December 1997; entering into force in respect to the EU on 16 April 1998.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

297. It is clear that the exclusion had been done before in respect to other treaties.[304] Had Spain desired to make a reservation at the time it signed and later ratified the ECT as a Contracting Party, it could have done so. But there is no evidence submitted by Respondent to the effect that either Spain or any other of the signatory States made any such effort to do so through a disconnection clause, to ensure that the provisions of a mixed agreement only apply *vis-à-vis* third parties and not as between EU Member States.

298. Respondent contends that there is no need for a disconnection clause since the principles of autonomy and primacy imply that they disconnect from the international convention, and supports its view by stating that an exercise of comparing the aim and purpose of the ECT with the aim and purpose of the EU Treaties and, even more so, to the Treaty of Lisbon, which acts as a "*lex posterior*", it is clear that the EU Treaties should prevail over the ECT under Articles 30 and 59 of the VCLT.[305] In support, Spain cites Opinion 1/03 of the CJEU of 7 February 2006[306] where it found that "*the existence of a disconnection clause is entirely without relevance*," to conclude that such "*reflection by the EU Commission*" is in itself sufficient to justify the reason why the introduction in the ECT, signed by the EU itself, of a disconnection clause, should not be necessary.

299. However, contrary to that contention, the ECT expressly contains an "*irrevocable consent*" to arbitration. The disconnection clause would need to be express, and could not have effect if simply implied, as has been suggested by Respondent. As the *Antin* tribunal noted:

> "*The ECT's purpose does not support the Respondent's interpretation. Article 2, captioned 'Purpose of the Treaty,' declares that '[t]his Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.' […] Nothing in this wording suggests the exclusion of claims by investors who are nationals of an EU Member State who is also a party to the ECT against another EU Member State. Moreover, such context does not call into question the ordinary meaning of Article 26.*"[307]

> "*If the arbitration clause, which is at the very heart of the Treaty to which the EU consented, were to exclude the variety of treaties and legislation mentioned by Spain, then the EU, which the Tribunal must assume acted in good faith when it negotiated and signed the ECT, would have, under international law, provided a formal warning, or an express exclusion or a reserve.*"[308] (Emphasis added)

---

[304] For example, the 1988 Joint Council of Europe/OECD Convention on Mutual Assistance in Tax Matters.
[305] Resp. C-Memorial, ¶ 188.
[306] **R-0218**, Opinion 1/03 of the plenary session of the CJEU, 7 February 2006, ¶¶ 83-84.
[307] **RL-0116**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. the Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 216.
[308] *Id.*, ¶ 225.

300.  The Tribunal also disagrees with Respondent's argument in respect to the alleged lack of consent to submit to arbitration the resolution of disputes on matters that require the interpretation and application of EU Law because: (i) EU Member States cannot not be obligated under Part III of the ECT since this represents an infringement of the EU's principle of primacy, and (ii) because the ECT itself recognises, in its Article 25, the principle of primacy of EU Law.[309] The contention that Article 25 of the ECT recognises the principle of primacy of EU Law in intra-EU relations and prevents that, under the MFN clause, said right is to be extended to nationals of ECT signatory States that are not members of the EU is irrelevant to the discussion in light of the above considerations.

301.  Respondent cites the *Achmea* Judgment to provide ample discussion and support to its contention of lack of jurisdiction by the Tribunal. However, the Tribunal fails to find any substance to such allegations. Simply put, the *Achmea* and this case are totally different and there can be no analogies found.

302.  Whereas the treaty in discussion in *Achmea* was a bilateral investment treaty among the Netherlands and Slovakia –before the Slovak Republic acceded to the EU, this dispute arises under the ECT, and the EU is a party to the ECT. The CJEU also distinguished that case by the fact that it applies to a treaty concluded by Member States and not the EU itself.[310] The CJEU also questioned the ability of Member States to submit disputes to a body which is not part of the judicial system of the EU to interpret both of the treaty and EU Law. This dispute, however, relates to the ECT where the EU accepted the terms of Article 26 to granting "*unconditional consent to the submission of a dispute to international arbitration*".

303.  In *Achmea,* the BIT called on the tribunal to apply the laws of the contracting party concerned, and other relevant agreements among the parties, and therefore the ECJ found that "*the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU Law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital*",[311] and since: (i) the arbitral tribunal is not an EU court or a court of an EU Member State, and (ii) its findings on EU Law are not subject to review by a court of an EU Member State, said mechanism for settling disputes established in the treaty is not capable of ensuring that those disputes will be decided by a court within the judicial system of the EU. As such, the CJEU concluded that the BIT had an "*adverse effect on the autonomy of EU Law."*[312] However, no such concerns are present in this case, because the powers of this Tribunal are limited to determining whether or not there is a breach of Articles 10 to 17 (Part III) of the ECT, and the Tribunal can only apply the terms of the ECT and international law,

---

[309] Resp. C-Memorial, ¶ 196.
[310] *Achmea* Judgment, ¶ 58.
[311] *Id.*, ¶ 42.
[312] *Achmea* Judgment, ¶ 59.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

without authority to apply EU Law. This same conclusion has been reached, among other tribunals, by those in *RREEF*,[313] *Novenergia*,[314] *Greentech*[315] and even *Charanne*.[316]

304.    Although the above reasoning is sufficient in the eyes of the Tribunal to reject the argument of the *Achmea* Judgment, the Tribunal notes that other reasons have been expressed by tribunals who have been faced with the same objection from Spain. These include the fact that, contrary to the *Achmea* case –where the arbitral proceedings were seated in Germany and subject to German law provisions on annulment of arbitral awards– the cases were subject to the ICSID Convention.[317]

305.    Multiple other tribunals have also analysed and rejected the relevance of the *Achmea* Judgment to disputes under the ECT. For example, the *Masdar v. Spain* tribunal,[318] which concluded that "*the* Achmea *Judgment does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party*", as well as the *Greentech,*[319] and *Vattenfall* tribunals.[320]

306.    Although Respondent places relevance on the January 2019 Declarations by 22 EU Member States[321] and the subsequent January 2019 Declaration by 5 EU Member States,[322] the undisputed fact is that they show: (i) that the EU Member States are not in agreement themselves as to whether the *Achmea* Judgment applies to the ECT; (ii) that, at best, they make an interpretation as to the effect under EU Law, and not public international law; (iii) since the first referenced Declaration by 22 Member States makes a clear distinction between <u>bilateral</u> investments treaties and the ECT, and declares that "*all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable*", it fails to address any effect on <u>multilateral</u> treaties such as the ECT, and simply indicates that they "*will discuss without further delay whether any additional steps are necessary to draw all the consequences from*

---

[313] **CL-148**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶ 87.

[314] The tribunal stated clearly that "*this Tribunal is not applying Union law*". **CL-055**, *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, ¶ 465.

[315] **CL-122**, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018, ¶¶ 218-219.

[316] **CL-019**, *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, ¶ 448.

[317] **CL-159**, *UP and C.D Holding Internationale v. Hungary,* ICSID Case No. ARB/13/35, Award, 9 October 2018, ¶ 253.

[318] **CL-139**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018, ¶ 679, and **CL-137**, *Marfin Investment Group Holdings S.A., Alexandros Bakatselos and others v. Republic of Cyprus,* ICSID Case No. ARB/13/27, Award, 26 July 2018, ¶ 592.

[319] **CL-122**, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018, ¶ 220.

[320] **CL-160**, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, ¶¶ 162 and 213.

[321] **RL-0118**, 22 Member States Declaration.

[322] **RL-0119**, 5 Member States Declaration.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

the Achmea *Judgment in relation to the intra-EU application of the Energy Charter Treaty*".[323] Five Member States went further declaring that "*it would be inappropriate … to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty*".[324] The absence of uniformity in the EU's position is further evidenced by a separate Declaration made by Hungary, an EU Member State, on 16 January 2019.[325] Even if the Declaration had been signed by all EU Member States and the *Achmea* decision addresses the status of the ECT, they do not deprive the Tribunal of jurisdiction. Respondent made an offer to covered investors under the ECT consenting to arbitration, and Claimants accepted the valid offer when they submitted this dispute thus a binding and formal consent had been created. That agreement to arbitrate is subject to public international law. Furthermore, Article 25(1) of the ICSID Convention provides that once consent has been given it cannot by withdrawn unilaterally.

307. For the reasons stated above, the Tribunal rejects the objection to the jurisdiction based on the arguments submitted by Respondent and concludes that is has jurisdiction *ratione materiae.*

## C. THIRD OBJECTION: LACK OF JURISDICTION *RATIONE TEMPORIS*

### (1) The Parties' Positions

#### a. *Respondent's Position*

308. Respondent contends that part of Claimants' investments was made during and after the Disputed Measures were adopted, which would prevent the Tribunal from exercising its jurisdiction *ratione temporis* if Claimants cannot prove the ownership of their investment before the dispute arose.[326]

309. Respondent argues that case law is unanimous in concluding that:

> "*an international tribunal lacks* ratione temporis *jurisdiction in cases in which an investor not protected by a certain BIT restructures their investment for the purpose of being included within the scope of application of said BIT, on a date after the dispute arises against the State receiving the investment.*"[327]

310. In support of its argument, Spain also cites to the decision in Vito G. Gallo v. Canada: *"Investment arbitration tribunals have unanimously found that they do not have*

---

[323] **RL-0118**, 22 Member States Declaration, page 4.
[324] **RL-0119**, 5 Member States Declaration.
[325] **RL-0120**, Hungary's Declaration.
[326] Resp. C-Memorial, ¶¶ 197-237; Resp. Rejoinder, ¶¶ 182-186; Resp. PHB, ¶¶ 46-47. *See* also Second Hearing, Resp. Opening Slide Presentation, slides 46-48, and Second Hearing, Tr. Day 1, 156:7-157:5 (Gil Nievas).
[327] Resp. C-Memorial, ¶ 203.

*jurisdiction unless the claimant can establish that the investment was owned or controlled by the investor at the time when the challenged measure was adopted".*[328]

311. Respondent notes that, according to case law, both the abuse of process objection and an objection based on *ratione temporis* are based on the principle of good faith.[329] Therefore, awards that have analysed the abuse of process objection based on the principle of good faith are also applicable to the *ratione temporis* jurisdictional objection. Spain refers to the award in *Philipp Morris v. Australia*, which concludes that a difference must be drawn between objections based on lack of jurisdiction *ratione temporis* and abuse of process.[330] Respondent recalls case law addressing the principle of good faith to further contend that said principle justifies the *ratione materiae* objection. In that regard, it draws support from the tribunals in *Phoenix v. Czech Republic*,[331] *Cementownia v. Turkey*,[332] and *Plama Consortium v. Bulgaria*.[333] In Spain's view, the good faith principle as expressed in international law must serve as a basis to determine the *ratione temporis* objection it invokes.[334]

312. Spain contends that, to decide on a *ratione temporis* objection, the Tribunal must analyse the entirety of the case's circumstances, paying special attention to issues of timing.[335] Particularly, emphasis must be placed on the moment in which the conflict arises and its relation to the timing of the investment.[336] Relying on the definition of a "*dispute*," Spain contends that the dispute in the present case arises on 7 March 2012, but the investment did not materialise until January 2014.[337]

313. Respondent includes the following chronology of events, showing that the date of Claimants' investments post-dates Spain's announcements of the regulatory adjustments:

- "*02/06/2010: Investment in the photovoltaic plants of Tordesillas, Valtierra I, II and III*

- *8=6[sic]/2011: Investment in the Fontellas and Lasesa plants*

- *19/12/2011: Announcement of the reform on the SES by the Prime Minister in his inaugural address.*

- *28/12/2011: CNE press release which reiterates the need to implement immediately, inter alia, proposals on the regulation of activities aimed at*

---

[328] Resp. C-Memorial, ¶ 204; **RL-0087**, *Vito G. Gallo v. The Government of Canada*, UNCITRAL Arbitration, Award 15 September 2011, ¶ 328.

[329] Resp. C-Memorial, ¶¶ 208-210.

[330] Resp. C-Memorial, ¶ 210.

[331] **RL-0002**, *Phoenix Action Ltd v. The Czech Republic*, ICSID Case No. ARB/06/5, ("**Phoenix v. Czech Republic**") Award, 15 April 2009, ¶ 108.

[332] **RL-0004**, *Cementownia v. Turkey*, ICSID Case No. ARB(AF)/06/2, Award 17 September 2009, ¶¶ 153-154.

[333] **RL-0003**, *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, ("**Plama v. Bulgaria**") Award, 27 August 2008, ¶ 138.

[334] Resp. C-Memorial, ¶¶ 212-215.

[335] Resp. C-Memorial, ¶¶ 216-223.

[336] Resp. C-Memorial, ¶ 225.

[337] Resp. C-Memorial, ¶ 233.

*eliminating the structural deficit of the system and mitigating debt financing costs.*

- *27/01/2012: Publication of RD-Act 1/2012, which suspended the remuneration pre-assignment procedures and the elimination of the economic incentives for new electric energy production plants based on cogeneration, renewable energy sources, and waste.*

- *07/03/2012: CNMC report on 'Measures to guarantee the financial-economic sustainability of the electricity sector.': in which short-term measures are recommended (materialised in RD-Act 2/2013). Birth of the dispute.*

- *30/3/2012: The Council of Ministers approved Royal Decree Act 13/2012 on Measures for correcting deviations due to imbalances between costs and revenues of the electricity and gas sectors, which is enacted as a first step towards a 'profound reform of the energy system'.*

- *27/4/2012: The Government approved the 'National Reform Program 2012' which reaffirms the commitment of the Kingdom of Spain to eliminate the tariff deficit.*

- *13/7/2012: Royal Decree-Act 20/2012, of 13 July, on measures to ensure budget stability and promote competitiveness, was enacted, stating in its eighth provision: 'The tariff deficit caused by the imbalances between the costs of the electricity system and the income obtained from the regulated prices set by the General State Administration is a structural problem whose solution is urgent because of the threat it poses to the system's economic sustainability'*

- *20/07/2012: The Kingdom of Spain signed the Memorandum of Understanding with the European Union as a result of the need that certain Spanish banks had for a bailout. Said Memorandum links the financial situation with other macroeconomic imbalances and commits the Kingdom of Spain to adopt structural reform measures to correct these imbalances.*

- *September 2012: the Government published another document 'The reforms of the Government of Spain: Determination against the crisis'. In the chapter entitled 'Planned reforms', it refers to the 'Reform of the energy sector'.*

- *27/09/2012: The Government approved in the Spanish Cabinet Meeting Decision the 'Draft Act on State Budgets for 2013'. In that Cabinet Meeting the 'Spanish Strategy for Economic Policy' was also approved: Assessment and structural reforms over the next six months'. In this Strategy the 'Energy reform' was mentioned and structural measures were announced to correct the tariff deficit permanently, as well as the presentation of a new Electricity Sector Act, to address inefficiencies that were detected.*

- *27/12/2012: Act 15/2012 on fiscal measures for energy sustainability is approved, as a first measure for the reforms on the Electricity Sector, which had an impact on renewable energies. First measure appealed, in execution of the short-term measures included in the CNE's 7 March 2012 report.*

- *1/2/2013: the Government of Spain approved two more of the short-term measures recommended by the CNMC Report112, on 7 March 2012, through the publication of Royal Decree-Act 2/2013113: (i) the replacement with effect of the Consumer Price Index that governed the adjustment of the remunerations, fees and premiums of the electricity sector's activities, among them, the production of renewable energy, by the Consumer Price Index to constant taxes without food not elaborated or energy products and, (ii) the reduction of the premium amount to a value of €0 in the pool option plus premium provided for in Royal Decree 661/2007. 19/03/2013.*

- *11/4/2013: the document of the 2013 National Reform Plan is published, in which (i) the same date expected for publishing the Reform is again stated, on 30 June of the same year, (ii) that the package of Measures provided for a preliminary draft bill for the reform of Act 54/1997 and (iii) that mechanisms to review the remuneration will be introduced: '... Before June 30 of this year, a package of regulatory measures will be presented... Preliminary Draft Bill for the Reform of Law 54/1997..., that introduces remuneration stabilisation and revision mechanisms periodically and adapted to the circumstances'.*

- *12/7/2013: RD-Act 9/2013, of July 12, is approved. Urgent measures to guarantee the financial stability of the electricity system, the first measure and core issue of this dispute.*

- *January 2014: Investment of the remaining 50% of the Lasesa plant"*[338]

314. Respondent concludes that, in light of the chronology included above, the timing of Claimants' investments "*coincide[s] perfectly with the announcements and the beginning of the dispute.*"[339]

   **b.  *Claimants' Position***

315. Claimants oppose Spain's objection, both in respect to the chronology presented by Spain, and on the factual and legal analysis of the objection.[340]

316. They contest Spain's presentation of the chronology of events, arguing that Spain's measures post-date Claimants' investments, which were made between March and October 2011.[341] In their Reply, Claimants include their own timeline of events, highlighting the Disputed Measures in shaded text below:[342]

---

[338] Resp. C-Memorial, ¶ 235. (Emphasis omitted).

[339] Resp. C-Memorial, ¶ 236.

[340] Cl. Reply, ¶¶ 134-161; Cl. Rejoinder on Jurisdiction, ¶¶ 90-94; and Cl. PHB, ¶ 5. *See also* June Hearing, Cl. Opening Slide Presentation, slides 155-157, and June Hearing, Tr. Day 1, 147:12-150:15. *See also* Second Hearing, Cl. Opening Slide Presentation, slides 121-122.

[341] Cl. Reply, ¶ 136.

[342] Cl. Reply, ¶ 137. (Emphasis in the original).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

| Date | Event |
|---|---|
| Spain 2009 | The Claimants begin looking at investment opportunities in Spain. |
| January/February 2010 | The Claimants commence due diligence on the First Investment Plants. |
| March 2010 | Rumours of potential rumours [*sic*] change to the RE framework emerge. |
| Mid-April 2010 | Rumours of possible regulatory change to the RE framework intensify. |
| 9 April 2010 | The Claimants meet with the CNE. The CNE indicates that there is no risk of retroactive amendment to the tariffs for existing PV plants and emphasizes the important of stability in the economic regime. |
| 2 June 2010 | The Claimants sign <u>conditional</u> SPAs for the acquisition of the First Investment Plants. The closing of the SPAs is contingent upon certain Regulatory Conditions. |
| 21 December 2010 | The Claimants pay the sellers a portion of the price of the First Investment Plants, subject to the right to unwind. |
| 21 February 2011 | The Claimants meet with the Ministry of Energy. A representative of Ministry reassures the Claimants that no further retroactive changes to the regulatory regime for PV plants are planned. |
| March 2011 | The parties complete the transactions under the SPAs in relation to the First Investment Plants. |
| 22 June 2011 | The Claimants acquire the Fontellas Plants. |
| 18 October 2011 | The Claimants acquire 50% of the Lasesa Plants. The Claimants enter into put/call option agreements for the remaining 50% with the sellers, Dalkia/Forcimsa binding them to acquire the remaining 50% at Dalkia's request. |
| 27 December 2012 | Spain enacts Law 15/2012 (entry into force on 1 January 2013). |
| 1 February 2013 | Spain enacts RDL 2/2013. |
| 12 July 2013 | Spain enacts RDL 9/2013. |
| December 2013 | Dalkia/Forcimsa communicate their intention to exercise the Put Option for the remaining 50% shares in Lasesa. |
| 26 December 2013 | Spain enacts Law 24/2013. |
| 29 January 2014 | The Claimants acquire the remaining 50% of the Lasesa Plant as required under the Put Option signed in October 2011. |
| 6 June 2014 | Spain enacts RD 413/2014. |
| 16 June 2014 | Spain enacts the June 2014 Order. |

317.  Claimants oppose Spain's timeline, particularly marking the Prime Minister's December 2011 speech and the March 2012 CNE report as the "*birth of the dispute*."[343] For Claimants, those events are not Disputed Measures, have no legal effect, and in any case, did not

---

[343] Cl. Reply, ¶ 138.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

foreshadow the "*complete repeal of the RD 1578/2008 economic regime with respect to existing investments*."[344]

318.  In addition, Claimants' challenge to Spain's objection is two-fold.

319.  *First*, in Claimants' view, Spain has not applied the underlined relevant legal test to its *ratione temporis* objection. Claimants note that Spain addresses a number of investment arbitration case law on the abuse of process, while not alleging any abuse of process by Claimants in the current dispute.[345] In addition, Spain expressly refers to the *Philipp Morris v. Australia* award in which the tribunal provides that a distinction must be made between an abuse of process objection and a *ratione temporis* objection.[346] Spain further cites to case law arguing that good faith justifies the *ratione temporis* objection, but does not argue that Claimants acted in bad faith to manufacture jurisdiction.[347] In that regard, Claimants distinguish their behaviour with the facts at issue in *Phoenix v. Czech Republic* and *ST-AD v. Bulgaria* which are relied on by Spain.[348] Moreover, Claimants indicate that the other two cases cited by Spain, *Cementownia v. Turkey* and *Plama v. Bulgaria* do not address *ratione temporis* arguments.[349]

320.  *Second,* Claimants turn to the underlined facts at issue, on which Spain appears to rely for its objection. As far as the Lasesa Plants are concerned, Claimants affirm that by October 2011, they had effectively committed to buy 100% of the shares in said Plants.[350] To this end, on 18 October 2011, Claimants entered into a share purchase agreement to purchase 50% of the share capital of Sariñena Solar, S.L. which held the Lasesa Plants; (ii) simultaneously, Claimants entered into *put option* and *call option* agreements for the remaining 50% of the shares, which could be exercised between 1 January and 1 February 2014; and (iii) in light of the 18 October 2011 undertakings, Claimants had no choice but to acquire the 50% shareholding in the Lasesa Plants.[351]

321.  Therefore, contrary to what Respondent alleges, the acquisition of the remaining 50% of shares was not a separate investment in 2014, because by October 2011 Claimants were already contractually bound to acquire those shares.[352] For Claimants, Spain confuses the exercise of a *call option* and a *put option* because under the latter, if the sellers were to exercise that option, Claimants had no discretion to refuse buying the shares, as reflected in the Put Option Agreement.[353] Relying on witness evidence by Messrs. Mathieu Lief and

---

[344] Cl. Reply, ¶ 138.
[345] Cl. Reply, ¶ 141.
[346] Cl. Reply, ¶ 141; **RL-0007**, *Philip Morris Asia Limited v. The Commonwealth of Australia*¸ PCA Case No. 2012-12, Award on Jurisdiction and Admissibility, 17 December 2015, ¶ 527.
[347] Cl. Reply, ¶ 142.
[348] Cl. Reply, ¶¶ 144-145.
[349] Cl. Reply, ¶ 146.
[350] Cl. Reply, ¶¶ 150-151.
[351] Cl. Reply, ¶ 150-153.
[352] Cl. Reply, ¶ 155.
[353] Cl. Reply, ¶ 157.  *See* **C-197**, Put Option Agreement, Recital III, 18 October 2011: "*Whereas the Grantor wishes to grant the Beneficiaries a joint option to sell and to require the Grantor to acquire all the Shares in accordance with the terms and conditions of this Agreement*".

Nikolaus Roessner, Claimants conclude that the investment in the Lasesa Plants was made on 18 October 2011, well before Spain enacted the Disputed Measures.[354]

### (2) The Tribunal's Analysis

322. Since the position of Respondent is that a portion of the investment made by Claimants (a 50% interest in the Lasesa Plants) was made in the month of January 2014, and since this was after the Disputed Measures were enacted, the protection to the investment should be rejected *ratione temporis*, the Tribunal therefore needs to examine: (i) when the "Disputed Measures" were enacted, and (ii) when the "investment" in the Lasesa Plants was "made" by Claimants.

323. In respect to the first point, the Parties agree on the "measures" adopted by Spain, but the only difference among Claimants and Respondent is whether the announcement of the reform on the Spanish Electricity System ("**SES**") by the Prime Minister in his inaugural address on 19 December 2011 should be deemed as the first prelude to the Disputed Measures, and the effect of this. Claimants reject that this should be deemed as such, since it had no legal effect.[355] Respondent did not follow in its Rejoinder with this argument, and actually acknowledged that the dispute arose on 7 March 2012 with the issuance of the CNE Report. Since such event took place <u>after</u> the date on which the investments were made –as seen below– the first point of this objection is mute.

324. On the timing of the investment, neither of the Parties dispute the evidence submitted in this regard. Thus, it is not a factual dispute of whether contracts were executed, and on what date the contracts were executed and closed, but rather a dispute on the interpretation as to when said actions should be deemed to have occurred for purposes of determining the date of the investment.

325. The evidence shows that Claimants entered on 18 October 2011 into a share purchase agreement to purchase 50% of the share capital of Sariñena Solar, S.L. –which owned the Lasesa Plants.[356] On the same date, Claimants and the sellers[357] simultaneously entered into a Put Option Agreement and a Call Option Agreement to respectively be bound to sell and purchase the remaining 50% of the shares, which put and options could be exercised between 1 January and 1 February 2014.

326. Pursuant to Clause 1.3 of the Put Option Agreement, Claimant Infracapital Solar B.V. (previously, Infracapital E&W B.V.), as grantor, "*expressly and irrevocably [undertook]*

---

[354] Cl. Reply, ¶¶ 157, 160; NR Witness Statement, ¶ 18; ML Witness Statement 2, ¶ 23; Cl. Rejoinder on Jurisdiction, ¶ 94.
[355] Cl. Reply, ¶ 138.
[356] **C-110,** Lasesa SPA.
[357] Dalkia Solar, S.L., Forcimsa Empresa Consructora, S.A.and Forcimsa AOC Obra Civil, S.L.

*to acquire or to ensure third parties to acquire the Shares, at the joint request of the Beneficiaries* […]".[358] There is no debate as to the date this commitment was made.

327. Then, on 29 January 2014, Claimants (through Infracapital Solar B.V.) acquired the remaining 50% of the stock of Sariñena Solar, S.L. though a Stock Purchase Agreement.[359]

328. During the two-year period comprised from (a) the date of execution of the share purchase agreement and the Put Option and Call Option Agreements, on the one hand, and (b) the closing of the purchase of the remaining stock for the Lasesa Plants, the Disputed Measures were enacted by Spain. Thus, Respondent argues that having closed the purchase after the measures were put into place this should deem that the investment was made *after* such measures were known to Claimants and hence not be protected *ratione temporis*.[360]

329. Claimants have stated that "[…] in light of the 18 October 2011 undertakings, Claimants had no choice but to acquire the 50% shareholding in the Lasesa Plants".[361]

330. The evidence shows that in mid-December 2013 and early January 2014,[362] representatives of the sellers and Infracapital Solar B.V. discussed sellers' intention to exercise the put option for the remaining shares in Sariñena Solar, S.L. Although there is no reference in the stock purchase agreement of January 2014 to the prior Put Option Agreement, and exercise of the put option granted to sellers, it is clear to this Tribunal that the agreement need not reflect the prior covenants of the parties leading to closure of the transaction and implementation of the obligations of the parties thereunder to be effective. The "*express and irrevocable*" commitment to sell –to quote the language in the Put Option Agreement– existed since this agreement was originally executed. Seller's desire to close was sufficient to have the right to force purchase on Infracapital Solar B.V.

331. The Tribunal believes that the evidence is sufficient to dismiss Respondent's objection, not only because the acquisition of the stock representing 50% of the Lasesa Plants was not a separate transaction, but rather the conclusion of a contract that had been entered into in 2011.

332. Despite the above factual analysis, however, Respondent has cited some precedents[363] that require this Tribunal to examine whether there might have been any abuse of process or

---

[358] **C-197**, Put Option Agreement between Infracapital E&W B.V. (grantor) and Dalkia Solar, S.L., Forcimsa Empresa Constructora, S.A. and Forcimsa AOC Obra Civil, S.L. (beneficiaries), 18 October 2011, Clause 1.3.

[359] In Spanish, the "*Contrato de Compraventa de Participaciones Sociales*", subsequently ratified on 29 January 2014 before Notary Public in Madrid. *See* **C-214**, Contract for Purchase and Sale of Corporate Shares between Dalkia Solar, S.L., Forcimsa Empresa Constructora, S.A. and Forcimsa AOC Obra Civil, S.L. (sellers) and Infracapital Solar B.V. (buyer) .

[360] Resp. Rejoinder, ¶¶ 183-186.

[361] Cl. Reply, ¶153.

[362] *See* **C-210**, Email from Kenton Bradbury to Hervé Péneau, 18 December 2013; **C-211**, Email from Luis de la Torre Ramos to Nikolaus Roessner, 8 January 2014; and **C-213**, Email from Nikolaus Roessner to Infracapital Directors, 23 January 2014.

[363] Among others, **RL-0007**, *Philip Morris Asia Limited v. The Commonwealth of Australia¸* PCA Case No. 2012-12, Award on Jurisdiction and Admissibility, 17 December 2015; **RL-0002**, *Phoenix v. Czech Republic*, Award; **RL-**

lack of good faith on the part of Claimants, *i.e.*, when the investor restructures its investment in order to access investment arbitration, at the time when the dispute is already foreseeable, and the *ratione temporis* objection, which refers to those investments made when the dispute is already a reality.

333. The Tribunal finds no elements to sustain such allegation. On the one hand, the cases Respondent has cited deal with the timing of an investment for the sole purpose of gaining access to international arbitration, or the absence of good faith in attempting to date the effectiveness of a transaction. Further, as Respondent acknowledges,[364] the only "investors" able to benefit from the protection of the ECT are those who, having said condition before the dispute becomes foreseeable or before it has already taken place, can contribute to that end by making an investment under the ECT.

334. But most relevant is the fact that there is nothing in the record to question whether the timing of the transactions entered into by Claimants leading to the purchase of the Plants was not done in good faith and with the sole purpose of gaining access to the jurisdiction of this Tribunal. The burden of proof to support this allegation rests on Respondent, and it has failed to meet it. Therefore, this line of the objection is equally rejected.

335. For the reasons above stated, the Tribunal dismisses the *ratione temporis* jurisdictional objection of Respondent.

### D. Fourth Objection: Lack of Jurisdiction *Ratione Voluntatis* Over Claims Under Article 10(1) of the ECT Arising out of the TVPEE

#### (1) The Parties' Positions

##### a. *Respondent's Position*

336. Respondent objects to the Tribunal's jurisdiction to hear claims concerning breaches of Article 10(1) of the ECT as a result of tax measures, namely, the TVPEE, introduced by Law 15/2012. Spain contends that it has not given its consent to submit such dispute to arbitration, given that Article 26 of the ECT only covers claims for breaches of obligations derived from Part III of the ECT.[365] Pursuant to Article 21 of the ECT, Article 10(1), although located in Part III, does not give rise to obligations between the Contracting Parties in connection to tax measures.[366]

---

**0004**, *Cementownia v. Turkey*, ICSID Case No. ARB(AF)/06/2, Award 17 September 2009; **RL-0006**, *Banro American Resources, Inc. and Société Aurifère du Kivu et du Maniema S.A.R.L. v. Democratic Republic of the Congo*, ICSID Case No. ARB/98/7, Award, 1 September 2000; and **RL-0003**, *Plama v. Bulgaria*, Award.
[364] Resp. C-Memorial, ¶ 211.
[365] Resp. C-Memorial, ¶¶ 238-240. For Respondent's position with regard to his objection, see Resp. C-Memorial, § III.D; Resp. Rejoinder, § III.D; Resp. PHB, ¶ 45. *See* also June Hearing, Resp. Opening Slide Presentation, in particular, 04 Jurisdiction, slides 42-51; and June Hearing, Tr. Day 1, 234:23-236:19 (Gil Nievas). *See* also Second Hearing, Resp. Opening Slide Presentation, slides 49-57, and Second Hearing, Tr. Day 1, 157:5-161:3 (Oñoro Sainz).
[366] Resp. C-Memorial, ¶ 241.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

337. In Spain's view, "[t]here cannot be an alleged breach of obligations that legitimises resorting to arbitration simply because there is no obligation regarding taxation measures, in this case, the TVPEE."[367]

338. Respondent explains that Article 21 of the ECT contains a general exclusion of taxation measures from the scope of application of the ECT (a taxation "*carve-out*"), with a few exceptions, stipulated expressly in Article 21, which according to Spain, do not refer to Article 10(1) of the ECT.[368]

339. For Spain, the TVPEE is a "Taxation Measure" within the meaning of Article 21(7)(a)(i), which includes, "[a]ny provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein […]."[369] Spain notes that Law 15/2012 is part of domestic law, passed by the Parliament of Spain and its provisions on the TVPEE are provisions "relating to a tax".[370]

340. Under Spanish domestic law, "*there is no doubt that the TVPEE is a tax*" as ratified by the Spanish Constitutional Court.[371] This is clear from Article 1 of Law 15/2012 which provides that the TVPEE is a "*tax of a direct and real nature levied on the performance of activities of production and incorporation into the electricity system of electrical energy*"[372] and is confirmed by Article 2 of Law 58/2003.[373] The TVPEE is a tax that applies to all electricity production facilities, covering both renewable and conventional sources. The applicable tax rate is 7% and its taxable period is generally the calendar year.[374] The tax is accrued on the last day of the period.[375] Spain notes that the TVPEE is a deductible expense on the corporate tax.[376]

341. For Respondent, there is also no doubt that the TVPEE is a tax under the international law perspective.[377] The TVPEE fits within the concept of tax as defined by arbitral tribunals because (i) it is established by law; (ii) it imposes an obligation on a class of people; and (iii) such obligation implies paying money to the State for public purposes.[378]

342. In addition, Spain argues, the EC has ratified the taxation nature of the TVPEE and its conformity with EU Law through the EU Pilot procedure 5526/13/TAXU.[379]

343. Finally, Respondent takes the view that the foregoing is sufficient to conclude that the TVPEE is a tax for the purposes of Article 21(7)(a)(i) of the ECT, without engaging in an

---

[367] Resp. C-Memorial, ¶ 255.
[368] Resp. C-Memorial, ¶¶ 258, 267; **ECT**, Art. 21(2)-(5).
[369] **ECT**, Art. 21(7)(i).
[370] Resp. C-Memorial, ¶¶ 273-277.
[371] Resp. C-Memorial, ¶¶ 278, 288-291.
[372] Resp. C-Memorial, ¶ 279; Law 15/2012, Art. 1.
[373] Resp. C-Memorial, ¶ 280; **R-0195**, Law 58/2003 of 17 December, on General Taxation, Art. 2 .
[374] Resp. C-Memorial, ¶ 281.
[375] Resp. C-Memorial, ¶ 281.
[376] Resp. C-Memorial, ¶¶ 285-287.
[377] Resp. C-Memorial, ¶ 292.
[378] Resp. C-Memorial, ¶¶ 301-314.
[379] Resp. C-Memorial, ¶¶ 317-326.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

analysis of the economic effects of the measure and its good faith.[380] In any event, Spain argues, the TVPEE is a *bona fide* measure given that:

- The TVPEE is a tax of general application, covering both renewable and conventional energy production facilities.[381]

- The TVPEE does not discriminate against RE producers in terms of "*repercussion*," that is, the possibility to transfer the amount of the tax by the payer to another person.[382] The TVPEE is a direct tax, which means that there is no "*legal repercussion*" of its amount.[383] There is also no discrimination from the perspective of the "*economic repercussion*."[384] This is because the costs of this tax are remunerated to RE producers under the applicable regulatory regime.[385]

344. Spain further notes that various arbitral tribunals have held that the TVPEE is a "*Taxation Measure*" for the purposes of the ECT and therefore found that they had no jurisdiction to hear claims derived from alleged breaches of obligations under Article 10(1) of the ECT.[386]

### b. *Claimants' Position*

345. Claimants oppose Respondent's objection[387], and although they acknowledge that the TVPEE has the elements of a tax measure, they contend that the key issue for the Tribunal to determine is whether the TVPEE is a *bona fide* tax.[388]

346. Claimants argue that Article 21 of the ECT only applies to *bona fide* taxation measures. Accordingly, Claimants maintain that (i) the Tribunal must interpret Article 21 of the ECT in good faith; (ii) Spain must comply with its obligations under the ECT in good faith; and (iii) Spain must exercise its rights under the ECT in good faith. If Spain wishes to avail itself of the exemption at Article 21 of the ECT, it can only do so if the exemption concerns *bona fide* tax measures.[389] On the contrary, if "*the disputed measure is merely a disguised*

---

[380] Resp. Rejoinder, ¶¶ 199-201.
[381] Resp. Rejoinder, ¶¶ 209-221.
[382] Resp. Rejoinder, ¶¶ 222-237.
[383] Resp. Rejoinder, ¶¶ 227-230.
[384] Resp. Rejoinder, ¶¶ 231-237.
[385] Resp. Rejoinder, ¶¶ 232-233.
[386] Resp. Rejoinder, ¶¶ 245-247. Respondent cites **RL-0010/RL-0094**, *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration SCC V 2013/153, Award, 12 July 2016; **RL-0059**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017; **RL-0081**, *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, Arbitration SCC 2015/063, Final Arbitral Award, 15 February 2018*v.* ; **RL-0107**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018; **CL-100**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018; **CL-122**, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018.
[387] Cl. Reply, ¶¶ 162-241; Cl. Rejoinder on Jurisdiction, ¶¶ 95-124; Cl. PHB, ¶ 5.
[388] Cl. Reply, ¶ 162.
[389] Cl. Reply, ¶ 171.

*tariff cut implemented to achieve an illicit purpose, the investor-protection provisions of the ECT must apply; a State cannot abuse its right to tax as an instrument to treat investors unfairly.*"[390] Claimants draw support from the *Yukos* and *Antaris* tribunals to argue that the Article 21 carve-out is subject to limits and does not cover all measures that a State could unilaterally define as a tax.[391]

347. Claimants draw a distinction between bona fide and abusive taxation measures under international law. For Claimants, "a State must not act in a way that is manifestly inconsistent; nor can it flout the principle of estoppel that is binding on it under international law."[392] These are principles that the Tribunal must take into account when interpreting the ECT.[393]

348. In that regard, whether a taxation measure is *bona fide* must be inferred from the State's conduct.[394] Drawing support from the *Yukos* tribunal, Claimants contend that the Tribunal must determine if the implementation of the TVPEE supports the conclusion that it is part of a "*scheme to deprive the Claimants of the rights they were granted under RD 1578/2008.*"[395]

349. For Claimants, there is prima facie evidence that the TVPEE is "arbitrary, discriminatory and was intended merely to cut the FIT that Spain had promised would remain stable."[396] Specifically, they argue that:

- Spain's conduct reveals that the TVPEE was intended as a tariff cut. By applying the TVPEE to all revenues generated by the plants, the measure is equivalent to a tariff cut because (i) the PV plants operate under a regulated regime and they have no choice but to absorb the decrease in those revenues; and (ii) the cost of paying the tax is higher for RE facilities.[397]

- The TVPEE is discriminatory and unrelated to its official aim. If the measure adopted applies to all electricity installations but has the effect of unfairly targeting a particular sector, the measure cannot be in good faith.[398] Spain has also not provided any link between the TVPEE and its professed aim for benefitting the environment.[399]

---

[390] Cl. Reply, ¶ 171.
[391] Cl. Reply, ¶¶ 173-177; **CL-099**, *Antaris Solar GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018. *See for example* ¶ 215; **CL-164**, *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, ("***Yukos v. Russia***") Final Award, 18 July 2014, ¶ 1407.
[392] Cl. Reply, ¶ 184.
[393] Cl. Reply, ¶ 184.
[394] Cl. Reply, ¶ 185.
[395] Cl. Reply, ¶ 187.
[396] Cl. Reply, ¶ 189.
[397] Cl. Reply, ¶¶ 199-201.
[398] Cl. Reply, ¶¶ 204-211.
[399] Cl. Reply, ¶¶ 213-214; Cl. Rejoinder on Jurisdiction, ¶ 120.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

- The TVPEE is a Government scheme to dismantle the economic regime under RD 1578/2008 through which Claimants invested.[400] For Claimants, the TVPEE is part of a series of interconnected measures that deprived them of the economic regime under RD 1578/2008.[401]

350. Moreover, Claimants argue that the mere fact that Spain labelled the measure as a "*Tax Measure*" within the meaning of Article 21 of the ECT is not determinative as to whether Article 21 is applicable.[402] It is also irrelevant whether the TVPEE is in compliance with Spain's domestic law and note that, in any event, the Spanish Constitutional Court did not analyse the *bona fide* nature of the TVPEE.[403] Claimants further observe that the Superior Court of Justice of Valencia has recently raised doubts as to the *bona fide* nature of the TVPEE.[404]

351. For Claimants, it is equally irrelevant whether the TVPEE falls within the definition of a tax under international law.[405]

352. Finally, Claimants note that on 19 September 2018 Spain announced the temporary suspension of the TVPEE which "*creates further uncertainty in the regulatory rollercoaster ride to which the Claimants' investments are subject*."[406]

### (2) The Tribunal's Analysis

353. The essence of Respondent's objection is that the TVPEE should be deemed a "taxation measure" for the purposes of Article 21(7)(a)(i) of the ECT, and the Tribunal lacks jurisdiction because Spain not only expressly rejected protection in respect to taxation measures under Article 21(1) of the ECT, but also because it provided its consent to submit to investment arbitration disputes solely related to alleged breaches of obligations derived from Part III of the ECT.

354. On the other hand, while Claimants do not dispute whether the TVPEE is a tax by nature, they strongly argue that it is not *bona fide*, that Article 21 of the ECT only applies to *bona fide* taxation measures, and that Respondent cannot exclude the measure from the jurisdiction of this Tribunal.

355. The issues for the Tribunal to decide are, essentially: (i) whether the TVPEE should indeed be deemed to be a "taxation measure" –including whether it should be deemed as a *bona fide* measure– and (ii) whether Spain's consent under the ECT to submit to investment arbitration disputes under the Treaty excludes any disputes related to such measures.

---

[400] Cl. Reply, ¶ 193.
[401] Cl. Reply, ¶ 222.
[402] Cl. Reply, ¶ 228.
[403] Cl. Reply, ¶¶ 233-234; Cl. Rejoinder on Jurisdiction, ¶ 102.
[404] Cl. Rejoinder on Jurisdiction ¶ 103; **C-247**, Decision of the Superior Court of Justice of Valencia nº 1491/2017, 22 February 2019.
[405] Cl. Reply, ¶¶ 236-240.
[406] Cl. Reply, ¶ 241.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

356. Section (7)(a)(i) of Article 21 of the ECT, provides that the term "taxation measure" includes any "*provision relating to taxes of domestic law of the Contracting Party*":

> "*7. For the purposes of this Article:*
>
> *a) The term "taxation measure" <u>includes</u>:*
>
> *i) Any <u>provision relating to taxes of the domestic law of the Contracting Party</u> or of a political subdivision thereof or a local authority therein; and*
>
> *ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.*"[407] (Emphasis added)

357. Thus, the definition of "taxation measure" reverts to a tax of the domestic law of Spain.

358. It is unquestionable that Law 15/2012 is part of the domestic law of Spain, and Claimants have not challenged this; it was enacted by the Parliament of Spain following the legislative process and has been confirmed by the Spanish Constitutional Court.[408]

359. The nature of the TVPEE is stated under Article 1 of Law 15/2012:

> "*Article 1. Nature. The tax on the value of the production of electric energy <u>is a tax of direct character</u> and real nature that taxes the performance of activities of production and incorporation into the electric system of electric energy, measured in power plant busbars, through each of the facilities indicated in Article 4 of this Law.*" (Emphasis added)

360. Law 58/2003,[409] which deals on "General Taxation" provides in Article 2 what should be understood as a tax:

> "*Article 2. Concept, purposes and types of taxes:*
>
> *1. The taxations are public revenue consisting in cash entitlements required by public Tax Authorities as a consequence of those qualifying conditions which the Law associates to the duty to contribute to the primary purpose of obtaining the revenue needed to sustain public expenses.*
>
> *These taxations besides being means to obtain the necessary resources for sustaining public expenses, may serve as instruments for the general economic policies, and may be focused on the*

---

[407] ECT, Art. 21(7)(a)(i).
[408] **R-0205**, Judgment 183/2014 of 6 November 2014 issued by the Plenary of the Constitutional Court.
[409] **R-0195**, Act 58/2003 of 17 December on General Taxation.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*implementation of the principles and purposes included in the Constitution.*"[410]

361. It is generally considered[411] that a tax has the following defining characteristics:

362. That the tax is established by law, which the TVPEE meets insofar as it is established by a law duly passed by the appropriate body through a legislative process and enacted.

363. That such law imposes an obligation on a defined class of persons, which the TVPEE also meets since TVPEE is applied to anyone that performs the activities of production and incorporation of electrical energy into the Spanish electricity system, whether the electricity production facilities use renewable energy or conventional energy; and

364. That such obligation implies the payment of revenues to the State, that are to be used for public purposes. The revenue corresponding to the TVPEE tax is income that is included in the General Budget of the Spanish State.[412]

365. As Respondent has further expressed, the EC has ratified the tax nature of the TVPEE, and the conformity of the TVPEE with EU Law. Indeed, in 2013 the EC commenced an information request procedure with Spain to verify the conformity of the TVPEE with EU Law (EU Pilot procedure 5526/13/TAXU),[413] and on 8 September 2014 the EC closed the EU Pilot procedure concluding that there were no grounds for considering that the TVPEE infringed EU Law, and therefore found no reason to initiate an EU Law infringement proceeding, governed by Article 258 of TFEU.

366. Claimants do not contest the principles for a tax to be deemed as such. They agree that the TVPEE has been imposed through Spanish law, and that it imposes an obligation on a class of persons.[414] They question whether the fact that the levy is used to "*increase* [Spain's] *finances*" is sufficient to deem that the measure is *bona fide*.[415] Claimants only challenge whether it is a measure established in good faith.

---

[410] Resp. Counter-Memorial, ¶ 280.

[411] **RL-0057**, *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, ¶¶ 164-166; **RL-0026**, *EnCana Corporation v. Republic of Ecuador*, Award, 3 February 2006, ¶¶ 141-142; **RL-0056**, *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, ¶ 174.

[412] **R-0227**, Excerpt from the Spanish General State Budget for 2018. This Budget can be consulted on the website of the State Secretariat for Budget and Expenditure of the Ministry of Finance and Civil Service: https://www.sepg.pap.hacienda.gob.es/Presup/PGE2018Ley/MaestroDocumentos/PGE-ROM/doc/1/2/1/2/1/N_18_E_R_2_101_1_2_198_1_101_1.PDF

[413] **R-0211**, European Commission's email to the Spanish Ministry of Foreign Affairs communicating the closure of EU Pilot Procedure 5526/13/TAXU, which records the closure thereof by the European Commission given that there is no evidence that there is an infringement of EU Law by the TVPEE. Respondent has warned that the record sheet is confidential and that the European Commission has only given its consent for its use in this arbitration.

[414] Cl. Reply, ¶ 236.

[415] Cl. Reply, ¶ 237.

367. Claimants alleged that the VCLT provides for a basic principle, which is that treaties must not only be interpreted in good faith,[416] but also that they must be performed in good faith.[417] The argument of Claimants follows by stating that, since one of the purposes of the ECT is to ensure that qualifying foreign investors are accorded fair and equitable treatment, Spain cannot use its tax powers to deprive Claimants of fair and equitable treatment by stripping away their rights in a way calculated to fall within the taxation carve-out of the ECT; this is, it must exercise its rights under the ECT in good faith. It cannot, they add, implement a measure with a declared purpose that is merely a sham.[418]

368. Among the different factors that Claimants enumerate to support their view that the TVPEE is not a *bona fide* tax, the following are cited: the fact that the TVPEE is a tax on revenues (not profits), and that the exact same amount of money that is raised by the tax is then simply returned to the electricity system rather than the general state budget, all point out to conclude that it was a measure designed to strip away the rights of Claimants' installations under the RD 1578/2008 regulatory regime. Not to raise revenues but to cut the FIT.[419] Further, it is a discriminatory because, contrary to conventional generators, RE installations cannot ultimately increase the cost of the electricity they sell to consumers.[420]

369. Determining good faith in the context of a taxation measure has been found by the Yukos tribunal to mean "actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1)".[421]

370. There is no dispute with the premise that each State elects how, how much, under what conditions and when to tax nationals, residents, assets, transactions and activities, among others. Each State shall be subject to internal laws and procedures to approve, to assess and to collect the relevant taxes and duties. In particular instances, international laws and principles will need to apply as well. As long as they meet the three elements (i) established by law; (ii) payment obligation imposed on a defined class of persons; (iii) that generates revenues to the State to be used for public purposes, with an addition under the *carve-out* of Article 21(1) of the ECT; and (iv) that it has been established in good faith –and not to achieve an entirely unrelated purpose– such as the destruction of a company.

371. The TVPEE, which applies from 1 January 2013, imposed a 7% tax on the income of all electricity produced by RE installations and fed into the national grid.

372. The Tribunal further takes support from the fact that, among others, and in addition to the EC action noted above: (i) the Spanish Constitutional Court itself has ratified the tax nature

---

[416] Cl. Reply, ¶ 165.
[417] Articles 31(1) and 26 VCLT.
[418] Cl. Reply, ¶ ¶ 183-184.
[419] Cl. Reply, ¶¶ 191-195.
[420] Cl. Reply, ¶¶ 204-205.
[421] **CL-164**, *Yukos v. Russia*, Final Award, ¶ 1407.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

of the TVPEE and its compliance with the Spanish Constitution,[422] and (ii) Spanish General Directorate of Taxes, whose functions include the interpretation of tax legislation, has indicated that the TVPEE is a tax which is considered a tax-deductible expense in the Corporations Tax for TVPEE taxpayers that are also Corporate Tax taxpayers.[423]

373. The Tribunal believes that since the TVPEE has been found to have the characteristics of a "tax measure", then its *bona fide* nature should be presumed. The burden imposed to prove that it is not falls on Claimants. And the arguments submitted by Claimants to the effect that the TVPEE was adopted by Spain –abusing its rights under the ECT to apply a tax measure that would be excluded from protection by an international tribunal– and ultimately to strip away the rights of Claimants by reducing the FIT, are unconvincing.

374. Having thus confirmed the nature of the TVPEE as a "taxation measure", and that there are no elements to conclude that it should not be deemed to be a *bona fide* measure, the Tribunal now examines whether the ECT has a "carve-out" with respect to the taxation measures.

375. The Tribunal finds that such a "carve-out" has been expressly established under the ECT by all Contracting States, not just Spain. The general principle is set out in Article 21(1) which provides that:

> "*Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*"[424]

376. The Tribunal acknowledges that this matter has been already addressed by other tribunals. Among others, the tribunal in *Plama v. Bulgaria*, which confirms the above conclusion.

> "*[…] Article 21 of the ECT specifically excludes from the scope of the ECT's protections taxation measures of a Contracting State, with certain exceptions […].*"[425]

377. An analysis of Article 21 finds that, although there are certain exclusions to the general principle, no limitation to the right of the Contracting Parties to the ECT exists to enact a tax similar to the TVPEE. This is understandable, since no State executing the ECT was willing to relinquish their right to tax, and equally to submit any disputes arising thereunder to the dispute resolution procedures under Article 26. Hence, as long as a "taxation

---

[422] *See* Resp. C-Memorial, footnote 140, detailing various appeals dismissed by the Spanish National Court.
[423] **R-0204**, Response of the General Tax Directorate to Binding Tax Consultation V3371-14, dated 23 December 2014.
[424] ECT, Art. 21(1).
[425] **RL-0003**, *Plama v. Bulgaria*, Award, ¶ 266.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

measure" has been enacted, protection is not available to investors on such measures under the ECT.

378. For the above reasons, the Tribunal finds the jurisdictional objection submitted by Respondent as valid, and confirms it lacks jurisdiction to examine the claims brought by Claimants in respect to the TVPEE.

## E. FIFTH OBJECTION: LACK OF NOTICE OF CONTROVERSY AND OF A GOOD FAITH REQUEST OF AN AMICABLE SOLUTION

### (1) The Parties' Positions

#### a. *Respondent's Position*

379. During the June Hearing,[426] Respondent raised for the first time two additional objections to jurisdiction for alleged breaches of pre-requirements for arbitration: (i) lack of notice of controversy; and (ii) lack of power of attorney.

380. Although raised until the June Hearing, Respondent argued that according to Article 41(2) of the ICSID Convention the Tribunal is compelled to consider all objections presented by the parties to an arbitration.[427] It stated that the objections should not be deemed untimely and that Rule 27 of ICSID Arbitration Rules is not applicable in this instance because it only refers to the Particular Procedures under Rule 41 of ICSID Arbitration Rules. There cannot be a waiver to the lack of jurisdiction and consent. Rule 41(1) "[…] *focuses on procedures to bring to an immediate close procedures in terms of merit when we are discussing bifurcation cases, not the ordinary proceeding* […]".[428] Respondent claims that these rules (referring to those under Chapter V of ICSID Arbitration Rules), apply to Particular Procedures (such as provisional measures, ancillary claims, preliminary objections, default, settlements and discontinuance, among others). The fact that Rule 41 of ICSID Arbitration Rules is under Chapter V of those Rules confirms that it applies to particular proceedings and not to the general proceeding that we have followed here.[429] The provision that should be followed here is the one under Article 41 of the ICSID Convention.[430]

381. The first of the new objections deals with an alleged failure on the part of Claimants to submit a proper notice of arbitration. Respondent argues that the letter Claimants presented on 3 March 2015 was "*presented in English to the Kingdom of Spain, and the Spanish Constitution, in Article 3, says that its official language is Castilian or Spanish.*"[431]

---

[426] June Hearing, Tr. Day 1, 216:23–219:13 (Gil Nievas). *See also* June Hearing, Tr. Day 4, 189:11–207:25 (Gil Nievas).
[427] June Hearing, Tr. Day 4, 191: 24-25 (Gil Nievas). *See* also, June Hearing, Tr. Day 4 (Spanish), 1206:1-4.
[428] June Hearing, Tr. Day 4, 195:7-10 (Gil Nievas).
[429] June Hearing, Tr. Day 4 (Spanish), 1211:1-5 (Gil Nievas).
[430] June Hearing, Tr. Day 4 (Spanish), 1211:5-6 (Gil Nievas).
[431] June Hearing, Tr. Day 4, 191:1-4 (Gil Nievas).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

382. As a result, argued Respondent, "the notice that appear at C-27 in the record […] had absolutely no consequences or effect in Spain, and it must be considered as not having been done, which spell [sic] the end of this arbitration, because if there is no formal notice of dispute, there is no arbitration."[432]

383. Respondent further stated that the Tribunal should not waive the lack of jurisdiction because it "[…] would affect claims in constitutional law, and that would have legal effects in Spain because it would mean accepting a letter in a language that is not provided for under Article 3 of the Spanish Constitution […]".[433]

384. In this respect, it further contends that under Article 26 of the ECT there is a prerequisite or condition for arbitration that requires, prior to commencing such proceeding, submitting a "*request of amicable settlement*", with a three-month period from the date upon which Claimants file their notice. Spain alleges that Claimants failed to send the notice in Spanish, and when this occurs then "*it is not a good faith investor trying to reach an amicable settlement*."[434] To accept the validity of such communication in a different language "[…] *would imply a violation of the principle of equality of nations and languages from the perspective of international law.*"[435]

**b. *Claimants' Position***

385. Claimants initially rejected the objection because they allege this is clearly out of time under Rule 41(1) of the ICSID Arbitration Rules; they argue that the language and requirements of this provision are clear: (i) any objections need to be made as early as possible, and (ii) no later than the filing of the counter-memorial. It equally rejected Spain's argument that Rule 41(1) only applies to bifurcation.[436]

386. Claimants also indicate that filing of the objection until the opening of the June Hearing is in violation of Section 14.1 of Procedural Order No. 1, since there was a sequence of pleadings included in Annex A of the Order, and which states that the Counter-Memorial "*including jurisdictional objections*" was due on 2 July 2019. That was the deadline, and therefore the objection is out of time.[437]

387. As regards the "merits" of the objection, Claimants contend that Spanish constitutional law does not govern the arbitration proceedings, nor does it govern how Article 26 of the ECT should be interpreted.[438]

388. The jurisdictional question before the Tribunal is whether there are any procedural requirements under the ECT in respect to the request submitted. Claimants add that there

---

[432] June Hearing, Tr. Day 1, 218:4-9 (Gil Nievas) and Tr. Day 4, 189:11-207:25 (Gil Nievas).
[433] June Hearing, Tr. Day 4, 193:9-13 (Gil Nievas).
[434] Resp. PHB, ¶ 30.
[435] Resp. PHB, ¶ 31.
[436] June Hearing, Tr. Day 4, 196:14-197:18 (Sullivan).
[437] Letter by Claimants to the Tribunal of 29 August 2019, p. 6.
[438] June Hearing, Tr. Day 4, 199:3-7 (Sullivan).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

is no requirement that it be in any particular language, nor does it require that the notice be in writing.[439] Spain objects that the written notice was made in English, but English is also an official language of the ECT.

389. Claimants further allege that Article 26(2) of the ECT provides that "[i]f […] disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution […]" to arbitration. Thus, the ECT does not impose any specific procedural requirements regarding the notice of dispute. It merely requires a party to request a dispute settlement.[440]

390. Finally, Claimants also express that, had Spain had any questions as to the content of the one-page document, it could have reached out or raised an objection then. But they failed to do so until the June Hearing.

### (2) The Tribunal's Analysis

391. Respondent's allegation that the two-page notice drafted in English dated 2 March 2015 – submitted on 3 March 2015– failed to meet the good faith duties of Claimants under international law, and more particularly, under Article 26 of the ECT, because it was not delivered in Spanish to allow the parties to negotiate an "*amicable settlement*" during the following three-month period, fails.

392. *First*, because there is no requirement under the ECT to that effect. *Second*, because Spain is a fully developed country that is integrated to the rest of the continent through the EU and should expect that communications flowing into high-level government positions (and this was addressed to the President, Mr. Mariano Rajoy Brey) should be immediately examined and, if incomprehensible by reason of the fact that it was in a language that is not Spanish, translated. Surely, they had the capability. But, addressing the merits, the *third* cause of the arguments' failure is that there is no evidence submitted by Spain that suggests that it was affected in its willingness to negotiate an amicable settlement expressed in Article 26 of the ECT.

393. In the notice of controversy letter, Claimants requested "[…] negotiations pursuant to Article 26(1) of the ECT, with a view to reaching an amicable resolution of the dispute. Infracapital would welcome an opportunity to meet with you at your earliest convenience to determine whether there is any scope for reaching an amicable settlement." The notice then added: "In the event that no such amicable settlement is possible, Infracapital reserves its right to submit its claims to international arbitration".[441] There is no evidence that settlement negotiations were commenced, or even a response from Spain to accept the petition of Infracapital.

---

[439] June Hearing, Tr. Day 4, 199:8-200:12 (Sullivan).
[440] Letter by Claimants to the Tribunal of 29 August 2019, p. 6.
[441] **C-027**, Letter from Allen & Overy LLP to President Mariano Rajoy Brey on behalf of the Claimants, 2 March 2015, p. 2.

394. Besides, there was no real adverse effect on Spain. When the Request for Arbitration was submitted by Claimants in June 2016 (fifteen months after delivering the initial notice), Claimants made reference then to having delivered in March 2015 the dispute and requested negotiations in the terms of Article 26(2) of the ECT, there was no reaction from Respondent alleging the March 2015 letter had not been received, nor that it had been received in another language in breach of applicable law.

395. On 29 June 2016, ICSID registered the Request for Arbitration pursuant to Article 36(3) of the ICSID Convention and Rules 6 and 7 of ICSID Institution Rules. Respondent was addressed on that Notice of Registration, and there was still no objection of the part of Spain. In the following months, the Tribunal was established and on 27 December 2017 Procedural Order No. 1 was issued by the Tribunal. Annex A to Procedural Order No. 1 (Option 2 – Timetable to apply in the event preliminary objections are raised, but there is no request for bifurcation) set the dates to file the Memorial by Claimants, and the Counter-Memorial by Respondent (*including jurisdictional objections, if any, joined to the merits*).

396. As scheduled under Procedural Order No. 1, on 9 July 2018, Respondent submitted its Counter-Memorial on the Merits and Memorial on Jurisdiction. In said submission, Spain advanced four objections to the jurisdiction of this Tribunal already examined above (*ratione personae, ratione materiae, ratione temporis* and that relating to the TVPEE). It did not object then to the language of the notice of March 2015.

397. It was until the June Hearing –four years after the notice had been delivered, two after the registration of the Request for Arbitration, and one after having filed its Counter-Memorial– that Respondent expressed the jurisdictional objection to the Tribunal.

398. On the question of the timing of this objection, the Tribunal disagrees with Respondent that Rule 41(1) only applies to "Particular Procedures" (Chapter V of the Rules) as opposed to "ordinary procedures", and thereby attempts to interpret that preliminary objections can only apply in respect to the actions covered in said Chapter V. It makes no sense, especially when the text is read and construed in the plan meaning of its text. This provision reads:

> "*Any objection that the dispute or any ancillary claim is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal <u>shall</u> be made <u>as early as possible</u>. A party shall file the objection with the Secretary-General <u>no later than the expiration of the time limit fixed for the filing of the counter-memorial</u>, or, if the objection relates to an ancillary claim, for the filing of the rejoinder—unless the facts on which the objection is based are unknown to the party at that time.*"[442] (Emphasis added)

399. There is no doubt that the terms of the first and second sentences require that the party challenging the jurisdiction take affirmative action "as soon as possible", but they establish a deadline, which is self-evident: the filing of the counter-memorial. The *raison d'être* of

---

[442] **RL-0064**, ICSID Convention Regulations and Rules, 2006, Art. 41(1).

this requirement is to allow the Tribunal and the other party to address such objection in the context of the arbitration proceeding. It would be absurd, for example, to have jurisdictional objections filed after all submissions have been made in a proceeding, the Hearing has concluded, and while the Tribunal is in deliberations or drafting the Award, to file the objections that were known or should have been known at the inception of the claim. The inefficiency and waste of resources in such a case would be tremendous.

400. Many decisions have been issued by tribunals regarding claims without legal merit, which is addressed in Rule 41(5) and those tribunals have failed to deem that this article applies only to "particular proceedings".[443]

401. Considering, therefore, that Respondent was aware of the notice of arbitration since March 2015, and assuming, even for the sake of argument, that the notice had been misplaced or failed to be translated, or that the office of the President of Spain did not realize the relevance of the issue at hand, there is no doubt that by the time the formal Request for Arbitration (also in English language) was submitted, or even two years later, upon receipt of the Memorial, Respondent should have realized of this alleged "defect" in the notice and proceeded to make the objection in its Counter-Memorial. But it did not object.

402. Aside from the elements that would permit the Tribunal to dismiss the objection by reason of the absence of any merit to the objection, this Tribunal rejects the objection since Respondent failed to file it on a timely basis.

## F. SIXTH OBJECTION: LACK OF A POWER OF ATTORNEY

### (1) The Parties' Positions

#### a. *Respondent's Position*

403. Respondent raised this objection for the first time during the June Hearing.[444] Respondent submitted that Claimants had granted powers of attorneys[445] to three individual lawyers (Jeffrey Sullivan, Naomi Briercliffe and David Ingle of Allen & Overy LLP).  However, noted Respondent, both the notice of controversy and the Request for Arbitration were signed by a juridical person, Allen & Overy LLP, which lacked the power of attorney to represent Claimants. As a result, Respondent argues, the notice of controversy and the

---

[443] Among others, *Transglobal Green Energy, LLC and Transglobal Green Panama, S.A. v. Republic of Panama*, ICSID Case No. ARB/13/28, Decision on the Admissibility of Respondent's Preliminary Objection to Jurisdiction of the Tribunal under Rule 41(5) of the Arbitration Rules, 17 March 2015; *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Decision on Claimants' Objection under ICSID Rule 41(5) to Respondent's Application for Revision, 8 March 2021.
[444] June Hearing, Resp. Opening Slide Presentation, 04 Jurisdiction, slides 5-8, and June Hearing, Tr. Day 1, 218:15-219:13 (Gil Nievas), Tr. Day 4, 189:11-190:18 (Gil Nievas).
[445] **C-029**, Resolution of the Board of Directors of Infracapital BV authorizing the Request for Arbitration, 12 May 2016; **C-030**, Power of Attorney from the Infracapital BV, 12 May 2016; **C-032**, Resolution of the Board of Directors of Infracapital F1 authorising the Request for Arbitration, 13 May 2016; and **C-033**, Power of Attorney from Infracapital F1, 13 May 2016.

Request for Arbitration should be deemed to not have been submitted due to the lack of capacity of Allen & Overy LLP.[446]

404. During the Second Hearing, after recalling that it had raised this objection because "there was no notice of controversy because the representation was not right: the power of attorney warded had not been properly done,"[447] Respondent informed the Tribunal that having confirmed that the representation was right, it withdrew its jurisdictional objection related to the power of attorney: *"[q]ueremos retirar la [excepción] de indebida representación de los demandantes en cuanto creemos que ha sido justificada. Para que conste en el record, la retiramos"*[448]

### a. *Claimants' Position*

405. Claimants rejected this objection for both lack of merit on the substance and untimeliness of its filing.

406. During the June Hearing, Claimants challenged the objection and stated that there is no requirement that there be a power of attorney granted and submitted as an attachment to the notice of controversy of March 2015, or even the Request for Arbitration.[449]

407. The applicable rules to follow, contend Claimants, are those under Rule 2(2)(f) of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings of ICSID (also known as Institution Rules) that deal with the formalities for submission of a request of conciliation or arbitration, and requires the request to "[…] (*f) state, if the requesting party is a juridical person, that it has taken all necessary internal actions to authorize the request.*" To that end, Claimants had not only the powers of attorney granted to the three counsel who are members of Allen & Overy, but also submitted information relating to a board of directors meeting appointing the firm to bring the notice of controversy.[450]

408. Claimants added that, at the time the Request for Arbitration was submitted, documentation to support the compliance with these requirements was attached.

409. Should Respondent had had any questions about the authority, argued Claimants, it could and should have raised them earlier.

### (2) The Tribunal's Analysis

410. In some jurisdictions, particularly those with a civil law background, evidencing proper representation is a formal requirement at the time a court claim or defence is submitted, for evident reasons. There is mistrust and therefore a need to ensure that counsel representing a client has duly empowered counsel, through a power of attorney which many times needs

---

[446] June Hearing, Tr. Day 4, 190:10-14 (Gil Nievas).
[447] Second Hearing, Tr. Day 1, 190:6-13 (Gil Nievas).
[448] Second Hearing, Tr. Day 1, 145:10-14 (Gil Nievas). Second Hearing, Tr. Day 1 (Spanish), 175:18-22 (Gil Nievas).
[449] June Hearing, Tr. Day 4, 201:21-202:4 (Sullivan).
[450] June Hearing, Tr. Day 4, 202:6-203:21 (Sullivan).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

to be granted before a notary public. Frequently, laws are written to impose the duty, and courts strictly enforce the formal requirement. It is not uncommon in such jurisdictions that challenges to the representation are frequent, and also not uncommon that litigation may be eventually won or lost, not on the merits, but rather on the formalities of the power of attorney submitted.

411. Claimants have cited Rule 2(2)(f) of ICSID Rules of Procedure, which focuses not on whether the claimant (who is a juridical person) has granted a power of attorney to the person who files the request of arbitration on its behalf, but on whether the claimant has taken all necessary internal actions to authorize the request. This is, whether corporate governance rules have been met –such as, for example, the approval of the board of directors, or the shareholders when there might be a joint venture relationship that so requires.

412. .In this case, it is evident that Claimants satisfied the requirements established in Rule 2(2)(f) at the time they filed their Request for Arbitration with the ICSID Secretariat on 15 June 2016.[451] Respondent had the information available from the outset of this case.

413. During the Second Hearing, Respondent confirmed that Claimants had satisfied such requirement under the Institution Rules and , "withdrew" the objection.

414. Therefore, in light of the withdrawal of this objection by Respondent, there is no need for the Tribunal to further examine and decide on its merits.

415. As the objection has been withdrawn, there is no need for the Tribunal to examine whether it was untimely filed in accordance with Rule 41(1).

## G. Seventh Objection: Lack of Clean Hands in Claimants

### (1) The Parties' Positions

#### a. *Respondent's Position*

416. Six months after the June Hearing had concluded, Respondent filed a seventh objection to the jurisdiction of the Tribunal under the scope of Section 11.4 of Procedural Order No. 1 based on facts it claimed to have recently obtained.[452] Upon a schedule established by the Tribunal to argue that matter, Respondent filed a subsequent submission on 19 March 2020.[453]

---

[451] *See* Request for Arbitration, ¶17 and **C-034**, Letter from Infracapital F1 S.à r.l., 13 May 2016; **C-031**, Letter from Infracapital Solar B.V., 12 May 2016; **C-032**, Resolution of the Board of Directors of Infracapital F1 S.à r.l., 13 May 2016; **C-029**, Resolution of the Board of Directors of Infracapital Solar B.V., 12 May 2016.

[452] Clean Hands Objection submitted on 20 December 2019 ("**Clean Hands Objection**"), ¶ 3.

[453] "Lack of Clean Hands by Claimants as a Jurisdictional Objection, and subsidiarily, of Inadmission. Validity of the allegation in respect to timeliness and merits" (the "**Resp. Second Submission on the New Objection**"). *Falta de*

417. Respondent asserts that "[…] suspicions of the Kingdom of Spain about potential wrongdoings, […] were confirmed during the cross-examination after Mr. Lief ratified his statement".[454] It was after the examination and the confirmation that the witness confirmed certain documents related to the Investment Committee of Claimants that "[…] gave […] [Respondent] legitimacy to continue investigating the statements made […]".[455] It was only then that "[…] it was only possible to prove that two criminal wrongdoings, and several wrongdoings of another nature, had been committed."[456]

418. Spain indicated that it would have wanted to cross-examine Mr. Lief again in a new hearing to ascertain whether "a third criminal wrongdoing" had been committed, but since the Tribunal ruled on 11 December 2019 that a request for a new hearing was only partially granted to the effect that opening statements be presented in light of the appointment of a new president after the resignation of Dr. José Emilio Nunes Pinto, Respondent states that it was until then that it "*immediately*" filed the "lack of clean hands" jurisdictional objection.[457]

419. Respondent has asserted that after their counsel became aware of "facts of a criminal nature" it was required to report them to the Public Prosecutor's Office, which it did, and on November 29, 2019, said Office initiated an investigation of "*facts that may constitute offences of disclosure of secrets, corruption between individuals or fraud […]*".[458] Respondent has failed to provide any information on the status of such investigation since.

420. On the question of whether a local investigation by the Special Prosecutor's Office for Corruption and Organized Crime should justify the objection, Respondent states that the issue raised should be deemed "*a question of* jus cogens*, of international public policy, as international arbitration cannot cover offences such as corruption or other wrongdoings committed by the Claimants*".[459] Respondent cites the *Niko Resources*[460] case which indicated that "*[i]t is widely accepted that the prohibition of bribery is of such importance*

---

*manos limpias de los Demandantes como Objeción de Jurisdicción y, subsidiariamente, de Inadmisión: Procedencia de la alegación en cuanto al tiempo y al fondo*, 19 March 2020.

[454] Clean Hands Objection, ¶ 12.
[455] Clean Hands Objection, ¶ 13.
[456] Clean Hands Objection, ¶ 17.
[457] Clean Hands Objection, ¶ 22-24.
[458] Clean Hands Objection, ¶ 28; **R-0386**, Special Prosecutor's Office Report on Corruption and Organized Crime of 29 November 2019.
[459] Clean Hands Objection, ¶ 34.
[460] **RL-0132**, *Niko Resources (Bangladesh) Ltd v. People's Republic of Bangladesh, Bangladesh Petroleum Exploration & Production Company Limited, Bangladesh Oil Gas And Mineral Corporation,* ICSID Case No. ARB/10/11 and ICSID Case No. ARB/10/18, Decision on Jurisdiction, 19 August 2013, ("*Niko Resources v. Bangladesh*") ¶ 431. Note: There was an error in the numbering of Respondent's Legal Authorities, *Niko Resources v Bangladesh* was listed as RL-131, but was filed as RL-132.

*for the international legal order that it forms part of what has been described as international or transnational public policy",* as well as others.[461]

421. It contends that the Tribunal must rule on the objection raised, as it is "*a matter of international public policy*", and international arbitration cannot protect corruption, the violation of international good faith and other serious wrongdoings committed by Infracapital during the investment process.[462]

422. The substance of Respondent's allegations is that Banco Santander shared with Claimants what Respondent describes as "inside information", and that such information was misused by Claimants in the study of the PV Plants in order to gain a competitive advantage in prejudice of the seller of the PV Plants. Respondent even argues that Claimants and Santander "plotted" to gain such benefit.[463] Spain contends that Claimants tried to gather inside information, acting behind the back of the seller of the plants in cooperation with Santander to do "*a joint and corrupt effort to create improper pressure on OPDE to sell the PV plants, which obviously affected the consideration of the SPA.*"[464]

423. In support of its objection, Spain's submission is accompanied by four reports of recognized experts, Professors Alejandro Garro,[465] Dr. Francisco Javier Álvarez García,[466] Dr. Luis Antonio Velasco San Pedro,[467] and a joint expert report by Dr. José Carlos Fernández Rozas and Dr. Sixto Alfonso Sánchez Lorenzo.[468] Each of the reports addresses complementary positions. Garro's Report deals primarily with the principle of good faith and fair dealing in contracting; the Álvarez Report on a factual analysis of the alleged wrongdoings and how such actions could be deemed as criminal offenses in Spain; the Velasco Report on whether Claimants may have committed violations of internal laws of

---

[461] **RL-0134**, *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, ("***CSOB v. Slovak Republic***") Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999; and then **RL-0135**, *CSOB v. Slovak Republic*, Decision of the Tribunal on the Respondent's Further and Partial Objection to Jurisdiction, 1 December 2000; **RL-0131**, *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/5/19, ("***Helnan v. Egypt***"), Award, 3 July 2008, ¶ 112, where the Tribunal admitted jurisdiction exceptions even after its Decision on Jurisdiction, indicating that although the Tribunal found that the new objection "could have been raised sooner" it agreed to examine it. Note: There was an error in the numbering of Respondent's Legal Authorities, the *Helnan v. Egyp* Award was listed as RL-132, but was filed as RL-131.

[462] Clean Hands Objection, ¶ 45.

[463] Resp. Second PHB, ¶ 3.

[464] Resp. Second Submission on the New Objection, ¶ 11.

[465] Report of Prof. Alejandro M. Garro ("*Dictamen jurídico: la buena fe como principio general en la contratación internacional*"), 22 November 2019 ("**Garro Report**").

[466] Report of Dr. Francisco Javier Álvarez ("*Dictamen emitido a petición del Departamento de Arbitrajes Internacionales de la Abogacía General del Estado*"), 30 November 2019 ("**Alvarez Report**").

[467] Report of Prof. Dr. Luis Antonio Velasco San Pedro ("*Informe jurídico sobre la conducta de 'Infracapital F1 S.À.R.L' e 'Infracapital Solar B.V.' en relación con la adquisición de la inversión que ha motivado su demanda ante el CIADI contra el Reino de España* (Arbitration ICSID Case NO. ARB/16/18)"), 12 November 2019 ("**Velasco Report**").

[468] Report of Dr. José Carlos Fernández Rozas and Dr. Sixto Alfonso Sánchez Lorenzo ("*Opinion legal relativa a 'La doctrina de las 'manos limpias' (*clean hands*) en el arbitraje intenacional de inversiones y su aplicación en el caso Infracapital Fl S.a.r.l. e Infracapital Solar B. V. v. Kingdom of SPAIN* (ICSID Case No. ARB/16/18)'"), 17 December 2019. ("**Fernández Rozas – Sánchez Lorenzo Report**").

Spain; and the Fernández Rozas-Sánchez Lorenzo Report on an analysis of the principle of "clean hands" in the field of international investment protection.

424. The Garro Report states that its objective was to consider the recognition of good faith as a model for conduct that must be observed in international contracting, with special reference to the United Nations Convention on Contracts for the International Sale of Goods and the Principles of UNIDROIT on International Commercial Contracts, and the role that good faith plays as a standard for conduct for assessing the due diligence on the part of the investor in the context of his negotiations with the State receiving the investment.[469] He mentions that that one of the typical manifestations of the principle of good faith is the prohibition of protecting a conduct that contradicts the understanding that such conduct causes in its counterparty, especially when the counterparty acted trusting reasonably in this understanding. This prohibition of contradictory behaviour is usually expressed as *"the clean hands doctrine"* in the *common law* tradition, and is also expressed as the principle *"venire contra factum proprio"* in continental civil law.[470] Prof. Garro concludes that although this principle has not yet been properly examined in the field of investment law, the principle of good faith and fair dealing is breached when the conduct of one of the contractual parties infringes the financial or data protection regulations on the subject of confidentiality as long as these regulations are recognized and receive widespread application in the context of international trade.[471]

425. The expressed objective of the Álvarez Report was to determine whether Claimants "*could have violated Spanish criminal law when making their investment in renewable energies in Spain.*"[472] Dr. Álvarez contends that Santander, as agent of sellers, shared with Claimants financial data of its customer in a disloyal manner. He analyses the objective and subjective elements of the criminal offence of disclosure of company secrets (*difusión de secreto de empresa*), disclosure of secrets (*revelación de secretos*) and corruption in business (*corrupción en los negocios*) to conclude that these are present in the factual information he had to examine.

426. The Velasco Report examines the "*correctness or incorrectness of the conduct of Infracapital and Santander, in relation to the rules and legal principles*" that the expert considered applicable.[473] Dr. Velasco discloses that his report is based on four documents that were supplied to him by Counsel to Respondent[474], and states that there are two behaviours to be assessed, but warns the reader that this is "*without going into a detailed examination of the factual circumstances that occurred, for which I do not have details, [but] based on the information provided* [...]", which he assumes to be "*exact and true*".[475] He examines the facts supplied by Respondent in respect to the information provided by Santander to Claimants, and in light of applicable law concludes that –if the facts occurred

---

[469] Garro Report, ¶ 2.
[470] Garro Report, ¶ 11(c).
[471] Garro Report, ¶¶ 11(d) and 28.
[472] Álvarez Report, ¶ A.II
[473] Velasco Report, ¶ page 4.
[474] *Abogacía General del Estado*.
[475] Velsasco Report, p. 4.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

as they are related– the conduct of Claimants, with the assistance of Santander in the contract of sale of the assets that was concluded with seller of the PV Plants, *would merit overall consideration as illegal*, since it violates many rules and principles consolidated in the Spanish law.[476]

427. Finally, the Fernández Rozas – Sánchez Lorenzo Report was prepared to determine the possibility of invoking the "clean hands" doctrine in response to the investor's conduct, to determine the lack of jurisdiction of the arbitral tribunal.[477] Dr. Fernández Rozas and Dr. Sánchez Lorenzo make a key disclosure at the outset: their report does not opine on whether or not the conduct by the investor alleged by Spain to have occurred is true, which "*is merely considered as an assumption*".[478] After examining the principles of the doctrine and its recognition in investment arbitration, both in the context of a treaty that considers the legality of the investment, and one that does not, as well as the unlawfulness at the time of the initial investment and supervening illegality, along with the seriousness of the unlawful conduct, Dr. Fernández Rozas and Dr. Sánchez Lorenzo conclude, *inter alia*, that the principle need not be incorporated into a treaty to be acknowledged as a requirement of the host State, the Tribunal would need to examine the seriousness of the wrongdoing, and if found so could determine the inadmissibility of the claim, but not the lack of jurisdiction of the tribunal.[479]

428. In response to Claimants' allegation that the objection was untimely, Respondent states that there are general principles followed by the civilized nations that constitute what has been considered "*international public policy*", and that wrongdoings contrary to international public policy cannot be accepted and tolerated by an international tribunal.[480] As such, this objection should be considered by the Tribunal under Rule 41(1) regardless of when it has been filed, and that there is no waiver for belated presentation, finding support in *AIG v. Kazakhstan*,[481] *CSOB v. Slovakia,*[482] *Helnan v. Egypt*[483] and *Gruslin v. Malaysia*[484] for the Tribunal to admit jurisdictional objections, even if belated.

429. In support of the timeliness of its Clean Hands Objection and aided by a description of the different topics in Chapter V of the ICSID Arbitration Rules, Respondent points out to Rule 41(1) which Respondent contends and confirms its interpretation that it applies to only "particular" or "special" proceedings, and argues that the new objection is justified to have been brought when submitted because it was until then the new fact arose.

[476] Velasco Report, page 15.
[477] Fernández Rozas – Sánchez Lorenzo Report, ¶ 2.
[478] Fernández Rozas – Sánchez Lorenzo Report, ¶ 3.
[479] Fernández Rozas – Sánchez Lorenzo Report, ¶¶ III.4-8
[480] Clean Hands Objection, ¶ 27.
[481] **RL-0133**, *AIG Capital Partners, Inc. and CJSC Tema eal Estate Company v. Republic of Kazakhstan*, ICSID Case No. ARB/01/6, Award, 7 October 2003, ¶¶ 9.1 and 9.2.
[482] **RL-0134**, *CSOB v. Slovak Republic*, Decision on Jurisdiction; and then **RL-0135**, *CSOB v. Slovak Republic*,, Decision of the Tribunal on the Respondent's Further and Partial Objection to Jurisdiction, 1 December 2000.
[483] **RL-0131**, *Helnan v. Egypt*, Award.
[484] **RL-0140**, *Philippe Gruslin v. Malaysia*, ICSID Case No. ARB/99/3, Award, 27 November 2000 ("***Gruslin v Malaysia***").

92.

430. On this point, Spain asserts that it was only after Mr. Lief was asked about the wrongdoings during the June Hearing that Respondent got the evidence; previously it only had a "*hint of wrongdoing*."[485]

431. In light of the findings and the support of the expert opinions, Respondent requested that the Arbitral Tribunal declares its lack of jurisdiction to hear the dispute based on the principles of Article 48 of the ICSID Convention and Rule 41 of the ICSID Arbitration Rules, and in accordance with international *jus cogens* and the most elementary principle of clean hands and zero tolerance for serious unlawful acts and corruption.[486]

432. Subsequently, in its Second Submission on the New Objections, Respondent requested from the Tribunal:

433. "That the Tribunal declares that the clean hands jurisdictional objection has been presented timely;

434. That the Tribunal declares that it lacks jurisdiction due to the clean hand jurisdictional objection as the Claimants have committed serious wrongdoings in their investment process that cannot be tolerated and cleared in International Investment Arbitration;

435. Subsidiarily, that the Tribunal considers the clean hands allegation as a ground for inadmission of the Claim and specifically states that an investor who commits wrongdoings in its investment cannot have any legitimate expectative of being internationally protected by international arbitral tribunals because if the investor did not act fairly it cannot has a right to any fair and equitable treatment."[487]

### b.  *Claimants' Position*

436. Upon receipt of the jurisdictional objection on 20 December 2019, the Tribunal allowed Claimants to submit their comments to the objection, and they submitted what they referred to as "initial" comments on 10 January 2020, and after Spain submitted the Second Submission on the New Objection, Claimants then filed their Response on 14 April 2020.[488]

437. Claimants first identify the new objection as part of "*repeated steps to obstruct, delay and aggravate the dispute*", describing them as "*guerrilla tactics*" in international arbitration, which include challenging the prior president of the Tribunal, threatening to publish documents in order to harass a witness, and even instigating a criminal investigation against Claimants' key witness.[489]

---

[485] Resp. Second Submission on the New Objection, ¶ 51.
[486] Clean Hands Objection, ¶ 74.
[487] Resp. Second Submission on the New Objection, ¶ 54.
[488] Claimants' Response to Spain's New Objection to Jurisdiction ("**Cl. Response to the New Objection**").
[489] Claimants' Initial Comments on Spain's New Objection to Jurisdiction of 10 January 2020 (the "**Cl. Initial Comments on the New Objection**"), ¶¶ 3-5.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

438. Claimants' primary position in respect to the new objection is that it is untimely. Under Rule 41(1) of the ICSID Arbitration Rules – which has been examined above in respect to the other objections filed by Respondent during or after the June Hearing– that "[…] *shall be made as early as possible*" and in any event *"[…] no later than the expiration of the time limit fixed for the filing of the counter-memorial* […]*"*, and that the objection is clearly out of time and barred by Rule 41(1).[490]

439. It should also be deemed untimely because Section 14.1 of Procedural Order No. 1 provides that "[t]*he number and sequence of pleadings is established in Annex A*". Pursuant to the revised Annex A, under option 2 (which applies here), Respondent's Counter-Memorial "*including jurisdictional objections, if any* […]" was to be filed by 9 July 2018.

440. In support of this argument, Claimants allege, *first*, that the objection is based on documents[491] that were exhibited with their Memorial, which Spain acknowledges when it indicated that its suspicions had been "confirmed".[492] Further, that in the document production phase of the proceedings, Respondent failed to make any request related to the documents, nor did Spain argue the objection during the June Hearing, even though it did introduce two others.[493]

441. *Second*, Claimants contend that the argument of Respondent to the effect that it was only after the Tribunal decided that there would not be a new hearing upon their request on 24 October 2019 is wrong, because Procedural Order No. 6 issued by the Tribunal (rejecting the request for a new hearing) cannot form any basis –factual or otherwise– for the new objection.[494]

442. *Third,* that the decision to initiate the criminal investigation does not constitute a "new fact" for the purposes of the final portion of Rule 41(1) which provides that the requirement that any jurisdictional objection be filed by the time the counter-memorial is due does not apply where "*the facts on which the objection is based are unknown to the party at that time*". This, because the "new fact" was orchestrated by Spain itself, and allowing this would flout the very purpose of Rule 41(1) and permit Parties to simply avoid its implications by unilaterally taking steps to create new facts.  The facts on which Spain argues its objection were based out of exhibits that were known to Respondent when it filed its Counter-Memorial, and the criminal investigation (Spain admits that the initiation of the Criminal Investigation was based on the IC papers and the transcript of Mr. Lief's cross-examination) is not, in and of itself, a new fact.[495]

---

[490] Cl. Initial Comments on the New Objection, ¶ 14 (some emphasis in the original).
[491] Cl. Initial Comments on the New Objection, ¶ 15. **C-064**, Infracapital, Preliminary Investment Committee report, 24 February 2010; **C-066**, Infracapital, Final Investment Committee report, 20 April 2010.
[492] Clean Hands Objection, ¶ 14.
[493] Cl. Initial Comments on the New Objection, ¶ 17. Cl. Response to the New Objection, ¶¶ 4, 9.
[494] Cl. Initial Comments on the New Objection, ¶ 22.
[495] Cl. Initial Comments on the New Objection, ¶ 23.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

443. Claimants draw support from *Vestey Group v. Venezuela*[496] where the tribunal found that "*a time lag of eight months does obviously not meet the 'as early as possible' requirement*" under Rule 41(1) and respondent's objection was therefore deemed inadmissible.

444. Responding to the contention of Spain that a tribunal must consider the merits of jurisdictional objections that are manifestly out of time and procedurally improper, Claimants argue that neither the ICSID Convention nor the ICSID Arbitration Rules require the Tribunal to do so, and when tribunals have indeed considered them it is because of the discretionary power to review it jurisdiction *ex officio*.[497] If States had the unrestricted right to raise meritless jurisdictional objections, this would unjustifiably delay the proceedings, and would render Rule 41(1) meaningless.[498]

445. In any event, Claimants add, this objection is not only procedurally improper, but also manifestly without merit,[499] because: (i) the four expert reports do not even support its case, as there is no factual evidence that supports conclusions as is recognized by Dr. Velasco;[500] (ii) Spain has failed to explain how the alleged wrongdoings (which are denied) would render Claimants' investment illegal or otherwise deprive them of treaty protection –indicating that the report by Dr. [Fernández] Rozas and Dr. [Sánchez] Lorenzo simply provide an overview of the unclean hands doctrine, but– as noted by the *Yukos*[501] and *Glencore v. Bolivia*[502] tribunals that Spain cited, there is no generalized acknowledgement that exists as a general principle of international law which would bar a claim by an investor;[503] and (ii) the lack of merit is "[…] *further attested by Spain's failure to raise any concerns about this New Objection at an earlier stage in the proceedings*."[504]

446. Claimants further question the fact that the "unclean hands doctrine" exists as a principle of international law, as Respondent contends, and argue that even Respondent's expert[s] engaged to deliver a report, Dr. [Fernández] Rozas [and Dr. Sánchez Lorenzo], cited diverse cases where this principle is deemed uncertain and that "*[m]ost of the cases Professor Rozas discusses in his report as supposedly addressing the clean hands doctrine are actually cases where the treaties contained an express legality requirement that was then applied by the respective tribunal*", and adds that "*[t]he ECT, of course, does not contain an express provision requiring legality of the investment*."[505]

---

[496] Cl. Response to the New Objection, ¶ 14. **RL-0063**, *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4 ("***Vestey v. Venezuela***"), Award, 15 April 2016, ¶ 147.
[497] Cl. Initial Comments on the New Objection, ¶ 24, and Cl. Response to the New Objections 14, citing **RL-0063**, *Vestey v. Venezuela*, Award, ¶ 147.
[498] Cl. Response to the New Objection, ¶ 17
[499] Cl. Response to the New Objection, ¶ 13-18.
[500] Cl. Initial Comments on the New Objection, ¶ 28.
[501] **CL-164**, *Yukos v. Russia*, Final Award, ¶ 1359; **RL-0097**, *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, UNCITRAL, PCA Case No. AA 226 ("***Hulley v. Russia***"), Final Award, 18 July 2014, ¶ 1359.
[502] **CL-187**¸*Glencore Finance (Bermuda) Limited v. Plurinational State of Bolivia*, PCA 2016-39, UNCITRAL, ("***Glencore v Bolivia***") Procedural Order No. 2: Decision on Bifurcation, 31 January 2018, ¶ 47.
[503] Cl. Initial Comments on the New Objection, ¶ 29. Cl. Response to the New Objection, ¶ 54.
[504] Cl. Initial Comments on the New Objection, ¶ 30.
[505] Cl. Response to the New Objection, ¶ 55.

447. In Claimants' Response to the New Objection, Claimants describe the facts underlying Spain's New Objection which, Claimants contend, Spain failed to raise when they already had the full evidence on the record. Claimants describe their relationship with OPDE, as seller of the PV Plants, and how they met along with Santander and La Caixa, both of whom had provided OPDE project financing for the PV projects, with "change of control provisions", meaning of course that if another party purchased the assets without the bank's consent, then the outstanding loans would be due and payable immediately, and which the banks had stated their willingness to waive if Infracapital acquired the assets from OPDE. Claimants describe how OPDE was aware of the information that Santander was sharing as part of the due diligence process, and how, even though Santander shared the credit rating of OPDE, the offer it eventually submitted was the same as that which had been made to OPDE *before* the information was shared.[506]

448. In essence, the information provided by Santander to Infracapital, which consisted of: (i) Santander's own assessment of OPDE's financial situation; and (ii) Santander's own internal credit rating of OPDE, cannot be characterized as OPDE's "inside information". This was, in fact, not information that belonged to OPDE at all. Rather, this was information that was created by and belonged to Santander,[507] and OPDE was well aware of the information regarding its financial condition shared by Santander to Infracapital during the negotiations.

449. In any case, Claimants allege that Respondent bears the burden of proof to show illegality in the making of the investment, and Respondent did not meet its burden under a standard of proof that is "*clear and convincing*" that, at a minimum, is based on "*substantiated facts*" as has been required by international tribunals.[508]

450. On the question of "good faith and fair dealing" that was expressed in the expert report of Dr. Garro as a general principle on international contracting, Claimants contend that the expert does not claim that good faith, or the absence thereof, could affect a tribunal's jurisdiction, but rather that it could affect the Tribunal's analysis of the *merits* of the investor's position by informing whether the investor had legitimate expectations at the time of the investment.[509]

451. Finally, Claimants examine the alleged breaches to Spanish Criminal Code (disclosure of business secrets, disclosure of private information and corruption), and find that all three types of conduct can only be prosecuted at the request of the alleged victim, and time has barred this action because their limitations period expired in 2015. Furthermore, one of the conducts alleged to have taken place, entered into force of law as a criminal offense 10 months after the facts occurred.[510] They further explore each of the alleged breaches, and

---

[506] Cl. Response to the New Objection, ¶ 28-35, 46.
[507] Cl. Response to the New Objection, ¶ 40.
[508] Cl. Response to the New Objection, ¶¶ 63-65.
[509] Cl. Response to the New Objection, ¶¶ 63-72.
[510] Cl. Response to the New Objection, ¶¶ 78-80.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

conclude the absence of any breach to regulations regarding trade, data protection and competition.[511]

## (2) The Tribunal's Analysis

452. The alternatives that Respondent suggested as a consequence of the alleged conduct are: (a) that the Tribunal lacks jurisdiction, or (b) subsidiarily, that the Tribunal consider the inadmissibility of the claim.[512]

453. To address this objection, the Tribunal believes that the key issues to be examined should be three:

454. Whether the ECT contains a "clean hands" provision, and if not, whether this is a principle of international arbitration law, as Respondent contends, and if so, what are the consequences of a lack thereof;

455. Assuming such principle should apply, whether Respondent has submitted adequate evidence in this case to show wrongdoing on the part of Claimants that met the threshold required under the clean hands principle; and

456. Assuming further that Respondent has evidenced the wrongdoing, whether Respondent timely filed the *Clean Hands Objection* in these proceedings.

457. The Tribunal disagrees with Respondent that there is an obligation on the part of the Tribunal to examine the merits of any jurisdictional objection filed during the arbitration, regardless of the timing thereof. Rather, the Tribunal believes that the rules applicable to determine jurisdiction and timeliness of an objection should provide the adequate guide to determine when the objection is or not timely. But although it is not a *duty* to examine such objections after the applicable rules have closed the window of opportunity –such as Rule 41(1) of the ICSID Arbitration Rules does– it is a *right* of the Tribunal to examine its own jurisdiction at any time, whether at the request from either party or *ex officio*. ICSID Arbitration Rule 41(2) states that the Tribunal "*may, on its own initiative*" consider its jurisdiction at any stage of the proceedings.[513]

458. The allegations of wrongdoing that involves criminal activity –however accurate or not– are sufficient to concern the Tribunal. Perhaps an easy solution would be to first examine whether the jurisdictional objection has been timely filed or not in accordance with the applicable rules, and if not, proceed to swiftly dismiss. Procedurally, this may be the most efficient manner to address the issue and continue with the process. However, when the objection has been charged with serious allegations, it is best for the Tribunal to examine the bases of the claim and the merits for the sake of the decisions to be addressed in the

---

[511] Cl. Response to the New Objection, ¶ 108.
[512] Resp. Second Submission on the New Objection, ¶ 54 (b) and (c).
[513] The tribunal in *Vestey v. Venezuela* indicated that "*the Tribunal's discretionary power to review its jurisdiction ex officio does not absolve the parties from compliance with ICSID Arbitration Rule 41(1)*". **RL-0063**, *Vestey v. Venezuela*, Award, ¶ 149.

Award. This would ensure that the Award is not tainted or perceived to be tainted with having dismissed a jurisdictional objection for a question of untimeliness –especially when timeliness is measured by a subjective term such as "*as early as possible*" as Rule 41(1) provides.

459. Therefore, before the Tribunal examines whether the Clean Hands Objection has been timely submitted by Respondent, the Tribunal has decided to examine the foundations of the claim, *i.e.*, whether the so-called "clean hands" doctrine exists as a principle of international investment law, and whether the burden of proof required thereunder has been met by Respondent in submitting the claim.

460. From the outset, the Tribunal observes that the doctrine of clean hands is recognised as part of equity in common law systems. Whether the doctrine is recognised as part of general international law is unclear and its content is not clearly defined. As the tribunal in the *Churchill Mining v. Indonesia*[514] case indicated: "*[t]he common law doctrine of unclean hands barring claims based on illegal conduct has also found expression at the international level, although its status and exact contours are subject to debate and have been approached differently by international tribunals.*" In the case of *Veteran Petroleum v. The Russian Federation*, the tribunal noted that "*[g]eneral principles of law require a certain level of recognition and consensus. However, on the basis of the cases cited by the Parties, the Tribunal has formed the view that there is a significant amount of controversy as to the existence of an 'unclean hands' principle in international law.*"[515]

461. In accordance with those who support the doctrine, if an investor has been involved in improper or illegal conduct at the time of making their investment, their claim may not be subject to protection under the relevant treaty or under principles of international law.[516] In other instances, the issue may be whether the wrongdoing has taken place subsequently, during the performance of the investment.

462. The first threshold is whether an investment treaty claim should be dismissed for lack of jurisdiction or as inadmissible because the investment was obtained through fraud or corruption or was not in accordance with the law of the host State (*i.e.*, the so-called legality requirement). In *Salini v. Morocco*,[517] having found that in the particulars of that case the respondent State did not show that the investor infringed the laws and regulations of the Kingdom of Morocco, the tribunal expressed that the specific language of Article 1.1 of the bilateral investment treaty:

---

[514] *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, ("***Churchill v. Indonesia***")Award, 6 December 2016, ¶ 493. Fernández Rozas – Sánchez Lorenzo Report, citing the *Churchill v. Indonesia* Award, ¶ 8.

[515] **CL-161**, *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, UNCITRAL, PCA Case No. AA 228, Final Award, 18 July 2014, ¶ 1359.

[516] *See* Fernández Rozas – Sánchez Lorenzo Report, footnote 8.

[517] *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4 ("***Salini v. Morocco***"), Decision on Jurisdiction, 23 July 2001, ¶ 46. Fernández Rozas – Sánchez Lorenzo Report, citing the *Salini v. Morocco* Decision on Jurisdiction, ¶ 13.

> *"[...] seeks to prevent the Bilateral Treaty from protecting investment that should not be protected, particularly because they would be illegal."* (Emphasis added)

463. In *Gustav F W Hamester GmbH & Co KG v. Ghana,* the tribunal expressed the same principle, but broadened the scope, to include a breach to national or international principles of good faith:

> *"An investment will not be protected if it has been created in violation of national or international principles of good faith; by way of corruption, fraud, or deceitful conduct; or if its creation itself constitutes a misuse of the system of international investment protection under the ICSID Convention. It will also not be protected if it is made in violation of the host State's law."*[518] (Emphasis added)

464. Another case where the issue was addressed is *Phoenix Action, Ltd v. Czech Republic*, where the tribunal noted that:

> *"The purpose of the international mechanism of protection of investment through ICSID arbitration cannot be to protect investments made in violation of the laws of the host State[...] or investments not made in good faith, obtained for example through misrepresentations, concealments or corruption, or amounting to an abuse of the international ICSID arbitration system. In other words, the purpose of international protection is to protect legal and* bona fide *investments."*[519] (Emphasis added)

465. It further noted:

> *In the Tribunal's view, States cannot be deemed to offer access to the ICSID dispute settlement mechanism to investments made in violation of their laws. If a State, for example, restricts foreign investment in a sector of its economy and a foreign investor disregards such restriction, the investment concerned cannot be protected under the ICSID/BIT system. These are illegal investments according to the national law of the host State and cannot be protected through an ICSID arbitral process."*[520] (Emphasis added)

---

[518] **CL-188**, *Gustav. v. F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24 ("***Hamester v. Ghana***"), Award, 18 June 2010, ¶ 123.
[519] **CL-193 / RL-0002**, *Phoenix v. Czech Republic*, Award, ¶ 100.
[520] *Id.*, ¶ 101.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

466. The illegality of the investment has been found to be provoked by corruption such as in *World Duty Free Company Limited v. Kenya* and *Metal-Tech Ltd v. Uzbekistan,*[521] but in other instances this may because of "misrepresentation" or "deliberate concealment amounting to fraud."[522]

467. Some tribunals have suggested that only when the relevant treaty contains an express provision requiring legality of the investment to determine whether the tribunal has jurisdiction, is the claim admissible. The ECT does not, however, include such a provision, and Respondent does not argue otherwise.

468. However, this Tribunal shares the opinion with others[523] that, in the absence of an express provision in the relevant treaty requiring legitimacy of the investment to afford protection, only an investment that was the direct result of an illegal wrongdoing that is so egregious (*e.g.*, fraudulent misrepresentations or corruption) as to be found to breach international public policy norms would impede the jurisdiction of the tribunal or the admissibility of the claim.

469. In this respect, despite the absence of such a legality requirement in the ECT, if the Tribunal finds that the conduct of Claimants in making their investments was contrary to international public policy, or affect the basic notions of good faith and fair dealing, the recourse to treaty arbitration would be denied.

470. In their expert Report, Dr. Fernández Rozas and Dr. Sánchez join in the view by stating that "[t]he respondent must not only prove the existence of the breach or unlawful conduct, it must also show that this is sufficiently serious to justify the inadmissibility of the claim […]". [524] They further clarify that if the principle of respect for legality is not expressly included in the treaty (as it is in our case because the ECT does not contain such a legality of the investment provision), "[…] the invocation of the clean hands principle is based on a general principle of international law and the seriousness of the conduct should be measured in terms of the transnational public order."[525] The seriousness of the conduct should be measured in terms of the transnational public order including "serious cases of corruption, fraud, financial crimes and breaches of human rights."[526]

---

[521] *World Duty Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB (AF)/00/7, Award, 4 October 2006, ¶ 157; **CL-192**, *Metal-Tech Ltd v. Republic of Uzbekistan,* ICSID Case No. ARB/10/3, Award, 4 October 2013, ¶¶ 293, 372. Fernández Rozas – Sánchez Lorenzo Report, ¶ 14, 52.
[522] **CL-061**, *Plama v. Bulgaria*, Award, ¶ 135.
[523] Among others, **CL-061**, *Plama v. Bulgaria*, Award; **CL-193 / RL-0002**, *Phoenix v. Czech Republic*, Award; **CL-164**, *Yukos v. Russia,* Final Award, ¶ 1359; **RL-0097**, *Hulley v. Russia,* Final Award, ¶ 1359.
[524] Fernández Rozas – Sánchez Lorenzo Report, ¶ 50.
[525] Fernández Rozas – Sánchez Lorenzo Report, ¶ 52.
[526] *Id.*

471.    The tribunal in *Inceysa v. El Salvador* recognized that the existence of rights arising from illegal acts would violate the "respect for the law" which is a principle of international public policy.[527]

472.    The tribunal in *Plama v. Bulgaria* identified, on the other hand, that the terms of the ECT should be interpreted in a manner consistent with the aim of encouraging respect for the rule of law, and that "[…] *the substantive protections of the ECT cannot apply to investments that are made contrary to law*",[528] concluding that the investments made in that particular case "*violate[d] not only Bulgarian law […] but also applicable rules and principles of international law, in conformity with Article 26(6) of the ECT which states that '[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*'"[529] Having found those violations, the tribunal failed to grant the substantive protections of the ECT.

473.    In light of the above, the question for the Tribunal is whether the actions of Claimants that have been alleged by Respondent to be "*serious wrongdoings in their investment process*" in the acquisition of the PV Plants should be deemed so egregious so as to be deemed to be contrary to international public policy. Based on the evidence submitted on the record, the Tribunal finds that this is clearly not the case.

474.    *First*, the allegations made by Respondent are only that: simple allegations. There is no evidence in the record of any actual illegal activity or wrongdoing by Claimants. Respondent presented as evidence supporting its objection an official *communiqué* sent by the Special Prosecutor of Corruption and Organized Crime advising that an investigation had been commenced in respect to facts that could be deemed as criminal activity arising from the report submitted by the Attorney General's Office related to this arbitration.[530] The Tribunal notes that such report was by the same office that handles this arbitration on behalf of Spain. Further, since then more than a year has elapsed and there is absence of any finding, or evidence even that the Special Prosecutor has pursued any line of investigation that has reached Claimants, Santander or OPDE, or that any of them has been served.

475.    In his expert report submitted on behalf of Respondent, Dr. Velasco caveats his report no less than three times stating that it has been made (i) "*without going into a detailed examination of the factual circumstances that occurred, for which I do not have details*"; (ii) based on the information provided to him by Respondent, which he "*logically assume[s] to be exact and true, although evidently the burden of proof of these conducts lies with the person alleging them*" and (iii) "[…] *even without knowing the specific details of the information provided and its exact scope.*"[531] With such lack of precision, how can

---

[527]  **CL-190**, *Inceysa Vallisoletana S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, ("***Inceysa v. El Salvador***") Award, 2 August 2006, ¶ 249.
[528]  **CL-061/RL-003**, *Plama v. Bulgaria*, Award, ¶ 139.
[529]  *Id*., ¶ 140.
[530]  **R-0386**, Comunication of special anticorruption and organized crime public prosecution service, dated 29 November 2019, addressed to Mr. Rafael Gil Nievas, relating to the opening of an investigation 25/2019.
[531]  Velasco Report, pages 4 and 6.

this expert reach credible conclusions in his report that purports to "assess the correctness or incorrectness of the conduct" of Claimants? If the expert is not able, how can Respondent allege wrongdoing?

476.  *Second*, the allegations by Respondent are in respect to offenses which, under the Spanish Criminal Code, can only be prosecuted at the request of the alleged victim (OPDE, the seller of the PV Plants), and there is no evidence in the record of this arbitration that indicates that OPDE filed any legal action or report in respect to an alleged criminal conduct. Moreover, as Claimants have argued, the offenses relating to alleged disclosure of business secrets and private information have been time-barred since 2015, and the third offense (business corruption) came into force after the alleged disclosures by Santander, but even if it were in force it would require a series of elements that are simply non-existent: payment of a bribe to Santander to induce pressure to OPDE into selling its assets. Even Spain's expert, Dr. Álvarez, admits in his report that: "*with regard to the crime of corruption in business [...] the facts reported are not conclusive in all respects.*"[532] Furthermore, the allegations of violation to trade, data protection and competition laws were not even attributed to Claimants, but rather on Santander.

477.  *Third*, the alleged offences cannot be deemed under any standard to be egregious so as to be deemed to be contrary to international public policy. They relate to alleged sharing of credit ratings, financial information and other disclosure of business secrets, private information and business corruption, in all instances affecting a commercial relationship among a willing buyer and a willing seller who voluntarily closed the transaction, without any subsequent challenges. Clearly, without any public policy implications that Spain has raised.

478.  The Tribunal now examines whether the Clean Hands Objection was timely submitted by Respondent.

479.  As in the case of the three objections to the jurisdiction of this Tribunal that were filed after Respondent's Counter-Memorial, Claimants reject the objection on the basis that it was not submitted in accordance with the terms of Rule 41(1), which the Tribunal once more recalls "[a]*ny objection that the dispute or any ancillary claim is not within the jurisdiction of the Centre or* [...] *within the competence of the Tribunal shall be made as early as possible ... [but]  no later than the expiration of the time limit fixed for the filing of the counter-memorial* [...]*"*,[533] along with Section 14.1 of Procedural Order No. 1 that required submitting "*jurisdictional objection, if any*" with the Counter-Memorial by 9 July 2018. Both provisions are clear in their terms.

480.  The question to be resolved by the Tribunal is simply whether Respondent filed the Clean Hands Objection "as early as possible" as required under the above Rule. The Tribunal dismisses from the outset any allegation made by Respondent on the basis of inapplicability

---

[532] Álvarez Report, ¶ 4.
[533] **RL-0064**, ICSID Convention Regulations and Rules, 2006, Art. 41(1).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

of this provision due to it being placed in a chapter that deals only with "Particular" or "Special" proceedings, which have been previously addressed in this Decision.

481. Respondent contends that it "confirmed" the wrongdoings during the cross-examination of Mr. Mathieu Lief at the June Hearing,[534] but the Tribunal notes that Spain submitted the objection almost six months <u>after</u> the end of such hearing, *i.e.*, on 20 December 2019. Claimants of course contest that the date to take into account for purposes of the timing is from the date documents on which Respondent bases the objection, and asserts that the statements made in Investment Committee meeting papers were submitted to the record of this arbitration as exhibits attached to Claimants' Memorial on 29 March 2018. Therefore, in their view it took a year and a half to raise the objection.

482. The Tribunal agrees with Claimants that Respondent had as from the date of submission of the Memorial sufficient information to identify whether in its view there were any wrongdoings on the part of Claimants. The Tribunal acknowledges that this information was part of a large number of exhibits that were delivered as part of the Memorial, and a party cannot be expected to have read, let alone studied, all such information within weeks after filing. But given that the Parties had agreed that the Counter-Memorial would be due three and one-half months afterwards, it was during this period that Spain should have completed its examination. The relevance of such Investment Committee papers is such that Respondent's counsel elected to cross-examine during the June Hearing Claimants' key witness –and Director of Infracapital in charge of seeking PV opportunities in Spain– precisely regarding the papers.[535] It was not casual. Spain could have, and if it had concerns, should have, submitted the objection in its Counter-Memorial. It could have requested additional information during the document production phase, but failed to do so.

483. Then, almost six months after the June Hearing it brought the Clean Hands Objection. Spain also contends that it was expecting to once more cross-examine Mr. Lief at a new hearing it expected to be called by the Tribunal upon the appointment of a new President after the resignation of Dr. Nunes Pinto.[536] Evidently, this is meritless. An objection cannot be dependent on the calling of a new hearing, and if Respondent had sufficient cause to make such objection after it "confirmed the wrongdoings", the timing of such objection was "*as soon as possible*" after the June Hearing concluded.

484. The Tribunal is well aware that under Rule 41(1) of the ICSID Arbitration Rules the objections must be filed "*no later than the expiration of the time limit fixed for the filing of the counter-memorial … <u>unless the facts on which the objection is based are unknown to the party at that time</u>.*"[537] This could have been a possibility available to Respondent under different factual circumstances, *i.e.*, under a situation where the information on the basis

---

[534] Clean Hands Objection, ¶ 14.
[535] June Hearing, Tr. Day 2, 74:17 and *seq.* (Gil Nievas).
[536] Clean Hands Objection, ¶ 22-24.
[537] **RL-0064**, ICSID Convention Regulations and Rules, 2006, Art. 41(1) (emphasis added).

of which the objection was filed had been "unknown" to Respondent until the June Hearing.

485. But despite having knowledge of the information, and even having "suspicions" many months elapsed after the June Hearing. Considering the dates on which Respondent entrusted the various reports and took other elated actions, it was likely in the month of November 2019 that Respondent internally decided to submit the Clean Hands Objection. It is during late November and early December 2019 that Respondent requested the Special Prosecutor to commence an investigation[538] and gathered the four expert reports.[539] This cannot be deemed to be "as soon as possible".

486. Attempting to define what should be deemed as "*as soon as possible*" needs to take into account the particular circumstances of the case. Other tribunals have examined objections made after the proceedings are well advanced. For example, in *Vestey v. Venezuela*, the tribunal found that "*a time lag of eight months does obviously not meet the 'as early as possible' requirement*"[540], and considered the objection untimely and inadmissible. In *Gavrilovic v. Croatia*[541], the tribunal also decided that the respondent State had failed to raise objections timely because the facts on which the objection were based were not "new", while it also considered the stage of the proceedings. As in that case, where the new objections were raised almost two years after the last hearing had taken place, in these proceedings the Clean Hands Objection was raised many months after the June Hearing which, had it not been for the replacement of the presiding arbitrator, would have been after the post-hearing briefs were due to be filed in accordance with Procedural Order No. 1.

487. For the above reasons, the Tribunal rejects the Clean Hands Objection as meritless and untimely.

# VI.   LIABILITY

## A.   APPLICABLE LAW

### (1) The Parties' Positions

#### a.   *Claimants' Position*

488. Claimants contend that the applicable law to the merits of the dispute is Article 42(1) of the ICSID Convention and Article 26(6) of the ECT. For Claimants, the ECT is the primary source of law applicable to the substance of the dispute and, where the ECT is silent, the

---

[538] The Special Prosecutor confirmed the commencement of the investigation on 1 December 2019.

[539] Garro Report dated 22 November 2019, Álvarez Report dated 30 November 2019, Velasco Report dated 12 December 2019 and Fernández Rozas – Sánchez Lorenzo Report dated 17 December 2019.

[540] **RL-0063**, *Vestey v. Venezuela*, Award, ¶ 147.

[541] **CL-186**, *Georg Gavrilovic and Gavrilovic d.o.o. v. Republic of Croatia*, ICSID Case No. ARB/12/39, Decision on the Respondent's Request of 4 April, 30 April 2018, ¶¶ 39-45.

Tribunal should apply customary international law and general principles of international law.[542]

### b. *Respondent's Position*

489. Spain espouses the view that the applicable law is the ECT and the laws and principles of international law, as established by Article 26(6) of the ECT and Article 42 of the ICSID Convention.[543] In Spain's view, EU Law forms part of international law and is both applicable law and a "*crucial fact*" for the resolution of the dispute.[544]

### (2) The Tribunal's Analysis

490. Article 26(6) of the ECT specifically provides that: "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles on international law". In turn, Article 42 of the ICSID Convention states: "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable".[545]

491. There is no dispute among the Parties in respect to the ECT being the primary source of law applicable to resolve this dispute, and where the ECT is silent, that applicable rules and principles of international law should apply. It is clear that "rules and principles" of international law include the law of treaties and the law of State responsibility. The question is whether it should include EU law in a dispute under the ECT involving an EU Member State.

492. Respondent places relevance on the fact that EU law is regarded as having a dual nature: as both forming part of the law in force in every Member State (*i.e.*, internal law) and as deriving from an international agreement between the Member States (*i.e.*, international law). But the dual nature of EU law is not conclusive to the issue of whether EU law is international law for the purposes of Article 26(6) of the ECT.

493. It is uncontroversial that EU law derives from international treaties and is therefore governed by international law. However, it does not follow that EU law is international law in all circumstances. The reference to "international law" in Article 26(6) of the ECT must, in its context, only refer to public international law since the ECT is a multilateral treaty that governs the international relations between the EU, Member States, and non-EU States. Given that EU law only governs the relations between Member States[546], EU law

---

[542] Cl. Memorial, ¶¶ 213-215. Second Hearing, Tr. Day 1, 83:12-16.

[543] Resp. Rejoinder ¶¶ 1092-1094.

[544] Resp. Rejoinder ¶ 1098. Second Hearing, Resp. Opening Presentation, slides: 107-116. Second Hearing, Tr. Day 1, 196:11-197:15.

[545] **RL-0064**, ICSID Convention Regulations and Rules, 2006, Art. 42.

[546] The Tribunal is aware that, as an exception, some EU law applies to European Free Trade Association (EFTA) States – Norway, Iceland and Liechtenstein. However, they have to incorporate it through their own legal processes.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

cannot form part of the international law applicable between EU Member States and non-EU countries. Under EU treaties, EU law forms part of the internal law of Member States. In this respect, the role of the Tribunal is to apply the provisions of the ECT, and principles of public international law as may be applicable. The Tribunal may, however, take into account EU law as a matter of internal law in the application of the relevant international standards of protection under the ECT.

## B. THE ARTICLE 10(1) OBLIGATIONS

494. Claimants contend that Respondent has violated Article 10(1) of the ECT. They argue that Spain has taken various wrongful measures which "*fundamentally altered and then dismantled the applicable legal and regulatory framework in reliance upon which the Claimants' PV Investments were made.*"[547] These measures include, in particular, the issuance and implementation of Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order.[548] According to Claimants, Spain has breached Article 10(1) of the ECT by:

   (a). "failing to encourage or to create stable, equitable, favourable and transparent conditions for the Claimants' investments;

   (b). "failing to accord the Claimants' investments fair and equitable treatment;

   (c). "failing to accord the Claimants' investments constant protection and security;

   (d). "impairing, by unreasonable and discriminatory measures, the management, maintenance, use, enjoyment and disposal of the Claimants' investments;

   (e). "failing to accord the Claimants' investments treatment which is required by international law; and

   (f). "failing to observe obligations it had entered into with the Claimants or their investments (the umbrella clause)."[549]

495. In turn, Respondent denies that it has breached Article 10(1) of the ECT. Spain argues that (i) it has not violated Claimants' legitimate expectations;[550] (ii) it has respected the duty to create stable conditions;[551] (iii) its conduct was transparent and coherent;[552] (iv) the measures taken by the Government were reasonable and proportionate;[553] and (v) it has not breached any obligations undertaken regarding Claimants' investment (umbrella clause).[554]

---

[547] Cl. Memorial, ¶ 238.

[548] Cl. Memorial, ¶ 238.

[549] Cl. Memorial, ¶ 239 and § 5.3; Cl. Reply, § 4.4. June Hearing, Cl. Opening Slide Presentation, slide 103. June Hearing, Tr. Day 1, 99:1-103:14.

[550] Resp. C-Memorial, § V.B.2; Resp. Rejoinder, § V.D.1.

[551] Resp. C-Memorial, § V.B.2; Resp. Rejoinder, § V.D.1.

[552] Resp. C-Memorial, § V.B.3; Resp. Rejoinder, § V.D.2.

[553] Resp. C-Memorial, § V.B.4; Resp. Rejoinder, § V.D.3.

[554] Resp. C-Memorial, § V.C.; Resp. Rejoinder, § V.E.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

496. Article 10(1) of the ECT is transcribed below:

> "*Each Contracting Party shall, in accordance with the provisions of this Treaty, **encourage and create stable, equitable, favourable and transparent conditions** for Investors of other Contracting Parties to make Investments in its Area. Such conditions **shall include** a commitment to accord at all times to Investments of Investors of other Contracting Parties **fair and equitable treatment**. Such Investments shall also enjoy the most **constant protection and security** and no Contracting Party **shall in any way impair by unreasonable or discriminatory measures** their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded **treatment less favourable than that required by international law**, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party*"[555] (Emphasis added]

497. Claimants contend that Spain has violated the Fair and Equitable Treatment ("**FET**") contained in Article 10(1) of the ECT.[556] Spain's conduct, Claimants argue, has been "*unfair, inequitable and contrary to the Claimants' legitimate expectations upon which they relied when they made their investments in Spain.*"[557]

498. In Claimants' view, it is clear that the FET standard in the ECT is an autonomous standard, broader than the minimum standard under customary international law, and has a specific legal meaning.[558] Claimants rely on the "*normal process of treaty interpretation,*" based on an analysis of the ordinary meaning of the terms, their context and the object and purpose of the treaty, to argue that the FET standard in the ECT is an "*absolute*" standard.[559] This means that the standard can be violated even if Claimants have received the same treatment as Spanish companies or companies from other nationalities of Contracting States.[560] Claimants' interpretation, they argue, is backed by numerous tribunals, including *MTD, Tecmed, Saluka, Azurix,* and *Kardassopoulos.*[561]

499. According to Claimants, arbitral practice has evaluated a State's conduct in applying the FET standard based on the following non-cumulative criteria, and present their case on claims arising from breaches to those criteria:

> (a). whether the State failed to provide a stable and predictable legal and business framework with regard to the investment;

---

[555] ECT, Art. 10(1) (emphasis added).
[556] Cl. Memorial, ¶ 275.
[557] Cl. Memorial, ¶ 275.
[558] Cl. Memorial, ¶¶ 276-278. Cl. Reply, ¶¶ 485-491. June Hearing, Cl. Opening Presentation, slides 116-118.
[559] Cl. Memorial, ¶¶ 278-280.
[560] Cl. Memorial, ¶¶ 278-280.
[561] Cl. Memorial, ¶¶ 281-283.

(b). whether the host State breached the investor's reasonable and legitimate expectations at the time of the investment;

(c). whether the State's conduct was transparent;

(d). whether the State's conduct was arbitrary or unreasonable;

(e). whether the State's actions were disproportionate.[562]

The Tribunal shall analyse each of the breaches below.

## C. SPAIN'S ALLEGED FAILURE TO PROVIDE A STABLE AND PREDICTABLE REGULATORY REGIME

### (1) The Parties' Positions

#### a. *Claimants' Position*

500. Claimants point to the first sentence of Article 10(1) of the ECT, which states that Contracting Parties are obliged to "*encourage and create stable, equitable, favourable and transparent conditions*" for Investors from other Contracting Parties.[563] In Claimants' view, by entering into the ECT, Spain accepted limitations on its regulatory power and an obligation to provide long-term stability for Claimants' investment conditions.[564] They acknowledge that this obligation does not mean, however, that Spain must completely freeze its regulatory regime.[565]

501. Claimants argue that Article 10(1) of the ECT imposes an autonomous obligation on Spain to provide a stable legal framework.[566] They argue that such stability was in any case essential if investment were to be attracted into the new, RE sector, as envisaged by the 1997 Electricity Law. Prior to Claimants' investments, Spain had taken legislative steps to establish stable conditions for investment in the PV sector: notably, RD 661/2007 and RD 1578/2008. These steps were supplemented by statements from the CNE,[567] which confirmed that RD 661/2007 and RD 1578/2008 contained clear stability commitments and legal certainty.[568] In addition, Claimants contend that the Spanish Government confirmed that the RD 1578/2008 regime would last for 25 years.[569] Claimants note that although the Government adopted further regulatory measures in 2010, such measures did not fundamentally alter the existing economic regime and Claimants were satisfied that the stability of the Special Regime was preserved.[570]

---

[562] Cl. Memorial, ¶ 284.
[563] Cl. Memorial, ¶ 241; ECT, Title II(4).
[564] Cl. Memorial, ¶¶ 243-244.
[565] Cl. Memorial, ¶ 244.
[566] June Hearing, Tr Day 1, 99:8-20 (Sullivan). Second Hearing, Tr Day 1, 78: 22-25 (Sullivan).
[567] Cl. Memorial, ¶¶ 245-248.
[568] Cl. Memorial, ¶¶ 246-248.
[569] Cl. Memorial, ¶ 249.
[570] Cl. Memorial, ¶ 251.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

502.    Claimants observe that although the *Charanne* award found that there was no violation of the ECT, this was because the tribunal only considered the modifications to the FIT in 2010, excluding from its analysis the measures adopted between 2012 and 2014.[571] Claimants also distinguish the facts in the *Isolux* case where the tribunal, which did consider the 2012-2014 measures, rejected the claim because the changes to the FIT regime were foreseeable at the time of Isolux's investments.[572] There is no doubt, Claimants conclude, that prior to Claimants' investments, Spain had created an RE regime intentionally designed to provide long-term stability to investors for the purposes of inducing investment.[573]

503.    In Claimants' view, "*Spain is guilty of the classic 'bait and switch.'*"[574] Once Claimants made their investments, Spain adopted a series of measures which were aimed at curtailing and repealing the regime on the basis of which Claimants made their investment.[575]

504.    According to Claimants, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, constituted a "*regulatory 'rollercoaster,'*" leaving in place a system "*plagued by uncertainty, lack of transparency and long-term instability with respect to the future.*"[576] Claimants assert that this uncertainty was exacerbated by the Spanish government's discretion to redefine the "*reasonable return*" for PV installations and change the remuneration regime every six years with regard to existing installations.[577]

505.    Claimants do not suggest that Article 10(1) of the ECT constitutes a stabilisation clause, but rather, that the ECT creates an obligation for Spain to "*encourage and create stable, equitable, favourable and transparent conditions for Investors.*"[578] Claimants rely on the *Antin v. Spain* tribunal[579] to contend that (i) the ECT imposes a specific commitment on the Contracting Parties to provide a stable and predictable legal framework; and (ii) the New Regime's methodology to determine the reasonable return lacked identifiable criteria for determining the payment due to CSP installations, and so was incompatible with the requirements of stability and predictability required under the ECT.[580] On this view, the New Regime had features that contrasted with the relative precision of the Original Regime "*which provided for objective and identifiable criteria for determining the remuneration*".[581]

506.    Claimants draw support from the *Eiser* and *Novenergia* tribunals to contend that Claimants "*were forced to suffer Spain's failure to provide the long-term stability and transparency*"

---

[571] Cl. Memorial, ¶¶ 252-253.
[572] Cl. Memorial, ¶¶ 255-257.
[573] Cl. Memorial, ¶ 258.
[574] Cl. Memorial, ¶ 260.
[575] Cl. Memorial, ¶ 260. June Hearing, Tr. Day 1, 10:5-10 (Sullivan).
[576] Cl. Memorial, ¶¶ 270-271; Cl. Reply, ¶ 525.
[577] Cl. Memorial, ¶ 271; Cl. Reply, ¶ 526.
[578] Cl. Reply, ¶ 526.
[579] **CL-100**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 533.
[580] Cl. Reply, ¶¶ 530-531; *Antin v. Spain*, ¶¶ 562-568.
[581] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 568; Cl. Reply, ¶ 568.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

at the heart of the first sentence of Article 10(1) of the ECT.[582] Citing the CNE's Report 3/2007, Claimants take the view that, although Spain is entitled to pass legislation in breach of its stability commitment, when doing so, Spain's international obligations are engaged and so require it to pay compensation.[583]

**b.  *Respondent's Position***

507. Spain submits that it has not breached the obligation to provide stable conditions.[584]

508. At the outset, Respondent sets out a view of the protection of investments under the ECT, arguing that the principal objective of the ECT with respect to investor protection is to achieve the implementation of a free market without discrimination based on the investor's nationality.[585] This emphasis on non-discrimination is offered as a corrective to what Respondent sees as Claimants' "*one-sided reading of the ECT, according to which this treaty would guarantee an alleged right to* petrification of general rules *in favour of foreign investors, even to the detriment of State Parties and the nationals of the State Party (i.e. consumers).*"[586]

509. For Respondent, an interpretation of the duty to create stable conditions as advanced by Claimants implies the obligation of the State to keep its regulatory framework frozen, which is unrealistic, and infringes the FET standard in the ECT, as it is usually understood.[587] Referring to the *Plama* award,[588] Spain argues that the standard invoked by Claimants must also be examined within the FET context, pursuant to the objective and purpose of the ECT.[589] In addition, and based on the *Plama* award, Spain argues that "*stable conditions*" mentioned in the ECT "*clearly admit the adoption of* reasonable and proportionate macroeconomic control measures*, provided that they are motivated by a reasonable cause.*"[590]

510. Quoting the tribunal in *AES Summit*, Spain contends that the ECT does not contain a "*stability clause*" in the context of a regulatory framework.[591] Further, in the absence of a "*specific commitment,*" the State has no obligation to grant regulated tariffs or maintain the

---

[582] Cl. Memorial, ¶ 272.
[583] Cl. Memorial, ¶ 274; **C-048**, CNE Report 3/2007, 14 February 2007, p. 22.
[584] June Hearing, Resp. Opening Slide Presentation, slides 52-56. June Hearing, Day 1, 252:11-254:3.
[585] Resp. C-Memorial, ¶ 1093.
[586] Resp. C-Memorial, ¶ 1103 (emphasis in the original).
[587] Resp. C-Memorial, ¶ 1200.
[588] **CL-061**, *Plama v. Bulgaria*, Award.
[589] Resp. C-Memorial, ¶ 1201.
[590] Resp. C-Memorial, ¶ 1202 (emphasis in the original).
[591] Resp. C-Memorial, ¶ 1203.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

framework unchanged once such benefits are granted.[592] In support of its position, Spain refers to the awards in *Mamidoil v. Albania*[593] and *Blusun v. Italy*.[594]

511. For Respondent, the Disputed Measures were adopted (i) on the basis of a need to ensure sustainability and balance of the Spanish electricity system; and (ii) in observance of the Law 54/1997 granting a reasonable rate of return on the investments in line with the cost of money on the capital market.[595] Respondent takes the view that through the Disputed Measures, Spain maintained the "*essential nature of the Regulatory Framework*" in which Claimants invested by:

(a). maintaining the subsidies for renewables as a cost of the Spanish electricity system in connection to their sustainability;

(b). maintaining the priority of access and dispatch;

(c). maintaining the principle that the remuneration of the Special Regime consists of a subsidy which, when added to the market price, allows the investors to reach the level of standard facilities during their useful lives in terms of a reasonable rate of return;

(d). maintaining the methodology whereby subsidies are determined according to any demand developments and other basic economic data, connected to investment and standard-facility operation costs; and

(e). resolving, in a rational and proportionate way, a situation of imbalance that endangered the economic sustainability of the Spanish electricity system.[596]

512. Respondent also rejects Claimants' position by arguing that (i) no retroactive measures in breach of the ECT were adopted; and (ii) Claimants had knowledge that the Government could approve reforms that would impact existing facilities.[597]

513. With regard to the alleged *retroactive nature of the Disputed Measures*, Respondent contends that for any regulation to have a retroactive effect, there must be acquired rights.[598] However, Claimants had no acquired rights as to future remuneration, since RDL 9/2013 only applies to future remunerations.[599] Spain draws support from the *Nations Energy v. Panama*[600] award to argue that what Claimants refer to as "*retroactive*

---

[592] Resp. C-Memorial, ¶¶ 1204-1205.
[593] **RL-0034**, *Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania*, Award, 30 March 2015, ¶¶ 617-618.
[594] Resp. C-Memorial, ¶¶ 1204-1205; **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016.
[595] Resp. C-Memorial, ¶ 1208 (emphasis omitted).
[596] Resp. C-Memorial, ¶ 1211.
[597] Resp. C-Memorial, ¶¶ 1113-1229.
[598] Resp. C-Memorial, ¶ 1215.
[599] Resp. C-Memorial, ¶ 1215.
[600] **RL-0030**, *Nations Energy Inc., Electric Machinery Enterprises Inc. and Jaime Jurado v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010, ¶¶ 642, 644, 646.

*measures*," is in fact the "*immediate effect*" of the new regulation for the future.[601] According to Spain, the effects of the Disputed Measures apply to future events only, but the remuneration "*previously received is intangible and not susceptible to any claim.*"[602]

514. Respondent also notes that the Spanish Constitutional Court has analysed the measures based on RDL 9/2013 and "*ruled that they are not retroactive as their effectiveness applies to the future, without affecting acquired rights.*"[603] It is Respondent's view that both under national and international law, the concept of retroactivity does not apply to RDL 9/2013 or any other Disputed Measure.[604]

515. With regard to Claimants' knowledge of the upcoming reforms, Spain contends that it is clear that Claimants "*were fully aware that their plants could be affected by any reform after their investment.*"[605] In support of its argument, Spain refers to a report prepared in 2010 by Nomura and another 2010 report by Deutsche Bank.[606]

**(2) The Tribunal's Analysis**

516. Claimants' "stability" claim arises out of the requirement to "*create stable, equitable, favourable and transparent conditions*" provided in the first sentence of Article 10(1) of the ECT.

517. From the outset, the Tribunal notes that the use of the word "shall" in the first sentence denotes a legal obligation. This, however, does not address whether it is separate and autonomous from the obligation to accord FET and the actual content of the obligation. The term "stability" is a concept that outside its proper context can provide for a wide room of interpretation. The Tribunal will therefore interpret the term "stable conditions" in its context and in light of the entire provision in Article 10(1) of the ECT and the object and purpose of the ECT. While the object and purpose of the ECT undoubtedly encourages international investments and recognises the role of entrepreneurs "*operating within a transparent and equitable legal framework*" as expressed in the Treaty's Preamble,[607] it is also accepted, as explained below, that the investment protections in the Treaty calls for a balanced approach to the interpretation of the obligations in Article 10(1) as well.

518. In examining the requirements in the first sentence, the terms "*stable, equitable, favourable and transparent*" are conditions that are all interlinked. Transparent and favourable conditions are linked to stable conditions. Stability is itself linked to an expectation of continuity and predictability as to future conduct of a State. That is to say, an expectation

---

[601] Resp. C-Memorial, ¶¶ 1216-1217.

[602] Resp. C-Memorial, ¶ 1218.

[603] Resp. C-Memorial, ¶ 1224; **R-0108**, *Judgment of the Constitutional Court of 17 December 2015* (App. Uncons. 5347/2013); **R-0109**, *Judgment of the Constitutional Court of 18 February 2016* (App. Uncons. 5852/2013); **R-0110**, *Judgment of the Constitutional Court of 18 February 2016* (App. Uncons. 6031/2013).

[604] Resp. C-Memorial, ¶ 1226.

[605] Resp. C-Memorial, ¶ 1227.

[606] **C-065**, Nomura Market Commentary/Strategy, *European Renewable Energy*, 16 April 2010; **C-068**, Deutsche Bank Company Alert, 21 April 2010.

[607] ECT, Preamble.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

that the legal framework will not be arbitrarily changed, and the State will exercise its regulatory powers reasonably. It is therefore not surprising that the requirement of stability in the text is placed in the broader context of the duty to treat investors and their investments fairly. This is apparent from the wording in the second sentence which provides that "*Such conditions* [*i.e.*, the "stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area"] *shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.*"[608]

519. Respondent argues that the stable and transparent conditions must be examined within the fair and equitable treatment context. According to Respondent, the FET standard allows the adoption of reasonable and proportionate measures. The Tribunal agrees with Respondent.

520. In this sense, the Tribunal also agrees with the approach of several international tribunals that have noted that *"the first sentence of Article 10(1) cannot be interpreted in isolation from the second sentence"*.[609]

521. Thus, the Tribunal concludes that the requirement of stable conditions must be assessed as an element of the obligation to act fairly as part of the FET standard. The implication of this is that the protections under the first sentence are not absolute. The requirement of fairness grants foreign investors with the right to a certain degree of legal stability, predictability and consistency under the FET standard, but such right does not affect the inherent right of States to alter the legal framework in response to changes in circumstances provided that there is an economic or social justification to do so.

522. As correctly put by the *PV Investors* tribunal:

> *"the requirement of stability is not absolute; it must be balanced with other principles, including those that are directly derived from 'State sovereignty', e.g., the State's right to regulate and to adapt the regulatory framework to changed circumstances. More generally, the protection of investments and the right to regulate operate in a balanced way under the ECT as in all other investment treaties."*[610]

---

[608] ECT, Art. 10(1).

[609] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 314; **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶ 315(c) and 319(3), *"the obligation to create stable conditions is conceived as part of the FET standard which is generally applicable to investments by virtue of the second sentence"*; **CL-099** / **RL-0114**, *Antaris GMBH and Dr. Michael Gode v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018, ¶ 365; **RL-0145**, *Stadtwerke München GMBH, Rweinnogy GMBH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, ¶ 195.

[610] **RL-0147**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, 28 February 2020, ¶ 570.

523.  More recently the Tribunal in *Eurus* noted:

> *"The legal standard embodied in the first and second sentences of Article 10(1) takes into account the prerogatives and responsibilities of governments as well as the rights and interests of investors, including their interest* in stability."[611]

524.  Thus, the requirement of stable conditions in Article 10(1) is not an expression of a higher level of protection than the protections provided by the FET standard. To state the opposite would result in the muting of the other obligations provided in the second sentence of Article 10(1).

525.  The Tribunal will now turn to the question whether Spain's conduct constitute a breach of the FET standard based on the alleged failure to provide a stable legal framework.

526.  Claimants argue that the first sentence imposes an independent obligation on Respondent not to "*fundamentally alter the regulatory framework*".[612]. They contend that the Disputed Measures violated the requirements of stable and transparent conditions because Spain "*fundamentally alter[ed] the regulatory framework applicable to existing investments*".[613] Claimants also contend that the "continual" changes in the legal framework created instability and uncertainty. They contend that the regulatory "rollercoaster" of changes is "sufficient" to establish Spain's violation of its obligation to provide Claimants' stable and transparent investment conditions.[614] Claimants' contend that they had a right to regulatory stability of the essential features of the economic regime under RD 1578/2008 since the legislation guaranteed a FIT regime that would be available for a specified amount for kWh of electricity produced for the first 25 years of a PV installation's life.[615] According to Claimants, this regulatory framework was inherently stable.[616]

527.  The Tribunal disagrees that, as a general proposition, a fundamental or continual change in regulations constitutes a breach of the FET standard. Absent a showing of a stabilisation clause or otherwise, States have the right to regulate and modify course in response to changing circumstances to alleviate a public concern or address public needs. The Tribunal considers that, in these circumstances, the FET would be breached if a State unreasonably modifies the legal framework or adopts an economic framework with the intention to modify it drastically once it had successfully induced the wanted investment in contradiction with specific commitments to the investor not to do so.[617]

---

[611] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 314.
[612] Cl. Memorial ¶ 244.
[613] Cl. Memorial ¶ 244.
[614] Cl. Memorial, ¶ 270; Cl. Reply, ¶ 525.
[615] Cl. Memorial, ¶¶ 245-247.
[616] Cl. Memorial, ¶ 327.
[617] *See* **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 451.

528. Consequently, the duty to provide stable conditions does not protect investors from *any and all* policy and regulatory changes that result in an uncertain investment environment. Economic landscapes change, policies change, regulations change. Such changes may even be significant, complex and / or constant, yet would not, *per se*, give rise to a breach of the FET standard.

529. Some tribunals have sought words to describe the "disproportionality" or "magnitude of change" to grasp a tipping point between acceptable change and the kind of overhaul of a regime that raises questions about the stability of the regime on which the investor relied when making the investment. For the *RWE v. Spain* tribunal, the question of disproportionality "*entails a consideration as to whether the changes were suitable and necessary to achieve the legislative intent, and whether an excessive financial burden was shifted to the Claimants who had committed very substantial resources on the basis of the Special Regime*".[618]  It examined whether there was any margin of appreciation to be accorded in the consideration of whether the measures adopted by Spain were necessary / not disproportionate.

530. The *OperaFund v. Spain* tribunal[619] deemed that the legitimate expectations of stability were "*clearly and fundamentally changed*" by the Disputed Measures, while the *Foresight v. Spain* tribunal[620], the issue was that "*the legal and regulatory framework could not be fundamentally and abruptly altered*", and that the New Regime "*constituted a fundamental change to the legal and regulatory framework that crossed the line from a non-compensable regulatory measure to a compensable breach of the FET standard in the ECT*". In the case of *Novernergia v. Spain*, the tribunal deemed that the measures enacting the New Regime were "*radical and unexpected*".

531. The Tribunal considers that for a regulatory change to be in breach of the requirement of stability under the FET standard the changes must be arbitrary, unreasonable or discriminatory.

532. In light of the above, the Tribunal considers that the analysis of whether the changes introduced by Spain to the FIT regime under RD 1578/2008 to existing PV plants constitute an unreasonable change and violate the FET standard including the requirement to afford legal stability to investors, inevitably requires an analysis of the apparent "stability commitments"[621] made by Spain to "existing installations"[622] in the context of the legitimate expectations claim and the FET under the reasonableness standard, which is carried out below.

---

[618] **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶¶ 550-551.

[619] **CL-204**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019, ¶ 513.

[620] **CL-122**, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v.  Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018, ¶¶ 365 and 397-398.

[621] Cl. Reply, ¶ 525.

[622]  Cl. Memorial ¶ 246.

### D. Spain's Alleged Breach to Claimants' Legitimate Expectations

### (1) The Parties' Positions

#### a. *Claimants' Position*

533. With regard to the standard of legitimate expectations, Claimants contend that it is a well-established principle of international investment law that treatment by the host State should not affect the basic expectations that were taken into account by the foreign investor to make the investment.[623] They argue, relying on *Saluka*,[624] that expectations that are protected include legislation and the totality of the business environment at the time of the investment. Claimants also claim that it is not their position that the obligation to accord FET in the ECT means that a host State must completely freeze its regulatory regime. However, according to Claimants, by entering into the ECT, Spain accepted limitations on its power to alter the regulatory framework applicable to Claimants' investments, particularly in ways that would be unfair, unreasonable and inequitable, including by undermining an investor's legitimate expectations. Claimants assert that in order to act consistently with the ECT Spain cannot dispense unilaterally with the entire legal framework it has put in place to attract investments into its renewable sector.

534. Claimants argue that domestic legislation including decrees created to "induce" investments constitute a "promise" to foreign investors which generate a legitimate expectation.[625] Claimants argue that the feed-in-tariff (FIT) offered under RD 1578/2008 was intentionally designed to induce investment by providing a stable FIT regime to investors. Claimants contend that stable, transparent and predictable legal and business environment are of particular importance in the energy sector where a substantial amount of capital is typically committed at the outset in the hope of generating a long-term return.

535. According to Claimants, through royal decrees, Spain promised not to apply future changes to the essential features of the FIT regime to existing PV installations.[626] They assert that their expectations were twofold: (a) regarding the nature, amount and duration of the FIT offered under RD 1578/2008; and (b) with respect to the stability of the RD 1578/2008 economic regime.[627]

---

[623] Cl. Memorial, ¶ 292, citing **CL-082**, *Técnicas Medioambientales Tecmed S. A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 154.

[624] Cl. Memorial, ¶ 292, citing **CL-070**, *Saluka Investments B. V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, ¶ 301.

[625] Cl. Memorial, ¶ 299, Claimants cite **CL-019**, *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, ¶ 514; **CL-034**, *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶¶ 264-266; **CL-047**, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. The Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶¶ 130 and 133; and **CL-030**, *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶¶ 513, 514 and 517. *See also* June Hearing, Tr. Day 1, 22:10-14 (Sullivan).

[626] Second Hearing, Tr. Day 1, 6:21-25 (Sullivan).

[627] Cl. Memorial ¶ 302.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

536. With regard to the nature, amount and duration of the FIT, Claimants argue that these are key characteristics of the FIT regime under RD 1578/2008 and that they are essentially the same as RD 661/2007: (i) specific remuneration per kWh of electricity production; (ii) annual updates to the FIT in accordance with inflation, and (iii) guarantees that the FITs be maintained for 25 years.[628] Claimants argue that if a PV installation was registered and received its RAIPRE certificate, an investor would reasonably expect it would receive a permanent FIT for 25 years. With respect to the stability of the economic regime, according to Claimants, their expectation was that future changes to the economic regime would not apply to existing installations.[629]

537. According to Claimants, Respondent also promised through "direct" representations to Claimants that any amendments to the regulatory regime for PV plants would be forward-looking only (*i.e.*, would apply only to new plants). Claimants contend that during meetings held between Infracapital representatives (including Mr. Lief) and the CNE, the CNE directly represented to Claimants that there was no risk of retroactive amendment to the tariffs for existing PV plants. At a meeting held in April 2009, Claimants argue that the CNE handed out presentation slides which in their view confirmed that the fundamental criteria for the regulation included ensuring the "[s]*ecurity and predictability of economic [incentives] to eliminate the regulatory risk (warranty by law)*" and being "non retroactive".[630]

538. Claimants contend that their expectations were further enhanced by Spain's active campaign to promote investments in its RE sector and laud the stability of the framework and economic regime for RE projects.[631] After knowingly inducing Claimants' investments based on these specific representations and undertakings, Respondent "hastily" withdrew them after the investments had been made and the Government had met its policy goals.[632]

539. According to Claimants, Spain frustrated their expectations by adopting a series of measures that dismantled the essential features of the legal and economic framework on which Claimants relied for their investment.[633] Such measures are:

- Spain's adoption of the TVPEE through Law 15/2012 which frustrated Claimants' expectations of the FIT they would be entitled to under RD 1578/2008;

- The Government's replacement of the CPI-linked updating mechanism for RD 1578/2008's FIT through RDL 2/2013;

---

[628] June Hearing, Tr. Day 1, 47:2-14 (Vázquez-Guillén). June Hearing, Cl. Opening Presentation, Slide 34.
[629] Cl. Memorial ¶304. June Hearing, Tr. Day 1, 99:24-100:6 (Sullivan), and 121:2-8 (Ingle).
[630] ML Witness Statement, ¶¶ 14-16; **C-066**, Infracapital, Final Investment Committee report, 20 April 2010, p. 2 Appendix E. June Hearing, Tr. Day 1, 54:3-54:19 (Vázquez-Guillén).
[631] Cl. Memorial, ¶ 307.
[632] Cl. Memorial, ¶ 308.
[633] June Hearing, Tr. Day 1, 88:23-89:5 (Sullivan).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

- Wiping out the economic regime of RD 1578/2008 through RDL 9/2013 and introducing a less favourable regime for Claimants.[634]

540. Claimants draw a comparison with the facts in the *Micula* case to argue that the complete upheaval of a certain regulatory framework can result in a violation of the FET standard.[635] In that case, the tribunal concluded that the support schemes granted by Romania and which were then revoked, constituted a breach of legitimate expectations.[636] In Claimants' view, the same conclusion is applicable in the present dispute where the Government assured investors that the economic regime under RD 1578/2008 would be available during the first 25 years of a PV installation's life, but subsequently reneged on its promises and frustrated Claimants' legitimate expectations.[637]

541. In that regard, Claimants note that other tribunals have found that the Disputed Measures violate investors' legitimate expectations, in breach of Article 10(1) of the ECT and cite to the *Masdar*,[638] *Antin*,[639] and *Greentech*[640] awards. In the same vein, Claimants dismiss Spain's reliance on the *Charanne* and *Isolux* awards to argue that the Disputed Measures are not in breach of investors' expectations.[641]

542. With regard to the nature of Claimants' expectations, Claimants say that Respondent is incorrect in alleging that the timing of Claimants' investments undermines their legitimate expectations because the investments took place before and during the approval of the Disputed Measures.[642] Claimants stress that their investments were made for the first group of plants in March 2011 and for the second group of plants in June and October 2011 whereas the Disputed Measures were adopted between 2012 and 2014, *i.e.,* after Claimants' had made their investments.[643]

543. Claimants go on to deny that the events leading up to their investment could have signalled that Spain would adopt the Disputed Measures.[644] Rather, they argue, Spain's actions gave them confidence that the PV plants regime would not be drastically changed.[645]

---

[634] Cl. Memorial, ¶ 308. June Hearing, Tr. Day 1, 89:6-92:7 (Sullivan).
[635] Cl. Memorial, ¶¶ 310-311.
[636] Cl. Memorial, ¶¶ 310-311.
[637] Cl. Memorial, ¶ 312.
[638] **CL-139**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Final Award, 16 May 2018.
[639] **CL-100**, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/13/31, Award, 15 June 2018.
[640] Cl. Reply, ¶¶ 558-560; **CL-122**, *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A., GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018.
[641] Cl. Reply, ¶ 561.
[642] Cl. Reply, ¶ 315.
[643] Cl. Reply, ¶¶ 315-316. June Hearing, Tr. Day 1, 62:4-14 (Sullivan).
[644] Cl. Reply, ¶ 330.
[645] Cl. Reply, ¶ 330.

544. Claimants further contest Spain's argument that Claimants failed to conduct appropriate due diligence in the analysis of the applicable regulatory regime.[646] Claimants note that Spain's arguments regarding the applicable standard of due diligence is moot because the *Novenergia* tribunal ruled that investors did not need to undertake sophisticated due diligence in order to invest in reliance upon RD 6671/2007.[647] Irrespective of the applicable standard of due diligence, Claimants argue, the standard is met in this case.[648] Claimants undertook significant due diligence before deciding to invest, including consultation with their legal advisers.[649] In that regard, it is also Claimants' view that Spain's analysis of Claimants' due diligence documents is misplaced.[650]

545. Moreover, for Claimants, Spain misrepresents the views of RE Associations, which allegedly stated that investors were fully aware of the "*nature of the reasonable return*" and the need to take measures to guarantee the stability of the Spanish electricity sector.[651] Relying on the findings of the *Novenergia* tribunal, Claimants argue that the views of the RE Associations are not relevant to assessing Claimants' legitimate expectations and "*are nothing more than a distraction.*"[652]

546. For Claimants, Spain's reliance on Spanish law arguments to assess Claimants' legitimate expectations is irrelevant.[653] Claimants dismiss Spain's reliance on the "*reasonable return*" principle.[654] Claimants argue that the concept of "*reasonable return*" was defined for the first time in 2013, which postdates Claimants' investments.[655] In Claimants' view, the principle of "*reasonable return*" is not a dynamic one and that theory goes against the Spanish and international regulatory practice.[656] For Claimants, Spain's envisioned rate of return was "*far higher than the 7.398% before tax (or 5.948% after-tax)*" established by the New Regime.[657] Claimants cite to government documents to argue that plants commissioned under RD 1578/2008 should have earned a return of 7% post tax.[658]

547. According to Claimants, the Spanish Supreme Court judgments are not relevant to Claimants' expectations.[659] Claimants dismiss the interpretation of the *Charanne* award according to which, Claimants should have known of the regulatory changes based on the Supreme Court case law.[660] Claimants further note that they have analysed in detail Spain's

---

[646] Cl. Reply, ¶¶ 361-379.
[647] Cl. Reply, ¶¶ 362-363; **CL-055**, *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, ¶ 679.
[648] Cl. Reply, ¶ 365.
[649] Cl. Reply, ¶ 365, ; Cl. Memorial, ¶¶ 112-117. June Hearing, Cl. Opening Presentation, slides: 58-62.
[650] Cl. Reply, ¶¶ 367-379.
[651] Cl. Reply, ¶ 380.
[652] Cl. Reply, ¶ 384.
[653] Cl. Reply, ¶¶ 385-423.
[654] Cl. Reply, ¶ 392.
[655] Cl. Reply, ¶ 393.
[656] Cl. Reply, ¶¶ 406-412.
[657] Cl. Reply, ¶ 413.
[658] Cl. Reply, ¶ 417.
[659] Cl. Reply, ¶¶ 418-423. June Hearing, Tr. Day 1, 121:10-124:8 (Ingle).
[660] Cl. Reply, ¶ 419.

domestic judgments in Appendix 1 and conclude that there is no indication in such judgments that Spain would make harmful changes to the regulatory framework.[661]

548. Finally, Claimants note that the EU State Aid rules are of no relevance in the assessment of Claimants' expectations, including the EC Decision and a decision issued by the EC in relation to the Czech RE support scheme.[662]

549. Claimants take the view that Spain's repeated commitments gave rise to legitimate expectations and contest the theory that legitimate expectations can only arise from a contract.[663] Claimants dismiss Spain's reliance on a number of arbitral awards (*Charanne*, *Isolux*, *Plama*, *AES Summit*, and *Blusun*) to argue that a regulatory regime cannot create legitimate expectations without a specific commitment addressed directly to the investor.[664]

### b. *Respondent's Position*

550. Respondent denies that it has infringed the FET standard contained in the ECT.[665] At the outset, Respondent notes that the burden of proof regarding the violation of the FET standard rests with Claimants,[666] and draws attention to Claimants' omission of relevant precedents that have applied the ECT standard.[667]

551. Respondent appears to accept that the FET standard includes the principle of the protection of investor's legitimate expectations. Respondent argues that for expectations to be protected they must be reasonable and objective as regards to the existing general regulatory framework.[668] This means, according to Respondent, that an investor must know and understand the regulatory framework, how it is applied, and how it affects its investment. Respondent argues that the Tribunal must analyse the investor's acquired knowledge about the general regulatory framework.

552. Respondent agrees with Claimants in that the purpose and objectives of the ECT need to be taken into consideration by the Tribunal to avoid the "absolute" protection of the investor, as expressed in the *Electrabel* case.[669]

553. According to Respondent, Claimants' approach with regard to legitimate expectations is that they expected the regulatory regime to be "*petrified*" and that they had an "*acquired right*" to all future tariffs throughout the entire useful life of the plants.[670]

---

[661] Cl. Reply, ¶ 422.
[662] Cl. Reply, ¶¶ 424-434. June Hearing, Tr. Day 1, 110:2-111:5 (Ingle).
[663] Cl. Reply, ¶¶ 446-474.
[664] Cl. Reply, ¶¶ 450-474.
[665] Resp. C-Memorial, ¶ 1125.
[666] Resp. C-Memorial, ¶ 1122. June Hearing, Tr. Day 1, 249:4-7 (Gil Nievas).
[667] Resp. C-Memorial, ¶ 1127.
[668] Resp. C-Memorial, ¶ 1130
[669] Resp. C-Memorial, ¶ 1123.
[670] Resp. C-Memorial, ¶ 1129.

120.

554. Respondent first contends that Claimants failed to conduct an exhaustive analysis of the legal framework prior to investing in PV plants.[671] It is Respondent's view that an investor must understand, at the time of the investment, the applicable regulatory framework, how it is applied, and how it affects the investment.[672] To support its argument, Spain relies on the awards in *Electrabel* and *Charanne*.[673]

555. In that regard, Spain notes that Claimants have not submitted any due diligence reports or any document that support their argument.[674] Rather, Respondent argues, Claimants' internal documents prove that they knew of the existence of regulatory changes, including the company's agreements related to the Tordesillas and Valtierra Plants signed in 2010, the Investment Committee's preliminary report, financial statements and operation and maintenance contracts.[675]

556. Respondent contends that any "*prudent and diligent investor*" should have knowledge of the fundamental elements of the regulatory framework upon which it makes its investments.[676] For Spain, Claimants should have been aware of Spanish case law, which interprets the regulatory framework, including the Spanish Supreme Court judgments since 2005, as recognised by the *Charanne* and *Isolux* awards.[677] In addition, Respondent argues, the main Associations in the RE sector knew of the possible adjustments to the regulatory framework.[678]

557. Respondent takes the view that Claimants "do not show that they had the level of diligence one would expect from a foreign investor in a highly regulated sector such as the energy sector" where a comprehensive analysis of the relevant legal framework is crucial to make the investment.[679] In that regard, the lack of due diligence shows that the expectations are neither real nor objective.[680]

558. Respondent then argues that, even if Claimants had performed a comprehensive due diligence process, the Disputed Measures are not in breach of Claimants' legitimate expectations.[681] Respondent's argument is two-fold: (i) Spain did not make any specific commitments on the future immutability of the remuneration regime regarding RE

---

[671] Resp. C-Memorial, ¶¶ 1130-1155.
[672] Resp. C-Memorial, ¶ 1131.
[673] Resp. C-Memorial, ¶¶ 1132-1133.
[674] Resp. C-Memorial, ¶ 1136.
[675] Resp. C-Memorial, ¶¶ 1138-1141; **C-075**, Tordesillas SPA, pp. 19-20; **C-076**, Valtierra I & II SPA, Sections v) and vi); **C-077**, Valtierra III SPA; **C-091**, Deed of Payment for Valtierra III SPA, 21 December 2010 ; **C-106**, Infracapital, Commissions Report on the final investment, 8 June 2011; **BQR-008**, O&M Contracts.
[676] Resp. C-Memorial, ¶ 1147.
[677] Resp. C-Memorial, ¶¶ 1147-1153; **RL-0037**, *Charanne B.V. Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. V 062/2012, Final Award, 21 January 2016, ¶¶ 506-508; **RL-0010**, *Isolux v. Kingdom of Spain*, SCC Case No. V 2013/153, Award, 12 July 2016, ¶¶ 793, 794; **R-0091**, Judgment from the Third Chamber of the Supreme Court, of 15 December 2005 (App. 73/2004); **R-0092**, Judgment from the Third Chamber of the Supreme Court, 25 October 2006 (App. 12/2005).
[678] Resp. C-Memorial, ¶ 1155.
[679] Resp. C-Memorial, ¶ 1154.
[680] Resp. C-Memorial, ¶ 1155. *See also* Resp. Rejoinder, ¶¶ 1180-1203.
[681] Resp. C-Memorial, ¶¶ 1156-1198.

facilities; and (ii) Claimants' expectations are not reasonable nor justified in relation to the Disputed Measures.

559. With regard to Spain's lack of specific commitments, Respondent argues that the facts make clear that nothing in RD 436/2004, RDL 7/2006, RD 661/2007, or RD 1578/2008 shows that Spain guaranteed or promised that it would freeze its regulatory framework applicable to Claimants' investments.[682] Respondent draws support from the *Charanne* case, noting that that tribunal recognised that the investor could not have had reasonable expectations that RD 661/2007 and RD 1578/2008 would remain unchanged.[683] Respondent also refers to the *Blusun* and *Isolux* awards to conclude that no reasonable investor could have legitimately expected anything other than receiving a "*reasonable return on its investment*."[684]

560. With regard to the reasonableness of Claimants' expectations, Respondent first contends that the regulatory framework actually in place in Spain could not have supported any reasonable expectations.[685] Respondent argues that there were successive regulatory changes concerning existing facilities to the framework upon which Claimants relied to make their investment in order to "*maintain the principle of reasonable rate of return*" within the Spanish electricity system.[686] Such regulatory changes were successively made through RD 436/2004, RDL 7/2006, RD 661/2007, RDL 6/2009, RD 1565/2010, RD 1614/2010 and RDL 14/2010.[687] In Respondent's view, Claimants placed all their expectations on RD 1578/2008 but, in stark contrast with Claimants' statement of facts, the RE sector did not infer from RD 1578/2008 a promise to freeze the tariffs for the existing facilities.[688] Legitimate expectations, Respondent argues, "*cannot be based on presentations, press releases, or political speeches*."[689]

561. Respondent also contends that Claimants' expectations are not reasonable with regard to the alleged campaign to attract foreign investors.[690] Respondent dismisses Claimants' argument that the Government led an active campaign through presentations and speeches to induce foreign investments.[691] For Respondent, presentations led by the IDAE, InvestinSpain or the CNE, could not have created objective expectations because they did not perform an analysis of the remuneration regime or the applicable regulatory framework, but merely exposed the steps to be taken for anyone who wished to set up a PV facility in Spain.[692] Even if Claimants could prove that they were aware of such presentations, Spain

---

[682] Resp. C-Memorial, ¶ 1158. June Hearing, Tr. Day 1, 249:15-19 (Gil Nievas), 190:11-14 (Torró Molés).

[683] Resp. C-Memorial, ¶ 1159; **RL-0037**, *Charanne B.V. Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. V 062/2012, Final Award, 21 January 2016, ¶¶ 504-508.

[684] Resp. C-Memorial, ¶¶ 1160-1168; **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016; **RL-0010**, *Isolux v . Kingdom of Spain*, SCC Case No. V 2013/153, Award, 12 July 2016.

[685] Resp. C-Memorial, ¶ 1171.

[686] Resp. C-Memorial, ¶ 1175.

[687] Resp. C-Memorial, ¶ 1176.

[688] Resp. C-Memorial, ¶¶ 1178-1179.

[689] Resp. C-Memorial, ¶ 1183.

[690] Resp. C-Memorial, ¶¶ 1184-1198.

[691] Resp. C-Memorial, ¶ 1185.

[692] Resp. C-Memorial, ¶¶ 1186-1190. June Hearing, Tr. Day 1, 243:8-247:22 (Gil Nievas).

contends[693] that such documents could not create reasonable expectations that the framework under RD 661/2007 would remain unchanged, citing the decisions in *Charanne*,[694] *Isolux*,[695] *Eiser*,[696] *Wirtgen*[697] and *Blusun*.[698]

562. Spain also notes that Claimants have misrepresented the regulatory framework under the 1977 Electricity Law, which establishes the objective of the Spanish subsidy mechanism: achieving reasonable rates of return indexed to the cost of money in the capital market.[699] For Spain, Law 54/1997 warned, *ab initio*, that there would be limits on receiving subsidies for the purposes of obtaining a reasonable return.[700]

### (2) The Tribunal's Analysis

563. Claimants' case largely depends on the existence of an alleged "expectation that the PV installations in which they invested would be entitled to the economic regime of RD 1578/2008 for 25 years".[701] Claimants characterise the provisions in law as "stability commitments" that the remuneration scheme under RD 1578/2008 will not be altered for 25 years for existing PV plants. Claimants contend that "guarantees" contained in domestic legislation constitute promises which generate legitimate expectations.

564. Before examining the merits of the claim, the Tribunal considers it important to note that the concept of legitimate expectations is not expressly contained as an obligation of host States under Article 10(1) of the ECT. Therefore, it is not an independent obligation. In this regard, the protection of the legitimate and reasonable expectations of investors must be measured against the duty of States to treat investors in a fair and equitable manner.

565. In this context, it is useful at the outset to draw a distinction between commitments based on legislation of general application and those generated by specific undertakings made by a host State to induce a specific investor to make an investment. The former does not generate legitimate expectations that the law will not change. If it were to be accepted that a provision in a law of general application can generate legitimate expectations for purposes of Article 10(1) of the ECT, and the mere derogation of such a provision would trigger liability under the ECT, then every provision in a law has the potential of becoming a stabilization clause. The Tribunal cannot accept this as a matter of treaty interpretation and common sense. In fact, it would even make redundant the umbrella clause in Article 10(1) and the reference to "international law" in the third sentence. Thus, the Tribunal

---

[693] Resp. C-Memorial, ¶¶ 1191-1196.
[694] **RL-0037**, *Charanne B.V. Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. V 062/2012, Final Award, 21 January 2016, ¶¶ 496, 497 and 795.
[695] **RL-0010**, *Isolux v. Kingdom of Spain*, SCC Case No. V 2013/153, Award, 12 July 2016.
[696] **RL-0059**, *Eiser Infrastructure Limited y Energia Solar Luxembourg S.À R.I.v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017.
[697] **RL-0072**, *Mr. Jürgen Wirtgen and others v. Czech Republic*, PCA Case No. 2014-03, Award, 11 October 2017.
[698] **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016.
[699] Resp. Rejoinder, ¶ 1164.
[700] Resp. Rejoinder, ¶ 1166.
[701] Cl. Memorial, ¶ 237. *See* also, Cl. Reply, ¶ 313.

agrees with the findings of recent ECT tribunals to the effect that no general legislation can create expectations that the law will not change.[702] Laws are the result of policy responses to economic, fiscal, social, environmental and legal circumstances. If the circumstances upon which the law was adopted change, the laws can be expected to change too. As explained in Section C above, not every regulatory norm granting certain economic benefits to investors implies the stability of the legal framework. This is even more applicable in the factual context of this dispute. As appropriately put by the *Blusun* tribunal:

> *"In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime. These considerations apply even more strongly when the context is subsidies or the payment of special benefits for particular economic sectors."*[703]

566. This argument is compelling because, under the fair and equitable treatment standard, States retain their sovereign power to enact, modify or derogate legislation at their own discretion provided that those changes to legislation are not arbitrary, unreasonable or disproportionate or made in bad faith. Thus, absent a specific and unambiguous assurance, promise or commitment by a competent authority that it will freeze the legislation in favour of a specific investor as an inducement to invest, an investor cannot legitimately expect that the legal framework will not change or evolve in future in response to changes in circumstances.

567. Any ordinary expectation that an investor might have had when it made the investment about the regulatory environment of a particular economic sector, even if the law creates rights designed to incentivise investment in such sector, does not in itself establish an obligation under the fair and equitable treatment standard not to frustrate such expectations. Case-law is clear in pointing out that the FET standard (i) is not a kind of insurance policy

---

[702] **RL-0147**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Award, ¶ 578; **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶ 459; **RL-0145**, *Stadtwerke v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, ¶ 264; **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 367-371; **RL-0037**, *Charanne v. Kingdom of Spain*, Award, ¶ 503; *See also* **CL-061 / RL-0003**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 219.

[703] **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 367-372; **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 459

against the risk of changes in legislation;[704] and (ii) does not elevate unconditionally the interests of investors above public interest considerations.[705]

568. This argument need not imply or entail that provisions in laws are irrelevant to the expectations of investors. Laws, regulations, policies and official statements, may influence the expectations of investors that cause them to invest in the host State. A guarantee in law, policies and other authoritative statements often cause investors to reasonably expect that authorities will conduct themselves in the implementation of laws and regulations in a manner consistent with the provisions of such legal instruments and policies. This is a reasonable expectation, but one that all investors have, regardless of whether there is a specific assurance to that effect. Thus, a failure of the State to implement, enforce or comply with its own laws or a regulatory change in general legislation which results in the disappointment of the investor's expectations, may, but would not automatically constitute a breach of the FET standard.[706] To meet the high threshold of a breach of the FET standard something more is required. As the *9Ren* tribunal said, "*in addition to deciding that its legitimate expectations have been frustrated by the host State, a claimant must also prove a breach of the FET standard*".[707] For that to occur, the conduct must meet the threshold of arbitrariness or unreasonableness under the international standard. In this regard, the repudiation of the investor's legitimate expectations is a relevant factor in determining whether there has been a breach of the FET standard.[708]

569. Thus, the starting point in an assessment of the FET obligation in the context of an investor's legitimate expectations rooted in legislation is that the State has a legitimate right to introduce changes to legislation in the public interest.[709] In this respect, the Tribunal agrees with the reasoning of the *Stadtwerke* tribunal:

> "*[the FET] does not protect [the investor] against the changes introduced to safeguard the public interest to address a change of circumstances, nor does it protect the investor who unreasonably and unjustifiably expects that the host government will introduce no amendments will to the legislation governing the investment. In the absence of a specific commitment contractually assumed by a State to freeze its legislation in favor of an investor, when an investor argues – as is the case here – that such expectation is rooted, among*

[704] **RL-0028**, *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, ¶ 217.
[705] **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶ 459(9) citing with approval *Antaris GMBH and Dr. Michael Gode v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018, ¶ 360.
[706] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 335.
[707] **RL-0143**, *9Ren Holdings S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, ¶ 308.
[708] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 317; **RL-0143**, *9Ren Holdings S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, ¶ 308.
[709] **RL-0147**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, ¶ 582; **RL-0145**, *Stadtwerke München GmbH, RWE Innogy GmbH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, ¶ 264.

> *others, in the host State's legislation, the Tribunal is required to conduct an objective examination of the legislation and the facts surrounding the making of the investment to assess whether a prudent and experienced investor could have reasonably formed a legitimate and justifiable expectation of the immutability of such legislation. For such an expectation to be reasonable, it must also arise from a rigorous due diligence process carried out by the investor."*[710]

570. The question remains as to what would constitute a reasonable and justifiable expectation. The Tribunal considers that the following conditions must be met. *First*, for an assurance or representation giving rise to legitimate expectations, the commitment must be grounded in the law.[711] Given that public authorities can only act in accordance with pre-existing legal norms, political statements or promotional advertising material cannot generate justifiable and reasonable expectations unless they have some normative value under the domestic law of the host State. As held by the *Blusun* tribunal, "*international law does not make binding that which was not binding in the first place*".[712]

571. *Second*, the specific commitment must be made by a competent authority.[713] In order to rely on statements or representations, a reasonable investor should inquire in advance whether the authority making the representations has the statutory power to make determinations on the relevant law or regulation.

572. *Third*, the assurance or representation must be clear and specific in order to generate an objective expectation and not a subjective perception of the content and scope of a purported legal commitment applicable to a plurality of people. In this regard, an investor's expectation could be based on a specific guarantee in legislation. As the *SolEs v. Spain*, the Tribunal held:

> *"As has been widely recognized, an investor's legitimate expectations can also arise from provisions of law and regulations and from statements made by or on behalf of the State for the purpose of inducing investment by a class of investors."*[714]

---

[710] **RL-0145**, *Stadtwerke München GmbH, RWE Innogy GmbH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award*, 2 December 2019,v.* ¶ 264.

[711] **RL-0145**, *Stadtwerke München GmbH, RWE Innogy GmbH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award*, 2 December 2019,v.* ¶ 287.

[712] **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶ 371.

[713] **CL-207**, *Cavalum SGPS, S.A. v. Kingdom of* Spain, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, ¶ 431.

[714] **CL-200**, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019, ¶ 313. Similarly, in *Cube Infrastructure v. Kingdom of Spain*: "*The Tribunal does not consider it necessary that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise. At least in the case of a highly-regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential*

573. *Fourth*, to assess the reasonableness of an expectation, the circumstances surrounding the making of the investment must be taken into account. To this end, a regulatory change that undermines the investor's expectations should not have been reasonably anticipated at the time of the making of the investment. If the regulatory measures were to be anticipated, an investor could not have had a legitimate expectation that it would be shielded from changes. For a determination on whether regulatory measures could have been reasonably anticipated the Tribunal must look at the circumstances surrounding the making of the investment including past regulatory conduct of the State, decisions of the judiciary, an analysis of the entire regulatory framework, and not only of a regulation in isolation. For this, the Tribunal must also examine the due diligence conducted by the investor. As noted by the *Electrabel* tribunal: "*Fairness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State.*"[715]

574. *Finally*, and in any event, for the expectation to rise to the level of reasonable and legitimate, the State's policy interests must also be taken into account.[716]

575. Claimants argue that they reasonably relied upon the "promise" of a stable FIT regime under RD 1578/2008. Claimants are essentially arguing the immutability of the remuneration system for RD 1578/2008 (existing) PV plants for 25 years. Respondent, on the other hand, rejects the proposition that RD 1578/2008 gave rise to a legitimate expectation for investors to receive a stable FIT for 25 years, and that changes would not apply to existing PV installations. According to Respondent, Claimants' only legitimate expectations were that any future regulatory changes would maintain an incentives system based on a "reasonable rate of return" with reference to the cost of money in the capital market.[717]

576. Claimants further contend that once they made the investments under Spain's policy of attracting foreign investments in RE projects, Spain unreasonably "*pulled the rug from under their feet*" by implementing a total and unreasonable change (the unreasonable or disproportionate factor). According to Claimants, Respondent is guilty of the classic "*bait and switch*".[718] Claimants imply bad faith conduct of Spain in the adoption of the Disputed Measures. The Tribunal rejects this argument. There is no evidence on the record to support the proposition that Spain adopted RD 1578/2008 and related incentives with the intention

---

*investors the prospect that the investments will be subject to a set of specific principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them*"; **CL-201**, *Cube Infrastructure Fund SICAV, Cube Energy S.C.A. and Cube Infrastructure Managers S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Award, 19 February 2019, ¶ 388. *See also* **CL-053** / **RL-0070**, *National Grid plc v. The Argentine Republic*, UNCITRAL, Award, 3 November 2008, ¶¶ 177-179.

[715] **CL-031**, *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.78.

[716] **RL-0145**, *Stadtwerke München GmbH, RWE Innogy GmbH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019,v. ¶ 264.

[717] Resp. C-Memorial, ¶ 1169. *See* also Resp. Rejoinder, ¶ 1164.

[718] Cl. Memorial ¶¶ 21, 260, 308.

to radically change them once Respondent had received the benefits of the RE investments. To the contrary, the evidence shows that starting in 2010 Spain provided a justification of a different kind for the introduction of measures to amend the regulatory regime: specifically, to correct the Tariff Deficit which, by 2010, had expanded to reach 600 million euros.[719]

577. The Tribunal has already concluded that the FET standard does not prevent a State from exercising its right to change a regulatory framework in the pursuit of a public interest. The next step then is for the Tribunal to determine whether the kind of stability that was legitimately expected was such that Spain would not modify the remuneration regime governing PV plants under RD 1578/2008, and further whether Respondent's regulatory conduct was consistent with whatever legitimately expected behaviour was created. It is therefore important to understand whether through law, regulation and policies Spain created such an expectation by means of the alleged "stability commitments". [720]

578. Claimants' investments were registered as PV plants under RD 1578/2008. Thus, the starting point is to look at what this regulation expressly provided. Said royal decree sets out a new remuneration regime applicable to PV plants that were not registered under RD 661/2007.  The new regime under RD 1578/2008 lowered the remuneration of PV plants that existed for RD 661/2007 plants in response to what the Government perceived as a risk of excessive remuneration which would have a negative impact on the costs of electricity. The Preamble of RD 1578/2008 explains the objective of the regulation:

> *"Just as inadequate remuneration would make investments unviable, excessive remuneration could have a significant impact on the costs to the electrical system and would disincentivise carrying out research and development, which would diminish this technology's superb mid- and long-term prospects. It has therefore been deemed necessary that the remuneration should be streamlined and, for that reason, the royal decree approved should modify the economic arrangement downwards, in line with the expected development of the technology, with a long-term perspective."[721]*

579. It is clear that the Government had concerns over the costs of the electricity system and was aiming at protecting its sustainability by tackling excessive remuneration. There is no text evidencing that the objective of the Royal Decree was to guarantee a high tariff to PV investors. It is also important to note that RD 1578/2008 does not provide that the remuneration would be maintained for 25 years. It provides that a rate would be maintained for a *maximum* period of 25 years.[722]

---

[719] **R-0086**, Report on regulatory impact of Draft of RD-Act 14/2010 establishing urgent measures for the correction of the tariff deficit in the electricity sector, 27 December 2010.
[720] Cl. Reply, ¶¶ 286 and 526.
[721] RD 1578/2008, Preamble.
[722] RD 1578/2008, Chapter 3(5).

580. Further, the RD 1578/2008 Fifth Additional provision also confirms that there was no clear and specific commitment to guarantee a FIT for the full term of 25 years. The Fifth Additional provision provides that:

> *"In 2012, in light of the technological growth of the sector and the market and the operations of the payment regime, payment for the activity of electricity production using solar photovoltaic technology may be modified."*[723]

581. Claimants assert that this provision only relates to changes due to the evolution of PV technology. Spain disagrees with this interpretation. It argues that changes could also be based on the impact of the subsidies on the economic sustainability of the electricity system.

582. The Tribunal is not convinced that the Fifth Additional provision only related to new plants in order to reflect cost reductions in the evolution of PV technology. The text of RD 1578/2008 clearly envisages possible downward changes to the remuneration of PV plants. The text refers to three possible new circumstances that could have arisen during the period 2008-2012: (1) new technology; (2) evolution of the electricity market; and / or (3) operation of the remuneration regime. The text does not say that the changes would only apply to new plants. Claimants rely on the principle of grandfathering allegedly reflected in RD 661/2007 to support their interpretation that new changes would only apply to new plants. Claimants make the point that the Fifth Additional provision in RD 1578/2008 was consistent with Article 44 of the RD 661/2007 in the sense that both provisions "expressly confirmed" in "clear and unambiguous terms" that any changes to the FIT would not affect existing plants. In other words, the essential features of RD 661/2007 continued to apply under the RD 1578/2008.  However, the text of RD 1578/2008 does not contain the "grandfathering" provision that Claimants give to Article 44 of RD 661/2007. The Tribunal further notes that the wording of Article 40.3 of RD 436/2004 was very similar to Article 44.3 of the RD 661/2007. Yet, it did not prevent regulatory changes to the remuneration of existing RE plants introduced by RD 661/2007.

583. Several tribunals addressing the same matter (that is, whether or not the Spanish regulations adopt the grandfathering principle) have taken different views. The fact is that this is an issue of interpretation.[724] Specific commitments creating legitimate expectations cannot be ambiguous or simply implied. As noted already, for expectations to be reasonable and legitimate, the undertaking by the State to an investor must be clear and specific. Given that the provision is unclear, it cannot give rise to a stabilisation commitment. In any event, the Tribunal agrees with Respondent's position that the Fifth Additional provision not only provides for changes in the remuneration regime based on new technologies, but also on the impact that the remuneration regime would have on the sustainability of the electricity system (*i.e.*, a balance between tariffs and the costs of electricity); therefore, it would be

---

[723] **R-0048**, RD 1578/2008, Fifth additional provision.
[724] *See* **CL-043**, *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration SCC V 2013/153, Award, 12 July 2016; **CL-019**, *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

reasonable to assume that changes to maintain the sustainability of the system may well require application to existing plants.

584. The Tribunal reads nothing in the text of RD 1578/2008 which could lead to a single and obvious interpretation of the Fifth Additional provision, and certainly not one that would lead to the conclusion that any changes would only apply to new plants. The opposite is the case. [725] The Tribunal also notes that the Fifth Additional provision of RD 1578/2008 just as Article 44.3 of RD 661/2007 and Article 40.3 of RD 436/2004 were provisions in legislation of general application, thus subject to change. The Tribunal is unconvinced that RD 1578/2008 constitutes a clear and specific "stability commitment" that gives rise to a legitimate expectation. Therefore, the Tribunal takes the view that no prudent investor could conclude that RD 1578/2008 Fifth Additional Provision or any other provision in the regulation "guaranteed" the maintenance of the remuneration regime for PV plants registered under RD 1578/2008. Even if Claimants' interpretation of the Fifth Additional provision were correct and the Tribunal were to see some merit in the interpretation, it is clear that the assurance did not rise to a level of precision and clarity as to create legitimate expectations to investors.

585. Besides, primary legislation in Spain does not support Claimants' position. The Tribunal considers relevant the hierarchy of the Spanish legal system in the analysis of Claimants' claims. The Spanish Constitution is supreme. Subordinate to the Constitution are laws enacted by Parliament, like the 1997 Electricity Law. Royal decrees such as RD 1578/2008 are instruments promulgated by Ministerial Orders in the exercise of regulatory powers created by laws or decree laws approved by Parliament.[726] Thus RD 1578/2008 is hierarchically inferior to Law 54/1997. Given that royal decrees develop policies and principles established in law, a royal decree cannot modify overriding principles found in law. The Preamble of RD 1578/2008 indicates that its function was to implement the principles provided in Law 54/1997. It is clear that RD 1578/2008 could not contradict Law 54/1997.

586. Law 54/1997, which created the Special Regime for renewables producers, did not impose a specific remuneration scheme. What it explicitly provided was that any remuneration for renewable sources would be based on the principle of economic sustainability of the electricity system. With regard to the remuneration regime for renewable sources, Article 30(4) of the Law provided that the aim was for "… *reasonable remunerative tariffs may be established related to the cost in assets on the capital market.*"[727] This is the overarching principle of the remuneration of the scheme for RE producers envisaged in law. It follows that, for purposes of legitimate expectations, it would have been unreasonable for investors to interpret the remuneration scheme in RD 1578/2008 as the fundamental principle of the

---

[725] The Tribunal bears in mind that although the *Memoria Justificativa* to RD 1578/2008 cannot be deemed to be a document determinant in the construction of the royal decree, it is nonetheless strongly relied on by Claimant. It provides that "*The tariff that is applicable to an installation will be maintained for a maximum period of 25 years from its start-up, as will the facilities that receive the remuneration provided for in the RD 661/2007*", making a distinction between facilities under the New Regime and those under RD 661/2007, but no exclusion for installations under RD 1578/2008 was made. Tribunal's free translation. **C-238**, Memoria Justificativa del RD 1578/2008.

[726] Resp. Rejoinder, ¶ 277.

[727] Electricity Law, Art. 30(4).

economic regime and thus constituting a stabilisation commitment that future regulatory changes to the regulatory regime for PV plants would apply to existing installations. The Tribunal thus agrees with Spain that the basic principle for the remuneration regime in the law was the guarantee of a reasonable profitability to Claimants' investment.

587. This can be the only assurance deemed to have been granted by Spain to Claimants that is found in Law 54/1997. In this regard, the Tribunal is of the view that the stability of this regime meant a reasonable rate of return which was expected throughout the lifetime of the installations. The Tribunal is in agreement with the reasoning of the *PV Investors* tribunal: *"[t]he requirement of reasonable profitability restricted the State's power to amend the framework and thereby guaranteed a level of stability of the conditions in which investors operated. Differently put, that requirement ensures the existence of 'stable conditions' pursuant to Article 10(1) of the ECT."*[728]

588. Furthermore, the Spanish Supreme Court has consistently held that the Spanish Government had the right to modify downwards the remuneration regime under the special regime of Law 54/1997, even more so in a "generalised economic crisis" and in light of the increase of the Tariff Deficit provided that a reasonable rate of return is maintained.[729]

589. The Tribunal is aware that, as a general principle, domestic law should not be used to assess whether a state has breached its international treaty obligations. Therefore, insofar as a decision of the Spanish Supreme Court in relation to domestic legislation under the Spanish Constitution is entitled to be respected, in the instant case nonetheless, those decisions "*did not address* [...] *the impact of changes in the Spanish regulatory system on Spain's obligation under* international law", and agrees with the Tribunal in *9Ren Holding v. Spain* which held:

> "The jurisprudence of the Spanish Supreme Court in relation to Spain's domestic law is entitled to great respect, but the judgments relied upon by the Respondent address a different issue than the issue before this Tribunal, which is concerned only with international law obligations.

> "It is not surprising that the Spanish Supreme Court should affirm that regulatory measures under domestic Spanish law may be modified in the exercise of Spanish sovereignty. The question before the Tribunal however is whether such changes can be made by Spain without financial consequences under the ECT.

> "The views of the Spanish Supreme Court concerning legal certainty or legitimate expectation may dispose of the issue of government liability at domestic law, but the Claimant does not rely on Spanish domestic law. It relies on Article 26(6) of the Energy

---

[728] **RL-0147**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, ¶ 616.

[729] **R-0092**, Ruling of the Third Chamber of the Supreme Court, 25 October 2006 (Appeal 12/2005); **R-0099**, Ruling of the Third Chamber of the Supreme Court, 12 April 2012 (Appeal 35/2011); **R-0239**, Judgment of the Supreme Court of 860/2017, 17 May 2017 (Appeal 568/2014).

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

> *Charter Treaty which mandates this Tribunal, not the Spanish Supreme Court, to determine whether the Claimant had a legitimate expectation of irrevocability and if so, whether that legitimate expectation was violated, and if so the legal consequences as a matter of international law. This is clear from Article 27 of the Vienna Convention which states that a 'party may not invoke the provisions of its internal law as justification for its failure to perform a treaty'".* [730]

590. The question of conformity with the Spanish Constitution and with the requirements of the ECT are quite separate, as the Spanish Constitutional Court stated.[731]

591. Claimants further contend that Spain made specific representations that the 2012 review of the remuneration mechanism envisaged in the Fifth Additional provision was meant to review the FITs only for new plants. The representations allegedly made *include* CNE' presentations,[732] InvestinSpain's presentation of November 2007,[733] and alleged "assurances" by CNE that "*the risk of a retroactive change to the FIT was low*".[734] Claimants assert that these representations induced them to investment in PV plants in Spain and also created reasonable expectations.

592. With respect to the CNE's and InvestinSpain presentations, the Tribunal has already concluded that no reasonable and legitimate expectation can arise out of promotional materials or documents with no normative value such as PowerPoint presentations. Therefore, the PowerPoint presentations in the record do not give rise to legitimate expectations. Claimants also rely on a document prepared by CNE dated 22 October 2009 in response to an enquiry by an individual regarding the Fifth Additional provision. At the June Hearing, Claimants quoted the following passage of the document in support of their argument that Spain had promised that it would guarantee a FIT to the investors:

> *"Given that Section 5 of Article 11 provides for a maximum duration of 25 years for the financial payment allocated to a facility registered under the scope of application of RD 1578/2008, the judgement of this Commission is that the modification of the remuneration scheme to which the 5th Additional Provision refers*

---

[730] **RL-0143**, *9Ren Holdings S.A.R.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, ¶¶ 242-244 (emphasis omitted).

[731] R-0108, Judgment of the Spanish Constitutional Court, 17 December 2015, which stated "*it is not for this Court to determine the compatibility or otherwise of a legal rule with an international treaty, nor can they be set up in fundamental regulations and constitutional standards*", at p. 19-20. .

[732] **C-055**, CNE Presentation, "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008, pp. 25, 27; **C-063**, CNE Presentation, "Renewable Energy Regulation in Spain", February 2, p. 29.

[733] **C-056**, Manuela García, Ministry of Industry, Tourism and Commerce and InvestInSpain presentation, "Opportunities in Renewable Energy in Spain", November 2008, p. 21.

[734] ML Witness Statement, ¶ 25.

> *should be applicable to new facilities that are registered starting in*
> *2012."* [735]

593. What Claimants failed to point out in their presentations at the June and Second Hearings is that in the following sentence the CNE carefully made it clear that it was its own interpretation and that it was not the competent authority to interpret the RD 1578/2008. It noted that:

> *"However, it should be noted that the Government has the competency to determine the application of the fifth additional provision of Royal Decree 1578/2008."* [736]

594. A diligent investor reading this document would have been aware that it was the Ministry, and not CNE, that was the only authority responsible to determine the application of the Fifth Additional provision. As noted by CNE itself, it was not the regulator on energy matters therefore not the competent authority to determine the application of RD 1578/2008. Given that the CNE was not the competent authority on regulatory matters in the energy sector in Spain and that the alleged expectation arises out of an interpretation of a regulation, the Tribunal is of the view that the statements made at the time by CNE cannot be equated with undertakings or assurances capable of creating reasonable and justifiable expectations. Only undertakings made by the regulator, *i.e.*, the Ministry, could have been capable of creating legitimate expectations if such commitments were made in clear terms and reflected in documents with normative value. Any reliance on interpretations of such provision by agencies other than the Ministry would have been unreasonable, thus incapable of creating legitimate expectations under the ECT.

595. Claimants further rely on Mr Lief's testimony. They contend that representatives of Infracapital "met with the ministry", "met with CNE" and "had confirmation from the US Embassy, directly from the Office of the Prime Minister, that there would be no retroactivity." [737] The Tribunal is unconvinced that these alleged representations made during meetings amount to specific commitments on which a diligent and prudent investor could reasonably rely on to make an investment of millions of dollars. The Tribunal, in any event, considers that Claimants made their investments on the basis of the provisions in RD 1578/2008 rather than alleged commitments made in meetings with government officials. This is confirmed by Claimants' own IC reports of February and April 2010. [738]

596. The Tribunal has also carefully reviewed the investment reports and the testimony of Mr Lief and concludes that these and other statements made to Claimants during meetings and

---

[735] **C-061**, CNE Response to a query from and individual regarding the Fifth Additional provision of RD 1548/2008, 22 October 2009, p. 2. *See* also, Second Hearing, Tr. Day 1, 33:3-18 (Vázquez-Guillén).
[736] *Id*.
[737] Cl. Memorial, ¶ 113. Second Hearing, Tr. Day 1, 52:4-14 (Sullivan).
[738] **C-064**, Infracapital, Preliminary IC report, 24 February 2010, p. 2; **C-066**, Infracapital, Final IC report, 20 April 2010.

email exchanges do not reach the level of clear and specific commitments creating legitimate expectations of a fixed FIT for 25 years for RD 1578/2008 PV plants.

597. Furthermore, and as explained above, for an expectation to be legitimate, the disputed measure must not have been reasonably anticipated at the time of the making of the investment. If the measures were anticipated, an investor could not have had a legitimate expectation of 25 years of FIT under RD 1578/2008. The Tribunal believes that, taken together, the framework of Law 54/1997 providing for a reasonable rate of return; the unfavourable evolution of the remuneration regimes going from RD 436/2004 replaced by RD 661/2007, and further modified downwards with RD 1578/2008; the Fifth Additional provision which expressly envisages changes to the economic regime; the RDL 14/2010, limiting the remuneration of PV plants; and RD 1614/2010, which was consistent with the PER 2005-2010, clearly show the evolution of the regulatory framework and a change in government policy, through legal text and conduct of further restrictions to the remuneration scheme to existing plants at the time the investors made their investment. If one is to analyse those regulations, together with the judgements of the Spanish Supreme Court and the increase in the Tariff Deficit during the financial crises, all in light of the explicit references in the regulatory framework to tackle excessive compensation, it would have been unreasonable not to have foreseen and anticipate changes in the FIT regime of RD 1578/2008 for existing investments.

598. Claimants undertook extensive due diligence and engaged several law firms to examine the regulatory and legal environment, and among the advice received it was acknowledged that "*the risk of retroactive tariff changes to RD 1578 solar PV facilities (such as the Projects) [was] fairly remote*" and "*the probability of such a risk materializing*" was "*very low*."[739] Although the reference to "remote" or "very low" were utilized, the advice received reflected the possibility of change to the remuneration regime to existing plants.

599. Further, the Tribunal also does not consider that the registration in the RAIPRE amounted to a specific commitment for purposes of the FET standard. The Tribunal sees RAIPRE as a mandatory administrative requirement that does not create rights under Spanish law. In the Tribunal's view, if it does not create rights under domestic law, it cannot have greater rights under international law.

600. The Tribunal does not doubt that Spain did give assurance to maintain a certain regime for PV installations. This is found in the primary legislation, *i.e.*, the 1997 Electricity Law (Law 54/1997) and implementing legislation. In this regard, the guarantee offered regarding remuneration was based on the principles of a reasonable profitability. Claimants had an assurance or guarantee of receiving a reasonable rate of return on their investment during the lifetime of the PV installations.

601. Having reviewed the legal framework in Spain in its entirety, including the 1997 Electricity law and royal decrees in force at the time of the making of the investment, the Tribunal concludes that no legitimate expectation was generated by any provision in law or

---

[739] **C-183**, Letter of 1 October 2010 from Juan I. González Ruíz of Uría Menéndez addressed to Mr. Lief of Infracapital, attached to an email of the same date, p. 3.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

regulation applicable to Claimants' plants that guaranteed a fix FIT rate for 25 years. Therefore, aside from the guarantee of receiving a reasonable rate of return on their investment during the lifetime of the installations as per the terms of the Law 54/1997, the Tribunal rejects the claim of "stable conditions" and "legitimate expectations" as regards to the alleged "guarantees" of the stability of the remuneration regime of RD 1578/2008.

602.    The Tribunal concludes that no provision in RD 1578/2008 gave rise to legitimate expectations under the FET standard. The Tribunal also concludes that other expectations of Claimants such as CNE reports and other materials were not reasonable or justified because they should have known at the time of their investment that there was no unalterable *right* to receive a fixed tariff for 25 years under the legal framework for renewable sources[740] and they knew or should have known when they were executing the SPAs that changes to the remuneration regime to existing plants were a possibility.[741]

## E.    SPAIN'S ALLEGED FAILURE TO PROVIDE TRANSPARENT CONDITIONS

### (1) The Parties' Positions

#### a.    *Claimants' Position*

603.    Claimants contend Respondent breached the obligation of "transparent conditions" in Article 10(1) in several ways.[742] According to Claimants, the legal standard is found in Article 20 of the ECT which imposes an obligation on Spain to promptly publish its laws, regulations, judicial decisions and administrative rulings of general application pertaining to or affecting investments.[743] Claimants further contend that the first sentence of Article 10(1) of the ECT requires Spain to "*provide transparent investment conditions for investors of another Contracting Party*."[744] Claimants contend that the condition of transparency is related to the FET standard which, according to Claimants, requires the absence of "ambiguity and uncertainty". In support of this proposition, they rely on *Tecmed v. Mexico*.[745] Claimants appear to imply that a lack of stable economic conditions in the

---

[740] **R-0092**, Judgment from the Third Chamber of the Supreme Court, 25 October 2006 (Appeal 12/2005), reference El Derecho EDJ 2006/282164, stating that, "*However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged*".

[741] For example, it is clear that the adoption of RDL 7/2006 and the subsequent replacement by RD 661/2007 of RD 436/2004 which Article 40 (3) is almost identical to Article 44 (3) of the RD 661/2007 affected existing plants by reducing their remuneration; see also Additional Fifth provision RD 1578/2008, which expressly stipulated the possibility of modifying remuneration for PV plants; see also R-0084 Noticias Jurídicas, 26 September 2008; R-0252 Suelo Solar, 29 April 2010: APPA report; R-36, RDL 14/2010. See also report prepared in 2010 by Nomura [C-65, p. 2] noting that "the risk [retroactive adjustment] is probably limited but should not be dismissed altogether"; see also [C-68] Deutsche Bank Company Alert, 21 April 2010.

[742] Cl. Memorial, ¶¶ 321-323; Cl. Reply, ¶¶ 21. June Hearing, Tr. Day 1, 101:14-21 (Sullivan); Second Hearing, Tr. Day 1, 79:7-16 (Sullivan).

[743] Cl. Memorial, ¶ 321.

[744] *Id.*

[745] **CL-082**, *Técnicas Medioambientales Tecmed S. A. v. The United Mexican States,* ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 154.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

regulatory framework (*i.e.*, by not maintaining the RD 1578/12008 regime) amounts to a non-transparent conduct by Respondent. Claimants articulate the standard of transparency by reference to other awards in *Electrabel*[746] and *Plama*.[747]

604. In Claimants' view, Spain used the legal and regulatory framework to attract investment but subsequently showed that the stability was just "*an illusion.*"[748]

605. Claimants' first claim on transparent conditions is mixed with the requirement of stability in the first sentence. Claimants contend that the regime under RD 1578/2008 was "inherently" stable because it provided for a "long-term application of a fixed FIT" and protected existing installations from future tariff reviews. According to Claimants, the New Regime eliminated these inherently stable features of the regulation. On this basis, Claimants argue, Respondent breached its obligation to provide "transparent conditions" for Claimants' investments.

606. Claimants' second claim is that Spain abused the function of the royal decrees to implement the New Regime. According to Claimants, royal decree laws do not allow for stakeholders to be consulted and can only be issued in cases of urgency. Claimants submit that "the consultations only took place after Royal Decree-Law 9/2013 had been put in place. So they repeal the regime, they identify the new regime, and then they consult. This is not a transparent process."[749] Claimants argue that an act of parliament was not needed to replace the regime under RD 1578/2008 and that RDL 9/2013 was used "*purely to avoid prior consultation and subsequent challenges in the Spanish courts*".[750]

607. Claimants also argue that RDL 9/2013 was followed by a transitory regime lasting more than eleven months, during which Respondent gave no indication regarding the precise remuneration to which any qualifying facilities would be entitled. Claimants say that neither RD 413/2014 nor the June 2014 Order provide any transparent analysis explaining the underlying criteria or calculations behind the Special Payment or those that will underpin the future updates of the new economic regime.[751]

608. Claimants' fourth claim is that Respondent acted in a non-transparent manner by failing to establish a clear or specific methodology or process for adjusting the Special Payment over the following regulatory periods. They contend that neither RD 413/2014 nor the June 2014 Order provide any "*transparent analysis explaining the underlying criteria or calculations*" of the New Regime; Spain has not offered any guidelines on key aspects of

---

[746] **CL-031**, *Electrabel S.A. v. The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.79.
[747] Cl. Memorial, ¶¶ 320-321; **CL-061**, *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 178.
[748] Cl. Memorial, ¶ 322.
[749] June Hearing, Tr. Day 1, 94:8-18 (Sullivan).
[750] Cl. Reply, ¶ 562. *See* also, June Hearing, Tr. Day 1, 94:8-18 (Sullivan).
[751] Cl. Memorial, ¶ 323(c).

the New Regime.[752] Claimants draw support from the *Antin* award in that regard.[753] Spain failed to establish a clear methodology as to its right to what Spain considers to be a "*reasonable return*" under the New Regime.[754] Claimants' view is that investors have no predictability in connection with their cash flows in the future.[755]

609. Claimants further contend that the New Regime does not provide any "clear" indication as to the timeframe during which the remuneration for installed capacity would apply or a methodology to determine whether a plant had earned reasonable profits pursuant to the New Regime.[756]

610. Finally, Claimants contend that Spain ignored the CNE's proposals when implementing the New Regime and subsequently abolished the CNE after it criticized the New Regime.[757] This conduct by Spain falls short of transparency.[758]

### b. *Respondent's Position*

611. Spain denies that it has acted in a non-transparent manner, breaching its obligations under the ECT.[759] For Respondent, Claimants are mistaken in that the ECT does not guarantee the predictability of the regulatory framework unless there are specific commitments by the State.[760]

612. Spain contends that it adopted a "*predictable and dynamic regulatory system*" founded on Article 30(4) of the 1997 Electricity Law that guarantees a reasonable rate of return and economic balance for RE projects and investments.[761]

613. Respondent contends that the *Tecmed* approach to transparency relied by Claimants is irrelevant and cannot be used as a precedent here because that case was not an ECT case.[762] By relying on the *AES v. Hungary* case,[763] Respondent argues that the ECT does not guarantee the predictability of the regulatory framework of the States that are party to it unless there is a specific commitment by the State in this regard. Following the standard applied by the *AES* tribunal, Respondent contends that the State does not violate

---

[752] Cl. Memorial, ¶ 323(c).

[753] Cl. Reply, ¶ 574; **CL-100**, *Antin Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶ 562-567.

[754] Cl. Memorial, ¶ 323.

[755] Cl. Reply, ¶ 578.

[756] Cl. Memorial, ¶ 323.

[757] Cl. Memorial, ¶ 323; Cl. Reply, ¶ 564.

[758] Cl. Memorial, ¶ 323; Cl. Reply, ¶ 564.

[759] Resp. C-Memorial, ¶¶ 1232-1236; Resp. Rejoinder, ¶¶ 35, 950-975, 1240-1247. *See* also, June Hearing, Tr. Day 1, 254:4-15 (Gil Nievas), and Second Hearing, Tr. Day 1, 203:14-19 (Garrido Moreno).

[760] Resp. C-Memorial, ¶ 1233.

[761] Resp. C-Memorial, ¶ 1235.

[762] Resp. C-Memorial, ¶ 1231.

[763] **RL-0029**, *AES Summit Generation Limited and AES-Tisza Eromu Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

"transparent conditions" obligation under the ECT if the State has acted within the "*acceptable range of legislative and regulatory conduct*".[764]

614. Respondent further argues that the standard of transparency in international law does not mean that the investor has to be a partner in the procedure for drawing up the rules that may have an effect on its investments.[765] In response to Claimants' allegation that the New Regime removed the inherent stable economic conditions of the RD 1578/2008 regime, Respondent contends that it never made any commitment to Claimants to maintain its regulatory framework or the regime established in RD 661/2007 and RD 1578/2008 in favour of its plants.[766]

615. With respect to the alleged lack of consultation process, it contends that structural reforms to the SES were announced by the Spanish government "*more than one year prior to its actual adoption, i.e., from December 2011*".[767] Respondent further contends that the disputed regulations have been promulgated in accordance with the procedures established under Spanish law. During their creation, a number of hearing procedures were offered where all interested parties of the SES were invited to participate.[768] Respondent further contends that report 2/2012 "On the Spanish Energy Sector" of 7 March 2012, was opened to public consultations in early February 2012 in which 477 claims were obtained from the various companies and sectors concerned.[769]

616. Respondent contends that the process of adoption of the RDL 9/2013 was done in accordance with the laws. With respect to further implementing regulations, Respondent says that it circulated drafts of proposed regulation to all relevant stakeholders four months after the entry into force of RDL 9/2013.[770] It therefore concludes that it has not breached its obligation to promote transparent conditions pursuant to Article 10(1) of the ECT.[771]

### (2) The Tribunal's Analysis

617. Issues of interpretation arise in understanding the scope and content of the obligation to act transparently. In the Tribunal's view, the use of the word "shall" indicates that the first sentence of Article 10(1) creates an obligation on the host State to create "transparent conditions" to investments of investors. However, and as already explained in section VI.C(2) above, the Tribunal does not read this as a stand-alone or independent obligation beyond that required under the second sentence of Article 10(1) (*i.e.*, the FET standard). In this sense, the Tribunal considers that the content of the obligation of transparency must be assessed as part of the commitment to accord to investments fair and equitable treatment. In this regard, the threshold to be met to establish a violation of the transparency condition

---

[764] Resp. C-Memorial, ¶ 1234.
[765] Resp. Rejoinder, ¶ 1243.
[766] Resp. Rejoinder, ¶ 1321.
[767] Resp. Rejoinder, ¶ 952.
[768] Resp. Rejoinder, ¶ 1244.
[769] Resp. Rejoinder, ¶ 955.
[770] Resp. Rejoinder, ¶ 957.
[771] Resp. C-Memorial, ¶ 1236.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

under the FET standard is high in the same way that it would be for other elements of the FET standard.

618.  To determine the content of the obligation to act in a transparent manner under customary international law, the Tribunal identifies this principle as a fundamental aspect of the notion of due process. Transparency is an obligation on host States to afford investors directly affected or to be affected by regulatory action a reasonable opportunity to acquire basic information about the legal requirements imposed on them so they can be in a position to protect their investment activities by seeking modification of the relevant regulatory action, or alternatively to adjust, adapt and comply with such requirements. This would include, where appropriate, the ability of relevant stakeholders to participate and influence the administrative and legislative process.

619.  However, the Tribunal deems that isolated non-transparent action does not constitute a violation of the FET. In this regard, the Tribunal agrees with the position of the *Stadtwerke* tribunal: "*a finding of lack of transparency sufficient to constitute a violation of Article 10(1) of the ECT must be manifested in a continuing pattern of non-transparent actions by a government over time*".[772] The threshold should remain high.

620.  Claimants contend that Respondent held out to investors that it was providing a stable legal and regulatory framework in order to attract the investment it needed in clean energy infrastructure.

621.  According to Claimants, RDL 9/2013 and implementing regulations wiped out the investment regime for Claimants' investment and was followed by an Interim Period of more than eleven months during which the Spanish Government gave no indication regarding the precise remuneration that any qualifying plants would be entitled to.[773] They argue that the New Regime was a major departure from the stability and predictability inherent to RD 1578/2008. Claimants equate the stability and predictability of the regulatory framework with the obligation of transparency. In other words, if the tariff regime stipulated in RD 1578/2008 is not maintained and existing installations are not excluded from further tariffs reviews in a long period of time (around 20 years) then the economic regime becomes unpredictable and thus non-transparent.

622.  In this respect, the Tribunal believes that this claim on transparency adds nothing to Claimants' claim on legitimate expectations and/or stable conditions. However, even if one is to find a breach of other elements of the FET standard, such a finding does not render the regulatory measures non-transparent. The fact that the New Regime would be subject to regulatory changes from time to time –even where remuneration could had been revised downwards– does not mean that the regulatory activity of the State was non-transparent and would constitute a violation of international law.

---

[772] **RL-0145**, *Stadtwerke München GmbH, RWE Innogy GmbH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 *v.* , ¶ 311.
[773] Cl. Memorial, ¶ 323(b).

623. Further, it is undisputed that public consultations were carried out with energy producers in preparation of the CNE Report on Energy Sector in 2012. Public hearings were conducted, and comments were submitted by relevant stakeholders during the enactment of RD 413/2014 in 2013.[774] Claimants admit that consultation process was conducted concerning the preparation of RD 413/2014 and the June 2014 Order that implemented the New Regime. Thus, Claimants' claim appears to focus on the apparent lack of consultation process in the introduction of RDL 9/2013. It is clear that the RDL 9/2013 and other regulations were published and made easily available to investors, and that under Spanish law, Respondent was not required to hold public consultations of draft RDL 9/2013. The Tribunal believes that, if a host State acts in good faith and in accordance with the law in the administrative process and makes available to the affected person actual information about the legal requirements, the conduct does not amount to a "*complete lack of transparency*" in the regulatory decision-making process.

624. Having examined the entire decision-making process during the period 2013 to 2014, the Tribunal is satisfied that relevant stakeholders were generally consulted, expressed their views to the Government prior to the enactment of the regulations, and all royal decrees were promptly published and made available in accordance with Spanish law, and therefore finds that Respondent acted reasonably transparent during the period in connection with the Disputed Measures.

## F.  ALLEGED IMPAIRMENT OF CLAIMANTS' INVESTMENTS THROUGH UNREASONABLE, DISPROPORTIONATE AND DISCRIMINATORY MEASURES

### (1) The Parties' Positions

#### a.  *Claimants' Position*

625. Claimants offer three grounds for the unreasonableness of Spain's measures, each turning on an assessment of the Tariff Deficit.[775] They argue that they have demonstrated that: (i) the Tariff Deficit, the growth of which is Spain's primary justification for its measures, is the product of Spain's own regulatory failures, creating a disparity between regulatory costs and income, which depended upon the regulated price of electricity; so, this is not a rational policy goal that might justify interference with Claimants' investments;[776] (ii) the growth of the Tariff Deficit is the result of Spain's failure to set consumer prices capable of covering the electricity system's actual costs[777]; and (iii) it is arbitrary and unreasonable for Spain to enact harmful measures targeting the PV sector with the purpose of financing

---

[774] As expressed by Respondent, the CNE issued Report 2/2012 *"On the Spanish Energy Sector"* on 7 March 2012, the first part of which is dedicated to the *"Measures to Ensure the Economic and Financial Sustainability of the Electricity System"*. For the preparation of this report, the CNE had begun a period of public consultation in early February 2012 in which 477 claims were received from companies and sectors affected. *See* Resp. C-Memorial, ¶ 859.

[775] June Hearing, Tr. Day 1, 130:23-132:23 (Ingle).

[776] Cl. Reply, ¶¶ 604-638.

[777] June Hearing, Tr. Day 1, 101:22-102:10 (Sullivan).

the result of years of regulatory malfeasance, not least since the PV sector made only a limited contribution to the Tariff Deficit.[778]

626. Claimants link their FET claim with the "unreasonable measures" claim. They argue that the Disputed Measures were unreasonable, arbitrary and disproportionate. Claimants contend that it is "*settled law that a measure that has no rational link to its purported aim is arbitrary.*"[779] Claimants contend that the term "unreasonable" is defined in the Oxford English Dictionary as "beyond what is reasonable or equitable", and rely on *Plama v. Bulgaria* where the tribunal defined the term "unreasonable" measures as "*those which are not founded in reason or fact but on caprice, prejudice or personal preference*".[780] Claimants also rely on *Saluka v. Czech Republic* which describes the standard of reasonableness as requiring that the "*State's conduct bear a reasonable relationship to some rational policy*".[781]

627. To further provide some definition of the standard of reasonableness, Claimants refer to the *Saluka* case, in which the tribunal found that the State's conduct has to "*bear a reasonable relationship to some rational policy*." Further, noting *Micula v. Romania*, in implementing that policy, "[…] *[f]or a state's conduct to be reasonable, it is not sufficient that it be related to a rational policy; it is also necessary that, in the implementation of that policy, the state's acts have been appropriately tailored to the pursuit of that rational policy with due regard for the consequences imposed on investors*".[782] The test, they argue, is a two-part one: *first*, a rational policy goal needs to be identified and, *second*, a demonstration of how measures taken in pursuit of that policy were "appropriately tailored" and had due regard for the consequences imposed on foreign investors.

628. Claimants contend that the Disputed Measures constitute "unreasonable conduct" because:

(a). Spain "dramatically" altered the applicable legal and regulatory framework (*i.e.*, RD 1578/2008 remuneration regime).[783] Claimants argue that it was unreasonable *to strip* them of the *key* guarantees upon which their investments were based. Claimants say that the FIT tariff of RD 661/2007 and RD 1578/2008 required to remain stable throughout the life of the PV plants because of the upfront costs that are incurred at the beginning (grandfathering principle). So, according to Claimants, a significant cut to the FIT is unreasonable;

(b). Spain "*departed from international practice*".[784] Claimants contend that the New Regime is "unprecedented in nature"; that the new measures do not exist anywhere

---

[778] Cl. Memorial, ¶ 338.
[779] Cl. Reply, ¶ 210.
[780] **CL-061**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 184.
[781] **CL-070**, *Saluka Investments B. V. (The Netherlands) v. The Czech Republic,* UNCITRAL, Partial Award, 17 March 2006, ¶ 460.
[782] Cl. Memorial, ¶ 324. A rational policy is taken by a state following a logical (good sense) explanation and with the aim of addressing a public interest matter: **CL-041**, *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 525.
[783] Cl. Memorial, ¶ 335
[784] Second Hearing Tr., page 127.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

else. The measures are also disproportionate because they did not follow "international practice"; and

(c).    The alleged rational policy, *i.e.*, tackling the Tariff Deficit, is not a rational policy goal because:

(d).    it existed long before the development of the PV in the country,[785] and

(e).    the deficit was the result of Spain's own regulatory decisions. The development of the Tariff Deficit was caused by Spain's own fault because –Claimants argue– it "failed to raise regulated tariffs" to consumers. They further contend that measures under the New Regime are unreasonable taking into consideration the limited contribution of PV to the Tariff Deficit and conclude that easing the consumer burden or avoiding excessive profits are not policy aims.[786]

629.    Claimants also contend that the regulatory changes were disproportionate.[787] They argue that the concept of proportionality is well-established in many national laws as well as international law.[788]

630.    Claimants allege that Spain breached that standard through its sudden and drastic change in policy towards the renewables sector. This entailed repeated and frequent changes to the applicable legal and regulatory framework. They argue that the Tariff Deficit cannot be a reasonable policy goal for the Disputed Measures, and contend that it "*cannot be disputed that those measures have 'impaired' the Claimants' investments*" and have caused Claimants damages in the amount of 49 million euros.[789]

631.    Claimants contend that the "case law" indicate that the test on whether a State measure is proportionate or not, requires that there must be a reasonable relationship between the burden imposed on the foreign investor and the aim sought to be realised by the State measure. Claimants say that changes to the FIT and ultimately "*wiping out the entire Special Regime*", was not a proportionate response to the Tariff Deficit because the FIT for PV installations only played a limited role in the accumulation of the Tariff Deficit.[790] and because of the harmful impact of the measures on Claimants' investments.

632.    According to Claimants, the burden of fixing the Tariff Deficit cannot be attributed to foreign investors protected under the ECT, such as Claimants, with undue regard for the harmful impact on their investment. Claimants add that the Disputed Measures cannot therefore be considered to be correlated to a rational policy goal.[791]

633.    Claimants also allege that a State measure is not proportionate unless it is necessary to achieve the goals pursued.  According to Claimants, this analysis implies an assessment as

---

[785] Cl. Reply, ¶ 615.
[786] Cl. Reply, ¶ 583.
[787] June Hearing, Tr. Day 1, 132:5-11 (Ingle).
[788] Cl. Memorial ¶ 331.
[789] Cl. Memorial, ¶ 340.
[790] Cl. Memorial, ¶ 332.
[791] Cl. Memorial, ¶ 330.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

to whether there are other less intrusive means with regard to the rights affected that are equally able to achieve the stated goal.[792]   To prove this, Claimants submitted the Regulatory Report, where they explore other possible alternatives open to Spain that Claimants believe would have led Spain to comply with the principles of good economic regulation (the "less intrusive" argument).[793]

634. As a final point, Claimants contend that even if Respondent can show that there was a rational policy aim underpinning its measures, it may still fail to comply with the criteria of reasonableness and proportionality if less intrusive alternatives were available.[794]

635. Claimants note that similar withdrawals of undertakings and assurances given in good faith to investors as inducements to making an investment were deemed to be unreasonable by the Tribunal in *BG v. Argentina* and a breach of the relevant treaty.[795]

636. In Claimants' view, action could have been taken to avoid the Tariff Deficit if Spain had "properly" set consumer prices as it was required to do under the 1997 Law and RDL 6/2009. Alternative measures were available, which would have had less harmful effects on Claimants' investments, so the Disputed Measures were not correlated to a rational policy goal.

637. Claimants note that the Spanish Supreme Court has issued several judgements and two sets of interim measures that find that Spain's failure to comply with RDL 6/2009 was a violation of Spanish law. It was under an obligation to abide by the principle of income sufficiency. This, they argue, is sufficient to support the proposition that the Tariff Deficit was rooted in repeated failures to set consumer prices at sufficient levels and is the result of governmental decision-making that was illegal in domestic law and unreasonable in character.[796]

638. Claimants also rely on the often called 'non-impairment' clause in the third sentence of Article 10(1) of the ECT which prohibits Spain from impairing investments by adopting "unreasonable or discriminatory measures". Claimants argue that it is sufficient to demonstrate that a host State's adverse measures are either unreasonable or discriminatory. A breach of this obligation not to impair would also entail a breach of the FET standard in Article 10(1) of the ECT, since no action of the host State can be fair or equitable if it is unreasonable or discriminatory. Claimants take the view that it would suffice to show that Spain adopted unreasonable or discriminatory measures to show a breach of Article 10(1) of the ECT.[797]

639. In summary, Claimants argue that the Tariff Deficit cannot constitute a reasonable policy goal for the Disputed Measures, which have impaired Claimants' investments, and caused

---

[792] Cl. Memorial, ¶ 334.
[793] *Id.*.
[794] Cl. Reply, ¶ 587.
[795] **CL-011**, *BG Group Plc. v. The Republic of Argentina*, UNCITRAL, Final Award, 24 December 2007, ¶ 343.
[796] Cl. Memorial, ¶ 339.
[797] Cl. Memorial, ¶ 337.

damages of around 49 million euros.[798] So, there is a violation of the FET standard and the obligation to refrain from impairing Claimants' investments through unreasonable measures.

**b.  *Respondent's Position***

640.  Respondent relies on *AES Summit v. Hungary* as the legal standard to determine whether or not a measure is abusive (unreasonable) or disproportionate under international law. The *AES* tribunal stated that:

> "There are <u>two elements</u> that require to be analysed to determine whether a state's act was unreasonable: the existence of a <u>rational policy</u>; and the <u>reasonableness of the act of the state in relation to the policy</u>.

> "<u>A rational policy</u> is taken by a state following a logical (good sense) explanation and with the <u>aim of addressing a public interest matter</u>.

> "(…) A challenged measure must also be reasonable. That is, there needs to be an <u>appropriate correlation between the state's public policy objective and the measure adopted to achieve it</u>. This has to do with the nature of the measure and the way it is implemented."[799] (Emphasis added by Respondent).

641.  Respondent contends that the support system for RE was based on the legal premise of a reasonable rate of return within the framework of a sustainable energy system.[800] According to Respondent, the Spanish system of support for renewables is based on two principles: (i) guarantee the economic sustainability of the SES; and (ii) avoid situations of over-compensation under applicable legislation. Respondent says that by 2012 there was a mismatch between the actual income and the costs of the electricity system which, it says, was designed under different economic scenario, *i.e.*, the remuneration system of Royal Decree 661/2007 considered a growth in primary energy consumption and income and "the fall was extraordinary". The mismatch between actual income of the SES and the SES costs designed under radically different economic premises was, according to Respondent, the cause of the exponential increase in the Tariff Deficit.[801] Respondent contends that the annual deficit of the SES in 2012 reached 5.609 billion euros. In 2012, this annual deficit generated a cumulative debt of the Spanish Electricity System (SES) totalling almost 40 billion euros. This annual deficit with its accumulated debt led the SES to its situation of financial unsustainability. It contends that placing an excessive burden on Spanish consumers was decisively leading to the generation of the so-called Tariff Deficit.

---

[798] Cl. Memorial, ¶ 340.

[799] Resp. C-Memorial, ¶ 1266, citing **RL-0029**, *AES Summit Generation Limited and AES-Tisza Eromu Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶ 10.3.6, 10.3.7, 10.3.9.

[800] Second Hearing, Tr. Day 1, 142:17-22 (Gil Nievas); 171:4-7 (Garrido Moreno); 198:17-21 (Garrido Moreno); 205:1-4 (Garrido Moreno);

[801] Resp. Rejoinder, ¶¶ 736-738.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

Respondent argues that it had to adopt "structural reform" measures to correct these imbalances[802] (*i.e.*, the Tariff Deficit).

642. Respondent argues that the need to protect both consumers, who were affected by increases in their electricity bills, and the sustainability of the SES itself *forced* the Spanish Government to take a series of measures, including the Disputes Measures, that affected all the cost and income items of the SES as a whole.[803]

643. Respondent contends that correcting a macroeconomic imbalance in an unsustainable situation comprises a public policy that falls within the criterion established by *AES Summit v. Hungary*. According to Respondent, the *AES* criteria were met:[804]

644. <u>Existence of a rational policy</u>: Respondent says that an action that endeavours to protect consumers by avoiding higher than reasonable remuneration for investors is a rational policy hence compliant with the FET standard established in the ECT. In this case, Respondent adds, the New Regime's aim was to correct and prevent paying investors higher than reasonable remuneration in order to protect consumers;[805]

645. <u>Reasonable relationship between the objective of the state public policy and the measure taken to reach this objective</u>. Respondent argues that the Disputed Measures distributed the burden to increase income and reduce the costs of the SES among consumers and all the operators in the system (producers, distributors and transmitters) with the aim of dealing with the Tariff Deficit;[806] and

646. <u>Impairment has not been proven</u>. The third and final requirement to determine whether the measures are unreasonable, Respondent says, is whether an impairment took place. Respondent contends that the rate of return after the measures in dispute of Claimants' plants would be 7.42%. This, according to Respondent, shows that the Disputed Measures are rational and proportionate to the legitimate and public interest.[807]

647. Respondent further addresses Claimants' arguments related to the impairment of investments together with its position on the proportionate and reasonable nature of the Disputed Measures within the context of the FET standard. Respondent's argument is that Claimants have not proved that the measures in dispute have impaired their investments, and so there is no evidence of a breach of the non-impairment standard or FET.[808] Respondent refers to the reports prepared by BDO and note that the experts conclude that the measures have caused no negative economic impact on Claimants' investments, and that, as such, there has been no impairment due to the Disputed Measures. Even in the current situation, the rate of return (IRR) calculated by BDO on the basis of data provided

---

[802] Resp. C-Memorial, ¶ 1270.
[803] Resp. C-Memorial, ¶ 1270.
[804] Resp. C-Memorial, ¶ 1266. June Hearing, Tr. Day 1, 254:16-20 (Gil Nievas).
[805] Resp. C-Memorial, ¶¶ 1267-1275.
[806] Resp. C-Memorial, ¶¶ 1276-1283.
[807] Resp. C-Memorial, ¶¶ 1284-1287.
[808] Resp. C-Memorial, ¶¶ 1284-1286.

by Claimants' own experts is 7.42%. They argue that this figure is high and is incompatible with any claim for damages.

648. Respondent argues that the return Claimants receive in the new regime is reasonable, and that it should be judged according to "*generally accepted criteria*". Respondent provides the following: the opportunity cost or rate of disagreement used by the agents involved in a particular economic activity; a comparison with other sectors regulated by the Spanish electricity system, such as the transport and distribution sectors, regulated with a return on a Spanish bond at 10 years plus 200 basis points. That is a return 100 basis points less than for generation activity in the RE sector. In their view, the rate of return in PV is reasonable according to this criterion.[809]

649. In Respondent's view, it has successfully passed the relevant tests established by international tribunals to determine whether a measure is discriminatory or disproportionate. Specifically, Respondent refers to the findings in *AES Summit v. Hungary,*[810] and contends that one needs to recall the rates of return available in the banking sector to determine whether a return of 7.398% before taxes on the relevant plants is deemed to be reasonable and proportionate, and concludes that, based on such comparison, it is.[811]

650. Respondent contends that the Disputed Measures are "*rational and proportionate to the legitimate and public interest that justified their adoption*" and accord full respect for the FET and non-impairment standards and adds that Claimants have not satisfied their burden of proving that the measures were irrational or discriminatory.[812]

651. Respondent takes the view that Claimants have presented a distorted view of the facts which should be considered by the Tribunal,[813] and includes a list of relevant facts to substantiate the reasonableness, proportionality and non-discriminatory nature of the Disputed Measures:

> "(1) The principle of sustainability of the [Spanish Electricity System];
>
> (2) The regulatory framework in place since 1997 and the case-law that has interpreted it since 2005;
>
> (3) The successive amendments since 2006 (i) for reasons of sustainability and over-remuneration, and which (ii) have affected the future of registered, installed plants;
>
> (4) The non-existence of specific commitments regarding future immutability in RD 661/2007 and RD 1578/2008;

---

[809] Resp. Rejoinder, ¶ 1304.
[810] **RL-0029**, *AES Summit Generation Limited and AES-Tisza Eromu Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶ 10.3.31 and 10.3.34.
[811] Resp. Rejoinder, ¶ 1305.
[812] Resp. C-Memorial, ¶¶ 1242, 1287. June Hearing, Tr. Day 1, 254:16-20 (Gil Nievas).
[813] Resp. C-Memorial, ¶ 1243.

> *(5) The awareness by the RE Sector about the regulatory framework, case-law and the State's 'ius variandi' powers, within the limit of ensuring a reasonable rate of return.*
>
> *(6) The worsening of the international crisis from 2009 to 2012, with an exceptional decrease in electricity demand. Suffice it to recall that Spain's risk premium compared to Germany reached 575 points on 18 June 2012, and 637 points on 24 July 2012.*
>
> *(7) The international commitments undertaken by the Kingdom of Spain in July 2012 in relation to the bailout of the Spanish financial sector.*
>
> *(8) The adoptions of macroeconomic control measures to ensure the sustainability of the SES and to avoid placing an excessive burden on consumers.* "[814]

652. It is Respondent's view that in their arguments, Claimants disregard the economic situation of the SES, notably the drop in demand and the predictable increase in the Tariff Deficit due to the costs associated with RE.[815] Claimants also ignore the EU's calls to correct the Tariff Deficit and review Spain's electricity system.[816] In analysing the effects of RDL 9/2013, Claimants also overlook the economic circumstances and the urgency in which RDL 9/2013 was adopted.[817] In that regard, Respondent argues that Claimants have failed to perform a balanced analysis of the public interests at stake that supported the adoption of the Disputed Measures.[818]

653. Spain further contends that the reasonableness of the Disputed Measures is supported by the fact that such measures were proposed by the RE Sector in 2009. It is Respondent's view that RDL 9/2013 does not infringe the FET standard because the main RE Associations proposed a similar remuneration scheme in 2009 as that established in 2013 by RDL 9/2013.[819] In addition, Spain highlights the fact that in 2015 the regulatory regime attracted over 5 billion euros, proving the stability and security of the investment climate in the RE sector.[820]

654. The *measures are non-discriminatory.* Respondent contends that the Disputed Measures pass the criteria established in *EDF v. Romania*[821] as the regulations (i) serve a legitimate purpose; (ii) are based on legal standards, are of general scope and do not discriminate a particular investor; (iii) were adopted according to its stated objective, which is to

---

[814] Resp. C-Memorial, ¶ 1244.
[815] Resp. C-Memorial, ¶ 1251.
[816] Resp. C-Memorial, ¶ 1251.
[817] Resp. C-Memorial, ¶ 1252.
[818] Resp. C-Memorial, ¶ 1253.
[819] Resp. C-Memorial, ¶ 1256.
[820] Resp. C-Memorial, ¶ 1257.
[821] **RL-0028**, *EDF (Services) Limited v. Rumania*, ICSID Case No. ARB/05/13, Award, 8 October 2009.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

guarantee the sustainability of the electricity sector; and (iv) were adopted in compliance with due process.[822]

655. The *measures are not disproportionate.* Respondent applies the test established in *AES Summit* to argue that the measures are not abusive or unreasonable.[823] According to Respondent, (i) the Disputed Measures meet a rational policy; and (ii) there is an appropriate correlation between the public policy objective and the measures adopted to achieve it.[824]

656. Respondent concludes that the Disputed Measures adopted by the Spanish Government guaranteed the remuneration and reimbursement of the investment in a reasonable and proportionate manner and thus, do not violate the FET standard under the ECT.[825]

### (2) The Tribunal's Analysis

657. Article 10(1) imposes an obligation on States not to impair the management, maintenance, use, enjoyment or disposal of investments by unreasonable or discriminatory measures. On its face, this third sentence appears to be as a self-standing obligation in the ECT. However, the same obligation of non-impairment is embodied in the FET standard in the second sentence.[826]

658. It is so because the principle of reasonableness is an element of the requirement of fairness. By the same token, the principle of non-discrimination referenced in the third sentence is part of the requirement of equality of treatment in the sense that it allows the possibility of different treatment but only on reasonable and justifiable grounds. For these reasons, the impairment clause of the third sentence forms part of the FET obligation. In this regard, the FET standard imposes a general limitation on States, so the exercise of their right to regulate and change legislation must not be contrary to the principles of reasonableness, transparency, due process and to the prohibition against discrimination and arbitrariness. Thus, a regulatory measure that is unreasonable, arbitrary, or discriminatory would entail a breach of the FET obligation of Article 10(1) of the ECT. The Parties accept this general principle.[827] In this regard, the Tribunal will follow the practice of several tribunals and assess the reasonableness of the Disputed Measures as part of the FET standard.

---

[822] Resp. C-Memorial, ¶¶ 1263-1265.
[823] Resp. C-Memorial, ¶¶ 1266-1287.
[824] Resp. C-Memorial, ¶¶ 1266-1287.
[825] Resp. C-Memorial, ¶ 1283.
[826] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 387; **CL-207**, *Cavalum SGPS, S.A. v. Kingdom of* Spain, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020 , ¶ 410; **RL-0122**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain,* ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 260.
[827] Cl. Memorial, ¶ 284; Resp. C-Memorial, ¶¶ 1259 and 1287.

659. The term reasonable means "*appropriate, in agreement with reason, proportionate and not exaggerated*".[828] Proportionality is thus linked to the notion of reasonableness in the sense that it addresses the balancing of competing rights, interests, and objectives. Reasonableness, in turn, is reflected in the FET standard. In this context, for a regulatory measure to be reasonable, *first,* it must be an adequate or appropriate response to a legitimate policy objective and, *secondly*, the interests and rights of those affected are taken into account.

660. To this end, the Tribunal endorses the approach adopted by the *AES Summit v. Hungary*[829] tribunal: that there must be a rational relationship between the public policy objective and the measure adopted to achieve it.[830] Following this approach, the unreasonableness analysis is divided into two components: (a) whether a rational policy for the measure existed[831], and (b) whether the measure(s) taken in relation to that policy were appropriate to achieve the regulatory intent.[832] Further, a measure would be unreasonable and contrary to the FET standard if in the exercise of the State's right to change legislation imposes an excessive burden on investors (*i.e.*, the proportionality element).

661. In this way, the requirement of reasonableness (and proportionality) establishes a form of balancing exercise where conflicting interests are weighted. This would include an examination of the interests protected, the rights involved, and the burden imposed on the investor. As the *Electrabel* tribunal observed:

> *FET standard allows for a balancing exercise by the host State in appropriate circumstances. The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance. As was decided by the tribunals in Saluka v. Czech Republic and Arif v. Moldova, an FET standard may legitimately involve a balancing or weighing exercise by the host State.*

> *That requires a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate in regard to the affected rights and interests.*[833]

---

[828] **R-0154**, Diccionario de la Real Academia Española.

[829] **RL-0029**, *AES Summit Generation Limited and AES-Tisza Eromu Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶ 10.3.9.

[830] *v. Id.*, ¶¶ 10.3.7-10.3.9.

[831] "*A rational policy is taken by a state following a logical (good sense) explanation and with the aim of addressing a public interest matter*". *v. Id.*, ¶ 10.3.8.

[832] "[T]*here needs to be an appropriate correlation between the state's public policy objective and the measure adopted to achieve it*". *Id.*, ¶ 10.3.7-10.3.9.

[833] **RL-0035**, *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, ¶¶ 165 and 180.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

662. But the assessment of reasonableness when dealing with the State's right to regulate does not mean that the Tribunal has an open-ended mandate to second-guess regulators.[834] In this context, the Tribunal considers it appropriate to allow some margin of appreciation with respect to a State's policy choices. It is generally accepted[835] that an international tribunal should not second-guess or substitute its own assessment of the nature and extent of what is in the public interest and / or determine what should have been a less restrictive means of achieving a desirable economic policy. An economic and social policy decision by a regulator should be respected unless the international tribunal is satisfied that there is no clear reasonable basis for such decision. This does not mean that the Tribunal is prevented from examining how the regulatory policies adopted by the regulator comport with the State's international obligations. The Tribunal will assess Claimants' claim in light of these parameters.

663. The claim of unreasonableness in this case is essentially premised on the notion that the Tariff Deficit is the product of Spain's regulatory failures[836] and is, therefore, not a reasonable policy goal that justified interference with Claimants' investments. According to Claimants, to the extent that the measures are unreasonable and have impaired their investments, these are contrary to Article 10(1) of the ECT. Respondent, on the other hand, contends that the modifications to the remuneration system were required to stabilise the Tariff Deficit by tackling excessive remuneration and maintaining a reasonable return for RE producers. It argues that the New Regime was reasonable because it affected all the subjects of the energy system and was aimed at distributing the burden among consumers and all photovoltaic producers, while ensuring a reasonable rate of return which Respondent contends is the "*cornerstone of the remuneration system for the production of electrical energy from renewable sources*"[837] since the 1997 Electricity Law.

664. The Tribunal will first examine the question of impairment. Claimants contend that their investments have been impaired, and therefore the measures are unreasonable.[838] The Tribunal accepts that there has been an impairment with regards to the revenue and value

---

[834] **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, ¶ 318; **CL-207**, *Cavalum SGPS, S.A. v. Kingdom of* Spain, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, ¶ 413; **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 553.

[835] **RL-0147**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, ¶ 626; **RL-0122**, *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 468; **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 338; **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 571.

[836] Cl. Memorial, ¶ 338, (b). and (c). "[…] *the Tariff Deficit is the result of a disparity between the regulated costs and the income of the Electricity System, which is dependent on the regulated price of electricity. The growth of the Tariff Deficit is the result of Spain's failure to set consumer prices at a level that is high enough to cover the Electricity System's actual costs*", which could have been avoided had Spain properly set consumer prices as it was required to do so as a matter of Spanish law.

[837] Resp. C-Memorial, ¶ 416.

[838] Cl. Memorial ¶ 340.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

of Claimants' investments. The Disputed Measures have reduced the revenues throughout the lifespan of the PV plants.[839] Respondent's own experts confirmed that one of the effects of the New Regime was to lower the target rate of return.[840]  Other examples of impairment on the profits and value of Claimants' plants include the adoption of RD 413/2014 and the June 2014 Order to existing plants requiring tariff payments previously received to be counted towards the total remuneration that a plant may receive in the future (the so-called claw-back provision).

665. However, the critical test to establish a breach of the FET standard is not whether an investor has shown that it has been affected or impaired by the measures complained of, but whether the regulatory changes are reasonable, i.e., were adopted in pursuit of a rational policy, implemented in a reasonable manner with due regard for the consequences imposed on investors.

666. In this regard, the initial question to be addressed is whether the Disputed Measures are based on a rational policy. To this end, it is necessary to assess the existence of a policy interest matter. Respondent has justified the adoption of the Disputed Measures by a desire to tackle the Tariff Deficit to maintain the economic sustainability of the SES. The contemporaneous evidence shows the gravity of the Tariff Deficit.[841] Spain argues that the increasing deficit was unsustainable. This was summarised in a CNE report of 2012:

> [T]he basic problem of the electricity sector, is the fact that the lack of alignment between the revenues and costs of regulated activities in the electricity system over the last ten years has generated rising debt levels in the electricity system. The imbalance between revenues and costs in the system is unsustainable.[842]

667. It was also described in the Preamble to RDL 9/2013:

> "... the Spanish electricity system has generated a tariff deficit for a decade, which, over the passage of time, has adopted a structural nature, due to the fact that the actual costs related to regulated activities and the operation of the electricity sector are higher than the collection of the tolls set by the Government, which are paid by consumers.
>
> Between the years 2004 and 2012, the revenue of the electricity system due to consumer toll fees increased by 122%, while the increase of the regulated costs of the system during this period has been 197%. Among the cost headings that have contributed the most to the increase are the special regime premiums and the annuities

---

[839] **C-124 / R-0062**, Order IET 1045/2014, 16 June 2014; *see also* Brattle First Regulatory Report, Figure 22, at p. 116 and Figure 23, at p. 118.
[840] June Hearing, Tr. Day 4, 54:22–55:4 (Sullivan, McGregor).
[841] RDL 6/2009, of 30 April 2009. Preamble; RDL 14/2010
[842] **R-0080**, Report from the National Energy Commission (CNE), 7 March 2012, p. 4.

> *of accumulated deficits, headings that have been multiplied by six and nine respectively in that period.*
>
> *According to the latest data available from the National Energy Commission, there is a balance of accumulated debt of 26,062.51 million euros as of 10 May 2013. Complementary to the calculation of the debt of the electricity system, the Commission notes that since 2003 and until 10 May 2013, the amount paid to finance the deficit of the electricity system through annuities incorporated into the consumer access tolls, at current prices for each year, amounts to 11,823 million euros".*[843]

668. The Tribunal considers the above justification to constitute evidence of a genuine public policy concern. Was there a genuine rational policy aimed at protecting the public interest matter? A downward adjustment to the support system to prevent excess payments beyond a reasonable rate of return to tackle the situation described in the Preamble of RDL 9/2013 would seem an appropriate, if not necessary, measure to address the public interest matter.

669. In fact, the policy objective of minimising the risk of excessive remuneration was already in place when Claimants' plants were registered.[844] For example, the Preamble of RD 1578/2008 states that, "*insufficient compensation would make the investments nonviable, excessive compensation could have significant repercussions on the costs of the electric power system.*"[845] In addition, the tackling of excessive compensation is also expressly mentioned in the Preamble of RDL 14/2010, which calls for a policy which would ensure "*adequate and <u>reasonable</u> remuneration*" to producers.[846] (Emphasis added)

670. Claimants contend that it was unreasonable for the changes to the remuneration regime under RD 1578/2008 to apply to existing PV plants. The Tribunal already concluded that Claimants' reasonable expectation was that the remuneration regime could change, it would do so by lowering the return, and that it could affect existing plants. The Fifth Additional provision in RD 1578/2008 states that changes to the remuneration scheme of plants could occur in 2012, and further expressly stated the commitment to maintaining the sustainability of the electricity system in the preambles of the legislation. The imbalance between revenue and costs was assessed by the Spanish Government in 2012.[847] It concluded that Tariff Deficit had reached unsustainable levels.[848] In the National Reform Programme of 2012, the Government concluded that new measures were required to deal

---

[843] RDL 9/2013, Preamble.

[844] *See* Electricity Law of 1997, Preamble; RD 1578/2008, Preamble and Fifth Additional Provision; CNE Report 30/2008; **R-0188**, Appearance before the Senate of Mr. Pedro Luis Martín Uribe, Secretary General of Energy, 16 October 2008; and RDL 6/2009, Preamble.

[845] RD 1578/2008, Preamble.

[846] RDL 14/2010, Preamble.

[847] **R-0069**, National Reform Programme 2012, Government of Spain, p. 208; *see also* **R-0070**, Spanish Strategy of Economic Policy: Balance and structural reforms for the next six months, Government of Spain, 27 September 2012, pp. 56-57.

[848] **R-0069**, National Reform Programme 2012, Government of Spain, footnote 25, at p. 208.

with the Tariff Deficit. It envisaged all the participants in the energy sector to be affected. It considered that the new measures:

> *shall be equally distributed amongst consumers, the private sector and the public sector as part of a comprehensive reform of the electricity sector, which shall involve cost reduction measures for regulated activities, an increase of revenue from tolls a review of energy planning and the establishment of a stable regulatory framework.*[849]

671. The report clearly did not envisage exempting those participants who were not responsible for the Tariff Deficit or contributed less to the deficit. In fact, it expressly states that the burden would be "equally distributed". Claimants contend that the PV sector was not responsible for the Tariff Deficit as PV only accounted for 9% of the electricity generated, and therefore the applicability of the measures on PV plants was unreasonable. The Tribunal notes that a similar claim was brought by the National Association of Producers and Investors in Renewable Energies in 2014 against Spain before the EU institutions. The industry claimed, as Claimants do here, that their legitimate expectations had been breached. The EC rejected the petition of the Spanish industry. The industry requested the EU to bring legal action against Spain due to the adoption of RD 2/2013 (one of the Disputed Measures). The Commission held that Member States had the right to take measures to tackle overcompensation and to adopt measures to address unforeseeable developments. It concluded:

> *Member States retain full discretion over whether they use support schemes or not and, should they use them, over their design, including both the structure and the level of support. This comprises the right for Member States to enact changes to their support schemes, for example to avoid overcompensation or to address unforeseen developments such as a particularly rapid expansion of a precise renewables technology in a given sector.*[850]

672. The Tribunal agrees. Tackling excessive remuneration by requiring all renewable producers (who benefited from the system) to share the burden of the costs of the system in order to protect consumers while ensuring a reasonable profit to PV producers and protect consumers from excessive prices was not an irrational policy.

673. Further, there is nothing irrational about lowering the remuneration of PV producers aimed at maintaining a balance between granting a reasonable return for producers and, at the same time, avoiding situations of over-remuneration in an attempt to correct the economic imbalance of the electricity system in existence in 2012. Indeed, reducing the remuneration

---

[849] **R-0069**, National Reform Programme 2012, Government of Spain, p. 208.
[850] **RL-0065**, European Parliament, Notice to Members Re Petition No. 2520/2014 dated 29 February 2016, p. 3.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

of RE producers appeared to be working to reduce the Tariff Deficit.[851] In this regard, the Disputed Measures *are related to* the Tariff Deficit and sought to achieve the economic equilibrium of the 1997 Electricity Law and the objectives set out in the Preamble of RD 1578/2008.

674. The Tribunal therefore concludes that reducing the remuneration to existing plants to deal with the Tariff Deficit was rational, and that there is a reasonable relationship between the public policy objective and the Disputed Measures.

675. Claimants also make a claim of arbitrary conduct.[852] They argue that a measure that has no rational link to its purported aim is arbitrary,[853] but appear to equate arbitrariness with unreasonableness, although the Tribunal has already assessed the general reasonableness of the measures and concluded that they bear a reasonable relationship with a genuine policy objective. The question, then, is whether the Disputed Measures were introduced in an arbitrary manner. The Tribunal does not find any evidence in the record showing that the legislative aim was arbitrary nor that the Disputed Measures were adopted in bad faith[854] or to "push out" foreign investors, nor were they based on individual discretion, capricious, prejudice, or personal preference without an apparent legitimate reason. The Fifth Additional provision in RD 1578/2008 states that changes to the remuneration scheme of plants could occur in 2012, and further expressly stated the commitment to maintaining the sustainability of the SES in the preambles of the decree. It therefore cannot be said that the Spanish Government arbitrarily ignored its own commitments under its regulations. Further, it is undisputed that a downward reduction in the remuneration of existing plants (*i.e.*, those under RD 661/2007 and RD 1578/2008 regime) which began in 2010 contributed to the reduction of the Tariff Deficit. The magnitude of the role of PV investors on the Tariff Deficit is of no great relevance to the analysis on whether it was reasonable to adopt a policy which shares the burden of the Tariff Deficit to those producers benefiting from a subsidised system and minimises the costs on consumers with the aim to maintain the sustainability of the energy system. Claimants also argue that the reference to the ten-year trailing average of the Spanish ten-year bond, plus a spread of 300 basis points was arbitrary.[855] It is difficult to see how this constitutes arbitrary conduct when this was a mechanism proposed by the industry itself. In May 2009 the *Asociación de Productores de Energías Renovables* (APPA) proposed to the Government to quantify the return based on the 10-year Spanish Bond plus 300 basis points.[856] The Tribunal believes that Respondent did not act in an arbitrary manner.

676. The Tribunal will now assess the question of proportionality as part of the requirement of reasonableness. One of Claimants' contentions is that the measures are unreasonable and disproportionate because there would have been less intrusive means available that were

[851] **R-0149**, Spain– Post Programme Surveillance Autumn 2014 Report, p. 27; *"67. The 2013 reform of the electricity sector helped to contain the tariff deficit, and the 2014 deficit should be considerably smaller or the system should be in balance"*. *See also* **R-0151**, Macroeconomic imbalances Country Report – Spain 2015, p. 62.
[852] Cl. Memorial, ¶¶ 170, 284 and 338(c).
[853] *See* Cl. Memorial, ¶ 324 and Cl. Reply, ¶ 210.
[854] Cl. Memorial, ¶ 210.
[855] Cl. PHB, ¶ 93.
[856] **R-0185**, Presentation of the Bill on Renewable Energy prepared by APPA.

equally able to achieve the stated goal. Respondent does not seem to dispute that there were other alternative policy options in the pursuit of the legitimate objective of addressing the Tariff Deficit. As already explained, it would be inappropriate for an international tribunal to conclude that a regulatory action is unreasonable (hence a breach of the FET standard) simply because alternative choices economically less burdensome to foreign investors were available to the State or other courses of action might have been more effective in tackling the Tariff Deficit problem than the one adopted. As explained above, the matter of choice of policy is a question for the authority not the Tribunal, and the Tribunal has already concluded that there are reasonable and justifiable grounds for the adoption of the regulatory changes in 2013.

677.    Here, the Spanish Government opted for a cut on premiums to all RE plants in order to avoid over-remuneration to existing plants to control the Tariff Deficit and maintain the sustainability of the electricity system, rather than increasing the toll to consumers. In other words, Respondent sought a policy aimed at protecting consumers already in difficulties due to the high price of electricity[857] and existing macroeconomic conditions at the time (2012), by imposing a reduction on remuneration to achieve the overall objective of maintaining the economic sustainability of the Spanish electric system. But this does not sufficiently address nor fully answer the question on whether Spain's actions were disproportionate and thus in breach of the FET standard.

678.    In assessing the proportionality of the measures, the Tribunal recalls that Respondent was under a duty to guarantee producers a reasonable rate of return under the principles of the 1997 Electricity Law. Respondent has consistently acknowledged this point in the arbitral proceedings, stating that investors have been "*always granted the same thing: a reasonable rate of return*" under the legal and regulatory regime in force since the enactment of the 1997 Electricity Law.[858]

679.    Indeed, Respondent expressly acknowledged the right of the producers to a reasonable rate of return in its pleadings. For example:

680.    In its Counter Memorial, Respondent stated that "[t]he only obligation that Spanish Law has generated in favor of producers of renewable energies is to obtain, in addition to the priority of access and dispatch, a 'reasonable rate of return' for their investment" adding that the Supreme Court of Spain had confirmed the principle on multiple judgments.[859]

681.    How successive regulatory changes concerning existing facilities and the framework upon which Claimants relied on to make their investment were made to "*maintain the principle of reasonable rate of return*" within the SES.[860]

682.    In its Post-Hearing Brief, Respondent described how regulations that developed the regime under the 1997 Electricity Law were made with the objective "[…] *to guarantee renewable*

---

[857] Resp. C-Memorial, ¶¶ 372-377.
[858] Resp. C-Memorial, ¶ 1333.
[859] Resp. C-Memorial, ¶¶ 1319-1322.
[860] Resp. C-Memorial, ¶ 1175.

*energy producers a reasonable rate of return ... within the framework of a sustainable Spanish Electricity System*".[861]

683.  Thus, even though the approach taken by Spain to fix the Tariff Deficit was a valid policy goal, and a rational relationship existed between the public policy objective and the Disputed Measures, Respondent's measures must have been also proportionate.

684.  As already explained in this section, proportionality requires a reasonable relationship between the State's public policy objective and the measure adopted to achieve it and not to be excessive to the interests of investors.[862] As the *RWE v. Spain* tribunal reflected in the context of the changes in the renewable sector in Spain in 2013, a relevant factor in assessing compliance with the FET standard is whether an excessive financial burden was shifted to Claimants.[863]

685.  As may be recalled, the 1997 Electricity Law is deemed to be the cornerstone of the SES. For the Special Regime that includes renewable sources, Article 30.4 established a right to receive a reasonable rate of return with reference to the cost of money in the capital markets.

686.  Several royal decrees followed to implement a regulatory framework to the 1997 Electricity Law. RD 436/2004 confirmed the principle of reasonable profitability by stating in its Preamble: "*Whichever remuneration mechanism is chosen, the Royal Decree guarantees operators of special regime installations fair remuneration for their investments* […]."[864]

687.  Given the commitment by Spain to guarantee a reasonable return to PV producers, the assessment of whether the measures are proportional is established by reference to the effects to the interests of Claimants in receiving a reasonable rate of return ensured by the 1997 Electricity Law. To this end, it is necessary to examine the actual impact on the returns received by Claimants' plants under the Disputed Measures,[865] which necessarily involves an assessment of the financial impact on Claimants' investments that resulted from the Disputed Measures (*i.e.*, the remuneration that Claimants' plants actually received under the New Regime). If it is established that the compensation received by Claimants' plants under the New Regime falls below the threshold of a reasonable return, it would constitute a disproportionate and unreasonable remuneration, and thus a violation of the FET standard.

---

[861] Respondent's PHB, ¶ 49.
[862] **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 570.
[863] **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶¶ 550-551.
[864] RD 436/2004, Preamble (emphasis added).
[865] **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶ 497; **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 356.

688. Before conducting an examination on the financial burden being imposed to Claimants, the Tribunal recalls its previous conclusions that neither the mere reduction in revenues caused by the reduction of the financial support (*i.e.*, subsidies) from the original FIT, nor the complexity of the New Regime, renders by itself a measure disproportionate. For the measures to be disproportionate, the impact on Claimants' plants must be excessive relative to the policy objective.

689. Claimants argue that the New Regime had a significant adverse impact on the profitability of its plants in several respects.[866]

690. *First*, they contend that the effect of the Special Payment being calculated by reference to the costs of a *standard* facility is that plants with higher costs are penalised. The Tribunal notes that the concept of *standard* facility was used previously in legislation[867] and considered by the industry itself.[868] Public consultations were carried out and comments received from stakeholders during the decision-making process of RD 413/2014 and Order IET 1045/2014.[869] Further, the Tribunal considers that grouping together thousands of facilities[870] based on technical and other characteristics to calculate subsidies and costs seems reasonable policy. The Tribunal therefore concludes that the use of *standard* facilities in the calculation of future payments was justified and not disproportionate relative to the policy objective.

691. *Second*, Claimants argue that the New Regime has a retroactive effect in that it penalises plants that obtained gains above the 7.398% target return. Claimants indicate that the most significant feature of Law 24/2013[871] was that it changed the entire remuneration methodology and it meant that previous earnings were "clawed back" by off-setting future earnings. This meant that the PV installations would be penalised for their past returns, "*effectively altering the rules of the game over the energy already produced and already sold on the market by the Claimants*".[872] This was subsequently addressed by the so-called "claw-back" provision under the 413/2014 and June 2014 Order. Brattle explains the adverse effects on the return of existing plants as follows:

> *Our view is that the July 2013 Disputed Measures reduce the remuneration to those installations that were already operating under the Original Regulatory Regime. Although technically the installations do not have to 'pay back any amount', reducing the future remuneration based on past gains is tantamount to asking to reimburse these gains, since the investors are being forced to offset*

---

[866] Cl. Memorial, ¶ 169.
[867] RD 436/2004; **R-0067**, PER 2005-2010.
[868] **R-0184**, Report on APPA Proposals, November 2006, p. 35.
[869] Resp. Rejoinder, ¶¶ 950-975.
[870] RD 1614/2010; Resp. C-Memorial, ¶ 938.
[871] Claimants refer to the Third Additional Provision and Annex III, of Law 24/2013, *see* Cl. Memorial, ¶ 267. June Hearing, Tr. Day 1, 97:3-12 (Sullivan).
[872] Cl. Memorial, ¶ 267.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

*what they have already earned against the remuneration due under the New Regulatory Regime.*[873]

692. According to Claimants, this means that returns received by plants many years before the implementation of the New Regime are used to calculate the returns to which they are subsequently entitled. They argue that the New Regime is fully retroactive "*as it claws back past revenues by offsetting future revenues in order to provide what the government decided in July 2013 should be a reasonable return*".[874] That has practically the same effect as if the amounts previously received had to be returned.

693. Respondent argues that the measures are not retroactive because Claimants never had a vested right to any future remuneration.[875] Respondent distinguishes between what it refers to as "*minimum level*", "*medium level*" and "*maximum level*" of retroactivity, adding that only the "maximum level" of retroactivity would be prohibited, but not "medium level", which is what we find in this case, since Spain has accredited that the reform contained in RD Law 9/2013 only has effects towards the future.[876] According to Respondent, the legislation expressly respects the remuneration received by the facilities before its entry into force, so that the new remuneration system has only future effects.

694. Respondent further states that the Spanish Constitutional Court and the Supreme Court have ratified the legality of legislative changes that, without affecting acquired rights, apply to the future.[877]

695. The Tribunal agrees that PV producers such as Claimants had no vested rights to an FIT in the future. But that is not relevant. The point is that the New Regime eliminated future earnings by reference to payments lawfully paid and received prior to the adoption of the New Regime on a very different basis. As observed by the *Eurus* tribunal, "[i]*t is one thing to amend payments for future production with immediate effect, and another to reduce payments that would have otherwise been made by reference to payments lawfully made in the past in respect to past production. Again, what matters is not the label 'retrospective', but the substance*".[878]

696. The Disputed Measures have the effect of clawing back remuneration which was legitimately obtained under the previous regime. This has an adverse effect on future remuneration of Claimants' plants and fails to take into account the rights and interests of Claimants under the previous regime. The Tribunal also finds difficult to understand how

---

[873] Brattle's First Regulatory Report, ¶ 211.
[874] Cl. Memorial, ¶ 169.
[875] Resp. Rejoinder ¶ 1006.
[876] Resp. Rejoinder ¶ 1007.
[877] Resp. Rejoinder ¶ 1021. Respondent makes reference to the Ruling of the Constitutional Court of 17 December 2015 (Appeal Inc. 5347/2013) (**R-0108**); the Ruling of the Constitutional Court of 18 February 2016 (Appeal Inc. 5852/2013) (**R-0109**); and the Ruling of the Constitutional Court of 18 February 2016 (Appeal Inc. 6031/2013) (**R-0110**), as well as the Ruling of the Supreme Court 63/2016 of 21 January 2016 (Administrative appeal 627/2012) (**R-0107**); and the Ruling of the Third Chamber of the Supreme Court on 9 December 2009 (Appeal 152/2007) (**R-0096**).
[878] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, ¶ 349.

the clawing back of remuneration was a necessary or adequate response to tackle the Tariff Deficit. The Tribunal agrees with the *Eurus* tribunal and many other tribunals that the taking into account of past remuneration in order to calculate future payments has the effect of penalising plants for their successful operation during the years prior to the New Regime. To the extent it was applied to Claimants, the Tribunal considers this unreasonable and excessive relative to the policy objective (to tackle the problem of the Tariff Deficit).[879]

697. The Tribunal agrees with the *RWE* tribunal which decided that "[…] the Respondent has breached Article 10(1) ECT (i) to the extent that it has procured repayment by the Claimants of sums previously paid by the Respondent under the regime in place prior to adoption of the Disputed Measures".[880] The Tribunal notes that recent tribunals in other cases cited by the Parties have had similar rulings.[881]

698. To the extent that it is in breach of its obligations under the ECT, the damage caused by Spain in connection with the claw-back needs to be compensated. This follows the *REEFF* tribunal decision: *"[T]o the full extent that the contested measures have been applied retroactively, such retroactive application, contrary to the Respondent's obligations, must result in an appropriate compensation for the damage that breach caused to the Claimants."*[882]

699. With regard to the *third* aspect on the impact of the measures on the profitability of the plants, the Tribunal will now examine the rate of return, and whether investors of RD 1578/2008 plants had a legitimate expectation thereto. In line with other international tribunals, the Tribunal agrees that the fundamental premise of the remuneration system for the RE under the Electricity Law 54/1997 was the principle of a reasonable rate of return.[883] Respondent has accepted that it created a legitimate expectation of a reasonable rate of return.

---

[879] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, ¶ 355.

[880] **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶¶ 621 and 748(2).

[881] **RL-0122**, *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 328-330; **CL-207**, *Cavalum SGPS, S.A. v. Kingdom of* Spain, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, ¶ 637; **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum of 2 December 201, ¶ 496.

[882] **RL-0122**, *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 328-330.

[883] **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶ 498; **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 356; **RL-0145**, *Stadtwerke München GmbH, RWE Innogy GmbH, and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, ¶ 327; **RL-0122**, *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 470, 521.

700. The Tribunal agrees with recent decisions that the relevant measure to assess the proportionality of the changes is the internal rate of return (IRR).[884] As explained, a significant reduction in Claimants' return would amount to an excessive burden imposed on Claimants.

## G. THE REASONABLE RATE OF RETURN

### (1) The Parties' Positions

#### a. *Claimants' Position*

701. Since the Tribunal has found that Claimants only had a right to a reasonable rate of return under the fundamental premise of the remuneration system for the RE established in the 1997 Electricity Law, the Tribunal shall restrict its examination of the arguments presented by Claimants in connection with what they refer to as the "alternative damages calculation". Claimants themselves indicate that the alternative damages calculation is only relevant if the Tribunal were to determine, based on the evidence before it, that Claimants' legitimate expectations were limited to receiving a reasonable rate of return.[885] Accordingly, those calculations relating to the subject of "primary valuation" are omitted.

702. In its Second Quantum Report, Brattle presented the so-called alternative damages calculation under a reasonable return that assumes an entitlement not to the FITs under the Original Regime, but rather to the "*reasonable return that was implicit in the FIT under RD 1578/2008.*"[886]

703. Brattle argues that as a consequence of the New Regime, Spain has caused harm in four ways: (a) reduced the return deemed reasonable; (b) abandoned the principle of a single cost target, associated with the "marginal plant" to appropriate the efficiency gains earned by more efficient plants on the system; (c) clawed-back allegedly excessive returns earned in previous years under the Original Regulatory Regime; and (d) undermined the incentive to maximise production through a change from a per MWh (of production) to a per MW (of capacity) payment.[887]

704. Claimants contend that for purposes of an alternative damages calculation, the Brattle Report seeks to follow, as closely as possible, the methodology used by Spain when

[884] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, ¶ 361; **RL-0122**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 521, citing **CL-055**, *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, ¶ 826; **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶ 503; **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 584.
[885] Cl. Reply, ¶ 701.
[886] Brattle's Second Quantum Report, ¶ 197.
[887] Brattle's Second Quantum Report, ¶ 197.

implementing the reasonable rate of return concept under the Original Regime adding that, even so, the New Regime failed to provide Claimants with a "reasonable" rate of return.[888]

705. Brattle concludes a valuation of the damage at EUR 36 million, based on an alternative tariff per MWh in the "Alternative But-For scenario", which would permit an efficient PV plant to recover costs and earn a reasonable return. [889]

706. To calculate the the alternative damages, Brattle has essentially reached the figure by constructing the tariff per MWh that should have applied in order to allow efficient PV installations to recover their capital and operating costs and earn a 7% *after-tax* return over a 25-year regulatory life. Brattle then compares the remuneration that would have been provided under this "reasonable return" tariff (the But-For scenario) to what Claimants actually would receive under the New Regime (the Actual scenario) in order to determine the alternative damages figure. [890]

707. Brattle describes its assumptions:[891]

708. A target rate of return to provide a 7% percent after-tax return over the lifetime of the facilities, which equals 8.7% *pre-tax* rate, which Brattle applies since the CNE confirmed that the RD 1578/2008 tariffs were consistent with a 7% after-tax return;[892]

709. Investments based on standards parameters for appropriate investment and operating costs for efficient PV plants (known as a "standard installation") under the June 2014 Ministerial Order under the New Regime. Brattle reconstructed a single "reasonable" return rate tariff for all plants registered for a particular RD 1578/2008 tariff. To identify the cost target implicit in RD 1578/2008, Brattle adopted the concept known in economics as the "marginal plant", *i.e.*, the most expensive plant on the system that is nevertheless efficient and sets costs in reference to the marginal plant. Brattle uses the marginal plant concept because RD 1578/2008 was a marginal plant system;[893]

---

[888] Cl. Reply, ¶ 701.
[889] Brattle's Second Quantum Report, ¶ 225. June Hearing, Tr. Day 3, 90:2-14 (Brattle-Caldwell). During the June Hearing, Mr. Caldwell (Brattle) noted in their presentation, that they had provided several sensitivities in their second report, with damages ranging between EUR 30-36 million.
[890] Brattle's Second Quantum Report, ¶ 198.
[891] Brattle's Second Quantum Report, ¶¶ 202-224.
[892] Brattle's Second Quantum Report, ¶ 202, citing CNE Report 3/2007, pp. 46-47 in Annex III.
[893] In support of adopting the "marginal plant" concept, Brattle recalls that according to Spain an investor in a single-axis plant in 2010 or 2011 chose the least expensive technology per MWh of production, and an investor in a double-axis plant inadvertently chose the most expensive technology per MWh of production. Yet, under RD 1578/2008, both the cheap single-axis and the expensive double-axis plant would receive the same FIT per MWh of production. The investor in the single-axis plant would therefore earn more money per MWh of lifetime production relative to the investor in a double-axis plant, reflecting the lower levelised costs per MWh of single-axis plants relative to double-axis. The extra money represents an efficiency gain for the investors in the cheapest technologies relative to those in more expensive types. Since the multiplication of standard installation types under the New Regime appropriates this efficiency gain, by reducing the remuneration to single-axis plants more than the remuneration to fixed-mounted and double-axis plants, and Brattle considers the appropriation of this efficiency gain to be inappropriate, it therefore eliminates it from its reconstruction of the Reasonable Return Tariff. *See* Brattle's Second Quantum Report, ¶¶ 209-210.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

710. Regulatory life and useful life of 25 years, given Spain's production forecast for the standard installation;

711. Prior earnings are ignored given the New Regime's retroactive treatment of past profitability;

712. Payment basis, where the incentive to maximize production in the But-For scenario is preserved, even though the New Regime effectively eliminated production incentives; and

713. Inflation indexation of the rate.

714. In its Second Quantum Report, Brattle indicates that the CNE originally supported the ability of PV investors to earn an 8% *after-tax* return when deriving the FIT for PV plants for RD 661/2007,[894] but acknowledges that the CNE later confirmed that the RD 1578/2008 tariffs were consistent with a 7% *after-tax* return.[895] Thus, it asserts, the Alternative Tariff therefore envisages the application of Spain's originally accepted 7% after-tax reasonable rate of return.

715. Following on this line, Brattle adds that a 7% after-tax return is the equivalent to an 8.7% pre-tax return, taking into account a 19.6% average tax rate across all of Claimants' PV Plants. The effective tax rate depends on the depreciation applied at each installation, and to this end Brattle assumes a 25-year regulatory lifetime and all-equity financing, which it adds is consistent with the original assumptions of the CNE and the Ministry in 2008 when deriving the FITs for RD 1578/2008. Two further assumptions are that (i) investments are depreciated on a straight-line basis, and (ii) that the project companies can claim the investment tax credit provided for by RDL 4/2004.[896]

716. However, according to Brattle, although the New Regime grants an allowed return of 7.398% before taxes, this equates to an after-tax return of 5.950% given the same assumptions about lifetime, all-equity financing and depreciation[897] which implies a 1.050% reduction in the after-tax return implied in the RD 1578/2008 tariffs, or a 1.305% reduction in the pre-tax return.

717. Regarding the use of the marginal plant, Brattle recalls in its Second Quantum Report that the New Regime introduces different standard installation types for fixed, single-axis and double-axis PV installations registered in 2010 and 2011, even though a single FIT applied to all types of installations under RD 1578/2008.[898] Further, that in the June 2014

---

[894] Brattle's Second Quantum Report, ¶ 202, citing (**C-048**), CNE Report 3/2007, 14 February 2007, pp. 46-47 in Annex III.
[895] Brattle's Second Quantum Report, ¶ 202, (**C-058**) [sic], citing the CNE, Report 30/2008, 29 July 2008, pp. 17-18. *See also* (**C-058**), CNE Presentation, Economic Analysis of Renewable Energy Technologies, 9-13 February 2009, slides 48-51. The per MWh FITs under RD 1578/2008 are generally lower than the FITs under RD 661/2007. This reflects decreasing investment costs for PV installations.
[896] Brattle's Second Quantum Report, ¶ 203.
[897] Brattle's Second Quantum Report, ¶ 204.
[898] According to Brattle, the choice to adopt different PV technology types involves inherent trade-offs: more upfront costs for double and single axis plants relative to fixed installations, in an attempt to achieve more production throughout the lifetime of operation. *See* Brattle's Second Quantum Report, ¶ 207.

Ministerial Order (IET/1045/2014), Spain estimated investment and operating costs, and production levels for each of the new standard installation types. Spain's cost and production estimates for the different types of standard installations reflect the relevant trade-offs between higher upfront costs and greater lifetime production, which ultimately suggest that double-axis plants had the highest levelised costs per MWh, that fixed-mounted installations had the next highest levelised costs, and that single-axis plants had the least levelised costs.[899]

718.    Brattle reconstructs a single Alternative Tariff for all plants registered for a particular RD 1578/2008 tariff. For a given RD 1578/2008 tender, the single Alternative Tariff then determines the remuneration for a particular plant, regardless of technology, type or location, just as a single RD 1578/2008 FIT would have applied to these same plants. They base the single Alternative Tariffs on the marginal plant registered in each of the relevant RD 1578/2008 tenders, adding that since the marginal plant is the standard installation type with the highest levelised costs per MWh in a particular tender, and thus the plant that will receive precisely a 7% after-tax return, it will not receive any efficiency benefit.[900]

719.    According to Brattle, this construction of the Alternative Tariff implies that investors in expensive double-axis plants earn only a 7% return on their investment costs, while investors in cheaper fixed-mounted and single-axis installations earn a higher return which represents an efficiency gain. However, the higher return is still considered a reasonable return as the investor is rewarded for being efficient consistent with the design of the Original Regime. The efficiency gain is small for plants registered under RD 1578/2008 in 2010 and 2011, because Spain's cost and production estimates imply only small differences in levelised costs between fixed-mounted and double-axis plants. Further, Brattle contends that the focus on the marginal plant does not therefore contribute significantly to the damages under its Reasonable Return scenario.[901]

720.    To determine the precise magnitude of the efficiency gain appropriated under the New Regulatory Regime, Brattle takes Spain's estimates of standard construction costs, operating costs, and production levels, and then computes the Fixed FITs per MWh that would generate streams of cash flow over a 25-year regulatory lifetime consistent with a given target internal rate of return. Further, Brattle assumes that the Fixed FITs would inflate over time, just as the tariffs under RD 1578/2008 were expected to do. The resulting Fixed FITs effectively represent the levelised costs of the different standard installation types defined by Spain under the New Regime and are directly comparable to the RD 1578/2008 tariff.

### b.  *Respondent's Position*

721.    As in the case of Claimants' arguments, the Tribunal deals only with those of Respondent and its expert BDO relating to the "alternative damages" claim, as it finds it unnecessary

---

[899] Brattle's Second Quantum Report, ¶ 208.
[900] Brattle's Second Quantum Report, ¶ 211.
[901] Brattle's Second Quantum Report, ¶ 212.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

to examine those on fair market valuation of the investment given its prior conclusion as to the scope and limits of Respondent's breach of the ECT.

722. From the outset, the Tribunal notes that Respondent has expressly acknowledged that investors such as Claimants have the right to a reasonable rate of return under the 1997 Electricity Law and are protected from market uncertainty and fluctuations, and deems "paradoxical" that Claimants have brought a claim.[902]

723. BDO challenges the alternative damages valuation, *first*, because it argues that a reasonable rate of return has evolved over time as "returns in other sectors" and, *second*, because Brattle intends to remunerate all PV plants equally, based on the plant whose costs per MW for the systems are highest (the "marginal plant" concept examined above), and it makes no sense in fixing remuneration in the renewable sector taking into account the remuneration of the most expensive plant. The remuneration level of each plant should cover investment and operation costs and provide investors with a reasonable return.[903]

724. BDO acknowledges that under the 1997 Electricity Law the objective is to "[…] *obtain reasonable rates of return with reference to the cost of money on the money market* […]" and deems that this should be similar to the cost of capital demanded by markets, commonly calculated by applying the weighted average cost of capital (WACC).[904]

725. However, BDO deems that the "target" returns under the New Regime are still higher than the reasonable rate of return under the regulatory framework.[905] This, insofar as the return of 7.398% before taxes would result according to BDO's calculations in 6.87% after taxes, and not in 5.95%, as Brattle states in its report. BDO asserts that the "target" would remain above the WACC after tax, and hence there is no harm to the investor.[906]

726. In response to the argument of Brattle in the sense that the cost of capital did not change between 2007-2008 and July 2013 and this should not justify the change of return, BDO attempts to justify the change, not in the cost of capital, but rather in the "*unsustainable imbalance generated in the regulatory framework of RD 661/2007*."[907] Nonetheless, BDO agrees with Brattle that the sector WACC did not substantially change between 2007-2008 and 2013 given that it went from 6.03% in 2007 to 6.17% in 2008 and 5.74% in 2013.[908]

727. According to BDO, the "target" rate of return exceeded the sector WACC by 0.97 percentage points, 0.83 percentage points and 1.26 percentage points in 2007, 2008 and 2013, respectively. BDO then compares the pre-tax "target" return of 7.38%, which is 6.87% after tax under the regulatory framework with the sector WACC in 2013, 2014, 2015 and 2016, which results according to BDO in an additional premium included in the

---

[902] Resp. C-Memorial, ¶ 1342.
[903] BDO Second Report, ¶¶ 56-57.
[904] BDO Second Report, ¶¶ 274-275.
[905] BDO Second Report, ¶ 68.
[906] BDO Second Report, ¶¶ 421-424.
[907] BDO Second Report, ¶ 280.
[908] BDO Second Report, ¶ 284.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

after-tax "target" return of 6.87% that results in 1.13, 2.05, 1.97 and 1.85 for each of those years, respectively.[909]

728. The following table presented by BOD[910] shows the after-tax WACC for the years 2007 through 2016, together with what it deems is the additional premium included in the after-tax "target return" of 7%:

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| After-Tax WACC | 6,03% | 6,17% | 5,62% | 6,10% | 6,59% | 6,29% | 5,74% | 4,82% | 4,90% | 5,02% |
| Premium to reach after-tax Target 7% | 0,97 | 0,83 | 1,38 | 0,90 | 0,41 | 0,71 | 1,26 | 2,18 | 2,10 | 1,98 |

729. In connection with the tax rate that should apply in making the determination of an "after-tax return", BDO argues that its difference in the applicable tax rate with Brattle is that BDO deems that (a) the depreciation should be 15 years and (b) participation loans are shareholder contributions and the tax benefit derived from interest must be considered when calculating the effective tax rate. This implies eliminating the tax deductibility associated with interest generated by participation loans. By applying these items, BDO concludes that the effective tax rate "could be" 7.138%.[911]

730. Thus, BDO concludes that the reasonable return after taxes under the New Regime is 6.87% that "*is above the return required by capital markets and very close to the 7% target under Royal Decree 1578/2008*", using a model that assumes specific parameters for the PV Plants.[912]

### (2) The Tribunal's Analysis

731. As a starting point, the Tribunal recalls that it has concluded that under the 1997 Electricity Law, investors had a right to receive a reasonable rate of return on their investment, and further, that Respondent has expressly acknowledged its obligation to provide such return. It follows that if it is established that the compensation received by Claimants' PV Plants under the New Regime falls below the threshold of a reasonable return, it would constitute a disproportionate and unreasonable remuneration and thus unfair treatment to Claimants' plants.

732. It is therefore apparent that the analysis of the burden imposed on Claimants' investments (a question on liability) is connected to the impact on the plants' profitability under the New Regime. In this regard, the Tribunal agrees with the *RREEF* tribunal that an

---

[909] BDO Second Report, ¶¶ 286-294.
[910] BDO Second Report, Table 18 "Evolution of the premium on the WACC for the 2007-1016 period within the framework of Royal Decree 661/2007".
[911] BDO Second Report, ¶ 132, referring to BDO Working Papers, Table C.
[912] BDO Second Report, ¶ 132.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

examination of the principles of proportionality and reasonableness is inseparable from an assessment of damages.[913]

733. Since Claimants have presented an "alternative damages calculation" which is based precisely on such reasonable rate of return, it is clear that the main difference among the Parties lies in connection with the amount, which is a result on the use of different elements or assumptions used to determine such rate.

734. The Tribunal notes that until the New Regime was put in place, the calculation of the "reasonable rate of return" was unnecessary, since the FIT was higher (*i.e.*, higher than what was offered in the New Regime).

735. In assessing the reasonable rate of return it is important to recall that the New Regime set a target return of 7.398% pre-tax. It is clear that such target does not necessarily constitute a reasonable rate of return for Claimants' PV plants. To examine the question of proportionality it is necessary to assess the impact to individual plants, which is consistent with the approach taken by the regulator when designing the special regime under Law 54/1997, as acknowledged by the *RWE v. Spain* tribunal.[914] Thus, the Tribunal will consider the post-tax rate of return of each of Claimant's PV Plants.

736. To address and determine the question of proportionality, it is necessary to *first* examine what constitutes a reasonable rate of return, *secondly,* how the IRR should be calculated, and *finally,* whether each of Claimants' plants obtained a return above or below that which has been established to be a reasonable rate.

737. As to what constitutes a reasonable return, the Tribunal is guided by the objective under the 1997 Electricity Law to allow investors to "[…] *obtain reasonable rates of return with reference to the cost of money on the money market* […]". Both Parties accept that the reference to be to the cost of capital demanded by markets, commonly calculated by applying the weighted average cost of capital (WACC).

738. The Tribunal notes that Respondent has acknowledged that under the New Regime, RE facilities have the right to "[…] *recover their investment costs, their operation and maintenance costs, and guarantee them a return of around 7.398%*",[915] and that this return should be *pre-tax* over the lifetime of the installation. Spain adds a caveat, however, and indicates that if the prior earnings were above sum percentage, then the prospective

---

[913] **RL-0122**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 523.

[914] **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 586: "*In examining the issue of proportionality, the Tribunal considers it necessary to look at the impacts to individual plants, and notes that this is consistent with the approach of the Respondent in establishing the Special Regime in Law 54/1997*".

[915] Resp. C-Memorial, ¶ 1323. This, in accordance with the Third Final Provision of Act 24/2013, of 26 December, the specific figure for the facilities already put into operation is around 7.398% of return on the whole project for a standard facility, as described in Section IV.G.3 of this Memorial. (**R-0041**, Royal Decree-Act 9/2013, of 12 July), as stated in footnote 874.

reasonable rate of return could be reduced to bring the overall rate of return in line with the target (*i.e.*, a *claw-back*).

739.  Turning to the question of what constitutes a reasonable post-tax rate of return, and having reviewed the evidence in the record, the Tribunal considers that the Original Regime provided a target return of around 7% *post-tax*.[916] This is in line with the approach adopted by the *PV Investors* and *REEFF* tribunals.[917]

740.  The Parties disagree as to how the target 7.398% pre-tax should translate into a post-tax return. Claimants maintain that the New Regime fixed a return of 7.398% equates to an after-tax return of 5.950%.[918] This is calculated with reference to the investment costs of a *standard* installation. The New Regime, they argue, implies a 1.050% reduction in the after-tax return implied in the RD 1578/2008 tariffs.[919] Thus, the return proposed by Claimants is 7% *after-tax* return, which Brattle contends equals an 8.7% *pre-tax* return. Brattle derives the effective tax rate and the pre-tax return equivalent, assuming a 25-year regulatory lifetime and all-equity financing, consistent with the original assumptions of the CNE and the Ministry in 2008.[920]

741.  Respondent, on the other hand, states that a 7.398% *pre-tax* under the New Regime is equivalent to 6.869% *after-tax* return and contends that this implies a small difference of only 0.131% with the 7.0% defined in RD 1578/2008.[921]

742.  As is evident to the Tribunal, the difference between the Parties lies primarily on the effective tax rate. Whereas Brattle applies an effective tax rate of 19.6% which represents an average effective tax rate across all of Claimants' plants. BDO applies a tax rate of 7.14%. The difference between their respective expert calculations appear to evolve around the issues of (a) depreciation applied to each PV Plants and (b) the tax deductibility of shareholder financing.

743.  In the case of Brattle, the rate is based on the level of depreciation of the plants of 25 years, which according to Claimants reflects the regulatory lifetime of the plants. Brattle considers a straight line of depreciation for the PV Plants over a 25-year period. For BDO,

---

[916] The PER 2005-2010 defined the return on *standard* installations to be calculated around 7% with equity and "after taxes".  The KPMG report, May 2012 noted "*reasonable rate of return shall be defined as profitability of 7% (before financing) and after taxes, which is the reference value used in the PER 2005-2010 and used by the CNE in its reports*"; Second BDO Quantum Report, ¶ 132; **C-0054**, CNE Report 30/2008, 29 July 2008; **C-003**, 2000-2010 Plan for the Promotion of Renewable Energies; First Brattle Regulatory Report, ¶ 195; First BDO Report, ¶ 299.

[917] **RL-0147**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, ¶ 709 and 754; and **RL-0122**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 588-589.

[918] Second Brattle Quantum Report ¶ 204.

[919] Second Brattle Quantum Report, ¶ 204.

[920] Second Brattle Quantum Report ¶ 203.

[921] First BDO Quantum Report ¶ 299.

the rate is based on a depreciation period of 15 years. BDO states that Claimants *could* apply a linear amortisation 14-years period allowed by the relevant tax regulations.[922]

744. In the Tribunal's view, BDO fails to identify whether the period of depreciation is improper, and simply identifies an option available under tax regulation, an option which Claimants have not elected to take. Thus, this Tribunal believes the period to consider should be 25 years.

745. BDO challenges the fact that Claimants fail to consider the tax benefit of interest associated with the participation loans contributed by the shareholders, which it contends should be considered as net assets because these are financing with shareholder equity that generate interest that is tax deductible on corporation tax. The argument of Spain's expert does not point out any improper accounting or tax election made by Claimants, and simply concludes that "[…] *an investment financed 100% with shareholder equity can have part of these funds contributed through equity loans, which would confer significant tax optimization.*"[923]

746. BDO explains that tax legislation allows investors to take an accelerated depreciation on the assets, which means that the investor can deduct the value of the asset over a shorter period. Respondent argues that it is necessary to factor in the tax benefit of the shareholder loan in order to get to the proper post-tax return of the PV installations, otherwise the investors would end up with a greater return through "financial engineering".[924]

747. Brattle challenges the determination made by BDO to the effect that PV plants under the New Regime earn an after-tax IRR of 6.869% and claims that this is consistent with the 7% after-tax return underlying the RD 1578/2008 FIT. Brattle asserts that BDO "*compares apples and oranges*", adding that the 6.869% after-tax IRR is not comparable to the 7% after-tax return because BDO calculates the 6.869% assuming that plants have debt financing, whereas the original 7% after-tax target assumed all-equity financing..

748. Claimants' expert argues that BDO erroneously assumes that the PV Plants have debt financing, and that debt financing provides an interest tax shield which reduces the taxes paid by a project which thereby increases the project IRR,[925] but Brattle ignores the interest tax shield, because it argues that Spain originally defined the returns under the Original Regulatory Regime as "own equity (before financing)."[926] Claimants contend that a consistent comparison requires comparison of the 7% return target to an after-tax return under the New Regulatory Regime that assumes all equity financing, and thus does not

---

[922] BDO Second Report, ¶¶ 127-128.
[923] BDO Second Report, ¶¶ 129-131.
[924] June Hearing, Tr. Day 4, p. 162:5-11 (Mitchell).
[925] Second Brattle Quantum Report ¶ 14. Brattle explains that there are several ways to compute the rate of returns. One approach to computing the return is the "project IRR". The other one is the "equity IRR" which computes the returns implied for shareholders. Given that the Government of Spain considered a project IRR when designing the original and new regimes. The Tribunal considers appropriate to reference the target rate of return on the basis of the project IRR. Brattle further indicates that Appendix C to its Report replicates the all equity (before financing) IRR calculations performed in the PER 2005-2010 and confirms that they exclude the interest tax shield. *See id.*, ¶ 75.
[926] Second Brattle Quantum Report, footnote 81.

include the interest tax shield. This is the reason their Report translates the 7.398% allowed pre-tax return under the New Regime to an after-tax equivalent using an effective tax rate of 19.6% by considering all-equity financing.

749. It is clear that if stockholder financing was used, the relevant company may have had the benefit of the tax deduction on the interest paid. But the Tribunal does not have certainty that such financing exists, and therefore that there is the alleged benefit that a tax shield has been claimed.

750. Since the Tribunal has accepted a straight line of depreciation for the PV Plants over a 25-year period, and absent information to counter the allegations that the PV Plants have debt financing and take the benefit of a tax shield, the Tribunal is willing to accept the 19.6% average tax rate across all of Claimants' PV Plants as proposed by Brattle.

751. The Tribunal also notes that even under BDO's assessment, it appears that at least the Valtierra II Plant did not reach the 7.398% pre-tax as acknowledged by Respondent's expert.[927] However, with respect to the rest of Claimants' plants the Tribunal is unclear as to the actual IRR for each PV Plant.

752. Based on these assumptions, the Tribunal concludes that the New Regime resulted in a post-tax reasonable return below the targeted post-tax return of 7% under the Original Regime.[928] In this respect, the New Regime has failed to maintain the reasonable rate of return ensured to Claimants under the 1997 Electricity Law and finds the Disputed Measures in breach of Article 10(1) of the ECT.

753. However, the Tribunal is cautious in this conclusion. It is subject to confirmation that no such equity financing existed in Claimants PV Plants. Should the information available to the Tribunal change, and the assumption on which the Tribunal based its conclusion vary, the Tribunal's conclusion will vary as well.

754. In this connection, the Tribunal recalls that both Claimants and Respondent agree on a principle that damages should cover reparation of the actual damage suffered by Claimants, should a breach exist. In the words of the *PV Investors* tribunal:

> *"As a matter of law, compensating the Claimants for taxes they have not paid would be contrary to the principle that reparation cannot exceed the harm effectively suffered. In other words, one cannot do better in litigation than in real life."*[929]

755. In assessing whether the reduction in earnings makes the measures disproportionate, the Tribunal agrees with the decision by the *RREEF* tribunal. It noted that investors:

---

[927] BDO Second Report, Table 11.
[928] Estimated return by CNE under RD 1578/2008.
[929] **RL-0147**, *The PV Investors v. The Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, ¶ 792.

> *"while entitled to compensation for unreasonable return on their investments – if established -, the Claimants cannot claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent; they can only get compensation to the extent that such decrease is below the threshold of a reasonable return."*[930]

## H.  ALLEGED BREACH TO THE UMBRELLA CLAUSE

756.  The last sentence of Article 10(1) ECT provides: "Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."[931]

### (1) The Parties' Positions

#### a.  *Claimants' Position*

757.  Claimants contend that Respondent has violated the umbrella clause of the ECT. Claimants note that the purpose of an umbrella clause is to "*bring the host State's compliance with commitments assumed vis-à-vis investors under the protective 'umbrella' of the ECT.*"[932]

758.  Claimants contend that the plain language of the umbrella clause in the ECT does not make a distinction between contractual obligations and legislative or regulatory undertakings, and is broad enough to encompass "*unilateral obligations, legislation and government acts relating to an investor's investment.*"[933]

759.  Claimants argue that the ECT provision does not distinguish between contractual obligations and legislative/regulatory undertakings. It has a broad character to it, and so it applies to obligations of the host State that have been assumed unilaterally by means of legislation or executive acts.[934] On this view, the meaning of the umbrella clause in the ECT is not restricted to contractual obligations. Claimants argue that commitments may be made to investors in the form of binding legal obligations towards investors by means of general legislation.

760.  In support of their argument that Article 10(1) of the ECT, last sentence, is sufficiently broad to include unilateral obligations, legislation and government acts that related to an

---

[930] **RL-0122**, *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S. á r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 523. The *RREEF* tribunal then determined that the relevant measure to calculate the reasonable return is the project IRR. The tribunal found that the reasonable post-tax rate of return was WACC plus 1%. It set the reasonable rate post-tax of each "concentrated solar power" plant at 6.86%, *id.*, ¶ 589.
[931] ETC, Art. 10(1).
[932] Cl. Memorial, ¶ 341. June Hearing, Tr. Day 1, 103:7-14 (Sullivan).
[933] Cl. Memorial, ¶ 348.
[934] Cl. Memorial, ¶¶ 342-348; Cl. Reply, ¶ 592.

investor's investment, they offer several kinds of authority: a report by UNCTAD; ICJ decisions and in particular the *Nuclear Tests Case*; and several arbitral awards.[935]

761. As further authority, Claimants cite two Argentinian cases, *LG&E v. Argentina*[936] and *Enron v. Argentina*[937]. In the former case, the tribunal found that guarantees, as set forth in a statute and its implementing regulations and subsequently included in promotional material for privatisation aimed at foreign investors, were legal obligations falling within the scope of the umbrella clause. In the latter case, Claimants find support in the finding by the tribunal that Argentina had reneged on certain obligations undertaken in relation to claimants' investments. This applied to the terms of certain contracts but also certain unilateral undertakings that were set out in the energy sector laws and regulations. The "obliteration" of these commitments was again found to be a violation by Argentina of the umbrella clause in the relevant BIT.

762. A further Argentinian case is cited in support of this view of the scope of the umbrella clause: *Sempra Energy International v. Argentine Republic*.[938] In this case, the tribunal held that Argentina had entered into certain obligations in relation to Sempra's investment by means of legislative acts and the terms of gas distribution licences entered into with companies in which the claimant held and equity interest. They fell within the scope of the protection of the umbrella clause.

763. Claimants dismiss Respondent's reliance upon the *Noble Ventures v. Romania* award to argue that umbrella clauses would in fact refer to investment contracts alone.[939] Claimants take the view that the tribunal's findings in that case were made in a very specific context in which Romania contended that the relevant provision did not apply to elevate contract breaches to treaty breaches.[940] It is Claimants' position that the statement made by the *Noble Ventures* tribunal does not support Spain's argument that the umbrella clause is not applicable to obligations other than those arising out of contracts, as the analysis of the *Noble Ventures* tribunal was precisely limited to contractual obligations.[941] Claimants also dismiss Respondent's reliance on international case law to limit the umbrella clause application to contractual obligations including *SGS v. Philippines*, *AES Summit v. Hungary*, and *Enron v. Argentina*, *LG&E v. Argentina* and *Sempra v. Argentina*.[942]

---

[935] Cl. Reply, ¶ 593.

[936] **CL-047**, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. The Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 175.

[937] **CL-034**, *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 274.

[938] **CL-073**, *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007, ¶¶ 312-314.

[939] Cl. Reply, ¶¶ 594-595.

[940] Cl. Reply, ¶ 594; **RL-0025**, *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, ¶ 51.

[941] Cl. Reply, ¶ 595.

[942] Cl. Reply, ¶ 596; **CL-150**, *SGS Société Générale de Surveillance S.A. v. The Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004, ¶ 121; **RL-0029**, *AES Summit Generation Limited and AES-Tisza Eromu Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010.

171.

764. Claimants reject the theory advanced by Respondent, based on certain of Professor Wälde's, writings that, because umbrella clauses have been referred to as "*pacta sunt servanda* clauses", they only protect contractual obligations.[943] Claimants note that Spain's interpretation of the comments in this article is misplaced since it is inconsistent with Professor Wälde's own "recognition that some commitments can be unilateral in nature".[944] Claimants also contest Respondent's citation of the ECT Reader's Guide, which does not seek to limit the sources of the obligations covered by the umbrella clause to contractual commitments.[945] In Claimants' view, *Blusun v. Italy* and *Charanne v. Spain* shed no light on the umbrella clause issue, and therefore, Respondent's reliance on those awards is irrelevant.[946]

765. Claimants' argument is that Respondent made specific commitments through RD 1578/2008 by which it recognized the application of the regulatory regime under RD 661/2007 to PV installations for their first 25 years of operation.[947] Such commitments were also reflected in the relevant RAIPRE certificates issued by the Government for each of the plants, amounting to a specific commitment between investor and State.[948] These are alleged to be binding obligations on Spain towards Claimants' investment. The new legislation Spain introduced departed from these commitments, removing the entire regulatory regime under RD 1578/2008 for future and existing installations. Specific examples of commitments are offered by Claimants: Article 11 of RD 1578/2008, established a specific FIT in cents per unit of electricity sold; Article 12 of the same Decree envisaged adjustments to the FIT on a quarterly basis but on a prospective basis only.

766. Claimants stress that Spain's argument that the investors can only be entitled to an expectation of a reasonable return "*rests on a strained interpretation of Article 30.4 of the 1997 Electricity Law.*"[949] Claimants say that the remuneration scheme under RD 1578/2008 was established in line with the 1997 Electricity Law but the term of "*reasonable return*" was not intended to be a cap or allow for a change in remuneration for existing facilities as Spain did with the Disputed Measures.[950]

767. In any event, Claimants argue, even if Spain's only obligation in favour of RE investors was to provide a "*reasonable rate of return,*" the Disputes Measures breach that obligation as the return in FIT schemes is "*significantly lower*" than that under the Special Regime (7% after tax under RD 1578/2008).[951]

---

[943] Cl. Reply, ¶ 598.
[944] Cl. Reply, ¶ 598; **RL-0042**, T. Wälde, "The 'Umbrella' Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases" (2005) Journal of World Investment & Trade 183, p. 214 and footnote 121.
[945] Cl. Reply, ¶ 598; **RL-0040**, Energy Charter Secretariat, "The Energy Charter Treaty: A Reader's Guide" (June 2002), p. 26.
[946] Cl. Reply, ¶ 599.
[947] Cl. Memorial, ¶ 349.
[948] Cl. Reply, ¶ 591. Second Hearing, Tr. Day 1, 79:19-80:6 (Sullivan).
[949] Cl. Reply, ¶ 602.
[950] Cl. Reply, ¶ 602.
[951] Cl. Reply, ¶ 603.

768. In summary, Claimants submit that a commitment was established between Spain and the investors and their investments through the decree RD 1578/2008, which recognised the application of the RD 661/2007 regulatory regime to the PV plants for the first 25 years of operation. The legal obligations entailed by this commitment were breached by a series of measures taken by Spain (the Disputed Measures): specifically, a series of laws were introduced that first modified the regulatory regime under RD 1578/2008 and then swept it away entirely with retroactive effect. So, Spain breached the umbrella clause under Article 10(1) ECT[952]. Claimants argue that these "drastic changes" applied retrospectively to existing plants, had the effect of stripping away the applicable regime, and thus violated Spain's commitments under RD 1578/2008, amounting to a "clear violation" of the umbrella clause of the ECT.[953]

### b. *Respondent's Position*

769. Respondent denies that it has breached the "so-called 'umbrella clause'" of the ECT.[954] It has two main objections to Claimants' arguments: the first is that Claimants' interpretation contradicts the literal sense of Article 10(1) of the ECT, as well as related doctrine on its interpretation and arbitral precedents, and is contrary to the concept commonly found in international law; and the second is that Spain is not bound to Claimants or their investment through unilateral acts, such as RD 1578/2008.[955]

770. Respondent interprets the wording of Article 10(1) in a more restrictive manner than Claimants do. Claimants' understanding that the last sentence of Article 10(1) leads to the application of an umbrella clause that would encompass "any" obligation evidences a "lack of understanding" of the provision.[956] First, it claims that the words "has entered into" applies to the State's assumption of specific obligations regarding a certain investor or a certain investment, and argues that this implies a bilateral relationship with the investor or investment, or a unilateral act aimed specifically at that investor or its investment, establishing a specific bilateral relationship. Respondent refers to the tribunal's remarks in *Noble Ventures v. Romania*, where a similar clause was considered in the US-Romania BIT, where the tribunal stated that:

> "[t]he employment of the notion 'entered into' indicates that specific commitments are referred to and not general commitments, for example by way of legislative acts. This is also the reason why Art. II (2)(c) would be very much an empty base unless understood as referring to contracts".[957]

---

[952] Cl. Memorial, ¶ 349.
[953] Cl. Memorial, ¶ 353.
[954] Resp. C-Memorial, ¶¶ 1288-1331; Resp. Rejoinder, ¶¶ 1307-1338. *See* June Hearing, Tr. Day 1, 255:12-19 (Gil Nievas), and Second Hearing, Tr. Day 1, 205:21-206:5 (Gil Nievas).
[955] Resp. C-Memorial, ¶ 1289.
[956] Resp. C-Memorial, ¶ 1290-1291.
[957] Resp. C-Memorial, ¶ 1291; **RL-0025**, *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, ¶v. 51.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

771. In Respondent's view, "it is difficult not to regard this as a clear reference to investment contracts."[958]

772. Respondent also draws support from the SGS v. Philippines award and cites the tribunal's finding that "[t]he host State must have assumed a legal obligation, and it must have been assumed vis-à-vis the specific investment-not as a matter of the application of some legal obligation of a general character."[959] Citing the award of CMS v. Argentina, Spain argues that an essential element of the umbrella clause is that the obligation "must exist in accordance with the domestic law of the state that receives the investment".[960] Spain also highlights that the obligation must have been entered into with the investor.[961]

773. Respondent argues that this analysis of the case law and the wording of the ECT text imply specific commitments rather than general ones such as are implied by legislative acts. This counters Claimants' reliance upon "any" in the ECT text as the basis for inclusion of RD 661/2007 and RD 1578/2008 as commitments specifically agreed with Claimants. Respondent concludes that the obligations of the State have to be specific and have to be assumed by the State in relation to a particular investor if they are to be included within the scope of the umbrella clause.[962]

774. Further, Respondent argues that litigation arising about the interpretation and scope of umbrella clauses has been raised in almost all cases about contracts that have been concluded between State and investor and not with respect to the legal framework of the receiving State. That suggests an exclusion of legislative acts from the scope of the umbrella clause.

775. Respondent makes a supplementary argument about the obligations eligible to be covered by the ECT's umbrella clause: the obligation must have been contracted with a foreign investor. Neither RD 661/2007 or RD 1578/2008 contain regulations, they argue, that are specifically aimed at attracting the foreign investor and its investment, in contrast to the approach taken by the Argentine government in several cases cited by Claimants.

776. Respondent presents an analysis of the interpretation of Article 10(1) of the ECT, and argues that a consensual relationship between State and the investor or investment is required. This can be described as a '*pacta sunt servanda*' clause. They cite *AES Summit*

---

[958] Resp. C-Memorial, ¶ 1291, citing **RL-0025**, *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, ¶ 51. Also cited in **CL-043**, *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration SCC V 2013/153, Award, 12 July 2016, ¶¶ 767-771; and **RL-0122**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. Spain*, Decision on Responsibility and on the Principles of Quantum, ICSID Case No. ARB/13/30, 30 November 2018, ¶ 284.

[959] Resp. C-Memorial, ¶ 1292, citing **RL-0024**, *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, ¶ 121.

[960] Resp. C-Memorial, ¶ 1294; **RL-0027**, *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 25 September 2007.

[961] Resp. C-Memorial, ¶ 1295.

[962] Resp. C-Memorial, ¶ 1296.

*Generation Limited v. Hungary*, which rejected the proposition that an investor could base a claim on this provision of Art 10(1) ECT observing:

> *"This Tribunal cannot rule on the scope of contract obligations and consequently cannot determine if the Claimants' contract rights under the 2001 Settlement Agreement – and the 2001 PPA – were eviscerated because it has no jurisdiction to do so."*[963]

777. Respondent refers to the ECT Reader's Guide issued by the ECT Secretariat and notes that the last sentence of Article 10(1) of the ECT is included under the heading of "individual investment contracts" and its scope is defined through the international principle of *pacta sunt servanda*.[964] Further, Spain emphasizes Claimants' "*lack of understanding of the very essence of the umbrella clause*" referencing Professor Waelde's statement that "[*t*]*he umbrella clause and investment treaties target an abuse of the state when situated in its dual role as both contract party and regulator*."[965]

778. Respondent observes that Claimants have failed to provide a single ECT precedent in support of the theory that specific commitments "entered into" by the State with investors can be derived from general rules. It notes that Claimants cite international decisions that apply treaty instruments very different from the ECT and Article 10(1). These are not relevant, Respondent argues.[966]

779. The same judgment is applied by Respondent to the various cases based on the US-Argentina BIT, cited by Claimants, since in such cases the relationship is between the State and investors by way of concessions or licences.[967] Moreover, these awards have been qualified or rejected by review bodies. Respondent also notes that a difference between the awards in Argentine cases referred to by Claimants and the current case is the direct relationship between the investor and the State through the legal medium of an administrative concession or licence, which determines a specific relationship between the two. This severely limits analogies between the regulatory regimes of Argentina and Respondent.[968]

780. In any event, Respondent argues, Claimants have failed to prove that the umbrella clause requirements set by case law have been satisfied in this case.[969] Namely, Claimants have

---

[963] Resp. C-Memorial, ¶ 1299, citing **RL-0029**, *AES Summit Generation Limited and AES-Tisza Eromu Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶ 9.3.4.

[964] Resp. C-Memorial, ¶ 1297; **RL-0040**, "The ECT: A Reader's Guide," June 2002, p. 26.

[965] Resp. C-Memorial, ¶ 1298; **RL-0042**, "The 'Umbrella' Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases", Wälde 2005, HEINONLINE 6 J. World Investment & Trade 183 2005, p. 226.

[966] Resp. C-Memorial, ¶ 1304.

[967] Resp. C-Memorial, ¶ 1306; **CL-034**, *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007; **CL-073**, *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007; **CL-047**, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006.

[968] Resp. C-Memorial, ¶ 1308.

[969] Resp. C-Memorial, ¶ 1311.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

not shown that the unilateral obligations are specific and public; have been contracted into repeatedly; have unequivocally promised a certain treatment to foreign investors; have been relied on by foreign investors for their investments; and have not been revoked before signing the contract with the investor.[970]

781. With respect to the legal framework, Respondent argues that none of it contains obligations covered by the umbrella clause in the sense that none of the measures generated an obligation entered into directly with Claimants or their investment: Law 54/1997, RD 2818/1998, RD 436/2004, RD 661/2007 or RD 1614/2010. These are regulations addressed to the general public and were not adopted to promote foreign investment in Spain. They cite the *Charanne* and *Isolux* awards in support of this.[971]

782. Further, they argue that registration in RAIPRE has not generated an obligation entered into towards Claimants or their investment since it is applicable to all electricity generators and lacks any specific link to any particular investor. It is therefore not, in Respondent's view, covered by the umbrella clause.[972]

783. Even if Spain were to accept Claimants' argument that the Government entered into commitments through RD 661/2007 and RD 1578/2008, Respondent contends that said commitments would be limited to applying the relevant legal regime in its entirety and not RD 661/2007 and RD 1578/2008.[973] Spain draws support from the Spanish Supreme Court decisions to argue that, under Spanish law, a regulatory provision can establish the inviolability of a certain level of specific benefits or the indefinite durability of formulas used for fixing bonuses.[974] In that sense, the only obligation generated by Spanish legislation in favour of RE generators is "*to obtain, in addition to the priority access and dispatch, a 'reasonable rate of return' for their investment*", as interpreted by the Supreme Court.[975]

784. According to Spain, an analysis of the case law and doctrine on this issue reflects that legislative acts are excluded from the scope of the umbrella clause.[976]

785. Spain also takes the view that Claimants were fully aware that the energy sector is a regulated industry and thus subject to national and EU changes; a business risk that Claimants consciously assumed.[977] This is expressly recognised by the *Blusun* tribunal in its finding that:

---

[970] Resp. C-Memorial, ¶ 1311.
[971] Resp. C-Memorial, ¶ 1316; **RL-0036**, *Charanne B.V. and Construction Investment S.A.R.L. v. The Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, ¶¶ 494, 504, 505; **RL-0010**, *Isolux v. The Kingdom of Spain*, SCC Arbitration No. V2013/153, Award, 12 July 2016.
[972] Resp. Rejoinder, ¶¶ 1333-1335. June Hearing, Tr. Day 1, 255:12-19 (Gil Nievas).
[973] Resp. C-Memorial, ¶ 1317.
[974] Resp. C-Memorial, ¶¶ 1319-1321; **R-0092**, Judgment from the Third Chamber of the Supreme Court, Third Legal Ground, 25 October 2006 (App.12/2005).
[975] Resp. C-Memorial, ¶ 1322.
[976] Resp. C-Memorial, ¶ 1296.
[977] Resp. C-Memorial, ¶ 1324.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

> *"International law does not make binding that which was not binding in the first place, nor render perpetual what was temporary only. In the present case, the expectations are even less powerful because European law had already lowered them: it was clear that the incentives offered were subject to modification [...]*
>
> *In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted [...]. These considerations apply even more strongly when the context is subsidies or the payment of special benefits for particular economic sectors."*[978]

786.  Moreover, Respondent supports its position citing to the findings in the *Perenco v. Ecuador* case:

> *"[w]here a State has duly considered a legislative/regulatory policy [...] governmental decisions taken thereafter must, during the lifetime of such contractual arrangements maintain fidelity to that policy framework. This is not to say that the policy framework is frozen and cannot be changed because this is not so unless the State has expressly stabilised its law* vis-à-vis *its contractual counterparty."*[979]

787.  Likewise, Spain refers to the findings in *Plama* where the tribunal concluded that "*the ECT does not protect investors against any and all changes in the host country's laws.*"[980] Spain also relies on Professor Wälde's writing in which he states that "*the umbrella/sanctity of contract clause may not 'freeze' applicable law, as some stabilization clause provisions purport to do, but that it prevents the State from invoking its sovereign and regulatory powers in an abusive way to escape from contractual commitments assumed earlier.*"[981]

**(2) The Tribunal's Analysis**

788.  Claimants have argued for a broader interpretation of the last sentence of Article 10(1) of the ECT in this respect: that the obligations assumed are not restricted to contractual obligations but may extend to unilateral undertakings such as those following from national laws whether as foreign investment legislation or administrative action aimed at the investment. As Claimants note, there is a body of legal scholarship and case law that

---

[978] Resp. C-Memorial, ¶ 1325; **RL-0061**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016.
[979] Resp. C-Memorial, ¶ 1326; **RL-0062**, *Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and on Liability, 12 September 2014.
[980] Resp. C-Memorial, ¶ 1327; **RL-0003**, *Plama Consortium Limited v. the Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008.
[981] Resp. C-Memorial, ¶ 1328; **RL-0042**, "The 'Umbrella' Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases," Wälde 2005, HEINONLINE 6 J. World Investment & Trade 183 2005, p. 200.

appears to support a view that where an administrative or legislative promise was intended to induce an investment and was the main reason why it was made, it may qualify as a commitment for the application of the umbrella clause. Respondent also seems to interpret the sentence as requiring a consensual relationship rather than a particular form of contract.

789.  The Tribunal notes that some tribunals have interpreted the umbrella clause broadly to include not only contractual commitments but also commitments contained in legislative instruments enacted by host States.[982]

790.  However, the question for this Tribunal is not whether obligations in the sense of Article 10(1) of the ECT can arise from legislative or administrative undertakings in the relationship between foreign investors or their investment on the one hand, and the host State on the other. The question is rather whether consensual obligations were entered into by Respondent in the sense of Article 10(1) of the ECT.

791.  Although the Tribunal acknowledges that the RAIPRE registration was only available once the investor had fulfilled the substantial condition of construction of the plant, and registration was a formal condition to receiving the benefits under law, this requirement had an administrative character or nature. Rather than creating an obligation the investor and Spain "*entered into*", it simply represented a domestic registration within an administrative procedure. In this regard, the Tribunal agrees with the approach and reasoning of the *RWE v. Spain* tribunal:

> "*[...] While [the RAIPRE certificates] were indeed signed, stamped and issued by Spain to RWE's installations, the Respondent is correct in stating that such certificates did not constitute a commitment from the Government to maintain indefinitely a future rate of return. The nature of the legal obligations engaged as a matter of registration in the RAIPRE is a matter of Spanish law, and the Claimants have failed to establish that, as a matter of such law, consensual obligations were entered into by Spain. The Claimants also refer to the July 2010 'agreement' but, even assuming in the Claimants' favour that this generated consensual obligations that remained valid in 2013-2014 (which the Tribunal does not accept), the 'agreement' was not 'entered into with' the Claimants or their Investments.*"[983]

792.  In the Tribunal's view the words 'entered into' in Article 10 (1) imply not only a degree of specificity, but also a consensual or bilateral obligation, which does not exist in the arguments of Claimants. Therefore, the Tribunal rejects the 'umbrella clause' claim.

---

.
[983] **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34. Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶ 670.

## I. CONCLUSIONS REGARDING LIABILITY

793. In light of the above analysis on the alleged breaches by Respondent to its obligations under Article 10(1) of the ECT, the Tribunal concludes, with a partial dissent of Prof. Peter D. Cameron, as follows:

(a). Claimants' claims regarding the stability of the legal framework are rejected. The Tribunal concludes that no specific legal commitment was made in favour of Claimants and no stable conditions were promised by any Spanish competent authority. The policy of reducing the remuneration to existing PV plants to correct the economic imbalance of the SES and deal with the Tariff Deficit was rational, and that there is a rational correlation between the public policy objective and the Disputed Measures.

(b). Claimants' claims on legitimate expectations are rejected. Except as indicated below, other expectations of Claimants were not reasonable or justified because Claimants should have known at the time of their investment that there was no unalterable *right* to receive a fixed tariff for 25 years under the legal framework for renewable sources.

(c). Claimants' claims of lack of transparency are rejected. The Tribunal is satisfied that proper reasonable procedures were followed by Respondent for consultation prior to the enactment of the Disputed Measures, which were promptly published and made available in accordance with Spanish law.

(d). In respect to the claims of unreasonable conduct, these are rejected, save for the *claw-back* provision. The retroactive application of the Disputed Measures should not have an adverse effect on future remuneration of Claimants' PV plants, *i.e.*, they cannot claw-back remuneration that was legitimately obtained under the previous regime and, as such, is inconsistent with the principle of requirement of fairness in Article 10(1) of the ECT.

(e). As to the issue of proportionality, the Tribunal concludes that although the measures enacted by Respondent to fix the Tariff Deficit had a valid policy goal, and a rational relationship existed between the public policy objective and the measure adopted to achieve it, the measures were not proportionate insofar as they failed to maintain the reasonable rate of return ensured to Claimants under the primary legislation.

(f). Finally, the 'umbrella clause' claim is rejected. The Tribunal does not find any obligation "entered into" among Claimants and Respondent, whether of a contractual or other nature, that could be deemed to have been breached under the so-called "umbrella clause" found in the last sentence of Article 10(1) of the ECT.

## VII.   DAMAGES

### (1) The Parties' Positions

#### a.   *Claimants' Position*

794.   Claimants contend that they are entitled to reparation in accordance with principles of customary international law, as codified in Article 31 of the ILC Articles. Reparation, whether restitution or compensation, must "*as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act has not been committed*", and that a State is obliged to make "make "*full reparation for the injury caused by the internationally wrongful act.*"[984]

795.   Claimants further contend that they are entitled to the restitution of the Original Regime under which the investments were made, and that Spain is obliged to effect restitution by withdrawing all the Disputed Measures and placing Claimants under the same legal framework that existed at the time the investments were made. In addition, they add, Spain must compensate Claimants for all losses suffered prior to the reinstatement of the Original Regime.[985] If the Tribunal considered restitution to be materially impossible or disproportionate, they conclude that Spain must pay Claimants compensation for any financially assessable damage, including loss of profits, insofar as this is caused by the Disputed Measures.[986]

796.   Claimants' position in respect to elements to determine the reasonable rate of return, such as the target rate, whether such rate should be before or after applicable taxes, the investment and operating costs of the PV plants, the useful life of the plants for purposes of depreciation, the applicable tax rate, has been addressed above. The Tribunal does not deem it is necessary to repeat in this section, but rather only examine some remaining claims for the calculation of the damages:

797.   Valuation date; and

798.   Tax gross-up on the damages.

799.   As to the <u>valuation date</u>, Claimants contend that it should be October 2016, when they sold the PV Plants, and the date of the sale of the plants is the most natural reference point for estimating damages because it was "*when the Claimants' losses crystallized*".[987] Although Claimants acknowledge that other tribunals have selected June 2014 – date on which the Disputed Measures were instituted by Respondent, Claimants argue that in none of those cases identified by Respondent was the valuation date in dispute.

---

[984] Cl. Memorial, ¶ 355.
[985] Cl. Memorial, ¶ 358.
[986] Cl. Memorial, ¶ 359.
[987] Cl. PHB, ¶ 114-118.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

800. On the subject of a <u>tax gross-up</u> over the amount that could be awarded to Claimants to account for the taxes they could be liable to pay on that amount, Claimants contend that, to achieve full reparation, their damages should include such a tax gross-up. They support their position by stating that the dividends that Claimants would receive from the Spanish PVs would benefit from the EU Participation Exemption, and thus be exempt from Dutch or Luxembourg corporate taxes but, in contrast, an award rendered to Claimants in this arbitration would not qualify for the EU Participation Exemption and would thus be subject to taxes.[988] Claimants propose options to this effect,[989] none of which –in their view– prejudice Spain and state that BDO had acknowledged that once the actual tax position of Claimants had been confirmed, the claim would no longer be speculative.[990]

### b. *Respondent's Position*

801. Respondent does not challenge the principles for compensation for violations by a State under Article 10 of the ECT.

802. As to the <u>valuation date</u>, Respondent submits that case-law supports the position that an *ex ante* date should apply, and that the principle of full reparation contained in *Chorzów* and enshrined in the ILC Articles can only be compatible with the principle of causality if such an *ex ante* date is applied.[991] Further, drawing support from Article 13(1) of the ECT[992], it argues that under the ECT the only valuation date considered is the *ex ante* date.

803. Respondent contends that since the date for the various investments made by Claimants were in June 2010, June 2011 and January 2014, but sold in October 2016, and the Disputed Measures were approved in 2012, 2013 and 2014, the proximity of dates makes any projections calculated by Brattle uncertain and highly subjective.[993]

804. Respondent further argues that the date should be June 2014, which is a date related to the Disputed Measures, and that date of sale of Claimants asset is a free commercial decision taken by Claimants that Respondent has no control over. In addition, it argues that at the June Hearing, Brattle acknowledged that "[…] *most of the instructions they have received so far in similar cases adopted June 2014 as the valuation date and that most of the tribunals used also June 2014 as the valuation date*."[994]

805. In respect to "<u>tax-gross-up</u>", Respondent objects to the concept, finding it as "*absolutely unfounded and speculative*",[995] citing the decisions in *Mobil v. Venezuela* which stated that a claim arising of the risk that other jurisdictions will seek to impose taxes that would have

---

[988] Cl. Memorial, ¶¶ 397-399.
[989] Cl. Reply, ¶¶ 716-718.
[990] Cl. PHB, ¶ 136.
[991] Resp. C-Memorial, ¶¶ 1368-1370.
[992] ECT, Art. 13(1) states *"Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the 'Valuation Date')"*.
[993] Resp. C-Memorial, ¶¶ 1388-1391.
[994] Resp. PHB, ¶ 158, citing June Hearing, Tr. Day 3, 121:17-19 and 130:1-10 (Brattle cross-examination).
[995] Resp. Rejoinder, ¶ 1387.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

been prevented in the absence of a disputed measure is a claim that is "*speculative and uncertain*",[996] and *Abengoa v. Mexico*[997] where the tribunal rejected a petition of claimant that compensation be paid net of any tax contribution. Respondent further contends that Claimants failed to define the nature of their gross-up calculations –which places Respondent in a position of defencelessness– and that the tax measures that may be adopted by the Netherlands and Luxembourg are not attributable to Spain.[998] In addition, it contends that Claimants have not provided any evidence that the nature of the amounts that may be granted a hypothetical conviction award would not be treated as "profit distributions" under Directive 2011/2011/96/EU, headquarters-subsidiary. Finally, Respondent points out that none of the awards handed down thus far in other arbitration proceedings initiated against the Kingdom of Spain by RE investors have granted any tax gross-up to Claimants, citing several cases in that regard.[999]

### (2) The Tribunal's Analysis

806.   As in the case of other tribunals in recent cases involving claims of breach to the ECT as a consequence of the adoption of the Disputed Measures by Spain,[1000] although the Tribunal has found liability on the part of Spain on some of the claims of breach to the ECT, the Tribunal believes it is unprepared to conclude the task of determination of damages with the information at hand, despite the efforts of both the experts to provide relevant information, and those undertaken by the Tribunal to quantify the difference between the reasonable rate of return that Claimants had a right to receive and that established under the New Regime.

807.   Thus, in the spirit of efficiency, the Tribunal believes that it would be best to allow the Parties and their experts to attempt to reach an agreement on a schedule to that end.

808.   Should the Parties reach an agreement on the amount due and payable to Claimants, they should report this to the Tribunal to enable it to issue an Award incorporating such

---

[996] **RL-0102**, *Venezuela Holdings, B.V., Mobil, and others v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award, 9 October 2014.

[997] **RL-0092**, *Abengoa, S.A. and COFIDES, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/09/02, Award, 18 April 2013.

[998] Resp. Rejoinder, ¶¶ 1377-1385.

[999] **RL-0059**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, ¶¶ 453 and 456; **RL-0107**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 657 to 660; **RL-0116**, *Antin Infrastructure Services Luxembourg s.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶ 669 and 671-673; and **RL-0147**, *The PV Investors v. The Kingdom of Spain*, PCA Case No. 2012-14, UNCITRAL, Final Award, 28 February 2020, ¶ 865.

[1000] **RL-0153**, *Eurus Energy Holdings Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶ 460; **RL-0122**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 592; **RL-0146**, *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and certain issues of Quantum, 30 December 2019, ¶¶ 744-745; **RL-0149**, *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, ¶ 616.

agreement and deal with any residual issues identified, including costs, thereby terminating the proceedings.

809. However, in the event the Parties were to fail to reach such agreement within three months after the date of this Decision, either Party may request the Tribunal to decide the outstanding issues in dispute. In such case, the Tribunal will issue a briefing schedule to address any remaining issues under dispute.

810. To enable the Parties and their experts to reach an agreement, the Tribunal advances the essential parameters on the basis of which the reparation should be determined.

811. The target rate of return. 7% after-tax return.

812. Investment and Operating costs. To determine the cost target Brattle adopted the "[…] *standard parameters for the relevant marginal plant (IT-00526, IT-00528 and IT-00536)* […]" with reference to the "marginal plant", which it acknowledges implies taking the most expensive plant on the system that is nevertheless efficient and sets costs in reference to the marginal plant in RD 1578/2008. It asserts that the Ministry's and CNE's after tax return expectations were related for a hypothetical or standard installation and not on actual investments costs incurred by particular investors.[1001]

813. However, Spain's expert argued that determining damages requires treating each of Claimants' PV Plants differently, because each plant should cover investment and operation costs and provide investors with a reasonable return.

814. The Tribunal recalls that Brattle has indicated that the plants have different investment costs depending on whether they are single-axis plants or double-axis plants, and in that respect takes into account that Claimants owned both single-axis plants (the Fontellas Plants and the Tordesillas Plants) and double-axis plants (the Lasesa Plants, the Valtierra I & II Plants and the Valtierra III Plants).

815. Thus, the exercise should take into account the separate characteristics of each of Claimants' PV Plants.

816. Tax rate. The Tribunal accepts the 19.6% average tax rate across all of Claimants' PV Plants as proposed by Brattle, under the assumption that Claimants' PV Plants have no debt financing that translates into a tax shield benefit that lowers this rate.

817. If, however, any of the Fontellas Plants, Lasesa Plants, Tordesillas Plants, Valtierra I & II Pants and Valtierra III Plants owned by Claimants through the various subsidiaries established had debt financing that received a tax shield benefit, this factor shall need to be taken into account individually for each PV Plant, as required, in order to determine the actual tax rate.

---

[1001] Second Brattle Quantum Report ¶¶ 205, 225.

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

818. <u>Date of Valuation</u>. In respect to the date as from which Claimants damages must be valued, Claimants contend that the valuation should be made on the date they sold the PV Plants, which is when they "*crystallised the[ir] losses*"; Claimants argue that this is the most natural reference point for estimating their damages to make them whole. [1002]

819. Since the date of sale of Claimants' PV Plants was a decision taken individually by Claimants, over which Spain had no control, any favourable or adverse effect on the amount of the damage caused by the date Claimants elected to sell should be borne by Claimants. The Disputed Measures were finally adopted in June of 2014 –date on which Spain enacted the final June 2014 Order that culminated with the Disputed Measures– and therefore the Tribunal deems that this is the date for calculation of the damage. The Tribunal notes that other tribunals have utilized the June 2014 date for valuation.[1003]

820. <u>Past Earnings</u>. Past remuneration cannot be clawed-back, and any amount that may have been applied by Respondent in detriment of Claimants should be compensated.

821. <u>Tax Gross-Up</u>. In respect to the claim for a gross-up that is requested by Claimants, the Tribunal rejects any such claim because any income Claimants receive as a consequence of an award that is taxed in a jurisdiction outside of Spain is Claimants' exclusive burden. Spain should not be held accountable to cover taxation on compensation for damages, regardless of whether such compensation should be subject or not to taxation in Claimants' tax residence or in any other jurisdiction.

## VIII.  DECISION

822. For the reasons set forth above, the Tribunal decides, with a partial dissent of Prof. Peter D. Cameron, as follows:

(1)   The Tribunal has jurisdiction to hear the claims of breach of Article 10(1) of the ECT brought by Claimants, save in respect to the tax measure identified in paragraph (2). below, and therefore the remaining six jurisdictional objections of Respondent are rejected.

(2)   The Tribunal lacks jurisdiction to hear the claim of breach of Article 10(1) of the ECT with respect to the TVPEE.

---

[1002] Cl. PHB, ¶ 115, citing **CL-127**, I. Marboe, "Calculation of Compensation and Damages in International Investment Law" (Oxford University Press), ¶ 3.324.  Brattle agreed, *see* June Hearing, Tr. Day 3, 69:14-19 (Brattle Quantum Presentation), and *id.*, 119:12-22 (Brattle Quantum cross-examination).
[1003] Respondent cited, among others, **RL-0116**, *Antin Infrastructure Services Luxembourg s.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018; and **CL-122**, *Greentech Energy Systems A/S, GWM Renewable Energy I S.P.A. and GWM Renewable Energy II S.P.A. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018.

(3)    Claimants did not have a legitimate expectation that the remuneration of RD 1578 would continue to be paid for at least 25 years.

(4)    Respondent breached of Article 10(1) of the ECT by clawing back past remuneration.

(5)    Respondent breached Article 10(1) to the extent that the remuneration of each of the plants failed to ensure payment to Claimants of a reasonable rate of return on their investment during the lifetime of Claimants' PV Plants, as a consequence of the adoption of the Disputed Measures.

(6)    All other claims of Claimants and requests of the Parties are dismissed.

(7)    The Parties are directed to attempt to reach an agreement on the amount of compensation to be paid by Respondent to Claimants in respect to its obligations on post-tax rate of return in accordance with the Tribunal's findings.

(8)    The Parties are directed to attempt to reach an agreement within three months after the date of this Decision.

(9)    Should the Parties reach an agreement, they are directed to so report to the Tribunal in order to enable the Tribunal to issue an Award incorporating such agreement and deal with any residual issues identified, including costs, thereby terminating the proceedings.

(10)    Should the Parties fail to reach an agreement in accordance with paragraph (7) *supra*, either Party may request the Tribunal to decide any outstanding issues in dispute, and the Tribunal will, following consultation with the Parties, fix a calendar for further submissions of the Parties on the outstanding issues relating to damages due to Claimants.

(11)    The decision on the final determination of the damages due is thus reserved and will be fixed in the Award, along with the Tribunal's decisions as to interest and costs.

_____
Prof. Peter D. Cameron
Arbitrator
*Subject to the attached dissenting opinion*

_____
Mr. Luis González García
Arbitrator


_____
Mr. Eduardo Siqueiros T.
President of the Tribunal

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

_____
Prof. Peter D. Cameron
Arbitrator
*Subject to the attached dissenting opinion*

_____
Mr. Luis González García
Arbitrator

_____
Mr. Eduardo Siqueiros T.
President of the Tribunal

ICSID Case No. ARB/16/18
Decision on Jurisdiction, Liability and Directions on Quantum

_____          _____
Prof. Peter D. Cameron                    Mr. Luis González García
Arbitrator                                Arbitrator
*Subject to the attached dissenting opinion*

_____
Mr. Eduardo Siqueiros T.
President of the Tribunal

188.

INFRACAPITAL F1 S.A.R.L and INFRACAPITAL SOLAR B.V. v The Kingdom of Spain
ICSID Case No ARB/16/18

# Partial Dissenting Opinion

# By Professor Peter D Cameron

13 September 2021

## Table of Contents

**Summary** ................................................................................................................... **2**

**Introduction: The Jurisprudential Context of the Spanish Cases** ................................... **3**

**A.    The ECT Requires Contracting Parties to Provide 'Stable Conditions'** ................... **6**
    Energy Investments ........................................................................................................ 7
    What 'stability' means .................................................................................................... 9
    The FET Standard .......................................................................................................... 12

**B.    Legitimate Expectations of Claimant were Breached by the Disputed Measures** ............. **15**
    Legitimate expectations ............................................................................................... 16
    The Stability Assurances Relied Upon .......................................................................... 19
    Assurances continued: The Testimony of Mr Lief ........................................................ 22

**C.    Impairment - The Measures Taken in 2012-14 Constituted a Fundamental Change and a Breach** .................................................................................................................. **29**
    The Character of the Changes Made ............................................................................ 30
    The Tariff Deficit as Defence ........................................................................................ 33

**D.    The Registration Requirement** ..................................................................... **34**

**E.    Conclusions** ................................................................................................. **35**

## Summary

1.  While I am in agreement with my distinguished colleagues on several points in the Decision on Jurisdiction, Liability and Directions on Quantum, I do not agree with some of their conclusions on liability and on the reasoning adopted to reach those conclusions. As a consequence, we differ on matters of quantum.

2.  With respect to the first, matters on which we agree, I share the view of the Tribunal on its finding on jurisdiction: it has jurisdiction to hear the dispute. Further, I agree with the Tribunal on its finding on the TVPEE: it lacks jurisdiction to hear this element of the claim. Finally, I agree with the Tribunal that the Respondent is in breach of Article 10(1) ECT: specifically, I agree that the Claimants were denied a reasonable rate of return (RRR) as legitimately expected according to Law 54/1997, and that the use of a 'clawback' mechanism was a breach of the FET. I agree that for the latter breaches Claimants are entitled to compensation.

3.  For reasons explained below, I do not agree with the Tribunal in its other findings on the merits (Section VI), or the reasoning it has provided to support them. In particular, I differ from my colleagues in five main areas:

    (i)   our understanding of 'stability' in relation to Article 10(1) of the ECT, sentences one and two (section C of the Decision);

    (ii)  our assessment of the legitimate expectations of Infracapital F1 S.A.RL. and Infracapital Solar B.V. in relation to the measures taken by Respondent in 2012-2014 in relation to Claimants' investments and the protection they deserved under the ECT (section D of the Decision);

    (iii) our assessment of the RRR in the 1997 Act, and its relation to subsequent legislation, especially between 2007 and 2011 (section D, ¶ 587, and section F);

    (iv)  our assessment of the justification for the measures taken in relation to the Tariff Deficit ((section F, ¶ 673-674); and finally

    (v)   our assessment of the significance of the registration requirement (section D, ¶ 599 and section H, ¶ 791).

2

4.  Given the above, my views on the damages to be awarded to the Claimants (section VII of the Decision) differ from those of the majority. These views will however only be noted in the dissent since I do not consider their elaboration to be necessary in the light of the majority's findings.

5.  Despite the above noted differences, I acknowledge and accept my duty to work with the Tribunal in the following stages of the process after this Decision.

## Introduction: The Jurisprudential Context of the Spanish Cases

6.  I think it worth noting at the outset that in this matter as in others, the Tribunal is not bound by previous decisions in its approach to the resolution of the dispute, but may nonetheless take relevant cases into account, especially when they are close factually and in terms of the issues that they raise. Previous decisions may be persuasive even though a tribunal will resolve the issues in a claim based on its own independent analysis, rather than on the basis of the decisions of other tribunals"[1]. A confirmation of arbitral discretion and independence seems more appropriate than usual since the Tribunal's Decision follows what is now a long line of awards, decisions and dissenting opinions, all arising from measures taken by the Respondent in 2012-14 with respect to its renewable energy regime. In the course of the arbitral proceedings in this matter, both parties have requested the Tribunal to place new awards, decisions, and dissents on the record, as they have become available, with sequential submissions as to the relevance of the findings and arguments they contain. In addition to the submission of new legal authorities in the post-hearing briefs, additional legal authorities were subsequently added to the record: namely, three awards, three decisions and five

---

[1] Cf. statements to this effect by tribunals in *Suez et al v Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Liability, 30 July 2019, ¶ 189; *EDF International et al v Argentina*, ICSID Case No. ARB/03/23, Award, 11 June 2012, ¶ 1022; *Ioan Micula et al v Romania (II)*, ICSID Case No. ARB/14/29, Award, 5 March 2020, ¶ 352 ("… the closer other cases are to the legal issues and factual circumstances of this case, the more persuasive the decisions in those cases may become. But they have no more weight than that"; *Eskosol S.p.a. In Liquidazione v The Italian Republic*, ICSID Case No ARB/15/50, Award, 4 September 2020, ¶ 278: "(i)n any event, and for the avoidance of doubt, the Tribunal emphasizes that it resolves the pending issues in this claim based on its own independent analysis, and not on the basis of the decisions of other tribunals".

3

dissenting opinions[2]. The Tribunal agreed to these requests. If it had wished to conduct its deliberations in a jurisprudential bubble isolating itself from this evolving case law, it is clear from these requests to update the record that the parties did not want it to do so.

7.   Since the Claimants first registered their claim, the body of jurisprudence has acquired formidable proportions. To my knowledge, there are now 20 awards and 9 decisions taken by tribunals addressing claims arising from these measures[3]. They have been accompanied by 14 dissenting and/or separate opinions[4]. All of this has arisen from

---

[2] ICSID Case No ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, ¶¶ 103-108 (hereinafter 'Decision').

[3] *Charanne B.V. + Construction Investments* v Spain, SCC Case No V 062/2012, Final Award, 21 January 2016; *Isolux Netherlands BV v Spain*, SCC Case V 2013/153, Final Award, 17 July 2016; *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.r.l v Spain*, ICSID Case No. ARB/13/36, Final Award, 4 May 2017; *Novenergia II – Energy and Environment (SCA)(Grand Duchy of Luxembourg) v Spain*, SICAR, SCC Case No. 2015/063, Final Award, 15 February 2018; *Masdar Solar & Wind Cooperatief U.A. v Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018; *Infrastructure Services Luxembourg S.a.r.l. and Energia Termosolar B.V.* v Spain (formerly Antin Infrastructure Services Luxembourg S.a.r.l. and Antin Energia Termosolar B.V.), ICSID Case No. ARB/13/31, Award, 15 June 2018; *Foresight Luxembourg Solar 1S.a.r.l. et al (inc. Greentech) v Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, and Award rendered on 11 December 2019; *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.* v Spain, ICSID Case N. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019 and Award, 31 May 2019; *9REN Holding S.a.r.l. v Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019; *Cube Infrastructure Fund SICAV and others v Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 and Award, 15 July 2019; *SolEs Badajoz GmbH v Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019; *Infrared Environmental Infrastructure GP Limited and others v Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019; *OperaFund Eco-Invest SICAV PLC & Schwab Holding AG v Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019; *BayWa re renewable energy and BayWa re Asset Holding v Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 and Award, 25 January 2021; *Stadtwerke München GmbH, RWE Innogy GmbH and others v Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019; *RWE Innogy GmbH and RWE Innogy Aresa S.A.U. v Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability and Certain Issues of Quantum, 30 December 2019 and Award, 18 December 2020; *Watkins Holding S.a.r.l, Watkins (NED) B.V., Watkins Spain S.L., Redpier S.L., Northsea Spain S.L., Parque Eolico Marmellar S.L. and Parque Eolico La Boga S.L. v Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020; *PV Investors v Spain*, UNCITRAL, Final Award, 28 February 2020; *Hydro Energy 1 S.a.r.l. and Hydroxana Sweden AB v Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020; *Cavalum SGPS, S.A. v Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020; *STEAG GmbH v Spain*, ICSID Case No. ARB/15/4, Decision on Jurisdiction, Liability and Directions on Quantum, 8 October 2020; *FRIEF Eurowind Holdings Ltd v Spain*, SCC Case V 2017/060, Final Award, 8 March 2021; *Eurus Energy Holdings Corporation v Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021.
I note that a further award was issued while this Opinion was being written: it is not part of the record here.

[4] *Charanne*: Dissenting Opinion of Prof Dr Guido Santiago Tawil, 21 December 2015; Isolux (Spanish only): Opinion disidente del Arbitro Prof Dr Guido Santiago Tawil, 6 July 2016; *Foresight Luxembourg*, SCC 2015/150: Partial Dissent by Raul E Vinuesa; *RREEF*: Partially Dissenting Opinion of Professor Robert Volterra to the Decision on Responsibility and the Principles of Quantum, 30 November 2018; *Cube Infrastructure*: Separate and Partial Dissenting Opinion by Prof Christian Tomuschat, 19 February 2019; *OperaFund*: Dissent on Liability and

the same set of measures as are at issue in the present arbitration, as well as the same Respondent and the same treaty, a concentration of legal effort that is almost certainly unique in international investment law. It has raised the level of scrutiny about the meaning of several investment-related provisions of the Energy Charter Treaty (ECT), especially Article 10(1), to a level that is without precedent in the history of that treaty.

8.   It is therefore not surprising that the Tribunal has considered the reasoning and outcomes of previous cases, allowing for differences of fact concerning the timing, manner or type of investment. It has referred to them at many points in its Decision.

9.   With only four exceptions, all of the tribunals to date have found the Respondent liable for a breach of Article 10(1) of the ECT[5]. Among the more recent awards and decisions, tribunals have been influenced in their assessment of claims of a breach by the theory that the core expectation of investors is limited to a reasonable rate of return (RRR). It was evident in *RREEF*, and subsequently, *PV Investors*, *BayWa* and *Cavalum* [6] . It has also been the subject of vigorous criticism by a number of

---

Quantum of Professor Philippe Sands, 13 August 2019; *Stadtwerke*: Dissenting Opinion of Professor Kaj Hober, 20 November 2019; *BayWa*: Dissenting Opinion of Horacio A Grigera Naon, 2 December 2019; *Watkins Holding*: Dissent on Liability and Quantum of Prof. Dr. Hélène Ruiz Fabri, 9 January 2020; *PV Investors*: Concurring and Dissenting Opinion of Charles N. Brower, 28 February 2020; *Cavalum SGPS, SA*: Dissenting Opinion of David R Haigh, 31 August 2020 (12,984 words, 325 paragraphs); *STEAG*: Dissenting Opinion of Pierre-Marie Dupuy (in Spanish), 8 October 2020; *RWE Innogy*: Separate Opinion of Mr. Judd L. Kessler, 1 December 2020; *Eurus*: Partial Dissent of Mr Oscar M. Garibaldi, 17 March 2021.

[5] The exceptions are: *Charanne BV Construction Investments S.A.R.L. v Kingdom of Spain*, SCC Case No V 062/2012, Award, 21 Jan. 2016; *Isolux Netherlands B.V. v Kingdom of Spain*, SCC Case V 2013/153, Award, 17 July 2016; *FREIF Eurowind Holdings (United Kingdom) v Kingdom of Spain*, SCC Case V 2017/060, Final Award, 8 March 2021; *Stadtwerke München et al v Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019. I note, however, that the scope of the breach found in some of the other cases was limited: for example, in *Eurus Energy Holdings Corporation v Spain*, ICSID Case No. ARB/16/4, the breach of Article 10(1) ECT was limited to the "retro-active claw back by Spain, in and after 2013, of subsidies earlier paid…" (¶ 467(c)).

[6] *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 517-524; *The PV Investors v Spain*, PCA Case No 2012-14, 28 February 2020, ¶¶ 649-651, 666-667, 689, 713-715; *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v Kingdom of Spain,* ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum of 2 December 2019, ¶ 614; *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum of 31 August 2020, ¶¶ 162, 180, 197-199, 533, 596-601, 610, 625-626, 629, 631-632, 655; and also in *Eurus Energy Holdings Corporation v Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021, ¶¶ 458-459; *FREIF Eurowind Holdings (United Kingdom) v Kingdom of Spain*, SCC Case V 2017/060, Final Award, 8 March 2021, ¶¶ 525, 538-539, 558-562, 571, 587; and P-M Dupuy, Dissenting Opinion:

distinguished arbitrators in several dissenting opinions[7]. As this partial dissenting opinion will show, I share the doubts about this theory as expressed in both these dissenting opinions, and, expressly or implicitly, in many of the awards to date[8].

10. In this context of arguments and findings made by some of the most able minds in international investment arbitration, it is perhaps worth noting the need for a tribunal to carefully assess the fact pattern in a particular investment claim before making a finding of law. Doctrines have their value but should not obscure the simple truth that among the 'Spanish cases' on various kinds of renewable energy, there are important differences in the facts presented by the many claimants. Even when the influence of this body of jurisprudence is apparent and frequently acknowledged as in this Decision, there is a need to defer to a specific fact pattern and in my view that is what the Decision fails to do.

A.  The ECT Requires Contracting Parties to Provide 'Stable Conditions'

*My understanding of the first two sentences of ECT Art 10(1) and the obligation they give rise to; the importance they give to 'stability' and what that means, especially in the context of the energy sector.*

11. The primary source of law applicable to resolve this dispute is the ECT[9]. In its very first sentence, Article 10(1) of the ECT requires contracting parties "to encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments…". It continues in the second sentence to add that "(S)uch conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment". Interpretation of these two sentences has provoked much discussion among arbitral

---

*STEAG GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/4, Decision on Jurisdiction, Responsibility and Directions on Quantification of Damages, 8 October 2020.

[7] For example, Professor Robert Volterra in *RREEF*, Judge Charles C. Brower in *PV Investors*, Dr. Horacio A. Grigera Naon in *BayWa* and Mr David R. Haigh in *Cavalum*.

[8] For example, *Novenergia II v Spain*, Final Award, ¶¶ 673, 674; *Cube v Spain*, Decision, ¶ 473; *SolEs Badajoz v Spain*, Award, ¶ 443.

[9] Decision, ¶ 488.

tribunals[10]. Clearly, they are linked. However, the ECT is unusual among international investment agreements in expressly giving such weight to the notion of stability in relation to the making of investments. [11] One may ask whether there is a connection between this unusual emphasis and the fact that this is the only treaty instrument explicitly concerned with investment activity in the energy sector. The Tribunal has chosen not to consider this contextual point in their analysis of the relationship between the first two sentences of Article 10(1), and instead to consider 'stability' in a general manner before examining it within the framework of the FET standard in sentence two. While I agree with the Tribunal that the linkage between the first two sentences is evident and the FET standard of protection should be the starting point for the analysis of liability, I consider the wording of the first sentence with respect to 'stable conditions' important to understanding and interpreting that FET standard in a manner that respects the distinct legal character of the ECT.

### Energy Investments

12. Both parties have provided the Tribunal with characterisations of energy investments that inform their understandings of the ECT. For the Claimants, these investments differ from many other types of investments in being capital-intensive with high up-front costs, as well as long-term in character due first to the period required for the investor to receive a return of and on their investment, and due second to their decades-long operating horizons.[12] For the Respondent, this is a "highly strategic and well-regulated sector" in the territories of all the ECT Contracting Parties[13.] For each

---

[10] For example, *BayWa v Spain*, Award, ¶¶ 457-463; *PV Investors v Spain*, Award, ¶¶ 566-571; *Novenergia II v Spain*, Final Award, ¶¶ 642-646; *Antin Infrastructure Service Luxembourg S.a.r.l. and Antin Energia Termosolar B.V. v Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶ 529-530; *Blusun S.A. Jean-Pierre Lecorcier and Michael Stein v Italian Republic,* ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 315, 319; contrast with *Plama Consortium Ltd v Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 163.

[11] For example, in the various Argentine cases that concern energy utilities, the cases based on the US-Argentina BIT could refer to Recital 4 of the Preamble that states: "fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment…", while those brought under the France-Argentina BIT or the UK-Argentina BIT had no comparable point of reference: see *LG&E v Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶¶ 124-125; *Occidental Exploration and Production Company v The Republic of Ecuador*, UNCITRAL Arbitration, Final Award of 1 July 2004, LCIA Case No UN 3467, ¶ 183; *National Grid plc v Argentina*, UNCITRAL, Award, 3 November 2008, ¶¶ 168-170.

[12] Claimants' Memorial on the Merits (hereinafter 'Cl. Memorial'), ¶ 225.

[13] Rejoinder on the Merits and Reply on Jurisdiction (hereinafter 'Resp. Rejoinder'), ¶ 1085.

of the parties to this dispute, the above features provide context for construction of the ECT text, such as its provisions on stability for energy investors and the need for flexibility for states to respond to changes in the public interest[14]. Commentary by scholars cited by the parties, including that of my late colleague, Professor Thomas Waelde, is drawn on to support the special character of these investments[15]. Of course, such tensions between investor requirements and state discretion are no doubt evident in other economic sectors, but I would argue that they are much more evident in the energy sector than in any other, and that the ECT attempts to manage such tensions in a way that contributes positively to the promotion and protection of investments in the territories of its Contracting Parties.[16] The unusual and explicit emphasis on 'stable conditions' in the treaty text is easier to understand in this light.

13.  In all parts of the energy sector, from renewable energy to hydrocarbons and nuclear, the role of the state is pervasive. It facilitates investment, provides regulatory oversight, often provides a variety of guarantees on remuneration, is the ultimate owner of energy resources and sometimes acts directly or indirectly as a participant in the energy activity concerned. Given the strategic interest that any state has in its domestic energy economy, it is hardly surprising that this is a sector in which the state has and retains extensive regulatory oversight. The pervasive role of energy in everyday life of any society underlines this strategic interest of the state. However unremarkable such observations may be, they are worth noting here since they distinguish the energy sector from many other sectors: financial services, information

---

[14] Cl. Memorial, ¶¶ 224-226: "(t)hese particular characteristics make a stable, predictable and transparent legal and regulatory framework a sine qua non for energy investments" (at ¶ 226); Resp. Rejoinder, ¶¶ 1085-1091: "in a sector as strategic as the energy sector, States enjoy a 'margin of appreciation' that should be taken into account by the Arbitral Tribunals when applying the corresponding Treaty" (at ¶ 1090).

[15] Cl. Memorial, ¶¶ 223, 228; Counter-Memorial on the Merits and Memorial on Jurisdiction (hereinafter 'Resp. C-Memorial'), ¶ 1113; Claimants' Reply Memorial on the Merits and Damages and Counter-Memorial on Jurisdiction ('hereinafter Cl. Reply'), ¶ 483; Resp. Rejoinder, ¶ 1078.

[16] This point is made in *Micula*, in several of the Italian renewable energy cases and in some of the Argentine cases. See, for example, *Ioan Micula et al. v Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶¶ 515, 516; *Sunreserve Luxco Holdings S.a.r.l. v The Italian Republic*, SCC Arbitration V (2016/32), Award, 25 March 2020, ¶¶ 684, 685; *Electrabel S.A. v Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.77; *El Paso International Company v The Republic of Argentina*, ICSID Case No. ARB/03/15, Award, ¶ 358; *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v The Argentine Republic,* ICSID Case No. ARB/03/19, Decision on Liability, 30 July 2010, ¶ 236.

technology, and most forms of manufacturing, for example. Yet, despite this pervasive role for the State, private and often foreign capital investment have been actively solicited by States with results that have often been highly successful for both parties, encompassing hydrocarbons and conventional electricity as well as wind and solar power. This pattern of investment flows has been supported by the kind of legal guarantees the ECT drafters assembled in Article 10, and explains at least in part why there is an emphasis on 'stable conditions' for what are typically long-term, capital intensive and frequently cross-border investments. Political risk for such investors is real and has to be anticipated in the legal arrangements for an investment. Several tribunals in cases arising from Spain's Disputed Measures have noted this sensitivity of energy investments to political risk[17], making risk allocation between the parties a matter of great practical importance. At a high level, the ECT tries to manage the political risk facing investors in a way that is compatible with the Contracting States' recognition of sovereignty and sovereign rights in Article 18 (implicitly a right to regulate). In addition to Article 10 (1), there are provisions in the ECT which, as the parties correctly note, recognize and support both the role of stability for investors and which impose some limits on the scope of State power[18].

14. Addressing the object and purpose of the ECT in Article 2, the tribunal in *Plama* found that "a balanced interpretation which takes into account the totality of the Treaty's purpose is appropriate". This means that the long-term relationships in the energy sector promoted by the ECT have to be balanced against the promotion of the economic interests of the contracting parties.[19]

## What 'stability' means

15. The above notion of balance appears in the Tribunal's observation that the notion of stability is "linked to an expectation of continuity and predictability as to future conduct of a State"[20]. However, after noting the other conditions in the first sentence

---

[17] *Watkins*, for example, ¶ 451.
[18] Among the relevant provisions in this context are Articles 12 (Compensation for Losses), 13 (Expropriation) and 21 (Taxation).
[19] *Plama Consortium Limited v  Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 167.
[20] Decision, ¶ 518.

and the obligations on States under the FET standard, it has nothing further to say about 'stable conditions' and what this obligation in Article 10 might imply for a contracting party; instead, it concludes that the ECT requirement to provide stable conditions "is not an expression of a higher level of protection than the protections of the FET standard"[21]. Further, the Tribunal concludes that the reference to 'stable conditions' in the first sentence does not affect "the inherent right of States to alter the legal framework in response to changes in circumstances provided that there is an economic or social justification to do so"[22], citing *PV Investors* and *Eurus* in support of this. To the extent that this reminds us of the need to balance any notion of stability of investor rights with state prerogatives and responsibilities in the highly regulated energy sector, it adds nothing new.

16. Next, the Tribunal proceeds to conclude that "as a general proposition" a fundamental or continual change in regulations would not necessarily be a breach of the FET standard[23], and that "the duty to provide stable conditions does not protect investors from any and all policy and regulatory changes that result in an uncertain investment environment"[24]. This view is said to be subject to tests of reasonableness and good faith[25]. All of these conclusions relate to the permissible degree of change within the scope of the ECT Article 10. Broadly, there appear to be three kinds of change implied in these statements: (1) a prohibition on any change in law; (2) a measure that imposes small-scale change, and finally (3) a measure which brings about fundamental or continual change. In the ECT context, a requirement to encourage and create 'stable conditions' does not seem to imply the kind of obligation often found in long-term contracts between investors and states. Some versions of a stabilization clause might imply a freezing of the legal regime at the time the investment is made, such as (1) above. This is clearly not the case here, and the parties are in agreement on this[26]. Since they admit the possibility of change in the regulatory regime at a later date, the

---

[21] Decision, ¶ 524.
[22] Decision, ¶ 521.
[23] Decision, ¶ 527.
[24] Decision, ¶ 528.
[25] Decision, ¶ 527.
[26] Resp. C-Memorial, ¶¶ 1202-1204; Cl. Reply, ¶¶ 526-528.

question then becomes how extensive that change may be with respect to existing investments without causing a breach of Article 10(1)[27]. That involves the kind of legislative change in (2) and (3) above. The scope and depth of such changes is clearly central to this case, not the question of whether any changes may be made by the State. For the Tribunal, some of the changes in (2) may result in an uncertain investment environment, but it also recognizes a category of "fundamental or continual change", which would in its view not necessarily be a breach of the FET standard. This falls into the third category above. Other tribunals faced with similar facts as in this case have attempted to characterise the difference between (2) and (3), as the Tribunal notes[28]. Indeed, the former category, 'changes with minimal effect', was characterised by the tribunal in *Cavalum* in the following manner:

> …the changes introduced by RD 1565/2010 and RDL 14/2010 were not radical. They did not alter the essential elements of the scheme. They were not disproportionate or discriminatory. They were well within Spain's margin of appreciation and within its regulatory powers under international law in general and the ECT in particular" (para 564).

17. Where such changes do have economic effects on *existing* investments, compensation for the relevant investors can be expected to follow. Indeed, that is what happened with the 2010 regulatory measures in Spain, when both RDL 14/2010 and Law 2/2011 after it, provided compensation for RD661 plants (unlike RD 1578 plants), to the extent that such plants suffered negative economic impacts[29]. This confirms a commitment to 'stable conditions', even when the changes in law are minimal.

18. What the above suggests is a 'middle ground' of legislative change, in which state actions may be taken without undermining the basic arrangements on which the investor's calculations were made, thereby respecting the predictability and continuity which this Tribunal has noted are linked to the notion of stable conditions.

---

[27] Investments not yet made clearly fall in a quite different category in which the State's discretion to innovate is very wide.

[28] Cl. Reply ¶¶ 520-521, and the citations there.

[29] Cl. Memorial, ¶¶ 133, 138, 146; Cl. Reply, ¶ 270, PHB, ¶¶ 50, 53.

To this we might add the element of consistency.[30] Some negative impacts on the investment may be permissible but their overall effects should be ones that preserve the continuity of business conditions on a basis that closely resembles that on which the investor's forward-looking calculations were made prior to committing the investment.

19. The category of 'fundamental or continual change' (category (3) above) would seem likely to challenge any definition of 'stable conditions' that respects notions of predictability and continuity, if it were to apply to existing investments. On the face of it, it implies legislative actions that up-end the economics predicted for the investment or its potential for being continuously operational or both, and would therefore seem to breach the undertaking given by contracting parties to the ECT.[31]

## The FET Standard

20. The reference to "(s)uch conditions" at the start of the second sentence of Article 10(1) establishes a link between the two sentences and clearly relates them to the FET standard. This takes us into familiar territory in international investment law. In relation to stability, there is a line of cases concerning investments in the regulated energy utility sector, that treat the expectation of a stable and predictable legal framework as part of FET. In *Enron v Argentina*, for example, the tribunal held that "a key element of fair and equitable treatment is the requirement of a stable framework for the investment"[32]. On that broad view of FET, the requirement to encourage and create stable conditions for investors would seem to be absorbed. The dominant assumption among tribunals and scholars is that the FET standard includes a protection of the investor's expectation of a stable legal and business framework,

---

[30] *InfraRed Environmental Infrastructure v Spain*, ICSID Case No. ARB/14/12, Award 2 August 2019, ¶ 368.

[31] Compare, *Cube Infrastructure Fund SICAV v Kingdom of Spain*, ICSID Case No. ARB/15/20, Award, 19 February 2019, ¶ 427.

[32] *Enron Corporation and Ponderosa Assets, L.P. v The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 260; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 124; *Occidental Exploration and Production Company v Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004, ¶ 183; *Plama Consortium Limited v Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 173.

although this assumption reflects a development in jurisprudence that has occurred in the years since the ECT was drafted and has largely been driven by non-ECT cases. Indeed, at the time the ECT was drafted and signed by the contracting parties, the doctrine of legitimate expectations was not yet associated with FET[33]. Whether that explains the emphasis on 'stable conditions' in the first sentence or not is a matter that should not concern us here, although its inclusion may provide further support for the argument that legal protection of stable conditions is especially important in this economic sector. What is clear is that a reading of the two sentences together requires an interpretation of FET that gives due weight to the expectation of a stable legal and business framework or else the obligation to provide stable conditions in the first sentence is lost. Given the large body of case law on the FET and on the meaning and scope of legitimate expectations as an element of it, a reasonable and efficient course for a tribunal would seem to be to interpret the two sentences together rather than to seek to develop the first sentence as an autonomous standard of legal stability. The latter is a road that may be taken but it is not necessary (or efficient) to do so[34].

21. However, as the Tribunal recognizes in the present case, the requirement to provide stability and predictability through FET does not mean that the regulatory power of the state is 'frozen' or petrified in some sense, defined by the Tribunal in *AES Summit Generation v Hungary* as "a covenant not to change the relevant law, usually for a certain period".[35] Citing the *CMS* award, also involving Argentina, the *Enron* tribunal noted that it was "not a question of whether the legal framework might need to be frozen as it can always evolve and be adapted to changing circumstances, but neither is it a question of whether the framework can be dispensed with altogether when specific commitments to the contrary have been made. The law of foreign investment

---

[33] The Tribunal notes that legitimate expectations is not expressly contained as an obligation of host states under Article 10(1) of the ECT: Decision, ¶ 564.

[34] A notable exception is *OperaFund Eco-Invest SICAV plc and Schwab Holding v Kingdom of Spain,* ICSID Case No. ARB/15/36, Award, 6 September 2019, which found separate breaches of FET and the stability obligation: ¶¶ 508-513. In non-renewable energy cases, claims concerning the obligation to provide a stable obligation under Art 10(1) have treated stability as one of the elements of FET and linked it to the protection of the investor's LEs (see *Plama* and *Electrabel*).

[35] *AES Summit Generation Limited v Republic of Hungary*, ICSID Case No ARB/07/22, Award, 23 September 2010, ¶ 9.3.25.

and its protection has been developed with the specific objective of avoiding such adverse legal effects."[36] This issue of balance in state measures between measures that *adapt* a legal framework and those that have broader effects on existing investments has been addressed on many occasions by arbitral tribunals. For example, in the *Charanne v Spain* award, the tribunal held that "an investor has a legitimate expectation that, when modifying the existing regulation based on which the investment was made, the State will not act unreasonably, disproportionately or contrary to the public interest". This has echoes of an earlier ECT case, *Electrabel v Hungary*, in which the tribunal held that "it is well established that the host State is entitled to maintain a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest. Consequently, the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently, and predictably, taking into account the circumstances of the investment"[37]. In this way, the foreign investor is not made to carry a disproportionate share of the burden on behalf of the host country's citizens. The task for the tribunal becomes one of identifying a possible breach of the investor's legitimate expectations, if it can prove that the investor relied on them to make the investment.

22. In conclusion, the wording in the first sentence of Article 10(1) of the ECT is clear in the sense that it elevates the creation of stable (and other) conditions for energy investments to a prime position in the promotion, protection and treatment of investors and investments. The implications of the wording can be debated, but its location as the first sentence of this important provision implies that considerable weight must be given to 'stable conditions' for investors, in addition to the plain reading of the ECT text. Of course, the language differs from that found in the various kinds of stabilisation clauses in foreign investment laws or investment contracts commonly used throughout the energy sector. It would also seem that the scope of the stable conditions that a state has to encourage and create will require the tribunal

---

[36] *Enron*, ¶ 261.
[37] *Electrabel v Hungary*, ICSID Case No ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.77.

to carry out, as one tribunal notes, "a complex task given that it will always depend on the specific circumstances that surrounds the investor's decision to invest, and the measure taken by the state in the public interest"[38]. However, the requirement in the first sentence of Article 10(1) in my view conditions the interpretation of FET in the second sentence in a way that supports the long line of cases that see stability as an important component of FET and the doctrine of legitimate expectations. Its inclusion in the first sentence signals to the interpreter of Article 10(1) that legal stability has a particular importance in the protection of energy investments under the ECT.[39] If the two sentences are treated together, this should not erase or modify the express language in the first sentence that attaches such weight to the creation of stable conditions for investors.

## B. Legitimate Expectations of Claimant were Breached by the Disputed Measures

*In certain limited circumstances general laws can create legitimate expectations, such as from an incentive-based, promotional RE regime; here, assurances that were relied upon by Claimants are specific, have a separate and a cumulative value, and were accompanied by extensive due diligence; as a result, the investor had a reasonable expectation of what 'stable conditions' meant in relation to the legal regime (some changes but not removal of the entire regime).*

23. The Tribunal has set out a view of legitimate expectations in Section D which I am not able to agree with. In addition, the Tribunal has an assessment of the specific assurances that the Claimant has relied upon in making its investment that I also do not agree with. The differences between my opinion and the majority's findings and the reasons for them are set out below.

---

[38] *AES Summit Generation Limited v Republic of Hungary*, ICSID Case No ARB/07/22, Award, 23 September 2010, ¶ 9.3.30.

[39] Of course, it may be observed that the concern of the ECT with then newly independent states played a role in drafting the text in the early 1990s. However, it requires no more than a superficial acquaintance with energy investments elsewhere, from Latin America to Asia and indeed in Europe, to appreciate that the offer of stability in the making of investments has a wider, global currency in this sector.

15

Legitimate expectations

24. Central to the Tribunal's view on this subject is the idea that sources of investor expectations taking the form of commitments based on general legislation cannot create expectations that the law will not change, in contrast to specific undertakings given to a specific investor. The Tribunal cites *PV Investors*, *Stadtwerke*, *Blusun* and *Charanne* in support, but acknowledges that other tribunals have differed on this point[40]. Applying this view, it rejects arguments that the Claimants had an expectation that the PV installations in which they invested would be entitled to an economic regime of RD 1578/2008 for 25 years [41]. In conclusion, the Tribunal finds that the investors "should have known at the time of their investment that there was no unalterable right to receive a fixed tariff for 25 years under the legal framework for renewable sources and they knew or should have known when they were executing the SPAs that changes to the remuneration regime to existing plants were a possibility."[42]

25. The first flaw in the above view can be traced back to its characterisation of stability that I have discussed in the previous section. A recurring assumption in the Tribunal's treatment of legitimate expectations under the FET standard is that stability is equivalent to 'no change in law'; with respect to general legislation, the argument then becomes that it cannot create an expectation that the law will not change or evolve according to circumstances, subject to an express provision to the contrary[43]. In my view, the requirement to create and encourage 'stable conditions', in the context of the ECT at least, permits a measure of legislative change by the host state and is certainly not limited to a freezing of the business conditions at the time of the investment. However, such change has to respect the fundamentals of continuity and predictability on which any investor must base its calculations about the making of an investment and ultimately its decision whether or not to invest. In the Tribunal's view,

---

[40] For example, the awards in *Masdar* and *Novenergia*, in which the tribunals held in cases with similar fact patterns that general legislation, representations and ancillary assurances made to foreign investors *can* induce them to invest in the Respondent's energy sector *and so create legitimate expectations that are protected under the ECT*.
[41] Decision, ¶¶ 563, 579, 602.
[42] Decision, ¶ 602.
[43] Decision, ¶¶ 565-566.

without a "specific and unambiguous assurance, promise or commitment by a competent authority" to freeze the legislation in favour of a specific investor as an inducement to invest, "an investor cannot legitimately expect that the legal framework will not change or evolve in future in response to changes in circumstances"[44]. Yet, as I have argued already, the statement misses the point entirely. As the pleadings in this dispute show, the Claimants have made it clear on several occasions that *some* change in the law was to be expected and not deemed to be incompatible with their business model[45]. Given the experimental character of regulation of the new PV sector at the time, this rather benign attitude towards a measure of possible legislative change is hardly surprising. Nor, in my view, is it incompatible with a view of stable conditions that permits continuity and predictability for an investor. Indeed, here as throughout its analysis, the Tribunal conflates two kinds of change in law, one of which is compatible with 'stable conditions' in Article 10(1) and one which is not (which a State may nevertheless adopt, but with the knowledge that compensation to investors may well be a consequence). In my view, the Disputed Measures had effects that were incompatible with an investor's expectations of a stable legal and business framework, as I shall explain below, and therefore have different implications from the first kind of change in law with respect to damages.

26. A second flaw lies in its slightly doctrinaire approach to legitimate expectations in relation to general legislation. I share the view of the tribunal in *Novenergia v Spain* that sought to frame the question not in terms of whether or not commitments can result from general statements in general laws or regulations, but "rather whether the statement or conduct *objectively* suffices to create legitimate expectations in the recipient"[46]. Similarly, as Professor Gary Born states in his opinion in *Wirtgen*, "(t)he decisive issue is not whether a state's undertaking is 'specific' or 'general', or statutory

---

[44] Decision, ¶ 566.
[45] For example, the witness testimony of Mr M Lief, a Director with the Claimants' companies, who led the work on the Spanish investments: "…we had factored in the risk of some minor legislative change over time (which we would expect in respect of any long-term investment in any jurisdiction)…" (First Witness Statement, 22 March 2018, at ¶ 56).
[46] *Novenergia II v Kingdom of Spain*, Case No. 2015/063, Final Award, 15 February 2018, ¶ 652 (emphasis in the original).

or contractual, but whether the statements and actions of the state provide a sufficiently clear commitment to give rise under international law to legitimate expectations or legal rights on the part of the investor".[47] Further, I note the view expressed by the tribunal in *El Paso v Argentina*, to the effect that what is 'specific' with respect to assurances depends on the circumstances of each case. In *El Paso*, the tribunal observed that there can be no general definition of what constitutes a specific commitment because it all depends upon the circumstances unique to each case. Two types of commitments could qualify as specific however: those "specific as to their addressee and those specific regarding their object and purpose".[48]

27. In this context, the significance of a cumulative and repetitive character of assurances was noted by the *El Paso* tribunal, when it found that:

> "a commitment can be considered specific if its precise object was to give a real guarantee of stability to the investor. Usually, general texts cannot contain such commitments, as there is no guarantee that they will not be modified in due course. However, a reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely.[49]

28. Even if the distinction drawn by the Tribunal were assumed to be generally correct, and the Tribunal acknowledges that there are other views on this than its own, the legal regime applicable to the PV investments at issue here is far from being one of general application[50]. It is not only a bespoke one that suits the needs of investment in a particular kind of energy business, but it is deliberately shaped so as to attract inward investment from outside Spain to stimulate what was then a new industry and

---

[47] RL-0072: *Jürgen Wirtgen and others v Czech Republic*, PCA Case No. 2014-03, Dissenting Opinion of Arbitrator Gary Born, 11 October 2017, ¶ 12.

[48] *El Paso Energy International Company v The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶ 375.

[49] *El Paso*, Award, ¶ 377.

[50] This point was made by Prof Dr Guido Santiago Tawil in his dissenting opinion in *Charanne B.V. Construction Investments S.A.R.L. v The Kingdom of Spain*, Arb No. 062/2012, ¶¶ 8-9. The relationship between the Royal Decrees and Law 54/1997, the scope of which covered the electricity sector generally, is discussed in ¶ 29 below.

one with challenging economics. The bespoke character is evident in the long-term FIT mechanism which became part of it from 2004 onwards and was one that any foreign investor familiar with this sector would recognize, understand and be able to work with since it was used by so many other governments in Europe for their renewable energy  sector. Business calculations about capital and operating costs could draw upon the experience known and generally accessible when the relatively small group of interested investors elected to assess the 'offer' from the Spanish authorities, and take action or not within specified time-frames. This was a very specific kind of regulatory regime with a specific object and purpose, whose attractions were emphasised to prospective investors by the Respondent.

### The Stability Assurances Relied Upon

29. Without a significant measure of commitment from the Spanish Government about the long-term stability of the regulatory regime, it is highly unlikely that Spain's invitation to foreign investors would have succeeded on the scale that it did. The founding law, Law 54/1997, was only a framework creating a special regime for non-conventional electricity, setting out the idea of a reasonable rate of return, as Respondent notes, and making it clear in Article 30.4 that remuneration would "be supplemented by the payment of a premium under statutory terms set out in regulations…". In the first implementation measure, Royal Decree 2818/1998, the Preamble also made it clear that incentives were required to address the higher costs of renewable forms of energy which "do not allow them to compete in the free market". These incentives evolved to include ones for those generators that were especially efficient. The Tribunal makes much of the assurance of a reasonable rate of return in this fundamental Law as the core of the stability in the regulatory regime[51], but in practice the skeletal structure and this principle failed to attract investments on the desired scale in the initial years.

30. This situation changed as examples of stability commitments emerged with Article 40.3 of RD 436/2004, and Article 44.3 of RD 661/2007 and the protection of pre-

---

[51] Decision, ¶¶ 587, 600.

existing investments was continued in RD 1578/2008 RD. The Tribunal makes only brief comments on RD 1578/2008, focussing rather on the Fifth Additional Provision[52]. My own view is that RD 1578/2008 contained a commitment sufficiently specific in object and purpose for investors like Infracapital to rely upon in terms of its plain and ordinary meaning. The object of the Decree is "to establish an economic system" for PV facilities (Article 1) to which the regulated tariffs provided in Article 36 of RD 661/2007 are not applicable. The Decree applies to facilities in group b.1.1 (i.e. solar PV facilities) that have obtained definitive registration after 29 September 2008 in RAIPRE. Paragraph 5 of Article 11 states that:

> "The regulated tariff that is applicable to an installation, in accordance with this royal decree, will be maintained for a maximum period of twenty-five years from the later of the two dates: the date the installation is commissioned or it is registered in the pre-allocation payment Registry. This payment may never apply prior to its registration date."

31. The Preamble does refer to concerns about excessive remuneration but the Tribunal's comment about the absence of any reference in RD 1578/2008 to support for "a high tariff to PV investors" seems puzzling since the remuneration regime was expressly designed to distribute benefits in a way that incentivised the most efficient generators (and thereby benefit the Respondent's electricity system)[53]. This is quite different from a guarantee of a high tariff as seems to be implied here.

32. There has been some discussion of the meaning of the words in the Fifth Additional Provision to RD 1578/2008, which Respondent views as an advance notice of the changes that eventually occurred from 2012 onwards[54]. Compensation, the text of the Provision says, "may be modified" in 2012. Clearly, a State may make changes in its laws for future application, but the inward investor will be seeking assurances that investments once made will not be subject to changes of a retroactive kind that undermine the business calculations on which decisions to commit were based. My

---

[52] Decision, ¶¶ 578-579.
[53] Decision, ¶ 579.
[54] Resp. C-Memorial, 9 July 2018, paras. 667-671, 1177-1178; Cl. Reply, ¶¶ 280-290.

interpretation of these provisions differs from that of the Tribunal, which sees the wording of the Fifth Additional Provision as amounting to a warning to investors, or even as 'the writing on the wall' for such investments as are committed by that date. By expressly referring to the impact of "technological evolution of the sector", the wording is not oriented to existing plants since they cannot benefit from subsequent declines in costs. I agree with the Claimants' expert, Brattle, that this implies a review of FITs for *new* installations only "given that all existing plant will continue to face the high costs that applied during their construction" [55]. Moreover, the *Memoria Justificativa* for the Decree makes it clear that this planned review was to have a limited scope, affecting only the percentage variation rate of the tariff adjustment mechanism[56]. In the light of regulatory actions in 2010, this reading of the text appears to confirm the modest evolutionary changes that Spain had every right to make in its regulatory regime and which were compatible with its policy of continuing to attract significant amounts of inward investment into this sector. A *modification* is also quite different from the kind of sweeping legislative change that occurred in 2012-14. It is hardly synonymous with or a warning of actions to sweep away an entire regulatory regime, replace its operation with another, opaque and unfamiliar one, applicable to existing installations, and to do so after a period of stasis when no details were available on which to base future business calculations.

33. Further, in this case the investor relied not only upon the commitments in the above legislation but also upon specific assurances from Spanish authorities that there would be no changes that applied to existing installations, all designed to attract investment such as this into the country[57]. Reliance upon this range of legislative and other assurances expressly given to the investor was further supplemented by a rigorous approach to the timing and manner of the investment itself. In the record there is an

---

[55] Brattle, *Changes to the Regulation of Photovoltaic Installations in Spain since December 2012*, 29 March 2018, ¶ 54.
[56] Exhibit C-238, p.7.
[57] In particular, I note assurances given by CNE officials on 9 and 22 April 2010, and by the DG for Energy and Mining Policy at the Ministry of Energy for Spain on 21 February 2011. Respondent has not presented evidence that these meetings did not take place or rebutted the statements that the officials made. The status of the CNE has been challenged as being merely an advisory body but without any evidence of contemporaneous warnings given to investors that statements from its officials could not therefore be relied upon.

abundance of detail on the approach taken by the investor, and how the timing of the investment was interwoven with specific assurances about the regulatory regime given to the Claimants at various stages of the process.

## Assurances continued: The Testimony of Mr Lief

34. In connection with the legitimate expectations claim, the Tribunal refers to the witness testimony of the Claimants' representative, Mr Lief[58], who led the Transaction Team in making the investment. In particular, it notes that he sought and relied upon a set of assurances from the Spanish authorities. In the Tribunal's view, these assurances "do not reach the level of clear and specific commitments creating legitimate expectations of a fixed FIT for 25 years for RD 1578/2008 PV Plants"[59]. Indeed, it argues that the only assurance of stability that an investor should expect with respect to remuneration was the guarantee of a reasonable profitability in the Law 54/1997[60].

35. I disagree. The assurances in this case are both clear and highly varied; in my view, they are cumulative, with a reinforcing effect. In addition to the ones in the regulatory regime noted above, a further assurance of stability came as late as 5 March 2011, when the Government adopted Law 2/2011, amending RD 14/2010, that "specifically state[d] that operational plants will not be subject [to] further retroactive cuts in the future"[61]. The fact that this was a Law and not a Decree was deemed by the Claimants to be "extremely reassuring". However, the Claimants had already sought to manage 'regulatory risk', a common factor in any utility investment, by seeking multiple further assurances prior to making any investment commitment. A brief review of the facts in the record demonstrates this:

     (i) The Claimants began the process of making the investment in 2009, based on the attractions of RD 1578/2008[62]. At that time, "a key incentive for investing" in the Spanish renewable energy sector was the FIT mechanism which "by

---

[58] Decision, ¶ 595.
[59] Decision, ¶ 596.
[60] Decision, ¶ 587.
[61] M. Lief, First Witness Statement, 22 March 2018, ¶ 47; Second Witness Statement, 26 November 2018, ¶ 17.
[62] M. Lief, First Witness Statement, ¶¶ 6-11.

setting a stable tariff over a long period of time, removes the merchant risk attached to these types of investments and, in particular, it removes exposure to volatile wholesale electricity prices"[63]. RD 1578/2008 provided for a FIT that would be fixed and inflation-linked, applying to qualifying PV plants for a period of up to 25 years, longer than the periods applicable to other renewable energy technologies.

(ii) In early 2010, in response to information of a possible change in the regulatory regime, "which would impose cuts to the tariffs applicable to PV plants",[64] Claimants sought clarifications and assurances from various parties, especially from the Spanish authorities. It was only following assurances from the *Comisión Nacional de la Energia* (CNE) that the new decree would not have a retroactive character that the Claimants' proposal for the First Investments was submitted internally and approved. The absence of retroactive risk was underscored in a slide presentation made by the CNE, and again in a further meeting soon afterwards. This evidence was not contradicted by the Respondent, although the significance of statements by the CNE was challenged on the ground that it was only an 'advisory' body, even if an official one[65]. Claimants sought further assurances from government bodies, on the basis of which they deemed the risk of retroactive change to be low. Despite this, *they chose to make any investment conditional* on a new decree not impacting on the economics of the First Investment plants.

(iii) Although three share purchase agreements (SPAs) were signed in June 2010, funding for these SPAs was conditional on any new regulation applicable to FIT for these plants being introduced without a retroactive impact. Further, such regulation could not impact on the revenue, exploitation costs or taxes affecting the IRR negatively by more than 0.75%. If these conditions were not met by a 'long stop' date, the SPAs would automatically terminate and the transaction would have terminated. This cautious approach continued after an official announcement in July 2010 about an agreement between the

---

[63] M. Lief, First Witness Statement, ¶ 9.
[64] M. Lief, First Witness Statement, 22 March 2018, ¶ 12.
[65] Resp. PHB, ¶¶ 14-17, and Resp. Reply PHB, ¶ 17.

government and solar power associations. Largely, this agreement affected RD 661/2007. An extension of the longstop date to the end of October was therefore sought and obtained.

(iv) When information reached the Claimants that a further, second decree might emerge, "with potentially some retroactivity", Claimants sought the advice of a leading Spanish law firm which advised them that the risk of retroactive change was "very low"[66]. However, Claimants initiated further negotiations with the sellers and changes in conditions introduced, such as a postponement of the longstop date and a provision allowing the Claimants to unwind the transaction if regulatory changes occurred before a final longstop date of March 2011.

(v) The two Royal Decrees that had been 'rumoured' were adopted in November and December 2010: respectively, RD 1565/2010 and RD 1614/2010. The first of these contained no retroactivity and did not affect the economic regime under which the First Investment plants would be governed. At this stage, the Claimants decided to proceed with the investment, which was protected in the event of further, adverse regulatory changes by provisions that allowed a price adjustment or a complete unwinding of the deal. The second decree was limited in scope and followed the agreement reached in July 2010 with the wind and solar thermoelectric power industry.

(vi) While the first payment to the sellers under the SPAs was made on 21 December 2010, *this was still made subject to Claimants' right to unwind the deal if further regulatory changes were introduced that were adverse in their effects upon the investment.*

(vii) A further decree, RDL 14/2010, was adopted in December 2010 which imposed a cap on the number of hours for which tariffs could be received and applied to all plants including those registered under RD 1578/2008. It appears that Claimants' interpretation of the three legislative measures was that they amounted to Spain's response to the tariff deficit issue, which was expressly addressed in the Preamble to RD 14/2010.[67]

---

[66] M. Lief, Second Witness Statement, ¶¶ 6-7.
[67] M. Lief, First Witness Statement, ¶ 40.

24

(viii) Nevertheless, prior to taking a final decision on the investment in 2011, Claimants sought further assurances that no additional retroactive changes were planned to the regulatory regime. At a further meeting with Spanish government officials from the Ministry of Energy, express and specific assurances were given to the Claimants that no further retroactive changes were planned for PV plants, followed by a written correspondence in which any such changes if they occurred would lead to payment of compensation. This evidence has not been rebutted by the Respondent. A further extension was made to the Final Longstop Date, allowing Claimants to unwind the deal if regulatory changes were made before that date. A further measure was adopted in March 2011 which "made clear that future regulatory changes would only be forward-looking and would not affect operational plants"[68]. This provided Claimants with sufficient assurance that the risk of further measures with retroactive effect was "highly unlikely" and they went ahead to complete the transaction on 9 March 2011, making the final payment on 31 March 2011.

(ix) The investment was then completed in two stages: the first was made in March 2011 (the First Investment), and the second in June and October 2011 (the Second Investment), comprising the Fontellas and Latesa plants, following a further period of due diligence[69].

36. I have presented the above extended summary since it is clear to me that in the various cases involving Spain and its renewable energy sector, there are important differences arising from the timing of the investments in ascertaining the legitimate expectations of investors[70]. In this case, the investments were made in 2011 after there had been important changes to the regulatory regime in 2010, and a fairly public discussion of further changes to the regime. In my view, the summary highlights three considerations of critical importance to the investor at this stage of the regime's development: the need to confirm the investors' understanding of the applicable law;

---

[68] Lief, ibid., ¶ 47.

[69] Lief, ibid., ¶ 51.

[70] This point was made by Charles N Brower in his Concurring and Dissenting Opinion in the *PV Investors* case, after an extended review of each of the cases to date, 28 February 2020, ¶ 14. It remains highly relevant.

the need to assess the significance of the 2010 measures for this understanding; the need for assurances that if an investment were to be made the essential features of the regime would remain operative for that investment over a significant term.

37. With respect to these three considerations, the above account shows a very high degree of caution in making these investments, and a pro-active approach to all three. It was more than an exercise of due diligence and involved repeated testing of the very assumptions on which the initial investment proposal had been initiated and at times a clear pulling back from a commitment to invest until the assessment had been completed.

38. Faced with these facts, the Tribunal agrees that "extensive" due diligence was indeed carried out by Claimants[71], but notes that the "possibility of some change to the remuneration regime for existing plants" was identified. This is both correct and unsurprising[72]. Its identification was in part a recognition of the state's ultimate power that could be exercised at some future date and in part a recognition of the possibility that this regulatory regime for renewable energy could evolve further as it had done in recent years. Due diligence would be a fruitless exercise if the purpose was to identify an absolutely risk-free context – in terms of *regulatory* risk, that is. The existence of such residual risk is quite different in my view from the kind of risk that might signal to investors that the entire present content of the regime might be replaced with respect to existing investments: clearly, that is a risk of a different kind, striking at the commercial heart of the investment, as well as one that implies a different policy towards inward investment in the sector, and at odds with the preservation of stable conditions for an investor, which contracting parties to the ECT undertook to offer investors.

39. The Tribunal's assessment of the various commitments obtained by the Claimants is negative. For the Tribunal, the starting point is a firm distinction between expectations

---

[71] Decision, ¶ 598.
[72] As the Claimants' representative noted, "there is no such thing as a risk-free investment" (Lief, Second Witness Statement, ¶ 17).

deriving from general legislation and those generated by specific undertakings made by a host state to induce a specific investor to make an investment. I have set out my views on this and disagreement with it above. However, the Tribunal's negative assessment of the evidence is guided by a five-part test for assessing the legitimacy of an expectation in relation to a specific purpose[73]. In the interests of economy, I confine my remarks on this largely to its application to the evidence.

40. For this five-part test, the first requirement is that the assurance is grounded in law. Not only was the Respondent's commitment to a specific remuneration regime grounded in law, but the Claimants' understanding of that law was confirmed by a wide variety of officials and experts as a result of their efforts to conduct due diligence prior to making their investment. The criterion has its limits however. It seems to restrict the scope to a single, unambiguous assurance[74], a 'magic bullet' so to speak, and rules out the possibility that an expectation may be based on an accumulation of sources, repeated over time to prospective investors, so that collectively they create an expectation for a reasonable and prudent investor about the stability of remuneration that is arguably an element of the regulatory regime [75]. This combination of sources is present in the account given in paragraph 35 above, sufficient in my view to ground an objective expectation of stability. The second requirement is that the specific commitment be made by a competent authority. Second, the definition of an institutional source as a single public authority with legal competence that is beyond doubt appears naïve. Public authority structures are often complex, presenting challenges to foreign investors, when seeking to validate their assurances, and can usually be best addressed by taking on board local advice from reputable independent bodies. In this case, the account above shows that various assurances given by the specialist energy agency, the CNE, and Ministry officials, were reviewed and confirmed by a leading Spanish law firm, subject only to the caveat about modification of the second category kind discussed earlier. In my view, the requirement is met.

---

[73] Decision, ¶¶ 570-574.
[74] Decision, ¶ 566.
[75] *SolEs Badajoz v Spain*, ¶ 426; *Charanne*, Tawil dissenting opinion, ¶ 9.

41. A third requirement is that the assurance or expectation must be clear and specific to generate an objective expectation. In this case, from the account in paragraph 35 above, we see evidence of a wide range of inducements adopted by the Respondent in the form of laws, press releases, Ministerial statements, statements by the CNE and InvestinSpain[76]. Even if one were to argue that they did not oblige Respondent to offer an FIT, they created an expectation of long-term stability about the remuneration regime on which a reasonable investor could elect to rely upon, and which the Claimants did rely upon.

42. A fourth requirement is that the circumstances surrounding the making of an investment need to be taken into account. In this case, the due diligence carried out by the Claimants, acknowledged to be "extensive" by the Tribunal generated an abundance of clarification about the meaning and future development of the regulatory regime on which the Claimants ultimately relied to make a final investment decision.

43. Finally, under the Tribunal's scheme there is a requirement that the State's policy interests be taken into account. Indeed. The entire regime for renewable energy was based on a policy commitment to satisfy Respondent's commitments to reduce the carbon footprint of its energy sector, and promote a more sustainable electricity sector. In choosing to substantially revise it after substantial investments had been made by foreign investors, and justified with respect to a different policy, the question arises as to who should bear the cost of the policy change that resulted in changes in the regulatory framework[77].

44. In all the above discussion of the various kinds of assurances, an individualised approach, one by one, has its limits. They are influential in my view when taken

---

[76] In this context, *Novenergia v Spain*, ¶ ¶ 665-667; *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No ARB/15/34, Dissenting Opinion of David R. Haigh Q.C., ¶ 23.
[77] *9REN Holdings v Spain*, ¶ 253. The Tribunal held the question to be "whether under the ECT the cost of such changes should fall on the investors who were attracted to Spain's renewable energy by specific promises of stability rather than fall on Spanish consumers or Spanish taxpayers generally".

together (cumulative effect) and when the apparent caveats are understood as the reminders of the margin of appreciation which any state enjoys (but not to be exercised so as to completely remove the regime without consequences).

45. In the light of the above, I therefore find myself in strong disagreement with the Tribunal that these commitments were unlikely to be sufficient to convince "a diligent and prudent investor" to make an investment of millions of dollars. On the contrary, the combination of the legislative guarantee in RD 1578/2008, and the various specific and written assurances from Spanish authorities, leads me to the same conclusion on this matter as Mr David R. Haigh Q.C. in *Cavalum*: they "objectively created an understanding of regulatory stability on which Claimant reasonably relied and which induced Claimant to invest as it did in Spain's renewable energy sector".[78] Moreover, the timing and manner in which the Claimants carried out their investment shows a clear understanding that while an expectation of absolute stability was incompatible with this regulatory framework, the evidence appeared to confirm that investments once made were likely to be protected by that regime over the long term.

46. In summary, in my view the Claimants reasonably relied upon several assurances made specifically to the Claimants in addition to the assurances in the RE regime itself, creating a cumulative framework for expectation of stability when taking the final decision to invest. They created a reasonable expectation in the Claimants that the framework would not subsequently be fundamentally dismantled by the Respondent in a manner that would cause disproportionate financial losses to the Claimants.

## C. Impairment - The Measures Taken in 2012-14 Constituted a Fundamental Change and a Breach

*The 2012-14 measures (Law 15/2012 to RD 413/2014 and the June 2014 Order) wiped out the core of the investment regime on which the investment decision had been made, and in a manner that fostered instability in the business conditions of the investor. So, they breached the Respondent's obligation to provide stable conditions and FET in Art 10(1).*

---

[78] *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No ARB/15/34, Dissenting Opinion of David R. Haigh Q.C., ¶ 27.

47. In its approach to impairment in Article 10(1) ECT, the Tribunal considers whether a rational policy for the Disputed Measures existed and whether the measure taken was appropriate to achieve the regulatory intent, adding a proportionality element: was the measure one that imposed an excessive burden on the investors? A limited balancing exercise is then to be carried out by the Tribunal, focussing on the interests protected, the rights involved and the burden imposed on the investor. The limit is that an international tribunal does not second guess the State's policy choices. The Tribunal concludes that reducing the remuneration to existing plants to deal with the Tariff Deficit was rational, and there is a reasonable relationship between the public policy objective and the Disputed Measures[79].

48. In my view, the main task for the Tribunal is to assess whether the measures taken are in conformity with Spain's treaty commitments under the ECT. The Tribunal has rightly pointed out that policy choices are a matter for the host state, in energy and indeed in other sectors of the national economy, and that the Tribunal ought not to be second guessing such choices. However, it is the undertakings that Spain gave when adhering to the ECT that are at issue here and not its choice of energy policy.

### The Character of the Changes Made

49. In Part A above I have argued that the notion of 'stable conditions' in Article 10(1) ECT is not absolute and allows a State to make minor modifications to its regulatory regime (if it wishes) without risking a breach of international law, particularly when such changes were either neutral or beneficial to the investors concerned. On multiple occasions in the record of this case, the Claimants have emphasised that they were aware of Spain's right to make changes, the modifications it had already made to the regulatory regime and, following an assessment based on their investigations, they had little or no concern about such exercise of state power[80]. I have also argued that there is another category of change that does not meet this test of 'stable conditions' compatible with international law. It may now be appropriate to characterise the

---

[79] Decision, ¶ 674.
[80] For example, Cl. PHB, ¶ 6; Cl. PHB Reply, ¶¶ 12, 19.

changes made by Spain with respect to existing investments that in my view had effects that fall into this latter category. In doing so, I note that Spain as any sovereign state had the right to introduce such changes, but in doing so it took the risk of incurring consequences in international law.

50. The measures introduced are described in the Decision so need not be detailed here: their effects were such as to replace the regulatory regime established under Law 54/1997 with a new regime and apply it to *existing* investors. This has been described as a 'fundamental *midstream* switch of regulatory paradigm'.[81] Among its disruptive effects were:

- *Remuneration.* The remuneration regime for existing as well as new installations was completely replaced. The FIT mechanism for existing PV plants was removed. In the new regime remuneration is no longer based on the amount of electricity generated. Formerly, the greater the volume, the greater the rewards, providing an incentive for the generator to produce more of an environmentally-friendly energy resource. Overall, there was a substantial reduction in the remuneration expected.

- *Term.* The remuneration regime introduced was one that may change every six years with effects on existing installations, impacting negatively on predictability. The specific remuneration was to apply only to the 'regulatory life' of the facility, which it set at 20 years.

- *Methodology.* The way in which a reasonable rate of return was to be calculated in the new regime was completely changed with the effect that the criteria for calculation were not clear.[82] A number of variables were to be set unilaterally and at the discretion of the Respondent, in a manner quite separate from the circumstances of the investors' commitments and operations.

- *Incentives.* The previous regime had a tariff structure that incentivised generation and longer operation, but this was shifted in the new regime to one that makes

---

[81] Brattle, *Changes to the Regulation of Photovoltaic Installations in Spain since December 2012*, ¶ 159. My emphasis added. A switch of regulatory paradigm for future investors is not at issue here.
[82] As the tribunal in *Antin* said, if compliance with the requirements of stability and predictability under the ECT were to be met, "the methodology for determining the payment due to CSP installations must be based on identifiable criteria", *Antin*, ¶¶ 562, 564-66.

31

payments for capacity irrespective of power generated. In this sense, it is capped, affecting the return.

- *Abruptness*: the manner in which the changes were made in the law was sudden. There was no evidence to a reasonable and prudent investor that change on this scale was probable before 2012.

- *Transparency*. There was a also lack of transparency in the way the changes were introduced[83]. For example, the introduction of a transitory regime that lasted more than 11 months. During this period the investors had no idea of the precise remuneration to which the qualifying facilities would be entitled. In both RD 413/2014 or the June 2014 Order the underlying criteria or calculations behind the Special Payment or those that would underpin the future updates of the new economic regime were not explained. No specific methodology or process was established for adjusting the Special Payment over the various Regulatory Periods: the underlying criteria or calculations of the New Regime or guidelines on key aspects were not provided.

- *Retroactive effect*. Payments that an installation had received in the past that are considered to be in excess of what is 'reasonable' within the terms of the New Regime will have to be set off against the financial incentives to which a plant is entitled under the New Regime. This clawing back of payments already made to generators for efficiencies under the former regulatory regime is retroactive in effect.

51. For my colleagues, there is no difference in terms of legal consequences between the above set of changes – the wholesale dismantling of the regulatory regime in 2012-14 - and the changes in law that occurred as the regulatory regime evolved in the years prior to the making of the investment in 2011[84]. In their view, these changes were taken in response to a rational policy objective and were proportionate to the problems addressed. Indeed, so clear was the risk of such change, in their view, that the Claimants ought to have understood the trend of development in regulation as

---

[83] Cf. *SolEs Badajoz v Spain*, ¶¶ 460-463.
[84] Except with respect to the 'claw-back' mechanism.

the 'writing on the wall', a sign that further change was probable. For the reasons set out in this opinion, that is a conclusion with which I strongly disagree.

52. As a result of the Disputed Measures, the Claimants were required to adopt an entirely new and – in terms of current practice in energy regulation – wholly unfamiliar basis for the calculation of returns on investments already made; supplied with inadequate information to do so; and required to significantly reduce the term of any such calculations to a six-year regulatory period. Significant uncertainty was then created for the Claimants about the calculation of their return on the kind of long-term investments that the ECT was designed to protect. The outcome was a lack of continuity, predictability and consistency in the regulatory regime for investors attracted to Spain on the basis of an entirely different regulatory model: the very opposite of encouraging and creating 'stable conditions'.

The Tariff Deficit as Defence

53. It has been found by the Tribunal that the Disputed Measures met a rational policy objective, addressing the Tariff Deficit, as a change of circumstances, and did so in a way that was proportionate[85]. I cannot agree with this conclusion. There were other ways of addressing the Tariff Deficit identified by the CNE 2012 Report and proposals from the European Commission at the time that would have met commitments to existing investors in the RE sector. Moreover, the Deficit was not rooted in the growth and evolution of the PV sector, but rather in the choice the Respondent made to set end-user electricity prices at levels that did not cover regulated costs. That choice was the Respondent's to make. Similarly, with respect to remedial action, the choice was its own. However, it is one thing to acknowledge that a prudent investor could expect some action to be taken to address it, as was done in 2010, and quite another to interpret this as a signal that the entire Special Regime with its FIT mechanism might be swept away. Ultimately, the decision to shift a proportion of the costs to foreign investors was one that would and did have consequences. However, in itself it could not solve the problem of the Tariff Deficit, which has been offered as the primary

---

[85] Decision, ¶ 674, subject to the finding on the claw-back provision: ¶ ¶ 695-700.

justification for the Disputed Measures. In the RE sector generally, the use of a FIT has been common and apparently successful, having no causal relationship to a phenomenon comparable to the Respondent's Tariff Deficit, essentially one that has arisen from purely domestic circumstances and public policy choices.

54. As conduct, I agree with the tribunal in *Watkins* that it "does not bear a reasonable relationship to Spain's policy"[86]. This was a set of legislative measures with sweeping and destructive effects on the Claimants' investments that did not bear a reasonable relationship to a rational policy goal.

## D. The Registration Requirement

55. Given my views on the legitimate expectations claim which would lead to the finding of full compensation for the Claimants, there is no need for me to examine the claim based on the fourth sentence of Article 10(1) ECT (the umbrella clause), and I shall not do so. However, I will make some comments on the RAIPRE, which seems to me to carry more than administrative significance in the Spanish regulatory regime, at least at the time of the Claimants' investments. My colleagues have the view that this does not rise to the level of a specific commitment[87].

56. I note that if one considers the regulatory regime as a whole, it is clear that the registration was an act required to be carried out by the investor if it was to be eligible for the benefits of RD 1578/2008. Without doing so, its expectation to receive what had been promised would fail, and it would not be able to claim regulated payments from Spain. I therefore agree with the interpretation of David R. Haigh, when he argues that registration in RAIPRE "had significance beyond merely an administrative act; it changed the relationship from one that was executory to one that had become executed".[88] Registration affirmed the fulfilment of the necessary pre-conditions in terms of planning, financing, constructing, and commissioning within a specific time-

---

[86] *Watkins Holding et al v Kingdom of Spain*, ICSID Case No ARB/15/44, Award, 21 January 2020, ¶ 604.
[87] Decision, ¶ 599.
[88] *Cavalum*, ibid, Dissenting Opinion of David R. Haigh, para 52; see also *Masdar v Spain*, ¶ 512.

period and Spain's duty to carry out the promised inducements. At this point – registration – Spain's obligations under Article 10(1) of the ECT became operative. I agree with this assessment.

## E. Conclusions

57. In my view, Spain breached Article 10(1), first and second sentences, when in 2013 it imposed a new regime on the Claimants' investments, which had been only recently made on the basis of expectations that any changes in law would be made within the framework of the Special Regime, including the FIT mechanism for remuneration over a maximum period of 25 years. Spain is therefore liable for full compensation to the Claimants.

13 September 2021

Date

Peter D. Cameron