# EXHIBIT 36

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

**InfraRed Environmental Infrastructure GP Limited**
**European Investments (Morón) 1 Limited**
**European Investments (Morón) 2 Limited**
**European Investments (Olivenza) 1 Limited**
**European Investments (Olivenza) 2 Limited**

Claimants

**v.**

**Kingdom of Spain**

Respondent

(ICSID Case No. ARB/14/12)

# AWARD

**The Tribunal**

Professor William W. Park
Professor Pierre-Marie Dupuy
Mr. Stephen L. Drymer, President

**Secretary of the Tribunal**
Ms. Natalí Sequeira

**Assistant to the Tribunal**
Mr. Bogdan-Alexandru Dobrota

Date: 2 August 2019

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

## REPRESENTATION OF THE PARTIES

_____

| *Representing*<br>***InfraRed Environmental Infrastructure GP Limited***<br>***European Investments (Morón) 1 Limited***<br>***European Investments (Morón) 2 Limited***<br>***European Investments (Olivenza) 1 Limited***<br>***European Investments (Olivenza) 2 Limited:*** | ***Representing the Kingdom of Spain:*** |
|---|---|
| Mr. Alberto Fortún Costea<br>Mr. Luis Pérez de Ayala Becerril<br>Professor Miguel Gómez Jene<br>Ms. Maribel Rodríguez Vargas<br>Dr. José Ángel Rueda García<br>Mr. Antonio Delgado Camprubí<br>Mr. Borja Álvarez Sanz<br>Mr. José Ángel Sánchez Villegas<br>Cuatrecasas<br>Almagro 9<br>28010 Madrid<br>Spain | Mr. José Manuel Gutiérrez Delgado<br>Ms. Amaia Rivas Kortázar<br>Mr. Antolín Fernández Antuña<br>Ms. Mónica Moraleda Saceda<br>Mr. Javier Castro López<br>Ms. María José Ruiz Sánchez<br>Mr. Roberto Fernández Castilla<br>Ms. Elena Oñoro Sainz<br>Abogacía General del Estado<br>The Ministry of Justice of the<br>Government of Spain<br>Calle Ayala 5<br>28001 Madrid<br>Spain |

_____

### GLOSSARY

| | |
|---|---|
| **2005-2010 Plan** | Plan for the Promotion of Renewable Energies in Spain 2005-2010. **R-0072**; **C-0221**. |
| **Accuracy ER-1** | "*Economic Report on the Incentives to the Solar Thermal Sector in Spain*," of 28 January 2016. Expert report prepared for the Respondent by the Accuracy Group. |
| **Accuracy Q-ER-1** | "*Economic Report on the Plaintiffs and their Claim*," of 28 January 2016. Expert report prepared for the Respondent by the Accuracy Group. |
| **Accuracy Q-ER-2** | "*Second Economic Report on the Claimants and their Claim*" of 30 November 2016. Expert report prepared for the Respondent by the Accuracy Group. |
| **Act 14/2000** | Act 14/2000 on fiscal, administrative and social order Measures of 29 December 2000. **C-0058**. |
| **Act 24/2013 or EPA of 2013** | Law 24 of 2013 on the Electric Power Sector enacted on 26 December 2013. **C-311**. |
| **Arbitration Rules** | ICSID Rules of Procedure for Arbitration Proceedings. |
| **Art./Arts.** | Article/Articles. |
| **BIT** | Bilateral Investment Treaty. |
| **Centre** | International Centre for Settlement of Investment Disputes. |
| **CER-1** | "*Changes to the Regulation of Concentrated Solar Power Installations in Spain*," of 19 May 2015. Expert report prepared for Claimants by the Brattle Group. |
| **CER-2** | "*Financial Damages to InfraRed*," of 19 May 2015. Expert report prepared for Claimants by the Brattle Group. |
| **CER-4** | "*Rebuttal Report: Financial Damages to InfraRed*," of 13 October 2016. Expert Report prepared for Claimants by the Brattle Group. |
| **Charter** | The European Energy Charter. |
| **Claimants** | i. InfraRed Environmental Infrastructure GP Limited, <br> ii. European Investments (Morón) 1 Limited, <br> iii. European Investments (Morón) 2 Limited, <br> iv. European Investments (Olivenza) 1 Limited; and <br> v. European Investments (Olivenza) 2 Limited. |
| **Cl. Mo-M** | Claimants' Memorial on the Merits, 14 October 2016. |
| **Cl. Reply** | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, 18 December 2015. |

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

| | |
|---|---|
| **Claimants' Comments to Commission's First Application** | Claimants' Comments to the Application for Leave to Intervene submitted by the European Commision, 9 January 2015. |
| **Claimants' Observations on Request for Bifurcation** | Claimants' Observations on Request for Bifurcation of 30 September 2015. |
| **Claimants' PHB** | Claimants' Post-Hearing Brief, 21 September 2017. |
| **Respondent's Submission on Achmea** | Respondent's Comments on Slovak Republic v. Achmea BV, Case No. C-284/16, ECLI:EU:C:2018:158, Judgment of the ECJ dated 6 March 2018, submitted on 23 March 2018. |
| **Claimants' Submission on Achmea** | Claimants' Comments to the Achmea Judgment of the ECJ, 23 March 2018. |
| **Claimants' Submissions on the January Declarations** | Claimants' comments on the declarations by EU Member States of January 15-16, 2019, 11 February 2019. |
| **Claimants' Written Observations to the Re-Application for Leave to Intervene** | Claimants' Written Observations to the Re-Application for Leave to Intervene submitted by the European Commission, 19 February 2016. |
| **CNE** | "*Comisión Nacional de Energía*", the Spanish National Energy Commission. |
| **Commission** | European Commission. |
| **Commission's First Application** | European Commission's Application for Leave to Intervene as a Non-Disputing Party, 12 November 2014. |
| **Commission's Second Application** | European Commission's Second Application for Leave to Intervene as a Non-Disputing Party, 9 December 2015. |
| **Council of Ministers' Press Release** | Council of Ministers' Press Release of 3 December 2010. |
| **CounterMoPO** | Claimants' Counter-Memorial on Preliminary Objections, 5 October 2016. |
| **CPI** | Consumer Price Index. |
| **Crawford WS** | Witness Statement of Mr. William Richard Crawford, 15 May 2015. |
| **CSP** | Concentrated solar power. |
| **DCF** | Discounted cash flow. |
| **ECJ** | European Court of Justice. |
| **ECT** | Energy Charter Treaty. |
| **Act 54/1997 or EPA 1997** | Act 54/1997 on the Electrical Power Sector of 27 November 1997. **C-0047**. |

| EU | European Union. |
|---|---|
| **EUR** | Euros. |
| **FIT** | Feed-in-Tariff mechanism provided in RD 661/2007. |
| **Hearing** | Hearing on Jurisdiction and the Merits held at Paris, France, from 24 April 2017 to 28 April 2017. |
| **ICSID** | International Centre for Settlement of Investment Disputes. |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of other States. |
| **IDEA** | *Instituto para la Diversificación y Ahorro de la Energía.* |
| **Institution Rules** | Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings. |
| **May 2007 Press Release** | Press release of 25 May 2007. |
| **MO IET/1045/2014** | Ministerial Order IET/1045/2014 of 16 June 2014, establishing certain aspects of the economic regime applicable to the different RE installations. **C-0321** and **C-321bis**. |
| **MO IET/1882/2014** | Ministerial Order IET/1882/2014 of 14 October 2014 calculating the power attributable to the use of fuels in thermosolar installations. **C-332**. |
| **MoPO** | Respondent's Memorial on Preliminary Objections and Request for Bifurcation, 17 July 2015. |
| **Morón Plant** | CSP Plant located at Morón de la Frontera, Seville, Spain. |
| **CNMC** | *Comisión Nacional de los Mercados y la Competencia* (National Commission on Markets and Competition). |
| **NEC** | National Energy Commission. |
| **Olivenza 1 Plant** | Ibereólica Solar Olivenza, S.L., a 50 MW CSP plant in Spain. |
| **Parties** | Collectively, the Claimants and the Respondent. |
| **Purported Agreement** | Document attached to an email of 8 July 2010 titled "*Agreement with the Thermosolar Sector*" sent on behalf of the "*D.G. Energy Policy and Mines*" to Protermosolar's Secretary General. **C-198**. |
| **PV** | Photovoltaic. |
| **RAB** | Regulatory Asset Base. |
| **RAIPRE** | "*Registro Administrativo de Instalaciones de Producción en Régimen Especial*", the registry of installations producing renewable energy under the Special Regime. |

| | |
|---|---|
| **RD** | Royal Decree. |
| **RD 413/2014** | Royal Decree 413/2014 of 6 June 2014, regulating the activity of electrical energy production from renewable energy, waste or co-generation sources. **C-328**. |
| **RD 436/2004** | Royal Decree 436/2004 of 12 March 2004 establishing the methodology for updating and systematizing the legal and economic regime governing electric power production under the special regime. **C-055**. |
| **RD 661/2007** | Royal Decree 661/2007 of 25 May 2007 which regulates the activity of electric energy production under the special regime. **C-0049**. |
| **RD 1614/2010** | Royal Decree 1614/2010 of 7 December 2010 regulating and modifying certain aspects of the electric energy production by thermosolar and wind technologies. **C-0050**. |
| **RD-L** | Royal Decree-Law. |
| **RD-L 2/2013** | Royal Decree-Law 2/2013 of 1 February 2013 concerning urgent measures in the electric system and the financial sector. **C-0322**. |
| **RD-L 6/2009** | Royal Decree-Law 6/2009, of 30 April 2009 which adopts certain measures in the energetic sector and passes the discount tariff. **C-0065**. |
| **RD-L 7/2006** | Royal Decree-Law 7/2006, of 23 June 2006 adopting urgent measures in the energy sector. **C-0061**. |
| **RD-L 9/2013** | Royal Decree Law 9/2013, enacted on 12 July 2013, by which urgent measures are adopted to guarantee the financial stability of the electricity system. **C-0327**. |
| **RD-L 14/2010** | Royal Decree-Law 14/2010, concerning urgent measures to correct the tariff deficit in the electric sector. **C-0069**. |
| **ReplyPO** | Respondent's Reply on Preliminary Objections, 21 November 2016. |
| **Request for Arbitration** | Claimants' Request for Arbitration, of 8 May 2014. |
| **RejoinderPO** | Claimants' Rejoinder on Preliminary Objections, 21 December 2016. |
| **Resp. Co-Mo** | Respondent's Counter-Memorial on the Merits, 29 January 2016. |
| **Respondent** | The Kingdom of Spain. |
| **Respondent's Observations regarding the Commission's First Application** | Respondent's Observations regarding the European Commission's Request to Intervene as a Non-Disputing Party, 19 February 2016. |

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

| | |
|---|---|
| **Respondent's PHB** | Respondent's Post Hearing Brief. |
| **Respondent's Rejoinder** | Respondent's Memorial of Rejoinder on the Merits and Reply on Jurisdiction, 1 March 2016. |
| **ROEI** | Regional Organization of Economic Integration. |
| **Sausmikat WS-1** | Witness statement of Mr. Daniel Sausmikat, 13 May 2015. |
| **Sausmikat WS-2** | Second Witness Statement of Mr. Daniel Sausmikat, 11 October 2016. |
| **Servert Report** | Dr. Jorge Servert, "*Morón and Olivenza Parabolic Trough CSP plants – Lifetime analysis*", November 2016. |
| **SES** | Spanish Electrical System. |
| **Spain** | The Kingdom of Spain. |
| **Treaty** | Energy Charter Treaty. |
| **TVPEE** | Tax on the value of the production of electrical energy, introduced by Law 15/2012. |
| **VCLT** | Vienna Convention on the Law of Treaties |

## TABLE OF CONTENTS

I.  THE FACTUAL BACKGROUND.................................................................................10

   A.  Overview...........................................................................................................10

   B.  The ECT ...........................................................................................................12

   C.  The Regulatory Framework In Force at the Time of the Investment..........................13

      i.  Act 54/1997 – the EPA 1997 ......................................................................14

      ii.  1997-2007: Policies and other measures to foster investment in the renewable energy sector................................................................................................15

      iii.  RD 661/2007.............................................................................................16

      iv.  2009-2010: Registration requirements restricting access to the Special Regime – RD-L 6/2009, the Pre-Allocation Registry and the RAIPRE ............................20

      v.  The Purported Agreement between the Spanish Government and the CSP Sector, the exchange of letters and resolutions and RD 1614/2010 ...........................21

   D.  Claimants' Investment.......................................................................................27

      i.  Claimants' Purported Expectations ...............................................................27

      ii.  Claimants' Due Diligence ............................................................................29

   E.  The Measures at Issue.......................................................................................31

      i.  Act 15/2012................................................................................................32

      ii.  RD-L 2/2013...............................................................................................33

      iii.  RD-L 9/2013...............................................................................................33

      iv.  Electric Power Act 24/2013 .........................................................................35

      v.  RD 413/2014 and Ministerial Orders MO IET/1045/2014, MO IET/1168/2014, MO IET/1882/2014 ……………………………………………………………………………35

   F.  The Impact of the Measures at Issue upon Claimants' Investment...........................38

II.  PROCEDURAL HISTORY .......................................................................................41

III.  THE NON-DISPUTING PARTY APPLICATIONS.......................................................53

IV.  THE TRIBUNAL'S JURISDICTION..........................................................................55

   A.  The Intra-EU Objection .....................................................................................57

      i.  The Respondent's Position............................................................................57

      ii.  The Claimants' Position...............................................................................64

      iii.  Recent decisions on point ...........................................................................68

      iv.  Analysis....................................................................................................74

   B.  The Taxation Objection .....................................................................................79

      i.  The Respondent's Position............................................................................80

      ii.  The Claimants' Position...............................................................................81

iii.   Relevant authorities ................................................................................... 83

iv.   Analysis ..................................................................................................... 85

V.      THE ISSUES ON THE MERITS ...................................................................... 88

VI.     DISCUSSION ................................................................................................ 94

A.   The Plants' Installed Capacity ............................................................................ 94

i.    The Parties' Positions ................................................................................ 94

ii.   Relevant arbitral authorities ...................................................................... 96

iii.  Discussion ................................................................................................. 97

B.   The Alleged Breach of Spain's FET Obligation ......................................... 99

i.    The standards governing the assessment of the FET ........................... 100

ii.   The alleged violation of Claimants' expectation of stability of the Original Regulatory Framework .................................................................................................. 110

iii.  The alleged violation of Respondent's duty of transparency and due process ...... 132

C.   The Other Grounds of Liability Asserted under Article 10 ECT .............. 135

D.   The Expropriation Claim ............................................................................ 136

i.    The Parties' Positions .............................................................................. 137

ii.   Relevant Authorities ................................................................................ 138

iii.  Discussion ............................................................................................... 140

E.   Damages .................................................................................................... 142

i.    Overview .................................................................................................. 142

ii.   Valuation Method ..................................................................................... 145

iii.  Plants' Operational Lifetime ..................................................................... 150

iv.   Other DCF Assumptions .......................................................................... 155

v.    The Tax "Gross-Up" Claim ...................................................................... 161

vi.   Conclusion on quantum ........................................................................... 162

vii.  Interest .................................................................................................... 162

viii. Costs ....................................................................................................... 163

VII.    AWARD ...................................................................................................... 166

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

## I.   THE FACTUAL BACKGROUND

### A.   OVERVIEW

1.   The present arbitration arises from the changes enacted by the Kingdom of Spain ("**Spain**" or the "**Respondent**") to the regulatory and legislative regime of state subsidies to renewable energy producers from 2012 through 2014. In particular, the issues in dispute pertain to the effect of those regulatory changes on two Concentrated Solar Power ("**CSP**") plants in which the Claimant entities invested.

2.   A CSP plant produces electricity by concentrating solar power using mirrors placed on towers or parabolic troughs placed on a line on the ground.[1] Thus concentrated, the solar power heats a fluid, typically oil, water or molten salts, which in turn generates steam that powers a turbine connected to a power generator.[2] CSP plants rely on what is referred to as "*thermal*" solar, or thermosolar, technology (as opposed to "*photovoltaic*" technology). CSP plants are described as "*capital intensive.*" The largest part of their cost relates to the initial investment necessary to build and commission the plant.[3] Investors' return on their initial investment comes principally in the form of profits earned during the period of operation of the CSP plant.[4]

3.   In the late 1990s and early 2000s, Spain pursued a vigorous policy to encourage renewable electricity production and attract investments in renewable technologies, including CSP sources. This policy furthered Spain's international commitments and obligations set out, among others, in the directives of the European Union and the Kyoto Protocol.[5]

4.   At that time, most renewable energy production sources were unprofitable by market standards alone. The costs required to design, install, commission and operate most renewable electricity production technologies were not recoverable solely from the revenues generated by selling the electricity on the open market.[6] State economic incentives were essential to the implementation of such technologies. That was particularly true for CSP, which, by the account of Respondent's experts in this arbitration, was the "*most immature renewable technology.*"[7] The implementation of CSP technology, in Spain and elsewhere, was therefore heavily dependant on state economic assistance.

5.   As of 1997, Spain established a regime of subsidies meant to provide renewable energy producers with the remuneration necessary to make renewable energy production

---

[1] Eduard Saura, Christophe Schmit, Stéphane Perrotto, *"Economic Report on the Incentives to the Solar Thermal Sector in Spain,"* expert report prepared for the Respondent by the Accuracy Group, 28 January 2016, ("**Accuracy ER-1**"), at para. 303.

[2] *Ibid.*

[3] José Antonio Garcia and Carlos Lapuerta, "*Changes to the Regulation of Concentrated Solar Power Installations in Spain,*" expert report prepared for Claimants by the Brattle Group, 19 May 2015, ("**CER-1**"), on p. 13. See also Accuracy ER-1, at para. 225.

[4] *Ibid.*

[5] See *inter alia* Accuracy ER-1, at paras. 223 and following.

[6] Accuracy ER-1, at para. 112.

[7] *Ibid.*, at para. 115.

profitable, and to turn Spain into an attractive investment destination for such technology. (These measures are discussed in detail below, at section I.C.)

6.    The Claimants in the present dispute (the "**Claimants**") are:

  (i)    InfraRed Environmental Infrastructure GP Limited ("**InfraRed Limited**"), a private limited company incorporated and existing, since January 16, 2008, under the laws of the United Kingdom. InfraRed Limited acts in its own name and on its own behalf and as a General Partner in the name and on behalf of InfraRed Environmental Infrastructure Fund I LP (a Limited Partnerships formed under the English Limited Partnerships Act 1907), InfraRed Environmental Infrastructure Fund II LP (a Limited Partnership formed under the English Limited Partnership Act 1907) and InfraRed Environmental Infrastructure Fund III LP (a Limited Partnership formed under the English Limited Partnership Act 1907). InfraRed Environmental Infrastructure Fund I LP, InfraRed Environmental Infrastructure Fund II LP and InfraRed Environmental Infrastructure Fund III LP are registered with the Registrar of Companies for England and Wales (Companies House);

  (ii)    European Investments (Morón) 1 Limited;

  (iii)    European Investments (Morón) 2 Limited;

  (iv)    European Investments (Olivenza) 1 Limited; and

  (v)    European Investments (Olivenza) 2 Limited.

  These four companies (listed at sub-paragraphs (ii) to (v) above) are private limited companies established under the laws of the United Kingdom on 20 July 2011.

7.    On or around 28 July 2011, Claimants invested a total of €31 million in two Spanish CSP plants: Ibereólica Solar Morón, S.L. ("**Morón**") and Ibereólica Solar Olivenza, S.L. ("**Olivenza**").[8]

8.    Between 2012 and 2014, Spain enacted a series of changes to the remuneration regime for renewable energy production, which – by all accounts – reduced the total remuneration available to renewable energy producers, including CSP plants. As discussed in further detail below, Spain claims that these changes were adopted in order to curb a so-called "*tariff deficit*" affecting the Spanish Electricity System (the "**SES**"), which became particularly acute after the liquidity crisis of 2008, as the income generated by the SES failed to keep up with the growing costs of electricity production and distribution, including the subsidies paid to renewable energy producers.

---

[8] Carlos Lapuerta, Richard Caldwell, José Antonio Garcia, *Financial Damages to InfraRed*, expert report prepared for Claimants by the Brattle Group, 19 May 2015, ("**CER-2**"), on p. 4.

InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain

**AWARD**

ICSID Case No. ARB/14/12

9.   The central question at issue in this arbitration is whether those legislative and regulatory changes violated Spain's international obligations under the Energy Charter Treaty (the "**ECT**").

**B.   THE ECT**

10.   The ECT is a multilateral treaty that was signed in December 1994 and entered into force in April 1998, the purpose of which is to "*promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the* [European Energy] *Charter.*"[9]

11.   One such principle of the European Energy Charter is the promotion and development of "*an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns.*"[10]

12.   Article 10 and following of the ECT provide for an array of protections that each Contracting Party undertakes to accord investors from other Contracting Parties with respect to investments in the energy sector. In particular, Article 10 (1) of the ECT provides as follows:

> "***Article 10: Promotion, Protection and Treatment of Investments***
>
> *(1)   Each Contracting Party shall, in accordance with the provisions of this Treaty, <u>encourage and create stable, equitable, favourable and transparent conditions</u> for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties <u>fair and equitable treatment</u>. Such Investments <u>shall also enjoy the most constant protection and security</u> and <u>no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal</u>. In no case shall such Investments be accorded treatment less favorable than that required by international law, including treaty obligations. <u>Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an investor of any Contracting Party</u>.*
>
> *(…)*"

[Emphasis added]

13.   This said, the ECT also recognizes the principle of state sovereignty over energy resources:

---

[9] Article 2 of the ECT,
[10] European Energy Charter, (**RL -0001**); cited in Respondent's *Rejoinder on the Merits*, 30 November 2016, ("Resp. **Rejoinder**"), at paras. 1067 and 1068.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

> "***Article 18: Sovereignty over Energy Resources***
>
> *(1)*    *The Contracting Parties recognize state sovereignty and sovereign rights over energy resources. They reaffirm that these must be exercised in accordance with and subject to the rules of international law.*
>
> *(…)*"

## C.    THE REGULATORY FRAMEWORK IN FORCE AT THE TIME OF THE INVESTMENT

14.    The regulatory framework governing the remuneration of CSP plants in force in Spain when Claimants invested in the Morón and Olivenza plants in 2011 (the "**Original Regulatory Framework**") was based principally on:

-    a legislative act, Act 54/1997 of November 27 on the Electrical Power Sector ("**Act 54/1997," also known the "EPA 1997**"),[11] which establishes the main parameters for what was called the "*Special Regime*" of remuneration benefitting renewable energy producers; and

-    a series of ensuing regulations (royal decrees or royal decrees-law) which establish, modify and/or detail the amounts, modalities and conditions of the remuneration available to renewable energy producers, including CSP plants.

15.    The regulations adopted subsequently to Act 54/1997 can be roughly grouped in two chronological periods: those enacted between 1997 and 2007, aimed at *encouraging* the construction and development of renewable energy facilities in Spain; and those enacted between roughly 2009 and 2010 aimed at *curbing* the number of producers that could benefit from the regime of state subsidies.

16.    So ambitious was the Spanish renewables programme that between 1997 and 2007, Spain more than doubled its 2010 target for the proportion of electrical energy produced using renewable sources – from 12% in 1997[12] to 29.4% in 2007.[13] As a result, by 2009, the total capacity of CSP plants proposed by would-be developers greatly surpassed the target set by the regulator (500 MW targeted versus 4,499 MW proposed).[14] This trend held for the entirety of the renewable sector.

---

[11] Act 54/1997 of November 27 on the Electric Power Sector (**C-0047t**) (the "**EPA 1997**").

[12] See the EPA 1997 (**C-0047t**), at the 25th additional provision.

[13] See Royal Decree 661/2007 of May 25 (**C-0049t**), regulating the activity of electric energy production under the Special Regime (the "**RD-661/2007**") at the preamble: *"With this Royal Decree it is intended that in the year 2010 the indicative national target included in Directive 2001/77/EC of the European Parliament and Council of September 27, 2001 on the promotion of electricity generated using renewable sources in the internal electricity market energy is achieved, so that at least 29.4 percent of gross electricity consumption in 2010 comes from renewable energy sources."*

[14] *"Resolution of 19 November 2009 of the Secretariat of State for Energy (…) regulating projects or facilities submitted to the Remuneration pre-allocation Register (…)"*, at paras. II and III of the Preamble, (**C-0091t**).

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

17.   As a result, in 2009 and 2010 – against the backdrop of the gathering economic storm and as the tariff deficit issue crept slowly into the political agenda – the Spanish government adopted, as mentioned, a series of regulations and decrees aimed at ensuring that the SES would be capable of absorbing the output of new renewables facilities and the associated costs (principally subsidies).

### *i.   Act 54/1997 – the EPA 1997*

18.   Act 54/1997 – the EPA 1997 – regulated electrical energy production and distribution and furthered the objective of market liberalization.[15] It established a free market framework for the production and distribution of electricity, but vested in the Spanish government the power to regulate certain aspects of the production and distribution process, such as the remuneration of electricity producers.[16]

19.   In this regard, article 15 of EPA 1997 provides:

"*Article 15. Remuneration of Activities*

*1.   Activities for the supply of electric power shall be financially remunerated in the manner prescribed herein, with charge tolls and prices settled.*

*2.   The remuneration of the regulated activities will be financed through revenue collected by transport and distribution network access tolls paid by consumers and producers.*

*3.   The tolls and prices will be determined by regulatory setting of the remuneration of the activities with objective, transparent and non-discriminatory criteria to encourage improvements in the management effectiveness, economic and technical efficiency of these activities and the quality of electric power supply.*"[17]

20.   More importantly for the present case, the EPA 1997 created a two-pronged remuneration scheme comprising an "*ordinary regime*" applicable to producers of electricity using non-renewable sources (the "**Ordinary Regime**") and a "special regime" (the "**Special Regime**") applicable to producers using renewable sources that comply with certain strict conditions.[18] In this regard, article 27 EPA 1997 provides as follows:

"*Article 27. Special regime for the production of electricity*

*1.   The electric power production activity <u>shall be considered production under the special regime in the following cases, when it is performed using facilities whose installed capacity does not exceed 50 MW</u>:*

*(…)*

---

[15] EPA 1997 (**C-0047t**), see Explanatory Preamble.
[16] Article 15 EPA 1997 (**C-0047t**).
[17] EPA 1997 (**C-0047t**).
[18] *Ibid.*, see Explanatory Preamble and Article 27.

> b)  <u>When any of the non-consumable renewable energies</u>, biomass or any type of biofuel <u>is used as primary energy</u>, whenever its owner is not engaged in production activities under the ordinary regime."[19]

[Emphasis added; bold characters in the original]

21.  In furtherance of the legislative purpose of "*promot*(ing) *renewable energies*", the EPA 1997 provided that the remuneration of renewable energy producers "*shall be supplemented with the perception of a premium*" to be established by subsequent regulations, which would allow the renewable energy producers to earn a reasonable return on their investment.[20] In that regard, Article 30(4) of the EPA 1997 provides:

> "**Article 30. Obligations and rights of producers under the special regime**
>
> (…)
>
> 4.  <u>The remuneration regime for power production facilities under the special regime shall be supplemented with the perception of a premium, in the terms to be developed by implementing regulations</u> (…):
>
> > The determination of premiums will take account of the voltage level of the delivery of energy to the network, the effective contribution to the improvement of the environment, the primary energy savings and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred, <u>in order to achieve reasonable rates of profitability with reference to the cost of the money on the capital markets</u>.
>
> (…)"[21]

[Underlining added; bold characters in the original]

22.  The EPA 1997 does not specify the precise amount or payment terms of the "*premium*" benefitting renewable energy producers. Respondent submits that – in accordance with the "*Kelsenian pyramid*" that describes the Spanish legal system – the EPA 1997 sets the general legal framework for remuneration under the Special Regime,[22] which is further developed and detailed in subsequent royal decrees and royal decree laws. According to Respondent, these royal decrees and royal decree laws must be considered as legally subordinated to and implementing the provisions of the governing statute, the EPA 1997, and, in particular, to the principle of "*reasonable rate of profitability with reference to the cost of the money on the capital markets.*"[23]

### ii.  1997-2007: Policies and other measures to foster investment in the renewable energy sector

---

[19]  *Ibid.*, at Article 27.
[20]  *Ibid.*, at Article 30(4).
[21]  *Ibid.*
[22]  See in particular the presentation titled *"Fundamental Facts: Objective Framework"* filed by Respondent's counsel at the hearing on the merits on 24 April 2017 in Paris, on pp. 11 and 12.
[23]  *Ibid.* See also Respondent's Counter-Memorial on the Merits, 29 January 2016, ("**Resp. Co-Mo**"), on pp. 16 and following.

23.     Between 1997 and 2007, Spain adopted a series of regulatory and legislative measures[24] that fleshed out the scheme of remuneration under the Special Regime created by the EPA 1997, as well as a suite of policies and other measures to encourage renewable energy production from solar sources and to attract investment in Spain's (at the time) fledgling solar sector.

24.     These initiatives include the following:

-       The adoption in 2000 of a *Renewable Energy Plan* which specifically listed thermal solar technology (e.g., CSPs) as a renewable source to be developed and established a target of 200 MW thermal solar installed capacity to be reached by 2010;[25]

-       A presentation prepared by the Institute for the Diversification and Saving of Energy (the "**IDAE**") [26] titled "*The Sun can be yours,*" intended to entice investors to invest in Spain's solar energy industry.[27] The presentation posed the question: "*Why is it good to invest in a solar thermal power facility?*" and answered the question as follows: "*Because … the RETURN on your investment is reasonable and at times can reach 15 %.*" [underlining added]

-       The adoption in 2005 of a new *Renewable Energy Plan* which raised the 2010 target for installed capacity of CSP projects to 500 MW.[28]

25.     These initiatives culminated in 2007 with the adoption by the Spanish Government of *Royal Decree 661/2007 of May 25,* which regulated the activity of electric energy production under the Special Regime ("**RD 661/2007**").[29]

###     iii.     RD 661/2007

26.     RD 661/2007 is invoked by Claimants as the main source of the rights and expectations they seek to vindicate.[30] In enacting RD 661/2007, Spain aimed to address the low rate

---

[24] See in particular *Royal Decree 2818/1998 of December 23, on electricity production by facilities using renewable sources of energy, waste and cogeneration* (**C-0054t**); *Act 14/2000, of December 29 on fiscal, administrative and social order measures*, (**C-0058t**) which modified the EPA 1997 to add, among others, the following provisions at Article 30(5) of the EPA: "*Nevertheless, the Government shall be able to authorize higher premiums than those indicated in the previous paragraph for those installations using solar energy as their primary energy source.*" See also *Royal Decree 436/2004, of March 12, establishing the methodology for updating and systematizing of the legal and economic regime governing electric power production under the Special Regime* ("**RD 436/2004**") (**C-0055t**). See also *Royal Decree-Law 7/2006, of June 23, adopting urgent measures in the energetic system* (**C-0061t**).

[25] See *Renewable Energy Promotion Plan in Spain 2000-2010* (**R-0071**), on p. 213.

[26] In Spanish, the *Instituto para la Diversificación y Ahorro de la Energía*. The IDAE is an entity affiliated with the Secretariat of State for Energy and its president is the Secretary of State for Energy. See in that regard Claimants' Memorial on the Merits, 21 May 2015, ("**Cl. Mo-M**"), at para. 51. See also Article 2(6) of RD 344/2012 (**C-0032t**).

[27] IDAE, "*El Sol puede ser suyo*", 6 June 2007 **C-0518,** and 24 May 2005 **C-0064**, the latter of which refers to a rate of return of 15 %.

[28] Spain Renewable Energy Promotion Plan 2005-2010 (**R-0072**; **R-0221**), see section 3.4.4. "*Goals for 2010.*"

[29] RD 661/2007 (**C-0049t**).

[30] See Cl. Mo-M, on pp. 229 and 230.

of investment in the renewable energy sector and the slow pace of progress towards Spain's renewable energy targets, in particular the target of 500 MW of installed CSP capacity to be achieved by 2010.[31]

27. One of the most significant features of RD 661/2007 is the remuneration regime it set forth,[32] which entitled renewable energy producers, including CSP plants, to remuneration in the form of a "*feed-in*" system that offered two alternative forms of revenues:

- A regulated "***feed-in tariff***"; essentially a price fixed by regulation that the producer receives per unit of energy (kWh) integrated into the SES distribution grid;[33]

- A "***pool price premium***"; a fixed supplement (or premium) in the amount of c€25.4/kWh over and above the prevailing market price for electricity that renewable producers were entitled to receive.[34]

28. RD 661/2007 granted renewable energy producers subject to the Special Regime the following remuneration entitlements (described by Claimants as the "*seven rights*" in reliance upon which they invested[35]):

1. **Right to opt between the tariff and the premium**: Under Article 24 of RD 661/2007, renewable energy producers, including CSP plants, had the right to elect to be paid under either the feed-in tariff or the premium method, at their discretion.[36]

2. **Right to sell full amount of electricity produced**: Under Article 17(b) of RD 661/2007, renewable producers, including CSP plants, had the right to "*incorporate into the system, through the electric distributor or transport company, their net production of electric energy or energy sold provided that it is technically possible for it to be absorbed into the grid.*"[37] [Emphasis added]

3. **Right to back-up fuel**: Under Article 2(1)(b)(1) of RD 661/2007, CSP producers had the right to receive remuneration under the Special Regime even for electricity produced with non-renewable back-up fuel (i.e. natural gas), to the extent that the

---

[31] See RD 661/2007 (**C-0049t**) at explanatory note, para. 3: "*The creation of the special regime electricity generation was an important milestone in our country's energy policy. The targets for the promotion of renewable energies and combined heat and power, are collected in 2005-2010 Renewable Energies Plan and the Strategy of Energy Saving and Efficiency in Spain (E4), respectively. <u>In view thereof it is found that although experienced by all the special arrangements for electricity generation has been remarkable growth in certain technologies, the objectives are still far from being achieved.</u>*" [Emphasis added]

[32] The "feed-in" system set out by RD 661/2007 maintained and further supplemented the one set out at Article 22 of RD 436/2004 (**C-0055t**).

[33] See Article 24(1)(a) of RD 661/2007 (**C-0049t**).

[34] Article 24(1)(b) of RD 661/2007 (**C-0049t**).

[35] See Cl. Mo-M, at paras. 171 and 172.

[36] Article 24 of RD 661/2007 (**C-0049t**).

[37] Article 17(b) of RD 661/2007 (**C-0049t**).

total amount of electricity so produced did not exceed 12 % of the total energy produced if the producer opted to be remunerated under the feed-in tariff option and 15 % if it opted for the pool price premium option.[38] This was deemed important for CSP plants, since efficiency considerations require the heat transmitter fluid to be maintained at a high temperature even in the absence of solar radiation.

4.  **Remuneration for lifetime of plants**: Under Article 36 of RD 661/2007, the CSP producers had a right to receive remuneration under the Special Regime for the entire lifetime of the CSP plants (the values of the tariffs and premiums were to decrease after the first 25 years of operation, from €26.9/kWh to €21.5/kWh for the tariff and from c€25.4/kWh to c€20.3/kWh for the premiums).[39]

5.  **Updating of tariff and premium**: Under Article 44(1) of RD 661/2007, the values of the tariff and premium were to be updated in accordance with the Consumer Price Index ("*CPI*") less 0.25% until 2012 and less 0.50% after 2012.[40]

6.  **Priority access**: According to Article 17(e) of RD 661/2007, the CSP producers were entitled to a right of priority in accessing and connecting to the Spanish electricity grid to distribute the energy produced, "*under the terms and conditions set out in Annex XI of this Royal Decree, or in such regulations that may supersede them.*"[41] [Emphasis added]

7.  **Reactive energy**: Under Article 29(1) of RD 661/2007, the CSP producers had the right to receive a supplement for reactive energy and were to pay a penalty depending on whether the plants respected certain prescribed "*power facts.*"[42] (It is telling, however, that during cross-examination at the hearing, the representative of InfraRed, Mr. Sausmikat was unable to answer questions

---

[38] Article 2(1)(b)(1) of RD 661/2007 (**C-0049t**).

[39] Article 36 of RD 661/2007(**C-0049t**). See also Table 3 at Article 36.

[40] Article 44 (1) of RD 661/2007 (**C-0049t**): *"The values of the tariffs, premiums, supplements and lower and upper limits of the hourly price of the market as defined in this Royal Decree, for category (b) [...] shall be annually updated, using as a reference the increase in the CPI less the value set out in the First Additional Provision of this Royal Decree."* The First Additional Provision of RD 661/2007 provides as follows: *"The reference value established for the subtraction of the CPI referred to in this Royal Decree for updating certain established values shall be twenty-five basis points* [0.25 %] *until December 31, 2012, and fifty basis points* [0.5 %] *thereafter."*

[41] Article 17(e) of RD 661/2007 (**C-0049t**).

[42] Article 29(1) of RD 661/2007 (**C-0049t**): *"All facilities under the special regime, by virtue of the application of this Royal Decree, excluding the exceptions established under law, regardless of the sale option elected under Article 24.1, shall receive a reactive energy supplement or penalty, as appropriate, for maintaining certain stipulated power factor values. This add is set as a percentage of the value of 8.2954 c €/kWh, depending on the power factor at which the energy is supplied, to be reviewed annually by the Minister of Industry, Tourism and Trade. This percentage shall be established in Annex V to the present Royal Decree."*

regarding the supplement for reactive energy, even from a purely commercial point of view.[43])

29. Article 44(3) of RD 661/2007 expressly contemplated a revision of the applicable tariffs, premiums and other remuneration variables in 2010 and every four years thereafter, which would be based on:

- the <u>costs associated with the respective renewable technologies</u>;[44]

- the "*degree of participation of the Special Regime in <u>covering the demand and its impact upon the technical and economic management of the system</u>*";[45]

- the necessity to "*guaranteeing <u>reasonable rates of return with reference to the cost of money in the capital markets</u>.*"[46]

[Emphasis added]

30. However, paragraph 2 of Article 44(3) specifically provided that the "*revisions (…) indicated in this section <u>shall not affect facilities for which the commissioning certificate had been granted prior to January 1 of the second year in which the revision has been performed</u>.*"[47] [Emphasis added]

31. Claimants submit that one of the key features of the Original Regulatory Framework as articulated in RD 661/2007 was that remuneration was calculated principally by reference to the electricity produced and sold. Claimants' experts describe the feed-in system of the Original Regulatory Framework as a "*performance-based system.*"[48] Under the pool price premium method, remuneration was calculated based on the electricity sold, the actual market price at the time of the sale, a reference premium fixed by RD 661/2007 (being c€25.4/kWh)[49] as well as upper and lower limits to the actual price received per kWh also fixed by RD 661/2007. (The upper and lower limits were meant to keep producers' remuneration within a fixed bracket – i.e. between c€25.4038/kWh and c€34.3976/kWh – should the market price sink too low or soar too high.[50])

32. In an internal memorandum on a draft version of the RD 661/2007 circulated two months prior to the adoption of that royal decree, Respondent stated that the premium option would entitle plants to a rate of return on their investment of 9.5 % for a standard

---

[43] See Transcript of the Hearing on the Jurisdiction, Merits and Quantum, held in Paris from April 24, 2017 - April 28, 2017, (the "**Transcript**"), Day 2, on pp. 22 and 23.
[44] See Article 44(3) of RD 661/2007 (**C-0049t**).
[45] *Ibid.*
[46] *Ibid.*
[47] Article 44(3) of RD 667/2007 (**C-0049t**).
[48] **CER-1**, on p.46.
[49] See Article 36 of RD 667/2007 (**C-0049t**).
[50] *Ibid.*

installation over the next twenty-five years, with a minimum of 7.6 % and a maximum of 11 %.[51]

### iv.    2009-2010: Registration requirements restricting access to the Special Regime – RD-L 6/2009, the Pre-Allocation Registry and the RAIPRE

33.    For the early to late 2000s, the installed capacity of renewable energy projects increased dramatically (by more than 50 000 MW, according to Respondent).[52] As of 2008, however, the demand for electricity started decreasing as a result of the impact of the international financial crisis on the Spanish economy.[53] This gave rise to a growing gap between the revenues generated by the SES (i.e, consumer rates and access tariffs collected on the deregulated market) and the costs of the SES, including the subsidies (in the form of the Special Regime feed-in tariffs and premiums) paid to renewable energy producers.[54] By 2013 this "*tariff deficit*" had reached €20 billion.[55]

34.    In May 2009, the Spanish government enacted Royal Decree Law RD-L 6/2009 ("**RD-L 6/2009**") which tightened the conditions under which producers would be eligible to receive remuneration under the Special Regime. In doing so the Spanish government expressly sought to address the growing tariff deficit that had already started to affect the SES:

"The growing tariff deficit *(that is, the difference between the amounts collected from the regulated tariffs established by the Administration and the rates paid by consumers for their regulated supply, and the access tariffs that are established by the deregulated market and the real costs associated to such tariffs)* is provoking serious problems that, in the context of the current international financial crisis, is seriously affecting the system and not only putting the financial situation of the companies in the electric power sector at risk, but also the sustainability of the system itself. *This imbalance is unsustainable and entails dire consequences, being that it is detrimental to the security and capacity of financing the investments that are necessary to supply electricity at the levels of quality and security demanded by the Spanish people.*"[56]

[Emphasis added]

---

[51] See *Draft Royal Decree Regulating the Activity of Energy Production Under the Special Regime and Certain Installations of Assimilated Technologies Under the Ordinary Regime*, from the General Directorate of Energy Policies and Mining, 21 March 2007, (**BRR-188**) on p. 188.
[52] Resp. Co-Mo, on p. 30.
[53] Resp. Co-Mo, on pp. 30 to 33.
[54] Resp. Co-Mo, on p. 33.
[55] Resp. Co-Mo, on p. 36.
[56] RD-L 6/2009, General Provisions (**C-0065t**), on p. 1.

35.    Access to the Special Regime was restricted by the creation of two "*registers*", a remuneration pre-allocation register (the "**Pre-Allocation Registry**")[57] and an administrative register of production facilities under the special regime (the "**RAIPRE**")[58].

36.    Under RD-L 6/2009 and a subsequent resolution of the Council of Ministers adopted on 24 November 2009 (the "**Council of Ministers Resolution**")[59], Spain obliged producers wishing to avail themselves of the Special Regime to: i) pre-register on the Pre-allocation Registry; and ii) begin producing electricity and register on the RAIPRE by a fixed date.[60] Producers that failed to comply would be disqualified from remuneration under the Special Regime.

37.    On 11 December 2009, the Olivenza and Morón plants registered on the Pre-Allocation Registry.[61] On 31 May 2012, the Morón plant registered on the RAIPRE.[62] The Olivenza plant registered on the RAIPRE on 18 December 2012.[63]

38.    The registration certificate of the the Morón plant states that its total capacity is 49,9 MW. The registration certificate of the Olivenza plant discloses that its capacity is 50 MW.[64]

>    ### v.    *The Purported Agreement between the Spanish Government and the CSP Sector, the exchange of letters and resolutions and RD 1614/2010*

39.    **Summary** – During the first half of 2010, the Spanish Government publicized its intention to "*slow down* [the] *current expansion*" of solar energy projects and to review the remuneration accorded to solar energy producers in view – among other things – of perceived technological improvements that contributed to a decrease in the capital and operating expenditures associated with such projects.[65]

40.    It is undisputed that, during the spring, summer and fall of 2010, a series of contacts and discussions occurred between representatives of the Spanish Government and of various industry associations. The nature of these discussions is the subject of controversy. Respondent qualifies the discussions as *consultations* with industry

---

[57] Created by RD-L 6/2009 (**C-0065t**).
[58] Created by RD 661/2007 but only used to restrict the criteria for access to the Special Regime after May 2009.
[59] **C-0091t**, on pp. 6 to 8.
[60] That date was thirty-six (36) months after notification of the plants' registration in the Pre-Allocation Registry. See in that regard Article 8 of RD-L 6/2009 (**C-0065t**). That date was subsequently changed to January 2016. See in that regard Article 4 of the Council of Ministers Resolution (**C-0091t**).
[61] See *Resolution from the General Directorate for Energy Policy and Mining whereby the facility THERMOSOLAR PLANT MORÓN is registered into the Pre-Allocation Register*, (**C-0095t**) and *Resolution from the General Directorate for Energy Policy and Mining whereby the facility THERMOSOLAR PLANT OLIVENZA 1 is registered into the Pre-Allocation Register* (**C-0096t**).
[62] See the certificate by Mr. Santiago Caravantes Moreno (who testified on Day 2 at the hearing on the merits) which attested that the Morón plant has been registered on the RAIPRE since 31 May 2012 (**C-0079t**).
[63] See the certificate by Mrs. Pilar Isla Franco, which attested that the Olivenza plant has been registered on the RAIPRE since 18 December 2012 (**C-0080t**).
[64] See **C-0079t** and **C-0080t**.
[65] See "*The 2020 Energy Mix*", presentation by the MINETUR (**C-0151t**) on p. 13.

representatives as part of the regular consultative process preceding a legislative or regulatory enactment. Claimants rather qualify these discussions, insofar as they concerned the CSP sector (separate discussions were held with other renewable energy producers), as *negotiations* preceding the conclusion of a binding agreement between the government and the CSP sector which exempted CSP facilities already in operation or registered on the Pre-Allocation Registry from the forthcoming regulatory changes.

41. The discussions – whether understood as consultations or negotiations – culminated in public communications by the Government of Spain which nonetheless referenced the term "*agreement*" and spoke of mutual concessions by the Ministry of Energy and Tourism (the "**MINETUR**") on the one hand, and the CSP sector on the other.[66] The announcement of this purported agreement was followed by a series of letters from the CSP plants in question and resolutions from MINETUR in which the plants agreed to postpone their start-up date (as Spain had requested) and Spain advised the plants in writing of the applicable remunerative regime. This exchange of letters and resolutions occurred contemporaneously with the adoption of royal decree RD 1614/2010 which – according to Claimants – enshrined as law the agreement entered into by CSP industry and the Government of Spain.

42. According to Claimants,  the discussions, the purported agreement, the exchange of letters and resolution and the enactment RD 1614/2010 form the basis of Claimants' contention that Spain undertook a specific commitment to maintain the Original Regulatory Framework stable for the duration of the plants' lifetime or, at the very least, to carve out the CSP plants registered on the RAIPRE (including the two plants at issue in this arbitration) from the scope of application of any regulatory reform.

43. **Discussions** – The Parties do not dispute and the evidence does indeed show that discussions were held during the spring and summer of 2010 between:

- **Government representatives**: Dr. Miguel Sebastián Gascón (Minister of Energy), Mr. Santiago Caravantes Moreno (head of the Special Regime Production Unit) and Antonio Hernández García (Director General of Energy Policy and Mining);[67] and

- **Industry representatives**: Mr. Luis Crespo, Secretary-General of *Protermosolar* (the industry association which purported to speak on behalf of Spain's CSP producers), and others.[68].

44. **The "Agreement"** – Following these discussions, on 2 July 2010, the MINETUR issued a press release titled: *"The Ministry of Industry closes an agreement with the wind and thermosolar sectors to revise their remuneration frameworks."* [69] [Emphasis added]

---

[66] See **C-0198t**.
[67] Mr. Caravantes provided a witness statement on behalf of Claimants and testified on Day 2 of the hearing.
[68] Mr. Crespo also provided a witness statement on behalf of Claimants and testified on Day 2 of the hearing.
[69] **C-0193t**.

According to the press release, the purported agreement contained the following elements:

- A waiver by the CSP producers of their right to avail themselves of the premium option (under Article 24(b) of RD 661/2007) for their first year of operation;

- A limitation of the number of hours of operation during which the electricity produced entitled the CSP plants to remuneration under the Special Regime;

- The deferral of the entry into operation of the CSP plants for a certain period of time;

45. The press release further stated that the agreement had the effect of "*guaranteeing the current premiums and tariffs of RD 661/2007 <u>for facilities in operation (and for those included in the pre-register) after 2013</u>*."[70] [Emphasis added]

46. On 8 July 2010, Ms. Rosa Francisca Gutiérrez Perez, acting "**On Behalf Of** *D.G. Energy Policy and Mines*" sent Mr. Crespo (Secretary-General of Protermosolar) an email titled: "*Solar Thermal Agreement*." [Bold characters in the original][71] The email contains a single sentence: "*In keeping with instructions from Mr. Antonio Hernández, <u>please find attached the Agreement with the Solar Thermal Sector</u>.*"[72] [Emphasis added] The document attached to the email bears the heading of the MINETUR and of Protermosolar and is titled: "*Agreement with the Thermosolar Sector*" (the "**Purported Agreement**").[73] The document provides as follows:

- Article 1 provides that the market price and premium option will be eliminated "*exceptionally and temporarily*" for one year;

- Article 2 provides for a "firm commitment to delay the entry into operation of several *of the plants entered on the basis of the attached list.*" The appendix titled "*Limitation to the entry into operation*" provides that the entry into operation of the Morón plant would be delayed from January 2011 to June 2012, while the entry into operation of the Olivenza plant would be delayed from January 2012 to June 2012;[74]

- Article 3 provides as follows: "*Amendment of Section 44.3 of Royal Decree 661/2007 <u>establishing that any future revisions of the premiums will not affect existing facilities, as it</u>* [is] *currently established for regulated tariffs, and upper and*

---

[70] *Ibid.*, p. 2.

[71] Email from Ms. Gutierréz Pérez to Mr. Crespo titled (in the English translation provided by the Claimants) as "*Solar Thermal Agreement*" (**C-0198t**). In the original document in Spanish, the title of the email is: "*Acuerdo Termosolar*" (**C-0198**).

[72] *Ibid.*: "*Siguiendo instrucciones de D. Antonio Hernández, adjunto se remite <u>Acuerdo con el Sector Termosolar.</u>*" [Emphasis added]

[73] *Ibid.*: "*Acuerdo con el Sector Termosolar.*" See **C-0198t**.

[74] **C-0198t**, on p. 5.

> *lower limits, nor those at the time of approval of the review* [that] *were already entered in the Feed-in Tariff Pre-assignment Registry created by Royal Decree-Law 6/2009, April 30, or that were definitely entered in the REPE prior to May 6, 2009.*"[75] [Emphasis added]

- Article 4 limits the number of hours of operation per year for which a given plant will be entitled to claim remuneration under the Special Regime as contemplated by RD 661/2007. In the case of the Morón and Olivenza 1 plants – which are thermosolar power plants using parabolic troughs without storage – the hours of operation entitling them to remuneration under the Special Regime are capped at 2,855.[76]

47. The Purported Agreement also provides, at Article 5, that the conditions contained therein "*are legally suitable* [and <u>shall</u>] *be reflected in the administrative decisions corresponding to each facility*."[77] [Emphasis added]

48. **Letters of waiver and resolutions** – During the fall of 2010, the same representatives of the Spanish Government and of the CSP industry who had led the discussions leading to the Purported Agreement (including Messrs. Crespo and Caravante) discussed, via email, the terms of the waiver letters that the CSP plants would submit to the Spanish Government by which they would formally defer their right to begin operations for an agreed period of time.[78] In November, 2010, the waiver letters were finalized and sent to the Spanish government on behalf of the Olivenza and Morón CSP plants.[79] The letters advised the Spanish Government of the waiver and requested the government to communicate the remuneration conditions applicable to the plants <u>for their operational life</u>.[80]

49. On 29 December 2010, the MINETUR sent resolutions directly to the Olivenza and Morón plants (the "**December Resolutions**"). The December Resolutions appear to respond explicitly to the letters of waiver.[81] Among other things, the December Resolutions provided that:

---

[75] **C-0198t**, on p. 2
[76] *Ibid.*
[77] *Ibid.*, on p. 3.
[78] **C-0276t** to **C-0284t**.
[79] See **C-0264t** and **C-0265t**.
[80] See the letters titled *Letter of waiver of entry into operation at a specific date in the phase assigned to the facility* [MORÓN SOLAR THERMAL PLANT / PLANTA TERMOSOLAR DE OLIVENZA] *pursuant to the Resolution of the Directorate General for Energy Policy and Mining of December 11, 2009 and upon request of a resolution communicating the remuneration conditions during the operational lifespan of said facility* (**C-0264t and C-0265t**) : "[…] *request*[ing] *to have the remuneration conditions for the facility <u>during its operational lifespan</u> communicated to* [them]" [Emphasis Added]
[81] The December Resolutions stipulate in their respective titles that each resolution is "*accepting the submission presented by* [each respective plant representative" (…) *to waive the right to commence the incorporation of electrical power before a specific date* (…)" See **C-0266t** and **C-0276t**.

- The General Directorate of the MINETUR "*accepts the waiver*" tendered by the Olivenza and Morón CSP plants;[82]

- The General Directorate of the MINETUR "*communicates that, at present,* (…) *the remuneration applicable to the facility is made up of the tariffs, premiums, upper and lower limits and supplements established by RD 661/2007, of May 25* (…)"[83]

50.   The December Resolutions also contained a provision stipulating that an appeal could be filed against each December Resolution in conformity with the modalities of Spain's laws on administrative procedure.[84] Respondent invokes this appeal mechanism to argue that the December Resolutions are records of administrative actions, not of contractual undertakings.[85] Respondent says that the December Resolutions would have been promulgated in any event, independently and irrespective of whether the plants tendered the letters of waiver.[86]

51.   **Council of Ministers' Press Release** – On 3 December 2010, the Council of Ministers issued a press release, referring as follows to a royal decree (ostensibly RD 1614/2010), which was to be enacted within a few days:

"*The Council of Ministers has approved a Royal Decree that regulates remuneration of electricity production by the wind and concentrated solar power technologies.*

*The new regulations, which were agreed with both sectors last July, have the main objectives of obtaining savings to benefit consumers and to make the objectives of promotion of renewable energies compatible with those of limiting electricity production costs to guarantee the sustainability of the electricity system.*

*The regulation also involves reinforcement of the visibility and stability of the regulation of these technologies in the future, and guarantees the present premiums and tariffs of Royal Decree 661/2007 as of 2013 for installations in operation and for those included on the pre-register.*"[87]

[Emphasis added]

52.   **RD 1614/2010** – On 8 December 2010, contemporaneously with the exchange of the waivers and December Resolutions discussed above, the Spanish government enacted

---

[82] **C-0266t** and **C-0276t**.
[83] *Ibid.*
[84] See the December Resolutions, **C-0266t** and **C-0276t** *in fine*: "*Appeals may be filed against the resolution included in the first point of this notification before the Secretariat of State for Energy within one month, according to the provisions of Act 30/1992, of November 26, on the Legal Regime of Public Administrations and Common Administrative Procedure.*"
[85] Resp. Co-Mo, on p. 109.
[86] *Ibid.*
[87] Press Release by the Council of Ministers, 3 December 2010 (**C-0248t**), on p. 3.

Royal Decree RD 1614/2010[88], which modified the prevailing regulatory framework along the lines mentioned in the Purported Agreement, among others by:

- Limiting the number of hours of operation during which the CSP plants are entitled to remuneration under the Special Regime (Article 2); and

- Forcing the CSP plants to receive remuneration solely under the market price and premium option during the first year of operation (Article 3).

53. Furthermore, and perhaps more significantly, Article 4 of RD 1614/2010 provided as follows:

   *"For thermosolar technology facilities under Royal Decree 661/2007, of May 25, the revisions of tariffs, premiums and lower and upper limits, to which Article 44.3 of said Royal Decree refers, <u>shall not affect those facilities (…) pre-registered on the remuneration pre-allocation Register pursuant to the Fourth Transitional Provision of Royal Decree-Law 6/2009 of April 30</u> (…)"* [89]

   [Emphasis added]

54. It is undisputed that, when RD 1614/2010 came into force, the Olivenza and Morón CSP plants had fulfilled the registration requirements provided by the applicable regulations and were duly registered on the Pre-Allocation Register.[90]

55. **RD-L 14/2010** – On 24 December 2010, the Spanish Government enacted *Royal Decree-Law 14/2010, establishing urgent measures to correct the tariff deficit in the electric sector* ("**RD-L 14/2010**"). In the introductory note, RD-L 14/2010 noted the rapid expansion of the renewable energy sector, the growing tariff deficit and the necessity that energy producers start shouldering more of the cost burden of the SES.[91] Among others, RD-L 14/2010 lifted payment exemptions on the use of transmission and distribution networks and imposed an access fee of €0.5 per MWh, applicable to all renewable energy producers.[92] RD-L 14/2010 also restricted the number of hours of

---

[88] Royal Decree 1614/2010, of December 7, by which specific aspects regarding the activity of electric energy production by means of which thermosolar and wind technologies are regulated and modified (**C-0050t**).
[89] *Ibid.*
[90] In particular, the Morón and Olivenza 1 CSP plants pre-registered on 11 December 2009 (see **C-0095t** and **C-0096t**) and finalized the registration on the RAIPRE on May 31, 2012 for Morón (see **C-0079t**) and on December 18, 2012 for Olivenza 1 (see **C-0080t**).
[91] *Royal Decree-Law 14/2010, of 23 December, on the establishment of urgent measures for the correction of the tariff deficit in the electricity sector* (**R-0069**), on p. 1.
[92] *Ibid.*, on p. 1: "<u>Therefore, firstly, payment exemptions on the use of transmission and distribution networks for pumping consumption are annulled and an obligation on electricity producers for the payment of such access fees is established, which shall allow for a fair evolution thereof. As generation facilities, especially under the special regime, have experienced significant growth, there has been greater investment in the electricity transmission and distribution networks, in order to carry electricity therein. In the current context of the crisis and tariff deficiency, it is deemed justified the producers contribute, through the payment of access fee for the expenditures attributable to the required investments, while the regulation of access fees is not under progress, which must satisfy the producers of electric energy, carriers and distributors an access fee of €0.5 per MWh, while using the framework established in this regard under the current regulations of the European Union as a reference.</u>" [Emphasis added]

operations of photovoltaic (***not*** thermosolar) producers for which they are entitled to receive remuneration under the Special Regime.[93]

56.  Both Parties invoke the changes brought about by RD-L 14/2010 in support of their arguments. Respondent invokes the imposition of access fees to renewable energy producers to cast doubt on Claimants' purported reliance on the perceived stability of the remunerative regime set out in RD 661/2007.[94] Claimants point out that the restriction on the hours of operation brought about by RD-L 14/2010 did not apply to CSP producers. This, they say, demonstrates that the Spanish Government considered itself bound by the Purported Agreement it allegedly entered into with the thermosolar industry.[95] (No such agreement appears to have been concluded with photovoltaic sector producers, who saw their hours of operation slashed by RD-L 14/2010.[96])

**D.  CLAIMANTS' INVESTMENT**

57.  On 23 June 2011, Claimants' investment committee approved an investment of up to €31 million in the Morón and Olivenza 1 Plants.[97] Claimants subsequently invested in the Plants on 28 July 2011. As discussed above, this was some 19 months after the Plants' registration on the Pre-Allocation Registry (on 11 December 2009), and some 16 months before their final registration on the RAIPRE (on 31 May 2012 for Morón, and on 18 December 2012 for Olivenza 1).

58.  At the time of Claimants' investment, construction on both plants was ongoing and the plants were under pressure to complete those works by the deadline for registration in the RAIPRE and the beginning of production of electrical energy.[98]

*i.  **Claimants' Purported Expectations***

59.  Claimants' argue that their investment strategy was largely informed by the their INFRARED ENVIRONMENTAL INFRASTRUCTURE FUND (the "**Fund**"), the vehicle by which Claimants invested in the Morón and Olivenza 1 plants.[99] The Fund's strategy prompts it to target "*projects employing commercially proven technologies, in established environmental infrastructure sectors and located in well-governed economies.*"[100] The Fund invests in projects during the initial stages of construction located in jurisdictions assessed as "*stable*" and "*reliable*" from a political and legal perspective.[101] This reflects a deliberate strategy to take on and manage the construction risk (i.e. the risk that delays or other construction issues interfere with the project's viability) but to avoid political risk (i.e. the risk that political upheaval in the target

---

[93] *Ibid.*, on p. 5, First Additional Provision.
[94] Resp. Co-Mo, at paras. 320 and following.
[95] Cl. Mo-M, at paras. 340 and following.
[96] *Ibid.*
[97] Witness Statement of Mr. William Richard Crawford, 15 May 2015, ("**Crawford WS**"), at para. 71.
[98] See in this regard Crawford WS, at paras. 52 and following.
[99] Witness statement of Mr. Daniel Sausmikat, 13 May 2015, ("**Sausmikat WS-1**"), at para. 12.
[100] *Ibid.*, at para. 13.
[101] *Ibid.*, at paras. 12 and 13.

jurisdiction affects the project's profitability). In this regard, Mr. Sausmikat, Director of Infrastructure at InfraRed Capital Partners Ltd., testified as follows:

"*When raising the capital for the Fund, INFRARED decided it was to be denominated in Euros since the primary geographic focus for investments were jurisdictions in Western Europe. Countries within this region were considered to have attractive and reliable regulatory frameworks for the environmental Infrastructure sector.*"[102]

[Emphasis added]

60.   Claimants say they regarded Spain as a "*stable, consolidated, reliable Western democracy and a country where the law and political commitments are honoured.*"[103] They say they started to seriously consider an investment in the CSP sector in Spain after the enactment of RD 1614/2010.[104]

61.   Claimants further contend that the remuneration scheme set out in RD 661/2007 and the content of RD 1614/2010 were crucial to their decision to invest in the Morón and Olivenza 1 plants.[105] They assert that, in deciding to invest €31 million in the plants, Claimants relied on RD 661/2007, on the fact that the target plants had been registered in the Pre-Allocation Register,[106] on the purported agreement between the Spanish government and the thermosolar sector and – most importantly – on RD 1614/2010, which, in Claimants' understanding, enshrined that agreement in law, including the undertaking that the remuneration regime would remain fixed for the plants' lifetime.

62.   Claimants argue that they decided to invest based on an expectation that their return on investment would be at least **15 % after tax**.[107] In particular, Mr. Crawford, then Director of Infrastructure at InfraRed Capital Partners LLP, testified that Claimants would not have invested had the forecasted rate of return been lower than 15 %.[108] He noted that Claimants' forecast was based on the remuneration regime set out in RD 661/2007 and the understanding that the "*remuneration regime would stay in force (a) in its existing form and (b) for the whole lifespan of the Projects.*"[109]

---

[102] Sausmikat WS-1, at para. 14.
[103] *Ibid.*, at para. 26.
[104] Claimants' Reply on the Merits, 14 October 2016, ("**Cl. Reply**"), on p. 132.
[105] *Ibid.*, on p. 132; See Crawford WS, then the Director Infrastructure and Partner in InfraRed Capital Partners LLP, on pp. 15 and following; see **Sausmikat WS-1**, at paras. 29 and following.
[106] Second Witness Statement of Mr. Daniel Sausmikat, October 11, 2016, ("**Sausmikat WS-2**"), at paras. 12 and following.
[107] Crawford WS, at para. 63.
[108] Crawford WS, at para. 63: "*I had a clear idea that we would not be doing the deal for less than 15% project life return and we set ourselves the hurdle of 15% for presentation to the investment committee.*"
[109] Sausmikat WS-1, at para. 35.

### ii.    *Claimants' Due Diligence*

63.    To assess the contemplated investment and build their financial models and other analysis, Claimants state that they carried out and relied on a multi-pronged due diligence process, including:[110]

-    A *legal* "*confirmatory due diligence*" carried out by the law firm Clifford Chance in the spring 2011 at the behest of certain of the financial institutions which had invested in the project.[111] To be clear, Claimants themselves did not perform an extensive or exhaustive due diligence of the regulatory framework in force in Spain, but rather relied on the verifications and due diligence performed by or for those banks and other financial institutions;[112]

-    Oral discussions with Clifford Chance lawyers, who – according to the testimony of Claimants' witnesses – confirmed that the main tenets of the Original Regulatory Framework would remain stable;[113]

-    An *accounting* due diligence which consisted principally in an audit of Claimants' financial models performed by Ernst & Young;[114]

-    An *engineering* verification of the project carried out by the engineering firm Lahmeyer International;[115]

-    An internal *Draft Investment Paper*,[116] (the "**Investment Paper**") prepared by Messrs. Crawford and Sausmikat and addressed to the attention of the Fund, with a view to obtaining the requisite authorization for the investment contemplated. The Investment Paper mentions that the renewable energy sector in Spain experienced some uncertainty in 2010 as a result of the government's efforts to address the tariff deficit, which put financial pressure on the subsidies available to the renewable energy producers,[117] but expresses the view that no further changes would be forthcoming given the Purported Agreement which had the effect of "*stabilizing*" the existing regulatory framework:[118]

---

[110] Claimants' Post-Hearing Brief, 21 September 2017 ("**Claimants' PHB**"), at para. 134.
[111] *Confirmatory Legal Review Report of the Solar Thermal Plants of Morón de la Frontera and Olivenza*, 8 April 2011 (**C-0676**).
[112] *Ibid.*, on p. 4: "*This confirmatory due diligence report has been (…) prepared by Clifford Chance, S.L. (…) at the request of HSBC Special Fund Management Limited (…).*
[113] See testimony of Mr. Daniel Sausmikat at the Hearing on the Merits during cross-examination, Transcript, Day 2, on pp. 53 and 54; see also testimony of Mr. Richard Crawford at the Hearing on the Merits during cross-examination, Transcript, Day 2, on pp. 117 and 118.
[114] Crawford WS, at para. 62. See also Claimants' PHB, at para. 134(i).
[115] See Claimants' PHB, at para. 134.
[116] *Draft Investment Paper for the InfraRed Environmental Infrastructure Fund*, dated 16 June 2011 (**C-0560**).
[117] Investment Paper (**C-0560**), on p. 8.
[118] *Ibid.*

> *"(…) The position has now been stabilized with agreement being reached late in 2010 that, in respect of CSP… As part of the changes, the government has removed the piece of the law which enabled them (in their view) to revisit the tariff and the tariff is now stated as lasting 25 years. It is notable that CSP project financings are occurring again, albeit at lease in the case of these projects, with recourse."*[119]

[Emphasis added]

- Site inspections of the Morón and Olivenza plants carried out during the summer of 2011 to ascertain the progress of the construction works;[120]

- Telephone conversations with Mr. Luis Crespo, the head of *Protermosolar*, regarding his discussions with the Spanish government and the purported agreement concluded between the government and the thermosolar industry;[121]

64.  Other than the Investment Paper, none of the documents invoked by Claimants contains an express statement regarding the "*stabilization*" of the remuneration scheme in force at the time of the investment, nor any advice as to the possibility of future regulatory change that might affect the plants' remuneration.[122] Further, the list of contracts binding on the Morón and Olivenza 1 Plants disclosed to Claimants by the sellers of the shares concurrently with the investment (the "**Disclosure List**")[123] does not mention the Purported Agreement.

65.  In cross-examination during the hearing on the merits, Claimants' representatives acknowledged that the due diligence which Clifford Chance carried out was understood as a follow-up to the banks' own verifications, not as a comprehensive review of the applicable regulatory framework. They also testified clearly and with noteworthy precision[124] that they explicitly raised the question of the stability of the remuneration scheme and scope and effect of the Purported Agreement in their discussions with Clifford Chance and with Mr. Crespo prior to investing.[125] According to those witnesses, Clifford Chance repeatedly confirmed that the plants' remuneration would not be affected by any future regulatory changes.[126]

---

[119] *Ibid.*
[120] Claimants' PHB, at para. 134(v).
[121] Claimants' PHB, at para. 134(iii).
[122] In particular, the *Confirmatory Legal Review Report of the Solar Thermal Plants of Morón de la Frontera and Olivenza*, 8 April 2011 (**C-0676**), prepared by Clifford Chance contains a list of the applicable regulations, including RD 661/2007 and RD 1614/2010 but does not opine on whether their provisions will remain stable or applicable to the Morón and Olivenza plants for the entirety of their operating life.
[123] "*Disclosure Letter from Ibereólica*," 28 July 2011, on p. 2.
[124] Both Mr. Sausmikat and Mr. Crawford placed the discussions in February 2011 and delivered similar testimony on the content of the discussions. See Transcript, Day 2, on pp. 53, 54, 117 and following. Mr. Crawford further specified that these discussions were held by telephone and during a meeting held in Madrid at the offices of Clifford Chance.
[125] For Mr. Sausmikat's testimony, see Transcript, Day 2, on pp. 53 and 54; for Mr. Crawford's testimony, see Transcript, Day 2, on pp. 117 and following.
[126] *Ibid.* See also Mr. Hall-Smith's testimony, Transcript, Day 2, on pp. 147 and following.

66.  As regards the Disclosure List, Messrs. Sausmikat and Crawford's uncontradicted evidence is that the list was a "*red-flag report*" and that it was not meant or understood to be an exhaustive list of all the contracts binding upon or benefitting the plants.[127] They further testified that the Disclosure List was compiled by the sellers in the transaction and for their benefit, as a means to limit their potential liability toward Claimants arising from the transaction., [128] As such, Claimants had no interest to press further or to insist on the exhaustiveness of the list.[129]

67.  Claimants' representatives also acknowledged that they were aware of Spain's tariff deficit and of the efforts under way by the Spanish authorities to address the issue.[130] The Investment Paper also shows that Claimants had contemplated the possibility of changes to the provisions of the Original Regulatory Framework that allowed renewable energy producers to receive remuneration under the Special Regime even for the electricity produced with natural gas:

> "*While the Spanish authorities allow CSP plants to generate up to 15% of power from natural gas, there is no guarantee that this percentage will stay the same for the duration of the project. Speaking to Lahmeyer and industry stakeholders, there is a residual risk that the level may either be reduced, as it may be considered too generous.*"[131]

[Emphasis added]

### E.  THE MEASURES AT ISSUE

68.  In November 2011, general elections were held in Spain amid much popular discontent over the country's economic and financial situation – which, by that time, had become a European concern. The Spanish electorate voted out the socialist government of José Luis Rodríguez Zapatero and replaced it with a government led by Mariano Rajoy Brey, head of the conservative, Christian democratic Partido Popular.[132] In December 2011, about four months after Claimants' investment, president-elect Rajoy announced plans to introduce a sweeping reform of the SES meant to curb the tariff deficit by slashing costs while at the same time sparing consumers any additional price increases.[133]

69.  As of 2012, the Spanish government began implementing that plan, enacting a series of legislative and regulatory initiatives, which altered the existing regime benefitting CSP plants and renewable energy producers more generally, in particular by reducing the

---

[127] For Mr. Sausmikat's testimony, see the Transcript, Day 2, on pp. 87 and following; for Mr. Hall-Smith's testimony in this regard see the Transcript, Day 2, on pp. 145 and following.
[128] *Ibid.*
[129] *Ibid.*
[130] See testimony of Mr. Sausmikat at the hearing, Transcript, Day 2, on pp. 46 and following. See also Investment Paper (**C-0560**) on p. 8.
[131] *Ibid.*, on p. 41.
[132] Resp. Co-Mo, on p. 115.
[133] Resp. Co-Mo, on pp. 115 and following; see also *Transcription of the Speech delivered by Mariano Rajoy during the inaugural session as President-elect of the Government, Congress of Deputies, Monday 19th of December 2011* (**R-0117t**).

remuneration that renewable energy producers were entitled to receive (the "**Measures at Issue**").

70.   Respondent argues that these changes were meant to achieve a valid public policy aim, namely to contain and reduce the tariff deficit without imposing rate hikes on consumers.[134] Respondent also argues that any decrease in remuneration to renewable energy producers was in any event nothing more than a reduction of an unjustifiable windfall that those producers – and CSP plants in particular – were receiving under a remuneration scheme that failed to reflect the changing economic and technological reality of energy markets in Spain and globally.[135] Claimants counter that – as mentioned – Respondent enticed them (and other investors) to invest in Spain's renewable energy sector by means of a remuneration model allegedly premised on stability. Claimants fault Respondent for changing that model "*mid-stream.*"[136] They argue that the Measures at Issue were enacted after their costs were already "*sunk*" in the construction of the plants. They claim that Spain improperly appropriated to itself the "*efficiencies*" that they and the plants would have been able to achieve based on the Original Regulatory Framework.[137] Claimants also argue that the Measures at Issue are neither justified nor reasonable since Spain had other means available to it to reduce the tariff deficit.[138]

71.   Be that as it may, both Parties seem to agree that the laws, royal decree-laws and royal decrees at issue had the overall combined effect of decreasing the remuneration that Claimants could have expected under the Original Regulatory Framework.

72.   The Measures at Issue are detailed below at subsections *I.E.i* to *I.E.v*. Their impact on Claimants' investment is discussed in section *I.F* of the present Award.

### *i.   Act 15/2012*

73.   On 27 December 2012, Spain enacted *Act 15/2012 of December 27 on fiscal measures for the energetic sustainability* ("**Act 15/2012**").[139] That legislation introduced two measures that are among those impugned by Claimants:

-   It eliminated the feed-in tariff remuneration scheme under the Special Regime for electricity produced using "*back-up*" non-renewable fuel, regardless of the proportion of the electricity thus produced over the total electricity produced of a given plant;[140]

-   It enacted the Tax on the Value of Electric Power Generation (the "**TVPEE**"). The TVPEE is a tax at the rate of seven per cent (7%) applicable to the total amount

---

[134] Resp. Co-Mo, on pp. 30 and following; Resp. Rejoinder, on pp. 87 and following.
[135] See Resp. Rejoinder, on pp. 88 and following and pp. 168 and following.
[136] See Cl. Reply, at paras. 532 and following.
[137] See the Cl. Reply, at paras. 524 and following.
[138] Cl. Reply, at paras. 232 and following.
[139] **C-0309t**.
[140] See Final provision one of Act 15/2012 (**C-0309t**).

received by an electricity producer for the production and incorporation of electric power into the Spanish electrical system.[141] The TVPEE applies equally to renewable and non-renewable energy producers.[142]

74. Claimants refer to Act 15/2012 as the first measure of the set of regulatory changes that would follow over the next few years and would culminate in the enactment of a series of ministerial orders in June, July and October 2014.[143] They argue that between December 2012 and October 2014, the plants operated in an environment of sheer uncertainty as regards their remuneration, which allegedly prejudiced their investment.[144]

### *ii. RD-L 2/2013*

75. On 1 February 2013, Spain enacted *Royal Decree-Law 2/2013 of February 1, on urgent measures in the electric system and the financial sector* ("**RD-L 2/2013**").[145] This royal decree law introduced the following two measures impugned by Claimants in this arbitration:

- The cancellation of the feed-in premium that plants expected to receive as a supplement to the market price for electricity under Article 36 of RD 661/2007.[146] The premium – set at c€25.4 per kWh by Article 36 of RD 661/2007 was effectively reduced to €0 by Article 2 of RD-L 2/2013.[147] As a result, the plants benefitting from remuneration under the Special Regime were forced to receive the state subsidies in the form of the regulated tariff, which according to Claimants, was less favourable to producers than the premium option;

- The establishment of a new method of updating the remuneration available to renewable energy producers by replacing the CPI index with the CPI at a constant tax rate without unprocessed foodstuffs or energy products;[148]

### *iii. RD-L 9/2013*

76. On 12 July 2013, Spain enacted *Royal Decree-Law 9/2013 of July 12, adopting measures to ensure the financial sustainability of the electric system* ("**RD-L 9/2013**").[149] This royal decree-law continued the reform of the remuneration regime available to renewable energy producers. Unlike the Measures at Issues enacted previously, RD-L

---

[141] Article 6 of Act 15/2012 (**C-0309t**); see also articles 1 to 11 of Act 15/2012 (**C-0309t**).
[142] *Ibid.*
[143] See Claimants' PHB, at paras. 41 and following.
[144] *Ibid.*
[145] RD-L 2/2013 (**C-0322t**).
[146] See Article 2 of RD-L 2/2013 (**C-0322t**).
[147] *Ibid.*
[148] Article 1 of RD-L 2/2013 (**C-0322t**): "*With effect from January 1, 2013, in all the methodologies that are linked to the Consumer Price Index and govern the updating of remunerations, tariffs and premiums received by parties of the electricity system by virtue of the application of sector regulations, said index will be substituted by the Consumer Price Index at a constant tax rate without unprocessed foodstuffs or energy products.*"
[149] **C-0327t**.

9/2013 modified the very structure of the remuneration available to renewable energy producers. RD-L 9/2013 did away with the feed-in remuneration system that awarded subsidies (in the form of a regulated tariff or premium) per kWh of energy produced. It introduced instead the concept of subsidies awarded per **actual unit of installed capacity** of a given plant, at a rate calculated based on a **standard plant** of the same type.

77. In particular, RD-L 9/2013 introduced the following contested measures:

- The complete abrogation of RD 661/2007 and – with it – the complete abrogation of the "*feed-in*" remunerative scheme based on a regulated tariff or a premium in addition to market prices calculated in c€ per kWh of energy produced and distributed into the electricity grid;[150]

- The modification of Article 30.4 of the EPA 1997 (which provided the remuneration modalities to renewable energy producers) and its replacement with the following provisions which enacted the new remuneration scheme based on subsidies per unit of installed capacity calculated according to standard plant types:[151]

"*4.   (…) the facilities may receive a specific remuneration composed by <u>a term per unit of installed capacity</u> which covers, where applicable, the investment costs for a <u>standard facility</u> that cannot be recovered through the sale of energy and a term to the operation which covers, if applicable, the difference between the operating costs and the revenues from this <u>standard facility</u> participating in the market.*

*To calculate said specific remuneration for a standard facility (…) the following [shall] be taken into account:*

*(a)   The <u>standard revenues</u> from the sale of energy generated valued at the production market price;*

*(b)   The <u>standard operating costs</u>;*

*(c)   The <u>standard value</u> of the initial investment.*"[152]

*(…)*

*This remuneration regime will not exceed the minimum level necessary to cover the costs which allow the facilities to compete on equal footing with the other technologies on the market and which <u>allow a reasonable profitability to be obtained with reference to the standard facility applicable in each case</u>.*

[Emphasis added]

---

[150] See Sole repealing provision, para. 2(a), of RD-L 9/2013 (**C-0327t**).
[151] See Article 1 of RD-L 9/2013 (**C-0327t**).
[152] Article 1 of RD-L 9/2013 (**C-0327t**).

### iv.   Electric Power Act 24/2013

78.   On 26 December 2013, Spain enacted *Act 24/2013, on the Electric Power Sector* (the "**EPA of 2013**").[153] Article 13 of the EPA enshrined the principle of the economic and financial sustainability of the SES in the following terms:

"*Article 13. Economic and financial sustainability of the electric system*

*1.     The actions of Public Administrations and other actors that fall within the scope of application of this act will be subject to the principle of the economic and financial sustainability of the electric system.*

*The principle of the economic and financial sustainability of the electric system refers to the ability to cover all of costs of the system (sic), in accordance with the provisions of this act and of its implementing regulations.*

*2.     The costs of the system will be financed using revenue from the electric system.*

*(…)*

*4.     Revenues of the system will be sufficient to cover all costs of the electric system.*

*(…)*"[154]

[Emphasis added]

79.   At Article 14, the EPA confirmed and enshrined the provisions of the new remuneration regime enacted by RD-L 9/2013.[155] This new remuneration regime entitled producers to state subsidies ("*specific remuneration*") of a monetary value per "*unit of installed capacity.*"[156] As mentioned, the subsidies are stated to cover the costs of investment and the operating costs of a *standard plant* of the *same type* as the plant at issue[157] and to allow that plant to "*achieve a reasonable return by reference to the standard facility applicable in each case.*"[158]

80.   The EPA of 2013 did not – however – establish the formula to compute the remuneration, nor the standard costs of investment or standard operating costs for the types of plants subject to this scheme, nor did it establish the value of the "*reasonable return by reference to the standard facility applicable in each case.*"[159] Those modalities and values were eventually established by a series of regulations and ministerial orders adopted in 2014, which are discussed in more detail below.

---

[153] **C-0311t**.
[154] Article 13 of the EPA of 2013 (**C-0311t**).
[155] Article 14 of the EPA of 2013 (**C-0311t**).
[156] See Article 14 of the EPA of 2013 (**C-0311t**); see also Article 1 of RD-L 9/2013 (**C-0327t**).
[157] Article 14(7) of the EPA of 2013 (**C-0311t**).
[158] *Ibid.*
[159] *Ibid.*

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

81.   The table below compares the main elements of the feed-in remuneration system under the Original Regulatory Framework and those enacted by the Measures at Issue:

| Original Regulatory Framework | Measures at Issue |
|---|---|
| **Article 30.4 of the EPA 1997**[160]<br><br>(…)<br><br>4.   The remuneration regime for power production facilities under the special regime <u>shall be supplemented with the perception of a premium</u>, in the terms to be developed by implementing regulations, in the following cases:<br><br>(…)<br><br><u>The determination of premiums will take into account the voltage level of the delivery of energy to the network</u>, the effective contribution to the improvement of the environment, the primary energy savings and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred, <u>in order to achieve reasonable rates of profitability with reference to the cost of the money on capital markets</u>.<br><br>[Emphasis added] | **Article 7 of the EPA 2013**[161]<br><br>7.   (…)<br><br>a)   (…)<br><br>This remuneration regime, which is in addition to remuneration from the sale of electric power produced valued at its price in the production market, will consist of <u>one period per power unit that covers, where appropriate, investment costs of each standard facility that cannot be recovered via the sale of energy in the market, and one period for the operation that covers, where appropriate, the difference between operating costs and revenue from the participation of said standard facility in the production market</u>.<br><br>b)   To calculate said specific remuneration consideration will be given, for a standard facility over the course of its regulatory useful life and with reference to the activity conducted by an efficient, well-managed company, to the values the result of (*sic*): |
| **Article 24 RD 661/2007**[162]<br><br>1.   In order to sell their net production of electrical energy in full or in part, holders of facilities under this Royal Decree shall choose one of the following options: | i.   <u>Standard revenue generated from the sale of electric power</u> produced valued at its price in the production market; |

---

[160] Article 30.4 of the EPA of 1997 (**C-0047t**).
[161] Article 7 of the EPA of 2013 (**C-0311t**).
[162] Article 24 of RD 661/2007 (**C-0049t**).

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

| Original Regulatory Framework | Measures at Issue |
|---|---|
| a) To assign the electricity to the system through the transmission or distribution grid, receiving in exchange <u>a regulated tariff, which shall be the same for all programming periods, expressed in Euro Cents per kilowatt hour</u>;<br><br>b) To sell the electricity in the electricity energy production market. <u>In this case the sale price of the electricity shall be the price resulting from the organized market or the price freely negotiated by the holder or the representative of the facility, supplemented, where appropriate by a premium, in Euro Cents per kilowatt hour</u>.<br><br>[Emphasis added] | ii. <u>Standard operating costs</u>;<br><br>iii. The <u>standard value of the initial investment</u>.<br><br>(…)<br><br>The remuneration regime will not exceed the minimum level necessary to cover costs that allow facilities that produce electricity from renewable energy sources, high-efficiency cogeneration, and recycling waste to compete on a level playing field with all other technologies in the market <u>and enable them to achieve a reasonable return by reference to the standard facility applicable in each case</u>.<br><br>[Emphasis added] |

### v. RD 413/2014 and Ministerial Orders MO IET/1045/2014, MO IET/1168/2014, MO IET/1882/2014

82. **RD 413/2014** – On 6 June 2014, Spain enacted Royal Decree 413/2014, by means of which electric energy generation from renewable energy sources, cogeneration and waste is regulated ("**RD 413/2014**").[163] Among its other provisions, RD 413/2014 specified the methodology for calculating the "*specific remuneration*" available to renewable energy producers as supplement to the remuneration derived from the distribution of the electricity on the free market. In particular, RD 413/2014 set out the formulas for calculating the two components of the "*specific remuneration*" under the new regime: the return on the investment per unit of installed capacity and the return on operation.[164] Both formulas are based – among other variables and constants – on **standard** values of initial investments into the type of facility at issue and of the costs to operate such a standard facility.[165]

---

[163] **C-0328t**.
[164] See Article 13 of RD 413/2014 (**C-0328t**).
[165] See Articles 16 and 17 of RD 413/2014 (**C-0328t**).

83.    RD 413/2014 also provides that the remuneration parameters could be revised at the end of each "*regulatory period*" of six (6) years and at the end of each "*semi (regulatory)*" period of three (3) years.[166]

84.    **The Ministerial Orders enacted in June, July and October 2014** - Starting in June 2014, Spain enacted a number of ministerial orders which further specified the remuneration parameters, the values of the standard type installations and fixed other variables of the formulas used to calculate the "*specific remuneration*" for renewable producers.

85.    Ministerial Order IET/1045/2014 ("**MO IET/1045/2014**")[167] fixed the lifetime for which CSP plants could receive "*specific remuneration*" under the EPA of 2013 at twenty-five (25) years.[168] MO IET/1045/2014 also set the maximum number of operating hours for which "*specific remuneration*" would be received at 2,040 hours per year,[169] a reduction from the higher cap of 2,855 hours per year set by RD 1614/2010.[170]

86.    MO IET/1045/2014 determined certain categories of standard CSP plants based on the date on which the commissioning certificates were issued and the type of technology used and classified each existing installations within these standard categories.[171] Finally, MO IET 1045/2014 also fixed the value of the reasonable rate of return ("*reasonable profitability value*") for those plants at 7.398 %.[172]

87.    All of these measures are vigorously contested by Claimants, who take the position that these modifications to the remunerative regime available to the CSP plants under the Original Regulatory Framework comprised a radical and fundamental shift away from a system based on the *actual production* of electricity and to a system based on the *supposed efficiency of so-called standard installations*. Claimants contend that the fundamental unfairness and illegality of this shift lies in the application of new efficiency standards to plants (including the Morón and Olivenza plants) that had been designed and built in reliance on the Original Regulatory Framework and that simply could not attain the new standards. The Measures at Issue thus doomed those plants to unprofitability or – at best – break-even status.

F.    THE IMPACT OF THE MEASURES AT ISSUE UPON CLAIMANTS' INVESTMENT

88.    **Impact on the Plants** – It is uncontested that the Morón and Olivenza 1 plants expected to draw the great majority of their revenues from the State subsidies under the

---

[166] See Article 15 of RD 413/2014 (**C-0328t**).
[167] *Ministerial Order IET/1045/2014, of June 16, approving the remuneration parameters for standard plants applicable to certain facilities which produce power from renewable energy sources of energy, cogeneration and waste* (**C-0321t**) ("**MO IET/1045/2014**").
[168] See Article 5 of MO IET/1045/2014 (**C-0321t**).
[169] See MO IET/1045/2014, at Appendix II, table 2. *"Remuneration parameters for the standard facilities applicable for 2014, 2015 and 2016"* (**C-0321t**).
[170] See Article 1(3) of RD 1614/2010 (**C-0050t**).
[171] See Cl. Mo-M, at paras. 694 and following.
[172] See Article 1.3 of Appendix III of MO IET/1045/2014 (**C-0321t**).

remuneration regime established by the Original Regulatory Framework.[173] Claimants say – and there is no dispute in this point – that the abrogation of the Original Regulatory Framework and the enactment of the Measures at Issue reduced significantly the remuneration available to the plants. According to Claimants, yearly earnings before income tax, depreciation and amortization ("**EBITDA**") were slashed by 40% to 60% each year for the first 25 years of the plants' operational lifespan and by 100% from year 26 onwards.[174] Claimants calculate that the drop in EBITDA resulted in net losses of €50,726,030 for the Olivenza 1 plant[175] and €53,845,950 for the Morón plant[176] during the fiscal year ending December 2013. Claimants also submit that the enactment of the Measures at Issue and the ensuing losses posted by the plants for the year ending 2013 triggered events of default under the plants' project financing schemes, which in turn triggered the plants' insolvency (i.e. a "*cause of dissolution*" under Spanish law).[177]

89.   As a result, Claimants say that the two plants were *underlined forced* to undergo a series of complex restructuring transactions to remain operational. The restructuring brought about the following consequences:

   1.   It forced the plants' shareholders to inject additional capital into the distressed companies (in an amount of €1,766,009 for the Morón plant and €2,876,298 for the Olivenza 1 plant).[178] This triggered the issuance of additional shares. Claimants say the did not participate in this issuance of these additional shares, as a mitigation measure, but that this issuance had the effect of significantly diluting their equity interest in the company (as exposed below);

   2.   It forced some of the companies' creditors, including Claimants, to swap their debt for equity to preserve the ratios within the parameters established by the credit agreements with the plants' institutional creditors.[179]

90.   **Impact on Claimants *qua* Investors** – Claimants argue that the above-mentioned restructuring transactions diluted significantly their equity interest and all but wiped out their debt interest in the two plants.[180] These effects can be summarized as follows:

---

[173] According to the Respondent, that is still the case today, with the plants earning only 18% of their income from selling the energy produced on the open market and 82% from state subsidies. See in this regard the presentation titled *Fundamental Facts: Objective Framework*, Presentation submitted by the Respondent at the Hearing on the Merits; see also Eduard Saura, Christophe Schmit, Stéphane Perrotto, "*Second Economic Report on the Claimants and their Claim*, 30 November 2016, expert report prepared for the Respondent by the Accuracy Group, ("**Accuracy Q-ER-2**"), figure 3, para. 67.
[174] Claimants' PHB, at paras. 74 and following.
[175] Audit Report - *Iberéolica Solar Olivenza, S.L Abridged Financial Statements for the financial year ended December 31, 2013*, on p. 1 (**C-0403t**).
[176] Audit Report - *Iberéolica Solar Morón S.L., Abridged Financial Statements related to year ending December 31, 2013*, on p. 1, (**C-0395t**).
[177] See in particular Cl. Mo-M, at para. 796, and Article 363(1)(e) of the Spanish Corporate Enterprise Act (**C-0396t**).
[178] See Cl. Mo-M, at paras. 776 to 793 and 831 to 843.
[179] See Cl. Mo-M, at paras 794 to 808 for the Morón plant and paras. 842 to 853 for the Olivenza 1 plant.
[180] See Cl. Mo-M, on pp. 241 and 250.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

| Morón Plant | Olivenza 1 Plant |
|---|---|
| - A reduction of Claimants' shareholder interest from 16% to 14.81 %;<br><br>- A reduction of Claimants' subordinated debt interest by 91.8% | - A reduction of Claimants' shareholder interest from 16% to 14.17%;<br><br>- A reduction of Claimants' subordinated debt interest by 92% |

91. Looking ahead in Claimants' investment horizon, the Parties do not seem to dispute that the Measures at Issue lowered considerably Claimants' expected overall rate of return, from 15% **_after taxes_** to 7.398% **_before taxes_**.[181] According to Claimants, under their financial model – and assuming a lifespan of 35 years[182] and that **_all_** the elements of the Original Regulatory Framework would have remained relatively unchanged for the entirety of the plants' lifespan – they expected to break even on their investment by 2017 and to begin earning profits as of that year.[183] By 2034, Claimants expected to earn yearly profits in excess of €100 million, a figure that was expected to double for the last three (3) years of the project, i.e. between 2045 and 2048.[184]

92. As a result of the enactment of the Measures at Issue and the correlative reduction in the plants' cash flows, Claimants contend that they do not expect to break even until 2035, and to make only a negligible profit in 2036 through 2039, the last year the plants will benefit from the "*specific remuneration*" established by the EPA of 2013.[185]

93. **The Quantum Calculations** – Claimants' experts calculated Claimants' loss of profit caused by the Measures at Issue using the discounted cash flow ("**DCF**") method.[186] Claimants' experts opine that the projected loss of cash flows for the two (2) plants over their useful life, discounted back to the valuation date of June 2014 (when Claimants say the new remuneration regime was fully concretized), yields a total loss of profit for Claimants of **€75.7 million**.[187] That is the amount claimed as damages in this arbitration.

---

[181] The Respondent argues, however, that the expected rate of return of 15% was not legitimate, but rather speculative, as it will be exposed below.
[182] This assumption is contested by the Respondent, who claims the lifespan is at most 25 years old. The disagreement is subject to a debate between the technical experts presented by each respective Party.
[183] See Claimants' PHB, at paras. 80 and following.
[184] *Ibid.*
[185] See Claimants' PHB, at para. 80.
[186] See Carlos Lapuerta, Richard Caldwell and José Antonio García, *Rebuttal Report: Financial Damages to InfraRed*, Expert Report prepared for the Claimants by the Brattle Group, 13 October 2016, ("**CER-4**").
[187] See **CER-4**, at para. 29. See also the *Joint Model by the Parties' Damages Experts*, 21 November 2017.

94.     Virtually all aspects of the Claimants' valuation are contested by Respondent, including the appropriateness of the DCF method.[188] On this issue, Respondent's experts are of the opinion that the DCF method should not be applied here because: i) it generates an exaggerated book-to-market value;[189] ii) it generates an excessive rate of return, surpassing even Claimants' expectations (36.7 % vs. the expected 15%);[190] iii) the CSP technology is immature and there is insufficient empirical evidence to allow for a meaningful extrapolation from historical performance and costs of CSP plants;[191] iv) the temporal horizon for such an extrapolation is too short for a meaningful statistical projection given the relative novelty of this technology.[192] Respondent's experts opine that the only appropriate method of evaluation is one based on the costs of construction (i.e. an asset-based valuation), the application of which demonstrates that the Disputed Measures in fact have no appreciable financial impact whatsoever on Claimants' investment:

> "538.     *Given that the current Spanish regulation specifically offers a reasonable return on the capital invested, the FMV of a typical facility has not been altered and therefore, there cannot be any claimable financial impact.*"[193]

[Emphasis added]

95.     Subsidiarily, Respondent's experts apply the DCF method, but using different discount rates based on different assumptions – in particular, that the plants' installed capacity is 55 MW (rather than 50 MW),[194] and that the Measures at Issue decreased the regulatory risk and increased the plants' marketability since they eliminated the tariff deficit and enhanced the sustainability of the Spanish subsidies regime.[195] Based on these assumptions, Respondent's experts opine that the Measures at Issue in fact result in a net **benefit** to Claimants of **€16.5 million**.[196] On the other hand, should the installed capacity be 50 MW (instead of 55 MW) Respondent's experts are of the opinion that the damages to Claimants calculated using the DCF method are at most **€7.7 million**.[197]

## II.     PROCEDURAL HISTORY

96.     On 8 May 2014, ICSID received from the Claimants a Request for Arbitration together with Exhibits C-001 to C-029.

97.     On 3 June 2014, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the

---

[188] See Eduard Saura, Christophe Schmit, Stéphane Perrotto, *Economic Report on the Plaintiffs and their Claim*, 28 January 2016, expert report prepared for the Respondent by the Accuracy Group, (**Accuracy Q-ER-1**), on pp. 53 and following.
[189] See **Accuracy Q-ER-2**, at paras. 69 and following.
[190] **Accuracy Q-ER-2**, at paras. 20 and following.
[191] *Ibid.*, at paras. 86 and following.
[192] *Ibid.*, at para. 110.
[193] **Accuracy Q-ER-1**, at para. 538.
[194] See below, at Section VI. A of the present Award for a complete discussion of the issue of installed capacity.
[195] **Accuracy Q-ER-1**, at paras. 700 and following.
[196] See **Accuracy Q-ER-1**, at paras. 762 and following.
[197] *Ibid.*

registration. In the notice of registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

98.   On 4 August 2014, in absence of an agreement of the Parties concerning the method for the Tribunal's constitution, the Claimants informed the Centre that they had opted to implement the procedure set forth in Article 37(2)(b) of the ICSID Convention. By this communication, Claimants also nominated Professor William W. Park, a national of the United States of America and Switzerland, as its party-appointed arbitrator. On 6 August 2014, Prof. Park accepted his appointment as arbitrator.

99.   On 16 September 2014, the Respondent appointed Professor Pierre-Marie Dupuy, a national of France, as its party-appointed arbitrator. On 24 September 2014, Prof. Dupuy accepted his appointment as arbitrator.

100.  On 10 October 2014, the Claimants informed the Centre that the Parties had not reached an agreement on the appointment of the presiding arbitrator and requested ICSID to proceed with the appointment.

101.  On 28 October 2014, the Centre sent the Parties a ballot inviting them to consider a list of candidates to act as the presiding arbitrator. On 6 November 2014, the Centre informed the Parties that the ballot procedure had not resulted in the selection of a mutually agreeable candidate.

102.  On 12 November 2014, the Secretary-General proposed to the Parties the appointment of Mr. Stephen L. Drymer, a national of Canada, as the presiding arbitrator. On 25 November 2014, Mr. Drymer accepted his appointment as the presiding arbitrator.

103.  In accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**") on 26 November 2014, the Centre informed the Parties that the Tribunal was deemed to have been constituted in accordance with Article 37(2)(b) of the ICSID Convention and the proceedings to have begun as of that date. The Centre further informed the Parties that Ms. Natalí Sequeira, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

104.  By letter of 12 January 2015, the Centre informed the Parties that Ms. Mairée Uran-Bidegain, ICSID Legal Counsel, would temporarily serve as Secretary of the Tribunal, replacing Ms. Sequeira.

105.  In accordance with ICSID Arbitration Rule 13(1), the Tribunal and the Parties held a First Session on 21 January 2015 by telephone conference.

106.  On February 4, 2015, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties and the decisions of the Tribunal on preliminary procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in force as of 10 April 2006, that the languages of the proceeding would be English and Spanish, and that the place of proceeding would be Washington D.C.,

United States of America. Annex A to Procedural Order No. 1 further reflects different procedural scenarios discussed by the Tribunal and the Parties and the agreed number, sequence and the corresponding timetables for the submissions of the Parties' pleadings.

107. On 19 May 2015, the Centre informed the Parties that Ms. Natalí Sequeira had resumed her role as the Secretary of the Tribunal.

108. On 21 May 2015, the Claimants filed their Memorial on the Merits along with a Chronological Appendix, Indexes of Factual Exhibits and Legal Authorities, the Witness Statements of Messrs. Daniel Sausmikat, James Hall-Smith, José Manuel Ramos Pérez-Polo, Luis Crespo Rodríguez, and William Richard Crawford together with their corresponding supporting documentation; Brattle's Regulatory and Quantum Expert Reports with their corresponding supporting documentation, Exhibits C-030 to C-442, and Legal Authorities CL-001 to CL-133 ("**Claimants' Memorial**").

109. On 22 June 2015, the Respondent informed to the Tribunal its intent to file a Request for Bifurcation. On 17 July 2015, the Respondent filed a Memorial on Preliminary Objections to Jurisdiction and Request for Bifurcation together with Exhibits R-001 to R-050, and Legal Authorities RL-001 to RL-036 ("**Request for Bifurcation**").

110. On 10 August 2015, the Claimants requested the Tribunal to order the Respondent to disclose the UNCITRAL award on jurisdiction in the proceedings between the *PV Investors v. the Kingdom of Spain* (PCA Case No. 2012-14).

111. The Tribunal invited the Respondent to submit its observations on the Claimants' request of 10 August 2015. The Respondent filed its observations on 21 August 2015.

112. On 23 August 2015, the Claimants requested leave from the Tribunal to file a reply to the Respondent's observations of 21 August 2015. The requested leave was granted and the Claimants filed their reply on 1 September 2015.

113. On that same date, the Respondent requested leave from the Tribunal to file a rebuttal on the Claimants' reply of 1 September 2015. The requested leave was granted and the Respondent filed its rebuttal on 4 September 2015.

114. On 25 September 2015, the Tribunal issued its Decision granting the Claimants' request of 10 August 2015, concerning the disclosure of the *PV Investors* case award on jurisdiction on the condition that Claimants are able to obtain the consent of the claimants in the PV Investors case for the disclosure of the Award on Jurisdiction in this proceeding (with appropriate redactions) then either Claimants or Respondent may produce the Award in this arbitration.

115. On 30 September 2015, the Claimants filed their Observations to Respondent's Request for Bifurcation, together with Exhibits C-443 to C-454, and Legal Authorities CL-017, and CL-154 to CL-158.

116. On 21 October 2015, the Centre informed the Parties that the Tribunal had decided to deny the Respondent's Request for Bifurcation and that the Tribunal's reasoning would be transmitted to the Parties in a procedural order.

117. On 13 November 2015, the Tribunal issued Procedural Order No. 3 on its "*Decision on Respondent's Request for Bifurcation*" detailing the Tribunal's reasoning and ordering the Parties to address the objections to jurisdiction together with the merits phase of the proceedings pursuant to the procedural timetable attached as Annex A of the Procedural Order No. 1.

118. On 27 January 2016, the Tribunal issued a revised Annex A to the Procedural Order No. 1, amending the procedural timetable of the proceedings.

119. On 29 January 2016, the Respondent filed its Counter-Memorial on the Merits, together with the Witness Statement of Mr. Carlos Montoya, Accuracy's Quantum and Regulatory Expert Reports their corresponding supporting documentation, and Respondent's Exhibits R-051 to R-189, and Legal Authorities RL-037 to RL-079.

120. On 28 April 2016, in accordance with the agreed procedural calendar, each Party filed its respective document production requests. The Claimants' request was accompanied by the resubmission of Exhibit C-444.

121. On 17 May 2016, the Tribunal issued Procedural Order No. 5, addressing the Parties' respective requests for document production.

122. On 7 June 2016, the Respondent filed a Request for the Tribunal's Reconsideration of Procedural Order No. 5 concerning document production. The Respondent's Request was accompanied by Legal Authorities RL-081 and RL-082.

123. On that same date, the Claimants filed a Request for the Tribunal to decide on Confidentiality of Documents.

124. On 17 June 2016, the Claimants filed their observations to the Respondent's Request of 7 June 2016 for the Tribunal's Reconsideration of Procedural Order No. 5 and filed further requests for the Tribunal to decide on document production alleging Respondent's non-compliance with Procedural Order No. 5. Claimants submission was accompanied by Legal Authorities CL-180 and CL-181. On the same date, the Respondent filed its observations on the Claimants' Request of 7 June for the Tribunal to decide on Confidentiality of Documents. The Respondent's observations were accompanied by Legal Authority RL-083.

125. On 27 June 2016, the Respondent filed its observations on the Claimants' request for the Tribunal to decide on document production of 17 June 2016. The Respondent's submission was filed along with Legal Authority RL-083.

126. On 30 June 2016, the Tribunal issued Procedural Order No. 7 reflecting its decisions on the "*Parties' Requests Further to Procedural Order No. 5*." (i.e. Respondent's request of

7 June 2016 and the Claimants' requests of 7 June and 17 June 2016). The Tribunal also informed the Parties of an amendment to the procedural calendar.

127. On 11 July 2016, each Party filed its comments to the Tribunal's Procedural Order No. 7. Claimants' submission was filed together with Annexes 1 and 2 and Legal Authority CL-182.

128. On 15 July 2016, the Tribunal requested the Claimants to submit by 19 July 2016, the unredacted version of the documents on which the Claimants had asserted privilege and confidentiality, for the Tribunal to make a decision on this issue based on the Claimants' claims and the Respondent's corresponding objections.

129. On 29 July 2016, the Tribunal issued Procedural Order No. 8, concerning the "*Legal Privilege and Commercial Confidentiality in Relation to Certain Documents Produced by Claimants.*"

130. On 2 August 2016, the Claimants informed the Tribunal that the Parties had agreed to extend the deadline for the Claimants to submit their Reply on the Merits and Counter-Memorial on Preliminary Objections until 30 September 2016. The Tribunal granted the extension.

131. On 4 August 2016, the Claimants filed a request for the Tribunal to decide on document production, accompanied by Annexes A and B. On that same date, the Tribunal invited the Respondent to file its observations to this request by 10 August 2016.

132. On 5 August 2016, the Respondent filed its observations on the Claimants' request for document production.

133. On 10 August 2016, the Tribunal issued Procedural Order No. 9 concerning "*Claimants' Supplementary Requests Further to Procedural Orders No. 5 and 7 re. Document Production*", ordering the Respondent to comply with the Tribunal's document production orders.

134. On 11 August 2016, the Respondent submitted observations to the Tribunal's Procedural Order No. 9 and requested and extension for the submission of documents. On 15 August 2016, pursuant to the Tribunal's invitation, the Claimants filed their comments to the Respondent's observations.

135. On 17 August 2016, the Respondent informed the Tribunal that it had complied with the Tribunal's document production orders with respect to a specific request and that it continued working on another request.

136. On that same date, the Tribunal issued Procedural Order No. 10 on the "*Respondent's Comments and Request further to Procedural Order No. 9*", by which the Tribunal granted an extension for the Respondent to comply with the document production requests, the Claimants' document production requests and an extension of the deadline to file the Claimants' Reply on the Merits and Counter-Memorial on Preliminary Objections by 5 October 2016.

137. On 11 September 2016, the Claimants filed an application along with Annexes A through D, for the Tribunal to decide on document production based on an alleged defective document production by the Respondent.

138. On 12 September 2016, the Tribunal invited the Respondent to submit its response. On 16 September 2016, the Respondent filed its observations to the Claimants' application of 11 September 2016.

139. On 18 September 2016, the Claimants filed their comments to the Respondent's observations and requested the Tribunal to amend the procedural calendar of the proceeding.

140. On 21 September 2016, the Tribunal issued Procedural Order No. 11 concerning the Claimants' application of 11 September 2016 and amending the procedural calendar of the proceeding.

141. On 5 October 2016, the Claimants submitted their Counter-Memorial on Preliminary Objections together with the Second Witness Statement of Mr. James Hall-Smith its supporting documentation, and Claimants' Exhibits C-467 to C-479, and Legal Authorities CL-183 to CL-199.

142. On 14 October 2016, the Claimants submitted their Reply on the Merits together with the Second Witness Statements of Messrs. Luis Crespo Rodríguez and Daniel Sausmikat the corresponding supporting documentation, and Claimants' Exhibits C-480 to C-651, the resubmission of Legal Authority CL-100, and Legal Authorities CL-200 to CL-234.

143. On 21 November 2016, the Respondent submitted its Reply on Preliminary Objections, Respondent's Exhibits R-190 to R-203, and Legal Authorities RL-084 to RL-091.

144. On 30 November 2016, the Respondent submitted its Rejoinder on the Merits along with the Second Witness Statement of Mr. Carlos Montoya and its supporting documentation; Accuracy's Second Quantum and Regulatory Expert Reports and supporting documentation; the Expert Reports of Dr. Jorge Servert on Lifetime Analysis of the Plants, Dr. Jesús Casanova Kindelán on Installed Capacity, and the Legal Expert Report of Professors Vaquer Caballería and Santos Morón, all with their corresponding supporting documentation, as well as Respondent's Exhibits R-204 to R-352, and Legal Authorities RL-092 to RL-106.

145. On 21 December 2016, the Claimants filed their Rejoinder on Jurisdiction along with Claimants' Exhibits C-652 to C-672, and Legal Authorities CL-235 to CL-240.

146. On 8 February 2017, the Parties filed the list of witnesses and experts they each proposed to cross-examine during the Hearing. In their submission, the Claimants further requested the Tribunal to allow the examination of Mr. Santiago Caravantes Moreno, the Secretary-General of Electric Energy at the Secretariat of State for Energy of Spain's Ministry of Energy, Tourism and Digital Agenda. On this same date, the

Tribunal invited the Respondent to comment on the Claimants' request by 10 February 2017.

147. On 9 February 2017, the Respondent requested an extension to file its response until 15 February 2017. The extension was granted by the Tribunal.

148. On 13 February 2017, the Respondent filed a proposal to have an "*Experts' Conference*" during the Hearing. Subsequently, the Tribunal invited the Claimants to submit their observations to the Respondent's proposal by 15 February 2017.

149. On 15 February 2017, the Claimants requested to the Tribunal an extension to file their observations until 20 February 2017, the request that was granted by the Tribunal. On the same date, the Respondent submitted its comments on the Claimants' request of 8 February 2017 concerning the examination of Mr. Caravantes Moreno.

150. On 20 February 2017, the Claimants submitted their reply to the Respondent's comments on the examination of Mr. Caravantes Moreno, and their observations to the Respondent's proposal to have an Experts' Conference during the Hearing. The Claimants' submission was accompanied by Legal Authority CL-241. The Tribunal then invited Respondent to file a reply to the Claimants' response concerning the experts' conference issue.

151. On that same date, the Respondent requested leave from the Tribunal to file a further submission on the Claimants' reply concerning the examination of Mr. Caravantes Moreno. The Tribunal granted the request and invited the Respondent to file its submission by 24 February 2017.

152. On 24 February 2017, the Respondent filed its additional comments on the Claimants' request concerning the examination of Mr. Caravantes Moreno and a reply to the Claimants' comments on the experts' conferencing issue.

153. On 1 March 2017, the Tribunal issued Procedural Order No. 12 on the "*Administration of Expert Witness Testimony*" and Procedural Order No. 13 on the "*Examination of Mr. Santiago Caravantes Moreno.*"

154. On 13 March 2017, the Tribunal, the Assistant and the Secretary of the Tribunal, held a pre-hearing organizational telephone conference with the Parties.

155. On 16 March 2017, the Tribunal issued Procedural Order No. 14 concerning the "*Conduct and Organization of the Hearing.*"

156. On 31 March 2017, the Parties informed the Tribunal of their agreement to allow the other Party to introduce additional Factual Exhibits into the record. Pursuant to this agreement, the Claimants introduced Exhibits C-692 to C-701, and additionally resubmitted the translation of Respondent's Exhibits R-093, R-165 and R-166. On the other hand, the Respondent introduced into the record Exhibits R-353 to R-377.

157. On 12 April 2017, the Tribunal issued Procedural Order No. 15 on the "*Conduct and Organization of the Hearing II*", together with Annex A (Hearing's List of Participants) and Annex B (Hearing's Agenda).

158. On 14 April 2017, pursuant to paragraph 30 of the Tribunal's Procedural Order No. 12, the Claimants submitted the Joint Experts' Statement on the Installed Capacity of the CSP Plants prepared by Messrs. Casanova and Mesa-Díaz and the Joint Expert's Statement on the Lifetime of the CSP Plants issued by Messrs. Mesa-Díaz and Servert.

159. The Hearing on Jurisdiction and the Merits was held at Paris, France, from 24 April 2017 to 28 April 2017 (the "**Hearing**").  The following persons were present at the Hearing:

| **Tribunal:** | |
| --- | --- |
| Mr. Stephen L. Drymer | President |
| Professor William W. Park | Co-Arbitrator |
| Professor Pierre-Marie Dupuy | Co-Arbitrator |
| | |
| **ICSID Secretariat:** | |
| Ms. Natalí Sequeira | Secretary of the Tribunal |
| | |
| **Assistant to the Tribunal** | |
| Mr. Bogdan-Alexandru Dobrota | |
| | |
| **For the Claimants:** | |
| *Counsel:* | |
| Mr. Alberto Fortún | Cuatrecasas |
| Mr. Luis Pérez de Ayala | Cuatrecasas |
| Ms. María Isabel Rodríguez | Cuatrecasas |
| Mr. Antonio Delgado | Cuatrecasas |
| Mr. José Ángel Rueda | Cuatrecasas |
| Ms. Mónica Lasquibar | Cuatrecasas |
| Mr. Miguel San Antonio | Cuatrecasas |
| Mr. José Ángel Sánchez | Cuatrecasas |
| Mr. Pedro Álvarez | Cuatrecasas |
| Ms. María Alarcia | Cuatrecasas |
| | |
| *Parties* | |
| Mr. Chris Gill | InfraRed Capital Partners Limited |

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

**Witnesses**

| | |
|---|---|
| Mr. Daniel Sausmikat | InfraRed Capital Partners Limited |
| Mr. James Hall-Smith | InfraRed Capital Partners Limited |
| Mr. Richard Crawford | InfraRed Capital Partners Limited |
| Mr. Luis Crespo | Protermosolar |

**Experts**

| | |
|---|---|
| Mr. José Mesa-Díaz | Inergetia |
| Mr. Carlos Lapuerta | The Brattle Group |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. José Antonio García | The Brattle Group |
| Ms. Ying-Ching Chou | The Brattle Group |
| Ms. Denisa Mackova | The Brattle Group |

**For the Respondent:**

| | |
|---|---|
| Mr. Amaia Rivas Kortazar | Abogacía General del Estado - Dirección General del Servicio Jurídico del Reino de España |
| Mr. Antolín Fernández Antuña | Abogacía General del Estado - Dirección General del Servicio Jurídico del Reino de España |
| Ms. Mónica Moraleda Saceda | Abogacía General del Estado - Dirección General del Servicio Jurídico del Reino de España |
| Mr. Javier Castro López | Abogacía General del Estado - Dirección General del Servicio Jurídico del Reino de España |

**Parties**

| | |
|---|---|
| Ms. Raquel Vázquez | IDAE |
| Mr. Alfonso Olivas | IDAE |
| Mr. David Pozas | IDAE |

**Witness:**

| | |
|---|---|
| Mr. Carlos Montoya | IDAE |
| Mr. Santiago Caravantes | Ministerio de Energía, Turismo y Agenda Digital |

**Experts**

| | |
|---|---|
| Mr. Eduard Saura | Accuracy |
| Mr. Christophe Schmit | Accuracy |
| Mr. Stéphane Perrotto | Accuracy |

| | |
|---|---|
| Ms. Laura Cózar | Accuracy |
| Ms. Alberto Fernández | Accuracy |
| Mr. Carlos Cangas | Accuracy |
| Dr. Jorge Servert | Solar Technology Advisors (STA), Madrid, Spain |
| Mr. Jesús Casanova | Universidad Politécnica Madrid |
| Mr. Marcos Vaquer Caballería | Universidad Carlos III Madrid |
| Ms. María José Santos | Universidad Carlos III Madrid |

**Court Reporters:**

| | |
|---|---|
| Mr. Trevor McGowan | The Court Reporter, Ltd., English Court Reporter |
| Mr. Paul Pelissier | DR Esteno, Spanish Court Reporter |
| Mrs. Luciana Sosa | DR Esteno, Spanish Court Reporter |

**Interpreters:**

| | |
|---|---|
| Mr. Jesus Getan Bornn | English-Spanish interpreter |
| Mr. Derek Holtemann-Young | English-Spanish interpreter |
| Mr. Charles Roberts | English-Spanish interpreter |

160.   During the Hearing, the following individuals were examined:

| | |
|---|---|
| Mr. Daniel Sausmikat | InfraRed Capital Partners Limited |
| Mr. Richard Crawford | InfraRed Capital Partners Limited |
| Mr. James Hall-Smith | InfraRed Capital Partners Limited |
| Mr. Luis Crespo | Protermosolar |
| Mr. Carlos Montoya | IDAE |
| Mr. Santiago Caravantes | Ministerio de Energía, Turismo y Agenda Digital |
| Mr. Marcos Vaquer Caballería | Universidad Carlos III Madrid |
| Ms. María José Santos | Universidad Carlos III Madrid |
| Mr. Eduard Saura | Accuracy |
| Mr. Christophe Schmit | Accuracy |
| Mr. Stéphane Perrotto | Accuracy |
| Mr. José Antonio García | The Brattle Group |

|  |  |
|---|---|
| Mr. Carlos Lapuerta | The Brattle Group |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. José Mesa-Díaz | Inergetia |

161. On 29 June 2017, the Centre transmitted to the Parties the procedural timetable concerning the next steps of the proceedings and invited them to send their observations to the Tribunal.

162. On 6 July 2017, the Respondent requested leave from the Tribunal to add an additional legal authority to the record, namely, the award in *Isolux Netherlands B.V. v. Kingdom of Spain* (SCC Case V2013/153), dated 17 July 2016. On 11 July 2017, the Claimants submitted a letter with its accompanying Annexes A to D, stating their observations on Respondent's request and requesting leave from the Tribunal to add into the record the award issued by the arbitral tribunal in *Eiser v. Kingdom of Spain* (ICSID Case No. ARB/13/36) on 4 May 2017.

163. On 14 July 2017, the Parties submitted their agreed corrections to the Hearing transcripts.

164. On 17 July 2017, the Respondent submitted further observations on its request of 6 July 2017 and on the Claimants' observations and request of 11 July 2017. Afterwards, the Tribunal granted both Parties' requests and invited them to introduce any additional legal authorities into the record by 20 July 2017. The Tribunal issued further procedural indications to the Parties, including the submission of a Joint and Interactive Quantum Model and a Joint Memorandum to be issued by the Quantum Experts.

165. On 20 July 2017, the Respondent introduced into the record the *Isolux v. Spain* (Award) as Legal Authority RL-107, and the Claimants introduced the *Eiser v. Spain* (Award) as Legal Authority CL-242, the award of 9 April 2015 rendered in *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/03/19) and *AWG Group Ltd. v. Argentine Republic* (UNCITRAL) as Legal Authority CL-243, and the *Individual Opinion issued by Mr. Henri Álvarez* to the decision on liability rendered in *Total v. Argentine Republic* (ICSID Case No. ARB/04/1) of 27 December 2010, as Legal Authority CL-244.

166. By letter of 7 August 2017, the Centre informed the Parties that Ms. Anneliese Fleckenstein, ICSID Legal Counsel, would temporarily serve as Secretary of the Tribunal, replacing Ms. Sequeira.

167. On 8 September 2017, the Respondent requested leave from the Tribunal to introduce additional evidence into the record. On 11 September 2017, the Claimants filed their observations to this request. On 17 September 2017, the Tribunal denied the Respondent's request of 8 September 2017.

168. The Parties filed Post-Hearing briefs and Joint Lists of Uncontested Facts on 21 September 2017. Pursuant to Procedural Order No. 1, the Centre transmitted the Parties' Post-Hearing simultaneously to the Tribunal and the other Party.

169. On 20 November 2017, pursuant to the Tribunal's instructions, the Quantum Experts submitted a Joint and Interactive Quantum Model.

170. On 22 November 2017, Brattle requested the Tribunal to release the Quantum Experts from their obligation to submit a Joint Memorandum. Following this communication, the Respondent supported Brattle's petition and requested the Tribunal to allow the Parties to submit their observations to the Joint Interactive Quantum Model. On this same date, the Claimants submitted their observations to both requests.

171. On 23 November 2017, the Respondent requested leave from the Tribunal to introduce into the record a decision from the European Commission regarding the Spanish State Aid Framework for Renewable Sources issued on 10 November 2017. The Claimants filed their observations to this request on 24 November 2017, agreeing to the request but asking the Tribunal to deny further petitions. The Respondent submitted further comments on 26 November 2017.

172. On 27 November 2017, the Tribunal granted the Respondent's request and invited the Parties to submit their comments to the Commission's decision by 4 December 2017.

173. On 4 December 2017, the Parties filed their comments to the Joint Interactive Quantum Model and to the Commission's decision.

174. On 5 December 2017, the Respondent requested leave from the Tribunal to file a rebuttal to the Claimants comments to the Joint Interactive Quantum Model and to reconsider its 17 September 2017 decision. On 6 December 2017, the Claimants filed their observations to this request and, subsequently the Tribunal asked the Parties to refrain from making further submissions to allow the Tribunal to decide on the Parties' requests.

175. On 11 December 2017, the Tribunal rejected the Respondent's requests of 5 December 2017.

176. On 17 January 2018, the Centre informed the Parties that Ms. Natalí Sequeira had resumed her role as the Secretary of the Tribunal.

177. On 14 February 2018, the Respondent requested leave from the Tribunal to introduce into the record the award rendered in *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v. The Czech Republic* (PCA Case No. 2014-03) on 11 October 2017. The Claimants filed their observations to this request on 21 February 2018. Claimants also requested the Tribunal to order the Respondent to produce a copy of the award rendered on 15 February 2018 on *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. the Kingdom of Spain* (SCC Case No. V 063/2015).

178. On 23 February 2018, the Claimants further informed the Tribunal that the *Novenergia II v. Spain* (Award) had become public and, thus, requested leave from the Tribunal to introduce it into the record.

179. On 28 February 2018, the Respondent submitted its comments to the Claimants' observations and request of 21 February 2018.

180. On 8 March 2018, the Tribunal allowed the Respondent's to introduce the *Wirtgen v. Czech Republic* (Award) and the Claimants to introduce the *Novenergia II v. Spain* (Award), into the record. The Tribunal gave further instructions to the Parties concerning next procedural steps in the proceeding. On the same date, the Respondent requested leave from the Tribunal to introduce into the record the Judgment of the European Court of Justice ("**ECJ**") of 6 March 2018, in the case *Slovak Republic* v. *Achmea BV*, Case C-284/16 ("**Achmea**").

181. On 9 March 2018, the Tribunal granted the Respondent's request to introduce the *Achmea* Judgment into the record.

182. On 20 March 2018, each Party submitted their comments to the *Wirtgen v. Czech Republic* (Award) and the *Novenergia II v. Spain* (Award). Respondent's submission was accompanied by Legal Authorities RL-109 and RL-110. Claimants' submission was accompanied by Legal Authorities CL-245 and CL-246.

183. On 23 March 2018, each Party filed their comments on the *Achmea* Judgment. The Respondent's submission was accompanied by Legal Authority RL-111.

184. On 6 April 2018, the Claimants informed the Tribunal that it had "*signed two agreements for the sale of its shareholding interests in Morón and Olivenza and the assignment of all the rights and obligations as creditor under the subordinated loans.*" The Claimants further contended that they retained "*their rights over the ECT claims and actions.*" On the same date, the Respondent filed its comments to this Claimants' communication.

185. On 7 April 2018, the Tribunal informed the Parties of its decision towards the Claimants' communication of 6 April 2018.

186. On December 28, 2018 the Tribunal directed the parties to file their costs submissions by 25 January 2019. Pursuant to the Tribunal's instructions the Parties filed their costs submissions on 25 January 2019

187. The proceeding was closed on April 18, 2019.

## III.    THE NON-DISPUTING PARTY APPLICATIONS

188. On 12 November 2014, the Commission filed an Application for Leave to Intervene as a Non-Disputing Party (the "**Commission's First Application**").

189. On 9 December 2014, the Respondent filed its observations on the Commission's First Application, and the Claimants did so on 9 January 2015.

190. On 9 February 2015, the Tribunal issued Procedural Order No. 2 concerning its Decision on the "*Application for Leave to Intervene as a Non-Disputing Party by the European Commission*". The Tribunal found that the Commission sought to intervene regarding an issue that was not raised by the Parties. Thus, it denied the Commission's First Application without prejudice to the Commission's re-submission of the request in an appropriate time.

191. On 9 December 2015, the Commission submitted a Second Application for Leave to Intervene as a Non-Disputing Party pursuant to Arbitration Rule 37(2) (the "**Commission's Second Application**").

192. On 19 February 2016, the Parties submitted their observations on the Commission's Second Application. The Claimants submission was accompanied by Indexes of Factual Exhibits and Legal Authorities, Exhibits C-455 to C-465, Legal Authorities CL-017, and CL-159 to CL-179. The Respondent submission was accompanied by Legal Authority RL-080.

193. On 19 April 2016, the Tribunal issued Procedural Order No. 4 concerning its "*Decision on the Re-Application for Leave to Intervene as Non-Disputing Party Submitted by the European Commission*". In its Decision, the Tribunal authorized the Commission to file a written submission addressing only the intra-EU jurisdictional objection and ordered it to "attach to its its Submission *all other requests, submissions, briefs or statements concerning the intra-EU jurisdictional objection submitted by the Commission to other international tribunals established under the ECT*"[198]. The submission was limited to 30 pages and ordered to be filed by 19 May 2016. The Commission was denied access to the record of the arbitration, to the Parties' pleadings, and to any hearings, and although it was not ordered to secure payment it was directed to comply with payment for its participation as non-disputing party shall a Party filed a request for reimbursement.

194. On 4 May 2016, the Commission submitted a "*Request to Alter the Procedural Order No. 4 of 19 April 2016: Decision on Re-Application for Leave to Intervene as a Non-Disputing Party submitted by the European Commission*" (the "**Commission's Reconsideration Request**") On this submission, the Commission informed that it was not in a position to comply with the Tribunal's directions established under Procedural Order No. 4.

195. Following the Tribunal's invitation, on 13 May 2016, the Parties filed their observations on the Commission's Reconsideration Request. Claimants' submission was accompanied by Exhibit C-466.

196. On 19 May 2016, the Secretary of the Tribunal informed the Parties that pursuant to the Tribunal's Procedural Order No. 4, the Centre had received on 18 May, the Commission's Submission. However, the Tribunal ordered the Centre not to transmit it to the Parties in view of the Commission's Reconsideration Request. The Tribunal

---

[198] Emphasis in the original.

further informed the Parties that it would shortly issue a procedural order concerning the Commission's Reconsideration Request.

197. On 19 May 2016, the Tribunal issued Procedural Order No. 6 concerning its "*Decision on the Request by the European Commission to Alter Procedural Order No. 4*", granting it in part. The Tribunal altered paragraph 55 of Procedural Order No. 4 as to protect third parties' confidential information and rejected the request to alter the Tribunal's directions on costs. The Tribunal informed the Parties that the procedural calendar remained unchanged and that they should present their observations to the Commission's Submission in their respective briefs. The Commission was ordered to file its Submission no later than on 24 May 2016.

198. By letter of 23 May 2016, the Commission notified the Tribunal that following its Procedural Order No. 6 it refrained from filing a written submission.

## IV. THE TRIBUNAL'S JURISDICTION

199. Pursuant to its *Memorial on Preliminary Objections and Request for Bifurcation* ("**MoPO**"), Respondent contests the jurisdiction of the Tribunal to hear all or part of the claims brought by Claimants upon the following six (6) grounds:

| Designation (MoPO) | Nature of the objection |
|---|---|
| A. | **The Intra-EU Objection:** Respondent submits that the ECT does not apply to what it terms "*intra-EU investments*," being investments made in an EU member state by an investor established in another EU member state. In particular, Respondent submits that the Claimant entities are not investors of "*another Contracting Party*" for the purposes of Article 26 of the ECT, since both the United Kingdom (where the Claimant entities are incorporated) and the Respondent Kingdom of Spain are Members of the EU, a Regional Economic Integration Organisation ("**REIO**") which has also signed and ratified the ECT.[199] |
| B. | **The Investor Standing Objection:** Respondent submits that the Claimants do not satisfy the criteria of "*investor with investments*" under Articles 1(6) and 26 of the ECT, and as such, have no standing to bring their claims to arbitration. Respondent alleges that the Claimant entities are mere conduits used to funnel the investments at issue in the Spanish entities from other entities upstream on the corporate ownership chain, which are not parties to this arbitration.[200] |
| C. | **The Taxation Objection:** Respondent submits that the Tribunal does not have jurisdiction to hear the part of the claim brought by Claimants under |

---

[199] Respondent's *Memorial on Preliminary Objections and Request for Bifurcation*, 17 July 2015, ("**MoPO**"), at paras. 13 and 35 to 92.
[200] MoPO, at paras. 14 and 93 to 188.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

| | | |
|---|---|---|
| | | Article 10(1) ECT with respect to the Tax on the Value of the Production of Electric Energy (the "**TVPEE**"), since the ECT contains a specific carve-out that renders Article 10(1) inapplicable to taxation measures enacted by the Contracting Parties.[201] |
| D. | | **The Taxation Expropriation Objection:** Respondent submits that the part of the claim brought on the basis of alleged expropriation as a result of the enactment of the TVPEE is inadmissible as long as the competent national tax authorities will not have issued a ruling on this matter in accordance with Article 21(5)(b) of the ECT.[202] |
| E. | | **The Insufficient Notice Objection:** Respondent submits that Claimant has not fulfilled the notification and negotiation steps pre-requisite to commencing arbitration with respect to a series of regulatory and/or legislative enactments adopted by Respondent after receipt of the initial Notice of Dispute.[203] |
| F. | | **No *prima facie* case on the merits:** Respondent submits that the allegations contained in the Request for Arbitration and in its Memorial on the Merits are so frivolous, implausible and contradictory that they do not disclose a *prima facie* case on the merits.[204] |

200.  In its Reply on Preliminary Objections, the Respondent explicitly withdrew objections B and E, stating that, "*in light of the memorials and documentation filed in the proceedings,*" it was not appropriate to maintain those objections.[205] As regards objection D, Respondent admitted that the Tribunal has jurisdiction to hear the expropriation claim based on the enactment of the TVPEE, given that the Spanish tax authorities had issued their conclusions within the requisite time period, thus satisfying the requirement at Article 21(5)(b) ECT.[206] As regards objection F, Respondent conceded that this jurisdictional objection has become moot further to the Tribunal's dismissal of Respondent's request for bifurcation, but reserved its rights to raise, on the merits, the alleged lacunae in Claimants' allegations.[207]

201.  As a result, the only remaining jurisdictional objections in dispute at the present stage are the Intra-EU Objection and the Taxation Objection.

202.  The Tribunal notes that, in the following ECT arbitration cases, the Kingdom of Spain has raised some or all of the objections that remain in dispute in the present case:

---

[201] MoPO, at paras. 17 and 189 *et seq.*
[202] MoPO, at paras. 18 and 293 to 314.
[203] MoPO, at paras. 315 to 351.
[204] MoPO, at paras. 352 to 403.
[205] Respondent's *Reply on Preliminary Objections*, 21 November 2016, ("**ReplyPO**"), at para. 6.
[206] ReplyPO, at para. 10.
[207] ReplyPO, at para. 196.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

    i.      *PV Investors* v. *Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, (13 October 2014), CL-0134;

    ii.     *Charanne B.V. and Construction Investments S.A.R.L.* v. *Kingdom of Spain*, SCC Arbitration No. 062/2012, Final Award, (21 January 2016), CL-0159t;

    iii.    *RREEF Infrastructure (G.P.) Limited and and RREEF Pan-European Infrastructure Two Lux S.à r.l..* v. *Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, (6 June 2016), CL-0183;

    iv.    *Isolux Infrastructure Netherlands B.V.* v. *Kingdom of Spain*, Arbitration SCC V2013/153, Award dated (12 July 2016), RL-107EN;

    v.     *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.R.I.* v. *Kingdom of Spain*, ICSID Case No. ARB/13/36, Award (4 May 2017);

    vi.    *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR* v. *Kingdom of Spain*, SCC Arbitration (2015/063), Final Award (15 February 2018), CL-0245.

203. The Tribunal also notes that the arbitral tribunals in the above-mentioned cases dismissed the Intra-EU objection and – for the most part – granted the taxation objection.[208]

**A.**    **THE INTRA-EU OBJECTION**

    ***i.    The Respondent's Position***

204. Respondent's arguments on the Intra-EU objection follows (albeit implicitly on occasion) the following two (2) main themes which run as common threads through Respondent's submissions on this issue:

    -    The ECT itself, interpreted in the context of its ratification and of the greater European economic integration system, excludes intra-EU disputes from its scope of application;

---

[208] The Tribunal notes in passing that the following authorities, which were filed by Claimants in support of their costs submissions, also treat the intra-EU jurisdictional objection: *Masdar Solar & Wind Cooperatief U.A.* v. *Kingdom of Spain*, ICSID Case No. ARB/14/1, Award (16 May 2018) ("**Masdar**"), **CL-0262**; and *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.* v. *Kingdom of Spain,* Award (15 June 2018) ("**Antin**"), **CL-0263**. However, since these authorities were not invoked or commented by any Party on the merits or the jurisdictional aspects of the case, the Tribunal has not considered them in the context of its analysis of the intra-EU jurisdictional objection, nor indeed in the context of any other substantive or jurisdictional issue determined in this award.

    -    EU law is supreme and peremptory among EU member states, and it excludes the jurisdiction of ECT tribunals to intra-EU investment disputes.[209]

205. The Tribunal will summarize Respondent's position on the intra-EU objection following the structure of these two main argumentative themes.

### 1. The ECT and its scope of application

206. ***Foreignness Criterion*** – First, and central to Respondent's arguments, is the contention that the foreignness criterion set out at Article 26 ECT[210] is not met in the context of intra-EU investment disputes. Respondent submits that the dispute-resolution mechanism contained at Article 26 ECT applies only to "*disputes between a Contracting Party and an Investor of __another__ Contracting Party*."[211] [Emphasis added] The Respondent submits that because the parties to the present dispute are an EU state (Spain) and investors of another EU state[212] and because the EU is itself a Contracting Party to the ECT, and signed the ECT as a REIO, the present dispute fails to meet the foreignness criterion and falls outside the scope of Article 26 ECT and of the jurisdiction of the Tribunal constituted pursuant to that provision.[213] Put differently, by Respondent's account, the investors in the present case cannot be considered "*of another Contracting Party*" than Spain, since they are EU investors claiming against an EU member state.

207. In support of this position, the Respondent marshals an array of arguments.

208. **EU legal system for investor protection** – The Respondent submits that the EU legal system created an integrated market governed by legal rules that provide privileges to intra-EU investors, both substantive and procedural (i.e. pertaining to the procedure of dispute resolution), which are "*greatly superior*" to the protection provided by the ECT.[214] As regards substantive rights, the Respondent cites the guarantees of free movement of goods, services, persons and capital; the broad right of establishment in any member state of the EU; and the prohibition of any differential treatment, in the EU, of intra-EU investments.[215] In terms of procedural guarantees, the Respondent submits that upon a breach of the foregoing substantive rights, investors have the choice of suing the respective member state before national courts, or invoking EU law and thus ultimately elevating the dispute to European courts.[216]

---

[209] The notion of the supremacy of EU law was not very prominent in Respondent's Memorial on Preliminary Objections and Request for Bifurcation. It was principally brought forward explicitly and developed as a basis for Respondent's arguments in the latter's *Reply on Preliminary Objections*.

[210] i.e. "*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former* […]"

[211] Art. 26 ECT.

[212] MoPO, at paras. 35 *et seq.*

[213] MoPO, at para. 40.

[214] MoPO, at paras. 41 *et seq.*

[215] MoPO, at paras. 43 *et seq.* The Respondent cites in this regard the following provisions of the *Treaty on the Functioning of the EU* (the "**TFEU**"): Articles 21, 45, 49, 54 and 63 TFEU.

[216] MoPO, at para. 51.

209. **ECT recognition of EU investor protection** – The Respondent further submits that the ECT explicitly recognizes the system for the protection and promotion of intra-EU investments. In support of this submission, Respondent first cites Article 25 ECT, which provides that Contracting Parties members of an Economic Integration Agreement ("**EIA**") shall not be obliged to extend to Contracting Parties non-members of that EIA any preferential treatment applicable solely as a result of adherence to that EIA. Second, Respondent cites the definitions of "*Contracting Party*" and "*Area*" at Articles 1(2) and 1(10) ECT and submits that the inclusion of REIOs and their territories within those definitions constitutes an explicit recognition of the system of protection of rights of intra-EU investors provided by EU law.[217]

210. **Interpretation of the ECT according to ordinary meaning** – The Respondent invokes the interpretative canon of the Vienna Convention on the Law of Treaties (the "**VCLT**") and submits that an interpretation of the ECT that includes intra-EU disputes within its scope is contrary to the ordinary meaning[218] of Articles 1(2), 1(10) and 26 of the ECT. In line with its argument summarized above, Respondent submits that where the dispute is brought by an investor established in an EU member state against another EU member state, the terms "*Contracting Party*" and "*Area*" must be interpreted to refer respectively to the EU and to the EU's territory (not to a particular EU member state or to the territory of such a state). Since the EU is itself a Contracting Party, the foreignness criteria is therefore not met, according to Respondent.

211. **Interpretation of the ECT according to its context, object and purpose** – Respondent invokes the investment protection systems provided respectively under EU law and the ECT and argues that the EU and its member states could not have intended the ECT to apply to an area purportedly already covered by EU law.[219] Respondent also submits that the objective of the ECT was to improve the security of energy supply of Western Europe by enticing energy transactions with ex-Soviet Republics and integrating the latter into the European market.[220] Respondent argues this type of integration was already achieved between EU member states at the time of signature of the ECT and that the application of the ECT to intra-EU disputes was not only unnecessary, but also contrary to the objective of an integrated market pursued by both the ECT and the EU treaties. In particular, Respondent relies upon this reasoning to distinguish the ECT arbitration cases cited by Claimants. Respondent pleads that those cases were brought against former Eastern Bloc countries that were not part of the EU when they adhered to the ECT (and could therefore contract Part III investor protection obligations at will).[221]

---

[217] MoPO, at paras. 56 and 57.
[218] Article 31(1) VCLT.
[219] MoPO, at para. 63; Article 31(1) VCLT.
[220] MoPO, at paras. 63, 64 *et seq.*
[221] *Ibid.*, at paras. 72 *et seq.*

### 2. The principle of primacy of EU law

212. **No power to enter into the ECT as among EU member states** – Respondent submits that, by acceding to the EU, member states abdicated their power to bind each other to the investor protection obligations set out at Part III of the ECT, including the dispute resolution mechanism set out at Article 26 ECT.[222] In support of this argument, Respondent invokes the following authorities and legal provisions:

- ***Costa* v. *ENEL***, a reference case rendered by the ECJ in 1964.[223]

- **Article 344 TFEU**, which provides that "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"[224] [Emphasis added]

- **Article 36(7) ECT**, which provides that, for the purpose of voting at the Charter Conference, a REIO shall have a number of votes equal to its number of member states and that the REIO shall not be entitled to exercise its votes if the member states exercise theirs. Respondent argues that this provision recognizes that some matters fall within the exclusive competence of the EU. According to Respondent, this explicit arrangement regarding voting rights implicitly recognizes that EU member states do not (and, presumably **did not**, at the time of adhesion to, and ratification of the ECT) have competence to bind themselves to the investor protection obligations set out at Part III of the ECT.[225]

213. **Peremptory application of EU law to intra-EU disputes** – Respondent argues that EU law applies peremptorily in intra-EU disputes, to the exclusion of any other norm of national or international law, and thus displaces the provisions of the ECT on investor protection and the recourses of investors against host states.[226]

214. In particular, Respondent argues that Article 26(6) ECT requires the Tribunal to resolve the present dispute in conformity with international law, which includes EU law.[227] Respondent further argues that this raises an applicable law conflict between the provisions of the ECT and EU law, or, at the very least, it raises issues subject to the application of EU law, such as the prohibition of state aid.[228] This will necessarily require the Tribunal to interpret and apply EU law, an exercise that is beyond its competence,

---

[222] ReplyPO, on p. 23, paras. 60 *et seq.*
[223] ReplyPO, at para. 61.
[224] See ReplyPO, at para. 53.
[225] ReplyPO, at paras. 65 *et seq.*
[226] ReplyPO, at para. 22. See also ReplyPO, at paras. 60 *et seq.*, where Respondent deploys the ancillary argument that, in entering into the EU founding treaties, the EU Member States have bound themselves to abridge their sovereign power to enter into treaties with each other on matters of investor promotion and protection.
[227] *Respondent's Comments on Slovak Republic v. Achmea BV, Case No. C-284/16, ECLI:EU:C:2018:158, Judgment of the European Court of Justice dated March 6, 2018.* ("**Respondent's Submission on Achmea**"), 23 March 2018, at para. 9.
[228] Respondent's Submission on Achmea, at para. 25.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

according to the Respondent's reading of the most recent decision in that regard by the ECJ (see below).[229]

215. To support this position, the Respondent marshals the following authorities and legal provisions:

- ***Slovak Republic v. Achmea***, *("Achmea"),* a judgment rendered by the ECJ on the operability of the arbitration clause contained in the bilateral investment treaty between Germany and the Slovak Republic (the "***Germany-Slovakia BIT***") in light of the provisions of EU law, including Article 344 TFEU.[230] The ECJ reaffirmed the principles of autonomy of EU law and the uniformity of its application and interpretation, in furtherance of which EU Member States undertook not to submit any dispute concerning the application and interpretation of the EU founding treaties to any method of settlement other than those provided for in those treaties.[231] The ECJ found that the international arbitration tribunal constituted under that BIT may be called upon to interpret and apply EU law, considering that Article 8 of the Germany-Slovakia BIT mandates the tribunal do decide the dispute on the basis of, *inter alia,* the "*the law in force of the Contracting Party concerned; the provisions of … other relevant agreements between the Contracting Parties.*"[232] The ECJ also ruled that the international arbitral tribunal constituted under the Germany-Slovakia BIT is not a tribunal within the EU legal order, that it may not make a reference to the ECJ for a preliminary ruling on a point of EU law (under Article 267 TFEU) and that its decision is subject only to limited review by the national courts of EU member states.[233] As a result, the ECJ ruled that Articles 344 and 267 TFEU render inoperative Article 8 of the Germany-Slovakia BIT, since the dispute settlement mechanism it sets out contemplates a ruling on a point of EU law by a decisional body outside the EU legal order, the decision of which is subject to only limited review by EU courts, the whole in breach of the provisions of the TFEU.[234]

- **The January Declarations** – On 15 January 2019, a group of 22 EU member states issued a declaration purporting to comment the "*consequences*" of the *Achmea* decision by the CJEU (the "**January 15 Declaration**").[235] Among others, the January 15 Declaration stated that – in the light of the ruling in *Achmea* –

---

[229] *Ibid.*

[230] *Slovak Republic* v. *Achmea BV*, Case C-284/16, ECJ, 6 March 2018 ("**Achmea**"), (**RL-0111**).

[231] *Achmea*, *op. cit.*, (**RL-0111**), at paras. 32 *et seq.*

[232] *Achmea*, *op. cit.*, (**RL-0111**), at para. 4, citing Article 8 of the Germany-Slovakia BIT.

[233] *Achmea*, *op. cit.*, (**RL-0111**), at paras. 49 and 53.

[234] *Ibid.*, at paras. 56 and following. The ECJ seems to limit the scope of its ruling to investment arbitration (in particular arbitration mandated by a BIT), explicitly carving out from the scope of its ruling commercial arbitration, which is based on the "wishes of the parties" in contradistinction to investment arbitration, which is based on a treaty between States. According to this reasoning, international investment arbitration clauses in BITs run afoul of Article 344 TFEU which places an obligation upon *States* (not commercial parties) not to submit disputes regarding the interpretation of the EU founding treaties to any method of settlement other than those provided for in those treaties. See *Achmea*, *op. cit.*, at paras. 54 to 56.

[235] *Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in* Achmea *and on Investment Protection in the European Union*, (**RL-0113**).

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

investor-State arbitration clauses contained in bilateral investment treaties ("**BITs**") are contrary to EU law and inapplicable.[236] The January 15 Declaration further stated that, to the extent that the arbitration clause in the ECT is interpreted as applicable between member states, such clause is incompatible with the foundational treaties and must be "*disapplied.*"[237] On 16 January 2019, a group of 5 EU member states issued a declaration reflecting the statements of the January 15 Declaration as regards BITs (the "**January 16 Declaration**"), but stopping short of making any statements regarding the ECT.[238] That same date, the Kingdom of Hungary issued a declaration sensibly to the same effect as the January 16 Declaration (the "**Hungary Declaration**," collectively with the January 15 Declaration and the January 16 Declaration, the "**January Declarations**").[239]

Respondent pleads that the January 15 Declaration discloses the true intention of the signatory parties to the ECT as regards the interpretation of Article 26 ECT. Respondent argues that the January 15 Declaration reflects "*a subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions,*" as per the terms of Article 31(3)(a) VCLT.[240] In the alternative, Respondent pleads that the January Declarations constitute "*subsequent practice … which establishes the agreement of the parties regarding the interpretation*" of the ECT, as per the terms of Article 31(3)(b) VCLT.[241] In particular, Respondent argues that Articles 31(3)(a) and 31(3)(b) VCLT do not require a consensus among *all* parties to a treaty and should rather be interpreted in a "*non-formalistic way.*" Respondent also argues that the January Declarations confirm the primacy of EU law over the ECT in case of conflict and regardless of the provisions of Article 30 VCLT which govern conflicts between successive treaties.[242]

Finally, Respondent argues that the absence of any mention of the ECT in the January 16 Declaration and the Hungary Declaration should not invalidate the interpretative force of the January 15 Declaration. Respondent says the Governments of Hungary and the 5 EU member states that issued the January 16 Declaration simply withheld their views on the inter-relation between EU law and

---

[236] *Ibid.*

[237] *Ibid.*

[238] *Declaration of the Representatives of the Governments of the Member States of 16 January on the Enforcement of the Judgment of the Court of Justice in* ACHMEA *and on Investment Protection in the European Union*, (**RL-0114**). The five (5) States signatories of the January 16 declaration are Finland, Malta, Sweden, Luxembourg and Slovenia.

[239] *Declaration of the Representative of the Government of Hungary, of 16 January 2019 on the Legal Consequences of the Court of Justice in* Achmea *and on Investment Protection in the European Union* (**RL-0115**).

[240] See *Respondent's Comments on the Declarations of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the CJEU in Achmea and on Investment Protection in the EU*, 11 February 2019 ("**Respondent's Submissions on the January Declarations**"), at paras. 11 to 14.

[241] *Ibid.*, at para. 15.

[242] *Ibid.*, at paras. 17 and following.

the ECT since that issue is presently pending before their respective national courts.[243]

- **What Spain refers to as the current controversy surrounding intra-EU BITs**. In June, 2015, the EC asked five (5) EU member states to terminate all the bilateral investment treaties ("**BITs**") entered into between them. This request is in line with the EC's position that intra-EU investment treaties are superfluous and pose a risk of fragmentation of the EU single market by conferring rights to investors on a bilateral basis.[244] Furthermore, according to Respondent, there is presently one more case – other than *Achmea* – where the opinion of the ECJ is sought on the issue of the compatibility between EU law and arbitration under intra-EU BITs.[245] Respondent draws an analogy between BITs and the ECT and submits that the European Commission's position is evidence of the incompatibility of the ECT and EU law.[246]

- ***Costa* v. *ENEL***[247] (see above at paragraph 212).

- **Article 25 ECT**, which stipulates that member states of a REIO are not bound by the provisions of the ECT to extend to states non-members of that REIO a treatment more favorable than the treatment that member states of that REIO agreed to extend to each other.

- **Article 36(7) ECT**, which as mentioned above, governs voting modalities for the purposes of the Charter Conference.

- **The EU rules on state aid** and the possibility that a potential award rendered by this Tribunal ordering Respondent to pay damages to Claimants may be considered illegal state aid by European authorities under European law. Respondent refers in this regard to the order of the ECJ in *Elcogás S.A.* v. *Administración del Estado, Iberdrola S.A.*[248], which held that amounts financed by the users of Spain's electricity system and distributed to producers by a state agency constitute state aid subject to the rules of European law. Respondent also refers to the decision by the European Commission ("**EC**") ordering Romania to suspend the execution of the award rendered by an ICSID tribunal in favour of Swedish investors in *Micula* v. *Romania*, on the grounds that the award amounted to illegal state aid. [249]

---

[243] *Ibid.,* at paras. 24 and 25.
[244] See the Press Release issued by the EC on 18 June 2015 (**R-0010**).
[245] See ReplyPO, on p. 15 and the two cases cited by Respondent, being the *Achmea* case, as well as *Micula* v. *Romania*, on the compatibility of the Sweden-Romania BIT with EU law. *Micula* v. *Romania* was referred to the ECJ on 6 November 2015.
[246] See MoPO, at paras. 82 *et seq.*
[247] ReplyPO, at para. 21.
[248] R-0011t.
[249] MoPO, at para. 90. See also *Ioan Micula, Viorel Micula and others* v. *Romania*, ICSID Case No. ARB/05/20, Award,11 December 2013, ("**Micula**").

- **The Lisbon Treaty,** which was entered into by the EU member states in 2007 and, which, according to Respondent "*expressly gathers competence in favour of the EU over foreign investment.*" [250]  According to Respondent, EU Law prevails over (and displaces) the ECT in the context of intra-EU disputes by virtue of the *lex posterior* principle enshrined at Article 59 VCLT. Respondent stops short, however, of citing any provision of the Lisbon Treaty that supports its conclusions. It also does not reference any incompatibility between the Lisbon Treaty – and EU law more generally – and the ECT.

### ii.    The Claimants' Position

216.    As a general matter, Claimants first plead that Spain's objections to jurisdiction are both frivolous and purely dilatory. [251] In its *Rejoinder on the Preliminary Objections*, Claimants specifically invoke Respondent's withdrawal of more than half of its objections in support of their request for the costs of the arbitration and for all legal costs that Claimants incurred.[252]

217.    As regards the Intra-EU Objection, Claimants plead that:

-    An interpretation of Article 26 ECT in the context of the other relevant ECT provisions and the *travaux préparatoires* disproves Respondent's position;

-    The principle of the primacy of EU law in intra-EU relations is not binding upon this Tribunal, and, at any rate, does not exclude the application of the ECT to intra-EU investment disputes;

-    The frivolous and purely dilatory nature of the preliminary objections render Respondent liable for the full costs incurred by Claimants, the Arbitral Tribunal and ICSID to deal with the jurisdictional objections and the request for bifurcation.

### 1.    The interpretation of the ECT

218.    **Article 26 ECT** – Claimants submit that the term "*Area*" as defined at Article 1(10) and used at Article 26 ECT refers to the area of contracting parties and to that of the REIO interchangeably, depending on whether the dispute is brought against a member state or against a REIO. The two definitions are not mutually exclusive, but rather interchangeable, depending on the identity of the respondent party.[253] According to Claimants, this is the only interpretation of Article 26 ECT that comports with the context of that provision, and in particular with Article 16 ECT. In turn, Article 16 ECT provides that where the parties to the ECT enter into a subsequent or prior agreement that

---

[250] ReplyPO, at para. 50.
[251] *Claimants' Counter-Memorial on Preliminary Objections*, 5 October 2016, ("**CounterMoPO**"), at para. 3; *Claimants' Rejoinder on Preliminary Objections*, 21 December 2016, ("**RejoinderPO")**, at para. 2.
[252] RejoinderPO, at para. 8.
[253] CounterMoPO, at paras. 16 *et seq.*

overlaps with the ECT, the provisions most favorable to the investors as between the two agreements (including on such matters as dispute resolution) shall prevail.[254]

219. **Absence of a disconnection clause** – Claimants submit that had the parties to the ECT intended to prevent the application of that treaty to intra-EU disputes, they would have included an explicit disconnection clause.[255] Claimants point out that one such clause was included in the ECT to govern the relation between the ECT and the Svalbard Treaty,[256] providing that in case of conflict, the latter shall prevail.[257] Claimants further submit that the *travaux préparatoires* of the ECT show that an explicit disconnection clause was initially proposed by the EC, but that the EC itself ultimately withdrew the proposal and such a clause never formed part of the final draft.[258]

220. **Jurisprudence constante** – Claimants submit that arbitral tribunals have consistently rejected the intra-EU objection. In this regard, Claimants invoke: i) recent intra-EU arbitral decisions against Spain rendered under the ECT; ii) intra-EU cases against other European member states rendered under the ECT; and iii) intra-EU cases against other European member states rendered under BITs. According to Claimants, these cases undermine the key assumptions of Respondent's arguments (in particular those regarding the EU integrated system of investment promotion and protection) and stand for the following propositions:

- The ECT and EU law do not cover the same subject-matter and, in any event, there is no inconsistency or incompatibility between the two;

- The ECJ does not have an interpretative monopoly preventing arbitral tribunals from exercising jurisdiction over cases that require the application of EU law;

- EU law does not prevent or prohibit investor-state arbitration of intra-EU disputes.[259]

221. Claimants submit that the EC itself implicitly admitted that the ECT applies in case of intra-EU disputes in the case *Electrabel* v. *Hungary*, since it only invoked the intra-EU jurisdictional objection against a part of the investors' claims under the ECT.[260] In *Electrabel*, it appears that the EC took the position that the claim brought under the ECT which is subject to EU state aid law is *not* within the jurisdiction of the tribunal, whereas those claims which are not subject to EU law would impliedly fall under the tribunal's jurisdiction.[261] As such, according to Claimants, the EC took the position that EU law

---

[254] CounterMoPO, at paras. 20 *et seq.*
[255] CounterMoPO, at paras. 28 *et seq.*
[256] *Ibid.*
[257] *Annex I to the Final Act of the European Charter Treaty.*
[258] CounterMoPO, at para. 34.
[259] CounterMoPO, at para. 39.
[260] CounterMoPO, at paras. 62 et *seq.*
[261] *Electrabel S.A.* v. *Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, (**CL-0036**), ("*Electrabel*"), at para. 5.11: "*As indicated above, this jurisdictional submission is directed primarily at the Claimant's PPA Termination Claim. As regards jurisdiction over the PPA Pricing and Regulated Pricing Claims (called by the Commission 'the negotiation request claim' and 'the*

does not *a priori* prevent EU member states from binding each (and as between each other) to Part III investor protection obligations, but rather that the ECT becomes inapplicable only to the extent of incompatibilities with EU law.[262]

### 2.    The primacy of EU law

222.    Claimants plead that the principle of primacy of EU law is not binding upon the Tribunal and, in any event, does not lead to the inapplicability of the ECT in the context of intra-EU disputes for the following reasons.

223.    **Constitutional treaty** – First, Claimants submit that the ECT is the "*constitutional*" treaty of the Tribunal and of this arbitration. In case of any inconsistency between the ECT and other treaties (such as the EU founding treaties), Claimants submit that the ECT prevails *"under all circumstances."*[263]

224.    **Article 16 ECT** – In any event, Claimants plead that the ECT itself settles any incompatibility issues that could possibly arise from its interaction with other treaties as it stipulates that the provisions of the treaty most favourable to the investor must prevail. Claimants plead that the ECT grants investors recourse in arbitration, whereas EU law does not. To the extent any incompatibility arises between the dispute resolution clause of the ECT and EU law (see comment above regarding whether Respondent successfully makes a showing of any such incompatibility), the former must therefore prevail.[264]

225.    **The *Achmea* decision** – The Claimants contest the applicability of the *Achmea* decision to Respondent's jurisdictional objection. The Claimants argue that this case, unlike *Achmea*, is sourced in the provisions of a *multilateral investment treaty*, not a BIT.[265] Even if it were applicable here, the *Achmea* decision is of no assistance to Respondent, say the Claimants, since it provides for the validity and applicability of international arbitration agreements to intra-EU disputes, *"provided that the autonomy of the EU and its legal order is respected."*[266] Claimants further argue that the autonomy of the EU legal order is not jeopardized here since: i) there is no regulation, directive or any legal act of the EU that is applicable to resolve the merits of this dispute; and, in any event, ii) no conflict or incompatibility exists between the provisions of the ECT and EU law.[267]

226.    The Claimants further argue that the *Achmea* decision is a judgment by the highest court in "*the legal sub-system*" of a Contracting Party.[268] As such, this decision has no bearing

---

*tariff decrees claim'), the European Commission submits that these fall within the Respondent's responsibility under the ECT, being 'neither ordered nor determined in substance by the European Commission or Community State aid law'* (…)" [Emphasis added]

[262] *Ibid.*

[263] RejoinderPO, at paras. 22 *et seq.*

[264] RejoinderPO, at para. 26.

[265] *Claimants' Comments to the Achmea Judgment of the CJEU*, 23 March 2018 ("**Claimants' Submission on Achmea**"), at para. 2.

[266] *Ibid.*, at para .5; *Achmea, op. cit.*, at para. 57.

[267] Claimants' Submission on Achmea, *op. cit.*, at para. 7.

[268] *Ibid.*, at paras. 10 *et seq.*

on the validity or scope of an arbitration agreement entered into by virtue of an international treaty, which is the "*constitutional treaty*" governing the Tribunal's jurisdiction. In the absence of an explicit disconnection clause that could have otherwise excluded the application of the ECT to disputes between an EU member state and an investor based in another EU member state, the Claimants argue that the EU cannot amend the ECT via a decision rendered by the ECJ.[269]

227. **The January Declarations** – The Claimants first argue that the January Declarations disclose divergent views among EU member states since the January 16 Declaration and the Hungary Declaration are at odds with the January 15 Declaration over the impact of the *Achmea* decision, if any, on the validity and applicability of Article 26 ECT to intra-EU disputes.[270] As such, Claimants argue that the January Declarations are, at best, an indication of the position of <u>some</u> EU member states. The Claimants also point out that, in any event, the January Declarations can have no interpretative effect since EU member states cannot unilaterally establish or modify the interpretation of the ECT without the agreement of the other signatories to the ECT which are <u>not</u> EU member states.[271] As such, Claimants argue that the January Declarations cannot qualify as instruments, subsequent agreements or practices under Articles 31(3)(a) and 31(3)(b) VCLT since they do not meet with the consensus of *all* ECT parties.[272] Regardless of the interpretative effect of the January Declarations, Claimants argue that the terms of Article 25(1) of the ICSID Convention forecloses Respondent from withdrawing its consent based on the January Declarations at this stage of the proceedings..[273] Claimants say Respondent's consent has been perfected when Claimants filed their Request for Arbitration on 8 May 2014 and thus accepted Respondent's standing offer to arbitrate investor-state disputes arising under the ECT.

228. **Article 344 TFEU** – Claimants submit that Article 344 TFEU does not apply to investor-state disputes, but rather only to state-state disputes. In any event, that provision could not prevent the Tribunal from disposing of the present dispute, since the prohibition against resorting to alternative dispute resolution methods is explicitly restricted to disputes concerning the "*interpretation and application*" of the founding treaties of the EU, whereas the present dispute concerns the interpretation and application of the ECT.[274]

229. **EU rules on state aid** – Claimants plead that the EU rules on state aid are not relevant for the assessment of the Tribunal's jurisdiction, since arbitral tribunals may apply – and have customarily considered – provisions of EU law on the merits of an investor-state

---

[269] *Ibid.*, at paras. 15 and 19.
[270] *Claimants' comments on the declarations by EU Member States of January 15-16, 2019,* February 11, 2019 ("**Claimants' Submissions on the January Declarations**"), at para. 3.
[271] *Ibid.*, at paras. 6 *et seq.*
[272] *Ibid.*
[273] *Ibid.*, at para. 11. Article 25(1) of the ICSID Convention provides that: "*… when parties have given their consent, no party may withdraw its consent unilaterally.*"
[274] CounterMoPO, at paras. 22 *et seq.*; see also Article 1(2) of the TFEU, which defines the term "*Treaties*" used at art. 344 TFEU.

dispute. One recent example of such an application of EU law – and in particular the rules with respect to state aid – is *Electrabel* v. *Hungary*, which, much like this case, was brought under Article 26 ECT. In that case, the tribunal analysed the case law of the ECJ and concluded that an international arbitration tribunal ruling upon private disputes or investor-state disputes is entitled to consider and apply the precepts of European law[275] to dispose of the issues on the merits. Claimants also submitted that the relief it seeks on the merits is not contrary to EU law, a submission that we shall analyse in more detail below,[276] as part of the Tribunal's discussion of the Parties' respective positions on the merits of the case.

### iii.   Recent decisions on point

230.   ***PV Investors* v. *Spain***[277] – This case is an *ad hoc* arbitration brought against Spain on 16 November 2011 by a group of investors established in Luxembourg, The Netherlands and Germany.  The arbitration was brought under the ECT, pursuant to the UNCITRAL Arbitration Rules and under the auspices of the Permanent Court of Arbitration (the "**PCA**"). Spain objected to the jurisdiction of the arbitral tribunal, invoking among other legal bases, the intra-EU nature of the dispute and its alleged lack of consent to refer to arbitration disputes with EU nationals.[278]

231.   The tribunal dismissed this objection. It started its analysis at Article 26 ECT and patterned its methodology upon the framework provided by the interpretative canon set out at Article 31 *et seq.* VCLT. In particular, it proceeded to interpret the scope of Article 26 ECT according to: i) the ordinary meaning of that provision in light of its context, purpose and other provisions of the ECT, as mandated by art. 31(1) VCLT; ii) subsequent agreements and subsequent practice between the parties regarding the application of the ECT; and iii) supplementary means of interpretation such as the *travaux préparatoires.*

232.   First, the tribunal held that, contrary to Respondent's position, the term "*Area*" as defined at Article 1(10) ECT and used at Article 26(1) ECT refers to the territory of the state member of a REIO when the claim is brought against that state, and to the REIO itself when the claim is brought against the REIO.[279] In *PV Investors*, the claim was brought against Spain by investors established in other states. The diversity of area requirement was therefore met.[280] The tribunal also relied on the absence of a disconnection clause with respect to intra-EU dispute. Since the parties to the ECT provided a disconnection clause in case of incompatibility with the provisions of another treaty (the Svalbard

---

[275] *Electrabel* (**CL-0036**), at paras. 4.155 to 4.166.
[276] RejoinderPO, at paras. 36 *et seq.*
[277] *The PV Investors v. the Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014, (**CL-0134**), ("***PV Investors***").
[278] It is noted that, unlike in the present case, the Tribunal in *P.V. Investors* v. *Spain* granted Spain's request for bifurcation and accepted to render a preliminary decision upon the jurisdictional objections, which were dismissed or – in case of the TVPEE objection – joined with the merits. As at the date of this award, the Parties did not bring to the attention of the Tribunal the decision – if any – rendered by the ECJ in the *Micula* case.
[279] *P.V. Investors*, at paras. 178 to 181.
[280] *Ibid.*

Treaty), it stands to reason that they would have done so as well if they truly intended EU law to prevail over the ECT.[281] Finally, with respect to Article 344 TFEU, the tribunal held that this Article does not give a monopoly to the ECJ over the interpretation of EU law in private and mixed investor-state disputes.

233. Second, the tribunal held that the Lisbon Treaty and the other European legal instruments (including various EU regulations and the positions of the EC) invoked by Spain do not qualify as "*subsequent agreements*" or "*subsequent practice*" for the purpose of the VCLT because they are not "*in the application*" of the ECT. In any event, such instruments are, at most, only binding between EU member states and do not establish the consent of **all** of the parties to the ECT.

234. Finally, as regards other circumstances such as the pivotal role of the EU in the conception and negotiation of the ECT and the controversy regarding intra-EU BITs, the tribunal held that such circumstances can at most serve as "*supplementary measures of interpretation*" under Article 32 VCLT. In conformity with the provisions of the VCLT, such circumstances can at most confirm the interpretation yielded by the application of Article 31 VCLT. In any event, these circumstances cannot assist Respondent in its proposed interpretation of the ECT.

235. ***Charanne B.V. and Construction Investments S.A.R.L* v. *Kingdom of Spain***[282] – This case is an SCC arbitration brought against Spain by Dutch and Luxembourgish investors on 7 May 2012, under the aegis of the ECT.[283] On 21 January 2016, the tribunal rendered its award disposing both of jurisdictional objections and of the merits of the case.[284] The tribunal dismissed all of Respondent's jurisdictional objections.

236. As regards the Intra-EU objection, the tribunal first held that the definition of the term "*area*" was to be read interchangeably as the area of the EU member state at issue **or** the area of the EU depending on the content of the particular claim and the entity against whom the claim was brought. In that case, since the claim was brought solely against Spain and on the sole basis of Spain's sovereign actions, the term "*area*" must designate the area of Spain. As such, the tribunal held that the criterion of diversity of areas under Article 26 ECT was satisfied.[285] Finally, the tribunal dismissed Spain's arguments based on Article 344 ECT (also invoked in the present arbitration[286]), holding that the latter provision applies solely to disputes between EU Member States and not to investor-state disputes.[287]

---

[281] *Ibid.*, at para. 183.
[282] *Charanne B.V. and Construction S.A.R.L v. Kingdom of Spain*, SCC Arbitration No. 062/2012, Award, 21 January 2016, (**CL-0159)**, ("*Charanne*").
[283] In that case, the Claimant exercised its option under Article 26(4)(c) to file the request before the Arbitration Institute of the Stockholm Chamber of Commerce.
[284] The merits section of the *Charanne* award is discussed in more detail below.
[285] *Charanne, op. cit.*, at paras. 427 to 432.
[286] See above, section IV.A.i.2 of the present Award.
[287] *Charanne, op. cit.*, at paras. 441 to 447.

237. ***RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain***[288] – This case is an ICSID arbitration initiated against Spain on 22 October 2013 by two (2) investors, one established in Luxembourg and another in the United States, under the ECT. On 5 February 2015, the tribunal granted Respondent's request to bifurcate the proceedings. On 6 June 2016, the tribunal dismissed all of Respondent's preliminary objections, including the Intra-EU Objection.

238. As regards the Intra-EU Objection, the tribunal acknowledged the dual nature of EU law as the constitutionally supreme body of law within the EU legal order, as well as a part of the larger body of international law outside the EU legal order.[289] According to the tribunal, EU law may well prevail over other domestic norms strictly as between EU members states. However, within the international legal order, EU law cannot bind non-European states that enter into international treaties with EU member states.[290] EU law is nothing more than *res inter alios acta* for the latter.[291] As such, in case of contradiction between EU law and the ECT, the latter must prevail given that it is the tribunal's "*'constitutional' instrument, upon which its jurisdiction is founded*."[292]

239. This said, the tribunal found that there is no conflict between EU law and the ECT and disposed of Respondent's argument based on Article 344 TFEU (the same argument as raised by Respondent in the present case[293]), ruling that the latter provision applies to disputes concerning the interpretation of EU founding treaties, whereas Article 26 ECT is concerned only with investor-state disputes.[294] Finally, the tribunal dismissed Respondent's argument based on an implicit disconnection clause (the same argument is *not* made in the present case), ruling that the parties to the ECT could have excluded its application in certain circumstances only if they did so expressly and unequivocally.[295]

240. ***Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain***[296] – This case is an SCC arbitration brought against the Kingdom of Spain by a Dutch investor on 3 October 2013, under the ECT. On 3 December 2014, the Kingdom of Spain sought an order for bifurcation and requested that its jurisdictional objections be heard before the hearing on the merits. That request was dismissed on 12 January 2015 and the tribunal rendered the Award on 12 July 2016, dismissing all of Respondent's jurisdictional objections, including the Intra-EU objection.

---

[288] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, (**CL-0183**), ("***RREEF***").
[289] *Ibid.*, at paras. 72 *et seq.*
[290] *Ibid.*
[291] *Ibid.*, at para. 74.
[292] *Ibid.*, at para. 75.
[293] See above, section IV.A.i.2 of the present Award.
[294] *RREEF, op. cit.*, at para. 79.
[295] *Ibid.*, at paras. 81 to 86.
[296] *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration SCC V2013/153, Award, 12 July 2016, ("***Isolux***"), (**RL-0107t**), at para. 644.

241.  As regards the Intra-EU objection, the tribunal assessed Respondent's arguments in two (2) broad categories, similar to those informing the arguments presented in the present case: i) the extraterritoriality (or absence thereof) argument based on the interpretation of Article 26 ECT; and ii) the purported primacy of EU law in intra-EU disputes.[297]

242.  Assessing the extraterritoriality argument, the tribunal held that, while the area of a REIO may cover the area of a Member State, this does not deprive that Member State of an "*area*" for the purpose of Article 1.10 of the ECT.[298] The term "*area*" at Article 26.1 ECT refers to the area of the Contracting Party against whom the investor is acting; here, that of Spain, not of the EU.[299] The tribunal also concluded that the absence of an explicit disconnection clause lends credence to this interpretation of Article 26 of the ECT.[300]

243.  Assessing the argument regarding the primacy of EU law in intra-EU disputes, the tribunal held that any alleged incompatibility between EU law and the ECT would raise a simple conflict of law (not of jurisdiction), a conflict which the tribunal is empowered to resolve.[301] The tribunal further held that Article 344 TFEU refers exclusively to the founding treaties of the EU, which are not in play in the dispute between the Dutch investors and the Kingdom of Spain since the investors' claims were not brought under EU law, but rather under the ECT. In any event, the tribunal held that it is empowered to apply EU law to the extent necessary to resolve the dispute.[302]

244.  ***Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.R.I. v. Kingdom of Spain*** – This case is an ICSID arbitration instituted by British and Luxembourgish investors in the CSP energy sector against the Kingdom of Spain on 9 December 2013, under the ECT. On 22 December 2014, the Kingdom of Spain filed a request for bifurcation, asking the tribunal to address its jurisdictional objections, including the Intra-EU Objection, as preliminary questions.[303] On 9 February 2015, the tribunal dismissed Respondent's request for bifurcation.[304]

245.  The Award was rendered on the merits on 4 May 2017 dismissing the Respondent's jurisdictional objection, including the intra-EU objection. Pursuant to the Award, the tribunal also granted the Claimants' claims on the merits and ordered the Kingdom of Spain to pay the investors an amount of €128 million based on the Respondent's failure to abide by its treaty obligations to provide fair and equitable treatment to the Claimants (Article 10(1) of the ECT).[305]

---

[297] *Isolux*, *op. cit.*, at paras. 628 *et seq* (**RL-0107t**).
[298] *Ibid.*, at para. 633.
[299] *Ibid.*, at para. 634.
[300] *Ibid.*, at para. 637.
[301] *Ibid.*, at para. 644.
[302] *Ibid.*, at para. 654.
[303] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.R.I.* v. *Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, (**CL-0242**), ("***Eiser***"), at paras. 14 *et seq.* The tribunal in that case was composed of Professor John R. Crook, President, as well as Dr. Stanimir Alexandrov and Prof. Campbell McLachlan QC, Arbitrators.
[304] *Ibid.*, at para. 20.
[305] *Eiser*, *op. cit.*, on pp. 152 and 156.

246. As regards the Intra-EU Objection, the tribunal assessed the Respondent's arguments pursuant to a two-pronged analysis, examining first the interpretation of Article 26 ECT and inquiring subsequently into Respondent's argument on the primacy of EU law in intra-EU disputes.

247. To interpret Article 26 ECT, the tribunal applied the interpretative canon provided at Articles 31 and 32 of the VCLT.[306] It found that the plain meaning of Article 26 ECT did not support the exclusion of intra-EU claims sought by the Respondent. Turning to the purpose of the ECT, the tribunal ruled that the exclusion sought by Respondent would have required some "*express warning.*" No such explicit language supporting Respondent's interpretation is to be found within the stated purpose of the treaty – formulated at Article 2 ECT – nor anywhere else.[307] The tribunal also suggested that the absence of a disconnection clause pertaining to intra-EU disputes – given other such disconnection clauses pertaining to the interaction of the ECT and other treaties – also suggests that the parties to the ECT did not intend to exclude intra-EU disputes from its scope.[308] As regards the context of Article 26 ECT, the tribunal held that the provisions of the ECT cited by the Respondent, being Article 36(7) regarding voting rights of a REIO and Article 25 regarding the non-discrimination obligation between member states of a given REIO, do not preclude any of those member states from mutually undertaking the investor protection obligations enshrined elsewhere in the ECT.[309] As such, the tribunal ruled that the foreignness argument asserted by the Respondent must fail because, on the one hand, investors organized in accordance with the law of any contracting party satisfy the definition of "*Investor*" of a "*Contracting Party*"; and, on the other hand, it is hard to see how those investors could qualify as investors of the EU, since there is no trans-national body of EU law regulating the constitution of companies.[310]

248. Finally, as regards the primacy of EU law, the tribunal held that Article 16 of the ECT resolves – in favour of the ECT – any conflict that could arise between EU law and the ECT.[311] The tribunal also held that Article 344 TFEU was not applicable to this dispute since that article only contemplates disputes between EU member states, not disputes between an EU member state and an international investor.[312]

249. ***Mr. Jürgen Wirtgen et al. v. The Czech Republic***[313] – This is an *ad hoc* arbitration brought against the Czech Republic by three (3) German investors in the photovoltaic energy sector on 24 June 2013, under the Germany-Czech Republic BIT (the "**Germany-Czechia BIT**"). On 22 September 2015, the European Commission (the

---

[306] *Ibid.*, at para. 179.
[307] *Ibid.*, at paras. 186 and 188.
[308] *Ibid.*, at para. 187.
[309] *Ibid.*, at paras. 190 to 192.
[310] *Ibid.*, at para. 196.
[311] *Ibid.*, at para. 201.
[312] *Ibid.* at paras. 203 and 204.
[313] *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KGi* v. *The Czech Republic*, PCA Case No. 2014-03, Award, 11 October 2017, (**RL-0109t**), ("*Wirtgen*"). The tribunal was composed of Professor Gabrielle Kaufmann-Kohler (Presiding Arbitrator), Mr. Gary Born and Judge Peter Tomka. Mr. Born penned a 36-page dissent on the merits of the dispute only.

"**EC**") filed an application to intervene as a non-disputing party in the arbitration.[314] On 22 September 2015, the Tribunal granted the EC's application to intervene[315] and on 11 December 2015, the EC filed its non-disputing party submission essentially setting forth the Intra-EU Objection to the tribunal's jurisdiction.[316] On 11 October 2017, the Tribunal rendered its award, dismissing the EC's Intra-EU Objection and dismissing the Claimants' claims on the merits.[317]

250.   In dismissing the Intra-EU Objection brought forth by the EC, the tribunal held that the accession of the Czech Republic to the European Union in 2004 did not terminate the Germany-Czech Republic BIT since that BIT and the TFEU do not relate to the same subject matter (i.e. EU law does not provide an investor protection mechanism as provided by that BIT).[318] As such, the conditions of Article 59 VCLT for the abrogation of a treaty by the coming into force of a subsequent treaty are not met. The tribunal also decided that Article 344 TFEU is not applicable to resolve the dispute because that Article only covers state-state disputes and does not prohibit the submission of investor-state disputes to another method of settlement.[319]

251.   ***Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain***[320] – This case is an SCC arbitration instituted against the Kingdom of Spain by Luxembourgish investors in the photovoltaic solar energy sector on 8 May 2015, under the ECT. On 29 April 2016, the Respondent filed its Statement of Defense and its jurisdictional objections, including the Intra-EU Objection. On 15 February 2018, the Tribunal issued the Award, dismissing the Respondent's Intra-EU objection and ordering the Respondent to pay the investors an amount of €53.3 million for having breached its obligations to accord the investments fair and equitable treatment (Article 10(1) ECT).

252.   As regards the intra-EU objection, the tribunal first examined whether it has jurisdiction *rationae personae* over the claims, in particular whether the diversity of territory criterion at Article 26 ECT was met. After deciding that issue affirmatively, the tribunal assessed whether the principle of the primacy of EU law in intra-EU relations deprives it of the jurisdiction granted by Article 26 ECT.[321]

253.   The tribunal first ruled that the diversity of territory criterion set out at Article 26 ECT was met. The tribunal applied the interpretative provisions of the VCLT and concluded that the ECT grants Contracting Parties individual standing, even where those Contracting

---

[314] *Wirtgen*, *op. cit.*, at para. 73.
[315] *Ibid.*, at para. 97. Mr. Born issued a dissenting opinion on 8 October 2015.
[316] *Ibid.*, at para. 99.
[317] *Ibid.*, on p. 132.
[318] *Ibid.*, at paras. 252 *et seq.*
[319] *Ibid.*, at paras. 258 *et seq.*
[320] *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR* v. *Kingdom of Spain*, SCC Arbitration (2015/063), Award, 15 February 2018, (**CL-0245**), ("**Novenergia**"). The tribunal was composed of Mr. Johan Sidkley (Chairperson), Professor Antonio Crivellaro and Judge Bernardo Sepúlveda Amor.
[321] *Novenergia*, *op. cit.*, at paras. 452 and 455.

Parties are members of REIO.[322] The tribunal found no basis in the ECT for limiting that individual standing where the investor is a national of a Contracting Party which is a member of the same REIO as the respondent.[323]

254. Second, the tribunal dismissed the Respondent's arguments on the primacy of EU law for the following reasons: i) the ECT contains no explicit exception to its application in the context of intra-EU disputes;[324] ii) the claims before the tribunal were not brought under EU law, but rather pursuant to the terms of the ECT;[325] iii) the jurisdiction of the tribunal is based solely on the terms of the ECT;[326] and iv) there is no incompatibility between EU law and the terms of the ECT.[327]

255. Finally, the tribunal invoked the *jurisprudence constante* issued by the international arbitral tribunals which considered the intra-EU objection in circumstances identical or similar to the one there and consistently dismissed it.[328]

### iv.  Analysis

256. The intra-EU jurisdictional objection ultimately raises the question of interpretation of the ECT and the interaction in time between different multilateral treaties entered into by a diversity of parties. It also raises the question as to whether the Tribunal must consider, interpret or apply EU law on the merits and – if so – whether any limitation on the interpretation and application of EU law contained in that body of law is determinative of the Tribunal's jurisdiction.

257. The Tribunal accepts Claimants' submission – which was also followed by the *RREEF* and *Novenergia* tribunals (to name only a few) – that the ECT is the Tribunal's "*constitutive treaty*." The Tribunal's jurisdiction is grounded in the ECT and no other legal instrument. As such, the starting point of the analysis into the question of jurisdiction is the ECT and its scope of application in the light of its own provisions.

258. This said, under the ECT, the Tribunal is also mandated to resolve this dispute in conformity with the "*applicable rules and principles of international law.*"[329] The EU law is undeniably part of the body of international law that the Tribunal is also bound to apply. The Parties do not seem to dispute that EU law is fundamentally treaty-based law. There is no disagreement that EU law is fundamentally sourced in the Treaty of Rome and has evolved over time as a result of various subsequent treaties and international instruments entered into between EU member states throughout the years.

---

[322] *Ibid.*, at paras. 452 and 453.
[323] *Ibid.*
[324] *Ibid.*, at para. 459.
[325] *Ibid.*, at para. 460.
[326] *Ibid.*, at para. 461.
[327] *Ibid.*, at para. 462.
[328] *Ibid.*, at para. 465.
[329] Article 26(6) ECT.

259.  In the circumstances, the Tribunal can take guidance from the provisions of the VCLT, in particular Articles 30 and 31 *et seq.* of the VCLT, raised by both parties in their pleadings, to determine the scope of application of the ECT and the impact – if any – of the foundational treaties of the EU and the various related instruments raised by both parties.[330]

260.  The Tribunal cannot, however, overstate the importance of the long record of recent arbitral awards or partial awards which disposed of the intra-EU jurisdictional objections and maintained the jurisdiction of the respective ECT tribunals.[331] In the Tribunal's view, these form an arbitral *jurisprudence constante* which, short of binding this Tribunal, provides nonetheless a persuasive, reasoned and documented analytical framework that the Tribunal endorses and adopts without the need to spell it out in detail below.

261.  In this case, the disputes that the Parties agreed to submit to international arbitration under the aegis of the ICSID pursuant to Article 26(4)(a)(i) ECT are defined at Article 26(1) of the ECT as follows: "*[d]isputes between a Contracting Party and an Investor of another Contracting Party <u>relating to an Investment of the latter in the Area of the former,</u> which concern an alleged breach of an obligation of the former under Part III (…).*" [Emphasis added]

262.  The Tribunal is of the view that the ordinary meaning of Article 26(1) of the ECT, read in its context and in the light of the ECT's object and purpose does ***not*** preclude the Tribunal's jurisdiction over disputes between an EU member state and an investor from another EU member state for the following reasons.

263.  First, the ordinary meaning of the the term "*Area*" used at Article 26(1) ECT does not obviate the foreignness criterion in the presence of an intra-EU investor-state dispute. Article 1(10) ECT provides two (2) definitions of the term "*Area.*" With respect to a state that is a Contracting Party, "*Area*" means the territory under the state's sovereignty.[332] With respect to a Regional Economic Organisation (REIO) which is also a Contracting Party, "*Area*" means the territory under the sovereignty of the member states of such REIO.[333] The Tribunal agrees with Claimants that the two definitions are not mutually exclusive. Rather, one or the other definition applies depending on the author of the actions impugned, the REIO or the member state.

264.  Second, this interpretation of the term "*Area*" is congruent with *the context* of related ECT provisions. Most importantly, it is the only definition that comports with Article 16 ECT, which states unequivocally that, in case of conflict between the dispute resolution provisions at Article 26(1) ECT and those of any other treaty, the provisions most

---

[330] The signatories of the ECT are also signatories of the VCLT, with the exception of Azerbaijan, Iceland, Norway, Romania and Turkey which have signed the ECT but not the VCLT.
[331] See among others *Electrabel* (**CL-0036**); *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Hungary,* ICSID Case No. ARB/07/22, Award, 23 September 2010, (**CL-0113**) ("*AES"*); *PV Investors*; *Charanne* (**CL-0159**); *RREEF* (**CL-0183**); *Eiser* (**CL-0242**); *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v. The Czech Republic,* PCA Case No. 2014-03, Award, 11 October 2017, (**RL-0109t**); *Novenergia* (**CL-0245**).
[332] See Article 1(10)(a) and (b) ECT.
[333] See Article 1(10) *in fine* ECT.

favourable to the investors must prevail. This shows that the Contracting Parties to the ECT intended to safeguard the applicability of the dispute resolution provisions at Article 26(1) ECT **even** in case of conflict with another treaty to the extent that the ECT is "*more favourable to the Investor or the Investment.*" The mere presence of an intra-REIO dispute is therefore insufficient to exclude international arbitration under Article 26(1) ECT. Per Article 16 ECT, to set aside the application of Article 26(1) ECT to intra-EU disputes, Respondent had the burden of showing that the EU legal system provides a method to resolve Claimants' dispute with Spain that is "*more favourable*" to the investors than the one provided at Article 26(1) ECT. Respondent failed to do so.

265.  By contrast, the rigoristic interpretation of the term "*Area*" proposed by Respondent finds no support in the other terms of the ECT cited by Respondent or in any relevant authorities. Article 25 ECT, invoked by the Respondent, applies to relationships between parties to an Economic Integration Agreement ("**EIA**") and non-parties to that EIA, and *vice versa.* This provision stipulates that the ECT cannot be invoked by outsiders to an EIA to avail themselves of rights under that EIA that they would otherwise not have. Article 25 ECT is of no relevance to determine under what conditions the foreignness criterion set out at Article 26(1) of the ECT is met. In any event, the interpretation of the term "*Area*" proposed by Claimants affects in no way the operability or sphere of application of Article 25 ECT.

266.  Third, there is no incompatibility between the object and purpose of the ECT and the jurisdiction of ECT international arbitration tribunals over intra-EU disputes. Even if the Tribunal were to accept that the integration of former Soviet bloc states into the West European energy market was as prominent a purpose of the ECT as the Respondent pleads it was, the Tribunal is not convinced that this purpose is in any way diminished or negated by the jurisdiction of ECT tribunals over intra-EU disputes. Quite to the contrary, the integration sought is perfected by the application of the same dispute resolution method to all ECT-related investor-state disputes, whether these disputes are intra-EU or not.

267.  Fourth, the Tribunal cannot qualify the various decisions, statements and legal positions of the European Commission as an "*instrument*," "*subsequent agreement*" or "*subsequent practice*" that the Tribunal is **bound** to consider under Articles 31(2)(b), 31(3)(a) or 31(3)(b) VCLT respectively. The same holds true for the *Achmea* decision. That is because all these instruments, decisions and/or statements have been enacted solely within the legal sphere of the European Union and, as such, have not met with the agreement of **all** ECT Contracting Parties (including non-EU member states Contracting Parties) nor can they be qualified as a practice establishing such an agreement between **all** ECT Contracting Parties.

268.  As regards the January Declarations in particular, the Tribunal reviewed carefully the only legal source provided by Respondent in support of its position that the term "*parties*" at Articles 31(3)(a) and 31(3)(b) VCLT should be interpreted as meaning some but not

necessarily all parties to a treaty.[334] The Tribunal sought but could not find in that legal source anything of assistance to Respondent's thesis.[335] As a result, the Tribunal cannot grant the January Declarations the "*interpretative force*" proposed by Respondent.[336]

269. Nor can the Tribunal accept Respondent's argument that the January Declarations have an interpretative effect on the scope and content of EU law regarding investment protection and treaties concluded, *inter alia*, between EU member states.[337] That is because the January Declarations were **not** adopted within the EU legal order and are **not** EU legal instruments. They are, at best, declarations by the governments of **some** EU member states. Although the governmental delegates who signed the January Declarations convened with the occasion of a meeting of the the the *Comité des représentants permanents* ("**COREPER**", itself an EU organ), the mere existence of three (3) distinct declarations enouncing three (3) distinct legal positions on the same issues by three (3) distinct groups of EU member states confirms that neither of those declarations can be attributed to the COREPER or, for that matter, to any other organ of the EU. In particular, the ECJ, which is the highest judicial body in charge of the interpretation of European law, has not taken so far any position as to the applicability of its judgment in the *Achmea* case to arbitration tribunals the jurisdiction of which is based on the ECT. Taken for what they are, i.e. declarations by sovereign states made within the framework of the general international legal system, the January Declarations cannot be considered as a source of an authentic interpretation of the part of EU law on which they purport to opine.

270. In any event, judging by its terms, the 15 January Declaration[338] invoked by Respondent exceeds the scope of a simple "*interpretative declaration*," as this term is commonly understood in international law. The 15 January Declaration states that a key provision of the ECT, namely Article 26 ECT – which is clear and contains no inherent ambiguity whatsoever – is to be simply set aside in the settlement of an intra-EU investor-state dispute, an initiative which comes very close to introducing a disconnection clause, of sorts, into the ECT, contrary to the original intention of the drafters of this treaty.[339] As such, the 15 January Declaration purports to bring about an effect akin to an amendment of the ECT or, at the very least, akin to a reservation by the states that signed it. Yet, such an amendment could be only valid with the unanimous consent of all ECT contracting parties as explicitly provided at Article 36(1)(a) of the ECT.[340] As for the

---

[334] See the Report of the International Law Commission A/73/10 of 2018, cited in *Respondent's Comments on the Declarations of the Member States on the Legal Consequences of the Judgment of the CJEU in Achmea and on Investment Protection in the EU*, 11 February 2019 ("**Respondent's Submissions on the January Declarations**"), at footnote 10.
[335] *Ibid.*
[336] *Ibid.*, at paras. 10 and following
[337] *Ibid.*, at paras. 17 to 23.
[338] *Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in* Achmea *and on Investment Protection in the European Union*, (**RL-0113**).
[339] *Ibid.*, on p. 2.
[340] Article 36 ECT.

possibility of a potential reservation, Article 46 ECT provides clearly that "*No reservations may be made to this Treaty.*"

271. Fifth, the *travaux préparatoires* of the ECT confirm that the Contracting Parties turned their minds to the possibility of a disconnection clause between the ECT and the EU treaties but ultimately stopped short of including such a clause in the final text of the ECT. This fact – in conjunction with the existence of a disconnection clause in favour of the Svalbard Treaty[341] – confirms the Contracting Parties' intention to apply the dispute resolution method provided at Article 26 ECT to intra-EU disputes.

272. This result might be different if the EU members states that signed the January Declarations would have withdrawn from the ECT or activated the procedure for amending the ECT. But that has not occurred. And in the absence of such a scenario, these documents cited by Respondent qualify at best as *"supplementary means of interpretation"* under Article 32 VLCT to which the Tribunal can resort at its discretion to either confirm the result of the interpretative exercise above or to infirm it in the limited circumstances set out at Articles 32(a) and (b) VCLT. The Tribunal chooses not to do the latter here, for the following reasons:

- The result yielded by the interpretation of Article 26(1) ECT in accordance with the ordinary meaning of its terms in their context and in the light of its object and purpose is not "*ambiguous or obscure*" nor is it "*manifestly absurd or unreasonable*";[342]

- The legal positions set forth in the foregoing EU decisions, statements, and/or declarations are largely based upon the premise that – in the context of intra-EU investor-state disputes –, international arbitral tribunals would be called upon to apply or interpret EU law to resolve the merits of the dispute. That premise does not hold true in this case. As shall be amply made clear below, the Tribunal is of the view that the provisions of EU law are not dispositive nor even relevant to resolve the issues raised by this dispute. For the reasons outlined below, in the sections dealing with the merits of this award, the same can be said for the Spain national law provisions invoked by Respondent.

- In any event, Respondent did not make a satisfactory demonstration of any incompatibility or conflict between any EU legal provisions and the ECT provisions applicable here, whether as regards the jurisdictional issues or the merits of this dispute. On the jurisdictional question, the ECJ implicitly upheld the validity and applicability of international agreements referring intra-EU disputes to non-EU decision-making bodies "*provided that the autonomy of the EU and its legal order are respected.*"[343] The Respondent failed to demonstrate that recourse to arbitration to resolve a dispute between an investor from an EU member state and another EU member state would jeopardize the autonomy of the EU. The Tribunal

---

[341] See Annex 1 to the Final Act of the European Energy Charter Conference.
[342] Articles 32(a) and 32(b) VCLT.
[343] *Achmea*, op. cit., at para. 57.

is not aware of – and the Respondent did not invoke – a recourse in international arbitration for aggrieved investors under EU law similar to the one created by Article 26 ECT. As regards the merits of this dispute, Respondent invoked a plethora of EU regulations, treaty provisions, guidelines and other instruments (especially pertaining to state aid)[344] but – in the Tribunal's view – failed to show any incompatibility thereof with the investor-protection regime contained at Articles 10 ECT and following.[345]

273. In the Tribunal's view, the foregoing reasons are dispositive as well for the argument raised by Respondent regarding the alleged primacy of EU law in the context of intra-EU disputes, which the Tribunal does not follow.

274. For all these reasons and given the *jurisprudence constante* on this issue, the Tribunal dismisses the intra-EU jurisdictional objection.

## B. THE TAXATION OBJECTION

275. As noted above, the purported taxation measure at issue insofar as the issue of jurisdiction is concerned is the Tax on the Value of the Production of Electric Energy (the "**TVPEE**"). The TVPEE was enacted on 27 December 2012 by the Act 15/2012, as part of the Regulatory Framework No. 2 impugned by Claimants.[346] Both parties agree that the TVPEE is a 7 % charge on the value received by an electricity producer in consideration for producing and incorporating electricity into Spain's electric system.[347] Both parties further agree that the TVPEE applies both to conventional power producers and renewable power producers.[348]

276. On the merits, Claimants invoke the TVPEE to demonstrate three (3) alleged breaches of the ECT by Respondent. Claimants argue that: i) the TVPEE amounts to an expropriation of its investments, in breach of Article 13 ECT;[349] ii) the enactment of the TVPEE amounts to a breach of its legitimate expectations regarding Spain's regulatory framework governing renewable energy production, and therefore constitutes a breach of Respondent's fair and equitable treatment ("**FET**") obligations under Article 10(1) ECT;[350] iii) the enactment of the TVPEE constitutes a breach of Respondent's obligation not to impair Claimants' investment by "*unreasonable*" or "*discriminatory*" measures, pursuant to Article 10(1) ECT.[351]

---

[344] See in particular Respondent's PHB, at paras. 181 and following.
[345] See *infra*, at paras. 411 and following.
[346] As shall be discussed in more detail in the merits section below, the Claimants take issue with two series of legislative and executive enactments, being Regulatory Framework No. 2 (2012-2013) and Regulatory Framework No. 3 (2013-2014), which allegedly altered fundamentally the legal framework governing the renewable energy market to the detriment of producers.
[347] MoPO, on pp. 54 and 55;
[348] Cl. Mo-M, at paras. 539 *et seq.*
[349] Cl. Mo-M, 291 *et seq.*
[350] Cl. Mo-M, on p. 356.
[351] Cl. Mo-M, on pp. 378 *et seq.*

277. The TVPEE appears central to the expropriation claim as well as to the non-impairment claim. It appears, however, only an ancillary foundation for the FET claim.

278. Respondent initially asked the Tribunal to declare that it lacks jurisdiction to hear all InfraRed claims invoking the TVPEE, both those based on expropriation (Article 13 ECT) and those based on FET and non-impairment obligations (Article 10 ECT). After Claimants responded to all of these jurisdictional objections, Respondent withdrew its objection with respect to Claimants' expropriation claim based on the TVPEE.

279. As it presently stands, Respondent's Taxation Objection relates solely to Claimants' FET and discrimination claims under Article 10 ECT in relation to the TVPEE.

### *i.*      *The Respondent's Position*

280. ***Summary of Respondent's Argument*** – Respondent submits that its consent to arbitration under the ECT is limited to disputes arising under Part III of the ECT. By virtue of the carve-out at Article 21(1) of the ECT, Part III of the ECT does not create obligations or rights with respect to Taxation Measures (as defined at Article 21(7) of the ECT), save for certain limited exceptions. According to Respondent, the TVPEE is one such Taxation Measure, which does not fall within the various exceptions provided by the ECT (referred to as "*claw-back provisions*" by the parties). As such, Respondent argues that it did not consent to arbitrate claims arising from the TVPEE.

281. ***Taxation Measure*** – Respondent argues that the TVPEE falls within the scope of the term Taxation Measure (Article 21(7)(a) ECT) because it is "*a provision related to taxation*" both under the laws of the Kingdom of Spain and according to international law. The Respondent invokes the provisions of the Act 15/2012 which creates the TVPEE as well as various orders and other legislative measures which, according to Respondent, establish that: i) the TVPEE is a direct tax; ii) taxpayers must record the TVPEE in their expense accounts and can apply for a deduction in corporate taxes as a result. The Respondent also submits that the TVPEE satisfies the international legal test for qualifying a taxation measure, since it is: i) a financial obligation imposed by law; ii) levied on a class of persons – specifically all electricity producers (both those using traditional and renewable technologies); and iii) for a public purpose.

282. ***Good faith*** - In response to Claimants' arguments that the TVPEE is not a good faith taxation measure, Respondent submits that: i) the good faith analysis proposed by the Claimants is not applicable in the present case; and ii) even if such analysis were indeed applicable, the TVPEE was enacted in good faith. In particular, Respondent submits that the good faith analysis proposed by Claimants (as undertaken by the tribunal in *Yukos v. the Russian Federation*) is only applicable in the presence of extraordinary circumstances, where the purpose of the taxation measure is entirely dissociated from the public interest and aims instead at the destruction of a particular corporation or the elimination of a political opponent.[352] Respondent submits that no such circumstances are present here. Even if the good faith analysis were applicable, Respondent defends

---

[352] ReplyPO, on p. 33.

the *bona fide* nature of the TVPEE by submitting that the TVPEE does not discriminate between energy producers since it is applicable to both renewable and conventional producers. In fact, the renewable energy producers are the least affected by this measure since, by Respondent's account, they are entitled recover some of the amounts levied through the remuneration they receive for the energy produced. Such remuneration includes a reimbursement of operating costs, which according to Respondent, includes the TVPEE.[353]

283. ***Non-Application of Claw-back*** – In response to Claimants' alternative argument regarding the so-called "*Claw-back*", the Respondent argues that the exceptions created by the ECT for the application of Part III obligations to taxation measures do not apply in the present case. Respondent submits that the exception provided at Article 21(3) ECT[354] finds no application here since the TVPEE is a tax on income, which can never come within the scope of the claw-back, per the clear language of Article 21(3) ECT.[355] The Respondent relies upon a Reader's Guide published by the Energy Charter Treaty Secretariat, which assimilates taxes on income with "*direct taxes.*" Respondent further argues that direct taxes are those which "*cannot be legally passed on by the taxpayer to another person*" (the most obvious example of which are taxes on consumption). By contrast, Respondent pleads that the TVPEE is a tax on income (albeit on gross income) and thus a direct taxation measure which cannot be passed down to consumers. Furthermore, Respondent also invokes the broad definition of the term "*taxes on income or on capital*" at Article 21(7)(b) ECT: "*there shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital (…) or substantially similar taxes, (…)*" [Our underlined]

284. Even if the TVPEE were not considered a tax on income, Respondent submits that this taxation measure cannot be subjected to the most favoured nation ("**MFN**") obligation invoked by Claimants, since the international treaty provisions invoked by Claimants to establish that obligation relate to taxation measures and, as such, are excluded from the scope of the claw-back.[356] Since MFN obligations cannot be imposed by virtue of the ECT with respect to advantages accorded by Spain pursuant to other tax provisions of international treaties, the Respondent argues that the TVPEE is therefore not subject to the obligations created by Article 10 ECT.

    *ii.    **The Claimants' Position***

---

[353] Resp. Co-Mo, on p. 129.
[354] Article 21(3) provides that Articles 10(2) (equal treatment) and Article 10(7) (most favorable nation treatment) shall apply to Taxation Measure other than those on income or capital. However, pursuant to Article 21(3)(a), these provisions shall not apply to "*impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to tax provisions of any convention, agreement or arrangement described in subparagraph 7(a)(ii) or resulting from membership of any Regional Economic Organisation.*"
[355] ReplyPO, on p. 161. See also Article 21(3) ECT: "*Article 10(2) and (7) shall apply to Taxation Measures of the Contracting parties other than those on income and capital, (…)*" [Emphasis added]
[356] ReplyPO, on pp. 45 and 46.

285. **Summary** – The Claimants submit that the TVPEE is in effect a State-mandated cut in the remuneration of renewable energy producers garbed in the disguise of a taxation measure. Claimants argue that the TVPEE is therefore not a good faith Taxation Measure. For this reason, it should not be affected by the carve-out stipulated at Article 21 ECT.[357] In any event, even if it were deemed a Taxation Measure, the investor protection obligations incumbent upon Spain are applicable to the TVPEE by virtue of the claw-back provision of Article 21(3) ECT since: i) TVPEE is not a tax on income or on capital;[358] and ii) Spain has already granted the protection sought here to investors from other countries. As a result of the MFN obligation salvaged from the carve-out by the claw-back provision, Respondent is bound to extend to Claimants the same protection as regard the TVPEE.[359]

286. **Good Faith** – Claimants submit that the TVPEE is not a *bona fide* Taxation Measure – though it bears the appearance of one – and is therefore not subject to the carve-out contained at section 21(1) of the ECT for the following principal reasons:

   - The TVPEE is not levied to finance public expenses : According to Claimants, the TVPEE was enacted to offset the costs of Spain's electricity system and thus tackle the deficit plaguing that system. Claimants submit that the budget of the electricity system is not a public expense because the electricity system functions as a private market in which various actors (producers, distributors, etc.) ply their various services, albeit under the supervision of a public body, the CNMC.[360] Therefore the costs of the electricity system (which generated the deficit) are liabilities payable to private actors, not government entities. By this account, any measure to offset those costs are beneficial to the private actors, not the state;

   - The TVPEE fails to respond to its environmental justification: Claimants submit that the ostensible environmental justification of the TVPEE is belied by the economic effects of the measure. Since the TVPEE affects both traditional energy producers and renewable producers, with no regard to their relative environmental footprints, Claimants infer that the Respondent could not have truly pursued an environmental purpose when it enacted the TVPEE.[361]

   - The TVPEE is economically equivalent to a reduction in the remuneration of the renewable energy producers: Claimants invoke several public declarations by high-ranking Spanish government officials to the effect that the government had considered implementing a direct cut in the remuneration of the renewable energy producers to address the tariff deficit, but, due to the legal problems this option posed, the Spanish government decided instead to enact the TVPEE. Claimants rely on these declarations to argue that both the TVPEE and a potential direct cut in the remuneration of renewable energy producers bring about the same

---

[357] Cl. Mo-M, on pp. 164 *et seq.*
[358] CounterMoPO, on pp. 44 and 45.
[359] CounterMoPO, on p. 46.
[360] *Comisión Nacional de la Energía*.
[361] CounterMoPO, at paras. 150 *et seq.*; RejoinderPO, at paras. 123 *et seq.*

economic effect, i.e. a reduction in the revenue of renewable energy producers.[362] As such, Claimants argue that the ultimate goal of the TVPEE was to "*slash the remuneration of Special Regime producers (…) to finance the tariff deficit.*"[363]

287. ***Application of the Claw-back*** – In the alternative, should the Tribunal find that the TVPEE is a good faith Taxation Measure for the purposes of Article 21(1) ECT, Claimants submit that it would nonetheless remain subject to the MFN obligations (Article 10(7) ECT) as a result of the claw-back provision contained at Article 21(3) ECT. In particular, Claimants submit that the TVPEE is ***not*** a tax on income and thus falls within the scope of the claw-back provision, since the TVPEE is levied on the gross revenue received by electricity producers, not on net income (obtained after deduction the costs of production, taxes, etc.).[364] Claimants invoke the ordinary meaning of the term "*taxes on income*" and cite the definition given to this term by the Organization for Economic Cooperation and Development ("**OECD**") which equates taxes on income with taxes levied on "*net income or profits (gross income minus allowable tax reliefs) (…).*"[365]

288. Since Respondent has generally undertaken FET, Most Constant Protection and Security ("**MCPS**"), Umbrella Clause and Non-Impairment obligations towards investors from other countries pursuant to certain BITs, it follows that it must extend that same treatment to Claimants with respect to the TVPEE, pursuant to the MFN obligation set out at Article 10(7) ECT which, in Claimants' account, remains applicable to the TVPEE by virtue of the claw-back.[366]

289. Finally, Claimants submit that the BITs they invoke to establish the Respondent's obligation to extend to them the same protection extended to other investors with respect to the TVPEE are not taxation measures nor conventions, agreements or arrangements for the purpose of Article 21(7)(a)(ii) ECT and are therefore included in the scope of the claw-back.[367]

### iii.  Relevant authorities

290. ***RREEF***[368] – Although the TVPEE objection was raised in *RREEF*, and although the tribunal in that case granted Spain's bifurcation request, the tribunal ultimately joined this partial jurisdictional objection to the merits of the dispute.

291. After reviewing the parties' arguments, the tribunal held that the characterization of the TVPEE as a *bona fide* or *mala fide* taxation measure cuts to the heart of the dispute on the merits and must be assessed in light of the entire body of "*a careful investigation of*

---

[362] Cl. Reply, on pp. 147 to 151.
[363] Cl. Reply, on p. 148.
[364] CounterMoPO, on p. 45.
[365] CounterMoPO, on p. 45.
[366] Cl. Reply, at para. 890. Claimants cite the investor protection provisions of two (2) BITs, namely Article 3 of the Spain-Ukraine BIT (CL-0208) and Article III of the Spain-Costa Rica BIT.
[367] RejoinderPO, on p. 44.
[368] *Op. cit.*

*the circumstances and of the effects of the challenged measure.*"[369] For this reason, the Tribunal joined this objection with the merits, without, however, prejudging the admissibility of this objection as a preliminary issue. The Parties did not bring the decision on liability in *RREEF* to the attention of the Tribunal.

292. ***Isolux***[370] – The tribunal first decided that the TVPEE is *prima facie* a taxation measure subject to the carve-out at Article 21(1) ECT.[371] Taking guidance from the authorities submitted by the Claimant (identical to the ones submitted by the Claimants in this case), the tribunal decided that the taxation carve-out only applies to *bona fide* taxation measures.[372] Tribunals are therefore empowered to inquire into the true nature of the impugned taxation measure and assess whether it was promulgated for ulterior motives, other than to raise revenues for the state.[373] The carve-out fails where the measure was enacted in bad faith.[374] Any impugned taxation measures is presumed in good faith and the claimant bears the burden to overturn that presumption.[375]

293. In *Isolux*, the tribunal found that the Claimant failed to overturn the presumption. The tribunal found that the TVPEE applied equally to the fossil fuel and renewable energies, without discriminating between traditional and more recent technologies, nor between the remuneration for the energy produced (market price or regulated tariff). Absent "*extreme purposes*",[376] the economic repercussions or effects of the taxation measure were held insufficient to overturn the presumption.[377] The tribunal conceded that the TVPEE may fail to measure up to its stated purpose in favour of the environment and its promulgation may have had no other real purpose than to reduce the tariff deficit. But, according to the tribunal, this incongruity between stated purpose and economic effect was not sufficient to overturn the presumption of good faith.[378] The tribunal therefore declined jurisdiction over the claim based on the enactment of the TVPEE.[379]

294. ***Eiser***[380] – As in *Isolux*, the *Eiser* tribunal first decided that the TVPEE has all the characteristics associated with a legitimate taxation measure and therefore falls within the literal definition of "*Taxation Measure*" under Article 21(7) ECT.[381] Unlike *Isolux*, however, the *Eiser* tribunal did not wade into the debate regarding the applicability of the carve-out set out at Article 21(1) ECT to taxation measures enacted in bad faith. The *Eiser* tribunal simply held that the evidence produced in the record falls short of demonstrating an improper or abusive use of the Kingdom of Spain's taxation power, or

---

[369] *Ibid.*, at para. 196.
[370] *Isolux, op. cit.*
[371] *Ibid.*, at para. 722.
[372] *Ibid.*, at paras. 728 to 732.
[373] *Ibid.*
[374] *Ibid.*, at para. 733.
[375] *Ibid.*, at para. 734.
[376] Such as the destruction of a political adversary. See in that regard *Yukos Universal Limited (Isle of Man)* v. *Russian Federation*, PCA Case No. AA/227, Award, 18 July 2014, (**CL-0125**), ("***Yukos***"), at para. 1407.
[377] *Ibid.*, at para. 739.
[378] *Ibid.*, at para. 740.
[379] *Ibid.*, at para. 741.
[380] *Eiser, op. cit.*
[381] *Ibid.*, at para. 266.

that that TVPEE was enacted to destroy the claimants.[382] The tribunal therefore declined jurisdiction over the part of the claims pertaining to the TVPEE.[383]

295. ***Novenergia***[384] – The ruling by the *Novenergia* tribunal on the TVPEE taxation measure follows the same analytical pattern as the ones adopted by the tribunals in *Eiser* and *Isolux*. The *Novenergia* tribunal first decided that Act 15/2012 enacting the TVPEE was *prima facie* a taxation measure within the meaning of Article 21(7) ECT.[385] Like the *Isolux* tribunal, the *Novenergia* tribunal accepted that the carve-out of taxation measures only applies to those taxation measures enacted in good faith.[386] The tribunal further ruled that the claimant bears the burden of proving that Act 15/2012 was enacted in bad faith. The claimant failed to discharge that burden since the evidence produced and arguments submitted fail to disclose the "*extreme actions*" which, according to other tribunals, constitute *mala fide* grounds.[387] As a result, the *Novenergia* tribunal declined jurisdiction over the part of the claim arising from the enactment of the TVPEE.[388]

### iv.    Analysis

296. In the light of the foregoing, it appears that the fundamental issues in dispute in the context of the Taxation Objection are the good (or bad) faith nature of the TVPEE and, subsidiarily only, whether the TVPEE is covered by the claw-back provision at Article 21(3) ECT.

297. ***Good faith*** – As regards the good faith nature of the TVPEE, the Tribunal is of the view that the parties are fundamentally in disagreement about the economic effects of the TVPEE. Indeed, the great majority (if not all) of the arguments raised by Claimants to impugn the good faith of the TVPEE seem to relate to the economic effects of this measure independently of its legal operation. As such, these arguments deal primarily with the economic objective prompting Spain to levy the TVPEE, the effectiveness of the TVPEE to accomplish that objective, the economic impact of the TVPEE upon the renewable and the conventional energy producers, etc.

298. The principal arbitral decision cited by the Parties that ruled on the exclusion of bad faith taxation measures from the scope of the tax carve-out provision in the ECT is *Yukos* v. *Russia*.[389] In that case, the tribunal held that Claimants successfully demonstrated that the taxation measures at issue were enacted by the Russian Federation with the sole motivation of eliminating a political opponent and bankrupting his company. In particular, the tribunal held that the claimants had demonstrated that, among others: a) the motivation of the State or the enacting authority was to achieve a purpose <u>entirely</u>

---

[382] *Ibid.*, at paras. 270 and 271.
[383] *Ibid.*, at para. 272.
[384] *Novenergia, op. cit.*
[385] *Ibid.*, at para. 519.
[386] *Ibid.*, at paras. 520 and 521.
[387] *Ibid.*, at paras. 521 and 524.
[388] *Ibid.*, at para. 525.
[389] Yukos, at paras. 1430 *et seq.*

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

underlined from the purpose of raising general revenue for the State;[390] and b) that such a motivation could be apparent independently of the effects of the taxation measure.[391]

299. This approach seems consistent with the legal test applied by other international arbitration tribunals in investor-state disputes to determine whether a taxation measure is covered by the scope of carve-out provisions contained in various BITs similar to the one contained at Article 21(3) ECT. For example, in *EnCana* v. *Ecuador*,[392] the tribunal held that the economic effects of a legislative enactment were only secondarily relevant to assess whether the enactment is a taxation measure for the purposes of the tax carve-out contained in the Canada-Ecuador BIT. Of primary importance is the legal operation of the taxation measure at issue, namely whether it was established by law and whether it imposes liability on classes of persons to pay funds to the State for public purposes.[393]

300. In light of the foregoing legal principles and of the evidence adduced in this case, the Tribunal is not convinced by Claimants' arguments that the TVPEE is a measure enacted in bad faith.

301. First, the Tribunal is satisfied by the evidence presented that the proceeds of the TVPEE are payable directly to the Kingdom of Spain and that the total revenue levied by the Kingdom of Spain through the TVPEE is reported in the General State Budget of Spain. The Tribunal is of the view that the TVPEE is in the nature of a taxation measure.

302. In the circumstances, Claimants bore the burden of proving that the TVPEE was nonetheless enacted to achieve a purpose entirely unrelated to that of levying state revenue and that this purpose is apparent independently of the economic effects of the TVPEE.

303. The Claimants failed to discharge this burden of proof.

304. The Claimants have, at best, presented arguments and evidence regarding the economic effects of the TVPEE which – even if accepted – fail to show that the TVPEE was enacted for any other reason than to levy revenue for the state.

305. Even if the Tribunal were to accept that the TVPEE benefits the private actors that operate in Spain's private electricity market, the tariff deficit remains nonetheless an issue of public interest, which affects the finances of the Kingdom of Spain. It is obvious that Kingdom of Spain incurs expenses as a result of the tariff deficit, including the subsidies it undertook to pay renewable energy producers, among others. As such, the reduction of the tariff deficit is directly related to the purpose of reducing expenses (and, by extension, raising general revenue) for the Kingdom of Spain.

306. Similarly, even if the Tribunal were to accept that the enactment of the TVPEE is contrary to sound environmental policy, such a finding would be of no assistance to the

---

[390] *Ibid.*, at para. 1431.
[391] *Ibid.*, at para. 1434.
[392] *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481, Award, 3 February 2006, (**RL-0020**).
[393] *Ibid.*, at paras. 141 *et seq.*

Claimants. The qualification of the TVPEE as a taxation measure is not tributary of its economic effects but rather of its legal operation.

307. The Tribunal is satisfied that the TVPEE targeted renewable and non-renewable energy producers alike. The environmental effects of the TVPEE and its ultimate economic effects on renewable energy producers like the plants at issue are of no direct relevance for the qualification of the TVPEE as a taxation measure.

308. For all these reasons, the Tribunal is of the view that Claimants failed to discharge their burden of proving that the TVPEE was enacted in bad faith and should not be considered a taxation measure.

309. ***Scope of the claw-back*** – The Tribunal notes that the carve-out set out at Article 21(1) ECT which excludes Taxation Measures from the purview of ECT obligations is phrased in broad and general terms. So is the definition of the term "*Taxation Measures*" set out at Article 21(7) ECT. The Tribunal is of the view that these broad and general terms are in furtherance of the principle of state sovereignty enshrined (in its application to state energy resources) at Article 18 ECT.

310. As regards the claw-back of certain types of taxes to bring them back within the purview of ECT obligations (set out at Article 21(3) ECT), the issue in dispute is concerned with the scope of the term "*taxes on income or on capital*" (Article 21(7)(b) ECT) and whether the TVPEE is part of this category of taxes.

311. If the TVPEE is a tax on income or on capital, then it remains unaffected by the claw-back and any related to it are excluded from the Tribunal's jurisdiction.

312. If the TVPEE is <u>not</u> found to be a "*tax on income*", then the TVPEE would be included in the scope of the claw-back and subject to the MFN obligation at Article 10(7) ECT, which would bind Spain to extend to the Claimants the same FET, Umbrella Clause and MCPS protections it extended to investors pursuant to other BITs.

313. The question is whether the term "*taxes on income*" at Article 21(7)(b) ECT includes only taxes on net income (i.e. profits) or whether it also includes taxes on gross income or revenues (i.e. sales). Since the determination of this issue requires the interpretation of a provision of an international treaty, the Tribunal will therefore take guidance from the interpretative canon provided at Article 31 VCLT.

314. The Tribunal is of the view that the Parties did not adduce any "*instruments*", "*agreements*" or "*practices*" which are useful to shed light upon the scope of the term "*taxes on income or on capital*." The Tribunal does not find the Reader's Guide published by the Energy Charter Secretariat (and invoked by Respondent) useful to decide whether the TVPEE falls into the category of "*taxes on income or on capital*," if only because the workings of the TVPEE transcend the dichotomy of "*direct*" versus "*indirect*" taxation measures set out in that document. Based on that document, Respondent argues that the TVPEE is a "*direct tax*" and is hence a "*tax on income or capital*" because the taxpayers (i.e. the energy producers) cannot "*recover the amount of the tax through*

*the repercussion of the amount of the tax to another person.*"[394] However, Respondent also submits that the energy producers <u>can</u> recover the amount of the TVPEE – presumably from the consumers – by factoring it into the cost of the power produced and sold.[395]

315.  The Tribunal finds equally inconclusive the definition given to the term "*taxes on income or on capital*" by the Organization for Economic Cooperation and Development ("**OECD**"). Claimants argue that the OECD equates the term "*taxes on income or on capital*" with taxes levied on "net income or profits (gross income minus allowable tax reliefs)."[396] Should this limit the scope of the term *"taxes on income or on capital"* to taxes on profits as the Claimants seem to argue? The Tribunal does not think so.

316.  Further to Article 31 VCLT, the Tribunal must interpret the term in accordance with its ordinary meaning, its context and in the light of the underlying objectives and purpose of the ECT. The term "*taxes on income or on capital*" is defined in the excessively broad terms to include, among others "*all taxes … on <u>elements</u> of income or capital … or <u>substantially similar taxes.</u>"* [Emphasis added]

317.  The Tribunal is of the view that such broad terms serve to restrict the scope of the claw-back of certain types of taxes. This is in keeping with the purpose of the ECT,[397] which explicitly incorporates the objectives and principles of the European Energy Charter, which, in turn, cite state sovereignty as an important consideration.[398]

318.  The Tribunal is of the view that even though the term "*income*" is not defined in the ECT, the TVPEE is undeniably a tax on the energy producers' gross income. As such, it is "*substantially similar*" – if not squarely identical – to a tax on income or on capital.

319.  For these reasons, the Tribunal declines jurisdiction on the parts of Claimants' claim that impugn the enactment of the TVPEE.

## V.   THE ISSUES ON THE MERITS

320.  In the light of the above-mentioned facts and given the Parties' positions described briefly above and further summarized below, the following issues (on the merits) are to be determined:

1.  As a preliminary issue, were the Olivenza 1 and Morón plants entitled to receive remuneration under the Special Regime? In particular, did the Olivenza 1 and Morón plants comply with the 50 MW installed capacity requirement set out at Article 27(1) of EPA 1997?

---

[394] ReplyPO, on p. 44.
[395] Resp. Co-Mo, on pp. 129 *et seq.*
[396] CounterMoPO, on p. 45.
[397] See Article 2 ECT.
[398] See in particular the Preamble and Title I: Objectives of the European Energy Charter.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

2.  Did Respondent accord Claimants' investment "*fair and equitable treatment*" ("**FET**") under Article 10(1) of the ECT? In particular:

-   **Legal Standard for FET** – What is the legal standard governing the assessment of the "*fair and equitable*" nature of the treatment that Spain was obliged to accord the Claimants' investments? In particular:

    •   Is the FET obligation of a host state under Article 10(1) of the ECT limited to a non-discrimination obligation, once the investment has been made on the territory of the host state, as pleaded by Respondent?

    •   What role, if any, does Claimants' due diligence play in the context of assessing Claimants' legitimate expectations and the scope of Respondent's FET obligation?

    •   In assessing Claimants' legitimate expectations and the scope of Respondent's FET obligation, how, if at all, should the Tribunal weigh the (un)foreseeability of the regulatory changes at issue and the public policy considerations pursued by Respondent in enacting them?

-   **Expectation of Stability** – Did Claimants have a legitimate expectation that the Original Regulatory Framework would remain fixed throughout the operational lifespan of the Morón and Olivenza plants?

    •   Among other things, did the Purported Agreement, the waiver letters and the December Resolutions, and the enactment of RD 1614/2010 give rise to a legitimate expectation that Respondent would not adopt *any* changes to the remunerative regime applicable to the CSP plants that were operational or had registered on the RAIPRE prior to December 2010?

-   **Expectation of Consistency** – Did Claimants have a legitimate expectation that the precepts of the Original Regulatory Framework would not be radically or fundamentally altered? Among other things, did such a legitimate expectation arise regarding the following specific elements of the Original Framework:

    •   The feed-in remuneration system based on the actual production and distribution of electricity and the option to choose remuneration (in € per MWh) based on a regulated tariff or on the "*pool price*" of electricity supplemented by a premium?[399]

---

[399] See Article 30(4) of the EPA 1997 (**C-0047t**) and Article 24 of RD 661/2007 (**C-0049t**).

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

- • The right to sell the total amount of the electricity produced?[400]

- • The entitlement to receive remuneration under the Special Regime for the electricity produced using non-renewable "*back-up fuel*" to the extent that such fuel is used to generate no more than 15 % of the total electricity produced?[401]

- • The right to receive remuneration under Original Regulatory Framework <u>for the entire operation lifetime of the plants</u>?[402]

- • The update of the feed-in remuneration regime based on the general CPI minus 0.25% until the end of 2012 and minus 0.50% thereafter;[403]

- • The right to priority access to the transmission and distribution grid?[404]

- • The right to receive a supplement for reactive energy?[405]

- If a legitimate expectation of consistency did arise, did the abrogation of the Original Regulatory Framework and the enactment of the Measures at Issue alter in a radical or fundamental way the remunerative regime for CSP producers? In particular, did the following aspects – taken separately or as a whole – constitute such a radical or fundamental shift:

- • The abrogation of the feed-in remuneration system based on the actual electricity produced and distributed as defined in EPA 1997 and its replacement with a remuneration system based on a rate of return per unit of installed capacity calculated on the basis of a standardized plant;

- • The abrogation of the right to use "*back-up fuel*" and receive remuneration under the Special Regime for the electricity thus produced;[406]

- • The abrogation of the right to sell the total amount of electricity produced;[407]

---

[400] See Article 30(2)(a) of the EPA 1997 (**C-0047t**) and Article 17(b) of RD 661/2007 (**C-0049t**).
[401] See Article 2(1)(b)(1) of RD 661/2007 (**C-0049t**).
[402] See Article 36 of RD 661/2007 (**C-0049t**).
[403] See Article 44 of RD 661/2007 (**C-0049t**).
[404] See Article 25(2) EPA 1997 (**C-0047t**).
[405] See Article 29(1) RD 661/2007 (**C-0049t**).
[406] See First Final Provision of Act 15/2012 (**C-0309t**).
[407] Claimants argue that the First Final Provision of Act 15/2012 (**C-0309t**) abrogate the CSP producers' right to receive remuneration under the feed-in system of the Special Regime by abrogating the CSP producers' right to receive such remuneration for the electricity. However, it bears noting that, by the time Claimants made

- • The purported abrogation of the right to receive remuneration under the Special Regime for the lifetime of the plants;[408]

- • The substitution of the updated standard with the CPI at a constant tax rate without unprocessed foodstuffs or energy products;[409]

- • The purported abrogation of the right to priority access to the transmission and distribution grid.[410]

3.   Does the answer to question 2 (above) dispose of the entire case on the merits? If so, must the Tribunal rule upon the remaining issues?

*If the Tribunal decides to rule upon the remaining issues*:

4.   Did Respondent breach the "*umbrella clause*" at Article 10(1) of the ECT by enacting the Measures at Issue? In particular:

- Did the Purported Agreement and the exchange of letters of waiver and December Resolutions constitute a unilateral or bilateral undertaking binding upon Respondent not to revise the Original Regulatory Framework or – at the very least – to carve out the Morón and Olivenza plants from the scope of application of any regulatory changes?

5.   Did the enactment of the Measures at Issue constitute an expropriation or a "*creeping expropriation*" of Claimants' investment?

6.   Did Respondent breach its obligation not to impair Claimants' investment with unreasonable and discriminatory measures?

7.   Did Respondent breach its obligation to accord Claimants' investment the most constant protection and security?

8.   If the Tribunal makes a finding of liability, what is the quantum of Claimants' damages? In particular:

---

their investment, RD 1614/2010, which Claimants invoke as the source of their legitimate expectation of regulatory stability, had already limited the number of hours of operation for which the CSP producers were entitled to remuneration under the Special Regime. See in this regard Article 2(3) of RD 1614/2010 (**C-0050t**).
[408] The Original Regulatory Framework did not limit the number of years of operation during which a CSP plant could receive Special Regime remuneration. Annex VIII of MO IET/1045/2014 (**C-0321t**) established the lifetime of CSP plants at 25 years and provided thus preventing the plants from receiving remuneration after 25 years of operation. According to Claimants, this is inaccurate since the lifetime of the CSP plants is at least 35 years. Both Parties produced expert reports to support their respective positions.
[409] See Article 1 of RD-L 2/2013 (**C-0322t**).
[410] The Claimants argue that Article 26(2) EPA 2013 (**C-0311t**) and RD 413/2014 (**C-0328t**) abrogated the CSP producers' rights to priority access. However, this is not immediately apparent from the text of these provisions and Respondent argues that the Measures at Issue maintained the CSP producers' right to priority access. See in this regard Resp. Co-Mo, at paras. 594 and following.

- Is the DCF method appropriate for calculating Claimants' damages or should the regulated asset based ("**RAB**") rather be used for that calculation?

| A. If the **DCF method** is chosen, how should the following sensitivities be considered in the context of the calculation: | B. If the **RAB method** is chosen, how should the following sensitivities be considered in the context of the calculation: |
|---|---|
| 1. Should the pool + premium option[411] be included in the *But For* scenario? | 1. What should be the investment base (i.e. the levelized costs) serving as the basis of the calculation? Those of a standard tower plant? Or the actual levelized costs of the Morón? And if the latter, then which assessment of the levelized costs should be used? Brattle's or by Accuracy's? |
| 2. What is the impact of the change in the CPI index for the purpose of updated values of the feed-in remuneration scheme and should it be considered in the calculations? | |
| 3. Should the TVPEE be considered in the calculations? | 2. What should be the after-tax target return (9.5% as proposed by Brattle or 5.4% as proposed by Accuracy?) |
| 4. Should the supplement for the reactive power be considered in the calculation? | 3. What should be the discount rate based on regulatory risk? |
| 5. *Quid* the entitlement to receive remuneration under the Special Regime for electricity produced with natural gas as back-up fuel? | |
| 6. What should be the value of the regulatory risk premium in the *But For* and *Actual* scenarios? | |
| 7. What should be the date of valuation (June 2014 or December 2012)? | |
| **C. Regardless of the method of valuation chosen:** | |
| 1. What should be the plants' lifetime (25 years or 35 years)? | |
| 2. What should be the liquidity discount in the *But For* and the *Actual Scenarios*? | |

---

[411] See Article 24 of RD 661/2007 (**C-0049t**).

3. Should the production expectation be based on InfraRed's expectations or those of the institutional lenders?

4. *Quid* InfraRed's management costs?

5. Should InfraRed's equity dilution be factored in as an element in the *But For* scenario (as proposed by Accuracy)?

6. Should the debt be assessed at face value or at estimated market value?

## VI.   DISCUSSION

### A.   THE PLANTS' INSTALLED CAPACITY

321.   This issue, raised by Respondent in its *Counter-Memorial on the Merits*, has a bearing upon: i. the admissibility of the Morón and Olivenza plants under the Special Regime established by the Original Regulatory Framework; and ii. quantum.

322.   It is undisputed that CSP plants the "*installed capacity*" of which exceed 50 MW would not, in principle, be entitled to remuneration under the Special Regime.[412]

### *i.   The Parties' Positions*

323.   **Claimants** – Claimants first argue that – in keeping with Article 3(1) of RD 661/2007[413] (in force when the plants were built and the generators installed) – the "*installed capacity*" must be interpreted as the capacity stated on the generator nameplate.[414] Claimants have produced as evidence the verification reports of Spain's National Commission on Markets and Competition – *i.e. Comisión Nacional de los Mercados y la Competencia* (the "**CNMC**") – which reproduce the inscriptions on the nameplates of the turbines of the two plants and which on their face confirm that the nameplates specify a capacity of 49,900 kW for Olivenza 1[415] and 50,000 kW for Morón.[416]

324.   Claimants further submit that the term "*installed capacity*" should be interpreted as the net capacity distributed to the grid, not the gross capacity produced by the generator since:

   i.   According to Claimants' technical experts, the term "*installed capacity*" indeed designates such net capacity. They testified that the common practice and usage of the CSP industry both in Spain and abroad (in particular in California, the site of the only CSP plants that have been in operation for more than 30 years) equates installed capacity with the net delivery of energy to the grid;[417]

   ii.   The output of the generators is measured at the node connecting the CSP plant to the grid, not at the terminals of the generators;[418]

---

[412] Article 27 of the EPA 1997 (**C-0047t**).

[413] See **C-0049t**.

[414] It is noted, however, that Article 3(1) of RD 661/2007 does not mention "*installed capacity*" but rather "*nominal capacity*" (i.e. "*potencia nominal*"): "*La potencia nominal <u>será la especificada en la placa de características</u> del grupo motor o alternador, según aplique* […]" [Emphasis added]

[415] See Cl. Reply, on pp. 138 and following; See also *Report on the Checks Carried on the Olivenza-1 Thermosolar Power Plant Installations owned by Ibereólica Solar Olivenza, S.L.* (**C-0573t**).

[416] *Ibid.*; see also *Report on the Checks Carried out on the Morón Thermosolar Power Plant Installations owned by Ibereólica Solar Morón, S.L.* (**C-0571t**), on p. 2.

[417] *Ibid.*; see also BQR-111, José Mesa-Díaz, *CSP Installed Capacity Assessment Report*, 13 October 2016, on p. 16.

[418] See Cl. Reply, at paras. 365 and following.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

iii.   The capacity measured at the node connecting the CSP plant to the grid is the measure remunerated under the Original Regulatory Framework;[419]

iv.   According to the reports issued by the Electric Network of Spain (*Red Eléctrica de España*), the capacity measured at the node connecting each of the two plants to the grid is 49.9 MW for the Morón plant[420] and 50 MW for the Olivenza 1 plant[421]

325.   Claimants also point out that the Spanish authorities themselves registered the CSP plants as having an installed capacity equal or less to 50 MW. They invoke the contracts entered into between each plant and the Spanish electricity network operator, Endesa Distribución Eléctrica S.L. Unipersonal, which identifies the capacity of the Morón and Olivenza 1 plants as 49.9 MW[422] and 50 MW respectively.[423]

326.   Finally, Claimants assert that Respondent should be estopped from arguing that the CSP plants do not conform with the 50 MW installed capacity requirement, since this position is in direct contradiction with Respondent's previous actions and representations, including the confirmation of conformity by the CNMC inspectors.[424]

327.   **Respondent** – Respondent argues that the calculation of "*installed capacity*" must take into account *the plants' own consumption of electricity*, which is equivalent roughly to 10% of electricity production (49.9 MW and 50 MW respectively) with the result that their installed capacity is actually 55 MW.[425]

328.   Respondent contends that the documents invoked by Claimants, i.e. the CNMC inspection reports, the contracts with the Spanish electricity network operator, Endesa Distribución Eléctrica S.L., and the reports issued by Red Eléctrica de Esapaña reflect administrative actions, not **technical** inspections or observations.[426] Respondent submits those documents are therefore irrelevant to the determination of the plants' installed capacity.[427]

---

[419] See in particular Article 20.1 of RD 661/2007 (**C-0049t**): "*The facilities under the special regime may pass into the system the totality of the net electricity energy produced, being understood as the gross electrical energy generated by the plant less own use by the system for the generation of electrical energy.*" [Emphasis added]

[420] See **C-0577t**.

[421] See **C-0578t**.

[422] See *Technical Contract for Supply of Electricity Produced under Special Regime for the 49,900-kW "Morón" Thermosolar Plant, owned by Ibereolica Solar Morón S.L. located at "El Torre ion"* [sic] *in the Municipality of Morón de la Frontera, Seville*, **C-0575t** at Article 5.1: "*The power of the installation is 49,900 kW.*"

[423] See *Technical Contract for Supply of Electricity Produced under Special Regime for the 50,000-kW Olivenza 1 Thermosolar Plant, owned by Ibereolica Solar Morón* [sic] *S.L. located at Valdelinares in the Municipality of Olivenza, Badajoz*, **C-0576t** at Article 5.1L "*The power of the installation is 50,000 kW.*"

[424] See Cl. Reply, on pp. 142 and 143. See also *Report on the Checks Carried on the Olivenza-1 Thermosolar Power Plant Installations owned by Ibereólica Solar Olivenza, S.L.* (**C-0573t**), on p. 2; see also *Report on the Checks Carried out on the Morón Thermosolar Power Plant Installations owned by Ibereólica Solar Morón, S.L.* (**C-0571t**), on p. 2.

[425] See Resp. Co-Mo, on pp. 43 and following.

[426] See Resp. Rejoinder, at paras. 1036 and following.

[427] *Ibid.*

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

329. For his part, Respondent's expert opines that the installed capacity of the plants is over 52.2 MWe.[428] To arrive at this conclusion, Mr. Casanova appears to have worked backwards from the "*net output delivered to the grid*" by the two (2) plants at issue, which he conceded is "*usually around 49.8 MWe.*"[429]

330. In his report, Mr. Casanova opines that the **gross output** of the Plants is 55 MWe and cites in support of his opinion the following documents:

- The turnkey contract between the plants and the service provider tasked with the operation and management of the plants, pursuant to which the service provider guaranteed a nominal power of 55 MWe;[430]

- The technical evaluation of the plants carried out by Garrigues Medio Ambiente, which states as follows:

  "*As regards the nominal power of the plant, it is important to stress that it is 55 MW, and does not exceed 50 MW of power at the connection point. It should be indicated that the nominal power of 55 MW does not comply with the limitation of 50 MW of the special regime according to Royal Decree 66/2007. In this regard, we refer to the Legal Adviser of the project.*"[431]

  [Emphasis added]

331. Mr. Casanova further offers what can only be described as a legal opinion – without (it seems to the Tribunal) explanation or justification – that, "*according to the Spanish legislation, in CSP plants the Installed Capacity is the nominal power of the electrical generator, which should be only slightly lower that (sic) the nominal power of the steam turbine due to mechanical losses and to internal losses of the generator*[.]" on the basis of which he states that "*it can be concluded that actual installed or nominal power or capacity of both Olivenza 1 and Morón CSP plants are certainly higher than 50 and 49.9 MW respectively.*"[432]

### ii. Relevant arbitral authorities

332. Of the many authorities cited by the Parties, *Eiser*[433] is the only ECT arbitration award in which the issue of the plants' installed capacity has been treated. It is noted that *Eiser*

---

[428] Mr. Jesús Casanova Kindelán, *Expert Witness Report Regarding Installed Capacity*, 30 November 2016, on p. 32.

[429] Mr. Jesús Casanova Kindelán, *Expert Witness Report Regarding Installed Capacity*, 30 November 2016, on p. 32.

[430] **JCK-005** and **JCK-007** in support of Mr. Casanova Kindelán's expert report.

[431] Garrigues Medio Ambiente, *Informe de Evaluación Técnica de una Instalación Solar Termoeléctrica Promovida por Ibereólica Solar en Olivenza (Badajoz)* (**R-0340t**), on p. 51.

[432] Mr. Jesús Casanova Kindelán, *Expert Witness Report Regarding Installed Capacity*, 30 November 2016, on p. 43.

[433] *Eiser* (**CL-0242**).

is also the only published award that considers the changes to the regulatory framework governing remuneration to Spain's renewable energy producers *in the CSP sector*.

333.  Both parties in *Eiser* made submissions substantially similar on this matter to those of the Parties in the present case. The tribunal in *Eiser* dismissed the claimant's estoppel argument. On the merits of the issue, the tribunal chose to interpret the term "*installed capacity*" for the purpose of admissibility to the Special Regime under article 27(1) of the EPA of 1997 based on the interpretation of the term "*nominal capacity.*"[434] This latter term is defined at Article 3(1) of RD 661/2007 as the "*… power* […] *specified on the specifications plate of the generator or alternator.*"[435]

334.  The uncontroverted evidence adduced in that case was to the effect that the power inscribed on the nameplate of the generators at issue was equal to or less than 50 MW.[436] The tribunal also noted that the CNMC inspected the plants and found that they complied with the conditions for remuneration under the Special Regime.[437] For these reasons, the tribunal in *Eiser* dismissed respondent's preliminary defense and concluded that the plants were *prima facie* admissible for remuneration under the Special Regime.[438]

### iii.   Discussion

335.  The technical experts seem largely in agreement with respect to the technical concepts at issue. In particular, both experts seem to agree on the definition of "*gross installed capacity,*" which is measured at the terminals of the generator inside the plant, and of "*installed capacity,*" which is measured at the nodes where the plant connects to the electricity grid.[439] Both experts also seem to agree that the net installed capacity is generally lower than the gross installed capacity as a result of power used by the equipment inside the plant, which draws its electricity directly from the turbine.

336.  The available evidence suggests that the net output – i.e. the power as measured at the point of connection of the Morón and Olivenza plants to the grid – was 50 MWe or less. The reports by the *Red Eléctrica de España* confirms as much.[440] In cross-examination, Respondent's expert attempted to cast doubt on whether those measures were actually taken before or after the commissioning of the plants. But he did not deny that the figure listed in those reports "*measures the electricity going into the grid. So (…) what is useful for actually the bill, is actually the electricity that goes into the network, not the actual power.*"[441] In his own report, Mr. Casanova appears to admit that the net output of the

---

[434] *Ibid.,* at paras. 339 and 340.
[435] *Ibid.,* at paras. 339 and 340; See also Article 3(1) of RD 661/2007 (**R-0062t**).
[436] *Ibid.,* at para. 340.
[437] *Ibid.*
[438] *Ibid.,* at paras. 336 to 345.
[439] See the expert conference between Messrs. José Mesa-Díaz and Jesús Casanova-Kindelán, *Transcript,* Day 4, on pp. 94 to 96.
[440] See **C-0577t** and **C-0578t**.
[441] Expert conference between Messrs. José Mesa-Díaz and Jesús Casanova-Kindelán, *Transcript,* Day 4, on pp. 134 and 135.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

plants (i.e. "*the electricity that goes into the network*") is lower than 50 MW, stating it is "*generally around 49.8 MWe.*"[442]

337.  On the evidence, the Tribunal cannot but accept that the net output of the plants is less than 50 MW. Claimants do not contest that the gross output (measured at the terminals of the generator) is slightly higher than 50 MW.

338.  The question to be decided is whether the term "*installed capacity*" at Article 27(1) of the EPA of 1997 is properly interpreted as the net output or the gross output of the plants.

339.  As did the tribunal in *Eiser, the Tribunal* relies on the capacity listed on the nameplate of the respective generators and on the CNMC's own confirmation that the plants' installed capacity is equal to or under 50 MW.[443]

340.  Even if the Tribunal were to engage in a textual and purposive interpretation of the term "*installed capacity*" at Article 27(1) of the EPA 1997[444], the result would be the same, considering, among others, the following factors:

- The plants are remunerated for their net output. Article 20 of RD 661/2007 is unequivocal in that regard;[445]

- For the operator of the grid, the "*net output*" is the most relevant and important variable, far more so than the "*gross output*" measured at the terminals of the generator. In this regard, both experts were at unison. Mr. Casanova, Respondent's expert testified as follows:

    "*A. (Professor Casanova) Yes, the grid operator has to know what is the power being delivered to the grid by each plant. In the case of thermosolar plant, he would have to know whether, if a turbo-generator generates 50, and the final transformer of connection with the grid may be delivering 45/46, depending on the case, obviously he would have to know what that value is, because he has to organise his grid and he would have to know how far he can go tapping into the energy delivered from that particular plant.*

    <u>*So the answer: yes. he has to know what is the energy per unit of time that is being delivered to the grid: 45 or 46, depending on the case.*</u>"[446]

341.  The Tribunal accords little weight to the excerpts of the Garrigues report and of the turnkey contracts invoked by Respondent for the following reasons:

- The fact that the service provider guarantees a "*nominal power*" of 55 MW does not lead inexorably to the conclusion that the actual installed capacity is 55 MW,

---

[442] Mr. Jesús Casanova Kindelán, *Expert Witness Report Regarding Installed Capacity*, 30 November 2016, on p. 32.
[443] See the CNMC's technical reports at **C-0575t** and **C-0576t**.
[444] **C-0047t**.
[445] **C-0049t**.
[446] Testimony of Mr. Jesús Casanova Kindelán, Transcript, Day 4, on pp. 134 and 135.

especially if "*installed capacity*" is to be interpreted as the net output of the plant measured at the nodes of connection to the grid. In this regard, both experts were in agreement that the power that the plant is **able** to generate must – in all cases – be higher than the measurement at the connection nod to satisfy the plant's "*ancillary consumption.*" On this matter, Mr. Casanova testified as follows:

> "THE PRESIDENT: It the net power of a CSP plant at the interconnection point of the grid is 50 megawatts, does it follow necessarily that the generator is able to generate between 10% and 15% more power than the megawatts of power delivered to the grid?
>
> (…)
>
> A. (Professor Casanova): <u>Yes. I would say that it would have to generate more than 50 in order to overcome that ancillary consumption in the plant, yes.</u>"[447]

[Emphasis added]

342.    The excerpt of the Garrigues report[448] cited by Respondent seems to be based on an equivocation of the terms "*installed capacity,*" "*gross output*" and "*nominal capacity.*" It seems at best a speculation of a possible legal interpretation of the term "*installed capacity*" which – it is suggested – is not binding upon the Tribunal.

### B.    THE ALLEGED BREACH OF SPAIN'S FET OBLIGATION

343.    Claimants' case with respect to Spain's alleged breach of the FET obligation is threefold:

-    **Violation of expectation of stability** – First, Claimants fault Respondent for having violated their legitimate expectations that the Original Regulatory Framework would remain stable (i.e. immutable) throughout the lifespan of the plants or, at the very least, that the Morón and Olivenza 1 plants would not be affected by subsequent regulatory changes (i.e. that the Original Regulatory Framework would be "*grandfathered*").[449]

-    **Arbitrariness (i.e. expectation of consistency)** – Second – and in the alternative to the above argument, it seems – Claimants submit that the Measure at Issue violate Spain's FET obligations because they constitute an arbitrary "*mid-*

---

[447] Expert conference between Messrs. José Mesa-Díaz and Jesús Casanova-Kindelán, Transcript, Day 4, on pp. 134 and 135.

[448] Garrigues Medio Ambiente, *Informe de Evaluación Técnica de una Instalación Solar Termoeléctrica Promovida por Ibereólica Solar en Olivenza (Badajoz)* (**R-0340**), on p. 51.

[449] This ground of liability overlaps with the one founded on the "umbrella obligation," but remains distinct from it in as much as the formation of a bilateral agreement or unilateral undertaking creating an obligational bond specifically as between the host state and the investor need not be proven to show breach of the FET. See the comparative analysis between the "umbrella obligation" and the FET standard in the case *Isolux* (**RL-0107t**), at paras. 767 to 772. The issue as framed in the context of the FET standard is not whether a distinct legal obligation was created but rather whether a legitimate expectation has arisen from Respondent's enactments, actions and representations leading Claimants to believe that future regulatory changes would not affect their investment.

stream switch" or "*paradigm shift*" that abrogated the essential elements of the Original Regulatory Framework, upon which Claimants relied to invest.

-   **Lack of transparency** – Third, Claimants submit that Spain violated its FET obligations by enacting the Measures at Issue without due process, without considering nor even disclosing in timely fashion, key expert reports it had commissioned (and purportedly disregarded) to establish the new remuneration values.

344.  The issues arising in the context of Claimants' case with respect to the FET obligation are therefore the following:

i.   What is the legal standard applicable in assessing a host state's FET obligation? In particular, is that standard limited strictly to an obligation of non-discrimination or to accord the minimum standards of treatment under international law (as Respondent seems to argue)[450] and, if not, what role does the investors' due diligence and the (un)foreseeability of the disputed measures bear in the analysis?

ii.  Did Claimants have a legitimate expectation that the Original Regulatory Framework would remain unchanged – at least in its application to the Morón and Olivenza 1 plants and, if so, was this expectation frustrated by the enactment of the Measures at Issue?

iii. Did Claimants have a legitimate expectation that the Original Regulatory Framework would not be modified in a fundamental or radical way and, if so, was that expectation frustrated by the enactment of the Measures at Issue?

iv.  Did Respondent enact the Original Regulatory Framework without due process or without the requisite transparency?

345.  Each of these issues is addressed in turn below, in the light of: a) the Parties' positions; and b) the authorities, including relevant recent arbitral awards.

#### *i.    The standards governing the assessment of the FET*

##### a)    The Parties' Positions

346.  **Claimants –** Claimants argue that the FET standard is the cornerstone of investor protection, and that it imposes upon a host state a broad obligation, among other things, to protect investors' legitimate expectations. The assessment of these expectations is made against the background of the information available to the investors at the time of the investment, including the host state's legislation and regulations in effect at the time, as well as its public representations and actions. As regards the *legal* standards applicable to assess Spain's FET obligation, Claimants submit as follows:

-   **Scope of FET obligation**: Claimants argue that the scope of the FET obligation is not restricted to mere non-discrimination or to the international minimum

---

[450] See in particular Resp. Rejoinder, at paras. 1070 and following.

standard requirements, and extends to the protection of investors' legitimate expectations, the duty of good faith and of proportionality.[451] Claimants assert that restricting the FET to mere non-discrimination would render redundant and meaningless the *specific* non-discrimination prohibitions at Article 10(1), 10(3) and 10(7) of the ECT.[452] Claimants also argue that the conflation of the FET standard with the international minimum standards of treatment ("**MST**") runs afoul of both the ordinary meaning and the object and purpose of Article 10(1) of the ECT.[453] They submit that the different words used to articulate the FET obligation indicate that a different meaning attaches to them. Claimants also submit that limiting the FET standard to MST would undermine the object and purpose of the ECT since "[t]*he promotion of investment and economic cooperation between ECT Contracting Parties supposes positive obligations that go beyond MST.*"[454]

- **Legitimate expectation of stability**: Claimants do not deny that the FET obligation does not, *in se*, curtail the host state's power to tailor its laws and regulations to changing circumstances, including national or global economic or political circumstances.[455] They argue, however, that under Article 10(1) ECT, the host state is liable to foreign investors where the exercise of its legislative and regulatory powers frustrates the investors' legitimate expectations.[456] According to Claimants, these expectations may comprise (based on the facts and circumstances of the case) an expectation that a given regulatory or legislative framework will remain stable (i.e. "*frozen*") in time. Claimants argue that a legitimate expectation of legal or regulatory stability can arise from the very structure of the legislative framework at the time of the investment;[457] from enticements to invest targeting investors in a specific technology;[458] or even from "*implicit state undertakings or assurances (which need not be 'specific'."*[459] *A fortiori*, Claimants say, a legitimate expectation of stability arises where a specific commitment to that effect is given by the host state. In support of this last point, Claimants invoke – among others – the following cases:

---

[451] See Cl. Reply, at para. 801.

[452] *Ibid.*, at para. 807.

[453] *Ibid.*, at paras. 812 and following. See also Article 31 of the *Vienna Convention on the Law of Treaties* ("VCLT") (**CL-0013**) upon which the Claimant bases this argument.

[454] Cl. Reply, at para. 822; see also T. Roe and M. Happold, *Settlement of Investments of Disputes under the Energy Charter Treaty*, Cambridge University Press, 2011, on p. 117 (**CL-0202**).

[455] See Cl. Reply, at para. 1147.

[456] Claimants invoke, among others, the case *Electrabel* (**RL-0005**), at para. 7.73 and following, as authority for the general proposition that a State's FET obligation under the ECT is intrinsically linked to the protection of the investor's legitimate expectations. (The Tribunal was composed of Mr. V.V. Veeder, President as well as Professors Gabrielle Kaufmann-Kohler and Brigitte Stern, Arbitrators.)

[457] Cl. Mo-M, at paras. 1124 and following.

[458] *Ibid.*

[459] *Claimants' Submission on the "Novenergia Award"*, 20 March 2018, at para. 6. See also *Novenergia* (**CL-0245**), at paras. 652 and following. (The tribunal in that case was composed of Mr. Johan Sidkley, Chairperson, Professor Antonio Crivellaro, Arbitrator and Justice Bernardo Sepúlveda Amor, Arbitrator.)

o   *Charanne B.V. and Construction Investments S.A.R.L* v. *Kingdom of Spain*,[460] where the tribunal dismissed a claim under Article 10(1) ECT brought against Spain by foreign investors in the country's photovoltaic solar energy sector, based on a finding that the regulatory framework applicable to the photovoltaic plants at issue did not contain a commitment of stability. The regulatory framework in that case included RD 661/2007 but **_not_** RD 1614/2010; nor (as explained above) did the case involve the equivalent of the letters of waiver and December Resolutions specific to Spain's *thermosolar* industy.   The tribunal in *Charanne* reasoned: *"According to the Arbitration Tribunal, <u>in the absence of a specific commitment</u> an investor cannot have the legitimate expectation that the regulation in place is going to remain unchanged."*[461] [Emphasis added]

o   *Parkerings* v. *Lithuania*,[462] in which an ICSID tribunal held as follows: "*A State has the right to enact, modify or cancel a law at its own discretion. <u>Save for the existence of an agreement, in the form of a stabilisation clause or otherwise</u>, there is nothing objectionable about the amendment brought to the regulatory framework existing at the time an investor made its investment.*"[463] [Emphasis added]

o   A string of arbitral awards in which revisions to Argentina's gas laws and the abrogation of certain tariffs were held to run afoul of specific commitments of stability made by Argentina;[464]

-   **Legitimate expectation of consistency**: Even in the absence of a legitimate expectation of stability, Claimants say that the basic FET standard comprises an obligation that the state will not "*arbitrarily*" modify the regulatory framework in reliance upon which the investors invested. Claimants seem to derive two distinct expectations from this obligation. First, they argue that investors legitimately expect a host state not to enact regulatory changes affecting adversely the investments at issue and <u>which are not proportional with the requirements of public policy or the public interest</u>.[465] Second, Claimants also argue that, in all circumstances, the FET obligation creates an expectation of consistency,

---

[460] *Charanne* (**RL-0082**).

[461] *Ibid.*, at para. 499.

[462] *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, (**RL-0058**), ("*Parkerings*"), at para. 332.

[463] *Parkerings* (**RL-0058**), at para. 332.

[464] See Cl. Reply, at paras. 1133 and following; see also *CMS Gas Transmission Company* v. *Argentine Republic*, ICSID Case No. ARB/01/08, (**CL-0059**), Award, at paras. 127 to 138; *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007 (**CL-0073**), at paras. 95 to 105; *Sempra Energy International* v. *Argentine Republic*, ICSID Case No. ARB /02/16, Award, 28 September 2007, (**CL-0087**), at paras. 141 to 169.

[465] See Cl. Reply, at paras. 1143 and following.

proscribing the adoption measures that <u>fundamentally or radically change</u> the prevailing legislative or regulatory framework.[466]

- **Due diligence**: Claimants appear to recognize that their due diligence prior to their investment is a relevant factor in the analysis.[467] However, they submit that this is a matter to be assessed in the light of the political and economic conditions prevailing in the host state at the time of the investment.[468] In any event, Claimants argue that the scope of due diligence verifications to be undertaken by international investors is limited to a familiarization with the relevant legal framework and whether the proposed investment complies with local laws, without a requirement to perform an exhaustive legal investigation.[469]

- **Due process and transparency**: Claimants argue that the FET standard imposes an obligation on the host state to be forthcoming with information about intended changes in policy that may adversely affect foreign investments, so that investors may plan and manage their investments accordingly.[470]

347. **Respondent** – Respondent first argues that the FET obligation is limited to a non-discrimination prohibition or, at best, is equal in content to the MST under international law. This submission seems based on a formalistic interpretation of the text Article 10(1).[471] Respondent argues that a host state is under an obligation to grant foreign investors the conditions listed in the first and second sentences of that Article (including the FET treatment) *only during the "investment-making process;"* that is – during the period immediately preceding the investment.[472] Respondent argues that once the investment is made, the host state's obligations are, as mentioned, limited principally to non-discrimination and to the MST. Without stating so explicitly, Respondent appears to imply that an investor bringing a cause of action under Article 10(1) ECT is bound to prove that it was subject to a worse treatment than that accorded to other investors (foreign or domestic) with investments on the territory of the host state.[473]

348. As part of what the Tribunal understands to be a subsidiary argument, Respondent engages with the merits of Claimants' submissions on the FET. It does not, however, appear to take serious issue with the purely legal underpinnings of Claimants' submissions, except as regards the following aspects:

- **Legitimate expectation of stability**: Respondent argues that the ECT was not meant to curtail a host state's sovereign power to modify its laws and regulations as required

---

[466] *Ibid.*
[467] Claimants' PHB, at paras. 121 and following.
[468] *Ibid.*
[469] *Ibid.* See also *Isolux* (**RL-0107t**).
[470] See Cl. Mo-M, at paras. 1197 and following. See also Article 10(1) ECT: "*[e]ach Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create […] transparent conditions for Investors of other Contracting Parties to make Investments in its Area.*"
[471] Resp. Rejoinder, at paras. 1070 and following.
[472] *Ibid.*
[473] Resp. Rejoinder, at paras. 1088 and following.

by changing economic or political circumstances.[474] It argues: "*The stability to which the ECT refers admits the adoption of reasonable and proportionate macroeconomic control measures*[...]"[475] Respondent argues that investors can have an expectation that the regulatory framework would remain unchanged __only__ where the host state entered into a specific stabilization commitment promising that it would not enact any changes to that framework.[476]

- **Due diligence**: Respondent submits that investors' alleged legitimate expectations are to be assessed based on an objective standard – that is, according to what the investor knew *or ought to have known* of the laws and regulations of the host state at the time of the investment.[477] In this context, *lacunae* in an investor's due diligence vitiate the legitimacy of an investor's expectations regarding the legislative or regulatory framework at issue.[478] According to Respondent, an adequate due diligence verification must entail a thorough analysis of the legal framework applicable to the target sector, including the jurisprudence of the host state's highest courts.[479]

    Respondent also submits that an investor cannot have a legitimate expectation that the host state would not enact changes which were foreseeable at the time of the investment.[480]

349. It is noted that, other than the foregoing, Respondent does not appear to take issue with the legal standards articulated by Claimants regarding investors' expectation of consistency (i.e. that the legislative or regulatory framework applicable to their investments would suffer no fundamental or radical shifts), transparency and due process. On these matters – and indeed on all other standards and norms related to its FET obligation – Respondent contends that Claimants failed to prove its case on the facts, as discussed in more detail below, at **section VI.B. ii and iii**.

    b)    **Relevant arbitral authorities**

350. **The scope of the FET standard** – The argument that the FET standard is limited to a non-discrimination obligation or to the MST standard in international law, was not considered (and perhaps not pleaded) in any of the recently-reported ECT cases of which the tribunal is aware involving changes to Spain's renewable energy remuneration

---

[474] See Resp. Co-Mo, at paras. 771 and following.
[475] See Resp. Co-Mo, at paras. 773 and following. See also the case *AES* (**CL-0113**): *"The stable conditions that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, it is not a stability clause. A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts."* [Emphasis added]
[476] See Resp. Co-Mo, at paras. 190 and following. See also Resp. Rejoinder, at paras. 1091 and following.
[477] Resp. Rejoinder, at paras. 1130 and following. See also Respondent's PHB, at paras. 226 and following.
[478] Respondent's PHB, at paras. 226 and following.
[479] *Ibid.*
[480] Resp. Rejoinder, at para. 1156.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

regime. Rather, all of the awards in those cases have framed the analysis of the FET standard according to the investors' legitimate expectations (if any).[481]

351. **The legitimate expectation of stability** – The requisite legal conditions for the formation of a legitimate expectation of stability are discussed in detail in *Charanne*,[482] an ECT award involving Spain and rendered against the backdrop of the regulatory changes to the remuneration of renewable energy producers in which the issue of a legitimate expectation of stability (i.e. immutability) is discussed in detail.

352. In *Charanne*, the tribunal articulated the legal test governing the assessment of such a legitimate expectation as follows: "(…) *in the absence of a specific commitment an investor cannot have the legitimate expectation that the regulation in place is going to remain unchanged.*"[483] The tribunal suggested that a "*specific commitment*" of stability (i.e. immutability) must identify with precision the regulation(s) at issue and include an explicit promise not to alter that particular regulatory regime.[484] General statements enticing investments on the basis of an existing regulatory framework, without more, are insufficient.[485]

353. In *Isolux Infrastructure Netherlands B.V.* v. *Kingdom of Spain*,[486] the tribunal assessed summarily whether Spain had made a commitment of stability to investors within the context of the "*umbrella obligation*" set out at Article 10(1) *in fine* of the ECT, **not** the FET standard.[487]

354. The issue of Spain's putative commitment of stability was only cursorily discussed in *Eiser Infrastructure Ltd.* v. *Kingdom of Spain*,[488] where the tribunal limited its remarks to the following statement of principle: "<u>Absent explicit undertakings directly extended to investors and guaranteeing that States will not change their laws or regulations, investment treaties do not eliminate States' right to modify their regulatory regimes to meet evolving circumstances and public needs.</u>"[489] [Emphasis added]

355. In *Novenergia II – Energy & Environment (SCA)* v. *Kingdom of Spain*,[490] the tribunal did not assess the existence of an expectation of stability at all (at least not in the sense discussed here). The tribunal rather assessed the existence of a legitimate expectation

---

[481] *Charanne* (**RL-0082**); *Isolux* (**RL-0107t**); *Eiser* (**CL-0242**); *Novenergia* (**CL-0245**).
[482] *Charanne* (**RL-0082**).
[483] *Ibid.*, at para. 499.
[484] *Ibid.*, at paras. 496 and 497.
[485] *Ibid.*
[486] *Isolux* (**RL-0107t**).
[487] *Ibid.*, at paras. 767 to 772.  As discussed above, the concept of **_obligation_** under Article 10(1) *in fine* entails the formation of a contractual-type bond – i.e. a bilateral contract or a unilateral undertaking – and arguably imposes a higher burden of proof upon the investor than the demonstration of a legitimate expectation under the FET standard stemming from a "*specific commitment.*"
[488] *Eiser* (**CL-0242**), at para. 362.
[489] *Ibid.*, at para. 362.
[490] *Novenergia* (**CL-0245**).

of consistency (i.e. that any subsequent legislative or regulatory changes would not fundamentally alter the existing framework).[491]

356. **The legitimate expectation of consistency –** Three of the four awards rendered by ECT tribunals in cases involving the solar energy industry in Spain explicitly recognized investors' legitimate expectation that the host state would not fundamentally or "*radically*"[492] change the key aspects of the prevailing legislative and regulatory framework. The fourth award, *Isolux*,[493] dismissed the investors' legitimate expectations claim on the facts, finding that the investors in that case were in a position to know that such fundamental changes were afoot before they invested.

357. In *Charanne*, the tribunal ruled that, <u>even in the absence of a specific commitment of stability</u>, "*an investor has the legitimate expectation that, when the State modifies the regulation under which the investor made the investment, it will not do so unreasonably, contrary to the public interest, or in a disproportionate matter.*"[494] The tribunal further specified that "*the proportionality requirement is fulfilled as long as the modifications (…) do not <u>suddenly and unexpectedly</u> <u>eliminate the essential features of the regulatory framework in place</u>.*"[495] [Emphasis added]

358. In *Eiser,* the tribunal framed the legitimate expectation that the prevailing regulatory regime would not be fundamentally altered as follows: "*Taking account of the context and of the ECT's object and purpose, the Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment <u>necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime</u> relied upon by investors in making long-term investments. This does not mean that regulatory regimes cannot evolve. Surely they can. (…) However, the Article 10(1) obligation to accord fair and equitable treatment means that regulatory regimes <u>cannot be radically altered as applied to existing investments</u> in ways that deprive investors who invested in reliance on those regimes of their investment's value.*"[496] [Emphasis added]

359. In *Novenergia*, the tribunal also recognized the existence of a legitimate expectation that the regulatory framework at issue would not be "*radically*" altered, even in the absence of specific commitments to that effect.[497]

---

[491] *Novenergia* (**CL-0245**), at para. 656: *"The Tribunal will, thus, have to assess whether the Claimant's expectations on the basis of RD 661/2007 and preceding legislation and conduct by the Respondent were legitimate and reasonable and <u>if subsequent legislation by the Respondent radically altered the essential characteristics of the legislation in a manner that violates the FET standard.</u>"* [Italics in the original; Emphasis added]

[492] *Eiser* (**CL-0242**), at para. 382.

[493] *Isolux* (**RL-0107**).

[494] *Charanne* (**RL-0082**), at para. 514.

[495] *Ibid.*, at para. 517.

[496] *Eiser* (**CL-0242**), at para. 382.

[497] *Novenergia* (**CL-0245**), at para. 656: *"The Tribunal will, thus, have to assess whether the Claimant's expectations on the basis of RD 661/2007 and preceding legislation and conduct by the Respondent were legitimate and reasonable <u>and if subsequent legislation by the Respondent radically altered the essential characteristics of the legislation in a manner that violates the FET standard.</u>"* [Italics in the original; emphasis added] See also para. 682.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

360. Finally, in *Isolux,* the tribunal suggested (without explicitly stating) that a legitimate expectation that the regulatory regime would not be fundamentally altered could potentially arise, but that such an expectation did not in fact arise in the circumstances of that case given the investors' actual knowledge that Spain was about to enact fundamental changes to the regulatory framework applicable to photovoltaic installations.[498]

361. **Due Diligence** – The awards rendered recently by ECT tribunals in the context of Spain's reform of the remuneration regime applicable to renewable energy producers show that tribunals generally: i) hold investors to a strict due diligence standard, requiring a thorough review of the legislative framework, including the decisions of the Spanish Supreme Court;[499] and ii) sanction an inexistent or faulty due diligence by means of a finding that the alleged expectation is not legitimate[500] _unless_ it is shown that even an adequate due diligence verification would not have revealed warning signs of impending regulatory changes.[501]

362. The sanction for a faulty due diligence in these cases seems to be informed by an assessment of the foreseeability of the measures at issue. Investors are effectively imputed with constructive knowledge of reasonably foreseeable regulatory changes. In other words, the central question for assessing the effects, if any, of a faulty due diligence seems to be: could a reasonably prudent investor with the benefit of an adequate due diligence verification have foreseen the measures at issue?[502]

363. A positive answer generally precludes a finding of a legitimate expectation that the impugned measures would not be adopted.[503] A negative answer should allow the analysis to proceed to the next step, at which the tribunal assesses whether or not the measures at issue altered the prevailing regulatory framework to such an extent as to frustrate the investor's legitimate expectations.

364. **The legitimate expectation of transparency and due process** – The legitimate expectation of transparency and due process is not treated as a discreet issue in any of the recent ECT awards involving changes to Spain's regulatory framework applicable to renewable energy producers. In fact, after considering and ruling on the question of the claimants' legitimate expectations of stability and consistency, tribunals have generally

---

[498] *Isolux* (**RL-0107**), at paras. 774, 775, 777 and 804.
[499] This is particularly so given the investors' high degree of sophistication and the highly regulated nature of the target sector. See among others *Charanne* (**RL-0082**), at para. 507: *"To the Tribunal's understanding, at the time of making the investment in 2009 the Claimants could have carried out an analysis of their investment's legal framework in Spanish law and understood that the regulations enacted in 2007 and 2008 could be modified. At least that is the degree of diligence that could be expected from a foreign investor in a heavily regulated sector like the energy industry. In such a sector, thorough prior analysis of the legal framework applicable thereto is essential to making an investment."* [Emphasis added].
[500] See *Charanne* (**RL-0082**); See also *Isolux* (**RL-0107**).
[501] *Novenergia* (**CL-0245**), at para. 678.
[502] See *Charanne* (**RL-0082**), at para. 507.
[503] *Ibid.*; see also *Isolux* (**RL-0107t**), at para. 804.

refused to consider in detail further grounds of liability advanced by claimants that would not have altered the award of damages.[504]

### c)   Discussion

365. **The scope of the FET obligation** – The Tribunal does not accept Respondent's submission that the scope of the FET obligation is limited to non-discrimination. The clear language of Article 10(1) ECT belies such an interpretation. So too does what might fairly be called a *jurisprudence constante* that is based on the understanding shared by the Tribunal to the effect that the FET obligation is a distinct standard linked (among others) to the legitimate expectations of investors as assessed on the facts of each case.

366. **The legitimate expectation of stability** – The Tribunal does, however, accept and agree with Respondent's position to the effect that a legitimate expectation of stability (i.e. immutability) can only arise in the presence of a specific commitment tendered directly to the investor or industry sector at issue. This finding is in keeping with the recent decisions in ECT cases concerning the changes enacted by Spain to the remuneration of renewable energy producers,[505] as well as with other arbitral decisions that assessed the issue of a legitimate expectation of stability, be it in application of Article 10(1) of the ECT or of similar investor protection clauses contained in other treaties.[506] This finding is also in keeping with the principle of state sovereignty – enshrined in the ECT and considered by tribunals as part of the balancing exercise carried out when assessing an investor's bilateral relation with the state.[507] The Tribunal is mindful of the significant limitation that a "*stability*" obligation would impose on the host state's sovereign legislative powers. The Tribunal cannot give effect to such a significant limitation of state sovereignty in the absence of a specific expression of consent by the host state.

367. Given the foregoing and the Parties' positions, the Tribunal must determine whether the Respondent tendered a *specific commitment* directly to the investors or to the CSP sector as a whole that the regulatory framework applicable to the remuneration of CSP producers would not be affected by future regulatory changes. In particular, the Tribunal must determine whether such a *specific commitment* was tendered with respect to each of the specific components of the Original Framework that the Claimants seek to vindicate in this arbitration.[508] The Tribunal will also determine whether the Claimants'

---

[504] *Novenergia* (**CL-0245**), at paras. 713 to 716; See also *Eiser* (**CL-0242**), at paras. 352 and following.
[505] See in that regard *Charanne* (**RL-0082**), at para. 499: *"According to the Arbitration Tribunal, in the absence of a specific commitment an investor cannot have the legitimate expectation that the regulation in place is going to remain unchanged."* See also *Eiser* (**CL-0242**), at para. 371.
[506] See among others *Parkerings* (**RL-0058**); *EDF (Services) Limited* v. *Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, (**RL-0054**), at para. 217; *Total S.A.* v. *Argentine Republic*, ICSID Case No. ARB/04/01, (**CL-0102**), at para. 123.
[507] *Ibid.*
[508] See the so-called "seven rights" invoked by the Claimants in Cl. Mo-M, on pp. 229 to 230.

expectation of stability was legitimate in light of the investors' knowledge (actual and constructive) at the time of the investment and in light of the due diligence carried out.

368. **The legitimate expectation of consistency** – Given the authorities cited by the Parties and discussed above, and the apparent absence of a contestation on the purely legal principles governing Claimants' alleged expectation of consistency, the Tribunal is of the view that an expectation of consistency, *i.e.*, that the regulatory framework will not be *radically* or *fundamentally* changed may arise even in the absence of such a specific commitment, depending on the facts.[509] A valid public policy purpose does not automatically foreclose a finding of breach of the FET standard since – in the balancing exercise that tribunals are called upon to carry out – the consideration of a legitimate legislative objective may be outweighed by the radical nature of the changes to the legislative framework at issue.[510] Although a host state enjoys the sovereignty to modify its laws and regulations, its liability towards investors may be engaged (again, depending on the facts) if, in doing so, it fundamentally or radically alters a regulatory framework upon which the investors legitimately relied to invest.[511]

369. The Tribunal will therefore determine whether the Claimants had a legitimate expectation that Respondent would not fundamentally or radically alter the main elements of the Original Regulatory Framework in light of the circumstances prevailing in June 2011, including the Claimants' due diligence and the (un)foreseeability of the type of regulatory change at issue. The Tribunal will then assess whether the Measures at Issue altered fundamentally or radically the essential elements of the Original Regulatory Framework.

370. **Due Diligence** – The Tribunal notes that the Parties seem to agree that that the plants in which Claimants invested derive the overwhelming majority of their revenue from state subsidies.[512] It is equally uncontested that the regime of state subsidies (i.e. the "*Special Regime*" under the EPA of 1997 or the "*specific remuneration*" under the EPA of 2013) is heavily regulated. In these circumstances the Tribunal is inclined to follow the approach taken by the tribunal in *Charanne* and hold Claimants to a stricter due diligence standard in keeping with both the nature of the sector in which they invested and with their own expectations as regards the main source of profit (i.e. state subsidies).

371. To rule on this question the Tribunal will assess whether the Claimants – or their legal advisers – carried out an adequate review of the regulatory framework applicable to the renewable energy sector in Spain (and in particular to CSP producers), including the case law of the Supreme Court of Spain. The Tribunal will also consider whether the Measures at Issue were foreseeable to a reasonably prudent investor with the benefit of an adequate due diligence.

---

[509] See in that regard *Charanne* (**RL-0082**), at paras. 512 to 514.
[510] See in that regard *Eiser* (**CL-0242**), at para. 371. See also *Charanne* (**RL-0082**).
[511] *Ibid.*
[512] See in particular **CER-1**, at paras. 30 to 33. See also *Fundamental Facts: Objective Framework*, presentation by Respondent at the Hearing on the Merits, on p. 4.

372. **The legitimate expectation of transparency and due process** – The legal standards governing this issue do not appear to be disputed. Article 10(1) ECT provides as follows: *"Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create (…) <u>transparent</u> conditions for Investors of other Contracting Parties to make Investments in its Area."*[513] [Emphasis added] The Tribunal understands that the Parties do not disagree on the purely legal standards underpinning Respondent's obligation of transparency and due process, although they are at odds as regards the application of these principles to the facts of the case. As such, the Tribunal is of the view that the issues to be determined to assess the alleged breach of transparency and due process are whether Respondent sufficiently disclosed the relevant information about the impending modification of Original Regulatory Framework to allow: i) the various actors of the CSP sector to participate in consultation process preceding the enactment of the Measures at Issue; and ii) to allow the Morón and Olivenza 1 plants – and by corollary – the Claimants to plan and organize their operations accordingly.[514]

### ii. The alleged violation of Claimants' expectation of stability of the Original Regulatory Framework

#### a) The Parties' Positions

373. **Claimants** – In a nutshell, Claimants submit that the enactment of RD 661/2007, the discussions between Protermosolar and the government in the summer of 2010, the Purported Agreement, the enactment of RD 1614/2010 and the exchange of letters of waiver and December Resolutions constituted a specific commitment that the Original Regulatory Framework would not be modified or at least that future modifications would not affect the Morón and Olivenza 1 plants.[515]

374. Applying the legal position discussed above to the facts of this case, Claimants argue that the following enactments, actions and/or representations by the Kingdom of Spain constituted such a "*specific commitment*" giving rise to a legitimate expectation that regulatory changes subsequent to RD 1614/2010 would not affect the Olivenza 1 and Morón plants:

- **RD 661/2007** – The enactment of RD 661/2007 and the so-called "*seven rights*" it granted to CSP producers (see the detail in this regard above, at para. 26 and following of the present Award);[516]

- **The May 2007 Press Release** – The publication of a press release in May 2007, shortly after the adoption of RD 661/2007 which mentioned that "*any revisions of tariffs to be carried out in the future <u>shall not affect the facilities already in</u>*

---

[513] Article 10(1) of the ECT.
[514] *Electrabel* (**RL-0005**), at para. 7.79.
[515] See among others Cl. Mo-M, at paras. 1136 and following.
[516] Cl. Mo-M, at paras. 1138 and following.

*operation. This guarantee provides legal certainty for the producer, providing stability for the sector and promoting its development.*"[517] [Emphasis added]

- **The Pre-Allocation Register** – The enactment of RD-L 6/2009,[518] the creation of the remuneration Pre-allocation Register and the registration of the Morón and Olivenza 1 plants on the Pre-allocation Register and the RAIPRE. Claimants argue that this enactment guaranteed the application of the Special Regime to the plants who registered on the pre-allocation register before the stipulated date (a requirement that the Morón and Olivenza 1 plants fulfilled);[519]

- **The November 2009 Resolution and Related Press Release** – Claimants argue that the resolution issued by the Council of Ministers on 13 November 2009 setting the dates of entry into operation of CSP plants like Morón and Olivenza 1 "*generated a further guarantee from the Respondent to the Claimants regarding the future stability of the regulatory framework and the maintenance of a friendly environment for investments in thermosolar energy.*"[520]

- **The Purported Agreement** – Claimants argue that the formation of the Purported Agreement is evidenced by the discussions that took place in the early summer of 2010, by the text of the Purported Agreement attached to the email issued by the MINETUR and by the subsequent references to the "*agreement*" in various communications by both protagonists (i.e. Protermosolar and MINETUR).[521] They qualify the Purported Agreement as a "*regulatory pact*" formed on the basis of a *quid pro quo*, whereby the CSP sector accepted certain modifications to the existing regulatory framework (i.e. a delayed entry in operation and a reduction in the hours of operation) in exchange of a promise that any subsequent changes would not affect the CSP sector.[522]

   Claimants also argue that Respondent failed to comply with documentary production requests because it denied the existence of certain documents in connection with the negotiation and internal discussions regarding the Agreement, when in fact, the examination of Respondent's representative at the Hearing on the Merits showed that he was not instructed to search in his files for those documents.[523] On this basis, Claimants are requesting the Tribunal to issue a negative inference.[524] Claimants are asking the Tribunal to "*infer that all documents responsive to* [the documentary production requests at issue] *would prove that the Respondent committed itself to keep Regulatory Framework No. 1*

---

[517] See Cl. Mo-M, at paras. 1142 and following. See also *Official Press Release of 25 May 2007* (**C-0067t**).
[518] **C-0065t.**
[519] See Cl. Mo-M, at paras. 1147 and following.
[520] See Cl. Mo-M, at paras. 1151 and following.
[521] See Claimants' PHB, at paras. 96 and following.
[522] See Claimants' PHB, at paras. 99 and following.
[523] Claimants' PHB, at para. 98.
[524] See Cl. Reply, at para. 314.

InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain

**AWARD**

ICSID Case No. ARB/14/12

applicable for Morón and Olivenza 1 against any subsequent regulatory change."[525]

- **RD 1614/2010 and Related Press Release** – Claimants argue that Respondent enacted RD 1614/2010 to crystallize the Purported Agreement into law. They say that of the seven (7) points contained in the Purported Agreement, four (4) were "*converted into law*" by RD 1614/2010.[526] In particular, Claimants submit that RD 1614/2010 contains the following "*specific commitments*" of stability:

  • A commitment not to alter the number of operating hours for which the Special Regime would be applicable to the plants registered on the RAIPRE or on the Pre-Allocation Register;[527]

  • A commitment extending the so-called "*grand-fathering clause*" of the regulated tariff and pool plus premium options contained at Article 44(3) of RD 661/2007 to the plants registered on the Pre-Allocation Register.[528]

  Claimants also argue that a press release dated 3 December 2010,[529] foreshadowing the adoption of RD 1614/2010, confirmed that the MINETUR intended to guarantee the stability of the Original Regulatory Framework.[530]

- **December Resolutions** – Claimants argue that the exchange of letters of waiver and the December Resolutions constituted a declaratory contract (*contrato de fijación jurídica*), whereby the plants agreed to delay their entry in operation (thus "*waiving*" their right to start producing electricity and receiving remuneration by a certain prescribed date) and, in exchange, the MINETUR guaranteed the stability of the Original Regulatory Framework for the plants' operational lifespan.[531] Claimants argue that the declaratory contracts were formed when the MINETUR issued the December Resolutions, thus tendering Respondent's acceptance to the plants' offers (i.e. the letters of waiver). Claimants argue that the declaratory contracts were formed to convert the Purported Agreement into law, also on a *quid pro quo* basis, whereby the plants waived their right to entry into operation by a prescribed date in exchange of a binding promise of stability.[532]

---

[525] See Cl. Reply, at para. 314.
[526] Claimants' PHB, at para. 101.
[527] *Ibid.*; see also RD 1614/2010 at Article 2(3) (**C-0050t**).
[528] *Ibid.*; see also RD 1614/2010 (**C-0050t**), at Article 4: "*For thermosolar technology facilities under Royal Decree 661/2007, of May 25, the revisions of tariffs, premiums and lower and upper limits, to which Article 44.3 of said Royal Decree refers, shall not affect those facilities finally registered in the administrative Register of power production facilities under the special regime [RAIPRE] of the General Directorate of Energy Policy and Mining as of May 7, 2009, nor to those facilities pre-registered on the remuneration pre-allocation Register (…)*" [Emphasis added]
[529] See **C-0248t**.
[530] Cl. Mo-M, at paras. 1157 and following.
[531] See, *inter alia*, Claimants' PHB, at paras. 102 and following.
[532] See Claimants' PHB, at paras. 105 and following.

In the alternative, Claimants seem to argue that, whether or not declaratory contracts (*contratos de fijación jurídica*) were validly formed under Spanish law, the exchange of waiver letters and December Resolutions is at the very least evidence of "*specific commitments*" by Respondent giving rise to a legitimate expectation of stability.

375. Claimants argue that they relied on all of the above legislative enactments and understood that they guaranteed the stability of the application of the Original Regulatory Framework to the Morón and Olivenza 1 plants.[533] Claimants argue that this legitimate expectation does not run afoul of the principle of state sovereignty, nor of Spain's sovereign power to adjust the regulatory framework at large.[534] But they invoke the Purported Agreement, RD 1614/2010 and the exchange of waiver letters and the December Resolutions to argue that Respondent deliberately decided to grant special treatment to the <u>CSP sector</u> and to guarantee those <u>CSP producers</u> registered on the Pre-allocation Registry that future regulatory changes would not affect them.[535]

376. Claimants argue that their due diligence verification was adequate since it had identified the key aspects of the Original Regulatory Framework, including the elements which, according to Claimants, guaranteed the stability of that framework (principally the Purported Agreement and RD 1614/2010).[536] Claimants also submit that the findings of their due diligence verification took account of Respondent's effort to curb the tariff deficit but that – in the circumstances – nothing could lead them to foresee that Respondent would alter the regulatory framework applicable to the CSP sector.

377. As regards the decisions of the Supreme Court of Spain, Claimants submit, as a general principle, that domestic law should not be used to assess whether a state has breached its international treaty obligations.[537] Even if the Tribunal decides to consider those decisions, Claimants argue that they should have little bearing upon the assessment of the legitimate expectations at issue. Claimants argue that these decisions were not rendered specifically on the CSP sector. They submit that many of these decisions were rendered after June 2011 (the date of the investment) and that those rendered before June 2011[538] were issued prior to the "*specific commitments*" tendered by Spain to the CSP sector under the Purported Agreement, RD 1614/2010 and the exchange of waiver letters and the December Resolutions.[539] In any event, Claimants say that the evidence before the Tribunal, including the uncontroverted written and oral testimony of its

---

[533] See Cl. Mo-M, at paras. 1164 and following.
[534] Cl. Reply, at paras. 1121 and following.
[535] Cl. Reply, at paras. 1127 and following: "*(…) Claimants are not sustaining that the regulatory framework cannot change or that the stability of the regulatory change is equivalent to its petrification. This is not the point of discussion. <u>What matters here is that there were specific commitments under which the Respondent freely decided not to change the regulatory framework for certain investments.</u>*" [Emphasis added]
[536] Claimants' PHB, at paras. 49 and following.
[537] Cl. Mo-M, at para. 912.
[538] See in particular the following judgments of the Spanish Supreme Court: judgment of 20 March 2007, appeal 11/2005 EDJ 2007/18059 (**R-0082t**); judgment of 9 October 2007, appeal 13/2006 EDJ 2007/175313 (**R-0083t**); judgment of 3 December 2009, appeal 151/2007 EDJ 2009/307349 (**R-0084t**).
[539] Claimants' PHB, at para. 144.

witnesses, shows that their expectations were legitimate and that, moreover, Claimants have taken the jurisprudence of the Supreme Court into consideration.[540]

378. Lastly, as regards EU legislation regulating so-called "*state-aid*" measures, Claimants acknowledge that EU documents show a concern by the EU toward Spain's tariff deficit and a request to address it in a "*comprehensive way.*"[541] However, Claimants argue that none of the EU measures cited by Spain mandated, heralded or otherwise rendered foreseeable the enactment of the Measures at Issue.[542]

379. For all of these reasons, Claimants submit that their expectation of stability was legitimate and that the adoption of the Measures at Issue violated of Respondent's FET obligation.

380. **Respondent** – Respondent argues that the CSP sector is "*not an island*" but rather an integral part of the SES and subject to the same rules as other renewable energy producers.[543] Respondent says that the SES is governed by a system of laws and regulations which are in constant flux to enable the state to respond to the changing circumstances of domestic and international markets.[544]

381. Respondent argues that the legislative framework and the actions and representation of the Kingdom of Spain evince no stabilization clause or any specific commitment of stability. Any purported expectation of stability on the part of Claimants was therefore not legitimate. In Respondent's view, that is especially so given that Claimants' due diligence – deficient though it was – actually revealed that changes to the Original Regulatory Framework were both legal and foreseeable.

382. Regarding the absence of a "*stabilization clause*" or of a specific commitment of stability, Respondent faults Claimant for taking an opportunistically narrow view of the Original Regulatory Framework, one that is conveniently restricted to RD 661/2007 and RD 1614/2010.[545] Respondent points out that these royal decrees are legally subordinated to the principle of "*reasonable return*" for renewable energy producers set out in the EPA 1997, to the overarching principle of state sovereignty and to the public policy objective of sustainability of the SES.[546]

383. Against this backdrop, Respondent counters each of the elements invoked by Claimants:

---

[540] See in particular Claimants' PHB, at paras. 146 and 147.
[541] See Claimants' PHB, at para. 201.
[542] See Claimants' PHB, at paras. 201 and following. In fact, a quick review of the EU legislation cited by Respondent shows that half of the documents cited post-date Claimants' investment. See in this regard, Respondent's PHB, at para. 181.
[543] Resp. Rejoinder, at para. 1122.
[544] See among others Resp. Co-Mo, on pp. 16 and following; see also Resp. Rejoinder, on pp. 42 and following.
[545] Resp. Co-Mo, at para. 669.
[546] See among others Resp. Co-Mo, on pp. 16 and following; see also Resp. Rejoinder, on pp. 42 and following.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

- **RD 661/2007**: According to Respondent, RD 661/2007 contains no specific commitment of stability. In particular, Respondent argues that Article 44(3) of RD 661/2007 does not pre-empt *any* revisions to the premium and regulated tariff. The revisions that Article 44(3) of RD 661/2007 was meant to pre-empt were only those "*referred to in this section.*"[547] Respondent says this means that the premium and regulated tariff set out at RD 661/2007 were to be shielded *only* from the revisions announced for 2010 and those to be carried out every four years thereafter.[548] In this regard, the text of Article 44(3) invoked by Respondent provides as follows:

    "*3. During 2010, (...) there will be a revision of the tariffs, premiums, supplements and lower and upper limits defined by this Royal Decree, considering the costs associated with each of these technologies, the degree of participation of the Special Regime in covering the demand and its impact upon the technical and economic management of the system, always guaranteeing reasonable rates of return with reference to the cost of money in the capital markets. Thereafter, every four years, a new revision shall be performed, maintaining the same criteria as previous.*"[549]

    [Emphasis added]

- **The May 2007 Press Release**: Respondent attempts to cast serious doubt on whether Claimants truly relied on this press release, given that it had been issued more than four (4) years prior to the investment and that the evidence seems to show that one of Claimants' representatives was in fact distrustful of the press.[550]

- **RD-L 6/2009**: Respondent argues that RD-L 6/2009 was enacted explicitly to curb the tariff deficit by restricting the criteria for access to remuneration under the Special Regime.[551] In any event, according to Respondent, registration on the RAIPRE and on the Pre-allocation Registry was but an administrative requirement to be able to sell electricity. It did not grant CSP producers any right or formulate any guarantee of a fixed remuneration stream.[552]

- **The November 2009 Resolution and Related Press Release**: Respondent argues that the objective of the resolution by the Council of Ministers was to stagger the entry into operation of the plants. As with the RD-L 6/2009, Respondent argues that the determination registration deadlines for the RAIPRE or the Pre-allocation Registry did not grant Claimants or CSP producers any right or formulate any guarantee of a fixed remuneration stream.[553]

---

[547] Resp. Rejoinder, at paras. 543 and following; see also Resp. Rejoinder, at paras. 1154 and following.
[548] *Ibid.*
[549] Article 44(3) of RD 661/2007 (**C-0049t**).
[550] See Resp. Rejoinder, at paras. 1154 and following; see also email from Mr. Richard Crawford to Ms. Tamara Prendergast dated 18 January 2011 (**C-0567**).
[551] See Resp. Rejoinder, at paras. 439 and following.
[552] See "Fundamental Facts: Objective Framework," presentation filed by Respondent at the Hearing on the Merits, on p. 71.
[553] See Resp. Rejoinder, at paras. 1164 and following.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

- **Purported Agreement of 2 July 2010**: Respondent says that the discussions leading to the Purported Agreement were not contractual negotiations but rather consultations under Article 24(d) of the *Law on Government (Ley del Gobierno)*,[554] which provides as follows:

  "*d) The procedure set forth in paragraph c) above shall not be necessary if aforesaid organizations or associations have participated in the drafting process noted paragraph b) above through reports or consultations.*"[555]

  Respondent argues that CSP producers participated in the consultation process that led to RD 1614/2010 through *queries* which should not be qualified as contractual negotiations.[556] Respondent's legal experts opined that Spain does not have the power to transact upon its regulatory or legislative function.[557] In testimony at the Hearing on the merits, Professors Vaquer and Santos were adamant that no contractual or legal obligation could arise, <u>under Spanish law</u>, from the Purported Agreement.[558]

  At the Hearing, Respondent's counsel and witnesses insisted that there exists an important distinction between the terms "*acuerdo*" (agreement), "*consenso*" (consensus) and "*convenio*" (convention).[559] Respondent's witnesses further insisted on the use of the term *"consenso"* to describe the negotiations that led to the Purported Agreement and the Purported Agreement itself.[560] Respondent's experts further opined that, in Spanish, the terms *"acuerdo"* and *"consenso"* do not connote a legally binding contract (*"contrato"*) or convention ("*convenio*").[561]

- **December Resolutions**: Respondent argues that the exchange of letters of waiver and December Resolutions did not validly form a declaratory contract (*contrato de fijación jurídica*) nor even an administrative agreement. Respondent's legal experts opined that the valid formation of such contracts in the present circumstances is impossible *under Spanish law* principally because: i) there was no economic compromise tendered by the plants, since the plants would have delayed their entry into operation anyhow, given construction delays;[562] and ii) in

---

[554] See Resp. Rejoinder, at paras. 1182 and following; see also Act 50/1997, of 27 November, on the Government (**R-0054t**).
[555] Act 50/1997, of 27 November, on the Government, Article 24(d) (**R-0054t**).
[556] See Resp. Rejoinder, at paras. 1182 and following.
[557] See Transcript, Day 3, on pp. 164 and following.
[558] *Ibid.*
[559] See for example Transcript, Day 3, on pp. 27 and following, the testimony of Mr. Santiago Caravantes, one of the Kingdom of Spain's high-ranking public officials, who acted as the "area chief in charge of the department of renewable energy" in 2010.
[560] *Ibid.*
[561] See Transcript, Day 3, on pp. 141 and following, testimony of Professor Marcos Vaquer Caballería.
[562] See Respondent's PHB, at paras. 69 and following.

any event, the state's regulatory power is not available for a compromise and may not become the subject of a private contract.[563]

384. Respondent further argues that Claimant would have been able to foresee the enactment of the Measures at Issue had it carried out an adequate due diligence and heeded the warnings of the due diligence it *actually* carried out before investing, deficient though it was.

385. On the one hand, Respondent faults Claimants' due diligence for having generally failed to engage in a "*thorough prior analysis of the legal framework applicable*" to the remuneration of CSP producers.[564] More specifically, Respondent argues Claimants and their legal advisors failed to review in detail the jurisprudence of the Supreme Court of Spain. Had they done so, Respondent argues, they would have realized that Spain's highest court considered similar changes to the remuneration available to electricity producers a perfectly legal and valid exercise of state sovereignty designed to control the tariff deficit.[565] By the same token, Respondent argues that Claimants failed to obtain adequate legal advice on the formation of the Purported Agreement, on the alleged declaratory contracts and on the effect of the so-called "*grand-fathering*" clauses alleged (i.e. Article 44(3) of RD 661/2007 and Article 4 of RD 1614/2010).[566] Had Claimants sought a legal opinion *under Spanish law*, Respondent argues they would have realized that none of the above-mentioned items could have given rise to legal obligations binding upon Spain or constitute a guarantee of regulatory stability.[567] Similarly, Respondent argues that Claimants failed to adequately take account of EU legislation which provides that subsidies to renewable energy producers constitutes "*state aid*" revisable periodically by the state.[568]

386. On the other hand, Respondent argues that Claimants' due diligence – deficient though it may have been – raised sufficient red flags to alert the investors that key the elements of the Original Regulatory Framework were likely to change. For example, Respondent argues that – shortly after the adoption of RD 1614/2010 and before Claimants invested – the Kingdom of Spain enacted RD-L 14/2010, a royal decree which introduced an access toll for all producers, thus decreasing the remuneration available to CSP

---

[563] See Resp. Rejoinder, at paras. 1190 and following; see also Opinion on the legal nature and effectiveness of certain actions of the Directorate-General for Energy Policy and Mines on Solar Thermal Facilities, by Professors Drs. Marcos Vaquer Caballería and María José Santos Morón, on pp. 54, 55 and 56.

[564] See *inter alia* the Resp. Rejoinder, at paras. 1224 to 1234. See *Charanne* (**RL-0082**), at para. 507: "*To the Tribunal's understanding, at the time of making the investment in 2009 the Claimants could have carried out an analysis of their investment's legal framework in Spanish law and understood that the regulations enacted in 2007 and 2008 could be modified. At least that is the degree of diligence that could be expected from a foreign investor in a heavily regulated sector like the energy industry. In such a sector, thorough prior analysis of the legal framework applicable thereto is essential to make an investment.*" [Emphasis added]

[565] See *inter alia* the Resp. Rejoinder, on pp. 263 and following; see also Respondent's PHB, at paras. 226 and following.

[566] See in particular Resp. Rejoinder, at paras. 641 and following and in particular at para. 646.

[567] *Ibid.*

[568] Respondent's PHB, at paras. 189 and following.

producers.[569] Respondent also argues that Claimants had identified, in their investment paper, the risk that the Kingdom of Spain could modify the CSP producers' entitlement to receive remuneration under the Special Regime even for the electricity produced with non-renewable "*back-up fuel.*"[570]

387.  As regards the Purported Agreement and the declaratory contracts, Respondent argues that Claimants were in a position to notice that no such agreements were listed on the letter disclosing the agreements binding upon the plants sent by the seller of the plants to the entities funded by Claimants which purchased the plants.[571]

388.  Finally, Respondent points out that the following elements of the Original Regulatory Framework were never subject to any regulatory clause or representation which could even remotely be construed as a commitment of stability:

-       The CPI Index;

-       The TVPEE;

-       The supplement for reactive power.

389.  In fact, as regards this latter element, Respondent points out that Claimants' witness was unable to describe and define the supplement for reactive power, let alone explain how Claimants may have held a legitimate expectation that it would remain unaffected by subsequent regulatory changes.[572]

### b)      Relevant authorities

390.  ***Charanne*** - As mentioned above, in *Charanne*,[573] the tribunal dismissed a claim brought under Article 10(1) ECT by Dutch investors who had invested in photovoltaic plants in Spain. The tribunal assessed both the claimants' purported expectation of stability and their argument that the measures at issue constituted a fundamental upheaval of the original regulatory framework.[574]

391.  On the first issue, the investors invoked RD 661/2007 and a separate royal decree (RD 1578/2008) to argue that Spain had guaranteed the stability of the regulatory framework applicable to the photovoltaic plants. In dismissing those claims, the *Charanne* tribunal first concluded that the evidence did not disclose a "*specific commitment entered into by*

---

[569] See Resp. Rejoinder, at paras. 1200 and following. Respondent also invokes the Sustainable Economy Law 2/2011 adopted in March 2011. However, upon review, there is no provision in the excerpts produced of that law produced by Respondent (**R-0216**) – and Respondent does not cite any – which could have arguably tipped Claimants off to the impending enactment of the Measures at Issue.
[570] See in that regard **C-0560**, on p. 41.
[571] See disclosure letter –**R-0279**.
[572] Respondent's PHB, at paras. 28 and 29. See also Transcript, Day 2, testimony of Mr. Daniel Sausmikat, on pp. 22 and 23.
[573] *Charanne* (**RL-0082**). This was an ECT arbitration conducted under the rules of the Stockholm Chamber of Commerce. The Tribunal was composed of Mr. Alexis Mourre, President, and Messrs. Guido Santiago Tawil and Claus Von Wobeser, Arbitrators.
[574] *Ibid.*, at paras. 512 and following.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

*Spain*" promising that the regulatory framework existing at the time of the investment would not change.[575] The tribunal held that RD 661/2007 did not constitute such a specific commitment even though it was addressed to a limited group of investors. The tribunal also ruled that registration with the RAIPRE was a mere "*administrative requirement*" and not a source of vested rights to a certain remuneration.[576] The tribunal further ruled that the investors were in a position to carry out a "*thorough*" review of the legal framework at the time of the investment, including the jurisprudence of the Supreme Court of Spain. Such a review would have revealed to the investors that the changes at issue were in fact possible, probable and legal. In this latter regard, the tribunal ruled as follows:

"*508.      Although these decisions by the Spanish courts are not binding on this Arbitration Tribunal, they are factually relevant to verify that the investor was unable, at the time of the disputed investment, to have the reasonable expectation that <u>in the absence of a specific commitment</u> the regulation was not going to be modified during the lifespan of the plants.*"[577]

[Emphasis added]

392.   The tribunal in *Charanne* held that the presentation *The Sun Can Be Yours* and other similar documents in which the Spanish solar sector was promoted to prospective foreign investors were too general to constitute a specific commitment of stability,[578] finding that these materials did not specifically state that RD 661/2007 and RD 1578/2008 would not be modified.[579]

393.   It is noted, however, that in *Charanne* no evidence was administered on discussions between Spain and the photovoltaic sector that could have resulted in a purported agreement similar to that alleged by Claimants in the present case. Nor of course did the tribunal in *Charanne* rule on RD 1614/2010 or on the December Resolutions and how these measures may have affected, if at all, the investors' legitimate expectations, given that they particular to the CSP sector.

394.   Most importantly perhaps, the tribunal in *Charanne* did not rule on any of the Measures at Issue in the present case; the impugned measures in *Charanne* were solely RD 1565/2010 and RD-L 14/2010.[580]

395.   ***Isolux*** – In *Isolux*,[581] the tribunal dismissed a claim by a Dutch company that had invested in Spain's photovoltaic sector. The investors had argued that RD 661/2007 and

---

[575] *Ibid.*, at para. 490: "*This kind of commitment could have been entered into on the basis of a stabilization clause, or through a kind of declaration made by the State to the investors, stating that the existing regulatory framework would not change. The Claimants were not the addressees of any such declaration.*"
[576] *Ibid.*, at para. 510.
[577] *Ibid.*, at para. 508.
[578] *Ibid.*, at para. 497.
[579] *Ibid.*, at para. 497.
[580] *Ibid.*, at para. 233: "*The measures that are the object of* [the present] *arbitration are exclusively RD 1565/2010 and RDL 14/2010.*"
[581] *Isolux* (**RL-0107t**). The tribunal was composed of Mr. Yves Derains, President, as well as Professor Guido Santiago Tawil and Mr. Claus von Wobeser, co-arbitrators.

a related regulation applying to the photovoltaic sector (RD 1578/2008) constituted a specific commitment which gave rise to a legitimate expectation of stability that Spain subsequently frustrated by enacting the measures at issue in that case. Like the tribunal in *Charanne*, the tribunal in *Isolux* ruled that RD 661/2007 and RD 1578/2008 do not contain a specific commitment on stability.[582] The tribunal also ruled that, since the regulations applied equally to domestic and foreign investors, any commitments they may have contained could not be said to be "*directed at investors*" or to "*seek foreign investment*".[583]

396.  It is noted, however, that the tribunal in *Isolux* seems to have made that determination in the context of its analysis of the "*umbrella clause*" at Article 10 ECT, not in the context of a determination as to whether Respondent breached the FET obligation. This could arguably be significant since a ruling that Respondent breached the "*umbrella clause*" requires the formation of a legal obligation, whereas a commitment giving rise to a legitimate expectation can be sourced in mere actions and representations which, *in se*, need not have obligatory force.[584]

397.  It is also noted that – as in *Charanne* – the tribunal in *Isolux* was not asked to consider RD 1614/2010 or the discussions that occurred between Protermosolar and the Spanish government in the summer of 2010, the ensuing Purported Agreement or the exchange of letters and December Resolutions. (As mentioned, these facts are particular only to the Spanish CSP sector.)

398.  Finally, *Isolux* is arguably distinguishable from the present case in that the investments there were made in October 2012. By that date, RD 661/2007 and RD 1578/2008 had already been modified on several occasions. Most importantly, the impending changes to the original regulatory framework applicable to the photovoltaic sector which started with the enactment of Act 15/2012 (introducing the TVPEE, among other measures) had already been publicly announced. Noting these particular circumstances <u>and the date of Claimants' investment</u>, the tribunal held that RD 661/2007 and RD 1578/2008 could not have given rise to a legitimate expectation that the main tenets of the original regulatory framework would remain unchanged.[585] Quite to the contrary, the tribunal held that the investors could have expected the type of fundamental changes that Spain ultimately enacted.[586]

399.  ***Eiser*** – In *Eiser*,[587] an ICSID tribunal granted a claim brought by investors in Spain's CSP sector on the basis of a violation of the FET obligation under the ECT for which it awarded damages in the amount of €128 million. As mentioned above, *Eiser* is the only

---

[582] *Ibid.*, at para. 772.
[583] *Ibid.*, at para. 772.
[584] See in particular *Electrabel*, *op. cit.*, (**RL-0005**), at paras. 7.78 and 7.79.
[585] *Isolux* (**RL-0107t**), at para. 804: "*In October 2012, any investor could have anticipated not only a fundamental modification of the contents of the Special Regime, but also the abolishment of the regime, whenever the principle of reasonable return on investment guaranteed by the LSE, also recalled by the NEC itself, is respected.*"
[586] *Ibid.*
[587] *Eiser* (**CL-0242**).

published arbitral award of which the Tribunal is aware dealing with changes to the regulatory framework applicable to CSP producers at issue in the present case. The claimants' case in *Eiser* was nearly identical, on the facts, to Claimants' case against Spain in the present arbitration.

400. The tribunal in *Eiser* dismissed the investors' submission that RD 661/2007 constituted, *in itself*, a specific commitment that the remuneration available to CSP producers would remain immutable during the plants' operational lifespan.[588] It bears noting, however, that the tribunal in *Eiser* did not assess the impact – if any – of the Purported Agreement, of RD 1614/2010 and of the exchange of letters of waiver and December Resolutions upon the legitimate expectations of the investors in that case. That is likely because in *Eiser*, Claimants committed its initial investment in October 2007, three years before the enactments and representations upon which Claimants rely in the present case.[589]

401. This said, the tribunal in *Eiser* found that the ECT protects investors among other things "*against the total and unreasonable change*" of the regulatory framework prevailing at the time of the investment.[590] And it is precisely such a "*total*", "*radical*" change that the *Eiser* tribunal determined that Spain enacted, starting with the adoption of RD-L 9/2013. The Tribunal's own views on the matter, are discussed below in **section VI.B.ii.c)**.[591]

402. ***Novenergia*** – In *Novenergia II Energy* v. *Kingdom of Spain*,[592] the tribunal granted a claim brought by investors in the photovoltaic solar sector on the basis of violations of Spain's FET obligation under the ECT and awarded the investors €53 million in damages.

403. While the tribunal ruled principally upon the same measures as those at issue in this arbitration (i.e. the 2013-2014 reform of the remuneration regime for renewable energy producers), the tribunal did not rule upon the effect of the Purported Agreement, RD 1614/2010 or of the December Resolutions. (As mentioned above, these measures are specific to the CSP sector.)

404. As such, the tribunal did not engage with the issue of "*stability*" or "*immutability*" of all or part of the regulatory framework applicable to photovoltaic producers. Rather, the tribunal dealt with the issue whether the investors in that case held a legitimate expectation that Spain would not "*radically*" alter the essential characteristics of the regulatory framework in effect at the time of the investment; and, if so, whether the measures at issue violated that legitimate expectation.[593]

405. The tribunal in *Novenergia* answered both questions affirmatively for the reasons discussed in more detail below.

---

[588] *Ibid.*, at para. 363.
[589] *Ibid.*, at para. 120.
[590] *Ibid.*, at para. 363.
[591] *Ibid.*, at paras. 388 to 418.
[592] *Novenergia* (**CL-0245**), at paras. 689 and 690.
[593] *Ibid.*, at para. 656.

c) **Discussion**

406. By way of prefatory comment regarding the discussion that follows, the Tribunal notes, first, that it does not consider that the evidentiary record in this case supports the existence of a promise or commitment by Spain to "*freeze*" the Original Regulatory Framework and all of its component laws, regulations, rules and remuneration variables. Nor does the evidentiary record support the existence of a specific promise or commitment by Spain to protect CSP producers such as Claimants from changes to *all* aspects of the Original Regulatory Framework. As explained below, the representations or enactments that could potentially be construed as a specific commitment by Spain in this regard constitute, at best, a commitment to shield CSP producers from subsequent regulatory changes to *certain elements* of the Original Regulatory Framework.

407. Second, as explained below, no enactment or representation by Spain *before 2010* could reasonably be interpreted *in se* as such a specific commitment. The Tribunal agrees with the tribunals in *Charanne* and *Novenergia* in this regard.[594] Even though Claimants argue that Article 44(3) of RD 661/2007 – in light of the language contained in the May 2010 press release – may be construed as one such specific commitment, it seems obvious that the regulatory changes subsequently enacted by Respondent (upon which Claimants themselves rely in this arbitration[595]) preclude a finding that RD 661/2007 and/or its associated press release gave rise, in and of itself, to a legitimate expectation of stability or immutability of the entire Original Regulatory Framework.

408. The same can be said for RD-L 6/2009 and the requirement for CSP plants to register in the RAIPRE and the Pre-allocation Register.[596] As Respondent correctly points out,[597] these enactments were part of Spain's efforts to curb the tariff deficit and were meant to restrict the conditions governing access to remuneration under the Special Regime, not to guarantee immutable economic rights to *all* CSP plants or a steady flow of remuneration over their operational lifespan.

409. In light of the above, the Tribunal is of the view that the questions central to Claimants' alleged expectation of stability could be more fruitfully restated as follows:

- Did the Purported Agreement,[598] the enactment of RD 1614/2010[599] and the exchange of letters of waiver and December Resolutions,[600] taken as a whole, give rise to a legitimate expectation that CSP plants registered on the Pre-allocation Register would be shielded from subsequent regulatory changes to *any particular element* (if not all) of the Original Regulatory Framework?

---

[594] *Charanne* (**RL-0082**), at paras. 507 and following, which ruled that RD 661/2007 and the requirement to register in the RAIPRE or in the Pre-allocation Registry did not give rise, *per se*, to a legitimate expectation of stability or to immutable economic rights. See *Novenergia* (**CL-0245**), at paras. 689 and 690.
[595] See *inter alia* RD-L 6/2009 and RD 1614/2010.
[596] See **C-0065t**.
[597] See in particular Rejoinder, at paras. 439 and following.
[598] **C-0193t**.
[599] **C-0050t**.
[600] **C-0264t** and **C-0265t** for the letters of waiver and **C-0266t** and **C-0267t** for the December Resolutions.

-      If so, what are these elements; were they modified by the Measures at Issue; and did any such modification violate Claimants' legitimate expectations?

410.   For the following reasons, the Tribunal is of the view that the Purported Agreement, RD 1614/2010 and the exchange of letters of waiver and December Resolutions *did* give rise to a legitimate expectation that CSP plants registered on the Pre-allocation Register would be shielded from subsequent regulatory changes to three specific elements of the Original Regulatory Framework, and that this expectation was violated by Spain.

411.   **Relevance of Spanish law and EU law** – The Tribunal is of the view that an analysis of the enactments and representations identified above *under Spanish law* is arguably not a fruitful avenue of inquiry. At issue is not the validity of the above-mentioned measures and purported agreements under Spanish law. The question is rather whether, as legally cognizable facts, these representations and enactments gave rise to a legitimate expectation under international law, and in particular under the ECT. This case presents the particularity of a substantial convergence existing between one provision of a general regulation (Article 4 of RD 1614/2010) and two specific commitments (the December Resolutions) addressed to the two plants at issue which were about to become the very object of Claimants' investment.

412.   **Objective content of the enactments and representations at issue** – The documentary record of the enactments and representations at issue contains clear language emanating from Spain stating that subsequent changes to at least some elements of the Original Regulatory Framework will not affect CSP plants registered on the Pre-allocation Register.

413.   For example, the Purported Agreement (even if Respondent is correct that it is devoid of legal effect as a binding agreement under Spanish law) states in unequivocal terms that: "… *any future revisions of the premiums will not affect existing facilities, as it currently established for regulated tariffs, and upper and lower limits, nor those that at the time of approval of the review were already entered in the Feed-in Tariff Pre-Assignment Registry created by Royal Decree-Law 6/2009, April 30, or that were definitively entered in the REPE prior to May 6, 2009.*"[601] [Emphasis added]

414.   Those terms are reflected in the text of Article 4 of RD 1614/2010, which states as follows: "*For thermosolar technology facilities under Royal Decree 661/2007, of May 25, the revisions of tariffs, premiums and lower and upper limits, to which Article 44.3 of said Royal Decree refers, shall not affect (…) those facilities pre-registered on the remuneration pre-allocation Register (…).*"[602] In turn, Article 4 of RD 1614/2010 is integrally incorporated in the December Resolutions.[603] [Emphasis added]

415.   The Tribunal is of the view that Article 4 of RD 1614/2010 specifically targets the CSP sector: the text of that provision explicitly identifies "*thermosolar technology facilities*

---

[601] See **C-0198t**.
[602] See **C-0050t**.
[603] See in particular **C-0266t** and **C-0267t**.

*Royal Decree 661/2007,*" which includes the CSP plants at issue in which the Claimants invested.

416. Respondent argues that, although Article 4 of RD 1614/2010 may have shielded some CSP plants from some regulatory revisions, it did not shield them from the changes enacted by the Measures at Issue.

417. Respondent points out that Article 4 of RD 1614/2010 mentions the "*revisions … to which Article 44.3 of said Royal Decree* [661/2007] *refers.*" [Emphasis added] Respondent proposes an exceedingly rigorist interpretation that would limit the scope of the term "*revisions*" strictly to the quadrennial revisions announced at Article 44.3 of RD 661/2007. Respondent seems to argue that, since the Measures at Issue were not strictly enacted as part of such quadrennial revisions, Article 4 of RD 1614/2010 finds no application in this case.[604]

418. The Tribunal does not agree. The Tribunal is rather of the view that the text of Article 4 of RD 1614/2010 and of Article 44.3 of RD 661/2007 must be read in the legislative and regulatory context of the time. Thus contextualised, these provisions suggest that Respondent intended to shield CSP plants registered on the Pre-allocation Register from future revisions of the _tariffs_, _premiums_ and _lower and upper limits_ that were in effect when Claimants invested.

419. First, it is clear from evidence emanating from MINETUR and contemporaneous with the enactment of RD 661/2007 that the legislative purpose of its Article 44.3 was to shield CSP facilities already in operation from future revisions of the tariffs and the upper and lower limits (tellingly, this provision does not make any reference to "*premiums*").[605] For example, the press release accompanying the enactment of RD 661/2007 states in plain terms:

> "*Any revisions of tariffs to be carried out in the future shall not affect the facilities already in operation. This guarantee provides legal certainty for the producer, providing stability _for the sector_ and promoting its development.*"[606]

> [Emphasis added]

420. The interpretation proposed by Respondent would render Article 44.3 of RD 661/2007 meaningless if the MINETUR discretionarily decided to change the timing of its regulatory revisions (as it did in 2011), thus stripping the provision of any legislative purpose.

421. What is more, Article 4 of RD 1614/2010 reiterated the "*guarantee*" set out at Article 44.3 of RD 661/2007 with even more specificity (explicitly identifying CSP plants), with a

---

[604] Resp. Rejoinder, on pp. 53 and following.
[605] See for example Press release dated 28 November 2006 and titled "*The Ministry of Industry assigns priority to profitability and stability in the new regime for assistance for renewable energy and cogeneration,*" **C-0066t**; see also Press release dated 25 May 2007 titled "*The Government assigns priority to profitability and stability in the new Royal Decree on renewable energy and cogeneration,*" **C-0067t**.
[606] Press release dated 25 May 2007 (**C-0067t**), on p. 2.

broader scope and in the context of even more forceful contemporaneous representations by Respondent.

422. In his testimony at the Hearing, Mr. Caravantes confirmed that Article 4 of RD 1614/2010 enshrined in law many of the elements of the Purported Agreement, in particular item 3 of the Purported Agreement, being the extension of the scope of Article 44.3 of RD 661/2007 to cover the "*premiums*" (i.e. the pool-plus premium remuneration option) and the CSP facilities registered on the Pre-allocation Register.[607]

423. Mr. Caravantes also testified to the effect that the Purported Agreement was nothing more than a dialogue with the CSP sector initiated by the Government in order to stave off a public outcry at the upcoming regulatory revisions, among other reasons.[608] It remains that, even when assessed as a simple fact, and not as a binding act, the so-called "*dialogue*" is replete with representations by the MINETUR that the Tribunal must consider.

424. The Tribunal notes the many references, in contemporaneous documents emanating from Respondent, to a "*guarantee*" of "*stability*" for CSP producers that had registered on the Pre-Allocation Registry. For example, a press release issued on 2 July 2010, contemporaneously with the release of the Purported Agreement states as follows: "*(…) this agreement strengthens the visibility and stability of the regulation of these technologies for the future, <u>guaranteeing the current premiums and tariffs of RD 661/2007 for facilities in operation (and for those included in the pre-register) after 2013</u>.*"[609] [Emphasis added]

425. Similarly, a press release issued by the Council of Ministers on 3 December 2010 to herald the adoption of RD 1614/2010 mentions that the imminent adoption of the royal decree (i.e. RD 1614/2010) "*involves <u>reinforcement of</u> the visibility and <u>stability</u> of the regulation of these technologies in the future, and <u>guarantees the present premiums and tariffs of Royal Decree 661/2007 as of 2013 for installations in operation and for those included on the pre-register</u>.*"[610] [Emphasis added]

426. Other contemporaneous documentary evidence reinforcing this assessment includes public remarks by Dr. Pedro Marín Uribe, Spain's Secretary of State for Energy in July 2010.[611] It is also telling that in public remarks tendered a few years later, Spain's Minister of Energy referred to the "*agreement*" purportedly entered into in 2010.[612] Telling as well are the many references to mutual concessions between the CSP sector and Spain, including the numerous emails exchanged between Mr. Crespo (Protermosolar) and Mr. Caravantes (MINETUR) in November 2010 with a view to finalize the language of the letters of waiver and the December Resolution.[613] This

---

[607] Testimony of Mr. Santiago Caravantes at the Hearing, Transcript, Day 3, on pp. 86 to 89.
[608] *Ibid.*, on pp. 82 to 86.
[609] **C-0193t**.
[610] **C-0248t**.
[611] **C-0492t**.
[612] See Claimants' PHB, at para. 95. See also Miguel Sebastián, "*Some thoughts on the energy situation*", Cuadernos de Energía, No. 41, December 2013 (**C-0135t**).
[613] See in this regard **C-0276t** to **C-0284t**.

suggests a mutual intention to arrive at a *quid pro quo* between the Respondent and CSP producers based on mutual and consensual commitments. Whether this *de facto* reality had legally binding effects under Spanish law or whether these exchanges were part of a larger consultative process mandated by Spanish administrative law is not a determinative issue for this arbitration. Even if Respondent's arguments on this matter are accepted, at the very least, these exchanges suggest to the Tribunal that Spain intended to grant the CSP sector a distinct and privileged status in the context of future regulatory revisions and to extend to CSP producers specific assurances in that regard.

427. Respondent correctly points out that the witness presented by Claimants regarding the Purported Agreement testified with some difficulty and at times somewhat incoherently.[614] However, this does not contradict the evidence emanating from Respondent which contains repeated, converging and clear mentions of a guarantee to shield CSP producers registered on the Pre-allocation Registry from future regulatory changes. As mentioned above, the Tribunal is not inclined to analyse the Purported Agreement as a source of binding contractual obligations under Spanish law, but rather as a legally cognizable fact, and in particular, as evidence of a representation by Respondent to maintain some of the elements of the Original Regulatory Regime for some CSP plants that satisfied certain administrative requirements.

428. Most importantly, the Purported Agreement (even when taken as a legally cognizable fact, as opposed to a binding act *per se*) as well as the other representations, public statements and enactments mentioned above culminated with the issuance of the December Resolutions.[615] Those resolutions were issued *directly* to the attention of – and in response to inquiries by – the CSP plants at issue as regards their remuneration. This is a key particularity of the present case. The substance of a general regulatory provision (Article 4 of RD 1614/2010) was reaffirmed in two specific instruments (the December Resolutions) sent by Spain's competent authority to the two plants at issue.

429. Pursuant to the December Resolutions, Spain specifically represented to the CSP plants that "*at present … the remuneration applicable to the facility is made up of the tariffs, premiums, upper and lower limits and supplements established by RD 661/2007 (…)*."[616]

430. Taken in isolation and out of the context of the contemporaneous representations and enactments by Respondent, the December Resolutions could indeed be construed as mere statements of the remunerative regime in effect strictly as at the date of their issuance, i.e. 29 December 2010. However, placed in the context of the Purported Agreement, of the adoption of RD 1614/2010 and of all the contemporaneous declarations and public statements by Respondent, its agencies and representatives, the Tribunal views the December resolutions as the clear expression of a specific commitment to maintain, for the future, the "*tariffs, premiums and lower and upper limits*"[617] to which the Morón and Olivenza 1 plants were subject.

---

[614] See Transcript, Day 2, Testimony of Mr. Luis Crespo, on pp. 171 and following and in particular on p. 208.
[615] See the December Resolutions (**C-0266t** and **C-0267t**).
[616] *Ibid.*, at Article 2.
[617] Article 4 of RD 1614/2010 (**C-0050t**).

431. The December Resolutions are Spain's answer to the CSP plants' clear and specific request addressed to the MINETUR in the letters of waiver, for confirmation of the remunerative regime applicable over the plants' entire operational lifetime "[…] *to have the remuneration conditions for the facility during its operational lifespan communicated* [to them]."[618]

432. As such, the temporal horizon of the CSP plants' inquiry (as clearly formulated in the Letters of Waiver) forms a context indissociable from the response received in the form of the December Resolutions. Spain in fact acknowledged the temporal horizon of the CSP plants' requests for information and explicitly set about to respond to those requests:

"*Finally, the applicant requests to receive communication of the remuneration conditions applicable to the facility during its operational life.*"[619]

433. The two sets of documents – i.e. the Letters of Waiver and the December Resolutions – must be read together; and doing so makes clear the specific commitment by the Government of Spain to the Morón and Olivenza 1 plants that these plants would be shielded from any revisions to the "*tariffs, premiums and lower and upper limits*" [620] during their operation lifetime.

434. This specific commitment is consistent with and confirms the clear terms of RD 1614/2010 as well as the promise contained in the press release accompanying the issuance of that Royal Decree. It is a specific commitment issued *not* to the CSP sector at large, but rather directly to the two CSP plants at issue.

435. This means that as of the date of the issuance of the December Resolutions (i.e. 29 December 2010), being less than six (6) months before investing, Claimants could reasonably expect that the CSP plants at issue would benefit from the "*tariffs, premiums and lower and upper limits*" established by RD 661/2007 for their entire operational life time.

436. The Tribunal finds this expectation reasonable and legitimate. The Tribunal finds no evidence dated between 29 December 2010 and 23 June 2011 that could controvert the reasonability or legitimacy of Claimants' expectation in this regard.

437. **Due diligence** – Respondent strenuously argues that Claimants should have carried out a more thorough due diligence verification of the Original Regulatory Framework. It says that Claimants should have initiated their own due diligence efforts, rather than taking the due diligence of the banks as a starting point. It argues that the nature and

---

[618] See **C-0264t** and **C-0265t**, letters titled "*Letter of waiver of entry into operation at a specific date in the phase assigned to the facility* [OLIVENZA 1 SOLAR THERMAL PLANT and MORÓN SOLAR THERMAL PLANT] *pursuant to the Resolution of the Directorate General for Energy Policy and Mining of December 11, 2009 and upon request of a resolution communicating the remuneration conditions during the operational lifespan of said facility".*

[619] See the December Resolutions (**C-0266t** and **C-0267t**) at point II of the Preamble, *in fine.*

[620] Article 4 of RD 1614/2010 (**C-0050t**).

value of their investment were such as to require a detailed legal opinion and not merely verbal assurances from their counsel.

438. However, even if the Tribunal were to accept that Claimants could and should have carried out the thorough due diligence verification of the Original Regulatory Framework proposed by Respondent, this would not undermine the legitimacy of Claimants' expectation of the stability of the *"tariffs, premiums and lower and upper limits"* as applicable to the CSP plants at issue.

439. Most, if not all, of the Supreme Court cases, EU laws and regulations as well as the other factors that Respondent faults Claimants for not having sufficiently considered before their investment were issued or came about *before* Spain's commitment of stability crystallized in the December Resolutions on 29 December 2010.

440. In view of this specific commitment to the CSP plants at issue, the previous enactments of Spain's legal system and the pre-existing Supreme Court jurisprudence loses its relevance for the present analysis.

441. As such, the evidence presented does not establish that a more thorough due diligence would have rendered the Measures at Issue – in particular with respect to the abrogation of the "*tariffs, premiums and lower and upper limits*"[621] – reasonably foreseeable to Claimants. As explained, the Tribunal is rather of the view that even the most thorough due diligence would still have demonstrated that Respondent specifically committed – by means of multiple representations and regulatory enactments, including those discussed above – to shield CSP plants registered in the Pre-allocation Register from future revisions of the "*tariffs, premiums and lower and upper limits*"[622] applicable under the Original Regulatory Framework. For the reasons expressed above at paras. 410 and following, the Tribunal considers that this conclusion would not have been altered or invalidated even by a minute analysis of the Supreme Court case law or by an inquiry into the binding effect of the Purported Agreement strictly under Spanish national law.

442. The Tribunal is of the view that even a perfect analysis of such jurisprudence could not have led the Claimants to foresee that Respondent might abrogate the very tenets of the Original Regulatory Framework (i.e. the premium and the lower and upper limits) that it undertook to maintain unchanged for the CSP sector.

443. By the same token, there is no provision to be found in any of the EU laws or regulations cited by Respondent which could have alerted Claimants to the impending enactment of the Measures at Issue. The Tribunal is prepared to accept that remuneration under the Special Regime may have been considered "*state aid,*" the purpose of which was to provide investors with a reasonable rate of return.[623] But that is not relevant to the analysis of the issue as to whether Respondent violated a specific commitment tendered to the CSP sector.

---

[621] Article 4 of RD 1614/2010 (**C-0050t**).
[622] Article 4 of RD 1614/2010 (**C-0050t**).
[623] See Respondent's PHB, at paras. 182 and following.

444.  Respondent has not pointed to any specific telltale sign that might have tipped Claimants to the foreseeability of the Measures at Issue even had Claimants assessed the EU regulations on state aid with the rigour proposed by Respondent. For these reasons, and given the Tribunal's finding (detailed above) that Respondent tendered a specific commitment of stability with respect to certain elements of the Original Regulatory Framework, the Tribunal is of the view that the content and interpretation of EU law and regulations is largely irrelevant to resolve the merits of the present dispute.

445.  In the Tribunal's view, the same can be said about the tenets of RDL 14/2010,[624] which was enacted shortly after the adoption of RD 1614/2010. It is true that RDL 14/2010 enacted changes to the maximum hours of operations of renewable energy producers, but these changes applied exclusively to the photovoltaic sector,[625] thus implicitly confirming the Respondent's commitment to the CSP sector. It is also true that RDL 14/2010 subjects <u>all</u> renewable energy producers to new network access fees,[626] but these new fees did not impact the "*tariffs, premiums and lower and upper limits.*"[627] As mentioned above, these tariffs, premiums and lower and upper limits in effect when the Claimants invested were reinforced by Respondent's specific commitment of stability. The fact that they remained unchanged further to the adoption of RDL 14/2010 implicitly confirms Respondent's commitment and Claimants' expectations in that regard.

446.  The Tribunal also notes that Claimants chose to invest in the CSP sector in a period that was marked by the aftermath of the 2008 economic crisis and the efforts by the Respondent to curb the so-called tariff deficit. The Tribunal agrees with Respondent that these elements should have been front and center for any diligent investor. Barred any specific commitments, a reasonable investor could not have relied on the stability of the remunerative regime set out in RD 661/2007. However, the importance of the 2008 crisis and of Respondent's efforts to curb the tariff deficit was superseded by the specific commitment tendered by Respondent to the CSP sector which culminated in the enactment of the December resolutions.

447.  In sum, the Tribunal is of the view that even a more thorough due diligence would not have alerted Claimants of the impending enactment of the Measures at Issue, in particular that the "*tariffs, premiums and lower and upper limits*"[628] would be modified or altogether rescinded even for the CSP plants that were registered in the Pre-allocation Register, such as the Morón and Olivenza 1 plants.

448.  **Distinguishing Factors** – The facts of this case distinguish it from *Charanne*, *Isolux* and *Eiser* in which the tribunals held that the original regulatory framework applicable to photovoltaic plants did not contain any "*specific commitment*" of stability (i.e. immutability). The tribunals in *Charanne* and in *Isolux* were not called upon to assess the effect of the Purported Agreement, RD 1614/2010 or the exchange of letters of waiver and the December Resolutions (as mentioned, these representations and

---

[624] **R-0069**.
[625] *Ibid.*, at First Additional Provision and Second Transitional Provision.
[626] *Ibid.*, at First Transitional Provision.
[627] Article 4 of RD 1614/2010 (**C-0050t**).
[628] Article 4 of RD 1614/2010 (**C-0050t**).

enactments are particular to the CSP sector and the tribunals in *Charanne* and *Isolux* dealt with claims by investors in the photovoltaic sector). Similarly, in *Eiser*, the tribunal did not consider the effect of these enactments and of the contemporaneous representations in that regard by Spain's high-ranking officials (possibly because, unlike in the present case, the Eiser claimants' initial investment *preceded* these enactments and statements by three years, although other investments were made subsequently).

449. **Scope of Respondent's Specific Commitment** – In the light of the above, the Tribunal finds that, by 2010, Respondent had in fact made a specific commitment to the CSP sector that CSP plants registered in the Pre-allocation Register would be shielded from subsequent regulatory changes at least as regards *certain* elements of the Original Regulatory Framework.

450. It remains to consider which particular elements of the Original Framework were subject to Respondent's specific commitment; and whether their modification or abrogation by the Measures at Issue violated Claimants' legitimate expectation?

451. Given the text of the Purported Agreement, of RD 1614/2010 and of the December Resolutions, as well as the representations tendered contemporaneously with those measures, the Tribunal finds that Respondent specifically committed that future revisions of the values of the *regulated tariff*, the *pool price premium* and the applicable *upper and lower limits* would not affect those CSP plants registered on the Pre-Allocation Register. The Tribunal considers that inherent to this specific commitment is the assurance that the regulated tariff and pool plus premium would continue to apply for the operational lifespan of the CSP plants registered on the Pre-allocation Register. (The duration of the plants' operational lifespan is a hotly contested issue that is analyzed below).

452. For the following reasons, however, the Tribunal is of the view that the same *does not* hold for the remaining five (5) rights (or entitlements) that Claimants seek to vindicate in this arbitration:

- **The right to sell the full net amount of electricity produced –** (Art. 30(2) EPA 1997): Not only is this right not guaranteed by the Original Regulatory Framework, but it has also suffered significant modification by enactments invoked by Claimants as the basis for other rights, including RD 1614/2010 which reduced the number of hours of operation for which CSP plants would have access to remuneration under the Special Regime;

- **The right to obtain remuneration under the Special Regime even for electricity produced using non-renewable "*back-up fuel*" –** (Art. 2(1)(b)(1) RD 661/2007): Not only was the future application of this provision not guaranteed by

Respondent, but Claimants in fact contemplated the possibility of modifications to this provision prior to investing.[629]

- **The updating of the feed-in remuneration scheme in accordance with the general CPI index minus 0.25% per year until the end of 2012 and minus 0.5% per year thereafter** – (Art. 44 of the First Additional Provision of RD 661/2007): No evidence was presented that could suggest that Respondent made any specific commitment with respect to the stability of the updating method or the ongoing application of the CPI index in that regard;

- **The right to priority access to the transmission and distribution grid** – (Art. 25(2) EPA 1997): Claimants fail to show where exactly or in what manner Respondent guaranteed that they would be shielded from modifications to this provision. In any event, Claimants did not show how this right was modified and how such modification, if any, constitutes a violation of Respondent's FET obligation. In fact, it is noted that Article 26(2) EPA 2013 seems to reassert the priority access to the transmission and distribution grid granted to renewable energy producers under the Original Regulatory Framework.[630] Finally, it also bears noting that both experts agreed that "*no one has yet attempted to estimate the financial impact (if any) associated with the elimination of the right to priority access and that the likely impact would be minor at most;*"[631]

- **The right to receive a supplement for reactive energy** – (Art. 29(1) of RD 661/2007): Not only is the evidence silent on any specific comment regarding a supplement for reactive energy, but the Claimant's own witness was not able to describe or explain the supplement for reactive energy. In the circumstances, the Tribunal is of the view that Claimant has not made its case regarding the legitimacy of any putative expectation in this regard.

453. Finally, the Tribunal is of the view that the abrogation of the regulated tariff and the pool premium and their replacement with a system based on a remuneration per unit of installed capacity calculated according to an "*efficient*" standard plant of the type at issue frustrated Claimants' legitimate expectation. First, the uncontradicted evidence produced in the record and administered at the Hearing shows that Claimants relied on the values of the regulated tariff and of the pool plus premium (colloquially dubbed the "*FiT*" by Claimants' witnesses at the Hearing). It is clear that Claimants forecasted that these values would not change for the lifespan of the plants. For the reasons mentioned above, the Tribunal finds this expectation reasonable and legitimate.

---

[629] See Claimants' *Investment Paper*, **C-0560**, on p. 41: "*While the Spanish authorities allow CSP plants to generate up to 15% of power from natural gas, there is no guarantee that this percentage will stay the same for the duration of the life of the project. Speaking to Lahmeyer and industry stakeholders, there is a residual risk that the level may either be reduced, as it may be considered too generous.*"
[630] See EPA 2013, at Article 26(3), **C-0311t**.
[631] See the joint letter of Accuracy and Brattle quantum experts dated 19 July 2017, on pp. 2 and 3.

454.  Second, it is clear that the change enacted by the Measures at Issue is significant. The abrogation of the feed-in remuneration system and its replacement with the "*specific remuneration*" under the EPA 2013 caused Claimants significant losses of up to €38 million (slightly higher than the value of Claimants' investment).[632]

455.  For these reasons, the Tribunal is of the view that Respondent breached its FET obligation under Article 10(1) by frustrating a legitimate expectation held by Claimants that future regulatory changes would not affect the CSP producers' right to receive the pool price premium set out at RD 661/2007 and reiterated by RD 1614/2010.

456.  Given this finding, the Tribunal does not find it useful to rule on Claimants' alleged expectation of consistency. Doing so would not yield a different quantum of damages since Claimants' arguments with respect to the violation of its alleged reasonable expectation of consistency could not serve to vindicate the rights (or entitlements) that the Tribunal decided to exclude from the quantum calculation for the reasons outlined at para. 452, above.

### iii.   The alleged violation of Respondent's duty of transparency and due process

#### a)   The Parties' Positions

457.  **Claimants** – The Claimants allege that the adoption of the Measures at Issue was marred by a number of irregularities that had the effect of violating the investors' right to be heard on the proposed changes and plunged the entire CSP sector into a period of harmful uncertainty as to the remuneration to be received by CSP plants.

458.  In conducting itself as it did, the Respondent allegedly failed in its obligation – encompassed within the scope of the FET standard – to be forthcoming with information regarding upcoming regulatory changes so to allow investors an opportunity to plan accordingly.[633]

459.  The Claimants fault the Respondent for allegedly disregarding and subsequently concealing from the public and the industry certain critical reports issued by two consulting firms – Boston Consulting Group ("**BCG**") and Roland Berger ("**RB**") – that were retained to advise the MINETUR on the envisaged reform.[634] The Claimants argue that Respondent persisted in its secretive conduct even in the course of this arbitration, allegedly violating an order by the Tribunal to disclose spreadsheets showing financial models exchanged between BCG and the IDEA that formed the basis of the new remunerative parameters. The Claimants ask the Tribunal to draw a negative inference from this conduct as regards the substance of the Measures at Issue, and to find that

---

[632] See the quantum experts' joint model dated 20 November 2017.
[633] See Cl. Reply, on pp. 370 and 371; See also *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, (**CL-0001**) and *Electrabel* (**RL-0005**), at para. 7.79.
[634] See Cl. Reply, on pp. 374 and following.

Respondent "*lowered arbitrarily the remuneration parameters for standard installations.*"[635]

460. The Claimants also complain of excessive delays in the implementation of the regulatory reform. For example, Claimants say that Respondent took nearly two (2) years to complete the new regulatory framework, between the beginning of the legislative reform in December 2012 (with the adoption of Act 15/2012)[636] and its completion in the summer and fall of 2014 (with the adoption of a set of ministerial orders, including MO IET/1045/2014[637] which established the new "*reasonable*" rate of return).[638]

461. According to Claimants, during this so-called "*inter-regnum*" period, CSP producers in Spain allegedly operated without knowing what their exact remuneration would be. Worse, Claimants say that further similar periods of uncertainty are likely in store, given that the new regulatory framework provides for Spain's discretion to conduct periodic reviews every 3 to 6 years.[639]

462. Other purported irregularities raised by Claimants include: Respondent's decision to implement some of the Measures at Issue through Royal Decrees and Royal Decree Laws, thus "*bypassing*" Parliament; the excessive amendments enacted to the EPA of 2013;[640] the excessive volume of a ministerial order that established key remuneration parameters under the new regulatory regime (i.e. MO IE/1045/2014 which purportedly contains 1,539 pages).[641]

463. **Respondent** – The Kingdom of Spain submits that the regulatory reform at issue was announced as early as December 2011 in a speech by the then president-elect, Mr. Mariano Rajoy.[642] This was followed by periodic announcements that provided increasing details regarding the proposed changes.[643]

464. Respondent argues that the enactment of the Measures at Issue complied with all relevant public consultation procedures provided by Spanish administrative law. More importantly, Respondent submits that the various actors in the CSP sector were given an opportunity to participate in consultations in regard to every aspect of the Measures at Issue. For example, Respondent points out that the first draft of RD 432/2014 contains hundreds of submissions from CSP producers, which were considered by the MINETUR as part of subsequent drafts of that royal decree.[644] Respondent produced evidence showing that the industry association Protermosolar filed pleadings with the MINETUR on key elements of the Measures at Issue. Respondent's witness on the enactment of

---

[635] Cl. Reply, at paras. 685 and 686.
[636] **C-0309t**.
[637] **C-0321t**.
[638] Cl. Mo-M, at paras. 1227 and following. See in particular para. 1232.
[639] Cl. Mo-M, at para. 1235.
[640] See Cl. Mo-M, at paras. 1213 and following.
[641] Cl. Reply, on p 379.
[642] Res. Co-Mo, at paras. 789 and following; see also **R-0117t**.
[643] *Ibid.*, at para. 789.
[644] See Resp. Rejoinder, at paras. 1399 and 1400.

the Measures at Issue, Mr. Carlos Montoya, also testified that companies related to the entities that own the Morón and Olivenza 1 plants participated in the consultation process by submitting "*claims*" regarding the various proposed regulatory enactments.[645]

465.    As regards the use of a royal decree (rather than legislation) to enact certain aspects of the regulatory reform, the Respondent pleads the urgency of the Measures at Issue and invokes a ruling of the Constitutional Court ratifying the method chosen.[646]

466.    Respondent also submits that it was not bound (and indeed was prevented, by confidentiality obligations) to disclose the preliminary drafts of the RB and BCG reports. It says that the final RB report was only issued after the completion of the regulatory reform and that a final BCG report was never issued given that BCG's mandate was prematurely terminated.[647]

467.    Finally, the Respondent says the voluminous nature of some of the ministerial orders at issue and the delays in completing the regulatory reform were warranted by the comprehensive nature of the reform and the complexity of the underlying subject matter.[648]

### b)    Relevant Authorities

468.    It is noted that, to the Tribunal's knowledge, there exists no published arbitral award involving Spain, solar investors and the recent regulatory changes that addresses an alleged breach by Spain of its transparency and due process obligations under the FET standard in respect of the adoption of the Measures at Issue.

### c)    Discussion

469.    The Parties seem to agree[649] and the Tribunal accepts that the FET standard encompasses an obligation by the host state to be "*forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations.*"[650]

470.    After carefully reviewing the evidence presented by the Parties, however, the Tribunal does not agree with Claimants that Respondent breached this obligation.

471.    The Tribunal is satisfied that the enactment of the regulatory reform was announced sufficiently in advance to allow the CSP sector investors and actors to react. The Tribunal is also satisfied that the consultation process was carried out in accordance with Spanish administrative law. Though this does not – in itself – necessarily entail

---

[645] See Resp. Rejoinder, at para. 1400.
[646] *Ibid.*, at paras. 1403 and following. See also Judgment of the Constitutional Court of 17 December 2015 (**R-0076t**).
[647] See Resp. Rejoinder, at paras. 1408 and following.
[648] *Ibid.*, at paras. 1393 to 1396.
[649] See Resp. Co-Mo, at para. 823 and Cl. Reply, at para. 1171; *Electrabel* (**RL-0005**), at para. 7.79.
[650] *Electrabel* (**RL-0005**), at para. 7.79.

conformity with the transparency obligation under the FET standard, the Tribunal is satisfied in this case that the CSP sector in general, as well as the industry association (Protermosolar) and an entity related to the Morón and Olivenza 1 plants in particular, in fact participated in the consultative process by submitting observations and requests to MINETUR.

472.    The outcome of this process – i.e., the enactment of the Measures at Issue – was contrary to Claimants' hopes and indeed to their expectations of stability (as detailed above, at Sections VI.B.i and III.B.ii of the present Award). However, in the Tribunal's view, the process itself did not run afoul of Spain's obligations under the FET standard. Spain could have decided, for political reasons or for other considerations, to provide for greater participation by industry actors in the reform process. It could have opted for broader and earlier disclosure of the documents and information upon which it based the regulatory reform, including the various RB and the BCG reports. But in the Tribunal's view, the announcements and the consultation process in place, imperfect though they may have been, provided the CSP producers and investors with ample opportunities to be heard, to react to the changes at issue, and to "*engage the host state in dialogue about protecting* [their] *legitimate expectations.*"[651]

473.    Given the Tribunal's finding regarding the violation of the FET standard (see Section VI.B.ii.c. of the present Award), the Tribunal is therefore of the view that the Claimants' request for negative inferences on the arbitrariness of the *substance* of the Measures at Issue has become moot.

474.    For all these reasons, the Tribunal is of the view that Respondent did not breach its duty of transparency and due process towards Claimants.

475.    In any event, even if the Tribunal were to find a breach, the Claimants acknowledged that they could not quantify a direct and distinct prejudice arising from the so-called "*inter-regnum period*" that allegedly spanned the period between the first salvo of measures enacted in the fall of 2012 and those adopted in the fall of 2014.[652]

### C.    THE OTHER GROUNDS OF LIABILITY ASSERTED UNDER ARTICLE 10 ECT

476.    Apart altogether from their claim for violation of the FET standard, Claimants advance three (3) further claims under Article 10 ECT, alleging that Respondent:

i)    breached the "*umbrella obligation*" set out at Article 10 ECT *in fine*, by enacting the Measures at Issue in violation of various legal obligations of a contractual nature entered into with the CSP sector;[653]

---

[651] *Electrabel* (**RL-0005**), at para. 7.79
[652] See Claimants' PHB, at para. 45.
[653] See Cl. Mo-M, on pp. 306 and following.

    ii)    failed to provide Claimants' investment the most constant protection and security ("**MCPS**");[654] and

    iii)    failed to provide Claimants' investment with protection against impairment by "*unreasonable*" or "*discriminatory*" measures.[655]

477.    The Tribunal is of the view that these claims effectively seek relief for the same acts as give rise to Claimants' cause of action under the FET standard, i.e. the abrogation of the Original Regulatory Framework, the adoption of the Measures at Issue and the impact of these regulatory changes upon Claimants' investment. The Tribunal views these claims as less suitable approaches by which to analyse and resolve the Claimants' overall case than the analysis under the FET standard carried out above at Section VI.B, which has the advantage of fully resolving the case asserted by Claimants under Article 10 ECT. Given considerations of procedural economy, and in keeping with the observations of other investor-state arbitration tribunals in this regard,[656] the Tribunal considers that it need not address issues that are not essential to its decisions.[657]

478.    Even if it were to rule on these other claims (which it expressly refrains from doing), the Tribunal would likely be inclined – much like the tribunal in *Novenergia*, it appears[658] – to hold that Claimants' MCPS and non-impairment claims are effectively "*further illustrations*" of the FET standard which would not modify the compensation owed for the violations of that FET standard. That is, the decision that Claimants violated the FET renders these claims moot. As regards the "*umbrella obligation*" claim, the Tribunal notes – again, in keeping with the views of the tribunal in *Novenergia* – that such a claim may well require demonstration of a personal obligation entered into by Respondent towards Claimants or their investments. Here, however, the Respondent's actions, enactments and representations were directed generally at the entire Spanish CSP sector, ***not*** directly or personally towards Claimants or their investments.

### D.    THE EXPROPRIATION CLAIM

479.    Notwithstanding the foregoing, the Tribunal feels compelled to address Claimants' expropriation claim under Article 13 ECT, if only because Claimants submit that the Tribunal has jurisdiction to rule upon the TVPEE under Article 13 ECT, which it otherwise lacks under Article 10 ECT.[659] If the Claimants' submissions in this regard are accepted, the expropriation claim – if granted – could change the assessment of the quantum of damages owed to Claimants. This said, for the following reasons, the Tribunal is inclined to dismiss Claimants' expropriation claim.

---

[654] *Ibid.*, on pp. 272 and following.
[655] *Ibid.*, on pp. 273 and following.
[656] *Eiser* (**CL-0242**), at para. 54; see also *Micula*, at para. 874.
[657] *Eiser* (**CL-0242**), at para. 54.
[658] See *Novenergia* (**CL-0245**), at paras. 713 and following.
[659] See above, section **IV.B.** of this Award.

### i.    The Parties' Positions

480.  **Claimants** – The Claimants argue that, under Article 13 ECT, the abrogation of the Original Regulatory Framework and the enactment of the Measures at Issue constitute a creeping (or indirect) and illegal expropriation of their investment in the Morón and Olivenza 1 plants.

481.  Claimants submit that the Measures at Issue drastically reduced the flow of income of the two (2) plants and resulted in a "*substantial deprivation*" of their investment – the standard to be applied in assessing the existence of an expropriation.[660]

482.  Claimants acknowledge that the Measures at Issue did not deprive them of their property rights over the shares and the debt obligations they hold (directly or indirectly) in the entities that own and operate the plants.[661] They argue, however, that the implementation of the new regulatory regime "*neutralized*" the benefit of those shares and debt obligations,[662] by impairing their ability to manage the plants (an ownership attribute attached to their investment) and depriving them of the enjoyment of the property of their shares and debt obligations.

483.  Claimants contend that the new regulatory framework affected the financial stability of the two plants to such an extent that Claimants were forced to devote almost the entirety of their efforts to avoiding a default under the plants' financing agreements,[663] making it impossible for them to manage the plants "*normally*".[664]

484.  Claimants further submit that the Measures at Issue directly caused a dilution of their shareholding interest in the entities that own and operate the plants, from 16% to 14.81%, and a reduction in their subordinated debt interest in those same entities by 93%.[665] Claimants say both entities teetered on the brink of bankruptcy – the Morón plant remaining in a "*cause of dissolution*" as at the date of filing of Claimants' Reply – thereby preventing the plants from issuing a dividend in the "*foreseeable future.*"[666]

485.  Finally, Claimants submit that none of the exceptions provided for at Article 13 ECT, paras. (a) to (d) is met, such that the purported indirect expropriation of their investment is illegal.[667]

486.  **Respondent** – Respondent does not seem to disagree with the standard applicable to assess whether an expropriation occurred, i.e. a "*substantial deprivation*" of the Claimants' investment. The Respondent counters, however, that the Claimants' case

---

[660] Cl. Mo-M on p. 291; Cl. Reply, on p. 285.
[661] Cl. Reply, on p. 278.
[662] See Cl. Mo-M, on p. 285.
[663] Cl. Mo-M, on pp. 291 and 292.
[664] Cl. Reply, on pp. 285 and following.
[665] Cl. Reply, on p. 287; see also *supra* at paras. 89 and 90.
[666] See Sausmikat WS-1, at paras. 64 *et seq.*
[667] Cl. Reply, on pp. 277 to 285.

discloses no property or right that may be subject to expropriation[668] and that, in any event, Claimants failed to demonstrate that they have been "*substantially deprived*" of their investment.[669]

487. Respondent argues that Claimants do not have an ownership right over the expected return of their investment in the Morón and Olivenza 1 plants, which is not "*appropriable property*" that can validly form the object of an expropriation claim.

488. Relying on *Electrabel* v. *Hungary*,[670] Respondent also submits that Claimants failed to meet the "*substantial deprivation*" test, which requires the demonstration of a loss of "*all significant economic value.*"[671] According to Respondent the Claimants would have had to show that the plants have become "*financially worthless.*"[672]

489. Respondent points out that the plants remain in operation, in the possession and under the control of the Claimants.[673] Respondent argues that the investors maintain the capacity to administer the plants, as was abundantly shown when Claimants steered the plants through the alleged financial troubles caused by the changes in the Original Regulatory Framework.[674] Respondent also points out that Claimants remain entitled to earn a profit on their initial investment even after the enactment of the Measures at Issue.[675]

490. Finally, and in any event, Respondent submits that, even if the Tribunal were to consider the Measures at Issue as an expropriation, such an expropriation would be justified – that is, legal – under Article 13(1)(a) to 13(1)(d) of the ECT.[676] Respondent argues that the Measures at Issue furthered the public interest in rebalancing the tariff deficit; were not discriminatory since they apply equally to all CSP producers as part of a reform that targets all renewable energy producers alike; and are reasonable and proportional since the renewable energy producers remain entitled to keep a profit of approximately 7% over and above their capital expenditures and operating costs.[677]

### ii. Relevant Authorities

491. ***Charanne*** – In *Charanne*, the tribunal dismissed an expropriation claim by Dutch investors arising from Spain's overhaul of the remunerative regime applicable to photovoltaic producers in 2010.

492. The tribunal recognized that the expropriation provisions of the ECT protect investments but held that this protection does not extend to the "*return on investment*" expected by

---

[668] Resp. Co-Mo, on pp. 264 and following.
[669] *Ibid.*, on pp. 270 and following.
[670] *Electrabel* (**RL-0005**).
[671] Resp. Co-Mo, on pp. 265 and following.
[672] *Ibid.*
[673] *Ibid.*, on pp. 270 and following.
[674] *Ibid.*
[675] *Ibid.*
[676] Resp. Co-Mo, on pp. 263 and following.
[677] *Ibid.*

the investors.[678] The *Charanne* tribunal held that the subject of claimants' investment in that case was not the returns expected, but rather the legal entities operating the plants. For the purpose of the expropriation analysis, the tribunal held that the property protected against expropriation is made up of claimants' shares in those plants; and the question guiding the tribunal's assessment of expropriation centered on the investors' rights as a shareholder.[679] The tribunal held that a finding of expropriation requires the "*destruction of value*" of the investment.[680]

493.  No such destruction occurred in *Charanne*, the tribunal held, since the claimants retained the property of the shares and – although the decrease in profitability *could entail serious consequences* – the plants would continue to earn a return of 6.72% or higher.[681]

494.  **Isolux** – In *Isolux*,[682] the tribunal also dismissed an expropriation claim brought by Dutch investors in Spain's photovoltaic sector.

495.  The tribunal held that Article 13(1) ECT protects the investments of foreign investors who invested in Spain's renewable energy sector, including the indirect shareholding interest in renewable energy plants.[683] However, the *Isolux* tribunal determined that the criteria for showing indirect expropriation could only be met if the measures at issue in that case were shown to have caused a "*substantial and significant*" decrease in the economic value of the investment:[684] "[T]*hat is to say, the impact on the rights or goods of the investor (…) must be of such magnitude that its investment loses all or a significant part of its value, which amounts to a significant deprivation of its property.*"[685]

496.  The *Isolux* tribunal held that the investors had failed to make such a showing, given that they continued fully to control and operate the plants, the current profitability of which was actually greater than under the original regulatory framework.[686]

497.  **Eiser** – As noted above, the tribunal in the *Eiser* case[687] chose not to address the investors' expropriation claim for reasons of "*judicial economy*" and in particular given that the tribunal had already decided to grant claimants' claim under the FET standard.

---

[678] *Charanne*, at para. 459.
[679] *Ibid.*, at para. 460: "*Consequently, in order to determine if there was an indirect expropriation, the Tribunal must examine if the disputed measures had the effect of depriving the investor, in full or in part, of its rights as a shareholder in T-Solar.*"
[680] *Ibid.*, at para. 464.
[681] *Ibid.*, at para. 466.
[682] *Isolux* (**RL-0107t**).
[683] *Ibid.*, at paras. 833 and 834.
[684] *Ibid.*, at para. 835.
[685] *Ibid.*, at para. 839.
[686] *Ibid.*, at paras. 840 and following.
[687] *Eiser* (**CL-0242**).

InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain

**AWARD**

ICSID Case No. ARB/14/12

498. ***Novenergia*** – In *Novenergia*,[688] the tribunal dismissed an expropriation claim by a Luxembourgish investor who had challenged the Measures at Issue as applicable to the photovoltaic industry.

499. In the context of its assessment of Respondent's alleged breach of the FET standard, the *Novenergia* tribunal ruled that the impugned regulatory changes constituted a "*substantial deprivation*" of claimant's investment,[689] viewed from the perspective of a 24% to 32% decrease in revenues of the photovoltaic plants and a correlative drop in the claimants' profits.[690]

500. The *Novenergia* tribunal applied the same criterion (i.e. "*substantial deprivation*" of claimant's investment) to assess the expropriation claim, but chose to do so from the perspective of the investors' property rights.[691] The Tribunal ruled that the investors' ownership rights in the photovoltaic plants and in the shares of the entities that operate them were left unaffected by the impugned measures,[692] even though the underlying assets diminished in value.[693]

501. In that case – as here – claimant retained ownership and control of its assets, its plants remained operational and those plants were expected to generate a certain profits over their operational lifetime, even though that profit was significantly lower than what the claimant had initially expected.[694] As a result, the tribunal in *Novenergia* ruled that the investors failed to prove an expropriation case.

### iii.   Discussion

502. Article 13(1) ECT provides: "*Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having the effect equivalent to nationalisation or expropriation (…) except where such Expropriation*" meets one of the conditions provided at Articles 13(1)(a) to 13(1)(d).[695]

503. The Tribunal subscribes to the analysis of the *Charanne* tribunal and will therefore assess whether an expropriation has occurred from the perspective of the rights of Claimants as shareholders and debt holders in the Morón and Olivenza 1 entities.

504. There seems to be no disagreement between the Parties that the standard of "*substantial deprivation*" is applicable to determine the existence of an expropriation purportedly brought about by the Measures at Issue. The Tribunal will therefore apply

---

[688] *Novenergia* (**CL-0245**).
[689] *Ibid.*, at para. 695.
[690] *Ibid.*
[691] *Ibid.*, at paras. 759 and following.
[692] *Ibid.*
[693] *Ibid.*, at paras. 762 and 763.
[694] *Ibid.*
[695] ECT (**RL-0001**), at Art. 13.

that standard, as articulated in *Electrabel* v. *Hungary,*[696] to assess whether, in the present case, the impugned regulatory changes constitute an expropriation.

505. In this regard, the tribunal in *Electrabel v. Hungary* stated that: "(...) *in both direct and indirect expropriation, consistently albeit in different terms, the requirement under international law for the investor* [is] *to establish the substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment.*"[697] [Emphasis added]

506. For the following reasons, the Tribunal is of the view that Claimants have not met this standard and that their expropriation claim must fail.

507. First, Claimants have clearly maintained control over their investment. This is evident from the fact that Claimants admittedly oversaw the restructuring process that helped steer the plants through the aftermath of the adoption of the Measures at Issue. Their shareholding and debt interest may have been diluted as a result of the restructuring, but that was at least in part the consequence of Claimants' decision to engage with the restructuring measures. The Tribunal observes in this regard that Claimants' decision to dedicate time, effort and resources to the restructuring effort is an implicit recognition that the investment maintained some value to them, despite the overhaul of the Original Regulatory Framework.

508. Second, and unlike the factual scenarios prevailing in certain of the cases concerning indirect (or "*creeping*") expropriation relied on by Claimants,[698] the plants at issue remain operational. Indeed, the new regulatory regime is premised upon the proposition that – in principle – the Plants should earn a return on investment of 7.4% before taxes, and, by Respondent's experts' own reckoning that the Plants will earn a return on investment of 6.2% before taxes.[699]

509. Third, and most importantly, Claimants will continue to benefit from their investment, if only marginally so. The calculations and forecasts of Claimants' damages experts show that, even after the adoption of the Measures at Issue, the investments in the CSP plants retain some value[700] and that some measure of free cash flows will be available to the investors throughout the first 25 years of operation.[701] Respondent's experts forecast an actual return on investment of 6.2% pre-tax.[702] Both forecasts are significantly lower than the rate of return that Claimants expected. In the Tribunal's view, however, although this decrease in value may constitute a violation of Claimants' legitimate expectations in

---

[696] *Electrabel* (**RL-0005**).
[697] *Ibid.*, at para. 6.62.
[698] See in particular *Metalclad Corporation* v. *United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, (**CL-0054**).
[699] Testimony of Mr. Saura at the Hearing on the Merits, Transcript, Day 5, on p. 16.
[700] See Cl. Mo-M, at para. 1324.
[701] See **CER-1**, on pp. 64 and 68.
[702] Testimony of Mr. Saura at the Hearing on the Merits, Transcript, Day 5, on p. 16

the circumstances, it does not constitute an expropriation of Claimants' shareholding or debt interest.

### E. DAMAGES

#### i. Overview

510. Both Parties seem to agree that, should the Tribunal find Respondent in breach of the ECT, compensatory damages represent the appropriate remedy to compensate the harm suffered by Claimants as a result, if any. Claimants argue – and Respondent does not disagree – that the principle of full compensation set forth in the *Chorzów Factory* case[703] must then apply:[704]

> "*The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe-out [sic] all the consequences of the illegal act and re-establish the situation as if it had not been committed.*"[705]

511. This said, the Parties disagree widely on almost all conceptual and economic elements underlying the assessment of Claimants' harm and the quantum of compensatory damages. On the most fundamental level, the Parties disagree regarding the appropriate method to assess Claimants' damages.

512. Claimants and their experts propose a DCF method, based on the free cash flows lost by the CSP plants at issue and the correlative decrease in Claimants' returns as a result of the enactment of the Measures at Issue. This method forecasts the free cash flows that the CSP plants would have generated during their operational lifetime *but for* the enactment of the Measures at Issue, and discounts those cash flows back to a pre-established evaluation date. The DCF method is premised on the construction of a hypothetical "*but for*" scenario and of an "*actual*" scenario, on an assessment of the variation between the two and on the application of a series of discount factors based on market risk and the time value of money. Relying on this method, the Claimants' experts opined that the enactment of the Measures at Issue caused Claimants to incur damages in the amount of **€75.7 million**.[706]

513. Respondent and its experts propose principally a regulated asset base ("**RAB**") method, based primarily on the variation between the value of the underlying assets of the CSP plants *before* and *after* the enactment of the Measures at Issue. This method is based on the premise that the investors' sole entitlement under the Original Regulatory

---

[703] *Chorzów Factory Case (Germany v. Poland)*, Judgment on the merits, PCIJ Series A, No. 17 September 13, 1928 (**CL-0128**), ("***Chorzów***").
[704] See Cl. Mo-M, at paras. 1286 to 1304; *cf.* Resp. Co-Mo, on pp. 285 and following and Resp. Rejoinder on pp. 353 and following.
[705] *Chorzów* (**CL-0128**).
[706] **CER-4**. The quantum experts presented by Claimants initially assessed damages in the amount of **€74 million** in their first report on quantum dated 19 May 2015 (**CER-2**) but reviewed that estimate in October 2016 to account for the impact of the restructuring incurred in the interim.

Framework was a remuneration that covered the plants' capital expenses, operating expenses and yielded a "*reasonable return*" on the initial investment. Applying this method, Respondent's experts concluded that the Claimants did not suffer any prejudice – they opined that the Measures at Issue maintained a remuneration that covered the plants' capital and operating expenses and provided Claimants with a reasonable return on their investment.

514. In the alternative to the above assessments, both Parties' experts also engaged with their counterparts' preferred evaluation method, Respondent's experts undertaking a subsidiary DCF evaluation and Claimants' a subsidiary RAB evaluation.

515. Pursuant to Respondent's subsidiary DCF assessment, the enactment of the Measures at Issue caused Claimants to incur damages in the amount of €7.7 million.[707] Applying a subsidiary RAB method, Claimants' experts opined that Claimants' damages are in the range of €50 to €57 million.[708]

516. The inconsistent results of the experts' respective principal and subsidiary assessments is explained by the fact that the disagreement between them also touches on the very different values they each ascribe to the many variables inputted into their DCF and RAB analyses to build the "*but for*" and "*actual*" scenarios, and the discount rate, among others.

517. Given this wide-ranging disagreement and the need to render the damages analysis sensitive to the Tribunal's findings on the issue of breach of ECT, the Tribunal – with the permission of the Parties – asked the experts to prepare a joint interactive quantum model (the "**Joint Model**") that would:

- Identify the issues in contention as regards the determination of quantum;

- Allow the Tribunal to assess the impact on the damages calculation (measured in €) of the Tribunal's decision in respect of each of the changes to the Original Regulatory Framework brought about by the Measures at Issue that Claimants contend constitutes a breach of the ECT (by "*toggling*", so to speak, between "*no breach/no liability/no damages*" on the one hand, and "*breach/liability/damages*" on the other);

- Allow the Tribunal to assess the impact on the damages calculation of a decision in respect of each of the disputed assumptions and other variables factored into the Parties' quantum calculations (by "*toggling*" between the Parties' respective positions regarding these factors).

---

[707] This is Respondents' subsidiary DCF assessment presuming that the plants' installed capacity does not exceed 50 MW in actual fact, in keeping with the Tribunal's finding above. See in this regard **Accuracy Q-ER-1**, on pp. 11 and following.

[708] See in this regard **CER-4**, on pp. 68 and following.

518. The Joint Model was submitted by the Parties' experts on 20 November 2017, followed by comments and additional submissions on damages filed by the Parties on 4 December 2017.

519. As discussed at paras. 452 to 454 above, the Tribunal has determined that the abrogation of the *pool-price plus premium* element of the Original Regulatory Framework by the Respondent and the imposition of a *fixed term for the remunerative regime* constituted breaches of Claimants' legitimate expectations,  and hence a breach of the ECT in the circumstances, but that the bulk of the other changes effected by the Measures at Issue – the withdrawal of special remuneration for the energy produced with non-renewable fuel; the abrogation of the supplement for reactive energy; the updating of the CPI index; the right to receive remuneration for the full amount of electricity produced; and the right to priority access to the distribution grid – do not. As well, the Tribunal has determined that it does not have jurisdiction to rule on the TVPEE claim. It is therefore only the impact of certain elements of the Measures at Issue that must be assessed when calculating Claimants' damages, which the Joint Model permits the Tribunal to do by switching "*on*" or "*off*" the toggle for each element.

520. The only outstanding matters of contention between the Parties and their experts that the Tribunal must resolve to rule on the quantum issue are the following:

- Whether the DCF method or the RAB method is most appropriate for calculating Claimants' damages?

- If the DCF method is to be preferred, what value should the Tribunal ascribe to the variables regarding the "*Regulatory Risk Premium*" and the "*Date of Valuation*" factored into that model?

  - If the RAB method is to be preferred, what value should the Tribunal ascribe to the variables regarding "*Levelized Cost/Investment Base*," "*After-tax Target Return*" and "*Discount Rate for Actual Scenario*"?

  - Regardless of the evaluation method chosen, what value should the Tribunal ascribe to the following variables common to both methods: "*Plant Lifetime*"; "*Liquidity Discount*"; "*Production"; "Management Costs*"; "*InfraRed Share Dilution*"; "*Value of Debt*"?

521. For the following reasons, the Tribunal is of the view that the DCF evaluation method is to be preferred. As regards the variables used in evaluating damages under that method, the Tribunal is of the view that the evaluation should assume a 25-year lifetime for the plants at issue, the lost cash flows for that period should be evaluated as at December 2014 and "*Production Assumption*" should be toggled to the value proposed by Respondent's experts; for the rest, the Tribunal is inclined to prefer the assumptions proposed by Claimants' experts.

### ii.   Valuation Method

#### a)   The Parties' Positions

522. **Claimants** – Relying on the opinion of their quantum experts, the Brattle Group ("**Brattle**"), Claimants submit that the DCF method is the most appropriate means of assessing their damages because the revenues and expenses of the Morón and Olivenza 1 plants are easy to calculate and to forecast. Brattle opines that the DCF method has become a standard practice for valuing investments in power plants.[709] In this case, they say, it allows for the most accurate modelling of the impact of the enactment of the Measures at Issue on the plants' cash flows:[710]

> "*DCF analyses have become the primary valuation tool due to the reliability of projecting future cash flows. Power stations have a relatively simple business, producing electricity, whose demand and long-run value can be analyzed and modeled in detail based on readily available data. Moreover, the costs and operating performance of power stations are easy to predict. The relative ease in predicting cash flows exists even for power plants not yet or recently completed and without a significant history of operating performance. In such circumstances, the cash flow forecasts can rely on well-established technical design parameters.*"[711]

523. Claimants and Brattle also submit that the DCF method has become a standard tool used in international commercial arbitration to value the impact of international law breaches on the value of a going concern.[712] This is so, they say, due to the accuracy with which a DCF method can identify and isolate the economic impact of a specific breach on the business's free cash flows – and hence the amount of the financial losses caused by that breach.

524. Replying to the critique levelled against the DCF method by Respondent, the Brattle experts state that the plants at issue present an operational track record of sufficient duration (three (3) years of operation when the Claimants' quantum report was filed and five (5) years by the time of the hearing) to allow for the construction reliable forecasts.[713] Claimants' quantum experts further opine that any uncertainty regarding the forecasts inherent in a DCF approach can be – and is in fact – reflected and accounted for by the application of appropriate discount factors.[714] As regards what Respondent contends are the overstated results yielded by Brattle's calculations, Brattle acknowledges the implied 76% premium between the book value and the market value of the investment in the "*but for*" scenario:[715] this premium is normal, it says, given the favourable

---

[709] **CER-2**, on pp. 16 and 17.
[710] *Ibid.*, on p. 16.
[711] *Ibid.*, at para. 46.
[712] See Cl. Reply, at paras. 1282 and following.
[713] **CER-4**, on p. 28.
[714] *Ibid.*, at para. 87.
[715] *Ibid.*, on p. 35.

resolution of the construction risk and the decrease in interest rates that rendered the remuneration provided for in the Original Regulatory Framework all the more valuable after 2012.[716] The same can be said for the internal rate of return (IRR) of 36.7 % implied in the Brattle DCF model, which is admittedly higher than the Claimants' expected return (15.5 %) but is nonetheless reasonable given the favourable resolution of the construction risk and the low rates of return at the evaluation date.[717]

525. **Respondent** – As a matter of principle, Respondent argues, in reliance upon the opinion of its quantum experts, Accuracy Asesores de Empresa S.A.U. ("**Accuracy**"), that the damages claimed by Claimants are so speculative as to be incapable of evaluation, and still less of a DCF evaluation. Respondent submits that the plants at issue did not benefit from a <u>guaranteed</u> income stream, nor were the specific values that formed part of the remuneration scheme established in RD 661/2007 "*frozen*". In Respondent's view, this renders useless any model based on a "*but for*" scenario constructed in reliance on those values.[718]

526. Respondent also claims that the DCF method is ill-adapted to the specificities of the present case: as demonstrated by Accuracy, CSP technology is too immature and the track-record of the Morón and Olivenza 1 plants too short to allow for a reliable DCF assessment.[719]

527. Respondent and its experts also state that Brattle's DCF calculation is speculative and unreliable, as demonstrated by the fact that it yields so-called damages that grossly exceed both the plants' net worth as reflected in their book value and the Claimants' actual investment expectations. Accuracy points out that the "*but for*" scenario in Brattle's DCF analysis results in an implicit book-to-market ratio of 76 %, which means that Brattle's assessment is 76 % higher than the book value declared in the plants' financial statements.[720] Similarly, Accuracy points out that Brattle's "*but for*" scenario discloses an implicit IRR of 36.7 %, which is more than double the Claimants' expected return on investment.[721]

528. Respondent also argues that the result of the DCF assessment is tributary to "*macroeconomic conditions, which are not related to the Disputed Measures.*"[722] Respondent cites a variation of €26 million in the quantum when shifting the date of valuation from December 2012 (as proposed by Respondent) to June 2014 (as proposed by Claimant), presuming all other assumptions and variables remain unchanged.[723]

---

[716] *Ibid.*, on p. 36.
[717] *Ibid.*, on p. 37.
[718] Resp. Rejoinder, at paras. 1714 and following.
[719] See also **Accuracy Q-ER-1**, at paras. 512 and following.
[720] Resp. Rejoinder, at para. 1732. See also **Accuracy Q-ER-1**, at paras. 433 and following.
[721] Resp. Rejoinder, at para. 1736. See also **Accuracy Q-ER-1b**, at paras. 410 and following.
[722] Respondent's Comments on the Quantum Joint Model, 4 December 2017, at paras. 10 and following.
[723] *Ibid.*

529. Respondent proposes instead the RAB method, which evaluates the underlying assets based on the costs of construction of the plants plus a reasonable return that may accrue to investors from the remuneration flowing to the plants.[724] According to Respondent, this method allows the Tribunal to assess the plants' fair market value before and after the enactment of the Measures at Issue. Respondent argues that since the Measures at Issue did not alter the underlying value of the assets, and since the remuneration received by the plants covers the construction costs and provides investors with a "*reasonable*" return, Claimants' investments did not suffer any legally cognisable harm:

> "*538. Given that the current Spanish regulation specifically offers a reasonable return on the capital invested, the FMV of a typical facility has not been altered and therefore, <u>there cannot be any claimable financial impact</u>.*"[725]

> [Emphasis added]

### b)   Relevant arbitral authorities

530. **Eiser** – In *Eiser,*[726] the Tribunal was similarly asked to choose between the DCF approach proposed by the claimant and the RAB approach proposed by the respondent. The tribunal opted for the DCF approach presented by claimants' experts (also Brattle in that case). The *Eiser* tribunal invoked arbitral practice and what it considered a consistent application of the DCF model in international investment cases to value the adverse impact of government action on a business operating as a going concern.[727] The tribunal dismissed the concerns raised by Spain and its  experts regarding the alleged unreliability of the DCF model arising from disputed economic assumptions, among other factors.[728] The tribunal acknowledged that certain of the assumptions used by Brattle to construct the DCF model differed from the tribunal's findings on liability. The tribunal nonetheless found that the model provided "*a reasoned and reasonable indication of the losses incurred by Claimants* (…).*"[729] [Emphasis added] The tribunal compared the amount awarded as damages in reliance on that model (€128 million) with the amount initially invested by claimants (€126 million), and found that the commensurability between the two served as a "*reality check*" confirming the reasonability of the DCF method.[730]

531. **Novenergia** – As did the *Eiser* tribunal, the tribunal in *Novenergia* also accepted the DCF assessment proposed by claimants and their experts (in that case, Compass Lexecon). The *Novenergia* tribunal held that the DCF method is a preferred method of valuation for "*income-earning assets*" and that it is consistently applied by arbitral tribunals to assess the value of going concerns impaired by government regulations.[731]

---

[724] **Accuracy Q-ER-1**, at paras. 525 and following.
[725] *Ibid.*, at para. 538.
[726] *Eiser* (**CL-0242**).
[727] *Ibid.*, at para. 465.
[728] *Ibid.*, at paras. 467 to 470.
[729] *Ibid.*, at para. 473.
[730] *Ibid.*, at para. 474.
[731] *Novenergia* (**CL-0245**).

The *Novenergia* tribunal also ruled that the DCF method is particularly well-suited for assessing regulated businesses with an income stream that derives principally from a legislative and regulatory remunerative framework.[732] As regards the details of the DCF calculation, the *Novenergia* tribunal dismissed critiques similar to those levelled in the present case by Accuracy against certain of the assumptions used in Brattle's DCF model, in particular pertaining to regulatory risk[733] and the illiquidity discount.[734]

### c)   Discussion

532.   After having considered the Parties' submissions and evidence, including principally the Brattle and Accuracy expert reports, the Tribunal is convinced that the DCF method is the most appropriate method for calculating damages in this case.

533.   It is axiomatic that no model or methodology for assessing damages can determine with absolute precision the loss visited on an investor by a regulatory change, given the many uncertainties and variables inherent in projecting revenues, costs and risk over time. The method used must rather be reasonable in the light of all the circumstances; [735] and where opposing methods are proposed, their respective merits are to be assessed on a balance of probabilities.

534.   In this context, the Tribunal considers that the DCF assessment proposed by Brattle – and used by Accuracy to elaborate its own alternative DCF model– provides the most reasonably certain method of calculating the damages suffered by Claimants as a result of Respondent's breach of the ECT.

535.   The Tribunal agrees with Brattle that the plants at issue have a sufficiently long track record both to permit a reasonably certain forecast of their future revenues and costs, and to identify with reasonable accuracy the uncertainties inherent in the approach and the discount factors to be applied to the calculation in consequence. The Tribunal considers that the DCF model is all the more appropriate in this case given that the plants derive the largest portion of their revenues from a regulated remuneration regime, the values of which are well-documented and easily accessible.[736] This bolsters the reliability and accuracy of the calculations underlying both the "*but for*" and "*actual*" scenarios.

536.   Much of Respondent's critique of Brattle's DCF model concerns what are primarily liability issues. In the Tribunal's view, this critique is addressed – intentionally – by the interactive features of the Joint Model requested by the Tribunal, which allows the Tribunal in effect to model the "*but for*" scenario based on its specific findings regarding Claimants' alleged legitimate expectations and the alleged breaches thereof.

537.   For example, the Tribunal has found that Respondent is correct that the Original Regulatory Framework did not "*freeze*" the remuneration regime in effect at June 2011,

---

[732] *Ibid.*, at para. 820.
[733] *Ibid.*, at para 832.
[734] *Ibid.*, at para. 833.
[735] *Eiser* (**CL-0242**), at para. 473; *Novenergia* (**CL-0245**), at paras. 820 and 821.
[736] See also *Novenergia, op. cit.* (**CL-0245**), at paras. 820 and 821.

nor did Spain's enactments or other conduct give rise to a legitimate expectation of such a freeze. Rather, as the Tribunal has determined, the enactments, assurances and other representations tendered by Spain to the CSP sector prior to Claimants' investment gave rise to the legitimate expectation that the Morón and Olivenza 1 plants would be shielded from revisions to the *regulated tariff*, *the pool price premium* and the *applicable lower and upper limits* of that regime. No such expectation arose, and so no breach of the ECT could have occurred, with respect to the balance of the provisions that made up the Original Regulatory Framework. As explained, thanks to the work of the Parties' experts, the Joint Model permits the Tribunal to exclude those other factors from the damages calculation.

538. Respondent correctly points out that Brattle's initial DCF model is based on the assumption of immutability of the *entire* Original Regulatory Framework. But this critique is also moot, again thanks to the Joint Model, which allows the Tribunal to re-model the "*but for*" scenario so as to exclude from the damages calculation the tenets of the Original Regulatory Framework in respect of which no legitimate expectation arose.

539. The Tribunal is equally receptive to Respondent's concern regarding the market-to-book ratio and the IRR implicit in Brattle's initial DCF model. However, the Tribunal is of the view that this critique too becomes academic given the re-modelling of the DCF assessment under the Joint Model, which, as explained below, reduces both the market-to-book ratio and the IRR to levels that obviate Respondent's critique.

540. The Tribunal does not agree with Respondent's statement that the damages calculated by the DCF model vary *randomly* depending on the macro-economic circumstances prevailing on the two competing evaluation dates proposed by the Parties. The Tribunal is of the view that this variability is not altogether removed from the breach. The valuation date (and the interest rate prevailing then) is rather directly related to the breach since it is a function of the moment or period at which the loss caused by the breach crystallized. In turn, the market circumstances prevailing at the time of the breach or thereafter, including the interest rate, are necessarily relevant to calculate the value of the future cash flows that Claimants lost as a result of Respondent's breach. The fact that those market conditions exposed Claimants to a more precarious position than when they first invested is largely due to the timing of Respondent's breach.

541. Finally, the DCF model ultimately put forward by the Joint Model allows the Tribunal to tailor its assessment not only to the specificities of the breach, but also to other related factors, such as the impact of the breach on regulatory risk and the liquidity in Spain (to name only a few). This feature, in conjunction with the benefit of the discount rate to account for future uncertainties (discussed above), satisfies the Tribunal that despite the inherent uncertainties associated with forecasting future losses, the result of the DCF assessment jointly proposed by Brattle and Accuracy pursuant to the Joint Model provides a reasonably certain calculation of Claimants' damages.

542. To the contrary, the RAB method does not sufficiently engage with the precise impact of the breach on Claimants' investment, and more specifically on the free cash flows accruing to Claimants over time. The effects of Respondent's breach were not *primarily*

wrought on the plants' underlying assets, but rather on the stream of income accruing to the plants and, by corollary, on the free cash flows available to Claimants. An asset-based valuation seems therefore ill-adapted to the economic reality of this case.

543. Similarly, the pith of the breach here does not consist in a variation of the reasonable rate of return, but rather in the frustration of Claimants' legitimate expectation that the Morón and Olivenza plants would be shielded from revisions of the regulated tariff, the pool price premium and the applicable lower and upper values contained in RD 661/2007. A valuation that is premised principally on the "*reasonable*" rate of return without regard to the actual remuneration impaired by the Measures at Issue seems equally ill-adapted to the regulatory and legislative landscape in the present case, especially given that the actual rate of return that Claimants receive under the new remunerative regime is inferior to Respondent's "*reasonable*" return target.[737]

544. As a result, in keeping with the decisions in *Eiser* and *Novenergia*, the Tribunal will apply the DCF approach for assessing Claimants' loss. This does not fully resolve the quantum issue since – as mentioned above – the Parties' positions vary significantly on the assumptions underlying the two (2) competing DCF assessments presented respectively by Brattle and Accuracy.

545. The Tribunal will therefore address the disagreement regarding the plants' operational lifetime (**iii**), before addressing the remainder of the assumptions in dispute (**iv**), the tax "*gross-up*" claim (**v**) and the question of interest (**vi**).

### *iii.    Plants' Operational Lifetime*

546. The operational lifetime of the plants is important to compute the timespan for remuneration under the Original Regulatory Framework in the *"but for"* scenario. As mentioned above, the Original Regulatory Framework did not establish a specific term or limit for remuneration under the "*Special Regime*" pursuant to the EPA 1997 and RD 661/2007. That term, however, was necessarily limited by the operational lifetime of a given plant.  That changed in 2014 with the enactment of MO IET/1045/2014, which fixed the lifetime for which CSP plants could receive "*specific remuneration*" under the EPA 2013 at twenty-five (25) years.[738]

### a)    The Parties' Positions

547. **Claimants** – Claimants argue that the plants' operational lifetime is 35 years, in reliance on the opinion of Mr. Jose Mesa-Díaz of ATA Renewables ("**ATA**"), who is of the view that the plants' "*technical lifetime*" ranges between 30 and 40 years.[739] ATA's opinion is based on forecasts contained in relevant literature, on the expected lifespan of the main equipment items making up the CSP plants at issue and on data from comparable CSP

---

[737] See the testimony of Mr. Saura (Accuracy) at the Hearing on the Merits, Transcript, Day 5, on p. 16.
[738] See Article 5 of MO IET 1045/2014 (**C-0321t**).
[739] Jose Mesa-Díaz, *CSP PT Plant Lifetime Expert Report*, October 12, 2016 (**BQR-110**), at paras. 3 and 37.

plants, the so-called SEGS plants, which were built and began operating in California in the late 1980s.[740]

548. The literature on CSP plants published between 2005 and 2015 and reviewed by Mr. Mesa-Díaz contains lifetime forecasts ranging between 20 to 50 years. Mr. Mesa-Díaz is of the view that – as a general trend – the more recent forecasts opt for a longer lifetime, closer to 50 than to 20 years.[741]

549. Mr. Mesa-Díaz opined that almost all the main components of a CSP plant – except for the turbines – have a designed lifetime of 25 years or less but can operate for at least 30 years if properly maintained. In particular, the ATA experts opined that:

-   The solar collector was designed to operate for a period of 20 years or more but could operate for 25 to 30 years if adequately maintained;[742]

-   As regards the synthetic oil, its lifetime is "*more than 25 years*";[743]

-   The heat exchangers were designed to operate for a period of 25 years, "*but provided that the equipment is properly operated and maintained during the entire lifetime, 40-50 years can be met*";[744]

-   The solar collector was designed to operate for 20-25 years, but can "*reach 25-30 years*" with the recommended maintenance;[745]

-   The safety valves were designed to operate for 10 years but could reach 15 years if properly maintained.[746]

550. Finally, Mr. Mesa-Díaz cited the experience of the SEGS plants in California – which have been operating for more than 25 years – as support for his opinion that the more recent CSP plants' operating lifetime should range between 30 and 40 years: "*The SEGS Plants provide a real life example of SCP PT plants that have lasted in excess of 25 years. Considering that these plants were the first ones to be built, it is reasonable to expect that with technological improvements that have been introduced in newer plants, these newer plants will have an even longer lifetime.*"[747]

551. **Respondent** – Respondent argues that the plants' operational lifetime is 25 years, at most, and relies on the opinion of its technical expert, Dr. Jorge Servert.[748]

---

[740] *Ibid.*
[741] *Ibid.*, on pp. 7 to 9.
[742] *Ibid.*, on pp. 11 and 12.
[743] *Ibid.*, on p. 11.
[744] *Ibid.*, on pp. 11 and 12.
[745] *Ibid.*, on p. 12.
[746] *Ibid.*, on p. 13.
[747] *Ibid.*, on p. 15.
[748] Dr. Jorge Servert, *Morón and Olivenza Parabolic Trough CSP plants – Lifetime analysis*, November 2016.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

ICSID Case No. ARB/14/12

552. Mr. Servert's report analyses the "*technical useful life*" of the CSP plants at issue, in other words "*the number of years the plant can be operated reliably without the need for significant additional investment.*"[749]

553. Mr. Servert first argued – based on supporting documents and data from U.S. government sources – that the SEGS plants required significant additional investment after 25 years, which means that the track record of those plants shows that CSP plants' "*technical useful life*" does not exceed 25 years.[750]

554. Mr. Servert also argued that the literature produced by Mr. Mesa-Díaz is unreliable to assess the technical useful life of the CSP plants since most of the forecasts it contains are either unsupported by hard data or are related to the SEGS experience, which – in Mr. Servert's opinion – belies Claimants' position.[751]

555. Mr. Servert analysed the engineering, procurement and construction contracts and opined that the following category of components making up the Morón and Olivenza 1 plants were designed and manufactured for the following lifetime:

- 20 to 25 years for the main equipment items constituting the **solar field**, except for the thermal receivers (i.e. the tubes containing the oils that is heated by the solar power), which have a lifetime of 12 years "*if the thermal oil is properly maintained*";[752]

- 25 years for the equipment constituting the steam generation system;[753] and

- 25 years for the power block.[754]

556. Mr. Servert also analysed the operation and maintenance agreement for the Olivenza 1 plant. He opined that – since that agreement is for a period of 18 years, subject to further five-year renewals – it is uncertain at best whether the plants will benefit from a reliable maintenance necessary to meet the design specifications or even to exceed them.[755]

557. For all these reasons, Mr. Servert opined that there is simply no evidence to suggest that the CSP plants at issue will exceed the lifetime for which they have been designed – i.e. 25 years – without significant additional investments.[756]

---

[749] *Ibid.*, on p. 5.
[750] *Ibid.*, on pp. 8 to 10.
[751] *Ibid.*, on pp. 11 to 13.
[752] *Ibid.*, on p. 26.
[753] *Ibid.*, on pp. 29 and 30.
[754] *Ibid.*, on pp. 30 to 33.
[755] *Ibid.*, on pp. 34 and following.
[756] *Ibid.*, on pp. 38 and following.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

### b) The Technical Experts' Joint Statement and Testimony

558.  On 12 April 2017, in conformity with Procedural Order No. 12, the Parties' technical experts filed a joint statement setting out the matters of agreement and disagreement between them (the "**Joint Statement**").

559.  The experts declared themselves in agreement on the definition of the term "*technical useful lifetime of a plant*" as meaning "*the number of years the plant can be operated reliably <u>without the need for significant additional investment</u>.*"[757] [Emphasis added]

560.  The experts also declared themselves in agreement that the SEGS plants needed "*major reinvestment*" after 23 to 24 years (for SEGS I-II) and "*reinvestment*" after 17 to 22 years (for SEGS III-IX).[758]

561.  Finally, the experts also agreed that, in the case of the Morón and Olivenza 1 plants, the engineering, procurement and construction contractors were requested to build CSP plants to last 25 years.

562.  The experts disagreed however on: the relevance of some of the literature containing forecasts regarding the operational period of CSP plants; the assessment of the technical useful lifetime of the various equipment components of the CSP plants at issue; and the details of the operations and maintenance contracts entered into by the plants as well as their relevance for the assessment of the plants' technical useful life.

563.  At the hearing, both experts confirmed their agreement that their respective analyses were focused on the "*technical useful life*" of the plants, and that the plants had been designed to operate for 25 years.[759] While Mr. Mesa-Díaz restated his opinion that the plants would last longer than 25 years if properly maintained, he also conceded that the plants "*may*" need significant additional investment to remain in operation beyond 25 years.[760]

### c) Relevant authorities

564.  ***Eiser*** – The only arbitral award dealing with the issue of the operational lifetime of CSP plants – in the context of the recent Spain renewable energy investor-state arbitrations – was issued in the *Eiser* case.[761]

---

[757] Technical Experts' Joint Statement on the Lifetime of the CSP Plants, 4 April 2017, on p. 1.
[758] *Ibid.*
[759] Transcript, Day 4, on p. 147.
[760] *Ibid.*, on pp. 186 and 187.
[761] *Eiser* (**CL-0242**).  The Tribunal also notes that the authorities *Masdar* (**CL-0262**) and *Antin* (**CL-0263**) also treat the issue (among others) of the operational lifetime of the CSP plants. However, as mentioned above, since these authorities were not invoked or commented by any Party on the merits of the case, the Tribunal has not considered them in the context of its analysis of the operational lifetime of the CSP plants nor indeed in the context of any other substantive or jurisdictional issue determined in this award.

565.  In *Eiser*, the claimants had argued that the CSP plants at issue had an operational lifetime of 40 years, while the Respondent relied upon the opinion of their expert in that case, also Mr. Servert, to argue in favour of a period of 25 years.[762] The tribunal first ruled that the claimants had the burden of proving the facts upon which they founded their request for compensation, including the purported operational lifetime of 40 years.[763] The tribunal held that the documents adduced in evidence which contained a reference to the plants' lifetime were essentially limited to a due diligence report by Garrigues Medioambiente (also filed in this case), which mentioned a 25-year operating lifetime.[764] The tribunal held that the opinion of the claimants' technical expert, supporting a 40-year lifetime was equivocal and preferred Mr. Servert's views.[765]

### d)    Discussion

566.  As a prefatory remark, the Tribunal takes note of the technical experts' agreement on the object of their respective opinions, the technical useful lifetime of the plants, that is, the number of years that the plants can operate without significant additional investment. The Tribunal's analysis will therefore be guided by the term "*technical useful lifetime*" as it was understood and defined by the technical experts.

567.  As was the *Eiser* tribunal, the Tribunal is of the view that Claimants bear the burden to establish their claim regarding the plants' lifetime; and the Tribunal is not convinced that Claimants discharged their burden to prove, on a balance of probabilities, that the Morón and Olivenza 1 plants will operate for longer than 25 years without significant additional investment.

568.  The evidence is rather to the effect that most of the plants' essential components were designed to operate for no longer than 25 years, and that certain of those components were designed to operate for no more than 10 to 12 years. Both experts confirmed this in their testimony.[766]

569.  The Claimants presented insufficient evidence to prove that it is more likely than not that the Morón and Olivenza 1 plants will be able to operate longer than the lifetime for which they were designed.

570.  First, the Tribunal is not convinced that the body of literature presented by Mr. Mesa-Díaz is directly relevant to determine the lifetime of the plants at issue in this case. Those sources contain forecasts over disparate periods, founded on various assumptions, many of which are not directly relevant for the plants at issue in this case, and yielding inconsistent conclusions.

571.  Second, the Tribunal notes that the evidence presented by Claimants and Mr. Mesa-Díaz regarding the SEGS plants does not seem to corroborate, at least not fully, the Claimants' position on the issue of the plants' lifetime. The disagreement between the

---

[762] *Ibid.*, at paras. 443 and following.
[763] *Eiser* (**CL-0242**).
[764] *Ibid.*, at para. 451.
[765] *Ibid.*, at para. 452.
[766] See in particular the testimony of Mr. Mesa-Díaz in this regard, Transcript, Day 4, on p. 154.

experts regarding the technical useful lifetime of the SEGS plants was at least partially resolved by the joint statement issued by Messrs. Mesa-Díaz and Mr. Servert on 4 April 2017, in which they both confirmed that the plants "*SEGS I-II needed major reinvestment around year 23 and 24*" and that the plants "*SEGS III-IX needed reinvestment between year 17-22 after commissioning but the amount and global scope is no [sic] known.*"[767] This confirms Mr. Servert's opinion that the SEGS plants' technical useful lifetime was not greater than 25 years.

572. Finally, as regards the effects of a proper operation and maintenance on the plants' lifetime, the Tribunal does not have to resolve the technical experts' disagreement on the adequacy of the service providers presently retained by the plants. It suffices to note that Mr. Mesa-Díaz did not point to any evidence directly relevant to the plants at issue in this case to support his opinion regarding the effects of operation and maintenance. In fact, Mr. Mesa-Díaz candidly acknowledged that the Morón and Olivenza 1 plants "*may*" need significant investments after their 25th year of operation.[768]

573. For all these reasons, the Tribunal is of the view that the Claimants did not discharge their burden to prove that the plants at issue will operate for 35 years without significant additional investment. The Tribunal therefore opts to switch the "Plant Lifetime" toggle in the Joint Model to "*25 Years.*"

### iv.    *Other DCF Assumptions*

574. **Date of valuation** – As mentioned above, the date of valuation is important to determine the moment in time when the value of the revenue stream lost by Claimants is calculated based on the time value of money and the economic conditions prevailing at that time.

575. Respondent and its experts propose December 2012 but do not provide much in the way of principled justification beyond arguing that the date of valuation should be the first date of the plants' service life (25 October 2012 for Morón, and 1 February 2013 for Olivenza 1).[769] Claimants propose June 2014, when the parameters of remuneration applicable to CSP plants were finally established and when the breach of the ECT crystallized. Claimants argue that this allows for a coherent evaluation, without the use of hindsight or extrapolation which might otherwise be necessary if the December 2012 date were chosen.[770] Claimants submit that, under international law, either the date of the breach or the date of the award may validly be chosen as the date of valuation. Claimants argue that moving the date of valuation closer to the date of the award would yield a higher figure of damages due to decreasing interest rates, and hence, the June 2014 date they propose is both conservative and reasonable.[771]

---

[767] Technical Experts' Joint Statement on the Lifetime of the CSP Plants, 4 April 2017, on p. 1.
[768] Transcript, Day 4, on pp. 186 and 187.
[769] **Accuracy Q-ER-1**, at para. 707.
[770] Claimants' Comments on Quantum Experts' Joint Model, 4 December 2017, at paras. 3 and 4.
[771] Claimants' Comments on Quantum Experts' Joint Model, 4 December 2017, at para. 5.

576.  The Tribunal agrees with Claimant that the valuation date may be either the date of the breach or the date of the award. Respondent has shown no principled basis for pegging the valuation date at December 2012. The abrogation of the pool price plus premium remuneration option did not even come to pass until 2013 and – as the Brattle experts correctly point out – the new remuneration standards did not come into effect until June 2014.[772] The Tribunal is satisfied that the breach of the ECT crystallized in June 2014, and that this is the appropriate moment at which to value Claimants' losses.

577.  **Regulatory risk and illiquidity discount** – The assumption regarding regulatory risk determines whether the actual regulatory environment presents a higher risk of default by Spain on its obligations than the one prevailing when the Claimants invested and whether this justifies a higher discount rate in the "*Actual*" scenario. The Brattle experts are of the opinion that it does. They say the regulatory reform significantly increased the risk that Spain might default on its payment obligations to electricity generators, lowering the regulatory risk rating from A+, when the Claimants invested, to BBB- after the adoption of the Measures at Issue.[773] For their part, the Accuracy experts say that the Measures at Issue eliminated the tariff deficit and actually created a more stable environment for investors, such that the regulatory risk should be assessed at BBB- for the "*But for*" scenario and AA for the "*Actual*" scenario.[774]

578.  The quantum experts offered similar opinions on the issue of the illiquidity discount. The Brattle experts opined that the Claimants' interests became more difficult to sell in the aftermath of the Measures at Issue, which justifies an illiquidity discount of 12% in the "*But For*" scenario and 25% in the "*Actual*" scenario. Respondent and its experts argue that, to the contrary, the illiquidity discount should be 35% in the "*But For*" scenario and 16.7% in the "*Actual*" scenario.

579.  The Tribunal favours the opinion offered by Brattle. Respondent's position on regulatory risk and the illiquidity discount is based on the premise that the Measures at Issue fostered a more propitious environment for investors in the energy sector, in particular in the CSP sector. The Tribunal is not convinced that this is so. The Tribunal rather agrees with Brattle that although the Measures at Issue may have reduced the Tariff Deficit, they nonetheless introduced greater uncertainty into Spain's energy market, as demonstrated by the country's reduced credit ratings and the widespread unfavourable commentary in the aftermath of its adoption the Measures at Issue.[775] It is clear to the Tribunal that the Original Regulatory Framework attracted significant investments in the solar energy industry in Spain and that its dismantlement caused significant turmoil in that industry and market. The Tribunal agrees that these measures served to increase,

---

[772] [*Ministerial*] *Order IET/1045/2014, of June 16, approving the remuneration parameters for standard plants applicable to certain facilities which produce power from renewable sources of energy, cogeneration and waste* (**C-0321t**) ("**MO IET/1045/2014**").
[773] **CER-4**, on pp. 53 to 56.
[774] **Accuracy Q-ER-1**, on pp. 63 to 75.
[775] Richard Caldwell, Carlos Lapuerta and Jose Antonio Garcia, "*Damages to InfraRed*," presentation filed at the Hearing on the merits, 27 April 2017, on pp. 18 and 19.

not decrease, the risk associated with Spain's regulatory environment and the correlative risk of illiquidity for investors such as Claimants as at the valuation date.

580. In coming to this conclusion, the Tribunal has carefully reviewed the opinion and the methodology of the Accuracy experts and of the Brattle experts. For example, as regards the regulatory risk, both teams of experts rely on the same set of figures which show a steep decline in energy market indicators (i.e. the credit ratings of securitized collection rights associated with the Tariff Deficit) as of December 2012 (from a rating of AAA down to a rating of about A- to BBB+) and a slow recovery as of the late fall of 2013 (from lows of A- to BBB+ up to A to A+).[776]

581. Accuracy proposes a higher regulatory risk in the "*Actual*" scenario (BBB) and a lower regulatory risk in the "*But For*" scenario (AA). Accuracy says the decline in the market indicators is owed largely to the rising concern regarding the high levels of the Tariff Deficit in 2011-2012 and that this concern was assuaged as of the late fall 2013, when the Measures at Issue were fleshed out by the Spanish Government.[777] Accuracy is of the view that – by curbing the Tariff Deficit – the Measures at Issue created a more stable environment for investors in Spain's energy sector.[778] Accuracy even suggests that this view is shared by the Brattle experts, who ostensibly acknowledged the upsurge in the market indicators as of late 2013 when the change of regulatory regime was in full swing.[779]

582. The Tribunal does not agree with the Accuracy experts. First, it is true that the Brattle experts acknowledged the upsurge in the credit ratings in late 2013, but they cautioned nonetheless that the market ratings "*remain well below the levels at the time of issue* [of the securities surveyed]*, reflecting continued investor concerns with regulatory risk.*"[780] The Tribunal agrees with this latter assessment. Most importantly, the Tribunal agrees with Brattle's assessment that Accuracy's opinion with respect to the salutary effect of the Measures at Issue is based largely on data that succeeded the valuation date of June 2014, and on projections into a temporal horizon well beyond that date.[781]

583. The majority of the Tribunal cannot accept to rely on such projections.[782] First, there is no meaningful data entered in the evidence regarding the state of Spain's energy market

---

[776] **Accuracy Q-ER-1**, on p. 72; see also **CER-2**, on p.43.
[777] **Accuracy Q-ER-1**, at paras. 636 and following.
[778] **Accuracy Q-ER-1**, at para. 636.
[779] *Ibid.*, at paras. 620 to 628.
[780] **Accuracy Q-ER-1**, on p. 72; see also **CER-2**, at para. 116.
[781] See for example **Accuracy Q-ER-1**, at para. 628.
[782] Contrary to the majority of the Tribunal, Professor Pierre-Marie Dupuy does not agree with the Brattle experts on the issue of Regulatory risk and illiquidity discount; this is far for being a secondary issue, as accepting Accuracy's opinion instead of the Brattle's one would have reduced the compensation to Claimants from approximately €26,4 million to approximately €4.5 million. According to Professor Dupuy, attention is indeed to be attributed to the opinion of two independent major credit rating agencies, Fitch and Moody's, on the effective impact of the Measures at Issue on the tariff's deficit and more generally on the Spanish economy. **Accuracy Q-ER-1**, at para. 623, it is in particular (and in Prof. Dupuy's view) clearly shown that the credit rating downgrade of the Spanish Tariff Deficit by Moody's in April 2013 was not caused by an increase in regulatory risk, but, on the contrary, as established by Moody's itself, was due to the fear that the Measures would not be sufficient to end the tariff deficits. As rightly pointed out by Accuracy in the same Report, "*in April*

beyond 2016. Even if such data were available, the Tribunal would be inclined not to rely on it, since doing so would presume a hindsight incompatible with the exercise to be carried out under the DCF analysis, which, in essence, requires a valuation of Claimants' lost cash flows and discounting them back <u>to the valuation date</u>. The Tribunal agrees with the Brattle experts that the credit ratings prevailing as at the valuation date reflect sufficiently the forward-looking assessment <u>at that date</u>.[783] By factoring in the analysis ratings issued <u>after</u> the valuation date and projecting continued improvement into an uncertain future – even if such a projection were to be borne out by the actual data, which is in any event unavailable after 2016 – the Accuracy experts introduce in the analysis other market variables unrelated to the Disputed Measures that may have contributed to the upsurge in the credit ratings.[784] The Tribunal agrees with the Brattle experts that this skews impermissibly the DCF analysis.

584. In any event, the Tribunal is reminded that Measures at Issue replaced a regime that provided producers with a guaranteed pool-price-plus-premium remuneration with a one which not only provides for a lesser remuneration, but which is also prone to ongoing fluctuations, since it is revisable every three (3) to six (6) years.[785] If only for this reasons, the Tribunal cannot agree with Accuracy's views on regulatory risk and illiquidity.

585. For all these reasons, the Tribunal will switch the toggles "*Regulatory Risk Premium*" and "*Liquidity Discount*" in the Joint Model to the values proposed by the Brattle experts.

586. **Production Assumption** – The Parties' quantum experts disagree as to the proper assumptions regarding the production of electricity by the plants at issue. Brattle proposes the production assumption espoused by the Claimants prior to investing and set out in the Claimants' investment paper,[786] while Accuracy proposes the production

---

*2013, uncertainty was, in effect, high, not because the Government had taken measures to reduce the tariff deficit, but precisely because it had not yet taken them and the unsustainable position of the Tariff Deficit, which continued to grow, demanded clear, convincing measures for investors".* As a matter of fact, once the last Measures were approved, the rating rose once more. Brattle itself recognizes it at para. 116 of its Report on *Financial Damage to InfraRed* (**CER-2**) when saying: "*Ratings for FADE and the Private Tariff Deficit Securities have since stabilized and recovered by one notch since the end of 2013*". This recognition by Brattle goes clearly against its own specific assumption according to which the absence of Measures would necessarily result in better solvency. In its second special Report (*Electric shock II: Iberian Tariff Deficit Analysis* – Fitch Ratings 25 September 2015), Fitch explains that the Measures have indeed reduced the deficit and brought the system to its sustainability level as illustrated by two graphics reproduced in the above-mentioned **Accuracy Q-ER-1** at para. 627 (Figure 6.7) and para. 628 (Figure 6.8). This again clearly contradicts the opinion offered by Brattle according to which the regulatory reform significantly increased the risk that Spain might default on its payment obligations. Contrary to the majority of the Tribunal, Professor Dupuy does believe that the Measures at Issue fostered a more propitious environment for investors in the energy sector, as further demonstrated by the actual evolution of the Spanish energy market, <u>an evolution which was already known and evident at the time of the valuation date</u> selected by Claimant himself and accepted by the Tribunal, i.e. June 2014. In order to get as much as possible a comprehensive perception of the economic situation which prevailed at that time, the dissenting arbitrator finds it appropriate, as Accuracy did, to reasonably introduce in the analysis variables not strictly related to the Disputed Measures, an approach which is in no way incompatible with the DCF method.

[783] **CER-4**, at paras. 178 and following.

[784] *Ibid.*

[785] Article 15 of RD 413/2004 (**C-0328t**).

[786] **CER-4**, at para. 157.

assumption used by the financial institutions when they decided to lend.[787] Accuracy notes that the financial institutions financed 70% of the construction cost of the plants, and in its opinion, "*the expectation of whoever invests less than the bank should be no different.*"[788] The Tribunal agrees with the Accuracy experts that it is more reasonable to consider the assumptions actually used by the financial institutions when they decided to lend, rather than using Claimants' production assumption, which was approximately 15% higher than that of the banks.[789] For these reasons, the Tribunal will switch the "*Production*" toggle in the Joint Model to the value "*Bank Case.*"

587. **Share Dilution** – Claimants argue that the dilution of their equity interest (from 16% to 14.8% at Morón and 14.17% at Olivenza 1) was directly caused by the Measures at Issue, which reduced the plants' cash flows and prevented them from meeting the ratios stipulated in the agreements with the project lenders. This triggered the project lenders' rights to withhold the cancellation of the shareholder guarantees at Morón and to withhold the payment of the last tranche of the project finance loan at Olivenza 1. In turn, this compelled the shareholders to inject additional funds in the plants, among others, to allow the plants to pay the constructors. Claimants elected not to participate in the issuance of new shares, invoking a waiver right that entitled them to sit out this equity injection under a side letter entered into with the other shareholders when they initially invested. Claimants and the Brattle experts defended this decision as a mitigation measure. They say it allowed Claimants to avoid much greater loss given the devaluation of the Morón and Olivenza 1 equity as a result of the Measures at Issue. As a result, Brattle opined that the dilution of Claimants' equity should be included in the "*Actual*" scenario but not in the "*But for*" scenario.

588. Respondent argues that Claimants are not entitled to claim damages resulting from the dilution of shares given the absence of a causal link between the Measures at Issue and the Claimants' decision to sit out the issuance of additional shares. Respondent says the dilution was caused not by the Measures at Issue, but rather by the web of private agreements entered into between the various intervenors in the plants, construction projects and equity financing.[790] To recover the amounts lost as a result of the equity dilution, Respondent says that "*InfraRed should have demonstrated that diluting themselves was the best option available among than other alternatives.*"[791] In the circumstances, the Accuracy experts opine that the share dilution should be included in the "*But for*" and in the "*Actual*" scenario.

589. The Tribunal agrees with Claimants and their experts that the Measures at Issue triggered the project lenders' rights and compelled additional injection of funds by the shareholders. The Tribunal further agrees that this forced Claimants to choose between an immediate additional investment and a dilution of their shares. As far as avoiding loss

---

[787] **Accuracy Q-ER-2**, at para. 176(c).
[788] *Ibid.*
[789] Richard Crawford, Daniel Sausmikat, *Draft Investment Paper for the InfraRed Environmental Infrastructure Fund*, on pp. 16 and 17 (**BQR-78**).
[790] *Respondent's Comments on the Quantum Joint Model*, 4 December 2017, at para. 51.
[791] *Ibid.*

altogether, this was a false choice. The Tribunal is convinced by Brattle's well explained and documented analysis to the effect that – in the circumstances that prevailed in early-to-mid 2013 – any course of action other than a resigned acceptance of Claimants' equity dilution would have exposed InfraRed to significant additional losses.[792] In the circumstances, the Tribunal is satisfied that the Claimants were compelled to accept the dilution and that their decision to do so was a reasonable (arguably the only reasonable) decision. This outcome would have been avoided but for the enactment of the Measures at Issue. The Tribunal is therefore inclined to switch the toggle "*InfraRed Share Dilution also in But For*" to the value "*No.*"

590. **Management costs** – The Parties' experts disagree on the calculation of the reduction, if any, of Claimants' equity interest in the plants corresponding to the proportion of the management costs Claimants must shoulder. Brattle estimates a fixed amount, while Accuracy opines that management costs should rather be calculated as a percentage of the investment value.

591. The Tribunal notes that the documents cited in support of Brattle's first expert report on quantum refer to management fees as a percentage (generally 1% of portfolio or net asset value).[793] Counsel for Respondent argued the same calculation of management costs as a proportion of net asset value should also apply in the DCF model.[794]

592. This said, the Brattle experts have stated on at least two occasions that, in their opinion, the management costs have no bearing on quantum, since Brattle's DCF analysis presumes that management costs remained unchanged after the enactment of the Measures at Issue.[795] Claimants argue that this is a generous assessment for Respondent since the witness testimony shows that management costs in fact increased as a result of the enactment of the Measures at issue.[796]

593. Switching the Joint Model's "*toggle*" for management costs to the values proposed by Accuracy reduces the total amount of Claimants' damages by €2.5 million (all else remaining constant). The Brattle experts argue[797] – and their counterparts at Accuracy do not deny[798] – that this is because Accuracy's alternative DCF analysis assumes that management costs dropped as a result of the enactment of the Measures at Issue. Claimants say no evidence whatsoever was adduced to support such an assumption, and that the opposite is in fact true. Claimants say Brattle's position on the issue of management costs should therefore prevail.[799]

---

[792] **CER-4**, at paras. 126 to 144.
[793] *Survey of Infrastructure Fund Management Charges*, **BQR-74**.
[794] *Respondent's Comments on the Quantum Joint Model*, 4 December 2017.
[795] *Claimants' Comments on Quantum Experts' Joint Model*, 4 December 2017, at para. 99; see also **CER-2** at paras. 186 to 187.
[796] *Claimants' Comments on Quantum Experts' Joint Model*, 4 December 2017, at para. 99.
[797] *Claimants' Comments on Quantum Experts' Joint Model*, 4 December 2017, at para. 36.
[798] See Joint Model, at the line "Management Costs."
[799] *Claimants' Comments on Quantum Experts' Joint Model*, 4 December 2017, at para. 36.

594.  The Tribunal agrees with Claimants and will therefore switch the "*Management Costs*" toggle in the Joint Model to the value "*Brattle*."

595.  **Value of debt** – The Accuracy experts opine that the book value of the plants' debt should be considered in the DCF assessment, while the Brattle experts opine in favour of accounting for the market value of the debt. Neither Respondent nor its experts have provided the Tribunal with a principled justification for their position, beyond stating that the impact of using the book value of the debt is important.[800] Claimants' experts, on the other hand, explain that a "*focus on market value is appropriate because of the potential for the Disputed Measures to impair the value of debt.*"[801] The Tribunal agrees and will therefore switch the toggle *"Use Debt Face Value or Estimated Market Value*" in the Joint Model to "*Estimated Market Value.*"

> ### *v.    The Tax "Gross-Up" Claim*

596.  Claimants request that the amount of damages awarded by the Tribunal be supplemented by an amount sufficient to offset any taxes that may be assessed by the United Kingdom on the total amount awarded (the tax "*gross-up*" claim).[802] Claimants argue that a tax "*gross-up*" is required to give full effect to the principle of full compensation.[803] Respondent counters with a battery of substantive arguments, including a purported inability to bring a tax "*gross-up*" claim under the ECT, the purported existence of a tax exemption in the United Kingdom, etc. [804]

597.  As was the case in *Eiser*,[805] the Tribunal considers that it does not need to delve into Respondent's counterarguments find that Claimants' tax "*gross-up*" claim fails on its face. Claimants have not adduced any evidence whatsoever of the taxation regime to which they are subject in the United Kingdom, or of the tax liability, if any, that they might incur as a result of a favourable award in this arbitration, or of need for a "*gross-up*" to offset such liability. Indeed, their experts specifically noted: "*We have not analysed the tax consequences of an award to the aggrieved party and whether a tax gross-up on damages would be needed to place the aggrieved party in the same financial position as it would have otherwise enjoyed.*"[806]

598.  In the circumstances, given the absence of evidence, the Tribunal is of the view that Claimants have not discharged their burden to prove the facts supporting their tax "*gross-up*" claim, which must therefore fail.

---

[800] *Respondent's Comments on the Quantum Joint Model*, 4 December 2017, at para. 51.
[801] See **CER-2**, on p. 56.
[802] Cl. Mo-M, at paras. 1338 to 1341; see also Cl. Reply on pp. 409 to 410.
[803] See Cl. Reply, on pp. 409 to 410.
[804] See Resp. Rejoinder, at paras. 1765 to 1793.
[805] See *Eiser* (**CL-0242**), at para. 456.
[806] See **CER-2**, at para. 197.

InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain

**AWARD**

ICSID Case No. ARB/14/12

### vi.   Conclusion on quantum

599.   Applying the decisions above and switching the "*toggles*" in the experts' Joint Model as described, the total amount of damages for which respondent is liable to Claimants equals €28.2 million plus interest.

600.   The Tribunal observes that this sum, calculated as described above, is roughly commensurate with the €31 million invested by the Claimants. As did the tribunal in *Eiser*,[807] this Tribunal considers that this contextualisation serves as a form of "*reality check*" regarding the reasonableness of the compensation awarded to Claimants in the circumstances of the case.

### vii.   Interest

601.   Claimants seek pre-award interest at the rate of Spain's ten-year bonds (2%, as assessed by Brattle).[808] Claimants are also seeking post-award interest at the rate of Spain's ten-year bonds (2%) plus a "*punitive or moratorium component*"[809] in the form of a "*moratorium differential of an* [additional] *2%*,"[810] which should, according to Claimants' counsel, incentivize a prompt voluntary execution of the award.[811]

602.   Respondent agrees that both pre and post-award interest is due (in the hypothesis that Claimants prevail on the merits) but disagrees with the rates proposed by Claimants. Spain argues that pre-award interest should rather be fixed at the rate of Spain's two or three-year bonds (0.6% or 0.9%).[812] Respondent also opposes the "*punitive or moratorium*" component of the post-award interest sought by Claimants. It argues that the purpose of post-award interest is purely compensatory and the punitive component sought by Claimants has no demonstrable basis in law.[813]

603.   The Tribunal agrees with the Respondent that the purpose of awarding interest is not to punish any party. There should not, in the Tribunal's view, be any *punitive or moratorium component* to the award of interest. As regards the rate of pre-award and post-award interest, the Tribunal first notes that almost five (5) years elapsed between the enactment of the first Measure at Issue (December 2012) and the completion of the post-hearing submissions (December 2017, when the Parties filed their submissions on the quantum experts' joint model).[814] The Tribunal also notes that Respondent has acknowledged, in this arbitration, that it applied for the annulment of a recent award rendered against it for having violated the ECT rights of other investors in Spain's solar

---

[807] See *Eiser* (**CL-0242**), at para. 474.
[808] Cl. Mo-M, on pp. 394 and 395.
[809] *Ibid.*, at para. 1334.
[810] *Ibid.*, at para. 1337.
[811] *Ibid.*, on pp. 396 and 397.
[812] Resp. Co-Mo, at paras. 1229 and following; **Accuracy Q-ER-1**, at para. 803.
[813] Resp. Rejoinder, at paras. 1755 and following.
[814] See *Claimants' Comments on Quantum Experts' Joint Model*, 4 December 2017 and *Respondent's Comments on the Quantum Joint Model*, 4 December 2017.

Case 1:19-cv-01618-TSC   Document 69-37   Filed 09/09/22   Page 164 of 168
Case 1:20-cv-00817   Document 69-3   Filed 09/29/20   Page 165 of 169

InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain

**AWARD**

ICSID Case No. ARB/14/12

industry[815] and that it sought remedy in the nature of rectification and clarification against another recent award.[816]

604. Given the foregoing, the Tribunal is of the view that the rate proposed by Respondent for both pre-award and post-award interest is insufficient to compensate Claimants. The Tribunal also notes that the rate proposed by Claimants (leaving aside the punitive or moratorium component) would result in interest at the rate of 2% both pre and post-award, which is less than the "*LIBOR +2%*" rate that is commonly used in international arbitration.

605. For all these reasons, the Tribunal is inclined to award Claimants a pre-award and post-award rate of interest of 2%.

### viii. Costs

606. Claimants request an award saddling Respondent with 100% of the costs of the arbitration including Claimants' legal costs, which in turn include Claimants' attorneys' fees, expert fees and legal expenses. These costs add up to the following amounts (reflecting the various currencies in which they were incurred): **€4,949,247.57**; **US$717,362.55**; and **GB£106,182.31**.[817]

607. Claimants invoke the principles "*costs follow the event*" and *restitutio ad integrum* to claim the entirety of their legal costs even though not all the damages they sought will have been awarded.[818] In any event, Claimants seek all legal costs associated with the debate on the preliminary objections. Claimants say Respondent presented but subsequently withdrew several preliminary objections which forced Claimants to incur needless costs.

608. Respondent requests the Tribunal to order Claimant to bear all the costs of the arbitration as well as the Respondent's legal costs (in the amount of **€1,704,438.11**).[819] Respondent cites no legal basis for claiming its legal costs in a context in which Claimants prevailed (at least partially) on the merits.

609. In response to Claimants' claim for costs, Respondent argues that a portion of Claimants' legal costs were not demonstrably incurred in the context of this proceeding. Further to the exchange of submissions on costs, Claimants withdrew certain of the claims contested by Respondent.[820] The only portion of Claimants' legal costs that

---

[815] i.e. the award in *Eiser*, op. cit.

[816] i.e. the award in *Novenergia*, op. cit.; see in this regard *Respondent's Comments on the Wirtgen vs. Czech Republic Award and the Novenergia II – Energy & Environment (SCA) SICAR v. Kingdom of Spain*, 20 March 2018, at paras. 42 and following.

[817] See *Claimants' Response Submission on Costs*, 8 February 2019, on p. 10.

[818] *Claimants' Submission on Costs*, 25 January 2019, at paras. 24 and following.

[819] *Respondent's Submission on Costs*, 25 January 2019, on pp. 9 and following.

[820] See *Respondent's Request Concerning Claimants' Submission on Costs*, 30 January 2019, at paras. 8 and following; see also *Claimants' Response Submission on Costs*, 8 February 2019, at paras. 7 and following. In response to Respondent's contestation of the amounts of £30,960 and €19,526.07 initially claimed by

remains in dispute (as to whether or not they were incurred in the context of this arbitration) are professional fees Claimants paid to the Allen & Overy lawyers (**£93,302**), who had advised Claimants prior to the commencement of the arbitration proceedings but were otherwise not involved in the arbitration.[821]

610. Besides this specific contestation, Respondent also contests the reasonability of Claimants' attorneys' fees more generally, including the total amount of hours purportedly worked by Claimants' attorneys (11,200) and the average hourly rate (€374) they charged.[822]

611. Claimants retort that the ECT required a mandatory cooling-off period before instituting proceedings and that the Allen & Overy lawyers were involved in negotiations with Spain during that period. As regards the reasonability of their attorneys' fees, Claimants plead that their lawyers' hourly average hourly rate is commensurate to that charged by other similar firms within the same market segment[823] and that the overall number of hours worked on the case is reasonable given its length (four years and 8 months), its relative complexity and the number of lawyers involved.[824]

612. Despite the above-mentioned divergences, both Parties agree that the Tribunal has a wide degree of discretion in issuing a costs award.[825]

613. Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

614. The arbitration costs, including the fees and expenses of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses, amount to (in **US$**):

---

Claimants as "Other Experts' Fees and Expenses," the Claimants withdrew their claim for those amounts. See *Claimants' Response Submission on Costs*, 8 February 2019, at paras. 7 to 9.
[821] *Ibid.*
[822] *Respondent's Request Concerning Claimants' Submission on Costs*, 30 January 2019, at paras. 14 to 19.
[823] *Claimants' Response Submission on Costs*, 8 February 2019, at para. 38.
[824] *Ibid.*, at paras. 26 and following.
[825] *Respondent's Submission on Costs*, 25 January 2019, at para. 21; *Claimants' Submission on Costs*, 25 January 2019, at para. 21.

*InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*

**AWARD**

*ICSID Case No. ARB/14/12*

| | |
|---|---|
| Arbitrators' and Tribunal's Assistant - Fees and expenses: | US$933,925.59 |
| ICSID's administrative fees: | US$180,000.00 |
| Direct expenses (estimated): | US$171,589.81 |
| **Total Costs of the Arbitration:** | **US$1,285,515.40** |

The above costs have been paid out of the advances made by the Parties in equal parts.[826]

615. Having considered the Parties' arguments, the Tribunal is of the view that Claimants are entitled to an award of a reasonable portion of the costs they incurred in this arbitration, among others because they have prevailed on both jurisdiction and liability, i.e. in proving that Respondent violated the ECT.

616. The Tribunal does not find compelling Respondent's contestation of Allen & Overy's fees, nor Respondent's contestation of the overall "*reasonability*" of Claimants' fees. While the attorneys' fees incurred by Claimants are far greater than those incurred by Respondent, these fees are commensurate with those of other firms in the same market segment and with those of other investors who prevailed in similar arbitrations.

617. The Tribunal is sensitive to Claimants' argument about the Respondent's untimely withdrawal of several preliminary objections that it had asserted, thus forcing Claimants to incur needless legal fees. The Tribunal is equally sensitive to the fact that Claimants did not prevail on all the issues they brought before this Tribunal. In particular, even though Claimants succeeded in proving a violation of the ECT, the damages awarded (**€28.2 million**) are far less than the damages claimed (**€75.7 million**).

618. For all those reasons, the Tribunal is inclined to order Respondent to bear all of the arbitration costs plus two thirds (66.66%) of Claimants' legal costs in the amounts set out above.

---

[826] ICSID will provide a detailed final statement of the case account to the Parties. The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

## VII.   AWARD

[619]   **FOR THESE REASONS, THE TRIBUNAL**:

[1]   **DECLARES** that the Arbitral Tribunal has jurisdiction *rationae personae* to hear and determine the dispute between i) InfraRed Environmental Infrastructure GP Limited, ii) European Investments (Morón) 1 Limited, iii) European Investments (Morón) 2 Limited, iv) European Investments (Olivenza) 1 Limited and v) European Investments (Olivenza) 2 Limited ("**Claimants**") and the Kingdom of Spain ("**Respondent**") and, consequently, **DISMISSES** the preliminary objection identified as "*Preliminary Objection A*" in Respondent's Memorial on Preliminary Objections and Request for Bifurcation;

[2]   **DECLARES** that the Arbitral Tribunal lacks jurisdiction *rationae materiae* to hear the claims submitted by Claimants based on the enactment of the tax on the value of electric power generation set out at Title I, Chapter I of *Act 15/2012, of December 2012, on fiscal measures for the energetic stability* and, consequently, **MAINTAINS** the preliminary objection identified as "*Preliminary Objection C*" in Respondent's Memorial on Preliminary Objections and Request for Bifurcation;

[3]   **TAKES NOTE** that Respondent has withdrawn or otherwise waived the jurisdictional objections identified as "*Preliminary Objection B*", "*D*", "*E*" and "*F*" in Respondent's Memorial on Preliminary Objections and Request for Bifurcation;

[4]   **DECLARES** that Respondent's selected acts and omissions identified and discussed above constitute breaches of the Respondent's obligations under Article 10 of the Energy Charter Treaty;

[5]   By majority,[827] **ORDERS** the Respondent to pay the Claimants compensation in the amount of €28,200,000, plus pre-award interest at a rate of 2% compounded annually, calculated from 30 June 2014 to the date of this Award, plus post-award interest at the rate of 2% compounded annually from the date of this Award to the date of payment;

[6]   **ORDERS** the Respondent to bear its own legal costs and to pay Claimants the costs of the arbitration incurred by Claimants in a total amount of US$642,757.7, as well as an amount equivalent to 66.66 % of the legal costs, plus post-award interest at the rate of 2% compounded annually from the date of this Award to the date of payment.

[*The signatures are to be found on the following page*]

---

[827] See above, footnote 782.

Prof. Pierre-Marie Dupuy
Arbitrator

Date: 21 JULY 2019

William W. Park

Prof. William W. Park
Arbitrator

Date: 20 JULY 2019

Mr. Stephen L. Drymer
President of the Tribunal

Date: 19 JULY 2019