# EXHIBIT 39

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**ADDIKO BANK AG AND ADDIKO BANK D.D.**

Claimants

and

**REPUBLIC OF CROATIA**

Respondent

**ICSID Case No. ARB/17/37**

---

## Decision on Croatia's Jurisdictional Objection Related to the Alleged Incompatibility of the BIT with the EU *Acquis*

---

***Members of the Tribunal***
Ms. Jean E. Kalicki, President of the Tribunal
Mr. Miloš Olík, Arbitrator
Professor Guido Tawil, Arbitrator

***Secretary of the Tribunal***
Mr. Alex B. Kaplan

12 June 2020

## REPRESENTATION OF THE PARTIES

*Representing Addiko Bank AG and Addiko Bank d.d.*:

Mr. Franz T. Schwarz, Mr. Gary B. Born, Mr. Daniel Costelloe, Ms. Rina See and Ms. Yoanna Schuch
Wilmer Cutler Pickering Hale and Dorr LLP
49 Park Lane
London W1K 1PS
United Kingdom

and

Ms. Danielle Morris
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006,
United States of America

*Representing Republic of Croatia*:

Mr. Boris Koketi and
Ms. Marijana Bertović
Office of the Attorney General
Gajeva 30a
10000 Zagreb
Republic of Croatia

and

Mr. Robert Volterra, Mr. Graham Coop, Ms. Jessica Pineda, and Mr. Govert Coppens
Volterra Fietta
8 Mortimer Street, Fitzroy Place
London W1T 3JJ
United Kingdom

i

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ....................................................................... 1

II.   PROCEDURAL HISTORY ................................................................................... 1

III.  THE PARTIES' POSITIONS ................................................................................ 8

    A.  Principles Regarding the Determination of Jurisdiction ............................... 8

        (1)  Burden of Proof ................................................................................... 8

            a.  Croatia's Position ..................................................................... 8

            b.  Addiko's Position ..................................................................... 9

        (2)  Tribunal's Standard of Review .......................................................... 10

            a.  Croatia's Position ................................................................... 10

            b.  Addiko's Position ................................................................... 10

        (3)  Date of Determination of Jurisdiction............................................... 11

            a.  Croatia's Position ................................................................... 11

            b.  Addiko's Position ................................................................... 12

        (4)  Status of Croatia's Consent to Arbitration........................................ 13

            a.  Croatia's Position ................................................................... 13

            b.  Addiko's Position ................................................................... 13

    B.  Impact of Article 11(2) of the BIT ............................................................. 15

        (1)  Croatia's Position............................................................................... 15

        (2)  Addiko's Position .............................................................................. 16

    C.  Compatibility Analysis Under Article 11(2) of the BIT ............................. 17

        (1)  Standard of Compatibility................................................................. 17

            a.  Croatia's Position ................................................................... 17

            b.  Addiko's Position ................................................................... 18

        (2)  Import of Other Arbitrations with Similar Issues ............................. 18

            a.  Croatia's Position ................................................................... 18

            b.  Addiko's Position ................................................................... 23

    D.  EU Declarations ......................................................................................... 25

        (1)  The Declarations' Effect on Compatibility Between Article 9 of the BIT and the *Acquis*.............................................................................. 26

            a.  Croatia's Position ................................................................... 26

            b.  Addiko's Position ................................................................... 27

        (2)  Whether the Declarations Are Binding on this Tribunal ................... 27

   a. Croatia's Position ................................................................... 27

   b. Addiko's Position ................................................................... 31

 E. *Achmea* ................................................................................................. 34

  (1) Correctness of *Achmea* ............................................................... 35

   a. Croatia's Position ................................................................... 35

   b. Addiko's Position ................................................................... 35

  (2) Force of *Achmea* in These Proceedings .................................... 36

   a. Croatia's Position ................................................................... 36

   b. Addiko's Position ................................................................... 38

  (3) Applicability of *Achmea* to ICSID Arbitrations ..................... 39

   a. Croatia's Position ................................................................... 39

   b. Addiko's Position ................................................................... 41

  (4) Retroactive Application of *Achmea* ........................................... 42

   a. Croatia's Submissions ........................................................... 42

   b. Addiko's Position ................................................................... 44

 F. The BIT's Compatibility with EU's Non-Discrimination Principles .......................... 45

   a. Croatia's Position ................................................................... 45

   b. Addiko's Position ................................................................... 47

 G. The BIT's Compatibility with GATS obligations ................................ 49

   a. Croatia's Position ................................................................... 49

   b. Addiko's Position ................................................................... 51

IV. THE EUROPEAN COMMISSION'S POSITION ......................................... 53

 A. Competence of the Arbitral Tribunal to Rule on its Jurisdiction ................................. 53

 B. Conflict Between Article 9 of the Austria-Croatia BIT and EU Law ......................... 53

  (1) The Tribunal May Have to Apply and Interpret EU Law .................................... 53

  (2) Lack of Valid Offer for Arbitration Since 1 July 2013 ........................ 54

  (3) Sunset Clauses Are Not Triggered and Inapplicable ............................ 54

 C. The Austria-Croatia BIT Has Been Terminated ................................ 55

  (1) The Conditions for Both Alternatives of VCLT Article 59(1) Are Fulfilled ....... 55

  (2) The Question of "Same Subject Matter" .................................... 56

  (3) There Is No Need to Follow the Formal Steps for Termination in VCLT Articles 65-68 .......................................................... 56

  (4) Croatia and Austria Have Confirmed the Lack of Valid Consent to Arbitration in a Declaration Pursuant to VCLT Article 31(2)(b) and 31(3)(a) ......................... 57

D.   In the Alternative: EU Law Prevails Over Article 9(2) of the BIT ............................. 57

(1)  Law Applicable to the Decision on Jurisdiction .................................................. 57

(2)  Primacy of EU Law as a Special Conflict Rule Codified in Declaration 17 of the Lisbon Treaty and Article 11(2) of the BIT ........................................................ 58

(3)  In the Alternative: The VCLT's Conflict Rules Lead to the Conclusion that EU Law Prevails over Article 9(2) of the BIT ............................................................ 58

(4)  No Legitimate Expectations and No Protection by VCLT Article 70 ................. 59

V.   THE TRIBUNAL'S ANALYSIS ................................................................................... 59

A.   Introductory Principles ............................................................................................. 59

B.   Interpretation of Key BIT Provisions ...................................................................... 61

C.   The Alleged Incompatibility of the BIT with the EU *Acquis* ................................. 72

(1)  Alleged Incompatibility with Articles 267 and 344 TFEU ................................. 72

a.   Summary of Achmea ...................................................................................... 74

b.   Scope of Achmea as it Pertains to Articles 267 and 344 TFEU.................... 81

c.   Implications of Achmea for the Austria-Croatia BIT ................................... 89

d.   Application to Pre-Achmea BIT Cases ......................................................... 99

e.   Relevance of the Declarations .................................................................... 104

f.   Additional Arguments of the Commission and Croatia ............................. 110

g.   Conclusion on Alleged Incompatibility with Articles 267 and 344 TFEU . 113

(2)  Alleged Incompatibility with EU Anti-Discrimination Principles .................... 114

a.   Articles 18, 49 and 63 of the TFEU .......................................................... 114

b.   The GATS ................................................................................................... 117

D.   *Monetary Gold* Principle ....................................................................................... 118

VI.  DECISION .................................................................................................................. 119

iv

TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| *Achmea* | Court of Justice of the European Union Case C-284/16, *Slowakische Republik v. Achmea B.V.*, Judgment (6 March 2018), RLM-12 |
| *Achmea* Wathelet Opinion | Case C-284/16 *Slowakische Republik v. Achmea BV,* Opinion of Advocate General Wathelet, CLM–145 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Article 11(2)-(3) Meeting Minutes | Minutes of the meeting with the Austrian representatives regarding the interpretation of Article 11 paragraph 2 and 3 of the Agreement on the promotion and protection of investment concluded with Austria, p. 1, 14 February 2018, C-225 |
| BIT or Treaty | Agreement between the Republic of Austria and the Republic of Croatia for the Promotion and Protection of Investments, which entered into force on 1 November 1999 |
| C-[#] | Claimants' Exhibit |
| CETA | Comprehensive Economic and Trade Agreement between Canada and the EU and its Member States |
| CJEU | Court of Justice of the European Union |
| *CETA* Opinion | CJEU Opinion 1/17, EU:C:2019:341, FJ-41 |
| Cl. Mem. | Claimants' Memorial on Croatia's Preliminary Objections to Jurisdiction dated 29 March 2019 |
| Cl. PHB1 | Claimants' Post Hearing Brief dated 18 October 2019 |
| Cl. PHB2 | Claimants' Post-Hearing Reply Brief dated 22 November 2019 |

| Cl. Rej. | Claimants' Rejoinder on Jurisdiction dated 28 April 2020 |
| --- | --- |
| Cl. Reply | Claimants' Reply Submission on Croatia's Preliminary Objections to Jurisdiction dated 7 June 2019 |
| CLM-[#] | Claimants' Legal Authority |
| Declarations | (i) the declaration by 22 Member States of the European Union on the legal consequences of the Judgment of the Court of Justice of the European Union in the *Achmea* case; (ii) the declaration by five EU Member States on the legal consequences of *Achmea*; and (iii) the declaration by Hungary on the legal consequences of *Achmea* |
| GATS | World Trade Organization General Agreement on Trade in Services |
| Hearing | Hearing on Jurisdiction held from 20 August 2019 through 21 August 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| Resp. Mem. | Respondent's Preliminary Objections to Jurisdiction dated 29 March 2019 |
| Resp. PHB1 | Respondent's Post Hearing Brief dated 18 October 2019 |
| Resp. PHB2 | Respondent's Reply Post-Hearing Brief dated 22 November 2019 |
| Resp. Reply | Respondent's Reply to the Claimants' Submission on its Preliminary Objections to Jurisdiction dated 7 June 2019 |

| Resp. Request | Respondent's Preliminary Objections to Jurisdiction and Request to Suspend the Proceedings on the Merits dated 21 December 2018 |
|---|---|
| RLM-[#] | Respondent(s)'s Legal Authority |
| TEU | Treaty on European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on [date] |
| *UniCredit* 2018 Decision | *UniCredit Bank Austria AG and Zagrebačka banka d.d. v. Republic of Croatia*, ICSID Case No. ARB/16/31, Decision on the Respondent's Article 9 Objection to Jurisdiction, 12 October 2018, CLM-136 |
| *UniCredit* 2020 Decision | *UniCredit Bank Austria AG and Zagrebačka banka d.d. v. Republic of Croatia*, ICSID Case No. ARB/16/31, Decision on the Respondent's Application for Reversal of the Article 9 Decision and Decision on Jurisdiction and Admissibility, 24 March 2020, RLM-271 |
| VCLT | United Nations, Vienna Convention on the Law of Treaties, 23 May 1969, United Nations Treaty Series, vol. 1155, p. 331 |
| WTO | World Trade Organization |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Agreement between the Republic of Austria and the Republic of Croatia for the Promotion and Protection of Investments, which entered into force on 1 November 1999 (the "BIT" or "Treaty") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, dated 14 October 1966 (the "ICSID Convention").

2.    The Claimants are Addiko Bank AG, a company organized under the laws of the Republic of Austria, and Addiko Bank d.d., a company organized under the laws of the Republic of Croatia (together, "Addiko" or the "Claimants").

3.    The Respondent is the Republic of Croatia ("Croatia" or the "Respondent").

4.    The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.    This dispute concerns Addiko's issuance of loans denominated in Swiss francs to Croatian consumers and businesses, and legislation enacted in the Republic of Croatia to convert the denomination of those loans into Euros.  The present ruling, however, concerns Croatia's assertion that the Tribunal lacks jurisdiction pursuant to Article 11(2) of the BIT, which states that "[t]he Contracting Parties are not bound by the present Agreement insofar as it is incompatible with the legal acquis of the European Union (EU) in force at any given time."

## II.    PROCEDURAL HISTORY

6.    On 21 December 2018, the European Commission (the "Commission") filed with the ICSID Secretariat its Application for Leave to Intervene as a Non-Disputing Party, dated 20 December 2018 (the "Commission's Application").

7.      Also on 21 December 2018, Croatia submitted its Preliminary Objection to Jurisdiction, and Request to Suspend the Proceedings on the Merits ("Croatia's Request" or "Resp. Request"), including the following documents:

- Consolidated Index of Supporting Documentation filed with Croatia's pleadings as at 21 December 2018;

- Exhibits R-0001 through R-0005; and

- Legal Authorities RLM-0001 through RLM-0032.

8.      On 24 December 2018, the Tribunal invited the Parties to submit their observations on the Commission's Application using a simultaneous filing procedure on 11 January 2019, which is also the day on which the procedural calendar at Annex B of Procedural Order No. 1 called for Addiko to submit its Response to Croatia's Request.

9.      Prior to the filing of these submissions, Croatia sought leave from the Tribunal on 31 December 2018 to submit into the record of this proceeding, in support of its Request, the Decision on Bifurcation in *Raiffeisen Bank AG and Raiffeisenbank d.d. v. Republic of Croatia* (ICSID Case No. ARB/17/34) ("*Raiffeisen*"). On 3 January 2019, Addiko indicated that it had no objection to Croatia's submission of the Decision on Bifurcation in *Raiffeisen*. On 4 January 2019, the Tribunal granted Croatia's request, and Croatia submitted it as RLM-0033.

10.     On 11 January 2019, Addiko filed both its Observations on the Commission's Application ("Addiko's Observations") and its Response to Croatia's Request (the "Response"). Croatia also filed its Observations on the Commission's Application ("Croatia's Observations").

11.     Following these submissions, on 17 January 2019, Croatia submitted a letter to the Tribunal regarding seeking leave to submit three additional documents in support of Croatia's Request: (i) the declaration by 22 Member States of the European Union ("EU") on the legal consequences of the Judgment of the Court of Justice of the European Union

("CJEU") in the *Achmea* case ("*Achmea*");[1] (ii) the declaration by five EU Member States on the legal consequences of *Achmea*; and (iii) the declaration by Hungary on the legal consequences of *Achmea* (collectively, the "Declarations"). The next day, on 18 January 2019, Addiko indicated that it had no objection to the introduction of the Declarations into the record. On 21 January 2019, the Tribunal granted on consent leave to submit the Declarations, and Croatia submitted them into the record the following day as RLM-41 through RLM-43.

12.    Also on 21 January 2019, the Tribunal issued its Procedural Order No. 2 in which it, *inter alia*, granted the Commission leave to make a written submission as a non-disputing party; declined Croatia's Request to suspend the proceedings on the merits; and determined to accelerate consideration of Croatia's preliminary objection related to the compatibility of the BIT with the *acquis* under Article 11(2) (the "accelerated issue"). In Procedural Order No. 2, the Tribunal also granted Addiko's request for production of "documents reflecting the occurrence of status of any State-to-State 'dialogue' that may have taken place under Article 11(3) of the BIT,"[2] a request that Addiko made during the briefing on Croatia's Request. In granting the request for production, the Tribunal invited Addiko to indicate by 28 January 2019 "any other disclosure that it contends would be material to the discrete legal issue accelerated for resolution."

13.    Consequently, on 28 January 2019, Addiko made additional requests for production. First, Addiko requested that Croatia "produce documents created, sent or received by Croatia regarding the status of the BIT or the compatibility of the BIT with the *acquis* regardless of whether these documents expressly refer to Article 11(3) of the BIT." Second, Addiko requested that Croatia "produce documents created, sent or received by Croatia, including documents sent to or received from the European Commission, regarding the Commission's application for leave to intervene as a non-disputing party in [this] arbitration and/or [the declarations]." Third, given Croatia's reliance on the Declarations, Addiko requested their *travaux préparatoires*.

---

[1] Case C-284/16, *Slowakische Republik v. Achmea B.V.*, Judgment (6 March 2018), RLM-12.
[2] Article 11(3) of the BIT provides that "[i]n case of uncertainties concerning the effects of paragraph 2 of this Article the Contracting Parties will enter a dialogue."

14.    On 4 February 2019, the Commission submitted its Amicus Curiae Brief (the "Commission Submission").

15.    Also on 4 February 2019, Croatia submitted its opposition to Addiko's requests for production of 28 January 2019, on the ground that they were overbroad and neither material nor relevant to the accelerated issue. Croatia contended that Addiko's purported justification for the additional requests for production—that the Commission's intervention and the Declarations are the result of political expedience and pressure—was without merit and in any event concerned an inquiry into the actions of the Commission and the Member States of the European Union and not those of Croatia, as the Respondent in this proceeding. To this latter point, Croatia noted that an inquiry into inter-State exchanges may raise confidentiality issues.

16.    Croatia also requested an extension of time until 25 February 2019 to produce documents, given that the Parties had agreed to, and the Tribunal had accepted, a one-week extension of the deadline for first round submissions on the accelerated issue.

17.    On 5 February 2019, the Tribunal, having received confirmation of both Parties' availability, confirmed that a hearing on the accelerated issue would be held in Washington, D.C. on 20 August and 21 August 2019.

18.    On 13 February 2019, the Tribunal issued Procedural Order No. 3, denying Addiko's additional requests for production and granting Croatia's request for an extension of time until 25 February 2019 to produce documents.

19.    On 29 March 2019, in accordance with Procedural Order No. 2, Croatia submitted its Preliminary Objections to Jurisdiction ("Resp. Mem."), including the following documents:

- Legal Opinion of Professor Paul Craig (Hon QC), dated 29 March 2019 ("Craig Opinion");

- Index of the Legal Authorities to Professor Paul Craig's Expert Opinion, with Legal Authorities PC-0001 through PC-0060;

4

- Consolidated Index of Supporting Documentation Filed with Croatia's pleadings (as of 29 March 2019);

- Exhibits R-0032 through R-0038; and

- Legal Authorities RLM-0001 through RLM-0165.

20.    Also on 29 March 2019, in accordance with Procedural Order No. 2, Addiko submitted its Submission on Croatia's Preliminary Objections to Jurisdiction ("Cl. Mem."), including the following documents:

- Legal Opinion of Sir Francis Jacobs KCMG, QC ("Jacobs Opinion"), with Exhibits FJ-0001 through FJ-0033;

- Consolidated Index of Supporting Documentation Filed with Addiko's Pleadings (as at 29 March 2019);

- Exhibits C-0222 through C-0226; and

- Legal Authorities CLM-0145 through CLM-0184.

21.    On 7 June 2019, Addiko filed their Reply Submission on Croatia's Preliminary Objections to Jurisdiction ("Cl. Reply"), including the following documents:

- Supplemental Legal Opinion by Sir Francis Jacobs KCMG, QC ("Jacobs Supp. Opinion"), with Exhibits FJ-0034 through FJ-0045; and

- Legal Authorities CLM-0185 through CLM-0197.

22.    On the same date, Croatia filed its Reply to Addiko's Submission on its Preliminary Objections to Jurisdiction ("Resp. Reply"), including the following documents:

- Second Expert Opinion of Professor Paul Craig (Hon QC) ("Craig Supp. Opinion"), with an Index of Legal Authorities to Professor Paul Craig's Second Expert Opinion and Legal Authorities PC-0061 through PC-0066;

- Exhibits R-0039 through R-0041; and

- Legal Authorities RLM-0166 through RLM-0176.

23.    On 30 July 2019, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

24.    On 2 August 2019, the Tribunal issued Procedural Order No. 5[3] concerning the organization of the hearing on the accelerated issue.

25.    A hearing on the accelerated issue was held in Washington D.C. from 20 August 2019 to 21 August 2019 (the "Hearing"). The following persons were present at the Hearing:

*Tribunal*:
| | |
|---|---|
| Ms. Jean E. Kalicki | President |
| Prof. Guido Santiago Tawil | Arbitrator |
| Mr. Miloš Olík | Arbitrator |

*ICSID Secretariat*:
| | |
|---|---|
| Mr. Alex Kaplan | Secretary of the Tribunal |

*For the Claimants*:
| | |
|---|---|
| Mr. Franz Schwarz | WilmerHale |
| Mr. Gary Born | WilmerHale |
| Mr. Naboth van den Broek | WilmerHale |
| Ms. Danielle Morris | WilmerHale |
| Mr. Daniel Costelloe | WilmerHale |
| Mr. Justine Nguyen | WilmerHale |
| Mr. Jose Romero | WilmerHale |
| Mr. Amy Titus | WilmerHale |
| Mr. Stefan Choi | Addiko Bank AG |

*For the Respondent*:
| | |
|---|---|
| Mr. Robert G. Volterra | Volterra Fietta |
| Mr. Graham Coop | Volterra Fietta |
| Ms. Angela Ha | Volterra Fietta |
| Mr. Govert Coppens | Volterra Fietta |
| Ms. Eva Paloma Treves | Volterra Fietta |

*Court Reporter*:
| | |
|---|---|
| Ms. Dawn K. Larson | B&B Reporters |

---

[3] The Tribunal in the interim had issued Procedural Order No. 4, addressing issues unrelated to the accelerated issue.

26.  During the Hearing, the following persons were examined:

*On behalf of the Claimants*:
   Sir Francis Jacobs KCMG, QC              Fountain Court Chambers

*On behalf of the Respondents*:
   Prof. Paul Craig (Hon QC)               University of Oxford, Faculty of Law

27.  On 26 August 2019, the Tribunal issued Procedural Order No. 7[4] confirming the schedule for post-hearing submissions on the accelerated issue.

28.  The Parties filed simultaneous post-hearing briefs on 18 October 2019 ("Cl. PHB1" and "Resp. PHB1," respectively), and simultaneous reply post-hearing briefs on 22 November 2019 ("Cl. PHB2" and "Resp. PHB2," respectively).

29.  On 20 December 2019, each Party filed a submission on costs.

30.  On 1 May 2020, the Tribunal issued Procedural Order No. 15,[5] which addressed *inter alia* the production into the record of this proceeding of a recent decision in another ICSID arbitration against Croatia under the Austria-Croatia BIT (the "*UniCredit* 2020 Decision").[6] The record had long included an earlier decision in that case (the "*UniCredit* 2018 Decision"),[7] and in light of the Parties' prior advice that the *UniCredit* 2018 Decision was the subject of a pending reconsideration request, the Tribunal's Procedural Order No. 5 had ordered Croatia to produce a copy of the reconsideration decision when it became available.[8] In Procedural Order No. 15, the Tribunal directed Croatia to produce in this case only a redacted version of the *UniCredit* 2020 Decision, to address certain stated

---

[4] The Tribunal in the interim had issued Procedural Order No. 6, addressing issues unrelated to the accelerated issue.

[5] The Tribunal in the interim had issued Procedural Order Nos. 8-14, addressing issues unrelated to the accelerated issue.

[6] *UniCredit Bank Austria AG and Zagrebačka banka d.d. v. Republic of Croatia*, ICSID Case No. ARB/16/31, Decision on the Respondent's Application for Reversal of the Article 9 Decision and Decision on Jurisdiction and Admissibility, 24 March 2020, RLM-271 ("*UniCredit* 2020 Decision").

[7] *UniCredit Bank Austria AG and Zagrebačka banka d.d. v. Republic of Croatia*, ICSID Case No. ARB/16/31, Decision on the Respondent's Article 9 Objection to Jurisdiction, 12 October 2018, CLM-136 ("*UniCredit* 2018 Decision").

[8] Procedural Order No. 5, ¶ 19.

concerns about confidentiality.[9] At the same time, the Tribunal advised that it already was "well on its way to producing" the instant decision, and was "not waiting for access" to the *UniCredit* 2020 Decision to complete its work.[10]

31.     On 29 May 2020, the Tribunal noted with disappointment that it had not yet received the redacted version of the *UniCredit* 2020 Decision, despite the passage of four weeks from Procedural Order No. 15, but reiterated that it would not defer issuing this ruling (which it was almost ready to issue) to await that authority. Later that day, Croatia submitted the redacted *UniCredit* 2020 Decision, which has now been added to the record of this case.[11]

## III.    THE PARTIES' POSITIONS

32.     The summary below is intended to frame the issues presented by the Parties, not to be an exhaustive summary of all their assertions or all authorities they invoke in support.  The absence of reference to particular assertions or authorities should not be taken as an indication that the Tribunal did not consider those matters.  The Tribunal has carefully considered all arguments submitted to it in connection with the accelerated issue.

### A.    PRINCIPLES REGARDING THE DETERMINATION OF JURISDICTION

#### (1)    Burden of Proof

33.     The Parties have set out their positions on the threshold issue of who bears the burden of proving the Tribunal's jurisdiction.

##### a.    Croatia's Position

34.     Croatia asserts that it is "accepted international practice" that Addiko bears the onus to establish the Tribunal's jurisdiction under both the BIT and the ICSID Convention.[12]  This is particularly so, Croatia says, as the Contracting Parties to the BIT made an offer to

---

[9] Procedural Order No. 15, ¶ 17.

[10] Procedural Order No. 15, ¶ 13.

[11] *UniCredit* 2020 Decision, RLM-271.

[12] Resp. Mem. ¶ 5.

arbitrate only a limited category of claims regarding investments that meet specific conditions.[13]

35.    Specifically, Croatia asserts that Addiko has failed to prove that the conditions for the "Application of the Agreement" enshrined in Article 11 of the BIT are fulfilled.  According to Croatia, Article 11(2) of the BIT subordinates the BIT to the EU *acquis* in force at any given time, yet Addiko has failed to explain how its claims and the arbitration clause at Article 9 of the BIT are compatible with the EU *acquis*.[14]

36.    Croatia also states that Addiko has not established the jurisdiction of this Tribunal under consented under the BIT to submit the Addiko's claims to the Centre.  The essential requirement of written consent under Article 25 of the ICSID Convention has thus not been satisfied.[15]

### b.  Addiko's Position

37.    Addiko considers that neither party bears the burden of establishing the Tribunal's jurisdiction.[16]  Addiko points to jurisprudence from the International Court of Justice ("ICJ") and ICSID to illustrate that while each Party bears the burden of proving the facts on which it relies, the existence of jurisdiction is a "legal determination reserved for the Tribunal" based on the facts presented and the parties' legal arguments.[17]  This approach is consistent, Addiko says, "with the principle that the Tribunal is entitled to determine the extent of its own jurisdiction and with other principles of international law such as *iura novit curia*."[18]  Quoting the ICJ, Addiko states that "[t]here is no burden of proof to be discharged in the matter of jurisdiction."[19]

---

[13] Resp. Mem. ¶ 7.
[14] Resp. Mem. ¶ 8; *see also* Tr. Day 1, 146:20-147:2.
[15] Resp. Mem. ¶¶ 5-10.
[16] Notwithstanding this assertion, Addiko sets out its affirmative case on jurisdiction in their Memorial in the Merits at pp. 44-50.
[17] Cl. Reply ¶¶ 53, 60.
[18] Cl. Reply ¶ 60.
[19] Cl. Reply ¶ 61 (quoting *Fisheries Jurisdiction (Spain v. Canada)*, Judgment of 4 December 1998, ICJ Reports 432, at p. 450 ¶ 38 (CLM-193).

(2)     **Tribunal's Standard of Review**

38.     In the Tribunal's Procedural Order No. 2, the Tribunal asked "[w]hether Article 11(2) of the BIT anticipates that the issue of alleged incompatibility with the EU *acquis* should be decided *de novo* by an arbitral tribunal otherwise empaneled pursuant to Article 9 of the BIT, or alternatively envisions some form of deference on this issue to the views of the EU courts?"[20]

   *a.  Croatia's Position*

39.     Croatia asserts that Article 11(2) "not only envisions but mandates deference to the CJEU's binding interpretations of EU law."[21] The deference reflected in Article 11(2) is "particularly relevant if the CJEU has specifically adjudicated the question before the Tribunal."[22] Because (in Croatia's view) the CJEU's *Achmea* Judgment "removed any uncertainty about the incompatibility of arbitration clauses in intra-EU BITS" with the Treaty on the Functioning of the European Union (the "TFEU"), and "conclusively determined that Article 9 of the BIT is incompatible with—at the very least—Articles 267 and 344 of the TFEU," the Tribunal "cannot in good faith adopt a different interpretation,"[23] and "it would be *ultra vires* for this Tribunal … to overrule or fail to apply the CJEU's determinative finding …."[24]

   *b.  Addiko's Position*

40.     For Addiko, the Tribunal is "not only permitted, but indeed required, to determine the extent of its jurisdiction *de novo*," and "owes no deference under international law to the views of the CJEU or the European Commission."[25] Article 41(1) of the ICSID Convention, which provides that "[t]he Tribunal shall be the judge of its own competence,"

---

[20] Procedural Order No. 2 ¶ 67(a).
[21] Resp. PHB2 ¶ 10; *see also* Resp. Request ¶ 17.
[22] Resp. Mem. ¶¶ 164-165.
[23] Resp. Request ¶¶ 19, 23.
[24] Resp. PHB2 ¶ 10; *see also* Tr. Day 1, 150:14-151:2 (contending that the Contracting Parties to the BIT "didn't constrain the ability of any tribunal to reach a decision on questions of jurisdiction, generally speaking, unless it related to the incompatibility of anything in the BIT with the *acquis* which … displaces for those purposes the otherwise autonomy of a tribunal to come to *de novo* decisions about jurisdiction and consent …."). 
[25] Cl. Mem. ¶¶ 12, 91; *see also* Cl. Reply ¶¶ 8, 58.

makes this plain.[26]  In its view, "Article 11(2) does not, and cannot, displace the basic principle of international adjudication that an international court or tribunal is always the judge of its own jurisdiction."[27]  Addiko thus rejects any suggestion that Article 11(2) "somehow created a carve-out from the Tribunal's acknowledged competence-competence."[28]  Nor does *Achmea* override the Tribunal's mandate to examine and establish its own jurisdiction *de novo*.  In Addiko's view, *Achmea* does not reach the issues in this case, nor even purport to engage in the public international law analysis of compatibility required by the BIT; in any event, *Achmea* is "plainly not binding on this Tribunal."[29]

### (3)    Date of Determination of Jurisdiction

41.    In Procedural Order No. 2, the Tribunal also asked, "As of what date does Article 11(2) of the BIT anticipate that the issue of alleged incompatibility with the EU *acquis* be assessed, including *inter alia*, (i) the date of Croatia's accession, (ii) the date of the investor's request for arbitration or ICSID registration of such a request, or (iii) the date of a tribunal's decision?"[30]  The Parties' respective answers to this question follow.

#### a.  Croatia's Position

42.    For Croatia, "incompatibility should be assessed as at the date the claim is filed."  Relying on ICSID Institution Rule 6(2) that states that a proceeding is instituted as of the date of its registration, the relevant date for this proceeding is 27 September 2017.[31]

43.    However, for Croatia, the date as of which incompatibility is assessed must be distinguished from the question of when the BIT became incompatible with the EU *acquis*.  According to Croatia, it is obvious that "in making its case on jurisdiction before a tribunal, a claimant cannot rely on the registration of its claim as proof that an agreement to arbitrate

---

[26] Cl. Mem. ¶ 12; *see also* Cl. Reply ¶ 58.
[27] Cl. Mem. ¶ 91; *see also* Cl. Reply ¶ 58.
[28] Cl. PHB1 ¶ 36.
[29] Cl. Mem. ¶ 116; *see also* Cl. Reply ¶ 8; Cl. PHB1 ¶¶ 32-35.
[30] Procedural Order No. 2 ¶ 67(b).
[31] Resp. Mem. ¶ 166; Resp. PHB1 ¶ 74.

was established upon registration."[32] Croatia states that the BIT has been incompatible with the EU *acquis* from the moment that it acceded to the TFEU on 1 July 2013, and thus when the case was registered on 27 September 2017, the BIT already was incompatible with the EU *acquis*.[33]

### b. *Addiko's Position*

44.    Addiko responds that the BIT's compatibility with the EU *acquis* is to be assessed as of the date of ICSID's registration of the request for arbitration. It reasons that the international law "critical date" doctrine, applied by both the ICJ and investment tribunals (including those constituted under the ICSID Convention), calls for determination of jurisdiction as on the date of institution of proceedings, such that any subsequent lapse or withdrawal of the jurisdictional instrument has no effect on the jurisdiction of the forum.[34] Addiko's position, as stated in the hearing, is that it obtained a "vested right […] to arbitrate under this Agreement, after consent ha[d] actually been perfected at the critical date."[35] Since ICSID Institution Rule 6(2) states that a proceeding is instituted on the date of registration of the request, and the Parties agree that registration occurred on 27 September 2017, the arbitration agreement between Addiko and Croatia cannot be vitiated on any grounds which arose after that "critical date." In Addiko's view, this would apply to Croatia's arguments about incompatibility between the BIT and the EU *acquis* under either *Achmea* or the Declarations, since each of those were issued after registration of Addiko's request for arbitration.[36]

---

[32] Resp. PHB1 ¶ 46.
[33] Resp. Mem. ¶ 167; Resp. PHB1 ¶ 74.
[34] Cl. Reply ¶ 97; Cl. Mem. ¶¶ 95-97, *citing Application of the Convention for the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia)*, Preliminary Objections, Judgment of 18 November 2008, [2008] ICJ 412, 438, 445 (¶¶ 80, 95), CLM-114 ("Genocide Convention Case"); *Antoine Goetz and others v. Republic of Burundi*, ICSID Case No. ARB/95/3, Award, 10 February 1999, ¶ 72, CLM-113; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005, ¶ 178, CLM-149. Addiko relies on the reasoning in the *Genocide Convention Case* that without the critical date doctrine, a respondent could deliberately place itself beyond the jurisdiction of the forum. CLM-114, ¶ 80.
[35] Tr. Day 1, p. 261:5-8.
[36] Cl. Mem. ¶ 99.

(4)     **Status of Croatia's Consent to Arbitration**

a.   *Croatia's Position*

45.   Croatia argues that consent is irrevocable only to the extent that it is actually given. Croatia reasons that since Article 11(2) relieves the Contracting Parties from BIT obligations incompatible with the EU *acquis* in force, and the BIT was incompatible as of Croatia's accession to the EU Treaties in July 2013, then Article 9 of the BIT was not binding on Croatia from that date forward. Accordingly, Croatia argues that there was no "irrevocable" offer to arbitrate that Addiko could have validly accepted by initiating this arbitration.[37]

46.   This is so even in the absence of *Achmea*, according to Croatia, because the Tribunal still would have had to determine compatibility with the EU *acquis* pursuant to Article 11(2), and the underlying TFEU provisions were already in place even absent the CJEU's eventual interpretation of them in *Achmea*. However, now that *Achmea* has rendered, and given that EU Member States are bound by the CJEU's interpretation of the TFEU, this Tribunal can benefit from that interpretation in the specific context of intra-EU bilateral investment treaties.[38]

b.   *Addiko's Position*

47.   Addiko argues that Article 9(2)(a) of the BIT[39] irrevocably binds the Contracting Parties to maintain their offer to arbitrate with investors such as Addiko, with the consequence that Croatia's consent to arbitration is not subject to subsequent events.[40] Addiko also relies on the *UniCredit* 2018 Decision for this proposition, where the tribunal stated "the language … does not admit the operation either explicitly or implicitly of any subsequent events … the language of Article 9 negates certain further potential conditions, including the requirement that there by a specific arbitration agreement between the parties or any prior

---

[37] Resp. Mem. ¶ 99; Resp. PHB1 ¶¶ 43-45; Tr. Day 1, 173-174, 277.

[38] Resp. Mem. ¶ 99.

[39] Article 9(2)(a) of the BIT provides in relevant part that "[i]n case of arbitration, each Contracting Party, by this Agreement irrevocably consents in advance, even in the absence of an individual arbitral agreement between the Contracting Party and the investor, to submit any such dispute to this Centre."

[40] Cl. Mem. ¶¶ 100-101, 103; Cl. Reply ¶ 5.  Addiko also relies on the preparatory works on the ICSID Convention where Aron Broches emphasized principles of irrevocability of consent. C. H. Schreuer *et al.*, *The ICSID Convention: A Commentary*, 2nd ed. 2009, at p. 230, CLM-183.

exhaustion of remedies."[41]  Addiko also points to Article 25(1) of the ICSID Convention, which prevents States from withdrawing their consent unilaterally after investors have given their own consent.[42]  Addiko therefore concludes that since Croatia consented to arbitration on the date of the BIT, and Addiko consented to arbitration on the date of institution of proceedings, a subsequent event cannot abrogate the irrevocable consent of the parties to this arbitration.[43]

48.    For Addiko, this is unaffected by Article 11(2) of the BIT which, Addiko argues, calls for compatibility between the BIT and the EU *acquis* to be assessed based on the state of the *acquis* in force at the "legally relevant" point in time, which for jurisdictional issues would be the date as determined by the critical date doctrine.[44]  Addiko also argues that Article 11(2) of the BIT must be interpreted in light of both the principle of effectiveness,[45] and the BIT's object and purpose of promotion and protection of investments,[46] as safeguarding a tribunal's jurisdiction by freezing the *acquis* to that in force at the time proceedings are instituted.[47]  In its view, the phrase "at any given time" in Article 11(2) of the BIT could not have been intended to allow State parties to escape responsibility based on developments in the *acquis* postdating the institution of proceedings.  Addiko stresses that the principle of good faith should govern the analysis of these issues as they relate to Croatia's consent to arbitration.[48]

---

[41] *UniCredit* 2018 Decision, ¶¶ 112-113, CLM-136.

[42] Cl. Mem. ¶¶ 163-64.  Article 25(1) of the ICSID Convention provides in relevant part that "[w]here the parties have given their consent, no party may withdraw its consent unilaterally."

[43] Cl. Mem. ¶ 102. Addiko relies on ICSID Institution Rule 2(3), which defines the "date of consent" as "the date on which the parties to the dispute consented in writing to submit it to the Centre; if both parties did not act on the same day, it means the date on which the second party acted."

[44] Cl. Mem. ¶¶ 104-105; *see also* Cl. PHB2 ¶ 17.

[45] Cl. Mem. ¶ 110, *citing* Appellate Body Report, *Korea – Definitive Safeguard Measure on Imports of Certain Dairy Products*, WT/DS98/AB/R, 14 December 1999, at p. 24 ¶ 80, CLM-174 (noting that a treaty must be interpreted in a manner to give effect to its terms, and not in a manner that would render its provisions futile), and the *UniCredit* 2018 Decision at ¶ 120, 124; *see also* Cl. PHB1 ¶ 48; Cl. PHB2 ¶ 13.

[46] Cl. Mem. ¶¶ 112-114; Cl. PHB1 ¶ 177.

[47] Cl. Mem. ¶ 109.

[48] Tr. Day 1, 230:18-22, 259:7-21, 268:3-270:15; *see* Resp. PHB1 ¶¶ 76-77 (Croatia describing Addiko's contention pertaining to the applicability of good faith when ascertaining whether the Tribunal has jurisdiction); *see also* Tr. Day 1, 230:18-22.

**B.    IMPACT OF ARTICLE 11(2) OF THE BIT**

**(1)    Croatia's Position**

49.    It is Croatia's position that the ordinary meaning of Article 11(2) of the BIT is clear and should be interpreted in light of this meaning pursuant to Article 30 of the Vienna Convention on the Law of Treaties ("VCLT").[49]  For Croatia, there can be no doubt that the article unequivocally refers to the EU *acquis* in force at any given time.  Thus, Croatia is not "bound" by the BIT insofar as it is incompatible with the EU *acquis*.

50.    According to Croatia, the meaning of Article 11(2) is further supported by the context and purpose of the provision to resolve any conflicts between the BIT and the Contracting Parties' obligations under the *acquis*.[50] Indeed, Croatia submits that Article 11(2) was included in the BIT to resolve precisely the conflict of norms now faced by this Tribunal, and to ensure that the Contracting Parties to the BIT would comply "at any given time" with their international legal obligations pursuant to EU Treaties.[51] Croatia also argues that Addiko cannot have more rights under the BIT than those to which the Republic of Austria agreed.[52]

51.    For Croatia, it is uncontroverted that States can determine the priority of treaties in force between them, and no rule of public international law restricts them from so regulating the priority of norms in force between them.  Both the Contracting Parties to this BIT and all Contracting Parties to EU treaties are unanimous in their agreement that EU Treaties prevail over treaties such as this BIT.[53]

52.    Croatia adds that if the Tribunal does not consider Article 11(2) to be dispositive, the same result (that the Tribunal lacks jurisdiction) in any event should result from the default

---

[49] United Nations, Vienna Convention on the Law of Treaties, 23 May 1969, United Nations Treaty Series, vol. 1155, p. 331, CLM-100.

[50] Resp. Mem. ¶¶ 11-19; Resp. PHB1 ¶¶ 1-5.

[51] Resp. Mem. ¶ 12; Resp. PHB1 ¶ 8; *see also* Cl. PHB1 ¶¶ 170-181.

[52] Resp. Mem. ¶ 17.

[53] Resp. Reply ¶¶ 15-16.

conflicts rule set out in Article 30 of the VCLT, regarding the application of successive treaties relating to the same subject matter.[54]

53.    Finally, Croatia warns that ICSID case law (such as *Caratube v. Kazakhstan*) confirms that any award rendered by a tribunal exercising jurisdiction beyond the consent of the parties would be subject to annulment.[55]

### (2)    Addiko's Position

54.    Addiko disagrees with Croatia about the impact of Article 11(2) on the Tribunal's jurisdiction.  For Addiko, Article 11(2) of the BIT has no impact on the established position under international law that a tribunal is always the judge of its own competence; as a result, the Tribunal has the power to interpret the instrument of consent, and must determine the issue of "incompatibility" based on international law principles, not based on the pronouncements of EU States or institutions.[56]

55.    In response to Croatia's alternative argument on the application of VCLT conflict rules, Addiko notes that investment treaty tribunals consistently have found that intra-EU BITs and EU Treaties do not have the same subject matter. Accordingly, neither VCLT Article 30 nor VCLT Article 59 (regarding the termination or suspension of the operation of a treaty implied by conclusion of a later treaty) have any application.  By their terms, both Article 30 and Article 59 apply only when successive treaties address the same subject-matter.

56.    Addiko criticizes Croatia for attempting to circumvent these VCLT provisions by seeking to elevate Article 11(2) of the BIT into a special clause that negates any need to resort to these default interpretive rules in the first place.[57]  In Addiko's view, Article 11(2) requires the same test of compatibility as these VCLT provisions, since it is inherent in the notion of "incompatibility" (expressed in Article 11(2) of the BIT) that treaties must have the

---

[54] Resp. Mem. ¶¶ 24-34.
[55] Resp. Mem. ¶ 18, *citing Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application, 21 February 2014, ¶ 74, RLM-194 ("Caratube v. Kazakhstan" or "Caratube".
[56] Cl. Mem. ¶¶ 91-92.
[57] Cl. Mem. ¶¶ 15-21; Cl. PHB1 ¶¶ 17-19.

same subject matter in order even possibly to be incompatible. Because the BIT and the EU Treaties do not have the same subject matter, Addiko argues that this disposes of the question under either Article 11(2) or the VCLT, without even needing to reach the second element of alleged "incompatibility."[58]

## C.  COMPATIBILITY ANALYSIS UNDER ARTICLE 11(2) OF THE BIT

57.     Having argued the relevance of Article 11(2) to the jurisdictional analysis, the Parties turn to the issue of compatibility. Croatia's premise, which forms the basis for this accelerated issue, is that Article 11(2) allegedly vitiates the Tribunal's jurisdiction due to the incompatibility between the BIT and the EU *acquis*. Croatia argues that both the BIT's arbitration clause (Article 9) and its substantive treatment standards are incompatible with the *acquis*.[59] Addiko argues that there is no incompatibility with respect to either the BIT's procedural or substantive provisions.

58.     However, prior to addressing these issues, the Parties address both the standard of "incompatibility" and the weight to be given to decisions of other arbitral tribunals, constituted under bilateral investment treaties as well as the Energy Charter Treaty ("ECT"), which have examined the compatibility of intra-EU investment arbitration.

### (1)     Standard of Compatibility

#### a.  Croatia's Position

59.     On the "standard of compatibility," Croatia argues that by Addiko's own submission,[60] incompatibility arises when complying with one treaty leads to the infringement of another. Using this "strict" definition of incompatibility, Croatia argues that if Article 11(2) of the BIT is not given effect, and this Tribunal upholds jurisdiction, both Croatia and Austria would be in breach of their obligations under the EU Treaties.[61]

---

[58] Cl. PHB1 ¶¶ 17-19.
[59] Resp. Mem. ¶ 8. Croatia emphasizes the unanimity regarding the incompatibility between intra-EU bilateral investment treaties and the EU *acquis* from all 28 EU Member States, the CJEU and the European Commission. Resp. Reply ¶ 2.
[60] Resp. Reply ¶ 60, *citing* Cl. Mem. 45.
[61] Resp. Reply ¶¶ 60-62.

### b. Addiko's Position

60.     Addiko argues that "compatibility" has an ordinary meaning which calls for same analysis conducted by numerous other arbitral tribunals which have considered this issue under Article 59 of the VCLT. Under this analysis, as explained below through the lens of prior case law, the BIT is not incompatible with EU law.[62]

### (2)    Import of Other Arbitrations with Similar Issues

61.     Croatia contends that the numerous other arbitral decisions Addiko cites, as upholding jurisdiction in intra-EU disputes and finding no incompatibility between various investment treaties and the EU *acquis*, must be disregarded.  In Croatia's view, the prior cases are either (a) inapposite to the analysis under Article 11(2) of the BIT, which is unique, or (b) were wrongly decided, in the case of *UniCredit* which examined Article 11(2) of the same BIT.[63] Addiko contends by contrast that the analysis of prior tribunals is instructive.[64]

### a. Croatia's Position

62.     First, Croatia argues in general terms why this Tribunal must not rely on the decisions of prior tribunals. Second, Croatia discusses and rebuts the post-*Achmea* cases on which Addiko relies, and discusses extensively the *UniCredit* 2018 Decision rendered under the same BIT as at issue here

### (i)  General Objections to other Arbitral Case Law

63.     **First**, Croatia notes that unlike prior arbitrations involving intra-EU BITs, with the exception of the *UniCredit* case,[65] this Tribunal need not undertake an extensive public international law analysis of compatibility between the BIT and the EU *acquis*. Instead, the ordinary, and "clearly drafted," Article 11(2) of the BIT must be interpreted in

---

[62] Cl. Mem. ¶ 88. Addiko argues that the term "compatibility" in VCLT Article 30 should be given the same interpretation as the term "incompatibility" in VCLT Article 59, *mutatis mutandis*. Cl. Mem. ¶ 88; *see also* Cl. PHB1 ¶¶ 18-19.

[63] Resp. Reply ¶ 3.

[64] Cl. Mem. Section III.A.

[65] Resp. PHB1 ¶ 48 n.33; Resp. PHB2 ¶ 2.

compliance with Article 31(1) of the VCLT which sets out general rules of interpretation for treaties.[66] Therefore, Croatia argues that any analysis by other tribunals considering treaties with no specific conflict clause such as Article 11(2) of the BIT are irrelevant. For this reason, Croatia argues that Addiko's reliance on such case law obfuscates the matter before this Tribunal.[67]

64.     ***Second***, Croatia argues that Addiko's position that Article 11(2) of the BIT and Article 30 of the VCLT both call for the application of the "same subject-matter" test is incorrect. Rather, Article 30 of the VCLT does not rightly apply in this context, as it is to be employed only in the absence of an express conflict clause such as Article 11(2) of the BIT and even if Article 30 of the VCLT did apply, the notion that it imposes a predicate "same subject matter" test is based on an "erroneous interpretation."[68]

65.     ***Third***, Croatia argues that Addiko's reliance on arbitral jurisprudence to support a restrictive interpretation of both the EU *acquis* and the *Achmea* Judgment exposes the risk sought to be avoided by both Article 11(2) of the BIT and the EU *acquis*. Croatia reasons that any reliance on prior cases leads (i) to rendering of awards incompatible with respondent-EU Member States' international legal obligations under the EU Treaties, and (ii) to the creation of authority to override the CJEU's binding interpretations of the EU Treaties. Croatia cautions that these issues pose a double risk to the autonomy of the EU legal order envisaged by *Achmea* and recognized by the Declarations.[69]

*(ii) Case-specific Objections to other Arbitral Case Law*

66.     Croatia argues that Addiko misrepresents the arbitral case law it invokes as purportedly supportive of the proposition that intra-EU bilateral investment treaties are "fully compatible" with the EU *acquis*.  For Croatia, on closer examination of the case law, it becomes evident that the findings of these cases are "fragmented," in that there is no

---

[66] Resp. Mem. ¶¶ 3, 14-15; Resp. Reply ¶ 13.
[67] Resp. Reply ¶ 17, 44.
[68] Resp. Reply ¶¶ 44-45.
[69] Resp. Reply ¶¶ 74-76; *see also* Resp. PHB1 ¶¶ 57-60.

consensus or uniformity among the tribunals, which in fact have found different ways to reject jurisdictional objections such as Croatia's.[70]

67.   Croatia focuses on those awards, seven in number, which were rendered after *Achmea*. Of these, Croatia notes that only three were under intra-EU bilateral investment treaties, whereas the rest were under the ECT.[71]

68.   With respect to *Antin v. Spain*, Croatia argues that the tribunal there was concerned with an objection that it had no jurisdiction *rationae personae*, and in fact refrained from addressing the compatibility issue.  The tribunal stated that this was an issue to be sorted out by the EU and the EU Member States parties to the ECT.[72]

69.   As for *Greentech Energy Systems v. Spain*, Croatia argues that the tribunal in that case held that both EU law and *Achmea* were irrelevant for its decision, and therefore did not address the compatibility issue either. [73]

70.   Croatia observes that in *Marfin v. Cyprus*, the tribunal had decided it would address compatibility only if it found that the that the Cyprus-Greece Bilateral Investment Treaty and the EU Treaties concerned the same subject-matter. Since the tribunal found no such "same subject-matter," it did not further examine incompatibility issues between the treaty and EU law.[74]

---

[70] Resp. Reply ¶¶ 18-20, 22, 27, 42.
[71] Resp. Reply ¶¶ 21, 23. *Marfin Investment Group Holdings S.A., Alexandros Bakatselos and others v. Republic of Cyprus*, ICSID Case No. ARB/13/27, Award, 26 July 2018, CLM-132 ("Marfin"), *UP and C.D Holding v. Republic of Hungary*, ICSID Case No. ARB/13/35, Award, 9 October 2018, CLM-137 ("UP and C.D Holding"), and *UniCredit* were decided under intra-EU bilateral investment treaties, whereas *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, CLM-112 ("Antin"), *Greentech Energy Systems A/S and others v. Kingdom of Spain*, SCC Arbitration V (2015/150), Award, 14 November 2018, CLM-129 ("Greentech"), *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, CLM-138 ("Vattenfall"), and *Eskosol S.p.A in liquidazione v. Italian Republic,* ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, CLM-192 ("Eskosol") were under the ECT.
[72] Resp. Reply ¶¶ 29-31, *citing Antin* at ¶ 224.
[73] Resp. Reply ¶¶ 32-33, *citing Greentech* at ¶¶ 214, 218, 220.
[74] Resp. Reply ¶ 24, *citing Marfin* at ¶¶ 584, 587, 591.

71.     In *Vattenfall v. Germany*, Croatia says the tribunal did not even touch on the compatibility issue. because it held that EU law did not apply to the ECT provision at issue.  That case, according to Croatia, was "highly specific to the ECT."[75]

72.     As for *UP and C.D Holding v. Hungary*, Croatia argues that the tribunal there merely held that it did not consider a detailed discussion of *Achmea* to be relevant because the case differed "in determinative aspects" from *Achmea*, particularly insofar as *Achmea* did not mention ICSID arbitration. Thus, the tribunal avoided addressing the incompatibility issue.[76]

73.     In *Eskosol v. Italy*, Croatia submits that the tribunal abstained from ruling on the compatibility issue and instead rejected jurisdictional objections on the basis of the ECT's applicable law provision and the "same subject-matter" requirement of Article 30 of the VCLT. Croatia notes that, as to *Achmea*, the tribunal held that it was inapplicable as it did not refer to multilateral treaties such as the ECT.[77]

74.     Finally, as to the *UniCredit* 2018 Decision, Croatia makes extensive arguments.[78]

75.     ***First***, Croatia argues that despite its having raised objections of incompatibility between the BIT and Articles 267 and 344 of the TFEU, the tribunal in *UniCredit* never once referred to these Articles in rejecting Croatia's jurisdictional objections.[79] Croatia emphasizes that the EU *acquis* cannot be reduced to *Achmea* and, instead, Article 11(2) of the BIT calls for comprehensive analysis of the EU Treaties in their entirety.[80] This is especially so, Croatia says, because nothing in public international law precludes States from establishing a hierarchy among treaties.[81]

---

[75] Resp. Reply ¶¶ 34-36, *citing Vattenfall* at ¶¶ 155, 167; Cl. PHB1 ¶ 121. Conversely, Addiko cites *Eskosol* and *Vattenfall* as evidence of post-*Achmea* international tribunals that rejected intra-EU jurisdictional objections allegedly similar to those raised by Croatia and the Commission in this case.

[76] Resp. Reply ¶ 25-26, *citing UP and C.D Holding* at ¶¶ 252-255, 258. Croatia also highlights the differences between *Achmea* and the case before the *UP and C.D Holding* tribunal, that enabled that tribunal to come to its finding.

[77] Resp. Reply ¶¶ 37-41, *citing Eskosol* at ¶¶ 113-115, 123, 144-145, 168.

[78] Resp. Reply Section IV.H.

[79] Resp. Reply ¶¶ 169-170.

[80] Resp. Reply ¶ 171.

[81] Resp. Reply ¶¶ 171-173.

76.    **Second**, Croatia states that the tribunal in *UniCredit* wrongly rejected application of the principle of *ex tunc* effect of CJEU decisions. Croatia argues that instead of considering the phrase "at any given time" in Article 11(2) of the BIT as meaning the EU *acquis* in force at the legally relevant time, the phrase calls for the commonplace diplomatic understanding of the EU *acquis* to mean the entire body of obligations under the EU Treaties.[82]

77.    **Third**, Croatia argues that the *UniCredit* 2018 Decision unduly relied on the principle of "legitimate expectations" to excuse any *ex tunc* application of *Achmea*. For Croatia, this approach is unsupported in the EU *acquis* and the case law.[83] Croatia further notes that neither the claimant in that case nor its legal expert provided a basis for the use of this principle.[84] Croatia also emphasizes that the only case that the tribunal relied on, ironically also a CJEU decision, also rejected application of the principle of legitimate expectations.[85]

78.    **Fourth**, Croatia argues that the principle of legitimate expectations is not a part of general public international law. While there may be a basis for the application of legitimate expectations to a merits analysis under the principle of "fair and equitable treatment," that principle was not applicable in *UniCredit* where the tribunal was concerned with access to dispute resolution, not merits issues.[86] In addition, Croatia argues that any application of the principle of legitimate expectations would be fickle, since at the time that arbitration was registered, doubt already had been cast on the compatibility of intra-EU bilateral investment treaties with the EU *acquis*.[87]

79.    **Fifth**, Croatia argues that the *UniCredit* tribunal inexplicably rejected the relevance of EU law despite clear reference to it in Article 11(2) of the BIT.[88] This, Croatia argues, was also the case in the tribunal's incorrect finding that the lack of an express mention of Article

---

[82] Resp. Reply ¶¶ 174-177, *citing UniCredit* 2018 Decision at ¶¶ 121, 123.
[83] Resp. Reply ¶ 178, *citing UniCredit* 2018 Decision at ¶¶ 126-127; Cl. PHB2 ¶ 86 n.100
[84] Resp. Reply ¶ 180.
[85] Resp. Reply ¶ 179, *referring to Fintan Duff and others v. Minister of Agriculture and Food. Ireland and the Attorney General*, Case C-63/93, Judgment, 15 February 1996 ¶¶ 19-20, RLM–174.
[86] Resp. Reply ¶¶ 182-183, *citing Obligations to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, Judgment, 1 October 2018, ICJ, ¶ 162, RLM–175.
[87] Resp. Reply ¶¶ 185-187.
[88] Resp. Reply ¶¶ 188-191.

9 in Article 11(2) of the BIT implies an ambiguity in the compatibility analysis with respect to the BIT's arbitration provision.[89] Croatia also questions the tribunal's decision to use the alleged "object and purpose" of the treaty to override the clear terms of Article 11(2) of the BIT, thereby violating Article 31(1) of the VCLT.[90]

80.    **Sixth**, and finally, Croatia argues that the tribunal erred in holding that a finding of incompatibility between the BIT and the EU *acquis* would obviate the sunset provision in Article 12 of the BIT. Croatia argues that such an understanding is unsupported in the VCLT, which contemplates the possibility of one treaty suspending another. At any rate, Croatia argues that Article 70 of the VCLT allows parties to agree on alternate methods for terminating a treaty, which has happened here by way of the Declarations.[91]

### b. Addiko's Position

81.    Addiko relies on numerous arbitral decisions regarding the compatibility issue and urges this Tribunal to follow suit.  In this regard, Addiko argues that the arbitral case law establishes compatibility between the BIT and Article 267 and 344 of the TFEU.

82.    First, Addiko argues that there is no reason to depart from the 23 decisions declining preliminary objections that intra-EU BITs allegedly are incompatible with the EU *acquis*.[92]

---

[89] Resp. Reply ¶¶ 197-201.

[90] Resp. Reply ¶¶ 202-206.

[91] Resp. Reply ¶¶ 192-196.

[92] Cl. Mem. ¶¶ 4, 8, 22, 39, 86; Cl. Reply ¶ 16. At Cl. Mem. ¶ 43, Addiko cites to 23 publicly known cases which examined intra-EU arbitration issues: *Eastern Sugar v. Czech Republic*, SCC No. 008/2004, Partial Award, 27 March 2007, CLM-121 ("Eastern Sugar"); *Binder v. Czech Republic*, Award on Jurisdiction, 6 June 2007, CLM-115 ("Binder"); *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, Decision on Jurisdiction, 30 April 2010, CLM-131 ("Oostergetel"); *Achmea (formerly Eureko) v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, CLM-109 ("Achmea Jurisdiction Award"); *European American Investment Bank AG v. Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction, 22 October 2012, CLM-124 ("EAI Bank"); *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, CLM-56 ("Electrabel"); *Charanne B.V. v. Kingdom of Spain*, SCC No. 62/2012, Award, 21 January 2016, CLM-119; *RREEF Infrastructure (G.P.) Limited & RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, CLM-135 ("RREEF"); *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Arbitration V2013/153, Award, 12 July 2016, CLM-130; *Blusun v. Italy*, ICSID Case No. ARB/14/3, Award, 27 December 2016, CLM-116; *WNC Factoring Ltd. v. Czech Republic*, PCA Case No. 2014-34, Award, 22 February 2017, CLM-139 ("WNC Factoring"); *Anglia Auto Accessories Limited v. Czech Republic*, SCC Arbitration Case V 2014/181, Award, 10 March 2017, CLM-111 ("Anglia"); *J.P. Busta & J.P. Busta v. Czech Republic*, SCC Arbitration Case V 2015/014, Award, 10 March 2017, CLM-117 ("Busta"); *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, CLM-123 ("Eiser "); *PL*

For Addiko, no matter Croatia's position on this case law, it cannot be contested that these tribunals confirmed "full compatibility" of intra-EU treaties with EU law under fundamental principles of international law.[93]

83.     It is Addiko's position that the persuasive effect of these numerous cases is unimpacted by Article 11(2) of the BIT, since the analysis called for by Article 11(2) of the BIT is identical to the "same subject-matter" standard applied by other tribunals under Articles 30(3) and 59 of the VCLT.[94]

84.     Addiko also agrees with tribunals that have found there could be no incompatibility because the BIT and the EU Treaties do not address the same subject matter. Addiko adds that, even if the BIT and the EU *acquis* were considered to have the same subject-matter, the earlier of the two only could be rendered inapplicable (by VCLT Article 30(3)) or terminated (by VCLT Article 59) if the two treaties were found to be incompatible. Incompatibility in this context calls for a situation where compliance with one treaty necessarily leads to a breach of the other.

85.     Second, Addiko relies on prior arbitral rulings to argue that there is no incompatibility between the arbitration provision in the BIT and Articles 267 and 344 of the TFEU.[95] Addiko states that these provisions of the TFEU do not create a "jurisdiction monopoly" for the CJEU which prevents other tribunals from applying EU law.[96] Finally, Addiko

---

*Holdings S.à.r.l. v. Republic of Poland*, SCC Arbitration No. V 2014/163, Award, 28 June 2017, CLM-134 ("PL Holdings"); *EDF v. Republic of Hungary*; *PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14; *Novenergia v. Kingdom of Spain*, SCC Arbitration (2015/063), Award, 15 February 2018, CLM-133; *Antin*; *Vattenfall*; *Marfin*; *UP and C.D Holding*; and *Greentech*.

[93] Cl. Mem. ¶ 70; Cl. Reply ¶¶ 4, 7, 15.
[94] Cl. Mem. ¶¶ 9, 10, 40, 44; Cl. Reply ¶¶ 7, 17.
[95] Cl. Mem. ¶¶ 49-52, *relying on EAI Bank* at ¶¶ 254-257, *Electrabel* at ¶ 4.151, *Eiser* at ¶ 204 and *PL Holdings* at ¶ 314. Addiko also makes the general argument that other investment tribunals have found such compatibility without necessarily falling back on the reason that Article 267 and 344 of the TFEU are inapplicable to investment tribunals. Cl. Reply ¶ 86.
[96] Cl. Mem. ¶ 53, *relying on EAI Bank* at ¶¶ 248-253, *Anglia* at ¶ 127 and *Busta* at ¶ 127. Addiko places special emphasis on *PL Holdings d* at ¶ 315, which held that "no jurisdiction in the world has asserted a monopoly – much less succeeded in asserting a monopoly – over the interpretation and application of its law, even though, it may of course claim to have 'the last word' on the meaning of its law."

argues that Article 344 of the TFEU is not even applicable to arbitral tribunals adjudicating disputes such as those in investment treaty arbitration.[97]

## D. EU DECLARATIONS

86.     Member States of the European Union adopted three declarations[98] (together, the "**Declarations**") on the consequences and enforcement of the CJEU judgment in *Achmea*.

87.     The Declarations state:

> [A]ll investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to [European] Union law and thus inapplicable.[99]

88.     Croatia argues that the Declarations unequivocally demonstrate that "all 28 EU Member States agree that the *Achmea* Judgment precludes all arbitration clauses in intra-EU BITs,"[100] a conclusion premised on the incompatibility between all intra-EU BITs and the EU *acquis*.[101] Consequently, the instant BIT, and especially its Article 9, is incompatible with the EU *acquis*. Croatia further submits that the Declarations are themselves a component part of the EU *acquis* and consequently are authoritative and binding on this Tribunal.[102]

89.     Addiko, on the other hand, argues that the Declarations have no legal force and do not affect the scope of either the *Achmea* Judgment or the content of EU law.[103] In other words, Addiko argues that they have no impact on either this Tribunal's jurisdiction or the substantive protections conferred by the BIT.

---

[97] Cl. Mem. ¶ 57, *relying on Electrabel ¶¶* 4.151, 4.153.
[98] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019 ("Declaration – 15 January 2019"), RLM-41; Declaration of 5 Member States on the enforcement of the *Achmea* Judgment, 16 January 2019 ("Declaration – 16 January 2019"), RLM-42; Declaration of Hungary on the Legal Consequences of the *Achmea* Judgment, 16 January 2019 ("Hungarian Declaration"), RLM-43.
[99] Page 1 of all Declarations.
[100] Resp. PHB2 ¶ 13.
[101] Resp. Mem. Section III.B(i)-(iii).
[102] Resp. Mem. Section III.B(iv); Resp. PHB1 ¶ 158; *see also* R-1; C–222 (definition of the EU *acquis*).
[103] Cl. Mem, Section IV.D; Cl. Reply ¶ 104; Cl. PHB1 ¶¶ 228-234.

**(1)     The Declarations' Effect on Compatibility Between Article 9 of the BIT and the *Acquis***

        *a.   Croatia's Position*

90.     In the first place, Croatia relies on the wording of the Declarations to argue that since "all" investor-State arbitration clauses in intra-EU BITs have been deemed incompatible with the TFEU (and hence the EU *acquis*), Article 9 of the BIT is itself incompatible with the EU *acquis*,[104] and accordingly, the incompatibility foreseen in Article 11(2) of the BIT is fulfilled.

91.     Croatia also says that the Declarations confirm its interpretation of *Achmea,* namely that Articles 267 and 344 of the TFEU preclude investor-State arbitration clauses in intra-EU BITs. Croatia places specific emphasis on the unanimity among the EU Member States in this regard.[105]  Noting Addiko's view that the Member States were not unanimous on the compatibility issue, Croatia cautions that this was only with regard to compatibility of the ECT with the *acquis*, not with respect to intra-EU BITs.[106]

92.     Next, Croatia posits that incompatibility as established in the Declarations is effective from the date of Croatia's accession to the EU Treaties and its membership in the EU, *i.e.,* 1 July 2013. For this, Croatia relies on the allegedly "unequivocal" statement in the Declarations that no valid offer of arbitration could be extended by Member States of the EU.[107]

93.     Croatia says this finding is confirmed in the decision of the German Federal Supreme Court, the *Bundesgerichtshof*, which set aside the award in *Achmea*.  This decision is deemed by Croatia to be *prima facie* evidence of incompatibility between the BIT at issue in *Achmea* (a BIT between the Netherlands and Slovakia) and the EU *acquis*. Croatia highlights that the *Bundesgerichtshof* set aside the award on this ground despite the CJEU's judgment regarding incompatibility having been rendered after the claim was filed, indicating that incompatibility was understood to run from the date of accession of the

---

[104] Resp. Mem. ¶¶ 35-38; Resp. PHB1 ¶ 158.
[105] Resp. Mem. ¶¶ 39-40.
[106] Resp. Reply ¶ 123.
[107] Resp. Mem. ¶ 41.

relevant Member State to the EU, and not simply from the date of the CJEU's judgment. On this basis, Croatia concludes that the Declarations confirm that the BIT was incompatible with the EU *acquis* from the date of Croatia's accession to the EU, *i.e.,* 1 July 2013.[108]

94.    Last, Croatia calls on the text common to all Declarations that the Member States undertook to "inform investment arbitration tribunals about the legal consequences of the *Achmea* … in all pending intra-EU investment arbitration proceedings" to argue the particular relevance of the Declarations in the present proceeding.[109]

### b. *Addiko's Position*

95.    Addiko does not speak to the impact that any of the Declarations have on the compatibility between the BIT and the EU *acquis*. Instead, Addiko argues that this Tribunal must pay no heed to the Declarations as they are irrelevant to its analysis of its jurisdiction under Article 9 of the BIT. Therefore, Addiko confines its arguments to those summarized below.[110]

### (2)    Whether the Declarations Are Binding on this Tribunal

### a. *Croatia's Position*

96.    Croatia argues that the Declarations are authoritative, binding this Tribunal to follow their interpretation of the BIT and the TFEU.[111]

97.    ***First***, Croatia relies on the Eur-Lex Glossary[112] to demonstrate that the definition of the "EU *acquis*" includes "declarations and resolutions adopted by the [European] Union." Accordingly, Croatia argues that this Tribunal is bound by the Declarations, as Article 11(2) mandates this Tribunal to apply the EU *acquis*.[113]

---

[108] Resp. Mem. ¶¶ 43-44, *relying on Bundesgerichtshof, Slowakische Republik v. Achmea BV*, Case ZB 2/15, Judgment, 31 October 2018 (Translation to English), PC-9 ("Bundesgerichtshof *Achmea* Decision").

[109] Resp. Mem. ¶ 42, *relying on* Declaration – 15 January 2019, at p. 3; Declaration – 16 January 2019, at p. 3 and Hungarian Declaration, at p. 2.

[110] Cl. PHB1 ¶ 226.

[111] Resp. Mem. Section III.B(iv).

[112] R-2.

[113] Resp. Mem. ¶¶ 46-47.

98.     Although Addiko argues that the EU Member States, even collectively, are "not an institution of the EU" for purposes of the definition of the EU *acquis*, Croatia disagrees because the Member States who signed the declarations acted within the powers of the EU and the Council of the EU (an EU institution), whose declarations are part of the EU *acquis*. To substantiate this argument, Croatia underscores that the Declarations were signed by the Member States in Brussels through their respective ambassadors to the EU or an equivalent EU body.[114]

99.     ***Second***, Croatia draws the Tribunal's attention to Article 11(3) of the BIT, also relied on by Addiko. Croatia argues that since Article 11(3) of the BIT calls for the Contracting Parties of the BIT to enter into a dialogue regarding any uncertainty about the effects of Article 11(2) of the BIT, the Declarations reflect the common position of both Austria and Croatia on the effect of incompatibility between the BIT and the EU *acquis*.[115]

100.    ***Third***, Croatia argues that the Declarations evidence the organization of mutual treaty obligations of both Austria and Croatia – *i.e.,* "[European] Union law takes precedence over bilateral investment treaties concluded between Member States." This, Croatia argues, is within their sovereign rights, with which this Tribunal cannot interfere. Croatia observes in this regard that a hierarchy between EU law and the BIT is not novel.[116] Instead, it is present in both Article 4(3) of the TFEU[117] and in the EU "Declaration on Primacy,"[118] which must be treated as an authoritative and binding interpretation of the Treaty of Lisbon under VCLT Article 31(2)(a). In other words, Croatia argues that the Declarations' subordination of the BIT to the EU *acquis* is well supported, and therefore authoritative for this Tribunal to follow.[119]

---

[114] Resp. Reply ¶ 122.

[115] Resp. Mem. ¶¶ 48-50.

[116] Resp. Reply ¶ 8, reiterating that the primacy of the EU Treaties and the position they enjoy in the hierarchy against other intra-EU treaties is a founding cornerstone of the EU Treaties.

[117] RLM–10.

[118] Declarations Annexed to the final act of the Intergovernmental Conference which adopted the Treaty of Lisbon, signed on 13 December 2007, Declaration 17 – Declaration concerning primacy, Official Journal 115, 09/05/2008 pp. 0344 – 0344, RLM-129 ("Declaration 17").  Croatia emphasizes that the principle of primacy is also enshrined in Article 11(2) of the BIT. Resp. Reply ¶ 10; *see also* Resp. PHB1 ¶ 89.

[119] Resp. Mem. ¶¶ 51-55; *see also* Cl. PHB1 ¶ 155.

101.    ***Fourth***, Croatia argues that the Declarations are a "subsequent agreement between the parties (Croatia and Austria) regarding the interpretation of the treaty (BIT) of the application of its provisions" under VCLT Article 31(3)(a), which sets out general rules of treaty interpretation. Accordingly, Croatia argues, the Declarations are binding on this Tribunal. Croatia further argues, relying on scholarship,[120] that the interpretation afforded by the Declarations is both prospective and retrospective, leading to the conclusion that this Tribunal is bound by the supremacy of EU law established by the Declarations.[121]

102.    Croatia characterizes as hyper-formalistic and manifestly absurd Addiko's argument that the failure of any mention of the BIT in the Declarations deprives them of any significance for the purposes of VCLT Article 31(3)(a).[122] Rather, for Croatia, the Declarations are a subsequent agreement between the parties to the BIT, as both Austria and Croatia declared (in concurrence with all Member States of the EU) that "all" of their intra-EU BITs are incompatible with the EU *acquis*.[123]

103.    Addressing Addiko's argument concerning the critical date doctrine, Croatia argues that Addiko's reading of the doctrine is inapposite, as the ICJ calls for inclusion of acts by a party to the dispute that are the "normal continuation of prior acts," and are not undertaken to improve that party's position in an ongoing dispute.[124] Croatia argues that the Declarations are a normal continuation of diplomatic relations between Member States.

104.    With respect to Addiko's reliance on a decision of a Singaporean Court regarding the admissibility of post-critical date evidence, Croatia argues that Addiko reads the judgment

---

[120] RLM–132.
[121] Resp. Mem. ¶¶ 56-62.
[122] Resp. Reply ¶ 124-125.
[123] Resp. Reply ¶¶ 125-126. Croatia adds that had the EU Member States understood *Achmea* to apply only to UNCITRAL arbitrations, they would have made an independent dissenting declaration to that effect.
[124] Resp. Reply ¶ 128, *relying on* ICJ, *Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia)*, Judgment, 17 December 2002, 2002 ICJ Reports 625, RLM-170.

selectively, ignoring the principle that post-critical date evidence is relevant if it confirms the position established by pre-critical date evidence.[125]

105.   With regard to Addiko's reference to Austria's prior statements about the BIT, Croatia highlights that it had informed Austria of the incompatibility between the BIT and the EU *acquis* by a *note verbale* even before it acceded to the EU Treaties.[126] In response to this, Austria deferred the resolution of this issue to the EU.[127] Accordingly, the Declarations cannot be rightly described as a change in Croatia's position on the compatibility between the BIT and the EU *acquis*, but rather as confirmation of the position it had held along. Instead, Croatia argues that it was Austria which changed its position on the compatibility of intra-EU BITs with the EU Treaties.[128]

106.   Moreover, even accepting *arguendo* Addiko's argument on a bar on evidence after the so-called critical date, Croatia argues that the very presence of Article 11(2) of the BIT clearly indicates that both Croatia and Austria contemplated prior to the critical date the issue of compatibility between the BIT and the EU Treaties.[129]

107.   ***Fifth***, and finally, Croatia argues that any award this Tribunal renders after confirming its jurisdiction would be unenforceable. For this, Croatia relies on the text of the Declarations, read in conjunction with Article 9(3) of the BIT.[130] In its view, the Declarations establish that an award by a tribunal recognizing jurisdiction under an intra-EU BIT would be in violation of the EU *acquis*, and Article 9(3) of the BIT establishes that an award would be unenforceable if it is beyond the limits of the national law of the Contracting States. On this basis, Croatia claims that any award rendered in violation of the EU *acquis* would be

---

[125] Resp. Reply ¶¶ 131-132, *relying on Sanum Investments Ltd. v. Government of the Lao People's Democratic Republic*, Court of Appeal of the Republic of Singapore, SGCA 57, Judgment, 29 September 2016, ¶ 108, CLM-163 ("Sanum").
[126] Note verbal of the Ministry of Foreign Affairs and European Integration of the Republic of Croatia to the Embassy of the Republic of Austria in Zagreb, No. 1594/11, 28 March 2011, R-39.
[127] Record of Consultations held with Austrian Representatives on 13 September 2011 in the Ministry of Economy, Labour and Entrepreneurship, 19 September 2011, p. 2, R-40.
[128] Resp. Reply ¶¶ 133-139; Resp. PHB1 ¶ 81; Resp. PHB2 ¶¶ 70,72.
[129] Resp. Reply. ¶ 130.
[130] Article 9(3) of the BIT provides that "[t]he award shall be final and binding; it shall be executed according to national law; each Contracting Party shall ensure the recognition and enforcement of the arbitral award in accordance with its relevant laws and regulations."

unenforceable since the national law of the enforcing Contracting State would call for that State's obligations under the EU Treaties to prevail over contradictory obligations. To confirm this argument, Croatia relies on decisions from German and Swedish Courts refusing to enforce awards on the grounds of incompatibility of intra-EU BITs with the EU *acquis*.[131]

### b. Addiko's Position

108.    Addiko argues that the Declarations are political and of no relevance for this Tribunal's inquiry into EU law or international law.[132] Addiko adds that they are also irrelevant given their silence on the compatibility of EU law with ICSID arbitration.[133] Addiko makes four points regarding the declarations.

109.    *First*, Addiko relies on its argument, discussed above, that the critical date for determining this Tribunal's jurisdiction is the date of institution of proceedings, which predates the Declarations.[134]

110.    *Second*, Addiko argues that the Declarations do not form part of the EU *acquis*,[135] and are thus irrelevant to application of Article 11(2) of the BIT. Addiko reasons that by the EU's own definition, also relied on by Croatia, the EU *acquis* comprises only those declarations that are "adopted by the Union."[136] Addiko says that the Declarations were issued in the name of Member States of the European Union and not in the name of the EU, which has its own distinct legal personality. Accordingly, Addiko argues (relying in part on the Jacobs Opinion with respect to past practice) that since the Declarations are "expressly issued in the name of the relevant member States, acting as such…[they are] (therefore) not an act of the EU at all and not part of the EU *acquis*."[137] Nor does Croatia's own expert consider

---

[131] Resp. Mem. ¶¶ 64-67, *relying on* Bundesgerichtshof *Achmea* Decision at ¶ 26 and Nacka District Court in Stockholm, Decision, 23 January 2019, at p. 13, RLM-135.
[132] Cl. Mem. ¶ 19; Cl. Reply ¶ 11.
[133] Cl. Reply ¶ 11.
[134] Cl. Mem. ¶ 152; Cl. Reply ¶ 104.
[135] Cl. Mem. ¶¶ 154-155; *see also* Cl. PHB1 ¶ 228; Tr Day 2, 394:9-11 (Craig).
[136] C-222; *see also* R-1 (containing the same definition of the EU *acquis*).
[137] Cl. Mem. ¶ 154; Jacobs Opinion ¶ 62.

the Declarations to be part of the EU *acquis*, instead choosing to refer to them as a "political manifestation of the Member States' obligations" within the EU legal order.[138]

111.    Addiko goes on to argue that the Declarations are not an interpretation of EU law, since the power to interpret is exclusive to the CJEU.[139] Nor can Member States alter or even confirm a judgment of the CJEU.[140]

112.    **Third**, Addiko argues that since the EU Member States have no authority to interpret EU law, the Declarations are not (contrary to Croatia's contention) an authoritative interpretation of the relationship between the TFEU and the BIT.[141] Addiko argues that Declarations do not constitute "a subsequent agreement regarding the interpretation" of Article 11(2) of the BIT, because they merely adopt the Member States' position on the legal consequence of *Achmea*, with no reference to the BIT whatsoever. Addiko argues that this very principle was followed by the tribunal in *Eskosol* to hold that Declarations were not an interpretation of the ECT.[142] Therefore, Addiko argues, the Declarations have no significance under Article 31(3)(a) of the VCLT.[143]

113.    **Fourth**, Addiko says that since the Declarations were issued after the critical date, they have no interpretive use and are irrelevant to this Tribunal's analysis of its jurisdiction under Article 9 of the BIT.  Addiko's reasoning relies on the decision of the Singapore Court of Appeals in *Sanum v. Laos*[144] under the China-Laos BIT. There, the Singaporean Court rejected as irrelevant under VCLT Articles 31(3)(a)-(b) two *notes verbales* between China and Laos because they post-dated the critical date of jurisdiction. The Singaporean Court held:

> The critical date doctrine … acts as a time constraint in the context
> of determining the relevance or weight of evidence in cases
> concerning issues of public international law. In short, the doctrine
> or principle renders evidence, which comes into being after the
> critical date and is self-serving and intended by the party putting it

---

[138] Cl. Reply ¶ 106, *relying on* Craig Opinion ¶¶ 59, 135, 160.
[139] Cl. Mem. ¶ 155, *relying on* Jacobs Opinion ¶ 63; Cl. Reply ¶ 107.
[140] Cl. Mem. ¶ 155, *relying on* Jacobs Opinion ¶ 63; Cl. Reply ¶ 107, *relying on* Jacobs Supp. Opinion ¶ 23.
[141] Cl. Reply ¶ 108.
[142] Cl. Reply ¶¶ 108-109, *relying on Eskosol* at ¶ 222.
[143] Cl. Mem. ¶¶ 156-158; *see also* Cl. PHB1 ¶¶ 230-234.
[144] CLM-163; Cl. Reply ¶ 112.

forward to <u>improve</u> its position in the arbitration, as being of little, if any weight … This suggests that if post-critical date evidence is sought to be adduced, it should be consistent with and a continuation of what the pre-existing position establishes. Its *function is to* corroborate and explain. To the extent that it contradicts what has been established by the pre-existing position to give the party seeking to rely on it an evidential advantage in its case, it should not be admitted.[145]

Applying the reasoning of the Singaporean Court, Addiko argues that since the critical date for determining this Tribunal's jurisdiction is 27 September 2017, the Declarations are not irrelevant to prove a joint understanding between Croatia and Austria as to the alleged incompatibility of the BIT with the EU *acquis*.[146]

114.    By contrast, Addiko argues that the evidence pre-dating the critical date of 27 September 2017 points to Croatia's and Austria's understanding that the BIT and the EU *acquis* were compatible.  For example, Addiko relies on the failure of the Treaty of Accession to address the status of intra-EU BITs as evidence that at the time of Croatia's accession to the EU, Austria and Croatia understood that compatibility existed between the BIT and the EU *acquis*.[147]

115.    Addiko also relies on a meeting between the Austrian and Croatian government on 14 February 2018, during which Austria (i) "reiterated its previously expressed position that it considers BITs valid and that it does not deem them incompatible with EU law," (ii) contended that incompatibility would have to be determined by the CJEU, (iii) remarked that "incompatibility should have effect as of the time when it is established, that is without retroactive effect," and (iv) considered that any decision finding incompatibility "would have no impact on pending proceedings."[148]

---

[145] CLM-163; Cl. Reply ¶¶ 104, 106.
[146] Cl. Mem. ¶¶ 164-165.
[147] Cl. Mem. ¶ 165; *see also* Cl. PHB1 ¶¶ 157-158.
[148] Cl. Mem. ¶ 166, *quoting* Minutes of the meeting with the Austrian representatives regarding the interpretation of Article 11 paragraph 2 and 3 of the Agreement on the promotion and protection of investment concluded with Austria, 14 February 2018, at p. 1, C-225; Cl. Reply ¶ 114.

- Addiko concludes on the basis of this evidence that at no time relevant for this Tribunal's determination of its jurisdiction was there an agreement between Austria and Croatia that the BIT was incompatible with the EU *acquis*. Accordingly, Addiko says that even if the Declarations *arguendo* were capable in principle of having significance under VCLT Article 31(3)(a), they are irrelevant to this Tribunal's determination of its jurisdiction under Article 9 of the BIT.[149]

**E.    *ACHMEA***

116.    The CJEU in *Achmea* considered a reference by the *Bundesgerichtshof* regarding Article 8(6) of the Netherlands-Slovak BIT, regarding the following question:

> Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?[150]

117.    The CJEU ruled on the question with the following text serving as its *dispositif*:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[151]

118.    Both Parties agree that this *dispositif* forms part of the EU *acquis*.  They disagree, however, on the impact of *Achmea* on the jurisdictional question before this Tribunal. Croatia argues that (1) *Achmea* confirms the incompatibility of Article 9 of the BIT with the EU *acquis*,

---

[149] Cl. Mem. ¶¶ 159-167; *see also* Cl. PHB1 ¶¶ 237-238.
[150] *Achmea* ¶ 23, RLM-12.
[151] *Achmea* ¶ 62, RLM-12.

effective from the date of Croatia's accession to the EU Treaties, and (2) *Achmea* is binding on this Tribunal.[152] Addiko by contrast (1) questions the correctness of the decision and (2) argues that *Achmea* is irrelevant to this Tribunal's decision on its jurisdiction, on the multiple grounds of being neither binding nor persuasive, inapplicable to ICSID arbitrations, and temporally inapplicable.[153]

### (1)    Correctness of *Achmea*

#### a.    Croatia's Position

119.    In response to Addiko's argument that *Achmea* was wrongly decided, Croatia contends that is neither for Addiko nor this Tribunal to determine the soundness of the judgment. Instead, since CJEU judgments are binding on the EU Member States, and form part of the legal *acquis* which in turn are prioritized in Article 11(2) of the BIT,[154] this Tribunal is bound by the *Achmea* precedent.

#### b.    Addiko's Position

120.    Addiko critiques the outcome of *Achmea* as wrong in its conclusion, and unpersuasive because it does not comport with the well-reasoned analysis of various investment law decisions and of the CJEU's own Advocate General.[155]

121.    In particular, Addiko submits that *Achmea* did not offer any persuasive reasons for distinguishing intra-EU investment treaty arbitrations from intra-EU commercial arbitrations, extra-EU investment arbitrations and proceedings before courts of non-EU Member States, in all of which a question of EU law may arise.[156]

122.    Addiko also aligns itself with Advocate General Wathelet's opinion in *Achmea* that (1) the CJEU has jurisdiction only over Member States and does not provide for a dispute settlement method between private parties and Member States, and (2) nothing in Article

---

[152] Resp. Mem. Section III.C.
[153] Cl. Mem. Section IV.C, ¶ 58; Cl. Reply Section IV, ¶¶ 84-85.
[154] Resp. Mem. ¶¶ 80-81;
[155] Cl. Mem. ¶ 11; Cl. Reply ¶ 8.
[156] Cl. Mem. ¶ 121, *relying on* Jacobs Opinion ¶¶ 18, 24(3).

267 of the TFEU prohibits the submission of a dispute to a court or tribunal to which that provision does not apply. [157]

123. Addiko further relies on the Jacobs Opinion to argue that *Achmea* likely does not follow a number of fundamental principles of EU law, including deference to established international law principles such as legal certainty and proportionality.[158]

124. Addiko notes that these arguments are further supported by the fact that other arbitral tribunals have come to the same conclusion regarding the shortcomings of the *Achmea* Judgment.

### (2)    Force of *Achmea* in These Proceedings

#### a.   *Croatia's Position*

125. Croatia argues that this Tribunal is bound by the CJEU's decision in *Achmea* and must therefore defer, while determining its jurisdiction under Article 9 of the BIT, to the CJEU's finding on the incompatibility with the EU *acquis* of arbitration clauses in intra-EU investment agreements. Croatia makes four points to advance this position.

126. ***First***, Croatia submits that the EU Treaties are 'treaties' for the purposes of public international law.[159] Croatia then refers to provisions of the EU Treaties to demonstrate that the CJEU has been designated to resolve questions relating to their interpretation.[160] Croatia argues that as a matter of public international law, the CJEU is established as the

---

[157] Cl. Mem. ¶ 120.a, *citing* Case C-284/16 *Slowakische Republik v. Achmea BV*, Opinion of Advocate General Wathelet at ¶¶ 131, 138-159, CLM–145 ("*Achmea* Wathelet Opinion"); *see also* Cl. PHB1 ¶ 45.
[158] Cl. Mem. ¶ 121, *relying on* Jacobs Opinion ¶ 25; *see also* Resp. PHB1 ¶ 29.
[159] Resp. Mem. ¶¶ 68-70, *relying on RREEF* at ¶¶ 71-72. Croatia notes that Addiko provides no support for its contrary suggestion. Resp. Reply, ¶¶ 66-67 (citing Cl. Mem. ¶¶ 81-85).
[160] Resp. Mem. ¶¶ 72-73, *citing* Article 19(1) of the TEU and Article 267 of the TFEU.

authoritative adjudicative body tasked with the interpretation of EU Treaties, binding on the Member States.[161] Accordingly, Austria and Croatia are bound by CJEU decisions.[162]

127.   Croatia argues that even if there was doubt as to the status of the EU Treaties, those doubts are resolved by the express terms of Article 11(2) of the BIT which mandates the application of EU *acquis* as a matter of treaty law.[163]

128.   ***Second***, Croatia argues that decisions of the CJEU form a part of the EU *acquis*, relying on multiple sources.[164] In addition, Croatia notes that Addiko itself relies on substantially the same source as Croatia for the definition of "EU *acquis*." to state that it is "the entire body of rights and obligations that are *binding* on the EU Member States. It includes…case law of the CJEU. It covers, in other words, all laws and regulations and other rules that are considered internally binding as a matter of EU law."[165] Croatia therefore argues that Addiko contradicts its own definition of the "EU *acquis*," by characterizing *Achmea* as "neither persuasive nor binding."[166] Croatia also points out that Addiko's own expert agrees that *Achmea* is an authoritative statement of EU law and forms part of the EU *acquis*.[167]

129.   ***Third***, Croatia claims that since the CJEU's interpretation of the EU Treaties establishes their international legal effects, other courts and tribunals cannot in good faith (as required by Article 31 of the VCLT) apply an interpretation of the EU *acquis* that contradicts the interpretation of the CJEU.[168]

---

[161] Croatia substantiates this position of public international law vis-à-vis the adjudicative body created by treaties as to the binding nature of body's interpretation of the treaties by calling it a "common and entirely uncontentious" practice. Resp. Mem. ¶ 71. Croatia also relies on Craig Opinion ¶¶ 17-23, 25-29, while making the same argument at Resp. Mem. ¶ 82. Croatia argues that this binding nature of the CJEU's decision is a founding cornerstone of the EU Treaties. Resp. Reply ¶ 7.

[162] Resp. Mem. ¶¶ 68-76.

[163] Resp. Reply ¶ 68; *see* Resp. PHB1 ¶¶ 71-74; *see also* Resp. PHB1 ¶¶ 110, 134, 147.

[164] Craig Opinion ¶ 7, citing R–1 which defines the EU *acquis* as including, *inter alia,* "the case law of the CJEU …".

[165] Resp. Reply ¶ 64, *quoting* Cl. Mem. ¶ 174.

[166] Resp. Reply ¶ 63, *quoting* Cl. Mem. ¶ 119.

[167] Resp. Reply ¶ 69, *referring to* Jacobs Opinion ¶ 28.

[168] Resp. Mem. ¶¶ 82-83.

130.   **Fourth**, Croatia cites the decision of the Dutch government to terminate all of its intra-EU BITs, despite initially having argued against the position eventually adopted by *Achmea*. Croatia claims that this decision, along with the Declarations, reflects the serious consequences[169] of Member States refusing to comply with the EU *acquis*. Accordingly, Croatia warns that any decision of this Tribunal that conflicts with *Achmea* would result in both Croatia and Austria infringing their EU Treaty obligations, a result that was sought to be avoided by Article 11(2) of the BIT.

131.   For these reasons, Croatia argues that this Tribunal must accept the incompatibility between Article 9 of the BIT and the EU *acquis* which has been definitively established by the CJEU in *Achmea*.[170]

### b.   *Addiko's Position*

132.   It is Addiko's position that this Tribunal owes no deference to the position of the CJEU or the European Commission.[171]

133.   Addiko first argues that while the CJEU has a mandate to interpret EU law, and in doing so applies principles specific to EU law developed in its own jurisprudence, the CJEU has no mandate to make authoritative findings on the state of public international law.[172]

134.   For this reason, Addiko emphasizes that this Tribunal must make an independent determination of its jurisdiction, including what comprises "incompatibility" for purposes of Article 11(2) of the BIT.   There is nothing in the EU Treaties stating that CJEU judgments are determinative for international tribunals in proceedings governed neither by the EU or its institutions.[173]   Therefore, Addiko argues that this Tribunal is permitted to interpret the BIT in the manner called for by Article 31 of the VCLT.

---

[169] Croatia also relies on provisions of the EU Treaties: Articles 258-260 of the TFEU.
[170] Resp. Mem. ¶¶ 82-86.
[171] Cl. Mem. ¶¶ 12, 123; Cl. Reply ¶¶ 87, 89.
[172] Cl. Mem. ¶ 122.
[173] Cl. Reply ¶ 88; Cl. PHB1 ¶¶ 35-37.

135.    Addiko also points out that for the most part, *Achmea* is silent on the specific issues raised by Croatia's jurisdictional objections.[174]

### (3)    Applicability of *Achmea* to ICSID Arbitrations

#### a.    *Croatia's Position*

136.    Croatia makes the following arguments relating to the applicability of *Achmea* to ICSID arbitrations.

137.    ***First***, Croatia argues that the *dispositif* of *Achmea* contemplates that all arbitration clauses in intra-EU BITs are incompatible with the EU *acquis*. In light of this, Croatia argues that this Tribunal must examine, not whether ICSID arbitrations were expressly *included* within the scope of the decision (as Addiko frames the question), but rather whether the decision expressly *carves out* ICSID arbitrations. Croatia argues that this lens is evident[175] from the general references in *Achmea* to arbitration clauses in intra-EU BITs, without distinguishing specifically between cases heard under the UNCITRAL Rules versus the ICSID Rules.[176]

138.    According to Croatia, the CJEU's primary concern in *Achmea* was the effect of intra-EU arbitration clauses on the autonomy of the EU legal order and on the mutual trust and cooperation among EU Member States.  Croatia observes that these concerns arise in ICSID arbitrations as well.[177]

139.    Croatia also submits that *Achmea* is applicable to ICSID arbitration given the possibility that an ICSID tribunal "may" have to apply or interpret the EU *acquis*. In this particular case, it submits that this follows from the second sentence of Article 42(1) of the ICSID Convention, since the BIT does not contain an applicable law clause; this Tribunal accordingly would have to apply Croatian law, which derives in various respects from EU law. Croatia further submits that Article 11(2) of the BIT likewise requires the Tribunal to

---

[174] Cl. Reply ¶ 9; Cl. PHB1 ¶ 34.
[175] Resp. Reply ¶¶ 86-92
[176] *Achmea* ¶¶ 23, 62.
[177] Resp. Reply ¶¶ 95-99, *relying on* Craig Supp. Opinion ¶¶ 13-17. Croatia argues that this is also clear from the CJEU's ruling referring to any arbitral tribunal that "may" have to interpret or apply EU law. Resp. Reply ¶ 100.

interpret or apply EU law, given that the accelerated jurisdictional issue turns directly on an assessment of the compatibility of the BIT with the EU *acquis*.[178]

140.    **Second**, and in response to Addiko's argument that the absence of any mention of ICSID arbitration in *Achmea* restricts its scope, Croatia argues that it is impracticable for the CJEU to list all possible fora where a dispute could be brought under an intra-EU investment agreement. Instead, Croatia argues, this Tribunal must pay heed to the general principle outlined in *Achmea* and apply it to the BIT.[179]

141.    **Third**, and finally, Croatia argues that Addiko's reliance on *UP and C.D Holding* and *UniCredit* to argue that *Achmea* does not apply to ICSID arbitrations is ill-conceived. Croatia critiques both decisions, also noting that the *UniCredit* decision was under reconsideration by the tribunal that issued it.[180]

142.    As to *UP and C.D Holding*, Croatia argues that the tribunal there preoccupied itself with the question of whether Hungary was still a party to the ICSID Convention, even though that question had no bearing on the validity of Hungary's consent to arbitrate. In other words, the tribunal confused the instrument of consent (the intra-EU investment agreement at issue) with obligations under the ICSID Convention. Croatia argues that the tribunal in *UniCredit* repeated the error in *UP and C.D Holding*.[181]

143.    Instead, Croatia submits, the ICSID Convention is irrelevant for interpretation of Croatia's consent, since Article 25(1) of the ICSID Convention comes into play only after it is established that the parties have consented to ICSID arbitration in another instrument. In other words, the effect of *Achmea* on the ICSID Convention cannot be considered before it is determined that the ICSID Convention indeed applies.[182] Croatia adds that any reliance by Addiko on its expert, Sir Francis Jacobs, for the purposes of addressing the ICSID Convention is misplaced, because the subject falls outside the scope of his expertise.[183]

---

[178] Resp. Reply ¶¶ 101-104; *see also* Resp. PHB1 ¶ 105.
[179] Resp. Reply ¶¶ 105-108.
[180] Resp. Reply ¶¶ 109-110.
[181] Resp. Reply ¶¶ 111-112
[182] Resp. Reply ¶ 113.
[183] Resp. Reply ¶ 114, *relying on* Jacobs Opinion ¶ 3.

b. *Addiko's Position*

144.    Addiko argues that, contrary to Croatia's broad reading of *Achmea* as extending to ICSID arbitrations, *Achmea* is silent regarding its applicability to ICSID arbitrations. Accordingly, Addiko argues that by virtue of its silence, *Achmea* does not extend to ICSID arbitrations, and therefore does not result in any incompatibility between Article 9(2) of the BIT and the EU *acquis*.[184]

145.    *First*, Addiko says that since *Achmea* interprets provisions of the EU Treaties as precluding "international agreements concluded between Member States, **such as** Article 8 of the [Netherlands-Slovakia BIT]," the ruling must be read as confined to intra-EU BITs which are similar in all material respects to the Netherlands-Slovakia BIT.[185] This also responds to Croatia's argument that *Achmea* was not limited in its applicability.[186]

146.    *Second*, Addiko argues that given its poor reasoning even from the perspective of internal EU law, *Achmea* must be adopted narrowly to avoid negative effects of the judgment from being multiplied, becoming difficult to correct and undermining the coherence and credibility of EU law. Addiko says this is especially true because of the lack of engagement of *Achmea* with General Advocate Wathelet's arguments.[187]

147.    *Third*, Addiko argues that *Achmea* overstated the policy consideration of ensuring a uniform interpretation of EU law, when the CJEU in fact exercises only a very limited control over EU law. Addiko attributes this to the limited number of cases involving EU law that are referred to the CJEU. Accordingly, Addiko argues that *Achmea*'s preclusion of investment arbitration is disproportionate.[188]

148.    *Fourth*, Addiko cites the 29 January 2019 Opinion of Advocate General Bot, prepared at Belgium's request, regarding the compatibility with EU law of the Comprehensive Economic and Trade Agreement between Canada and the EU and its Member States

---

[184] Cl. Mem. ¶¶ 13-14, 124-137; Cl. Reply ¶ 9.
[185] Cl. Mem. ¶ 125, *relying on* Jacobs Opinion ¶ 17.
[186] Cl. Reply ¶ 90, *responding to* Resp. Mem. ¶¶ 78, 165.
[187] Cl. Mem. ¶ 126, *relying on* Jacobs Opinion ¶ 28; Cl. Reply ¶¶ 90-91, *relying on* Jacobs Opinion, ¶ 28; Jacobs Supp. Opinion ¶ 6.
[188] Cl. Mem. ¶ 127, *relying on* Jacobs Opinion ¶ 27; Cl. Reply ¶ 92.

("**CETA**").[189] Addiko argues that given the pains to which Advocate General Bot had to go to distinguish *Achmea* from the CETA, *Achmea* must be interpreted narrowly by this Tribunal.[190] This, along with the lack of persuasive value of *Achmea*, is also clear from Advocate General Bot's opinion that the CETA is compatible with EU law.[191]

149.    ***Fifth***, Addiko argues that there are compelling grounds on which *Achmea* is distinguishable from the issues presented in this proceeding. The Netherlands-Slovakia BIT at issue in *Achmea* called for arbitration under the UNCITRAL Rules, while this arbitration is conducted under the multilateral ICSID Convention, with the result that Croatia is required to comply not only with its obligations under the BIT but also with its undertakings under the ICSID Convention. Addiko argues further that since the ICSID Convention has non-EU Member States as parties, Croatia's participation in arbitration proceedings such as this one is a matter not only between EU Member States, but rather one of interest to all ICSID Convention parties. Since this obligation of respondent States would be affected by extending *Achmea* to ICSID arbitrations, Addiko argues that *Achmea* ought to be read narrowly as not extending to intra-EU BITs providing for ICSID arbitration.[192] Addiko adds that since the CJEU did not consider these material differences between ICSID and UNCITRAL arbitrations, indeed not mentioning ICSID at all, *Achmea* cannot be assumed to apply to ICSID arbitrations.[193]

### (4)    Retroactive Application of *Achmea*

#### a.    *Croatia's Submissions*

150.    Croatia argues that since the CJEU merely interprets provisions of the EU Treaties, the interpretation in *Achmea* applies from the date on which the underlying EU Treaty

---

[189] *See* Opinion of Advocate General Bot, http://curia.europa.eu/juris/document/document.jsf?text=&docid=210244&pageIndex=0&doclang=EN&mode=req&dir=&occ=first&part=1&cid=6530294 ("CJEU Opinion 1/17"); *see also* Cl. PHB1 ¶ 137.

[190] Cl. Mem. ¶¶ 128-130, *relying on* Jacobs Opinion ¶¶ 32(1)-(2), 33.

[191] Cl. Reply ¶¶ 93-94, *citing* CJEU Opinion 1/17, and *relying on* Jacobs Supp. Opinion ¶¶ 7-10.

[192] Cl. Mem. ¶¶ 131-134, *relying on* Jacobs Opinion ¶¶ 38, 40, 44, 45 and Aron Broches, The Convention on the Settlement of Investment Disputes between States and Nationals of other States, 136 Recueil des Cours, 1972 II, pp. 379-380, CLM–177; Cl. Reply ¶ 95.

[193] Cl. Reply ¶ 96.

provisions it interprets came into force.[194] In other words, *Achmea* has an *ab initio* or *ex tunc* effect.[195] Croatia cites to decisions of the CJEU, the Craig Opinion, and other decisions and scholarship for this proposition.[196] Accordingly, Croatia argues that since the principle of *ab initio* effect is a universally applied principle (not limited to the EU *acquis*), the incompatibility between intra-EU BITs and the EU *acquis* established by *Achmea* applies from the date the EU Treaties came into force as between the Contracting States to the BIT, which is the date of Croatia's EU accession (1 July 2013).

151.    Croatia argues that an interpretation of a treaty provision is inherently retroactive. For Croatia, if an interpretation cannot be read into the original document retroactively, that interpretation would not apply to the litigants before it. Croatia therefore disagrees that *Achmea* is exceptional and prospective only in its effect.[197]

152.    Croatia emphasizes that the *ab initio* or *ex tunc* effect of the CJEU's interpretation of EU Treaties is a principle of the EU *acquis*, integrated into the BIT via Article 11(2). This, Croatia argues, is accepted by Addiko in light of its definition of the "EU *acquis*," which includes "principles" of EU law such as the *ex tunc* effect of the CJEU's interpretations.[198] Therefore, without the CJEU itself having imposed a temporal limitation on the effect of its decision in *Achmea*, that decision is effective from the effective date of the EU Treaties it interprets.[199]

---

[194] Resp. Mem. ¶¶ 87-91; Resp. Reply ¶¶ 70-73, 146, 151.

[195] Cl. PHB1 ¶ 184.

[196] *Amministrazione Delle Finanze Dello Stato v. Denkavit Italiana S.r.l.*, Case 61/79, 27 March 1980, p. 1223, CLM-110; Ángel Barreira Pérez v. Instituto Nacional de la Seguridad Social (INSS), and Tesorería General de la Seguridad Social (TGSS), C-347/00, 3 October 2002, ¶ 44, RLM-140; Craig Opinion ¶61; Access to German Minority Schools in Upper Silesia, Advisory Opinion, PCIJ (series A/B) No. 40, 15 May 1931, ¶ 57, RLM-141; Lady Hale, President of The Supreme Court of the United Kingdom, "Devolution and The Supreme Court –20 Years On", Scottish Public Law Group 2018 Edinburgh, 14 June 2018, p. 15, R-35.

[197] Resp. Reply ¶¶ 77-81.

[198] Resp. Reply ¶ 82, *relying on* Craig Opinion ¶¶ 61-64. Croatia also relies on Alan Dashwood *et al.*, *Wyatt and Dashwood's European Union Law* (6th ed., 2011), at p. 229, RLM-167 ("Alan Dashwood, 2011").

[199] Resp. Reply ¶¶ 83-85, *relying on* Alan Dashwood, 2011, at p. 229. Croatia emphasizes that this was the position taken by the claimant's expert in *UniCredit*.

### b. *Addiko's Position*

153.    ***First***, Addiko argues that *Achmea* does not apply *ex tunc* even under EU law. Addiko reasons that the principle of *ex tunc* effect of CJEU decisions was developed to protect private parties found to have been harmed by Member States conduct, and to prevent Member States from deriving an advantage from their own past failure to adhere to their EU Treaty obligations.  By contrast, Addiko says, the effect of extending *Achmea* back in time would be the opposite, namely to deprive private parties of the protections that BITs afforded them up to the date of the *Achmea* decision.[200] Therefore, consistent with the concerns in EU law, the *Achmea* decision should be interpreted as not affecting intra-EU arbitration cases that already had commenced prior to the date when it was rendered.

154.    ***Second***, Addiko submits that *Achmea* need not be taken into consideration as it became part of the EU *acquis*, if at all, after the initiation of this arbitration. Addiko argues *Achmea* does not form part of the "EU *acquis* <u>in force</u>" on the date these proceedings were instituted, within the meaning of Article 11(2) of the BIT, because there is no indication in the BIT that Article 11(2) was to have retroactive effect.[201] Addiko adds that EU law (such as the principle of *ex tunc* effect of CJEU decisions) cannot override or circumvent the critical date doctrine for jurisdictional purposes under international law. [202] Addiko underscores that the *UniCredit* tribunal reached this same conclusion.[203]

155.    Addiko therefore concludes that the CJEU's finding of incompatibility, if at all applicable as a part of the EU *acquis*, came into existence as of 6 March 2018, prior to which time there was no determination by the CJEU of such incompatibility. In fact, every other forum concerned with the question until then had ruled that there was no incompatibility between the EU *acquis* and arbitration clauses in intra-EU BITs.[204]  The fact that Achmea B.V., the losing party in *Achmea*, did not make a request to the CJEU for non-retroactivity (as may

---

[200] Cl. Mem. ¶¶ 144-145, *relying on* Jacobs Opinion ¶¶ 50, 52; *see also* Tr. Day. 1, 230:10 *et seq*.
[201] Cl. Mem. ¶ 141 (emphasis added).
[202] Cl. Mem. ¶¶ 140-141, *referring to* Resp. Request ¶ 19; Cl. Reply ¶ 100.
[203] Cl. Mem. ¶ 142, *relying on UniCredit* ¶ 123; Cl. Reply ¶ 10.
[204] Cl. Mem. ¶ 143.

be relevant in EU law under the "First Occasion Rule") should not affect the outcome of the international law question of compatibility in this case.[205]

156. **Third**, Addiko argues that the *ex tunc* principle of EU law is not mandatory in any event, and must instead be balanced against other principles of EU law such as legal certainty, proportionality and the protection of fundamental rights, to which the "First Occasion Rule" must give way.[206] Addiko says that legal certainty requires that individuals be able to unequivocally ascertain their rights at a given point in time, especially where financial consequences are involved. Addiko describes the principle of proportionality as calling for legal measures to pursue a legitimate aim and to be limited to what is necessary to achieve that aim. Finally, Addiko submits that the principle of protection of fundamental rights calls for non-interference with fundamental rights unless there is legal basis and need for retroactivity either to serve a general interest or to protect the rights of others.

157. Addiko also argues that the fact that *Achmea* was both radical and detrimental to claimants, while favorable to Member States, provides a further reason to refuse the *ex tunc* application of the decision. Addiko says that this is particularly the case for investors who brought proceedings before *Achmea* under the reasonable belief that the BIT was valid and enforceable.[207]

## F.    THE BIT'S COMPATIBILITY WITH EU'S NON-DISCRIMINATION PRINCIPLES

158. Croatia argues that the BIT is incompatible with the non-discrimination principle that it deems to be part of the EU *acquis*. Addiko disagrees.

### a.    Croatia's Position

159. Croatia draws this Tribunal's attention to Articles 18, 49 and 63 of the TFEU which establish the principle of non-discrimination between EU Member States. Croatia explains

---

[205] Cl. Mem. ¶ 146, *relying on* Jacobs Opinion ¶¶ 49, 54(1), 54(3).

[206] Cl. Mem. ¶¶ 147-148, *relying on* Jacobs Opinion ¶¶ 25(1), 25(2), 25(3), 25(4), 55, and Case 169/80 *Administration des Douanes v. Gondrand Frères SA*, CLM–151, Case 325/85 *Ireland v.* Commission, CLM–152, Case C-331/88 *R v. Minister of Agriculture ex p. FEDESA*, CLM–153 and Article 52 of the EU Charter of Fundamental Rights, CLM–169.

[207] Cl. Mem. ¶¶ 149-150, *relying on* Jacobs Opinion ¶¶ 53, 56.

that these provisions prohibit EU Member States from discriminating between individuals of different Member States of the grounds of their nationality.[208]

160.    According to Croatia, the BIT is incompatible with the principle of non-discrimination since it grants rights only on a bilateral basis, an point that it contends was confirmed by the CJEU in *Achmea*.[209] Croatia argues that the BIT constitutes indirect discrimination in violation of the TFEU, as it makes the exercise of fundamental freedoms under the EU Treaties less attractive for nationals from Member States that are not party to the BIT.[210]

161.    Specifically, Croatia argues that BIT perpetrates discriminatory treatment both substantively (through its Article 2(1) requiring fair and equitable treatment, Article 3(1) requiring national treatment, and Article 4 protecting against expropriation) and procedurally (through its Article 9 arbitration clause).  Each of these provisions benefits to Austrian and Croatian investors that are not available to investors from other Member States. Accordingly, Croatia argues that these provisions violate Articles 18, 49 and 63 of the TFEU, and for that reason the BIT is incompatible with the EU *acquis*.[211]

162.    Croatia further points to the consistent support that the non-discrimination argument has received from the European Commission by way of its Guidance Fact Sheet ("**EC Guidance Fact Sheet**")[212] and its interpretation of rulings of the CJEU.[213]

---

[208] Resp. Mem. ¶¶ 94-95, 100, *relying on* Craig Opinion, ¶¶134-137. Croatia also states that the non-discrimination principle is accepted by Addiko's legal expert, *citing* Jacobs Opinion ¶ 70.

[209] Resp. Mem. ¶ 100, *citing Achmea* ¶ 51.

[210] Resp. Mem. ¶¶ 94-95, *relying on* Craig Opinion ¶¶ 9, 94-97, 104-158.

[211] Resp. Mem. ¶¶ 101-102.

[212] Resp. Mem. ¶ 97, *referring to* EC Guidance Fact Sheet, at p. 2: "Intra-EU BITs constitute a parallel system overlapping with Single Market rules. In addition, intra-EU BITs conflict with the principle of non-discrimination among EU investors within the Single Market by conferring rights on a bilateral basis to investors from some Member States only. Furthermore, intra-EU BITs may constitute the basis for the award of unlawful state aid in violation of the level playing field in the single market."

[213] Resp. Mem. ¶¶ 96-97, *relying on Eastern Sugar* at ¶ 119, European Commission, Protection of Intra-EU Investment, Communication from the Commission to the European Parliament and the Council, COM(2018) 547 final, 19 July 2018, p. 2, R-36, European Commission, Press Release – Commission Asks Member States to Terminate Their Intra-EU Bilateral Investment Treaties, Document No. IP/15/5198, 18 June 2015, R–37, European Commission, Fact Sheet – September Infringement Packages: Key Decisions, 29 September 2016, R-38 and European Commission, Fact Sheet – Commission provides guidance on protection of cross-border EU investments – Questions and Answers, 19 July 2018, p. 2, PC-28 ("EC Guidance Fact Sheet"). *See also* Resp. Mem. ¶¶ 98-99, *referring to* Case C-546/07 *European Commission v. Federal Republic of Germany*, EU:C:2010:25, ¶ 42, PC-29, Case 235/87 *Annunziata Matteucci v. Communauté française of Belgium and Commissariat général aux relations internationales of the*

163.    Croatia disagrees with Addiko's argument that the BIT is compatible with non-discrimination obligations under the EU Treaties since it does not require the Contracting States to treat investors from non-Contracting States differently.  In Croatia's view, this argument is unavailing, as the BIT provides indisputable advantages for Austrian and Croatian investors that are unavailable to investors from other Member States.[214] Croatia adds that, at any rate, Article 11(2) of the BIT calls upon this Tribunal to test discrimination as interpreted by the CJEU, which contradicts Addiko's proposed definition of discrimination.[215]

164.    As to Addiko's argument that the BIT is akin to intra-EU taxation treaties which are permitted by the EU *acquis*, Croatia relies on its legal expert's opinion to state that double taxation treaties cannot be equated to bilateral investment treaties since Member States have expressly retained competence over direct taxation in Article 65(1)(a) of the TFEU.[216]

###    b.    Addiko's Position

165.    In response to Croatia's argument that the BIT is incompatible with Articles 18, 49 and 63 of the TFEU because it confers protections bilaterally on the basis of investors' nationality in violation of the principle of non-discrimination, Addiko points to the findings of at least two dozen arbitral tribunals regarding compatibility of the BIT and the EU *acquis*.[217] Addiko adds that neither Croatia nor its legal expert offer any basis to distinguish this case from the prior ones, especially because neither *Achmea* nor the Declarations even address the issue of compatibility between the EU *acquis* and substantive protections in intra-EU bilateral investment treaties.[218]

---

*Communauté française of Belgium,* EU:C:1988:460, ¶¶ 16, 19-21, PC-30, Case C-478/07 *Budĕjovický Budvar, národní podnik v. Rudolf Ammersin GmbH,* EU:C:2009:521, ¶¶ 97-98, PC-31.
[214] Resp. Reply ¶¶ 153-154.
[215] Resp. Reply ¶¶ 155-156, *relying* on Craig Supp. Opinion ¶ 45.
[216] Resp. Reply ¶¶157-159 *relying* on Craig Supp. Opinion ¶ 52.
[217] Cl. Reply ¶¶ 31-33.
[218] Cl. Reply ¶¶ 34-35, *relying on* Jacobs Supp. Opinion ¶ 24 and Jacobs Opinion ¶ 83. Addiko also emphasizes, in response to Croatia's arguments that the past tribunals were incorrect, that those tribunals had good grounds to consistently reject objections similar to the ones raised by Croatia here. Cl. PHB2 ¶ 39.

166.    In submitting that there is no incompatibility between the arbitration provision at Article 9 of the BIT and the general discrimination provision at Article 18 of the TFEU, Addiko relies on its legal expert's opinion that the BIT does not require Croatia to provide less favorable treatment to non-Austrian investors, just to ensure that Austrian investors would not be treated less favorably than the others.[219] Addiko contends that this argument is supported by the CJEU's own case law.[220] Addiko also recalls General Wathelet's opinion in *Achmea* that intra-EU investment treaties, like double taxation treaties, are not discriminatory simply because they afford treatment on a bilateral basis.[221] This is so, according to Addiko, because investors who enjoy protection under a treaty occupy a different position from those who do not, since the treaty is likely to have been a factor in their decision to make their investment in the first place.[222] This reasoning, Addiko states, has been followed by tribunals in *Binder* and *EAI Bank*.[223]

167.    Addiko also argues that there is no incompatibility between the substantive protections in the BIT and the TFEU.[224] Addiko notes that Croatia disregards multiple arbitral decisions that consistently rejected assertions of incompatibility between substantive investment protections in intra-EU bilateral investment treaties and the TFEU.[225]

168.    In any event, Addiko states that, as with the arbitration provisions, nothing in the BIT's substantive protections requires the Contracting States to treat investors from other EU Members less favorably than others.  Addiko argues that treaties dealing with the same

---

[219] Cl. Mem. ¶ 62, *relying on* Jacobs Opinion ¶¶ 70, 83; Cl. Reply ¶¶ 35-36.

[220] Jacobs Opinion ¶ 74(1)-(2); *Achmea Wathelet Opinion* at ¶ 56.

[221] Jacobs Opinion ¶ 74(2)-(4), *relying on Achmea Wathelet Opinion* at ¶ 79. Addiko also points to Case C-376/03 *D v. Inspecteur van de Belastingdienst*, in which the Court rejected a claim of discrimination by holding that the very fact that a treaty existed between two EU Member States meant that an investor not from one of those EU Member States was necessarily not in a similar situation, and as such, no discrimination could arise.

[222] Cl. Mem. ¶ 67, *relying on* Jacobs Opinion ¶ 75.

[223] Cl. Mem. ¶¶ 68-69, *citing Binder* at ¶ 65 and *EAI Bank* at ¶¶ 274, 278.

[224] Cl. Mem. ¶¶ 71-80. Addiko also emphasis that neither *Achmea* nor Declaration – 15 January 2019 address the compatibility of substantive protections in intra-EU bilateral investment treaties with the principles of non-discrimination in the EU Treaties, precluding Croatia from denying the relevance of arbitral decisions directly on the point. Cl. Reply ¶¶ 31-34.

[225] Cl. Mem. ¶ 77, *citing Eastern Sugar* at ¶¶159, 178-185, *EAI Bank* at ¶ 184, *PL Holdings* at ¶ 312, and *Marfin* at ¶ 588. Cl. Reply ¶ 4.

subject matter can be cumulatively applied, and since the TFEU contains no substantive equivalent to the protections confirmed by the BIT, the two are not incompatible.[226]

## G.    THE BIT'S COMPATIBILITY WITH GATS OBLIGATIONS

169.    Croatia contends that the BIT conflicts with obligations under the World Trade Organization ("WTO") General Agreement on Trade in Services ("GATS") and as such with the EU *acquis*. Addiko disputes the GATS' place in the EU *acquis* and argues that the BIT does not violate it in any event.

### a.    Croatia's Position

170.    Croatia makes a three-fold argument. First, it argues that the GATS forms part of the EU *acquis*, requiring an assessment of the BIT's compatibility with the GATs for purposes of Article 11(2) of the BIT. Second, Croatia argues that the BIT breaches Croatia and Austria's obligations under Article II(1) of the GATS. Third, and finally, Croatia argues that nothing in public international law restricts the application of the GATS to investment treaties.

171.    **First**, Croatia argues that agreements concluded by the EU are binding on its Member States, and accordingly, form an integral part of the EU *acquis*.[227] Since the EU is a party to the GATS, the GATS and other WTO agreements (by virtue of EU's membership to the WTO) are part of the EU *acquis*, and any failure by a Member State to implement these international agreements constitutes a violation of obligations under EU law by that Member State. Accordingly, an incompatibility between the BIT and the GATS would give rise to an incompatibility between the BIT and the EU *acquis*.[228] Moreover, although Addiko points out that the CJEU has stated it will not review the legality of WTO

---

[226] Cl. Mem. ¶¶ 78-80 (collecting cases); Jacobs Opinion ¶ 68.
[227] Resp. Mem. ¶¶ 103-105, *relying on* Article 216(2) of the TFEU, R-2 and *R. & V. Haegeman v. Belgian State*, Case 181/73, Judgment of the European Court of Justice, 30 April 1974, ¶ 5, PC-56, Opinion 1/91 of the European Court of Justice relating to the creation of the European Economic Area, 14 December 1991, ¶ 37, PC-57; Resp. Reply ¶¶ 160-161.
[228] Resp. Mem. ¶ 106.

agreements, Croatia argues that CJEU review is irrelevant to the substantive question of whether the BIT is compatible with the *acquis*.[229]

172.    ***Second***, Croatia notes that Article II(1) of the GATS imposes upon the Member States an obligation requiring "that investment incentives or restrictions be applied equally to all foreign sources of inward service industry-related investments,"[230] which is equivalent to a most-favored nation ("MFN") requirement. In Croatia's view, the BIT is a trade measure that is covered by the GATS.  Since the BIT by definition is a bilateral treaty, it necessarily does not accord MFN treatment to all WTO members.   For this reason, the BIT is incompatible with the GATS, and thus with the *acquis*.[231]  Croatia rejects Addiko's point that relations among EU Member States are considered domestic and unregulated by GATS, relying on scholarship to explain that by virtue of being an individual member of the WTO, Croatia and each EU Member State had the obligation of non-discrimination.[232] Accordingly, Croatia's obligation under the GATs to render no less favorable treatment extends to other EU Member States as well.[233]

173.    ***Third***, Croatia argues that as multiple WTO Member States have expressly exempted bilateral investment treaties from the scope of their MFN obligations under the GATS, it is clear that investment treaties such as the BIT otherwise fall within the scope of Article II of the GATS.[234] Croatia argues that since neither Austria nor Croatia so excluded

---

[229] Resp. Reply ¶ 162.

[230] Resp. Mem. ¶ 108; Cl. PHB1 ¶ 243.

[231] Resp. Mem. ¶ 114.

[232] Resp. Reply ¶ 164, *relying on* Eva Steinberger, The *WTO Treaty as a Mixed Agreement: Problems with the EC's and the EC Member States' Membership of the WTO*, 17 European Journal of International Law 4 (2006), p. 855, RLM–171.

[233] Resp. Reply ¶ 165, *relying on* Appellate Body Report, *Argentina – Financial Services*, WT/DS453/AB/R, 14 April 2016, ¶ 6.105, CLM-173 and Mitsuo Matsushita et al, *The World Trade Organization: Law Practice, and Policy* (Oxford University Press, 2015),  at p. 780, RLM-142.

[234] Resp. Mem. ¶ 115, *citing* the express exclusion of bilateral investment treaties from the MFN obligations under the GATS by Canada (World Trade Organisation, Canada – Final List of Article II (MFN) Exemptions, GATS/EL/16, 15 April 1994, p. 1, RLM-149), Chile (World Trade Organisation, Chile – Final List of Article II (MFN) Exemptions, GATS/EL/18, 15 April 1994, p. 1, RLM-150), Costa Rica (World Trade Organisation, Costa Rica – Final List of Article II (MFN) Exemptions, GATS/EL/22, 15 April 1994, p. 1, RLM-151), Kuwait (World Trade Organisation, Kuwait – Final List of Article II (MFN) Exemptions, GATS/EL/49, 15 April 1994, p. 1, RLM-152), Poland (World Trade Organisation, Poland – Final List of Article II (MFN) Exemptions, GATS/EL/71, 15 April 1994, p. 1, RLM-153), Singapore (World Trade Organisation, Singapore – Final List of Article II (MFN) Exemptions, GATS/EL/76, 15 April 1994, p. 1, RLM-154), Uruguay (World Trade Organisation, Uruguay – Final List of Article II (MFN) Exemptions, GATS/EL/91, 15 April 1994, p. 1, RLM-155).

investment treaties from Article II of the GATS, Article II applies to their investment treaties, thereby creating an incompatibility between the BIT and the GATS.[235]

### b. *Addiko's Position*

174.    Addiko presents five arguments why this Tribunal need not take into consideration the GATS which, at any rate, should be considered as compatible with the EU *acquis*.

175.    ***First***, Addiko argues that although the EU *acquis* may include a few international agreements concluded by the EU, that is not the case for the GATS (or any other WTO agreement). Addiko relies on the CJEU's consistent jurisprudence[236] that the flexibility[237] the WTO agreements offer for conduct among WTO Member States makes them "in principle" not among the rules under which the CJEU must review the legality of measures adopted by the Community institution. Croatia argues that, in fact, the CJEU (at the request of the European Commission and Council) has found WTO Agreements to be persuasive but not binding upon the EU. Addiko therefore argues that the GATS is not a part of the EU *acquis*.[238]

176.    ***Second***, Addiko argues that even if the GATS was considered to be part of the EU *acquis*, it does not generate obligations for the EU towards investors in Austria. Addiko argues that the WTO Agreements impose upon the EU the duty to refrain from discriminating against foreign goods and services in favor of domestic goods and services. Accordingly, Addiko argues, the EU's obligation under the GATS is to accord MFN treatment to services and supplies from outside the EU, not to those from EU Member States such as Croatia or Austria. Therefore, the GATS is not incompatible with the BIT since they do not overlap in their scope. While the GATS caters to obligations towards service and service providers

---

[235] Resp. Mem. ¶¶ 118-119.

[236] Case C-149/96 *Portugal v. Council*, ¶ 41, CLM-154.

[237] Addiko notes that since the WTO allows for compensation *in lieu* of withdrawal of measures, resolution of a dispute through mutual amicable settlement, etc., the WTO affords significant flexibility to its Members and does not determine appropriate legal means of ensuring good faith compliance with its Agreements. Cl. Mem. ¶ 177. For this, Addiko also relies on Case C-21/14 *Commission v. Rusal Armenal*, ¶ 38, CLM-150.

[238] Cl. Mem. ¶¶ 174-180; Cl. Reply ¶¶ 12, 117-120; Cl. PHB1 ¶ 249.

from non-EU WTO Member States, the BIT merely applies to service and service providers from its Contracting Parties.[239]

177.   **Third**, Addiko argues that nothing in the BIT calls on Croatia or Austria to provide a certain level of treatment to investors not from the other Contracting Party. Instead, Addiko argues, each Contracting Party remains open under the BIT to accord identical or no less favorable treatment to all other States. Accordingly, in its view, the BIT does not violate the GATS MFN obligation.[240]

178.   **Fourth**, Addiko rejects Croatia's argument that the exclusion by some States of investment agreements from Article II of the GATS indicates incompatibility between such agreements and the GATS.  In its view, the fact that many prominent WTO Member States have not excluded investment agreements from the application of Article II of the GATS indicates that those WTO Member States do not believe that there is any such incompatibility.[241] Addiko notes that when pressed at the hearing, Croatia admitted that its argument about the GATS would mean that unless expressly exempted through the procedure provided by the GATs, "no BIT would be valid under this argument."[242]

179.   **Fifth**, Addiko argues that by Croatia's own argument, bilateral investment treaties are not "measures" within the meaning of Article II of the GATS. At any rate, Addiko argues that, assuming investment treaties are "measures" for purposes of Article II of the GATS, Croatia's argument that by their very nature such treaties violate the GATS MFN obligation would cause seismic ramifications for the over 3,000 bilateral investment treaties[243] between WTO Member States. For these reasons, Addiko argues that Croatia's arguments must be approached with caution.[244]

---

[239] Cl. Mem. ¶¶ 181-185; Cl. Reply ¶¶ 121-122.
[240] Cl. Mem. ¶¶ 186-188; Cl. Reply ¶¶ 12, 123-124.
[241] Cl. Mem. ¶ 169.
[242] Cl. PHB1 ¶ 244 (quoting Tr. Day 1, 135:18-20).
[243] Addiko relies on data available at: https://investmentpolicyhub.unctad.org/IIA.
[244] Cl. Mem. 170-171.

## IV.    THE EUROPEAN COMMISSION'S POSITION

180.    The Commission's Submission is focused on the legal consequences of the CJEU's *Achmea* Judgment. The Commission argues that the judgment is an authoritative interpretation of EU law, binding upon EU Member States, investors established in those States and intra-EU arbitral tribunals as a part of international law applicable to the dispute. Accordingly, the Commission argues that the offers by Croatia and Austria to investors from the other State to arbitrate investment disputes were invalid since Croatia's accession to the EU on 1 July 2013. The Commission accordingly considers that the Tribunal lacks jurisdiction over this case.[245]

### A.    COMPETENCE OF THE ARBITRAL TRIBUNAL TO RULE ON ITS JURISDICTION

181.    The Commission cites the ICJ for the proposition that an international court or tribunal "must … always be satisfied that it has jurisdiction, and must if necessary go into that matter *proprio motu*."[246] In its view, "[t]he competence to decide on such claims necessarily presupposes the possibility to analyse possible obstacles to the validity of the offer to arbitrate, and the existence and validity of consent to arbitrate."[247] Accordingly, this Tribunal must assess whether the offer of arbitration made by Croatia was applicable when Addiko filed its request for arbitration.

### B.    CONFLICT BETWEEN ARTICLE 9 OF THE AUSTRIA-CROATIA BIT AND EU LAW

182.    The Commission argues that there is a conflict between Article 9(2) of the BIT and the EU law because (i) the Tribunal may have to apply and interpret the EU law, (ii) there is no valid offer to arbitrate, and (iii) the sunset clause in the BIT are either not triggered or are inapplicable.

#### (1)    The Tribunal May Have to Apply and Interpret EU Law

183.    The Commission argues that the scope of *Achmea* disallows the application and interpretation of the EU law by any tribunal established under any intra-EU BIT. That is

---

[245] Commission Submission ¶¶ 1-5.
[246] Commission Submission ¶ 22.
[247] Commission Submission ¶ 22.

because these tribunals are not part of EU judicial system, cannot be regarded as courts of Member States and cannot make a reference to the CJEU for a preliminary ruling. The application and interpretation of EU law by these tribunals thus contradicts the principle of mutual trust among Member States and the preservation of the nature and autonomy of the EU law, which moreover was confirmed by the German Federal Supreme Court. In this case, the Commission argues, the applicable law of the BIT includes Croatian law, which comprises EU law, and for this reason a tribunal established under Article 9 of the BIT would have to interpret and apply EU law just as would the arbitral tribunal proceeding under the BIT at issue in *Achmea*.[248]

### (2) Lack of Valid Offer for Arbitration Since 1 July 2013

184.    The Commission contends that the conflict between Article 9 of the BIT and the EU law has existed since the date of Croatia's accession to the EU, 1 July 2013. The Commission argues that *Achmea* applies *ex tunc, i.e.,* from the very outset of Croatia's accession. The CJEU has the authority to limited the *ex tunc* application of its rulings, but it did not do so in *Achmea*. Thus, since consent to arbitrate under the BIT was lacking *ab initio*, since 1 July 2013, there was no valid offer to arbitrate outstanding at the time Addiko filed its request for arbitration. The Commission supports this argument by relying on the *Bundesgerichtshof*'s final decision in *Achmea* and the Svea Court of Appeal's suspension of the enforcement of two intra-EU investment arbitration awards seated in Stockholm.[249]

### (3) Sunset Clauses Are Not Triggered and Inapplicable

185.    The Commission submits that the sunset clause in Article 12(3) of the BIT regulates only the legal consequences of unilateral termination of the BIT. Here, however, the BIT was terminated by the plurilateral Treaty of Accession of Croatia to the EU, which is not addressed by Article 12(3) of the BIT. In the alternative, the Commission stresses that *Achmea* precludes the offer for arbitration, which itself renders the sunset clause incompatible with and precluded by the EU law.[250]

---

[248] Commission Submission ¶¶ 6-12
[249] Commission Submission ¶¶ 13-16.
[250] Commission Submission ¶¶ 17-20.

C.    **THE AUSTRIA-CROATIA BIT HAS BEEN TERMINATED**

186.    The Commission invites the Tribunal to find it lacks jurisdiction because the BIT has been terminated.[251] The Commission contends that (i) the requirements of VCLT Article 59 for implied termination of the BIT are fulfilled, (ii) the BIT and the EU law have the "same subject matter" for purposes of Article 59, (iii) there is no need to follow the formal requirements of VCLT Articles 65-68 for termination of the BIT, and (iv) Croatia and Austria confirmed the lack of valid consent to arbitration by a declaration consistent with VCLT Article 31.[252]

(1)    **The Conditions for Both Alternatives of VCLT Article 59(1) Are Fulfilled**

187.    The Commission argues that the investments listed in Article 1 of the BIT fall within the ambit of application of the fundamental freedoms guaranteed by the EU law, namely the TFEU. Importantly, EU law provides for a complete set of legal remedies and effective judicial protection in the case of violations of investors` rights. Contrary to the decision in *Eastern Sugar*, the Commission considers that the protection of fundamental freedoms includes the post-establishment phase of the investment. The Commission also relies on CJEU decisions that EU law takes precedence over agreements concluded between Member States, to argue that such precedence also applies to treaties that originally were not between Member States but became such upon the latter's State's accession to the EU. With regard to this case, the Commission argues that Croatia and Austria both were well aware of the rule of primacy of the EU law as of Croatia's accession on 1 July 2013, and therefore their intention when signing the Treaty of Accession was for the protection of intra-EU investments to be governed henceforth only by EU law.  This is especially evident under this BIT, the Commission says, given its inclusion of Article 11(2). Thus, the Commission argues, the BIT has been impliedly terminated since 1 July 2013.[253]

188.    Alternatively, the Commission considers that all substantive provisions of the BIT are incompatible with the EU law because they implement a parallel system overlapping with Single Market rules, preventing a full application of the EU law. The overlap occurs when

---

[251] Commission Submission ¶¶ 34-38.
[252] Commission Submission ¶¶ 23-25.
[253] Commission Submission ¶¶ 26-28.

intra-EU investment agreements form the basis for an award of unlawful State aid or when they confer rights only in respect of investors from one of two Member States, conflicting with the principle of non-discrimination on the ground of nationality. For these reasons, the Commission argues, the BIT in its entirety is incompatible with EU law, fulfilling the condition under Article 59(1)(b) of the VCLT. In this regard the Commission mentions that Article 59 of the VCLT also can support partial termination of an international agreement.[254]

### (2)    The Question of "Same Subject Matter"

189.    The Commission states that arbitral tribunals have previously considered the requirement that two treaties relate to the same subject matter as an additional condition for VCLT Article 59, rather than as a condition that is automatically met whenever other conditions of Article 59 are fulfilled. However, such decisions in its view are superficial and at odds with Article 59's drafting history.  In this regard, citing the VCLT's *travaux préparatoires*, the Commission argues that Article 59(1) does not require that two treaties be related to the same subject matter, but only that they lay down rules for the same issue. Thus, since any investment made by an investor from one Member State in another falls within the scope of application of the fundamental freedoms of the EU law, both the BIT and the EU law govern the same issue.[255]

### (3)    There Is No Need to Follow the Formal Steps for Termination in VCLT Articles 65-68

190.    The Commission argues that, contrary to rulings of other arbitral tribunals, the *travaux préparatoires* of the VCLT makes it clear that implied termination under VCLT Article 59 does not require the formal steps for termination under VCLT Articles 65-68 to be followed.[256]

---

[254] Commission Submission ¶¶ 29-30.
[255] Commission Submission ¶¶ 31-32.
[256] Commission Submission ¶ 33.

### (4) Croatia and Austria Have Confirmed the Lack of Valid Consent to Arbitration in a Declaration Pursuant to VCLT Article 31(2)(b) and 31(3)(a)

191.    The Commission argues that a Declaration[257] dated 15 January 2019 issued by Croatia and Austria together with other EU Member States confirms that (i) *Achmea* precludes Article 9(2) of the BIT, (ii) the effects of *Achmea* are *ex tunc* as of 1 July 2013, (iii) the conflict between Article 9(2) of the BIT is governed by the conflict rule of primacy of the EU law, and (iv) the application of VCLT Article 30 leads to the same outcome. According to the Commission, this Declaration serves as a clarification by both Croatia and Austria that the object and purpose of the Treaty of Accession, within the meaning of VCLT Article 31(1), was to impliedly terminate the BIT altogether, or at least terminate its Article 9.[258]

### D.    IN THE ALTERNATIVE: EU LAW PREVAILS OVER ARTICLE 9(2) OF THE BIT

192.    The Commission argues that in the event the Tribunal disagrees with its submission under VCLT Article 59, under all possible conflict of law rules applicable, the conflict between Article 9(2) of the BIT and the EU law must be resolved in favor of EU law.[259]

### (1)    Law Applicable to the Decision on Jurisdiction

193.    Replying on the *Bundesgerichtshof*'s final decision on *Achmea* and decisions in *JSW v. Czech Republic* and *Zhinvali v. Georgia,* the Commission argues that the general principle of primacy of EU law is part of the Croatian legal order and of international law applicable between Croatia and Austria.  Thus, EU law governs the jurisdiction of this Tribunal and takes precedence over Article 9(2) of the BIT. The Commission acknowledges an alternative view, supported by practice of the PCIJ and in academic writing and reflected by the decision in *CSOB v. Slovakia*, to the effect that the question of whether the parties have effectively expressed their consent to arbitral jurisdiction is governed by international law. However, it contends that this view is not applicable in this case, which presents the inverse scenario of that in *CSOB v. Slovakia*. Thus, the Commission considers that to assess

---

[257] Declaration of Representatives of the Governments of the Member States of 15 January 2019. Available at https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf.
[258] Commission Submission ¶¶ 34-38.
[259] Commission Submission ¶ 40.

the validity of the arbitration agreement, the law of the host State should be applied. Even if international law regulates the issue of consent, it contends that the outcome will be the same: EU law should be applied when assessing jurisdiction.[260]

### (2) Primacy of EU Law as a Special Conflict Rule Codified in Declaration 17 of the Lisbon Treaty and Article 11(2) of the BIT

194.   In the Commission's view, the applicable conflict rule is that of the primacy of EU law *vis-à-vis* other international agreements concluded between Member States, including pre-accession international treaties. For this argument, the Commission relies on *Costa/ENEL*, the Declaration 17 annexed to the Final Act of the Intergovernmental Conference adopting the Treaty of Lisbon, and Article 11(2) of the BIT. Also, based on decisions of the CJEU, and the ICSID award in *Electrabel v. Hungary,* the Commission considers that in the case of pre-accession international treaties the precedence of EU law takes effect as of the date of accession.[261]

### (3) In the Alternative: The VCLT's Conflict Rules Lead to the Conclusion that EU Law Prevails over Article 9(2) of the BIT

195.   The Commission argues that application of VCLT Article 30(3) also would result in EU law prevailing over Article 9(2) of the BIT. The reason is that in contrast to *Eastern Sugar*, and according to the VCLT's *travaux préparatoires* and the decision in *PL Holding,* Article 30(3) does not impose two separate conditions requiring the "same subject matter" and a "conflict" between treaties; instead, there is only a single requirement of conflict. In the context of this argument, the Commission contends that the Tribunal ought to consider the interpretation given by the Contracting Parties themselves to their successive obligations, namely through their Declaration of 15 January 2019, stressing that cross-border investment in the EU is governed by the complete framework of EU law. Thus, the Commission concludes that under VCLT Article 30(3), the arbitration clause and the sunset clause in the BIT are incompatible with the Treaty of Lisbon and the Treaty of Accession.[262]

---

[260] Commission Submission ¶¶ 41-47.
[261] Commission Submission ¶¶ 48-52.
[262] Commission Submission ¶¶ 53-56.

**(4)**      **No Legitimate Expectations and No Protection by VCLT Article 70**

196.    Finally, relying on the *Bundesgerichtshof*'s final decision in the *Achmea* case, the Commission argues that Addiko cannot invoke the doctrine of legitimate expectations. The Commission also argues that the *Eastern Sugar* tribunal misapplied VCLT Article 70, interpreting it contrary to the International Law Commission's ("ILC") observation that Article 70 was not concerned with the rights of individuals but solely with those of States.[263]

## V.      THE TRIBUNAL'S ANALYSIS

### A.    INTRODUCTORY PRINCIPLES

197.    Article 25(1) of the ICSID Convention, to which both Austria and Croatia are Contracting States, provides that jurisdiction "shall extend to any legal dispute arising directly out of an investment, between [Croatia] and a national of [Austria], which the parties to the dispute consent in writing to submit to the Centre."[264] The question for this Decision is whether Croatia has consented to submit to ICSID arbitration the particular dispute at issue, namely a claim by an Austrian investor alleging violation of certain substantive standards of the Austria-Croatia BIT. There is no question that the other party to this dispute, Addiko, has consented to any valid offer of consent that Croatia may have made, by initiating this arbitration consistent with the ICSID Rules. At the same time, it is trite law that an investor may not bind a State beyond the limits of the State's own predicate offer of consent, and States are free to limit the circumstances of their advance consent to ICSID arbitration.[265] Where they have done so, tribunals must respect the clear limits of the requisite consent.

198.    The starting point for determining the validity and reach of Croatia's consent is the BIT itself, which must be interpreted according to the principles set forth in VCLT Articles 31

---

[263] Commission Submission ¶¶ 57-58.

[264] ICSID Convention, Article 25(1).

[265] *See, e.g.*, C. Schreuer, et al., The ICSID Convention: A Commentary (Cambridge University Press, 2d ed. 2009), ¶ 514, RLM-126 ("Where ICSID's jurisdiction is based on an offer made by one party, subsequently accepted by the other, the parties' consent exists only to the extent that offer and acceptance coincide…. It is evident that the investor's acceptance may not validly go beyond the limits of the host State's offer.").

and 32. In conducting such an analysis, the Tribunal bears in mind several propositions. First, under VCLT Article 31, the provisions of the BIT are to be interpreted and applied in accordance with the "ordinary meaning" of their terms, in the "context" in which they occur and in light of the Treaty's "object and purpose."[266]  While the Contracting Parties' use of unambiguous terms should be taken as reflecting their clear intent, context and purpose must also be considered. The relevant "context" for construing any given passage in a treaty includes the words and sentences found in close proximity to that passage, including definitional terms, as well as other provisions of the same treaty which help illuminate its object and purpose.[267]  In accordance with VCLT Article 31(3), a tribunal construing the terms of the Austria-Croatia BIT should also take into account (*inter alia*) "[a]ny subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions," as well as "[a]ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation" and "[a]ny relevant rules of international law applicable in the relations between the parties.[268]

199.     In accordance with Article 32 of the VCLT, "[r]ecourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion," only "to confirm the meaning" resulting from the textual approach required by Article 31, or in the event the textual approach leaves a meaning "ambiguous or obscure" or would lead to a result that is "manifestly absurd or unreasonable."[269] The ICJ has explained that even in these circumstances, "a decisive reason" (such as unmistakable evidence of the State Parties' intentions from such supplementary materials)

---

[266] VCLT, Article 31(1).

[267] *See generally Kiliç İnşaat İthalat İhracat Sanayi ve Ticaret Anonim Şirketi v Turkmenistan*, ICSID Case No ARB/10/1, Award, 2 July 2013, ¶ 5.2.6, *available at* https://www.italaw.com/sites/default/files/case-documents/italaw1515_0.pdf ("Treaty terms are obviously not drafted in isolation, and their meaning can only be determined by considering the entire treaty text. The context will include the remaining terms of the sentence and of the paragraph; the entire article at issue; and the remainder of the treaty […].").

[268] VCLT, Article 31(3).

[269] VCLT, Article 32.

would be required "[t]o warrant an interpretation other than that which ensues from the natural meanings of the words" of a provision.[270]

200.    In applying these VCLT principles to interpret a treaty text, no burden of proof applies as between the parties to a particular dispute.  The Tribunal must satisfy itself of the correct meaning of the treaty, and this correct reading will not shift based on traditional notions of burden of proof, which exist primarily to define the duty placed on a party to demonstrate or refute a disputed fact.[271]  The fact that the treaty interpretation exercise in this case is necessary to determine the Tribunal's jurisdiction further underscores the point, since – as the ICJ has stated – "the establishment or otherwise of jurisdiction is not a matter for the parties but for the [Tribunal] itself," which must determine from all the points advanced by the Parties "whether an intention on the part of the Parties exists to confer jurisdiction upon it."[272]  The Tribunal turns below to interpretation of the particular BIT provisions that are most central to the accelerated jurisdictional issue here.

## B.    INTERPRETATION OF KEY BIT PROVISIONS

201.    Articles 9 and 11 of the BIT contain the provisions which are critical for interpreting the scope and limits to Croatia's consent, and these two Articles must be read in the context of each other, pursuant to VCLT Article 31(1). Beginning with Article 9, entitled "Settlement of Investment Disputes," the BIT refers to a class of disputes, described in Article 9(1) as "[a]ny dispute arising out of investment, between a Contracting Party and an investor of the other Contracting Party." In accordance with Article 9(2), if such a dispute cannot be settled amicably within three months of notification by the investor, then upon the request of either the investor or the host State, "the dispute *shall* … be subject to the following procedures" (emphasis added). The word "shall" connotes a mandatory requirement, subject only to such conditions or exceptions as may also be specified in the BIT. Article 9(2) then provides a choice between two dispute resolution procedures, namely ICSID

---

[270] *Admission of a State to Membership in the United Nations* (Charter, Art.4), Advisory Opinion I.C.J Reports 1948, pp. 57, 63, *available at* https://www.icj-cij.org/files/case-related/3/003-19480528-ADV-01-00-EN.pdf.

[271] *See UniCredit* 2018 Decision ¶ 89, CLM-136; *WNC Factoring* ¶ 293, CLM-139.

[272] ICJ, *Fisheries Jurisdiction Case* pp. 450-451, ¶¶ 37-38, CLM-193.

arbitration (addressed in Article 9(2)(a)) or UNCITRAL Rules arbitration (addressed in Article 9(2)(b)).

202.    Importantly, for either path, the BIT expressly states that "[i]n the case of arbitration, each Contracting Party, by this Agreement irrevocably consents in advance, even in the absence of an individual arbitral agreement between the Contracting Party and the investor, to submit such dispute" for resolution by the applicable tribunal.[273] This statement of "irrevocabl[e] consent[] in advance" contains two important elements. First, *irrevocability* means what it says: the States may not resile from the consent so granted. Second, and equally important, what is irrevocable is the "consent[] *in advance*," namely the offer of consent to qualified investors of the other State. Under the plain language of Articles 9(2)(a) and 9(2)(b), Austria's and Croatia's mutual pledge of irrevocability does not attach only *after* a particular investor accepts an offer of arbitration for a particular dispute, in the fashion in which (for example) Article 25(1) of the ICSID Convention operates (*i.e.,* "[w]hen the parties [*plural*] have given their consent, no party may withdraw its consent unilaterally"). Rather, the irrevocability addressed in Articles 9(2)(a) and 9(2)(b) of the BIT relates to the Contracting States' *advance offer* itself. The ordinary meaning of the phrase "irrevocably consents in advance" thus means that neither Austria nor Croatia may withdraw its standing advance offer of ICSID or UNCITRAL arbitration, made for the benefit of qualified investors of the other State, so long as the BIT itself (or at least Article 9, which contains this stipulation) remains in full force and effect.

203.    Article 9 must however be read in the context of Article 11 of the BIT, which is entitled "Application of the Agreement." The "Agreement" at issue in Article 11 is the BIT itself, *i.e.,* "[t]he present Agreement" between Austria and Croatia,[274] not the subsequent agreement that may come into mutual force with a particular investor by consequence of its acceptance of the "irrevocabl[e] consent[] in advance" that each Contracting State offered in Article 9. Since Article 11 relates to "Application" of the BIT itself, the terms of Article 11 operate as a gateway to all other provisions of the BIT, including both those

---

[273] BIT Articles 9(2)(a) and 9(2)(b).

[274] BIT Articles 11(1) ("The *present Agreement* shall apply to…") and 11(2) ("The Contracting Parties are not bound by the *present Agreement* …") (emphasis added).

addressing the Contracting Parties' substantive obligations (Articles 2-8) and those addressing their procedural obligations (Articles 9-10). As a result, an investor can invoke the substantive and procedural protections of these other Articles only if the circumstances exist for "Application of the Agreement," as specified in Article 11 of the BIT.[275]

204.    The critical provision for this dispute is Article 11(2), which provides that "[t]he Contracting Parties are not bound by the present Agreement insofar as it is incompatible with the legal acquis of the European Union (EU) in force at any given time." The Tribunal agrees with Croatia that this is an unusual provision, not present in other investment treaties that tribunals have analyzed for purposes of jurisdictional objections in intra-EU investment disputes (except for the *UniCredit* case, which concerned the same BIT as here).[276] Article 11(2) therefore requires special attention, beginning with a careful VCLT analysis of its terms.

205.    The first terms of note are included in the phrase, "the Contracting Parties are *not bound by* the present Agreement *insofar as* …" (emphasis added). Structurally, this sentence has two parts, with the first part ("are not bound by") identifying the *consequence* of a stated circumstance, and the second part defining the *nature* of the circumstance that would trigger such consequence ("insofar as …"). Starting with the former, the consequence is not that the BIT ceases to be in force as such; Article 11(2) does not provide for the express or implied termination of the treaty or any of its provisions. Rather, the consequence of the circumstance arising is that the Contracting Parties are excused from ("not bound by") particular obligations that they otherwise undertook in the BIT. The phrase "*insofar as*" demonstrates, according to its ordinary meaning, that the Contracting Parties will be so excused only *if and to the extent* compelled by the applicable circumstance (*i.e.,* "insofar as," but *no farther than*). Otherwise stated, Article 11(2) is not necessarily an all-or-nothing proviso regarding applicability of the BIT, such that either all of the BIT's provisions apply

---

[275] *See similarly Louis Dreyfus Armateurs SAS v. The Republic of India*, PCA Case No. 2014-26, Award, 11 September 2018, ¶¶ 314-315, *available at* https://www.italaw.com/sites/default/files/case-documents/italaw11242.pdf (describing treaty provisions entitled "Scope of the Agreement" as having the "very function" of delineating the treaty's reach, and thus functioning "as a gateway" before investors can invoke the protections of the treaty's other provisions).

[276] *See* Resp. Reply ¶ 13; Resp. PHB1 ¶ 3; Tr. Day 1, p. 10:2-18.

or none of them do. It is entirely possible, consistent with the phrase "insofar as," that the Contracting Parties could be held "not bound by" a particular provision of the BIT as to which the stated circumstance applies, while remaining bound by other provisions of the BIT as to which there is no Article 11(2) cause for concern.

206.    This is an important distinction in the context of the next relevant term in Article 11(2), which concerns "incompatib[ility]" with another body of law ("the legal acquis of the [EU] in force at any given time"). The Tribunal accepts Croatia's point that State Parties can agree on any hierarchy among their mutual obligations that they wish,[277] but in the case of Article 11(2), they have not said that the EU *acquis occupy the entire field* of their obligations *inter se*, such that there is no possible room for BIT provisions to apply in parallel. Rather, they have agreed to excuse each other from BIT obligations only "*insofar as*" (and no farther than) an incompatibility exists. The question for the Tribunal is whether a particular incompatibility arises here, and if so, in what manner and to what extent. One hypothesis could involve a *per se* incompatibility, under which the very notion of an intra-EU BIT (or at least one in which disputes are to be resolved by arbitration) is by definition incompatible with the *acquis*. Another hypothesis could involve a more nuanced approach to incompatibility, in which only the manner in which particular provisions of the BIT are invoked in the context of a particular dispute might render them potentially incompatible with the *acquis*. (A third hypothesis, of course, is no incompatibility at all.) The Tribunal returns to these distinctions further below, in the context of the Parties' particular arguments about incompatibility. The point here is simply to note that as a matter of ordinary meaning, Article 11(2)'s use of the phrase "*insofar as*" requires a Tribunal to consider not only *whether* an incompatibility in fact exists, but if so, *to what extent*, since the Contracting Parties will be excused from their BIT obligations only to that applicable extent.

207.    The next relevant phrase in Article 11(2) is "*incompatible with*," used in the context of describing another body of law. The word "incompatible" is not defined in the BIT, but the notion of incompatibility has a recognized meaning in public international law, in the

---

[277] *See* Tr. Day 1, pp. 24:7-11, 25:8-12.

context of resolving alleged conflicts between two different sets of international obligations. The same word is used *inter alia* in Articles 30 and 59 of the VCLT, and given that both Austria and Croatia have ratified the VCLT, the Tribunal considers that they should be viewed as intending to incorporate a consistent meaning for purposes of Article 11(2).

208.    Fortunately, there is no dispute between the Parties as to what the term "incompatibility" means for purposes of international law. Both Parties accept that obligations in two treaties are incompatible if compliance with one obligation places a State into non-compliance with the other obligation.[278] This definition of incompatibility necessarily requires a finding that the obligations of two separate treaties cannot be *cumulatively* applied, as perhaps imposing parallel or additional obligations but not flatly inconsistent ones. Rather, under public international law, incompatibility arises only when the act of complying with one obligation brings a State into non-compliance with another. In that sense, a relationship of "incompatibility" between treaty provisions is fundamentally distinct from a relationship of complementarity.[279]

209.    Because Article 11(2) of the BIT contains its own rule about the relationship between the BIT and the EU *acquis*, there is no need to resort to Article 30 of the VCLT with respect

---

[278] *See, e.g.*, Resp. Mem. ¶ 32 (defining incompatibility as a circumstance where two obligations "cannot be complied with simultaneously," in the sense that "a State party to both treaties cannot comply with one of them without breaching the other"); Cl. Mem. ¶ 45 (defining incompatibility as "a situation where a State, by complying with an obligation under one treaty, necessarily breaches an obligation under another treaty"); Resp. PHB1 ¶ 50 (noting Parties' agreement on the test for incompatibility); Cl. PHB1 ¶¶ 15, 17-18 (same); Resp. PHB2 ¶ 4 (same). Both Parties cite to a 2006 report by an International Law Commission Study Group, entitled "Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law," U.N. Doc. A/CN/4/L.682, 13 April 2006, ¶ 24, CLM-180 (the "ILC Fragmentation Report") ("conflict exists if it is possible for a party to two treaties to comply with one rule only by thereby failing to comply with another rule. This is the basic situation of incompatibility. An obligation may be fulfilled only by thereby failing to fulfill another obligation.").

[279] An example of complementarity (by contrast with incompatibility) exists in Article 8(1) of the BIT, which addresses the situation in which an investor may be entitled to greater protection under another treaty than provided under the BIT. Article 8(1) provides that "[i]f the provisions of law of either Contracting Party or international obligations existing at present or established thereafter between the Contracting Parties in addition to the present Agreement, contain a rule, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such rule shall to the extent that it is more favourable prevail over the present Agreement." This confirms that investors remain entitled to the benefits of whichever treaty provides greater protections, with the effect that the BIT may only ratchet up (and may never ratchet down) the protections each State grants to investors of the other.

to that issue, because (as the Parties seem to agree), the VCLT's rules about the relationship between successive treaties are residual ones, which are meant to be invoked only where there is no *lex specialis* rule already agreed. Article 11(2) however operates as a *lex specialis* rule for this purpose, so Article 30 of the VCLT does not govern the issue at hand.[280]

210.  The Tribunal does not accept Addiko's invitation to conclude that Article 11(2) of the BIT nonetheless requires an examination of whether two sets of treaties have the "same subject matter." For Addiko, the concept of "incompatibility" in Article 11(2) of the BIT "requires as a … logical prerequisite" that the two sets of treaties have the "same subject matter," or else they could never have incompatible provisions.[281] Addiko therefore suggests that the Tribunal need not even assess putative incompatibility between the BIT and the EU *acquis*, unless it first finds them to have the same overall subject matter.[282] But this would collapse the Article 11(2) inquiry into the same type of analysis as under VCLT Article 30, when Article 11(2) does not so provide. Unlike VCLT Article 30, which explicitly imposes a "same subject matter" test as part of determining the relationship between successive treaties, Article 11(2) of the BIT conditions non-applicability of its terms only on the issue of "incompatibility," without imposing a threshold "subject matter" test or in any other way cross-referencing VCLT Article 30 or its additional terms. In these circumstances, the Tribunal cannot sidestep the central question Article 11(2) poses, by reverting to a separate inquiry that VCLT Article 30 requires but Article 11(2) of the BIT does not. The Tribunal instead focuses squarely on the issue of incompatibility, without reaching the hypothetical question of whether there ever could be a situation in which specific provisions of two treaties are incompatible even though the treaties in general, taken at a macro-level, may address different subject matters.

---

[280] *See similarly UniCredit* 2020 Decision ¶¶ 224-225.

[281] Tr. Day 1, p. 198:10-199:1; Cl. PHB1 ¶ 22 ("a requirement of sameness of subject-matter … is inherent in the very concept of incompatibility and so forms a pre-requisite for any finding of incompatibility under Article 11(2) as well").

[282] Cl. PHB2 ¶ 4 (contending that "[i]ncompatibility, as a logical precondition, requires that the two comparators have the same subject-matter. As investment tribunals have uniformly held, however, intra-EU BITS and EU law do not have the same subject-matter. As a matter of principle, there can therefore be no incompatibility between them").

211.    The next logical step in construing Article 11(2) is to determine the *specific body of law* on which the provision conditions application of BIT terms, based on a threshold requirement of no incompatibility. Article 11(2) refers to the "legal acquis of the European Union (EU) in force at any given time." The first part of this phrase, referencing to the EU "legal acquis," is not terribly controversial, as it has an accepted meaning under EU law. The Parties both accept that the *acquis communautaire* of the EU includes, *inter alia*, (a) the content, principles and political objectives of the EU Treaties (notably the Treaty on European Union ("TEU") and the TFEU); (b) legislation adopted by the EU in application of the EU Treaties; (c) the case law of the CJEU; (d) declarations and resolutions adopted by the EU; and (e) international agreements concluded by the EU that are binding on it and on its Member States.[283]    The Parties and their legal experts also agree that the *acquis* includes opinions rendered to the CJEU by its Advocates General, to the extent not subsequently rejected by the CJEU or otherwise incompatible with primary elements of the *acquis* such as the EU Treaties.[284]

212.    With respect to the judgments of the CJEU, it is undisputed that (in the words of the *Eskosol* tribunal) these constitute "decisive interpretations of the particular issues of EU law that they actually reach."[285]    The Tribunal thus agrees with Croatia that in considering the content of the EU *acquis* for purposes of an Article 11(2) objection under the BIT, it would not be "at liberty to set … aside" the CJEU's clear statements of what the *acquis* actually provide.[286]    However, while the CJEU's interpretations of the *acquis* are authoritative to the extent the CJEU has clearly spoken, this does not mean that an international tribunal applying Article 11(2) of the BIT has no independent role in assessing incompatibility with the *acquis*. As with any other provision of the BIT, the arbitral tribunal must render its best

---

[283] Resp. Mem. ¶ 13 (citing EUR-Lex, *Glossary – "Acquis"*, R-1); Cl. Mem. ¶ 174 (citing *Acquis – European Commission*, C-222); *see also* Resp. Reply n.69 (noting that Addiko's authority C-22 is substantially the same source that Croatia submitted as R-2).

[284] Tr. Day 1, pp. 222:1-14 (Addiko) and 308:17-21 (Croatia); Tr. Day 2, pp. 404:16-405:2, 405:22-406:9 (Professor Craig).

[285] *Eskosol* ¶ 153, CLM-192.

[286] Resp. Reply ¶ 54; Resp. PHB2 ¶ 9 ("the CJEU's interpretation confirms and constitutes the EU *acquis*. Not applying the CJEU's interpretation means not applying the law as it binds the EU Member States.").

and most faithful interpretation of Article 11(2), as that provision becomes relevant in any given case. This may arise in a number of different contexts.

213.    First, on any given question, there may be a dispute as to whether the CJEU has yet spoken. If the CJEU has not yet spoken to an issue, then the tribunal necessarily must examine for itself the content of other elements of the *acquis* with which particular BIT provisions are said to be incompatible and thus inapplicable under Article 11(2). Moreover, even if the CJEU has spoken to some element of an issue, there may be a dispute between the parties to a BIT dispute as to the scope of its pronouncements. Unless and until the CJEU resolves such ambiguities by subsequent rulings, it necessarily falls to this Tribunal applying Article 11(2) to determine the extent to which the CJEU's prior judgments actually reach the particular issue, as to which a claim of incompatibility with the *acquis* has been presented to the tribunal.[287]

214.    Finally, in all instances, after identifying the point at issue in the *acquis*, the Tribunal must independently determine the claim of incompatibility, since incompatibility under Article 11(2) is an international law question, not a question of EU law. Consistent with the notion of *competence-competence*, the BIT does not require a tribunal to suspend its independent judgment with respect to a claimed incompatibility. Article 11(2) is not self-judging, as it might have been if it were phrased alternatively, "[t]he Contracting Parties are not bound by the present Agreement insofar as [*one such Contracting Party claims that*] it is incompatible with the legal acquis of the European Union (EU) in force at any given time." Rather, it falls to the Tribunal to determine whether the BIT indeed is incompatible, in the public international law sense previously discussed, with the *acquis* "in force at any given time," while exercising appropriate deference to the CJEU as to what the content of that *acquis* actually was at the relevant time.

---

[287] *Cf.* Tr. Day 2, pp. 439:15-440:18 (Professor Jacobs' testimony that this approach would be consistent with the CJEU's own practice, in which "[t]he Court itself has fully accepted that, while [its] ruling is binding and, indeed, forms part of the European Union acquis, it is for the court or tribunal hearing the new case to decide whether and, if so, to what extent, the ruling applies" to the facts and issues before it; "the scope of the ruling, in the absence of a further reference to the Court of Justice, is entirely a matter for the tribunal hearing the new case").

215.    This point brings the Tribunal finally to the important temporal elements of Article 11(2), reflected in the phrase "in force at any given time," within the broader context of absolving the Contracting Parties from the BIT "insofar as it is incompatible with the legal acquis of the European Union (EU) in force at any given time." The first point is that "in force at any given time" is a composite of two smaller phrases, "in force" and "at any given time," and that the latter point about a "given time" qualifies the former point about the scope of the relevant *acqui*s (that it be the *acquis* then "in force"). While this may appear obvious, it is nonetheless worth mentioning, because a slightly different interpretation of Article 11(2) might result if the phrase "at any given time" were to qualify the reference to incompatibility, rather than the reference to the *acquis* (*viz.,* "[t]he Contracting Parties are not bound by the present Agreement insofar as it is *incompatibl*e [*at any given time*] with the legal acquis …"). The question in that case might be whether the acquis, as it has *evolved in toto* by the date of the Tribunal's assessment, compels a finding of incompatibility such as to release the Parties from obligations otherwise imposed by the BIT. By contrast, under the *actual* placement of the phrase "at any given time" (referring to "the legal acquis … *in force at any given time*"), the temporal inquiry must be into the state of the *acquis* itself (*i.e.,* what elements were or were not in force as part of the *acquis,* as of a particular date).

216.    This is consistent with the reality that all bodies of law evolve over time, including the EU *acquis*.  The *acquis* evolves in at least two different senses.  First, elements of it emanate from political acts that are taken at a particular moment in time, such as entry into additional treaties binding the EU Member States (*e.g.,* the Lisbon Treaty), or adoption of particular legislation in application of the EU Treaties. Second, elements of the *acquis* emanate from the case law of the CJEU, which like courts in many jurisdictions progressively interprets underlying texts (*e.g.,* the EU Treaties) as particular questions about those texts are put to it. The CJEU's interpretation of the EU Treaties may evolve over time, just as the opinions rendered to the CJEU by its Advocates General may also evolve. Any given pronouncement by the CJEU (or any given opinion by an Advocate General, prior to the CJEU's decision) may become part of the *acquis* once it is rendered, but it cannot be said to have be "in force" as part of the *acquis* prior to when it is rendered. By contrast, the *underlying texts* which the CJEU interprets (the EU Treaties) were "in

force" as of the date of their adoption, even if the CJEU has not yet had occasion to opine on a particular question arising about those texts.

217.     This distinction becomes particularly relevant here, as it relates to the Parties' discussion of whether and how *Achmea* should be considered as part of the Tribunal's jurisdictional analysis. The Parties agree that for purposes of any jurisdictional question under the ICSID Convention, the "critical date" for determining the existence of consent to arbitration is the date on which the relevant request for arbitration was registered (here, 27 September 2017). What follows from that, and from Article 11(2) of the BIT, is that (a) *if* the Tribunal were to find that as of that critical date, Croatia's offer of consent to arbitration in Article 9(2) of the BIT was not already incompatible with the *acquis* then in force (*i.e.*, with the EU Treaties), (b) *then* no subsequent event could retroactively vitiate the mutual consent to arbitration cemented by the act of Addiko's acceptance.[288] As previously discussed, any such retroactive vitiation of prior consent would be inconsistent with Article 9(2)'s own express provision that the standing offer of consent is irrevocable, so long as that Article was valid under Article 11(2), with which it must be read in context.  Accordingly, since *Achmea* postdated the critical date for determining compatibility, it cannot *itself* be said (*qua* a CJEU judgment) to have comprised part of the *acquis* "in force at [the] given time" relevant to the jurisdictional analysis. However, this does not excuse the Tribunal from assessing, for purposes of the incompatibility analysis, the content and import of the *EU Treaties*, which (unlike *Achmea*) were clearly already part of the *acquis* "in force" as of the critical date.

218.     In this context, the Tribunal acknowledges that Croatia is not arguing that post-critical date events (such as *Achmea*) dramatically altered the pre-existing *acquis*, creating a new incompatibility that should be applied retroactively to vitiate a prior consent that was valid under the *acquis* as of the critical date. Croatia rather argues that certain incompatibilities

---

[288] The Tribunal thus agrees with the *UniCredit* 2018 Decision that "incompatibility with the EU *acquis* is measured for purposes of Article 9 at the time the request for arbitration is submitted and the State's consent becomes operative," and that Article 11(2) cannot be read as leaving room for a "condition subsequent" (such as a new element of the evolving *acquis*) to vitiate consent retroactively after consent already has become irrevocable. *UniCredit* 2018 Decision, ¶¶ 114, 117, 120, CLM-136.

between the BIT and the EU Treaties were *inherent* from the date of its accession to the EU (1 July 2013), even if the CJEU did not have occasion to "clarify" that point until years later.[289] According to Croatia, the CJEU's eventual pronouncement in *Achmea* was simply a "confirmation" of what always had existed in the *acquis*,[290] not a declaration of change, and therefore "[e]ven without the *Achmea* Judgment, this Tribunal would have to interpret and apply these provisions" of the EU Treaties.[291] The Tribunal acknowledges this argument, and therefore considers it essential that it address directly the content of the *Achmea* as it relates to the pre-existing provisions of the EU Treaties, and not simply sidestep that content on the grounds that *Achmea* was issued only after the critical date in this case.

219.    At the same time, the Tribunal acknowledges Addiko's counter-argument that an incompatibility between the EU Treaties and the BIT could not be said to have existed *sub rosa*, as part of the EU *acquis* already in force, before it was ever recognized as such by the CJEU. To some extent, the Parties' contrasting positions on this point – whether an incompatibility can be said to have existed vis-à-vis the EU Treaties, before the CJEU announced any interpretation one way or the other – can be said to echo the famous metaphysical question about observation and perception, "if a tree falls in a forest and no one is around to hear it, does it make a sound?"[292] Of course, as Addiko also argues, there was at least one sound in the forest of relevant interpretations as of the critical date, namely Advocate General Wathelet's opinion on the EU Treaties offered in the *Achmea* case, which Addiko asserts formed part of the *acquis* "in force" up until such time as the CJEU later departed from it.

---

[289] *See, e.g.*, Tr. Day 1, pp. 57:15-19 (referring to *Achmea* as a "clarification" of a "status [that] has existed since the Republic of Croatia acceded to the European Union").

[290] *See, e.g.*, Tr. Day 1, pp. 82:21-83:2 (describing *Achmea* as "simply confirm[ing] the extant incompatibility between intra-EU BITs and the EU *acquis*, which incompatibility arises directly out of the EU Treaties …").

[291] Resp. PHB2 ¶ 51; *see also* Tr. Day 1, p. 104:17-20 (contending that "the legal basis of the incompatibility … is not the *Achmea* Judgment, as such, but Articles … of the TFEU").

[292] *See* https://en.wikipedia.org/wiki/If_a_tree_falls_in_a_forest.

220.    The Tribunal considers each of these arguments as presenting serious issues, and returns to them further below, after first examining certain predicate contentions about the nature of the alleged incompatibility itself (as expressed in *Achmea* and otherwise).

C.    THE ALLEGED INCOMPATIBILITY OF THE BIT WITH THE EU *ACQUIS*

221.    Croatia alleges that from the date of Croatia's accession to the EU, the BIT is incompatible with the EU *acquis* – and therefore was not binding on the Contracting Parties pursuant to Article 11(2) of the BIT – in two different respects.

222.    First, Croatia contends that Article 9(2)'s offer to submit BIT disputes to international arbitration was incompatible from the date of Croatia's EU accession with Articles 267 and 344 of the TFEU. In Croatia's view, these Articles categorically forbid referral of any EU law questions to an authority (the arbitral tribunal) that is unable to make a preliminary reference to the CJEU, the way the national courts of EU Member States could do. These Articles therefore (in its view) do not allow the creation of any dispute settlement mechanisms outside the EU court structure that may have to consider issues of EU law.

223.    Second, Croatia argues, the BIT violates anti-discrimination principles in the EU *acquis*, reflected in particular in Articles 18, 49 and 63 of the TFEU, because it extends special rights and protections (both procedurally and substantively) to Austrian and Croatian nationals, which the Contracting Parties do not also extend to nationals of other EU Member States. The procedural discrimination is said to arise from the grant of arbitration rights only to Austrian and Croatian nationals, and the substantive discrimination to arise from the grant only to the same nationals of various protections reflected in the BIT's substantive treatment obligations. In Croatia's view, these two aspects of favorable treatment also violate core principles of equal treatment reflected in the GATS, which Croatia contends is part of the EU *acquis*.

224.    The Tribunal addresses these contentions separately below.

**(1) Alleged Incompatibility with Articles 267 and 344 TFEU**

225.    Article 267 of the TFEU provides as follows:

The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

(a) the interpretation of the Treaties;

(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay.

226.    Article 344 of the TFEU provides as follows:

Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

227.    According to Croatia, the incompatibility of intra-EU BIT arbitration with these two provisions of the EU *acquis* was "clarified and confirmed" by *Achmea*,[293] even if (in its view) that proposition already was inherent in Articles 267 and 344 of the TFEU prior to the CJEU's pronouncement. Otherwise stated, while Croatia does not invoke *Achmea* as a new event somehow transforming the pre-existing *acquis*, it does rely almost entirely on the analysis in *Achmea* as reflecting the applicable meaning of Articles 267 and 344 of the TFEU as it relates to intra-EU BIT arbitration. Given this reliance on *Achmea* to frame the content of the relevant *acquis*, it is necessary for the Tribunal to consider what the CJEU actually decided in *Achmea*, and correspondingly what the CJEU did not unambiguously

---

[293] Tr. Day 1, p. 60:16-21; *see also id.*, p. 92:2-5 (referring to Articles 267 and 344 of the TFEU "as clarified in" *Achmea*); Resp. Request ¶ 22 (Articles 267 and 344 as "confirmed in" *Achmea*); Resp. PHB1 ¶ 62 (Articles 267 and 344 "as clarified by" *Achmea*).

decide. For this purpose, the Tribunal considers it important to view the *Achmea dispositif* in the context of the CJEU reasoning which preceded it, and not simply in isolation.

228.    The Tribunal therefore starts with a summary of *Achmea* (section "a" below), before turning to a discussion of the scope of the CJEU's ruling (section "b") and the implications of *Achmea* for the compatibility of Article 9(2) of the Austria-Croatia BIT (section "c"). The Tribunal then discusses the temporal issues debated by the Parties, including the application of any broader interpretation of Articles 267 and 344 of the TFEU to BIT cases commenced before *Achmea* (section "d"). Finally, the Tribunal discusses the relevance of the Declarations (section "e") and certain other issues raised by Croatia and the Commission (section "f"), before setting forth in section "g" below its conclusions on the alleged compatibility of this BIT arbitration with Articles 267 and 344 of the TFEU.

### a.  Summary of **Achmea**

229.    The Tribunal prefaces this summary with an acknowledgment that it largely tracks the detailed summary of *Achmea* set forth in the *Eskosol* decision,[294] by a tribunal which included two members of this Tribunal. Since the Tribunal agrees with that summary, it sees no need to reformulate the summary in different language. The Tribunal of course could have simply cross-referenced the relevant passages of *Eskosol*, but that would require readers of this decision to resort to that decision, to follow the Tribunal's assessment of the implications of *Achmea* provided in subsequent sections of this Decision. Since the Tribunal prefers this Decision to stand on its own, it instead incorporates the relevant summary here, rather than simply cross-referencing it.

230.    The *Achmea* matter came before the CJEU on a request by the German Bundesgerichtshof for a preliminary ruling. In December 2012, an UNCITRAL tribunal had issued an arbitration award in favor of Achmea B.V., a Dutch company, finding that the Slovak Republic had violated certain obligations owned to the company under the Netherlands-Slovakia BIT. As the seat of the arbitration was in Frankfurt, the Slovak Republic brought a set-aside action before the Oberlandesgericht Frankfurt am Main, and when that court

---

[294] *Eskosol* ¶¶ 155-166, CLM-192.

dismissed its action, the Slovak Republic appealed to the Bundesgerichtshof on a point of law.

231.    The Bundesgerichtshof in turn decided to stay the appeal and sought a preliminary ruling from the CJEU on the following questions, referring to the text of Articles 18, 267 and 344 of the TFEU:

> (1)    Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?
>
> If Question 1 is to be answered in the negative:
>
> (2)    Does Article 267 TFEU preclude the application of such a provision?
>
> If Questions 1 and 2 are to be answered in the negative:
>
> (3)    Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?[295]

232.    Advocate General Wathelet proposed that the CJEU should answer these questions as follows:

> Articles 18, 267 and 344 TFEU must be interpreted as not precluding the application of an investor/State dispute settlement mechanism established by means of a bilateral investment agreement concluded before the accession of one of the Contracting States to the European Union and providing that an investor from one Contracting State may, in the case of a dispute relating to investments in the other Contracting State, bring proceedings against the latter State before an arbitral tribunal.[296]

---

[295] *Achmea* ¶ 23, RLM-12.

[296] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 September 2017, ¶ 273, CLM-145.

233.    The CJEU did not, however, accept Advocate General Wathelet's proposed resolution. Instead, it began by reformulating the questions posted by the Bundesgerichtshof, into a combined first and second questions framed as follows:

> By its first and second questions, which should be taken together, the referring court essentially asks whether Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[297]

234.    The CJEU's reformulation included a specific reference to Article 8 of the Netherlands-Slovakia BIT. That clause provided first, in Article 8(1), that "[a]ll disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall, if possible, be settled amicably." Failing such a settlement, Article 8(2) of the Netherlands-Slovakia BIT provided that "[e]ach Contracting Party hereby consents to submit a dispute referred to in paragraph 1 of this Article to an arbitral tribunal." The Netherlands-Slovakia BIT then provided as follows in Article 8(6), regarding the law applicable to such a dispute:

> The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:
>
> - the law in force of the Contracting Party concerned;
>
> - the provisions of this Agreement, and other relevant agreements between the Contracting Parties;
>
> - the provisions of special agreements relating to the investment;
>
> - the general principles of international law.[298]

235.    Beginning its analysis, the CJEU set out various EU law considerations which it considered relevant:

---

[297] *Achmea* ¶ 31, RLM-12.

[298] *Achmea* ¶ 4 (quoting Article 8 of the Netherlands-Slovakia BIT), RLM-12.

32.   In order to answer those questions, it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties ….

33.   Also according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other ….

34.   EU law is thus based on the fundamental premiss [sic] that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss [sic] implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU ….

35.   In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law ….

36.   In that context, in accordance with Article 19 TEU, it is for the national courts and tribunals and the Court of Justice to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law ….

37.  In particular, the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties ….

38.  The first and second questions referred for a preliminary ruling must be answered in the light of those considerations.[299]

236.  The CJEU then organized its analysis into three intermediary questions. The first was "whether the disputes which the arbitral tribunal mentioned in Article 8 of the BIT is called on to resolve are liable to relate to the interpretation or application of EU law."[300] The CJEU answered this question in the affirmative, reasoning as follows:

40.  Even if, as Achmea in particular contends, that tribunal, despite the very broad wording of Article 8(1) of the BIT, is called on to rule only on possible infringements of the BIT, the fact remains that in order to do so it must, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties.

41.  Given the nature and characteristics of EU law mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.

42.  It follows that on that twofold basis the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital.[301]

237.  The second intermediate question was "whether an arbitral tribunal such as that referred to in Article 8 of the BIT is situated within the judicial system of the EU, and in particular whether it can be regarded as a court or tribunal of a Member State within the meaning of Article 267

---

[299] *Achmea* ¶¶ 32-38 (citations omitted), RLM-12.

[300] *Achmea* ¶ 39, RLM-12.

[301] *Achmea* ¶¶ 40-42, RLM-12.

TFEU."[302]  The CJEU answered this question in the negative, on the basis that an international arbitral tribunal is neither part of the judicial system of a single EU Member State nor a court common to a number of such States.[303]

238.    The CJEU's third intermediate question was "whether an arbitral award made by such a tribunal is, in accordance with Article 19 TEU in particular, subject to review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the Court by means of a reference for a preliminary ruling."[304] It noted that under the UNCITRAL Arbitration Rules, a tribunal may choose its own seat, and it was only by virtue of the chosen seat in this instance being Frankfurt that a set-aside proceeding was brought in the German courts.[305] Even in these circumstances, moreover, judicial review was limited by German law to the validity of the arbitration agreement and the consistency of the award with public policy.[306] While the CJEU had accepted the notion of limited review of commercial awards, "provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the Court for a preliminary ruling,"[307] it considered that "arbitration proceedings such as those referred to in Article 8 of the BIT are different from commercial arbitration proceedings." The CJEU explained as follows:

> While the latter originate in the freely expressed wishes of the parties, the former derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law …, disputes which may concern the application or interpretation of EU law. In those circumstances, the considerations set out in the preceding paragraph relating to commercial arbitration cannot be applied to arbitration proceedings such as those referred to in Article 8 of the BIT.[308]

---

[302] *Achmea* ¶ 43, RLM-12.

[303] *Achmea* ¶¶ 45-46, RLM-12.

[304] *Achmea* ¶ 50, RLM-12.

[305] *Achmea* ¶¶ 51-52, RLM-12.

[306] *Achmea* ¶ 53, RLM-12.

[307] *Achmea* ¶ 54, RLM-12.

[308] *Achmea* ¶ 55 (citations omitted), RLM-12.

239.   Based on this analysis, the CJEU considered as follows:

> 56.   Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT …, it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.

> 57.   It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected ….

> 58.   In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above.

> 59.   In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.[309]

240.   The CJEU accordingly concluded as follows:

> 60.   Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from

---

[309] *Achmea* ¶¶ 56-59, RLM-12.

one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

…

62.  On those grounds, the Court (Grand Chamber) hereby rules:

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[310]

### b.  Scope of **Achmea** *as it Pertains to Articles 267 and 344 TFEU*

241.  Croatia argues that *Achmea* must be construed as determining that the arbitration clauses of *all* intra-EU BITs are incompatible with Articles 267 and 344 TFEU. In its view, the CJEU's use of the phrase "such as Article 8 of the [Netherlands-Slovakia BIT]" in its *dispositif* (paragraph 62 of *Achmea*) is a descriptive phrase denoting Article 8 *in toto* as a submission to arbitration, and should not be limited to any specific aspect of Article 8, such as the choice of law clause in Article 8(6) of the Netherlands-Slovakia BIT.[311]

242.  The Tribunal begs to differ. Like the *Eskosol* tribunal before it, the Tribunal considers that the phrase "such as Article 8" was inserted to refer to particular characteristics of Article 8, and make clear that the CJEU's holding would be extended to "comparable provisions" in other BITs.[312] As to which features of a BIT might "supply the requisite similarities,"

---

[310] *Achmea* ¶¶ 60, 62, RLM-12.

[311] *See, e.g.*, Tr. Day 1, 95:3-8 (contending that the CJEU "conclusively and bindingly clarified [in *Achmea*] that *all* arbitration clauses and bilateral investment treaties entered into between EU Member States are incompatible with Articles 267 and 344 of the TFEU") (emphasis added); Resp. PHB1 ¶¶ 64, 66 (arguing that there is "no textual basis" in *Achmea* to assume that the CJEU's "such as" phrase concerned the choice of law clause in Article 8(6) in particular, and therefore limited the CJEU's holding to BITs with comparable choice of law clauses).

[312] *Eskosol* ¶ 169, CLM-192.

the Tribunal further agrees with *Eskosol* that the "most important" feature for the CJEU's analysis was Article 8's choice of law clause, because "the CJEU was at pains throughout its analysis … to emphasize a concern about submission to arbitration of *disputes requiring application of law*."[313]

243.   Several aspects of the CJEU's reasoning illustrate the centrality of choice of law to its analysis and conclusions.

244.   First, the questions submitted to the CJEU by the Bundesgerichtshof were broadly framed, as general questions which addressed all intra-EU BITs submitting claims to arbitration, regardless of choice of law.[314] As noted above, the CJEU not only reformulated the question to include the phrase "such as Article 8,"[315] but it went on in its analysis to emphasize the choice of law issue. This is evident in the CJEU's description of both the "principle … enshrined in" Article 344 TFEU  (as a Member State undertaking "not to submit a dispute *concerning the interpretation or application of the [EU] Treaties*" outside the EU court system) and the "object" of Article 267 TFEU ("of securing *uniform interpretation of EU law*").[316]

245.   Second, the CJEU's central focus on choice of law issues is evident in the care it took to distinguish international treaties which establish dispute resolution mechanisms responsible only for "the interpretation and application of *their provisions*," *i.e.*, of the standards and obligations set out in the treaties themselves.[317] The CJEU emphasized that it had no objection to the submission of such pure international law issues to the decision-making of courts or tribunals outside the EU structure.

246.   Third, that distinction was further emphasized by the CJEU's emphasis, for purposes of its concern, on only *two of the four* parts of the choice of law provision in Article 8(6) of the Netherlands-Slovakia BIT.  In particular, the CJEU referred to Article 8(6)'s mandate that

---

[313] *Eskosol* ¶¶ 169, 171, CLM-192.

[314] *See Achmea* ¶ 23, RLM-12.

[315] *Achmea* ¶ 31, RLM-12.

[316] *Achmea* ¶¶ 32, 37, RLM-12 (emphasis added).

[317] *Achmea* ¶ 57, RLM-12 (emphasis added).

disputes under the Netherlands-Slovakia BIT be decided *not only* based on "the provisions of this Agreement" and "the general principles of international law" – elements which (as above) it confirmed would *not* run afoul of Articles 344 and 267 TFEU – but also based on "the law in force of the Contracting Party concerned" and "other relevant agreements between the Contracting Parties."[318]   The CJEU specifically stated that "[e]ven if" the claims in the *Achmea* arbitration only involved alleged infringements of the BIT, "the fact remains that in order to" rule on such claims, the arbitral tribunal "must, *in accordance with Article 8(6) of the BIT*, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties," both of which  "must be regarded" as including EU law.[319] Tellingly, the CJEU concluded that "on that *twofold* basis" – namely, *those two elements* of Article 8(6)'s choice of two clause, as distinguished from the *other two unobjectionable elements* – a tribunal under the Netherlands-Slovakia BIT would have to "interpret or indeed to apply EU law."[320]  It was this conclusion, about the "twofold" elements of the particular choice of law clause in that particular BIT, which led to the CJEU to state that *"[c]onsequently*, having regard to all the *characteristics* of the arbitral tribunal mentioned in Article 8 of the BIT," that the provision in question was precluded by Articles 267 and 344 TFEU.[321] The CJEU repeated the phrase *"[c]onsequently*" in the paragraph immediately transitioning to its *dispositif*,[322] making clear that the *dispositif* was based on the particular findings that preceded it, namely those about the scope and implications of the choice of law clause in the applicable BIT.

247.   The Tribunal thus agrees with the *Eskosol* tribunal that "nothing in the CJEU's Judgment suggested that EU Member States were barred from offering to arbitrate disputes under treaties *not* governed even in part by EU law, but only by express treaty provisions and by general principles of international law."[323]  As the *Eskosol* tribunal further explained:

---

[318] *Achmea* ¶ 6, RLM-12.

[319] *Achmea* ¶¶ 40-41, RLM-12 (emphasis added).

[320] *Achmea* ¶ 42, RLM-12 (emphasis added); *see Eskosol* ¶¶ 172-173, CLM-192 (noting the CJEU's emphasis in its reasoning on "that twofold basis" arising from the applicable law clause of the Netherlands-Slovakia BIT, as distinct from that clause's other unobjectionable elements).

[321] *Achmea* ¶ 57, RLM-12 (emphasis added).

[322] *Achmea* ¶ 60, RLM-12 (emphasis added).

[323] *Eskosol* ¶ 175, CLM-192 (emphasis in original).

The *Achmea* Judgment was not predicated on the exclusive competence of the EU to enter into such treaties on its Member States' behalf.  Rather, the Tribunal understands the *Achmea* Judgment more narrowly, as objecting only to treaty provisions that by their terms give tribunals the authority (or indeed the mandate) to decide a dispute among other things by reference to EU law, in either or both of the "twofold" aspects the CJEU identified.  Put otherwise, it appears that EU Member States may bring arbitral tribunals into being for the purposes of deciding treaty disputes under general principles of international law, but are no longer allowed to authorize such disputes to apply EU law in addition.[324]

248.    This reading of *Achmea* is also supported by the distinction about applicable law which the Commission itself had urged the CJEU to adopt, in its 2016 submission in the *Achmea* case. The Commission took pains to distinguish between investment treaties under which EU law was part of the governing law, and those (such as with non-EU Member States) under which arbitrations "concern only the application and interpretation of the Agreement and not the rest of Union law." Importantly, the Commission acknowledged that EU law still might play a role in disputes under these third-country treaties, depending on the facts alleged, and that tribunals empowered under those treaties therefore might have to interpret EU law, but it explained that in such cases the "*interpretation [of EU law] plays a role only as a factual element* in the context of the finding of a possible breach of the agreement and in no way binds the courts of the Union."[325] The Commission argued to the CJEU that no incompatibility with the *acquis* therefore arose, because notwithstanding these possible interpretations of EU law as issues of fact, "arbitral tribunals operating on the basis of these agreements must therefore *only apply* the investment protection rules enshrined in international law between the Union and the third country, and not those provided by Union law."[326]

---

[324] *Eskosol* ¶ 175, CLM-192.

[325] European Commission, Written Observations regarding a Prejudicial Decision, submitted pursuant to Article 23, second paragraph, of the protocol of the Court of Justice's statute (Ref. sj.c(2016) 5385926 - 30/08/2016),  ¶ 162, unofficial translation from French original available at

http://ec.europa.eu/dgs/legal_service/submissions/c2016_284_obs_fr.pdf     (emphasis     added)     ("Commission Observations in *Achmea*"); *Eskosol* ¶ 171, CLM-192 (quoting same).

[326] Commission Observations in *Achmea*, ¶ 163; *Eskosol* ¶ 171, CLM-192 (quoting same).

249.    Moreover, the CJEU reinforced this distinction in its Opinion 1/17, rendered after *Achmea*, upholding the legality under the EU *acquis* of the investment dispute settlement provisions of the CETA.[327] In this decision, which is just as much a part of the *acquis* as *Achmea*, the CJEU began by reiterating its statement in *Achmea* that an international treaty establishing a mechanism for interpretation of its own provisions "is, in principle, compatible with EU law."[328] It further stated that the fact the CETA established a dispute resolution mechanism that was "indeed separate from" the EU court system did not render it incompatible *per se* with the EU *acquis*.[329] The key point, the CJEU emphasized, was that "EU law does not preclude" a treaty conferring on a tribunal "the jurisdiction to interpret and apply the provisions of the [treaty] having regard to the rules and principles of international law applicable between the Parties," so long as the tribunal was not granted the power "to interpret and apply provisions of [EU law]."[330] The CJEU then emphasized that under the CETA's applicable law provision, alleged breaches of CETA were to be determined by applying the terms of CETA itself and "other rules and principles of international law," but the CETA tribunal could not "determine the legality of a measure … under the domestic law of a Party."[331] The CJEU distinguished "the investment agreement at issue in" *Achmea* on several grounds, the very first of which was that under *its* applicable law, a tribunal "would be called upon to give rulings on disputes that might concern the interpretation or application of EU law."[332]

250.    Importantly, the CJEU went on to discuss what it meant by "interpretation and application of EU law," in the context of a treaty-based dispute. It indicated that it was not troubled by the CETA's express provision that "in determining the consistency of a measure with this Agreement, the [CETA] Tribunal *may consider, as appropriate, the domestic law of a Party as a matter of fact*," because it would be guided by the "prevailing interpretation" of domestic law provided by domestic courts, and in any event "any meaning given to

---

[327] Opinion 1/17, EU:C:2019:341, FJ-41 ("*CETA* Opinion").

[328] *CETA* Opinion, ¶ 106.

[329] *CETA* Opinion, ¶¶ 114-115, 117.

[330] *CETA* Opinion, ¶ 118.

[331] *CETA* Opinion, ¶ 121.

[332] *CETA* Opinion, ¶ 126.

domestic law by the [CETA] Tribunal shall not be binding upon" those courts.[333] The CJEU further explained this distinction between considering EU law "as a matter of fact" (acceptable under the *acquis*) and purporting to offer binding interpretations of EU law (not acceptable under the *acquis*), as follows:

> Those provisions serve no other purpose than to reflect the fact that the CETA Tribunal, when it is called upon to examine the compliance with the CETA of the measure that is challenged by an investor and that has been adopted by the investment host State or by the Union, will inevitably have to undertake, on the basis of the information and arguments presented to it by that investor and by that State or by the Union, an examination of the effect of that measure. That examination may, on occasion, *require that the domestic law of the respondent Party be taken into account*. However, … *that examination cannot be classified as equivalent to an interpretation, by the CETA Tribunal of that domestic law*, but consists, on the contrary, of that domestic law being taken into account *as a matter of fact* ….[334]

251.  Based on this understanding – that taking EU law "into account as a matter of fact" "cannot be classified as equivalent to an interpretation" of EU law – the CJEU concluded that the CETA's dispute resolution provisions were compatible with the EU *acquis*. It emphasized again that the governing law of CETA, and hence the "powers of interpretation" of CETA tribunals, were "confined to the provisions of the CETA in the light of the rules and principles of international law …."[335] These of course were the same two categories of applicable law that the CJEU had not objected to in *Achmea*, when it framed its concern there as only about the other "twofold" elements of the four-part applicable law clause in the Netherlands-Slovakia BIT.[336]

252.  Finally, it is of interest that in the wake of both *Achmea* and the *CETA* Opinion, the Commission emphasized essentially the same distinction in an Explanatory Note it issued with a revised draft EU proposal on ECT modernization. In that Explanatory Note, the

---

[333] *CETA* Opinion, ¶ 130 (emphasis added).

[334] *CETA* Opinion, ¶ 131 (emphasis added).

[335] *CETA* Opinion, ¶ 134.

[336] *Achmea* ¶ 42, RLM-12.

Commission explained that it proposed adding a new footnote to the ECT "making explicit that domestic law is not part of the applicable law to a dispute and that it can only be considered by a tribunal as a matter of fact."[337] Notably, the ECT's *existing* applicable law clause (Article 26(6)) calls for disputes to be decided only under "this Treaty and applicable rules and principles of international law."[338] Neither of these categories incorporates EU law, either as part of the law in force in the host State or as arising from other treaties between two or more of the ECT Parties.[339] The Commission does not suggest otherwise, but rather states an intent now to "mak[e] explicit" what the Commission therefore apparently accepts as *already implicit*, namely that a provision limiting the applicable law to the terms of a treaty itself and to general rules and principles of international law *does not* thereby incorporate domestic law (*i.e.*, EU law) as "part of the applicable law to a dispute."[340] The actual proposed footnote confirms that this is intended simply "[f]or greater certainty" about the existing text, and not to enact a substantive change.[341] Moreover, the Commission evidently accepts that a tribunal's consideration of EU law purely "as a matter of fact," in the course of deciding such a dispute, *would not* be incompatible with the EU *acquis*.[342] It can be presumed that the Commission would not urge adoption of a clarifying footnote that it considered incompatible with the *acquis*. The Commission's position about what is unacceptable under the *acquis* (an investment treaty incorporating EU law as applicable law) versus acceptable (consideration of EU law as merely fact, in a dispute under a treaty that does not incorporate EU law as applicable law)

---

[337] Energy Charter Treaty Modernisation, Draft EU Proposal, 20 April 2020, WK 3937/2020 INIT, Article 26, *available at* https://www.transnational-dispute-management.com/legal-and-regulatory-detail.asp?key=24581 ("Draft Proposal on ECT Modernisation").

[338] ECT Article 26(6).

[339] *See generally Eskosol* ¶¶ 112-123, 174, CLM-192.

[340] Draft Proposal on ECT Modernisation, Article 26.

[341] EU Text Proposal for the Modernisation of the Energy Charter Treaty (ECT), footnote to Article 26(6), 28 May 2020, *available at* https://trade.ec.europa.eu/doclib/docs/2020/may/tradoc_158754.pdf ("*For greater certainty*, the domestic law of a Contracting Party shall not be part of the applicable law. Where a tribunal is required to ascertain the meaning of a provision of the domestic law of a Contracting Party as a matter of fact, it shall follow the prevailing interpretation of that provision given by the courts or authorities of that Contracting Party and any meaning given to the relevant domestic law of a Contracting Party by the tribunal shall not be binding upon the courts or authorities of that Contracting Party. A tribunal shall not have jurisdiction to determine the legality of a measure, alleged to constitute a breach of the obligations under Part III of this Treaty, under the domestic law of a Contracting Party.") (emphasis added).

[342] Draft Proposal on ECT Modernisation, Article 26.

is consistent with the position that it urged the CJEU to adopt in *Achmea*. The two Commission statements are useful bookends to that effect before and after the two CJEU decisions (*Achmea* and the *CETA* Opinion) which adopt the same distinction.

253.    In these circumstances, the Tribunal does not have to enter into an abstract intellectual debate about the "normative utility" of the CJEU's "fact/law distinction," as discussed by the Parties' experts in this case,[343] or evaluate Professor Douglas' arguments (cited by Croatia) about the logic or illogic of distinguishing between national law as a referenced fact versus as part of a treaty's applicable law.[344] Whatever the answer to that interesting question as an academic matter is, the fact remains that the CJEU itself has adopted the distinction. The distinction therefore must be recognized as an integral part of the EU *acquis.*

254.    As a result, the Tribunal considers the EU *acquis* – as reflected in *Achmea* and the *CETA* Opinion which are authoritative interpretations of the EU *acquis* – to provide that (a) treaties whose applicable law raises the same functional concerns as the CJEU found objectionable under the Netherlands-Slovakia BIT would in that respect be incompatible with Articles 344 and 267 of the TFEU, but (b) treaties whose applicable law is limited to the terms of the treaties themselves and general principles of international law, which the CJEU found not to be problematic in either *Achmea* or the *CETA* Opinion, would not be incompatible with Articles 344 and 267 of the TFEU. The latter conclusion remains the case under the *acquis* even if EU law might have to be "taken into account as a matter of fact" in a particular case for purposes of applying the governing international law standards (in the language of the *CETA* Opinion).

255.    Based on this determination, and as noted by the *Eskosol* tribunal, there is therefore a need "to determine whether the danger [recognized in *Achmea*] actually arises in the context of a particular treaty" at issue in a different case. The Tribunal accordingly turns below to the Austria-Croatia BIT in particular.

---

[343] Tr. Day 1, 299:20-300:1 (Professor Craig, commenting on Professor Jacobs' report).
[344] Resp. PHB2 ¶¶ 33-36 (discussing RLM-209).

### c.   Implications of **Achmea** *for the Austria-Croatia BIT*

256.   The first observation is that on its face, the Austria-Croatia BIT contains no equivalent express incorporation into its applicable law of either category of law that the CJEU found offending in Article 8(6) of the Netherlands-Slovakia BIT at issue in *Achmea* (the domestic law of the host State, or other relevant agreements between the Contracting Parties). Equally true, however, is that the Austria-Croatia BIT contains no express exclusion of those elements from its applicable law. There is simply no express provision addressing the issue of applicable law either way.

257.   This does *not* mean, however, that the BIT should be construed as having no applicable law at all.  A treaty is not an empty vessel with no governing law whatsoever, until some is assigned to it through resort to the default rules of a particular dispute resolution mechanism.  Under the very definition of a treaty provided by Article 2(1)(a) of the VCLT, a treaty is "an international agreement concluded between States in written form and governed by international law …."[345]  In other words, the starting proposition for any treaty is that, by virtue of entering into that arrangement, its Contracting States have agreed that it shall be interpreted by reference not only to its terms (on which those States have expressly agreed), but also by reference to general principles of international law (on which those States have implicitly agreed). If the Contracting Parties wish to add other elements to the applicable law, they generally would do so through incorporation of an express provision to that effect, as the Netherlands and Slovakia for example did in Article 8(6) of their BIT. If the Contracting Parties do not wish to add other elements to the implicit applicable law arising from the VCLT, they do not need to include an express applicable law provision, although of course they may choose to do so for avoidance of doubt. The fact that they do not include any express clause does not, however, connote that the Contracting States had *no shared understanding at all* regarding the issue. It certainly does not connote that they had a *shared intention to depart* from the basic VCLT proposition that treaties are governed by their express terms and by reference to general principles of international law.

---

[345] VCLT Article 2(1)(a).

258.     The Tribunal's second observation is that investment treaties often offer investors a choice among several arbitration rules for the administration of proceedings that the investors may initiate, pursuant to standing offers of arbitration in the treaties themselves. Article 9(2) of the Austria-Croatia BIT offers investors a choice between the ICSID Arbitration Rules and the UNCITRAL Arbitration Rules; other treaties may offer options of arbitration under the rules of the International Chamber of Commerce ("ICC"), the Stockholm Chamber of Commerce ("SCC"), or other institutions. Each of these institutional rules has some default mechanism for determining applicable law in the absence of party agreement, but the content of those rules differs from one set of rules to another.[346] The Tribunal sees no reason to assume that in offering such choices, the Contracting States intended *the treaty itself* to be interpreted differently, based on which procedural mechanism different investors might choose to elect.[347] A particular jurisdictional requirement in a treaty, or a particular substantive obligation imposed by a treaty, should not have a different meaning for a tribunal constituted under the ICSID Arbitration Rules than it would for a tribunal constituted under the UNCITRAL Arbitration Rules, the ICC Rules, or the SCC Rules. Either way, the treaty says what it says, and a tribunal constituted under any set of procedural rules should apply that treaty according to its terms (interpreted in accordance with VCLT principles of treaty interpretation), as well as in accordance with general principles of international law which apply to all such treaties.

259.     In the view of the Tribunal, Article 42(1) of the ICSID Convention does not mandate a different approach to interpretation of investment treaties. This is not only because, as a

---

[346] For example, Article 35(1) of the 2013 UNCITRAL Arbitration Rules provides that in the absence of party agreement on applicable law, "the arbitral tribunal shall apply the law which it determines to be appropriate," a broad discretion that is echoed in Article 21(1) of the 2017 ICC Arbitration Rules ("apply the rules of law which it determines to be appropriate") and Article 27(1) of the 2017 SCC Rules ("apply the law or rules of law that it considers most appropriate"). The application of such discretion may or may not lead to the same outcome as the default rule in ICSID Convention Article 42(1), which specifically requires, in the absence of party agreement on applicable law, that "the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable."

[347] Of course, the choice of a particular procedural mechanism may result in the imposition of *additional* jurisdictional requirements, such as (for example) those derived from the ICSID Convention. This possibility arises because two different treaties have now come into play, potentially giving rise to a need to satisfy the requirements of both (the so-called "double keyhole" scenario). However, that does not mean that the underlying treaty which offered ICSID arbitration in the first place (*e.g.,* the Austria-Croatia BIT in this case) should *itself* be given a different meaning.

general principle which Croatia itself invokes for a different purpose in its pleadings, "the ICSID Convention is irrelevant for the interpretation of the instrument of consent."[348] It also must be recalled that Article 42(1), along with the rest of the Convention, was developed at a time when contractual agreements between States and investors were expected to be the main source of consent to arbitrate disputes – and certainly before the proliferation of investment treaties ("arbitration without privity") became an alternate path to arbitration for investors with whom States had no direct contractual agreements.[349] In that context, it is hardly surprising that Article 42(1) was constructed to begin with a reaffirmation about the primacy of consent between the two *disputing* parties: "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties."[350] But in the newer "arbitration without privity" world of investment treaties, it is far less likely that there will be any direct agreement on applicable law between the disputing parties (the investor and the State).[351] Therefore, any such agreement generally must be found through the same two-step process by which mutual consent to arbitrate is formed in the first place – namely with (first) a standing offer of arbitration agreed between Contracting States, and (second) an acceptance of that standing offer by a particular qualified investor. This means, of course, that one looks to the investment treaty itself for the "offer" of applicable law, and that the investor's consent to that applicable law is implicit in its invocation of the treaty as the basis for commencing arbitration.

---

[348] Resp. Reply ¶ 113.

[349] *See, e.g.*, Memorandum of the meeting of the Committee of the Whole, 18 December 1962, ¶ 36, in *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States*, Vol. II, Part 1 (1968), CLM-270 (Aron Broches, the ICSID Convention's principal architect, stating during the Convention's negotiations that a circumstance in which a State would "ma[k]e a general statement that it would submit to arbitration a defined class of disputes with all comers" was "hardly ever likely to obtain," and that the far "more likely … situation was that an arbitration clause would be incorporated in an investment agreement").

[350] ICSID Convention Article 42(1) (first sentence).

[351] This reality was noted by the tribunal in "the first instance in which the Centre has been seized by an arbitration request exclusively based on a treaty provision and not in implementation of a freely negotiated arbitration agreement directly concluded between the [p]arties among whom the dispute has arisen." *Asian Agricultural Products Limited v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, ¶ 18 ("*AAPL*"). The *AAPL* tribunal observed that in this new world of treaty-based rather than contract-based arbitration, "the prior choice-of-law referred to" the first sentence of Article 42(1) "could hardly be envisaged" as involving an agreement directly between the disputing parties, because they will have had "no opportunity to exercise their right to choose in advance the applicable law determining the rules governing the various aspects of their eventual dispute." *AAPL*, ¶ 19.

260.    In these circumstances, the Tribunal believes that by accepting an offer to arbitrate contained in an investment treaty that does not contain an express applicable law clause, but which nonetheless is implicitly governed by its own terms and by international law under VCLT Article 2(1)(a), an investor thereby agrees to such applicable law for the proceedings. In these circumstances, there generally will be no need to proceed to the second sentence of Article 42(1) of the ICSID Convention, which supplies a default applicable law "[i]n the absence of [an] agreement" between the disputing parties.[352] In the context of contractual arbitration in which the ICSID Convention Articles were developed, it was entirely possible that a (poorly drafted) contract might reflect no agreement at all on applicable law. But in the context of treaty-based arbitration, it is difficult to imagine a treaty which does not reflect at least an implicit agreement on applicable law, based on the treaty's terms and general principles of international law. This is particularly so since investment treaties incorporate by mutual agreement among Contracting States certain substantive standards of behavior – essentially, "thou shalt do x" and "thou shalt not do y" – which themselves were developed in the context of international law (expropriation, fair and equitable treatment, etc.). The Tribunal agrees with Addiko that these standards form a *lex specialis* that the Contracting States agree to govern their respective relationships with each other's investors, and which the investors in turn accept to govern any disputes alleging non-compliance with those standards.[353]

261.    This approach to ICSID Convention Article 42(1) in the context of investment treaties is consistent with that of a number of prior tribunals. For example, the tribunal in *ADC v. Hungary* considered that "by consenting to arbitration under [a BIT between Hungary and Cyprus], the Parties also consented to the applicability of the provisions of the Treaty," which "are Treaty provisions pertaining to international law. That consent falls under the

---

[352] ICSID Convention Article 42(1) (second sentence) ("In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.").

[353] *See, e.g.*, Tr. Day 1, 247:6-20, 248:7-19; Cl. PHB1 ¶¶ 9, 79, 104-106 (arguing *inter alia* that "[t]his implicit choice of international law is a common occurrence and follows naturally from the nature of the Treaty as a creature of public international law").

first sentence of Article 42(1) of the ICSID Convention ….”[354] The consent so expressed "must also be deemed to comprise a choice for general international law, including customary international law, if and to the extent that it comes into play for interpreting and applying the provisions of the Treaty."[355] The *ADC* tribunal reasoned that this approach would be consistent with "the generally accepted presumption in conflict of laws … that parties choose one coherent set of legal rules governing their relationship …, rather than various sets of legal rules, unless the contrary is clearly expressed."[356] By contrast, an approach which found the treaty not to reflect already an implicit agreement on applicable law would require a resort to the default rules of different arbitral institutions (in that case ICSID and the ICC) to determine the applicable law, depending which of those offered in the treaty a given investor chose to accept. Yet "[t]he application of those subsidiary conflict rules may give differing results, which in turn may affect the manner in which the Treaty provisions, in particular the substantive ones, are to be interpreted and applied."[357] The tribunal considered that "[i]t cannot be deemed to have been the intent of the State Parties to the BIT to have agreed to such a potential disparity."[358]

262.    Similarly, the *ad hoc* committee deciding the annulment application in *Azurix v. Argentina* rejected an argument that the tribunal had disregarded applicable law by determining that its inquiry was governed "by the ICSID Convention, by the BIT and by applicable international law," and not also by the national law of Argentina.[359] The *Azurix* committee did not believe the tribunal was obliged to apply Argentine law by virtue of the second sentence of Article 42(1), because that sentence "cannot possibly be understood as having the effect that, in the absence of an *express* choice of law clause, the municipal law of the Contracting State will be the applicable law in claims for alleged breaches of an investment

---

[354] *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶ 290, CLM-28 ("ADC").

[355] *ADC* ¶ 290, CLM-28.

[356] *ADC* ¶ 290, CLM-28.

[357] *ADC* ¶ 291, CLM-28.

[358] *ADC* ¶ 291, CLM-28.

[359] *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12 (Annulment Proceeding), Decision on the Application for Annulment, ¶¶ 132, 141, CLM-272 ("Azurix").

treaty."[360] Rather, the committee reasoned that the treaty already reflected an implicit choice of law, because "[b]y definition, a treaty is governed by international law" (citing Article 2(1)(a) of the VCLT.[361] Since an investment treaty in particular "is itself a source of international law as between the State parties to that treaty," the Committee found, "the applicable law in any claim for a breach of that treaty can thus be said to be the treaty itself specifically, and international law generally," the latter referring to "general principles of international law, including principles of the international law of treaties."[362]

263.    The *Azurix* committee acknowledged that in some cases, an investment treaty itself might refer to provisions of national law. The example it identified was where the treaty expressly required a host State "to comply with specified provisions of its own municipal law," with the result that a host State's breach of municipal law "may thus amount to a breach of the treaty."[363] The committee explained that in such cases municipal law still "does not as such form part of the law applicable to a claim for breach of a treaty," even though "it may be necessary to determine whether there has been a breach of municipal law *as a step* in determining whether there has been a breach of the treaty."[364] The correct framework in such circumstances, the committee said, was that previously identified by the International Law Commission, under which "internal law is *relevant* to the question of international responsibility," but "this is *because the rule of international law makes it relevant*, e.g., by incorporating the standard of compliance with internal law as the applicable international standard or as an aspect of it."[365]  The provisions of national law thus become "*relevant as facts* in applying the applicable international standard," particularly when they "are actually incorporated in some form, conditionally or unconditionally, into that standard," but international law remains the governing law of the dispute.[366] The *Azurix* committee

---

[360] *Azurix*, ¶ 147 (emphasis added), CLM-272.

[361] *Azurix*, ¶ 146, CLM-272.

[362] *Azurix*, ¶ 146, CLM-272.

[363] *Azurix*, ¶ 149, CLM-272.

[364] *Azurix*, ¶ 149, CLM-272 (emphasis added).

[365] *Azurix*, ¶ 149, CLM-272 (quoting the ILC Articles, commentary to Article 3, itself quoting the Case concerning Elettronica Sicula S.p.A. (ELSI) (United States America v. Italy), Judgment, I.C.J. Reports 1989 ("ELSI" case) ¶ 124) (emphasis added).

[366] *Azurix*, ¶ 149, CLM-272 (quoting the ILC Articles, commentary to Article 3, itself quoting the *ELSI* case, ¶ 124).

concluded that "even in this situation, municipal law would not thereby become part of the applicable law under Article 42 of the ICSID Convention for purposes of determining whether there was a breach of … the BIT. Rather, any breach of municipal law that might be established would be a fact or element to which the terms of the BIT and international law would be applied in order to determine whether there was a breach of" the applicable BIT standard.[367]

264.    In the view of this Tribunal, the same proposition identified by the *Azurix* committee logically would apply also to other treaty provisions which expressly or implicitly make aspects of national law relevant to application of the treaty standard. For example, Croatia argues that Article 11(1) of the Austria-Croatia BIT requires investments to have been made "in accordance with [Croatian] legislation" as a precondition for qualifying for BIT protection, and contends that this includes Croatian consumer protection law, of which "EU law formed an intrinsic part."[368] But even if so, this just means – again echoing the words of the CJEU in the *CETA* Opinion – that Croatian law must be "*taken into account as a matter of fact*"[369] in applying the BIT's own stated requirements; Croatian law becomes relevant only because the applicable rule of international law – the treaty provision – "*makes* it relevant."[370] In considering issues of Croatian law (which Croatia contends "adopted and approximated the regulatory framework of EU law" in the consumer protection area),[371] the tribunal would be looking to the interpretations of relevant Croatian and EU courts, just as international tribunals frequently look to the decisions of national courts to understand what the law is in a particular country. But that does not mean that Croatian law or EU law becomes part of the applicable law of the treaty, much less the

---

[367] *Azurix*, ¶ 151, CLM-272.

[368] Resp. PHB1 ¶¶ 162-163. Addiko argues that Croatian consumer protection legislation is not relevant to the analysis under Article 11(1) of the BIT, which in its view limits the legality analysis to "fundamental principles of Croatian law like corruption or fraud." Cl. PHB1 ¶ 133. The Tribunal expresses no view on this issue at present, since the Article 11(1) objection was joined to the merits and remains to be explored further in the upcoming hearing.

[369] *CETA* Opinion, ¶ 131 (emphasis added).

[370] *Azurix*, ¶ 149, CLM-272 (emphasis added).

[371] Resp. PHB1 ¶¶ 165, 167.

legal basis for deciding the jurisdictional objection presented under the treaty. Those remain the terms of the treaty itself, together with general principles of international law.[372]

265.     There are other examples of ICSID tribunals finding that investment treaties inherently reflect an agreement on applicable law, for purposes of the first sentence of Article 42(1) of the ICSID Convention, even where the treaties do not contain an express choice of law provision. For example, in *Alpha Projecktholding v. Ukraine*, the tribunal noted that the applicable BIT did not contain "any express guidance on the governing law,"[373] but nonetheless determined that the dispute over an alleged breach "can only be answered by reference to the [BIT's] own terms. The Tribunal will apply the provisions of the [BIT] and interpret the [BIT] in a manner consistent with customary international law," although where national law defined the parties' rights and obligations under certain contracts relevant to the dispute, "such questions will be decided as questions of fact."[374]

266.     The Tribunal acknowledges that certain other ICSID tribunals have followed a different approach, presuming that the absence of an *express applicable law clause* in a treaty meant the *absence of agreement* on applicable law, and therefore requiring resort to the default approach set out in the second sentence of Article 42(1).[375] In a number of such cases, however, it is not clear that the issue of an *implicit agreement* by the Contracting States with respect to applicable law, accepted by the investor in invoking the treaty, was even

---

[372] The same is true for the areas in which Croatia says EU law may be relevant to resolving Addiko's merits claims. *See* Resp. PHB1 ¶¶ 174-184. Even if so, the Tribunal views that relevance the same way the CJEU framed the point in the *CETA* Opinion, namely as one of *factual background* which may be taken in account in the application of treaty standards (*e.g.,* "fair and equitable treatment"), but not as the applicable law of the dispute, and not purporting to bind the EU courts in their separate interpretation and application of EU law.  *See similarly Eskosol* ¶ 123, CLM-192 (explaining that an ECT tribunal "could … consider EU law as a matter of fact if potentially relevant to the merits of a dispute, just as an ECT tribunal may consider a State's domestic law as part of the factual matrix of a case") (emphasis in original).

[373] *Alpha Projekthholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, ¶ 228, 8 November 2010, CLM-31 ("*Alpha Projekthholding*").

[374] *Alpha Projekthholding*, ¶ 233, CLM-31.

[375] *See* Resp. PHB1 ¶¶ 114-115; Resp. PHB2 at n.45 (listing cases, although a few of these involved contractual arbitration clauses rather not treaty-based arbitration).

argued to the tribunals.[376] Even in the few cases where it apparently was,[377] there is no evidence that the tribunals considered the corollary question that follows from rejecting the notion of any such implicit agreement, namely whether the Contracting States really could have intended the applicable law of disputes under their treaty to depend on which institutional rules different claimants selected (*e.g.*, ICSID versus UNCITRAL). The Tribunal considers this to be an important factor, as discussed above, and believes the correct approach is that adopted thoughtfully among others by the *ADC* tribunal and the *Azurix ad hoc* committee.

267.    For these reasons, the Tribunal finds that the applicable law of the Austria-Croatia BIT consists of the terms of that BIT itself, which set for a *lex specialis* to govern any disputes initiated by investors accepting the offer of arbitration extended by the BIT, together with general principles of international law which may help to inform the concepts embedded in the treaty terms. These are precisely the sources of applicable law that the CJEU accepted in both *Achmea* and the *CETA* Opinion as presenting no incompatibility with the EU *acquis*. Moreover, the Austria-Croatia BIT does not incorporate EU law as part of its

---

[376] *See, e.g.*, *Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and on Liability, 12 September 2014, ¶ 532, RLM-80 (stating in a two-sentence analysis that "the Treaty does not contain an express applicable law clause. Accordingly, the Tribunal must apply Article 42(1), second sentence, of the ICSID Convention …"); *Quiborax S.A. and Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award, 16 September 2015, RLM-108, ¶¶ 90-91 (noting simply that the BIT itself "contains no choice of law" and concluding that "[c]onsequently, the Tribunal shall apply Bolivian law and international law when appropriate" in addition to the BIT); *see also CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, ¶ 108, CLM-5 ("The parties in this case have not chosen a particular law applicable to the resolution of the dispute nor has the Treaty. In the absence of such choice, Article 42(1) [second sentence] becomes the rule governing the determination of the law to be applied by the Tribunal").

[377] *See, e.g.*, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 85, CLM-9 (rejecting the notion of an "implicit agreement by the Parties as to the applicable law," on the basis that an agreement on applicable law "require[es] more decisive actions" than simply Argentina's entering into the treaty and LGE's invoking the treaty, "thus presumably choosing the Treaty and the general international law as the applicable law for this dispute"); *M.C.I. Power Group L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Award, 31 July 2007, ¶¶ 214-217, CLM-74 (noting Claimants' argument "that the BIT includes an implicit agreement on the applicability of international law," satisfying the first sentence of Article 42(1) of the ICSID Convention, but concluding only that "[f]rom the supporting documentation supplied by the parties during the proceedings, the Tribunal finds no evidence of any agreement on the law applicable to this dispute," requiring it therefore to proceed under the second sentence of Article 42(1)).

applicable law, as did the Netherlands-Slovakia BIT which the CJEU found incompatible for that reason with the EU *acquis*.

268.    For the avoidance of doubt, this conclusion is not altered by the existence of Article 11(2) of the BIT, because contrary to Croatia's contention,[378] that provision does not function as an *applicable law* clause at all; rather, it presents an exception to the Contracting Parties' *being bound* by the BIT. As its terms state, if circumstances arise that make the BIT (or certain of its provisions) incompatible with the EU *acquis* in force at a given time, "[t]he Contracting Parties *are not bound by the present Agreement*" (emphasis added). But nothing in Article 11(2) purports to supply the applicable law for interpreting other BIT terms in cases where the Contracting Parties remain bound. Article 11(2) does not state that the BIT itself should be interpreted and applied under EU law.

269.    For these reasons, the Tribunal concludes that the Austria-Croatia BIT does not present the same functional concerns about applicable law that the CJEU found were present in the Netherlands-Slovakia BIT, rendering arbitration under that BIT in its view incompatible with Articles 344 and 267 of the TFEU.[379] This remains the case even if, to some extent, certain issues of EU law may need to be "taken into account as a matter of fact" for purposes of applying the BIT's governing international law standards, based on the way the Parties have pleaded various other jurisdictional and merits issues in the case. The Tribunal agrees with Croatia that in most cases, the compatibility of a BIT with the *acquis* will not depend on specific allegations raised in a particular case, but rather must be

---

[378] Resp. PHB1 ¶¶ 110, 148.

[379] Because the Tribunal so finds with regard to the Austria-Croatia BIT, it need not reach the additional distinction with *Achmea* that Addiko proffered, to the effect that *Achmea* concerned an UNCITRAL rather than an ICSID arbitration. In Addiko's view, the CJEU's ruling did not reach the issue of offers to arbitrate under the ICSID Convention, which would require additional analysis given State Parties' independent obligations under that separate multilateral treaty involving both EU Member States and third states. *See, e.g.*, Cl. PHB1 ¶¶ 77-78, 85-86, 91, 94-102; Cl. PHB2 ¶¶ 51-60. By contrast, Croatia argues that *Achmea* cannot be limited to non-ICSID cases, because the issue of ICSID Convention obligations does not arise unless and until there is a valid consent to arbitrate in the first place, such as through a BIT; the validity of an offer to arbitrate therefore must be determined on its own merits and in light of the EU *acquis*, and not by reasoning backwards from the ICSID Convention. *See, e.g.*, Resp. PHB1 ¶¶ 35, 61-62, 93; Resp. PHB2 ¶ 16. While both Parties present interesting arguments on these points, the Tribunal's determination that the Austria-Croatia BIT does not designate EU law as part of its applicable law (the way the Netherlands-Slovakia BIT did) renders the CJEU's ruling in *Achmea* inapposite to this BIT, and thereby makes it unnecessary for the tribunal to assess any operative differences between the two paths to arbitration offered under the BIT.

assessed based on the treaty itself,[380] considering issues of its applicable law as the Tribunal has done above. At most the pleadings in a particular case may require, in the words of the CJEU in the *CETA* Opinion, that EU law "be taken into account … as a matter of fact" in applying the governing treaty standards,[381] but nothing in that possibility results in EU law becoming the applicable law of the arbitration, or in the arbitration clause of the BIT becoming incompatible with the EU *acquis*, for the reasons detailed above.

### d.  Application to Pre-Achmea BIT Cases

270.  For the reasons above, the Tribunal concludes that arbitration under the Austria-Croatia BIT is not incompatible with the EU *acquis*, and hence Croatia remains bound by the offer to arbitrate reflected in that BIT. However, for avoidance of doubt, the Tribunal also concludes that, even if (*arguendo*) the CJEU's judgment in *Achmea* were to be interpreted more broadly – as not hinging on the applicable law of particular BITs, but rather precluding all intra-EU BIT arbitration regardless of applicable law – that interpretation could not be applied to release Austria and Croatia from their expressly promised "irrevocabl[e] consent[] in advance" to arbitration,[382] in cases where investors acted to accept that ostensibly valid offer before *Achmea* was decided, and therefore itself became part of the *acquis*.

271.  In reaching this conclusion, the Tribunal emphasizes that it is not purporting to resolve the debate between the Parties (and their respective experts) about the *ex tunc* or *ex nunc* effect of *Achmea* as a matter of EU law. Rather, the Tribunal rests its conclusion on the interaction of two factors: the express reference in Article 11(2) of the BIT the *acquis* "in force at any given time," and certain general principles regarding invalidity of treaty provisions to which both Contracting Parties agreed in the VCLT.

272.  First, the Tribunal recalls its discussion in Section V.B above about the evolving nature of the EU *acquis*, and the limitation in Section 11(2) to the *acquis* as it was "in force" at the "given time" relevant to consent to arbitrate, which the Parties here agree was 27

---

[380] Resp. Reply ¶ 101.
[381] *CETA* Opinion, ¶ 131.
[382] BIT Articles 9(2)(a) and 9(2)(b).

September 2017. As of that date, while the TFEU was obviously "in force," the *Achmea* interpretation of Articles 267 and 344 had not yet been rendered, and in fact the only then-extant interpretation of those Articles, by an authority whose interpretations were capable of being considered part of the *acquis*, was Advocate General Wathelet's, which was rendered on 19 September 2017, just eight days before the critical date in this arbitration.[383] While the CJEU subsequently rejected elements of Advocate General Wathelet's interpretation, and his Opinion thereby ceased to that extent to be part of the *acquis*, that had not yet occurred at the "given time" relevant here.

273.    The Tribunal accepts that under an *ex tunc* view of the *Achmea* Judgment, one might posit in hindsight that the TFEU already had the meaning the CJEU later ascribed to it, even though Advocate General Wathelet did not then perceive it and the CJEU had not previously had occasion to pronounce it. The Tribunal acknowledges the *UniCredit* tribunal's concern that such a proposition could undermine the force of the "at any given time" language of Article 11(2), because "[e]ven if there is *ex tunc* application of an EU judgment by virtue of a subsequent interpretation, that application is by virtue of a subsequent event" which had not yet occurred at the "given time" relevant to formation of consent.[384] The *UniCredit* tribunal considered that "if the intent had been to enshrine the *ex tunc* principle in the Treaty, Article 11(2) would have been written without the 'in force …' clause or would have been written with far more precision."[385]

274.    Be that as it may, one thing is clear: if intra-EU BIT arbitration was broadly incompatible with the TFEU from the moment of each new EU Member State's accession, then this ostensible defect in intra-EU BITs was overlooked not only by Advocate General Wathelet in his Opinion in *Achmea*, but also for many critical years by multiple other participants in

---

[383] Case No. C-284/16, *Slovak Republic v. Achmea BV*, RLM-12; Opinion of Advocate General Wathelet, 19 September 2017, CL-145.

[384] *UniCredit* 2018 Decision ¶ 123, CLM-136.

[385] *UniCredit* 2018 Decision ¶ 123, CLM-136. The tribunal concluded that the BIT "does not admit of conditions subsequent," and therefore that "the only conditionality that Article 11(2) of the BIT could bring to bear on Article 9 would be if, at the time a claim is submitted, there is *demonstrated inconsistency* between the irrevocable offer made by the Respondent for arbitration and the EU *acquis* by virtue of decisions or conduct that has occurred *prior to that date*." *Id.* ¶¶ 123-124 (emphasis added).

the EU system, including numerous EU Member States and the Commission itself. It is useful to recall that Croatia and the EU (then referred to as the "European Communities") began the process of working towards Croatia's EU accession in 2001, with a Stabilisation and Association Agreement which specifically encouraged the conclusion of BITs between Croatia and existing EU Member States.[386] While Austria and Croatia did not need this particular form of encouragement – they already had concluded their BIT, which entered into force on 1 November 2009 – the Stabilisation and Association Agreement must be seen as an official endorsement by the EU of such arrangements. Importantly, nothing in that Agreement suggested that these BITs would be a transitional arrangement that would terminate upon Croatia's accession to the EU. That remained true in the Treaty of Accession that Croatia and the EU Member States signed in 2011 and that entered into force in 2013, which expressly required Croatia to withdraw from or amend certain other pre-accession treaties, but imposed no such obligation on it with respect to intra-EU BITs.[387]

275.   It is therefore hardly surprising that the States involved did not perceive these BITs to be immediately invalid under the EU *acquis* upon the moment of EU accession. Croatia did seek Austria's opinion in 2011 regarding a possible obligation to terminate the BIT upon accession, but it did not suggest that it believed the two States would be automatically relieved of their obligations under the BIT absent termination, by virtue of Article 11(2) or otherwise. Moreover, Croatia's own record of the direct consultations confirms Austria's response that it did not believe any BIT termination would be appropriate, until the EU arranged an alternate legal framework in EU law "that would protect the investments in the same manner as they are protected under the bilateral investment treaties."[388] This

[386] Stabilisation and Association Agreement, Article 85, TSV-16 (entitled "Investment promotion and protection," and providing that one of the "particular aims of cooperation shall be … the conclusion, where appropriate, with Member States of bilateral agreements for the promotion and protection of investment …").

[387] Act Concerning the Conditions of Accession, appended to the Treaty on the Accession to the European Union of Croatia, dated 24 April 2012, Official Journal of the European Union, L 112/3, RLM-13 (requiring, for example in its Article 6(9), that "Croatia shall withdraw from any free trade agreements with third countries ….").

[388] Record of consultations held with Austrian representatives on 13 September 2011 in the Ministry of Economy, Labour and Entrepreneurship, 19 September 2011, R-40.

suggested that Austria too understood the BIT as remaining both in force and enforceable for the time being.

276. While it is true that the Commission increasingly began to express its views about the incompatibility issue in a variety of fora, the fact is that certain EU Member States (Austria included) resisted that notion, which as of the critical date in this case was far from reflecting a consensus understanding.[389] As noted above, in September 2017 Advocate General Wathelet issued an Opinion rejecting the notion that intra-EU BIT arbitration was incompatible with the TFEU.[390] This arbitration was registered by ICSID eight days after that Opinion.

277. In these circumstances, the best that can be said about the alleged incompatibility of intra-EU BIT arbitration with the TFEU was that it was certainly not *manifest*, in the ordinary meaning of that term as evident or obvious, prior to the CJEU's finding incompatibility at least with respect to some such intra-EU BITs in the *Achmea* Judgment. In these circumstances, the binding agreement by Austria and Croatia to Articles 46 and 69 of the VCLT come into play. Article 46 of the VCLT prevents States from invoking provisions of their own law to invalidate their consent to be bound by a treaty, unless the violation of internal law "was manifest" in the sense that it "would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith."[391] Article 69 of the VCLT then provides that while treaty invalidity is grounds to render the provisions of such treaty without legal force, "if acts have nevertheless been performed in reliance on such a treaty" and "in good faith before the invalidity was invoked," those acts "are not rendered unlawful by reason only of the invalidity of the treaty."[392]

---

[389] Indeed, as late as 14 April 2018 (well after the critical date for jurisdiction in this case), Austria continued to state its understanding, in direct consultations with Croatia under Article 11(3) of the BIT, that "it considers BITs valid and that it does not deem them incompatible with the EU law," and in an event that any issue of "incompatibly should have effect as of the time when it is established, that is without retroactive effect," such that even "should the CJEU decide that the dispute resolution provision is incompatible with the EU law … Austria considers that such decision would not change the dispute resolution provision and would have no impact on the pending proceedings." Minutes of the meeting with the Austrian representatives regarding the interpretation of Article 11 paragraph 2 and 3 of the Agreement on the promotion and protection of investment concluded with Austria, C-225.

[390] Opinion of Advocate General Wathelet in *Slowakische Republik v. Achmea BV*, Case C-284/16, CL-145.

[391] VCLT, Article 46; *see also Eskosol* ¶¶ 190-193, CLM-192.

[392] VCLT, Article 69.

278.    In the Tribunal's view, this is the case for Addiko's acceptance of Croatia's apparent "irrevocabl[e] consent[] in advance" to arbitration, stated in Article 9(2) of the BIT, which was done prior to any invalidity in such consent (on grounds of incompatibility with the EU *acquis*) being invoked by any authority in the EU whose pronouncements were capable of forming part of the *acquis*, and certainly prior to any invalidity becoming "manifest." It was not until the CJEU actually issued the *Achmea* Judgment that it could be said that investors were placed on notice by a competent authority in the EU legal system about the risks under that system of relying on the apparent consent to arbitration reflected in Article 9(2) of the BIT.[393]

279.    The Tribunal does not suggest that these articles of the VCLT somehow "trump" Article 11(2) of the BIT, regarding the consequences of any incompatibility of the BIT with the EU *acquis*. However, nor can it be said that Article 11(2) of the BIT demonstrates an intention to resile, for purposes of this BIT, from the Parties' mutual agreement to the basic principles of public international law reflected in the VCLT. Rather, the BIT must be read as a whole, including not only its Article 11(2) reference to the *acquis* "in force at any given time" (which recognizes that the *acquis* evolves and that the state of the *acquis* at a particular critical date is important), but also its Article 9 commitment to the irrevocability of Austria and Croatia's advance offer of consent to arbitrate.[394] Both of these provisions moreover must be read in light of the general principles of international law which are inherently part of the applicable law of the BIT. In these circumstances, the Tribunal is unable to accept that, whatever EU law may provide regarding the *ex tunc* or *ex nunc* effect of the *Achmea* Judgment, Article 11(2) of the BIT mandates that this judgment be applied to international effect contrary to the basic propositions of both Article 9 of the same BIT and the generally accepted principles of the VCLT regarding good faith reliance on treaty validity prior to the invocation of invalidity, so long as the grounds for invalidity were not already manifest at the time of such reliance.

---

[393] *See Eskosol*, ¶¶ 191, 193, 204-206 (concluding the same with respect to the ECT).

[394] *See UniCredit* 2018 Decision ¶ 131 (emphasizing the importance of the BIT's language about "irrevocably consent[ing] in advance" to arbitration, and noting that the Netherlands-Slovakia BIT at issue in *Achmea* did not include any such language).

280.    The Tribunal thus finds that as a matter of international law, any invalidation of Article 9(2)'s stated "irrevocabl[e] consent[] in advance" to arbitration, by virtue of an incompatibility with the EU *acquis* pursuant to Article 11(2) of the BIT, could not be applied to invalidate a consent to arbitration that was given before the *Achmea* Judgment, but only prospectively for investors who had not yet initiated a BIT arbitration. In the Tribunal's view, this conclusion holds whether the *Achmea* Judgment *itself* is considered under EU law to be applied *ex nunc* or alternatively *ex tunc*.[395]

### e. Relevance of the Declarations

281.    The Tribunal turns next to the 2019 Declarations by various EU Member States, and in particular, the Declaration – 15 January 2019 which both Austria and Croatia signed, and which Croatia therefore invokes as the relevant one for purposes of this case.[396] The document is entitled "Declaration of Representatives of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union." Citing *Achmea*, the Declaration – 15 January 2019 first states that "Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law."[397]  The rest of the Declaration may be divided into two parts, the first expressing views on certain legal issues in the wake of the *Achmea* Judgment,[398] and the second declaring that in accordance with those views, the 22 EU Member States "will undertake the following actions without undue delay."[399]

282.    Regarding the legal issues, the signatories state *inter alia* as follows:

> Union law takes precedence over bilateral investment treaties concluded between Member States.[1] As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable.  They do not produce effects including as regards

---

[395] *See Eskosol*, ¶ 199, CLM-192 (concluding the same with respect to the ECT).

[396] RLM-41; Tr. Day 1, 109:6-12.

[397] RLM-41, p. 1.

[398] RLM-41, pp. 1-2.

[399] RLM-41, pp. 3-4.

provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses). An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.[400]

The statement that "Union law takes precedence over bilateral investment treaties concluded between Member States" contains a footnote which cites certain CJEU judgments and then asserts, without any analysis or citations, that "[t]he same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*)."[401]

283. Regarding the actions to be taken by the 22 signatories, the Declaration – 15 January 2019 pledges that they will "undertake the following," *inter alia*:

> 1. By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.
>
> 2. In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.
>
> 3. By the present declaration, Member States inform the investor community that no new intra-EU investment arbitration should be initiated.
>
> …
>
> 5. In light of the *Achmea* judgment, Member States will terminate all bilateral investment treaties concluded between them by means

---

[400] RLM-41, pp. 1-2.

[401] RLM-41, p. 1, n. 1.

of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.

…

8.  Member States will make best efforts to deposit their instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating bilateral investment treaties between Member States no later than 6 December 2019.[402]

284.    Croatia has duly followed through on the first undertaking above, by virtue of informing this Tribunal about the Declaration -15 January 2019. Having been so informed, the question for the Tribunal is whether that Declaration has legal significance for its jurisdiction to proceed in this case.

285.    Croatia argues first that the Declaration itself is now part of the EU *acquis*, and therefore part of the body of EU law that Article 11(2) of the BIT requires the Tribunal to examine, for purposes of determining if any BIT provisions are incompatible with the *acquis.* Croatia relies on the Eur-Lex Glossary,[403] which includes within its definition of the "EU *acquis*" the "declarations and resolutions adopted by the [European] Union."[404] The Tribunal has considerable doubt, however, that a Declaration issued in the name of particular EU Member States (even collectively) can be equated with an act of the EU itself. Indeed, Croatia's own EU law expert (Professor Craig) does not agree that the Declaration is part of the EU *acquis*, and concedes that this is a point of agreement between him and Addiko's EU law expert, Professor Jacobs.[405] In any event, the Declaration certainly could not be described as part of the EU *acquis* "in force" at the time relevant to determination of this Tribunal's jurisdiction, which was 27 September 2017. Whatever EU law might say about the *ex tunc* application of CJEU judgments such as *Achmea*, the Declaration – 15 January 2019 is not itself entitled to *ex tunc* effect. It therefore could not form part of the *acquis* relevant, under Article 11(2) of

---

[402] RLM-41, pp. 3-4.
[403] R-2.
[404] Resp. Mem. ¶ 46; Resp. Reply ¶ 122.
[405] Tr. Day 2, 394:2-11; Jacobs Opinion ¶ 62.

the BIT, to the validity of Croatia's offer to arbitrate at the time when Addiko accepted that offer.

286.    Second, Croatia suggests that the Declarations constitute an authoritative "interpretation of Articles 267 and 344 of the TFEU" by the various Contracting Parties to the TFEU,[406] or alternatively stated, "an agreement among all the Contracting Parties to the TFEU on the interpretation of Articles 267 and 344 of the TFEU."[407] However, the Declarations do not actually purport to *interpret the TFEU*, but rather to address the perceived "legal consequences of the judgment of the Court of Justice in *Achmea*."[408] This is an important distinction, because EU Member States do not have the power to interpret the TFEU; only the CJEU has the power to do so within the EU legal order.[409] As for *Achmea*, of course, its judgment says what it says, and while the CJEU may in due course provide further guidance on how to read that judgment, the EU Member States do not themselves have the authority to "alter or extend the meaning of a judgment of the CJEU … Interpretations of the Treaties by the CJEU can only be altered by the CJEU itself or by amending the Treaties."[410]

287.    This latter point is important because, as the *Eskosol* tribunal noted, "in their statements regarding legal issues on the first pages of the January 2019 Declaration, the signatories have gone far beyond the actual holding in *Achmea* Judgment."[411] Specifically, the Declaration – 15 January 2019 declares that *Achmea* stands for the proposition that "*all* investor-state arbitration clauses contained in bilateral investment treaties … are contrary to Union law,"[412] but *Achmea* does not actually so state. Rather, as explained in Section V.C.1.b above, the CJEU's finding in *Achmea* was limited to intra-EU BITs with a "provision … *such as* Article 8" of the *Achmea* BIT,[413] and its reasoning in *Achmea* makes clear that the concern was about clauses that make EU law part of the applicable law of the treaty. In these circumstances,

---

[406] Resp. Mem. ¶ 39.

[407] Tr. Day 1, 111:20-112:2.

[408] RLM-41, p. 1.

[409] *See* Jacobs Opinion, ¶ 63.

[410] Jacobs Opinion, ¶ 63.

[411] *Eskosol* ¶ 213, CLM-192.

[412] RLM-41, p. 1 (emphasis added).

[413] *Achmea* ¶ 62 (emphasis added).

107

while *Achmea* itself now forms part of the EU *acquis*, EU Member States cannot by simple declaration extend *Achmea* beyond its own terms, or declare a more sweeping proposition about the *acquis* than the CJEU itself was willing to embrace.

288.   Croatia's third argument is that the Declaration – 15 January 2019 qualifies as a "subsequent agreement" between Austria and Croatia (*inter* alia) on interpretation of the BIT, for purposes of VCLT Article 31(3)(a), which provides that "[t]here shall be taken into account, together with the context … any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions."[414] One of the difficulties with this argument is that, as noted above, the Declaration by its terms addresses the perceived "legal consequences" of a 2018 CJEU judgment, but does not purport to interpret the provisions of this BIT or any other BIT for that matter.[415]

289.   Moreover, the ILC's 1966 Commentaries on the Draft VCLT Articles suggest that the purpose of Article 31(3)(a) was to allow Contracting States to clarify later "[a] question of fact … as to whether an understanding reached during the negotiations [of a particular treaty] concerning the meaning of a provision was or was not intended to constitute an agreed basis for its interpretation."[416] But the Declaration – 15 January 2019 does suggest that Austria and Croatia (or any other pair of States whose BIT became an intra-EU BIT upon the second State's EU accession) had contemporaneously shared *any* "understanding" at the time of their BIT negotiations that arbitration provisions would become inoperative upon EU accession. To the contrary, it would be impossible to claim this was an originally shared understanding between Austria and Croatia, because as late as February 2018, Austria itself was stating the opposite with regarding to its own understanding of the Austria-Croatia BIT.[417] In these

---

[414] VCLT, Article 31(3)(a).

[415] *Eskosol*, ¶ 222, CLM-192 (noting similarly, in connection with the ECT, the difficulty in presenting a VCLT Article 31(3)(a) argument about a Declaration that does not actually purport to "interpret" any particular term of the underlying treaty).

[416] *See* ILC Draft Articles on the Law of Treaties with Commentaries, 1966, p. 221 (Art. 27, Commentary, item 14), RLM-0131.

[417] Minutes of the meeting with the Austrian representatives regarding the interpretation of Article 11 paragraph 2 and 3 of the Agreement on the promotion and protection of investment concluded with Austria, p. 1, 14 February 2018, C-225 ("Article 11(2)-(3) Meeting Minutes") (Austria "reiterated its previously expressed position that it considers BITs valid and that it does not deem them incompatible with the EU law").

circumstances, the Declaration at best can be seen as offering a new shared *intention* with respect to the BIT's arbitration clause, rather than confirming a previously shared understanding.[418] Nor can the Declaration constitute *stricto senso* a new *agreement* between the relevant States, given that it was signed by plenipotentiaries rather than being ratified in accordance with the appropriate procedures for ratification of international agreements. Finally, this new shared intention (at best) between Austria and Croatia clearly came into being well after the critical date for jurisdiction in this case, which was in September of 2017.

290.    A similar observation pertains to Croatia's argument that the Declaration – 15 January 2019 reflects the binding results of a dialogue between it and Austria for purposes of the BIT's own Article 11(3), which provides that "[i]n case of uncertainties concerning the effects of [Article 11(2) of the BIT] the Contracting Parties will enter a dialogue." For this argument, the Tribunal need not decide whether the bilateral dialogue envisioned in the BIT could be satisfied by a broader multi-State dialogue in which both Contracting Parties participated. Notwithstanding Addiko's objection to this concept, the Tribunal sees no reason in principle that two State Parties to a BIT could not agree to such a route.[419] Rather, the real issue is a temporal one, namely the attempted application of the results of such a dialogue to an arbitration that already had been pending for five months at the time Austria and Croatia met, and for sixteen months by the time of the Declaration - 15 January 2019. In the view of the Tribunal, any dialogue between Austria and Croatia under Article 11(3) of the BIT would have to be prospective in effect, rather than applied after-the-fact to pending cases initiated under the BIT prior to the date of such dialogue. Giving a new dialogue effect in a pending case, with the result of defeating jurisdiction that was not demonstrably already contrary to

---

[418] *See Eskosol*, ¶ 223, CLM-192 (concluding the same with regard to the ECT).

[419] On several occasions, Austria suggested to Croatia that the States await EU-wide developments before progressing with any further bilateral dialogue under the BIT. *See, e.g.*, Record of consultations held with Austrian representatives on 13 September 2011, 19 September 2011, p. 2. R-40 (Austria suggesting to Croatia in September 2011, with regard to the issue of potential BIT termination, that "the parties involved should wait until the issue is resolved at the level of the European Union"); Article 11(2)-(3) Meeting Minutes, p. 1 C-225 (noting that "Austria contends incompatibility with the EU law should be determined by the CJEU" and "Austria considers that the CJEU will merely provide instructions for the Member States on the incompatibility, that is how to align with the EU law"); Correspondence between ministries of the Contracting Parties, 23 February 2018 to 30 January 2019, p. 2, R-41 (Austria's representative suggesting to Croatia's representatives in July 2018 that "[w]e also think it is indeed better to wait for the results of the discussions in Brussels before we continue our bilateral dialogue").

the acquis "in force" as of the date the case commenced, would be contrary to Austria and Croatia's own pledge in Article 9(2)(a) of the BIT to "irrevocably consent[] in advance" to arbitration. Moreover, as the *Eskosol* tribunal noted with respect to the same Declaration – 15 January 2019, "it would be inconsistent with general notions of acquired rights under international law to permit States effectively to non-suit an investor part-way through a pending case, simply by issuing a joint document purporting to interpret long-standing treaty text so as to undermine the tribunal's jurisdiction to proceed."[420] As discussed further below, the fact that the signatories to the Declaration did not even evince a belief that their respective intra-EU BITs had been implicitly terminated from the date of accession, but rather announced their intent to explore *future* steps leading to eventual termination,[421] further confirms that the Declaration cannot be given legal force to invalidate BIT arbitration clauses in cases already then underway.

### f.   *Additional Arguments of the Commission and Croatia*

291.   Finally, the Tribunal addresses several additional arguments the Commission presented in its non-disputing party submission, some (but not all) of which Croatia also raised in its filings.

292.   First, both the Commission and Croatia rely on Declaration 17 annexed to the Final Act of the Intergovernmental Conference adopting the Treaty of Lisbon, for the proposition that EU law takes primacy over intra-EU treaty commitments of Member States, and not just over the national laws of Member States.[422] Addiko disagrees with this proposition, arguing that the primacy of EU law applies only vis-à-vis Member State laws, and not vis-à-vis treaty commitments.[423] In the Tribunal's view, there is no need in this case to resolve the debate, given the express provision in Article 11(2) of the Austria-Croatia BIT that "[t]he Contracting Parties are not bound by the present Agreement insofar as it is incompatible with the legal acquis of the European Union (EU) in force at any given time." This provision acts as *lex specialis*, and effectively provides a conflicts rule for this case insofar as any incompatibility

---

[420] *Eskosol* ¶ 226, CLM-192.

[421] RLM-41, pp. 3-4 ("In light of the *Achmea* judgment, Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.").

[422] Commission Submission ¶¶ 49-50; Resp. Mem. ¶¶ 124-125.

[423] Cl. Mem. ¶ 82; Cl. PHB1 ¶ 153.

actually were to exist, so there is no need to resort to Declaration 17 as a source of a general conflicts rule arguably elevating EU law over other Member State commitments. The fact remains, however, that the Tribunal has found no incompatibility with the *acquis* to exist in relation to arbitration under the BIT's Article 9(2), for the reasons stated in Section V.C.1.c above, so neither conflicts rule becomes operational in the circumstances of this case.

293.   Second, the Commission invokes Article 30(3) of the VCLT,[424] which Croatia also invokes as an alternative to its primary argument about Article 11(2) of the BIT.[425] VCLT Article 30 is entitled "Application of successive treaties relating to the same subject-matter," and its first subparagraph states that "the rights and obligations of State parties to *successive treaties relating to the same subject-matter* shall be determined in accordance with the following paragraphs."[426] Subparagraph (3) then provides that "[w]hen all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty."[427] As the Tribunal already has noted, however, VCLT Article 30 does not apply, given that Article 11(2) of the BIT provides its own rule regarding the relationship between the BIT and the EU *acquis*, which operates as *lex specialis*. Moreover, even as an "alternative" argument (as Croatia offers it), Article 30(3) of the VCLT would not dictate the result Croatia seeks, for two reasons. First, the Tribunal has found that Article 9(2) of the BIT is not incompatible with the *acquis*, so the conflicts rule represented by VCLT Article 30(3) would not apply even if (*arguendo*) the Tribunal were to find the predicate step of "same subject matter" satisfied on the facts of this case.[428] The Tribunal however does *not c*onsider the "subject matter" test to be satisfied either, because (as

[424] Commission Submission ¶ 53.

[425] Resp. Mem. ¶¶ 24, 129.

[426] Article 30(1) of the VCLT (emphasis added).

[427] Article 30(3) of the VCLT.

[428] For avoidance of doubt, the Tribunal agrees with *Eskosol* that Article 30(3) of the VCLT imposes two separate tests ("same subject matter" and "incompatibility") rather than a single test, as Croatia and the Commission both contend. *See Eskosol* ¶¶ 135-139, CLM-192 (explaining that accepting the Commission's position would "effectively require rewriting the text" rather than adhering "to the natural and ordinary meaning of the terms," and would also ignore "that the comparators in Articles 30(1) and 30(3) are different: Article 30(1) examines the relationship between treaties as a whole (whether they 'relat[e] to the same subject matter'), while Article 30(3) examines the relationship between particular provisions within such related treaties (whether they are 'compatible'))."

explained more fulsomely by the *Eskosol* tribunal), the BIT and the EU Treaties cannot be considered – using the analysis adopted by the ILC to explain the relevant terms – as elements of a related "treaty regime[]" involving "'clusters' of treaties that are linked institutionally and that States parties envisage as part of the same concerted effort."[429]

294.    Third, the Commission argues that the BIT already was implicitly terminated under Article 59 of the VCLT, and indeed that such implicit termination occurred from the moment of Croatia's accession to the EU.[430] Croatia does not advance this argument, and the Tribunal considers it frankly to be a non-starter.

295.    Article 59 of the VCLT, entitled "Termination of suspension of the operation of a treaty implied by conclusion of a later treaty," provides in relevant part that "[a] treaty shall be considered as terminated if all the parties to it conclude a later treaty *relating to the same subject-matter* and (a) it appears from the later treaty or is otherwise established that *the parties intended* that the matter should be governed by that treaty; or (b) [t]he provisions of the later treaty are *so far incompatible* with those of the earlier one that the two treaties are not capable of being applied at the same time."[431] But as a threshold matter, as discussed above, the Tribunal does not consider the BIT and the EU Treaties to involve the "same subject matter" for purposes of international law, which is a preliminary requirement under VCLT Article 59(1) for implicit termination of an earlier treaty by virtue of a later treaty. Nor has the Tribunal found that Article 9(2) of the BIT and the TFEU are "so far incompatible" that they "are not capable of being applied at the same time," within the meaning of Article 59(1)(b) of the VCLT.

296.    Finally, with respect to Article 59(1)(a), there is no evidence that the two State Parties to the BIT both *intended* upon accession that the BIT itself, or even just its arbitration provisions, had been superseded by the TFEU, with the result that the BIT (or those provisions) might be implicitly terminated by mutual intent. The Tribunal recalls in this regard that while Croatia in 2011 solicited Austria's views on whether the two States should take affirmative action to

---

[429] *Eskosol* ¶¶ 141-147, CLM-192.

[430] Commission Submission ¶¶ 5, 25.

[431] VCLT, Article 59(1) (emphasis added).

terminate the BIT upon accession, Austria declined to pursue any such bilateral action in advance of a broader EU-wide determination. Nothing in the exchange suggested that either State believed termination could occur implicitly upon accession, without the need for some additional affirmative steps. The notion of implicit termination by mutual intent is also specifically belied by the text of the Declaration – 15 January 2019, which contains two undertakings framed in the *future* tense: number 5, by which the signatories state that they "*will terminate*" all bilateral investment treaties concluded between them, and number 8, by which they pledge they "*will make best efforts*" to complete this process by 6 December 2019.[432] The use of the future tense clearly indicates that the signatories did not believe their intra-EU BITs already had been terminated, on grounds of invalidity of the underlying consent or otherwise. Finally, even the recent EU agreement on termination of intra-EU BITs, which certain Member States (including Croatia) signed on 5 May 2020 – but Austria notably did not – provides for termination *by virtue* of (and effective upon) that new treaty's entry into force.[433] The whole *raison d'être* of the new treaty is to effect a change in the status of the covered intra-EU BITs, which would not be necessary of such BITs already had been implicitly terminated under VCLT Article 59.

### g.  Conclusion on Alleged Incompatibility with Articles 267 and 344 TFEU

297.  For these myriad reasons, the Tribunal rejects Croatia's jurisdictional objection on the basis that Article 9(2) of the Austria-Croatia BIT, "irrevocably consenting in advance" to arbitration of investor claims under the BIT's substantive provisions, is incompatible with Articles 267 and 344 of the TFEU. The Tribunal turns below to Croatia's separate argument that various provisions of the BIT are incompatible with anti-discrimination principles reflected in the EU *acquis.*

---

[432] RLM-41, pp. 3-4 (emphasis added); *see Eskosol* ¶ 217, CLM-192 (noting this future tense language).

[433] *See* Agreement for the termination of bilateral investment treaties between the EU Member States, *available at* https://ec.europa.eu/info/files/200505-bilateral-investment-treaties-agreement_en, Article 4(2) ("The termination in accordance with Article 2 of Bilateral Investment Treaties listed in Annex A … shall take effect, for each such Treaty, as soon as this Agreement enters into force for the relevant Contracting Parties").

### (2)  Alleged Incompatibility with EU Anti-Discrimination Principles

298.  Independent of Croatia's arguments about Articles 267 and 344 of the TFEU, it contends that the BIT is incompatible with other aspects of the *acquis* that forbid Member States from discriminating between nationals of other EU Member States, such as by providing some EU investors with more beneficial treatment by virtue of the protections in intra-EU BITs than others would have (by virtual of their home States not being party to equivalent BITs). Croatia invokes Articles 18, 49 and 63 of the TFEU as the source of such antidiscrimination principles, as well as the non-discrimination provisions of the GATs. It contends that the Austria-Croatia BIT is incompatible with these principles because it provides both substantive and procedural advantages to Austrian and Croatian nationals, in the form of the substantive protections enshrined in the BIT as well as a right of access to investor-State arbitration to pursue alleged violations of those protections. The Tribunal turns to these arguments below.

### a.  Articles 18, 49 and 63 of the TFEU

299.  The first paragraph of Article 18 TFEU provides as follows:

> Within the scope of application of the Treaties, and without prejudice to any special provisions contained therein, any discrimination on grounds of nationality shall be prohibited.

Article 49 of the TFEU prohibits Member States from imposing any "restrictions on the freedom of establishment of nationals of a Member State in the territory of another Member State," and Article 63 of the TFEU prohibits "all restrictions on the movement of capital between Member States and between Member States and third countries."

300.  Croatia invokes these TFEU provisions for the proposition that the BIT's procedural and substantive provisions were incompatible, immediately upon Croatia's accession to the EU, with core provision of the EU *acquis* which prevent any Member State from providing more favorable treatment to nationals of another Member State than they would to all other EU nationals.[434] Accordingly, Croatia argues, Article 11(2) of the BIT provides that the

---

[434] Resp. Mem. ¶¶ 95, 101-102.

Contracting Parties are not bound by these provisions of the BIT because of their incompatibility with the *acquis*.

301. The Tribunal first recalls that Article 11(2) refers to the *acquis* "in force at any given time." But neither at the time of Addiko's commencement of this arbitration, nor even as of today, has the CJEU interpreted the TFEU as barring the procedural or substantive provisions of intra-EU BITs on discrimination grounds. The only competent EU authority that has addressed the issue of discrimination (at least vis-à-vis intra-EU arbitration) was Advocate General Wathelet in his Opinion in *Achmea*, which expressly *rejected* any putative incompatibility on those grounds.[435] The CJEU then declined to address the matter, effectively leaving Advocate General Wathelet's Opinion as the only standing interpretation on the issue in the EU *acquis*. As the Tribunal noted in Section V.B above, the Parties and their respective EU law experts agreed in this case that the *acquis* includes opinions rendered to the CJEU by its Advocates General, to the extent not subsequently rejected by the CJEU or otherwise incompatible with primary elements of the *acquis* such as the EU Treaties.[436] In these circumstances, the Tribunal must accept that Advocate General Wathelet's Opinion on the discrimination issue still stands as part of the *acquis*, unless the Tribunal were prepared to declare that Opinion fundamentally wrong as a matter of EU law (*i.e.*, as incorrectly interpreting the TFEU). But this would be fundamentally inconsistent with Croatia's argument that the Tribunal should not second-guess the prevailing interpretations of the *acquis* that were provided by the competent EU bodies.

302. Moreover, even if the Tribunal *arguendo* were prepared to disregard Advocate General Wathelet's Opinion as an existing part of the *acquis* with respect to the discrimination issue, the result would be no different. First, as the *UniCredit* tribunal explained in its 2020 Decision, a procedural provision giving investors access to arbitration does not guarantee any investor a substantive decision in its favor, but simply provides a particular forum for claims to be considered: "[j]ust as the national laws of the EU Member States also provide

---

[435] Case C-284/16 *Slowakische Republik v. Achmea BV*, Opinion of Advocate General Wathelet, ¶ 82, CLM-145 (finding that the Netherlands-Slovakia BIT's arbitration mechanism "does not constitute discrimination on the ground of nationality, prohibited by Article 18 TFEU").

[436] Tr. Day 1, 222:1-14 (Addiko) and 308:17-21 (Croatia); Tr. Day 2, 404:16-405:3, 405:22-406:9 (Professor Craig).

for different common courts based on various criteria (*e.g.,* the place of domicile of the respondent) without that being incompatible with the EU *acquis*, the BIT provides for ICSID arbitration," but it is not clear why this difference in procedural rights necessarily constitutes discrimination *per se*.[437] The *UniCredit* tribunal similarly concluded that the fact that "the catalogue of rights in the BIT is not identical to that in the TFEU or more broadly in the EU acquis" does not make them necessarily incompatible, where both are "protection mechanisms" for investment and "a protection mechanism enshrined in a set of particular rights is not the goal itself but a tool to ensure the desirable result."[438] The Tribunal understands this reasoning to suggest that discrimination does not necessarily arise simply from phrasing in different ways protections against improper treatment.

303.  In this connection, the Tribunal recalls the Parties' agreement that "incompatibility" under Article 11(2) should be understood as referring to a situation in which compliance with one obligation places a State into non-compliance with the other obligation.[439] As the Tribunal noted in Section V.B, this definition of incompatibility necessarily requires a finding that the obligations of the BIT and the TFEU cannot be cumulatively applied. As a matter of international law, the Tribunal does not consider that to be the case for the BIT's provisions, because nothing in the BIT *requires* Austria or Croatia to provide differential (*i.e.*, *more* favorable) treatment to the other's investors than they would to any other EU national. The BIT certainly prohibits its Contracting Parties from providing *less* favorable treatment than it provides other investors, but that norm itself establishes a proposition of non-discrimination. So long as Austria and Croatia provide other EU nationals with the *same treatment* as they provide each other's investors, they would not run afoul either of the BIT's anti-discrimination provisions or those applicable under the TFEU. In that sense, the two sets of legal obligations (the BIT and the EU *acquis*) work towards the same end, not disparate ends, and can be cumulatively applied without any inherent inconsistency. This is true not only of the BIT's substantive provisions, but also of its provision for access to international arbitration, since (as explained above in this Decision), nothing in the EU

---

[437] *UniCredit* 2020 Decision ¶ 240, RLM-271.

[438] *UniCredit* 2020 Decision ¶ 241, RLM-271.

[439] *See, e.g.*, Resp. Mem. ¶ 32; Cl. Mem. ¶ 45; Cl. PHB1 ¶¶ 15, 17-18; Resp. PHB2 ¶ 4.

*acquis* (as interpreted by the CJEU in *Achmea*) actually prevents Member States from agreeing to treaty arbitration so long as the proceedings are governed only by the terms of the treaty and general international law, and not by EU law as such.

### b.  The GATS

304.  Croatia also contends that the BIT conflicts with the anti-discrimination principles of Article II(1) of the GATS, which imposes upon WTO Member States an obligation requiring "that investment incentives or restrictions be applied equally to all foreign sources of inward service-industry related investments." Because the GATS (in Croatia's view) form part of the EU *acquis*, this conflict between the BIT and the GATS results in the BIT's not being binding on either it or Austria, by virtue of Article 11(2) of the BIT.[440]

305.  The Tribunal has some doubt whether the GATS actually constitutes part of the EU *acquis*, for the reasons presented by Addiko in this case.[441] However, even assuming *arguendo* that it does, the same point applies as under Croatia's other discrimination arguments, namely that there is no inherent incompatibility so long as the Contracting Parties to the BIT do not provide *less* favorable "investment incentives or restrictions" to other GATS members than they do to each other. Otherwise, of course – if the mere existence of a BIT between two States constituted a violation of GATS principles of non-discrimination – then every WTO Member State that was a party to any BIT would equally be in violation of its GATS obligations.[442] Indeed, Croatia acknowledged at the Hearing that the necessary implication of its position was that "no BIT would be valid under this argument" unless excepted under the procedure for exemptions provided for by the GATS, which only a few GATS members have sought to do.[443] The fact that such a charge has never been leveled

---

[440] Resp. Mem. ¶¶ 103-119; Resp. Reply ¶¶ 160-167.

[441] *See* Cl. Mem. ¶¶ 174-180 (noting *inter alia* that the CJEU consistently has found that WTO Member States have considerable flexibility in implementing WTO regulations and that these are not among the rules under which the CJEU must examine the legality of EU Member State actions); Cl. Reply ¶¶ 117-120; Cl. PHB1 ¶¶ 246-248.

[442] *See* Cl. Mem. ¶ 171 (noting that "the ramifications throughout the international legal system would be seismic" if Croatia's arguments were to be accepted, because "[t]oday, there are more than 3,000 BITs in place between WTO Members. Croatia's argument implies that all or most of these BITs would be unenforceable, because they are by definition incompatible with the GATS").

[443] Tr. Day 1, 135:12-21; Cl. PHB1 ¶ 244 (noting that among other WTO Members, neither the United States, the European Union, Japan or China have scheduled Article II exemptions for their BITs).

against any State that has not expressly exempted its BITs underscores the novelty (and in the Tribunal's view, the fallacy) of Croatia's argument in that respect.

### D.  *MONETARY GOLD* PRINCIPLE

306.    Finally, Croatia argues that as a matter of international law, this case cannot proceed because any finding that the Tribunal has jurisdiction would necessarily amount to a finding that *Austria* (and not just Croatia) has violated its obligation under the EU Treaties not to act in a manner incompatible with the EU *acquis*, and the Tribunal cannot sit in judgment of Austria without its participation in a case, pursuant to the principle identified by the ICJ in the *Monetary Gold* case.[444]

307.    The Tribunal rejects this argument as ill-founded. The *Monetary Gold* principle, such as it is, is not part of the EU *acquis*, and therefore does not come into play under the BIT by virtue of Article 11(2)'s provisions on the results of any incompatibility between the BIT and the *acquis*. In any event, the concerns that the ICJ stated in *Monetary Gold* relate to a situation in which the very subject-matter of the dispute involves a determination of a third State's international legal responsibility, such as where that determination is a necessary prerequisite for decision on the claimant's claims.[445] Those concerns do not apply in this context, because nothing the Tribunal might decide, by virtue of allowing Addiko to proceed with its claims against Croatia, would adjudicate the legality of any acts by Austria, whether under EU law, the BIT, or any other set of obligations. To be clear, this Tribunal will not be entertaining any claims about any acts of Austria. Moreover, nothing in this Decision would preclude Austria from presenting arguments in future to a different arbitral tribunal, or to the CJEU, about the validity of the BIT or the enforceability of its consent to arbitral jurisdiction under the BIT. Austria's procedural and substantive rights thus will remain entirely unaffected by this Decision and by whatever ruling the Tribunal eventually renders on other issues as between Addiko and Croatia.[446] Moreover, even to

---

[444] *See, e.g.*, Resp. Mem. ¶¶ 158-162.

[445] *See* Cl. PHB1 ¶¶ 256, 261-265 (discussing *Monetary Gold* and subsequent ICJ decisions elaborating on the principle).

[446] *See UniCredit* 2018 Decision ¶ 136, CLM-136 (concluding that "[t]he fact that Austria happens to be a party to the BIT, and is an EU Member State, in the Tribunal's view does not give it a sufficient interest under the *Monetary Gold*

the extent the Tribunal is deciding herein that the Austria-Croatia BIT remains in force and has not been implicitly terminated, that decision takes no stand beyond the position that Austria apparently itself recently has taken, by declining to sign on (with other EU Member States) to the treaty for termination of various intra-EU BITs.[447]

## VI.    DECISION

308.    For the reasons stated above, the Tribunal denies Croatia's jurisdictional objection related to the alleged incompatibility of the Austria-Croatia BIT with the EU *acquis*, which it previously accelerated for decision in advance of a plenary hearing on all other jurisdictional and merits issues in this case. Accordingly, the case therefore moves forward to consideration of the remaining issues, on the procedural schedule currently in place for the remaining stages of this arbitration.

---

principle in the issue at hand. Austria's rights under the BIT, including consultation and termination rights, are unimpaired by this decision.").

[447] *See* Agreement for the termination of bilateral investment treaties between the EU Member States, *available at* https://ec.europa.eu/info/files/200505-bilateral-investment-treaties-agreement_en.

Professor Guido S. Tawil
Arbitrator

Mr. Miloš Olík
Arbitrator

Ms. Jean E. Kalicki
President of the Tribunal