# EXHIBIT 41

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

**RWE INNOGY GMBH**
**AND**
**RWE INNOGY AERSA S.A.U.**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/14/34**

---

## DECISION ON JURISDICTION, LIABILITY, AND CERTAIN ISSUES OF QUANTUM

---

***Members of the Tribunal***
Ms. Anna Joubin-Bret, Arbitrator
Mr. Judd L. Kessler, Arbitrator
Mr. Samuel Wordsworth QC, President

***Secretary of the Tribunal***
Ms. Mercedes Cordido-Freytes de Kurowski

*Date of dispatch to the Parties:* December 30, 2019

## REPRESENTATION OF THE PARTIES

*Representing RWE Innogy GmbH and*
*RWE Innogy Aersa S.A.U*:

Mr. Antonio Vázquez-Guillén
Ms. Marie Stoyanov
Ms. Virginia Allan
Mr. David Ingle
Mr. Pablo Torres
Ms. Patricia Rodríguez
Allen & Overy LLP
Serrano 73
28006 Madrid
Spain

 and

Mr. Jeffrey Sullivan
Gibson, Dunn & Crutcher LLP
Temple Avenue
London, EC4Y 0HB
United Kingdom

*Representing Kingdom of Spain*:

Mr. José Manuel Gutiérrez Delgado
Mrs. Elena Oñoro Sainz
Mr. Roberto Fernández Castilla
Mrs. María José Ruiz Sánchez
Mr. Diego Santacruz Descartín
Mr. Antolín Fernández Antuña
Mr. Javier Torres Gella
Ms. Amaia Rivas Kortazar
Mrs. Patricia Froehlingsdorf Nicolás
Mr. Pablo Elena Abad
Mr. Alberto Torró Molés
Mr. Rafael Gil Nievas
Ms. Alicia Segovia Marco
Abogacía General del Estado
Depto. Arbitrajes Internacionales
c/Marqués de la Ensenada, 14-16
2ª. Planta
28004 Madrid
Spain

i

TABLE OF CONTENTS

I.  INTRODUCTION AND PARTIES ........................................................................ 1

II. PROCEDURAL HISTORY .................................................................................. 1

   A.  REGISTRATION OF THE REQUEST FOR ARBITRATION ................................ 1

   B.  CONSTITUTION OF THE TRIBUNAL ............................................................ 2

   C.  WRITTEN AND ORAL PHASES OF THE PROCEEDING ................................... 2

III. THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ......................... 23

   A.  THE CLAIMANTS' CLAIMS ......................................................................... 23

   B.  THE CLAIMANTS' REQUESTS FOR RELIEF .................................................. 24

   C.  THE RESPONDENT'S POSITION .................................................................. 26

IV. LEGAL AND FACTUAL BACKGROUND ..................................................... 28

   A.  THE SPECIAL REGIME: LEGAL AND ECONOMIC FRAMEWORK ................. 28

      (1)  The 1997 Electricity Law (Law 54/1997) ......................................... 28

      (2)  Royal Decree 2818/1998 ("RD 2818/1998") and the Plan for Renewable Energy Promotion 2000-2010 ("2000 PER") ......................................... 31

      (3)  Royal Decree 436/2004 and Further Implementing Regulations, including Royal Decree No. 661/2007 .......................................................... 33

         a.  Royal Decree 436/2004 ("RD 436/2004") ..................................... 33

         b.  The 2005-2010 Plan for Renewable Energy ("2005 PER") ...................... 37

         c.  Royal Decree Law 7/2006 ("RDL 7/2006") .................................... 38

         d.  Royal Decree No. 661/2007 of 25 May 2007 ("RD 661/2007") .................. 40

         e.  Royal Decree Law 6/2009 ("RDL 6/2009") and the Pre-Assignment Register ......................................... 48

         f.  Further developments in the Special Regime 2009-2010 .......................... 50

   B.  THE CLAIMANTS' INVESTMENTS IN SPAIN .................................................. 54

   C.  SPAIN'S MEASURES AND THE NEW REGIME ............................................. 62

         a.  The CNE report of 7 March 2012; the MOU of 20 July 2012 .................... 63

         b.  Law 15/2012 ................................................................................. 64

         c.  RDL 2/2013, RDL 9/2013 and Law 44/2013 ................................... 65

         d.  The impact of Spain's measures on the Claimants' investments .............. 69

         e.  European Commission State Aid Procedures ............................................ 71

   D.  THE SUPREME COURT JUDGMENTS ........................................................... 73

V.  JURISDICTION .................................................................................................. 74

   A.  JURISDICTIONAL OBJECTIONS ................................................................... 74

ii

**B.** **THE CLAIMANTS' CORPORATE RESTRUCTURING** ....................................................... 76

**C.** **THE INTRA-EU OBJECTION** ............................................................... 77

    **(1)** **The Parties' Positions** ............................................................. 77

        *a.* *The Respondent's Position* .................................................... 77

        *b.* *The Claimants' Position* ...................................................... 83

    **(2)** **The European Commission's *Amicus Curiae* Submission** .............................. 87

    **(3)** **The *Achmea* Judgment** .......................................................... 88

        *a.* *The Respondent's Position on the Achmea Judgment* ............................. 90

        *b.* *The Claimants' Position on the Achmea Judgment* ............................... 92

    **(4)** **The European Commission's Updated *Amicus Curiae* Submission** ............... 94

        *a.* *The Respondent's Position on the EC's Updated Submission* .................. 96

        *b.* *The Claimants' Position on the EC's Updated Submission* ....................... 97

    **(5)** **The Declarations of 15-16 January 2019** ...................................... 97

        *a.* *The Respondent's Position on the 2019 Declarations* ............................ 99

        *b.* *The Claimants' Position on the 2019 Declarations* ............................. 101

    **(6)** **The Tribunal's Analysis** ....................................................... 102

        *a.* *The law applicable to the intra-EU objection* ............................... 102

        *b.* *Interpretation and application of Article 26(1) ECT pursuant to the VCLT* . ............................................................... 105

        *c.* *The Respondent's argument that EU law applies and prevails* ................ 115

        *d.* *Conclusion re the intra-EU objection* ...................................... 123

**D.** **THE TAX OBJECTION** ............................................................... 123

    **(1)** **The Parties' Positions** ........................................................ 123

        *a.* *The Respondent's Position* .................................................. 123

        *b.* *The Claimants' Position* .................................................... 125

    **(2)** **The Tribunal's Analysis** ...................................................... 127

**VI.** **LIABILITY** ............................................................... 131

**A.** **APPLICABLE LAW** ............................................................... 132

**B.** **ATTRIBUTION AND AUTHORISATION** ............................................. 132

**C.** **ARTICLE 10(1) OF THE ECT: ISSUES OF INTERPRETATION WITH RESPECT TO STABLE CONDITIONS AND LEGITIMATE EXPECTATIONS** ................................. 135

    **(1)** **The Parties' Positions** ........................................................ 135

        *a.* *The Claimants' Position* .................................................... 135

        *b.* *The Respondent's Position* .................................................. 139

(2) The Tribunal's Analysis ................................................................ 142

    *a. The first sentence of Article 10(1)* ........................................... 143

    *b. The second sentence of Article 10(1): FET* .............................. 144

**D. RWE's Case on Breach of Article 10(1) by reference to Alleged Legitimate Expectations** .......................................................... 156

(1) The Parties' Positions ................................................................ 156

    *a. The Claimants' Position* ......................................................... 156

    *b. The Respondent's Position* ...................................................... 161

(2) The Tribunal's Analysis ................................................................ 164

    *a. The significance of the time when the Investments were made* ............... 164

    *b. The question of whether, as a matter of fact, the Claimants relied on the RD 661/2007 regime in making investments post-2007* ................... 168

    *c. Due diligence* ................................................................. 177

    *d. The decisions of the Spanish Supreme Court* ........................... 180

    *e. Do the Claimants have legitimate expectations based on specific commitments of the Respondent?* ..................................... 189

    *f. Conclusions as to the Claimants' case on legitimate expectations; disproportionality* ........................................................... 198

**E. Failure to create stable conditions** .................................... 225

(1) The Parties' Positions ................................................................ 225

    *a. The Claimants' Position* ......................................................... 225

    *b. The Respondent's Position* ...................................................... 228

(2) The Tribunal's Analysis ................................................................ 229

**F. The Disputed Measures were unreasonable** ........................ 234

(1) The Parties' Positions ................................................................ 234

    *a. The Claimants' Position* ......................................................... 234

    *b. The Respondent's Position* ...................................................... 239

(2) The Tribunal's Analysis ................................................................ 244

**G. Breach of transparency** ...................................................... 247

(1) The Parties' Positions ................................................................ 247

    *a. The Claimants' Position* ......................................................... 247

    *b. The Respondent's Position* ...................................................... 250

(2) The Tribunal's Analysis ................................................................ 253

**H. Violation of the Umbrella Clause** ...................................... 258

(1) The Parties' Positions ............................................................... 258
      *a. The Claimants' Position* .............................................. 258
      *b. The Respondent's Position* ........................................ 261
(2) The Tribunal's Analysis ........................................................... 262

VII. REPARATION .......................................................................... 264
  A. RESTITUTION ........................................................................ 264
    (1) The Parties' Positions ........................................................ 264
       *a. The Claimants' Position* ........................................... 264
       *b. The Respondent's Position* ...................................... 265
    (2) The Tribunal's Analysis ..................................................... 265
  B. COMPENSATION .................................................................... 266
    (1) The Parties' Positions ........................................................ 266
       *a. The Claimants' Position* ........................................... 266
       *b. The Respondent's Position* ...................................... 276
    (2) The Tribunal's Analysis ..................................................... 281

VIII. DECISION .............................................................................. 287

## TABLE OF DEFINED TERMS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| C-[#] | The Claimants' Exhibit |
| Cl. Mem. | The Claimants' Memorial on the Merits dated 26 February 2016 |
| Cl. PHB | The Claimants' Post Hearing Brief dated 28 July 2017, as revised on 7 August 2017 |
| Cl. Rej. | The Claimants' Rejoinder on Jurisdiction dated 2 March 2017 |
| Cl. Reply | The Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 11 November 2016 |
| CL-[#] | The Claimants' Legal Authority |
| Cl. Skeleton | The Claimants' Skeleton of the Case dated 24 April 2017 |
| ECT | Energy Charter Treaty, adopted in Lisbon on 17 December 1994 |
| Hearing | Hearing on the merits and jurisdiction held in Paris, France on 15-20 May 2017 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | The Respondent's Exhibit |

| RE | Renewable Energy |
|---|---|
| Resp. C-Mem. | The Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 20 May 2016 |
| Resp. PHB | The Respondent's Post Hearing Brief dated 14 July 2017 |
| Resp. Rej. | The Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 19 January 2017 |
| Resp. Skeleton | The Respondent's Skeleton of the Case dated 5 May 2017 |
| RL-[#] | The Respondent's Legal Authority |
| RfA | The Claimants' Request for Arbitration dated 16 December 2014 |
| Tr. Day [#] [Speaker(s)] [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 4 November 2015 |

## I.  INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 for Germany and the Kingdom of Spain (the "**ECT**" or "**Treaty**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.  The claimants are RWE Innogy GmbH ("**RWE**"), a company incorporated under the laws of Germany, and RWE Innogy Aersa S.A.U. ("**RWE Innogy Aersa**"), a company incorporated under the laws of the Kingdom of Spain (together, the "**Claimants**"). The respondent is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

3.  The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

4.  This dispute relates to measures implemented by the government of Spain modifying the regulatory and economic regime of renewable energy projects.

## II.   PROCEDURAL HISTORY

### A.    REGISTRATION OF THE REQUEST FOR ARBITRATION

5.  On 19 December 2014, ICSID received a request for arbitration dated 16 December 2014 from RWE and RWE Innogy Aersa against Spain (the "**Request**"), together with Exhibits C-001 to C-0015.

6.  On 23 December 2014, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

## B.    CONSTITUTION OF THE TRIBUNAL

7.    By letter of 23 March 2015, the Claimants, noting that the Parties had not been able to reach an agreement on the method for the appointment of the Tribunal within 60 days after the registration of the Request, informed the Secretary-General that they chose the formula provided for in Article 37(2)(b) of the ICSID Convention, according to which the Tribunal would consist of three arbitrators, one arbitrator appointed by each party and the third and presiding arbitrator, appointed by agreement of the Parties.

8.    On 3 June 2015, the Parties informed the Centre of their agreement on the method for appointing the presiding arbitrator. The President was to be appointed by agreement of the Parties. Absent an agreement, there would be a ballot procedure, and in the event that this resulted in no appointment, it was agreed that ICSID would then make the appointment.

9.    The Tribunal is composed of Mr Samuel Wordsworth QC, a national of the United Kingdom, President, appointed by the Secretary-General of ICSID pursuant to the Parties' agreement; Mr Judd Kessler, a national of the United States, appointed by the Claimants; and Ms Anna Joubin-Bret, a national of France, appointed by the Respondent. Mr Kessler and Ms Joubin-Bret accepted their respective appointments on 3 April 2015 and 3 June 2015.

10.    On 4 November 2015, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms Mercedes Cordido-Freytes de Kurowski, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

## C.    WRITTEN AND ORAL PHASES OF THE PROCEEDING

11.    In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 14 December 2015 by teleconference. The Parties confirmed that the

Tribunal was properly constituted and that no party had any objection to the appointment of any Member of the Tribunal.

12.     Following the first session, on 15 December 2015, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be the seat of the Centre in Washington, D.C. Procedural Order No. 1 also sets out the agreed timetable for the various phases of the proceeding.

13.     On 15 December 2015, the European Commission filed an Application for Leave to Intervene as Non-Disputing Party pursuant to ICSID Arbitration Rule 37(2) ("**EC's First Application**").

14.     At the Tribunal's invitation, on 8 January 2016, each party filed observations on the EC's First Application of 15 December 2015. The Respondent filed together with its submission Legal Authorities RL-0001 to RL-0003.

15.     On 10 February 2016, the Tribunal issued Procedural Order No. 2 dismissing the EC's First Application pursuant to ICSID Arbitration Rule 37(2). The Tribunal noted that the proceeding was still at a very early stage, the Respondent had not yet raised any jurisdictional objections. The Tribunal felt that it was ill-equipped at the time to assess whether the European Commission's submission would assist it in the determination of an issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the Parties.

16.     On 26 February 2016, the Claimants filed a Memorial on the Merits together with its supporting documentation ("**Claimants' Memorial**" or "**Cl. Mem.**"), including: witness statements of Mr Hans Bünting, Mr Ulrich Schäfer, Mr Alan Henderson, and Mr Robert Navarro; the expert report of Compass Lexecon dated 24 February 2016, together with Exhibits CLEX-001 to CLEX-0147; Exhibits C-0016 to C-0212; and Legal Authorities CL-0001 to CL0094.

3

17.    On 7 April 2016, the Claimants notified the Tribunal that they were going through a corporate restructuring process.

18.    On 13 April 2016, the Tribunal invited the Respondent to comment on the Claimants' letter of 7 April 2016.

19.    On 21 April 2016, the Respondent informed the Tribunal that it reserved its right to submit its comments about the Claimants' restructuring process at the timely procedural step.

20.    By letter of 25 April 2016, the Claimants responded to the Respondent's letter and requested the Tribunal to instruct the Respondent to refrain from making any untimely submissions. This was followed by the Respondent's comments by letter of 29 April 2016.

21.    After consultation with the Parties, on 11 May 2016, the President of the Tribunal confirmed that the Hearing would be held at the World Bank Conference Centre in Paris, France from 15 May until 20 May 2017 (the "**Hearing**").

22.    On 20 May 2016, the Tribunal took note that the Respondent would comment on the Claimants' corporate restructuring process in its Counter-Memorial on the Merits and Memorial on Jurisdiction. The Tribunal also allowed the Claimants to raise any objections to the Respondent's comments if they saw fit, as long as reference was made to the Claimants' letter of 24 March 2016.

23.    On the same date and in accordance with the procedural calendar, the Respondent filed a Counter-Memorial on the Merits and Memorial on Jurisdiction together with supporting documentation ("**Respondent's Counter-Memorial**" or "**Resp. C – Mem**"), including: the witness statement of Mr Juan Ramón Ayuso; the expert report of BDO dated 20 May 2016; Exhibits R-0001 to R-0254; and Legal Authorities RL-0001 to RL-0067.

24.    On 20 June 2016, the Claimants submitted a copy of the agreement regarding the merger by absorption of RWE Innogy GmbH by RWE International SE.

25.   On 21 June 2016, the European Commission filed a Second Application for Leave to intervene as a Non-Disputing Party pursuant to ICSID Arbitration Rule 37(2) ("**EC's Second Application**").

26.   On 24 June 2016, the President of the Tribunal invited: (i) the Parties to provide any observations on the EC's Second Application; and (ii) the Respondent to comment on the merger agreement provided by the Claimants on 20 June 2016.

27.   On 5 July 2016, each party filed their observations on the EC's Second Application.

28.   On the same date, the Respondent filed its comments on the Claimants' merger agreement provided on 20 June 2016.

29.   On 13 July 2016, the Tribunal issued Procedural Order No. 3 regarding the EC's Second Application, making the following ruling:

> "*Ruling:*
>
> (i)   *Subject to (ii) below, the European Commission's Application for Leave to Intervene as a Non-Disputing Party dated June 21, 2016 is accepted with respect to sub-paragraphs 27(i) and (ii) of the Application.*
>
> (ii)  *The deadline for filing of the European Commission's written amicus curiae submission will be one month from the date of this Order. The submission will be limited to the matters of jurisdiction identified in the Application, and will be limited to 25 pages in length (following the same format as the Application). No permission is given to the European Commission to attend any hearing in these proceedings.*
>
> (iii) *The Application is rejected with respect to its sub-paragraph 27(iii). Accordingly, the European Commission shall have no access to the documents filed in this case.*
>
> (iv)  *There be no order as to costs (either with respect to the determination of the Application or the subsequent consideration and determination of such written amicus curiae submission as is submitted in accordance with the above).*"

30.     On 22 July 2016, following exchanges between the Parties, the Claimants filed the Parties' Joint Document Production Application with their respective Redfern Schedules for the Tribunal to decide on production of documents. On 26 July 2016, the Respondent confirmed its agreement to the Joint Document Production Application submitted by the Claimants. Together with the Parties' Joint Document Production Application, the Claimants filed two annexes, which they later identified as Exhibits C-0213 and C-0214.

31.     On 1 August 2016, the Claimants informed the Tribunal that the Claimants' Redfern Schedule submitted on 22 July 2016 was incomplete, as a number of the requests had been inadvertently omitted. The Claimants filed a corrected version of the Joint Document Production Application of 22 July 2016, that replaced the one originally filed. On 2 August 2016, the Respondent confirmed its agreement to the text contained in the corrected version.

32.     On 11 August 2016, pursuant to ICSID Arbitration Rule 37(2), the European Commission filed a written *amicus curiae* submission in accordance with the Tribunal's instruction on Procedural Order No. 3 ("**EC's *amicus curiae* submission**").

33.     On 23 September 2016, the Tribunal issued Procedural Order No. 4 concerning the Parties' Joint Document Production Application.

34.     On 29 September 2016, the Parties submitted an agreed amendment to the procedural calendar.

35.     On 30 September 2016, the Respondent filed a submission regarding the Spanish Council of Ministers' discussions Minutes as outlined in Procedural Order No. 4. On 7 October 2016, the Claimants filed their objections in such regard.

36.     On 25 October 2016, the Tribunal issued Procedural Order No. 5 addressing the Claimants' requests on production of documents regarding discussions of the Council of Ministers of Spain.

37.     On 3 November 2016, the Parties informed the Tribunal of their agreement to a one-week extension of the deadline for the filing of the Reply and the amended procedural calendar.

On the same date, the Tribunal confirmed the revised procedural calendar, as agreed by the Parties: the Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction would be filed on 11 November 2016; the Respondent's Rejoinder on the Merits and Reply on Jurisdiction on 13 January 2017, and the Claimants' Rejoinder on Jurisdiction on 24 February 2017.

38.    On 11 November 2016, the Claimants submitted a Reply on the Merits and Counter-Memorial on Jurisdiction ("**Claimants' Reply**" or "**Cl. Reply**"), with supporting documents including: a second expert report of Compass Lexecon; Exhibits C-0215 to C-0332; Legal Authorities CL-0095 to CL-0160; and four appendixes: Appendix 1 – Table of Spanish Supreme Court Judgments, Appendix 2 – the Claimants' Consolidated Table of Defined Terms, Appendix 3 – The Claimants' Consolidated List of Factual Exhibits and Appendix 4 – The Claimants' List of Legal Authorities.

39.    On 24 November 2016, the Respondent filed a request dated 18 November 2016 for the Tribunal to decide on the admissibility of the Award rendered in *Isolux Netherlands BV v Spain (SCC Arbitration V2013/153)* ("*Isolux* **award**") as new evidence on the record, together with a request for the Tribunal to order the Parties and their counsel to keep the *Isolux* award strictly confidential.  The Respondent also requested that both Parties be allowed to submit a brief submission regarding the *Isolux* award.

40.    On 28 November 2016, following an invitation from the Tribunal of 27 November 2016, the Claimants filed their observations to the Respondent's request of 24 November 2016. In their communication, the Claimants invited the Respondent to confirm whether Isolux Netherland BV had consented for the *Isolux* award to be included in the record of this proceeding.

41.    By communication of the same date, the Tribunal invited the Respondent to comment on the Claimants' communication and, in particular, to confirm whether Isolux Netherlands BV had consented for the *Isolux* award to be put on the record in this proceeding.

42.    The Parties' subsequent communications (the Respondent's communications of 29 November 2016, 15 and 22 December 2016, and the Claimants' communications of 5

and 16 December 2016) referred to the issue of confidentiality that had been raised with respect to the *Isolux* award.

43. On 11 January 2017, the Parties informed the Tribunal of their agreement to extend the deadlines for the Parties' Memorials and translations. On the same date, the Tribunal confirmed the extension of the deadlines for the remaining submissions and translations, as agreed by the Parties.

44. On 19 January 2017, the Respondent filed a Rejoinder on the Merits and Reply on Jurisdiction together with its supporting documentation ("**Respondent's Rejoinder**" or "**Resp. Rej.**"), including: the second witness statement of Juan Ramón Ayuso; the second expert report of BDO, Exhibits R-0254 Bis to R-0336; and Legal Authorities RL-0068 to RL-0087.

45. On 20 January 2017, the Respondent requested the Tribunal for leave to include under a footnote reference to a legal authority that was inadvertently omitted from its Rejoinder on the Merits and Reply on Jurisdiction of 19 January 2017.

46. On 24 January 2017, the Tribunal authorised the Respondent to include a legal authority as a footnote reference, and to provide updated Spanish and English versions of its Rejoinder on the Merits and Reply on Jurisdiction.

47. By letter of 2 February 2017, the Respondent requested leave from the Tribunal to file two additional documents which had become known to the Respondent after the submission of the Rejoinder of the Merits: (i) the Claimants' Cuatrecasas Legal Report titled "*changes to the legal framework applicable to solar thermal plants*" as Exhibit R-337, and (ii) the European Commission's Decision regarding the ECT, in a Czech State Aid procedure, which is publicly available in the European Commission website, as Exhibit R-0338. The Respondent also ratified its request to add to the record of the proceedings the *Isolux* award.

48. On 3 February 2017, the Tribunal invited the Claimants to make any observations they might have on the Respondent's request. The Tribunal also informed the Parties that it

would decide on the Respondent's request regarding the *Isolux* award, together with the Respondent's request of 2 February 2017.

49. On 9 February 2017, the Claimants filed observations to the Respondent's request of 2 February 2017.

50. On 13 February 2017, the Tribunal posed certain questions to the Parties concerning the issue of confidentiality raised with respect to the *Isolux* award, and fixed the deadlines for the Parties to submit their respective responses (the Respondent by 20 February 2017 and the Claimants by 27 February 2017).

51. On 15 February 2017, at the request of the Respondent, to which the Claimants had no objections, the Tribunal extended the above deadlines to 27 February 2017 for the Respondent and 13 March 2017 for the Claimants.

52. Pursuant to the revised schedule, the Parties filed their respective responses to the Tribunal's questions concerning the confidentiality of the *Isolux* award.

53. By letter of 24 February 2017, the Tribunal invited: (i) the Claimants to provide a "*Memo on the fulfilment by Marquesado Solar SL of the conditions described in sections e) and f) of article 4 of Royal Decree 6/2009 of 30 April for the registering of the thermosolar plant promoted by it in the Registry for Pre-Assignation of Tariff*" issued by CMS Albiñana & Suarez de Lezo (the "**Further CMS Note**"), to which the Claimants had referred to in their letter of 9 February 2017, and (ii) the Respondent to produce the confidentiality order or agreement in the *Isolux* matter.

54. On 27 February 2017, the Claimants produced the *Further CMS Note* referred to in the Claimants' letter of 9 February 2017. On the same date, the Tribunal acknowledged receipt of the Claimants' submission and invited the Respondent to file a brief submission, if it so wished, on the *Further CMS Note*.

55. On 2 March 2017, the Respondent submitted a response to the Tribunal's invitation of 24 February 2017, clarifying that there was no further confidential agreement between

the Parties of the *Isolux* matter different than the one established in the Procedural Order No. 1 issued by the tribunal of the case.

56.  On 2 March 2017, the Claimants filed a Rejoinder on Jurisdiction ("**Claimants' Rejoinder**" or "**Cl. Rej.**"), including Exhibits C-0333 to C-0335, and three Appendixes: Appendix 1 – the Claimants' Consolidated List of Defined Terms, Appendix 2 – the Claimants' Consolidated List of Factual Exhibits and Appendix 3 – the Claimants' List of Legal Authorities.

57.  On 6 March 2017, the Respondent filed a submission regarding the *Further CMS Note*, in accordance with the Tribunal's directions of 24 February 2017.

58.  By letter of 8 March 2017, the Claimants requested the opportunity to file a pre-hearing skeleton brief, recalling that such a possibility was left open during the first session to be considered at a later stage. By communication of the same date, the Respondent objected to the Claimants' proposal, mainly for reasons of cost, and because in its view such additional pleadings were not reasonably justified.

59.  In preparation for the Hearing, by letter of 13 March 2017, the Tribunal (i) invited the Parties to prepare an agreed consolidated USB with the Parties' submissions; (ii) proposed dates for a Pre-Hearing Organisational Meeting provided under Section 19.1 of Procedural Order No. 1; (iii) provided a Draft Agenda for the Pre-Hearing Organisational Meeting, inviting the Parties to submit a joint proposal advising the Tribunal of any agreements on the agenda items, or of their respective positions; and (iv) after considering the position of the Parties on the question of skeleton arguments/outline submissions, the Tribunal invited the Parties to submit Skeleton Arguments/Outline Submissions of up to 20 pages long, as follows: (i) the Claimants by three weeks before the hearing (i.e., by Monday, 24 April 2017), and (ii) the Respondent by ten days prior to the hearing (i.e., by Friday, 5 May 2017).

60.  On 18 March 2017, the Tribunal confirmed that the Pre-Hearing Organisational Meeting would be held by telephone conference on Thursday, 30 March 2017.

61.   On 22 March 2017, the Tribunal issued Procedural Order No. 6 concerning the Respondent's request filed on 24 November 2016 for authorisation to add the *Isolux* award to the record, making the following ruling:

> (i)   "*Subject to (iii) below, the Respondent is not excluded from deploying before this Tribunal extracts from the Isolux award containing the reasoning of that tribunal, together with an English translation of the same.*
>
> (ii)  *The Respondent shall inform the Tribunal within 7 days of the steps taken, if any, pursuant to the invitation to it at item No. 41 of the Redfern Schedule appended to PO No. 4.*
>
> (iii) *The Parties shall seek to agree between themselves any specific confidentiality protections that they may consider appropriate with respect to the Isolux award and any decision or award that may eventually be made available to this Tribunal in accordance with (ii) above, and shall report back to the Tribunal in this respect within 14 days.*"

62.   On 28 March 2017, the Parties submitted a Joint Draft Agenda for the Pre-Hearing Organisational Meeting, including the Parties' confidentiality agreement on the use of the *Isolux* award.

63.   On 28 and 29 March 2017, each of the Parties submitted a proposed schedule for the Hearing.

64.   On 30 March 2017, the Tribunal held a Pre-Hearing Organisational Meeting with the Parties by telephone conference.

65.   On 31 March 2017, the Tribunal issued Procedural Order No. 7 reflecting the agreements and decisions taken during the Pre-Hearing Organisational Meeting.

66.   On 6 April 2017, in accordance with Tribunal's letter of 2 February 2017, the Respondent filed two new exhibits: (i) R-0337 - *Memorandum on Changes to the legal framework applicable to solar thermal plants by Cuatrecasas*, dated 27 January 2011, and (ii) R-0338 - *State Aid SA.40171 (2015/NN) – Czech Republic Promotion of electricity production from renewable energy sources*, dated 28 November 2016.

11

67.    On 18 April 2017, the Claimants filed their comments on the Respondent's Exhibits R-0337 and R-0338, and on 26 April 2017, the Respondent sent a message in such regard.

68.    On 19 April 2017, the Claimants filed a request for the Tribunal to decide on the admissibility of five exhibits as new evidence. On 25 April 2017, the Respondent filed observations on the Claimants' request. By letter of 25 April 2017, the Tribunal took note that the Respondent had no objection to the filing by the Claimants of two of the exhibits: Exhibit C-0339 - *Order ETU/130/2017 dated 17 February 2017*, and Exhibit C-0340 - *CNMC Report on the draft order dated 12 January 2017*. As a result, the Tribunal decided to admit those two documents into the record as the Claimants' Exhibits C-0339 and C-0340.

69.    On 24 April 2017, the Claimants filed a Skeleton Brief, as did the Respondent on 5 May 2017.

70.    On 27 April 2017, the Claimants filed a response to the Respondent's observations of 25 April 2017 on the Claimants' request for admissibility of new evidence of 19 April 2017.

71.    By letter of 28 April 2017, the Tribunal authorised the Claimants to add into the record: Exhibit C-0336 (*Iberdrola Presentation* "*Renewable Energies in Spain: New Regulation (RD 661-2007)*" dated 29 May 2007);   Exhibit C-0337 (Iberdrola's Presentation *"Renewable Energies in Spain: New Regulation (RD 661-2007)"* dated 22 October 2009); and Exhibit C-0338 (*Iberdrola Renovables, S.A. and Subsidiaries Audit Report, Consolidated Financial Statements and Consolidated Management Report for the year ended December 31, 2010* dated 22 February 2011). The Tribunal also authorised the Respondent to add into the record: Iberdrola's presentation called "*Renewable Energies: New Regulation*", dated 17 March 2004. This presentation was filed by the Respondent on 10 May 2017 as Exhibit R-0339.

72.    On 8 May 2017, the Claimants filed a request for the Tribunal to decide on the admissibility of the award rendered in *EISER Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v Kingdom of Spain* (ICSID Case No. ARB/13/36) (the "***Eiser award***") as new evidence on the record. On 9 May 2017, the Respondent stated that it

did not have objections to the Claimants' request. Accordingly, with the Tribunal's authorisation, on 10 May 2017, the Claimants filed the *Eiser* award in its English and Spanish versions as CL-0170.

73.    On 10 May 2017, with the Claimants' agreement and the Tribunal's authorisation, the Respondent filed a Supreme Court Judgment of 12 April 2012 as Exhibit R-0144, to replace another Judgment that had been mistakenly filed as Exhibit R-0144.

74.    A hearing on the merits and jurisdiction was held at the World Bank Conference Centre in Paris, France from 15 May to 19 May 2017 (the "**Hearing**"). The following persons were present at the Hearing:

*Tribunal*:
Mr Samuel Wordsworth QC              President
Ms Anna Joubin-Bret                      Arbitrator
Mr Judd L. Kessler                        Arbitrator

*ICSID Secretariat*:
Ms Mercedes Cordido-Freytes             Secretary of the Tribunal
de Kurowski

*For the Claimants*:
Counsel:
Mr Antonio Vázquez-Guillén             Allen & Overy LLP
Mr Jeffrey Sullivan                      Allen & Overy LLP
Mr Antonio Jiménez-Blanco               Allen & Overy LLP
Ms Marie Stoyanov                        Allen & Overy LLP
Ms Virginia Allan                        Allen & Overy LLP
Mr David Ingle                           Allen & Overy LLP
Mr Tomasz Hara                           Allen & Overy LLP
Ms Stephanie Hawes                       Allen & Overy LLP
Mr Gonzalo Jiménez-Blanco               Allen & Overy LLP

Parties:
Mr Jutta Dissen                          Innogy (RWE)
Mr Gunnar Helberg                        Innogy (RWE)

*For the Respondent*:
Counsel:

|  |  |
|---|---|
| Mr Diego Santacruz | Ministry of Justice |
| Mr Francisco Javier Torres | Ministry of Justice |
| Ms Elena Oñoro | Ministry of Justice |
| Mr Antolín Fernández | Ministry of Justice |
| Ms Patricia Fröhlingsdorf | Ministry of Justice |

Parties:

|  |  |
|---|---|
| Ms Carmen López | IDEA |
| Ms Carmen María Roa | IDEA |

*Court Reporter(s)*:

|  |  |
|---|---|
| Ms Claire Hill | English-Language Court Reporter (The Court Reporter Ltd) |
| Mr Leandro Iezzi | Spanish-Language Court Reporter (DR-Steno) |
| Ms Luciana Sosa | Spanish-Language Court Reporter (DR-Steno) |

*Interpreters*:

|  |  |
|---|---|
| Mr Jesús Getan Bornn | English-Spanish Interpreter |
| Ms Amalia Thaler de Klemm | English-Spanish Interpreter |
| Ms Roxana Dazin | English-Spanish Interpreter |

75.     During the Hearing, the following persons were examined:

*On behalf of the Claimants*:

Witnesses:

|  |  |
|---|---|
| Mr Hans Bünting | Innogy (RWE) |
| Mr Robert Navarro | Innogy (RWE) |
| Mr Alan Henderson | Innogy (RWE) |

Experts:

|  |  |
|---|---|
| Mr Pablo Spiller | Compass Lexecon |
| Mr Antón García | Compass Lexecon |
| Mr Alan Rozenberg | Compass Lexecon |
| Mr Rui Pratinha | Compass Lexecon |

*On behalf of the Respondent*:

Witness:

|  |  |
|---|---|
| Mr Juan Ayuso | IDEA |

14

Experts:
Mr David Mitchell                    BDO
Mr Gervase Macgregor                 BDO
Ms Susan Blower                      BDO
Mr Eduardo Pérez                     BDO
Mr Javier Espel                      BDO
Mr Manuel Vargas                     BDO

76. By letter of 26 May 2017, the Tribunal (i) took note of the Parties' agreement regarding the further proceeding, as informed by the Parties during the last day of the Hearing, and amended by the Parties' emails of 26 May 2017; and (ii) posed a number of questions to the Parties to be addressed in their Post-Hearing Briefs.

77. On 7 July 2017, the Parties filed the Final Transcripts of the Hearing, incorporating the corrections agreed by the Parties.

78. By letter of 11 July 2017, the Claimants requested leave to submit two additional documents into the record: (i) *Transcript of the Spanish Parliamentary Session No. 13 on Energy, Tourism and Digital Agenda dated 28 June 2017* (as Exhibit C-0343); and (ii) *Article in Cinco Días: "Nadal wants to cut renewables premium by half" dated 26 June 2017* (as Exhibit C-0344).

79. By letter of 12 July 2017, the Respondent filed observations in such regard.

80. By communication of 13 July 2017, the Tribunal informed the Parties that unless either party raised any objection by 14 July 2017, the Tribunal had decided (i) to extend the deadline for the filing of the Parties' simultaneous Post-Hearing Briefs by two (2) weeks; (ii) to authorise the Claimants to incorporate the Additional Documents into the record as Exhibits C-0343 and C-0344); (iii) to invite the Respondent to submit any responsive documents within ten days; and ( iv) that the Parties could comment as they saw fit on the new documents in their Post-Hearing Briefs.

81. The Parties filed simultaneous Post-Hearing Briefs on 28 July 2017, including answers to the questions posed by the Tribunal on 26 May 2017. The Respondent filed with its Post-Hearing Brief Exhibits R-0345 to R-0353.

82.    By letter of 30 July 2017, the Claimants requested the Tribunal to (i) strike Exhibits R-0345 to R-0353 from the record; (ii) strike paragraphs 174 and 182 from the Respondent's Post-Hearing Brief where the Respondent referred to those new exhibits; and (iii) direct Spain to file a revised Post-Hearing Brief not containing paragraphs 174 and 182 and otherwise left unchanged for the exclusion of evidence. On 31 July 2017, the Respondent filed observations on the Claimants' request for the exclusion of the new evidence.

83.    On 31 July 2017, the Tribunal, considering that no prejudice would be caused to the Claimants so long as they had the opportunity to respond to the new documents, admitted them into the record, and invited the Claimants to comment on exhibits R-0345 through R-0353. The Claimants were also encouraged to include any such comments in a revised version of their Post-Hearing Brief. On 7 August 2017, the Claimants thus filed a revised Post-Hearing Brief.

84.    On 23 November 2017, the Respondent filed a request for the Tribunal to decide on the admissibility of a Decision from the European Commission regarding the Spanish State Aid Framework for Renewable Sources (the "**EC Decision on State Aid**") into the record, and to allow the Parties to file a short submission regarding the implications of the EC Decision on the issues discussed in this proceeding.  On 30 November 2017, the Claimants filed observations on this request.

85.    On 30 November 2017, following the resignation of Arbitrator Anna Joubin-Bret, the Secretary-General notified the Parties of the vacancy on the Tribunal and the proceeding was suspended pursuant to ICSID Arbitration Rule 10(2).  On 12 January 2018, Ms Anna Joubin-Bret accepted her reappointment as arbitrator by the Respondent in accordance with ICSID Arbitration Rule 11(1).

86.    On 14 January 2018, the Tribunal decided to allow the introduction of the EC Decision on State Aid onto the record on the basis that its relevance and weight would be assessed by the Tribunal together with all the materials submitted. Subsequently, on 19 January 2018, the Respondent filed as its Legal Authority RL-0089 the European Commission's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support

16

for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste, together with a submission as to its relevance and importance. On 26 January 2018, the Claimants filed their *Reply to Respondent's Comments on the European Commission's Decision SA.40348 (2015/NN)*.

87.    On 2 March 2018, the Claimants filed a request for the Tribunal to decide on the admissibility of the final award rendered in *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v Kingdom of Spain* (SCC Arbitration (2015/063)), dated 15 February 2018 (the "***Novenergia* award**") as an additional legal authority into the record. The Claimants further requested that the Tribunal allow the Parties to file brief comments on the relevance of the *Novenergia* award in the event that the document was admitted into the record.

88.    Following the Tribunal's invitation, the Respondent filed observations on 9 March 2018 on the Claimants' request of 2 March 2018, concerning the admissibility of new documents. With regard to the *Novenergia* award, the Respondent requested leave from the Tribunal to file the clarifications, corrections and/or complements of that award and the further Judgment rendered by the competent Swedish Jurisdictional Court in the appeal filed against the *Novenergia* award. The Respondent further requested authorisation from the Tribunal to file into the record: (i) the award rendered in the *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic* (ICSID Case No. ARB/14/3), dated 27 December 2018 (the "***Blusun* award**"); (ii) the Final award rendered in the *Mr Jürgen Wirtgen, Mr Stefan Wirtgen, Mrs Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v The Czech Republic*, dated 11 October 2017 (the "***Wirtgen* award**"); and (iii) the Final Judgment issued by the Court of Justice of the European Union (the "**CJEU**"), in Case C-284/16, *Slowakische Republik v Achmea BV* (the "***Achmea* Judgment**").

89.    Following the Tribunal's invitation, the Claimants filed a response on 13 March 2018 to the Respondent's observations and further request of 9 March 2018, concerning the admissibility of new documents.

17

90.     On 15 March 2018, the Tribunal decided to allow the introduction into the record of (i) the *Novenergia* award, together with, so far as they were in existence as of that date, any clarifications, corrections and/or supplements to the *Novenergia* award and the Judgment in the appeal filed against the *Novenergia* award; (ii) the *Wirtgen* award*; and (iii) the *Achmea* Judgment. The Tribunal invited the Parties to submit comments on their relevance. The Respondent's application to introduce into the record the *Blusun* award was denied because it was already on the record.

91.     On 22 March 2018, the Claimants requested leave from the Tribunal to file the *Novenergia* award without having to wait for the Respondent's further documents.

92.     By email of 22 March 2018, the Respondent informed the Tribunal that an Application for Clarification, Amendment and Correction of calculation errors of the *Novenergia* award was filed on 14 March 2018, but that no Resolution had been issued yet. The Respondent submitted with its communication: (i) the Respondent's Comments on the *Achmea* Judgment together with four annexes, including the *Blusum* award; (ii) the *Wirtgen* award and the Dissenting Opinion, both as RL-89; and (iii) the *Achmea* Judgment, as RL-90.

93.     On 23 March 2018, the Claimants filed a request for the exclusion of the new legal authorities attached as annexes to the Respondent's comments to the *Achmea* Judgment submitted on 22 March 2018. This was followed by the Respondent's observations of the same date.

94.     On 28 March 2018, the Claimants filed comments on the *Wirtgen* award and the *Achmea* Judgment. On 2 April 2018, the Claimants filed the *Novenergia* award, together with their comments on its relevance. On 11 April 2018, the Claimants filed a revised submission on the *Achmea* Judgment incorporating their observations on Annexes 2-4 to the Respondent's submission on the *Achmea* Judgment.

95.     On 16 May 2018, the European Commission offered to update the EC's *amicus curiae* submission of 11 August 2016 in light of the *Achmea* Judgment, and set out its view on the consequences of that judgment for pending arbitration cases based on the ECT (the

"**EC's Communication**").  On 31 May 2018, the Tribunal invited each Party to file its observations on the EC's Communication.

96. On 29 May 2018, the Claimants requested leave (i) to introduce the award dated May 16, 2018 rendered in *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain* (ICSID Case No. ARB/14/1) (the "***Masdar* award**") as an additional authority to the record; and (ii) to allow the Parties to file simultaneous submissions on its relevance.  On 30 May 2018, the Tribunal invited the Respondent to comment on the Claimants' request and, by letter of 5 June 2018, as revised by letter of 6 June 2018, the Respondent filed its observations.

97. On 6 June 2018, the Tribunal decided to allow the Claimants to introduce the *Masdar* award as an additional authority, and the Parties to submit consecutive comments on its relevance. The Tribunal emphasised (i) that it would not be assisted by any attempt to re-litigate issues that were before the *Masdar* tribunal, and (ii) that the *Masdar* award might (or might not) be of assistance to the Tribunal because of the persuasive (or otherwise) nature of the reasoning on issues of law, and not because of the facts, given that the facts in the present case are unique (just as those of the *Masdar* case).

98. On 7 June 2018, each Party filed observations on the EC's Communication.

99. On 13 June 2018, the Claimants filed the *Masdar* award as CL-0191, together with their comments thereon. The Respondent's comments followed on 20 June 2018.

100. On 22 June 2018, the Tribunal accepted the European Commission's invitation of 16 May 2018 to update the EC's *amicus curiae* submission dated 11 August 2016.

101. On 13 July 2018, the European Commission filed its updated *amicus curiae* submission (the "**EC's Updated Submission**"), together with annexes 1 to 6.

102. On the same date, the Tribunal informed the Parties that, upon receipt of the EC's Updated Submission, the Respondent would be able to submit comments of up to three pages within the following seven days, and then the Claimants likewise within a further seven days.

103.    On 24 July 2018, the Respondent informed the Tribunal that it had not been able to submit its comments by the deadline, because of a hearing in another case, and requested leave to submit its comments on 25 July 2018. On the same date, the Claimants informed the Tribunal that although the deadline for the Respondent's comments had expired, they had no objections to the Respondent's request.

104.    Also, on 24 July 2018, the Secretary of the Tribunal informed the Parties, that the Respondent's request had been granted, with its comments due on 25 July 2018. The Claimants would be afforded a similar extension of the deadline, if they so wished, in which case their comments on the EC's Updated Submission would be due by 6 August 2018. Accordingly, the Respondent filed its comments on 25 July 2018, and the Claimants theirs on 6 August 2018.

105.    On 10 August 2018, the Claimants requested leave (i) to introduce the award dated 15 June 2018 rendered in *Antin Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v Kingdom of Spain* (ICSID Case No. ARB/13/31) (the "***Antin award***") as an additional authority to the record; and (ii) to allow the Parties to file simultaneous submissions on its relevance.  On 17 August 2018, the Respondent filed observations on the Claimants' request of 10 August 2018, regarding the *Antin* award. On 20 August 2018, the Tribunal allowed the Claimants to introduce the *Antin* award as an additional authority, and the Parties to submit consecutive comments on its relevance. Thus, on 27 August 2018, the Claimants filed this award as CL-0192, together with their comments thereon. The Respondent's comments followed on 3 September 2018.

106.    On 12 September 2018, the Claimants requested leave (i) to introduce the "Decision on the *Achmea* Issue" dated 31 August 2018 issued in *Vattenfall AB and others v Federal Republic of Germany* (ICSID Case No. ARB/12/12) (the ***Vattenfall* Decision**) as an additional authority to the record; and (ii) to allow the Parties to file simultaneous submissions on its relevance.

107.    On 21 September 2018, the Respondent expressed that it did not have objections and, on 23 September 2018, the Tribunal authorised (i) Claimants to introduce the *Vattenfall* Decision as an authority, as agreed by the Parties, and (ii) the Parties to submit

consecutive comments on its relevance.[1] Thus on 2 October 2018, the Claimants filed this Decision as CL-0193, together with their comments thereon. The Respondent's comments followed on 9 October 2018.

108.    On 25 January 2019, the Respondent requested authorisation from the Tribunal to submit to the record the "*Declaration of the Representatives of the Governments of the Member States, of 15 January 2015 on the legal consequences of the judgment of the Court of Justice in Achmea and on Investment Protection in the European Union*" (the "**Declaration of 15 January 2019**").

109.    On the same date the Parties informed the Tribunal of their agreement to file simultaneous submissions on costs on 8 February 2019.[2]

110.    On 30 January 2019, the Claimants opposed the Respondent's request of 25 January 2019, noting that in the event that the Tribunal was minded to allow the Respondent to introduce the Declaration, the Claimants requested leave to introduce as additional authorities to the record: (i) the "*Declaration of the Representatives of the Governments of the Member States, of 16 January 2019, on the enforcement of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union*" signed by the Representatives of the Governments of Finland, Luxembourg, Malta, Slovenia and Sweden (the "**Five Member States' Declaration**"); and (ii) the "*Declaration of the Representative of the Government of Hungary, of 16 January 2019, on the legal consequences of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union*", signed by Hungary ("**Hungary's Declaration**").

---

[1] On 26 September 2018, Arbitrator Joubin-Bret, informed the Parties of her intention to participate in the Euro-Mediterranean Community Conference in Madrid on 19 and 20 October 2018. The Claimants filed observations on 3 October 2018. Subsequently, by letter of 8 October 2018, Arbitrator Joubin-Bret clarified certain questions regarding the conference program, and informed the Parties that she had decided to cancel her participation in the conference, where she could be replaced by one of her colleagues.

[2] On 3 October 2018, the Tribunal had informed the Parties on the status of the Award and invited the Parties to confer and submit to the Tribunal's consideration an agreed date for the simultaneous filing of the Parties' submissions on costs.

111.   On 1 February 2019, the Tribunal authorised the submission (i) by Respondent of the Declaration; and (ii) by Claimants of the additional Declarations identified in Claimants' letter of 30 January 2019, and fixed the deadlines for the Parties to submit comments on their relevance. Accordingly, on 5 February 2019, the Respondent filed the Declaration and the Claimants in turn introduced the Five Member State's Declaration and Hungary's Declaration. In accordance with the Tribunal's directions, the Respondent filed its comments on 12 February 2019, and so did the Claimants on 19 February 2019.[3]

112.   On 26 February 2019, each Party filed a Submission on Costs.[4]

113.   On 11 April 2019, the Respondent filed a request for leave from the Tribunal to submit the Decision on Responsibility and on the Principles of Quantum rendered in the *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l v Kingdom of Spain* (ICSID Case No. ARB/13/30) (the "***RREEF* Decision**"), on 30 November 2018, jointly with the Partially Dissenting Opinion. On 22 April 2019, the Claimants filed observations on the Respondent's request of 11 April 2019. On 25 April 2019, the Tribunal allowed the Respondent to introduce the Decision and Partial Dissent, and the Parties to submit consecutive comments.

114.   On 3 May 2019, the Respondent filed the *RREEF* Decision and the *RREEF* Partial Dissent as RL-099EN and RL-100EN, respectively, together with their comments thereon. The Claimants comments followed on 10 May 2019.

115.   On 9 August 2019, the Claimants requested the Tribunal (i) to confirm that it had sufficient availability to work expeditiously to issue the Award; (ii) to declare the

---

[3] On 25 February 2019, the Secretary of the Tribunal transmitted to the Parties the following message from the President of the Tribunal: "*I have recently become aware that, in a bilateral investment treaty case in which I am instructed on issues of jurisdiction and liability (only), BDO (Mr Gervase MacGregor) is acting as the expert on quantum for the opposing party (the case concerns the alleged expropriation and other BIT breaches with respect to a Finnish investor's property in Egypt in the early 2000s). I have not been following the issues on quantum in that case, have not read and will not read the report(s) prepared by BDO in that case, and will not attend the hearing during the examination of the BDO expert or be in any way involved in that aspect of the case. The above of course does not affect in any way my impartiality and independence as arbitrator in this case.*"

[4] On 6 February 2019, the Claimants had informed the Tribunal of the Parties' agreement to request an extension of the deadline for the Parties to submit their submissions on costs until 26 February 2019. Following the Respondent's confirmation on 7 February 2019 of its agreement, on the same date the Tribunal confirmed the extension of the deadline, as agreed by the Parties.

proceeding closed in accordance with Rule 38(1) of the ICSID Arbitration Rules; and (iii) to provide clarity as to when it intends to render its Award.

116.   On 13 August 2019, the Tribunal provided the following update to the Parties: "Since its letter of 3 October 2018, the Tribunal has met for deliberations in person, and has additionally held multiple teleconferences and kept regular contact by email, almost on a weekly basis. The Tribunal has concluded its deliberations and has very recently completed its final draft, albeit that time must be allowed for final edits, translation, and proofreading, a process which may push delivery into the early autumn (…)".

## III.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

### A.    THE CLAIMANTS' CLAIMS

117.   The Claimants submit that Spain has violated Article 10(1) of the ECT, and that the Claimants are entitled to relief accordingly. In particular, it is alleged that:

    i)   "Spain has breached its obligation to accord, at all times, FET to the Claimants' investments. This is because:

        a.   Spain's measures have violated the Claimants' reasonable and legitimate expectations at the time the relevant investment decisions were made;

        b.   Spain has failed to provide a stable and predictable regulatory framework;

        c.   Spain's implementation of the New Regime was not transparent, and the New Regime does not provide certainty as to the economic and regulatory regime that will apply to the Claimants' investments in Spain from now on;

        d.   Spain's actions are profoundly unreasonable, as Spain's justifications behind the measures (the Tariff Deficit and overcapacity of the RE infrastructure) are the result of Spain's own regulatory decisions; and

        e.   Spain's actions are disproportionate, as there is no reasonable relationship between the burden imposed on the Claimants' investments and the stated goal of addressing the Tariff Deficit.

> Spain's measures had a disproportionate impact on RWE's investments – significantly reducing the fair market value of the Claimants' investments and causing damages in an amount superior to EUR 275 million – and were adopted notwithstanding Spain's alternative options to adopt less harmful measures with respect to ECT-protected investments.

> ii)   Spain caused substantial impairment of the Claimants' investments through unreasonable measures; and

> iii)  Spain's wrongful measures depart from the obligations it entered into with respect to the Claimants' investments, in breach of the umbrella clause under Article 10(1) of the ECT (the **Umbrella Clause**). Those obligations, specifically to "grandfather" the Claimants' already-existing installations, i.e., not to subject them to future tariff reviews, were endorsed in RD 436/2004, and RD 661/2007, as well as in the July 2010 Agreement and RD 1614/2010, regarding the 'guaranteed' application of the RD 661 economic regime going forward."[5]

## B.    THE CLAIMANTS' REQUESTS FOR RELIEF

118.   The Claimants included in their Request for Arbitration ("**RfA**") the following Request for Relief:

> (i)    "declaring that Spain has violated Articles 10 and 13 of the ECT, as well as its obligations under the applicable rules and principles of international law;

> (ii)   requiring that Spain make full reparation to the Claimants for the injury or loss to their investments arising out of Spain's violations of the ECT and international law, by way of: (1) full restitution to the Claimants by reinstating the legal and regulatory framework in place before the issuance of, including but not limited to, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the Ministerial Order; or (2) full compensation to the Claimants for all losses suffered by them as a result of Spain's violations of the ECT and international law, in an amount to be determined in the course of these proceedings, including interest on all amounts awarded at a reasonable rate;

> (iii)  directing Spain to pay all costs incurred in connection with these arbitration proceedings, including the costs of the arbitrators and ICSID, as well as the legal and other expenses incurred by the Claimants, including but not limited to the fees of their legal counsel, experts and

---

[5] Cl. Mem. ¶ 73.

consultants and those of the Claimants' own employees, on a full indemnity basis, plus interest thereon at a reasonable rate;

(iv) directing Spain to pay post-award interest, compounded monthly, on the amounts awarded until full payment thereof; and

(v) any other relief the Arbitral Tribunal may deem appropriate in the circumstances."[6]

119.    In the Claimants' Memorial on the Merits dated 26 February 2016, they requested the following Request for Relief:

(i)    "DECLARING that Spain has breached Article 10(1) of the ECT; and

(ii)    ORDERING that Spain:

a.    provide full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered before restitution; or

b.    pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT; and

in any event:

a.    pay the Claimants pre-award interest at a rate of 7.61% compounded monthly; and

b.    pay the Claimants post-award interest, at a rate of 7.61% compounded monthly from the date of the award until full payment thereof; and

c.    pay the Claimants the costs of this arbitration on a full-indemnity basis, including all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel, experts and consultants; and

d.    any other relief that the Tribunal may deem just and proper."[7]

---

[6] RfA ¶ 128.

[7] Cl. Mem. ¶ 580.

120.    The Claimants reserved their rights to amend or supplement their Memorial on the Merits and to request such additional, alternative or different relief as may be appropriate.[8]

121.    In the Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 11 November 2016, they included the following Request for Relief:

> "The Claimants repeat the relief set out at paragraph 580 of the Memorial and also ask the Tribunal to dismiss all of Spain's jurisdictional objections. In addition to the reservation of rights contained at paragraph 581 of the Memorial, the Claimants also reserve their right to address any discrepancies that the Claimants subsequently discover between the English and the Spanish versions of Spain's Counter-Memorial, the Claimants having relied on the English translation."[9]

122.    In the Claimants' Rejoinder on Jurisdiction dated 2 March 2017, the Claimants included the following Request for Relief:

> "Insofar as Spain's jurisdictional Objections are concerned (and in addition to the relief set out at paragraph 580 of the Claimants' Memorial and paragraph 736 of the Claimants' Reply), the Claimants hereby request the Tribunal to:
>
> • dismiss both of Spain's jurisdictional Objections; and
>
> • order that Spain bear the Claimants' costs associated with these jurisdictional Objections."[10]

## C.    THE RESPONDENT'S POSITION

123.    In the Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 20 May 2016, the Respondent requested the Tribunal to:

> a)    "Declare its lack of jurisdiction over the claims of the Claimants or, if applicable, the inadmissibility of said claims.
>
> b)    Secondarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the claims of the Claimants

---

[8] Cl. Mem. ¶ 581.

[9] Cl. Reply ¶ 736.

[10] Cl. Rej. ¶ 77.

regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to section III herein, with regard to the Merits.

c) Secondarily, to dismiss all the Claimant's claims for damages as the Claimant has no right to compensation, in accordance with section V herein; and

d) Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment."[11]

124. The Respondent reserved the right to supplement, modify or complement its Counter-Memorial on the Merits and Memorial on Jurisdiction and present any and all additional arguments that might be necessary in accordance with the ICSID Convention, the ICSID Rules of Arbitration, procedural orders and the directives of the Arbitral Tribunal in order to respond to all allegations made by the Claimants in regard to this matter.[12]

125. In its Rejoinder on the Merits and Reply on Jurisdiction dated 19 January 2017, the Respondent asked the Tribunal to:

a) "Declare its lacks of jurisdiction to hear the claims of the Claimants, or if applicable their inadmissibility, in accordance with what is set forth in section III of this Document, referring to Jurisdictional Objections;

b) Secondarily, for the case that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, that it dismiss all the claims of the Claimants on the merits because the Kingdom of Spain has not breached in any way the ECT, in accordance with what is stated in paragraphs (A) and (B) of section IV of this Document, on the substance of the matter;

c) Secondarily, to dismiss all the Claimants' claims for damages as said claims are not entitled to compensation, in accordance with section V of this Document; and

d) Sentence the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees,

---

[11] Resp. C-Mem. ¶ 1084.
[12] Resp. C-Mem. ¶ 1085.

and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment."[13]

126.    The Respondent again reserved the right to supplement, modify or complement its Rejoinder on the Merits and Reply on Jurisdiction and present any and all additional arguments that may be necessary in accordance with the ICSID Convention, the ICSID rules of arbitration, procedural orders and the directives of the Arbitral Tribunal in order to respond to all allegations made by the Claimants with regard to this matter.[14]

## IV.    LEGAL AND FACTUAL BACKGROUND

127.    The following section of the Award sets out an overview of the legal and factual background to the dispute, referring in turn to (A) the most important elements of the electricity generation regime into which the Claimants invested, (B) the actual investments of the Claimants, (C) the disputed measures, and (D) the Spanish court decisions on which emphasis has been placed by the Respondent.

### A.    THE SPECIAL REGIME: LEGAL AND ECONOMIC FRAMEWORK

128.    From the mid-1990s, Spain has sought to develop its renewable energy ("**RE**") generation sector.

#### (1)    The 1997 Electricity Law (Law 54/1997)[15]

129.    On 27 November 1997, Spain adopted Law 54/1997 on the Electric Power Sector ("**Law 54/1997**"). According to its Preamble, the basic purpose of Law 54/1997 was "to regulate the electricity sector with the traditional, three-fold goal of guaranteeing the supply of electrical power, its quality and the provision of such supply at the lowest cost possible."

---

[13] Resp. Rej. ¶ 1136.

[14] Resp. Rej. ¶ 1137.

[15] **C-0028/R-0003**, Law 54/1997, on the Electricity Sector (the 1997 Electricity Law), 27 November 1997 (published 28 November 1997) (hereinafter "**Law 54/1997**"), Arts. 27 *et seq.*

130.  The financial regime for activities regulated by Law 54/1997 was established by its Title III, including Article 15 "Remuneration of activities" which provided as follows:

> "1. The activities involved in the supply of electric power shall be remunerated economically in the manner provided by this Act, as charged to the rates and prices paid.
>
> 2. To determine the rates and prices that consumers must pay, the remuneration of activities shall be stipulated in regulations with objective, transparent and non-discriminatory criteria that act as an incentive to improve the effectiveness of management, the economic and technical efficiency of said activities and the quality of the electricity supply."[16]

131.  Law 54/1997 distinguished in its Title IV between the "Ordinary regime" for electricity generation (Chapter I of Title IV) and the "Special regime" (Chapter II of Title IV), which applied to installations generating no more than 50 MW and in particular to "non-consumable renewable energies" (Article 27(1)). Pursuant to Article 27(2) of this Law, generation under the special regime was to be "governed by specific provisions and, in cases not provided for in these special provisions, by the general regulations on electricity generation where applicable."[17]

132.  Article 28(1) then established a requirement of prior administrative authorisation for *inter alia* the construction and operation of installations under the special regime, whilst a series of rights and obligations for such installations was established by Article 30. In particular, Article 30(4) provided:

> "4. The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases:
>
> a) The installations referred to in letter a) of point 1 in article 27.
>
> b) Hydroelectric power stations whose installed capacity is equal to or less than 10 MW and all other installations referred to by letter b) of point 1 in article 27.

---

[16] **R-0003**, Law 54/1997, p. 33.

[17] **R-0003**, Law 54/1997, p. 47; see also Art. 16(7) with respect to remuneration.

For the purposes of this Act, neither solid urban waste nor hazardous waste shall be considered biomass.

c) Hydroelectric plants of between 10 and 50 MW, the installations referred to in letter c) of point 1 of article 27 as well as the installations mentioned in the second paragraph of point 1 in article 27.

To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets."[18]

133. According to the Respondent, this provision established the principle of "reasonable return", which it portrays as the stable basis of the remunerative regime with respect to the production of energy from renewable sources.[19] It portrays this as a key, overarching concept, that (i) requires a balance between the cost of the premiums for consumers and profitability for the investor, (ii) has a dynamic character, (iii) represents a guarantee for the investor, and (iv) imposes on the regulator an obligation of a result.[20] The Claimants contend that the reference to "reasonable return" in Law 54/1997 is undetermined and unquantified, and thus has no meaning on its own, except when implemented through regulations establishing the tariff to which qualifying RE installations are entitled, which is what RD 2818/1998 did by implementing the Special Regime FIT ("feed-in" tariff system: "**FIT**").[21]

134. Law 54/1997 also provided (in its Sixteenth transitory provision) that: "*In order for renewable energy sources to cover at least 12% of Spain's total energy demand by the year 2010, a plan shall be drawn up to promote renewable energies and whose objectives shall be taken into account in the setting of premiums.*"

---

[18] **R-0003**, Law 54/1997, pp. 50-51.

[19] Resp. C-Mem. ¶¶ 335-355, Resp. Rej. ¶¶ 301 *et seq*.

[20] Resp. C-Mem. ¶ 342.

[21] Cl. Reply ¶¶ 270-271.

(2)    **Royal Decree 2818/1998**[22] (**"RD 2818/1998"**) **and the Plan for Renewable Energy Promotion 2000-2010 ("2000 PER")**[23]

135.    RD 2818/98 was subsequently promulgated to "[*t*]*he regulatory development, as regards the special plan of Law 54/1997 … in relation to the requirements and procedures to adhere to the special plan, to the registration procedures in the corresponding Record …*",[24] establishing a regime of incentives for installations under the special regime. According to the Preamble of RD 2818/98, "*for the facilities based on renewable energies and waste, the incentive established has no time limit as the environmental benefits need to be internalised, and because of their special characteristics and technological level, their higher costs do not allow them to compete in the free market*."[25]

136.    The incentives established by RD 2818/98 were in the form of a premium to be paid on top of the market price for power generated or alternatively a fixed tariff for each kWh of electricity sold, in lieu of the market price (Articles 26 and 28).[26] Pursuant to Article 32, there was to be a review every four years "*taking into account changes in the price of electric energy in the market, the share of these facilities in the coverage of demand and their impact on the technical management of the system.*"[27]

137.    According to the Claimants, the incentives established by RD 2818/98 were to apply during the whole useful life of RE plants,[28] whilst the (i) FIT mechanism, (ii) encouragement of and reward for efficiency in production, (iii) choice between Premium and Regulated Tariff, and (iv) availability of the FIT for the life of the installation were to remain common features of the Spanish RE regulatory framework throughout the

---

[22] **C-0177**, Royal Decree 2818/1998 of 23 December 1998, on electricity production installations supplied by renewable energy, waste or cogeneration (hereinafter "**RD 2818/1998**").

[23] **C-0035/R-0118**, Ministry of Science and Technology and IDAE (the *Instituto para la Diversificación y Ahorro de la Energía*), "Plan for the Promotion of Renewable Energy in Spain 2000-2010" (hereinafter "**Renewable Energy Promotion Plan 2000-2010**" or "**2000 PER**"), December 1999.

[24] **C-0177**, RD 2818/1998, Article 1.

[25] **C-0177/R-0098**, RD 2818/1998.

[26] *See also*, Cl. Mem. ¶¶ 131-136. **C-0177**, RD 2818/1998, Article 28; Compass I ¶¶ 64-67; **C-0152**, Harpen 2003 Report, p. 5; Cl. Skeleton ¶¶ 14-16.

[27] **C-0177/R-0098,** RD 2818/1998; Cl. Mem. ¶ 136; Resp. C-Mem. ¶ 395.

[28] Cl. Mem. ¶ 108; Claimants' oral opening at day 1/69.

entire period that RWE made its investments in Spain.[29] According to the Respondent, the remuneration framework was designed to meet the legal principle of reasonable return, did not include the "grandfathering" of the subsidies, while factors relating to the economic sustainability of the electricity system or the reasonableness of the profitability received could make it possible at any time to make reforms other than those provided for in RD 2818/1998.[30]

138.    The RD 2818/1998 regime was in force when the Claimants first invested in the Spanish wind and hydro sectors.[31] Under this regime, nine of the Claimants' plants began operating.[32]

139.    On December 1999, Spain approved the 2000 PER for the promotion of RE, establishing a series of targets per area that would enable renewable energy sources to meet at least 12% of Spain's primary energy demand by 2010.[33] The Claimants submit that the plan acknowledged that one of the key elements for its success was the recognition that, for investors, financial resources were dependent upon the principles of profitability, opportunity and stability.[34]

140.    According to the Respondent, the 2000 PER indicated that it was not necessary to increase the remuneration for wind and hydroelectric technologies to reach the target. The plan established the methodology for determining the remunerative regime of the RE which consisted of:

> "defining, within each technology and according to the state of the art existing from time to time, different standard facilities. Once these standard facilities had been determined, different standards were established in each

---

[29] Cl. Mem. ¶ 31.

[30] Resp. C-Mem. ¶¶ 25 and 394-395.

[31] Cl. Reply ¶ 284.

[32] Resp. C-Mem. ¶ 387; Cl. Mem., Appendix 4: List of facilities. These facilities were: i) wind technology: Wind Farm in Acampo Armijo, Wind Farm la Ciesma de Grisel, Wind Farm Bosque Alto; Wind Farm Plan de María; Wind Farm Río Gallego; Wind Farm Plana de la Balsa; Wind Farm Los Labrados; Wind Farm Plana de Zaragoza; ii) hydroelectric technology: Mora Hydroelectric Plant; Villalgordo Hydroelectric Plant.

[33] Cf. Cl. Mem. ¶ 269; Compass Report ¶ 117.

[34] Cl. Mem. ¶ 123; **C-0035**, Renewable Energy Promotion Plan 2000-2010, Introduction.

one of them (investment cost, operation cost, useful life of the plant, hours of rewarded production, market price) that allowed such plant to reach, in a given period of time (useful life), a reasonable return according to the cost of money in the capital market."[35]

(3) **Royal Decree 436/2004 and Further Implementing Regulations, including Royal Decree No. 661/2007**

a. ***Royal Decree 436/2004 ("RD 436/2004")***[36]

141. On 27 December 2002, RD 1432/2002 was adopted, establishing the methodology for the approval or modification of the average or reference tariff (the "*tarifa media de referencia*": "**TMR**").

142. On 12 March 2004, the Spanish Government enacted RD 436/2004, which repealed RD 2818/1998.[37]

143. As part of the backdrop to this new regulation, on 27 September 2001, the European Union (the "**EU**") issued Directive 2001/77/EC ("**2001 Renewables Directive**") which mandated the Member States of the EU to take certain actions to meet the objectives of the Kyoto Protocol. According to the Claimants, the 2001 Renewables Directive recognised the need to provide government-backed economic incentives for RE power generation projects, including through FITs.[38] The Respondent accepts that the 2001 Renewables Directive recognised the need to give public aid to RE, although it emphasises that this would be as set by States within the obligations imposed by Articles 87 and 88 of the Treaty on State Aid. According to the Respondent, in 2014 the Court of

---

[35] Resp. C-Mem. ¶ 405; **R-0118**, Renewable Energy Promotion Plan 2000-2010, pp. 200-218.

[36] **C-0016,** Royal Decree 436/2004 of 12 March 2004, establishing the methodology for the updating and systematisation of the legal and economic regime for electric power production in the Special Regime (published on 27 March 2004) (hereinafter "**RD 436/2004**" or "**RD 436**").

[37] Cl. Mem. ¶¶ 32-33; Resp. C-Mem. ¶ 409.

[38] Cl. Mem. ¶ 113; **C-0178**, Directive 2001/77/EC of the European Parliament and Council on the promotion of electricity produced from renewable energy sources, Official Journal of the European Union Series L 283, 27.10.2001, Recital (12) and Recital (14).

Justice of the European Union ("**ECJ**") recognised as State aid the amounts that end users pay to private companies producing energy.[39]

144.  As explained in the Preamble to RD 436/2004, the plant operator would have a choice to sell energy produced in return for remuneration in the form of a regulated tariff, i.e. a single, flat rate defined as a percentage of the TMR fixed in accordance with RD 1432/2002, or to sell directly in the market, in which case the operator would receive the market price plus an incentive and a premium if the specific plant was entitled to receive one (as also calculated by reference to the TMR, although specified on a case-by-case basis taking into account the criteria mentioned in Article 30(4) of Law 54/1997). The Preamble continued:

> "Whichever remuneration mechanism is chosen, the Royal Decree guarantees operators of special regime installations fair remuneration for their investments and an equally fair allocation to electricity consumers of the costs that can be attributed to the electricity system although incentives are offered for market participation because this is deemed to be the way to minimise administrative intervention in the setting of electricity prices as well as to better, and more efficiently allocate the system costs especially with respect to deviation (differences) management and the provision of ancillary services."

145.  Article 1(a) further defined the purpose of the Decree as to "update, systematise and consolidate the regulatory provisions issued to develop and implement the legislation on the legal regime for electric power production in the special regime covered by" Law 54/1997. The economic regime outlined in the Preamble was provided for in Articles 22-23. Article 22 established that operators had a choice between a fixed tariff and payment of a payment above the wholesale market price per kWh of energy produced, while pursuant to Article 23, the regulated tariff and the premium were to be calculated by

---

[39] Resp. C-Mem. ¶¶ 309-310; **RL-0015**, Directive 2001/77/EC, Recital (12); **RL-0019**, Court Order of 22 October 2014, issued in a Preliminary Ruling C-275/13 ("***Elcogás Case***") ¶ 21: "in order for benefits to be classified as aid in the sense established in Article 107.1 TFEU, they must be granted directly or indirectly through State resources, on the one hand and, on the other, be attributable to the State." ¶ 33: "the sums awarded to a private electricity producer that are financed by all the end users of electricity within the national territory and distributed among the companies in the electricity sector by a public organisation according to predetermined legal criteria constitute aid granted by the State or through State resources."

reference to set percentages of the TMR, fixed each year in accordance with Article 2 of RD 1432/2002.

146.    Pursuant to Article 40(1) of RD 436/2004, "in view of the findings of the monitoring reports on the degree of performance of the renewable energies promotion Plan", the tariffs and premiums as defined in the Decree were to be revised in 2006, and then every four years. However, as established by Article 40(2) and (3), such revisions were not to have any backdated effect:

> "2. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall come into force on January 1st of the second year subsequent to the year that the revision has been carried out.
>
> 3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums."[40]

147.    Article 34(5) also provided specifically in relation to wind energy:

> "Notwithstanding the provisions of article 40, whenever group b.2 [installations that solely use wind power as primary energy] reaches 13,000 MW of installed capacity the figures for the tariffs, incentives and premiums stated in this article shall undergo revision."[41]

148.    RD 436/2004 also established a transitional scheme. Pursuant to the Second Transitory Provision: "*Electric power production installations covered under Royal Decree 2818/1998, dated December 23rd, which on the entry into force of this Royal Decree have full registration in the Administrative Register of special regime production installations attached to the Ministry of Economy, shall have a transitional period available to them until January 1st 2007.*" Pursuant to this provision, it was also permitted to opt for such installations to be covered by RD 436/2004 right away.

---

[40] **C-0016/R-0100**, RD 436/2004, Article 40.

[41] According to Cl. Reply, ¶ 340, this 13,000 MW figure was passed in the course of 2007.

149.   The Claimants contend that RD 436/2004 guaranteed the economic conditions that it contained for the entire life of a plant, and also established a stability commitment, according to which future changes to the RE tariffs would not apply to installations that had already achieved start-up unless of equivalent or better economic terms.[42]  Relying on the report of 14 February 2007 of Spain's National Energy Commission ("**CNE**"),[43] the Claimants say that Article 40.3 of RD 436/2004 "*introduced an explicit grandfathering guarantee*",[44] and they also contend that Spain's internal documents confirm that the greater stability provided for by RD 436/2004 was specifically to incentivise investment.[45]

150.   The Respondent submits that RD 436/2004 was linked to the 2000 PER and responded to the same methodology for determining the remunerative regime of the RE established in the 2000 PER, i.e. the subsidies granted were calculated through a methodology aimed at granting a standard facility a reasonable return over a given period of time.[46] It contends that the wording of Article 40.3 of RD 436/2004 is confined and does not extend to all possible revisions to the remunerative regime.[47] The Respondent also says that RD 436/2004 linked the evolution of the subsidies in the collection to the evolution of the

---

[42] Cl. Mem. ¶ 33; **C-0016**, RD 436/2004, Article 40.3; Bünting Statement ¶ 49; Claimants' oral opening at day 1/78-79.

[43] **C-0249**, CNE, "Report 3/2007 on the proposed RD regulating the activity of electricity production under the special regime", 14 February 2007, (hereinafter "**CNE Report 3/2007**"), pp. 23-24. As noted in **C-0103**, Pöyry Report, *Report, Current and Future State of Wind Energy in Spain and Portugal*, 1 July 2007 (hereinafter "**Pöyry July 2007 Report (Wind)**"), p. 30: "The CNE (*Comisión Nacional de Energía*) was created by the Hydrocarbons Law (Law 34/1998) and acts as the regulatory entity of the energy sector. The powers of CNE are limited at present to consultation, participation, inspection, arbitration, and the provision of reports." *See also*, the position of the Respondent at Day 2/18-19.

[44] Cl. Reply ¶¶ 291-292; Bünting Statement ¶ 53. The principle of "grandfathering" was explained by the Claimants in their oral opening, day 1/57, as follows: "*Once an investment is made, it is entitled to the tariff for its service life, and we know the cost of renewable will come down over time, but only new investments take advantage of that cost reduction. ... That is why you have this grandfathering principle ... .*"

[45] Cl. Reply ¶ 293; referring to **C-0263**, Draft Proposal for RD 436/2004, dated 30 January 2004, pp. 3-4; **C-0264**, *Memoria Económica* for RD 436/2004, undated, p. 10; **C-0265**, Ministry of Economy Report on RD 436/2004, 9 February 2004, p. 1.

[46] Resp. C-Mem. ¶¶ 409(b) and 411.

[47] Resp. C-Mem. ¶¶ 423-427; **R-0100**, RD 436/2004, Article 40.3.

TMR, which potentially endangered the economic sustainability of the Spanish Electricity System ("**SES**") in addition to producing situations of over-remuneration.[48]

b.    *The 2005-2010 Plan for Renewable Energy ("2005 PER")*[49]

151.    In August 2005, Spain published a Renewable Energies Plan for 2005-2010 (the "**2005 PER**"), maintaining the 12% target for energy from renewable sources that had been set in the Plan for 2000-2010.[50]

152.    The 2005 PER noted that satisfactory progress had been made with respect to wind energy, but that small-scale hydroelectric energy generation had grown more slowly than envisaged. Certain areas, including solar, were identified as growing at well below the desired rates. A new target was set for the wind energy sector in the form of an increase in output of 12,000 MW over the period 2005-2010 (which would mean ending the decade with a total installed potential of 20,155 MW).[51] It was also stated with respect to wind energy that it was "*essential that the current legislative framework be retained without substantial changes over the period 2005-2010 (Law 54/1997 on the Electricity Sector and Methodology for Revision of Tariffs established in Royal Decree 436/2004 on the Special System).*"[52]

---

[48] Resp. C-Mem. ¶ 26.

[49] **C-0034**, 2005-2010 Renewable Energy Plan.

[50] Ministry of Science and Technology and IDAE, "Plan for the Promotion of Renewable Energy in Spain 2005-2010", August 2005. *See*, the Summary at **C-0047** and extracts at **C-0034** and **R-0119**. According to a report from Pöyry dated March 2011 entitled "Current State and Future Trends of Solar Power in Spain" submitted by the Respondent: "The renewable energy planning documents - Plan de Energías Renovables ("**PER**") - set out the specific growth projections for each technology and breaks it down by autonomous region. Based on the documents, the Government sets a tariff (published in the form of a Royal Decree) for each technology depending on the level of growth that is required from each technology. Renewable energy planning documents are the best indicators of the future development of the different renewable technologies." *See*, **R-0277**, Pöyry, Current and Future Trends in the Spanish Solar Sytem, March 2011, p. 22.

[51] **C-0047**, 2005-2010 PER Summary p. 17. *See*, pp. 20-23 for the target re hydroelectric power generation. *See also*, Henderson Statement, ¶ 17, referring to this 20,155 MW target.

[52] **C-0047**, Ministry of Industry, Tourism and Commerce & IDEA, Summary of the Spanish Renewable Energy Plan (PER) 2005-2010, p. 40. At Cl. Reply, ¶ 301, the Claimants also rely on and emphasise a passage p. 48 where it was said that "it is necessary to provide further incentives if possible in particular technology areas in order to make them more attractive to future investors." However, it appears from the context that this does not concern wind energy (or micro-hydro).

153.    The 2005 PER included a detailed section on the funding of the Plan. In introducing this section, reference was made to a stable regulatory framework, and it was explained that the funding requirements were established on the basis of an assumed 7% return (after tax) for a standard facility.[53]

154.    The Claimants submit that the 2005 PER laid the groundwork for further improvements to the Special Regime, and recognised that the legal framework of wind energy must be maintained without substantial changes between 2005-2010.[54] They say that the stability of the framework was recognised as the decisive factor.[55]

155.    The Respondent claims that the 2005 PER is essential to understanding the remuneration scheme set in RD 661/2007, and that the plan "*followed the traditional methodology and established its profitability targets for the plants in a given period of time (lifetime) based on the calculation of the costs of the standard facilities for the various technologies and revenue forecasts, according to the prevailing macroeconomic circumstances.*"[56] The Respondent contends that the remuneration scheme set the different parameters required for each standard facility to reach a return on the project close to 7% on equity throughout its lifetime.[57]

c.    *Royal Decree Law 7/2006 ("RDL 7/2006")*[58]

156.    On 23 June 2006, the Spanish Government adopted Royal Decree Law 7/2006 which, through its Article 1, de-linked the calculation of tariffs and premiums from the TMR (as

---

[53] **C-0034**, 2005-2010 Renewable Energy Plan. The Claimants rely on an extract from the 2005 PER, p. 52, stating with respect to Law 54/1997 and RD 436/2004: "Royal Decree 436/2004, on the Special Regime, explains the law, and establishes an economic regime guaranteed for the whole life of the facility, by updating and revising the legal regime that affects photovoltaic solar energy." However, this passage is concerned with the photovoltaic sector, and does not appear in the equivalent passages of the detailed sections in the 2005 PER dealing with wind and hydroelectric power.

[54] Cl. Mem. ¶¶ 142-143; **C-0047**, Ministry of Industry, Tourism and Commerce & IDAE, "*Summary of the Spanish Renewable Energy Plan (PER) 2005-2010*", August 2005, p. 40.

[55] Claimants' oral opening at day 1/83.

[56] Resp. C-Mem. ¶ 446.

[57] Resp. C-Mem. ¶ 456; **R-0119**, Renewable Energy Plan 2005-2010 ¶ 274.

[58] **C-0053**, Royal Decree Law 7/2006, on the adoption of urgent measures for the energy sector, 23 June 2006 (hereinafter "**RDL 7/2006**"), Preamble.

the method of calculation under RD 436/2004 was having an unforeseen upwards impact on the rates of tariffs and premiums) and froze the tariffs. This was intended as an urgent and temporary measure, with the intention being that new regulations be developed for the establishment of tariffs and premiums. Industry associations (including the **APPA** and **AEE** of which the Second Claimant is an active member) reacted with extreme hostility.[59]

157.    The Claimants submit that RDL 7/2006 provided further incentives: (i) froze the consumer tariff paid by electricity consumers for the purposes of determining the FIT for RE installations,[60] and (ii) conferred on qualifying RE installations priority of access to the transmission and distribution network.[61] This was done to enhance the economic regime for RE to comply with the EU's policy.[62]

158.    According to the Respondent, RDL 7/2006 was adopted to correct the negative effects that RD 436/2004 had on the sustainability of the SES caused by the ties of the RE subsidies to the TMR.[63] Thus, RDL 7/2006 froze the subsidies of the Special Regime until a new remuneration model was developed, as well as de-linking the calculation of tariffs and premiums from the TMR.[64] The Claimants accept this point as to de-linking.[65]

---

[59] *See*, **R-0015,** *The Controversial Energy Decree-Act*, APPA Alegaciones magazine No. 22, May-July 2006; and **R-0016,** APPA Info magazine No. 23, August-December 2006. Representatives of the Second Claimant attended the meetings of the APPA and the AEE, at least from 2008: *see*, e.g. Mr Henderson at Day 3/3-4. *See also*, Resp. C-Mem. ¶ 439-442; **R-0224,** "Review Economic Regime of Renewable Energy; Report on APPA proposals", November 2006.

[60] **C-0053, RDL 7/2006,** Second Transitional Provision.

[61] Cl. Mem. ¶ 149; **C-0053,** RDL 7/2006, Article 1 ¶ 12, amending Article 30(2)(b) of the 1997 Electricity Law.

[62] Cl. Mem. ¶¶ 148 and 149.

[63] Resp. C-Mem. ¶¶ 432 and 437.

[64] Resp. C-Mem. ¶¶ 26 and 437; **R-0088,** RDL 7/2006, Second Transitory provision. "Until the regulatory implementation of the provisions contained in paragraphs one to twelve of Article 1 in accordance with the provisions of the second final provision of this Royal Decree-Law: 2. The revision of the average rate performed by the Government shall not apply to prices, premiums, incentives and tariffs that form part of the remuneration of the activity of production of electricity in the special regime.".

[65] Claimants' oral opening at day 1/85.

d.    *Royal Decree No. 661/2007 of 25 May 2007 ("RD 661/2007")*[66]

159.    New draft regulations were published in November 2006, and these were reviewed by the CNE in a report of 14 February 2007, following adverse reaction to the draft from industry bodies such as the APPA and the AEE.[67] The CNE listed out a number of "fundamental criteria" that it considered must influence the legal and economic regulation of electricity production, including:

> "**(b) Minimize regulatory uncertainty.** The NEC [National Energy Commission] understands that transparency and predictability in the future of economic incentives reduce regulatory uncertainty, incentivising investments in new capacity and minimizing the cost of financing, thus reducing the final cost to the consumer. The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility. In each case, regulation must provide both transparent annual adjustment mechanisms, associated to robust trend indexes (such as the average or reference tariff, the CPI, ten-year bonds, etc.) and regular reviews that only affect new facilities (e.g. every four years) with regard to investment costs, which could also affect the reduction of operating costs at existing facilities."[68]

160.    The CNE also stated, however, that it did not regard legal certainty or the protection of legitimate expectations as meaning that legislation would be immune to reform:

> "As shown both in the scientific doctrine and case law, in a social and democratic State of Law the principles of legal certainty and protection of legitimate expectations cannot be built on insurmountable obstacles to the innovation of a body of law, nor can they be used as instruments to petrify current Law at any moment. In other words, the principle of legal certainty is not by definition as anti-evolutionary or conservative principle; it does not mean that legislation is resistant or immune to reform. In this sense, these principles do not impede dynamic innovation … . Thus the principles

---

[66] Royal Decree No. 661/2007 of 25 May 2007, regulating the activity of electricity production under the special regime (published on 26 May 2007) (hereinafter "**RD 661/2007**" or "**RD 661**").

[67] **C-0249/R-0128,** CNE Report 3/2007, regarding the proposed Royal Decree, regulating the activity of electricity production under the special regime and of certain facilities of comparable technology under the ordinary regime, 14 February 20017 (hereinafter "**CNE Report 3/2007**").

[68] **C-0249/R-0128**, CNE Report 3/2007, p. 16, bold in original. *See also*, p. 24: "The developers who have invested in special regime production facilities during the validity of Royal Decree 436/2004 have done so in stable regulatory conditions, fundamentally based on a secure and predictable regulated tariff during the entire service life of the facility. The guarantees covered in Royal Decree 436/2004 have allowed cheaper financing, with lower project costs and a lower impact on the electricity tariff ultimately paid by the consumer."

only require that regulatory innovation—especially if sudden, unpredictable or unexpected—be carried out with certain guarantees and caution (sufficient transition periods for adaptation and, where applicable, compensatory measures) that cushion, moderate and minimise as far as possible the defrauding [sic] of expectations generated by previous regulations."[69]

161.   The new regulation, RD 661/2007, was adopted on 25 May 2007 and came into force on 1 June 2007. It is of central importance to the Claimants' case in these proceedings.[70] The Claimants say that they made the following investments on the basis of the RD 661/2007 regime: Project Ulysses, investing €363.5m (the Urvasco acquisition); Project Aldea, investing €12m; and Project Dia, investing €48m.[71] Further, consistent with the provisions of RD 661/2007, the Claimants contend that they spent €6.8m upgrading various wind plants (Grisel, Acampo, Armijo, Muel, Balsa, Labrados, and Zaragoza).[72]

162.   In its Preamble, RD 661/2007 explained that the "*modification of the economic and legal framework which regulates the special regime existing to date has become necessary for various reasons*." These reasons were stated to be:

> "First of all, the growth seen in the special regime over recent years tied to the experience accumulated during the application of Royal Decree 2818/1998, of 23 December and Royal Decree 436/2004, of 12 March, has shown the need to regulate certain technical aspects in order to contribute to the growth of those technologies, while maintaining the security of the electrical system and ensuring the quality of supply, and minimising the restrictions on the production of electricity generated in this manner. In view of the behaviour of the prices in the market, where certain variables which were not considered in the cited compensation system for the special regime have, over recent times, acquired greater importance, the economic circumstances established by Royal Decree 436/2004, of 12 March, make it necessary to modify the compensation system and de-link it from the Mean Electricity Tariff, or Reference Tariff, which has been used to date. Finally,

---

[69] **C-0249/R-0128**, CNE Report 3/2007, p. 18.

[70] **C-0017**; **R-0101**, Royal Decree 661/2007, regulating the activity of electricity production under the special regime (hereinafter "**RD 661/2007**").

[71] Cl. Skeleton ¶ 27; **C-0091**, Circular decision by Executive Board of RWE AG, April 2008; and **C-0098**, Transaction Approval Request Form (TARF) for RWE Innogy Project DIA, April 2009; Bünting Statement ¶¶ 42 and 47. *See also*, Claimants' oral opening at day 1/86.

[72] Cl. Skeleton ¶ 27.

it is necessary to include the changes in the legislation deriving from European law, and from Royal Decree-Law 7/2006 … ."[73]

163.    The Preamble further explained:

"The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable, although incentives are provided to playing a part in this market since it is considered that in this manner lower government intervention will be achieved in the setting of prices, together with better, more efficient, attribution of the costs of the system, particularly in respect of the handling of diversions and the provisions of supplementary services.

To this effect, a system which is analogous to that provided in Royal Decree 436/2004, of 12 March, is maintained, in which the owner of the facility may opt to sell their energy at a regulated tariff, which will be the same for all scheduling periods, or alternatively to sell this energy directly on the daily market, the term market, or through a bilateral contract, in this case receiving the price negotiated in the market plus a premium. …"[74]

164.    The Claimants submit that the Government introduced RD 661/2007 with the aim of achieving the EU objectives concerning RE production and the 2005-2010 PER.[75] By contrast, the Respondent argues that RD 661/2007 was adopted to ensure the economic sustainability of the SES, which could be affected by a system of subsidies linked to the TMR.[76]

165.    Pursuant to Article 9.1 of RD 661/2007, and in line with previous legislation (e.g. Article 21.4 of Law 54/1997, Article 9 of RD 2818/1998, and Article 9.1 of RD 436/2004),

---

[73] **C-0017** and **R-0101**, RD 661/2007, pp. 1-2.

[74] **C-0017** and **R-0101**, RD 661/2007, pp. 2-3.

[75] Cl. Mem. ¶ 151; Cl. Reply ¶¶ 300, 303 and 304; **C-0017**, RD 661/2007, Preamble; **C-0246**, Ministry of Industry, "Report on the draft of RD regulating the activity of electricity production under the special regime", dated 23 March 2007, p. 3.

[76] Resp. C-Mem. ¶ 460.

facilities under the special regime were subject to compulsory registration in the *Registro Administrativo de Instalaciones de Producción en Régimen Especial* (the "**RAIPRE**"):

> "In order to ensure appropriate monitoring of the special regime and in particular in order to ensure the management and control of the receipt of the regulated tariffs, the premiums and supplements, both in respect of the categories, groups, and sub-groups, the installed power, and where applicable the date of entry into service, and in respect of the evolution of the electrical energy produced, the energy sold to the grid, the primary energy employed, the useful heat produced, and the primary energy saving achieved, facilities for the production of electrical energy under the special regime shall be subject to compulsory registration in Section Two of the Public Authority Register of facilities for the production of electrical energy indicated in Article 21.4 of Law 54/1997, which is a part of the Ministry of Industry, Tourism, and Trade. Section Two of the Public Authority Register indicated above shall hereinafter be known as the Public Authority Register for production facilities under the Special Regime."[77]

166.    Chapter III of RD 661/2007 (Articles 16-23) was concerned with the rights and duties of facilities under the special regime. Article 17 established certain key rights, with Article 17.1 providing as follows:

> "Without prejudice to the provisions of Article 30.2 of Law 54/1997, of 27 November, the proprietors of production facilities under the special regime shall enjoy the following rights:
>
> a) To connect their generating unit or units in parallel to the grid of the distribution or transport company.
>
> b) Transfer to the system their net production of electrical energy or energy sold, by way of the distribution or transport company upon condition that it is technically possible for it to be absorbed by the grid.
>
> c) Receive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree. The right to receive the regulated tariff, or if appropriate the premium, shall be subject to final registration of the facility in the Register of production facilities under the special regime of the General Directorate of Energy Policy and Mines, prior to the final date set out in Article 22.

---

[77] **C-0017** and  **R-0101**, RD 661/2007, p. 16.

d) To sell all or part of their net production by way of direct lines.

e) To enjoy priority in access and connection to the electricity grid under the terms and conditions set out in Annex XI of this Royal Decree, or in such regulations as may supersede them."[78]

167. Chapter IV (Articles 24-51) then established the new economic regime. Pursuant to Article 24.1, producers under the special regime benefited from an option to choose between sale of energy on the basis of a fixed tariff or by reference to the market price plus, where appropriate, a Premium (subject to a cap and to a floor). Detailed provisions then followed for calculation of the Fixed Tariff and the Premium, including with specific respect to wind energy and hydroelectric power (Articles 36, 38 and 40). The Premium option for wind and hydro technologies was subject to (i) an upper limit or "cap" of 8.4944 €cent/kWh, and (ii) a lower threshold or "floor" of 7.1275 €cent/kWh. According to the Claimants, the fact that the lower Premium price was very close to the Fixed Tariff of 7.3228 €cent/kWh, made the Premium option more attractive.[79]

168. Article 22 established the "Period of maintenance of the regulated tariffs and premiums", providing in this respect that:

> "1. As soon as 85% of the power target for any Group or Sub-Group as established in Articles 35 to 42 of the present Royal Decree has been reached, the maximum period during which such facilities as have been registered in the Public Authority Register of production facilities under the special regime prior to the date of the termination of such period shall have the right to a premium or if applicable the regulated tariff established in the present Royal Decree for such Group or Sub-Group, which shall be no less than twelve months, shall be established by Resolution of the General Secretariat for Energy. . . ."

169. Article 44 provided for "Updating and review of tariffs, premiums, and supplements." Article 44.3, and in particular its final paragraph, are of great importance in the way the claim has been put, providing that:

---

[78] **C-0017** and **R-0101**, RD 661/2007, p. 23.

[79] Cl. Mem. ¶ 170.

> "During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously. The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed."[80]

170.    RD 661/2007 also contained detailed transitional provisions, enabling those facilities operating under RD 436/2004 to elect to continue receiving premiums under that regime until 31 December 2012 (see Transitory Provision One). It is common ground that most wind energy producers took the benefit of these provisions and remained under the old tariff regime. The Claimants' plants opted for the application of RD 436/2004 until 31 December 2012, and the application of RD 661/2007 thereafter.[81]

171.    Pursuant to the Fifth Transitory Provision of RD 661/2007, older wind farms had to upgrade their technology to qualify for the application of RD 661/2007.[82] The Claimants' case is that, in reliance on the provisions of RD 661/2007 to the effect that the tariffs would apply during the whole operational life of the plant and that any future reviews would not affect those plants that had already complied with all registration and other

---

[80] **C-0017** and **R-0101**, RD 661/2007, pp. 45-46. Cf. the first draft of what was to become RD 661/2007, as summarised by the CNE in its February 2007 report. *See*, **C-0249** and **R-0128**, CNE Report 3/2007, p. 6 (¶ 11). *See also*, **C-0266**, the *Memoria Económica* for RD 661/2007, 21 March 2007, describing the provision on revisions as ultimately included in Article 44(3), p. 9.

[81] Cl. Mem. ¶ 40.

[82] Cl. Mem. ¶ 164. **C-0017**, RD 661/2007, Transitory Provision Five.

requirements and achieved start-up, the Claimants invested funds to carry out those upgrades.[83]

172.  In light of the above provisions, the Claimants submit that RD 661/2007 provided for a FIT mechanism (Fixed Tariff or Premium), incentives based on production to encourage and reward efficiency, long-term tariff guarantee (entitlement expressly granted for the life of the installation), and the promise of "grandfathering" existing installations in the event of future tariff reviews.[84]

173.  The Respondent says that the provisions of RD 661/2007 must be analysed in harmony with the principles of Law 54/1997 and keeping in mind that RD 661/2007 maintained the link of the subsidies with the prior methodology, as well as with the base economic parameters embodied in the 2005-2010 PER.[85] It refutes the argument that, due to a "grandfathering" commitment, the Claimants' investments made between April 2001 and December 2012 became entitled to the RD 661/2007 regime during the lifetime of all the plants.[86]

174.  The adoption of RD 661/2007 was accompanied by a press release from Spain's Ministry of Industry, Tourism and Commerce entitled "The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power." This three-page document set out the basic lines of the Royal Decree. In the opening paragraph, the Ministry stated as follows (in relevant part):

> "The purpose of this Royal Decree is to improve the compensation for those technologies that are less mature, such as biomass and solar thermal, in order to be able to reach the objectives of the Renewable Energy Plan 2005-2010, as well as the objectives imposed on Spain by the EC. By developing these technologies, renewable energy in Spain will cover 12% of energy consumption in 2010. The new regulation guarantees a return of 7% for wind farms and hydro-electric facilities that opt to transfer their production

---

[83] Cl. Mem. ¶ 41.

[84] Cl. Mem. ¶ 36. *See further*, the Claimants' oral opening at day 1/86-99 identifying five key benefits arising from RD 661/2007: a FIT scheme, identifying the actual tariff, with a cap/floor, stability through Articles 22 and 44.3, and a transitional regime.

[85] Resp. C-Mem. ¶ 462.

[86] Resp. Skeleton ¶¶ 1-2.

to distributors and between 5% and 9% if they participate in the electricity production market. ... Tariffs will be revised every 4 years, taking into account the fulfilment of the objectives set out. This will make it possible to adjust the tariffs based on the new costs and the degree of fulfilment of the objectives. Future adjustments to said tariffs will not affect installations which are already in operation. This guarantees legal certainty for the electricity producer and stability for the sector, favouring development. The new legislation will not be retroactive. Facilities functioning by 1 January 2008 may keep to the previous legislation in the fixed tariff option during their entire lifespan. When they participate in the market, they may keep to their regulation prior to 31 December 2012. The emission of 6.3 million tonnes of C02 per year will be avoided by achieving the objectives set out for combined heat and power for 2010."[87]

175.    It was also reiterated at page 2 of the press release:

"Renewable energy Returns With regards to returns, the new regulation guarantees an average return of 7% for wind farms and hydro-electric facilities that opt to transfer their production to distributors and returns between 5% and 9% if they participate in the electricity production market."[88]

176.    The Claimants submit that the Spanish Government, led by the Ministry and the State Company for the Promotion and Attraction of Foreign Investment ("**InvestinSpain**"),[89] also launched a domestic and international campaign to attract foreign investments in the Spanish RE sector, highlighting the economic conditions and long-term tariff of RD 661/2007.[90] The Claimants referred in particular to presentations in 2007 in Graz,

---

[87] **C-0238,** Ministry of Industry, Tourism and Commerce, announcement of RD 661/2007, "*The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power*", 25 May 2007 (hereinafter "**Announcement of RD 661/2007**").

[88] **C-0238**, Announcement of RD 661/2007, p. 2. These figures are the same as are found in the *Memoria Económica* for RD 661/2007, 21 March 2007, at **C-0266**, 17.

[89] InvestinSpain's website explicitly states that it is "subject to control mechanisms characteristic for public limited companies that are fully owned by the [S]tate." *See*, **C-0059**, InvestinSpain website, "*About Us*", , available at <www.investinspain.org/invest/en/cabecera/about-us/index.html> (last accessed on 15 February 2016) (hereinafter "**InvestinSpain website, '***About Us*****'**").

[90] Cl. Mem. ¶¶ 181-185. *See*, **C-0059**, InvestinSpain website, "*About Us*". **C-0030**, Manuela García, "Opportunities in Renewable Energy in Spain", INTERES InvestinSpain Power Point presentation, Graz (Austria), 15 November 2007, pp. 4, 15, 18, 19, 32, 40 and 42.

Austria[91] and in Germany in 2008 on "*Opportunities in Renewable Energy in Spain*."[92] Reference was also made to two presentations made by the CNE in February 2009.[93] While the Claimants do not contend that they relied on what was said at specific presentations, they do rely on such presentations as evidence of how Spain itself understood the Special Regime that it has established.[94]

e.    *Royal Decree Law 6/2009 ("RDL 6/2009")*[95] *and the Pre-Assignment Register*

177.    On 30 April 2009, Spain adopted Royal Decree Law 6/2009. Royal Decree-Laws have the same value as a law and may be issued by the Spanish Government in cases of extraordinary and urgent need.[96]

178.    As recorded in its Preamble, RDL 6/2009 was adopted against the backdrop of the international financial crisis of 2008 and what was portrayed as an increasingly unsustainable electricity tariff deficit in Spain:

> "The growing tariff deficit, that is to say, the difference between revenue from the regulated tariffs that are set by the Administration and that consumers pay for their regulated supply and from the access tariffs that are set in the liberalised market and the real costs associated with these tariffs, is causing serious problems which, in the current context of international financial crisis, is having a profound effect on the system and placing at risk not only the financial situation of the companies that make up the Electricity Industry, but also the very sustainability of the system. This imbalance is

---

[91] **C-0030**, Manuela García, "Opportunities in Renewable Energy in Spain", INTERES InvestinSpain Power Point presentation, Graz (Austria), 15 November 2007, p. 32.

[92] Cl. Mem. ¶¶ 183-184. **C-0060**, Manuela García, "Opportunities in Renewable Energy in Spain", InvestinSpain and the Spanish Ministry for Industry, Tourism and Commerce, November 2008.

[93] Cl. Mem. ¶¶ 183-187. **C-0133**, Luis Jesús Sánchez de Tembleque, "The Regulation of Renewable Energy", CNE Power Point presentation, Barcelona, February 2009; **C-0183**, Carlos Solé Martín, Luis Jesús Sánchez de Tembleque, "Renewable Energies: The Spanish Case", CNE Power Point presentation, Cartagena de Indias, 9-13 February 2009. It is striking that if the Tariff Deficit was a problem to solve, Spain continued to encourage further RE investments that would increase the system costs. Cf. Resp. Skeleton ¶ 3.

[94] *See e.g.*, Claimants' oral opening at Day 1/103.

[95] **C-0061**, Royal Decree Law 6/2009, which adopted certain measures within the energy industry and approved the special rate, 30 April 2009 (published on 7 May 2009) (hereinafter "**RDL 6/2009**").

[96] Cl. Mem., fn. 232; Resp. C-Mem. ¶ 504. *See*, **C-0021**, Constitution of Spain of 27 December 1978, Section 86(1): "In case of extraordinary and urgent need, the Government may issue temporary legislative provisions which shall take the form of decree-laws and which may not affect the legal system of the basic State institutions, the rights, duties and freedoms of the citizens contained in Part 1, the system of the Self-Governing Communities, or the general electoral law."

> unsustainable and has serious consequences, as it undermines the security and the capacity to fund the investments needed for the supply of electricity at the levels of quality and security that Spanish society requires."[97]

179.    With specific reference to facilities under the special regime, the Preamble explained that:

> "… due to the growing impact on the tariff deficit, mechanisms are established with respect to the remunerative system of special regime facilities. The trend that these technologies are following could place system sustainability at risk in the short term, both from the economic point of view due to its impact on the electricity tariff and from the technical point of view, also compromising the economic viability of already completed facilities whose operation depends on the suitable balance between manageable and non-manageable generation. Therefore there is a need to adopt an urgent measure that serves to guarantee the necessary legal security of those who have made investments, and lays down the bases for establishing new economic regimes that encourage compliance with the intended objectives: the achievement of certain power objectives from technology at a reasonable cost for the consumer and the technological evolution thereof, which makes possible a gradual reduction in their cost and consequently their concurrence with conventional technologies."[98]

180.    Pursuant to its Article 1, RDL 6/2009 sought to eliminate the tariff deficit by 1 January 2013, amending the additional provisions to Law 54/1997 so as to provide that: "As of 1 January 2013, access fees shall be sufficient to satisfy the entire costs of the regulated activities without the possibility of any ex ante deficit appearing."[99] Article 4 of RDL 6/2009 also introduced a new requirement of registration in the Remuneration Pre-assignment Registry as a necessary condition to being awarded the right to the economic

---

[97] **C-0061**, RDL 6/2009, p. 1.

[98] **C-0061**, RDL 6/2009, pp. 3-4. Cf. the description of this part of the Preamble at Reply, ¶ 350, where it is said that it confirms the Claimants' understanding of Article 44(3) of RD 661/2007 and guarantees the fixed tariff for existing installations. At Reply, ¶ 352, the Claimants refer to section 5 of the *Memoria Económica* for RDL 6/2009, dated 5 May 2009, saying that this makes expressly clear that RDL 6/2009 was designed specifically to protect the legitimate expectations of existing investments. The passage referred to, in context, is as follows: "Application of the remuneration system foreseen in Royal Decree 661/2007, of 25 May, has proven to be excessively inflexible and ineffective to guarantee the achievement of its two fundamental objectives. In turn, if this change is not immediately put in place an irreversible situation could arise, consisting of authorised facilities being implanted no longer legally affected by the intended amendment, endangering the system's technical and economic sustainability and consequently damaging both electricity consumers and the facility owners themselves. In any case, possible expectations are taken into account, with the necessary precautions to ensure that, certainly, no acquired rights or legitimate expectations are affected without adequately foreseeing the necessary transitional regime."

[99] **C-0061**, RDL 6/2009, p. 6.

regime established in RD 661/2007, enabling the Government to stagger the entry into operation of new installations.[100]

181.    Industry associations including the APPA strongly criticised this RD.[101] Both parties agree that there was a tariff deficit in the SES and that the main goal of RDL 6/2009 was to eliminate this. According to the Claimants, by 2009 the tariff deficit was in excess of EUR 20 billion.[102] The Claimants say that the tariff deficit was caused by the Respondent's failure to comply with Law 54/1997 and ensure that end-user tariffs for electricity are at levels sufficient to cover the actual costs of the SES, including the costs of the Special Regime.[103] The Respondent say that imbalance in the SES was largely due to the sharp reduction in the demand for electricity caused by the economic crisis.[104]

f.    *Further developments in the Special Regime 2009-2010*

182.    On April 23, 2009, the EU adopted Directive 2009/28/EC (the "**2009 Renewables Directive**"),[105] fixing 2020 as the date by when the EU would seek to obtain 20% of its total energy consumption requirements from RE sources (the "**2020 Target**").[106] In accordance with the 2009 Renewables Directive, on 30 June 2010, Spain adopted a National Action Plan for Renewable Energy ("**NAPRE**") to meet the targets of the directive.[107] With respect to "Future developments in support schemes for electricity generation from renewable energies", this Plan stated that: "Electrical energy production

---

[100] It is understood that all of the Claimants' plants were in operation by this time, and this provision therefore had no direct impact on the Claimants' plants. *See*, Cl. Mem. ¶ 195. However, the Claimants contend that RDL 6/2009 confirmed their understanding that if a plant had obtained the definite RAIPRE registration it had secured its right to benefit from the economic conditions of RD 661/2007.

[101] *See*, **R-0018**, *Europe, new policy. Spain, new imposed decree*, APPA info magazine No. 29, May 2009. *See also*, Resp. C-Mem. ¶¶ 510-515; cf. Cl. Reply ¶¶ 396-397.

[102] Compass Report, Figure 8.

[103] *See e.g.*, Cl. Mem. ¶ 70; **C-0029**, Law 54/1997, on the Electric Power Sector (version as of 1 January 2008).

[104] Resp. C-Mem. ¶¶ 503 and 517.

[105] **C-0018**, Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009, on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, Official Journal of the European Union Series L 140/16, 5.6.2009, pp. 16-62 (entered into force on 25 June 2009) ("**2009 Renewables Directive**").

[106] Cl. Mem. ¶ 39.

[107] Resp. C-Mem. ¶¶ 531-532; National Action Plan for Renewable Energy in Spain (hereinafter "**PANER**") 2011-2020 (**R-0120**).

under the special procedure is founded on three basic principles, namely legal certainty, feasibility and regulatory stability."[108]

183.    The Respondent contends that, during 2010, there was an exceptional reduction in electricity demand, which among other factors, led to the need for reform in the Electricity Sector.[109]

184.    On 2 July 2010, Spain's Ministry of Industry, Tourism, and Trade issued a press release announcing that it had reached "an agreement with the solar thermal and wind power sectors to revise their rate structures" (the "**July 2010 "agreement"**").[110] This referred to a cap on the number of hours that would benefit from the tariffs of RD 661/2007, and a reduction of the Premium until 2013. However, the incentives and rates of RD 661/2007 were otherwise to be maintained.[111] The press release announced that:

> "The agreements include short-term measures, which will allow the impact on the price of electricity to be reduced, as well as long-term measures, which will guarantee stability and certainty to both sectors for its future development.
>
> The premium for wind provided by RD 661/2007 will be reduced by 35% until 2013. ...
>
> It is agreed to limit the number of hours with above-market remuneration rights for wind power and solar thermal plants, taking into account the different technologies and the provisions of the Renewable Energies Plan 2005-2010 for the calculation of the profitability of the facilities. ...
>
> With this measure, which does not jeopardise the profitability of the existing facilities, it will be guaranteed that the production of renewable energy above the expected amounts will benefit consumers and not jeopardise the financial sustainability of the system.
>
> This pact furthermore assumes the reinforcement of the visibility and

---

[108] **R-0120,** PANER 2011-2020, p. 118.

[109] Resp. C-Mem. ¶ 33.

[110] **C-0063**, Government of Spain, Ministry of Industry, Tourism and Commerce, press release: "*The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Rate Structures*", 2 July 2010 (hereinafter, "**2 July 2010 Press Release**").

[111] Cl. Mem. ¶¶ 199-204; **C-0063**, 2 July 2010 Press Release.

stability of the regulation of these technologies in the future, guaranteeing the current incentives and rates of RD 661/2007 for the facilities in operation (and for those included in the pre-registration) starting in 2013.
…

The Ministry of Industry, Tourism and Trade will immediately start the proceedings that allow the content of the agreements to transfer into regulation." [112]

185.    Shortly before the July 2010 "agreement", representatives of the First Claimant (including Mr Henderson and Mr Navarro) had met with representatives of the Government. As to this meeting, Mr Henderson said:

"They [the Spanish Government representatives] believed that Article 44.3 gave them the right to change the premium but not the fixed tariff, that was their interpretation of it, so the fixed tariff they couldn't touch, but the premium yes. And their proposal to the sector was that in return for these temporary adjustments, as I say, to reduce the premium component for a limited period, and also the operating hours, with some caps on operating hours, they would guarantee to the sector, and they did guarantee to the sector in the July 2010 agreement and subsequent legislation, that they would never again touch the parameters applicable to 661 and to our assets." [113]

186.    On 19 November 2010, Spain issued Royal Decree 1565/2010 ("**RD 1565/2010**")[114] which introduced certain technical and economic measures for the wind energy sector. This was followed on 7 December 2010 by issue of Royal Decree 1614/2010 ("**RD 1614/2010**"). [115]

---

[112] **C-0063**, 2 July 2010 Press Release, pp. 1-2.

[113] Mr Henderson, Day 3/33. *See also*, Navarro Statement, ¶ 69: "In conversation with RWE, Spain made clear that this was a temporary course of action and that normality would be restored." *See also*, **C-0191**, Minutes of the meeting held between representatives of RWE Innogy and the Ministry of Industry, 23 June 2010 (hereinafter "**Minutes of 23 June 2010 Meeting**").

[114] **R-0104**, RD 1565/2010 of 19 November 2010.

[115] **C-0065** and **R-0105**, Royal Decree 1614/2010 of 7 December 2010, regulating and modifying certain aspects relating to the production of electricity based on thermoelectric and wind technologies (published on 8 December 2010) (hereinafter "**RD 1614/2010**" or "**RD 1614**").

187.    In its Preamble, RD 1614/2010 recorded that with "the growth in wind, solar thermoelectric and photovoltaic technologies, the objectives for 2010 for installed power having been equalled and indeed exceeded", and that the support regime "must adapt, while ensuring the legal security of investments and the principle of fair return … ." A limit on the number of hours entitled to remuneration at the fixed tariff or to a premium was established by Article 2(4).[116] Article 5 of RD 1614/2010 also provided that reviews under Article 44(3) of RD 661/2007 would not apply to installations that had obtained the definitive registration in the RAIPRE on or before 7 May 2009,[117] nor to any installations that at the time of entry into force of RDL 6/2009 met the requirements for registration in the Pre-Assignment Register, and were effectively registered in the RAIPRE on or before 31 December 2013.[118]

188.    Article 5(3) thus reiterated the final sentence of Article 44(3) of RD 661/2007 with specific respect to facilities registered definitively in the RAIPRE as of 7 May 2009 and those that had met the requirements for registration in the Remuneration Pre-assignment Registry (see Article 4 of RDL 6/2009).[119]

189.    The final legislative act establishing the framework into which the Claimants were making their various investments is **Royal Decree Law 14/2010**, adopted on 23 December 2010 ("**RDL 14/2010**").[120] This RDL required producers under the ordinary

---

[116] Cl. Mem. ¶¶ 206-207; **C-0065**, RD 1614/2010, Article 5(3).

[117] It is recalled that Article 44(3) of RD 661/2007 stated that a review of the Fixed Tariffs or the Premiums would be carried out in 2010, at the end of the planning period set forth in the PER 2005-2010 and when Spain anticipated it would reach its RE installed capacity goals. **C-0065**, Article 5(3) thus provides: "Without prejudice to that which is set forth in this Royal Decree, for wind technology facilities adhered to Royal Decree 661/2007, of 25 May, the revisions of the tariffs, premiums and upper and lower limits referred to in article 44.3 of the aforementioned Royal Decree, shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009 … ."

[118] Cl. Mem. ¶ 211; **C-0065**, RD 1614/2010, Article 5(3).

[119] According to the Reply, ¶¶ 364-365, Article 5 was included despite a warning from the State Council as to this establishing "immutability" with respect to premiums in the future. Reference is made to **C-0269**, State Council Report on draft RD 1614/2010, 26 November 2010, p. 18 and **C-0268,** Memoria Económica for RD 1614/2010, p. 11. Following a careful review, the Tribunal does not see these documents as assisting the Claimants with respect to the intended scope of Article 5.3 of RD 1614/2010.

[120] **R-0090**, Royal Decree Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, 23 December 2010, Preamble (hereinafter "**RDL-14/2010**").

regime (traditional electric power plants) and under the special regime to pay an access fee for the use of transmission and distribution networks and affected the RE producers' profit.[121] According to the Respondent, this demonstrates that RD 1614/2010 was not intended to freeze the economic regime established in RD 661/2007.[122] The Claimants contend that these cuts were only for PV installations, so the wind and hydro sector did not suffer.[123] The Tribunal notes, however, that the introduction of the access fee under RDL 14/2010 was of general application, whereas certain provisions of this RDL were confined to the PV sector i.e. certain limits on operating hours.

B.    THE CLAIMANTS' INVESTMENTS IN SPAIN

190.    Between April 2001 and December 2011, the Claimants bought and developed in Spain (i) four hydroelectric plants (Cepeda and La Mora in Ávila, Chomba in Asturias, and Villalgordo in Albacete) with a total installed production capacity of approximately 12.20 MW and (ii) 16 wind farms (Grisel, Acampo-Armijo, Muel, Bosque Alto, Plana de María, Río Gallego, Lanternoso, Los Labrados, Plana de la Balsa, Plana de Zaragoza, Bancal, Siglos, Juno, Luna, Urano and Aldehuelas) with a total installed production capacity of approximately 446.75 MW.[124] The Claimants say that they invested more than EUR 577 million in these plants between 2001 and 2011.[125]

191.    As follows from the details below, the investments were acquired in three broad tranches: first, in a series of transactions in 2001 to early 2004 totalling in excess of EUR 45 million, in particular with respect to the acquisition of 100% of the share capital of Agrupació

---

[121] **R-0090**, RDL-14/2010, First transitory provision.

[122] Resp. C-Mem. ¶¶ 584-591, relying also on **R-0150**, the Supreme Court ruling of 25 June 2013 for the proposition that this was lawful as a matter of Spanish law, and noting that the Supreme Court here reiterated its conclusion that RD 661/2007 was not inalterable or unchangeable by reference to alleged principles of legal certainty and legitimate expectations and still less did such principles obstruct the regulator from taking general or non-tax measures. The Court concluded: "It is therefore legitimate to decide that all producers of electricity, without exception, should contribute through the payment of tolls to the costs that can be attributed to investments required to make it possible for the energy produced to be transported and distributed."

[123] Cl. Mem. ¶ 212.

[124] Cl. Mem. ¶ 17, Appendix 4 of Cl. Mem., **CLEX-0004**, pp. 93-94.

[125] Claimants' oral opening, Day 1/24; also at Day 1/133-135.

Energías Renovables, S.A.U. (Aersa) (the "**Aersa Acquisition**");[126] second, on 6 June 2008, the Claimants acquired a 100% interest in Urvasco Energía, S.A. (Urvasco) for EUR 363.5 million (the "**Urvasco Acquisition**");[127] third, in a series of transactions from December 2008 up until December 2012, the Claimants increased their shareholding interests in the various plants in which they already had an interest through their prior acquisitions.

192.    The Claimants' first investments were made through the First Claimant's predecessor company, Harpen AG (Harpen).[128]

193.    In April 2001, Harpen acquired the **Grisel** wind farm for EUR 3,500.[129] In June 2001, Harpen and PEG entered into an agreement with BBB Umwelttechnik Erneuerbare Energien GmbH (BBB) and Germania Windpark GmbH & Co. (GWP), in which PEG acquired from BBB all authorisations, permits and licences of the Grisel plant for EUR 3.5 million.[130]

194.    In May 2002, Harpen acquired 100% of the share capital of Agrupació Energías Renovables S.A.U. (Aersa) for EUR 42 million. Harpen thus acquired interests in the following wind farms: **Acampo Armijo** (100%); **Muel** (77.67%); **Puena de la Balsa** (81%); **Los Labrados** (81%); **Plana de Zaragoza** (81%); **Aldehuelas** (20.81%). Also through the Aersa acquisition, Harpen acquired a 100% interest in the hydroelectric plants **Chomba del Plagano**, **Cepeda** and **La Mora**, and a 60% interest in the hydroelectric plant **Villalgordo**.[131]

---

[126] Cl. Mem. ¶ 216; **C–0069**, Public deed of sale and purchase agreement between Harpen Aktiengesellschaft as buyer and Agrupación Mutua del Comercio I de la Industria, Mutua D'Assegurances I Reassegurances a Prima Fixa, Agrupación Bankpyme Seguros de Vida y Salud, S.A., and Agrupación Mutua Fondo de Pensiones as sellers, dated 17 May 2002, pp. 1 and 10; Schäfer Statement ¶ 29.

[127] Cl. Mem. ¶ 233.

[128] Cl. Mem. ¶¶ 22 and 215-219.

[129] Cl. Mem. ¶ 215.

[130] Cl. Mem. ¶ 215; **C-0174**, Public deed of sale and purchase agreement entered into between Windfarm Holding GmbH and Harpen, dated 10 April 2001; Public deed of sale and purchase agreement between BBB, GWP, Harpen and PEG, dated 18 July 2001, pp. 2, 7 and 15; Schäfer Statement ¶ 27.

[131] Cl. Mem. ¶¶ 216-234.

195.   As at the time of the Aersa Acquisiton, RWE Aersa owned 90% of Prodenergías-2, S.L. ("**Prodenergías 2**"),[132] which owned 46.26%[133] of each Parque Eólico La Luna ("**Luna**"), Parque Eólico Juno ("**Juno**") and Parque Eólico Urano ("**Urano**") through the company Danta de Energías, S.A. The percentage interest was increased to 50% on 1 April 2004 due to a capital increase in Dante, with the result that the Claimants had a 45% in Luna, Juno and Urano as of that date.[134]

196.   A draft due diligence report was produced by Price Waterhouse Coopers in April 2002 with respect to the Aersa acquisition, although this focused on the individual plants as opposed to the details of the Spanish regulatory regime.[135] In July 2002, Ilex Energy Consulting (Ilex) prepared for the Claimants a report entitled "Projecting Wholesale Electricity Prices in Spain."[136] This report drew attention to RD 2818/1998, which it described as "encourag[ing] new investments in co-generation and renewable energies by placing them under a Special Regime and subsidising electricity purchases from renewable energy generators with a capacity of less than 50MW."[137] Under the section "Future of the Special regime", a "main risk" was identified as "the possibility of partial or total elimination of the Special regime subsidies", although it was added that "we consider it unlikely that support for renewable energy would disappear completely."[138]

197.   On 30 December 2003, a further 21.97% interest in Aldehuelas was acquired for EUR 586,363.[139]

198.   It follows that the Claimants invested in excess of EUR 49.5 million under the regulatory regime put in place by RD 2818/1998 and prior to the adoption of RD 436/2004. A further

---

[132] Cl. Mem. ¶ 219; Schäfer Statement ¶ 30.

[133] Cl. Mem. ¶ 219; **C-0209**, "Danta de Energías, S.A.", Landwell and PriceWaterhouseCoopers Summary. p. 4. *See also*, **C-0211**, Registry Book of Shares of Danta de Energías, S.A., dated 15 April 2002, p. 6.

[134] Cl. Mem. ¶ 220.

[135] **C-0085**, *Financial Review Due Diligence Draft Report*, for Agrupación Energías Renovables, S.A., PWC PowerPoint presentation, April 2002.

[136] **C-0088**, Ilex Energy Consulting Report to Harpen, *Projecting wholesale electricity prices in Spain*, July 2002.

[137] **C-0088**, Ilex Energy Consulting Report to Harpen, *Projecting wholesale electricity prices in Spain,* p. 11.

[138] **C-0088**, Ilex Energy Consulting Report to Harpen, *Projecting wholesale electricity prices in Spain,* p. 12.

[139] Cl. Mem. ¶ 230.

1.77% interest in this plant was acquired on 1 April 2004 for around EUR 40,000, i.e. a few days after RD 436/2004 was adopted.[140]

199.    In October 2004, Ilex prepared for the Claimants a further report, entitled "Wind Power Price Projections for Spain", having been retained by Harpen "to examine the background to, and project the prospects for, wind power in Spain for the period to 2022."[141] In this report, Ilex stated in the Executive Summary that:

> "The future for renewable generation will depend on the form and level of any support mechanism. The Special Regime mechanism is subject to periodic review, and there have been discussions about introducing a market-based mechanism in accordance with the latest EU directive on renewable generation. However, given the success of the current mechanism, … it is likely that the current tariff/premium methodology will continue, at least until 2010…

> Given the uncertainty surrounding the Special Regime and the future policy and support mechanism for the development of renewable energy to meet the set targets, it is difficult to accurately project potential additional revenue to wind generators. However, there is a commitment by the Spanish Government to continue support in some form, whether it is through subsidies set annually and funded by the regulated tariffs, or through market-based mechanisms."[142]

200.    In July 2007, Ilex (now called Pöyry) prepared a report for RWE Power AG, "Current and Future State of Wind Energy in Spain and Portugal."[143] This report post-dates RD 661/2007 (25 May 2007) but pre-dates the Claimants' acquisition of Urvasco (6 June 2008, see further below). It is noted that the Claimants' witnesses did not read this report, and it has not been established that it was relied on in the acquisition of Urvasco.[144]

201.    In its Executive Summary, Pöyry identified under its first heading "*Recent market events in Spain*" various matters including "*ongoing problems with the tariff deficit*" and

---

[140] Cl. Mem. ¶ 230.

[141] Cl. Mem. ¶ 230; **C-0089**, Ilex Energy Consulting Report to RWE, *Wind power price projections for Spain*.

[142] At (ii), footnotes omitted and (v)-(vi); **C-0089**, Ilex Energy Consulting Report to RWE, *Wind power price projections for Spain*, pp. 6 and 9.

[143] Cl. Mem.; **C-0103**, Pöyry July 2007 Report (Wind).

[144] The Claimants' witness, Mr Navarro, was aware of but did not read this report, whilst the Claimants' witness, Mr Henderson, was not aware of it. *See*, Day 2/193 and Day 3/25.

"*changes in legislation to cap revenue to Special Regime generators*." It also stated that "*given recent high Pool prices, Special Regime generators, in particular wind farms, have been making supra-normal profits. As a result of these excessive profits the government has intervened in order to cap profits by modifying RD 436/2004 (the main special regime legislation for the period 2004-2007) and publishing RD 661/2007 to replace it*." It continued:

> "Due to these major changes by the Government, Pöyry believes the Spanish market will continue to be dominated by the government, with it actively managing the market to try and maintain a cap on generator profits. What seems increasingly probable is that the government is unlikely to opt for direct intervention in the Pool. Rather it appears to prefer intervention outside the Pool (as RD 1634/2006 and lTC 400/2007 legislation to cap generators profits and total system cost). Thus the government is more likely to intervene to tax companies for windfall profits, or cap revenues (RD 661/2007), than it is to directly intervene in the wholesale market and cap prices."[145]

202.    In the ensuing "Summary of legislation for renewables in Spain", Pöyry set out the basic elements of RD 661/2007, stating *inter alia*:

> "The Spanish Government, through Royal Decree (RD) 661/2007, encourages new investments in co-generation and renewable energies by placing them under a Special Regime, and subsidising electricity purchases from renewable energy generators. Under RD 661/2007, these subsidies (environmental premiums) are guaranteed during the operating lifetime of the plant. RD 661/2007 supplants the previous legislation governing the special regime market, RD 436/2004.
>
> The main conclusion for the industry from the implementation of RD 661/2007 is that although the potential income to be received has been capped so have the potential losses. In our opinion the revised remuneration for wind generators will not cause any real lasting damage to the Spanish wind industry – a concern that had been raised after the publication of the first draft in November 2006."[146]

203.    Pöyry's forecast was, in its summary form, as follows:

> "The Spanish wind farms remuneration has changed with the recent introduction of RD 661/2007. It provides a new measure to control revenues

---

[145] **C-0103**, Pöyry July 2007 Report (Wind), pp. 1-2.
[146] **C-0103**, Pöyry July 2007 Report (Wind), pp. 2-3. *See also*, pp. 81-82.

wind farms by imposing a cap and a floor (also referred to as a 'collar'). This way the Spanish Government limits the return wind assets will obtain. Pöyry estimates that the expected IRR (Internal Rate of Return, post-tax nominal) ungeared for wind farms at market prices would be in the range of 5% to 7.5% (see Pöyry's DCF model in Annex E). The IRR range implies a decrease in expected IRR compared to those that result from RD 436/2004 scheme which allowed higher returns. Existing wind farms opting for the transitory period will have an IRR ungeared in the range of 5.5% to 8%. We estimate that the impact RD 661/2007 for the existing assets is, therefore, limited."[147]

204.  In the section on regulatory/political risks, Pöyry explained that: "*2006 saw a significant increase in Government intervention in the energy market in Spain. The ever-increasing tariff deficit caused by low hydro and ever increasing Brent prices forced the Government to take drastic measures. Towards the end of 2005, the Government announced that it intended to analyse the Special regime remuneration (specifically wind), since it was viewed as profiting from the high SMP [pool] price as well as the increasing TMR.*"[148] As it had in the 2004 report, Pöyry also considered the possibility of introduction of a market-based mechanism to replace the tariff system, but it considered this very unlikely. The report stated that: "*In any case, in the event of a change from the current feed-in tariff mechanism to a market mechanism (possibly at the end of 2010), we would expect to see a transitory period essentially extending the feed-in tariff mechanism applicable to operating wind farms for a number of years.*"[149]

205.  Approximately one year following issue of the 2007 Pöyry report, on 6 June 2008, RWE Aersa acquired a 100% interest in Urvasco Energía, S.A. (Urvasco) for EUR 363.5 million.[150] As a result, RWE Aersa acquired 100% of: (i) Parque Eólico Bancal, S.L., which held the **Bancal** wind farm; (ii) Parque Eólico Los Siglos, S.L., which held the **Los Siglos** wind farm; (iii) Guijosa Eólica, S.A., which held the **Lanternoso** wind farm; (iv)

---

[147] **C-0103,** Pöyry July 2007 Report (Wind), p. 7. *See also*, pp. 97-98. As stated there, Pöyry considered that its estimation suggested that the majority of wind generators would remain under the market option as opposed to opting for the fixed tariff.

[148] **C-0103,** Pöyry July 2007 Report (Wind), pp. 57-58.

[149] **C-0103,** Pöyry July 2007 Report (Wind), p. 58.

[150] Cl. Mem. ¶ 233.

Parque Eólico Río Gallego, S.L., which held the **Río Gallego** wind farm; (v) Parque Eólico Bosque Alto, S.A., which held the **Bosque Alto** wind farm; and (vi) Explotaciones Eólicas Plana de María, S.L., which held the **Plana María** wind farm.[151] The Claimants consider that they paid a high price for these assets, which was justified because they were able to afford the price under the regime in place.[152]

206.    On 23 December 2008, the Second Claimant acquired a further 23.75% interest in Aldehuelas for EUR 12 million.[153]

207.    On 7 May 2009, a few days after the adoption of Royal Decree Law 6/2009, the Second Claimant acquired a further 49.23% interest in La Luna, Juno and Urano for EUR 48 million.[154] Also, in the second half of 2009, upgrades to fourteen plants were made in accordance with the Fifth Transitory Provision of RD 661/2007, in the amount of EUR 6.8 million.[155]

208.    In a series of transactions in October-December 2010, i.e. in the months after the Ministerial press release of 2 July 2010 concerning the "*agreement with the solar thermal and wind power sectors to revise their rate structures*", the Claimants acquired further interests in Plana de la Balsa (a further 13.7% for EUR 1.2 million[156]), Los Labrados

---

[151] **C–0081**, Public deed of share purchase agreement between Grupo Urvasco, S.A., Mr Rodolfo Di Pietro, Mr Luis Alonso, Mr Pablo Couto, Mr Jesús Esparza, Mr Julio Esparza and RWE Aersa, dated 6 June 2008, pp. 1, 14, 15, 29 and 30; Bünting Statement ¶ 42.

[152] Bünting Statement ¶ 63.

[153] Cl. Mem. ¶ 231.

[154] Cl. Mem. ¶ 221; **C-0212**, Public deed of sale and purchase agreement between Eólica Renovables de Inversiones, S.A. and Agrupació Energías Renovables, S.A.U., dated 7 May 2009,  pp. 1 and 8. *See also*, Bünting Statement ¶¶ 44-45, referring to Transaction Approval Request Form dated 6 April 2009. That Form contains the same "assumption" referring to RDs 436/2004 and 661/2007 as the Form of 12 December 2008.

[155] Cl. Mem. ¶¶ 235-236.

[156] Cl. Mem. ¶ 224; **C-0077**, Public deed of share purchase agreement between Compañía Leonesa de Energías Alternativas Renovables, S.L. and RWE Aersa, dated 19 October 2010, pp. 1, 5 and 6.

(a further 13.98% for EUR 1.65 million[157]), Plana de Zaragoza (a further 19% for EUR 2.725 million[158]), and Muel (a further 17.32% for EUR 1.7 million).[159]

209.   Further significant investments were made by the Claimants in 2011 (subsequent to the adoption of RD 1614/2010 and RDL 14/2010). In February 2011, the Second Claimant acquired a further interest in Muel through the acquisition of Promotura Acurado SA (approximately 5% for EUR 4.6 million),[160] and also bought the remaining 10% interest in Prodenergías 2, thereby increasing its interest in Plana de la Balsa and Los Labrados to 100%.[161] On 2 December 2011, RWE Aersa acquired a further 47.50% of the share capital of Aldehuelas for EUR 25,540,000,[162] increasing its interest in the Aldehuelas wind farm to 95%.[163] Finally, on 1 December 2012, the Claimants acquired a 'golden share' with respect to the Muel plant (for EUR 50,000).[164]

---

[157] Cl. Mem. ¶ 226; **C-0078**, Public deed of share purchase agreement between Compañía Leonesa de Energías Alternativas Renovables, S.L. and RWE Aersa, dated 19 October 2010, pp. 1, 5, 6 and 12.

[158] Cl. Mem. ¶ 228; **C-0162**, Public deed of share purchase agreement between Compañía Leonesa de Energías Alternativas Renovables, S.L. and RWE Aersa, dated 2 December 2010, pp. 1, 5 and 6.

[159] Cl. Mem. ¶¶ 223-224, 226 and 228. *See also*, Bünting Statement ¶¶ 44-45, referring to Transaction Approval Request Form dated 12 July 2010; also **C–0072**, Public deed of share purchase agreement between Compañía Leonesa de Energías Alternativas Renovables, S.L. and RWE Aersa, dated 19 October 2010, pp. 1 and 5; **C–0073**, Public deed of share purchase agreement between Hidráulica del Loureiro-Enorsa, S.L. and RWE Aersa, dated 22 December 2010, pp. 1, 5, 6 and 13.

[160] Cl. Mem. ¶ 223.

[161] Cl. Mem. ¶¶ 221, 225 and 227; This 10% interest was achieved by means of Aersa's purchase (i) to Promotora Acurado of a 5% interest in Prodenergías 2 (**C-0074**, Public deed of share purchase agreement between Ms María Begoña Amann Garbisu, Mr Joaquín Barrera Amann, Mr Antonio Barrera de Irimo, Ms María Teresa Barrera Amann, Ms Gracia Barrera Amann, Mr Iñigo Barrera Amann, Ms María Asunción Barrera Amann, Ms Ana María Barrera Amann, Corporación Atlántica de Servicios, S.A. and RWE Aersa, dated 1 February 2011, pp. 1 and 8-9) and (ii) the remaining 5% interest from Servicios Generales Corporativos, S.L. (**C-0086**, Public deed of share purchase agreement and loan amortisation between Servicios Generales Corporativos, S.L. and Agrupació Energías Renovables, S.A.U., dated 2 February 2011, pp. 1, 5 and 6.)

[162] **C–0185**, Public deed of share purchase agreement entered into between Enel Green Power España, S.L. and RWE Aersa, dated 2 December 2011, pp. 1, 7 and 9. *See also*, **C-0148**, Registry Book of Shares of Explotaciones Eólicas Aldehuelas, S.L., p. 8.

[163] Cl. Mem. ¶ 232.

[164] Cl. Mem. ¶ 223; The Golden Share refers to a minority stake representing 0.001% of the share capital of Muel (that is, one out of 110,000 shares) owned by Taim-Weser, S.A., a Spanish company acting in several industry fields including crane manufacturing, waste treatment or renewable energy. Its existence is due to the fact that the Municipality of Muel, at the time, required a company based in the Spanish region of Aragón to be part of the share capital of Muel holding a minimum of one share. **C-0075**, Resolution of the Board of Directors of RWE Aersa on the "Acquisition of the "Golden Share" Explotaciones Eólicas de Muel, S.L.", dated 6 June 2012, p. 1. Taim-Weser, S.A., as original owner of 100% of the share capital of Explotaciones Eólicas de Muel. S.L. retained the "Golden Share", which granted it certain rights including the approval of sales to third parties; **C-0189**, Transaction Approval Request

210.    The Respondent does not make any challenge to the Claimants' ownership of the investments in Spain. However, it does emphasise that the investments were acquired over a period of more than 12 years, and it criticises the Claimants for giving the impression that the only regulations in the Spanish Regulatory Framework that any investor had to take into account were RD 661/2007 and RD 1614/2010.[165] The Respondent also says that the Claimants failed to carry out any due diligence subsequent to July 2007.[166] The issue of due diligence, as with the evidence on actual reliance on the applicable regulations, is considered in section VI below.

## C.    SPAIN'S MEASURES AND THE NEW REGIME

211.    According to the Claimants, from December 2012 until June 2014, Spain adopted a series of measures (the Disputed Measures) which seriously undermined the RD 661/2007 economic regime and amounted to the reneging of the promises that had induced the making of the Claimants' investments.[167]

212.    The Respondent says in contrast that the measures adopted to reform the Electricity Sector had been announced publicly,[168] were reasonable and proportionate, and affected all subjects of the SES. The Respondent says that the measures affected in particular consumers whose electricity bills had increased disproportionately between 2003 and 2012,[169] and that the Disputed Measures were adopted in a context of international crisis

---

Form for RWE Innogy Project, 28 September 2010, p. 4 and fn. 2,  p. 3. The obligation was waived on May 2012, after Aersa's formal request for waiver. Therefore, on 1 December 2012, by means of a sale and purchase agreement entered into between Aersa and Taim-Weser, S.A., Aersa was able to acquire the Golden Share, consolidating its stake in Muel and becoming its sole shareholder; **C-0207**, Resolutions of the Board of Directors of RWE Innogy GmbH on the Acquisition of the "Golden Share" Explotaciones Eólicas de Muel, S.L., dated 6 June 2012, p. 1).

[165] Resp. Rej. ¶¶ 205-212.

[166] Resp. Rej. ¶ 213.

[167] Cl. Mem. ¶¶ 54-55.

[168] The Respondent refers to **R-0192**, a speech by Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011, www.lamoncloa.gob.es; **R-0170**, a press release by the National Energy Commission: "The CNE (National Energy Commission) is analysing the revision of access tolling and certain tariffs and premiums of installations under a special regime", press release of the National Energy Commission", 28 December 2011.

[169] Resp. C-Mem. ¶ 36.

that produced severe effects on the demand for electricity and capital market yields.[170] In the Respondent's view, the reforms maintained the essential elements of the support system for renewable energies.[171]

a.    *The CNE report of 7 March 2012; the MOU of 20 July 2012*

213.   On 27 January 2012, the Spanish Government asked the CNE to prepare a report on the regulatory adjustment measures that could be adopted in the energy sectors, including in terms of addressing the development of the tariff deficit in the electrical sector. The CNE issued a report on 7 March 2012.[172] According to the CNE, the deficit between revenues and costs of the electrical system was unsustainable, the system debt having grown to €21,812 M.[173] It stated that "*the urgent adoption of regulatory solutions is needed, in the electrical and natural gas sectors*."[174]

214.   The CNE proposed a number of possible "*urgent and necessary*" short and medium term measures, some of which were radical in nature i.e. financing the cost of the special regime through CO2 auctions and a tax on the sale of petrol and gas, some of which envisaged relatively minor reductions to the current remuneration to RE generators (such as reductions to the annual increase in accordance with the CPI, reductions impacting solar thermoelectric plants pre-registered but not yet finally registered in the RAIPRE, and restrictions on use of fossil fuels in generation of renewable energy to 5%), some of which envisaged an increase in access tolls.[175] The CNE did not propose the replacement of the Special Regime fixed tariff / premium put in place by RD 661/2007.

215.   Three months later, on 25 June 2012, the Spanish Government requested external financial assistance from the EU in the context of the ongoing restructuring and recapitalisation of the Spanish banking sector. This led, on 20 July 2012, to conclusion

---

[170] Resp. Skeleton ¶¶ 31-33.

[171] Resp. C-Mem. ¶ 37.

[172] **C-0163** and **R-0131,** CNE, *Report on the Spanish Electricity Sector*, 7 March 2012 (hereinafter "**2012 CNE Report**").

[173] **C-0163**, 2012 CNE Report, p. 6.

[174] **C-0163**, 2012 CNE Report, p. 4, emphasis in the original.

[175] **C-0163**, 2012 CNE Report, p. 10.

of a Memorandum of Understanding with the EU on "Financial Sector Policy Conditionality." This MOU recorded how the global financial and economic crisis had exposed weaknesses in the growth pattern of the Spanish economy, how Spanish banks had largely lost access to wholesale funding markets on affordable terms, and set out a roadmap for the restructuring and recapitalisation of Spanish banks. Further, at paragraph 31 of the MOU it was stated:

> "31. **Regarding structural reforms, the Spanish authorities are committed to implement the country-specific recommendations in the context of the European Semester.** These reforms aim at correcting macroeconomic imbalances, as identified in the in-depth review under the Macroeconomic Imbalance Procedure (MIP). In particular, these recommendations invite Spain to: … 6) complete the electricity and gas interconnections with neighbouring countries, and address the electricity tariff deficit in a comprehensive way."[176]

b.    *Law 15/2012*

216.    Law 15/2012 of 27 December 2012 ("**Law 15/2012**"),[177] which came into force on 1 January 2013,[178] imposed (i) a 7% levy on all income obtained by all generators, renewable or otherwise, and (ii) a 22% levy on the use of mainland waters (reduced to 2.2 % for hydro plants with an installed capacity of less than 50 MW). According to the Claimants, this was not a 'tax measure' but rather a disguised tariff cut.[179] The Respondent states that the economic impact of the taxes on RE producers is neutralised because they are one of the costs remunerated to RE producers under the payment regime applicable to them.[180]

---

[176] **RL-0067**, Memorandum of Understanding signed with the European Union: VI. Public Finances, Macroeconomic Imbalances and Financial Sector Reform (hereinafter "**MOU with the EU**"), emphasis added.

[177] **C-0019**, Law 15/2012 of 27 December 2012, concerning tax measures to ensure energy sustainability (published on 28 December 2012) (hereinafter "**Law 15/2012**").

[178] Resp. C-Mem. ¶ 652; **R-0030**, Law 15/2012, Fifth Final Provision: "This Law shall enter into force on 1 January 2013".

[179] Cl. Mem. ¶ 55.

[180] Resp. C-Mem. ¶¶ 661 and 672; **R-0115**, Order IET/1045/2014, dated 16 June 2014, approving those compensation parameters for standard energy facilities applicable to certain electric power production facilities from renewable energy sources, cogeneration and waste, Explanatory Memorandum III. "On the other hand, other costs among those variable operating costs that depend on the standard facility's output are taken into account including, but not limited to: insurance costs, administrative costs and other general costs, representation costs on the market, taxes on access to

64

c.     *RDL 2/2013, RDL 9/2013 and Law 44/2013*

217.    Spain issued Royal Decree Law 2/2013 on 1 February 2013 ("**RDL 2/2013**").[181] This
adopted further  "*Urgent Measures within the Electricity System and the Financial
Sector*", pursuant to which: (i) the value of the Premium was reduced to nil; and (ii) the
inflation adjustments that were envisaged under RD 661/2007 for the FIT were reduced,
removing key components of the CPI, because it replaces the CPI with the Consumer
Price Index at constant taxes excluding unprocessed food and energy products ("**CPI-
IP**").[182] In the Preamble to RDL 2/2013, these measures were explained as being a
response to new increases in the tariff deficit, it being said that this was to a great extent
"due to a greater increase in the cost of the special regime on account of an increase in
operating hours which was greater than expected, to an increase in remuneration values
due to their being indexed to the Brent price, and to a decrease in revenue from fees due
to a very marked fall in demand which was consolidated during this tax year."[183]

218.    On 12 July 2013, the Spanish Government adopted Royal Decree Law 9/2013 ("**RDL
9/2013**")[184] the principal measure of which the Claimants complain in this case.
According to the Preamble of RDL 9/2013, the electricity sector debt had become
unsustainable, and urgent and immediately-applicable measures were needed. The
Preamble described the urgent measures that had previously been taken by Spain, gave
an explanation as to why these had not proved sufficient, and then described the new
measures and their legal basis as follows:

> "First of all, the Government is empowered to approve a new legal and
> economic regime for existing electricity production installations using
> renewable, co-generation and waste energy sources. In this way article 30.4

---

transport and distribution networks that must be paid by producers of electric power, operation and maintenance (both
preventive and corrective), the tax on the value of the electric power produced envisaged by Law 15/2012, dated 27
December, fiscal measures for energy sustainability, as well as other taxes whatsoever regulated by the aforesaid
law.."

[181] **C-0020**, Royal Decree Law 2/2013 of 1 February 2013, concerning urgent measures within the Electricity System
and the financial sector (published on 2 February 2013) (hereinafter "**RDL 2/2013**").

[182] Cl. Mem. ¶ 55, Resp. C-Mem. ¶ 674.

[183] **C-0020**, RDL 2/2013. The Claimants challenges the reference to over-remuneration: *see e.g.*, Cl. Mem. ¶¶ 284-
285.

[184] **C-0024**, Royal Decree Law 9/2013 of 12 July 2013, by which urgent measures are adopted to guarantee the
financial stability of the Electricity System (published on 13 July 2013) (hereinafter "**RDL 9/2013**").

of Law 54/1997, of 27 November, concerning the Electricity Sector, is modified to introduce the concrete principles on which this regime will be based, in order to establish the scope of activity of the Government in developing remuneration regimes for these installations. This shall be based on receiving the revenue deriving from market participation, with an additional remuneration which, were it to prove necessary, covers those investment costs that an efficient and well-run company cannot recover from the market. In this way, in line with Community jurisprudence, an efficient and well-run company shall be understood to be one that has the necessary resources to carry out its activity, whose costs are those of a company that is efficient in its activity, and taking into account the corresponding revenue and a reasonable return for carrying out its functions. The objective is to guarantee that the high costs of an inefficient company are not used as a benchmark.

...

Furthermore, in Law 54/1997 of 27 November, the concept of reasonable return is embodied and regulated, and is established, in line with jurisprudence and doctrine that has been laid down in recent years, in a project profitability that will depend, before tax, on the average yield from ten-year Government Bonds on the secondary market, by applying the appropriate differential."

219.    Pursuant to Article 1 of RDL 9/2013, Article 30.4 of Law 54/1997 was radically amended so as to read as follows (in relevant part):

"Additionally, subject to the terms that the Council of Ministers might adopt pursuant to Royal Decrees, in relation to the remuneration for the generation of electricity calculated according to market price, installations may receive a specific remuneration [the Special Payment] composed of an amount per unit of installed capacity. Such amount shall cover, as appropriate, the investment costs of a standard installation that cannot be recovered through the sale of energy, as well as an amount for the operation of the installation to cover, as the case may be, the difference between exploitation costs and the revenues obtained from the participation of such a standard installation in the market.

...

This remuneration regime shall not exceed the minimum required level to cover the costs that are necessary for installations to compete on an equal footing with the rest of the technologies in the market in order to allow those installations to obtain a reasonable return, by reference to the standard installation, as the case may be. Notwithstanding the above, exceptionally

66

the remuneration regime might also include an incentive to investments and timely execution of an installation, if this was going to result in a significant cost reduction for the Spanish islands or the extra-peninsular territories' electricity systems.

Such reasonable return will be based on, before taxes, the average returns in the secondary market of the State's ten-year bonds plus the adequate differential.

The parameters of the remuneration regime can be revised every six years."

220.    Pursuant to this RDL's First Additional Provision, the adequate differential referred to in the revised Article 30(4) was fixed at 300 base points.

221.    On 4 September 2013, a report was produced by CNE[185] in which the impact of the new methodology was described inter alia as follows (emphasis in original):

"The new methodology incorporates periodic revisions of the specific payment in order to ensure that so-called reasonable rates of return are obtained, avoiding *underpayments* and also *overpayments;* however, the methodology also presents great uncertainties for its application to the approximately 60,000 existing installations, since its application depends on a series of standard parameters that will be defined in the development order of the royal decree."

222.    On 26 December 2013, Spain introduced a new Electricity Law, Law 24/2013 ("**Law 24/2013**"), repealing Law 54/1997 save with regard to certain limited provisions.[186] The new Law confirmed and developed the principles set out in RDL 9/2013, with Article 30(4) of Law 54/1997 as amended by RDL 9/2013 becoming Article 14(7) of Law 24/2013. Pursuant to its Article 26(2), RE producers were accorded priority of dispatch where market economic conditions are equal, and priority of access and connection to the grid.[187]

---

[185] **C-0123,** CNE, *Report 18/2013 on the proposed RD regulating activities of electrical energy production from sources of renewable energy, cogeneration and waste,* 4 September 2013 (hereinafter "**CNE Report 18/2013**").

[186] **C-0025,** Law 24/2013 of the electricity sector, 26 December 2013 (published 27 December 2013) (hereinafter "**Law 24/2013**"), p. 7.

[187] The Claimants contend that Law 24/2013 nonetheless deprived RE installations of the unconditional right of priority of grid access and priority of dispatch that existed under the previous regime. *See*, Cl. Mem. ¶¶ 319-320; Reply ¶ 555.

223. Law 24/2013 did not however define what the precise economic regime would be going forward, or the precise amount of the Special Payment. This transitory period lasted for 11 months.[188]

224. Spain then enacted Royal Decree 413/2014 of 6 June 2014 ("**RD 413/2014**")[189] and Ministerial Order IET/1045/2014 of 16 June 2014 ("**June 2014 Order**")[190], which established the parameters for the Standard Installation, i.e. an important factor in calculation of remuneration under RDL 9/2013.[191]

225. As a result of the new Law and the new regulations, RE producers obtain the pool price for electricity sold in the open market, plus a Special Payment.[192] This Special Payment:

   a)  is limited to the regulatory useful life of 20 years (for wind) or 25 years (for hydro as opposed to the previous regime which guaranteed the incentives for the whole useful life.[193]

   b)  is composed of two elements: i) a remuneration per MW of installed capacity; and ii) a remuneration per MW hour ("**MWh**") of electricity produced, seeking to cover the operating costs that cannot be met by market prices;[194] and is determined by reference to a standard installation (the "**Standard Installation**") and capped by

---

[188] Cl. Mem. ¶ 59.

[189] **C-0026**, Royal Decree 413/2014 of 6 June 2014, regulating the activity of electric power production from renewable energy sources, cogeneration and waste (published on 10 June 2014) (hereinafter "**RD 413/2014**").

[190] **C-0027**, Order IET/1045/2014 of 16 June 2014, approving the remuneration parameters of standard installations that apply to specific installations for the production of electricity from renewable energy sources, co-generation, and wastes (published on 20 June 2014) (hereinafter "**June 2014 Order**").

[191] Cl. Mem. ¶ 60; **C-0027**, June 2014 Order.

[192] Cl. Mem. ¶ 304.

[193] Cl. Mem. ¶ 305; **C-0025**, Law 24/2013, Article 14(7); **C-0024**, RDL 9/2013, Article 1(two); and **C-0026**, RD 413/2014, Articles 16 and 19. **C-0027**, June 2014 Order, Article 5.

[194] Cl. Mem. ¶¶ 62 and 307; **C-0024**, RDL 9/2013, Article 1(two); **C-0025**, Law 24/2013, Article 14(7); and **C-0026**, RD 413/2014, Articles 11, 16 and 17.

the concept of "*reasonable return*", defined as a rate of return of 300 basis points above the average yield on Spanish ten-year government bonds, set at 7.398%;[195]

c)    is subject to revision every six years;

d)    takes into account the amounts received under the RDL 661/2007 regime in assessing whether a plant has achieved a reasonable return during the regulatory life,[196] i.e. if a plant has obtained in the past a return higher than the capped rate, that plant will receive a lower Special Payment (or none at all) to compensate for the excess and reach the target of a 7.398% return.[197]

226.    It follows that although certain of the benefits accorded to RE producers by RD 661/2007 have remained in place, the structure of remuneration was radically altered by RDL 9/2013, Law 24/2013 and the further regulations of June 2014.

d.    *The impact of Spain's measures on the Claimants' investments*

227.    As identified above, the Claimants acquired Investments in Spain through acquisitions and improvements costing in excess of EUR 513 million.  The Claimants' RE plants are now substantially less profitable than they were prior to the adoption of the Disputed Measures.

228.    According to the Claimants, the Disputed Measures have "wiped out 56% of the fair market value of RWE's investments", reducing the fair market value by EUR 267.7 million.[198] Their position is also that the equity value of RWE Aersa has been reduced to zero (taking into account inter-company debt).[199]

229.    According to the Respondent, the Claimants' plants have received or will receive a reasonable return. Its case is that:

---

[195] Cl. Mem. ¶ 63; **C-0024**, RDL 9/2013, First Additional Provision; **C-0025**, Law 25/2013, Third Final Provision; **C-0026**, RD 413/2014, Article 19.

[196] Cl. Mem. ¶ 65.

[197] Cl. Mem. ¶ 334; **C-0026**, RD 413/2014, Annex XIII.

[198] Cl. Mem. ¶¶ 67, 73 and 328; Claimants' PHB, ¶ 7.c.

[199] Cl. Reply ¶¶ 14, 399, 429 and 597.

   *a)*    Certain plants have already been exceptionally profitable and hence are no longer entitled to a subsidy. Thus, the rates of return are stated as: with respect to Muel, 11.2%; Acampo Armijo, 18.6%; Bosque Alto, 10.1%; Los Labrados, 11.4%; Plana María, 10.1%; Plana Zaragoza, 13.7%; Río Gallego phase I, 10.8% and phase II, 16.1%; Aldehuelas, 19.2%. It is said that, overall, "the Claimants recover their investment costs and, taking operating costs into account, will obtain a total consolidated rate of return of 10.6% before tax or 8.2% after tax."[200]

   *b)*    Pursuant to the Claimants' 'But-for scenario', the average rate of return would be 14.5% for the Claimants' wind farms and 7.1% for the Claimants' hydro plants. The Respondent says that these return rates are disproportionate in relation to the risk profile of the investments.[201]

230.    The Claimants have put forward, through Compass Lexecon, various rates of return figures, including figures based on standard plants corresponding to the Claimants' plants.[202]

   *a)*    According to Compass Lexecon, the expected rate of return achieved by the standard plants corresponding to each of the Claimants' plants is 5.7% after tax as a result of Spain's measures ("the actual scenario"), as opposed to 9% after tax under their "but-for scenario."[203]

---

[200] Resp. Rej. ¶¶ 1046 and 1102, referring to BDO Second Report, Table 13: "BDO calculated the rates of return obtained by the plants after the measures as 10.7% for wind power and 7.5% for hydro, before tax (average, 10.6% before tax, equivalent to 8.27% after tax)." It is noted that these rates of return are calculated by reference to the asset and construction cost of the various plants (i.e. as if they were greenfield sites), giving a figure of EUR 462 million. The Claimants' actual cost of acquisition was higher, i.e. around 513 million.

[201] Rejoinder ¶ 1103, and *see*, Compass Lexecon, Second Report, p. 120, Table 10. These are pre-tax figures.

[202] Compass Lexecon, Second Report, ¶ 117, where it is said that "there is evidence that the Claimants' wind plants have above-average performance. The fact that above-average performance naturally leads to higher returns (and that *vice versa* below-average performance leads to below-average returns) needs to be taken into account when assessing whether the returns achieved by the Claimants' Plants are reasonable. To account for this, we have not used for each the Claimants' Plants' revenues and costs, but we have used those of the corresponding standard plant as defined by Spain in the Order, which according to the Spanish Government and BDO are representative of an efficient and well-managed plant."

[203] Compass Lexecon, Second Report, ¶¶ 117-121 and Table 4. These % figures take wind and hydro together.

b)    A comparison is made by Compass Lexecon to the percentage figures to the rates of return referred to in the CNE Report 3/2007, on the basis that these were what the CNE had considered to be reasonable. The Tribunal notes, however, that the rates of return contained in the CNE report concerned (i) CNE's calculation of average rates of return under the then draft RD, i.e. 8.2% (wind) and 9.7% (hydro) for both the fixed tariff and premium options, and (ii) CNE's proposed rates of return for plants coming into operation after 1 January 2008, being the same for the fixed tariff option, but 9.9% (wind) and 11.2% (hydro) for the premium option.[204] Given that none of the Claimants' plants came into operation after 1 January 2008, the Tribunal does not consider the CNE proposed rates (9.9% (wind) and 11.2% (hydro)) to be relevant.[205] It is also not clear to the Tribunal whether these CNE figures were pre- or post-tax.

e.    *European Commission State Aid Procedures*

231.    Respondent submits that, following the European Court of Justice ("**ECJ**") preliminary ruling C-275/13 (the *ELCOGAS* case),[206] in which a definition on the concept of state aid was given, Spain was obliged to notify the European Commission ("**EC**") of the support measures provided for RE relating to this arbitration.[207] Respondent informed the European Commission of the measures adopted through the June 2014 Order and the European Commission opened an investigation procedure No. SA.40348 2014/N.[208] It is the Respondent's position that, under Article 108 of the Treaty on the Functioning of the European Union ("**TFEU**"), the EC has the exclusive competence to declare the compatibility of an aid with EU law. The Respondent also notes that the ECJ is the only body competent to review the EC's decision.[209]

---

[204] **R-0128**, CNE Report 3/2007, pp. 53-54.

[205] Cf. Compass Lexecon, Second Report, ¶¶ 117-121 and Claimants' oral closing at Day 5/120.

[206] **R-0024**, Order of the European Court of Justice laid down regarding the preliminary ruling C-275/13, ELCOGAS, on 22 October 2014.

[207] Resp. C-Mem. ¶¶ 800 and 805; Article 4.3 of the Treaty on the European Union (**"TEU"**).

[208] Resp. C-Mem. ¶ 801.

[209] Resp. C-Mem. ¶ 807.

232.   According to the Claimants, the State aid issues are irrelevant to the resolution of this arbitration for the following reasons:

  *a)*   The EC investigation concerns the June 2014 Order, so the New Regime is what is under investigation, not the Special Regime on which the Claimants relied to invest.[210]

  *b)*   There is no evidence that the Disputed Measures were motivated by State aid concerns, as the preambles do not mention State aid.[211]

  *c)*   Neither the Community Guidelines on State Aid for Environmental Protection and Energy 20142020, Number 2014/C200/0170 (the "**2014 Guidelines**"), nor the guidelines approved by the Communication from the European Commission 2008/C82/0171 (the "**2008 Guidelines**"), mentioned by Respondent, required Spain to adopt the Disputed Measures.[212]

  *d)*   It is a principle of EU State aid law that beneficiaries of support schemes should be allowed to rely upon a stable legal framework. The 2014 Guidelines provide that a reduction in renewable incentives should apply prospectively to new RE installations.[213]

233.   On 10 November 2017, the EC made its the Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste.[214] In light of this Decision, the

---

[210] Cl. Reply ¶ 489.

[211] Cl. Reply ¶ 490.

[212] Cl. Reply ¶ 491.

[213] Cl. Reply ¶ 492; **C-0281**, European Commission, Guidelines for State Aid for Environmental Protection, OJ 2014/C200/01, 28 June 2014 ¶ 249: "such aid can be granted for the entire period under the conditions laid down in the scheme at the time of the confirmation to the extent that the aid is compatible with the rules applying at the time of the confirmation."

[214] EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste (**RL-0089**, it being noted that the Respondent has accorded this exhibit number to more than one exhibit).

Parties developed their respective positions on the State aid issue, as considered further in Section V (Jurisdiction) below.

### D.    THE SUPREME COURT JUDGMENTS

234.    The Respondent has put before the Tribunal multiple judgments of the Spanish Supreme Court, and it contends that since 2005 a consistent case-law on the remuneration scheme for RE has been established.[215] It refers to the Judgment of 15 December 2005, involving a challenge to RD 436/2004, in which the Supreme Court stated that: "*There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration* [...]."[216] In the years following this Judgment – in particular in 2006, 2007, 2009, 2012, 2013 and 2016[217] – the Supreme Court issued further judgments which, according to the Respondent, confirmed that:

    *a)*    There was no right to an economic system remaining unaltered;

    *b)*    The only limit to be respected by the Government in regulatory modifications was the provision to SR facilities of a reasonable return with reference to the cost of money on the capital market;

    *c)*    The integration of SR facilities into the SES implied that companies had to assume a certain regulatory risk.[218]

---

[215] Resp. Skeleton ¶ 23.

[216] **R-0137**, Judgment of the Supreme Court, 15 December 2005 (translated extract).

[217] Resp. C-Mem. ¶ 361-379; **R-0138**, Judgment of the Supreme Court, appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish), 25 October 2006; **R-0139**, Judgment of the Supreme Court, appeal 11-2005 EDJ 2007-18059, 20 March 2007; **R-0140**, Judgment of the Supreme Court, appeal 13-2006 EDJ 2007-175313, 9 October, 2007; **R-0141**, Judgment of the Supreme Court, appeal 151/2007 EDJ 2009/307349, 3 December 2009; **R-0002,** Judgment of the Supreme Court of 9 December 2009, rec. 152/2007, reference The Law 2009/307357, Fifth Point of Law; **R-0144**, Judgment of the Spanish Supreme Court of 12 April 2012, rec. 40/2011, Fourth Point of Law; **R-0146**, Judgment of the Supreme Court of 19 June 2012 (appeal 62/2011); **R-0150**, Judgment of the Supreme Court of 25 June 2013 (RJ/2013/6733), rec. 252/2012; **R-0155**, Judgment 63/2016 of 21 January 2016, of the Supreme Court handed down in cassation appeal 627/2012.

[218] Resp. Rej.¶ 238.

235.    In judgments of 1 June and 12 July 2016, the Supreme Court considered and rejected various challenges to RD 413/2014 and Order IET/1045/2014. In rejecting the arguments put before it on legitimate expectations and legal certainty, the Supreme Court stated that "*no provisions of RD 661/2007 … guaranteed that the regulated tariffs could not be changed.*"[219] According to the Supreme Court, its jurisprudence "*has been constant over the years on indicating that, in the interpretation and application of the rules ordering the legal and economic system for electricity generation based on renewable energy sources, such regulations guarantee reasonable return on their investments to the owners of these facilities, but do not acknowledge an unmodifiable right to them regarding the unalterability of the remuneration framework approved by the owner of the regulatory powers.*"[220]

236.    The Claimants reject the relevance of the various judgments on the basis that they are not analogous, i.e. they did not relate to incentives that were part of the guaranteed RE regime, and/or they post-date the period when the Claimants made their investments.[221] The Parties' competing positions as to the Supreme Court judgments are considered in Section VI (Liability) to which the Tribunal turns following its consideration of the jurisdictional issues below.

## V.    JURISDICTION

### A.    JURISDICTIONAL OBJECTIONS

237.    The Respondent has raised two jurisdictional objections:

---

[219] **R-0264**, Ruling of the Supreme Court, 1264/2016, 1 June 2016, p. 8; **R-0336**, Supreme Court Judgment, 1730/2016.rca 456.2014 AEE, 12 July 2016, p. 8; in each case referring to the judgment of the Supreme Court of 15 December 2005 (appeal 73/2004) as well as judgments of 25 October 2006 (appeal 12/2005), 20 March 2007 (appeal 11/2005), 9 December 2009 (appeals 149/2007 and 152/2007), 12 April 2012 (appeal 40/2011), 13 September 2012 (appeal 48/2011), 15 October 2012 (appeal 64/2011), 10 December 2012 (appeal 138/2011), 29 January 2013 (appeal 232/2012), 29 May 2013 (appeal 193/2010) and 16 March 2015.

[220] **R-0264**, Ruling of the Supreme Court, 1264/2016, 1 June 2016, pp. 8-9; **R-0336**, Supreme Court Judgment, 1730/2016.rca 456.2014 AEE, 12 July 2016, pp. 8-9.

[221] Cl. Reply ¶¶ 367-368 and 371-372.

74

(i) Lack of jurisdiction of the Tribunal *ratione personae* to rule on the dispute raised by the Claimants due to the absence of investors protected under the ECT: the Claimants are not from the area of another Contracting Party as Germany and Spain are Member States of the European Union, and the ECT does not apply to disputes relating to intra-EU disputes;[222]

(ii) Lack of jurisdiction of the Tribunal to hear an alleged breach by Spain of obligations derived from Article 10(1) ECT through the introduction of taxation measures by Law 15/2012: Spain has not consented to submit this matter to arbitration given that, pursuant to Article 21 ECT, Article 10(1) ECT does not generate obligations regarding taxation measures of the Contracting Parties.[223]

238.    Article 41(1) of the ICSID Convention provides that: "*The Tribunal shall be the judge of its own competence*."  Article 25 of the ICSID Convention provides:

> (1) "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally. (…)"

239.    Article 26 ECT, which concerns the "*Settlement of disputes between an Investor and a Contracting Party*", provides in relevant part as follows:

> *1)*    "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

> *2)*    If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

---

[222] Resp. Rej. III (B).
[223] Resp. Rej. III (C).

(a) To the courts or administrative tribunals of the Contracting Party, party to the dispute;
(b) in accordance with any applicable, previously agreed dispute settlement procedure;
(c) in accordance with the following paragraphs of this Article.

*3)*    (a) Subject only to subparagraphs b) and c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. …

*4)*    In the event that an Investor chooses to submit the dispute resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a) (i) The International Centre for the Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Dispute between States and Nationals of other States opened for signature at Washington, 18 March 1965, (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party, party to the dispute, both parties to the ICSID Convention; …

*5)*    (a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

(i) written consent of the parties to a dispute purposes of Chapter II of the ICSID Convention …

*6)*    A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

## B.    THE CLAIMANTS' CORPORATE RESTRUCTURING

240.    In its Counter-Memorial on the Merits and Memorial on Jurisdiction of 20 May 2016, the Respondent reserved its right to supplement or modify its claims and arguments, and to formulate additional jurisdictional objections where appropriate in view of the supporting documentation concerning the corporate restructuring by which RWE International SE had allegedly succeeded RWE Innogy GmbH.[224] However, in its

---

[224] Resp. C-Mem. ¶¶ 49-55.

Rejoinder on the Merits and Reply on Jurisdiction of 19 January 2017, the Respondent confirmed that it raised no jurisdictional objection related to the Claimants' corporate restructuring.[225]

## C.     THE INTRA-EU OBJECTION

### (1)     The Parties' Positions

241.     The Tribunal has considered not only the positions of the Parties as summarised below, but also the numerous detailed arguments made in their written submissions and authorities submitted. To the extent that these arguments are not referred to expressly, they have been subsumed into the Tribunal's analysis, and the same applies so far as concerns the submissions received from the EC.

#### a.     *The Respondent's Position*

242.     The Respondent submits that the Arbitral Tribunal lacks jurisdiction *ratione personae* to hear the present intra-EU dispute brought by alleged investors from Germany against the Kingdom of Spain due to the absence of a protected investor under the ECT. The Claimants are not investors protected under the ECT from the area of another Contracting Party, as required by Article 26 ECT in order to be able to resort to arbitration.[226] Both Germany, the Claimants' State for the purposes of this arbitration, and Spain are and were, at the time of ratification of the ECT, EU Member States, whilst the EU is also a Contracting Party to the ECT.[227] Hence, the Claimants fail to comply with the requirement of Article 26(1) ECT which states that to access arbitration the dispute must be "*between a Contracting Party and an Investor of another Contracting Party.*"[228]

243.     According to the Respondent, the requirement in Article 26(1) ECT that the dispute occur between "*a Contracting Party*" and an "*Investor of another Contracting Party*" "*implies the exclusion of this article from any case where an investor of an EU State has a dispute*

---

[225] Resp. Rej. ¶ 7.
[226] Resp. C-Mem. ¶ 5
[227] Resp. Skeleton ¶ 7.
[228] Resp. C-Mem. ¶¶ 5 and 108. Resp. Skeleton ¶ 7.

*with an EU State, in relation to an investment in said State*" (respectively, an "**intra-EU dispute**" and an "**intra-EU investment**").[229]

244.    The Respondent's case is that because both Spain and Germany were already members of the EU at the time of their ratification of the ECT, "*they were unable to contract obligations between themselves within the framework of the Internal Energy Market harmonized by the EU.*"[230] The Claimants' investments were made within the framework of the internal market in electricity of the EU. The Respondent submits that the EU system confers particular protection upon the EU-national investor, which is preferential to the protection conferred by the ECT, and which must prevail over any other international treaty. It is said that "*EU Law forbids the existence of any dispute settlement mechanism other than that established by its Treaties, which may interfere with the bases of the Internal Market.*"[231]

245.    According to the Respondent, the above is reflected in the literal interpretation, context and purpose of the ECT: (i) the literal interpretation of the ECT provides that between EU Member States, the EU system prevails;[232] (ii) Article 26 ECT prevents arbitration between an intra-EU investor and an EU Member State;[233]and (iii) the purpose of the ECT confirms this interpretation.[234]

246.    Thus, the Respondent contends that the special regime for intra-EU disputes follows from the literal interpretation of the wording of the ECT with respect to Regional Economic Integration Organizations ("**REIOs**"), the EU being the only REIO that is Party to the ECT. According to the Respondent, Article 1(3) ECT, which defines REIO as "*an*

---

[229] Resp. C-Mem. ¶ 57.

[230] Resp. C-Mem. ¶ 61. At Resp. Rej. ¶ 83, the Respondent distinguishes the Award in *Electrabel v Hungary* on the basis that "*Hungary signed the ECT when it had not yet joined the EU. Therefore, Hungary, unlike Spain and Germany, was able to contract obligations under Part III of the ECT.*"

[231] Resp. C-Mem. ¶¶ 62-63 and 66 *et seq*.

[232] Resp. C-Mem. ¶¶ 76-83.

[233] Resp. C-Mem. ¶¶ 84-93; Article 344 of the TFEU; **R-0022**, Opinion 1/91 of 14 December 1991 issued by the Court of Justice of the European Union regarding the "*Agreement to Create a European Economic Area*" (EEA) (original Spanish version).

[234] Resp. C-Mem. ¶¶ 94-97; **RL-006**, Article 1 of the ECT and Preface to the ECT.

*organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters*" acknowledges the special nature of the EU and the transfer of competence. The Respondent also cites Articles 1(10), 16, 25 and 36(7) ECT as further illustration of the special status of the EU and the supremacy of the treaties governing the EU over the ECT.[235]

247.    The Respondent particularly emphasises Article 26(6) ECT, which provides that a tribunal established under Article 26 "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*" and which, it is said, means treating EU law and applicable international law on equal terms when it comes to resolving the dispute.[236]

248.    The Respondent relies on *Electrabel v Hungary* where the tribunal concluded "*that Article 307 EC precludes inconsistent pre-existing treaty rights of EU Member States and their own nationals against other EU Member States; and it follows, if the ECT and EU law remain incompatible notwithstanding all efforts at harmonization, that EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State.*"[237]

249.    According to the Respondent, submission of an intra-EU dispute to arbitration under Article 26 ECT would be contrary to Article 344 TFEU which precludes Member States from submitting "*a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*" Such dispute would in turn require an arbitral tribunal to rule on the rights of EU investors within the EU's internal market, matters over which only the ECJ is competent, and in this respect it relies

---

[235] Resp. C-Mem. ¶¶ 79-82.

[236] Resp. C-Mem. ¶ 83.

[237] Resp. C-Mem. ¶ 84 referring to **RL-0002**, *Electrabel S.A v Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (original version in English) ¶ 4.189 (hereinafter "***Electrabel*, Decision on Jurisdiction, Applicable Law and Liability**").

in support on Legal Opinion 1/91 regarding the "*Agreement to Create a European Economic Area*."[238]

250.    The Respondent relies on the purpose of the ECT and cites the objective of the ECT established in Article 2 as "*a legal framework in order to promote long term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter*" and further intended to "*promote East-West industrial cooperation through the establishment of legal safeguards in areas such as investment, transit and trade*." The Respondent also relies on the writings of Bruno Poulain[239] and Professor Jan Kleinheisterkamp.[240] The Respondent says that, according to Professor Kleinheisterkamp, the issue is not the selection and application of the "*most favourable regulation*", but the fact that between EU Member States and their citizens, EU Law puts aside the application of any other regulation by dint of the principle of supremacy.[241] It is said that both the Respondent and the EC have taken the position that arbitration under the ECT is not a suitable means to review the legality of government measures that are governed by EU law and that affecting the fundamentals of the EU by means of the ECT would be incompatible with EU law, which cannot have been the intention of the Contracting Parties. Moreover, the rules and principles of the EU are rules and principles of international law, and must be applied with the same hierarchy as the ECT.[242]

251.    The Respondent also refers to the impact on the result of this arbitration of the EC evaluation of the measures supporting Renewable Energies and cogeneration in Spain

---

[238] Resp. C-Mem. ¶¶ 85-90, referring to **R-0022**, Opinion 1/91 on 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA).

[239] Resp. C-Mem. ¶ 98. *See,* **RL-0060**, *Développements récents du droit communautaire des investissements internationaux*, Bruno Poulain, Revue Générale de Droit International Public, C XIII/2009, 4, p. 881. The omitted footnote says: "*Our opinion is grounded on Article 25 of the [ECT], [which proposes] a disconnection clause for the benefit of the parties of a regional economic integration organisation and in article 16 which seems to link material law and dispute settlement mechanism.*".

[240] Resp. C-Mem. ¶ 99-101. *See,* **RL-0064**, *Investment protection and EU Law: the intra- and extra-EU dimension of the Energy Charter Treaty*, Jan Kleinheisterkamp, Journal of International Economic Law 15 (1), Oxford University Press, 2012, pp. 101, 103 and 108.

[241] Resp. C-Mem. ¶ 101.

[242] Resp. C-Mem. ¶¶ 100-103.

(procedure SA.40348 2014/N). Reference is made to the Order of 22 October 2014 of the Court of Justice of the European Union ("**CJEU**") regarding preliminary ruling C-275/13 (the *ELCOGAS* case) where it was said with respect to Spain:

> "Article 107.1 TFEU must be interpreted as meaning that the sums awarded to a private electricity producer that are financed by all the end users of electricity within the national territory and distributed among the companies in the electricity sector by a public organisation according to predetermined legal criteria, constitute aid granted by the State or through State resources."[243]

252.  It is contended that Member States are required to bear in mind the EC Guidelines on State aid, and it is said that the existence of this procedure is particularly relevant in the light of the decisions of the EC of 26 May 2014 and 30 March 2015, ordering Romania to suspend payment of the award in *Micula v Romania*, and then deciding that such payment breached the EU State aid rules and had to be returned by the beneficiary companies.[244] The Respondent has also relied subsequently on the EC's Decision of 10 November 2017 on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste.[245]

253.  In its Reply on Preliminary Objections, the Respondent drew the Tribunal's attention to pending cases before the ECJ and the then forthcoming decision in *Achmea* (considered further below). The Respondent also insisted on the principle of primacy of EU law and its recognition in the ECT, as said to be stated in Article 25(1) of the ECT:

> "The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA" to extend by means of most favoured national treatment, to another Contracting Party which is not a party to the

---

[243] Resp. C-Mem. ¶¶ 104-105, referring to **RL-0019**, Order of the Court of Justice of the European Union laid down regarding the preliminary ruling C- 275/13, ELCOGAS, on 22 October 2014.

[244] Resp. C-Mem. ¶¶ 106-107, referring to **R-0025**, Decision (EU) 2015/1470 by the Commission on 30 March 2015 pertaining to State Aid SA.38517 (2014/C) (ex 2014/NN) carried out by Romania, Arbitration Award *Micula/Romania* on 11 December 2013.

[245] **RL-0089,** EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste.

EIA, any preferential treatment applicable between the parties to that EIA
as a result of their being parties thereto."

254.    According to the Respondent, under this principle, it is the laws of the EU and not the
ECT which must be applied to resolve this dispute, as it is EU law that has always applied
to the investments of the Claimants. In addition, the dispute affects essential elements of
EU law such as State aid, free movement of capital and freedom of establishment, that
the Tribunal does not have the power to rule on, this power being reserved to the EU's
own judicial system and ultimately to the CJEU.[246]

255.    The Respondent rejects or distinguishes the arbitral awards cited by the Claimants,
including on the basis that such concern disputes based on intra-EU BITs, or obligations
contracted by given States before acceding to the EU, or fail to analyse the argument
based on the principle of primacy. By contrast, in addition to *Electrabel*, the Respondent
has referred the Tribunal to:

    a)    *Blusun v Italy*, where the tribunal considered that it must apply EU Law "*as part of
    international law or as part of the law of Italy. The Tribunal evidently cannot
    exercise the special jurisdictional powers vested in the European courts, but it can
    and where relevant should apply European law as such.*"[247]

    b)    *Jürgen Wirtgen et al. v Czech Republic* which, it is said, supported the reasoning
    and conclusions of the *Electrabel,* concluding that that the applicable international
    law in addition to the Treaty encompasses EU law.[248]

256.    The Respondent also challenges the Claimants' interpretation of the ECT, saying that it
would lead to an ineffective interpretation which does not recognise that the EU Member
States could not be linked to each other under Part III of the ECT and because the ECT

---

[246] Resp. Rej. ¶¶ 70-78; Resp. oral opening at Day 1/270-271.

[247] Resp. Comments on *Achmea* of 22 March 2018, citing **CL-0187**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic,* ICSID Case No. ARB/14/3, Award, 27 December 2016 (hereinafter **"*Blusun*"**) ¶ 278. Annex 1.

[248] Resp. Comments on *Achmea* of 22 March 2018, citing **RL-0089**, *Mr Jürgen Wirtgen et al. v The Czech Republic*, PCA Case No. 2014-03, Final Award, 11 October 2017 (hereinafter **"*Wirtgen*"**) ¶¶ 177 and 178.

itself recognises in Article 25 the principle of primacy of EU law. Furthermore, by advocating the inapplicability of the TFEU dispute settlement mechanism to the dispute at hand, the Claimants ignore the fact that the Tribunal would have to rule on essential pillars of EU law and that Spain cannot be submitted to any other system than the EU judicial system in relation to this matter.[249]

257.    According to the Respondent, this first jurisdictional objection affects the entirety of the dispute raised by the Claimants.[250]

b.    *The Claimants' Position*

258.    The Claimants say that every single investment-treaty arbitral tribunal that has considered the issue has concluded that the intra-EU nature of the dispute does not preclude jurisdiction.[251] They say that there is no basis for distinguishing between States that were not Member States of the EU at the time they ratified the ECT and States that were (such as Spain and Germany), contending that the awards in *Charanne v Spain¸ PV Investors v Spain*, and *RREEF v Spain* have confirmed that Article 26 ECT applies amongst 'old' Member States. It is said that there is no support for the argument that Article 26 ECT applies to an intra-EU dispute so long as either the home or host State was not an EU Member State at the time the ECT was ratified, but that it does not apply

---

[249] Resp. Rej. ¶¶ 100-125.

[250] Resp. C-Mem. ¶ 7.

[251] Cl. Reply ¶ 107; **CL-0042**, *Electrabel,* Decision on Jurisdiction, Applicable Law and Liability. In the context of other investment treaties *see*, **CL-0097**, *Eastern Sugar B.V.(Netherlands) v The Czech Republic*, SCC Arbitration No. 088/200, Partial Award, 27 March 2007; **CL-0099**, *Jan Oostergetel and Theodora Laurentius v The Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010; **CL-0098**, *Eureko B.V. v Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010; **C-0218**, L E Peterson, "Details Surface on Jurisdiction Holding in Binder v Czech Republic; Ad-Hoc Tribunal Saw No Conflict between BITs and EU law"; and **CL-0095**, *European American Investment Bank AG (EURAM) v The Slovak Republic*, UNCITRAL, Award on Jurisdiction, 22 October 2012. In addition, it has been reported that the tribunal in *EDF v Hungary* upheld EDF's claims of unfair and inequitable treatment, notwithstanding an Intra-EU Objection being advanced. **C-0219**, L E Peterson, "Intra-EU Treaty Claims Controversy: New Decisions and Developments in Claims Brought by EU Investors vs. Spain and Hungary"; **CL-0096**, *The PV Investors v The Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014 ¶ 375; **CL-0134**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v The Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (hereinafter "**RREEF, Decision on Jurisdiction**"), ¶ 232(4); and **CL-0094**, *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain*, SCC Arbitration No. 062/2012, Award, 21 January 2016 ¶ 432 (hereinafter "**Charanne**").

to intra-EU disputes if both of the relevant States were EU Member States at that time.[252] It is also said that there are numerous ECT cases involving disputes between EU Member States and EU investors where no intra-EU Objection was even raised by the respondent State, such as *AES Summit Generation Limited v Hungary*, *Electrabel v Hungary* or *Micula v Romania*.[253]

259.   The Claimants refute the Respondent's reliance on Opinion 1/91 on intra-EU disputes, saying that the Respondent ignores the fact that "*the CJEU has stressed that an international dispute-settlement mechanism set forth by an international treaty to which the EU is a party is compatible with EU law, and that the decisions of the court with jurisdiction to decide disputes under that treaty will be binding on the CJEU*."[254] Spain's reliance on the EC's intervention in the enforcement of the award in *Micula v Romania* to support the intra-EU Objection is said to be misleading and only serves to highlight the frivolous nature of the objection.[255]

260.   The Claimants also reject the Respondent's argument that the text of the ECT indicates that Investors from an EU Member State may not bring a claim against another EU Member State under Article 26 ECT. The Claimants say that: (i) a good faith interpretation of the ordinary meaning of Article 26 shows that there is no intra-EU exception to the Contracting Parties' unconditional consent to arbitration; (ii) the ordinary meaning of the terms of Article 26 of the ECT is clear and the Tribunal has jurisdiction to hear the present dispute as Article 26 applies to disputes between <u>any</u> Contracting Party of the ECT and an Investor of <u>any</u> other Contracting Party; (iii) the phrase "*in the Area of the former* [Contracting Party]" in Article 26(1) ECT refers to the particular dispute initiated by the Investor; (iv) the relevant "*Area*" is that of the

---

[252] Cl. Reply ¶¶ 108-109; cf. Resp. CM ¶¶ 61 and 108.

[253] Cl. Reply ¶ 111, referring to **CL-0101**, *AES Summit Generation Limited and AES-Tisza Erömü Kft v The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, (hereinafter "***AES Summit,*** **Award**"), Section 6; **CL-0042**, *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability; and **CL-0052**, *Ioan Micula, Viorel Micula and others v The Republic of Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (hereinafter "***Micula***").

[254] Cl. Reply ¶ 114; **CL-0102**, CJEU, Opinion 1/91, Economic Area Agreement, ECR 1991, I-6079, 14 December 1991.

[255] Cl. Reply ¶ 115.

Contracting Party "*that is party to the dispute*." The relevant "Area" in this case is the territory of Spain (not of the EU); and (v) that there are no valid grounds to contend that an intra-EU dispute brought under Article 26 would contravene Article 344 TFEU as it applies only to disputes between EU Member States "*regarding the interpretation of EU law*" and does not prohibit Member States from submitting disputes that are not related to EU law to other fora.[256]

261.    According to the Claimants, the fact that the ECT expressly recognises the existence of the REIO under Articles 25, 1(2), 1 (3) and 1(10) does not impact on the rights of Investors under Article 26: it does not set any limitation to disputes, but merely clarifies the possibility to bring a claim against the REIO itself (Article 1(10) defining the REIO area) or Article 25 limiting more favourable treatment via the MFN provision).

262.    Regarding the argument that the relevant "Area" is the territory of the REIO as opposed to the territory of the Contracting State, the Claimants rely on the findings in *PV Investors v Kingdom of Spain*,[257] where it was held that: "*While it is true that the second sentence of Article 1(10) of the ECT defines Area with respect to a REIO as 'the Areas of the member states of such Organization', the first sentence of Article 1(10) of the ECT defines Area with respect to a state that is a Contracting Party as the territory under the state's sovereignty.* Therefore, the Area under consideration in Article 26(1) is that of the Contracting Party that is party to the dispute. The Claimants say that the *Charanne* Tribunal[258] made the same finding, and they submit that the connection between the term Area and the REIO are relevant when a dispute is brought against the REIO, which is a possibility as the EU is a signatory to the ECT.

263.    The Claimants also say that the Respondent's objection would require the Tribunal to speculate as to what might have been the private and unexpressed intentions of the EU and its Member States when they took part in the conclusion of the ECT. The Claimants

---

[256] Cl. Reply ¶¶ 117-125.
[257] **CL-0096**, *PV Investors v The Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014 ¶¶ 178-180.
[258] **CL-0094**, *Charanne*, ¶¶ 427-432.

submit that the meaning of Article 26 is clear and unambiguous, so there is no justification for the Tribunal to resort to supplementary means of interpretation, whereas the Respondent seeks to take into account the subjective intention of the parties.[259]

264.    The Claimants also refute the argument that the provisions of the ECT contradict EU law and that the EU internal market protections are superior to those contained in the ECT. Protection under EU law is different from the protection provided in the ECT to investors and investments. Protection under EU law is primarily focused on ensuring access to the market of another Member State.[260] Additionally, EU law does not provide for an investor to bring claims in international arbitration proceedings for violation of any illegal governmental action taken against foreign investment. Therefore, the ECT grants investors rights that are additional to any other rights provided by the internal market and there is no inconsistency between EU law and the ECT. This was made very clear by, among others, the tribunals in *Electrabel* and *Eastern Sugar*.[261] Further, even if it were found that EU law and the ECT cover the same subject matter, Article 16 of the ECT provides that the provisions more favourable to the investor shall apply.[262]

265.    Finally, the Claimants submit that the ECT does not contain an explicit or implied disconnection clause that would allow the Tribunal to disregard its provisions in an intra-EU dispute. It is said that the EU has experience in disconnection clauses, but that there is no such disconnection clause in the ECT whereby the provisions of the ECT could not apply to the EU Member States' *inter se* relationship.[263]

266.    The Claimants conclude by asking the Tribunal to rule that the Claimants have an unconditional right to bring a claim against Spain in arbitral proceedings under Article 26 and to recognise that it has jurisdiction over the Claimants' claims.[264]

---

[259] Cl. Reply ¶¶ 127-130.

[260] *See for example*, **CL-0112**, C. Barnard, The Substantive Law of the EU: The Four Freedoms (2nd ed., Oxford University Press, 2007), p. 19.

[261] Cl. Reply ¶¶ 130-135. *See*, **CL-0042**, *Electrabel*, Decision on Jurisdiction, ¶ 4.166; and **CL-0097**, *Eastern Sugar B.V. v The Czech Republic*, SCC Arbitration No. 088/2004, Partial Award, 27 March 2007 ¶ 165.

[262] Cl. Reply ¶ 135.

[263] Cl. Reply ¶¶ 137-146.

[264] Cl. Reply ¶ 146.

(2)     **The European Commission's** *Amicus Curiae* **Submission**

267.    On 11 August 2016, pursuant to ICSID Arbitration Rule 37(2), the EC filed a written *amicus curiae* submission, stating its position that the Tribunal does not have jurisdiction under Article 26 ECT. The EC says that the applicable investment protection law to intra-EU investments is EU Law, in particular the rules of free movement of capital and freedom of establishment. Pursuant to Article 3(2) of the TFEU, EU Member States are barred from concluding agreements between themselves that may affect or alter the scope of EU Law. Therefore, it follows that the EU Member States lack the competence to conclude bilateral or multilateral agreements concerning protection of investments.[265]

268.    Neither Spain nor Germany, who were Member States of the European Communities when they ratified the ETC, had the competence to enter into *inter se* obligations concerning the protection of intra-EU investments. That competence laid with the European Communities (currently, with the EU and EURATOM).[266] Thus, the EC submits that those EU Member States that were members of the European Communities when they entered into the ECT did not create any *inter se* obligations between Member States, but only between third countries and the competent subject of international law, i.e. either the EU or its Member States. However, the EC contends that even if the ECT did create certain obligations between the EU Member States in the areas where they retained competence, the Tribunal would still lack jurisdiction because the substantive competence for protection of intra-EU disputes and the jurisdictional competence for those disputes have been transferred to the EU by the Member States. The EC also submits that if the ECT is interpreted as having created *inter se* obligations, including in the protection of intra-EU investments, those obligations would have been superseded by the ratification of other treaties that postdate the ECT, like the Lisbon Treaty.[267]

269.    The EC contends that the appropriate forum is the competent national court or tribunal which is the "*juge du droit commun du droit de l'Union.*" In this forum, the Claimants

---

[265] The European Commission's *Amicus Curiae* Brief ¶ 5.

[266] The European Commission's *Amicus Curiae* Brief ¶ 7.

[267] The European Commission's *Amicus Curiae* Brief ¶¶ 11-13.

could have asked the judge to decide whether the ECT, which is part of EU Law, applies to their dispute, and this question could have been referred to the ECJ.[268]

270.     The EC insists on the essential characteristics of EU law and in particular its primacy over the laws of the Member States and the direct effect of a series of provisions which are applicable to nationals and to EU Member States. These characteristics set EU law apart from other treaties. The EC affirms that it has both internal and external competence over Foreign Direct Investment matters, and thereby to conclude investment agreements,[269] whereas, energy matters are a shared competence. This prevents EU Member States from agreeing investment protection rules *inter se*, outside of the Union legal order. The EC also finds support in the applicable principle of international law for the determination of the extent of international obligations and international liability of Member States: "*Liability follows competence.*"[270]

271.     Alternatively, should the Tribunal find that it has jurisdiction, the EC invites the Tribunal to stay the proceeding until the EC has issued its decision regarding the Respondent's State aid under the Special Regime.[271]

(3)     **The *Achmea* Judgment**

272.     On 6 March 2018, the Court of Justice of the European Union ("**ECJ**") issued its Judgment in *Slowakische Republik (Slovak Republic) v Achmea BV* (Case C-284/26) (the "***Achmea* Judgment**"), submitted by the Respondent as Authority **RL-90**.

273.     At the origin of the *Achmea* Judgment is an award rendered against the Slovak Republic on 7 December 2012 by reference to the 1991 bilateral investment treaty concluded between The Netherlands and the Czech and Slovak Federative Republic. The Slovak Republic sought to set aside the award before the German courts, arguing *inter alia* that there was no valid consent to arbitration because the provision on which the jurisdiction of the arbitral tribunal was based violated Union law, and in particular Article 267 and

---

[268] The European Commission's *Amicus Curiae* Brief ¶ 8.
[269] The European Commission's *Amicus Curiae* Brief ¶¶ 21-24.
[270] The European Commission's *Amicus Curiae* Brief ¶¶ 35, 73 and 88-92.
[271] The European Commission's *Amicus Curiae* Brief ¶ 4.

344 of the TFEU as well as the general principle of EU law of autonomy. When the matter came before the German Bundesgerichtshof, it suspended proceedings and made a request for a preliminary ruling to the ECJ.

274.    The questions put to the ECJ by the German Bundesgerichtshof were as follows:

"(1)    Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

If Question 1 is to be answered in the negative:

(2)    Does Article 267 TFEU preclude the application of such a provision?

If Questions 1 and 2 are to be answered in the negative:

(3)    Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?"

275.    The ECJ gave an affirmative answer to both Questions 1 and 2 and decided that there was hence no need to answer Question 3. The Court ruled as follows:

"Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investment in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

a.     ***The Respondent's Position on the* Achmea *Judgment***

276.  On 22 March 2018, the Respondent filed written comments on the *Achmea* Judgment. It contended that the Judgment was not "*something new*" but rather stemmed from a long tradition in EU law,[272] namely:

> *a)*  In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the EU Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law;

> *b)*  In that context, in accordance with Article 19 TEU, it is for the national courts and tribunals and the Court of Justice to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law;

> *c)*  In particular, the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU which, by setting up a dialogue between one court and another, specifically between the CJEU and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties;

> *d)*  Given the nature and characteristics of EU law, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.[273]

277.  With respect to the application of these principles, the Respondent notes that the ECJ found:

---

[272] Resp. Comments on *Achmea*, 22 March 2018 ¶¶ 12-24.

[273] Resp. Comments on *Achmea*, 22 March 2018 ¶ 27.

a) The arbitral tribunal was not part of the judicial system and could not be classified as a court or tribunal of a Member State within the meaning of Article 267 TFEU;

b) Investment arbitrations are different from commercial arbitration proceedings. While the latter originate in the freely expressed wishes of the parties, the former derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts (and hence from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law) disputes which may concern the application or interpretation of EU law.

c) The States parties to the BIT had thus established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensured the full effectiveness of EU law, even though they might concern the interpretation or application of EU law.[274]

278. The Respondent submits that this reasoning applies equally so far as concerns the ECT "*since the ECT arbitration clause, as interpreted by the Claimants, remove the dispute between an EU investor and EU member State from the jurisdiction of their own courts and therefore prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law.*" Moreover, it relies on three additional reasons as follows:

a) EU law would be especially relevant for this dispute, insofar as the claim concerns a tariff scheme that the EC has qualified as State aid. In this respect, on 19 January 2018, the Respondent had already submitted its Comments on the EC's Decision of 10 November 2017 on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste.[275]

---

[274] Resp. Comments on *Achmea*, 22 March 2018 ¶ 28.

[275] **RL-0089**, EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste.

b) Article 6(1) ECT establishes a binding rule for the Contracting Parties which affects to EU Rules on competition: "*Each Contracting Party shall work to alleviate market distortions*." Article 6(1) ECT is not subject to a claim according to Article 26(1). ECT not only allows, but also obliges EU Member States to act according to applicable EU rules on competition, and their acts are outside the scope of the investors' claims, as they are autonomous and primary rules. Any investor should have been aware of Article 6(1) ECT when investing under ECT provisions.

c) In accordance with Article 10(8) ECT "*any dispute concerning subsidies ... shall be reserved for the supplementary treaty described in paragraph 4*."[276]

279.    The Respondent contends that the application of EU law is inevitable, and also that under Article 26(6) ECT the Tribunal is bound to apply EU law, at least as international law binding both Parties.[277]

b.    ***The Claimants' Position on the* Achmea *Judgment***

280.    On 28 March 2018, the Claimants provided their observations on the *Achmea* Judgment. Their position is that the *Achmea* Judgment is not relevant to the present arbitration because:

a)    "the judgment makes it clear that it applies only to a treaty where the EU is not itself a Contracting Party, which is not the case of the ECT;

b)    there can be no incompatibility between the ECT (a treaty to which the EU is a Contracting Party) and EU law. As the *RREEF* tribunal correctly determined, should there ever be an inconsistency, the ECT would prevail;

c)    the ECT is binding on the EU and provides for arbitration of disputes concerning violations of the ECT as a result of EU measures that EU institutions might adopt. In other words, if a treaty claim can be brought against the EU under the ECT, and that is by definition not incompatible with EU law, it follows that the investor-State

---

[276] Resp. Comments on *Achmea*, 22 March 2018 ¶¶ 30-32.

[277] Resp. Comments on *Achmea*, 22 March 2018 ¶¶ 33-35.

—

arbitration mechanism under the ECT is also not incompatible with EU law; and

d)  unlike the Netherlands-Slovakia BIT, the ECT provides that investor-State disputes shall be decided in accordance with this Treaty (the ECT) and public international law, not the law of the host State (and EU law)."[278]

281.  As to the first of these points, the Claimants highlight that in the *Achmea* Judgment the ECJ stated that the "*competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions … .*"[279]

282.  As to the second point, the Claimants refer to the *Electrabel* case and the conclusion there that "*it would have made no sense for the European Union to promote and subscribe to the ECT if that had meant entering into obligations inconsistent with EU law*", and also refer to Article 216(2) TFEU which provides that: "*Agreements concluded by the [EU] are binding on the institutions of the [EU] and on its Member States.*"[280]

283.  As to the third point, the Claimants contend that the ECT, through Article 26, expressly grants the investor a right of action, through international arbitration, against the offending Contracting Party, including the EU. It follows that this cannot, by definition, be contrary to EU law, and hence the investor-State arbitration mechanism under the ECT (to which the EU is party) cannot be deemed incompatible with EU law.

284.  As to the final point, the Claimants say that the investor-State arbitration mechanism under Article 26 ECT is not open to claims for breaches of EU law by a Contracting Party and, moreover, the Tribunal is not being called upon to apply EU law in any shape or

---

[278] Claimants' Submission on the *Achmea* Judgment, 28 March 2018 ¶ 8 (footnotes omitted).

[279] Claimants' Submission on the *Achmea* Judgment, 28 March 2018 ¶ 10, referring to *Achmea* Judgment ¶ 57.

[280] Claimants' Submission on the *Achmea* Judgment, 28 March 2018 ¶ 10, referring to **RL-0002**, *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶ 3.31.

form as the claims are based on the ECT and customary international law, not EU law, as was also confirmed in *RREEF*, *Eiser* and *Novenergia*.[281]

285.    The Claimants also say that there are a number of shortcomings in the *Achmea* Judgment, including in the untenable distinction drawn between commercial arbitration (said by the ECJ to originate in the freely expressed wishes of the parties) and investment arbitration (said to derive from a Treaty by which Member States agree to remove from the jurisdiction of their own courts disputes which may concern the interpretation or application of EU law).[282]

286.    Finally, the Claimants are dismissive of the further matters introduced by the Respondent in its submission. They say that Article 6(1) is being raised by the Respondent for the first time, 10 months after the close of the hearing, and that Article 10(8) has no relevance to *Achmea*. As to the Respondent's assertion that the claim concerns compensation derived from a tariff scheme that the EC has qualified as State aid, the Claimants say that the EC expressly confirmed that it did not address the remuneration under RD 661/2007 and its compatibility with the EU rules on State aid.[283] This is the position that had already been set out by the Claimants in their submission of 26 January 2018, Claimants' Reply to Respondent's Comments on the EC's Decision SA.40348 (20151NN).[284]

(4)    **The European Commission's Updated *Amicus Curiae* Submission**

287.    On 13 July 2018, the EC filed (with permission) an update of its written submission in the light of the Judgment in *Achmea*. [285] The starting point for the EC's consideration is that EU law forms part of the public international law order, and of the "*rules and principles of international law*" pursuant to Article 26(6) ECT, for the purposes of this

---

[281] Claimants' Submission on the *Achmea* Judgment, 28 March 2018 ¶ 14.

[282] Claimants' Submission on the *Achmea* Judgment, 28 March 2018 ¶¶ 15 -19.

[283] Claimants' Submission on the *Achmea* Judgment, 28 March 2018 ¶¶ 20-21.

[284] **RL-0089**, EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste.

[285] Update of Written Submission in the Light of the Judgment of the European Court of Justice in *Achmea*, 13 July 2018 (the "**EC's Updated Submission**").

proceeding. The EC also explains that the ECT is part of EU law because the EU is Party to it.[286]

288.    The EC says that the key steps of the reasoning in the *Achmea* Judgment apply so far as concerns the ECT: EU law is applicable to the dispute; an investment treaty tribunal within Article 26 ECT is not a national court or tribunal within Article 267 TFEU; there is no complete review of an award by a national court or a tribunal of a Member State. This conclusion is not undermined by paragraph 57 of the *Achmea* Judgment concerning treaties to which the EU is a party, including because the autonomy of EU law and its legal order is not respected by Article 26 ECT.[287]

289.    The EC's position is that the *Achmea* Judgment applies to all pending investment arbitration cases, and the award in the *Masdar* case is criticised for treating the Judgment as confined to bilateral treaties. It is hence stated that EU law precludes the interpretation of Article 26 of the ECT put forward by the Claimants in this case.[288]

290.    According to the EC:

> "the ECT does not apply at all in the *inter se* relationship between EU Member States. Rather, the ECT created international obligations only between third countries and the competent subject of international law of the area of Union law. Second, and in the alternative, the Commission takes the view that even if the ECT did create certain *inter se* obligations between the EU Member States, *quod non,* those obligations would not comprise the provisions of the ECT on investment protection (Chapter III) and dispute settlement (Article 26 ECT) as both the substantive competence for protection of investments by EU investors in other EU Member States, including in the field of energy, and the jurisdictional competence for those disputes have been transferred to the Union. In consequence, Spain (and the Union) has made an offer for arbitration only to investors from Contracting Parties that are not Member States."[289]

---

[286] EC's Updated Submission ¶¶ 3 and 20.

[287] EC's Updated Submission ¶¶ 23-24.

[288] EC's Updated Submission ¶¶ 26-32.

[289] EC's Updated Submission ¶ 34.

291.    The EC also contends that, under Article 30(4)(a) of the Vienna Convention on the Law of Treaties (the "**VCLT**" or "**Vienna Convention**"),[290] the ECT only applies to the extent that its provisions are compatible with those of later treaties. The provisions of the ECT on dispute settlement (Article 26 ECT), when applied between two Member States, are not compatible with EU law as it results from later treaties. Hence, pursuant to Article 30(4)(a) VCLT, such provisions are not applicable. The EC's position is that this conclusion is not undermined by Article 16 ECT, *inter alia* because it is overridden by the general principle of primacy and Article 351 TFEU (*a contrario*).[291]

292.    The EC says that, should this Tribunal have any doubts as to the position, it should refer the matter to the ECJ through a *juge d'appui*.[292]

293.    The EC also addresses the issue of State aid. Its position is that the measures contested by the Claimants constitute State aid in the sense of Article 107(1) TFEU, and that Spain has notified the disputed measures to the Commission on the basis of Article 108(3) TFEU. It is said that the EC had set out in its decision that "*investors could not entertain any legitimate expectations that the initial support scheme would remain unchanged, not least because that initial support scheme (which was replaced and superseded by the amended support scheme) constituted unlawful State aid (it had not been notified to and approved by the European Commission).*"[293]

a.    ***The Respondent's Position on the EC's Updated Submission***

294.    On 25 July 2018, the Respondent filed written comments on the EC's Updated Submission. It saw the EC's interpretation of the *Achmea* Judgment as confirming that the Tribunal "*lacks jurisdiction to hear the present intra-EU dispute that not only concerns the fundamental freedoms of the EU but also a key institution of EU Law: State Aid.*" The Respondent drew the Tribunal's attention to a communication from the EC to the European Parliament and Council regarding "*Protection of intra-EU investment*"

---

[290] **CL-0004**, Vienna Convention on the Law of Treaties, 1155 United Nations Treaty Series, 331, 23 May 1969 (entry into force 27 January 1980) (hereinafter "**Vienna Convention**").
[291] EC's Updated Submission ¶¶ 44-46.
[292] EC's Updated Submission ¶¶ 47-48.
[293] EC's Updated Submission ¶¶ 49 and 50-55.

published on 20 July 2018, and also to a statement of the German Federal Government to the German Parliament dated 30 April 2018 to the effect that the admissibility of arbitral proceedings under the ECT must be newly assessed in the light of the *Achmea* Judgment, and stating that: "*The Federal Government thus believes that the legal principle from the Achmea judgment by the CJEU is also claimed for the validity of the Energy Charter Treaty.*"[294]

b. ***The Claimants' Position on the EC's Updated Submission***

295.    On 6 August 2018, the Claimants filed their written comments on the EC's Updated Submission. The Claimants take issue with the points made by the EC and, in making the argument that nothing in the *Achmea* Judgment can invalidate Article 26 ECT, contend *inter alia* that "*Germany's opinion on the ECT is clearly not authoritative of the objective meaning of the ECT (not least since it is also a respondent to ECT claims).*" They also contend that should there be a conflict between the ECT and the EU Treaties (*quod non*), then the ECT prevails, including by virtue of Article 16 ECT, while as to Article 30(4)(a) VCLT, the ECT and the EU Treaties cover different subject matters and the ECT is *lex posterior* with respect to the EU Treaties. They also say that the EU treaties also confirm that the ECT prevails as Article 216(2) TFEU provides that agreements concluded by the EU are binding on institutions of the EU and on its Member States, and they say that Article 351 TFEU is of no application since the ECT was entered into after accession to the EU Treaties. The Claimants also reject the suggestion that the Tribunal refer the issue to the ECJ via a *juge d'appui*, and reiterate that the EC Decision on State aid has no relevance to the jurisdiction and the merits of the present case.[295]

(5)    **The Declarations of 15-16 January 2019**

296.    On 15 January 2019, a Declaration was made by twenty-two EU Member States entitled "Declaration of the Representatives of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment

---

[294] Resp. Comments on the EC's Updated *Amicus* Brief, 25 July 2018.

[295] Cl. Comments on the EC's Updated *Amicus* Brief, 6 August 2018.

Protection in the European Union" ("**the Declaration of 15 January 2019**"). This Declaration refers to the ruling of the ECJ in the *Achmea* Judgment, stating:

> "Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law.
>
> Union law takes precedence over bilateral investment treaties concluded between Member States. As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so called sunset or grandfathering clauses). An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.
>
> Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied."

297.   Pursuant to the Declaration of 15 January 2019, the signatory Member States then declare *inter alia* that:

> "1. By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.
>
> 2. In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent."

298.   On 25 January 2019, the Respondent sought permission for admission of the Declaration of 15 January 2019 onto the record of this arbitration. The Claimants objected to this

request on 30 January 2019 stating however that, if the Tribunal were minded to admit the Declaration of 15 January 2019, two further Declarations of 16 January 2019 should be admitted, namely the Declaration of Finland, Luxembourg, Malta, Slovenia and Sweden ("**the Declaration of Five Member States**") and the Declaration of Hungary ("**Hungary's Declaration**").

299.    According to the Declaration of Five Member States, the *Achmea* Judgment is silent on the subject of the arbitration provision in the ECT. It is also noted that various tribunals have decided that such provision is applicable as between EU Member States, and that this interpretation is currently contested before a national court in a Member State (in the *Novenergia II* case). It is then said:

> "Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra-EU application of the Energy Charter Treaty."

300.    It is said in Hungary's Declaration that –

> "… in Hungary's view, the *Achmea* judgment concerns only the intra-EU bilateral investment treaties. The *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty ("ECT") and it does not concern any pending or prospective arbitration proceedings initiated under the ECT.
>
> Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its view as regards the compatibility with Union law of the intra-EU application of the ECT. The ongoing and future applicability of the ECT in intra-EU relations requires further discussion and individual agreement amongst the Member States."

301.    The Tribunal decided that all three Declarations should be admitted onto the record, and invited brief submissions from the Parties.

a.    ***The Respondent's Position on the 2019 Declarations***

302.    On 12 February 2019, the Respondent filed its written comments. The Respondent's position is that:

> "… by means of the Declaration [of 15 January 2019] the signatory Member States inform the arbitral investment community that an arbitral tribunal established on the basis of investor-State arbitration clauses such as Article 26 of the ECT lacks jurisdiction when the dispute is intra-EU. Such lack of jurisdiction is due to the fact that the Member States never interpreted Article 26 of the ECT as a valid offer to arbitrate between EU Members because such consent to arbitration would be opposed to EU law. The Kingdom of Spain considers that the Declaration holds paramount relevance to this case because it is a definite and distinct demonstration of the will of the States that signed the ECT as to how Article 26 of the ECT should be interpreted in relation to EU Law."[296]

303. The Respondent says that the Tribunal can and should interpret the ECT in harmony with EU law, and that the primacy of EU law prevents the ECT from incorporating an offer to arbitrate intra-EU disputes. It also contends that the Declaration of 15 January constitutes a "*subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions*" for the purposes of Article 31(3)(a) VCLT or, if not, at least subsequent "*practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation*" within Article 31(3)(b) VCLT.[297]

304. The Respondent also says that if the Tribunal is not convinced that a harmonious interpretation of Article 26 with EU law is possible, then EU law prevails as *lex posterior* consistent with Articles 30(3) and (5) VCLT or by way of a special conflicts rule through the primacy of EU law that applies regardless of the VCLT (which rule is in turn *lex posterior*).[298] As to the Declaration of the Five Member States, the Respondent says that this does not express a view opposed to the Declaration of 15 January 2019, and it emphasises that the latter has been signed both by Germany and itself, stating:

> "Any theoretical discussion about the legal characterization of the Declaration cannot change the nature and the binding nature of the commitments it encloses for both Spain and Germany. In order to comply with EU Law and respect its international commitments as expressed in the Declaration, Spain has no option but to respectfully insist on the objection to the jurisdiction of this Arbitral Tribunal. The fact that both the host State and the Respondent State have signed the Declaration makes it ever more

---

[296] Resp. Comments on the Declaration, 12 February 2019, ¶ 8.
[297] Resp. Comments on the Declaration, 12 February 2019 ¶¶ 9-15.
[298] Resp. Comments on the Declaration, 12 February 2019 ¶¶ 14-17.

100

clear, that Article 26 of the ECT does not comprise an intra-EU arbitration clause."[299]

305.    Finally, the Respondent suggests that the Tribunal request Germany to submit a communication to the Tribunal regarding the legal consequences of the *Achmea* Judgment for these proceedings.[300]

b.    ***The Claimants' Position on the 2019 Declarations***

306.    On 19 February 2019, the Claimants filed their written comments on the 2019 Declarations. Their position is that the Declaration of 15 January 2019 distinguishes between bilateral investment treaties and the ECT, and contend that "*there is no agreement among EU Member States (including between the 22 signatories to the Declaration) regarding the consequences of Achmea for the ECT or whether EU law has precedence over the ECT*."[301] Thus the Claimants emphasise that, as follows from the different approaches in the different declarations, "*Member States do not agree on the compatibility of the ECT with EU law. Therefore, contrary to Spain's suggestion, the EU Member States' original intention cannot have been to exclude the intra-EU application of Article 26 of the ECT.*"[302]

307.    The Claimants also challenge the Respondent's invocation of Article 31(3)(a) and (b) VCLT, contending that the Declaration of 15 January 2019 does not establish an agreement for the purposes of either provision, characterising it as a political statement that does not set out how the ECT is to be interpreted. Further, it is said that it is clearly not the case that all parties to the ECT have been involved in any interpretation, and also that "*on any view, the Declaration can have no bearing on the Tribunal's jurisdiction since it postdates the commencement of the present proceeding. It is an accepted principle of international law that jurisdiction is determined by reference to the date on which the proceedings are instituted.*"[303]

---

[299] Resp. Comments on the Declaration, 12 February 2019 ¶¶ 19-20.
[300] Resp. Comments on the Declaration, 12 February 2019 ¶ 21.
[301] Cl. Comments on the Declarations of the EU Member States, 19 February 2019 ¶¶ 2-4.
[302] Cl. Comments on the Declarations of the EU Member States, 19 February 2019 ¶ 7.
[303] Cl. Comments on the Declarations of the EU Member States, 19 February 2019 ¶¶ 10-12.

308.    In addition to addressing briefly the Respondent's arguments that EU law prevails, including by rejecting the argument that EU law is *lex posterior*, the Claimants state that Germany should not be allowed to intervene. It is said that Germany's view on the legal consequences of the *Achmea* Judgment is not relevant for this arbitration, and that "*Germany's intervention in this proceeding is not contemplated by the ICSID Convention nor the ECT, and it would be incompatible with the objective of depoliticising investor-State disputes.*"[304]

(6)    **The Tribunal's Analysis**

309.    The Tribunal has reviewed the Parties' arguments with extreme care, and likewise the position of the EC in its two submissions. It has also studied the positions of the EU Member States as expressed in the three Declarations of 15-16 January 2019.

a.    ***The law applicable to the intra-EU objection***

310.    The jurisdiction of the Tribunal derives from Article 25 of the ICSID Convention and Article 26 ECT. No particular issues arise under Article 25 of the ICSID Convention save for the question of whether there is indeed consent to arbitration under Article 26 ECT. It follows from the fact that this is an ICSID arbitration that the Tribunal is not concerned with the application of a curial law (unlike in the *Achmea* case, for example), which might bring into play EU law as a matter of that curial law.

311.    Article 26 ECT, and all other provisions of the ECT, are to be interpreted and applied in accordance with the VCLT, to which both Spain and Germany are parties.

312.    The Respondent places particular weight on Article 26(6) ECT in the context of its intra-EU objection. This provides:

> "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

---

[304] Cl. Comments on the Declarations of the EU Member States, 19 February 2019 ¶¶ 14-18.

313.    According to the Respondent: "*It is precisely Article 26(6) ECT that prevents an intra-EU investor from bringing arbitration proceedings against an EU Member State for reasons related to its investment. Admitting this possibility would be contrary to EU law, which is applicable international law.*" The argument is that, to the extent that the ECT is incompatible with EU law, the latter prevails as a matter of the EU Treaties, whilst Article 344 TFEU means that Spain cannot submit to arbitration any matters concerning the EU internal market in electricity (i.e. matters raised by the current claim).[305]

314.    Certainly, it is correct that the EU Treaties, i.e. the Treaty on the European Union ("**TEU**") and the TFEU are instruments established in, and constitute one part of the broad corpus of, international law. That however does not mean that the entirety of EU law is to be regarded as international law as the Respondent appears to suggest. Insofar as a given rule of EU law is established by a treaty, then it exists in and is governed by international law, but there are also rules of EU law that operate only within the internal legal order of the EU.[306]

315.    However, the Tribunal does not accept the Respondent's position that Article 26(6) ECT applies as a choice of law provision with respect to the ascertainment of the Tribunal's jurisdiction.  As noted by the tribunal in the *Vattenfall* case, the "*dispute*" with which Article 26(6) is concerned is the "*dispute*" as further identified in Article 26(1), i.e. a dispute concerning an alleged breach of an obligation under Part III.[307] It follows that Article 26(6) is concerned with the law applicable to the merits of the dispute, and in this

---

[305] Resp. C-Mem. ¶¶ 84-86.

[306] **CL-0193**, *Vattenfall AB and others v Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 (hereinafter "*Vattenfall,* **Decision on the *Achmea* Issue**"), ¶ 146: "It would be more exact to say that the corpus of EU law derives from treaties that are themselves a part of, and governed by, international law, and contains other rules that are applicable on the plane of international law, while also containing rules that operate only within the internal legal order of the EU and, at least arguably, are not a part of international law; … ." Cf. **RL-0002**, *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶ 4.120.

[307] **CL-0193**, *Vattenfall*, Decision on the *Achmea* Issue, ¶¶ 114-121.

respect is functionally equivalent to Article 42(1) ICSID Convention.[308] Article 27(3)(g) ECT is understood to be to the same effect.[309]

316.    The Tribunal sees nothing shocking in the above.[310] To the contrary, it considers that it would be unusual for an international law tribunal, in considering whether it has jurisdiction, to be mandated to apply law beyond the treaty being the source of its jurisdiction together with secondary rules of international law going to matters such as interpretation and any specific law that arises in the application of a jurisdictional requirement.[311] Thus, this Tribunal is plainly mandated to determine, for example, whether an Investor is "*organised in accordance with the law applicable in [the] Contracting Party*" as per Article 1(7) ECT), or to consider other sources of international law to the extent provided for in application of the VCLT, such as under Articles 30 or 31(3)(c) VCLT. If primary rules of international law exterior to the ECT were intended to be applied in considering the existence of the Tribunal's jurisdiction without the framing devices provided by the VCLT, the Tribunal would have expected to see unambiguous wording to that effect, not least because otherwise the Tribunal would be left without established and generally applicable international law rules as to the inter-relationship between any competing primary rules as to jurisdiction.[312]

317.    On this basis, if EU law is indeed to prevail, this must follow from the wording of the ECT as interpreted and applied in accordance with the VCLT, and the Respondent has

---

[308] **CL-0193**, *Vattenfall*, Decision on the *Achmea* Issue, ¶¶ 117-119 referring to *Schreuer, The ICSID Convention: A Commentary*. *See also*, as to Article 42(1) ICSID Convention, **CL-0180**, *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013, ¶¶ 236-241.

[309] The Tribunal has considered whether the reference in Article 26(6) to the law to be applied by a "*tribunal established under paragraph (4)*" assists it, but considers that this is neutral: read in context, this may be understood as a reference to a tribunal established in accordance with the jurisdictional requirements of Article 26(4) and the preceding provisions that it refers back to, i.e. a tribunal as to which the various jurisdictional requirements have been met; but it could also be understood as a reference to a tribunal that has been constituted and is considering its jurisdiction.

[310] Cf. Resp. Comments on the *Vattenfall* Decision and the EC's Communication, 9 October 2018 ¶¶ 7-13.

[311] As an example of the distinction between primary and secondary rules of international law, *see* **RL-0078**, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries 2001, General Commentary ¶¶ 1-4.

[312] Cf. for example the rules on successive treaties provided for in Articles 30 and 59 VCLT or Article 31(3)(c) as to "*taking into account*" – as opposed to applying – "*any relevant rules of international law applicable in the relations between the parties*."

made certain arguments based on the interpretation of Article 26, as well as on the impact of Articles 30 and 59 VCLT, as considered in sub-sections (i)-(iii) below.  The Tribunal considers that these arguments fail.

318.  Even if the Respondent were correct that Article 26(6) mandated the application of EU law (to the extent that it qualifies as international law) to the issue of the existence and scope of the Tribunal's jurisdiction, the intra-EU objection would still fail.  This follows from the reasoning in section (c) below, where the Tribunal considers the Respondent's arguments deriving from EU law to the effect that Spain has no obligations under Part III ECT and/or consent to arbitration under Article 26 ECT does not apply with respect to intra-EU disputes.

b.  ***Interpretation and application of Article 26(1) ECT pursuant to the VCLT***

319.  As follows from the above, the Tribunal approaches the Respondent's contentions from its position as an arbitral tribunal that, insofar as it has jurisdiction, derives that jurisdiction from Article 25 of the ICSID Convention and Article 26 ECT, i.e. two treaties that fall to be interpreted and applied as a matter of international law.

*(i) Article 26(1): the Respondent's arguments with respect to the "Area" and Article 1(3) ECT*

320.  Pursuant to Article 26(1) ECT:

> "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably."

321.  Pursuant to Article 1(2) ECT:

> "'Contracting Party' means a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force."

322.  The Regional Economic Integration Organization (REIO) is defined in Article 1(3) as meaning –

> " … an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters."

323.   By reference to the ordinary meaning of the words of Article 1(2) ECT, the Respondent is "*a state … which has consented to be bound by this Treaty and for which the Treaty is in force*", and so is Germany. Applying the definitions at Article 1(6) and 1(7) ECT, the Claimants are Investors of another Contracting Party, i.e. Germany, and they have made Investments in Spain.

324.   There is a question nonetheless as to whether it is correct to regard those Investments as qualifying for the purposes of Article 26(1) i.e. as Investments "*in the Area of the former [Contracting Party]*." This is because, as is common ground, the EU is a REIO that has consented to be bound by the ECT and for which the ECT is in force, i.e. it is a Contracting Party for the purposes of Article 1(2), which also has a defined Area under Article 1(10) ECT. Given that both Spain and Germany are EU Member States, the question is therefore whether the Claimants do indeed have Investments in the Area of another Contracting Party.

325.   Article 1(10) establishes a definition of "Area" both with respect to a State and a REIO, as follows:

> "'Area' means with respect to a state that is a Contracting Party:
>
> (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and
>
> (b) subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.
>
> With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization."

326.   Thus, with respect to the EU, as a Contracting Party to the ECT, the defined Area is the Areas of its Member States "*under the provisions contained in the agreement*

*establishing [the EU]*." This definition is predicated on individual States that are Contracting Parties having their own Areas.

327.    Applying these definitions in the interpretation and application of Article 26(1), Spain is a Contracting Party, the Claimants are Investors of another Contracting Party i.e. Germany, and their Investment is "*in the Area of the former*" Contracting Party, i.e. Spain. There is nothing in Articles 1(2), 1(10) or 26(1) to suggest that, where both Contacting Parties are within the Area of the EU, they are either to be regarded as ceasing to have their own Areas as States and Contracting Parties to the ECT or that the relevant Area becomes the Area of the EU (and exclusively so).

328.    Of course, if the dispute were with the EU as the relevant Contracting Party, then the Area for the purposes of Article 26(1) would be the Area of the EU as defined by Article 1(10). But the current claim has not been brought against the EU, and the Tribunal sees nothing in Article 26(1) that would lead it to conclude that, because the relevant Area in that provision could in an appropriate case be the Area of the EU, Spain should cease to have its own independent Area as defined by Article 1(10) in the circumstances of the current dispute.

329.    There is likewise nothing in Articles 26(1) or 26(3) to suggest that Spain (or any other EU Member State) as the Contracting Party was limiting the consent to arbitrate to Investors from non-EU States; and although it follows from Article 1(3) that EU Member States "*have transferred competence over certain matters*", there is no language in Articles 1 or 26 or elsewhere in the ECT[313] that suggests that such matters are engaged with the effect of disapplying Article 26 (or the substantive protections of ECT, Part III).[314]

330.    Further, as the Claimants contend, had the EU or the EU Member States wished to deny access to arbitration in the case of an intra-EU dispute, one would expect to see some form of disconnection clause or declaration of competencies that would allow the

---

[313] This includes Article 36(7) ECT to which the Respondent refers.

[314] *See*, to similar effect, the analysis of the tribunal in **CL-0187**, *Blusun*, ¶¶ 280-282, with which the Tribunal agrees.

Tribunal to disregard Article 26 and/or conclude that EU Member States were not competent to accept obligations under Part III.[315]

331.   As noted by the Claimants, through Article 27(2) of the 1988 Council of Europe/OECD Convention on Mutual Assistance in Tax Matters, it was established that: "*Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.*"[316] There is no equivalent to such provision in the ECT. As the Claimants also point out, in concluding the Final Act of the European Energy Charter Conference, there was a decision on a conflicts rule ensuring the prevailing effect of the Svalbard Treaty and expressly disapplying Article 16 ECT.[317] Again, there is no equivalent that the Respondent has pointed to. The EU did make a statement pursuant to Article 26(3)(b)(ii) ECT on its "*policies, practices and conditions with regard to disputes between an investor and a Contracting Party and their submission to international arbitration or conciliation*", but again this contains no indication that Article 26 would not apply so far as concerns intra-EU disputes,[318] as would have been expected had that then been the EU's understanding or intention.

332.   These factors militate strongly against the Respondent's position – and that of the EC – that because Spain and Germany were already members of the EU at the time of their ratification of the ECT they thereby lacked competence to accept obligations under Part III ECT (including Article 16).[319]

---

[315] Cl. Reply ¶¶ 137-146.

[316] Cl. Reply ¶ 138, referring to **CL-0116,** 1988 Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters, Article 27, quoted in *Fragmentation of International Law: difficulties arising from the diversification and expansion of international law,* Report of the Study Group of the International Law Commission, finalised by M Koskenniemi, International Law Commission, fifty-eight session, Geneva,1 May-9 June and 3 July-11 August 2006, Document A/CN.4/L.682, 13 April 2006.

[317] Cl. Reply ¶ 143, referring to **CL-0007**, Energy Charter Secretariat, "Decision of the Energy Charter Conference, Subject: Road Map for the Modernization of the Energy Process", Energy Charter Secretariat, 24 November 2010.

[318] Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty.

[319] Cf. Resp. Rej. ¶¶ 73-74 and 105, referring to *Costa v ENEL. See also*, Resp. C-Mem. ¶ 61.

333.    Accordingly, the Tribunal rejects the Respondent's contentions based on the Area and Article 1(3) ECT.

*(ii) The Respondent's arguments with respect to object and purpose and Article 25 ECT*

334.    The Respondent emphasises the purpose of the ECT, through the reference in Article 2 ECT to the Energy Charter, as being to "*promote East-West industrial cooperation through the establishment of legal safeguards in areas such as investment, transit and trade.*" It is suggested that it would be quite wrong to assume that the EU and its Member States wished through the ECT "*to cover an area, that of intra-EU investments, which had been totally covered – and in a far superior manner – for years by EU law*" which, moreover, would mean "*taking competences away from the ECJ.*" [320]

335.    It is of course correct that Article 26, as with all other provisions of the ECT, must be interpreted in accordance with the ordinary meaning to be given to its terms, in their context and in the light of the ECT's object and purpose, as required by Article 31(1) VCLT (and customary international law).  However, the Tribunal sees nothing in either the ECT or Titles I and II of the Energy Charter to suggest that one purpose of the ECT was to establish a system of protection for non-EU investors whilst excluding from the ambit of protection EU investors in EU Member States, and nor does it accept that the object and purpose of the ECT more generally is consistent with or points to such a result. Still less does it see any expression of any purpose to distinguish between intra-EU and other investments that calls into question the ordinary meaning of Articles 26(1) and (3), and likewise so far as concerns the provisions of Part III ECT and its application to EU Member States.

336.    The Respondent also contends that the ECT itself recognises through its Article 25 the principle of primacy of EU law. [321] The Tribunal does not accept this. Article 25 ECT is concerned with most favoured nation treatment, and merely establishes that a Contracting Party that is a party to an Economic Integration Agreement (EIA) is not required, by

---

[320] Resp. C-Mem. ¶¶ 94-97; **RL-0006**, ECT, Article 1 and Preface.
[321] Resp. Rej. ¶¶ 93 and 114.

means of most favoured nation treatment, to extend "*any preferential treatment applicable between the parties to that EIA*" to another Contracting Party that is not a party to that EIA. It says nothing about the primacy of EU law and recognises no principle in that respect. The same applies with respect to the declaration concerning Article 25 made by the EU and its Member States.[322]

### (iii) The Respondent's arguments with respect to Articles 30, 31(3)(c) and 59 VCLT

337.    The Respondent contends that EU law prevails by virtue of Articles 30 and 59 VCLT.[323] Article 30 VCLT provides:

> "1. … the rights and obligations of States Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.
>
> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one:
>
> > (*a*) as between States Parties to both treaties the same rule applies as in paragraph 3;
> >
> > (*b*) as between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.
>
> 5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are

---

[322] Cf. Resp. Rej. ¶ 93.

[323] Resp. Rej. ¶¶ 94-96, Resp. Comments on the Declaration, 12 February 2019 ¶ 14.

incompatible with its obligations towards another State under another treaty."

338.    As follows from Article 30(2) VCLT, Article 30 is a default rule, and it cannot be applied without consideration of a specific provision in a treaty dealing with the issue of prior or subsequent treaties.

339.    So far as concerns the ECT, Article 16 ("*Relation to other agreements*") establishes a rule of non-derogation in favour of the Investor and Investment as follows:

> "Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> > (1)  nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
> >
> > (2)  nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,
>
> where any such provision is more favourable to the Investor or Investment."

340.    If it is assumed in the Respondent's favour that the TFEU (or the TEU) constitutes a "*subsequent international agreement, whose terms … concern the subject matter of Part III or V of this Treaty*", then the Respondent and the EU nonetheless remain bound as Contracting Parties to the ECT in accordance with Article 16, i.e. nothing in the terms of the TFEU (or the TEU) can be construed to derogate from the provisions of Part III or Part V or from any right to dispute resolution with respect thereto. The Tribunal accepts that the provisions of Part III and Part V that are relied on in the context of the current claim are correctly seen as "*more favourable to the Investor or Investment*" such that Article 16 is engaged.[324]

---

[324] Cf. Resp. Rej. ¶ 100.

341.    Although the Tribunal does not rule out that Article 16 ECT could be displaced by express language in a subsequent treaty, (i) this would have to be in a provision agreed to by all Contracting Parties to the ECT,[325] and (ii) even if it were somehow otherwise, the Tribunal has seen no provision that suggests any such intention. Further, although the TFEU was concluded subsequent to the ECT, the rules that Articles 267 and 344 TFEU establish existed in treaties prior to the ECT such that, if there had been any intention to attempt to displace Article 16 ECT, there is all the more reason to expect that this would have been through express language, whether in the TFEU or elsewhere.

342.    It follows that Article 16 applies, and even if Articles 267 and 344 TFEU are seen as concerning the subject matter of Parts III or V (which the Tribunal does not accept), there is no basis on which to have recourse to the rule in Article 30(4)(a) VCLT or any other of the rules of Article 30, and there is no basis for saying that Articles 267 and 344 TFEU or any other provisions of the TFEU or TEU prevail over Parts III or V ECT. (This is subject to the Respondent's position that Spain and Germany lacked competence to undertake any obligations in Part III ECT including Article 16, which is considered further below.)

343.    Article 59 VCLT establishes rules in relation to the termination or suspension of the operation of a treaty implied by the conclusion of a later treaty. It establishes under Article 59(1) two limbs where termination or suspension of the earlier treaty may be implied "*if all the parties to it conclude a later treaty relating to the same subject matter.*" This has not happened. The EU Treaties are concluded by only certain of the parties to the ECT. Nor have Spain and Germany made a notification of suspension to the other ECT parties as would be required under Article 65(1) VCLT (the Declaration of 15 January 2019 cannot be construed as such a notification: it says nothing about suspension of the ECT, is addressed to investment arbitration tribunals as opposed to the Contracting Parties of the ECT, and does not purport to meet the requirements of Article 65(1) VCLT).

---

[325] Cf. Resp. Comments on the Declaration, 12 February 2019 ¶¶ 16-17.

344.    The Respondent has made a belated reference to Article 31(3)(c) VCLT, and is critical of the conclusion of the *Vattenfall* tribunal to the effect that EU law is not to be taken into account under Article 31(3)(c) to interpret Article 26 ECT in the way that was sought by the EC in the *Vattenfall* case, but no argument is put forward to support the Respondent's criticism.[326]

345.    The Tribunal agrees with the *Vattenfall* tribunal that relevant rules of international law applicable in the relations between the parties are to be taken into account under Article 31(3)(c) VCLT, which does not imply that there is to be a re-writing of a provision such as Article 26 ECT so as to arrive at an interpretation that is both contrary to the ordinary meaning of its terms and has the result that the same provision has different meanings for different parties to the same treaty.[327] Moreover, as discussed further below, the Tribunal does not consider that there is any relevant rule of international law that has been identified to it on the basis of the *Achmea* Judgment or elsewhere.[328]

### *(iv) Conclusion: pacta sunt servanda*

346.    The Tribunal therefore does not see any sound basis within the ECT, or by application of the VCLT, for the Respondent's contention that EU law prevails.

347.    As follows from the principle of *pacta sunt servanda* referred to by the tribunal in the *RREEF* case, the provisions of Part III ECT to which Spain and Germany have subscribed must be taken as binding given the absence of any qualification or reservation by these two States or by the EU. Thus, the *RREEF* tribunal noted that:

> "… when the very essence of a treaty to which the EU is a party is at issue, … then precisely because the EU is a party to the treaty a formal warning that EU law would prevail over the treaty, such as that contained in a disconnection clause, would have been required under international law.

---

[326] Resp. Comments on the *Vattenfall* Decision and the EC's Communication, 9 October 2018 ¶ 15; cf. **CL-0193**, *Vattenfall*, Decision on the *Achmea* Issue, ¶¶ 151-165.

[327] **CL-0193**, *Vattenfall*, Decision on the *Achmea* Issue, ¶¶ 154-158; cf. Resp. Comments on the Declaration, 12 February 2019 ¶ 9.

[328] *See also*, **CL-0193**, *Vattenfall*, Decision on the *Achmea* Issue ¶¶ 159-164.

This follows from the basic public international law principle of *pacta sunt servanda*. If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself ... ."[329]

348. The position was also expressed by the tribunal in the *Blusun* case as follows, in reasoning with which this Tribunal agrees:

"Pursuant to Article 6 of the VCLT, every State possesses capacity to conclude treaties and is bound by those obligations pursuant to the principle of *pacta sunt servanda*. No limitation on the competence of the EU Member States was communicated at the time that the ECT was signed. Article 46 of the VCLT provides that a State may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance. While EU law operates on both an internal and international plane, a similar principle must apply. Even if, as a matter of EC law, the EC has exclusive competence over matters of internal investment, the fact is that Member States to the EU signed the ECT without qualification or reservation. The *inter se* obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that the EC says can be inferred from a set of EU laws and regulations dealing with investment."[330]

349. The Tribunal accordingly rejects the Respondent's arguments to the effect that Article 26 does not establish jurisdiction with respect to intra-EU cases and likewise that Spain and Germany have no obligations under Part III with respect to intra-EU investments due to a lack of competence.

350. The Tribunal gets to this result on the basis that its mandate, in considering its jurisdiction, does not extend to the application of EU law. If that were wrong however, whether because the Tribunal is incorrect in its analysis of Article 26(6) ECT or otherwise, the Tribunal would still get to the same result through application of EU law.

---

[329] **CL-0134**, *RREEF*, Decision on Jurisdiction, ¶¶ 84-85.

[330] **CL-0187**, *Blusun*, ¶ 283.

c.        ***The Respondent's argument that EU law applies and prevails***

351.    The Respondent's position is that: "*The EU is an economic integration area which includes as part of its regulations on the Internal Market an integral system to promote and protect intra-EU investments, which prevails over the provisions of the ECT.*"[331] Its argument, as developed by reference to Articles 267 and 344 TFEU and by reference to the *Achmea* Judgment, is that the Tribunal accordingly lacks jurisdiction in respect of an intra-EU dispute concerning the EU internal market in electricity (i.e. matters raised by the current claim).[332]

352.    Pursuant to Article 267 TFEU:

> "The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:
>
> (a) the interpretation of the Treaties;
>
> (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;
>
> Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.
>
> Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.
>
> If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay."

353.    Pursuant to Article 344 TFEU:

> "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."

---

[331] Resp. C-Mem. 66.

[332] Resp. C-Mem. ¶¶ 66-74 and 84-86; Resp. Comments on *Achmea*, 22 March 2018.

### (i) The claim is for breach of the ECT, not EU law

354.   As to the potential application of Articles 267 and 344 TFEU, the Tribunal considers that the claim has been brought for and concerns breach of the ECT, not EU law. It also considers that the Claimants are correct to say that the ECT grants investors rights that are additional to any other rights provided by the internal market and that there is no inconsistency between EU law and the ECT.  Thus, it considers that the position is as described as follows in the *Charanne* and *Eiser* cases –

> "This case does not entail any assessment with regards to the validity of community acts or decisions adopted by European Union organs. Additionally, it does not concern in any way allegations by the European Union that EU law has been violated, nor claims against such organization. In this arbitration there is not an argument according to which the content of the disputed provisions [...] is contrary to EU law."[333]

355.   It does not follow from the mere fact that there is an EU internal market in electricity with EU Directives on renewable energy that there is any incompatibility with the ECT or the application of the ECT in this case.[334] Indeed, as identified by the tribunal in the *Electrabel* case, the genesis of the ECT is inconsistent with any incompatibility: "*it would have made no sense for the European Union to promote and subscribe to the ECT if that had meant entering into obligations inconsistent with EU law.*"[335]

356.   The Tribunal notes the Respondent's position that the dispute affects essential elements of EU law including State aid,[336] as is supported by the views expressed in these proceedings by the EC,[337] and as has been developed in the Respondent's submissions including its Comments on the EC's Decision of 10 November 2017 on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation

---

[333] **CL-0170**, *EISER Infrastructure Limited and Energia Solar Luxembourg S.A.R.L v Kingdom of Spain*, Award, 4 May 2017, (hereinafter "*Eiser*"), ¶ 199, referring to **CL-0094**, *Charanne*, ¶ 448.

[334] Cf. Resp. C-Mem. ¶¶ 66-70.

[335] **RL-0002**, *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶¶ 4.133-4.134.

[336] Resp. Rej. ¶ 78; Resp. oral opening at Day 1/270-271.

[337] EC's Updated Submission ¶¶ 49 and 50-55.

from Renewable Energy Sources, Cogeneration and Waste.[338] However, the Tribunal agrees with the position of the Claimants, in particular to the effect that:

    *a)*   The EC investigation concerned the new regime introduced in 2013-2014, not the Special Regime on which the Claimants say they relied to invest;

    *b)*   There is no evidence that the Disputed Measures were motivated by State aid concerns, as the relevant preambles do not mention State aid.[339]

357.    Indeed, as appears from section 2.1 of the EC's Decision of November 2017, the scheme notified by Spain to the EC was that introduced by RDL 9/2013 and subsequent measures, not "*the premium economic scheme*" of RD 661/2007. The EC later stated in its Decision that:

> "As Spain has decided to replace the premium economic scheme with the notified aid measures it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not."[340]

358.    Thus, notwithstanding the position of the Respondent that the EC's Decision of November 2017 is binding, the Tribunal does not see how that Decision is of assistance to the Respondent's case on the intra-EU objection. No determination is made there with respect to the measures at issue in this case. As a matter of EU law, it appears that only the operative part of the Decision is binding,[341] and the operative part is merely to the effect that the new regime was in breach of Article 108(3) TFEU (Spain started implementing the scheme and before a Commission decision), but otherwise the EC had

---

[338] **RL-0089**, EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste. *See also*, Resp. Comments on the EC's Updated *Amicus* Brief, 25 July 2018.

[339] Cl. Reply ¶¶ 489-491; Claimants oral opening at Day 1/215.

[340] **RL-0089**, EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste ¶ 156.

[341] Claimants' Reply of 26 January 2018, ¶ 3, referring to Joined Cases T-443/08 and T-455/08, Freistaat Sachsen and Land Sachsen-Anhalt ¶ 223, where it is stated: "In addition, only the operative part of an act is capable of producing binding legal effects (*see*, to that effect, Case C-355/95 P *TWD v Commission* [1997] ECR I-2549, paragraph 21, and Case T-251/00 *Lagardère and Canal v Commission* [2002] ECR II-4825, paragraph 6."

decided "*not to raise objections to the aid on the grounds that it is compatible with the internal market pursuant to Article 107(3)(c) TFEU.*"[342]

359.    The Tribunal sees this as a matter solely for the EC and for the Respondent. No part of the Claimants' claim concerns the issue of whether the new regime concerns unlawful State aid. It is not because the regime has been found to be lawful under Article 107(3)(c) TFEU (albeit also unlawful under Article 108(3) TFEU) that it cannot also, and quite independently, be in breach of the ECT.

360.    In addition, the fact that a subsidy to the RE sector may be a form of State aid does not mean that the current case requires the application of EU law concerning State aid; it does not. Likewise, the obligation of Contracting Parties under ECT Article 6(1) "*to alleviate market distortions and barriers to competition in Economic Activity in the Energy Sector*", and the consideration given by Article 10(8) ECT to "*programmes under which a Contracting Party provides grants or other financial assistance, or enters into contracts, for energy technology research and development*", do not impact in any way on the Tribunal's jurisdiction in this case.[343]

361.    Nor, as follows from what it has already said, does the Tribunal accept that it lacks jurisdiction over acts of Spain said to be in breach of Part III ECT by virtue of the contention of the Respondent (and the view expressed by the EC) that the applicable investment protection law to intra-EU investments is EU law, in particular the rules of free movement of capital and freedom of establishment, and that pursuant to Article 3(2) TFEU, EU Member States lack the competence to conclude bilateral or multilateral agreements concerning protection of investments.[344] The Tribunal considers that the protections provided for in Part III are consistent with EU rules such as on free movement of capital and freedom of establishment, but different. There is nothing in the ECT that suggests that the EU saw the Part III protections as falling within an area of its exclusive

---

[342] **RL-0089**, EC's Decision on the State Aid SA.40348 (20151NN) proceeding regarding Spain's Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste, section 5 "Conclusion". *See also* **RL-0089,** ¶ 89 with respect to Art. 108(3) TFEU.

[343] Cf. Resp. Comments on *Achmea*, 22 March 2018 ¶¶ 30-32.

[344] The European Commission's *Amicus Curiae* Brief ¶ 5.

competence and, even if Article 3(2) TFEU were engaged, it has not been demonstrated to the Tribunal how or why this would override the jurisdiction that is established by the plain wording of Article 26 ECT and the unalterable fact that Spain is a party to the ECT (including Parts III and V) and bound by the principle of *pacta sunt servanda* as much as any other Contracting Party, including the EU. [345]

### (ii) The impact, if any, of the Achmea Judgment

362.   According to the *Achmea* Judgment, Articles 267 and 344 TFEU are brought into play where, through a BIT, EU Member States establish a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might not concern the interpretation or application of that law.[346]

363.   The Claimants contend that the reasoning and outcome of the *Achmea* Judgment can be distinguished for a number of reasons, including in particular that the *Achmea* Judgment is predicated on the EU not being a party to the BIT then at issue, whereas the EU is a Contracting Party to the ECT and is bound by its provisions including Article 26 ECT. Notwithstanding the position of the Respondent, and that of the large majority of EU Member States as expressed in the Declaration of 15 January 2019, the Tribunal can only agree with the Claimants on this point, and it does not consider that the impact of Articles 267 and 344 TFEU is to deprive it of jurisdiction (even assuming, which it does not accept, that these provisions fall to be applied under Article 26(6) to the question of whether the Tribunal has jurisdiction or not).

364.   First, as already noted, the Tribunal does not consider that it has to determine any issues of EU law to resolve the current dispute, so Articles 267 and 344 are not implicated.[347]

---

[345] *See*, **CL-0193**, *Vattenfall*, Decision on the *Achmea* Issue ¶ 131 and **CL-0187**, *Blusun*, ¶ 283.

[346] **RL-0090**, *Achmea* Judgment ¶ 56.

[347] *See*, to similar effect, **CL-0170**, *Eiser*, ¶ 204.

365.    Second, although in the *Achmea* Judgment the potential for the application of EU law appears to have been sufficient,[348] it also appears to have been fundamental to the reasoning that the EU itself was not a party to the relevant investment treaty. The ECJ thus held:

> "It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected (see, to that effect, Opinion 1/91 (EEA Agreement — I) of 14 December 1991, EU:C:1991:490, paragraphs 40 and 70; Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, paragraphs 74 and 76; and Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 182 and 183).
>
> In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States."[349]

366.    Here, by contrast, the relevant treaty i.e. the ECT – including its Article 26 – was concluded by the EU and is binding on the EU and its institutions, including as follows from Article 216(2) TFEU. It would appear from the *Achmea* Judgment that such an agreement "*is not in principle incompatible with EU law*." Indeed, the EU has – without any reservation – exposed itself to the possibility of a claim being brought against it under Article 26 ECT, with the possibility that a Tribunal might apply EU law to the merits of a given dispute (to the extent that EU law qualifies as international law under Article 26(6)). Given that the EU has accepted this possibility, the Tribunal cannot see how

---

[348] **RL-0090**, *Achmea* Judgment ¶¶ 40-42.

[349] **RL-0090**, *Achmea* Judgment ¶¶ 57-58.

Article 26 could suddenly have an adverse effect on the autonomy of EU law where a claim was brought against a Member State as opposed to against the EU.

367.    The Tribunal notes that, through the Declaration of 15 January 2019, some 22 EU Member States have expressed their position that –

> "… international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied."

368.    The Respondent has put this forward as an "*authentic interpretation*", invoking Article 31(3)(a) VCLT and, in the alternative, Article 31(3)(b) VCLT.[350]

369.    As an initial point, it is not clear to the Tribunal that the Declaration of 15 January 2019 contains an interpretation of Article 26 ECT. As appears in the passage quoted above, there is a statement on the status of the ECT, and the conclusion that the interpretations made by arbitral tribunals of Article 26 leads to an incompatibility such that the provision would have to be disapplied. This appears to be a statement as to how Article 26 ECT is received and applied (or disapplied) in EU law as opposed to an interpretation of that provision.

370.    As to Article 31(3) VCLT, this provides in relevant part that:

> "There shall be taken into account, together with the context:
>
> (*a*) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;
>
> (*b*) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; …"

371.    As follows from Article 31(3)(a), it would not matter whether the Declaration of 15 January 2019 constituted a subsequent agreement regarding the interpretation of the ECT

---

[350] Resp. Comments on the Declaration, 12 February 2019 ¶¶ 9-15.

or rather its application. However, it is plain that Article 31(3)(a) does not apply as the Declaration sets out the agreed position of only certain of the ECT Contracting Parties, whilst among the EU Member States as a whole (being ECT Contracting Parties) there is disagreement.[351] The Tribunal does not know the position of the ECT Contracting Parties that are not EU Member States, but the materials before it are to the effect that even among the EU Member States there is no common understanding sufficient for the purposes of Article 31(3)(a) to be found reflected in the Declaration of 15 January 2019.

372.   As a result of the same factors, the Tribunal is unable to find that the Declaration of 15 January 2019 establishes or reflects subsequent practice in the application of the ECT *"which establishes the agreement of the parties regarding its interpretation"* within Article 31(3)(b) VCLT. The Tribunal would certainly accept that the subsequent practice for the purposes of Article 31(3)(b) need not be of all treaty parties, but it cannot agree with the Respondent's position that the only relevant States are Spain and Germany.[352] All ECT Contracting Parties have an interest in the interpretation of Article 26 ECT, which after all binds them all. On the Respondent's approach, it would be possible to have different interpretations of Article 26 dependent on the identity of the host State and investor State in any given case, which would be neither coherent nor workable. On the materials before it, the Tribunal sees that one State (Hungary) positively disagrees with the position stated in the Declaration of 15 January 2019, five States are expressly withholding their view, whilst the views of ECT Contracting Parties that are not EU Member States are unknown but cannot be taken as either acquiescent to the Declaration of 15 January 2019 or irrelevant.[353]

---

[351] *See also*, the Commentary p. 29, ¶ 4 to the ILC *"Draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties"*, A/73/10, where it is stated that: *"The term 'the parties' indicates that such an agreement must be reached between all the parties to the treaty."* As footnoted in Resp. Comments on the Declaration, 12 February 2019, http://legal.un.org/ilc/reports/2018/english/a_73_10_advance.pdf. Cf. Resp. Comments on the Declaration, 12 February 2019 ¶ 11.

[352] Resp. Comments on the Declaration, 12 February 2019 ¶ 12.

[353] *See also*, Conclusion 10 of the ILC *"Draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties"*, A/73/10, including the Commentary thereto, including at ¶ 3, where it is stated that: *"Conflicting positions regarding interpretation expressed by different parties to a treaty preclude the existence of an agreement. This has been confirmed, inter alia, by the Arbitral Tribunal in the case of German External Debts, which held that a 'tacit subsequent understanding' could not be derived from a number of communications by*

d.    *Conclusion re the intra-EU objection*

373.    On the basis of the above, the Tribunal rejects the Respondent's intra-EU objection. It also rejects the suggestion that, should this Tribunal have any doubts as to the position, it should refer the matter to the ECJ through a *juge d'appui*.[354] The Tribunal does not see how it could do this without the consent of the Parties before it (which has not been given), and considers that the Tribunal cannot lose sight of the fact that it has been constituted under Article 26 ECT to decide the case before it, and has no general powers of delegation whether under the ECT or the ICSID Convention and Arbitration Rules.

374.    Finally, the Tribunal is naturally concerned that its award should be capable of enforcement, and notes the statement in the Declaration of 15 January 2019 that "*defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent*." However, the issue of recognition and enforcement are ultimately a matter for the courts of concerned ICSID Contracting States in accordance with Article 54 of the ICSID Convention, and the Tribunal cannot determine its jurisdiction by reference to how differing Contracting States may understand and apply their obligations under Article 54.

**D.    THE TAX OBJECTION**

(1)    **The Parties' Positions**

a.    *The Respondent's Position*

375.    The Respondent contends that the Tribunal lacks jurisdiction to hear the claims of breach of Article 10(1) ECT with respect to the two Taxation Measures introduced by Law 15/2012 of 27 December 2012 (**"Law 15/2012"**): (i) the Tax on the Value of the Production of Electrical Energy (**"TVPEE"**), and (ii) the Levy on the use of mainland

---

administering agencies since one of those agencies, the Bank of England, had expressed a divergent position."
http://legal.un.org/ilc/reports/2018/english/a_73_10_advance.pdf.

[354] EC's Updated Submission ¶¶ 47-48. The Tribunal has also considered and rejected the Respondent's suggestion that Germany be invited to intervene regarding the legal consequences of the *Achmea* Judgment for these proceedings: Resp. Comments on the Declaration, 12 February 2019 ¶ 21.

waters for the production of electrical energy (**"Water Levy"**).[355] Its position is that the TVPEE and the Water Levy are correctly regarded as taxes as a matter of Spanish and also international law (by reference to tests set out in *EnCana v Ecuador*, *Duke Energy v Ecuador* and *Burlington Resources Inv. v Republic of Ecuador*).[356]

376. According to the Respondent, it has not consented to submit this issue to arbitration given that, pursuant to Article 21 ECT, Article 10(1) ECT does not generate obligations regarding taxation measures of Contracting Parties. It contends that Article 21(7) ECT provides that for the purposes of Article 21, 'Taxation Measure' includes any provisions relating to taxes of the domestic law of the Contracting Party. Therefore, both the TVPEE and the Water Levy constitute Taxation Measures for the purposes of the ECT. The Respondent relies *inter alia* on the award in *Isolux Netherlands BV v Spain* in support of its objection.[357]

377. The Respondent further submits that, even if the Tribunal considers that the foregoing is not sufficient and that some additional analysis is necessary in terms of examining the economic effects of these taxes, the TVPEE and the Water Levy are, in any case, *bona fide* Taxation Measures.[358] It says that the TVPEE applies to all energy production facilities, both ordinary and renewable, and that renewables generators are not entitled to preferential treatment giving them tax benefits not accorded to others. In the case of the Water Levy, it applies to all hydro plants. Further, the taxes do not discriminate against RE producers (because, according to the Claimants, these cannot shift the burden to consumers), nor is it a disguised tariff cut, as the cost of the tax is remunerated to these producers through their remuneration under the post-2014 regulatory regime.

378. In support of its arguments that the TVPEE and the Water Levy are *bona fide* tax measures of general application the Respondent contends that the focus should be on the

---

[355] Resp. C-Mem. ¶ 6; **R-0030**, Law No. 15/2012, of 27 December 2012, regarding fiscal measures for energy sustainability, Articles 4 and 29.

[356] Resp. C-Mem. ¶¶ 168-207 and 222-245.

[357] Resp. C-Mem. ¶ 6, Resp. Skeleton ¶¶ 8-10.

[358] *See e.g.*, Resp. Skeleton ¶ 9; Respondent's oral opening at Day 1/6-17.

legal operation and not the economic effect of a measures, citing the award in *Encana Corporation v Ecuador*.[359] It is also said that the European Commission has confirmed the legality of the TVPEE under European Law.

b.    ***The Claimants' Position***

379.    The Claimants submit that Article 21 ECT applies only to *bona fide* Taxation Measures. They say that the Respondent cannot avoid liability by framing a measure as a tax and that the mere labelling of the measures as taxes does not automatically mean that the carve-out of Article 21 of the ECT applies.[360] Therefore, the Tribunal only needs to decide whether the TVPEE and the Water Levy are more consistent with *bona fide* taxes or measures implemented under the guise of taxation as part of a scheme to deprive the Claimants of the rights they were granted under the Special Regime.[361] The Claimants contend, based on the findings of the *Yukos* tribunal that "*there is prima facie evidence that the 7% levy and the Water Levy are arbitrary and discriminatory and that the Tribunal must draw inferences in favour of the Claimants, in the same way that the tribunal did in Yukos.*"[362]

380.    The Claimants argue that the most obvious evidence that the TVPEE and the Water Levy were not *bona fide* measures is that the money raised by these taxes went from the electricity producers to the State budget only to be returned in the same amount to the electricity system. The intermediate step via the State budget was so that the measures could be labelled as a tax and not a tariff cut.[363]

381.    Further, the Claimants submit that numerous other factors support their position: (i) the Minister for Energy stated that the Respondent applied the taxes as a way to reduce the premium for RE installations;[364] (ii) the taxes are discriminatory and contrary to its

---

[359] **RL-0027**, *Encana Corporation v Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006.

[360] Cl. Reply ¶¶ 152-160; Claimants' oral opening at Day 1/244-246.

[361] Cl. Reply ¶¶ 147 and 167.

[362] Cl. Reply ¶ 171.

[363] Cl. Reply ¶ 173; **C-0019**, Law 15/2012 of 27 December 2012, Additional provision two.

[364] Cl. Skeleton ¶ 9; **C-0108,** Patricia Carmona & Javier Mesones, Interview with the Minister of Industry, *La Gaceta*, 14 October 2012.

environmental protection purpose because (a) the TVPEE discriminates against RE installations as opposed to conventional generators, which could pass some of the additional cost imposed by the TVPEE to the end consumers, and (b) the Water Levy targeted the cleanest form of clean electricity for the alleged purpose of protecting the environment when the funds collected were intended to cover the Respondent's Tariff Deficit;[365] and (iii) the taxes were two of other measures implemented by the Respondent as part of a scheme to deprive the Claimants of their rights under the Special Regime.[366] In this last respect, consistent with *Quasar de Valors v Russia*, the Tribunal must engage in a comprehensive factual assessment and, likewise with respect to *RosInvest v Russia*, consider the Respondent's measures in their totality including as to the cumulative effect on the Claimants.[367]

382.    As to their discriminatory nature, the Claimants say that the two measures are unrelated to their purported rationale to benefit the environment. To the contrary, while introducing Law 15/2012 with a preamble referring to support to the environment and the environmental policy of the EU, the measures constitute a cut to the FIT, which had been specifically designed to increase investment in the RE sector in Spain. The Regulatory Dossier[368] prepared in connection with adoption of the Law shows that Spain did not consider these effects. The Law actually has the opposite effect and the law maker does not address this and nor does it envisage alternatives, showing that Spain's true purpose was not to introduce an environmental measure but to implement a disguised tariff cut.[369]

383.    Finally, the Claimants argue that the Respondent's characterisation of the TVPEE and the Water Levy as a tax under its internal law is not determinative as to whether the taxation carve-out of Article 21 ECT applies.[370] The TVPEE and the Water Levy were

---

[365] Cl. Reply ¶¶ 185-186; Cl. Skeleton ¶ 10.

[366] Cl. Reply ¶ 209.

[367] **CL-0128**, *Renta 4 S.V.S.A, Ahorro Corporacion Emergentes F.I., Quasar de Valors SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A., ALOS 34 S.L v The Russian Federation*, SCC No. 24/2007, Award, 20 July 2012, ¶¶ 181 and 184-185.

[368] **C-0226**, Regulatory Dossier, Law 15/2012, tax measures for energy sustainability, Memoria p. 13.

[369] Cl. Reply ¶¶ 192-206.

[370] Cl. Reply ¶¶ 221 and 228.

intentionally framed as taxes under Spanish law to breach the Respondent's commitments to the Claimants without incurring liability under the ECT. Even if these taxes could fall within the definition of taxes in international law or EU Law, this does not mean that the measures are *bona fide* because they were used as a backdoor tariff cut targeting RE installations.[371]

(2)     **The Tribunal's Analysis**

384.     Pursuant to Article 21(1) and (7) ECT, in relevant part:

> (1) "Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
> …
>
> (7) For the purposes of this Article:
>
>   (a) The term 'Taxation Measure' includes:
>
>     (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and
>
>     (ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.
>
>   (b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation."

385.     On a plain reading of the wording of Articles 4-11 and 29 of Law 15/2012, the TVPEE and the Water Levy appear to fall within the broad definition of Taxation Measures at Article 21(7), being in each case a "*provision relating to taxes of the domestic law of the*

---

[371] Cl. Reply ¶¶ 222-227.

*Contracting Party*." The Spanish Constitutional Court, in a judgment dated 6 November 2014, ruled on the constitutionality of the TVPEE,[372] and the Tribunal has no basis for considering it anything other than a valid tax as a matter of Spanish law. The same conclusion applies so far as concerns the Water Levy. Indeed, this appears to be largely accepted by the Claimants which, as noted above, contend that the Respondent's characterisation of a given measure as a tax within its domestic law cannot be determinative for the purposes of Article 21.

386. The Tribunal also accepts the Respondent's position that the TVPEE and the Water Levy would fall within the descriptions of taxation measures or matters of taxation as contained in cases such as *EnCana v Ecuador* and *Burlington v Ecuador*, i.e. these are measures established by law, imposing an obligation on a class of people to pay money to the State for public purposes. Again, this was not seriously challenged by the Claimants (subject to their point that the money is paid straight back from the State budget to the SES), and they portrayed these submissions of the Respondent as irrelevant.[373]

387. Instead, the Claimants have portrayed the key issue for the Tribunal as being to determine whether the TVPEE and the Water Levy are *bona fide* taxes or, on the contrary, measures implemented under the guise of taxation: if they are the latter, they cannot be Taxation Measures for the purposes of the Article 21 exclusion.[374]

388. The Tribunal notes that the Claimants' position on the correct interpretation of Taxation Measures under Article 21 is not as clear cut as might at first sight appear. Through Articles 21(3) and (5), the ECT Parties included specific adaptations or exceptions to the exclusion effected by Article 21(1) with respect to Articles 10(2) and (7) and Article 13 (expropriation), and yet there is no equivalent with respect to Article 10(1). It could readily be said that Article 21(1) establishes a general exclusion for the defined Taxation Measures, subject only to certain specified exceptions dealing (*inter alia*) with arbitrary

---

[372] Resp. C-Mem. ¶¶ 179-181, referring to **R-0043**, Judgment 183/2014 of 6 November 2014 issued by the Constitutional Court Plenary in appeal number 1780-2013 with regard to articles 4, 5 and 8 of Law No. 15/2012 (and other regulations).

[373] Cl. Reply ¶¶ 223-225.

[374] Cl. Reply ¶¶ 147, 221 and 228.

128

or discriminatory conduct in limited scenarios such as expropriation, and that if the ECT Parties had wished to make an exception for Article 10(1) with respect to Taxation Measures that were alleged not to be *bona fide* (which could have the effect of allowing a multiplicity of claims wherever investors were dissatisfied with Taxation Measures), they would have done so.[375]

389.    However, as was also concluded by the tribunal in *Eiser* with respect to the TVPEE,[376] the Tribunal does not consider that it needs to decide the issue of whether Article 21(1) only excludes *bona fide* Taxation Measures. It considers that the Claimants have not established, whether *prima facie* or otherwise,[377] that the TVPEE and the Water Levy were made in bad faith and were "*part of a scheme to deprive the Claimants of the rights they were granted under RD 661/2007.*"[378]

390.    The Claimants' position is that the TVPEE and the Water Levy are disguised tariff cuts. Yet this alone would not be sufficient for their case as the measures have been formulated in domestic legislation as "taxes", a designation that the Claimants have been unable successfully to challenge by reference to domestic law or to criteria suggested in other investment treaty cases, so the Claimants' attempts at re-characterisation alone could not result in the TVPEE and the Water Levy falling outside the broad definition of "*provision[s] relating to taxes of the domestic law of the Contracting Party.*" Hence, the Claimants' case goes further, and it is said that Spain was looking to "*circumvent the stabilisation provision in RD 661/2007*" in circumstances where it "*was fully aware that adverse changes to existing investments made under RD 661/2007 had provoked claims from foreign investors enforcing their rights under the ECT*", that Spain had retained legal advice and would have been aware of the Article 21 exclusion, such that: "*The*

---

[375] Cf. Cl. Reply ¶¶ 159 and 215, referring to **CL-0124**, *Yukos Universal Limited (Isle of Man) v The Russian Federation*, PCA Case No. AA 227, Final Award of 18 July 2014 ¶¶ 1407 and 1433. It is noted that the alleged facts that the tribunal was considering in *Yukos* are in no way analogous to those alleged in these proceedings.

[376] **CL-0170**, *Eiser*, ¶ 269.

[377] Cf. Cl. Reply ¶ 171.

[378] Cl. Reply ¶¶ 169 and 184.

*inference must be that the 7% Levy and the Water Levy were framed as taxes with the purpose of avoiding liability for breaching investors' rights under the ECT.*"[379]

391.    In circumstances where, just seven months later, Spain did replace the remuneration regime of RD 661/2007 through the adoption of RDL 9/2013 (in plain breach of Article 10(1) on the Claimants' case), this series of contentions is far from convincing, including because, on the Claimants' approach, the Respondent in drawing up Law 15/2012 would presumably also have been advised of the requirements of good faith performance of its ECT obligations and the risk of ECT claims if it failed to act in good faith.  Further, although the TVPEE appears to have been expected to have a greater impact on the RE sector, it nonetheless was a tax imposed on the Ordinary Regime also, and the Claimants' evidence does not demonstrate that the TVPEE was designed to target RE installations as opposed to being a measure that was expected to have a greater impact on such installations.[380] As to the Water Levy, the Claimants may consider that "*it makes no sense that a law ostensibly designed for the improvement of the environment would introduce a tax solely on the use of water for the purpose of generating electricity and nothing else*",[381] but this does not come close to pointing to, let alone establishing, bad faith.

392.    There is no witness or documentary evidence to support a finding that the TVPEE and/or Water Levy were disguised as taxes with a view to defeating potential ECT claims. Moreover, the decisions of the Spanish Supreme Court on changes to the Special Regime would have encouraged the Respondent to consider that there was no "*stabilisation provision*" in RD 661/2007 (see Section IV.D above), and it has not been demonstrated that the Respondent considered that a tariff cut would have been a breach of the ECT (whereas it is implicit in the Claimants' contentions that the Respondent must have believed this). The Claimants rely on an October 2012 statement by the former Minister of Energy that: "*We could have opted for a reduction in premiums but we opted for the fiscal measures. There were distinct alternatives on the table … .*"[382] But this does not

---

[379] Cl. Reply ¶¶ 181-183.

[380] Cf. Cl. Reply ¶¶ 197-200.

[381] Cf. Cl. Reply ¶ 205.

[382] Cl. Reply ¶ 180; **C-0108**, Patricia Carmona & Javier Mesones, Interview with the Minister of Industry, *La Gaceta*, 14 October 2012.

come close to evidencing bad faith: there is no suggestion here that the Minister considered that a reduction in payments would not have been permissible under the ECT, while the open reference to the reduction in premiums is inconsistent with there being a motive to dissimulate.

393. The Tribunal concludes that the case that the TVPEE and/or Water Levy were not *bona fide* Taxation Measures has not been made out, and that Article 21(1) ECT applies. It follows that Article 10(1) does not impose any obligations with respect to the TVPEE and/or Water Levy, and that therefore there is no basis for any Article 10(1) claim in relation thereto.

## VI.  LIABILITY

394. The Claimants submit that the Respondent has, through the acts and omissions of its organs as well as agencies and entities under its direction and control, taken various wrongful measures in breach of Article 10(1) ECT that have caused substantial losses to the Claimants' investments in Spain. These allegedly wrongful acts include but are not limited to RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order (the "**Disputed Measures**").[383]

395. The Claimants' case is that the Respondent has breached Article 10(1) of the ECT by:

1) failing to create and maintain "stable, equitable, favourable and transparent" investment conditions;

2) failing to afford the Claimants "fair and equitable" treatment, by (a) frustrating RWE's legitimate expectations, (b) acting non-transparently, and/or (c) employing unreasonable, arbitrary and disproportionate measures;

---

[383] Cl. Mem. ¶ 425. The Disputed Measures as defined in the Claimants' Memorial include Law 15/2012. Given that the Tribunal has found that it lacks jurisdiction over the claims with respect to Law 15/2012, the Tribunal has excluded this from the definition.

3)   impairing the investments through "unreasonable or discriminatory measures"; and

4)   failing to observe obligations entered into with RWE or its investments (violation of the Umbrella Clause).[384]

## A.   APPLICABLE LAW

396.  Article 42(1) of the ICSID Convention provides:

> "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable."

397.  ECT Article 26(6) provides:

> "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[385]

398.  As follows from the above, the Tribunal will decide the issues in dispute in accordance with the ECT and applicable rules and principles of international law. Insofar as reference to any other source of law is mandated by the ECT or other applicable rules and principles of international law, the Tribunal will refer to any other such source.

## B.   ATTRIBUTION AND AUTHORISATION

399.  The Claimants submit that the International Law Commission's 2001 Articles on the Responsibility of States for Internationally Wrongful Acts (the "**ILC 2001 Articles**") are applicable to this case, because the ECT does not contain any specific provisions dealing with issues of attribution.[386] The Tribunal accepts that, insofar as the ILC 2001

---

[384] Cl. Mem. ¶ 428; Cl. Skeleton ¶ 48.

[385] **C-0001**, Energy Charter Treaty (hereinafter "**ECT**"), Art. 26(6).

[386] Cl. Mem. ¶ 410; **CL-0018**, International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, Annex to General Assembly Resolution 56/83 of 12 December 2001, and corrected by

Articles reflect customary international law, they may fall to be applied under ECT Article 26(6).

400. Pursuant to Articles 4-5 and 8 of the ILC 2001 Articles, Spain is responsible for the acts or omissions of: its organs, entities or persons exercising elements of governmental authority, and entities or persons that Spain directs or controls, as follows:

    *a)* Article 4 of the ILC 2001 Articles provides:

> "1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.
>
> 2. An organ includes any person or entity which has that status in accordance with the internal law of the State."[387]

    *b)* Article 5 of the ILC 2001 Articles provides:

> "The conduct of a person or entity which is not an organ of the State under Article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance."[388]

    *c)* Article 8 of the ILC 2001 Articles provides:

> "The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct."[389]

---

document A/56/49 (Vol. I) Corr. 4 (2002) (hereinafter the "**ILC 2001 Articles**"). *See also*, **CL-0019**, *Siemens A.G. v The Argentine Republic*, ICSID Case No. ARB/02/8, Award of 6 February 2007 ¶ 350 (noting that "[t]he Draft Articles are currently considered to reflect most accurately customary international law on State responsibility.")

[387] **CL-0018**, ILC 2001 Articles, Article 4.

[388] **CL-0018**, ILC 2001 Articles, Article 5.

[389] **CL-0018**, ILC 2001 Articles, Article 8.

401. According to the Claimants, in this case, Spain's organs are: "*(i) the executive – i.e. the Spanish Government (including the Ministry, the Secretary of State for Energy and, more generally, all present and former Ministers and Deputy Ministers of the Spanish Government) including, inter alia, those who agreed and published the July 2010 Agreement and who passed Law 15/2012, RDL 2/2013, RDL 9/2013, RD 413/2014 and the June 2014 Order; and (ii) the legislature ("las Cortes"), comprising the Congress of Deputies and the Senate, which approved Law 15/2012 and Law 24/2013*."[390] It is plainly correct that Spain's executive and legislature constitute organs of the State. Additionally, it is contended that the Instituto para la Diversificación y Ahorro de la Energía (the "**IDAE**")[391] and InvestinSpain[392] also qualify as organs of the State, or that the Respondent is responsible for their conduct on the basis of Article 8 of the ILC 2001 Articles.[393] The Respondent does not challenge these contentions, and the Tribunal accepts that in general terms the acts of IDAE and InvestinSpain in this case are attributable to the Respondent.

402. The Claimants also contend that, pursuant to Article 5 of the ILC 2001 Articles, the Respondent is responsible for the acts or omissions of the CNE – because the CNE is controlled by the Ministry and empowered to exercise elements of governmental authority which leads to its conduct being attributable to Spain.[394] The Respondent has not expressly challenged this, although the specific functions of the CNE must be borne

---

[390] Cl. Mem. ¶ 416.

[391] IDAE is a public entity with its own legal personality but it reports directly to the Ministry.

[392] InvestinSpain is a private company controlled directly by the Spanish Government. It was established by the Ministry of Economic Affairs and Competitiveness through the Secretariat of State for Trade. The Claimants note that although InvestinSpain formally has a separate legal personality under Spanish law, this is not conclusive as a matter of international law given that an entity that has a formal separate personality may still be an organ of a State in international law. **C-0059**, InvestinSpain website, "*About Us*".

[393] Cl. Mem. ¶¶ 417-420. **CL-0018**, ILC 2001 Articles, Article 8.

[394] Cl. Mem. ¶¶ 421-422. **CL-0018**, ILC 2001 Articles, Article 5. The CNE is controlled by the Ministry and has the power to issue rules that are compulsory: it can issue instructions for the development and execution of royal decrees and ministerial orders that are published in the Spanish Gazette. It provides recommendations to the Ministry on regulations and price setting measures. It also issued the monthly liquidations by which Spain's electricity distributors were to remunerate market participants.; **C-0159**, "Presentación", CNE website, available at <www.cne.es/cne/contenido.jsp?id_nodo=3&&&keyword=&auditoria=F>.

in mind in considering any issue of attribution. The CNE is a regulatory authority, and its powers at the material times were, so far as is relevant, broadly advisory in nature.[395]

## C. ARTICLE 10(1) OF THE ECT: ISSUES OF INTERPRETATION WITH RESPECT TO STABLE CONDITIONS AND LEGITIMATE EXPECTATIONS

403.    Although there are various different elements to the Claimants' case on breach of Article 10(1), they have placed the greatest weight on the claims based on alleged legitimate expectations and an alleged failure to provide stable investment conditions.    The Tribunal considers these elements of the Claimants' case first, noting that there is some overlap in the way that these two elements have been formulated and argued by the Parties, as well as in how the concepts of legitimate expectations and stability have been analysed in many of the prior cases. As with respect to the issues of jurisdiction, and with respect to the further issues on liability, the Tribunal has considered not only the positions of the Parties as summarised below, but also the numerous detailed arguments made in their written submissions and authorities submitted. To the extent that these arguments are not referred to expressly, they have been subsumed into the Tribunal's analysis.

### (1) The Parties' Positions

#### a.    *The Claimants' Position*

404.    The Claimants' starting point is that the ECT falls to be interpreted by reference to Articles 31 and 32 VCLT.[396] In particular, the ECT shall be interpreted in good faith in accordance with the ordinary meaning given to its terms in their context and in the light of the ECT's object and purpose.[397]

---

[395] As noted in **C-0103**, Pöyry July 2007 Report (Wind), p. 30: "The CNE (*Comisión Nacional de Energía*) was created by the Hydrocarbons Law (Law 34/1998) and acts as the regulatory entity of the energy sector. The powers of CNE are limited at present to consultation, participation, inspection, arbitration, and the provision of reports."

[396] Cl. Mem. ¶ 390.

[397] Cl. Mem. ¶ 392.

405.    The Claimants describe the ECT as the first multilateral investment treaty that contains binding provisions on the promotion and protection of investments specifically in relation to the energy sector,[398] and they contend that the ECT provides for a standard of protection above and beyond the typical investment treaty.[399] They emphasise that energy investments are different from many other types of investment due to their capital intensive nature and other factors. Relying for support on Article 2 of the ECT and the 1991 European Energy Charter, the Claimants say that this makes a stable, predictable and transparent legal and regulatory framework a *sine qua non* for energy investments.[400]

406.    By reference to the works of Professor Wälde and other sources, the Claimants say that, under the ECT, a host State enjoys less regulatory freedom than under other investment treaty regimes, and that various controls are placed on the State within the text of the ECT. Hence, while the ECT recognises the legislative and regulatory authority of the Contracting Parties in relation to matters of vital national interests, it also carefully circumscribes that authority in favour of the investment-related obligations assumed by those States under the ECT regarding the treatment to be accorded to foreign investors and investments in the energy sector.[401]

407.    It is the Claimants' position that, as confirmed by the *Blusun* tribunal,[402] Article 10(1) ECT establishes in its first sentence a free-standing commitment to ensure regulatory stability, while any contrary interpretation would defeat the purpose of Article 10(1).[403]

---

[398] Cl. Mem. ¶ 393; **CL-0005**, A. Konoplyanik & T. W. Wälde, "Energy Charter Treaty and its Role in International Energy" (2006) 24 Journal of Energy & Natural Resources Law 523, noting on p. 528 that the ECT "can be considered as the multilateral investment treaty with the widest scope; it is distinct from all other bilateral treaties by the fact that it is only applicable to energy – defined in a wide way."

[399] Cl. Mem., Section 12, Cl. Skeleton ¶ 50.

[400] Cl. Mem. ¶¶ 395-399.  Also Cl. Mem. ¶ 408, referring to **CL-0007**, Energy Charter Secretariat, "Decision of the Energy Charter Conference, Subject: Road Map for the Modernization of the Energy Process", Energy Charter Secretariat, 24 November 2010, Area D, p. 6.

[401] Cl. Mem. ¶ 407; Claimants' oral opening at Day 1/171-180.

[402] Cl. PHB ¶ 18-19; **CL-0187**, *Blusun*, ¶ 319(1).

[403] Claimants' oral opening at Day 1/171-175; Cl. PHB ¶ 17.

408.    They also submit that the obligation to provide a stable regulatory framework is an essential element of the Fair and Equitable Treatment ("**FET**") standard,[404] especially in the context of the first sentence of Article 10(1) of the ECT.[405] According to the Claimants, even if it were found that the first sentence of Article 10(1) of the ECT does not contain a free-standing obligation to ensure regulatory stability, the FET standard requires a Contracting Party to the ECT to maintain a stable regulatory framework.[406]

409.    The Claimants say that investment treaty tribunals have typically looked at a number of non-cumulative factors in identifying whether there has been a breach of the FET standard including (i) breach of the investor's reasonable and legitimate expectations when the investment was made, (ii) whether the State failed to provide regulatory stability, (iii) transparency, arbitrary or unreasonable conduct, and (v) whether the State's acts were disproportionate.[407] They emphasise that the FET standard (ECT Article 10(1)), and the national treatment standard (Article 10(7)) are different standards of investor protection under the ECT, and that it is not permissible under the Vienna Convention to interpret the ECT as if these separate protections were the same.[408]

410.    The Claimants say in particular that a "*central feature of the State's obligation to ensure FET for investments is the general principle that the State must not frustrate a foreign investor's legitimate expectations on which that investor relied at the time it made its*

---

[404] **CL-0053**, *Metalclad Corporation v The United Mexican States*, ICSID Case No. ARB (AF)/97/1, Award of 30 August 2000 ¶ 99: "Mexico failed to ensure a transparent and predictable framework for Metalclad's business planning and investment." *See also*, **CL-0038**, *CMS Gas Transmission Company v The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, (hereinafter "*CMS, Award*"), ¶ 274: "there can be no doubt…that a stable legal and business environment is an essential element of fair and equitable treatment." *See also*, **CL-0025**, *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v The Argentine Republic*, ICSID Case No. ARB/01/3, Award, of 22 May 2007 (hereinafter "*Enron*"), ¶ 260: the arbitral tribunal considered that the key element of the FET standard is a stable framework for investment. *See also*, **CL-0039**, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (hereinafter "*LG&E*"), ¶¶ 124-125 and 131. *See also*, **CL-0037**, *Occidental Exploration and Production Company v The Republic of Ecuador*, UNCITRAL, Final Award of 1 July 2004 (hereinafter "*Occidental*"), ¶ 183.

[405] Cl. Mem. ¶ 474; Cl. Reply ¶ 561.

[406] Cl. PHB ¶¶ 20-21.

[407] Cl. Mem. ¶ 441.

[408] Cl. Reply ¶ 496.

*investments*."[409] This does not mean that a "*host State must freeze its regulatory regime*", although they say that by entering the ECT "*Spain accepted limitations on its power to alter the regulatory framework applicable to the Claimants' investments*."[410]

411.    A particularly important element of legitimate expectations is said to be "*the protection from State action that threatens the stability of the legal and business framework upon which an investor reasonably relied on making or maintaining its investments*",[411] reference being made in this respect to *CMS v Argentina*, *Occidental v Ecuador*, *LG&E v Argentina*, and *PSEG v Turkey*.[412] Their case is also that the legal framework of a State relating to the investment can contribute to the creation of a legitimate expectation on the investor. Such legal framework "*typically consists of legislation and treaties, and assurances contained in decrees, licences and similar executive assurances or undertakings*."[413]

412.    The Claimants emphasise that tribunals deciding cases under the ECT have held that Article 10.1 of the ECT includes the protection of legitimate expectations, including the *Charanne* and *Eiser* awards.[414]

---

[409] Cl. Mem. ¶ 456. *See e.g.,* **CL-0034**, *Saluka Investments B. V. v The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006 (hereinafter "**Saluka**") ¶ 302; **CL-0032**, *Técnicas Medioambientales Tecmed S.A. v The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 (hereinafter "*Tecmed*"), ¶ 154; and **CL-0045**, *CME Czech Republic B. V. v The Czech Republic*, UNCITRAL, Partial Award, 13 September 2001 ¶ 611, finding a breach of the FET standard because of the host State's "evisceration of the arrangements in reliance upon which the foreign investor was induced to invest."

[410] Cl. Mem. ¶ 457. *See also*, the Claimants' oral closing at Day 5, pp. 96-97.

[411] Cl. Mem. ¶ 458.

[412] Cl. Mem. ¶¶ 458-460; **CL-0038**, *CMS*, Award, ¶ 274; **CL-0037**, *Occidental,* ¶ 183; **CL-0039**, *LG&E,*¶ 131; **CL-0050**, *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v The Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, (hereinafter "*PSEG*"), ¶ 250.

[413] Cl. Mem. ¶ 462; **CL-0031**, R. Dolzer, "Fair and Equitable Treatment: Today's Contours" (2014) 12 Santa Clara Journal of International Law 7, p. 22; **CL-0025**, *Enron*, ¶¶ 264-266; **CL-0039**, *LG&E,* ¶¶ 130 and 133.

[414] Cl. PHB ¶ 26; **CL-0051**, *Plama Consortium Limited v Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (hereinafter "*Plama*")¶ 178; **CL-0073**, *Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Trans Trading Ltd v Republic of Kazakhstan*, SCC Arbitration No. V116/2010, Award, 19 December 2013 (hereinafter, "*Anatolie Stati*"), ¶ 1087; **CL-0182**, *AES Corporation and Tau Power B.V. v Republic of Kazakhstan*, ICSID Case No. ARB/10/16, Award, 1 November 2013, ¶ 291; **CL-0173**, *Limited Liability Company Amto v Ukraine*, Arbitration No. 080/2005, Final Award, 26 March 2008 ¶ 99; **CL-0094**, *Charanne*, ¶ 514; **CL-0170**, *Eiser* ¶ 382.

413.    The Claimants contend that the appropriate test to evaluate the existence of legitimate expectations was set out in the *Micula* case, saying that this concerned a similar factual matrix of a long-term investment incentive scheme implemented through legislation in order to induce investment.[415] On the basis of *Micula*, they say that to establish legitimate expectations under Article 10.1 of the ECT it must be shown that: "*(a) Spain made a promise or assurance; (b) RWE relied on that promise or assurance as a matter of fact; and (c) such reliance (and expectation) was reasonable.*" The *Micula* test is said to be consistent with Spain's position.[416]

414.    The Claimants also say that the ECT contains no relevant exceptions to Spain's FET obligations. The exception contained in Article 10(8) only applies to "*energy technology research and development*', which is not in dispute in this case. Likewise, the carve-out of Article 9(4) is not applicable as it only relates to obligations on Contracting Parties to promote conditions enabling access to a Contracting Party's capital market.[417] The Claimants note that the exception established by Article 24(2) with respect to measures "necessary to protect human, animal or plant life or health" does not apply to Article 10(1) and other provisions of Part III of the ECT, and say that investor protection was therefore prioritised over such matters.[418]

b.    ***The Respondent's Position***

415.    The Respondent contends that the main objectives of the ECT are: (i) non-discrimination and (ii) fostering market-oriented price formation,[419] and not the unconditional protection of foreign investors through the FET standard or National Treatment.[420] It says that the protection for investments must be understood in the context of the ECT, and that the

---

[415] Cl. PHB ¶ 32; **CL-0052**, *Micula* ¶ 668.

[416] Cl. PHB ¶¶ 34-35.

[417] Cl. Reply ¶¶ 500-502.

[418] Cl. PHB ¶¶ 97-99; Transcript Day 1, pp. 183-189.

[419] Resp. C-Mem. ¶¶ 848-850; Rej. ¶¶ 932 and 936.

[420] Resp. Rej. ¶ 953.

Claimants fail to recognise the true objectives and principles established in the European Energy Charter:[421]

> "to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the *principle of non-discrimination* and on *market-oriented price formation*, taking due account of environmental concerns."[422]

416.    In the Respondent's view, these objectives are inconsistent with maintaining over-remuneration that distorts the free market.[423] It also refers to a number of cases in support of the proposition that the FET standard under the ECT requires a balancing exercise between the investor's interests and the public interest that guides the State's action.[424]

417.    The Respondent portrays the first sentence of Article 10(1) as "soft law",[425] although it does not dispute the existence of some form of stability obligation arising under Article 10(1) as part of the commitment to accord FET.[426] In this respect, the Respondent refers to the statement in *Plama Consortium v Bulgaria* that "*stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT*", but emphasises that this does not mean that the Claimants have the benefit of a stabilisation clause.[427]

418.    According to the Respondent, in the absence of a specific commitment to stability, an investor cannot have an expectation that a regulatory framework will not change.[428] For

---

[421] Resp. Rej. ¶ 935.

[422] **RL-0006**, European Energy Charter, Title I "Objectives." Emphasis added by the Respondent.

[423] Resp. Skeleton ¶ 42, referring to **RL-0048**, *Electrabel S.A. v Hungary,* ICSID Case No. ARB/07/19, Award, 25 November 2015 ¶ 165 (hereinafter "***Electrabel*, Award**"), and other cases.

[424] Resp. Rej. ¶ 935.

[425] Resp. C-Mem. ¶ 852.

[426] E.g. Resp. C-Mem. ¶¶ 924-934.

[427] Resp. C-Mem. ¶¶ 926-928, referring to **RL-0034**, *Plama Consortium Limited v Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (hereinafter "***Plama***") ¶ 173 and also **RL-0039**, *AES Summit*, Award, ¶¶ 9.3.29-30.

[428] Resp. C-Mem. ¶ 862; Rej. ¶ 945.

this proposition, it relies *inter alia* on *Plama*[429] and *AES Summit v Hungary.*[430] According to the Respondent, while investors may reasonably and legitimately expect a host Country to provide them with stable conditions for their investment, the doctrine and cases regarding the stable conditions referred to by the ECT allow the adoption of reasonable and proportionate macroeconomic control measures by the host State, provided that they are motivated by a reasonable cause.[431] The Respondent maintains that this interpretation has been established in the same two cases (*Plama,*[432] and *AES*[433]) and also in *Mamidoil v Albania,*[434] and *Charanne v Spain.*[435]

419.    The Respondent also submits that, in accordance with the literal wording of Article 10(1) and the cases that have applied the ECT, it is wrong to say that the ECT standard of providing stable conditions includes the obligation to establish and maintain a "predictable" regulatory framework.[436]

420.    In applying the ECT to the circumstances of the current case, the Respondent relies on the tribunal's reasoning in *Charanne* that:

> "To convert a regulatory standard into a specific commitment of the state, by the limited character of the persons who may be affected, *would constitute an excessive limitation on power of states to regulate the economy in accordance with the public interest.*
>
> [...] in the absence of a specific commitment toward stability, *an investor cannot have a legitimate expectation that a regulatory framework such* as that at issue in this arbitration is to not be modified at any time *to adapt to the needs of the market and to the public interest.*"[437]

---

[429] **RL-0034**, *Plama*, ¶ 219.

[430] **RL-0039,** *AES Summit*, Award, upheld by the **RL-0042,** *AES Summit* Decision of the *ad hoc* Committee for Annulment, 29 June 2012 ("***AES Summit,* Annulment Decision***")* ¶ 95. *See also*, the Respondent's Comments of 22 March 2018 on **RL-0089**, *Wirtgen*.

[431] Resp. C-Mem. ¶¶ 926-929.

[432] **RL-0034**, *Plama,* ¶ 219.

[433] **RL-0039**, *AES Summit,* Award, ¶¶ 9.3.29 and 9.3.30.

[434] **RL-0046**, *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v The Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015 (hereinafter "***Mamidoil***"), ¶¶ 617-618.

[435] **RL-0049**, *Charanne*, p. 499.

[436] Resp. Rej. ¶ 995.

[437] Resp. Rej. ¶ 947; **RL-0049**- *Charanne,* ¶¶ 493 and 510. Emphasis added by the Respondent.

421.     The Respondent argues that the ECT does not prevent justified macroeconomic control measures from being adopted,[438] and it characterises the Claimants as attempting to use the ECT as an insurance policy against situations of crisis, such that the Claimants are even more protected than the national investors of Spain.[439] It also says that *Micula v Romania* is not relevant as it is not an ECT case.[440]

422.     The Respondent also emphasises the importance of due diligence in the context of legitimate expectations, saying that, to establish whether the FET standard was breached, the Arbitral Tribunal must analyse the knowledge of the investor about the general regulatory framework at the time of the investment, or rather the aspects that its knowledge should have covered.[441] It says that the cases have established that, at the time of the investment, the investor must know and understand the regulatory framework, how it is applied, and how it affects an investment.[442]

(2) **The Tribunal's Analysis**

423.     Pursuant to Article 10(1) ECT:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."

---

[438] Resp. C-Mem. ¶¶ 863-878.

[439] Resp. Rej. ¶ 954.

[440] Resp. Rej. ¶ 965.

[441] Resp. C-Mem. ¶ 890. *See also*, Resp. PHB ¶¶ 31-33.

[442] Resp. C-Mem. ¶ 891; **RL-0048**, *Electrabel,* Award, ¶ 7.78; **RL-0049,** *Charanne,* ¶¶ 495 and 505.

424.  This provision of course falls to be interpreted in accordance with the rules set out at Articles 31-32 of the Vienna Convention.

a.  *The first sentence of Article 10(1)*

425.  The first sentence of Article 10(1) establishes, through the use of the word "shall", certain obligations on the Contracting Parties concerned with the conditions for Investors to make Investments. The formula "*make Investments*" is defined in Article 1(8) ECT as "*establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment Activity.*"

426.  It follows that although the first sentence of Article 10(1) is cast in mandatory terms, when read in isolation, it is concerned only with the conditions in which the Investment is made, as opposed to establishing any ongoing obligation of stability.[443] While the Claimants rely on the *Blusun* case to support the (correct) proposition that the first sentence of Article 10(1) is not hortatory in nature,[444] the conclusion of the *Blusun* tribunal with respect to this provision was merely as follows:

> "The requirement to 'encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area' is not limited to the initial making of the investment but includes subsequent extension of the investment as well as changes of form."[445]

427.  This Tribunal agrees, noting that this conclusion does not suggest that the first sentence of Article 10(1) is concerned with ongoing protection once the Investment has been made, other than in the limited sense of where the Investment is being added to or undergoing a change in form.[446]

---

[443] Cf. Cl. PHB ¶ 17.

[444] Cl. PHB ¶¶ 18-19; **CL-0187**, *Blusun*, ¶ 319(1).

[445] **CL-0187**, *Blusun*, ¶ 319(2).

[446] Arbitrator Joubin-Bret clarifies her views that the first sentence of Article 10(1) addresses the conditions in which an Investment is being made or is in the making, typically covering the pre-establishment period, during which the State can undergo various types of obligations, ranging from the one at issue in the current case to a commitment to provide national and most favoured nation treatment, including during this phase of the investment.

428.    However, the second sentence of Article 10(1) then provides that: "*Such conditions [i.e. the "stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area"] shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment*." It is this second sentence that is concerned with ongoing protection of the Investment once it has been made (as is the case with the remaining sentences of Article 10(1)), which is made all the more clear by the use in the second sentence of the formula "*at all times*."

429.    Reading the two sentences together, the Tribunal considers that there is an obligation on the host State to ensure ongoing regulatory stability, but only to the extent that this forms part of the commitment to accord FET established in the second of the two sentences and, by that second sentence, embedded into the first. The Tribunal notes that the first sentence of Article 10(1) establishes an obligation with respect to the Investor, whereas the second sentence is concerned with treatment of the Investment. However, that does not detract from its conclusion that, on the facts of this case, the first sentence of Article 10(1) does not add materially to the protection accorded by the FET standard: insofar as the first sentence may be relevant to the ongoing treatment of an Investment, it is only to the extent that an ongoing commitment to FET is embedded by the second sentence of 10.1 into the first sentence.

430.    This interpretation is consistent with the object and purpose of the ECT, considered further below.

b.    *The second sentence of Article 10(1): FET*

431.    Although there is some agreement between the Parties as to the basic elements that may be engaged by the commitment to accord FET under the second sentence of Article 10(1),[447] there is disagreement as to the precise nature and scope of the elements identified

---

[447] The Respondent relies upon passages in cases that treat the protection of legitimate expectations and the concept of stability as elements of the FET standard. E.g. Resp. PHB ¶¶ 15 and 31.

by the Claimants, including as to (i) protection of the Investor's reasonable and legitimate expectations, and (ii) regulatory stability.[448]

432.    In their respective interpretations of the FET standard under Article 10(1), both Parties have taken as their starting point, and focused extensively on, the object and purpose of the ECT.[449] Pursuant to Article 2 ECT, headed "*Purpose of the Treaty*":

> "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."

433.    For further detail on the broad goal of promotion of long-term cooperation in the energy field, reference must thus be made to the European Energy Charter. This Charter is also referred to in the Preamble to the ECT, including in the expression of the desire "*to place the commitments contained in that Charter on a secure and binding international legal basis*" and the desire "*to establish the structural framework required to implement the principles enunciated in the European Energy Charter.*"

434.    The "*Objectives*" of the European Energy Charter are set out under its Title I. It is stated:

> "Within the framework of State sovereignty and sovereign rights over energy resources and in a spirit of political and economic cooperation, they undertake to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns. They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies by implementing market principles in the field of energy."

435.    As to the action to be taken in accordance with those principles, paragraph 2 of Title I refers to "*Cooperation in the energy field*", which is to entail amongst other matters "*formulation of stable and transparent legal frameworks creating conditions for the development of energy resources.*"

---

[448] Cl. Mem. ¶ 441.
[449] Cl. Mem. ¶¶ 393-409; Resp. CM ¶¶ 844-878.

436.    Title II of the Charter, "*Implementation*", lists out the coordinated action to be taken to achieve the objectives set out under Title I. At paragraph 4, under the heading "*Promotion and protection of investments*", it is stated:

> "In order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.
>
> They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes.
>
> Moreover, the signatories will guarantee the right to repatriate profits or other payments relating to an investment and to obtain or use the convertible currency needed.
>
> They also recognise the importance of the avoidance of double taxation to foster private investment."

437.    The Claimants have focused on references in the above to the concepts of stability and transparency, whilst the Respondent has emphasised the references to the principle of non-discrimination and market-oriented price formation.

438.    In light of Article 2 ECT, both sets of references are important for the current purposes of interpretation, but both are far from decisive. The references in Title I to non-discrimination and market-oriented price formation are not exclusively concerned with investment, and it is plain from the face of the ECT that its investment provisions, including Article 10(1), are in no sense confined to establishing protection against discrimination or focused on protecting market-oriented price formation. As to the references in Titles I and II to a stable and transparent legal framework, these are focused on establishment at the national level as opposed to the acceptance of international legal obligations owed to Investors, whilst the reference in Title II to the legal framework to be established at the national level is to "*conformity with the relevant international laws and rules on investment and trade.*" This raises the question as to what such international laws and rules are, supporting reference by the interpreter most obviously to customary international law.

439.   In the view of the Tribunal, the objects and purposes of the ECT are therefore more balanced than either Party allows for, and it approaches the interpretation of Article 10(1) on that basis. The Tribunal notes that, to support their general contentions on the ECT, both Parties have also referred to the Reader's Guide to the ECT that has been published by the ECT Secretariat. This Guide does not purport to offer any definitive interpretation of the Treaty's provisions. It is, on its face, a guide, nothing more, and the Tribunal considers it of little assistance in the current exercise of interpretation.

440.   As to the ordinary meaning of the commitment to accord FET under Article 10(1), the Tribunal considers that reference to dictionary definitions scarcely helps it in interpreting the formula "*fair and equitable*." The terms "*fair*" and "*equitable*" are not in any event particularly difficult to understand as a matter of ordinary meaning: the difficulty, as is very well-known, is how and where to draw the line between what is fair / unfair, equitable / inequitable, in particular in the context of a State's adoption of regulations of general application. Both Parties have referred to multiple cases in order to assist the Tribunal in this respect, and the Tribunal has paid particular attention to those cases concerning specifically Article 10(1) ECT. It is of course the case that the correct interpretation of any given FET standard will be the result of attention to the specific wording, in context, and in light of the object and purpose of the given treaty; and hence the reasoning in awards concerning FET provisions in other treaties may well be of less persuasive value.

441.   Both Parties have referred the Tribunal to the award in the *Blusun* case,[450] where the tribunal's conclusions as to the FET commitment in Article 10(1) and its application in the context of a State's regulatory acts were stated as follows:

> "… the core commitment is that in the second sentence, expressly included in the first, 'to accord *at all times* to Investments of Investors of other Contracting Parties fair and equitable treatment' (emphasis added). This incorporates the fair and equitable treatment standard under customary international law and as applied by tribunals.

---

[450] E.g. Cl. PHB ¶¶ 45-51; Respondent's Application of 9 March 2018, by which it sought leave to introduce the case onto the record (Application refused as the case was already on the record).

> That standard preserves the regulatory authority of the host state to make and change its laws and regulations to adapt to changing needs, including fiscal needs, subject to respect for specific commitments made.
>
> In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime."[451]

442.    The Tribunal considers this to be a useful reference point for its own consideration of the FET standard under Article 10(1), and notes that the Claimants expressly rely on this paragraph of the *Blusun* Award.[452]

443.    The conclusion of the *Blusun* tribunal is that the second sentence of Article 10(1) incorporates the fair and equitable treatment standard under customary international law. There is no reference to international law in this second sentence, although the conclusion that the FET standard was intended to be tied back to customary international law is consistent with the reference in Title II, paragraph 4, of the European Energy Charter to "*conformity with the relevant international laws and rules on investment*."[453]

444.    There is a reference to "*international law, including treaty obligations*" in the fourth sentence of Article 10(1), i.e. an important part of the relevant context, and this raises a question as to whether the inclusion of the FET standard would serve any purpose if all that was intended was treatment in accordance with customary international law: that purpose appears to be achieved by the fourth sentence, which requires treatment no less favourable than international law (including conventional law). At the same time, however, Article 10(1) contains a number of different concepts that plainly overlap, so only limited weight can be placed on this line of analysis.

---

[451] **CL-0187**, *Blusun*, ¶ 319(3)-(5), footnote omitted.

[452] Cl. PHB ¶ 49.

[453] At **CL-0187**, *Blusun*, ¶ 319(3),  reference is made to *Plama Consortium Limited v Republic of Bulgaria*, ICSID Case No. ARB/03/24.    ¶¶ 161-173, which is said to be similar effect. It is not clear to this Tribunal that the award in *Plama* supports a reference to customary international law.

445.   As part of the relevant context, the Tribunal also considers Article 24(2) to be of importance. The impact of this complex provision is that while, as a general rule, the provisions of the Treaty do not preclude the adoption or enforcement of measures "*necessary to protect human, animal or plant life or health*", the provisions of Part III of the ECT – which includes Article 10(1) – are not included within that general rule.

446.   While the Claimants have made the point that this may seem a very unusual policy choice,[454] they did not explain and substantiate their position that under the ECT investor protection was being prioritised over protection of human life etc.[455] The Tribunal notes that the drafters of Article 24(2) appear to have taken Article XX GATT as their starting point, and the doctrine and cases with respect to Article XX may shed light on the intention behind Article 24(2). However, the Tribunal was not referred to such materials. It considers that the limitation of the general exception in Article 24(2) with respect to human life etc is more readily comprehensible if the ECT Contracting Parties understood themselves to be adopting a series of confined investment protections in Part III such that, for example, a regulation adopted to protect human life would not be regarded as unfair and inequitable unless it was arbitrary or discriminatory or in some other way contrary to customary international law.

447.   This line of analysis can only take matters so far, given that certain aspects of Part III do go further than the requirements of customary international law, but the Tribunal is of the view that Article 24(2) ECT militates against any expansive concept of FET standard under Article 10(1) and supports an interpretative approach that, where a term in Article 10(1) can be seen as referable to customary international law, it is more likely that this is what the Contracting Parties intended. The formula "*fair and equitable treatment*" was not agreed to by the ECT Contracting Parties in a legal vacuum, but against a backdrop where the formula had been used for many decades as a standard of investment protection closely tied to customary international law and, consistent with the object and purpose of the ECT as it appears from Title II, paragraph 4, of the European Energy Charter, the

---

[454] Claimants' oral opening at Day 1/184; Cl. PHB ¶ 99.
[455] Cl. PHB ¶¶ 97-99. *See also*, Claimants' oral opening, Day 1/183-189.

Tribunal considers that the FET standard in Article 10(1) should be approached on that basis.

448.    As to the regulatory authority of the host State, subject to respect for specific commitments made, the Tribunal considers that in the usual course it would be neither unfair nor inequitable within Article 10(1) for regulations to change over the course of a given Investment as that is merely one expected facet of investment activity. Multiple tribunals have come to similar conclusions, including those focused on the application of Article 10(1) ECT in the context of renewable energy cases against the Respondent. As noted by the tribunal in the *Eiser* case (a case on which both Parties rely):

> "Absent explicit undertakings directly extended to investors and guaranteeing that States will not change their laws or regulations, investment treaties do not eliminate States' right to modify their regulatory regimes to meet evolving circumstances and public needs. As other tribunals have observed, '[i]n order to adapt to changing economic, political and legal circumstances the State's regulatory powers still remain in place'. '[T]he fair and equitable treatment standard does not give a right to regulatory stability *per se*. The state has a right to regulate, and investors must expect that the legislation will change, absent a stabilization clause or other specific assurance giving rise to a legitimate expectation of stability.'"[456]

449.    The tribunal in *Eiser* found, however, that the FET standard in Article 10(1) did offer protection from certain forms of fundamental regulatory change. It stated:

> "… the Respondent's obligation under the ECT to afford investors fair and equitable treatment does protect investors from a fundamental change to the regulatory regime in a manner that does not take account of the circumstances of existing investments made in reliance on the prior regime. The ECT did not bar Spain from making appropriate changes to the regulatory regime of RD 661/2007. Thus, the Tribunal does not accept Claimants' contention that RD 661/2007 gave them immutable economic rights that could not be altered by changes in the regulatory regime.

---

[456] **CL-0170**, *Eiser*, ¶ 362, referring in turn to *Parkerings-Compagniet AS v Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 ¶ 332; **RL-0035**, *EDF (Services) Ltd. v Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 (hereinafter "*EDF v. Romania*"), ¶¶ 217-218; **CL-0049**, *BG Group Plc. v Argentine Republic*, UNCITRAL, Award, 24 December 2007 ¶ 298; **CL-0052**, *Micula*, ¶ 666.

> Nevertheless, the ECT did protect Claimants against the total and unreasonable change that they experienced here."[457]

450.    A similar conclusion was reached by the tribunal in the *Blusun* case, in the following terms:

> "… the fair and equitable treatment standard which, by virtue of the second sentence, is at the core of the obligation of stability under the first sentence has a relatively high threshold. The *El Paso* tribunal spoke of 'a total alteration of the entire legal setup for foreign investments, and added that 'all the different elements and guarantees just mentioned can be analysed as a special commitment of Argentina that such a total alteration would not take place'. The tribunal in *LG&E* spoke of 'completely dismantling the very legal framework constructed to attract investors'. The emphasis is on the subversion of the legal regime."[458]

451.    Regardless of the question of whether the second sentence of Article 10(1) is correctly seen as incorporating the FET standard under customary international law or as establishing an autonomous standard, the Tribunal agrees with the above approach. To adapt the formulation from *Eiser*, absent explicit undertakings directly extended to investors and guaranteeing that ECT Contracting Parties will not change their laws or regulations, the second sentence of Article 10(1) does not eliminate the Contracting Parties' right to modify their regulatory regimes to meet evolving circumstances and public needs.  However, even absent a showing of specific commitments that the regulatory regime would not change, a breach of Article 10(1) may be established if there has been some form of total and unreasonable change to, or subversion of, the legal regime.

452.    This raises the question of what would qualify for these purposes as a specific commitment and, more particularly, whether such a commitment could be located in a

---

[457] **CL-0170**, *Eiser*, ¶ 363, referred to in the Claimants' oral opening at Day 1/191. According to the Claimants in their oral opening at Day 1/194, the core of the reasoning of the *Eiser* tribunal was the wholesale regulatory change and its retroactive application, as opposed to the impact on the Eiser investment. The Tribunal does not agree with this reading of the *Eiser* award. *See e.g.,* the Award at ¶¶ 365 and 382, where there was a strong focus on the impacts of the changes to *Eiser*, i.e. the fact that the Eiser investment was being stripped of virtually all its value.

[458] **CL-0187**, *Blusun*, ¶ 363, referring to **CL-0091**, *El Paso Energy International Co v Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (hereinafter, "***El Paso*, Award**"),¶ 517; **CL-0039**, *LG&E*, ¶ 139.

regulation of general application – as opposed to in a commitment made specifically to a given Investor such as through conclusion of a contract.

453.    Whilst it has been widely recognised that, in assessing whether there has been a breach of the FET standard under Article 10(1) it is important to consider whether the legitimate expectations of an Investor have been defeated, there is no consensus as to what kinds of commitments can give rise to legitimate expectations. In particular, as identified in the *Masdar* case, there are differing schools of thought as to whether a commitment given in general regulations can give rise to a legitimate expectation (in *Masdar*, the examples given for two different schools were: *Suez v Argentina*, the analysis of UNCTAD,[459] the dissents of Professor Tawil in *Charanne* and *Isolux*, *Electrabel v Hungary* (to support the position that laws and regulations may suffice); *El Paso v Argentina*, *Continental Casualty v Argentina*, *Charanne* (to support the position that laws and regulations would not be sufficient).[460]

454.    As to the differing schools, there is much to be said for the approach of the tribunal in the *Electrabel* case, where it was held that:

> "While specific assurances given by the host State may reinforce the investor's expectations, such an assurance is not always indispensable: *MTD v Chile* (ICSID Case No. ARB/01/7), Award, 25 May 2004; *GAMI Investments v Mexico*. UNCITRAL, Final Award, 15 November 2004; and *SD Myers v Canada,* UNCITRAL, Second Partial Award, 21 October 2002. Specific assurances will simply make a difference in the assessment of the investor's knowledge and of the reasonability and legitimacy of its expectations."[461]

455.    The attraction of this approach is that the task for a tribunal considering the second sentence of Article 10(1) is solely to determine whether the State has failed to accord fair and equitable treatment, and there is therefore a question as to how useful it can be to be overly proscriptive about the concept and creation of legitimate expectations, a concept which after all is nowhere mentioned in the Treaty language. As aptly stated in the well-

---

[459] As relied on by the Claimants at e.g. oral opening, Day 1/226.

[460] **CL-0191**, *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 490-510.

[461] **CL-0042**, *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶ 7.78.

known passage in the Decision of the Annulment Committee in *MTD v Chile*: "*The obligations of the host State towards foreign investors derive from the terms of the applicable investment treaty and not from any set of expectations investors may have or claim to have.*"[462]

456.    The Tribunal notes that in the *Isolux* case, relying on the analysis of UNCTAD, it was considered that legitimate expectations could be generated where either (i) a specific commitment had been addressed to the investor personally or (ii) rules had been put in place that were not addressed to a particular investor but had the specific aim of inducing foreign investment and which were relied on in making the investment.[463] The tribunal in the *Novenergia* case also found that there was no requirement of a specific commitment made to the investor, considering that the relevant question "*is whether the statement or conduct is objectively sufficient to create legitimate expectations in the recipient. Such conduct or statements can take the form of laws or regulations.*"[464]

457.    By contrast, the tribunal in *Charanne* determined that RD 661/2007 (and RD 1578/2008), although directed to a limited group of investors, did not thereby become a specific commitment, losing their general nature. It considered that: "*To convert a regulatory standard into a specific commitment of the state, by the limited character of the persons who may be affected, would constitute an excessive limitation on power of states to regulate the economy in accordance with the public interest*."[465] This Tribunal agrees at least to the extent that caution would need to be applied with respect to any analysis that treated domestic legal acts that are quite different in nature – i.e. (i) specific commitments made by the host State to an individual investor and (ii) regulations of general nature – as if they generated the same consequences as a matter of international law.  The tribunal in *Charanne* went on to consider whether the regulations at issue might nonetheless generate

---

[462] **RL-0030**, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 (hereinafter, "***MTD*, Decision on Annulment**") ¶ 67.

[463] **RL-0088**, *Isolux Infrastructure Netherlands B.V. v Spain*, SCC Arbitration No. V2013/153, Award, 17 July 2016 ¶ 775 (hereinafter "***Isolux***"), referring to UNCTAD, *Fair and Equitable Treatment*, 2012, p. 69.

[464] **CL-0190**, *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v Spain*, SCC Arbitration No. 2015/063, Final Award, 15 February 2018 ¶ 547 (footnote omitted).

[465] **CL-0094/RL-0049**,*Charanne*, ¶ 493.

a legitimate expectation that the regime would remain unchanged for the lifetime of the claimants' plants, but rejected this on the basis that:

> "Admitting the existence of such an expectation would, in effect, be equivalent to freeze the regulatory framework applicable to eligible plants, although circumstances may change. Any modification in the amount of the tariff or any limitation of the number of eligible hours would then constitute a violation of international law. In practice, the situation would be the same that if the State had signed a stabilisation clause or adopted a commitment to not modify the regulatory framework. The Arbitral Tribunal cannot support such a conclusion. The Claimants have made very clear that they do not claim to have had the legitimate expectation that the regulatory framework would remain unchanged." [466]

458.    This Tribunal shares the difficulty in approaching a provision of domestic law of general application as if had, in substance, the same effect as a contractual stabilisation clause or some specific commitment to similar effect.  It can readily be said that the State could have, but has not, given an individual commitment of some sort, and that as a matter of expectations an investor would naturally regard such a commitment as of greater value than anything in a general regulation.

459.    In considering the question of whether domestic laws could generate legitimate expectations for the purposes of Article 10(1), the tribunal in the *Blusun* case referred to *Charanne*, *El Paso v Argentina* and *Philip Morris v Uruguay* in support of its view that investment treaty tribunals had declined to sanctify laws as promises, and then reasoned as follows:

> "It is true that informal representations can present difficulties, which is why tribunals have increasingly insisted on clarity and the appropriate authority to give undertakings binding on the state. It is also true that a representation as to future conduct of the state could be made in the form of a law, sufficiently clearly expressed. But there is still a clear distinction between a law, i.e. a norm of greater or lesser generality creating rights and obligations while it remains in force, and a promise or contractual commitment. There is a further distinction between contractual commitments and expectations underlying a given relationship: however legitimate, the latter are more matters to be taken into account in applying other norms than they are norms in their own right. International law does

---
[466] **CL-0094/RL-0049**, *Charanne*, ¶¶ 503 and 510.

not make binding that which was not binding in the first place, nor render perpetual what was temporary only. …

In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime. These considerations apply even more strongly when the context is subsidies or the payment of special benefits for particular economic sectors."[467]

460.    The Tribunal finds this approach persuasive in its two key respects.

461.    First, in considering whether a legitimate expectation has been generated that falls for protection under Article 10(1), a representation in the form of domestic law cannot correctly be elided with a specific promise or contractual commitment: a law remains a norm of general application (greater or lesser), and only applies whilst it remains in force. Further, if the application of the Article 10(1) FET standard turns on a question of whether legitimate expectations had been defeated, and it were accepted that such expectations could readily be generated by domestic law, the FET standard would in practical terms start to approximate an overarching stabilisation clause, elevating each change in a domestic legal regime to a source of potential breach of international law. The Tribunal does not consider that this could be the intention of the ECT Contracting Parties, not least bearing in mind that there is an umbrella clause in Article 10(1), but one that is limited to "obligations" that have been "entered into" as opposed to "expectations" that have been "generated."

462.    Second, however, the absence of a specific commitment does not mean that the fact that an investor has invested by reference to a given tariff regime ceases to be a relevant factor in applying the FET standard under Article 10(1).  The Tribunal's task is to assess whether the Respondent State has acted fairly and equitably, and in considering this one important tool is an assessment of whether the change to a given tariff regime is disproportionate, which this Tribunal considers – in the current context – as entailing considerations both

---

[467] **CL-0187,** *Blusun*, ¶¶ 367-372, referring to **CL-0091**, *El Paso,* Award, ¶ 517; **CL-0039**, *LG&E*, ¶ 139.

as to what is necessary and as to the financial burden that is being shifted to those investors who have committed substantial resources on the basis of the earlier regime. At the same time, it is important to assess whether the Respondent State took into account impacts to such investors in its decision-making process. The Tribunal is of the view that these considerations are of particular importance in the current context, which concerns changes to the particular benefits of a specific economic regime in which investors (including foreign investors) were being invited and encouraged to invest through a number of factors, including a very attractive regime of remuneration.

### D.    RWE'S CASE ON BREACH OF ARTICLE 10(1) BY REFERENCE TO ALLEGED LEGITIMATE EXPECTATIONS

463.    Against the backdrop of the above conclusions as to interpretation of relevant aspects of the FET standard under Article 10(1), the Tribunal turns in this Section to the details of the Claimants' case on the existence of legitimate expectations by reference to alleged guarantees on the part of the Respondent. The Tribunal ultimately concludes (in Section D(2)(e) below) that no specific commitment was made to the Claimants sufficient to ground legitimate expectations in this case. Consistent with its position on the interpretation of Article 10(1) outlined above, Section D goes on to examine the question of whether there was nonetheless a breach of the FET standard in circumstances where Investors invested on the basis of a given tariff regime, and the change to that tariff regime was disproportionate, and/or there was a failure to take into account impacts to such investors in the host State's decision-making process (see Section D(2)(f)).

### (1)    The Parties' Positions

#### a.    *The Claimants' Position*

464.    The Claimants submit that the Respondent breached its FET obligations under Article 10(1) of the ECT because the Respondent's adoption of the Disputed Measures frustrated the Claimants' legitimate expectations "*with respect to the guarantees offered to*

*investors under the Special Regime that were put in place precisely to attract investment.*"[468]

465.    The Claimants say that the "time of investment" for purpose of their legitimate expectations includes the time of the initial decision to invest in Spain, the subsequent times that the Claimants increased Investments in Spain, and the Investment decisions taken pursuant to RD 661/2007's First Transitory Provision. It is said that this represented an important decision that concerned all of the Claimants' Investments made up to that point in time. Additionally, it is said that the offer in RD 661/2007 was subject to the oldest plants being upgraded. RWE's interest in the applicability of RD 661/2007 resulted in RWE deciding to invest in upgrading the plants.[469]  The Claimants also say that the position that "*the relevant time to consider the legitimate expectations can be different from the time an investment is made is shared by some scholars and relevant precedents,*"[470] such as Professor Schreuer and Professor Kribaum, and the *Franck Charles Arif v Moldova* and the *Mamidoil v Albania* cases.[471]

466.    The Claimants contend that their expectations were twofold: "*(i) regarding the nature amount and duration of the FIT offered under the first RD 2918/1998, then RD 436/2004 and finally RD 661/2007 and RD 1611/2010; and (ii) with respect to the stability of the economic regime.*"[472]

467.    As to (i), it is said that RWE –

> "expected that because its RE installations complied with all the legal requirements in each case, they would continue to be subject to the FIT regime. Therefore:
>
>> i.    the plants would have a choice between selling electricity at a Fixed Tariff or at the Premium;

---

[468] Cl. Mem. ¶ 444; Cl. Reply ¶ 523.

[469] Cl. Mem. ¶¶ 453-454.

[470] Cl. Mem. ¶ 450.

[471] Cl. Mem. ¶¶ 450-452; **CL-0041**, C. Schreuer and U. Kribaum, "At What Time must Legitimate Expectations Exist?"  In "Liber Amicorum: Thomas Wälde", in 9 TDM 1, 2012, p. 269; **CL-0026**, *Mr Franck Charles Arif v The Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 543; **CL-0093**, *Mamidoil*, ¶ 707.

[472] Cl. Mem. ¶ 464.

      ii.    the FIT or premiums would apply to all of the electricity produced, without any limitations on production;

      iii.    the FIT or premiums would apply for the entire operational life of the RE installations;

      iv.    the plants would have priority of dispatch under RD 661/2007; and

      v.    the FIT would be subject to inflation adjustments in accordance with the CPI under RD 661/2007."[473]

468. As to (ii), the Claimants "*expected that any future changes to the applicable regime in detriment to the installations would only apply prospectively, i.e. to new installations, while existing installations would remain unaffected*." According to the Claimants, the Respondent "*explicitly promised that the economic regime for qualifying Special Regime installations would remain stable under RD 436/2004 and RD 661/2007... [and] subsequently reiterated this commitment in its July 2010 Agreement with the wind sector, which was then confirmed in RD 1614/2010*."[474] These commitments were key to the Claimants' decisions to invest in Spain[475] and were understood as a guarantee by Spain.[476]

469. In response to the Respondent's position that none of RD 436/2004, RD 661/2007, RD-L 6/2009 and RD 1614/2010 contained a commitment to 'grandfathering', the Claimants say that:[477]

    "(a) The PER 2005-2010 confirmed that 'Royal Decree 436/2004, on the Special Regime, explains the law, and establishes an economic regime guaranteed for the whole life of the facility'.[478]

---

[473] Cl. Mem. ¶ 465.

[474] Cl. Mem. ¶¶ 466-467; **C-0016**, RD 436/2004, Article 40(2); **C-0017**, RD 661/2007, Article 44(3).

[475] Bünting Statement ¶¶ 49-52; and Schäfer Statement ¶ 31.

[476] Cl. Skel ¶ 25, referring to **C-0238**, Announcement of RD 661/2007; **C-0202**, Alfonso Olivas La Llana, *Wind Energy in Spain, 2020 Objectives and actions*, IDAE – Wind Energy Department and Ministry of Industry, Tourism and Commerce PowerPoint presentation, Madrid, 7 October 2010, and **C-0296,** Second Draft of RD 661/2007 of the Ministry, 19 March 2007.

[477] Cl. Reply ¶ 524.

[478] Referring to **C-0034**, 2005-2010 Renewable Energy Plan, p. 166.

158

(b) The CNE confirmed that RD 661/2007 'exempt[ed] existing facilities from revision every four years because the new incentives that are being put into place only affect new facilities'. The Ministry equally explained that '[t]he subsequent revisions of the tariffs will not affect the installations which have already been commissioned. This guaranty provides legal certainty to the producer, ensuring the stability and development of the sector'.[479]

(c) Spain confirmed in the preamble to RDL 6/2009 that it 'guarantee[d] the necessary legal security of those who have made investments'.[480]

(d) Spain stated that RD 1614/2010 was a pact 'guaranteeing the current incentives and rates of RD 661/2007 for the facilities in operation'. The government stated that this 'assure[d] the invariability of the premium for wind and solar thermoelectric installations'."[481]

470.    The Claimants contend that the reasoning of *Micula v Romania*,[482] where the tribunal "*found an implied commitment based on the fact that Romania specifically sought to induce investment by offering the incentives*", applies to this case.[483] It is submitted that, from 2012, the Respondent frustrated the Claimants' legitimate expectations and eventually entirely dismantled the legal and business framework under which the investments had been made:

"i) First, Spain's introduction of the 7% levy (Law 15/2012) on production constitutes a disguised and unjustified cut of the FIT;

ii) Secondly, the Government's elimination of the Premium (under RDL 2/2013) frustrates the expectations RWE had under the Special Regime;

iii) Thirdly, the Government's replacement under RDL 2/2013 of the CPI-linked updating mechanism for the FIT departs from RWE's expectations that the FIT would be updated during the life of the plants to reflect variations of the general CPI; and

---

[479] Referring to **C-0239**, CNE, "Report 30/2008 regarding the Proposed Royal Decree for Regulating the Economic Incentives to the Production of Electric Energy for Photovoltaic Installations Not Subject to the Economic Regime defined by Royal Decree 661/2007, of 25 May", 29 July 2008, p. 20; **C-0248**, InvestinSpain PowerPoint presentation, "Legal Framework for Renewable Energies in Spain", undated, p. 4.

[480] Referring to **C-0061**, RD 6/2009, Preamble.

[481] Referring to **C-0064**, Draft 2010 Decree; **C-0268**, *Memoria Económica* for RD 1614/2010, p. 11.

[482] **CL-0052**, *Micula*.

[483] Cl. Reply ¶¶ 527-528.

iv) Finally, in July 2013, with RDL 9/2013 wiping out the entire Special Regime and in particular the RD 661/2007 economic regime that by then applied to all of RWE's installations, and by introducing a substantially less favourable regime that eliminated the FIT, Spain violated the basic foundations upon which RWE made each and every one of its investments."[484]

471.   The Claimants say that, in the *Micula* case, the "*termination of a FIT remuneration scheme resulted in a violation of the FET standard.*" The Claimants contend that, in a way similar to *Micula*, here: "*only a few years after Spain enacted RD 661/2007, encouraged the Claimants to upgrade the existing installations and confirmed the stability of the regime through the July 2010 Agreement and RD 1614/2010, Spain eviscerated all of its key characteristics. It has reneged on its promises, thereby frustrating the Claimants' legitimate expectations and upsetting the legal framework it had previously guaranteed. This behaviour constitutes a breach of its obligation to abide by the FET standard.*"[485]

472.   As to the Respondent's position that the expectations were unreasonable, it is said:

   *a)*   The Claimants carried out a careful and thorough analysis of the regulatory framework prior to its original Investment and updated this,[486] while the Claimants' expectations matched the Respondent's own understanding.[487]

   *b)*   Further, "*Iberdrola and the RE associations shared RWE's understanding of the Special Regime ... . AEE told Spain that the New Regime breached Spain's commitments at Article 44.3 of RD 661 and Article 5.3 of RD 1614 by applying a tariff revision to existing installations. The same goes for Pöyry, who advised RWE that the 'RD 661/2007 ... (environmental premiums) are guaranteed during the operating lifetime of the plant.*"[488] As to the statement made by Osborne Clark on

---

[484] Cl. Mem. ¶ 471.

[485] Cl. Mem. ¶¶ 472-473.

[486] Cl. Reply ¶¶ 514-522; ¶ Cl. Skeleton ¶ 66; Navarro Statement ¶¶ 38-62; Henderson Statement ¶¶ 23-27 and 38-34.

[487] Cl. Reply ¶¶ 531-532; Cl. Skeleton ¶ 66.

[488] Cl. Skeleton ¶ 67; **R-0237**, Submissions from the AEE concerning draft Order IET/1045/2014 before the CNMC dated 26 February 2014, p. 2; **C-0103**, Pöyry July 2007 Report (Wind), p. 2.

which the Respondent relies and the decisions of the Spanish Supreme Court, it is said that the former "*is a summary of the 2012 Supreme Court judgment made after RWE had made its investments. The same applies to most of the Supreme Court judgments Spain cites; they post-dated RWE's investments. The remainder did not indicate that cuts could be made to the guaranteed Special Regime FIT (and certainly not the Fixed tariff).*"[489]

c) The Claimants' "*pre-RD 661 investments were made in reliance on earlier commitments contained in the Special Regime*", and under the 'grandfathering' principle of the Special Regime all those installations were brought "*under the protection of the RD 661 FIT.*"[490]

473. In the alternative, the Claimants say that even if their legitimate expectations had been limited by Spain's concept of a 'reasonable return', the Respondent would still be in breach of the ECT.[491] In such a case, the reasonable return would fall to be calculated at the time the Claimants made their Investments with the return, by reference to the 2007 CNE report, at between 8.2% and 11.2% after-tax.[492]

b. ***The Respondent's Position***

474. According to the Respondent, the Claimants have proven neither the alleged commitment to 'grandfathering' nor that their expectations could hinge on the alleged 'grandfathering'. Its position is that the Claimants did not request any legal report that confirmed the alleged 'grandfathering', and that they have not produced a legal due diligence supporting the alleged "*expectations about a 'commitment' of the Kingdom of Spain to petrify the regime arising from RD 661/2007 or to maintain or improve it by*

---

[489] Cl. Skeleton ¶ 68; **R-0302,** Osborne Clarke Publications, *Supreme Court Case-Law in the Framework of the Appeals against Royal Decree 1565/2010*, 12 April 2012.

[490] Cl. Skeleton ¶ 69.

[491] Cl. Reply ¶ 535

[492] Cl. Reply ¶ 537; Compass Lexecon, Second Report ¶ 107. *See also*, **CLEX-0036**, CNE, Report 3/2007, 14 February 2007 "*Informe 3/2007 de la CNE Relativo a la Propuesta de Real Decreto por el que se Regula la Actividad de Producción de Energía Eléctrica en Régimen Especial y de Determinadas Instalaciones de Tecnologías Asimilables del Régimen Ordinario.*" , pp. 54-55.

*subsequent reforms. That is important because the institution or the concept of 'grandfathering' does not exist in Spanish legislation or, as a result, in the regulatory framework of the SES.*"[493]

475.     In the context of due diligence, the Respondent highlights an alleged, inexcusable failure on the part of the Claimants to take into account and configure their expectations by reference to Spain's domestic case law, which is the ultimate interpreter of the provisions establishing the regulatory framework and which, from 2005, has held that the regulations do not guarantee the indefinite continuance of the formulae used to set premiums.[494]

476.     Further, and regardless of the issue of due diligence, it is said that the Disputed Measures do not violate the Claimants' legitimate expectations because Spain did not make any specific commitment in favour of the Claimants while, with respect to any changes in the law of the host State it would have to be shown that expectations were reasonable and justified, which the Claimants cannot show.[495]

477.     The Respondent argues that it did not make a promise or guarantee to petrify their framework in favour of the Claimants or its investments, nor did it make a promise of 'grandfathering'.[496] According to the Respondent, the absence of such commitments was corroborated in the *Charanne* case, which examined the legal framework in Spain for the electricity sector in 2007 and 2008.[497]

478.     The Respondent also says that the Claimants' expectations were not reasonable on the basis of the legal framework in force during the 11 years during which the Claimants invested in Spain.[498] It relies on the allegedly contrary expectations of the main RE

---

[493] Resp. C-Mem. ¶¶ 896-898.

[494] Resp. C-Mem. ¶¶ 902-903; Resp. Skeleton ¶¶ 22-28.

[495] Resp. C-Mem. ¶ 905.

[496] Resp. C-Mem. ¶ 907.

[497] Resp. C-Mem. ¶¶ 908-909; **RL-0049**, *Charanne*, ¶¶ 504 to 508.

[498] Resp. C-Mem. ¶ 912. The same argument is made with respect to the Claimants' alternative case based on a reasonable return of between 8.2% and 11.2% per-tax. Resp. Skeleton ¶ 53.

Associations, of RE investors like Iberdrola and of advisors like Pöyry.[499] The Respondent says that any investor knew, or should have known, that the regulatory framework was based on the following principles:

> "(1) … the principle of regulatory [hierarchy] and the result of legally stipulated regulation creation procedures.
>
> (2) The regulatory framework is not limited to RD 661/2007 and RD 1614/2010 as claimed by the Claimant. It is configured on the basis of Law 54/1997 and any regulatory standards that have implemented it, as interpreted by Case-law.
>
> (3) The fundamental principle that RE subsidies are a cost of the SES, secondary to the principle of economic sustainability of the same.
>
> (4) Right to priority of access and dispatch of electricity production.
>
> (5) That the remuneration of the RE consists of a subsidy which, once added to the market price, provides RE Plants with reasonable profitability, in the context of its useful life, according to capital markets, which has a dynamic and balanced nature within the SES. This return was linked exclusively to the cost made in the construction and operation of the plants.
>
> (6) That the subsidies were determined according to the evolution of the demand and other basic economic data, expressed in the Renewable Energy Plans on the investment and operation costs of standard installations, with a view to ensuring that these installations are able to reach reasonable profitability during their useful lives.
>
> (7) That the regulatory changes in the remuneration regime of the RE have been motivated since 2004 (i) to correct situations of over-remuneration, or (ii) by the strong variation in the economic data that served as the basis for the estimation of subsidies."[500]

479.   It is also said that the Claimants had no, and could have no, expectations on the basis of documents such as the InvestinSpain presentations.[501]

480.   As to the wording of Article 44.3 of RD 661/2007, the Respondent says that this does not make reference to updates, rewarded hours, the operational life of the plants, priority of

---

[499] Resp. Skeleton ¶¶ 48-49.
[500] Resp. C-Mem. ¶ 913.
[501] Resp. Rej. ¶ 674.

dispatch, or any other aspect of the Special Regime. The Respondent portrays this provision as concerned only with specified periodic reviews, not any reviews of the tariff system. It is contended that the provision does not mention 'grandfathering' and does not guarantee that the tariffs would be kept.[502]  Further, by reference to the principle of hierarchy, RD 661/2007 and RD 1614/2011, which developed the mandate under Law 54/1997, could not have contradicted or nullified the provisions of that Law. Therefore, a diligent investor would have known that RD 661/2007 could not have frozen the remuneration regime indefinitely, as that would have gone against the principle of economic sustainability.[503] Reliance is placed on the *Isolux* award, where it was held that the only legitimate expectation of the claimant was to receive a reasonable return for its investment.[504]

481.    The Respondent's position is thus that "*no diligent investor could expect that the Spanish State would no longer adapt measures to resolve any deficit or economic imbalance that affected the sustainability of the* SES" while, by contrast, the applicable legal framework "*allowed regulatory changes in relation to existing installations, by maintaining the principle of reasonable profitability at all times within the framework of a sustainable SES*."[505]

(2)    **The Tribunal's Analysis**

a.    ***The significance of the time when the Investments were made***

482.    On the Claimants' case on legitimate expectations, it is for them to show that: "*(a) Spain made a promise or assurance; (b) RWE relied on that promise or assurance as a matter of fact; and (c) such reliance (and expectation) was reasonable*."[506] As follows from this,

---

[502] Resp. C-Mem. ¶ 917. Resp. Skeleton ¶ 51.

[503] Resp. Rej. ¶¶ 221-223; **R-0003**, Law 54/1997, Article 29.

[504] Resp. Skeleton ¶ 54, referring to **RL-0088**, *Isolux*, ¶ 787. *See also*, the reliance placed by the Respondent in its Comments of 3 May 2019 on **RL-0099**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (hereinafter "***RREEF,* Decision on Responsibility and on the Principles of Quantum**").

[505] Resp. C-Mem. ¶¶ 914-915. Resp. Skeleton ¶¶ 29-33.

[506] Cl. PHB ¶¶ 34-35, referring to *Micula v Romania*.

and as is anyway obvious, it is important to identify precisely when a given Investment was made by the Claimants and what the promises or assurances were that were then relied upon as a matter of fact. There is nothing in *Arif v Moldova* or *Mamidoil v Albania* or indeed the writings of Professors Schreuer and Kribaum that suggests otherwise.[507] Further, in any consideration of reasonable reliance, a series of investments cannot be looked at as a non-dissectible whole, and the Claimants' reference to expropriation cases, where it may well be inappropriate to look at individual rights making up the investment (such as individual intellectual property rights), is inapposite.[508] The question in that context is whether there has been substantial deprivation, which involves quite different considerations. The same would apply where, in the jurisdictional context, it may be appropriate for a tribunal to consider the unity of a given investment.

483.  The issue of timing is important because the Investments were made across a period of around 12 years in which materially different regulations applied, as well as different investment conditions. In very broad terms, the Investments were made in three different periods, i.e. in –

   *a)*  The period prior to RD 436/2004, when the Claimants made Investments into the regime established by RD 2818/1998, which had no equivalent provision to Article 40.3 of RD 436/2004 or Article 44.3 of RD 661/2007 (pursuant to which it was stated that future revisions would not affect plants for which a deed of commissioning had already been granted);

   *b)*  The period of the regime established by RD 436/2004 and then RD 661/2007, but before further regulations or laws were adopted, starting with RDL 6/2009, in which Spain sought to modify the RD 661/2007 regime in order to address the tariff deficit;

---

[507] Cl. Mem. ¶¶ 450-452; **CL-0041**, C. Schreuer and U. Kribaum, "At What Time must Legitimate Expectations Exist?" In "Liber Amicorum: Thomas Wälde", in 9 TDM 1, 2012, p. 269; **CL-0026**, *Mr Franck Charles Arif v The Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 ¶ 543; **CL-0093**, *Mamidoil*, ¶ 707.
[508] Cf. Cl. PHB ¶¶ 54-56.

      *c)*  The period post-RDL 6/2009 in which the RD 661/2007 regime was becoming increasingly subject to modification, but prior to the adoption of the Disputed Measures.

484.    So far as concerns the alleged legitimate expectations as to the first of these three broad periods, the issues are more straightforward, and it is convenient to deal with them up front.

485.    The Claimants' case is that (i) RD 2818/1998 established a set of incentives for qualifying Investments, in particular the payment of a premium or a fixed tariff, (ii) that the regulation expressly confirmed that these incentives would have no temporal limit, and (iii) the Claimants relied on these incentives in making its Investments.[509]

486.    It is correct that the Preamble of RD 2818/98 stated that the incentive it established for RE facilities "*has no time limit as the environmental benefits need to be internalised, and because of their special characteristics and technological level, their higher costs do not allow them to compete in the free market.*"[510] That was a correct statement so far as concerns the substantive provisions that then followed. It was not, however, a statement that the incentives would not change at some point in the future, and it could not be reasonably relied on as such. Indeed, Article 32 of RD 2818/1998 expressly provided that there would be a review every four years "*with reference to changes to the market price of electricity in the market, the contribution made by the facilities in supplying demand and the impact on the technical management of the system.*"[511] Unlike RD 436/2004 and RD 661/2007, there was no wording to the effect that such reviews would only effect future plants.[512]

---

[509] Cl. PHB ¶¶ 15-16, referring in particular to **C-0177**, RD 2818/1998, preamble.

[510] **C-0177/R-0098**, RD 2818/1998.

[511] **C-0177/R-0098**, RD 2818/1998; Cl. Mem. ¶ 136; Resp. C-Mem. ¶ 395.

[512] Mr Schäfer, who speaks to the motivating factors of the Claimants with respect to Grisel and Project Aida in his Statement at ¶ 28 and ¶ 31, does not suggest otherwise and does not point any other relevant factor.

487. There are no representations from the Respondent and no other relevant materials that change these basic facts.[513] Indeed, the Claimants' internal documentation and the 2002 Ilex/Pöyry report "*Projecting Wholesale Electricity Prices in Spain*" show that the Claimants were aware (or at least informed) that there could be unfavourable changes in the Special regime as it then stood.[514]

488. In such circumstances, the Tribunal has no difficulty in finding that the only reasonable expectation was that the regime could readily change, and possibly significantly for the worse. It makes no difference that, pursuant to the 'grandfathering' provisions of the later regulations, the plants operating under RD 2818/1998 could and did later opt into the RD 436/2004 and (then) RD 661/2007 regimes. Such plants came to have the benefits of those later regimes, but where an Investment is made by reference to a prior regime, the relevant expectations – i.e. the expectations at the time the Investments were made – could only be formed by reference to that prior regime.

489. It follows that no good claim can be made on the basis of legitimate expectations with respect to Investments made prior to RD 436/2004, i.e. the following acquisitions:

    a) April 2001: acquisition of the Grisel wind farm for approximately EUR 3.5 million.[515]

    b) May 2002: acquisition of 100% of the share capital of Aersa for EUR 42 million, and thus interests in the following wind farms: Acampo Armijo (100%); Muel (77.67%); Puena de la Balsa (81%); Los Labrados (81%); Plana de Zaragoza

---

[513] Cf. e.g. Cl. PHB ¶ 16.

[514] **C-0183**, Carlos Solé Martín, Luis Jesús Sánchez de Tembleque, "Renewable Energies: The Spanish Case", CNE Power Point presentation, Cartagena de Indias, 9-13 February 2009 and **C-0088,** Ilex Energy Consulting Report to Harpen, *Projecting wholesale electricity prices in Spain*; Executive Summary, at (ii); and pp. 11-12. *See also*, Resp. oral opening at Day 2/125-126.

[515] Cl. Mem. ¶ 215.

(81%); Aldehuelas (20.81%), to which a further 21.97% interest in Aldehuelas was acquired for EUR 586,363 in December 2003.[516]

c)   May 2002: also through the Aersa acquisition, the 100% interest in the hydroelectric plants Chomba del Plagano, Cepeda and La Mora, and a 60% interest in the hydroelectric plant Villalgordo.[517]

d)   May 2002: also through the Aersa acquisition, 90% of Prodenergías 2, which indirectly owned 46.26% of Luna, Juno and Urano (increased to 50% on 1 April 2004).[518]

490.   It is recalled however that, so far as concerns the above plants, further Investments were also made after RD 661/2007 came into force (through acquisition of further shares in those plants and through upgrades certain plants said to have been made in order qualify under the RD 661/2007 regime).[519] It follows that the finding made in the preceding paragraph does not apply with respect to the entirety of the Claimants' Investment in these plants, and it is emphasised that the finding is made only with respect to the claims so far as they are dependent on alleged legitimate expectations.

b.   ***The question of whether, as a matter of fact, the Claimants relied on the RD 661/2007 regime in making investments post-2007***

491.   The most substantial of the Investments with which this case is concerned – the Urvasco acquisition (Project Ulysses) through which the Claimants acquired the Bancal, Los Siglos, Lanternoso, Rio Gallego, Bosque Alto and Plana Maria wind farms for EUR 363.5 million[520] – took place in June 2008. The acquisition followed a change in the group strategy of the Claimants in 2008, pursuant to which RE came to be seen as a core

---

[516] Cl. Mem. ¶ 230. A further 1.77% interest in this plant was acquired on 1 April 2004 for around EUR 40,000. The Tribunal sees this as linked to the preceding sales, and in the absence of specific evidence of reliance does not see any significance to the fact that this sale took place a few days after the adoption of RD 436/2004 on 27 March 2004.

[517] Cl. Mem. ¶¶ 216-234.

[518] Cl. Mem. ¶ 219. As with the 1.77% interest acquisition in Aldehuelas on 1 April 2004, the Tribunal sees this as linked to the preceding sales, and in the absence of specific evidence of reliance does not see any significance to the fact that this sale took place a few days after the adoption of RD 436/2004 on 27 March 2004.

[519] Cl. Mem. ¶¶ 453-454.

[520] Cl. Mem. ¶ 233.

business.[521] According to the Chief Executive Officer of the Second Claimant, Mr Bünting:

> "As a consequence of the strategic shift in the Group, we decided to invest in renewable power and heat generation capacity. During the first years, we had an investment budget of approximately EUR 1 billion per year and had to spend it profitably. In this regard, we looked at our portfolio and identified where we were able to obtain the best growth.
>
> … Spain had defined its regulatory framework, and developed it first in RD 2818/1998, then RD 436/2004 and then RD 661/2007, regulations which were not only favourable for investments, but each one had even better conditions than its predecessor, showing a clear commitment to supporting renewable technology." [522]

492.  In the Executive Board decision approving the Urvasco Acquisition, specific mention was made of RD 661/2007, including as follows under the heading "*Tariffs in Spain*":

> "The total revenues of Spanish wind parks are from a wholesale power price portion (pool price) and an additional renewable subsidy 'premium'. Currently all of Urvasco's plants - same for AERSA - operate under the transitory regime of Royal Decree (RD) 436/2004. However, the revenue system under the new RD 661/2007, which is expected to be applied from 2013 on, adopts a 'cap and floor' system which effectively provides a guaranteed band of revenues. Revenues can vary within this 'cap and floor' mechanism."[523]

493.  After explaining the attractive nature of Spain as a place for RE investment in 2008 by reference to the Claimants' prior Investments there, its favourable meteorological conditions and its EU membership, Mr Bünting continued:

> "But all the above would not have been important if no stable and predictable regime had been offered. Indeed, the most important element in investing in Spain was the stability of the investment climate, due to the government's strong policy in favour of renewables indicated by the adoption of several attractive regulations that guaranteed stability and predictability of revenues.

---

[521] Bünting Statement ¶¶ 18 and 40.

[522] Bünting Statement ¶¶ 18-19.

[523] **C-0091**, Circular decision by Executive Board of RWE AG in relation to Project Ulysses, 15 April 2008, p. 6.

Spain had declared itself one of the front-runners in RE and had built up a significant industry in renewables. When investing, we were aware of the existence of a stable remuneration system which was already announced in the Law on the Electricity Sector of 1997 and was further reinforced by subsequent regulation. Overall, strong political, legal and public support made it highly attractive for us to invest in Spain because of the stability that such support and legal framework promised.

…

… As explained, in 2008 there was a change of strategy within the company pursuant to which the renewables business was considered a core business. This change in strategy, together with the subcritical size of the existing business, and, of course, the favourable investment climate I described above, led us to increase the size of the Spanish business, first through Project Ulysses."[524]

494.  The cross-examination of Mr Bünting, which was focused more on the issue of whether reliance was reasonable as opposed to whether there was actual reliance, did not undermine the above extracts from the written evidence. The Tribunal has not seen any evidence of a detailed consideration of Article 44.3 of RD 661/2007 being carried out by the Claimants and factored into its decision-making process with respect to the Urvasco acquisition, although it notes that in the June 2008 RWE Fact Book reference is made to future legislation changes and it is stated that the reviews provided for in RD 661/2007 "*will not affect plants which are awarded the start-up certificate before January 1 of the second year after the year in which the review is carried out*."[525] The emphasis in Mr Bünting's evidence was on the offer of a "*stable and predictable regime*", as opposed to a specific understanding of and reliance on individual provisions of RD 661/2007. In the Tribunal's view, the evidence shows that the Urvasco acquisition was made by reference to the RD 661/2007 regime, and that in making the Investment the Claimants placed

---

[524] Bünting Statement ¶¶ 36-37 and 40. *See also*, Henderson Statement ¶ 22: "In short, our confidence in a stable and transparent regulatory regime was the minimum and necessary base point for absolutely everything we did in deciding to continue to invest in Spain." As already noted, the Claimants accept that they paid a high price for the Urvasco acquisition: Bünting Statement ¶ 63. The Respondent makes the point, by reference to the evidence of Mr Bünting, that the Claimants were "brownfield" investors, and that it is thus incorrect to portray Spain as benefiting from the Investment: *see*, Resp. oral closing at Day 5/170; cf. Claimants' oral closing at Day 5/103. The Tribunal does not consider this area of disagreement to be of relevance. The Special Regime could have, but did not, distinguish between investment into new and "brownfield" sites.

[525] **C-0095**, p. 33; Mr Bünting, Day 2/170; Henderson Statement ¶ 25.

reliance on the stability of the regulatory regime (as opposed to by reference to a specific understanding of and reliance on individual provisions of RD 661/2007).

495.    As to the acquisition on 23 December 2008 of a further 23.75% interest in Aldehuelas for EUR 12 million,[526] and with respect to the subsequent acquisitions, Mr Bünting explained in his witness statement:

> "From 2008 to 2011, we made a series of acquisitions in Spanish wind farms in which we already had an ownership interest, either to become the majority shareholder or to increase our minority share substantially.
>
> Again, the next step in our new strategy of investing in renewables was to obtain as much control of the existing assets as possible, and to integrate them completely into our asset management system. It is easier to optimise a portfolio when you own 100% of the assets and you do not have to observe minority rights or deal with third parties, something which is time-consuming and entails some administrative complexity. Furthermore, we were investing in wind farms where we already had a stake and had sufficient management expertise. Therefore, these operations entailed a lower risk from the point of view that we were buying something that we already knew. On top of this, RD 661/2007 was taken into account in the evaluation and, again, the investment decisions were based on the crucial fact that there was a stable and reliable business environment."[527]

496.    As to this last point, Mr Bünting refers in support to RWE Transaction Approval Request Forms dated 12 December 2008, 6 April 2009 and 12 July 2010. The Form of 12 December 2008 shows that the economic evaluation for the acquisition was made on the "*assumption*" of an "*energy price*" i.e. "*current feed-in-tariff Royal Decree [sic] (RD) 436/2004 until 2012, respectively RD 661/2007 with cap and floor system from 2013*", and reference is made to "*the sustainable commitment of the Spanish Government to the*

---

[526] Cl. Mem. ¶ 231.

[527] Bünting Statement ¶¶ 44-45, referring to Transaction Approval Request Forms dated 12 December 2008, 6 April 2009 and 12 July 2010; also Navarro Statement ¶ 36; Henderson Statement ¶¶ 39-43.

*support of Renewable Energy.*"[528] The Form of 6 April 2009 contains a similar reference to RD 661/2007.[529]

497.    As with the Urvasco acquisition, the Tribunal considers that the 2008-2009 acquisitions were also made by reference to the RD 661/2007 regime, and that the Claimants were relying on the stability of the regulatory regime. The same conclusion is reached with respect to the 2009 upgrades to certain of the plants, costing EUR 6.8 million.[530]

498.    As to the transactions in October-December 2010 and February 2011, i.e. the further interests acquired in Plana de la Balsa, Los Labrados, Plana de Zaragoza, and Muel,[531] the RWE Transaction Approval Request Form of 12 July 2010 contains an assumption as follows:

> "April 2010 EEO Data. 2010 figure has been corrected as this year has been fully hedged (as per RWE lnnogy Hedging Policy). Regarding Project REA (realisation assumed in 2014) only adjusted pool price plus reactive premium assumed (no premium corresponding to RD 661/2007 calculated)."[532]

499.    The Form also contemplates the possibility that Spain would reduce the number of hours per year for which the premium was payable, although this was considered unlikely.[533]

500.    As of mid-2010, the Claimants also had the benefit of a specific meeting with the Spanish Government. A minute of this meeting, of 23 June 2010, was taken by the Claimants, and

---

[528] **C-0094**, Transaction Approval Request Form for Project Aldea, 1 March 2008, pp. 3-4, introduced in the Claimants' oral opening at Day 1/137.

[529] **C-0098**, Transaction Approval Request Form for Project Dia, 6 April 2009, p. 7.

[530] Cl. Mem. ¶¶ 235-236; Henderson Statement ¶¶ 46-49; **C-0082,** Transaction Approval Request Form for Voltage ride through, 1 March 2008.

[531] Cl. Mem. ¶¶ 221 and 223-228.

[532] **C-0099**, Transaction Approval Request Form for Minority Shareholders Buyout, 12 July 2010 (hereinafter "**Transaction Approval Request Form, 12 July 2010**", p. 5.

[533] **C-0099**, Transaction Approval Request Form, 12 July 2010, p. 6 under "risks."

in the absence of any countervailing witness or other evidence from the Respondent, the Tribunal accepts this as an accurate record.[534] The minute records in material part:

> "RWE lnnogy explained its presence in Spain emphasising the substantial investments made over the last 24 months especially and our vision for future growth and development in a market which to date we had considered attractive and stable not the least for its continued support to renewable energy.
>
> The DG explained that they had been actively working with all associations within the renewable sector to establish to what extent they could accept changes to the Tariff regime as their contribution to the Spanish governments overall efforts to reduce the budget deficit and at this point in time they believed they had made sufficient progress that an agreement was imminent and probably would take place within 24 hours, in addition all of our discussion should be considered confidential give the sensitivity of the issues and that what we would discuss did not yet reflect final positions.
>
> The DG believed that their legal basis for being able make changes to the existing renewable tariff regime was article 44 of the Royal Decree 661/2007 which in their mind permitted them to review the level of the 'premium' component of the tariff (and interestingly not the fixed tariff) as and when circumstances justified this change. The circumstances in this case were the economic backdrop in general but specifically the dramatic decrease in electricity demand that had taken place over the preceeding 12 months leading to a increased tariff deficit due to the subsidies payable to renewables bearing in mind that the installed renewable capacity was thus proportionally greater within the overall sector mix. They explained that the wind sector was not considered negatively in the sense of receiving acceptable returns …
>
> In their opinion such a change would not be considered a retroactive change and as such perfectly within their powers to implement. Our opinion was that the renewables sector, including ourselves, were clearly not in agreement with this and that any change of this type would be considered retroactive and as such legally challengeable.
>
> The DG then explained that the current position was that those wind assets that were in the transitory phase between RD436 and RD 661, which

---

[534] Cf. Resp. oral closing at Day 5/195. The Tribunal notes that the Claimants have made a global submission as to the absence of witnesses on the part of the Respondent from the Ministry and the CNE, and sought an inference that those responsible in Spain at the Ministry and the CNE were not willing to support the case being put by the Respondent: Day 1/36-38. Such an inference is not warranted; but where, as here, a record of a meeting is exhibited to the Claimants' Memorial, and governmental personnel were present, but there is no evidentiary basis for any challenge to the accuracy of the record, the Tribunal naturally considers that it must be accepted as accurate.

accounts for all the Aersa operational portfolio, would remain on the current tariff structure and that they would respect the 2013 date for the change from one regime to the other, in contrary to recent press speculation. They felt aggrieved that this portion of the sector would not contribute to the deficit reduction but that was the current status and expected outcome. …

Those assets currently on the RD 661 tariff regime, or pre-assigned this regime for the future, would however be subject to a reduction in premium during 2011 and 2012 of a level to be agreed and in return for this "effort" the government would agree to guarantee them the return to the current tariff structure and premium levels in January 2013 and in addition modify Article 44 of RD 6611 for these assets to the extent that the government would not be able at any future stage to interfere with the tariff structure. They believed that the sector was agreeable to this … The DG also discussed the concept of putting a limit on operating hours above which the energy generated by such wind assets would only receive the pool price but he believed that this may not make sense and as such less likely to be implemented. …

As regards the future the DG brought a copy of the recently published Long term plan to 2020 which they are obliged to submit to Brussels as their position by the end of the month but as regards the associated tariff regimes they believed that this would only be discussed as and when the 'retroactive' debate had finished and as such clarity should not be expected before the end of this year. (we will forward a report on the Spanish targets to 2020 next week). The DG did however make the comment that in his opinion the likely outcome for future wind would be to guarantee a floor and above this level receive the pool price."[535]

501.    According to Mr Henderson, the "*meeting confirmed many principles which gave us comfort*", and he explained:

"One which was clear was that they saw the wind sector as, let's say, a very key sector for them. They confirmed that the assets were not overremunerated in their mind. They confirmed more or less the principles that would be applied, and I think it was probably a week later that it became the July agreement, and basically wanted to give us comfort that we shouldn't see this as some future risk to our assets, and that they would also be guaranteeing the premium component of the 661 legislation which they

---

[535] **C-0191**, Minutes of 23 January 2010 Meeting.

believed they had some flexibility in terms of adjustments. So they would guarantee that that premium would not be adjusted in the future."[536]

502.    It therefore appears that the Claimants were placing some reliance on the meeting and on the July 2010 "agreement."[537]

503.    In the RWE Transaction Approval Request Forms of 12 July 2010 and 28 September 2010, which concern the next set of acquisitions by the Claimants, the approvals given are expressly subject to publication of a final tariff agreement by the Respondent.  Thus the Request Form of 12 July 2010 says that approval is sought "**subject to** publication of tariff agreement by the Spanish Government" and records that "**Final agreement subject to official approval of regulatory framework**."[538] There is however no reference to the meeting of 23 June 2010.[539] The Request Form of 28 September 2010 likewise refers to "*a revised tariff agreement by the Spanish Government*" and says that this "*was expected to confirm no material change to the current valuation*" of the assets, i.e. the shares that were being acquired. Such a change was however contemplated as a possibility,[540] and the acquisition price and structure were formulated with this in mind. Again, no mention

---

[536] Mr Henderson in re-examination, Day 3/32. *See also*, the passage quoted in Section IV.A above from Day 3/33. Also at Day 3/28 he said: "We met with the Government and understood that they believed they had the right to change the premium, so that was a doubt we had, but clearly this agreement, the July 2010 agreement put to bed, once and for all, any doubt whatsoever in our mind that the regulation was clear, stable and for the duration of the operating life of the assets." *See also*, Navarro Statement ¶ 69: "In conversation with RWE, Spain made clear that this was a temporary course of action and that normality would be restored."

[537] **C-0063**, 2 July 2010 Press Release.

[538] **C-0099**, Transaction Approval Request Form, 12 July 2010, emphasis in original. The acquisition concerns a 19% share in Zaragoza, a 12.32% share in Muel, and a 10% shareholding in Prodenergias 2.

[539] **C-0099**, Transaction Approval Request Form, 12 July 2010, p. 4, it is said: "Under an agreement recently reached between the Ministry of Industry and the Wind Association, certain wind farms will suffer a reduction in premium during 2011 and 2012. The wind farms in this TARF are not under a regime where this reduction would apply. This agreement has been published on the Government web site and has been widely reported in the press, but to avoid any risk, the final approval of these investments is subject to the official publication of the agreement, expected by the end of July."

[540] **C-0115,** Transactional Approval Request Form, Minority Shareholders Second Tranche, 28 September 2010. Note in particular on p. 5: "*Should the Tariff Agreement prove to be different from the current tariff RD 436/2004, then the price agreed with CLEAR will need to be adjusted. Although a definition of 'material' is needed, a residual risk of dispute regarding the interpretation remains. Should CLEAR not agree to this new price and do not have funds to repay, then AERSA will retain 100% of the shares without any further payments. It is considered extremely unlikely that there would be a change to the decree reducing the current EV by more than 50%.*" Also **C-0189,** Transaction Approval Request Form for RWE Innogy Project, 28 September 2010.

was made of the meeting of 23 June 2010.[541] Under the heading "*Strategic evaluation*", it was however stated that "*Spain is one of RWEI's core markets due to its high wind speed levels and the continuous Government commitment to the support of renewable energy.*"[542]

504.  On the basis of the above, the Tribunal considers that the Claimants did rely on RD 661/2007 in making the Investments of 2010 and early 2011, although on the basis that there had been changes to the regime and that there might be more. The Request Forms of 12 July and 28 September 2010 do not suggest material reliance on the meeting of 23 June 2010, and they show that the July 2010 "agreement" was not regarded as fixed pending its finalisation, which was in the form of regulations i.e. RD 1614/2010. However, reliance was being placed on the "agreement" and its finalisation in regulations, with respect to the acquisitions and establishment of the acquisition price.

505.  As to the acquisition on 2 December 2011 of a further 47.50% of the share capital of Aldehuelas for EUR 25,540,000,[543] no mention is made of RD 661/2007 or RD 1614/2010 in the RWE Transaction Approval Request Form of 22 November 2011 or of Spain's commitment to renewable energy.[544] Other than the witness evidence, which does not address this transaction in any detail, there is no evidence of any actual reliance on RD 661/2007 (or RD 1614/2010) or on the stability of the Special Regime, although the economic calculations in the Transaction Approval Request Form are based on the continued payment of a premium. It is plain, by contrast, that the Claimants wished to become the owner of the Aldehuelas wind farm (the acquisition increased their interest to 95%). In light of the many uncertainties in the regulatory situation as of November 2011, and in the absence of stronger evidence on reliance, the Tribunal is unable to conclude that the Claimants made this Investment on the basis that the Special Regime would not be undergoing some major changes. The same conclusion applies to the Claimants'

---

[541] **C-0115**, Transactional Approval Request Form, Minority Shareholders Second Tranche, 28 September 2010, p. 3. The acquisition concerns a 19% share in La Balsa, a further 10% share in Muel, and a 19% share in Los Labrados.

[542] **C-0115**, Transactional Approval Request Form, Minority Shareholders Second Tranche, 28 September 2010, p. 4.

[543] Cl. Mem. ¶ 232.

[544] **C-0102,** Transaction Approval Request Form for Project Aldea II, 22 November 2011.

acquisition of a 'golden share' with respect to the Muel plant (for EUR 50,000) in December 2012.[545]

506.    Finally, as to the issue of the extent to which there was actual reliance on RD 661/2007 in making Investments, the Tribunal notes that the Claimants' case is not that it expected that there would be no changes at all to the RD 661/2007 regime, i.e. petrification.[546] In the words of Mr Bünting: "*Of course a revision can change some things, but it should not change the general value of the regulation to the investor.*"[547]

### c.  *Due diligence*

507.    As was well-expressed in the *Electrabel* case, to which the Respondent has referred in the context of due diligence: "*Fairness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State.*"[548]

508.    The Claimants' witness statements paint a rather confused picture as to the due diligence that was carried out. It appears that, although there was undoubtedly due diligence with respect to the economics of the major acquisitions and matters such as whether good title was being obtained, the position was different for the regulatory regime and the risk of changes to the regime. According to the Chief Financial Officer of the Second Claimant, Mr Navarro:

> "From what I remember, we never requested a report from any legal adviser about risks of changes in the regulatory framework. What we did was due diligence regarding the main acquisitions and within due diligence there was of course a legal issue, and it is reasonable to expect that the lawyers, should there be the risk of a radical change in the regulations, they should have advised us, and this did not happen."[549]

---

[545] Cl. Mem. ¶ 223.

[546] E.g. Claimants' oral opening at Day 1/45; Mr Navarro, Day 2/216.

[547] Mr Bünting, day 2/176. *See also*, the Claimants' oral closing at Day 5/96-97.

[548]  Resp. PHB ¶ 32, referring to **CL-0042**, *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶ 7.78.

[549] Mr Navarro, Day 2/233, lines 13-21; also p. 195, lines 13-19. *See also*, Bünting Statement, p. 25 and Day 2/165, lines 5-6; Mr Navarro, Day 2/195, lines 5-19.

509.    Mr Henderson, who it appears shared the task of following policy and regulatory changes with Mr Navarro, said:

> "With regard to regulatory due diligence, we only tasked external advisers with providing a legal regime when it was unclear to us. However, when we had already made investments under a certain set of regulations and knew how they worked, we did not instruct any external advisers to carry out regulatory due diligence. From the time I entered the company in 2008, and indeed well before that time, and up to the end of 2012, the regulatory regime was very clear and deemed to be stable … ."[550]

510.    In the Tribunal's view, there was however ample reason for a diligent investor to carry out specific regulatory due diligence at the time of the Urvasco acquisition in June 2008, as well to keep this up to date in respect of the regulatory developments that were taking place,[551] and the Tribunal rejects the view that it could reasonably be left to the Claimants' lawyers to advise without their being tasked with a specific regulatory due diligence exercise.[552] The Urvasco acquisition was a very substantial Investment indeed. Moreover, it was the first Investment by the Claimants under the new regime established by RD 661/2007, which had been formulated in the context of considerable industry controversy and complaint as to the instability of the regime.[553] Yet no external legal advice was sought on the regulatory regime (cf. the level of legal due diligence as to the regulatory regime noted by the tribunal in the *Antin* case[554]).

511.    It appears from the written and oral evidence that there was some internal due diligence on the regulatory position, which was the responsibility of the country development team. However, no specific details or documents were provided, and the specific individual

---

[550] Henderson Statement at ¶ 39; and Day 3/3, lines 4-6, with respect to the joint responsibility of Mr Navarro and Mr Henderson. *See also*, the evidence of Mr Bünting, Day 2/166, and the Claimants' position in its oral opening at Day 1/153-154 to the effect that Osborne Clarke was being relied upon to "*provide red flag regulatory advice*" but that "*there were no red flags to raise.*"

[551] Cf. Claimants' oral closing at Day 5/114.

[552] Cf. Mr Navarro, Day 2/233; Claimants' oral closing at Day 5/113-116.

[553] *See e.g.*, **R-0016**, APPA Info magazine No. 23, August-December 2006; **R-0281**, Submission from APPA concerning the draft RD 661/2007; **R-0296**, AEE Press release on RD 661/2007, 9 May 2007.

[554] **CL-0192**, *Antin Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v Kingdom of Spain*, ICSID Case No. ARB/13/31 (hereinafter "***Antin***"), Award, 15 June 2018, ¶¶ 376-381 and 384.

identified by the Claimants' witnesses was the "*business development manager*", who was not legally qualified.[555] It follows that the Tribunal cannot place material weight on such internal due diligence.

512. Although, as of the date of the Urvasco acquisition, the Claimants did have the benefit of the July 2007 Pöyry report,[556] this was not, and has not been presented as, a legal due diligence exercise. Moreover, the Claimants' witnesses did not read this report, and it is not clear to what extent it was relied on in the acquisition of Urvasco.[557] It also appears that, despite the various regulatory changes subsequent to RD 661/2007, RWE commissioned no further report by Pöyry. In this respect, the Respondent has submitted a report from Pöyry dated March 2011 entitled "Current State and Future Trends of Solar Power in Spain", commissioned by some other unidentified party.[558] The Respondent relies on this report as showing that Pöyry was then saying that there could be further reductions to remuneration to renewables (not just solar), and the Tribunal considers this to be a fair portrayal.[559]

513. It follows from the above that, given the scale of the acquisitions being made and the fact that there was some plainly visible regulatory instability given RDL 7/2006 and then the controversial repeal and replacement of RD 436/2004 by RD 661/2007, it must be regarded as having been incumbent on the Claimants – in the context of the application of the FET standard under Article 10(1) – to have performed some discrete due diligence exercise on the applicable law and regulations, and they failed to do this.[560]

---

[555] *See*, the evidence of Mr Henderson, Day 3/30-31.

[556] Cl. Mem., **C-0103**, Pöyry July 2007 Report (Wind).

[557] The Claimants' witness, Mr Navarro, was aware of but did not read this report, whilst the Claimants' witness, Mr Henderson, was not aware of it. *See*, Day 2/193 and Day 3/25.

[558] **R-0277**, Pöyry, Current and Future Trends in the Spanish Solar Sytem, March 2011.

[559] Resp. oral opening at Day 2/104; **R-0277**, Pöyry, Current and Future Trends in the Spanish Solar Sytem, March 2011, 5.6.7.2: "Considering the Government behaviour, it is likely that future changes might be implemented if considered needed. RDL 14/2010 is aimed at tackling the lack of funds in the electricity system, reducing the revenue of renewable generators as well as introducing additional revenue sources (i.e., grid tolls). We feel that the Government is in a position to continue with the same energy policy, if considered a requirement, including implementation of further reductions in remuneration to renewables and non-renewable technologies."

[560] Cf. Cl. PHB ¶¶ 88-90.

514. It does not automatically follow that the Claimants' could not reasonably base their Investments on RDL 661/2007 and/or RD 1614/2010 or rely on stability in the Special Regime. However, the Tribunal must bring into account any statements, reports or legal decisions that would have been considered in a due diligence exercise, in particular the decisions of the Spanish Supreme Court on which the Respondent has placed great weight, while the absence of due diligence is consistent with the evidence in sub-section (b) above which shows that the Claimants' key Investments were not made by reference to a specific understanding of and reliance on individual provisions of RD 661/2007.

### d. *The decisions of the Spanish Supreme Court*

515. The principal limb of the Respondent's argument on due diligence is thus that the Claimants should have made their investments taking into account the decisions of Spain's Supreme Court, including the finding in the judgment of 15 December 2005 that: "*There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration [...]*."[561]

516. So far as concerns similar decisions made prior to the Urvasco acquisition of June 2008, in a further ruling relied on by the Respondent, the Spanish Supreme Court accepted in a 2006 decision the proposition that "*electricity producers under the special regime do not have an 'unalterable right' to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future*."[562] The Claimants' witness, Mr Navarro, was asked whether he was aware of the existence of Supreme Court rulings from 2006 that established that the limit for modification of the regulations applying to the RE sector

---

[561] E.g. Resp. Skeleton ¶ 23; **R-0137**, Judgment of the Supreme Court, rec. 52-2011, 15 December 2005. *See also*, e.g. Resp. oral opening at Day 1/275-276.

[562] **R-0138**, Judgment of the Supreme Court, appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish), 25 October 2006.

was that of reasonable return in relation to the cost of money in the capital markets, and he confirmed that he was.[563]

517.    The Respondent has also referred to two Supreme Court decisions of 2007, dated respectively 20 March and 9 October 2007, which it says confirm that there was no vested right to receive a specific subsidy in the future.[564] In the first of these decisions, which concerned application of the transitional provisions under RD 436/2004, the Supreme Court stated that:

> "Owners of facilities under a Special Regime are not guaranteed the intangibility of a given benefit or income regime in relation to those obtained in previous years, nor are they guaranteed the indefinite permanence of the formulas used to fix premiums. Changes should be made within the legal limits."[565]

518.    The Tribunal agrees that some review of these decisions should have formed part of a due diligence exercise prior to the Urvasco acquisition, and it considers that a diligent Investor must be taken to have known their contents.[566] It also notes that the CNE appears to have had these cases in mind when it referred to case law in its February 2007 report.[567] However, the Tribunal agrees with the Claimants' contention that the Supreme Court's findings were not made in a sufficiently analogous context.[568] The decisions concerned the prior regimes and the transitional provisions under RD 436/2004, not a claim by an operator to the tariff or premium fixed under the RD 436/2004 regime and thus made with the benefit of Article 40.3 of that Decree.

519.    In a context where there was no basis for the given claimant/operator to refer to Article 40.3 of RD 436/2004 or Article 44.3 of RD 661/2007, the decisions are of limited

---

[563] Mr Navarro, Day 2/205. Mr Navarro could not recall when he became aware of such rulings, but assumed it was before meetings that he had in 2010 with the APPA.

[564] Resp. CM ¶ 364, referring to **R-0139**, Judgment of the Supreme Court, appeal 11-2005 EDJ 2007-18059, 20 March 2007 and **R-0140**, Judgment of the Supreme Court, appeal 13-2006 EDJ 2007-175313, 9 October, 2007.

[565] **R-0139**, Judgment of the Supreme Court, appeal 11-2005 EDJ 2007-18059, 20 March 2007.

[566] Resp. PHB ¶ 74.

[567] Resp. Rej. ¶ 250; **R-0128**, CNE Report 3/2007, regarding the proposed Royal Decree, regulating the activity of electricity production under the special regime and of certain facilities of comparable technology under the ordinary regime, 14 February 2007.

[568] Cl. Reply ¶¶ 371-374; Cl. PHB ¶ 151.

significance. The Tribunal does not consider that, as of June 2008, they would have been taken by a diligent Investor as establishing how these two Decrees would be applied given the specific wording of Article 40.3 and Article 44.3 (respectively). It follows that the Tribunal does not consider that these decisions can of themselves negate the Claimants' case on reasonable reliance so far as concerns the 2008 Urvasco acquisition and the Investments made later that year. In reaching this conclusion, the Tribunal recognises that it is diverging from the finding made by the *Charanne* tribunal with respect to the Supreme Court decisions of 2005-2006.[569] However, it considers that the absence in the Supreme Court decisions of consideration of a provision such as Article 40.3 of RD 436/2004 or Article 44.3 of RD 661/2007 could reasonably have been considered material by a diligent Investor making an investment in 2008.

520. There were multiple subsequent decisions of the Supreme Court along similar lines, as a line of consistent jurisprudence was established on this point. Three Supreme Court judgments were handed down in December 2009, one of which – Appeal 151/2007 – did concern an operator seeking to rely on Article 40.3 of RD 436/2004 as a form of guarantee of non-retroactivity.[570] That position was rejected:

> "(…) The argument that the transitional Provision under appeal represents a weakening of the principle of legal certainty enshrined in Article 9.3 of the Constitution must be rejected - because it produces, as it is claimed, a situation of uncertainty in the legal system regarding the regulation of the activity of electrical energy producers under the special scheme. Hence it cannot be followed that the said regulation does not meet the requirements of the principle of legal certainty, which does not include any right whatsoever to freeze the existing law."[571]

[569] **RL-0049**, *Charanne*, ¶ 507. *See also*, **RL-0088**, *Isolux*, ¶ 790.

[570] Resp. CM ¶¶ 367-372, referring to **R-0002**, Judgment of the Supreme Court, rec. 152/2007, reference El Derecho EDJ 2009/307357, 9 December 2009; and **R-0141**, Judgment of the Supreme Court, appeal 151/2007 EDJ 2009/307349, 3 December 2009; cf. Cl. Reply ¶¶ 377-379 contesting the relevance of these judgments; and Spain's position in response at Resp. Rej. ¶¶ 244 *et seq*.

[571] **R-0141**, Judgment of the Supreme Court, appeal 151/2007 EDJ 2009/307349, 3 December 2009, p. 6, unofficial translation.

521.    Moreover, the judgment in Appeal 151/2007 was considered in a press release from the APPA in April 2010,[572] an industry association of which the Second Claimant was an active and participating member, as it was of the AEE.[573] The release was referred to in a report from another industry body, Suelosolar, where the author considered the Supreme Court cases and noted "*that the rulings examined do not deal specifically and directly with the subject that concerns us, viz. the legality of possible retroactive regulations that would modify downwards the regulated tariff or the premiums that are received by renewables installations already in operation*"; but then stated: "*I highlight the above because it gives a small hope that the above rulings have not mentioned in their reasoning the second paragraph of article 44.3 of the Royal Decree 661/2007 … .*" It was thus the view of the author of this April 2010 report that there was only "*small hope*" that the Supreme Court's line of reasoning would not be applied in a context where the operator could invoke Article 44.3 of RD 661/2007.

522.    Although it is not clear to the Tribunal that the Claimants would have had any sight of this Suelosolar report, the evidence is sufficient to establish that the December 2009 ruling in Appeal 151/2007 was a matter of concern to the APPA.[574] The Tribunal also notes that the December 2009 cases and the earlier Supreme Court jurisprudence were referred to by the AEE in a submission made to the CNE in August 2010 in the context of the new Royal Decree that was then anticipated.[575] This submission recognised the Supreme Court's jurisprudence to the effect that there was no right to an unchanged regime, subject to the requirement of a reasonable return.[576] Moreover, the judgment of

---

[572] As reflected in a report of Suelosolar, **R-0266**, Suelo solar, *What do judges think of retroactivity premiums for renewables?*, 29 April 2010.

[573] *See e.g.*, the evidence of Mr Bünting, Day 2/167, 170; Mr Navarro, Day 2/209. *See also*, Cl. Skeleton ¶ 25 relying on the shared understanding of RWE and APPA (in a different context).

[574] Cf. Claimants' oral closing at Day 5/127, understating the concern of APPA.

[575] **R-0287**, Observations submitted by the main Spanish Wind Energy Association AEE before the CNE against the draft of RD 1614/2010; **R-0166**, Submissions of the AEE before the CNE during the CCE hearing on the proposed Royal Decree which will regulate and amend certain aspects of the special regime, 30 August 2009 (hereinafter "**AEE's 30 August 2009 submissions before the CNE**", as referred to in Resp. oral opening at Day 2/85-86 and in closing at Day 5/188-189.

[576] **R-0166**, AEE's 30 August 2009 submissions before the CNE, p. 6; Resp. oral closing at Day 5/188-189.

December 2009 was picked up and summarised in the wider press.[577] The Claimants' representatives attended the meetings of the APPA and the AEE, sharing views with these Associations,[578] and the Claimants either were or should have been aware of the cases[579] and the attention these industry bodies were paying to the developing line of jurisprudence (as well as of the concerns of the APPA and the AEE more generally).

523.     In light of the above, in considering the Investments made subsequent to the December 2009 decisions of the Supreme Court, one factor for the Tribunal to consider with respect to any legitimate expectations is the application of a consistent line of jurisprudence in the December 2009 ruling in Appeal 151/2007 in a context where the claimant/operator was relying – without success – on what was characterised as "*the guarantee of non-retroactivity established by Article 40.3 of Royal Decree 436/2004.*"[580]

524.     There have also been a number of Supreme Court cases that post-date the making of the Claimants' Investments. Whilst these could not be factored into the question of reasonable reliance in the same way, the Tribunal does not accept the Claimants' contention that they are clearly irrelevant.[581] Where, in subsequent judgments, the Supreme Court has ruled on the meaning of RD 661/2007 including taking into account its Article 44.3 then, in the Tribunal's view, careful consideration must be given to what was decided and on what basis: the Supreme Court is after all fulfilling its function as the ultimate arbiter in domestic law of the correct interpretation of the provisions of Spanish law before it, and in the usual course it could readily be argued that provisions being interpreted in judgments in 2014-2016 must always have meant what the Supreme Court then decided. There is no case on the Claimants' part that the judgments of the Supreme Court are tainted by some denial of justice.[582]

---

[577] **R-0312**, Cinco Días, *The Supreme Court allows retroactive change in premiums,* 23 April 2010.

[578] *See e.g.*, Mr Bünting, Day 2/167, 170; Mr Navarro, Day 2/209.

[579] Mr Navarro, Day 2/204-205.

[580] **R-0141**, Judgment of the Supreme Court, appeal 151/2007 EDJ 2009/307349, 3 December 2009, p. 6.

[581] Cf. Cl. Reply ¶ 381; Cl. PHB ¶ 159.

[582] Cf. *e.g.* **CL-0129**, *Marvin Roy Feldman Karpa v. United Mexican States*, ICSID Case No. ARB (AF)/99/1, Award of 16 December 2002, ¶ 139.

525.    The Tribunal is not in strict terms bound by the domestic court's decisions as to the meaning and effect of domestic law, and it is of course correct that the question of whether an act is in conformity with domestic law is quite separate to the question of conformity with international law.[583] But the issue here is rather different. The Claimants are seeking to establish the existence of legitimate expectations largely by reference to certain discrete provisions of domestic law. In the usual course, it is the superior courts of the given jurisdiction that are best qualified to rule on what the meaning and effect of a provision of domestic law is. In the current case, the issue is whether an alleged legitimate expectation formulated largely by reference to domestic law was defeated in circumstances such that there is a breach of Article 10(1) ECT, i.e. a separate issue of international law. The domestic law only features as a result of the way that the Claimants have formulated their case, i.e. the specific legitimate expectations they assert.[584]

526.    The Claimants have referred to the *Perenco* award, which usefully summarises the allocation of competencies between domestic and international tribunals, but in a way that identifies that matters of domestic law, in this and analogous contexts, are indeed primarily for the domestic court:

> "Turning to the Constitutional Court's decision, the fact that the Court has spoken on Law 42's constitutionality does not of course preclude this Tribunal from exercising its jurisdiction under the Treaty to consider the international lawfulness of Law 42. But in applying international law, the Tribunal does not act as a court of appeal on questions of Ecuadorian law. This jurisdictional limit is well-established in the jurisprudence. The Tribunal must recognise the allocation of competencies between adjudicatory bodies at the national and international levels. An international tribunal cannot second-guess the court's interpretation and application of local law. At the same time, under well-established principles of international law, as codified in Article 3 of the ILC Articles on State Responsibility, the fact that a law has been declared constitutional by the

---

[583] Cl. PHB ¶¶ 164-168.

[584] The Tribunal notes that the Claimants refer to the practice of other States, and say that this is relevant as an evidentiary matter, forming part of the factual matrix that informs the investor's expectations and confirming them to be reasonable: Cl. PHB ¶ 78. At least so far as concerns the facts of this case, the Tribunal sees no merit to this submission.

local courts, even by the highest court of the land, is not dispositive of whether it was in conformity with international law."[585]

527. The Claimants also contend that where both the investor and the host State have the same understanding of the law at the time of the investment, subsequent court decisions concerning that law are not relevant.[586] That is to overstate matters, but there is some force to the point. The Tribunal is seeking (*inter alia*) to identify whether reliance placed by the Claimants on RD 661/2007 and the stability of the regime in making its investments was reasonable, and it naturally follows that particular weight should be given to what the Spanish Government was saying at the time.

528. Against this backdrop, it is necessary to examine what the Spanish Supreme Court has found as to the meaning and effect of RD 661/2007, and also what the Government was saying during the period that Investments were being made.

529. In a judgment of 1 June 2016, the Supreme Court considered a challenge to RD 413/2014 and Order IET/1045/2014. In rejecting the arguments put before it on legitimate expectations and legal certainty, the Supreme Court stated that "*no provisions of RD 661/2007 … guaranteed that the regulated tariffs could not be changed.*"[587]

530. In a judgment of 12 July 2016, the Supreme Court considered a challenge by the AEE to RD 413/2014 and Order IET/1045/2014. It again rejected the arguments put before it on legitimate expectations and legal certainty. The Court held (in a passage repeated from the judgment of 1 June 2016):

> "Nor do we believe that the system in place at that time could alone be deemed to be a conclusive enough external sign to generate the legitimate expectation in the appellant; i.e. the rational and well-founded belief that the electrical power remuneration regime that it produced could not be altered in the future, as no provision of the RD 661/2007, by which its facilities were protected, guaranteed that the regulated tariff would not be subject to change.

---

[585] **CL-0183**, *Perenco Ecuador Ltd. v The Republic of Ecuador and Empresa Estatal Petróleos del Ecuador (Petroecuador)*, ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and on Liability, 12 September 2014 ¶ 583.

[586] Cl. PHB ¶ 161.

[587] **R-0264**, Judgment of the Supreme Court, 1264/2016, 1 June 2016, p. 8.

In this regard, the jurisprudence of this Court has been constant over the years on pointing out, in the interpretation and application of the authorising rules of the legal and economic system applicable to electricity production using renewable energy sources, which guarantee the right to the reasonable rate of return on the investments made by the owners of these facilities, but do not recognise their unalterable right to maintain the remuneration framework approved by the holder of regulatory power unaltered.

Thus, over ten years ago, this Chamber noted in its ruling of 15 December 2005 (appeal 73/2004), a relapse in proceedings on the legality of Royal Decree 436/2004, on the methodology for updating and systematisation of the legal and economic regime of the activity of electricity production under the special regime, that '*no legal obstacle exists for the Government, in exercise of its regulatory power and the broad qualifications it possesses in* a *heavily regulated area such as electricity, to modify* a *particular remuneration system, provided it remains within the framework established by the LSE*'. And in the same direction, the STS of 25 October 2006 (appeal 12/2005), relapsed into an appeal that contested Royal Decree 2351/2004, amending the procedure resolving technical restrictions and other regulations of the electricity market, pointed out that section 30.4 of the Electricity Sector Act allowed the respective companies to aim for '*reasonable rates of return with reference to* the *cost of money in the capital market*' or '*a reasonable remuneration for their investments', without* the analysed remuneration regime, by contrast, ensuring owners of facilities in special regime '*the intangibility of* a *certain level of profits or revenues relative to those obtained in previous years, nor the indefinite stay of formulas used to set premiums.*'

This jurisprudential line has continued to this day, in rulings of this Court of 20 March 2007 (appeal 11/2005), 9 December 2009 (appeals 149/2007 and 152/2007), 12 April 2012 (appeal 40/2011), 13 September 2012 (appeal 48/2011), 15 October 2012 (appeal 64/2011), 10 December 2012 (appeal 138/2011), 29 January 2013 (appeal 232/2012), 29 May 2013 (appeal 193/2010) and 16 March 2015 (appeal 118/2013), among others, in which this Court has insisted, in the face of successive regulatory amendments, that it was not possible for electricity production facility owners in the special regime to be granted an 'unalterable right' for the future in which the remuneration framework approved by the owner of regulatory power remains unchanged, provided that the requirements of the Electricity Sector Act are respected in terms of reasonable return on investment."[588]

---

[588] **R-0336**, Judgment of the Supreme Court, 1730/2016.rca 456.2014 AEE, 12 July 2016, p. 11. *See also*, Resp. oral closing at Day 5/204.

531.    It follows that it has been held by the Spanish Supreme Court in plain terms that "*no provision of the RD 661/2007... guaranteed that the regulated tariff would not be subject to change*." As the Tribunal understands it, this finding is reached through analysing RD 661/2207 in its broader context, i.e. as a Royal Decree that is hierarchically inferior to Law 54/1997 such that, regardless of the existence of a provision such as Article 44.3, there may be a change to the tariff regime provided that the overarching principle of reasonable return in Law 54/1997 is satisfied.

532.    With regard, however, to what the Spanish Government was saying at the time that the Claimants' Investments were made, the Spanish Ministry of Industry, Tourism and Commerce stated on 25 May 2007 that:

> "The new regulation guarantees an average return of 7% for wind farms and hydro-electric facilities that opt to transfer their production to distributors and between 5% and 9% if they participate in the electricity production market. ... Tariffs will be revised every 4 years, taking into account the fulfilment of the objectives set out. ... Future adjustments to said tariffs will not affect installations which are already in operation. This guarantees legal certainty for the electricity producer and stability for the sector, favouring development."[589]

533.    In addition, although the Tribunal places less weight on these, the presentations of InvestinSpain and the CNE also support the contention that Spain understood Article 44.3 as protecting existing plants against any future tariff revisions.[590] The Claimants also rely on what was said by Spain's representatives at the meeting of June 2010, although the

---

[589] **C-0238**, Announcement of RD 661/2007.

[590] Cl. Mem. ¶¶ 181-185 and Cl. Reply ¶¶ 84-91. *See inter alia,* **C-0059**, InvestinSpain website, "*About Us*". *See also*, **C-0030**, Manuela García, "Opportunities in Renewable Energy in Spain", INTERES InvestinSpain Power Point presentation, Graz (Austria), 15 November 2007, pp. 4, 15, 18, 19, 32, 40 and 42; **C-0060**, Manuela García, "Opportunities in Renewable Energy in Spain", InvestinSpain and the Spanish Ministry for Industry, Tourism and Commerce, November 2008; **C-0248**, InvestinSpain PowerPoint presentation, "Legal Framework for Renewable Energies in Spain", undated, p. 4; **C-0133**, Luis Jesús Sánchez de Tembleque, "The Regulation of Renewable Energy", CNE Power Point presentation, Barcelona, February 2009; **C-0183**, Carlos Solé Martín, Luis Jesús Sánchez de Tembleque, "Renewable Energies: The Spanish Case", CNE Power Point presentation, Cartagena de Indias, 9-13 February 2009.

position being adopted there was apparently that the premiums could change, but not the fixed tariffs.[591]

534.     In these unusual circumstances, the Tribunal does not consider it appropriate to approach its application of the FET standard on the basis that Article 44.3 of RD 661/2007 can only ever have had the meaning and effect that follows from the recent decisions of the Spanish Supreme Court, and that such meaning and effect should have been known to a diligent Investor making Investments in 2008-2012. This is not to cut across the principle of deference that is reflected in *Perenco* and various other awards, but merely to recognise that, in certain situations, what a superior court subsequently says as to the meaning and effect of domestic law may not establish what a diligent Investor could or should have concluded at the time of an Investment.

   e.   ***Do the Claimants have legitimate expectations based on specific commitments of the Respondent?***

535.     The Claimants' case is that their legitimate expectations are founded on specific commitments made in Article 40.3 of RD 436/2004, Article 44.3 of RD 661/2007 and Article 5.3 of RD 1614/2010, which are to be read in conjunction with the provisions in the Decrees including in particular those establishing the right to receive the regulated tariff or the premium (and, insofar as concerns Article 5.3 of RD 1614/2010, in conjunction also with the July 2010 "agreement").[592] Of particular importance, Article 44.3 of RD 661/2007 provided for a 2010 review "*of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree*", and then stated:

        "The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed. . . ."[593]

536.     As to the interpretation of this provision, and its position within the framework established by Law 54/1997, the Tribunal considers that RD 661/2007 (just like RD

---

[591] Cl. PHB ¶ 162, referring to the evidence of Mr Henderson.

[592] *See e.g.*, Cl. PHB ¶ 51.

[593] **C-0017/R-0101**, RD 661/2007, regulating the activity of electricity production under the special regime, 25 May 2007 (published 26 May 2007), pp. 45-46.

436/2004 before it) established the specific mechanics of the remuneration under the Special Regime, in implementation of Article 30.4 of Law 54/1997, which stated that: "*The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations ... .*" Thus, whereas Article 30.4 established the basic principle that the RE producers would receive a reasonable return,[594] the subsequent Royal Decrees including RD 661/2007 constituted the regulatory implementation of that principle, as indeed appears from the Preamble to RD 661/2007:

> "The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable ... ."[595]

537.  While the Respondent is correct to say that Article 44.3 of RD 661/2007 does not refer to "*any*" revision, it is readily understood as meaning that, once a producer qualified under the new regime established by RD 661/2007, the revisions would only be in accordance with Article 44.3. The Tribunal has already considered the import of the decisions of the Supreme Court, and it sees the above understanding as supported in general terms by the Ministerial press release that accompanied RD 661/2007.[596]

538.  It does not however follow that, for the purposes of legitimate expectations, Article 44.3 is to be considered as a specific commitment. First, the Tribunal has considerable doubts as to whether Article 44.3 can correctly be interpreted as a form of representation to RE investors that, come what may, the RD 661/2007 remuneration regime would remain substantially in place so far as they were concerned.[597] Certainly there is no sufficient

---

[594] **R-0003**, Law 54/1997, pp. 50-51.

[595] **C-0017/R-0101**, RD 661/2007, regulating the activity of electricity production under the special regime, 25 May 2007 (published 26 May 2007), p. 2.

[596] **C-0238,** Announcement of RD 661/2007.

[597] **CL-0187**, *Blusun*, ¶ 371: "… a representation as to future conduct of the state could be made in the form of a law, sufficiently clearly expressed."

evidence that the Claimants relied on it as such a representation, and moreover did not do so following an adequate due diligence exercise (see Section D(2)(b) and (c) above[598]). The same points apply with respect to Article 22 of RD 661/2007, on which the Claimants also placed some (but lesser) weight.[599] Second, and in any event, Article 44.3 was a provision in a regulation of general application that, just as had been the case with RD 436/2004, was susceptible to change by the State – notwithstanding, in the case of RD 436/2004, the stability that was to some extent established by its Article 40.3.[600]

539.    The Claimants made their post-2007 Investments knowing – including through the July 2007 Pöyry report[601] – that, despite its Article 40.3, the regime of remuneration established by RD 436/2004 had not lasted unchanged for more than around two years, with a significant change being implemented by RDL 7/2006. This was a matter of well-voiced concern to the APPA and the AEE.[602] Then, through RD 661/2007, the RD 436/2004 regime had been replaced in its entirety.

540.    Indeed, following the adoption of RDL 7/2006 and the publication of the draft Decree that (following amendments) became RD 661/2007, there were various complaints of damage being done to Spanish Constitutional principles of legal certainty and protection of legitimate expectations. The CNE, in its report of February 2007, considered these complaints to be ill-founded, stating:

> "As shown both in the scientific doctrine and case law, in a social and democratic State of Law the principles of legal certainty and protection legitimate expectations cannot be built on insurmountable obstacles to the innovation of a body of law, nor can they be used as instruments to petrify

---

[598] *See also*, Resp. oral opening at Day 2/129.

[599] *See e.g.*, Claimants' oral opening at Day 1/90 and 93-94.

[600] **CL-0187**, *Blusun*, ¶ 371; **RL-0049**, *Charanne*, ¶¶ 491-494. As to RD 436/2004, Article 40.3, *see* **C-0016/R-0100**, RD/436/2004, establishing the methodology for the updating and systematisation of the legal and economic regime for electric power production in the special regime, 12 March 2004 (published 27 March 2004): "3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums."

[601] **C-0103**, Pöyry July 2007 Report (Wind), pp. 1-2.

[602] *See*, **R-0015**, *The Controversial Energy Decree-Act*, APPA Alegaciones magazine No. 22, May-July 2006; and **R-0016**, APPA Info magazine No. 23, August-December 2006; also **R-0166**, AEE's 30 August 2009 submissions before the CNE.

current Law at any moment. In other words, the principle of legal certainty is not by definition an anti-evolutionary or conservative principle; it does not mean that legislation is resistant or immune to reform. In this sense, these principles do not impede dynamic innovation … . Thus the principles only require that regulatory innovation —especially if sudden, unpredictable or unexpected— be carried out with certain guarantees and caution (sufficient transition periods for adaptation and, where applicable, compensatory measures) that cushion, moderate and minimise as far as possible the defrauding of expectations generated by previous regulations."[603]

541. Although the CNE was speaking in an advisory role to the Government as opposed to as a body that could make determinations on the relevant law, in the current context of whether legitimate expectations were validly formed, the CNE's publicly-stated view that there could be regulatory innovation, apparently notwithstanding a provision such as Article 40.3 of RD 436/2004, is of some importance and is not supportive of the Claimants' case.[604] The July 2007 Pöyry report, which was of course commissioned by the Claimants, also envisaged that there could be regulatory change, even though at the same time it spoke of a guarantee under RD 661/2007.[605]

542. The Tribunal considers that neither through Article 44.3, nor through any other provision of RD 661/2007,[606] nor through any other source, was a specific commitment made to the Claimants to the effect that the Special Regime remuneration as established by RD 661/2007 would remain substantially unchanged. While the presentations of InvestinSpain and the CNE that the Claimants now refer to may possibly have been influential in terms of certain investment decisions made by foreign investors, even if

---

[603] **C-0249/R-0128,** CNE, Report 3/2007, regarding the proposed Royal Decree, regulating the activity of electricity production under the special regime and of certain facilities of comparable technology under the ordinary regime, 14 February 2007, p. 18. The case put by the Claimants to the Respondent's witness, Mr Ayuso, was that a CNE report was a valuable source for an investor. Mr Ayuso accepted that it was one of the sources an investor would use: *see,* Day 3/71.

[604] Cf. Claimants' oral opening at Day 1/156-157 (in response to a question from the Tribunal). According to the Resp. oral closing at Day 5/205-206, the CNE in its March 2012 report would not have been suggesting regulatory revisions if it had believed that regulations affecting existing installations could not be altered. The Tribunal considers that the March 2012 report is consistent with its conclusion above as to the 2007 report.

[605] **C-0103**, Pöyry July 2007 Report (Wind), p. 58, cf. pp. 2 and 81; Claimants' oral closing at Day 5/132; Respondent's oral closing at Day 5/181.

[606] In their oral opening at Day 1/90 and 93-94, weight was placed on Article 22 as a form of stability commitment. The Tribunal does not agree with that characterisation.

such could amount to specific commitments, there is no suggestion that the Claimants attended and relied upon any such presentations, and the Tribunal does not see how they could have generated any expectations.[607] The existence of a background factual matrix in which other States have FIT schemes does not detract from this.[608]

543. The same basic point applies with respect to the Ministerial press release of 25 May 2007, as to which there is no case that this was seen and relied on by the Claimants.[609] Moreover, although the Claimants have emphasised that this press release refers to a "guarantee", they have expressly not put their case on the basis of a specific commitment made in the terms of the press release of 25 May 2007.[610] In these circumstances, the Tribunal does not consider further whether the press release might be regarded as separate to and of a different nature to RD 661/2007, such that it might itself qualify as a form of special commitment.

544. The registration of the plants in which the Claimants have an interest in the RAIPRE does not alter the above conclusions, and the issuance of a registration certificate to the operating companies is not, in this Tribunal's view, to be seen as a form of specific commitment for the purposes of application of the Article 10(1) FET standard. Consistent

---

[607] *See e.g.*, **RL-0089**, *Wirtgen*, ¶ 421. Cf. Cl. Mem. ¶¶ 181-185 and Cl. Reply ¶¶ 84-91. See *inter alia* **C-0059**, InvestinSpain website, "*About Us*". *Also see*, **C-0030**, Manuela García, "Opportunities in Renewable Energy in Spain", INTERES InvestinSpain Power Point presentation, Graz (Austria), 15 November 2007, pp. 4, 15, 18, 19, 32, 40 and 42; **C-0060**, Manuela García, "Opportunities in Renewable Energy in Spain", InvestinSpain and the Spanish Ministry for Industry, Tourism and Commerce, November 2008; **C-0248,** InvestinSpain PowerPoint presentation, "Legal Framework for Renewable Energies in Spain", undated, p. 4; **C-0133**, Luis Jesús Sánchez de Tembleque, "The Regulation of Renewable Energy", CNE Power Point presentation, Barcelona, February 2009; **C-0183**, Carlos Solé Martín, Luis Jesús Sánchez de Tembleque, "Renewable Energies: The Spanish Case", CNE Power Point presentation, Cartagena de Indias, 9-13 February 2009. In the Claimants' oral opening, it was explained that the Claimants did not attend the InvestinSpain events, which were relied on to support the reasonable nature of the Claimants' expectations and to demonstrate the Respondent's understanding of the regime: *see*, at Day 1/103. The Tribunal understands this to be the Claimants' position with respect to the CNE presentations also. *See also*, Resp. oral opening at Day 2/110-111 to the effect that there is no proof that the CNE presentations were used to attract investors, and that these were not formal CNE reports.

[608] Cf. Cl. PHB ¶ 78 and the emphasis placed by practice in other States with respect to FITs e.g. in Claimants' oral opening at Day 1/56-62. While the Tribunal accepts that such could be deemed of limited relevance as part of the factual matrix, what matters in this case is the Spanish regulatory regime and whether legitimate expectations were generated by representations or commitments of Spain.

[609] **C-0238**, Announcement of RD 661/2007. Cf. e.g., **RL-0089**, *Wirtgen*, ¶ 421.

[610] Cl. PHB ¶ 69 to the effect that "*it would be wrong to impute to RWE the expectation that it would receive the returns contained in Government statements contemporaneous with RD 661.*"

with the views expressed in the *Charanne* case,[611] the Tribunal sees RAIPRE registration as the completion of the administrative requirements for qualification under the given Special Regime, not as an independent commitment to a given investor.[612] Registration in the RAIPRE was compulsory under Article 9.1 of RD 661/2007 and was "*to ensure appropriate monitoring of the special regime and in particular in order to ensure the management and control of the receipt of the regulated tariffs, the premiums and supplements*",[613] not to establish a specific commitment to pay premiums or tariffs.

545.    The Tribunal also notes the view of the AEE, as set out in in its 2008 Yearbook, that Article 44.3 of RD 661/2007 did not extend retroactive protection so far as concerns revisions to premiums and was seriously flawed. Although the AEE could not and was not purporting to put forward any definitive interpretation, in the context of whether legitimate expectations were formed, some (if not great) weight attaches to their view, as follows:

> "The new decree also foresees the allocation of remuneration in a long-lasting manner, for 20 years. However, the system of revisions and updates set out in this decree, despite restoring the non-retroactivity of modifications to the regulated tariff and of the upper and lower limits of remuneration values, excludes premiums and supplements from this guarantee, as article 44.3 allows for the retroactive application to past and current investments of new premiums and supplements upon subsequent modification.
>
> The measure clearly contradicts the allocation of these values over a 20-year period, rendering the concept of durability completely fictitious, insofar as subsequent changes to these values have also been planned that, as a result, would be applied retroactively."[614]

---

[611] **RL-0049,** *Charanne*, ¶ 510. Cf. *Antin,* ¶¶ 551-552, although the Tribunal understands that the analysis of the *Antin* tribunal in these paragraphs turns more on "*the precision and detail exhibited in the royal decrees, particularly the contemplation that the treatment would be accorded for a defined period of time*" as opposed to the RAIPRE registrations. The Tribunal also notes the different fact pattern of the *Antin* case.

[612] Cf. Cl. Reply ¶¶ 523-532; **C-0015,** Excerpts of the RAIPRE certificates of the installations.

[613] **C-0017/R-0101**, RD 661/2007, regulating the activity of electricity production under the special regime, 25 May 2007 (published 26 May 2007), p. 16.

[614] **R-0284**, Annual Report of the Spanish Wind Energy Association, 2007; Mr Navarro said he was unaware of this, Day 2/216-217.

546.    As to the meeting of 23 June 2010, this is in a different category as it involved statements being made directly by the Respondent's officials (the Director General for Energy Policy and Department Head, Electricity Sector) to the Claimants (including Messrs Henderson and Navarro). However, the discussions were expressly on the basis that they "did not reflect final positions",[615] and the Tribunal sees this meeting as reflecting part of the discussions in the context of the July 1010 "agreement" that was ultimately to develop into RD 1614/2010. As appears from their contemporaneous documents, the Claimants do not appear to have understood that any commitments were being made to them at this meeting on which they could (or did) reasonably rely.[616] Moreover, although certain of the statements made by the Respondent's representatives were to the effect that the RD 661/2007 regime would be given full effect in 2013 so far as concerns the Claimants' plants,[617] the Director General also made comments that appear to suggest that there would be further changes in the long term.[618] Accordingly, the Tribunal does not consider that specific commitments were made at the meeting of 23 June 2010 that generated legitimate expectations on the part of the Claimants.

547.    As to the July 2010 "agreement" itself,[619] the Claimants say somewhat cautiously that "*RWE had access*" to this,[620] although the Tribunal has seen no agreement as such, but merely reference to agreement having been reached in the Ministerial press release of 2 July 2010. It appears from the press release that it was always the intention – as in the

---

[615] **C-0191**, Minutes of 23 January 2010 Meeting.

[616] **C-0099**, Transaction Approval Request Form, 12 July 2010; and **C-0115,** Transactional Approval Request Form, Minority Shareholders Second Tranche, 28 September 2010. The Tribunal notes the evidence of Mr Henderson at Day 3/28-33, including to the effect that the meeting gave the Claimants comfort, but this does not change its assessment.

[617] **C-0191**, Minutes of 23 January 2010 Meeting, p. 1: "The DG then explained that the current position was that those wind assets that were in the transitory phase between RD436 and RD 661, which accounts for all the Aersa operational portfolio, would remain on the current tariff structure and that they would respect the 2013 date for the change from one regime to the other, in contrary to recent press speculation."

[618] **C-0191**, Minutes of 23 January 2010 Meeting, p. 2: "As regards the future the DG brought a copy of the recently published Long term plan to 2020 which they are obliged to submit to Brussels as their position by the end of the month but as regards the associated tariff regimes they believed that this would only be discussed as and when the 'retroactive' debate had finished and as such clarity should not be expected before the end of this year. (We will forward a report on the Spanish targets to 2020 next week). The DG did however make the comment that in his opinion the likely outcome for future wind would be to guarantee a floor and above this level receive the pool price."

[619] **C-0063**, 2 July 2010 Press Release.

[620] Cl. Mem. ¶ 201.

event transpired – that the contents of the "agreement" would be transferred and developed in regulations, i.e. RD 1614/2010, and the "agreement" does not appear to have been treated contemporaneously as giving rise to any independent obligations.[621] Further, although the Claimants have described the "agreement" as a "*quid pro quo*", i.e. an agreed temporary cut to the premium under RD 661/2007 and in operating hours in return for a guaranteed return to the RD 661/2007 regime from 2013, the Claimants' plants did not participate in the "*quo*" because they were still in transition from the RD 436/2004 regime. It is not just that the Claimants were not party to an actual agreement, but insofar as an agreed package was being sought in relation to a cut in tariffs, there was no consensual basis for this so far as concerns the Claimants.[622] By reference to the above, the Tribunal does not consider that the "agreement" gave rise to a specific commitment generating legitimate expectations so far as the Claimants are concerned.

548.   As to RD 1614/2010, the Tribunal does not consider that its Article 5.3 adds materially to Article 44.3 of RD 661/2007. The Tribunal notes that the Claimants place weight on documents commenting on the draft of Decree 1614, in particular the Opinion of the Council of State of 26 November 2010.[623]   Although this Opinion questions the appropriateness of the draft Decree, including with respect to the limit being placed on future revisions by the then draft Article 5.3, the Tribunal does not understand it as saying that draft Article 5.3 could not be changed by future regulations. Referring to the Supreme Court judgment of 9 December 2009, the Opinion notes that "*the Supreme Court has expressed its opinion on the lack of any violation of the principles of legal security and*

---

[621] Cf. Claimants' oral closing at Day 5/108-109. *See also*, Resp. oral closing at Day 5/196-197, referring to a series of AEE and other submissions where reference to and reliance on an agreement (as such) would be expected, but is not to be found. *See e.g*., the AEE submission to the CNE of October 2010; **R-0166**, AEE's 30 August 2009 submissions before the CNE.  The Tribunal considers that, if an agreement giving rise to consensual obligations of some sort had been concluded, the Claimants would be able to identify where this had been treated as such.

[622] *See*, **C-0191**, Minutes of 23 January 2010 Meeting, where Spain's representatives are recorded as stating "that the current position was that those wind assets that were in the transitory phase between RD 436 and RD 661, which accounts for all the Aersa operational portfolio, would remain on the current tariff structure and that they would respect the 2013 date for the change from one regime to the other, in contrary to recent press speculation. They felt aggrieved that this portion of the sector would not contribute to the deficit reduction but that was the current status and expected outcome."

[623] Cf. Claimants' oral closing at Day 1/109-110, referring to **C-0333**, Ministry of Industry, Commerce and Tourism, "*Report on the Draft RD 1614/2010*", and emphasising in particular views expressed in the subsequent Council of State Opinion on the draft considering the comments of the Ministry and others, **C-0269**, State Council Report on draft RD 1614/2010, 26 November 2010.

*non-retroactive effect via legislation that amends the remuneration of facilities under the special regime*", and refers to "*the more than questionable juridical value that ... a precept imposing automatic legal restrictions might have in relation to later revisions of the legislation*". The Tribunal thus does not see the Opinion as supportive of the Claimants' case, and notes further that it states:

> "Indeed, one of the most persistent needs arising in the regulation of remuneration for electric power production under the special regime has been for it to be constantly revised and amended. This has brought about numerous legislative amendments since the approval of Royal Decree 661/2007, which initially raised doubts over whether they were in keeping with the principles of art. 9.3 of the Constitution (such problems have already been referred to in this opinion as well as in the aforementioned opinion number 2.264/2010). In view of this set of circumstances the idea that attempts are now being made to exclude such facilities from future revisions of the remuneration system seems neither appropriate nor consistent." [624]

549.    The Tribunal concludes from all the above that the FET standard is not to be applied as if a specific commitment, on which the Claimants could reasonably and actually did rely, had been made to the Claimants that their plants would always receive substantially the same remuneration as established by RD 661/2007. As follows from its analysis of the FET standard under Article 10(1) in Section C above, the Tribunal considers that, even with respect to those Investments made after RD 436/2004 and RD 661/2007 (cf. Section D(2)(a) above), the Claimants had no legitimate expectations that the Special Regime would remain substantially unchanged.[625] Likewise, the Claimants' alternative claim as to legitimate expectations fails, as this is based on an alleged reasonable return being the "*promised return when RWE invested*", with it being said that: "*RWE invested in reliance on the Special Regime FIT and all of its installations were entitled to the RD 661 FIT pursuant to Spain's grandfathering commitments. When enacting RD 661, the CNE*

---

[624] **C-0269,** State Council Report on draft RD 1614/2010, 26 November 2010.

[625] It follows that the Tribunal does not have to decide whether legitimate expectations could have been generated specifically with respect to the Investments made subsequent to the December 2009 decisions of the Supreme Court (cf. Section D(2)(d) above). *See*, in particular, **R-0141,** Judgment of the Supreme Court, appeal 151/2007 EDJ 2009/307349, 3 December 2009.

considered a return of between 8.2% and 11.2% after tax to be reasonable".[626] In this Tribunal's view, there was no such "*promised return when RWE invested*", and it does not see the CNE Report 3/2007 as capable of generating any legitimate expectation to a return of between 8.2% and 11.2% after tax (or indeed to any other return).[627]

### f.  *Conclusions as to the Claimants' case on legitimate expectations; disproportionality*

550.  As follows from the discussion in sub-section (e) above, the Tribunal considers that this is not a case where specific commitments were made to an investor such as to found legitimate expectations. However, as identified in Section C above, the absence of a specific commitment does not mean that the fact that an Investor has invested by reference to a given tariff regime ceases to be a relevant factor in applying the FET standard under Article 10(1). In the current context, and against the backdrop of the matters considered in the preceding sub-sections, the Tribunal considers it appropriate to assess whether the changes to the tariff regime were disproportionate, and whether the Respondent gave due consideration to impacts to Investors such as the Claimants in its decision-making process.[628]

551.  As identified and discussed further below, the question of disproportionality in the current context entails a consideration as to whether the changes were suitable and necessary to achieve the legislative intent, and whether an excessive financial burden was shifted to the Claimants who had committed very substantial resources on the basis of the Special Regime. There is also an initial question as to what, if any, margin of

---

[626] Cl. Skeleton ¶ 71; see also Cl. Reply ¶¶ 535-537; Cl. PHB ¶¶ 76-77. Cf. e.g. Resp. Skeleton ¶ 53.

[627] As to the conclusion of the *RREEF* tribunal with respect to a legitimate expectation to a reasonable return more generally, this did not become part of the Claimants' case. They stated that it was an "*erroneous conclusion that Spain's main commitment towards investors was the guarantee to provide reasonable return. This finding of the RREEF tribunal is both wrong and contrary to the majority of ECT awards that have found that Spain promised investors such as the Claimants that it would not alter retroactively the specific tariffs of RD 661 and 1614/2010.*" See Claimant's Comments of 10 May 2019 on **RL-0099**, *RREEF,* Decision on Responsibility and on the Principles of Quantum, ¶ 2.

[628] The Claimants alleged that the Disputed Measures were disproportionate together with its allegation that the Disputed Measures were unreasonable. In light of its view on the relevant legal principles as stated in Section C above, the Tribunal deals with the issue of alleged disproportionality here.

appreciation is to be accorded in the consideration of whether the measures adopted by Spain were necessary / not disproportionate.

### (i) Margin of appreciation?

552.    The Claimants have stated that although a margin of appreciation analysis could conceivably apply in general terms when it comes to the reasonableness or proportionality of Spain's decision-making,[629] such an approach should not be adopted in the ECT context. They rely on the limited nature of the exceptions established by Article 24 ECT, and contend that the Tribunal must apply a high level of scrutiny, and must independently and objectively assess Spain's justifications for the Disputed Measures.[630] It is also said that a margin of appreciation is only relevant when: "*(1) the regulatory authorities of the State are better placed to rule on matters within their competence; and (2) the State measures represent the sovereign will of the democratic Government which should not be lightly interfered with. These issues do not apply here.*"[631]

553.    The Tribunal has already rejected the Claimants' interpretation of Article 24 ECT. It notes that a margin of appreciation has been accorded by various tribunals considering whether a State's regulatory measures can be regarded as necessary,[632] and likewise so far as concerns the reasonableness or proportionality of a State's regulatory measures[633] including in the ECT context.[634] The Tribunal considers that this must be appropriate in the current legal and factual context, and it does not accept that allowing some margin of

---

[629] Cl. PHB ¶ 112. The Claimants' case at PHB ¶¶ 110-111, by reference to *Blusun*, is that margin of appreciation plays no role where an investor has legitimate expectations. Regardless of whether this is correct or not, and consistent with *Blusun*, the Tribunal does not consider that the Claimants benefit from legitimate expectations given the absence of specific commitments.

[630] Cl. PHB ¶¶ 112-116.

[631] Cl. PHB ¶ 118.

[632] *E.g.*, **CL-0084**, *Continental Casualty Company v The Argentine Republic,* ICSID Case No. ARB/03/9, Award, 5 September 2008, (hereinafter **"*Continental*"**) ¶ 181.

[633] Cl. PHB ¶ 113, referring to **CL-0186**, *Philip Morris Brand Sàrl (Switzerland), Philip Morris Products S.A. (Switzerland) and Abal Hermanos S.A. (Uruguay) v Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, (hereinafter **"*Philip Morris*"**) ¶ 399; **CL-0178**, *Chemtura* ¶ 123, and **CL-0084**, *Continental*,¶ 181.

[634] Resp. PHB ¶ 110, referring to **RL-0048**, *Electrabel*, Award,¶ 8.35.

appreciation would only be suitable in cases involving public health or essential security interests.[635] A consideration of whether a State's response to one aspect of an economic crisis was disproportionate must, in the Tribunal's view, allow some reasonable margin of appreciation to the State,[636] given that the Tribunal is at once in a better position (it has the benefit of hindsight and of experts suggesting different and arguably better ways of addressing the Tariff Deficit) and a worse position (its perspective is inevitably far narrower than that of a State addressing differing aspects of an economic crisis) to assess what was disproportionate, including in terms of balancing the differing public and private interests that may be in play. The Tribunal emphasises, as was noted by the tribunal in *Saluka*, that the FET standard does not create an "*open-ended mandate to second-guess government decision-making*."[637]

### (ii) Were the Disputed Measures suitable and necessary to the legislative aim?

554.    In considering an issue of proportionality, it is useful (and usual) to assess whether the given measure was suitable and necessary to the stated legislative aim.[638] Suitability is generally seen as a relatively undemanding standard and, consistent with the statement in the *Saluka* case above, the Tribunal does not see this as requiring more than a relationship of suitability between the measure and the objective to be achieved. The question of whether a given measure is necessary is more demanding. Although it will generally be appropriate to allow some margin of appreciation to the State in this context, the question of whether a measure is necessary will typically involve some analysis as to whether there were any less restrictive means reasonably available to the State for meeting the given objective. If it is established that – even according a margin of appreciation to the State – less restrictive means were reasonably available, it is difficult to see how the given measure can be considered necessary.

---

[635] Cf. Cl. PHB ¶ 113, referring to **CL-0186**, *Philip Morris*, ¶ 399, **CL-0178**, *Chemtura*, ¶ 123, and **CL-0084**, *Continental* at fn. 266.

[636] Cf. Cl. PHB ¶ 118.

[637] **CL-0034**, *Saluka*, ¶ 284, referring to *SD Myers Inc v Canada* ¶ 261. *See also*, **RL-0089**, *Wirtgen* ¶ 444.

[638] At Cl. Mem. ¶ 494 the Claimants state that for a measure to be proportionate it must be necessary to achieve the goals pursued.

555.   The Tribunal considers that the broad legislative aim of the Disputed Measures was to put in place a new regime that addressed the problem of the Tariff Deficit and the unsustainable electricity sector debt. The Preamble to RDL 9/2013 states:

> " … for the past decade, the Spanish electricity system has generated a tariff deficit which, over time, has become structural due to the fact that the real costs associated with regulated activities and with the operation of the electricity sector are higher than the revenues collected from the fees set by the government and paid by consumers.
>
> Between 2004 and 2012, the electricity system's income from consumer fees has increased by 122%, while the increase in the system's regulated costs in the same period has been 197 percent. Prominent among the cost items that have most contributed to such an increase are the special scheme premiums and the accumulated deficit annual payments, items that have multiplied by six and nine respectively during the said period.
>
> According to the latest data provided by the National Electricity Commission, as of 10 May 2013 there is an accumulated debt of 26,062.51 million euros. In addition to the calculation of the electricity system debt, the Commission notes that from 2003 to 10 May 2013 the amount paid out to fund the deficit of the electricity system by means of the annual payments which are included in consumers' access fees, in current prices for each year, amounts to 11,823 million euros.
>
> These figures testify to the unsustainable nature of the electricity sector debt and to the need to adopt urgent and immediately-applicable measures that make it possible to bring such a situation to an end."[639]

556.   The accumulated debt that resulted from the Tariff Deficit – in excess of EUR 26 billion as at May 2013 – had been growing fast, i.e. by approximately EUR 5 billion in 14 months. Thus, according to the CNE report of 7 March 2012, the system debt then stood at EUR 21,812 million, with the CNE then considering that the deficit between revenues and costs of the electrical system had become unsustainable.[640] The CNE stated:

> "Significantly, the fundamental problem in the electrical sector is that the lack of convergence between revenues and costs for activities regulated in the electrical sector in these last 10 years has created a growing debt in the electrical system. This imbalance between revenue and costs in the system is unsustainable due to the impact of the growing debt accumulated on

---

[639] **C-0024**, RDL 9/2013.

[640] **C-0163**, 2012 CNE Report, p. 6.

access licenses, present and future, for consumers, and the temporal impact on the indebtedness of the companies that are obligated to finance the system's deficit.

… the urgent adoption of regulatory solutions is needed, in the electrical and natural gas sectors, both, to prevent problems with structural rate deficits, as well as containing the costs of regulated activities, review their regulations and promote more efficient and competitive operation of the markets."[641]

557.     The CNE proposed a number of possible "*urgent and necessary*" short and medium term measures, some of which were radical in nature i.e. financing the cost of the special regime through CO2 auctions and a tax on the sale of petrol and gas, some of which envisaged relatively minor reductions to the remuneration to RE generators (such as reductions to the annual increase in accordance with the CPI, reductions impacting solar thermoelectric plants pre-registered but not yet finally registered in the RAIPRE, and restrictions on use of fossil fuels in generation of renewable energy to 5%), some of which envisaged an increase in access tolls.[642] The CNE did not propose the replacement of the Special Regime fixed tariff / premium put in place by RD 661/2007,[643] but the Tribunal sees its report as strong evidence that it was necessary to act in some way to address the Tariff Deficit.

558.     As noted in Section IV.C above, on 25 June 2012, three months subsequent to this CNE report, the Spanish Government requested external financial assistance from the EU, leading on 20 July 2012 to conclusion of the MOU on "Financial Sector Policy Conditionality", at paragraph 31 of which it was stated:

"31. Regarding structural reforms, the Spanish authorities are committed to implement the country-specific recommendations in the context of the European Semester. These reforms aim at correcting macroeconomic imbalances, as identified in the in-depth review under the Macroeconomic Imbalance Procedure (MIP). In particular, these recommendations invite Spain to: …

---

[641] **C-0163**, 2012 CNE Report, p. 4.

[642] **C-0163**, 2012 CNE Report.

[643] *See e.g.*, Claimants' oral opening at Day 1/42.

6) … address the electricity tariff deficit in a comprehensive way."[644]

559.    This was an invitation, not a requirement, but it is nonetheless evidence of the gravity of the Tariff Deficit problem. Further, although as the Claimants have correctly stated it would have been irrational to require RE installations to bear the cost of bailing out Spanish banks,[645] it is plain from the MOU and other sources that as of 2012-2013 Spain was facing an ongoing financial crisis and that it had become imperative to address the Tariff Deficit.[646] The Tribunal does not accept that the Tariff Deficit should be regarded as a known quantity as of the date of adoption of RD 661/2007, such that Spain should be regarded as taking on board and accepting all risks with respect to growth in the Deficit. The Tribunal considers that the subsidies established by RD 661/2007 were grounded in the macroeconomic data forecast in the 2005 PER,[647] and that Spain's economy was hit very hard indeed by the global economic crisis of and from 2008, with the Tariff Deficit increasing as electricity consumption dropped well below what had been forecast in the 2005 PER.[648]

560.    The Tribunal considers that the Disputed Measures were suitable in terms of addressing the Tariff Deficit: they were directly aimed at reducing the Deficit and in the event the Deficit dropped rapidly as a result of their implementation.[649]

561.    The question of whether the Disputed Measures were necessary is more difficult. The question is not whether there was a state of necessity precluding wrongfulness,[650] but the Tribunal does not consider it sufficient that, in 2013, it had become necessary to change in some way the Special Regime as implemented by RD 661/2007. The focus must be on the particular measures selected by the Respondent.

---

[644] **RL-0067**, MOU with the EU.

[645] Cl. PHB ¶ 125.

[646] *See e.g.*, Resp. oral opening at Day 2/22-24.

[647] Resp. PHB ¶ 116.

[648] Resp. C-Mem. ¶¶ 594-596; Resp. Rej. ¶¶ 286-289.

[649] *See e.g.*, the view of the Claimants' expert, Dr García of Compass Lexecon, Day 3/158. Lines 11-12.

[650] Cf. Cl. Reply ¶¶ 506 and 585-587.

562.    The Claimants contend that other means were available to deal with the Deficit.[651] As to this, their experts, Compass Lexecon, identified two combined methods to deal with an estimated annual Deficit of EUR 3 billion, namely (a) a 3.1% increase in domestic tariffs and a 2% increase in industrial tariffs, coupled with (b) a 1.4% increase in indirect taxation, through an increase in VAT or the introduction of a carbon tax on fuels such as petrol, coal and gas.[652] The Tribunal is not persuaded that these means were available and would have met the desired objective. In this respect, the annual Deficit to be addressed was not EUR 3 billion, but in excess of EUR 5 billion – the Deficit for 2012 was EUR 5.6 billion and the average of the 5 years prior to 2013 was EUR 5.1 billion. The lowest annual figure was EUR 3.85 billion, which may indicate that the measures that had been taken in 2010 had initially had some success.[653] The Compass Lexecon figure of EUR 3 billion is taken on the basis of the figure for 2013, but as RDL 9/2013 was adopted mid-way through 2013, the figure for 2013 as a whole does not appear useful to the Tribunal.  Further:

a)    As to the increase in electricity charges, it is not as if the Respondent had not considered increasing electricity charges. As appears from the extract from the Preamble of RDL 9/2013 referred to above, the RDL was at least in part predicated on the fact that increased charges to consumers had not solved the problem. In its report of 7 March 2012, the CNE considered a scenario where the Tariff Deficit would be addressed by an increase in access fees, which it considered would mean a 35.5% increase in 2012 and then further increases in subsequent years (0.6% in 2013 and 6.4% in 2014) and considered that this would be "*unsustainable*" for consumers.[654] By coupling its other proposed regulatory measures with an increase in access fees, the increase would be reduced to 15.1% in 2012, a decrease of 4.5%

---

[651] Cl. Mem. ¶ 494; Cl. Reply ¶ 58; Claimants' oral closing at Day 5/148-149.

[652] Compass Report ¶¶ 19-21 and section V; Compass Lexecon, Second Report, section V, Day 3/158-163.

[653] Compass Report ¶ 141, Figure 8.

[654] **C-0163**, 2012 CNE Report, p. 8.

in 2013 and then an increase of 2.3% in both 2014 and 2015, which it considered would be "*difficult to sustain for consumers*."[655]

b) As to the suggestion that the Deficit could in part have been addressed by tax increases, no analysis has been provided as to the broader economic impacts of using such an increase to address the Tariff Deficit (at a time of extreme economic uncertainty),[656] including the potential for a decrease in electricity consumption caused by the general reduction in disposable income.

563.   The Claimants also say that the CNE, in its report of 7 March 2012, provided a comprehensive range of proposals that would solve the Tariff Deficit, and that these were simply ignored by the Respondent.[657] This CNE report was the result of a specific direction from Spain's Ministry of Industry, Energy and Tourism to prepare a report on the measures that could be adopted in the energy sector, with particular regard to the Tariff Deficit.[658] The report contained a series of proposals as to short and medium term measures:

a) Short term: (i) establish new time-frames for the premiums to be received by the solar thermal power plants registered in the pre-assignment registry, without a final commissioning certificate; (ii) limitation on the use of fossil fuels with premium support to 5% of primary energy; (iii) remove the automatic increase in the X factor of the efficiency in the tariffs and premiums update index (CPI-X); (iv) standardisation of the premium on the tariff applicable to solar thermal plants to avoid situations of over-remuneration; (v) partial financing by reference to $CO_2$ auctions; (vi) partial financing by charges to sectors responsible for the consumption of fossil fuels or alternatively through the General State Budget; (vii)

---

[655] **C-0163**, 2012 CNE Report, p. 9.

[656] Cf. Compass Lexecon, Second Report ¶ 199.

[657] Cl. Reply ¶ 584.

[658] **C-0163**, 2012 CNE Report, p. 1; Resp. C-Mem. ¶ 628.

modulation of the rate of penetration initially expected in the PER in line with the provisions of RDL 1/2012.[659]

b) Medium term: (i) revision of the existing regulation through the establishment of competitive mechanisms (auctions) and premiums based on cost regulatory information; (ii) removal of subsidies from the end of the economic life (estimated useful life) of the plant; (iii) review of the premium's ceiling and floor, so that when the market price exceeded the ceiling, the premium was returned as the system net tax income; (iv) allocation of actual operating costs.[660]

564.    The Tribunal notes that CNE was not examining the 2012 Deficit, which had increased to EUR 5.61 billion from the 2011 figure of EUR 3.85 billion (according to Compass Lexecon's figures). It is also noted that some of the above would appear to involve significant changes to – and reduction of – the remuneration established by RD661/2007.

565.    According to the Respondent, it adopted, along with measures related to this arbitration, "*another plurality of measures to increase the income of the System and reduce the costs thereof*", including reducing costs "*in line with the recommendations made by the CNE on 7 March 2012.*" It is said that:

> "On the income side, it was agreed to feed the SES with the sums deriving from the collection of the public revenues referred to in Act 15/2012. This measure represented an exception to the principle of the self-financing of the SES, based on the aim of promoting the development of Renewable Energies.
>
> The measures to increase the revenues of the SES were linked to important measures to reduce the costs of the SES. Apart from the costs involved in the premiums on renewables, all the SES costs were reduced, in line with the recommendations made by the CNE on 7 March 2012, to adapt them to the new economic scenarios arising from the crisis.

---

[659] **C-0163**, 2012 CNE Report; Resp. C-Mem. ¶ 632.
[660] **C-0163**, 2012 CNE Report; Resp. C-Mem. ¶ 633.

> In this situation, measures were adopted to reduce the costs of the SES, about which the Claimants have said nothing. The measures in question did not exist as far as they were concerned: … ."[661]

566.    The Tribunal accepts that the Respondent did take various measures other than the Disputed Measures, and the Claimants have failed to establish as incorrect the Respondent's contention that SES costs were reduced "*in line with the recommendations made by the CNE on 7 March 2012*." At the hearing, the Claimants' focus was on the alternatives put forward by Compass Lexecon, and the Tribunal has already rejected the case that these were available and would have met the desired objective.[662] The Claimants have failed to establish that CNE's recommendations that were not followed would have met the legislative aim of addressing the problem of the Tariff Deficit and the unsustainable electricity sector debt.  Indeed, if the Claimants had confidence that the CNE proposals would have worked (without causing significant loss to them and/or other investors in the RE sector), they would presumably have submitted an expert report to that effect, as opposed to Compass Lexecon providing their own alternatives to the Disputed Measures.

567.    The Tribunal considers that some margin of appreciation must be accorded to the Respondent in assessing what measures would successfully address the complex and acute problem of the Tariff Deficit and the unsustainable electricity sector debt but, even without such a margin, it does not consider that the Claimants have established that other less restrictive means were available. In light of the above, the Tribunal considers that the Claimants have failed to establish that the Disputed Measures were not necessary.

### (iii) Disproportionality (sensu stricto)

568.    The above conclusion, however, does not mean that the issue of disproportionality inevitably falls to be decided in the Respondent's favour. According to the Claimants, relying chiefly on the *Tecmed* case, proportionality requires that there be a reasonable relationship between the burden imposed on the foreign investor and the aim sought to

---

[661] Resp. Rej. ¶¶ 566-569, referring to C-Mem. ¶¶ 601-612.

[662] *See e.g.*, Day 1/221.

be realised by a given State measure.[663] The Claimants also contend that particular attention must be paid to the harm to their investments.[664] The Respondent relies on *AES Summit v Hungary* as establishing the applicable test,[665] including that "*there needs to be an appropriate correlation between the state's public policy objective and the measure adopted to achieve it.*"[666]

569. The Tribunal notes that the formulation in *Tecmed* formed part of its consideration of whether there had been an indirect expropriation, whilst the test relied on from *AES Summit* concerns reasonableness, not proportionality (or at least not expressly). In a case involving the FET standard, the tribunal in *EDF v Romania* stated as follows with respect to proportionality:

> "As held by other tribunals, in addition to a legitimate aim in the public interest there must be 'a reasonable relationship of proportionality between the means employed and the aim sought to be realized'; that proportionality would be lacking if the person involved 'bears an individual and excessive burden'."[667]

570. There is considerable scholarly debate as to how, and to what end precisely, a proportionality test is to be applied. The Tribunal considers that a consideration of proportionality within the FET standard should take into account the nature of the right and the specific context. In the current context, where investors including protected foreign investors such as the Claimants have been generally invited and encouraged to invest in a particular sector through a particularly attractive tariff regime, the Tribunal considers that it is appropriate to identify the burden that has been borne by the Claimants when that regime undergoes radical change, and whether that burden is excessive in relation to the legitimate aim being pursued through the change. In this respect, the

---

[663] Cl. Mem. ¶ 492; **CL-0032**, *Tecmed*, ¶ 122.

[664] Cl. Mem. ¶ 497.

[665] Resp. C-Mem. ¶ 984.

[666] **RL-0039**, *AES Summit*; Award, ¶ 10.3.9.

[667] **RL-0035**, *EDF v. Romania*, ¶ 293, referring to *Azurix Corp. v The Argentine Republic*, Award of 14 July 2006 ¶ 311.

Tribunal also notes that, in considering the concept of arbitrariness under Article 10(1) ECT, the *Electrabel* tribunal stated that:

> "The relevance of the proportionality of the measure has been increasingly addressed by investment tribunals and other international tribunals, including the ECtHR. The test for proportionality has been developed from certain municipal administrative laws, and requires the measure to be suitable to achieve a legitimate policy objective, necessary for that objective, and not excessive considering the relative weight of each interest involved."[668]

571. This engages a form of balancing exercise which an international arbitral tribunal will generally approach with some caution, i.e. a tribunal will have no wish to replace its own subjective appreciations for those of the State. It may be assisted in this regard by allowing to the State a margin of appreciation, although the appropriate width of the margin will also be context specific. In the instant case, where an attractive tariff regime has been established with the aim of attracting investors into an industry that requires large up-front investment, and where the State was in 2007 speaking of a "*guarantee*" both in the press release announcing the RD 661/2007 regime and in the July 2010 "agreement", the Tribunal does not consider it appropriate to allow a particularly wide margin.

      a.   Specific contentions of the Claimants with respect to proportionality and the Tariff Deficit

572. The Respondent contends that the burden is on the Claimants to show that the Disputed Measures were disproportionate, and the Tribunal accepts this.[669]

573. Within the context of proportionality, the Claimants contend that the FIT for wind and hydro plants only played a limited role in the accumulation of the Tariff Deficit, that Spain had caused the Deficit by its failure to increase tolls and charges to cover the true

---

[668] **RL-0048**, *Electrabel*, Award, ¶ 179.
[669] Resp. Rej. ¶ 1031.

cost of electricity, and that other means were available to deal with the Deficit.[670] The latter contention has already been considered under the topic of suitability and necessity.

574.    The Claimants seek to evidence the first contention above by a breakdown of the Deficit for 2013, which was EUR 3.188 billion, as to which it is said that the extra costs associated with wind and mini hydro only represented 12% of the regulated costs of the Electricity System.[671] However, this is of limited evidentiary value given that (i) the Disputed Measures in RDL 9/2013 were not aimed solely at the wind and mini-hydro sector while, on Compass Lexecon's figures, the extra costs of the RE sector as a whole accounted for 44% of the Deficit for 2013, (ii) RDL 9/2013 was adopted in July 2013, and it is unclear from Compass Lexecon's figures whether the impact of the RDL is reflected in the EUR 3.188 billion figure for 2013. In this respect, as already noted, the Tariff Deficit for 2012 was EUR 5.609 billion, and that 2012 figure would appear to the Tribunal to have been a more relevant figure to establish what proportion of the Tariff Deficit was due to the RE sector when RDL 9/2013 was adopted.

575.    The second contention may be correct to a degree, but the Tribunal is not able – and would have required considerably more in-depth expert evidence – to assess what price electricity could reasonably have been borne by consumers, including without leading to other adverse impacts to the Tariff Deficit such as a drop in consumption.[672] The Respondent's position is that Disputed Measures were imposed on the entire system while, in the period 2003-2012, electricity prices for consumers increased by 81%, with the biggest increases in 2008 (10%), 2009 (10.1%) and 2011 (17.7%) with the result that the price of electricity in Spain is amongst the highest in Europe.[673] These figures were not challenged.[674] Further, according to the CNE report of 7 March 2012: "*To summarize,*

---

[670] Cl. Mem. ¶¶ 492 and 494; Cl. Reply ¶¶ 581 *et seq*.; also ¶¶ 594 *et seq*.; Claimants' oral opening, Day 1/217-221.

[671] Cl. Mem. ¶¶ 492 and 494; Compass Report ¶ 144.b.

[672] As to the drop in consumption in the period 2005-2010 compared to that anticipated in the 2005 PER, *see*, BDO first report ¶ 143 and Resp. oral opening at Day 2/25.

[673] Resp. C-Mem. ¶¶ 285-293; Resp. Rej.¶ 950; BDO first report, pp. 105-106 and Resp. oral opening at Day 2/26.

[674] The Claimants' answer in their oral opening, Day 1/220-221, was instead to the effect that electricity in Spain may be higher than elsewhere (albeit not the highest in Europe) as Spain is very dependent on energy imports, and that policy choices had been made by Spain with respect to the payment of a premium for renewable energy.

*in Spain the end electricity prices of industrial consumers, which have a direct impact on industrial competitiveness, are at the threshold of the highest prices in Europe. With regards to the end prices of household-residential consumers, especially of electricity, the highest positions in the European ranking are recorded (third position excluding taxes),… ."*[675]

576.    In these circumstances, the Tribunal does not accept that the failure to pass the full cost of the electricity system on to consumers means that it was disproportionate (or unreasonable) to adopt the Disputed Measures.

### b.   The burden falling on the Claimants' Investments

577.    On the Respondent's case, the reforms of 2013-2014 maintained the essential elements of the previous support system for renewable energies, including: (i) access priority, (ii) dispatch priority, (iii) methodology for setting the subsidies based on installation types and common standards, (iv) the market price for energy sold, plus a subsidy in order to achieve reasonable rates of return with reference to the cost of money in the capital market, recognising that (v) premiums are a cost of the SES and must be sustainable.[676]

578.    The Tribunal accepts that certain important elements of the Special Regime were retained in some form, including access and dispatch priority and a subsidy element in addition to market price. However, this fact is not in itself sufficient to answer the question of disproportionality and, as already identified, it is necessary to pay close attention to the impact of the Disputed Measures on the Claimants' plants in terms of lost remuneration.

579.    The Tribunal has been presented with various sets of figures aimed at showing the impact of the Disputed Measures on the Claimants' plants in terms of the remuneration that will actually be received under the new regime, set in opposition to what would have been received under the RD 661/2007 regime.

---

[675] **R-0131**, 2012 CNE Report, p. 17.

[676] E.g. Resp. C-Mem. ¶ 37; Resp. Rej. ¶¶ 797 *et seq.*; Resp. oral opening at Day 1/253, Day 2/35-36.

> *a)* The calculations in the second statement of Mr Ayuso, and also one set of calculations in the second Compass Lexecon report, are made by reference to the Standard Installations introduced by Order IET 1045/2014 that most closely approximate the Claimants' plants.
>
> *b)* A further set of calculations in the second Compass Lexecon report, and calculations in the BDO reports, are made by reference to the initial investment in the actual plants and subsequent capital expenditure, pursuant to data disclosed by the Claimants in the disclosure phase of the arbitration.[677]

580.  According to the figures of Mr Ayuso, five of the Standard Installations approximating to the Claimants' plants will still achieve an internal rate of return (IRR) in excess of 10% pre-tax, whilst the remainder will achieve the 7.398% pre-tax provided for in the Disputed Measures.[678] Further, Mr Ayuso's evidence is that the Claimants' wind plants are more productive by around 15% than the Standard Installations,[679] and so will earn more so far as concerns power sold to the market.

581.  As to the calculations in the second Compass Lexecon report, the summary at Table 4 shows that in the 'but for' scenario where the RD 661/2007 regime remains in place, the Standard Installations approximating to the Claimants' plants achieve an average 9% IRR post-tax, whereas in the actual scenario they achieve an average 5.7% IRR (a comparison is made to percentage figures in the 2007 CNE report that are said to show what would be reasonable[680]). These actual scenario figures, once converted into pre-tax figures, are very close to the figures of Mr Ayuso.[681] It follows that the Parties are in agreement that, so far as concerns the actual scenario under the Disputed Measures, by reference to the Standard Installations, and pre-tax:

---

[677] Compass Lexecon, Second Report ¶¶ 262-263 and Table 10; BDO second report ¶ 240 and Table 13.

[678] **RW-0002**, Ayuso Second Statement, Tables 7-8.

[679] **RW-0002**, Ayuso Second Statement ¶¶ 99-100. According to Compass Lexecon, Second Report ¶ 112, the figure is 8%.

[680] Cf. ¶ 230 above; Compass Lexecon, Second Report ¶ 120.

[681] *See*, the pre-tax figures of Compass Lexecon at **CLEX-226**, IRR of Standard Plants in But-For and Actual.

    *a)*  Nine of the Claimants' wind plants will achieve an IRR of approximately 10% or above (IT-00648: Muel; IT-00651: Grisel I; IT-00652: Acampo Armijo, Bosque Alto, La Balsa, Los Labrados, Plana Maria, Plana Zaragoza; IT-00653: Rio Gallego I).[682]

    *b)*  The remaining eleven wind plants (IT-00654: Aldehuelas, Juno, Lanternoso, Luna, Urano; IT-00655: Grisel II; IT-00656: Rio Gallego II; IT-00657: Bancal I and II, Siglos I and II) will achieve an IRR of approximately 7.4%.

    *c)*  One of the Claimants' hydro plants will achieve an IRR of approximately 11% (IT-00751: Villalgordo).

    *d)*  The remaining three hydro plants (IT-00673: Chomba; IT-00699: Cepeda; IT-00701: La Mora) will achieve an IRR of approximately 7.4%.

582.    The Tribunal takes note of these figures, but it considers that the estimated returns that are more closely based on the actual investment and other costs of the Claimants' plants are of more assistance to it. The position of the Respondent's expert, Mr Pérez from BDO, was that these were the more useful figures,[683] and the Tribunal agrees. The issue now being examined is whether the Disputed Measures have had a disproportionate impact on the individual plants in which the Claimants invested and, in assessing this, it is appropriate to look at actual impacts (so far as possible) as opposed to the impacts by reference to a series of Standard Installations that are, after all, merely one facet of the Disputed Measures. Moreover, it has been the Respondent's consistent position in this arbitration that the remuneration regime of plants including the Claimants' plants was based on a reasonable return as established by Law 54/1997,[684] while the return figure

---

[682] The "IT" reference denotes the standard installation most closely approximating the Claimants' plants.

[683] *See*, at Day 5/35-36:

"Q. … For your IRR analysis, however, you use what you believe to be the actual investment costs though, isn't that right?

A. (By Mr Pérez) (Interpreted) Yes, that's correct. Because in the end, that's the return they get, so it's important to take into account the overall return they actually do get."

[684] *See e.g.*, Resp. Rej. ¶ 302; **R-0003**, Law 54/1997, Article 30.4, pp. 50-51, referring to the "*remuneration arrangements for electric power generation installations operating under the special regime*."

that it has focused on has always been at or around a 7% return (albeit initially as a post-tax figure).

583.    An attempt at calculating the actual returns was made in the first BDO report on a "*provisional basis*", i.e. estimating the individual plant investment costs, and various other matters.[685] The BDO figures were "*corrected*" in the second report of Compass Lexecon so as to take account of the actual (and higher) investment costs of the plants as reflected in the financial statements of the various plants, and other factors.[686] Table 10 of the second report of Compass Lexecon is reproduced below.

**Table 10: BDO's Corrected Pre-Tax Returns of the Claimants' Plants**

| Plant | IT | Original BDO IRRs | | Corrected IRRs | |
|---|---|---|---|---|---|
| | | But-for | Actual | But-for | Actual |
| Muel | IT-00648 | 19.1% | 18.4% | 13.5% | 12.3% |
| Grisel fase I | IT-00651 | 14.3% | 11.9% | 10.8% | 7.8% |
| Acampo Armijo | IT-00652 | 28.8% | 27.6% | 20.6% | 18.7% |
| Bosque Alto | IT-00652 | 25.0% | 23.6% | 17.3% | 15.1% |
| La Balsa | IT-00652 | 15.7% | 12.9% | 10.9% | 7.3% |
| Los Labrados | IT-00652 | 19.6% | 17.6% | 13.8% | 11.0% |
| Plana Zaragoza | IT-00652 | 22.2% | 20.5% | 16.2% | 13.7% |
| Plana María | IT-00652 | 17.6% | 15.3% | 13.1% | 10.0% |
| Río Gállego fase I | IT-00653 | 22.4% | 20.1% | 16.2% | 13.3% |
| Aldehuelas | IT-00654 | 21.8% | 19.0% | 22.9% | 19.0% |
| Juno | IT-00654 | 14.2% | 9.4% | 13.8% | 8.8% |
| Lantemoso | IT-00654 | 21.7% | 18.3% | 16.7% | 12.0% |
| Luna | IT-00654 | 15.3% | 11.6% | 15.2% | 11.0% |
| Urano | IT-00654 | 8.9% | 3.2% | 9.1% | 2.8% |
| Grisel fase II | IT-00655 | 15.8% | 11.8% | 9.9% | 5.8% |
| Río Gállego fase II | IT-00656 | 17.9% | 15.0% | 12.7% | 9.7% |
| Bancal fase I | IT-00657 | 9.2% | 8.3% | 4.7% | 4.4% |
| Bancal fase II | IT-00657 | 8.8% | 7.9% | 4.6% | 4.2% |
| Siglos fase I | IT-00657 | 10.0% | 8.7% | 5.6% | 4.7% |
| Siglos fase II | IT-00657 | 9.8% | 8.5% | 5.5% | 4.7% |
| **Wind plants** | | **17.9%** | **15.1%** | **14.5%** | **11.1%** |
| Chomba | IT-00673 | 13.4% | 13.6% | 9.0% | 9.1% |
| Cepeda | IT-00699 | 4.4% | 2.1% | 2.7% | -1.4% |
| La Mora | IT-00701 | -2.0% | -0.4% | -6.3% | -5.0% |
| Villalgordo | IT-00751 | 21.4% | 20.4% | 18.5% | 17.2% |
| **Hidraulic plants** | | **9.4%** | **7.8%** | **7.1%** | **4.4%** |

*Source: Correction of BDO's working papers, Table A (CLEX-235).*
*Note: When cash flows are corrected the IRR of La Mora in the But-for scenario is negative and*
*undefined. For this plant the table provides an upper bound estimate of the return.*

---

[685] BDO first report ¶¶ 104-111 and Table 4.
[686] Compass Lexecon, Second Report ¶¶ 262-263 and Table 10. *See also*, Mr Perez at Day 5/75-77.

584.    The Tribunal considers this comparison of IRR figures as a useful tool in assessing the impact of the Disputed Measures on the overall profitability of the Claimants' plants and the question of the burden that is being imposed as a result of the Disputed Measures.[687] According to Table 10, the overall IRR for the 'but for' scenario (wind plants) is 14.5% pre-tax as compared to an actual scenario of 11.1%. For the hydro plants, the figures are 7.1% and 4.4% respectively.

585.    So far as concerns the Claimants' wind plants, these Compass Lexecon return figures are in fact slightly higher than those calculated by BDO in their second report[688] (where BDO accepted some but not all of the corrections of Compass Lexecon[689]). According to BDO's Table 13, the IRR for the actual scenario (wind plants) is 10.7% pre-tax, and the BDO figures for the individual wind plants are broadly in line with those of Compass Lexecon. For the hydro plants, the BDO figure is 7.5%, so again close to the Compass Lexecon figure.  In light of the overall proximity of the two sets of figures, and by reference to the considerable weight placed by the Respondent specifically on Table 10 of the second report of Compass Lexecon in its oral closing,[690] the Tribunal has determined that it can safely use this Table 10 (and its supporting spreadsheet[691]) as the basis for its consideration of this aspect of proportionality.

586.    Overall, as appears from Table 10, the Claimants' wind plants have to bear the burden of the reduction of the Tariff Deficit to the extent of a reduction in IRR of 3.4% (the figure

---

[687] *See also*, **RL-0099**, *RREEF,* Decision on Responsibility and on the Principles of Quantum, ¶ 520. The Tribunal notes that the overall IRR for wind plants, i.e. by far the greater part of the Investments as a whole, is 11.1%, which compares favourably to the reasonable return figure calculated by the tribunal in the *RREEF* case: see at ¶¶ 568-589.

[688] Mr Perez at Day 5/75-77.

[689] BDO second report ¶¶ 240-244 and Table 13.

[690] *See*, Mr Fernández at Day 5/221-222: "And now to conclude, allow me to show you a table, table 10. We have seen it today during the cross-examination, and why? That was what Mr Santacruz was explaining. These investors will recoup their costs, investment and operational costs, and they will get a very high rate of return. And now I am not speaking about standards, no, no standards here, I am speaking of those specific investors and their specific investments. I am not even talking about BDO calculations, no. You see it on the title, table 10, it says the returns corrected by Compass Lexecon on the basis of BDO's calculations, so it's BDO's corrected pre-tax returns of the Claimants' plants. You have the but-for and the actual, after the measures. So in sum, 14.5% is claimed, and they get 11.1%. Table 10 of Compass Lexecon's report. And we are told that there is an appropriation. Which one? The legislator should ensure the necessary adjustments to achieve a level playing field. And neither windfall profits nor remunerations lower than those in the market can be admitted."

[691] **CLEX-0235**, Correction of BDO's working papers, Table A, 22 March 2017.

is 2.7% for the hydro plants). However, in examining the issue of proportionality, the Tribunal considers it necessary to look at the impacts to individual plants, and notes that this is consistent with the approach of the Respondent in establishing the Special Regime in Law 54/1997, and in adopting the Disputed Measures, i.e. in the attempt through Order IET 1045/2014 to secure what the Respondent considers to be a reasonable return by reference to more than 150 Standard Installations that are intended to approximate to individual plants.[692]

587.    As follows from Table 10 of the second report of Compass Lexecon, the majority of the Claimants' plants are estimated to achieve an IRR in excess of or around 7.398%, i.e. the reasonable return figure established by the Disputed Measures with respect to the Standard Installations. However, certain plants are estimated to achieve significantly lower returns, namely: Urano (2.8%), Grisel II (5.8%), Bancal I (4.4%), Bancal II (4.2%), Siglos I (4.7%) and Siglos II (4.7%), and the hydro plant Cepeda (-1.4%).[693] It may be that, by reference to a hypothetical Standard Installation, these plants would achieve an IRR in excess of 7.398%, but by reference to actual investment and other costs, and actual and projected revenues, the evidence is that they will not. Instead, they will receive considerably less than the return figure that the Respondent itself has considered to be reasonable and proportionate (by reference to the Standard Installation).

588.    The Tribunal does not consider that it has been established that this result is justified by reference to plant or other inefficiencies:

---

[692] *See also*, Resp. PHB ¶¶ 3-5 i.e. the Respondent's answer to Question 1 of the Questions put by the Tribunal to the Parties following the hearing, to the effect that in order to determine a breach of Art. 10(1), the investors must precisely identify the investments and how they were affected. The Respondent's position was that the Claimants have failed to do so, and such failure prevents determining if the Respondent has breached Art. 10(1). The Tribunal does not accept that blanket submission, but does consider that the Respondent is correct that the question of breach (and, if so, any resulting damages) must be approached by reference to the individual categories of investments identified as well as, so far as relevant, specific individual investments.

[693] The detailed calculations are set out in **CLEX-0235**, Correction of BDO's working papers, Table A, 22 March 2017.

a) The Respondent contends that the production is very low at the Bancal and Siglos plants, and that they would not have achieved any better return under the RD 661/2007 regime,[694] but that is incorrect as Table 10 demonstrates.

b) A similar point is made in the BDO reports with respect to the Urano plant,[695] and in the Rejoinder as to the Cepeda hydro plant, which is said to be oversized.[696] However, it has not been established to the Tribunal's satisfaction that the alleged plants inefficiencies render proportionate the massive reduction in returns at Urano, i.e. from 9.1% to 2.8%, and the conversion of Cepeda into a loss-making plant.

589. Even allowing to the Respondent some margin of appreciation, and recognising the Respondent's good faith effort made to replicate the investment costs and performance of actual plants through the Standard Installations, the Tribunal considers that, in certain respects, the Claimants are having to bear an excessive burden so far as concerns the measures adopted to deal with the Tariff Deficit.[697] Further, while the Tribunal is in no sense bound by the Respondent's assessments of what is reasonable or proportionate, the Tribunal notes that the Respondent itself puts forward the 7.398% return as a return that is reasonable and proportionate.[698] Against a backdrop where the overall impact of the Disputed Measures is already a very significant reduction in the returns of the Claimants' plants when looked at as a whole, the Tribunal considers that an excessive and disproportionate burden is being borne by the Claimants with respect specifically to the Claimants' investment in the wind plants Urano, Grisel II, Bancal I and II, Siglos I and II, and the hydro plant Cepeda, in circumstances where the IRR for these plants is now

---

[694] Resp. oral opening at Day 2/49.

[695] *See*, fns. 13-14 of the first BDO report (and in later related footnotes), and fns. 239-240 and 244 of the second BDO report.

[696] Resp. Rej.¶ 837, referring to a 2002 report of Price Waterhouse Coopers, **C-0085,** *Financial Review Due Diligence Draft Report*, for Agrupació Energías Renovables, S.A., PWC PowerPoint presentation, April 2002. The factors referred to there include damage from a 2001 storm, and deficient management as of 2002, which are of little assistance. The report does say that the plant is oversised.

[697] **RL-0035**, *EDF v. Romania*, ¶ 293, referring to *Azurix Corp. v The Argentine Republic*, Award of 14 July 2006 ¶ 311.

[698] *See e.g.*, Resp. CM ¶¶ 973 and 997; Resp. Rej.¶ 318; Respondent's Comments of 3 May 2019 on **RL-0099**, *RREEF, Decision on Responsibility and on the Principles of Quantum*, ¶ 9.

estimated at well below what the Respondent itself has decided to be reasonable and proportionate (albeit by reference to the Standard Installation).

**(iv) Was due consideration given to impacts to investors such as the Claimants in its decision-making process?**

590. The Tribunal considers that, in a context such as the present, a relevant factor in assessing compliance with the FET standard is whether, in its decision-making process, the State gave due consideration to impacts to investors such as the Claimants. A case that measures impose a disproportionate burden on investors will naturally be strengthened where a State fails duly to consider that burden.

591. Although the new regime put in place in 2013-2014 involved a radical change in the way subsidies for the RE sector were calculated, the Tribunal considers that, from RDL 6/2009 onwards,[699] the Respondent was attentive to the need to protect investors in its attempts to address the growing problem of the Tariff Deficit. As to RDL 9/2013,[700] Article 1 offers a demonstration of how consideration was being given to impacts of the changed regime on existing investors who were to receive the Special Payment  to "*cover, as appropriate, the investment costs of a standard installation that cannot be recovered through the sale of energy, as well as an amount for the operation of the installation to cover, as the case may be, the difference between exploitation costs and the revenues obtained from the participation of such a standard installation in the market.*" Whether this new regime in fact led to a disproportionate burden being borne by investors is a separate issue; for now, the Tribunal is concerned solely with the question of whether due consideration was being given to investors in the Respondent's decision-making process.

592. In the context of their arguments on transparency, the Claimants make contentions relevant to the current question, namely, it is said that:

---

[699] *See*, **C-0061**, RDL 6/2009, pp. 3-4. *See also*, the *Memoria Económica* for RDL 6/2009, dated 5 May 2009.
[700] **C-0024**, RDL 9/2013.

*a)* The Disputed Measures came unannounced. The Respondent "*misled investors by holding out that the RD 661 FIT was guaranteed, right up to the abrupt enactment of the Disputed Measures.*"[701]

*b)* There was no consultation or investor participation prior to the introduction of the Disputed Measures. It is said that: "*The February 2012 consultation was carried out for the March 2012 CNE Report, whose recommendations Spain ignored.*" Further, the Claimants also deny that there was a stakeholder participation in Law 24/2013 and the 2014 Ministerial Order since, in the CNE's Report of 4 September 2013, it was noted that: "*the urgent process relating to the consultation … does not guarantee the effective participation of various agents involved.*"[702] Likewise, it is said that there is evidence of numerous submissions "*strongly objecting to the unfairness of the New Regime*" to which the Respondent did not "*provide any evidence that the New Regime was modified in response to those submissions.*"[703]

*c)* The Respondent denied access to its expert reports, and it only later became known that the BCG report was never prepared while the Roland Berger report was finished several months after the publication of the June 2014 Order.[704]

593. Against these points, the Respondent contends that it had, from 2006, warned of the need for action to remedy over-remuneration and to improve the sustainability of the SES and, since 2009, warned of the need to introduce reforms to tackle the Tariff Deficit.[705] The

---

[701] Cl. Reply ¶ 601; Cl. Skeleton ¶ 84; Claimants' oral opening, Day 1/146.

[702] **C-0123**, CNE Report 18/2013, pp. 4 and 15.

[703] Cl. Reply ¶ 602; Cl. Skeleton ¶ 85.

[704] Cl. Mem. ¶ 481(ii); **C-0111**, "*The Government authorizes cuts to renewables without a technical report*", Press Release from Expansión, 13 March 2015; Cl. Reply ¶ 45; Claimants' oral closing at Day 5/156.

[705] Resp. C-Mem. ¶ 954(1); Resp. Rej.¶ 1017(a)-(g). *See*, **R-0274**, Appearance of the Minister of Industry, Tourism and Trade before the Senate on 26 October 2006; **R-0258**, Appearance of the Secretary General for Energy before the Spanish Senate; **R-0101**, RD 661/2007, Preamble; **R-0259**, Appearance of the Secretary General for Energy before the Spanish Senate; **R-0089**, Royal Decree-Law 6/2009 (hereinafter "**RD-Act 6/2009**"), Preamble, 30 April 2009; **R-0090**, RD-Act 14/2010; **R-0074**, Sustainable Economy Act 2/2011, 4 March 2011, Article 79.4 a) and d); **R-0278**, Congress of Deputies Journal validation of RD-Act 14/2010; **R-0192**, Speech by Prime Minister Rajoy, 19 December 2011; **R-0092**, Royal Decree-Act 13/2012, 30 March 2012, page 8 (hereinafter "**RD-Act 13/2012**"); **R-0121**, National Reform Programme 2012, Government of Spain; **R-0174**, The Reforms of the Spanish Government: Determination in the face of the crisis, Secretariat of State for Communication, Ministry of the Presidency, September 2012, Chapter III, Page 18; **R-0122**, Spanish Economic Policy Strategy, Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012, Section C.8, page 70; **RL-0067**, MOU with the EU.

Tribunal accepts the basic point: as of 2013-2014, it was plain to all that the Tariff Deficit was unsustainable, and that the Respondent was engaged on an ongoing basis in seeking to address it. As follows from sub-section (ii) above, the Tribunal does not accept that the Respondent ignored the recommendations of the 2012 CNE report, and it is also noted that the methodology for the calculation of Special Payments adopted in 2013 is in certain respects notably similar to that proposed by APPA (with Greenpeace) in a draft Renewable Energies Law of May 2009. Article 23 of this draft Law provided as follows with respect to the determination of regulated tariffs, premiums and supplements:

> "The Government shall set the rate of regulated tariffs, premiums and supplements, in all cases considering the costs of operation and maintenance and the investment costs that the owners of the facility may incur, with an end to ensuring reasonable rates of return with reference to the cost of money on the capital market. The capital return rate shall be set at an annual percentage rate equivalent to the previous year's average yield on 10-year Spanish government bonds, plus a spread of 300 basis points.
>
> For the foregoing purposes, the Government shall estimate the investment costs associated with the different classes of facilities, distinguished by technology and size so as to reflect the usual values that such investments would actually achieve."[706]

594. The Tribunal notes that there appears to have been a lack of consultation with RE operators in the period immediately prior to RDL 9/2013, but the Tribunal accepts that the Respondent was *bona fide* adopting urgent measures[707] and that the precise economic regime and the precise amount of the new Special Payment were not then being

---

[706] **R-0187,** Presentation of the Draft Bill on Renewable Energy by the Association of Renewable Energy Producers (APPA by its Spanish acronym) and Greenpeace to the Ministry of Industry, Tourism and Commerce, 21 May 2009 (hereinafter "**Draft Act presented by APPA-Greenpeace on 21 May 2009**"), ¶¶ 4 and 5. The Tribunal understands that this provision was to apply with respect to new plants: *see*, Article 27(1) of the draft Law and Claimants' oral opening at Day 1/209, and oral closing at Day 5/126. However, the document is still of some relevance in considering the introduction of a methodology based on 10-year Spanish government bonds, plus a spread of 300 basis points, which the Claimants portray as arbitrary at e.g. Day 5/146.

[707] Resp. PHB ¶ 146, referring to **R-0154,** the Ruling from the Constitutional Court in Plenary Session, dated 17 December 2015. In this lengthy and reasoned judgment, the Court rejected the contention that RDL 9/2013 was in violation of the Spanish Constitution due to the absence of the requisite urgency. Cf. Cl. PHB ¶¶ 197-198. The Tribunal has no sound basis on which to reach a conclusion on urgency different to that of the Constitutional Court, and rejects the Claimants' case on absence of the required urgency, as well as any suggestion on the Claimants' part that the Respondent's use of the RDL procedure was not *bona fide*. Cf. Claimants' oral opening at Day 1/166 to the effect that the Respondent "*chose a Royal Decree Law to circumvent any consultations*."

220

established (a matter of which the Claimants complain[708]). The Respondent did then receive submissions from the RE Sector in relation to the subsequent CNE report,[709] and then the drafts of RD 413/2014 and Order IET 1045/2014,[710] and the Tribunal accepts the evidence of Mr Ayuso that "*many RE Stakeholders submissions were accepted in the final definition of the Standard Facilities and Parameters.*"[711] He explains that the draft of the Order was circulated in January 2014, that there was a public consultation process in which (*inter alia*) AEE and APPA participated, leading to various changes to the Order, including with respect to the parameters of the standard installations relevant to the Claimants' plants.[712] None of this was challenged on cross-examination.

595.    In conclusion, the Tribunal considers that, in its decision-making process, the Respondent did – as a matter of the process followed – in general terms give due consideration to impacts to investors such as the Claimants. However, the Tribunal does take note of the fact that one expert report commissioned by the Respondent (the BCG report) was never prepared and one (the Roland Berger report) was finished several months after the publication of the June 2014 Order. As to this, in the Reply, the Claimants state:

> "The absence of any witness from the Ministry also leaves unexplained its conduct in relation to consultants Roland Berger and the BCG. After implementing RDL 9/2013, Spain commissioned these two external consultants to define the economic details of the New Regime. IDAE's 2013 bid documentation, dated 1 October 2013, which set out the basis on which those consultants were instructed by the Government, stated that the studies should 'evaluate and establish the standards for investment costs and operation for electricity generation technologies' (i.e. define the standard assumptions under the New Regime). Curiously, in its responses to the Claimants' document request concerning Roland Berger, Spain claimed that: 'the Respondent has explained in its Counter-Memorial that the Final

---

[708] Cl. Mem. ¶ 59.

[709] **C-0123**, CNE report 18/2013, pp. 12-15.

[710] Resp. C-Mem. ¶ 954(3).

[711] Resp. Skeleton ¶¶ 61-62; Resp. Rej.¶ 1019; the Respondent points to the following documents as evidence of participation: Information on the public consultation on regulatory adjustment measures in the energy sector of 2 February and 9 March 2012, published on the National Energy Commission (CNE), www.cne.es. **R- 0194**; **R-0234**, Submissions from Protermosolar concerning RD 413/2014, 30 July 2013; **R-0305**, Elecnor financial statements, 31 December 2013, page 90; **R-0086** and **R-0087,** regulatory records of RD 413/2014 of 6 June 2014 and OIET 1045/2014 of 16 June 2014; **R-0124**, Report of the Council of State dated 6 February 2014, issued in the administrative appeal relative to the draft Royal Decree 413/2014; **RW-0002**, Ayuso Second Statement ¶¶ 65 to 84.

[712] **RW-0002**, Ayuso Second Statement ¶¶ 65 to 82.

Report was received after [it] enacted the Ministerial Order with the parameters. So, it is no controversial matter that the Respondent did not use the Roland Berger report in setting the economic parameters of the New Regime'. In reality, however, the Counter-Memorial omits any mention of Roland Berger and fails to address the Claimants' submissions on this issue. With respect to BCG, in response to the Claimants' document requests, Spain noted that 'the [BCG] contract was terminated prior to the receipt of BCG's final report' for reasons that Spain refused to state and that the Roland Berger report was finalised after the parameters of the New Regime were implemented. The Counter-Memorial also ignores this issue. Press reports indicate that Spain ignored the reports of these consultants because they did not reflect the cuts to RE incentives that Spain was intent on making. Once again there is no evidence to contest this and Spain has simply avoided the issue in its Counter-Memorial."[713]

596.  This description was not challenged by the Respondent in the Rejoinder. It thus appears that the contract with one expert was terminated for unknown reason, whilst Spain did not wait for the Berger report before adopting RD 413/2014 and Order IET 1045/2014.

597.  While a State is not necessarily obliged to follow or wait for expert advice that it has commissioned, the Respondent was putting itself into a position where there could be a greater risk of unintended or disproportionate impacts arising from the adoption of RD 413/2014 and Order IET 1045/2014.

*(v) Conclusion on disproportionality*

598.  On the specific facts of this case, where the background context is formed by general invitation and encouragement by the Respondent to invest in a particular sector by reference to benefits including a very favourable remuneration regime (to which must be added the more specific encouragement in the form of the statements made at the meeting of 23 June 2010), the Tribunal considers that, consistent with the approach in *EDF v Romania* and the *Electrabel* case, it is important to assess whether the Claimants, in respect of the plants in which they have invested, bear an individual and excessive burden relative to the policy objective of the Respondent. In this respect, the Tribunal considers that it is correctly focused on the burden imposed on the Claimants' plants by the Disputed

---

[713] Cl. Reply ¶ 46.

Measures, not on the question of burden more generally, even though the Disputed Measures plainly have far broader impacts than those before this Tribunal.

599. There are a number of factors which have led the Tribunal to the conclusion that this burden is excessive and disproportionate so far as concerns the impact to certain of the Claimants' Investments, such as to give rise to a breach of the FET standard under Article 10(1).

a) The Claimants' plants have lost and will lose very considerable revenues as a result of the Disputed Measures, resulting in very significantly reduced cash flows to the Claimants. It is common ground that ten of the plants in which the Claimants has invested now receive no subsidy, while the others are subject to the impact of past payments being called into account in calculating the entitlement to the Special Payment. Overall, the Claimants' plants are impacted by a drop in future revenue in excess of EUR 400 million, with the Claimants suffering a 54% reduction in forecasted cash flows from their plants.[714] These are by any standards very substantial reductions. These very substantial overall reductions in revenues/cash flows form a very important backdrop in the current issue of disproportionality. Moreover, as follows from the various consultations with industry bodies at different stages (including specifically with the Claimants on 23 June 2010) including those leading to the July 2010 "agreement" on which the Claimants relied in making certain Investments, the Respondent was well aware of the serious impacts that the Disputed Measures would have, including on the Claimants' plants.

b) An examination of the estimated impacts to individual plants shows that a particular burden falls to be borne by certain of the Claimants' plants (to the wind plants Urano, Grisel II, Bancal I and II, Siglos I and II, and the hydro plant Cepeda) which

---

[714] See, Compass Lexecon slide 38, and Dr Spiller at Day 3/190. The figures on this slide (as opposed to their relevance in the context of the appropriateness or otherwise of a DCF approach to damages) do not appear to have been disputed: see, Mr Pérez at Day 5/56. See also, Compass Lexecon slide 39 based on Figure 8 of their second report.

will achieve a return considerably less than the 7.398% return that the Respondent itself puts forward as reasonable and proportionate.[715]

c)   While that 7.398% return figure is, pursuant to the Disputed Measures, to be calculated by reference to the Standard Installations, the Tribunal sees that means of calculation as merely a mechanism for enabling the minimum return figure that the Respondent itself considers to be reasonable and proportionate, and not as an indispensable feature of, or qualification to, a proportionate approach. Further, although the Tribunal has rejected the Claimants' case that the Disputed Measures were not necessary, the Tribunal does not accept that the Measures – in particular RD 413/2014 and Order IET 1045/2014 – could not have been formulated so as to avoid the actual impacts to individual plants being significantly more severe than the impacts as legislated for by the Respondent by reference to Standard Installations.  Moreover, by not following or waiting for expert advice that it had commissioned, the Respondent was putting itself into a position where there could be a greater risk of unintended or disproportionate impacts arising from the Disputed Measures.

d)   While the Tribunal is in no sense bound by the Respondent's assessments of what is reasonable or proportionate, on the facts of this case, and bearing in mind that it considers that some margin of appreciation is accorded to the Respondent, the Tribunal considers that the 7.398% return figure – as estimated by reference to actual plants as opposed to Standard Installations – is an appropriate minimum figure to protect against an excessive and disproportionate burden being placed on investors such as the Claimants with respect to the Respondent's need to address the Tariff Deficit. In this respect, the Tribunal notes that a return figure of 7% (albeit post-tax) has long been associated with the RE tariff regime of the Respondent, including at a time when the Claimants were making their principal Investments.[716]

---

[715] *See e.g.,* Resp. CM ¶¶ 973 and 997; Resp. Rej.¶ 318; Respondent's Comments of 3 May 2019 on **RL-0099,** *RREEF*, Decision on Responsibility and on the Principles of Quantum, ¶ 9.

[716] Cf. Claimants' oral closing at Day 5/121-124. *See e.g.*, the 2005 PER and **C-0238**, Announcement of RD 661/2007.

*e)* The Tribunal considers excessive and disproportionate the burden on the Claimants' Investments to the extent that even the 7.398% pre-tax return figure is not reached so far as concerns the projected returns of actual plants.

600. On the basis of the evidence before it, the Tribunal considers that, in all the circumstances, the burden in respect of the wind plants Urano, Grisel II, Bancal I and II, Siglos I and II, and the hydro plant Cepeda is excessive relative to the policy objective of the Respondent, i.e. is disproportionate. It finds that it is unfair and inequitable for the adverse impacts to these specific plants to be borne by the Claimants. To that extent, it finds that there has been a breach by the Respondent of the FET standard under Article 10(1) through adoption of the Disputed Measures and in particular RD 413/2014 and Order IET 1045/2014.

## E. FAILURE TO CREATE STABLE CONDITIONS

### (1) **The Parties' Positions**

#### a. *The Claimants' Position*

601. According to the Claimants, the adoption of the Disputed Measures "*wrongfully subjected the Claimants' investments to a 'roller-coaster' of changes in the regulatory framework, by negotiating and agreeing in July 2010 'medium-term' limitations to the economic conditions of RD 661/2007 (in purported exchange for 'guaranteeing' the tariffs in the long term) then by applying the 7% levy to the Claimants' investments in 2012, and ultimately by wiping out the Special Regime in its entirety in July 2013.*"[717] They further contend that the New Regime was not fully implemented until June 2014, which left the entire RE sector in "*11 months of 'limbo' during which it was impossible to discern the details of the regulatory framework or the remuneration parameters to which Aersa's installations would be subject.*" According to the Claimants, this uncertainty is still prevalent, including with respect to what may happen from 2019.[718]

---

[717] Cl. Mem. ¶ 476; Cl. Reply ¶ 552.

[718] Cl. Reply ¶¶ 553, 554. Also ¶ 557-558, referring to **C-0145**, ECOFYS, Task 2 Report, "*Design Features of Support Schemes for Renewable Electricity*", 27 January 2014, p. 24. *See also*, Cl. PHB ¶¶ 204 *et seq.*

Thus they claim that the New Regime does not provide a detailed indication of the criteria the Government will follow in approving the economic regime for RE installations after each six-year regulatory period.[719] They say that neither the differential nor the methodology for calculating the reasonable return are precluded from change, thus, both may be changed or reduced to zero, and that this is not theoretical, as Spain reduced the Premium to zero in RDL 2/2013.[720]

602.    The Claimants' case is also that, during this transitory regime, Law 24/2013 introduced further harmful measures. It is said that (i) the distinction between the Ordinary Regime and the Special Regime announced by RDL 9/2013 formally disappeared; (ii) conventional and RE generators were put on an equal footing, thereby depriving the RE installations of the unconditional right of priority of grid access and priority of dispatch that existed under the previous regime; and (iii) a concept of "reasonable return" was now to be applied by reference to the entire useful life of the plant, which affected the future and past income stream of the Claimants plants. Through this last measure, it is said that "*Spain committed a 'double-whammy' retroactivity by directly impacting the past income streams of the plant, effectively altering the rules of the game over the energy already produced and already sold on the markets by RWE's plants. It is hard to imagine conditions less stable … .*"[721] The Claimants also complain that the Respondent retains discretion to "*re-define reasonable return and arrogates itself the right to change the remuneration regime every six years, even with respect to existing installations.*"[722]

603.    It is said that the Respondent's case that the New Regime retains the essential features of the Special Regime – the subsidies and priority of dispatch – is "absurd" because: (i) the Respondent "*wiped out the incentives completely*", and the "*fact that some of Claimants'*

---

[719] Cl. PHB ¶ 204.

[720] Cl. PHB ¶ 205, referring to Pérez, Day 5, p.14, lines 14 to 18: "Q. So you think they will use 300 basis points? A. They can, but they would have to examine this according to market conditions at the time. I have no reason to believe that they would or would not use it, it depends on the circumstances ... ." *See further*, Cl. PHB ¶¶ 207-211.

[721] Cl. Reply ¶¶ 555-556. **C-0025**, Law 24/2013, Third Final Provision. *See also*, Cl. PHB ¶ 176.

[722] Cl. Reply ¶ 560. *See also*, Cl. PHB ¶¶ 204 *et seq.*, arguing that the New Regime does not provide a detailed indication of the criteria the Government will follow in approving the economic regime for RE installations after each six-year regulatory period.

*installations might (but not necessarily) receive some kind of subsidy under the New Regime does not demonstrate that the regulatory regime remains the same*",[723] while (ii) there is no priority of dispatch, because the purpose of such priority was to ensure that RE installations could sell all their electricity irrespective of fluctuation of demand, and "*Spain abandoned this commitment by introducing the Disputed Measures because of a fall in electricity demand.*"[724]

604.     The Claimants emphasise that the Disputed Measures are retroactive in nature, notwithstanding the Respondent's arguments to the contrary.[725] They say that the issue of retroactivity as a matter of Spanish law is "*a complete red herring*" and submit that, irrespective of whether the Respondent's changes to the framework were possible under Spanish law, the Respondent made a commitment that the Claimants would receive the Special Regime FIT, the abandonment of which gives rise to liability under the ECT.[726] As noted above, it is also their position that even under Spanish law, such changes were impermissibly retroactive,[727] and they contend that EUR 19.4 million was paid by the ten plants that do not receive a Special Payment under the new regime in the period between the adoption of RDL 9/2013 and Order IET 1025/2014, and that this sum subsequently had to be repaid.[728]

---

[723] Cl. Reply ¶ 562, referring to Compass Lexecon, Second Report ¶ 149, and to **CL-0052**, *Micula,* ¶ 687.

[724] Cl. Reply ¶ 563.

[725] Cl. Reply ¶¶ 564-572; *See for example*, First Compass Report ¶¶ 91, 130-32 and 167; **C-0145**, ECOFYS, "*Design Features of Support Schemes for Renewable Electricity*", 27 January 2014, p. 24; **C-0139**, Communication from the European Commission, "Delivering the Internal Electricity Market and Making the Most of Public Intervention", 7243 final, dated 5 November 2013, p. 15; **C-0257**, Report from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, Renewable energy progress report, COM(2013) 175 final, 27 March 2013, p. 9. **C-0238**, Announcement of RD 661/2007, p. 1; **C-0288**, CNE PowerPoint presentation, "The Regulation of Renewable Energy", 25 October 2007, p. 10; **C-0241**, CNE PowerPoint presentation, "Renewable Energy Regulation in Spain", February 2010, p. 10; **C-0030**, Manuela García, "Opportunities in Renewable Energy in Spain", INTERES InvestinSpain Power Point presentation, Graz (Austria), 15 November 2007, p. 32. *See also*, Cl. PHB ¶ 174.

[726] Cl. Reply ¶ 573. *See also*, Cl. PHB ¶¶ 177-182.

[727] Cl. Reply ¶¶ 573 and 576-578.

[728] Cl. Reply ¶ 478 referring to Compass Lexecon, Second Report ¶ 169; Claimants' oral opening at Day 1/146.

b.       *The Respondent's Position*

605.    The Respondent submits that it has ensured stability, contending (i) the Disputed Measures maintain the essential elements of the Spanish remuneration models in place since 1997, (ii) it is permitted to adopt reasonable and proportionate macroeconomic measures based on a public policy, and (iii) the Disputed Measures are not retroactive as they do not affect acquired rights, but project their effects into the future.[729]

606.    The Respondent says that the remuneration model arising from the Spanish regulatory framework at the time of the Claimants' investments (between 2001 and 2012) aimed to guarantee a reasonable rate of return on investments and to prevent over-remunerations in certain sectors.[730] Specifically, the framework was generally conceived to "*ensure that all investors could recover, by taking a 'standard installation' as a reference, (1) the cost of their investment, (2) the operating costs and (3) obtain a reasonable profitability.*"[731] Thus, the Respondent says that it granted stable conditions to the Claimants according to the ECT standard because, after the reform of 2013, "*it maintained the essential nature of the Regulatory Framework in which the Claimants invested*", i.e. it maintained the subsidies and priority of dispatch, enabling RE investments to recover, in accordance with the standard installation, investment costs, operations costs, and also reasonable profits.[732]

607.    According to the Respondent, the reasons that justified the adoption of the Disputed Measures "*are the same as those which have provoked the regulatory changes since RDL 7/2006: (i) the economic sustainability of the system and (ii) in order to avoid the over-remuneration of RE Plants obtaining subsides after having reached the 'level playing field' to compete with other Energy producers of the Energy market.*"[733]

608.    The Respondent says that both were foreseeable to the diligent investor, citing in support the *Isolux* award where the tribunal held that: "*the regulatory framework had already*

---

[729] Resp. Skeleton ¶ 55, 58, referring to **RL-0088**, *Isolux*, ¶¶788 and 823. *See also*, Resp. PHB ¶¶ 134-136.

[730] Resp. Rej.¶ 1004.

[731] Resp. C-Mem. ¶ 931.

[732] Resp. C-Mem. ¶ 932; Resp. Rej.¶ 1007.

[733] Resp. Skeleton ¶ 56.

*been modified several times. The proper RDs 611/2007 and 1565/2008 were no more than amendments to RD 436/2004. After that, RD 1565/2010 and Royal Decree Law 14/2010 modified the established economic regime in RD 661/2007 for the photovoltaic sector. All of these regulations issued for the implementation of Law 54/1997, of 27 November 1997, regarding the Electrical Sector (LSE), showed a very unstable character of a regulatory framework that the government has the power and the duty to adapt to the economic and technical needs of the moment, within the LSE framework.*"[734]

609.   As noted above, the Respondent also contends that the Disputed Measures were not retroactive under international or Spanish law,[735] in particular because the Claimants have "*never had an 'acquired right' to a remuneration in the future, sine die, by means of a fixed and unchanging FIT, not subject to possible macroeconomic control measures or reforms of the SES.*"[736]   It portrays the new regime as preventing "*cases of over-remuneration, which can (i) distort the energy market and (ii) constitute government subsidies contrary to EU law.*"[737]

(2)    **The Tribunal's Analysis**

610.   As follows from the legal discussion on stability and the FET standard in section C above, the question for the Tribunal is whether there has been some form of total and unreasonable change to, or subversion of, the legal regime.

611.   It is recalled that Article 17 of RD 661/2007 accorded a number of rights to producers under the Special Regime, namely rights of connection and transfer of net production, the right to sell all or part of net production by way of direct access, priority of access,

---

[734] Resp. Skeleton ¶ 57; **RL-0088**, *Isolux*, ¶ 788.

[735] Resp. Skeleton ¶¶ 58-59, referring to **RL-0040**, *Nations Energy Inc. and others v Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010, (hereinafter "***Nations Energy***")¶¶ 642, 644 and 646; **RL-0049**, *Charanne* ¶¶ 546 and 548; **RL-0088**, *Isolux*, ¶¶ 813-814 and 915; Resp. C-Mem. ¶¶ 940, 937 and 947-948, referring to **R-0154**, Constitutional Court ruling of 17 December 2015, delivered in an appeal of unconstitutionality No. 5347/2013; **R-0156**, Judgment of the Constitutional Court of 18 February 2016, issued in the appeal of unconstitutionality No. 5852/2013; and **R-0157**, Judgment of the Constitutional Court of 18 February 2016, issued in the appeal of unconstitutionality No. 6031/2013.

[736] Resp. C-Mem. ¶ 939. *See also*, Resp. PHB ¶¶ 134-136.

[737] Resp. Rej.¶ 1013.

and finally the right to remuneration in accordance with Article 24(1) i.e. by reference to a fixed tariff or the premium option. Notwithstanding the Disputed Measures, the Claimants' Investments still receive the benefits of connection, transfer, sale and priority of access. Although the Claimants say that they no longer benefit from priority of access,[738] this is really a more general complaint about the introduction of the Disputed Measures being due to a drop in demand. Pursuant to Article 26(2) of Law 24/2013, RE producers are expressly accorded "*priority of grid access and connection.*"[739]

612.    It follows that the claim in respect of stability must focus on the change in the system of remuneration, but bearing in mind that other key elements of the prior regime have remained substantially unchanged. As noted in section D above, although RE producers are in principle still entitled to a Special Payment, i.e. a subsidy, the method of calculation of remuneration has changed radically and to the obvious detriment of the Claimants.

613.    The Respondent is correct, however, that the history of the RE regime in Spain has been one of regulatory change (including with respect to remuneration), with various important changes taking place prior to the making of the Claimants' investments. Further, although the Claimants are correct to contend that the reasonable return that is provided for under the Disputed Measures may be changed following the scheduled six-year review,[740] the possibility of further change does not establish the required total and unreasonable change to, or subversion of, the legal regime (which is not to suggest that further changes might not, when actualised, lead to separate breaches by the Respondent).[741] In the Tribunal's view, the key question in terms of such change or subversion is whether the Disputed Measures have an impermissibly retroactive effect.

---

[738] Cl. Reply ¶ 563.

[739] **C-0025**, Law 24/2013.

[740] Cl. PHB ¶¶ 204-205.

[741] Cf. Cl. PHB ¶ 210; Resp. PHB ¶¶ 180-184. The Tribunal does not consider that it has been established that the reasonable return will be set at a considerably lower rate in the future. The Tribunal also notes that the Respondent has put forward the positive results of auctions held in May and July 2017 as evidence of the reasonable nature of the future periodic revisions: Resp. PHB ¶¶ 173-175. The Claimants contend that such auctions, which concern investments made from 2017, are irrelevant so far as concerns its Investments, which were made much earlier: Cl. PHB ¶ 218-219. The Tribunal agrees with the Claimants' assessment in this respect.

614.    As explained by the Claimants:

> "… the New Regime sets a cap on the return of 7.398% during the whole regulatory life of the relevant standard plant. This means that if the Government considers that a plant has obtained in the past a return higher than the capped rate, that plant will receive a lower Special Payment (or none at all) to compensate for the excess and reach the target of a 7.398% return. Therefore, while the plant does not have to pay back any amounts it received in the past, they will simply be deducted from present earnings to make up the difference, which in the end has precisely the same effect."[742]

615.    The impact of this new methodology has been that ten of the Claimants' plants now receive no subsidy at all: Muel, Grisel (phase I), Acampo Armijo, Bosque Alto, Plana de la Balsa, Los Labrados, Plana María, Plana de Zaragoza, Río Gallego (phase I) and Villalgordo.[743]

616.    According to the Respondent, "*for a regulation to be retroactive it must affect acquired rights.*"[744] It says that the awards in *Nations Energy v Panama*, *Charanne*, and *Isolux*, "*have stated that a Law does not have retroactive effect if it does not revoke any rights acquired by the Investor, being applied to the future.*"[745] However, the Respondent does not challenge the Claimants' broad description (above) of the way that the subsidy under the new regime is calculated. Its position is that: "*The legislator has modified the remuneration regime of the facilities, establishing a Reasonable Return in the useful activity of the facility as a whole. This remuneration makes it possible to take into account the remunerations already received from the start of operations at the facility, in order to calculate the remuneration already received and the subsidies to be received in the future, in addition to market revenue. This prevents cases of over-remuneration, which can (i) distort the energy market and (ii) constitute government subsidies contrary to EU law.*"[746] Further, in oral evidence, Mr Ayuso accepted that, in calculating whether a given

---

[742] Cl. Mem. ¶ 334, fns. omitted to **C-0024**, RDL 9/2013, First Additional Provision; **C-0025**, Law 24/2013, Third Final Provision; **C-0026**, RD 413/2014, Article 19; **C-0026**, RD 413/2014, Annex XIII.

[743] First Compass Report, Table 6; Second Compass Report fn. 121.

[744] Resp. C-Mem. ¶¶ 940 and 937.

[745] Resp. Skeleton ¶ 59, referring to **RL-0040**, *Nations Energy*, ¶¶ 642, 644 and 646; **RL-0049**, *Charanne*, ¶¶ 546 and 548; **RL-0088**, *Isolux*, ¶¶ 813-814 and 915.

[746] Resp. Rej.¶ 1013.

plant had reached a reasonable return, or is entitled to a subsidy going forwards, it is necessary to go back to the year following the date of commissioning of the plant and bring into account the past expenditures and revenues.[747]

617.    There is no doubt that this marked a radical change to the way in which the Claimants' plants were remunerated. However, it appears to the Tribunal that, as a factual matter, the new regime has a retrospective rather than an impermissible retroactive effect: sums that were duly received under the RD 661/2007 regime in the period 2007 to July 2013, and to which the plant owners had an unrestricted entitlement, are now brought back into account, but there is – at least in theory – no question of repayment of such sums.

618.    The Respondent has contended that the Disputed Measures are not impermissibly retroactive as a matter of Spanish law, as established by the Spanish courts,[748] but that is a separate matter. This Tribunal is concerned with the application of Article 10(1) ECT, and is considering the impact of the new regime in that specific light.

619.    As to Article 10(1), the Tribunal does not see the existence or otherwise of an acquired right as determinative in this context.[749] The issue of whether an investor has acquired a right as a matter of a given law appears to the Tribunal to be quite separate; although it might be of particular interest in (say) an expropriation claim, it is not so here.[750] However, the substance of the complaint is that the Claimants have invested by reference to basis X and, after a number of years, that has been changed to basis Y which takes into account the prior payments received. Yet, the Claimants had no legitimate expectation that basis X would not change, and the Tribunal cannot and does not interpret the requirement of stability under Article 10(1) as a form of reiteration of the protection that

---

[747] Mr Ayuso, Day 3/49-50.

[748] Resp. C-Mem. ¶¶ 947-948; **R-0154,** Constitutional Court ruling of 17 December 2015, delivered in an appeal of unconstitutionality No. 5347/2013; **R-0156,** Judgment of the Constitutional Court of 18 February 2016, issued in the appeal of unconstitutionality No. 5852/2013 and **R-0157,** Judgment of the Constitutional Court of 18 February 2016, issued in the appeal of unconstitutionality No. 6031/2013. Cf. Cl. Reply ¶¶ 573 and 576-578 and PHB ¶¶ 177-182.

[749] Cf. Resp. C-Mem. ¶ 939.

[750] The Parties' respective positions as to the existence or otherwise of acquired rights as a matter of Spanish law were spelled out in a response to a question from the Tribunal: Cl. PHB ¶¶ 171-173; Resp. PHB ¶¶ 140-141.

may be afforded where there are legitimate expectations.[751] The Tribunal is looking in this context for total and unreasonable change or subversion and, bearing in mind that key elements of the prior regime have remained substantially unchanged, the change in remuneration effected by the New Regime – although undeniably detrimental to the Claimants – does not qualify as such.

620.    As to the contention that EUR 19.4 million was paid by the ten plants that do not receive a Special Payment under the new regime in the period between the adoption of RDL 9/2013 and Order IET 1025/2014, and that this sum subsequently had to be repaid, the Tribunal considers this to be of a different order. This contention was made in the Reply and in oral opening and closing,[752] while the only response has been to accept the principle that there could be no recovery of sums already paid, as follows:

> "Something is forbidden in the international law, that is the idea of claiming excessive premiums already received. Those cannot be claimed and cannot be received by law.
>
> If it did happen, then these can be recouped and proceedings may be entered before the Supreme Court."[753]

621.    The Tribunal does consider that it would be a subversion of the prior legal regime, and in breach of the FET standard in Article 10(1), for the Respondent to require repayment of sums already paid, including in the period between the adoption of RDL 9/2013 and Order IET 1025/2014. The Claimants say that EUR 19.4 million nonetheless had to be repaid. That fact has not been challenged. It follows that, subject to verification and precise quantification of the amount paid, there has been a breach of Article 10(1) ECT, and the Claimants are entitled to return of all sums repaid.

---

[751] Cf. **RL-0099**, *RREEF*, Decision on Responsibility and on the Principles of Quantum, ¶¶ 326-329. The Tribunal notes that it differs here from the conclusion reached in *RREEF*, but it has been unconvinced by the Claimants' arguments, and is further not convinced as to the relevance of the principle concerning the non-retroactivity of treaties or the helpfulness of the analogy to the rights of shareholders with respect to paid dividends, as referred to at *ibid.* ¶¶ 326-329. The Tribunal remains of the view that, in light of the way the claim is put, the critical question concerns legitimate expectations (if any) with respect to how future payments are calculated.

[752] Cl. Reply ¶ 478 referring to Compass Lexecon, Second Report ¶ 169; Claimants' oral opening at Day 1/146; Claimants' oral closing at Day 5/139.

[753] Resp. oral opening at Day 2/138.

233

**F.  THE DISPUTED MEASURES WERE UNREASONABLE**

   (1) **The Parties' Positions**

      a.  ***The Claimants' Position***

622.    The third limb to the Claimants' case is that the Disputed Measures were unreasonable and disproportionate.[754] The case on disproportionality has already been considered above.

623.    The Claimants agree with the Respondent that the reasonableness of the Disputed Measures must be analysed applying a two-element test set out in the *AES v Hungary* case, i.e. it is necessary for the State to establish "*the existence of a rational policy; and the reasonableness of the act of the state in relation to the policy*."[755]

624.    Regarding the first element, the Claimants say that there are a number of difficulties with the Respondent's submission that its policy "*was to correct the 'imbalance' that was leading to the generation of the so-called tariff deficit, which by law had to be corrected*" to "*protect consumers from increases in their electricity bills*", and likewise the Respondent's case that these problems had to be "*addressed in the context of an economic crisis and a decline in electricity demand,*" as well as commitments the Respondent had made with other Member States of the EU.[756] Thus the Claimants contend:

    *a)*    The Respondent created the Tariff Deficit problem and, consistent with RDL 6/2009, the Tariff Deficit was to be solved by increasing charges for consumers and not by repealing RD 661/2007.[757]

    *b)*    In regard to the Respondent's claim that the New Regime was implemented to protect consumers, the Claimants argue that this did "*not require commitments to RE investors to be abandoned to provide for artificially low tariff to… consumers*", and they say that Compass Lexecon has shown that there were other

---

[754] E.g. Cl. Reply ¶¶ 579 *et seq.*

[755] Cl. Reply ¶ 579; **RL-0039**, *AES Summit*, Award, ¶¶ 10.3.7 to 10.3.9.

[756] Cl. Reply ¶ 581.

[757] Cl. Reply ¶ 583.

measures that could resolve the Tariff Deficit problem: "*increasing electricity prices and without breaching the commitments made to RE installations*."[758] Additionally, prior to the adoption of the Disputed Measures, the CNE had made proposals that would solve the Tariff Deficit,[759] which did not include cutting the RD 661/2007 FIT, and yet these had simply been ignored.[760]

c)   Regarding the Respondent's reference to the economic crisis, the Claimants contend that "*Spain appropriated money it had guaranteed to RE installations so that it could continue to enjoy electricity prices that did not reflect the true cost of that electricity*", which in the Claimants' view is not a rational policy goal, with reference being made to the award of the Iran-US Claims Tribunal in *Amoco*.[761] Further, the Claimants say that the Respondent is trying to introduce a necessity defence under Article 25 of the ILC 2001 Articles.[762] This defence fails, according to the Claimants, because (i) "*abandoning the Special Regime was not the only way to address the Tariff Deficit problem*",[763] and (ii) the Respondent contributed to the situation of necessity because it "*created the Tariff Deficit*."[764]

d)   With respect to the dip in electricity demand relied on by the Respondent, the Claimants say that: "*(1) Special Regime installations were protected against demand risk; (2) Spain reiterated the RD 661/2007 tariff guarantees in 2010 after the dip had occurred; and (3) this was a temporary dip that did not warrant the abandonment of a regime that was promised for 20 years and beyond*."[765] Additionally, the Claimants contend that the Respondent is trying to introduce a

---

[758] Compass Lexecon, Second Report, Section V.

[759] **C-0163**, 2012 CNE Report, p. 57.

[760] Cl. Reply ¶ 584.

[761] Cl. Reply ¶ 585; **CL-0055**, *Amoco International Finance Corporation. v The Government of the Islamic Republic of Iran et al.*, 15 Iran-United States Claims Tribunal 189, Award, 14 July 1987, ¶ 145.

[762] **CL-0018**, ILC 2001 Articles, Article 25.

[763] Compass Lexecon, Second Report, Section V.

[764] Cl. Reply ¶¶ 586-587.

[765] Cl. Reply ¶ 588.

*force majeure* defence under Article 23 of the ILC 2001 Articles, which fails because: (i) the commentary to Article 23 confirms that economic problems do not qualify as *force majeure*,[766] and (ii) the Respondent "*assumed the risk of a fall in electricity demand*."[767]

e)    Finally, the Claimants submit that the commitments with other EU States referred to by the Respondent, are irrelevant as they did not require the Respondent to "*abandon its existing commitments to RE installations*." The Claimants affirm that either way, commitments to others do not allow States to abandon existing commitments.[768]

625.    Regarding the second element of the *AES v Hungary* case (the reasonableness of the act of the State), the Claimants submit that the *Micula v Romania* case has established the appropriate analysis:

"[F]or a state's conduct to be reasonable, it is not sufficient that it be related to a rational policy; it is also necessary that, in the implementation of that policy, the state's acts have been appropriately tailored to the pursuit of that rational policy with due regard for the consequences imposed on investors."[769]

626.    The Claimants argue that: "*Spain provides no support for its proposition that this is not applicable to the present case, as Micula was not an ECT decision. Spain's position is untenable: the ECT provides a higher level of investor protection that the Micula BIT*."[770]

627.    The Claimants say that the Respondent did not satisfy the above-mentioned test because the two justifications given by the Respondent for adopting the Disputed Measures (overcapacity in the sense that there were too many RE plants earning the FIT and the Tariff Deficit) were the result of the Respondent's "*own regulatory decisions, and the*

---

[766] **CL-0018**, ILC 2001 Articles, Article 23, Commentary ¶ 3.

[767] Cl. Reply ¶¶ 589-591; **C-0017**, RD 661/2007, Article 17.

[768] Cl. Reply ¶ 592.

[769] Cl. Reply ¶ 579; **CL-0052,** *Micula,* ¶ 525.

[770] Cl. Skeleton ¶ 75.

*burden of fixing them cannot be attributed to foreign investors protected under the ECT, such as RWE.*"[771]

a)    With respect to the overcapacity in the RE sector, the Claimants argue that this was a result of the Respondent's misjudgment to locate sole control over access to the economic benefits of RD 661/2007 with the Autonomous Communities, instead of locating sole central control in the Ministry.[772] Thus, "*the Autonomous Communities were willing to accept all qualifying applications, because RE installations benefited them and their municipalities through the payment of taxes and by the provision of local employment*."[773]

b)    With respect to the Tariff Deficit, the Claimants say: "*(i) the measures cannot be said to be reasonably correlated to a rational policy goal; (ii) the Tariff Deficit was of Spain's own making; and (iii) the measures affected wind and hydro disproportionately*."[774] In particular, it is said that the Tariff Deficit existed long before the development of renewables under RD 661/2007, and was anyway caused by Spain's failure to increase charges for electricity despite its own law. Further, there were alternative options that the Respondent could have adopted that were less harmful to the Claimants' investments.[775]

628.    The Claimants also dispute the four points on which the Respondent relies to assert that the Disputed Measures were reasonable:

a)    The Claimants submit that the Respondent's argument that the reforms affect all subjects of the electricity system is wrong. The measures were intended to protect consumers, who have always enjoyed low electricity prices, that were

---

[771] Cl. Mem. ¶ 483.

[772] Cl. Mem. ¶ 484. **C-0017**, RD 661/2007, Arts. 4 and 10.

[773] Cl. Mem. ¶ 484.

[774] Cl. Mem. ¶ 486.

[775] Cl. Mem. ¶ 487; Compass Report ¶¶ 19 and 147; **C-0163**, 2012 CNE Report, pp. 16-64.

further reduced following the Disputed Measures.[776] Ordinary Regimes installations remained "*virtually unaffected*" as opposed to Special Regime producers such as RWE, while distributors did not suffer any loss.[777]

b)    The New Regime "*bears almost no relation to the APPA proposal nor was the New Regime prompted by that proposal.*"[778]

c)    The Disputed Measures "*reduced the equity value of RWE Aersa to zero*",[779] so the Respondent's argument that the Claimants' installations continue to receive reasonable profitability is incorrect. It is said that: "*RWE does not receive anything like the profitability promised at the time it invested or the profitability considered to be reasonable prior to the introduction of the New Regime.*"[780] Moreover, the New Regime is subject to review in 2019, as to which it is said that the Respondent's own witness (Mr Ayuso) has stated that he has no idea what the Ministry will be doing.[781]

d)    The Disputed Measures have not been accepted "*by most domestic and foreign investors.*" On the contrary, they have "*provoked hundreds of domestic claims, provoked a number of State organs to bring a constitutional challenge against them, and single-handedly made Spain the most sued nation in investor-State history.*" The Disputed Measures have also been subject to "*fierce criticisms*" from the IMF, the International Energy Association and the European Union.[782]

---

[776] *See*, Section 8.1(c) *above*; **C-0259**, Press Release from Expansión, "The Government Will Use the First Superavit in the Electric System since 2000 to Reduce the Electricity Bill", 20 September 2015; **C-0251**, "*Soria announces a decrease of 7.5% in the price of electricity during this term*", El Economista, 10 April 2015.

[777] Cl. Reply ¶¶ 594-595.

[778] Cl. Reply ¶ 596.

[779] Compass Lexecon, Second Report ¶ 134. *See*, the Claimants' oral closing at Day 5/98.

[780] Cl. Reply ¶ 597.

[781] *See*, the Claimants' oral closing at Day 5/93.

[782] Cl. Reply ¶ 598; Compass Lexecon, Second Report ¶¶ 92-93 and 174-176.

b.     *The Respondent's Position*

629.    The Respondent submits that the Disputed Measures comply with three different tests set in applicable arbitral precedents that determine whether the FET standard in the ECT has been infringed or not, i.e. tests established in: (i) *EDF v Romania*;[783] (ii) *AES Summit v Hungary*;[784] and *Total v Argentina*.[785] It has dealt with the issues of alleged unreasonableness, disproportionality and discrimination together.[786]

630.    The Respondent first contends that the Disputed Measures were not discriminatory (which the Respondent sees as the critical issue engaged by Article 10(1) ECT).[787] Although the Claimants do not contend that the Disputed Measures were discriminatory (other than with respect to the TVPEE and the Water Levy), and the Tribunal accepts this to be the case, the Respondent's arguments are outlined below as there is some overlap with the issues as to whether the Measures were reasonable. Thus, it is said by reference to *EDF v Romania* and criteria listed by Professor Schreuer that the Disputed Measures do not constitute:

    i.     *A measure that inflicts damage on the investor without serving any apparent legitimate purpose*: The purpose of the Disputed Measures is legitimate because they "*aim to resolve an unsustainable situation of imbalance, in which the domestic and international economic circumstances had led to a decrease in demand that required the system to be rebalanced.*" Additionally, they concerned a legitimate aim: "*not excessively burdening consumers to reach this rebalance and avoiding unjustified over-compensation.*"[788]

---

[783] **RL-0035,** *EDF v. Romania,* ¶ 303.

[784] **RL-0039**, *AES Summit*, Award, ¶¶ 10.3.7 to 10.3.9.

[785] Resp. Skeleton ¶ 65; **RL-0050**, *Total S.A. v The Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010.

[786] E.g. Resp. C-Mem. ¶¶ 956 *et seq.*

[787] Resp. Rej.¶¶ 1024-1025, Resp. C-Mem. ¶ 983.

[788] Resp. C-Mem. ¶ 982(a).

ii. *A measure that is not based on legal standards but on discretion, prejudice or personal preference*: The Disputed Measures were implemented observing the laws and the Spanish Supreme Court case-law, which guaranteed the principle of reasonable rate of return. Further, the Disputed Measures apply to all involved in the energy market, so are not discriminatory against a particular investor.[789]

iii. *A measure taken for reasons that are different from those put forward by the decision maker*: The reasons for adopting the Disputed Measures were already announced in RD-L 6/2009, RD-L 14/2010 and RD 1614/2010.[790]

iv. *A measure taken in wilful disregard of due process and proper procedure*: The Respondent enacted the Disputed Measures following the procedures prescribed by law. Further, the Respondent shared the "*successive drafts of the measures with the interested parties*" and established a procedure for submitting additional arguments, which were assessed and taken into account, according to Responder.[791]

631. By reference to *AES Summit v Hungary*, the Respondent submits that the Disputed Measures are reasonable and compliant with the FET standard of the ECT.[792] It refutes the Claimants' case that the *Micula* case is applicable because this does not apply the ECT "*nor takes into account its objectives and principles*."[793] Therefore, the applicable test, according to the *AES Summit v Hungary* case, is whether (i) there was a rational policy when adopting the macroeconomic control measures and (ii) the measures were reasonable and proportionate to the policy.[794]

---

[789] Resp. C-Mem. ¶ 982(b).
[790] Resp. C-Mem. ¶ 982 (c).
[791] Resp. C-Mem. ¶ 982(d).
[792] Resp. C-Mem. ¶ 984
[793] Resp. Rej.¶ 1027.
[794] Resp. Rej. ¶¶ 1027-1028 and 1029-1040.

632.    As to the first of these elements, the Respondent says that the Disputed Measures were adopted "*to correct and prevent, in order to protect consumers, paying investors higher than reasonable remuneration*" which was leading to the Tariff Deficit, which "*by law had to be corrected.*" This policy "*was valid and met the objective of a public economic policy.*"[795]

633.    The Respondent denies that the Tariff Deficit was attributable to its failure sufficiently to increase consumer tariffs.  The Respondent says that it raised consumer tariffs "*by 81% between 2003 and 2012*" and that "*indefinitely increasing consumer tariffs, as the Claimant asks, is not a rational policy.*"[796]

634.    Further, the Respondent refutes the Claimants' assertion that the ILC 2001 Articles apply to this case. The Respondent says that the Claimants are referring to the 2001 Articles because they require that a measure adopted by a Government "*be the only possibility, placing the burden of proof on the Government seeking to adopt the measure.*" However, the Claimants are the ones with the burden of proof under Article 10(1) to show that the Disputed Measures are unreasonable and disproportionate. Additionally, the Claimants have not "*proven the viability of the alternative measures*" to the Disputed Measures they propose.[797]

635.    The Respondent says that it has explained the (i) existence of an economic crisis, (ii) the difficulty of obtaining "*international financing, which gave rise to the need to suspend issues of the Securitisation Fund for the Tariff Deficit between March and November 2012*", and (iii) the bailout of July 2012 which included the signature of the MOU with the EU[798] that imposed on the Respondent "*the commitment of adopting numerous macroeconomic measures in different sectors of the economy*" which implied a "*structural reform of the SES.*" It says that the economic crisis led the Respondent to adopt a series of macroeconomic measures in various sectors, including the energy sector.

---

[795] Resp. C-Mem. ¶¶ 986 and 993.

[796] Resp. Rej. ¶ 1031(1).

[797] Resp. Rej. ¶ 1031(2).

[798] **RL-0067**, MOU with the EU.

According to the Respondent, the Claimants "*say nothing about the reasonableness of macroeconomic control measures aimed at guaranteeing the economic sustainability of the SES, in the context of the collapse of the Spanish financial system and when the EU bailout and the conditions imposed on the Kingdom of Spain are well-known facts.*"[799]

636.    The Respondent contends that the second element of the *AES Summit v Hungary* test "*requires the Government's action to be reasonable, demanding an appropriate correlation between the objective of the state public policy and the measure taken to reach said objective.*"[800]

637.    The Respondent submits that the Disputed Measures are reasonable because they affect all the subjects of the SES (consumers and all the operators in the system), deal with the Tariff Deficit and maintain the reasonable profitability of RE producers. Additionally, the Respondent submits that the remuneration established in the Disputed Measures corresponds "*to the system proposed by the RE Sector's main Association in 2009.*"[801]

638.    The Respondent also alleges that the Disputed Measures are proportionate because they maintain the producers' reasonable profitability of 7.398%, which could be even "*higher if the standards set for an average facility are surpassed*", and that such rate was even proposed by APPA in 2009.[802] The remuneration scheme established through RD 413/2014 and Order IET/1045/2014 "*provides for remuneration for operations in order to cover all operational costs needed to perform the activity in an efficient and well-managed manner.*"[803]

639.    Further, as to the four points on which the Claimants rely to say that the Disputed Measures are unreasonable:

---

[799] Resp. Rej. ¶ 1031(3) (incorrectly numbered ¶¶ 406-408).

[800] Resp. C-Mem. ¶ 994.

[801] Resp. C-Mem. ¶ 995.

[802] Resp. C-Mem. ¶¶ 997-998.

[803] Resp. C-Mem. ¶ 999; **R-0115**, Order EIT/1045/2014, 16 June 2014, Preamble, section III ¶¶ 14 to 21.

a)      The allegations that the Disputed Measures "*have not had a sufficient effect on consumers and have not affected other producers*" lacks proof. On the contrary, the reform of the SES "*was comprehensive in scope, affecting all operators and after having increased consumer tariffs by 81% between 2003 and 2012*."[804]

b)      The allegation that the "*method of remuneration proposed by APPA in 2009 is completely unrelated to the contested remuneration method*" is inconsistent with the fact that "*a simple reading of the 2009 APPA proposal is enough*" to observe that the current remuneration framework "*conforms to the remuneration model sought by the RE sector itself.*"[805]

c)      The Respondent has presented sufficient evidence proving that the Disputed Measures have been accepted as reasonable by "*international arbitration tribunals, international institutions, rating agencies and the markets all accept the adopted measures as reasonable and proportional.*"[806]

d)      The allegation that "*the rate of return received on their plants is unreasonable, as it is not the rate of return promised*" is misconceived as RD 661/2007 "*did not promise to freeze a fixed rate of return during the entire useful life of the plants.*"[807] In addition, under the current remuneration scheme, "*the rate of return obtained by the Claimants' plants as a group comes to a total weighted return of 10.6% before tax or 8.27% after tax*",[808] which is higher than the WACC of the sector,[809] higher than the rate of return of other regulated sectors of the SES,[810] and further reasonable compared with the return levels currently given by Banks.[811] Moreover, those plants that "*no longer receive subsidies are*

---

[804] Resp. Rej. ¶ 1033(1), referring to Resp. C-Mem. ¶¶ 275-306 and 592-608.

[805] Resp. Rej. ¶ 1033(2); **R-0187**, Draft Act presented by APPA-Greenpeace on 21 May 2009, Article 23.4.

[806] Resp. Rej. ¶ 1033(3); **R-0326**, IMF, Document Spain: *Staff Concluding Statement of the 2016 Article IV Mission*, 13 December 2016".

[807] Resp. Rej. ¶ 1033(4).

[808] BDO second report ¶¶ 244 and 245.

[809] BDO first report ¶ 99.

[810] **R-0077**, Act 24/2013 on the Electricity Sector, 26 December 2013, Tenth Additional Provision.

[811] Resp. Rej. ¶¶ 1034-1037.

*going to obtain a rate of return throughout their useful life of between 20.7% and 7.4% before tax.*"[812]

640.  As to *Total v Argentina,* according to the Respondent, the test from this case allows an examination of whether the Disputed Measures "*respected the minimum protection standard guaranteed by International Law for long-term investments*" by maintaining the economic balance of the investments allowing the investors to recover "*its operational costs, amortize its investment and obtain a reasonable rate of return during that period of time.*"[813] It is said that the Claimants have not "*challenged the relevance of this test nor the due fulfilment of all elements of this test.*"[814]

641.  The Respondent says that the test has been fulfilled because, as was also confirmed by Mr Juan Ramón Ayuso,[815] "*the reform implemented by Spain respects the minimum standard of FET acceptable under international law, by respecting the principle of economic equilibrium of the investment, thus allowing the investor to recover the full cost of their investment in addition to obtaining a reasonable rate of return on their investment amounting to 10.6% before tax or 8.2% after tax.*"[816]

(2)    **The Tribunal's Analysis**

642.  It is common ground between the Parties that conduct that is unreasonable or discriminatory is prohibited by the FET standard under Article 10(1) ECT, and the Tribunal is content to proceed on that basis. Further, Article 10(1) separately provides that:

> "…no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal."

---

[812] Resp. Rej. ¶ 1038.

[813] Resp. C-Mem. ¶¶ 1004-1006, Resp. Rej. ¶ 1022.

[814] Resp. Rej. ¶ 1043.

[815] **RW-0001**, Ayuso First Statement.

[816] Resp. C-Mem. ¶ 1009; Resp. Rej.¶ 1049.

643.    The Tribunal accepts that impairment has been established in respect of the enjoyment of the Claimants' Investments. There is no claim as to the Disputed Measures being discriminatory other than with respect to the TVPEE and the Water Levy, and the Tribunal has already found that it lacks jurisdiction with respect to these. The major issue concerns whether unreasonableness can be established.

644.    As to unreasonableness, the Tribunal agrees with the Parties that, consistent with the *AES v Hungary* case, it needs to consider two factors, i.e. "*the existence of a rational policy; and the reasonableness of the act of the state in relation to the policy.*"[817] It is necessary to determine whether there is "*an appropriate correlation between the state's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented.*"[818]

645.    As follows from its consideration of the facts in Section D(2)(f) above, the Tribunal accepts that the Respondent was acting pursuant to a rational policy in adopting the Disputed Measures.

646.    As to the reasonableness of the Respondent's acts in relation to the relevant policy, the principal contentions of the Claimants on the facts have also been considered in Section D(2)(f) above, albeit in the context of whether the Disputed Measures were necessary and were not disproportionate, and largely rejected.[819]

647.    The Tribunal considers that some margin of appreciation should be allowed to the Respondent in implementing its policy to address the Tariff Deficit (see under Section D(2)(f) above), and it also considers that the threshold in terms of establishing unreasonableness is a high one, that is frequently assimilated with arbitrariness.[820] In *EDF v Romania*, basing itself on the view of Professor Schreuer as to what constituted

---

[817] Cl. Reply ¶ 579; **RL-0039,** *AES Summit*, Award, ¶¶ 10.3.7 to 10.3.9.

[818] Cl. Reply ¶ 579; **RL-0039,** *AES Summit*, Award, ¶¶ 10.3.7 to 10.3.9; **RL-0048**, *Electrabel*, Award, ¶ 179.

[819] See paras. 554-583 above.

[820] *See e.g.*, **RL-0048**, *Electrabel,* Award, ¶¶ 167 and 179.

arbitrary conduct, the tribunal proceeded on the basis that there would be unreasonable or discriminatory conduct where there was -

> "a measure that inflicts damage on the investor without serving any apparent legitimate purpose;
>
> a measure that is not based on legal standards but on discretion, prejudice or personal preference;
>
> a measure taken for reasons that are different from those put forward by the decision maker;
>
> a measure taken in wilful disregard of due process and proper procedure."[821]

648.  The Tribunal considers this to be appropriate to describe what is required to show unreasonableness within Article 10(1) ECT although, consistent with the view expressed by the *Electrabel* tribunal,[822] it also considers that the consideration of whether an act is unreasonable under Article 10(1) may engage an issue of disproportionality.

649.  To the extent that the Disputed Measures were disproportionate as identified in Section D(2)(f) above, the Tribunal considers that these Measures were unreasonable (if not necessarily arbitrary). The case on unreasonableness is otherwise rejected, and it is recalled that it has already been found that no specific commitments were made to the Claimants that the remuneration regime under RD 661/2007 would remain substantially unchanged. The Tribunal considers that there is no sound basis for the Claimants' invocation of "*the profitability promised at the time it invested or the profitability considered to be reasonable prior to the introduction of the New Regime*."[823] There was no such promise.[824]

---

[821] **RL-0035,** *EDF v. Romania,* ¶ 303.

[822] **RL-0048,** *Electrabel,* Award, ¶ 179.

[823] Cf. Cl. Reply ¶ 597.

[824] *See* paras. 535-549 above. The Tribunal also does not accept the Claimants position as to the rates of return referable to "*the profitability considered to be reasonable prior to the introduction of the New Regime.*" On the basis of the 2005 PER and the Ministerial press release of 25 May 2007, the relevant rate of return could only be 7% or the range 5%-9% (after tax). The Tribunal has already rejected the case that the CNE report of March 2007 shows something different and, in any event, that report preceded the press release of 25 May 2007.

650.    As follows from the consideration of the facts in Section D(2) above, none of the factors on which the Claimants rely lead to the conclusion that the Disputed Measures otherwise inflicted damage on the investor without serving any apparent legitimate purpose; or were not based on legal standards but on discretion, prejudice or personal preference; or were taken for reasons that are different from those put forward by the decision maker; or were taken in wilful disregard of due process and proper procedure.

## G.  BREACH OF TRANSPARENCY

### (1)  **The Parties' Positions**

#### a.  *The Claimants' Position*

651.    The Claimants submit that the Respondent's conduct in dismantling the Special Regime was a breach of the FET standard which requires that a "*State's conduct toward investors and its legal environment be transparent (i.e. free from ambiguity and uncertainty).*"[825] Reliance in this respect is placed on *Tecmed v Mexico*,[826] *Electrabel v Hungary*,[827] and *Plama v Bulgaria*.[828]

652.    The Claimants allege that the Respondent's conduct was not transparent because:

    a)    Through RDL 9/2013, the Respondent "*not only wiped out the investment regime for the Claimants' investment*", but this was followed by the 11-month Transitory Regime during which the "*government gave no indication regarding the precise remuneration that any qualifying plants would be entitled to*", which prevented RE installations from forecasting future cash flows.[829]

    b)    RD 413/2014 and the June 2014 Order, which were supposed to "*define the precise economic regime that would apply to qualifying installations*", did not provide any "*transparent explanation of underlying criteria or calculations behind the Special*

---

[825] Cl. Mem. ¶¶ 478 and 481.

[826] **CL-0032**, *Tecmed*, ¶ 154.

[827] **CL-0042,** *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶ 7.79.

[828] **CL-0051**, *Plama*, ¶ 178.

[829] Cl. Mem. ¶ 481(i). *See also*, Cl. PHB ¶¶ 199-202.

*Payment or whether there would be any future updates of the economic regime. Indeed, Spain has not offered any guidelines whatsoever on many key aspects of the New Regime.*"[830] Additionally, Spain denied access to its expert reports and it only later became known that the BCG report was never prepared while the Roland Berger report was finished several months after the publication of the June 2014 Order.[831]

c)   The fact that the Special Payment is calculated by reference to a Standard Installation, and not an actual plant, creates further uncertainties. By reference to the Compass Report, it is said that "*some parameters of the Standard Installation will remain constant over time, but the Government retains the discretion to alter many other parameters for existing plants…, which provides no visibility of the regime that will apply going forward.*"[832]

d)   Under the New Regime, the Respondent has the right to review the Special Payment to "*make sure that the prevailing yield on ten-year Spanish bonds plus a spread… continues to apply.*" According to the Claimants, the Respondent has not established a clear methodology for adjusting the Special Payment, "*let alone done so in a coherent and transparent manner.*"[833]

e)   "*The New Regime does not provide any clear indication as to the timeframe during which the remuneration for installed capacity… will apply.*" The Claimants argue that the Respondent could "*withdraw this element of the Special Payment before the end of the estimated useful life of the plants if the Government determines that the Standard Installation has already earned a 'reasonable return'.*"[834] However,

---

[830] Cl. Mem. ¶ 481(ii); Compass Report ¶¶ 96, 137-138 and fn. 86.

[831] Cl. Mem. ¶ 481(ii); **C-0111**, "*The Government authorizes cuts to renewables without a technical report*", Press Release from Expansión, 13 March 2015.

[832] Cl. Mem. ¶ 481(iii); Compass Report ¶ 96.

[833] Cl. Mem. ¶ 481(iv). *See also*, Cl. PHB ¶¶ 203-211.

[834] **C-0026**, RD 413/2014, Second Additional Provision ¶ 5.

the Respondent has not established a method for determining when a plant has earned reasonable profits.[835]

653.  The Claimants reject the Respondent's arguments for saying that its conduct was transparent:

    *a)*  As to whether a specific commitment was made, the Claimants reiterate their arguments as to legitimate expectations, and say that issue of the RAIPRE certificates specifically confirmed the entitlement of each of RWE's installations to the RD 661/2007 FIT.[836]

    *b)*  The Disputed Measures came unannounced. The Respondent "*misled investors by holding out that the RD 661 FIT was guaranteed, right up to the abrupt enactment of the Disputed Measures,*" through "*RD 661; RDL 6/2009; the July 2010 Agreement; and RD 1614.*"[837]

    *c)*  There was no consultation or investor participation prior to the introduction of the Disputed Measures. It is said that: "*The February 2012 consultation was carried out for the March 2012 CNE Report, whose recommendations Spain ignored.*" Further, the Claimants also deny that there was a stakeholder participation in Law 24/2013 and the 2014 Ministerial Order since, in the CNE's Report of 4 September 2013, it was noted that: "*the urgent process relating to the consultation … does not guarantee the effective participation of various agents involved.*"[838] Likewise, it is said that there is evidence of numerous submissions "*strongly objecting to the unfairness of the New Regime*" to which the Respondent did not "*provide any evidence that the New Regime was modified in response to those submissions.*"[839]

---

[835] Cl. Mem. ¶ 481(v); Compass Report, fn. 242.

[836] Cl. Reply ¶¶ 523-532; **C-0015**, Excerpts of the RAIPRE certificates of the installations.

[837] Cl. Reply ¶ 601; Cl. Skeleton ¶ 84.

[838] **C-0123**, CNE Report 18/2013, pp. 4 and 15.

[839] Cl. Reply ¶ 602; Cl. Skeleton ¶ 85; Cl. PHB ¶¶ 199-202.

*d)* The remuneration system under the New Regime is opaque and unpredictable because the "*triennial reviews permit Spain unilaterally to cut RWE's remunerations at its discretion.*"[840] According to the Claimants, the CNE report of September 2013 demonstrates that the New Regime raised great uncertainties for RE installations because it was subject to periodic reviews.[841] Their case is that the New Regime is subject to ongoing instability, and that the only stable element in the New Regime is that the remuneration will be set by reference to the ten-year Spanish bond and a spread that will change.[842] BDO accepted that the reasonable return could be changed in 2019.[843] The Claimants conclude that, from 2019, it "*appears that the reasonable return not only could but in fact will be set considerably lower than 7.398%.*"[844]

b.    ***The Respondent's Position***

654.    The Respondent contends that the ECT does not guarantee complete predictability of the regulatory framework during the validity of an investment unless there is a specific commitment by the State, and says that the tribunal in *AES Summit v Hungary* confirms this.[845] It rejects the application of (i) the *Tecmed* case because the award was "*disputed by the Annulment Committee of the MTD Case*";[846] (ii) the *Electrabel* award because the claimant made no allegation of transparency;[847] and (iii) the *Plama* award because it

---

[840] Cl. Skeleton ¶ 82.

[841] Cl. Reply ¶ 604.

[842] Cl. PHB ¶ 207. *See also*, at Day 5, pp. 93-94, where it is said in the light of the 2019 revision that the New Regime is arbitrary and unpredictable.

[843] Cl. PHB ¶ 208, referring to Mitchell, Day 5, p.13, lines 6 to 17.

[844] Cl. PHB ¶¶ 210-211. This is said to be apparent from a statement of the Minister of Industry, as follows: "Regarding the reasonable return, that some parliamentary groups have brought up, it is not the subject of this appearance, but I can tell you something. You may think that the law should not be applied such as it is and that the remuneration of regulated activities should not be linked, as it is, to [Spanish] Treasury bonds. That would mean that electricity [prices] will not be reduced for each and every Spanish consumer by between 5 and 10%. … On the reasonable return topic, I have already responded. We are in favour of that producing a substantial discount on the electricity bill for all the Spanish consumers." **C-0343**, Transcript of the Spanish Parliamentary Session No. 13 on Energy, Tourism and Digital Agenda dated 28 June 2017, pp. 47-48; **C-0344**, Article in Cinco Días: "Nadal wants to cut renewables premium by half", 26 June 2017.

[845] Resp. C-Mem. ¶¶ 951-952; **RL-0039**, *AES Summit*, Award, ¶ 9.1.6 and fn. 28.

[846] Resp. C-Mem. ¶ 951(1); **RL-0030**, *MTD,* Decision on Annulment, ¶¶ 66 and 67.

[847] Resp. C-Mem. ¶ 951(2); **RL-0048**, *Electrabel*, Award, ¶ 115.

"*merely refers this ECT standard to the FET and the stability of the regulatory framework.*"[848]

655.  According to the Respondent, the following facts prove that the Respondent did not violate its obligation to promote transparent conditions under Article 10(1) of the ECT:

   a)  The Respondent never made a commitment to the Claimants to "*maintain its regulatory framework or the regime established in RD 661/2007 unchanged.*"[849]

   b)  The Respondent "*warned of action to remedy over-remuneration and to improve the sustainability of the SES*" since 2006, and "*warned of the need to introduce reforms to tackle the tariff deficit*" since 2009.[850]

   c)  The Respondent followed the procedures established by law in adopting the Disputed Measures without delay and "*guaranteeing the participation of the legitimate stakeholders in the regulatory process.*" The Respondent received submissions from the "*RE Sector in relation to the drafts of RD 413/2014 and Ministry Order 1045/2014 that the Claimant alleges to be unaware of have been accredited. This contradicts the unfounded claim that the Facilities were in the "dark" for 11 months asserted by the Claimant.*"[851] Further, the Respondent has shown that the Claimants "*could participate in the Regulatory procedure by submitting pleading in 2012 (before the CNE) and all along 2013 and 2014, before the CNE and the State Council*" and that, as stated by Mr Ayuso, "*many of the RE*

---

[848] Resp. C-Mem. ¶ 951(3); **CL-0051**, *Plama*, ¶ 178.

[849] Resp. C-Mem. ¶ 954(1).

[850] Resp. C-Mem. ¶ 954(1); Resp. Rej.¶ 1017(a)-(g). *See*, **R-0274**, Appearance of the Minister of Industry, Tourism and Trade before the Senate on 26 October 2006; **R-0258**, Appearance of the General Secretary for Energy before the Congress of Deputies; **R-0101**, RD 661/2007, Preamble; **R-0259**, General Secretariat on Energy before The Senate; **R-0089**, RD-Act 6/2009, Preamble; **R-0090**, RD-Act 14/2010, Preamble; **R-0074**, Sustainable Economy Act 2/2011, 4 March 2011, Article 79.4 a) and d); **R-0278**, Congress of Deputies Journal validation of RD-Act 14/2010, 26 January 2011; **R-0192**, Speech by Prime Minister Rajoy, 19 December 2011; **R-0092**, RD-Act 13/2012, page 8; **R-0121**, National Reform Programme 2012, Government of Spain; **R-0174**,The Reforms of the Spanish Government: Determination in the face of the crisis, Secretariat of State for Communication, Ministry of the Presidency, September 2012, Chapter III, Page 18; **R-0122**, Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012, Section C.8, page 70; **RL-0067**, MOU with the EU.

[851] Resp. C-Mem. ¶ 954(3).

*Stakeholders submissions were accepted in the final definition of the Standard Facilities and Parameters.*"[852]

d)     The Respondent adopted "*a predictable and dynamic regulatory system that continues to guarantee reasonable profitability for the RE projects and the economic equilibrium of the investment.*" The Respondent says that "*the establishment of regulatory periods offers security to investors and guarantees that reasonable profitability is maintained, preserving this profitability throughout the regulatory useful life, along with the recovery of the investment value.*"[853] Further, Law 24/2013[854] and RD 413/2014[855] did contain rules to ensure that investors at all times receive reasonable profitability on their facilities.[856] It is said that the Law establishes specific fixed boundaries within which revisions shall be made, distinguishing between: "*(i) The regulated process that shall be followed in order to review the rate of return and (ii) The objective limits that shall be respected by the Regulator when making the revision.*"[857] These boundaries are intended to restrict the discretionary powers of Government. Further, the Law also provides the procedure of revision with the necessary tools in order to guarantee that the revisions will allow the plants to maintain a reasonable return.[858]

---

[852] Resp. Skeleton ¶¶ 61-62; Resp. Rej.¶ 1019; the Respondent points to the following documents as evidence of participation: **R-0194**, Information on the public consultation on regulatory adjustment measures in the energy sector of 2 February and 9 March 2012, published on the National Energy Commission (CNE), www.cne.es, 17 September 2014; **R-0234**, Submissions from Protermosolar concerning RD 413/2014, 30 July 2013; **R-0305**, Elecnor financial statements, 31 December 2013, page 90; **R-0086** and **R-0087**, full, hyperlinked index of the regulatory records of RD 413/2014 and OIET 1045/2014. These indexes provide online access to the submissions presented by the various stakeholders and to all processing of these regulatory records, with full transparency; **R-0124**, Report of the Council of State dated 6 February 2014, issued in the administrative appeal relative to the draft Royal Decree 413/2014. The report sets out the processing, with the participation of the whole sector and the restart of its processing as a result of the proposals admitted; **RW-0002**, Ayuso Second Statement ¶¶ 65 to 84.

[853] Resp. C-Mem. ¶ 954(4).

[854] **R-0077**, Act 24/2013 on the Electricity Sector, 26 December 2013, Article 14.4.

[855] **R-0110**, Royal Decree 413/2014, 6 June 2014, Article 20(1).

[856] **RW-0001**, Ayuso First Statement. *See also*, Resp. PHB ¶¶ 154 *et seq.*

[857] Resp. PHB ¶ 156.  *See further*, ¶¶ 158-172.

[858] Resp. PHB ¶ 157.

(2)    **The Tribunal's Analysis**

656.    Article 10(1) ECT provides in relevant part:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment."

657.    As to allegations that concern the time when the Investments were actually made, the obligation of transparency (the encouragement and creation of transparent conditions to make Investments) is established by the first sentence of Article 10(1). The Claimants' allegation that the Respondent "*misled investors by holding out that the RD 661 FIT was guaranteed*"[859] may be seen as engaging this first sentence of Article 10(1). However, the Tribunal does not consider that this allegation adds materially to those made specifically with respect to the Claimants' alleged legitimate expectations, and rejects it for the same reasons.

658.    The Claimants' allegations principally concern a failure in transparency in the period 2013-2014 (and a lack of transparency going forward), i.e. some considerable time after their Investments were made.  As to an ongoing obligation of transparency, it follows from the Tribunal's conclusions in Section C above with respect to the interplay between the first two sentences of Article 10(1), this obligation is established but only to the extent that transparency forms part of the commitment to accord FET established in the second of the two sentences and, by that second sentence, embedded into the first.

659.    The Tribunal agrees with the Respondent that the *Plama* and *Electrabel* cases offer little guidance as to the content of an obligation of transparency under Article 10(1), and notes the equivocal language used in both cases.

   a)    According to *Plama*, "*the  condition of transparency, stated in the first sentence of Article 10(1) of the ECT, can be related to the standard of fair and equitable*

---

[859] Cl. Reply ¶ 601; Cl. Skeleton ¶ 84; Claimants' oral opening at Day 1/165.

*treatment. Transparency appears to be a significant element for the protection of both the legitimate expectations of the Investor and the stability of the legal framework.*"[860] The Tribunal has already rejected the Claimants' case on legitimate expectations and stability, and the award is otherwise equivocal as to the role played by transparency under Article 10(1).

    *b)*  As to *Electrabel,* the Respondent is correct to say that the claimant in that case made no allegation of transparency.[861] The tribunal stated in its discussion of Article 10(1) that: "*The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations.*"[862] Again, this is equivocal and is linked back to legitimate expectations.

660.    As to the well-known passage from *Tecmed v Mexico*[863] that the Claimants rely on, this concerns a controversial description of the basic expectations of investors, and the Tribunal does not consider that Article 10(1) ECT establishes a requirement on a Contracting State to act in a manner "*free from ambiguity and totally transparently in its relations with the foreign investor.*" There is nothing in Article 10(1) or elsewhere in the ECT to suggest that the Contracting States were willing to accept such an exacting obligation. While the Tribunal considers that a lack of transparency may constitute a breach of the FET standard under Article 10(1) independent of any consideration of legitimate expectations or stability, it also considers that, consistent with its views as to the standard referable to the concept of unreasonableness under Article 10(1), there is a high threshold to be met in order to establish a breach. The Tribunal sees no reason why, and no basis in the ECT to suggest that, a lower threshold would apply in the particular context of transparency. It also notes that various awards have suggested that there is a

---

[860] **CL-0051,** *Plama*, ¶ 178.

[861] Resp. C-Mem. ¶ 951(2); **RL-0048,** *Electrabel*, Award, ¶ 115.

[862] **CL-0042,** *Electrabel*, Decision on Jurisdiction, Applicable Law and Liability, ¶ 7.79.

[863] **CL-0032,** *Tecmed*, ¶ 154.

need to establish a complete lack of transparency, or some equivalent phraseology, in order to serve as a foundation for a breach of the FET standard.[864]

661.    Turning to the specific allegations made by the Claimants, it may be that RDL 9/2013 was "*abruptly enacted*" but, as already noted in Section D above, the Respondent was *bona fide* adopting urgent measures,[865] and moreover there had been a public consultation exercise in the context of the CNE February 2012 report, which stated that the deficit between revenues and costs of the electrical system had become unsustainable and that "*the urgent adoption of regulatory solutions is needed.*"[866] It is correct that RDL 9/2013 was followed by an 11-month period during which there was uncertainty as to the precise remuneration that any qualifying plants would be entitled to, which must have caused difficulties for RE operators.[867] However, during this period there was the publication of drafts of the Royal Decree and Order IET 1045/2014, a public consultation, with responsive changes being made.[868] The Tribunal does not accept there was a lack of transparency such as to engage Article 10(1).

662.    As to the alleged lack of transparent explanations and guidance in RD 413/2014 and Order IET 1045/2014,[869] the Tribunal has not seen any evidence that indicates an inadequacy that could engage Article 10(1). As to the fact that the Special Payment is calculated by reference to a Standard Installation as to which the Government retains the discretion to alter certain parameters,[870] this appears to the Tribunal to be more a complaint as to lack of predictability as opposed to lack of transparency.[871] As follows

---

[864] *See e.g.*, the well-known passage concerning Article 1105 NAFTA, but often referred to in other treaty contexts, in *Waste Management Inc v United Mexican States*, ICSID Case No. ARB(AF)/00/3, (2004) 11 ICSID Reports 361, 386 ¶ 98, referred to in **RL-0030**, *MTD*, Decision on Annulment, ¶¶ 66 and 67.

[865] Cf. Cl. PHB ¶ 201.

[866] **C-0163**, 2012 CNE Report, p. 6.

[867] Cl. Mem. ¶ 481(i); Cl. PHB ¶ 202.

[868] **RW-0002**, Ayuso Second Statement ¶¶ 65 to 82; Resp. oral opening at Day 2/140, referring to the July and December drafts of RD 413/2014 and submissions made with respect to these drafts by APPA, AEE and others.

[869] Cl. Mem. ¶ 481(ii); Compass Report ¶¶ 96, 137-138 and fn. 86.

[870] Cl. Mem. ¶ 481(iii); Compass Report ¶ 96; Cl. PHB ¶¶ 203-211.

[871] Cl. PHB ¶¶ 203-211, making claims in respect of ongoing instability as part of PHB section 7 entitled "Spain's reform lacked – and still lacks – transparency." The claim in respect of ongoing instability has already been considered in Section E above.

from the Tribunal's earlier reasoning, it does not consider that the Claimants have a sound basis on which to claim that the remuneration regime applicable to their plants may not change over time. All depends on the nature of that change, and whether it is sufficiently radical to engage the FET standard under Article 10(1), whether as a matter of disproportionality, stability or otherwise. In the future, a change may ground a further claim by the Claimants. But the scope for the exercise of discretion within the Disputed Measures, albeit a cause for legitimate concern on the part of the Claimants, does not provide a sound basis for such a claim in anticipation of a change. The same point applies with respect to the impacts of future reviews of the Special Payment, including the spread allowed and the applicable timeframe.[872] In the future, the Claimants may have a valid ground for complaint, including to the effect that further changes in the system of remuneration mean that measures of the Respondent have a more disproportionate impact on their Investments than the Tribunal has identified; but the Tribunal does not consider that the current scope for future change grounds a claim at this stage. Any future changes to the remuneration received by the Claimants' plants may after all be beneficial in whole or part, not exclusively detrimental as the Claimants now suggest (but has not been established),[873] and their legality would anyway have to be assessed against the circumstances then prevailing.

663.    As to the allegation that Spain denied access to its expert reports,[874] this has already been considered in the context of disproportionality above. If it is assumed that, as the Claimants suggest, Spain did not abide by the views of these experts because of disagreement as to the regime that should be implemented, it does not follow there is a failure of transparency such as to engage Article 10(1). A State is not obliged to follow or wait for expert advice that it has commissioned, nor to make initial expert views with which it disagrees public (although that may be desirable). However, even if such a course of action does not amount to a lack of transparency, the State is, as already noted,

---

[872] Cl. Mem. ¶ 481(iv) and (v).

[873] *See e.g.*, Cl. PHB ¶¶ 203-211; cf. Resp. PHB ¶¶ 181-184.

[874] Cl. Mem. ¶ 481(ii); **C-0111**, "*The Government authorizes cuts to renewables without a technical report*", Press Release from Expansión, 13 March 2015.

exposing itself further to the risk of unintended or disproportionate impacts to protected investors.

664.     As to the complaint that Spain ignored the results of the March 2012 CNE report, the Tribunal has already found that the Claimants have not established this (see Section D above). As to their reliance on the CNE report of 4 September 2013,[875] the Tribunal understands that the reference in that report to the presence of "*great uncertainties for its [the new regime's] application to the approximately 60,000 existing installations, since its application depends on a series of standard parameters that will be defined in the development order of the royal decree*" is a function of the fact that the report was made prior to the adoption of Order IET 1045/2014.[876] On the same page of this report, the CNE stated that: "*The new methodology could ensure reasonable rates of return as long as it offers an additional payment to installations during their useful life, which will level the playing field so that they can participate in the market, allowing them to receive the signal of the market price without distortions.*" It does not appear to the Tribunal to have been pointing to a defect in RDL 9/2013 irrespective of the Order that was to follow.

665.     It is correct that, in this CNE report, it was noted that "*the urgent process relating to the consultation … does not guarantee the effective participation of various agents involved*", but nonetheless both APPA and AEE were able to and did make submissions to the CNE in the context of this report, and it has not been demonstrated to the Tribunal that the insufficiencies identified by the CNE were not addressed by the subsequent consultation that preceded the adoption of RD 413/2014 and Order IET 1045/2014.

666.     In conclusion, the Tribunal finds no lack of transparency sufficient to establish a breach of Article 10(1) ECT.

---

[875] Cl. Reply ¶¶ 602 and 604; Cl. Skeleton ¶¶ 82, 85; **C-0123**, CNE Report 18/2013, pp. 4 and 15.
[876] Cf. Cl. Reply ¶ 604.

### H. VIOLATION OF THE UMBRELLA CLAUSE

#### (1) **The Parties' Positions**

##### a. *The Claimants' Position*

667.   The Claimants submit that the Respondent violated the umbrella clause established in Article 10(1) of the ECT. According to the Claimants, "*the plain language of the Umbrella Clause in Article 10(1) of the ECT does not differentiate between contractual obligations and legislative/regulatory undertakings. In fact … the expression '[a]ny obligations' in this Umbrella Clause 'means not only obligations of a certain type, but 'any' – that is to say, all – obligations entered into with regard to investments of investors of the other Contracting Party*'."[877]

668.   Therefore, the umbrella clause may encompass "*obligations specifically entered into vis-à-vis an investor or its investment may be considered covered by the Umbrella Clause, regardless of their source (contractual or otherwise), where the host State has specifically assumed a commitment as an obligor and where there is a clear obligee.*"[878] It is said that this was confirmed in *Eureko v Poland*, *Plama v Bulgaria*, *Enron v Argentina*, *LG&E v Argentina*, *El Paso v Argentina*, *SGS v Pakistan*, *Bureau Veritas v*

---

[877] Cl. Mem. ¶¶ 498-499; **CL-0062**, *Eureko B. V. v The Republic of Poland*, Partial Award on Jurisdiction and Merits, 19 August 2005 (hereinafter "*Eureko*"), ¶ 246.  *See also*, **CL-0051**, *Plama,* ¶ 186 ("the wording of this [Umbrella] clause in Article 10(1) of the ECT is wide in scope since it refers to "any obligation." An analysis of the ordinary meaning of the term suggests that it refers to any obligation regardless of its nature, i.e., whether it be contractual or statutory."); **CL-0061**, United Nations Conference on Trade and Development, Bilateral Investment Treaties in the Mid-1990s (United Nations Publications, 1998), p. 56; **CL-0058**, *Nuclear Tests (Australia v France)*, ICJ Rep 1974, Judgment of 20 December 1974 ¶ 43 ("It is well recognised that declarations made by way of unilateral acts, concerning legal or factual situations, may have the effect of creating legal obligations…When it is the intention of the State making the declaration that it should become bound according to its terms, that intention confers on the declaration the character of a legal undertaking, the State being thenceforth legally required to follow a course of conduct consistent with the declaration;" **CL-0059**, *Case concerning the Temple of Preah Vihear (Cambodia v Thailand)*, ICJ Rep 1961, Preliminary Objections, Judgment of 26 May 1961, p. 17; and **CL-0060**, *Case Concerning the Frontier Dispute (Burkina Faso v Republic of Mali)*, ICJ Rep 1986, Judgment of 22 December 1986, p. 554.

[878] Cl. Reply ¶ 617.

*Paraguay* and *Sempra Energy International v Argentina*.[879] The Claimants say that the Respondent's attempts to distinguish such cases "are ... misguided."[880]

669.     Further, the Claimants say that the Respondent misrepresents the cases on which it relies to claim that the umbrella clause only applies within the framework of a contract or similar bilateral instrument between the State and the investor.[881] The Claimants say that *Noble Ventures v Romania* is taken out of context because "*the case before the Noble Ventures tribunal was precisely limited to contractual obligations*."[882] The *SGS v Pakistan* and *SGS v Philippines* awards are said to "*recognise that umbrella clauses may cover obligations other than those derived from contractual agreements*."[883] It is also said that *AES Summit v Hungary* "*made no finding as to the scope of obligations that would fall within the protection of the Umbrella Clause*", while the *Charanne* case "*contains no discussion of the Umbrella Clause in the ECT [and] nor did the case involve a claim for breach of the Umbrella Clause*."[884] Finally, the portion of the ECT Reader's Guide[885] quoted by the Respondent is said to be "*an extract from a section dedicated precisely to investment contracts… It says nothing about the kinds of obligations covered by Article 10(1) in fine: it certainly does not purport to limit the source of the obligations covered by this provision only to contractual ones*."[886]

---

[879] Cl. Mem. ¶¶ 499 and 503-508; **CL-0062**, *Eureko*, ¶ 246; **CL-0051**, *Plama* ¶ 186; **CL-0025**, *Enron*; **CL-0039**, *LG&E*; **CL-0065**, *El Paso Energy International Company v The Argentine Republic*, ICSID Case No. ARB/03/15, Decision on Jurisdiction, 27 April 2006; **CL-0066**, *SGS Société Générale de Surveillance S.A. v The Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision on Objections to Jurisdiction, 6 August 2003 (hereinafter "*SGS v Pakistan*, **Decision on Objections to Jurisdiction**"),¶ 166; **CL-0064**, *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC B.V. v The Republic of Paraguay*, ICSID Case No. ARB/07/9, Decision on Objections to Jurisdiction, 29 May 2009; **CL-0048**, *Sempra Energy International v The Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007 (hereinafter "*Sempra*").

[880] Cl. Reply ¶¶ 614-615.

[881] Cl. Reply ¶¶ 605 and 608.

[882] **RL-0026**, *Noble Ventures, Inc. v The Republic of Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005 (hereinafter "*Noble Ventures*"), ¶ 51.

[883] **CL-0066**, *SGS v Pakistan*, Decision on Objections to Jurisdiction, ¶ 166; **CL-0139**, *SGS Société Générale de Surveillance S.A. v The Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Jurisdiction, 29 January 2004 ¶ 121.

[884] Cl. Reply ¶ 616.

[885] **RL-0053**, The Energy Charter Treaty: A Reader's Guide, June 2002, (hereinafter "**ECT: A Reader's Guide**"), p. 26.

[886] Cl. Reply ¶¶ 608-613 and 614-616.

670.   On this basis, the Claimants submit that:

    *a)*    Through RD 661/2007 (Article 44(3)) and RD 1614/2010 (Articles 4 and 5(3)) "*Spain expressly recognised the application of the FIT to the RE installations for the entire operational lifetime of the RE installations and held out to investors that no review of the tariffs would affect existing installations*",[887] and that the Respondent even "*made a specific undertaking to the wind producers with the July 2010 Agreement, whereby... the Government agreed to recognise the application of the RD 661/2007 economic regime and the stabilisation of the FIT.*"[888] The Claimants reject the Respondent's position that the commitments contained in RD 661/2007 and RD 1614/2010 did not apply against new macroeconomic circumstances or in situations of over-compensation because "*there was no 'over-compensation' nor did Spain make any such ex ante finding*", and the reference to new macroeconomic circumstances is an attempt to raise a *force majeure* defence, which fails.[889]

    *b)*    Through the registration in the RAIPRE the Respondent "*entered into clear obligations with regard to each of RWE's investments.*" According to the Claimants, the RAIPRE "*is a favourable administrative act that contains an obligation on the Spanish State that is more binding than an obligation contained in a bilateral contract between an investor and the State.*"[890] The Claimants submit the RAIPRE was "*signed, stamped and issued by Spain to RWE's installations. It confirmed on its face the installation's right to receive the Special Regime FIT.*"[891]

---

[887] Cl. Mem. ¶ 510.

[888] Cl. Mem. ¶ 512.

[889] Cl. Skeleton ¶ 88.

[890] Cl. Reply ¶ 620.

[891] Cl. Skeleton ¶ 89. *See*, **C-0015**, Excerpts of the RAIPRE certificates of the installations. The RAIPRE certificates are issued by the Ministry on request. The RAIPRE certificates were issued by the Autonomous Communities to certify an installation's inscription in the Special Regime.

b.    *The Respondent's Position*

671.    The Respondent submits that the umbrella clause claim should be dismissed because "*neither the Claimant as the investor, nor the investment of the Claimant are covered under the umbrella clause of the ECT, as the Kingdom of Spain has not contracted any specific commitments, vis-á-vis, with the Claimant or their investment to petrify the RD 661/2007 regime in their favour.*"[892]

672.    According to the Respondent, because the last sentence of Article 10(1) of the ECT uses the term "*entered into*", the correct interpretation of the umbrella clause in Article 10(1) is that it only applies to "*specific bilateral obligations assumed by the Government with respect to an investor through an express, unequivocal and individual commitment for each investor or investment. This implies the formalisation or signature (entering into) a contract or equivalent bilateral instrument… .*"[893]

673.    In support of its interpretation, the Respondent cites *Noble Ventures v Romania*,[894] *SGS v Philippines*,[895] *AES Summit v Hungary,*[896] as well as to the ECT Readers' Guide.[897]

674.    The Respondent says that the cases cited by the Claimants in support of their interpretation are not applicable. According to the Respondent, (i) the tribunal in *Eureko B.V. v Poland* "*does not interpret 'any obligation' as referring to obligations outside of those arising from a contract*";[898] (ii) the criterion established in *LG&E v Argentina* and *Enron v Argentina* has been refuted by other awards, such as *El Paso v Argentina*, which

---

[892] Resp. C-Mem. ¶ 1039.

[893] Resp. Rej.¶ 1056.

[894] Resp. C-Mem. ¶ 1016; **RL-0026**, *Noble Ventures,* ¶ 51.

[895] Resp. C-Mem. ¶ 1017; **RL-0024**, *Société Générale de Surveillance SA v Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004 ¶ 166.

[896] Resp. C-Mem. ¶ 1021; **RL-0039**, *AES Summit*, Award.

[897] Resp. C-Mem. ¶ 1019; **RL-0053**, ECT: A Reader's Guide, p. 26.

[898] Resp. C-Mem. ¶ 1029(a); **RL-0043**, *Eureko,* ¶ 258.

decided that there must be an investment agreement for the umbrella clause to apply (as also decided in *CMS v Argentina*[899]).

675.  The Respondent says that it has not entered into any obligations with the Claimants for the purposes of Article 10(1).

a)  RD 661/2007 and RD 1614/2010 are generally applicable and do not apply vis-à-vis to the Claimants or their investments (as confirmed by the *Isolux* award[900]). RD 661/2007 "*did not contain specific commitments: (i) neither immutability of the remuneration regime against new macroeconomic circumstances or in situations of over-compensation; and (ii) nor immutability of non-economic measures*."[901] The *Charanne* award confirmed the "*non-existence of a freezing commitment of the regime of RD 661/2007.*"[902]

b)  Registration of the plants in the RAIPRE is not "*a commitment from the Government to indefinitely maintain a future rate of return for the entire RE Sector*." The Respondent says that it would be "*absurd to suggest that the tens of thousands of owners and the tens of thousands of facilities registered in the RAIPRE have a vis-a-vis commitment with the Government*." Additionally, the *Charanne* award dismissed the argument that such registration could create the expectations alleged by the Claimants.[903]

(2)  **The Tribunal's Analysis**

676.  Pursuant to the final sentence of Article 10(1) ECT:

---

[899] Resp. C-Mem. ¶ 1029(b)-(c); **RL-0041**, *El Paso,* Award, ¶ 533; **RL-0031,** *CMS Gas Transmission Company v Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Annulment, 25 September 2007 (hereinafter "***CMS,*** **Decision on Annulment**").

[900] Resp. Skeleton ¶ 71; **RL-0088**, *Isolux*, ¶¶ 771-772.

[901] Resp. Rej.¶ 1070.

[902] Resp. Rej. ¶ 1071; **RL-0049**, *Charanne*, ¶¶ 510 and 511.

[903] Resp. Rej.¶¶ 1074-1076.

> "Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."

677. The key issue for the Tribunal is whether this protection requires some form of specific consensual obligation in order to be engaged. The Tribunal considers that it does, as follows from the ordinary meaning of the words "*obligations it has entered into with an Investor or an Investment … .*"  Although the provision at issue was not identical to Article 10(1) ECT (it was broader in its terms[904]), the Tribunal is persuaded by the analysis of the formula "*entered into*" of the *ad hoc* Committee in *CMS v Argentina*, as follows:

> "In speaking of 'any obligations it may have *entered into* with regard to investments', it seems clear that Article II(2)(c) is concerned with consensual obligations arising independently of the BIT itself (*i.e.* under the law of the host State or possibly under international law). Further they must be specific obligations concerning the investment. They do not cover general requirements imposed by the law of the host State."[905]

678. The Tribunal considers that this analysis applies all the more so in the context of the ECT wording, where the obligation must be "*entered into with*" as opposed to "*entered into with regard to*" an Investor or Investment. This is all the more suggestive of a direct consensual link.

679. The Claimants have not pointed to any form of consensual obligation that would engage the Article 10(1) umbrella clause. The provisions of Spanish law that the Claimants rely on (RD 661/2007, Article 44(3), and RD 1614/2010, Articles 4 and 5(3)) do not qualify as such, and likewise the RAIPRE certificates of registration for the individual plants. While these were indeed signed, stamped and issued by Spain to RWE's installations, the Respondent is correct in the Tribunal's view in stating that such certificates did not constitute a commitment from the Government to maintain indefinitely a future rate of return. The nature of the legal obligations engaged as a matter of registration in the RAIPRE is a matter of Spanish law, and the Claimants have failed to establish that, as a

---

[904] Article II(2)(c) of the Argentina-USA BIT provides that "Each Party shall observe any obligation it may have entered into with regard to investments."
[905] **RL-0031**, *CMS*, Decision on Annulment, ¶ 95(a).

matter of such law, consensual obligations were entered into by Spain. The Claimants also refer to the July 2010 "agreement" but, even assuming in the Claimants' favour that this generated consensual obligations that remained valid in 2013-2014 (which the Tribunal does not accept), the "agreement" was not "*entered into with*" the Claimants or their Investments.

680.    Accordingly, this aspect of the claim fails.

## VII.    REPARATION

### A.    RESTITUTION

#### (1)    **The Parties' Positions**

##### a.    ***The Claimants' Position***

681.    The Claimants' primary remedy sought is restitution from Spain by (i) withdrawing all of the Disputed Measures and (ii) placing the Claimants under the same legal and regulatory framework that existed pursuant to the Special Regime's final regulation, RD 661/2007. Additionally, the Respondent must compensate the Claimants for the damages caused by the change in the regulatory regime. The Claimants reserved their right to value such losses if the Tribunal decides to order restitution.[906]

682.    According to the Claimants, as a result of the Respondent's breaches of Article 10 of the ECT, the Claimants are entitled to reparation according to the principles of customary international law, as codified in the ILC 2001.[907] The reparation must "*as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.*"[908] The Claimants submit that, under the principles codified in Articles 1, 28, 34, 35 and 36 of

---

[906] Cl. Mem. ¶ 523.

[907] Cl. Mem. ¶¶ 518-519; **CL-0018**, ILC 2001 Articles and **CL-0021**, J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), p. 60.

[908] Cl. Mem. ¶ 520, **CL-0068**, *Case Concerning the Factory at Chorzów (Germany v Poland)*, PCIJ Rep, Series A, No. 17, Judgment of 13 September 1928, (hereinafter "***Chorzów Factory***"),  p. 47; ILC 2001 Articles, Article 31.

the ILC 2001 Articles, Spain is under an obligation to make restitution to, or alternatively, compensate the Claimants for, its internationally wrongful acts and put the Claimants in the position they would have been but for Spain's wrongdoing.[909] According to the Claimants, the Respondent has not objected to the application of the ILC 2001 Articles and the principles contained in them.[910]

683.  In short, the Claimants seek restitution and, in the alternative (if the Tribunal believes that restitution is materially impossible or disproportionate[911]), the Claimants seek compensation for the damages caused by the Disputed Measures.[912]

b.   *The Respondent's Position*

684.  The Respondent denies that the Claimants are entitled to any form of reparation (restitution or compensation) because (i) the current regulatory regime continues to offer a reasonable profitability, as has been offered since 1997, and (ii) the Respondent has not breached the ECT.[913]

(2)   **The Tribunal's Analysis**

685.  The Tribunal considers that reparation must be ordered consistent with the basic proposition that reparation must "*as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.*"[914] As this is plainly not an appropriate case for restitution, the real issue concerns the amount of compensation to be awarded to the Claimants so as to ensure "*full reparation for the injury caused by the internationally wrongful act*", as per Article 31(1) of the ILC 2001 Articles. Not only has the Tribunal only found a breach of Article 10(1) ECT by reference to only certain of the Claimants' plants, even if the breach were as extensive as contended for by the Claimants, restitution

---

[909] Cl. Mem. ¶ 522.

[910] Cl. Reply ¶ 639.

[911] **CL-0018**, ILC 2001 Articles, Article 35.

[912] Cl. Mem. ¶ 524; **CL-0018**, ILC 2001 Articles, Article 36; **CL-0050**, *PSEG*, ¶ 282.

[913] Resp. C-Mem. ¶¶ 1041-1043.

[914] **CL-0068**, *Chorzów Factory* , p. 47; ILC 2001 Articles, Article 31.

would obviously involve a burden to the Respondent out of all proportion to the benefit to the Claimants deriving from restitution instead of compensation.[915] This case involves State regulation that is generally applicable across a very important sector in Spain i.e. the RE sector whereas, by contrast, the Claimants can very readily be afforded full reparation through compensation.

## B.    COMPENSATION

### (1)    The Parties' Positions

#### a.    *The Claimants' Position*

##### (i)    <u>Primary Valuation</u>

686.    The Claimants seek compensation for the damages due to Spain's breach of Article 10(1) ECT in the amount of EUR 415.6 million.[916]

687.    The Claimants say that the appropriate standard for compensation for a breach of Article 10(1) ECT is the "fair market value", specifically the difference in the fair market value of the investments with and without the Disputed Measures. The Claimants say that a number of tribunals have accepted that the fair market value is the appropriate standard of compensation when a treaty is silent on the standard of damages applicable for breaches other than expropriation.[917] The Claimants also say that the Respondent has not expressly objected to the fair market value standard.[918]

688.    The Claimants contend that the most appropriate method for calculating the fair market value, given the facts of the case, is the Discounted Cash Flow ("**DCF**") method.[919]

---

[915] **CL-0018**, ILC 2001 Articles, Article 35(b).

[916] Cl. Reply ¶ 638.

[917] Cl. Mem. ¶¶ 525-526; **CL-0038**, *CMS*, Award, ¶¶ 409-410; **CL-0025**, *Enron*, ¶¶ 361-363; **CL-0048**, *Sempra,* ¶¶ 403-404; **CL-0035**, *Azurix Corp v The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (hereinafter "***Azurix***"), ¶ 424; **CL-0073**, *Anatolie Stati*, ¶¶ 1460-1461; **CL-0056**, *Occidental Petroleum Corporation and Occidental Exploration and Production Company v The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012, ¶ 708.

[918] Cl. Reply ¶ 639.

[919] Cl. Mem. ¶¶ 539-540; Cl. Reply ¶¶ 659-667.

According to the Claimants' expert, Compass Lexecon, the DCF method is the most appropriate –

> "i) As it is a forward-looking method that assesses value based on anticipated future cash flows, it is particularly appropriate for the valuation of renewable energy projects, whose value comes from their expected future energy production rather than the amount of money historically invested.
>
> ii) It has been supported as the preferred valuation method for revenue producing assets by leading authors.
>
> iii) It is a widely used method of valuation analysis. The majority of investors and asset owners alike rely on DCF analyses to decide whether or not to embark upon a project.
>
> iv) International Organisations, such as the World Bank, support it as a valid method to estimate fair market value in the context of international disputes.
>
> v) It is a well-adapted valuation method for companies whose projected revenues are fully or partly defined by contract, law or regulation, as is the case of the Claimants' investments."[920]

689. The Claimants emphasise that the Tribunal does not need to look at the internal law to determine the appropriate method for reparation,[921] which is a question to be determined solely by reference to public international law and the ECT standard of fair market value. Thus, the views in the Judgment of the Spanish Supreme Court of 24 September 2012[922] on the DCF method have no bearing on this question.[923]

---

[920] Cl. Mem. ¶ 541.

[921] **CL-0004**, Vienna Convention, Article 27; **CL-0018**, ILC Articles 2001, Article 32; **CL-0066**, *SGS v Pakistan*, Decision on Objections to Jurisdiction; **CL-0144**, *Biwater Gauff (Tanzania) Ltd v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008; **CL-0146**, *ATA Construction, Industrial and Trading Company v The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010; **CL-0039**, *LG&E*, ¶ 146; **CL-0153**, *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v The Argentine Republic*, ICSID Case No. ARB/03/19, and *AWG Group Ltd v The Argentine Republic*, UNCITRAL, Decision on Liability, 30 July 2010; and **CL-0143**, *GAMI Investments, Inc. v The United Mexican States*, UNCITRAL, Final Award, 15 November 2004; **CL-0131**, *Asian Agricultural Products Ltd. v The Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990.

[922] **R-0147**, Judgment of the Supreme Court of 24 September 2012, Appeal 60/2011, Legal Ground Six.

[923] Cl. Reply ¶ 651.

690. The Claimants also contend that a valuation through an investment-based method, especially the "regulatory asset base" (RAB) is inappropriate because: (i) there is no investment-treaty jurisprudence that has adopted the RAB method, (ii) it is inadequate to value RE installations the value of which is fundamentally dependent on future regulatory cash flows, and (iii) the RAB method ignores the change in the RE regime in which Claimants expected a FIT regime for the entire operational life of the RE installations.[924]

691. Compass Lexecon has carried out the DCF valuation of the Claimants' assets as of 20 June 2014 comparing the (i) "But-For" scenario and the (ii) "Actual" scenario. The difference between the two scenarios represents the damages to the Claimants due to the lost value of the investments as of the date of valuation.[925] The But-For scenario assumes that the Disputed Measures were never implemented, thus, the Claimants' installations continue operating for their entire operating life under the Special Regime of RD 661/2007. The Actual scenario carries out the valuation with the full effect of the Disputed Measures.[926]

692. The Claimants contend that the correct date for the calculation of the DCF is as of 20 June 2014 following the "irreversible deprivation" test in cases of indirect expropriation, which has been adopted by tribunals in cases other than expropriations.[927] According to the Claimants, in cases where there has been an indirect expropriation resulting from a series of measures, the appropriate date for determining liability and valuing damages should be the culmination of all the events rather than the date of the first event.[928] It is said that the correct date for valuation is 20 June 2014 because (i) Spain published Order IET/1045/2014 finally defining the parameters of the New Regime, (ii) the Transitory Regime following the coming into force of the New Regime would not allow the Claimants to value their investments with a reasonable degree of certainty and therefore

---

[924] Cl. Reply ¶¶ 708-719. Compass Lexecon, Second Report ¶¶ 239-240. *See also*, Claimants' oral opening at Day 1/232-234.

[925] Cl. Mem. ¶ 531.

[926] Cl. Mem. ¶ 531.

[927] **CL-0035**, *Azurix*, ¶¶ 417-418.

[928] Cl. Mem. ¶ 547; **CL-0081**, *Compañía del Desarrollo de Santa Elena v Costa Rica*, ICSID Case No. ARB/96/1, Award, February 2000, ¶ 76.

a valuation carried out during such period would be artificial,[929] and (iii) Order IET/1045/2014 represented the final act of an approximately two-year legislative backlash against RE which wiped out 56% of the value of the Claimants' Investments.[930]

693.  Further, Compass Lexecon has followed two approaches when making the DCF analysis: (i) a free cash flows to firm ("**FCFF**") approach, which is the cash flow available to the company, based on revenues over the life of the project after deducting all operating expenses, expenditures in working and fixed capital, discounted at a rate that reflects the cost of raising capital, both equity and debt for a similar company; and (ii) a free cash flow to equity ("**FCFE**") approach, which also deducts all debt interests and net debt capital payments, discounted at the rate that reflects the cost of raising equity capital for a similar project.[931]

694.  Under the But-For scenario and the Actual scenario, Compass Lexecon's valuation comprises two main elements: (i) the Claimants' lost cash flows between 1 January 2013 (when Law 15/2012 entered into force) and 20 June 2014 ("**Lost Cash Flows**") and (ii) the Claimants' lost future cash flows as at 20 June 2014 ("**Lost Value**").[932]

695.  To calculate the Lost Cash Flows, Compass Lexecon compares what the Claimants would have earned, but for the Disputed Measures, to what the Claimants actually earned (using actual data) with the Disputed Measures in place. The difference between the two scenarios amounts to the lost historical cash flows.[933] This analysis has the benefit of the hydro and wind plants' actual financial and operational data for that period.[934]

696.  Compass Lexecon makes assumptions as follows to define the But-For scenario in order to calculate the Lost Cash Flows:

---

[929] Navarro Statement ¶¶ 83-84.
[930] Cl. Mem. ¶ 556. Compass Report ¶¶ 22, 29-30 and 219.
[931] Cl. Mem. ¶ 542; Compass Report ¶ 185.
[932] Cl. Mem. ¶ 533.
[933] Cl. Reply ¶ 652.
[934] Cl. Mem. ¶ 559; Cl. Reply ¶ 650; Compass Report ¶ 269.

a)   The FIT continues under RD 661/2007 in the But-For scenario, whereas in the Actual scenario, the Premium has been withdrawn. In the Actual scenario, Compass Lexecon assumes the plants are paid in what they define as the "**Second Regulatory Framework**"[935] (i.e., on an interim basis from 14 July 2013) until 20 June 2014.[936]

b)   The Disputed Measures do not have any effect on the actual MWh of production.[937]

c)   In the But-For scenario, there is no imposition of the 7% levy, which does apply in the Actual scenario (which likely increased the pool price of electricity). Compass therefore lowers the pool prices by 7% in the But-For scenario to adjust for that effect.[938]

d)   The operating expenses ("**OPEX**") are the same in the But-For and Actual scenario, except for the 7% levy on production for all wind projects and the 7% and 2.2% levies on the use of mainland waters in the case of hydro plants, which apply only in the Actual scenario.[939]

e)   The capital expenditures ("**CAPEX**") are the same in both scenarios.[940]

697.  By reference to the above, Compass Lexecon has calculated the Lost Cash Flows at EUR 8.3 million.[941]

---

[935] Compass Report ¶ 4(a): "*The "Second Regulatory Framework," in force from January 1, 2013 to July 13, 2013, was implemented through Law 15/2012 of December 27, 2012 ("Law 15/2012") and Royal Decree Law 2/2013 of February 1, 2013 ("RDL 2/2013"). It eliminated certain support payment options, modified the annual indexing mechanism of support payments and introduced a 7.0% levy on power plant revenues and an additional 2.2% levy on mini-hydro plant revenues, levies which continue to be in force.*"

[936] Cl. Mem. ¶ 561(i); Compass Report, Appendix D ¶¶ 271-272.

[937] Cl. Mem. ¶ 561(ii); Compass Report, Appendix D, fn. 268.

[938] Cl. Mem. ¶ 561(iii); Compass Report, fn. 74 and Appendix D ¶¶ 201-201, 274-275 and 280.

[939] Cl. Mem. ¶ 561(iv); Compass Report ¶¶ 201-203 and 274-275.

[940] Cl. Mem. ¶ 561(v); Compass Report ¶ 204, Appendix D ¶ 276.

[941] Cl. Reply ¶ 652; Compass Lexecon, Second Report ¶¶ 244-245. Compass had calculated the Lost Cash Flows in the Compass Report at EUR 8.5 million, but after having corrected three minor mistakes (i) production for wind plants, (ii) cost of access charges, and (iii) accumulated net operating losses, resulted in a decrease of the damages (*See,.* Compass Lexecon, Second Report ¶¶ 243-244).

698. To measure the Lost Value as at 20 June 2014, Compass Lexecon forecasts the cash flows that the wind and hydro assets are expected to generate over time in both the But-For and Actual scenarios then calculates the difference between them. This difference represents the impact of the Disputed Measures on the Claimants' investments.[942]

699. Compass Lexecon calculates the net present value ("**NPV**") of the reasonably expected cash flows of the Claimants' wind and hydro installations for both the Actual and the But-For scenarios. Compass has again made two calculations in both scenarios: (i) a Free Cash Flows to Firm ("**FCFF**") calculation[943] and (ii) a Free Cash Flows to Equity[944] ("**FCFE**") calculation.[945] In order to calculate the NPV:

a)     It is assumed that the plants operate until the end of their technical life, after which they would be dismantled, (i) 20 years in the case of wind plants and (ii) 25-40 years in the case of hydro plants, in the Both For and Actual scenario.[946]

b)     In the But For scenario, revenues are calculated as the product of electricity production (based on Aersa's latest business plan prior to the Disputed Measures) and the unitary remuneration. To achieve this, the regulated tariff and the premium options are projected using the most recent inflation forecast for Spain from the International Monetary Fund (IMF) minus 0.5%, and it is assumed that the plants will always opt for the alternative which yields the highest expected payment. For the Actual scenario, Compass Lexecon calculates the revenues as the sum of the investment payment and the revenues received from the wholesale market as the plants receive no operating payment. In the Actual scenario, Compass Lexecon has also considered the "claw-back" payment intended for repayment of the revenues collected during the Transitory Period in excess of the revenues that the plants were

---

[942] Cl. Reply ¶ 653; Cl. Mem. ¶ 563.

[943] Cl. Mem. ¶ 564. Calculation that measures the value of a business by adding the cash flows that the company expects to generate in the future, discounted at a rate that reflects the company's opportunity cost of investing in the project(s).

[944] Cl. Mem. ¶ 564.Calculation that measures the cash flows available to the company's equity holders after deducting all debt interest and principal payments, discounted at a rate that reflects the cost of raising equity for a similar project.

[945] Cl. Mem. ¶¶ 563-564; Compass Report ¶ 185.

[946] Cl. Mem. ¶ 565; Compass Report ¶¶ 43 and 191.

entitled to under the Third Regulatory Period.  As part of the revenues, Compass Lexecon has also considered the revenues for reactive energy.[947]

c)   Compass Lexecon has projected spot prices for 2014-2017 in the Actual scenario using future contracts traded in OMIP, the Iberian Energy Derivatives Exchange.[948] Compass then assumes the prices will converge to the variable costs of combined cycle gas turbine generators in 2025, and that thereafter, prices will grow at the inflation rate. In the But For scenario, Compass uses the same prices but adjusts the 7% levy.[949]

d)   Compass Lexecon adopts the inflation forecast of the IMF until 2019. Thereafter, due to the lack of IMF forecasts after 2019, it adopts the European Central Bank target inflation rate of 2%.[950]

e)   The OPEX are the same in the But-For and Actual scenarios adjusted pursuant to inflation, with the exception of the access fee to the grid. In the Actual scenario, Compass Lexecon has also taken into account the 7% levy on electricity production for both wind and hydro installations, and the 2.2% levy on the use of mainland waters in the case of hydro installations.[951]

f)   Compass Lexecon uses Aersa's projections for the CAPEX until 2023. Thereafter, it maintains CAPEX at a stable level for each project until the end of its useful life.[952]

g)   The value of all scheduled debt service is calculated at the company's cost of debt of 5.79%.  Compass Lexecon also assumes no further issuance of debt.[953]

---

[947] Cl. Mem. ¶ 565; Compass Report ¶¶ 195-8.

[948] **CLEX-104**, OMIP, Spanish Electricity Futures as of 20 June 2014.

[949] Cl. Mem. ¶ 565; Compass Report, Appendix D ¶¶ 279-280.

[950] Cl. Mem. ¶ 565; Compass Report, Appendix E ¶ 278.

[951] Cl. Mem. ¶ 565; Compass Report ¶¶ 202 and 274.

[952] Cl. Mem. ¶ 565; Compass Report ¶ 204.

[953] Cl. Mem. ¶ 565; Compass Report ¶ 205.

h)    Income tax of the Claimants' investments is at 30%, which is the statutory Spanish income tax rate in force as of the date of valuation.[954]

i)    The rate of return in the actual scenario is the 7.398% rate of return for the first regulatory period. For the following regulatory periods, Compass Lexecon has used the one-year average return of the ten-year Spanish sovereign bond of 3.79% plus 300 basis points, which results in a pre-tax rate of return of 6.79%.[955]

700.    Compass Lexecon then calculates the discount factor in the FCFF approach, discounting the expected free cash flows using the weighted average cost of capital ("**WACC**"), a rate that represents the cost of raising debt and equity in the corresponding industry and location.[956]

701.    The Capital Asset Pricing Model ("**CAPM**")[957] is then used to calculate the cost of equity. The cost of equity is calculated by using the standard parameters of the risk-free rate, the "β" (beta), the market risk premium and the country-risk premium:[958] Compass Lexecon adopts a risk-free rate of 1.61%,[959] a β of 0.76,[960] a market-risk premium of 5%,[961] and a country risk premium of 2.18%,[962] which are then used in the standard CAPM equation to derive a discount rate of 7.61%.[963]

702.    With respect to the cost of debt, Compass Lexecon estimates an industry risk premium of 2% and uses the same risk-free rate and country-risk premium used to calculate the

---

[954] Cl. Mem. ¶ 565; Compass Report ¶ 208.

[955] Cl. Mem. ¶ 565; Compass Report, Appendix D ¶¶ 287-288.

[956] Cl. Mem. ¶ 566.

[957] **CL-0079**, M. Kantor, Valuation for Arbitration: Compensation Standards, Valuation Methods and Expert Evidence (Kluwer Law International, 2008), p. 163.

[958] Cl. Mem. ¶¶ 566-567.

[959] Compass Report, Appendix C ¶ 248.

[960] Compass Report, Appendix C ¶ 251.

[961] Cl. Mem. ¶ 567(i); Compass Report, Appendix C ¶ 249.

[962] Cl. Mem. ¶ 567(iv); Compass Report, Appendix C ¶ 259; Compass Report, Appendix C ¶¶ 260 and 261.

[963] Compass Report, Appendix C, Table 11.

cost of equity, which results in a pre-tax cost of debt of 5.79% or an after-tax cost of debt 4.05% (in Euros).[964]

703.  With respect to the FCFE approach, the discount rate is only represented by the cost of equity, which is calculated as mentioned above (discount rate of 7.61%).[965]

704.  The Claimants further request the Tribunal to grant pre-award and post-award interest. The Claimants contend that the appropriate benchmark for calculating interest is contained in Article 13 of the ECT, which provides that interest will be calculated "*at a commercial rate established on a market basis from the date of expropriation until the date of payment*." The Claimants say that this Article also applies to damages arising out of breaches of the ECT that do not amount to an expropriation.[966]

705.  The Claimants submit that both pre-award and post-award interests should be awarded at a rate of 7.61%, compounded monthly.[967]

706.  In the Memorial, the Claimants submitted that in order to achieve full reparation the damages should include a gross-up over the amount awarded for taxes, and reserved their rights to provide a figure for gross-up at a later stage because it was uncertain in which fiscal year the award would be rendered.[968] In the Reply, the Claimants included a tax gross-up calculation in the amount of EUR 55.9 million or 15.5%. This calculation assumes: (i) that RWE Aersa is the recipient of any potential compensation; (ii) a corporate income tax rate of 25%; (iii) that the award is rendered in 2018; and (iv) net operating losses as of 2018 of EUR 192.1 million.[969]

707.  In summary, the Claimants contend that their damages are correctly calculated at EUR 267.7 million[970] (excluding interest and a tax gross-up) under the Free Cash Flows to the

---

[964] Compass Report, Appendix C ¶ 265.
[965] Compass Report, Appendix C ¶ 243.
[966] Cl. Mem. ¶ 571.
[967] Cl. Mem. ¶¶ 575-578.
[968] Cl. Mem. ¶ 579.
[969] Cl. Reply ¶¶ 638, 731-735.
[970] Compass Lexecon, Second Report ¶ 44 and Section VI.4.

Firm (FCFF) approach, or EUR 263.7 million[971] (excluding interest and a tax gross-up) under the Free Cash Flows to the Equity (FCFE) approach.[972]

708. Compass Lexecon capitalises the damages suffered by the Claimants under the FCFF approach at the pre-judgment rate of 7.61% to reach a capitalised damages figure of EUR 359.7 million.[973] Further, including the tax gross-up calculation of EUR 55.9 million or 15.5%, the total compensation figure amounts to EUR 415.6 million.[974]

709. The Claimants contend that the damages sought are not speculative because the Claimants' expectations were not limited to a reasonable return. Further, even if the Tribunal finds that they were in fact limited by the concept of reasonable return, the Claimants have not received (and will not receive) a reasonable return under the New Regime. Therefore, Spain would still be liable and would have to compensate the Claimants for the losses suffered.[975]

(ii)    **Alternative claim by reference to reasonable return**

710. In the alternative that the Tribunal finds that the Claimants' expectations were limited to a reasonable return, the Claimants say that they have still losses, and they have calculated the fair market value of their investments with and without the Disputed Measures within the reasonable return paradigm.[976]

711. For this alternative valuation, Compass Lexecon assumes that the sole entitlement of the Claimants' plants is to earn the return that the CNE considered reasonable when Spain implemented RD 661/2007, that is 8.2%-11.2% after tax.[977] This return is applied to the

---

[971] Compass Lexecon, Second Report ¶ 45 and Section VI.4.

[972] Cl. Reply ¶ 637.

[973] Compass Lexecon, Second Report ¶ 258.

[974] Cl. Reply ¶ 638; Compass Lexecon, Second Report ¶ 259.

[975] Cl. Reply ¶ 648.

[976] Cl. Reply ¶ 724.

[977] Compass Lexecon, Second Report ¶¶ 7, 47 and 256.

model installations defined under the New Regime that Spain has assigned to the Claimants' installations.[978]

712. Compass Lexecon makes this calculation under two approaches: (i) the Alternative FIT But-For approach[979] and (ii) the Alternative Capacity Payment But-For approach,[980] with a DCF method applied.[981]

713. Under the Alternative FIT But-For approach, the losses amount to EUR 320.5 million under the FCFF approach, and EUR 311.2 million under the FCFE approach.[982] Under the Alternative Capacity Payment But-For approach, the losses amount to EUR 261.5 million under the FCFF approach, and EUR 254.7 million under the FCFE approach.[983] These amounts are net of interest and tax.[984]

b.   **The Respondent's Position**

714. The Respondent submits that the Claimants are not entitled to any form of reparation. However, the Respondent also submits its own alternative valuations in the event that the Tribunal finds that it has jurisdiction, that Spain breached its obligations under the ECT, and that the DCF method is appropriate in this case.[985]

715. The Respondent contends that the Claimants' alleged damages are not subject to compensation because they are speculative. The Respondent argues that the Claimants' "*approach of distinguishing between 'historical' flows and future flows fails to take into*

---

[978] Cl. Reply ¶ 725.

[979] Compass Lexecon calculates the alternative values of the RD 661/2007 Fixed Tariff and Premium that would apply to the Claimants' wind and hydro installations from 1 January 2013, based on the concept of "reasonable return." The figures for the Fixed Tariff and Premium are fixed so that the "*standard plant (as defined by the current regulatory framework) can achieve the rates of return assessed as reasonable by the CNE in its report 3/2007.*" Compass Lexecon, Second Report ¶ 96.

[980] Compass Lexecon calculates the damages assuming that the Government replaced the FIT scheme "*with a fixed annual payment per MW of installed capacity analogous to the fixed investment payment defined under the current regulatory framework.*" Compass Lexecon, Second Report ¶ 257(b).

[981] Compass Lexecon, Second Report, p. 253.

[982] Compass Lexecon, Second Report, p. 254.

[983] Compass Lexecon, Second Report, p. 255.

[984] CL. Reply ¶ 730; Compass Lexecon, Second Report, pp. 254-255.

[985] Cl. Reply ¶ 1082.

*account the essential concept of regulatory useful life and omits the joint consideration of cash flows, past and future, in order to guarantee reasonable profitability on the investments that were made. As a result, said approach should be fully rejected.*"[986]

716.   The Respondent submits that the Claimants base their claim on a comparison between an Actual and But-For scenario, assuming that the actual scenario is going to be maintained during the next decade and ignoring the principles of reasonable return. In this sense, the Claimants try to predict "*data like the pool price (dependent on the price of crude oil) and the demand for energy. It is because of all this that the projection of the existing parameters is hypothetical and illusory.*"[987] The long-term horizon in which the calculation is made, and the fact that there is no guarantee that the remuneration scheme will be petrified as it is, makes the Claimants' valuations of damages speculative.[988]

717.   The Respondent relies on the Supreme Court of Spain's Ruling of 24 September 2012, Point of Law Six,[989] in which according to the Respondent, the Supreme Court says that extrapolations to so far a future lack security and therefore the assumptions do not meet the burden of proof. The Respondent says that Compass Lexecon's assumptions are such as the Supreme Court refers to.[990]

718.   With respect to the DCF method, the Respondent says that this is not appropriate because it is also speculative. It is said that both Parties accept that the DCF method is not appropriate in all cases, as was established in the award in *Rusoro v Venezuela*.[991]

719.   According to the Respondent, *Ripinsky*[992] has established that the use of DCF could lead to the overvaluation of financial impacts based on future events when numerous

---

[986] Resp. C-Mem. ¶¶ 1049-1051.

[987] Resp. Rej.¶ 1085.

[988] Resp. Rej. ¶ 1086.

[989] **R-0147**, Judgment of the Supreme Court of 24 September 2012, Legal Ground Six.

[990] Resp. Rej.¶ 1089.

[991] Resp. Rej.¶¶ 1091-1093. **RL-0074**, *Rusoro Mining Limited v Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016, ¶ 760.

[992] **RL-0057**, S. Ripinsky & K. Williams, *Damages in International Investment Law* (British Institute of International and Comparative Law, 2008) (hereinafter "**Ripinsky & Williams**"), pp. 200 and 201.

assumptions need to be made as to the future.[993] The Respondent says that there are various circumstances in this case that makes inappropriate the use of the DCF method:

> "(a)The fact that it involves a capital-intensive business, with a significant asset base. Practically all its costs arise from investing in tangible infrastructure. There are no relevant intangible assets to analyse.
>
> (b) The high dependency of the cash flows on external, volatile and unpredictable elements, such as the price of the pool, inter alia.
>
> (c) The long-term nature of the forecasts.
>
> (d) The contradiction between said time horizon and the useful life declared in some of the plants' official accounting records, which is shorter.
>
> (e) The disproportion between the alleged investments (and the alleged assumed risk) and the amount claimed, evidenced by the profitability obtained."[994]

720. In light of these circumstances, the Respondent says that the appropriate valuation methods are based on the cost of assets, examining whether they are recovered and a reasonable return is obtained.[995] According to the Respondent, *Marboe* also stresses the advantages of methods based on assets, which are less speculative and simpler to apply, and makes reference to normal profitability and book value as obligatory references, particularly when the investment is very recent.[996]

721. The Respondent's expert, BDO, puts forward the view that "*a payment model based on the regulatory asset base is perfectly valid for remunerating producers of renewable energies. Thus, the United Kingdom has already considered a payment model based on RAB within the different alternatives to provide support to renewable energies.*"[997]

---

[993] Resp. C-Mem. ¶ 1062.

[994] Resp. C-Mem. ¶ 1063.

[995] Resp. Rej.¶ 1096; **RL-0057**, Ripinsky & Williams, p. 227.

[996] Resp. C-Mem. ¶¶ 1066-1067; **RL-0058**, Irmgard Marboe, *Calculation of Compensation and Damages in International Investment Law* (Oxford, Oxford International Arbitration Series, 2009), pp. 267 and 275; BDO second report ¶¶ 19-22.

[997] BDO second report ¶ 18.

722. The Respondent then submits that the profitability rates obtained by the Claimants' installations are higher than reference return rates, thereby removing the grounds for claiming any damages whatsoever with regard to the investments. Additionally, the Respondent argues that Compass Lexecon's valuation method should be disregarded because it provides abnormal results.[998] According to BDO:

> "the results obtained do not change our conclusions reached in our First Report which are that the return in the Actual scenario is above the return demanded by the capital markets and that the return that would have been achieved in the But-for scenario presented by Compass Lexecon would be excessive for a business such as the one under analysis."[999]

723. Also, according to BDO: (i) in a But-For scenario the average profitability rates for the Claimants' installations would be 17.9% for the wind farms and 9.4% for the hydro plants. These profitability rates are disproportionate in relation to the risk profile of the investments;[1000] (ii) in the Actual scenario, BDO calculated the profitability rates at 15.1% for wind power and 7.8% for hydro;[1001] (iii) BDO calculated the average profitability rate for the installations obtained over their full useful life, taking July 2013 as the appraisal date, with the wind power installations obtaining 16.0% and the hydro power installations 8.0%;[1002] and (iv) BDO also calculated the rates of return obtained by the plants after the measures as 10.7% for wind power and 7.5% for hydro, before tax (average, 10.6% before tax, equivalent to 8.27% after tax).[1003]

724. The Respondent contends on the basis of the above figures that "*it is clear that profitability figures are notably high, especially when compared to rates such as: the reasonable profitability laid down by the legislation in force at 7.398%; the WACC of the sector calculated by BDO, at 4.9%; the WACC of the sector in Germany, at 4.6%;*

---

[998] Resp. C-Mem. ¶ 1071; BDO first report ¶¶ 100 *et seq*.

[999] BDO second report ¶ 244.

[1000] Resp. C-Mem. ¶ 1072; BDO first report ¶¶ 29-34.

[1001] Resp. C-Mem. ¶ 1073; BDO first report ¶ 112.

[1002] Resp. C-Mem. ¶ 1074; BDO first report ¶¶ 125-128.

[1003] Resp. Rej.¶ 1102; BDO second report ¶¶ 244-245 and table 13.

*even the WACC calculated by Compass Lexecon itself, at 6.06%; and, lastly, the interest on the Spanish 10-year bond, at around 1.8%.*"[1004]

725.    With respect to the claimed 7.61% rate of interest, compounded monthly, the Respondent says that no justifications are given BDO proposes as "more reasonable" an interest rate according to the cost of Spain's public debt, the Spanish 2-year bond, at 0.60%.[1005] The Respondent says that Mark Kantor[1006] and awards such as in *National Grid v Argentina*,[1007] advocate for a "risk free rate."[1008]

726.    With respect to the Tax Gross-Up, the Respondent submits that, besides the Claimants failing to assert in its Memorial "*the specific tax (or taxes) that would be applicable; the Government that would supposedly impose said tax (the home country or the host country); and, unsurprisingly, even an approximate quantification of the amount of said tax*", the Tax Gross-Up is unjustified.[1009] With respect to the Tax Gross-Up argument made in Claimants' Reply, based on corporate tax from RWE Aersa at 25%, the Respondent states that at "*no time during the process prior to the Counter-Memorial has the Claimant's representation stated that compensation is paid only to the Spanish company* [RWE Aersa]. *This was not stated in the Request or in the Memorial on the Merits.*"[1010] Moreover, it is said that the request lacks justification as the Claimants have not provided any factual or legal background or expert report in substantiation.

727.    In addition, the Respondent says that the Tax Gross-Up is inadmissible on the following grounds: (i) the Tax Gross-Up is vetoed in Article 21 ECT,[1011] which established a Tax

---

[1004] Resp. C-Mem. ¶ 1075, BDO second report ¶¶ 52-54.

[1005] BDO First Report ¶ 263; Resp. Rej.¶¶ 1109-1110.

[1006] **RL-0076**, Mark Kantor, "*Valuation for Arbitration: Compensation Standards, Valuation Methods and Expert Evidence*" (Kluwer Law International, 2008), p. 49.

[1007] **RL-0079**, *National Grid P.L.C. v Argentine Republic*, UNCITRAL, Award, 3 November 2008, fn. 122.

[1008] Resp. Rej.¶¶ 1113-1114.

[1009] Resp. Rej. ¶¶ 1115-1116.

[1010] Resp. Rej.¶ 1120.

[1011] "Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency."

Gross-Up carve out,[1012] and (ii) even if the ECT is considered not to have a Tax Gross-Up carve-out, for the reasons explained above – the request is essentially speculative, contingent and uncertain – no Tax Gross-Up should apply.[1013]

728.    Finally, with respect to the Claimants' alternative FIT valuation, BDO says that Compass Lexecon has failed to understand the way in which the regulatory framework concerning the Spanish Electricity Grid works in terms of incentives to renewable energies. It is said that it is not rational to assume that the alleged reasonable returns in which payments were calculated under RD 661/2007 would not change during the life of the plants. Further, the calculation should have taken into account the fact that "*the current regime has a lower risk than the previous one, given that its revenue is linked, on the most part, to investment.*"[1014]

### (2)    The Tribunal's Analysis

729.    The Parties' experts have adopted largely different approaches to the assessment of damages, leading to radically different outcomes (as indeed is not uncommon in investment treaty cases). This is not, however, a case where the Tribunal can prefer the evidence of one expert over another and then select one of two very different damages figures put forward, at least as a basepoint from which to make its own calculations. The Tribunal has found a breach of Article 10(1) in this case, but this is a breach so far as concerns only –

   i.    the procurement of repayment of any sums already paid to the Claimants in the period between the adoption of RDL 9/2013 and Order IET 1025/2014;

   ii.    disproportionality with respect to certain of the Claimants' plants, i.e. the wind plants Urano, Grisel II, Bancal I and II, Siglos I and II, and the hydro plant Cepeda;

---

[1012] Resp. Rej. ¶¶ 1125-1128.

[1013] Resp. Rej. ¶¶ 1129-1135; **RL-0083**, *Abengoa, S.A. and COFIDES, S.A. v United Mexican States*, ICSID Case No. ARB(AF)/09/2, Award, 18 April 2013. ¶¶ 775, 776 and 777.

[1014] BDO second report ¶¶ 95-99.

730.   There is no basis for the Tribunal to be looking to establish and pay compensation by reference to the fair market value of the Claimants' Investments, which are still held by the Claimants, and which continue to generate significant revenue for them. Likewise, the Tribunal sees no basis for compensation by reference to an alleged reasonable return in the range of 8.2% to 11.2%.

731.   As to breach (i) identified above, the Claimants say that EUR 19.4 million had to be repaid, which has not been challenged. All that is required is verification and precise quantification of amounts paid.

732.   As to breach (ii), it is compensation with respect to the breach concerning the disproportionate impacts to the specific plants that the Tribunal must assess, as opposed to a breach with respect to the Claimants' Investments as a whole by reference to the defeating of legitimate expectations or one of the other bases pursuant to which the Claimants have formulated their fair market value and (alternative) reasonable return claims for damages. The evidence, as summarised in Section VI(D)(2) above, in particular in the form of Table 10 of the second report of Compass Lexecon which the Tribunal has accepted as reliable, is that certain plants are to achieve significantly lower returns than the 7.398% pre-tax benchmark that the Tribunal has adopted in its consideration of disproportionality, namely: Urano (2.8%), Grisel II (5.8%), Bancal I (4.4%), Bancal II (4.2%), Siglos I (4.7%) and Siglos II (4.7%), and the hydro plant Cepeda (-1.4%). According to Table 10, but for the Disputed Measures, the IRRs for these plants would have been: Urano (9.1%), Grisel II (9.9%), Bancal I (4.7%), Bancal II (4.6%), Siglos I (5.6%) and Siglos II (5.5%), and the hydro plant Cepeda (2.7%).[1015]

733.   As noted in the Commentary to Article 31 of the ILC 2001 Articles on State Responsibility:

> "The obligation placed on the responsible State by article 31 is to make 'full reparation' in the *Factory at Chorzów* sense. In other words, the responsible State must endeavour to 'wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that

---

[1015] The detailed calculations are set out in **CLEX-0235**, Correction of BDO's working papers, Table A, 22 March 2017.

act had not been committed' through the provision of one or more of the forms of reparation set out in chapter II of this part."

734.   This requires in the first instance identification of the relevant illegal act: here, breach by the Respondent of Article 10(1) through the disproportionate impact of the Disputed Measures to the Claimants' plants as listed above. The task for the Tribunal is to identify the level of compensation appropriate to wipe out all the consequences of that illegal act, and to "re-establish" – as opposed to "establish" – the situation which would, in all probability, have existed if the illegal act had not been committed. Thus, this very well-known formulation suggests that there is some limit on the extent to which the Tribunal can calculate damages by reference to a hypothetical scenario.

735.   On the current facts, on the 'but for' scenario set out by the Claimants' experts in their Table 10, certain of the plants that the Tribunal has identified as impacted to a disproportionate degree would achieve a return of more than 7.398%, but certain would achieve less.  Against that backdrop, the Tribunal identifies three possible approaches to establishing the appropriate measure of compensation:

   a)   The aim of the Disputed Measures may be taken as ensuring that, given the high investments costs for RE plants compared to other forms of generation, a minimum return of 7.398% would be achieved (subject to plant or operator inefficiencies), hence the compensation should aim at realising that minimum return for all the Claimants' plants.

   b)   Damages should be awarded by reference to the 'but for' scenario, which can be seen as a simple and balanced means of compensation in the slightly unusual circumstances where some plants would have received more, some less, than the 7.398% benchmark which the Tribunal has taken as an indicator of what is / is not disproportionate.

   c)   Damages should be awarded by reference to the 'but for' scenario, but with a cap to ensure that there is no recovery beyond the 7.398% benchmark.

736.    Approach (a) is problematic in that, with respect to the less profitable plants (Bancal I and II, Siglos I and II, and Cepeda), the Claimants would in fact be receiving compensation based on higher returns than if RD 661/2007 had remained in place. In other words, with respect to these plants, the Claimants would be placed in a situation better than that which would, in all probability, have existed if the illegal act had not been committed. Hence this approach is rejected.

737.    As to approach (b), there is no reason why those plants that were apparently not set to achieve returns as high as 7.398% under RD 661/2007 (Bancal I and II, Siglos I and II, and Cepeda) should attract compensation beyond what they would have achieved 'but for' the change in the regime.  Hence, the difference between the 'but for' and the 'actual' gives an appropriate measure of compensation. As to the plants that would be compensated on the basis of 'but for' returns of more than 7.398% (Urano and Grisel II), there is a question as to whether approach (b) is appropriate – hence the inclusion of approach (c), pursuant to which these two plants would only get compensation to the extent that the decrease in profits is below the 7.398% threshold that the Tribunal has taken as marking what is and is not disproportionate.

738.    In considering which of approaches (b) and (c) is to be preferred, it is useful to consider the approach to assessment of quantum in the *RREEF* case.  There, the tribunal found that:

> "… the Claimants were not immune from reasonable changes in the regime applicable to its investment; therefore, it is only to the extent that the modifications would have exceeded the limits of what is reasonable that compensation would be due and should be calculated."[1016]

739.    It was further held:

> "… the Tribunal considers that, while entitled to compensation for unreasonable return on their investments – if established -, the Claimants cannot claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent; they can only

---

[1016] Cf. **RL-0099**, *RREEF*, Decision on Responsibility and on the Principles of Quantum, ¶ 515. Cf. e.g. Cl. Mem. ¶¶ 525-526.

get compensation to the extent that such decrease is below the threshold of a reasonable return."[1017]

740.    In the context of the decisions on liability made in the *RREEF* case, this reasoning may appear persuasive. The relevant illegal act was found to be breach of the FET standard through the defeating of the legitimate expectation to a reasonable return.[1018] In terms of re-establishing the situation which would, in all probability, have existed if the illegal act had not been committed, the tribunal is understood to have been assessing compensation by reference to a pre-existing entitlement under (and a legitimate expectation generated by) Article 30(4) of Law 54/1997, i.e. to a return that is reasonable with reference to the cost of money in the capital market.[1019]

741.    The question for the Tribunal is whether similar reasoning may be deployed in this case, i.e. it could be said that the Claimants were not immune from changes in the regime applicable to their investment that were not disproportionate; therefore, it is only to the extent that the modifications would have exceeded the limits of what is not disproportionate that compensation would be due and should be calculated. It is necessary to ask, of course, whether this approach is consistent with Article 31 of the ILC 2001 Articles and *Factory at Chorzów*. The Tribunal considers this to be the case. Pursuant to the Tribunal's conclusions on liability, the Respondent has breached Article 10(1) through adoption of the Disputed Measures and in particular RD 413/2014 and Order IET 1045/2014 which, as the Claimant has noted, defined the parameters of the New Regime.[1020]    If such parameters had been formulated differently, the disproportionate impacts could readily have been avoided, notwithstanding the prior adoption/enactment of RDL 2/2013, RDL 9/2013 and Law 24/2013. In these very particular circumstances, in terms of re-establishing the situation that would, in all probability, have existed if the illegal act had not been committed, the Tribunal does not

---

[1017] **RL-0099**, *RREEF*, Decision on Responsibility and on the Principles of Quantum, ¶ 523.

[1018] The tribunal also found that there had been breach on the basis of retroactivity, but this was seen as either subsumed within the broader damages or raising separate issues that do not appear relevant for present purposes.

[1019] **RL-0099**, *RREEF*, Decision on Responsibility and on the Principles of Quantum, ¶ 523.

[1020] Resp. C-Mem. ¶ 60.

consider it appropriate to seek to re-establish the situation as established by RD 661/2007 and the further regulations under the old Special Regime.

742. Thus, by reference to this Tribunal's finding on liability, the "situation which would, in all probability, have existed if [the illegal] act had not been committed" is the replacement of the regime established by RD 661/2007 through the adoption of a regime largely equivalent to the Disputed Measures that did not however lead to disproportionate impacts due to different parameters being set. In light of this, the Tribunal considers it most appropriate to proceed on approach (c) as identified above.

743. In terms of assessing the damages to the Claimants by reference to the cash flows that they would have been received 'but for' the disproportionate impacts of RDL 9/2013 and Order IET/1045/2014 on the Claimants' plants as already identified, the Tribunal is greatly assisted by the detailed spreadsheet that backs up Table 10 to the second report of Compass Lexecon.[1021] This contains annual revenue and cash flow figures for each plant up to the end of the relevant period.

744. However, the Tribunal is not in a position to make a final calculation of damages by reference to this spreadsheet because: (a) Compass Lexecon has excluded the 7% tax cost in their 'but for' cash flow projections from 2013 onwards, whereas this is a matter over which the Tribunal has held that it has no jurisdiction; (b) the cash flows with respect to Urano and Grisel II need to be capped by reference to the 7.398% IRR benchmark; and (c) the appropriate discount rate needs to be applied with respect to cash flows that would have been received only in the future. As to this, the Tribunal accepts the discount rate of 7.61% advanced by the Claimants.[1022]

745. Given the figures already contained in the detailed spreadsheet, and the availability to the Parties of their respective experts, the Tribunal considers that these are matters that could readily be resolved between the Parties, enabling the Parties to revert to the Tribunal with an agreed figure. The Tribunal would then proceed to determine the final

[1021] **CLEX-0235**, Correction of BDO's working papers, Table A, 22 March 2017.
[1022] Cl. Mem. ¶ 568; Compass Report, Appendix C, Table 11.

damages figures, resolving the issues of interest and the tax gross-up that has been claimed, as well as costs.

746. Failing agreement reached between the Parties by **January 23, 2020**, the Tribunal will, following consultation with the Parties, fix a calendar for further submissions of the Parties on the damages due to the Claimants in respect of (i) the verification and precise quantification of those sums repaid with respect to those plants not entitled to any special payment under the new regime, (ii) Urano, Grisel II, Bancal I and II, Siglos I and II, and Cepeda, using as a base Table 10 to the second report of Compass Lexecon and the spreadsheet that underlies it.

747. Thus, by reference to the agreement of the Parties, or on the basis of further submissions, the Tribunal will decide on the amount of the compensation due to the Claimants. The Tribunal reserves its decision concerning interest and tax gross-up, and also on costs.

## VIII. DECISION

748. For the reasons set out above, the Tribunal decides as follows:

(1)     That it lacks jurisdiction to hear the claims of breach of Article 10(1) ECT with respect to the two Taxation Measures introduced by Law 15/2012 of 27 December 2017, but that the jurisdictional objections of the Respondent are otherwise rejected.

(2)     That the Respondent has breached Article 10(1) ECT (i) to the extent that it has procured repayment by the Claimants of sums previously paid by the Respondent under the regime in place prior to adoption of the Disputed Measures, and (ii) the disproportionate nature of the new measures that it has adopted, with specific respect to Urano, Grisel II, Bancal I and II, Siglos I and II, and Cepeda.

(3)     All other claims and requests of the Parties are dismissed.

(4)     The Parties are directed to attempt to reach an agreement on the amount of compensation to be paid by the Respondent to the Claimants in respect of its breaches of its obligations as identified in paragraph (2), in accordance with the Tribunal's

findings. In a first phase, the Parties are invited to agree by **January 23, 2020** on a reasonable schedule within which to attempt to reach agreement. If the Parties are unable to agree on such a schedule, such will be fixed by the Tribunal through further directions.

(5)    Insofar as the Parties fail to reach an agreement in accordance with (4) above, the Tribunal will, following consultation with the Parties, fix a calendar for further submissions of the Parties on the damages due to the Claimants.

(6)    The decision on the final determination of the damages due is thus reserved and will be fixed in the Award, along with the Tribunal's decisions as to interest, tax and costs.

_____

Ms. Anna Joubin-Bret
Arbitrator

_____

Mr. Judd L. Kessler
Arbitrator

_____

Mr. Samuel Wordsworth QC
President of the Tribunal