# EXHIBIT 43

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**SILVER RIDGE POWER BV**

Claimant

and

**ITALIAN REPUBLIC**

Respondent

**ICSID Case No. ARB/15/37**

---

# AWARD

---

***Members of the Tribunal***
Judge Bruno Simma, President
Judge O. Thomas Johnson
Prof. Bernardo M. Cremades

***Assistant to the Tribunal***
Dr. Andreas Müller

***Secretary of the Tribunal***
Mr. Francisco Abriani

*Date of dispatch to the Parties:* February 26, 2021

**REPRESENTATION OF THE PARTIES**

| | |
|---|---|
| *Representing Silver Ridge Power BV*: | *Representing the Italian Republic*: |

Mr. Barton Legum
Mr. Heiko Heppner
Dentons Europe LLP
5, boulevard Malesherbes
75008 Paris
France

  and

Mr. Michele Cicchetti
DWF
Via dei Bossi, 6
20121 Milano
Italy

Avv. Gabriella Palmieri
Avv. Carlo Sica
Avv. Giacomo Aiello
Avv. Pietro Garofoli
Avv. Laura Delbono
Avvocatura dello Stato
Via dei Portoghesi, 12
00186 Roma (I)
Italy

  and

Prof. Avv. Maria Chiara Malaguti
External Counsel to the Legal Service of the
Ministry of Foreign Affairs
Piazzale della Farnesina
00135 – Roma (I)
Italy

TABLE OF CONTENTS

I.     INTRODUCTION AND PARTIES ................................................................. 1
II.    PROCEDURAL HISTORY .......................................................................... 1
III.   FACTUAL AND REGULATORY BACKGROUND ................................. 14
       A.    The Claimant's Investments in Italy .................................................. 14
       B.    Elements and Evolution of the Italian Incentivization Regime for Photovoltaic
             Energy………… ......................................................................... 16
             (1)   European Union legislation .................................................... 17
             (2)   Italy's legislative and regulatory framework .................................. 18
       C.    The Challenged Measures ................................................................ 28
IV.    REQUESTS FOR RELIEF .......................................................................... 29
V.     JURISDICTION .......................................................................................... 32
       A.    The "Intra-EU Objection" ................................................................ 32
             (1)   The Parties' Positions ........................................................... 32
             a)    Respondent's Position .......................................................... 32
             b)    Claimant's Position ............................................................. 38
             c)    The European Commission's Position ....................................... 43
             (2)   The Tribunal's Analysis ......................................................... 44
             a)    EU Law as Law to be Applied by Investment Tribunals ................ 45
             b)    ECT or EU Law as the Prevailing Law ..................................... 49
             c)    Relevance of EU Law for the Interpretation of the ECT, notably Article 26 .. 55
             d)    Modification of the ECT, notably Article 26 ............................... 59
             e)    Relevance of the Enforceability of the Award ............................. 61
             f)    Conclusion ........................................................................ 63
       B.    Lack of Consent due to Exclusive Jurisdiction Clauses in the GSE Conventions .. 63
             (1)   The Parties' Positions ........................................................... 63
             a)    Respondent's Position .......................................................... 63
             b)    Claimant's Position ............................................................. 65
             (2)   The Tribunal's Analysis ......................................................... 66
       C.    Lack of Prior Request for Amicable Solution Regarding the Romani Decree ....... 70
             (1)   The Parties' Positions ........................................................... 70
             a)    Respondent's Position .......................................................... 70
             b)    Claimant's Position ............................................................. 72
             (2)   The Tribunal's Analysis ......................................................... 73

D.  Taxation "Carve-out" regarding the Administrative Fee imposed by the Fifth Energy Account ................................................................................... 76

    (1)  The Parties' Positions ..................................................................... 76

    a)  Respondent's Position ..................................................................... 76

    b)  Claimant's Position ......................................................................... 79

    (2)  The Tribunal's Analysis .................................................................. 80

E.  Conclusion ............................................................................................. 85

VI.  LIABILITY ................................................................................................... 86

A.  The Spalma-Incentivi Decree ................................................................ 86

    (1)  The Parties' Positions ..................................................................... 86

        a.  Claimant's Position ................................................................. 86

        (i)  Umbrella clause ..................................................................... 88

        (ii) Fair and equitable treatment ................................................. 91

        b.  Respondent's Position ............................................................ 94

        (i)  Umbrella clause ..................................................................... 95

        (ii) Fair and equitable treatment ................................................. 97

    (2)  The Tribunal's Analysis ................................................................ 101

        a.  Umbrella clause ................................................................... 102

        (i)  GSE conventions ................................................................. 102

        (ii) Legislative Decree No. 387/2003, the Romani Decree, the Second, Third, Fourth and Fifth Energy Accounts and the GSE tariff recognition letters ... 108

        (iii)Conclusion .......................................................................... 109

        b.  Fair and equitable treatment ................................................. 109

        (i)  Applicable legal standard ..................................................... 110

        (ii) Existence of legitimate expectations .................................... 124

        (iii)Reliance of the Claimant on legitimate expectations ............ 130

        (iv)Frustration of legitimate expectation of the Claimant ............ 132

        (v) Conclusion .......................................................................... 145

    (3)  Conclusion ................................................................................... 146

B.  Project Vega and the Adoption of the Romani Decree and the Fourth Energy Account ................................................................................................. 146

    (1)  The Parties' Positions ................................................................... 146

        a.  Claimant's Position ............................................................... 146

        b.  Respondent's Position .......................................................... 155

    (2)  The Tribunal's Analysis ................................................................ 157

    (3)  Conclusion ................................................................................... 165

C.  The Frosinone Plants and the Adoption of the Fifth Energy Account ................. 165

(1) The Parties' Positions ....................................................................... 165

    a.  Claimant's Position ................................................................ 165

    b.  Respondent's Position ........................................................... 172

(2) The Tribunal's Analysis.................................................................... 176

    a.  The fair and equitable treatment claim regarding the Frosinone plants . 177

    (i) Reasonableness.................................................................... 179

    (ii) Foreseeability ..................................................................... 179

    (iii)Proportionality.................................................................... 189

    (iv)Conclusion......................................................................... 192

    b.  The indirect expropriation claim regarding the Frosinone plants .......... 193

    c.  Introduction of an administrative management fee by the Fifth Energy Account and its amendment by the Spalma-incentivi Decree...................... 194

(3) Conclusion ...................................................................................... 199

D.  Conclusion................................................................................................. 199

VII. COSTS ................................................................................................. 200

A.  Claimant's Submission on Costs ............................................................... 200

B.  Respondent's Submission on Costs ........................................................... 200

C.  The Tribunal's Decision on Costs ............................................................. 200

VIII. AWARD ............................................................................................... 202

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| *Achmea* judgement | Judgement of the Court of Justice of the European Union in Case C-284/16, *Slovak Republic v. Achmea BV*, EU:C:2018:158, issued on 6 March 2018 (CL-116) |
| AEEG | Autorità per l'energia elettrica e il gas (Authority for the Electric Energy and Gas) |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ASR | Articles on Responsibility of States for Internationally Wrongful Acts, Annex to General Assembly Resolution 56/83 dated 12 December 2001 |
| C-[#] | Claimant's Exhibit |
| CJEU | Court of Justice of the European Union |
| Cl. *Achmea* Comments | Claimant's Comments on the *Achmea* Judgement dated 23 March 2018 |
| Cl. Counter-Memorial | Claimant's Counter-Memorial on Jurisdiction dated 8 June 2018 |
| Cl. Memorial | Claimant's Memorial on All Issues dated 29 September 2017 |
| Cl. PHB | Claimant's Post-Hearing Brief dated 8 November 2019 |
| Cl. Rejoinder | Claimant's Rejoinder on Jurisdiction dated 14 September 2018 |
| Cl. Reply | Claimant's Reply on All Issues dated 22 March 2019 |
| Cl. Reply PHB | Claimant's Reply Post-Hearing Brief dated 22 November 2019 |
| CL-[#] | Claimant's Legal Authority |
| EC | European Commission |
| EC Submission | *Amicus Curiae* Submission of the European Commission dated 22 October 2018 |
| ECT | Energy Charter Treaty |
| EU | European Union |

| FIT | Feed-in tariffs |
|---|---|
| GSE | Gestore dei Servizi Energetici S.p.A. (Management of Electricity Services Company) |
| GSE conventions | Conventions concluded between GSE and energy producers |
| G.U. | Gazzetta Ufficiale della Repubblica Italiana |
| Hearing on Jurisdiction | Hearing on Jurisdiction held on 1 November 2018 |
| Hearing on the Merits | Hearing on the Merits held from 23 September to 26 September 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IRR | Internal rate of return |
| PV plant | Photovoltaic plant |
| R-[#] | Respondent's Exhibit |
| REIO | Regional Economic Integration Organisation |
| Reply to the Request for Termination | Claimant's Reply to the Respondent's Request for Termination dated 18 February 2019 |
| Request | Request for Arbitration dated 29 July 2015 |
| Request for Termination | Respondent's Request for an Award Declaring Immediate Termination dated 31 January 2019 |
| Resp. *Achmea* Comments | Respondent's Comments on the *Achmea* Judgement dated 23 March 2018 |
| Resp. Counter-Memorial | Respondent's Counter-Memorial and Request for Bifurcation dated 2 February 2018 |
| Resp. PHB | Respondent's Post-Hearing Brief dated 8 November 2019 |
| Resp. Rejoinder | Respondent's Rejoinder on the Merits dated 28 June 2019 |
| Resp. Reply | Respondent's Reply on Jurisdiction dated 27 July 2018 |
| Resp. Reply PHB | Respondent's Reply Post-Hearing Brief dated 22 November 2019 |

| RL-[#] | Respondent's Legal Authority |
|---|---|
| Romani Decree | Legislative Decree Nr. 28/2011 of 3 March 2011 on the Implementation of Directive 2009/28/EC on the promotion of the use of energy from renewable sources (CL-080) |
| SME | Small and medium-sized enterprises |
| Spalma-incentivi Decree | Law Decree Nr. 91/2014 of 24 June 2014 (CL-085) |
| SPV | Special purpose vehicles |
| Terna S.p.A. | Rete Elettrica Nazionale (Italian electricity transmission system operator) |
| TEU | Treaty on European Union. Consolidated version published in the Official Journal of the European Union on 26 October 2012 |
| TFEU | Treaty on the Functioning of the European Union. Consolidated version published in the Official Journal of the European Union on 26 October 2012 |
| Tr. [Day] [Speaker(s)] [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 2 May 2017 |
| VAT | Value-added tax |
| VCLT | Vienna Convention on the Law of Treaties |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Energy Charter Treaty (the "ECT"), dated 17 December 1994, which entered into force for the Italian Republic and the Kingdom of the Netherlands on 16 April 1998,[1] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force for the Italian Republic and the Kingdom of the Netherlands on 28 April 1971 and 14 October 1966, respectively (the "ICSID Convention").

2.    The Claimant is Silver Ridge Power BV ("Silver Ridge" or the "Claimant"), a private limited liability company incorporated in the Kingdom of the Netherlands.

3.    The Respondent is the Italian Republic ("Italy" or the "Respondent").

4.    The Claimant and the Respondent are collectively referred to as the "Parties". The Parties' representatives and their addresses are listed above on page (i).

5.    In the present dispute, the Claimant challenges a series of measures taken by the Respondent between 2011 and 2014 as constituting violations by the Respondent of Articles 10 and 13 of the ECT.

## II.    PROCEDURAL HISTORY

6.    On 29 July 2015, ICSID received a request for arbitration of the same date from Silver Ridge against Italy (the "Request").

7.    On 11 August 2015, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule

---

[1] The fact that the Italian Republic notified the depositary of its withdrawal from the ECT on 31 December 2014 (see CL-248) and that this withdrawal took effect, pursuant to Article 47(2) of the ECT, one year later, i.e. on 1 January 2016, is not relevant in the present case since Article 47(3) of the ECT states that the treaty provisions shall continue to apply to investments made in the Respondent's territory as of the date when the withdrawal takes effect for a period of 20 years from such date.

7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.  By letter of 12 January 2016, ICSID noted that the Parties had not taken any steps in the proceedings following the registration and informed the Parties that, pursuant to ICSID Arbitration Rule 45, if no steps were taken within a six-month period, i.e. by 11 February 2016, the Secretary-General would discontinue the proceedings.

9.  By letter of 13 January 2016, the Claimant informed ICSID of its intent to continue the proceedings.

10.  By letter of 27 January 2016, the Claimant proposed a method of constituting the Tribunal. By email of 24 February 2016, the Claimant noted that the Respondent had not yet agreed to its proposal and asked if Italy was planning to propose a different method of constitution.

11.  By letter of 25 February 2016, the Respondent agreed with the Claimant's proposed method of constitution. In accordance with Article 37(2)(a) of the ICSID Convention, the Tribunal would be constituted as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

12.  By letter of 24 June 2016, the Claimant informed ICSID that the Parties had agreed to suspend the proceedings until 16 January 2017. By email of 28 June 2016, the Respondent confirmed its agreement to the suspension.

13.  By letter of 18 January 2017, the Claimant informed the Centre that it intended to resume the proceedings and that it would nominate its arbitrator in the coming weeks.

14.  By letter of 26 January 2017, the Claimant appointed Judge O. Thomas Johnson (U.S.) as arbitrator. By letter of 30 January 2017, ICSID confirmed that Judge Johnson had accepted his appointment.

15.  By letter of 28 February 2017, the Respondent appointed Prof. Bernardo M. Cremades (Spanish) as arbitrator. By letter of 1 March 2017, ICSID confirmed that Prof. Cremades had accepted his appointment.

16.     By letter of 28 April 2017, the Respondent informed the Centre that the Parties had jointly agreed to nominate Judge Bruno Simma (German/Austrian) as the President of the Tribunal. By email of the same date, the Claimant confirmed its agreement.

17.     On 2 May 2017, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mr. Francisco Abriani, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

18.     The Tribunal is composed of Judge Bruno Simma, a national of Germany and Austria, President, appointed by agreement of the Parties; Judge O. Thomas Johnson, a national of the United States of America, appointed by the Claimant; and Prof. Bernardo M. Cremades, a national of Spain, appointed by the Respondent.

19.     By letter of 23 May 2017, the Tribunal asked the Parties, *inter alia*, if they would consent to the appointment of Dr. Andreas Müller as Assistant to the Tribunal. By letters of 30 May 2017, both Parties confirmed that they had no objection to the appointment.

20.     In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 19 June 2017 by teleconference.

21.     Following the first session, on 10 July 2017, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, that the place of proceeding would be Paris, France, and that Dr. Andreas Müller would serve as Assistant to the Tribunal. Procedural Order No. 1 also sets out the agreed schedule for the merits phase of the proceedings.

22.     On 29 September 2017, the Claimant filed its Memorial on All Issues ("Cl. Memorial") with accompanying documentation.

23.     On 2 February 2018, the Respondent filed its Counter-Memorial ("Resp. Counter-Memorial"), which included a request for bifurcation and a request that the Tribunal

3

suspend the proceedings pending the decision of the Court of Justice of the European Union ("CJEU") in Case C-284/16.

24. By letter of 17 February 2018, the Tribunal invited the Claimant to respond to the Respondent's requests of 2 February 2018 by 21 February 2018.

25. By letter of 21 February 2018, the Claimant asked the Tribunal to reject the Respondent's requests for bifurcation and the suspension of the proceedings in full.

26. By letter of 27 February 2018, the Tribunal informed the Parties that it intended to rule on the Respondent's bifurcation request after the CJEU's decision in Case C-284/16 on 6 March 2018.

27. On 7 March 2018, on behalf of the Tribunal, ICSID transmitted the English and French versions of the CJEU's decision in Case C-284/16, *Slovak Republic v. Achmea BV* (the "*Achmea* judgement") to the Parties and invited them to provide any comments by 23 March 2018.

28. On 23 March 2018, both Parties provided their comments on the *Achmea* judgement ("Cl. *Achmea* Comments" and "Resp. *Achmea* Comments").

29. On 19 April 2018, the Claimant, on behalf of the Parties, transmitted a draft confidentiality order to the Tribunal for the Tribunal's consideration and signature.

30. On 19 April 2018, the Tribunal issued Procedural Order No. 2 granting the Respondent's request for bifurcation and laying out a procedural calendar for the next phase of the proceedings.

31. By letter of 27 April 2018, the Claimant asked the Tribunal to clarify the procedural calendar beyond the hearing on jurisdiction and provided suggested dates for further submissions/hearings. By email of 30 April 2018, the Tribunal invited the Respondent's comments on the Claimant's proposed calendar by 7 May 2018.

32. By email of 7 May 2018, the Respondent provided its comments on the calendar for the remainder of the proceedings.

33. By email of 8 May 2018, ICSID noted that it had not received a confirmation from the Respondent of its agreement to the confidentiality order received from the Claimant on

19 April 2018. It informed the Parties that, unless the Respondent objected, the Tribunal intended to sign and issue the order the following day. By email of the same date, the Respondent confirmed that it agreed with the contents of the order.

34.    By letter of 9 May 2018, the Tribunal proposed slight modifications to the confidentiality order and invited the Parties to provide their comments by 11 May 2018.

35.    By email of 10 May 2018, the Claimant confirmed its agreement to the Tribunal's proposed wording for the confidentiality order.

36.    By email of 17 May 2018, the Tribunal reiterated its request that the Respondent provide comments on the Tribunal's proposed changes to the confidentiality order. By email of 18 May 2018, the Respondent confirmed its agreement to the changes.

37.    On 21 May 2018, the Tribunal issued Procedural Order No. 3, embodying the Parties' confidentiality order.

38.    On 23 and 30 May 2018, the Claimant and the Respondent, respectively, provided signed copies of the confidentiality order pursuant to Procedural Order No. 3.

39.    On 8 June 2018, the Claimant submitted its Counter-Memorial on Jurisdiction ("Cl. Counter-Memorial") with accompanying documentation.

40.    On 27 July 2018, the Respondent submitted its Reply on Jurisdiction ("Resp. Reply") with accompanying documentation.

41.    On 14 September 2018, the Claimant filed its Rejoinder on Jurisdiction ("Cl. Rejoinder") with accompanying documentation.

42.    By email of 19 September 2018, the Respondent asked that the hearing on jurisdiction scheduled for 1-2 November 2018 be rescheduled to the following week. By email of the same date, the Claimant confirmed its availability for the new dates, but asked that, should the Tribunal not be available, the hearing proceed as scheduled on the original dates. By email of 20 September 2018, the Tribunal informed the Parties that it was not available for the new dates and that the hearing would proceed as originally scheduled.

43.    By emails of 28 September 2018, the Parties submitted their joint proposal for the upcoming hearing and informed the Tribunal that, unless it thought otherwise, the pre-

hearing conference call could be canceled. By email of 29 September 2018, the Tribunal confirmed that the pre-hearing call was canceled.

44.    On 1 October 2018, the European Commission filed an application to intervene as a non-disputing party.

45.    By email of 2 October 2018, the Tribunal invited the Parties to provide their comments on the European Commission's application by 9 October 2018.

46.    On 9 October 2018, the Parties filed their observations on the European Commission's application.

47.    By letter of 12 October 2018, the Tribunal granted the European Commission permission to submit a 15-page written submission by 17 October 2018. The Parties were granted until 26 October 2018 to respond in writing, with the understanding that the Commission's submission could also be addressed at the upcoming hearing on jurisdiction.

48.    On 17 October 2018, the European Commission filed its *Amicus Curiae* Submission with accompanying documentation.

49.    By email of 18 October 2018, the Claimant objected to the format of the *Amicus Curiae* Submission, which it stated was not in compliance with the Tribunal's decision of 12 October 2018 and, as a result of the Commission's font size, illegible.

50.    By letter of 19 October 2018, the Tribunal asked the European Commission to resubmit its *Amicus Curiae* brief in 12-point font, with 1.5 spacing, in compliance with the 15-page limit by 22 October 2018.

51.    On 22 October 2018, the European Commission provided an updated version of its *Amicus Curiae* Submission ("EC Submission").

52.    By letter of 23 October 2018, the Tribunal invited the European Commission to indicate, by 30 October 2018, if there were "any pending cases before the EU Court which concern the application of the Achmea principle in a case involving the Energy Charter Treaty, and the status of those proceedings".

53. By letter of 25 October 2018, the European Commission provided its response to the Tribunal's letter of 23 October 2018.

54. By email of 26 October 2018, the Claimant submitted additional legal authorities into the record.

55. On 29 October 2018, the Tribunal issued Procedural Order No. 4 regarding the organization of the hearing.

56. A hearing on jurisdiction was held at the World Bank's Paris headquarters on 1 November 2018 (the "Hearing on Jurisdiction"). The following persons were present at the Hearing:

*Tribunal*:
  Judge Bruno Simma                  President
  Prof. Bernardo M. Cremades      Arbitrator
  Judge O Thomas Johnson Jr.       Arbitrator

*Assistant to the Tribunal*:
  Dr. Andreas Müller             Assistant to the Tribunal

*ICSID Secretariat*:
  Mr. Francisco Abriani           Secretary of the Tribunal

*For the Claimant*:
  *Counsel:*
  Mr. Bart Legum                 Dentons Europe LLP
  Mr. Heiko Heppner             Dentons Europe LLP
  Ms. Anne-Sophie Dufêtre       Dentons Europe LLP
  Ms. Jungmin Cho              Dentons Europe LLP
  Ms. Ilektra Athanasiou-Ioannou  Dentons Europe LLP
  Mr. Alexander Scholten        Dentons Europe LLP
  *Parties:*
  Mr. Charlie Chipchase         Riverstone LLC

*For the Respondent*:
  *Counsel:*
  Avv. Sergio Fiorentino         Avvocatura dello Stato
  Avv. Andrea Giordano         Avvocatura dello Stato
  Ms. Laura Del Bono           Avvocatura dello Stato
  Ms. Giuditta Marra            Avvocatura dello Stato
  Prof. Maria Chiara Malaguti    Ministero degli Affari Esteri e della Cooperazione Internazionale

*Court Reporter*:
  Ms. Diana Burden            Court Reporter

57.    On 26 November 2018, the Tribunal issued Procedural Order No. 5, rejoining the jurisdiction and merits phases and inviting the Parties to provide an agreed procedural calendar by 3 December 2018.

58.    By email of 26 November 2018, the Respondent asked for a one-week extension to provide the draft procedural calendar. By email of the same date, the Tribunal granted the request.

59.    By email of 8 December 2018, the Claimant submitted the Parties' proposed procedural calendar. By email of 10 December 2018, the Respondent confirmed its agreement.

60.    By letter of 10 December 2018, the Tribunal confirmed its agreement to the Parties' proposed schedule for the remainder of the proceedings.

61.    On 31 January 2019, the Respondent submitted its Request for an Award Declaring Immediate Termination (the "Request for Termination") with accompanying documentation.

62.    By email of 1 February 2019, the Tribunal invited the Claimant to reply to the Request for Termination by 18 February 2019.

63.    By letter of 18 February 2019, the Claimant submitted its Reply to the Request for Termination, asking for it to be dismissed by the Tribunal.

64.    By email of 19 February 2019, the Respondent asked the Tribunal for permission to respond to the Claimant's 18 February 2019 letter. By email of 21 February 2019, the Tribunal informed the Parties that it would not allow further comments by the Respondent and decided that "[t]he issues raised by the Respondent relate to the Tribunal's jurisdiction and should thus be addressed in accordance with the Tribunal's Order at the next stage of the proceedings".

65.    On 22 March 2019, the Claimant filed its Reply on All Issues ("Cl. Reply") with accompanying documentation.

66.    By email of 10 June 2019, the Claimant asked the Tribunal to confirm the date of the pre-hearing telephone conference.

67.  By letter of 11 June 2019, the Tribunal confirmed that the pre-hearing conference would be held on 11 July 2019.

68.  On 18 June 2019, the Respondent filed a request for the Tribunal to suspend the proceedings.

69.  By email of 19 June 2019, the Tribunal invited the Claimant to respond to the Respondent's 18 June 2019 request by 28 June 2019.

70.  On 28 June 2019, the Respondent submitted its Rejoinder on the Merits ("Resp. Rejoinder") with accompanying documentation.

71.  On the same date, the Claimant submitted its response to the Respondent's request for the suspension of the proceedings with accompanying documentation.

72.  On 8 July 2019, the Tribunal issued Procedural Order No. 6 dismissing the Respondent's request to suspend the proceedings.

73.  On 11 July 2019, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

74.  By email of 9 August 2019, the Respondent requested permission to submit a further legal authority into the record. By email of the same date, the Tribunal invited the Claimant to provide its observations on the Respondent's request by 16 August 2019.

75.  On 13 August 2019, the Tribunal issued Procedural Order No. 7 regarding the organization of the hearing.

76.  By letter of 14 August 2019, the Claimant confirmed that it had no objection to the Respondent's request to submit a new legal authority, which it considered in line with the Tribunal's letter of 10 December 2018, and stated that it also intended to submit further legal authorities prior to the hearing.

77.  By email of 21 August 2019, the Tribunal confirmed that the Respondent could submit its new legal authority into the record. The Respondent subsequently did so on 16 September 2019.

78. By letter of 3 September 2019, the Claimant sought the Tribunal's permission to have Mr. Claudio Pisi Vitagliano testify by video conference at the upcoming hearing. By email of 12 September 2019, the Tribunal invited the Respondent to provide its views on the request by 13 September 2019. By email of the same date, the Respondent confirmed that it had no objection.

79. By emails of 13 September 2019, the Parties provided their views on the schedule for the upcoming hearing.

80. By email of 16 September 2019, the Claimant submitted legal authorities CL-305 through CL-311 into the record.

81. By letter of 16 September 2019, the Tribunal provided its ruling on the organization of the hearing. Following further emails from the Parties, by email of 18 September 2019, the Tribunal asked the Parties to submit a detailed, agreed hearing schedule with times indicated.

82. A hearing on the merits was held at the World Bank's Paris headquarters from 23 to 26 September 2019 (the "Hearing on the Merits"). The following persons were present at the Hearing:

*Tribunal*:
Judge Bruno Simma                        President
Prof. Bernardo M. Cremades               Arbitrator
Judge O Thomas Johnson Jr.               Arbitrator

*Assistant to the Tribunal*:
Dr. Andreas Müller                       Assistant to the Tribunal

*ICSID Secretariat*:
Mr. Francisco Abriani                    Secretary of the Tribunal

*For the Claimant*:
*Counsel:*
Mr. Barton Legum                         Dentons Europe LLP
Mr. Heiko Heppner                        Dentons Europe LLP
Ms. Anne-Sophie Dufêtre                  Dentons Europe LLP
Mr. Obioma Ofoego                        Dentons Europe LLP
Ms. Pauline Weess                        Dentons Europe LLP
*Parties:*
Mr. Charles Chipchase                    Riverstone Holdings LLC
Mr. Brian Potskowski                     Riverstone Holdings LLC

*For the Respondent*:
  *Counsel:*
  Avv. Giacomo Aiello                Avvocatura dello Stato
  Avv. Pietro Garofoli               Avvocatura dello Stato
  Avv. Andrea Giordano               Avvocatura dello Stato
  Avv. Laura Delbono                 Avvocatura dello Stato
  Prof. Maria Chiara Malaguti        Ministry for Foreign Affairs and
                                     International Cooperation – external
                                     consultant

  *Parties:*
  Eng. Daniele Bacchiocchi           GSE
  Eng. Luca Miraglia                 GSE
  Dott. Valerio Venturi              GSE
  Avv. Cosimo Danilo Raimondi        GSE
  Avv. Paolo Berisio                 GSE

*Court Reporter*:
  Ms. Anne-Marie Stallard            The Court Reporter

*Interpreters*:
  Ms. Daniela Ascoli
  Ms. Monica Robiglio

83.    During the Hearing, the following persons were examined:

       *On behalf of the Claimant*:

         *Witnesses:*
         Mr. Christopher Hunt              Riverstone Europe LLP
         Ms. Aneliya Erdly                 Silver Ridge Power LLC
         Mr. Claudio Pisi Vitagliano       ContourGlobal
         *Experts:*
         Dr. Boaz Moselle                  Compass Lexecon
         Ms. Ruxandra Ciupagea             Compass Lexecon
         Ms. Despina Doneva                Compass Lexecon

       *On behalf of the Respondent*:

         *Witnesses:*
         Eng. Daniele Bacchiocchi          GSE
         Eng. Luca Miraglia                GSE
         *Experts:*
         Prof. Corrado Gatti               Sapienza University of Rome
         Prof. Giacomo Rojas Elgueta       University RomaTre, Rome

84.    By email of 11 October 2019, the Claimant requested that the Tribunal rule on the
       outstanding points of disagreement between the Parties concerning revisions to the

transcript. By email of the same date, the Respondent submitted its comments on the Claimant's request.

85. By letter of 25 October 2019, the Claimant provided its comments on exhibit R-48, submitted by the Respondent during the hearing.

86. The Parties filed post-hearing briefs on 8 November 2019 ("Cl. PHB" and "Resp. PHB") and reply post-hearing briefs on 22 November 2019 ("Cl. Reply PHB" and "Resp. Reply PHB").

87. On 6 December 2019, the Respondent filed an application to submit two documents into the record. By email of the same date, the Tribunal invited the Claimant's observations on the Respondent's application by 11 December 2019.

88. By letter of 11 December 2019, the Claimant objected to the Respondent's 6 December 2019 application.

89. The Claimant filed its submissions on costs on 13 December 2019.

90. On 27 December 2019, the Tribunal issued its decision on corrections to the transcript.

91. On 30 March 2020, the Respondent filed an application to submit the award from *SunReserve Luxco Holdings v. Italian Republic*, SCC Case No. 2016/132, into the record.

92. By letter of 31 March 2020, the Tribunal decided to grant the Respondent's 6 December 2019 and 30 March 2020 applications to submit new legal authorities. The Respondent duly did so on 6 April 2020.

93. On 20 April 2020, both Parties submitted their observations on the Respondent's three new legal authorities.

94. On 21 September 2020, the Claimant filed an application to submit the award from *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, into the record.

95.   On 22 September 2020, the Respondent filed an application to submit the award from *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, into the record.

96.   By email of 22 September 2020, the Tribunal invited the Parties to submit both awards into the record by 23 September 2020 and provide their comments, if any, on the relevance of the awards to the present arbitration by 5 October 2020.

97.   On 23 September 2020, the Parties submitted their new legal authorities.

98.   By letter of 5 October 2020, the Claimant submitted its comments on the Parties' two additional legal authorities.

99.   By email of 6 October 2020, the Respondent stated that it had overlooked the deadline for its comments and requested an extension until 12 October 2020 to provide them.

100.   By email of 7 October 2020, the Claimant objected to the Respondent's request and asked that, should the Tribunal be minded to grant it, the Claimant be given an opportunity to respond. By email of the same date, the Respondent confirmed that it did not object to the Claimant being allowed to respond to its forthcoming submission.

101.   By email of 9 October 2020, the Tribunal invited the Respondent's submission by 12 October 2020 and the Claimant's response, if any, by 16 October 2020.

102.   On 12 October 2020, the Respondent provided its comments on the new legal authorities.

103.   By letter of 15 October 2020, the Claimant provide its comments on the Respondent's 12 October 2020 submission.

104.   The proceeding was closed on 9 February 2021.

## III.    FACTUAL AND REGULATORY BACKGROUND

105.    Before addressing the Parties' contentions regarding the Tribunal's jurisdiction (see Chapter V.; paras. 150 et seq.) as well as regarding the liability of the Respondent for alleged violations of Articles 10 and 13 of the ECT (see Chapter VI.; paras. 314 et seq.), the Tribunal deems it useful to briefly set out the factual and regulatory background to the present proceedings.

106.    In making its findings in the present and in the following Chapters, the Tribunal has carefully considered all written and oral submissions and arguments submitted to it by the Parties in the course of the proceedings, but refers to them in the following only inasmuch as they are relevant for this Award.

## A.    THE CLAIMANT'S INVESTMENTS IN ITALY

107.    The Claimant, i.e. Silver Ridge Power BV, is a private limited liability company incorporated in the Kingdom of the Netherlands (see para. 2). The Claimant indirectly owned and controlled – through its wholly-owned Dutch holding company SRP Italia Holdings BV – Silver Ridge Power Italia s.r.l., a limited liability company incorporated in the Italian Republic. Before the creation of SRP Italia Holdings BV in 2014, the Claimant (then known as AES Solar Energy BV) had directly owned and controlled Silver Ridge Power Italia s.r.l. (then known as AES Sole Italia s.r.l.).[2] Silver Ridge Power Italia s.r.l. owned and controlled the ten Italian local development companies[3] which in turn owned and operated the 25 photovoltaic plants (PV plants) subject to the current dispute[4] (see Request, paras. 13, 15, 33-34; Cl. Memorial, paras. 44, 46, 86, 236).

108.    These 25 PV plants went into operation between September 2010 and May 2012, with a combined capacity of approximately 130 megawatts (MW) (see Request, paras. 6, 31; Cl. Memorial, para. 84). According to the Claimant, the total cost for the acquisition,

---

[2] See Rome Chamber of Commerce, Historical File, Commercial Company, p. 41, 54 (C-008).

[3] These development companies are: ASI Cellino San Marco FV s.r.l., ASI Frosinone s.r.l., ASI Torchiarolo FV s.r.l., Ecosicily s.r.l., Fontesol s.r.l., Impianto Alpha s.r.l., Soemina Energeia s.r.l., SR10 s.r.l., SR11 s.r.l., and Zisa s.r.l.

[4] As regards the so-called "Project Vega" PV plant with an envisaged capacity of 123 MW, which was however never realized, see Chapter VI.B (paras. 478 et seq.).

construction and maintenance of the 25 plants was approximately EUR 470 million (Cl. Memorial, para. 94).[5] The Claimant further submits that it is common practice in the solar energy market to finance PV plants with a leverage of 70-85 % of the construction costs[6] (Cl. Memorial, para. 92).

109. For each of the plants, the *Gestore dei Servizi Energetici S.p.A.* (GSE), i.e. Italy's Management of Electricity Services Company, and the respective local development company entered into an agreement, the so-called "GSE conventions" (see para. 120). All the plants benefited from feed-in tariffs (FIT) under the Second, Third, Fourth and Fifth Energy Accounts (see paras. 123 et seq., 129 et seq.). All but two PV plants (Cangiano and Santa Maria, i.e. the so-called "Frosinone plants") also profited from the off-take regime (see para. 117), with four among them (i.e. Rimo, Gim, South and Cutrona) qualifying for the minimum guaranteed prices (see para. 118) under the off-take regime (Request, paras. 29, 36).

110. The 25 PV plants subject to the present arbitration are enlisted below together with the corresponding Energy Account regime that they were subject to (see Request, para. 32; Cl. Memorial, para. 85):

| | Nr. | Name of Plant | Municipality | Capacity (kW) | Energy Account | Entry into operation |
|---|---|---|---|---|---|---|
| 1. | 177772 | **Cellino** | Cellino San Marco e Brindisi | 42,692 | II | 29/09/2010 |
| 2. | 210170 | **Ciminna** | Ciminna | 6,753 | II | 07/04/2011 |
| 3. | 237131 | **Rimo** | Ugento | 996 | II | 18/01/2011 |
| 4. | 237708 | **Gim** | Ugento | 974 | II | 18/01/2011 |
| 5. | 237857 | **South** | Ugento | 980 | II | 18/01/2011 |
| 6. | 243742 | **Alinca** | Cisterna di Latina | 2,998 | II | 29/04/2011 |
| 7. | 247417 | **Torchiarolo** | Torchiarolo | 8,001 | II | 23/12/2010 |
| 8. | 530505 | **Raineri** | Francoforte | 3,427 | III | 29/04/2011 |
| 9. | 531748 | **Cocomeri** | Cisterna di Latina | 3,781 | III | 29/04/2011 |
| 10. | 533417 | **Scopeto** | Scopeto | 2,125 | III | 31/05/2011 |
| 11. | 533761 | **Francavilla Apollo** | Francavilla Fontana | 8,001 | III | 26/04/2011 |
| 12. | 601811 | **La Cogna** | Aprilia | 7,997 | IV | 29/08/2011 |

[5] See also Witness Statement of Claudio Pisi, para. 25.

[6] See also ibid., para. 26.

| 13. | 602234 | **Apollo 2** | Manduria | 7,500 | IV | 30/08/2011 |
|---|---|---|---|---|---|---|
| 14. | 610412 | **Nepi** | Nepi | 1,097 | IV | 31/08/2011 |
| | | | | 2,155 | | 31/10/2011 |
| 15. | 615545 | **Del Vicario** | Sabaudia | 5,222 | IV | 30/06/2011 |
| 16. | 616653 | **Lucia** | Carlentini | 993 | IV | 29/06/2011 |
| 17. | 617404 | **Francaviglia** | Carlentini | 1,000 | IV | 29/06/2011 |
| 18. | 617449 | **Brunno** | Carlentini | 896 | IV | 29/06/2011 |
| 19. | 662666 | **Giovannino** | Augusta | 823 | IV | 29/09/2011 |
| 20. | 664009 | **Baresi** | Siracusa | 935 | IV | 31/10/2011 |
| 21. | 666998 | **Cutrona** | Lentini | 893 | IV | 23/12/2011 |
| 22. | 668097 | **Rinaldone** | Viterbo | 4,977 | IV | 29/11/2011 |
| 23. | 669076 | **Panevino** | Aprilia | 4,997 | IV | 30/11/2011 |
| 24. | 1003182 | **Cangiano** | Frosinone | 4,836 | V | 27/03/2012 |
| 25. | 1003223 | **Santa Maria** | Frosinone | 4,997 | V | 09/05/2012 |

111.   In March 2017, Silver Ridge Power Italia s.r.l. entered into agreements by which subsidiaries owning PV plants with a capacity of about 105 MW were sold to an affiliate of Cubico Sustainable Investments. The parties to these agreements explicitly agreed that the Claimant retains the treaty claims asserted in the present arbitration[7] (Cl. Memorial, para. 48).

**B.   ELEMENTS AND EVOLUTION OF THE ITALIAN INCENTIVIZATION REGIME FOR PHOTOVOLTAIC ENERGY**

112.   In view of the benefits of producing energy from sunlight in terms of avoiding pollution associated with fossil fuel electricity generation, producing energy locally, lowering the dependence on energy imports, thus contributing to energy efficiency and energy security, multiple efforts to encourage investment in renewable energy in general, and in PV plants producing solar energy in particular, have been made in Europe in general (see Subsection 1; paras. 113 et seq.) and in Italy in particular (see Subsection 2; paras. 116 et seq.), notably since the turn of the millennium.

---

[7] See also Witness Statement of Christopher B. Hunt, para. 60.

**(1) European Union legislation**

113.   On 27 September 2001, the European Parliament and the Council adopted Directive 2001/77/EC,[8] the "First Renewables Directive", in order to reduce greenhouse gas emissions and to meet the international targets set by the Kyoto Protocol. According to the Directive's preamble,

> (1) […] The Community recognises the need to promote renewable energy sources as a priority measure given that their exploitation contributes to environmental protection and sustainable development. […]
>
> (14) Member States operate different mechanisms of support for renewable energy sources at the national level, including green certificates, investment aid, tax exemptions or reductions, tax refunds and direct price support schemes. One important means to achieve the aim of this Directive is to guarantee the proper functioning of these mechanisms, until a Community framework is put into operation, in order to maintain investor confidence.[9]

114.   The Directive established national indicative targets with a view to achieving the EU's target of generating 22.1 % of the total electricity consumed from renewable energy sources.[10] Italy's target was 25 %.[11] The Directive obliged the Member States to maintain properly functioning schemes to support renewable energy as well as an objective, transparent and non-discriminatory legislative and regulatory framework that provided for timely administrative procedures.[12] At the same time, it left the possibility for each Member State to identify the incentivization regime which "corresponds best to its particular situation".[13]

115.   In 2009, the First Renewables Directive was repealed and replaced by Directive 2009/28/EC, i.e. the "Second Renewables Directive".[14] The new Directive created mandatory national overall targets for electricity consumption based on renewable

---

[8] Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market, OJ 2001 L 283/33 (hereinafter: First Renewables Directive) (CL-006).

[9] Ibid., recitals 1 and 14.

[10] See ibid., Article 3(4).

[11] See ibid., Annex.

[12] See ibid., Article 6.

[13] See ibid., recital 23.

[14] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable energy sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, OJ 2009 L 140/16 (hereinafter: Second Renewables Directive) (CL-007).

energy in order for the EU to achieve a share of 20 % by 2020.[15] Italy's mandatory target was to have a gross consumption of 17 % through energy produced from renewable sources by 2020.[16] These objectives have the primary purpose "to provide certainty for investors and to encourage continuous development of technologies which generate energy from all types of renewable sources".[17] In this regard, the Directive encourages Member States to implement renewable energy support schemes in order to achieve their renewable energy targets,[18] which may *inter alia* comprise "direct price support schemes including feed-in tariffs and premium payments".[19]

### (2) Italy's legislative and regulatory framework

116. Italy implemented the First Renewables Directive through Legislative Decree No. 387/2003.[20] Article 7 of this decree delegated the definition of specific criteria for measures to encourage the production of electricity from PV sources, including the methods for determining the scope of specific incentive rates for electricity generated by PV plants, to subsequent ministerial decrees.[21] It required that, "[f]or the electricity produced by photovoltaic conversion of solar energy, the criteria [laid down in the ministerial decrees] provide for a specific incentive tariff by decreasing amount and duration as to ensure a fair remuneration of investment and operating costs".[22]

117. In addition to the *"Conto Energia"* regime (see paras. 119 et seq.), Legislative Decree No. 387/2003 created another incentivization scheme, the so-called "off-take regime". This regime entitled eligible producers, specifically renewable energy producers with a capacity of less than 10 MW, to sell their electricity directly to the GSE which in turn sold the electricity into the market. The *Autorità per l'energia elettrica e il gas* (AEEG), i.e. Italy's Authority for Electric Energy and Gas, was tasked with establishing the

---

[15] See ibid., recital 13.

[16] See ibid., Article 3 and Annex.

[17] See ibid., recital 14.

[18] See ibid., Article 3(3).

[19] Ibid., Article 2(2)(k).

[20] Legislative Decree No. 387 of 29 December 2003, G.U. of 31 January 2004, n. 25, Recital 1 as well as Article 1 (CL-075).

[21] See ibid., Article 7(1): "Within six months from the date of entry into force of this Decree, the Minister of Economic Activities, in consultation with the Minister of the Environment and the Protection of the Territory, in agreement with the Joint Conference, shall adopt one or more decrees by which the criteria for encouraging the production of electricity from solar source[s] are defined".

[22] Ibid., Article 7(2)(d).

modalities of the system.[23] All of the PV plants subject to the present arbitration except Cangiano and Santa Maria (i.e. the so-called Frosinone plants) benefited from the off-take regime (see para. 110).

118.    Moreover, owners of small plants (i.e. with a capacity below 1 MW) could sell their electricity at minimum guaranteed prices (*prezzi minimi garantiti*). At the end of the year, the GSE would reimburse the difference in price if the market price (*prezzo zonale orario*) was higher than the minimum guaranteed prices. Four of the PV plants subject to the present arbitration (Rimo, Gim, South and Cutrona) profited from the minimum guaranteed prices regimes under the off-take regime (see para. 110).

119.    Under the terms of Article 7 of Legislative Decree No. 387/2003 (see para. 116), three[24] consecutive ministerial decrees were adopted which were called "*Conti Energia*" or "energy accounts" and which established the terms and conditions for the incentive tariff regime specifically for PV plants.  In particular, the energy accounts granted PV plants connected to the national transmission grid special rates funded by the electricity consumers, referred to as "feed-in tariffs" (FIT). The level of FIT depended on capacity, technology, whether the plant was on rooftops or on the ground and the date when the PV plant was effectively connected to the transmission grid and therefore entered into operation.

120.    Once the PV plants were built and operational, they could apply for FIT under the applicable energy account. Subsequently, the GSE and the respective local development company signed an agreement, by which the GSE agreed to pay FIT at a specified rate for 20 years (*convenzione per il riconoscimento delle tariffe incentivanti*, i.e. "GSE conventions").[25] While the specific terms of the GSE conventions differ to some extent depending on the applicable Energy Account, the contents of the various GSE conventions widely overlap.[26] The terms of the conventions within a given energy account are identical, except for plant-specific information. The date of entering into service of the PV plants (or the date of the application for the incentives if made after

---

[23] See ibid., Article 13(3) and 13(4).

[24] Out of five in total; see paras. 122 et seq., 129 et seq.

[25] See Article 24(2)(d) of the Legislative Decree No. 28/2011, i.e. the so-called Romani Decree (CL-080).

[26] As regards the GSE conventions pertinent in the present arbitration, see the sets of contracts for the Second Energy Account (C-030), the Third Energy Account (C-060), the Fourth Energy Account (C-063) and the Fifth Energy Account (C-068).

15 days from entering into service) fixed the starting point for the FIT under the energy accounts. Furthermore, the GSE conventions provided that any modifications to their terms were to be agreed between the GSE and the producers in writing.[27]

121.    Renewable energy technology scaled up over time in response to these incentives. The advances in technology drove down the costs associated with the construction and operation of PV plants. Furthermore, the cost of producing renewable energy decreased due to resulting economies of scale. In order to take into account the decreasing costs, FIT were progressively reduced over time on the occasion of the adoption of new Energy Accounts.

122.    The First Energy Account (*Conto Energia I*),[28] adopted on 28 July 2005, was directed towards PV plants with an individual capacity between 1 kW and 1 MW, granting them the right to receive a specific incentive tariff for every kWh of electricity produced.[29] None of the PV plants subject to the present arbitration falls under the regime of the First Energy Account (see para. 110).

123.    By virtue of the Second Energy Account (*Conto Energia II*),[30] adopted on 19 February 2007, for the first time the application of the incentives was extended to the totality of the energy produced by a PV plant and not merely that produced and consumed locally. In addition, the upper limit of 1 MW prescribed by the First Energy Account was removed. The Second Energy Account granted a base FIT for PV plants that went into operation on or before 31 December 2008. For plants commencing operation between 1 January 2009 and 31 December 2010, the tariff was reduced by 2 % for each calendar year after 2008.[31] The Second Energy Account also provided that PV plants connected to the grid after 14 months from Italy's reaching an overall installed capacity of 1,200

---

[27] See, for instance, GSE Contracts under the Second Energy Account (C-030), Article 10; see, however, GSE Contracts under the Fifth Energy Account (C-068), Article 17.3, according to which the GSE could unilaterally amend the terms of the contracts in case of a regulatory change, subject to the producers' right to terminate the contract.

[28] Ministerial Decree of 28 July 2005, *Criteri per l'incentivazione della produzione di energia elletrica mediante conversion fotovoltaica della fonte solare, G.U.* of 5 August 2005, n. 181 (CL-076), partially modified and integrated by Ministerial Decree of 6 February 2006 (hereinafter: First Energy Account).

[29] See ibid., Articles 5(2), 6(2) and 6(3).

[30] Ministerial Decree of 19 February 2007, *Criteri e modalità per incentivare la produzione di energia elettrica mediante conversione fotovoltaica della fonte solare, G.U.* of 23 February 2007, n. 45 (CL-077) (hereinafter: Second Energy Account).

[31] See ibid., Article 6.

MW would not be eligible for FIT.[32] Seven of the PV plants subject to the present arbitration (Alinca, Cellino, Ciminna, Gim, Rimo, South, Torchiarolo) fall under the regime of the Second Energy Account (see para. 110).

124.    Subsequently, Law-Decree No. 3/2010,[33] the so-called "Salva Alcoa Decree", extended the FIT under the Second Energy Account to PV plants the construction of which was concluded by 31 December 2010, if they were connected to the grid by 30 June 2011,[34] thus extending the temporal scope of the Second Energy Account.

125.    The Third Energy Account (*Conto Energia III*),[35] adopted on 6 August 2010, granted FIT for PV plants that entered into operation between 31 December 2010 and 31 December 2013.[36] It also established a mechanism of progressive reduction of FIT not any longer on an annual, but on a tri-annual basis in order to better reflect the evolution of PV technology and the significant reduction of costs components and PV systems. The cumulative threshold of the capacity of PV plants admitted to the incentivization program was increased from 1,200 MW in the Second Energy Account to 3,000 MW and extendable to PV plants that were connected to the grid within 14 months of the date on which this threshold was reached by Italy. The GSE was obliged to make a public announcement if the incentivized installed capacity for PV plants achieved under that account reached the threshold of 3,000 MW.[37] Four of the PV plants subject to the present arbitration (Cocomeri, Francavilla Apollo, Raineri, Scopeto) fall under the regime of the Third Energy Account (see para. 110).

126.    The Second Renewable Directive of the EU (see para. 115) was implemented in Italy by Legislative Decree No. 28/2011,[38] the so-called "Romani Decree", which was

---

[32] See ibid., Article 13.

[33] Law-Decree No. 3/2010 of 25 January 2010, converted into Law No. 129/2010 of 13 August 2010, G.U. of 18 August 2010, n. 192 (CL-079 = R-018) (hereinafter: Salva Alcoa Decree).

[34] See ibid., Article 1-septies.

[35] Ministerial Decree of 6 August 2010, *Incentivazione della produzione di energia elletrica mediante conversione fotovoltaica della fonte solare, G.U.* of 24 August 2010, n. 197 (CL-078) (hereinafter: Third Energy Account).

[36] See ibid., Article 8.

[37] See ibid., Articles 3(2) and (6).

[38] Legislative Decree No. 28/2011 of 3 March 2011, Attuazione della dirrettiva 2009/28/CE sulla promozione dell'uso dell'energia da fonti rinnovabili, recante modifica e successive abrogazione delle direttive 2001/77/CE e 2003/30/CE, G.U. of 28 March 2011, n. 61, Recitals, Article 1 (CL-080) (hereinafter: Romani Decree).

adopted on 3 March 2011 and entered into force on 29 March 2011. Article 24 of this decree ("Incentive mechanisms")[39] states in its relevant part:

> (1) The production of electricity from renewable sources commissioned after 31 December 2012 shall be promoted through the instruments and on the basis of general criteria listed in paragraph 2 and the specific criteria set out in paragraphs 3 and 4. The preservation of non-incentivized productions is performed with instruments referred to in paragraph 8.
>
> (2) The electricity produced by the installations referred to in paragraph 1 [i.e. PV plants] shall be promoted on the basis of the following general criteria:
>
> a) the incentive has the purpose of ensuring fair returns of investment and operating cost;
>
> b) the period of entitlement to the incentive shall be equal to the average useful life of the specific types of conventional plant and shall start from the date of entry into operation of the same;
>
> c) the incentive shall remain constant throughout the period of right, and may take into account the economic value of the energy produced […].[40]

127.   Furthermore, the Romani Decree limited the applicability of the Third Energy Account to PV plants commencing operation by 31 May 2011, as opposed to the originally envisaged end-date of 31 December 2013.[41] In addition, the Romani Decree added further conditions to the eligibility of PV plants to receive FIT, based on size, organization and zoning of land. In particular, according to the Romani Decree, any PV plant built on agricultural land would be eligible for FIT only if the plant in question had a capacity below 1 MW, occupied less than 10 % of the parcel on which it was erected and, in case of PV plants built on land belonging to the same owner, the plants were required to be located at least 2 km from one another.[42] As an exception to this rule on PV plants located on agricultural land, if the construction permit had been issued before the entry into force of the Romani Decree (i.e. 29 March 2011) or if the

---

[39] By virtue of Article 25(11)(b)(3) of the Romani Decree, this provision abrogates Article 7 of Legislative Decree No. 387/2003.

[40] Article 24(1) and (2) of the Romani Decree (CL-080).

[41] See ibid., Article 25(9).

[42] See ibid., Article 10(4) and (6).

application for the permit was submitted by 1 January 2011, the new requirements would not apply provided that the plant entered into operation before 29 March 2012.[43]

128.   Like its predecessor, i.e. Legislative Decree No. 387/2003, the Romani Decree tasked certain ministries, namely the Ministry of Economic Development and the Ministry of Protection of Land and Sea, to determine the incentive regime for renewable energy investments by way of special decrees.[44] Two additional energy accounts were adopted on the basis of this authorization.

129.   The Fourth Energy Account (*Conto Energia IV*),[45] adopted on 5 May 2011, applied to PV plants entering into operation between 1 June 2011 and 31 December 2016.[46] The Fourth Energy Account also introduced a distinction between "small plants" and "large plants", the former being defined as "photovoltaic plants installed on buildings that have a power output of no more than a [sic] 1,000 kW, other photovoltaic plants with power output of not more than 200 kW […]".[47]

130.   In this regard, an electronic register for large PV plants eligible for FIT was established which was to be maintained by the GSE. In this register, plants were ranked according to several criteria. For the 2011 tariffs, the GSE had to compile two registers, one in July for applications made between 20 May and 30 June 2011, and one in September, for applications made between 15 and 30 September 2011. Inclusion in the registers was subject to certain cost thresholds for incentive payments, the cost limit for the period between 1 June 2011 and 31 December 2011 being EUR 300 million which was estimated to equal to 1,200 MW of installed capacity. In this framework, large PV plants that came into operation by 31 August 2011 would be automatically eligible for FIT. Large plants that entered into operation between 1 September 2011 and 31 December 2012 had to be listed in the register and would benefit from FIT provided that their ranking on the register so allowed and that their certificate of work completion

---

[43] See ibid., Article 10(6).

[44] See ibid., Articles 24(5) and 25(10).

[45] Ministerial Decree of 5 May 2011, *Incentivazione della produzione di energia elettrica da impianti solari fotovoltaici, G.U.* of 12 May 2011, n. 109 (CL-081) (hereinafter: Fourth Energy Account).

[46] See ibid., Articles 1(2) and 12(1) and (2).

[47] Ibid., Article 3(1)(u). According to ibid., Article 3(1)(v), "large plants" are defined as any PV plant other than the ones which were "small plants".

was sent to the GSE within seven months (or nine months for plants with electric power capacity above 1 MW) from the date of publication of the ranking.[48]

131.    In addition, for the first time, a national indicative installed capacity target for PV plants was introduced which was set at 23 GW, corresponding to an indicative annual cumulative cost of incentives estimated to be between EUR 6 and 7 billion.[49] The incentive regime was tied to this yearly cumulative cost threshold, and the Ministry for Economic Development was entitled to revise the FIT for future PV plants when Italy reached the lower end of the threshold, i.e. EUR 6 billion.[50]

132.    Twelve of the PV plants subject to the present arbitration (Apollo 2, Barresi, Brunno, Cutrona, Del Vicario, Francaviglia, Giovannino, La Cogna, Lucia, Nepi, Panevino, Rinaldone) fall under the regime of the Fourth Energy Account (see para. 110).

133.    The Fifth Energy Account (*Conto Energia V*) was adopted on 5 July 2012.[51] According to its Article 1(3), the incentivization regime under that energy account would apply 45 days after the publication of the AEEG resolution provided by Article 1(2) of the Fifth Energy Account. On 15 July 2012, the AEEG decided that "[t]he indicative cumulative annual cost of the incentives receivable for photovoltaic plants has reached 6 billion euros per year on 12 July 2012".[52]

134.    The Fifth Energy Account provided for two different incentive regimes based on PV plants' capacities. The first regime applied to plants up to 1 MW capacity and awarded them an "all-inclusive tariff" which included the price of the electricity and the value of the incentive. The second regime applied to PV plants exceeding a capacity of 1 MW and awarded them an amount equal to the difference between the all-inclusive tariff and the market price of electricity plus the revenues deriving from the sale of the energy on

---

[48] See ibid., Articles 6, 8, 12(2) and Annex 5.

[49] See ibid., Article 1(2).

[50] See ibid., Article 2(3).

[51] Ministerial Decree of 5 July 2012, *Attuazione dell'art. 25 del decreto legislative 3 marzo 2011, n. 28, recante incentivazione della produzione di energia elettrica da impianti solari fotovoltaici, G.U.* of 10 July 2012, n. 159 (CL-082) (hereinafter: Fifth Energy Account).

[52] AEEG Resolution No. 292/2012/R/EFR, 12 July 2012 (CL-083).

the market. In addition, regardless of their capacity, all plants were entitled to a bonus tariff on the electricity produced and consumed by them.[53]

135.    The incentive regime under the Fifth Energy Account was to cease to apply to new PV plants 30 days after the adoption of a further resolution by the AEEG that the cost threshold of EUR 700 million for incentive tariffs (bringing the total cost of PV incentives to EUR 6.7 billion per year) was reached.[54] This resolution was passed on 6 June 2013.[55] Two of the PV plants subject to the present arbitration (Cangiano and Santa Maria, the so-called Frosinone plants) fall under the regime of the Fifth Energy Account (see para. 110).

136.    In addition, the Fifth Energy Account also contained a provision requiring PV energy producers benefiting from incentive tariffs under any of the energy accounts to pay, as of 1 January 2013, an annual administrative fee of EUR 0.0005 per kWh of incentivized energy. The relevant part of Article 10 ("Management of the incentives system and implementing regulations") of the Decree establishing the Fifth Energy Account reads:

> (1)    Producers applying for the feed-in tariffs set forth in this decree shall pay to the GSE a fee for the processing of the application equal to EUR 3 for each kW of nominal power for plants below 20 kW and EUR 2 for each kW above 20 kW. […]

> (4)    In order to cover for management, control and inspection costs of the GSE, the responsible entities acceding to the feed-in tariffs under this decree […] shall pay to the GSE starting 1 January 2013, also through the set-off of the incentives due, a fee of 0.05 c euro for each kWh of incentivized energy. […][56]

137.    On 23 December 2013, Legislative Decree No. 145/2013,[57] the so-called "*Destinazione Italia* Decree", was adopted: "For the purpose of containing the annual burden on prices and on the electric rates of the incentives for renewable energy and for the purpose of maximizing the medium-long term production contribution from the existing power

---

[53] See Article 5(1) and (4) of the Fifth Energy Account (CL-082).

[54] See ibid., Article 1(5).

[55] AEEG Resolution No. 250/2013/R/FER, 6 June 2013 (CL-084).

[56] See Article 10 of the Fifth Energy Account (CL-082).

[57] Legislative Decree No. 145/2013 of 23 December 2013, converted into Law No. 9/2014 on 21 February 2014, *Interventi urgenti di avvio del piano "Destinazione Italia", per il contenimento delle tariffe elettriche e del gas, per l'internazionalizzazione, lo sviluppo e la digitalizzazione delle imprese, nonché misure per la realizzazione di opera* (R-029) (hereinafter "*Destinazione Italia* Decree").

plants",[58] this decree gave PV plant operators the choice between (i) continuing the existing incentive regime for the 20 year period without any additional benefits after the expiration of this period; and (ii) accepting a reduced percentage of tariffs under the Energy Accounts, in exchange for an extension in the duration of the incentive period by seven years.[59]

138.    On 24 June 2014, Italy enacted Legislative Decree No. 91/2014,[60] the so-called "*Spalma-incentivi* Decree", which entered into force on 25 June 2014. "In order to optimize the management of the collection and distribution of incentives and to foster more sustainable policies supporting renewable energy",[61] the decree, according to its own terms, sought to "remodulate" or "reformulate" the incentive payments under the energy accounts (*"la tariffa incentivante […] è rimodulata"*[62]) and to provide for altered modalities for disbursement of the FIT starting from 1 January 2015. The remodulation of the FIT regime by the *Spalma-incentivi* Decree was applicable for PV plants with a capacity above 200 kW. This measure affected all of the 25 plants subject to the present arbitration (see para. 110).

139.    The new regime offered PV plant operators three options, which they could choose from:[63]

-    Under *Option A*, the FIT were to be spread over 24 years instead of the original 20 year period and reduced by 17 to 25 % depending on duration of the "residual period".

-    Under *Option B*, the FIT were to be paid for the original 20 year period, but the tariffs would be remodulated by creating two periods, a first period between 2015 and 2019, in which a reduced incentive tariff would be disbursed, followed by a second period in which the incentive tariffs would be increased. The relevant

---

[58] Ibid., Article 1(3).

[59] See ibid.

[60] Legislative Decree No. 91/2014 of 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014, *Disposizioni urgenti per il settore agricolo, la tutela ambientale e l'efficientamento energetico dell'edilizia scolastica e universitaria, il rilancio e lo sviluppo delle imprese, il contenimento dei costi gravanti sulle tariffe elettriche, neaonché per la definizione immediate di adempimenti derivanti dalla normative europea, G.U.* of 20 August 2014, n. 192 (CL-085=R-030) (hereinafter: "*Spalma-incentivi* Decree").

[61] Ibid., Article 26(1).

[62] Ibid., Article 26 (3).

[63] See ibid.

percentages are set out in the Decree of the Ministry of Economic Development of 17 October 2014.[64]

- Under *Option C*, the FIT were to be paid for the original 20 year incentive period, but reduced during the residual period depending on the capacity of the respective PV plant. This would result in a reduction of (a) 6 % for PV plants having a capacity between 200 and 500 kW; (b) 7 % for PV plants having a capacity between 500 and 900 kW; and (c) 8 % for PV plants having a capacity higher than 900 kW.

140.    The *Spalma-incentivi* Decree granted PV plant operators until 30 November 2014 to communicate to the GSE which of the aforementioned three options they would select. In the absence of a communication from the producers, the default option to be applied by the GSE would be the third one, i.e. *Option C*.[65] The re-modulation of the FIT became effective as of 1 January 2015.[66]

141.    All of the 25 PV plants subject to the present arbitration were assigned the third option by default. In view of the fact that they all have a capacity higher than 900 kW (see para. 110), each of the plants, as of 1 January 2015, was subject to an 8 % decrease in FIT (see Request, para. 40).

142.    The *Spalma-incentivi* legislation also modified the FIT payment mechanisms. Starting from 1 July 2014, the GSE would pay the FIT in monthly instalments during a given year in an amount equal to 90 % of the solar plants' forecast annual average production for each calendar year of reference. On 30 June of the subsequent year, the GSE would pay the remaining balance to the producers, based on the electricity actually produced by the solar plants.[67]

143.    In addition, the *Spalma-incentivi* Decree altered the administrative management fee introduced by the Fifth Energy Account (see para. 136). The fee was made contingent on the PV plant's capacity in the following terms: (a) 2.20 EUR/kW for PV plants having a capacity between 3 and 6 kW; (b) 2 EUR/kW for PV plants having a capacity

---

[64] Ministerial Decree of 17 October 2014, Laying down the mode for the restructuring of tariffs for electricity produced by photovoltaic plants, in compliance with article 26, paragraph 3, letter b) of Decree-Law 24 June 2014, n. 91, G.U. of 24 October 2014, n. 248 (CL-087=R-034).

[65] See Article 26(3)(c) *in fine* of the *Spalma-incentivi* Decree (CL-085=R-030).

[66] See ibid., Article 26(3) *in initio*.

[67] See ibid., Article 26(2).

between 6 and 20 kW; (c) 1.80 EUR/kW for PV plants having a capacity between 20 and 200 kW; (d) 1.40 EUR/kW for PV plants having a capacity between 200 and 100 kW; and (e) 1.20 EUR/kW for PV plants having a capacity above 1 MW.[68]

## C.    THE CHALLENGED MEASURES

144.    In the present arbitration proceedings, the Claimant challenges a series of measures taken by the Respondent between 2011 and 2014 as constituting violations by the Respondent of Articles 10 and 13 of the ECT. These "challenged measures" are the following (in chronological order):

a)    the adoption of the Romani Decree (see para. 126) in 2011, restricting the applicability of the Third Energy Account and allegedly forcing the Claimant to abandon the so-called Project Vega, thus breaching Article 10(1), first and second sentences, of the ECT (see Section VI.B; paras. 478 et seq.);

b)    the adoption of the Fifth Energy Account (see para. 133) in 2012, allegedly resulting in the non-accessibility of the Fourth Energy Account for the Frosinone plants and forcing them into the Fifth Energy Account regime, thus breaching Article 10(1), first and second sentences, as well as Article 13(1) of the ECT (see Sections VI.C.2.a and VI.C.2.b; paras. 566 et seq.), and creating an administrative management fee (see para. 136), thus allegedly breaching Article 10(1), second and last sentences, of the ECT (see Section VI.C.2.c; paras. 613 et seq.);

c)    the adoption of the *Spalma-incentivi* Decree (see para. 138) in 2014, reducing the FIT the Claimant received for its 25 PV plants (see Section VI.A; paras. 316 et seq.) and raising the administrative management fee (see para. 143) introduced by the Fifth Energy Account (see Section VI.C.2.c; paras. 613 et seq.), thus allegedly breaching Article 10(1), first, second and last sentences, of the ECT.

---

[68] See ibid., Article 25; see further *infra* note 396.

## IV.    REQUESTS FOR RELIEF

145.    In the present arbitration proceedings, the Claimant argues that the Respondent, by adopting the contested measures referred to above (see para. 144), has breached Articles 10 and 13 of the ECT. The Respondent rejects the Claimant's submissions and claims that it has not violated Articles 10 and 13 of the ECT. In addition, the Respondent raises four objections to the Tribunal's jurisdiction.

146.    In its various submissions (see Cl. Reply, para. 393; see similarly Request, para. 109; Cl. Memorial, para. 417; Cl. Counter-Memorial, para. 351; Cl. Rejoinder, para. 257; Cl. PHB, para. 175; Cl. Reply PHB, para. 60), the Claimant requests an Award:

a)    Declaring that the Tribunal has jurisdiction under the ECT and the ICSID Convention over the Claimant's claims;

b)    Declaring that the Italian Republic has breached its obligations under Part III of the Energy Charter Treaty;

c)    Ordering the Italian Republic to pay to Silver Ridge Power BV damages, in an amount to be proven at the hearing;

d)    Ordering the Italian Republic to pay interest on the above sum from the date of the first breach to the date of the award at the rate for Italian bonds, compounded annually;

e)    Ordering the Italian Republic to pay the expenses incurred by the Claimant in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention;

f)    Ordering the Italian Republic to pay interest on the sums awarded at the rate for one-year Italian bonds, compounded annually;

g)    Ordering such other and further relief as the Tribunal deems appropriate in the circumstances.

147. In its various submissions (see Resp. Counter-Memorial, para. 602; Resp. Rejoinder, para. 617; see similarly Resp. Reply, para. 212), the Respondent requests the Tribunal to:

   a) Decline jurisdiction to decide, as the ECT does not cover intra-EU disputes;

   b) Alternatively, decline jurisdiction over the claims on the *Spalma-incentivi* Decree and the Fifth Energy Account, since the requirement of unconditional consent under Article 26 ECT is not satisfied as the GSE conventions contain an exclusive jurisdiction clause;

   c) Decline jurisdiction over the claim on the Romani Decree, since the requirement of Article 26 ECT of prior request for amicable solution has not been fulfilled;

   d) Decline jurisdiction over the imposition of administrative fees to cover GSE costs because these are Taxation Measures under Article 26 ECT; and

   e) In a further alternative, decline admissibility of protection of the Claimant's alleged interests since this is barred from seeking relief, since an exclusive forum clause was selected in the GSE conventions (relevant for claims on the *Spalma-incentivi* Decree and the Fifth Energy Account), as well as no amicable solution was addressed to Italy as for the Romani Decree.

148. Should the Tribunal decide that it has jurisdiction over the case and that claims are either totally or partially admissible, the Respondent further requests the Tribunal to

   a) Declare, on the merits, that the Respondent did not violate Article 10(1) ECT, first and second sentence, since it did not fail to grant fair and equitable treatment to the Claimant's investment, and to ensure them stable, equitable, favorable and transparent conditions;

   b) Equally, declare, on the merits, that Article 10(1) ECT, last sentence (the so-called "umbrella clause") does not apply in the case at stake, or, alternatively, that the Respondent did not violate it;

   c) Further, declare that Italy did not violate Article 13 ECT either, since its behaviors did not amount to indirect expropriation of two of the Claimant's plants; and

   d) Consequently, declare that no compensation is due.

149.    In the event that the Tribunal were to recognise the legitimacy of one of the Claimant's grievances, the Respondent requests the Tribunal to:

a)  Declare that the damages were not adequately proved;

b)  In addition, declare that both the methods for calculation and the Claimant's calculation of damages itself are inappropriate and erroneous; and

c)  Order the Claimant to pay the expenses incurred by the Italian Republic in connection with these proceedings, including professional fees and disbursements.

## V.    JURISDICTION

150.    The Claimant contends that all pertinent requirements of both Article 26 of the ECT and Article 25 of the ICSID Convention are met and that, therefore, the Centre has jurisdiction and the Tribunal has competence to decide the dispute at stake (Request, paras. 111-127; Cl. Memorial, paras. 222-269).

151.    In the course of the proceedings, the Respondent has raised four jurisdictional objections, namely: (A) that the ECT does not apply to disputes between an investor of a Member State of the European Union ("EU Member State") and another EU Member State, i.e. the so-called "intra-EU objection" (see paras. 153 et seq.); (B) that there is a lack of consent due to the exclusive jurisdiction clauses contained in the GSE conventions (see paras. 239 et seq.); (C) that the requirement under Article 26(1) and (2) of the ECT for prior request for amicable settlement is not met in the present case in relation to the Romani Decree[69] (see paras. 265 et seq.); and (D) that the administrative fee imposed by the Fifth Energy Account falls under the "carve out" for taxation measures according to Article 21 of the ECT (see paras. 284 et seq.).

152.    Apart from the aforementioned objections, which the Tribunal will address subsequently, the Respondent has not engaged with, let alone contested, the Claimant's factual submissions concerning the fulfilment of the conditions enshrined in Article 26 of the ECT and Article 25 of the ICSID Convention (Cl. Counter-Memorial, paras. 3-5).

### A.    THE "INTRA-EU OBJECTION"

### (1) The Parties' Positions

#### a) Respondent's Position

153.    The Respondent argues that the application of Article 26(1) of the ECT, which presupposes a dispute "between a Contracting Party and an Investor of another Contracting Party", is excluded in a case where an investor of an EU Member State (such as the Netherlands) has a dispute with another EU Member State (such as Italy) in relation to an investment in this State, i.e. a so-called "intra-EU dispute". The

---

[69] Legislative Decree Nr. 28/2011 of 3 March 2011, on the Implementation of Directive 2009/28/EC on the promotion of the use of energy from renewable sources (CL-080).

Respondent contends that the Claimant can therefore not benefit from Article 26(1) of the ECT in the present arbitration.

154. In its pertinent submissions, the Respondent relies on Article 26(6) of the ECT according to which "[a] tribunal established under [Article 26(4) of the ECT] shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law". In this regard, the Respondent argues that EU law forms part of the "applicable rules and principles of international law" to be applied when judging on the case and that the provision refers to any issue in dispute, including jurisdictional issues.

155. In addition, according to the Respondent, the duty of consistent interpretation under Article 31(3)(c) of the Vienna Convention on the Law of Treaties ("VCLT") calls for acknowledging the relevance of EU law in the interpretation of the ECT arbitration clause. As concerns existing arbitral awards recognizing jurisdiction on intra-EU disputes, the Respondent contends that, while tribunals are not bound by previous awards, they are bound by EU law and CJEU decisions, including the *Achmea* judgement,[70] since these pertain to international law to be applied under Article 26(6) of the ECT (Resp. Reply, paras. 6-18, 118; Resp. *Achmea* Comments, paras. 4-5; Request for Termination, p. 2; Resp. Rejoinder, paras. 6, 109-135).

156. On this basis, the Respondent submits that investment protection for investments carried out by an EU investor in another EU Member State is governed by EU law, in particular by the rules of free movement of capital and freedom of establishment, the general principles of Union law, the Charter of Fundamental Rights of the European Union and relevant secondary legislation. Pursuant to Article 3(2) of the Treaty on the Functioning of the European Union ("TFEU"), EU Member States are prohibited from concluding an agreement between themselves which might affect the rules of EU law or alter their scope. According to the Respondent, EU Member States therefore lack the competence to conclude bilateral or multilateral international agreements concerning protection of intra-EU investments.

157. Moreover, the Respondent contends that, pursuant to Articles 267 and 344 of the TFEU, EU Member States cannot submit a dispute concerning the interpretation and

---

[70] CJEU, Case C-284/16, *Slovak Republic/Achmea BV*, 6 March 2018, EU:C:2018:158 (CL-116).

application of EU law to any method of settlement other than those provided for therein. An international agreement concluded between two EU Member States that contains an offer for intra-EU investment arbitration thus violates Articles 267 and 344 of the TFEU and the general principle of autonomy of EU law. Hence, the offer to arbitrate by the Respondent must be deemed inapplicable to intra-EU disputes from the outset, as the incompatibility of the arbitration mechanism with the primacy of EU law existed since the entry into force of the EU Treaties. According to the Respondent, the ECT does therefore not apply to disputes between an investor of an EU Member State and another EU Member State. The appropriate forum for the Claimant to bring an action against the Respondent would be the competent courts of Italy (Resp. Counter-Memorial, paras. 45, 105, 134-147; Resp. Reply, paras. 30-48; Resp. *Achmea* Comments, paras. 6-10, 20).

158.    In its further submissions, the Respondent notably relies on Article 1 of the ECT. Article 1(3) of the ECT defines "Regional Economic Integration Organisation" (REIO) as "an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters". Pursuant to Article 1(10) of the ECT, "area" with respect to a REIO means "the Areas of the member states of such Organisation, under the provisions contained in the agreement establishing that Organisation".

159.    Accordingly, the Respondent argues that the recognition of the overlapping of the "territories" of the Member States and the Union in this provision confirms the recognition by the ECT of the existence of a single, unified area within the EU where competences are internally allocated with external relevance. Hence, according to the Respondent, the ECT expressly acknowledges that the EU has competence over some of the matters regulated by the ECT and that that competence entails the power to issue decisions that are binding on the members of the ECT and, by extension, on tribunals constituted by them. The binding nature of the rulings of the CJEU was therefore contemplated and accepted by the Contracting Parties of the ECT (Resp. Counter-Memorial, paras. 51-54; Resp. Rejoinder, para. 136).

160.    Moreover, according to the Respondent, Article 25 of the ECT can be reasonably interpreted as being based on the understanding that between the ECT Contracting

Parties that are members of the EU, a "preferential treatment" exists and is fully recognized by the ECT. In addition, the final part of Article 25(2) of the ECT seems specifically to recognize not only that rules of an Economic Integration Agreement, but also their further implementation by secondary measures prevail and are recognized by the ECT (Resp. Counter-Memorial, paras. 55-57).

161.    As regards the purpose of the ECT, the Respondent argues that Article 2 of the ECT refers to the European Energy Charter process which was planned since its very beginning as a tool to regulate relations between the European and the Eastern Europe/Soviet Union markets, and not to regulate the EU internal market for energy (Resp. Counter-Memorial, paras. 68-70).

162.    The Respondent further contends that the fact that the ECT does not apply to disputes between an investor of an EU Member State and another EU Member State is also confirmed by the practice of EU Member States as well as the EU. According to the Respondent, no investor-state arbitration concerning a purely intra-EU situation was instituted under the ECT until the *Electrabel v. Hungary* case in 2007. Starting from that very first arbitration, the EU and its Member States objected to the jurisdiction of arbitral tribunals, and the European Commission ("EC") repeatedly asked to intervene as *amicus curiae* to the same end. This shows that the EU and its Member States have maintained a judicial behavior that confirms their intention for the ECT not to cover intra-EU situations (Resp. Counter-Memorial, paras. 72-76; Resp. Reply, paras. 49, 110-111; Resp. Rejoinder, para. 78).

163.    With respect to Article 16 of the ECT, the Respondent contends that EU law represents a more developed and articulated legal system which is without doubt more favorable and offers more articulated forms of protection to the investors and their investments than a multilateral treaty such as the ECT. EU law includes a complete set of substantive and procedural rules that govern investments of EU investors in other EU Member States. Those rules cover all stages of the investment life cycle (Resp. Counter-Memorial, paras. 58-59, 94-95, 133; Resp. Reply, para. 61; Resp. *Achmea* Comments, paras. 34-38).

164.    According to the Respondent, even leaving aside Article 16 of the ECT, Article 30 of the VCLT leads to the same conclusion (Resp. Counter-Memorial, para. 96). In

particular, the Respondent submits that Article 30 of the VCLT applies to the succession of treaties between the ECT and EU law as it stands after the entry into force of the Lisbon Treaty. According to the Respondent, the International Law Commission's Report on Fragmentation of International Law[71] does not require exact coincidence of provisions or objectives as regards the "same subject-matter" requirement. As the provisions of EU law and of the ECT both level the playing field, ensure development and factually cover the same situation of an investor entering a foreign market, they relate indeed to the same subject-matter; hence, Article 30 of the VCLT applies (Resp. Counter-Memorial, paras. 87-92).

165.    The Respondent further refers to Article 41 of the VCLT and argues in this regard that, also in the light of Article 16 of the ECT, the Lisbon Treaty is a perfectly legitimate *inter se* agreement derogating from the general rules of the ECT by reinforcing the treatment of investors and investments within the EU. By adopting the Lisbon Treaty, EU Member States did not affect, by any means directly nor indirectly the enjoyment by the other Contracting Parties and their investors of their respective rights under the ECT (Resp. Counter-Memorial, paras. 98-104; Resp. Reply, paras. 62-63).

166.    As regards the CJEU's *Achmea* judgement, the Respondent submits that in terms of implications of this judgement, no distinction can be drawn between bilateral and multilateral treaties or treaties exclusively undertaken by EU Member States (like BITs) as opposed to agreements to which the EU itself is party (like the ECT). The reference in the *Achmea* judgement to international agreements also signed by the EU should be read as addressing situations where obligations against third parties are undertaken. What is decisive, in the light of the CJEU's jurisprudence, is whether an international tribunal has to apply and interpret EU law. It is clear therefore, according to the Respondent, that arbitral tribunals having the features of a tribunal based on the ECT are, as far as intra-EU situations are concerned, incompatible with EU law (Resp. Reply, paras. 66-109; Resp. *Achmea* Comments, paras. 11-17).

---

[71] International Law Commission, Report of the Study Group, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, UN Doc. A/CN.4/L.682/Add. 1, 2 May 2006 (CL-151bis).

167.    The Respondent further relies on the EC Communication of 19 July 2018[72] as well as on the Declaration of the Representatives of the Governments of the Member States of 15 January 2019[73] in support of its submission that the investor-State arbitration clause in the ECT is incompatible with the EU Treaties and must therefore be disapplied. According to the Respondent, the Declaration is a binding instrument emanating from sovereign States and providing an authentic interpretation of the scope of application of Article 26 of the ECT as far as the Contracting States signing the Declaration (that include Italy and the Netherlands) are concerned. A minority of EU Member States simultaneously signed a parallel declaration that is not an objection to the 22 Member States Declaration, but only declared the intention to wait for an express decision of the CJEU to provide an authoritative interpretation on the question (Resp. Reply, paras. 1-51; Request for Termination, p. 2; Resp. Rejoinder, paras. 1-57).

168.    Moreover, the Respondent contends that the 22 Member States Declaration is not a reservation, prohibited under Article 46 of the ECT, but reflects a subsequent agreement regarding the interpretation of the ECT within the meaning of Article 31(3)(a) of the VCLT. The Respondent also argues that the Declaration constitutes, for the purposes of Article 31(3)(b) of the VCLT, subsequent practice in the application of the ECT establishing agreement of the Parties regarding its interpretation. These are primary means of treaty interpretation. Hence, while it is undisputed that an arbitral tribunal has the authority to interpret the ECT, it is called to rely upon the pertinent legal instruments (Resp. Rejoinder, paras. 58-63; Request for Termination, p. 2).

169.    Finally, the Respondent submits that, if the Tribunal resolved to proceed to the merits phase and issue an award, the latter would be unenforceable and subject to non-recognition duties. According to the Respondent, there is a general duty of a tribunal to render an enforceable award, as exemplified in Article 40 of the ICC Rules of Arbitration, in order to preserve the integrity of the arbitral function. This aspect alone should warrant the Tribunal's acceptance of the Respondent's jurisdictional objection or, if the Tribunal prefers to treat this as a matter of admissibility, the refusal to exercise

---

[72] EC, Communication on Protection of Intra-EU Investment, COM(2018) 547 final, 19 July 2018 (CL-229).

[73] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019,                                                                      available                                                                      at https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf (CL-267).

its jurisdiction in the present case. In addition, the Respondent argues that a tribunal in this situation should decline to exercise its jurisdiction in the light of the principles of international comity and *forum non conveniens* (Resp. Reply, paras. 120-123; Resp. *Achmea* Comments, paras. 44-45; Resp. Rejoinder, paras. 147-164).

### b) Claimant's Position

170. The Claimant argues that the text, the context and the object and purpose of the ECT confirm that the Tribunal has jurisdiction to hear the present dispute under Article 26 of the ECT (Cl. Counter-Memorial, para. 14).

171. As regards the first element, the Claimant submits that nothing in the language of Article 26 of the ECT supports the Respondent's jurisdictional objection. The clear text of the first paragraph of this provision states that "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former" may be submitted to ICSID arbitration. The provision applies to disputes between any Contracting Party to the ECT, including Italy, and an investor of any other Contracting Party, including the Netherlands. The ordinary meaning of Article 26 of the ECT is that the Contracting Parties' consent to arbitration is unconditional and that there is no exception for disputes between EU investors and EU Member States (Cl. Counter-Memorial, paras. 15-27).

172. As concerns secondly other relevant provisions of the ECT, the Claimant contends that nothing in Article 16 of the ECT supports the Respondent's position that EU law should prevail over the ECT, as the Respondent fails to establish that EU law represents a more developed and articulated legal system than the ECT. To the contrary, according to the Claimant, the ECT provides protection to investors that does not exist under EU law such as investor-State arbitration. Furthermore, Article 25 of the ECT means that most-favored nation treatment obligations do not require EU Member States to extend the rights of the EU internal market to investors from beyond the EU. At the same time, nothing supports the Respondent's assertion that this provision establishes some preferential treatment of intra-EU relations or that rules of EU law prevail over the ECT.

173. Moreover, the Claimant argues that the definitions of "Regional Economic Integration Organisation" ("REIO") and "Area" in Article 1(3) and Article 1(10) of the ECT,

respectively, do not prevent EU investors from arbitrating energy investment disputes. In particular, nothing in Article 1 of the ECT suggests that the existence of an Area for a REIO excludes the existence of Areas of Member States for which the latter remain responsible. Furthermore, the existence of Decision No. 1 of the European Energy Charter Conference, according to which in case of a conflict between the Svalbard Treaty and the ECT the former shall prevail, manifests that, when the ECT Contracting Parties intended for the ECT to be displaced by another treaty in case of a conflict, they clearly expressed their intent to do so. Yet, the ECT Contracting States did not include such exception regarding the EU Treaties (Cl. Counter-Memorial, paras. 28-52).

174.    Thirdly, the Claimant submits that the object and purpose of the ECT of creating a broader European energy market fully accords with the application of the ECT to all its Contracting Parties and their investors without exception. Hence, the ECT creates obligations binding upon all Contracting Parties, including EU Member States in their mutual relations (Cl. Counter-Memorial, paras. 53-64).

175.    As regards the Respondent's submissions on subsequent practice, the Claimant contends that the self-interested positions of a minority of ECT Contracting States cannot establish a subsequent practice in the application of the ECT that would establish the agreement of the parties regarding its interpretation in the meaning of Article 31(3)(b) of the VCLT. In addition, when the Respondent asserts that all EU Member States have always raised the intra-EU objection, the Respondent is itself an exception to the asserted rule, since it did not raise the objection in the *Blusun v. Italy* case, where only the EC did (Cl. Counter-Memorial, para. 69; Cl. Rejoinder, paras. 136-137).

176.    Moreover, the Claimant argues that the allocation of competences between the EU and its Member States does not detract from the grant of jurisdiction in Article 26 of the ECT. In particular, EU Member States that are parties to the ECT cannot be excused from their treaty obligations, which they accepted upon signing and ratifying the ECT, simply because they are Members of the EU. Furthermore, the EU and its Member States have never issued a so-called "declaration of competence", as they have done in the case of many other treaties, to the effect that the ECT would not be binding between EU Member States. In fact, the EC did propose a so-called "disconnection clause", but the other ECT Contracting Parties rejected it so that the EC withdrew its proposal. Hence, the ECT Contracting Parties declined to adopt a "Community exception" with

the consequence that EU Member States, in their mutual relations, are not exempted from their ECT obligations (Cl. Counter-Memorial, paras. 71-111; Cl. Rejoinder, paras. 118-135).

177.    Inasmuch as the Respondent claims that Article 26(6) of the ECT requires the Tribunal to apply EU law as part of the "applicable rules and principles of international law", the Claimant submits that Article 26(6) of the ECT deals with the substantive law governing the merits of the case, but not with issues of jurisdiction. In a similar vein, according to Article 42 of the ICSID Convention, a tribunal shall decide a dispute, i.e. the merits of the case, while the jurisdiction of an ICSID tribunal is governed by Article 25 of the ICSID Convention and by the instruments expressing consent (Cl. Rejoinder, paras. 25-33).

178.    In addition, the Claimant objects to the Respondent's argument that Article 30 of the VCLT is relevant with respect to the succession of treaties between the ECT and the Lisbon Treaty. Article 30 of the VCLT applies in case of an incompatibility between successive treaties relating to the same subject-matter. However, according to the Claimant, none of these conditions is fulfilled here. First, the ECT and the EU Treaties do not relate to the same subject-matter. Secondly, these treaties co-exist and can be applied harmoniously. In particular, Article 26 of the ECT is compatible with Articles 267 and 344 of the TFEU as well as with the principle of mutual trust under EU law. Thirdly, the pertinent provisions of EU law predated the ECT; hence, the ECT is the applicable *lex posterior*. That the Lisbon Treaty was concluded after the entry into force of the ECT is of no relevance in this regard (Cl. Counter-Memorial, paras. 112-149, 159-169; Cl. Rejoinder, paras. 164, 166).

179.    The Claimant further argues that, if an incompatibility should exist between the ECT and the EU Treaties, this conflict would be governed by Article 16 of the ECT by virtue of which the ECT Contracting Parties expressly derogated from Article 30 of the VCLT. Article 16 of the ECT resolves the conflict in favor of the treaty that offers the most favorable protections to the investors and the investment, including substantive provisions and the right to dispute resolution. According to the Claimant, the ECT is more protective of investors' rights than the EU Treaties because the ECT provides for investor-State arbitration, while EU law does not, and because the ECT offers protections at all stages of the investment whereas EU law mostly covers the pre-

40

investment phase (Cl. Counter-Memorial, paras. 154-158; Cl. Rejoinder, paras. 164-165).

180.    As far as Article 41 of the VCLT is concerned, the Claimant rejects the Respondent's argument that the Lisbon Treaty is a permissible *inter se* modification of the ECT. Nowhere does the Lisbon Treaty state that it was intended to modify the ECT. In addition, under Article 41(2) of the VCLT, any proposed modification must be notified to all signatories; no such notification was provided in the present case. Moreover, also in a substantive perspective, such modification would be an impermissible *inter se* agreement because the Lisbon Treaty would, due to its lower level of protection of investors' rights, be incompatible with the object and purpose of the ECT. Finally, according to the applicable *lex specialis*, i.e. Article 1(13) read in conjunction with Article 33 of the ECT, the negotiations of the Lisbon Treaty would have had to be "authorized" and its text "adopted" by the Charter Conference; however, this was not the case (Cl. Counter-Memorial, paras. 170-182; Cl. Rejoinder, paras. 167-171).

181.    The Claimant further submits that numerous arbitral tribunals, operating on the basis of the ECT, have repeatedly and consistently rejected the argument that the ECT did not apply to the *inter se* relations between EU Member States that were ECT Contracting Parties. As these tribunals have come to their conclusion by applying the ECT and the same principles of international law that the present Tribunal is called upon to apply, the Claimant invites the present Tribunal to follow their example (Cl. Counter-Memorial, paras. 183-198; Cl. Rejoinder, paras. 136-148; Cl. PHB, para. 171).

182.    Turning specifically to the *Achmea* judgement, the Claimant sees no support for the Respondent's assertion that this judgement confirms the lack of jurisdiction of arbitral tribunals under Article 26 of the ECT in intra-EU investment disputes. In particular, the Claimant contends that the *Achmea* judgement is irrelevant to the present dispute, since, differently from the situation before the CJEU, the ECT is a treaty also concluded by the EU and since the policy and constitutional concerns underlying the *Achmea* judgement are not pertinent to the legal regime agreed to by the EU and the other ECT Contracting Parties. Furthermore, according to the Claimant, the present Tribunal's jurisdiction, including the validity of the Respondent's offer to arbitrate, is to be determined exclusively on the basis of the ECT and international law. In this regard, the Respondent does not explain how the *Achmea* judgement could possibly impact the

agreement on which this Tribunal is based (Cl. *Achmea* Comments, p. 4-7; Cl. Counter-Memorial, paras. 208-244; Cl. Rejoinder, paras. 99-117).

183.   As concerns the aforementioned EC Communication,[74] the Claimant argues that the Respondent makes general comments about a non-binding policy document issued by the EC which discusses general principles of EU law, but suggests no incompatibility between EU law and the ECT (Cl. Rejoinder, paras. 152-160).

184.   Furthermore, with respect to the aforementioned EU Member States Declaration,[75] the Claimant submits that this Declaration is merely a political statement without legal effect and that it reflects the position of some, but not all EU Member States' representatives. This is manifested by the fact that, on 16 January 2019, other EU Member States (Finland, Luxembourg, Malta, Slovenia and Sweden) issued another declaration on the same topic,[76] and that, on the same date, Hungary also issued a separate declaration.[77] Hence, there is no consensus among EU Member States on the legal consequences of the *Achmea* judgement with respect to the ECT. Moreover, the Claimant rejects the Respondent's argument that the Declaration falls within Article 31(3)(a) or Article 31(3)(b) of the VCLT since it does not reflect the agreement of all ECT Contracting Parties (Reply to the Request for Termination, p. 2-6; Cl. Reply, paras. 377-389).

185.   Finally, the Claimant contends that there is no merit in the Respondent's argument that an award in the present case would be unenforceable. Of the 154 States that have ratified the ICSID Convention, only 27 are EU Member States. This leaves 127 States not subject to EU law where the award could be enforced. While it is undisputed that arbitrators should make every reasonable effort to ensure enforceability of the award, an arbitral tribunal should not frustrate the arbitration agreement in the interests of ensuring enforceability. Hence, according to the Claimant, the award's supposed

---

[74] See *supra* note 72.

[75] See *supra* note 73.

[76] Declaration of the Representatives of the Governments of the Member States, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (CL-268).

[77] Declaration of the Representative of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (CL-269).

unenforceability could not justify a finding of lack of jurisdiction or inadmissibility in the present case (Cl. Rejoinder, paras. 72-97).

### c) The European Commission's Position

186.  The EC Submission (see para. 51) exclusively concerns the "intra-EU objection", notably the question as to whether Article 26 of the ECT, i.e. a provision of a treaty that forms part of EU law and covers a field regulated by EU law, namely energy law, contains an offer for arbitration from Italy to investors from the Netherlands, and, if so, whether that offer for arbitration is valid and applicable (EC Submission, para. 1). The observations made by the EC are presented subsequently in summary fashion. The Tribunal will consider them, however, only to the extent that they relate to arguments also made by one of the Parties to the present dispute.

187.  The EC first submits that the proper interpretation of Article 26 of the ECT – in the light of the wording, context as well as the object and purpose of the ECT, as established by reference to prior international agreements referenced in the ECT's preamble and the circumstances of its conclusion – leads to the conclusion that the arbitration offer made by the Respondent when ratifying the ECT is solely addressed to investors from Contracting Parties other than EU Member States and did not create any international obligations between Member States *inter se*. According to the EC, all ECT signatory states, including the non-EU Member States, were fully aware that the EU was using its internal shared competence for energy and had set up an autonomous regime which should not be impacted or overlapped by the ECT. The EC further submits that the ECT Contracting Parties have been made aware of the special features of the EU legal order and the particularities of transfer of competences to REIOs, as notably recognized in Article 1(3) and 1(10) of the ECT. Hence, according to the EC, there exists no intra-EU offer for arbitration with the consequence that the present Tribunal should decline jurisdiction (EC Submission, paras. 8-17).

188.  Even if Article 26 of the ECT were construed in the opposite manner, i.e. as entailing an offer also to EU investors, the EC argues that EU law prevails in such a case. In this regard, the EC submits that EU law is applicable to the dispute as a matter of "applicable rules and principles of international law" between Italy and the Netherlands pursuant to Article 26(6) of the ECT. According to the EC, it is generally recognized that the conflict rules in Article 30(3) to (5) of the VCLT were conceived as residual rules. In

43

contrast, EU law provides for a special conflict rule, namely the primacy of EU law. This rule applies not only vis-à-vis the domestic laws of each Member State but also vis-à-vis international treaties concluded between two Member States, regardless of whether these were concluded before or after accession to the EU (EC Submission, paras. 3, 18-27).

189.  Furthermore, even if one were to consider that the rules applicable to a conflict between the ECT and EU law are the general rules of conflict contained in the VCLT, the EC considers that the *inter se* obligations between EU Member States would have been superseded on the basis of Article 30(4)(a) of the VCLT because the ECT and the EU Treaties relate to the same subject-matter. According to the EC, Article 16 of the ECT does not lead to a different conclusion since that provision does not contain a rule of conflict, but only a rule of interpretation. In addition, even if one were to consider Article 16 of the ECT as a special conflict rule, it would have been overruled by the later special conflict rule of the primacy of EU law and Article 351 of the TFEU (EC Submission, paras. 28-35).

190.  In addition, the EC rejects the reasoning of the *Masdar v. Spain* award[78] according to which the *Achmea* judgement is limited to bilateral investment treaties, but does not apply to a treaty such as the ECT. According to the EC, the phrase "a provision in an international agreement concluded by the Member States"[79] in this judgement clearly includes treaties such as the ECT, if applied on an intra-EU basis. Hence, it follows from the *Achmea* judgement that intra-EU investment arbitration, irrespective of whether it is based upon bilateral or multilateral instruments of investment protection, is precluded by the general principles of autonomy and primacy of EU law, by Article 19 of the Treaty on European Union ("TEU") as well as by Articles 267 and 344 of the TFEU (EC Submission, paras. 2, 4, 38-39).

**(2) The Tribunal's Analysis**

191.  In addressing the Respondent's first jurisdictional objection, as to whether there exists, on the basis of the ECT, jurisdiction with respect to claims of an investor of an EU Member State against another EU Member State in relation to an investment in this

---

[78] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-120).

[79] CJEU, Case C-284/16, *Slovak Republic/Achmea BV*, 6 March 2018, EU:C:2018:158, para. 60 (CL-116).

State ("ECT intra-EU claims"), the Tribunal will proceed, as follows: (a) it will first clarify whether EU law is law to be applied by investment tribunals when deciding on jurisdiction regarding ECT intra-EU claims (see paras. 192 et seq.); (b) secondly, in view of an affirmative response to the previous question, the Tribunal will have to determine whether the ECT or EU law is the prevailing law in decisions on jurisdiction regarding ECT intra-EU claims (see paras. 201 et seq.); (c) thirdly, the Tribunal will turn to the question of whether EU law is relevant for the interpretation of the ECT, notably its Article 26 (see paras. 214 et seq.); (d) fourthly, the Tribunal will address the further contention that a modification, according to Article 41 of the VCLT, has been effectuated with regard to the ECT, notably its Article 26, as far as intra-EU claims are concerned (see paras. 226 et seq.); (e) finally, the Tribunal will deal with the question of whether the impact which the CJEU's *Achmea* judgement may have upon the Claimant's ability to enforce this Award should be a relevant concern for the present Tribunal (see paras. 232 et seq.).

### a) EU Law as Law to be Applied by Investment Tribunals

192. In their submissions concerning the "intra-EU objection", both the Respondent and the Claimant repeatedly refer to provisions of EU law and consider these provisions to be relevant to the dispute at hand, notably to the Tribunal's decision on the Respondent's jurisdictional objection. Accordingly, the Tribunal must first clarify whether, and to what extent, EU law, from the perspective of an investment tribunal established on the basis of the ECT, forms part of the law to be applied by the tribunal.

193. The relevant parts of Article 26 of the ECT state in this regard:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

> (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

> (a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b)    in accordance with any applicable, previously agreed dispute settlement procedure; or

(c)    in accordance with the following paragraphs of this Article.

(3)    (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

[…]

(4)    (4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a)    (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention;

[…]

(6)    A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

194.    As regards the question of what the applicable law for decisions on jurisdiction is and, consequently, whether EU law forms part of the applicable law from the perspective of an investment tribunal established on the basis of the ECT,[80] two interpretations of Article 26 of the ECT have been put forward.

195.    The first approach, which is supported by the Respondent (see para. 154), relies on Article 26(6) of the ECT according to which a tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law". In case Article 26(6) of the ECT applies, such rules and principles of international law would also include EU law inasmuch as it is based on international

---

[80] See *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, para. 76 (CL-299): "[…] the source of the Tribunal's jurisdiction is in the international legal order, not the EU legal order".

46

treaties concluded between the EU Member States, i.e. the TEU and the TFEU,[81] including judgements of the CJEU.[82] In this regard, it deserves mention that the CJEU's *Achmea* judgement expressly characterizes EU law as "deriving from an international agreement between the Member States".[83]

196.    The opposite view, which is defended by the Claimant (see para. 177), insists that, with respect to applicable law, a distinction must be made between decisions on jurisdiction and decisions on the merits of a dispute. Accordingly, the reference in Article 26(6) of the ECT to "the issues in dispute" only covers the decision on the merits whereas the applicable law for decisions on jurisdiction is to be derived from Article 25 of the ICSID Convention and by the instruments expressing consent.

197.    As indicated by the Claimant, in the context of the interpretation of the ICSID Convention, a similar controversy exists in relation to Articles 25 and 42 of the Convention. According to Article 42(1) of the ICSID Convention, "[t]he Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable". Some arbitral tribunals have relied on this provision in deciding on questions of jurisdiction and have thus also applied other "rules of international law".[84] Others have rejected this approach and stated that the reference to "decid[ing] a dispute" in Article 42(1) of the ICSID Convention only covers the decision on the merits, whereas questions of jurisdiction are to be decided exclusively

---

[81] See *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, paras. 4.120, 4.195 (GRA-015); *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, para. 73 (CL-107); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea issue, 31 August 2018, para. 146 (CL-197).

See, however, *Eiser Infrastructure Limited and Energie Solar Luxembourg S.à.r.l. v. Kingdom Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 198 (CL-012); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 397 (CL-271): "'principles of international law' […] must in this context refer to public international law, not EU law".

[82] See *Vattenfall AB and others* v. *Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 148 (CL-197).

[83] CJEU, Case C-284/16, *Slovak Republic/Achmea BV*, 6 March 2018, EU:C:2018:158, para. 41 (CL-116): "Given the nature and characteristics of EU law mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States".

[84] See the references in *Schreuer*, The ICSID Convention: A Commentary, 2nd ed., 2009, Article 42, para. 8, fn. 11.

on the basis of Article 25 of the ICSID Convention as well as the treaty provisions containing the offer to consent to arbitration.[85] The second view appears to be the prevailing one.[86]

198.    The arbitral tribunals deciding on ECT intra-EU claims have not adopted a consistent view on this issue. On the one hand, the *Vattenfall v. Germany* tribunal confirmed the view that "the law applicable to the assessment of its jurisdiction is the ECT, in particular Article 26 thereof, in conjunction with Article 25 of the ICSID Convention"[87] (see para. 196). On the other hand, other tribunals have not taken issue with applying Article 26(6) of the ECT in regard to jurisdictional objections (see para. 195).[88]

199.    In the first alternative, EU law does not form part of the law to be applied by investment tribunals in decisions on jurisdiction concerning ECT intra-EU claims. As only the ECT is applicable, the problem of how to deal with successive treaties (see *infra* b) does not arise in this constellation. Yet, EU law may still be relevant for the question of interpretation of the ECT, notably its Article 26 (see *infra* c). In the second alternative, EU law is part of the applicable law in jurisdictional decisions regarding ECT intra-EU

---

[85] *Československa obchodní banka, a.s. v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999, para. 35 (CL-199); *CMS Gas Transmission Co.* v. *Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003, paras. 42, 88 (CL-201); *AES Corporation* v. *Argentine Republic*, ICSID Case No. ARB/02/17, Decision on Jurisdiction, 26 April 2005, paras. 34-39 (CL-124); *Saipem S.p.A. v. People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007 (CL-128); *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, paras. 101-103 (CL-132); *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, paras. 225-227 (CL-029); *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.17 (CL-013). See also *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 109, 118-119 (CL-197).

[86] See *Schreuer*, The ICSID Convention: A Commentary, 2nd ed., 2009, Article 42, paras. 3 et seq., notably para. 7.

[87] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 166 (CL-197); see also the analysis in ibid., paras. 113-121; see also *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, paras. 198-199 (CL-012); *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018, paras. 459, 461 (CL-112); see further *Foresight Luxembourg Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018, para. 218 (CL-270): "[…] Article 26(6) ECT applies to the merits of the case and not to jurisdiction. The Tribunal must determine its jurisdiction exclusively in accordance with the jurisdictional requirements of the ECT".

[88] See *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 278 (CL-010); *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID No. ARB/13/31, Award, 15 June 2018, paras. 223-224 (CL-196); see also implicitly *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 397 (CL-271); *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, para. 173 (CL-299).

claims. Consequently, it is relevant for all questions discussed subsequently, including that of successive treaties.

200.  The Tribunal does not need to decide the question of which of the alternatives is the preferable one at this stage, but will return to it in the following section (see para. 213).

### b) ECT or EU Law as the Prevailing Law

201.  If EU law forms part of the applicable law in decisions on jurisdiction regarding ECT intra-EU claims (i.e. the second alternative), the question arises whether, in case a conflict between the ECT and EU law exists, the ECT, notably Article 26 thereof, or rather EU law prevails. The existence of such a conflict is suggested by the aforementioned *Achmea* judgement. This judgement considers an international agreement "under which an investor from one of [the] Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State had undertaken to accept",[89] to be incompatible with Articles 267 and 344 of the TFEU due to the interference of the jurisdiction of such tribunals with the fundamental principle of autonomy of EU law.[90]

202.  While it is true that the CJEU has not yet expressly ruled on the question[91] of whether its ruling in *Achmea* solely applies to arbitral tribunals based on a bilateral investment

---

[89] See CJEU, Case C-284/16, *Slovak Republic/Achmea BV*, 6 March 2018, EU:C:2018:158, para. 60 (CL-116).

[90] See ibid., para. 59.

[91] This is emphasized by the Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 16 January 2019, adopted by five EU Member States (Finland, Luxembourg, Malta, Slovenia and Sweden), available at https://www.regeringen.se/48ee19/contentassets/d759689c0c804a9ea7af6b2de7320128/achmea-declaration.pdf, p. 3 (CL-268): "The *Achmea* case concerns the interpretation of EU law in relation to an investor-state arbitration clause in a bilateral investment treaty between Member States. The Member States note that the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the *Achmea* judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State [...]. Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty".

See, in a similar vein, Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 16 January 2019, paras. 8-9 (CL-269): "The *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty [...]. Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its views as regards the compatibility with Union law of the intra-EU application of the ECT. The ongoing and future applicability of the ECT in intra-EU relations requires further discussion and individual agreement amongst the Member States".

agreement (as was the case in *Achmea*) – as argued by the Claimant (see para. 182)[92] – or also extends to multilateral treaties with the participation not only of the EU Member States, but of the EU itself, namely the ECT – as submitted by the Respondent (see para. 166) and the EC (see para. 190)[93] –, the Tribunal assumes, for the sake of argument, that the latter is the case and that therefore a conflict between the ECT and EU law exists in regard to the jurisdiction of ECT-based arbitral tribunals such as the present one.[94]

203.  The first provision to consider for the Tribunal in this regard is Article 30 of the VCLT which deals with the "Application of successive treaties relating to the same subject-matter" and to which also the Parties (see paras. 164, 178) as well as the EC (EC Submission, paras. 22 et seq.) have referred in their respective submissions.

204.  According to Article 30(3) of the VCLT, in case of successive treaties relating to the same subject-matter, "[w]hen all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with

---

[92] This means to make an argument *e contrario* from CJEU, Case C-284/16, *Slovak Republic/Achmea BV*, 6 March 2018, EU:C:2018:158, para. 58 (CL-116) with respect to the pertinent Netherlands-Slovakia BIT: "[…] an agreement which was concluded not by the EU but by Member States". See in this regard notably CJEU, Case C-284/16, *Slovak Republic/Achmea BV*, Opinion of Advocate General Wathelet, 19 September 2017, EU:C:2017:699, para. 43 (CL-110) as well as *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, paras. 679, 682 (CL-120); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 161-163 (CL-197); *Foresight Lux. Solar 1 S.a.r.l. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018, para. 220 (CL-270); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 398 (CL-271).

[93] See further Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019, p. 2, adopted by the other 22 EU Member States (CL-267): "Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between the Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied".

[94] For the sake of argument, the present Tribunal also leaves aside the argument of numerous arbitral tribunals which have concluded, even if the regimes of the ECT and EU law are applied simultaneously, there is no conflict between them; see *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, paras. 4.146, 4.172 (GRA-015); *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 438-439 (CL-011); *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, para. 87 (CL-107); *Eiser Infrastructure Limited and Energie Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 199 (CL-012); *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018, paras. 438-442, 462 (CL-112); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, para. 340 (CL-120); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, paras. 350-351 (CL-271).

those of the later treaty". Pursuant to Article 30(4) of the VCLT, the rule that the later treaty prevails (*lex posterior derogat legi priori*) also governs situations where the parties to the earlier and later treaties do not coincide, but its effect is then limited to the States which are parties to both treaties. This is the relevant scenario in the present context, as the relationship of, on the one hand, the ECT and, on the other hand, the EU Treaties, i.e. the TEU and the TFEU, which are the foundation of EU law (Article 1(2) of the TEU), is under scrutiny.

205.    However, in order for Article 30 of the VCLT to apply, the treaties in question must have the "same subject-matter". As far as the ECT and the EU Treaties are concerned, according to numerous arbitral tribunals, this requirement is not met.[95] In addition, with respect to the concept of "successive treaties", there are different views as to whether the ECT or the EU Treaties qualify as the earlier or later treaties within the meaning of Article 30 of the VCLT. The ECT was adopted in 1994 and entered into force in 1998. While it is true that Articles 267 and 344 of the TFEU, which are the critical provisions of EU law from the point of view of the *Achmea* judgement (see para. 201), form part of the TFEU which was introduced by the 2007 Treaty of Lisbon (which entered into force in 2009), these provisions have existed in substantively similar form since the 1957 Treaty of Rome establishing the European Economic Community (Articles 177 and 219 of the EEC Treaty).[96]

206.    The Tribunal does not have to take a stand on these questions since, according to Article 30(2) of the VCLT, "[w]hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail". In this regard it is relevant that the ECT contains an Article 16 ("Relation to Other Agreements"), which provides:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement,

---

[95] See *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, paras. 159-166 (CL-129); *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, para. 4.176 (GRA-015); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 194, 214 (CL-197); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 346 (CL-271). See, however, International Law Commission Study Group, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, UN Doc. A/CN.4/L.682/Add. 1, 2 May 2006, paras. 22-23 (CL-151bis), challenging an overly strict interpretation of the "same subject-matter" requirement.

[96] See *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 218 (CL-197).

whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.[97]

207. According to its terms (arg. "construed"), Article 16 of the ECT appears to represent a rule of interpretation rather than a conflict rule. This has been particularly emphasized by the EC (EC Submission, para. 35), but was also brought up by the Respondent (Resp. Counter-Memorial, para. 58). In contrast, the Claimant has endorsed the contrary position, i.e. that Article 16 of the ECT is a conflict rule (Cl. Counter-Memorial, para. 154; Cl. Rejoinder, para. 165). Arbitral tribunals[98] have also considered Article 16 of the ECT to work as a conflict rule, in case provisions of two treaties are not compatible with each other, and the present Tribunal shares this view. Hence, Article 16 of the ECT is *lex specialis* vis-à-vis Article 30 of the VCLT and is therefore to be applied preferentially.

208. In this regard, the Tribunal notes that the question of whether the ECT and the EU Treaties have the "same subject-matter", which is crucial to the operation of Article 30 of the VCLT (see para. 204), does not arise in the context of Article 16 of the ECT. Inasmuch as this provision requires that the EU Treaties "concern the subject matter of Part III or V" of the ECT, thus calling for a significantly weaker link than Article 30 of the VCLT, the Tribunal is satisfied that the substantive guarantees of freedom of establishment and free movement of capital (Articles 49 and 63 of the TFEU) and the

---

[97] See also Decision 1 with respect to the ECT (Annex 2 to the Final Act of the European Energy Charter Conference): "Decision with respect to the Treaty as a whole: In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply". As regards the Svalbard Treaty see further *infra* note 105.

[98] See *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 217, 223, 229 (CL-197); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 341 (CL-271).

mechanism of judicial protection of EU law (notably in the interpretation given to it in the *Achmea* judgement) overlap with the standards of investment protection and the dispute settlement mechanism in Parts III and V of the ECT to a sufficient degree for this condition of the application of Article 16 of the ECT to be met.

209. Furthermore, Article 16 of the ECT operates irrespective of the question of timing, as it applies to both prior and subsequent international agreements relating to Part III ("Investment Promotion and Protection"; Articles 10-17 of the ECT) or Part V of the ECT ("Dispute Settlement"; Articles 26-28 of the ECT). Accordingly, the issue of whether the ECT is the earlier or later legal instrument vis-à-vis the EU Treaties, which is of relevance with respect to Article 30 of the VCLT, does not affect the application of the *lex specialis* of Article 16 of the ECT.

210. According to the clear terms of this provision (see para. 206), neither Part III and V of the ECT nor the terms of the other agreement (*in casu* the EU Treaties) shall be construed to derogate from any substantive guarantee of investment protection or from any right of dispute resolution with respect thereto, "where any such provision is more favourable to the Investor or Investment".

211. Accordingly, the effect of Article 16 of the ECT essentially depends on whether the substantive and procedural guarantees of either Part III/V of the ECT or of EU law are more favorable to EU investors and investments. The Parties have taken contrary positions on this question. On the one hand, the Respondent argues that EU law represents without doubt a more developed legal system offering more articulated forms of protection, both at the substantive and procedural levels, to the investors and their investment than a multilateral treaty such as the ECT (see para. 163). On the other hand, the Claimant contends that the ECT provides protection to investors that does not exist under EU law such as investor-State arbitration (see para. 172). In the arbitral jurisprudence on the subject[99] it has been affirmed that Article 26 of the ECT is at least in some aspects more favorable to investors and investments than EU law, thus

---

[99] See *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, para. 141 (CL-024); *Eiser Infrastructure Limited. and Energie Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 202 (CL-012); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, para. 332 (CL-120); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 194 (CL-197); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, paras. 340-341 (CL-271).

preventing a reading of Article 16 of the ECT which would limit EU investors' rights to dispute resolution under the ECT.[100] In particular, the *Masdar v. Spain* tribunal has found that

> Article 16 of the ECT affords precedence to the more favourable investor-protection provisions of Article 26 of the ECT of which Claimant has availed itself over any conflicting provision of the EU treaties. They are more favourable, not least, because they obviate the need to bring the claim in the Spanish courts and Respondent cannot derogate from Article 26, pursuant to which it has given unconditional consent to arbitration.[101]

212. The Tribunal embraces this statement and thus concludes that at least some of the provisions of Part III and Part V of the ECT are more favorable to investors and investments with respect to ECT intra-EU claims than EU law. In particular, the mere existence of Article 26 of the ECT and the possibility of having access to international arbitration can be seen as an advantage of the ECT over the EU system of judicial remedies. As a consequence, from the perspective of the ECT which the Tribunal must primarily apply, the provisions of the ECT, notably its Article 26, prevail over those of EU law.

213. This is basically the end of the matter. In the light of the foregoing reasons, the Respondent's intra-EU objection must fail. The Tribunal reaches this result, irrespective of what position one takes with respect to the question of whether EU law forms part of the law to be applied by an ECT-based investment tribunal in matters of jurisdiction (see paras. 192 et seq.). Either one denies the applicability of EU law in the first place (see para. 196) or one accepts its applicability (see para. 195), but, when called to apply Article 16 of the ECT, one gives preference to Article 26 of the ECT. In either case, the ECT emerges as the law to be applied by the Tribunal.

---

[100] See *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, paras. 75, 87 (CL-107); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 196 (CL-197): "[…] Article 16 [ECT] confirms beyond doubt that Respondent's proposed reading of the provisions of the ECT is untenable. In light of this provision it is not possible to 'read into' Article 26 [ECT] an interpretation whereby certain investors would be deprived of their right to dispute resolution, whether against an EU Member State or otherwise".; see further *ibid.*, para. 229: "[…] Article 16 [ECT] poses an insurmountable obstacle to Respondent's argument that EU law prevails over the ECT".

[101] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, para. 332 (CL-120).

### c) Relevance of EU Law for the Interpretation of the ECT, notably Article 26

214.    In order to complete the picture, however, the Tribunal must also address the issue of treaty interpretation, notably regarding the question of whether EU law in general and the *Achmea* judgement in particular have an indirect impact on jurisdiction regarding ECT intra-EU claims via the interpretation of (Article 26 of) the ECT.

215.    To start with, it is generally accepted that the ECT, and notably its Article 26, must be interpreted in accordance with Articles 31 to 33 of the VCLT and notably the general rule of interpretation in Article 31(1) of the VCLT according to which "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms in their context and in the light of its object and purpose".[102]

216.    Throughout the proceedings, the Claimant (see paras. 170 et seq.) has consistently opposed the argument that the proper interpretation of the relevant provisions of the ECT would lead to the exclusion of intra-EU claims from ECT dispute settlement, since plainly no such restriction exists in the language of the ECT. In a similar vein, numerous arbitral tribunals have unanimously stated that such carve-out or disconnection clause with regard to intra-EU claims could not be implicit but would have to be express and clear.[103]

217.    The Tribunal endorses this position. Prior to the conclusion of the ECT, the EU had been aware of and had actually used express disconnection clauses so as to ensure that

---

[102] See *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID No. ARB/13/31, Award, 15 June 2018, para. 206 (CL-196); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 125, 166 (CL-197); *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018, para. 201 (CL-270).

[103] See *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, para. 437 (CL-011); *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, paras. 84-85 (CL-107); *Eiser Infrastructure Limited and Energie Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, paras. 186, 189 (CL-012); *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018, para. 454 (CL-112); *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID No. ARB/13/31, Award, 15 June 2018, para. 215 (CL-196); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 202, 207 (CL-197); *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, paras. 91 f. (CL-299); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, paras. 338, 342 (CL-271); *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 297 (CL-313).

provisions of a mixed agreement would not apply between EU Member States.[104] Furthermore, as opposed to the "intra-EU scenario" on which the ECT is silent, the ECT includes provisions which explicitly limit its application, notably with respect to the Svalbard Treaty[105] as well as in Article 28 of the ECT. Moreover, the EU had proposed the insertion of a disconnection clause during the negotiations of the ECT, but the clause was ultimately dropped from the draft treaty.[106]

218.    Furthermore, while the Respondent reads Article 1(3) and (10) of the ECT, which define the terms "Regional Economic Integration Organisation" and "Area" for the purposes of that treaty, to prevent Article 26(1) of the ECT from applying to "intra-EU disputes" (see paras. 158-159) and is joined in this reading by the EC (EC Submission, para. 13), the Tribunal cannot find anything in the language of these provisions that would support such a far-reaching conclusion.[107] The Tribunal has before it claims of a Dutch investor against Italy, i.e. a dispute between a Contracting Party and an investor of another Contracting Party. That the home and host States also form part of the EU as a REIO is of no relevance in this regard.

219.    Moreover, as regards the Respondent's contention that Article 25 of the ECT can be reasonably interpreted as being based on the understanding that between the ECT Contracting Parties that are EU Member States a preferential treatment exists (see para. 160), the Tribunal would agree. It would add, however, that the fact that the EU

---

[104] See *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 203 (CL-197), referring to Article 27(2) of the 1988 Joint Council of Europe/OECD Convention on Mutual Assistance in Tax Matters.

[105] See Decision 1 with respect to the ECT (Annex 2 to the Final Act of the European Energy Charter Conference): "Decision with respect to the Treaty as a whole: In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply". See regarding Article 16 ECT *supra* note 97 as well as the reference to the Decision at the beginning of Part V of the ECT.

See *Eiser Infrastructure Limited and Energie Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 187 (CL-012); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, para. 311 (CL-120); *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 204 (CL-197); *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 343 (CL-271).

[106] See *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 205 (CL-197).

[107] See similarly *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Case No. 2013/153, 12 July 2016, paras. 633, 636 (CL-108bis); *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 429-432 (CL-011).

Member States have concluded an "Economic Integration Agreement" within the meaning of Article 25(1) of the ECT and are therefore not required under their most-favored nation treatment obligations to extend preferential treatment within the EU internal market to non-EU investors has no implications for the question of what treatment is to be accorded to EU investors pursuant to the precepts of the ECT.[108]

220. In addition, the Respondent submits that the rules and principles of EU law, in particular as authoritatively interpreted by the CJEU in the *Achmea* judgement and as established in the EC Communication of 2018,[109] should be taken into account by the Tribunal when interpreting the ECT, by virtue of Article 31(3)(c) of the VCLT as embodying a "duty of consistent interpretation" (Resp. Rejoinder, paras. 109, 127-135). Indeed, pursuant to Article 31(3)(c) of the VCLT, when a treaty is interpreted, "any relevant rules of international law applicable in the relations between the parties" shall be taken into account together with the context. The Tribunal is, however, not convinced that this provision can be relied upon to "carve out" intra-EU claims from the scope of Article 26 of the ECT that is couched in clear terms.

221. Article 31(3)(c) of the VCLT is not to be applied in isolation, but as an integral part of the general rule of interpretation as enshrined in Article 31(1) of the VCLT (see para. 215). The Tribunal agrees that the role of this provision in the exercise of treaty interpretation cannot be to introduce external elements into a treaty with the effect of rewriting the treaty altogether.[110] Against this background, neither the ordinary meaning of the terms used by the ECT nor the systematic analysis of its provisions offer a basis for the Tribunal to conclude that, by drawing on the findings of the CJEU in the *Achmea* judgement or the EC's statements in its legally non-binding 2018 Communication, the ECT, and notably its Article 26, is to be construed as removing intra-EU claims from ECT dispute settlement.

---

[108] See in a similar vein *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 282 (CL-313).

[109] See *supra* note 72.

[110] See *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 154 (CL-197); *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, para. 126 (CL-299).

222. This also holds true for the Respondent's reference to the ECT's object and purpose (see para. 161). According to Article 2 of the ECT, this treaty "establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter". In particular, the Respondent claims that the European Energy Charter process was planned since its very beginning as a tool to regulate relations between the European and the Eastern Europe/Soviet Union markets (Resp. Counter-Memorial, para. 69; see also EC Submission, para. 11). The Claimant, in contrast, reads this clause as creating a broader European energy market applying to all its Contracting Parties and their investors without exception (Cl. Counter-Memorial, para. 58). Irrespective of whether one rather leans towards the one or the other interpretation of Article 2 of the ECT, in the Tribunal's view, it would mean putting too much burden on the function of teleological interpretation within the general framework of Article 31 of the VCLT to go as far as construing the ECT, and notably its Article 26, as excluding intra-EU claims from ECT dispute settlement altogether on this shaky basis.

223. Moreover, inasmuch as the Respondent (see paras. 167-168) contends that the Declaration of 22 EU Member States[111] reflects a subsequent agreement regarding the interpretation of the ECT within the meaning of Article 31(3)(a) of the VCLT or constitutes, for the purposes of Article 31(3)(b) of the VCLT, subsequent practice in the application of the ECT establishing agreement of the Parties regarding its interpretation, the Tribunal shares the reservations articulated by the Claimant (see para. 184). To be sure, this Declaration, as well as the two further Declarations, which were adopted by the remaining EU Member States,[112] may have some interpretative value. Yet, being non-binding instruments and not reflecting a consensus of all EU

---

[111] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019,                                    available                                    at https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf (CL-267).
[112] See the references in *supra* note 91.

Member States, let alone all ECT Contracting Parties, these Declarations cannot change the clear terms of the ECT and in particular its Article 26.[113]

224.   In addition, the Tribunal does not find merit in the Respondent's claim (Request for Termination, p. 2; Resp. Rejoinder, paras. 4, 8, 51) that the Declaration of 22 EU Member States can be broken down into a bundle of bilateral declarations – one of them between Italy and the Netherlands – that provide an authentic interpretation of the scope of application of Article 26 ECT as far as the participating ECT Contracting Parties are concerned. In the Tribunal's view, the Declaration remains what it is: an instrument which becomes part of, and is relevant to, the exercise of interpretation that is guided by Article 31(1) of the VLCT. Under this regime, there is no such thing as "authentic interpretation" with the effect of directly *changing* the treaty provisions to be applied, let alone ending an agreement. This can only be effectuated when respecting the pertinent rules of the VCLT on the modification or termination of treaties. While the Tribunal will address the issue of modification separately (see paras. 226 et seq.), none of the scenarios of treaty termination, as set out in Part V of the VCLT, is applicable in the present case (Cl. Rejoinder, paras. 54-63; Reply to the Request for Termination, p. 6; Cl. Reply, paras. 388, 390).

225.   In the same vein, the instances of some EU Member States objecting to the jurisdiction of arbitral tribunals in intra-EU situations or of the EC intervening in such proceedings (see para. 162) do not amount to a subsequent practice in the application of the ECT establishing agreement of (all) the ECT Parties regarding its interpretation. Even if they did, this isolated aspect could not result in an understanding of Article 26 of the ECT that is so remote from the ordinary meaning of the terms used and from the systematic analysis of this provision in the context of the ECT, as established above.

### d) Modification of the ECT, notably Article 26

226.   As regards the further contention by the Respondent (see para. 165), which is contested by the Claimant (see para. 180), that Article 41 of the VCLT permits some of the parties of a treaty to enter into a second treaty by which they modify the previous one among themselves and that the Lisbon Treaty is a perfectly legitimate *inter se* agreement

---

[113] See in a similar vein *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, paras. 218-220 (CL-299).

derogating from the general rules of the ECT, the Tribunal refers to the terms of Article 41 of the VCLT ("Agreements to modify multilateral treaties between certain of the parties only"):

> (1) Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
> (a) the possibility of such a modification is provided for by the treaty; or
>
> (b) the modification in question is not prohibited by the treaty and:
>
>> (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>> (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> (2) Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

227.    To start with, the Tribunal notes that Article 30(5) of the VCLT expressly states that Article 30(4) of the VCLT (see para. 204) is without prejudice to Article 41 of the VCLT. Against this background, one might make the argument that the 2007 Lisbon Treaty should be considered an *inter se* modification of (Article 26 of) the ECT by the EU Member States, introducing an implicit disconnection clause into the ECT insofar as the relations between the EU Member States are concerned. For the purpose of evaluating the merits of the Respondent's argument, the Tribunal leaves aside for the moment that, as a matter of fact, the ECT was the later treaty in relation to Articles 177 and 219 of the EEC Treaty (see para. 205).

228.    For Article 41 of the VCLT to be applicable, it must however be clarified whether such modification is, in the meaning of its paragraph 1, provided for or at least not prohibited by the ECT, in particular Article 42 ("Amendments") thereof. While the former alternative ("provided for") does not apply due to the lack of a pertinent provision in the ECT (as regards Article 33 of the ECT, see para. 230), one might well take the

position that the ECT does not contain an explicit prohibition of such modification either.[114]

229.    Yet, under Article 41 of the VCLT, it is further required that the modification does not affect the enjoyment by other parties of their rights or the performance of their obligations under the ECT and that the modification does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole. With respect to the latter requirement (which must be cumulatively fulfilled with the former one), the Tribunal is not convinced by the Respondent's submission (Resp. Counter-Memorial, para. 99) that the purported treaty modification was about reinforcing the treatment of investors and investment within the EU. In fact, the dispute settlement provision entitling investors to have recourse to international arbitration is often perceived as the most essential element of an investment treaty[115] and is also considered by the present Tribunal as a decisive element in conceiving of the ECT as being more favorable than EU law for purposes of the Article 16 ECT assessment (see para. 212).

230.    Moreover, there can be no doubt that the notification requirement laid down in Article 41(2) of the VCLT – which applies in the present case since, contrary to the Respondent's submission (Resp. Counter-Memorial, para. 100), the requirement of paragraph 1(a) is not met (see para. 226) – has not been complied with.[116] Even if the Respondent sought to rely on Article 33 ECT (Cl. Counter-Memorial, paras. 177 et seq.; Cl. Rejoinder, para. 170), the procedural requirements of this provision would not have been satisfied either.

231.    Thus, the Respondent's argument based on Article 41 of the VCLT must fail.

### e)  Relevance of the Enforceability of the Award

232.    Finally, the Respondent (see para. 169) contends that in view of the fact that an award on the merits would be unenforceable due its incompatibility with EU law and in

---

[114] See, however, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 221 (CL-197), stating that a modification excluding intra-EU claims would be prohibited by the ECT.

[115] See e.g. Case C-284/16, *Slovak Republic/Achmea BV*, Opinion of Advocate General Wathelet, 19 September 2017, paras. 77, 208 (C-110).

[116] See also *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 308 (CL-313) in this regard.

particular the CJEU's *Achmea* judgement, the Tribunal should decline, or at least refuse to exercise, its jurisdiction in the present case in order to preserve the integrity of the arbitral function. The Claimant (see para. 185) rejects this argument and sees no reason for the Tribunal to find a lack of jurisdiction or admissibility.

233.   While neither the ICSID Convention nor the ECT contain a rule analogous to Article 40 of the ICC Rules of Arbitration,[117] according to which arbitral tribunals "shall make every effort to make sure that the award is enforceable at law", the question may be asked whether serious problems to be expected with respect to the enforceability of the award rendered should indeed prompt an arbitral tribunal to refrain from exercising its jurisdiction in order to preserve the integrity of the arbitral function.[118]

234.   In this regard, the *Micula v. Romania* tribunal aptly stated that

> it is not desirable to embark on predictions as to the possible conduct of various persons and authorities after the Award has been rendered, especially but not exclusively when it comes to enforcement matters. It is thus inappropriate for the Tribunal to base its decisions in this case on matters of EU law that may come to apply after the Award has been rendered. It will thus not address the Parties' and the Commission's arguments on enforceability of the Award […]. [T]he Tribunal notes that Articles 53 and 54 of the ICSID Convention […] apply in any event to [this] Award.[119]

235.   This was confirmed by the *Eskosol v. Italy* tribunal, which found:

> [T]he Tribunal rejects Italy's contention that any award it may render (in either Party's favour) necessarily would be unenforceable. […] In these circumstances, a tribunal finding that it has jurisdiction under the ICSID Convention and the ECT should not decline to exercise that jurisdiction, simply because there are certain scenarios under which one or the other Party might face challenges in enforcement in certain jurisdictions, based on their national laws and/or their other treaty obligations. This Tribunal has a duty to exercise the jurisdiction it has found to exist, and will proceed to do so with respect to the issues remaining in this case.[120]

---

[117] International Chamber of Commerce, Rules of Arbitration, 2017 (CL-232).

[118] See also *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 230 (CL-197).

[119] *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, paras. 330, 340-341 (CL-048).

[120] *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, para. 235 (CL-299); see further *Vattenfall AB and others v. Federal*

236. The Tribunal agrees. Articles 53 and 54 of the ICSID Convention deal with post-award issues conclusively. The Tribunal has a duty to issue an Award on the merits, to the extent that it has jurisdiction over the claims submitted to it.

237. Accordingly, the Tribunal sees no reason to refrain from exercising its jurisdiction.

### f) Conclusion

238. For the foregoing reasons, the Tribunal rejects the Respondent's first jurisdictional objection and sees no reason to refrain from exercising its jurisdiction in the present case.

**B. LACK OF CONSENT DUE TO EXCLUSIVE JURISDICTION CLAUSES IN THE GSE CONVENTIONS**

**(1) The Parties' Positions**

### a) Respondent's Position

239. The Respondent submits that the requirement for unconditional consent under Article 26 of the ECT is not satisfied since all GSE conventions contain a provision on exclusive jurisdiction or choice-of-forum clause in favor of the courts of Rome. According to the Respondent, if an exclusivity agreement has been legitimately reached, this agreement must prevail over the ECT (Resp. Counter-Memorial, paras. 19, 151; Resp. Reply, paras. 125, 127, 132, 137).

240. The Respondent argues in particular that Article 26(2)(b) of the ECT, which contains the phrase "in accordance with any applicable, previously agreed dispute settlement procedure", permits the parties to agree on a specific settlement procedure for a dispute. Article 26(3) of the ECT expressly states that unconditional consent to the submission of a dispute to international arbitration is given "[s]ubject only to subparagraphs (b) and (c)", which refers back to Article 26(2)(b) of the ECT. Accordingly, there is no unconditional consent to international arbitration in a case where the parties have opted for an alternative exclusive dispute settlement procedure (Resp. Counter-Memorial, para. 155; Resp. Reply, paras. 133-136).

---

*Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 230 (CL-197).

241.    The Respondent further submits that the language of the contractual clause contained in the GSE conventions is particularly wide, as it does not only refer to disputes directly arising out of such conventions, but also to any dispute related to the interpretation and execution of "the acts it [i.e. the convention] refers to". According to the Respondent, this should be read as referring not just to a direct breach of contract, but also to any other claim in any way connected to the contract, including the behavior challenged by the Claimant in the present proceedings and allegedly indirectly affecting the GSE conventions, either in terms of interpretation or execution thereof. In particular, the scope of the contractual clause is not limited to issues raised exclusively under Italian law. The Respondent further contends that no provision expressly states that Article 26 of the ECT would override contractual exclusive forum clauses nor can this be inferred from any provision of the ECT (Resp. Counter-Memorial, paras. 153, 155-156, 160).

242.    As regards the Claimant's objection that there would only exist a limitation if the Claimant had actually initiated a procedure before the domestic courts, the Respondent insists that such an understanding of the choice-of-forum clause would deprive the parties' reciprocal undertakings to exclusively settle disputes related to the GSE conventions before the courts of Rome of any actual content. Article 26 of the ECT does more than avoiding double proceedings by leaving the parties the autonomy to agree on a specific forum as possibly exclusive (Resp. Reply, paras. 125, 138).

243.    Moreover, the Respondent rejects the Claimant's submission that the Respondent's understanding of the exclusive jurisdiction clause would leave the Claimant in a forum where no justice could be done. To the contrary, the Respondent argues that the Claimant could receive substantially equal protection before the domestic courts of Italy, namely compensation for the losses arising from the decrease in revenues allegedly suffered by the Claimant (Resp. Reply, paras. 141, 145).

244.    In addition, the Respondent submits that this lack of consent should be considered as affecting the jurisdiction of the Tribunal. If the Tribunal should, however, prefer to qualify this as a matter of admissibility, the Respondent contends that the aforementioned arguments on the existence of an exclusive forum clause should be deemed as having also been put for the purposes of an objection based on inadmissibility of the claims in question (Resp. Counter-Memorial, paras. 161, 187-193, 195).

### b) Claimant's Position

245.   The Claimant contends that the Respondent's jurisdictional objection finds no support in Article 26(2) and (3) of the ECT. To the contrary, the text, the context and the object and purpose of these provisions confirm that the Tribunal has jurisdiction to hear the present dispute (Cl. Counter-Memorial, para. 246).

246.   The Claimant submits that the text of Article 26(2) of the ECT makes it clear that the investor "may choose" to submit its dispute with the host State to any one of the fora listed in sub-paragraphs (a) to (c). In offering this choice, the ECT explicitly anticipated in sub-paragraph (b) that the parties might have previously agreed on an applicable dispute resolution mechanism, whether under a contract or otherwise (Cl. Counter-Memorial, para. 250; Cl. Rejoinder, para. 190).

247.   According to the Claimant, there is one exception to the Respondent's unconditional consent to arbitration, i.e. where the investor has previously "submitted" the dispute to the domestic courts. Contrary to the Respondent's submissions, this term is synonymous with the term "refer" the dispute to a court and does not mean to "select" a competent court under an exclusive jurisdiction clause (Cl. Counter-Memorial, paras. 253-255; Cl. Rejoinder, paras. 193-195). The Claimant further contends that the Respondent's statement made under Article 26(3)(b)(ii) of the ECT even allows an investor who might have submitted the dispute to the domestic courts of Italy to "turn around" and submit the same dispute to international arbitration up until the domestic courts "resolve" the dispute (Cl. Counter-Memorial, paras. 265-266; Cl. Rejoinder, paras. 196-197).

248.   Moreover, the Claimant argues that the type of dispute envisaged by the GSE conventions is not the same type of dispute as the one before the present Tribunal, as (a) the jurisdiction clause in the GSE conventions does not cover disputes under Part III of the ECT; (b) the Claimant in this arbitration is not relying directly on the GSE conventions, but rather on the Respondent's commitment in the ECT to observe the obligations it has entered into vis-à-vis the Claimant's investments; and (c) the Claimant is not a party to the GSE conventions, but only its local subsidiaries are (Cl. Counter-Memorial, para. 274; Cl. Rejoinder, paras. 178, 185, 209-212).

249.   In addition, the Claimant contends that it has not previously submitted the present dispute to any other fora, in particular to no court or administrative tribunal in Italy. Inasmuch as the Respondent refers to investors who have supposedly addressed the administrative courts of Rome or the Italian Constitutional Court, the Claimant insists that it is not one of these (Cl. Memorial, para. 256; Cl. Counter-Memorial, paras. 275-278; Cl. Rejoinder, para. 179).

250.   The Claimant further submits that the cases on which the Respondent relies for its objection based on the exclusive jurisdiction clause do not actually support its submissions. In particular, these cases do not shed light on the interpretation of Article 26 of the ECT which spells out clear rules on how to address potential conflicts of jurisdiction. Furthermore, these cases concerned purely contractual claims whereas the present dispute relates to treaty claims. Hence, according to the Claimant, these cases are distinguishable based on both the text of the applicable treaties and the nature of the alleged breaches (Cl. Counter-Memorial, paras. 282-294; Cl. Rejoinder, para. 182).

251.   Finally, the Claimant refers to the *Greentech v. Italy* case in which the Respondent had raised the same arguments and in which the tribunal dismissed Italy's objection based on the exclusive forum selection clause (Cl. Reply, paras. 351-359).

**(2) The Tribunal's Analysis**

252.   The Respondent's second jurisdictional objection is based on the argument that the GSE conventions contain a provision on exclusive jurisdiction or choice-of-forum clause in favor of the courts of Rome and that the requirement for unconditional consent under Article 26 of the ECT is therefore not satisfied.

253.   The relevant parts of Article 26 of the ECT state in this regard:

(1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)    If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a)      to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b)      in accordance with any applicable, previously agreed dispute settlement procedure; or

(c)      in accordance with the following paragraphs of this Article.

(3)      (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41. [...]

254.    The GSE conventions under the Fifth Energy Account (and for that matter also under the other Energy Accounts) contain the following clause: "For any dispute arising out of or in relation to the interpretation and implementation of this Agreement and the documents referred to herein, the Parties agree to the exclusive jurisdiction of the Courts of Rome".[121]

255.    The question to be addressed in the following is whether such exclusive jurisdiction clause deprives the Tribunal of its jurisdiction, as argued by the Respondent and as denied by the Claimant. The Respondent particularly relies on the phrase "any applicable, previously agreed dispute settlement procedure" in Article 26(2)(b) of the ECT for this purpose. The Tribunal agrees with the Respondent that a clause such as the one contained in the GSE conventions (see para. 254) might qualify as a "previously agreed dispute settlement procedure" in the meaning of Article 26(2)(b) of the ECT (see, however, para. 262 regarding the question of who was party to the GSE conventions).

---

[121] The Italian text of the clause reads: "*Per qualsiasi contoversia derivante o cumunque connessa all'interpretazione e/o all'esecuzione della presente convenzione e degli atti dalla stessa richiamati, le Parti convengono la competenza esclusiva del Foro di Roma*". (C-060, C-063).

256. The Claimant is, however, justified in equally emphasizing the phrase "the Investor party to the dispute may choose to submit" in the *chapeau* of Article 26(2) of the ECT. Hence, it is the investor's choice on which of the three options offered by sub-paragraphs (a), (b) or (c) of that provision it relies. According to the very terms of the provision, the investor is in no way bound to opt for the option of sub-paragraph (b) rather than the other two. On the basis of the choice offered by Article 26(2) of the ECT, the Claimant has opted for sub-paragraph (c) in the present case, i.e. international arbitration pursuant to Article 26(3) of the ECT which is perfectly compatible with the requirements of that provision.

257. Yet, the picture would not be complete without considering Annex ID to the ECT, to which both Parties have referred in their pleadings. According to Article 26(3)(b)(i) of the ECT, "[t]he Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b)". Italy is listed in Annex ID[122] and made the following declaration:

> In accordance with Article 26(3)(b)(ii), Italy declares that it does not allow the dispute between an Investor and a Contracting Party to be submitted for international arbitration or conciliation, provided that an Investor has already submitted the dispute to:
>
> (a) Italian courts or administrative tribunals; or
> (b) has followed an applicable, previously agreed procedure for the settlement of disputes.
>
> In this respect the distinction must be made between two options:
>
> 1) if the resolution of the dispute has not yet been made by the internal judicial or conciliation bodies, the Investor may revoke his judicial action or arbitral procedure by the procedural or lateral renouncement and apply to other forms of dispute settlement;
>
> (2) if a resolution or any formal or legal document of execution has already been made to settle the dispute, conciliation or international arbitration is no longer possible. […]

258. Hence, under the regime of this declaration, the investor must opt for submitting a dispute to either international arbitration or to the domestic courts. However, according to the terms of Italy's declaration, this fork-in-the-road clause is flexible in the sense

---

[122] Energy Charter Secretariat, Annex ID: List of Contracting Parties Not Allowing an Investor to Resubmit the Same Dispute to International Arbitration at a Later Stage under Article 26, nr. 14: Statement sent by the Italian Embassy in Lisbon on 17 December 1997 (CL-154).

that the investor, even after having submitted a dispute to the competent domestic tribunal in Italy, may revoke this step as long as the dispute has not been resolved by the domestic tribunal.

259.    In the present case, the Claimant has consistently claimed "that it has not previously submitted the dispute to the courts or administrative tribunals of Italy, nor in accordance with any other applicable, previously agreed dispute settlement procedure".[123] There is no reason for the Tribunal to doubt the truth of this statement. In addition, the fact that other investors have brought their disputes before the domestic courts of Italy, notably the Administrative Tribunal of Lazio as well as the Italian Constitutional Court, as noted by the Respondent,[124] is irrelevant for the operation of Article 26 of the ECT in the present case.

260.    Accordingly, the restrictions contained in Annex ID have no implications regarding the case at hand, and the Claimant was free to choose among the three options offered by Article 26(2) of the ECT. The Claimant chose option (c), i.e. international arbitration, and the Tribunal cannot see anything that would put this choice into question.

261.    Inasmuch as the Respondent seems to argue that the phrase "submit a dispute" appearing in Article 26 of the ECT and the respective Italian declaration should be understood as also covering the "selection" of a competent court under an exclusive jurisdiction clause (Resp. Counter-Memorial, para. 189), the Tribunal does not agree. It is clear from the terms used that the pertinent provisions deal with the *ex post*-decision where to refer an already existing dispute to, and not the *ex ante*-decision in what forum disputes arising in the future should be decided.

262.    This result is corroborated by the fact that, according to the Claimant's submissions, which have not been contested by the Respondent, the Claimant itself is not even party to the GSE conventions, but only its local subsidiaries. In this regard, the Tribunal endorses the finding of the *Greentech v. Italy* tribunal: "[…] Claimants are not party to the GSE Agreements. Thus, regardless of the wide scope of the forum selection clause in those agreements which Respondent alleges, Claimants do not appear to have

---

[123] Resolution of the Board of Managing Directors of Silver Ridge Power BV, 17 July 2015, 1 (C-006).
[124] See the list in Resp. Reply, para. 127, n. 21.

standing to assert claims for breach of contract in Italian court and Respondent has not stated otherwise".[125]

263.    Moreover, it is doubtful whether, had the competent domestic courts been approached on the basis of the exclusive jurisdiction clause in the GSE conventions, they would actually have dealt with the same dispute. It is obvious that before the present Tribunal the Claimant claims violations of the ECT, notably the use of state powers to unilaterally modify the GSE conventions (i.e. treaty claims).[126] To the extent that a possible claim before the domestic courts relied on alleged violations of the GSE conventions due to non-performance of contractual obligations (i.e. contractual claims), there would not even be identity of the dispute and the fork-in-the-road mechanism would not be triggered in the first place. As the *Vivendi I v. Argentina* annulment decision aptly put it: "where 'the fundamental basis of the claim' is a treaty laying down an independent standard by which the conduct of the parties is to be judged, the existence of an exclusive jurisdiction clause in a contract between the claimant and the respondent state or one of its subdivisions cannot operate as a bar to the application of the treaty standard".[127]

264.    For the foregoing reasons, the Tribunal rejects the Respondent's second jurisdictional objection. The result would not be different were this objection construed as a challenge to the admissibility of the claim in question.

## C.    LACK OF PRIOR REQUEST FOR AMICABLE SOLUTION REGARDING THE ROMANI DECREE

### (1) The Parties' Positions

#### a) Respondent's Position

265.    The Respondent argues that the Claimant sent a number of letters to the Respondent between 21 December 2012, and 5 May 2015, and addressed various measures, notably

---

[125] *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 220 (CL-271); see also ibid., paras. 204-205. See further *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 367 (CL-313).

[126] See in a similar vein *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 371 (CL-313).

[127] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, para. 101 (CL-122; footnote omitted); see in a similar vein *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 220 (CL-271).

including the *Spalma-incentivi* Decree[128] and the Fifth Energy Account, but has referred to the Romani Decree in none of these letters (Resp. Counter-Memorial, paras. 163-168; Resp. Reply, paras. 148-150).

266.  The Respondent further contends that one of the letters, i.e. the one of 5 May 2015, even contains an explicit recognition that the measures taken before 2012 were not only legitimate, but deserve praise. The Romani Decree, however, had been adopted already in 2011 (Resp. Counter-Memorial, paras. 169-170; Resp. Reply, para. 152).

267.  According the Respondent, the Claimant's reference to "acts and omissions of Italy since at least 2011" is not a sufficiently clear statement nor does the letter of 5 May 2015, apart from mentioning the Vega Project, state that the abandonment of the project was a direct consequence of the Romani Decree. The Respondent became aware of the claim that the Vega Project was allegedly abandoned because of the Romani Decree only when it received the Request. The principle of good faith would have required the investor to be clear in its claims and not to *ex post* construe them as referring to any possible past behavior not related to the other claims (Resp. Reply, paras. 147, 153-155, 161).

268.  In addition, the Respondent argues that the claim in question is completely autonomous and different from the other claims, which relate to plants that were already in operation and therefore entitled to receive incentives, in that it concerns the specific situation of a plant that never reached the stage of even applying for incentives. Given the fact that the claim relating to the Romani Decree is based on premises completely different from the other claims, it cannot be said that the latter would implicitly include the former (Resp. Counter-Memorial, para. 171; Resp. Reply, paras. 158-159).

269.  Hence, according to the Respondent, as far as the Romani Decree is concerned, no attempt amicably to settle the dispute has ever been made. The Respondent thus submits that the requirement under Article 26(1) of the ECT of prior request for amicable solution has not been met as regards the claim in relation to the Romani Decree (Resp. Counter-Memorial, paras. 171-172).

---

[128] Law Decree Nr. 91/2014 of June 24, 2014 (CL-085).

270.    In addition, the Respondent argues that, should the Tribunal – contrary to the view endorsed by the Respondent – qualify this as a matter of admissibility rather than jurisdiction, the aforementioned arguments should be deemed as also be put for the purposes of an objection based on inadmissibility of the claim in question (Resp. Counter-Memorial, paras. 187, 194-195).

### b) Claimant's Position

271.    The Claimant contends that it fully satisfied the procedural requirements in Article 26(1) and (2) of the ECT with respect to prior request for amicable solution regarding the Romani Decree and that it specifically put the Respondent on notice of the claim regarding Project Vega which is based on the Romani Decree. In particular, the Claimant argues that it made multiple written requests for amicable settlement regarding Project Vega, notably in its letter of 5 May 2015. Therefore, the Respondent had clear notice of the Claimant's claim regarding the Romani Decree and Project Vega prior to the beginning of the arbitration (Cl. Memorial, paras. 253-254; Cl. Counter-Memorial, paras. 297, 300-304, 307; Cl. Rejoinder, para. 215; Cl. Reply, para. 363).

272.    Furthermore, the Claimant submits that the Respondent did not acknowledge receipt of any but one of the Claimant's letters requesting amicable settlement and that the Respondent thus made no effort whatsoever to engage in a good faith effort to resolve the dispute. Hence, according to the Claimant, nothing in the record suggests that any aspect of the present dispute, including Project Vega, was capable of amicable resolution. Moreover, following the 5 May 2015 letter, the Claimant on 29 July 2015 filed the Request that further detailed its claim based on the Romani Decree and its impact on Project Vega, and requested the Centre not to register the Request until after 5 August 2015, i.e. the date three months after the 5 May 2015 notice of dispute letter (Cl. Counter-Memorial, paras. 305-306).

273.    The Claimant further contends that, in any event, the three-months waiting period in Article 26(2) of the ECT is a procedural requirement rather than a jurisdictional one and that this requirement is satisfied as long as the Parties have had such a three months opportunity before the Tribunal's decision is taken. In addition, this procedural requirement is intended to promote amicable settlement and can therefore not be relied upon as a delay tactic by a party that has no interest in settlement. According to the Claimant, the Respondent never attempted to negotiate with the Claimant over any of

the claims described in the aforementioned letters, including the Project Vega claim (Cl. Counter-Memorial, paras. 308-312).

274.   As regards the Respondent's argument that the Claimant should be estopped from raising the claim based on the Romani Decree, the Claimant submits that Article 26 of the ECT does not require that the notice be in any particular form or mention any State act by its name. Furthermore, if the Respondent had been genuinely perplexed about the Claimant's notice regarding Project Vega or the reference in the 5 May 2015 letter to the Respondent's acts and omissions dating back to 2011, the latter could have and should have reached out for clarification (Cl. Reply, paras. 217-221).

### (2) The Tribunal's Analysis

275.   The Respondent's third objection is based on the argument that the requirement under Article 26(1) and (2) of the ECT for prior request for amicable settlement is not met in the present case in relation to the Romani Decree. According to these provisions,

> (1)   Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

> (2)   If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution: [...].

276.   In this regard, the Parties have notably been in dispute about the meaning and implications of the Claimant's Notice of Dispute Letter of 5 May 2015, which reads in the relevant parts:

> The specific acts described above, as well as related acts and omissions of Italy since at least 2011, constitute serious and material violations of the protections accorded to the Investors and their investments under the ECT. [...]

> As an example only, Italy's wrongful alterations to the legal and business framework governing renewable energy facilities caused the Investors to

73

abandoned *[sic]* a project known as Project Vega, a facility with a planned capacity of approximately 150 MW, at an early stage of its development.[129]

277.    The Claimant contends that, by virtue of this (and previous) letter(s), the Respondent was properly put on notice, and invited to make an effort of amicable settlement, with regard to Project Vega and its alleged failure due to the adoption of the Romani Decree. In contrast, the Respondent argues that the reference to "acts and omissions of Italy since at least 2011" is not a sufficiently clear statement and that the letter in question does in particular not state that the abandonment of the project was a direct consequence of the Romani Decree. According to the Respondent, in light of the completely autonomous character of the claim regarding the Vega Project as compared to the other claims in the present arbitration, that concern plants that were already in operation and therefore entitled to receive incentives, the Claimant would have been required to make a more specific statement in its letter in order for the prerequisite of prior request of amicable settlement under Article 26 of the ECT to be met.

278.    First, the Tribunal observes that Article 26 of the ECT, apart from laying down the requirement that relevant disputes "shall, if possible, be settled amicably", does not define in any way in what form and in what degree of specificity an investor should put the host State on notice in order to prepare the ground for an amicable settlement of the dispute. Article 26(1) ECT differs in this regard from, for instance, Article 1119 of the NAFTA, which requires the investor to "deliver to the disputing Party written notice of its intention to submit a claim to arbitration at least 90 days before the claim is submitted"[130] and that such "notice shall specify"[131] four different elements about the dispute. With respect to Article 26(1) and (2) of the ECT, the Tribunal endorses the approach of the *Greentech v. Italy* tribunal, "flatly rejecting a formalistic approach toward the notice of dispute, which need not be exhaustive".[132]

279.    Secondly, the good faith argument made by the Respondent cuts both ways. If, and to the extent that, the Respondent insists that the principle of good faith requires the

---

[129] Notice of Legal Dispute Arising Under the Energy Charter Treaty and Offer of Amicable Settlement from Silver Ridge BV and Documentation of the Date of its Receipt, 5 May 2015, 9 (C-004).

[130] North American Free Trade Agreement, 17 December 1992, 32 ILM 296 and 604 (1993), Article 1119 (CL-216).

[131] Ibid., Article 1119.

[132] *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 213 (CL-271).

investor to be clear in its claims and not to *ex post* construe them as referring to any possible past behavior not related to the other claims, there exists also a *bona fide* obligation on the part of the host State to request further clarification from the investors if, from its perspective, the claim is not phrased in sufficiently clear terms. As has been aptly stated by the *Amto v. Ukraine* tribunal:

> The purpose of Article 26(2) – to provide for settlement discussions – requires the avoidance of legal forms, and the facilitation of open communication. The Investor must inform the State of the state of affairs involving disagreement, and request amicable settlement. If the State considers there is insufficient information to initiate discussions then the good faith response is simply to so advise the Investor, and require more detail. In other words, to initiate the type of communications envisaged by Article 26(2).[133]

280.  In the present case, the afore-cited passages regarding Project Vega (see para. 276) were certainly sufficiently specific to call for such reaction on the part of the Respondent. However, according to the case record, there has been no reaction at all to the Claimant's Notice of Dispute Letter of 5 May 2015.

281.  Thirdly, Article 26(1) of the ECT does not state an absolute or categorical duty of settling disputes amicably, but requires amicable settlement "if possible". Hence, Article 26(1) of the ECT enshrines an obligation of means calling for serious efforts on the part of both the investor and the host State to achieve an amicable settlement. Yet, according to the case record, there has never been any reaction on the part of the Respondent to any of the Claimant's five letters which it had received between 2012 and 2015.[134] Hence, in the circumstances of the case, the Claimant was justified to assume that it was highly doubtful whether it would actually be "possible" to amicably settle its claims or any part or aspect of these claims. The Tribunal agrees with the *Eiser v. Spain* award that Article 26(1) and (2) of the ECT simply require an investor to "clearly inform[] Respondent of the existence of a dispute and of Claimants' wish to seek its amicable settlement",[135] but do not "require the dispute to be carved into

---

[133] *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008, para. 57 (CL-020).

[134] Both the Claimant and the Respondent accept the number of five letters; see e.g. Cl. Counter-Memorial, para. 311; Resp. Counter-Memorial, para. 164.

[135] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 316 (CL-012).

multiple slices".[136] This is "particularly evident" where "[n]othing in the record suggests that further requests for negotiations […] would have been more effective in securing an amicable settlement".[137]

282. Taking note of the facts that (a) the Claimant filed the Request on 29 July 2015, (b) but simultaneously requested the Centre not to register the Request until after 5 August 2015[138], i.e. the date three months after the Claimant's Notice of Dispute Letter of 5 May 2015, (c) that the Claimant, on 5 August 2015, submitted a supplement to the Request explaining that the Respondent never reacted to the Notice of Dispute Letter,[139] and (d) that the Centre registered the Request only on 11 August 2015,[140] with the consequence that the present arbitration proceedings were only initiated on that date, the Tribunal is satisfied that the three-months waiting period was complied with before the registration of the Request and that the requirement, under Article 26 of the ECT, for prior request for amicable settlement has been met in the present case.[141]

283. Accordingly, the Tribunal rejects the Respondent's third objection to its jurisdiction. The result would not be different were this objection construed as a challenge to the admissibility of the claim in question.

## D.    TAXATION "CARVE-OUT" REGARDING THE ADMINISTRATIVE FEE IMPOSED BY THE FIFTH ENERGY ACCOUNT

### (1) The Parties' Positions

#### a) Respondent's Position

284. The Respondent contends that the administrative fee imposed by the Fifth Energy Account is a taxation measure in the meaning of Article 21 of the ECT and therefore excluded from the scope of application of the ECT, i.e. the so-called "taxation carve-out" (Resp. Counter-Memorial, para. 173; Resp. Reply, para. 167).

---

[136] Ibid., para. 318.

[137] Ibid., para. 319.

[138] Letter from Silver Ridge Power BV to ICSID, 29 July 2015.

[139] Letter from Silver Ridge Power BV to ICSID, 5 August 2015 (supplement to the Request).

[140] Notice of Registration from ICSID to Silver Ridge Power BV and Italian Republic, 11 August 2015.

[141] See in a similar vein *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, paras. 357 (CL-313).

285.  The Respondent further submits that the definition of the term "taxation measures" in Article 21(7) of the ECT is extremely large and covers an open-ended category of measures. In particular, two features are characteristic for a "taxation measure" for the purposes of the ECT: the source of the measure must be either in the domestic legislation or in an international treaty, and the measure must generally relate to fiscal measures. Beyond that, it is up to domestic law to define when a domestic measure is of a fiscal nature, also bearing in mind the discretionary powers that the ECT intentionally leaves to the Contracting Parties in this matter. In particular, the Claimant's argument that international law rather than domestic law is the decisive parameter in defining what qualifies as a taxation measure under the ECT is inapposite. The same holds true as regards the further submission that the term "*imposte*" used in the Italian version of Article 21(7)(a)(i) of the ECT should have the same meaning as "*imposta*" under Italian law. Fiscal measures according to Article 21 of the ECT are a wider category than "*imposte*" and include any measure having the characteristics of a "fiscal measure" under Italian law (Resp. Counter-Memorial, paras. 174-175; Resp. Reply, paras. 163-164, 173-183).

286.  The Respondent also argues that, in the absence of legislative measures defining when a specific measure is to be considered a fiscal measure (*tributo*), one should take guidance from the pertinent caselaw, notably that of the Italian Constitutional Court. Accordingly, irrespective of the name given to the measure, the features which qualify a disbursement as of fiscal nature are: a) "dutifulness" of the withdrawal, i.e. that it is established by law, b) absence of exact reciprocity between the parties, and c) connection of the withdrawal to the public spending by linking this to an economically significant prerequisite. Moreover, the pertinent domestic caselaw has constantly qualified similar types of fees as fiscal measures (Resp. Counter-Memorial, paras. 177-178, 186).

287.  In addition, the Respondent refers to the OECD Glossary, according to which "[t]he OECD working definition of a tax is a compulsory unrequited payment to the government", and considers this definition to define exactly the same elements as those identified by the Italian Constitutional Court, i.e. a payment required by law ("compulsory") and absence of exact reciprocity between the parties ("unrequited") (Resp. Counter-Memorial, para. 179).

288. According to the Respondent, the administrative fees imposed by the Decree establishing the Fifth Energy Account on all producers with plants benefitting from energy accounts, were established as an annual fee corresponding to a fixed amount per kWh and were meant to cover GSE's general management, audit and control expenses. The Respondent contends that the fee therefore satisfies the requirements to be qualified as a "fiscal measure", as it is mandatory, i.e. established by law, and does not correspond to an identifiable specific service obtained from GSE, but is imposed on all operators whose plants can be subject to auditing and investigation. Measures serving the purpose of raising general revenue for covering specific public activities and thus addressing only those categories of taxpayers that would more directly benefit from those public activities, are to be qualified as fiscal measures. The dividing criterion cannot be simply whether a measure addresses the generality of taxpayers or merely a category of them, as classes of fiscal measures may address only part of the population (Resp. Counter-Memorial, paras. 183-184; Resp. Reply, paras. 186-190; Resp. Rejoinder, para. 168).

289. The Respondent contends that, contrary to the Claimant's submissions, the use of the term "*contributo*" does not indicate that the measure is a fee in the sense of a payment for a specific service. According to the Respondent, the term is used exactly to show that there is no synallagmatic relationship between what is paid and the services received. In addition, the producers charged with the administrative fee contribute in relation to the amount of incentives they receive, and not in proportion to the services they actually receive. The lack of any synallagmatic relationship becomes manifest in the fact that producers cannot refuse to pay by stating that they will not use the services provided by the GSE. It is also irrelevant for the assessment whether the administrative fee is subject to VAT or not (Resp. Reply, paras. 195-198, 202-204).

290. Furthermore, the Respondent refers to the *CEF Energia v. Italy* award in which the tribunal had to decide on the very same claim and the very same measures and concluded that the administrative fee constitutes a taxation measure in the meaning of Article 21 of the ECT (Resp. Rejoinder, para. 169).

291. As regards the argument made by the Claimant based on Article 21(3) of the ECT, the Respondent submits that this provision contains a "claw-back" provision with respect to Articles 10(2) and (7) of the ECT, which concern the most-favored nation and

national treatment principles. However, the Claimant has not relied on any of these provisions in the present case, but has based its claims solely on Article 10(1) of the ECT. In addition, a treaty of the kind of the ECT cannot be compared to the Italy-Lebanon BIT so that the latter cannot be used to widen the interpretation of the former (Resp. Reply, paras. 206-211; Resp. Rejoinder, paras. 171-198).

### b) Claimant's Position

292.    The Claimant submits that it is not, as suggested by the Respondent, up to domestic law to define when a domestic measure is a "taxation measure" in the meaning of Article 21 of the ECT. As the ECT is an instrument of international law, its terms must be interpreted in accordance with international law (Cl. Counter-Memorial, paras. 318-321; Cl. Rejoinder, paras. 230-232).

293.    According to the Claimant, the ordinary meaning of "tax" is a payment imposed to fund general public services, as opposed to a "fee" that is paid in exchange for a specific service or public benefit. In particular, the very definition of "tax" in the OECD Glossary on which the Respondent relies refers to "a compulsory *unrequited* payment to the government", i.e. the government provides nothing in return to the individual unit making the payment. In contrast, the OECD defines a "fee" as a charge for specific services rendered by a state entity. Furthermore, the Respondent's reliance on other authentic texts of the ECT, on the basis of Article 33 of the VCLT, does not change that result. Both the Spanish and French texts, just like the English and Italian versions, confirm that the treaty term "taxation measures" is defined in terms of "taxes" (Cl. Counter-Memorial, paras. 323-330; Cl. Rejoinder, paras. 234-243).

294.    The Claimant further argues that the GSE administrative fee does not resemble a tax. It is rather a charge for specific services provided to solar producers (notably for processing the application and for management, control and inspection costs of the GSE) as part of an incentive scheme that benefits those producers. It is not coherent for the Respondent to argue, on the one hand, that the GSE administrative fee is equitable because the Claimant benefits from the GSE services and, on the other, that such fee constitutes an unrequited tax (Cl. Counter-Memorial, paras. 331-337; Cl. Rejoinder, paras. 244-249; Cl. Reply, paras. 364-366).

295.    In addition, the Claimant contends that the fact that the administrative fee is not a tax
        is also confirmed by the Respondent's practice of charging value-added tax on that fee
        (Cl. Counter-Memorial, paras. 338-341; Cl. Rejoinder, para. 250; Cl. Reply, para. 365).
        It is, amongst others, on this basis that the Claimant seeks to distinguish the present
        case from the *CEF Energia v. Italy* award where there was no mention of the fact that
        the GSE charged VAT on its fee (Cl. PHB, paras. 172-174).

296.    Finally, the Claimant submits that, should the Tribunal qualify the GSE administrative
        fee as a "taxation measure" under Article 21 of the ECT, the taxation carve-out would
        still not apply because Article 21(3) of the ECT specifically claws back the
        Respondent's most-favored nation obligation from the taxation exception. According
        to the Claimant, the Respondent, in its bilateral investment treaty (BIT) with Lebanon,
        agreed to provide, amongst others, fair and equitable treatment, without excluding
        taxation measures from this obligation. Pursuant to Article 10(7) of the ECT, the
        Respondent must therefore accord the Claimant's investments "treatment no less
        favourable" than that it accords to the Lebanese investors. This implies that the
        Claimant is entitled to the same level of substantive protection as the Lebanese
        investors, i.e. one that includes taxation measures. Contrary to the Respondent's
        submissions, the ECT and the Italy-Lebanon BIT contain the same substantive
        provisions and protect the same categories of investors, including companies. In
        particular, there is no support for the Respondent's argument that the rights protected
        under the Italy-Lebanon BIT are less articulated and specific as those of the ECT
        (Cl. Counter-Memorial, paras. 341-349; Cl. Rejoinder, paras. 252-255; Cl. Reply,
        paras. 313-335).

### (2) The Tribunal's Analysis

297.    The Respondent's fourth jurisdictional objection is based on the argument that the
        administrative fee imposed by the Fifth Energy Account is a taxation measure in the
        meaning of Article 21 of the ECT and therefore excluded from the scope of application
        of the ECT (the so-called "taxation carve-out"). The Tribunal would observe at the
        outset that this objection must be understood to solely relate to the claims made by the
        Claimant under Article 10(1) of the ECT. As far as the Claimant argues that its
        investments have become subject to indirect expropriation, the claw-back provision of
        Article 21(5)(a) of the ECT applies, according to which "Article 13 [of the ECT] shall

apply to taxes". Hence, in this regard the jurisdiction of the Tribunal is beyond dispute anyway.

298.    According to Article 21(1) of the ECT, "[e]xcept as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency".

299.    Pursuant to Article 21(7)(a) of the ECT, "[t]he term 'Taxation Measure' includes:

(i)  any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound".

300.    The Parties are in disagreement whether the "fee" ("*contributo*") introduced by the Fifth Energy Account constitutes a taxation measure for the purposes of Article 21 of the ECT. The relevant parts of Article 10 ("Management of the incentives system and implementing regulations") of the Decree establishing the Fifth Energy Account read:

(1)      Producers applying for the feed-in tariffs set forth in this decree shall pay to the GSE a fee for the processing of the application equal to EUR 3 for each kW of nominal power for plants below 20 kW and EUR 2 for each kW above 20 kW. […]

(4)      In order to cover for management, control and inspection costs of the GSE, the responsible entities acceding to the feed-in tariffs under this decree […] shall pay to the GSE starting 1 January 2013, also through the set-off of the incentives due, a fee of 0.05 c euro for each kWh of incentivized energy. […][142]

301.    The Decree thus creates (a) a one-time administrative fee that all producers with plants benefitting from the energy accounts have to pay to the GSE for the processing of the application (paragraph 1) and (b) an annual fee corresponding to a fixed amount per

---

[142] Ministerial Decree of 5 July 2012, Implementation of art. 25 of Italian legislative decree no. 28 dated 3 March 2011, encouraging the production of electricity from photovoltaic systems (so-called 5th Feed-in Tariff), Article 10 (CL-082).

kWh of incentivized energy in order to cover for management, control and inspection costs of the GSE (paragraph 4).

302.    While the definition of "taxation measure" in Article 21(7)(a) of the ECT refers to "taxes of the domestic law of the Contracting Party", the reference to domestic law should not be understood in a manner that would put it completely at the disposal of the respective Contracting Party what it designates as a "taxation measure" for the purposes of the taxation carve-out of Article 21 of the ECT. After all, this is a term used in an international treaty, directing the interpreter, however, to have due regard to the definition of taxes in the respective domestic legal order.

303.    The Tribunal takes note in this regard of the controversy between the Parties on whether Article 21 of the ECT should be subject to a narrow reading, given that the Italian authentic version of the ECT refers to "*imposte*" (see para. 293), or whether it should be construed more broadly to cover all "tribute" which would not only include "*imposte*" (taxes), but also "*tasse*" (fees) and "*contributi*" (contributions) (see para. 285). At the same time, the Tribunal agrees with the *Greentech v. Italy* award that it "need not determine whether Respondent's broad interpretation or Claimants' narrower interpretation of Taxation Measures is correct".[143]

304.    What is decisive in the definition of taxes is, and insofar the Parties appear to be in agreement (Cl. Counter-Memorial, para. 323; Resp. Counter-Memorial, para. 177), that the obligation to pay these taxes must be laid down in a law or other binding State regulation and that there is no reciprocity between the payment and a service offered by the State, but that the payment contributes to the general public spending.

305.    These elements are also present in the OECD working definition according to which a tax is a "compulsory unrequited payment to the government" on which both Parties have relied in the present case (Cl. Counter-Memorial, para. 325; Resp. Counter-Memorial, para. 179). Furthermore, according to the OECD, taxes "are described as unrequited because the government provides nothing in return to the individual unit making the payment, although governments may use the funds raised in taxes to provide goods or services to other units, either individually or collectively, or to the community

---

[143] *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 244 (CL-271).

as a whole".[144] In contrast, "[f]ees charged by central or local governments can be distinguished from taxes when they are charged as payments for the supply of particular services by the authorities".[145]

306.   Against this background, the Tribunal considers the administrative fee established by the Fifth Energy Account to qualify as a fee rather than a tax. Producers with plants benefitting from the energy accounts have to make this payment for specific purposes, i.e. for the processing of the application as well as in order to cover for management, control and inspection costs of the GSE (see para. 301). This specific purpose is confirmed by Recital 22 of the Decree establishing the Fifth Energy Account which states that the Ministry "[d]eemed it appropriate and fair that those who benefit from the feed-in tariffs for photovoltaics contribute to the coverage of charges for the management of the photovoltaic incentive scheme".[146]

307.   The Tribunal is aware that there is no strict reciprocal or synallagmatic relationship between the payments made to the GSE and the services offered by it. Nor do the fees paid by the producers cover the full costs of the GSE. Similarly to the *Greentech v. Italy* award,[147] the present Tribunal considers, however, that a sufficient degree of reciprocity has been established so as to qualify the payments in question as fees (or charges, as the *Greentech v. Italy* tribunal refers to them), and not as taxes.

308.   The Tribunal would note in this context that the Respondent's representation of the pertinent caselaw of the Italian Constitutional Court on fiscal measures (see para. 286) does not appear to be fully accurate. While the Respondent identifies the "absence of exact reciprocity between the parties" as an element of the *jurisprudence constante* of that court, the cited judgements speak of "the lack of a relationship of reciprocal nature

---

[144] OECD Glossary of Statistical Terms, 18 November 2011 (CL-192).

[145] OECD Glossary of Tax Terms (CL-193).

[146] Ministerial Decree of 5 July 2012, Implementation of art. 25 of Italian legislative decree no. 28 dated 3 March 2011, encouraging the production of electricity from photovoltaic systems (so-called 5th Feed-in Tariff), Recital 22 (CL-082). The English translation of this recital was not made available in CL-082, but can be found in Resp. Counter-Memorial, para. 183, n. 59. The Italian original reads: "*RITENUTO opportuno ed equo che alla copertura degli oneri per la gestione del sistema di incentivazione per il fotovoltaico concorrano i soggetti che beneficiano delle tariffe incentivanti per il fotovoltaico, anche alla luce di quanto previsto dal Titolo VIII, Capo II del decreto legislativo n. 28 del 2011*".

[147] See *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 244 (CL-271).

between the parties",[148] i.e. in the Italian original "*mancanza di un rapporto sinallagmatico tra parti*".[149] The Respondent's reading of this phrase, and in particular the addition of the word "exact", promote a widened understanding of the concept of taxes, with the Respondent suggesting that also financial measures with a considerable degree of, but not full, reciprocity would have to be deemed to lack "exact reciprocity" and would thus constitute taxes. The Tribunal is not convinced that this is what the Italian Constitutional Court held in the decisions it was referred to.

309.    The Tribunal would further observe that it is true that the *CEF Energia v. Italy* tribunal[150] qualified the administrative fee in question as a tax in the meaning of Article 21 of the ECT and thus applied the taxation carve-out to it. It deserves mention, however, that that tribunal embraced the Respondent's reading of the Constitutional Court's caselaw, notably including the aforementioned criterion of "absence of exact reciprocity between the parties".[151] While acknowledging that the fees in question were "consideration for a given service rendered by a public body"[152] and that "they are imposed by Respondent (or an emanation thereof) in order to fund a service rendered in support of photovoltaic operators",[153] the *CEF Energia v. Italy* tribunal nonetheless concluded that these fees were taxes, without however explaining how this result is compatible with accepting the existence of a robust element of reciprocity between the payments made and the services received. The *ESPF Beteiligungs GmbH et al. v. Italy* tribunal has recently adopted the same view as *CEF Energia v. Italy*.[154]

310.    The conclusion of the present Tribunal, i.e. that the amounts charged to the energy producers are actually a fee, and not a tax in the meaning of Article 21 of the ECT, is further corroborated by the fact, which is also conceded by the Respondent (Resp.

---

[148] See the reference in Resp. Counter-Memorial, para. 177, n. 53 to Italian Constitutional Court, Decision Nr. 238/2009, 16 July 2009, para. 7.2.1, Free Partial Translation (R-013).

[149] Italian Constitutional Court, Decision No. 238/2009, 16 July 2009, para. 7.2.1 (R-013), referring *ex plurimis* to Decisions Nr. 73/2005, 334/2006, 64/2008, 335/2008, 131/2009.

[150] *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019 (RL-037).

[151] Ibid., para. 198.

[152] Ibid., para. 199.

[153] Ibid., para. 199.

[154] See *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 357 (CL-313).

Reply, paras. 197-198), that the fees are subject to value-added tax. This is an additional significant indicator of the non-tax character of the fee in question.[155]

311.    For the foregoing reasons, the Tribunal finds that the administrative fee imposed by the Fifth Energy Account does not constitute a taxation measure in the meaning of Article 21 of the ECT and thus rejects the Respondent's fourth jurisdictional objection. In the light of this result, there is no need for the Tribunal to entertain the Claimant's claim based on the claw-back provision of Article 21(3) of the ECT with respect to most-favored nation treatment.

## E.    CONCLUSION

312.    On the basis of the Claimant's respective submissions in these proceedings, which have remained uncontested by the Respondent (see paras. 150, 152), the Tribunal is satisfied that the general jurisdictional requirements of both Article 26 of the ECT and Article 25 of the ICSID Convention are met in the present case.

313.    Having dismissed all the Respondent's jurisdictional objections – and seeing no reason to take up the Respondent's submissions on unenforceability of the award, on exclusive forum clauses and on the requirement of prior request for amicable settlement as a separate matter of admissibility (see paras. 237, 264 and 283) –, the Tribunal finds that the Centre has jurisdiction and that the Tribunal has competence to decide the claims made by the Claimant.

---

[155] See in a similar vein, ibid., para. 357.

## VI.   LIABILITY

314. In the present proceedings, the Claimant argues that the Respondent has breached Articles 10(1) and 13 of the ECT and refers to three distinct sets of facts in this regard, namely – in chronological order – the so-called Project Vega, the so-called Frosinone plants and the changes brought about by the *Spalma-incentivi* Decree.

315. As the Parties' have made particularly extensive submissions with respect to the latter claim, the Tribunal will begin its liability analysis with the issues relating to the adoption of the *Spalma-incentivi* Decree in 2014 (Section A; see paras. 316 et seq.) and will only afterwards address the Claimant's contentions regarding Project Vega and the adoption of the Romani Decree and the Fourth Energy Account (Section B; see paras. 478 et seq.) as well as regarding the Frosinone plants and the adoption of the Fifth Energy Account (Section C; see paras. 533 et seq.).

### A.   THE *SPALMA-INCENTIVI* DECREE

316. In the present Section, the Tribunal discusses the submissions of the Parties with respect to the impact of the *Spalma-incentivi* Decree (see para. 143) on the Claimant's 25 PV plants (see para. 110).

317. In addition, this decree also amended the provisions on the administrative management fee that had been introduced by the Fifth Energy Account (see para. 136). Accordingly, the Tribunal deems it preferable to consider this aspect of the *Spalma-incentivi* Decree in the context of its analysis of that energy account (see paras. 613 et seq.).

#### (1)   The Parties' Positions

##### a.   *Claimant's Position*

318. The Claimant contends that the *Spalma-incentivi* Decree severely affected the 25 PV plants it was operating by way of both reducing the amount of FIT and deferring the payments of the incentives, thus causing substantial economic losses to the Claimant (Cl. Memorial, para. 148).

319. According to the Claimant, the immediate effect of the *Spalma-incentivi* legislation was the unilateral modification of the main terms of the GSE conventions. Each GSE convention contained a provision explicitly stating the amount of the FIT, which for all

plants (except the two Frosinone plants) was to remain constant over the duration of the agreement, i.e. for 20 years. Under the terms of the *Spalma-incentivi* Decree, due to the lack of an express choice on the part of the Claimant, Option C applied to the Claimant's PV plants by default[156] and resulted in a 6 % to 8 % cut in FIT, depending on the plant's power, starting from 1 January 2015 (Cl. Memorial, paras. 149-151; Cl. PHB, paras. 6-10).

320.    Furthermore, according to the Claimant, under the new incentives payment terms introduced by the *Spalma-incentivi* Decree, the 25 PV plants of the Claimant no longer received FIT on a monthly basis in amounts corresponding to the actual production of solar energy. Rather, amounts due in a given year were both curtailed and partially deferred to the next year, thus negatively affecting the cash flows of the Claimant's subsidiaries (Cl. Memorial, para. 152).

321.    Moreover, the Claimant submits that its revenues were negatively impacted by the increased administrative fees imposed by the *Spalma-incentivi* Decree (Cl. Memorial, para. 153; Cl. PHB, paras. 11-14).

322.    The Claimant further argues that the strain imposed on the cash flows by the *Spalma-incentivi* Decree affected the ability of the Claimant's subsidiaries to meet their obligations under the project financing agreements they had entered into based on the FIT promised by the Respondent. The pertinent repayment schedules provided that, in the event that the relevant financial ratios fell below certain thresholds, the subsidiaries would be prohibited from distributing dividends to the Claimant (Cl. Memorial, paras. 148, 155-156).

323.    According to the Claimant, already in July 2014, the reduced cash flows due to the retroactive cut of the FIT and the amended FIT payment terms caused the aforementioned financial ratios to drop below the allowed thresholds, thus resulting in the imposition of a dividends distribution block. All the revenues coming from the sale of solar energy and from the FIT were required to be used to pay the loans and the plants' operating costs, with no amount left to pay dividends to the holding company.[157] In addition, three of the Special Purpose Vehicles (SPV) established to operate the

---

[156] See Witness Statement of Claudio Pisi, paras. 48-50.
[157] See ibid., para. 56.

Claimant's PV plants went into so-called "technical default", i.e. the respective financial ratios dropped to a level where disposal of any proceeds was not possible anymore without the lenders' consent, except in specific cases (Cl. Memorial, paras. 156-157).

324. The Claimant argues that, against this background, it decided to renegotiate the terms of the banking loans in order to solve the distribution block situation and avoid the possible consequences of technical defaults.[158] In September 2015, the Claimant was able to agree on the terms of the restructuring. The new terms included a EUR 15.7 million partial prepayment of the loans, the rescheduling of payment dates and the modification of some of the financial ratios.[159] On this basis, in October 2015, there was agreement with the banks to modify some of the terms of the banking loans. In March 2016, final agreements adopting the amendments were concluded. The Claimant submits in this regard that, while the renegotiation of the banking loans allowed the resuming of the distribution of dividends, it also meant that the Claimant ultimately bore all of the losses resulting from the *Spalma-incentivi* legislation (Cl. Memorial, paras. 158-160).

325. On this basis, the Claimant contends that the Respondent's adoption of the *Spalma-incentivi* Decree violated both (i) Article 10(1), last sentence, of the ECT on the observance-of-obligations or umbrella clause and (ii) Article 10(1), first and second sentences, of the ECT on fair and equitable treatment (Cl. Memorial, paras. 316, 342; Cl. Reply, para. 35; Cl. Reply PHB, para. 3).

*(i) Umbrella clause*

326. As regards the former, the Claimant argues that the Respondent used its sovereign legislative power to change the terms of the obligations to the detriment of the investment, thus breaching the ECT's observance-of-obligations clause. In this regard, the Claimant first submits that the Respondent's obligations under Article 10(1), last sentence, of the ECT not only cover obligations entered into with an investor, but also with an investment. As the GSE conventions were entered into with the Claimant's local subsidiaries and as these companies were investments in the meaning of

---

[158] See ibid., para. 57; Silver Ridge Power, Discussion Memorandum to the Board of Directors, 30 January 2015, 1-2 (C-084).

[159] See Silver Ridge Power, Discussion Memorandum to the Board of Directors, 14 September 2015, 1-2 (C-085).

Article 1(6)(b) of the ECT, the GSE entered into obligations with respect to the Claimant's investments (Cl. Memorial, paras. 318-320; Cl. PHB, para. 7).

327.    Secondly, according to the Claimant, the Respondent's contention (see para. 345) that the term "entered into" in Article 10(1), last sentence, of the ECT implies a negotiation between two parties, while each Energy Account was a general, non-negotiated measure, is baseless. It is commonplace that parties enter into binding obligations without negotiation (Tr. 23 September 2019, 30:12-18 [Legum]). In addition, the context of Article 10(1), last sentence, of the ECT itself contemplates the formation of agreements without negotiation since Article 26 of the ECT provides for an agreement to arbitrate based on the investor's acceptance of the State's consent to arbitration given in the Treaty which is not preceded by any negotiation between the host State and the investor (Cl. PHB, paras. 20-22; Cl. Reply PHB, para. 11; Tr. 23 September 2019, 30:17-25 – 31:1-8 [Legum]).

328.    Thirdly, the Claimant argues that the GSE is a State-owned entity, controlled by the Ministry of Economy and Finance and in charge of regulating the renewable energy market, including administering the Energy Accounts. In the Claimant's view, the GSE thus expressly exercises governmental authority as concerns electricity generated from renewable sources in Italy, has the status of a State organ under Italian law and forms part of the administration, i.e. of the executive branch of the Italian Republic. Applying the pertinent principles of attribution of conduct to a State, as notably laid down in Articles 4 and 5 of the Articles on Responsibility of States for Internationally Wrongful Acts, the GSE acted on behalf of the Respondent when entering into the GSE conventions (Cl. Memorial, paras. 321-331; Cl. Reply, paras. 44-46; Cl. Reply PHB, para. 10).

329.    Fourthly, the Claimant contends that, contrary to Article 10(1), last sentence, of the ECT, the Respondent breached the obligations it had entered into with the Claimant's investments. In the Claimant's view, the Respondent did so by failing to observe the obligations set out in the GSE conventions, namely that each of the Claimant's 25 PV plants would receive the applicable FIT (under the Second, Third, Fourth or Fifth Energy Accounts, as the case may be) for 20 years from the plant's entry into operation. Thus, the *Spalma-incentivi* Decree caused *de facto* the unilateral repudiation by the Respondent of the key aspect of the GSE conventions. In addition, these conventions

stipulated that amendments could be made only if agreed to in writing. In spite of this provision, the Claimant argues, the *Spalma-incentivi* Decree unilaterally amended the GSE conventions by imposing a retroactive reduction of FIT and by modifying the payment terms (Cl. Memorial, paras. 332-335; Cl. Reply, para. 42; Cl. Reply PHB, para. 6).

330. Fifthly, the Claimant argues that, contrary to the Respondent's submissions (see para. 346), there is no need to show an "autonomous act" of the GSE. In a similar vein, it is irrelevant that the *Spalma-incentivi* legislation was neither decided nor adopted by the GSE. Furthermore, according to the Claimant, the fact that the *lex contractus* of the GSE conventions is Italian law does not imply, as insinuated by the Respondent, that the application of the umbrella clause is ruled out when a breach of the obligation is not established under the municipal law governing the obligation. In particular, no case and no commentator has ever adopted the position put forward by the Respondent that the umbrella clause only applies to breaches of contract under municipal law and has no application where, as is the case here, a State uses its sovereign powers to interfere with an investor's contractual bargain through legislative change. In the Claimant's view, the Respondent's invocation of its own internal law, as interpreted by the Italian Constitutional Court, cannot shield it from its international responsibility for breaches of the ECT (Cl. Reply, paras. 47-55; Cl. PHB, paras. 31-43).

331. Sixthly, the Claimant rejects the Respondent's contention that the GSE conventions do not reflect contractual obligations, but commitments contemplated or required by legislation which do not fall within the ECT's observance-of-obligations clause. According to the Claimant, the GSE conventions are contracts which set out specific obligations vis-à-vis specific investments of the Claimant and are as such undisputedly covered by Article 10(1), last sentence, of the ECT. In particular, each of these conventions was denominated as an agreement between, on the one hand, the GSE and, on the other, a given local development company, indirectly owned and controlled by the Claimant at all relevant times. The price or FIT at which the GSE would buy electricity was clearly set out as well as the method of payment, the duration of contract and other specific obligations concerning access to documents or checks and inspections. Each GSE convention thus concerned a specific investment, responsible for a specific PV plant. Furthermore, the Claimant submits that the record does not

90

support the Respondent's suggestion that legislation or regulation dictated the entire content of the GSE conventions (see Cl. Reply, paras. 67-72; Cl. PHB, paras. 25-30; Cl. Reply PHB, paras. 8-9).

332.    In a similar vein, the Claimant contradicts the Respondent's contention (see para. 346) that the GSE conventions were merely accessory contracts, which simply transpose legal provisions. To the contrary, the Energy Accounts, GSE tariff recognition letters and the GSE conventions concluded with the Claimant's subsidiaries amount to obligations entered into with specific PV operators, i.e. the Claimant's investments. In any event, in the Claimant's view, the GSE conventions are private law contracts under Italian law, as also indicated by the Romani Decree (Cl. Reply, paras. 73-80).

333.    Moreover, the Claimant rejects the Respondent's submission (see para. 344) that umbrella clauses do not allow the inclusion of legislative and regulatory obligations within their scope, but concludes from the broad wording of Article 10(1), last sentence, of the ECT ("any obligation"), as well as from the pertinent caselaw, that umbrella clauses protect specific undertakings which the State has entered into by contract or otherwise (Cl. Memorial, para. 304; Cl. Reply, paras. 58-66). In any event, the Claimant deems the Respondent's contention to be beside the point because there is no dispute that the ECT's umbrella clause covers contractual obligations (Cl. Reply, para. 67).

### (ii) Fair and equitable treatment

334.    As concerns the latter claim, i.e. the breach of the fair and equitable treatment clause of Article 10(1), second sentence, of the ECT, the Claimant argues that the *Spalma-incentivi* Decree both violated its legitimate expectations and failed to ensure the stability and transparency of the Italian legal framework. The Claimant contends that each element of its legitimate expectations and its stability and transparency claims is met in the present case (Cl. Memorial, paras. 337, 342; Cl. PHB, paras. 49-54).

335.    First, according to the Claimant, the Respondent made specific representations that it would maintain a stable legal framework, including the levels of FIT fixed by law and in contracts. In particular, the Respondent committed in each Energy Account that, once a PV plant qualified for a given FIT, that applicable tariff was granted for 20 years. With respect to the Claimant's 25 PV plants, these specific commitments were memorialized in writing in the respective GSE conventions. In the Claimant's view, the

record therefore establishes that the Respondent adopted the Energy Accounts with the specific aim to induce investments in solar energy and, in order to achieve this purpose, gave specific assurances to specific investments of the Claimant that these investments would receive the specified FIT for the whole 20 year period (Cl. Memorial, paras. 337-338; Cl. Reply, paras. 107-118; Cl. PHB, para. 54).

336.    Secondly, the Claimant argues that it relied on these representations when making its long-term investments which required a very substantial capital investment upfront. In particular, the Claimant submits that it relied on two main elements when making its investment: the FIT rates guaranteed for 20 years upon a plant's entry into operation and the stability and visibility of the legal framework which would not be changed without proper advance notice. In the Claimant's submission, the certainty provided by the fixed FIT for a 20-year period was a critical factor in justifying decisions to invest in PV plants in Italy. Furthermore, the Claimant contends that it relied not only on the GSE conventions, but also on the Italian legal framework as a whole, from the Energy Accounts through the GSE tariff recognition letters to the GSE conventions (Cl. Memorial, para. 339; Cl. Reply, paras. 119-126; Cl. PHB, paras. 56-58, 87-92; Cl. Reply PHB, paras. 15-16).

337.    Thirdly, the Claimant argues that its expectations based on these commitments were reasonable and legitimate under the circumstances. The representations were reflected in official acts that were unqualified. In a similar vein, the GSE conventions required the consent of both parties for an amendment or modification of the obligations to be valid (Cl. Memorial, para. 340; Cl. PHB, para. 61).

338.    Fourthly, the Claimant contends that the Respondent adopted measures directly contradicting its prior representations and fundamentally altering the legal framework, thus frustrating the Claimant's investments due to a sharp and unexpected reduction in FIT. In particular, the adoption of the *Spalma-incentivi* Decree in 2014 violated the Claimant's legitimate expectations that its 25 PV plants would receive a fixed FIT for 20 years from the start of operation of these plants. In the Claimant's submission, the retroactive cut in FIT imposed by Option C, which applied to the Claimant's subsidiaries by default, caused an immediate reduction in FIT of 7 % to 8 % for each of the 25 PV plants, resulting in a loss of EUR 37.5 million in future cash flows, and thus deprived the Claimant of a significant part of its projected revenues. Contrary to

the Respondent's contention that the *Spalma-incentivi* legislation was designed to avoid a disproportionate remuneration of PV investors, the expected internal rate of return of the Claimant's PV plants was not excessive. As a matter of fact, the actual return on the Claimant's investments was negative, even after the sale of the Italian assets in 2017 and 2018. Hence, the Claimant submits that it realized a substantial loss on its investments in Italy (Cl. Memorial, para. 341; Cl. Reply, paras. 128-143, 157-163).

339.    The Claimant further contends that the *Spalma-incentivi* Decree was in no sense a necessary "fine-tuning" of the FIT, but an unreasonable and disproportionate measure on the part of the Respondent. In changing the basic parameters of the Energy Accounts retroactively, this legislation was not just operating a "re-modulation" of tariffs or a modest reduction of the applicable FIT, but the Respondent suddenly and fundamentally altered the regulatory framework under which the Claimant had made its investment in a way that was not foreseeable. In addition, according to the Claimant, there can be no "fine-tuning" in an *ex ante* support scheme such as the Energy Accounts where the government guarantees incentive payments at a specified level which the investor will take into account when planning the project, assessing the potential profitability and deciding whether to invest. The situation would be different in an *ex post* scheme where the government guarantees a certain rate of return and then adjusts the support periodically to maintain the desired return despite fluctuations in costs and performance. For plants in operation that had secured a specific tariff for 20 years, the Claimant could not have anticipated the reduction imposed by the *Spalma-incentivi* Decree (Cl. Reply, paras. 144-156; Cl. PHB, paras. 65-78; Cl. Reply PHB, paras. 19-20).

340.    Finally, the Claimant also rejects the Respondent's argument (see paras. 341, 352) that without the *Spalma-incentivi* Decree, Italy's renewable incentive system would have been at risk of default because of an over-excessive burden on consumers. According to the Respondent, this excessive burden would have led to a reduction in consumption on the part of the consumers, making it necessary to modify the incentive system to guarantee its sustainability, but at the same time to ensure that renewable energy producers receive a "fair remuneration". The Claimant argues, however, that there is no evidence that, absent this legislation, electricity consumers would have faced increasing charges in relation to the FIT. In addition, the *Spalma-incentivi* Decree

caused only a small reduction in prices to relevant consumers, notably particular types of industrial users, but excluded from its scope all residential customers. Moreover, according to the Claimant, the decrease in industrial electricity demand which can be observed since 2011 is the result of increasing energy efficiency and Italy's low GDP growth. As electricity demand is very inelastic to price, the *Spalma-incentivi* Decree, which slightly reduced the electricity bill of some industrial consumers, was therefore unlikely to stimulate any significant increase in demand for electricity. In the Claimant's view, there is thus no support for the Respondent's argument that the Energy Account incentive scheme would have been at risk of default save for adoption of the *Spalma-incentivi* legislation (Cl. Reply, paras. 164-180; Cl. PHB, paras. 79-86; Cl. Reply PHB, para. 18).

### b. *Respondent's Position*

341. The Respondent argues that its intervention – first by the *Destinazione Italia* Decree and subsequently by the *Spalma-incentivi* legislation – was necessary to avoid the overburdening of the consumers who pay the main share of the expenses for the renewable energy incentives through their electricity bills. An additional increment of the costs would have led to a further reduction of energy consumption, with the result of exposing the FIT mechanism itself to a high risk of financial instability. In addition, the Respondent contends that, following the economic crisis that also had a fierce impact on Italy, there was a need to reinvigorate the Italian industry. At the same time, costs continued to decrease for PV energy producers and returns from operating plants were still extremely high compared to original estimates. In sum, the Respondent's intervention was motivated by promoting the sustainability of the renewable energy system, thus also benefiting the PV energy producers (Resp. Counter-Memorial, paras. 311-113, 319, 323-325, 335, 391; Resp. Rejoinder, paras. 423-440; Resp. PHB, paras. 16-17; Resp. Reply PHB, paras. 43, 46).

342. According to the Respondent, the *Spalma-incentivi* Decree contained a set of emergency measures to cope with the exceptional economic situation prevailing in Italy at the time. While encompassing provisions of a different nature, all of these provisions had the objective of enhancing competitiveness of Italian markets, including the reduction of costs of electricity for small- and medium size businesses through a reduction and redistribution of the general charges of the electricity system. Thus, the

aforementioned Decree did not, as argued by the Claimant (see para. 338), abrogate Italy's incentive payment regime and replace it with a new system, but remodulated incentives under the existing system and therefore implemented a fine-tuning of a still valid and stable support system. The Respondent further argues that this did not occur abruptly, but through progressive measures, starting with voluntary and moving on to compulsory remodulation, albeit with the offering of alternatives to the PV energy producers. Moreover, the remodulated tariffs did not apply retroactively, but only to future incentives. In this regard, according to the Respondent, a distinction is necessary between, on the one hand, situations where the measure in question removes legal effects already completed and concluded (so-called "claw back" provisions) and, on the other, situations where long-term relationships are affected by the measure in the sense that it intervenes in the regulation, but only for the future; the latter is the relevant scenario in the present case. In sum, the *Spalma-incentivi* legislation was part of the general and progressive readjustment of the support schemes for renewable energy and adopted reasonable and proportionate solutions in this regard (Resp. Counter-Memorial, paras. 332-335, 388-390; Resp. Rejoinder, paras. 409-422; Resp. PHB, paras. 18-19).

343. Against this background, the Respondent rejects both claims, i.e. (i) that the adoption of the *Spalma-incentivi* Decree violated Article 10(1), last sentence, of the ECT on the umbrella clause and (ii) that it further breached Article 10(1), first and second sentences, of the ECT on fair and equitable treatment (Resp. Counter-Memorial, paras. 28-29; Resp. Rejoinder, paras. 367-368; Resp. PHB, paras. 25-26).

### (i) Umbrella clause

344. As regards the first claim, the Respondent first submits that both the text and function of the umbrella clause do not allow the inclusion of legislative and regulatory obligations within its scope. The reason for this exclusion lies in the rationale of the umbrella clause which is to "internationalize" contractual obligations which otherwise would remain excluded by the scope of the investment treaty, due to their private nature. Therefore, Legislative Decree No. 387/2003, the Romani Decree, as well as the Second, Third, Fourth and Fifth Energy Accounts are not covered by the ECT's umbrella clause (Resp. Counter-Memorial, paras. 427-428; Resp. Rejoinder, paras. 505, 509-512).

345. The Respondent further contends that the term "entered into", as contained in Article 10(1), last sentence, of the ECT, implies an activity of negotiation between the parties. However, the Energy Account Decrees were not at all negotiated between investors and the Respondent. The same holds true for the GSE conventions which are not the result of a free negotiation between the parties, but are unilaterally established by, and entirely subject to, the general regulatory framework (Resp. Rejoinder, paras. 213, 508-509; Resp. PHB, paras. 49, 102-103; Resp. Reply PHB, para. 50).

346. In addition, the Respondent argues that the GSE conventions are different from genuinely private contracts. They are of special nature and can only be understood within the regulatory context they depend on. In fact, they represent the final and lowest level of a single and unitary general regulatory framework. According to the Respondent, they are to be qualified as "accessory contracts" (*"contratto accessorio"* or *"contratto accessivo"*) establishing the operational rules to implement the relevant public measure they are connected to. In particular, as opposed to private contracts, the parties do not autonomously determine the essential elements of the agreement, which are established outside the contract by the legislative and/or regulatory act they depend upon. In fact, the whole of the GSE conventions is a mere reproduction of the pertinent regulatory acts, without the need that each individual word or sentence be repeated. Hence, the Respondent did not undertake any autonomous commitments under the ECT by having the GSE sign these agreements, compared to the obligations undertaken through the adoption of the relevant general measures. Put differently, the GSE conventions must be considered jointly with the public measure as a unique act for the purposes of international investment law. This holds true irrespectively of the reference to private law made in the Romani Decree (Resp. Counter-Memorial, paras. 116-117, 253, 266-267, 428-429; Resp. Rejoinder, paras. 209-215, 524-527; Resp. PHB, paras. 51-53; Resp. Reply PHB, para. 51).

347. Moreover, the Respondent contends that, contrary to the submissions of the Claimant (see para. 328), the GSE is by no means the regulator of the renewable energy sector. The authority in charge of regulation of the sector is rather the AEEG. Accordingly, the drafting of the standard agreements governing the concrete disbursement of the incentives, i.e. the GSE conventions, is not the competence of the GSE, but of the AEEG (Resp. Counter-Memorial, para. 252; Resp. Rejoinder, para. 209).

348.    Furthermore, according to the Respondent, the Claimant did not actually prove any infringement of the GSE conventions by the Respondent. In particular, the Claimant did not challenge any conduct by the GSE, and as far as the Respondent's regulatory measures are concerned, they do not have any relevance with respect to the infringement of the GSE conventions. As a matter of law, as further argued by the Respondent, contracts produce their obligatory effects only between the parties; thus, the Respondent's regulatory measures were intrinsically not apt to be a violation of the obligations set out in the GSE conventions (Resp. Counter-Memorial, paras. 432-438).

349.    In addition, the Respondent contends that also the Italian Constitutional Court did not accept that the conventions between the GSE and the investors were contracts governed by private law, but that they were of a regulatory nature and had the character of accessory agreements (Resp. Counter-Memorial, para. 440; Resp. Rejoinder, paras. 524, 530; Resp. Reply PHB, paras. 52-61).

### (ii) Fair and equitable treatment

350.    With respect to the second claim, the Respondent denies that the fair and equitable treatment clause of the ECT has been breached in the present case.

351.    In this regard, the Respondent first argues in a general perspective that the legitimacy – and thus the legal protection – of an expectation may not be simply determined by relying on the legislative framework existing in a State at the time of the investment, but must also take into account the State's fundamental sovereign prerogative of legislating, i.e. its power to regulate. Otherwise, a State would have the obligation to freeze its own normative activity each time this activity requires modification of a rule existing at the time of the investment and negatively affecting a foreign investment. In the Respondent's view, stability of legislation is not at all equivalent to a freezing clause, but implies a degree of reasonable modification of existing rules. At the same time, the Respondent concedes that not all regulatory modifications made by the host State would be legitimate, notably if the host State acted either unfairly, unreasonably or inequitably in the exercise of its legislative power (Resp. Counter-Memorial, paras. 451-455, 467; Resp. Rejoinder, paras. 453-471).

352.    As concerns the purported legitimate expectations on the part of the Claimant, the Respondent further contends that the renewable energy market is a regulated market

and that incentives are subsidies given to a category of producers with the objective of correcting a market failure to support consumption of PV energy. According to the Respondent, this needs to be understood within the context of the pertinent EU legislation, i.e. the First and Second Renewable Directives, but also the EU's State aid regime, which requires that no excessive subsidies artificially distorting the market be granted and the sustainability of the overall scheme be ensured. Any prudent investor operating in a regulated market, in particular the Claimant as a very sophisticated investor, should be aware of such a market's dynamics and of the specific role of the regulator in this context. Incentives may be necessary to support the market to maturity, but need not become a source of overcompensation and consequently market distortion and inefficiency. Adjustment of policies is therefore an inherent feature of these markets and of the renewable energy market in particular (Resp. Counter-Memorial, paras. 382-384, 394; Resp. Rejoinder, paras. 201-202; Resp. PHB, para. 4).

353.    In addition, the Respondent states that an adequate assessment of risk would have required the Claimant to take into consideration that it entered the Italian market at a late stage, when the support mechanism was close to reaching its sustainability limits, as well as the general crises that all European economies had undergone since 2009. The Respondent contends that the Claimant could not simply rely on extremely favorable incentives and ignore any other reasonable assessment of the context in which it was operating. The Respondent particularly submits in this regard that no legal due diligence could be found in the exhibits submitted by the Claimant (Resp. Counter-Memorial, para. 395; Resp. PHB, para. 7; Resp. Reply PHB, para. 13).

354.    Furthermore, the Respondent submits that the pertinent legal framework contained general measures addressed to the generality of the public, i.e. to anyone wanting to produce solar energy, irrespective of legal status, nationality or dimension. Hence, contrary to the Claimant's contention (see para. 335), the incentivization regime for PV energy production was not put in place with a specific aim to induce foreign investments (Resp. Reply PHB, paras. 8-9).

355.    Moreover, the Respondent contends that, beyond the Claimant's insistence on investor confidence, the goals of the pertinent EU renewable energy legislation such as efficiency, competitiveness and sustainability have to be taken into account as relevant context for the Respondent's development of PV energy support schemes as well as the

investors' legitimate expectations in this respect. In particular, while permitting support schemes as a public measure to intervene in the market, EU legislation is concerned with efficiency, which must include cost-related measures and the avoidance of overcompensation. According to the Respondent, EU legislation always requests national measures to be sustainable and consistent with EU market principles, notably including State aid rules (Resp. Rejoinder, paras. 376-379).

356. Furthermore, the Respondent submits that a distinction needs to be made between a "stable" and a "fixed" tariff. Incentives that remain stable do not necessarily remain identical. The Respondent argues that the Claimant has not been able to prove that fixed tariffs were promised or specific commitments were made by statutory act. According to the Respondent, with its interpretation of the relevant legal framework the Claimant incorrectly takes off itself any regulatory risk (in addition to the elimination of the market risk effectuated by the FIT), notwithstanding that the Claimant acts in a regulated market which by definition has a component of regulatory risk precisely arising from the possibility of redefinition of administrative conditions to adjust to policy needs (Resp. Counter-Memorial, paras. 385-386; Resp. Rejoinder, paras. 380-383, 386-389).

357. According to the Respondent, the fact that the Claimant could not rely on fixed tariffs also becomes clear when considering the time of the investment because the entitlement to obtain a specific tariff only came into existence when the PV plant in question entered into operation and was connected to the grid, i.e. after the investment date. In addition, there might be various external reasons for not obtaining the tariff initially expected, e.g. due to construction delays. As a matter of fact, none of the Claimant's investment companies had obtained either a tariff recognition letter or a GSE convention at the time of investment. As legitimate expectations have to be assessed at the time of making the investment, allowing investors to rely on the GSE conventions for the purposes of legitimate expectations would amount to an "*ex post* assurance" of the stability of the incentive regime for renewable energy (Resp. Counter-Memorial, paras. 471-474; Resp. Rejoinder, paras. 392-400, 407; Resp. PHB, paras. 7, 31-47; Resp. Reply PHB, paras. 4, 6, 10-12).

358. Thus, the Respondent only accepts that the Claimant could legitimately rely on the overall or macro-stability of the incentive regimes in the sense of ensuring a "fair

remuneration" over the long term, as provided by the pertinent primary legislation, including the fact that the incentives would be maintained at a level, both in terms of amount and duration, that would guarantee a fair return on the Claimant's investment. At the same time, an expectation that incentives would be ironclad, irrespective of the fact that they proved to be excessive and that they were not socially sustainable any longer, including the risk of failure of the system itself, could not be considered legitimate. Hence, the crucial question is to assess whether the challenged measures of the Respondent were reasonable, equitable and proportionate with respect to the expectations of stability of the incentive regime that investors were legitimate to have (Resp. Counter-Memorial, paras. 476-477; Resp. Rejoinder, paras. 472-484; Resp. PHB, para. 5).

359.   In this regard, the Respondent contends that it did not provide any stabilization clause in its regulation concerning PV plants. The *Spalma-incentivi* Decree simply reshaped the incentives for PV plants, but left the basic structure of the incentive regime intact. When assessing the reasonableness and proportionality of the adopted measures, what is important are the way the host State changes its previous regulation, the consistency of such modification and the concrete reasons underlying it. Furthermore, according to the Respondent, the absence in previous legislation of the express possibility for tariffs to be modified would not limit to any extent the power of the State to introduce such a change. To the contrary, only an express prohibition in a previous statutory act to modify, i.e. a stabilization clause, would have impeded the State from doing so (Resp. Counter-Memorial, paras. 480-489; Resp. Rejoinder, paras. 216-223, 390; Resp. Reply PHB, para. 44).

360.   In particular, the Respondent submits that, at the time when the Claimant started its investments, the operational costs to produce PV energy had been sharply reduced due to technological progress and economies of scale. The progressive reductions of FIT in the Third and Fourth Energy Accounts, however, were not sufficient to overcome the imbalance between PV investors' remuneration and the reduced costs for producing electricity, also in reason of the huge growth of PV plants in Italy, where the conditions for investors were particularly favorable compared to the rest of Europe. This situation, the Respondent argues, was detrimental for consumers who entirely bore the growing economic weight of the incentives. After an attempt in 2013 to favor voluntary

mechanisms via the *Destinazione Italia* Decree, in 2014 the Respondent adopted the *Spalma-incentivi* Decree with the aim of balancing the necessity of avoiding excessive and cost-disproportionate burdens on consumers with the commitment to grant PV investors an equitable remuneration of the costs of investment and operation (Resp. Counter-Memorial, paras. 490, 496).

361.    In sum, according to the Respondent, the *Spalma-incentivi* Decree is reasonable, as it is aimed at balancing the need to grant incentives to PV energy with the necessity to respect a cost-effectiveness criterion, to avoid a disproportionate remuneration of PV investors and to protect the interests of final consumers. In addition, the Respondent considers the aforementioned legislation to be proportionate because the concrete way of reshaping the incentive tariffs is made by providing different mechanisms, notably by leaving PV investors the possibility of opting for one of three options, thus having a limited impact on the PV investors. Moreover, the Respondent deems the *Spalma-incentivi* Decree to be consistent and coherent with the existing regulatory framework, both at the Italian and the EU levels (Resp. Counter-Memorial, paras. 497-501; Resp. Rejoinder, paras. 441-452, 486-496; Resp. PHB, para. 8).

362.    Moreover, the Respondent submits that information documents such as guides or brochures of the GSE or other institutional subjects that have over time conducted information campaigns on the Energy Account regime cannot be the basis of protected assurances to the benefit of the Claimant (Resp. PHB, para. 54).

363.    The Respondent further argues that, in April 2018, the Claimant sold 18 PV plants to Cubico Sustainable Development.[160] This shows that the plants are still valuable assets (Resp. Counter-Memorial, para. 406).

        **(2)    The Tribunal's Analysis**

364.    The Claimant contends, and the Respondent rejects, that the adoption of the *Spalma-incentivi* Decree violates, on the one hand, Article 10(1), last sentence, of the ECT on the observance-of-obligations or umbrella clause (a.) and, on the other, Article 10(1), first and second sentences, of the ECT on fair and equitable treatment (b.). The Tribunal will address these two claims in turn.

---

[160] See Exhibit R-039.

### a. Umbrella clause

365.    Article 10(1), last sentence, of the ECT states: "Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party".

366.    The Claimant argues that the agreements which the GSE concluded with the corresponding local development companies concerning each of the Claimant's 25 PV plants (see para. 109), i.e. the so-called GSE conventions, constitute obligations which the Respondent entered into with the Claimant in the meaning of the afore-cited umbrella clause of the ECT and that the Respondent subsequently used its sovereign legislative power to change the terms of these obligations to the detriment of the investment, thus breaching the umbrella clause. The Claimant justifies its claim with a series of arguments all of which the Respondent rejects.

367.    The Tribunal notes that the Claimant has also referred to the debate as to whether the ECT's umbrella clause extends exclusively to contractual obligations or may also cover legislative or regulatory acts (Cl. Memorial, para. 304; Cl. Reply, para. 64; see para. 333). At the same time, the Claimant considers this debate to be "beside the point" (Cl. Reply, para. 67) in the case at hand, since contractual obligations such as the GSE conventions are without a doubt covered by the umbrella clause. Against this background, the Tribunal will focus its analysis on the Parties' arguments as to whether the GSE conventions are covered by the ECT's umbrella clause (i) and address this clause's relevance with respect to Legislative Decree No. 387/2003, the Romani Decree, the Second, Third, Fourth and Fifth Energy Accounts, as well as the GSE tariff recognition letters subsequently (ii).

### (i) GSE conventions

368.    First, the Tribunal agrees with the Claimant's contention that the terms of the ECT's umbrella clause do not only cover obligations entered into with an investor, but also with an investment, and that the GSE conventions which were concluded between the GSE, on the one hand, and the Claimant's local subsidiaries, on the other (see paras. 109, 120), fall under Article 10(1), last sentence, of the ECT in this respect.

369.    Secondly, the Tribunal is not convinced by the Respondent's submission (see para. 345) that the use of the words "entered into" in the ECT's umbrella clause implies that

negotiations must have taken place between the parties to the obligation. The Claimant (see para. 327) is correct to argue that it is common for parties to enter into binding obligations both with or without previous negotiations.

370.    Thirdly, the Tribunal further accepts the Claimant's position (see para. 328), which has remained unchallenged by the Respondent, that under the rules of State responsibility, the conduct of the GSE, which acts as an organ of the Italian State, in particular when concluding the GSE conventions, is attributable to the Respondent.

371.    Fourthly, the Tribunal considers that, while it is disputed between the Parties whether, and to what extent, Italian law is relevant to determining the existence of an obligation under the umbrella clause,[161] the GSE conventions can be governed by no legal order but the Italian one. The Tribunal agrees with the Claimant (Cl. Reply, paras. 40, 49-56) that this does not imply that the latter must prove a breach of contract under Italian law in order to succeed under the umbrella clause claim. Making this concession to the Claimant, however, does not prevent the Tribunal from accepting in principle that the GSE conventions are governed by Italian law.

372.    Against this background, the Tribunal observes that also Legislative Decree No. 387/2003, the Romani Decree, as well as the Second, Third, Fourth and Fifth Energy Accounts (see paras. 116 et seq.), which constitute the legislative and regulatory basis for the renewable energy incentive scheme, form part of Italian law as the *lex contractus*. This is relevant in the light of the Respondent's submission that the GSE conventions are not standard commercial contracts governed by private law, as argued by the Claimant (see para. 332), but "accessory contracts" governed by administrative law (see para. 346). Accordingly, also the aforementioned legislative and regulatory provisions are to be taken into account by the Tribunal in order to properly examine the legal nature of the GSE conventions in light of the ECT's umbrella clause.

373.    The Tribunal notes in this regard that there exist so-called *contratti accessori* or *contratti accessivi*, i.e. "accessory" or "ancillary" contracts, in Italian (administrative) law which have certain characteristics distinguishing them from regular private law contracts. Here, the Tribunal accepts the evidence from the Respondent's legal expert,

---

[161] See notably Letter of the Claimant of 20 April 2020, 2.

Professor Rojas, that "the agreements between the Claimant's SPVs and the GSE are not mere 'private law contracts' but have an 'accessory nature'".[162]

374. The Tribunal also takes into consideration in this context that the Italian Constitutional Court has ruled that the GSE conventions are "accessory to the provisions granting the incentives", and were not "private law contracts".[163] Furthermore, according to the same decision, "the agreements reached with the GSE cannot be qualified as contracts meant to determine the exclusive profit of the operator [...]. They are instead regulatory instruments [...]".[164] These findings were endorsed subsequently by the Italian Court of Cassation.[165]

375. The Tribunal is aware of the fact that, as an arbitral body operating under international law, it is not legally bound by the aforementioned decisions and must independently adjudicate the dispute before it, since "[t]he purpose of investment arbitration is neutral adjudication of a dispute by a tribunal independent from both parties", as aptly described by the *Burlington v. Ecuador* tribunal.[166] The same tribunal declared, however, that international tribunal should certainly consider decisions rendered by national courts.[167] Having this in mind, the Tribunal accepts the relevance of the Italian Constitutional Court's findings for its own assessment of the nature of the GSE conventions in light of the ECT's umbrella clause.

376. In particular, the Tribunal observes that, on the basis and within the limits of the pertinent regulatory framework, the GSE submitted the GSE conventions for signature by the renewable energy producer only at the end of a process that included several previous steps (namely the energy accounts themselves as well as the GSE tariff recognition letters, which are both unilateral in character) and at a moment in time when the core elements of the incentivization scheme for the individual PV plant (notably the

---

[162] First Opinion of Professor Giacomo Rojas Elgueta, para. 212.

[163] Italian Constitutional Court, Decision No. 16/2017 of 7 December 2016, G.U. of 24 January 2017, nr. 11 (CL-094=R-036); in the Claimant's translation: "the ancillary relevance of these 'deeds' in the granting of the incentives"; "private law deeds".

[164] Ibid., nr. 8.3; in the Claimant's translation: "the agreements entered into with the GSE are not considered contracts intended for the exclusive profit of the operator [...], but constitute tools of regulation [...]".

[165] See Italian Court of Cassation, Ruling No. 10795/2017 of 4 May 2017 (CL-092).

[166] *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Liability, 14 December 2012, para. 410 (CL-034).

[167] See ibid., para. 410.

identity of the parties, the duration, the beginning and the amount of incentive payments as well as the payment modalities) had already been fixed. In fact, the GSE conventions only reflect a legal relationship whose existence and essential features have been determined before.

377.   Accordingly, the Tribunal agrees with the Respondent's position that the latter did not undertake any autonomous commitments by having the GSE sign the GSE conventions compared to the obligations the Respondent had already undertaken by virtue of adopting the relevant general regulatory measures since these conventions do nothing more than implement the general measures. In that sense, the GSE conventions are indeed mere "accessories" to the pertinent regulatory framework, as notably embodied in the unilateral energy accounts and the equally unilateral issuing of the tariff recognition letters by the GSE, and do not create commitments beyond the administrative acts they are sourced in.

378.   The Claimant (Cl. Reply, para. 77) is correct to refer the Tribunal to the Romani Decree according to which "incentives shall be allocated through private-law contracts between the GSE and the entity responsible for the system, based on a standard contract defined by the [AEEG] […]".[168] However, the question of whether or not the GSE conventions are private law contracts under Italian law or not and the corresponding question of the correct interpretation of the afore-cited provision within the Italian legal order are not issues for this Tribunal to decide. Precisely as they concern matters of Italian law, the Tribunal defers in this regard to the qualification made by the Italian Constitutional Court (see para. 374), which also took the aforementioned provision of the Romani Decree into account in its decision and still characterized the GSE conventions not to be mere private law contracts.[169]

379.   The characterization of the GSE conventions as accessory in nature and thus not creating commitments beyond the administrative acts in which they have their source, is not only relevant at the level of Italian law, the interpretation of which is not within

---

[168] Article 24(2)(d) of the Romani Decree (CL-080), which reads in the original version, as follows: "*gli incentive sono assegnati tramite contratti di diritto private fra il GSE e il soggetto responsabile dell'impianto, sulla base di un contratto-tipo definite dall'Autorità per l'energia elettrica e il gas* […]".

[169] See Italian Constitutional Court, Decision No. 16/2017 of 7 December 2016, G.U. of 24 January 2017, nr. 8.2, 11 (CL-094=R-036); see also *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 829(i) (RL-050).

the Tribunal's purview, but also for the purposes of the ECT's umbrella clause. In the Tribunal's view, an obligation can only be deemed to have been "entered into" in the meaning of Article 10(1), last sentence of the ECT if it embodies a relevant measure of autonomy and self-standing vis-à-vis general legislative and regulatory acts preceding and predetermining it. If such predetermination encompasses all its essential elements, thus reducing it to an act of essentially declaratory character, the necessary degree of autonomy and self-standing will not be reached and an obligation in the meaning of the umbrella clause cannot be considered to have been "entered into".

380.   While it has remained disputed between the Parties (Cl. Reply PHB, para. 9; Resp. PHB, paras. 51-53; Resp. Reply PHB, para. 51) whether the content of the GSE conventions was completely, or virtually completely, predetermined by the relevant legislative and regulatory acts, there can be no doubt on the basis of the evidence before the Tribunal that the degree of predetermination of the GSE conventions was overwhelming and certainly included all essential elements of the obligation (see para. 376). Accordingly, the Tribunal comes to the conclusion that the GSE conventions lack the necessary autonomy vis-à-vis the legislative and regulatory framework and do therefore not give rise to obligations entered into in the meaning of the ECT's umbrella clause.

381.   That fact that these acts are denominated as "*convenzione*" (see para. 120), translating as "conventions", "agreements" or even "contracts", does not change this result, as the denomination of an act can only provide an indication, but does not constitute the decisive factor in the Tribunal's assessment.

382.   In a similar vein, the Claimant's contention (Tr. 23 September 2019, 33:2-3 [Legum]; Cl. PHB, para. 26) that there is "no carve-out for obligations contemplated by legislation" in the ECT's umbrella clause, does not lead to a different conclusion. The crucial point in applying the ECT's umbrella clause is not whether a contract or convention is mentioned, provided for or, whatever the exact meaning of the concept may be, "contemplated" by legislation, since contracts and notably contracts concluded by the government are typically concluded on the basis, and within the framework and limits, of legislative provisions. What makes the case of the GSE conventions different from the standard relationship between legislative basis and contract based upon it is, as demonstrated before, that the pertinent legislative and regulatory acts predetermine

the conventions concluded by the GSE in all their essential elements, leaving no space for an autonomous legal obligation arising from the GSE conventions as such (Tr. 25 September 2019, 108:21-25 [Rojas]).

383. The Tribunal's conclusion is also in line with the thrust of the existing arbitral decisions on the matter. So far, the *Greentech v. Italy* and the *ESPF Beteiligungs GmbH et al. v. Italy* awards have been the only instances where it has been accepted that the ECT's umbrella clause would operate under these circumstances.[170] The *Greentech* majority's relatively brief examination of the accessory contracts argument which had also been raised in that case, resulted in the finding that "taken as a whole, the *Conto Energia* decrees, the GSE letters, and the GSE Agreements, amounted to obligations 'entered into with' specific PV operators".[171] The present Tribunal considers, however, that for the purposes of identifying whether an "obligation" has been "entered into" for the purposes of the ECT's umbrella clause, it is not appropriate to assess the combined legal effects of various legal acts of very different legal character. The decisive role attributed by the majority in *Greentech v. Italy* (and for that matter by the majority in *ESPF Beteiligungs GmbH et al. v. Italy*[172]) to the energy accounts and the GSE tariff recognition letters rather testifies, in this Tribunal's opinion, to the non-autonomous character of the GSE conventions, thus militating *against* qualifying them as obligations entered into by the Respondent for the purposes of the ECT's umbrella clause.

384. In a similar vein, the *CEF v. Italy* tribunal unanimously did not accept that the claimant in that case could rely on the ECT's umbrella clause with respect to the GSE conventions, notably by referring to their character as "municipal matters, subject to Italian law".[173] Moreover, the investor's umbrella clause argument regarding the GSE conventions was rejected in the equally unanimously adopted *Belenergia v. Italy* award, finding that "[t]he Italian legal and regulatory framework before the *Spalma Incentivi*

---

[170] See *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 466 (CL-271); *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, paras. 752 et seq., 811 et seq. (CL-313).

[171] *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 466 (CL-271).

[172] See *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 792 (CL-313); as for the dissenting position of arbitrator Prof. Laurence Boisson de Chazournes see ibid., para. 828.

[173] *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, para. 255 (RL-037).

Decree and the *Destinazione Italia* Decree was clearly addressed to national and foreign investors and thus could not be interpreted as creating obligations specifically '*entered into with*' Belenergia".[174] These ranks have been joined recently in the equally unanimously adopted *SunReserve et al. v. Italy* award,[175] which, amongst other things, extensively dealt with the parties' arguments on the accessory character or not of the GSE conventions[176] and concluded that neither the GSE tariff recognition letters nor the GSE conventions could create "obligations" that would fall within the meaning of that term in the ECT's umbrella clause.[177]

385.   Thus, in the Tribunal's view, the GSE conventions, as accessory contracts, do not fall within the ambit of the ECT's umbrella clause as an obligation "entered into" with the Claimant's investments. In the light of this conclusion and the ensuing non-applicability of Article 10(1), last sentence, of the ECT in the present case, there is no need for the Tribunal to further analyze the Parties' submissions on whether the unilateral modification of the content of the GSE conventions by the *Spalma-incentivi* Decree resulted in a breach of these conventions.

> ### (ii) Legislative Decree No. 387/2003, the Romani Decree, the Second, Third, Fourth and Fifth Energy Accounts and the GSE tariff recognition letters

386.   This brings the Tribunal back to the Claimant's initial contention, i.e. its reference to the possibility that legislative or regulatory acts as such also might give rise to obligations in the meaning of the ECT's umbrella clause (see para. 333) and its acknowledgement that there is an ongoing debate on this issue, with a range of positions taken by various arbitral tribunals (see para. 367). The present Tribunal sees no need to enter into this debate for the purposes of the case before it, since the Claimant, in the Tribunal's view, cannot in any event derive the desired legal conclusions from Legislative Decree No. 387/2003, the Romani Decree, the Second, Third, Fourth and Fifth Energy Accounts or the pertinent GSE tariff recognition letters as the relevant legislative and regulatory acts in the case at hand.

---

[174] *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, para. 618 (CL-311).

[175] See *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020 (RL-050).

[176] See ibid., paras. 821-830, 1002-1007.

[177] See ibid., paras. 998, 1010.

387.  While the Tribunal cautions against equalizing the thresholds for "entering into obligations" for the purposes of the ECT's umbrella clause on the basis of legislative and regulatory acts, on the one hand, and for "specific commitments" in such legislative and regulatory acts giving rise to legitimate expectations (to be analyzed below; see paras. 403 et seq.), on the other, the Tribunal will assume for the sake of argument that these thresholds are identical, i.e. that the Claimant could rely on the content of the specific commitments made by the Respondent in the present case also in terms of obligations "entered into" by the Respondent under the ECT's umbrella clause. However, even under this assumption, the content of this obligation would only be that the legal framework for the incentivization of PV energy would remain intact over 20 years, i.e. that it would not be subject to fundamental or radical changes (see para. 437). Since, under the circumstances of the present case, there is no added value for the Claimant in relying on the ECT's umbrella clause with regard to the pertinent legislative and regulatory acts, the Tribunal sees no need to further delve into this question.

### (iii) Conclusion

388.  For these reasons, the Tribunal concludes that the GSE conventions, as accessory contracts, do not fall within the ambit of the ECT's umbrella clause as obligations "entered into" with the Claimant's investments. The Tribunal further finds that, for the purposes of the present case, there is no need to further delve into the question of whether Legislative Decree No. 387/2003, the Romani Decree, the Second, Third, Fourth and Fifth Energy Accounts or the GSE tariff recognition letters create obligations entered into by the Respondent for the purposes of Article 10(1), last sentence, of the ECT.

### b. Fair and equitable treatment

389.  Art. 10(1) of the ECT provides in relevant part:

> Each contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.

390.  The Parties agree that this provision involves the general obligation of a State to grant foreign investors fair and equitable treatment which notably includes the protection of

109

the legitimate expectations of these investors (Cl. Memorial, para. 296; Cl. Reply, para. 93; Cl. PHB, para. 48; Resp. Counter-Memorial, paras. 443, 446; Resp. Rejoinder, para. 453). The Parties are further in agreement on the fact that Article 10(1) of the ECT contains no definition of fair and equitable treatment (Cl. Reply, para. 93; Resp. Counter-Memorial, para. 444).

391.    The positions of the Parties, however, only partly overlap regarding the actual meaning to be given to the fair and equitable treatment standard under the ECT, notably regarding the balance to be struck between the State's sovereign prerogatives and the investor's legitimate expectations. Against this background, the Tribunal will first determine the applicable legal standard (see paras. 392 et seq.) and then analyze the various aspects of the Claimant's fair and equitable treatment claim and the Respondent's objections to it in view of the facts of the case (see paras. 423 et seq.).

### (i)  Applicable legal standard

392.    To start with, there can be no doubt that the exercise of interpretation of Article 10(1), first and second sentences, of the ECT, that the Tribunal will undertake in the following, must be guided by the customary rules of treaty interpretation as reflected in Articles 31 to 33 of the VCLT.[178] This is not only confirmed by the Parties in the present case, either explicitly (Cl. Memorial, para. 276) or at least implicitly (Resp. Counter-Memorial, paras. 444 et seq.), but also wholly accepted in the pertinent caselaw.[179] Hence, according to the general rule of interpretation codified in Article 31(1) VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose".

393.    In the context of interpretation of Article 10(1), first and second sentences, of the ECT, the Tribunal notes that the Parties' views differ as to whether these provisions include two distinct standards of protection ("stable, equitable, favourable and transparent conditions", "fair and equitable treatment") or one combined standard of treatment. As regards the former position, the Claimant (Cl. Memorial, para. 273) has notably referred

---

[178] Vienna Convention on the Law of Treaties of 23 May 1969, 1155 UNTS 331 (CL-005).

[179] See, for instance, *Orascom TMT Investments S.à.r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Award, 31 May 2017, paras. 271 et seq. (CL-059); see recently *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, paras. 676 et seq. (RL-050).

the Tribunal to the observation of the *Plama v. Bulgaria* tribunal that the standards of protection in Article 10(1) of the ECT "though related, are separate and autonomous".[180] At the same time, the Claimant, again referring to the *Plama v. Bulgaria* award[181] as well as to other arbitral decisions,[182] takes the view that the host State's guaranteeing of stability and transparency of the legal framework is, together with the protection of the investor's legitimate expectations, the second key element of the fair and equitable treatment standard (Cl. Memorial, paras. 289-291; Cl. Reply, para. 96). This also seems to be the view held by the Respondent (Resp. Counter-Memorial, para. 454 et seq.; Resp. Rejoinder, paras. 455 et seq.). In any event, the present Tribunal agrees with the *ESPF Beteiligungs GmbH et al. v. Italy* tribunal that eventually little turns on the question of whether to accept the existence of one integrated standard of protection including multiple sub-standards or to split Article 10(1) of the ECT up into several (relatively) autonomous protection standards.[183]

394. Against this background, the Tribunal will focus its analysis on the fair and equitable treatment standard, as enshrined in Article 10(1), second sentence, of the ECT. However, it will come back to this question and examine whether Article 10(1), first sentence, in view of the facts and submissions in the present case, offers the Claimant any additional protection (see para. 475).

395. The Tribunal observes in this regard that the terms of the ECT, as accepted by the Parties (see para. 390), contain no further clarification as to what the obligation "to accord at all times to Investments of Investors of other Contracting Parties fair and

---

[180] *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 163 (CL-025).

[181] See ibid., para. 177 (quoting *LG&E Energy Corp. et al. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, para. 125 [CL-050]), according to which the stability of the legal framework has been identified as "an emerging standard of fair and equitable treatment in international law".

[182] See, e.g., *Metalclad Corp. v. United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, para. 76 (CL-051); *Occidental Exploration and Production Co. v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004, para. 183 (CL-056); *CMS Gas Transmission Co. v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, para. 274 (CL-036); *Enron Corp. v. Argentine Republic*, ICSID Case No. ARB/01/03, Award, 22 May 2007, para. 260 (CL-042); *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. 064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009, para. 183 (CL-021); *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 519 (CL-048).

[183] See *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, paras. 443-444 (CL-313).

equitable treatment" means, let alone a legal definition of the term "fair and equitable treatment".

396.    Applying the aforementioned regime of treaty interpretation to Article 10(1), second sentence, of the ECT, the ordinary meaning of the term "fair and equitable treatment" contains a clear indication that the host State is not free to act vis-à-vis investors protected under the ECT *ad libitum* or to interfere with their rights and assets at its whim. At the same time, the general nature of the words "fair" and "equitable" suggests that the protection of the investors' position is not absolute and unqualified, but rather a matter of degree and balancing.

397.    As concerns the ECT's object and purpose, the Tribunal notes that Article 2 ECT ("Purpose of the Treaty") stipulates: "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefit, in accordance with the objectives and principles of the Charter". This makes clear that the ECT aims at creating a legal framework in the energy field which is characterized by two interrelated features, i.e. taking account of the long-term relationships that are characteristic of this field and emphasizing that such long-term relationships can only realize their potential and effectively promote the goals of the ECT if they are conducted in a spirit of cooperation, mutual respect and a fair distribution of benefits and risks between investors and host States.

398.    In view of the express reference of Article 2 of the ECT to the European Energy Charter,[184] the Tribunal also considers this document, notably its preamble and its "Title 1: Objectives", reproduced in part below, to be relevant to enlighten the ECT's object and purpose.

> Preamble
>
> […] Recognising State sovereignty and sovereign rights over energy resources; […]
>
> Recognising the role of entrepreneurs, operating within a transparent and equitable legal framework, in promoting co-operation under the Charter;

---

[184] See Article 1(1) of the ECT (CL-001): "'Charter' means the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991; signature of the Concluding Document is considered to be signature of the Charter".

Determined to establish closer, mutually beneficial commercial relations and promote energy investments; [...]

Title I: Objectives

The signatories are desirous of improving security of energy supply and of maximising the efficiency of production, conversion, transport, distribution and use of energy, to enhance safety and to minimise environmental problems, on an acceptable economic basis.

Within the framework of State sovereignty and sovereign rights over energy resources and in a spirit of political and economic co-operation, they undertake to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns. They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies by implementing market principles in the field of energy.

To this end, and in accordance with these principles, they will take action in the following fields: [...]

formulation of stable and transparent legal frameworks creating conditions for the development of energy resources; [...].[185]

399.    The extracts quoted from the European Energy Charter underscore, and specify, the two features identified before. As regards the perspective of the host State, a functioning long-term cooperation in the energy (as in any other) field requires respect for its particular role and responsibilities under international law, as embodied in the concept of sovereignty. At the same time, as concerns the investors' side, their investment can only be economically viable and flourish in the long run if States create and maintain a climate favorable to the operation of enterprises and to the flow of investments. In the long-term perspective, this particularly means that investors can operate within a transparent, stable and equitable legal framework.

400.    When looking, thirdly, at the context of Article 10(1), second sentence, of the ECT, the Tribunal notes that the immediately preceding sentence, already referred to above (see para. 393), lays down the host State's obligation to "encourage and create stable, equitable, favourable and transparent conditions" for investors. This is fully consistent

---

[185] Preamble and Article 1 of the European Energy Charter (CL-001).

with the aforementioned need to create and maintain a climate favorable to the operation of enterprises and the flow of investments.

401. The Tribunal observes in this context that the Respondent has argued that, in order to correctly understand Article 10(1) of the ECT, it must be read consistently with customary international law on the matter, "in accordance with the hermeneutical principle that requires international treaties to be interpreted, if possible, in a manner consistent with general international law" (Resp. Counter-Memorial, para. 444). Apart from the fact that the Tribunal does not consider that such a principle of interpretation "in accordance with customary international law" exists in international law or can, in this generality, be inferred from the interpretation regime of Articles 31 to 33 VCLT, Article 10(1) of the ECT is, in the Tribunal's view, a paradigmatic example of where such interpretation cannot be applied. The special features of the ECT, as analyzed above, make it evident in the Tribunal's view that the ECT's fair and equitable treatment standard differs from, and goes beyond, the minimum standard of protection under customary international law and must therefore be determined autonomously.[186]

402. This does not answer the question of, however, what legal standard should positively apply in view of the ECT's guarantee of fair and equitable treatment. The Tribunal takes note in this respect of the Parties' agreement that "specific commitments" by a State may give rise to legitimate expectations of investors protected under the fair and equitable treatment standard (Cl. Reply, para. 98; Resp. Rejoinder, para. 462). Furthermore, both Parties accept the proposition that, even in the absence of specific commitments, the fair and equitable treatment standard protects foreign investors from fundamental or radical modifications to the legal framework in which their investment was made (Cl. Reply, para. 95; Resp. Counter-Memorial, para. 467). At the same time, there is significant disagreement between the Parties as to how these principles operate in more detail. The Tribunal will analyze them in turn.

---

[186] See in a similar vein, *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, paras. 671 et seq. (RL-050).

*aa) Specific commitments*

403.   While the Parties accept the proposition that specific commitments by a State may give rise to protected legitimate expectations (see para. 402), they disagree as to what constitutes such specific commitment.

404.   On the one hand, the Claimant argues that legitimate expectations can arise from explicit or implicit representations on the part of the host State (Cl. Memorial, para. 301), including specific commitments made by the host State through legislation or contracts (Cl. Reply, para. 107). To this effect, the Claimant (Cl. Reply, para. 98) refers to various arbitral decisions, notably the *Blusun v. Italy*[187] and the *Mobil Exploration v. Argentina* awards.[188] Furthermore, the Claimant (Cl. PHB, para. 51) relies on the *9Ren v. Spain* award,[189] which affirmatively cited the proposition in the UNCTAD 2012 Report on Fair and Equitable Treatment[190] that "an investor may derive legitimate expectations […] from […] rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investments and on which the foreign investor relied in making his investment".[191]

405.   The Respondent, on the other hand, while accepting that legitimate expectations of the investor may originate from a specific commitment of the host state explicitly directed at a foreign investor (Resp. Rejoinder, para. 463), relies on the *Parkerings-Compagniet v. Lithuania* award[192] and requires that such specific commitment to come into existence, it be laid down in an "agreement". According to the Respondent (Resp. Rejoinder, para. 467), for such agreement the following three conditions must be met: (i) it is agreed between the host State and a specific investor; (ii) it has a specific aim;

---

[187] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 319(4) (CL-010), holding that the FET standard "preserves the regulatory authority of the host state to make and change its laws and regulations … subject to respect for specific commitments made".

[188] *Mobil Exploration and Development Argentina Inc. Suc. Argentina and Mobil Argentina Sociedad Anónima v. Argentine Republic*, ICSID Case No. ARB/04/16, Decision on Jurisdiction and Liability, 10 April 2013, para. 955 (CL-281): "even a reasonable general regulation can be considered a violation of the FET standard, in case it violates a specific commitment towards the investor".

[189] *9Ren Holding S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, para. 294 (CL-308).

[190] *United Nations Conference on Trade and Development (UNCTAD)*, Fair and Equitable Treatment, UNCTAD Series on Issues in International Investment Agreements II, 2012 (RL-038).

[191] Ibid., 69.

[192] See *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case Nor. ARB/05/8, Award, 11 September 2007, para. 332 (RL-014).

and (iii) it is typically adopted before the starting of the foreign investment. In particular, the Respondent (Resp. Counter-Memorial, paras. 453, 463) insists that legitimate expectations cannot arise from the general legislative framework or regulatory measures (such as an administrative decree) existing in a State at the time of the investment and refers to the *Blusun v. Italy*[193] and *Charanne v. Spain*[194] awards in this respect.

406.    The *Masdar v. Spain* tribunal[195] is often cited for its dictum that in order to determine which kind of specific commitments can give rise to legitimate expectations, two schools of thought exist. "In essence, one school of thought considers that such commitments can result from general statements in general laws or regulations. The other considers that any such commitments have to be specific".[196] While the Respondent seems to endorse the second school of thought and to distance itself from the first one, the Tribunal considers the distinction between them to be artificial. The Tribunal agrees with the *Novenergia II v. Spain* tribunal, according to which "[t]he relevant question is rather whether the statement or conduct *objectively* suffices to create legitimate expectations in the recipient".[197] Put differently, "[t]he decisive issue is not whether a state's undertaking is 'specific' or 'general', or statutory or contractual, but whether the statements and actions of the state provide a sufficiently clear commitment to give rise under international law to legitimate expectations or legal rights on the part of the investor".[198]

407.    Thus, the Tribunal is not convinced by the three prerequisites for a specific commitment to come into existence, as identified by the Respondent (see para. 405), at least if they are considered (as is obviously done by the Respondent) to apply cumulatively and categorically. In particular, the Tribunal does not derive from the existing arbitral

---

[193] See *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 367 (CL-010).

[194] *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 492-493 (CL-011).

[195] *Masdar Solar & Wind Cooperatief v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2008 (CL-120).

[196] Ibid., para. 490.

[197] *Novenergia II v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018, para. 652 (emphasis in the original) (CL-112).

[198] *Jürgen Wirtgen and others. v. Czech Republic*, PCA Case No. 2014-03, Dissenting Opinion of Gary Born, 11 October 2017, para. 12 (RL-043).

jurisprudence on the matter that, in order for a specific commitment to create legitimate expectations, it is indispensable that there exists an individual agreement between the host State and a specific investor. The *Mobil Exploration v. Argentina* tribunal, for instance, has found that "two types of commitments might be considered 'specific'; those specific as to their addressee and those specific regarding their object and purpose",[199] thus construing conditions (i) and (ii) as an alternative, with the possibility of the absence of the one to be compensated by the presence of the other.

408.    The present Tribunal agrees with this approach[200] and is therefore of the view that a State may make specific commitments to investors also by virtue of legislative or regulatory acts which are not addressed to particular individuals, provided that these acts are sufficiently specific regarding their content and their object and purpose.[201] In this context, the Tribunal considers the creation of legitimate expectations more likely where a State has adopted legislative or regulatory acts "with a specific aim to induce […] investments".[202]

409.    The assessment of whether such acts are actually capable of giving rise to protected legitimate expectations on the part of the investor is a factual question that must be made in view of the circumstances of the case, involving the evaluation whether these circumstances objectively justify such conclusion. The Tribunal will undertake this exercise subsequently (see paras. 424 et seq.), after having clarified the standard of

---

[199] *Mobil Exploration and Development Argentina Inc. Suc. Argentina and Mobil Argentina Sociedad Anónima v. Argentine Republic*, ICSID Case No. ARB/04/16, Decision on Jurisdiction and Liability, 10 April 2013, para. 957 (CL-281).

[200] See also *Continental Casualty Co. v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, para. 261 (CL-039).

[201] See also *Ioan Micula, et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 671 (CL-048): "This promise, assurance or representation may have been issued generally or specifically, but it must have created a specific and reasonable expectation in the investor". See further *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 377 (CL-041; emphasis omitted): "a commitment can be considered specific if its precise object was to give a real guarantee of stability to the investor. Usually general texts cannot contain such commitments, as there is no guarantee that they will not be modified in due course. However, a reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behavior of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely".

[202] See also *United Nations Conference on Trade and Development (UNCTAD)*, Fair and Equitable Treatment, UNCTAD Series on Issues in International Investment Agreements II, 2012, 69 (RL-038); see also *9Ren Holding S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019, para. 294 (CL-308), quoting the aforementioned UNCTAD report.

117

protection applying in case of fundamental or radical modifications to the legal framework.

*bb) Protection against fundamental or radical modifications*

410.   As stated above (see para. 402), both Parties accept the proposition that, even in the absence of specific commitments, the fair and equitable treatment standard protects foreign investors from fundamental or radical modifications to the legal framework in which they made their investment. While the Claimant submits that the *Spalma-incentivi* Decree fundamentally altered the incentive regime for PV plants in a sudden and unpredictable manner (see para. 339), the Respondent argues that the modifications of the tariff regime brought about by the *Spalma-incentivi* Decree were reasonable and proportionate (see para. 342). The Parties' disagreement is partly due to their different positions on the factual side of the case, which the Tribunal will address subsequently (see paras. 438 et seq.). However, the Parties also hold different views as to how the relevant legal standard, i.e. protection against fundamental or radical modifications of the existing legal framework, is to be construed; this legal standard must first be determined by the Tribunal before applying it to the facts.

411.   In order to draw the proper line between acceptable adaptations and non-acceptable alterations of the legal framework, in the Tribunal's view, the ECT requires that a balance be struck between two principles which are both recognized by this treaty and which are both indispensable in reaching its overarching objective to promote long-term cooperation in the energy field (see para. 397): on the one hand, the interest of investors in a stable and transparent legal framework as well as in respect for their legitimate expectations (as also accepted by the Respondent; Resp. Counter-Memorial, paras. 446, 467), and on the other, the host State's sovereignty, notably including the ability to adapt its legislative and regulatory framework to new developments, which are unavoidable in a long-term cooperation (as also acknowledged by the Claimant; Cl. Reply, para. 96).

412.   The tension between these principles and the need to find a proper balance between them have been recognized by numerous arbitral tribunals, also referred to by the Parties. For instance, the *Novenergia II v. Spain* tribunal recognized that a tribunal must undertake in this context "a *balancing* exercise, where the state's regulatory interests

are weighed against the investors' legitimate expectations and reliance".[203] In a similar vein, the *Foresight v. Spain* tribunal found that, "[i]n the absence of a specific commitment to the investor by the host State, the investor cannot expect the legal or regulatory framework to be frozen. In such circumstances, a host State has space to reasonably modify the legal or regulatory framework without breaching an investor's legitimate expectations of stability".[204] Moreover, the *Saluka* tribunal found:

> No investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged. In order to determine whether frustration of the foreign investor's expectations was justified and reasonable, the host State's legitimate right subsequently to regulate domestic matters in the public interest must be taken into consideration as well.[205]

413.    Furthermore, the Tribunal finds it useful to refer to the recent *SunReserve v. Italy* award, which observed that "stability and transparency in the legal framework are important ingredients of the host State's [fair and equitable treatment] obligation"[206] and that "the objectives of creating a stable, transparent and favourable legal framework for investments are required to be balanced against the host State's right to regulate".[207]

414.    The present Tribunal endorses this view and, in assessing the claims regarding the alleged violation by the *Spalma-incentivi* Decree of the fair and equitable treatment guarantee of the ECT, is therefore required to conduct a balancing exercise between, on the one hand, the Claimant's legitimate interest, protected by the ECT, in the stability and transparency of the legal framework created by the host State, and, on the other, the equally protected right of the Respondent to adapt this legal framework to relevant developments over time. Against this background, the Tribunal agrees with the Claimant that Article 10(1) ECT "intended to provide real and effective protection for investment" (Cl. Memorial, para. 286) because otherwise the protection of the investor's legitimate expectations would become moot. At the same time, this cannot

---

[203] *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg) v. Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, para. 694 (CL-112; emphasis in the original).

[204] *Foresight Lux. Solar I S.à.r.l. et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018, para. 356 (CL-270).

[205] *Saluka Investment BM v. The Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, para. 305 (CL-063).

[206] *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 684 (RL-050).

[207] Ibid., para. 685.

mean that the fair and equitable treatment standard would require the host State to freeze its legal framework, as emphasized by the Respondent (Resp. Counter-Memorial, paras. 454-456, 466; Resp. Rejoinder, paras. 455, 458-459) and also accepted by the Claimant (Cl. Memorial, para. 292; Cl. Reply, para. 94; Cl. PHB, para. 49). Otherwise, the host State's sovereignty and its ensuing "right to regulate" would lose any practical effect.

415. It is well established in arbitral practice that, under its obligation to accord fair and equitable treatment, the host State is not required "to freeze its legal framework, but rather to act in an open manner and consistent with commitments it has undertaken",[208] that "[n]o investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged"[209] and that "the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently, predictably, taking into account the circumstances of the investment".[210]

416. Hence, "[t]he legitimate expectations of foreign investors cannot be that the State will never modify the legal framework, especially in times of crisis, but certainly investors must be protected from unreasonable modifications of that legal framework".[211] Similarly, the *Eiser v. Spain* tribunal stated that the "obligation under the ECT to afford investors fair and equitable treatment does protect investors from a fundamental change to the regulatory regime in a manner that does not take account of the circumstances of existing investments made in reliance on the prior regime",[212] thus requiring the host State "to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments. […] [T]he Article 10(1) obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive

---

[208] *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. 064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009, para. 185 (CL-021), quoting *CMS Gas Transmission Co. v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, para. 277 (CL-036).

[209] *Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, para. 305 (CL-063).

[210] *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 7.77 (CL-013).

[211] *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, 21 June 2011, para. 291 (CL-046).

[212] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, para. 363 (CL-012).

investors who invested in reliance on those regimes of their investment's value".[213] The *Novenergia II v. Spain* tribunal found that the fair and equitable treatment standard "protect[s] investors from a radical or fundamental change to legislation".[214] Moreover, the *Foresight* tribunal "agree[d] with the *Eiser v. Spain* and *Novenergia v. Spain* tribunals that the [fair and equitable treatment] standard in the ECT protects investors from radical or fundamental change in the legal or regulatory framework under which the investments are made".[215] In a similar vein, the *Plama v. Bulgaria* tribunal found that "the ECT does not protect investors against any and all changes in the host country's laws".[216]

417. It has therefore become manifest, and is also accepted by the Parties in the present case, that, especially in a long-term relationship, a circumspect investor must be prepared for modifications in the legal framework applicable to it. The Parties are even in agreement on the proposition that the threshold of violation of legitimate expectations, and thus of the fair and equitable treatment standard, is reached if the change is *radical* or *fundamental* in character. According to the Claimant, the Respondent "has an obligation under the ECT to protect investors from fundamental changes to the regulatory regime that fail to take into account the circumstances in which the investments were made" (Cl. Reply, para. 95). The Respondent accepts that "while the legal category of legitimate expectations does not equate to a stabilization clause, not any regulatory modification made by the host State would be legitimate as such when colliding with investor expectations. However, this would be limited to when the State acted either unfairly, unreasonably or inequitably in the exercise of its legislative power" (Resp. Counter-Memorial, para. 467).

418. That the stability interest of the investor is only one factor to be taken into account in the balancing exercise which investment arbitration tribunals have to undertake and that therefore not every change of the existing legal framework by a State, but only

---

[213] Ibid., para. 382; see also ibid., para. 387.

[214] *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg) v. Kingdom of Spain*, SCC Case No. 2015/063, Final Arbitral Award, 15 February 2018, para. 654 (CL-112); see also ibid., para. 697.

[215] *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018, para. 359 (CL-270).

[216] *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 219 (CL-025).

fundamental or radical modifications, reach the threshold of Article 10(1) of the ECT has been aptly expressed by the *Antaris v. Czech Republic* tribunal:

> (8) The requirements of legitimate expectations and legal stability as manifestations of the FET standard do not affect the State's rights to exercise its sovereign authority to legislate and to adapt its legal system to changing circumstances.
>
> (9) The host State is not required to elevate the interests of the investor above all other considerations, and the application of the FET standard allows for a balancing or weighing exercise by the State and the determination of a breach of the FET standard must be made in the light of the high measure of deference which international law generally extends to the right of national authorities to regulate matters within their own borders.[217]

419.    There is even, to a certain degree at least, common ground between the Parties as regards the relevant factors in assessing whether a fundamental or radical change has occurred. While those factors are interrelated and partly overlapping, the pertinent submissions of the Parties (see paras. 338-339, 342, 351, 358-361) can be classified in three groups, namely as to whether or not the modifications brought about by the *Spalma-incentivi* Decree (1) could draw on a public policy purpose, i.e. were reasonable, (2) should have been expected by the Claimant, i.e. were foreseeable, and (3) did not exceed what was necessary, i.e. were proportionate.

420.    These criteria also resonate in the pertinent caselaw. For instance, the *Electrabel v. Hungary* tribunal found:

> While the investor is promised protection against unfair changes, it is well-established that the host State is entitled to maintain a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest. Consequently, the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently and predictably, taking into account the circumstances of the investment.[218]

Furthermore, according to the *Parkingers-Compagniet v. Lithuania* tribunal,

> there is nothing objectionable about the amendment brought to the regulatory framework existing at the time an investor made its investment. As a matter of fact, any businessman or investor knows that laws will evolve

---

[217] *Antaris GmbH and Dr. Michael Göde v. The Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018, para. 360(8) and (9) (RL-027).

[218] *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 7.77 (CL-013).

over time. What is prohibited however is for a State to act unfairly, unreasonably or inequitably in the exercise of its legislative power.[219]

Moreover, the *Charanne v. Spain* tribunal found that "an investor has a legitimate expectation that, when modifying the existing regulation based on which the investment was made, the State will not act unreasonably, disproportionately or contrary to the public interest".[220]

421.   The Parties hold diverging views, however, concerning the relative weight of these factors and, in particular, regarding their application to the facts of the present case. The Tribunal notes in this regard that the assessment of whether a change in the legal framework amounts to a fundamental or radical change or remains below this threshold is neither a mathematical test nor a philosophical exercise that is made in the abstract, but a judgment to be made by the Tribunal considering the specific circumstances of the case before it. In a similar vein, the *SunReserve v. Italy* tribunal has observed that "fairness and/or equitability are not absolute concepts that are capable of being reduced to universally applicable definitions. Instead, what constitutes fair and/or equitable treatment is a question to be determined by taking into account all circumstances of a given case".[221]

422.   Against this background, the Tribunal will discuss the Parties' various arguments subsequently and offer its own assessment of these arguments. In its analysis, the Tribunal will proceed in three steps: First, the question is to be addressed whether the conduct of the host State gave rise to any expectations, and if so, whether these expectations were legitimate and reasonable in the circumstances of the case (ii). Secondly, the Tribunal will examine whether the investors relied on these expectations in making their investments in the host State (iii). Thirdly, it must be clarified whether the host State frustrated these expectations by its subsequent conduct (iv).

---

[219] *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, para. 332 (RL-014).

[220] *Charanne B.V. Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, para. 514 (CL-011).

[221] *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 683 (RL-050).

*(ii) Existence of legitimate expectations*

423.    Having clarified that the fair and equitable treatment standard under the ECT protects foreign investors against violations, on the one hand, of their legitimate expectations arising from specific commitments of the host State and, on the other, of their equally protected expectation that the legal framework existing at the time of the investment will not be fundamentally or radically altered, the Tribunal will now examine whether under the circumstances of the present case the conduct of the Respondent gave rise to any expectations enjoying protection under the ECT.

*aa) Specific commitments*

424.    First, the Tribunal will address the question of whether, and to what extent, the Respondent's conduct brought into existence specific commitments, creating legitimate expectations that these commitments would be respected. In the Tribunal's view, when applying the legal standard set out above (see para. 408) to the facts of the dispute, this is the case with respect to Legislative Decree No. 387/2003 and the Romani Decree in combination with the Second, Third, Fourth and Fifth Energy Accounts, which were adopted under the direction, and on the basis, of these legislative decrees (see paras. 116 et seq.).

425.    Pursuant to these legal acts, PV plants fulfilling the necessary conditions during a specific window of time would receive a constant[222] FIT for a period of twenty years from the entry into operation of the respective PV plant. The Tribunal thus agrees with the Claimant's statement that "[e]ach Energy Account sets out very precisely for each category of plants (plants on buildings or other plants) the exact amount of the payable feed-in tariff based on the plant's capacity and date of entry into operation" (Cl. PHB, para. 56). Accordingly, the terms of each of the energy accounts in combination with the legislative decrees forming their legal basis were detailed and specific.

426.    Moreover, the fact that the Italian FIT regime for PV plants was not an ephemeral effort, but a more than decade-long endeavor (with Legislative Decree No. 387/2003 being adopted in 2003 and the First Energy Account in 2005; see paras. 116, 122), and that it was framed by, and embedded within, the EU's incentivization strategy for renewable

---

[222] As to meaning of the term "constant" in this context see para. 433.

energies (see paras. 113-115), thus successively building one energy account upon the other, all containing the same type of commitment,[223] presents itself to the Tribunal, in the terms used by the *El Paso Energy v. Argentina* tribunal, as "a reiteration of the same type of commitment in different types of general statements",[224] justifying qualifying it as "a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely".[225]

427.    At the same time, the Tribunal considers that the fact that this commitment was subsequently confirmed, and individualized, for every single of the Claimant's PV plants in GSE tariff recognition letters and GSE conventions (Cl. Reply, paras. 114-115) does not add to the specificity of the commitment. Nor does, for the same reason, the non-existence of these letters and conventions at the time of investment detract from the qualification of the aforementioned legislative decrees and energy accounts as a clear, specific and repeated commitment on the part of the Respondent. The Tribunal finds it plausible that the Claimant, like many other investors, understood, at the time when it took the investment decision, that it would obtain at a later moment in time a convention from the GSE, provided it could deliver the PV plants in line with the specifications provided in the energy accounts (Tr. 24 September 2019, 14:1-4 [Hunt]). Yet, this very understanding did not have its basis in the GSE tariff recognition letters or the GSE conventions as such which, as conceded by the Claimant itself (Cl. Reply, para. 115), were only issued after the investment had been made, but rather in the energy accounts which directed the GSE to issue these letters and conventions if certain conditions were fulfilled. In this regard, the GSE had to decide on issuing these letters and conventions on the basis of the criteria laid down in the pertinent laws and administrative decrees.[226]

428.    Accordingly, as the GSE tariff recognition letters and GSE conventions were, by definition, only issued after the entry into operation of the respective PV plant, i.e. a considerable time after the Claimant's investment decision, and as the Claimant could

---

[223] See Article 6(1) of the Second Energy Account (CL-077); Article 8(4) of the Third Energy Account (CL-078); Article 12(2) of the Fourth Energy Account (CL-081); Article 5(4) of the Fifth Energy Account (CL-082).

[224] *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 377 (CL-041).

[225] Ibid., para. 377.

[226] See e.g. Articles 24(2) and 42(1) of Romani Decree (CL-080); Article 21 of the Fourth Energy Account (CL-081).

only rely on commitments known to it at the time of the investment, in the present case the GSE tariff recognition letters and the GSE conventions are irrelevant for the assessment of the specificity of the commitments in question. This logic is confirmed by the approach taken by the *CEF v. Italy*[227] and the *Belenergia v. Italy* tribunals.[228] Hence, the Tribunal is not convinced by the position taken by the majority in the *Greentech v. Italy* case which also considered the individual GSE letters and GSE conventions to form the basis for specific assurances of Italy, giving rise to legitimate expectations upon which the investors could rely.[229]

429.   In addition, there can be no doubt that Legislative Decree No. 387/2003, the Romani Decree and the Second, Third, Fourth and Fifth Energy Accounts were the result, and manifestation, of Italy's efforts at incentivizing renewable energy, notably solar energy. As mentioned above (see para. 116), Legislative Decree No. 387/2003 contemplated the adoption of subsequent decrees "by which the criteria for *encouraging* the production of electricity from solar source are defined",[230] which led to the adoption of the Second and the Third Energy Accounts. In a similar vein, the Romani Decree establishes the "incentives and institutional, financial and legal framework necessary to achieve the targets for 2020 on the overall share of energy from renewable sources in transports".[231] Furthermore, although the Respondent argues differently (see para. 354), even the Respondent's legal expert, Professor Rojas (Tr. 25 September 2019, 37:25-38:4 [Rojas]), accepts that "[t]he purpose of providing incentive tariffs was of course to incentivize investment in the photovoltaic sector, because, as we know, photovoltaic energy was costly to produce, it was below market price; with no incentive, there would

---

[227] See *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, paras. 187-189 (RL-037) with regard to the *Megasol* and *Phenix* plants where the GSE tariff recognition letters and GSE conventions post-dated the claimant's investment; see, *e contrario*, ibid. para. 190 with respect to the *Enersol* plant where the claimant's investment decision post-dated the connection to the grid, the tariff recognition letters and GSE conventions.

[228] See *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, para. 579 (CL-311).

[229] See *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 453 (CL-271). For a more convincing reasoning see *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 641 (CL-313): "The GSE Agreements, which came after the investments were already made, did not themselves create the expectation that the tariff rates would remain unchanged, but they are contemporaneous evidence that the expectation created by the legislation was a legitimate one".

[230] Article 7(1) of Legislative Decree No. 387/2003 (CL-075; emphasis added); see also ibid., Article 1.1(a): "This decree […] is aimed at: a) promoting a greater contribution of the renewable energy sources for the production of electricity in the relevant Italian and European market".

[231] Article 1 of the Romani Decree (CL-080).

have not been investment". As explained before (see para. 408), the adoption of legislative and regulatory acts with the specific aim to induce investment makes the coming into existence of legitimate expectations more likely, and the Italian incentive tariff regime undeniably did just that.

430.    The incentivization efforts of the Respondent are further illustrated by a number of statements from the GSE website as well as from policy statements[232] to which the Tribunal has been referred by the Claimant (Cl. Reply, para. 113). When analyzing the content of these statements, however, the Tribunal considers them not sufficiently specific to give rise to commitments in their own right. Accordingly, there is no reason for the Tribunal to look further into the questions of who authored these statements and at what time they were made.

431.    Considering the aforementioned aspects, the Tribunal concludes that the pertinent Italian legal framework on the incentivization of PV energy, including Legislative Decree No. 387/2003, the Romani Decree, as well as the Second, Third, Fourth and Fifth Energy Accounts, has indeed given rise to specific commitments of the Respondent, thus creating legitimate expectations upon which the Claimant could rely. Yet, nowhere in the pertinent legislative or regulatory framework did the Respondent commit itself to leave this legal framework untouched for twenty years.[233] All efforts by the Claimant to argue the opposite cannot convince the Tribunal.

432.    First, to start at the top of the pertinent legal framework, Article 7.2(d) of Legislative Decree No. 387/2003,[234] which sets out the criteria for the ministerial decrees to be adopted subsequently, i.e. the energy accounts (see paras. 122 et seq.), states that "[f]or the electricity produced by photovoltaic conversion of solar energy, the criteria provide for a specific incentive tariff by decreasing amount and duration as to ensure a fair remuneration of investment and operating costs". In a similar vein, Article 24(2) of the Romani Decree,[235] which replaced Article 7 of Legislative Decree No. 387/2003,

---

[232] See GSE, The Energy Accounts (5th ed.), April 2010, 27 (C-019); GSE website, Fourth Feed-In Scheme – Photovoltaic Plants, 19 March 2012, 1 (C-065); Italian Republic, Presidency of Council of Ministers, Energy: Issues and Challenges for Europe and Italy, Position Paper of the Italian Government, 10 September 2007, 4, para. 29 (C-109).

[233] See, however, for this position the majority in *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, paras. 518 et seq., 642 (CL-313).

[234] CL-075.

[235] CL-080.

maintains the emphasis on a fair remuneration, specifying that the incentives should take into consideration the average conventional useful life of plants in setting an appropriate rate of compensation. Accordingly, the pertinent legislative acts create a system which promises PV energy producers a fair return or remuneration for the useful life of PV plants, without guaranteeing them a defined amount of compensation.

433.  In addition, when Article 24(2)(c) of the Romani Decree further states that the incentives should remain "constant throughout the period of entitlement and may take account of the economic value of the energy produced", there can be no doubt that, as argued by the Respondent (Resp. Counter-Memorial, paras. 242, 255-256), the term "constant" (*"costante"*) does not mean "fixed", but that the monetary value of the incentives will be stable in the sense that it is not subject to updates with inflation rates.[236] The same expression is also used in the energy accounts[237] and was consistently interpreted as meaning that there would be no indexing of the monetary incentives.[238]

434.  At the regulatory level, the criteria defined by the pertinent legislation were further specified. In particular, the energy accounts set a duration for the incentive payments of twenty years and a specific amount per kWh of energy produced which would be constant in the aforementioned sense. It is true that the provision in Legislative Decree No. 387/2003 stating that the decrees to be adopted should set a "specific rate with decreasing amount", was implemented in the energy accounts in the manner that a PV plant, once admitted to the incentivization regime, would obtain a specific incentive tariff and would keep it for the full duration of twenty years. A lower amount of incentives would then be offered only in the following energy account for PV plants newly admitted to the incentive tariff system. This approach was modified by the *Spalma-incentivi* Decree (as well as, albeit on a voluntary basis, already half a year earlier by the *Destinazione Italia* Decree; see paras. 137-138).

435.  Yet, nowhere in the pertinent legislative acts or administrative decrees is there a guarantee or promise that this approach would be maintained in all its aspects

---

[236] See, however, for the opposite view *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 526 (CL-313).

[237] See Article 6(2) of the Second Energy Account (CL-077); Article 12(2) of the Fourth Energy Account (CL-081): "constant at current prices".

[238] See also *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, paras. 808 et seq. (RL-050).

throughout the duration of the incentivization regime. In particular, the energy accounts do not contain any mechanism that would prevent the relevant ministry (or the legislator, adopting a provision of normative higher value) from intervening and adapting the incentive tariff regime in certain ways, notably by reducing (or, for that matter, increasing) the amount and/or the duration of incentive payments. Hence, in the Tribunal's view, the fact that the Respondent maintained a fixed incentive for already existing PV plants through the adoption of the various energy accounts must not be confounded with a legal guarantee of the Respondent to maintain the incentive tariff, once awarded, in its full amount and duration, thus immunizing it against any following modifications. This would require a stabilization or freezing clause which cannot be found anywhere in the pertinent legislative or regulatory acts.

436. The Tribunal accepts the Claimant's evidence that "[t]he certainty provided by the fixed feed in tariffs for a 20-year period was a critical factor in justifying decisions to invest in solar plants in Italy"[239] and that, in making the decision whether to invest in Italy's renewable energy sector, it "relied on the entire legislative and contractual regime offered by Italy to induce investment in renewable energy"[240] (see also para. 336). Yet, this merely proves that the Claimant intended to rely on the FIT being fixed for 20 years. As explained before (see para. 409), the Tribunal's task of identifying relevant legitimate expectations calls for an objective assessment as to whether the circumstances, from the perspective of a circumspect and reasonable investor, justify the conclusion that the Respondent has made specific commitments regarding the stability of the incentivization system created by the pertinent legislative acts and energy accounts.

437. In this respect, also taking into account that specific commitments purely based on legislative and administrative acts addressed to the general public should not be admitted lightly, but must actually pass the specificity test (see para. 408) regarding all the elements where such commitment is claimed to exist, the Tribunal finds that the Respondent did not make any specific commitment in the pertinent legislative decrees or energy accounts that it would maintain the amount or the duration of incentive

---

[239] First Witness Statement of Christopher Hunt, para. 27; see also Second Witness Statement of Claudio Pisi, paras. 11-12.
[240] Second Witness Statement of Christopher Hunt, para. 6.

payments exactly at the level originally laid down in the applicable energy accounts. At the same time, in the Tribunal's view, the pertinent legal framework, considering all the aspects analyzed before (see paras. 425-430), led a circumspect and reasonable investor to believe that the incentive tariff regime created by the Respondent would remain intact in its overall structure and its essential elements, i.e. that it would not be subject to fundamental or radical changes to the detriment of the investors. Differently put, the investor community in the Italian renewables sector could legitimately rely on the overall integrity of the incentivization regime for solar energy in Italy. This community nonetheless had to be prepared for certain, non-radical modifications of the applicable legal framework, without this constituting a violation of their legitimate expectations, as these only protected them against fundamental or radical changes.

*bb) Protection against fundamental or radical modifications*

438.   In view of the conclusion of the previous section, it becomes clear that, under the circumstances of the present case, the Claimant's legitimate expectations arising from specific commitments of the Respondent coincide with the Claimant's equally protected expectation that the legal framework applicable to it would not be subject to fundamental or radical modifications (see paras. 410 et seq.). Against this background, the Tribunal can proceed with the remaining steps of its analysis, i.e. whether the Claimant actually relied on such expectations in making its investments in Italy (iii.) and whether these expectations were frustrated by the Respondent's subsequent conduct (iv.), without any further need to distinguish between the "specific commitment" and the "protection against fundamental or radical modification" scenarios.

*(iii) Reliance of the Claimant on legitimate expectations*

439.   In order for the Claimant to establish that it had legitimate expectations entitled to protection by Article 10(1) of the ECT, it must also demonstrate that it relied upon the Respondent's specific commitment in making its investment and that such reliance was objectively reasonable.[241]

---

[241] See *Ioan Micula, et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 668 (CL-048).

440. In this regard, the Tribunal finds that the Claimant has sufficiently demonstrated that it actually relied upon the commitments made by the Respondent with respect to the incentive tariff scheme for renewable energy when making its investments in Italy. In particular, the Tribunal accepts the Claimant's evidence that "[t]he certainty provided by the fixed feed-in-tariffs for a 20-year period was a critical factor in justifying decisions to invest in solar plants in Italy",[242] that in making the decision whether to invest in Italy's renewable energy sector, the Claimant "relied on the entire legislative and contractual regime offered by Italy to induce investment in renewable energy"[243] and that "[e]ntry into operation entitled the company operating the plant to feed-in tariffs at a pre-established rate upon application. The feed-in tariffs that the plant was entitled to were known in advance, as they were set in the Energy Accounts, based on the plant's capacity (in megawatts) and date of entry into service".[244]

441. This finding is not put into question by the fact that the Claimant's expectations did not only cover, but even exceeded the Respondent's specific commitments which were limited to the guarantee that the incentive tariff scheme for PV energy established by the Respondent would not be subject to fundamental or radical changes (see para. 437). This excessive reliance on the part of the Claimant notably becomes manifest in its reiterated submission that, when making its investments in Italy, it relied on the "stability and visibility of the legal framework, which would not be changed without proper advance notice" (Cl. Reply, para. 124), that "its investments would receive fixed feed-in tariffs for 20 years upon a plant's entry into operation" (Cl. Reply, para. 126) and that "Silver Ridge, like many other solar investors and banks providing financing, relied on the promises made in the Energy Accounts in making its investments, chief among which [was] the Government's promise to pay fixed feed-in tariffs for 20 years from the date of entry into operation of a solar plant" (Cl. Reply PHB, para. 14; Cl. PHB, para. 58). As shown above, the reliance of the Claimant on the certainty of the Italian FIT regime (see para. 436) was not objectively justified under the circumstances and was therefore not reasonable, inasmuch as it goes beyond the commitment to

---

[242] First Witness Statement of Christopher Hunt, para. 27; see also Second Witness Statement of Claudio Pisi, paras. 11-12.

[243] Second Witness Statement of Christopher Hunt, para. 6.

[244] Ibid., para. 9.

maintain the overall structure and the essential elements of the incentive tariff scheme for renewable energy.

442.   As stated before (see para. 439), the Tribunal's task is only to take those expectations on which the Claimant relied *and* where such reliance was objectively reasonable, to the last step of its analysis, i.e. the question of whether such legitimate expectations of the investor were frustrated by the host State's conduct. In this regard, excessive subjective reliance of the Claimant does not do any harm to its case, but only results in the Tribunal's leaving aside of the Claimant's reliance on expectations to the extent that it goes beyond what was objectively reasonable.

443.   The Tribunal further takes note of the Claimant's evidence that it "engaged numerous legal, financial and technical experts in Italy to inform [its] views"[245] and that it "evaluated [the Italian] system very carefully, as did hundreds of other developers, and it was deemed that if [Silver Ridge] built the project and […] got it operational, the GSE was obligated, under the regulations, to sign the contract" (Tr. 24 September 2019, 13:16-20 [Hunt]). In the Tribunal's view, in spite of certain contentions on the part of the Respondent to the contrary (see para. 353), the quality of the Claimant's due diligence efforts does not raise any concerns regarding the reasonableness of the Claimant's reliance on the Respondent's commitment to protect the Claimant from fundamental or radical modifications of the legal framework applicable to it.

444.   Accordingly, the Tribunal finds that the Claimant could reasonably rely on the Respondent's commitment to protect the Claimant from fundamental or radical modifications of the Italian incentive tariff scheme for PV energy and that the Claimant actually relied on this commitment when making its investments in Italy.

*(iv) Frustration of legitimate expectation of the Claimant*

445.   The decisive question therefore becomes whether the Respondent, by its conduct subsequent to the investment, notably by adopting the *Spalma-incentivi* Decree, frustrated the legitimate expectations of the Claimant in the afore-described sense. This boils down to the assessment whether the modification of the existing incentive tariff regime for renewable energy produced from PV plants was fundamentally or radically

---

[245] Ibid., para. 7.

altered, as contended by the Claimant (see para. 339), or only adapted to new developments in a manner and to an extent that remains under this threshold, in the form of a "fine-tuning" of the system, as argued by the Respondent (see para. 342).

446.    The self-characterization of the *Spalma-incentivi* Decree, which sought, according to its own terms, to "reformulate" or "remodulate" (*"la tariffa incentivante […] è rimodulata"*)[246] the incentives regime under the energy accounts, suggests the latter to be the case. Yet, this cannot be the authoritative test for the Tribunal when answering the question of whether the change brought about by the *Spalma-incentivi* Decree was sufficiently momentous to qualify it as fundamental or radical. As explained above (see para. 419), the balancing exercise to be undertaken by the Tribunal between the Claimant's interest in the stability of the legal framework and the Respondent's right to adapt its legislative and regulatory framework to new developments (see para. 411) can be usefully structured by considering and weighing three factors, i.e. whether or not the modifications brought about by the *Spalma-incentivi* Decree (aa) could draw on a public policy purpose, i.e. were reasonable, (bb) could have been expected by the Claimant, i.e. were foreseeable and (cc) did not exceed what was necessary, i.e. were proportionate. Accordingly, the Tribunal will analyze the pertinent arguments of the Parties within this framework.

*aa) Reasonableness*

447.    As concerns the first factor, the Respondent has argued throughout the proceedings that the adoption of the *Spalma-incentivi* Decree and the ensuing reduction of incentive tariff payments were triggered by developments which prompted the Respondent to become active (see paras. 341-342). In particular, the Respondent submits that, given the rapid growth of the market of renewable energy production, the ever-growing burden for the energy consumers had to be mitigated in order to avoid a reduction in energy consumption. Accordingly, the decree, in order to enhance the competitiveness of the country, sought to weigh the sustainability of the support scheme for renewable energy against a comprehensive evaluation of burdens for enterprises in general and small and medium-sized enterprises (SME) in particular (Resp. Rejoinder, para. 364).

---

[246] Article 26(3) of the *Spalma-incentivi* Decree (CL-085).

448.    While the Parties' submissions differ as to whether energy consumers had to shoulder an excessive or disproportionate burden or not (Cl. Reply, paras. 160, 164-182; Counter-Memorial, paras. 314-326, 497), the Tribunal notes that the *Spalma-incentivi* Decree expressly enumerates amongst its goals to "foster more sustainable policies supporting renewable energy".[247] Furthermore, according to the official documents accompanying the draft law-decree presented to the Italian Parliament, it had two objectives:

> On the one hand enhance the economy, especially referred to small and medium-size enterprises which are the backbone of the Italian economic system. On the other hand guarantee fair tariffs in the electric sector, rebalancing the charges among the different categories of consumers and reducing forms of levying which are excessive or unjustified.[248]

449.    The Tribunal observes that the *Blusun v. Italy* tribunal, though assessing the Romani Decree and the Fourth Energy Account, accepted the reduction in incentive tariff payments at that time (i.e. three years before the *Spalma-incentivi* Decree) to have been "a response to a genuine fiscal need, given the large take-up under the earlier Energy Accounts".[249] Furthermore, the Italian Constitutional Court, addressing the 2014 *Spalma-incentivi* Decree, stated:

> In fact, in 2014 the legislature intervened in an economic environment in which – in view of the profitability of feed-in tariffs for solar energy from photovoltaic sources, gradually become more pronounced, both compared to production costs (due to the sudden technological development of the sector), and with respect to the overall European framework – came into light an increasing economic weight of such incentives on the final consumers of electricity (especially small- and medium-sized companies in the domestic economy).
>
> It acted to rebalance the situation, with the declared aim of "promoting better sustainability in the policy of support for renewable energy" (Art. 26, paragraph 1 of Law Decree no. 91 of 2014) and to "achieve a more equitable distribution of costs among the various categories of consumers of electricity", providing in this regard that the lower charges for the user resulting from the reorganization of incentives for photovoltaic plants

---

[247] Ibid., Article 26(1).

[248] Illustrative Report to the Project of Law Converting the Law Decree 91/2014 presented to the Parliament, Comment to Article 23, p. 40 (R-031).

[249] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 342(a) (CL-010); see even going further ibid., para. 318: "Except perhaps in very clear cases, it is not for an investment tribunal to decide, contrary to the considered view of [the host State] authorities, the content of the public interest of their state, nor to weigh against it the largely incommensurable public interest of the capital-exporting state".

are, in fact, "intended for the reduction of electricity rates for customers in medium-voltage and low-voltage ranges [...]" (Art. 23 cited law decree).

The matter in question is therefore an intervention that responds to a public interest, in terms of the balancing of opposing interests at stake, which aims to combine the policy of supporting the production of energy from renewable sources with the higher correlated costs charged to end users of electricity.[250]

450. In the context of its reasonableness assessment, it is not for the Tribunal to decide whether the host State made the right choice in selecting and prioritizing public policy objectives, but rather to determine whether the reasons relied upon by the host State in order to justify its conduct are, under the circumstances, plausible public policy objectives. In the Tribunal's view, this is indeed the case in respect to the Respondent's claim that, when adopting the *Spalma-incentivi* Decree, it saw a need to strengthen the sustainability of the incentive tariff scheme for renewable energy.[251] The Tribunal also accepts that securing the stability of the incentivization regime may entail a certain redistribution of economic advantages and disadvantages among the actors participating in the system, notably including the producers of PV energy.

451. In addition, the Respondent has argued that the economic emergency situation prevailing in Italy at the time called for action on the part of the State (see para. 342). The Tribunal observes that also the unanimous *Belenergia v. Italy* tribunal accepted the Respondent's contentions qualifying the *Spalma-incentivi* Decree "as an emergency measure to tackle the economic crisis".[252] In a similar vein, in the *Greentech v. Italy* award, it was stated that "[t]he majority of the Tribunal does not deny that Italy faced 'a situation of economic difficulty', as Professor Sacerdoti writes in his dissenting

---

[250] Italian Constitutional Court, Decision No. 16/2017 of 7 December 2016, G.U. of 24 January 2017, nr. 8.2 (CL-094=R-036).

[251] See in a similar vein *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, para. 239 (RL-037): "As to the reasons for the issuance of the *Spalmaincentivi* the Tribunal has taken note that the Decree Law and accompanying official documents, spell out the reasons for reducing the incentives provided to the PV operators through the various *Conto Energia*. The rationale was that of reducing the burden of the electricity bill to the consumers, especially small and medium enterprises, in order to stimulate economic growth and competitiveness. […]". See also *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Award, 4 September 2020, paras. 391, 400 (RL-051): "a policy choice to rebalance the program could be seen as entirely consonant with its original objectives, which were to encourage industry growth by ensuring builders of new PV plants a fair (but not excessive) return over costs, while managing the financial burdens on electricity consumers […]".

[252] *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, paras. 518 et seq. (CL-311).

opinion. However, none of the circumstances evidenced in this case reach the level of *force majeure*".[253] Indeed, Professor Sacerdoti acknowledged that the incentivization scheme "was quite onerous for the Italian economy, even more so in times of economic difficulty and lack of growth, making the reduction of the burden desirable".[254] Leaving aside the question of *force majeure* as not relevant to the case at hand, the present Tribunal notes that in both cases, in spite of their very different outcomes, all of the arbitrators agreed that the Italian government acted in a situation of economic difficulty when adopting the *Spalma-incentivi* Decree.

452.    Against this background, the Tribunal is satisfied that the Respondent, when adopting the *Spalma-incentivi* Decree, could plausibly claim to have acted on the basis of legitimate public policy objectives, notably strengthening the sustainability of the incentive tariff scheme for renewable energy in a situation of economic difficulty. In that sense, the measures taken by the Respondent in response to these challenges, in particular the *Spalma-incentivi* Decree, can claim to be reasonable.

*bb) Foreseeability*

453.    As already acknowledged by the Tribunal (see para. 434), the approach taken by the *Spalma-incentivi* Decree (as well as, for that matter, by the *Destinazione Italia* Decree; see paras. 137-138) was new in the sense that under the previous reforms, a PV plant, once admitted to the incentivization regime, would obtain a specific incentive tariff and would keep it for the full duration of twenty years; the lower amount of incentive payments offered in the subsequent energy accounts would then only apply for PV plants newly admitted to the system. In contrast, the *Spalma-incentivi* Decree modified the amount and/or duration of the incentive payments for existing PV plants already receiving incentive tariffs under one of the energy accounts starting from 1 January 2015 (see para. 138). In this respect, the Tribunal agrees with the Claimant's submission that the *Spalma-incentivi* Decree was indeed "the first of its kind" (Cl. PHB, para. 75).

454.    This raises the question of whether such modification of approach was at all foreseeable for the Claimant. According to the Claimant itself, "[t]he measure was not predictable,

---

[253] *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 451 (CL-271).

[254] Ibid., Dissenting Opinion of Giorgio Sacerdoti, 5 December 2018, para. 48 (RL-045).

contrary to Italy's assertion" (Cl. PHB, para. 75). To start with, the Tribunal is not convinced by the *Belenergia v. Italy* tribunal's finding that the reduction in incentive payments brought about by the *Spalma-incentivi* Decree "is not surprising in light of Italy's previous significant reductions of incentives to new plants entering into operation before Belenergia first invested in Italy in September 2011".[255] As explained in the preceding paragraph, the "previous significant reductions" were all prospective reductions, with none of them providing for changes applying to already existing plants. Accordingly, the Claimant (see para. 339) is correct to argue that these reductions could not, therefore, reasonably prompt an investor to expect that the Respondent would make changes to the incentive payments it had offered to PV plants already in operation and already covered by an existing energy account.

455.    Furthermore, although the Respondent (Resp. Rejoinder, para. 449; Tr. 23 September 2019, 161:23-162:4 [Aiello]) considers the *Destinazione Italia* Decree to be a clear signal to the operators in the renewable energy market that there was a need to reconsider the incentives tariffs regime, the Tribunal sides with the Claimant (Cl. PHB, para. 78) on this issue. The *Destinazione Italia* Decree is not relevant to the assessment of whether the Claimant could have foreseen the *Spalma-incentivi* Decree because all of the Claimant's investments in the present case had already been made by the date of this decree's adoption in December 2013 (see para. 137).

456.    As holds true for the legitimate expectations analysis as a whole, the relevant moment with respect to which one has to assess what was foreseeable to the investor or not must be the moment of making the investment. In this regard, the Tribunal wishes to recall its previous finding (see para. 437) that, at this moment in time, the Claimant could legitimately rely on the maintaining of the overall integrity of the incentivization regime for solar energy in Italy, but had to be prepared for certain, non-radical modifications of this legal framework. The Tribunal deems it important to further recall that at no moment in time was the energy accounts' approach of only applying the reduced incentives to newly admitted PV plants part and parcel of the investor's legitimate expectations (see para. 435). Accordingly, the *Spalma-incentivi* Decree's changing of the approach that had hitherto been practiced and its modifying of the amount and/or duration of incentive tariff payments for PV plants already admitted to an energy

---

[255] *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, para. 594 (CL-311).

account from 1 January 2015 on was, in the Tribunal's view, not unforeseeable to the Claimant at the moment when it took its investment decisions.

457.    In this regard, the Tribunal agrees with the submission of the Respondent (Resp. Counter-Memorial, paras. 394-395) that a prudent investor acting in a highly regulated market such as the electricity market must, in the course of its risk assessment, analyze and take into consideration the whole range of potential advantages and disadvantages associated with the dynamics of the market which might also call for policy adjustments on the part of the host State. Having said that, this does not mean that every turn of policy must be anticipated. In particular, even the reasonable and circumspect investor must not anticipate radical change, which takes the Tribunal to the third step of its analysis.

*cc) Proportionality*

458.    As regards thirdly the proportionality question, i.e. whether the measures taken by the Respondent to reach the aforementioned public policy objectives, i.e. a 6 % to 8 % reduction in FIT, did not exceed what was necessary, the Tribunal notes that the positions of the Parties on this issue diverge massively, ranging from a mere "fine-tuning" which did not meaningfully impact the economics of the incentives (Resp. Counter-Memorial, para. 391) to claiming that "Italy fundamentally altered the regulatory framework under which Silver Ridge Power BV had made its investment" (Cl. Reply, para. 145), thus effectuating "a sudden, unexpected and fundamental shift of the regulatory regime" (Cl. Reply, para. 156).

459.    The Tribunal further observes that, according to the Respondent, the internal rate of return of PV plants of the size and entry into operation of the Claimant's PV plants is around 13 to 16 % (Resp. Counter-Memorial, para. 404; Resp. PHB, para. 61).[256] The Claimant (Cl. Reply, paras. 128, 133, 143) contends, however, that the return in its particular case was below that estimate and that the cut in the FIT deprived it of a significant part of its projected revenues. In particular, the Claimant submits that when it decided to invest in the Frosinone plants (see paras. 533 et seq.), the anticipated return

---

[256] See also GSE, *Evoluzione dei costi di generazione: il caso del fotovoltaico in Italia*, 26 June 2013, slide 14 (R-038).

138

to the equity investors was estimated at a rate of 8.7 %[257] and that the average unlevered IRR of its investment portfolio in Italy projected at the time of making the investment decision was in the range of 10.3-10.4 % (post-tax).[258]

460.    When confronted with a similar situation of sharply differing numerical submissions of the Parties, the *SunReserve v. Italy* tribunal[259] recalled the standard of "fair remuneration" or "fair return", as contained in Article 7(2)(d) of Legislative Decree No. 387/2003 as well as, as this Tribunal would add, Article 24(2) of the Romani Decree (see para. 432), and concluded:

> The Tribunal does not consider it appropriate or necessary to determine the precise percentage or range that satisfied the "fair remuneration" criteria, especially in the absence of such a numerical benchmark having been set by Italy while regulating the photovoltaic energy market. […] For the purposes of determining Italy's liability under Article 10(1) ECT, the Tribunal considers it sufficient to understand "fair remuneration" qualitatively, as opposed to quantitatively.[260]

The present Tribunal endorses this qualitative approach and will also apply it in answering the question of whether the 6 % to 8 % reduction in FIT brought about by the *Spalma-incentivi* Decree was proportionate or not.

461.    In this regard, the Tribunal first observes that the *Spalma-incentivi* Decree did not eliminate the existing energy accounts system. Its main consequence was a reduction of the incentive payments for solar energy which amounted, with respect to the Claimant's PV plants, to an 8 % decrease in FIT from 1 January 2015 on (see paras. 139-141). In the Tribunal's view, maintaining a system with modifications, as opposed to replacing it by a completely new system, may serve to some extent as an indicator of whether a change was fundamental or not. At the same time, the Tribunal acknowledges that this can only be one factor to be taken into account in a more comprehensive analysis, which notably has to include an assessment of the impact of the modifications in question. Otherwise a host State could immunize itself against the

---

[257] AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, Appendix 3, 13 (C-058); see also AES Solar Energy, Investment Memorandum to the Board of Directors, 12 December 2010, Table 2, 3 (C-024).

[258] Second Witness Statement of Claudio Pisi, para. 25.

[259] *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 844 (RL-050).

[260] Ibid., para. 845.

claim of radically changing the legal framework by simply referring to the continued existence of the overall system, irrespective of how momentous the adopted modifications are.

462.   In this context, the Tribunal further notes the Claimant's submission that the *Spalma-incentivi* Decree had retroactive effect (Cl. Reply, para. 156; Resp. Counter-Memorial, para. 334), thus indicating a structural deviation from the existing framework. The Tribunal would recall with respect to this claim of retroactivity that the reduction in incentive tariff payments became effective only from 1 January 2015 onwards, i.e. after the adoption and entry into force of the decree (see para. 138). Accordingly, the Claimant could keep the FIT it had already received and obtained reduced incentive payments for the future. The fact that the Claimant expected the FIT to be fixed for the whole 20-year period (see paras. 436, 441) is not relevant in this regard as long as the incentive payments received by the Claimant in the remainder of the period still represent a fair remuneration or return, since this was the (only) reasonable expectation on which the Claimant could, and did rely, in the present case (see para. 444). In that sense, the *Spalma-incentivi* Decree was not a retroactive measure.[261]

463.   Moreover, the Claimant (see para. 339) has characterized the Italian incentive tariff regime for renewable energy as an "*ex ante* support scheme" where the government guarantees incentives payments at a specified level which the investor will take into account when planning its investment. According to the Claimant, by adopting the *Spalma-incentivi* Decree, the Respondent surprisingly introduced elements of an *ex post* regime which the Claimant could not have anticipated. In this regard, the Tribunal accepts the Claimant's evidence (Cl. Reply, paras. 119, 121; Cl. PHB, para. 57)[262] that investments in the renewables sector require a substantial capital investment upfront. This means that if changes in the remuneration scheme occur over the lifetime of the PV plant, the investor is not as flexible as in other industries to adapt to such a change of circumstances. In the Tribunal's view, this aspect must be taken into account in the Claimant's favor in the overall assessment to be made, without losing sight of the fact,

---

[261] See in a similar vein *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Award, 4 September 2020, para. 411 (RL-051).

[262] See also First Witness Statement Christopher Hunt, para. 27 as well as the acknowledgment by the Respondent's own witnesses of the significant upfront capital investment required in order to build and develop a solar plant (Tr. 24 September 2019, 112:8-21 [Bacchiocchi]).

however, that the Claimant was not stripped of all scope of maneuvering, e.g. with respect to operating costs.

464. In any event, neither the purported retroactivity of the *Spalma-incentivi* legislation nor the alleged shift from an *ex ante* to an *ex post* support scheme can change the overall assessment of the Tribunal that the Italian incentivization scheme for solar energy, as modified by the *Spalma-incentivi* Decree, was essentially the same as the previous one.

465. Nonetheless, although the quantitative element is in itself not decisive (see para. 460), the Tribunal accepts that a reduction of 8 % of incentive payments had a considerable impact on the Claimant's solar plants, in particular in combination with the aforementioned aspect that in the PV sector, the investor is not as flexible as in other industries to adapt to such a change of circumstances. While this consideration might cast some doubt on the proportionality of the *Spalma-incentivi* legislation, the Tribunal is satisfied that it did not exceed what was necessary to reach its public policy objectives, namely for the following reasons.

466. To begin with, the *Spalma-incentivi* Decree did not apply a one-size-fits-all approach to the entire community of PV investors, but offered them a certain choice between three options (see para. 139). Furthermore, as concerns Option C, which is the relevant one in the case at hand, the decree distinguished between three categories of PV plants depending on their respective capacity and reduced the incentive payments for smaller plants by 6 % and for bigger plants by 8 %. This strikes the Tribunal as a plausible effort of differentiation by virtue of which the host State sought to adequately distribute the economic burden of the FIT reduction on the PV energy producer community. That the Claimant, whose plants all fall in the high-capacity category (see para. 141), had to bear a FIT reduction of 8 % is the result of that effort of differentiation and the host State's legitimate policy choice to privilege smaller PV plants.[263]

467. The Tribunal is aware that, as emphasized by the Respondent (Resp. Counter-Memorial, paras. 355-359), Article 26 of the *Spalma-incentivi* Decree introduced certain safeguard measures. In particular, it was possible for the beneficiaries of the modified incentives to access bank loans for a maximum amount equal to the difference

---

[263] See, in a similar vein, para. 604.

between the original and the modified incentive.[264] In addition, the beneficiaries could transfer a portion of the received incentives, up to a maximum of 80 %, to an acquirer selected among major European financial operators.[265] At the same time, the Tribunal acknowledges that the Claimant (Cl. Memorial, paras. 133-134) has challenged the effectiveness of these safeguard measures. The Tribunal appreciates the Respondent's effort to provide mitigating mechanisms for PV producers, but, in view of the lack of reliable evidence on this matter, does not include it in its proportionality assessment.

468.  Moreover, the Tribunal also takes note of the financial problems incurred by the Claimant due to the reduction of FIT by virtue of the *Spalma-incentivi* Decree which have allegedly magnified its negative effects (see para. 322). However, the Respondent (Counter-Memorial, para. 397) submits that these problems were not so much the result of the decree's adoption, but rather of the Claimant's excessive use of leverage in financing its investment projects. In this regard, the Tribunal accepts the Claimant's contention (Cl. Memorial, para. 92; see para. 108) that financing a PV plant with a leverage of 70-85 % of the construction costs was common practice in the renewables industry. At the same time, while an investor is free to choose the financing structure it deems best for its investment, this does not dispense it, as a reasonable investor would do, from preparing itself for certain strains or stumbles in the flow of incentive payments, for whatever reason. Accordingly, in the Tribunal's view, the inability of the Claimant's subsidiaries to meet their obligations under the project financing agreements due to reduced cash flows and the ensuing imposition of dividends distribution blocks and technical defaults (see paras. 322-323), might well have implied financial losses for the Claimant exceeding the 8 % reduction in incentive payments for the remainder of the 20-year period, but these additional losses cannot be attributed to the decree as such, but rather to entrepreneurial choices of the Claimant.

469.  For the foregoing reasons and considering that the fair and equitable treatment standard has, in the words of the *Blusun v. Italy* tribunal, "a relatively high threshold",[266] which is echoed in the recent *SunReserve v. Italy* award according to which, "the overall

---

[264] See Article 26(5) of the *Spalma-incentivi* Decree (CL-085).

[265] See ibid., Article 26(7).

[266] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 363 (CL-010).

standard to establish a breach of the FET obligation is high",[267] the present Tribunal, while acknowledging that an 8 % reduction in incentive tariff payments for the bulk of the 20-year incentivization period must have resulted in a relevant reduction in income for the Claimant, does not consider this reduction to be excessive or disproportionate.

470.    This result is confirmed both in the caselaw of the Italian Constitutional Court and in what the Tribunal considers to be the emerging trend in the arbitral tribunals' assessment of the *Spalma-incentivi* Decree.

471.    The Italian Constitutional Court stated with respect to a constitutional challenge of Article 26(2) and (3) of the *Spalma-incentivi* Decree on the ground that it was contrary to Articles 3 and 41 of the Italian Constitution:

> 8. The complaints of violations of the Constitution and European parameters referred to in the appeals share a basic argument that the contested paragraph 3 of Art. 26 of Law Decree no. 91 of 2014 would weaken the legitimate expectations of the producers with regard to the tariffs in question, preserving their established positions of advantage recognized in agreements with GSE. […]
>
> 8.2. The examination of the reasoning and the content of the contested provision leads to the conclusion that this has had no impact on lasting relationships attributable to agreements with GSE entered into by the beneficiaries of incentives in an unreasonable, arbitrary and unpredictable manner, infringing (as claimed) the principle noted. […]
>
> 8.3. […] the guaranteed consistency of the incentive throughout the period of entitlement does not imply as a necessary consequence that the related measure should remain for 20 years unchanged and completely shielded from the variations common to lasting relationships. This is even more so when one considers that the agreements entered into with the GSE are not considered contracts intended for the exclusive profit of the operator who should see the initial conditions unchanged for 20 years, even if the technological conditions change significantly, but constitute tools of regulation aimed at achieving incentives of certain energy sources, balancing them with other sources of renewable energy, and with minimal sacrifice for users who also bear the economic burden of it. […]
>
> All this leads to the conclusion that the reformulation of the incentives by the contested provision does not present the alleged characteristic of "unpredictability", and indeed the same resulting in some way forewarned and finalized precisely to ensure the "stability" taken into account by the laws establishing the incentives for photovoltaic plants as a characteristic of

---

[267] *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 688 (RL-050).

the entire system and not the individual incentive; in addition to being (in the context of a "regulated" sector market, like the one under discussion) an element physiologically related to a regulatory business risk.[268]

472.    As regards the assessment of the *Spalma-incentivi* Decree by arbitral tribunals, it is true that the majority in *ESPF Beteiligungs GmbH et al. v. Italy* found that "the effect of the *Spalmaincentivi* Decree on the Claimants' investments was significant"[269] and that this had "a sizable impact and cannot be qualified as a *de minimis* effect".[270] In a similar vein, the majority in the *Greentech v. Italy* award stated: "While the investor might need to live with some minor adjustments, nothing alerted the Claimants that they would need to accept changes of the magnitude imposed by the *Spalma-incentivi* Decree".[271] In contrast, the dissenting arbitrator in that case, Professor Sacerdoti, came to the conclusion that "[t]he 6-8% reduction only moderately affected PV operators' revenues […]".[272] Subsequently, the unanimous *Belenergia v. Italy* award spoke of "a modest 6% to 8% reduction to a subsidy (feed-in tariff) paid in addition to the energy price applicable for 20 years of a PV plant's estimated life",[273] and the equally unanimous *SunReserve v. Italy* award found "an 8% reduction in incentive tariffs [not] to result in an unfair remuneration for any of Claimants' power plants"[274] as well as that "the remodulation of the incentive tariff regime by the *Spalma-incentivi* Decree did not impede the prospects of fair remuneration for photovoltaic plants".[275]

473.    Furthermore, while it is true that the majority of the *CEF v. Italy* tribunal concluded that the *Spalma-incentivi* Decree constituted a breach of Article 10(1) ECT, it did so in the light of the particular features of the legitimate expectations claim it had accepted with respect to the claimant's investment in the *Enersol* plant,[276] which are not

---

[268] Italian Constitutional Court, Decision No. 16/2017 of 7 December 2016, G.U. of 24 January 2017, nr. 8, 8.2, 8.3 (CL-094=R-036).

[269] *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, para. 578 (CL-313).

[270] Ibid., para. 578.

[271] *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Case No. 2015/095, Final Award, 23 December 2018, para. 448 (CL-271).

[272] Ibid., Dissenting Opinion of Giorgio Sacerdoti, 5 December 2018, para. 49 (RL-045).

[273] *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, para. 595 (CL-311).

[274] *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 852 (RL-050); see also ibid., para. 692.

[275] Ibid., para. 867.

[276] See *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, para. 244 (RL-037).

transposable to the analysis of the present Tribunal. Moreover, Professor Sacerdoti even dissented from this finding and stated that "[a]s to the tariff cut put in place by the *Spalmaincentivi*, the evidence shows in my opinion that it was a reasonable measure, taken in a transparent way".[277]

*dd) Conclusion*

474.   Against this background, the Tribunal concludes that the changes brought about by the Respondent's adoption of the *Spalma-incentivi* Decree (notably the 8 % FIT reduction applied to the Claimant's PV plants from 1 January 2015 on) were, considering all relevant elements of the case, reasonable, foreseeable and proportionate and did therefore not constitute a fundamental or radical alteration of the applicable legal framework to the detriment of the investor. Thus, the corresponding legitimate expectation of the Claimant was not frustrated and the fair and equitable treatment claim based on the *Spalma-incentivi* Decree must be rejected.

475.   Having found that the fair and equitable treatment standard, as enshrined in Article 10(1), second sentence, of the ECT, has not been violated in the present case, the question remains whether the guarantee in Article 10(1), first sentence, according to which each ECT Contracting Party shall "encourage and create stable, equitable, favourable and transparent conditions" offers the Claimant any additional protection with respect to its claim based on the *Spalma-incentivi* Decree (see para. 394). The Tribunal responds to this question in the negative as all relevant arguments regarding maintaining an appropriate degree of stability of the existing legal framework as well as regarding the necessary measure of transparency when modifying this legal framework have already been addressed above.

*(v) Conclusion*

476.   For these reasons, the Tribunal concludes that the Respondent, by adopting the *Spalma-incentivi* Decree, did not violate Article 10(1), first and second sentences, of the ECT on encouraging and creating stable, equitable, favourable and transparent investment conditions and on according at all times fair and equitable treatment to investments protected under the ECT.

---

[277] See ibid., para. 247.

### (3) Conclusion

477. In sum, the Tribunal concludes that, by adopting the *Spalma-incentivi* Decree, the Respondent has not breached Article 10(1) of the ECT and therefore rejects the Claimant's claim in this regard.

### B. PROJECT VEGA AND THE ADOPTION OF THE ROMANI DECREE AND THE FOURTH ENERGY ACCOUNT

### (1) The Parties' Positions

#### a. *Claimant's Position*

478. According to the Claimant, the so-called "Project Vega" should have consisted of a single 123 MW solar plant to be constructed in the northern part of the Italian region of Puglia, on the outskirts of the Troia municipality. The project was to be built entirely on agricultural land and was to be divided into five units. Three units were to be built north of the Troia municipality and the remaining two to the south of it. Both the north and the south units were to be connected to a single medium-voltage substation through 36 km of medium-voltage cables. The medium-voltage substation, in turn, was to be connected to a second high-voltage substation built by Terna, i.e. the Italian electricity transmission system operator, in order to feed the produced energy into the national high-voltage grid.[278] At the time, Project Vega would have been the largest solar plant in Europe and constituted, from the Claimant's point of view, a unique investment opportunity because its size would have permitted economies of scale (Cl. Memorial, paras. 162, 164, 177; Cl. PHB, para. 126).

479. The Claimant further submits that in 2007, AES Solar Energy BV, Silver Ridge Power BV's predecessor (see para. 107), entered into an exclusivity agreement with the Italian developers who owned Project Vega at the time.[279] On 31 October 2007, the AES Corporation wrote to the Italian developers stating its willingness to option ten solar projects, including Project Vega, and paid consideration of EUR 3.2 million.[280] On 8

---

[278] See AES Solar Energy, Expenditure Approval Memorandum to the Board of Directors, 13 December 2010, 8 (C-025).

[279] See Exclusivity Agreement between the AES Corporation and En.It Puglia s.r.l., Puglia Energia s.r.l. and Energia s.r.l., 23 July 2007 (C-009).

[280] Letter from the AES Corporation to Mr. Alessandro D'Amato, 31 October 2007 (C-010).

July 2008, AES Sole Italia s.r.l. entered into a framework option agreement[281] with the holding company of the Italian developers, i.e. World Wind Energy Holding s.r.l. Under this agreement, which replaced the 2007 exclusivity agreement, AES Sole Italia s.r.l. acquired the option to purchase a number of solar projects once they were granted the relevant authorizations and the related land agreements had been concluded. As consideration, AES Sole Italia s.r.l. undertook to pay an option price of EUR 20,000 per each optioned MW.[282] The framework option agreement covered some of the original projects, including Project Vega, for a price of EUR 4.5 million, EUR 3.2 million of which was already paid under the first exclusivity agreement[283] (Cl. Memorial, paras. 166-169; Cl. PHB, para. 127).

480.    The Claimant contends that, between June 2007 and November 2011, the Italian developers filed the documents needed for the issuance of the Single Authorization (*autorizzazione unica*) by the Puglia Region. They also ensured that Terna would connect Project Vega to the high-voltage grid and concluded preliminary lease and acquisition agreements for the land on which both the medium-voltage substation and the plant would be built.[284] In addition, on 18 January 2011, AES Solar, through ASI Troia s.r.l., concluded a contract with Siemens s.p.a. and Guastamacchia s.p.a. for the engineering, procurement, construction, testing and commissioning of the substation on a turnkey basis, for a price of EUR 4.1 million and with a view to complete the substation by September 2011.[285] Furthermore, starting from November 2010, AES Sole Italia s.r.l. ordered PV modules from First Solar GmbH pursuant to a framework agreement that its ultimate parent company, AES Solar Energy Ltd., had concluded with First Solar in April 2008[286] (Cl. Memorial, paras. 170, 175-176).

481.    The Claimant emphasizes that, under the projected construction schedule, Project Vega would have been mostly completed in 2011 and would have benefited from the FIT under the Third Energy Account. At the end of 2010, the Claimant made various efforts

---

[281] Framework Option Agreement between AES Sole Italia s.r.l. and World Wind Energy Holding s.r.l., 8 July 2008 (C-012).

[282] See ibid, Art. 1.0, 2.0, 4.0.

[283] See ibid., Art 9.0 and Attachment 9.0.

[284] Witness Statement Claudio Pisi, para. 73.

[285] Substation Engineering, Procurement and Construction Contract between ASI Troia s.r.l. and Siemens s.p.a. and Guastamacchia S.p.a., 18 January 2011 (C-028).

[286] Framework Agreement on the Sale and Purchase of Solar Modules between AES Solar Energy Ltd. and First Solar GmbH, 14 April 2008 (C-011); see also Exhibits C-014, C-015, C-022 and C-023 in this regard.

to accelerate the execution of the project in order to connect as many MW as possible in 2011 under the Third Energy Account.[287] On 14 January 2011, AES Sole Italia s.r.l. entered into an agreement with A.B.C. General Engineering s.r.l. for the execution of demining works.[288] In January and February 2011, AES Solar selected three contractors, i.e. Biosar, GES and Assyce, for construction of the five units composing the solar plant[289] (Cl. Memorial, paras. 163, 172-174, 178-179).

482. On 3 February 2011, the Region of Puglia issued the Single Authorization for Project Vega. On 17 February 2011, the Single Authorization was published in the Puglia Region Official Gazette[290] (Cl. Memorial, para. 181).

483. As regards financing, the Claimant submits that AES Solar intended to fund the construction of Project Vega with a combination of equity and project finance, in the amount of 17 % and 83 %, respectively, as was common practice in the market.[291] The Claimant denies that such an equity/debt ratio was a risky business choice or made the project more difficult to be financed. The Claimant further argues that, in view of the magnitude of the project, it started looking for financing early on, i.e. in December 2010/January 2011, by reaching out to banks it had already dealt with in the past, namely BNP Paribas, Crédit Agricole, Dexia, Société Générale and Unicredit. According to the Claimant, initial reactions were positive and AES Solar was expecting to receive financing on terms similar to those obtained for the other 25 PV plants.[292] On 17 February 2011, AES Solar, through a subsidiary of AES Sole Italia s.r.l., i.e. ASI L s.r.l., entered into a financing agreement with Investec Bank PLC for the acquisition of further solar panels[293] (Cl. Memorial, paras. 180, 183, 193; Cl. Reply, para. 235; Cl.

---

[287] See AES Solar Energy, Expenditure Approval Memorandum to the Board of Directors, 13 December 2010, 1f (C-025); Preliminary Acquisition Agreement between AES Sole Italia s.r.l. and En.It Puglia s.r.l., 22 December 2010 (C-026).

[288] See Framework Contract for Demining Works between AES Sole Italia s.r.l. and A.B.C. General Engineering s.r.l., 14 January 2011 (C-027).

[289] See Witness Statement Claudio Pisi, para. 81.

[290] Decision of the Director of Energy, Network Services and Physical Infrastructures for Development of 3 February 2011, n. 32, Puglia Region Official Gazette, n. 26 (lt.), 17 February 2011 (C-032).

[291] See Witness Statement Claudio Pisi, para. 83.

[292] See ibid., para. 84; Second Witness Statement of Claudio Pisi, para. 35; see also Crédit Agricole Email, Cover Letter and Termsheet, 14 January 2011, 1 (C-112).

[293] See Secured Revolving Facility Agreement between ASI L s.r.l. and Investec Bank PLC, 17 February 2011 (C-033).

PHB, paras. 127-128; Cl. Reply PHB, para. 39; Tr. 23 September 2019, 234:16-21 [Pisi]).

484. Hence, according to the Claimant, Project Vega was ready to enter the final stage, i.e. the construction of the solar plant. However, as submitted by the Claimant, in the spring of 2011, the Romani Decree and the Fourth Energy Account dramatically changed the conditions for access to the FIT, making it impossible for the Claimant to secure financing for Project Vega and forcing it to abandon the project, thus incurring substantial additional expenses (Cl. Memorial, paras. 184-185, 192).

485. In particular, the Claimant contends that between the entry into force of the Romani Decree on 29 March 2011 and the new deadline for the Third Energy Account, as set by the Romani Decree for 31 May 2011, only two months remained. There was thus no way that Project Vega, which was not yet built, could qualify for FIT under the Third Energy Account. The Claimant further asserts that the Romani Decree did not provide for a new FIT regime, but left this issue open until the Fourth Energy Account was enacted on 5 May 2011. Moreover, the Romani Decree created new restrictions for PV plants built on agricultural land. According to the Claimant, this is relevant to the present arbitration since Project Vega was to be constructed on agricultural land and no land use restrictions were provided in the previous legislation. However, Project Vega was encompassed by the exception provided for in the Romani Decree (see para. 127), as its Single Authorization had been issued on 3 February 2011, i.e. before the entry into force of the Romani Decree on 29 March 2011; hence, Project Vega was required to be connected to the grid before 29 March 2012 in order to accede to FIT under any energy account[294] (Cl. Memorial, paras. 187-190, 194; Cl. PHB, paras. 129-130).

486. The Claimant argues that the Romani Decree led to a great outcry in the Italian solar market and resulted in the lending institutions halting disbursements even on loans and leasing agreements already decided. As regards Project Vega more specifically, the Claimant submits that because of the Romani Decree's 29 March 2012 deadline and the cancellation of the Third Energy Account, the banks contacted by AES Solar were not willing to take on either the risk that the construction of the plant would not be completed by the deadline (thus resulting in the project not qualifying for any renewable

---

[294] See also Witness Statement of Claudio Pisi, para. 85.

incentives) or the uncertainty about the FIT to be published in the future energy account (Cl. Memorial, paras. 26, 191-193; Cl. Reply, paras. 28, 234-235, 249; Cl. PHB, paras. 133-135; Cl. Reply PHB, para. 37; Tr. 23 September 2019, 209:5-11 [Pisi]).

487.    Furthermore, according to the Claimant, the uncertainty with respect to the new level of FIT prevented it from determining the economic viability of Project Vega and, as a consequence, from approving the expenditures necessary to advance the project and from presenting it to potential lenders in order to secure project financing. Hence, AES Solar decided to halt all major expenditures on the project and to consider resuming the project only after the new FIT were known. It also created a suspension budget that would allow the Claimant to quickly resume the project and connect it by 29 March 2012, once the new tariffs became known[295] (Cl. Memorial, paras. 194-195; Cl. PHB, para. 131; Cl. Reply PHB, para. 36; Tr. 24 September 2019, 133:13-134:4 [Bacchiocchi]).

488.    The Claimant contends that, only after the adoption of the Fourth Energy Account on 5 May 2011, it was finally in a position to reassess the economic viability of Project Vega. The Claimant submits in this regard that the project, if built and connected by December 2011, would have obtained FIT more than 32 % lower than those under the Third Energy Account and that the late adoption of the new FIT forced the Claimant to further delay the project's construction to a point where the scheduled date for completion was dangerously close to the 29 March 2012 cut-off date imposed by the Romani Decree[296] (Cl. Memorial, paras. 202-203, 206-209; Cl. Reply, para. 236; Cl. PHB, para. 132).

489.    Moreover, according to the Claimant, the Fourth Energy Account created the additional hurdle of having to qualify for the two solar plant registers to be administered by the GSE, as a prerequisite to accede to the 2011-2012 incentives. The Claimant argues in this regard that, in the absence of a central database listing the applications for permits to build solar plants, it was impossible to anticipate how many applications to the GSE registers there would be and whether Project Vega would be included in either register. Under these circumstances, the Claimant would have had to wait until September 2011

---

[295] See ibid., paras. 87-90; see also AES Solar Energy, Memorandum to the Board of Directors, 15 March 2011, 1, 5f. (C-041).
[296] See Witness Statement of Claudio Pisi, paras. 94-95, 97.

and the publication of the final GSE register to know with certainty whether Project Vega would be admitted to the register and therefore qualify for FIT under the Fourth Energy Account[297] (Cl. Memorial, paras. 204-205).

490. The Claimant argues that, in May 2011, its subsidiaries and itself had already sustained approximately EUR 11 million in acquisition and development costs for Project Vega.[298] In addition, AES Sole Italia s.r.l. had already bought 60 MW worth of solar panels and had undertaken to buy another 40 MW from First Solar,[299] which constituted a major financial liability. Hence, AES Sole Italia made efforts to renegotiate delivery terms and the price of the panels. Furthermore, the Claimant started considering alternative development scenarios for Project Vega, for instance by reducing the size of the solar plant (e.g. resulting in the so-called "Project Phoenix" as a 38.5 MW plant instead of the 123 MW for Project Vega), thus allowing for a reduction in equity funding requirements.[300] Moreover, the Claimant scrutinized other options, notably securing short-term financing to cover the construction expenses (e.g. with UBS) or finding new equity investors or final buyers.[301] While initial reactions from major players in the renewables market were promising, all interested parties eventually withdrew from negotiations because they considered the risk of Project Vega not achieving the incentives to be too high (Cl. Memorial, paras. 197-200, 210-213).

491. According to the Claimant, since all estimated scenarios could not be realized or would have resulted in a substantial loss for the Claimant, its board concluded in May 2011 that, in light of the dramatic change in the regulatory environment, it could not go forward with Project Vega in any variation and had no choice but to abandon the project. Termination letters were sent to the Italian developers on 1 June 2011[302] and to Siemens on 27 May 2011.[303] Eventually, Silver Ridge Power LLC redeployed part of

---

[297] See ibid., para. 96.

[298] AES Solar Energy, Memorandum to the Board of Directors, 18 May 2011, 8 (C-053).

[299] Witness Statement of Claudio Pisi, para. 98.

[300] AES Solar Energy, Memorandum to the Board of Directors, 26 May 2011, 3 (C-054).

[301] See Witness Statement of Claudio Pisi, paras. 89, 92-93, 95, 98; see also AES Solar Energy, Memorandum to the Board of Directors, 15 March 2011, 1, 5f. (C-041); Email from Jon Poley to Claudio Pisi, Dave Sundstrom, Becky Cranna et al., 18 March 2011 (C-042); AES Solar Energy, Memorandum to the Board of Directors, 18 May 2011, 4 (C-053).

[302] Letter from AES Sole Italia s.r.l. to En.It Puglia s.r.l., Alessandro D'Amato, Angela Destino et al., 1 June 2011 (C-056).

[303] Letter from ASI Troia s.r.l. to Siemens s.p.a., 27 May 2011 (C-055).

the PV panels in stock (i.e. the equivalent of 60 MW) on other solar projects it was developing in Italy, the United States and India, but given the panels' sharply decreased value, it registered a loss amounting to EUR 13.18 million. Additionally, AES Sole Italia s.r.l. had to cancel the solar panel financing agreement with Investec Bank PLC,[304] incurring further costs amounting to EUR 1.2 million (Cl. Memorial, paras. 214-216; Cl. PHB, para. 136; Cl. Reply PHB, para. 41; Tr. 24 September 2019, 42:12-15 [Hunt]).

492.    In sum, the Claimant argues that it was forced to cancel Project Vega, after having invested more than EUR 20 million in that project, due to the combined effects of the land use restriction contained in the Romani Decree and the dramatic decrease in the FIT effectuated by the Fourth Energy Account, suddenly making Project Vega economically unviable (Request, para. 82; Cl. Memorial, paras. 217, 361; Cl. Reply, para. 238; Cl. PHB, para. 136).

493.    The Claimant contends that the conditions for investment created by the Respondent were anything but stable, equitable, favorable and transparent and did not accord fair and equitable treatment, as required by Article 10(1), first and second sentences, of the ECT (Cl. Memorial, paras. 359, 364; Cl. Reply, paras. 242-243, 246, 250; Cl. PHB, paras. 125, 149; Cl. Reply PHB, para. 42). Quite the contrary, according to the Claimant, the adoption of the Romani Decree in March 2011 marked a sudden, radical and unforeseeable change in approach to PV plants' eligibility for FIT. These changes altered the fundamental elements of the incentive regime on which the Claimant relied in making its investments in Project Vega. The Romani Decree prematurely terminated the Third Energy Account that had been adopted just seven months before, i.e. in August 2010, setting as a new end-date the respective plant's entry into operation until 31 May 2011 instead of the originally applicable date of 31 December 2013. In addition, the uncertainty arising from the Respondent's measures made it impossible for Project Vega to be completed before the new 29 March 2012 deadline set by the Romani Decree (Cl. Memorial, paras. 360-361; Cl. Reply, para. 245). Hence, according to the Claimant, the Romani Decree and the Fourth Energy Account, in the very short timeframe of two months, profoundly altered the Italian incentives regime available for PV plants,

---

[304] Letter from ASI L s.r.l. to Investec Bank PLC, 27 April 2011 (C-050).

negatively affecting projects such as Project Vega that were already at an advanced stage of development (Cl. Memorial, paras. 362-363).

494.    Moreover, the Claimant argues that the Respondent does not deny the instability created by the Romani Decree, the Fourth Energy Account and the pre-qualification system introduced by the latter. Accordingly, the Respondent's attempt to relativize that period of profound instability by downplaying its length is without merit. The uncertainty began in March 2011 and ended in September 2011. For a large project like the one in question, additionally facing the March 2012 completion deadline imposed by the Romani Decree, this was crucial and indeed lethal for Project Vega (Cl. Reply, para. 240).

495.    As regards the Respondent's reliance on the *Blusun v. Italy*[305] and *Charanne v. Spain*[306] awards, the Claimant argues that the Respondent overlooks the distinctions between these cases and the present one. According to the Claimant, *Charanne v. Spain* was not really a legal stability claim. The *Blusun v. Italy* award, on its part, is distinguishable on the facts. First, the project in that case consisted of 120 small plants and 250 km of cables, as opposed to one plant of 5 units along 36 km of cables for Project Vega. Secondly, the *Blusun v. Italy* award was based in substantial part on concerns as to the validity of more informal construction permits issued by localities under a law intended for small constructions, whereas Project Vega obtained a Single Authorization issued by the Region of Puglia. Hence, according to the Claimant, Project Vega did not face the same technical and legal challenges as the *Blusun* project (Cl. Memorial, para. 359; Cl. Reply, para. 244; Cl. PHB, paras. 138-139; Cl. Reply PHB, para. 38; Tr. 24 September 2019, 36:16-18 [Hunt]).

496.    In particular, the Claimant insists that the record provides no support for the Respondent's assertions (see para. 502) that no causal link can be found between the adoption of the Romani Decree and the Fourth Energy Account and the failure of Project Vega, and that any deadlock of financing cannot therefore be imputed to the Respondent. On the contrary, in the Claimant's view, the Romani Decree did just that:

---

[305] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 319(4) (CL-010).

[306] *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016 (CL-011).

it created a deadlock for financing large solar projects. There is thus a clear causal link between the contested measures and the failure of Project Vega (Cl. Reply, paras. 247-249; Cl. PHB, paras. 137-138; Cl. Reply PHB, para. 38).

497.    Moreover, as concerns the Respondent's contention that many other PV projects managed to obtain financing (see paras. 502, 504), the fact that smaller projects were realized under the Fourth and Fifth Energy Accounts does not, from the Claimant's point of view, refute its case with respect to Project Vega, as the Romani Decree had a dramatic effect especially on large PV projects located on agricultural land such as Project Vega (Cl. PHB, paras. 140-142).

498.    Furthermore, the Claimant submits that the Respondent's argument that the Claimant's project was huge and that the fact that the Claimant waited until a late stage to look for financing (see para. 505) demonstrates a lack of understanding of how such projects are carried out, as well as of the fact that they require a great deal of preparation before they can be presented to potential lenders and construction works can commence (Cl. PHB, paras. 143-144; Tr. 23 September 2019, 213:4-6 [Pisi]; 24 September 2019, 39:13-15 [Hunt]; 26 September 2019, 86:5-8 [Dufêtre]).

499.    In a similar vein, according to the Claimant, the Respondent errs in contending that the Claimant purchased solar panels too early and for too high a price (see para. 506). Solar panels had to be shipped from Asia to Italy, which was a long process, particularly as there was a "market crunch" and the Claimant, like other investors, was having great difficulty in getting a sufficient amount of solar panels to build its projects. This is why the Claimant chose to enter into a framework agreement for the purchase of solar panels at an early stage[307] and made a rational entrepreneurial choice by doing so (Cl. PHB, paras. 145-147; Cl. Reply PHB, para. 40; Tr. 23 September 2019, 220:7-11, 232:22-233:2 [Pisi]; 24 September 2019, 44:17-45:2 [Hunt], 78:23-79:4 [Erdly]).

500.    Finally, as concerns the Respondent's contention that Project Vega is "alive" (see para. 509), the Claimant submits that the Province of Foggia, where Project Vega is located, was affected by a severe drought in 2012 which was recognized as a "catastrophic event" by a ministerial decision of January 2013. A law adopted in

---

[307] Framework Agreement on the Sale and Purchase of Solar Modules between AES Solar Energy Ltd. and First Solar GmbH, 14 April 2008 (C-011).

December 2013 enabled the extension of the deadline to access FIT under the Fifth Energy Account for PV plants in areas affected by those "catastrophic events", thus enabling ASI Troia to benefit from incentive tariffs under the Fifth Energy Account. Yet, when the Claimant made the decision to abandon Project Vega in 2011, it could not have foreseen this course of events (Cl. PHB, para. 148; Cl. Reply PHB, para. 41; Tr. 24 September 2019, 140:19-23, 141:15-22, 142:14-25 [Bacchiocchi]).

### b. *Respondent's Position*

501.   The Respondent does not object to the Claimant's submissions regarding Project Vega's location, size, major technical features and the administrative steps taken in order to realize the project in question (see paras. 478-482). At the same time, the Respondent rejects the Claimant's contentions concerning the alleged failure of Project Vega due to the adoption of the Romani Decree and the Fourth Energy Account.

502.   In particular, the Respondent contends that Project Vega follows the same pattern as the failed project which the *Blusun v. Italy* award[308] dealt with. According to the Respondent, in that as well as in the present case, the immediate cause for the failure of the project was the lack of financing. The Respondent submits in this regard that the Claimant (which carries the burden of proof) cannot provide any evidence that the lack of financing for Project Vega resulted from the adoption of the Romani Decree. To the contrary, a huge number of PV projects in the very same period obtained financing in an orderly manner. According to the Claimant's own submissions, the problem was not that it could not find financing, but that it considered the deal it was offered too burdensome. Hence, the Respondent argues that no causal link exists between the Romani Decree and the Fourth Energy Account, on the one hand, and the failure of Project Vega on the other (Resp. Counter-Memorial, paras. 283-291, 416-419, 565; Resp. Rejoinder, paras. 578-579; Resp. PHB, paras. 11, 65; Resp. Reply PHB, paras. 29-30).

503.   As regards the authority of the *Blusun v. Italy* award, the Respondent submits that it might be true that the award was challenged in annulment, not on the assessment of the Romani Decree, but on different grounds. Hence, according to the Respondent, the

---

[308] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 319(4) (CL-010).

*Blusun v. Italy* award stands unchallenged with respect to the Romani Decree issue (Resp. Rejoinder, para. 594).

504.    In the Respondent's view, the real reason for the lack of financing for Project Vega was the Claimant's risky business choices. This includes first and foremost the huge and ambitious character of Project Vega, which would have constituted, following the Claimant's own submissions, the largest solar plant in Europe at the time. Moreover, in order to maximize revenues, the Claimant chose to develop the project financing with a high equity/debt leverage of approximately 20/80. Thus, the project's size and ambition made it riskier in comparison to many other projects in the market that could attract financing because they entailed a lower risk (Resp. Counter-Memorial, paras. 409-411; Resp. PHB, paras. 12, 66-67; Resp. Reply PHB, para. 26; Tr. 23 September 2019, 129:22-130:2 [Malaguti]).

505.    Furthermore, the Respondent argues that the Claimant decided to first start a number of operations and constructions that implied high expenditures and only at a later stage began looking for financing. While this might have been a good strategy in abstract terms, since a more mature project would have possibly been more attractive, this choice forced the Claimant to disburse most of the available funds before having secured any concrete financial partners (Resp. Counter-Memorial, para. 411; Resp. Reply PHB, para. 26; Tr. 23 September 2019, 130:22-131:13 [Malaguti]).

506.    Moreover, according to the Respondent, it is highly surprising that the Claimant decided to commission the building of substations to connect the future plant to the national grid, which is an extremely costly operation, as well as to proceed with the acquisition of PV modules for the total capacity of the plant, without having even signed an EPC contract for the construction of such a plant. This particularly holds true, as argued by the Respondent, in view of the fact that the cost of PV modules was dropping at the time on an almost daily basis (Resp. Counter-Memorial, paras. 412-413; Resp. PHB, paras. 68-69; Resp. Reply PHB, para. 27).

507.    The Respondent further submits that all this shows a project that still was missing its fundamental pillars in 2011. Thus, it insists that Project Vega never reached, indeed, it never came close to, the point of becoming eligible for incentives under any energy account. It is difficult for the Respondent to believe that the Claimant was peacefully

planning its project while staying confident that no changes in the regulatory framework would occur in the light of the huge dynamics in the market. According to the Respondent, regulatory changes that intervene at a time when the investor did not yet qualify for an incentive tariff, i.e. before the acquisition of a "subjective right", do not interfere with any legitimate expectations, since at this stage the individual only has a "mere factual aspiration", and not a legal expectation, to obtain a certain benefit from the regulatory framework. In this regard, the Respondent also refers to the caselaw of the Italian *Consiglio di Stato*, the highest judicial authority in administrative matters, as well as to the *Blusun v. Italy* award (Resp. Counter-Memorial, paras. 408, 415, 566; Resp. Rejoinder, paras. 580, 583-590; Resp. PHB, para. 12; Resp. Reply PHB, paras. 26, 28).

508.    In addition, the Respondent contends that – in the light of its submissions regarding the *Spalma-incentivi* Decree and thus irrespective of the Claimant's submissions regarding the Romani Decree and the Fourth Energy Account – the Claimant could not have had any legitimate expectation at the time when it made the investment to benefit from FIT under a certain energy account (Resp. Counter-Memorial, para. 564; Resp. Rejoinder, paras. 591-592).

509.    Moreover, according to the Respondent, Project Vega is back on track again and has received incentive tariffs under the Fifth Energy Account due to its 2013 registration. As a consequence, the Respondent argues, the claim regarding Project Vega should be rejected by the Tribunal. At the very least, the Tribunal should take this fact into consideration at the damages level (Resp. Rejoinder, paras. 595-598; Resp. PHB, paras. 12, 70).

510.    For the aforementioned reasons, the Respondent contends that its submissions refute the Claimant's claims both under the stability and transparency of conditions and the fair and equitable treatment standards and thus concludes that no infringement of Article 10(1), first and second sentences, of the ECT has occurred in the present case (Resp. Counter-Memorial, paras. 552-557; Resp. Rejoinder, paras. 577, 599-600).

### (2)    The Tribunal's Analysis

511.    The Claimant's claim regarding Project Vega is framed in terms of both Article 10(1), first and second sentences, of the ECT, which read:

Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.

512.    The first and second sentences of Article 10(1) of the ECT require an ECT Contracting Party to observe certain standards of treatment vis-à-vis investors of other ECT Contracting Parties investing in the former's territory. If these obligations are breached, this constitutes an internationally wrongful act which entails the international responsibility of the host State (see Articles 1 and 2 of the Articles on Responsibility of States for Internationally Wrongful Acts,[309] hereinafter "ASR") and gives rise to the legal consequences as laid down in Articles 28 et seq. of the ASR.

513.    According to Article 31(1) of the ASR, which represents customary international law,[310] the State responsible for an internationally wrongful act is under an obligation to make full reparation for the injury *caused by* the internationally wrongful act. Hence, there can be no doubt that, under general international law, the existence of a causal link between the alleged infringement of obligations under international law and the damage ensuing from it is an indispensable prerequisite for a compensation claim.[311] This general tenet of international law also applies in international investment law. Accordingly, if an obligation under the ECT is not complied with and results in damages to the detriment of the investor, the ECT Contracting Party in question becomes liable to compensate the investor for the damage caused by its wrongful act, and only for that damage.[312]

514.    While the Parties agree that the immediate cause of Project Vega's failure was the lack of financing (Cl. Memorial, para. 193; Cl. PHB, para. 134; Resp. Rejoinder, para. 578), the Parties fundamentally disagree on the relevance of the adoption of the Romani Decree and the Fourth Energy Account in March and May 2011, respectively, in this

---

[309] Articles on Responsibility of States for Internationally Wrongful Acts, Annex to General Assembly Resolution 56/83 of 12 December 2001 (CL-004).

[310] See e.g. *Factory at Chorzów (Germany* v. *Poland)*, Merits, 13 September 1928, PCIJ Series A, No. 17, p. 27.

[311] See Articles on Responsibility of States for Internationally Wrongful Acts. Text and Commentary, ILC Yearbook 2001, Vol. II, 30 (92) (CL-004).

[312] See ibid., 92: "This phrase is used to make clear that the subject matter of reparation is, globally, the injury resulting from and ascribable to the wrongful act, rather than any and all consequences flowing from an internationally wrongful act".

context. The Claimant (see paras. 486 et seq.) argues that the lack of financing was due to the adoption of these legal acts by the Respondent, which triggered a phase of regulatory uncertainty and led to a sharp decrease in FIT, thus severely affecting Project Vega's economic viability and eventually forcing the Claimant to abandon the project. Accordingly, the Claimant considers the Respondent's adoption of the aforementioned acts and the legal instability created by it to be the real reason for the unavailability of financing for Project Vega. In contrast, the Respondent (see paras. 502 et seq.) contends that the project's economic failure was mainly due to the Claimant's own business choices and that therefore no causal link exists between the Romani Decree and the Fourth Energy Account, on the one hand, and the failure of Project Vega on the other.

515.   Both Parties rely on the *Blusun v. Italy* award[313] in support of their arguments, again in a contradictory manner. Whereas the Respondent (see para. 502) considers the relevant facts in the present arbitration to be the same as, or at least widely similar to, those before the *Blusun v. Italy* tribunal, thus permitting the transposition of the legal solution in that case to the present one, the Claimant (see para. 495) argues that the *Blusun v. Italy* award must be distinguished on the facts, mainly claiming that two elements in the factual basis of the case at hand are substantially different from that case. First, while both projects were quite large, the *Blusun* project consisted of 120 small plants with 250 km of cables, as opposed to Project Vega, which consisted of only 5 units with 36 km of cables. Secondly, whereas the *Blusun v. Italy* award dealt with administrative permits issued by localities, Project Vega obtained a Single Authorization issued by the Region of Puglia. Accordingly, in the Claimant's view, Project Vega did not face the same technical and legal challenges as the *Blusun* project.

516.   Indeed, the *Blusun v. Italy* award unanimously concluded:

> In the Tribunal's view, the Claimants have not discharged the onus of proof of establishing that the Italian state's measures were the operative cause of the Puglia Project's failure. Of far greater weight was the continued dependence on project financing, and the failure to obtain it was due both to the size of the Project and to justified concerns about the scope of DIA authorisation, on which the legality of the Project depended. That being so, the claim under Article 10(1) for loss of the Project would fail in any event.[314]

---

[313] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (CL-010).

[314] See ibid., para. 394.

517.   The Tribunal acknowledges the Claimant's efforts to distinguish the factual features of Project Vega from those of the project in the *Blusun v. Italy* case and to relate these allegedly distinct features to the two reasons the *Blusun v. Italy* tribunal specifically offered to explain the lack of a causal nexus between Italy's measures and the failure of that project (i.e. the size of the project and legal concerns regarding the authorizations). In this regard, the present Tribunal accepts that the fact that, on 3 February 2011, the Region of Puglia issued the Single Authorization for the construction of Project Vega[315] constitutes a relevant difference when comparing the two cases. At the same time, in terms of their planned capacity, the two projects are similar (120 MW for the *Blusun* project and 123 MW for Project Vega) and either of them would have constituted (one of) Europe's largest solar plant(s) at the time.[316]

518.   What is decisive for the Tribunal, however, is that the *Blusun v. Italy* tribunal based its conclusion on the finding that the Puglia project "ran a significant risk of incurring legal or administrative difficulties, even if these could be (and in the event largely were) overcome. Its success was by no means certain".[317] Differently put, the *Blusun v. Italy* tribunal found that in that case there were other plausible reasons for the difficulties regarding the attraction of adequate financing, and concluded that the claimants in that case had not succeeded in discharging the burden of proof falling upon them, i.e. that the measures adopted by Italy were the proximate cause of the failure of the project (see para. 516).

519.   The present Tribunal also embraces this approach. At the time when the Romani Decree and the Fourth Energy Account were adopted, i.e. in March and May 2011, respectively, some aspects of Project Vega had already been realized, notably the issuing of the Single Authorization in February 2011, but many others had not. While contractors had been selected for the planned substations and PV plants and solar panels had been acquired around the turn of the year 2010/2011 (see paras. 480-481), the construction works had not yet begun, in spite of the Claimant's submission that, under

---

[315] Decision of the Director of Energy, Network Services and Physical Infrastructures for Development of 3 February 2011, n. 32, Puglia Region Official Gazette, n. 26 (It.), 17 February 2011 (C-032).

[316] See para. 478 and *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 53 (CL-010).

[317] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 386 (CL-010).

its projected construction schedule, Project Vega would have mostly been completed in 2011 and that it decided to accelerate the project (see para. 481; see notably Cl. Memorial, paras. 163, 172).

520.    The Tribunal acknowledges that the early end that the Romani Decree brought to the Third Energy Account was certainly an unfortunate development from the point of view of the Claimant. At the same time, while the FIT under the Third Energy Account were not available due to the 31 May 2011 deadline, it seems that incentive tariffs under the Fourth Energy Account should have been accessible for Project Vega, even if taking into account that the specific modalities under which that energy account would operate were not immediately known when the Romani Decree was adopted in March 2011. They were only officially announced on 5 May 2011 (see para. 129), but were already prepared for by a draft of the Fourth Energy Account issued by the Italian Government on 19 April 2011 (Cl. Memorial, para. 201). If it is true, as expressly argued by the Claimant (see para. 481), that it was prepared to mostly complete Project Vega in 2011, it should have been able to complete and connect the PV plant to the grid by the 29 March 2012 cut-off date set by the Romani Decree for PV plants on agricultural land with a construction permit predating the entry into force of the Romani Decree, as was the applicable rule for Project Vega because of its Single Authorization of 3 February 2011 (see para. 127), even if taking into account a certain delay of some weeks due to the adoption of the new rules.

521.    To make use of the existing time window, it might have been necessary for the Claimant to intensify its efforts to accelerate the construction of the PV plants (which was apparently on the Claimant's agenda anyway; see para. 481) and to familiarize itself with the specific modalities of the incentivization regime under the Fourth Energy Account, including the working of the registers administered by the GSE. The Tribunal notes in this regard that twelve of the Claimant's PV plants have managed to obtain FIT under the Fourth Energy Account (see para. 132).

522.    Yet, according to the Claimant's own submissions (see para. 491), its board concluded in May 2011 that it could not go forward with Project Vega in any variation and had no choice but to abandon the project. This is certainly a legitimate decision for a prospective investor to make, in particular if it concludes that any additional economic input in order to accelerate the project does not make it profitable, and it is not for the

Tribunal to second-guess such decision. At the same time, the prospective investor must also bear the economic consequences flowing from its decision and cannot claim the Respondent has become responsible for it, except if it can establish that the Respondent's adoption of the Romani Decree and the Fourth Energy Account are the proximate cause of the failure of Project Vega.[318]

523. By addressing alternative scenarios, the Tribunal has already indicated that there would have well been other ways for the Claimant to deal with the legal framework for incentive payments, as modified by the Respondent in the spring of 2011. The fact that the Claimant considered these alternatives as resulting in losses and took the entrepreneurial decision of not pursuing a project deemed economically unviable indicates, in the Tribunal's view, quite the opposite of what the Claimant is called upon to prove in order to substantiate its claim. It rather suggests that it was an active choice of the Claimant not to take Project Vega further and that this choice took into account several factors, with the adoption of the Romani Decree and the Fourth Energy Account perhaps being the trigger, but in view of other intervening factors, not the proximate cause of the project's abandonment.

524. This result is corroborated by the Claimant's own submission (Cl. Memorial, para. 198) that, in the wake of the Respondent's adoption of the new measures, AES Sole Italia s.r.l. entered into negotiations with UBS and that UBS expressed interest in granting a EUR 175 million loan. However, in view of the amount of the proposed fees and interest rate as well as of the fact that UBS was not ready to lend the money without security from AES Sole Italia s.r.l.'s parent companies,[319] both the AES Corporation and Riverstone considered the deal too burdensome and eventually decided not to accept these terms.[320] This indicates, in the Tribunal's view, that the direct cause for the abandonment of Project Vega was the inability of the Claimant to secure financing for the project that it considered economically attractive.

525. In addition, the Tribunal observes that the Claimant (see para. 497) seems to accept that smaller PV projects were still able to obtain financing even after the adoption of the

---

[318] See in this regard e.g. Articles on Responsibility of States for Internationally Wrongful Acts. Text and Commentary, ILC Yearbook 2001, Vol. II, 30 (93) (CL-004).

[319] AES Solar Energy, Memorandum to the Board of Directors, 18 May 2011, 4 (C-053); Witness Statement of Claudio Pisi, para. 89.

[320] See Witness Statement of Claudio Pisi, para. 89.

Romani Decree and the Fourth Energy Account, so that these legal acts did not result in the creation of a general deadlock for financing solar projects. Yet, the Claimant maintains that this was still the case for larger PV projects such as Project Vega. The Tribunal would note in this regard that it was the Claimant's business choice to initiate a (for the standards of the time very) large PV project in the first place. In view of the modified legal situation, the Claimant pondered the possibility of reducing the project's size (see para. 490), but eventually decided against it. Once again, this is a legitimate entrepreneurial choice for the Claimant to make, but the Tribunal cannot see how, on this basis, a direct causal nexus can be construed between the Respondent's adoption of the Romani Decree and the Fourth Energy Account and Claimant's decision to abandon Project Vega.

526.   In sum, the Tribunal considers that in the spring of 2011, when the Romani Decree and the Fourth Energy Account were adopted, as stated in the *Blusun v. Italy* award, Project Vega's "success was by no means certain".[321] In view of the various factors involved and the Claimant's own entrepreneurial decision-making in reaction to the decrees adopted as well as the changes of behavior of banks and other business partners, the Tribunal cannot see that the Claimant has successfully discharged its burden of proof of establishing that its problems with obtaining financing for Project Vega were sufficiently clearly linked to the adoption of the Romani Decree and the Fourth Energy Account so as to qualify the latter as the proximate cause for Project Vega's failure. Hence, the Tribunal concludes that, in the absence of evidence establishing the necessary causal nexus, the Respondent cannot be held responsible under international law for the failure of Project Vega.

527.   This finding suffices to reject the Claimant's claim under Article 10(1), first and second sentences, of the ECT regarding Project Vega as unfounded. Accordingly, there is no need for the Tribunal to address the other submissions made by the Parties with respect to Project Vega.

---

[321] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 386 (CL-010).

528.  For the sake of completeness,[322] the Tribunal would, however, recall that Article 10(1), first and second sentences, of the ECT, as has been analyzed previously (see paras. 423 et seq.), protects the Claimant from fundamental or radical modifications of the applicable legal framework. To be sure, the Third Energy Account was supposed to apply to PV plants connected to the grid by 31 December 2013 before the Romani Decree limited its application to PV plants commencing operation by 31 May 2011 (see paras. 125, 127). The Claimant (see para. 493) argues in this regard that the adoption of the Romani Decree, and the ensuing reduction of the incentive tariff payments, the restrictions for PV plants built on agricultural land and the establishment of the GSE registers for which PV operators had to apply, marked a sudden, radical and unforeseeable change in approach to PV plants' eligibility to FIT, thus giving rise to a breach of the fair and equitable treatment standard under the ECT.

529.  The Tribunal does not agree with these arguments. Under the very regime of the Third Energy Account (as well as the previous energy accounts), it was clear that PV operators would not obtain access to FIT before the PV plant in question was completed and connected to the grid. In view of the great dynamism in the renewable energy market and the strong increase of PV operators acceding to incentive payments, a reasonable and circumspect investor would not have relied on the Third Energy Account remaining unchanged for three full years, but would have been prepared for regulatory changes restricting the future access to FIT, notably with respect to (very) large PV plant projects such as Project Vega.

530.  In addition, efforts to avoid excessive reduction of agricultural land were also certainly not unforeseeable for the reasonable and circumspect investor.[323] Moreover, the differentiated legal regime, which the Fourth Energy Account applied in this regard, contained, amongst others, an exception clause that still made access to FIT possible for certain PV plant projects, if connected to the grid by 29 March 2012, and from which

---

[322] *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Award, 4 September 2020, para. 380 (RL-051) focuses on this aspect as the "issue of causation logically becomes relevant only if a breach of duty is first shown. If a State has not violated its treaty obligations with respect to a particular investor and investment, then it does not matter what consequences the State's non-wrongful action may have had for a particular business project". Since the tribunal concludes that Italy did not violate its treaty obligations (see ibid., para. 489), it saw no need to look into the causation issue.

[323] See *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Award, 4 September 2020, paras. 419 et seq. (RL-051).

Project Vega could have profited.[324] This indicates that the measures adopted were not disproportionate in nature.

531.    Accordingly, in the Tribunal's view, the adoption of the Romani Decree and the Fourth Energy Account cannot be considered a fundamental or radical change to the detriment of the Claimant with respect to Project Vega, even less when taking into account that, differently from the situation regarding the *Spalma-incentivi* Decree (see VI.C.) where the Claimant had already acceded to a specific FIT regime by virtue of completing the PV plants in question and connecting them to the grid, here the Tribunal is dealing with a project where the actual construction had not even begun. In this regard, the Tribunal recalls the finding which the *CEF v. Italy* tribunal made in distinguishing the *Blusun v. Italy* case from the situation before it and which the present Tribunal deems to also apply to Project Vega, namely that the Claimant was "still at a preliminary stage of its attempts to invest in the Italian photovoltaic market".[325]

### (3)    Conclusion

532.    For the foregoing reasons, the Tribunal concludes that the Claimant has not successfully discharged its burden of proof of establishing that its problems with obtaining financing for Project Vega were sufficiently linked to the adoption of the Romani Decree and the Fourth Energy Account so as to create the necessary causal nexus and to make the Respondent responsible under international law for the failure of Project Vega. Hence, the Tribunal rejects the Claimant's claim.

### C.    THE FROSINONE PLANTS AND THE ADOPTION OF THE FIFTH ENERGY ACCOUNT

### (1)    The Parties' Positions

#### a.    *Claimant's Position*

533.    The Claimant argues that in late September/early October 2011, it decided to invest in the Cangiano and Santa Maria projects, located in the Italian Province of Frosinone (the so-called "Frosinone plants"). These projects involved the construction of two PV plants, each of them with a peak power slightly below 5 MW (Cl. Memorial, para. 111). According to the Claimant, at the time of the investment decision, the Frosinone plants

---

[324] See ibid., paras. 412 et seq.
[325] *CEF Energia B.V. v. Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, para. 220 (RL-037).

were anticipated to cost approximately EUR 26 million to be put into place[326] (Cl. Memorial, para. 350; Cl. Reply, paras. 183, 187; Cl. PHB, para. 101).

534. The Claimant further submits that its board based its investment decision on the Fourth Energy Account (see para. 129), which was published on 5 May 2011[327] and the content of which the Claimant describes as follows: this energy account applied to PV plants entering into operation between 1 June 2011 and 31 December 2016 and offered FIT depending on the date when a PV plant entered into service. In particular, there were to be several windows during which producers could apply to GSE registers in order to gain access to incentive payments in 2011 and 2012.[328] Producers could apply to be included in the registers before PV plants entered into operation, although this entailed a lower ranking.[329] Registration was not required to gain access to FIT in 2013 or later.[330] Moreover, the owners of large plants that entered into service before 31 December 2012 were entitled to have access to the 2013 incentive payments, with the date of entry into service and the FIT to be memorialized by contract.[331] In addition, the 2011 and 2012 feed-in premiums were subject to national indicative cost targets[332] and the Fourth Energy Account itself was subject to an indicative target of about 23 GW of incentivized capacity or EUR 6 to 7 billion of incentive payments[333] (Cl. Memorial, paras. 112, 114-115).

535. The Claimant further contends that, at the time when it decided to invest in the Frosinone plants, the GSE had provided no guidance to investors on when the aforementioned cost limits would be reached[334] (Cl. Memorial, para. 114; Cl. Reply, para. 189). In particular, the Claimant submits that there is no support for the Respondent's contention (see para. 558) that its cost commitments under the Fourth Energy Account could be monitored daily through the GSE website, even though the

---

[326] See AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, 13 (C-058).

[327] See ibid., 1.

[328] Article 8(2) of the Fourth Energy Account (CL-081).

[329] Ibid., Annex 3-A, art. (h).

[330] Ibid., Article 4(4).

[331] See GSE Implementing Rules for the Fourth Energy Account, December 2011, 10, fn. 2 (CL-081bis).

[332] Article 4(2), Table 1.1 of the Fourth Energy Account (CL-081).

[333] Ibid., Articles 1(2) and 2(3).

[334] See Witness Statement of Claudio Pisi, para. 61.

burden to prove the assertion that the GSE published the relevant cost data falls upon the Respondent.

536.   According to the Claimant, the Respondent presents no contemporaneous documents such as excerpts from the GSE website dating back to the last semester or quarter of 2011, but only documents dating from 2013.[335] Despite the evidence produced during the closing statement on the final day of the Hearing on the Merits (Tr. 26 September 2019, 92:16-22 [Legum]), the Respondent has failed to prove the fact it relies on. The Respondent's position on exactly how often (daily, weekly, monthly) and when the PV counter was updated remains unclear. The only contemporaneous screenshots produced by the Respondent confirm that the counter was activated on 19 October 2011,[336] while the documents referenced from 2012, 2013, 2015 and 2016 provide imprecise statements whose exact relationship to the Respondent's case remains unclear. In any event, as emphasized by the Claimant, the new evidence confirms that as of 1 May 2012, just one week before the connection of the second of the two Frosinone plants to the grid, the total cumulative cost figure published by the GSE was about EUR 5.65 billion[337] and therefore still well short of the lower end of the indicative target (Cl. Reply, paras. 190-193; Cl. PHB, paras. 111-117; Cl. Reply PHB, paras. 29-32).

537.   The Claimant argues that, against this regulatory background, it planned to finish the Frosinone plants in time to qualify for the FIT of EUR 181 per MWh for plants entering into service in December 2011[338] or for the premium of EUR 156 per MWh for plants entering into service in the first half of 2012.[339] At the very least, as the Claimant submits, the PV plants were expected to be commissioned in the first half of 2013 which would have led to a comprehensive FIT including the market price of electricity of EUR 205 per MWh[340] (Cl. Memorial, paras. 113-114; Cl. PHB, paras. 101-102).

538.   According to the Claimant, its subsidiary ASI Frosinone s.r.l. applied to the GSE register at the first opportunity following the Claimant's acquisition of the rights to the

---

[335] Letter from Italy to Silver Ridge Power BV, 26 February 2013, 1 (R-026).

[336] See Slides 36, 41 from Respondent's Closing Statement.

[337] See Slide 39 from Respondent's Closing Statement.

[338] See AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, 1 (C-058); Fourth Energy Account, Annex 5, Table 2 (CL-081).

[339] See AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, 1 (C-058); Fourth Energy Account, Annex 5, Table 3 (CL-081).

[340] See AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, 5 (C-058).

Frosinone plants, i.e. between 1 and 30 November 2011.[341] As predicted by the Claimant, the December 2011 GSE register did not rank the plants in a position that would qualify them for 2011 or early 2012 incentives.[342] The Claimant contends, however, that it had multiple other opportunities under the Fourth Energy Account to apply to the GSE registers or, at a minimum, to accede to the 2013 tariff (Cl. Memorial, para. 115; Cl. Reply, paras. 196-197).

539. The Claimant further argues that only on 20 January 2012 did the GSE issue a press release communicating that the cost limit for large plants (such as the Frosinone plants) had been reached for all of 2012 and, therefore, there would be no GSE register for the second half of 2012.[343] This meant that some EUR 580 million had been committed to the plants already registered.[344] According to the Claimant, this came as a surprise as there was no way to know that the targets for 2012 would be reached so early (Cl. Memorial, para. 116).

540. However, as the Claimant submits, under the Fourth Energy Account it remained entitled to access to the 2013 tariff if the plants were brought into service before 31 December 2012. Against this background, the construction of the Frosinone plants was completed and they went into operation on 7 March 2012 and 9 May 2012, respectively,[345] i.e. while the Fourth Energy Account was still in force. Under the GSE rules implementing the Fourth Energy Account, the PV plants were entitled to access the 2013 FIT, but the respective application had to be filed as from 1 January 2013, not before[346] (Cl. Memorial, paras. 117, 350).

541. On 5 July 2012, the Respondent adopted the Fifth Energy Account (see para. 133). The Claimant argues that this measure drastically reduced FIT for plants exceeding 1 MW in capacity and that the Respondent, in addition, applied the Fifth Energy Account to PV plants which, like the Frosinone plants, had been constructed and brought into service before the Fifth Energy Account's entry into force and which were otherwise entitled to access the FIT for 2013 under the Fourth Energy Account. In particular,

---

[341] See Witness Statement of Claudio Pisi, para. 62.
[342] Ibid., para. 62.
[343] GSE Press Release, 20 January 2012 (C-062).
[344] See Article 4(2), Table 1.1 of the Fourth Energy Account (CL-081).
[345] See GSE Contracts under Fifth Energy Account, 1 August 2013, 1 (C-068).
[346] See GSE Implementing Rules for the Fourth Energy Account, December 2011, 10, fn. 2 (CL-081bis).

according to the Claimant, unlike the Fourth Energy Account's provisions for fixed payments per kWh in addition to the market price of electricity, the Fifth Energy Account provided only for variable payments representing the difference between a nominal minimum price and the market price. In effect, the Fifth Energy Account therefore only guaranteed a minimum price for electricity fed into the grid, with this minimum price being EUR 107 per MWh in the case of the Frosinone plants[347] (Cl. Memorial, paras. 118-119).

542. Moreover, as the Claimant further contends, the Fifth Energy Account required all renewable energy producers benefiting from any energy account to reduce the incentives received to account for a newly invented administrative fee of EUR 0.0005/kWh starting on 1 January 2013,[348] thus negatively affecting all of the Claimant's PV plants in Italy.[349] Furthermore, on 1 January 2015, the calculation method for the fee was changed by virtue of the *Spalma-incentivi* Decree (see para. 138), which according to the Claimant approximately doubled the fee (Cl. Memorial, para. 120; Cl. Reply, paras. 224-225).

543. Moreover, the Claimant argues that, as a consequence of the Respondent's measures, the profitability of the Frosinone plants was eliminated since the revenues provided by the Fifth Energy Account did not even permit for the Claimant's investment to be recovered. In sum, the Frosinone plants do therefore not provide any benefit to the Claimant, and never have (Cl. Memorial, para. 121).

544. On this basis, the Claimant claims a threefold violation of the Respondent's obligations under the ECT.

545. First, the Claimant submits that, when it made its investment in the Frosinone plants, it reasonably expected that these plants would benefit from incentives under the Fourth Energy Account. The sudden and unpredictable enactment of the Fifth Energy Account, however, compromised these plants' profitability and stripped the Claimant of any benefit from its investment. According to the Claimant, the profoundly unfair and inequitable character of the Respondent's measures failed to ensure stability and

---

[347] See GSE Contracts under Fifth Energy Account, 1 August 2013, 1 (C-068).
[348] See Article 10(4) of the Fifth Energy Account (CL-082).
[349] See Witness Statement of Claudio Pisi, paras. 46-47; Witness Statement of Christopher Hunt, para. 46.

transparency of the legal framework since the change from the Fourth to the Fifth Energy Account altered the essential characteristics of the incentives regime, and violated the Claimant's legitimate expectations regarding the Frosinone plants. From the Claimant's perspective, the promises under the Fourth Energy Account gave rise to the reasonable and justified expectation that the Frosinone plants, when built and connected under the Fourth Energy Account, would receive the FIT applicable under that account (Request, para. 54; Cl. Memorial, paras. 344-347, Cl. Reply, para. 184; Cl. PHB, paras. 95, 97, 100).

546.    In this regard, the Claimant rejects the Respondent's argument (see para. 555) that the change from the Fourth to the Fifth Energy Account was foreseeable and transparent and that no legitimate expectation could have been created on the maintenance of tariffs under the Fourth Energy Account because it was known that the duration of that energy account would depend on reaching certain levels of investment. According to the Claimant, the Fourth Energy Account only set an indicative target, but did not fix a threshold based on the disbursement of a certain amount of incentives or provide for an automatic cut-off upon attainment of the threshold. In addition, at the time of making the investment for the Frosinone plants, the GSE had not provided any guidance to investors on when the capacity or cost limits would be reached (see para. 535).

547.    Moreover, the Claimant insists that it did everything it reasonably could to monitor the situation under the Fourth Energy Account (Tr. 24 September 2019, 20:21-21:6 [Hunt]). Based on the information available to it when making the investment decision for the Frosinone plants, the Claimant considered it reasonable to assume that the installed capacity was well below the total threshold of 23 GW envisaged under the Fourth Energy Account and that the corresponding cost of incentives would therefore be far removed from the total cost target of EUR 6 to 7 billion[350] (Cl. Reply, paras. 188-189, 193; Cl. PHB, paras. 104, 107-108; Cl. PHB, para. 118; Cl. Reply PHB, para. 33).

548.    The Claimant further rejects the Respondent's argument (see para. 556) that the Claimant did not qualify for the Fourth Energy Account because it had made the business choice to wait and take the risk that in the meantime thresholds would be reached. The contemporaneous documents show that the Claimant made its investment

---

[350] See Second Witness Statement of Claudio Pisi, para. 29.

decision because the Fourth Energy Account provided for automatic access to 2013 tariff rates without registration prior to the plants' entry into service. It only required that the plants to go into operation before the end of 2012 and that an application be filed on or after 1 January 2013. According to the Claimant, it was only due to the Fifth Energy Account's adoption on 5 July 2012 that the 2013 incentives under the Fourth Energy Account became unavailable to the Frosinone plants. Thus, the Claimant made no decision whatsoever to wait, but it was the Respondent's adoption of the Fifth Energy Account that frustrated the Claimant's legitimate expectations with respect to the Frosinone plants (Cl. Reply, paras. 196-200).

549. Secondly, the Claimant contends that the Frosinone plants were subjected to measures having effect equivalent to nationalization or expropriation in the meaning of Article 13(1) of the ECT and that they do not fall within any of the exceptions defined in subparagraphs a) through d) of that provision. In particular, after these plants were fully constructed and were providing electricity to the grid, the Respondent replaced the Fourth Energy Account with the Fifth Energy Account, thus abandoning the fixed FIT and instead putting into place a price-support mechanism that only paid the difference between the market price for electricity and a specified nominal amount. According to the Claimant, this measure applied retroactively to plants built and entered into service in reliance on the previous incentive regime. As the revenues under the Fifth Energy Account are insufficient to offset the cost of acquiring, constructing and putting into service the Frosinone plants, they cannot generate a positive return for the Claimant. The measures' retroactive character combined with their interference with distinct, reasonable investment-backed expectations thus resulted, in the Claimant's submission, in the transfer of wealth from PV investors to the Italian administration, thus confirming the expropriatory character of these measures (Cl. Memorial, paras. 33, 348-354; Cl. PHB, para. 119).

550. The Claimant further submits that there can be no doubt that the adoption of the Fifth Energy Account dramatically decreased the value of the Frosinone plants. The fact that the plants were later sold to a third party does not prove that they were profitable, but the transaction rather highlights the magnitude of the Claimant's economic loss, with the price paid representing only a small fraction of the cost to build the plants (Cl. Reply, paras. 206-215; Cl. PHB, para. 122).

551.    In addition, the Claimant contends that the Respondent's argument that there is no need to compensate the Claimant since the Fifth Energy Account falls under the definition of a regulatory taking, must fail. According to the Claimant, the Fifth Energy Account is not a regulatory measure as it does not address public welfare objectives such as public health, safety and the environment, which are characteristic of regulatory measures, and in any event, a State's compensation obligation remains, even if regulatory action is at issue. In particular, the ECT does not provide any exception for a regulatory taking. Moreover, there is no consensus among arbitral tribunals that a State may escape its compensation obligation just because it deems its taking "regulatory". Hence, the Claimant insists that it is entitled to full compensation for the indirect expropriation of the Frosinone plants (Cl. Reply, paras. 216-222).

552.    Thirdly, the Claimant argues that the Fifth Energy Account failed to observe the Respondent's obligations with respect to 23 of the 25 plants by unilaterally reducing the incentive payments to compensate for a newly invented GSE administrative fee and by increasing this fee subsequently by virtue of the *Spalma-incentivi* Decree. In so doing, the Respondent effectively modified each of the GSE conventions under the Second, Third and Fourth Energy Accounts, although none of them provided for such a deduction from the incentives paid. The Claimant further submits in this regard that this unilateral deduction from the incentive payments also violated the Claimant's legitimate expectations that the Respondent would respect its promises in the energy accounts to pay a precisely stated rate as an incentive for renewable energy, thus resulting in a breach of the Respondent's obligations under the last and the second sentences of Article 10(1) of the ECT (Cl. Memorial, paras. 355-358; Cl. Reply, paras. 223, 227-231).

### b. *Respondent's Position*

553.    With respect to the Claimant's investment in the Frosinone plants, the Respondent argues that it has already addressed this issue in its letter of 26 February 2013,[351] sent in response to the Claimant's Amicable Letter dating from 21 December 2012.[352] In this letter, the Respondent claims to have indicated to the Claimant that the Fourth

---

[351] Letter from Italy to Silver Ridge Power BV, 26 February 2013 (R-026).

[352] Communication pursuant to Article 26(1) of the Energy Charter Treaty requesting amicable settlement of a dispute, 21 December 2012 (C-001).

Energy Account had fixed a threshold of EUR 6 billion, calling for the adoption of a new energy account once the threshold was exceeded. The Respondent also indicated in that letter that the Fourth Energy Account provided for the publication on the GSE website of the cumulative indicative annual cost of the incentives and that this provision was promptly implemented by the GSE which updated its website on a daily basis. Thus, contrary to what the Claimant states, the passage from the Fourth to the Fifth Energy Account was foreseeable for reasonable investors (Resp. Counter-Memorial, paras. 296-299, 517).

554.    The Respondent further claims that, given the terms of the Fourth Energy Account, the Claimant was aware of the possibility of not being included in the register in a position useful to the admission to the incentive payments. In addition, according to the Respondent, the possibility of not opening the second register of 2012 was known to the operators since this was expressly provided for in the Fourth Energy Account. Hence, the Claimant invested in the Frosinone plants while accepting the risk that the incentives allocated under the Fourth Energy Account would be exhausted due to the achievement of the cost limits set in that energy account and that the legislator could intervene to modify the tariffs to be paid to PV plants (Resp. Counter-Memorial, para. 299; Resp. Reply PHB, paras. 38, 40).

555.    Against this background, the Respondent contends that no legitimate expectations could have been created that the FIT under the Fourth Energy Account be maintained, since it was known that that energy account's duration would depend on reaching certain levels of disbursement of incentive payments (Resp. Counter-Memorial, para. 518; Resp. Rejoinder, paras. 370, 533-534; Resp. Reply PHB, para. 33). In the Respondent's view, the passage from the Fourth to the Fifth Energy Account was always justified by the achievement of the indicated targets and thresholds, was predictable and transparently realized and contemplated safeguard measures to permit a smooth change (Resp. Reply PHB, paras. 32, 35).

556.    According to the Respondent, it was due to the Claimant's business choice that the Frosinone plants did not profit from FIT under the Fourth Energy Account. Had the Claimant managed to qualify for the incentive regime already by the end of 2011, it would have surely been admitted to the rates under that energy account. In the Respondent's view, the Claimant's decision to wait and take the risk that meanwhile

173

the relevant threshold would be reached, was a business choice that cannot be imputed to the Respondent. After all, twelve out of the 25 plants of the Claimant did apply and could benefit from the Fourth Energy Account (Resp. Counter-Memorial, para. 519).

557.   Moreover, the Respondent argues that the Claimant's assertion that there was no way to know that the targets for 2012 would be reached so early is contradicted by the fact that, through the photovoltaic counter, it was possible for the investors to monitor the costs of the PV system (Resp. Rejoinder, para. 543).

558.   The Respondent notably submits with respect to the Claimant's contention that the GSE website was not updated regularly (see para. 535) that, on 19 October 2011, the GSE published on its website, within the "Photovoltaic" section, the value of indicative annual costs of incentives for each energy account.[353] There the contents of the GSE database were explained and it was stated that on that date around 288,000 plants were in operation, corresponding to an installed power of over 11,100 MW and total cumulative costs of approximately EUR 4.9 billion per year[354] (Resp. Rejoinder, paras. 534-535). Furthermore, the Respondent relies on two decisions of the Lazio Regional Administrative Tribunal,[355] according to which it was undisputed that the operators were informed through the so-called photovoltaic counter (*"contatore fotovoltaico"*) of the number of plants that progressively gained access to the incentives, as well as on the decisions of the Italian *Consiglio di Stato* confirming the aforementioned decisions[356] (Resp. Rejoinder, paras. 541-542; Resp. PHB, paras. 71-79).

559.   In addition, as concerns the claim that the Frosinone plants had been constructed and brought into service before the entry into force of the Fifth Energy Account, thus creating a retroactive effect (see paras. 541, 549), the Respondent submits that, according to the GSE Implementing Rules for the Fourth Energy Account, for PV plants such as the Frosinone plants, the relevant date to qualify for the obtainment of the

---

[353] Second Witness Statement of Daniele Bacchiocchi, para. 14.

[354] Press Release, 19 October 2011, Annex 1 to Second Witness Statement of Daniele Bacchiocchi.

[355] Lazio Regional Administrative Tribunal, 2 December 2013, No. 10309, para. 3.1, p. 5 (GRA-53) and 2 December 2013, No.10310, para. 3.1, p. 5 (GRA-54).

[356] Consiglio di Stato, 19 March 2015, No. 1443, para. 4, p. 6 (GRA-9); 19 March 2015, No. 1440, para. 4, p. 6 (GRA-20): "through the monitoring of the s.c. photovoltaic counter, the operators of the sector were able to follow the evolution of the annual cumulative costs of the incentives".

incentive payments (and therefore for the determination of the applicable tariff) was not the date of the plant's entry into operation, but the first day of the semester in which the request was filed at the GSE. Hence, the fact that the Frosinone plants went into service between March and May 2012 is not relevant for the acquisition of the right to obtain the incentive. This is not problematic if one considers that the Fourth Energy Account expressly provided for a cumulative cost limit that, if exceeded, would lead to the adoption of a new energy account (Resp. Rejoinder, paras. 546-547).

560.   Furthermore, the Respondent rejects the second claim regarding the Frosinone plants, i.e. that of indirect expropriation. According to the Respondent, the Claimant cannot establish that there has been a concrete and substantial deprivation of the Claimant's assets. In particular, in order to establish an (indirect) expropriation, it is not sufficient to state that a host State measure has reduced expected incomes, but the operation and the profitability of the asset must have been severely compromised. Furthermore, according to news reports, the Frosinone plants were sold to Cubico Sustainable Investments; if this is true, they must be considered to be profitable. Moreover, even assuming for the sake of argument that there was a significant damage, the Claimant cannot prove a causal link between such alleged damage and the Respondent's acts, since the lack of obtainment of the incentives must be ascribed to the Claimant, who should have been aware of the reaching of the thresholds of the Fourth Energy Account and the consequent passage to the Fifth Energy Account (Resp. Counter-Memorial, paras. 521-533; Resp. Rejoinder, paras. 371, 551-558).

561.   In this regard, the Respondent further contends that it is accepted in investment law doctrine and caselaw that in case of regulatory takings, which, though interfering with the investment, are adopted in a non-discriminatory manner and which aim at generally regulating a matter of public interest, no compensation is required. According to the Respondent, the energy accounts squarely fall into this definition of regulatory takings since the ministerial decrees instituting the energy accounts all constitute general measures having a regulatory nature. Moreover, they did not entail any discrimination between Italian and foreign investors. The public interest underlying the energy accounts is also evident, given the fact that they are designed in a logic of reasonable balance of costs to promote renewable energy, as part of a broader regulatory framework dictated by the EU. Moreover, they seek to take into account the need to

175

avoid excessive reduction of agricultural land. Hence, according to the Respondent, there was no violation of Article 13 of the ECT with respect to the Frosinone plants (Resp. Counter-Memorial, paras. 534-542).

562.    Thirdly, the Respondent also objects to the claim that the imposition by the Fifth Energy Account of an administrative fee on all PV energy producers to cover GSE costs that were previously imposed on the final users violated Article 10(1), last sentence, of the ECT. In particular, the Respondent emphasizes how limited the cost of the fee is, i.e. EUR 0.0005 per kWh, which is approximately 0.15 % of the average of the incentive tariffs, thus an extremely reasonable amount for the activity of the GSE. In this regard, the possibility of off-setting the administrative fee with the amount of incentives payments due by the GSE is merely a modality to collect fees and does not interfere with any contractual obligations (Resp. Counter-Memorial, paras. 543-548; Resp. Rejoinder, 574-576).

563.    The Respondent further submits that the introduction of the GSE administrative fee does not constitute a violation of the Claimant's legitimate expectations since the Respondent never affirmed or made investors believe that it would not impose any new fiscal measures or any fees on administrative costs. In particular, neither the energy accounts nor the GSE conventions expressly stated that administrative fees would be zero. In the Respondent's view, the silence of the law was not sufficient to create in foreign investors a legitimate expectation that an existing regulatory situation would be maintained because otherwise the fair and equitable treatment clause would be transformed into a general clause freezing regulatory activity of a State (Resp. Counter-Memorial, para. 549; Resp. Rejoinder, 563-573).

### (2)    The Tribunal's Analysis

564.    The Claimant's claim regarding the impact of the Respondent's adoption of the Fifth Energy Account on the Frosinone plants is framed in terms of Article 10(1), first, second and last sentences, of the ECT (see paras. 365, 389) as well as of Article 13 of the ECT, which reads in relevant part:

> (1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation […].

565.   The Tribunal will address the fair and equitable treatment claim (a.) and the indirect expropriation claim (b.) regarding the Frosinone Plants as well as the further claim of a breach of the fair and equitable treatment standard and of the umbrella clause of the ECT due to the introduction of an administrative management fee by virtue of the Fifth Energy Account and its subsequent modification by the *Spalma-incentivi* Decree (c.) in turn.

### a.   The fair and equitable treatment claim regarding the Frosinone plants

566.   The Claimant argues that, when it made its investment in the Frosinone plants, it had the reasonable and justified expectation that these plants, when built and connected, would receive the incentive tariffs under the Fourth Energy Account. The sudden and unpredictable enactment of the Fifth Energy Account, however, altered the essential characteristics of the incentives regime and therefore violated the Claimant's legitimate expectations regarding the Frosinone plants, thus violating Article 10(1), first and second sentences, of the ECT (see para. 545).

567.   It has remained undisputed between the Parties that the Cangiano and Santa Maria projects (i.e. the two Frosinone plants) have a capacity of 4.836 and 4.997 MW and, after the relevant construction works had been completed, went into operation on 27 March 2012 and 9 May 2012, respectively (see para. 110). Furthermore, the Fourth Energy Account, when adopted on 5 May 2011, was supposed to apply to PV plants entering into operation between 1 June 2011 and 31 December 2016 (see para. 129).[357] Yet, on 5 July 2012, the Fifth Energy Account (see para. 133) was adopted and entered into force on the day following its publication in the Official Gazette of the Italian Republic on 10 July 2012. According to the terms of the Fifth Energy Account, a limited scope of application (e.g. for small plants) remained for the Fourth Energy Account,[358] but the Frosinone plants were not covered by it and they therefore fell under the regime of the Fifth Energy Account (see para. 135).

568.   Against this background, the Claimant rightly argues that at the moment when the Frosinone plants went into operation, the Fourth Energy Account was in force and that the Fifth Energy Account was only published and entered into force approximately

---

[357] See Article 20(2) of the Fourth Energy Account (CL-081).
[358] See Article 1(4) of the Fifth Energy Account (CL-082).

3 1/2 and 2 months after the respective Frosinone plants' connection to the grid. This timeline certainly distinguishes the present set of facts from that which the Tribunal examined in the previous section where the actual construction of the Project Vega plant had not even begun when the regime existing under the Third Energy Account was modified by the Romani Decree and the Fourth Energy Account (see para. 531).

569. At the same time, the situation also differs from the *Spalma-incentivi* Decree which also affected PV plants that had already acceded to a specific FIT regime (see paras. 138 et seq.). This is not the case with respect to the Frosinone plants. At the time of the adoption and entry into force of the Fifth Energy Account, the Frosinone plants had not yet been admitted to incentive payments under the Fourth Energy Account; in particular the pertinent GSE tariff recognition letters and GSE conventions for the Cangiano and Santa Maria plants had not yet been issued.[359]

570. Nonetheless, the Claimant contends that it had the legitimate expectation that the plants, once built and connected to the grid, would receive FIT under the Fourth, and not the Fifth Energy Account. The Tribunal would recall in this regard that the GSE tariff recognition letters and the GSE conventions are not decisive for the assessment of the legitimate expectations of the Claimant (see paras. 427-428). Insofar as the Claimant can rely on legitimate expectations in the present case, they can only be based upon the pertinent legislative decrees, i.e. Legislative Decree No. 387/2003 and the Romani Decree in combination with the pertinent administrative decrees, in particular the Fourth Energy Account. The Tribunal has already identified the relevant features of the Italian regime for the incentivization of renewable energy above and has concluded that the Claimant could rely on the overall integrity of this incentivization system and could therefore expect to be protected against fundamental or radical changes of this system, but had to be prepared for certain, non-radical modifications of the applicable legal framework (see paras. 424 et seq.). This also holds true with regard to the Claimant's claim regarding the Frosinone plants inasmuch as it is based on Article 10(1), first and second sentences, of the ECT.[360]

---

[359] See Agreements for the Payment of Subsidized Rates for Electricity produced by Photovoltaic Conversion from a Solar Source, 1 August 2013 (C-068).

[360] As regards the indirect expropriation claim see paras. 608 et seq.

571.   Furthermore, when assessing whether the Respondent frustrated this legitimate expectation by adopting the Fifth Energy Account, the Tribunal recalls that, in order to strike the proper balance between the Claimant's interest in the stability of the legislative and regulatory framework and the Respondent's right to adapt it to new developments, three factors are to be taken into account, namely whether the adopted measures were (i) reasonable, (ii) foreseeable and (iii) proportionate (see para. 446).

### (i) Reasonableness

572.   In terms of reasonableness, i.e. whether or not the modifications brought about by the Fifth Energy Account could draw on a public policy purpose, the Tribunal refers to its analysis above which is also applicable in the present context (see paras. 447 et seq.).[361] Thus, the Tribunal is satisfied that the Respondent, when adopting the Fifth Energy Account, could plausibly claim to act on the basis of legitimate public policy objectives, notably strengthening the sustainability of the incentive tariff scheme for renewable energy in a situation of economic difficulty.

### (ii) Foreseeability

573.   As regards, secondly, the question of whether the changes brought about by the Fifth Energy Account could have been expected by the Claimant, the Tribunal takes note of the Claimant's submission that, while in the previous energy accounts, the date of entry into operation of a PV plant was decisive for its access to incentive payments, the Fifth Energy Account modified this system. The Tribunal considers, however, that this aspect calls for further analysis.

574.   Pursuant to Article 6(2) of the Fourth Energy Account, "large plants that come into operation by 31 August 2011 have direct access to the feed-in tariffs, without prejudice to the obligation to communicate to the GSE of the plant's commissioning within 15 calendar days from this date".[362] In view of the fact that "large plants" essentially meant PV plants having a capacity of more than 1 MW[363] (see para. 129) and that the two Frosinone plants thus qualified as large plants, they would have indeed had access to FIT under the Fourth Energy Account, had they come into operation 7 or 8.5 months

---

[361] See also Recitals 13 et seq. of the Fifth Energy Account (CL-082).

[362] Article 6(2) of the Fourth Energy Account (CL-081).

[363] See also Article 3(1)(u) and (v) of the Fourth Energy Account (CL-081).

earlier, i.e. before the 31 August 2011 deadline (not considering for the moment that the adoption of the Fifth Energy Account modified this deadline).

575.   However, already the Fourth Energy Account provided for a modified regime for large plants not covered by Article 6(2). According to Article 6(3),

> [f]or the years 2011 and 2012, the large plants that are not covered by subparagraph 2, can access feed-in tariffs if they satisfy both of the following additional conditions:
>
> a)   the plant has been entered into the register pursuant to Art. 8 in such a position as to be within the specific cost limits defined for each of the reference periods mentioned in Art. 4, paragraph 2. To this end, the cost limit for 2011 is inclusive of the costs related to the promotion of large plants that entered into operation by 31 August 2011. If all incentive costs for the large plants that entered into operation by 31 August 2011 and that entered into the register pursuant to Art. 8 for the year 2011 exceed the limit of expected cost for the same period, the excess cost will reduce the cost limit for the second half of 2012;
>
> b)   the certificate of work completion regarding the plant is to be sent to GSE within seven months from the date of publication of the ranking pursuant to Art. 8, paragraph 3; the above term is increased to nine months for plants generating power greater than 1 MW.

576.   It was therefore clear from the adoption of the Fourth Energy Account that, in order for large PV plants with a date of entry into operation after 31 August 2011 – such as the Frosinone plants – to have access to FIT under that energy account, it was a constitutive requirement, over and above the plant's entry into operation, that it be included in the GSE register in an appropriate position. As can be seen from the above-quoted provision, the Fourth Energy Account contained a differentiated regime in this regard which is further detailed in Article 8 ("Enrollment in the register for large plants"), providing for several periods of enrollment in 2011 and 2012 (see para. 130). In particular, the question of whether and to what extent further periods of enrollment in the register were to be reopened, depended on whether there was further availability within the semi-annual cost limits laid down in Article 4(2) of the Fourth Energy Account.[364]

577.   Hence, producers who sought to qualify for FIT under the Fourth Energy Account with a PV plant project that was to enter into operation after 31 August 2011 (as is the case

---

[364] See in particular Article 8(2) in conjunction with Article 4(2) of the Fourth Energy Account (CL-081).

here, as evidenced by the Claimant's own submission regarding the decision to invest having been taken in late September/early October 2011; see para. 533), were aware that the possibility of doing so depended on obtaining a promising ranking in the register for large plants. This in turn depended on the development of the market, in particular on the number and size of PV projects with a better ranking that had successfully qualified for access to incentive payments. Article 6(3)(a) of the Fourth Energy Account leaves no doubt that, if the incentive cost for (i) the large plants that entered into operation by 31 August 2011 and (ii) those that entered into the register pursuant to Article 8 for the year 2011 exceeds the limit of expected cost for the same period (i.e. an installed capacity of 1,200 MW, corresponding to a cost threshold of EUR 300 million[365]), the excess cost would reduce the cost limit for the second half of 2012. This signifies, and was evident also for PV producers, that a very active market in the first months of operation of the Fourth Energy Account would imply more limited possibilities to accede to FIT for those PV plants meeting the requirements set by the Fourth Energy Account only at a later stage. This particularly holds true with respect to the Frosinone plants since the Claimant was well aware that, while applying to the GSE register in November 2011, "the plants did not qualify in a position granting access to the tariff, because of their early stage of development",[366] that "the registration required for the 2011 or 2012 tariffs was unlikely because there was 'a large backlog of plants with very old permit dates'",[367] and that because of a transgression of the applicable cost limits, the register for large plants might not be reopened for the second half of 2012 (see para. 589), thus leaving the Claimant only with the option of acceding to the 2013 tariff (see paras. 581 et seq.).

578.  This result is not called into question by Article 6(4) of the Fourth Energy Account according to which "[i]n all cases, the payable feed-in tariff is the one existing at the date of entry into operation of the plant". This only means that under paragraph 2 as well as paragraph 3 of Article 6 (see paras. 574-575), i.e. in "all cases", the amount of the FIT to be granted to the PV producer would be the one existing at the date of the

---

[365] See Article 4(2) of the Fourth Energy Account, Table 1.1 ("1/06/2011-31/12/2011") (CL-081).

[366] See Witness Statement of Claudio Pisi, para. 62.

[367] Cl. Reply, para. 196, referring to AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, 7 (C-058).

respective plant's entry into operation, but only if the requirements, set by Article 6(3) as to whether the respective PV plant qualified for FIT in the first place, were met.

579.   Thus, already the Fourth Energy Account, on which the Claimant seeks to base its legitimate expectations (see para. 545), provided for a differentiated regime that made the date of entry into operation a necessary, but not sufficient, condition for the access of large plants such as the Frosinone plants to FIT under that energy account. In this context, the Tribunal recalls its observation, made with respect to the changes brought about by the *Spalma-incentivi* Decree and their relevance for the Claimant's legitimate expectations (see para. 456), that at no moment in time was the energy accounts' approach of applying the reduced incentives only to newly admitted PV plants part and parcel of the investor's legitimate expectations. For the reasons explained before, the Tribunal considers this reasoning to apply also and with even greater force in the present context.

580.   Indeed, nowhere in the pertinent legislative acts or administrative decrees is there a guarantee or promise that a PV plant would have access to FIT exclusively depending on the date of its completion or entry into operation. To the contrary, it has become clear that the Fourth Energy Account provided for a differentiated regime for large plants entering into operation after 31 August 2011 (such as the Frosinone plants) which made FIT access additionally dependent on an appropriate ranking in the register. Hence, the admission of PV plants to the energy account in force at the moment of entry into operation of the respective plant under earlier energy accounts (a system already considerably modified by the Fourth Energy Account) must not be confounded with a legal guarantee on the part of the Respondent that, at the moment when a PV plant enters into operation, it will have access to FIT under the energy account in force. Such immunization of the *status quo* from following modifications would require a stabilization or freezing clause which cannot be found anywhere in the pertinent legislative or regulatory acts. As demonstrated in the previous paragraph, rather the opposite holds true for the Fourth Energy Account. Hence, the Claimant could not have a legitimate expectation protected under the fair and equitable treatment clause of the ECT that the Frosinone plants would accede to FIT under the Fourth Energy Account solely by virtue of the fact that they entered into operation at a moment when the Fourth Energy Account was in force.

581.    The question remains whether it was foreseeable for the Claimant that the Frosinone plants would not be able to accede to the Fourth Energy Account at all, even not to the 2013 tariff, which was due to the early termination of that energy account (originally planned to apply to PV plants entering into operation between 1 June 2011 and 31 December 2016; see para. 129) by the adoption of the Fifth Energy Account. In the Claimant's view, this question becomes even more urgent in view of the fact that the Fifth Energy Account was only adopted and entered into force in July 2012, i.e. at a moment in time when the Frosinone plants had already entered into operation.

582.    To begin with, the Tribunal observes that the reduction of the incentivization period of one energy account by the adoption of its successor was not new. As already discussed in the context of the Project Vega claim (see paras. 528 et seq.), the very Fourth Energy Account on which the Claimant seeks to base its legitimate expectations regarding the Frosinone plants (see para. 545), shortened the originally envisaged end-date for the application of the Third Energy Account, i.e. 31 December 2013, to 31 May 2011. Accordingly, the very genesis of the Fourth Energy Account had made the investor community familiar with this mechanism.

583.    Moreover, a further characteristic feature of the Fourth Energy Account was that it introduced an indicative target of installed power at the national level of about 23 GW, which corresponded to an indicative cumulative cost of incentives estimated to be between EUR 6 and 7 billion[368] (see para. 131). In addition, Article 2(3) of the Fourth Energy Account stated that, upon reaching the lower level of the annual cumulative cost value, the incentive arrangements referred to in the Fourth Energy Account may be revised by decree of the Minister of Economic Development in agreement with the Minister of the Environment of the Territory and the Sea, having heard the Joint Conference, in each case favoring the further development of the sector.[369]

584.    Article 1(1) of the Fifth Energy Account specifically refers to Article 2(3) of the Fourth Energy Account[370] as does the preamble of the Fifth Energy Account.[371] Furthermore, this preamble stated that the estimated cumulative costs of incentives had reached an

---

[368] See Article 1(2) of the Fourth Energy Account (CL-081).
[369] See ibid., Article 2(3) (CL-081).
[370] See Article 1(1) of the Fifth Energy Account (CL-082).
[371] See ibid., Recital 6 (CL-082).

amount of EUR 5.6 billion at the end of March 2012 and that it had therefore been considered appropriate to intervene in due time.[372]

585.   In the Tribunal's view, this offers a clear indication that the thresholds laid down in Article 1(2) of the Fourth Energy Account would be reached not even a year after its adoption and therefore long before the originally stated end-date of 31 December 2016. This testifies to the enormous dynamism that was to be observed in the Italian solar energy market at the time, with a massive number of PV plant projects crowding to obtain access to the incentive payments. What reasonable and circumspect investors could, and should, have therefore taken from the overall situation is the insight that the market for PV energy in Italy was on its way to maturity and that, in such dynamic and volatile circumstances, regulatory interventions were to be expected, not only long before 31 December 2016, but already in spring 2012 when the reaching of the thresholds set by the Fourth Energy Account itself became imminent.

586.   The Tribunal harbors no doubt that the estimated cumulative costs of incentives had actually reached an amount of EUR 5.6 billion at the end of March 2012, as stated in the preamble of the Fifth Energy Account (see para. 584), and that the reaching of the aforementioned indicative cost threshold could therefore be expected to be merely a matter of weeks or a few months.

587.   In this context, the Tribunal notes that the Parties have made extensive submissions (see paras. 535, 558) as to whether, and to what extent, the GSE has complied with the obligation under Article 24(2) of the Fourth Energy Account ("Publication of the date on accumulated powers and on costs"), which reads: "The GSE publishes on its website and continuously updates the value of the costs of the incentives as per Art. 3, paragraph 1, letters z) and aa), as well as the values of applicable tariffs in each period".[373]

588.   In spite of the conflicting evidence submitted by the Parties on the frequency of updates of the so-called "photovoltaic counter" (*"contatore fotovoltaico"*) administered by the GSE, the Tribunal observes that eventually there is little to gain for the Claimant's case by referring the Tribunal to possible violations by the GSE of Article 24(2) of the Fourth Energy Account. The Tribunal would refer to the testimony of Mr. Bacchiocchi and a

---

[372] See ibid., Recital 7 (CL-082).
[373] Article 24(2) of the Fourth Energy Account (CL-081).

press release of 19 October 2011,[374] according to which at that time around 288,000 PV plants were in operation, corresponding to an installed power of more than 11,110 MW and a total cumulative annual cost of approximately EUR 4.9 billion. Already this contemporary document sufficed to alert a reasonable and circumspect investor that the cumulative annual costs were continuously, and rapidly, increasing.

589. Furthermore, the Claimant itself (see para. 539) concedes that, on 20 January 2012, the GSE issued a press release communicating that the cost limit for large PV plants had been reached for all of 2012.[375] In addition, the GSE announced that, under the regime of the Fourth Energy Account, the incentive costs for large PV plants that entered into operation by 31 August 2011 as well as for those PV plants that entered into the register for the year 2011 amounted to EUR 1 billion, which is more than three times as much as the EUR 300 million cost limit set by Article 6(3)(a) in conjunction with Article 4(2) of the Fourth Energy Account for that period (see para. 577). By virtue of the latter provision, the excess cost was to be deducted from the cost limit for the second half of 2012, which was thereby reduced to zero, and the register for large PV plants for that period was therefore not to be opened.[376] The vast amount by which the cost limit set by the Fourth Energy Account for the period of June to December 2011 was exceeded offered just another strong indication to the investor community that the market was already highly dynamic during the first semester of the Fourth Energy Account's operation.

590. Against this background, the Tribunal is satisfied that, for the purpose of the foreseeability analysis it has to undertake, relevant information was both available and accessible for interested PV producers in order to realize that the costs for the incentivization of solar energy were rapidly increasing in the relevant period and approaching the thresholds set by the Fourth Energy Account, thus making an intervention of the Italian authorities foreseeable. Moreover, had a circumspect investor observed that the GSE website – contrary to Article 24(2) of the Fourth Energy Account – was not updated regularly in those critical months, it would have been easy to contact

---

[374] See Second Witness Statement of Daniele Bacchiocchi, para. 14; Press Release of 19 October 2011, Annex 1 to the Witness Statement (https://www.gse.it/servizi-per-te_site/news_site/Pagine/QUARTO-CONTO-ENERGIA-ATTIVATO-IL-CONTATORE-DEL-COSTO-INDICATIVO-ANNUO-DEGLI-INCENTIVI.aspx). See also Tr. 25 September 2019, 99:2-21, 153:1-5, 154:11-15 (Bacchiocchi).

[375] See GSE Press Release, 20 January 2012 (C-062).

[376] See ibid.

the GSE on this important issue. However, in the present proceedings, the Claimant has neither argued that it has approached the GSE nor that the GSE, once contacted, would have refused, or delayed, to provide the necessary information.

591. The Tribunal would add that the Lazio Regional Administrative Tribunal considered it undisputed that the PV plant operators were informed through the photovoltaic counter of the number of plants that progressively gained access to the incentives,[377] and that the *Consiglio di Stato*, Italy's highest judicial authority in administrative matters, confirmed these decisions, notably stating that "through the monitoring of the s.c. photovoltaic counter, the operators of the sector were able to follow the evolution of the annual cumulative costs of the incentives".[378]

592. Furthermore, the Lazio Regional Administrative Tribunal found that the Fourth Energy Account would "exclude any chance of legitimate expectations, given that the operators were well aware of the fact that the tariffs of the fourth account were subject to a limit, not merely a time limit, but a limit regarding the level of costs of the incentives, which were also periodically monitored with the 'photovoltaic counter' so that operators could promptly be informed of the situation".[379] The Tribunal is well aware that it is not legally bound by the findings of the competent national courts, but will take their decisions into consideration whenever appropriate (see para. 375). The Tribunal sees no reason whatsoever to put these findings into doubt. Accordingly, the Tribunal concludes that, in the period between fall 2011 and spring 2012, it was manifest for the reasonable and circumspect investor that the cumulative annual costs of incentives were quickly increasing and approaching the cost limits set by Article 1(2) of the Fourth Energy Account, reaching an amount of EUR 5.6 billion at the end of March 2012.

593. More recently, and conclusively, the *Consiglio di Stato* stated in a 2016 decision:

> And therefore, as noted by the Council of State (see, in particular, sent. N. 1443 of 2015, cit.), [i]t appears that the operators of the sector have not only been warned of the possibility of a reduction in the benefits granted starting since 2011, but have also been placed, both through the control of

---

[377] See Lazio Regional Administrative Tribunal, 2 December 2013, No. 10309, para. 3.1, p. 5 (GRA-53) and 2 December 2013, No.10310, para. 3.1, p. 5 (GRA-54).

[378] Consiglio di Stato, 19 March 2015, No. 1443, para. 4, p. 6 (GRA-9); see also 19 March 2015, No. 1440, para. 4, p. 6 (GRA-20).

[379] Lazio Regional Administrative Tribunal, 2 December 2013, No. 10309, para. 4, p. 6 (GRA-53) and 2 December 2013, No.10310, para. 4, p. 6 (GRA-54).

the so-called photovoltaic meter (published on the website of the GSE, which periodically gave an account of the number of plants that received the incentives and the related annual cost supported), and through specific publications on the official website of the GSE (such as that of 20 January 2012, entirely relevant in this case, with which the failure to open the register for the second half of 2012 was announced, due to the exhaustion of its availability pursuant to Article 6, paragraph 3, of Ministerial Decree 5 May 2011), in the concrete condition to follow the evolution of the annual cumulative costs of the incentives and to make their own appraisals of convenience in view of the approaching moment from which, once the six billion euro limit has been reached, the incentive methods could have been revised.[380]

594.   While the quoted rulings of Italian domestic courts are not binding upon the Tribunal (see para. 375), they are nonetheless worth being considered by it, in particular inasmuch as they confirm the Tribunal's interim conclusion (see para. 590) that in the first semester of the Fourth Energy Account's operation interested PV producers had access to relevant information in order to become aware that the costs for the incentivization of solar energy were rapidly increasing and approaching the thresholds set by the Fourth Energy Account, thus making an intervention of the Italian authorities foreseeable for a reasonable and circumspect investor.

595.   Contrary to the Claimant's submission (see para. 546), the question for the Tribunal is not at what moment in time the cumulative annual cost of incentives reached an amount of EUR 6 billion (which corresponds to the lower threshold set by Article 1(2) of the Fourth Energy Account), whether there existed under that energy account an automatic cut-off mechanism upon attainment of a certain threshold or whether the transition from the Fourth to the Fifth Energy Account occurred exactly in the manner and procedure provided for by Article 2(3) of the Fourth Energy Account. As already clarified by the Tribunal (see paras. 431 et seq.), the pertinent Italian legal framework on the incentivization of PV energy has indeed given rise to legitimate expectations upon which the Claimant could rely under the fair and equitable treatment standard of the ECT. Yet, as also explained above, these legitimate expectations do not protect the Claimant against a deviation from every single provision contained in the pertinent administrative decrees, but only against fundamental or radical changes of the applicable legal framework.

---

[380] Consiglio di Stato, No. 11922/2016; see Respondent's Closing Statements, 26 September 2019, slide 42; Resp. PHB, para. 76.

596.    In the light of these reasons, the Tribunal cannot but conclude that the changes brought about by the Fifth Energy Account that resulted in the Frosinone plants' not qualifying for FIT under the Fourth, but the Fifth Energy Account, were foreseeable for a reasonable and circumspect investor.

597.    This conclusion need not be modified in view of the Claimant's reliance (see para. 540) on the GSE Implementing Rules for the Fourth Energy Account according to which

> [i]n case of large PV plants that entered into operation between 31 August 2011 and 31 December 2012, without being registered within the specific costs limits of the relevant period, the Responsible Entities will be entitled to request admission to the incentives from the year 2013 and a fictitious date of entrance into operation will be established to determine the applicable feed-in tariff and the beginning of the incentive period, that is the first day of the semester in which the request is filed at the GSE.[381]

598.    As indicated before, the legitimate expectations relevant in the present case do not protect the Claimant against a deviation from every single provision of the applicable legislative or administrative decrees, but only against fundamental or radical changes of the applicable legal framework. Accordingly, in no manner whatsoever could the Claimant derive from this phrase a guarantee on the part of the Respondent that, when filing an application from 1 January 2013 on, the respective PV plants would be entitled to access for the 2013 incentive tariffs of the Fourth Energy Account.

599.    As a final observation on this point, it is not for the Tribunal to decide whether, as contended by the Respondent and rejected by the Claimant (see paras. 556 and 548), it was a business choice of the latter to wait and take the risk that in the meantime the pertinent thresholds would be reached, as this question is immaterial to the case at hand. The same holds true with respect to the fact that twelve of the PV plants subject to the present arbitration have managed to be covered by the Fourth Energy Account (see para. 132). The question to be answered here is whether it was foreseeable for a reasonable and circumspect investor at the time that, in light of the highly dynamic development of the market and its direct implications for the overall costs of Italy's incentivization regime for renewable energy, the Respondent would intervene and modify the existing regulatory framework already with effect for PV plants coming into

---

[381] See GSE Implementing Rules for the Fourth Energy Account, December 2011, 10, footnote 2 (CL-081bis).

operation in the spring of 2012, and the Tribunal answers this question in the affirmative.

### (iii) Proportionality

600.    Thirdly, the Tribunal is called to assess whether the modifications brought about by the Fifth Energy Account with respect to the Frosinone plants are proportionate, i.e. whether they did not exceed what was necessary to reach the purposes of that regulatory act.

601.    In this regard, the Tribunal observes that the Fifth Energy Account entailed both a qualitative and a quantitative change in the existing incentivization regime. The Claimant (see para. 541) is correct to turn the Tribunal's attention to the fact that, unlike the Fourth Energy Account and its predecessors which provided for fixed payments per kWh in addition to the market price of electricity, the Fifth Energy Account awarded large PV plants such as the Frosinone plants an amount equal to the difference between the all-inclusive tariff, as laid down in Annex 5 to the Fifth Energy Account, and the market price of electricity plus the revenues deriving from the sale of the energy on the market[382] (see para. 133 et seq.). The Tribunal further notes the testimony of the Respondent's legal expert, Professor Rojas at the Hearing on the Merits that, "when the system switched from Energy Account IV and Energy Account V, there was a change in the paradigm of the incentive scheme, which was not considered any longer as a pure subsidy, but now the tariff became granting a minimal price" (Tr. 25 September 2019, 55:12-17 [Rojas]). In a similar vein, Mr. Miraglia testified at the Hearing, as follows: "In the Fifth Energy Account the mechanism changed towards a sliding feed-in premium" (Tr. 24 September 2019, 218:10-11 [Miraglia]). And he added: "So it changed the kind of mechanism" (Tr. 24 September 2019, 218:20-21 [Miraglia]).

602.    The Tribunal does not consider, however, that this change in the remuneration system, albeit noteworthy, resulted in a genuine overhaul of the existing practices of incentivization of solar energy in Italy. After all, the PV producers still received a payment per unit produced, which was raised if the electricity was consumed on site.[383] Moreover, it deserves mention that, as the Claimant itself concedes (see para. 537), the

---

[382] See Article 5(1) of the Fifth Energy Account (CL-082).
[383] See ibid., Article 5(1).

2013 tariff of EUR 205 per MWh under the Fourth Energy Account, to which the Claimant wished to have acceded, provided (in contrast to the 2011 and 2012 tariffs) both for a comprehensive FIT including the market price of electricity and a special tariff for self-consumed energy,[384] thus indicating that no fundamental or radical change could be observed in the transition from the Fourth to the Fifth Energy Account. Against this background, the afore-quoted statements of Mr. Rojas and Mr. Miraglia do not, in the Tribunal's view, provide a conclusive basis for the Claimant's contention (Cl. PHB, para. 97) that the replacement of the Fourth by the Fifth Energy Account altered the essential characteristics of the Italian incentives regime for solar energy nor can the Respondent be understood to have accepted this at any point during the proceedings.

603.    Furthermore, the Tribunal acknowledges that, in quantitative terms, the Fifth Energy Account – as its predecessors – entailed a reduction in the level of FIT payments. In the case of the Frosinone plants, the applicable all-inclusive tariff was set by the Fifth Energy Account at EUR 107 per MWh,[385] which led to a substantial decrease[386] in the incentives from which the Frosinone plants could profit, compared with the scenario in which they would have been admitted to the 2013 tariff under the Fourth Energy Account, which amounted to EUR 205 per MWh for facilities such as the Frosinone plants.[387] According to the Claimant's economic experts, this generated historical losses of EUR 1.32 million and future losses of EUR 14.10 million, i.e. total losses of EUR

---

[384] See Annex 5, Table 4 ("Other photovoltaic plants"; "1000 < P < 5000") of the Fourth Energy Account (CL-081).

[385] See GSE Conventions under the Fifth Energy Account, 1 August 2013, Article 4(1)(a) (C-068); see also Annex 5 of the Fifth Energy Account (CL-082).

[386] See in this regard also First Experts' Statement on Economic and Financial Issues of Damage Compensation Alleged by the Claimant, Prof. Enrico Laghi and Prof. Corrado Gatti, 2 February 2018, 17: "[…] the new EA [i.e. the Fifth Energy Account] was intended to lead the sector to grid parity in a context in which costs had to be strongly contained. […] It is worthy to underline that it was the largest decrease, as a percentage, on the previous EA".

[387] See Annex 5, Table 4 ("Other photovoltaic plants"; "1000 < P < 5000"; "All-inclusive Tariff") of the Fourth Energy Account (CL-081); see also AES Solar Energy, Investment Memorandum to the Board of Directors, 30 September 2011, 1 (C-058).

See, however, also Article 4(4) in conjunction with Annex 5, Table 5 of the Fourth Energy Account (CL-081), providing for reductions of the incentive payments if the indicative cost limits as defined in Table 1.2 are exceeded; as regards the massive rise in FIT during 2011, clearly exceeding the cost limit of EUR 580 million set for 2011 and 2012 together (Article 4(2) of the Fourth Energy Account, Table 1.1), see para. 589.

15.42 million.[388] These figures were subsequently lowered to historical losses of EUR 1.31 million and future losses of 12.02 million, i.e. total losses of EUR 13.33 million.[389]

604.    When placing the changes brought about by the Fifth Energy Account in a broader context, the Tribunal notes that that energy account, for instance, privileged small PV plants as well as integrated PV plants with innovative features and concentrated plants (Titles III and IV of the Fourth Energy Account) in the sense that under certain conditions the provisions of the Fourth Energy Account, and thus more attractive incentive tariffs, would apply to those plants.[390] The Tribunal accepts this as a legitimate policy choice on the part of the host State,[391] with the categories of privileged plants, as should be underscored, not being newly introduced by the Fifth Energy Account, but taken from the Fourth Energy Account with which the investor community was already familiar.[392] In view of the rapid increase in the overall amount of incentivized energy, which made certain prioritizations necessary, it appears to the Tribunal as a sound approach to privilege PV plants with innovative features which meet special technical standards.[393] In a similar vein, the Tribunal deems it reasonable in such a situation to offer small plants a better deal than large plants such as the Frosinone plants with a combined capacity of 10 MW, since this involves advantages for smaller, and often economically weaker plants. A lesser reduction in the incentive tariffs for large plants would have restricted the ability of the Respondent to apply relatively better incentive tariffs to those plants that should be prioritized by the Fifth Energy Account.

605.    What is decisive, in the Tribunal's view, is the enormous dynamism of the market in the months preceding the adoption of the Fifth Energy Account. The Tribunal accepts

---

[388] See First Expert Report of Dr. Boaz Moselle and Dr. Ronnie Barnes, 29 September 2017, paras. 148 et seq., 155 et seq., Tables 13 and 14.

[389] See Second Expert Report of Dr. Boaz Moselle and Ms. Ruxandra Ciupagea, 22 March 2019, para. 3.5, Table 2.

[390] See Article 1(4) of the Fifth Energy Account (CL-082).

[391] See also para. 466.

[392] See First Experts' Statement on Economic and Financial Issues of Damage Compensation Alleged by the Claimant, Prof. Enrico Laghi and Prof. Corrado Gatti, 2 February 2018, 18-19: "Only large, ordinary PV plants that had not obtained a registration in the GSE 2012 ranking list and were not installed on property belonging to the Public Administration could not, under any circumstances, qualify for the 4th EA, and were subject to the rules of the 5th EA, even if they commenced operations before 27 August 2012. This specification, though probably not liked by some investors, simply followed an earlier orientation emerging from what [was] announced before and specified by the 4th EA".

[393] See in this regard Title III of the Fourth Energy Account (CL-081).

the Respondent's contention that it sought to act swiftly and effectively in order to avoid that the total amount of incentivized energy would exceed the thresholds set out in the Fourth Energy Account and thus to maintain the sustainability of the incentivization regime for solar energy. In view of this important public policy objective, the massive dynamism in the market which called for swift and effective action on the part of the authorities, as well as the legitimate choices the authorities made in prioritizing certain PV plants over others, it strikes the Tribunal as at least plausible that the substantial reduction in incentive rates which the Fifth Energy Account entailed for large PV plants such as the Frosinone plants, that would have otherwise qualified for the 2013 tariffs under the Fourth Energy Account, did not exceed what was necessary to achieve that goal in the circumstances of the case.

*(iv) Conclusion*

606.   Hence, while the Tribunal would accept that the extent of reduction in FIT which the Fifth Energy Account entailed for the Frosinone plants is a disturbing factor in assessing the compatibility of that energy account with the fair and equitable treatment standard under Article 10(1), first and second sentences, of the ECT, this aspect is, in the Tribunal's view, compensated for by the qualified presence of other factors, notably the fact that the changes were foreseeable for reasonable and circumspect investors and that the changes, while involving relevant quantitative reductions, maintained the overall structure and the essential elements of the Italian incentivization regime for solar energy.

607.   As to the effort, mandated by this very provision (see paras. 411 et seq.), to strike a proper balance between the Claimant's interest in being able to operate in a stable and transparent legal framework over time and the Respondent's interest in being able to adapt its legal framework to new developments, the Tribunal concludes that the Respondent was justified in adopting the Fifth Energy Account and that the changes it brought with respect to the Frosinone plants were, considering all relevant elements of the case, reasonable, foreseeable and proportionate and did not constitute a fundamental or radical alteration of the applicable legal framework. Thus, the corresponding legitimate expectation of the Claimant was not frustrated and the fair and equitable treatment claim regarding the Frosinone plants must be rejected.

### b. *The indirect expropriation claim regarding the Frosinone plants*

608.  As regards the further claim that the Frosinone plants were subject to measures having effect equivalent to nationalization or expropriation in the meaning of Article 13(1) of the ECT, i.e. an indirect expropriation, because the adoption of the Fifth Energy Account dramatically decreased the value of the Frosinone plants (see paras. 549-550), the Claimant has relied on the *Electrabel v. Hungary* decision, according to which, for an indirect expropriation to be realized, the measures adopted by the host State must have effected a "substantial, radical, severe, devastating or fundamental deprivation of [the investor's] right or the virtual annihilation, effective neutralization or factual destruction of its investment, its value or enjoyment".[394]

609.  Applying this jurisprudence to the case at hand, the Tribunal considers that, at the moment of adoption and entry into force of the Fifth Energy Account in July 2012, the Claimant's investment with respect to the Frosinone plants essentially consisted in the completed PV plants. Having this in mind, the Tribunal cannot see how the Fifth Energy Account would have, even in an indirect manner, annihilated, neutralized or factually destroyed this installation or its value as it existed at that moment in time.

610.  The argument that the Claimant seeks to make, by raising its claim of indirect expropriation, appears to be that the adoption of the Fifth Energy Account withdrew the possibility from the Claimant of having access to the 2013 tariff under the Fourth Energy Account and brought the Frosinone plants under the regime of the Fifth Energy Account instead. Yet, at the moment of the adoption and entry into force of the Fifth Energy Account, accession to the 2013 tariff was a mere aspiration on the part of the Claimant, but not a "right" in the meaning of the *Electrabel v. Hungary* decision, of which the Claimant would have been deprived. Differently put, what the Claimant has lost is, as argued by the Respondent (Resp. Rejoinder, para. 553), income that the Claimant expected to generate from its investment. The Claimant did, however, not have an acquired right to that expected income.

---

[394] *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 6.62 (CL-013).

611.  Accordingly, the FIT reduction cannot be considered, for the purposes of Article 13(1) ECT, to have annihilated, effectively neutralized or factually destroyed the Claimant's investment in the Frosinone plants as it existed in July 2012.

612.  In the light of this finding, the Tribunal sees no need to further delve into the other submissions of the Parties regarding the alleged indirect expropriation of the Frosinone plants and rejects the Claimant's claim inasmuch as it is based on Article 13(1) ECT.

###### c. *Introduction of an administrative management fee by the Fifth Energy Account and its amendment by the Spalma-incentivi Decree*

613.  In addition, the Fifth Energy Account also contained a provision requiring PV energy producers benefiting from incentive tariffs under any of the energy accounts to pay, as of 1 January 2013, an annual administrative fee of EUR 0.0005 per kWh of incentivized energy (see para. 136). The relevant parts of Article 10 ("Management of the incentives system and implementing regulations") of the Decree establishing the Fifth Energy Account read:

> (1)  Producers applying for the feed-in tariffs set forth in this decree shall pay to the GSE a fee for the processing of the application equal to EUR 3 for each kW of nominal power for plants below 20 kW and EUR 2 for each kW above 20 kW. […]

> (4)  In order to cover for management, control and inspection costs of the GSE, the responsible entities acceding to the feed-in tariffs under this decree […] shall pay to the GSE starting 1 January 2013, also through the set-off of the incentives due, a fee of 0.05 c euro for each kWh of incentivized energy. […][395]

614.  Subsequently, the *Spalma-incentivi* Decree (see para. 143) altered the administrative management fee, notably by making it contingent on the PV plant's capacity in the following terms: (a) 2.20 EUR/kW for PV plants having a capacity between 3 and 6 kW; (b) 2 EUR/kW for PV plants having a capacity between 6 and 20 kW; (c) 1.80 EUR/kW for PV plants having a capacity between 20 and 200 kW; (d) 1.40 EUR/kW for PV plants having a capacity between 200 and 100 kW; and (e) 1.20 EUR/kW for PV plants having a capacity above 1 MW.[396]

---

[395] See Article 10 of the Fifth Energy Account (CL-082).

[396] See Article 25 of the *Spalma-incentivi* Decree (CL-085=R-030); see further *Decreto Ministeriale*, 24 December 2014, *Gazzetta Ufficiale della Republica Italiana, no. 302,* 31 December 2014, p. 32 (CR-010); GSE, *Modalità*

615.   Having concluded that this administrative management fee does not constitute a taxation measure in the meaning of Article 21 of the ECT and having therefore rejected the Respondent's respective jurisdictional objection (see para. 311), the Tribunal will now address whether the introduction of the fee by the Fifth Energy Account and/or its amendment by the *Spalma-incentivi* Decree violated, as argued by the Claimant (Cl. Memorial, paras. 355-358; Cl. Reply, paras. 223-231), on the one hand, Article 10(1), second sentence, of the ECT on fair and equitable treatment and, on the other, Article 10(1), last sentence, of the ECT on the observance-of-obligations or umbrella clause.

616.   To begin with, the Claimant (Cl. Memorial, para. 357) contends that through the unilateral deduction of incentive payments under the label of an administrative management fee, the Respondent violated the Claimant's legitimate expectations, namely to receive a precisely stated rate as an incentive for renewable energy, and therefore breached the fair and equitable treatment clause of the ECT.

617.   In this regard, the Tribunal refers to the standard identified above, namely that the pertinent Italian legislative and regulatory framework gave rise to the legitimate expectation that the overall integrity of the Italian incentivization system for renewable energy would be maintained and that the Claimant would therefore be protected against fundamental or radical changes of this system, but had to be prepared for non-radical modifications of the applicable legal framework (see paras. 424 et seq.). Furthermore, when assessing whether the Respondent frustrated these legitimate expectations by introducing the aforementioned administrative management fee, the Tribunal recalls that, in order to strike a proper balance between the Claimant's interest in the stability of the legislative and regulatory framework and the Respondent's right to adapt this framework to new developments, three factors are to be taken into account, namely whether the adopted measures were (i) reasonable, (ii) foreseeable and (iii) proportionate (see para. 446).

---

*operative per il riconoscimento delle tariffe a coperatura dei costi sostenuti dal GSE per le attività di gestione, verifica e controllo relative ai meccanismi di incentivazione e sostegno delle fonti rinnovabili e dell'efficienza energetica*, 24 December 2014, p. 3 (CR-011); GSE, *Nota di sintesi "Modalità di copertura di oneri sostenuti dal gestore dei servizi energetici GSE S.p.A." per il triennio 2015-2017, ai sensi del Decreto-Legge 24 giugno 2014, n. 91, articolo 25 (c.d. "Decreto Competitività")*, 21 August 2014, p. 4 (R-027).

618.    In terms of reasonableness, i.e. whether or not the introduction of the administrative management fee could draw on a public policy purpose, the Tribunal refers to its analysis above which is also applicable in the present context (see paras. 447 et seq.).[397] In this regard, the Tribunal refers to its previous finding that PV energy producers with plants benefiting from the energy accounts have to pay the fee for specific purposes, i.e. for the processing of their application as well as in order to cover for the management, control and inspection costs of the GSE (see paras. 301, 306). This is confirmed by Recital 22 of the Decree establishing the Fifth Energy Account which states that the Ministry "[d]eemed it appropriate and fair that those who benefit from the feed-in tariffs for photovoltaics contribute to the coverage of charges for the management of the photovoltaic incentive scheme".[398] The Tribunal is satisfied that allocating a part of the costs of managing the electricity system to energy producers benefiting from the incentivization regime represents a public policy objective also for the purposes of the reasonableness assessment to be made in the context of the fair and equitable treatment analysis.

619.    As concerns, secondly, the question of whether the introduction and subsequent modification of the administrative management fee by the Fifth Energy Account and the *Spalma-incentivi* Decree was to be expected by a reasonable and circumspect investor, the Tribunal agrees with the Respondent (see para. 563) that the Claimant could not have reasonably expected on the basis of the existing legislative and regulatory framework that no such administrative fee would be introduced throughout the incentivization period. In particular, the Tribunal recalls the distinction to be made between the promise of a *fixed* and a *stable* amount of incentives to be paid to PV producers, with the latter scenario being the relevant one with respect to the Italian incentivization system for solar energy (see paras. 433, 435). Hence, a reasonable and circumspect PV producer would have been prepared for certain modifications in the amount of the incentives received.

620.    Finally, the Tribunal is called to ascertain whether the introduction and modification of the administrative management fee was proportionate, i.e. did not exceed what was necessary to reach the purposes of the regulatory act. The Tribunal notes in this regard

---

[397] See in this regard also Recitals 13 et seq. of the Fifth Energy Account (CL-082).
[398] See ibid., Recital 22 (CL-082).

that the Respondent considers the fee to be "extremely low" and to "have a very limited economic impact on the PV producers", arguing that the fee amounted to 0.15-0.17 % of the average of the incentive tariffs (Resp. Counter-Memorial, paras. 309-310, 547; Resp. Rejoinder, para. 572).

621.    At the same time, the Tribunal acknowledges the Claimant's submission that the real impact of the fee in question is a multiple of the percentage posited by the Respondent (Cl. Reply, para. 227), notably because the modification of the fee's calculation method by the *Spalma-incentivi* Decree approximately doubled the fee (Cl. Memorial, para. 120; Cl. Reply, para. 225). The Tribunal further observes that the Claimant's economic experts, while first having quantified the Claimant's losses as a result of the administrative fee at around EUR 2.85 million (EUR 172,000 for historical losses and EUR 2,678,000 for future losses),[399] subsequently lowered this assessment in their second report to around EUR 1.7 million (EUR 118,000 of historical losses and EUR 6,000 of future losses due to the introduction of the fee as well as EUR 1,565,000 for future losses due to the increase of the fee).[400]

622.    While the Claimant (Cl. Reply, para. 227) criticizes the Respondent for having failed to submit any appropriate evidence for the quantification of the administrative management fee, the Tribunal observes that the latter (Resp. Counter-Memorial, paras. 309-310) has relied on a 2014 report which was submitted by the GSE to the Ministry of Economic Development pursuant to Article 25(2) of the *Spalma-incentivi* Decree.[401] According to this report, in 2013, the GSE recorded total operative costs of EUR 36.41 million for the photovoltaic sector, EUR 15.60 million of which were borne by the beneficiaries of the incentives; for 2014, the respective numbers were EUR 37.97 million and EUR 11.40 million.[402] When comparing the beneficiaries' contribution with the amount of incentive payments for PV energy in 2013 and 2014 of EUR 6.62 billion and 6.93 billion, respectively, the relative contribution of the beneficiaries of PV

---

[399] See First Expert Report of Dr. Boaz Moselle and Dr. Ronnie Barnes, 29 September 2017, paras. 151 et seq., Tables 13 and 14.

[400] See Second Expert Report of Dr. Boaz Moselle and Ms. Ruxandra Ciupagea, 22 March 2019, para. 3.5, Table 2.

[401] See GSE, *Nota di sintesi "Modalità di copertura di oneri sostenuti dal gestore dei servizi energetici GSE S.p.A." per il triennio 2015-2017, ai sensi del Decreto-Legge 24 giugno 2014, n. 91, articolo 25 (c.d. "Decreto Competitività"),* 21 August 2014 (R-027); for the report's legal basis see Article 25(2) of the *Spalma-incentivi* Decree (CL-085).

[402] See ibid., Annex I.

incentives on average accounted for 0.236 % and 0.165 % of the incentives received.[403] The Tribunal notes in this context that the Respondent (Resp. Counter-Memorial, para. 310), while referring to the numbers of the year 2013, considers it evident that the contribution of the beneficiaries only amounted to 0.16 % of the incentives perceived, which appears to come closer to the relevant figure for 2014; in any event, this does not change the Tribunal's analysis on this aspect.

623.    Furthermore, the Tribunal observes that the 2014 GSE report expected annual contributions from the incentivized PV sector of EUR 23.9 million for the years 2015 to 2017,[404] i.e. already under the regime of the administrative fee as modified by the *Spalma-incentivi* Decree. Accordingly, even the modification of the method of calculation of the fee, which also involves an increase of the fee, brings the beneficiaries' contribution up to only about 0.345 % of the incentives received.

624.    Against this background, even taking into account that the GSE report merely provides information on the average impact of the fee on PV producers, the Tribunal is satisfied that the economic burden for the Claimant arising from the introduction and the modification of the administrative management fee consists in a relatively low amount,[405] not exceeding half of a percent of the incentives received by the Claimant, and may therefore be considered proportionate.

625.    In the overall assessment to be made under the fair and equitable treatment standard, the Tribunal cannot but conclude that the introduction and modification of the administrative management fee by the Fifth Energy Account and the *Spalma-incentivi* Decree constituted a non-radical modification of the applicable legal framework. In a similar vein, the recent *SunReserve v. Italy* tribunal found that it "does not consider such a minimal impact on operating costs to constitute a frustration of Claimants' legitimate expectations".[406] This also holds true when further considering, as the Tribunal is required to do, the combined effect of the FIT deduction effectuated by the

---

[403] See ibid., Annex I.

[404] See ibid., Annex II.

[405] See also *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 884 (RL-050), according to which the fee "did not have a significant impact on Claimants' plants".

[406] *SunReserve Luxco Holdings S.à.r.l. (Luxembourg) et al. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, para. 885 (RL-050).

*Spalma-incentivi* Decree (see para. 141) and the administrative fee discussed here. In view of the relatively low amount of the administrative management fee, the Tribunal sees no need to reconsider its observations made with respect to the reasonableness, foreseeability and proportionality of the *Spalma-incentivi* Decree (see paras. 445 et seq.).

626.    As regards the claim based on the umbrella clause and the Claimant's submission that the introduction of the administrative management fee effectively modified the GSE conventions under the Second, Third and Fourth Energy Accounts (Cl. Memorial, para. 355; Cl. Reply, paras. 229-230), the Tribunal can limit itself to recall its previous finding that the GSE conventions, as accessory contracts, do not fall within the ambit of the ECT's umbrella clause (see para. 388).

627.    Hence, the Respondent did not violate Article 10(1), second or last sentence, of the ECT by introducing or amending the administrative management fee.

### (3)    Conclusion

628.    For the foregoing reasons, the Tribunal concludes that, by adopting the Fifth Energy Account, the Respondent did not breach the ECT. In particular, the Fifth Energy Account neither violated the fair and equitable treatment standard with regard to the Frosinone plants nor did it constitute an indirect expropriation of those plants. Furthermore, the introduction of an administrative management fee by the Fifth Energy Account and its subsequent amendment by the *Spalma-incentivi* Decree did not violate Article 10, second or last sentence, of the ECT.

### D.    CONCLUSION

629.    Having rejected all of the Claimant's claims, the Tribunal concludes that the Respondent has not breached Articles 10(1) or 13 of the ECT.

630.    As the Claimant has not succeeded on its liability claims, there is no need for the Tribunal to summarize or resolve the Parties' respective positions concerning damages. The Tribunal thus proceeds to the only remaining issue, i.e. the assessment and distribution of fees and expenses pursuant to Article 61(2) of the ICSID Convention.

## VII.   COSTS

### A.   CLAIMANT'S SUBMISSION ON COSTS

631.   In its submission on costs of 13 December 2019, the Claimant made the following submission on costs:

| | |
|---|---|
| Legal fees and disbursements | €2,712,427.34 |
| Experts | €497,074.25 |
| Witness and Silver Ridge hearing expenses | €6,886.82 |
| TOTAL | €3,216,388.41 |

### B.   RESPONDENT'S SUBMISSION ON COSTS

632.   The Respondent has not filed a submission on costs.

### C.   THE TRIBUNAL'S DECISION ON COSTS

633.   Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

634.   This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

635.   While the Respondent ultimately prevailed on the merits, the Claimant prevailed in relation to significant non-merits issues.  Notably, the Claimant successfully defended itself against four jurisdictional objections on the part of the Respondent that have resulted in the bifurcation of the proceedings and the subsequent rejoining of the jurisdiction and merits phases (as regards Procedural Orders No. 2 and 5, see paras. 30, 57), various briefs of the Parties regarding jurisdictional and admissibility questions (see paras. 39 et seq.) and a separate Hearing on Jurisdiction on 1 November 2018 (see para. 56) in which the parties comprehensively argued their respective positions regarding the Tribunal's jurisdiction and the admissibility of the claims brought by the

200

Claimant. In addition, the Respondent submitted a Request for Termination which the Tribunal rejected by Procedural Order No. 6 (see paras. 61 et seq.).

636.   In the Tribunal's view, in its decision on the allocation of costs it would not be appropriate to ignore the fact that the Respondent's objections and request significantly contributed to the overall costs of the proceedings. Considering that both Parties prevailed to some significant extent, the Tribunal concludes on this issue that each Party should bear half of the costs of the arbitration and should bear its own direct costs incurred in connection with the proceedings.

637.   The costs of the arbitration, including the fees and expenses of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' and Tribunal's Assistant fees and expenses | 886,624.63 |
| ICSID's administrative fees | 158,000 |
| Direct expenses (estimated) | 76,247.15 |
| **Total** | **1,120,871.78** |

638.   The above costs have been paid out of the advances made by the Parties.[407] As a result, each Party's share of the costs of arbitration amounts to USD 560,435.89.

---

[407] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

## VIII.  AWARD

639.   For the reasons set forth above, the Tribunal decides as follows:

(1)   The Tribunal unanimously rejects all of the Respondent's jurisdictional objections and sees no reason to refrain from exercising its jurisdiction in the present case.

(2)   The Tribunal, by majority, rejects the Claimant's claim that, by the adoption of the *Spalma incentivi* Decree in 2014, the Respondent breached Article 10(1), first, second and/or last sentences, of the ECT.

(3)   The Tribunal unanimously rejects all other of the Claimant's liability claims to the effect that, by the Respondent's actions and omissions, notably by the adoption of the Romani Decree, the Fourth and the Fifth Energy Accounts, the Respondent breached Article 10(1), first, second and/or last sentences, of the ECT and/or Article 13(1) of the ECT.

(4)   The Tribunal unanimously orders each Party to bear half of the costs of the arbitration. Apart from that, both Parties' requests for an award of costs are denied.

[Signed]

_____
Judge O. Thomas Johnson
Arbitrator
Subject to the attached Dissenting Opinion

Date: 24 February 2021

_____
Prof. Bernardo M. Cremades
Arbitrator

Date:

_____
Judge Bruno Simma
President of the Tribunal

Date:

[Signed]

_____        _____
Judge O. Thomas Johnson                    Prof. Bernardo M. Cremades
Arbitrator                                          Arbitrator
Subject to the attached Dissenting Opinion

Date:                                          Date:    Feb 24 2021


_____
Judge Bruno Simma
President of the Tribunal

Date:

204

_____          _____
Judge O. Thomas Johnson                    Prof. Bernardo M. Cremades
Arbitrator                                        Arbitrator
Subject to the attached Dissenting Opinion

Date:                                           Date:

[Signed]
_____
Judge Bruno Simma
President of the Tribunal

Date: Feb. 24, 2027

**Dissenting Opinion of Judge O. Thomas Johnson**

1.      Article 10(1) of the ECT obliges Respondent "to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment." Respondent thus was, and is, under a treaty obligation to treat Claimant's investments fairly.  I write this separate opinion because, unlike my two colleagues, I have concluded that Respondent did not treat Claimant's investments fairly when, through the Spalma Incentivi Decree, it unilaterally revised the terms of the Third, Fourth and Fifth Energy Accounts so as to deny to those investments some of the benefits to which they were entitled under the terms of those Accounts.

**I.      Introduction**

2.      I begin with a hypothetical case.  A father observes that the house he shares with his children (assume he is a single parent) has become rather untidy.  He approaches his young daughter and son and asks if they would like to assist in cleaning the house, suggesting that they might begin by putting away all of the toys that are strewn around their respective rooms.  When neither steps forward, he makes them the following offer: if you help me to achieve my goal of living in a tidy house by putting away all of your toys before dinner time, I will give each of you for desert two scoops of ice cream.  The daughter complies, and does so before dinner.  (The son is slow off the mark.)

3.      After dinner the father gives his daughter a dish with only one scoop of ice cream.  When the daughter reminds her father that he had promised two scoops of ice cream the father replies: "That was this morning, and since then I have concluded that this family is spending too much money on ice cream, so I decided, exercising my undoubted authority to take whatever action I deem appropriate for the good of the family, to give you only one scoop of ice cream, even though you cleaned up your room exactly as I asked."  To which the precocious daughter replies: "I do not doubt your authority as my father to give me less ice cream than you said you would, and I have no doubt that you believe you are acting in the best interests of the family as a whole, still, THIS IS NOT FAIR."  Whatever a father in this situation might say in response, one cannot imagine that it would include an

assertion that his treatment of his daughter was fair. The father might argue that he acted out of some economic necessity, or that the daughter was eating too much ice cream, or that he just changed his mind and, after all, he did not radically and fundamentally change his commitment because he did give her *one* scoop of ice cream. But it would not dawn on a father in this situation to argue to his daughter that her judgment was wrong, that she in fact had been treated fairly; it certainly would not occur to him to tell her that she could not legitimately have expected him to do as he said he would do.

4.     The claim before this Tribunal concerning Respondent's reduction of benefits to which the Claimant's investments were entitled under the various energy accounts is every bit as simple and easy to evaluate as my ice cream hypothetical: whatever justifications might be offered for the reduction, one cannot say that it was fair. Yet my colleagues say just that. I shall examine their reasoning below. I can, however, summarize that reasoning in terms of my hypothetical as follows: Because the daughter in my example knew that her father had the authority to give her less than two scoops of ice cream, and because the father had not given his daughter a separate promise that he would not exercise that authority, the daughter had no "legitimate expectation" that her father would comply with his commitment to give her two scoops of ice cream and, thus, was treated fairly when given only one scoop of ice cream.[1]

## II.     The Pertinent Facts

5.      Italy implemented the EU's First Renewables Directive through Legislative Decree No. 387/2003, which delegated to the Minister of Economic Activities the authority "to adopt one or more decrees by which the criteria for encouraging the production of electricity from solar source are defined."[2] Pursuant to this authority, a series of so-called "energy accounts" ("*conti energia*") were established by ministerial decree. These accounts stated the terms and conditions of the incentive tariff regime that would apply to PV plants for a stated period of time.[3] Each account provided that any investor that

---

[1] *See* Award at paras. 431, 434-437.
[2] Legislative Decree No. 387 of 29 December 2003, G.U. of 31 January 2004, n. 25, Recital 1 as well as Article 1 (CL-075). *See* Award at para. 116.
[3] *See* Award*.,* para. 119.

developed a PV plant of a given capacity and connected it to the grid within a given time frame would be paid a given rate for the electricity that it produced for a period of 20 years.[4] In 2014, Italy enacted Legislative Decree No. 91/2014,[5] the so-called "*Spalma-incentivi* Decree*"*, which modified the terms of the existing energy accounts by reducing the rates payable to existing investors by anywhere from six to twenty-five percent over the remainder of the terms to which they were entitled under their energy accounts. (Claimant's reduction was between six and eight percent.)

6.      In other words, the Italian government agreed to provide a very specific benefit to investors who helped Italy achieve its EU-mandated renewables goals by making specified investments within specified time periods and, after investors -- including Claimant -- made the required investments and had begun to receive the promised benefits, the Italian government reduced the benefits below the promised level.  I do not believe that either of my colleagues would disagree with this characterization of the situation that we are called upon to measure against the ECT's requirement that Italy treat Claimant's investments fairly and equitably.

## III.    Fair and Equitable Treatment, and Specific Commitments

7.      The award's discussion of fair and equitable treatment begins sensibly enough.  It notes at the outset the agreement of the Parties that "the general obligation of a State to grant foreign investors fair and equitable treatment … notably includes the protection of the legitimate expectations of these investors."[6] Some paragraphs later the award takes note of the further agreement of the Parties "that 'specific commitments' by a State may give rise to legitimate expectations of investors protected under the fair and equitable treatment standard …."[7] The award even resolves (to my mind, correctly) the Parties' dispute over whether a "specific commitment" can arise only from an agreement between the host State and the

---

[4] *See id.,* para. 120.
[5] Legislative Decree No. 91/2014 of 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014, *Disposizioni urgenti per il settore agricolo, la tutela ambientale e l'efficientamento energetico dell'edilizia scolastica e universitaria, il rilancio e lo sviluppo delle imprese, il contenimento dei costi gravanti sulle tariffe elettriche, neanché per la definizione immediate di adempimenti derivanti dalla normative europea*, G.U. of 20 August 2014 (CL-085=R-030) (hereinafter: "*Spalma-incentivi* Decree").
[6] Award, para. 390.
[7] *Id.,* para. 402.

investor that precedes the investment. After quoting the dissent in *Jürgen Wirtgen and others. v. Czech Republic* with approval,[8] the award states the following conclusions in successive paragraphs:

> [T]he Tribunal does not derive from the existing arbitral jurisprudence on the matter that, in order for a specific commitment to create legitimate expectations, it is indispensable that there exists an individual agreement between the host State and a specific investor.[9]

> [A] State may make specific commitments to investors also by virtue of legislative or regulatory acts which are not addressed to particular individuals, provided that these acts are sufficiently specific regarding their content and their object and purpose. In this context, the Tribunal considers the creation of legitimate expectations more likely where a State has adopted legislative or regulatory acts "with a specific aim to induce … investments."[10]

The award subsequently goes on to determine:

- that the energy accounts, combined with their legislative authorization, were "detailed and specific";[11]

- that the Italian strategy of "successively building one energy account upon the other, all containing the same type of commitment, presents itself to the Tribunal, in the terms used by the *El Paso Energy v. Argentina* tribunal, as 'a reiteration of the same type of commitment in different types of general statements,' justifying qualifying it as 'a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely'";[12] and

- (quoting Respondent's expert with approval) that "'[t]he purpose of providing incentive tariffs was of course to incentivize investment in the photovoltaic sector,

---

[8] "The decisive issue is not whether a state's undertaking is 'specific' or 'general', or statutory or contractual, but whether the statements and actions of the state provide a sufficiently clear commitment to give rise under international law to legitimate expectations or legal rights on the part of the investor". Award, para. 406, *quoting Jürgen Wirtgen and others. v. Czech Republic*, PCA Case No. 2014-03, Dissenting Opinion of Gary Born, 11 October 2017, para. 12.
[9] Award, para. 407.
[10] *Id.,* para. 408 (footnotes omitted).
[11] *Id.,* para. 425.
[12] *Id.,* para. 426 (footnotes omitted).

because, as we know, photovoltaic energy was costly to produce, it was below market price; with no incentive, there would have not been investment.'"[13]

All of which leads the majority to conclude that "the pertinent Italian legal framework on the incentivization of PV energy … has indeed given rise to specific commitments of the Respondent, thus creating legitimate expectations upon which the Claimant could rely."[14]

8.    All of this strikes me as plainly correct.  The energy accounts offered clear and specific benefits to investors who complied with clear and specific conditions.  The accounts were legislatively authorized.   The accounts were promulgated solely for the purpose of incentivizing investment in the solar-power sector and created legitimate expectations on which investors, including Claimant, relied in making their investments.   One might wonder what more the majority requires before finding that Respondent has breached its obligation to treat Claimant's investments fairly?   The answer comes in the sentence immediately following the language quoted at the end of the preceding paragraph: "Yet, nowhere in the pertinent legislative or regulatory framework did the Respondent commit itself to leave this legal framework untouched for twenty years."[15]

9.    It is hard to know where to begin in replying to this.  In the first place, it is not, in any meaningful sense, true; one of Respondent's specific commitments in the energy accounts was that investors who qualified would enjoy the benefits stated in the Accounts for 20 years.  It is, of course true that Respondent never gave a separate promise that it would not violate the terms of its specific commitment.  The obvious response to this true statement is: so what!  Can it really be "fair" to break a promise unless one has separately promised not to break the promise?  A full and careful reading of the award's discussion of fair and equitable treatment leaves the reader with no doubt that my colleagues believe exactly this. Their last word on the subject is the following: "the Tribunal finds that the Respondent did not make any specific commitment in the pertinent legislative decrees or energy accounts that it would maintain the amount or the duration of incentive payments exactly at the level

---

[13] *Id.,* para. 429, quoting Professor Rojas (Transcript, Day 3, 37:25-38:1-4).
[14] *Id.,* para. 431.
[15] *Id.*

originally laid down in the applicable energy accounts."[16]  One must view the word "fair" in the manner of Humpty Dumpty to conclude that the lack of a promise to keep a promise renders it fair to break the original promise.[17]

10.    I speculate that the source of my colleagues' error is what might be called a category mistake.  They are applying the concept of a contractual stabilization clause – that is, a clause in a contract with a sovereign in which the sovereign explicitly surrenders its sovereign authority to unilaterally modify its contracts – in a context to which the concept has no application.  A sovereign's authority to modify its contracts would be relevant to our consideration of Claimant's claims under the ECT's umbrella clause, but it has nothing to do with whether Italy acted fairly when it unilaterally modified the energy accounts on which Claimant had relied.  If, as my colleagues have concluded, Italy's solar-power incentives were specific commitments that created "legitimate expectations upon which the Claimant could rely," frustration of those expectations cannot be rendered fair by the lack of a parallel commitment from Italy not to change its mind.  To go back to my ice cream hypothetical, my colleagues' reliance on the lack of a stabilization clause has about the same persuasive appeal as would a statement from my hypothetical father to his displeased hypothetical daughter that, while he had promised to give her two scoops of ice cream, he has treated her fairly because he never promised not to give her less.

11.    There is a second possible source of my colleague's error, which also would be a category mistake, and that is that they may view the degree to which Italy reduced incentives below the committed level as sufficiently modest to remain within the range of Claimant's legitimate expectations.  This reason is nowhere stated explicitly in the award, but there are suggestions.  For example, in paragraph 437 (quoted above), the majority says that Italy did not make a commitment that it would leave incentives "*exactly* at the level originally laid down in the applicable energy accounts."  (Italics added.)  And in paragraph 431 (also quoted above), the majority says "nowhere … did the Respondent commit itself to leave [the incentives] *untouched* for twenty years." (Italics added.)  If the majority in fact means

---

[16] *Id.,* para. 437.

[17] "'When I use a word,' Humpty Dumpty said in a rather scornful tone,'it means just what I choose it to mean, neither more nor less.'"  Lewis Carrol, *Through the Looking Glass* 94 (1872).

that unilateral reductions in promised benefits are fair if the reductions are small, the obvious answer is that the magnitude of the reductions goes to damages, not liability. A modest reduction of benefits will cause investors less damage than would a greater reduction of benefits, all else remaining equal. But to contend that it is fair for a state to breach a specific commitment if it does so only modestly is nonsense. That no doubt is why the majority does not actually make this contention. (My hypothetical father would be in less trouble with his hypothetical daughter if he gave her one and one-half scoops of ice cream instead of only one, but he would still be in trouble.)

12.     The jurisprudence concerning specific commitments and fair and equitable treatment is, to say the least, inconsistent. The award, I think, does an admirable job of applying clear thinking to this jurisprudence. On the important contentious issues (*see* paragraph 7, above), the award describes the differing views and comes out on what I believe to be the right side of the debate, accompanied by cogent and persuasive reasoning. Having gotten so much right in the award, I have great trouble understanding why my colleagues have reached a conclusion that not only, in my view, is wrong but cannot be reconciled with their correct conclusions concerning the preliminary questions. It simply cannot be true that the provisions of Respondent's energy accounts are specific commitments on which Claimant justifiably relied and also be true that Respondent treated Claimant fairly when it modified those commitments to Claimant's detriment. And this logical impossibility is not remedied by observing that Respondent never promised that it would keep its specific commitment. That may be sufficient to avoid liability under the ECT's umbrella clause, but it has nothing to do with whether Respondent has complied with its obligation to treat Claimant's investments fairly.

## IV.     Conclusion

13.     Lawyers – perhaps particularly international lawyers – are inclined to treat as difficult issues that strike the layman as simple. This inclination, I fear, is evident in the award's discussion of fair and equitable treatment. As is recognized in the Award, the starting point for any exercise in treaty construction is Article 31(1) of the Vienna Convention on the Law of Treaties, which provides that "[a] treaty shall be interpreted in good faith in

accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."[18]  Applying the ordinary meaning of "fair and equitable" can be difficult if one is assessing the effects of changes to a general regulatory regime, such as revisions to environmental, worker-safety, or land-use regulations. It is not difficult, however, when one is dealing with specific commitments, as we are in this case.[19]  To be in compliance with Article 10(1) of the ECT, Respondent's treatment of Claimant's investments must have been both "fair" and "equitable".  It is not possible to fit Respondent's revisions of the specific commitments it made to Claimant's investments within the ordinary meaning of the word "fair," and there is nothing in the context of Article 10(1) or in the object and purpose of the ECT that can change that inescapable fact.  My hypothetical father could not fairly give his daughter less ice cream than he promised to encourage her to help clean the house, and Italy cannot fairly give Claimant less-valuable benefits than it promised to encourage Claimant to expand Italy's solar-power capacity.  It really is as simple as that.

[Signed]

O. Thomas Johnson

Date:  24 February 2021

---

[18] Award, para. 392.

[19] At the beginning of the hearing, counsel for Claimant made the following quite apt observation:

> [I]n finding its path through the jurisprudence relied on by the parties, the Tribunal will find it helpful to keep in mind a fundamental distinction. The measures at issue here are not regulatory measures.  Regulatory measures define what conduct by market actors is or is not permissible.
> \*        \*        \*        \*
> That is not what the measures at issue here do. They do not say what is or is not permissible. Instead, the Energy Accounts define the terms of a promise made by the state to investors.

Tr. Day 1, pp. 7-8.