# EXHIBIT 45

# CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES

## WASHINGTON, D.C.

En el procedimiento de arbitraje entre

## STEAG GMBH

Demandante

y

## REINO DE ESPAÑA

Demandada

## CASO CIADI NO. ARB/15/4

---

## DECISIÓN SOBRE JURISDICCIÓN, RESPONSABILIDAD E INSTRUCCIONES SOBRE CUANTIFICACIÓN DE DAÑOS

---

***Miembros del Tribunal***
Eduardo Zuleta, Presidente
Pierre-Marie Dupuy, Árbitro
Guido Santiago Tawil, Árbitro

***Secretaria del Tribunal***
Sra. Ana Constanza Conover Blancas

*Fecha de envío a las Partes*: 8 de octubre de 2020

## REPRESENTANTES DE LAS PARTES

_____

*En representación de la Demandante*:

Sr. José Antonio Caínzos
(hasta el 15 de marzo de 2019)
Sr. Ignacio Díaz
Sr. Elías Soria Iglesias

Clifford Chance, S.L.
Paseo de la Castellana, 110
28046, Madrid
España

*En representación de la Demandada*:

Sr. José Manuel Gutiérrez Delgado
Sra. Gabriela Cerdeiras Mejias
Sr. Pablo Elena Abad
Sr. Antolín Fernández Antuña
Sr. Roberto Fernández Castilla
Sra. Patricia Froehlingsdorf Nicolás
Sra. Socorro Garrido Moreno
Sr. Rafael Gil Nievas
Sra. Lourdes Martinez de Victoria Gómez
Sra. Elena Oñoro Sainz
Sr. Francisco de la Torre Díaz
Sr. Alberto Torró Molés
Sr. Juan Rodríguez de la Rúa
Sr. Mariano Rojo Pérez
Sra. Mª José Ruiz Sánchez

Abogacía General del Estado
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
España

i

TABLA DE CONTENIDOS

I.      INTRODUCCIÓN ..................................................................................................1
II.     LAS PARTES .......................................................................................................1
III.    CONSENTIMIENTO AL ARBITRAJE ...............................................................1
IV.     ACTUACIONES PROCESALES .........................................................................2
V.      ANTECEDENTES DE HECHO .........................................................................17
VI.     PRETENSIONES DE LAS PARTES ..................................................................31
        A.   PRETENSIONES DE LA DEMANDANTE ...........................................................31
        B.   PRETENSIONES DE LA DEMANDADA ..............................................................32
VII.    OBJECIONES A LA JURISDICCIÓN ...............................................................33
        A.   LA OBJECIÓN INTRA-UE ...............................................................................34
             1.    Posición de la Demandada.................................................................34
             1.1.  Jurisdicción *ratione personae*.........................................................34
             1.2.  Jurisdicción *ratione materiae* .........................................................38
             2.    Posición de la Demandante ...............................................................43
             3.    Análisis del Tribunal ........................................................................52
             3.1.  Cuestión preliminar: La relevancia de la decisión del TJUE en *Achmea*.........53
             3.2.  La aplicabilidad del TCE respecto de inversionistas intra-UE e inversiones intra-UE ................................................................................56
             3.3.  La relevancia del derecho de la UE para la determinación de la jurisdicción del Tribunal ....................................................................61
             3.4.  Los efectos de los tratados europeos sobre las obligaciones contraídas en el TCE a la luz de los artículos 30 y 59 de la CVDT ..........................................70
             3.5.  El régimen de ayudas de Estado .......................................................72
        B.   LA OBJECIÓN ACERCA DE LA JURISDICCIÓN DEL TRIBUNAL SOBRE ASUNTOS RELACIONADOS CON LA INTRODUCCIÓN DEL IVPEE.....................................76
             1.    Posición de la Demandada.................................................................76
             2.    Posición de la Demandante ...............................................................80
             3.    Análisis del Tribunal ........................................................................83
        C.   LA OBJECIÓN ACERCA DE LA JURISDICCIÓN *RATIONE TEMPORIS* DEL TRIBUNAL ............88
             1.    Posición de la Demandada.................................................................88
             2.    Posición de la Demandante ...............................................................92
             3.    Análisis del Tribunal ........................................................................98
             3.1.  La jurisdicción *ratione temporis* del Tribunal .................................98
             3.2.  Las alegaciones de abuso del derecho ............................................102
        D.   LA OBJECIÓN ACERCA DE LA ADMISIBILIDAD DE LA RECLAMACIÓN RELATIVA A LA SUPUESTA VIOLACIÓN DEL ARTÍCULO 13 TCE (EXPROPIACIÓN) MEDIANTE LA INTRODUCCIÓN DEL IVPEE ..................................................................103
             1.    Posición de la Demandada.................................................................103

|        | 2. | Posición de la Demandante | 105 |
|        | 3. | Análisis del Tribunal | 106 |
| VIII.  | EL FONDO DE LA DISPUTA | | 110 |
| A. | TRATO JUSTO Y EQUITATIVO (ARTÍCULO 10(1) DEL TCE) | | 110 |
|        | 1. | Posición de la Demandante | 110 |
|        | 2. | Posición de la Demandada | 124 |
|        | 3. | Análisis del Tribunal | 139 |
|        | 3.1. | Las expectativas legítimas de Steag | 140 |
|        | 3.2. | La estabilidad del marco regulatorio relevante para la inversión | 179 |
| B. | PROTECCIÓN Y SEGURIDAD COMPLETAS | | 180 |
|        | 1. | Posición de la Demandante | 180 |
|        | 2. | Posición de la Demandada | 180 |
|        | 3. | Análisis del Tribunal | 181 |
| C. | EXPROPIACIÓN | | 181 |
|        | 1. | Posición de la Demandante | 181 |
|        | 2. | Posición de la Demandada | 184 |
|        | 3. | Análisis del Tribunal | 189 |
| D. | CLÁUSULA PARAGUAS | | 190 |
|        | 1. | Posición de la Demandante | 190 |
|        | 2. | Posición de la Demandada | 192 |
|        | 3. | Análisis del Tribunal | 194 |
| IX.    | DAÑOS | | 196 |
| A. | POSICIÓN DE LAS PARTES | | 196 |
|        | 1. | Posición de la Demandante | 196 |
|        | 2. | Posición de la Demandada | 201 |
| B. | ANÁLISIS DEL TRIBUNAL | | 206 |
|        | 1. | Parámetros generales para la determinación del perjuicio indemnizable | 206 |
|        | 2. | Medidas internacionalmente ilícitas atribuibles a España relevantes para el análisis de daños | 208 |
|        | 3. | Fecha a partir de la cual debe hacerse el cálculo de daños | 209 |
|        | 4. | Contribución de Steag al perjuicio | 210 |
|        | 5. | Efectos de la operación de desinversión del año 2020 | 220 |
|        | 6. | Vida útil de la planta Arenales Solar | 221 |
|        | 7. | El *tax gross-up* | 224 |
|        | 8. | Cálculo del perjuicio indemnizable: metodología | 226 |
| X.     | DECISIÓN | | 228 |

## LISTA DE TÉRMINOS DEFINIDOS
_____

| | |
|---|---|
| ¶ / ¶¶ | párrafo / párrafos |
| APPRI | Acuerdo de Promoción y Protección de Inversiones |
| Arenales Solar | Arenales Solar PS, S.L. |
| Audiencia | Audiencia sobre jurisdicción, fondo y daños llevada a cabo del 10 al 15 de diciembre de 2018 en Washington, D.C. |
| Audiencia, Día [ ], [página: línea] (Orador) | Transcripción de la Audiencia (versiones finales de 26 de febrero de 2019) |
| art. / arts. | artículo / artículos |
| C-[#] | Anexo documental de la Demandante |
| CIADI o Centro | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| CL-[#] | Autoridad legal de la Demandante |
| CNE | Comisión Nacional de Energía |
| CNMC | Comisión Nacional de los Mercados y la Competencia |
| Convenio del CIADI | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, de fecha 18 de marzo de 1965 |
| CSP | Energía termosolar de concentración (CSP, por sus siglas en inglés: *Concentrated Solar Power*) |
| CVDT | Convención de Viena sobre el Derecho de los Tratados |
| Demandada o España | Reino de España |
| Demandante | STEAG GmbH |
| EEE | Espacio Económico Europeo |
| EERR | Energías Renovables |
| HTF | fluido transmisor de calor (por sus siglas en inglés) |
| IDAE | Instituto para la Diversificación y Ahorro de la Energía |
| IPC | Índice de Precios de Consumo |
| LES | Ley de Economía Sostenible |
| MW | Megavatios |
| NRR | Nuevo Régimen Regulatorio |
| ORIE | Organización Regional de Integración Económica |
| p. / pp. | página / páginas |

iv

| | |
|---|---|
| Partes | STEAG GmbH y el Reino de España |
| PCA | Corte Permanente de Arbitraje (por sus siglas en inglés) |
| Plan 2005-2010 | Plan de Fomento de las Energías Renovables en España 2005-2010 |
| R-[#] | Anexo documental de la Demandada |
| RAIPRE | Registro Administrativo de Instalaciones de Producción en Régimen Especial |
| RCSD | Ratio de Cobertura del Servicio de Deuda |
| RD | Real Decreto |
| RDL | Real Decreto-Ley |
| Reglas de Arbitraje | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI en vigor a partir del 10 de abril de 2006 |
| RL-[#] | Autoridad legal de la Demandada |
| RRO | Régimen Regulatorio Original |
| SE | sector de energías renovables |
| SEE | Sistema Eléctrico Español |
| SMAG | Solar Millenium AG |
| TBI | Tratado Bilateral de Inversiones |
| TCE | Tratado sobre la Carta de la Energía |
| TFUE | Tratado de Funcionamiento de la Unión Europea |
| TJE | Trato Justo y Equitativo |
| TJUE | Tribunal de Justicia de la Unión Europea |
| Tribunal | Tribunal de arbitraje constituido el 25 de octubre de 2016 en el Caso CIADI No. ARB/15/4 |
| TUE | Tratado de la Unión Europea |
| UE | Unión Europea |

## I.   INTRODUCCIÓN

1.   El presente caso se refiere a una controversia presentada ante el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones ("**CIADI**" o el "**Centro**") con base en el Tratado sobre la Carta de la Energía que entró en vigor el 16 de abril de 1998 con respecto a la República Federal de Alemania y el Reino de España (el "**TCE**"), y el Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, que entró en vigor el 14 de octubre de 1966 (el "**Convenio del CIADI**").

2.   La diferencia se relaciona con medidas adoptadas por la Demandada que modificaron el marco regulatorio y de remuneración aplicable a los productores de energía termosolar de concentración ("**CSP**", por sus siglas en inglés). La Demandante sostiene que tales medidas afectaron negativamente su inversión en Arenales Solar PS, S.L. ("**Arenales Solar**"), una compañía española propietaria de un proyecto de construcción y operación de una planta de generación de energía termosolar con almacenamiento de sal ubicada en el municipio de Morón de la Frontera, Sevilla (el "**Proyecto**" o "**Proyecto Arenales**").

3.   La Demandante alega que España ha incumplido sus obligaciones conforme a los artículos 10(1) y 13 del TCE. La Demandante sostiene que tiene derecho a recibir una indemnización que no resulte inferior a EUR 79 millones por los daños causados a su inversión como consecuencia de las violaciones al TCE.

## II.   LAS PARTES

4.   La Demandante es STEAG GmbH ("**Steag**"), una sociedad constituida de conformidad con la legislación alemana, con domicilio social en Essen.

5.   La Demandada es el Reino de España ("**España**"), un Estado soberano y Parte contratante del TCE y del Convenio del CIADI.

6.   En lo sucesivo se hará referencia a la Demandante y a la Demandada conjuntamente como las "**Partes**".

## III.   CONSENTIMIENTO AL ARBITRAJE

7.   La Demandante ha presentado una reclamación con base en el artículo 26 del TCE y el Convenio CIADI en contra del Reino de España, como se detalla en la Sección IV *infra*. La Demandada es Parte Contratante del TCE y del Convenio CIADI. El Tribunal constata que ambas partes han consentido por escrito al presente arbitraje, sin perjuicio de las objeciones de la Demandada a la jurisdicción del Tribunal.

## IV.  ACTUACIONES PROCESALES

8.  El 9 de enero de 2015, el Centro recibió una solicitud de arbitraje de Steag en contra de España acompañada de los anexos documentales C-0001 a C-0008 ("**Solicitud de Arbitraje**"), de conformidad con el artículo 36 del Convenio del CIADI.

9.  El 21 de enero de 2015, la Secretaría General del CIADI registró la Solicitud de Arbitraje conforme al artículo 36(3) del Convenio del CIADI y notificó el registro a las Partes. En la notificación del acto de registro, la Secretaría General invitó a las Partes a informar al Centro sobre cualquier estipulación convenida respecto al número de árbitros y su método de nombramiento, conforme a la regla 7(c) de las Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje del CIADI. Además, les invitó a proceder a constituir un tribunal de arbitraje conforme a los artículos 37 a 40 del Convenio del CIADI.

10.  El 17 de junio de 2015, el CIADI informó a las Partes que, salvo que intervinieran en el procedimiento o solicitaran una suspensión del mismo a más tardar el 21 de julio de 2015, la Secretaría General emitiría una orden por la que se tomaría nota de la terminación del procedimiento conforme a la regla 45 de las Reglas Procesales Aplicables a los Procedimientos de Arbitraje ("**Reglas de Arbitraje**").

11.  El 21 de julio de 2015, la Demandante nombró al Prof. Dr. Guido Santiago Tawil como árbitro, nacional de la República Argentina[1], y formuló una propuesta a la Demandada sobre el número de árbitros y el método para su nombramiento. En la misma fecha, el Centro informó a las Partes que, conforme al Convenio del CIADI y a las Reglas de Arbitraje, no tomaría medidas respecto del nombramiento del Prof. Dr. Tawil hasta que las Partes alcanzaran un acuerdo sobre el número de árbitros y el método para su nombramiento.

12.  Mediante comunicaciones de fechas 10 de agosto, 15, 18 y 24 de septiembre de 2015, las Partes intercambiaron propuestas con respecto al número de árbitros y el método para su nombramiento. Las Partes acordaron constituir el tribunal con arreglo al artículo 37(2)(a) del Convenio del CIADI de la siguiente manera: el tribunal se constituiría con tres árbitros designados, uno por cada Parte y el tercero que presidiría el tribunal, de común acuerdo.

13.  El 29 de septiembre de 2015, el CIADI notificó a las Partes que el profesor Dr. Tawil había aceptado su nombramiento como árbitro en el procedimiento.

14.  El 23 de octubre de 2015, la Demandada nombró como árbitro al profesor Pierre-Marie Dupuy, nacional de la República Francesa. El 27 de octubre de 2015, el CIADI notificó a las Partes que el profesor Dupuy había aceptado su nombramiento como árbitro.

15.  El 30 de diciembre de 2015, el Centro invitó a las Partes a que le informaran sobre el estado de sus consultas respecto al nombramiento del Presidente del Tribunal. El 31 de diciembre

---

[1] Mediante carta de 31 de julio de 2020, el Prof. Dr. Tawil informó a las Partes que había adquirido recientemente la nacionalidad portuguesa además de la nacionalidad argentina.

de 2015, la Demandante indicó que las Partes habían iniciado y deseaban continuar conversaciones con miras a lograr un acuerdo sobre el nombramiento del árbitro presidente.

16.    El 10 de mayo de 2016, a falta de información de las Partes con posterioridad a la comunicación de la Demandante del 31 de diciembre, el Centro invitó a las Partes a confirmar si deseaban extender el plazo de seis meses previsto en la regla 45 de las Reglas de Arbitraje.

17.    El 22 de junio de 2016, la Demandante solicitó que el Presidente del Consejo Administrativo del CIADI efectuara el nombramiento del Presidente del Tribunal, de conformidad con lo previsto en el artículo 38 de Convenio del CIADI y la regla 4 de las Reglas de Arbitraje.

18.    El 23 de junio de 2016, el CIADI acusó recibo de la solicitud de la Demandante del 22 de junio de 2016 e informó a las Partes que les proporcionaría inicialmente una boleta de votación con miras a seleccionar un árbitro presidente de mutuo acuerdo. En caso de que las boletas no resultaran en la selección de mutuo acuerdo de alguno de los candidatos propuestos, el Presidente del Consejo Administrativo del CIADI procedería a nombrar al Presidente del Tribunal de la Lista de Árbitros del CIADI en consulta con las Partes.

19.    El 4 de agosto de 2016, el Centro proporcionó a las Partes una boleta de votación con cinco candidatos propuestos para desempeñarse como Presidente del Tribunal. El 5 de septiembre de 2016, cada Parte transmitió al CIADI su boleta de votación completada. El 6 de septiembre de 2016, el Centro informó a las Partes que el proceso de votación no había resultado en la selección de un candidato de mutuo acuerdo.

20.    El 23 de septiembre de 2016, el Centro informó a las Partes que tenía la intención de proponer al Presidente del Consejo Administrativo del CIADI la designación del Dr. Eduardo Zuleta Jaramillo, nacional de la República de Colombia, como tercer árbitro y Presidente del Tribunal, e invitó a las Partes a que presentaran cualquier observación que pudieran tener al respecto a más tardar el 29 de septiembre de 2016.

21.    El 17 de octubre de 2016, el Centro transmitió a las Partes información adicional proporcionada por el Dr. Zuleta en relación con observaciones presentadas por las Partes el 29 y 30 de septiembre de 2016. Asimismo, el CIADI informó a las Partes que cualquier observación adicional en relación con esta propuesta debía recibirse a más tardar el 20 de octubre de 2016 y que, a falta de dichas observaciones de las Partes, el Centro procedería con la designación propuesta.

22.    El 21 de octubre de 2016, el CIADI informó a las Partes que, tras no haber recibido observaciones adicionales sobre el nombramiento del Dr. Zuleta, el Presidente del Consejo Administrativo del CIADI procedería a nombrarlo como presidente del Tribunal conforme al artículo 38 del Convenio del CIADI y la regla 4(1) de las Reglas de Arbitraje.

23.    El 25 de octubre de 2016, el Dr. Zuleta aceptó su nombramiento como Presidente del Tribunal. En la misma fecha, la Secretaria General Interina del CIADI notificó a las Partes que los tres árbitros habían aceptado sus respectivos nombramientos, que el Tribunal había quedado constituido y que el procedimiento se daba por iniciado. Asimismo, el Centro

informó a las Partes que la señora Ana Constanza Conover Blancas, Consejera Jurídica del CIADI, se desempeñaría como Secretaria del Tribunal.

24. El 5 de diciembre de 2016, el Tribunal celebró una primera sesión con las Partes mediante conferencia telefónica, de conformidad con la regla 13(1) de las Reglas de Arbitraje.

25. El 10 de enero de 2017, el Tribunal emitió la Resolución Procesal No. 1 que incorporó los acuerdos de las Partes sobre cuestiones procesales y las decisiones del Tribunal respecto de las cuestiones controvertidas. La Resolución Procesal No. 1 estableció, *inter alia*, que las Reglas de Arbitraje aplicables serían aquellas en vigor desde el 10 de abril de 2006, que el español sería el idioma del procedimiento, y que el lugar del procedimiento sería Washington, D.C. La Resolución Procesal No. 1 estableció asimismo el calendario procesal aplicable al presente arbitraje.

26. El 26 de mayo de 2017, la Demandante presentó su Memorial de Demanda acompañado por los anexos documentales C-0009 a C-0020; las autoridades legales CL-0001 a CL-0068; y los siguientes documentos: *(i)* Declaración testimonial de D. Joachim Rumstadt de fecha 24 de mayo de 2017 (presentado en idioma inglés); *(ii)* Declaración testimonial de D. Gregor Timmerhaus de fecha 24 de mayo de 2017 (presentado en idioma inglés); *(iii)* Declaración testimonial de D. Daniel Ponce de León Pérez de fecha 25 de mayo de 2017; *(iv)* Informe pericial de The Brattle Group titulado "*Cambios en la normativa española sobre instalaciones de energía solar termoeléctrica*" de fecha 26 de mayo de 2017, realizado por el Dr. D. José Antonio García y D. Richard Caldwell (presentado en idioma inglés); e *(v)* Informe pericial de The Brattle Group titulado "*Daños y perjuicios económicos sufridos por STEAG*" de fecha 26 de mayo de 2017, realizado por D. Richard Caldwell y el Dr. D. José Antonio García (presentado en idioma inglés).

27. Mediante comunicaciones de fechas 31 de mayo y 6 de junio de 2017, tras haber recibido observaciones de las Partes, el Tribunal solicitó a la Demandante presentar traducciones al español de las dos declaraciones testimoniales y los dos informes periciales presentados en idioma inglés con su Memorial. La Demandante proporcionó dichas traducciones el 11 de julio de 2017.

28. El 1 de septiembre de 2017, el Tribunal emitió la Resolución Procesal No. 2 relativa al número de copias y la forma de presentación de los escritos de las Partes.

29. El 3 de noviembre de 2017, la Demandada presentó su Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, acompañado por los anexos documentales R-0001 a R-0243; las autoridades legales RL-0001 a RL-0089; y un informe pericial de Accuracy titulado "*Primer Informe Económico sobre la Demandante y su reclamación*" de fecha 3 de noviembre de 2017, realizado por D. Eduard Saura y D. Nicolas Barsalou (presentado en idioma inglés).

30. En esa misma fecha, el Tribunal solicitó a la Demandada presentar una traducción al español del informe pericial presentado en idioma inglés con su Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos. La Demandada proporcionó dicha traducción el 10 de noviembre de 2017.

31. El 22 de diciembre de 2017, luego de intercambios entre las Partes y de conformidad con el calendario procesal establecido en la Resolución Procesal No. 1, las Partes presentaron sus respectivas solicitudes de exhibición de documentos en formato de tablas Redfern para la decisión del Tribunal.

32. El 15 de enero de 2018, el Tribunal emitió la Resolución Procesal No. 3 relativa a las solicitudes de exhibición de documentos de las Partes.

33. El 11 de mayo de 2018, la Demandante presentó su Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, acompañada por los anexos documentales C-0021 a C-0075; las autoridades legales CL-0069 a CL-0128; y los siguientes documentos: *(i)* Declaración testimonial de D. Daniel Voswinkel de fecha 10 de mayo de 2018; *(ii)* Declaración testimonial de D. Peter Weiß de fecha 11 de mayo de 2018; *(iii)* Informe pericial de The Brattle Group titulado "*Informe de réplica: Cambios en la normativa española sobre instalaciones de energía solar termoeléctrica*" de fecha 11 de mayo de 2018, realizado por el Dr. D. José Antonio García y D. Richard Caldwell (presentado en idioma inglés); *(iv)* Informe pericial de The Brattle Group titulado "*Informe de Refutación: Daños y perjuicios económicos sufridos por STEAG*" de fecha 11 de mayo de 2018, realizado por D. Richard Caldwell y el Dr. D. José Antonio García (presentado en idioma inglés); e *(v)* Informe pericial de Enolcon titulado "*Opinión de Expertos acerca de la vida útil esperada*" de fecha 11 de mayo de 2018 (presentado en idioma inglés).

34. En esa misma fecha, la Demandante indicó que aportaría en el menor plazo posible las traducciones al español de los documentos presentados en idioma inglés con su Réplica. La Demandante proporcionó dichas traducciones con fechas 21, 24 y 30 de mayo de 2018.

35. El 27 de junio de 2018, la Demandada presentó una "*Solicitud de inspección de la Planta CSP (Concentrated Solar Power) de energía termosolar de concentración Planta Arenales por peritos de vida útil y sobrepotenciación*". En su Solicitud, la Demandada pidió al Tribunal que ordenara a la Demandante permitir a los peritos designados por la Demandada tener acceso a la Planta Arenales para llevar a cabo una revisión técnica de la planta y verificar su funcionamiento y mantenimiento actual.

36. El 2 de julio de 2018, la Demandante presentó observaciones a la solicitud de la Demandada del 27 de junio de 2018, acompañadas por los anexos documentales C-0076 a C-0079.

37. El 6 y 9 de julio de 2019, las Partes presentaron observaciones adicionales a la solicitud de la Demandada del 27 de junio de 2018.

38. El 10 de julio de 2018, el Tribunal emitió la Resolución Procesal No. 4 relativa a la solicitud de la Demandada del 27 de junio de 2018. En dicha resolución, el Tribunal observó que las Partes estaban de acuerdo en que los peritos de la Demandada realizaran una visita a la Planta Arenales, y decidió sobre los puntos controvertidos por las Partes sobre los términos y condiciones de la visita.

39. El 9 de agosto de 2018, la Demandada presentó su Memorial de Dúplica y Réplica de Jurisdicción, acompañado por los anexos documentales R-0244 a R-0432; las autoridades

legales RL-0090 a RL-0136; y los siguientes documentos: *(i)* Declaración testimonial de D. Carlos Montoya de fecha 26 de julio de 2018; *(ii)* Informe pericial de Accuracy titulado "*Segundo Informe Económico sobre la Demandante y su reclamación*" de fecha 6 de agosto de 2018, realizado por D. Eduard Saura y D. Nicolas Barsalou; *(iii)* Dictamen pericial jurídico de fecha 6 de agosto de 2018, realizado por D. David Ramos Muñoz; *(iv)* "*Informe testifical de experto sobre la potencial nominal de la planta térmica solar de concentración 'Arenales'*" de fecha 31 de julio de 2018, realizado por D. Jesús Casanova Kindelán (presentado en idioma inglés); e *(v)* Informe pericial "*Arenales Planta CSP: Análisis de vida útil*" de fecha 28 de julio de 2018, realizado por el Dr. Jorge Servert y el Ing. José Manuel Nieto (presentado en idioma inglés).

40. En esa misma fecha, la Demandada indicó que aportaría en el menor plazo posible las traducciones al español de los documentos presentados en idioma inglés con su Dúplica. La Demandada proporcionó dichas traducciones el 26 de octubre y el 19 de noviembre de 2018.

41. El 9 de agosto de 2018, la Demandada presentó una "*Solicitud de recusación del árbitro presidente Don Eduardo Zuleta Jaramillo*" (la "**Solicitud de Recusación**"), acompañada por los anexos 1 a 20. En esa misma fecha, el Centro informó a las Partes que el procedimiento quedaba suspendido conforme a la regla 9(6) de las Reglas de Arbitraje y que los demás miembros del Tribunal decidirían sobre la recusación propuesta, conforme al artículo 58 del Convenio del CIADI y la regla 9(4) de las Reglas de Arbitraje.

42. El 10 de agosto de 2018, la Secretaría del Tribunal comunicó a las Partes el cronograma fijado por los co-árbitros con respecto a la Solicitud de Recusación. Conforme a dicho cronograma: *(i)* el 16 de agosto de 2018, la Demandante presentó una "*Oposición a la recusación del Presidente del Tribunal Arbitral Dr. Eduardo Zuleta-Jaramillo*", acompañada por los anexos CR-001 a CR-016; *(ii)* el 21 de agosto de 2018, el Dr. Zuleta Jaramillo presentó observaciones a la Solicitud de Recusación; y *(iii)* el 28 de agosto de 2018, cada Parte presentó observaciones adicionales sobre la Solicitud de Recusación.

43. El 11 de septiembre de 2018, los co-árbitros emitieron una "*Decisión sobre la solicitud del Reino de España de recusación del árbitro Eduardo Zuleta-Jaramillo*", en la que rechazaron la Solicitud de Recusación. De conformidad con la regla 9(6) de las Reglas de Arbitraje, el procedimiento se reanudó a partir de esa fecha.

44. El 21 de septiembre de 2018, la Comisión Europea remitió al CIADI una "*Solicitud de autorización para intervenir como parte no contendiente*" en idioma inglés, con base en la regla 37(2) de las Reglas de Arbitraje. En esa misma fecha, la Secretaría del Tribunal transmitió la solicitud al Tribunal y a las Partes y, conforme a las instrucciones del Tribunal, solicitó a la Comisión Europea que presentara una traducción al español de su solicitud a la brevedad posible. El Tribunal precisó que no tomaría decisión alguna ni invitaría a las Partes a presentar comentarios hasta que recibiera dicha traducción.

45. El 1 de octubre de 2018, la Demandante presentó una "*Solicitud en relación con los nuevos documentos y alegatos introducidos por España en el Memorial de Dúplica*". El 8 de octubre de 2018, la Demandada presentó una "*Oposición a la solicitud de la Demandante en relación con los nuevos documentos y alegatos introducidos por España en el Memorial de Dúplica*".

El 16 de octubre de 2016, el Tribunal emitió la Resolución Procesal No. 5 relativa a la solicitud de la Demandante del 1 de octubre de 2018.

46.    El 30 de octubre de 2018, el Tribunal celebró una reunión organizativa preliminar con las Partes mediante conferencia telefónica para tratar asuntos procesales, administrativos y logísticos relativos a la audiencia sobre jurisdicción, fondo y daños (la "**Audiencia**"). Las siguientes personas estuvieron presentes en dicha reunión:

Miembros del Tribunal

| | |
|---|---|
| Dr. Eduardo Zuleta Jaramillo | Presidente |
| Prof. Dr. Pierre-Marie Dupuy | Árbitro |
| Prof. Dr. Guido Santiago Tawil | Árbitro |

Secretariado del CIADI

| | |
|---|---|
| Sra. Ana Constanza Conover Blancas | Secretaria del Tribunal |

En representación de la Demandante

| | |
|---|---|
| Ignacio Díaz de la Cruz | Clifford Chance, S.L. |
| Elías Soria Iglesias | Clifford Chance, S.L. |

En representación de la Demandada

| | |
|---|---|
| Roberto Fernández Castilla | Abogacía General del Estado, Ministerio de Justicia del Gobierno de España |
| María José Ruiz Sánchez | Abogacía General del Estado, Ministerio de Justicia del Gobierno de España |
| Patricia Elena Fröhlingsdorf Nicolás | Abogacía General del Estado, Ministerio de Justicia del Gobierno de España |
| Ana María Rodríguez Esquivias | Abogacía General del Estado, Ministerio de Justicia del Gobierno de España |
| Javier Comerón Herrero | Abogacía General del Estado, Ministerio de Justicia del Gobierno de España |

47.    El 31 de octubre de 2018, la Demandante presentó su Dúplica sobre Jurisdicción, acompañada por los anexos documentales C-0080 a C-0090; y las autoridades legales CL-0129 a CL-0146. En esa misma fecha, conforme a los términos de la Resolución Procesal No. 5, la Demandante presentó un "*Memorial adicional sobre nuevos argumentos empleados por el Reino de España en el Memorial de Dúplica*", acompañado por los anexos documentales C-0091 a C-0101; y las autoridades legales CL-0147 a CL-0154 ("**Memorial adicional**").

48.    El 1 de noviembre de 2018, el Tribunal emitió la Resolución Procesal No. 6 relativa a la organización de la Audiencia.

49.    El 14 de noviembre de 2018, la Comisión Europea transmitió al CIADI una traducción al español de su solicitud de autorización para intervenir como parte no contendiente de fecha 21 de septiembre de 2018. En esa misma fecha, la Secretaria del Tribunal transmitió la traducción al Tribunal y a las Partes e invitó a las Partes, conforme a instrucciones del

Tribunal, a presentar observaciones sobre la solicitud de la Comisión Europea. Las Partes presentaron sus observaciones el 19 de noviembre 2018.

50.    El 21 de noviembre de 2018, el Tribunal emitió la Resolución Procesal No. 7 por la que autorizó a la Comisión Europea a presentar un escrito que tratara exclusivamente sobre la cuestión de la jurisdicción del Tribunal, sujeto a las siguientes condiciones: el escrito debía presentarse en idioma español a más tardar el 28 de noviembre de 2018; el escrito no debía exceder de 15 páginas; y en el escrito la Comisión Europea debía comprometerse expresamente a asumir cualquier costo que resultase de su intervención. Además, el Tribunal rechazó las solicitudes de la Comisión Europea de tener acceso al expediente y de comparecer en la Audiencia.

51.    El 28 de noviembre de 2018, la Comisión Europea remitió al CIADI una "*Solicitud de modificación de la Resolución Procesal N.º 7, de 21 de noviembre de 2018, relativa a una solicitud de la Comisión Europea para intervenir como parte no contendiente con arreglo a las Reglas CIADI 37(2)*". En este documento, la Comisión Europea solicitó al Tribunal eliminar "*el compromiso de la Comisión relativo a los costes*" y que "[e]*n caso de que el Tribunal… decida no modificar la resolución procesal n. 7, la Comisión sugiere que su solicitud de intervención como parte no contendiente se registre en el expediente del presente asunto*". Conforme a instrucciones del Tribunal, el Centro transmitió una copia de la solicitud a las Partes y les invitó a presentar observaciones con respecto a la misma.

52.    En esa misma fecha, la Secretaria del Tribunal informó al Tribunal que el CIADI recibió en esa misma fecha un documento titulado "Escrito de *Amicus Curiae*" y doce anexos por parte de la Comisión Europea. Esta documentación se envió únicamente al Secretariado del CIADI sin copia a los Miembros del Tribunal. Conforme a las instrucciones del Tribunal, ninguno de estos documentos se transmitió a los Miembros del Tribunal ni a las Partes y fueron retenidos por el Secretariado del CIADI en espera de nuevas instrucciones del Tribunal una vez recibidos los comentarios de las Partes.

53.    El 30 de noviembre de 2018, las Partes presentaron sus observaciones a la solicitud de modificación de la Comisión Europea.

54.    Mediante carta de fecha 3 de diciembre de 2018, el Tribunal observó que, según la información suministrada por el Secretariado del CIADI, el Escrito de *Amicus Curiae* y sus anexos sumaban más de 800 páginas. El Tribunal invitó a la Comisión Europea a limitar su intervención a un escrito de 15 páginas sin incluir los doce anexos y señaló que de cumplirse esa condición podría reconsiderar la decisión contenida en la Resolución Procesal No. 7 en lo relativo al compromiso de la Comisión Europea de asumir los costes que generara su intervención, con base en las siguientes consideraciones:

> "El Tribunal considera que no es razonable pretender que en apenas una semana que les resta para preparar la audiencia, las Partes puedan estudiar y pronunciarse sobre el Escrito de *Amicus Curiae* y sus más de 800 páginas de anexos. Ello generaría una carga indebida a las Partes y perjudicaría injustamente al menos a una de las Partes, la Demandante que se opuso a la intervención tardía, si no a ambas. Pero, además, la intervención perturbaría seriamente el

> procedimiento dado que, aún asumiendo que las Partes pudieren
> estudiar y comentar el Escrito *Amicus Curiae* de la Comisión en
> apenas una semana, habría que modificar sustancialmente la
> estructura de las audiencias para dar una oportunidad suficiente a
> las partes para debatir el citado escrito"[2].

55.   El 4 de diciembre de 2018, la Comisión Europea remitió al CIADI una nueva versión del
Escrito de *Amicus Curiae* de 15 páginas que no incluyó los anexos y solicitó al Tribunal que
reconsiderara su decisión sobre los costes prevista en la Resolución Procesal No. 7. En esa
misma fecha, el CIADI transmitió al Tribunal una copia de la comunicación de la Comisión,
sin adjuntar el Escrito de *Amicus Curiae* en espera de instrucciones.

56.   Mediante carta de fecha 5 de diciembre de 2018, el Tribunal informó a la Comisión Europea
lo siguiente:

> "En vista de que la Comisión Europea ha limitado su escrito y
> eliminado los anexos con lo cual se reduce sustancialmente el
> riesgo de perturbar el procedimiento y generar cargas y perjuicios
> a las Partes, el Tribunal aceptará la intervención de la Comisión
> Europea limitada al escrito de 15 páginas antes mencionado, y no
> aplicará para ese escrito, dado su alcance limitado, la condición
> prevista en la Resolución Procesal No. 7".

57.   En esa misma fecha, conforme a instrucciones del Tribunal, el CIADI transmitió a las Partes
la comunicación enviada a la Comisión Europea y el *Escrito de Amicus Curiae*, e informó a
las Partes que podrían referirse al Escrito de *Amicus Curiae* durante la Audiencia y que, en
todo caso, el Tribunal daría a las Partes la oportunidad de pronunciarse por escrito sobre la
posición de la Comisión Europea con posterioridad a la Audiencia.

58.   El 5 de diciembre de 2018, la Demandada solicitó autorización al Tribunal para aportar al
expediente la "*Decisión sobre responsabilidad y sobre los principios de cuantificación de
daños*" de fecha 30 de noviembre de 2018 emitida en el procedimiento arbitral *RREEF
Infrastructure (G.P.) Limited y RREEF Pan-European Infrastructure Two Lux S.à r.l. c.
Reino de España*, Caso CIADI No. ARB/13/30 (la "**Decisión de RREEF**" y el
caso "***RREEF***"). En la misma fecha, la Demandante informó al Tribunal y a la contraparte
que uno de sus peritos, el Dr. D. Jürgen Wortmann, no acudiría a la Audiencia.

59.   En esa misma fecha, el Presidente del Tribunal invitó a la Demandante a que se pronunciara
sobre la solicitud de la Demandada de incorporar al expediente la Decisión de RREEF, e
invitó a la Demandada a que se pronunciara sobre la comunicación de la Demandante relativa
a la ausencia de su perito en la Audiencia. La Demandada presentó sus observaciones el 5 de
diciembre de 2018 y la Demandante presentó sus observaciones el 6 de diciembre de 2018.

60.   El 7 de diciembre de 2018, conforme a instrucciones del Tribunal de fecha 6 de diciembre
de 2018, la Demandada se pronunció con respecto a si existía alguna restricción de

---

[2] Carta a la Comisión Europea de fecha 3 de diciembre de 2018, p. 2.

confidencialidad en relación con la Decisión de RREEF y si se requería el consentimiento de la demandante en dicho arbitraje para la entrega de la decisión a este Tribunal.

61. El 8 de diciembre de 2018, la Demandada informó al Tribunal y a la contraparte que el Dr. D. José Manuel Nieto no acudiría en persona a la Audiencia y propuso que su presencia tuviera lugar mediante videoconferencia.

62. De conformidad con el calendario establecido en el Anexo A de la Resolución Procesal No. 1, según se actualizó mediante carta de fecha 10 de octubre de 2018, el Tribunal y las Partes celebraron la Audiencia del 10 al 15 de diciembre de 2018 en Washington, D.C.

63. Las siguientes personas estuvieron presentes durante la Audiencia:

Miembros del Tribunal

Dr. Eduardo Zuleta-Jaramillo                  Presidente
Prof. Dr. Pierre-Marie Dupuy                  Árbitro
Prof. Dr. Guido Santiago Tawil               Árbitro

Secretariado del CIADI

Sra. Ana Constanza Conover Blancas        Secretaria del Tribunal

Parte Demandante

*Abogados*:

Sr. Ignacio Díaz de la Cruz                     Clifford Chance, S.L.P.
Sr. Elías Soria Iglesias                            Clifford Chance, S.L.P.

*Representantes de Parte*:

Sr. Manfred Ziwey                                STEAG GmbH
Sra. Ilva Elkemann-Reusch                    STEAG GmbH
Sr. Dirk Sohns                                     STEAG GmbH

*Testigos*:

Sr. Daniel Ponce de León Pérez              Arenales Solar PS, S.L.
Sr. Joachim Rumstadt                           STEAG GmbH
Sr. Daniel Voswinkel                            STEAG GmbH

*Peritos*:

Dr. José Antonio García                         The Brattle Group
Sr. Richard Caldwell                             The Brattle Group
Sr. Alejandro Zerain                             The Brattle Group
Sra. Aurora Valente                             The Brattle Group
Dr. Günter Schneider                           Enolcon GmbH

Parte Demandada

*Abogados*:

Sr. Roberto Fernández Castilla               Abogacía General del Estado
Sra. María José Ruíz Sánchez                 Abogacía General del Estado

10

| | |
|---|---|
| Sra. Patricia Elena Fröhlingsdorf Nicolás | Abogacía General del Estado |
| Sr. Pablo Elena Abad | Abogacía General del Estado |
| Sr. Juan Rodríguez de la Rua Puig | Abogacía General del Estado |

*Testigos*:

| | |
|---|---|
| Sr. Carlos Montoya | IDAE |

*Peritos*:

| | |
|---|---|
| Sr. Eduardo Saura | Accuracy |
| Sr. Nicolas Barsalou | Accuracy |
| Sr. Alberto Fernández | Accuracy |
| Sr. Carlos Canga | Accuracy |
| Sra. Laura Cózar | Accuracy |
| Sra. Alba Suru | Accuracy |
| Dr. Jorge Servert del Río | Perito de vida útil |
| Ing. José Manuel Nieto | |
| (mediante videoconferencia) | Perito de vida útil |
| Dr. Jesús Casanova Kindelán | Perito de potenciación |
| Dr. David Ramos Muñoz | Perito jurídico – Universidad Carlos III |

*Asistente*:

| | |
|---|---|
| Sra. Raquel Vázquez Meco | IDAE |

*Estenógrafos*:

| | |
|---|---|
| Sr. Leandro Iezzi | D-R Esteno |
| Sr. Dionisio Rinaldi | D-R Esteno |

*Intérpretes*:

Sra. Elena Howard
Sra. Judith Letendre
Sra. Olivia Reinshagen-Hernández
Sra. Ulrike Wiesner
Sr. Alexander Schmitt
Sr. Charles Roberts

64.  Las siguientes personas fueron interrogadas durante la Audiencia:

Testigos de la Demandante

Sr. Daniel Ponce de León Pérez
Sr. Joachim Rumstadt
Sr. Daniel Voswinkel

Testigos de la Demandada

Sr. Carlos Montoya

Peritos de la Demandante

Dr. Günter Schneider
Dr. José Antonio García
Sr. Richard Caldwell

Peritos de la Demandada

Dr. David Ramos Muñoz
Dr. Jorge Servert del Río
Ing. José Manuel Nieto (mediante videoconferencia)
Dr. Jesús Casanova Kindelán
Sr. Eduardo Saura
Sr. Nicolas Barsalou

65. El 15 de enero de 2019, el Tribunal emitió la Resolución Procesal No. 8 en la que rechazó la solicitud de la Demandada de incorporar al expediente la Decisión de RREEF y resolvió otras cuestiones procesales pendientes, *inter alia*, relativas a las transcripciones de la Audiencia y los escritos posteriores a la Audiencia.

66. El 18 de enero de 2019, la Demandada solicitó al Tribunal reconsiderar su decisión sobre la aportación de la Decisión de RREEF.

67. El 29 de enero de 2019, tras recibir observaciones de la Demandante a la solicitud de reconsideración de la Demandada, el Tribunal emitió la Resolución Procesal No. 9. En ella, el Tribunal rechazó la solicitud de la Demandada de aportar la Decisión de RREEF por considerar que se encontraba protegida por una orden de confidencialidad vigente e indicó que el Tribunal podría, sin embargo y a su discreción, revisar esta decisión si llegare a encontrar que la Decisión de RREEF dejó de estar amparada por confidencialidad.

68. El 31 de enero de 2019, las Partes presentaron al Tribunal las correcciones acordadas de las transcripciones de la Audiencia, así como sus puntos de desacuerdo.

69. El 1 de febrero de 2019, la Demandada solicitó al Tribunal autorización para aportar al expediente del caso la "*Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union*" (la "**Declaración**") y permitir comentarla en los escritos posteriores a la Audiencia.

70. El 7 de febrero de 2019, la Demandante solicitó al Tribunal rechazar la inclusión de la Declaración e indicó que, en caso de que el Tribunal admitiera dicho documento, se deberían también incluir dos declaraciones adicionales de países Miembros de la Unión Europea de fecha 16 de enero de 2019, a saber: *(i)* la declaración realizada por Finlandia, Luxemburgo, Malta, Eslovenia, y Suecia; y *(ii)* la declaración realizada por Hungría (las "**Declaraciones Adicionales**"), ambas de dominio público.

71. El 13 de febrero de 2019, el Tribunal emitió la Resolución Procesal No. 10 en la que decidió, *inter alia*, aceptar la incorporación al expediente de la Declaración y de las Declaraciones Adicionales.

72. El 26 de febrero de 2019, la Secretaria del Tribunal transmitió a las Partes las transcripciones finales de la Audiencia, que incluyeron las correcciones adoptadas por el Tribunal respecto de los puntos de desacuerdo de las Partes.

73. El 15 de marzo de 2019, las Partes presentaron en forma simultánea una primera ronda de escritos posteriores a la Audiencia. El escrito de la Demandada se acompañó de las autoridades legales RL-0137 a RL-0139.

74. En la misma fecha, la Demandada solicitó autorización al Tribunal para aportar al expediente la Decisión de RREEF, entre otros motivos, sobre la base de que ésta se había hecho pública.

75. El 21 de marzo de 2019, la Demandante presentó observaciones a la solicitud de la Demandada del 15 de marzo de 2019. En esa misma fecha, la Demandada presentó observaciones adicionales y reiteró su solicitud de incorporación de la Decisión de RREEF al expediente del procedimiento.

76. El 25 de marzo de 2019, la Demandante presentó observaciones adicionales a la solicitud de la Demandada del 15 de marzo de 2019.

77. El 27 de marzo de 2019, el Tribunal emitió la Resolución Procesal No. 11 en la que rechazó la solicitud de la Demandada de aportar la Decisión de RREEF e indicó que el Tribunal podría, sin embargo y a su discreción, revisar esta decisión si llegare a encontrar que la Decisión de RREEF dejó de estar amparada por confidencialidad.

78. El 2 de abril de 2019, la Demandada remitió al Tribunal una resolución procesal emitida en el caso *RREEF* sobre la terminación de la confidencialidad de la Decisión de RREEF y solicitó al Tribunal reconsiderar la admisión de esta decisión en el procedimiento.

79. El 5 de abril de 2019, la Demandante presentó sus observaciones a la solicitud de reconsideración de la Demandada del 2 de abril de 2019. En sus observaciones, la Demandante solicitó al Tribunal que: *(i)* admitiera la inclusión en el expediente del laudo final dictado el 14 de noviembre de 2018 en el caso *Greentech Energy System A/S, Foresight Luxembourg Solar 1 S.A.R.L., Foresight Luxembourg Solar 2 S.A.R.L., GWM Renewable Energy l S.P.A, GWM Renewable Energy ll S.P.A c. Reino de España*, Caso SCC No. 2015/50 ("**Laudo de Greentech**"); y que *(ii)* condicionara la admisión en el expediente de la Decisión de RREEF a que España también aportara el voto particular del Profesor Robert Volterra de la Decisión de RREEF y dos decisiones adicionales, a saber: la Decisión de 19 de febrero de 2019 emitida en el caso *Cube Infrastructure Fund SICAV & otros c. el Reino de España*, Caso CIADI No. ARB/15/20 ("**Decisión de Cube**"), y la Decisión de 12 de marzo de 2019 emitida en el caso *NextEra Energy Global Holdings B.V. & NextEra Energy Spain Holdings B.V. c. el Reino de* España, Caso CIADI No. ARB/14/11 ("**Decisión de NextEra**").

80. El 10 de abril de 2019, en respuesta a una solicitud del Tribunal, la Demandada presentó comentarios a las observaciones de la Demandante del 5 de abril de 2019.

81. El 16 de abril de 2019, la Demandada respondió a una solicitud del Tribunal con respecto a si alguna de las Decisiones de Cube y NextEra estaba amparada por una orden de confidencialidad.

82. El 22 de abril de 2019, el Tribunal emitió la Resolución Procesal No. 12 en la que decidió, *inter alia*, *(i)* autorizar la solicitud de la Demandada de aportar la Decisión de RREEF junto

con la opinión separada del Profesor Robert Volterra y autorizar la incorporación del Laudo de Greentech; *(ii)* autorizar la incorporación de cualquier otro laudo o decisión que cualquiera de las Partes considerara relevante siempre que se tratara de laudos o decisiones emitidos por tribunales arbitrales en arbitrajes de inversión relativos a los casos de energía en que fuera parte el Reino de España, que fueran públicos y que no estuvieran en el expediente; y que *(iii)* la Demandada debía realizar las gestiones necesarias para obtener el consentimiento necesario para incorporar al expediente la Decisión de NextEra, informar al Tribunal acerca del resultado de dichas gestiones e informar al Tribunal tan pronto se levantara la confidencialidad de la Decisión de Cube.

83.  El 29 de abril de 2019, conforme a lo dispuesto en la Resolución Procesal No. 12, la Demandada introdujo al expediente *(i)* la Decisión de RREEF junto con la opinión parcialmente disidente del profesor Robert Volterra (RL-0140 y RL-0141); y *(ii)* el Laudo de Greentech junto con la opinión disidente del profesor Raúl E. Vinuesa (RL-0142 y RL-0143).

84.  El 10 de mayo de 2019, conforme al plazo establecido por el Tribunal en la Resolución Procesal No. 12, las Partes presentaron en forma simultánea una segunda ronda de escritos posteriores a la Audiencia.

85.  En la misma fecha, las Partes presentaron un escrito separado sobre el impacto de la Decisión de RREEF, la opinión separada del profesor Robert Volterra, el Laudo de Greentech y otros laudos y/o decisiones públicas. El 25 de mayo de 2019, las Partes presentaron en forma simultánea una ronda adicional de escritos sobre este particular.

86.  El 10 de junio de 2019, la Demandante solicitó autorización al Tribunal para incorporar al expediente *(i)* el laudo dictado el 31 de mayo de 2019 en el caso *9REN Holding, S.à.r.l. c. el Reino de España*, Caso CIADI No. ARB/15/15 ("**Laudo de 9REN**"); *(ii)* el laudo dictado el 31 de mayo de 2019 en el caso *NextEra* ("**Laudo de NextEra**"); y *(iii)* la Decisión de NextEra. El 14 de junio de 2019, en respuesta a una invitación del Tribunal, la Demandada indicó que no se oponía a la inclusión de dichos documentos, que eran de dominio público.

87.  El 5 de julio de 2019, en respuesta a una invitación del Tribunal, las Partes presentaron observaciones simultáneas respecto de los documentos cuya inclusión solicitó la Demandante el 10 de junio de 2019. El escrito de la Demandante se acompañó de las autoridades legales CL-0155 a CL-0157.

88.  El 4 de diciembre de 2019, la Demandada solicitó autorización del Tribunal para incorporar al expediente *(i)* el Laudo dictado el 2 de diciembre de 2019 en el caso *Stadtwerke München GmbH, RWE Innogy GmbH, et al. c. Reino de España*, Caso CIADI No. ARB/15/1 ("**Laudo de Stadtwerke**") y *(ii)* la Decisión sobre jurisdicción, responsabilidad y daños emitida el 2 de diciembre de 2019 en el caso *BayWa r.e. renewable energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Caso CIADI No. ARB/15/16 ("**Decisión de BayWa**").

89.  El 6 de diciembre de 2020, en respuesta a una invitación del Tribunal, la Demandante solicitó que el Tribunal rechazara la inclusión del Laudo de Stadtwerke y de la Decisión de BayWa. La Demandante añadió que si el Tribunal estimaba pertinente la inclusión de dichos

documentos en el expediente, deberían asimismo admitirse los siguientes documentos: *(i)* la Decisión sobre jurisdicción, responsabilidad y decisión parcial sobre daños ("**Decisión de Cube**") adoptada el 19 de febrero de 2019 en el caso *Cube Infrastructure Fund SICAV et al. c. el Reino de España*, Caso CIADI No. ARB/15/20, así como el laudo ("**Laudo de Cube**") dictado en ese mismo caso el 15 de julio de 2019; *(ii)* el laudo dictado el 31 de julio de 2019 en el caso *SolEs Badajoz GmbH c. el Reino de España*, Caso CIADI No. ARB/15/38 ("**Laudo de SolEs**"); *(iii)* el laudo dictado el 2 de agosto de 2019 en el caso *InfraRed Environmental Infrastructure GP Limited et al. c. el Reino de España*, Caso CIADI No. ARB/14/12 ("**Laudo de InfraRed**"); *(iv)* el laudo dictado el 6 de septiembre de 2019 en el caso *OperaFund Eco-Invest SICAV PLC y Schwab Holding AG c. el Reino de España*, Caso CIADI No. ARB/15/36 ("**Laudo de OperaFund**").

90.    El 13 de diciembre de 2019, el Tribunal decidió incorporar al expediente aquellos laudos y decisiones solicitados por las Partes, en la medida en que estuviesen disponibles públicamente.

91.    El 18 de diciembre de 2019, la Demandante incorporó al expediente el Laudo de Cube, el Laudo de SolEs, y el Laudo de OperaFund, con inclusión de las opiniones disidentes aplicables, como autoridades legales CL-0158 a CL-0163. La Demandante no incorporó al expediente el Laudo de Infrared, señalando que no era público y que la Demandada podía aportarlo por estar en su poder. La Demandada tampoco aportó el Laudo de Infrared. En la misma fecha, la Demandada presentó el Laudo de Stadtwerke y la Decisión de BayWa, con inclusión de las opiniones disidentes aplicables, como autoridades legales RL-0144 a RL-0147.

92.    El 14 de enero de 2020, la Demandada solicitó autorización del Tribunal para incorporar al expediente la Decisión sobre jurisdicción, responsabilidad y determinadas cuestiones sobre daños adoptada el 30 de diciembre de 2019 en el caso *RWE Innogy GmbH y RWE Innogy Aersa S.A.U. c. el Reino de España*, Caso CIADI No. ARB/14/34 ("**Decisión de RWE**"). La Demandada añadió que no consideraba necesario que las Partes hicieran observaciones escritas sobre esta decisión.

93.    El 15 de enero de 2020, el Tribunal informó a las Partes lo siguiente:

> "En vista del estado avanzado del procedimiento en que los árbitros han deliberado y están preparando su fallo sobre la presente disputa, el Tribunal no incorporará más autoridades legales a menos que haya acuerdo de las partes o que la parte que solicite la incorporación demuestre, y el Tribunal esté convencido, que se trata de un documento absolutamente relevante para la resolución de la controversia".

94.    Mediante carta de 4 de febrero de 2020, la Demandante informó al Tribunal sobre la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V.

95.    El 12 de febrero de 2020, la Demandada presentó sus observaciones a la comunicación de la Demandante de fecha 4 de febrero de 2020.

96.  El 13 de febrero de 2020, el Tribunal invitó a la Demandante a explicar la reciente transacción realizada con Fronterasol B.V. y a presentar comentarios sobre la comunicación de la Demandada de 12 de febrero de 2020. Mediante la misma comunicación, el Tribunal otorgó a la Demandada un plazo de siete días, contados a partir de la recepción de dicha presentación, para responder a la presentación de la Demandante.

97.  El 20 de febrero de 2020, la Demandante presentó su respuesta a la comunicación presentada por la Demandada el 12 de febrero de 2020.

98.  El 26 de febrero de 2020, la Demandada presentó su respuesta a la comunicación presentada por la Demandada el 20 de febrero de 2020.

99.  Mediante comunicación de 27 de febrero de 2020, el Tribunal invitó a la Demandante a presentar un escrito sobre: "*si la cláusula 2.1.6.c de la Primera Modificación de la Financiación y Compromiso de Socios de 20 de noviembre de 2012 (Documento DR-009, cláusula 2.1.6.c, página 21) resultó o no aplicable a la transacción efectuada por STEAG y las razones de la respuesta afirmativa o negativa*". Mediante la misma comunicación, el Tribunal otorgó a la Demandada un plazo de siete días, contados a partir de la recepción de dicha presentación, para responder a la presentación de la Demandante.

100.  El 5 de marzo de 2020, la Demandante presentó su respuesta a la pregunta planteada por el Tribunal el 27 de febrero de 2020.

101.  El 12 de marzo de 2020, la Demandada presentó sus comentarios a la comunicación de la Demandante de 5 de marzo de 2020.

102.  El 16 de junio de 2020, la Demandada solicitó autorización del Tribunal para incorporar al expediente la decisión sobre anulación emitida el 11 de junio de 2020 en el caso *Eiser Infrastructure Limited y Energía Solar Luxembourg S.à r.l. c. el Reino de España*, Caso CIADI No. ARB/13/36.

103.  El 19 de junio de 2020, en respuesta a una invitación del Tribunal, la Demandante presentó sus comentarios sobre la solicitud de la Demandada de 16 de junio de 2020.

104.  El 22 de junio de 2020, el Tribunal rechazó la solicitud de la Demandada de 16 de junio de 2020.

## V.   ANTECEDENTES DE HECHO

105.   El Tribunal presenta a continuación un resumen de los hechos más relevantes de la disputa, acordados, no disputados o determinados por el Tribunal.

106.   Esta disputa está relacionada con ciertas medidas tomadas por la Demandada en el sector de energías renovables ("**SE**") y las supuestas infracciones de sus obligaciones bajo el TCE, respecto de las inversiones de la Demandante[3].

107.   La tecnología *Central Solar Power* ("**CSP**") es una forma de tecnología termo solar, donde la energía proveniente del sol se captura en un fluido portador de líquido, que se utiliza para calentar aceite térmico como fluido transmisor de calor ("**HTF**", por sus siglas en inglés) en el interior de tubos de absorción. El HTF convierte el agua en vapor utilizando un generador de vapor o, de manera alternativa, el calor se transfiere a un sistema de almacenamiento térmico para su posterior utilización. El vapor generado posteriormente impulsa una turbina, que a su vez está conectada a un generador que produce electricidad. La Planta Arenales utiliza un diseño de cilindro parabólico, donde la radiación solar es concentrada en receptores por espejos o colectores cilindro-parabólicos[4].

108.   Mediante la utilización de gas natural, las plantas CSP incrementan su eficiencia de conversión de energía solar a eléctrica y la confiabilidad de su producción.

109.   Desde la Constitución española de 1978, el Reino de España ha adoptado un conjunto de leyes que rigen el Sistema Eléctrico Español ("**SEE**"). El SEE está integrado por la generación, transmisión, distribución y suministro de electricidad, los consumidores de electricidad y las diversas autoridades reguladoras del Estado[5].

110.   El 27 de noviembre de 1997, España promulgó la Ley 54/1997[6], que abrió de forma parcial a la competencia el sector de electricidad (con actividades tanto reguladas como liberalizadas), y que puso fin al sistema tradicional de servicios públicos de titularidad estatal. Esta ley estableció el marco jurídico general para el sector eléctrico en España, incluidos sus principios rectores.

111.   La Ley 54/1997 trazó una distinción entre un "*Régimen Ordinario*", aplicable a las fuentes de producción de energía convencionales (tales como las centrales de carbón), y un "*Régimen Especial*", destinado a favorecer la generación de electricidad a partir de fuentes de energía renovables por distintos medios y aplicable a las instalaciones de producción de electricidad de menos de 50MW que generaban electricidad a partir de fuentes de energías renovables no consumibles[7].

---

[3] Memorial de Demanda, ¶¶ 91-100.
[4] Estudio Cuatrecasas, Gonçalves Pereira. Informe de Auditoría Legal: Proyecto Termosolar Arenales Solar PS, S.L., Cuatrecasas, Gonçalves Pereira S.L.P., de 26 de julio de 2011 [**C-0017**].
[5] Plan de Energías Renovables en España 2005-2010 del Consejo de Ministros, de agosto de 2005 ("**Plan 2005-2010**") [**CL-0016**; **R-0101**].
[6] Ley 54/1997, de 27 de noviembre de 1997, del Sector Eléctrico ("**Ley 54/1997**" o "**LSE de 1997**") [**CL-0008**; **R-0003**].
[7] Artículo 27(1) de la Ley 54/1997 [**CL-0008**; **R-0003**].

112.  La ley especificaba que la producción de energía, con la excepción de la actividad de producción en Régimen Especial, se consideraba una actividad liberalizada[8].

113.  La Demandada indica que este doble régimen de generación de energía eléctrica respondía a la necesidad de fomentar una producción de fuentes de energía en que "*el precio que pueden obtener en el mercado competitivo es insuficiente para cubrir sus costes de construcción y operación, con un retorno razonable de la inversión. Por ello, precisan de subsidios para ser rentables*"[9]. Las Partes no disputan que, debido a los elevados costos de inversión, los proyectos de generación de energía CSP requieren incentivos económicos reconocidos por el Gobierno para ser competitivos en términos de costes con los proyectos de energía convencional.

114.  La aplicación del Régimen Especial se encontraba sujeta al cumplimiento de una serie de requisitos, establecidos en las disposiciones legales y reglamentarias aplicables al SEE.

115.  La Ley 54/1997 preveía además una "*tasa de rentabilidad razonable*" para los productores de energía. En ese sentido, el artículo 30(4) de la Ley 54/1997 establecía lo siguiente:

> "Para la determinación de las primas se tendrá en cuenta el nivel de tensión de entrega de la energía a la red, la contribución efectiva a la mejora del medio ambiente, al ahorro de energía primaria y a la eficiencia energética, y los costes de inversión en que se haya incurrido, al efecto de conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales"[10].

116.  El 30 de diciembre de 1997 se dictó el Plan de Fomento de las Energías Renovables 2000-2010[11]. En este Plan se evalúan los costes que para el SEE supone el despliegue de energías renovables en función de la rentabilidad razonable que se prevé otorgar y se analiza si dichos costes son sostenibles por el SEE en un determinado escenario energético previsible.

117.  Como primer desarrollo reglamentario de la Ley 54/1997, España sancionó el Real Decreto ("**RD**") 2818/1998[12] sobre producción de energía eléctrica por instalaciones abastecidas por recursos o fuentes de energía renovables, residuos y cogeneración. El RD 2818/1998 buscaba establecer "*un sistema de incentivos temporales para aquellas instalaciones que requieren de ellos para situarse en posición de competencia en un mercado libre*"; para alcanzar este objetivo determinó "*una prima para aquellas instalaciones mayores de 50 MW que utilicen como energía primaria energías renovables no consumibles y no hidráulicas, biomasa, biocarburantes o residuos agrícolas, ganaderos o de servicios, de acuerdo con lo establecido en el artículo 30.5 de la Ley del Sector Eléctrico*"[13]. La norma admitía la revisión y

---

[8] Exposición de motivos de la Ley 54/1997 [**CL-0008**; **R-0003**].
[9] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 293 (énfasis omitido).
[10] Artículo 30(4) de la Ley 54/1997 [**CL-0008**; **R-0003**].
[11] Plan de Fomento de las Energías Renovables en España 2000-2010, de 19 de diciembre de 1999 [**R-0100**].
[12] Real Decreto 2818/1998, de 23 de diciembre de 1998, sobre producción de energía eléctrica por instalaciones abastecidas por recursos o fuentes de energía renovables, residuos y cogeneración ("**RD 2818/1998**") [**R-0080**]; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶ 306; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 710-712.
[13] RD 2818/1998, art. 1 [**R-0080**].

actualización periódica de tarifas y primas aplicables a los productores de energías renovables ("**EERR**")[14]. El artículo 32 de dicho Reglamento, bajo la rúbrica "*modificaciones de primas y precios*", preveía revisiones de las primas cada cuatro años.

118. La promoción y el desarrollo de las energías renovables constituyen también un objetivo importante para la Unión Europea ("**UE**"). Las metas y objetivos de la UE han sido establecidos por referencia a los objetivos globales acordados en el Protocolo de Kioto. A su vez, en aplicación de los objetivos de la UE, "*y para cumplir sus propios objetivos e intereses, España adoptó medidas para promover las energías renovables*"[15].

119. El 27 de septiembre de 2001, la UE adoptó la Directiva 2001/77/CE[16] "*relativa a la promoción de la electricidad generada a partir de fuentes de energía renovables en el mercado interior de la electricidad*" ("**Directiva 2001/77/CE**"). La Directiva 2001/77/CE "*tiene por objetivo fomentar un aumento de la contribución de las fuentes de energía renovables a la generación de electricidad en el mercado interior de la electricidad y sentar las bases de un futuro marco comunitario para el mismo*"[17]. La Directiva 2001/77/CE también reconoció la necesidad de apoyo público de los Estados miembros de la UE en favor de las fuentes de energía renovable, incluidos mecanismos tales como certificados verdes, ayudas a la inversión, exenciones o desgravaciones fiscales, devoluciones de impuestos y los sistemas de apoyo directo a los precios[18]. Exigía además que los Estados miembros de la UE adoptaran las medidas adecuadas para cumplir las metas de reducción de emisión de gases de efecto invernadero, así como para aumentar la proporción de electricidad producida utilizando fuentes renovables y establecer objetivos indicativos nacionales compatibles con el objetivo indicativo global del 12% del consumo interior bruto de energía a más tardar en el año 2010[19].

120. Además, la Directiva 2001/77/CE exigía que los miembros adoptaran las disposiciones legales, reglamentarias y administrativas necesarias para dar cumplimiento a lo dispuesto en ella a más tardar en el año 2003[20], y que garantizaran que la tarificación del transporte y la distribución no conlleve una discriminación de la electricidad procedente de fuentes de energías renovables[21]. El objetivo indicativo de España fue obtener el 29,4% de su electricidad a partir de fuentes renovables a más tardar en el año 2010[22].

---

[14] RD 2818/1998, art. 32 [**R-0080**].
[15] Memorial de Demanda, ¶ 28. Véase también Directiva 2001/77/CE del Parlamento Europeo y del Consejo de 27 de septiembre de 2001 relativa a la promoción de la electricidad generada a partir de fuentes de energía renovables en el mercado interior de la electricidad, Diario Oficial de las Comunidades Europeas Serie L 283/33 ("**Directiva 2001/77/CE**") [**CL-0012**]; Directiva 2009/28/EC del Parlamento Europeo y del Consejo de 23 de abril de 2009 relativa al fomento del uso de energía procedente de fuentes renovables y por la que se modifican y se derogan las Directivas 2001/77/CE y 2003/30/CE ("**Directiva 2009/28/EC**") [**RL-0017**]; Plan 2005-2010, Introducción [**CL-0016; R-0101**].
[16] Directiva 2001/77/CE, art. 1 [**CL-0012**].
[17] Directiva 2001/77/CE, art. 1 [**CL-0012**].
[18] Directiva 2001/77/CE Preámbulo, inc. 14 [**CL-0012**].
[19] Directiva 2001/77/CE, art. 3, inc. 4. [**CL-0012**].
[20] Directiva 2001/77/CE, art. 9 [**CL-0012**].
[21] Directiva 2001/77/CE, art. 7 [**CL-0012**].
[22] Directiva 2001/77/CE, anexo (cifra de España) [**CL-0012**].

121.  El 27 de diciembre de 2002, España expidió el RD 1432/2002, por el que se establece la metodología para la aprobación o modificación de la tarifa eléctrica media o de referencia[23], y que se propone "*fijar [la] determinación [de la tarifa] cada año, así como definir las circunstancias en que se han de tomar en consideración otras modificaciones*"[24].

122.  El 12 de marzo de 2004, España expidió el RD 436/2004[25] que procuraba implementar un "*marco regulatorio objetivo y transparente*" para fomentar las inversiones en el sector de las energías renovables. Para alcanzar este propósito, realizó los siguientes ajustes: *(i)* actualizar, sistematizar y redefinir las disposiciones reglamentarias dictadas en la Ley 54/1997; *(ii)* establecer un régimen económico duradero para las instalaciones acogidas al régimen especial, basado en una metodología de cálculo de la retribución, objetiva y transparente; *(iii)* establecer regímenes económicos transitorios para las instalaciones acogidas al RD 2366/1994 y al RD 2818/1998; *(iv)* determinar una prima complementaria para aquellas instalaciones mayores de 50 MW, de acuerdo con lo establecido en el artículo 30(5) de la Ley 54/1997; y *(v)* establecer la posibilidad de que los productores en Régimen Especial vendieran la energía producida, ya sea a una tarifa fija regulada, o a precio de mercado más una prima por unidad de electricidad[26].

123.  El RD 436/2004 estableció la revisión y modificación de las tarifas, primas e incentivos en forma periódica[27]. Asimismo, las tarifas, primas, incentivos y complementos resultantes de dichas revisiones serían aplicables a las instalaciones que comenzaran a operar con posterioridad a la fecha de entrada en vigor de las modificaciones correspondientes[28].

124.  El 26 de agosto de 2005, el Instituto para la Diversificación y Ahorro de la Energía ("**IDAE**"), órgano consultivo del Ministerio de Industria, Turismo y Comercio español (el "**Ministerio**"), propuso una serie de recomendaciones para contribuir al crecimiento de la inversión en el sector de EERR en España, que fueron recogidas y aprobadas por el Consejo de Ministros Español en el Plan de Fomento de las Energías Renovables en España 2005-2010 (el "**Plan 2005-2010**")[29].

125.  En su Capítulo 3.4, el Plan 2005-2010 resume qué es la energía termoeléctrica, y hace un diagnóstico de cómo opera este tipo de energía en otros lugares del mundo[30]. El Plan 2005-2010 también analizó el RD 436/2004 y concluyó que éste propuso un marco económico suficientemente favorable para el desarrollo del sector solar termoeléctrico, pero circunscribió las condiciones retributivas, estableciendo un máximo de 200MW[31]. El Plan

---

[23] Real Decreto 1432/2002, de 27 de diciembre de 2002, por el que se establece la metodología para la aprobación o modificación de la tarifa eléctrica media o de referencia y se modifican algunos artículos del Real Decreto 2017/1997 ("**RD 1432/2002**") [**CL-0014**].
[24] RD 1432/2002, Preámbulo [**CL-0014**].
[25] Real Decreto 436/2004, de 27 de diciembre de 2002, por el que se establece la metodología para la actualización y sistematización del régimen jurídico y económico de la actividad de producción de energía eléctrica en régimen especial ("**RD 436/2004**") [**CL-0015**; **R-0082**]; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 307-310.
[26] RD 436/2004, art. 18 [**CL-0015**; **R-0082**].
[27] RD 436/2004, art. 40 [**CL-0015**; **R-0082**].
[28] RD 436/2004, art. 40 [**CL-0015**; **R-0082**].
[29] Plan 2005-2010, Introducción [**CL-0016**; **R-0101**].
[30] Plan 2005-2010, Introducción, pp. 131, 132 [**CL-0016**; **R-0101**].
[31] Plan 2005-2010, Introducción, p. 138 [**CL-0016**; **R-0101**].

reconoció en forma expresa que, debido a la baja rentabilidad de las tecnologías, eran necesarias primas más elevadas para garantizar la sustentabilidad del proyecto[32]. A continuación, identificó una serie de barreras económicas, tecnológicas y normativas para el desarrollo de proyectos termoeléctricos, incluida la necesidad de asistencia en la inversión o subsidios para los primeros proyectos, poca regulación para las centrales termoeléctricas, y limitaciones a las primas y tarifas actuales para las centrales dentro del umbral de los 200MW[33].

126. El 23 de junio de 2006, España expidió el Real Decreto-Ley ("**RDL**") 7/2006[34], "*por el que se adoptan medidas urgentes en el sector energético*", que modificó algunas disposiciones de la Ley 54/1997. El RDL 7/2006 modificó el artículo 30 de la Ley 54/1997, al efecto de otorgar "*prioridad en el acceso a las redes de transporte y de distribución*" a la energía generada por productores en Régimen Especial[35]. Sin embargo, esta prioridad de acceso estaba sujeta al "*mantenimiento de la fiabilidad y seguridad de las redes*"[36]. En la Disposición Segunda Transitoria indicó que hasta que se desarrollase reglamentariamente lo previsto en los apartados uno a doce del artículo 1, la revisión de la tarifa media que efectuare el Gobierno no tendría aplicación sobre los precios, primas, incentivos y tarifas otorgados a los productores de EERR en Régimen Especial.

127. El 25 de mayo de 2007, España expidió el RD 661/2007[37], que respondió a la necesidad de modificar el régimen retributivo disponible para los productores en Régimen Especial. El RD 661/2007 también buscaba desligar dicha retribución de la tarifa eléctrica de referencia utilizada hasta la fecha, así como regular ciertos aspectos técnicos y contribuir así al crecimiento de las tecnologías de EERR.

128. El RD 661/2007 derogó el RD 436/2004. Entre sus objetivos estaba "*el establecimiento de un régimen jurídico y económico de la actividad de producción de energía eléctrica en régimen especial*"[38]. Para ello modificó el régimen económico y jurídico que regulaba el régimen especial vigente hasta el momento. Las razones del cambio están explicadas en la Exposición de Motivos del RD[39].

129. La primera razón era el crecimiento experimentado por el régimen especial en los últimos años, sumado a la necesidad de regular ciertos aspectos técnicos para contribuir al crecimiento de estas tecnologías, salvaguardando la seguridad en el sistema eléctrico y garantizando la calidad del suministro, así como la necesidad de minimizar las restricciones a la producción de dicha generación: el régimen económico establecido en el RD 436/2004 no consideró ciertas variables en el comportamiento que experimentaron los precios del

---

[32] Plan 2005-2010, Introducción, p. 139 [**CL-0016**; **R-0101**].
[33] Plan 2005-2010, Introducción, p. 143 [**CL-0016**; **R-0101**].
[34] RDL 7/2006 [**R-0071**].
[35] RDL 7/2006, art. 1 [**R-0071**].
[36] RDL 7/2006, art. 1 [**R-0071**].
[37] Real Decreto 661/2007, de 25 de mayo de 2007, por el que se regula la actividad de producción de energía eléctrica en régimen especial ("**RD 661/2007**") [**CL-0018**; **R-0084**]; Memorial de Objeciones Jurisdiccionales y Contestación Sobre Méritos, ¶ 409; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 317-321; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 714, 715.
[38] RD 661/2007, art. 1, *lit.* a [**CL-0018**; **R-0084**].
[39] RD 661/2007, Exposición de Motivos [**CL-0018**; **R-0084**].

mercado en los últimos tiempos, y que han adquirido más relevancia en el citado régimen retributivo del Régimen Especial[40]. Por esto, dice la Exposición de Motivos, se hizo necesaria la modificación del esquema retributivo, desligándolo de la Tarifa Eléctrica Media o de Referencia, utilizada hasta ese momento[41].

130.   El artículo 2 del RD 661/2007 dispuso que el Régimen Especial sería aplicable a "*instalaciones que utilicen como energía primaria alguna de las energías renovables no consumibles, biomasa, o cualquier tipo de biocarburante, siempre y cuando su titular no realice actividades de producción en el régimen ordinario*".

131.   El RD 661/2007 estableció un sistema donde los productores en régimen especial podrían: *(a)* vender la electricidad al sistema a través de la red de transporte o distribución, percibiendo por ella una tarifa regulada, única para todos los períodos de programación, expresada en céntimos de euro por kilovatio-hora ("**Tarifa Fija**"), o *(b)* vender la electricidad en el mercado de producción de energía eléctrica, en cuyo caso el precio de venta de la electricidad será el precio que resulte en el mercado organizado o el precio libremente negociado por el titular o el representante de la instalación, complementado, en su caso, por una prima en céntimos de euro por kilovatio-hora ("**Prima**")[42]. La elección entre estas dos opciones de tarifas ("**FIT**") era aplicable durante períodos de un año. Para tecnologías tales como la CSP, la opción de Primas se encontraba sujeta a umbrales inferiores y superiores.

132.   Adicionalmente, el RD 661/2007 tenía las siguientes características:

a.   El artículo 14 establecía que la inscripción definitiva de la instalación en el Registro Administrativo de Instalaciones de Producción en Régimen Especial (el "**RAIPRE**"), administrado por el Ministerio, era requisito necesario para que dicha instalación se encontrará sujeta a los beneficios del Régimen Especial en virtud del RD 661/2007.

b.   El artículo 17(e) otorgaba prioridad en el acceso y conexión a la red eléctrica a los productores de EERR sobre los productores de energía convencional, en virtud de los términos establecidos en el Anexo XI del RD 661/2007.

c.   El artículo 2(1)(b) permitía que las instalaciones de producción de EERR en Régimen Especial utilizaran combustibles para la generación de electricidad, en tanto la electricidad producida por dichos combustibles no superara el 12% de la producción total si la instalación vendía energía a través de la opción de Tarifa Fija, o el 15% si la instalación vendía energía a través de la opción de Primas.

d.   El artículo 22 disponía que las tarifas y primas establecidas en el RD 661/2007 podrían ser revisadas si España alcanzaba determinados volúmenes de capacidad instalada de EERR, aunque dicha revisión no sería aplicable a aquellas instalaciones ya inscritas en el RAIPRE con anterioridad a esa fecha.

---

[40] RD 661/2007, Exposición de Motivos [**CL-0018**; **R-0084**].
[41] RD 661/2007, Exposición de Motivos [**CL-0018**; **R-0084**].
[42] RD 661/2007, art. 31 [**CL-0018**; **R-0084**].

e.   El artículo 36 establecía tarifas únicas y primas, que serían aplicables durante toda la vida operativa de cada instalación.

f.   El artículo 44(1) disponía que las tarifas y primas y los límites inferior y superior se ajustarían por referencia a los índices de precios de combustibles y al Índice de Precios de Consumo ("**IPC**").

133.   Bajo el artículo 44(3) del RD 661/2007:

> "Durante el año 2010, a la vista del resultado de los informes de seguimiento sobre el grado de cumplimiento del [Plan 2005-2010] y de la Estrategia de Ahorro y Eficiencia Energética en España (E4), así como de los nuevos objetivos que se incluyan en el siguiente Plan de Energías Renovables para el período 2011-2020, se procederá a la revisión de las tarifas, primas, complementos y límites inferior y superior definidos en este real decreto, atendiendo a los costes asociados a cada una de estas tecnologías, al grado de participación del régimen especial en la cobertura de la demanda y a su incidencia en la gestión técnica y económica del sistema, garantizando siempre unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales. Cada cuatro años, a partir de entonces, se realizará una nueva revisión manteniendo los criterios anteriores. Las revisiones a las que se refiere este apartado de la tarifa regulada y de los límites superior e inferior no afectarán a las instalaciones cuya acta de puesta en servicio se hubiera otorgado antes del 1 de enero del segundo año posterior al año en que se haya efectuado la revisión".

134.   El mismo día que España adoptó el RD 661/2007, el Ministerio de Industria, Energía y Turismo remitió un comunicado de prensa[43], en el que identificó el propósito y los elementos del nuevo RD bajo el título: "*El Gobierno prima la rentabilidad y la estabilidad en el nuevo Real Decreto de energías renovables y cogeneración – Apuesta gubernamental por las energías limpias y autóctonas*".

135.   El 23 de abril de 2009, se aprobó la Directiva 2009/28/CE[44] (la "**Directiva UE 2009**") del Parlamento Europeo y del Consejo "*relativa al fomento del uso de energía procedente de fuentes renovables y por la que se modifican y se derogan las Directivas 2001/77/CE y 2003/30/CE*". La Directiva reafirma el compromiso de la UE con la promoción de las EERR[45] y establece como objetivo para la UE procurar obtener el 20% de sus requerimientos totales de consumo de energía a partir de fuentes de EERR para el año 2020[46].

---

[43] Comunicado de Prensa del Ministerio de Industria, Energía y Turismo, 25 de mayo de 2007 [**CL-0019**]; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶ 378; Memorial de Demanda, ¶¶ 39-43.

[44] Directiva 2009/28/EC del Parlamento y del Consejo, de 23 de abril de 2009, relativa al fomento del uso de la energía procedente de fuentes renovables y por la que se modifican y derogan las Directivas 2001/77/CE y 2003/30/CE, publicada en el Diario Oficial de la Unión Europea de 5 de junio de 2009 [**RL-0017**].

[45] Directiva 2009/28/EC, Preámbulo, ¶ 1 [**RL-0017**].

[46] Directiva 2009/28/EC, Preámbulo, ¶ 8 [**RL-0017**].

136.  El 30 de abril de 2009 se aprobó el RDL 6/2009[47]. En la Exposición de Motivos se menciona el creciente déficit tarifario; y se indica que el desajuste en las tarifas y los ingresos afectó la capacidad de financiación de las inversiones necesarias para el suministro de electricidad de la sociedad española. El RDL 6/2009 adopta diversas medidas que buscan "*proteger al consumidor y a garantizar la sostenibilidad económica del sistema eléctrico* [...] *[y] reactivar y relanzar las inversiones en el sector energético*"[48], estableció límites máximos de déficit tarifario para los años 2009, 2010, 2011, y 2012, y dispuso que el déficit tarifario debería eliminarse a más tardar para el año 2013[49].

137.  El RDL 6/2009 establece un nuevo proceso de registro, que consistió en exigir a las instalaciones de EERR que se inscribieran en el Registro Administrativo de Preasignación de Retribución antes de inscribirse en el RAIPRE[50]. Se trataba de un requisito obligatorio para recibir los beneficios otorgados por el régimen especial. Tras haber obtenido la inscripción en el Registro de Preasignación de Retribución, la central tenía un plazo máximo de 36 meses para ser inscrita con carácter definitivo en el RAIPRE al efecto de beneficiarse del régimen económico del RD 661/2007[51].

138.  El 11 de diciembre de 2009, Arenales Solar realizó la inscripción en la Fase 3 del registro de preasignación[52]. La Fase 3 del registro de preasignación exigía que la Planta se registrara en el RAIPRE antes del 1 de enero de 2013. Posteriormente, Arenales Solar solicitó el cambio a la Fase 4, solicitud que fue concedida por el Ministerio de Industria[53].

139.  El 19 de noviembre de 2010, España expidió el RD 1565/2010[54], por el que se regularon y modificaron determinados aspectos relativos a la actividad de producción de energía eléctrica en Régimen Especial. Limitó a veinticinco la cantidad de años durante los cuales las instalaciones fotovoltaicas ("**FV**") estarían sujetas a las tarifas reguladas establecidas en el régimen del RD 661/2007. El RD 1565/2010 sólo era aplicable a productores FV; no reguló a los productores CSP o eólicos.

---

[47] Real Decreto-Ley 6/2009, de 30 de abril de 2009, por el que se adoptan determinadas medidas en el sector energético y se aprueba el bono social ("**RDL 6/2009**") [**CL-0020**]; Memorial de Objeciones Jurisdiccionales y Contestación Sobre Méritos, ¶¶ 482, 483; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 326, 327; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 811.

[48] RDL 6/2009, Preámbulo [**CL-0020**; **R-0072**].

[49] RDL 6/2009, art. 1 [**CL-0020**; **R-0072**].

[50] Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 486-489.

[51] RDL 6/2009, art. 4, inc. 1 [**CL-0020**; **R-0072**].

[52] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**]; Memorial de Demanda, ¶ 63.

[53] Resolución de la Dirección General de Política Energética y Minas por la que se resuelve la solicitud de adelanto o retraso de fase asociada a la instalación de tecnología solar termoeléctrica Arenales, cuyo titular es Arenales Solar PS, S.L., inscrita en el registro de preasignación de retribución, al amparo del mecanismo previsto por el Acuerdo de Consejo de Ministros de 13 de noviembre de 2009, por el que se procede a la ordenación de los proyectos o instalaciones presentados al registro administrativo de preasignación de retribución para las instalaciones de producción de régimen especial, 18 de febrero de 2010 [**C-0010**]; Memorial de Demanda, ¶ 64; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶ 399.

[54] Real Decreto 1565/2010, de 19 de noviembre de 2010, por el que se regulan y modifican determinados aspectos relativos a la actividad de producción de energía eléctrica en régimen especial ("**RD 1565/2010**") [**R-0087**].

140. El 7 de diciembre de 2010, España promulgó el RD 1614/2010[55] que reguló y modificó aspectos relativos a la actividad de producción de energía eléctrica a partir de tecnologías CSP y eólica. El RD 1614/2010 pretendía "*resolver determinadas ineficiencias en la aplicación del citado Real Decreto-Ley 6/2009*"[56], en consonancia con el Acuerdo de julio de 2010.

141. Específicamente, el RD 1614/2010 limitaba el número de horas al año que las instalaciones tenían para percibir la cuantía correspondiente al FIT de conformidad con el RD 661/2010[57]. Disponía que las instalaciones CSP no serían acogidas para vender electricidad de acuerdo con la opción de Primas durante su primer año de operación o durante los primeros 12 meses posteriores a la entrada en vigor del RD 1614/2010, si la planta ya había obtenido el acta de puesta en servicio definitiva[58]. Sin embargo, durante este primer año, se les permitía a las instalaciones CSP aumentar el porcentaje de electricidad generada a partir de combustibles secundarios, incluido el gas, hasta un 15%, y aún beneficiarse de la Tarifa Fija para la totalidad de su producción de electricidad[59]. A su turno, el artículo 4 del RD 1614/2010 disponía lo siguiente:

> "Para las instalaciones de tecnología solar termoeléctrica acogidas al Real Decreto 661/2007 […] las revisiones de las tarifas, primas y límites inferior y superior, a las que se refiere el artículo 44.3 del citado real decreto, no afectarán a las instalaciones inscritas con carácter definitivo en el Registro administrativo de instalaciones de producción en régimen especial dependiente de la Dirección General de Política Energética y Minas a fecha 7 de mayo de 2009, ni a las que hubieran resultado inscritas en el Registro de preasignación de retribución al amparo de la disposición transitoria cuarta del Real Decreto-Ley 6/2009 […] y cumplieran la obligación prevista en su artículo 4.8, extendida hasta el 31 de diciembre de 2013 para aquellas instalaciones asociadas a la fase 4 prevista en el Acuerdo del Consejo de Ministros de 13 de noviembre de 2009"[60].

142. El 23 de diciembre de 2010, España promulgó el RDL 14/2010, por el que se establecen medidas urgentes para la corrección del déficit tarifario y para garantizar la sustentabilidad del SEE[61]. El objetivo de la norma era corregir, con carácter urgente, el déficit tarifario del sector eléctrico[62]. El Decreto modificó algunos artículos de la Ley 54/1997, estableció

---

[55] Real Decreto 1614/2010, de 7 de diciembre de 2010, por el que se regulan y modifican determinados aspectos relativos a la actividad de producción de energía eléctrica a partir de tecnologías solar termoeléctrica y eólica ("**RD 1614/2010**") [**CL-0022**; **R-0088**]; Memorial de Objeciones Jurisdiccionales y Contestación Sobre Méritos, ¶¶ 512-548 y 1032-1073; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 349-353; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 792, 793, 818.
[56] RD 1614/2010, Preámbulo [**CL-0022**; **R-0088**].
[57] RD 1614/2010, art. 2 [**CL-0022**; **R-0088**].
[58] RD 1614/2010, art. 3 [**CL-0022**; **R-0088**].
[59] RD 1614/2010, art. 3.3 [**CL-0022**; **R-0088**].
[60] RD 1614/2010, art. 4 [**CL-0022**; **R-0088**].
[61] Real Decreto-Ley 14/2010, de 23 de diciembre de 2010, por el que se establecen medidas urgentes para la corrección del déficit tarifario del sector eléctrico ("**RDL 14/2010**") [**R-0073**]; Memorial de Objeciones Jurisdiccionales y Contestación Sobre Méritos, ¶ 512; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 336, 337.
[62] RDL 14/2010, Exposición de motivos [**R-0073**].

recortes al número de horas por las que las instalaciones FV se beneficiarían de las tarifas del Régimen Especial del RD 661/2007[63] y creó peajes de acceso que debían satisfacer los productores (tanto del Régimen Ordinario como del Régimen Especial) y los consumidores por la utilización de las redes de transporte y distribución[64].

143. Los productores FV interpretaron el RDL 14/2010 como una modificación retroactiva del régimen retributivo al que tenían derecho. Como consecuencia de ello, se incoaron reclamaciones ante el Tribunal Supremo español, cuestionando la validez del RD 1565/2010 y del RDL 14/2010. El Tribunal Supremo dictó una serie de sentencias que rechazaron estas reclamaciones, estableciendo que el régimen retributivo aplicable a los productores de EERR podría modificarse de manera legítima, de conformidad con el principio de rentabilidad razonable (las "**Sentencias de 2012**")[65].

144. Steag es una compañía alemana especializada en la planificación, construcción y explotación de centrales eléctricas que utilizan combustibles fósiles y fuentes de energía renovables a través de varias filiales[66]. Al momento de la presentación de la reclamación, Steag era propietaria de la totalidad de las acciones de Steag 1 Beteiligungs-GmbH ("**Steag 1**"), también constituida en Alemania que. a su vez, según se explica a continuación, para ese momento era titular del 26,01% de las acciones de Arenales Solar PS S.L., propietaria de la planta CSP Arenales, con una potencia teórica de 49,9MW[67].

145. A finales de 2011 Steag conoció sobre la posibilidad de adquirir la participación de Solar Millenium AG ("**SMAG**") en Arenales Solar a través del propio SMAG[68]. El 21 de diciembre de 2011, SMAG se declaró en estado de insolvencia[69].

146. Arenales Solar PS es una sociedad española domiciliada en Madrid, inicialmente constituida por la sociedad Fotowatio, S.L. para la promoción y construcción de una planta de energía solar termoeléctrica en el municipio de Morón de la Frontera. El 8 de abril de 2011, Fotowatio, S.L. vendió el 100% de sus participaciones a las sociedades OHLI y SMAG[70]. Con posterioridad, RREEF adquiriría de OHLI y SMAG un 49% de las participaciones en Arenales Solar[71].

---

[63] RDL 14/2010, Disposición Adicional Primera [**R-0073**].
[64] RDL 14/2010, art. 1 [**R-0073**].
[65] Memorial de Objeciones Jurisdiccionales y Contestación Sobre Méritos, ¶ 555.
[66] Memorial de Objeciones Jurisdiccionales y Contestación Sobre Méritos, ¶ 556.
[67] Memorial de Demanda, ¶¶ 8-9, 58 y 68, ss.
[68] Declaraciones testificales del Sr. Joachim Rumstadt, de 24 de mayo de 2017 ("**Declaración testifical del Sr. Rumstadt**"), ¶ 11 [**C-0014**] y del Sr. Gregor Timmerhaus, de 24 de mayo de 2017 ("**Declaración testifical del Sr. Timmerhaus**"), ¶ 9 [**C-0015**].
[69] Memorial de Demanda, ¶ 71.
[70] Acuerdo de Inversión, Expositivo VI, p. 3 (p. 12 del documento electrónico) [**C-0011**].
[71] Acuerdo de Inversión, Expositivo VII, p. 3 (p. 12 del documento electrónico) [**C-0011**]; Acuerdo de Inversión, cláusula 4.4, p. 7 (p. 16 del documento electrónico) [**C-0011**].

147. Steag realizó varios estudios[72] para comprobar los riesgos y beneficios de la inversión[73] y financieros, con base en la información que SMAG puso a su disposición.

148. En marzo de 2012, la Comisión Nacional de Energía ("**CNE**"), cuyas funciones fueron asumidas por la Comisión Nacional de los Mercados y la Competencia ("**CNMC**") en 2013[74], publicó un informe sobre el sector energético español proponiendo "*medidas de ajuste regulatorio para atajar la creciente evolución del déficit tarifario del sector eléctrico*"[75].

149. El 25 de abril de 2012 se realizó una presentación al órgano ejecutivo de Steag del proyecto de inversiones[76], para valorar sus ventajas y desventajas. El 10 de mayo de 2012, el Consejo de Administración de Steag aprobó la inversión en Arenales Solar[77]; SMAG aceptó la oferta de Steag, y celebró un contrato[78] con Steag 1, una filial de Steag, para la adquisición de la participación de SMAG en Arenales Solar por 20.5 millones de euros.

150. El 8 de junio de 2012, Steag 1 firmó el SPA para la adquisición de las participaciones de SMAG en Arenales Solar, donde se comprometió irrevocablemente a pagar la mencionada cantidad al administrador concursal de SMAG[79].

151. El 22 de junio de 2012, Steag adquirió las acciones de SMAG, sustituyendo a esta última en su posición como accionista de Arenales Solar[80]. Sumado a lo anterior, a mediados de 2012 Steag firmó una serie de contratos relativos a su subrogación en la posición contractual previamente mantenida por SMAG. El Contrato de Subrogación Parcial y Modificación del Acuerdo de Inversión entre SMAG, el resto de "*sponsors*" originales del Proyecto, y Steag, fue firmado el 31 de julio de 2012[81]. Para el cierre de la operación, se celebró el Contrato de Novación Modificativa y no Extintiva de Documentos de la Financiación y Otros Pactos, firmado el 20 de noviembre de 2012[82].

---

[72] Declaración testifical del Sr. Rumstadt, ¶¶ 11-13 [**C-0014**]; Declaración testifical del Sr. Ponce de León, de 25 de mayo de 2017 ("**Declaración testifical del Sr. Ponce de León**"), ¶ 13 [**C-0016**]; Informe de Auditoria Legal: Proyecto Termosolar Arenales PS, S.L., Cuatrecasas, Gonçalves Pereira S.L.P., de 26 de julio de 2011 [**C-0017**]; Arenales Solar PS, S.L. – Due Diligence – Executive Summary, Fröhlingsdorf Abogados, de 5 de junio de 2012 [**C-0031**]; Memorial de Demanda, ¶¶ 70-79; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 262-270.
[73] Primer Informe sobre Daños (Brattle) [**IP C-001**].
[74] Cf. Ley 3/2013, de 4 de junio de 2013, de creación de la Comisión Nacional de los Mercados y la Competencia ("**Ley 3/2013**") [**R-0063**].
[75] Informe sobre el sector energético español Parte I. Medidas para garantizar la sostenibilidad económico-financiera del sistema eléctrico, de 7 de marzo de 2012 [**CL-0023**].
[76] Presentación al Órgano Ejecutivo de Steag, *Proyecto: Central Termosolar Arenales*, de 25 de abril de 2012 [**C-0040**]; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶ 285.
[77] Memorial de Demanda, ¶ 82. Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 286, 287.
[78] Acuerdo de compraventa de determinadas acciones y créditos de Arenales Solar PS, S.L., de 8 de junio de 2012 [**C-0006**].
[79] Memorial de Demanda, ¶¶ 83-87; Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶ 287.
[80] Réplica sobre el Fondo y Memorial de Contestación Sobre Excepciones a la Jurisdicción, ¶¶ 288, 289.
[81] Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012 [**C-0019**].
[82] Contrato de Novación Modificativa No Extintiva de Documentos de la Financiación y otros pactos, de

152. El 28 de diciembre de 2012, España promulgó la Ley 15/2012[83], que introdujo cambios al Régimen Especial aplicable a los productores CSP. La nueva ley creó el Impuesto sobre el Valor de la Producción de la Energía Eléctrica (el "**IVPEE**") sobre los ingresos totales provenientes de la producción e incorporación de energía eléctrica a la red eléctrica nacional. El IVPEE, que equivale a 7% de este ingreso, se aplicaba a todos los productores de energía, tanto convencional como renovable, incluyendo aquellos sujetos al Régimen Especial[84].

153. La disposición final primera de la Ley 15/2012 introdujo modificaciones a la Ley 54/1997. En particular, modificó el apartado 2 del artículo 15 de la Ley 54/1997:

> "Los costes de las actividades reguladas, incluyendo entre ellos los costes permanentes de funcionamiento del sistema y los costes de diversificación y seguridad de abastecimiento, serán financiados mediante los ingresos recaudados por peajes de acceso a las redes de transporte y distribución satisfechos por los consumidores y los productores, así como por las partidas provenientes de los Presupuestos Generales del Estado"[85].

154. La Ley 15/2012 añadió además un apartado 7 en el artículo 30 de la Ley 54/1997:

> "La energía eléctrica imputable a la utilización de un combustible en una instalación de generación que utilice como energía primaria alguna de las energías renovables no consumibles, no será objeto de régimen económico primado, salvo en el caso de instalaciones híbridas entre fuentes de energía renovables no consumibles y consumibles, en cuyo caso la energía eléctrica imputable a la utilización de la fuente de energía renovable consumible sí podrá ser objeto de régimen económico primado […]"[86].

155. El 1 de febrero de 2013, España expidió el RDL 2/2013, de medidas urgentes en el sistema eléctrico y en el sector financiero[87]. De conformidad con el artículo 1, con efecto desde el 1 de enero de 2013, todas las retribuciones, tarifas y primas del sistema eléctrico que anteriormente se actualizaban de conformidad con el IPC —incluidas aquellas aplicables a los productores en Régimen Especial— se actualizarían ahora de conformidad con el IPC a impuestos constantes sin incluir alimentos no elaborados ni productos energéticos[88].

156. En virtud del artículo 2 del RDL 2/2013, cuando los productores en Régimen Especial optaran por un esquema de retribución del precio de mercado más una Prima, esta Prima se reduciría al valor de EUR 0,0 céntimos/kWh, tanto para las instalaciones presentes como futuras.

---

20 de noviembre de 2012 [**C-0020**].
[83] Ley 15/2012, de 27 de diciembre de 2012, de medidas fiscales para la sostenibilidad energética ("**Ley 15/2012**") [**CL-0024**]; Memorial de Demanda, ¶¶ 24, 25; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 997-1000.
[84] Ley 15/2012, arts. 1-8 [**CL-0024**].
[85] Ley 15/2012, Disposición final primera [**CL-0024**].
[86] Ley 15/2012, Disposición final primera [**CL-0024**].
[87] Real Decreto-Ley 2/2013, de 1 de febrero de 2013, de medidas urgentes en el sistema eléctrico y en el sector financiero ("**RDL 2/2013**") [**CL-0025**; **R-0077**].
[88] RDL 2/2013, art. 1 [**CL-0025**; **R-0077**].

157.  El 12 de julio de 2013, España expidió el RDL 9/2013[89], que modificaba la Ley 54/1997. Específicamente, el artículo 1 del RDL 9/2013 modificaba el artículo 30(4) de la Ley 54/1997 en los siguientes términos:

> "4. Adicionalmente y en los términos que reglamentariamente por real decreto del Consejo de Ministros se determine, a la retribución por la venta de la energía generada valorada al precio del mercado, las instalaciones podrán percibir una retribución específica [el Pago especial] compuesta por un término por unidad de potencia instalada, que cubra, cuando proceda, los costes de inversión de una instalación tipo que no pueden ser recuperados por la venta de la energía y un término a la operación que cubra, en su caso, la diferencia entre los costes de explotación y los ingresos por la participación en el mercado de dicha instalación tipo.
>
> Para el cálculo de dicha retribución específica se considerarán, para una instalación tipo, a lo largo de su vida útil regulatoria y en referencia a la actividad realizada por una empresa eficiente y bien gestionada:
>
> a.  Los ingresos estándar por la venta de la energía generada valorada al precio del mercado de producción.
>
> b.  Los costes estándar de explotación.
>
> c.  El valor estándar de la inversión inicial. […]
>
> Este régimen retributivo no sobrepasará el nivel mínimo necesario para cubrir los costes que permitan competir a las instalaciones en nivel de igualdad con el resto de tecnologías en el mercado y que posibiliten obtener una rentabilidad razonable por referencia a la instalación tipo en cada caso aplicable. […]
>
> Esta rentabilidad razonable girará, antes de impuestos, sobre el rendimiento medio en el mercado secundario de las Obligaciones del Estado a diez años aplicando el diferencial adecuado.
>
> Los parámetros del régimen retributivo podrán ser revisados cada seis años".

158.  El 26 de diciembre de 2013, la Demandada sancionó la Ley 24/2013[90], que sustituyó a la Ley 54/1997.

159.  El régimen creado por la Ley 24/2013 eliminó formalmente la distinción entre el Régimen Ordinario y el Régimen Especial[91]. Los productores convencionales y de EERR quedaron sujetos a idénticas condiciones, los últimos teniendo exclusivamente derecho al Pago

---

[89] Real Decreto-Ley 9/2013, de 12 de julio de 2013, por el que se adoptan medidas urgentes para garantizar la estabilidad financiera del sistema eléctrico ("**RDL 9/2013**") [**CL-0026**]; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1029-1031.
[90] Ley 24/2013, de 26 de diciembre de 2013, del Sector Eléctrico ("**Ley 24/2013**") [**CL-0009**].
[91] Ley 24/2013, Preámbulo [**CL-0009**].

Especial creado por el RDL 9/2013[92]. La Ley 24/2013 eliminó también el derecho prioritario de acceso a la red eléctrica y la prioridad de entrega a las instalaciones de EERR[93]. Cuando se adoptaron el RDL 9/2013 y la Ley 24/2013, España todavía no había adoptado un régimen integral sobre el régimen jurídico y económico de las instalaciones de EERR[94]. Durante los meses siguientes siguió aplicándose la Tarifa Fija (aunque no la Prima, que había sido eliminada por el RDL 2/2013).

160. El 6 de junio de 2014, mediante la expedición del RD 413/2014[95], España inició la implementación de la Ley 24/2013, que reguló la actividad de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos. Sin embargo, el RD 413/2014 no estableció los parámetros de compensación para las Instalaciones Tipo.

161. El 20 de junio de 2014 se publicó en el Boletín Oficial del Estado la Orden Ministerial IET/1045/2014, "*por la que se aprueban los parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos*"[96]. Como segunda medida que implementara la Ley 24/2013, la Orden Ministerial estableció los parámetros de retribución aplicables a los productores de EERR en virtud del régimen de la Ley 24/2013. De acuerdo con la Orden Ministerial IET/1045/2014 se estableció en 7,398% la tasa de rentabilidad razonable aplicable a las instalaciones existentes con anterioridad a la entrada en vigor del RDL 9/2013.

162. En virtud del nuevo régimen aplicable a las instalaciones de EERR, que incluye a la Planta Arenales, los productores de EERR tienen derecho a obtener un Pago Especial adicional al precio de mercado de la electricidad que ellos producen. Las instalaciones CSP tienen derecho al Pago Especial sólo durante una vida útil regulatoria de veinticinco años, y no durante la totalidad de la vida operativa de las instalaciones. Además, el Pago Especial se calcula por referencia a una instalación tipo. Tampoco se tienen en cuenta los costes incurridos ni las inversiones realizadas como consecuencia de leyes o regulaciones locales. Por último, el Pago Especial puede exceder el mínimo necesario para permitir que los productores de EERR obtengan una tasa de rentabilidad razonable, calculada en 7,398% para las instalaciones existentes.

163. Como consecuencia de lo anterior, la Demandante afirma que el régimen regulatorio aplicable a la Planta Arenales ha cambiado de manera significativa desde el momento en que Steag realizó su inversión. Las medidas han generado una alteración del marco regulatorio que, a juicio de la Demandante, resulta inconsistente con el sistema anterior, toda vez que se

---

[92] Ley 24/2013, Preámbulo [**CL-0009**].
[93] Ley 24/2013, art. 26(1) [**CL-0009**].
[94] Ley 24/2013, Disposición Final Tercera [**CL-0009**].
[95] Real Decreto 413/2014, 6 de junio de 2014, por el que se regula la actividad de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos ("**RD 413/2014**") [**CL-0027**].
[96] Orden Ministerial IET/1045/2014, 16 de junio de 2014, por la que se aprueban los parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos ("**Orden Ministerial IET/1045/2014**") [**CL-0028**].

ha pasado de una retribución basada en una tarifa fija o una prima otorgada por cada MWh producido a un sistema de "*ratios*" por instalaciones estándar[97].

164. En febrero de 2020, Steag realizó una operación de desinversión por la cual vendió su participación en Arenales Solar a RREEF[98]. De acuerdo con la Demandante, la participación se vendió por una suma de EUR 9.422.027[99].

## VI.    PRETENSIONES DE LAS PARTES

### A.    PRETENSIONES DE LA DEMANDANTE

165. La Demandante solicita al Tribunal:[100]

1.    Que se declare que el Demandado ha vulnerado el art. 10(1) TCE al modificar el Régimen Regulatorio Original, suprimiendo el apoyo económico que suponía para el Proyecto

---

[97] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 523.
[98] Comunicación de la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V., 4 de febrero de 2020, ¶¶ 2-3.
[99] Respuesta a los comentarios de España sobre la operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 4.
[100] Memorial de Demanda, ¶ 291 ("*En virtud de cuanto se ha expuesto en el presente escrito, se solicita:* [...] *(a) Que se declare que el Demandado ha vulnerado el art. 10(1) TCE al modificar el Régimen Regulatorio Original, suprimiendo el apoyo económico a inversores que en él se encontraba y sustituyéndolo por un sistema remuneratorio distinto que ha conducido a la pérdida de la inversión de Steag. (b) Que se declare que el cambio normativo descrito podría constituir una expropiación contraria al art. 13 TCE. (c) Que se concedan al Demandante los remedios que el tribunal estime oportunos, incluyendo, pero no limitándose a, una compensación pecuniaria por el daño ocasionado a Steag en un importe no inferior a 83 millones de euros. (d) Que se condene a España al pago de intereses sobre la compensación monetaria desde el día del incumplimiento del TCE o desde el día en que se dicte el laudo hasta el día en que se pague la cantidad adeudada. (e) Que se realice cualquier otra declaración que el tribunal entienda oportuna.*"); Réplica sobre el Fondo y Contestación sobre las Excepciones a la Jurisdicción, ¶ 524 ("*En virtud de cuanto se ha expuesto en el presente escrito, se solicita:* [...] *(a) Que se declare que el Demandado ha vulnerado el art. 10(1) TCE al modificar el Régimen Regulatorio Original, suprimiendo el apoyo económico que suponía para el Proyecto Arenales y sustituyéndolo por un sistema remuneratorio distinto que ha conducido a la pérdida de la inversión de Steag. (b) Que se declare que el cambio normativo descrito podría constituir una expropiación contraria al art. 13 TCE. (c) Que se concedan al Demandante los remedios que el tribunal estime oportunos, incluyendo, pero no limitándose a, una compensación pecuniaria por el daño ocasionado a Steag en un importe que no resulte inferior a 83 millones de euros y que deberá incluir también el efecto fiscal para Steag de conformidad con el informe "Rebuttal Report: Financial Damages to STEAG" de The Brattle Group. (d) Que se condene a España al pago de intereses sobre la compensación monetaria desde el día del incumplimiento del TCE o desde el día en que se dicte el laudo hasta el día en que se pague la cantidad adeudada. (e) Que se realice cualquier otra declaración que el tribunal entienda oportuna.*"); Memorial Adicional, ¶ 201 ("*En virtud de cuanto se ha expuesto en el presente escrito, y como continuación de lo pedido en el escrito de demanda, el memorando de réplica y la dúplica sobre jurisdicción, se solicita: (a) Que el Tribunal Arbitral desestime todas las objeciones planteadas por el Reino de España. (b) Que el Tribunal Arbitral declare que España ha vulnerado el art. 10(1) TCE al modificar el Régimen Regulatorio Original, suprimiendo el apoyo económico que suponía para el Proyecto Arenales y sustituyéndolo por un sistema remuneratorio distinto que ha conducido a la pérdida de la inversión de Steag, lo que también podría constituir una expropiación contraria al artículo 13 TCE. (c) Que se concedan al Demandante los remedios que el tribunal estime oportunos, incluyendo, pero no limitándose a, una compensación pecuniaria por el daño ocasionado a Steag en un importe que no resulte inferior a 79 millones de euros y que deberá incluir también el efecto fiscal para Steag de conformidad con el informe 'Rebuttal Report: Financial Damages to STEAG' de The Brattle Group. (d) Que se realice cualquier otra declaración que el Tribunal Arbitral entienda oportuna.*").

Arenales Solar y sustituyéndolo por un sistema remuneratorio distinto que ha conducido a la pérdida de la inversión de Steag.

2. Que se declare que el cambio normativo descrito podría constituir una expropiación contraria al art. 13 TCE.

3. Que se concedan al Demandante los remedios que el tribunal estime oportunos, incluyendo, pero no limitándose a, una compensación pecuniaria por el daño ocasionado a Steag en un importe no inferior a 79 millones de euros[101] y que deberá incluir también el efecto fiscal para Steag de conformidad con el informe "Rebuttal Report: Financial Damages to STEAG" de The Brattle Group.

4. Que se condene a España al pago de intereses sobre la compensación monetaria desde el día del incumplimiento del TCE o desde el día en que se dicte el laudo hasta el día en que se pague la cantidad adeudada.

5. Que se realice cualquier otra declaración que el tribunal entienda oportuna.

## B.    PRETENSIONES DE LA DEMANDADA

166. La Demandada solicita al Tribunal que:[102]

1. Declare carecer de jurisdicción para conocer de las reclamaciones de la Demandante, o en su caso la inadmisibilidad de las mismas.

---

[101] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶ 89; Memorial Adicional, ¶ 201.

[102] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1204 ("*A la vista de los argumentos expuestos en el presente Escrito, el Reino de España solicita respetuosamente al Tribunal Arbitral que: a) Declare carecer de jurisdicción para conocer de las reclamaciones de la Demandante en relación con el IVPEE, de conformidad con lo expuesto en la sección III del presente Memorial. b) Desestime todas las pretensiones de la Demandante en cuanto al resto de las medidas impugnadas, ya que el Reino de España no ha incumplido, en modo alguno, el TCE, de acuerdo con lo expuesto en la sección IV del presente Memorial. c) Subsidiariamente, que se desestimen todas las pretensiones resarcitorias de la Demandante por cuanto ésta no tiene derecho a una compensación, de conformidad con lo expuesto en la sección V del presente Memorial; y d) Condene a la Demandada al pago de todas las costas y gastos que se deriven del presente arbitraje, incluidos los gastos administrativos incurridos por CIADI, los honorarios de los árbitros y los honorarios de la representación letrada del Reino de España, sus peritos y asesores, así como cualquier otro coste o gasto en que se haya incurrido. Dichos costas y gastos deberán devengar asimismo una tasa de interés razonable desde la fecha en que se incurra en dichos costes hasta la fecha de su pago efectivo*"); Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1529 ("*A la vista de los argumentos expuestos en el presente Escrito, el Reino de España solicita respetuosamente al Tribunal Arbitral que: i. Declare carecer de jurisdicción para conocer de las reclamaciones de la Demandante, o en su caso la inadmisibilidad de las mismas, de conformidad con lo expuesto en la sección III del presente Escrito, referida a Objeciones Jurisdiccionales; ii. Subsidiariamente, para el caso de que el Tribunal Arbitral decida que tiene jurisdicción para conocer de la presente controversia, que desestime todas las pretensiones de la Demandante en cuanto al fondo, ya que el Reino de España no ha incumplido en modo alguno el TCE, de acuerdo con lo expuesto en las secciones IV y V del presente Escrito, referidas a los Hechos y el Fondo del Asunto, respectivamente; iii. Subsidiariamente, que se desestimen todas las pretensiones resarcitorias de la Demandante por cuanto ésta no tiene derecho a una compensación, de conformidad con lo expuesto en la sección VI del presente Escrito; y iv. Condene a la Demandante al pago de todas las costas y gastos que se deriven del presente arbitraje, incluidos los gastos administrativos incurridos por CIADI, los honorarios de los árbitros y los honorarios de la representación letrada del Reino de España, sus peritos y asesores, así como cualquier otro coste o gasto en que se haya incurrido, todo ello incluyendo una tasa de interés razonable desde la fecha en que se incurra en dichos costes hasta la fecha de su pago efectivo*").

2. Subsidiariamente, para el caso de que el Tribunal Arbitral decida que tiene jurisdicción para conocer de la presente controversia, que desestime todas las pretensiones de la Demandante en cuanto al fondo ya que el Reino de España no ha incumplido en modo alguno el TCE.

3. Subsidiariamente, que se desestimen todas las pretensiones resarcitorias de la Demandante por cuanto ésta no tiene derecho a una compensación.

4. Condene a la Demandante al pago de todas las costas y gastos que se deriven del presente arbitraje, incluidos los gastos administrativos incurridos por CIADI, los honorarios de los árbitros y los honorarios de la representación letrada del Reino de España, sus peritos y asesores, así como cualquier otro coste o gasto en que se haya incurrido, todo ello incluyendo una tasa de interés razonable desde la fecha en que se incurra en dichos costes hasta la fecha de su pago efectivo.

## VII.  OBJECIONES A LA JURISDICCIÓN

167. En su Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, del 3 de noviembre de 2017, y en su Memorial de Dúplica y Réplica de Jurisdicción, del 3 de agosto de 2018, la Demandada ha formulado las siguientes objeciones de jurisdicción y de admisibilidad:

   a. El Tribunal carece de jurisdicción para conocer de una controversia entre un inversionista de un Estado miembro de la UE y un Estado miembro de la UE ("**controversia intra-UE**"), relativa a una inversión realizada por el primero en el territorio del segundo ("**inversión intra-UE**").

   b. El Tribunal carece de jurisdicción sobre la reclamación relativa a la supuesta violación del artículo 10(1) por la introducción del IVPEE a través de la Ley 15/2012 del 27 de diciembre de 2012[103]. Por operación del artículo 21 del TCE, el artículo 10(1) del TCE no da lugar a obligaciones respecto de "medidas impositivas", lo que supone que España no ha consentido al arbitraje de la controversia[104].

   c. El Tribunal carece de jurisdicción *ratione temporis*. La Demandante realizó su inversión con posterioridad al surgimiento de la disputa, cuando las medidas objeto de la controversia ya habían sido implementadas o anunciadas[105].

   d. La reclamación relativa al supuesto incumplimiento del artículo 13 del TCE (expropiación) a través de la introducción del IVPEE es inadmisible; el artículo 21(5)(b) del TCE exige que el asunto sea sometido inicialmente a las autoridades fiscales

---

[103] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 5 y 110-203; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 8 y 206-290.
[104] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 5; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 8.
[105] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 840-842; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 10 y 311-335.

competentes de España, para que éstas se pronuncien dentro de un término de seis (6) meses[106].

168. La Demandante ha presentado sus argumentos contra las objeciones de jurisdicción y admisibilidad en el Memorial de Réplica sobre el Fondo y de Contestación sobre Excepciones a la Jurisdicción, del 11 de mayo de 2018[107], y en el Memorial de Dúplica sobre Jurisdicción, del 31 de octubre de 2018[108].

## A. LA OBJECIÓN INTRA-UE

### 1. Posición de la Demandada

169. El Reino de España alega que este Tribunal carece de jurisdicción para conocer de una controversia entre un Estado miembro de la Unión Europea y un inversor de otro Estado miembro de la Unión Europea ("**intra-UE**"), más aún cuando la controversia exige interpretar y aplicar el derecho comunitario, incluyendo el régimen relativo a ayudas de Estado[109]. España plantea su objeción intra-UE como una objeción relativa tanto a la jurisdicción *ratione personae*[110], como a la jurisdicción *ratione materiae* de este Tribunal[111].

### 1.1. Jurisdicción *ratione personae*

170. La Demandada alega que el Tribunal carece de jurisdicción *ratione personae* para conocer de la controversia[112] porque el artículo 26 del TCE cubre exclusivamente disputas entre "*una Parte Contratante*" y "*un inversor de otra Parte Contratante*"[113]. De ahí concluye que el mecanismo de resolución de controversias previsto por el TCE no es aplicable a una controversia intra-UE, relativa a una inversión intra-UE[114]. España resalta que su posición es consistente con la decisión del Tribunal de Justicia de la Unión Europea ("**TJUE**") en el caso *Achmea*[115], y enfatiza que una sentencia del TJUE "*es derecho*"[116]. En ese sentido, la Demandada llama la atención del Tribunal sobre la decisión del Tribunal de Apelación de

---

[106] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 6 y 204-223; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 9 y 291-310.
[107] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 18, ss.
[108] Dúplica sobre Jurisdicción, ¶¶ 1, ss.
[109] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 4, 57, ss. y 84-93; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 73, ss.
[110] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 4, 57, ss.; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 73, ss.
[111] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 84-205.
[112] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 4, 57, ss.; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 73, ss.
[113] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 58.
[114] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 58. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 75, 77.
[115] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 76, 80.
[116] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 81.

Svea en el caso *Novenergia II*[117]. Adicionalmente, la Demandada afirma que, al menos desde el año 2014, Steag conocía "*los problemas que planteaban los arbitrajes intra-UE*"[118].

171. La inversión de la Demandante es "*una inversión realizada en el ámbito del Mercado interior de la electricidad de la UE*" y en dicho ámbito la protección que ofrece el sistema de la UE tiene un carácter específico y preferente respecto de la protección ofrecida por el TCE[119]. La Demandante es una sociedad constituida en la República Federal de Alemania, país que, al igual que el Reino de España, es actualmente un Estado miembro de la UE y lo ha sido desde antes de la ratificación del TCE[120] y, al ratificar el TCE, los dos Estados referidos "*no pudieron contraer entre sí obligaciones en el ámbito del Mercado interior de la energía, armonizado por la UE*"[121]. Precisamente por ello, según la Demandada, la UE es una de las Partes Contratantes del TCE[122].

172. La Demandada entiende que el ejercicio de jurisdicción sobre controversias entre Estados de la UE e inversionistas de la UE sería incompatible con "*la necesidad de garantizar la autonomía y la primacía del ordenamiento comunitario*"[123]. El derecho de la UE "*prohíbe la existencia de cualquier mecanismo de solución de controversias ajeno al establecido por sus tratados, que pueda interferir en los fundamentos del Mercado interior*"[124] y en tanto el derecho de la UE es "*derecho internacional aplicable*", en caso de conflicto, el derecho de la UE debe prevalecer sobre el TCE[125]. Para decidir sobre este caso, el Tribunal tendría que referirse a los derechos de supuestos inversores de la UE dentro del mercado interior de electricidad[126], lo que supondría una interferencia en el ámbito de competencia del sistema judicial de la Unión[127].

173. La Demandada explica que las normas acerca del Mercado Interior proveen "*un sistema integral de promoción y protección de las inversiones intra UE*"[128]. Incluso antes de la firma del TCE, la política en materia energética ya era un elemento de las políticas de la UE[129]. En el marco de las obligaciones contraídas para alcanzar los objetivos trazados por las Directivas comunitarias ha promovido la inversión en energías renovables[130]. La Demandada concluye

---

[117] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 82, refiriéndose a la Decisión de la Corte de Apelación de Svea para suspender de forma indefinida la ejecución del laudo, de 16 de mayo de 2018 [**RL-0110**].
[118] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 76, haciendo referencia a los Anexos **R-0366** ("Grupo de trabajo Arenales. Reunión GF 11 de marzo de 2014" STEAG, p. 13) y **R-0382** (Impacto de las medidas políticas previstas en España).
[119] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 62.
[120] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 59-61; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 78.
[121] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 61-66. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶ 78.
[122] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 78.
[123] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 75.
[124] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 63.
[125] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 63.
[126] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 64.
[127] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 64.
[128] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 66. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶ 78.
[129] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 68.
[130] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 69, citando, además, el Considerando 14 de la Directiva 2009/28/CE del Parlamento Europeo y del Consejo, de 23 de abril de 2009, relativa al fomento

que "*el marco institucional y judicial de la UE ofrece los recursos y acciones judiciales apropiadas cuando los derechos de los inversores son vulnerados*"[131].

174.   Para la Demandada, sólo un inversor de un país que no es miembro de la UE puede calificar como "*inversor extranjero*"[132]. En ese contexto, el artículo 54 del Tratado de Funcionamiento de la Unión Europea ("**TFUE**"), según ha sido entendido por el TJUE, prohíbe la adopción de medidas nacionales cuyo efecto sea disuadir a un inversor intra-UE de establecerse en un Estado miembro, aún si la aplicación de dichas medidas no conlleva discriminación basada en la nacionalidad[133].

175.   La Demandada argumenta que el TCE reconoce la aplicación preferente que el sistema de la UE tiene entre los Estados de la UE[134] y en sustento de su argumento cita el artículo 1(2) del TCE, que incluye dentro de la definición de "*Partes Contratantes*" a las Organizaciones Regionales de Integración Económica ("**ORIEs**")[135], siendo la UE la única ORIE parte del TCE[136]. Invoca, además, el artículo 1(3) del TCE que define las ORIEs y sus facultades[137]; el artículo 1(10), que define el término "*territorio*" respecto de las ORIEs[138]; el artículo 16, que se refiere a la relación del TCE con acuerdos anteriores y posteriores entre las Partes, incluyendo los de la UE[139]; el artículo 25 (Acuerdos de Integración Económica) que, a juicio de la Demandada, establece claramente que el trato de nación más favorecida bajo el TCE no obliga a los Estados miembros de la UE a extender el sistema de promoción y protección de inversiones intra-UE a otros Estados parte del TCE[140]; el artículo 36(7), que se refiere al voto de las ORIEs sobre materias que sean de su competencia[141]; el artículo 26(1), bajo el cual la controversia debe establecerse entre una Parte Contratante y un inversor de otra Parte Contratante[142]; y el artículo 26(6) que, según la interpretación de la Demandada, exige aplicar el derecho de la UE como "*Derecho Internacional aplicable*"[143].

176.   La Demandada enfatiza que "*[e]s precisamente el artículo 26(6) del TCE el que impide que un inversor intra-UE pueda demandar en arbitraje a un Estado miembro de la UE por razón de su inversión*"[144]. Basándose en *Electrabel c. Hungría*, España asegura que, en caso de incompatibilidad irresoluble entre el TCE y el derecho de la UE, debe prevalecer este

---

del uso de energía procedente de fuentes renovables y por la que se modifican y se derogan las Directivas 2001/77/CE y 2003/30/CE [**RL-0017**]. La Demandada (¶ 69, n. 8) se refiere también al Considerando 14 de la Directiva 2001/77/CE [**RL-0015**].

[131] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 72.
[132] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 73.
[133] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 74, citando en ese sentido la Sentencia del TJUE (Sala Tercera) en el caso *Attanasio Group Srl c. Comuni di Carbognano*, Asunto C-384/08 (11 de marzo de 2010), ¶ 43 [**RL-0020**].
[134] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 75, ss.
[135] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 76.
[136] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 76.
[137] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 77, 78.
[138] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 79.
[139] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 80.
[140] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 81.
[141] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 82.
[142] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 83.
[143] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 83.
[144] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 84.

último[145]. El artículo 344 del TFUE "*impide a España someter al arbitraje cuestiones relativas al mercado interior de la electricidad*"[146].

177. La Demandada resalta que, de asumir jurisdicción sobre la presente disputa, este Tribunal tendría que tomar una decisión acerca de los derechos que en el Mercado Interior goza un inversor intra-UE[147]. Citando el Dictamen 1/91 del TJUE sobre el Acuerdo de Creación de un Espacio Económico Europeo ("**EEE**"[148]), España agrega que, cuando se firmó el TCE, los Estados miembros de la CE ya habían cedido su soberanía en lo que se refiere al Mercado Interior, por lo que "*no pudieron contraer obligaciones entre sí en materia de mercado interior*"[149].

178. Señala la Demandada que "*el artículo 26 del TCE no genera obligaciones entre los Estados miembros*"[150] y la "*interpretación armónica*" del TCE con el sistema de la UE lleva a concluir que el TCE sólo se aplica a disputas entre un inversor de un país que no hace parte de la UE y un Estado parte de la UE, o a una disputa entre un Estado que no es parte de la UE y un inversor de la UE[151].

179. La Demandada afirma que una lectura teleológica del TCE confirma su conclusión[152] pues, cuando se firmó el TCE, el derecho comunitario ya protegía las inversiones intra-UE[153]. Incluir las controversias intra-UE dentro del ámbito del TCE sería "*hurtar sus competencias al TJUE*"[154].

180. Según España "*el origen del TCE está en el deseo del Consejo de la entonces Comunidad Europea de acelerar la recuperación económica de la Europa del Este tras la caída del Muro de Berlín, a través de la cooperación en el sector energético*"[155]. De ahí que una interpretación de los artículos 26(1) y 26(6) del TCE, acorde al contexto y objetivo del TCE, tenga por resultado la "*improcedencia*" del arbitraje de controversias intra-UE[156]. Para la Demandada "*entre los Estados miembros de la UE y sus ciudadanos, el Derecho UE desplaza la aplicación de cualquier otra norma, en virtud del principio de primacía*"[157]. La legislación española se enmarca en las Directivas de la UE sobre energías renovables, de

---

[145] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 84, citando *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶ 4.189 [**RL-0002**].

[146] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 85.

[147] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 86.

[148] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 87-90, citando el Dictamen 1/91 del TJUE sobre el Proyecto de Acuerdo por el cual se crea el Espacio Económico Europeo (14 de diciembre de 1991), ¶¶ 34, 38 [**RL-0191**].

[149] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 91.

[150] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 92. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶ 78.

[151] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 92-93, invocando el caso *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶ 4.158 [**RL-0002**].

[152] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 94, ss.

[153] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 94.

[154] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 94.

[155] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 96.

[156] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 97.

[157] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 101.

modo que la controversia debe resolverse bajo el derecho de la UE, donde aplica el artículo 344 del TFUE[158]. Sería contrario al derecho de la UE, aplicable bajo el artículo 26(6) del TCE, someter a arbitraje una controversia intra-UE sobre las libertades de establecimiento y libre circulación de capitales en el campo de energías renovables[159].

181. La Demandada se refiere al Procedimiento SA.40448 2014/N ante la Comisión Europea, sobre medidas de apoyo para energías renovables y cogeneración, indicando que éste podría tener "*incidencia*" sobre el resultado del proceso arbitral[160]. España argumenta que los Estados miembros de la UE tienen la obligación de tomar en consideración las directrices comunitarias sobre ayudas estatales relativas a energía y protección del medio ambiente[161].

182. La Demandada destaca que la Comisión Europea ha considerado en el pasado que el pago de compensaciones reconocidas por tribunales de inversión a inversores intra-UE puede constituir una ayuda estatal no autorizada y violatoria del artículo 108(3) del TFUE, y ha establecido asimismo que los inversores deben reembolsar las sumas recibidas por ese concepto[162]. La Comisión ha llegado a la misma conclusión en relación con laudos dictados al amparo del TCE[163].

183. La Demandada concluye que, tratándose en este caso de una controversia intra-UE, no se cumple el requisito del artículo 26(1) del TCE, que exige que el arbitraje se refiera a una controversia entre una Parte Contratante y un inversor de otra Parte Contratante[164]. En consecuencia, este Tribunal carece de jurisdicción *ratione personae*[165].

### 1.2.  Jurisdicción *ratione materiae*

184. La Demandada alega que, dado el carácter intra-UE de la controversia, el Tribunal Arbitral también carece de jurisdicción *ratione materiae*[166]. La Demandada apoya su argumento en los artículos 26(4) y 26(6) del TCE, así como en la decisión del TJUE en el caso *Achmea*[167].

---

[158] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 102.

[159] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 103.

[160] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 104.

[161] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 106.

[162] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 107-108. La Demandada menciona la decisión en que la Comisión Europea ordenó a Rumania suspender el pago del laudo CIADI del caso *Ioan Micula c. Rumania* [**RL-0081**], dictada con base en el Reglamento (EC) No. 659/1999, que autoriza a la Comisión a ordenar la suspensión del pago de ayudas que a su juicio sean ilegales (¶ 107). La Demandada (¶ 107) cita también la Decisión (UE) 2015/1470 de la Comisión, relativa a la ayuda estatal SA.38517 (2014/C) (ex 2014/NN) ejecutada por Rumania – Laudo arbitral Micula/Rumania del 11 de diciembre de 2013 (30 de marzo de 2015), donde la Comisión Europea encontró que el pago por el Estado rumano de compensaciones a inversores suecos contravenía las normas comunitarias sobre ayudas de Estado, y estableció que los inversores debían devolver las sumas recibidas [**R-0025**].

[163] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 108; Decisión C(2016) 7827 final de la Comisión, relativa al expediente de ayudas SA.40171 (2015/NN) – República Checa (28 de noviembre de 2016) [**RL-0070**].

[164] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 109; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 75.

[165] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 65, 109; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 73, 83.

[166] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 84, ss.

[167] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 84, ss., haciendo referencia a la Sentencia del Tribunal de

185. La Demandada considera que el artículo 26(6) del TCE incorpora el principio *iura novit curia* al TCE, exigiendo así que el Tribunal "*determine y concrete la norma internacional aplicable*" que, a juicio de España, "*no se agota en el TCE mismo*"[168] porque "*[e]n una relación intra-EU* […] *el Tribunal está llamado a interpretar y aplicar las normas y principios del Derecho Comunitario como Derecho Internacional*"[169].

186. España sostiene que el derecho de la UE "es derecho primario que nace y se constituye mediante Tratado Internacional"[170] y destaca que diferentes tribunales de inversión han reconocido que el derecho comunitario es parte del derecho internacional a los efectos del artículo 26 del TCE[171]. La Demandada cita también el laudo *Wirtgen c. República Checa*, sugiriendo que el derecho de la UE podría ser aplicado bajo el "*principio de proximidad*" del artículo 31(3)(c) de la CVDT[172]. La Demandada encuentra que el derecho de la UE es adicionalmente relevante como parte del derecho interno de cada uno de los Estados miembros de la Unión y, además, como "*hecho fundamental*" para la configuración de las expectativas legítimas de Steag[173].

187. Adicionalmente, España enfatiza que la controversia sometida a este Tribunal tiene un impacto sobre las ayudas de Estado como "*institución esencial de la UE*"[174]. La compensación que requiere la Demandante proviene de "*un esquema de subsidios*" y sería, siguiendo el criterio de la Comisión Europea y del TJUE, una ayuda de Estado[175]. Los incentivos establecidos a través del RD 661/2007 y del RD 1578/2008 constituyen ayudas de Estado[176]. Para España lo anterior implica que este Tribunal "*deberá pronunciarse sobre si las plantas de la Demandante tienen derecho a la percepción sine die de una concreta cantidad de Ayuda de Estado*"[177]. Una decisión que tenga por efecto la distorsión de las condiciones del mercado, favoreciendo a Steag, contravendría el derecho comunitario[178].

---

Justicia de la UE (Gran Sala) en el caso *República de Eslovaquia c. Achmea BV*, Asunto C-284/16 (6 de marzo de 2018) [**RL-0103**].

[168] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 89.

[169] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 90.

[170] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 90. Cf. también ¶ 91, haciendo también referencia a la sentencia del TJUE en el caso *Achmea* en el ¶ 92.

[171] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 93-94, refiriéndose a los casos *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶ 4.122 [**RL-0002**]; *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 278 [**RL-0068**].

[172] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 95, refiriéndose al caso *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-13 (11 de octubre de 2017), ¶ 174 [**RL-0100**].

[173] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 96.

[174] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 90 y 97-98.

[175] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 98, 99, citando en apoyo de su argumento la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017), ¶ 156 [**RL-0092**] y la orden del TJUE en el caso ECOLGAS (22 de octubre de 2014) [**RL-0019**].

[176] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 100-103 y 107, haciendo referencia a la respuesta de la Comisión Europea a una solicitud dirigida a iniciar un proceso de infracción contra el Reino de España (26 de febrero de 2016) y a la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017), ¶ 158 [**RL-0092**].

[177] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 104.

[178] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 105.

España observa que la Comisión Europea ha determinado que un Tribunal Arbitral no es competente para autorizar una ayuda de Estado[179].

188. La Demandada se refiere también a la relevancia del derecho de la UE en la determinación del alcance del estándar de trato justo y equitativo ("**estándar de TJE**") y la delimitación de las expectativas legítimas[180]. La Comisión Europea ha indicado que, cuando una ayuda Estatal no ha sido notificada a la Comisión, no puede haber expectativa legítima alguna sobre dicha ayuda[181] y, por esa razón, para la Comisión tampoco puede darse en ese contexto una violación del estándar de TJE[182]. La propia Comisión Europea considera que este pronunciamiento es vinculante para tribunales de arbitraje que apliquen el derecho de la UE[183]. La Demandada invoca también el artículo 1(3) del TCE que, en su interpretación, "*reconoce que los Estados Miembros de la Unión estarán legalmente obligados a cumplir las decisiones de la Unión Europea adoptadas bajo el Derecho de la Unión Europea*"[184].

189. Según España "*el régimen de Ayudas de Estado de la Unión Europea se encuentra reservado a la competencia exclusiva de la Comisión*"[185] y un tribunal arbitral no puede realizar pronunciamientos acerca de "*pilares esenciales*" del derecho comunitario pues la competencia está reservada al TJUE[186].

190. En el caso *Achmea*, explica la Demandada, "[el TJUE] *ha declarado la incompatibilidad entre los arbitrajes y el Derecho de la Unión Europea cuando los primeros afecten o puedan afectar a la autonomía del Derecho de la Unión Europea*"[187].

191. La Demandada alega que la conclusión del TJUE en *Achmea* es "*extensible*" a este proceso arbitral[188]. Si bien el TJUE se refirió específicamente a un TBI entre dos Estados miembros de la UE[189], el mismo razonamiento aplica cuando una disputa bajo el TCE "*se refiera o tenga por objeto una materia que, como ocurre con el régimen de Ayudas de Estado, es esencial dentro del ordenamiento jurídico comunitario*"[190], ya que en tales casos se presenta también una afectación a la autonomía del derecho de la UE[191].

---

[179] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 107, haciendo referencia a la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017) [**RL-0092**].
[180] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 108.
[181] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 109, citando la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017), ¶ 158 [**RL-0092**].
[182] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 110, citando la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017), ¶ 164 [**RL-0092**].
[183] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 111, citando la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017), ¶ 166 [**RL-0092**].
[184] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 114-116, citando también en ese contexto el caso *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶ 4.142 [**RL-0002**].
[185] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 98.
[186] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 98, apoyándose en el Dictamen 1/91 del TJUE (14 de diciembre de 1991) [**R-0191**].
[187] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 85.
[188] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 145, ss.
[189] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 146.
[190] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 147.
[191] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 147.

192. La Demandada nota que la sentencia del TJUE en *Achmea* no se refiere a "*tratados bilaterales de inversión*" sino a "*acuerdos internacionales*", y tampoco hace referencia a "*un acuerdo internacional celebrado entre dos Estados miembros*" sino a un "*acuerdo internacional celebrado entre Estados miembros*"[192]. De lo anterior concluye la Demandada que el TCE cabe dentro de la noción de "*acuerdo internacional*" utilizada por el TJUE en *Achmea*, de manera que las conclusiones de dicho tribunal pueden aplicarse también al artículo 26(4) del TCE[193]. España explica que, desde una perspectiva sustantiva, la incompatibilidad de la cláusula arbitral con el derecho de la UE está dada por tres condiciones:

> "(1) que para resolver la controversia el Tribunal arbitral esté llamado a interpretar y/o aplicar la legislación de la UE; (2) que el Principio de autonomía de la UE no se respete porque el TJUE no pueda ejercer su función de garantizar la plena aplicación de la legislación de la UE en todos los Estados miembros y []garantizar la protección judicial de los derechos de las personas en virtud de esa ley; y (3) que el laudo dictado por el Tribunal arbitral no esté sujeto a revisión por un Tribunal de un Estado miembro"[194].

193. La Demandada considera que estos requisitos se cumplen porque en una controversia intra-UE "*están sin duda en juego*" las libertades fundamentales de la UE y, en este caso particular, la disputa involucra además una ayuda de Estado[195]. Por otra parte, España explica que un Tribunal constituido bajo el TCE no puede formular una petición de decisión prejudicial bajo el artículo 267 del TFUE[196]. La Demandada concluye que, si se interpreta la cláusula arbitral del artículo 26(4) del TCE en el sentido que sugiere Steag, dicha cláusula sería incompatible con el derecho comunitario (particularmente con los artículos 267 y 344 del TFUE), que debe ser aplicado en virtud del artículo 26(6) del TCE[197].

194. La Demandada se refiere también a la afirmación del TJUE en *Achmea*, donde resalta que el tratado analizado en ese caso fue concluido por algunos Estados miembros de la UE, y no por la UE[198]. Señala que el TJUE se refirió a la posibilidad de la creación, mediante acuerdos internacionales, de órganos jurisdiccionales cuyas decisiones sean vinculantes para las instituciones comunitarias[199]. La Demandada destaca que el TJUE encontró que esta posibilidad no sería "*en principio*" incompatible con el derecho de la UE, bajo condición de que se garantice la autonomía de la UE y de su ordenamiento[200]. Ese requisito no se cumpliría

---

[192] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 151.
[193] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 152.
[194] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 153, 154 (notas al pie omitidas).
[195] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 155.
[196] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 156-158, citando en este contexto también a los tribunales en los casos *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 278 [**RL-0068**] y *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 199 [**RL-0091**].
[197] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 159, 160.
[198] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 161, ss., refiriéndose específicamente al ¶ 58 de la decisión del caso *Achmea*.
[199] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 162, 163, refiriéndose específicamente al ¶ 57 de la decisión del caso *Achmea*.
[200] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 162, ss. El Estado se refiere también a otras decisiones del TJUE sobre la compatibilidad de tratados internacionales con el derecho comunitario (¶¶ 164, 165).

si se extiende el artículo 26 del TCE a controversias intra-UE[201]. La Demandada afirma que su posición encuentra apoyo en la Comunicación de la Comisión al Parlamento Europeo y al Consejo del 19 de julio de 2018[202].

195.   España encuentra que hay ausencia de consentimiento bajo el TCE para llevar a arbitraje una controversia cuya resolución exija interpretar y aplicar el derecho comunitario[203]. El artículo 26 del TCE aplica únicamente a controversias relativas a las obligaciones previstas en la Parte III del TCE[204] y en vista de la cesión de competencias que conlleva la integración europea y la primacía del derecho comunitario, los Estados miembros de la UE no contrajeron obligaciones entre sí al amparo de la Parte III del TCE[205]. Esta circunstancia se refleja en los artículos 1(2), 1(3), 25 y 36(7) del TCE[206]. Esto supone también que el artículo 16 del TCE, estando ubicado en la Parte III del TCE, no sea aplicable en este contexto[207]. De estas disposiciones concluye la Demandada que "*en algunas materias reguladas por el TCE, la Parte Contratante es la UE y en otras son sus Estados Miembros*"[208] y "*[l]a decisión de quién es la Parte Contratante competente en cada materia no compete al Tribunal Arbitral sino al TJUE*"[209].

196.   La Demandada considera que, si se tuviera que establecer qué ordenamiento prevalece, tal determinación tendría que hacerse con arreglo a los artículos 30 y 59 de la Convención de Viena sobre el Derecho de los Tratados ("**CVDT**"), y no con base en el artículo 16 del TCE[210]. La CVDT "*conduciría inexorablemente a la aplicación del Derecho de la UE*"[211]. Los Tratados Constitutivos de las Comunidades Europeas son anteriores al TCE, y comparten y superan los objetivos del TCE[212] y las Partes del TCE conocían el proceso de integración europeo, lo que queda en evidencia en el propio texto del TCE[213]. La Demandada alega que una cláusula de desconexión es innecesaria cuando el nuevo tratado "*abarca ámbitos en los que se ha realizado una armonización total*"[214].

197.   La Demandada sostiene que, aún si se aplicara el artículo 16 del TCE, no podría concluirse que el TCE prevalece sobre el derecho de la UE[215]. En primer lugar, el TCE no otorga a inversionistas derechos sustantivos más favorables que los previstos por el derecho

---

[201] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 166-168.
[202] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 169, 170.
[203] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 171, ss. y 205.
[204] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 172.
[205] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 173, 195.
[206] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 174-181.
[207] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 173.
[208] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 181.
[209] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 181-183, apoyando su argumento en el Dictamen 1/91 del TJUE sobre el Proyecto de Acuerdo por el cual se crea el Espacio Económico Europeo (14 de diciembre de 1991) [**RL-0191**] y en los ¶¶ 32-44 de la sentencia del TJUE en *Achmea*.
[210] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 186, 194.
[211] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 186. Cf. también ¶ 189.
[212] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 186, apoyándose en el caso *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶¶ 4.137 y 4.141 [**RL-0002**].
[213] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 188.
[214] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 190, 191, citando textualmente los ¶¶ 83, 84 del Dictamen 1/03 del TJUE (7 de febrero de 2006) [**R-0312**].
[215] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 192.

comunitario[216]. Adicionalmente, el artículo 26 del TCE prevé diferentes mecanismos para la solución de controversias, incluido el recurso a los tribunales nacionales; nada indica que el arbitraje sea el más favorable de ellos[217]. Por ende, cualquier "*hipotético conflicto*" se resuelve a favor del derecho de la UE, de conformidad con el artículo 25 del TCE, por la primacía del derecho comunitario en el ámbito intra-UE[218]. La misma Steag discutió internamente las dificultades que supone el arbitraje de disputas intra-UE[219].

198.   La Demandada cierra su argumento sobre la jurisdicción *ratione materiae* explicando que el derecho de la UE sobre ayudas de Estado debe entenderse como un asunto de orden público internacional, de conformidad con la jurisprudencia del TJUE y en línea con otras decisiones arbitrales[220]. Un laudo arbitral que contravenga las normas de orden público sobre ayudas de Estado puede ser anulado por ese motivo[221].

### 2.    Posición de la Demandante

199.   La Demandante considera que la objeción relativa a la jurisdicción intra-UE es infundada[222]. Steag clasifica los argumentos de la Demandada en dos categorías[223]. La primera se refiere al tenor literal de las cláusulas del TCE relativas a la solución de disputas; la segunda concierne a la relación y supuesto conflicto entre el TCE y el derecho de la UE[224]. Asimismo, Steag analiza la posible relevancia de la decisión del TJUE en el caso *Achmea*[225] y presenta cinco argumentos principales contra la objeción intra-UE formulada por España[226].

200.   Un **primer argumento** es que la Demandada ha elevado sin éxito la misma objeción en otros procesos arbitrales[227] e incluso en el caso *Novenergia II c. España* el tribunal rechazó la

---

[216] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 192.

[217] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 192.

[218] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 177, 178, 193 y 195. La Demandada hace referencia también al caso *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶¶ 4.178-4.191 [**RL-0002**].

[219] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 196.

[220] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 197-204. El Estado apoya su argumento en las decisiones dictadas en los casos *Comunidades Europeas c. República Francesa*, Asunto C-18/84, Sentencia del TJUE (7 de mayo de 1985), ¶ 13 [**RL-0113**]; *Eco Swiss China Time Ltd. c. Benetton International NV*, Asunto C-126/97, Sentencia del TJUE (1 de junio de 1999), ¶¶ 36, 39 [**RL-0117**]; *Vincenzo Manfredi et al. c. Lloyd Adriatico Assicurazioni SpA et al.*, Asuntos C-295/05 a C-298/04, Sentencia del TJUE (13 de julio de 2006), ¶ 31; *Klausner Holz Niedersachsen GmbH c. Land Nordrhein-Westfalen*, Asunto C-505/14, Sentencia del TJUE (11 de noviembre de 2015), ¶¶ 44-46 [**RL-0116**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 449 [**RL-0049**].

[221] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 203, apoyando su argumento en el caso *Eco Swiss China Time Ltd. c. Benetton International NV*, Asunto C-126/97, Sentencia (1 de junio de 1999), ¶¶ 36-41 [**RL-0117**].

[222] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 18, ss.; Dúplica sobre Jurisdicción, ¶¶ 2-5 y 11, ss.

[223] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 20, 21.

[224] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 21.

[225] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 22; Dúplica sobre Jurisdicción, ¶¶ 103, ss.

[226] Cf. Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 18, ss. y 41, ss.; Dúplica sobre Jurisdicción, ¶¶ 11 y 16-141.

[227] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 19 y 27, ss. En particular, en los ¶¶ 27-30 de su Memorial, la Demandante cita los casos *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 443 [**CL-0029**]; *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶¶ 636, 640 [**RL-0003**]; *RREEF*

solicitud de España para reabrir el caso en vista de la decisión del TJUE en *Achmea*[228]. La objeción ha tenido éxito en arbitrajes contra otros Estados de la UE[229]. La Demandante cuestiona que el caso *Electrabel c. Hungría* apoye la conclusión de la Demandada acerca del artículo 26(6) del TCE, y observa que en ese caso el tribunal concluyó que no había incompatibilidad entre el derecho de la UE y el TCE[230]. Para Steag, los laudos relevantes permiten concluir que:[231] *(a)* la membresía de la UE al TCE no excluye la legitimación de los Estados de la UE para ser demandados por inversores provenientes de otros Estados de la UE; *(b)* el TCE no incluye la noción de "*inversor de la Unión Europea*"; *(c)* dado que el TCE no contiene explícita ni implícitamente una "*cláusula de desconexión*", nada excluye que un inversor de la UE inicie un arbitraje contra un Estado de la UE; *(d)* no existe un conflicto entre el TCE y el derecho de la UE; y *(e)* la UE fue impulsora del TCE y el TCE fue ratificado con posterioridad a la entrada en vigor del Tratado de Roma, lo que permite presumir que el TCE se diseñó para ser compatible con el derecho de la UE.

201.  La Demandante afirma que, aunque estas decisiones arbitrales no constituyan precedente, "*el proceso decisorio del Tribunal Arbitral sí se inserta en el marco de una extensa y profunda revisión de decisiones anteriores en casos similares de hecho o de derecho*".[232]

202.  El **segundo argumento** de la Demandante es que el derecho de la UE es compatible con el TCE[233]. Comparando los artículos 2 del TCE y 3 del Tratado de la Unión Europea ("**TUE**"), Steag encuentra que los objetivos y ámbitos de aplicación del derecho de la UE y del TCE son diferentes[234]. En cuanto a la relevancia del caso *Achmea* para este arbitraje, explica la Demandante que, a diferencia del presente caso, la fuente de jurisdicción en *Achmea* era el APPRI entre los Países Bajos y Checoslovaquia, y la sede del tribunal se encontraba en Alemania, país miembro de la UE[235]. El APPRI incluía como ley aplicable el derecho doméstico que, tratándose de Eslovaquia, encerraba el derecho de la UE[236]. España no ha

---

*Infrastructure (G.P.) Ltd. et. al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶¶ 79, 80 [**CL-0030**]; y *Eiser Infrastructure Ltd. et. al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶¶ 179-207 [**CL-0003**].

[228] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 31, 32, haciendo referencia al caso *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Resolución Procesal No. 17, Caso CCE No. 2015/063 (9 de abril de 2018) [**CL-0070**].

[229] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 24, ss. y 33, ss. Steag (¶¶ 37-38) cita los casos *AES Summit Generation Ltd. et.al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶ 6.1.4 [**RL-0039**] y *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶¶ 280-284 [**RL-0068**]. En estos casos el tratado aplicable era el TCE (¶¶ 37, 38). Más adelante, la Demandante (¶ 39) hace referencia a los casos *Eastern Sugar B.V. (Netherlands) c. República Checa*, Laudo Parcial, Caso CCE No. 088/2004 (27 de marzo de 2007), ¶¶ 168, 172 [**CL-0071**]; *Binder c. República Checa*, Laudo sobre jurisdicción, Caso CNUDMI (6 de junio de 2007), ¶¶ 63-66 [**CL-0072**]; y *Sr. Jan Oostergetel c. República de Eslovaquia*, Decisión sobre jurisdicción, Caso CNUDMI (30 de abril de 2010), ¶¶ 74-98 [**CL-0073**].

[230] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 35, 36, refiriéndose al caso *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶¶ 4.189, 4.191 y 4.196 [**RL-0002**].

[231] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 26.

[232] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 40.

[233] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 83.

[234] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 83, 84.

[235] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 85, 88; Dúplica sobre Jurisdicción, ¶¶ 104, 105.

[236] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 88; Dúplica sobre

justificado hasta qué punto este Tribunal estaría vinculado por el derecho comunitario, teniendo en cuenta además que la sede del presente Tribunal no se encuentra dentro de la UE[237].

203.    La Demandante señala que España no aclara la relación entre las obligaciones que impone el TCE y las que emanan del derecho de la UE[238], relación que está ligada al carácter que se adscriba al derecho de la UE[239]. Steag encuentra que el artículo 216(2) del TFUE favorece una aproximación monista[240] y desde el monismo no aparece conflicto alguno entre el derecho de la UE y el TCE[241]. El artículo 344 del TFUE garantiza el monopolio del TJUE sobre la interpretación del derecho de la UE, monopolio que es preexistente al TCE; por su parte, la solución de controversias bajo el TCE busca garantizar la efectividad de la protección que el TCE otorga a inversionistas extranjeros[242].

204.    Para la Demandante, incluso bajo una concepción dualista tampoco se observa un conflicto entre el TCE y el derecho de la UE[243]. Tal conflicto sólo surgiría si el Tribunal tuviera que aplicar el derecho de la UE; de ahí que "*[e]l Tribunal Arbitral puede ignorar completamente su aplicación al caso concreto al no tener que aplicarlo, y así sin poner en duda la primacía del propio Derecho de la Unión Europea en relación con las normas que permeen su ordenamiento – normas domésticas o normas internacionales que accedan a él*"[244]. Para la Demandante, lo anterior no sólo es consistente con la decisión del TJUE en el caso *Achmea*, sino que además encuentra apoyo en la doctrina[245].

205.    Para la Demandante, el derecho de la UE es un "*ordenamiento 'sui generis'*" que "*puede mostrar en un plano sus características de Derecho Internacional Público y, en otro plano, sus características de orden legal autónomo y diferenciado*"[246]. En este contexto, el principio de autonomía del derecho de la UE "*[s]ólo implica que la Unión Europea es libre para crear sus propias normas jurídicas*" y que esas disposiciones pueden primar sobre otras normas de derecho nacional[247]. El principio de primacía exige que el derecho comunitario "*no ceda [en] su eficacia*" a medidas unilaterales de los Estados miembros[248] y en esa medida el principio de primacía del derecho comunitario "*sólo puede predicarse respecto del derecho doméstico de los Estados Miembros*"[249]. Si el Tribunal llegare a concluir que el derecho comunitario es

---

Jurisdicción, ¶ 105.

[237] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 85-87.

[238] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 89.

[239] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 76, 89. Cf. también Dúplica sobre Jurisdicción, ¶¶ 11-13, 16 y 31.

[240] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 90.

[241] Cf. Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 91.

[242] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 91.

[243] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 92.

[244] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 93.

[245] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 93-95, citando un escrito académico [**CL-0083**] en el ¶ 94.

[246] Dúplica sobre Jurisdicción, ¶¶ 16, 31.

[247] Dúplica sobre Jurisdicción, ¶¶ 19-22, particularmente en el ¶ 22.

[248] Dúplica sobre Jurisdicción, ¶¶ 23-25, citando en este contexto la sentencia del Tribunal de Justicia de la Comunidad Económica Europea en el caso *Costa c. ENEL*, Caso 7/64, Sentencia (15 de julio de 1964) [**CL-0079**].

[249] Dúplica sobre Jurisdicción, ¶¶ 26, ss., citando en apoyo de su argumento el ¶ 21 del Dictamen 1/91 del TJUE (14 de diciembre de 1991) [**R-0191**]. La Demandante cita también escritos de doctrina [**CL-0134**] y un Informe del Consejo de Estado sobre la inserción del derecho europeo en el ordenamiento español, de 14 de febrero de

un ordenamiento autónomo del derecho internacional público, entonces no puede ser derecho internacional aplicable bajo el artículo 26(6) del TCE[250].

206. Con respecto a la decisión del tribunal arbitral en el caso *Vattenfall*, donde se ubica al derecho de la UE dentro del campo del derecho internacional público[251], Steag considera que, si este Tribunal compartiere dicha conclusión, y se llegare a encontrar un conflicto entre el derecho de la UE y el TCE habría que entrar a examinar los artículos 30 y 59 de la CVDT[252].

207. La Demandante afirma que el TCE es un tratado internacional actualmente vigente entre Alemania y España[253]. En relación con el artículo 59 de la CVDT, Steag destaca que sólo algunas de las Partes Contratantes del TCE son miembros de la UE, lo que parece excluir la aplicación del artículo 59 de la CVDT[254]. Además, el Tratado de Maastricht y el TCE se refieren a materias completamente diferentes lo que elimina el supuesto de hecho del artículo 59(1)(b) de la CVDT[255]. En cuanto al posible efecto del Tratado de Lisboa del año 2007, la Demandante observa que éste no fue suscrito por todas las Partes Contratantes del TCE y, además, perseguía objetivos que iban más allá del TCE: No puede decirse entonces que, como consecuencia del Tratado de Lisboa, el TCE ya no se encuentre en vigor[256]. La Demandante no encuentra que España haya probado que los Estados de la UE pretendieran que hubiera una incompatibilidad entre los acuerdos de la UE y el TCE[257].

208. La Demandante explica que el artículo 30(3) de la CVDT no aplica en cuanto no coinciden las partes del tratado anterior y del tratado posterior respecto del TCE y el TUE y el TFUE[258]. El artículo 30(3) de la CVDT sujeta la aplicación de disposiciones del tratado anterior a su compatibilidad con el tratado posterior[259]. Además, dado que este Tribunal no debe analizar al derecho comunitario, ni tampoco interpretarlo, no se está ante la incompatibilidad a que se refiere el artículo 30(3) de la CVDT[260]. En cualquier caso, la aplicación del artículo 30(3) de la CVDT no conduciría a la conclusión de que el derecho de la UE prevalece sobre el TCE, como sugiere la Demandada[261], ya que el TCE es posterior a los Tratados Constitutivos de las Comunidades Europeas[262].

---

2008 [**CL-0135**].

[250] Dúplica sobre Jurisdicción, ¶¶ 30, 31.

[251] Dúplica sobre Jurisdicción, ¶ 33, haciendo referencia al caso *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 150 [**CL-0131**].

[252] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 96, 97; Dúplica sobre Jurisdicción, ¶¶ 34 y 39-44.

[253] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 96, 97; Dúplica sobre Jurisdicción, ¶¶ 35-36, 48, 60 y 84, citando el artículo 42 de la CVDT, y observando que el TCE no ha sido denunciado por Alemania o España de conformidad con el artículo 47 del TCE.

[254] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 97, 98.

[255] Dúplica sobre Jurisdicción, ¶¶ 40, 41.

[256] Dúplica sobre Jurisdicción, ¶ 43.

[257] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 98.

[258] Dúplica sobre Jurisdicción, ¶ 44.

[259] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 99; Dúplica sobre Jurisdicción, ¶¶ 30, 42 y 44.

[260] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 100, 101.

[261] Dúplica sobre Jurisdicción, ¶ 37.

[262] Dúplica sobre Jurisdicción, ¶¶ 38, ss. y 42.

209. Asimismo, la Demandante considera insostenible la posición de que el TCE fue modificado por los tratados que, sobre la base de la Comunidad Europea, dieron lugar a la Unión Europea[263]. En este contexto no puede darse aplicación al criterio *lex posterior*: los artículos que supuestamente son incompatibles con el TCE (arts. 267 y 344 del TFUE) eran también parte del Tratado que estableció la Comunidad Europea[264]. Steag rechaza también la idea de que España y Alemania hayan modificado el TCE "*inter se*" (art. 41(1) de la CVDT), para excluir el arbitraje respecto de sus nacionales[265]. Esa posibilidad está excluida por el artículo 16 del TCE, que aplica como *lex specialis*[266].

210. Finalmente, la Demandante argumenta que, aún si se llegare a hallar un conflicto entre el derecho de la UE y el TCE, la regla de conflicto aplicable es el artículo 16 del TCE, que requiere la aplicación de las disposiciones más favorables para la inversión o para los inversores[267]. Aunque España ha alegado que el sistema de la UE otorga un "*nivel de protección*" similar al que ofrece el TCE, no presenta una argumentación sólida y hace caso omiso de la ausencia de un recurso al arbitraje inversionista-Estado en el derecho de la UE.[268] La cláusula de solución de controversias del TCE, sumada a la amplia protección de las legítimas expectativas bajo el estándar de TJE y la cláusula paraguas del artículo 10(1) del TCE, desvirtúan la supuesta superioridad de las garantías ofrecidas por el derecho comunitario[269]. En caso de conflicto, debe primar el TCE de conformidad con el artículo 16 del TCE[270]. Por lo tanto, no habiendo conflicto alguno entre el TCE y el derecho de la UE, este Tribunal tiene jurisdicción sobre la disputa[271].

211. El **tercer argumento** se opone particularmente a la objeción a la jurisdicción *ratione personae*[272] y se enfoca en la interpretación del artículo 26(1) del TCE y la ausencia de una cláusula de desconexión en el TCE[273]. Steag considera que el TCE no excluye de su campo

---

[263] Dúplica sobre Jurisdicción, ¶ 47.

[264] Dúplica sobre Jurisdicción, ¶ 47.

[265] Dúplica sobre Jurisdicción, ¶ 47.

[266] Dúplica sobre Jurisdicción, ¶ 47.

[267] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 102. En apoyo de su conclusión relativa al artículo 16 del TCE, la Demandante (¶¶ 104, 105) cita los casos *RREEF Infrastructure (G.P.) Ltd. et. al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶ 87 [**CL-0030**] y *Eiser Infrastructure Ltd. et. al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 202 [**CL-0003**]. Cf. también Dúplica sobre Jurisdicción, ¶¶ 49, ss.

[268] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 106-108. Steag cita en este punto (¶¶ 107, 108) doctrina [**CL-0087**] y el caso *Eastern Sugar B.V. (Netherlands) c. República Checa*, Laudo Parcial, Caso CCE No. 088/2004 (27 de marzo de 2007), ¶ 180 [**CL-0071**]. Cf. también Dúplica sobre Jurisdicción, ¶¶ 51, 52.

[269] Dúplica sobre Jurisdicción, ¶¶ 53-59 (particularmente en el ¶ 58). La Demandante apoya su argumento en los casos *Eastern Sugar B.V. (Netherlands) c. República Checa*, Laudo Parcial, Caso CCE No. 088/2004 (27 de marzo de 2007), ¶¶ 164, 165 y 180 [**CL-0071**] y *Sr. Jan Oostergetel c. República de Eslovaquia*, Decisión sobre jurisdicción, Caso CNUDMI (30 de abril de 2010), ¶¶ 75-77 [**CL-0073**].

[270] Dúplica sobre Jurisdicción, ¶¶ 60, 84.

[271] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 109.

[272] Dúplica sobre Jurisdicción, ¶¶ 61, 63 y 80.

[273] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 42, ss.; Dúplica sobre Jurisdicción, ¶¶ 64, ss.

de aplicación a las disputas intra-UE[274]. Para Steag, la pregunta real es si una interpretación jurídica indica que los Estados miembros de la UE no están vinculados por el TCE[275].

212. Para la Demandante, el canon de interpretación gramatical no indica que el artículo 26(1) del TCE excluya disputas intra-UE: "*[l]o único que exige el tenor literal del artículo 26(1) del TCE es que el inversor provenga de una Parte Contratante distinta del demandado*"[276]. Alemania, España y la UE son todas Partes Contratantes del TCE[277]. Asimismo, el TCE prevé dos tipos de territorio, el de un Estado y el de una ORIE, lo que implica que la UE – y no sólo un Estado miembro – puede infringir el TCE dentro de su territorio y ser demandada bajo el TCE[278].

213. La Demandante alega que en este proceso es indiscutido que Steag es una sociedad alemana y no una "*sociedad europea*": su personalidad jurídica está dada por el derecho alemán, y no por el derecho de la UE[279]. Citando la decisión del tribunal del caso *Eiser c. España*[280], la Demandante concluye que el artículo 26 del TCE debe entenderse en el sentido que un inversor intra-UE puede acceder al mecanismo allí previsto para la solución de controversias[281].

214. La Demandante considera que la argumentación de la Demandada asume que el TCE prevé una cláusula implícita de desconexión, que excluiría el arbitraje de disputas intra-UE[282]. Steag observa que el TCE contiene ciertas cláusulas de desconexión explícitas[283] y que otros tratados en cuya redacción ha participado la UE también contienen cláusulas de este tipo[284]. De lo anterior infiere que, si se hubiera querido excluir disputas intra-UE del campo de aplicación del TCE, se habría introducido una cláusula explícita en ese sentido[285]. La Demandante sostiene que múltiples decisiones arbitrales han confirmado su interpretación del TCE[286]. En vista de lo anterior, una lectura del TCE acorde a los principios

---

[274] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 42, ss.

[275] Dúplica sobre Jurisdicción, ¶ 67.

[276] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 48.

[277] Dúplica sobre Jurisdicción, ¶ 75.

[278] Dúplica sobre Jurisdicción, ¶¶ 76 y 78-79, interpretando el artículo 1(10) del TCE. La Demandante cita en apoyo de su argumento los casos *Masdar Solar & Wind Cooperatief U.A. c. Reino de España*, Laudo, Caso CIADI No. ARB/14/1 (16 de mayo de 2018), ¶ 323 [**CL-0129**], *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 218 [**CL-0130**] y *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 182 [**CL-0131**].

[279] Dúplica sobre Jurisdicción, ¶ 77. La Demandante también resalta que inclusive la ciudadanía de la UE es dependiente de la de un Estado miembro bajo el artículo 20.1 del TFUE (¶ 75).

[280] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 49, citando *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶¶ 195, 196 [**CL-0003**]. En apoyo de su argumento, la Demandante (¶ 50) cita también el laudo dictado en el caso *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 453 [**CL-0069**].

[281] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 51.

[282] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 52.

[283] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 56.

[284] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 57. Steag menciona los ejemplos del artículo 27(2) de la Convención de la OCDE sobre Asistencia Administrativa Mutua en Materia Fiscal [**CL-0077**] y el artículo 57(3) del Reglamento Sanitario Internacional de la OMS [**CL-0078**].

[285] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 58.

[286] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 59-61. En este

de buena fe y *pacta sunt servanda* impide concluir que el tratado incluye una cláusula de desconexión implícita[287].

215.   El **cuarto argumento** se enfoca en la interpretación del artículo 26(6) del TCE y se opone particularmente a la objeción *ratione materiae* formulada por la Demandada[288]. La Demandante considera que la ley aplicable al presente arbitraje no incluye al derecho de la UE[289]. La Demandante observa que en el caso *Novenergia II c. España* se desestimaron los argumentos de la Demandada respecto de la interpretación del artículo 26(6) del TCE como una disposición que reconoce la primacía del derecho de la UE[290].

216.   Con respecto a si el derecho de la UE es derecho internacional público para los efectos del artículo 26 del TCE, la Demandante reitera que desde un punto teórico se plantean dos posibilidades: o bien considerar al derecho internacional y al derecho de la UE como elementos de un ordenamiento común (posición monista), o bien clasificarlos como ordenamientos diferentes (posición dualista)[291]. Afirma la Demandante que, si bien el derecho de la UE podía inscribirse dentro del derecho internacional público en sus orígenes, ha evolucionado y aparece hoy como un "*ordenamiento jurídico propio y autónomo*"[292].

217.   La Demandante sostiene que la jurisdicción del Tribunal se deriva del TCE y no del derecho de la UE[293]. Las fuentes de jurisdicción de este Tribunal son exclusivamente el artículo 26 del TCE y el Convenio del CIADI[294]. Una interpretación literal del artículo 26(6) del TCE bajo el artículo 31 de la CVDT indica que las "*normas del Derecho Internacional aplicables*" son las normas aplicables al fondo del asunto: aunque se diga que el derecho de la UE es derecho internacional público, éste no es aplicable en lo que respecta a la jurisdicción del Tribunal[295].

218.   Con respecto al argumento de España sobre la posible aplicación del derecho de la UE bajo el "*principio de proximidad*" del artículo 31(3)(c) de la CVDT[296], Steag encuentra que este argumento no justifica aplicar los artículos 267 y 344 del TFUE y el caso *Achmea* en este arbitraje[297]. La decisión del TJUE en *Achmea* parte de una visión dualista del derecho de la

---

contexto, la Demandante se refiere particularmente a los casos *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶ 85 [**CL-0030**]; *Eiser Infrastructure Ltd. et. al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 207 [**CL-0003**]; *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 437 [**CL-0029**]; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 454 [**CL-0069**].

[287] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 62, 63.
[288] Dúplica sobre Jurisdicción, ¶¶ 84, ss.
[289] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 72.
[290] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 73.
[291] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 76.
[292] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 74, 75.
[293] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 80. En apoyo de esa afirmación, Steag (¶ 80) cita el caso *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 199 [**CL-0003**].
[294] Dúplica sobre Jurisdicción, ¶¶ 87, 88.
[295] Dúplica sobre Jurisdicción, ¶¶ 87-93.
[296] Dúplica sobre Jurisdicción, ¶ 106.
[297] Dúplica sobre Jurisdicción, ¶ 106.

UE, considerándolo autónomo del derecho internacional público[298]. Este dualismo es inconsistente con la pretensión de aplicar el artículo 31(3)(c) de la CVDT, que se refiere a la relación de disposiciones de derecho internacional entre sí, y muy particularmente a la interrelación entre tratados y la costumbre internacional[299]. A juicio de Steag, España no ha demostrado que en este caso se cumplan los requisitos para aplicar el artículo 30(3)(c) de la CVDT[300]. Ninguna norma de derecho internacional aplicable exige que el artículo 26 del TCE sea interpretado a la luz de los artículos 267 y 344 del TFUE[301].

219. La Demandante considera que las circunstancias de la celebración del artículo 26 del TCE, de conformidad con el artículo 32 de la CVDT, dejan también claro que la cláusula de solución de controversias es aplicable a los Estados miembros de la UE[302]. El TCE fue ratificado por la UE y sus Estados miembros porque la materia del TCE es una competencia compartida entre la Unión y los Estados que hacen parte de ella[303]. La UE no sólo no se opuso a que los Estados miembros ratificaran el TCE, sino que afirmó en su momento que el TCE prevé tanto obligaciones para la UE, como obligaciones que pueden aplicar directamente a sus Estados miembros[304]. Específicamente, se entendió que tanto la UE como sus Estados miembros podrían ser demandados bajo el artículo 26 del TCE[305]. Alemania y España se vincularon entre sí respecto de la oferta de arbitraje del artículo 26[306]. El propio TJUE ha considerado que el arbitraje de disputas de inversión no es una competencia exclusiva de la UE[307]. En cuanto al caso *Achmea*, la Demandante considera que no es aplicable en el contexto de este arbitraje, dadas las diferencias entre dicho caso y el presente[308].

220. Steag argumenta que, en cualquier caso, en este arbitraje "*[n]o se discute la conformidad de las medidas aprobadas por el Reino de España con el Derecho de la Unión Europea*"[309] y el derecho de la UE no es relevante para resolver la disputa entre las Partes[310]. Steag resalta que sus reclamaciones se refieren a "*protecciones típicas del Derecho Internacional de Inversiones*", como lo son el estándar de TJE y la protección frente a medidas con efectos expropiatorios, previstos en los artículos 10(1) y 13 del TCE[311]. Si bien la posición de la UE

---

[298] Dúplica sobre Jurisdicción, ¶ 107. Según Steag, es por eso que el caso *Achmea* suele vincularse al caso *Kadi*, con el que el TJUE abrió camino a su actual postura dualista (¶¶ 106, 107). La Demandante cita aquí a la decisión de la Sala Séptima del Tribunal General de la UE en el caso *Yassin Abdullah Kadi c. Comisión Europea*, Sentencia, Caso T-85/09 (30 de septiembre de 2010), ¶ 285 [**CL-0082**].

[299] Dúplica sobre Jurisdicción, ¶¶ 108, 109.

[300] Dúplica sobre Jurisdicción, ¶¶ 109, 110.

[301] Dúplica sobre Jurisdicción, ¶ 111, apoyándose en el caso *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 158-165 [**CL-0131**].

[302] Dúplica sobre Jurisdicción, ¶¶ 94, ss. y 101.

[303] Dúplica sobre Jurisdicción, ¶ 95, citando la Decisión del Consejo y de la Comisión, de 23 de septiembre de 1997, relativa a la conclusión, por parte de las Comunidades Europeas, del Tratado sobre la Carta de la Energía y el Protocolo de la Carta de la Energía sobre la eficacia energética y los aspectos medioambientales relacionados [**C-0082**].

[304] Dúplica sobre Jurisdicción, ¶¶ 96-98, citando los Anexos **C-0082** y **C-0083**.

[305] Dúplica sobre Jurisdicción, ¶¶ 97, 98, citando el Anexo **C-0083**.

[306] Dúplica sobre Jurisdicción, ¶ 99.

[307] Dúplica sobre Jurisdicción, ¶ 100, citando el Dictamen núm. 2/15 del Pleno del Tribunal de Justicia de la Unión Europea, de 16 de mayo de 2017 [ECLI:EU:C:2017:376] [**CL-0137**].

[308] Dúplica sobre Jurisdicción, ¶¶ 104, 105.

[309] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 41.

[310] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 41, 64, ss. y 67.

[311] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 67.

sobre las energías renovables puede ser relevante en el análisis del estándar de TJE, "*debe quedar claro que no se solicita que se enjuicie el Nuevo Régimen Regulatorio* [("**NRR**")] *bajo la lupa de esas disposiciones comunitarias*"[312].

221. La Demandante alega que si, como dice la Demandada, las medidas fueron adoptadas en respuesta a una "*fuerte crisis económica*" para atender el déficit de tarifa y la sostenibilidad del SEE, entonces el Tribunal no necesita entrar a interpretar o discutir el derecho de la UE: en últimas, el "*leitmotiv*" de las medidas no fue cumplir con el derecho comunitario[313]. Más aún, España no ha demostrado que una decisión favorable a Steag en el presente arbitraje sería incompatible con las normas de competencia de la UE[314].

222. Steag señala que, no siendo necesario aplicar el derecho de la UE, la relación entre dicho ordenamiento y el derecho internacional público no tiene relevancia para el caso *sub judice*[315].

223. Finalmente, **el quinto argumento** se refiere específicamente al tema de las ayudas de Estado[316]. La Demandante enfatiza que el objeto de la controversia es si España frustró las expectativas legítimas de Steag bajo el artículo 10(1) del TCE y si se ha cometido una expropiación, y no si el Régimen Regulatorio Original ("**RRO**") era una ayuda de Estado[317]. La Demandante considera que la cuestión de si el RRO tenía el carácter de ayuda de Estado es ajena al proceso e irrelevante para decidir sobre las pretensiones presentadas[318]. Steag acepta que si bien en el presente arbitraje se puede fijar una compensación cuyo monto tenga en cuenta los flujos de caja que se habrían percibido bajo el RRO, la Demandante no ha pedido que el Tribunal declare que tiene derecho a recibir tales flujos de caja indefinidamente[319].

224. Steag resalta que las Partes no han discutido si el RRO se enmarca dentro del campo de aplicación del artículo 107(1) del TFUE[320]. Además, si la Comisión Europea llegare a declarar que el RRO constituye una ayuda de Estado ilegal, tal decisión no podría oponerse a Steag; por el contrario, conllevaría una nueva infracción del estándar de TJE[321]. La aplicabilidad del TCE respecto de programas de subvenciones o de ayuda financiera concierne sólo el artículo 10(7) del TCE y, en cualquier caso, no afecta la aplicación del artículo 10(1) del TCE[322].

---

[312] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 68.
[313] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 69. En apoyo de su conclusión, Steag (¶ 70) se refiere al caso *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 448 [**CL-0029**].
[314] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 71.
[315] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 82.
[316] Dúplica sobre Jurisdicción, ¶¶ 62, 63 y 112, ss.
[317] Dúplica sobre Jurisdicción, ¶¶ 114 y 116-118.
[318] Dúplica sobre Jurisdicción, ¶¶ 117-121.
[319] Dúplica sobre Jurisdicción, ¶¶ 122, 123.
[320] Dúplica sobre Jurisdicción, ¶ 117.
[321] Dúplica sobre Jurisdicción, ¶ 117.
[322] Dúplica sobre Jurisdicción, ¶ 117.

225. La Demandante enfatiza que el RRO "*no ha sido declarado como una ayuda de [E]stado legal o ilegal*"[323]. Aunque la Comisión Europea se ha referido al NRR[324], no ha analizado ni la prima ni la posibilidad de recurrir a una tarifa respecto del RRO[325]. Tampoco se ha referido al RRO en abstracto.[326]. El único punto relativo al RRO tomado en cuenta por la Comisión fueron los flujos de caja de instalaciones estándar[327]. Pero aún si la decisión sobre el NRR contuviera un pronunciamiento acerca del RRO, lo cierto es que esa decisión de la Comisión no está en firme, y es objeto de procedimientos que aún están en curso[328]. La Demandante concluye indicando que España no podrá evitar la ejecución de un laudo a favor de Steag amparada en el argumento sobre las ayudas de Estado[329].

226. Con respecto a la decisión de la Comisión en el caso *Micula c. Rumania*, Steag nota que esa decisión está siendo examinada por el TJUE[330]. Adicionalmente, en el caso *Micula* la Comisión Europea había declarado ilegal la disposición que sirvió como fundamento para la compensación reclamada, lo que marca una importante diferencia con el presente caso[331]. Más aún, la disputa en *Micula* concernía la eliminación de incentivos como consecuencia del acceso de Rumania a la UE y en este caso las medidas de España no responden a la necesidad de cumplir con obligaciones bajo el derecho de la UE[332]. La Demandante agrega que, de acuerdo con la jurisprudencia del propio TJUE, el pago de una indemnización por actos ilícitos del Estado no constituye una ayuda de Estado ilegal[333].

### 3.    Análisis del Tribunal

227. Habiendo considerado la totalidad de los argumentos presentados por las Partes respecto de la jurisdicción intra-UE elevada por la Demandada, el Tribunal encuentra que la discusión entre las Partes ha girado alrededor de cinco ejes:

(1)  ¿Qué efecto tiene la decisión del TJUE en el caso *Achmea* sobre la jurisdicción del Tribunal Arbitral?

(2)  ¿Impone el TCE obligaciones respecto de inversionistas intra-UE e inversiones intra-UE?

(3)  ¿Debe este Tribunal aplicar el derecho de la UE de manera preferente?

---

[323] Dúplica sobre Jurisdicción, ¶ 125.
[324] Dúplica sobre Jurisdicción, ¶ 126.
[325] Dúplica sobre Jurisdicción, ¶ 126.
[326] Dúplica sobre Jurisdicción, ¶¶ 126-128.
[327] Dúplica sobre Jurisdicción, ¶ 126.
[328] Dúplica sobre Jurisdicción, ¶ 129.
[329] Dúplica sobre Jurisdicción, ¶ 130.
[330] Dúplica sobre Jurisdicción, ¶ 134, haciendo referencia a Recurso interpuesto el 28 de noviembre de 2015 – Micula y otros/Comisión, Asunto T-704/15 [**C-0087**].
[331] Dúplica sobre Jurisdicción, ¶ 135.
[332] Dúplica sobre Jurisdicción, ¶ 135.
[333] Dúplica sobre Jurisdicción, ¶¶ 136-140, citando la sentencia de la Sala Quinta del Tribunal de Justicia en el caso *Asteris AE c. Grecia y Comunidad Económica Europea*, Casos 106 a 120/87 (27 de septiembre de 1988), ¶¶ 22-24 [**CL-0141**].

(4)  ¿Qué efectos tienen los tratados europeos sobre las obligaciones contraídas en el TCE a la luz de los artículos 30 y 59 de la CVDT?

(5)  ¿Debe el Tribunal abstenerse de ejercer jurisdicción sobre la disputa por incluir el tema de ayudas de Estado?

228.  A continuación, el Tribunal analizará los argumentos de las Partes sobre cada uno de estos puntos.

### 3.1.  Cuestión preliminar: La relevancia de la decisión del TJUE en *Achmea*

229.  España sostiene que la conclusión del TJUE en *Achmea* "*es Derecho*"[334] y por lo tanto es "*extensible*" a este proceso arbitral[335]. La Demandada esboza varias razones. *Primero*, aunque reconoce que la decisión del TJUE se refirió específicamente a un TBI entre dos Estados miembros de la UE[336], considera que los principios de esa decisión pueden extenderse a casos bajo el TCE[337]. *Segundo*, afirma que los fundamentos de la decisión en *Achmea* no son sólo "*formalistas*" sino sustanciales, en la medida que son aplicables donde se discute si el origen de la jurisdicción del tribunal de inversión pugna con la autonomía del sistema de la EU.[338] *Tercero*, la decisión hace referencia a un "*acuerdo internacional celebrado entre Estados miembros*"[339] y, como el TCE es un "*acuerdo internacional celebrado entre Estados miembros*", España sostiene que las conclusiones de *Achmea* deben aplicarse también al artículo 26(4) del TCE[340] en este caso.

230.  El inversionista considera que la decisión[341] del TJUE no debe aplicarse a este caso porque *la fuente de jurisdicción en Achmea era el TBI entre los Países Bajos y Checoslovaquia y la sede del tribunal se encontraba en Alemania, país miembro de la UE*[342]. También resalta que el caso *Achmea* no analiza los instrumentos de derecho internacional público aplicable a esta controversia, el TCE y el Convenio del CIADI, sino que decide una cuestión relativa a la interacción entre el TBI con el derecho de la UE[343]. Para Steag, el derecho aplicable a este procedimiento no incluye el derecho de la UE[344]. Steag destaca que el Tribunal está constituido bajo el TCE y no pertenece al sistema judicial de la UE[345]. Por último, la Demandante asevera que el caso *Achmea* no consolida una norma de derecho internacional aplicable a este caso, sino que resuelve un caso concreto con unas circunstancias muy

---

[334] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 81.
[335] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 145, ss.
[336] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 146.
[337] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 147.
[338] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 148.
[339] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 151 (énfasis omitido).
[340] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 152.
[341] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 22; Dúplica sobre Jurisdicción, ¶¶ 103, ss.
[342] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 85, 88; Dúplica sobre Jurisdicción, ¶¶ 104, 105.
[343] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 88; Dúplica sobre Jurisdicción, ¶ 104.
[344] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 87, 88; Dúplica sobre Jurisdicción, ¶ 105.
[345] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 86, 87.

específicas[346]. Steag alega que España no ha demostrado la existencia de una norma de derecho internacional que sea aplicable a este caso y bajo la cual el artículo 26 del TCE deba leerse a la luz de los artículos 267 y 344 del TFUE, según fueron interpretados por el TJUE[347]. En síntesis, la Demandante considera que, dadas las diferencias entre ambos casos, el razonamiento del TJUE en *Achmea* no es extensible a las circunstancias de este arbitraje[348].

231. En vista de los argumentos esgrimidos por las Partes, este Tribunal debe responder a una pregunta: ¿es la conclusión del TJCE en el caso *Achmea* extensible al TCE?

232. El 6 de marzo de 2018, el TJUE dictó sentencia en el caso C-284/16 *Slowakische Republik c. Achmea BV*[349]. La sentencia encontró que los artículos 267 y 344 del TFEU "*deben interpretarse en el sentido de que se oponen a una disposición de un tratado internacional celebrado entre Estados miembros, como el artículo 8 del Tratado para el Fomento y la Protección Recíprocos de las Inversiones entre el Reino de los Países Bajos y la República Federal Checa y Eslovaca*"[350]. El TJUE determinó que otorgarle competencia al tribunal constituido bajo el TBI Países Bajos-Eslovaquia para interpretar y aplicar la normatividad de la UE, pone en riesgo el "*diálogo de juez a juez precisamente entre el Tribunal de Justicia y los órganos jurisdiccionales de los Estados miembros, tiene como finalidad garantizar la interpretación uniforme del Derecho de la Unión, permitiendo de ese modo asegurar su coherencia, su plena eficacia y su autonomía, así como, en última instancia, el carácter propio del Derecho instituido por los Tratados*"[351]. El TJUE añade que "*un tribunal arbitral como el establecido en el artículo 8 del TBI no puede calificarse de «órgano jurisdiccional de uno de los Estados miembros» en el sentido del artículo 267 TFUE y no está facultado, por tanto, para solicitar una decisión prejudicial al Tribunal de Justicia*"[352].

233. Después de considerar los argumentos presentados por las partes y analizar la decisión del TJUE en *Achmea*, este Tribunal considera que las conclusiones del TJUE en el caso mencionado no pueden extenderse a este arbitraje. Las razones son tres.

234. *Primero*. Como han afirmado otros tribunales[353], el procedimiento del caso *Achmea* tiene características fácticas y legales específicas, que lo diferencian de un procedimiento bajo el artículo 26 del TCE. La decisión del TJUE en *Achmea* se refiere a un TBI específico, bilateral y celebrado entre dos Estados miembros de la UE. El TJUE no se refirió al supuesto de un tratado multilateral de carácter "*mixto*" celebrado por la propia UE, sus Estados miembros y

---

[346] Dúplica sobre Jurisdicción, ¶ 110.

[347] Dúplica sobre Jurisdicción, ¶ 111.

[348] Dúplica sobre Jurisdicción, ¶¶ 104, 105, 110 y 111.

[349] Decisión de la Gran Sala del Tribunal de Justicia de la Unión Europea en el caso de la *República de Eslovaquia c. Achmea BV*, Caso C-284/16 (6 de marzo de 2018) [**CL-0084**].

[350] Decisión de la Gran Sala del Tribunal de Justicia de la Unión Europea en el caso de la *República de Eslovaquia c. Achmea BV*, Caso C-284/16 (6 de marzo de 2018), ¶ 62 [**CL-0084**].

[351] Decisión de la Gran Sala del Tribunal de Justicia de la Unión Europea en el caso de la *República de Eslovaquia c. Achmea BV*, Caso C-284/16 (6 de marzo de 2018), ¶ 37 [**CL-0084**].

[352] Decisión de la Gran Sala del Tribunal de Justicia de la Unión Europea en el caso de la *República de Eslovaquia c. Achmea BV*, Caso C-284/16 (6 de marzo de 2018), ¶ 49 [**CL-0084**].

[353] Cf. *Cube Infrastructure Fund SICAV et al. c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y decisión parcial sobre daños, Caso CIADI No. ARB/15/20 (19 de febrero de 2019), ¶ 144 [**CL-0158**]; *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 161, ss. [**CL-0131**].

terceros Estados[354]. EL TCE es difícilmente equiparable al TBI Países Bajos-Eslovaquia para estos efectos y el análisis del TJUE se limitó a ese contexto específico. Como bien lo advirtió el tribunal en *Vattenfall c. Alemania*, en su decisión en el caso *Achmea*, el TJUE no abordó la distinción entre cláusulas de solución de controversias previstas en tratados bilaterales entre Estados miembros de la UE y el TCE, trazada en las Conclusiones del Abogado General M. Wathelet, del 19 de septiembre de 2017[355].

235. *Segundo*. A diferencia del artículo 26(4) del TCE, el artículo 8 del TBI Países Bajos-Eslovaquia no prevé la posibilidad de iniciar un procedimiento arbitral bajo el Convenio del CIADI. En *Achmea*, el proceso no estuvo cobijado por la Convención de Washington de 1965. Se trató de un proceso arbitral bajo el reglamento de la CNUDMI y con sede en Frankfurt, Alemania[356]. El presente procedimiento arbitral está cubierto por el Convenio del CIADI y no tiene sede dentro del territorio de ningún Estado miembro de la UE. Las cortes de los Estados miembros de la UE carecen de competencia para anular el laudo. Como acertadamente indicó el tribunal del caso *Cube Infrastructure c. España*, un tribunal CIADI constituido bajo el TCE no puede equipararse para estos efectos con un tribunal CNUDMI con sede en el territorio de un Estado miembro de la UE:

> "[…] El Tribunal debe su existencia a dos tratados internacionales, el TCE y el Convenio del CIADI, que no están específicamente conectados con el ordenamiento jurídico de uno de los Estados involucrados. Ambos instrumentos son acuerdos multilaterales que tienen un ámbito de aplicación *ratione personae* y *ratione territorii*, que se extiende mucho más allá de las fronteras de la UE […]"[357].

236. *Tercero*. La Demandada dice en uno de sus escritos que en este caso se cumplen todos "*los requisitos previos establecidos por la Sentencia Achmea para establecer la incompatibilidad de la Cláusula de Arbitraje del artículo 26(4) del TCE (interpretada por la Demandante) y el Derecho de la UE*"[358]. Este Tribunal no encuentra que la decisión del TJUE indique criterios o requisitos claros que permitan determinar si la cláusula de solución de controversias de un tratado multilateral, adoptado por los Estados miembros de la UE, la propia UE y terceros Estados, es compatible o no con el derecho de la UE[359]. Nada en la

---

[354] *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶ 142 [**RL-0146**]; *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 162 [**CL-0131**]. Cf. también *BayWa r.e. Renewable Energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶ 282 [**RL-0144**].

[355] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 163 [**CL-0131**], haciendo referencia al ¶ 43 de las Conclusiones del Abogado General M. Wathelet.

[356] Decisión de la Gran Sala del Tribunal de Justicia de la Unión Europea en el caso de la *República de Eslovaquia c. Achmea BV*, Caso C-284/16 (6 de marzo de 2018), ¶¶ 5, 51 y 52 [**CL-0084**].

[357] Traducción del Tribunal. Texto original: "*The Tribunal owes its emergence to two international treaties, the ECT and the ICSID Convention, that are not specifically connected to the legal order of one of the States involved. Both instruments are multilateral agreements that have a scope of application ratione personae and ratione territorii that extends far beyond the boundaries of the EU*". *Cube Infrastructure Fund SICAV et al. c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y decisión parcial sobre daños, Caso CIADI No. ARB/15/20 (19 de febrero de 2019), ¶ 144 [**CL-0158**].

[358] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 159.

[359] Cf. *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI

decisión del TJUE en *Achmea* indica la existencia de un obstáculo para el ejercicio de jurisdicción en el presente caso.

237.  De la lectura de los dos tratados se puede afirmar que, por la naturaleza, las partes y el alcance del TCE, no es posible asimilarlo con el TBI entre los Países Bajos y Eslovaquia, al que se refirió el TJUE en *Achmea*. El Tribunal concluye entonces que el razonamiento y las conclusiones de la decisión del TJUE en el caso *Achmea* no pueden trasladarse a este proceso arbitral.

### 3.2.    La aplicabilidad del TCE respecto de inversionistas intra-UE e inversiones intra-UE

238.  Uno de los ejes centrales de la objeción jurisdiccional intra-UE elevada por España es que, según la Demandada, el artículo 26 del TCE se refiere a disputas entre "*una Parte Contratante*" y "*un inversor de otra Parte Contratante*", lo que a su juicio excluye su aplicación en el contexto de una disputa intra-UE[360]. La Demandada hace referencia a varias disposiciones del TCE[361]. El argumento se enfoca en los artículos 1(2), 1(3), 1(10) y 36(7) del TCE, relativos a las ORIEs[362], así como en los artículos 16, 25 y 26 del TCE[363]. A juicio de España, la naturaleza del derecho comunitario indica que los Estados miembros de la UE, al ratificar el TCE, no contrajeron entre sí obligaciones bajo la Parte III del tratado[364].

239.  A su turno, Steag sostiene que el artículo 26(1) del TCE, y la ausencia de una cláusula de desconexión en el cuerpo del TCE, dejan claro que las controversias intra-UE no están excluidas del ámbito de aplicación del TCE[365]. Para Steag, el artículo 26(1) sólo exige que el inversionista sea proveniente de una Parte Contratante, y que esa Parte Contratante no coincida con la Parte Contratante demandada[366]. Las definiciones del TCE, a juicio de la Demandante, indican que tanto la UE como un Estado miembro de la UE son susceptibles de infringir el TCE y de ser demandados por inversionistas de cualquier otra Parte Contratante[367].

240.  El Tribunal encuentra que asiste la razón a la Demandante. La interpretación del TCE a la luz de la regla general de interpretación del artículo 31 de la CVDT impone esta conclusión. Una lectura de las disposiciones invocadas por España (es decir, los artículos 1, 16, 25, 26 y 36 del TCE) – atendiendo a su contexto y al sentido ordinario de los términos utilizados en el tratado – permite concluir que el TCE es aplicable a controversias intra-UE.

---

No. ARB/12/12 (31 de agosto de 2018), ¶ 159 [**CL-0131**].

[360] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 58. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 75, 77.

[361] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 75, ss.

[362] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 76-79 y 82.

[363] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 80, 81 y 83.

[364] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 173-181 y 195.

[365] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 42, ss., 51, ss.; Dúplica sobre Jurisdicción, ¶¶ 61, ss. y 80.

[366] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 48.

[367] Dúplica sobre Jurisdicción, ¶¶ 75, ss.

241. El punto de partida para el Tribunal es el artículo 26(1) del TCE, que se refiere a "*las controversias entre una Parte Contratante y un inversor de otra Parte Contratante respecto al supuesto incumplimiento por parte de aquélla de una obligación derivada de la Parte III relativa a una inversión de éste en el territorio de la primera*". La lectura de esta disposición permite observar la ausencia de una exclusión explícita de las controversias intra-UE[368]. La interpretación del artículo 26(1) del TCE a la luz de las definiciones previstas en el artículo 1 del tratado confirman esta observación y además indican que tampoco hay una exclusión implícita de las controversias intra-UE.

242. El TCE define el término "*Parte Contratante*" en su artículo 1(2):

> "[…] 'Parte Contratante', un Estado u Organización Regional de Integración Económica que han acordado vincularse mediante el presente Tratado y para los cuales el Tratado está en vigor".

243. A su turno, el artículo 1(3) del TCE contiene una definición de "*Organización Regional de Integración Económica*":

> "[…] 'Organización Regional de Integración Económica', una organización constituida por Estados a la que éstos han transferido competencias relativas a determinados ámbitos, algunos de los cuales están regulados por el presente Tratado, incluida la facultad de tomar decisiones vinculantes para dichos Estados con respecto a dichos ámbitos".

244. El término "*territorio*" también se encuentra expresamente definido en el TCE. Bajo el artículo 1(10) del TCE, este término se refiere tanto al territorio de un Estado contratante como al territorio de una ORIE:

> "[…] 'territorio', *con respecto a un Estado que sea una Parte Contratante*,
>
> a) el territorio sobre el que ésta ejerza su soberanía, entendiéndose por territorio el suelo, las aguas interiores y el mar territorial, y
>
> b) de conformidad con el Derecho Marítimo Internacional, el mar, el lecho marino y su subsuelo, sobre los que la Parte Contratante ejerza derechos de soberanía y jurisdicción.
>
> *Con respecto a una Organización Regional de Integración Económica que constituyan Partes Contratantes*, el término "territorio" abarcará los "territorios" de los Estados miembros de dicha organización, con arreglo a lo dispuesto en el acuerdo por el que se crea tal organización" (énfasis añadido).

---

[368] Cf. *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 280 [**RL-0068**] ("*On its face there is nothing in the text of the ECT that carves out or excludes issues arising between EU Member States*").

245. El Tribunal encuentra que estas disposiciones, invocadas por España para justificar la exclusión de las controversias intra-UE del ámbito del artículo 26 del TCE[369], conducen justamente a la conclusión contraria. El texto del TCE indica que hay diversidad de territorios cuando un inversionista de la UE presenta una reclamación contra un Estado miembro de la UE, siempre que este último sea diferente a su país de origen. Como lo explicó el tribunal en el caso *Isolux c. España*:

> "[…] [T]anto el territorio de los Países Bajos como el territorio del Reino de España son partes del territorio de la UE como ORIE. Sin embargo, el mismo Artículo precisa que respecto a un Estado que sea parte Contratante el "*territorio*" es "*el territorio sobre el que ejerza su soberanía*". No hay duda que los Países Bajos y el Reino de España ejercen su soberanía sobre sus respectivos territorios nacionales.
>
> Así, el hecho de que el "*territorio*" de la UE, según el Artículo 1.10 TCE, abarque los territorios de los Países bajos y del Reino de España no impide que cada uno de ellos conserve un "*territorio*" también en el sentido del TCE. Solo una interpretación del Artículo 26.1 TCE permite determinar a qué "territorio" hay que referirse para verificar que se cumpla la exigencia de diversidad de territorios.
>
> […]
>
> El Artículo 26.1 se refiere a controversias entre "*una Parte Contratante y un inversor de otra Parte Contratante… relativa a una inversión de éste en el territorio de la primera*". Eso conlleva claramente que el territorio de que se trata es el territorio de la Parte Contratante en contra de la cual el inversor está actuando. En la presente controversia, la supuesta inversión fue hecha en España por un inversor que pretende ser holandés y que está actuando sobre la base del TCE contra el Reino de España, no contra la UE"[370].

246. Basado en las consideraciones anteriores, el tribunal del caso *Isolux c. España* concluyó que "*la Controversia sometida al Tribunal Arbitral se presenta como una controversia entre una Parte Contratante (España) y un inversor de otra Parte Contratante (Países Bajos) relativa a una inversión de este último en la primera*"[371]. De acuerdo con el tribunal de ese caso, "*el hecho de que el Reino de España y los Países Bajos pertenecen a la misma ORIE no conlleva que la presente controversia no pueda oponerse por un inversor de una Parte Contratante a otro Inversor de una Parte Contratante*"[372]. Estas conclusiones, que el Tribunal comparte,

---

[369] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 76-79 y 82.
[370] *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶¶ 633, 634 y 636 [**RL-0003**] (notas al pie omitidas).
[371] *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶ 636 [**RL-0003**].
[372] *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶ 640 [**RL-0003**].

son plenamente consistentes con las decisiones de otros tribunales constituidos bajo el TCE[373].

247.  Este Tribunal también encuentra que el requisito de diversidad de territorios bajo el artículo 26(1) del TCE se cumple cuando el Estado demandado no coincide con el Estado de cuyo territorio proviene el inversionista. En el presente caso, tanto Alemania como España son "*Partes Contratantes*", con sus respectivos territorios, de conformidad con las definiciones del artículo 1 del TCE. Si la UE y España son Partes Contratantes independientes y autónomas, es posible aplicar el TCE de manera diferenciada en lo que respecta a la responsabilidad de cada una de ellas. Como indicó el tribunal en *BayWa r.e. c. España*:

> "Si, como el Tribunal considera, los Estados Miembros eran Partes Contratantes del TCE en su propio derecho, no hay dificultad en aplicar el Artículo 26 de manera separada a ellos en asuntos relativos a su propio territorio y responsabilidad[374].

248.  La Demandante en este proceso es una sociedad constituida en Alemania. Steag ha insistido, con razón, en que su personalidad jurídica está determinada por el derecho alemán y no por el derecho comunitario[375]. El artículo 1(7)(ii) del TCE establece que un "*inversionista*" es "*la empresa u otra organización constituida con arreglo a la legislación aplicable en la Parte Contratante*". De ahí que lo determinante para efectos jurisdiccionales sea bajo qué legislación fue constituida una compañía, con independencia de que ese lugar de constitución se encuentre dentro del territorio de una ORIE[376]. Para este Tribunal, Steag es una sociedad constituida con arreglo a la legislación de la República Federal de Alemania, y para los efectos del artículo 26(1) del TCE no se requiere que sea un inversor de la UE que realiza una inversión dentro de la UE sino un inversor alemán que realiza una inversión en el Reino de España.

---

[373] *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶¶ 218-222 [**CL-0130**]; *BayWa r.e. Renewable Energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶¶ 247-248 [**RL-0144**]; *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 430 [**CL-0029**]; *Masdar Solar & Wind Cooperatief U.A. c. Reino de España*, Laudo, Caso CIADI No. ARB/14/1 (16 de mayo de 2018), ¶¶ 317, ss. [**CL-0129**]; *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶ 131 [**RL-0146**]; *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 182-184 [**CL-0131**].

[374] Traducción del Tribunal. Texto original: "*[I]f, as the Tribunal considers, the Member States were Contracting Parties to the ECT in their own right, there is no difficulty in applying Article 26 severally to them in matters concerning their own territory and responsibility*". *BayWa r.e. Renewable Energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶ 250 [**RL-0144**].

[375] Dúplica sobre Jurisdicción, ¶ 77. La Demandante también resalta que inclusive la ciudadanía de la UE es dependiente de la de un Estado miembro bajo el artículo 20.1 del TFUE (¶ 75).

[376] *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶ 128 [**RL-0146**] ("*The operative word in Article 26(1) is "organized," not "operating under" or "functioning under" a particular State's law. While it is true that all the Claimants by virtue of conducting their activities within the EU are therefore operating to some degree under EU law, they were not created or organized under EU law, but under the laws of Germany or, in Marquesado's case, of Spain. Thus, it cannot be said that, for purpose of Article 26(1) of the ECT, they are Investors of the EU, as well as of Germany*").

249. A la luz de las definiciones del artículo 1 del TCE y del texto del artículo 26(1) del TCE, se desprende entonces con meridiana claridad que las Partes Contratantes no pactaron – ni expresa ni implícitamente – una cláusula de desconexión excluyendo algunas "*controversias entre una Parte Contratante y un inversor de otra Parte Contratante*" del ámbito de aplicación del artículo 26. La interpretación de estas disposiciones como una cláusula de desconexión implícita ha sido reiteradamente rechazada por otros tribunales arbitrales. En *RREEF c. España*, el tribunal explicó:

> "El propósito de una cláusula de desconexión es dejar claro que los Estados Miembros de la UE aplicarán el derecho de la UE en sus relaciones *inter se*, antes que la convención donde [dicha cláusula] aparece. En ausencia de tal cláusula en un tratado multilateral, éste busca ser aplicado integralmente por la UE y sus Estados Miembros. No se ha cuestionado que no se ha incluido tal cláusula en el TCE. [...] En opinión del Tribunal, dado que no hay desarmonía o conflicto entre TCE y UE, como se observó arriba, simplemente no había necesidad de una cláusula de desconexión, implícita o explícita"[377].

250. En ese mismo caso, el tribunal explicó con acierto que una cláusula de desconexión explícita habría sido necesaria para excluir la aplicación del TCE en el ámbito intra-UE:

> "[...] Cuando la propia esencia de un tratado del que hace parte la UE está en juego, como sería el caso del TCE si la interpretación sugerida por la Demandada fuera correcta, entonces, precisamente porque la UE es parte del tratado, una advertencia formal de que el derecho de la UE prevalecería sobre el tratado – como la que contiene una cláusula de desconexión – se habría requerido bajo el derecho internacional.
>
> Esto se desprende del principio básico del derecho internacional *pacta sunt servanda*. Si una o más partes de un tratado desean excluir la aplicación de dicho tratado en cierto respecto o circunstancias, deben, o bien hacer una reserva (excluida en el presente caso por el Artículo 46 del TCE), o bien incluir una cláusula de desconexión inequívoca en el tratado mismo. El intento de construir una cláusula implícita dentro del Artículo 26 del TCE es insostenible"[378].

---

[377] Traducción del Tribunal. Texto original: "*The purpose of a disconnection clause is to make clear that EU Member States will apply EU law in their relations* inter se *rather than the convention in which it is inserted. Absent such a clause in a multilateral treaty, it is intended to be integrally applied by the EU and its Member States. It has not been challenged that no such clause has been included in the ECT. [...] In the Tribunal's view, given that there is no disharmony or conflict between the ECT and EU, as noted above, there was simply no need for a disconnection clause, implicit or explicit*". *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶ 82 [**CL-0030**] (notas al pie omitidas). Cf. también *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 438 [**CL-0029**].

[378] Traducción del Tribunal. Texto original: "[...] *when the very essence of a treaty to which the EU is a party is at issue, such as it would be for the ECT if the interpretation proposed by the Respondent were correct, then precisely because the EU is a party to the treaty a formal warning that EU law would prevail over the treaty, such as that contained in a disconnection clause, would have been required under international law. This follows from*

251. El Tribunal concuerda con este análisis. Esta conclusión resulta aún más acertada en vista del hecho que, como señala la Demandante, el TCE contiene disposiciones que regulan sus efectos en caso de posibles colisiones con otros tratados, tales como el Tratado de Svalbard[379]. Lo anterior sugiere que, como lo han constatado otros tribunales[380], si las Partes hubiesen querido realmente excluir del ámbito del artículo 26 del TCE las relaciones intracomunitarias, lo habrían pactado de manera explícita. Más aún, este Tribunal no puede pasar por alto que, al ratificar el TCE, tanto las Comunidades Europeas como sus Estados Miembros se abstuvieron de realizar una reserva en relación con el ámbito intra-comunitario[381].

252. El Tribunal tampoco encuentra que el artículo 36(7) del TCE indique la existencia de una cláusula de desconexión implícita, como sugiere España[382]. De acuerdo con esta norma, "*[c]uando vote una Organización Regional de Integración Económica, tendrá un número de votos igual al de los estados miembros de ésta que sean Partes Contratantes del presente Tratado; siempre que la Organización no ejerza su derecho de voto cuando los estados miembros que la forman ejerzan el suyo, y viceversa*". Salta a la vista que esta disposición se refiere específicamente a las votaciones en el contexto de decisiones de la Conferencia sobre la Carta. Nada tiene que ver con el ámbito de aplicación del artículo 26 del TCE.

253. Finalmente, el Tribunal no encuentra que artículos 16 y 25 del TCE indiquen que el TCE es inaplicable en las relaciones intra-UE[383]. Este argumento está enfocado particularmente hacia la supuesta primacía del derecho de la UE. Por ese motivo, el Tribunal lo abordará en la sección 3.3 *infra*.

### 3.3. La relevancia del derecho de la UE para la determinación de la jurisdicción del Tribunal

254. La tercera cuestión planteada por las Partes en relación con la objeción intra-UE se refiere a la relevancia del derecho de la UE para la jurisdicción del Tribunal. España alega que no ha prestado su consentimiento para someter a arbitraje "*cuestiones […] atenientes a la autonomía y primacía del ordenamiento [comunitario]*"[384]. La Demandada analiza el artículo 26(6) del TCE y sostiene que éste "*impide que un inversor intra-UE pueda demandar*

---

the basic public international law principle of pacta sunt servanda. *If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable*". *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶¶ 84, 85 [**CL-0030**] (notas al pie omitidas).

[379] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 56.

[380] Cf. *Masdar Solar & Wind Cooperatief U.A. c. Reino de España*, Laudo, Caso CIADI No. ARB/14/1 (16 de mayo de 2018), ¶ 311 [**CL-0129**]; *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 204 [**CL-0131**].

[381] Cf. *BayWa r.e. Renewable Energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶ 249 [**RL-0144**].

[382] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 82.

[383] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 80, 81 y 83.

[384] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 7 (cf. también ¶¶ 73, ss. y 84-205). Véase también Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 4, 57 y 84-93.

*en arbitraje a un Estado miembro de la UE por razón de su inversión*"[385]. Por su parte, la Demandante se opone a los argumentos esgrimidos por España en este contexto. Para Steag, el derecho de la UE no es aplicable, ni tiene relevancia alguna, para la determinación de la jurisdicción de este Tribunal[386].

255.   El Tribunal observa que los argumentos de las Partes sobre este punto giran, en particular, en torno a la interpretación y efectos del artículo 26(6) del TCE. El tenor de dicha disposición es el siguiente:

> "En virtud del apartado 4) se creará un tribunal que decidirá las cuestiones en litigio con arreglo al presente Tratado y a las normas del Derecho Internacional aplicables".

256.   El Tribunal encuentra que esta cláusula no crea un obstáculo para el ejercicio de jurisdicción sobre el presente caso. Tampoco considera que el derecho de la UE sea determinante para la decisión sobre jurisdicción. Cuatro razones sustentan esta conclusión.

257.   *Primero*. El artículo 26(6) del TCE se refiere únicamente al derecho aplicable al fondo de la controversia. El Tribunal no puede desconocer o pasar por alto la distinción entre el derecho aplicable al fondo y el derecho aplicable a la jurisdicción[387]. Una lectura del artículo 26(6) del TCE en su contexto, conforme a la regla general de interpretación prevista en el artículo 31 de la CVDT, indica que las "*cuestiones en litigio*" son justamente las cuestiones relativas a las obligaciones sustanciales previstas en la Parte III del TCE[388]. No puede ser de otra manera, ya que el artículo 26(1) circunscribe la jurisdicción del tribunal a controversias relativas a la Parte III del TCE y es entonces respecto de esas controversias que opera la elección de derecho aplicable expresada en el artículo 26(6) del TCE[389]. En *Stadtwerke München c. España*, el tribunal acertadamente explicó:

> "El Tribunal observa que, contrario a lo que argumenta la Demandada, el derecho aplicable a la jurisdicción de este Tribunal no está prescrito por el Artículo 26(6) del TCE sino por los Artículo 26(1)-(5), que confieren jurisdicción al Tribunal. El Artículo 26(6) del TCE no apoya entonces a la Demandada en la demostración de la superioridad del derecho de la UE ni de su sistema de protección respecto del TCE, para el propósito de decidir esta objeción jurisdiccional. El Artículo 26(6) rige el derecho aplicable al fondo de la disputa; esto es claro del texto de esta disposición: "En virtud del apartado 4) se creará un tribunal que decidirá las cuestiones en litigio con arreglo al presente Tratado y a las normas del Derecho Internacional aplicables". Una "controversia" es definida en el Artículo 26(1): "supuesto incumplimiento por parte de aquélla [una

---

[385] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 84.
[386] Dúplica sobre Jurisdicción, ¶¶ 72, ss. y 84, ss.
[387] *OperaFund Eco-Invest SICAV PLC y Schwab Holding AG c. Reino de España*, Laudo, Caso CIADI No. ARB/15/36 (6 de septiembre de 2019), ¶ 326 [**CL-0162**].
[388] *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶ 157 [**CL-0161**].
[389] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 116 [**CL-0131**]; *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶ 157 [**CL-0161**].

Parte Contratante] de una obligación derivada de la Parte III". La Parte III del TCE contiene los estándares sustantivos de protección, mientras que la disposición de solución de controversia puede encontrarse en la Parte V del TCE ("Solución de Controversias"). El derecho de la UE, y en particular los Artículos 267 y 344 del TFUE, según fueron interpretados en *Achmea*, no rige, en consecuencia, la jurisdicción de este Tribunal en virtud del Artículo 26(6) del TCE"[390].

258. Este Tribunal concuerda también con la observación del tribunal arbitral en el caso *SolEs Badajoz c. España*, cuando afirmó que, si la voluntad de las Partes hubiese sido que el artículo 26(6) del tratado aplicara a cuestiones jurisdiccionales y se extendiera consecuentemente más allá de la Parte III del TCE, habrían expresado esa voluntad en el texto de la disposición[391].

259. El Tribunal observa, además, que el artículo 26(6) del TCE expresa un acuerdo entre las partes acerca del derecho aplicable a los efectos del artículo 42(1) del Convenio del CIADI, de conformidad con el cual "*[e]l Tribunal decidirá la diferencia de acuerdo con las normas de derecho acordadas por las partes*". La referencia que se hace en el artículo 42(1) a "*la diferencia*" indica que la disposición concierne exclusivamente al derecho aplicable al fondo, y no a la jurisdicción[392]. Lo anterior es plenamente coherente con la interpretación del artículo 26(6) del TCE como norma relativa al derecho aplicable al fondo de la controversia. En este contexto resulta útil referir al análisis del tribunal del caso *Vattenfall c. Alemania*:

> "Bajo el Convenio CIADI, una objeción jurisdiccional está claramente demarcada del fondo de la controversia. Cuando el Artículo 42(1) se refiere a la ley aplicable cuando el Tribunal "[decide] la diferencia", no incluye una decisión sobre una objeción jurisdiccional. […] Dado que las partes han celebrado un acuerdo sobre el derecho aplicable en el Artículo 26(6) del TCE, la regla

---

[390] Traducción del Tribunal. Texto original: "*The Tribunal notes that contrary to what the Respondent argues, the law applicable to the jurisdiction of this Tribunal is not prescribed by Article 26(6) of the ECT but by Articles 26(1)-(5), which confer jurisdiction upon the Tribunal. Article 26(6) of the ECT does not, therefore, assist the Respondent in demonstrating the superiority of EU law or its protection system over the ECT for the purposes of deciding this jurisdictional objection. Article 26(6) governs the law applicable to the merits of the dispute; this is clear from the wording of this provision:* "a tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." *A* "dispute" *is defined in Article 26(1):* "an alleged breach of an obligation of [a Contracting Party] under Part III." *Part III of the ECT contains the substantive standards of protections, while the dispute resolution provision can be found in Part V of the ECT (*"Dispute Settlement"*). EU law, and in particular Articles 267 and 344 of the TFEU as interpreted in* Achmea, *does not, therefore, govern this Tribunal's jurisdiction by virtue of Article 26(6) of the ECT*". *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶ 137 [**RL-0146**]. Cf. también *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶¶ 157, 159 [**CL-0161**].

[391] *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶ 157 [**CL-0161**] ("*Absent an indication to the contrary, the phrase* "issues in dispute" *in paragraph (6) of Article 26 can be expected to have the same scope as paragraph (1), which refers to disputes that* "concern an alleged breach of an obligation [...] under Part III," *in other words, to the merits of a dispute. If the drafters of the ECT had intended the scope of Article 26(6) to extend beyond Part III of the ECT, such that it governed the law to be applied by Tribunal to decide whether it had jurisdiction over a dispute, they could have so indicated. Article 16 of the ECT, which addresses the relationship between the ECT and other treaties, for example, refers both to Part III and Part V (*Dispute Settlement*)*").

[392] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 119 [**CL-0131**].

supletoria en la segunda frase del Artículo 42(1) del Convenio CIADI no entra en operación. […] En conclusión, el Artículo 26(6) TCE, sea visto a través del Artículo 42(1) del Convenio CIADI o interpretado de manera independiente respecto del Convenio CIADI, aplica sólo al fondo de una disputa entre las Partes. No aplica a asuntos o cuestiones relativos a la jurisdicción del Tribunal. Por esta razón, debe rechazarse el argumento de la Demandada de que el Artículo 26(6) conlleva la aplicación del derecho de la UE y de la sentencia del TJUE en el contexto de la jurisdicción del Tribunal"[393].

260.   Este análisis de los alcances del artículo 26(6) del TCE es correcto. La jurisdicción de este Tribunal se fundamenta en los términos mismos del TCE y, particularmente, de sus artículos 26(1) a 26(5)[394]. La fuente de la jurisdicción de este Tribunal es el TCE y no el derecho de la UE[395].

261.   Lo anterior no supone que el TCE se interprete y aplique de manera aislada del derecho internacional. Por el contrario, su interpretación y aplicación se rigen por el derecho de los tratados[396]. En este contexto, España ha sugerido que el derecho de la UE podría ser aplicado bajo el "*principio de proximidad*" del artículo 31(3)(c) de la CVDT[397]. La Demandante cuestiona este argumento y considera que la Demandada no ha logrado demostrar que el artículo 26 del TCE deba interpretarse a la luz del TUE y el TFUE, según fueron interpretados por el TJUE en el caso *Achmea*[398]. El principio de proximidad del artículo 31(3)(c) de la CVDT no tiene pertinencia para la determinación de la jurisdicción de este Tribunal, cuya fuente es el TCE, por las razones expresadas en los párrafos anteriores[399].

---

[393] Traducción del Tribunal. Texto original: "*Under the ICSID Convention, a jurisdictional objection is clearly demarcated from the merits of the dispute. When Article 42(1) refers to the applicable law when the Tribunal "decides a dispute", it therefore does not include a decision on any jurisdictional objection […] Since the Parties have made an agreement in Article 26(6) ECT regarding the applicable law, the default rule in the second sentence of Article 42(1) ICSID Convention does not come into operation […] In conclusion, Article 26(6) ECT, either viewed through Article 42(1) ICSID Convention or interpreted independently of the ICSID Convention, applies only to the merits of a dispute between the Parties. It does not apply to issues or questions relating to the Tribunal's jurisdiction. For this reason, Respondent's argument that Article 26(6) brings EU law and the ECJ Judgment into application in the context of the Tribunal's jurisdiction must fail*". *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 119-121 [**CL-0131**]. Véase también: *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶¶ 158, 159 [**CL-0161**].
[394] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 124 [**CL-0131**].
[395] Cf. *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 462 [**CL-0069**]; *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶ 74 [**CL-0030**].
[396] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 125 [**CL-0131**]. Cf. también *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶¶ 138, ss. [**RL-0146**].
[397] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 95.
[398] Dúplica sobre Jurisdicción, ¶¶ 106-111.
[399] Cf. *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 151, ss. [**CL-0131**]. Cf. también *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶¶ 138, ss. [**RL-0146**].

262.  *Segundo*. El argumento de la Demandada parte de la premisa de que existe un conflicto insalvable entre el derecho de la UE y la protección de inversiones e inversores intra-UE bajo el TCE[400]. La Demandante, a su turno, ha enfatizado que el derecho de la UE es compatible con el TCE[401]. Este Tribunal no encuentra que la Demandada haya demostrado la existencia de una incompatibilidad específica entre una disposición del TCE y el derecho comunitario. La Demandada afirma, pero no explica ni prueba, que la disputa afecte las libertades de la UE. Tampoco logra fundamentar que este proceso afecte las competencias del TJUE en cuanto a la aplicación del derecho de la UE, poniendo en riesgo la autonomía del derecho comunitario.

263.  El TCE y los tratados de la UE establecen regímenes plenamente coherentes entre sí[402]. Mientras que el TCE persigue el objetivo puntual de establecer "*un marco legal para fomentar la cooperación a largo plazo en el campo de la energía, basado en la consecución de complementariedades y beneficios mutuos, con arreglo a los objetivos y principios expresados en la Carta*" (art. 2 del TCE), el Preámbulo y el artículo 3 del TUE, así como el Preámbulo del TFUE, indican que el ordenamiento de la UE persigue objetivos mucho más ambiciosos. Pero el proceso de integración europea no excluye la existencia de un régimen paralelo en materia energética, más aún cuando éste tiene un ámbito de aplicación distinto e involucra a terceros Estados.

264.  Específicamente en relación con el artículo 26 del TCE, para este Tribunal no es posible concluir que exista un conflicto entre el artículo 26 del TCE y el artículo 344 del TFUE. El artículo 26 del TCE se ocupa de la solución de "*controversias entre una Parte Contratante y un inversor de otra Parte Contratante*", mientras que el artículo 344 del TFUE regula la prohibición a los Estados Miembros de presentar "*controversias relativas a la interpretación o aplicación de los Tratados*" de la UE. Se trata de disposiciones independientes, que se refieren a materias distintas y que, como acertadamente afirmó el Tribunal en el caso *Vattenfall c. Alemania*, pueden coexistir y ser aplicadas simultáneamente[403]. La decisión del TJUE en el caso *Achmea*, en cuanto se refirió al caso específico de un arbitraje bajo un tratado bilateral entre dos Estados miembros de la UE y con sede en el territorio de un Estado de la UE, según se explicó en la sección 3.1 *supra*, en nada afecta esta conclusión.

265.  La Demandada afirma también que "*desde el momento en que en una disputa que afecta a las libertades fundamentales de la UE y al pilar de ayudas de Estado, se impide que el TJUE pueda ejercer su labor de garantizar la plena aplicación del derecho de la UE*"[404]. Sin embargo, España no logra explicar por qué la resolución de la presente disputa exige que el Tribunal se pronuncie sobre el derecho de la UE. Como se explicará en la sección 3.5 *infra*, la Demandada tampoco logra demostrar que la resolución de la controversia exige

---

[400] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 63; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 75.
[401] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 83, ss.
[402] Cf. *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶¶ 292-303 [**RL-0068**].
[403] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 125 [**CL-0131**]. Cf. también *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶¶ 138, ss. [**RL-0146**].
[404] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 185.

determinar, en particular, si el RRO constituye una ayuda de Estado a la luz del derecho comunitario.

266. El Tribunal resalta que la presente controversia se refiere específicamente a las obligaciones de España bajo los artículos 10(1) y 13 del TCE. Para establecer si la Demandada ha incumplido esas obligaciones, no es necesario determinar la validez de ningún acto de la UE[405]. Tampoco es necesario establecer si las medidas de España son conformes al derecho comunitario. Este Tribunal examinará esas medidas bajo el prisma del TCE y no del derecho de la UE. Por eso mismo, el ejercicio de jurisdicción en este caso no colisiona con las competencias del TJUE y de otros órganos europeos. La declaración de las medidas como conformes con el TCE, o como violatorias de éste, no conlleva determinación alguna de su conformidad con el derecho de la UE ni priva a los órganos competentes de tomar una decisión al respecto en el futuro.

267. *Tercero*. La Demandada ha enfocado parte de su argumento en la caracterización del derecho de la UE como "*derecho internacional aplicable*" bajo el artículo 26(6) del TCE[406], alegando que el derecho de la UE tiene primacía y que esa primacía está además reconocida en el artículo 25 del TCE[407]. Por su parte, la Demandante hace un análisis de las aproximaciones dualista y monista y sostiene que, aunque el derecho comunitario podría clasificarse como derecho internacional público en sus orígenes, hoy en día constituye un "*ordenamiento jurídico propio y autónomo*"[408]. Para la Demandante, el derecho de la UE no es aplicable en este contexto y, en cualquier caso, no prima sobre el TCE[409].

268. El Tribunal ya se pronunció sobre los alcances del artículo 26(6) del TCE, que se refiere únicamente a la ley aplicable al fondo de la controversia y no tiene efectos sobre la jurisdicción del Tribunal. También concluyó que el derecho de la UE no es relevante para la determinación de la jurisdicción del Tribunal. Adicionalmente, ante la ausencia de una colisión o inconsistencia entre el TCE y el derecho de la UE, la discusión acerca de la jerarquía de uno respecto del otro pierde cualquier relevancia práctica para el caso *sub judice*[410].

269. Aunque a la luz de estas conclusiones no sería necesario abordar los argumentos relativos a la primacía y autonomía del derecho de la UE, el Tribunal considera pertinente hacer referencia al mismo, dada la importancia que las Partes han adscrito a este punto.

---

[405] Una situación similar se presentó en el caso *Charanne c. España*. Cf. *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 448 [**CL-0029**].

[406] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 63 y 83, ss.

[407] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 75, 173, 177-178, 185, ss., 193 y 195. Cf. también Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 63, ss., 101.

[408] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 74, 75 y 89. Cf. también Dúplica sobre Jurisdicción, ¶¶ 11-13, 16 y 31.

[409] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 93, ss.; Dúplica sobre Jurisdicción, ¶¶ 16, 23, ss.

[410] Cf. *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶¶ 462, 463 [**CL-0069**].

270. De manera preliminar, el Tribunal encuentra infundada la interpretación del artículo 25 del TCE que pretende la Demandada[411]. Sobre este particular, el Tribunal concuerda con la interpretación del tribunal en *Stadtwerke München c. España* que, al abordar un argumento similar, concluyó:

> "El Tribunal no está persuadido, igualmente, de la referencia de la Demandada al Artículo 25 del TCE para apoyar su posición. Esta disposición simplemente elimina la posibilidad de que Partes Contratantes que no son partes de un Acuerdo de Integración Económica se beneficien del trato conferido entre las partes de dicho acuerdo. No exige la prevalencia del sistema de protección de la UE respecto del TCE. Como tal, esta disposición es irrelevante para la presente discusión"[412].

271. El Tribunal observa que, en otros casos resueltos bajo el TCE, se ha encontrado que el derecho de la UE es derecho internacional[413]. Desde la perspectiva de un Tribunal constituido bajo el TCE, cuya autoridad no deriva del derecho de la UE, los tratados europeos deben ser vistos ante todo como tratados internacionales, de conformidad con la definición del artículo 2(1)(a) de la CVDT[414]. Según esta disposición "*se entiende por 'tratado' un acuerdo internacional celebrado por escrito entre Estados y regido por el derecho internacional, ya conste en un instrumento único o en dos o más instrumentos conexos y cualquiera que sea su denominación particular*". La cuestión se reduce entonces a determinar si los tratados europeos prevalecen sobre otro tratado internacional, en el caso el TCE.

272. Para este Tribunal no puede pretenderse que el derecho de la UE tenga una primacía sobre otras fuentes del derecho internacional *fuera del ámbito comunitario*. En *Cube Infrastructure c. España*, el tribunal analizó un argumento muy similar al que España formuló en el presente procedimiento arbitral y concluyó:

> "Afirmar que el derecho de la UE hace parte del derecho internacional y que, a pesar de ello, tiene primacía sobre otros componentes del derecho internacional externos a la UE es, a juicio del Tribunal, una caracterización errada del derecho de la UE y una confusión de cuestiones que pertenecen a dos ordenamientos

---

[411] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 75, 173, 177-178, 185, ss., 193 y 195. Cf. también Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 63, ss., 101.

[412] Traducción del Tribunal. Texto original: "*[T]he Tribunal is equally unpersuaded by the Respondent's reliance on Article 25 of the ECT to support its position. This provision simply eliminates the possibility of Contracting Parties that are not parties to an Economic Integration Agreement to benefit from the treatment conferred between the parties to such agreement. It does not mandate the prevalence of the EU protection system in respect of the ECT. As such, this provision is inapposite for the present discussion*". *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶ 132 [**RL-0146**] (nota al pie omitida).

[413] *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶¶ 4.120, ss. [**RL-0002**]; *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶ 73 [**CL-0030**]; *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 119-121 [**CL-0131**]. Véase también: *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶¶ 158-159 [**CL-0161**].

[414] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶¶ 119-121 [**CL-0131**]. Véase también: *SolEs Badajoz GmbH c. Reino de España*, Laudo, Caso CIADI No. ARB/15/38 (31 de julio de 2019), ¶¶ 158, 159 [**CL-0161**].

jurídicos diferentes. Los tratados de la UE son ciertamente acuerdos internacionales de un tipo conocido en el derecho internacional, vinculantes entre los Estados partes; pero también cumplen la función de ser la constitución de una comunidad autónoma. Las reglas establecidas por la legislación secundaria de la UE son esencialmente regulaciones supra-nacionales, antes que parte del cuerpo del derecho internacional propiamente dicho. De manera similar, el derecho de la UE tiene supremacía *dentro del ordenamiento jurídico de la UE* sobre los ordenamientos nacionales de los Estados que son Miembros de la UE y que, consecuentemente, se suscriben al sistema jurídico de la UE. Pero el derecho de la UE es sólo uno dentro de varios sistemas jurídicos regionales y muchos nacionales; y es el derecho internacional el que regula las relaciones entre estos diferentes sistemas jurídicos. *Dentro del sistema del derecho internacional, el derecho de la UE no tiene supremacía, y no tiene prioridad jerárquica respecto de los derechos de Estados no Miembros, o sobre reglas de derecho internacional, incluido el TCE. Cualquier pretensión de prioridad desafiaría el fundamento del TCE como un tratado multilateral, afirmando unilateralmente un derecho para la UE y sus Estados Miembros a ser tratados de manera diferente frente a todas las demás Partes Contratantes del TCE.* Las Partes Contratantes del TCE podrían haber acordado expresamente otorgar un trato diferente a la UE y a sus Estados Miembros en relación con los asuntos relevantes para la presente controversia; pero no lo hicieron. De hecho, parece que no se les solicitó que lo hicieran"[415].

273. Estas consideraciones son acertadas. El Tribunal destaca una vez más que su fuente de jurisdicción es el TCE, es decir, un tratado que genera obligaciones para los Estados miembros de la UE y la propia UE frente a terceros Estados. El derecho de la UE no es entonces determinante para la jurisdicción de este Tribunal[416].

---

[415] Traducción del Tribunal. Texto original: "*To say that EU law is a part of international law and yet has supremacy over other, non-EU components of international law is, in the view of the Tribunal, to mischaracterize EU law and confuse questions belonging to two different legal orders. The EU treaties are, certainly, international agreements of a kind familiar in international law, binding as between the States Parties; but they also function as the constitution of an autonomous community. The rules established by EU secondary legislation are essentially supra-national regulations rather than part of the corpus of international law as such. Similarly, EU law has supremacy* within the EU legal system *over the national laws of the States that are Members of the EU and accordingly subscribe to the EU legal system. But EU law is only one among several regional, and many national, legal systems; and it is international law that regulates relations between these different legal systems. Within the system of international law, EU law does not have supremacy, and has no hierarchical priority over the laws of non-Member States, or over rules of international law, including the ECT. Any such claim to priority would challenge the basis of the ECT as a multilateral treaty, unilaterally asserting for the EU and its Member States a right to be treated differently from all other ECT Contracting Parties. The ECT Contracting Parties could have agreed expressly to give different treatment to the EU and its Member States in relation to the matters relevant to the present dispute; but they did not do so. Indeed, it appears that they were not asked to do so*". *Cube Infrastructure Fund SICAV et al. c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y decisión parcial sobre daños, Caso CIADI No. ARB/15/20 (19 de febrero de 2019), ¶ 130 [**CL-0158**] (énfasis en el original y nota al pie omitida).

[416] Cf. también *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre jurisdicción, Caso CIADI No. ARB/13/30 (6 de junio de 2016), ¶ 74 [**CL-0030**] ("*[T]his Tribunal has been established for a specific treaty, the ECT, which binds both the EU and its Member States on the one hand and non-EU States on the other hand. As for the latter, EU law is res inter alios acta and it cannot be upheld that, by ratifying the ECT, those*

274. *Cuarto*. Como se indicó arriba, España no ha logrado demostrar la existencia de una colisión o inconsistencia entre el derecho de la UE y las disposiciones de las Partes III y V del TCE. Pero aún si se aceptase la hipótesis de que existe un conflicto entre el TCE y el derecho comunitario (*quod non*), este Tribunal debe aplicar la regla de conflicto prevista en el propio TCE[417]. El artículo 16 del TCE dispone:

> "Artículo 16. Relación con otros acuerdos.
>
> Cuando dos o más Partes Contratantes sean signatarias de un acuerdo internacional anterior, o firmen un acuerdo internacional posterior, cuyas condiciones afecten, en cualquiera de los dos casos, a las cuestiones reguladas en las Partes III ó V del presente Tratado,
>
> 1) nada de lo dispuesto en las Partes III ó V del presente Tratado se interpretará de manera que deje sin efecto ninguna disposición del otro acuerdo, o del derecho de exigir una solución de la controversia relativa a ello con arreglo a dicho acuerdo, y
>
> 2) nada de lo dispuesto en el otro acuerdo se interpretará de manera que deje sin efecto ninguna disposición de las Partes III ó V del presente Tratado o del derecho de exigir una solución de la controversia relativa a ello con arreglo al presente Tratado,
>
> en la medida en que tales disposiciones sean más favorables para los inversores o la inversión"[418].

275. El artículo 16 es la norma que rige la relación del TCE con acuerdos anteriores y posteriores suscritos por las Partes, incluyendo los de la UE, y resuelve cualquier conflicto en favor de las disposiciones que resulten más favorables para la inversión o el inversionista.[419] En *BayWa c. España*, el tribunal analizó el artículo 16 del TCE y concluyó con acierto que el artículo 16 del TCE exige, como condición inicial, que exista un tratado que se refiera a la misma materia que las Partes III o V del TCE[420]. Resulta evidente que, para que opere la regla de conflicto, debe haber en primer lugar un conflicto[421]. Esa condición, se insiste, no se cumple en el caso *sub judice*.

276. Ahora bien, si se aceptase la hipótesis de un conflicto entre el TCE y el derecho comunitario, la pregunta que se formula es: ¿es el derecho de la UE más favorable para Steag o su inversión? La Demandada alega que el sistema de la UE ofrece un nivel de protección similar

---

*non-EU States have accepted the EU law as prevailing over the ECT. [...] This is what the Parties to the ECT agreed amongst themselves; it is not within the jurisdiction of the Tribunal to alter this*").

[417] Cf. *OperaFund Eco-Invest SICAV PLC y Schwab Holding AG c. Reino de España*, Laudo, Caso CIADI No. ARB/15/36 (6 de septiembre de 2019), ¶ 329 [**CL-0162**].

[418] TCE, art. 16 [**RL-0006**].

[419] *Vattenfall AB et al. c. República Federal de Alemania*, Decisión sobre la Cuestión *Achmea*, Caso CIADI No. ARB/12/12 (31 de agosto de 2018), ¶ 193 [**CL-0131**].

[420] *BayWa r.e. Renewable Energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶ 270 [**RL-0144**].

[421] Cf. *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 439 [**CL-0029**].

al ofrecido por el TCE[422]. Sin embargo, no explica cuáles son las razones para considerar que los tratados de la UE ofrecen protecciones más favorables que las ofrecidas por el TCE. En *BayWa c. España*, analizando una objeción similar a la que la Demandada presentó en este caso, el tribunal encontró que las Partes III y V del TCE serían la norma más favorable[423]. También en *Stadtwerke München c. España* el tribunal concluyó que, inclusive si se afirmara la existencia de un conflicto entre el artículo 26 del TCE y el artículo 344 del TFUE, el primero prevalecería sobre el segundo de conformidad con el artículo 16 del TCE:

> "[…] Incluso si el argumento de la Demandada sobre este asunto fuera aceptado y dichas disposiciones se consideraren inconsistentes entre sí, el Artículo 16 del TCE exigiría resolver el conflicto a favor del TCE. Ello es así porque el Artículo 26 del TCE otorga a un inversor de una Parte Contratante el derecho de someter su disputa a adjudicación ante un tribunal arbitral, mientras que el Artículo 344 del TFUE no lo hace. El Artículo 26 es entonces 'más favorable para los inversores' bajo los términos del Artículo 16 del TCE"[424].

277. Este Tribunal concuerda con el análisis de los tribunales citados. El derecho comunitario no prevé la posibilidad de iniciar directamente un arbitraje contra el Estado receptor de una inversión que tenga por objeto determinar si las medidas adoptadas se ajustan a garantías iguales o más favorables a las previstas en la Parte III del TCE[425].

### 3.4. Los efectos de los tratados europeos sobre las obligaciones contraídas en el TCE a la luz de los artículos 30 y 59 de la CVDT

278. La Demandada considera que existe un conflicto entre los tratados del TCE y la UE que debe resolverse con arreglo a los artículos 30 y 59 de la Convención de Viena sobre el Derecho de los Tratados ("**CVDT**"), y no con fundamento en el artículo 16 del TCE[426]. La Demandante reconoce que el derecho comunitario podía clasificarse como derecho internacional público

---

[422] Memorial de Contestación, ¶ 93.

[423] *BayWa r.e. Renewable Energy GmbH y BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶ 271 [**RL-0144**].

[424] Traducción del Tribunal. Texto original: "*[E]ven if the Respondent's case on this issue were to be accepted, and such provisions considered as conflicting with each other, Article 16 of the ECT would mandate the resolution of the conflict in favour of the ECT. This is so because Article 26 of the ECT provides an investor of a Contracting Party with the right to submit its dispute to adjudication before an arbitral tribunal, whereas Article 344 of the TFEU does not. Article 26 is thus "more favourable to the Investor" within the terms of Article 16 of the ECT*". *Stadtwerke München GmbH et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/1 (2 de diciembre de 2019), ¶ 145 [**RL-0146**].

[425] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y dirección sobre daños, Caso CIADI No. ARB/15/16 (2 de diciembre de 2019), ¶ 271 [**RL-0144**] ("*The Tribunal would be inclined, if necessary, to hold that the second condition is met here, in that Article 10 of the ECT, in conjunction with Part V, is more favourable to the Investor or the Investment. Nothing in the TFEU allows a direct challenge by an Investor to a State measure harmful to it on grounds specified in Article 10, or on more favourable grounds. Nor does the TFEU provide for an international tribunal to decide disputes directly between investors and host States, as Part V of the ECT does*". (nota al pie omitida)).

[426] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 186, 194.

en sus orígenes, aunque considera que en la actualidad es un ordenamiento autónomo[427] y si existiere un conflicto entre el derecho de la UE y el TCE, prevalecería el TCE[428].

279.  En la sección 3.3 *supra.*, el Tribunal se pronunció sobre la relación entre el derecho de la UE y el derecho internacional aplicable. También encontró que no hay conflicto entre el derecho de la UE y el TCE y que, si hubiera un conflicto, éste se resolvería a favor del TCE, con arreglo al artículo 16 del TCE. En vista de lo anterior, al Tribunal sólo le resta pronunciarse sobre los argumentos de las Partes relativos a los efectos de los artículos 30 y 59 de la CVDT sobre la relación entre el TCE y el derecho de la UE.

280.  El artículo 30 de la CVDT tiene por objeto establecer las reglas que deben tenerse en cuenta para determinar qué tratado aplicar en caso de incompatibilidad entre los "*derechos y obligaciones*" de las partes en tratados sucesivos acerca de la misma materia[429].

281.  Por su parte, el artículo 59 de la CVDT regula la compatibilidad entre un tratado anterior y posterior en el tiempo[430]:

282.  La diferencia entre los artículos 30 y 59 de la CVDT radica en que, mientras el artículo 59 se refiere a la terminación de un tratado, el artículo 30 concierne el escenario de incompatibilidades particulares entre tratados anteriores y subsiguientes[431]. El artículo 59 de

---

[427] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 74, 75. Cf. también Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 76, 89. Cf. también Dúplica sobre Jurisdicción, ¶¶ 11-13, 16 y 31.

[428] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 102, ss.

[429] "Artículo 30. Aplicación de tratados sucesivos concernientes a la misma materia.
1. Sin perjuicio de lo dispuesto en el artículo 103 de la Carta de las Naciones Unidas, los derechos y las obligaciones de los Estados partes en tratados sucesivos concernientes a la misma materia se determinarán conforme a los párrafos siguientes.
2. Cuando un tratado especifique que está subordinado a un tratado anterior o posterior o que no debe ser considerado incompatible con ese otro tratado prevalecerán las disposiciones de este último.
3. Cuando todas las partes en el tratado anterior sean también partes en el tratado posterior, pero el tratado anterior no quede terminado ni su aplicación suspendida conforme al artículo 59, el tratado anterior se aplicará únicamente en la medida en que sus disposiciones sean compatibles con las del tratado posterior.
4. Cuando las partes en el tratado anterior no sean todas ellas partes en el tratado posterior:
a) en las relaciones entre los Estados partes en ambos tratados se aplicará la norma enunciada en el párrafo 3:
b) en las relaciones entre un Estado que sea parte en ambos tratados y un Estado que solo lo sea en uno de ellos, los derechos y obligaciones recíprocos se regirán por el tratado en el que los dos Estados sean partes.
5. El párrafo 4 se aplicará sin perjuicio de lo dispuesto en el artículo 41 y no prejuzgará ninguna cuestión de terminación o suspensión de la aplicación de un tratado conforme al artículo 60 ni ninguna cuestión de responsabilidad en que pueda incurrir un Estado por la celebración o aplicación de un tratado cuyas disposiciones sean incompatibles con las obligaciones contraídas con respecto a otro Estado en virtud de otro tratado".

[430] "Artículo 59. Terminación de un tratado o suspensión de su aplicación implícitas como consecuencia de la celebración de un tratado posterior.
1. Se considerará que un tratado ha terminado si todas las partes en él celebran ulteriormente un tratado sobre la misma materia y:
a) se desprende del tratado posterior o consta de otro modo que ha sido intención de las partes que la materia se rija por ese tratado; o
b) las disposiciones del tratado posterior son hasta tal punto incompatibles con las del tratado anterior que los dos tratados no pueden aplicarse simultáneamente.
2. Se considerará que la aplicación del tratado anterior ha quedado únicamente suspendida si se desprende del tratado posterior o consta de otro modo que tal ha sido la intención de las partes".

[431] *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-13 (11 de octubre de 2017), ¶ 260 [**RL-0100**].

la CVDT presupone no sólo que los dos tratados se refieran a la misma materia, sino además que sea clara la intención de las partes de terminar el tratado anterior, en los términos del artículo 59(1)(a), o que se presente una incompatibilidad tal que sea imposible dar aplicación simultánea a ambos tratados, en los términos del artículo 59(1)(b).

283. La Demandada no ha demostrado el cumplimiento de ninguno de esos requisitos. Para comenzar, no ha demostrado que el TCE y el derecho de la UE se refieran a la misma materia. Tampoco que las partes hayan tenido la intención de terminar el TCE, de conformidad con el artículo 59(1)(a). En cuanto al artículo 59(1)(b), el Tribunal reitera que no ha encontrado que exista incompatibilidad alguna entre el TCE y el derecho de la UE, lo que supone que no hay impedimento alguno para que ambos tratados sean aplicados simultáneamente. Existe complementariedad y no incompatibilidad, ni sustantiva ni procesal, entre el TCE y el derecho de la UE.

284. Los argumentos de las Partes acerca del artículo 30 de la Convención de Viena se han enfocado en los artículos 30(3) y 30(4) de la CVDT. Este Tribunal comienza por observar que estas disposiciones aplican cuando los tratados entre los cuales se presenta la alegada inconsistencia no contienen una regla de conflicto. Si se ha pactado una regla de conflicto especial, ésta prevalece sobre las disposiciones de la CVDT (*lex specialis*). El Tribunal observa que en este caso existe una regla de conflicto expresa, que se encuentra en el artículo 16 del TCE. Por las razones presentadas en la sección 3.3 precedente, este Tribunal concluye que dicha regla favorece la aplicación del TCE en el presente caso. El artículo 30(3) de la CVDT sólo aplica cuando "*todas las partes en el tratado anterior sean también partes en el tratado posterior*". Ese requisito no se cumple entre el TCE, por una parte, y el TUE y el TFUE, por otra parte. Las Partes Contratantes del TCE incluyen, además de los Estados Miembros de la UE, a la propia UE y a terceros Estados.

285. Finalmente, la conclusión del Tribunal acerca de la ausencia de un conflicto entre las obligaciones previstas en el TCE y las obligaciones que se desprenden del TUE y el TFUE, es también relevante para el análisis de los artículos 30(3) y 30(4) de la CVDT. En efecto, si no hay inconsistencias, el artículo 30 de la CVDT es inaplicable.

### 3.5. El régimen de ayudas de Estado

286. España alega que la compensación que persigue Steag se enmarca dentro de un "esquema de subsidios" y constituiría una ayuda de Estado[432]. De acuerdo con la Demandada, dado que los incentivos previstos en el RD 661/2007 y el RD 1578/2008 son ayudas de Estado[433], este caso impone que el Tribunal haga una determinación acerca del derecho a percibir una ayuda de Estado, ejerciendo competencias que el derecho de la UE reserva a la Comisión[434]. Según la Demandada, si se distorsiona el mercado mediante una decisión a favor de Steag, se

---

[432] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 90 y 97-99; Escrito Post-Audiencia - Segunda Ronda (España), ¶ 177.
[433] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 100-103 y 107.
[434] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 98, 103 y 107. Cf. también ¶¶ 155, 184.

vulneraría el derecho comunitario[435]. En sus argumentos, la Demandada sugiere también que el artículo 10(8) del TCE excluye la aplicación del tratado a subsidios[436].

287. La Demandante se opone al argumento de la Demandada, resaltando que la discusión acerca de si el RRO es una ayuda de Estado es irrelevante para decidir sobre sus pretensiones bajo el TCE en el presente proceso arbitral[437]. La Demandante reconoce que la compensación que se otorgue a Steag debe tomar en consideración los flujos de caja que se obtendrían bajo el RRO, pero indica que su pretensión no es que el Tribunal declare que tiene un derecho a percibirlos de manera indefinida[438]. Steag explica que el RRO aún no ha sido declarado como una ayuda de Estado, ya que no hay una decisión en firme de la Comisión sobre el NRR[439]. La Demandante sostiene también que la discusión sobre la aplicabilidad del TCE a subvenciones se refiere sólo al artículo 10(7) del TCE y no tiene relevancia para la aplicación del artículo 10(1) del TCE[440].

288. El Tribunal encuentra infundados los argumentos jurisdiccionales de la Demandada sobre el régimen comunitario de ayudas de Estado. El Tribunal comienza por observar, de manera preliminar, que, como se afirmó en el laudo dictado en *Greentech c. España*, la decisión de la Comisión Europea sobre el NRR no realiza una evaluación del RRO y, particularmente, del RD 661/2007[441].

289. La disputa que se presenta ante este Tribunal concierne el supuesto incumplimiento de obligaciones bajo el TCE, no una disputa acerca del carácter de ayuda de Estado del RRO. En efecto, la calificación de los incentivos concedidos bajo el RD 661/2007 y el RD 1578/2008 como ayudas de Estado no es una cuestión de derecho que deba ser resuelta por el presente Tribunal para poder resolver la disputa relativa a las obligaciones de España bajo el TCE.

290. El Tribunal también ha tomado en consideración los argumentos de la Demandada sobre la supuesta ilicitud del RRO bajo el régimen comunitario de ayudas de Estado y su relevancia para el análisis de las expectativas legítimas de Steag. En particular, España ha argumentado que el RRO constituye una ayuda de Estado que, al no haber sido notificada a la Comisión, es ilícita y no podía dar lugar a expectativa legítima alguna[442].

---

[435] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 105.

[436] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 113.

[437] Dúplica sobre Jurisdicción, ¶¶ 62, 63 y 112-121.

[438] Dúplica sobre Jurisdicción, ¶¶ 122, 123.

[439] Dúplica sobre Jurisdicción, ¶¶ 125-128; Respuesta de Steag a los comentarios de España al laudo *Greentech* y a la decisión *RREEF*, ¶ 48.

[440] Dúplica sobre Jurisdicción, ¶ 117.

[441] *Foresight Luxembourg Solar 1 S.À.R.L. et al. c. Reino de España*, Laudo Final, Caso CCE No. V2015/150 (14 de noviembre de 2018), ¶ 381 [**RL-0142**]. Las Partes se pronunciaron sobre este aspecto de la decisión en sus escritos posteriores a la audiencia: Contestación a los comentarios de la Demandante respecto a la decisión sobre responsabilidad y principios de daños en el asunto *RREEF c. España* y sobre el laudo en el asunto *Greentech c. España*, ¶¶ 19, 20 (refiriéndose particularmente a la Opinión Parcialmente Disidente del Árbitro Raúl E. Vinuesa [**RL-0143**]); Respuesta a los comentarios de España al laudo *Greentech* y a la decisión *RREEF*, ¶ 48.

[442] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 109, haciendo referencia a la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017), ¶ 158 [**RL-0092**].

291. Como se indicó anteriormente, para resolver sobre el caso *sub judice*, el Tribunal no debe decidir si el RRO es o no una ayuda de Estado bajo el derecho de la UE. Sin perjuicio de lo anterior, el Tribunal acepta que, en principio, la posible aplicabilidad del régimen de ayudas de Estado puede ser un factor a tener en cuenta al realizar una inversión y, en consecuencia, puede tener un impacto en la evaluación de las expectativas que legítimamente tenía el inversionista al realizar su inversión. Así lo afirmó el tribunal en *Antin c. España*:

> "En principio, la pregunta de si un inversor en un país Miembro de la UE que otorga ayudas estatales a inversores ER debería, al realizar la inversión, considerar que el programa de subsidios del Estado se rige no sólo por el derecho nacional aplicable, sino también por reglas comunitarias sobre ayudas de estado que son jurídicamente vinculantes para los Estados Miembros bajo el derecho de la UE, podría ser relevante para determinar las expectativas legítimas del inversor"[443].

292. El Tribunal resalta que la mera ausencia de notificación del RRO a la Comisión no excluye *per se* la posibilidad de que surjan expectativas legítimas. Debe establecerse, por ejemplo, hasta qué punto puede el Estado fundamentar una defensa en sus propias omisiones y qué alcance o consecuencias deberían darse a éstas. Adicionalmente, debe evaluarse qué podía esperar un inversionista razonable y diligente en las circunstancias del caso. Como lo afirmó el tribunal en el caso *Cube Infrastructure c. España*:

> "Las obligaciones acerca de ayudas de Estado recaían sobre la Demandada, y los inversionistas podían asumir que habían sido tenidas en cuenta por la Demandada al redactar su legislación. Las Demandantes no debían lanzar conjeturas sobre la legislación de la Demandada. Más aún, al momento en que se realizaron las inversionistas, no era totalmente claro que el régimen de tarifa debía considerarse como ayuda de Estado y menos aún como una ayuda de Estado no permitida"[444].

293. No obstante, lo anterior significa únicamente que el régimen de ayuda de Estado es uno entre muchos factores que, dentro de la matriz fáctica de un caso particular, deben considerarse al estudiar las expectativas del inversionista. No se trata entonces de evaluar si España cumplió con sus obligaciones bajo el derecho de la UE, sino de determinar, como una cuestión de

---

[443] Traducción del Tribunal. Texto original: "*In principle, the issue of whether an investor in an EU Member State that provides state aid to RE investors should, when making the investment, consider that the State's RE subsidy programme is governed not only by the applicable national regime, but also by EU state aid rules which are legally binding on Member States under EU law, could be relevant to determine the legitimate expectations of the investor*". *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 658 [**CL-0130**].

[444] Traducción del Tribunal. Texto original: "*The obligations regarding State aid were incumbent upon the Respondent, and investors were entitled to assume that they had been taken into account by the Respondent when drafting its legislation. It was not for the Claimants to second-guess the Respondent's legislature. Moreover, at the time that the investments were made it was not at all clear that the tariff regime should be regarded as State aid, let alone as impermissible State aid*". *Cube Infrastructure Fund SICAV et al. c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y decisión parcial sobre daños, Caso CIADI No. ARB/15/20 (19 de febrero de 2019), ¶ 306 [**CL-0158**].

hecho, si el riesgo de un incumplimiento debió ser tenido en cuenta por el inversionista (y, en su caso, con qué alcance) al comprometer su capital en el proyecto Arenales Solar.

294.  Por estas razones, los argumentos esgrimidos por España no plantean un problema relativo a la jurisdicción del Tribunal sino un posible elemento de la discusión fáctica alrededor de las expectativas de Steag, punto que el Tribunal considerará en su decisión sobre el fondo de la controversia, particularmente en relación con el estándar de trato justo y equitativo bajo el artículo 10(1) del TCE.

295.  El Tribunal también toma nota del argumento de España, según el cual un laudo a favor de Steag podría considerarse una ayuda de Estado ilícita.[445] El Tribunal no encuentra en este alegato un argumento de jurisdicción suficientemente fundamentado. El argumento se construye sobre una serie de suposiciones sobre posibles decisiones futuras de la Comisión Europea y otros órganos comunitarios. Pero la Demandada no ha demostrado la existencia de un riesgo real de que un laudo favorable al inversionista y cobijado por el Convenio del CIADI podría ser inejecutable por este motivo. Tampoco tiene en cuenta que, dado que este Tribunal no tiene sede en el territorio de un Estado Miembro de la UE, el laudo no es anulable por los tribunales de ninguno de esos Estados. Más aún, España tampoco ha explicado hasta qué punto el supuesto riesgo de incumplimiento del laudo puede o debe tener un efecto sobre la jurisdicción de este Tribunal.

296.  El Tribunal no descarta, como mera hipótesis, que la ejecución de un laudo favorable a Steag en algunas jurisdicciones y, particularmente, en el territorio de Estados Miembros de la UE, pueda enfrentar dificultades si se llegare a aceptar el argumento de España sobre ayudas de Estado. Pero el mero hecho de que, hipotéticamente, la ejecución de un laudo pueda resultar difícil no significa que el laudo sea inejecutable. La jurisdicción del Tribunal emana del TCE y del Convenio del CIADI. Las normas de los ordenamientos jurídicos nacionales que rigen la ejecución de laudos no determinan el ejercicio de la jurisdicción que dichos instrumentos otorgan al Tribunal.

297.  Finalmente, el Tribunal observa que las Partes se han referido brevemente a los artículos 10(7) y 10(8) del TCE. El Tribunal nota que el artículo 10(8) se refiere a "*[l]as condiciones de aplicación del apartado 7 a los programas por los que una Parte Contratante concede subvenciones u otro tipo de ayuda financiera o firma de contratos de investigación y desarrollo de tecnologías energéticas [...]*". La disposición indica que esas condiciones de aplicación "*se reservarán al tratado complementario mencionado en el apartado 4*". Este Tribunal está de acuerdo con la Demandante[446] en que tanto el apartado 7 como el apartado 4 (que a su vez remite al apartado 3 del artículo 10 del TCE), se refieren concretamente a obligaciones de trato más favorable respecto de otros inversionistas. Ninguna de las disposiciones citadas excluye la aplicación de las obligaciones establecidas en los artículos 10(1) y 13 del TCE, que son justamente a las que se refieren las pretensiones de Steag.

---

[445] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 105.
[446] Dúplica sobre Jurisdicción, ¶ 117.

298. Por estas razones, el Tribunal considera que tiene jurisdicción sobre las Partes en este caso y rechaza la objeción intra-UE formulada por la Demandada.

**B.    LA OBJECIÓN ACERCA DE LA JURISDICCIÓN DEL TRIBUNAL SOBRE ASUNTOS RELACIONADOS CON LA INTRODUCCIÓN DEL IVPEE**

1.    Posición de la Demandada

299. La Demandada sostiene que su consentimiento al arbitraje no cubre la disputa sobre la supuesta violación del artículo 10(1) del TCE a través de la introducción del IVPEE, motivo por el cual este Tribunal carece de jurisdicción sobre la misma[447]. Para España, por operación del artículo 21 del TCE, el artículo 10(1) del TCE "*no genera obligaciones respecto de medidas impositivas*"[448].

300. La Demandada explica que el IVPEE, introducido mediante la Ley 15/2012 (en vigor desde el 1 de enero de 2013), "*grava la realización de actividades de producción e incorporación al sistema eléctrico de energía eléctrica en el sistema eléctrico español*"[449]. La Demandada detalla la base imponible, tipo exigido y período impositivo del IVPEE, y caracteriza el IVPEE como "*un impuesto de aplicación general*" aplicado a la producción de instalaciones de generación convencionales y renovables[450].

301. España alega que, bajo el artículo 26 del TCE, su consentimiento al arbitraje se limita a obligaciones derivadas de la Parte III del TCE, de modo que "*de no existir obligación derivada de la Parte III del TCE, no cabe un supuesto incumplimiento de la misma y por tanto, no existe consentimiento*"[451]. La Demandada considera que ese es el escenario que plantea el IVPEE[452].

302. La Demandada argumenta que, bajo el artículo 21 del TCE, la regla general es que el TCE no da lugar a obligaciones respecto de medidas impositivas[453]. España explica que dicha disposición "*recoge una exclusión general de las medidas impositivas del ámbito de aplicación del TCE (taxation carve-out) que solo presenta una serie de excepciones (claw backs)*"[454]. Esas excepciones están previstas en el artículo 21(2) a (5) del TCE[455]. España

---

[447] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 110-113; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 206, ss. y 290.
[448] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 112, 113, 120 y 121; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 207, 218.
[449] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 114-116; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 284.
[450] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 116-119.
[451] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 122-126; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 286-289.
[452] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 127, 128.
[453] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 130 (cf. también ¶¶ 129, 136); Memorial de Dúplica y Réplica de Jurisdicción, ¶ 207.
[454] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 130; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 211-214.
[455] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 131-133. En apoyo de su interpretación del artículo 21, la Demandada (¶¶ 134, 135) cita la guía publicada por la Secretaría del TCE sobre el tratado [**RL-0053**] y el caso *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No.

nota que las antedichas excepciones incluyen los apartados (2) y (7) del artículo 10 del TCE, pero no el apartado (1) del mismo[456]. Para la Demandada, lo anterior implica que el artículo 10(1) del TCE no genera obligación alguna respecto de medidas impositivas[457]. Adicionalmente, en caso de conflicto, el artículo 21 prevalece frente a cualquier otra disposición del TCE[458].

303. La Demandada considera que las disposiciones de la Ley 15/2012 acerca del IVPEE constituyen una medida impositiva bajo el TCE[459]. El artículo 21(7)(a)(i) del TCE contiene una definición expresa de "*medida impositiva*", definición que incluye "*[l]as disposiciones sobre impuestos de la legislación nacional de la Parte Contratante*"[460]. La Demandada sostiene que el IVPEE encaja dentro de esa definición[461]. En primer lugar, la Ley 15/2012 fue aprobada por las Cortes Generales a través del procedimiento legislativo ordinario y de conformidad con el artículo 133 de la Constitución, lo que implica que hace parte de la "*legislación nacional*" de España[462]. Segundo, las normas sobre el IVPEE son "*disposiciones sobre un impuesto*", sea que se tome la noción de "*impuesto*" del derecho español o la del derecho internacional[463].

304. En cuanto al derecho español, la Demandada considera que el carácter impositivo del IVPEE se deduce del propio tenor literal de la Ley 15/2012[464]. La Demandada cita la Ley General Tributaria (Ley 58/2003), que define el concepto de tributo, categoría general que se subdivide en tasas, contribuciones especiales e impuestos[465]. España explica los elementos del IVPEE, y describe el Modelo 583, a través del cual opera la declaración del impuesto y su ingreso al Tesoro Público[466]. La Demandada afirma que el IVPEE constituye un gasto fiscalmente deducible del Impuesto sobre Sociedades[467]. Finalmente, la Demandada resalta que el Tribunal Constitucional confirmó el carácter impositivo del IVPEE, así como su legalidad[468]. De lo anterior concluye la Demandada que el IVPEE es un impuesto bajo el derecho español[469].

---

ARB/03/24 (27 de agosto de 2008), ¶ 266 [**RL-0034**].
[456] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 137-140.
[457] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 137.
[458] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 130.
[459] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 141, 144; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 285.
[460] Art. 21(7)(a)(i) del TCE; Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 142.
[461] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 142, ss.
[462] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 143-147.
[463] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 143, 148 y 149; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 215.
[464] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 150, 151.
[465] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 152.
[466] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 153-155.
[467] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 157, 158. La Demandada nota que este carácter ha sido reconocido por la Dirección General de Tributos (¶ 159).
[468] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 150 y 160, ss., haciendo referencia a la Sentencia 183/2014 del Pleno del Tribunal Constitucional, Recurso de Inconstitucionalidad No. 1780-2013 (6 de noviembre de 2014) [**R-0043**]. El Estado (¶ 156) observa que también el Instituto de Contabilidad y Auditoría de Cuentas confirma el carácter impositivo del IVPEE: Consulta No. 1 de BOICAC 94/junio 2013 [**R-0006**].
[469] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 163.

305. En cuanto al derecho internacional, la Demandada se refiere en primer lugar al concepto de impuesto utilizado en decisiones arbitrales[470]. La Demandada cita también el *Black's Law Dictionary* y resalta la similitud entre la definición de impuesto en él prevista con la que prevé el artículo 2 de la Ley 58/2003,[471] y que es "*en esencia, una contribución obligatoria al tesoro público*"[472]. La Demandada considera que esa definición es consistente con la práctica arbitral[473]. Para España, la noción de "*impuesto*" utilizada en laudos arbitrales encierra tres elementos, a saber: "*[q]ue el impuesto se establezca mediante ley, [q]ue dicha ley imponga una obligación sobre una clase de personas, y [q]ue dicha obligación suponga pagar dinero al Estado para fines públicos*"[474]. La Demandada considera que el IVPEE cumple con estas tres características[475].

306. *Primero*, el IVPEE fue introducido mediante la Ley 15/2012[476]. *Segundo*, la ley obliga al pago del IVPEE a una "*clase de personas*", a saber, "*a todos los sujetos que realizan las actividades de producción e incorporación al sistema eléctrico de energía eléctrica en el sistema eléctrico español*"[477]. La Ley no distingue para estos efectos entre las instalaciones de energías renovables y aquellas que utilizan energías convencionales[478]. *Tercero*, el IVPEE supone una obligación de pago de dinero al Estado español para fines públicos, y constituye un ingreso para el Estado que, como tal, se incluye en los Presupuestos Generales y contribuye a financiar los gastos públicos[479]. España explica que el equivalente a la recaudación anual estimada de los tributos incluidos en la Ley 15/2012 se destina a la financiación de los costes del sector eléctrico[480]. El IVPEE también contribuye específicamente a cubrir los costes del sistema eléctrico referidos al fomento de las energías renovables[481].

---

[470] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 166, 187 y 188. Cf. también ¶¶ 164, ss.

[471] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 167, 168, citando la novena edición del *Black's Law Dictionary* [**RL-0025**].

[472] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 168.

[473] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 169-172. La Demandada cita en ese sentido los casos *EnCana Corp. c. República del Ecuador*, Laudo, Caso LCIA No. UN 3481 (3 de febrero de 2006), ¶ 142 [**RL-0027**]; *Duke Energy Electroquil Partners et al. c. República del Ecuador*, Laudo, Caso CIADI No. ARB/04/19 (18 de agosto de 2008), ¶ 174 [**RL-0033**]; y *Burlington Resources Inc. c. República del Ecuador*, Decisión sobre jurisdicción, Caso CIADI No. ARB/08/5 (2 de junio de 2010), ¶¶ 164, 165 [**RL-0036**].

[474] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 173.

[475] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 174.

[476] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 175.

[477] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 176.

[478] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 176.

[479] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 177-182. España menciona los Presupuestos Generales desde la introducción del IVPEE, correspondientes a 2013, 2014, 2015, 2016 y 2017 (¶¶ 180, 181). Cf. también la cita del artículo 27 de la Ley 47/2003 (General Presupuestaria) sobre la destinación de los recursos del Estado (¶ 186).

[480] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 183 (haciendo referencia a la Disposición Adicional 2 de la Ley 15/2012).

[481] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 184. En este contexto, la Demandada explica que la Disposición Adicional 5 de la Ley 17/2012 destina a la financiación de "*los costes del sistema eléctrico previstos en la Ley del Sector Eléctrico, referidos a fomento de energías renovables*" una suma equivalente a "*[l]a estimación de la recaudación anual derivada de los tributos incluidos en la ley de medidas fiscales para la sostenibilidad energética*" (¶ 184). Esta disposición aplica también a los demás tributos creados por la Ley 15/2012 (¶ 185).

307. La Demandada observa que también la Comisión Europea ha reconocido el carácter impositivo del IVPEE y, más aún, ha encontrado que el IVPEE se ajusta al derecho de la UE[482]. La Demandada manifiesta que la Comisión Europea inició en 2013 un proceso EU Pilot (fase previa a un procedimiento de infracción bajo el artículo 258 TFUE) acerca del IVPEE (Procedimiento EU Pilot 5526/13/TAXU)[483]. En ese caso, la Comisión no encontró motivos para concluir que el IVPEE fuera contrario al derecho de la UE y cerró el proceso piloto, lo que a juicio de la Demandada confirma que el IVPEE se ajusta al derecho comunitario[484].

308. La Demandada concluye que, siendo el IVPEE una "*medida impositiva*" bajo el artículo 21(7)(a)(i) del TCE, España no ha prestado su consentimiento para el arbitraje de la controversia relativa a la conformidad del IVPEE con el artículo 10(1) del TCE[485]. La Demandada destaca que, en el Memorial de Réplica, Steag reconoció expresamente que "*el IVPEE es una medida impositiva*"[486]. Por ese motivo, solicita al Tribunal declararse falto de jurisdicción sobre dicha controversia[487].

309. La Demandada considera que, para los efectos del artículo 21(7)(a)(i) del TCE, basta con constatar que una medida es de carácter impositivo para que opere la exclusión prevista[488]. La Demandada no considera necesario analizar los efectos económicos del IVPEE para analizar si se trata de una medida de "*buena fe*"[489]. España nota que en el caso *Yukos c. Rusia*, por ejemplo, el análisis de la buena fe se produjo bajo una situación diferente a la del presente arbitraje, relativa a una situación donde se utiliza el manto de una medida tributaria para perseguir un fin ajeno al recaudo, como lo sería causar daño a un antagonista político[490]. La Demandada cuestiona que los efectos económicos de una medida sean determinantes para el análisis de una medida impositiva; lo importante es la "*operativa legal*" de la medida[491]. La Demandada resalta además que Steag no ha probado que el IVPEE sea una medida de mala fe[492].

310. La Demandada considera que, en cualquier caso, el IVPEE es una medida de buena fe[493]. Esta afirmación se apoya en tres puntos[494]. *Primero*, el IVPEE da el mismo trato a todos los productores de energía convencional y renovable[495], a quienes se aplica el mismo gravamen

---

[482] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 189.
[483] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 189-196.
[484] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 197, 198.
[485] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 199-203.
[486] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 216, 217.
[487] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 203.
[488] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 219, ss.
[489] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 220, ss.
[490] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 222, haciendo referencia a los laudos *Hulley Enterprises Ltd. c. Federación Rusa*, Caso CPA No. AA 226, Laudo Final (18 de julio de 2014), ¶ 1407 [**RL-0096**] y *Yukos Universal Ltd. c. Federación Rusa*, Caso CPA No. AA 227, Laudo Final (18 de julio de 2014), ¶ 1407 [**RL-0120**].
[491] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 223-225, citando el laudo *EnCana Corp. c. República del Ecuador*, Laudo, Caso LCIA No. UN 3481 (3 de febrero de 2006), ¶ 142 [**RL-0027**].
[492] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 226.
[493] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 227, 228 y 285.
[494] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 229, ss.
[495] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 229-247. La Demandada cita en este contexto la Sentencia 183/2014 del Pleno del Tribunal Constitucional, Recurso de Inconstitucionalidad No. 1780-2013, de 6 de noviembre de 2014 [**R-0043**], y la igualdad de trato que concede a los productores de energía.

sobre la misma base imponible[496], lo que resulta consistente con el "*carácter medioambiental*" del IVPEE[497]. *Segundo*, la Demandada explica que el IVPEE no conlleva un trato discriminatorio desde la perspectiva de la repercusión[498], es decir, "*la traslación del importe de ese impuesto por parte del contribuyente de ese impuesto a otro sujeto*"[499]. Este argumento se refiere, en primer término, a la "*repercusión jurídica*" (es decir, la exigida por la norma misma, propia de los impuestos indirectos): el IVPEE es un impuesto directo y la Ley 15/2012 trata de la misma manera a todos los contribuyentes del impuesto[500]. En segundo lugar, la Demandada se refiere a la "*repercusión económica*" donde, en atención a su estructura de costes, el empresario decide repercutir el impuesto mediante el precio: los productores de energías renovables del régimen regulado reciben una retribución por ciertos costes, tales como el IVPEE[501]. *Tercero*, el IVPEE no fue diseñado para recortar las retribuciones a los productores termo-solares, sino para recaudar ingresos que se destinan a un fin público[502]. Finalmente, la Demandada nota que los tribunales en los casos *Isolux*, *Eiser* y *Novenergia II* se declararon faltos de jurisdicción en lo que se refiere al IVPEE[503].

## 2.   Posición de la Demandante

311.   La Demandante no pone en duda que el IVPEE sea una "*medida impositiva*", pero cuestiona que se trate de una medida que, habiendo sido adoptada de buena fe, se encuentre cobijada por el artículo 21 del TCE[504]. Asimismo, Steag considera que la Demandada equivocadamente presenta el IVPEE como una medida aislada, y no como el "pri*mer paso*" en el "*drástico cambio*" que se introdujo al RRO[505]. Para la Demandante, "*el IVPEE puede ser analizado bajo el artículo 10(1) del TCE al formar parte de un acto compuesto de España que infringe el estándar de trato justo y equitativo*"[506]. En particular, Steag argumenta que debe analizarse el "*efecto cumulativo de todas las Medidas*", incluido el IVPEE, posibilidad reconocida en decisiones arbitrales para que la protección que otorga el tratado no sea soslayada mediante el "*fraccionamiento de las medidas*"[507]. La Demandante alega entonces

---

[496] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 245, 246.
[497] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 241, ss.
[498] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 248-266.
[499] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 248.
[500] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 250 y 253-256.
[501] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 251, 257-266 (particularmente ¶¶ 258, 259), refiriéndose en este contexto particularmente a la Orden IET/1045/2014, de 16 de junio de 2014, por la que se aprueban los parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos [**R-0229**].
[502] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 267-272.
[503] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 273-282, refiriéndose a los casos *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶ 741 [**RL-0003**], *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 271 [**RL-0086**] y *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 525 [**RL-0104**].
[504] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 111; Dúplica sobre Jurisdicción, ¶ 142.
[505] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 112, 114.
[506] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 113. Cf. también ¶ 114.
[507] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 114.

que, más que una medida introducida de buena fe, el IVPEE es uno de los elementos del NRR, que a su vez es un "*acto compuesto*" contrario al estándar de TJE[508].

312. La Demandante desarrolla su argumento explicando la noción de "*acto compuesto*" en el artículo 15 del Proyecto de artículos sobre la responsabilidad del Estado por hechos internacionalmente ilícitos ("**Artículos sobre la Responsabilidad del Estado**")[509]. Steag destaca que, como lo muestra el ejemplo de las *creeping expropriations*, "*esta doctrina reconoce que un Estado puede adoptar medidas que por sí solas no constituirían ninguna infracción pero que tomadas en conjunto sí*"[510]. Steag sostiene que la misma doctrina se ha aplicado analógicamente a infracciones del estándar de TJE[511]. Así, por ejemplo, el laudo dictado en *El Paso c. Argentina* habla de "*violaciones progresivas*" del estándar de TJE[512].

313. La Demandante resalta que, como lo han reconocido otros tribunales, el artículo 21 del TCE sólo cobija medidas impositivas adoptadas de buena fe, motivo por el cual es esencial analizar si el Estado español actuó de buena fe al adoptar el IVPEE[513]. Para Steag, los argumentos de España sobre la buena fe se quedan en el "*plano puramente legal y jurídico*" y nunca llegan a un "*análisis económico*" sobre el particular[514]. La Demandante explica que la determinación de si el IVPEE es un impuesto de buena fe, que puede aislarse así de los demás elementos del acto compuesto que Steag considera contrario al TCE, debe partir de un "*estudio sustantivo de la medida tributaria*" y no depende exclusivamente de la caracterización formal que de la misma hace el Estado[515].

314. Steag considera que el diseño del IVPEE estaba particularmente dirigido a afectar las instalaciones de generación de energía solar termoeléctrica[516]. La Demandante encuentra que España no ha respondido adecuadamente a lo afirmado en el Memorial de Demanda y en el informe de sus peritos acerca del "*desproporcionado efecto del IVPEE sobre instalaciones como la de Arenales Solar*"[517]. Steag pone además en duda que, como dice la Demandada,

---

[508] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 115, 116.

[509] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 117.

[510] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 118.

[511] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 119.

[512] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 119, citando el caso *El Paso Energy International Company c. República Argentina*, Laudo, Caso CIADI No. ARB/03/15 (31 de octubre de 2011), ¶ 518 [**CL-0088**]. La Demandante (¶ 120) se refiere también al caso *Swisslion DOO Skopje c. República de Macedonia*, Laudo, Caso CIADI No. ARB/09/16 (6 de julio de 2012), ¶ 275 [**CL-0089**].

[513] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 121-124. La Demandante cita los casos *RosinvestCo UK Ltd. c. Federación Rusia*, Laudo Final, Caso CCE No. V(079/2005) (12 de septiembre de 2010), ¶ 567 [**CL-0090**]; *Renta 4 S.V.S.A. Ahorro Corporación Emergentes F.I. et al. c. Federación Rusia*, Laudo, Caso CCE No. 24/2007 (20 de julio de 2012), ¶¶ 120, 121 [**CL-0091**]; *Yukos Universal Ltd. (Isle of Man) c. Federación Rusa*, Laudo CPA No. AA 227, Laudo Final (18 de julio de 2014), ¶¶ 626, 627 [**CL-0092**].

[514] Dúplica sobre Jurisdicción, ¶ 144 (cf. también ¶ 146). En el ¶ 147 Steag cuestiona también el uso que hace la Demandada del caso *EnCana c. Ecuador*.

[515] Dúplica sobre Jurisdicción, ¶¶ 148-150. La Demandante cita en apoyo de su argumento los laudos dictados en *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 317 [**CL-0130**] y *Antaris Solar GmbH et al. c. República Checa*, Laudo, Caso CPA No. 2014-01 (2 de mayo de 2018), ¶ 249 [**CL-0142**].

[516] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 125, ss.

[517] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 125. Steag se refiere en este punto a los ¶¶ 240-242 del Memorial de Demanda. Cf. también Dúplica sobre Jurisdicción, ¶¶ 152, ss.

los costes asociados al IVPEE sean neutros por tratarse de un coste remunerado bajo el NRR[518]. En particular, la Demandante considera que deben tenerse en cuenta dos factores:[519]

a. El NRR condiciona la remuneración total por costes operativos a un mínimo de horas. Si no se alcanza ese mínimo, aunque se recibe la remuneración por el coste de inversión, se reduce la remuneración por costes operativos. De ahí que el IVPEE tenga impacto muy fuerte si Arenales Solar no alcanza el mínimo. En efecto, dado que uno y otro tipo de incentivo devenga IVPEE, en ese escenario "*la remuneración por costes operativos debe pagar el IVPEE devengado por ella y cubrir, además, el IVPEE devengado por la recepción de la remuneración por el coste de inversión*".

b. El NRR introdujo un "*máximo de horas operativas*" a partir del cual no se otorga una remuneración adicional, pero sigue devengándose el IVPEE, que no puede considerarse entonces como un "*coste neutro*".

315. En vista de lo anterior, la Demandante sostiene que "*el IVPEE no es una medida impositiva establecida de buena fe en el sentido del TCE o comúnmente aceptado por distintos tribunales de arbitraje*"; el IVPEE es un eslabón del NRR, que debe examinarse como un "acto compuesto" bajo el estándar de TJE[520]. Para Steag, "*el IVPEE fue diseñado de manera consciente por España para afectar a aquellos productores de energía eléctrica con una mayor capacidad, entre los que se encuentra la energía solar termoeléctrica*"[521]. A pesar de que la Exposición de Motivos de la Ley 15/2012 afirma que el IVPEE persigue un objetivo medioambiental, el impuesto grava la "*capacidad económica de los productores de energía eléctrica*" y, a juicio de la Demandante, "*carece de cualquier tipo de discriminación entre tecnologías*"[522]. Steag observa que el Tribunal Supremo español planteó al Tribunal Constitucional una cuestión de inconstitucionalidad relativa a ciertas disposiciones de la Ley 15/2012; en dicho auto, el Tribunal Supremo reconoció la dificultad que supone hallar la "*finalidad extrafiscal*" del IVPEE[523]. El Tribunal Constitucional desestimó la cuestión de inconstitucionalidad, pero no se pronunció sobre ese punto en particular[524]. La Demandante alega que este Tribunal debe analizar si el IVPEE "*responde al objetivo no declarado de recortar de manera soterrada la retribución de los productores de energía renovable*"[525]. Para Steag, ese es justamente el caso[526].

---

[518] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 126.

[519] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 126. Cf. también Dúplica sobre Jurisdicción, ¶¶ 153-155.

[520] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 117, 127.

[521] Dúplica sobre Jurisdicción, ¶ 156.

[522] Dúplica sobre Jurisdicción, ¶¶ 158-161.

[523] Dúplica sobre Jurisdicción, ¶ 162, citando el Auto de la Sección Segunda de la Sala de lo Contencioso-Administrativo del Tribunal Supremo de España (10 de enero de 2018) [**CL-0143**].

[524] Dúplica sobre Jurisdicción, ¶ 163, citando el Auto No. 69/2018 del Pleno del Tribunal Constitucional de España (20 de junio de 2018) [**CL-0144**].

[525] Dúplica sobre Jurisdicción, ¶ 164.

[526] Dúplica sobre Jurisdicción, ¶ 165.

3. <u>Análisis del Tribunal</u>

316. La Demandada afirma nunca haber manifestado su consentimiento al arbitraje sobre la disputa originada en la violación del artículo 10(1) del TCE por la implementación del IVPEE[527]. España enfatiza que únicamente ha consentido someter a arbitraje controversias sobre supuestos incumplimientos de las obligaciones derivadas de la Parte III del TCE[528]. Añade que el artículo 21 del TCE no genera obligaciones respecto de medidas impositivas y que las disposiciones de Ley 15/2012 acerca del IVPEE constituyen una medida impositiva para los efectos del TCE[529]. Steag señala que el IVPEE es una medida que hace parte de una maniobra de la Demandada en su contra y que debe analizarse en conjunto con otras disposiciones legales y teniendo en cuenta los efectos producidos por el impuesto, al que califica como un "*acto compuesto*" contrario al estándar de TJE.[530]

317. En vista de los argumentos de las partes, el Tribunal debe decidir en primer lugar si el IVPEE es una medida impositiva y si dicha medida está excluida del TCE. En segundo lugar, es preciso determinar si la creación del impuesto en la Ley 15/2012 constituye un acto de mala fe.

318. La Demandada sostiene que el artículo 21(1) del TCE es una disposición de "*exclusión*" que exime las medidas fiscales del ámbito de aplicación del TCE[531]. Esta interpretación se basa en el texto del TCE y en la decisión en el caso *Plama Consortium c. Bulgaria*[532]. La Demandante concuerda con la Demandada en calificar al IVPEE como una "*medida impositiva*"; sin embargo, afirma que este tipo de medidas no están excluidas del artículo 21 del TCE[533].

319. El artículo 21(1) del TCE estipula:

> "A no ser que se disponga lo contrario en el presente artículo, no existe disposición alguna en el presente Tratado que establezca derechos o imponga obligaciones con respecto a las medidas impositivas de las Partes Contratantes. En caso de que hubiese incompatibilidad entre el presente artículo y cualquier otra disposición del Tratado, prevalecerá lo dispuesto en el presente artículo en la medida en que haya incompatibilidad".

320. Para la Demandada, basta con constatar que una medida es de carácter impositivo para que opere la exclusión prevista en la norma[534]. El Tribunal coincide con la Demandada en que de la redacción del artículo 21(1) se concluye que las "*medidas impositivas*" están excluidas del

---

[527] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 110-113; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 206, ss. y 290.

[528] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 125.

[529] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 141-144; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 285.

[530] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 110-113.

[531] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 110, 111.

[532] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 135; *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 266 [**RL-0034**].

[533] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 111.

[534] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 219, ss.

TCE. Para resolver la objeción es entonces necesario definir si el IVPEE es una "*medida impositiva*".

321. Como se indicó anteriormente, las dos partes afirman en sus escritos que el IVPEE es una "*medida impositiva*"[535]. La Demandada concentra su argumento en que el IVPEE es un impuesto definido y regulado tanto en el derecho nacional como en el derecho internacional[536]. Añade que tribunales arbitrales internacionales, en casos como *EnCana c. Ecuador*, *Duke Energy c. Ecuador* y *Burlington Resources c. Ecuador,* han definido algunos criterios para determinar si una medida es impositiva[537]. Agrega la Demandada que el IVPPE cumple con los tres elementos característicos de un tributo, a saber[538]: "*(i) establecido en la ley; (ii) imposición de una obligación sobre un grupo de personas, y; (iii) obligación de pagar una suma de dinero al Estado*"[539]. A su turno, Steag alega que el IVPEE hace parte de una serie de decisiones y conductas adoptadas de mala fe por parte del Reino de España, que generaron un cambio drástico en el RRO, afectando su inversión[540].

322. El artículo 21(7)(a) del TCE define "*medida impositiva*" como:

> "i) las disposiciones sobre impuestos de la legislación nacional de la Parte Contratante, o de una subdivisión política de la misma o de una autoridad local dentro de ésta; y
>
> ii) las disposiciones sobre impuestos de cualquier convenio para evitar la doble imposición y de cualquier acuerdo o arreglo internacional al que esté vinculada la Parte Contratante".

323. El Tribunal coincide con la Demandada en que el IVPEE encaja dentro de la definición del artículo 21(7)(a)(i) del TCE[541]. No cabe duda de que la Ley 15/2012, que introdujo el IVPEE, es una ley nacional adoptada por el legislador español. El Título I de la Ley 15/2012 es "*Impuesto sobre el valor de la producción de la energía eléctrica*". De la lectura del texto normativo, se concluye que el objetivo de la Ley 15/2012 es armonizar el régimen fiscal y algunos tributos con la política ambiental del Reino de España. Así lo indica su preámbulo:

> "La presente Ley tiene como objetivo armonizar nuestro sistema fiscal con un uso más eficiente y respetuoso con el medioambiente y la sostenibilidad. […] mediante esta Ley se regulan tres nuevos impuestos: el impuesto sobre el valor de la producción de la energía eléctrica, el impuesto sobre la producción de combustible nuclear

---

[535] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 111; Dúplica sobre Jurisdicción, ¶ 142; Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 114-116; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 211-218.

[536] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 145-150 y 164.

[537] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 169-172, citando *EnCana Corp. c. República del Ecuador*, Laudo, Caso LCIA No. UN 3481 (3 de febrero de 2006), ¶ 142 [**RL-0027**]; *Duke Energy Electroquil Partners et al. c. República del Ecuador*, Laudo, Caso CIADI No. ARB/04/19 (18 de agosto de 2008), ¶ 174 [**RL-0033**]; y *Burlington Resources Inc. c. República del Ecuador*, Decisión sobre Jurisdicción, Caso CIADI No. ARB/08/5 (2 de junio de 2010), ¶¶ 164, 165 [**RL-0036**].

[538] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 174.

[539] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 173.

[540] Dúplica sobre Jurisdicción, ¶ 148.

[541] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 142, ss.

gastado y residuos radiactivos resultantes de la generación de energía nucleoeléctrica y el impuesto sobre el almacenamiento de combustible nuclear gastado y residuos radiactivos en instalaciones centralizadas"[542].

324.  Además, el artículo 8 establece que el "*Impuesto se exigirá al tipo del 7 por ciento*". Para el Tribunal, no cabe la menor duda de que la intención de esta regulación es imponer cargas tributarias a varios actores en el sector de las energías renovables. El Tribunal constata entonces que el IVPEE es una "*medida impositiva*", aprobada de acuerdo con el ordenamiento jurídico español[543].

325.  El Tribunal también está de acuerdo con los criterios que establecen los tribunales[544] citados por la Demandada como indicadores que permiten determinar, más allá del derecho nacional, si una medida es un tributo. Las características del IVPEE también concuerdan con estos criterios.

326.  En sus escritos, la Demandante invoca la doctrina del "*acto compuesto*"[545], desarrollada por algunos tribunales en casos como *El Paso c. Argentina*[546] y *Swisslion c. Macedonia*[547], y solicita que el IVPEE sea analizado por el Tribunal como un elemento dentro de un "*acto compuesto*" de España, acto compuesto que a su juicio infringe el estándar de TJE[548].

327.  El Tribunal encuentra dos razones para rechazar la aplicación de la doctrina del "*acto compuesto*" en los términos que sugiere la Demandante. *Primero*, un impuesto normalmente se enmarca en otras medidas legislativas o administrativas, que pueden en su conjunto afectar a una inversión. Pero eso no significa que el impuesto, como acto del Estado, se confunda con esas otras medidas como un elemento de un "*acto compuesto*" y – por esa vía – pierda su carácter impositivo. *Segundo*, el Tribunal no encuentra ninguna prueba convincente en el expediente que demuestre la "*conexión*" entre las medidas adoptadas por el Estado o del efecto negativo causado por el "*acto compuesto*" a la inversión de Steag. La Demandante describe la doctrina del "*acto compuesto*", pero no explica cómo se debe aplicar a este caso.

328.  Por las razones expuestas anteriormente, el Tribunal concluye que el IVPEE es una "*medida impositiva*" bajo la legislación española y de conformidad con los criterios aceptados por

---

[542] Ley 15/2012, Preámbulo [**CL-0024**].
[543] El proceso de tramitación y aprobación de la Ley 15/2012 por el Congreso de los Diputados y el Senado españoles es público y puede consultarse en detalle en la página web del Congreso de los Diputados y del Senado [**R-0034**]; Sentencia 183/2014 del Pleno del Tribunal Constitucional, Recurso de Inconstitucionalidad No. 1780-2013, de 6 de noviembre de 2014 [**R-0043**].
[544] *EnCana Corp. c. República del Ecuador*, Laudo, Caso LCIA No. UN 3481 (3 de febrero de 2006), ¶ 142 [**RL-0027**]; *Duke Energy Electroquil Partners et al. c. República del Ecuador*, Laudo, Caso CIADI No. ARB/04/19 (18 de agosto de 2008), ¶ 174 [**RL-0033**]; y *Burlington Resources Inc. c. Ecuador*, Decisión sobre jurisdicción, Caso CIADI No. ARB/08/5 (2 de junio de 2010), ¶¶ 164, 165 [**RL-0036**]. La Demandada discute estos casos en su Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 169-172.
[545] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 117.
[546] *El Paso Energy International Company c. República Argentina*, Laudo, Caso CIADI No. ARB/03/15 (31 de octubre de 2011), ¶ 518 [**CL-0088**].
[547] *Swisslion DOO Skopje c. República de Macedonia*, Laudo, Caso CIADI No. ARB/09/16 (6 de julio de 2012), ¶ 275 [**CL-0089**].
[548] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 117.

otros tribunales. El IVPEE encaja dentro de la definición de "*medida impositiva*" prevista en el artículo 21(7)(a) del TCE.

329. Con respecto al argumento de que el IVPEE es una medida impositiva adoptada de mala fe, la Demandante afirma que, bajo el artículo 21 del TCE, sólo las medidas impositivas adoptadas de buena fe pueden "*gozar de la defensa que los acuerdos de protección de inversiones otorgan a las medidas tributarias*"[549].

330. La Demandante, haciendo alusión a los laudos dictados en *Antin c. España*[550] y *Antaris Solar c. República Checa*[551], pide a este Tribunal no limitarse a la caracterización formal del IVPEE por parte del Estado[552]. A su turno, España afirma que el IVPEE es un impuesto adoptado de buena fe[553], pues establece la misma base imponible[554], no discrimina a los contribuyentes del impuesto[555], y persigue el propósito de recaudar ingresos para el Estado[556]. El Reino de España sostiene que, para establecer si el IVPEE fue adoptado de buena fe, el Tribunal sólo debe realizar un análisis sobre las cuestiones legales y no sobre los efectos económicos de la "*medida impositiva*"[557].

331. El Tribunal está de acuerdo en que, para que aplique la exclusión de las medidas impositivas del artículo 21(1) del TCE, la "*medida impositiva*" debe haber sido adoptada de buena fe. Este Tribunal debe analizar entonces si el impuesto creado en la Ley 15/2012 fue adoptado de buena fe o si, como afirma la Demandante, el IVPEE fue "*diseñado con el objetivo específico de suponer un recorte a la remuneración que se percibía bajo el Régimen Regulatorio Original*"[558].

332. El Tribunal observa que la carga de probar que el Estado no actuó de buena fe al introducir el IVPEE a través de la Ley 15/2012 recae sobre la Demandante. Por regla general, la parte que hace una alegación debe probarla. Steag debía demostrar entonces que el IVPEE no fue diseñado para satisfacer el interés general de España, sino con otro objetivo, malicioso y dirigido a afectar las inversiones en el sector. El estándar para desvirtuar la presunción de buena fe es alto. Como afirmó el tribunal en *Isolux c. España*, "*[n]o es fácil destruir la presunción de que las medidas impositivas promulgadas por un Estado son bona fide*".[559] Asimismo, en *Antin c. España* el tribunal afirmó:

> "Está bien establecido en derecho internacional que una reclamación por abuso del derecho está sujeta a un alto umbral

---

[549] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 123
[550] *Antin Infrastructure Services Luxembourg S.à.r.l. et. al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 317 [**CL-0130**].
[551] *Antaris Solar GmbH et al. c. República Checa*, Laudo, Caso CPA No. 2014-01 (2 de mayo de 2018), ¶ 249 [**CL-0142**].
[552] Dúplica sobre Jurisdicción, ¶¶ 148-150.
[553] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 229, ss.
[554] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 245, 246.
[555] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 250 y 253-256.
[556] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 267-272.
[557] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 219, ss.
[558] Dúplica sobre Jurisdicción, ¶ 144.
[559] *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶¶ 739, 740 [**RL-0003**].

probatorio. El Tribunal debe entonces determinar si el IVPEE fue adoptado por España con el propósito específico de abusar de sus derechos bajo el TCE, creando estratégicamente el IVPEE para limitar los derechos del inversor bajo el TCE, de una manera que buscaba emplear abusivamente la exclusión de medidas impositivas"[560].

333. Después de haber revisado y evaluado la evidencia presentada por la parte Demandante, el Tribunal no encuentra probado que el Reino de España haya actuado de mala fe al expedir la Ley 15/2012. Steag no logró demostrar que la intención de España al introducir el IVPEE fuera diferente a la que declara el preámbulo de la Ley, citado anteriormente. En ese sentido, este Tribunal comparte el análisis de los árbitros en el caso *Isolux c. España*:

> "[…] Las repercusiones económicas o los efectos del IVPEE pueden resultar oscuros y discutibles, pero eso no constituye un argumento suficiente para concluir que el IVPEE es una medida impositiva promulgada de mala fe.
>
> Es probable que dicha medida impositiva no tenga el pretendido efecto a favor del medioambiente y que su promulgación no tenía otro propósito más que el de disminuir el déficit tarifario, según lo afirma la Demandante. Sin embargo, el Tribunal Arbitral no necesita pronunciarse al respecto, puesto que, si la verdadera finalidad de la medida hubiera sido meramente recaudaría de acuerdo con la argumentación desarrollada por la Demandante, coincidiría con la finalidad legítima de todo impuesto sin que se pueda caracterizar la mala fe de esta medida impositiva. Si fuera cierto que el Estado presentó una medida meramente recaudaría como medida favorable al medioambiente, la conclusión sería la misma. Es la finalidad real de la medida que tiene que ser valorada por el Tribunal y no su presentación cosmética que puede explicarse por motivos políticos que no caben dentro del análisis del Tribunal Arbitral"[561].

334. A partir del análisis realizado anteriormente, se impone la conclusión de que este Tribunal no tiene jurisdicción para pronunciarse sobre la supuesta violación del artículo 10(1) del TCE mediante la introducción del IVPEE, a través de la Ley 15/2012.

---

[560] Traducción del Tribunal. Texto original: "*It is well established in international law that at an abuse of right claim is subjected to a high threshold of proof. The Tribunal must therefore determine if the TVPEE was adopted by Spain with the precise aim of abusing its rights under the ECT, by strategically creating the TVPEE to curtail the investors' alleged rights under the Treaty, in a manner that abusively sought to employ the taxation exclusion*". *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 317 [**CL-0130**].

[561] *Isolux Infrastructure Netherlands BV c. Reino de España*, Laudo, Caso CCE No. V 2013/153 (12 de julio de 2016), ¶¶ 739, 740 [**RL-0003**].

C.    LA OBJECIÓN ACERCA DE LA JURISDICCIÓN *RATIONE TEMPORIS* DEL TRIBUNAL

1.    Posición de la Demandada

335.    La Demandada sostiene que este Tribunal carece de jurisdicción *ratione temporis*[562]. La Demandada nota de manera preliminar que, mientras que en el Memorial de Demanda se enuncia el 8 de junio de 2012 como la fecha de la inversión, los peritos de Steag indican que la inversión se fue realizando por partes entre los años 2012 y 2014[563]. España alega que: *(i)* para la fecha de inversión indicada en el Memorial de Demanda, la disputa era previsible y existente; y *(ii)* si se toman las fechas indicadas en el informe pericial, se tiene que buena parte de las inversiones tuvieron lugar cuando la disputa ya se había cristalizado en medidas aprobadas[564]. La Demandada busca demostrar que, al realizar su inversión, Steag era consciente de que, a más tardar durante la primera mitad del año 2013, España aprobaría medidas que afectarían a todos los operadores del sistema eléctrico y que alterarían el modelo de retribución vigente para energías renovables, sin perjuicio de la garantía de una *"rentabilidad razonable"*[565].

336.    La Demandada explica que el TCE sólo ampara a inversores que puedan acreditar que eran titulares de la inversión antes del surgimiento de la controversia[566]. Invocando decisiones arbitrales y escritos académicos, la Demandada afirma que hay ausencia de jurisdicción *ratione temporis* cuando, con posterioridad al surgimiento de una controversia, un inversor ha modificado la estructura de su inversión con el fin de acceder a la protección de un TBI[567].

337.    La Demandada observa que los conceptos de *"inversor"* y de *"inversión"* en los artículos 1(6) y 1(7) del TCE *"se definen recíprocamente"*[568]. En ese sentido, *"la inversión debe ser poseída o controlada directa o indirectamente por un inversor para poder beneficiarse de la protección del TCE y viceversa, un inversor debe ostentar una inversión para ser protegido por el TCE"*[569]. Para la Demandada, Steag no era titular de una inversión protegida por el TCE cuando nació la controversia, por lo que tampoco tenía la *"condición de inversor"*[570]. La Demandada nota, además, que los acuerdos de inversión buscan, entre otros, establecer

---

[562] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 840, ss.; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 311, ss. y 335.

[563] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 840, haciendo referencia al ¶ 9 y a la Sección C.II del Memorial de Demanda, y a la Sección II, ¶ 7, del Informe Pericial Brattle sobre daños y perjuicios económicos.

[564] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 840, 842; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 319.

[565] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 841; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 318.

[566] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 844; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 320.

[567] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 845. La Demandada (¶ 846) apoya su argumento en el caso *Vito G. Gallo c. Canadá*, Laudo, Caso CNUDMI (15 de septiembre de 2011), ¶ 328 [**RL-0079**]; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 321, 322 (con referencia al caso *Vito G. Gallo*) y 325. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶ 316, citando *Renée Rose Levy y Gremcitel S.A. c. República del Perú*, Laudo, Caso CIADI No. ARB/11/17 (9 de enero de 2015), ¶ 182 [**RL-0112**].

[568] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 847, 848; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 323, 324.

[569] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 848.

[570] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 848.

"*condiciones favorables para la inversión*"[571]. La Demandada considera que ese fin no puede cumplirse si, al tiempo de la inversión, ya hay certeza acerca de las medidas objeto de la controversia[572].

338. España considera que existe una "*estrecha línea*" entre la objeción por abuso del proceso y la objeción de jurisdicción *ratione temporis*[573]. La Demandada explica que la primera se refiere a casos donde el inversor prevé la disputa y, con el fin de obtener acceso al arbitraje, reestructura su inversión[574]. A su turno, la objeción *ratione temporis* corresponde a casos donde la inversión se ha realizado cuando ya hay certeza acerca de la controversia[575]. La Demandada sostiene que el principio de buena fe del derecho internacional constituye el fundamento de ambas objeciones[576]. España invoca decisiones relativas al abuso del proceso y, en particular, el laudo dictado en el caso *Philip Morris c. Australia*[577]. Para la Demandada, esa decisión deja en claro que el momento relevante para la objeción *ratione temporis* es "*cuando las medidas adquieren consistencia*"[578].

339. Haciendo alusión al artículo 2 del TCE (objetivo del tratado), la Demandada afirma que la protección del TCE sólo puede extenderse a las entidades que han adquirido la condición de "inversores" cuando la controversia aún no ha surgido ni es previsible, y han contribuido así a la realización del propósito del tratado[579]. La Demandada cita múltiples decisiones arbitrales, indicando que sólo las inversiones conformes al principio de buena fe pueden obtener protección bajo un tratado de inversión[580].

340. Adicionalmente, la Demandada dice que una objeción *ratione temporis* exige examinar "*todas las circunstancias del caso concreto*" y, en particular, "*las circunstancias del timing*"[581]. España resalta que la previsibilidad de la disputa es "*determinante*" para

---

[571] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 849.

[572] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 849.

[573] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 850; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 325, 326.

[574] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 850.

[575] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 850.

[576] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 851, 857. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 313, 327.

[577] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 851, 852, refiriéndose al caso *Philip Morris Asia Ltd. c. Mancomunidad de Australia*, Laudo sobre jurisdicción y admisibilidad, Caso CPA No. 2012-12 (17 de diciembre de 2015), ¶ 527 [**RL-0037**]. Cf. también Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 317, 328.

[578] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 317.

[579] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 853.

[580] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 854-857. La Demandada se refiere en este punto (¶¶ 854-856) a los casos *Phoenix Action Ltd. c. República Checa*, Laudo, Caso CIADI No. ARB/06/5 (15 de abril de 2009), ¶¶ 106-108 [**RL-0030**]; *Cementownia "Nowa Huta" S.A. c. República de Turquía*, Laudo, Caso CIADI No. ARB(AF)/06/2 (17 de septiembre de 2009), ¶¶ 153, 154 [**RL-0083**]; y *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 138 [**RL-0034**].

[581] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 858. La Demandada (¶¶ 859-864) cita en apoyo de su afirmación los casos *Banro American Resources Inc. et. al. c. República Democrática del Congo*, Laudo, Caso CIADI No. ARB/98/7 (1 de septiembre de 2000), ¶ 11 [**RL-0087**]; *Cementownia "Nowa Huta" S.A. c. República de Turquía*, Laudo, Caso CIADI No. ARB(AF)/06/2 (17 de septiembre de 2009), ¶ 118 [**RL-0083**]; *Phoenix Action Ltd. c. República Checa*, Laudo, Caso CIADI No. ARB/06/5 (15 de abril de 2009), ¶¶ 68, 69 y 135-140 [**RL-0030**]; *ST-AD GmbH c. República de Bulgaria*, Laudo de jurisdicción, Caso CPA No. 2011-06 (ST-BG) (18 de julio de 2013), ¶ 416 [**RL-0044**]; *Pac Rim Cayman LLC c. República de El Salvador*, Decisión sobre objeciones jurisdiccionales, Caso CIADI No. ARB/09/12 (1 de junio de 2012), ¶ 2.46 [**RL-0084**];

establecer un abuso del proceso[582]. La Demandada traza un paralelo entre el surgimiento de la disputa y la realización de la inversión, y observa que "*la supuesta inversión de STEAG se produce, justamente, cuando el conflicto ya ha surgido*"[583].

341. La Demandada, analizando el surgimiento de la disputa, explica que una controversia legal se refiere a "*un conflicto [...] entre las partes de una relación jurídica*"[584]. Partiendo de esa noción, España sostiene que en el presente caso "*la disputa surge el 7 de marzo de 2012 con la emisión del informe de la CNE*", en el que supuestamente se anunciaron las medidas recurridas por la Demandante[585]. La fecha de la inversión sería posterior, y correspondería al 8 de junio de 2012[586]. La Demandada resalta que la Demandante "*es consciente*" de lo anterior, en cuanto hace mención del Informe de la CNE en su Memorial de Demanda[587]. Para la Demandada, en ese momento "*la disputa no sólo era previsible, sino que ya había surgido*"[588].

342. La Demandada alega que la falta de jurisdicción *ratione temporis* puede evidenciarse en "*la coincidencia de fechas entre los anuncios de ajustes en el modelo retributivo de las energías renovables y las fechas esenciales de la planificación y ejecución de la inversión*"[589]. La Demandada presenta una línea del tiempo, trazando un paralelo entre las fechas en que funcionarios españoles anunciaron los ajustes al modelo de retribución aplicable a energías renovables, por una parte, y las decisiones relativas a la inversión de la Demandante, por otra parte[590].

343. La Demandada considera que la "cristalización de las medidas" se produjo desde la segunda mitad de 2011, y se enmarca dentro de una serie de medidas adoptadas a partir del año 2010 con el fin de garantizar la sostenibilidad del SEE[591]. En particular, España alega que las

---

[582] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 867-871. En ese contexto, la Demandada (¶¶ 868-871) cita los casos *Phoenix Action Ltd. c. República Checa*, Laudo, Caso CIADI No. ARB/06/5 (15 de abril de 2009), ¶ 136 [**RL-0030**]; *Pac Rim Cayman LLC c. República de El Salvador*, Decisión sobre objeciones jurisdiccionales, Caso CIADI No. ARB/09/12 (1 de junio de 2012), ¶ 2.99 [**RL-0084**]; y *Philip Morris Asia Ltd. c. Mancomunidad de Australia*, Laudo sobre jurisdicción y admisibilidad, Caso CPA No. 2012-12 (17 de diciembre de 2015), ¶ 554 [**RL-0037**].

[583] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 865, 866.

[584] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 872-874. En ese contexto, la Demandada (¶¶ 872, 873) cita el Diccionario de la Real Academia Española, que define "*controversia*" como una "*[d]iscusión de opiniones contrapuestas entre dos o más personas*" [**R-0070**], así como la decisión de la Corte Permanente de Justicia Internacional en el caso The Mavrommatis Palestine Concessions, *Grecia c. Reino Unido*, CPJI/PCIJ, Ser. A. No 2, (1924) p. 11 [**RL-0024**]. En relación con la noción de "*controversia*", la Demandada (¶ 875) cita además el caso *Empresas Lucchetti S.A. et al. c. República del Perú*, Laudo, Caso CIADI No. ARB/03/4 (7 de febrero de 2005), ¶ 48 [**RL-0028**].

[585] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 875.

[586] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 875.

[587] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 876.

[588] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 842; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 319.

[589] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 877.

[590] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 878.

[591] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 878; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 314.

medidas fueron anunciadas en diferentes momentos, a saber: *(i)* el discurso de investidura del Presidente del Gobierno del 19 de diciembre de 2011; *(ii)* la Nota de Prensa de la CNE del 28 de diciembre de 2011; *(iii)* el RDL 1/2012 del 27 de enero de 2012; *(iv)* el Informe de la CNMC (entonces CNE) sobre la sostenibilidad económico-financiera del sistema eléctrico, del 7 de marzo de 2012; *(v)* el RDL 13/2012 del 30 de marzo de 2012; *(vi)* el Programa Nacional de Reformas 2012, del 27 de abril de 2012; *(vii)* el RDL 20/2012 del 13 de julio de 2012; *(viii)* la suscripción de un Memorándum de Entendimiento con la UE, que responde a la necesidad de rescatar ciertas entidades financieras; *(ix)* el documento titulado "*las reformas del Gobierno de España: la determinación frente a la crisis*", de septiembre de 2012; *(x)* el "*Proyecto de Ley de Presupuestos Generales del Estado para 2013*" y el documento "*Estrategia Española de la Política Económica: Balance y reformas estructurales para el próximo semestre*", aprobados por el Consejo de Ministros el 27 de septiembre de 2012; *(xi)* la Ley 15/2012 del 27 de diciembre de 2012 que, según el Estado, comienza a ejecutar ciertas medidas sugeridas en el Informe de la CNE; *(xii)* el RDL 2/2013 del 1 de febrero de 2013, que cristaliza algunas de las medidas sugeridas en el Informe de la CNMC; *(xiii)* el Plan Nacional de Reformas de 2013, del 11 de abril de 2013; y *(xiv)* el RDL 9/2013 del 12 de julio de 2013[592].

344.  Entre estas medidas, España adscribe particular importancia a la Ley 2/2011 del 4 de marzo de 2011 y, muy particularmente, al Informe 2/2012 del 7 de marzo de 2012[593]. Para la Demandada, ese informe marca el nacimiento de la controversia[594].

345.  Para la Demandada, las medidas, que habían sido anunciadas con anterioridad, fueron finalmente aprobadas mediante la Ley 15/2012 del 27 de diciembre de 2012; el RDL 2/2013 del 1 de febrero de 2013; el RDL 9/2013 del 12 de julio de 2013; la Ley 24/2013 del 26 de diciembre de 2013; el RD 413/2014 del 6 de junio de 2014; y la Orden IET/1045/2014 del 16 de junio de 2014[595]. De ahí concluye la Demandada que "*toda inversión posterior a marzo de 2012, pero, especialmente, a diciembre de 2012, excede el ámbito de jurisdicción de este honorable Tribunal, ratione temporis*"[596].

346.  La Demandada sostiene que Steag vio la posibilidad de invertir en Arenales Solar a finales de 2011 y, tras el estudio preliminar de enero de 2012 y la aprobación del Consejo de Administración del 7 de mayo de 2012, realizó el 8 de junio de 2012 la que la Demandante caracteriza como su inversión y los peritos de Steag describen como la primera de múltiples inversiones[597]. La Demandada explica que entre 2012 y 2014 tienen lugar las "*sucesivas inversiones*" a las que se refiere el Informe Brattle[598]. De lo anterior concluye que "*los*

---

[592] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 878.
[593] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 312, 315.
[594] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 317.
[595] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 312.
[596] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 312.
[597] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 878. La Demandada se refiere en este punto al ¶ 84 del Memorial de Demanda y a la Sección 2, ¶ 7 del Informe Pericial Brattle sobre daños y perjuicios económicos.
[598] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 878. El Estado se refiere en este punto al ¶ 84 del Memorial de Demanda y a la Sección 2, ¶ 7 del Informe Pericial Brattle sobre daños y perjuicios económicos; Expositivo IV, p. 78 del Acuerdo de Inversión [**C-0011**].

*tiempos de la alegada inversión de la Demandante coinciden perfectamente con los anuncios y el surgimiento de la disputa*"[599].

347. En suma, la Demandada solicita a este Tribunal Arbitral declarar que carece de jurisdicción *ratione temporis* para conocer de la disputa "*puesto que la controversia es anterior al momento de la alegada adquisición de la inversión por parte de la Demandante*"[600].

### 2.  Posición de la Demandante

348. La Demandante considera que la objeción *ratione temporis* de la Demandada "*se construye sobre una interpretación interesada de unos anuncios gubernamentales relacionados con diversos problemas macroeconómicos*" y sólo tiene sentido a partir de un "*absoluto desconocimiento*" acerca del funcionamiento de las estructuras de financiación detrás de proyectos como Arenales Solar[601]. Steag considera que la objeción es infundada y debe ser desestimada[602].

349. En primer lugar, la Demandante explica que "*la objeción 'rationae* [sic] *temporis' es en realidad una infundada alegación de abuso de derecho*"[603]. Steag dice que debe trazarse una distinción entre la jurisdicción *ratione temporis* de un Tribunal CIADI y la "*aplicabilidad 'rationae* [sic] *temporis'*" de los estándares de protección previstos en el tratado[604]. La Demandante nota que una objeción *ratione temporis* normalmente se refiere a la aplicación de un APPRI en el tiempo, y se concentra en si la disputa surgió antes de la entrada en vigor del APPRI, o si alguna cláusula limita la aplicación en el tiempo de las garantías previstas en el acuerdo[605].

350. Contrario a lo que afirma la Demandada, Steag sostiene que "*el artículo 2 del TCE no constituye ninguna limitación temporal a las protecciones que se conceden en el texto del tratado*"[606]. La Demandante considera que España alega un abuso del derecho y *treaty shopping*, poniendo en duda la buena fe de Steag, pero sin especificar en qué consiste el supuesto abuso del derecho cometido[607]. La Demandante nota que, a diferencia de lo ocurrido en *Philip Morris c. Australia*, la inversión de Steag no fue reestructurada tras el nacimiento de la controversia con miras a asegurar la aplicabilidad del tratado: Steag es un inversionista de buena fe[608].

---

[599] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 879.
[600] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 880.
[601] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 134, 135.
[602] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 136; Dúplica sobre Jurisdicción, ¶¶ 173, 216.
[603] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 136, 137, ss. Cf. también Dúplica sobre Jurisdicción, ¶¶ 214, ss.
[604] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 138.
[605] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 139.
[606] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 140.
[607] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 141; Dúplica sobre Jurisdicción, ¶¶ 214, 215.
[608] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 142; Dúplica sobre Jurisdicción, ¶¶ 215, 216.

351. A juicio de la Demandante, la objeción de la Demandada parte del supuesto de que las medidas controvertidas habían sido anunciadas y eran previsibles *antes* de que se realizara la inversión[609]. De ahí que sea esencial determinar dos momentos: *(i)* el momento en que surge la disputa, fecha que para Steag coincide con la aprobación del IVPEE el 27 de diciembre de 2012; y *(ii)* el momento en que se realizó la inversión, fecha que para Steag sería el 8 de junio de 2012[610].

352. En cuanto al **surgimiento de la controversia**, Steag alega que la disputa surge con la *aprobación* de las medidas[611], de modo que "*[e]l mero anuncio de unas medidas impugnadas no da por tanto lugar al nacimiento de una controversia*"[612]. La Demandante explica que múltiples laudos arbitrales, incluidos los laudos citados por España, confirman que la "*fecha crítica*" coincide con el momento en que las medidas controvertidas son aprobadas[613]. Para la Demandante, la "*fecha crítica*" sería entonces el 27 de diciembre de 2012, cuando se aprobó el IVPEE, fecha que es posterior a la adquisición de las participaciones de SMAG[614].

353. La Demandante sostiene que, aún si este Tribunal llegare a concluir que el anuncio de las medidas revela el nacimiento de la disputa, ninguno de los anuncios del Estado español fue un "*aviso claro, contundente e inequívoco de las Medidas*"[615]. Steag explica que el corazón del argumento de la Demandada es que "*las Medidas eran previsibles para cualquier inversor diligente*"[616]. Steag encuentra que la argumentación de España no es del todo consistente. Por una parte, en su Contestación sobre Méritos, España da a entender que la controversia nace con la Ley de Economía Sostenible ("**LES**") del 4 de marzo de 2011[617]. De ser así, no se entiende la relevancia o necesidad del supuesto anuncio de las medidas con ocasión de las elecciones de diciembre de 2011[618]. Por otra parte, España da un vuelco a su argumento al sugerir que la controversia surge el 7 de marzo de 2012, con el Informe de la CNE, con lo que pretende demostrar que la controversia antecedió a la inversión[619]. Steag observa que: *(i)* los anuncios del nuevo Gobierno sólo hablaban de la reducción del déficit de tarifa, y no

---

[609] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 143.

[610] Dúplica sobre Jurisdicción, ¶ 174.

[611] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 143. En cuanto a la fecha en que se considera que ha nacido la controversia, Steag (¶ 143) cita el caso *Philip Morris Asia Ltd. c. Mancomunidad de Australia*, Laudo sobre jurisdicción y admisibilidad, Caso CPA No. 2012-12 (17 de diciembre de 2015), ¶ 533 [**RL-0037**]. En apoyo de su argumento, la Demandante (¶ 144) se refiere también al caso *Renée Rose Levy y Gremcitel S.A. c. República del Perú*, Laudo, Caso CIADI No. ARB/11/17 (9 de enero de 2015), ¶ 149 [**CL-0096**]. Cf. también Dúplica sobre Jurisdicción, ¶¶ 178-185.

[612] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 145; Dúplica sobre Jurisdicción, ¶¶ 175, ss.

[613] Dúplica sobre Jurisdicción, ¶¶ 175-183, citando los casos *Renée Rose Levy y Gremcitel S.A. c. República del Perú*, Laudo, Caso CIADI No. ARB/11/17 (9 de enero de 2015), ¶ 149 [**CL-0096**], *Philip Morris Asia Ltd. c. Mancomunidad de Australia*, Laudo sobre jurisdicción y admisibilidad, Caso CPA No. 2012-12 (17 de diciembre de 2015), ¶ 533 [**RL-0037**] y *Vito G. Gallo c. Canadá*, Laudo, Caso CNUDMI (15 de septiembre de 2011), ¶¶ 323-325 [**RL-0079**]. La Demandante considera que el caso *Phoenix Action*, también referido por España, no es relevante para el presente caso (¶ 184).

[614] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 145; Dúplica sobre Jurisdicción, ¶ 174.

[615] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 146.

[616] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 147.

[617] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 147, refiriéndose a los ¶¶ 618-623 del Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos.

[618] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 147, 148 y 162.

[619] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 149, 150.

del "*drástico cambio*" que se avecinaba; y *(ii)* el Informe de la CNE indicaba ajustes al RRO cuyo efecto era neutral, pero no mencionaba las medidas que fueron adoptadas entre 2013 y 2014[620].

354. La Demandante presenta un cronograma de sus decisiones de inversión, comenzando en el otoño de 2011, cuando se dio el primer contacto con SMAG sobre una posible inversión en Arenales Solar, y finalizando el 31 de julio de 2012, cuando se elevaron a públicos el SPA y los otros acuerdos celebrados entre Steag y SMAG[621]. Steag concluye que la decisión de invertir se tomó de buena fe, cuando las medidas aún no habían sido anunciadas[622]. Steag esboza tres argumentos principales[623].

355. *Primero*, dice la Demandante que la LES sólo establecía "*principios orientadores*" consistentes con la LSE de 1997, y no anunciaba el NRR, ni dejaba entrever la alteración del régimen retributivo[624]. Steag encuentra que la LES buscaba "*profundizar el modelo de planificación indicativa*", que se estaba aplicando bajo el RRO[625]. La LES de 2012 buscaba extender la porción correspondiente a la energía solar termoeléctrica y a otras energías renovables dentro del "*mix*" energético de España, lo que resulta consistente con los objetivos trazados con miras al año 2020[626]. Haciendo un análisis de la LES de 2012, Steag concluye que ésta no puede entenderse como un anuncio de la reforma que se adoptaría después[627].

356. *Segundo*, explica Steag que "*[e]ntre finales de 2011 y mediados de 2012 el Gobierno de España sólo anunció que quería eliminar el déficit de tarifa sin concretar cómo lo haría*"[628]. En su discurso de investidura de 2011, el Presidente Rajoy "*no definió cuál sería la estrategia de su gabinete respecto del déficit de tarifa más allá de que buscaría una reducción de los costes del sistema*"[629]. Steag acepta que el nuevo Presidente reconoció la complejidad del tema y afirmó que un aumento de las tarifas no debía recaer en su totalidad sobre el consumidor, pero dice que las palabras del Presidente no excluían la adopción de medidas diferentes a las finalmente adoptadas[630].

---

[620] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 151.

[621] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 152.

[622] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 153, 178.

[623] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 154.

[624] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 154-157.

[625] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 157. La Demandante se refiere en este contexto a la exposición de motivos de la LSE de 1997.

[626] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 158, 159. En este contexto, la Demandante hace referencia al artículo 79(3) de la LES de 2012.

[627] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 160, 161. Steag se refiere particularmente al artículo 79(4) de la LES, que prevé los principios legislativos para las medidas del Gobierno (¶ 160).

[628] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 154 y 163, ss.

[629] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 163.

[630] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 163-165. La Demandante menciona como ejemplos de estas alternativas: *(i)* ajustar el incremento en los peajes de acceso al SEE; *(ii)* introducir cambios para garantizar la sostenibilidad del sistema en el largo plazo a través de un incremento en inversión en energías renovables, y la reducción del CO$_2$ y de costes medioambientales; *(iii)* introducir medidas impositivas que no se concentren únicamente en los productores de energía eléctrica; o *(iv)* incrementar la competencia entre los productores de energía eléctrica para fomentar la eficiencia.

357. Steag resalta que "*[l]a indefinición de las medidas a tomar fue una constante durante los siguientes meses*" *y se refiere a los hitos que, según el Estado, anunciaron las medidas, a saber: (i) la nota de prensa de la CNE del 28 de diciembre de 2011 sobre la eliminación del déficit de tarifa; (ii) el RDL 1/2012 del 27 de enero de 2012; (iii) el RDL 13/2012 del 30 de marzo de 2012; y (iv) el Programa Nacional de Reformas aprobado el 27 de abril de 2012*"[631]. Steag afirma que estas medidas, como tales, "*no afectaron a las plantas de energía solar termoeléctrica*"[632]. La Demandante dice haber visto con buenos ojos que la energía solar termoeléctrica estuviera "*al margen de los cambios regulatorios*", lo que resultaba coherente con el RD 661/2007, el RD 1614/2010, los objetivos trazados en el Plan de Acción Nacional de Energías Renovables 2011-2020, así como con el Resumen del Plan de Energías Renovables 2011-2020[633].

358. Steag alega que entre finales de 2011 y mediados de 2012, la Demandada no sólo no había anunciado aún el NRR, al menos en lo que respecta a la energía solar termoeléctrica, sino que sus medidas indicaban que habría continuidad en las políticas adoptadas para este sector.[634] En su Memorial de Dúplica sobre Jurisdicción, la Demandante sostiene que, en cualquier caso, en sus últimos escritos la Demandada abandonó sus argumentos relativos a que la LES de 2011 y otros actos del año 2011 anunciaban las medidas, ubicando así el surgimiento de la disputa en el momento de publicación del Informe de la CNE, en marzo de 2012[635].

359. *Tercero*, la Demandante considera que el Informe de la CNE de marzo de 2012 sugería medidas cuyo alcance y principios eran muy distintos a los de las medidas que dieron lugar al NRR en los años 2013 y 2014[636]. Para Steag, el Informe, preparado por un órgano independiente y considerado no vinculante por el Gobierno, proponía meros "*ajustes menores del Régimen Regulatorio Original*", que además respetaban las inversiones en instalaciones de energía solar termoeléctrica[637]. Steag explica que España rechazó esas sugerencias, en parte por el impacto que su anuncio tuvo en la bolsa, e inclusive afirmó que ciertas medidas no serían adoptadas[638]. Considera la Demandante que la implementación del NRR inició con la aprobación del IVPEE el 27 de diciembre de 2012, cuando Steag ya había realizado su inversión, y no con el Informe de la CNE[639].

360. Las medidas que a juicio de la Demandante hacen parte de la implementación son la Ley 15/2012; el RD 2/2013; el RD 9/2013; la LSE de 2013 [Ley 24/2013]; el RD 413/2014; y la

---

[631] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 166.
[632] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 167, 168.
[633] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 168-170.
[634] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 171.
[635] Dúplica sobre Jurisdicción, ¶ 172.
[636] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 154, 172 y 173; Dúplica sobre Jurisdicción, ¶ 191.
[637] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 174-177. La Demandante se refiere en detalle al carácter "*independiente y consultivo*" de la CNE en la Dúplica sobre Jurisdicción (¶¶ 186-188).
[638] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 175; Dúplica sobre Jurisdicción, ¶¶ 189, 190, citando un artículo de prensa [**C-0089**] y un comunicado de prensa del Ministerio de Presidencia sobre el Informe de la CNE de marzo de 2012 [**C-0090**].
[639] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 176; Dúplica sobre Jurisdicción, ¶¶ 174, 185.

Orden Ministerial IET/1045/2014[640]. Steag resalta las diferencias entre las medidas adoptadas y las que había sugerido el Informe de la CNE[641]. Para la Demandante es por eso "*sorprendente*" que la Demandada ubique el surgimiento de la disputa en ese Informe[642]. Steag encuentra, en fin, que las normas y documentos en los que supuestamente se anunciaron los cambios regulatorios no permitían anticipar las medidas, e insiste en su buena fe[643].

361. La Demandante ubica la **fecha de la inversión** el día 8 de junio de 2012, aunque reconoce que hubo inyecciones de capital posteriores a esa fecha[644]. Steag dice contar con "*una actividad económica y una inversión real*" e insiste en que su inversión no puede caracterizarse como "*una mera relocalización de activos*" dirigida a asegurar la cobertura del TCE[645]. Steag considera incorrecta la caracterización de las "*inyecciones de capital*" de 2013 y 2014 como "*nuevas inversiones*", posteriores al surgimiento de la disputa[646].

362. La Demandante explica que los términos "*inversión*" y "*realizar inversiones*" están definidos en los artículos 1(6) y 1(8) del TCE, respectivamente[647]. La Demandante argumenta que, al adquirir las inversiones de SMAG, el día 8 de junio de 2012, Steag realizó una inversión que está cobijada por las antedichas definiciones del TCE[648]. Steag también afirma haber adquirido en ese momento la obligación de hacer ciertas inyecciones de capital en el futuro[649]. El cierre de la operación se produjo el 20 de noviembre de 2012, previo cumplimiento de algunas condiciones suspensivas establecidas en el SPA[650]. Para la Demandante, la inversión realizada el 8 de junio de 2012 cumple además con los criterios formulados en *Salini c. Marruecos*[651].

363. Steag explica que Arenales Solar fue proyectado a través de una financiación de proyecto (*project finance*), donde los accionistas de la sociedad vehículo (*sponsors*) aportan parte de los fondos requeridos por el proyecto y el resto se financia mediante un préstamo sindicado[652]. Los sponsors asumen la obligación de aportar al menos un porcentaje de los fondos ("**Ratio de Apalancamiento**"), que inicialmente se pactó en 27,37%, y la de conservar un determinado Ratio de Cobertura del Servicio de Deuda ("**RCSD**"), que inicialmente se pactó en un RCSD igual o superior a 1,05x[653]. Estas obligaciones suponen que los *sponsors* realicen nuevos aportes de capital con cada disposición del crédito

---

[640] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 176.
[641] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 176.
[642] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 177.
[643] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 178.
[644] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 179, ss.; Dúplica sobre Jurisdicción, ¶¶ 1192, ss.
[645] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 180.
[646] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 181; Dúplica sobre Jurisdicción, ¶¶ 193 y 202, ss.
[647] Dúplica sobre Jurisdicción, ¶¶ 195-197.
[648] Dúplica sobre Jurisdicción, ¶¶ 198, 199.
[649] Dúplica sobre Jurisdicción, ¶¶ 198, 199.
[650] Dúplica sobre Jurisdicción, ¶ 198.
[651] Dúplica sobre Jurisdicción, ¶¶ 200, 201 y 208, refiriéndose al caso *Salini Costruttori S.P.A. et al. c. Reino de Marruecos*, Decisión sobre jurisdicción, Caso CIADI No. ARB/00/4 (16 de julio de 2001), ¶ 52 [**CL-0146**].
[652] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 182, ss.
[653] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 190, 191.

otorgado[654]. La amortización del crédito se realizaría con los flujos de caja de Arenales Solar[655]. Una alteración en los flujos de caja puede entonces alterar la distribución de riesgos y, por eso mismo, exige recalcular el Caso Base y realizar nuevos aportes con miras a mantener el RCSD[656]. Los flujos de caja de Arenales Solar correspondían a la remuneración obtenida por la energía vertida en la red, regida por el RD 1514/2010 y el RD 661/2017, y dependían del régimen tarifario previsto en el RRO[657].

364.  La Demandante sugiere que es justamente este esquema el que explica por qué, tras haber adquirido las participaciones de SMAG por 20,5 millones de Euros el 8 de junio de 2012, Steag realizó inyecciones de capital por un total de 26,7 millones de Euros entre 2012 y 2014[658]. Se trataba de aportes exigidos por obligaciones contractuales que se adquirieron con anterioridad al NRR (y, particularmente, la obligación de mantener el Ratio de Apalancamiento pactado)[659]. No se trató de nuevas "*inversiones*"[660]. En este contexto, Steag cita el caso *Novenergia II*, donde España argumentó sin éxito que las inyecciones de capital en un *project finance* debían mirarse como "*inversiones*" para los efectos de determinar las expectativas legítimas del inversionista; para el tribunal de *Novenergia II*, según lo entiende la Demandante, lo relevante es en qué momento el inversionista "*se comprometió a invertir en el sector*"[661]. Ese momento sería, en el caso de Steag, el 8 de junio de 2012[662]. La Demandante aclara que los compromisos que se fueron asumiendo son sin embargo relevantes, por ejemplo, para valorar los perjuicios sufridos como consecuencia de la violación del TCE[663].

365.  Más aún, la Demandante alega que el NRR afectó los flujos de caja de Arenales Solar, lo que causó alteraciones en el Ratio de Apalancamiento y exigió que Steag realizara nuevos aportes[664]. Steag se refiere particularmente a los efectos del IVPEE, el RDL 2/2013 y el RDL 9/2013[665]. Según la Demandante, las medidas y la pérdida de la tarifa de referencia llevaron a las entidades financieras a negar la disposición de fondos disponibles bajo el contrato de crédito, por lo que los *sponsors* tuvieron que hacer aportes adicionales entre febrero y junio de 2013[666]. El 2 de agosto de 2013 se celebró una novación del contrato de financiación, donde se recalculó el Caso Base y se fijó un nuevo Ratio de Apalancamiento de 39,18 /

---

[654] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 191-194.
[655] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 194.
[656] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 196. La Demandante también menciona las cláusulas acerca de los posibles cambios en los flujos de caja que sean consecuencia de cambios regulatorios (¶ 197).
[657] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 194.
[658] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 200-204 y 222; Dúplica sobre Jurisdicción, ¶¶ 204, ss.
[659] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 198, ss. y 204, ss. Cf. también Dúplica sobre Jurisdicción, ¶¶ 205, 206, citando las cláusulas 5.1, 5.2 y 5.4 del Acuerdo de Inversión [**C-0011**].
[660] Dúplica sobre Jurisdicción, ¶¶ 202, 203 y 207.
[661] Dúplica sobre Jurisdicción, ¶ 209, citando el caso *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶¶ 536-539 [**CL-0069**].
[662] Dúplica sobre Jurisdicción, ¶¶ 210, 213.
[663] Dúplica sobre Jurisdicción, ¶¶ 211, 212.
[664] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 209, ss.
[665] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 209.
[666] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 213, 214.

60,82[667]. Los aportes realizados de ahí en adelante obedecieron también al cumplimiento de obligaciones contractuales y, particularmente, a la obligación de mantener el Ratio de Apalancamiento pactado[668]. Steag observa que esas obligaciones pueden exigir aún aportes adicionales, dependiendo de los resultados de nuevas negociaciones con las entidades financieras[669].

### 3.    Análisis del Tribunal

366.    Bajo la rúbrica de su objeción *ratione temporis*, la Demandada alega esencialmente que "*la controversia es anterior al momento de la alegada adquisición de la inversión por parte de la Demandante*"[670]. Steag se opone al argumento de la Demandada, resaltando que España desconoce la naturaleza de las estructuras de financiación de proyectos (*project finance*), como la que se utilizó para Arenales Solar[671]. Además de explicar en detalle la estructura de la inversión que asevera haber realizado, la Demandante afirma que la objeción de España no se refiere en realidad a la jurisdicción *ratione temporis* del Tribunal, sino que es una objeción por abuso del derecho[672].

367.    Habida cuenta de los argumentos presentados por las partes, el Tribunal estudiará en primer término su jurisdicción *ratione temporis* propiamente dicha y posteriormente resolverá acerca de las objeciones de la Demandada referidas al abuso del derecho.

### 3.1. La jurisdicción *ratione temporis* del Tribunal

368.    En relación con la objeción *ratione temporis*, las alegaciones de las Partes se han concentrado en la determinación de la fecha de la inversión y la fecha en que surge la controversia[673]. No está en discusión que la inversión no se realizó antes del 8 de junio de 2012[674]. Lo que se discute es si para esa fecha ya había una controversia y si, como ha sugerido la Demandada, las inyecciones de capital que ocurrieron entre 2012 y 2014 pueden calificarse como "*sucesivas inversiones*" que deben analizarse de manera separada[675].

369.    El Tribunal comienza por observar que la jurisdicción *ratione temporis* está intrínsecamente ligada al principio de no retroactividad en la aplicación de tratados internacionales[676]. El

---

[667] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 215.
[668] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 216, ss.
[669] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 224, 225.
[670] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 880.
[671] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 141; Dúplica sobre Jurisdicción, ¶¶ 202 – 213.
[672] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 141; Dúplica sobre Jurisdicción, ¶¶ 214, ss.
[673] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 840, ss.; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 319, ss.; Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 143, ss. (surgimiento de la controversia) y 179, ss. (fecha de la inversión); Dúplica sobre Jurisdicción, ¶¶ 175, ss. (surgimiento de la controversia) y 192, ss. (fecha de la inversión).
[674] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 875; Dúplica sobre Jurisdicción, ¶ 174.
[675] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 878; Dúplica sobre Jurisdicción, ¶¶ 202, 203, 207 y 209.
[676] *Pac Rim Cayman LLC c. República de El Salvador*, Decisión sobre objeciones jurisdiccionales, Caso CIADI

tratado – en este caso el TCE – debe ser aplicable a la situación de hecho a la que se refiere el proceso arbitral, en el momento en que dicha situación tuvo lugar[677]. De ahí se desprende que el tribunal no tiene jurisdicción sobre hechos anteriores a la ratificación del tratado o sobre hechos ocurridos cuando no había una inversión protegida[678].

370. Partiendo de lo anterior, la pregunta central que se plantea a este Tribunal para los efectos de la objeción jurisdiccional *ratione temporis* es la siguiente: ¿existía una inversión protegida cuando surgió la disputa relativa a la inversión?

371. El primer paso para dar respuesta a este interrogante es determinar la fecha en que se realizó la inversión. El Tribunal encuentra que la fecha de la inversión fue el 8 de junio de 2012. La Demandada caracteriza las inyecciones de capital realizadas por Steag con posterioridad a esa fecha como "*inversiones*" adicionales.[679] La estructura del proyecto de acuerdo con las pruebas aportadas no sustenta la alegación de España.

372. La Demandante ha explicado y probado de manera detallada y satisfactoria no solamente que la adquisición de Arenales Solar se estructuró a través de un *project finance*, sino las obligaciones asumidas por los accionistas (*sponsors*) de Arenales Solar incluyendo la obligación de conservar un determinado RCSD.[680] La amortización del crédito, como es propio de un *project finance*, se hace con los flujos de caja de Arenales Solar, pero las obligaciones asumidas por los accionistas (*sponsors*) suponen que deban realizar nuevos aportes de capital con cada disposición del crédito otorgado[681]. Si los flujos de caja de la sociedad vehículo no son suficientes para el pago de la deuda, los accionistas (*sponsors*) tendrán que aportar nuevos recursos en la forma y condiciones pactadas en los contratos que hacen parte de la estructura del *project finance*.

373. El Tribunal considera que el hecho de haberse pactado entre los accionistas (*sponsors*) y los financiadores un esquema que implica realizar inyecciones de capital adicionales no significa que cada inyección de capital sea una nueva inversión. La inversión es una sola – la adquisición de las participaciones de SMAG en Arenales Solar el 8 de junio de 2012. Las inyecciones de capital adicionales corresponden al cumplimiento de obligaciones contractuales dentro del mismo proyecto que se adquirieron con anterioridad al NRR. No son, en consecuencia, nuevas "*inversiones*". Todos los aportes se enmarcan en una misma operación.

374. La estructura económica de una operación puede llevar a que haya diferentes inyecciones de capital en un período prolongado de tiempo, sin que ello necesariamente implique la existencia de múltiples inversiones independientes. En este caso, Steag realizó múltiples

No. ARB/09/12 (1 de junio de 2012), ¶ 2.101 [**RL-0084**]; *Renée Rose Levy y* Gremcitel *S.A. c. República del Perú*, Laudo, Caso CIADI No. ARB/11/17 (9 de enero de 2015), ¶ 147 [**CL-0096**].

[677] *ST-AD GmbH c. Bulgaria*, Laudo sobre jurisdicción, Caso CPA No. 2011-06 (ST-BG) (18 de julio de 2013), ¶ 300 [**RL-0044**].

[678] *Renée Rose Levy y* Gremcitel *S.A. c. República del Perú*, Laudo, Caso CIADI No. ARB/11/17 (9 de enero de 2015), ¶ 146 [**CL-0096**].

[679] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 878-880.

[680] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 190, 191.

[681] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 191-194.

inyecciones de capital en el marco de un único proyecto, iniciando el 8 de junio de 2012[682]. Esa es la fecha de la inversión. Asimismo, independientemente de la calificación de inyecciones de capital posteriores como "*inversiones*", las partes disputan que el 8 de junio de 2012 Steag realizó *una* inversión.

375. Asunto diferente es la relevancia de los compromisos que se fueron asumiendo por parte de STEAG con posterioridad al 8 de junio de 2012 a efectos de determinar las legítimas expectativas de la Demandante y los perjuicios que hubiere sufrido como consecuencia de la alegada violación del TCE. Pero este es un tema de mérito y no de jurisdicción que se tratará al abordar la discusión sobre méritos.

376. El segundo paso, tomando el 8 de junio de 2012 como la fecha de la inversión, es resolver si a ese momento ya había una disputa relativa a la inversión.

377. La parte relevante del artículo 26 del Tratado al referirse a las disputas que pueden someterse a arbitraje señala que son aquellas disputas entre una Parte Contratante y un Inversor de otra Parte Contratante relativas a una Inversión de la última en el Área de la primera, que se refiera al alegado incumplimiento de una obligación de la primera bajo la Parte III ("*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III*")[683].

378. El Tratado no define lo que es una "*disputa*", sin embargo, en su sentido natural la palabra "*disputa*" implica un desacuerdo u opiniones en conflicto entre dos o más personas. Como lo ha señalado la CPJI en el caso *Mavrommatis*, una disputa es "*un desacuerdo en un punto de derecho o de hecho, un conflicto de posiciones jurídicas o de intereses entre dos personas*"[684]. En términos generales no podría existir una disputa si una parte ha hecho una manifestación o declaración o ha sostenido una posición respecto de hechos o del derecho y la otra parte no ha hecho manifestación alguna ni ha manifestado su oposición o desacuerdo.

379. Las disputas que pueden someterse a arbitraje según el artículo 26 del Tratado son disputas entre una Parte contratante y un inversor de la otra Parte contratante "*relativas a Inversiones*" de esta última y que se refieran al "*supuesto incumplimiento*" de obligaciones bajo la Parte III del TCE. Se deduce entonces que no toda disputa, no todo "*desacuerdo en un punto de derecho o de hecho*" entre las partes se puede someter a arbitraje bajo el Tratado. Para calificar como una "*disputa*" en el sentido del artículo 26 del TCE, el desacuerdo debe surgir con respecto a las inversiones de la Demandante en el territorio de la Demandada y debe estar relacionado con alegadas violaciones de obligaciones bajo la Parte III del Tratado.

380. Partiendo de lo anterior, de conformidad con el artículo 26 del Tratado, el Tribunal tiene jurisdicción para resolver la disputa entre las Partes sólo si dicha disputa surge de una reclamación por violación del Tratado que esté relacionada con la inversión de la Demandante en España. Cualquier disputa derivada de presuntos incumplimientos del

---

[682] Cf. Dúplica sobre Jurisdicción, ¶¶ 195 y ss.
[683] TCE, art. 26 [**RL-0006**].
[684] The Mavrommatis Palestine Concessions, *Grecia c. Reino Unido*, CPJI/PCIJ, Ser. A. No 2, (1924) p. 11 [**RL-0024**] [Traducción del Tribunal].

Tratado en relación con la inversión de Steag, pero que haya surgido antes de que la Demandante adquiriera Arenales Solar, no estaría dentro de la jurisdicción *ratione temporis* del Tribunal.

381. España ha hecho un esfuerzo por demostrar que la disputa surgió con la publicación del Informe de la CNE el 7 de marzo de 2012[685]. Según la Demandada, existieron una serie de anuncios de las medidas que se estaban preparando y la controversia se "*cristalizó*" con la expedición del citado Informe de la CNE. La misma Demandante reconoce que las medidas que afirma fueron anunciadas en 2011 y a principios de 2012 no fueron aprobadas antes de diciembre de 2012, con la Ley 15/2012[686].

382. El Tribunal considera que no asiste la razón a la Demandada. Reitera el Tribunal que una disputa es un desacuerdo sobre un punto de derecho o de hecho, o un conflicto de posiciones jurídicas o de intereses entre dos personas. Las declaraciones unilaterales de la Demandada, que ni siquiera fueron objetadas o discutidas por la Demandante, no pueden considerarse como expresiones de desacuerdos en un punto de hecho o de derecho para estos efectos. Una disputa entre España y Steag surge únicamente una vez que aquélla adopta una medida. La adopción de la medida es la que da lugar a una afectación de los derechos e intereses del inversor, que puede entonces oponerse a ella. Hasta su emisión no hay acto estatal susceptible de generar agravio. Un anuncio no es un acto jurídico y no impacta en modo alguno los derechos o situaciones jurídicas de los interesados. Tal afectación sólo puede producirse por actos que puedan producir efectos jurídicos de conformidad con la normatividad aplicable que, en este caso, sería el derecho español. Ninguna disputa existe, anterior a la fecha de la inversión, entre Steag y la Demandada. Ni el Informe CNE, ni los actos que "*anunciaron*" las medidas, alteran esta conclusión.

383. La disputa, además, debe surgir con respecto a las inversiones de la Demandante en el territorio de la Demandada y debe estar relacionada con alegadas violaciones de obligaciones bajo la Parte III del Tratado. Ninguna alegación se ha presentado por la Demandante de que los hechos anteriores al 8 de junio de 2012 podrían constituir, siquiera potencialmente, una violación del TCE en relación con el proyecto Arenales Solar.

384. Asiste entonces la razón a la Demandante cuando observa que lo determinante para los efectos de la jurisdicción *ratione temporis* no es el *anuncio* de las medidas, sino su *aprobación*[687]. La previsibilidad de las medidas al momento en que se realizó la inversión es ciertamente relevante para el estudio de las expectativas legítimas del inversionista y, por eso mismo, puede tener un impacto sobre el éxito de sus reclamaciones de fondo. Pero la presencia o ausencia de esas expectativas no afecta la existencia de una inversión protegida a los efectos de la jurisdicción *ratione temporis* del Tribunal. El mero anuncio de una medida no plantea un problema de retroactividad en la aplicación del tratado y, por ende, no puede

---

[685] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 875.

[686] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 312.

[687] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 145; Dúplica sobre Jurisdicción, ¶¶ 175, ss.; *Vito G. Gallo c. Canadá*, Laudo, Caso CNUDMI (15 de septiembre de 2011), ¶ 328 [**RL-0079**] ("*Investment arbitration tribunals have unanimously found that they do not have jurisdiction unless the claimant can establish that the investment was owned or controlled by the investor at the time when the challenged measure was adopted*". Énfasis añadido).

equipararse a la adopción de la medida para efectos jurisdiccionales. Un mero anuncio no es un acto jurídico; no impacta de ninguna manera los derechos o situaciones jurídicas de los interesados. Tal efecto sólo lo producen los actos jurídicos. En *Renée Rose Levy c. Perú* el tribunal afirmó:

> "La determinación de la fecha crítica es, por ende, esencial para establecer la jurisdicción *ratione temporis* del Tribunal. En la opinión del Tribunal, la fecha crítica es aquella en que el Estado adopta la medida controvertida, incluso cuando dicha medida represente la culminación de un proceso o serie de sucesos que puede haber comenzado años antes"[688].

385. La medida controvertida no es ninguno de los "*anuncios*" por parte de la Demandada, ni el Informe del CNE. Las medidas controvertidas por la Demandante y respecto de las cuales existe la disputa fueron todas medidas expedidas con posterioridad a la inversión de la Demandante.

386. Por las razones expuestas, el Tribunal encuentra que tiene jurisdicción *ratione temporis* para conocer de la presente disputa.

### 3.2. Las alegaciones de abuso del derecho

387. En el marco de su objeción sobre la jurisdicción *ratione temporis* del Tribunal, la Demandada sugiere también que Steag podría estar incursa en un abuso del derecho[689]. Subrayando que el *timing* de la disputa es "*determinante*" para establecer tal abuso[690], España alega que "*la supuesta inversión de STEAG se produce, justamente, cuando el conflicto ya ha surgido*"[691]. A su turno, la Demandante sostiene que la Demandada no ha especificado en qué consiste el supuesto abuso del derecho de Steag[692]. En este punto asiste la razón a la Demandante.

388. La objeción de falta de jurisdicción *ratione temporis* es conceptualmente diferente a una objeción por abuso del derecho[693]. En el presente caso, la Demandada no ha presentado una objeción por abuso del derecho suficientemente diferenciada de sus alegaciones sobre la ausencia de jurisdicción *ratione temporis* ni ha presentado hechos o pruebas que sustenten tal objeción. Se trata de una mera sugerencia dentro de la alegación de la falta de jurisdicción *ratione temporis*.

389. La carga de probar que Steag ha cometido un abuso del derecho y, en ese sentido, ha faltado a la buena fe, recae sobre la Demandada. Como lo reconoció el tribunal en *Philip Morris*

---

[688] *Renée Rose Levy y* Gremcitel *S.A. c. República del Perú*, Laudo, Caso CIADI No. ARB/11/17 (9 de enero de 2015), ¶ 149 [**CL-0096**] (notas al pie omitidas).
[689] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 867-871.
[690] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 867-871.
[691] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 865, 866.
[692] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 141; Dúplica sobre Jurisdicción, ¶¶ 214, 215.
[693] Cf. *Pac Rim Cayman LLC c. República de El Salvador*, Decisión sobre objeciones jurisdiccionales, Caso CIADI No. ARB/09/12 (1 de junio de 2012), ¶ 2.101 [**RL-0084**].

*c. Australia*, el estándar que debe satisfacer el Estado que alega abuso del derecho es alto[694]. El Tribunal encuentra que España no ha satisfecho dicha carga.

390. El abuso del derecho está estrechamente ligado a la exigencia de la buena fe del inversionista.

391. En el caso *sub judice*, nada indica que Steag tuviera una inversión "*no protegida*" con anterioridad al 8 de junio de 2012 y que haya estructurado su inversión con el único objeto de acceder a la jurisdicción bajo el TCE sin tener derecho a ello. Ningún elemento de la operación económica de 2012 permite llegar a la conclusión de que Steag abusó de sus derechos. Más aún, como se indicó anteriormente en relación con la jurisdicción *ratione temporis*, antes del 8 de junio de 2012 no había una medida que afectara los intereses de Steag. Menos aún podría hablarse de un abuso del derecho anterior a esa fecha.

392. Por las razones anteriores, el Tribunal encuentra que la Demandada no ha probado la ocurrencia de abuso del derecho atribuible a la Demandante. Lo anterior no obsta para que los "*hitos*" anteriores al 8 de junio de 2012 puedan ser relevantes para evaluar las expectativas del inversionista, en el análisis del fondo de la controversia y, particularmente, en relación con el estándar de trato justo y equitativo bajo el artículo 10(1) del TCE.

393. En vista de lo anterior, el Tribunal rechaza la objeción *ratione temporis* y las alegaciones de abuso del derecho formuladas por la Demandada.

**D.    LA OBJECIÓN ACERCA DE LA ADMISIBILIDAD DE LA RECLAMACIÓN RELATIVA A LA SUPUESTA VIOLACIÓN DEL ARTÍCULO 13 TCE (EXPROPIACIÓN) MEDIANTE LA INTRODUCCIÓN DEL IVPEE**

### 1.    Posición de la Demandada

394. La Demandada alega que la reclamación relativa a la supuesta violación del artículo 13 del TCE (expropiación) a través de la introducción del IVPEE es inadmisible[695]. La Demandada enfatiza que el artículo 21 del TCE declara que el TCE no establece derechos u obligaciones respecto de medidas impositivas (*taxation carve out*), con excepción de los casos listados en la misma disposición (*claw backs*)[696]. Bajo el artículo 21(5)(a) del TCE, el artículo 13 del TCE (expropiación) es una de esas excepciones[697].

395. El arbitraje de tales reclamaciones está, sin embargo, sujeto a ciertos requisitos. El artículo 21(5)(b) del TCE exige que cuestiones relativas al carácter expropiatorio de un impuesto o al carácter discriminatorio del mismo sean sometidas en primer término a la autoridad fiscal competente, bien sea por el inversor o, si éste no lo hiciere, por el Tribunal Arbitral[698].

---

[694] *Philip Morris Asia Ltd. c. Mancomunidad de Australia*, Laudo sobre jurisdicción y admisibilidad, Caso CPA No. 2012-12 (17 de diciembre de 2015), ¶¶ 539, 550 [**RL-0037**].
[695] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 204, ss.; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 291, ss.
[696] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 207.
[697] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 208-210.
[698] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 205, 216 y 217; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 292.

El término "*autoridad fiscal competente*" es definido por el artículo 21(7)(c) del TCE como "*la autoridad competente en virtud de un acuerdo de doble imposición en vigor entre las Partes Contratantes*"[699]. En ausencia de tal acuerdo, se entiende que el término hace referencia a "*el ministro o el ministerio encargado de los impuestos o sus representantes autorizados*"[700]. La autoridad fiscal competente debe procurar resolver el asunto dentro de un plazo de seis meses desde la presentación del recurso; sólo al cabo de ese período es posible someter la cuestión a arbitraje[701]. La Demandada resalta que este requisito constituye una obligación, como se desprende del uso del término "*someterá*" en el artículo 21(5)(b) del TCE[702].

396. La Demandada afirma no tener conocimiento de que Steag haya sometido la cuestión relativa al supuesto efecto expropiatorio del IVPEE a la autoridad fiscal competente[703]. La Demandada se refiere específicamente a la comunicación de Steag al Presidente del Gobierno de España, al Ministro de Economía y Competitividad y a otros altos funcionarios, fechada el 12 de mayo de 2014[704]. La Demandada observa que "*dicha carta es simplemente una Trigger Letter en la que Steag solicita al Gobierno español entrar en negociaciones para tratar de alcanzar una solución amigable a la controversia*"[705]. La Demandada enfatiza que la carta no hace una solicitud relativa a los supuestos efectos expropiatorios del IVPEE, para los efectos del artículo 21(5)(b) del TCE, norma que ni siquiera es mencionada en la misiva[706]. En efecto, la carta habla de una violación del TCE "*en general*" a través de la Ley 15/2012, sin referirse específicamente ni al artículo 13 del TCE, ni al IVPEE[707]. La Demandada concluye que Steag no podía esperar que las autoridades competentes hicieran "*un ejercicio de adivinación*" para entender que se les estaba pidiendo un pronunciamiento acerca del supuesto carácter expropiatorio del IVPEE[708]. Finalmente, España alega que la carta no se envió al Ministro de Hacienda y Administraciones Públicas o a su representante autorizado, quien era la autoridad fiscal competente para los efectos del artículo 21(7)(c) del TCE, de conformidad con el artículo 3(1)(g) del Convenio de Doble Imposición entre Alemania y España[709].

397. En consecuencia, la Demandada solicita que este Tribunal: *(i)* declare la inadmisibilidad de la reclamación acerca del supuesto efecto expropiatorio del IVPEE; y *(ii)* en caso de que la Demandante no cumpla con su obligación de someter el asunto a la autoridad fiscal nacional competente, remita la cuestión a dicha autoridad, para que ésta se pronuncie dentro del plazo previsto en el artículo 21(5) del TCE[710]. Asimismo, la Demandada se reserva el derecho de

---

[699] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 212.

[700] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 212.

[701] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 205, 218 y 219. La Demandada se apoya en este contexto en un documento de la Secretaría del TCE [**RL-0039**] y una obra académica [**RL-0040**].

[702] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 213, 214. En apoyo de esta interpretación, la Demandada (¶ 215) cita el caso *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 266 [**RL-0034**].

[703] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 206, 211 y 220.

[704] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 295, ss., refiriéndose al Anexo **C-0005**.

[705] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 297.

[706] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 300.

[707] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 301-304.

[708] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 305.

[709] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 306.

[710] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 221, 222; Memorial de Dúplica y

presentar alegatos sobre esta cuestión una vez se haya sometido el asunto a la antedicha autoridad fiscal[711].

2.    Posición de la Demandante

398.    En referencia al argumento de la Demandada bajo el artículo 21(5)(b) del TCE, la Demandante afirma haber enviado una carta al Gobierno de España el 12 de mayo de 2014, en la que buscó alcanzar un acuerdo amistoso sobre la controversia[712]. En dicha misiva, dice la Demandante, "*Steag ya anunciaba que el IVPEE podía suponer una infracción de las protecciones reconocidas a los inversores por la Parte III del TCE*"[713]. La Demandante resalta que esas protecciones incluyen, además del estándar de TJE previsto en el artículo 10(1) del TCE, la cláusula relativa a expropiaciones del artículo 13 del TCE[714].

399.    La Demandante considera haber cumplido con su obligación de someter el asunto a la autoridad fiscal competente[715]. El Ministro de Economía y Hacienda es la autoridad competente del Reino de España bajo el artículo 3(1)(g) del Convenio de Doble Imposición entre Alemania y España y, por tanto, debe tenerse como "*autoridad fiscal competente*" para los efectos del TCE, de conformidad con el artículo 21(7)(c) del TCE[716]. Steag hace un recuento de los funcionarios a quienes envió la carta[717]. La Demandante explica que, aunque la carta no se envió al Ministro de Hacienda y Administraciones Públicas, sí se envió al Presidente de Gobierno, quien es su superior jerárquico[718]. La Demandante afirma también que la carta fue recibida, entre otros, por el Ministro de Economía y Competitividad[719].

400.    La Demandante considera que los argumentos de la Demandada, para quien dicha comunicación no es suficientemente explícita ni se dirigió a la autoridad competente, "*suponen un mero formalismo*" y constituyen una "*distracción para ocultar la realidad*"[720]. Steag afirma que su misiva se refería claramente a la Ley 15/2012 y que, entre las medidas previstas en dicha Ley, sólo el IVPEE podía referirse a productores de energía solar termoeléctrica[721].

---

Réplica de Jurisdicción, ¶¶ 307-310.
[711] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 223.
[712] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 128, 129; Dúplica sobre Jurisdicción, ¶ 166.
[713] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 130.
[714] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 130.
[715] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 113, 133.
[716] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 132, refiriéndose al artículo 3(1)(g) del Convenio de Doble Imposición entre la República Federal de Alemania y el Reino de España (3 de febrero de 2011) [**CL-0094**].
[717] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 131.
[718] Dúplica sobre Jurisdicción, ¶¶ 169, 170.
[719] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 132; Dúplica sobre Jurisdicción, ¶ 169.
[720] Dúplica sobre Jurisdicción, ¶¶ 166, 167.
[721] Dúplica sobre Jurisdicción, ¶ 168.

3.    Análisis del Tribunal

401.   La Demandada solicita al Tribunal que declare la inadmisibilidad de la reclamación acerca del supuesto efecto expropiatorio del IVPEE puesto que, según España, la Demandante no cumplió con su obligación de someter el asunto a una "*autoridad fiscal competente*", como lo exige el artículo 21(5) del TCE[722]. Según España, la "*autoridad fiscal competente*" nunca recibió tal solicitud de la Demandante[723]. Steag considera que sí cumplió con su obligación de someter el asunto relativo al supuesto efecto expropiatorio del IVPEE a la "*autoridad fiscal competente*" del Reino de España[724]. La Demandante asegura que envió la carta correspondiente al Presidente de Gobierno, quien es el superior jerárquico[725] del Ministro de Economía y Competitividad[726]. Agrega Steag que las alegaciones de la Demandada sobre el incumplimiento de los requisitos "*suponen un mero formalismo*" y es parte de una estrategia que constituye una clara "*distracción para ocultar la realidad*" al Tribunal[727].

402.   El artículo 21(5)(b) del TCE dispone:

> "Siempre que surja un conflicto en relación con lo dispuesto en el artículo 13 en el sentido de si un impuesto determinado constituye una expropiación o si un impuesto que se alega constituye una expropiación es discriminatorio, se aplicarán las siguientes disposiciones:
>
> i) el inversor de la Parte Contratante que alegue se trata de una expropiación someterá la cuestión de si el impuesto es una expropiación o si es discriminatorio a las autoridades fiscales competentes; de no mediar dicho recurso por parte del inversor o de la Parte Contratante, los organismos a los que se recurra para resolver controversias de conformidad con la letra c) del apartado 2) del artículo 26 ó el apartado 2) del artículo 27 someterán la cuestión a la autoridad fiscal competente".

403.   No existe controversia alguna entre las partes en cuanto a la exigencia bajo el artículo 21(5)(b) del TCE de someter las cuestiones relativas al supuesto carácter expropiatorio o discriminatorio de un impuesto a las "*autoridades fiscales competentes*". Tampoco está en disputa que el IVPEE es un impuesto. Así las cosas, el Tribunal debe resolver dos puntos. Primero, si la carta efectivamente "*sometía la cuestión*" del supuesto carácter expropiatorio del impuesto a la autoridad. Segundo, si la carta efectivamente se envió a la "*autoridad fiscal competente*" para conocer de la solicitud.

404.   Con respecto al primer asunto, el Tribunal encuentra que la carta del 12 de mayo de 2014 no cumpliría con el requisito previsto en el artículo 21(5)(b) del TCE. Dicha disposición es clara

---

[722] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 221, 222; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 307-310.
[723] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 205, 216 y 217; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 292.
[724] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 113, 133.
[725] Dúplica sobre Jurisdicción, ¶¶ 169, 170.
[726] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 132; Dúplica sobre Jurisdicción, ¶ 169.
[727] Dúplica sobre Jurisdicción, ¶¶ 166, 167.

en que las cuestiones relativas al carácter expropiatorio de un impuesto deben "*someterse*" a la autoridad fiscal competente. A su turno, la carta comienza anunciando que el propósito de la comunicación es "*notificar la existencia de un incumplimiento por parte del Reino de España de [las] obligaciones hacia Steag de acuerdo con la Parte III del TCE*"[728]. Más adelante, la comunicación procede a explicar los "*orígenes*" del supuesto incumplimiento, los cuales atribuye a los cambios regulatorios en materia fiscal hechos por España, y que afectaron directamente las inversiones de Steag en el sector de las energías renovables:

> "El incumplimiento tiene su origen en los cambios regulatorios que afectan al régimen financiero aplicable a las plantas de energía termosolar que se han producido en diferentes normas: Ley 15/2012, de 27 de diciembre, de medidas fiscales para la sostenibilidad energética ("Ley 15/2012"), Real Decreto-ley 2/2013, de 1 de febrero, de medidas urgentes en el sistema eléctrico y en el sector financiero ("RDL 2/2013"), Real Decreto-ley 9/2013, de 12 de julio, por el que se adoptan medidas urgentes para garantizar la estabilidad financiera del sistema eléctrico ("RDL 9/2013"), Ley 24/2013, de 26 de diciembre, del Sector Eléctrico ("LSE") y su posterior desarrollo que está en estos momentos disponible como borrador (el futuro Real Decreto por el que se regula la actividad de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos; y la futura Orden del Ministerio de Industria, Energía y Turismo, por la que se aprueban los parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos"[729].

405. Steag concluye alegando que los cambios regulatorios contravienen los estándares sobre el tratamiento y la protección ofrecidas por el Reino de España al inversionista y contenidos en el TCE. La comunicación cita el artículo 26(1) del TCE como fundamento para "*convocar*" a la autoridad competente del Gobierno español a intentar buscar una solución amigable a la controversia.

406. Salta a la vista que en la comunicación no se hace referencia alguna al artículo 21(5)(b) del TCE. La carta tampoco contiene la palabra "*expropiación*". No existe en el texto ninguna indicación sobre la intención de los remitentes de considerar que el impuesto era expropiatorio, o que pretendían someter "*la cuestión de si el impuesto es una expropiación*" a las autoridades.

407. La regla general de interpretación prevista en el artículo 31 de la CVDT, exige que la interpretación de un tratado se realice de buena fe y de conformidad con el "*sentido corriente*" de los términos en él utilizados. Lo central en este caso es el término "*someter*". El Tribunal debe establecer si Steag efectivamente "*sometió*" la cuestión del carácter expropiatorio del impuesto a las autoridades fiscales competentes del Reino de España. Ello

---

[728] Carta para un acuerdo amistoso enviado por Steag al Reino de España, de 12 de mayo de 2014 [**C-0005**].
[729] Carta para un acuerdo amistoso enviado por Steag al Reino de España, de 12 de mayo de 2014 [**C-0005**].

supone determinar si, en su comunicación, la Demandante les pedía a esas autoridades pronunciarse o aclarar lo relativo al supuesto carácter expropiatorio del IVPEE. El lenguaje contenido en el documento no tiene el sentido de una notificación destinada a que los remitentes estudiaran si el impuesto propuesto podría considerarse expropiatorio. El receptor de esa carta no podía entender o intuir, a partir de su texto, que se le estaba pidiendo iniciar el proceso previsto en el artículo 21(5) del TCE.

408. Para el Tribunal, lo anterior ya es suficiente para concluir que la Demandante no sometió la cuestión del carácter expropiatorio del IVPEE a la autoridad fiscal competente. Pero, adicionalmente, el Tribunal abordará el segundo argumento planteado por España. Sobre este segundo punto, observa el Tribunal que el artículo 21(7)(c) del TCE[730] dispone:

> "[P]or "autoridad fiscal competente" se entiende la autoridad competente en virtud de un acuerdo de doble imposición en vigor entre las Partes Contratantes o, cuando no esté en vigor ningún acuerdo de este tipo, el Ministro o el Ministerio encargado de los impuestos o sus representantes autorizados".

409. Del artículo 21(7)(c) se desprende que, para este caso, las "*autoridades fiscales competentes*" son aquellas designadas en virtud de los acuerdos bilaterales de doble imposición celebrados entre el Reino de España y la República Federal de Alemania[731]. La Demandante anexa al expediente el "*Convenio para evitar la doble imposición y prevenir la evasión fiscal en temas de impuestos sobre la renta y sobre el patrimonio*" (Anexo **CL-094**)*,* celebrado entre España y Alemania. El Convenio dispone en su artículo 3(1)(g) que la "*autoridad competente*" significa, en el caso de España, "*el Ministro de Economía y Hacienda o su representante autorizado*"[732].

410. Para el Tribunal, los requisitos del artículo 21(5)(b) pueden ser satisfechos por una carta, siempre y cuando ésta esté debidamente formulada y sea dirigida a la autoridad fiscal competente de la Demandada. Así, bastaría con que una Demandante "*someta*" la cuestión del carácter expropiatorio del IVPEE al Ministro de Hacienda de España.

411. En los escritos de Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción y la Dúplica sobre la Jurisdicción, la Demandante asegura haber enviado una carta al Gobierno de España el 12 de mayo de 2014, con el propósito de alcanzar un acuerdo amistoso sobre la controversia[733]. Reitera que la carta fue enviada al Presidente del Gobierno,

---

[730] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 132, refiriéndose al artículo 3(1)(g) del Convenio de Doble Imposición entre la República Federal de Alemania y el Reino de España (3 de febrero de 2011) [**CL-0094**].

[731] Instrumento de Ratificación del Convenio entre el Reino de España y la República Federal de Alemania para evitar la doble imposición y prevenir la evasión fiscal en materia de impuestos sobre la renta y sobre el patrimonio y su protocolo, hecho en Madrid el 3 de febrero de 2011 [**CL-0094**].

[732] Instrumento de Ratificación del Convenio entre el Reino de España y la República Federal de Alemania para evitar la doble imposición y prevenir la evasión fiscal en materia de impuestos sobre la renta y sobre el patrimonio y su protocolo, hecho en Madrid el 3 de febrero de 2011 [**CL-0094**].

[733] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 128, 129; Dúplica sobre Jurisdicción, ¶ 166.

por ser el superior jerárquico en la estructura del Estado español[734]. Nada indica, sin embargo, que la carta haya sido remitida al Ministro de Hacienda de España.

412. El término "*autoridad fiscal competente*" está definido expresamente en el TCE, que remite de forma expresa e inequívoca a un "*acuerdo de doble imposición en vigor entre las Partes Contratantes*". Existiendo un acuerdo de esa naturaleza entre España y Alemania y hallándose en éste una definición clara de "*autoridad fiscal competente*", es esa autoridad, y ninguna otra, a quien debe presentarse la solicitud correspondiente. Este Tribunal no puede pasar por alto el tenor literal e inequívoco del TCE. No basta entonces con que Steag haya enviado una comunicación a algún funcionario dentro de la estructura del Estado español, por alta que sea la jerarquía de ese funcionario. Tampoco se ha presentado por la Demandante un argumento claro que permita concluir que alguna de las autoridades que recibieron su carta del 12 de mayo de 2014 pueden considerarse, para los efectos del TCE, como "*autoridad fiscal competente*".

413. En suma, la Demandante no ha logrado demostrar que su carta del 12 de mayo de 2014 fue enviada a una "*autoridad fiscal competente*", término definido en el TCE, que remite al Convenio de Doble Imposición suscrito entre España y Alemania. Más aún, el texto de la carta no indica que se estuviera solicitando que la autoridad competente determinara los posibles efectos expropiatorios de una medida fiscal.

414. En consecuencia, el Tribunal concluye que la Demandante no sometió a la "*autoridad fiscal competente*" la cuestión del supuesto carácter expropiatorio del impuesto del 7% sobre la producción de energía, establecido en virtud de la Ley 15/2012. En consecuencia, no cumplió con el requisito previsto en el artículo 21(5)(b) del TCE. La reclamación relativa a la supuesta violación del artículo 13 del TCE a través de la introducción del IVPEE es inadmisible.

415. El Tribunal se abstiene de someter por iniciativa propia la cuestión del carácter expropiatorio del IPVEE a la autoridad española antes señalada en tanto ello produciría un retraso innecesario en la decisión de las cuestiones sometidas a este Tribunal. El Tribunal comienza por observar que los argumentos de la Demandante sobre el artículo 13 TCE se refieren al RRO en su conjunto y no presentan un argumento suficientemente diferenciado acerca del carácter expropiatorio del IPVEE. En cualquier caso, un pronunciamiento de la autoridad española no alteraría en modo alguno las conclusiones a las que ha llegado el Tribunal en los párrafos 679 y 680 de la presente decisión. El Tribunal destaca que, en consecuencia, un pronunciamiento del Ministro de Economía y Hacienda de España o su representante autorizado no conduciría a una decisión diferente por parte de este Tribunal.

---

[734] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 131; Dúplica sobre Jurisdicción, ¶ 169.

## VIII. EL FONDO DE LA DISPUTA

### A. TRATO JUSTO Y EQUITATIVO (ARTÍCULO 10(1) DEL TCE)

#### 1.  Posición de la Demandante

416.  La Demandante analiza el estándar de trato justo y equitativo ("**TJE**") como elemento del artículo 10(1) del TCE[735]. La Demandante afirma que el estándar incluye al menos tres elementos: la protección de expectativas legítimas básicas que motivaron la inversión[736], la obligación de actuar de buena fe[737] y, finalmente, la prohibición de medidas con carácter discriminatorio o efectos exorbitantes[738].

417.  Steag describe *in extenso* la interpretación del estándar de TJE en decisiones arbitrales y escritos académicos, enfocándose particularmente en el elemento de la protección de las expectativas legítimas de los inversionistas[739]. Para la Demandante, el estándar exige la estabilidad y predictibilidad del "marco jurídico y empresarial"[740], lo que implica que las decisiones del Estado sean consistentes, razonables y transparentes[741].

---

[735] Memorial de Demanda, ¶ 206. Steag observa que el estándar proviene del derecho internacional general y destaca la "*generalidad y falta de precisión*" del estándar de TJE, pero reconoce que el significado del mismo se ha venido desarrollando y concretando a través de la práctica de los tribunales arbitrales (¶¶ 206, 207, 215 y 216).

[736] Memorial de Demanda, particularmente en los ¶¶ 206, 210-216. Particularmente en los ¶¶ 206, 211, donde cita *Técnicas Medioambientales Tecmed S.A. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/00/2 (29 de mayo de 2003), ¶ 154 [**CL-0032**].

[737] Memorial de Demanda, particularmente en los ¶¶ 217-220.

[738] Memorial de Demanda, particularmente en el ¶ 221.

[739] Memorial de Demanda, ¶¶ 206-221, citando los casos *CMS Gas Transmission Company c. República Argentina*, Laudo, Caso CIADI No. ARB/01/8 (12 de mayo de 2005), ¶ 274 [**CL-0045**]; *Duke Energy Electroquil Partners et al. c. República del Ecuador*, Laudo, Caso CIADI No. ARB/04/19 (18 de agosto de 2008), ¶ 340 [**CL-0037**]; *Gami Investments, Inc. c. Los Estados Unidos Mexicanos*, Laudo Final, Caso CNUDMI (15 de noviembre de 2004) [**CL-0042**]; *LG&E Energy Corp. et al. c. República Argentina*, Decisión sobre responsabilidad, Caso CIADI No. ARB/02/1 (3 de octubre de 2006) [**CL-0038**]; *The Loewen Group. et al. c. Los Estados Unidos de América*, Laudo, Caso CIADI No. ARB(AF)/98/3 (26 de junio de 2003) [**CL-0047**]; *Mondev International Ltd. c. Los Estados Unidos de América*, Laudo, Caso CIADI No. ARB(AF)/99/2 (11 de octubre de 2002), ¶ 116 [**CL-0048**]; *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Laudo, Caso CIADI No. ARB/01/7 (25 de mayo de 2004), ¶ 113 [**CL-0039**]; *Nykomb Synergetics Technology Holding AB c. República de Letonia*, Laudo, Caso CCE (16 de diciembre de 2003) [**CL-0049**]; *Occidental Exploration and Production Company c. República del Ecuador*, Laudo Final, Caso LCIA No. UN 3467 (1 de julio de 2004), ¶ 191 [**CL-0040**]; *Parkerings-Compagniet AS c. República de Lituania*, Laudo, Caso CIADI No. ARB/05/8 (11 de septiembre de 2007) [**CL-0033**]; *PSEG Global Inc. et al. c. República de Turquía*, Laudo, Caso CIADI No. ARB/02/5 (19 de enero de 2007), ¶ 250 [**CL-0036**]; *Saluka Investments BV c. República Checa*, Laudo Parcial, Caso CNUDMI (17 de marzo de 2006), ¶ 309 [**CL-0041**]; *S.D. Myers, Inc. c. Canadá*, Segundo Laudo Parcial, Caso CNUDMI (21 de octubre de 2002) [**CL-0043**]; *Técnicas Medioambientales Tecmed S.A. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/00/2 (29 de mayo de 2003), ¶ 133 [**CL-0032**]; *Waste Management, Inc. c. Los Estados Unidos Mexicanos II*, Laudo, Caso CIADI No. ARB(AF)/00/03 (30 de abril de 2004) [**CL-0044**].

[740] Memorial de Demanda, ¶¶ 210, 212, fundamentándose particularmente en los casos *PSEG Global Inc. et al. c. República de Turquía*, Laudo, Caso CIADI No. ARB/02/5 (19 de enero de 2007), ¶ 250 [**CL-0036**]; *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Laudo, Caso CIADI No. ARB/01/7 (25 de mayo de 2004), ¶ 113 [**CL-0039**]; *Occidental Exploration and Production Company c. República del Ecuador*, Laudo Final, Caso LCIA No. UN 3467 (1 de julio de 2004), ¶ 191 [**CL-0040**].

[741] Memorial de Demanda, ¶ 213, citando *Saluka Investments BV c. República Checa*, Laudo Parcial, Caso CNUDMI (17 de marzo de 2006), ¶ 309 [**CL-0041**].

418. Aunque la Demandante reconoce que el Estado tiene cierta "flexibilidad regulatoria"[742], explica que el estándar de TJE protege al inversionista en sus expectativas y confianza legítimas, fundadas en las "representaciones específicas" del Estado que fueren determinantes para la inversión[743]. En particular, "*el inversor extranjero puede esperar legítimamente que el entorno general bajo el que la inversión se realizó permanecerá constante, y que cualquier alteración se realizará de una manera justa y equitativa*"[744]. En su análisis, Steag destaca la relación del estándar de TJE con la prohibición de medidas con carácter exorbitante o discriminatorio[745], así como con el principio de buena fe[746], aclarando que la buena fe no excluye *per se* una posible violación del estándar de TJE[747]. Para la Demandante, el estándar de TJE requiere que las políticas estatales y su implementación sean razonablemente justificables, consistentes, transparentes, equitativas y libres de discriminación[748].

419. En su Memorial de Réplica, la Demandante ahonda en este argumento y afirma que el Estado español tiene la obligación de crear condiciones estables, favorables al inversionista y transparentes[749]. Lo anterior implica que no puede haber un cambio abrupto en el marco normativo de la inversión[750]. Para Steag, el artículo 10(1) del TCE inclusive "va más allá", en cuanto es expreso en la exigencia de estabilidad[751]. Steag aclara que el artículo 10(1) no opera como una cláusula estabilizadora[752]. Lo que se prohíbe no es que un régimen normativo cambie, sino que "*el cambio sea drástico, irracional, inesperado por el inversor, y desproporcionado*"[753]. De esta manera, aunque la Demandante reconoce reiteradamente que

---

[742] Memorial de Demanda, ¶ 214.

[743] Memorial de Demanda, ¶ 214, citando *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Laudo, Caso CIADI No. ARB/01/7 (25 de mayo de 2004), ¶ 113 [**CL-0039**]; *Waste Management, Inc. c. Los Estados Unidos Mexicanos II*, Laudo, Caso CIADI No. ARB(AF)/00/03 (30 de abril de 2004) [**CL-0044**].

[744] Memorial de Demanda, ¶ 214, refiriéndose a los casos *Occidental Exploration and Production Company c. República del Ecuador*, Laudo Final, Caso LCIA No. UN 3467 (1 de julio de 2004), ¶ 191 [**CL-0040**]; *CMS Gas Transmission Company c. República Argentina*, Laudo, Caso CIADI No. ARB/01/8 (12 de mayo de 2005), ¶ 274 [**CL-0045**].

[745] Memorial de Demanda, ¶ 221, citando el laudo *Nykomb Synergetics Technology Holding AB c. República de Letonia*, Laudo, Caso CCE (16 de diciembre de 2003) [**CL-0049**].

[746] Memorial de Demanda, ¶ 217. La Demandante desarrolla este argumento en los ¶¶ 218-220, citando *Waste Management, Inc. c. Los Estados Unidos Mexicanos II*, Laudo, Caso CIADI No. ARB(AF)/00/03 (30 de abril de 2004) [**CL-0044**]; *Saluka Investments BV c. República Checa*, Laudo Parcial, Caso CNUDMI (17 de marzo de 2006), ¶ 307 [**CL-0041**].

[747] Memorial de Demanda, ¶ 220, citando *Mondev International Ltd. c. Los Estados Unidos de América*, Laudo, Caso CIADI No. ARB(AF)/99/2 (11 de octubre de 2002), ¶ 116 [**CL-0048**].

[748] Memorial de Demanda, ¶ 219, citando *Saluka Investments BV c. República Checa*, Laudo Parcial, Caso CNUDMI (17 de marzo de 2006), ¶ 307 [**CL-0041**].

[749] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 239, ss.

[750] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 240, 241, citando *Sempra Energy International c. República Argentina*, Laudo, Caso CIADI No. ARB/02/16 (28 de septiembre de 2007), ¶¶ 303, 304 [**CL-0101**].

[751] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 242, citando *PSEG Global Inc. et al. c. República de Turquía*, Laudo, Caso CIADI No. ARB/02/5 (19 de enero de 2007), ¶ 250 [**CL-0036**].

[752] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 242, citando *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 9.3.29-9.3.31 [**RL-0039**].

[753] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 243-246, citando *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶ 179 [**RL-0048**]. En relación con la posibilidad de que el régimen regulatorio cambie, la Demandante cita *The AES Corporation &*

el TCE no prohíbe a España adaptar su régimen regulatorio, incluido el RD 661/2007[754], destaca que "*el TCE sí protegía a Steag frente a un cambio total e irrazonable del marco regulatorio*"[755].

420.  Explica Steag que el artículo 10(1) del TCE debe interpretarse a la luz del objetivo del acuerdo, que consiste en crear "*un marco legal para fomentar la cooperación a largo plazo en el campo de la energía*"[756]. Para la Demandante, alcanzar dicho propósito supone una garantía de "*estabilidad fundamental*" respecto de las "*características esenciales*" del marco jurídico vigente al momento de la inversión[757].

421.  Steag argumenta que, con el NRR, la Demandada rompió con esa estabilidad, manifestando una conducta no transparente, poco razonable e inconsistente, por lo que ya ha sido condenada en otros arbitrajes bajo el TCE[758]. Para la Demandante, el NRR constituye una violación del estándar de TJE[759].

422.  En esencia, la Demandante considera que – a través del RD 661/2007, la Comunicación ER 2010 y el RD 1614/2010 – el Estado generó la expectativa de que "*la remuneración del Proyecto Arenales no sería modificado sustancialmente y de forma injustificada*"[760]. A juicio del inversionista, el NRR defraudó esas expectativas al sustituir las tarifas garantizadas por la ratio de rentabilidad razonable[761]. A esto se suma que, de acuerdo con Steag, el Estado incumplió obligaciones contraídas con inversionistas en los términos del inciso final del artículo 10(1) del TCE, en cuanto privó a las instalaciones preasignadas de las primas y tarifas del RD 661/2007, violando así la garantía que se desprendía del Comunicado ER 2010 y del RD 1614/2010[762]. Finalmente, afirma Steag, la ausencia de "*justificación económica*" del IVPEE supone también un incumplimiento de los requisitos de la buena fe y la ausencia de discriminación, de manera que esta medida tributaria – con independencia de su conformidad con el derecho local – es contraria al TCE[763].

---

*TAU Power B.V. c. República de Kazajistán*, Laudo, Caso CIADI No. ARB/10/16 (1 de noviembre de 2013), ¶ 258 [**CL-0102**]. La Demandante también menciona los ¶¶ 362, 363 del laudo dictado en el caso *Eiser c. España*.
[754] Memorial de Demanda, ¶ 225. Véase también: Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 230. Cf. también ¶¶ 231, ss.
[755] Memorial de Demanda, ¶ 226, fundándose en *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 363 [**CL-0003**].
[756] Memorial de Demanda, ¶¶ 230-232 citando el artículo 2 del TCE.
[757] Memorial de Demanda, ¶¶ 231, 232.
[758] Memorial de Demanda, ¶¶ 223, 224, citando *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶¶ 362-387 [**CL-0003**]. Steag menciona también al caso *Charanne c. España*, donde el tribunal falló a favor del Estado, pero sostiene que ese caso se refirió a las modificaciones del régimen regulatorios de 2010, cuyos efectos no tienen la misma entidad que los del caso *sub judice* (¶ 227).
[759] Memorial de Demanda, ¶¶ 222, ss. Cf. también ¶¶ 234, 243.
[760] Memorial de Demanda, ¶ 223.
[761] Memorial de Demanda, ¶¶ 222, 223.
[762] Memorial de Demanda, ¶¶ 237, 238.
[763] Memorial de Demanda, ¶¶ 239, 240. Steag explica que un tribunal arbitral puede examinar medidas tributarias, mencionando los casos *Kaiser Bauxite c. Jamaica* y *Petrola Hellas c. Grecia*. En relación con los requisitos de buena fe y no discriminación, Steag se fundamenta en el caso *Marvin Roy Feldman Karpa c. Los Estados Unidos Mexicanos*, Laudo Arbitral, Caso CIADI No. ARB(AF)/99/1 (16 de diciembre de 2002) [**RL-0072**]. En relación con la conformidad de la medida con el derecho local, la Demandante menciona los casos *Feldman c. México* y *OEPC c. Ecuador*.

423. No es entonces la evolución del régimen regulatorio, sino su "*modificación arbitraria*" y la supuesta defraudación de las expectativas de los inversionistas, lo que a juicio de Steag constituye una violación del estándar de TJE[764]. La Demandante sugiere que el NRR es exorbitante y no puede justificarse en el déficit tarifario[765], ya que, en cualquier caso, la respuesta del Estado frente al déficit debía ser razonable y consistente con el TCE[766]. Steag encuentra que las reformas de los años 2013 y 2014 tuvieron un carácter irrazonable y drástico[767]. Más aún, Steag alega que España no ha actuado de buena fe[768]. En últimas, dice Steag, el Estado atrajo a los inversionistas con condiciones favorables y, cuando éstos ya habían desarrollado el sector, alteró "*radicalmente*" el régimen[769].

424. En sus memoriales, la Demandante procede a explicar en detalle los fundamentos de sus expectativas y la manera como éstas fueron supuestamente frustradas por la Demandada. Steag afirma repetidamente que su expectativa nunca consistió en la petrificación del RRO[770]. La Demandante explica que, cuando Steag invirtió, España llevaba quince años siguiendo una política pública de fomento a las energías renovables[771]. Bajo el TCE, dice Steag, el Estado tiene una obligación de transparencia respecto del régimen regulatorio[772], obligación que hace parte del contexto necesario para la consideración de las expectativas del inversionista[773]. El Estado tiene el deber de actuar coherentemente frente al inversionista, dándole la oportunidad de "*conocer de antemano cuál sería la política del Estado en el área relevante para su inversión*"[774]. Destaca Steag, además, que la estabilidad que exige el TCE es diferente de conceptos similares de derecho doméstico, por lo que la caracterización de las medidas como no retroactivas por el Tribunal Supremo español resulta irrelevante[775].

425. A juicio de la Demandante, lo relevante es que la conducta de España creó una expectativa de que el RRO no cambiaría en su esencia, que Steag es un inversionista diligente y de buena fe, y que entre 2013 y 2014 la Demandada desmanteló el RRO[776].

---

[764] Memorial de Demanda, ¶ 233.

[765] Memorial de Demanda, ¶ 229.

[766] Memorial de Demanda, ¶¶ 229, 235. La Demandante cita el Informe Regulatorio Brattle para afirmar que las medidas adoptadas "*no remedian de manera mínimamente razonable*" el déficit tarifario, lo que indica que están motivadas por un "*cambio de enfoque sobrevenido*" y no son justificables (¶ 236). Este argumento es desarrollado en más detalle en el Memorial de Réplica.

[767] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 233.

[768] Memorial de Demanda, ¶¶ 230-232.

[769] Memorial de Demanda, ¶ 228.

[770] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 229. Steag resume la posición del Estado en los ¶¶ 226-228 de su Memorial de Réplica.

[771] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 238.

[772] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 233, ss.

[773] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 234.

[774] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 235-237, citando *Técnicas Medioambientales Tecmed S.A. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/00/2 (29 de mayo de 2003) [**CL-0032**]. Steag sugiere que la aproximación de dicho tribunal ha influenciado la interpretación del artículo 10(1) del TCE (¶¶ 236, 237), citando *Técnicas Medioambientales Tecmed S.A. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/00/2 (29 de mayo de 2003) [**CL-0032**]; *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶¶ 175-178 [**RL-0034**]; *Ioannis Kardassopoulos & Ron Fuchs c. República de Georgia*, Laudo, Casos CIADI No. ARB/05/18 & ARB/07/15 (3 de marzo de 2010), ¶¶ 440, 441 [**CL-0100**]

[775] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 246, 247.

[776] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 247.

426. La Demandante hace un recuento del *due diligence* realizado respecto del RRO con antelación a la inversión[777]. Explica que en 2012 se analizaron los riesgos que supondría la inversión, incluida la "*situación regulatoria*", pero reconoce que en ese momento no se analizó el TCE "*toda vez que no se consideró que España estuviera dispuesta a incumplir los convenios internacionales de los que es parte*"[778]. Steag explica que su *due diligence* incluyó el estudio realizado por las entidades financieras, el estudio de Fröhlingsdorf Abogados y los análisis internos preparados para los órganos de Steag[779].

427. La Demandante observa que el derecho internacional impone un estándar de *due diligence* meramente razonable[780]. El deber de diligencia muestra que los acuerdos de inversión no son pólizas de seguro contra todo riesgo, sino que la protección se concede frente a actos que no son "*razonablemente previsibles*"[781]. Sin embargo, afirma Steag, el deber de conducir un *due diligence* de buena fe no supone un deber de prever un ilícito internacional[782], ni excusa un comportamiento incoherente del Estado[783]. El deber de diligencia exige que el inversionista adquiera conocimiento del "*entorno regulatorio*", analizando "*todas las circunstancias que rodean a su inversión*", y realizando así predicciones fiables y razonable[784].

428. La Demandante afirma haber cumplido con estos requisitos[785]. Haciendo referencia al Anexo **C-0017**, Steag remite al informe realizado para las entidades financieras por la firma Cuatrecasas, Gonçalves Pereira S.L.P. en el año 2011, que incluía un análisis del régimen retributivo bajo el RRO, refiriéndose al RD 661/2007, al RDL 6/2009 y al RD 1614/2010[786]. La conclusión de dicho Informe era que, asumiendo que se cumplieran plazos aplicables, el proyecto podría obtener la retribución prevista en el RD 661/2007 porque había sido pre-asignado bajo el RDL 6/2007[787]. Steag afirma haber tenido acceso al Informe de Auditoría Legal de Cuatrecasas a principios de 2012[788].

429. La Demandante relata que Steag adicionalmente encargó un nuevo estudio a la firma Fröhlingsdorf Abogados[789]. Dicha firma presentó siete informes entre enero de 2012 y junio

---

[777] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 248, ss., 251 y 252.

[778] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 249.

[779] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 250.

[780] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 254, ss. Para Steag, el estándar de *due diligence* pretendido por España es "*exorbitante*" y supondría conducir un "*análisis exhaustivo del marco regulatorio*" (¶ 250).

[781] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 254, 256 y 258, citando *Parkerings-Compagniet AS c. República de Lituania*, Laudo, Caso CIADI No. ARB/05/8 (11 de septiembre de 2007), ¶ 333 [**CL-0033**]. Véase también la referencia al caso *Saluka* en el ¶ 259.

[782] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 255.

[783] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 257, citando *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Laudo, Caso CIADI No. ARB/01/7 (25 de mayo de 2004), ¶ 165 [**CL-0039**].

[784] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 260.

[785] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 261, ss. y 279.

[786] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 262-264. En el ¶ 266 se menciona también el "*profundo informe técnico realizado por ALATEC*" [**C-0029**].

[787] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 265.

[788] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 267, haciendo referencia al Anexo **C-0017**.

[789] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 268.

de 2012[790]. Los informes en cuestión tomaron en consideración que la Planta estaba dentro del registro de pre-asignación por la moratoria del RDL 1/2012[791]. De acuerdo con Steag, también se concluyó que Arenales Solar estaba amparada por el régimen especial[792]. Fröhlingsdorf analizó los contratos de financiación y el riesgo asumido por Steag ante los demás *sponsors*[793]. También advirtió en febrero de 2012 que, para mantener los beneficios derivados del registro, la Planta debía estar funcionando antes del 1 de enero de 2014[794]. El informe consolidado del 5 de junio de 2012 determinó que Arenales se beneficiaría del régimen del RD 661/2007 y que la moratoria le permitiría beneficiarse del régimen retributivo previsto bajo el RRO[795]. Steag afirma que "*sobre esta base*" se desarrollaron las negociaciones posteriores con SMAG[796].

430.    La Demandante explica que, realizado este *due diligence*, se tomó la decisión de realizar la inversión[797]. De acuerdo con Steag, desde la primera oferta (13 de febrero de 2012) se enfatizó la importancia de la moratoria del RDL 1/2012[798]. Asimismo, en abril se presentó el proyecto, incluyendo los puntos regulatorios, al órgano ejecutivo de Steag[799]. También se refiere la Demandante a la presentación interna de los resultados del *due diligence*[800]. Relata el inversionista que, para cuando se firmó el SPA del 8 de junio de 2012, Steag había estudiado el proyecto por cerca de seis meses[801]. A lo anterior se suma la discusión interna del proyecto dentro del órgano supervisor y los accionistas de Steag[802]. Todo lo anterior confirma, a juicio de la Demandante, su diligencia[803].

431.    La Demandante se refiere a la jurisprudencia del Tribunal Supremo acerca de las reformas introducidas por el RD 1565/2010 y el RDL 14/2010, pero enfatiza que esos cambios no afectaron a las plantas de energía solar termoeléctrica, por disposición del RD 1614/2010[804].

---

[790] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 269, 270.

[791] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 271.

[792] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 272.

[793] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 273, 274. Según Steag, se tomó en cuenta la posibilidad de que RREEF obtuviera un "*repago preferente*" por un 8% (en el ¶ 274). La Demandante también resalta que el informe de ALATEC fue también objeto de análisis por Fröhlingsdorf (¶ 275). Cf. también (¶ 277).

[794] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 275, haciendo referencia a los Anexos **C-0035** (p. 9) y **C-0036** (pp. 3, 6).

[795] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 278, refiriéndose al Anexo **C-0031**.

[796] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 280.

[797] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 281. La Demandante explica en detalle cómo se desarrolló el proceso interno de toma de decisión en el ¶ 282.

[798] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 283, haciendo referencia al Anexo **C-0038**. Se menciona también en el ¶ 284 el testimonio del responsable del proyecto, D. Daniel Voswinkel (Anexo **C-0043**).

[799] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 285, refiriéndose al Anexo **C-0040**.

[800] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 286, haciendo referencia al Anexo **C-0018**. Véase también ¶¶ 295, 297.

[801] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 287.

[802] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 288, 289, haciendo énfasis en que en ese proceso se formularon y respondieron a treinta y dos preguntas sobre el proyecto. La Demandante hace referencia a los Anexos **C-0042** y **C-0044**.

[803] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 290.

[804] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 291, 292.

Steag explica que, no siendo relativas a la energía solar termoeléctrica, estas decisiones "*no tenían por qué ser revisadas por un inversor interesado en una planta que utilizaría dicha tecnología*"[805]. Para Steag, debe tenerse en cuenta también que los casos *Isolux* y *Charanne*, citados por España en este contexto, se refirieron a inversiones en plantas de energía solar fotovoltaica y a un conjunto de medidas diferente al que se analiza en el presente caso[806]. Adicionalmente, la Demandante resalta que, en su mayoría, las sentencias del Tribunal Supremo a las que se refiere la Demandada fueron proferidas con posterioridad al *due diligence* de la firma Fröhlingsdorf Abogados[807]. En suma, para Steag, España no ha podido mostrar que un *due diligence* diferente al que se llevó a cabo le habría permitido prever las reformas al RRO que sobrevinieron durante los años 2012 y 2013[808].

432.    Steag considera que la inversión en Arenales Solar fue el producto de los esfuerzos del Reino de España por "*atraer inversores*" en el sector, esfuerzos que se extendieron por un período de quince años[809]. Tras un recuento de los argumentos de la Demandada sobre la evolución del régimen regulatorio, Steag esboza tres conclusiones[810].

433.    ***Primero***, desde antes del RRO se estaba aumentando la remuneración en energías renovables con el fin de atraer la inversión[811]. Para Steag, lo anterior puede observarse fácilmente a partir de la evolución paulatina del régimen regulatorio desde la LSE de 1997[812]. En ese sentido, la Demandante afirma que las reformas no conllevaron un "*cambio radical*" sino que, durante mucho tiempo, todas ellas propendían hacia la creación de un "*marco regulatorio favorable a la inversión en EERR*"[813]. Steag hace particular referencia al RD 436/2004, y sugiere que el artículo 40(3) del mismo implicaba ya un compromiso de que las revisiones de primas no tendrían efecto sobre plantas que habían sido puestas en funcionamiento[814]. La Demandante nota que el Informe 3/2007 del CNE consideraba que, a través de la eliminación de la revisión cuatrianual prevista en el RD 436/2004, se "*minimiza el riesgo regulatorio, otorgando estabilidad y predictibilidad a los incentivos económicos*"[815]. En relación con el RDL 7/2006, la Demandante argumenta que éste tomó medidas temporales mientras se desarrollaba el

---

[805] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 293.

[806] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 294.

[807] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 296, explicando que "*de las casi 69 sentencias que se aportan en el Anexo R-0124, apenas 21 de esas sentencias se pronuncian entre enero de 2012 y el 22 de junio de 2012, fecha en la que Steag decidió invertir*" y que "*[n]inguna de esas 21 sentencias analizó el RD 1614/2010 ni la situación de la energía solar termoeléctrica*" (¶ 296). Cf. también ¶ 297.

[808] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 298, 299.

[809] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 300, ss.

[810] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 301, 302.

[811] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 302, ss.

[812] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 303-305.

[813] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 305. En desarrollo de ese argumento, Steag realiza un recuento de las reformas, analizando el RD 2818/1998 (¶ 306), el RD 436/2004 (¶¶ 307-313), el RDL 7/2006 (¶¶ 314, 315).

[814] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 309. Steag desarrolla este argumento en mayor detalle en los ¶¶ 312, ss., donde critica la interpretación que la Demandada hace del artículo 40.3.

[815] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 310, citando la p. 23 del Informe 3/2007 de la CNE relativo a la propuesta de real decreto por el que se regula la actividad de producción de energía eléctrica en régimen especial y de determinadas instalaciones de tecnologías asimilables del régimen ordinario, de 14 de febrero de 2007 [**CL-0017**]. En ese sentido, la Demandante cita también al Memoria Económica de la Propuesta de Real Decreto, aportada como Anexo **R-0014**.

régimen que finalmente se cristalizó en el RD 661/2007[816]. Tras un examen detallado de la evolución del derecho español sobre la materia, la Demandante concluye que "*[e]sos sucesivos cambios, sin embargo, no estuvieron destinados a un mejor ajuste entre los ingresos y los costes del sistema eléctrico español*"[817]. Más bien, dice Steag, "*[r]espondían al declarado propósito de atraer nuevos inversores al mercado*"[818].

434. **Segundo**, la Demandante afirma que la Demandada "*procuró tratar de manera consistente el esquema retributivo fijado en el [RRO] hasta 2013*"[819]. Steag sostiene que el fin del régimen retributivo del RD 661/2007 no era "*garantizar la sostenibilidad económica del SEE*", como afirma España, sino atraer la inversión extranjera en el sector[820]. Para la Demandante, este fin fue una constante desde el RD 2818/1998, y se "*profundizó*" con el cambio de gobierno en 2004[821]. Steag sugiere que este fue el fin al que respondió, por ejemplo, la inclusión de la "*cláusula de estabilidad regulatoria*" del artículo 44(3) del RD 661/2007[822]. Asimismo, resalta la Demandante que con el mecanismo de "*cap y floor*" del RD 661/2007 se esperaba dar una rentabilidad adecuada y razonable a los inversionistas en el sector de las energías renovables[823]. Todo lo anterior indica, en opinión de Steag, que el espíritu orientador del RRO era "*fomentar la implantación de EERR en España*"[824].

435. La Demandante reconoce que con el RDL 6/2009 se introdujeron cambios en el RRO que tenían la capacidad de afectar plantas de energía solar termoeléctrica, pero anota que la norma operaba "*sólo a futuro y en relación con las plantas que se proyectaran*"[825]. Para Steag, este RDL buscaba "*una entrada en funcionamiento más escalonada que se ajustara mejor a distintos escenarios de demanda de energía eléctrica*"[826]. De acuerdo con Steag, una vez identificado el problema del déficit de tarifa, la Demandada optó sin embargo por mantener su interpretación del RRO, buscando garantizar seguridad jurídica y creando el registro de preasignación, sin afectar en ningún momento el régimen retributivo del RD 661/2007[827]. Desde la perspectiva de la Demandante, el registro de preasignación daba la oportunidad de

---

[816] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 314, 315, haciendo referencia en el ¶ 315 a la Exposición de Motivos del RDL/2006, aportada como Anexo **R-0071**.
[817] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 316.
[818] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 316.
[819] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 317, ss. y 341.
[820] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 317, 318, haciendo referencia al ¶ 416 del Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos.
[821] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 318, haciendo referencia a los ¶¶ 101-105 del Primer Informe sobre Daños (Brattle) [IP **C-001**] en el ¶ 319. La Demandante analiza también en este contexto una serie de documentos internos de España (¶¶ 320, ss.).
[822] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 321-323, basando su argumento en los Anexos **C-0046**, **C-0047** y **CL-0017**. La Demandante hace particular énfasis en la p. 16 del Informe 3/3007 de la CNE relativo a la propuesta de real decreto por el que se regula la actividad de producción de energía eléctrica en régimen especial y de determinadas instalaciones de tecnologías asimilables del régimen ordinario, de 14 de febrero de 2007 [**CL-0017**].
[823] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 324, citando los ¶¶ 101-103 del Informe Brattle [**C-0003**], las pp. 22, 23 del Informe 3/2007 de la CNE [**CL-0017**], las pp. 13, 14 Memoria del Proyecto del RD 661/2007 [**R-0065**] y la p. 4 del Informe de la Secretaría General Técnica del Ministerio de Industria, Comercio y Turismo [**C-0048**].
[824] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 325.
[825] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 326.
[826] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 327, haciendo referencia en este punto al Anexo **C-0049**.
[827] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 328.

"*modular la entrada en funcionamiento de las centrales eléctricas en atención a los objetivos de EERR y a la capacidad de absorción de la potencia instalada*"[828]. Steag considera que la propia resolución del registro de asignación de Arenales Solar confirma que la función del registro era la indicada[829]. Para la Demandante, los cambios que trajo el RDL 6/2009 buscaban "*proteger al inversor y fomentar las inversiones en EERR*", inclusive cuando el déficit de tarifa ya era un problema conocido[830].

436. La Demandante observa que en 2010 España procedió a modificar la remuneración para energía solar fotovoltaica, reforma que fue analizada en el caso *Charanne*, donde se concluyó que la reforma mantuvo las "*características esenciales*" del RD 661/2007[831]. Steag anota, sin embargo, que estos cambios no afectaron la energía solar termoeléctrica, como lo indican el RD 1614/2010 y el Comunicado ER 2010[832]. El RDL 14/2010 tampoco afectó a las plantas de energía solar termoeléctrica ya que, de manera consistente con el régimen vigente en ese momento, aplicaba sólo a las fotovoltaicas[833]. Para Steag, el "*único*" cambio relevante para la producción de energía solar termoeléctrica se dio con el RDL 1/2012, que afectó a las instalaciones nuevas, salvaguardando los derechos de las que se encontraban en el registro de preasignación de retribuciones[834]. Para el inversionista, lo anterior confirma que España entendía que la inscripción en dicho registro podía generar expectativas legítimas[835].

437. ***Tercero***, Steag sostiene que Arenales Solar se diseñó de manera que su capacidad fuera inferior a 50 MW, con el fin de que la planta quedara amparada bajo el RD 661/2007[836]. Según Steag, lo anterior coincide con los resultados de la inspección de la CNMC del 1 de junio de 2015[837].

438. La Demandante argumenta que la Demandada generó la expectativa de que no habría un cambio regulatorio drástico en lo que respecta a instalaciones de energía solar termoeléctrica

---

[828] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 328.

[829] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 329, citando el Anexo **C-0009**.

[830] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 330.

[831] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 331.

[832] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 332-335, haciendo referencia a también al ¶ 114 del Anexo **C-0003**. Steag resalta la consistencia de esta medida con el objetivo de promover las energías renovables, y cita la p. 82 de un artículo del Prof. Cayetano Espejo Marín [**CL-0105**]. En este contexto, la Demandante (¶¶ 333, 334) hace referencia detallada a la Exposición de Motivos del RD 1614/2010.

[833] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 336-338, refiriéndose particularmente a la Disposición Adicional Primera del RDL 14/2010.

[834] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 339, 340.

[835] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 340.

[836] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 342, ss., particularmente en el ¶ 345. La Demandante se refiere a los argumentos de España relacionados con la capacidad de la planta en los ¶¶ 342-344. De acuerdo con la Demandante, la Demandada misma ha reconocido este punto en diferentes documentos (¶ 345), citando las pp. 1, 6 y 105 del Proyecto de Ejecución de la Planta [**C-0051**]; la resolución del 23 de noviembre de 2007 de la Consejería de Innovación, Ciencia y Empresa de la Junta de Andalucía [**C-0052**]; la carta de Arenales Solar del 14 de octubre de 2009, relativa al registro de pre-asignación [**C-0053**]; la descripción técnica del proyecto del 12 de mayo de 2011 (particularmente en las pp. 31, 71-72 y 84 [**C-0054**]; el Contrato EPC, en su cláusula 3.1 [**C-0013**]; y las resoluciones administrativas aportadas en el Anexo **C-0055**. Cf. también ¶ 348.

[837] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 346, 347, citando las pp. 1-2, 4, 5, 9, 32 y 33 del Anexo **C-0056**.

incluidas en el registro de preasignación, expectativa que fue reforzada por el RD 1614/2010 y el RDL 1/2012, y que fue fundamental en la decisión de invertir en Arenales Solar[838]. Steag explica que una expectativa puede generarse no sólo de compromisos contractuales, sino también a partir de declaraciones de carácter unilateral o del mismo régimen regulatorio[839]. La Demandante sugiere que sus expectativas surgieron de la labor misma de *due diligence* realizada con anterioridad a la inversión, y que se encuentran protegidas bajo el inciso final del artículo 10(1) del TCE[840].

439. En desarrollo de estos argumentos, la Demandante argumenta que las cláusulas paraguas de los acuerdos de inversión no sólo protegen obligaciones contractuales, sino también "*compromisos asumidos de manera implícita por un Estado a través de su actuación política y regulatoria*"[841].

440. Steag afirma que las declaraciones de España indicaban los cambios a las tarifas de la energía solar termoeléctrica no impactarían a las plantas ya existentes y operarían únicamente a futuro[842]. Sostiene la Demandante que, a pesar de los reajustes sucesivos al RRO, la Demandada "*no lograba atraer la cantidad de inversión necesaria para el desarrollo de su política energética*"[843]. Eso explica, a su juicio, que adquiriera compromisos unilaterales en 2007 y 2010, y que los cambios fueran aumentando la remuneración que se ofrecía a los productores de energías renovables[844]. Los elementos que España necesitaba para alcanzar sus objetivos en el sector incluían la introducción de una remuneración mínima y una remuneración máxima, fijar una prima para la vida operativa de las plantas, y establecer una metodología para la revisión de la prima[845]. Estas políticas, al hacer previsibles los flujos de caja, permitían que las inversiones en el sector utilizaran esquemas de *project finance*[846]. Steag resalta que España publicitó el régimen regulatorio en todo el mundo, invitando la inversión en el sector[847].

441. Para la Demandante, el RD 661/2007 dio lugar a una competencia por el desarrollo de proyectos de energía solar termoeléctrica, para cumplir con el objetivo máximo de instalación (500 MW) establecido en el Plan 2005-2010[848]. Steag resalta que los operadores creían que tendrían seguridad jurídica bajo el RD 661/2007, a partir del registro de preasignación y la

---

[838] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 349, ss. y 353.
[839] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 349-351. Steag se refiere aquí también a los argumentos de España sobre la protección de expectativas legítimas de inversionistas.
[840] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 352.
[841] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 354. Steag realiza un análisis detallado de decisiones arbitrales y escritos académicos relativos a la cláusula paraguas en los ¶¶ 354-370. Estos argumentos serán considerados en el acápite relativo a las pretensiones de Steag bajo la cláusula paraguas.
[842] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 371, ss., particularmente en los ¶¶ 373, 374. La Demandante analiza los argumentos de España en los ¶¶ 371-373.
[843] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 374.
[844] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 375.
[845] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 376. Cf. también las explicaciones de Steag sobre la eficiencia del mecanismo de la prima para promover un mercado competitivo en el sector (¶ 377).
[846] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 378.
[847] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 378.
[848] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 379.

posterior inscripción en el RAIPRE[849]. En ese contexto, la Demandante encuentra que el motivo del RD 1614/2010 consistía en "*adecuar las horas de funcionamiento previstas en el Plan de Energías Renovables 2005-2010 a las que se estaban logrando en la realidad por el efecto de la evolución tecnológica*"[850]. La Demandante enfatiza que el RD 1614/2010 reconocía que los productores del sector de energía solar termoeléctrica tenían derecho a una compensación por el ligero impacto que la reforma tenía en las plantas existentes,[851] lo que "*recalcaba el compromiso adquirido en el RD 661/2007*"[852]. Para la Demandante, las medidas de España y sus anuncios a lo largo de los *años* "*generaron unas legítimas expectativas en inversores como Steag*"[853].

442. La Demandante afirma que Steag, basada en la conducta de la Demandada y el *due diligence* de Fröhlingsdorf Abogados, "*confió en la estabilidad del marco regulatorio*"[854]. Según el inversionista, el RD 1614 y la moratoria del RDL 1/2012 le dieron a entender que el RRO se mantendría vigente para Arenales Solar[855], como se desprende de los documentos internos de Steag[856]. La Demandante alega que la moratoria jugó un papel importante en la decisión de realizar la inversión:[857] durante la etapa previa a la inversión, esa moratoria garantizó la continuidad del régimen retributivo del RD 661/2007, garantía que constituye "*el único hito relevante que afectó a los productores de energía solar termoeléctrica*"[858]. Arenales Solar

---

849 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 379, 380. Steag sugiere que el RAIPRE, el RDL 6/2009 buscaban que se controlara el "*flujo de inscripciones*" y explica que el Estado "*decidió proteger a este sector [de energía solar termoeléctrica] con gran potencial tecnológico de los cambios que sí se produjeron en el sector de energía fotovoltaica*" (¶ 380).

850 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 381, citando las pp. 13, 14 del Anexo **CL-0113**. Cf. también el análisis de Steag de los fines del artículo 2 del RD 1614/2010 (¶ 382), donde cita las pp. 23, 24 del Informe de la CNE sobre la propuesta de Real Decreto por el que se regulan y modifican determinados aspectos relativos al régimen especial, de 14 de septiembre de 2010 [**CL-0114**]. Más adelante, Steag cita un artículo académico que se refiere a la interrelación entre el RD 1614/2010 y el RDL 6/2009, de autoría del Prof. Pere Mir [**CL-0115**] (¶ 383).

851 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 384, 385, citando el artículo 4 del RD 1614/2010 y la Memoria del Análisis de Impacto Normativo del Proyecto de RD 1614/2010 [**R-0066**].

852 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 386, citando el Anexo **CL-0021**. En apoyo de su argumento, Steag (¶¶ 387, 388) cita también las pp. 28, 29 del análisis del IDAE del año 2011 (Anexo **CL-0116**).

853 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 389.

854 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 390. Cf. también ¶ 405.

855 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 390. Cf. también ¶ 401.

856 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 391. La Demandante cita en este punto la p. 3 del documento interno referente a la primera oferta [Anexo **C-0038**], donde se tomaba en consideración la moratoria para proyectos pre-registrados bajo el RDL 6/2009. También se refiere la Demandante (¶ 392) a las pp. 8-9 de la presentación del 25 de abril de 2012 para el equipo de Steag que analizaba el proyecto de inversión [**C-0040**].

857 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 393-395, citando en el ¶ 393 los resúmenes internos de Steag sobre el proyecto, en las versiones del 27 de abril y del 25 de mayo de 2012 (Anexo **C-0057**) (particularmente las pp. 6, 7). Steag se refiere acto seguido al contexto de la moratoria, en los ¶¶ 396-398, donde cita la Exposición de Motivos y los artículos 4.5 y 4.8 del RDL 6/2009, así como la Resolución de la Secretaría de Estado de Energía sobre la ordenación de los proyectos registrados en el registro de pre-asignación [**CL-117**].

858 Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 407.

estaba registrada en el registro de preasignación, circunstancia que fue valorada por Steag como una indicación de que su inversión estaría "*en el lado seguro de la muralla*"[859].

443.    Steag considera entonces que España generó expectativas legítimas, y que éstas están protegidas por el estándar de TJE[860]. La Demandante afirma también que, aún si se considerara que las expectativas legítimas no están cobijadas por el estándar de TJE, éste en todo caso protege a los inversionistas frente a un cambio regulatorio "*irrazonable[] e incoherente[]*"[861].

444.    La Demandante argumenta que España infringió "*la obligación de promover un marco jurídico estable*" y la protección que dicho artículo otorga frente a "*medidas ilógicas e inconsistentes*"[862]. El punto central de este argumento es que las medidas introducidas por España "*carecen de toda justificación política racional*"[863].

445.    Comienza la Demandante por explicar que algunos de los laudos en que la Demandada basa su argumento a favor del NRR no se refirieron a la energía solar termoeléctrica[864]. Adicionalmente, explica Steag, en *Charanne* no se analizó el RD 1614/2010[865]. Por su parte, *AES Summit c. Hungría* se refirió a hechos muy distintos a los del presente caso[866]. La Demandante se refiere brevemente también al test de proporcionalidad del caso *Electrabel*[867]. Steag observa que el laudo dictado en el caso *Eiser* fue el primero en analizar la situación

---

[859] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 399-404. La Demandante (¶¶ 401, 402) se refiere a las actas del órgano de supervisión de Steag donde consta que se discutió el pre-registro, citando particularmente las pp. 15-17 del Anexo **C-0058** y las pp. 6, 7 del Anexo **C-0041**. Dice la Demandante que, en contraste con lo anterior, las afirmaciones que – según el Estado – anunciaban las medidas desde diciembre de 2012 fueron meras "*afirmaciones vacías*" (¶ 406).

[860] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 408-411.

[861] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 409.

[862] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 415, 416. En este contexto, la Demandante se refiere *in extenso* a los argumentos del Estado sobre las pretensiones basadas en el artículo 10(1) del TCE (¶¶ 412, ss.), haciendo un recuento de las pretensiones de Steag (¶ 413) y de los argumentos del Estado (¶ 414).

[863] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 415.

[864] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 417-432, haciendo referencia a los laudos *AES Summit Generation Ltd. et. al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010) [**RL-0039**]; *AES Summit Generation Ltd. et. al. c. Hungría*, Decisión del Comité *ad hoc* sobre Anulación, Caso CIADI No. ARB/07/22 (29 de junio de 2012) [**RL-0042**]; *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015) [**RL-0048**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016) [**CL-0029** y **RL-0049**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016) [**RL-0003**].

[865] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 294, 421, haciendo referencia a *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016) [**CL-0029** y **RL-0049**].

[866] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 422-426, haciendo referencia a *AES Summit Generation Ltd. et. al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010) [**RL-0039**]. Sin embargo, dice la Demandante, dado que las medidas de la Demandada "*no han sido ni lógicas ni razonables*", se cumple el estándar definido por el tribunal en ese caso (¶¶ 426, 427), haciendo referencia a los ¶¶ 10.3.6-10.3.9 del laudo dictado en *AES Summit Generation Ltd. et. al. c. Hungría* [**RL-0039**]. Cf. también la referencia a la decisión del Comité de Anulación en ese caso en el ¶ 428 del Memorial de Réplica.

[867] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 429, 430, notando que ese test se basó en casos anteriores, que fueron tenidos en cuenta por Steag en sus argumentos acerca del estándar de TJE.

para el sector de la energía solar termoeléctrica[868]. La Demandante considera también el laudo dictado en *Novenergia II* donde, aunque se trataba de un caso acerca de inversiones en energía fotovoltaica, se reconoció que las reformas desde el RDL 9/2013 fueron radicales, inesperadas y de impacto sobre el inversionista[869]. La pregunta es entonces si las medidas fueron "*razonables, lógicas y proporcionadas*"[870]. Steag considera que no es así, aduciendo cuatro razones.[871]

446.   La **primera razón** es que la Demandada misma caracterizó las reformas de 2013 y 2014 como un "*nuevo paradigma*"[872]. Steag alega que las medidas no pueden verse como "*meros ajustes*" al RRO, como lo confirman las aseveraciones de la Demandada sobre la necesidad de un "*nuevo marco regulatorio*"[873]. La Demandante explica que el nuevo sistema giraría en torno al fin de la sostenibilidad económica, sacrificando el régimen retributivo para productores de energías renovables[874]. El inversionista resalta que el propio Consejo de Estado español reconoció que la LSE de 2013 sustituye los mecanismos retributivos anteriores[875]. El nuevo paradigma, de carácter "*radical*", fue confirmado mediante el RD 413/2014 y la Orden Ministerial IET/1045/2014[876].

447.   La **segunda razón** es que el problema del déficit de tarifa venía de tiempo atrás y, más aún, no fue resuelto por el NRR[877]. La Demandante sugiere que el déficit de tarifa precede, inclusive, a las medidas de apoyo a las energías renovables[878]. Según la Demandante, el Informe de The Brattle Group demostró que el NRR no era razonable ni proporcional desde una perspectiva económica, lo que indica que el nuevo régimen no respondió a la necesidad de resolver el déficit de tarifa, problema que además fue de creación de España por no haber fijado tarifas que reflejaran los costos del SEE[879].

---

[868] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 432, ss., refiriéndose a *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017) [**CL-0003**].

[869] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 434, citando el caso *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 695 [**CL-0069**].

[870] La Demandante explica en este punto que los informes del Grupo Brattle estudian si las medidas eran "*razonables, lógicas y proporcionadas*". Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción. Cf. también ¶ 431.

[871] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 435.

[872] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 435.

[873] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 436-438. Steag hace un análisis detallado de los argumentos del Estado y de cada una de las medidas adoptadas.

[874] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 439-443, citando la Exposición de Motivos del RDL 9/2013, las pp. 16, 17 de la Memoria de Análisis de Impacto Normativo del RDL 9/2013 [**CL-0118**], las pp. 64, 65 del Informe de la Secretaría General Técnica del Ministerio de Industria, Turismo y Comercio [**CL-0119**] y la p. 8 del Informe No. 103/2013 de la Comisión Nacional de Competencia sobre el Anteproyecto de la Ley de Sector Eléctrico [**R-0114**].

[875] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 444.

[876] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 445, 446.

[877] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 435, 447 y ss.

[878] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 453.

[879] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 447-449 (particularmente en el ¶ 449). Steag añade que España no ha explicado los ingresos del SEE y la combinación de precios regulados y libres, concentrándose sólo en los costos del sistema (¶ 450).

448.  Steag explica que, en el análisis de proporcionalidad y razonabilidad bajo el TJE, es preciso examinar el caso concreto, de manera que "*en este caso no se enjuicia la totalidad del sistema eléctrico español, sino su incidencia específica en el sector de la energía solar termoeléctrica*"[880]. La Demandante encuentra que la Demandada no ha proporcionado un análisis concreto: no ha explicado las causas del déficit ni las razones por las que se rechazaron las medidas alternativas que propuso The Brattle Group[881]. Más bien, dice Steag, la Demandada quiso evitar el "*coste electoral*" de introducir precios que reflejen el costo de la electricidad[882].

449.  La Demandante resalta que las asesorías a España en relación con el NRR, por el Boston Consulting Group y Roland Berger, fueron posteriores al momento en que se aprobaron las medidas y están nubladas por las presiones que supuestamente ejerció el Ministerio de Industria para que los resultados reflejaran lo que la Demandada quería[883]. Por lo anterior, dice la Demandante, está claro que las medidas no fueron proporcionales ni lógicas, ni estuvieron apoyadas por una asesoría verdaderamente independiente[884].

450.  La **tercera razón** es que el NRR carece de "*buen sentido*", creando "*inestabilidad regulatoria*"[885]. Steag hace un recuento de los argumentos de la Demandada acerca de la supuesta recepción e impacto positivo del NRR sobre la inversión[886]. Para Steag, ese aumento de la inversión se debe al fenómeno de la adquisición por fondos de capital de riesgo de instalaciones renovables[887]. Pero, dice la Demandante, lo cierto es que el NRR ha generado que muchos proyectos no puedan siquiera amortizar los préstamos tomados para la inversión en infraestructura[888].

451.  Steag afirma que la "*fuente de la inestabilidad*" se encuentra en la revisión de la rentabilidad razonable, así como de los parámetros retributivos, en los términos de los artículos 19 y 20 del RD 413/2014[889]. La razón es que la rentabilidad razonable quedó vinculada al retorno medio de los bonos españoles a diez años, sumado al diferencial de 300 puntos básicos en el período regulatorio inicial: como consecuencia de las compras de bonos efectuadas por el Banco Central Europeo, dice Steag, esa rentabilidad es mínima[890]. A juicio de la Demandante, el mecanismo carece de lógica económica[891], y nunca se explicó

---

[880] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 453.
[881] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 454.
[882] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 454.
[883] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 455. La Demandante analiza ese asesoramiento en detalle en los ¶¶ 456-458, y a la insatisfacción del Ministerio de Industria respecto de los resultados de la asesoría, citando los Anexos **C-0059**, **C-0060** y **C-0061**. La Demandante nota que el Informe de Ronald Berger no tuvo en cuenta, por ejemplo, la LSE 2013, y sugiere que sus conclusiones se ajustaron a "*las cuantías que España quería que reflejaran*" (¶ 458), citando el Anexo **C-0062**. Sobre la controversia, la Demandante menciona un artículo de prensa, aportado como Anexo **C-0063**.
[884] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 459, 460.
[885] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 435, 461 y ss.
[886] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 461.
[887] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 462. Cf. también ¶¶ 464, 465, conde se hace referencia a un escrito académico sobre este fenómeno (aportado como Anexo **CL-0121**).
[888] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 463.
[889] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 466.
[890] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 467.
[891] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 468, 471,

adecuadamente el por qué del diferencial de 300 puntos ni la manera como el diferencial sería actualizado[892]. La Demandante se refiere también al efecto que el NRR tuvo en la bolsa[893], a la recomendación de algunos bancos de inversión de evitar inversiones en el SEE[894] y, finalmente, al temor de los inversionistas de entrar al mercado[895]. La Demandante resalta que la remuneración podría ser menor aún en los próximos años, inestabilidad que resulta de la "*ausencia de lógica*" de las medidas[896]. Steag agrega que las críticas al NRR no han sido sólo económicas, sino también sociales, habiendo reserva inclusive por parte de la Comisión Europea[897]. Según la Demandante, no hubo apoyo del sector ni de expertos[898].

452.  La **cuarta razón** es que el daño a la inversión de Steag ha sido significativo[899]. Steag sostiene que "*[l]os efectos del drástico cambio regulatorio son lo suficientemente serios como para que no sea necesario [...] que se produzca una total pérdida del valor de la inversión de Steag*"[900]. No obstante lo anterior, la Demandante considera que, si este Tribunal encontrara que una violación del estándar de TJE presupone una pérdida total, las pérdidas de Steag tendrían el quebranto requerido[901]. Steag concluye que la introducción del NRR, con las reformas de los años 2013 y 2014, es violatoria del estándar de TJE[902].

2.  Posición de la Demandada

453.  En su Memorial de Contestación, España resalta dos puntos centrales[903]. El primer punto es que la carga de probar la violación del estándar de TJE recae sobre la Demandante[904]. El

---

apoyándose en los ¶¶ 193-195 y 221-225 del Primer Informe sobre Daños (Brattle) [IP **C-001**].

[892] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 469-470, haciendo referencia a la discusión al interior del Estado español, citando los Anexos **CL-0122** y **CL-0123**, donde se plantearon dudas que, según Steag, no fueron atendidas.

[893] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 472-474, sugiriendo que el sector tuvo pérdidas superiores a los 2.000 millones euros de cotización en bolsa en un día, y afirmando en el ¶ 474 que ha habido una reacción en el mercado ante la posibilidad de que la remuneración se reduzca en el futuro, apoyándose en el Anexo **C-0068**.

[894] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 473, apoyándose en los Anexos **C-0065**, **C-0066**, que contienen notas de prensa sobre el particular.

[895] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 473, apoyándose en el Anexo **C-0067**, que contiene una nota de prensa sobre el particular.

[896] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 474-476 apoyándose el Anexo **C-0068**.

[897] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 477, apoyándose en las notas de prensa aportadas en los Anexos **C-0069** y **C-0070**.

[898] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 478, haciendo referencia en este contexto a una posible interpretación del ¶ 382 del Laudo del caso *Eiser* [**CL-0003**].

[899] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 435, 477 y ss.

[900] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 477, 478, apoyándose en las notas de prensa aportadas en los Anexos **C-0069** y **C-0070**.

[901] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 479, haciendo referencia al Anexo **C-0014**.

[902] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 480.

[903] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 882, 883.

[904] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 882, citando *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶ 154 [**RL-0048**]. En la Contestación (¶¶ 881, ss.), España resalta que el Memorial de Demanda omitió el análisis de normas nacionales, sentencias del TSJ español, secciones de informes de la CNE y diversas declaraciones de actores del sector que, a su juicio, "*determinan que el Reino de España no ha vulnerado el estándar de TJE*" (¶¶ 884, 885). La Demandante nota también que el Memorial de Demanda basa su análisis ante todo en laudos que se referían a incumplimientos de contratos estatales, pero omite importantes decisiones que se refirieron específicamente al TCE (¶¶ 886, 887). En

segundo punto es que las garantías previstas en el TCE deben ser leídas a la luz de la teleología del tratado[905]. Para la Demandada, "*[e]llo impide que la protección al Inversor se convierta en un valor absoluto, por encima de las necesidades de interés general del Estado e, incluso, por encima de los nacionales, sean consumidores o inversores nacionales*"[906].

454.  La Demandada alega que el Estado no ha violado las legítimas expectativas de Steag[907]. Haciendo un resumen del argumento de la Demandante, España encuentra que, en últimas, la expectativa de Steag sería que el régimen regulatorio sólo cambiaría respecto de instalaciones futuras, quedando "*petrificado*" en lo que respecta a las demás[908]. La Demandada resalta que, de aceptarse tal argumento, se daría lugar a un "derecho adquirido" respecto de "*todas las tarifas futuras, durante toda la vida útil de las Plantas, por toda la energía que produzcan las plantas*"[909].

455.  Explica la Demandada que, para efectos del estándar de TJE, es preciso determinar qué expectativas tenía legítimamente el inversionista en el momento de invertir[910]. España enfatiza que "*[e]stas expectativas deben ser razonables y objetivas respecto del marco general regulatorio existente*"[911] .

456.  Para la Demandada, el conocimiento que tenía o debía tener el inversionista acerca del marco regulatorio es relevante para evaluar sus expectativas, lo que supone el ejercicio de cierta diligencia en el análisis de las normas aplicables[912]. De lo anterior concluye que "*es, por tanto, una obligación inexcusable de todo inversor que invierte en España conocer cuál es el* marco general regulatorio *que rige las inversiones, y que incluye las normas y la Jurisprudencia que serán aplicables a su inversión*"[913]. La Demandante no puede esperar que los árbitros ignoren el marco normativo existente, parcial o totalmente, alegando que lo desconocía[914].

457.  España resalta que Steag no ha aportado informes de debida diligencia que indiquen la existencia de un derecho ilimitado respecto de "*todas las tarifas futuras, por toda la energía que produjesen las instalaciones, durante* toda *la vida útil de las instalaciones*"[915]. Por el contrario, resalta la Demandada que las reformas del 2006, 2007 y 2009 habían sido objeto de críticas por su supuesta retroactividad[916]. Steag debía haber dado una mirada al marco

---

este contexto, la Demandada menciona los casos *AES Summit* (Laudo y Decisión de Anulación), *Electrabel*, *Charanne* e *Isolux*.

[905] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 883.

[906] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 883, citando *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶ 154 [**RL-0048**].

[907] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 888, ss.

[908] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 888, 889.

[909] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 889 (énfasis en el original).

[910] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 890.

[911] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 890.

[912] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 890-893, haciendo referencia a al caso *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 495, 505 [**RL-0049**] y citando también el caso *Electrabel S.A. c. Hungría*, ¶ 7.78 [**RL-0048**].

[913] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 894 (énfasis en el original).

[914] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 894, 895.

[915] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 896 (énfasis en el original).

[916] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 897.

jurídico preexistente[917], lo que le habría dejado claro que el régimen regulatorio podía cambiar[918].

458. En particular, dice la Demandada, la jurisprudencia del Tribunal Supremo sobre la materia ha sido consistente desde el 2005 y es un ingrediente fundamental para la configuración de las expectativas legítimas de un inversionista[919]. De acuerdo con el Tribunal Supremo, los cambios podían referirse tanto a los ingresos o beneficios propiamente, tales como a las fórmulas aplicables a la determinación de la "*rentabilidad razonable*"[920]. La Demandada resalta que las asociaciones del sector conocían esta jurisprudencia, lo que torna en "*inexcusable*" la omisión de Steag[921]. España nota que la carga de la prueba de la debida diligencia recae sobre Steag y encuentra que, en últimas, "*[l]a falta de debida diligencia impide considerar como reales y objetivas las expectativas que pretende la Demandante*"[922].

459. De manera subsidiaria, la Demandada alega que – aún si se llegare a encontrar que Steag sí ejerció la debida diligencia – las medidas adoptadas no vulneraron sus expectativas legítimas[923]. España resalta que "*el TCE no es una especie de póliza de seguro a favor del inversor contra el riesgo de cambios en el marco regulatorio*"[924]. Destaca la Demandada que la protección de las expectativas del inversionista presupone: *(i)* que se cumpla el requisito de "*compromisos específicos hechos a un inversor de que la regulación va a permanecer inmutable*"[925]; y *(ii)* que las expectativas sean razonables y estén justificadas[926]. La Demandada sostiene que las expectativas de la Demandante no cumplen con estos requisitos[927].

460. En **primer lugar**, explica la Demandada, el RD 436/2004, el RDL 7/2006, el RDL 6/2009, el RD 1614/2010 y, muy particularmente, el RD 661/2007, no prometen petrificar el régimen regulatorio, sino que garantizan una "*rentabilidad razonable*"[928]. Citando el laudo dictado en *Charanne*, la Demandada observa que – en los años 2007 y 2008 – el marco jurídico no

---

[917] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 898.

[918] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 899, haciendo referencia al caso *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 495, 505 [**RL-0049**].

[919] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 900-902, haciendo referencia a al caso *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 506-508 [**RL-0049**] y citando también el caso *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶¶ 793, 794 [**RL-0003**].

[920] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 903.

[921] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 904, 905.

[922] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 905 (énfasis en el original).

[923] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 906, ss.

[924] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 906 (énfasis en el original).

[925] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 906 *lit.* a, haciendo referencia a los casos *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 219 [**RL-0034**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 506-508 [**RL-0049**]; *EDF (Services) Ltd. c. Rumania*, Laudo, Caso CIADI No. ARB/05/13 (8 de octubre de 2009), ¶ 217 [**RL-0035**]; *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶ 9.3.39 [**RL-0039**].

[926] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 906 *lit.* b, haciendo referencia a los casos *Plama Consortium Ltd. c. República de Bulgaria*, ¶ 219 [**RL-0034**] y *Electrabel S.A. c. Hungría*, ¶ 7.78 [**RL-0048**].

[927] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 907.

[928] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 908, 910.

contenía "*compromiso específico*" alguno en ese sentido[929]. La inexistencia de tal compromiso se predica de los regímenes retributivo, de horas / años de subsidio a la producción, así como de la actualización tarifaria[930].

461. Reitera la Demandada que el sector conocía bien la jurisprudencia del Tribunal Supremo, que permitía la modificación del régimen regulatorio siempre y cuando se mantuviera la garantía de una "*rentabilidad razonable*"[931]. De ahí concluye la Demandada que "*ningún inversor diligentemente informado podía esperar la* petrificación *a su favor de todos estos regímenes por el hecho de cumplir un requisito reglamentario para obtener los subsidios, como la inscripción en un registro administrativo obligatorio*"[932]. Para la Demandada, Steag tenía o debía tener conocimiento del riesgo regulatorio y no podía tener la expectativa de una estabilidad indefinida de las condiciones[933].

462. En **segundo lugar**, la Demandada considera que las expectativas de Steag no son razonables[934]. En ese sentido, España presenta una relación de los hechos ocurridos entre 2011 y 2014, insistiendo que el inversionista tenía conocimiento o debía estar informado de las reformas introducidas por el Estado con miras a garantizar la sostenibilidad del SEE y prevenir la sobre-retribución, con sujeción a la garantía de la "*rentabilidad razonable*"[935]. Describiendo los "*principios esenciales*" del marco regulatorio[936], la Demandada concluye que para un inversionista diligente debía ser claro qué circunstancias de "*déficit o desequilibrio económico*", con el potencial de afectar la sostenibilidad del SEE, darían lugar a "*medidas de control macroeconómico*"[937].

463. La Demandada observa que Steag ha basado sus supuestas expectativas particularmente en el RD 661/2007[938]. Empero, desde la perspectiva de España, del RD 661/2007 no se desprende la "*inmutabilidad del régimen retributivo*"[939]. La Demandada hace referencia particular al artículo 44(3) del RD 661/2007, observando que éste concierne únicamente la "*revisión periódica obligatoria de las tarifas*"[940]. Para la Demandada, dicha disposición no cubre "*modificaciones no planificadas*" adoptadas para asegurar la sostenibilidad del SEE o "corregir situaciones de sobre-retribución"[941]. Así, la norma no se refiere a aspectos tales

---

[929] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 909, citando *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 499, 503-505 y 511 [**RL-0049**].
[930] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 910.
[931] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 911, 913 y 914, apoyándose en el caso *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016) [**RL-0003**].
[932] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 912 (énfasis en el original).
[933] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 912.
[934] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 915, 918.
[935] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 916. Cf. también ¶¶ 920, 921, refiriéndose al RD 436/2004, RDL 7/2006, RD 661/2007, RDL 6/2009, RD 1565/2010, RD 1614/2010 y RDL 14/2010, y haciendo mención de la jurisprudencia del Tribunal Supremo.
[936] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 918.
[937] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 919.
[938] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 922.
[939] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 923.
[940] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 923 (énfasis en el original).
[941] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 923 *lit.* a.

como "*vida operativa de las plantas*" o "*actualizaciones de tarifa*"[942]. Para España, la finalidad del RD 661/2007 era la de "*garantizar la sostenibilidad financiera del SEE y corregir situaciones de sobre-retribución*"[943].

464. La Demandada resalta que Steag fundamenta su argumento en decisiones arbitrales que se refirieron a situaciones fácticas distintas, donde España había adquirido compromisos explícitos frente a los inversionistas cubiertos[944]. En el caso *sub judice*, todas las normas relevantes son *erga omnes*[945]. En particular, la Demandada considera que el Comunicado ER 2010 no cristaliza un acuerdo entre Steag y España dirigido a 'petrificar' el régimen de retribución previsto en el RD 661/2007[946]. En ese sentido, resalta la Demandada que una nota de prensa no equivale a un contrato, y subraya que no puede haber expectativa legítima con fundamento en declaraciones de quien no es competente ni para otorgar ni para cumplir el supuesto compromiso[947].

465. Para la Demandada, Steag "*intenta distorsionar*" las características del marco regulatorio[948]. Citando el laudo dictado en el caso *Invesmart c. República Checa*, España enumera una serie de criterios a tener en cuenta al examinar las expectativas del inversionista[949]. Aplicando estos criterios al presente caso, la Demandada alega:

> "(i) que la Demandante conoció y asumió el riesgo regulatorio desde el inicio de sus operaciones *browfield*; (ii) que la Demandante no participó en negociación ni en acuerdo alguno, siéndole de aplicación normas generales aplicables *erga omnes*, a nacionales y extranjeros; (iii) que no realizó una Due Diligence comprensiva del funcionamiento del Marco regulatorio español; (iv) que el Marco regulatorio y su Jurisprudencia interpretativa no admite la posición de la Demandante; (v) que los Acuerdos internacionales suscritos por España por el rescate del Sector financiero determinaron el compromiso de adoptar medidas de control macroeconómico que no podían desatenderse; y (vi) la competencia (a) del Gobierno y de las Cortes Generales para adoptar modificaciones en el Marco regulatorio y (b) del Tribunal Supremo para su interpretación última".[950]

---

[942] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 923 *lit.* b.

[943] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 416. Lo anterior se enmarca dentro del análisis detallado que hace la Demandada del contexto y contenido del RD 661/2007, en los ¶¶ 409, ss.

[944] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 924, refiriéndose a los casos *Total S.A. c. Argentina*, ¶¶ 53, 54 y 58 y *LG&E c. Argentina*, ¶¶ 36, 42, 49, 51 y 53.

[945] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 925.

[946] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 940, 941 y 945.

[947] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 942-944, refiriéndose a los casos *ECE Projektmanagement International GmbH et al. c. República Checa*, Laudo, Caso CPA No. 2010-5 (19 de septiembre de 2013), ¶ 4.771 [**RL-0045**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 496, 497 [**RL-0049**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016) [**RL-0003**].

[948] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 926.

[949] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 927, 928, citando el laudo *Invesmart, B.V. c. República Checa*, Laudo, Caso CNUDMI (26 de junio de 2009), ¶¶ 251-258 [**RL-0021**].

[950] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 929. Cf. también ¶ 930.

466. España llama la atención del Tribunal sobre la conducta de Steag con posterioridad a algunas de las medidas que han dado lugar a la controversia[951]. En particular, la Demandada sostiene que las inversiones de Steag se realizaron cuando las medidas ya eran una realidad, de manera que "*la Demandante conoció que iban a ser aprobadas y las consintió*"[952]. La Demandada nota también que el RD 1565/2010, el RD 1614/2010 y RDL 14/2010 afectaron a instalaciones que ya estaban en funcionamiento, lo que ya indicaba que el artículo 44(3) del RD 661/2007 no petrificaba la retribución a la producción[953]. Ello resultaba acorde con la jurisprudencia del Tribunal Supremo[954]. La Demandada destaca en este contexto que en *Charanne* se examinaron los cambios regulatorios de 2010, y se falló a favor de España[955].

467. En **tercer** lugar, la Demandada considera que, contrario a lo afirmado por Steag, España sí ha otorgado "*condiciones estables*" a la inversión[956]. Resalta la Demandada que el TCE no exige que el marco regulatorio sea inmutable ni consagra al TJE como una "*cláusula de estabilidad*", sino que admite "*medidas de control macroeconómico razonables y proporcionadas*"[957].

468. España enfatiza que las medidas buscaron mantener la "sostenibilidad y equilibrio del SEE" y aseguraron la "*rentabilidad razonable*" de las inversiones, conforme a la LSE de 1997[958]. Para la Demandada, no se han alterado los "*caracteres esenciales del Marco regulatorio*" y se ha seguido una "*metodología consistente*"[959]. Según la Demandada, dado que se mantuvo la prioridad de despacho y los subsidios, la realidad es que empresas "*diligente[s] y bien gestionada[s]*" pueden recuperar los costes y alcanzar una "*rentabilidad razonable*" durante la vida útil de las instalaciones[960]. Así, el RDL 9/2013 determina a qué rentabilidad pueden aspirar los inversionistas[961].

469. En **cuarto** lugar, la Demandada rechaza la caracterización de las medidas como retroactivas y violatorias del estándar de TJE.[962] Explica España que ninguna decisión arbitral apoya el argumento de Steag.[963] Más aún, a juicio de la Demandada, el inversionista hace caso omiso

---

[951] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 931, ss.

[952] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 933.

[953] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 934, 935, 938 y 939.

[954] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 936.

[955] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 937.

[956] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 946, ss. Cf. también ¶ 948, refiriéndose al caso *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 173 [**RL-0034**].

[957] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 947-951, refiriéndose a los casos *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 219 [**RL-0034**]; *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 9.3.29, 9.3.30 [**RL-0039**]; *Mamidoil Jetoil Greek Petroleum Products Societe S.A. c. República de Albania*, Laudo, Caso CIADI No. ARB/11/24 (30 de marzo de 2015), ¶¶ 617, 618 [**RL-0046**].

[958] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 952, 953 y 956.

[959] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 954, 956.

[960] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 954-956.

[961] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 955. La Demandada destaca que sus conclusiones han sido confirmadas por el tribunal en el caso *Isolux* (¶ 957), refiriéndola al caso *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016) [**RL-0003**].

[962] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 958, 959 y 969.

[963] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 960.

de que "*[p]ara que una norma sea retroactiva debe afectar a <u>derechos adquiridos</u>*"[964]. España alega que "la Demandante nunca ha tenido un "*'derecho adquirido' a una retribución a futuro,</u> sine die, por medio de un FIT fijo e inamovible*"[965]. La Demandada añade que el RDL 9/2013 aplica a futuro[966].

470.    La Demandada hace un recuento de decisiones arbitrales que se han referido al concepto de la retroactividad, notando que se habla de retroactividad sólo "*[s]i los derechos adquiridos son perjudicados o suprimidos por una norma posterior a su adquisición*"[967]. Resalta la Demandada que esta situación no equivale a normas sobre "*<u>hechos futuros sobre situaciones jurídicas en curso</u>*" que no tocan "*derechos ya adquiridos*"[968]. Fundamentándose en el laudo dictado en *Charanne*, España explica que el Estado puede adoptar una medida con un efecto inmediato acerca de una situación en curso: así, la inscripción en el RAIPRE no dio lugar a un derecho adquirido a percibir la totalidad de las tarifas del RD 661/2007 por la totalidad de la 'vida operativa' de las instalaciones[969].

471.    España nota que, bajo el RDL 9/2013, las retribuciones ya percibidas son intangibles y se aplica el régimen nuevo sólo hacia el futuro[970], permitiendo en todo caso la recuperación de la inversión y los costos de explotación, así como la obtención de una "*rentabilidad razonable*"[971]. El Pleno del Tribunal Supremo, el Consejo de Estado y el Pleno del Tribunal Constitucional han encontrado que las medidas impugnadas son aplicables hacia el futuro y no afectan derechos adquiridos[972]. Para la Demandada, no puede hablarse en este contexto de retroactividad[973].

472.    Habiendo formulado estos cuatro argumentos sobre el punto de las expectativas legítimas, España pasa a alegar que su conducta ha sido tanto coherente como transparente[974]. Explica la Demandada que el argumento de Steag asume que el TCE exige "*total claridad y previsibilidad del marco regulatorio*" al punto que impone una "*petrificación*" de las normas aplicables, efecto que sólo puede darse si hay un "*compromiso específico*"[975].

473.    La Demandada considera que en el presente caso no se infringió la obligación de "*promover unas condiciones transparentes*" bajo el TCE porque: **(i)** España no asumió compromiso

---

[964] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 961 (énfasis en el original).
[965] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 961 (énfasis en el original).
[966] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 961.
[967] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 962, 963, y haciendo referencia en los ¶¶ 962, 966 al caso *Nations Energy Inc. et. al. c. República de Panamá*, Laudo (extracto), Caso CIADI No. ARB/06/19 (24 de noviembre de 2010), ¶¶ 642, 644 y 646 [**RL-0040**].
[968] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 963 (énfasis en el original).
[969] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 966-968, refiriéndose al caso *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 509, 510, 546 y 548 [**RL-0049**], y mencionando el caso *Isolux* en el ¶ 968 [**RL-0003**].
[970] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 964.
[971] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 965.
[972] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 970-972.
[973] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 973.
[974] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 981, ss. En este contexto, la Demandada destaca que se apoya en decisiones arbitrales que no se referían al TCE (¶ 982).
[975] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 983-985, citando *AES Summit Generation Ltd. et. al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 9.3.29, 9.3.73 [**RL-0039**].

alguno de mantener el marco regulatorio y el régimen del RD 661/2007 inmutables: todas sus normas son *erga omnes* y no discriminatorias; *(ii)* las reformas realizadas entre 2004 y 2013 han perseguido el fin de dar una "*rentabilidad razonable*", garantizar la sostenibilidad del sistema y evitar la sobre-retribución; *(iii)* las reformas han sido anunciadas y muchas veces contaron con la participación activa de asociaciones del sector; *(iv)* las reformas se ajustaron a los procedimientos aplicables; y *(v)* el régimen normativo ha estado 'dotado de previsibilidad y dinamismo' manteniendo siempre la garantía de la "rentabilidad razonable" y el "*equilibrio económico*" de la inversión[976].

474.  La Demandada sostiene además que sus medidas "*han sido razonables y proporcionadas*"[977]. España destaca que los argumentos de Steag sobre el supuesto "*carácter exorbitante o abusivo*" y "*desproporcionado*" de las medidas se basan en decisiones ajenas al TCE acerca de hechos no comparables con los del presente caso[978], ya que en muchos de esos casos hubo "*compromisos específicos*"[979].

475.  La Demandada enfatiza que la carga de probar el carácter discriminatorio o irracional de las medidas recae sobre la Demandante[980]. Para evaluar este aspecto, dice España, "*[e]l Tribunal Arbitral ha de valorar [] todas [las] circunstancias concurrentes y si las medidas se adoptaron por un motivo razonable*"[981]. La Demandada encuentra que, en su presentación del caso, Steag omitió hechos relevantes.[982]

476.  La Demandada hace un recuento de los hechos[983], y se refiere a casos donde se ha encontrado que cambios regulatorios justificados por el interés general son admisibles bajo el TCE, haciendo énfasis en el carácter racional de las medidas[984]. España resalta que, en 2012, el Estado se enfrentó a "*una crisis económica internacional*"[985]. En el sector eléctrico, la crisis causó una reducción de la demanda y un aumento de las tarifas del consumidor[986]. A ello se sumó la sobre-retribución en el sector de energías renovables y la expectativa del crecimiento del régimen de tarifa[987]. Para España, ello dejaba entrever que el SEE sería insostenible[988].

---

[976] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 986, 987.
[977] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 988, ss.
[978] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 988.
[979] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 989, 990, discutiendo los casos *LG&E c. Argentina*, *CMS c. Argentina* (Laudo y Decisión sobre Anulación), *BG c. Argentina* y *El Paso c. Argentina*. La Demandada considera que casos dictados bajo el TCE donde no hubo tales compromisos son una mejor guía para el presente caso (¶ 991), mencionando los casos *AES Summit* [**RL-0039**], *Electrabel* [**RL-0048**], *Charanne* [**RL-0049**] y *Mamidoil* [**RL-0046**].
[980] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 992, citando *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶ 154 [**RL-0048**].
[981] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 993.
[982] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 993.
[983] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 994.
[984] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 995-998, citando los casos *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010) [**RL-0039**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 493, 510 [**RL-0049**]; *Isolux Infrastructure Netherland, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶¶ 823, 825 [**RL-0003**].
[985] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 999.
[986] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 999.
[987] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 999.
[988] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 999.

La Demandada nota que estas circunstancias eran conocidas por Steag, como se desprende de la referencia que se hizo a la crisis económica en la presentación del proyecto al Consejo de Administración[989]. España destaca que la Demandante no hizo mención en su Memorial de Demanda a los compromisos del Estado frente a la UE, en el año 2012, referidos a la adopción de "*medidas de control Macroeconómico en el SEE*"[990].

477. La Demandada resalta también que el RDL 9/2013 introdujo un método de retribución "*análogo*" al que propuso la Asociación de Productores de Energías Renovables (APPA) en 2009, considerándolo el mejor sistema para mantener la rentabilidad razonable, dar "*seguridad y estabilidad*" a la inversión y lograr el desarrollo duradero y sostenible de las energías renovables[991]. España agrega que en 2015 tuvieron lugar importantes inversiones en el sector de las energías renovables, resaltando que esta "*realidad económica*" evidencia que las medidas adoptadas fueron proporcionales y razonables[992].

478. La Demandada añade que las medidas adoptadas no tuvieron un carácter discriminatorio[993]. La Demandada analiza en primer lugar los criterios planteados por el tribunal en el caso *EDF c. Rumania*[994], y concluye que en el caso *sub judice* no hubo discriminación en cuanto: *(i)* los cambios normativos persiguieron un objetivo legítimo; *(ii)* la reforma respetó el marco jurídico aplicable y fue de "*alcance general*"; *(iii)* la motivación de las medidas coincide con las razones presentadas por la Demandada en la exposición de motivos del RDL 6/2009, el RDL 14/2010 y la MAIN del RD 1614/2010, que enfatizaron la "*sostenibilidad*" del sistema; y *(iv)* se surtió un proceso transparente y en cumplimiento con las formalidades aplicables[995].

479. En segundo término, España considera el "*test*" del caso *AES Summit c. Hungría*, que se concentra en los elementos de existencia de una política racional y la razonabilidad de las medidas en relación con dicha política[996]. La Demandada explica que las reformas objeto de la presente disputa se adoptaron en el marco de una política económica pública racional, que evitó otorgar a los inversionistas retribuciones que superaran el umbral de lo que es razonable, para proteger así los intereses de los consumidores[997]. En cuanto al criterio de la razonabilidad de las medidas, observa que España enfrentó el déficit de tarifa a través de una política proporcionada, que mantuvo una "*rentabilidad razonable*" de cerca del 7,398%[998].

480. En su Memorial de Dúplica, analizando los argumentos de la Demandante, España alega que Steag hace un "*planteamiento errático*" sobre el artículo 10(1) del TCE, que desborda el

---

[989] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1000, citando el Anexo **C-0018**.

[990] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1001.

[991] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1002-1005, haciendo referencia a los Anexos **R-0148** y **R-0167**.

[992] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1006-1008.

[993] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1009, ss.

[994] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1009 y 1111-1113, haciendo referencia al caso *EDF (Services) Ltd. c. Rumania*, Laudo, Caso CIADI No. ARB/05/13 (8 de octubre de 2009), ¶ 303 [**RL-0035**].

[995] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1012.

[996] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1014, refiriéndose al caso *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 10.3.7-10.3.9 [**RL-0039**].

[997] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1015-1023.

[998] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1024-1031.

alcance del estándar de TJE[999]. España alega que además de que Steag no ha cumplido con la carga de probar sus expectativas legítimas, España ha probado lo contrario[1000]. La Demandada afirma que Steag "*tergiversa*" decisiones arbitrales y se fundamenta parcialmente en casos que se referían a incumplimientos contractuales[1001], ignorando los laudos *Charanne* e *Isolux* con el argumento de que no se referían al sector termosolar[1002].

481.    Para la Demandada, el argumento de Steag se enfoca en la estabilidad que garantizaba el registro en el RAIPRE, y que supuestamente impediría a España ejercer su *ius variandi* respecto de Arenales Solar[1003]. España encuentra que Steag no ha acreditado que se haya generado una expectativa objetiva consistente en que la retribución prevista en el RD 661/2007 se aplicaría durante la totalidad de la vida útil de la planta[1004]. Este argumento, a juicio de la Demandada, pasa por alto que el artículo 30(4) de la LSE de 1997 (inc. final) indica que el sistema subsidiado busca "*conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*"[1005]. En vista de lo anterior, dice la Demandada, las reformas no revocan el régimen preexistente, sino que lo ajustan con base en "*premisas preestablecidas*"[1006]. España añade que las ayudas que dará en adelante "*superarán el 83% de los ingresos de las Plantas CSP*"[1007].

482.    La Demandada insiste en que el Tribunal debe tomar en consideración la eficiencia del mercado, los intereses de quienes invirtieron y las cargas que recaen sobre los consumidores[1008]. España explica que un Estado puede modificar su derecho interno "*por una causa de interés público, mediante medidas razonables y proporcionadas*" sin infringir el estándar de TJE[1009]. De ahí que, para España, Steag no podía esperar una protección incondicional a sus intereses, inclusive a costa de distorsionar el mercado y perjudicar al consumidor[1010].

---

[999] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1233-1236, apoyándose en los casos *Electrabel c. Hungría*, Decisión de Jurisdicción, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶ 7.73 [**RL-0003**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶¶ 765, 822 [**RL-0090**]; *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 646 [**RL-0104**]; *Eiser Infrastructure Ltd. et. al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017) [**RL-0091**]; *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-03 (11 de octubre de 2017), ¶ 446 [**RL-0100**].

[1000] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1237, 1238.

[1001] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1239, 1240.

[1002] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1241.

[1003] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1242, 1243. La Demandada hace también un recuento detallado del argumento de Steag sobre sus supuestas expectativas legítimas en los ¶¶ 1242-1251 del Memorial de Dúplica.

[1004] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1244.

[1005] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1245-1247.

[1006] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1248.

[1007] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1248.

[1008] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1249, apoyándose en *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶ 165 [**RL-0048**].

[1009] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1250, mencionando los casos *AES Summit* [**RL-0039**], *Mamidoil* [**RL-0046**], *Charanne* [**RL-0049**], *Isolux* [**RL-0090**], *Blusun* [**RL-0068**] y *Wirtgen* [**RL-0100**].

[1010] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1251.

483.  España reconoce que una violación del estándar de TJE exige evaluar las expectativas del inversionista al realizar su inversión[1011]. Se exige que tales expectativas sean "*razonables y objetivas*"[1012], lo que supone tomar en consideración el conocimiento del marco regulatorio por el inversionista[1013]. La existencia o ausencia de compromiso específico del Estado es también un ingrediente fundamental del análisis de las expectativas[1014].

484.  Al analizar el cumplimiento de estas condiciones en el presente caso[1015], la Demandada comienza por argumentar que las expectativas de Steag "*no son objetivas*"[1016]. La Demandada resalta que, cuando no media un "*compromiso específico*" del Estado, no puede haber una expectativa objetiva sobre la inmutabilidad del derecho interno relevante[1017]. Por el contrario, los inversionistas "*tienen que prever y anticipar cambios en la regulación*"[1018]. España nota que la inversión se comienza a realizar en junio de 2012, momento en el que ya se habían anunciado las medidas, y termina en 2014, cuando las medidas controvertidas ya habían sido aprobadas[1019]. La Demandada encuentra que, en su análisis, Steag pasó por alto que el marco regulatorio, incluido el régimen retributivo, estaban sujetos a cambios[1020].

485.  España resalta además que el esquema de retribución a energías renovables constituye una ayuda de Estado, y está sujeto a los límites previstos en el derecho de la UE[1021]. En este caso,

---

[1011] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1252, 1253. Sobre el momento en que deben considerarse las expectativas, la Demandada se fundamenta en el caso *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 9.3.8-9.3.11 [**RL-0039**].

[1012] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1252, 1253. En relación con la razonabilidad de las expectativas, la Demandada se apoya en los casos *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 219 [**RL-0034**]; *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶ 154 [**RL-0048**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 497 [**RL-0049**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 778 [**RL-0090**]; *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-03 (11 de octubre de 2017), ¶¶ 407-411 [**RL-0100**].

[1013] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1252, 1253, apoyándose en los casos *Charanne* e *Isolux*. La Demandada cita además *Parkerings-Compagniet AS c. República de Lituania*, Laudo, Caso CIADI No. ARB/05/8 (11 de septiembre de 2007), ¶¶ 323-333 [**CL-0033**]; *Invesmart, B.V. c. República Checa*, Laudo, Caso CNUDMI (26 de junio de 2009), ¶¶ 250-258 [**RL-0021**]; *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 507 [**RL-0049**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 781 [**RL-0090**]. España también cita el ¶ 7.78 del caso *Electrabel*.

[1014] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1252, mencionando los casos *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 499 [**RL-0049**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶¶ 771, 775 [**RL-0090**]; *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶ 9.3.39 [**RL-0039**]; *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015), ¶¶ 154, 155, 156, 157 y 162 [**RL-0048**]; *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 319 [**RL-0068**].

[1015] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1254, ss.

[1016] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1255, ss. La Demandada reitera el requisito de que las expectativas sean objetivas en los ¶¶ 1258-1262 del Memorial de Dúplica, haciendo referencia a los casos *Isolux* [**RL-0090**], *Electrabel* [**RL-0048**], *Wirtgen* [**RL-0100**], *Invesmart* [**RL-0021**] y *Blusun* [**RL-0068**].

[1017] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1255.

[1018] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1265.

[1019] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1256.

[1020] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1257. Cf. también los ¶¶ 466, 493, y 755 y ss. del Memorial de Dúplica.

[1021] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1257. Cf. también los ¶ 1263.

la remuneración de Steag procede en un 83% de subsidios[1022]. Ese "*carácter altamente subvencionado del mercado*" debía, a juicio de la Demandada, ser de conocimiento de un inversionista diligente[1023]. España subraya que un "*compromiso específico*" no puede derivarse de una regulación general[1024]. También explica la Demandada que en el caso *Eiser* se negó que el RD 661/2007 incluyera "*cláusulas de inmutabilidad*"[1025], y que en *Novenergia II* se indicó que el inversionista no podía esperar que ningún cambio regulatorio fuera a afectar el valor de la inversión[1026].

486.  En vista de lo anterior, España sostiene que el marco normativo existente al momento en que se hizo la inversión, el contexto económico, el "*conocimiento y entendimiento del sector*", los documentos internos de Steag, los conceptos de expertos legales españoles, y la ausencia de un compromiso de estabilidad, generaban "*la expectativa objetiva y razonable de que el esquema retributivo vigente del RD 661/2007 debía y podía modificarse para garantizar la sostenibilidad económica del SEE*"[1027].

487.  España considera que las expectativas del inversionista debían incluir la estructura del derecho español[1028] y el principio de la sostenibilidad económica del SEE[1029]. También debían incluir las exigencias del derecho de la UE sobre ayudas de Estado, la rentabilidad razonable, la jurisprudencia del Tribunal Supremo y la evolución del derecho español sobre la materia (que, según la Demandada, precede a la realización de la inversión)[1030]. La Demandada resalta además que no podía haber una "*expectativa objetiva y legítima*" de que el RAIPRE petrificaría el régimen retributivo del RD 661/2007, más aún si se considera que el registro buscaba monitorear las instalaciones[1031]. Para la Demandada, tampoco tiene

---

[1022] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1257. Cf. también los ¶ 1263.

[1023] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1262, 1264, refiriéndose a la noción de *due reliance* desarrollada en el caso *Blusun S.A. et. al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶¶ 319, 371 y 372 [**RL-0068**].

[1024] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1265, apoyándose en los casos *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016) [**RL-0049**]; *Electrabel S.A. c. Hungría*, Laudo, Caso CIADI No. ARB/07/19 (25 de noviembre de 2015) ¶¶ 165, 166 [**RL-0048**]; *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶ 9.3.31 [**RL-0039**]; *AES Summit Generation Ltd. et al. c. Hungría*, Decisión del Comité *ad hoc* sobre Anulación, Caso CIADI No. ARB/07/22 (29 de junio de 2012), ¶ 95 [**RL-0042**]; *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 219 [**RL-0034**]; *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶¶ 371, 372 [**RL-0068**]. Cf. también la referencia al caso *Blusun* en el ¶ 1290.

[1025] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1266, citando el caso *Eiser Infrastructure Ltd. et. al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 363 [**RL-0091**].

[1026] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1267, citando el caso *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶ 688 [**RL-0104**].

[1027] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1268, 1269, siguiendo los criterios postulados en el laudo *Invesmart, B.V. c. República Checa*, Laudo, Caso CNUDMI (26 de junio de 2009), ¶¶ 250-255 [**RL-0021**].

[1028] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1269, refiriéndose al caso *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 7.88 [**RL-0090**].

[1029] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1269, refiriéndose al caso *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 373 [**RL-0068**].

[1030] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1269.

[1031] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1269.

fundamento considerar que el RD 1614/2010 aseguraba la "*inmutabilidad*" del régimen regulatorio para instalaciones de CSP[1032].

488.  España alega que la única expectativa objetivamente existente era la de la "*rentabilidad razonable con arreglo al costo del dinero en el mercado de los capitales*"[1033]. Esa expectativa, dice la Demandada, no ha sido frustrada, en cuanto Steag recuperó el costo de su inversión y percibe una rentabilidad del 6%[1034].

489.  La Demandada explica que, más aún, las expectativas que aduce la Demandante no son razonables[1035]. El marco regulatorio no se reduce al RD 661/2007 y al RD 1614/2010[1036]. La LSE garantizaba sólo la rentabilidad razonable durante la vida útil de las instalaciones, según la entendía el propio Tribunal Supremo[1037], punto que fue confirmado en el laudo del caso *Isolux*[1038]. España llama la atención sobre las advertencias del Estado sobre la sostenibilidad del SEE, entre los años 2006 y 2010, a lo que se suma el régimen europeo sobre ayudas de Estado[1039]. Para la Demandada, ningún inversor que ejerciera debida diligencia podía esperar que la UE permitiera sobre-remuneraciones en ayudas de Estado, o una distorsión del mercado[1040]. Según España, el fin de los subsidios era lograr el *level playing field* y, a partir de 2006, podían preverse cambios para evitar distorsiones y sobre-retribuciones[1041].

490.  Para España, la esencia del régimen regulatorio no ha cambiado. La Demandada recuerda que en el caso *Charanne* se identificaron las siguientes "*características esenciales*" del marco regulatorio (para los años 2008-2009): la existencia de un subsidio, un "*acceso privilegiado*" a la red eléctrica y la "*rentabilidad razonable*" prevista en el artículo 30.4 de la LSE[1042]. En *Isolux*, la "*rentabilidad razonable*" fue el elemento esencial[1043].

491.  La Demandada explica que, bajo el régimen actual, Steag recibe un subsidio, tiene los privilegios de acceso a la red eléctrica y de despacho, recupera sus costos de inversión y puede obtener un "*retorno razonable*"[1044]. Esto supone que se respetaron las características

---

[1032] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1269.

[1033] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1270.

[1034] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1271, citando el Segundo Informe Económico sobre la Demandante y su reclamación (Accuracy). Cf. También la referencia a este punto en el ¶ 1293, donde se hace referencia al caso *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017) [**RL-0091**], si bien la Demandada manifiesta su desacuerdo con algunos aspectos de dicha decisión en el ¶ 1292.

[1035] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1272, ss.

[1036] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1273.

[1037] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1274. Cf. también ¶ 1279.

[1038] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1274, citando *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 807 [**RL-0090**], donde el tribunal se refirió al artículo 30.4 de la Ley 54/1997.

[1039] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1275, 1276.

[1040] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1276.

[1041] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1277, 1278.

[1042] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1281, 1282, citando el caso *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶¶ 517, 518 [**RL-0049**].

[1043] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1283, 1284, citando *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶¶ 787, 807 [**RL-0090**].

[1044] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1285.

fundamentales del marco regulatorio[1045]. En cuanto al RD 667/2007, España observa que éste no fue un elemento dentro de una supuesta "*campaña dirigida a atraer inversores extranjeros*", según se reconoció en *Isolux*[1046]. Era ampliamente conocido que el régimen podía cambiar y, dice la Demandada, todo inversionista diligente tendría que haber sido consciente de dicha circunstancia[1047].

492.  España cuestiona también la línea argumentativa de los laudos dictados en los casos *Eiser* y *Novenergia II*, citados por Steag, resaltando que el primero es objeto de un proceso de anulación iniciado por España y que la ejecución del segundo fue suspendida por las cortes suecas[1048]. Este último caso, dice la Demandada, afirma erróneamente que el Estado está obligado a dar "*estabilidad fundamental*" y omite: *(i)* que las expectativas del inversionista deben ser objetivas; y *(ii)* la exigencia de un *due diligence* por parte del inversor[1049]. El laudo de *Novenergia II* admite la posibilidad de que haya cambios regulatorios, siempre que no sean "*radicales*", pero – dice la Demandada – nunca explica por qué los cambios introducidos por España fueron de entidad "*radical*"[1050].

493.  La Demandada concluye que las expectativas de Steag no eran razonables[1051]. También afirma que España actuó siempre con transparencia, de buena fe y en cumplimiento del debido proceso[1052]. Las medidas fueron anunciadas públicamente, se ofreció toda la información pertinente a los interesados, la reforma se aprobó siguiendo los procedimientos vigentes, se consultó previamente a los grupos de interés y, finalmente, no se dieron efectos retroactivos al nuevo régimen[1053]. Tras recordar los argumentos de Steag sobre este punto[1054], España resalta que "*el estándar de transparencia en derecho Internacional no significa que el inversor tenga que ser copartícipe en el procedimiento de elaboración de las normas que le afecten*"[1055]. España explica específicamente que el Informe de Ronald Berger, al que se

---

[1045] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1280-1288.

[1046] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1289, citando *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 772 [**RL-0090**].

[1047] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1291, 1292, refiriéndose al *Powering the Green Economy: The feed-in tariff handbook* [**RL-0062**].

[1048] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1293-1295 y 1302.

[1049] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1296-1298. Explica la Demandada que el laudo del caso *Novenergia II* se contradice al decir que el cambio normativo fue "*radical*", pero reconociendo que el principio de "*sostenibilidad económica*" ya aparecía en la Ley 54/1997 (¶ 1298).

[1050] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1299. Cf. también la crítica a la supuesta falta de aplicación en el caso *Novenergia II* del "*ejercicio de equilibrio*" entre los intereses contrapuestos (¶¶ 1300, 1325-1328). Además, se critica el análisis de daños en esa decisión (¶ 1301).

[1051] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1303, 1304, citando el caso *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-03 (11 de octubre de 2017), ¶¶ 437, 446 [**RL-0100**].

[1052] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1305, ss.

[1053] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1306. Cf. también ¶¶ 1310, 1311, citando el caso *Philip Morris Asia Ltd. c. Mancomunidad de Australia*, jurisdicción y admisibilidad, Caso CPA No. 2012-12 (17 de diciembre de 2015), ¶ 1311 [**RL-0037**]. En este punto, España cita también el Dictamen del Consejo de Estado No. 39/2014 [**R-0106**].

[1054] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1307.

[1055] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1308. La Demandada (¶ 1309) basa su análisis de la transparencia de las medidas en el caso *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶ 9.3.40 [**RL-0039**].

refiere Steag, se recibió después de que se aprobaran el RD 413/2014 y la Orden Ministerial IET/1045/2014, por lo que no genera un problema de transparencia[1056].

494.    Acto seguido, la Demandada alega que las medidas fueron proporcionales y no pueden calificarse como arbitrarias[1057], En este contexto, la Demandada analiza en detalle los análisis de proporcionalidad en los llamados "*green energy arbitrations*"[1058].

495.    La Demandada observa que en *Blusun c. Italia* se estableció un "*umbral muy elevado*" para una violación del estándar de TJE, admitiendo además que éste respeta el poder regulatorio del Estado[1059]. Para España, *Blusun* introduce un "*ejercicio de balance de intereses*" donde se toma en cuenta: *(i)* si se garantizó un FIT (*feed-in-tariff*); *(ii)* cuál era la "*confianza razonable*" de los inversionistas; y *(iii)* si el cambio regulatorio era necesario y proporcional, considerando el interés público y sin entrar a sustituir las políticas del Estado[1060]. La Demandada nota que, en el caso presente: *(i)* nunca se garantizó un "FIT inmodificable"; *(ii)* en cuanto a la confianza, el SEE está regulado al detalle y sujeto a las normas europeas sobre ayudas de Estado; y *(iii)* las medidas responden a una "*finalidad pública*" dada por el contexto económico de las medidas, y son también proporcionales: las tarifas eléctricas en España son las más altas de Europa y los productores están recuperando los costos de la inversión, además de obtener 6% de rentabilidad, siendo financiados en un 83% por subsidios que paga el consumidor[1061].

496.    La Demandada resalta que "*la concurrencia de un interés público [ ] justifica las medidas*", y que se trató de una decisión de política pública racional[1062]. España destaca el laudo dictado en el caso *Wirtgen c. República Checa*, que tomó en consideración el contexto macroeconómico de las medidas y el análisis de proporcionalidad de la Comisión Europea relativo a las tarifas remuneratorias aprobadas en materia de ayudas de Estado[1063]. Para la

---

[1056] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1312, 1313. Cf. también los ¶¶ 1128, ss.

[1057] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1312, 1313. Cf. también los ¶¶ 1314, ss.

[1058] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1312, 1313. Cf. también los ¶¶ 1315, ss.

[1059] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1315, citando *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶¶ 363, 319 [**RL-0068**]

[1060] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1316, 1317, citando *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶¶ 318-319, 371-372 y 383-386 [**RL-0068**]. La Demandada sugiere que "*la existencia de un interés público se presume*", apoyándose en este punto en un reporte de UNCTAD, aportado como Anexo **RL-0047**.

[1061] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1318-1329.

[1062] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1321-1328, citando *Charanne BV et al. c. Reino de España*, Laudo, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 536 [**RL-0049**]; *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 823 [**RL-0090**]. Dice la Demandada que inclusive en *Eiser* se reconoció que había una "*política de interés público*", citando *Eiser Infrastructure Ltd. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/36 (4 de mayo de 2017), ¶ 371 [**RL-0086**]. La Demandada también analiza en cierto detalle el laudo dictado en el caso *Novenergia II*, criticando la supuesta falta de un análisis de proporcionalidad (¶¶ 1325-1328), citando *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR c. Reino de España*, Laudo Final, Caso CCE No. 2015/063 (15 de febrero de 2018), ¶¶ 656-657, 665-670, 679, 681, 688-689 [**RL-0104**]

[1063] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1329-1335, citando *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-03 (11 de octubre de 2017), ¶¶ 348-391, 406, 442 y 444 [**RL-0100**]. En lo relativo a las decisiones de la Comisión Europea sobre ayudas de Estado, la Demandada llama la atención sobre la decisión de la Comisión sobre ayudas de Estado para el caso de España (aportada como Anexo **RL-0092**), que sigue esta línea en su ¶ 120. La Demandada resalta también en el ¶ 1335 de su Memorial de Dúplica, que en el caso *Wirtgen* se tomaron en consideración no sólo decisiones de la Comisión Europea, sino

Demandada, las medidas cumplen con los criterios desarrollados en *Wirtgen*, en cuanto fueron introducidas cuando no era viable seguir aumentando las tarifas que pagan los consumidores, con el fin de asegurar la sostenibilidad el SEE y prevenir la sobre-retribución en una situación de "*crisis económica internacional severa*"[1064]. España destaca que sus actuaciones fueron consideradas ajustadas a derecho por el Tribunal Supremo y el Tribunal Constitucional, siendo además consistentes con las políticas de otros Estados de la UE, como lo afirma la propia Comisión Europea[1065].

497. A juicio de la Demandada, en suma, el argumento de Steag "*tergiversa la realidad del contexto económico y social*" de las medidas[1066]. Siempre fue claro que éstas estaban dirigidas a asegurar la "*sostenibilidad del SEE*" así como la "*rentabilidad razonable*" para los productores[1067]. En cuanto a la razonabilidad y la proporcionalidad[1068], la Demandada destaca que "*[l]a rentabilidad del marco regulatorio del 7,398% pre-tax y la rentabilidad de la planta de las Demandante* [sic] *post-tax es superior al coste del capital de las Demandantes calculada por sus propios peritos*"[1069]. También nota la Demandada que la rentabilidad de la Demandante supera la de otros sectores dentro del sistema eléctrico, tales como el sector de transporte y distribución[1070]. La proporcionalidad se confirma, según España, al observar los "*niveles de rentabilidad*" que ofrecen los bancos[1071].

498. La Demandada concluye que, en estas condiciones, no puede hablarse de una violación del estándar de TJE[1072].

### 3. Análisis del Tribunal

499. La Demandante alega que la Demandada ha infringido su obligación de brindar un TJE a la inversión, en los términos del artículo 10(1) del TCE:

> "De conformidad con las disposiciones del presente Tratado, las Partes Contratantes fomentarán y crearán condiciones estables, equitativas, favorables y transparentes para que los inversores de otras Partes Contratantes realicen inversiones en su territorio. Entre dichas condiciones se contará el **compromiso de conceder en todo momento a las inversiones de los inversores de otras Partes Contratantes un trato justo y equitativo**. Estas inversiones gozarán asimismo de una protección y seguridad completas y

---

también del Tribunal Constitucional checo.

[1064] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1336.

[1065] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1337, 1342 y 1343, citando el ¶ 120 y la n. 57 de la Decisión C(2017) 7384 de la Comisión Europea, S.A. 40348(2015/NN) (10 de noviembre de 2017) [**RL-0092**].

[1066] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1344. Cf. también ¶ 1345.

[1067] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1344. Cf. también ¶¶ 1346-1348.

[1068] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1349-1355.

[1069] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1352, citando el segundo Informe Brattle (coste del capital de 4,84%).

[1070] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1353, citando la Disposición adicional décima de la Ley 24/2013, aportada como Anexo **R-0048**.

[1071] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1354, observando que este elemento de análisis fue tenido en cuenta en el caso *AES Summit Generation Ltd. et. al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 10.3.31, 10.3.34 [**RL-0039**]

[1072] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1355. Cf. también la conclusión en los ¶¶ 1338-1341.

ninguna Parte Contratante perjudicará en modo alguno, mediante medidas exorbitantes o discriminatorias, la gestión, mantenimiento, uso, disfrute o liquidación de las mismas. En ningún caso podrá concederse a estas inversiones un trato menos favorable que el exigido por el derecho internacional, incluidas las obligaciones en virtud de los tratados […]"[1073].

500.  El Tribunal comienza por observar que, como lo ha señalado la Demandada, la carga de probar la violación del estándar de TJE recae sobre Steag[1074]. Los argumentos esgrimidos por la Demandante pueden dividirse en dos puntos principales:

(i)  El primero corresponde a la violación del estándar como consecuencia de la frustración de las expectativas legítimas de Steag[1075]. La Demandante sostiene que el RD 661/2007, la Comunicación ER 2010 y el RD 1614/2010, sumados a la inscripción del Proyecto Arenales en el registro de preasignación, generaron la expectativa de que no habría cambios sustanciales injustificados en la remuneración del proyecto[1076]. El inversor no podía prever cambios a la esencia del sistema[1077]. La Demandada defraudó esa expectativa al adoptar el NRR, que conllevó "*la supresión de las tarifas garantizadas por la producción de energía eléctrica y su sustitución por el Nuevo Régimen Regulatorio que prevé como remuneración de la inversión de Steag un 'ratio' de rentabilidad razonable*"[1078].

(ii)  El segundo es que, bajo el TCE, el estándar de TJE encierra una garantía de estabilidad.[1079] En ese orden de ideas, Steag sostiene que "*aun si se entendiera que el estándar de trato justo y equitativo se corresponde con un mínimo internacional que no incluye la protección de las legítimas expectativas de los inversores, lo cierto es que sí protege frente a drásticos cambios que sean irrazonables e incoherentes, para lo que habrá que tener en cuenta precisamente las legítimas expectativas generadas en el inversor*"[1080].

501.  A continuación, el Tribunal analizará cada argumento por separado.

### 3.1.  Las expectativas legítimas de Steag

502.  Las Partes no disputan que la frustración de las expectativas legítimas de un inversionista protegido puede constituir una violación del estándar de TJE del artículo 10(1) del TCE. El Tribunal concuerda con las Partes en que la anterior es una de las funciones centrales del estándar de TJE[1081].

---

[1073] TCE, art. 10(1) [**RL-0006**] (énfasis añadido).
[1074] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 882.
[1075] Memorial de Demanda, ¶ 233.
[1076] Memorial de Demanda, ¶¶ 223, 237 y 238.
[1077] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 247.
[1078] Memorial de Demanda, ¶ 222.
[1079] Memorial de Demanda, ¶¶ 231, 232; Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 229, ss. y 239, ss.
[1080] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 409.
[1081] *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No.

503. Sin embargo, no cualquier expectativa del inversionista es relevante a efectos de establecer una violación del artículo 10(1) del TCE[1082]. La noción de "*expectativas legítimas*" se ha venido decantando en numerosas decisiones arbitrales relativas al artículo 10(1) del TCE. En general, esas decisiones han indicado que las expectativas deben establecerse en términos objetivos, existir al momento de realizar la inversión y fundamentarse en la conducta positiva del Estado[1083].

504. Para los efectos del presente caso, debe determinarse en primer lugar qué actos de la Demandada eran susceptibles de generar una expectativa legítima relativa a la inversión de Steag para la fecha en que se realizó la inversión, es decir, el 8 de junio de 2012 **(a)**. También resulta necesario establecer hasta qué punto esa conducta del Estado fue determinante para la decisión de Steag de invertir en España, lo que supone examinar la conducta del inversor y la información que conocía o debía conocer al realizar su inversión **(b)**. De encontrar que hay una base objetiva para la formación de expectativas legítimas y que los actos susceptibles de generar expectativas jugaron un papel en la decisión de invertir en España, el Tribunal tendrá que determinar entonces en qué consistían las expectativas de Steag, es decir, cuál era su alcance **(c)**. Concluido este análisis, el Tribunal debe entrar a analizar hasta qué punto la adopción del NRR frustró esas expectativas **(d)**.

### a) *Actuaciones de la Demandada susceptibles de generar expectativas legítimas en relación con la inversión de Steag*

505. Existe cierto consenso en que la generación de expectativas legítimas exige que haya actos imputables al Estado que sean objetivamente susceptibles de generar esas expectativas. Sin embargo, se ha discutido si esos actos deben consistir necesariamente en representaciones específicas a uno o más inversionistas determinados, o bajo qué condiciones actos de carácter general pueden dar lugar a una expectativa legítima[1084].

506. Algunos tribunales constituidos bajo el TCE han encontrado que, aunque los elementos de un régimen regulatorio se dirijan a ciertos inversionistas determinados, "*eso no los convierte en compromisos específicamente dirigidos a cada uno de ellos*"[1085]. Se ha dicho entonces que "*[c]onvertir una norma reglamentaria, por el carácter limitado de las personas que puedan estar sujetas a la misma, en un compromiso específico tomado por el Estado hacia cada uno de dichos sujetos, constituiría una limitación excesiva a la capacidad de los Estados de regular la economía en función del interés general*"[1086].

---

[1082] *RREEF Infrastructure (G.P.) Ltd. et al. c. Reino de España*, Decisión sobre responsabilidad y sobre los principios de cuantificación de daños, Caso CIADI No. ARB/13/30 (30 de noviembre de 2018), ¶¶ 260, 261 [**RL-0140**].

[1083] *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 536 [**CL-0130**]; *Sr. Jürgen Wirtgen et al. c. República Checa*, Laudo Final, Caso CPA No. 2014-13 (11 de octubre de 2017), ¶¶ 407, 411 [**RL-0100**].

[1084] *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶ 7.76 [**RL-0002**]; *Parkerings-Compagniet AS c. República de Lituania*, Laudo, Caso CIADI No. ARB/05/8 (11 de septiembre de 2007), ¶ 331 [**CL-0033**].

[1085] *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 493 [**RL-0049**].

[1086] *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016),

507. Otros tribunales han encontrado que el marco normativo en industrias altamente reguladas puede dar lugar a expectativas legítimas. Así, en *Cube Infrastructure c. España*, el tribunal explicó:

> "El Tribunal no encuentra necesario que se haya realizado un compromiso específico a cada demandante individual para que surja una expectativa legítima. Al menos en el caso de una industria altamente regulada, y siempre y cuando las representaciones sean suficientemente claras e inequívocas, basta que un régimen regulatorio sea establecido con el fin manifiesto de atraer inversiones, ofreciendo a inversores potenciales la perspectiva de que las inversiones estarán sujetas a un conjunto de principios regulatorios que, por política deliberada, se mantendrán en vigor por una cantidad finita de tiempo. Tales regímenes están evidentemente dirigidos a crear expectativas, en las que los inversores confiarán; y en tanto esas expectativas sean objetivamente razonables, dan lugar a expectativas legítimas cuando efectivamente se realicen inversiones con base en ellas"[1087].

508. No se puede establecer como regla general que normas de rango legal sean siempre susceptibles de generar expectativas legítimas. Pero tampoco puede afirmarse, como regla general, que las normas de rango legal no puedan generar expectativas legítimas o cristalizar compromisos específicos. Todo depende del caso concreto. Las expectativas de un inversionista pueden surgir de actos administrativos, disposiciones legislativas, contratos u otros actos que sean atribuibles al Estado, o una combinación de varios de ellos, según las circunstancias del caso[1088]. Cuando las normas legales dotan de contenido a actos administrativos particulares y concretos, el compromiso puede surgir de la combinación de ambos. La existencia o ausencia de un compromiso específico no deben examinarse desde una discusión abstracta alrededor de la naturaleza legislativa, administrativa o contractual de los actos relevantes para el surgimiento de las expectativas. Lo fundamental es si, en las

---

¶ 493 [**RL-0049**].

[1087] Traducción del Tribunal. Texto original: *Cube Infrastructure Fund SICAV et al. c. Reino de España*, Decisión sobre jurisdicción, responsabilidad y responsabilidad sobre daños, Caso CIADI No. ARB/15/20 (19 de febrero de 2019), ¶ 388 [**CL-0158**] ("*The Tribunal does not consider it necessary that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise. At least in the case of a highly-regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them*"). Véase también 9Ren Holding S.à.r.l. c. Reino de España*, Laudo, Caso CIADI No. ARB/15/15 (31 de mayo de 2019), ¶ 295 [**CL-0157**] ("*There is no doubt that an enforceable 'legitimate expectation' requires a clear and specific commitment, but in the view of this Tribunal there is no reason in principle why such a commitment of the requisite clarity and specificity cannot be made in the regulation itself where (as here) such a commitment is made for the purpose of inducing investment, which succeeded in attracting the Claimant's investment and once made resulted in losses to the Claimant*"); *Charanne BV et al. c. Reino de España*, Opinión Disidente del Prof. Dr. Guido Santiago Tawil, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 12 ("[…] *cuando un inversor cumple con todos los requisitos establecidos por la normativa vigente para ser acreedor a un beneficio específico y determinado, su desconocimiento posterior por parte del Estado receptor de la inversión viola una expectativa legítima*").

[1088] Cf. *Frontier Petroleum Services Ltd. c. República Checa*, Laudo, Caso CNUDMI (12 de noviembre de 2010), ¶ 285 [**CL-0111**].

circunstancias particulares del caso que se examina, hay actos atribuibles al Estado que, individualmente o en su conjunto, pudieran generar en el inversionista una expectativa determinada.

509. Este Tribunal encuentra que en el caso particular de Steag, tal como fue presentado ante este Tribunal, no es necesario abordar el debate de si una norma determinada, de carácter legal o reglamentario, puede crear una expectativa legítima. No está en discusión que un compromiso específico del Estado a un inversor puede crear una expectativa legítima y, en el caso de Arenales Solar, el Tribunal encuentra probado que hubo actos particulares del Estado español relativos al proyecto que, en el contexto de la legislación relevante, eran susceptibles de generar expectativas legítimas. Específicamente, el Estado español expidió a favor de Arenales Solar una resolución de inscripción en el registro de pre-asignación de retribuciones, que constituye un acto administrativo de carácter particular y concreto, y no una norma de carácter general o de carácter reglamentario. Ese acto administrativo, aplicable solamente a su destinatario, señalaba de manera explícita, específica e inequívoca que dicha instalación gozaría, en los términos y condiciones establecidos en el marco regulatorio aplicable, del régimen económico del RD 661/2007.

510. La Resolución de Inscripción de Arenales Solar es, en fin, un acto particular, que expresa un compromiso específico del Estado español. Asiste la razón a Steag cuando afirma que el registro era susceptible de generar expectativas legítimas[1089]:

511. Para comenzar, el título mismo de la resolución indica que ésta tiene efectos que van más allá de un mero registro administrativo: "*Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el* Registro *de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., **a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo**"*[1090].

512. La parte motiva de la resolución dice expresamente: "*De acuerdo con lo previsto en el apartado 1 de la disposición transitoria quinta del referido Real Decreto-Ley [RDL 6/2009], **el régimen económico de las instalaciones que sean inscritas en el Registro de pre-asignación de retribución en aplicación de lo previsto en la disposición transitoria cuarta del mismo, será el previsto en el Real Decreto 661/2007**, de 26 de septiembre*"[1091].

513. Los efectos jurídicos de un acto administrativo particular y concreto, como lo es esta resolución, dependen de la legislación en cuyo marco se expide el acto en cuestión. Es por eso que el significado de esta representación específica sólo puede entenderse a partir de una lectura integral del régimen legal aplicable al registro de pre-asignación de retribución.

---

[1089] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 340.

[1090] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**] (énfasis añadido).

[1091] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**] (énfasis añadido).

514. El artículo 9 del RD 661/2007 exige la inscripción de las instalaciones de producción en régimen especial en lo que se denominó "*Registro administrativo de instalaciones de producción en régimen especial*"[1092]. La Sección 4 del RDL 6/2009 establece el "*Registro de preasignación para el régimen especial*"[1093]. El Tribunal observa que diversas disposiciones del RD 1614/2010 expresan la relevancia y efectos de la inscripción en el RAIPRE y en el registro de preasignación para las plantas de energía solar termoeléctrica (cf. arts. 2.3, 2.4, 4). Las Partes discuten cuál era la función de ese registro.

515. Para España, el registro cumple una mera función administrativa; se trata de un "*registro administrativo obligatorio*" que no tenía un significado más allá del de un mero "*requisito reglamentario para obtener los subsidios*"[1094]. Para Steag, cuando el Estado español se enfrentó al déficit de tarifa, se acudió al registro de preasignación para mantener la seguridad jurídica de los inversionistas; con el registro se modulaba el inicio de la operación de las plantas, atendiendo a la capacidad de absorción de la potencia instalada[1095]. Steag sostiene que el RDL 6/2009 perseguía también la protección de las inversiones en energías renovables[1096]. Para el inversionista, había una expectativa de estabilidad a partir de la inscripción en el registro de preasignación[1097].

516. El Tribunal no puede compartir la posición de España de que se trata de un simple "*requisito reglamentario para obtener los subsidios*".

517. El registro de preasignación no puede analizarse de forma aislada sino en el marco legal dentro del cual fue creado y teniendo en cuenta la sucesión de disposiciones normativas que adoptó el Estado español a partir de la creación de dicho registro[1098].

518. Particularmente, el artículo 2 del RDL 1/2012, del 27 de enero de 2012, suspendió los procesos de pre-asignación de retribución, pero protegió explícitamente a las instalaciones que ya habían sido registradas o que se encontraban en proceso de registro:

> "Artículo 2. Ámbito de aplicación.
>
> 1. El presente real decreto-ley será de aplicación a las siguientes instalaciones:
>
> a) Aquellas instalaciones de régimen especial que a la fecha de entrada en vigor del presente real decreto-ley **no hubieran resultado inscritas en el Registro de preasignación de retribución previsto en el artículo 4.1 del Real Decreto-ley 6/2009, de 30 de abril**, por el que se adoptan determinadas medidas en el sector energético y se aprueba el bono social.

---

[1092] RD 661/2007, art. 9 [**CL-0018**; **R-0084**].

[1093] RDL 6/2009, sección 4 [**CL-0020**; **R-0072**].

[1094] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 912.

[1095] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 328.

[1096] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 330.

[1097] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 379, 380.

[1098] Ya en otros casos bajo el TCE se ha concluido que el registro en el RAIPRE no era un mero "*requisito administrativo*", sino que conllevaba sendas consecuencias jurídicas. *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 552 [**CL-0130**].

144

b) Aquellas instalaciones de régimen especial de tecnología fotovoltaica que a la fecha de entrada en vigor del presente real decreto-ley no hubieran resultado inscritas en el Registro de preasignación de retribución previsto en el artículo 4.1 del Real Decreto 1578/2008, de 26 de septiembre, de retribución de la actividad de producción de energía eléctrica mediante tecnología solar fotovoltaica para instalaciones posteriores a la fecha límite de mantenimiento de la retribución del Real Decreto 661/2007, de 25 de mayo, para dicha tecnología.

[…]

2. El presente real decreto-ley **no será de aplicación a las instalaciones de régimen especial que hubieran presentado solicitud de inscripción en el Registro de preasignación de retribución**, cuando el correspondiente plazo de resolución, en virtud de lo previsto en los apartados 2 y 3 del artículo 42 de la Ley 30/1992, de 26 de noviembre, de Régimen Jurídico de las Administraciones Públicas y del Procedimiento Administrativo Común, hubiera ya vencido a la fecha de su entrada en vigor"[1099].

519. La resolución de registro de Arenales Solar tiene entonces un significado que va mucho más allá de la certificación del cumplimiento de un mero requisito administrativo. El registro, en el contexto normativo del ordenamiento español, materializa la promesa de otorgar cierto grado de estabilidad en el régimen económico aplicable a la instalación. España, en los términos expresos de la resolución de registro de Arenales Solar, "*otorga el régimen económico regulado en el Real Decreto 661/2007*"[1100]. Las normas que regulaban el registro definitivo en el RD 661/2007 y el registro de preasignación en el RDL 6/2009, en su conjunto, permitían inferir que esta resolución garantizaba cierta protección frente a cambios futuros. El RDL 1/2012 y el RD 1614/2010 confirmaban esta lectura y, como se verá más adelante, concretaban el alcance de dicha garantía.

520. Cuando el Estado ha otorgado a un inversionista un estatus determinado, a través de un acto administrativo particular y concreto, al que el derecho interno otorga ciertos efectos jurídicos, la combinación del acto administrativo y de las normas que lo dotan de contenido puede generar expectativas legítimas. En tal situación, la expectativa no nace de la legislación de carácter general, considerada de manera aislada, sino de un acto particular al que la legislación dota de efectos jurídicos específicos. En una situación como la presente, donde la administración se dirige a un particular específico (Arenales Solar), a través de una resolución de registro, y el propio legislador define los efectos de esa declaración administrativa, existe una base clara y sólida para la formación de expectativas legítimas. Tratándose de actos que generan efectos jurídicos bajo el derecho del Estado receptor de la inversión, podría decirse que en esta situación surge un compromiso inclusive más sólido del

---

[1099] RDL 1/2012, art. 2 [**R-0074**] (énfasis añadido).
[1100] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**].

que surgiría de una mera declaración no vinculante o de las comunicaciones entre representantes del inversor y un funcionario del Estado.

521.    El Tribunal observa que, según España, el registro de preasignación no podía generar expectativas legítimas porque podría presentarse una incompatibilidad con el régimen comunitario de ayudas de Estado. El Tribunal encuentra que esa posible incompatibilidad no genera obstáculo alguno para que los actos positivos del Estado español descritos arriba den lugar a una expectativa legítima.

522.    Para comenzar, no existe una decisión de un órgano comunitario que indique claramente que el RRO sea violatorio del derecho comunitario. Más aún, de haber una contradicción con el derecho comunitario, ésta supondría que el Estado español ha incumplido sus obligaciones bajo el derecho de la UE. Bajo el principio de buena fe del derecho internacional no puede permitirse al Estado valerse de su propia conducta ilícita para escapar a su responsabilidad bajo el estándar de TJE; *nemo auditur propriam turpitudinem allegans*. Asimismo, asiste la razón a Steag cuando afirma que el deber de ejercer debida diligencia antes de realizar la inversión no exige prever un ilícito internacional[1101].

> *b) Relevancia de la conducta de Steag y del due diligence realizado con anterioridad a la fecha de la inversión para la determinación de la existencia y alcance de las expectativas legítimas.*

523.    Para los efectos del estándar de TJE del artículo 10(1) del TCE, las expectativas legítimas del inversionista deben determinarse, no en términos abstractos, sino en atención a las circunstancias específicas que rodearon la decisión de realizar una inversión y al momento de la inversión misma. Además de la existencia de actos del Estado susceptibles de generar una expectativa, debe evidenciarse que esos actos efectivamente motivaron la inversión o, al menos, fueron tenidos en cuenta a la hora de invertir.

524.    Este análisis supone establecer qué información conocía o debía conocer el inversionista al momento de realizar su inversión. El inversionista no puede ampararse en expectativas subjetivas originadas en un desconocimiento negligente del régimen regulatorio aplicable. En ese sentido, el inversionista tiene la carga de informarse adecuadamente sobre las circunstancias del lugar donde pretende invertir.

525.    En el caso *Parkerings c. Lituania*, el tribunal explicó:

> "El inversor tendrá un derecho a la protección de sus expectativas legítimas, siempre y cuando haya ejercido debida diligencia y sus expectativas legítimas hayan sido razonables a la luz de las circunstancias. En consecuencia, un inversor debe anticipar que las circunstancias pueden cambiar y, así, estructurar su inversión para poder adaptarla a cambios potenciales en el marco jurídico"[1102].

---

[1101] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 255.
[1102] Traducción del Tribunal. Texto original: "*The investor will have a right of protection of its legitimate expectations provided it exercised due diligence and that its legitimate expectations were reasonable in light of the circumstances. Consequently, an investor must anticipate that the circumstances could change, and thus*

526. En el presente caso, ambas Partes están de acuerdo en la relevancia del *due diligence*, entendido como un estándar objetivo y razonable, para efectos de determinar la existencia y alcance de expectativas legítimas[1103].

527. El Tribunal concuerda con España en que un inversionista tiene la carga de realizar un *due diligence* adecuado y razonable, tomando en consideración las normas básicas aplicables a la inversión, el marco regulatorio relevante y los cambios de dicho marco que sean previsibles en el momento en que se realiza la inversión[1104]. Como bien señala la Demandada, las expectativas legítimas del inversionista deben fundarse en un análisis objetivo, y no meramente en las creencias subjetivas que pudo haber tenido el inversionista al momento de invertir[1105]. Al mismo tiempo, el Tribunal debe tomar en consideración que, como se explicó en *Isolux c. España*, "[…] *no se puede exigir de un inversor que haga una investigación jurídica extensiva. Lo importante para determinar si las expectativas alegadas por el inversor son razonables es lo que todo inversor prudente tiene que saber del marco regulatorio antes de invertir y la información efectiva del inversor que invoca expectativas específicas*"[1106].

528. Dado que las expectativas legítimas del inversionista deben existir al momento de la inversión, el Tribunal procederá a examinar los informes de *due diligence* anteriores al 8 de junio de 2012 – fecha en que se realizó la inversión – que Steag tomó en cuenta al evaluar la posibilidad de invertir en el proyecto Arenales Solar. El Tribunal observa que los Informes de Fröhlingsdorf y Cuatrecasas resaltaban la importancia de la inscripción en el registro de preasignación para efectos del régimen económico que se aplicaría a Arenales Solar.

529. El Informe Consolidado de Fröhlingsdorf, del 5 de junio de 2012 resalta la importancia del registro de preasignación de Arenales Solar, como condición que, si se cumplían otros requisitos, permitiría "***obtener las tarifas de alimentación aseguradas según el RD 661/2007** del 25 de mayo*"[1107]. El Informe Fröhlingsdorf, indica que se esperaba mantener ciertos beneficios del RRO[1108]. El Informe Cuatrecasas también toma en consideración la pre-asignación del proyecto Arenales Solar en los términos del RDL 6/2009 e indica que, si se cumple con el requisito del registro definitivo antes del 1 de enero de 2014, "***podrá recibir el régimen retributivo establecido en el Real Decreto 661/2007**, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial ("RD 661/2007") […]*"[1109].

structure its investment in order to adapt it to the potential changes of legal environment". *Parkerings-Compagniet AS c. República de Lituania*, Laudo, Caso CIADI No. ARB/05/8 (11 de septiembre de 2007), ¶ 333 [**CL-0033**].

[1103] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 36; Escrito Post-Audiencia - Segunda Ronda (España), ¶ 87.

[1104] Escrito Post-Audiencia - Primera Ronda (España), ¶ 71.

[1105] Escrito Post-Audiencia - Primera Ronda (España), ¶ 69.

[1106] *Isolux Infrastructure Netherlands, B.V. c. Reino de España*, Laudo, Caso CCE No. V2013/153 (12 de julio de 2016), ¶ 781 [**RL-0090**].

[1107] Arenales Solar PS, S.L. – Due Diligence – Executive Summary, Fröhlingsdorf Abogados, de 5 de junio de 2012 [**C-0031**] (énfasis añadido).

[1108] Cf. también Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 278, refiriéndose al Anexo **C-0031**.

[1109] Informe de Auditoría Legal: Proyecto Termosolar Arenales Solar PS, S.L., Cuatrecasas, Gonçalves Pereira

530. Observa el Tribunal que dos firmas de abogados diferentes (Fröhlingsdorf y Cuatrecasas) llegan a la misma conclusión en sus informes de *due diligence*: que la inscripción de Arenales Solar en el registro de preasignación era una fuente de estabilidad del marco regulatorio relevante para la inversión[1110].

531. Los mencionados informes también ponen de manifiesto la importancia que se dio a otras normas que desarrollaron el régimen económico especial como el RDL 6/2009, el RD 1614/2010 y en especial a la moratoria del RDL 1/2012[1111]. En efecto, como señala la Demandante, ellos indican: *(i)* la relación entre el diseño de la Planta Arenales Solar (capacidad inferior a 50 MW) con la finalidad de asegurar la aplicación del RD 661/2007[1112]; *(ii)* la relevancia del registro de preasignación para la decisión de Steag de invertir en Arenales Solar[1113]; y *(iii)* el acceso a los informes con anterioridad al 8 de junio de 2012[1114].

532. Estos elementos fueron fundamentales para la decisión de Steag de acometer una inversión en el proyecto Arenales Solar. En efecto, la Demandante ha explicado que los informes fueron puestos a consideración de los análisis internos presentados a los órganos de Steag[1115]. El Sr. Voswinkel insistió en el registro de pre-asignación como uno de los puntos fuertes de su proceso de inversión[1116]. Haciendo referencia al propósito del "*due diligence*" legal que se llevó a cabo, el Sr. Voswinkel explicó: "*Según nuestra manera de ver las cosas lo que analizamos fue la base para el sistema de tarifa regulada de los feed in tariff; si ha habido cambios, sí o no, y **cuál fue la situación en el momento en que íbamos a entrar y cómo iba a desarrollarse en el futuro. Y esta evolución es de la mayor importancia, porque muestra si el proyecto es factible a través del tiempo o no**"*[1117].

### c) Objeto de la expectativa

533. Las expectativas legítimas relevantes para la determinación de una violación del estándar de TJE del artículo 10(1) del TCE son aquellas que existían al tiempo de la inversión, que en este caso es el 8 de junio de 2012. El momento de la inversión marca, además, una diferencia fundamental con las circunstancias fácticas analizadas por diferentes tribunales bajo el TCE. En el contexto del SEE y de las medidas adoptadas por España con posterioridad al Decreto 661/2007, no es lo mismo invertir, por ejemplo, en el año 2009 que en el año 2012. Para determinar qué expectativas podía tener Steag para junio de 2012 es preciso en primer lugar atender a la evolución del marco normativo aplicable hasta ese momento.

---

S.L.P., de 26 de julio de 2011 [**C-0017**] (énfasis añadido).

[1110] Cf. Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 248, ss., 251-252 y 265; Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 55, ss.

[1111] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 283.

[1112] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 340, ss.

[1113] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 281, 349, ss. y 399, ss. La Demandante explica en detalle cómo se desarrolló el proceso interno de toma de decisión en el ¶ 282.

[1114] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 269-272.

[1115] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 250.

[1116] Cf. Escritos post-audiencia Demandada, ¶ 87.

[1117] Audiencia, Día 2, 411:13-21 (Voswinkel) (énfasis añadido).

534. El Tribunal ha establecido que la obtención de la resolución de inscripción en el registro de preasignación[1118] podía generar expectativas legítimas. También está claro que la inscripción en el registro de pre-asignación de retribuciones fue una circunstancia específicamente considerada en los informes de *due diligence* realizados con anterioridad a la fecha de la inversión. Las Partes disputan, sin embargo, cuál era el objeto de la expectativa de Steag.

535. La Demandante explica que, dentro del marco regulatorio que España diseñó para atraer inversiones, "*[l]os operadores consideraron que tras la inscripción en el RAIPRE, los proyectos gozarían de impulso a la luz del marco regulatorio del RD 661/2007*"[1119]. Específicamente, Steag alega que "*España generó en la Demandante la legítima expectativa de que la regulación de la energía solar termoeléctrica para instalaciones inscritas en el registro de pre-asignación de retribuciones no sufriría drásticos cambios*"[1120]. La Demandante afirma que, en su entender, "***las tarifas aplicables a la energía solar termoeléctrica** sólo se revisarían a futuro y no afectarían de manera negativa a las Plantas Existentes*"[1121]. Para España, esta expectativa carece de fundamento, porque el derecho español garantizaba únicamente una rentabilidad razonable y no la petrificación del régimen regulatorio[1122].

536. El Tribunal comienza por observar que las Partes coinciden en que el derecho español garantiza una rentabilidad razonable. Para el tiempo de la inversión, la rentabilidad razonable había sido una constante en la evolución del ordenamiento jurídico español. El principio de rentabilidad razonable aparece en la LSE de 1997[1123], en el RD 436/2004[1124], el RDL

---

[1118] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**].

[1119] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 379.

[1120] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 349, ss.

[1121] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 373 (énfasis añadido).

[1122] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 908, 910.

[1123] El artículo 30.4 de la LSE de 1997 preveía para las instalaciones del régimen especial que "*[p]ara la determinación de las primas se tendrá en cuenta el nivel de tensión de entrega de la energía a la red, la contribución efectiva a la mejora del medio ambiente, al ahorro de energía primaria y a la eficiencia energética, y los costes de inversión en que se haya incurrido, **al efecto de conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales***" [**CL-0008**; **R-0003**] (énfasis añadido).

[1124] La Disposición Adicional Primera del RD 436/2004 decía: "*El régimen económico de estas instalaciones tendrá en cuenta especialmente su contribución efectiva a la mejora del medio ambiente, al ahorro de energía primaria y a la eficiencia energética, y tendrá en cuenta los costes de inversión en que hayan incurrido, al efecto de conseguir unas **tasas de rentabilidad razonables con referencia al coste del dinero en los mercados de capitales***" [**CL-0015**; **R-0082**] (énfasis añadido).

7/2006[1125], el RD 661/2007[1126], el RD 1614/2010[1127] y el RDL 1/2012[1128]. En ese sentido, este Tribunal concuerda con la conclusión del laudo dictado en *RREEF c. España*, donde se concluyó que, "*una rentabilidad o beneficio razonable era, sin duda, parte de las garantías otorgadas a los Demandantes – y, de manera más general, a todos los inversores en el sector de ER de España*"[1129]. Lo que se discute en este caso es si Steag tenía una expectativa de estabilidad adicional, más allá del concepto general de rentabilidad razonable al que se referían las disposiciones citadas o, en otras palabras, si Steag tenía una expectativa legítima de que se mantuviera una determinada rentabilidad que se había establecido en su momento por España como rentabilidad razonable.

537.   Tras analizar los argumentos de las partes y los documentos que constan en el expediente, el Tribunal encuentra que Steag sí tenía una expectativa de estabilidad de una determinada rentabilidad que había sido determinada como razonable y que iba más allá del mero concepto general de rentabilidad razonable. Esa expectativa, como se explicará adelante, se refería únicamente a tres elementos del régimen económico del RD 661/2007, a saber: *(i)* tarifas; *(ii)* primas; *(iii)* y límites inferior y superior. Esta conclusión se desprende no solamente del análisis de las normas que, en su conjunto y con anterioridad a la fecha de la inversión, concretan la promesa económica inherente a la inscripción de Arenales Solar en el registro de preasignación, sino de las propias alegaciones y manifestaciones de la Demandante.

> (i)   El significado del registro de pre-asignación de Arenales Solar en el contexto normativo vigente al tiempo de expedición de la resolución de registro

538.   El Tribunal ha constatado que la Resolución de la Dirección General de Política Energética y Minas, fechada el 11 de diciembre de 2009, inscribe a Arenales Solar en el registro de pre-asignación de retribución y "*le otorga el régimen económico regulado en el Real Decreto 661*"[1130]. El alcance de esta resolución sólo puede discernirse analizándola en conjunto con las demás normas del régimen regulatorio que estaban vigentes para ese momento.

---

[1125] El RDL 7/2006, artículo 1.13, que modifica el art. 30 de la Ley 54/1997 hace referencia a la meta de "*conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*" [**R-0071**] (énfasis añadido).

[1126] El artículo 44(3) del RD 661/2007, que se refería a la revisión de tarifas, primas, complementos y límites inferior y superior (discutido en la sección 1.3.1 *supra*) decía que las revisiones se surtirían "*garantizando siempre unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*" [**CL-0018**; **R-0084**] (énfasis añadido).

[1127] El Preámbulo del RD 1614/2010 indicaba que "*el régimen de respaldo, tal y como se recoge en su formulación, debe adaptarse, salvaguardando la seguridad jurídica de las inversiones y el principio de rentabilidad razonable, a la dinámica realidad de las curvas de aprendizaje de las distintas tecnologías y a los condicionantes técnicos que afloran con el incremento de la penetración de las mismas en el «mix» de generación*" [**CL-0022**; **R-0088**] (énfasis añadido).

[1128] El artículo 3 del RDL 1/2012 reitera la garantía de "*unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*", inclusive para nuevas instalaciones [**R-0074**].

[1129] *RREEF Infrastructure (G.P.) Ltd. et. al. c. Reino de España*, Decisión sobre responsabilidad y sobre los principios de cuantificación de daños, Caso CIADI No. ARB/13/30 (30 de noviembre de 2018), ¶ 381 [**RL-0140**].

[1130] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**].

539. El punto de partida ha de ser el RD 661/2007[1131], que introdujo un sistema remuneratorio para la producción de energía eléctrica en régimen especial. El sistema de ese decreto establecía, *inter alia*:

(i) La opción de retribución por la opción de tarifa fija o la tarifa regulada, prevista en los artículos 17(c)[1132] y 24(1)[1133]. El artículo 17(c) aclara que "*[e]l derecho a la percepción de la tarifa regulada, o en su caso, prima, estará supeditada a la inscripción definitiva de la instalación en el Registro de instalaciones de producción en régimen especial dependiente de la Dirección General de Política Energética y Minas, con anterioridad a la fecha límite establecida en el artículo 22*"[1134].

(iii) El artículo 2(1)(b)(1) del RD 661/2007 permitía a ciertas instalaciones acogerse al régimen especial, incluyendo "*instalaciones que utilicen como energía primaria alguna de las energías renovables no consumibles, biomasa, o cualquier tipo de biocarburante, siempre y cuando su titular no realice actividades de producción en el régimen ordinario*". La norma establecía ciertas subcategorías de instalaciones. El subgrupo b.1.2 correspondía a las "*[i]nstalaciones que utilicen únicamente procesos térmicos para la transformación de la energía solar, como energía primaria, en electricidad. En estas instalaciones se podrán utilizar equipos que utilicen un combustible para el mantenimiento de la temperatura del fluido trasmisor de calor para compensar la falta de irradiación solar que pueda afectar a la entrega prevista de energía. La generación eléctrica a partir de dicho combustible deberá ser inferior, en cómputo anual, al 12 por ciento de la producción total de electricidad si la instalación vende su energía de acuerdo a la opción a) del artículo 24.1 de este real decreto* [tarifa regulada por kilovatio / hora]. *Dicho porcentaje podrá llegar a ser el 15 por ciento si la instalación vende su energía de acuerdo a la opción b) del citado artículo 24.1* [precio de mercado más prima]*".

(iii) Con fundamento en el artículo 17(b), el derecho a "*[t]ransferir al sistema a través de la compañía eléctrica distribuidora o de transporte su producción neta de energía*

---

[1131] RD 661/2007 [**CL-0018**; **R-0084**].

[1132] Así, el artículo 17(c) del RD 661/2007 dispone que los productores en régimen especial tienen derecho a "*c) Percibir por la venta, total o parcial, de su energía eléctrica generada neta en cualquiera de las opciones que aparecen en el artículo 24.1, la retribución prevista en el régimen económico de este real decreto […]*" [**CL-0018**; **R-0084**].

[1133] El artículo 24.1 del RD 661/2007 dispone que "*1. Para vender, total o parcialmente, su producción neta de energía eléctrica, los titulares de instalaciones a los que resulte de aplicación este real decreto deberán elegir una de las opciones siguientes: a) Ceder la electricidad al sistema a través de la red de transporte o distribución, percibiendo por ella una tarifa regulada, única para todos los períodos de programación, expresada en céntimos de euro por kilovatio-hora. b) Vender la electricidad en el mercado de producción de energía eléctrica. En este caso, el precio de venta de la electricidad será el precio que resulte en el mercado organizado o el precio libremente negociado por el titular o el representante de la instalación, complementado, en su caso, por una prima en céntimos de euro por kilovatio-hora*" [**CL-0018**; **R-0084**].

[1134] El artículo 22.1 del RD 661/2007 se refiere al "*plazo de mantenimiento de las tarifas y primas reguladas*" y dispone que "*1. Una vez se alcance el 85 por ciento del objetivo de potencia para un grupo o subgrupo, establecido en los artículos 35 al 42 del presente real decreto, se establecerá, mediante resolución del Secretario General de Energía, el plazo máximo durante el cual aquellas instalaciones que sean inscritas en el Registro administrativo de instalaciones de producción en régimen especial con anterioridad a la fecha de finalización de dicho plazo tendrán derecho a la prima o, en su caso, tarifa regulada establecida en el presente real decreto para dicho grupo o subgrupo, que no podrá ser inferior a doce meses*" [**CL-0018**; **R-0084**].

*eléctrica o energía vendida, siempre que técnicamente sea posible su absorción por la red*".

(iv) El artículo 17(e) concedía a las instalaciones del régimen especial el derecho de "*[p]rioridad en el acceso y conexión a la red eléctrica en los términos establecidos en el Anexo XI de este real decreto o en las normas que lo sustituyan*".

(v) Conceder una remuneración por la vida útil de las plantas, de conformidad con el artículo 36, que distinguía entre diferentes categorías. Según el Informe de Fröhlingsdorf[1135], Arenales Solar se encontraba clasificada en el grupo b.1.2, que otorga una tarifa regulada c€/kWh de 26,9375 por los primeros 25 años, con una prima de referencia de 25,4000. A partir de la terminación de esos 25 años se toma una tarifa regulada c€/kWh de 21,5498, con una prima de referencia de 20,3200. Para plantas en este grupo se establecía un límite superior c€/kWh de 34,3976 y un límite inferior c€/kWh de 25,4038.

(vi) El artículo 44.1 preveía un mecanismo para la "*actualización y revisión de tarifas, primas y complementos*". El artículo 44.3 preveía, específicamente, "*la revisión de las tarifas, primas, complementos y límites inferior y superior definidos en este real decreto, atendiendo a los costes asociados a cada una de estas tecnologías, al grado de participación del régimen especial en la cobertura de la demanda y a su incidencia en la gestión técnica y económica del sistema, garantizando siempre unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales. Cada cuatro años, a partir de entonces, se realizará una nueva revisión manteniendo los criterios anteriores*". El párrafo segundo de esa disposición disponía que "*[l]as revisiones a las que se refiere este apartado de la tarifa regulada y de los límites superior e inferior __no afectarán a las instalaciones cuya acta de puesta en servicio se hubiera otorgado antes del 1 de enero del segundo año posterior al año en que se haya efectuado la revisión__*"[1136].

540. El Tribunal observa que el segundo párrafo del artículo 44(3) del RD 661/2007 se refiere a las instalaciones cuyas respectivas actas de puesta en servicio precedieran cierta fecha. No está de más resaltar que el RD 661/2007 no hizo referencia alguna al registro de pre-asignación, que sería creado más tarde, con el RDL 6/2009. En cualquier caso, salta a la vista que la estabilidad que prometía el segundo párrafo del artículo 44(3) del RD 661/2007 se refería exclusivamente a las revisiones de la tarifa regulada y de los límites superior e inferior.

541. Es en el año 2009, con la expedición del RDL 6/2009, que se crea el registro de pre-asignación de retribución. La razón de ser de este mecanismo se explica en la parte motiva del RDL, de acuerdo con la cual:

> "*La actual regulación del régimen especial no establece mecanismos suficientes que permitan planificar las instalaciones de este tipo de energías, ni el montante y la distribución en el*

---

[1135] Arenales Solar PS, S.L. – Due Diligence – Executive Summary, Fröhlingsdorf Abogados, de 5 de junio de 2012 [**C-0031**].

[1136] RD 661/2007, art. 44(3) [**CL-0018**; **R-0084**] (énfasis añadido).

*tiempo de las primas de retribución y por tanto el impacto en los costes que se imputan al sistema tarifario.* ***La medida prevista en el Real Decreto-ley, mediante la creación del Registro de pre-asignación de retribución, permite corregir la situación descrita más arriba desde el mismo momento de su entrada en vigor.*** *Permitirá* ***conocer en los plazos previstos en el Real Decreto-ley, las instalaciones que actualmente, no sólo están proyectadas, sino que cumplen las condiciones para ejecutarse y acceder al sistema eléctrico con todos los requisitos legales y reglamentarios, el volumen de potencia asociado a las mismas y el impacto en los costes de la tarifa eléctrica y su calendario.*** *En cualquier caso,* ***se respetan los derechos y expectativas de los titulares de las instalaciones****, configurándose las cautelas precisas y previéndose un régimen transitorio necesario para la adaptación*"[1137].

542.   Del texto mismo de la disposición se observa que el registro de preasignación buscaba proteger los derechos y específicamente las "*expectativas*" de los titulares de las instalaciones. Ello confirma, una vez más, que el registro de preasignación era susceptible de generar expectativas.

543.   En todo caso, la inscripción en el registro de preasignación, en los términos del RDL 6/2009, del 30 de abril, no concedía aún un derecho definitivo al régimen económico del RD 661/2007. De acuerdo con el artículo 4(2) del RDL 6/2009, "*[l]a inscripción en el Registro de pre-asignación de retribución será condición necesaria para el otorgamiento del derecho al régimen económico establecido en el Real Decreto 661/2007, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial*"[1138]. En ese mismo sentido, el Acuerdo del Consejo de Ministros del 13 de noviembre de 2009 resaltaba que, con el artículo 4 del RDL 6/2009, "*se crea un Registro administrativo de preasignación de retribución para las instalaciones de producción de energía eléctrica y se establece que la inscripción en el mismo de los proyectos e instalaciones será* ***condición necesaria para la percepción del régimen económico asociado a su condición de régimen especial***"[1139]. El mismo Acuerdo resaltaba la importancia del registro definitivo (sec. IV). El artículo 4(8) del RDL 6/2009 clarificaba, además, que "*[l]as instalaciones inscritas en el Registro de pre-asignación de retribución dispondrán de un plazo máximo de treinta y seis meses a contar desde la fecha de su notificación, para ser inscritas con carácter definitivo en el Registro administrativo de instalaciones de producción en régimen especial dependiente del órgano competente y comenzar la venta de energía.* ***En caso contrario les será revocado el derecho económico asociado a la inclusión en el Registro de pre-asignación de retribución***"[1140].

---

[1137] RDL 6/2009, Preámbulo [**CL-0020**; **R-0072**] (énfasis añadido).

[1138] RDL 6/2009, art. 4(2) [**CL-0020**; **R-0072**].

[1139] Resolución de 19 de noviembre de 2009, de la Secretaría de Estado de Energía por la que se publica el Acuerdo del Consejo de Ministros de 13 de noviembre de 2009, por el que se procede a la ordenación de los proyectos o instalaciones presentados al registro administrativo de preasignación de retribución para las instalaciones de producción de energía eléctrica, previsto en el Real Decreto-Ley 6/2009, de 30 de abril, por el que se adoptan determinadas medidas en el sector energético y se aprueba el bono social, de 24 de noviembre de 2009 [**R-0098**] (énfasis añadido).

[1140] RDL 6/2009, art. 4(8) [**CL-0020**; **R-0072**] (énfasis añadido).

544. El RDL 6/2009 permite entender el alcance que tenía la Resolución de la Dirección General de Política Energética y Minas, que "*otorga el régimen económico regulado en el Real Decreto 661/2007*" a Arenales Solar PS, S.L, del 11 de diciembre de 2009[1141].

545. El registro de pre-asignación crea expectativas de estabilidad y otorga el régimen económico del RD 661/2007, pero lo hace bajo las condiciones del RDL 6/2009. En el caso de Arenales Solar, el Tribunal observa que la resolución del 11 de diciembre de 2009 hace alusión constante al RDL 6/2009[1142]. La inscripción se realiza de conformidad con la disposición transitoria cuarta, relativa a los requisitos para la pre-inscripción[1143], y con sujeción a la disposición transitoria quinta, sobre el cumplimiento de los objetivos de potencia instalada[1144].

546. El RDL 6/2009 prevé que las instalaciones debían inscribirse definitivamente en el RAIPRE dentro de un plazo determinado y establece que el incumplimiento de ese requisito conllevaría a no tener el "*derecho económico asociado a la inclusión en el registro de pre-asignación de retribución*". Es decir, la resolución de registro en el registro de preasignación no generaba un derecho adquirido, sino que fundamentaba una expectativa – legítima y objetiva – de que, si se cumplía con una serie de requisitos adicionales, se podría acceder al régimen económico del RD 661/2007. El registro, como lo dice el propio RDL 6/2009 y lo reafirma el Acuerdo del Consejo de Ministros del 24 de noviembre de 2009[1145], era una *condición* para llegar a percibir definitivamente el régimen económico del RD 661/2007.

---

[1141] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/200,7 de 25 de mayo de 2007 [**C-0009**].

[1142] La resolución dice: "*De acuerdo con lo previsto en el apartado 1 de la disposición transitoria quinta del referido Real Decreto-ley [RDL 6/2009], el régimen económico de las instalaciones que sean inscritas en el Registro de pre-asignación de retribución en aplicación de lo previsto en la disposición transitoria cuarta del mismo, será el previsto en el Real Decreto 661/2007, de 26 de septiembre*" [**C-0009**].

[1143] RDL 6/2009, Disposición Transitoria Cuarta ("*Instalaciones del régimen especial que a la entrada en vigor del presente real decreto-ley cumplieran los requisitos del Registro de pre-asignación de retribución. Aquellos proyectos de instalaciones, salvo los de tecnología solar fotovoltaica, que a la entrada en vigor del presente real decreto-ley cumplieran los requisitos establecidos en el artículo 4.3, salvo lo previsto en su párrafo i), dispondrán de un periodo de 30 días naturales a contar desde el día de la entrada en vigor del presente real decreto-ley para presentar su solicitud ante la Dirección General de Política Energética y Minas. Así mismo, dispondrán de 30 días naturales adicionales para depositar el aval a que hace referencia el apartado 3.i) del artículo 4 de este real decreto-ley y remitir el resguardo acreditativo a la Dirección General de Política Energética y Minas. Una vez verificado el cumplimiento de los requisitos previos de los proyectos de instalaciones, serán inscritos en el Registro de pre-asignación de retribución*") [**CL-0020**; **R-0072**].

[1144] RDL 6/2009, Disposición Transitoria Quinta ("*Cumplimiento de los objetivos de potencia instalada del régimen especial a la entrada en vigor del presente real decreto-ley. 1. Cuando la potencia asociada a los proyectos inscritos en aplicación de la disposición transitoria cuarta de este real decreto-ley, para un grupo y subgrupo, sea inferior al objetivo de potencia correspondiente establecido en el Real Decreto 661/2007, de 25 de mayo, el régimen económico previsto en el mismo se extenderá hasta el cumplimiento del objetivo considerado. Cuando, por el contrario, la potencia asociada a los proyectos inscritos sea superior al objetivo previsto, el régimen económico establecido en el citado Real Decreto 661/2007, de 25 de mayo, será de aplicación y se agotará con dichas instalaciones inscritas. En este caso, mediante acuerdo del Consejo de Ministros, a propuesta del Ministro de Industria, Turismo y Comercio, se podrá establecer restricciones anuales a la ejecución y entrada en operación de las instalaciones inscritas y la priorización de las mismas al objeto de no comprometer la sostenibilidad técnica y económica del sistema, extendiendo convenientemente, en su caso, el plazo máximo establecido en el artículo 4.8 de este real decreto-ley*") [**CL-0020**; **R-0072**].

[1145] Resolución de 19 de noviembre de 2009, de la Secretaría de Estado de Energía por la que se publica el Acuerdo del Consejo de Ministros de 13 de noviembre de 2009, por el que se procede a la ordenación de los proyectos o

547. El derecho que adquiere Arenales Solar gracias a la resolución del 11 de diciembre de 2009 no es entonces definitivo. La instalación aún debía cumplir las condiciones necesarias para el registro definitivo.

          (ii)   <u>El RD 1614/2010 y la expectativa de estabilidad sobre tarifas, primas y los límites inferior y superior</u>

548. De acuerdo con Steag, en el año 2010, España otorgó a las instalaciones inscritas en el registro de pre-asignación el derecho a una estabilidad reforzada. La Demandante invoca, en primer lugar, el Comunicado ER de 2010.

549. El Comunicado ER en el cual, según Steag, el Estado "*recalcaba el compromiso adquirido en el RD661/2007*" es en realidad una Nota de prensa titulada "*Industria cierra con los sectores eólico y termosolar un acuerdo para revisar sus marcos retributivos*" del Ministerio de Industria, Turismo y Comercio, del 2 de julio de 2010. El mensaje concreto en este documento es que: "*El Ministerio de Industria, Turismo y Comercio ha cerrado con las patronales eólica y termosolar, la Asociación Eólica Empresarial (AEE) y Protermosolar, respectivamente, sendos acuerdos para la revisión de los marcos regulatorios de la producción eléctrica con estas tecnologías*"[1146].

550. Este documento efectivamente habla de un "*pacto*" o "*acuerdo*" entre el Ministerio y los sectores de energía termosolar sobre algunas modificaciones que iba sufrir el régimen regulatorio. El documento dice expresamente *(i)* que las primas de la tecnología eólica previstas en el RD 661/2007 se reducirán un 35% hasta el 1 de enero de 2013; *(ii)* que se impedirá el acceso de las plantas termosolares a la opción de mercado y prima durante un año de operación; *(iii)* que se retrasa la entrada en operación de las plantas termosolares con respecto a la fecha prevista en la ordenación de los proyectos presentados al pre-registro del RDL 6/2009; y *(iv)* que se limita el número de horas con derecho a una retribución sobre el precio del mercado de las plantas eólicas y termosolares[1147].

551. Asimismo, el Tribunal reconoce que en la nota de prensa, el Estado anuncia que reforzará "*la visibilidad y estabilidad de la regulación de estas tecnologías a futuro, garantizándose las primas y tarifas actuales del RD 661/2007 para las instalaciones en operación (y para las incluidas en el pre-registro) a partir de 2013*"[1148].

552. Sin embargo, el Comunicado ER 2010 no tiene el alcance que le quiere dar la Demandante en sus escritos[1149]. El Tribunal considera que este comunicado sirve como información de contexto y revela que, a mediados de 2010, España ya planeaba modificar algunos elementos

---

instalaciones presentados al registro administrativo de preasignación de retribución para las instalaciones de producción de energía eléctrica, previsto en el Real Decreto-Ley 6/2009, de 30 de abril, por el que se adoptan determinadas medidas en el sector energético y se aprueba el bono social, de 24 de noviembre de 2009 [**R-0098**].

[1146] Nota de prensa: "Industria cierra con los sectores eólico y termosolar un acuerdo para revisar sus marcos retributivos" del Ministerio de Industria, Turismo y Comercio, p. 1 [**CL-0021**].

[1147] Nota de prensa: "Industria cierra con los sectores eólico y termosolar un acuerdo para revisar sus marcos retributivos" del Ministerio de Industria, Turismo y Comercio, p. 2 [**CL-0021**].

[1148] Nota de prensa: "Industria cierra con los sectores eólico y termosolar un acuerdo para revisar sus marcos retributivos" del Ministerio de Industria, Turismo y Comercio, p. 2 [**CL-0021**].

[1149] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 386.

del régimen regulatorio de las energías renovables, al mismo tiempo que buscaba garantizar a las empresas registradas cierta estabilidad. Pero el Comunicado ER 2010 no otorgaba derechos económicos específicos.

553. El compromiso de estabilidad específico, claro y objetivo se cristaliza con el RD 1614/2010, del 7 de diciembre. El hito normativo fue el RD 1614/2010, del 7 de diciembre.

554. Para comenzar, en la exposición de motivos del RD 1614/2010 se lee:

> "Por ello, el presente real decreto pretende resolver determinadas ineficiencias en la aplicación del citado Real Decreto-ley 6/2009, de 30 de abril, para las tecnologías eólica y solar termoeléctrica. Éste pretendía asegurar el régimen económico vigente en el Real Decreto 661/2007, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial, a los proyectos que se encontraran en un estado de maduración avanzado"[1150].

555. El artículo 4 del RD 1614/2010 dispone:

> "Artículo 4. Revisiones del régimen económico de las instalaciones de tecnología solar termoeléctrica del Real Decreto 661/2007, de 25 de mayo. Para las instalaciones de tecnología solar termoeléctrica acogidas al Real Decreto 661/2007, de 25 de mayo, **las revisiones de las tarifas, primas y límites inferior y superior**, a las que se refiere el artículo 44.3 del citado real decreto, **no afectarán a las instalaciones** inscritas con carácter definitivo en el Registro administrativo de instalaciones de producción en régimen especial dependiente de la Dirección General de Política Energética y Minas a fecha 7 de mayo de 2009, **ni a las que hubieran resultado inscritas en el Registro de preasignación de retribución al amparo de la disposición transitoria cuarta del Real Decreto-Ley 6/2009**, de 30 de abril, y cumplieran la obligación prevista en su artículo 4.8, extendida hasta el 31 de diciembre de 2013 para aquellas instalaciones asociadas a la fase 4 prevista en el Acuerdo del Consejo de Ministros de 13 de noviembre de 2009"[1151].

556. La *Memoria del Análisis de Impacto Normativo del Proyecto de Real Decreto 1614/2010* indica:

> "Ligado con la medida prevista en el apartado anterior, como compensación a la reducción de la retribución durante el periodo de un año referido, se modifica la redacción del artículo 44 del Real Decreto 661/2007, **asegurando a las instalaciones en funcionamiento y a las preasignadas, el mantenimiento en el**

---

[1150] RD 1614/2010, Preámbulo [**CL-0022**; **R-0088**].
[1151] RD 1614/2010, art. 4 [**CL-0022**; **R-0088**] (énfasis añadido).

**tiempo, además del valor de las tarifas reguladas y límites, también del valor de la prima**"[1152].

557.   Las Partes han discutido *in extenso* el alcance del artículo 4 del RD 1614/2010 y su relación con el artículo 44(3) del RD 661/2007.

558.   Desde la perspectiva de la Demandante, esta disposición efectivamente "*confirmaba que las revisiones tarifarias contempladas en el RD 661/2007 no aplicarían a las instalaciones CSP inscritas*"[1153]. Haciendo alusión a la *Memoria del Análisis de Impacto Normativo del Proyecto de Real Decreto 1614/2010*, citada arriba, Steag afirma que "*España veía que el Régimen Regulatorio Original cincelado por el RD 661/2007 y el RD 1614/2010 suponía un compromiso con las instalaciones de energía solar termoeléctrica*"[1154].

559.   Steag explica que el RD 1614/2010 se expidió en un momento en que España introducía una reforma al régimen aplicable a la energía fotovoltaica, a través del RD 1565/2010[1155]. Para Steag, "*como quiera que se interpreten las reformas del año 2010, lo evidente es que la energía solar termoeléctrica quedó expresamente excluida de esas reformas en el régimen retributivo. De hecho, España reforzó su compromiso para con el sector y para con inversores como los de Arenales Solar a través del RD 1614/2010 y el Comunicado ER 2010*"[1156]. La Demandante considera que la finalidad del RD 1614/2010 era, como se desprende de su exposición de motivos, la salvaguardia de "*la seguridad jurídica de las inversiones y el principio de rentabilidad razonable*"[1157].

560.   Para la Demandante, el RD 1614/2010 introdujo, particularmente en su artículo 2, unos cambios dirigidos a "*adecuar las horas de funcionamiento previstas en el Plan de Energías Renovables 2005-2010 a las que se estaban logrando en la realidad por el efecto de la evolución tecnológica*"[1158]. Y justamente en ese contexto, con el artículo 4 del RD 1614/2010, "*España reconocía que debía compensar a los productores de energía solar termoeléctrica por esta medida que había impactado ligeramente en las Plantas Existente*"[1159]. Ello "*recalcaba el compromiso adquirido en el RD 661/2007*"[1160].

---

[1152] Memoria del Análisis de Impacto Normativo del Proyecto de Real Decreto [1614/2010] por el que se regulan y modifican determinados aspectos relativos a la actividad de producción de energía eléctrica a partir de tecnologías Solar Termoeléctrica y Eólica, 4 de noviembre de 2010. Secretaría de Estado de Energía. DGPEM, p. 7 [**R-0066**] (énfasis añadido).
[1153] Memorial de Demanda, ¶ 50; Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 386.
[1154] Memorial de Demanda, ¶ 50; Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 389.
[1155] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 331.
[1156] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 332.
[1157] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 334.
[1158] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 381, citando las pp. 13, 14 del Anexo **CL-0113**. Cf. también el análisis de Steag de los fines del artículo 2 del RD 1614/2010 (¶ 382), donde cita las pp. 23, 24 del Informe de la CNE sobre la propuesta de Real Decreto por el que se regulan y modifican determinados aspectos relativos al régimen especial, de 14 de septiembre de 2010 [**CL-0114**].
[1159] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 384, 385, citando el artículo 4 del RD 1614/2010 y la Memoria del Análisis de Impacto Normativo del Proyecto de RD 1614/2010 [**R-0066**].
[1160] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 386.

561. En apoyo de su argumento, Steag cita un Estudio Técnico del IDAE, institución de carácter público que se encontraba adscrita al Ministerio de Industria, Energía y Turismo[1161]. En ese documento, publicado en el año 2011, el IDAE decía que "s*e ha acordado el retraso en la entrada en operación de las plantas termosolares con respecto a la fecha prevista en la ordenación de los proyectos presentados al pre-registro del Real Decreto-ley 6/2009* […] *Este pacto supone, asimismo, el refuerzo de la visibilidad y estabilidad de la regulación de estas tecnologías a futuro, garantizándose las primas y tarifas actuales del RD 661/2007 para las instalaciones en operación (y para las incluidas en el pre-registro) a partir de 2013*"[1162]. Steag destaca el uso de los términos "*acuerdo*" y "*pacto*" en el documento.

562. Steag dice que, de los textos normativos, anuncios e informes que reposan en el expediente, puede concluirse que "*España veía que el Régimen Regulatorio Original cincelado por el RD 661/2007 y el RD 1614/2010 suponía un compromiso con las instalaciones de energía solar termoeléctrica*"[1163]. Para la Demandante, las medidas de España y sus anuncios a lo largo de los años "*generaron unas legítimas expectativas en inversores como Steag*"[1164]. La Demandante destaca, en particular, que "***el RD 1614/2010 jugó un papel fundamental*** *en la configuración de las legítimas expectativas de Steag*"[1165].

563. Al mismo tiempo, Steag clarifica en su Memorial de Réplica sobre el Fondo que "*[l]a postura de la Demandante no es que* el *Régimen Regulatorio Original fuera inmutable, sino únicamente que a lo largo de un extenso período de tiempo España anunció que las tarifas aplicables a la energía solar termoeléctrica sólo se revisarían a futuro y no afectarán de manera negativa a las Plantas Existentes*"[1166].

564. La Demandada cuestiona la interpretación que hace Steag de las disposiciones mencionadas. Según España, estas normas no constituyen una cláusula de estabilización, ni fundamentan una expectativa objetiva de petrificación del régimen retributivo a partir del registro en el RAIPRE. En relación con el artículo 44(3) del RD 661/2007, la Demandada presenta dos argumentos.

565. ***Primero***, que del tenor literal del artículo no se puede deducir la existencia de una cláusula de estabilización que congele el marco regulatorio español por un tiempo indefinido[1167]. El texto de la disposición circunscribe su ámbito de aplicación a las revisiones previstas en ese apartado de la norma. Sólo hace referencia a las revisiones "*de la tarifa regulada y de los límites superior e inferior*"[1168]. La norma no otorga estabilidad frente a "cualquier

---

[1161] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 387.
[1162] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 386, citando Evaluación del Potencial de Energía Solar Termoeléctrica, Estudio Técnico PER 2011-2020, IDAE, 2011, pp. 28, 29 [**CL-0116**].
[1163] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 389.
[1164] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 389.
[1165] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 335 (énfasis añadido).
[1166] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 373.
[1167] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 448; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 650.
[1168] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 453.

revisión"[1169]. Así pues, explica España, el artículo 44(3) no impide que haya revisiones dirigidas a evitar sobre-retribuciones o a asegurar la sostenibilidad el SEE y ciertamente no petrifica la opción entre los regímenes de tarifa y prima, ni la actualización por el IPC[1170].

566.   La Demandada traza un paralelo entre el artículo 40(3) del RD 436/2004 y el artículo 44(3) del RD 661/2007. El artículo 40 del RD 436/2004 se refería a "*tarifas, primas, incentivos y complementos*" y usaba un leguaje mucho más restrictivo, diciendo expresamente que las revisiones aplicarían a plantas que entraran en funcionamiento después de la entrada en vigor del decreto y "*sin retroactividad sobre tarifas y primas anteriores*"[1171].

567.   Esta redacción contrasta con la del artículo 44 del RD 661/2007, que no tiene aplicación sobre las primas, los incentivos y los complementos, ni habla de retroactividad[1172]. La Demandada observa que el Tribunal Supremo encontró repetidamente que el artículo en mención no impedía tomar medidas regulatorias, siempre que éstas fueran consistentes con la garantía de una rentabilidad razonable y acordes con la Ley 54/1997[1173].

568.   ***Segundo***, España explica que las normas reglamentarias en materia de energía se encontraban subordinadas a la Ley 54/1997 y, en consecuencia, al principio fundamental de la sostenibilidad del SEE[1174]. En casos como *Charanne* e *Isolux* se decidió que el marco regulatorio no era susceptible de generar la expectativa legítima de que dicho marco no sería alterado por normas como las que fueron adoptadas en 2010[1175].

569.   En relación con el artículo 4 del RD 1614/2010, la Demandada afirma que se trata simplemente de una disposición que, atendiendo a la entrada en vigencia del RDL 6/2009 y al Acuerdo del Consejo de Ministros de 13 de noviembre de 2009, extiende el artículo 44(3) del RD 661/2007 a ciertas instalaciones termosolares[1176]. Específicamente, la norma tiene por objeto extender lo previsto en el artículo 44(3) párrafo 2 del RD 661/2007 a las primas de las instalaciones pre-inscritas[1177].

570.   Retomando su argumento sobre las diferencias entre el artículo 40(3) del RD 436/2004 y el RD 661/2007, España observa que el artículo 40(3) del RD 436/2004 – siendo mucho más restrictivo – no impidió la aplicación de numerosas revisiones a las instalaciones existentes (ej. las revisiones resultantes del RDL 7/2006, el RD 661/2007, el RDL 6/2009, el Acuerdo del Consejo de Ministros de 13 de noviembre de 2009 y el RD 1565/2010)[1178]. Con mayor razón, dice España, los artículos 4 y 5(3) del RD 1614/2010 no podían tener el efecto de

---

[1169] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 449.
[1170] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 451, 452.
[1171] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 459, 460.
[1172] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 460.
[1173] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 461.
[1174] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 455.
[1175] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 463-466.
[1176] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1056.
[1177] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 853. Cf. también ¶¶ 859, 860.
[1178] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 861.

impedir otras revisiones[1179]. El artículo 4 del RD 1614/2010 no constitue entonces una cláusula de estabilización, ni modifica el objeto del artículo 44(3) del RD 661/2007[1180].

571. Para España, el efecto de los artículos 4 y 5(3) del RD 1614/2010 es meramente variar la redacción del artículo 40(3) del derogado RD 436/2004, extender lo dispuesto en el artículo 44(3) del RD 661/2007 a las primas y, finalmente, determinar que ello se aplique a las instalaciones pre-inscritas.[1181] A juicio de la Demandada, no es entonces correcta la interpretación que hace el inversionista en cuanto a que la norma impide al regulador "*revisar el régimen económico vigente, cuando la necesidad de garantizar la sostenibilidad del SEE y la garantía de la rentabilidad razonable así lo exijan*"[1182]. España insiste en que la constante de las normas aplicables a la retribución de productores de energía es la garantía de una rentabilidad razonable y no la petrificación del régimen regulatorio[1183].

572. Las Partes disputan también el objetivo que perseguían las normas objeto de análisis. Steag sostiene que el derecho español sobre esta materia estaba dirigido, más que a ajustar los ingresos y costes del SEE, al "*declarado propósito de atraer nuevos inversores*"[1184]. España afirma que el RD 661/2007 nunca fue elemento de una campaña del Estado para cautivar inversionistas y recalca que cualquier inversionista diligente sabía que el marco normativo podía cambiar[1185].

573. A juicio del Tribunal, la evidencia indica que, durante un largo período de tiempo, España efectivamente buscó crear un marco más o menos estable para los inversionistas. Así, inclusive antes del RD 661/2007, el RD 436/2004 ya buscaba consolidar un marco regulatorio para las tarifas especiales que fuera "*duradero, objetivo y transparente*"[1186]. Igualmente, en los preámbulos del RD 661/2007 y RD 1614/2010, relativos al sector de la energía renovable[1187], y en otros documentos como el Plan 2005-2010, se reconoce que, para cumplir los objetivos de política en relación con el sector del CSP, España necesitaba proporcionar incentivos que garantizaran una estabilidad a largo plazo[1188].

574. El Tribunal considera que el texto del artículo 4 del RD 1614/2010 y del artículo 44(3) del RD 661/2007, ambos expedidos con anterioridad a la inversión de la Demandante, deben ser interpretados en el contexto legislativo y reglamentario de la época en que cada uno se expide. Antes de las inversiones de Steag en 2012, tuvieron lugar cambios regulatorios en el sector de las energías renovables que afectaban las instalaciones en funcionamiento. Dichos cambios fueron regulados por el Real Decreto 1565/2010, el Real Decreto 1614/2010 y el RDL 14/2010[1189]. Estos cambios regulatorios de finales de 2010 obviamente debieron ser

---

[1179] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 861.

[1180] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 852.

[1181] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 859, 860.

[1182] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1056.

[1183] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 908, 910.

[1184] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 316.

[1185] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1289, citando en este contexto el ¶ 772 de *Isolux c. España* [**RL-0090**].

[1186] RD 436/2004 [**CL-0015**; **R-0082**]; Memoria Económica del RD 436/2004, p. 2 [**R-0014**].

[1187] RD 661/2007 [**CL-0018**; **R-0084**]; Memoria del proyecto de RD 661/2007 [**R-0065**].

[1188] Plan 2005-2010 [**CL-0016**; **R-0101**].

[1189] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 934. El 19 de noviembre de 2010

tenidos en cuenta por cualquier inversor que pretendiera efectuar una inversión en el sector, como es el caso de la Demandante.

575. Al mismo tiempo, habiendo considerado los argumentos de las Partes sobre los artículos 44(3) del RD 661/2007 y 4 del RD 1614/2010, el Tribunal encuentra razón en que las normas citadas reflejan la intención de otorgar estabilidad en determinados elementos a las instalaciones que estaban en el registro de preasignación. Al menos a la expedición del RD 1614/2010, aplicable a la energía solar termoeléctrica, las instalaciones que estaban inscritas en el registro de preasignación podían esperar legítimamente que se les mantuvieran en el tiempo ciertos elementos del RRO. La propia España reconoce que el RD 1614/2010 hace extensivo el artículo 44(3) del RD 661/2007 a ciertas instalaciones termosolares, en vista de la entrada en vigencia del RDL 6/2009 y del Acuerdo del Consejo de Ministros del 13 de noviembre de 2009[1190].

576. El artículo 4 del RD 1614/2010, aplicable a Arenales Solar como instalación pre-inscrita bajo la disposición transitoria cuarta del RDL 6/2009, protege a esa instalación frente a revisiones específicas. El alcance de esa protección no es ilimitado y no se refiere a todos los elementos económicos del régimen especial del RD 661/2007. A juicio de este Tribunal, es claro que, como dice la Demandante en sus alegaciones sobre sus expectativas, "*el RD 1614/2010 jugó un papel fundamental en la configuración de las legítimas expectativas*"[1191]. Es la misma Demandante la que acepta que las expectativas creadas por la Resolución de registro son las que resultan del RD 661/2007 y del RD 1614/2010, interpretados en su conjunto y no del RD 661/2007 en forma aislada. Para la fecha de la inversión no había fundamento objetivo para extender la expectativa de estabilidad más allá de los tres elementos enumerados en el antedicho artículo 4 del RD 1614/2010: *(i)* tarifas; *(ii)* primas; y *(iii)* límites inferior y superior.

(iii) <u>Los anuncios del año 2011 y la moratoria del RDL 1/2012</u>

577. En el año 2011, España hizo declaraciones importantes respecto del futuro del SEE. Así, la Ley de Economía Sostenible, de marzo de 2011, decía:

> "De acuerdo con esta planificación [energética], la legislación ordenará los incentivos públicos necesarios para satisfacer los objetivos fijados en el apartado anterior, de acuerdo con los siguientes principios: a) Garantía de un retorno adecuado de las inversiones en las tecnologías del régimen especial, que incentive un volumen de instalación compatible con los objetivos establecidos en los planes de energías. […] e) En todos los casos se deberá cumplir que los objetivos se alcanzan teniendo en cuenta los

---

se aprobó el RD 1565/2010, por el que se regulan y modifican determinados aspectos relativos a la actividad de producción de energía eléctrica en régimen especial. El 7 de diciembre de 2010 se aprobó el RD 1614/2010, por el que se regulan y modifican determinados aspectos relativos a la actividad de producción de energía eléctrica a partir de tecnologías solar termoeléctrica y eólica. El 23 de diciembre de 2010 se aprobó el Real Decreto-Ley 14/2010, por el que se establecen medidas urgentes para la corrección del déficit tarifario del sector eléctrico.
[1190] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1056.
[1191] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 335.

principios de eficiencia económica entre las distintas alternativas y de sostenibilidad económica de las medidas que se adopten"[1192].

578. En diciembre de 2011, en su discurso de investidura, el Presidente del Gobierno, Mariano Rajoy Brey, expresamente aludió a la necesidad de llevar a cabo reformas estructurales en materia de energía debido a la situación económica de déficit de tarifa:

> "Hemos de ser muy conscientes de que España tiene un problema energético importante, especialmente en el sector eléctrico, con un déficit anual que supera los 3.000 millones de euros y una deuda tarifaria acumulada de más de 22.000 millones. Las tarifas eléctricas para consumidores domésticos son las terceras más caras de Europa, y las quintas más elevadas para consumidores industriales. [...] Si no se emprenden reformas, el desequilibrio será insostenible y los incrementos de precios y tarifa colocarían a España en la situación de mayor desventaja en costes energéticos de todo el mundo desarrollado. **Tendremos, pues que aplicar una política basada en frenar y reducir los costes medios del sistema**, en la que se tomen las decisiones sin demagogia, utilizando todas las tecnologías disponibles, sin excepciones, y se regule teniendo como objetivo primordial la competitividad de nuestra economía"[1193].

579. Estos anuncios permitían anticipar que habría cambios. Pero no indicaban que esos cambios fueran a afectar los beneficios económicos que el artículo 4 del RD 1614/2010 otorgaba a las instalaciones inscritas en el registro de pre-asignación.

580. Con posterioridad a la expedición del RD 1614/2010 y algunos meses antes de la fecha de la inversión de Steag, España introdujo la moratoria en la inscripción de nuevas instalaciones de energía eléctrica a través del RDL 1/2012, del 27 de enero.

581. El objeto del RDL 1/2012, en los términos del artículo 1 del mismo, consistía en "*a) La supresión de los incentivos económicos para las instalaciones de producción de energía eléctrica en régimen especial y para aquellas de régimen ordinario de tecnologías asimilables a las incluidas en el citado régimen especial que se detallan en el artículo 2.1. b) La suspensión del procedimiento de preasignación de retribución para el otorgamiento del régimen económico primado*"[1194].

582. El artículo 2 del RDL 1/2012, que define su ámbito de aplicación, da un clarísimo alcance material al registro en el registro de preasignación:

---

[1192] Ley 2/2011, de 4 de marzo de 2011, de Economía Sostenible ("**Ley 2/2011**"), Art. 79.4, *lit.* a y d [**R-0062**].
[1193] Discurso de Mariano Rajoy en la sesión de investidura como presidente del Gobierno, Congreso de los Diputados de 19 de diciembre de 2011, p. 11 [**R-0173**] (énfasis añadido).
[1194] Real Decreto-Ley 1/2012, de 27 de enero de 2012, por el que se procede a la suspensión de los procedimientos de preasignación de retribución y a la supresión de los incentivos económicos para nuevas instalaciones de producción de energía eléctrica a partir de cogeneración, fuentes de energía renovables y residuos ("**RDL 1/2012**") [**R-0074**].

"1. El presente real decreto-ley será de aplicación a las siguientes instalaciones:

a) Aquellas instalaciones de régimen especial que a la fecha de entrada en vigor del presente real decreto-ley **no hubieran resultado inscritas en el Registro de preasignación de retribución** previsto en el artículo 4.1 del Real Decreto-ley 6/2009, de 30 de abril, por el que se adoptan determinadas medidas en el sector energético y se aprueba el bono social.

[…]

2. El presente real decreto-ley **no será de aplicación a las instalaciones de régimen especial que hubieran presentado solicitud de inscripción en el Registro de preasignación de retribución**, cuando el correspondiente plazo de resolución, en virtud de lo previsto en los apartados 2 y 3 del artículo 42 de la Ley 30/1992, de 26 de noviembre, de Régimen Jurídico de las Administraciones Públicas y del Procedimiento Administrativo Común, hubiera ya vencido a la fecha de su entrada en vigor"[1195].

583.  Además, el artículo 4 del RDL 1/2012 suspendió el registro de nuevas instalaciones con el registro de pre-asignación.

584.  La Demandante alega que "*[e]sta moratoria fue también fundamental para que la Demandante se interesara por Arenales Solar, al entender que con ella finalizaban definitivamente los ajustes aplicables a las EERR y, en concreto, a la energía solar termoeléctrica*"[1196]. Específicamente, de acuerdo con la Demandante, la moratoria y las normas que la antecedieron llevaron a Steag a entender que Arenales Solar gozaría del RRO durante su vida regulatoria y que esa retribución no se vería reducida[1197]. En palabras de la Demandante, "*[l]a moratoria del RDL 1/2012, la presencia del RD 1614/2010 en relación con el RD 661/2007 y la inscripción en el registro de pre-asignación de retribuciones y en el RAIPRE supusieron las principales fuentes de seguridad para la Demandante en relación con la remuneración que percibiría Arenales Solar por su producción eléctrica*"[1198].

585.  A su turno, la Demandada afirma que Steag interpretó erróneamente el hecho de que estas medidas no afectaran su inversión como un signo de que España no iba a modificar los compromisos existentes que se formalizaron mediante la inscripción en el RAIPRE[1199].

586.  El Tribunal está de acuerdo con la Demandante cuando asevera que la moratoria introducida por el RDL 1/2012 y la inclusión en el registro de preasignación de retribuciones del RDL

---

[1195] RDL 1/2012, art. 2 [**R-0074**] (énfasis añadido).
[1196] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 339. Cf. también ¶ 11.
[1197] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 353, 392, 393 y 395.
[1198] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 401-403.
[1199] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 476.

6/2009, generaban la expectativa de que dicho registro protegía los mecanismos de retribución de la planta[1200].

587.    También encuentra el Tribunal que la estabilidad que se prometía iba más allá de un concepto genérico de rentabilidad razonable. La rentabilidad razonable en general es una garantía concedida no sólo a instalaciones inscritas en el registro de preasignación, sino también a nuevas instalaciones. Así, por ejemplo, el inciso final del artículo 3 del RDL 1/2012, que establece la "*[s]upresión de los incentivos económicos para las nuevas instalaciones*", indica que la determinación de los regímenes económicos específicos se realizará "*teniendo en cuenta unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*"[1201]. De esta manera, bajo la norma citada, una instalación no necesariamente debe estar en el registro de preasignación para que el derecho español le asegure una rentabilidad razonable.

588.    Al mismo tiempo, el Tribunal encuentra que el RDL 1/2012 no alteraba el contenido del artículo 4 del RD 1614/2010. No variaba, entonces, el alcance de la expectativa que generaban las normas anteriores. Como se señaló arriba, la protección se refería a elementos muy específicos del régimen remuneratorio, enunciados en la antedicha norma del año 2010: *(i)* tarifas; *(ii)* primas; y *(iii)* límites inferior y superior.

589.    El Tribunal observa que, para el 8 de junio de 2012, fecha de la inversión, Arenales Solar tenía una legítima expectativa de que se le aplicara el régimen económico resultante de los RD 667/2007 y 1614/2010, si cumplía con ciertas condiciones.

590.    El propio Informe Fröhlingsdorf[1202] señala que: *(i)* Arenales Solar en ese momento ya estaba reconocida como productor en régimen especial, en el grupo b.1.2 del RD 661/2007; *(ii)* la instalación o proyecto están inscritos en el registro de preasignación, en la fase 4, lo que significa que la inscripción definitiva debía ocurrir antes del 31 de diciembre de 2013, "*para obtener las tarifas de alimentación aseguradas según el RD 661/2007*"; y *(iii)* Arenales tiene acceso prioritario, con una potencia de 50 MW en la estación SET Don Rodrigo. El Informe concluía diciendo que "*ARENALES ha cumplido las condiciones generales esenciales para aplicar el régimen tarifario asegurado, pero debe asegurarse de que la instalación se termina en plazo*"[1203].

591.    El inversor solicitó a Fröhlingsdorf Abogados un informe acerca de la situación regulatoria de la Planta Arenales y los permisos de tipo inmobiliario necesarios para operar. En el documento de análisis[1204] firmado el 7 de enero de 2012, se expresa claramente que al momento de realizar su inversión la planta Arenales Solar "*has been entered into the registry of pre-registrations (Registro de Preasignación, Real Decreto Ley 6/ 2009 dated 30/4 and*

---

[1200] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 278.
[1201] RDL 1/2012 [**R-0074**].
[1202] Arenales Solar PS, S.L. – Due Diligence – Executive Summary, Fröhlingsdorf Abogados, de 5 de junio de 2012 [**C-0031**].
[1203] Arenales Solar PS, S.L. – Due Diligence – Executive Summary, Fröhlingsdorf Abogados, de 5 de junio de 2012, ¶ 4(a) [**C-0031**].
[1204] Analysis of the Legal Report Regarding the Current Situation of Approvals and Real Estate Legal, Fröhlingsdorf Abogados, de 7 de enero de 2012 [**C-0032**].

*Real Decreto 1/2012 dated 27 January), initially in phase 3, but on application by ARENALES now in phase 4. As a result, the definitive registration in the Registro Autonómico de Instalaciones de Producción en Regimen Especial (RAIPRE) must be effected before 1 January 2014 **in order to be able to obtain the promised feed-in tariffs according to RD 661/2007** dated 25 May*"[1205].

592.    De la misma manera, el Informe de Cuatrecasas[1206] indicaba que el proyecto Arenales estaba pre-asignado y se encontraba para ese momento en la fase 4, lo que significaba que debía surtirse el registro definitivo para el 1 de enero de 2014 y que "*[e]n el **caso en el que** el Proyecto cumpla con dichos plazos **podrá recibir el régimen retributivo establecido en el Real Decreto 661/2007**"*[1207].

(iv)    Conclusión sobre el alcance de la expectativa legítima de Steag

593.    Después de analizar en conjunto el RD 661/2007, el RDL 6/2009, el RD 1614/2010 y el RDL 1/2012, el Tribunal ha encontrado que la resolución de inscripción de diciembre de 2009, leída a la luz del RDL 6/2009 y en vista de la promesa de estabilidad formulada en el artículo 4 del RD 1614/2010, también asociada a esa resolución, era susceptible de generar una legítima expectativa de estabilidad sobre algunos elementos en el régimen económico aplicable a Arenales Solar.

594.    Dicha expectativa de estabilidad no se traduce en un "*congelamiento*" de la totalidad del RD 661/2007 frente a Arenales Solar. España fijó en las normas citadas los elementos de lo que consideraba una rentabilidad razonable y Steag obtuvo de España un acto administrativo de carácter particular y concreto que definía los elementos de la rentabilidad razonable si se cumplían ciertos requisitos. La expectativa que objetivamente podía tener y tenía Steag para el 8 de junio de 2012 era que la rentabilidad razonable determinada por España para ese momento se le mantendría, que se le mantendrían las tarifas, primas y los límites inferior y superior a que se refiere el RD 1614/2010, norma que la misma Demandante considera fundamental en sus expectativas. Esa estabilidad se extendería por la vida útil de la planta, siempre y cuando se cumpliera con el requisito del registro definitivo antes del 1 de enero de 2014, requisito que efectivamente se cumplió.

*d) Frustración de las expectativas legítimas de Steag*

595.    La Demandante ha logrado acreditar que tenía una expectativa de estabilidad sobre los elementos de prima, tarifa y límites inferior y superior, en el régimen económico de la planta Arenales Solar, durante la vida útil de la instalación. Steag alega que su expectativa se vio frustrada mediante la adopción gradual del NRR. Concretamente, la Demandante afirma que, después de la realización de la inversión, "*el Gobierno español, bajo la presidencia del Sr.*

---

[1205] Analysis of the Legal Report Regarding the Current Situation of Approvals and Real Estate Legal, Fröhlingsdorf Abogados, de 7 de enero de 2012, ¶ 8 [**C-0032**] (énfasis añadido).
[1206] Informe de Auditoría Legal: Proyecto Termosolar Arenales Solar PS, S.L., Cuatrecasas, Gonçalves Pereira S.L.P., de 26 de julio de 2011 [**C-0017**].
[1207] Informe de Auditoría Legal: Proyecto Termosolar Arenales Solar PS, S.L., Cuatrecasas, Gonçalves Pereira S.L.P., de 26 de julio de 2011, p. 10 [**C-0017**] (énfasis añadido).

*Rajoy Brey, introdujo, con carácter retroactivo, una serie de cambios en el régimen aplicable a las plantas de energía solar térmica (entre las que, por supuesto, se encuentra Arenales Solar) con el argumento de que, de esa forma, conseguiría eliminarse el déficit tarifario español*"[1208].

596.   De acuerdo con Steag, el NRR se configuró a partir de seis hitos normativos[1209]: *(i)* la Ley 15/2012; *(ii)* el RDL 2/2013; *(iii)* el RDL 9/2013; *(iv)* la Ley 24/2013 o LSE de 2013; *(v)* el RD 413/2014; y, finalmente, *(vi)* la Orden Ministerial IET/1045/2014.

597.   La Demandante afirma que las normas del NRR significaron un "*drástico cambio*", cuya gravedad fue aumentando paulatinamente, a medida que se iban adoptando los instrumentos normativos arriba señalados[1210]. Steag describe cómo España fue desmontando, poco a poco, el régimen económico del RD 661/2007 y el RD 1614/2010[1211]. A continuación, el Tribunal entra a examinar cada uno de esos hitos normativos, para examinar hasta qué punto las medidas adoptadas a través de ellos rompen con la expectativa legítima de Steag, relativa a la estabilidad de tarifas, primas y de los límites inferior y superior, en los términos descritos anteriormente.

598.   La **Ley 15/2012**[1212], de 27 de diciembre, de medidas fiscales para la sostenibilidad energética, perseguía el objetivo de armonizar el sistema fiscal con un uso más eficiente y respetuoso con el medioambiente y la sostenibilidad. La reclamación de Steag se refiere a dos medidas introducidas a través de esta Ley.

599.   La primera de ellas fue la creación de un impuesto del 7 % sobre el valor total de toda la energía alimentada a la Red Eléctrica Nacional por los productores de energía (el IVPEE). El Tribunal advierte, de manera preliminar, que el análisis de fondo relativo a la supuesta violación del artículo 10(1) del TCE excluye las alegaciones relativas a la creación del IVPEE del 7%, a través de la Ley 15/2012. El Tribunal ha establecido que carece de jurisdicción sobre este punto, en cuanto el IVPEE es una "*medida impositiva*" bajo el artículo 21(7)(a) del TCE.

600.   La segunda medida fue la eliminación de la posibilidad de vender la energía producida con gas natural con base a la tarifa regulada[1213]. El Tribunal observa que la Disposición Final Primera, numeral 2, de la Ley 15/2012, añade un séptimo apartado al artículo 30 de la Ley 54/1997, del siguiente tenor:

> "7. La energía eléctrica imputable a la utilización de un combustible en una instalación de generación que utilice como energía primaria

---

[1208] Memorial de Demanda, ¶ 88. Cf. también la descripción que hace España del objeto del RDL 2/2013 en el Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 676; Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 3(b).
[1209] Memorial de Demanda, ¶ 89.
[1210] Memorial de Demanda, ¶¶ 91, ss.
[1211] Memorial de Demanda, ¶¶ 91, ss.
[1212] Ley 15/2012 [**CL-0024**].
[1213] Memorial de Demanda, ¶ 91. Cf. también la descripción que hace España de este aspecto de la Ley 15/2012: Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 3(a).

> alguna de las energías renovables no consumibles, no será objeto
> de régimen económico primado, salvo en el caso de instalaciones
> híbridas entre fuentes de energía renovables no consumibles y
> consumibles, en cuyo caso la energía eléctrica imputable a la
> utilización de la fuente de energía renovable consumible sí podrá
> ser objeto de régimen económico primado.
>
> A estos efectos, por orden del Ministro de Industria, Energía y
> Turismo se publicará la metodología para el cálculo de la energía
> eléctrica imputable a los combustibles utilizados"[1214].

601. Esta medida simplemente excluye la energía producida con combustibles como el gas del
régimen especial. Lo que se afecta es, en últimas, la posibilidad que preveía originalmente el
artículo 2(1)(b)(1) del RD 661/2007, que permitía que las instalaciones del subgrupo b.1.2
vendieran dentro del régimen especial electricidad generada a partir de un combustible (en
un porcentaje que puede llegar hasta el 15% de la producción anual cuando se escogía la
opción de precio de mercado más prima, o hasta un 12% si se ha escogido la opción de tarifa
regulada por kilovatio/hora).

602. En relación con esta medida, la pregunta que debe formularse el Tribunal es si la posibilidad
de vender electricidad generada a partir de un combustible dentro del régimen especial hace
parte de las tarifas, primas y los límites inferior y superior, a los que se refiere el RD
1614/2010 y, en consecuencia, de los elementos del RRO a los que se refieren las legítimas
expectativas de Steag. Para el Tribunal, la respuesta a este interrogante no es autoevidente.
En los escritos de Steag se afirma que el RD 661/2007 "*permitía la utilización de gas hasta
un 15 % de la generación total*".[1215] Se dice también que la Ley 15/2012 "*eliminó las primas
para la electricidad generada con gas*".[1216] Para la misma Demandante, la posibilidad de
incluir la energía producida con gas natural es diferenciable y distinta de las medidas relativas
a la tarifa regulada. En efecto, en sus análisis de daños, Steag incluye esta medida dentro de
las medidas impugnadas, como una medida diferenciable de las medidas relativas a la manera
como se ajustaba la tarifa regulada (es decir, el paso al ajuste con referencia al IPC
subyacente), la reducción a cero de la prima de la opción pool más prima y, finalmente, el
cambio en el régimen remuneratorio (es decir, la determinación de la rentabilidad con
referencia a la hipótesis de una instalación tipo)[1217].

603. El Tribunal, no está convencido de que la eliminación de la posibilidad de vender la
producción generada a partir de gas bajo el régimen especial, en los términos de la
Ley 15/2012, tenga por objeto las tarifas, primas y los límites inferior y superior a los que se
refiere el artículo 4 del RD 1614/2010, disposición que no hace referencia explícita a una
garantía de estabilidad sobre la electricidad generada a partir de un combustible. Cuando el
RD 1614/2010 se refiere a la posibilidad de vender energía eléctrica producida por

---

[1214] Ley 15/2012, Disposición final primera [**CL-0024**].

[1215] Memorial de Demanda, ¶ 42.

[1216] Memorial de Demanda, ¶ 91. Cf. también Memorial de Réplica sobre el Fondo y Contestación sobre
Excepciones a la Jurisdicción, ¶ 438 ("*[La Ley 15/2012] eliminó cualquier opción de recibir Prima para la
electricidad generada con gas*").

[1217] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas,
¶¶ 6, ss.

instalaciones de tecnología solar termoeléctrica a partir de combustibles, lo hace en otro contexto, en el artículo 3(3), del que no se desprende una garantía de estabilidad basada en el registro de preasignación.

604. La carga de probar que esta medida específica afectaba una expectativa legítima recae sobre Steag. Excepto por los cálculos de daños, la medida en cuestión simplemente se menciona en algunos apartados de los memoriales de Steag[1218]. Esas menciones no son suficientes para declarar que España incurrió en una violación del estándar de TJE a través de esa medida. Además, la Demandante no demostró que se trate de una medida que afecte la promesa de estabilidad que se desprendía del registro de preasignación y de las normas relativas al mismo. Steag ha hecho énfasis exclusivamente en su expectativa legítima respecto de las tarifas, primas y los límites inferior y superior. Para el Tribunal, la Demandante no presentó una argumentación convincente sobre este aspecto de la Ley 15/2012. Steag no probó que tuviera una expectativa legítima sobre la posibilidad de vender la energía producida con combustibles como el gas bajo el régimen especial.

605. Con el **RDL 2/2013**[1219], se introdujeron dos medidas relevantes para el presente caso. *Primero*, la tarifa regulada dejó de ajustarse con referencia al IPC y se comenzó a ajustar por el IPC subyacente (que excluye los precios de productos energéticos y alimentos no procesados)[1220]. De acuerdo con el artículo 1 del RDL 2/2013:

> "Con efectos desde el 1 de enero de 2013, en todas las metodologías que, estando vinculadas al Índice de Precios de Consumo, rigen la actualización de las retribuciones, tarifas y primas que perciban los sujetos del sistema eléctrico por aplicación de la normativa sectorial, se sustituirá dicho índice por el Índice de Precios de Consumo a impuestos constantes sin alimentos no elaborados ni productos energéticos"[1221].

606. En la exposición de motivos del RDL 2/2013 se explica la razón de ser de esta medida: "*En la normativa de este sector, determinadas metodologías de actualización de la retribución de las diferentes actividades del sector eléctrico están ligadas a la evolución del Índice de Precios de Consumo (IPC), en el cual podrían influir las variaciones impositivas, especialmente relevantes en el pasado año. No resulta adecuado que el incremento de un tributo provoque a su vez incrementos en las retribuciones reguladas del sector eléctrico, cuyos costes no están directamente relacionados con la imposición directa sobre el consumo. Por consiguiente, a fin de utilizar un índice más estable que no sea vea afectado por la volatilidad de los precios de alimentos no elaborados ni de los combustibles de uso doméstico, se establece que todas aquellas metodologías de actualización de retribuciones que se encuentren vinculadas al IPC, sustituyan éste por el Índice de Precios de Consumo a*

---

[1218] Memorial de Demanda, ¶¶ 91, 278; Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 438.

[1219] RDL 2/2013 [**CL-0025**; **R-0077**].

[1220] Memorial de Demanda, ¶ 92. Cf. también la descripción que hace España del objeto del RDL 2/2013 en el Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 676; Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 3(b).

[1221] RDL 2/2013, art. 1 [**CL-0025**; **R-0077**].

*impuestos constantes sin alimentos no elaborados ni productos energéticos*"[1222]. Para el Tribunal, es claro que esta medida afecta la expectativa de Steag, relativa a tarifas, a primas y a los límites inferior y superior.

607.  *Segundo*, de acuerdo con Steag, el RDL 2/2013 "*eliminó totalmente la Opción de percibir la prima, dejando a los productores del CSP la opción de tarifa a precio de mercado o la de tarifa fija*"[1223]. El artículo 2 del RDL 2/2013 modifica algunas disposiciones del RD 661/2007. Entre ellas, se modifican las tarifas y primas aplicables a las instalaciones de la categoría b), previstas en la Tabla 3, en el artículo 36 del RD 661/2007. Cabe recordar que el grupo de Arenales Solar es el b.1.2. Esa tabla era la que establecía la tarifa regulada, la prima de referencia, el límite superior y el límite inferior. El artículo 2 del RDL 2/2013 dispuso:

> "Artículo 2. Modificación del Real Decreto 661/2007, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial. El Real Decreto 661/2007, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial, queda modificado como sigue […] Dos. **En la tabla 3 del artículo 36, se modifica el valor de la prima de referencia de todos los subgrupos, que pasa a tener un valor de 0 c€/kWh y se suprimen los valores de los límites superiores y límites inferiores**"[1224].

608.  El artículo 4, inciso 2, del RDL 2/2013 disponía:

> "Los valores de la prima y los límites superior e inferior aplicables se calcularán a partir de los valores para las instalaciones solares termoeléctricas de 50 MW publicados en la Orden IET/3586/2011, de 30 de diciembre, por la que se establecen los peajes de acceso a partir de 1 de enero de 2012 y las tarifas y primas de las instalaciones del régimen especial, reducidos en el porcentaje que se indique en la citada resolución, los cuales serán actualizados según lo establecido en el artículo 44 del Real Decreto 661/2007 de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial"[1225].

609.  El **RDL 2/2013** elimina la opción de mercado, que permitía a las instalaciones de energía solar termoeléctrica recibir la prima, por lo que sólo podían acudir a la tarifa a precio de mercado o a la tarifa fija. El artículo 3 dispone:

> "[Las] instalaciones de régimen especial que a partir de la entrada en vigor del presente real decreto-ley opten por vender su energía de acuerdo con la opción b) del artículo 24.1 del Real Decreto 661/2007, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial, **no podrán**

---

[1222] RDL 2/2013, Preámbulo [**CL-0025**; **R-0077**].
[1223] Memorial de Demanda, ¶ 92.
[1224] RDL 2/2013, art. 1 [**CL-0025**; **R-0077**] (énfasis añadido).
[1225] RDL 2/2013, art. 4, inc. 2 [**CL-0025**; **R-0077**].

**acogerse con posterioridad al cambio de opción previsto en el apartado 4 del artículo 24 de dicho real decreto**"[1226].

610. En la exposición de motivos del RDL 2/2013 se lee:

> "[T]eniendo en cuenta la volatilidad del precio del mercado de producción, la opción de retribución de la energía generada en régimen especial de prima que complemente dicho precio, hace difícil cumplir el doble objetivo de garantizar una rentabilidad razonable para estas instalaciones, y evitar al mismo tiempo una sobre-retribución de las mismas, que recaería sobre los demás sujetos eléctricos. Por ello, **es necesario que el régimen económico primado se sustente únicamente en la opción de tarifa regulada, sin perjuicio de que los titulares de las instalaciones puedan vender su energía libremente en el mercado de producción sin percibir prima**"[1227].

611. Para el Tribunal, no cabe duda que estas medidas afectaron la expectativa de Steag, relativa a tarifas, a primas y a los límites inferior y superior, en los términos descritos anteriormente.

612. El **RDL 9/2013** fue, según la narrativa de la Demandante, el punto de quiebre[1228]. La Demandante observa que el RD 9/2013 "*modificó el Artículo 34* [sic] *de la Ley del Sector Eléctrico de 1997 y derogó el RD 661/2007 eliminando todo el régimen de tarifas fijas y primas. En definitiva, eliminó el Régimen Regulatorio Original y lo sustituyó por un sistema que provee una 'retribución específica' basada en los costes 'tipo' (pero no reales) por unidad de potencia instalada, más sumas estándares por costes operativos*"[1229].

613. El Tribunal constata que el RDL 9/2013 hace una modificación profunda del artículo 30(4) de la LSE de 1997. En los términos del artículo 1 del RDL 9/2013:

> "[…] Se modifica el artículo 30.4 que queda redactado como sigue:
>
> «4.    Adicionalmente y en los términos que reglamentariamente por real decreto del Consejo de Ministros se determine, a la retribución por la venta de la energía generada valorada al precio del mercado, las instalaciones podrán percibir una retribución específica compuesta por un término por unidad de potencia instalada, que cubra, cuando proceda, **los costes de inversión de una instalación tipo que no pueden ser recuperados por la venta de la energía** y un término a la operación que cubra, en su caso, la diferencia entre los costes de explotación y los ingresos por la participación en el mercado de dicha instalación tipo.
>
> Para el cálculo de dicha retribución específica se considerarán, **para una instalación tipo, a lo largo de su vida útil regulatoria y en**

---

[1226] RDL 2/2013, art. 3 [**CL-0025**; **R-0077**] (énfasis añadido).
[1227] RDL 2/2013, Preámbulo [**CL-0025**; **R-0077**] (énfasis añadido).
[1228] Memorial de Demanda, ¶ 93.
[1229] Memorial de Demanda, ¶ 93.

**referencia a la actividad realizada por una empresa eficiente y bien gestionada**:

a) Los **ingresos estándar** por la venta de la energía generada valorada al precio del mercado de producción.

b) Los **costes estándar** de explotación.

c) El **valor estándar** de la inversión inicial.

A estos efectos, en ningún caso se tendrán en consideración los costes o inversiones que vengan determinados por normas o actos administrativos que no sean de aplicación en todo el territorio español. Del mismo modo, sólo se tendrán en cuenta aquellos costes e inversiones que respondan exclusivamente a la actividad de producción de energía eléctrica.

Como consecuencia de las singulares características de los sistemas eléctricos insulares y extrapeninsulares, podrán definirse excepcionalmente instalaciones tipo específicas para cada uno de ellos.

Este régimen retributivo no sobrepasará el nivel mínimo necesario para cubrir los costes que permitan competir a las instalaciones en nivel de igualdad con el resto de tecnologías en el mercado y que posibiliten obtener una rentabilidad razonable por referencia a la instalación tipo en cada caso aplicable. No obstante lo anterior, excepcionalmente el régimen retributivo podrá incorporar además un incentivo a la inversión y a la ejecución en plazo determinado cuando su instalación suponga una reducción significativa de los costes en los sistemas insulares y extrapeninsulares.

**Esta rentabilidad razonable girará, antes de impuestos, sobre el rendimiento medio en el mercado secundario de las Obligaciones del Estado a diez años aplicando el diferencial adecuado**.

Los parámetros del régimen retributivo podrán ser revisados cada seis años.»"[1230].

614.  El Tribunal constata también que el RDL 9/2013 derogó tanto el RD 661/2007 como el artículo 4 del RDL 6/2009, que creaba el registro de pre-asignación de retribución[1231]. La Disposición Derogatoria Única del RDL 9/2013 dispone:

"1. Quedan derogadas todas las normas de igual o inferior rango en cuanto contradigan o se opongan a lo dispuesto en el presente real decreto-ley.

2. **Quedan derogados expresamente**:

---

[1230] RDL 9/2013, art. 1 [**CL-0026**] (énfasis añadido).
[1231] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 176.

a) El **Real Decreto 661/2007**, de 25 de mayo, por el que se regula la actividad de producción de energía eléctrica en régimen especial.

[…]

c) **El artículo 4, la disposición adicional primera y el apartado 2 de la disposición transitoria quinta del Real Decreto-ley 6/2009**, de 30 de abril, por el que se adoptan determinadas medidas en el sector energético y se aprueba el bono social"[1232].

615. En el preámbulo del RD 9/2013 España reconoce que a partir del año 2012 "*la intervención pública en el sector, y con objeto de corregir los desajustes producidos por la evolución expansiva de las partidas de costes del sistema eléctrico, se han venido adoptando en los últimos años una serie de medidas de carácter urgente que afectan tanto a la partida de costes como a la de ingresos*"[1233]. Dentro de las medidas mencionadas se incluyen el RDL 1/2012, que procede a la suspensión de los procedimientos de pre-asignación de retribución o la Ley 15/2012 que introdujo medidas de carácter excepcional para que los costes del sistema fueran financiados con los ingresos que proceden de los peajes de acceso[1234]. En su parte motiva, el RDL señala que su propósito es articular un nuevo marco regulatorio para dar una "*respuesta global al relevante cambio de las circunstancias experimentado en los últimos años, en términos que obedecen a motivos más que justificados*". Añade que para "*articular este nuevo régimen se procede a la derogación del artículo 4 del Real Decreto-ley 6/2009*"[1235]. Para el Tribunal, las medidas del RD 9/2013 estaban intrínsecamente relacionadas con la expectativa de Steag, en cuanto eliminan el régimen de tarifas fijas y primas del RRO.

616. La **Ley 24/2013**, dice la Demandante, "*eliminó por completo la distinción entre Regímenes ordinario y especial*"[1236]. El Tribunal ha comprobado las afirmaciones de la Demandante. La propia exposición de motivos de la LSE de 2013 (Ley 24/2013) dice: "*El título IV regula la producción de energía eléctrica. **Se eliminan los conceptos diferenciados de régimen ordinario y especial** sin perjuicio de las consideraciones singulares que sea preciso establecer*"[1237]. El artículo 14 de la LSE de 2013 (Ley 24/2013) regula la retribución de actividades y, en su numeral 7, prevé que: "*Excepcionalmente, el Gobierno podrá establecer un régimen retributivo específico para fomentar la producción a partir de fuentes de energía renovables […]*"[1238].

617. La Ley especifica los elementos o características de ese régimen retributivo específico. En el literal a) se indica:

"Este régimen retributivo, adicional a la retribución por la venta de la energía generada valorada al precio del mercado de producción, estará compuesto por un término por unidad de potencia instalada

---

[1232] RDL 9/2013, Disposición derogatoria única [**CL-0026**] (énfasis añadido).
[1233] RDL 9/2013, Preámbulo [**CL-0026**].
[1234] RDL 9/2013, Preámbulo [**CL-0026**].
[1235] RDL 9/2013, Preámbulo [**CL-0026**].
[1236] Memorial de Demanda, ¶ 95 (énfasis añadido).
[1237] Ley 24/2013, Preámbulo [**CL-0009**] (énfasis añadido).
[1238] Ley 24/2013, art. 14 [**CL-0009**].

que cubra, cuando proceda, **los costes de inversión para cada instalación tipo** que no pueden ser recuperados por la venta de la energía en el mercado, y un término a la operación que cubra, en su caso, la diferencia entre los costes de explotación y los ingresos por la participación en el mercado de producción de dicha **instalación tipo**"[1239].

618.  Los parámetros para la remuneración se encuentran definidos en el literal b), que dice:

> "b) Para el cálculo de dicha retribución específica se considerarán, para una **instalación tipo, a lo largo de su vida útil regulatoria** y en referencia a la actividad realizada por una **empresa eficiente y bien gestionada**, los valores que resulten de considerar:
>
> i. Los **ingresos estándar** por la venta de la energía generada valorada al precio del mercado de producción.
>
> ii. Los **costes estándar** de explotación.
>
> iii. El **valor estándar** de la inversión inicial.
>
> A estos efectos, en ningún caso se tendrán en consideración los costes o inversiones que vengan determinados por normas o actos administrativos que no sean de aplicación en todo el territorio español. Del mismo modo, sólo se tendrán en cuenta aquellos costes e inversiones que respondan exclusivamente a la actividad de producción de energía eléctrica.
>
> […]
>
> El régimen retributivo no sobrepasará el nivel mínimo necesario para cubrir los costes que permitan competir a las instalaciones de producción a partir de fuentes de energía renovables, cogeneración de alta eficiencia y residuos en nivel de igualdad con el resto de tecnologías en el mercado y que permita obtener una rentabilidad razonable referida a la instalación tipo en cada caso aplicable. **Esta rentabilidad razonable girará, antes de impuestos, sobre el rendimiento medio en el mercado secundario de las Obligaciones del Estado a diez años aplicando el diferencial adecuado**"[1240].

619.  El Tribunal encuentra que las medidas anteriores tienen por objeto la esencia del régimen retributivo y, por lo tanto, afectan la expectativa de estabilidad en relación con las tarifas, primas y los límites inferior y superior descrita en el párrafo 594 *supra*.

620.  Finalmente, el literal d) de la LSE de 2013 (Ley 24/2013) dispone: "*d) **La energía eléctrica** imputable **a la utilización de un combustible en una instalación de generación que utilice como energía primaria alguna de las energías renovables no consumibles no será objeto de régimen retributivo específico**, salvo en el caso de instalaciones híbridas entre fuentes de*

---

[1239] Ley 24/2013, art. 14, inc. 7(a) [**CL-0009**] (énfasis añadido).
[1240] Ley 24/2013, art. 14, inc. 7(b) [**CL-0009**] (énfasis añadido).

*energía renovables no consumibles y consumibles, en cuyo caso la energía eléctrica imputable a la utilización de la fuente de energía renovable consumible sí podrá ser objeto de régimen retributivo específico […]*"[1241]. Sobre este punto, el Tribunal se remite a la conclusión esbozada en relación con la Disposición Final Primera, numeral 2, de la Ley 15/2012, que había eliminado la posibilidad de aplicar el régimen especial a energía producida con combustibles como el gas[1242].

621. El siguiente hito normativo es el **RD 413/2014**[1243]. La Demandante afirma que el RD 413/2014 introdujo un nuevo criterio para calcular la retribución, basado en la hipótesis del funcionamiento de una planta eficiente[1244]. En particular, dice la Demandante, "*[l]a fuente de esta inestabilidad son los artículos 19 y 20 del RD 413/2014, que fijan respectivamente cómo se procederá a la revisión de la rentabilidad razonable y de los parámetros retributivos*"[1245].

622. El artículo 19 del RD 413/2014 regula la "*[r]evisión del valor sobre el que girará la rentabilidad razonable*" en los siguientes términos:

> "1. El valor sobre el que girará **la rentabilidad razonable de las instalaciones tipo se calculará como la media del rendimiento de las Obligaciones del Estado a diez años en el mercado secundario de los 24 meses previos al mes de mayo del año anterior al del inicio del periodo regulatorio incrementada en un diferencial**.
>
> Las revisiones del valor sobre el que girará la rentabilidad razonable aplicarán en lo que reste de vida útil regulatoria de las **instalaciones tipo**.
>
> 2. Antes del 1 de enero del último año del periodo regulatorio correspondiente, el Ministro de Industria, Energía y Turismo elevará al Consejo de Ministros un anteproyecto de ley en el que se recogerá una propuesta del valor que tomará el diferencial señalado en el apartado anterior en el periodo regulatorio siguiente, de acuerdo con los criterios fijados en el artículo 14.4 de la Ley 24/2013, de 26 de diciembre.
>
> Para fijar este valor, el Ministerio de Industria, Energía y Turismo podrá recabar informe de la Comisión Nacional de los Mercados y la Competencia que deberá emitirse antes del 1 de julio del penúltimo año del periodo regulatorio correspondiente, así como contratar los servicios de una entidad especializada independiente"[1246].

---

[1241] Ley 24/2013, art. 14, inc. 7(d) [**CL-0009**] (énfasis añadido).
[1242] Ley 15/2012, Preámbulo [**CL-0024**].
[1243] RD 413/2014 [**CL-0027**].
[1244] Memorial de Demanda, ¶ 96.
[1245] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 466.
[1246] RD 413/2014, art. 19 [**CL-0027**] (énfasis añadido).

623. A su turno, el artículo 20 del RD 413/2014 regula lo relativo a la "*[r]evisión y actualización de los parámetros retributivos*". Estas disposiciones concuerdan con el preámbulo del RD 413/2014, que dice:

> "Para el cálculo de la retribución a la inversión y de la retribución a la operación se considerará para una **instalación tipo**, los **ingresos estándar por la venta de la energía valorada al precio del mercado**, los **costes estándar de explotación necesarios para realizar la actividad y el valor estándar de la inversión inicial, todo ello para una empresa eficiente y bien gestionada**.

> […]

> La retribución a la inversión y, en su caso, la retribución a la operación permitirán cubrir los mayores costes de las instalaciones de producción a partir de fuentes de energía renovables, cogeneración de alta eficiencia y residuos, de forma que puedan competir en nivel de igualdad con el resto de tecnologías y puedan obtener **una rentabilidad razonable por referencia a la instalación tipo en cada caso aplicable**.

> Adicionalmente, **se concreta la plasmación normativa del concepto de rentabilidad razonable de proyecto, estableciéndolo**, en línea con la doctrina judicial sobre el particular alumbrada en los últimos años, **en una rentabilidad antes de impuestos situada en el entorno del rendimiento medio de las Obligaciones del Estado a diez años en el mercado secundario de los 24 meses previos al mes de mayo del año anterior al de inicio del periodo regulatorio incrementado con un diferencial**"[1247].

624. Para el Tribunal, estas medidas afectaban la propia esencia de la expectativa de estabilidad en materia de tarifas, primas y de los límites inferior y superior, que el RD 1614/2010 había generado en las instalaciones que se encontraban en el registro de pre-asignación de retribución.

625. Finalmente, la Orden Ministerial IET/1045/2014[1248], de 16 de junio de 2014, aprobó los "*parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos*", cuyo preámbulo indica que "*[p]ara el cálculo de la retribución a la inversión y de la retribución a la operación se consideraran para una **instalación tipo**, los **ingresos estándar** por la venta de la energía valorada al precio del mercado, los **costes estándar de explotación** necesarios para realizar la actividad y el **valor estándar** de la inversión inicial, todo ello para una **empresa eficiente y bien gestionada**, a lo largo de su vida útil regulatoria*"[1249]. A juicio del Tribunal, esta medida concreta los elementos de un nuevo

---

[1247] RD 413/2014, Preámbulo [**CL-0027**] (énfasis añadido).
[1248] Orden IET/1045/2014 [**CL-0028**].
[1249] Orden IET/1045/2014, Preámbulo [**CL-0028**] (énfasis añadido).

régimen retributivo y, como tal, afecta la expectativa de estabilidad en materia de tarifas, primas y de los límites inferior y superior.

626. El Tribunal ha considerado en detalle las normas que, según la reclamación de la Demandante, frustraron sus expectativas legítimas. Para el Tribunal es incuestionable que España alteró las tarifas, primas y los límites inferior y superior a que se refieren el RD 661/2007 y el RD 1614/2010. El NRR no solamente introduce cambios al régimen económico de las instalaciones inscritas en el registro de preasignación y en el RAIPRE, sino que altera su propia esencia, determinando la rentabilidad bajo parámetros completamente nuevos como la "*instalación eficiente*" y la rentabilidad determinada con base en una "*instalación tipo*", cuyas características son enteramente determinadas por el Estado español a su exclusivo criterio.

627. Como se indicó anteriormente, para el 8 de junio de 2012 Steag tenía la expectativa legítima de que, si se cumplía con el registro definitivo antes del 1 de enero de 2014, podría gozar de esas tarifas, primas y límites inferior y superior durante la vida útil de la instalación Arenales Solar. La Demandada alteró radicalmente los elementos del régimen remuneratorio que había prometido mantener para las instalaciones que se encontraban en el registro de pre-inscripción. España afectó la expectativa que ella misma había generado acerca del régimen que se aplicaría si el inversor cumplía con la inscripción en el registro de pre-asignación, inscripción que en el caso de la Demandante fue reflejada, como se dijo, mediante un acto de carácter particular y concreto.

628. El Tribunal nota que la defensa de la Demandada ha girado alrededor de los motivos de la reforma. España ha explicado que el NRR fue una respuesta al déficit de tarifa y que responde al objetivo de asegurar el equilibrio y sostenibilidad del SEE[1250]. La Demandada también resalta la situación a la que se enfrentaba el país como resultado de la "*crisis económica internacional*", que generó un riesgo de insostenibilidad del sistema, generando un aumento en las tarifas que paga el consumidor y una reducción de la demanda[1251]. España destaca además que sus medidas cristalizan una política pública racional frente al déficit de tarifa[1252]. Se trató, dice la Demandada, de medidas no discriminatorias, de aplicación general, transparentes y que perseguían la finalidad de asegurar la sostenibilidad del SEE[1253].

629. La Demandada destaca que, bajo el nuevo régimen, un productor diligente y con buena gestión puede alcanzar una rentabilidad razonable y cubrir la inversión, así como los costes de operación[1254]. La Demandada nota que la rentabilidad de la Demandante supera la de otros sectores del sistema eléctrico. (ej. transporte y distribución)[1255]. La Demandada observa que el argumento de Steag se enfoca en la estabilidad que garantizaba el registro en el RAIPRE, y que supuestamente impediría a España ejercer su *ius variandi* respecto de Arenales

---

[1250] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 952-956.
[1251] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 999.
[1252] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1014-1031.
[1253] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1009-1012.
[1254] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 954-956 y 965.
[1255] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1353, citando la Disposición Adicional Décima de la Ley 24/2013, aportada como Anexo **R-0048**.

Solar[1256]. España duda que Steag pudiera esperar que se protegieran sus intereses inclusive a costa del consumidor y de una distorsión del mercado[1257]. Más aún, dice España, las medidas del NRR nunca fueron retroactivas y no podían afectar derechos adquiridos de la Demandante, ya que Steag nunca adquirió un derecho a una retribución por una FIT fija e inamovible[1258]. Para la Demandada, las medidas del NRR son, además, proporcionadas y razonables[1259].

630. Este Tribunal no tiene motivos para cuestionar los fines legítimos que ha perseguido España al realizar ajustes al régimen económico de instalaciones de producción de energía eléctrica, como parte de su política pública en materia energética. El Tribunal no tiene necesidad de entrar a examinar si el NRR era la mejor opción regulatoria a disposición de la Demandada, o si fue o no exitoso en resolver el déficit de tarifa[1260]. Basta con señalar que, para justificar un cambio radical en la manera como se determina la remuneración que obtiene una inversión protegida, no basta con la mera invocación de algún fin de política pública, por loable o importante que éste pueda ser, en este caso para la economía. Lo anterior es particularmente cierto cuando se ha adquirido un compromiso específico frente a un inversionista extranjero, generando expectativas legítimas que motivaron una inversión particular.

631. En el presente arbitraje no se discute en abstracto si la regulación del SEE podía cambiar o no. La Demandante ha explicado que su expectativa no era la inmutabilidad absoluta del marco regulatorio[1261]. Para el Tribunal, el estándar de TJE del artículo 10(1) del TCE no se opone a que España ejerza su poder regulatorio sobre el sector eléctrico. En este caso no está en discusión el *ius variandi* de España. Los Estados pueden modificar su legislación y sus reformas pueden, naturalmente, tener un impacto negativo sobre inversiones protegidas.

632. Sin perjuicio de lo anterior, el TCE sí exige que el Estado ofrezca un marco jurídico, estable y transparente, para las inversiones cubiertas. El artículo 10(1) del TCE hace referencia al fin de crear "*condiciones estables, equitativas, favorables y transparentes para que los inversores de otras Partes Contratantes realicen inversiones en su territorio*". Esta finalidad está en línea con la Carta Europea de la Energía, a la que se hace remisión expresa en el artículo 2 del TCE. Asimismo, dentro de los "*objetivos*" listados en el Título I del TCE se hace referencia a "*la elaboración de marcos jurídicos estables y transparentes que creen las condiciones para el desarrollo de los recursos energéticos*".

633. El artículo 10(1) del TCE no elimina el poder regulatorio del Estado, sino que establece ciertos límites al mismo, protegiendo al inversionista frente a alteraciones en los elementos esenciales del régimen regulatorio que motivó su inversión[1262].

---

[1256] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶¶ 1242, 1243. La Demandada hace también un recuento detallado del argumento de Steag sobre sus supuestas expectativas legítimas en los ¶¶ 1242-1251 del Memorial de Dúplica.

[1257] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 1251.

[1258] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 961 y 966-968.

[1259] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 988, ss.

[1260] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 435, 447 y ss.

[1261] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 349, ss. y 373.

[1262] Cf. *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶¶ 530, 532 [**CL-0130**]; *OperaFund Eco-Invest SICAV PLC y Schwab Holding*

634. En particular, cuando el Estado ha generado una expectativa legítima y, más aún, lo ha hecho a través de un acto particular y concreto, no puede frustrar esa expectativa sin ofrecer una compensación razonable al afectado. Como afirmó el Tribunal en el caso *Charanne c. España*, "*un Estado no puede inducir [a] un inversor a realizar una inversión, generando expectativas legítimas, para luego desconocer los compromisos que hayan generado dichas expectativas*"[1263]. El Estado debe respetar compromisos específicos adquiridos y, en cualquier caso, debe ejercer su *ius variandi* de manera proporcionada y teniendo en cuenta los intereses de los afectados[1264]. En este caso, España podía ejercer su poder regulatorio, pero debía respetar la expectativa que su propia conducta generó en Steag al tiempo de la inversión y que protegía, específicamente, las tarifas, primas y los límites inferior y superior, en los términos del artículo 4 del RD 1614/2010.

635. El Tribunal ha tomado en consideración el argumento de España acerca de la supuesta previsibilidad del NRR para un inversionista diligente, y acerca de la supuesta ausencia de diligencia por parte de Steag en lo que se refiere al riesgo político y legal que suponía una inversión en España en el año 2012[1265]. Dice la Demandada que Steag no tuvo en cuenta riesgos regulatorios, riesgos macroeconómicos y la inminente reforma del RRO[1266]. Para España es incontrovertible que Steag tenía suficiente información sobre la crisis económica[1267] de las energías renovables, sobre el cambio regulatorio anunciado en el Informe de la CNE del 7 de marzo de 2012, y sobre la materialización de dicho cambio a través del proyecto de Ley 15/2012[1268]. A su turno, Steag manifiesta que, pese a haber realizado un *due diligence* razonable y adecuado a las circunstancias de la inversión, los cambios que introdujo el NRR no eran previsibles[1269].

636. El Tribunal encuentra que, más allá de si el inversionista podía esperar o no que hubiera cambios en el RRO en general, lo que no era previsible a la fecha de la inversión es que estos cambios serían aplicados respecto de las tarifas, primas y límites inferior y superior de las instalaciones que, como Arenales Solar, estaban en el registro de preasignación. Más aún, si bien en la primera mitad de 2012 se empezaban a sentir vientos de cambio, los alcances precisos de la reforma al régimen económico de las instalaciones sólo vinieron a vislumbrarse en los años 2013 y 2014. Aún si se aceptara la premisa de que un inversionista diligente debía anticipar un cambio, lo cierto es que no era posible pronosticar la eliminación total de los criterios de tarifa, primas y límites inferior y superior, determinantes para la rentabilidad de Arenales Solar.

637. Pero la conducta de España va más allá. España no sólo alteró los criterios de las tarifas, primas y límites inferior y superior a los que se refería el artículo 4 del RD 1614/2010, sino

---

*AG c. Reino de España*, Laudo, Caso CIADI No. ARB/15/36 (6 de septiembre de 2019), ¶¶ 508, 509 [**CL-0162**].
[1263] *Charanne BV et al. c. Reino de España*, Laudo Final, Caso CCE No. V 062/2012 (21 de enero de 2016), ¶ 486 [**RL-0049**].
[1264] Cf. *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 319, núm. 4 y 5 [**RL-0068**].
[1265] Escrito Post-Audiencia - Primera Ronda (España), ¶ 54.
[1266] Escrito Post-Audiencia - Primera Ronda (España), ¶ 65.
[1267] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 85.
[1268] Escrito Post-Audiencia - Primera Ronda (España), ¶ 65; Escrito Post-Audiencia - Segunda Ronda (España), ¶¶ 84, 85.
[1269] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 51, 54.

que además los sustituyó por criterios completamente nuevos, que no aparecían en la regulación vigente al momento de hacer la inversión. Un cambio de esa naturaleza exige, en cualquier caso, una justificación más allá de la mera invocación de fines de política pública. Se debe justificar, de manera plausible y clara, por qué se reemplaza el sistema de tarifas fijas y primas del RRO por el sistema de retribución basado en los costes de una instalación tipo por unidad de potencia instalada. En ese sentido, el Tribunal concuerda con Steag en que no es claro cómo se determinaría el diferencial, ni los criterios como éste se ajustaría[1270]. También asiste la razón a la Demandante cuando nota que, hasta la fecha, nunca ha quedado claro por qué se entendió que la tasa de retorno de los bonos españoles a diez años debía ser la base para la medición del coste del dinero en los mercados de capitales[1271].

638. En el presente caso, España generó una expectativa de estabilidad reforzada a través de las normas que regían el registro de preasignación y la resolución de registro de Arenales Solar que, en sus propios términos, "*otorga el régimen económico regulado en el Real Decreto 661/2007*"[1272]. Esa expectativa se concreta en el año 2010, cuando se promete que se mantendrán las tarifas, primas y los límites inferior y superior a que se refiere el artículo 4 del RD 1614/2010. Esa estabilidad se extendería por la vida útil de la planta, siempre y cuando se cumpliera con el requisito del registro definitivo antes del 1 de enero de 2014. Un nuevo régimen retributivo, radicalmente distinto al del RD 661/2007 y que aplica plenamente a Arenales Solar, quiebra esa expectativa y constituye una violación del estándar de TJE del artículo 10(1) del TCE.

639. Específicamente, la expectativa se vio vulnerada por tres medidas: *(i)* el cambio en la manera como se ajustaba la tarifa regulada, que dejó de ajustarse con referencia al IPC, para ser ajustada en adelante con referencia al IPC subyacente (que excluye los precios de productos energéticos y alimentos no procesados); *(ii)* la reducción a cero de la prima de la opción pool + prima, que supuso el paso a una tarifa fija; y, finalmente, *(iii)* la sustitución del régimen remuneratorio preexistente por un nuevo régimen remuneratorio, que determina la rentabilidad con base en la hipótesis de una "*instalación tipo*".

640. En cambio, no se encontró una reclamación suficientemente determinada y clara respecto de la supuesta frustración de una expectativa legítima de Steag a través de la eliminación de la posibilidad de vender la electricidad producida con gas bajo la tarifa regulada. Por otra parte, como se señaló anteriormente, el Tribunal no tiene jurisdicción para decidir sobre la supuesta violación del artículo 10(1) del TCE a través de la introducción del IVPEE.

### 3.2.  La estabilidad del marco regulatorio relevante para la inversión

641. La Demandante argumenta que el artículo 10(1) del TCE, aunque no constituye una cláusula estabilizadora, protege al inversionista frente a un "*cambio total e irrazonable del marco*

---

[1270] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 469, 470.
[1271] Memorial de Demanda, ¶ 143.
[1272] Resolución de la Dirección General de Política Energética y Minas por la que se inscribe en el Registro de pre-asignación de retribución la instalación ARENALES cuyo titular es ARENALES SOLAR PS, S.L., a la que se le otorga el régimen económico regulado en el Real Decreto 661/2007, de 25 de mayo de 2007 [**C-0009**].

*regulatorio*"[1273]. Para Steag, hay una garantía de "*estabilidad fundamental*" respecto de las 'características esenciales' del marco jurídico vigente al momento de la inversión[1274].

642. El Tribunal observa que, en los escritos de la Demandante, estos alegatos están entremezclados con los argumentos relativos a la frustración de las expectativas legítimas de Steag. No hay un argumento suficientemente diferenciado.

643. En cualquier caso, este Tribunal ya encontró que España incurrió en una violación del artículo 10(1) del TCE al frustrar las expectativas legítimas de Steag, fundadas en los compromisos específicos adquiridos por España frente a la instalación Arenales Solar. Por ese motivo, no es necesario entrar a analizar la hipótesis de una posible infracción del TCE en ausencia de una expectativa legítima.

## B.    PROTECCIÓN Y SEGURIDAD COMPLETAS

### 1.    Posición de la Demandante

644. La Demandante hace una muy breve referencia a "*las previsiones del TCE relativas a la* […] *protección* […] *que el Estado receptor debe conceder a las inversiones*"[1275].

### 2.    Posición de la Demandada

645. La Demandada responde a esta referencia a la obligación de protección, argumentando que España ha cumplido con su obligación de otorgar a Steag protección y seguridad completas[1276]. España resalta que el estándar de "*most constant protection and security*" en el TCE no debe ser sacado de contexto, y no puede entenderse como una garantía de "*condiciones estables, transparentes o razonables al inversor*", que ya están cubiertas por el estándar de TJE.[1277]

646. Destaca la Demandada que Steag no hizo un análisis diferenciado de los dos estándares[1278]. Para la Demandada, el estándar de protección y seguridad – en línea con *El Paso c. Argentina* y *Electrabel c. Hungría* – debe entenderse como una obligación de debida diligencia para prevenir y castigar daños causados por terceros al extranjero, obligación cuyo incumplimiento no ha sido probado por la Demandante[1279].

---

[1273] Memorial de Demanda, ¶ 226. Cf. también Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 242, 409.

[1274] Memorial de Demanda, ¶¶ 231, 232.

[1275] Memorial de Demanda, ¶ 204. Cf. también ¶¶ 205, 206.

[1276] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 974, ss.

[1277] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 976.

[1278] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 977.

[1279] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 978-980, refiriéndose al caso *El Paso Energy International Company c. República Argentina*, Laudo, Caso CIADI No. ARB/03/15 (31 de octubre 2011) [**RL-0041**]. La Demandada también considera el caso *Electrabel S.A. c. Hungría* [**RL-0048**] en este contexto.

3.    Análisis del Tribunal

647.  El Tribunal encuentra que la Demandante no ha presentado un argumento suficientemente claro o diferenciado respecto del estándar de protección y seguridad plenas. Asiste la razón a la Demandada cuando afirma que Steag no ha demostrado el incumplimiento de la obligación de proporcionar protección y seguridad al inversionista, en los términos del artículo 10(1) del TCE.

C.    EXPROPIACIÓN

1.    Posición de la Demandante

648.  La Demandante afirma que, bajo el artículo 13 del TCE, según ha sido interpretado por diversos tribunales[1280], la expropiación de una inversión puede ser directa cuando existe una afectación clara a los derechos de propiedad o indirecta cuando "*la interferencia encubierta o incidental en el uso de la propiedad que tenga como efecto privar al propietario, en todo o en una parte significativa, del uso o de la expectativa razonable de beneficio de la propiedad, incluso si no es necesariamente para el beneficio obvio del Estado receptor de la inversión*"[1281]. Steag cita escritos académicos para explicar que puede existir una expropiación indirecta cuando el derecho del inversionista queda "*intacto pero le priva de la posibilidad de emplear la inversión de forma significativa*"[1282].

649.  Para la Demandante, el problema en este tipo de casos radica en establecer en qué situaciones se configura una expropiación indirecta[1283]. Los tribunales analizan los hechos de acuerdo con cada caso y ponderan diversos factores, como por ejemplo la intensidad de la privación de los derechos de propiedad o el impacto económico en la inversión[1284].

650.  Steag considera que, al examinar la posible existencia de una expropiación indirecta, un tribunal debe analizar si ha ocurrido: *(i)* incremento significativo de impuestos[1285]; *(ii)* la revocación de un estatus de zona de libre comercio[1286]; *(iii)* la denegación de los permisos necesarios para el desarrollo de una actividad[1287]; o *(iv)* incumplimiento de contrato cuando la acción del gobierno hace la ejecución del contrato más onerosa en condiciones discriminatorias[1288]. Como ejemplo, cita los casos *Pope & Talbot c. Canadá*[1289] y *CME c.*

---

[1280] *Metalclad Corporation c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/97/1 (30 de agosto de 2000) [**CL-0051**]; Memorial de Demanda, ¶ 245.

[1281] Memorial de Demanda, ¶ 245, 246.

[1282] Memorial de Demanda, ¶ 247, citando Dolzer / Schreuer, *Principles of International Investment Law*, p. 92 [**CL-0052**].

[1283] Memorial de Demanda, ¶ 247.

[1284] Memorial de Demanda, ¶ 247.

[1285] Memorial de Demanda, ¶ 248, haciendo referencia a *Revere Copper c. OPIC*, Laudo (24 de agosto de 1978) 56 ILR (1980).

[1286] Memorial de Demanda, ¶ 248, haciendo referencia a *Antoine Goetz et al. c. República de Burundi*, Laudo mediante acuerdo, Caso CIADI No. ARB/95/3, (10 de febrero de 1999).

[1287] Memorial de Demanda, ¶ 248, haciendo referencia a *Metalclad Corporation c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/97/01 (30 de agosto de 2000) [**CL-0051**].

[1288] Memorial de Demanda, ¶ 248, haciendo referencia a *Salini Costruttori S.P.A. et al. c. Reino de Marruecos*, Decisión sobre jurisdicción, Caso CIADI No. ARB/00/4 (16 de julio de 2001) [**CL-0146**].

[1289] En *Pope & Talbot Inc. c. Canadá*, el tribunal afirmó que, aunque la sola reducción del valor de la inversión

181

*República Checa*[1290]. La Demandante concluye que el estándar aplicable a este caso debe ser la privación sustancial de la inversión[1291].

651. La tesis de la Demandante es que las medidas adoptadas por España tienen un efecto equivalente a la expropiación pues el NRR eliminó todo el valor de la inversión de Steag en Arenales Solar[1292]. A la fecha, la Demandante alega que no obtiene ningún tipo de beneficio por su participación en la sociedad y que, además, ha tenido que hacer aportes de capital a la misma sociedad como consecuencia de la disminución en los flujos de caja de la operación[1293].

652. La Demandante alega *(i)* que la inversión de Steag está protegida por el TCE frente a medidas equivalentes a la expropiación; y *(ii)* que el NRR privó a Steag sustancialmente de su inversión[1294]. A juicio de Steag, España se equivoca al afirmar que los derechos expropiados deben definirse con base en el derecho local, enfocándose en la distinción entre derechos adquiridos y expectativas bajo la legislación española[1295]. Lo correcto, dice la Demandante, es definir los derechos expropiados con base en el derecho internacional aplicable, que indica que sus inversiones están protegidas bajo el artículo 1(6) del TCE.

653. La Demandante enfatiza en que para resolver este punto de la controversia es necesario tener en cuenta la creación en el año 2009 del registro de preasignación, pues "*con la inscripción en dicho registro un inversor podía tener la legítima expectativa de que recibiría el apoyo financiero derivado del Régimen Regulatorio Original*"[1296]. De la lectura de la exposición de motivos y los artículos 4(5) y 4(8) del RDL 6/2009 se deduce que la inscripción en el registro suponía el reconocimiento del derecho a percibir una retribución determinada[1297]. El derecho a percibir la prima no es meramente hipotético[1298].

654. Para Steag, la regulación adoptada por España en el sector de las energías renovables es ilógica, desproporcional y contraria a la buena fe[1299]. Es inaceptable, afirma la Demandante, que España use su derecho a regular, para dejar de retribuir económicamente a las empresas que usan energía termoeléctrica y además se beneficie por la operación[1300]. La Demandada disfruta de los beneficios medioambientales, aprovecha la curva de aprendizaje que generan las plantas de energía solar, se beneficia de los empleos generados y disfruta de una mayor

---

debido a la regulación gubernamental no es suficiente para declarar una expropiación, la privación total del valor de la inversión sí lo es.

[1290] Memorial de Demanda, ¶ 247, haciendo referencia a Dugan C.F., Wallace D., Rubins N.D. y Sabahi B., *Investor-State Arbitration* (OUP 2008), p. 460 [**CL-0053**]. En el caso *CME c. República* (al que la Demandante hace referencia en el ¶ 250 del Memorial de Demanda) se señaló que existe mayor propensión de atribuir algún tipo de responsabilidad al Estado cuando el valor residual de la inversión disminuye como consecuencia de las medidas regulatorias adoptadas por el Estado.

[1291] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 497.
[1292] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 481.
[1293] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 481.
[1294] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 483.
[1295] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 484.
[1296] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 486.
[1297] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 487.
[1298] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 489.
[1299] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 491.
[1300] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 493.

seguridad energética y geopolítica[1301]. Steag expresó que era imposible asumir el riesgo regulatorio de que los efectos de las medidas pusieran fin a cualquier tipo de beneficio económico que se pudiera esperar bajo el RRO[1302].

655.    De acuerdo con el laudo parcial del caso *Pope & Talbot c. Canadá*, citado por la Demandante, las medidas de carácter regulatorio pueden tener efectos expropiatorios y constituir una expropiación indirecta[1303]. Aunque las medidas de carácter regulatorio sean clasificadas como ejercicio del "*poder de policía*" por el Estado o se adopten para proteger el interés público, como argumenta España, están sujetas al control judicial frente a posibles efectos expropiatorios[1304].

656.    Así pues, explica la Demandante, se puede afirmar que una inversión es expropiada de manera indirecta de comprobarse que perdió su viabilidad económica[1305]. En este caso, el Tribunal debe aplicar el estándar de privación sustancial de la inversión[1306]. Explica Steag que el NRR la privó sustancialmente de su inversión, pues perdió sus derechos económicos derivados del reconocimiento expreso a su filial, su inclusión en el Régimen Especial y el apoyo financiero que recibía de España[1307].

657.    A continuación, la Demandante pasa a explicar y demostrar cada una de las razones por las cuales considera que el NRR la despojó sustancialmente su inversión[1308]. Steag manifiesta que el efecto directo de las medidas regulatorias sobre la inversión fue la reducción en los flujos de caja[1309], lo cual limitó sustancialmente la repartición de dividendos entre los accionistas[1310]. Resalta que algunos de los factores que contribuyeron a esta disminución son la reducción de la remuneración ofrecida a la planta por España y la dificultad para renegociar mejores condiciones con las entidades financieras[1311].

658.    Para la Demandante, España no tiene ningún fundamento fáctico o jurídico para sustentar que las medidas no son permanentes ni generaron una transferencia de activos (por lo que, según España, no afectaron ni privaron sustancialmente a Steag de su inversión)[1312].

659.    En su escrito de réplica, la Demandante analiza algunas decisiones de tribunales internacionales[1313], que describen lo que se considera una medida temporal y lo que sería una

---

[1301] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 493.
[1302] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 494. Steag cita el caso *ADC Affiliate Limited et al. c. Hungría* [**CL-0061**], para reforzar su argumento.
[1303] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 495.
[1304] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 495.
[1305] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 496.
[1306] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 497.
[1307] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 497.
[1308] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 498.
[1309] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 498.
[1310] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 498.
[1311] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 498.
[1312] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 499, 500. La Demandante se refiere en este punto también a la alegación de que Steag no realizó ningún análisis específico del caso para determinar la existencia de una privación sustancial de la inversión y omitió a propósito cualquier mención al IP C-002 aportado junto con el Memorial de Demanda.
[1313] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 500, citando *Wena Hotels Ltd. c. República Árabe de Egipto*, Laudo, Caso CIADI No. ARB/98/4 (8 de diciembre de 2000) [**CL-**

medida permanente, y expresa cierta reserva frente a la aproximación seguida por esos tribunales[1314]. La simple temporalidad de las medidas no debe ser el criterio relevante para determinar si se configura o no una expropiación indirecta; el punto de partida debe ser pregunta: ¿fue Steag privada de su inversión?[1315] La Demandante considera que el Tribunal "*debe adoptar un estándar por el que evalúe el efecto real que el poder regulatorio del Estado ha tenido sobre la inversión controvertida*"[1316].

660.  La manera correcta de medir si los efectos de las medidas privaron sustancialmente a Steag de su inversión es, a juicio de la Demandante, aplicar el estándar del "*valor justo de mercado*" de conformidad con el artículo 13 del TCE[1317]. La Demandante sostiene que el estudio y los cálculos contenidos en los informes de The Brattle Group acreditan la disminución en el flujo de caja cuya consecuencia inmediata fue la pérdida total de la inversión[1318].

## 2.  Posición de la Demandada

661.  Para España, la Demandante parte de una definición incorrecta del concepto de expropiación indirecta[1319]. Cita incorrectamente una serie de laudos arbitrales que no son aplicables a este caso, o no acredita la concurrencia de los requisitos o estándares en ellos analizados[1320]. A pesar de la confusión intencional que según la Demandada pretende generar la Demandante, la Demandada alega que no existen fundamentos para equiparar los efectos de las medidas adoptadas a una expropiación[1321].

662.  En el Memorial de Demanda, la Demandante reconoce que el objeto de la inversión es el "*26,01 % de las acciones de la compañía española Arenales Solar PS, S.L. ('Arenales Solar'), que es una sociedad limitada constituida conforme al ordenamiento jurídico español propietaria del Proyecto Arenales*"[1322]. Partiendo del supuesto que la inversión de Steag son las acciones en Arenales Solar P.S., dice la Demandada, la Demandante no acreditó: *(i)* el derecho que otorgan esas acciones a percibir los subsidios del RD 661/2007 indefinidamente; y *(ii)* que España haya privado sustancialmente al inversionista de su inversión[1323].

663.  De acuerdo con España, la Demandante interpreta parcialmente el apartado (1) del artículo 13 del TCE, con respecto a la inexistencia de una expropiación indirecta por falta de objeto, pues omite dos apartados indispensables para interpretar correctamente lo que dicta el artículo[1324]. De la lectura completa del apartado (3) del artículo 13 del TCE, se debe concluir que la definición de expropiación está condicionada a la existencia de un "*bien*" o derecho

---

0066]; *LG&E Energy Corp. et. al. c. República Argentina*, Decisión sobre responsabilidad, Caso CIADI No. ARB/02/1 (3 de octubre de 2006), ¶¶ 198, 199 [**CL-0038**]; *BG Group Plc. c. República Argentina*, Laudo Final, Caso CNUDMI (24 de diciembre de 2007) [**RL-0061**].

[1314] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 500.
[1315] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 501.
[1316] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 502.
[1317] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 505.
[1318] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 505.
[1319] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1076.
[1320] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1076, 1077.
[1321] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1076, 1077.
[1322] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1078.
[1323] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1079.
[1324] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1080.

de propiedad susceptible de ser despojado[1325]. De acuerdo con esta lectura del artículo 13(3) del TCE, la parte expropiada debe "*probar (i) la existencia del derecho o bien expropiable, conforme al Derecho del Estado anfitrión (ii) su posesión o propiedad, (iii), la existencia de una relación de causalidad entre la medida adoptada por el Estado y (iv) la incidencia de ésta sobre la propiedad de dicho bien*"[1326].

664.  Con respecto al primero de estos requisitos, España dice que "*las Demandantes […] no tienen 'patrimonializado' ningún derecho a obtener un rendimiento ni a gestionar o administrar las sociedades titulares de las Plantas, sino que solamente tiene la expectativa de obtener dividendos futuros y de fiscalizar la administración y dirección de las entidades*"[1327]. Para la Demandada, la inversión de la Demandante no es un bien expropiable[1328], y en este caso se debe acreditar la expropiación de las acciones y no los hipotéticos rendimientos o ingresos de la Planta CSP Arenales[1329]. Según España, Steag no tiene ningún derecho que pueda ser potencialmente expropiado, lo único que tiene es una expectativa sobre unos dividendos futuros que pensó que podía recibir[1330]. La Demandada cita decisiones de distintos tribunales[1331] para sostener que debe acudirse al derecho del Estado anfitrión para delimitar qué derechos o bienes son susceptibles de expropiación[1332]; en este caso se debe analizar entonces cuáles son los derechos que otorga una acción en una sociedad mercantil, conforme a la legislación española[1333]. Resalta España que en ninguno de los escritos de la Demandante se hizo referencia a un bien o un derecho expropiable: Steag simplemente afirma que perdió su inversión, es decir, el valor de sus acciones[1334]. Aunque Steag alega tener un derecho a los subsidios del artículo 36 del RD 661/2007[1335], dice la Demandada, nunca acreditó derecho alguno a percibir los pretendidos subsidios futuros[1336].

665.  La Demandada afirma que recibir subsidios, como consecuencia de tener participaciones indirectas en la SPV titular de la Planta CSP, no cabe dentro del concepto de inversión protegida bajo el artículo 1(6) del TCE[1337]. De acuerdo con la Demandada, no puede haber una expropiación sobre la posible futura adquisición de un bien o derecho hipotético[1338]. Cualquier inversión susceptible de ser expropiada debe consistir en un derecho o activo debidamente constituido, definido, formado y reconocido bajo las leyes del Estado anfitrión[1339]. Las acciones de la Demandante sólo le conceden la expectativa de obtener

---

[1325] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1081.
[1326] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1081, 1082; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1397.
[1327] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1401.
[1328] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1082, 1083.
[1329] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1084.
[1330] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1084.
[1331] *Suez, Sociedad General de Aguas de Barcelona S.A., et al. c. República Argentina*, Decisión sobre responsabilidad, Caso CIADI No. ARB/03/19 (30 de julio de 2010), ¶ 151 [**CL-0126**]; *EnCana Corp. c. República del Ecuador*, Laudo, Caso LCIA No. UN 3481 (3 de febrero de 2006), ¶ 184 [**RL-0027**].
[1332] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1404.
[1333] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1405.
[1334] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1083; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1398.
[1335] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1084.
[1336] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1084.
[1337] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1085.
[1338] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1085, 1086.
[1339] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1088.

dividendos y de fiscalizar la gestión y administración del órgano de administración, pero, en ningún caso, un derecho cierto al dividendo, ni a la administración y gestión directa[1340]. Así, dice España, no existe fundamento jurídico en el derecho internacional[1341], ni tampoco en el derecho español, para afirmar que es posible expropiar derechos hipotéticos y eventuales[1342].

666.    La Demandada alega que sus medidas no son equivalentes a una expropiación[1343], sino adaptaciones regulatorias y no discriminatorias que se han realizado de buena fe, con el fin de proteger el interés público, de manera proporcional, y en cumplimiento del debido proceso[1344]. España alega que tanto la jurisprudencia como la doctrina reconocen que los actos del Estado son una expresión de su poder regulatorio ("*police powers*")[1345]. Añade la Demandada que diferentes tribunales han analizado la diferencia entre una medida regulatoria no sujeta a compensación y una medida equivalente a una expropiación sujeta a compensación[1346].

667.    Según la Demandada, para determinar si una medida regulatoria es una medida equivalente a una expropiación, habría que analizar[1347]: *(i)* si la medida se reconoce como uno de los poderes regulatorios del Estado; *(ii)* el propósito (público) y el efecto de la medida; *(iii)* si la medida es discriminatoria; *(iv)* la proporcionalidad entre los medios empleados y el objetivo perseguido; y *(v)* la naturaleza *bona fide* de la medida[1348]. España dice haber acreditado que las medidas adoptadas no son equivalentes a una expropiación pues son medidas regulatorias razonables y proporcionales, expedidas con el único propósito de proteger el interés público[1349].

668.    En sus escritos, España señaló que la razón para adoptar las medidas adoptadas es la protección del interés público[1350], pues su objetivo principal es el de evitar el colapso del sistema eléctrico[1351] y de la economía española en general, finalidad merecedora de protección. La Demandada no encuentra que las medidas en disputa sean discriminatorias[1352].

---

[1340] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1407-1409.
[1341] *Nations Energy Inc. et al. c. República de Panamá*, Laudo (extracto), Caso CIADI No. ARB/06/19 (24 de noviembre de 2010) [**RL-0040**].
[1342] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1093, 1095.
[1343] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1411.
[1344] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1096; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1411.
[1345] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1097; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1411.
[1346] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1099-1102, citando *Fireman's Fund Insurance Company c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/02/01 (17 de julio de 2006), ¶ 176; *CME Czech Republic B.V. c. República Checa*, Laudo Parcial, Caso CNUDMI (13 de septiembre de 2001), ¶ 603; *Saluka Investments BV c. República Checa*, Laudo Parcial, Caso CNUDMI (17 de marzo de 2006), ¶¶ 255-265 [**RL-0085**]; *El Paso Energy International Company c. República Argentina*, Laudo, Caso CIADI No. ARB/03/15 (31 de octubre 2011), ¶ 240 [**CL-0088**]; Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1099-1102.
[1347] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1104.
[1348] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1412.
[1349] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1412, 1413.
[1350] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1106; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1414.
[1351] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1107; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1414.
[1352] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1108, 1109; Memorial de Dúplica

España afirma que el requisito de la no discriminación exige que la medida no tenga impacto en un solo sujeto y que no se dirija a un grupo de sujetos por razones de raza, nacionalidad o similares[1353]. En este caso está demostrado que las medidas estaban dirigidas a todos los sectores de la sociedad y a todas las tecnologías del régimen especial[1354]. Por estas razones, España no acepta que las medidas aquí analizadas sean desproporcionadas o poco razonables con respecto al fin que perseguían[1355].

669. España considera que las medidas adoptadas no constituyen una expropiación indirecta[1356], pues ninguna de ellas tiene efectos expropiatorios[1357]. El argumento de la Demandada parte de la premisa que el TCE no contiene una definición del término "*expropiación*" que permita entender a qué se refiere con "*medidas de efecto equivalente*" a una expropiación[1358]. Para determinar si una medida tiene un efecto equivalente a una expropiación indirecta, debe emplearse el test decantado en la práctica de los tribunales arbitrales, en particular bajo el TCE[1359]. La aplicación de dicho test resulta en que una medida adoptada por un Estado es equivalente a una expropiación cuando impida al inversor continuar operando sobre su inversión o seguir haciendo uso de ésta, o limite cualquier derecho de propiedad sobre la inversión[1360].

670. España fundamenta su posición en el test utilizado en las decisiones de varios tribunales internacionales[1361]. En los fallos se afirma que una privación sustancial se configura cuando se produce una pérdida de control de la inversión o una eliminación de su valor económico, no siendo suficiente que la inversión haya sufrido efectos adversos[1362]. En este caso, explica la Demandada, que a pesar de que la Demandante afirmó que se le ha privado de su inversión, seguía ostentando el 26.01% de su participación en Arenales Solar PS. S.L., hasta el momento de la venta de sus acciones a Fronterasol, B.V. el 12 de diciembre de 2019[1363] sin que esa propiedad haya sido intervenida por la Demandada de forma alguna[1364].

---

y Réplica de Jurisdicción, ¶¶ 1414, 1415.
[1353] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1108, 1109.
[1354] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1108, 1109.
[1355] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1110; Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1414, 1415.
[1356] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1113.
[1357] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1113.
[1358] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1115.
[1359] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1115.
[1360] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1115, 1116.
[1361] *Electrabel S.A. c. Hungría*, Decisión sobre jurisdicción, derecho aplicable y responsabilidad, Caso CIADI No. ARB/07/19 (30 de noviembre de 2012), ¶¶ 6.53-6.57, 6.63 [**RL-0002**]; *Nykomb Synergetics Technology Holding AB c. República de Letonia*, Laudo, Caso CCE (16 de diciembre de 2003), ¶ 4.3.1 [**CL-0049**]; *CMS Gas Transmission Company c. República Argentina*, Laudo, Caso CIADI No. ARBI/01/8 (12 de mayo de 2005), ¶¶ 262-264 [**CL-0045**]; *Pope & Talbot, Inc. c. Canadá*, Laudo Interino, Caso CNUDMI, (26 de junio de 2000), ¶ 102 [**CL-0124**]; *Sr. Marvin Roy Feldman Karpa c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/99/1 (16 de diciembre de 2002), ¶¶ 152, 153 [**RL-0072**]; *Sempra Energy International c. República Argentina*, Laudo, Caso CIADI No. ARB/02/16 (28 de septiembre de 2007), ¶ 285 [**CL-0101**]; *AES Summit Generation Ltd. et al. c. Hungría*, Laudo, Caso CIADI No. ARB/07/22 (23 de septiembre de 2010), ¶¶ 14.3.1-14.3.4 [**RL-0039**].
[1362] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1127.
[1363] Comunicación de la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V. de 4 de febrero de 2020.
[1364] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1129.

671. Según España, el test debe considerar si las medidas equivalentes a una expropiación tienen un carácter permanente[1365], como lo han exigido otros tribunales[1366]. En este contexto, explica que las medidas adoptadas por el Reino de España en ejercicio de su potestad regulatoria son dinámicas, responden a la necesidad de garantizar la sostenibilidad del SEE, mediante la reducción del déficit y la adaptación de la rentabilidad razonable a los costes reales de los inversores[1367].

672. Asimismo, la Demandada señala que en otros casos[1368] se ha entendido que, cuando las medidas adoptadas por el Estado suponen una mejora para la sociedad en general, y no existe un beneficio económico o una transferencia de activos clara hacia una entidad privada, no puede hablarse de una expropiación[1369].

673. En definitiva, dice España, el test que ha de aplicarse para los casos de expropiación indirecta es el de una privación sustancial de la inversión y los parámetros establecidos por los tribunales arbitrales. La Demandada encuentra que sus medidas: *(i)* no privaron al inversor de su inversión[1370]; *(ii)* suponen una mejora para la sociedad en general, sin incurrir en beneficio económico o transferencia alguna de activos hacia el Gobierno de España o a una entidad privada[1371]; y *(iii)* no afectan a las inversiones de manera permanente[1372]. Por las razones expuestas, la Demandada encuentra que en este caso no se configura una expropiación indirecta[1373].

674. Por último, España alega que, aún si el tribunal aplicara el estándar contenido en las referencias arbitrales[1374] y doctrinales[1375] invocadas por las Demandantes, no podría declararse la ocurrencia de una expropiación[1376]. Steag no acreditó la falta de proporcionalidad y razonabilidad de las medidas adoptada por España respecto del interés público que las motivó[1377]. Tampoco demostró que las mismas impliquen una privación sustancial y permanente de su inversión[1378]. Por el contrario, España afirma haber acreditado que: *(i)* las medidas discutidas obedecen a la potestad regulatoria del Estado, ejercida en un sector económico ampliamente regulado y en atención a garantizar la sostenibilidad del

---

[1365] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1131.
[1366] *Suez, Sociedad General de Aguas de Barcelona S.A., et al. c. República Argentina*, Decisión sobre responsabilidad, Caso CIADI No. ARB/03/19 (30 de julio de 2010), ¶¶ 134, 140 [**CL-0126**]; *BG Group Plc. c. República Argentina*, Laudo Final, Caso CNUDMI (24 de diciembre de 2007), ¶¶ 268-272 [**RL-0061**]; *Ulysseas, Inc. c. República del Ecuador*, Laudo Final, Caso CNUDMI (12 de junio de 2012), ¶ 189 [**RL-0067**].
[1367] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1135.
[1368] *S.D. Myers, Inc. c. Canadá*, Segundo Laudo Parcial, Caso CNUDMI (21 de octubre de 2002), ¶ 287 [**CL-0043**]; *Sr. Eudoro Armando Olguín c. República del Paraguay*, Laudo, Caso CIADI No. ARB/98/5 (26 de julio de 2001), ¶ 84 [**RL-0073**].
[1369] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1136.
[1370] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1141.
[1371] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1142.
[1372] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1143.
[1373] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1144.
[1374] *Metalclad Corporation c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/97/1 (30 de agosto de 2000), ¶¶ 106, 109 [**CL-0051**]; *Técnicas Medioambientales Tecmed S.A. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/00/2 (29 de mayo de 2003), ¶ 115 [**CL-0032**].
[1375] R. Dolzer / C. Schreuer, *Principles of International Investment Law*, p. 92 [**CL-0052**].
[1376] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1145.
[1377] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1150.
[1378] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1150.

sistema, reduciendo el déficit tarifario y eliminando sobre-retribuciones injustificadas, con pleno respeto a la "*rentabilidad razonable*"; *(ii)* no se ha producido privación sustancial alguna, ni del valor económico de la inversión de la Demandante, ni de sus facultades de administración y gestión; *(iii)* las medidas carecen de carácter permanente; y *(iv)* no se ha producido una traslación de valor de la Demandante al Estado[1379].

675. La Demandada añade que la Demandante no acreditó la existencia de un derecho a percibir un determinado nivel de subsidios[1380]. Existen meras expectativas, que no están cobijadas por concepto de inversión del artículo 1(6) del TCE, ni pueden beneficiarse de la protección del artículo 13 del TCE[1381]. Además, al aplicar el test de "*privación sustancial*", se llega a la conclusión que las medidas adoptadas por el Reino de España: *(i)* no significaron una privación sustancial de la inversión; *(ii)* no representan un beneficio económico o transferencia de activos hacia el Gobierno de España o una entidad privada[1382]; y *(iii)* constituyen una regulación proporcional, no discriminatoria, de buena fe, expedida con el fin de proteger intereses públicos, y en cumplimiento del debido proceso[1383]. En conclusión, dice la Demandada, las medidas adoptadas por España no tienen efectos expropiatorios sobre la inversión de la Demandante[1384].

### 3.    Análisis del Tribunal

676. El Tribunal ha encontrado que la Demandada incurrió en una violación del estándar de TJE a través de ciertas medidas que se encontraban enmarcadas dentro del NRR, a saber: *(i)* el ajuste de la tarifa regulada con referencia al IPC subyacente; *(ii)* el paso a una tarifa fija por la reducción a cero de la opción pool más prima; y *(iii)* la introducción de un nuevo régimen remuneratorio basado en el supuesto de una "*instalación tipo*". En lo que se refiere a esas medidas, el Tribunal encuentra innecesario entrar a analizar si ellas, además de ser violatorias del estándar de TJE, son contrarias al artículo 13 del TCE.

677. Una violación del artículo 13 del TCE podría ser entonces relevante si se encuentra que alguna de las medidas respecto de las cuales no se encontró una violación del estándar de TJE tienen efectos expropiatorios. Esas medidas son dos. La primera es el impuesto del 7% sobre la producción de energía, establecido en virtud de la Ley 15/2012. Sobre este punto, el Tribunal ha encontrado que la reclamación acerca del supuesto carácter expropiatorio del impuesto es inadmisible porque Steag no cumplió con el requisito previsto en el Artículo 21(5)(b) del TCE.

678. La segunda medida respecto de la cual no se declaró una violación del estándar de TJE es la eliminación de la posibilidad de vender la electricidad producida con gas bajo la tarifa regulada. Sobre este punto, el Tribunal no encuentra que la Demandante haya presentado un argumento claro sobre el carácter expropiatorio de esa medida. Ni siquiera se ha demostrado

---

[1379] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1154.
[1380] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1157.
[1381] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1158.
[1382] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1159.
[1383] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1160.
[1384] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1161.

que hubiera un derecho adquirido a la tarifa regulada en lo que se refiere a la energía producida con gas.

679. Pero aún si se pasara por alto lo anterior, el Tribunal observa que el punto central de la Demandante es "*que las Medidas adoptadas por España tienen un efecto equivalente a la expropiación: el Nuevo Régimen Regulatorio ha eliminado el valor de la inversión de Steag en Arenales Solar. A día de hoy, la Demandante no obtiene ningún tipo de beneficio de su participación en esta sociedad. Además, ha tenido que inyectar fondos adicionales en la sociedad para evitar su disolución como consecuencia de la reducción de los flujos de caja previstos*"[1385].

680. El Tribunal no puede compartir esta afirmación. Cualquier duda queda disipada en el hecho de que el inversor pudo vender su participación en Arenales Solar en la operación de febrero de 2020[1386]. Steag afirma haber recibido una suma de EUR 9.422.027 por la misma, suma que le fue desembolsada por RREEF[1387]. Cuando un inversionista del mismo mercado está dispuesto a invertir en un proyecto, es claro que no se ha eliminado el valor económico de ese proyecto. Más aún, en uno de sus escritos relativos a la operación de desinversión, la Demandante ha reconocido que su posición contractual "*tenía un indudable valor implícito*" y que, además, "*la posición contractual permitió a Steag obtener una contraprestación por su participación más beneficiosa que la que lograría normalmente*"[1388].

681. En vista de lo anterior, el Tribunal no declarará una violación del artículo 13 del TCE.

**D.   CLÁUSULA PARAGUAS**

### 1.   Posición de la Demandante

682. La Demandante sostiene que España ha vulnerado la llamada cláusula paraguas del artículo 10(1), último inciso, del TCE. Steag circunscribe el ámbito de aplicación de la cláusula paraguas a los supuestos "*compromisos*" asumidos con ella y su inversión en virtud del 'acuerdo de julio de 2010' y el RD 1614/2010[1389]. Según Steag, la Demandada generó en Steag la expectativa de que el entorno regulatorio no sufriría cambios del carácter de los introducidos desde diciembre de 2012, expectativa que goza de protección específica bajo el último inciso del artículo 10(1) del TCE[1390].

---

[1385] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 481.

[1386] Comunicación de la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V., 4 de febrero de 2020, ¶¶ 2, 3.

[1387] Respuesta a los comentarios de España sobre la operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 4.

[1388] Respuesta a los Comentarios de España sobre la Operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 14.

[1389] Memorial de Demanda, ¶ 237.

[1390] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 352.

683. La Demandante argumenta que las obligaciones o compromisos de la Demandada pueden surgir en ausencia de un compromiso contractual, con base en el régimen regulatorio general y las declaraciones unilaterales emitidas por el Estado anfitrión[1391].

684. Para la Demandante, la interpretación de España sobre la limitación de las cláusulas paraguas a obligaciones de naturaleza contractual es incorrecta[1392]. Steag se refiere al caso *LG&E c. Argentina*[1393], donde se analizó la posible cobertura por una cláusula paraguas de las obligaciones que habría asumido la República Argentina al promocionar la inversión extranjera[1394]. También discute el caso *Sempra c. Argentina*[1395], que estimó que la cláusula paraguas podía llegar a cubrir las obligaciones que Argentina asumió frente a los inversionistas[1396].

685. A juicio de Steag, algunas obligaciones adquiridas por España, como la de no congelar las tarifas o sujetarlas al control del precio y no alterar el marco regulatorio, están contenidas en la cláusula paraguas. España se comprometió a mantener el Régimen Regulatorio Original de las centrales solares termoeléctricas[1397]. La Demandante observa que, en *Plama c. Bulgaria*, el tribunal hizo referencia específica al amplio alcance de la cláusula 10(1)[1398], concluyendo que la disposición cubre obligaciones tanto contractuales como estatutarias[1399].

686. La Demandante reconoce en su escrito de réplica que el TCE no exige la congelación del entorno regulatorio[1400]. Una cuestión diferente es si un inversionista determinado podía esperar que las características esenciales del marco regulatorio se mantuvieran intactas durante un período prudente de tiempo[1401]. La interpretación del último inciso del artículo 10(1) del TCE de conformidad con el artículo 31 de la CVDT indica que el tenor literal del precepto no se limita a compromisos de tipo puramente contractual[1402].

---

[1391] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 351. Las cláusulas paraguas incluidas en los tratados de protección de inversiones también protegen los compromisos asumidos de manera implícita por un Estado a través de su actuación política y regulatoria, de manera que un compromiso contractual, como por ejemplo una concesión, no es necesaria para proteger las legítimas expectativas (¶ 354).

[1392] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 361. En este punto, Steag observa que el Estado se fundamenta en un artículo del Profesor T.W. Wälde (**RL-0055**). Para la Demandante, Wälde realmente encuentra que la cláusula paraguas no se limita a obligaciones contractuales (¶ 361). Citando la decisión de jurisdicción del caso *SGS c. Pakistán* [**CL-0110**], Wälde sostiene que las cláusulas paraguas no cubren únicamente obligaciones de carácter contractual o consensual, sino que se extienden a obligaciones de toda naturaleza (¶ 360), de tal manera que su propósito consiste en "*añadir y ampliar la protección otorgada por un tratado de protección de inversiones*" (¶ 361).

[1393] *LG&E Energy Corp. et. al. c. República Argentina*, Decisión sobre responsabilidad, Caso CIADI No. ARB/02/1 (3 de octubre de 2006), ¶ 175 [**CL-0038**].

[1394] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 362.

[1395] *Sempra Energy International c. República Argentina*, Laudo, Caso CIADI No. ARB/02/16 (28 de septiembre de 2007), ¶ 298 [**CL-0101**].

[1396] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 363.

[1397] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 364.

[1398] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 365.

[1399] *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶¶ 185, 186 [**RL-0034**].

[1400] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 366.

[1401] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 366.

[1402] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 367.

687. Las legítimas expectativas de Steag se basan en el marco legal de España y en los compromisos y representaciones explícitos o implícitos del Estado[1403]. Según Steag, varios tribunales arbitrales, tales como *Frontier Petroleum Services Ltd. c. República Checa*[1404], *Binder c. República Checa*[1405], *Toto c. Líbano*[1406], y *Sempra c. Argentina*[1407], han sostenido que un Estado puede asumir compromisos vinculantes con inversionistas extranjeros a través de disposiciones legales[1408]. Cualquier obligación que el Estado haya adquirido, está protegida por el artículo 10(1) del TCE y debe cumplirse[1409].

688. La postura de la Demandante no es que el RRO fuera inmutable, sino que a lo largo de un período de tiempo España anunció que las tarifas aplicables a la energía solar termoeléctrica "*sólo se revisarían a futuro y no afectarían de manera negativa a las Plantas Existentes*"[1410]. España asumió una serie de compromisos unilaterales en el año 2007 y los reafirmó en el año 2010[1411]. Para Steag, el Estado se embarcó en un ambicioso proyecto de publicidad con el fin de atraer nuevos jugadores al sector[1412]. Los anuncios y medidas legislativas adoptadas por España a lo largo de los años generaron legítimas expectativas en inversionistas como Steag[1413].

2.  Posición de la Demandada

689. La Demandada rechaza los argumentos de la Demandante acerca de la supuesta violación de la cláusula paraguas del inciso final del artículo 10(1) del TCE[1414], mediante el incumplimiento de obligaciones supuestamente contraídas por España a través de actos unilaterales[1415].

690. Para la Demandada, la interpretación de la cláusula paraguas que hace la Demandante es errónea, no es fiel al tenor literal del inciso final del artículo 10(1)[1416]. Además, es contraria al concepto de la cláusula paraguas dominante en la práctica de los tribunales internacionales y en la doctrina[1417]. España tampoco se obligó "*vis-á-vis*" con la Demandante ni con su inversión en virtud del marco regulatorio[1418].

---

[1403] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 368, 369.
[1404] *Frontier Petroleum Services Ltd. c. República Checa*, Laudo, Caso CNUDMI (12 de noviembre de 2010), ¶ 285 [**CL-0111**].
[1405] *Binder c. República Checa*, Laudo sobre jurisdicción, Caso CNUDMI (6 de junio de 2007), ¶ 443 [**CL-0072**].
[1406] *Toto Costruzioni Generali S.P.A. c. República Libanesa*, Laudo, Caso CIADI No. ARB/07/12 (7 de junio de 2012), ¶ 159 [**CL-0112**].
[1407] *Sempra Energy International c. República Argentina*, Laudo, Caso CIADI No. ARB/02/16 (28 de septiembre de 2007), ¶ 298 [**CL-0101**].
[1408] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 368, 369.
[1409] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 370.
[1410] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 373.
[1411] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 375.
[1412] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 378.
[1413] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 389.
[1414] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1032; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1356.
[1415] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1357.
[1416] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1358.
[1417] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1036.
[1418] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1358.

691. En particular, España alega que la lectura de la norma que hace la Demandante omite el análisis sobre el término "*entered into*"[1419] y asume equivocadamente que el RD 1614/2010 es un compromiso específicamente acordado con ella, relativo a su supuesta inversión[1420]. Según la opinión mayoritaria[1421], el término "*entered into*" exige la asunción de obligaciones específicas por parte del Estado respecto de un inversionista o una inversión concretos[1422]. La Demandada sostiene que en este caso no hay una fuente de obligaciones particulares entre España y el inversionista: el RD 1614/2010 no tiene esas características pues es general y tiene efectos *erga omnes*[1423].

692. Explica España que no asumió obligaciones específicas con ningún inversor ni inversión en virtud del RD 1614/2010 y el "*acuerdo de julio de 2010*", es decir, no se ha obligado frente a la Demandante a través de actos unilaterales[1424]. La cláusula paraguas no ampara este tipo de obligaciones. Ninguna de las disposiciones legales, ni de las declaraciones oficiales invocadas por la Demandante, contienen compromisos del Estado español amparados por la cláusula paraguas[1425].

693. Según el Estado, la cláusula paraguas no contiene ni obligaciones específicas, ni otorga derechos al inversionista extranjero[1426]. Varios tribunales (ej. *Charanne*, *Isolux* y *Eiser*) han establecido que el RD661/2007 no generaba a favor de los inversionistas compromisos específicos de petrificación normativa[1427]. Para la Demandada, no es posible afirmar que el marco normativo haya generado una expectativa para la Demandante, sea a partir de las normas analizadas o con base en las afirmaciones del Estado o los documentos aportados por Steag[1428].

694. España enfatiza en que tanto el RD 1614/2010 como el "*acuerdo*" se dirigen exclusivamente a los titulares de las plantas y no a quienes tienen participaciones en las sociedades propietarias de las plantas[1429]. Para la Demandada, las obligaciones invocadas por la Demandante solamente podrían referirse a las instalaciones de EERR, pero, en ningún caso, a los terceros tenedores de participaciones y deuda[1430]. Por lo anterior, la Demandada

---

[1419] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1361.

[1420] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1037-1039.

[1421] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1040-1042, haciendo referencia a *Noble Ventures, Inc. c. Rumanía*, Laudo, Caso CIADI No. ARB/01/11 (12 de octubre de 2005), ¶ 51 [**RL-0026**]; *Société Général de Surveillance S.A. c. República de Filipinas*, Decisión sobre objeciones a la jurisdicción, Caso CIADI No. ARB/02/6 (29 de enero de 2004), ¶ 166; y *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 367 [**RL-0068**].

[1422] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1040.

[1423] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1046, 1047.

[1424] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1048.

[1425] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1049, 1050.

[1426] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1050.

[1427] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1053; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1363.

[1428] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1054-1056; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1370.

[1429] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1059.

[1430] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1059.

encuentra que no se ha cumplido el requisito esencial de que las supuestas obligaciones, cualquiera que fuera su origen, se hubieran contraído con Steag o con su inversión[1431].

695.  En cualquier caso, dice la Demandada, España nunca se ha comprometido a garantizar a la Demandante o a su inversión la petrificación del régimen retributivo vigente al momento de la inversión[1432]. El régimen retributivo contenido en el artículo 30(4) de la Ley 54/1997 obliga a dar a los inversionistas un subsidio, pero no concedía un derecho a la congelación del marco normativo[1433]. Resalta la Demandada que, ni en el derecho español, ni en el derecho internacional[1434], existe la obligación que Steag pretende elevar al ámbito internacional a través de la cláusula paraguas[1435]. La única obligación que el derecho español ha generado a favor de los productores de energías renovables es la de darles una "*rentabilidad razonable*"[1436]. España dice que no sustituyó el régimen regulatorio y siempre mantuvo las líneas esenciales del sistema de ayudas públicas[1437]. Añade que realizó algunos ajustes como es práctica común de cualquier Estado, según lo han sostenido algunos tribunales[1438] y la doctrina[1439]. Agrega que la Demandante era consciente de que la energía es un sector regulado en España, y que el marco normativo está sujeto a cambios. La Demandada concluye que cumplió con todas sus obligaciones[1440].

### 3.    Análisis del Tribunal

696.  La Demandante afirma que "*[l]os trabajos académicos más relevantes en esta materia reconocen que las conocidas como cláusulas paraguas de los tratados de protección de inversiones también protegen los compromisos asumidos de manera implícita por un Estado a través de su actuación política y regulatoria por lo que un compromiso contractual, como por ejemplo una concesión, no es necesaria para proteger las legítimas expectativas*"[1441]. Después de hacer alusión a los orígenes de la cláusula paraguas, la Demandante enmarca su argumento dentro del apartado sobre legítimas expectativas. Asegura que las obligaciones contraídas por España son fuentes objetivas de sus legítimas expectativas en este caso.

---

[1431] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1060.
[1432] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1061.
[1433] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1062.
[1434] *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 371 [**RL-0068**]
[1435] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1065.
[1436] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1066.
[1437] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1067.
[1438] *Blusun S.A. et al. c. República de Italia*, Laudo, Caso CIADI No. ARB/14/3 (27 de diciembre de 2016), ¶ 371 [**RL-0068**]; *Perenco Ecuador Limited c. República del Ecuad*or, Decisión en las restantes cuestiones sobre jurisdicción y responsabilidad Caso CIADI No. ARB/08/6 (12 de septiembre de 2014), ¶ 562 [**RL-0071**]; *Plama Consortium Ltd. c. República de Bulgaria*, Laudo, Caso CIADI No. ARB/03/24 (27 de agosto de 2008), ¶ 219 [**RL-0034**].
[1439] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1072 ("*No puede equipararse la cláusula paraguas con una suerte de cláusula de estabilización o de 'congelación' de la normativa vigente al tiempo de formalizar el contrato*"), citando Thomas W. Wälde, The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases, 6 J. World Investment & Trade 183 2005, p. 200 [**RL-0055**].
[1440] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1073.
[1441] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 354.

Puntualmente, Steag dice que tenía la legítima expectativa de que el marco jurídico aplicable a su inversión permanecería estable y no sufriría cambios abruptos[1442].

697. Para España, los argumentos de la Demandante no pueden ser acogidos por el Tribunal Arbitral por dos razones. *Primero*, la interpretación de la cláusula paraguas que realiza la Demandante es contraria al tenor literal del artículo 10(1) del TCE. *Segundo*, el Reino de España no se ha obligado unilateralmente "*vis-á-vis*", ni con la Demandante en virtud del RD 661/2007, el RD-Ley 6/2009 o el RD 1614/2010, ni en virtud de ningún acto unilateral. Añade que en el presente caso no se ha suscrito ningún contrato de inversión o comercial entre la Demandante y el estado español, ni tampoco los vehículos de propósito específico de las CSP han firmado contrato alguno con la Demandada[1443]. La obligación amparada por la cláusula paraguas tiene que ser específicamente contraída con el inversor extranjero[1444]. Concluye que el RD 661/2007 y el RD 1614/2010 no están específicamente dirigidas a Steag, ni expresan un compromiso de congelar el marco jurídico aplicable a la inversión[1445].

698. La Demandada[1446] está de acuerdo con la Demandante[1447] en la importancia de la literalidad del artículo 10(1) del TCE, cuyo último inciso dispone:

> "Toda Parte Contratante cumplirá las obligaciones que haya contraído con los inversores o con las inversiones de los inversores de cualquier otra Parte Contratante".

699. Las Partes están de acuerdo en que el artículo 10(1) del TCE debe interpretarse de conformidad con el artículo 31 de la Convención de Viena sobre el Derecho de los Tratados, que contiene la norma general de derecho internacional consuetudinario para la interpretación de los tratados.

700. Steag presenta su alegación con respecto a la cláusula paraguas en el aparte titulado "*España generó en la Demandante la legítima expectativa de que la regulación de la energía solar termoeléctrica para instalaciones inscritas en el registro de pre -asignación de retribuciones no sufriría drásticos cambios*"[1448], específicamente en la sección "*a) Las expectativas legítimas de un inversor pueden surgir de la actuación general del Estado*"[1449], sección dedicada a la presentación de su argumento sobre el estándar de TJE y las fuentes de sus legítimas expectativas.

701. El inversionista mezcla su alegato sobre incumplimiento de la cláusula paraguas con su alegato sobre la infracción del estándar de TJE. Sobre la cláusula paraguas el inversionista manifiesta que España asumió voluntariamente ciertas obligaciones para "*estabilizar*" el marco jurídico a través del acuerdo alcanzado con los representantes del sector termosolar en el Comunicado ER 2010 y con el RD 1614/2010 y que con la entrada en vigor del NRR,

[1442] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 354.
[1443] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1365.
[1444] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1366.
[1445] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1373.
[1446] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1360.
[1447] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 367.
[1448] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 349-411.
[1449] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 349-370.

España incumplió su compromiso configurando una violación del inciso final del articulo 10(1) del TCE[1450]. En su alegato sobre el TJE Steag dice que el RD 661/2007, la Comunicación ER 2010 y el RD 1614/2010, sumados a la inscripción del Proyecto Arenales en el registro de preasignación, generaron la expectativa de que no habría cambios sustanciales injustificados en la remuneración del proyecto[1451]. Es evidente la similitud entre los dos argumentos.

702.    En la sección sobre TJE, el Tribunal encontró que la resolución de inscripción en el registro de preasignación, en el marco regulatorio que determina los efectos jurídicos de la misma y, particularmente, el RD 661/2007 y el RD 1614/2010, fundamenta una expectativa legítima de estabilidad respecto de ciertos elementos del RRO. Esos elementos, se reitera, son los que lista el artículo 4 del RD 1614/2010: *(i)* tarifas; *(ii)* primas; y *(iii)* límites inferior y superior. Asimismo, no se encontró que hubiera una expectativa legítima de Steag relativa a la posibilidad de vender la electricidad producida con gas bajo la tarifa regulada. Tampoco se declaró una violación del estándar de TJE a través de la introducción del IVPEE.

703.    El argumento de la Demandante sobre la cláusula paraguas no altera estas conclusiones sobre la violación del artículo 10(1) del TCE. En cuanto al IVPEE, se reitera que el Tribunal carece de jurisdicción sobre la reclamación relativa a la violación del artículo 10(1) del TCE a través de esta medida impositiva. Asimismo, Steag no demostró que la cláusula paraguas protegiera la posibilidad de vender la electricidad producida con gas bajo la tarifa regulada. El Tribunal no encuentra que se haya formulado un argumento diferenciado sobre esa medida.

704.    En vista de lo anterior, el Tribunal no encuentra que sea necesario o conducente entrar a examinar la discusión sobre los alcances de la expresión "*contraído*" ("*entered into*", en la versión en inglés) en el artículo 10(1) del TCE.

## IX.    DAÑOS

### A.    Posición de las Partes

#### 1.    Posición de la Demandante

705.    La Demandante resalta que la consecuencia de la violación del TCE por parte de España es la obligación de reparar el daño, de conformidad con el artículo 31 de los Artículos sobre la Responsabilidad del Estado, y explica los conceptos de restitución y el remedio alternativo de una compensación en dinero[1452]. Steag afirma que el estándar consuetudinario de compensación, basado en la decisión de la CPJI en *Factory at Chorzów* de 1928, aplica para la indemnización por el incumplimiento de cada una de sus reclamaciones bajo los artículos 10(1) y 13 del TCE (haciendo la salvedad del escenario de una expropiación legítima)[1453].

---

[1450] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 366, 369 y 370.
[1451] Memorial de Demanda, ¶¶ 223, 237 y 238.
[1452] Memorial de Demanda, ¶¶ 252-261.
[1453] Memorial de Demanda, ¶ 262. Véase también ¶¶ 265, 266.

706. En particular, Steag afirma que tiene derecho, primero, a "*'el valor que tendría una restitución en especie', lo que significa una cantidad que toma en consideración el valor de mercado de los activos afectados por el acto ilegítimo*"[1454]. En segundo lugar, Steag pide una indemnización por "*'daños por las pérdidas soportadas que no estén cubiertas por la restitución en especie o el pago en su lugar', como costes y gastos no incluidos en la valoración de los activos afectados por el acto ilegítimo y otros tipos de daños como, por ejemplo, daños reputacionales y daños consecuenciales*"[1455].

707. En sus argumentos sobre daños, la Demandante afirma que "*[l]a participación de Steag en Arenales Solar a través de Steag 1 se ha visto drásticamente afectada por los cambios regulatorios: no sólo carece su inversión por completo de valor en la actualidad, sino que es probable que, para garantizar su viabilidad, el Proyecto requiera nuevas inyecciones de liquidez por parte de los socios de Arenales Solar*"[1456]. Steag basa su cuantificación de daños en el informe de The Brattle Group del 26 de mayo de 2017 [**IP C-002**] y en el informe de refutación de The Brattle Group del 11 de mayo de 2018 [**IP C-004**][1457]. La conclusión de la Demandante es que "*la posición de Steag en Arenales Solar tiene un valor de 0 € ya que, además, el Nuevo Régimen Regulatorio no ofrece una tasa de rentabilidad razonable*"[1458].

708. La Demandante explica que, para la cuantificación del daño, es preciso hacer una comparación de los flujos de caja reales de Arenales Solar, de un lado, y de los flujos de caja hipotéticos que se habrían obtenido en ausencia del NRR, de otro lado[1459]. Steag cuantifica sus daños a partir del 20 de junio de 2014, "*por ser este el día en el que España fijó definitivamente la remuneración que resultaría aplicable a la Planta como resultado de los cambios regulatorios*"[1460].

709. La Demandante manifiesta que para la cuantificación de los daños se siguen tres pasos. El **primer paso** se refiere a la capitalización de los flujos de caja hipotéticos (sin el NRR) y reales (con el NRR)[1461]. De ahí halla Steag una pérdida de flujos de caja de EUR 6,8 millones y gastos extraordinarios de EUR 45 millones[1462]. En proporción a la participación de Steag en el proyecto, se llega entonces a una cifra de EUR 1,8 millones por flujos de caja perdidos, cifra a la que se suman EUR 11,8 millones por repagos de deuda anticipados[1463].

710. El **segundo paso** consiste en hacer el descuento de los flujos de caja futuros, tanto del escenario hipotético como del escenario real, que posteriormente se comparan en la Fecha de Evaluación, para poder establecer el valor de mercado real e hipotético de la Planta[1464].

---

[1454] Memorial de Demanda, ¶ 264.
[1455] Memorial de Demanda, ¶ 264.
[1456] Memorial de Demanda, ¶ 268.
[1457] Memorial de Demanda, ¶ 269; Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 503.
[1458] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 504 (notas al pie omitidas). El Tribunal observa que este punto se presenta en un acápite relativo a la reclamación por expropiación.
[1459] Memorial de Demanda, ¶ 270.
[1460] Memorial de Demanda, ¶ 271.
[1461] Memorial de Demanda, ¶¶ 273-275.
[1462] Memorial de Demanda, ¶ 274.
[1463] Memorial de Demanda, ¶ 275.
[1464] Memorial de Demanda, ¶¶ 276, 277.

El Informe Brattle aplica aquí el método de "Descuento de los Flujos de Caja" ("**DCF**")[1465]. El Informe tiene en cuenta además ciertos elementos que reducen el valor de la inversión, tales como: *(i)* el riesgo de mercado, que se calcula a partir de la información de sociedades cotizadas similares a Arenales Solar; *(ii)* el riesgo regulatorio, que refleja la preocupación por la estabilidad regulatoria en España; y *(iii)* la liquidez de la inversión[1466]. Con base en este método se llega a una cuantificación de la pérdida de Steag en EUR 83 millones[1467]. Dicha cifra se actualizó posteriormente a EUR 79 millones.[1468]

711. Finalmente, el **tercer paso** consiste en la capitalización de los daños hasta la fecha del laudo arbitral[1469]. Además, debe ajustarse el monto de la indemnización atendiendo a los tributos que pudieren generarse[1470]. Steag pide también que se reconozca que el monto a que tiene derecho Steag devenga intereses[1471].

712. Frente a los argumentos de la Demandada y de Accuracy sobre los defectos del método DCF, Steag afirma que dicho método es fiable y que ha sido aplicado en otros casos de inversión[1472]. Steag resalta que Accuracy hace un trabajo incompleto, porque pone en duda las asunciones de Brattle para la hipótesis "*but for*" (bajo el RRO) y no para el escenario "*actual*" (bajo el NRR)[1473]. Para estos efectos, remite al informe de refutación de The Brattle Group (**IP C-004**) y explica que el método DCF puede utilizarse en este contexto, porque la "*abundancia de datos históricos*" y la "*relativa simpleza del negocio de [la] producción eléctrica*" permite modelizar las variables[1474].

713. En ese orden de ideas, Steag afirma que el marco analítico con el que se determinan los flujos de caja no es especulativo, ya que "*no resulta controvertido cuál es el marco analítico que permite diseñar el escenario 'But For', es decir, el escenario que habría tenido lugar si España no hubiera desbaratado el Régimen Regulatorio Original*"[1475]. El RRO establecía flujos de caja mínimos asegurados[1476]. La Demandante alega que son predecibles: *(i)* la producción durante la vida útil de Arenales Solar; *(ii)* la remuneración mínima otorgada bajo el RRO; y *(iii)* los costes de mantenimiento y operación de Arenales Solar[1477]. Steag afirma repetidamente que la vida útil de la planta Arenales Solar podría llegar a los 40 años, si bien admite que se esperaba disfrutar de la tarifa del RRO por un período de 20 a 25 años[1478]. Asimismo, el calendario de amortización y los intereses correspondientes son conocidos[1479].

---

[1465] Memorial de Demanda, ¶ 279.
[1466] Memorial de Demanda, ¶¶ 281, 282.
[1467] Memorial de Demanda, ¶ 283.
[1468] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶ 89; Memorial Adicional, ¶ 201.
[1469] Memorial de Demanda, ¶¶ 284, 285.
[1470] Memorial de Demanda, ¶ 285.
[1471] Memorial de Demanda, ¶¶ 286-288.
[1472] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 506, ss. y 517, ss. En los ¶¶ 518, ss. Steag hace una relación de casos de inversión donde se ha aplicado el método DCF.
[1473] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 516.
[1474] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 510-513.
[1475] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 514.
[1476] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 515.
[1477] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 514.
[1478] Memorial de Demanda, ¶¶ 79, 118 y 146. Cf. también Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 514.
[1479] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 514.

Tampoco hay mayores obstáculos para incluir otros factores relevantes, como la inflación[1480]. Steag anota, finalmente, que el método DCF es más difícil de aplicar al NRR, ya que "*la revisión del diferencial aplicable al rendimiento de las Obligaciones del Estado a diez años no responde a ningún método de cálculo definido*"[1481].

714.  Ante la solicitud formulada por el Tribunal a las Partes en la Resolución Procesal Núm. 8 de presentar una tabla señalando el impacto separado de las medidas impugnadas usando el método DCF, la Demandante explica que "*todas las Medidas se encuentran relacionadas y cada cambio en los parámetros refleja un escenario but for diferente que debe compararse con el escenario actual*"[1482]. Dice además que "*es necesario definir la combinación específica de Medidas que estima conformes con el TCE, y además el orden cronológico aplicable y la vida útil de la Planta Arenales*"[1483]. En su escrito, Steag presenta tres tablas.

715.  La primera tabla muestra el impacto que sobre el análisis de daños tiene la eliminación de una medida (es decir, si se encuentra que una medida determinada es conforme al TCE), dejando los demás datos constantes[1484]. Esta primera tabla no analiza el impacto simultáneo de las medidas[1485]. La segunda tabla mide el impacto de la eliminación de la opción entre la tarifa regulada o el precio de la prima más el *pool*, pero no muestra el impacto que genera la combinación de más de dos medidas[1486]. Por último, la tercera tabla presenta el "*efecto incremental de las medidas*", lo que permite calcular su efecto combinado[1487].

716.  En sus escritos posteriores a la audiencia, la Demandante alega adicionalmente que "*deben concederse a Steag los daños derivados del impacto fiscal del pago del laudo porque recibir el valor del proyecto a través de un potencial laudo es menos favorable de lo que habría obtenido de no haber adoptado España las medidas objeto de reclamación*"[1488]. Dice Steag que el tratamiento tributario de ingresos a través de flujos de caja por dividendos y préstamos amortizados es diferente del que se da a una indemnización ordenada por un laudo arbitral[1489].

717.  Steag comienza por abordar las diferencias existentes entre los informes de expertos que presentaron las partes[1490]. Para la Demandante, no está en discusión: (i) que Steag hace parte de una unidad fiscal para efectos del derecho tributario alemán; (ii) que el pago del laudo se

---

[1480] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 514.
[1481] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 515.
[1482] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas, ¶ 2.
[1483] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas, ¶ 2 (énfasis en el original omitido).
[1484] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas, ¶¶ 5-8.
[1485] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas, ¶¶ 5-8.
[1486] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas, ¶¶ 5, 9 y 10.
[1487] Escrito Post-Audiencia - Primera Ronda (Steag), Anexo I: Impacto Económico Separado de las Medidas, ¶¶ 5 y 11, ss.
[1488] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 191, ss.
[1489] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 192.
[1490] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 194, ss.

toma como un pago de dividendos para dichos efectos; (iii) que el impuesto de sociedades alemán (CIT) es de 15,825%; y (iv) que el impuesto comercial alemán (TT) es de 16,8%[1491].

718. La diferencia está en la determinación del obligado tributario y el "*tipo efectivo aplicable*"[1492]. La Demandante critica el Informe Noerr, citado por la Demandada. Según dicho Informe, con las Medidas, la obligada al CIT no será Steag, sino los socios de su accionista única (KSBG): el gravamen depende del balance de cada socio de KSBG, y sería "*potencialmente*" de 15,825%[1493]. En lo que respecta al TT, el obligado tributario sería KSBG y no sus socios, y el gravamen sería del 16,8%[1494]. Eso daría un 32,625% en total[1495]. En el escenario de "*flujos de caja a través de dividendos*", según el Informe de Noerr, el tipo marginal acumulado habría sido también del 32,625%[1496]. El mismo Informe indica que un deterioro o amortización de los préstamos de Steag a Arenales podían constituir una pérdida y reducir la base imponible[1497].

719. La Demandante se aparta de esas conclusiones y explica que, en todo caso, Steag sería la obligada tributaria[1498]. Comienza la Demandante por aclarar que Steag está sujeta a tributación en Alemania, sin límite alguno, y debe entregar sus propias declaraciones al fisco[1499]. Lo que se traslada a KSBG no son los ingresos de Steag, sino la base imponible (que puede dar positiva o negativa), de conformidad con el "*acuerdo de absorción de pérdidas y beneficios*" celebrado entre Steag y KSBG[1500].

720. La Demandante reconoce que Steag es parte de una "*unidad fiscal*" para efectos tributarios en Alemania, pero observa que eso no implica que los impuestos calculen y devenguen al nivel de KSBG: cada filial realiza ciertos ajustes y luego se integran las bases imponibles, que se trasladan al nivel de la matriz[1501]. Steag como filial sigue siendo la obligada tributaria, porque responde por los *trade taxes*, lo que supone que el incumplimiento tributario de la matriz permite al fisco reclamar el pago de la filial[1502]. Los ajustes tributarios al nivel de la filial son los que generan un tratamiento diferente según las fuentes de los ingresos (dividendos vs. laudo potencial)[1503].

721. Como la base imponible se obtiene al nivel de la filial, dice la Demandante, el tratamiento de los ingresos debe analizarse al nivel de Steag y no de KSBG[1504]. Bajo el RRO habría habido flujos de caja para amortizar la deuda de Arenales con las Entidades Financieras y los

---

[1491] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 194.
[1492] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 195.
[1493] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 195.
[1494] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 195.
[1495] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 196.
[1496] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 196.
[1497] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 196.
[1498] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 198, ss.
[1499] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 200, ss.
[1500] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 201, 202.
[1501] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 203, 204.
[1502] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 205.
[1503] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 206.
[1504] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 207.

accionistas y, además, distribuir dividendos entre los accionistas de Arenales Solar PS, S.L.[1505].

722.  Los dividendos así percibidos por Steag 1 se trasladarían a Steag GmbH y, bajo el régimen alemán de exención de participaciones, no serían gravables en un 95%[1506]. Ese régimen se aplica si hay una participación mínima del 10% en la filial para el CIT y del 15% para el TT[1507]. Cuando se está ante una "*unidad fiscal*", la aplicabilidad del régimen de participaciones se analiza al nivel de la matriz[1508]. De acuerdo con Steag, si se analizan las condiciones previstas por el derecho alemán al nivel de KSGB, se tiene que habría habido una exención del 95% para el CIT y el TT[1509]. La consecuencia es que, al calcular la base imponible de Steag, sólo se habría considerado el 5% de los dividendos remitidos por Steag 1[1510]. La Demandante presenta sus cálculos y nota que, tomando en cuenta el 16,8% correspondiente al TT que asume Steag bajo el acuerdo con KSBG, el "*tipo de gravamen efectivo*" sería del 1,631%[1511]. La diferencia entre el tipo de gravamen efectivo que se habría dado sin las medidas y el que resulta de un laudo favorable a Steag es del 30,994%[1512].

723.  La Demandante se refiere acto seguido al punto de si era posible minorar la base imponible por el deterioro contable de los préstamos dados a Steag 1[1513]. Según el Informe de Noerr, es irrecuperable un préstamo dado a una filial por una matriz que tiene más del 25% del capital, salvo que se trate de un préstamo otorgado en condiciones de mercado iguales a las que habría aceptado un tercero[1514]. La Demandante observa que ese Informe no acreditó que esas condiciones se cumplieran en el caso de los préstamos otorgados por Steag GmbH a Steag 1[1515].

### 2.  Posición de la Demandada

724.  España comienza por explicar que el daño que supuestamente sufrió Steag debe establecerse a partir de los modelos e impactos que se hicieron con el primer y segundo informe económico de Accuracy[1516]. La Demandada considera que el modelo propuesto por Steag ignora el concepto elemental de vida útil regulatoria y obvia la consideración conjunta de los flujos de caja en el tiempo, para garantizar la rentabilidad razonable a las inversiones realizadas. La Demandada afirma que este planteamiento debe rechazarse de plano[1517]. Los supuestos daños estimados en los informes de Brattle no son indemnizables, al ser especulativos[1518], pues el método empleado para calcular su cuantía depende en gran medida

---

[1505] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 209.
[1506] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 210.
[1507] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 210.
[1508] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 211.
[1509] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 211.
[1510] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 212.
[1511] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 213.
[1512] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 217.
[1513] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 214, ss.
[1514] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 215.
[1515] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 216.
[1516] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1166.
[1517] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1170.
[1518] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1419.

de condiciones macroeconómicas que no están relacionadas con las medidas y que necesariamente cambiarán con el paso del tiempo[1519].

725. La Demandada cita el caso *Gemplus c. México*, donde se encontró que el inversor tiene la carga de probar el daño que alega y que, en consecuencia, aún si se encuentra que ocurrió un hecho internacionalmente ilícito que comprometa la responsabilidad internacional del Estado, el Tribunal debe rechazar una reclamación cuando los daños sean inciertos, especulativos o no se haya satisfecho la carga de la prueba por otro motivo[1520].

726. En los escritos de la Demandada y en el informe de Accuracy se señala que el método DCF resulta inapropiado por las "*circunstancias concurrentes*" del supuesto daño[1521]. España resalta que la Demandante ha empleado el método DCF para calcular únicamente el valor de mercado, considerando los flujos de caja futuros de las plantas termosolares. Dicho cálculo se basa "*en una simplista comparativa de escenarios ('real' y contrafáctico), dando por hecho que el 'real' se va a mantener durante las próximas décadas, obviando que el principio rector del sistema está constituido por la rentabilidad razonable garantizada*"[1522].

727. La Demandada se apoya en la doctrina[1523] y en varias decisiones arbitrales[1524] que rechazan los métodos especulativos como el DCF[1525]. Alega que en varios casos los tribunales han empleado métodos basados en el análisis del reembolso de sus inversiones más una rentabilidad adecuada sobre los costes de ellas[1526], o han considerado si los costes operativos son recuperados y si se obtiene una rentabilidad razonable sobre los mismos[1527].

728. Resalta la Demandada que en las circunstancias de este caso no se puede aplicar el método DFC por las siguientes razones: *(i)* no existen intangibles relevantes que valorar; *(ii)* la alta dependencia de los flujos de caja de elementos exógenos volátiles e impredecibles, como el precio del *pool*, entre otros; *(iii)* la proyección a largo plazo de las predicciones; *(iv)* el riesgo asumido; y *(v)* la falta de historial financiero que permita hacer una proyección futura de los flujos de caja[1528].

---

[1519] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 105.
[1520] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1176; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1427; citando el caso *Gemplus S.A. et al. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/04/3 y ARB(AF)/04/4 (16 de junio de 2010), ¶¶ 12-56 [**RL-0075**] ("*Burden of Proof: Under international law and the BITs, the Claimants bear the overall burden of proving the loss founding their claims for compensation. If that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established against the Respondent*").
[1521] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1177, ss.
[1522] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1172.
[1523] La Demandada cita los textos de Ripinsky / Williams, *Damages in International Investment Law* [**RL-0057**]; Marboe, *Calculation of Compensation and Damages in International Investment Law* [**RL-0058**]; y Sabahi, *Compensation and Restitution in Inveestor-State Arbitration* [**RL-0059**].
[1524] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1428-1432, citando *Rusoro Mining Limited c. República Bolivariana de Venezuela*, Laudo, Caso CIADI No. ARB(AF)/12/5 (22 de agosto de 2016), ¶ 760 [**RL-0076**]; *Tenaris S.A.* y *Talta-Trading e Marketing Sociedade Unipessoal LDA. c. República Bolivariana de Venezuela*, Laudo, Caso CIADI No. ARB/11/26 (29 de enero de 2016), ¶¶ 525-527 [**RL-0077**].
[1525] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1183.
[1526] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1181.
[1527] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1189; Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1435.
[1528] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1183.

729. En lugar del *top-down* DCF propuesto por Brattle, España considera más apropiado adoptar el método de "*valoración basada en activos*" ("***Asset Based Valuation***" o "**ABV**"), estructurado en la rentabilidad sobre la inversión en un mercado regulado[1529]. En sus escritos, España describe el ABV como un método de valoración que toma en consideración dos parámetros: *(i)* el importe de la inversión, un valor preciso y conocido de antemano; y *(ii)* la tasa de rentabilidad esperable, parámetro que puede calcularse de forma objetiva[1530]. Atendiendo a estos dos parámetros, se calcula la anualidad (o flujo de caja anual) para la vida del activo[1531]. Con base en este enfoque, España aduce que para determinar la existencia de los supuestos daños se deben *(i)* identificar los requisitos económicos de un inversor que invierte en un mercado regulado; y *(ii)* verificar si esos requisitos se satisfacen una vez adoptadas las medidas[1532].

730. En el caso de utilizar el método DFC para calcular los supuestos daños presentado por la Demandante, es necesario corregir algunos de los defectos en los distintos parámetros considerados por Brattle; en particular, España menciona: "*la* contributory fault *de la Demandante; el* Flow-Through *de los hipotéticos daños; el* Tax Gross-Up*; la incorrecta determinación de la fecha de valoración considerada; la posible sobrepotenciación de la planta termosolar de la Demandante; la determinación de la fecha y de la cuantía de la inversión; o la improcedente inmunidad ante el riesgo empresarial*"[1533]. El resultado del cálculo de los daños con el método DCF corregido es un 94% inferior al calculado originalmente por Brattle[1534].

731. De acuerdo con la estimación hecha por Accuracy, la vida útil de las plantas es de un máximo 25 años, conforme a la información disponible[1535]. De igual modo, se deben descontar los efectos del impuesto del 7% y de la utilización del gas para producir electricidad subvencionada como si fuera energía renovable, ambas medidas introducidas por la Ley 15/2012[1536]. A lo anterior se debe sumar el hecho de que los ingresos estarían sujetos a un mayor riesgo en el escenario *but-for*[1537]. En el segundo informe de Accuracy se actualiza el análisis de la rentabilidad obtenida por las plantas con las medidas en disputa y la rentabilidad reclamada.

732. Contrariamente a la tesis de cambio de paradigma regulatorio de Brattle, se puede observar que, independientemente del nombre que reciba la subvención (FIT, opción prima, Ri+Ro), los principios fundamentales de la regulación no cambian; las subvenciones están diseñadas para complementar los ingresos del mercado con el fin de cubrir tres componentes: costes operativos, costes de inversión y una rentabilidad razonable[1538].

---

[1529] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 97.
[1530] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 128.
[1531] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 129.
[1532] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 94.
[1533] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1167.
[1534] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1198.
[1535] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1446, 1447.
[1536] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶¶ 1199, 1200.
[1537] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1201.
[1538] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 79.

733. La Demandada explica que las plantas obtienen un EBITDA de alrededor de EUR 28 millones anuales después de la expedición de las medidas, lo que se traduce en una rentabilidad razonable de un TIR de proyecto del 5,7% *post-tax*[1539]. Para la planta de la Demandante, el modelo *but for* de Brattle muestra una rentabilidad *post-tax* del 11 %, que se compara con un coste de capital del 4,84%[1540], lo cual excede la rentabilidad razonable.

734. Con respecto al criterio que se debe utilizar parar calcular los intereses entre la fecha de valoración y la del laudo, la Demandada considera que no se debe optar por el bono a 10 años, sino por el bono a un plazo igual al gap temporal entre la fecha de valoración y la estimación de la fecha del laudo[1541].

735. En conclusión, teniendo en cuenta los riesgos asumidos por Steag y las correcciones de algunas hipótesis erróneas de Brattle (vida útil, atribuir el efecto de los acuerdos con RREEF a España, opción pool más prima), el impacto real de las medidas en los intereses de Steag sería entre EUR 3,8 y EUR 10,3 millones, es decir hasta un 95% inferior al importe reclamado por la Demandante[1542].

736. En sus alegatos de cierre sobre daños, España hace un cálculo del daño resultante bajo diferentes combinaciones de medidas y vida útil, dependiendo de qué medidas se declaran como violatorias del TCE y qué vida útil se adscribe a la planta[1543]. En sus alegatos de cierre, la Demandada observa preliminarmente que el Tribunal solicitó el cálculo de los escenarios "*bajo las asunciones del modelo de cuantificación de daños de Brattle*"[1544] y destaca que "*las asunciones del modelo de Brattle ignoran el impacto económico de la posición minoritaria de STEAG GmbH frente a RREEF*"[1545] cuyo impacto económico separado asciende a EUR 12,7 millones[1546].

737. En ese contexto, la Demandada remite a las conclusiones de Accuracy[1547]. En concreto, la Demandada explica que Steag aceptó a favor de RREEF dividendos preferentes con un interés del 8%, lo que supone que "*el impacto de las medidas en STEAG GmbH no es proporcional a su participación accionaria*"[1548].

738. La Demandada explica que, para el análisis de daños bajo esta metodología, el escenario *but for* debe referirse al régimen normativo aplicable con anterioridad a la primera medida que

---

[1539] Memorial de Dúplica y Réplica de Jurisdicción, ¶¶ 1439-1445.
[1540] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 82.
[1541] Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1202.
[1542] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1470.
[1543] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 4.
[1544] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 5.
[1545] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 6.
[1546] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶¶ 6, 7.
[1547] Tabla con el Impacto Económico Separado de cada de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶¶ 6-8.
[1548] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 8.

el Tribunal encuentre violatoria del TCE[1549]. Lo anterior supone que, por ejemplo, si se encuentra que el IVPEE no es contrario al TCE o que no entra dentro del ámbito de la jurisdicción del Tribunal, "*el escenario contra-factual debe considerar que ese impuesto también hubiera existido*"[1550]. Para la Demandada, los expertos de Brattle no se oponen a este punto[1551]. España explica posteriormente los alcances del cálculo solicitado a Accuracy, atendiendo al efecto de la Ley 15/2012, del RDL 2/2013 y de las medidas posteriores[1552]. España presenta una tabla indicando cuál sería el daño si se considera cada medida individualmente[1553]. La Demandada nota sin embargo que, si se declara que una o más medidas son lícitas, la sumatoria de los impactos económicos individuales no representan correctamente el impacto acumulado de las medidas[1554]. España presenta entonces una relación preparada por Accuracy del impacto acumulado de las medidas, en los escenarios de una vida útil de 40, 25 y 20 años[1555].

739. En sus escritos posteriores a la audiencia, la Demandada dio respuesta a los argumentos de la Demandante sobre el supuesto impacto fiscal en Alemania de un laudo favorable a Steag. En su primer escrito, España se remite al Informe de Noerr, y explica que los dos impuestos relevantes son el TT (16,80%) y el CIT (15,825%)[1556]. Para el Estado, el responsable tributario es KSBG en relación con el TT y los "*limited partners*" en KSBG en relación con el CIT[1557]. Según la Demandada, toda la discusión se centra en la aplicabilidad del régimen de exención de impuestos sobre dividendos[1558]. Para que aplique ese régimen en Alemania, deben cumplirse ciertos requisitos, tales como que la participación del pagador supere el 10%[1559]. Los *limited partners*, dice el Estado, no cumplen ese requisito, porque ninguno tiene más de un 19% de KSBG, y ésta a su turno sólo controla el 26% de Arenales: así, cada *limited partner* no tiene más que un 4,94% indirecto de Arenales[1560]. Por estos motivos, no aplicaba la exención[1561].

740. En su segundo escrito posterior a la audiencia, España dice que no es cierto que, como dice Steag, las partes estén de acuerdo en que un laudo favorable a Steag sería una renta ordinaria totalmente gravable[1562]. Explica el Estado que el Informe de Noerr afirma que en Alemania

---

[1549] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 11.
[1550] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶¶ 12, 13.
[1551] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 13.
[1552] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 15.
[1553] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶¶ 16-18.
[1554] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 18.
[1555] Tabla con el Impacto Económico Separado de cada una de las Medidas Impugnadas bajo el Modelo DCF presentado por los Expertos de la Demandante de 15 de marzo de 2019, ¶ 19.
[1556] Escrito Post-Audiencia - Primera Ronda (España), ¶¶ 233-235.
[1557] Escrito Post-Audiencia - Primera Ronda (España), ¶ 236. Cf. también ¶¶ 237, 238.
[1558] Escrito Post-Audiencia - Primera Ronda (España), ¶ 236. Cf. también ¶ 239.
[1559] Escrito Post-Audiencia - Primera Ronda (España), ¶ 236. Cf. también ¶¶ 240-243.
[1560] Escrito Post-Audiencia - Primera Ronda (España), ¶ 236. Cf. también ¶ 244.
[1561] Escrito Post-Audiencia - Primera Ronda (España), ¶ 236. Cf. también ¶¶ 245, 246.
[1562] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 160.

no hay jurisprudencia sobre el tratamiento fiscal de ese tipo de ingresos[1563]. Así, puede ser que ese pago se considere un dividendo y también puede ser que no se considere un dividendo[1564]. Haciendo un recuento de las críticas de Steag al Informe de Noerr[1565], la Demandada resalta que las conclusiones de Noerr no partían del supuesto de que Steag no fuera contribuyente en Alemania[1566]. España dice que, más allá de ello, "*lo importante es que STEAG no pagará ningún impuesto y que el impuesto sobre los dividendos de Arenales se determinará a nivel de KSBG a efectos de Trade Tax ("TT") y a nivel de los socios de KSGB a efectos del impuesto de sociedades*"[1567]. A juicio del Estado, las diferencias entre los Informes de Noerr y EY se originan en una aplicación errada del derecho alemán al determinar los ingresos por dividendos de STEAG y los efectos de su atribución a KSBG[1568].

741. España encuentra que, en el escenario hipotético de que no se hubieran adoptado las Medidas, los ingresos de Steag no se habrían beneficiado de una exención del 95%, aplicándose un tipo impositivo efectivo de 1,631%, como pretende la Demandante[1569]. En cuanto al CIT, la razón es que, siendo la participación de Steag 1 en Arenales del 26,01%, "*ningún socio de KSBG posee una participación indirecta de 10% o más en Arenales, que es la sociedad que paga los dividendos*"[1570]. En cuanto al TT, la Demandada argumenta que KSGB es una "*partnership*" y, por ende, no cumple los requisitos para que aplique la directiva europea matriz-filial: con ello se incumple también el requisito de que haya una participación de al menos un 10% en Arenales[1571]. Por eso, la carga tributaria aplicable si se dicta un laudo favorable a Steag sería la misma que en el escenario hipotético planteado[1572].

742. En cuanto a la posibilidad de deducir los préstamos de los accionistas, dice España que corresponde a Steag demostrar que los préstamos cumplían con el principio de la transacción de mercado[1573]. La Demandada resalta que Steag está sugiriendo que ese principio no se cumplió en el préstamo de accionistas de este caso, lo que supondría una infracción de las normas vigentes[1574].

**B.    ANÁLISIS DEL TRIBUNAL**

1.    Parámetros generales para la determinación del perjuicio indemnizable

743. El Tribunal ha encontrado que la Demandada incurrió en una violación del estándar de TJE del artículo 10(1) del TCE al frustrar las expectativas legítimas y objetivas de la Demandante al tiempo de la inversión, es decir, el 8 de junio de 2012. Esas expectativas iban más allá de la rentabilidad razonable. Steag tenía la expectativa de que se le mantendrían las tarifas,

---

[1563] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 160.
[1564] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 161.
[1565] Escrito Post-Audiencia - Segunda Ronda (España), ¶¶ 162, 163.
[1566] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 164.
[1567] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 165.
[1568] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 167.
[1569] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 169.
[1570] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 171.
[1571] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 171.
[1572] Escrito Post-Audiencia - Segunda Ronda (España), ¶¶ 172, 175.
[1573] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 174.
[1574] Escrito Post-Audiencia - Segunda Ronda (España), ¶ 174.

primas y los límites inferior y superior a que se refiere el RD 1614/2010. Esa estabilidad se extendería por la vida útil de la planta, siempre y cuando se cumpliera con el requisito del registro definitivo antes del 1 de enero de 2014, requisito que efectivamente se cumplió.

744.    La frustración de las expectativas legítimas que Steag tenía al tiempo de la inversión constituye una violación del estándar de TJE que, al comprometer la responsabilidad internacional de España, exige la reparación integral de los daños ocasionados por el hecho internacionalmente ilícito.

745.    El Tribunal comienza por observar que, como han explicado otros tribunales, el artículo 10 del TCE no establece un estándar de compensación aplicable cuando se presenta una violación de las obligaciones en él previstas[1575]. El Tribunal considera que en este contexto aplica la regla general del artículo 31 de los Artículos sobre la Responsabilidad del Estado, que dispone:

> "Artículo 31. Reparación.
>
> 1. El Estado responsable tiene la obligación de reparar íntegramente el daño causado por el acto internacionalmente ilícito.
>
> 2. El perjuicio comprende todo daño, tanto material como moral, causado por el hecho internacionalmente ilícito del Estado".

746.    Para efectos de la reparación, aplican entonces los principios generales desarrollados por la CPJI en su decisión en el caso de la fábrica de *Chorzów* del 13 de septiembre de 1928:

> "El principio esencial contenido en la noción actual de un acto ilícito – principio que parece estar establecido por la práctica internacional y, en particular, por las decisiones de los tribunales arbitrales – es que la reparación debe, hasta donde sea posible, eliminar todas las consecuencias del acto ilegal y reestablecer la situación que habría existido, con toda probabilidad, de no haberse cometido dicho acto. La restitución en especie o, si esto no fuere posible, el pago de una suma que corresponda al valor que tendría una restitución en especie; la concesión, de ser necesaria, de perjuicios por pérdidas sufridas que no estarían cubiertas por la restitución en especie o el pago en lugar de éstos, son los principios que deben servir para determinar el monto de la compensación debida por un acto contrario al derecho internacional"[1576].

---

[1575] Cf. *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 659 [**CL-0130**].

[1576] Traducción del Tribunal. Texto original: "*The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it-such are the principles which should serve to determine the amount of compensation due for an act contrary to international law*" (CPJI, Serie A, Núm. 17, p. 47).

747.   La carga de probar el daño recae sobre la Demandante[1577]. En vista de la manera como las Partes han presentado sus alegaciones respecto de los daños de Steag y las circunstancias del caso, el Tribunal considera que hay varios factores relevantes para la determinación del perjuicio indemnizable: (**2**) las medidas internacionalmente ilícitas atribuibles a España relevantes para el análisis de daños; (**3**) la fecha a partir debe realizarse el cálculo de daños; (**4**) la contribución de Steag al perjuicio; (**5**) los efectos de la operación de desinversión del año 2020; (**6**) la vida útil de la planta Arenales Solar; (**7**) el *tax gross-up*; y (**8**) la metodología para el cálculo del perjuicio indemnizable.

### 2.   Medidas internacionalmente ilícitas atribuibles a España relevantes para el análisis de daños

748.   La conducta internacionalmente ilícita del Estado debe ser la causa fáctica y próxima del daño, de acuerdo con el artículo 31 de los Artículos sobre la Responsabilidad del Estado[1578]. El Tribunal ha encontrado que la Demandada incurrió en una violación del estándar de TJE del artículo 10(1) del TCE con la implementación del NRR y, particularmente, a través de: *(i)* el ajuste de la tarifa regulada con referencia al IPC subyacente; *(ii)* el paso a una tarifa fija por la reducción a cero de la opción pool más prima; y *(iii)* la introducción de un nuevo régimen remuneratorio basado en el supuesto de una "*instalación tipo*"[1579].

749.   Dentro de estas medidas no se incluye el IVPEE, que no hizo parte del análisis de fondo del Tribunal. Las razones para la exclusión del IVPEE son dos. *Primero*, tomando en consideración que el IVPEE es una "*medida impositiva*" bajo los parámetros del artículo 21(7)(a) del TCE, el Tribunal concluyó que carece de jurisdicción sobre la supuesta violación del Artículo 10(1) del TCE mediante la introducción del IVPEE, a través de la Ley 15/2012. *Segundo*, el Tribunal encontró que la reclamación por los supuestos efectos expropiatorios del IVPEE es inadmisible, por no haberse cumplido con el requisito establecido en el Artículo 21(5)(b) del TCE. En vista de lo anterior, para la determinación del monto del daño indemnizable deben excluirse cualesquiera perjuicios que resulten del IVPEE.

750.   Tampoco se incluye dentro del análisis de daños la eliminación de la posibilidad de vender la electricidad producida con gas bajo la tarifa regulada. En efecto, en su análisis sobre el fondo, el Tribunal no encontró que España hubiera incurrido en una violación de los artículos 10(1) o 13 del TCE a través de esta medida.

751.   El Tribunal reitera en este contexto que sólo son indemnizables los perjuicios que Steag haya sufrido como consecuencia de la conducta internacionalmente ilícita de España. Asimismo, como se explicará en la próxima sección, los daños se calculan a partir del momento en que ese cambio afectó en términos económicos a Arenales Solar. Según la Demandante, ese momento corresponde al 20 de junio de 2014[1580].

---

[1577] *Gemplus S.A. et al. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/04/3 y ARB(AF)/04/4 (16 de junio de 2010), ¶¶ 12-56, 13-80 y 13-81 [**RL-0075**].
[1578] *Ioan Micula et al. c. Rumanía*, Laudo, Caso CIADI No. ARB/05/20 (11 de diciembre de 2013), ¶ 923 [**RL-0081**].
[1579] Párrafo 639 *supra*.
[1580] Memorial de Demanda, ¶ 271.

3.    Fecha a partir de la cual debe hacerse el cálculo de daños

752.  El Tribunal debe definir qué fecha debe tomarse como referencia para la cuantificación del daño indemnizable. La regla general, según ha sido enunciada por otros tribunales, es que el cálculo de daños se realiza a partir de la fecha del perjuicio resultante del hecho internacionalmente ilícito[1581]. Cuando la violación del tratado es producto de varias medidas sucesivas, suele tomarse como referencia para la cuantificación del daño la fecha en que culminan todos los eventos relevantes, en la cual se produce un impacto económico irreversible sobre la inversión[1582].

753.  Con base en estos parámetros, el Tribunal encuentra que monto del perjuicio indemnizable debe calcularse a partir del momento en que la conducta internacionalmente ilícita de España impactó económicamente al proyecto Arenales Solar. La Demandante ubica esa fecha en el 20 de junio de 2014, cuando "*España fijó definitivamente la remuneración que resultaría aplicable a la Planta como resultado de los cambios regulatorios*"[1583]. En el Informe Daños Brattle, los expertos indican que "*[l]os asesores jurídicos de STEAG nos dieron instrucciones para medir el valor actual de los daños y perjuicios a 20 de junio de 2014, cuando España definió finalmente las tarifas aplicables a la planta termosolar de STEAG*"[1584].

754.  Esa fecha coincide con la publicación en el Boletín Oficial del Estado de la Orden Ministerial IET/1045/2014, "*por la que se aprueban los parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos*"[1585]. Como se indicó en párrafo 161 *supra*, la Orden Ministerial IET/1045/2014 fijó en 7,398% la tasa de rentabilidad razonable aplicable a las instalaciones existentes con anterioridad a la entrada en vigor del RDL 9/2013.

755.  El Tribunal concuerda con la Demandante en que el momento en que la inversión de Steag sufrió un daño económico irreversible es el 20 de junio de 2014. La Orden Ministerial IET/1045/2014 representa el final de la serie de medidas que dieron lugar a la violación del estándar TJE. Fue en ese momento, y no antes, cuando se definieron de manera concreta los parámetros del NRR. Realizar una cuantificación antes del 20 de junio de 2014 exigiría acudir a un método de valoración artificial y retrospectivo. Los efectos económicos del NRR no se produjeron, ni eran determinables de manera precisa y cierta, antes de esa fecha.

756.  Por estas razones, el Tribunal fijará el día 20 junio de 2014 como la fecha a partir de la cual debe calcularse el perjuicio indemnizable.

---

[1581] *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 581 [**CL-0130**].

[1582] *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 581 [**CL-0130**].

[1583] Memorial de Demanda, ¶ 271.

[1584] Demandante – Informe sobre Daños Brattle, ¶ 11.

[1585] Orden Ministerial IET/1045/2014, 16 de junio de 2014, por la que se aprueban los parámetros retributivos de las instalaciones tipo aplicables a determinadas instalaciones de producción de energía eléctrica a partir de fuentes de energía renovables, cogeneración y residuos ("**Orden Ministerial IET/1045/2014**") [**CL-0028**].

4.    Contribución de Steag al perjuicio

757.  El Tribunal ha determinado que la fecha de la inversión de Steag es el 8 de junio de 2012, fecha para la cual había una expectativa de que a Arenales Solar se le mantendrían las tarifas, primas y los límites inferior y superior a que se refiere el RD 1614/2010, durante la vida útil de dicha instalación.

758.  Las Partes han explicado que, con posterioridad al 8 de junio de 2012, Steag realizó múltiples inyecciones de capital, que se extendieron inclusive durante los años 2013 y 2014[1586]. Las inyecciones de capital se producen inclusive cuando ya se han empezado a adoptar, paulatinamente, las medidas que conforman el NRR.

759.  El Tribunal observa que, de acuerdo con la narrativa de la Demandante, el proyecto Arenales Solar había perdido su atractivo económico con la llegada del NRR[1587]. Surge entonces la pregunta de si, cuando las medidas ya habían sido anunciadas o adoptadas, la Demandante continuó realizando cuantiosas inyecciones de capital porque no tenía otra alternativa bajo los contratos que había suscrito o si asumió un riesgo no obstante tener opciones para reducir o eliminar el eventual perjuicio de las medidas que ahora cuestiona. El interrogante es, en otras palabras, si la conducta de Steag es o no una causa concurrente del perjuicio que afirma haber sufrido.

760.  El Tribunal comienza por observar que la conducta de la parte que alega haber sufrido un daño y, particularmente, su contribución al daño o perjuicio, es un elemento ampliamente reconocido para el análisis y cuantificación del perjuicio indemnizable[1588]. Así se desprende del artículo 39 de los Artículos sobre la Responsabilidad del Estado, cuyo tenor literal es el siguiente:

> "Artículo 39. Contribución al perjuicio. Para determinar la reparación se tendrá en cuenta la contribución al perjuicio resultante de la acción o la omisión, intencional o negligente, del Estado lesionado o de toda persona o entidad en relación con la cual se exija la reparación".

761.  Como afirmó el tribunal del caso *Gemplus c. México*:

> "El artículo 39 de los Artículos sobre Responsabilidad Internacional del Estado de la CDI excluye la recuperación, total o no, cuando, mediante el acto u omisión intencional o negligente del Estado o persona demandante, dicho Estado o persona haya contribuido al perjuicio por el cual pide reparación por parte del Estado demandado"[1589].

---

[1586] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 205, ss.
[1587] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 435.
[1588] Cf. *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Laudo, Caso CIADI No. ARB/01/7 (25 de mayo de 2004), ¶¶ 242, 243 [**CL-0039**].
[1589] Traducción del Tribunal. Texto original: "*Article 39 of the ILC's Articles on State Responsibility precludes full or any recovery, where, through the wilful or negligent act or omission of the claimant state or person, that state or person has contributed to the injury for which reparation is sought from the respondent state*". *Gemplus S.A. et al. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/04/3 y ARB(AF)/04/4 (16 de

762. Para determinar si Steag contribuyó al perjuicio y en qué medida lo hizo, debe analizarse en primer lugar si el inversor podía haberse negado a continuar participando en el proyecto o a realizar inyecciones adicionales de capital para evitar o reducir los impactos del NRR. Las Partes han adoptado diferentes posiciones sobre este particular.

763. La Demandada afirma que los contratos firmados en el año 2012 permitían a Steag salirse de la operación y que, en consecuencia, la decisión de permanecer en ella y realizar nuevos aportes fue una decisión libre de Steag[1590]. España sostiene que la salida de Steag de la operación en febrero de 2020 confirma su interpretación[1591]. Para la Demandada, la desinversión fue realizada de conformidad con los términos acordados en 2012[1592].

764. A su turno, Steag explica que sus recursos estuvieron comprometidos desde un principio y que los nuevos aportes eran consecuencia de las obligaciones contraídas en 2012, dentro de una estructura de *project finance*[1593]. Para la Demandante, una desinversión en el año 2013 o 2014 habría implicado un incumplimiento contractual y un acto de mala fe[1594]. Steag asevera además que la desinversión realizada en 2020 no tiene relación alguna con los contratos de 2012[1595].

765. El Tribunal procede entonces a analizar estos argumentos, considerando los antecedentes y la estructura del *project finance*. En julio 2011 se suscribió una financiación estructurada a través de una serie de contratos que incluyeron contratos de inversión, financiación, compromiso de socios y garantías[1596]. Una de las partes contratantes fue SMAG, quien participó en la fase inicial de negociación y estructuración de la inversión[1597].

---

junio de 2010), ¶ 11.12 [**RL-0075**].

[1590] Escrito Post-Audiencia - Primera Ronda (España), ¶¶ 53 y 113, ss.; Escrito Post-Audiencia - Segunda Ronda (España), ¶¶ 8, ss., 31, ss. y 94, ss.

[1591] Comentarios a la comunicación de la demandante de 20 de febrero de 2020 sobre la desinversión de Steag GmbH en la planta de Arenales a favor de RREEF, 26 de febrero de 2020, ¶¶ 12, ss.

[1592] Comentarios a la comunicación de la demandante de 20 de febrero de 2020 sobre la desinversión de Steag GmbH en la planta de Arenales a favor de RREEF, 26 de febrero de 2020, ¶¶ 12, ss.

[1593] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 205, ss.

[1594] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 69, ss.

[1595] Respuesta a los Comentarios de España sobre la Operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶¶ 7, ss.; Comentarios de Steag sobre la ausencia de relación entre la operación y la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios, 5 de marzo de 2020, ¶¶ 6, ss.

[1596] Contrato de Inversión entre OHLI, SMAG y RFEEF, de 28 de julio de 2011 [**C-0011**]; Contrato de Contragarantía (también denominado en los diferentes escritos como de "Coordinación y Garantías") [**BQR-011**]; "Contrato de Financiación", de 28 de julio de 2011 (**BQR-018**); "Contrato de Compromisos de Socios" de Arenales Solar, por medio del cual los socios asumían ciertas obligaciones con los miembros del Sindicato de Bancos, de 28 de julio de 2011 [**C-0012**]; Ocho Contratos Marco de Operaciones Financieras ("CMOF") de Cobertura de Riesgos de Tipos de Interés firmados entre la Sociedad de Proyecto y los miembros del Sindicato de Bancos para mitigar el riesgo asociado a variaciones del tipo de interés [**BQR-020**].

[1597] Contrato de Inversión entre OHLI, SMAG y RFEEF, de 28 de julio de 2011 [**C-0011**]; Contrato de Contragarantía (también denominado en los diferentes escritos como de "Coordinación y Garantías") [**BQR-011**]; "Contrato de Financiación", de 28 de julio de 2011 [**BQR-018**]; "Contrato de Compromisos de Socios" de Arenales Solar, por medio del cual los socios asumían ciertas obligaciones con los miembros del Sindicato de Bancos, de 28 de julio de 2011 [**C-0012**]; Ocho Contratos Marco de Operaciones Financieras ("CMOF") de Cobertura de Riesgos de Tipos de Interés firmados entre la Sociedad de Proyecto y los miembros del Sindicato de Bancos para mitigar el riesgo asociado a variaciones del tipo de interés [**BQR-020**].

766. El 21 de diciembre de 2011, SMAG presentó una solicitud de declaración de insolvencia ante el Tribunal de Insolvencia de Fürth, Alemania, que declaró la insolvencia mediante resolución del 28 de febrero de 2012[1598].

767. Posteriormente, el 8 de junio de 2012, se firmó el Contrato de Compraventa de Participaciones (*Share Purchase Agreement*, o SPA) entre SMAG y STEAG, por cual la primera vendió a la segunda el 26% de sus acciones en Arenales Solar, por una suma de EUR 16 millones. A este primer contrato se añadió el Acuerdo Adicional al SPA sobre Asunción de Riesgos, que establece las condiciones que deben cumplirse para completar la transacción[1599].

768. Los contratos de 2011 y 2012 hacen parte de una operación más amplia. El propio SPA del 8 de junio de 2012 dispone en su cláusula 1.5:

> "The Parties acknowledge that this Agreement takes place in the context of a wider and more complex transaction […]"[1600].

769. Como ha explicado Steag, un *project finance* consiste en la financiación de un proyecto de inversión, habitualmente sin recurso a los accionistas o, como en el caso de Arenales Solar, con recurso a los accionistas solamente durante la fase de construcción, y del que se espera una amortización de la financiación a través de los flujos de caja del propio proyecto[1601].

770. La Demandada dice, con razón, que el proceso de inversión no se limitó a la negociación y celebración de unos contratos. El diseño y estructura de la inversión son el reflejo de una valoración estratégica y de una estructura compleja que implica decisiones diferenciables, en diversos momentos[1602]. Es en ese contexto que deben analizarse las posibilidades reales que tenía Steag de salirse del proyecto.

771. El 8 de junio de 2012, las partes acordaron dar los pasos necesarios para cumplir las condiciones establecidas en el SPA antes del 4 de julio de 2012 y, en caso de no ser posible, extender el plazo nuevamente, hasta el 16 de julio de 2012[1603]. El SPA es un contrato bilateral, suscrito entre Solar Millenium AG y Steag 1. De la lectura de la cláusula 1.5 del SPA, salta a la vista que el cumplimiento de las condiciones dependía de negociaciones con los bancos y con otros *sponsors*, así como de las aprobaciones respectivas de Steag, matriz de Steag 1.

772. Es evidente que Steag 1 podía haberse negado a continuar con la operación de no haber podido llegar a un acuerdo con terceros o si los órganos de su propia matriz se hubieran opuesto a ello. En este punto, el Tribunal concuerda con la Demandada en que las condiciones

---

[1598] Dictamen Pericial elaborado por el Sr. David Ramos, p. 15.
[1599] Acuerdo de compraventa de determinadas acciones y créditos de Arenales Solar PS, S.L., de 8 de junio de 2012 [**C-0006**] y Acuerdo Adicional al SPA sobre Asunción de Riesgos, de 31 de julio de 2012 [**C-0024**].
[1600] Acuerdo de compraventa de determinadas acciones y créditos de Arenales Solar PS, S.L., de 8 de junio de 2012, cláusula 1.5 [**C-0006**].
[1601] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 183.
[1602] Memorial de Dúplica y Réplica sobre Jurisdicción, ¶ 338.
[1603] Acuerdo de compraventa de determinadas acciones y créditos de Arenales Solar PS, S.L., de 8 de junio de 2012, cláusula 1.1 [**C-0006**].

en cuestión no eran puramente potestativas, ya que su cumplimiento no dependía sólo de la voluntad de Steag 1, sino también de la voluntad de terceros, incluida Steag GmbH[1604]. En ese sentido, tiene razón la Demandada cuando dice que, bajo el SPA, cualquier órgano de Steag GmbH podía haber frenado la transacción[1605]. No puede ser de otra manera, si se tiene en cuenta que la propia cláusula 1.7 del SPA decía:

> "The Parties acknowledge that, unless otherwise stated by both of them in writing, the failure to complete any of the aforementioned steps will automatically render ineffective those steps which already had or could have been completed, and will oblige the Parties to do any such things or carry out any such acts which may be necessary to put the respective counterparty in the situation it was in prior to taking the first step of the Transaction, despite of the obligation of the Parties to conduct in good faith. Both Parties renounce in such case to claim from each other any compensation or indemnification and, in general, any amount whatsoever"[1606].

773. El Tribunal concuerda con España en que la cláusula 1.7 del SPA "*opera como un pacto válido y voluntario con efecto resolutorio ante el incumplimiento de los pasos regulados en las cláusulas anteriores del SPA, numerales 1.1 a 1.6*"[1607].

774. El 31 de julio de 2012, las partes elevaron a escritura pública el Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG. En este contrato se establecen por segunda vez las condiciones que deben cumplir las partes para que Steag 1 adquiera la posición contractual de SMAG, con todos los derechos y obligaciones de la operación[1608]. A través de este contrato, Steag contrajo la obligación de realizar sus mejores esfuerzos para lograr el cierre de la operación, en los siguientes términos:

> "Each of the Parties expressly undertakes, provided that the anti-trust authorization or clearance and the approval by the lenders of the project financing of the Project Company for this transfer have been obtained, to complete the transactions contemplated in this Amendment Agreement to the IA and to execute the documents and take the actions on the Closing Date described in Clause 3.6 below, carrying out as many actions as may be required or convenient for such purpose. […]"[1609].

775. Si bien esta cláusula puede entenderse como una restricción del margen de maniobra de Steag para salirse de la operación, el Tribunal no puede pasar por alto el hecho que, para ese momento, Steag ya conocía la situación económica de España y el posible impacto que

---

[1604] Escrito Post-Audiencia - Primera Ronda (España), ¶ 164.

[1605] Escrito Post-Audiencia - Primera Ronda (España), ¶ 129.

[1606] Acuerdo de compraventa de determinadas acciones y créditos de Arenales Solar PS, S.L., de 8 de junio de 2012, cláusula 1.7 [**C-0006**].

[1607] Escrito Post-Audiencia - Primera Ronda (España), ¶ 155. Cf. también ¶¶ 156, 157.

[1608] Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012, cláusulas 2.1 y 3 [**C-0019**]; Contrato de Subrogación Parcial y Modificación del Contrato de Contragarantía entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012, cláusulas 3 y 4 [**C-0023**].

[1609] Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012, cláusula 3.4 [**C-0019**].

futuras medidas podrían tener sobre el proyecto Arenales Solar. La cláusula 3.4 de ese mismo contrato – suscrito tan sólo un mes después de la fecha de la inversión – dice de manera explícita:

> "[…] The breach of this obligation by any of the Parties would imply severe damages for the Project Company, its shareholders, and therefore for the viability of the whole project. In this regard **STEAG and STEAG 1 acknowledge the current financial crisis in Spain together with the economic measures being taken and to be taken by the Spanish government affecting the Project Company, its shareholders, and therefore the project. In this regard STEAG and STEAG 1 expressly agree that the referred crisis and measures shall under no circumstances be used by STEAG and STEAG 1 in order to avoid execute the documents** and take the necessary actions on the Closing Date as described in Clause 3.6 below[1610]".

776. Es claro que, poco tiempo después de la fecha de la inversión, Steag ya sabía que había una crisis económica, sabía que España iba a adoptar medidas para enfrentarla y sabía que esas medidas podían afectar a la instalación Arenales Solar. A pesar de ello, aceptó continuar a bordo del proyecto, y aceptó continuar negociando. Pero lo que es fundamental, renunció a invocar las medidas que pudiera adoptar España como justificación para abandonar el proyecto.

777. Las Partes convinieron extender el plazo para el cierre hasta el 30 de septiembre de 2012[1611], como consta en la cláusula 5 del Acuerdo Complementario del SPA. Las condiciones se cumplieron finalmente en noviembre de 2012, cuando se perfeccionaron dos contratos. El primero de ellos es el Contrato de Novación Modificativa No Extintiva de Documentos de la Financiación y Otros Pactos[1612], en donde se autoriza la subrogación de Steag 1 en la posición contractual de SOLAR y se expresa el deseo de las partes de novar ciertas cláusulas del Contrato de Compromiso de Socios y otros documentos de la financiación[1613]. La cláusula 2.1.6(c) hace parte de las modificaciones a la estipulación 2 referente a "*las obligaciones de los socios*". Esta cláusula regula las obligaciones que tienen los socios de realizar aportes en determinadas circunstancias y establece unas reglas comunes al aporte de fondos. El segundo es el Contrato de Novación de Contrato de Deuda Subordinada[1614].

778. Como se indicó arriba, la Demandante afirma haber adquirido las participaciones de SMAG por 20,5 millones de Euros el 8 de junio de 2012, y haber realizado inyecciones de capital por un total de 26,7 millones de Euros entre 2012 y 2014[1615]. Steag aduce, sin embargo, que

---

[1610] Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012, cláusula 3.4 [**C-0019**] (énfasis añadido).

[1611] Acuerdo Adicional al SPA sobre Asunción de Riesgos, de 31 de julio de 2012, cláusula 5 [**C-0024**].

[1612] Contrato de Novación Modificativo No Extintiva de Documentos de la Financiación y otros pactos, de 20 de noviembre de 2012 [**C-0020**].

[1613] Contrato de Novación Modificativo No Extintiva de Documentos de la Financiación y otros pactos, de 20 de noviembre de 2012 [**C-0020**].

[1614] Contrato de Novación Modificativo No Extintiva de Documentos de la Financiación y otros pactos, de 20 de noviembre de 2012 [**C-0020**].

[1615] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 200-204 y 222; Dúplica sobre Jurisdicción, ¶¶ 204, ss.

estas inversiones son consecuencia de la estructura que se negoció, pues son aportes exigidos por obligaciones contractuales adquiridas con anterioridad al NRR[1616].

779.    Específicamente, bajo la estructura del *project finance*, los *sponsors* debían aportar un porcentaje mínimo de los fondos (Ratio de Apalancamiento) y mantener un RCSD; inicialmente, el ratio de apalancamiento acordado era del 27,37% y el RCSD era del 1,05x[1617]. De ahí se desprende que, cada vez que ocurría una disposición del crédito, los *sponsors* estaban en la obligación de realizar un nuevo aporte de capital[1618]. Dentro de esta estructura, explica Steag, la amortización del crédito depende de los flujos de caja de Arenales Solar[1619], que a su vez dependen de la remuneración correspondiente a la energía vertida en red y, en consecuencia, del régimen remuneratorio[1620].

780.    En ese orden de ideas, Steag afirma que las inyecciones de capital adicional en 2013 y 2014 nacen del compromiso previamente asumido de conformidad con el Acuerdo de Inversión y los Contratos de Financiación[1621]. Steag afirma que inyectó un total de EUR 12.503.351,68 en el año 2013 por concepto de fondos propios en Arenales Solar, de conformidad con el artículo 13.6 del Acuerdo de Inversión, en la redacción dada por el Acuerdo de Subrogación y Modificación del Acuerdo de Inversión[1622]. Los accionistas de Arenales aportaron montos adicionales en el año 2014[1623].

781.    La Demandante aduce además que las inyecciones de capital se realizaron para contrarrestar el efecto negativo sobre la inversión de las nuevas medidas regulatorias expedidas por España[1624].

782.    Las inyecciones adicionales de capital fueron aprobadas por el órgano de administración de Steag el 23 de abril de 2013[1625], hasta por un máximo de EUR 13.800.000; la aprobación de los accionistas se dio el 27 de mayo de 2013[1626]. Steag afirma que el Ratio de Apalancamiento ascendió durante la fase de construcción de la planta a 39,18 / 60,82 y que dicha modificación supuso que los *sponsors* tuvieran que inyectar fondos adicionales a los previstos en los contratos iniciales[1627].

783.    Las Partes disputan si, bajo el régimen contractual pactado el 20 de noviembre de 2012, Steag podía haber abandonado el proyecto, para evitar esas cuantiosas aportaciones de capital

[1616] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 198, ss. y 204, ss. Cf. también Dúplica sobre Jurisdicción, ¶¶ 205, 206, citando las cláusulas 5.1, 5.2 y 5.4 del Acuerdo de Inversión [**C-0011**].

[1617] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 190, 191.

[1618] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 191-194.

[1619] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 194.

[1620] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 194.

[1621] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 129, 153.

[1622] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 216.

[1623] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶¶ 218, ss. Cf. también cláusula 4.2.9 (ii) del Acuerdo de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012 [**C-0019**].

[1624] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 153.

[1625] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 152 y Anexo **R-0387**.

[1626] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 152 y Anexo **R-0388**.

[1627] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 210. Cláusula 3.1 del Contrato de Novación de 2013, 2 de agosto de 2013 [**BQR-018**].

adicional. Como se indicó arriba, la manzana de la discordia es la cláusula 2.1.6(c) del Contrato de Novación Modificativa No Extintiva de Documentos de la Financiación y Otros Pactos[1628]. El tenor de dicha cláusula es el siguiente:

> "2.1.6. Reglas comunes a las aportaciones de fondos:
>
> Las aportaciones de fondos por los Socios reguladas en el presente apartado 2.1 seguirán las reglas siguientes:
>
> […]
>
> (c) Salvo que se señale un plazo específico para el pago o que la Acreditada y/o el Agente señalen en el supuesto concreto un plazo específico a tal efecto, en cuyo caso dichos plazos serán de obligado cumplimiento para los Socios, los Socios deberán realizar estas aportaciones a la Acreditada no más tarde de cinco (5) Días Hábiles antes de la fecha en la que la Acreditada deba hacer frente al pago correspondiente, sin necesidad de requerimiento previo. Los Socios no podrán excusar su incumplimiento en la falta de información respecto al estado de las cuentas de la Acreditada o al alcance de las obligaciones de la Acreditada frente a los Acreedores Garantizados o cualquier tercero.
>
> En caso de que, llegada cualquier fecha en que los Socios hubiesen debido aportar Fondos Propios a la Acreditada en virtud de lo dispuesto en los apartados 2.1.4 y 2.1.5 anteriores conforme a lo previsto en el párrafo anterior, cualquiera de ellos no hubiese realizado la aportación que le correspondiese, OHL INDUSTRIAL y FRONTERASOL vendrán obligados, de forma solidaria entre si y respecto a STEAG 1, a aportar a la Acreditada, dentro de los cinco (5) Días Hábiles anteriores a la fecha la que la Acreditada deba hacer frente al pago correspondiente, los Fondos Propios que no hubiesen sido aportados a la Acreditada por el/los Socio/s de que se trate/n.
>
> Asimismo, en caso de que, llegada cualquier fecha en que STEAG 1 hubiese debido aportar Fondos Propios a la Acreditada en virtud de los previsto en el apartado 2.1.2 anterior conforme a lo previsto en el primer párrafo del presente apartado (c), STEAG 1 no hubiese realizado la aportación que le correspondiese, OHL INDUSTRIAL vendrá obligado, de forma solidaria respecto a STEAG 1, a aportar a la Acreditada, dentro de los cinco (5) Días Hábiles anteriores a la fecha en la que la Acreditada deba hacer frente al pago correspondiente, los Fondos Propios que no hubiesen sido aportados a la Acreditada por STEAG 1".

784. El 12 de diciembre de 2019, Steag llegó a un acuerdo para transmitir a Fronterasol B.V. su participación en el proyecto Arenales Solar, operación que se cerró el 3 de febrero de

---

[1628] Contrato de Novación Modificativo No Extintiva de Documentos de la Financiación y otros pactos, de 20 de noviembre de 2012, cláusula 2.1.6.(c) [**C-0020**].

2020[1629]. En el marco de dicha operación, Steag recibió un monto de EUR 9.422.027 como contraprestación[1630].

785.  En sus escritos, la Demandada ha alegado que esta operación evidencia que, bajo la cláusula 2.1.6 del Contrato de Novación[1631], citada *supra.*, Steag podía optar por una salida unilateral de la operación[1632]. A su turno, Steag sostiene que dicha cláusula no daba un derecho a una salida unilateral, y que dar dicho paso habría supuesto un incumplimiento contractual[1633]. Adicionalmente, la Demandante afirma que la susodicha cláusula "*había quedado ya sin efecto por motivo del paso del tiempo*"[1634], argumentando que "*la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios quedó sin efecto tan pronto como quedaron sin efecto las distintas obligaciones de aportación de fondos reguladas en la Cláusula 2.1 del Contrato de Compromisos de Socios*"[1635]. La Demandante agrega que la antedicha cláusula 2.1.6(c) quedó sin efectos, en cualquier caso, por operación del Contrato de Refinanciación del Proyecto del 22 de noviembre de 2018[1636].

786.  El Tribunal no encuentra convincente el argumento de que la cláusula 2.1.6(c) permitiera, por sí misma, una salida unilateral de Steag. Más bien, dicha cláusula prevé una garantía para el caso de que no se realicen los aportes aludidos. El mero hecho de que el cumplimiento de una obligación esté garantizado por otra parte contractual no significa, de ninguna manera, que la inejecución de la obligación deje de constituir un incumplimiento del contrato.

787.  Aunque la operación de 2020 no indique inequívocamente que la cláusula 2.1.6(c) daba la opción de una salida unilateral, la conducta contractual de las partes en el *project finance* sí permite concluir que había un margen para la negociación y que la estructura del proyecto no imponía la camisa de fuerza que alega Steag.

788.  Steag afirmó que, entre el 4 de febrero de 2013 y el 28 de junio de 2013, a medida que se ejecutaban los desembolsos por la Demandante, se mantuvieron las negociaciones con las entidades financieras para asegurar que la construcción de la planta Arenales Solar no se ralentizara y que Arenales continuara disponiendo de los montos previstos en los Contratos de Financiación[1637]. Asimismo, el 2 de agosto de 2013 se celebró un nuevo Acuerdo de Novación (**BQR-018**)[1638]. En el contexto de estas u otras negociaciones, Steag podría haber

---

[1629] Comunicación de la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V., 4 de febrero de 2020, ¶¶ 2, 3.

[1630] Respuesta a los comentarios de España sobre la operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 4.

[1631] Contrato de Novación Modificativo No Extintiva de Documentos de la Financiación y otros pactos, de 20 de noviembre de 2012, cláusula 2.1.6. [**C-0020**].

[1632] Comentarios a la comunicación de la demandante de 20 de febrero de 2020 sobre la desinversión de Steag GmbH en la planta de Arenales a favor de RREEF, 26 de febrero de 2020, ¶¶ 12, ss.

[1633] Respuesta a los comentarios de España sobre la operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶¶ 7, ss.

[1634] Comentarios de Steag sobre la ausencia de relación entre la operación y la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios, 5 de marzo de 2020, ¶¶ 15, ss.

[1635] Comentarios de Steag sobre la ausencia de relación entre la operación y la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios, 5 de marzo de 2020, ¶ 16.

[1636] Comentarios de Steag sobre la ausencia de relación entre la operación y la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios, 5 de marzo de 2020, ¶ 17.

[1637] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶¶ 214, 215.

[1638] Réplica sobre el Fondo y Memorial de Contestación sobre Excepciones a la Jurisdicción, ¶ 215.

intentado negociar su salida del proyecto o acordar cláusulas que de alguna manera redujeran el impacto financiero a la luz de las medidas que venía tomando la Demandada y que afectaban el proyecto. Sin embargo, nada indica que haya siquiera planteado a los demás contratantes la posibilidad de retirarse del proyecto, de reducir su participación en el mismo o de modificar el modelo financiero para reducir el impacto que ahora reclama.

789. La existencia de un margen de negociación queda comprobada, en últimas, por el hecho mismo de que Steag pudo acordar una desinversión entre 2019 y 2020, recibiendo un monto significativo por su participación en el proyecto Arenales Solar. La propia Steag dice en su escrito del 20 de febrero de 2020:

> "**[L]a posición contractual de Steag tenía un indudable valor implícito** porque cualquier tercer adquirente estaría obligado a tener que acordar con Steag numerosos aspectos de la gestión del Proyecto Arenales. Si la posición contractual de Steag no hubiera tenido un particular valor, como sostenía Accuracy para justificar una reducción de los daños, RREEF no habría hecho ofrecimiento alguno a Steag y se habría limitado a transmitir su parte al tercero sin tener en cuenta a Steag. Lo cierto es que **la posición contractual permitió a Steag obtener una contraprestación por su participación** más beneficiosa que la que lograría normalmente. No en vano, RREEF pagó el precio indicado en un único pago, sin posibilidad de ulteriores ajustes"[1639].

790. Lo anterior es particularmente significativo si se tiene en cuenta que, según la Demandante, la aprobación del RDL 17/2019 de 22 de noviembre de 2019, continuó afectando su posición contractual[1640]. En ese contexto, Steag habla de "*los mayores daños que sufriría Arenales debido a la menor remuneración que recibirá como consecuencia de esta nueva modificación del Nuevo Régimen Regulatorio*"[1641].

791. Es decir que, según la narrativa de Steag, su situación en 2020 es más grave que la que existió entre 2013 y 2014; pero, aún así, según la propia Demandante, su participación sigue teniendo un "*valor implícito*" por el que otro inversionista estuvo dispuesto a pagar una contraprestación. Con mayor razón, con anterioridad a la adopción del RDL 17/2019, debía ser posible negociar una salida del proyecto. Si Steag no lo juzgó conveniente, y ni siquiera intentó iniciar tal negociación en ese momento, no puede esperar que España asuma las consecuencias de su decisión.

792. El Tribunal no está convencido de que los documentos del *project finance* constituyeran, como lo afirma la Demandante, una especie de "*camisa de fuerza*" de la que era imposible escapar. En primer lugar, y como lo afirmó la misma Demandante al referirse a la venta de su participación en Arenales Solar, Steag tenía una posición contractual que tenía un valor. En segundo lugar, no existe evidencia alguna de que la Demandante, directamente o con el

---

[1639] Respuesta a los Comentarios de España sobre la Operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 14 (énfasis añadido).
[1640] Comentarios de Steag sobre la Ausencia de Relación entre la Operación y la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios, 5 de marzo de 2020, ¶¶ 11, 12.
[1641] Comentarios de Steag sobre la Ausencia de Relación entre la Operación y la Cláusula 2.1.6.(c) del Contrato de Compromisos de Socios, 5 de marzo de 2020, ¶ 12.

concurso de sus socios, haya intentado una renegociación o restructuración del proyecto para reducir de alguna manera el impacto en Arenales Solar. Ni las cláusulas de los contratos celebrados ni la financiación ni el flujo de caja previsto para el proyecto impedían que la Demandante buscara en forma diligente una revisión del modelo económico o un ajuste en los flujos de caja para reducir el impacto de las medidas. Ningún *project finance* es inmodificable y por lo general es ajustable cuando hay condiciones que afectan los flujos de pagos. Sin embargo, nada se ha informado al Tribunal sobre esfuerzos de la Demandante para intentar renegociar los acuerdos o convenir medidas que redujeran o eliminaran el impacto en la estructura. La Demandada no tendría por qué asumir la totalidad de las consecuencias del esquema de financiación de la Demandante cuando esta última no hizo los esfuerzos necesarios para negociar una modificación.

793.    Aún si se admite que los contratos de 2012 eran efectivamente una "*camisa de fuerza*", inflexible, que obligaba a Steag a seguir realizando aportes de capital con un margen mínimo o nulo de negociación, lo cierto es que dichos contratos fueron negociados libremente por Steag. Como se señaló arriba, el 31 de julio de 2012, en la cláusula 3.4 del Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG[1642], Steag reconoció expresamente la existencia de una crisis económica y el riesgo de que se adoptaran medidas que afectaran el proyecto Arenales Solar. Conociendo el riesgo, en la misma cláusula renunció a invocarlo como causa para abandonar las negociaciones. Si los contratos celebrados a finales de 2012 realmente no preveían la posibilidad de una salida unilateral por parte de Steag y la obligaban a seguir inyectando fondos, a pesar de que su inversión – según la narrativa de la Demandante – carecía "*por completo de valor*"[1643], la responsabilidad por esa estructura recae sobre Steag.

794.    El Tribunal encuentra que, si bien España infringió el estándar de TJE al introducir un régimen regulatorio radicalmente diferente del RRO, frustrando las expectativas que ella misma generó en Steag y que existían a la fecha de la inversión, la estructura que negoció Steag también jugó un papel en la causación del daño. Steag hizo parte de continuas negociaciones, posteriores a la fecha de la inversión, en que se estructuró la financiación del proyecto. Como consecuencia de la manera como estructuró el *project finance*, Steag realizó múltiples inyecciones de capital entre la segunda mitad de 2012 y 2014, inclusive cuando las medidas de España ya estaban anunciadas o habían sido adoptadas. El Tribunal no puede hacer caso omiso del hecho que el perjuicio que alega haber sufrido la Demandante se debe parcialmente a la manera como Steag condujo las sucesivas negociaciones del *project finance*.

795.    La consecuencia de dicha contribución al perjuicio es una reducción en el monto de la indemnización. El Tribunal goza de un amplio margen de discreción para determinar el

---

[1642] Contrato de Subrogación Parcial y Modificación de Acuerdo de Inversión entre los inversores originales y STEAG 1 y STEAG, de 31 de julio de 2012, cláusula 3.4 [**C-0019**].
[1643] Memorial de Demanda, ¶ 268.

porcentaje por el cual se reduce la indemnización[1644]. La reducción en otros casos ha sido, por ejemplo, del 25%[1645] o del 50%[1646].

796.  El Tribunal, habiendo analizado todas las circunstancias del caso, y dentro del margen de discreción que tiene, encuentra que la contribución de Steag al perjuicio puede cuantificarse en un 25%. Este porcentaje refleja la contribución fáctica parcial de Steag al monto del perjuicio, al tiempo que reconoce la gravedad de la conducta de España como causa principal del daño sufrido. En consecuencia, una vez se determine el monto de los daños sufridos por el inversionista, el Tribunal procederá a reducir el monto indemnizable en la proporción indicada.

5.    Efectos de la operación de desinversión del año 2020

797.  El Tribunal debe tomar en consideración la venta de la participación de Steag en Arenales Solar que, según lo informó Steag al Tribunal, tuvo lugar en febrero de 2020[1647]. En su Memorial de Réplica, Steag afirmó que, como consecuencia de la conducta de España, "*[s]e reduce de manera sustancial el resultado de explotación de la Planta, lo que impide un reparto de ingresos libres a los accionistas e impide que la Demandante recupere su inversión. Se dificulta la renegociación de los accionistas de Arenales Solar frente a las Entidades Financieras, que permita una extensión del plazo de devolución de los préstamos concedidos para la construcción de la Planta o una reducción del tipo de interés aplicable, que permita liberar flujos de caja suficientes como para ofrecer remuneración a los accionistas de Arenales Solar. Se reduce la liquidez de la posición de Steag en Arenales Solar, cuyo justo valor de mercado se ve reducido a 0 € bajo un análisis de descuento de flujos de caja y de tal manera se impide que Steag limite sus pérdidas al transmitir su posición a un posible inversor*"[1648].

798.  En vista de la manera como se alegaron los daños, y la afirmación de Steag de que el valor de mercado de su participación era igual a EUR 0, el Tribunal no puede hacer caso omiso al hecho que el inversor pudo vender su participación en Arenales Solar en la operación de febrero de 2020[1649], obteniendo – como lo admite la propia Demandante – una suma de EUR 9.422.027 por la misma, suma que le fue desembolsada por RREEF[1650]. En uno de sus escritos acerca de dicha operación, ya citado anteriormente, la Demandante ha reconocido que su posición contractual "*tenía un indudable valor implícito*" y que, además, "*la posición*

---

[1644] *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. República del Ecuador*, Laudo, Caso CIADI No. ARB/06/11 (5 de octubre de 2012), ¶ 670 [**CL-0040**].
[1645] *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. República del Ecuador*, Laudo, Caso CIADI No. ARB/06/11 (5 de octubre de 2012), ¶ 687 [**CL-0040**].
[1646] *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Laudo, Caso CIADI No. ARB/01/7 (25 de mayo de 2004), ¶ 243 [**CL-0039**].
[1647] Comunicación de la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V., 4 de febrero de 2020, ¶¶ 2, 3.
[1648] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 504 (énfasis añadido). El Tribunal observa que este punto se presenta en un acápite relativo a la reclamación por expropiación.
[1649] Comunicación de la operación de transmisión de la posición de STEAG GmbH en Arenales Solar PS, S.L. a Fronterasol, B.V., 4 de febrero de 2020, ¶¶ 2, 3.
[1650] Respuesta a los comentarios de España sobre la operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 4.

*contractual permitió a Steag obtener una contraprestación por su participación más beneficiosa que la que lograría normalmente*"[1651].

799.  El Tribunal deberá entonces descontar del monto del perjuicio indemnizable la suma que Steag recibió por su participación en Arenales Solar.

6.  <u>Vida útil de la planta Arenales Solar</u>

800.  El Tribunal concuerda con las Partes en que la vida útil regulatoria de las plantas es un parámetro indispensable para calcular el régimen económico de las inversiones y, por lo tanto, el daño. Como se indicó en el análisis de la expectativa legítima de la Demandante, Steag podía esperar razonablemente que la instalación Arenales Solar recibiría el régimen económico del RD 661/2007 durante la vida útil de la planta.

801.  De manera preliminar, el Tribunal observa que las partes han discutido decisiones arbitrales anteriores, donde se ha encontrado que la vida útil de las plantas respectivas era de 25 años[1652]. La Demandante ha resaltado que este caso es diferente a los anteriores[1653]. La diferencia central está, dice Steag, en que esos laudos no han encontrado probado que las plantas respectivas operarían por más de 25 años y han resaltado la necesidad de tomar en cuenta los altos costes de mantenimiento[1654].

802.  El Tribunal concuerda con Steag en que cada caso es particular. La vida útil de Arenales Solar para los efectos del cálculo de daños debe estimarse con base en los datos disponibles para esa planta y en atención a la manera como fue estructurada la inversión.

803.  Las Partes y sus expertos difieren sobre la vida útil de la Planta Arenales Solar, que debe tenerse en cuenta para el cálculo de daños. Los cálculos de la vida útil que se han presentado al Tribunal oscilan entre 20 y 40 años. Así, el Informe de Brattle del 26 de mayo de 2017 sugiere que la vida útil de la Planta Arenales Solar alcanzaría los 40 años[1655]. En ese sentido, los expertos explican:

> "Nuestro análisis presupone que *Arenales* podría funcionar durante 40 años sin tener que realizar inversiones importantes. El Régimen Regulatorio Original ofrecía incentivos para seguir en funcionamiento más allá de los 25 años, porque las ayudas económicas descendían un relativamente modesto 20% después de ese punto. El acusado descenso de los ingresos previstos después del año 2038 en el Escenario real refleja el cierre efectivo de *Arenales*"[1656].

---

[1651] Respuesta a los Comentarios de España sobre la Operación de Fronterasol y Steag en Arenales Solar PS, S.L., 20 de febrero de 2020, ¶ 14.

[1652] Audiencia, Día 1, 87:19-22 (Díaz de la Cruz); 175:1-3 (Fernández Castilla).

[1653] Audiencia, Día 1, 87:21-22 y 88:1-3 (Díaz de la Cruz).

[1654] Audiencia, Día 1, 180:14-22 y 181:1-3 (Fernández Castilla). Cf. Informes, Profesor Servert [**JSRC-16** y **JSRC-17**].

[1655] Daños y perjuicios económicos sufridos por Steag (Brattle), ¶¶ 69, 70 y n. 57.

[1656] Daños y perjuicios económicos sufridos por Steag (Brattle), ¶ 69 (nota al pie omitida).

804. El Tribunal no encuentra probado que la vida útil de la planta Arenales Solar sea de 40 años, ni siquiera desde punto de vista técnico. El Tribunal ha considerado con detenimiento los argumentos que ha formulado el señor Schneider para justificar el cálculo de una vida útil de 40 años. El Tribunal, sin embargo, no está convencido de que pueda hablarse de una vida útil de 40 años para efectos del cálculo de daños. Para comenzar, en la audiencia, el propio señor Schneider explicó que su cálculo se basa en los ciclos de la planta, criterio que a su vez es variable; en palabras del experto, "*un ciclo puede durar 1 hora o también puede durar 3 días, por ejemplo*"[1657]. Pero, más aún, el señor Servet puso de presente que, aún desde el punto de vista técnico, no está probado que la planta Arenales Solar vaya a operar por 40 años. El señor Servet resaltó que "*los ciclos, siendo importantes, no son el único elemento decisivo para la vida de un equipo. La temperatura de funcionamiento, la corrosión, la fatiga normal, como bien ha dicho mi colega, cómo se hacen los ciclos de arranque y parada, todo eso es muy importante*"[1658]. Teniendo en cuenta algunas incertidumbres y defectos técnicos, Servet habla inclusive de una vida útil de 20 años[1659]. La conclusión de Servet es que "*la planta fue diseñada para 25 años y que debería haber durado 25 años, pero con todos los problemas que ha habido en ingeniería con equipos, construcción, operación y mantenimiento lo más que puedo estimar son 20 años. Esa planta no ha sido operada, mantenida ni ha sido construida correctamente, y eso va a pagar*"[1660].

805. El Tribunal encuentra que, aunque los expertos difieren en el número de años que la planta Arenales Solar podrá operar desde el punto de vista técnico, no está en duda que planta fue diseñada para operar durante 25 años[1661]. Adicionalmente, aún si la planta teóricamente pudiera operar por un período adicional, la tarifa fija se concedía por un período de 25 años. Además, el Tribunal está de acuerdo con la Demandada en que la planta Arenales Solar fue diseñada para que tuviera una vida útil de 25 años[1662].

806. Para efectos del cálculo de daños, una vida útil de 25 años resulta adecuada no sólo en atención al diseño de la planta, sino también en atención al hecho que esa fue la vida útil que se tomó en consideración, de manera consistente, para los cálculos correspondientes a aspectos económicos y financieros del proyecto. En ese sentido, tiene razón el informe de Accuracy cuando, al disputar el punto de partida del Informe Brattle, explica que una vida útil de las plantas de 25 años sería una "*cifra conservadora*", mucho más adecuada que 40 años[1663]. Para Accuracy, no hay justificación para partir de una vida útil de 40 años en el escenario en que el RRO se mantuviera vigente (escenario *but for*)[1664]. Accuracy llama la atención del Tribunal sobre diferentes elementos fácticos[1665]:

---

[1657] Audiencias, Día 3, 792: 11-12 (Schneider).
[1658] Audiencia, Día 3, 864:5-11 (Servet).
[1659] Audiencia, Día 3, 870:13-15; 873:6-11; 878:1-4; 884:22 y 885:1-7 (Servet).
[1660] Audiencia, Día 3, 884:22 y 885:1-7 (Servet).
[1661] Audiencia, Día 3, 855:18-22 (Servet) ("el criterio de diseño es para qué se diseñó esta planta, para cuántos años y en eso creo que estamos de acuerdo los dos peritos: son 25 años el criterio de diseño, la calidad de diseño"). Cf. también Audiencia, Día 3, 863:1-10 (Servet).
[1662] Escrito Post-Audiencia - Primera Ronda (España), ¶ 262.
[1663] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 145(c).
[1664] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 145(c).
[1665] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 145(c).

(i) De acuerdo con las cuentas anuales de Arenales, para el cálculo de la amortización se tomaba una vida útil de 25 años[1666]. Asimismo, el contrato EPC partía de una vida útil de 25 años[1667].

(ii) Algo similar ocurría con el informe de inversión, ya que la TIR del proyecto se basaba en una vida útil calculada entre 20 y 25 años[1668].

(iii) También un informe técnico del año 2012, citado en las cuentas anuales de Arenales Solar, indicaba que la vida útil era de 25 años[1669]. El aparte citado las cuentas anuales es claro en este punto: "*La Sociedad amortiza los elementos de su inmovilizado material desde la puesta en funcionamiento siguiendo el método lineal distribuyendo el coste de los activos entre los años de vida útil estimada que según un estudio técnico realizado por un experto independiente en 2012 asciende a 25 años para todos los elementos del activo*"[1670].

(iv) Accuracy considera una vida útil de 25 años de la Planta Arenales en los escenarios actual y *but for*, como el horizonte máximo más razonable[1671]. En el escenario *actual*, se calculó la tasa de rentabilidad en el 7,398% *pre-tax*, rentabilidad incluida en el RDL 9/2013, aplicada a una vida útil de 25 años.

807. En la audiencia se justificó la continua referencia en sus informes a una vida útil de 25 años en la diferencia entre la vida útil "*técnica*" y "*económica*" de Arenales Solar. Así, el señor Ponce de León declaró: "***Nosotros tenemos una tarifa a 25 años y a día de hoy no podemos amortizar el activo más allá de esa tarifa*** *que es la justificación que tenemos fiscal, que se pueda justificar a Hacienda, de la vida útil de la planta. Porque una cuestión es la vida útil técnica y otra cuestión es la vida útil económica. Evidentemente si no tenemos una tarifa que soporte los costes que podamos tener en ese momento, pues no podremos seguir operando la planta. Por eso estamos amortizando contablemente y fiscalmente a 25 años*"[1672]. En otras palabras, ni siquiera la Demandante partió del supuesto de que el activo se amortizaría por 40 años.

808. Para este Tribunal resulta esencial que la propia Demandante no esperaba la remuneración del RRO más allá de 25 años. Este arbitraje se refiere al cambio del RRO al NRR y sus efectos sobre la inversión de Steag[1673]. En la audiencia quedó claro que Steag nunca esperó, a partir de la legislación vigente en España al momento de realizar su inversión, obtener una remuneración basada en el RRO por más de 25 años. De acuerdo con la declaración del señor Rumstadt relativa a la *due diligence* jurídica: "*Se me explicó que esto es una norma sólida y de rango jurídico y que nos aseguraría dándonos buen confort para una inversión que*

---

[1666] Cuentas anuales de Arenales [**BQR-03**]
[1667] Contrato EPC para la construcción de la Planta con Ecolaire España S.A de 28 julio 2011, p. 18 [**C-0013**].
[1668] Presentación del Proyecto por parte de los Directores al Consejo de Administración, p. 21 [**C-0018**].
[1669] Cuentas anuales de Arenales [**BQR-03**].
[1670] Cuentas anuales de Arenales [**BQR-03**].
[1671] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 26.
[1672] Audiencia, Día 1, 349:6-18 (Ponce de León) (énfasis añadido).
[1673] En el caso del NRR, el artículo 5 de la Orden IET/1045/2014 [**R-0229**] determina la vida útil regulatoria de las instalaciones tipo en una tabla, cuyos valores oscilan entre 20 y 30 años. Para la mayoría de tipos, la vida regulatoria es de 25 años.

*empezaría para una duración de que por 25 años íbamos a tener o recibir la tarifa como fue propuesta en los tres decretos mencionados*"[1674]. El señor Rumstadt también explicó que "*es típico que podemos ver estos proyectos para un plazo de 20 años y era una ventaja para nosotros que esperábamos en este caso tener un plazo de 25 años para esa tarifa de alimentación o feed in*"[1675]. La tarifa de alimentación se calculó sobre 25 años[1676].

809.  Asimismo, en su declaración testimonial, el señor Daniel Voswinkel admitió que, en atención al RRO, la tasa interna de retorno para Arenales Solar fue calculada bajo el supuesto de una vida útil de 25 años:

> "Las decisiones de inversión dentro de STEAG se basan en la tasa interna de retorno alcanzable utilizando el método de cálculo de descuento de los flujos de caja. Como práctica interna general en STEAG, los proyectos se calculan primero sobre una base conservadora de una vida útil de 20 años, ignorando el tiempo de vida real técnico y económico de una planta de energía. **El Régimen Tarifario Original, sin embargo, se aplicaba de forma completa durante los primeros 25 años de funcionamiento. Consideramos que esto era relevante. La tasa interna de retorno calculada para el Proyecto Arenales se basó en una vida útil de 25 años,** y la tarifa regulada con Prima condujo a una tasa interna de retorno del 12.5 %. Además, se consideró el compromiso original de España de proporcionar apoyo financiero para la combustión de gas hasta en un 15 % de la producción. Los ingenieros de STEAG me informaron de que la vida útil técnica de la Planta de Arenales se estima en alrededor de 40 años. Los 15 años restantes se consideran como un complemento de la TIR proyectada originalmente"[1677].

810.  Por las razones anteriores, el Tribunal encuentra que no está probado que la planta Arenales Solar tuviera tenga una vida útil de 40 años. Lo que sí está probado es que la inversión se proyectó sobre la base de una vida útil de 25 años. El Tribunal concluye entonces que, para los efectos de la determinación del perjuicio indemnizable, debe partirse de una vida útil de 25 años.

### 7.    El *tax gross-up*

811.  El Tribunal ha considerado el argumento de la Demandante acerca de los supuestos daños que derivarían del "*impacto fiscal del pago del laudo*"[1678]. El punto central del argumento de la Demandante es que "[…] *sobre la base del principio de indemnización íntegra de los daños y perjuicios sufridos por Steag, no es lo mismo recibir unos flujos de caja a través de dividendos y amortización de préstamos que a través de un potencial laudo que conceda una indemnización*"[1679]. Para la Demandante, "*[m]ientras que la primera vía recibe un*

---

[1674] Audiencia, Día 1, 299:4-14 (Rumstadt).
[1675] Audiencia, Día 1, 305:5-13 (Rumstadt).
[1676] Audiencia, Día 1, 322:13-22 y 323:1-2 (Rumstadt).
[1677] Declaración testifical del Sr. Daniel Voswinkel, de 10 de mayo de 2018, ¶ 31 (énfasis añadido).
[1678] Escrito Post-Audiencia - Primera Ronda (Steag), ¶¶ 191, ss.
[1679] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 192.

*tratamiento tributario determinado, los flujos de caja recibidos por un laudo reciben un tratamiento tributario diferente*"[1680]. El Estado se ha opuesto a esta pretensión y ha controvertido las premisas del argumento del inversor[1681].

812. El Tribunal nota que las Partes han apoyado sus pretensiones sobre este punto en dos informes. Steag apoya su reclamo en el informe rendido por Ernst & Young GmbH (Anexo **BQR-056**)[1682]. Según la Demandante, "*la recepción de ingresos a través de los dividendos que hubiera repartido Arenales Solar PS, S.L., habrían sido gravados a un tipo de gravamen efectivo del 1,631 %. Sin embargo, en el escenario real, los ingresos que pudieran recibirse gracias a un laudo favorable a Steag se verían gravados en su totalidad, lo que arrojaría un tipo de gravamen efectivo del 32,625 %*"[1683].

813. A su turno, España se opone a las conclusiones del inversor con base en un informe preparado por la firma Noerr (Anexo **ACQ-0062**). Con base en ese Informe, el Estado afirma que "*[l]a conclusión de que el escenario "But-for" sería igual al escenario "Actual", incluso suponiendo (pero no aceptando, como sugiere STEAG) que una eventual compensación otorgada por el Tribunal fuera gravada como ingresos ordinarios*"[1684]. Para el Estado, hay dos posibles escenarios:

> "(i) o bien la compensación se considera como un pago equiparable a un dividendo (que lo es, desde un punto de vista económico) donde por tanto automáticamente no cabe un "tax gross up" porque el escenario "Actual" y el escenario "But-for" se tratarían igual desde un punto de vista fiscal; (ii) o bien se considera un ingreso ordinario, por tanto sujeto a las normas fiscales ordinarias, en cuyo caso tenemos que analizar cuál hubiera sido el tratamiento fiscal de los dividendos en el escenario "But-for", como hizo Noerr en su informe. Como recordará el Tribunal, Noerr concluyó que, debido a ciertas normas tributarias, los dividendos (escenario "But-for") no se benefician de exención fiscal y por lo tanto se gravan como ingresos ordinarios"[1685].

814. El Tribunal observa que la carga de probar el daño recae sobre Steag[1686]. Esa carga no se refiere únicamente a la existencia de un daño, sino también a su cuantía. Es la Demandante quien debe demostrar el supuesto perjuicio generado por "*impacto fiscal del pago del laudo*" que, según ella, justificaría un "*tax gross-up*".

815. El Tribunal encuentra que Steag no ha satisfecho esta carga. Habiendo considerado los argumentos de las Partes con detenimiento y previa revisión de los informes presentados, el Tribunal concluye que el perjuicio que alega Steag es incierto. El argumento del inversor se basa en hipótesis contingentes e interpretaciones de las normas aplicables que no están libres

---

[1680] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 192.

[1681] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶¶ 172, 175.

[1682] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 191.

[1683] Escrito Post-Audiencia - Primera Ronda (Steag), ¶ 217.

[1684] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶ 162.

[1685] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶ 161.

[1686] *Gemplus S.A. et. al. c. Los Estados Unidos Mexicanos*, Laudo, Caso CIADI No. ARB(AF)/04/3 y ARB(AF)/04/4 (16 de junio de 2010), ¶¶ 12-56, 13-80 y 13-81 [**RL-0075**].

de controversia, como lo revela el Informe Noerr. De acuerdo con dicho informe, "*[n]o hay jurisprudencia sobre el tratamiento fiscal en Alemania de un laudo dictado bajo el Tratado de la Carta de la Energía ("TCE") como el presente caso*"[1687]. Asiste entonces la razón a España cuando afirma que "*existe una incertidumbre jurídica que podría resolverse en opuestas direcciones por futuras decisiones de los tribunales fiscales en Alemania*"[1688].

816. Por las razones anteriores, el Tribunal no otorgará el *tax gross-up* solicitado por la Demandante.

### 8.  Cálculo del perjuicio indemnizable: metodología

817. Las Partes han discutido *in extenso* cuál es el método más adecuado para el cálculo de daños. Como se explicó anteriormente*.,* la Demandante presenta su cálculo de daños con base en el método DCF, comparando los flujos de caja reales de Arenales Solar (escenario actual) y los flujos de caja hipotéticos que se habrían obtenido en ausencia del NRR (escenario *but for*)[1689]. La Demandante llega a la cifra de EUR 79 millones[1690], más lo que corresponda por la capitalización de ese monto hasta la fecha del laudo, los impuestos que genere el laudo y los intereses[1691].

818. La Demandada alega que los daños reclamados por Steag son "*total y absolutamente especulativos*"[1692]. Para la Demandada, el método DCF no es aplicable a cualquier situación fáctica y resulta inapropiado para las circunstancias del presente caso[1693]. La Demandada va más allá y afirma que "*el DCF de Brattle adolece de defectos que, una vez corregidos darían como resultado la inexistencia de un daño*"[1694]. España afirma que "*[l]a parte Demandante pretende sostener una reclamación con fundamento en una simplista comparativa de escenarios ('real' y contra fáctico), dando por hecho que el 'real' se va a mantener durante las próximas décadas, obviando que el principio rector del sistema está constituido por la rentabilidad razonable garantizada. Entre otros, en sus modelos trata de predecir datos como el precio del pool (dependiente del precio del crudo) y la demanda energética. Es por todo ello que la proyección de los parámetros vigentes resulta hipotética e ilusoria*"[1695]. España considera que los daños deben tasarse con base en el método ABV estructurado en la rentabilidad sobre la inversión en un mercado regulado[1696]. Bajo este método, el flujo de caja anual de un activo se determina con base en el importe de la inversión y la tasa de rentabilidad esperada[1697].

---

[1687] Informe Noerr [**ACQ-0062**], pp. 4, 9.
[1688] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶ 161.
[1689] Memorial de Demanda, ¶¶ 270-275.
[1690] Escrito Post-Audiencia - Segunda Ronda (Steag), ¶ 89; Memorial Adicional, ¶ 201.
[1691] Memorial de Demanda, ¶¶ 284-288.
[1692] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 58. Cf. también ¶ 1419.
[1693] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 61.
[1694] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 65. Cf. también ¶¶ 1419, ss.
[1695] Memorial de Dúplica y Réplica de Jurisdicción, ¶ 1421. Cf. también Memorial de Objeciones Jurisdiccionales y Contestación sobre Méritos, ¶ 1172.
[1696] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶ 97.
[1697] Primer Informe Económico sobre la Demandante y su reclamación (Accuracy), ¶¶ 128, 129.

819. El Tribunal comienza por observar que, como lo han señalado otros tribunales arbitrales, no hay métodos correctos o incorrectos para el cálculo de daños[1698]. Sin embargo, el método DCF es ciertamente uno de los métodos de uso más frecuente[1699]. Este Tribunal no está llamado a resolver en abstracto qué método es más adecuado para valorar inversiones, sino, más bien, si el método DCF utilizado por la Demandante y sus expertos es apropiado para la inversión particular de Steag.

820. A juicio de este Tribunal, el uso del método DCF en el presente caso resulta razonable en cuanto se trata de una planta en operación cuyos flujos de caja pueden determinarse y proyectarse. Asiste la razón a la Demandante cuando explica que el marco bajo el cual se establecen los flujos de caja para el escenario *but for* no son especulativos, porque se basan en los criterios del RRO, que garantizaba unos flujos de caja mínimos[1700]. El Tribunal encuentra que es posible construir un escenario hipotético basado en el RRO, para calcular el monto del daño indemnizable en términos objetivos y determinados.

821. Si bien en principio el cálculo de los daños a partir del método DCF y de la comparación de un escenario hipotético (correspondiente al RRO) con el real (NRR) resulta lógico y coherente con las circunstancias del caso, eso no significa que el Tribunal esté de acuerdo con las conclusiones y escenarios del informe de daños de The Brattle Group. En particular, el Tribunal considera que la tasación de daños debe tener en cuenta y estar basada en los elementos discutidos en esta decisión, a saber:

    (i) La exclusión del IVPEE del conjunto de medidas que se tienen en cuenta para calcular el perjuicio indemnizable;

    (ii) La exclusión de la posibilidad de vender energía producida con gas a tarifa regulada del conjunto de medidas que se tienen en cuenta para calcular el perjuicio indemnizable;

    (iii) El 20 de junio de 2014 como la fecha a partir de la cual debe calcularse el perjuicio;

    (iv) El descuento del 25%, que representa la contribución del inversor al perjuicio;

    (v) Los efectos de la desinversión del año 2020; y

    (vi) La vida útil de la planta Arenales Solar, que para efectos del cálculo de daños no puede ser de 40 años, como sugiere el escenario *but for* de Brattle, sino que corresponde a 25 años.

    (vii) La exclusión del *tax gross-up* solicitado por la Demandante.

822. Dado que los cálculos de daños presentados hasta la fecha por las Partes no han tenido en cuenta la totalidad de los elementos indicados los párrafos 820 y 821 *supra*, el Tribunal solicitará a las Partes presentar un cálculo de mutuo acuerdo que tenga en cuenta los criterios

---

[1698] *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 688 [**CL-0130**].
[1699] *Antin Infrastructure Services Luxembourg S.à.r.l. et al. c. Reino de España*, Laudo, Caso CIADI No. ARB/13/31 (15 de junio de 2018), ¶ 688 [**CL-0130**].
[1700] Memorial de Réplica sobre el Fondo y Contestación sobre Excepciones a la Jurisdicción, ¶ 515.

allí señalados. De no ser posible llegar a un acuerdo, las Partes deberán presentar un documento indicando los puntos de acuerdo y desacuerdo respecto del monto del perjuicio indemnizable. El Tribunal considera que, en atención a la complejidad del caso, un plazo de noventa (90) días contados a partir de la notificación de esta decisión resulta razonable para estos efectos. Cumplido ese plazo, el Tribunal procederá a determinar el monto de la indemnización y los intereses correspondientes.

## X.    DECISIÓN

823.  Por las razones expuestas, el Tribunal resuelve:

1.  Por unanimidad, declarar que carece de jurisdicción para conocer la controversia sobre la supuesta violación del artículo 10(1) del TCE mediante la introducción del IVPEE.

2.  Por unanimidad, declarar inadmisible la reclamación relativa a la supuesta violación del artículo 13 del TCE a través de la introducción del IVPEE.

3.  Por unanimidad, rechazar todas las demás objeciones de jurisdicción de la Demandada.

4.  Por mayoría, declarar que el Reino de España ha vulnerado el estándar de trato justo y equitativo previsto en el artículo 10(1) del TCE, en los términos señalados en la sección VIII(A)(3) de la presente Decisión.

5.  Por unanimidad, desestimar las demás pretensiones de la Demandante sobre la supuesta violación de los artículos 10(1) y 13 del TCE.

6.  Por mayoría, ordenar a las Partes (a) presentar al Tribunal en un término de noventa (90) días contado a partir de la fecha de notificación de esta decisión un cálculo elaborado de mutuo acuerdo del monto de la indemnización, cálculo que deberá seguir la metodología señalada en el párrafo 820 de esta decisión y tener en cuenta los criterios indicados en el párrafo 821 de la presente decisión; (b) en caso de desacuerdo total o parcial sobre el valor final de la indemnización, presentar al Tribunal en el citado plazo de noventa (90) días los puntos de acuerdo y desacuerdo en relación con el cálculo de la indemnización.

_____
Profesor Pierre-Marie Dupuy
Árbitro
(Sujeto a la opinión disidente adjunta)

Fecha: 8 de octubre de 2020

_____
Profesor Guido Santiago Tawil
Árbitro

Fecha: 8 de octubre de 2020

_____
Dr. Eduardo Zuleta
Presidente del Tribunal

Fecha: 8 de octubre de 2020