# EXHIBIT 48



INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### UP AND C.D HOLDING INTERNATIONALE

### V.

### HUNGARY

### (ICSID CASE NO. ARB/13/35) – ANNULMENT PROCEEDING

I hereby certify that the attached document is a true copy of the *ad hoc* Committee's Decision on Annulment, rendered on August 11, 2021.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., August 11, 2021

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**UP AND C.D HOLDING INTERNATIONALE**

and

**HUNGARY**

**ICSID Case No. ARB/13/35**

---

# DECISION ON ANNULMENT

---

***Members of the ad hoc Committee***
Ricardo Ramírez Hernández, President of the *ad hoc* Committee
Bertha Cooper-Rousseau, Member of the *ad hoc* Committee
Carita Wallgren-Lindholm, Member of the *ad hoc* Committee

***Secretary of the ad hoc Committee***
Francisco Abriani

*Date of dispatch to the Parties:* August 11, 2021

## REPRESENTATION OF THE PARTIES

*Representing UP and C.D Holding Internationale*:

Ms. Isabelle Michou
Mr. Alexander Leventhal
Mr. Akshay Shreedhar
Quinn Emanuel Urquhart & Sullivan LLP
6 rue Lamennais
75008 Paris
France

*Representing Hungary*:

Dr. András Nemescsói
Dr. Dávid Kőhegyi
Ms. Zsófia Deli
Ms. Kate Mala
DLA Piper Posztl, Nemescsói, Győrfi-Tóth & Partners Law Firm
Csörsz u. 49-51.
H-1124 Budapest
Hungary

 and

Mr. Michael Ostrove
Mr. Théobald Naud
Ms. Clémentine Emery
DLA Piper France LLP
27 rue Laffitte
75009 Paris
France

## TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................ 1

II.   PROCEDURAL HISTORY.......................................................................... 2

III.  THE PARTIES' POSITIONS AND THE COMMITTEE'S ANALYSIS ........................ 10

   A.  Introduction and General Approach by the Committee ............................... 10

   B.  *Achmea* related grounds ...................................................................... 11

      (1)  Preliminary issues related to the *Achmea* Decision ............................. 12

          a.  How was the Achmea Decision brought before the Tribunal ....................... 12

          b.  What was argued by Respondent before the Tribunal ................................. 13

          c.  How did the Tribunal address the Achmea Decision in its Award and whether the Tribunal addressed the applicability of Article 9(2)...................... 22

      (2)  Whether the Tribunal failed to apply the proper law ............................. 27

          a.  Respondent's position ..................................................................... 27

          b.  Claimants' position........................................................................ 33

          c.  The Committee's analysis ................................................................. 37

      (3)  Whether there was a failure to state reasons on which the Award is based.......... 46

          a.  Respondent's position ..................................................................... 46

          b.  Claimants' position........................................................................ 49

          c.  The Committee's analysis ................................................................. 53

      (4)  Whether the Tribunal wrongly asserted jurisdiction............................... 56

          a.  Respondent's position ..................................................................... 56

          b.  Claimants' position........................................................................ 63

          c.  The Committee's analysis ................................................................. 69

   C.  Serious Departure from a Fundamental Rule of Procedure........................... 72

      (1)  Respondent's position .................................................................. 72

          a.  Standard................................................................................... 72

          b.  Departure was serious ................................................................... 75

      (2)  Claimants' position ..................................................................... 76

          a.  Standard................................................................................... 76

          b.  Departure was serious ................................................................... 79

      (3)  Committee's analysis ................................................................... 79

          a.  Facts....................................................................................... 79

          b.  Standard................................................................................... 82

IV.  COSTS ..................................................................................................... 86

    A.  The Parties' Cost Submissions ................................................................. 86

        (1)  Respondent's Cost Submission ....................................................... 86

        (2)  Claimants' Cost Submission .......................................................... 86

    B.  The Committee's Analysis ....................................................................... 87

V.  DECISION ................................................................................................. 90

**TABLE OF ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| 2019 Joint Declarations | Declarations by the Member States of the European Union on the legal consequences of the *Achmea* Decision on investor-State arbitration clauses contained in intra-EU bilateral investment treaties. Signed by France on January 15, 2019 and Hungary on January 16, 2019 (**RL-288** and **RL-289**). |
| *Achmea* Decision | *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber) (March 6, 2018) EU:C:2018:158 |
| *Amicus Curiae* Brief | Brief filed by the European Commission on February 3, 2020, together with annexes EC-1 through EC-23. |
| Applicant or Respondent | Hungary |
| Application | Application for annulment of the Award rendered on October 9, 2018, by the Tribunal in the Underlying Arbitration. |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006. |
| Award | Award rendered on October 9, 2018, by the Tribunal. |
| BIT or the Treaty | Agreement between the Government of the Republic of France and the Government of the People's Republic of Hungary on the Encouragement and Reciprocal Protection of Investments which entered into force on September 30, 1987. |
| C-[#] | Claimants' Exhibit |
| CL-[#] | Claimants' Legal Authority |
| CJEU | Court of Justice of the European Union |
| Claimants | UP and C.D Holding Internationale |
| Commission | European Commission |

iv

| | |
|---|---|
| Committee | *Ad hoc* Committee composed of Professor Ricardo Ramírez Hernández (President), Ms. Bertha Cooper-Rousseau and Ms. Carita Wallgren-Lindholm. |
| Counter-Memorial on Annulment | Claimants' Counter-Memorial on Annulment dated January 24, 2020. |
| Decision on Jurisdiction | Tribunal's Decision on Preliminary Issues of Jurisdiction of 3 March 2016. |
| *Edenred* Award | Award rendered in the case *Edenred S.A. v. Hungary*, ICSID Case No. ARB/13/21 dated December 13, 2016 ("**Edenred**"). |
| EU | European Union |
| EU BIT | European Union Bilateral Investment Treaty |
| Hearing | Hearing on Annulment held on September 8-9, 2020. |
| ICJ | International Court of Justice |
| ICSID Convention or the Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965. |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ILC | International Law Commission |
| LCD | Le Chèque Déjeuner, former name of UP |
| Memorial on Annulment | Respondent's Memorial on Annulment dated October 18, 2019. |
| NAFTA | North American Free Trade Agreement |
| R-[#] or AF-[#] | Respondent's Exhibit |
| RL-[#] or AL-[#] | Respondent's Legal Authority |
| Rejoinder on Annulment | Claimants' Rejoinder on Annulment dated June 12, 2020. |

| Reply on Annulment | Respondent's Reply on Annulment dated April 3, 2020. |
| --- | --- |
| TEC<br>TEEC<br>TEU | Treaty Establishing the European Community<br>Treaty Establishing the European Economic Community<br>Treaty of the European Union |
| Termination Treaty | Agreement for the Termination of Bilateral Investment Treaties Between the Member States of the European Union. |
| TFEU | Treaty on the Functioning of the European Union |
| Tr. Day [#][page:line] | English Transcript of the Hearing before the Committee |
| Tribunal | Arbitral tribunal composed of Professor Karl-Heinz Böckstiegel (President), The Honourable L. Yves Fortier and Sir Daniel Bethlehem in ICSID Case No. ARB/15/35 in the arbitration proceeding between UP and C.D Holding Internationale and Hungary on June 30, 2014. |
| Underlying Arbitration | Arbitration proceedings between UP and C.D Holding Internationale and Hungary. |
| UP and C.D Internationale | UP, formerly known as LCD, a cooperative company (*société* cooperative *de production à forme anonyme et capital variable*) incorporated under the laws of France, and C.D Holding Internationale ("**CD Internationale**"), a simplified joint stock company (*société par actions simplifiée*) wholly owned by UP and organized under the laws of France. |
| VCLT | Vienna Convention on the Law of Treaties |

## I.    INTRODUCTION AND PARTIES

1.    This decision concerns an application for annulment ("**Application**"), submitted by Hungary ("**Respondent**"), of the Award rendered on October 9, 2018, by a tribunal composed of Professor Karl-Heinz Böckstiegel (President), The Honourable L. Yves Fortier and Sir Daniel Bethlehem in ICSID Case No. ARB/15/35 ("**Award**") in the Underlying Arbitration proceeding between Respondent and UP, formerly known as Le Chèque Déjeuner ("**LCD**"), a cooperative company (*société cooperative de production à forme anonyme et capital variable*) incorporated under the laws of France, and C.D Holding Internationale ("**CD Internationale**"), a simplified joint stock company (*société par actions simplifiée*) wholly owned by UP and organized under the laws of France (hereinafter referred to as UP and CD Internationale[1] or **Claimants**").

2.    Respondent and Claimants are hereinafter collectively referred to as the "**Parties**" and individually as "**Party**." The Parties' legal representatives are listed above on page (i).

3.    The Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Agreement between the Government of the Republic of France and the Government of the People's Republic of Hungary on the Encouragement and Reciprocal Protection of Investments, which entered into force on September 30, 1987 ("**BIT**" or "**Treaty**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**" or the "**Convention**") which entered into force on October 14, 1966.

4.    The dispute in the Underlying Arbitration related to Hungary's fringe benefit system (non-wage remuneration that is a component of an employee's overall compensation). The dispute arose when Hungary modified this system in 2011. The Tribunal unanimously found that this reform amounted to an unlawful expropriation under Article 5(2) of the BIT and awarded Claimants EUR 23,196,000 plus interest.

---

[1] Award, para. 2.

1

5.      Hungary seeks the annulment of the Award under Article 52(1)(b), (d), and (e) of the ICSID Convention. The grounds for such annulment under Article 52(1) of the ICSID Convention state as follows: *(b)* the Tribunal manifestly exceeded its powers; *(d)* there was a serious departure from a fundamental rule of procedure; and *(e)* the Award failed to state the reasons on which it was based.

## II.      PROCEDURAL HISTORY

6.      On February 5, 2019, Respondent filed with the Centre the Application pursuant to Article 52 of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"). The Application was accompanied by exhibits AF-1 through AF-9 and legal authorities AL-1 through AL-39.

7.      On February 13, 2019, the Acting Secretary-General registered the Application and notified the Parties of the registration.

8.      On February 14, 2019 the Centre informed the Parties that "it note[d] that Hungary's application for annulment did not contain a request for provisional stay of enforcement of the Award".

9.      On the same day, the Centre acknowledged receipt of Respondent's request for "a provisional stay of the enforcement of the Award rendered on October 9, 2018, in accordance with Article 52(5) of the ICSID Convention and Rule 54 of the ICSID Rules." Hungary was advised that its request would be communicated to the *ad hoc* Committee once constituted.

10.     On April 16, 2019, the *ad hoc* Committee ("**Committee**") was constituted in accordance with Article 52(3) of the ICSID Convention. Its members are: Professor Ricardo Ramírez Hernández (Mexican), serving as President, Ms. Bertha Cooper-Rousseau (Bahamian) and Ms. Carita Wallgren-Lindholm (Finnish). All the members were appointed to the Committee by the Chairman of the Administrative Council. In its letter of April 16, 2019, the Centre informed the Parties that the Committee had been constituted, that the annulment proceeding was deemed to have begun in accordance with Arbitration Rules 6

and 53, and that Mr. Francisco Abriani, Legal Counsel, would serve as Secretary of the Committee.

11.    On May 20, 2019, the Committee: (i) circulated a draft Agenda and a draft Procedural Order No. 1 for the Parties' comments in preparation for the first session; (ii) invited the Parties to indicate their availability for the first session; and (iii) invited Respondent to confirm whether it maintained its request for a provisional stay of enforcement of the Award.

12.    On May 27, 2019, Respondent confirmed its availability for a first session on June 14, 2019. Respondent also confirmed that it maintained its request for the stay of enforcement of the Award.

13.    On May 28, 2019, Claimants confirmed their availability for a first session by video conference on June 12 or 14, 2019.

14.    On June 6, 2019, the Committee confirmed that the first session would be held on June 14, 2019 and asked the Parties to indicate their preference for a video conference or a telephone conference. The Committee also invited the Parties to agree on a schedule for written submissions on Respondent's request for the stay of enforcement of the Award.

15.    On June 11, 2019, the Parties indicated that they preferred to hold the first session by telephone conference.

16.    On June 14, 2019, the Parties submitted their comments on the draft Procedural Order No. 1, and included a proposed schedule for written submissions on Respondent's request for the stay of enforcement of the Award.

17.    On June 14, 2019, the Committee held the first session with the Parties by telephone conference.

18.    On June 20, 2019, the European Commission ("**Commission**") filed an application for Leave to Intervene as a Non-Disputing Party in this annulment proceeding ("**Application to Intervene**").

19.     On June 24, 2019, the Committee invited the Parties to confirm their availability to hold a hearing on annulment at the International Dispute Resolution Centre in London on August 12-13, 2020.

20.     On July 2, 2019, Claimants confirmed their availability on the dates proposed by the Committee, while Respondent requested the Committee to provide an alternative date for the hearing.

21.     On July 5, 2019, Respondent requested the Committee "to order a provisional stay of enforcement of the Award pending its decision on the stay of enforcement."

22.     On July 8, 2019, the Committee issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Committee on disputed issues. This order also set out the schedule for the submissions regarding Respondent's request for the stay of enforcement of the Award.

23.     On the same date, the Committee invited the Parties to submit their observations on the Commission's Application to Intervene by July 22, 2019.

24.     On July 9, 2019, the Committee invited the Parties to confirm whether they would be available to hold a hearing in London on August 20-21 and August 24-25, 2020.

25.     On July 15, 2019, Respondent filed its Application for the Stay of Enforcement of the Award, accompanied by exhibit AF-10 and legal authorities AL-2, AL-9, and AL-40 through AL-50.

26.     On July 16, 2019, Claimants confirmed their availability to hold the hearing on annulment on the dates proposed by the Committee, while Respondent informed the Committee that "finding suitable dates in August 2020 prove[d] to be challenging," and that "Hungary's legal team would certainly be amenable to agree to a hearing date in the first half of July or early September in 2020."

27.     On July 18, 2019, Respondent commented on the Application to Intervene.

4

28.    On July 19, 2019, the Committee invited the Parties to confirm whether they would be available to hold a hearing in London on September 7-10, 2020 or September 15-18, 2020.

29.    On July 22, 2019, Respondent confirmed its availability to hold a hearing in London on September 7-10, 2020.

30.    On the same date, Claimants filed a letter in response to the Application to Intervene.

31.    On July 26, 2019, Claimants confirmed their availability to hold a hearing in London on September 7-10, 2020.

32.    On July 29, 2019, the Committee confirmed that the hearing on annulment would be held on September 8 and 9, 2020, in London.

33.    On July 29, 2019, Claimants filed their Response to Hungary's Application for the Stay of Enforcement of the Award, accompanied by exhibits C-0192 and C-0193, and legal authorities CL-0265 through CL-0279.

34.    On August 5, 2019, Respondent filed its Reply in Support of its Application for the Stay of Enforcement of the Award, accompanied by legal authorities AL-51 through AL-59.

35.    On August 12, 2019, Claimants filed their Rejoinder on Hungary's Application for the Stay of Enforcement of the Award, accompanied by exhibit C-0194, and legal authorities CL-0280 through CL-0283.

36.    On October 18, 2019, Respondent filed its Memorial on Annulment, along with exhibits R-68 through R-78 and legal authorities RL-287 through RL-346 ("**Memorial on Annulment**").

37.    On December 27, 2019, the Committee issued its Decision on Stay of Enforcement of the Award whereby it denied Respondent's request for a stay of enforcement of the Award pending its decision on annulment.

38.    On December 27, 2019, the Committee issued Procedural Order No. 2 concerning the Commission's Application to Intervene. The Committee granted the Commission's Application in part as follows:

> In view of the above, the Committee hereby:
>
> a. Decides to allow the Commission to file a written submission as a non-disputing party on matters directly related to the grounds for annulment as follows:
>
> • the Commission shall file its written submission by Monday, February 3, 2020;
>
> • the Commission shall limit its submission to 25 pages. The Commission shall send six (6) hard copies to the Secretary of the *ad hoc* Committee for transmission to the Committee and the Parties;
>
> • the Commission shall limit its submission to the legal consequences of *Achmea* and the Declarations for this annulment proceeding;
>
> • the Commission may include with its submission any relevant exhibits, provided that they fall within the scope of the submission. An exhibit for which the original language is not English shall be filed in its original language with a translation into English. If the document is lengthy, the Commission shall specify the relevant parts and provide the English translation only for these parts; and
>
> • the Commission shall bear its own costs.
>
> b. Decides that, should they wish to do so, the Parties may present their views on the Commission's submission no later than by Monday, March 16, 2020.
>
> c. Rejects the Commission's request to have access to the documents filed in this annulment proceeding.
>
> d. Rejects the Commission's request to attend hearings.

  e. Decides that this Procedural Order shall be communicated to the Commission for its exclusive use in this annulment proceeding.[2]

39. On January 24, 2020, Claimants filed their Counter-Memorial on Annulment, together with exhibits C-0195 through C-0204 and legal authorities CL-0284 through CL-0341 ("**Counter-Memorial on Annulment**").

40. On February 3, 2020, the Commission filed its *Amicus Curiae* Brief, together with annexes EC-1 through EC-23 ("***Amicus Curiae* Brief**").

41. On March 16, 2020, Respondent filed its Comments on the *Amicus Curiae* Brief, along with legal authorities AL-347 and AL-348, while Claimants filed their Comments on the *Amicus Curiae* Brief together with legal authorities CL-0342 and CL-0343.

42. On March 23, 2020, Respondent requested that the Committee either (i) grant the Parties a relief from the hard copy and USB drive provision obligations stipulated under paragraph 13.3 of Procedural Order No. 1 for the entire proceedings going forward, or (ii) grant the Parties leave to submit the hard copies of their next submission at a later, unspecified date, prior to the hearing on annulment.

43. On March 24, 2020, the Parties were invited to cease providing ICSID with hardcopies and USB drives with individual submissions, as previously required under paragraph 13.2 of Procedural Order No. 1. The Parties were also informed that until further notice, the members of the Committee did not need to receive hard copies of the Parties' submissions.

44. On March 25, 2020, the Parties requested that the Committee move the due dates for Respondent's Reply on Annulment and the Claimants' Rejoinder on Annulment to April 3, 2020 and June 12, 2020, respectively, which the Committee approved on the same day.

45. On April 3, 2020, Respondent filed its Reply on Annulment, along with exhibits R-79 through R-82 and legal authorities RL-347 through RL-366 ("**Reply on Annulment**").

---

[2] Procedural Order No. 2, para. 55.

46.     On May 21, 2020, Respondent requested leave from the Committee to submit the Agreement for the Termination of Bilateral Investment Treaties Between the Member States of the European Union ("**Termination Treaty**") of May 5, 2020, and proposed that "the parties be allowed to file simultaneous observations strictly limited to legal significance of the Termination Treaty for the purposes of this proceeding, within a short timeframe after the filing by UP and C.D. Holding Internationale of their Rejoinder on Annulment."

47.     On May 22, 2020, the Committee invited Claimants to provide their comments on Respondent's request of May 21, 2020.

48.     On May 29, 2020, Claimants provided their observations on Respondent's request of May 21, 2020, opposing Respondent's request to submit the Termination Treaty into the record.

49.     On June 12, 2020, Claimants filed their Rejoinder on Annulment, along with exhibits C-0205 through C-0207 and legal authorities CL-0344 through CL-0373 ("**Rejoinder on Annulment**").

50.     On June 30, 2020, the Committee advised the Parties that, given the current state of and projections regarding the pandemic, and related limitations on travel, the hearing scheduled for September 8-9, 2020 was unlikely to take place in person on those dates. The Committee further noted that, in order to preserve the hearing dates of September 8-9, 2020, it would be advisable to conduct the hearing remotely, and invited the Parties to share their views on the organization of such remote hearing.

51.     On July 2, 2020, the Parties informed the Committee that they agreed with the Committee's views with regard to the organization of the hearing on annulment.

52.     On July 31, 2020, the Committee informed the Parties that it had decided to allow the introduction of the Termination Treaty into the record, and that they would be allowed to make submissions on the new document as part of their oral submissions at the hearing. The Committee also confirmed that, in light of the Parties' agreement, the hearing on annulment would be held by video conference on the dates originally agreed upon by the Parties. Finally, the Committee: (i) invited the Parties to confirm their availability on

August 10, 2020 for a pre-hearing organizational meeting; (ii) circulated a draft Agenda for the pre-hearing organizational meeting; and (iii) invited the Parties to confer and to submit their comments on the draft Agenda.

53. On August 4, 2020, the Parties confirmed their availability on August 10, 2020 for the pre-hearing organizational meeting.

54. On August 10, 2020, the Parties submitted their comments on the draft Agenda for the pre-hearing organizational meeting.

55. On August 10, 2020, the Committee held a pre-hearing organizational meeting with the Parties by telephone conference.

56. On August 19, 2020, the Committee circulated a draft Procedural Order No. 3 concerning the organization of the hearing on annulment and invited the Parties to confer regarding paragraph 18 thereof.

57. On August 24, 2020, Claimants provided their comments on the draft Procedural Order No. 3. Claimants noted, *inter alia*, the Parties' agreement on the deadline for the exchange of Demonstrative Exhibits mentioned at paragraph 18 of the draft Procedural Order No. 3, which Respondent confirmed on the same date.

58. On August 31, 2020, the Committee issued Procedural Order No. 3 concerning the organization of the hearing on annulment.

59. A hearing on annulment was held by video conference on September 8 and 9, 2020 ("**Hearing**"). The following persons were present at the Hearing:

*Committee*:
Ricardo Ramírez Hernández          President
Bertha Cooper-Rousseau             Member
Carita Wallgren-Lindholm           Member

*ICSID Secretariat*:
Francisco Abriani                  Secretary of the Committee
Céline Pommier                     Paralegal

*For Claimants*:
  Isabelle Michou                          Quinn Emanuel Urquhart & Sullivan LLP
  Alexander G. Leventhal                   Quinn Emanuel Urquhart & Sullivan LLP
  Akshay Shreedhar                         Quinn Emanuel Urquhart & Sullivan LLP
  Elizaveta Tukhsanova                     Legal Counsel, Direction des Affaires
                                           Financières et Juridiques | UP

*For Respondent*:
  Michael Ostrove                          DLA Piper France LLP
  Théobald Naud                            DLA Piper France LLP
  Clémentine Emery                         DLA Piper France LLP
  Dávid Kőhegyi                            DLA Piper Posztl, Nemescsói, Györfi-
                                           Tóth and Partners Law Firm
  Zsófia Deli                              DLA Piper Posztl, Nemescsói, Györfi-
                                           Tóth and Partners Law Firm
  Kate Mala                                DLA Piper Posztl, Nemescsói, Györfi-
                                           Tóth and Partners Law Firm
  Dr. Piling Nikolett                      State of Hungary

*Court Reporter*:
  Claire Hill

60.    On September 30, 2020, the Parties filed their statements of costs.

61.    On the same date, Respondent submitted the Parties' agreed proposed corrections to the transcript, which Claimants confirmed on October 1, 2020.

62.    The proceeding was closed on June 11, 2021.

## III.   THE PARTIES' POSITIONS AND THE COMMITTEE'S ANALYSIS

### A.   INTRODUCTION AND GENERAL APPROACH BY THE COMMITTEE

63.    Respondent is bringing four claims invoking three legal grounds for annulment, namely, Articles 52(1)(b) 52(1)(d) and 52(1)(e). With respect to Article 52(1)(b), Respondent argues that the Tribunal manifestly exceeded its jurisdiction by: (*i*) failing to take proper account of Article 9(2) of the BIT; and (*ii*) wrongly exercising its jurisdiction due to the incompatibility of Article 9(2) of the BIT with European Union "**EU**" law. With respect to Article 52(1)(e), the Tribunal's failure to address Hungary's core jurisdictional objection

10

on the inapplicability of Article 9(2) of the BIT in Respondent's view constitutes a failure to state reasons on which the Award was based. Finally, with respect to Article 52(1)(d), Respondent contends that the Tribunal seriously departed from a fundamental rule of procedure when it decided, *sua sponte*, to introduce the *Edenred v. Hungary*, ICSID Case No. ARB/13/21 ("*Edenred* **Award**") into the record.

64.     In light of the fact that three of the four claims relate to the judgment of the European Court of Justice in *Slovak Republic v. Achmea BV* ("*Achmea* **Decision**")[3] and are very much intertwined, the Committee will address them together, whereas the ground related to Article 52(1)(e) will be addressed separately.

**B.**     *ACHMEA* **RELATED GROUNDS**

65.     As already mentioned, three of the four claims invoked for annulment are premised on the impact or effect that the *Achmea* Decision had (or should have had) upon the Award. The Committee will approach this issue as follows: given the importance for the Committee of the *Achmea* Decision and how it was brought to the attention of and discussed by the Tribunal, the Committee will start by first addressing, under (1): a) how that Decision was brought before the Tribunal; b) what was argued by Respondent before the Tribunal; and c) how the Tribunal dealt with the *Achmea* Decision in the Award, in particular, whether the Tribunal addressed the applicability of Article 9(2). The Committee will then (under 2) address the alleged failure to apply the proper law and (3) state reasons for the Award. Finally, the Committee will (under 4) address the claim that the Tribunal wrongly exercised its jurisdiction.[4]

66.     With leave from the Committee, on February 3, 2020, the Commission filed an *Amicus Curiae* Brief.  Where appropriate, the Committee will recall or take note of some of the views put forward in that submission.

---

[3] **RL-287**, *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber) (March 6, 2018) EU:C:2018:158.

[4] In response to a question by the Committee during the Hearing, Respondent made clear that only with respect to this ground the Committee "would have to agree with [Respondent's] interpretation both of what the Achmea Decision says, and the logical knock-on effect of that as a matter of international law, that the consent was no longer effective as of 2004." (Tr. Day 2, page 11).

### (1)    Preliminary issues related to the *Achmea* Decision

#### a.  *How was the Achmea Decision brought before the Tribunal*

67.    The Tribunal was constituted on June 30, 2014.[5]

68.    On July 17, 2015, Respondent requested bifurcation of the proceedings.[6]

69.    On November 12, 2015, the Tribunal decided to bifurcate the proceedings and to address, as a preliminary issue, the Tribunal's jurisdiction.

70.    On March 3, 2016, the Tribunal issued its Decision on Jurisdiction. The Tribunal addressed Hungary's objections related to whether claims of fair and equitable treatment could be made based on the application of the BIT's most favored nation clause. The Tribunal dismissed the objections and declared that it had "jurisdiction over all the claims raised."[7]

71.    On April 14, 2017, Hungary sent a letter to the Tribunal. In that letter Respondent drew "the attention of the Tribunal to a recent development"[8] which was its submission of an application for annulment of the *Edenred* Award.

72.    On March 6, 2018, the *Achmea* Decision was published.

73.    On March 7, 2018, the Tribunal invited the Parties to submit comments regarding the relevance, if any, of the *Achmea* Decision.

74.    On March 28, 2018, Respondent submitted its comments related to the *Achmea* Decision.[9]

75.    On April 18, 2018, Claimants submitted their comments related to the *Achmea* Decision.[10]

---

[5] **R-69**, *UP (formerly Le Chèque Déjeuner) and C.D Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35, Decision on Jurisdiction, March 3, 2016, para. 30.

[6] Award, para. 15.

[7] **R-69**, *UP (formerly Le Chèque Déjeuner) and C.D Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35, Decision on Jurisdiction, March 3, 2016, para. 228.

[8] **C-0199**, Letter from Hungary to the Tribunal, April 14, 2017, page 1.

[9] Award, para. 91.

[10] *Ibid.*, para. 92.

76.    On May 2, 2018, Respondent submitted its Response to Claimants' letter to the Tribunal of April 18, 2018 concerning the *Achmea* Decision.[11]

77.    On May 16, 2018, Claimants submitted their Response to Respondent's comments concerning the *Achmea* Decision.[12]

78.    On August 20, 2018, the Commission lodged with the Tribunal its Application for Leave to Intervene as a Non-Disputing Party, together with two supporting Annexes.[13]

79.    On August 22, 2018, the Tribunal invited the Parties to submit their comments on the Commission's Application, by Friday, August 24, 2018.[14]

80.    On August 24, 2018, the Parties submitted their respective comments on the Commission's Application.[15]

81.    On August 27, 2018, the Tribunal issued Procedural Order No. 12 regarding the Commission's Application ("**PO-12**"), denying the Commission's Application.[16]

82.    On August 27, 2018, the Tribunal closed the arbitration proceedings.[17]

83.    The Committee thus notes that objections brought as a result of the *Achmea* Decision were raised late in the proceeding.

### b. *What was argued by Respondent before the Tribunal*

84.    In the letter dated April 14, 2017, Respondent pointed out that one of the arguments raised in the application was that the "Award should be annulled for the reason that Article 9 of the BIT is incompatible with EU law."[18]  Respondent mentioned the fact that the issue of "whether investor–state dispute resolution clauses included in intra-EU BITs may be

---

[11] *Ibid.*, para. 93.

[12] *Ibid.*, para. 94.

[13] *Ibid.*, para. 95.

[14] *Ibid.*, para. 96.

[15] *Ibid.*, para. 97.

[16] *Ibid.*, para. 98.

[17] *Ibid.*, para. 99.

[18] **C-0199**, Letter from Hungary to the Tribunal, April 14, 2017, p. 1.

incompatible with Articles 344, 267 and 18 of the Treaty on the Functioning of the European Union ("TFEU")—has recently been referred to the [Court of Justice of the European Union ("**CJEU**")] by the highest court in Germany in the case *Slovak Republic v. Achmea*."[19]  Furthermore, Hungary specified that the outcome of this case "is of crucial importance because the decision would be applicable retroactively and with *erga omnes* effect, including to the parties here, and thus to any award rendered, in this case."[20]

85.    Hungary elaborated further that: "[w]hile the CJEU decision in *Achmea* would not directly bind this Tribunal, it would become part of the vast body of EU law, the *acquis communautaire*."[21] Respondent added that "EU law is part of the 'rules and principles of international law' which, by the operation of Article 9(3) of the BIT, applies to determining this Tribunal's jurisdiction. The result is that were the CJEU to determine there to be a conflict, and it is likely that it will, this Tribunal would be deprived of jurisdiction to entertain the present claim."[22]

86.    Based on this view, Hungary posited that "it would be prudent for any tribunal deciding an investor-state dispute stemming from an intra-EU BIT to review its own jurisdiction (even in the absence of a preliminary objection raised to this effect) in light of *Achmea*. In this vein, the doctrine of comity further suggests that it would be appropriate for this Tribunal to consider delaying or postponing final deliberations and issuance of an award until after the outcome of the *Achmea* case is known."[23] Hungary made clear that it was not requesting a delay of the hearing but "[r]ather, Hungary proposes that to the extent further submissions on this issue are required by either party, this could most efficiently and effectively be provided through oral argument at the hearing, and/or if necessary, in limited post-hearing submissions."[24]

---

[19] *Ibid.*, pp. 1-2.

[20] *Ibid.*, p. 2.

[21] *Idem.*

[22] *Idem.* On this issue, the European Union takes the view that: "[t]he arbitration agreement is based on Article 9(2) of the French-Hungarian BIT, which constitutes the '*entrance gate*' to the ICSID Convention. If that entrance remains firmly closed, because that provision is not applicable, the claimant does not reach the ICSID Convention." (*Amicus Curiae* Brief, para. 40a.)

[23] *Idem.* Footnote omitted.

[24] *Ibid*., p. 3.

14

87.    The hearing took place on May 22-25, 2017. During the hearing, responding to questioning by the Tribunal, Respondent made clear its position:

> [W]e are actually asking the Tribunal that it delays its deliberations until the decision in Achmea is known. Basically, we did not raise a formal objection to the jurisdiction of the Tribunal because no one at this point in time knows what the decision in the Achmea case would be, and hence, if the outcome is going to be as we expect it to be, then it may compromise the jurisdiction of the Tribunal, but at this point in time we do not know what that would be.[25]

88.    On May 24, 2017, the Tribunal posed eleven questions to the Parties, one of which related to the *Achmea* Decision. The question was: "[w]hat is the relevance, if any, of the case *Slovak Republic* v. *Achmea* (Case C-284/16) as it presently stands for the present case?"

89.    On September 22, 2017, Hungary filed its Post-Hearing Brief where it took the view that should the CJEU find that there is a conflict between the dispute resolution clauses of the intra-EU BITs and the TFEU, such a "finding would compromise the jurisdiction of the Tribunal"[26] and that Claimants "would be barred from relying on the dispute resolution clause contained in Article 9 of the BIT."[27] Respondent took the view that: "[p]ursuant to Article 9(3) of the BIT and Article 25(1) of the ICSID Convention, the rules of international law apply to the Tribunal's determination of its jurisdiction. EU law is part of general international law and must therefore be considered when determining whether the Tribunal has jurisdiction and whether there are any impediments to the exercise of that jurisdiction."[28]

90.    Moreover, Respondent reiterated that "preliminary rulings of the CJEU are considered part of the *acquis communautaire*, and are therefore considered to be binding in the same way as statutory EU law"[29] and that based on this, the *Achmea* ruling would "apply with *erga omnes* effect thus extending the consequences of these rulings to all EU Member States, as

---

[25] **C-0200**, Transcript, Day 1, May 22, 2017, pp. 10-11.

[26] **C-0203**, Hungary's Post-Hearing Brief, September 22, 2017, p. 20.

[27] *Ibid.*, para. 25.

[28] *Ibid.*, para. 21. Footnote omitted.

[29] *Ibid.*, para. 22. Footnote omitted. See also *Amicus Curiae* Brief, para. 35.

well as private entities like the Claimants"[30] and "to all ongoing proceedings and legal relationships in existence before the ruling has been issued."[31]

91.    Finally, Hungary stated that "it would be prudent for the Tribunal to delay or postpone its final deliberations and the issuance of an award until after the final outcome of the *Achmea* case is known."[32]

92.    Claimants took the view that "regardless of the outcome the CJEU Decision will have no impact on the Tribunal's jurisdiction. The *Achmea* case is therefore of no relevance for this case. There is no reason to delay this arbitration any further."[33]

93.    On March 6, 2018 the CJEU handed down its ruling in *Achmea*. On March 7, 2018, the Tribunal invited the Parties to submit comments regarding the relevance, if any, of the *Achmea* ruling.[34] On March 28, 2018, Respondent submitted its comments on the *Achmea* Decision.

94.    In that submission Respondent took the view that the *Achmea* Decision must be considered part of the law applicable to its jurisdiction. At the outset, Respondent made clear that its position was: "predicated on the fact that EU law directly applies to the jurisdiction of the Tribunal in accordance with Article 9(3) of the BIT."[35]

95.    Respondent restated its previous views that: "[p]ursuant to Article 9(3) of the BIT and Article 25(1) of the ICSID Convention, the rules of international law apply to the Tribunal's determination of its jurisdiction. EU law is part of general international law and must therefore be considered when determining whether the Tribunal has jurisdiction and whether there are any impediments to the exercise of that jurisdiction"[36]; "preliminary rulings of the CJEU are considered part of the *acquis communautaire*, and are therefore

---

[30] *Idem*.

[31] *Ibid*., para. 23.

[32] *Ibid.*, para. 26.

[33] **R-78**, Claimants' Post-Hearing Brief, September 22, 2017, para. 284.

[34] Award, para. 90.

[35] **C-0201**, Letter from Hungary to the Tribunal, March 28, 2018, p. 5.

[36] *Idem*. Footnotes omitted.

considered to be binding in the same way as statutory EU law"[37]; and that: "preliminary rulings of the CJEU have *erga omnes* effect, thus extending the consequences of the CJEU's rulings on the interpretation of EU law to all EU Member States, as well as to private entities."[38] Respondent also reiterated its view that the retroactive nature of the rulings "flows from the fact that such rulings do not create new rules but rather clarify the meaning of pre-existing EU law 'as it must be or ought to have been understood and applied from the time of its coming into force'."[39] As a consequence: "Articles 267 and 344 of the TFEU precluded the application of Article 9(2) of the BIT at the time when the Claimants submitted their request for arbitration to ICSID. The result of these two facts means that the *Achmea* Decision applies to all ongoing proceedings and legal relationships in existence before the ruling has been issued."[40]

96.    Respondent also cited the MOX plant case as supporting its view that when jurisdictional issues are "crucially dependent" on a ruling of the CJEU, tribunals should defer to the CJEU's determinations.[41]

97.    Alternatively, Respondent argued that in order "to prevent the fragmentation of international law resulting from the proliferation of international and/or the issuance of conflicting decisions and unenforceable awards,"[42] the Tribunal should decline jurisdiction. Based on this, according to Respondent, "the only solution in line with judicial propriety would be for the Tribunal to defer, as a matter of comity, to the *Achmea* Decision and to refrain from exercising its jurisdiction."[43]

98.    On May 2, 2018, Respondent made a second submission to the Tribunal on this issue.

99.    First, Respondent re-stated its previous position that "questions of jurisdiction and consent must necessarily be addressed with reference to the relevant provisions of the France-

---

[37] *Ibid.*, p. 6.

[38] *Idem.*

[39] *Idem.*

[40] *Idem.*

[41] *Ibid.*, pp. 7-8.

[42] *Ibid.*, p. 9.

[43] *Ibid.*, p. 10.

Hungary BIT, and to Article 25(1) of the ICSID Convention. Article 9(3) of the BIT as well as the default provision of Article 25(1) of the ICSID Convention both provide that international law applies to the Tribunal's determination of its jurisdiction."[44]

100.    Responding to Claimants' contention that EU law does not form part of the "rules and principles of international law", Respondent stated that "there is significant authority for the proposition that EU law forms part of international law that then must be considered in determining the extent of consent."[45]

101.    According to Respondent the offer to arbitrate made by Hungary (provided for in Article 9(2) of the BIT) was revoked "through the conclusion of another treaty (such as the TFEU) that is incompatible with the BIT and which by the operation of the principles of international law, would lead to the termination or inapplicability of the BIT, either as a whole or with respect to specific provisions of the BIT only."[46]

102.    Respondent postulated that the conflict between Article 9(2) of the BIT and the TFEU warrants the application of the "conflict resolution tools"[47] provided for in the rules and principles of international law. In particular, the tools referred to were the *lex superior*, the *lex posterior* and the *lex specialis*.

103.    With respect to *lex superior*, Respondent submitted that the "principle of primacy of EU law within the relationship between Member States renders Article 9(2) of the BIT inapplicable, in the face of its incompatibility with Articles 267 and 344 of the TFEU."[48]

104.    In response to an argument by Claimants that, in accordance with Article 351 of the TFEU, the "procedural right to access to ICSID arbitration […] [is] not affected by the provisions of the TFEU and the *Achmea* Judgement,"[49] Respondent argued that the "absolute precedence of EU treaties […] over agreements concluded by [EU] Members States *inter*

[44] **R-73**, Hungary's further comments on the *Achmea* Decision, May 2, 2018, para. 10.
[45] *Ibid*., para. 12.
[46] *Ibid*., para. 16.
[47] *Ibid*., para. 17.
[48] *Ibid*., para. 23.
[49] **R-75**, Claimants' Letter to the Tribunal, April 18, 2018, pp. 14-15.

*se,* was also confirmed"[50] by rulings of the CJEU, the International Law Commission Report and even endorsed by investment tribunals.[51]

105.   As to the *lex posterior* argument, according to Respondent, its arguments were "primarily based on the primacy of the TFEU over the BIT."[52] In fact, Respondent acknowledged that "it did not base its position on Article 30(3) of the Vienna Convention on the Law of Treaties ("**VCLT**") in its initial submission, dated March 28, 2018."[53] Based on the reasoning in the *Achmea* Decision, Respondent argued that there is an incompatibility between the dispute settlement clauses of intra-EU BITs and the TFEU and, in accordance with the *lex posterior* rule, "the contravening provision of the earlier treaty [the BIT] is no longer applicable."[54]

106.   Regarding *lex specialis,* Respondent argued that EU law could also be characterized as *lex specialis* in light of its "self-contained nature."[55] In addition, Respondent stated that "[t]o the extent that the Claimants' argument has merit in that the BIT also provides for 'specific protections' for investors, the *lex specialis* principle is unhelpful for the assessment of this Tribunal. In any event, as stated above, the *lex superior* principle overrides the *lex specialis* principle within the special relationship of Member States."[56]

107.   Regarding the incompatibility between Article 9 of the BIT and the TFEU, preliminary rulings of the CJEU, according to Respondent, "have a retroactive effect."[57] The interpretation put forward by the *Achmea* Decision "ought to be given" to Article 9(2) and, thus, the "incompatibility arose with Hungary's accession to the EU on May 1, 2004."[58]

---

[50] **R-73**, Hungary's further comments on the *Achmea* Decision, May 2, 2018, para. 21.

[51] *Ibid.*, paras. 20 and 22.

[52] *Ibid.*, para. 24.

[53] "Upon further consideration, and with the intention to address the Claimants' submission, the Respondent confirms its intention to submit this argument as a subsidiary argument in addition to its reasoning on the primacy of EU law." (*Ibid.*, footnote 27.)

[54] *Ibid.*, para. 26. See also paras. 27-28.

[55] *Ibid.*, footnote 28.

[56] *Idem.*

[57] *Ibid.*, para. 29.

[58] *Idem.* See also *Amicus Curiae* Brief, para. 44.

108.    In order to support that preliminary rulings of the CJEU have a retroactive effect based on its case law, Respondent alleged that such rulings are "purely declaratory"[59] in the sense that they only clarify the meaning of the relevant provision, i.e. how such provision " must be, or ought to have been, understood and applied from the time of its entry into force."[60] Respondent also posited that this view is consistent with public international law.[61] Thus, "[A]rticles 267 and 344 of the TFEU likewise must be held to have always borne the meaning that the CJEU placed upon them when it interpreted them in March 2018 through the *Achmea* Decision."[62]

109.    Respondent also contended that "[t]he incompatibility between Articles 267 and 344 of the TFEU and the dispute resolution mechanisms contained in intra-EU BITs clarified in the *Achmea Decision* must be transposed to Articles 292 and 234 of the Treaty Establishing the European Community ("**TEC**") and to Articles 177 and 219 of the Treaty establishing the European Economic Community ("**TEEC**")."[63]

110.    As to the binding nature of the *Achmea* Decision, Respondent alleged that such ruling is binding in light of the interpretative authority given to the CJEU provided by Article 267 of the TFEU.[64] In addition, Respondent stated that support for this position could be found in the ICJ *Diallo* case.[65] Moreover, in light of Article 288 of the TFEU decisions issued by the CJEU are also binding on EU Members States.[66] Furthermore, Respondent argued that the CJEU's case law "affirms the *erga omnes* effect of such preliminary judgments (*i.e.* the binding effect vis-à-vis third parties of a preliminary judgment interpreting EU law)."[67] The consequence of this view is that "the Tribunal is – respectfully – bound to rule that Articles 267 and 344 of the TFEU preclude a provision in an international agreement between Member States, such as Article 9(2) of the BIT, under which an investor from one

---

[59] *Ibid.*, para. 30.
[60] *Ibid.*, para. 31.
[61] *Ibid.*, para. 33.
[62] *Ibid.*, para. 34. Footnote omitted.
[63] *Ibid.*, para. 35. See also paras. 36-39.
[64] *Ibid.*, paras. 52-53.
[65] *Ibid.*, paras. 47 and 50.
[66] *Ibid.*, para. 54.
[67] *Ibid.*, para. 55.

Member State may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the other Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."[68]

111.    In the alternative, Respondent took the view that if the Tribunal finds that the *Achmea* Decision was not binding, the application of Article 31(3)(c) of the VCLT "would effectively lead to the same result."[69] According to Respondent "'rules of international law'"[70] should include EU law. Since the issue at hand is the interpretation of the TFEU and its impact on dispute resolution clauses contained in intra-EU BITs, it follows, according to Respondent, that "in order to comply with the provisions of Article 31(3)(c) of the VCLT, the Tribunal, in interpreting the TFEU, would need to apply the *Achmea* Decision. If it does so, it would conclude that Article 9(2) is inapplicable, and could not have constituted a valid offer of consent, and therefore could not have been a valid basis for its jurisdiction at the time of the institution of these proceedings."[71]

112.    Finally, Respondent alleged that the revocation of consent does not violate Article 25 of the ICSID Convention or other applicable rules of international law.[72] Respondent argued that since the consent, provided for in Article 25 of the ICSID Convention, was withdrawn before the consent was perfected, "the Respondent's revocation of its offer of consent—resulting both from the principles of *lex posteriori* and the principle of primacy—likewise took effect prior to any arguable acceptance by the Claimants."[73]

113.    In sum, the Committee considers that Hungary's case before the Tribunal was premised on the Tribunal agreeing that by applying Article 9(3) of the BIT, it would find that, as a result of the *Achmea* Decision, there was a conflict between Article 9(2) of the BIT and Articles 267 and 344 of the TFEU. Once a conflict was identified, by applying the VCLT, the Tribunal would have to find that Article 9(2) was not applicable, and thus, that it had no

---

[68] *Ibid*., para. 60.

[69] *Ibid*., para. 61.

[70] *Ibid*., para. 64.

[71] *Ibid*., para. 68.

[72] *Ibid*., paras. 70-72.

[73] *Ibid*., para. 73.

jurisdiction over this dispute. Furthermore, Respondent contended that, as a result of applying this interpretation, Article 25 of the ICSID Convention was not relevant because its consent to ICSID arbitration was withdrawn before this dispute was brought under the ICSID Convention.

### c. How did the Tribunal address the Achmea Decision in its Award and whether the Tribunal addressed the applicability of Article 9(2)

114. As stated previously, in the Committee's view, Hungary's case was premised on the Tribunal agreeing that by applying Article 9(3) of the BIT, it would find that, as a result of the *Achmea* Decision, there was a conflict between Article 9(2) of the BIT and Articles 267 and 344 of the TFEU. Once a conflict was identified, by applying the "conflict resolution tools"[74] of the VCLT, the Tribunal would have to find that Article 9(2) was not applicable, and thus, that it had no jurisdiction over this dispute. Therefore, the issue before the Tribunal was whether the *Achmea* Decision had any effect on the Tribunal's jurisdiction. In that sense, the Committee agrees with Claimants that "Hungary's argument in the Arbitration was that the *Achmea* Decision applied to the Arbitration to defeat the Tribunal's jurisdiction, and not that Article 9(2) became inapplicable upon Hungary's adherence to the EU (independent of that decision)."[75]

115. At paragraphs 211-220 and 232-244 of the Award, the Tribunal summarized the Parties' arguments.

116. In the analysis section of the Award, the Tribunal began by stating that "it will address only those [issues] which in its view are determinative for its decision in this matter in the case at hand."[76] This is consistent with the title of this section of the Award, *i.e.* "The Relevance of the *Achmea* Decision"[77]. To the Committee this clearly conveys the purpose of the Tribunal's inquiry which was addressing whether the *Achmea* Decision had any bearing on the case, in particular with respect to its jurisdiction. What the Tribunal was asked to do

---

[74] *Ibid*., para. 17.

[75] Rejoinder on Annulment, para. 108.

[76] Award, para. 252.

[77] *Ibid*., p. 43.

was to determine whether [the] *Achmea* [Decision] would have altered in any way its previous finding that it had jurisdiction "over all the claims."[78]

117. Paragraphs 253-264 in the Award are exclusively devoted to examine the Tribunal's jurisdiction under the ICSID Convention. It seems that the Tribunal was engaging with Respondent's arguments that ICSID's jurisdiction under Article 25 was "irrelevant" because consent was revoked prior to its acceptance by the Claimants.[79] Respondent's view was:

> To determine whether Hungary's offer to arbitrate contained in Art. 9(2) of the BIT and in 25(1) of the ICSID Convention was still present at the time the Claimants accepted it, the Tribunal must apply the conflict resolution tools of international law.[80]
>
> A State may revoke its consent to ICSID's jurisdiction through the conclusion of another treaty (such as the TFEU) that is incompatible with the BIT and which, by operation of the principles of international law, would lead to the termination or inapplicability of the BIT, either as a whole or with respect to specific provisions of the BIT. The revocation of consent does not run afoul of Art. 25 of the ICSID Convention or any other applicable rules of international law.[81]

118. As a result, the Tribunal pointed out that the *Achmea* Decision contained no references to the ICSID Convention or Arbitration Rules and thus, "and in view of the above mentioned determinative differences between the *Achmea* case and the present one, the *Achmea* Decision cannot be understood or interpreted as creating or supporting an argument that, by its accession to the EU, Hungary was no longer bound by the ICSID Convention."[82] In addition, the Tribunal stressed that there is no provision under EU law which provides that the obligations under the ICSID Convention are inconsistent with EU law or that the

---

[78] **R-69**, *UP (formerly Le Chèque Déjeuner) and C.D Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35, Decision on Jurisdiction, March 3, 2016, para. 228.

[79] Reply on Annulment, para. 43. See also **R-73**, Hungary's further comments on the *Achmea* Decision, May 2, 2018, para. 73.

[80] Award, para. 239.

[81] *Ibid*., para. 244. Footnote omitted.

[82] *Ibid*., para. 258.

obligations were "terminated or replaced"[83] when Hungary acceded to the EU.  Moreover, the Tribunal took the view that "[r]egardless of what may be argued from the *Achmea* Decision regarding BITs between EU Member States, as regards jurisdiction under the ICSID Convention it is undisputed that Hungary did not expressly terminate its participation in and submission to arbitration pursuant to the ICSID Convention when it joined the EU in 2004."[84] Respondent takes issue with this statement.[85] The Committee considers that the Tribunal made it clear that consent under ICSID was not withdrawn, irrespective of what was stated in the *Achmea* Decision. Therefore, the Committee is of the view that this section of the Award is an indication that the Tribunal considered that Hungary's consent under ICSID was independent, still valid and not related to or impacted by the *Achmea* Decision.

119.   Elaborating on this point the Tribunal stated that there was not an express withdrawal under Article 71 of the ICSID Convention and that the burden was on Respondent to establish that there was "an implied withdrawal from the ICSID Convention."[86]

120.   Continuing on this issue and on an *arguendo* basis, the Tribunal took the view that even if it could be interpreted that there was a denunciation of ICSID, in accordance with Article 72: "this denunciation would not have the effect of retroactively withdrawing the Respondent's acceptance of ICSID arbitration contained in the BIT."[87] In the same vein, the Tribunal reiterated that "the CJEU did not say anything in the *Achmea* Decision about the effect of its Decision on consent to arbitration under Art. 25 of the ICSID Convention."[88] In the Committee's view, this further confirms the Tribunal's line of reasoning related to the lack of linkage or relation between the *Achmea* Decision and consent under the ICSID Convention.

---

[83] *Ibid*., para. 259.

[84] *Idem*.

[85] Reply on Annulment, para. 43.

[86] Award, para. 260.

[87] *Ibid*., para. 261.

[88] *Ibid*., para. 263.

121.    Finally, concluding its analysis on the *Achmea* Decision and consent under the ICSID Convention, the Tribunal stated that "[t]he Respondent has not demonstrated in any way that EU law (as interpreted by the CJEU in the *Achmea* Decision) would have the effect of validly withdrawing the Respondent's consent to arbitration with retroactive effect. As a consequence, Article 25 of the ICSID Convention applies and the Respondent's consent remains valid. Accordingly, the Tribunal has jurisdiction under the Convention."[89]

122.    Once it determined that its jurisdiction under the ICSID Convention remained unaffected, the Tribunal, on an *arguendo* basis, discussed the specific scenario of whether Article 9(2) became inapplicable in the case of a retroactive termination of the BIT:

> Even further assuming *arguendo* that the France-Hungary BIT was retroactively terminated as of 1 May 2004, the BIT – including the submission to ICSID arbitration in Art. 9(2) of the BIT – would still remain in force for a period of 20 years as a result of the "*survival clause*" contained in Art. 12(2) of the BIT as this provision does not contain any limitation or exception as to its application and applies to all investments made prior to the expiry of this Agreement. Thus, investments made prior to the expiration of this BIT remain submitted to it for a period of 20 years from the date of expiry. In the present case, the investments were made prior to 1 May 2004. Therefore, the Claimants would still benefit from the protection offered by the ICSID Convention until 2024. As is undisputed, neither Hungary nor France has made any attempt to renegotiate, modify, or shorten the relevant "*survival*" period. Accordingly, **even on the Respondent's own analysis regarding the BIT,** the Claimants would still benefit from **Art. 9(2) of the BIT** and the ICSID Convention, **and the Tribunal would still have jurisdiction to hear this case.**[90]

123.    In light of the above, the Tribunal agreed with the argument made by Claimants "that the BIT – including Art. 9(2) – would remain in force for a period of 20 years as a result of the 'survival clause' contained in Art. 12(2) of the BIT."[91] Thus, the Tribunal considered that

---

[89] *Ibid*., para. 264.

[90] Award, para. 265. Emphasis added.

[91] "The BIT was not terminated in 2004 and, therefore, Respondent's consent to ICSID jurisdiction was not withdrawn. Even if the BIT was retroactively terminated as of 1 May 2004, the BIT – including Art. 9(2) – would remain in force for a period of 20 years as a result of the 'survival clause' contained in Art. 12(2) of the BIT. Claimants, thus, would benefit from the protection offered under the BIT until 2024." (Award, para. 221. Footnote omitted.) In its *Amicus*

even agreeing with Respondent's position on the effect of the *Achmea* Decision, the Tribunal would still have jurisdiction.[92] To the Committee, this suggests that the Tribunal was addressing and rejecting in a summary fashion Respondent's argument regarding how *Achmea* would render Article 9(2) inapplicable. The Tribunal sustained this approach at paragraph 252 when it stated that "in the present Award, the Tribunal **does not consider that a detailed discussion of the substance of *Achmea* is required**, because the present case differs in determinative aspects from the case in *Achmea.*"[93] This is consistent with the Tribunal's view laid out at the beginning of its reasoning, in which it chose to "address only those [arguments] which in its view are determinative for its decision." Also, this does not vary from the Tribunal's overall conclusion at paragraph 266 that: "the *Achmea* Decision does not change the conclusion reached by this Tribunal in its Decision of 3 March 2016 that the Tribunal has jurisdiction over all the claims raised."

124.  Thus, the Committee takes the view that in grappling with this issue the Tribunal considered that it was important to first examine whether its jurisdiction under the ICSID Convention remained unaffected by the *Achmea* Decision. Once it found that it did, the Tribunal took an *arguendo* approach to confirm that even if it agreed with Respondent's claim regarding the inapplicability of Article 9(2), its jurisdiction still stood. The Tribunal neither failed nor refused to address the Respondent's arguments related to the *Achmea* Decision, it just considered that, even if upheld, they did not change its ultimate conclusion. It is not the task of this Committee to agree or disagree with the Tribunal's approach in addressing Respondent's claims and arguments or its findings and conclusions. Thus, the Committee agrees with Claimants' view that:

> [W]hen placed in context, it is clear that the Tribunal rejected the suggestion that the *Achmea* Decision could effectively withdraw Hungary's consent with retroactive effect because the Arbitration was an ICSID arbitration and consent was subject to international law. Even if the *Achmea* Decision could be said to render

---

*Curiae* Brief, the EU takes the view that the survival clause only applies to unilateral termination or, in the alternative, that this clause is also inconsistent "for the same reasons as to the offer to arbitrate itself." (*Amicus Curiae* Brief, paras. 47-49.) It is important to note though that during the arbitration and besides quoting this argument in a footnote, Respondent did not contest, made any comment or put forward any alternative interpretation of this clause.

[92] Award, para. 266.

[93] Emphasis added.

inapplicable *unperfected* consent *going forward* or *as a matter of EU law*, it could not defeat *perfected consent retroactively* and *as a matter of international law*.[94]

**(2)    Whether the Tribunal failed to apply the proper law**

### a. *Respondent's position*

125.    Respondent argues that, (i) the Tribunal failed to apply the proper law governing its jurisdiction, i.e. the BIT; (ii), that the Tribunal failed to address the application of Article 9(2) of the BIT in light of the *Achmea* Decision and, (iii) that such failure amounted to a "manifest" failure to apply the proper law.

### (i) *Failure to apply the proper law*

126.    Respondent alleges that "it is well-established that an ICSID tribunal's outright failure to apply the proper law constitutes a manifest excess of powers."[95] According to Hungary, a tribunal's failure to apply the proper law "is not limited" to its application of the wrong system of law, it also entails its failure to apply "the particular rule of law," including provisions of a BIT, and is not only limited to the law "governing the merits" but also includes "issues of jurisdiction."[96]

127.    Based on an Article by Professor Schreuer, Respondent argues that a failure to apply a provision of the BIT "may warrant annulment under Article 52(1)(b)."[97]

128.    Responding to Claimants' allegation, Hungary clarifies that its challenge is based not on a failure by the Tribunal to apply the proper law but rather on the "Tribunal's complete failure to apply Article 9(2) of the BIT in determining its jurisdiction."[98] Furthermore, Respondent contends that Claimants "misrepresent the jurisprudence and doctrine pertaining to this annulment ground."[99] According to Respondent the correct standard warrants the application of the pertinent provisions of a proper system of law, in this case,

---

[94] Rejoinder on Annulment, para. 121. Emphasis in the original.

[95] Memorial on Annulment, para. 70.

[96] *Ibid.*, paras. 72-75.

[97] *Ibid.*, para. 72.

[98] Reply on Annulment, para. 23. See also para. 22.

[99] *Ibid.*, para. 24.

the BIT.[100] It also asserts that the previous conclusion is supported by past and contemporary committees' decisions.[101] Contrary to Claimants' position, the "more recent jurisprudence" reaffirms the abovementioned view "that a tribunal's failure to apply the relevant provisions of the applicable law may be constitutive of a manifest excess of powers."[102]

### (ii) Failure to apply the BIT

129.    According to Respondent "the Tribunal failed to address the application of Article 9(2) of the BIT in light of the *Achmea* Decision."[103] Respondent alleges that it did not address the "implication" of the *Achmea* Decision in which it was "determined that EU Member States' obligations under the EU Treaties preclude investor-State arbitration provisions in Intra-EU BITs, such as Article 9(2)."[104]

130.    Respondent contends that the Tribunal focused "solely on the applicability of the ICSID Convention."[105] In this regard, there are according to Respondent "always two sets of jurisdictional requirements"[106] and Claimants themselves "agreed that jurisdiction would have to be determined 'on the basis of Art. 25(1) of the ICSID Convention and Art. 9 of the [France-Hungary] BIT.'"[107] Respondent argues that this was acknowledged in the Tribunal's Decision on Jurisdiction.[108] Hungary clarifies that it "never argued that consent to arbitration under the ICSID Convention was affected by the *Achmea* Decision. Rather, Hungary argued that, as a result of the *Achmea* Decision, Article 9(2) of the BIT had been rendered inapplicable following Hungary's accession to the EU."[109]

---

[100] *Ibid.*, para. 25.

[101] *Ibid.*, paras. 26, 27-29, 30-33, 35-37.

[102] *Ibid.*, para. 34. See also para. 37.

[103] Memorial on Annulment, para. 77.

[104] *Ibid.*, para. 78.

[105] *Ibid.*, para. 79.

[106] *Ibid.*, para. 80.

[107] *Ibid.*, para. 82.

[108] *Idem.*

[109] *Ibid.*, para. 84.

131.   Respondent takes issue with the Tribunal's discussion in the Award related to the "'survival clause' contained in Article 12.2 of the BIT"[110] and states that this consideration is "beside the point."[111] On this issue, Hungary contends that it "never submitted" that "the *Achmea* Decision had the effect of terminating the BIT." "To the contrary," it argued that "all provisions of the BIT save for Article 9(2) continued to be applicable."[112]

132.   On this issue, Respondent summarized that this is a case of a "non-application of a critical rule [Article 9(2) of the BIT] that was required to be applied."[113]

133.   Respondent states that its claim is that "the Tribunal failed in its analysis on jurisdiction to consider the application of Article 9(2) of the BIT at all."[114] Also, the Tribunal "failed to address whether Article 9(2) of the BIT was still applicable at the time Claimants initiated this proceeding."[115]

134.   Respondent argues that the Tribunal "on the basis that Hungary's consent to arbitrate under the ICSID Convention remained intact"[116], disregarded the consent to arbitration provided for in Article 9(2) of the BIT.[117]  After surveying the Award,[118] Respondent concludes that there is not only a lack of discussion of its objection related to the inapplicability of Article 9(2), but also the Tribunal "overtly refused to assess its jurisdiction under Article 9(2) of the BIT based on the erroneous conclusion that its jurisdiction would in any event prevail under the ICSID Convention."[119]

---

[110] *Ibid.*, para. 85, citing Award, para. 265.

[111] *Ibid.*, para. 86.

[112] *Idem.*

[113] *Ibid.*, para. 88.

[114] Reply on Annulment, para. 39.

[115] *Ibid.*, para. 41.

[116] *Ibid.*, para. 42. Emphasis omitted.

[117] *Idem.*

[118] *Ibid.*, para. 43.

[119] *Ibid.*, para. 44.

135.   In replying to Claimants' contention that the Tribunal did address Article 9(2), Respondent contends that "even a superficial review" of the paragraphs cited by Claimants shows that the Tribunal failed to address the applicability of Article 9(2).[120]

136.   In response to the contentions that the jurisdiction was clearly established in the Decision on Jurisdiction and that it was "decided, that [the Achmea] Decision could not revoke previously perfected consent under the BIT,"[121] Respondent argues that the text of the Award does not support that view. There is no analysis of jurisdiction under the BIT "because of the Tribunal's misguided contention that […] Hungary's consent to arbitrate would still exist under another instrument, i.e., the ICSID Convention."[122] According to Respondent the jurisdictional analysis pertains only to the ICSID Convention.[123] This omission constitutes "a failure to apply the proper law" under Article 52(1)(b) of the ICSID Convention.[124]

### (iii) Manifest

137.   Respondent alleges that the Tribunal's excess of powers was manifest and that "the 'manifest' requirement is always satisfied when an error committed by the tribunal leads to a decision that is wrong on jurisdiction."[125] Replying to Claimants, Respondent asserts that the notion that a different standard for jurisdictional errors and other excesses of powers has been "consistently" rejected, and is "unavailing."[126] It further contends that the decisions relied upon by Claimants have taken into account neither the context, object or purpose, nor the preparatory works, as demanded by the VCLT.[127]

---

[120] *Ibid.*, para. 47. See also para. 48.

[121] *Ibid.*, para. 55, citing Counter-Memorial on Annulment, para. 203.

[122] *Idem.*

[123] *Ibid.*, para. 56.

[124] *Ibid.*, para. 59.

[125] Memorial on Annulment, para. 91.

[126] Reply on Annulment, para. 196.

[127] *Ibid.*, paras. 196-199.

138.    According to Respondent, due to its "cardinal importance" a jurisdictional error is the "most obvious example of an excess of powers."[128]

139.    Moreover, Respondent posits that Claimants' reliance on Articles 41[129] and 53[130] of the ICSID Convention does not advance their case. Regarding Article 41, Respondent contends that this provision does not create a "presumption in favour of the correctness of the tribunal's decision on jurisdiction"[131] and that the decision on jurisdiction is not "immune from review" or "so deferential" as to preclude any analysis.[132]  With respect to Article 53, Respondent's view is that this article is not a basis for limiting a review of a decision on jurisdiction[133] and, conversely, *ad hoc* committees have taken the view that this provision "relates to the review of awards on the *merits*."[134]  Respondent also takes issue with Claimants' challenge of the authorities which support Respondent's position. Specifically, Respondent argues that the views contained in these authorities come from recognized arbitrators[135] and the "rationale" on which their arguments were based "remains intact today."[136]

140.    In replying to Claimants' argument that only those jurisdictional errors that are ascertained "without the need for an elaborate analysis" are subject to scrutiny, Respondent asserts that this view "ignores entirely the 'particularly complex and technical nature' of jurisdictional

---

[128] *Ibid.*, para. 200.

[129] *Ibid.*, paras. 201-202, 206.

Article 41: (1) The Tribunal shall be the judge of its own competence. (2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

[130] *Ibid.*, paras. 203-205, 206.

Article 53: (1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

[131] *Ibid.*, para. 201.

[132] *Ibid.*, para. 202.

[133] *Ibid.*, para. 204.

[134] *Ibid.*, para. 205. Emphasis in the original.

[135] *Ibid.*, para. 208.

[136] *Ibid.*, para. 209.

issues in treaty arbitration,"[137] and precisely because of the "very nature and importance of jurisdictional matters." According to Respondent, the Committee's analysis as to the Tribunal's jurisdiction should be rigorous and "should not be lulled into complacency by Claimants' misplaced reliance on the term 'manifestly'."[138]

141.    Alternatively, Respondent contends that under the test of a "manifest excess of powers," the Tribunal's fault needs to be "'evident' and 'serious.'"[139] According to Respondent the test "would be met"[140] because "[i]t is beyond *prima facie* evident from the text of the Award that the Tribunal failed to assess the applicability of Article 9(2) of the BIT to determine its jurisdiction."[141] Addressing Claimants' denial that the Tribunal's error would, in any case, not be evident, Respondent argues that "Claimants do not even attempt to demonstrate that it would require more than a *prima facie* examination of the Award by the *Ad Hoc* Committee to conclude that the Tribunal failed to consider the inapplicability of Article 9(2) of the BIT as a basis for its jurisdiction."[142]

142.    Finally, regarding the seriousness of the excess of powers, Respondent posits that based on a wrongly asserted jurisdiction, the Tribunal held "Hungary liable under the BIT and ordered Hungary to pay EUR 23,196,000 to Claimants."[143] Responding to Claimants' arguments as to the relevance of the liability and quantum decision, Hungary takes the view that Claimants seem to ignore "the long line of authorities" and only focus on the "obvious" and evident error, failing to recognize the "dual" nature of the "manifest" criteria.[144]

---

[137] *Ibid.*, para. 210.
[138] *Ibid.*, para. 211.
[139] Memorial on Annulment, para. 92.
[140] *Idem.*
[141] *Ibid.*, para. 93.
[142] Reply on Annulment, para. 215.
[143] Memorial on Annulment, para. 94.
[144] Reply on Annulment, para. 216.

### b. *Claimants' position*

#### (i) *Failure to apply the proper law*

143.  Claimants qualify this argument as "nothing more than another version of [Respondent's] 'failure to state reasons' argument."[145]

144.  Claimants contend that there is a "very high threshold" to apply Article 52(1)(b). A "mere 'misinterpretation,'" "incorrect application of the law" or "even a serious error" of the applicable law is not enough to give rise to grounds for annulment but for "an exceptional situation [where the misapplication or error is] of such egregious nature."[146]

145.  According to Claimants, an incorrect application of the law would not entail a failure to apply the law if the argument is "directed solely at the accuracy of application of the law, and not [at] the fact that the law was not applied."[147] "[O]nly a 'complete failure' […] to 'apply the proper law in toto', and not just a mere *provision* of the law"[148] will give rise to a manifest excess of powers violation.

146.  Claimants also take issue with Respondent's use of an Article by Professor Schreuer to support its argument that a failure to apply a provision of the BIT could warrant annulment under Article 52(1)(b).[149] According to Claimants, this view "has been soundly rejected by more recent case law."[150]

147.  Claimants reiterate their view that only a "complete failure" to apply the proper law amounts to an excess of powers under Article 52(1)(b).[151] Claimants further contend that Respondent does not address the precedents and authorities that have taken the view that a

---

[145] Counter-Memorial on Annulment, para. 222.

[146] *Ibid.*, paras. 228-229.

[147] *Ibid.*, para. 231.

[148] *Ibid.*, para. 233. Footnote omitted.

[149] *Ibid.*, para. 236.

[150] *Ibid.*, para. 237. See also para. 238.

[151] Rejoinder on Annulment, paras. 65-66.

partial non-application of the law could not lead to annulment and misrepresents the ones that allegedly support its case.[152]

*(ii) Failure to apply the BIT*

148. Claimants reject the argument that the Tribunal failed to apply Article 9(2).[153] They contend that the Tribunal "found that previously perfected consent could not be retroactively revoked because, unlike in *Achmea*, this case is governed by the ICSID Convention."[154]

149. Claimants also argue that the jurisdiction of the Tribunal was clearly established in the Decision on Jurisdiction and that the Tribunal made it clear that "the *Achmea* Decision does not change the conclusion reached by this Tribunal in its Decision of 3 March 2016 that the Tribunal has jurisdiction over all the claims raised."[155]

150. In response to Respondent's argument that the Tribunal did not address Article 9(2), Claimants contend that the argument was not directed at the Tribunal's reasoning or interpretation of Article 9(2) but the circumstance "that it <u>failed to fail</u> to apply Article 9(2), or, at best, that the Tribunal <u>misapplied</u> the proper law because it did not accept Hungary's newly articulated argument that Article 9(2) is 'inapplicable'."[156] According to Claimants, no other committee had agreed that a failure to address a party's argument or to follow an argument related to a certain provision constitutes a valid ground for annulment under Article 52(1)(b).[157] Thus, "it is clear that misapplication of the proper law is not a valid annulment ground."[158]

151. Claimants also allege that Respondent has not demonstrated that "any failure to apply the proper law would be 'manifest'."[159] Claimants further reiterate that there is a finding by

---

[152] *Ibid.*, paras. 70-83.
[153] Counter-Memorial on Annulment, para. 224.
[154] *Ibid.*, para. 225.
[155] *Ibid.*, paras. 234-235, citing Award, para. 266.
[156] Rejoinder on Annulment, para. 27. Emphasis in the original. See also para. 26.
[157] *Ibid.*, paras. 28-30 and 43.
[158] *Ibid.*, para. 31. See also paras. 32-33.
[159] *Ibid.*, para. 35. See also paras. 36-37.

the Tribunal that it had jurisdiction under the ICSID Convention and the BIT[160] and that Hungary's consent was perfected.[161] Moreover, Claimants contend that the jurisdictional objection that the Tribunal was asked to address was not the applicability of Article 9(2) but "whether the *Achmea* Decision could defeat Hungary's consent to arbitration 'with retroactive effect.'"[162]

152.    Claimants in addition allege that in their comments to the Commission's *Amicus Curiae* Brief, Respondent accepts that the Tribunal did apply Article 9(2).[163] In replying to Respondent's assertions about the Award, Claimants reiterate that the Award did apply Article 9(2).[164]

> *(iii) Manifest*

153.    Claimants allege that Respondent's contention that the manifest requirement is always satisfied where a Tribunal error leads to a decision that is wrong on jurisdiction, is "unfounded."[165] According to Claimants this view has been "consistently rejected" by *ad hoc* committees[166] and goes against the "clear language of the ICSID Convention."[167] Claimants contend that the text of Article 52(1)(b) does not distinguish between jurisdiction and merits arguments[168] and that Articles 41(1) and 53 provide context to support this view.[169] Thus, according to Claimants, the "same high annulment standard must therefore apply, whether the issue relates to jurisdiction or to the merits."[170] Finally, to support their argument of a high threshold,  Claimants take issue with the authorities

---

[160] *Ibid.*, para. 38. See also para. 44.

[161] *Ibid.*, para. 45.

[162] *Ibid.*, para. 38. See also para. 57.

[163] *Ibid.*, para. 42.

[164] *Ibid.*, paras. 51-62.

[165] Counter-Memorial on Annulment, para. 158.

[166] *Ibid.*, paras. 159, 160, citing **RL-292**, *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr. Soufraki, June 5, 2007 ("*Soufraki v. UAE*") and para. 161, citing **RL-339**, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, April 5, 2016).

[167] *Ibid.*, para. 164.

[168] *Ibid.*, para. 162.

[169] *Ibid.*, para. 163.

[170] *Ibid.*, para. 165.

used by Respondent. First, they contend that these sources are outdated (before 2005).[171] Second, they assert that at that time there were only two annulment decisions which dealt with this issue and that one of them did not support Respondent's view.[172] According to Claimants, the "modern position" is that an incorrect determination of jurisdiction "must be <u>manifest</u>."[173]

154.   Claimants oppose Hungary's reliance on the VCLT to contest the jurisprudence relied upon by Claimants. According to Claimants, under the text of the VCLT, recourse to preparatory work can only be had in the specific circumstances called upon by Article 32.[174]  Further, Claimants assert that the contention made by Hungary is inapposite and unhelpful[175] since what Hungary relies upon is a "terse and off-point statement made in Professor Schreuer's commentary."[176] Also, on this issue, Claimants contend that, contrary to what Respondent argued regarding Articles 41 and 53 to support its view on the standard of manifest, the cases Respondent referred to "gets Hungary no further."[177]

155.   Claimants allege that Hungary's contention seems to be based on a view that the jurisdiction "is always a clear-cut question." However, this view "<u>has been abandoned by</u> <u>*ad hoc* committees</u>."[178] Claimants contend that in order to be manifest the errors in the Tribunal's jurisdictional decision need to be "obvious, clear or self-evident, without the need for an elaborate analysis of the decision."[179]

156.   Finally, Claimants posit that Hungary does not establish why the Tribunal's alleged failure to address the impact of the *Achmea* Decision would result in a manifest excess of powers. In fact, Hungary's "argument awkwardly focuses on the 'implications' of the Tribunal's

---

[171] *Ibid.*, para. 166.

[172] *Ibid.,* paras. 167-168, referring to **RL-332**, *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, *Ad Hoc* Committee Decision on Annulment, May 3, 1985 ("*Klöckner I*").

[173] *Ibid.*, para. 169. Emphasis in the original.

[174] Rejoinder on Annulment, paras. 175-178. See also footnote 186.

[175] *Ibid.*, para. 182.

[176] *Ibid.*, para. 181.

[177] *Ibid.*, para. 189. See also paras. 187-188.

[178] *Ibid.*, para. 194. Emphasis in the original. See also paras. 195-197.

[179] Counter-Memorial on Annulment, para. 171.

decision […] Under the ICSID Convention, however, it is the 'ease with which [an excess of powers] is perceived' that determines whether it is manifest – and not the gravity of its implications on the losing party."[180]

### c. The Committee's analysis

#### (i) New arguments and new evidence

157.    The Committee will start by making a few remarks related to the new evidence and arguments introduced in these proceedings. Although most of the Parties' related allegations have already been discussed below in the context of the Claimants' allegation that the 2019 Joint Declarations constitute new evidence, the Committee wishes to clarify its general approach to the alleged new evidence and arguments put forward.

158.    Claimants contend that the 2019 Joint Declarations "are irrelevant to these Annulment Proceedings because they did not form part of the factual and legal elements on which the Tribunal founded its decision on jurisdiction."[181] Respondent draws a distinction between new evidence or arguments on the merits and the issue at hand, which relates to a tribunal's jurisdiction, contending that the authorities cited by Claimants either do not refer to new evidence or arguments on jurisdictional issues or are "unsubstantiated."[182]

159.    The Committee agrees that, as a general rule and in light of the nature of an annulment proceeding,[183] it is not authorized to entertain evidence or arguments which were not put forward before the Tribunal.[184] It also agrees that "it cannot exclude" that there could be some instances where a Committee may need to review or address new evidence or

---

[180] *Ibid.*, para. 175.

[181] *Ibid.*, para. 118.

[182] Reply on Annulment, paras. 139-145.

[183] "Under Article 52 of the ICSID Convention, an annulment proceeding is not an appeal, still less a retrial; it is a form of review on specified and limited grounds which take as their premise the record before the Tribunal" (**CL-0290**, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, March 21, 2007, para. 31).

[184] **CL-0312**, *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision on Annulment, March 1, 2011 ("*Duke v. Peru*"), para. 99; **RL-336**, *Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., et al. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, December 27, 2016, para. 208; **CL-0289**, *Teinver S.A, Transportes de Cercanias S.A. and Autobuses Urbanos del sur S.A. v. The Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Annulment, May 29, 2019 ("*Teinver v. Argentina*"), para. 86; **RL-290**, Christoph Schreuer, Loretta Malintoppi, August Reinisch and Anthony Sinclair, *The ICSID Convention: A Commentary*, 2nd Edition, 2009, p. 932, para. 108; **RL-332**, *Klöckner I*, para. 83.

arguments.[185] Looking at the grounds for annulment invoked and the claims put forward, the Committee sees no basis to depart from the general rule. Thus, the Committee will analyze all claims put forward by the Parties based solely on the evidence on the record and arguments presented to the Tribunal.

### (ii) Interpretation of Article 52(1)(b)

160. Since some of the elements of Article 52(1)(b) are a matter of contention between the Parties, the Committee will start with the interpretation of this provision, in accordance with the customary rules of interpretation, as reflected in Articles 31 and 32 of the VCLT.[186]

Article 52(1)(b) of the ICSID Convention states:

(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds: […]

---

[185] **RL-293**, *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Application for Annulment of the Award, June 29, 2010, para. 74.

[186] Article 31. GENERAL RULE OF INTERPRETATION:

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) Any relevant rules of international law applicable in the relations between the parties.

4. A special meaning shall be given to a term if it is established that the parties so intended.

Article 32. SUPPLEMENTARY MEANS OF INTERPRETATION:

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a) Leaves the meaning ambiguous or obscure; or

(b) Leads to a result which is manifestly absurd or unreasonable.

**RL-322.** United Nations, Vienna Convention on the Law of Treaties, May 23, 1969, United Nations, Treaty Series, vol. 1155.

> (b) that the Tribunal has manifestly exceeded its powers;
> […].

161. We commence with the text. As to the plain meaning of "manifest excess of powers" the Committee notes that "powers" means "possession of control, authority, or influence over others."[187] "Exceeds" means "surpasses proper, or specified limits"[188] and finally, "manifest" means "readily perceived by the senses and especially by the sense of sight, easily understood or recognized by the mind, obvious."[189] The French version uses very similar wording to the English one: "*excès de pouvoir manifeste du Tribunal.*" The Spanish version states, "*el Tribunal se hubiere extralimitado manifiestamente en sus facultades*," the word "*facultades*" referring to powers granted to authorities.[190] Thus, based on the plain meaning of the three versions of this provision, the Committee concludes that an excess of powers is one in which a tribunal "obviously surpasses its authority."

162. The Parties disagree on the need for a further inquiry when dealing with an alleged excess of powers pertaining to a jurisdictional matter. According to Respondent, "the 'manifest' requirement is always satisfied when an error committed by the tribunal leads to a decision that is wrong on jurisdiction."[191] Conversely, Claimants contend that Respondent's view is unfounded and is inconsistent with "the clear language of the ICSID Convention."[192] The Committee agrees with Claimants that there is no textual basis for the proposition that there would be some scenarios in which the manifest requirement could be obviated. Thus, "[n]o distinction is to be drawn in this regard between the standard to be applied to determining an excess of power based on alleged excess of jurisdiction and any other excess of power. In both cases, the excess must be manifest."[193]

---

[187] power. 2021. In *Merriam-Webster.com*. Retrieved July 10, 2021, from https://www.merriam-webster.com/dictionary/power

[188] exceed. 2021. In *Merriam-Webster.com*. Retrieved July 10, 2021, from https://www.merriam-webster.com/dictionary/exceed

[189] manifest. 2021. In *Merriam-Webster.com*. Retrieved July 10, 2021, from https://www.merriam-webster.com/dictionary/manifest

[190] "Facultad: Autoridad, derecho o poder inherente a un cargo para determinadas cosas" ("*Authority, right or inherent power to a position to do certain things*"). Moliner María, *Diccionario de uso del español*, 3rd Edition), 2007.

[191] Memorial on Annulment, para. 91.

[192] Counter-Memorial on Annulment, para. 164.

[193] **CL-0312,** *Duke v. Peru*, para. 98; **RL-292,** *Soufraki v. UAE*, para. 119.

163. As to the approach to determine whether there is a "manifest excess of powers," various Committees have taken a two-step approach, addressing first, whether there is an excess of powers and, as second, whether such excess is manifest. The Committee notes that the exercise of scrutinizing an award to determine whether there is an excess of powers, will also assist the assessment of whether any such excess is manifest.

164. Finally, regarding the test to determine whether an excess of powers is manifest, both Parties agree that the excess needs to be "evident." Respondent contends, however, that since "the Tribunal's jurisdictional error must be both '*evident*' and '*serious'* to warrant the annulment of the Award – that test would be met in the present case".[194]  The Committee considers that the excess must be "self-evident,"[195] "plain on its face,"[196] "obvious by itself,"[197] and "found with certainty and immediacy"[198] in order to be manifest. With respect to seriousness as an additional component in the manifest inquiry, to the Committee, the seriousness of the excess flows from the nature of an annulment inquiry, in which, as with any other of the grounds listed in Article 52(1), the challenged error needs to be serious or substantial. [199]

165.  The Committee wishes to make clear that the fact that the excess of powers needs to be obvious or self-evident, does not undermine the depth of its inquiry. In this sense, the Committee agrees that determining whether the "manifest" requirement has been met is not just a "leap off the page" kind of exercise.

> The reasoning in a case may be so complex that a degree of inquiry and analysis is required before it is clear precisely what the tribunal

---

[194] Memorial on Annulment, para. 92.

[195] **CL-0325**, *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on Annulment, February 5, 2002 ("*Wena v. Egypt*"), para. 25; **CL-0289**, *Teinver v. Argentina*, para. 80.

[196] **CL-0288***, CDC Group plc v. Republic of Seychelles*, ICSID Case No. ARB/02/14, Decision on Annulment, June 29, 2005 ("*CDC v. Seychelles*"), para. 41.

[197] **CL-0339**, *Repsol YPF Ecuador S.A. v. Empresa Estatal Petróleos del Ecuador (Petroecuador)*, ICSID Case No. ARB/01/10, Decision on the Application for Annulment, January 8, 2007, para. 36.

[198] **RL-334**, *Mr. Patrick Mitchell v. Democratic Republic of the Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, November 1, 2006 ("*Mitchell v. Congo*"), para. 20.

[199] **RL-295**, *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, January 15, 2016 ("*Adem Dogan v. Turkmenistan*"), paras. 103-104. For the proposition that the manifest means both obvious and serious: see also **RL-296**, *Malicorp Limited v. The Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited, July 3, 2013, para. 56; **RL-292**, *Soufraki v. UAE*, para. 40.

has decided. In such a case, the need for such inquiry and analysis will not prevent an excess of powers from being "manifest".[200]

166. Regarding the overall approach to determine whether there is a manifest excess of powers, the Tribunal notes that its task is not to make an appeal type, or much less a *de novo*, review of the Award on the issue at hand.[201] In this sense, the Committee agrees that:

> [I]t is no part of the Committee's functions to review the decision itself which the Tribunal arrived at, still less to substitute its own views for those of the Tribunal, but merely to pass judgment on whether the manner in which the Tribunal carried out its functions met the requirements of the ICSID Convention.[202]

> *(iii) Whether there was a failure to apply the proper law*

167. The Committee will now address Respondent's position that the Tribunal failed to apply the proper law. Despite the different views as to its contours, it is uncontested between the Parties that an excess of powers includes a failure to apply the law.

168. Respondent's claim is that the Tribunal failed to apply Article 9(2) of the BIT when determining its jurisdiction. Respondent contends that, "as a result of the *Achmea* Decision, Article 9(2) of the BIT had been rendered inapplicable following Hungary's accession to the EU."[203] To Respondent the "non-application [by the Tribunal] of a critical rule [Article 9(2) of the BIT] that was required to be applied"[204] amounts to a violation of Article 52(1)(b).  According to Claimants the Tribunal did apply Article 9(2) and correctly found that "previously perfected consent could not be retroactively revoked because, unlike in

---

[200] **CL-0327**, *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic,* ICSID Case No. ARB/03/23, Decision on Annulment, February 5, 2016, para. 193.

[201] "Article 52(1)(b) does not provide a mechanism for *de novo* consideration of, or an appeal against, a decision of a tribunal under Article 41(1) after the tribunal has given its award" (**RL-299**, *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Application for Annulment of the Argentine Republic, July 30, 2010 ("*Enron v. Argentina*"), para. 69); "[A] request for annulment is not an appeal, which means that there should not be a full review of the tribunal's award" (**CL-0352**, I*ndustria Nacional de Alimentos, S.A. and Indalsa Perú,S.A. (formerly Empresas Lucchetti, S.A. and Lucchetti Perú, S.A.) v. Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment, September 5, 2007 ("*Lucchetti v. Peru*"), para. 101).

[202] **CL-0352**, *Lucchetti v.  Peru*, para. 97.

[203] Memorial on Annulment, para. 84.

[204] *Ibid.,* para. 88.

*Achmea*, this case is governed by the ICSID Convention."[205] Claimants also allege that Respondent's argument is really one of "misapplication of the law"[206] which could not be a valid ground for annulment.

169.    In relation to the standard applicable, Respondent posits that the standard allows not only to challenge the application of a "system of law"[207] but also failures to apply relevant provisions of a law applicable to jurisdictional issues. Conversely, Claimants contend that excess of power under Article 52(1)(b) can only be a valid ground where there is a "complete failure"[208] and that a partial non-application of the law is not enough to qualify as an excess of powers.

170.    For the Committee it is important to understand, firstly, what question was put forward to the Tribunal. Secondly, how did the Tribunal address the question. Lastly, whether it failed to apply Article 9(2).

171.    In the Committee's view, Hungary's case was premised on the Tribunal agreeing that, by applying Article 9(3) of the BIT, as a result of the *Achmea* Decision, there was a conflict between Article 9(2) of the BIT and Articles 267 and 344 of the TFEU. Once a conflict was identified, by applying the "conflict resolution tools"[209] of the VCLT the Tribunal would have to find that Article 9(2) was not applicable, and thus, it had no jurisdiction over this dispute.

172.    The first part of the analysis as framed by Respondent would involve agreeing that EU law was part of "the 'rules and principles of international law,'" under Article 9(3) of the BIT.[210] Then, there should be agreement that such rules of international law, including EU

---

[205] Counter-Memorial on Annulment, para. 225.

[206] *Ibid.,* para. 226.

[207] Memorial on Annulment, para. 72.

[208] Counter-Memorial on Annulment, para. 233.

[209] **R-73**, Hungary's further comments on the *Achmea* Decision, dated May 2, 2018, para. 17.

[210] *Idem.*

law, must be applicable to the jurisdiction issue.[211] After that, the Tribunal would have to agree that the *Achmea* Decision had an *erga omnes*, binding and retroactive effect.

173. According to Respondent, the decision would be binding because preliminary rulings of the CJEU "are considered part of the *acquis communautaire*, and are therefore considered to be binding in the same way as statutory EU law."[212] They have *erga omnes* effect and hence extend to all EU Member States and private entities,[213] as well as to all ongoing proceedings and legal relationships in existence before the relevant ruling was issued.[214] According to Hungary, the retroactive effect "flows from the fact that such rulings do not create new rules but rather clarify the meaning of pre-existing EU law."[215]  Thus, the conflict of laws arose on May 1, 2008, the date the BIT entered into force or "[i]n the alternative […] on December 1, 2009, when the TFEU came into effect."[216] After agreeing with this view, the Tribunal would have to apply the VCLT and determine that there was an incompatibility between EU law (as interpreted by the *Achmea* Decision) and the BIT. This would render Article 9(2) inapplicable because, based on the principle of *lex superior*, EU law would prevail over the BIT.[217] In its last submission to the Tribunal, Respondent put forward that the conflict of laws could also be addressed using the principle of *lex posterior*, by applying Article 30(3) of the VCLT, because the "contravening provision of the earlier treaty is no longer applicable."[218] Finally, Respondent argued that the conflict could also be solved, based on the principle of "*lex specialis*," in favor of EU law "considered as *lex specialis* due to its 'self-contained nature'."[219]

---

[211] "EU law is part of general international law and must therefore be considered when determining whether the Tribunal has jurisdiction and whether there are any impediments to the exercise of that jurisdiction." (**C-0201**, Letter from Hungary to the Tribunal, dated March 28, 2018, p. 5.)

[212] *Ibid.*, p. 6.

[213] **C-0203**, Hungary's Post-Hearing Brief, September 22, 2017, para. 22. See also **C-0201**, Letter from Hungary to the Tribunal, March 28, 2018, p. 6.

[214] *Ibid.*, para. 23. See also **R-73**, Hungary's further comments on the *Achmea* Decision, May 2, 2018, paras. 55-60.

[215] **C-0201**, Letter from Hungary to the Tribunal, March 28, 2018, p. 6.

[216] **R-73**, Hungary's further comments on the *Achmea* Decision, May 2, 2018, para. 46.

[217] *Ibid.*, paras. 22-23.

[218] *Ibid.*, para. 26.

[219] *Ibid.*, footnote 28.

174.   As explained in the previous paragraphs, this was how the issue at hand was framed for the Tribunal. Now the Committee turns to analyze how the Tribunal approached the issue at Section VI of the Award.

175.   First, the issue was framed exclusively in the context of the *Achmea* Decision. At no point did Respondent argue or allege that this was a new jurisdictional objection, independent from the *Achmea* ruling. The basis for its jurisdictional objection was the *Achmea* Decision. This is clear from how the impact of the *Achmea* Decision, for purposes of applying the proper law, was brought before the Tribunal. It was not until that ruling became final that the Tribunal, on its own initiative, requested that the Parties provide their views on this issue. Second, the Tribunal's jurisdiction was established by the time the issue was brought before the Tribunal since once the preliminary jurisdictional objection was resolved, there were no further objections to its jurisdiction. In fact, Respondent made clear that the Tribunal's jurisdiction was valid and that it, under Article 25(1) and Article 9(2), consented to arbitrate this dispute.[220]

176.   Turning to the Award, to the Committee, the applicability of Article 9(2) was not the claim before the Tribunal but rather **the consequence of agreeing with the interpretation put forward by Respondent**:

> The Respondent maintains its view that the *Achmea* Decision must be considered by this Tribunal as part of the law applicable to its jurisdiction, and that application of the *Achmea* Decision **should lead the Tribunal** to conclude that it lacks jurisdiction due to the underlying incompatibility between the TFEU and Article 9(2) of the BIT that precludes the operation of Article 9(2) of the BIT with effect from May 1, 2014 – Hungary's accession to the EU.[221]

177.   Respondent's challenge, hence, is not directed towards the failure to apply a particular law. According to Respondent, Article 9(2)'s applicability, instead, is hinged upon the relevance of the *Achmea* Decision in Respondent's interpretation. The inapplicability of Article 9(2)

---

[220] **C-0197**, Hungary's Counter-Memorial and Objections to Jurisdiction, July 17, 2015, paras. 105-127.
[221] **R-73**, Hungary's further comments on the *Achmea* Decision, May 2, 2018, p. 1. Emphasis added.

would have been the result of agreeing with Respondent's interpretation.[222] Hence, the issue was whether the *Achmea* Decision could trigger the application of Article 9(3) so that a conflict of laws could be identified that would result in the inapplicability of Article 9(2). Thus, in this case the Committee cannot "reproach [the Tribunal] for not having done what it was obligated to do, namely in that it did not examine [Article 9(2)]."[223] As Hungary puts it, its argument was that: "**as a result** of the *Achmea* Decision, Article 9(2) of the BIT had been rendered inapplicable following Hungary's accession to the EU."[224]  The relevance of the *Achmea* Decision is the essence of the challenge brought by Respondent. Thus, in the Committee's view, Hungary is taking issue with the fact that the Tribunal did not address the ultimate finding, *i.e.*, inapplicability of Article 9(2), which should have been the result of agreeing with Respondent's analysis. Article 9(3) in any case was the provision that should have been considered to trigger the claim that was put forward by Respondent. Nevertheless, the Tribunal never reached the finding that Article 9(2) was applicable because the Tribunal disagreed with the relevance of the *Achmea* Decision.

178.    Based on this reasoning, the Committee sees no need to further address the arguments put forward by the Parties, neither with respect to the meaning of proper law, nor with respect to whether the excess is manifest.

179.    Thus, the Committee considers that the Tribunal applied the proper law. In any event, the Tribunal found that the *Achmea* Decision had no bearing on its jurisdiction. For the reasons stated, the Committee rejects this ground for annulment.

---

[222] Hungary's contention was that: "It is only Art. 9(2) of the BIT offering the possibility of referring disputes in connection with dispossession measures to ICSID arbitration that is in conflict with Art. 267 and 344 of the TFEU." (Award, para. 248.)

[223] **RL-334**, *Mitchell v. Congo*, para. 20.

[224] Memorial on Annulment, para. 84. Emphasis added.

**(3)    Whether there was a failure to state reasons on which the Award is based**

    *a.    Respondent's position*

        *(i)  Standard*

180.   Respondent takes the view that the standard under Article 52(1)(e) is based on Article 48(3) of the ICSID Convention, which obliges a tribunal to "address crucial or decisive arguments that could change the outcome, if accepted"[225] and "the award must enable the reader to understand the tribunal's motives and 'follow the reasoning of the Tribunal on points of fact and law'."[226]

181.   According to Respondent, the task of the committee is "to assess whether the tribunal's reasons are 'frivolous, perfunctory or absurd', and whether they are sufficient to allow the parties to understand the decision."[227]

182.   Respondent takes issue with the suggestion that it is for the Tribunal to decide what are crucial or decisive arguments[228] and postulates that "a tribunal may not be excused for failing to address *'essential questions'* that could have been outcome-determinative, for the simple reason that the tribunal chose to ignore those questions."[229] Furthermore, Hungary contends that a Tribunal is required to address "all the claims" as opposed to "all the arguments."[230] In this case, Hungary submits that the Tribunal "completely failed to address Hungary's claim regarding the inapplicability of Article 9(2) of the BIT – an essential question that the Tribunal was mandated to address."[231]

183.   Respondent also takes issue with the "implicit reasons" standard put forward by Claimants. According to Respondent "*ad hoc* committees may 'explain' reasons that are not apparent in an award <u>only</u> 'provided they can be <u>reasonably inferred</u> from the terms used in the

---

[225] *Ibid.*, para. 195.

[226] *Ibid.*, para. 198.

[227] *Ibid.*, para. 199.

[228] Reply on Annulment, paras. 226-229.

[229] *Ibid.*, para. 232.

[230] *Ibid.*, para. 235. See also paras. 233-234.

[231] *Ibid.*, para. 236.

decision'."[232] Respondent, on the other hand, appears to agree with Claimants that "'genuinely' contradictory reasons in an award that 'completely cancel each other out' amount to a cause for annulment under Article 52(1)(e) of the ICSID Convention."[233]

### (ii) The Tribunal failed to address Hungary's arguments on the inapplicability of Article 9(2) of the BIT

184.    Respondent alleges that by focusing solely on the applicability of the ICSID Convention,[234] the "Tribunal entirely failed to address Hungary's argument that Hungary's consent under the BIT (a separate instrument) was not valid due to the inapplicability of Article 9(2) of the BIT."[235]

185.    Respondent further takes issue with the fact that the Tribunal addressed the "survival clause" in Article 12(2) of the BIT. Respondent contends that "[i]t had never been Hungary's 'own analysis' that the BIT had expired or had been otherwise terminated and that, in such circumstances, Article 9(2) would have survived"[236] and that this fact "does not compensate for the Tribunal's failure to address Hungary's argument on the inapplicability of Article 9(2) of the BIT."[237]

186.    In its Reply on Annulment, Respondent argues that it is not enough that the Tribunal "faithfully summarized" the Parties' arguments, the Tribunal needed also to address the claim of inapplicability of Article 9(2) of the BIT because that was an "essential" or "decisive" question.[238]

187.    Addressing Claimants' contention that the Tribunal did not need to engage in a detailed discussion on the *Achmea* Decision because its jurisdiction also derived from the ICSID Convention, Respondent posits that it:

---

[232] *Ibid.*, para. 238. Emphasis in the original.

[233] *Ibid.*, para. 244. See also paras. 243-246.

[234] Memorial on Annulment, paras. 204-205.

[235] *Ibid.*, para. 206. See also para. 203.

[236] *Ibid.*, para. 211.

[237] *Ibid.*, para. 207.

[238] Reply on Annulment, para. 256. See also paras. 254-255.

"never formulated the question of 'jurisdiction under the ICSID Convention' as a premise to jurisdiction under Article 9(2) of the BIT. Jurisdiction under both instruments are distinct issues, and Claimants cannot rely on the Tribunal's determination on one issue (which was never argued by Hungary) to contend that the Tribunal effectively dealt with a claim made by Hungary in relation to a distinct issue."[239]

188.    Respondent contends that the Tribunal's analysis of jurisdiction under the ICSID Convention is irrelevant and cannot serve as a substitute for Respondent's claim of the inapplicability of Article 9(2) of the BIT.[240] Respondent also considers irrelevant the reference made in the Award to the termination of the BIT.[241]  Finally, with respect to the survival clause, Respondent reiterates that this argument was never made, and that the Tribunal was wrong in basing its reasoning "on the presumption that the BIT had been 'terminated' as a whole and not on the presumption that Article 9(2) of the BIT had been rendered inapplicable."[242]

### (iii) The Tribunal's reasoning is contradictory

189.    According to Respondent, the Award is also contradictory because, despite having found that the consent derives from the BIT, "the Tribunal failed to assess, in the Award, the consequences of the *Achmea* Decision on the 'written consent' purportedly set out under the BIT."[243] In this vein, Respondent also alleges that there is a contradiction in the Award when, on one side, in the Award the Tribunal stated that "[r]egardless of what may be argued from the Achmea Decision regarding BITs between EU Member States,"[244] whilst on the other side, in its previous Decision on Jurisdiction asserted that consent from the BIT was required.  Thus, Respondent concludes that "the Tribunal's departure from its previous determination – that consent not only derives from the ICSID Convention but also

---

[239] *Ibid.*, para. 262. See also paras. 257-261.

[240] *Ibid.*, paras. 264-266.

[241] *Ibid.*, para. 265.

[242] *Ibid.*, paras. 268-269.

[243] Memorial on Annulment, para. 216.

[244] *Ibid.*, para. 217, citing Award, para. 259.

from the specific treaty commitment between the parties – reveals a genuine contradiction in the Tribunal's reasoning."[245]

190.    Replying to Claimants' allegation that the Tribunal focused on the existence and not on the scope of consent, Respondent submits that "Claimants cannot circumvent the Tribunal's general holding that consent in ICSID arbitration <u>must necessarily exist in more than one instrument</u>, which in the case of Respondent 'usually takes the form of a treaty commitment'."[246] With respect to the allegation that the Tribunal never stated that its jurisdiction was based exclusively on the ICSID Convention, Respondent puts forward paragraph 265 of the Award where the Tribunal stated that it would have jurisdiction "[r]egardless of what may be argued from the Achmea Decision regarding BITs between EU Member States" and reiterates that "while the Tribunal addressed the question of the impact of the *Achmea* Decision on the ICSID Convention, it failed to address the question of the inapplicability of Article 9(2) that had been raised by Hungary."[247]

### b. *Claimants' position*

#### (i) *Standard*

191.    When it comes to the standard for the requirement that a Tribunal shall state the reasons on which an award is based, Claimants oppose the reliance of Respondent on Article 48(3) of the ICSID Convention.  According to them, the standard under Article 52(1)(e) "is much higher."[248] The standard put forward by Claimants is "where the tribunal's reasoning lacked 'any expressed rationale' on a given point that the tribunal *itself* considered necessary; and most importantly, 'that point must itself be necessary to the tribunal's decision.'"[249] Even though they agree that the Tribunal's failure to deal with "crucial or decisive arguments" would amount to a violation under Article 52(1)(e), it is for the Tribunal to decide the arguments that it will deal with. According to Claimants, "'it is in

---

[245] *Ibid.*, para. 223.

[246] Reply on Annulment, para. 276. Emphasis in the original.

[247] *Ibid.*, para. 279.

[248] Counter-Memorial on Annulment, para. 187.

[249] *Ibid.*, para. 188. Emphasis omitted.

the discretion of the [T]ribunal not to' explicitly address arguments that it finds irrelevant to its reasoning."[250]

192.    Claimants contend that the requirement to state reasons can be complied with if the reasons are "implicit."[251] This is so, according to Claimants, when the "tribunal has already stated the reasons for rejecting the premises."[252] Finally, with respect to the applicable standard, Claimants argue that a reasoning which is contradictory will only amount to a failure to state reasons when the contradictions are so profound that they "cancel each other out"[253] or are "incapable of standing together on any reasonable reading of the decision."[254]

193.    Based on previous decisions, Claimants reiterate the discretion that tribunals have to determine which issue is 'crucial' or 'decisive' and that the role of annulment committees is "limited to a consideration of <u>whether the reasons are sufficient to allow a reader to understand how the tribunal's conclusion was reached</u>."[255]

194.    Even if there had been an omission of addressing the inapplicability of Article 9(2), according to Claimants, Respondent would still have to demonstrate that the omission "would render the Award unintelligible."[256]

195.    Claimants reiterate that "the Tribunal's reasoning in the Award can be easily followed"[257] and Respondent "has no response to Claimants' argument that a failure to deal with a question must amount 'to a failure in the intelligibility of the reasoning in the award itself'."[258]

---

[250] *Ibid.*, para. 190.

[251] *Ibid.*, para. 191.

[252] *Ibid.*, para. 194.

[253] *Ibid.*, para. 195.

[254] *Ibid.*, para. 197.

[255] Rejoinder on Annulment, para. 137, citing **CL-0331**, *Poštová banka, a.s. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Decision on Annulment, September 29, 2016, para. 136. Emphasis in the original.

[256] *Ibid.*, para. 141. See also para. 144.

[257] *Ibid.*, para. 151.

[258] *Ibid.*, para. 152.

> *(ii) The Tribunal failed to address Hungary's arguments on the inapplicability of Article 9(2) of the BIT*

196.   Claimants contest the proposition that the Tribunal did not address the applicability of Article 9(2). Claimants argue that, as Respondent concedes, the Tribunal "faithfully summarized" the Parties' arguments.[259] The Tribunal rejected the *Achmea* Decision's relevance[260] and with that "implicitly dealt with any intra-EU BIT argument, by rejecting the very premise on which such arguments were grounded."[261]

197.   Claimants also allege that the "Tribunal went further"[262] when addressing the retroactive effects of the *Achmea* Decision. Claimants submit that the Tribunal addressed arguments that Hungary in fact made related to the contention that the *Achmea* Decision would operate like a denunciation[263] and with respect to the survival clause.[264]

198.   Responding to the argument that the Tribunal failed to examine Hungary's argument on the applicability of Article 9(2), Claimants assert that:

> "[e]ven if Hungary were correct, the Tribunal cannot be blamed for failing to address an objection that Hungary never made. As explained above […], the Tribunal <u>did</u> address the *Achmea* Challenge that Hungary actually made during the Arbitration, i.e. that the *Achmea* Decision rendered Hungary's consent invalid and defeated jurisdiction. The Tribunal decided that the *Achmea* Decision could not have such effect given that consent was perfected under international law."[265]

199.   In response to the argument that the Award does not contain any analysis of the inapplicability of Article 9(2), Claimants recall that "Hungary's argument in the Arbitration was that the *Achmea* Decision applied to the Arbitration to defeat the Tribunal's

---

[259] Counter-Memorial on Annulment, para. 201.

[260] *Ibid.*, para. 203.

[261] *Ibid.*, para. 204.

[262] *Ibid.*, para. 205.

[263] *Ibid.*, para. 206.

[264] *Ibid.*, paras. 207-208.

[265] Rejoinder on Annulment, para. 99. Emphasis in the original.

jurisdiction, and not that Article 9(2) became inapplicable upon Hungary's adherence to the EU (independent of that decision)."[266]

*(iii) The Tribunal's reasoning is contradictory*

200. Claimants dispute that there is a contradiction in the Tribunal's reasoning. First, Claimants submit that Respondent misrepresents the Tribunal's Decision on Jurisdiction because the Tribunal "was not focused on the <u>existence</u> of consent, but the <u>scope</u> of such consent."[267] According to Claimants the existence of consent was never challenged by Hungary and in fact Hungary accepted such consent.[268] Finally, Claimants posit that Respondent "misrepresents"[269] the Award because the Tribunal never took the view that "jurisdiction is based exclusively on the ICSID Convention"[270] but rather "that it had jurisdiction under Article 25 of the ICSID <u>and</u> Article 9(2) of the BIT in its Decision on Jurisdiction."[271]

201. Addressing the alleged contradiction at paragraph 259 of the Award, Claimants contend that:

> "when placed in context, it is clear that the Tribunal rejected the suggestion that the Achmea Decision could effectively withdraw Hungary's consent with retroactive effect because the Arbitration was an ICSID arbitration and consent was subject to international law. Even if the *Achmea* Decision could be said to render inapplicable *unperfected* consent *going forward* or *as a matter of EU law*, it could not defeat *perfected consent retroactively and as a matter of international law*."[272]

202. Based on the Tribunal's reasoning, Claimants allege that there was no need "to address whether the *Achmea* Decision rendered Article 9(2) of the BIT inapplicable because – even

---

[266] *Ibid.*, para. 108.

[267] Counter-Memorial on Annulment, para. 211. Emphasis in the original. See also paras. 212-215.

[268] *Ibid.*, para. 216.

[269] *Ibid.*, para. 217.

[270] *Ibid.*, para. 218. Emphasis omitted.

[271] *Ibid.*, para. 219. Emphasis in the original.

[272] Rejoinder on Annulment, para. 121. Emphasis in the original.

if that were true – the *Achmea* Decision could not retroactively withdraw consent in this case."[273]

203.    Finally, with respect to the alleged contradiction in the Award, Claimants respond that "Hungary's claim to spot a contradiction between the Decision on Jurisdiction and the Award in relation to the *Achmea* Challenge is disingenuous because Hungary knows full well what was argued in the Arbitration and that those arguments were fully addressed in a coherent way in the Award, which flows from the Decision on Jurisdiction."[274]

### *c.   The Committee's analysis*

204.    Article 52(1)(e) provides:

> (1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds: […]
>
>> (e) that the award has failed to state the reasons on which it is based.[275]

205.    Article 52(1)(e) sets out the minimum requirement for a reader of an award to understand the motives that led the tribunal to adopt its decisions. In reviewing the claims put forward by Respondent, the Committee adopts the standard put forward by the *MINE v. Guinea* committee:

> The Committee is of the opinion that the requirement that an award has to be motivated implies that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. It implies that, and only that. The adequacy of the reasoning is not an appropriate standard of review under paragraph (l)(e), because it almost inevitably draws an *ad hoc* Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention. A Committee might be tempted to annul an award because that

---

[273] *Ibid.*, para. 133.
[274] *Ibid.*, para. 157.
[275] Article 52(1)(e) of the ICSID Convention.

examination disclosed a manifestly incorrect application of the law, which, however, is not a ground for annulment.

In the Committee's view, the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons.[276]

206.    The Committee also endorses the view that "[i]f the arguments of the parties have been correctly summarized and all the claims have been addressed, there is no need explicitly to address each and every one of the arguments raised in support of the particular claims, and it is in the discretion of the tribunal not to do so"[277] and that "reasons may be stated succinctly or at length, and different legal traditions differ in their modes of expressing reasons. Tribunals must be allowed a degree of discretion as to the way in which they express their reasoning."[278]

207.    Respondent puts forward two arguments. First, that "the Tribunal entirely failed to address Hungary's argument on the inapplicability of Article 9(2) of the BIT."[279] Second, that there was a contradiction in the Tribunal's reasoning because it departed from its previous finding "that consent not only derives from the ICSID Convention but also from the specific treaty commitment between the parties."[280]

208.    With respect to the first claim, the Committee already discussed at paragraphs 174-179 its finding that the Tribunal did address the applicability of Article 9(2) of the BIT. The Committee recalls the standard laid out above that there is no need to address each and every one of the arguments raised by the parties and that a tribunal's reasons may be stated

---

[276] **RL-344**, *Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award dated 6 January 1988, December 14, 1989, paras. 5.08-5.09.

[277] **RL-333**, *Republic of Kazakhstan v. Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S.*, ICSID Case No. ARB/05/16, Decision of the *ad hoc* Committee, March 25, 2010, para. 84.

[278] **RL-301**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3 (formerly *Compañía de Aguas del Aconquija, S.A. and Compagnie Générale des Eaux v. Argentine Republic*), Decision on Annulment, July 3, 2002, para. 64.

[279] Memorial on Annulment, para. 203.

[280] *Ibid.*, para. 223.

briefly.[281] From the Committee's reading of the Award, the Tribunal analyzed and summarily rejected the inapplicability of Article 9(2). For that reason, the Committee finds that the Tribunal did not fail to address Hungary's argument on the inapplicability of Article 9(2).

209.   As to the claim that there is a contradiction between the Tribunal's previous finding that consent derives "from more than one text,"[282] it seems that this is another formulation of the same claim regarding the alleged failure to engage with Hungary's argument on the inapplicability of Article 9(2) of the BIT.[283] Based on the analysis at paragraphs 174-179 above, the Tribunal did analyze consent under Article 9(2) of the BIT. Thus, the Committee cannot find any contradiction in the Tribunal's reasoning.

210.   In light of its findings in the previous paragraphs, the Committee considers moot and sees no reason to address whether the failure to address the inapplicability was "crucial or decisive" as posed by Respondent[284] or whether the Tribunal's reasoning is "implicit" as argued by Claimants.[285]

211.   For the reasons stated, the Committee considers that there was no failure to state reasons by the Tribunal and, accordingly, rejects this ground for annulment.

---

[281] "[R]easons may be terse, summarizing a tribunal's overall impression of evidence without evaluating it in detail." **RL-291**, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey,* ICSID Case No. ARB/11/28, Decision on Annulment, December 30, 2015 ("*Tulip v. Turkey*"), para. 105.

[282] Reply on Annulment, para. 272, citing Decision on Jurisdiction, para. 196.

[283] "[T]he Tribunal's omission of any analysis of the applicability of Article 9(2) of the BIT creates an irreconcilable contradiction." (*Ibid.*, para. 219.)

[284] Memorial on Annulment, paras. 195-212, Reply on Annulment, paras. 222-236; Counter-Memorial on Annulment, paras. 182-190.

[285] Reply on Annulment, para. 237; Counter-Memorial on Annulment, paras. 191-194.

**(4)    Whether the Tribunal wrongly asserted jurisdiction**

### a.  *Respondent's position*

#### (i)  The Achmea *Decision is authoritative on EU law*

212.   Respondent recalls how the *Achmea* Decision came about[286] and cites what it considers are its core findings, including:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[287]

> [A]rbitration proceedings such as those referred to in Article 8 of the [Netherlands-Slovakia] BIT […] derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law [...], disputes which may concern the application or interpretation of EU law.[288]

213.   With regard to the *Achmea* Decision, Respondent maintains that this "is the first ruling" on the question  of  the incompatibility of investor-State arbitration provisions in intra-EU BITs.[289] It is drafted in a way that it has a broad application;[290] it is "<u>authoritative</u> with respect to the proper interpretation of EU law on this very issue";[291] is binding in accordance with Article 288 of the TFEU[292] and, as a CJEU ruling, has "*erga omnes*"

---

[286] Memorial on Annulment, paras. 100-116.

[287] *Ibid.*, para. 103, citing **RL-287**, *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber) (March 6, 2018), EU:C:2018:158, para. 62.

[288] *Ibid.*, para. 114, citing **RL-287**, *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber) (March 6, 2018), EU:C:2018:158, para. 55. Emphasis omitted.

[289] *Ibid.*, para. 119.

[290] *Ibid.*, para. 120.

[291] *Ibid.*, para. 122. Emphasis in the original.

[292] *Ibid.*, para. 123.

effect, as confirmed by many of its decisions.[293] As EU Member States, Hungary and France are bound by this ruling.[294] Moreover, Respondent argues that international law acknowledges the "great weight" and "deference" that should be "accorded to the decisions of permanent bodies."[295]

214.    Based on all of this, Respondent posits that the:

> "*Achmea* Decision establishes, authoritatively, the correct interpretation and scope of the international law obligations undertaken by EU Member States under the EU Treaties. These obligations preclude – and are therefore incompatible with – investor-State arbitration provisions in international agreements concluded between EU Member States."[296]

> *(ii) Article 9(2) of the BIT is incompatible with France's and Hungary's obligations under the EU treaties*

215.    Respondent alleges that in light of the fact that Article 9(2) of the BIT and Article 8 of the Netherlands-Slovakia BIT, which was the subject of the *Achmea* Decision,[297] contain a similar mechanism, "the terms of the *Achmea* Decision apply, *mutatis mutandis*, to Article 9(2) of the BIT."[298]

216.    Hungary contends that Article 9(2) contravenes EU law for "the same three reasons determined in the *Achmea* Decision."[299] First, to Respondent "it is irrelevant that the Tribunal was not itself required to take account of provisions of EU law in order to resolve the dispute […] it suffices that Article 9(2) may lead a tribunal in any dispute under the BIT to take account of provisions of EU law for Article 9(2) to be determined to be incompatible with EU law."[300] Second,  the Tribunal is not an EU court or tribunal.[301]

---

[293] *Ibid.*, para. 124.

[294] *Ibid.*, para. 125.

[295] *Ibid.*, paras. 126-129.

[296] *Ibid.*, para. 130.

[297] *Ibid.*, para. 131.

[298] *Idem.*

[299] *Ibid.*, para. 132.

[300] *Ibid.*, para. 135.

[301] *Ibid.*, para. 136.

Third, the parties could not request a preliminary ruling from the CJEU; in fact, Respondent contends that this case is "one step further removed" than the *Achmea* case "from the jurisdiction of EU courts."[302]

217.    According to Respondent, "as a *preliminary* matter, a tribunal must ascertain, in light of the instruments of international law, whether the BIT and its provisions that form the basis of a tribunal's jurisdiction are still in operation."[303]

218.    Regarding the contention that only the BIT and the ICSID Convention apply, Respondent asserts that Claimants themselves recognize the relevance of international law for determining jurisdiction.[304] Respondent argues that this view is supported by case law.[305] To Hungary, "it follows that – irrespective of the application of the choice of law clause set out in Article 9(3) of the BIT – the determination of jurisdiction under the BIT is effectively governed by the rules of international law that apply as between France and Hungary."[306]

219.    To Respondent it is uncontested that the TFEU is an international treaty and that the alleged conflict is between Article 9(2) of the BIT and Articles 267 and 344 of the TFEU; thus, "there is, in fact, no need for the Parties to agree on the status of the whole body of EU law (including secondary EU law) in this arbitration. […] In this sense, the issue whether the whole body of EU law, as such, must be regarded as international law or domestic law is irrelevant."[307]

220.    Responding to Claimants' argument regarding the differences between the investment agreement before the *Achmea* tribunal and this case, Hungary argues that since domestic law, including EU law, "is always relevant in investment treaty cases not to furnish a rule

---

[302] *Ibid.*, para. 138. See also Reply on Annulment, para. 118.

[303] Reply on Annulment, para. 99. Emphasis in the original.

[304] *Ibid.*, paras. 84-86.

[305] *Ibid.*, paras. 87-88.

[306] *Ibid.*, para. 89. According to the European Union, "the law applicable to the merits also applies to jurisdiction. Thus, in an intra-EU investment arbitration, EU law is part of the law applicable to deciding issues related to jurisdiction. That view is also in line with the findings of the German Federal Supreme Court." (*Amicus Curiae* Brief, para. 30. Footnote omitted. See also paras. 31-32.)

[307] *Ibid.*, para. 95.

of decision on the merits, but to determine with respect to jurisdiction, among other things, the extent of property rights and the lawfulness of investments,"[308] the broad language of the *Achmea* Decision allows for the possibility that this Tribunal "<u>may be called on to interpret or indeed to apply EU law</u>."[309] Furthermore, Respondent claims that "the rationale that underlies the *Achmea* Decision applies to Article 9(3) of the BIT."[310]

221.    In reply to the argument that the *Achmea* Decision does not mention or address the BIT or the ICSID Convention, Respondent reiterates that the broad language of the *Achmea* Decision "did not carve-out any particular type of arbitration"[311] because such a carve out "would in fact be irreconcilable with the CJEU's reasoning [of general applicability] underpinning the *Achmea* Decision."[312] Regarding the differences in enforcement mechanisms in both instruments, Respondent submits that "the enforcement of an award may not affect a tribunal's jurisdiction."[313]

222.    As to the authoritative nature of the CJEU's ruling, Respondent submits that the alleged non-binding force of the *Achmea* Decision is "without basis"[314] and maintains that "if the CJEU has authoritatively confirmed (as it did) that the TFEU is in conflict with Article 9(2) of the BIT, then the inescapable conclusion is that Article 9(2) of the BIT is also in conflict with the TFEU."[315]

> *(iii) France and Hungary agree that the EU treaties preclude investor-State arbitration provisions in intra-EU BITs*

223.    "[L]eaving aside the fact that the *Achmea* Decision is dispositive of this issue,"[316] Respondent raises the 2019 Joint Declarations which state that "arbitration clauses contained in bilateral investment treaties […] are contrary to Union law and thus

---

[308] *Ibid.*, para. 109.

[309] *Ibid.*, paras. 108-109. Emphasis in the original.

[310] *Ibid.*, para. 112.

[311] *Ibid.*, para. 115.

[312] *Ibid.*, para. 116.

[313] *Ibid.*, para. 120.

[314] *Ibid.*, para. 133.

[315] *Ibid.*, para. 131.

[316] Memorial on Annulment, para. 140.

inapplicable."[317] According to Respondent this "constitutes an authoritative interpretation"[318] of France's and Hungary's "obligations under EU Treaties."[319] To Hungary, these declarations "confirm that, <u>as a matter of international law</u>, the international obligations they have assumed under the EU Treaties preclude investor-State arbitration provisions in Intra-EU BITs, such as Article 9(2) of the BIT."[320]

224.    Responding to the contention that these Declarations were not part of the record, Respondent cites the same authority as Claimants to argue that new arguments and evidence in particular instances where the "annulment ground concerns the issue of the tribunal's jurisdiction"[321] are admissible. Since the 2019 Joint Declarations pertain to this specific issue "that evidence is relevant and admissible"[322] in this proceeding.

225.    As to the 2019 Joint Declarations having the effect of withdrawing consent, Respondent submits that "consent became inapplicable in 2004" and the Declarations "simply confirm" their understanding of their own treaties.[323]

226.    Replying to the argument that the 2019 Joint Declarations do not have authoritative interpretation value, Respondent contends that "[t]he fact that some treaties expressly provide for a *joint interpretation* mechanism – such as the NAFTA – does not mean that a joint interpretation issued by State parties cannot have the same binding effect absent such expressly-agreed mechanism."[324] Hungary clarifies that it "has never argued that the

---

[317] **RL-288**, Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, January 15, 2019, p. 1; **RL-289**, Declaration of the Representatives of the Government of Hungary of 16 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, January 16, 2019, p. 2. The two declarations only differ with regard to the compatibility of the arbitration provision in the Energy Charter Treaty with the EU treaties, which is not a point at issue in this proceeding.

[318] Memorial on Annulment, para. 141.

[319] *Idem.*

[320] *Ibid.*, para. 142. Emphasis in the original.

[321] Reply on Annulment, paras. 142. See also paras. 139-144.

[322] *Ibid.*, para. 145.

[323] *Ibid.*, para. 147.

[324] *Ibid.*, para. 152. Emphasis in the original; footnote omitted. See also para. 153. Respondent also dismisses as irrelevant Claimants' view on this issue related to the VCLT, *ibid.*, footnote 157.

Declarations had the effect of modifying or terminating Article 9(2) of the BIT."[325] Instead, its argument is that "the agreed interpretation of the EU Treaties under the Declarations as well as the agreed interpretation of Intra-EU BITs as containing investor-State arbitration provisions 'such as' Article 8 of the Dutch-Slovak BIT, results under any of the applicable conflict resolution rules considered in the *inapplicability* of Article 9(2) of the BIT."[326]

(iv) *Article 9(2) of the BIT became inapplicable upon Hungary's accession to the EU in 2004*

227.   With respect to the application of the conflict rule provided under the TFEU, Hungary takes the view that Article 351 of the TFEU[327] provides a "special orientation rule of international law."[328] Although this provision only refers to treaties between EU Member States and third countries, Respondent submits that the CJEU has taken the view that this provision also applies to treaties concluded between Member States.[329] Respondent also contends that the precedence of EU law over other international instruments agreed by Member States has also been confirmed by the International Law Commission[330] and other ICSID tribunals.[331]

---

[325] *Ibid.*, para. 154. The European Union takes the view that the Declarations are "subsequent agreements" in accordance with Article 31(3)(a) of the VCLT. (*Amicus Curiae* Brief, para. 5.)

[326] *Idem.* Emphasis in the original. The European Union alleges that: "the judgment in *Achmea* cannot be read narrowly […] Any doubt as to whether it applied beyond the specific arbitration clause in the Dutch-Slovak BIT has been definitively resolved by the CJEU in the recent opinion handed down in relation to the compliance of the CETA with EU law." (*Amicus Curiae* Brief, para. 36.)

[327] "The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.

In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States."

[328] Memorial on Annulment, para. 155.

[329] *Ibid.*, para. 157-159.

[330] *Ibid.*, para. 160.

[331] *Ibid.*, paras. 161-163.

228.    Finally, according to Respondent, by applying the later in time rule provided for in Article 30(3) of the VCLT, the TFEU prevails over the BIT.[332] Addressing the allegation that these instruments do not have the same subject matter, Respondent contends, first, that this "is not a stringent criterion" and it leans more toward a test involving whether both instruments could be simultaneously applied.[333] In this case it is clear, according to Respondent, that complying with EU treaties "directly contradicts Article 9(2)."[334] Thus, the ""*same subject-matter*" condition of Article 30 of the VCLT is satisfied."[335]

229.    Replying to Claimants' contention as to the non-existence of a "special orientation rule of international law,"[336] Respondent alleges that this rule is a "well-established concept of international law."[337] In support of this, Respondent provides that, "EU Member States […] directly stipulated in Article 351 of the TFEU that any conflict between the provisions of the TFEU and the BIT […] would be resolved in favour of the TFEU."[338] Respondent also disagrees with the contention that Article 351 only conflicts as between EU Member States and third parties. According to Respondent the understanding "for decades" has been that the TFEU prevails over other agreements.[339] This precedence has been confirmed, according to Respondent, by the International Law Commission and investment tribunals.[340]

230.    Responding to the VCLT Article 30(3) argument that the BIT and TFEU do not share the same subject matter, Respondent reiterates its view that the existence of a conflict is a valid test and "substantial authority" has been provided to confirm this.[341]

---

[332] *Ibid.*, paras. 165-167.

[333] *Ibid.*, para. 170. See also para. 171.

[334] *Ibid.*, para. 172. See also *Amicus* Curiae Brief, paras. 76-80.

[335] *Ibid.*, para. 174.

[336] Reply on Annulment, para. 170.

[337] *Ibid.*, para. 171. See also paras. 172 -174.

[338] *Ibid.*, para. 175.

[339] *Ibid.*, para. 176.

[340] *Ibid.*, paras. 177-181.

[341] *Ibid.*, para. 189. See also paras. 182-188.

### b. *Claimants' position*

231.    Claimants contend that the only instruments relevant to the Tribunal's jurisdiction are the ICSID Convention and the BIT.[342] Claimants contest the application of EU law to jurisdictional issues: first, because EU law is an "autonomous legal order"[343]/ a "'*sui generis*' legal order";[344] second, although to an extent EU law could be considered international law, it could not be characterized as "*customary* international law."[345] Thus, "[t]he decisions of the CJEU – and its interpretation of EU law and the EU Treaties – are just as binding on this Tribunal as would be the decisions of a domestic court."[346] According to Claimants this conclusion has been shared by various investor-State tribunals.[347]

232.    Claimants take issue with the allegation that jurisdiction is governed by the rules of international law. According to them, "the Tribunal's jurisdiction is governed only by the BIT and the ICSID Convention – *lex specialis* that may derogate from the general rules of customary international law so long as the rules from which they seek to derogate are not mandatory rules of international law (*jus cogens*)."[348] Hence, Claimants conclude that the "European legal order" is not "part of customary or (general) international law (much less *jus cogens*)."[349] Furthermore, Claimants contend that EU law does not apply to questions of jurisdiction because both parties to the dispute are not the same as the BIT's parties.[350]

---

[342] Counter-Memorial on Annulment, paras. 92-93.

[343] *Ibid.*, para. 95. See also para. 97.

[344] *Ibid.*, para. 96.

[345] *Idem.* Emphasis in the original.

[346] *Ibid.*, para. 98.

[347] *Ibid.*, para. 99.

[348] Rejoinder on Annulment, para. 236.

[349] *Idem.*

[350] *Ibid.*, para. 239.

233.   Claimants also argue that the *Achmea* Decision did not intend to interpret the BIT or the ICSID Convention.[351] The issue that the *Achmea* tribunal was called upon to decide pertained to EU law, not international law.[352]

234.   With regards to the *erga omnes* effect of the *Achmea* Decision, Claimants contest such effect arguing that, in any case, this can only be so with respect to the "EU legal order" and not a matter of international law or with respect to "rights acquired by third-parties."[353]

235.   With regard to the interpretation of Hungary's and France's international obligations, Claimants argue that whilst the interpretation of EU law may be delegated to the CJEU, the interpretation of the BIT is vested solely with the Tribunal.[354] Thus, a finding that the BIT is incompatible with Hungary's EU law obligations "would have no effect on the Tribunal's interpretation of obligations under the BIT."[355]

236.   Claimants raise "two critical differences"[356] between the investment instrument (Netherlands-Slovakia BIT) before the *Achmea* tribunal and the BIT. First, Claimants argue that the text of the investment instrument "expressly provides for the application of EU law"[357] by including the text "law in force of the Contracting Party concerned […] and other relevant Agreements between the Contracting Parties"[358] as opposed to the BIT where there is no mention of a particular legal system.[359] To Claimants this difference is important because "[i]t was on this basis that the CJEU decided that 'Article 8 of the BIT has an adverse effect on the autonomy of EU law.'"[360]

---

[351] Counter-Memorial on Annulment, para. 101.

[352] *Ibid.*, para. 102.

[353] *Ibid.*, para. 104. Emphasis omitted.

[354] *Ibid.*, para. 105.

[355] *Idem.*

[356] *Ibid.*, para. 108.

[357] *Ibid.*, para. 109.

[358] Article 8(6) of the Netherlands-Slovakia BIT.

[359] Article 11(5) of the France-Poland BIT states: "The arbitral tribunal shall rule in accordance with the provisions of this Agreement and the rules and principles of international law." See also Counter-Memorial on Annulment, para. 109.

[360] *Ibid.*, para. 110. See also para. 111.

237. The second and more important difference, according to Claimants, is that the investment arbitration underlying the *Achmea* Decision "was not an ICSID arbitration."[361] This is important because of the difference between both arbitral proceedings in terms of the binding and enforceable nature of an award as well as the mechanism for reviewing awards under ICSID.[362] Thus, the CJEU does not mention anything "about the compatibility with EU law of the ICSID Convention and ICSID arbitration."[363]

238. Claimants maintain that Respondent's argument "that the Tribunal lacked jurisdiction because it 'may [have been] called on to interpret or indeed to apply EU law' is simply not credible."[364]

239. Claimants take issue with Respondent's statement that "if the CJEU has authoritatively confirmed (as it did) that the TFEU is in conflict with Article 9(2) of the BIT, then the inescapable conclusion is that Article 9(2) of the BIT is also in conflict with the TFEU." First, Claimants point out that such conflict was never confirmed by the *Achmea* Decision.[365] Second, the *Achmea* Decision never identified a conflict in accordance with Article 30(3) of the VCLT. Thus, "[t]here is simply no reason why the Tribunal should have taken the Achmea Decision at face value on an issue that it did not even purport to resolve."[366]

> (i) *France and Hungary agree that the EU treaties preclude investor-State arbitration provisions in intra-EU BITs*

240. Claimants reject the relevance or value of the 2019 Joint Declarations.[367] First, because they were not part of the record before the Tribunal.[368] Second, "[t]hey could not have the

---

[361] *Ibid.*, para. 112.

[362] *Ibid.*, para. 114.

[363] *Idem.*

[364] Rejoinder on Annulment, para. 242.

[365] *Ibid.*, para. 254.

[366] *Idem.*

[367] Counter-Memorial on Annulment, para. 117.

[368] *Ibid.*, paras. 118-119.

effect of withdrawing Hungary's consent to arbitration"[369] in particular because the 2019 Joint Declarations postdate the issuance of the Award.[370]

241.    Finally, Claimants contest the authoritative value of the 2019 Joint Declarations.[371] According to Claimants, they are merely joint declarations which do not fit into any of the categories that parties can use to "affect their treaty obligations,"[372] as provided under the VCLT[373] or other treaties.[374] This view has been confirmed by other ICSID tribunals.[375]

242.    Claimants contest the argument that the introduction of new evidence and arguments should be allowed when dealing with jurisdiction issues and argue that Respondent has not been able to submit "a single authoritative source" to support this argument.[376]

243.    Claimants take issue with the fact that Respondent is relying on the two Declarations "regardless of the Achmea Decision." For Claimants this is a new argument[377] and in addition posits that "[i]f Hungary really believed it had an objection to raise regardless of the *Achmea* Decision, it would not have waited until that decision to say so."[378]

244.    With respect to the authoritative value of the 2019 Joint Declarations, Claimants argue that "Hungary still offers <u>no legal source</u> to support its claim that the Joint Declarations can somehow modify the clear language of the BIT – except general statements that distort the sources upon which Hungary relies."[379] According to Claimants, "it is uncontroversial that the Joint Declarations have no relevant, interpretative value."[380]

---

[369] *Ibid.*, para. 120.

[370] *Idem.*

[371] *Ibid.*, paras. 122-130.

[372] *Ibid.*, para. 124.

[373] Amendment under Article 39 and termination or suspension of a treaty under Articles 54 and 57.

[374] Joint interpretation of the NAFTA Parties.

[375] Counter-Memorial on Annulment, paras. 126-129.

[376] Rejoinder on Annulment, para. 169. Emphasis omitted.

[377] *Ibid.*, paras. 206-209.

[378] *Ibid.*, para. 210.

[379] *Ibid.*, para. 214. Emphasis in the original. See also para. 212.

[380] *Ibid.*, para. 215.

245.    Claimants also allege that even assuming that the 2019 Joint Declarations constitute an authoritative interpretation of the BIT, Respondent has not been able to explain how they could have "a retroactive effect."[381] In particular, Claimants raise the fact that such Declarations were made after the issuance of the Award and caution about the implication of this interpretation,

> "[i]f Hungary were correct and the Joint Declarations *could* deprive the Tribunal of jurisdiction, it would mean that a party to an investment treaty could defeat any treaty claim against it *ex post* by purporting to interpret the treaty so as to defeat the claims on which an investment tribunal had already rendered a decision. That would violate general principles of international law, the rule of law and equality of the parties."[382]

Claimants also argue that this retroactive effect would violate "general principles of EU law."[383]

### (ii) Article 9(2) of the BIT became inapplicable upon Hungary's accession to the EU in 2004

246.    Addressing the *lex posterior* argument, Claimants submit that the BIT and TFEU do not address the same subject matter and, therefore, there could not be a conflict between these treaties.[384] According to Claimants, these instruments do not share the same object and purpose[385] and the TFEU does not contain an "offer to arbitrate directly with investors the disputes that arise out of the Contracting State's failure to perform its obligations under the BIT."[386] According to Claimants, this interpretation, based on TFEU's lack of an investor dispute settlement mechanism, "has been adopted by numerous investment tribunals."[387]

---

[381] *Ibid.*, para. 217. Emphasis in the original.

[382] *Ibid.*, para. 218. Emphasis in the original.

[383] *Ibid.*, para. 219.

[384] Counter-Memorial on Annulment, para. 135. See also Rejoinder on Annulment, paras. 248-250.

[385] *Ibid.*, para. 137.

[386] *Ibid.*, para. 138.

[387] *Ibid.*, para. 139.

In its Rejoinder, Claimants further reiterate that "Hungary can point to <u>no decision of any international law tribunal</u> that supports its position."[388]

247.    Claimants also take issue with Hungary's view that the same subject test is satisfied if there is a conflict between certain provisions of treaties.[389] Claimants reject this by arguing that this contradicts the "plain language" of the VCLT.[390]

248.    Claimants allege that even if the BIT and the TFEU had the same subject matter, there would not be a conflict because the *lex posterior* rule would not be applicable in this case. This is so because the *Achmea* Decision was only an interpretation of provisions of EU law, *i.e.*, the TFEU.[391] In addition, looking at Articles 267 and 344 of the TFEU, Claimants conclude that, contrary to Respondent's view, there is nothing which would support Respondent's view that these provisions are incompatible with Article 9(2) of the BIT.[392]

249.    Finally, with regard to Respondent's contention that Article 351 of the TFEU contains a special orientation rule that gives precedence to this instrument over the BIT, Claimants question the existence of such a rule.[393] In addition, Claimants contest the validity of this rule in light of the fact that the text does not provide a conflict rule for agreements between EU Members and Hungary's assertion to this effect is not supported.[394]  In this regard, Claimants argue that Article 351 "<u>cannot</u> be read to create some rule that would render allegedly incompatible <u>provisions</u> of treaties <u>between Members States</u> 'inapplicable' <u>automatically</u>."[395] Finally, Claimants argue that Respondent "can point to no provision of the EU Treaties that expressly establishes – even under EU law – that the EU Treaties would prevail over any *'inconsistent'* treaty between EU Member States."[396]

---

[388] Rejoinder on Annulment, para. 250. Emphasis in the original.

[389] Counter-Memorial on Annulment, para. 141.

[390] *Ibid.*, para. 144. See also paras. 142-143.

[391] *Ibid.*, para. 147.

[392] *Ibid.*, paras. 148-150. See also Rejoinder on Annulment, paras. 252-253.

[393] *Ibid.*, paras. 151-152.

[394] *Ibid.*, paras. 153-154.

[395] Rejoinder on Annulment, para. 257. Emphasis added.

[396] Counter-Memorial on Annulment, para. 155.

### c. *The Committee's analysis*

250. It is a widely shared view that "[w]here a tribunal assumes jurisdiction in a matter for which it lacks competence under the relevant BIT, it exceeds its powers."[397]

251. At the outset the Committee notes that whilst in its Memorial on Annulment,[398] Respondent characterizes *the allegation that Article 9(2) of the BIT became inapplicable by Hungary's accession to the EU* as a derivative claim, in its Reply on Annulment,[399] it characterizes it as a claim additional to the Tribunal's failure to apply the proper law. In any case, the Committee will address it as an additional/independent claim.

252. As mentioned before, the Tribunal's jurisdiction was clearly established "over all the claims raised" in the Decision on Jurisdiction.[400] The date the *Achmea* Decision was issued, Respondent "urged the Tribunal to, therefore, decline jurisdiction in this matter or, alternatively, to rule that it is precluded from issuing a decision on the merits."[401] In turn, "the Tribunal invited the Parties to submit their comments regarding the relevance, if any[,] for the […] Arbitration, of the *Achmea* Decision."[402] Two rounds of submissions followed. The Award addressed the submissions under the heading "Jurisdiction of the Tribunal." In that section the Tribunal starts by recalling that it "has jurisdiction over all the claims raised."[403] The Tribunal framed the issue raised by Respondent as follows:

> The issue before the CJEU in *Achmea* was the incompatibility of dispute resolution clauses contained in intra-EU BITs with EU law and their resultant inapplicability. The *Achmea* Decision is applicable to these proceedings, as commenced pursuant to the BIT.

---

[397] **CL-0352**, *Lucchetti v. Peru*, para. 99.

[398] "The Tribunal manifestly exceeded its powers on two grounds, as a consequence of which the Award should be annulled. First, the Tribunal failed to apply the proper law governing its jurisdiction (A). Second, **and as a consequence,** the Tribunal exercised jurisdiction without a proper basis (B)" (Memorial on Annulment, para. 69. Emphasis added).

[399] "**In addition** to its failure to apply the proper law to its jurisdiction, the Tribunal exercised a jurisdiction that it did not have (1). **Whether or not** the Tribunal applied the proper law, its wrongful exercise of jurisdiction constitutes a "manifest excess of powers" under Article 52(1)(b) of the ICSID Convention, as a result of which the Award should be annulled (2)." (Reply on Annulment, para. 60. Emphasis added.)

[400] **R-69**, *UP (formerly Le Chèque Déjeuner) and C.D Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35, Decision on Jurisdiction, March 3, 2016, para. 228.

[401] Award, para. 89.

[402] *Ibid.*, para. 90.

[403] *Ibid.*, para. 206.

> As a consequence of the *Achmea* Decision, the Tribunal lacks jurisdiction. In the alternative, the Tribunal should decline exercising any jurisdiction over this matter. There are no procedural grounds that would justify the Tribunal disregarding the *Achmea* Decision.[404]

253.  The contention put forward by Respondent in this annulment proceeding is the following:

> While determining in its earlier Decision on Jurisdiction that "*a respondent's written consent usually takes the form of a treaty commitment*", the Tribunal failed entirely to address the consequences of the *Achmea* Decision on Article 9(2) of the BIT, which contained Hungary's purported treaty commitment to arbitration.[405]

> The Tribunal's failure – and explicit refusal – to conduct the necessary jurisdictional analysis under the BIT, i.e. the proper law, had a material impact on the Award: the Tribunal exercised a jurisdiction it did not have.[406]

254.  The Committee understands that what Respondent is asking us to address is whether the decision by the Tribunal that "the *Achmea* Decision does not change the conclusion reached by this Tribunal in its Decision of 3 March 2016 that the Tribunal has jurisdiction over all the claims raised"[407] could be considered a manifest excess of the Tribunal's powers.

255.  As found in paragraphs 174-179, it is the Committee's view that the Tribunal neither failed nor refused to address the claim related to the inapplicability of Article 9(2). Thus, in order to find that the Tribunal wrongly exercised its jurisdiction, the Committee would need to make a "fresh" determination of whether the Tribunal had jurisdiction based on Respondent's arguments and claims put forward.[408]

---

[404] *Ibid.*, para. 230. Footnote omitted.

[405] Memorial on Annulment, para. 97.

[406] Reply on Annulment, para. 61.

[407] Award, para. 266.

[408] At the Hearing, Respondent's counsel stated: "To find in our favour on the second one [wrongly exercised of jurisdiction], you would have to agree with our interpretation both of what the Achmea Decision says, and the logical knock-on effect of that as a matter of international law, that the consent was no longer effective as of 2004." (Tr. Day 2 11:18-22 (Respondent).)

256.    The Committee has serious difficulties with such an approach for the following reasons.

257.    The Committee is not an appellate body and much less a first trier of fact. In having to reach a conclusion on this issue, the Committee would have to examine reformulated or recast arguments from the ones that were put before the Tribunal and, more serious, even further beyond the Committee's jurisdiction, assess evidence that was not put before the Tribunal.

258.    Even if the Committee were to somehow examine the arguments and evidence submitted by Respondent on this issue, a determination that the Tribunal did not have jurisdiction as a result of the *Achmea* Decision would not be "obvious, clear or self-evident"[409]. First to reach that conclusion a lot of complex and unsettled interpretative hurdles would have to be overcome. Some examples of these are: whether European law could be considered international law under Article 9(3) of the BIT; the binding nature of the *Achmea* Decision outside the EU legal sphere; and whether there is a conflict under Article 30(3) of the VCLT between Articles 267 and 344 of the TFEU and Article 9(2) of the BIT. Second, the Committee notes that even the interpretation by Hungary of the effect of *Achmea* varied during the Underlying Arbitration and also in the case put forward before the Committee.[410] Moreover, the Committee notes that the views of Hungary and the EU are not fully aligned.[411] To the Committee this is an indicator that the issue is neither "obvious, clear or self-evident". Third, the applicability of *Achmea* to investment dispute settlement clauses under various international instruments is not a settled question in the case law.[412]

259.    The Committee wishes to emphasize that it is not making a judgement or expressing a view as to whether an ICSID investment tribunal lacks jurisdiction based on the *Achmea*

---

[409] Counter-Memorial on Annulment, para. 171.

[410] Such as, its view as to the binding nature of the *Achmea*, the role of Article 9(3) as the gateway to assess its argument or the approach to identifying the relevant conflict and which tools of the VCLT should be applicable.

[411] For instance, in its *Amicus Curiae* Brief the EU elaborates at length the argument that the BIT "has been implicitly terminated" and that "the BITs are entirely incompatible with EU law." Respondent never put forward this view before the Tribunal or this Committee (*Amicus Curiae* Brief, para. 64. See also, paras. 55-57). Furthermore, not only did the Respondent raise "special conflict rule" only until its Reply Submission (and never before the Tribunal) but also the argument differs from that put forward by the European Union. (Reply on Annulment, paras. 169-171. See also *Amicus Curiae* Brief, paras. 72-75.)

[412] Counter-Memorial on Annulment, para. 99.

Decision. What the Committee is concluding is that the Tribunal's lack of jurisdiction under the BIT based on the *Achmea* Decision is not manifest or obvious.

## C.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### (1)    Respondent's position

#### a.    *Standard*

260.    According to Respondent, the Tribunal made a serious departure from a fundamental rule of procedure when it introduced the *Edenred* Award in the proceedings and "substitute[d] the reasoning of the *Edenred* Tribunal for certain of its findings."[413]

261.    At the outset Respondent submits that a fundamental rule of procedure is "any procedural rule concerned with the integrity and fairness of the proceeding."[414] In particular, Respondent contends that the principle at issue is the equal treatment or "'equality of arms', [which] implies that each party is afforded equal opportunity to present its case, including evidence, 'under conditions that do not place [one party] <u>at a substantial disadvantage</u> vis à vis its opponent'."[415] According to Respondent, such principle is contravened "if the tribunal adopts a posture or proceeds in a manner that results in disadvantaging one party to the benefit of the other."[416]

262.    Further, Respondent contends that the power of a tribunal to order the production of documents "is <u>not</u> unrestricted"[417] or at "absolute discretion."[418] To support this, Respondent quotes another case where a tribunal did not accept documents pertaining to another arbitration after "due consideration of [the] diverging interests"[419] and based on "'the general interest of ensuring the integrity of the procedure'."[420]

---

[413] Memorial on Annulment, para. 226.

[414] *Ibid.*, para. 227.

[415] *Ibid.*, para. 229. Emphasis in the original.

[416] *Ibid.*, para. 231.

[417] Reply on Annulment, para. 290. Emphasis in the original.

[418] *Ibid.*, para. 295.

[419] *Ibid.*, para. 293.

[420] *Ibid.*, para. 294.

263.    Respondent takes issue with the fact that the Tribunal did not invite the parties to comment on the introduction of the *Edenred* Award into the record. When that award was introduced into the record: "Hungary faced the unenviable task of responding to UP and CD Holding's arguments, <u>as well as</u> facing (again) the distinct arguments presented by Edenred in the separate proceeding."[421] These concerns were raised by Hungary before the Tribunal.[422]

264.    Respondent denies Claimants' contention that it did have an opportunity to comment before the order on the production of the *Edenred* Award was made.[423] Respondent adds that the Tribunal did not provide "compelling reason[s]" to introduce this award, "[i]n particular, the Tribunal failed to establish that the serious risk that the admission of the *Edenred* Award posed to Hungary's right to equal treatment would be counterbalanced by other legitimate – and equally important – concerns."[424]

265.    Respondent also posits that after being admitted, the Tribunal "failed to address the unique nature of the *Edenred* Award and to distinguish it from the more general body of investments treaty awards."[425]

266.    The admission and consideration of that award, Respondent contends, was "particularly detrimental."[426] This is so, according to Respondent, because "Hungary was placed under the undue burden of having to refute, in addition to Claimants' own arguments, the arguments advanced by Edenred, for fear that these would be adopted by the Tribunal as Claimants' own."[427]   Respondent cites as an example two witnesses whose testimonies were compared with their statements in the *Edenred* case, without the Tribunal knowing the evidence submitted by such witnesses in that proceeding.[428]  "Hungary was therefore prevented from contextualizing and explaining the partial testimony improperly included

---

[421] Memorial on Annulment, para. 235. Emphasis in the original.

[422] *Ibid.*, para. 236.

[423] Reply on Annulment, paras. 298-300.

[424] *Ibid.*, para. 301.

[425] Memorial on Annulment, para. 238.

[426] *Ibid.*, para. 239.

[427] *Ibid.*, para. 240.

[428] *Ibid.*, paras. 241-242.

in the record in this case."[429] Another example is that Claimants use the *Edenred* Award to criticize Respondent's quantum expert.[430] In reply, Respondent adds the fact that Claimants invoked the *Edenred* Award in their post-hearing brief "to support their factual assertions – *i.e.*, in an attempt to ease their burden of proof."[431]

267.  Respondent contends that Claimants have not engaged with "Hungary's explanations as to why the admission of the *Edenred* Award put Claimants in an improperly advantageous position."[432]

268.  Finally, "of even greater concern" for Respondent is the fact that "Hungary faced the inevitable risk that, in assessing the Parties' respective positions, the Tribunal be unintentionally biased by the findings of the *Edenred* Award – and fail to conduct a fully neutral and objective analysis of the facts and arguments at issue. Against this backdrop, Hungary's ability to persuade the Tribunal would undeniably be severely undermined – with the position of Claimants being, conversely, significantly eased."[433] According to Respondent, this bias is confirmed by the ostensible reliance on the *Edenred* Award in factual and legal issues in the Award.[434]  To support this, Respondent raises four instances of reliance (related to voucher rates, expropriation and quantum findings) and one where the Tribunal "[r]ather than explaining" a difference in criteria, simply agreed with and referred to the *Edenred* Award.[435]

269.  Respondent concludes that "[i]n relying on the *Edenred* Award, the Tribunal at a minimum failed to provide its own detailed reasoning in support of its findings; at worst, it substituted its own analysis by that found in the *Edenred* Award."[436] Respondent reiterates that Claimants have not been able to contest the fact that the Tribunal did not distinguish the

---

[429] *Ibid.*, para. 242.

[430] *Ibid.*, paras. 243-244.

[431] Reply on Annulment, para. 304.

[432] *Ibid.*, para. 305.

[433] Memorial on Annulment, para. 245.

[434] *Ibid.*, para. 246.

[435] *Ibid.*, para. 247.

[436] *Ibid.*, para. 248.

*Edenred* Award from other decisions.[437] For Respondent this omission to distinguish it "only reinforced Hungary's concerns that the *Edenred* Award could bias the Tribunal's analysis – affecting Hungary's right to have its case adjudicated in a fully neutral and objective manner."[438]

270.   With respect to the instances in which the Tribunal relied on the *Edenred* Award, Respondent alleges that these instances are the "most *obvious* examples"[439] and the fact that in some of those instances the Tribunal states that its findings were "in conformity" with *Edenred* "indicate that the Tribunal (*i*) at a minimum was not confident in its decision and felt the need to find validation by relying on the *Edenred* Award (irrespective of the fact that it had been rendered by a different tribunal facing a different record) and (*ii*) at worst, ultimately sought to model its decision on the *Edenred* Award."[440]

271.   Finally, responding to the allegation that there is nothing that prevents tribunals from referring to other awards, Hungary replies that "[i]t is one thing for a tribunal to adopt broadly-applicable legal reasoning with respect to a broadly-applicable legal standard as expressed by another tribunal. It is quite another thing for a tribunal to adopt case-specific factual findings, case-specific legal reasoning and case-specific quantum determinations from another tribunal that made those findings, expressed that reasoning and reached those determinations on a different record."[441]

### b. *Departure was serious*

272.   In terms of the applicable standard, Respondent alleges that the departure from a fundamental rule of procedure is "serious"[442] if it is shown "that the observance of the rule had the <u>potential</u> of causing the tribunal to render an award substantially different from what it actually decided."[443] According to Hungary, in this case "the *Edenred* Award

---

[437] Reply on Annulment, paras. 315-316.

[438] *Ibid.*, para. 317.

[439] *Ibid.*, para. 322. Emphasis in the original.

[440] *Ibid.*, para. 321.

[441] *Ibid.*, para. 326.

[442] Memorial on Annulment, para. 252.

[443] *Ibid.*, para. 251. Emphasis in the original.

undoubtedly affected the Tribunal's own findings and conclusions on the merits and on quantum. It follows that the effect of the Tribunal departing from the fundamental principle of equal treatment is necessarily serious."[444]

273.    Respondent takes issue with Claimants' contention that the appropriate test is to establish an actual material effect on the award. Respondent therefore reiterates that the majority of annulment committees have endorsed the "*potential material effect* test."[445] Finally, Hungary disagrees with the view that the Article 52(1)(d) standard is fulfilled only in "extreme" or "egregious" cases.[446]

### (2)    Claimants' position

#### a.    Standard

274.    For Claimants, the fact that Respondent never objected to the Tribunal's power to order the production of documents *sua sponte*, is "fatal to Hungary's annulment argument."[447]

275.    Moreover, Claimants contend that in order to be successful on a claim that the Tribunal did not give equal treatment to the parties, Hungary would need to demonstrate that "the Tribunal 'consistently and perversely ma[de] findings favourable to [Claimants] without any basis in the evidence.'"[448]

276.    In reply, Claimants assert that Respondent did not engage with the contention that a committee "cannot second guess the Tribunal's exercise of its discretion."[449]

277.    Claimants allege that the cases relied on by Respondent to support the proposition that the Tribunal's discretion is not "unrestricted" are either unapplicable to this case[450] or in fact support Claimants' position.[451]    In any case, Claimants posit that those cases are

---

[444] *Ibid.*, para. 253.

[445] Reply on Annulment, para. 338. Emphasis in the original.

[446] *Ibid.*, para. 343.

[447] Counter-Memorial on Annulment, para. 245. See also paras. 241-242.

[448] *Ibid.*, para. 251.

[449] Rejoinder on Annulment, para. 282. See also paras. 283-284.

[450] *Ibid.*, para. 285. See also paras. 286-287.

[451] *Ibid.*, para. 288.

"irrelevant" because, according to Claimants, those decisions were made in arbitration proceedings and "do not speak to any <u>annulment grounds</u>, let alone Article 52(1)(d)."[452]

278.    With  respect to the allegation of a lack of compelling reasons for ordering the production of the *Edenred* Award, Claimants argue that it was within the Tribunal's discretion to order the documents and, in any case, "Hungary would need to demonstrate that the Tribunal 'applied inconsistent standards in the way that it has treated the requests of the different parties'."[453] According to Claimants, Respondent had the opportunity to "contextualise, clarify or explain the Edenred Award" after it was introduced into the record of the proceeding.[454]

279.    According to Claimants, "Hungary confirms that in fact it takes issue, not with what happened <u>after</u> the Edenred Award was produced (i.e., the potential impact of the <u>Edenred</u> Award on the outcome of the case, but rather with <u>how</u> the Tribunal exercised its discretion in <u>ordering</u> production of the Edenred Award."[455]

280.    Claimants allege that Hungary was not put at a disadvantage with the production of the *Edenred* Award because it was given the opportunity to comment before and after the production of the award.[456]  Moreover, Claimants argue that the fact that Hungary had to reply to Claimants and the arguments put forward in the *Edenred* case, a separate proceeding, could not be a serious departure from a fundamental rule of procedure.[457] In the same vein, Claimants contend that "[t]he mere risk that the Tribunal would be 'unintentionally biased by the findings of the *Edenred* Award' is no ground for claiming that production of that award was a violation of the equal treatment of the Parties."[458]

281.    With regard to the two instances cited by Respondent to show that Hungary was put at a disadvantage, Claimants reply that Hungary has not been able to show that this "concern

---

[452] *Ibid.*, para. 289. Emphasis in the original.
[453] *Ibid.*, para. 317.
[454] *Ibid.*, para. 320.
[455] *Ibid.*, para. 323.
[456] Counter-Memorial on Annulment, para. 254.
[457] *Ibid.*, para. 255.
[458] *Ibid.*, para. 257.

actually led to any disadvantage" and that "Hungary does not point to any finding of the Tribunal that would have found either of these issues dispositive – because it cannot."[459]

282.    With respect to the Tribunal's alleged reliance on the *Edenred* Award, Claimants respond that the Tribunal did not consider the *Edenred* Award or any decision to be "binding on the Tribunal."[460]    Addressing each of the four instances raised by Respondent to support its reliance argument, Claimants consider them as "misleading"[461], "not 'borrowed' from the Edenred Award",[462] not showing that Hungary suffered any disadvantage or that the Tribunal was "unintentionally biased."[463] Claimants further argue that the Tribunal's failure to give reasons for "[a]ny differences regarding the relevant standard on discrimination between the Treaty and EU law were not dispositive of the issue decided by the Tribunal – for which, the Tribunal provided detailed reasoning without any reference to the Edenred Award."[464]

283.    Responding to the argument that the *Edenred* Award was "unique" and that the Tribunal failed to distinguish it from other awards, Claimants contend, first, that the Tribunal clearly stated that such decision was not binding, and second, that Respondent failed to show "why this piece of evidence deserved treatment entirely different from the hundreds of other exhibits on record."[465]

284.    Finally, regarding the claim that the Tribunal relied on the *Edenred* Award, Claimants respond that Hungary did not address Claimants' responses to the instances cited to substantiate that argument.[466] Moreover, Claimants characterize as speculative and unsupported Respondent's statement that the instances raised indicate, at a minimum, a

---

[459] *Ibid.*, para. 258.

[460] *Ibid.*, para. 260.

[461] *Ibid.*, para. 262.

[462] *Ibid.*, para. 264.

[463] *Ibid.*, para. 265.

[464] *Ibid.*, para. 267.

[465] Rejoinder on Annulment, paras. 330-331. See also para. 329.

[466] *Ibid.*, paras. 335-337.

lack of confidence by the Tribunal and, at worst, the intention to "model its decision on the *Edenred* Award."[467]

### b. Departure was serious

285. Claimants allege that even if the instances raised by Hungary could be considered a departure from a fundamental rule of procedure, they could not be considered serious. Contrary to what Respondent argues, Claimants contend that the departure needs to have an actual impact on the award.[468] Moreover, Claimants argue that none of the instances raised by Respondent "had a substantial impact on the outcome of the case."[469] Finally, even if the standard is that the departure from a fundamental rule of procedure had potential impact on the award as Respondent postulates, Claimants contend that "Hungary cites no case in which an *ad hoc* committee annulled an award under similar circumstances" because in the cases used by Respondent to support its allegations the "departure has been much more 'serious'."[470]

286. With respect to the applicable test, according to Claimants, Respondent has failed "to demonstrate that, had the Tribunal declined to order production of the *Edenred* Award, it could have 'render[ed] an award substantially different from what it actually decided.'"[471] Moreover, Claimants posit that "whether an alleged serious departure from a fundamental rule of procedure has a 'substantial impact' is also dependent upon the alleged rule and the purported departure from that rule."[472]

### (3) Committee's analysis

### a. Facts

287. On December 13, 2016, the ICSID Tribunal in the *Edenred* case issued its award.

---

[467] *Ibid.*, para. 338.

[468] Counter-Memorial on Annulment, paras. 271-272.

[469] *Ibid.*, para. 273.

[470] *Ibid.*, para. 275. See also paras. 274 and 276.

[471] Rejoinder on Annulment, para. 300.

[472] *Ibid.*, para. 301.

288.    On January 18, 2017, the Tribunal took note of the existence of this award and ordered its inclusion into the record:

> The Tribunal has taken note of GAR's report of December 16, 2016, on the award in the ICSID arbitration between Edenred and the Respondent (the "*Edenred Award*"). According to the GAR report, which, for convenience, is attached to this letter, that case seems to be very similar to the present arbitration. The Tribunal, therefore, considers that that Edenred Award should not be neglected in the present case and that the Parties should be given the opportunity to comment on it before the hearing scheduled to take place in May.[473]

289.    On January 30, 2017, Hungary asked the tribunal to reconsider its request, stating that:

> While Hungary understands that there is no doctrine of precedent in investment treaty arbitration, Hungary nonetheless believes that the Tribunal's consideration of the Edenred award in this case would be highly prejudicial and unfair. Respectfully, reliance on the Edenred award in the present circumstances is not akin to reliance on other ICSID authority. While certainly true that both parties have introduced other investment treaty cases to offer guidance as to how other learned tribunals have considered various legal issues, in this case the award to be reviewed looks not only at that tribunal's treatment of certain legal issues, but also at the particular legal measures as well as many of the same facts at issue in this case. Notably, however, Edenred's case was heard on a different factual record – and one that was and is not necessarily before this Tribunal. In this regard, Hungary draws particular attention to the fact that it specifically exercised its right to elect different counsel in these proceedings than the Edenred case, and has otherwise elected to present its case in the manner in which it deems best given the present circumstances, including how LCD has elected to plead its case. Reviewing the Edenred award would necessarily frustrate these choices.[474]

290.    On February 15, 2017 the Tribunal ordered the circulation of the award to the Parties:

> After having examined the comments from the Parties in Respondent's letter dated 30 January 2017, and Claimants' letter dated 6 February 2017, the Tribunal has concluded that, though the Edenred Award and its considerations and conclusions are by no

---

[473] **R-70**, Letter from the Tribunal to the Parties regarding the *Edenred* Award, January 18, 2017, p. 2.

[474] **R-71**, Letter from Hungary to the Tribunal regarding the *Edenred* Award, January 30, 2017, p. 2.

means binding for the present Tribunal, the full text of the Edenred Award should be not only known to Respondent, but also to Claimants, and that both Respondent and Claimants should have the opportunity to comment on the arguable relevance of the Award for the present case.[475]

291.    On March 27, 2017, in its comments regarding the relevance of this award, Respondent reiterated its views that: "consideration of the *Edenred* Award in these proceedings is improper and prejudicial."[476] The Tribunal summarized Respondent's views as follows:

> Respondent explained that the *Edenred* Award offers limited useful guidance to the Tribunal and, given its potential prejudicial impact and the absence of a *stare decisis* doctrine in investment arbitration, it should be deemed irrelevant to its deliberations. The only guidance that the Tribunal could draw from the *Edenred* Award relates to how that tribunal recited generally-held legal principles and points of law. The *Edenred* tribunal's application of these principles, however, was inconsistent with predominant and accepted (though non-binding) views of international law and investment law jurisprudence. Importantly, the Tribunal cannot consider the *Edenred* tribunal's determination(s) or characterization(s) of the factual evidence. It is precisely because of the factual and other similarities between the present case and the *Edenred* dispute that Respondent objects to any consideration of the *Edenred* Award in these proceedings. The *Edenred* tribunal faced a different record than the one before the Tribunal, but assessed some of the same factual and expert evidence as has been presented in this case. This places Respondent in the impossible position of needing to refute *Edenred* arguments in these proceedings, as the same claims could now be adopted by Claimants, who may seek to draw conclusions based on comparing the testimony of witnesses who appear in both cases. Notably, neither Claimants nor their witnesses are subject to the same degree of scrutiny. The *Edenred* tribunal's decision regarding indirect expropriation is predicated on an erroneous factual finding – one that is both incorrect and at odds with the *Edenred* tribunal's own description of the record. The *Edenred* tribunal's reliance on the CJEU adjudication – one that involved an entirely different legal system with no relevance under the BIT – was also improper. Finally, the *Edenred* tribunal's damages award disregards recent changes to the fringe benefit system undertaken in light of the CJEU Decision and thereby gave

---

[475] **R-77**, Procedural Order No. 9, February 15, 2017, para. 3.

[476] **R-76**, Hungary's Submission concerning the *Edenred* Award, March 27, 2017, para. 3.

Edenred a double recovery. Although the facts here differ, the risk of granting Claimants a double recovery is no less significant.[477]

292.    With respect to the consideration of the *Edenred* Award, the Tribunal stated the following:

> In addition to the *Edenred* Award, the Parties have extensively referred to decisions of other tribunals. However, there is no dispute that, in any event, the decisions of other tribunals are not binding on the Tribunal. The many references by the Parties to certain arbitral decisions in their pleadings do not contradict this conclusion.[478]

> This does not preclude the Tribunal from considering arbitral decisions and the arguments of the Parties based upon them, to the extent that it may find that they shed any useful light on the issues that arise for the decision in the present case.[479]

> Such an examination, including the *Edenred* Award, is conducted by the Tribunal later in this Award, after the Tribunal has considered the Parties' contentions and arguments regarding the various issues argued and relevant for the interpretation of the applicable BIT provisions, while taking into account the specificity of the BIT to be applied in the present case.[480]

### b.    Standard

293.    Article 52(1)(d) states:

> (1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds: […]

>> (d) that there has been a serious departure from a fundamental rule of procedure [...].[481]

294.    The Committee agrees with the proposition that "unequal treatment of the parties" may qualify as a serious violation of a fundamental rule of procedure.[482] The Committee also

---

[477] Award, para. 287.

[478] *Ibid.*, para. 288.

[479] *Ibid.*, para. 289.

[480] *Ibid.*, para. 290.

[481] Article 52(1)(d) of the ICSID Convention.

[482] **RL-291**, *Tulip v. Turkey*, paras. 84-85.

agrees that "a finding of this nature would require clear and incontrovertible substantiation."[483] A Tribunal has ample discretion as to "the relevance and evaluation of the elements of proof presented by each Party"[484] and "an applicant's dissatisfaction with the way a tribunal has exercised its discretion" is not enough to find an unequal treatment of the parties.[485]

295.    Respondent contends that the introduction of the *Edenred* Award "could improperly influence the Tribunal."[486] This is so, according to Respondent, because "the *Edenred* Award was concerned with identical claims founded on the exact same law as that at issue in the present proceeding (i.e. 2011 Reform), albeit with respect to a distinct investor, with distinct factual issues and legal analyses."[487] Because of this, once the *Edenred* Award was introduced into the record, "Hungary faced the unenviable task of responding to UP and CD Holding's arguments, as well as facing (again) the distinct arguments presented by Edenred in the separate proceeding."[488] Respondent states that these concerns were brought before but ignored by the Tribunal.[489]

296.    The Committee sees three distinct permutations of Respondent's argument. The first one goes to the admission of the *Edenred* Award, the other goes to the alleged prejudice caused by having to engage with issues related to the *Edenred* Award, and last are the consequences of the "introduction and consideration of the *Edenred* Award."[490]

297.    The Committee fails to see how the exercise of its discretion, expressly given by Article 34 of the ICSID Convention and the Tribunal's Procedural Order No. 1, by ordering the introduction into the record of the *Edenred* Award, could amount to a lack of equal treatment of the Parties. The Tribunal gave the opportunity to the Parties to comment on

---

[483] *Ibid.*, para. 84.

[484] **CL-0325**, *Wena v. Egypt*, para. 65. See also **CL-0288**, *CDC v. Seychelles*, paras. 59-61; **CL-0289**, *Teinver v. Argentina*, para. 175.

[485] **RL-291**, *Tulip v. Turkey*, para. 85.

[486] Memorial on Annulment, para. 234. Emphasis in the original.

[487] *Idem.*

[488] *Ibid.*, para. 235. Emphasis in the original.

[489] *Ibid.*, paras. 236-237.

[490] *Ibid.*, para. 239.

its relevance while making it clear that the *Edenred* Award, as with decisions of other tribunals, was not binding on the Tribunal.  Further, the Committee observes that the examination of the award was done "after the Tribunal ha[d] considered the Parties' contentions and arguments regarding the various issues argued and relevant for the interpretation of the applicable BIT provisions, while taking into account the specificity of the BIT to be applied in the present case."[491] Thus, the Committee concludes that Respondent had the opportunity to "contextualise, clarify or explain the Edenred Award"[492] after it was introduced into the record of the proceeding.

298.    Respondent clarifies that its challenge derives from the failure by the Tribunal to consider the "specific and unique nature of the *Edenred* Award and its repeated reliance on its findings throughout the Memorial, in complete disregard of the concerns of Hungary as to the significant party imbalance that resulted from the admission of the *Edenred* Award in the proceeding."[493] If this statement implies that the "specific and unique nature" stems from the fact that that Award addressed the same measure (*i.e.* Hungary's fringe benefit system) and that Respondent did not prevail in that case, the Committee considers that, in and of itself, this could not be a valid basis for rejecting  introduction of the Award into the record of the Underlying Arbitration. Moreover, the Committee agrees with Claimants that "[t]here is no rule of procedure that would prevent the Tribunal from referring to other awards on various issues."[494]

299.    Regarding the second permutation that Hungary "was placed under the undue burden of having to refute, in addition to Claimants' own arguments, the arguments advanced by Edenred,"[495] the Committee notes, again, that the fact that one Party is faced with having to reply to some arguments is not enough to support a finding that a party has been treated unequally. Respondent attempts to illustrate this by raising instances where Claimants

---

[491] Award, para. 290.

[492] Rejoinder on Annulment, para. 320.

[493] Reply on Annulment, para. 324.

[494] Counter-Memorial on Annulment, para. 267. See also **RL-299**, *Enron v. Argentina*, para. 94: "There is nothing to prevent a tribunal from agreeing with, and incorporating by reference as its own, reasoning found in any other source, provided that it is ultimately sufficiently clear what are the tribunal's reasons."

[495] Memorial on Annulment, para. 240.

allegedly "undermine the credibility" of Respondent's witnesses and quantum experts using statements made in the Edenred arbitration. The Committee first observes that Respondent fails to establish how these instances are linked or related to the findings in the *Edenred* Award.[496] Moreover, in the Committee's view, this cannot be characterized as an issue having to do with the treatment of the Parties. To the Committee, this is more closely related to the assessment of the evidence and arguments put forward by the Parties.

300.    Finally, "[o]f even greater concern" to Respondent is its contention that the Tribunal was "unintentionally biased by the findings of the *Edenred* Award – and failed to conduct a fully neutral and objective analysis of the facts and arguments at issue."[497] The claim does not go to the acceptance of the evidence as such but to an alleged bias in the weight given to the *Edenred* Award by the Tribunal. Any allegation of bias, intentional or not, is very serious. The threshold to establish bias is very high and the Committee fails to see how the instances raised by Respondent could even come close to demonstrating a "fail[ure] to conduct a fully neutral and objective analysis" by the Tribunal.[498]

301.    As a result of its findings, the Committee considers moot the Parties' arguments regarding the seriousness of the alleged departure from a fundamental rule of procedure.

302.    Based on the above, the Committee concludes that there is no violation of a fundamental rule of procedure.

---

[496] *Ibid.*, para. 241. See also paras. 240-243.
[497] *Ibid.*, para. 245.
[498] *Idem.*

## IV.     COSTS

### A.     THE PARTIES' COST SUBMISSIONS

303.    On September 30, 2020, both Parties filed their respective statement on costs according to paragraph 30 of Procedural Order No. 3, dated August 31, 2020, and under ICSID Arbitration Rules 28(2).

### (1)     Respondent's Cost Submission

304.    In its statement on costs, Hungary submits that Claimants should bear all the costs and expenses of the proceedings, totaling HUF 256,032,000 and USD 575,000, broken down as follows: [499]

| Attorney Fees | |
|---|---|
| DLA Piper | HUF 256,032,000 |
| ICSID Costs | |
| Advances | USD 550,000 |
| Registration fee | USD 25,000 |
| TOTAL | HUF 256,032,000 and USD 575,000 |

### (2)     Claimants' Cost Submission

305.    In their statement on costs, Claimants argue that Respondent should bear all the costs of the annulment proceeding incurred by Claimants, including attorney fees and expenses totaling EUR 1,009,090.32, broken down as follows:

| Attorney fees | EUR 1,000,896.00 |
|---|---|
| Expenses | EUR 8,194.32 |
| Total | EUR 1,009,090.32 |

---

[499] Hungary's Statement of Costs, September 30, 2020, paras. 2-3.

306. Claimants argue that the Committee has full discretion in matters pertaining to costs. Claimants state that "[r]ecent ICSID annulment practice largely follows the 'costs follow the event' approach"[500] and that "recent *ad hoc* committee decisions have required the losing party to bear entirely not only the costs of the proceedings, but also the other party's attorney fees."[501]  Claimants contend that "[t]he Committee has no reason to depart from this approach."[502]

307.  Claimants further argue that they had to incur "substantial costs that have been increased due to Hungary's conduct,"[503] referring to the "unsuccessful attempt to stay the Award's enforcement"[504] as well as to the introduction of "new factual evidence"[505] and "the intervention of the Commission."[506] They also request the Committee to take into account that, until then, Hungary had refused to pay out any amounts under the Award "in violation of Article 53 of the ICSID Convention."[507]

308. Therefore, Claimants request the Committee to "order Hungary to pay Claimants a total amount of EUR 1,009,090.32 with interest running at a rate that the Committee considers appropriate until full payment by Hungary."[508]

## B.    THE COMMITTEE'S ANALYSIS

309. Article 61(2) of the ICSID Convention, applicable to these proceedings in accordance with Article 52(4) of the ICSID Convention, provides as follows:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and

---

[500] Claimants' Statement on Costs, September 30, 2020, para. 6.

[501] *Ibid.*, para. 7

[502] *Ibid.*, para. 8.

[503] *Ibid.*, para. 9.

[504] *Ibid.*, para. 10.

[505] *Ibid.*, para. 12.

[506] *Ibid.*, para. 13.

[507] *Ibid.*, para. 10.

[508] *Ibid.*, para. 15.

by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.[509]

310.    Additionally, Regulation 14(3)(e) of the Administrative and Financial Regulations also applies. Article 61(2) of the ICSID Convention, as well as Regulation 14(3)(e), grant the Committee discretion to allocate costs, fees, and expenses incurred by (i) the disputing parties, (ii) ICSID, and (iii) members of this *ad hoc* Committee.

311.    Claimants recognize the discretion of the Committee to allocate costs[510] and refer to recent *ad hoc* committees' decisions, which have required the losing party to bear entirely the costs of the proceedings and have endorsed the rule known as "costs follow the event."[511] Moreover, Claimants contend that "numerous recent ad hoc committee decisions have required the losing party to bear entirely not only the costs of the proceedings, but also the other party's attorney fees."[512]  Respondent's only request is that the Committee "order UP and C.D Holding Internationale to bear all costs of the proceedings."[513]

312.    The Committee will base its decision on costs taking into account the applicable provisions of the ICSID Convention and Arbitration Rules, which grant it discretion to allocate costs, fees, and expenses.[514] The ICSID Secretariat acknowledges a recent trend that "a majority of Committees have decided that the Applicant should bear all or a majority of the Costs of Proceeding when the application for annulment was unsuccessful"[515] and that "some *ad*

---

[509] Article 61(2) of the ICSID Convention.

[510] Claimants' Statement on Costs, September 30, 2020, para. 6.

[511] Claimants' Statement on Costs, September 30, 2020, para. 6.

[512] Hungary's Statement of Costs, September 30, 2020, para. 7.

[513] Hungary's Statement of Costs, September 30, 2020, para. 3.

[514] **CL-0289**, *Teinver v. Argentina*, para. 257; **CL-0340**, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment, December 6, 2018, para. 396; **RL-298**, *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Decision on Annulment, November 21, 2018, para. 314; **RL-300**, *Central European Aluminium Company (CEAC) v. Montenegro*, ICSID Case No. ARB/14/8, Decision on Annulment, May 1, 2018, para. 155; **RL-295**, *Adem Dogan v. Turkmenistan*, paras. 279-281; **CL-0336**, *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment, July 10, 2014, para. 264.

[515] **RL-337**, Updated Background Paper on Annulment for the Administrative Council of ICSID, May 5, 2016, para. 65.

*hoc* Committees have also ruled that the losing party should bear the legal fees and expenses of the successful party, in most instances the defending party."[516]

313.    The Committee observes that: (i) the Application for Annulment has been rejected in its entirety; (ii) both Parties have contended that the other party shall bear all costs of the proceedings; (iii) neither Party has provided a detailed substantiation or explanation of its legal representation costs and expenses and there is a discrepancy between the amounts of Respondent´s and Claimant´s respective legal costs and expenses. Based on this and in exercise of its discretion, the Committee decides that Respondent shall bear the costs, fees, and expenses of these proceedings incurred by ICSID and members of this *ad hoc* Committee. With respect to the fees and expenses of the Parties,[517] the Committee finds that Respondent shall reimburse Claimants in the amount of EUR 504,545.16 for their legal costs and expenses.

314.    The costs of the annulment proceeding, including the fees and expenses of the Committee, ICSID's administrative fees, and direct expenses, amount to (in USD):

| | |
|---|---|
| Committee's Fees and Expenses | 303,408.45 |
| ICSID's Administrative Fee | 126,000 |
| Direct Expenses | 6,450.29 |
| **TOTAL** | **435,858.74** |

315.    The above costs have been paid out of the advances on costs made by Respondent.

---

[516] **RL-337**, Updated Background Paper on Annulment for the Administrative Council of ICSID, May 5, 2016, para. 65.

[517] "It is widely accepted that *ad hoc* committees enjoy a wide discretion in assessing the reasonableness of the parties' representation costs." **CL-0289**, *Teinver v. Argentina*, para. 257.

**V.    DECISION**

316.    For the reasons set forth above, the Committee decides as follows:

(1)    The Application for Annulment of the Award is dismissed.

(2)    Respondent shall bear in full the cost of USD 435,858.74 incurred by ICSID in these annulment proceedings, including the fees and expenses of the Members of the *ad hoc* Committee.

(3)    Respondent shall reimburse Claimants the amount of EUR 504,545.16 for their legal costs and expenses, within ninety days of the date of dispatch of this Decision.

(4)    If no full payment is made in accordance with sub-paragraph (3) within the ninety-day period, the amount payable is to be increased by interest compounded annually until full payment at the rate provided in paragraph 623 of the Award.

_____
Bertha Cooper-Rousseau
Member of the *ad hoc* Committee

Date: August 9, 2021

_____
Carita Wallgren-Lindholm
Member of the *ad hoc* Committee

Date:

_____
Ricardo Ramírez Hernández
President of the *ad hoc* Committee

Date:

91

_____
Bertha Cooper-Rousseau
Member

Date:

Carita Wallgren-Lindholm
Member

Date: 9 August 2021


_____
Ricardo Ramírez Hernández
President of the Committee

Date:

92

_____
Bertha Cooper-Rousseau
Member of the *ad hoc* Committee

Date:

_____
Carita Wallgren-Lindholm
Member of the *ad hoc* Committee

Date:


_____
Ricardo Ramírez Hernández
President of the *ad hoc* Committee

Date: August 8, 2021

93